**Exhibit 2**

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION TO EXCLUDE GENERAL CAUSATION
TESTIMONY OF PLAINTIFFS' EXPERTS**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

HIGHLY CONFIDENTIAL

Page 1

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

            FOR THE COUNTY OF LOS ANGELES

2

3     COORDINATION PROCEEDING          ) JCCP No. 5255

      SPECIAL TITLE [Rule 3.400]       ) For Filing Purposes:

4                                      ) 22STCV21355

                                       )

5     IN RE: SOCIAL MEDIA ADOLESCENT   )

      ADDICTION (JCCP No. 5255)        )

6

7     THIS DOCUMENT RELATES TO:

8     Cristina Arlington Smith, et al.

      V. Meta Platforms, Inc., et al.,

9     Case No. 22STCV21355

10

11        HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDERS

12

13

14

15     VIDEOTAPED DEPOSITION OF EVA H. TELZER, Ph.D.

16

17                      JB Duke Hotel

18

19                    230 Science Drive

20

21                  Durham, North Carolina

22

23

24

25          Thursday, June 12, 2025, 9:12 a.m.

HIGHLY CONFIDENTIAL

Page 2

```
1   APPEARANCES:
2   For MDL Plaintiffs:
3            BY:  SARA COUCH, ESQ.
                  NELSON L. DRAKE, ESQ. (Washington, D.C.)
4                 KATY LAWRIMORE
                  JODI W. FLOWERS, ESQ.
5        Motley Rice LLC
6        28 Bridgeside Boulevard
         Mount Pleasant, South Carolina 29464
         843.216.9670
7        scouch@motleyrice.com
8        ndrake@motleyrice.com
         jflowers@motleyrice.com
9
10  For Plaintiffs:
11           BY:  MATTHEW P. BERGMAN, ESQ.
         Social Media Victims Law Center
12       600 1st Avenue, Suite 102 - PMB 2383
         Seattle, Washington 98104
13       206.741.4862
         matt@socialmediavictims.org
14
15  For the Defendants Meta Platforms, Inc., and
    Instagram, LLC:
16           BY:  PHYLLIS A. JONES, ESQ.
                  NICOLE ANTOINE, ESQ.
17                BRIAN T. REISER, ESQ.
                  ALEX KENNEDY, ESQ. (L.A.)
18                LINDSEY BARNHART, ESQ. (Remotely)
         Covington & Burling LLP
19       One CityCenter
         850 Tenth Street, NW
20       Washington, DC 20001-4956
         202.662.6000
21       pajones@cov.com
         nantoine@cov.com
22       breiser@cov.com
         akennedy@cov.com
23       lbarnhart.cov.com
24
25       (Appearances continued on next page.)
```

HIGHLY CONFIDENTIAL

Page 3

```
1            APPEARANCES CONTINUED:
2
3   For the Defendant Snap:
4            BY:  ROSE LEDA EHLER, ESQ.
                  ARIELLA PARK, ESQ. (Remotely)
5        Munger Tolles & Olson LLP
         350 South Grand Avenue
6        50th Floor
         Los Angeles, California 90071-3426
7        213.683.9240
         rose.ehler@mto.com
8        ariella.park@mto.com
9   For the Defendants Alphabet Inc., Google LLC, and
10  YouTube LLC:
11           BY:  NEELUM J. WADHWANI, ESQ.
                  LYDIA WEIANT, ESQ.
12       Williams & Connolly LLP
         680 Maine Street SW
13       Washington, DC 20024
         202.434.5584
14       nwadhwani@wc.com
         lweiant@wc.com
15
16  For the Defendants TikTok, Ltd.; TikTok, LLC;
    TikTok, Inc.; ByteDance Ltd.; and ByteDance, Inc.:
17           BY:  GREGORY S. CHERNACK, ESQ.
18       King & Spalding LLP
         1700 Pennsylvania Avenue, NW
19       Suite 900
         Washington, DC 20006
20       202.626.9227
         gchernack@KSLAW.com
21
22       (Appearances continued on next page.)
23
24
25
```

HIGHLY CONFIDENTIAL

Page 4

```
1            APPEARANCES CONTINUED:
2
            APPEARING REMOTELY:
3
4   Jennifer K. Emmel, Esq., Beasley Allen Law Firm
    Joseph VanZandt, Esq., Beasley Allen Law Firm
5   Jonathan P. Kieffer, Esq., Wagstaff & Cartmell
    Tricia L. Campbell, Esq., Wagstaff & Cartmell
6   J. Kirk Goza, Esq., Wagstaff & Cartmell
    Patrick Andrews, Esq., Lieff Cabraser
7   Kelly McNabb, Esq., Lieff Cabraser
    Lucy Monroe
8
9   Also Present:  Matt Walters, Videographer
                   Ryan Knecht, Exhibit Technician
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

HIGHLY CONFIDENTIAL

Page 5

```
1                I N D E X
2                                            PAGE
3   EXAMINATION BY MS. JONES                   8
4
5             E X H I B I T S
6
    TELZER
7   NUMBER       DESCRIPTION                  PAGE
8   EXHIBIT 1    Video Re:  Healthy Heels      11
                 Digital Minds:  Brain
9                Development in the Age of
                 Technology
10
    EXHIBIT 2    Expert Report of Eva Telzer,  28
11               Ph.D., April 18, 2025
12  EXHIBIT 3    Invoices of Dr. Telzer, Bates 62
                 TELZER0001-016
13
14  EXHIBIT 4    Reliance list and materials  111
                 considered list
15  EXHIBIT 5    Excel printout titled        137
                 Smartphone Data
16
    EXHIBIT 6    Screen time school data      137
17
    EXHIBIT 7    Date showing total screen time 142
18               and total social media screen
                 time
19
    EXHIBIT 8    Haag cleaned dataset         145
20
    EXHIBIT 9    2023 WRAL-TV News Clip       176
21
    EXHIBIT 10   Heels Care Network document  186
22               titled Mental Health Seminar:
                 Digital Minds
23
24
25
```

HIGHLY CONFIDENTIAL

Page 6

```
 1   EXHIBIT 11   Document titled Momentary      193
 2                Links Between Adolescents'
                  Social Media Use and Social
 3                Experiences and Motivations:
                  Individual Differences by Peer
                  Susceptibility
 4
 5   EXHIBIT 12   Video - Healthy Heels Digital   205
                  Minds:  Brain Development in
 6                the Age of Technology

 7   EXHIBIT 13   JAMA Pediatrics - Association    244
                  of Habitual Checking Behaviors
 8                on Social Media with
                  Longitudinal Functional Brain
 9                Development

10   EXHIBIT 14   Video - Alan Hu Foundation       254
                  Webinar
11   EXHIBIT 15   Research Article titled Daily     281
                  links between objective
12                smartphone use and sleep among
                  adolescents
13
     EXHIBIT 16   Document titled Social Media      285
14                Use Is Linked to Brain Changes
                  in Teens, Research Finds, The
15                New York Times
16   EXHIBIT 17   The Journal of Child             294
                  Psychology and Psychiatry -
17                Commentary:  An updated agenda
                  for the study of digital media
18                use and adolescent development
                  - future directions following
19                Odgers & Jensen (2020)
20   EXHIBIT 18   Article titled Dispositional     305
                  and Social Correlates of
21                Digital Status Seeking Among
                  Adolescents
22
     EXHIBIT 19   Article titled Youths'           314
23                sensitivity to social media
                  feedback:  A computational
24                account
25
```

HIGHLY CONFIDENTIAL

Page 7

```
 1   EXHIBIT 20   Article titled Developmental     350
                  changes in brain function
 2                linked with addiction-like
                  social media use two years
 3                later
 4   EXHIBIT 21   Journal of Children and Media     397
                  - U.S. adolescents' daily
 5                social media use and
                  well-being:  Exploring the
 6                role of addiction-like social
                  media use
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

HIGHLY CONFIDENTIAL

Page 8

```
 1              P R O C E E D I N G S
 2                    * * *
 3          THE VIDEOGRAPHER:  We are now on the
 4   record.  Today's date is June 12th, 2024 --
 5          THE WITNESS:  No.
 6          THE VIDEOGRAPHER:  -- 25, and the time
 7   is 9:12 a.m.  This is the video deposition in
 8   regards to Social Media Adolescent Addiction
 9   Personal Injury Product Liability Litigation,
10   Case Number 4:22-MD-03047-YGR.  Counsel will be
11   noted on the stenographic record.
12          Can our court reporter please swear in
13   our witness.
14                    * * *
15          EVA H. TELZER, Ph.D.,
16    having been first duly sworn, was examined and
17             testified as follows:
18                    * * *
19             EXAMINATION
20   BY MS. JONES:
21     Q.   Hi, Dr. Telzer.
22     A.   Hi.
23     Q.   How are you?  I'm Phyllis Jones.  We
24   met in the hallway earlier.  I'm one of the lawyers
25   for Meta Platforms, which is one of the defendants
```

HIGHLY CONFIDENTIAL

Page 9

```
 1   in this case.  It's nice to see you.  Thank you for
 2   your time.  Have you been deposed before?
 3     A.   No.
 4     Q.   First time today?
 5     A.   Yes.
 6     Q.   Okay.  Well, welcome.  You brought with
 7   you, it appears, a couple of gigantic binders.
 8   What do you have with you?
 9     A.   I have my report on 4/18 and the 5/16
10   version of that.
11     Q.   Okay.  So your -- the binder that you
12   first referred to is your report --
13     A.   The JCCP report.
14     Q.   Okay.  Let me -- let me give you a
15   little bit of feedback early on just on deposition
16   because we'll be in trouble with the court reporter
17   if I -- we talk over each other.
18          Give me a chance to finish my question,
19   and I'll give you a chance to finish your answer.
20   Does that work?
21     A.   Yes.
22     Q.   Okay.  So the first binder that you
23   referred to, you said, was a copy of your report
24   from the JCCP proceeding, correct?
25     A.   Correct.
```

HIGHLY CONFIDENTIAL

Page 10

1    Q.   And do you understand what the JCCP
2  proceeding is relative to the other proceeding?
3    A.   Broadly speaking.
4    Q.   Okay.  And then the second binder that
5  you have is a copy of your expert report from the
6  so-called MDL proceeding; is that right?
7    A.   Correct.
8    Q.   Okay.  And does that include -- what
9  does that include beyond just the text of your
10 report itself?
11   A.   What does this include?
12   Q.   Yes.
13   A.   This includes the text of my report,
14 the materials I considered, my CV, the underlying
15 data to -- unpublished data.
16   Q.   Okay.  What about in the binder for the
17 MDL?
18   A.   Similar.
19   Q.   Okay.  And we don't have to do it right
20 now, but on a break we might just flip through it
21 quickly just so we have an understanding of what
22 specifically is in there in terms of the hard
23 copies.  Is that okay?
24   A.   Yes.
25   Q.   Okay.  Let me -- I actually want to

HIGHLY CONFIDENTIAL

Page 11

1  just start by seeing if we can get a little bit of
2  a sense of your views on some of the issues that
3  we're going to be talking about today and tomorrow.
4  And we're going to start with an exhibit that is
5  actually a video clip.  We've marked this as
6  Exhibit Number 1.
7         MS. JONES:  And this is 78-B, Ryan.
8         (TELZER EXHIBIT 1, Video Re:  Healthy
9  Heels Digital Minds:  Brain Development in the Age
10 of Technology, was marked for identification.)
11 BY MS. JONES:
12   Q.   And I think it's going to play on the
13 screen in front of you and perhaps one of these
14 other screens in the room, okay?
15        (Playing video.)
16 BY MS. JONES:
17   Q.   That is a video of you; is that right?
18   A.   That is me.
19   Q.   And that's a talk that you did in
20 February of 2025; is that right?
21   A.   I don't know.  You have not given me
22 any context of where that is from.
23   Q.   Okay.  Do you recall giving a talk in
24 2025 called "Brain Development in the Age of
25 Technology"?

HIGHLY CONFIDENTIAL

Page 12

1    A.   I give lots and lots of talks.  So I'd
2  have to refer to my CV for a specific one.
3    Q.   Okay.  That's fine.
4         Let's assume for a moment that this was
5  a talk that you gave in February of 2025.  That
6  would have been four months ago, right?
7         MS. COUCH:  Objection.  Lack of
8  foundation.
9  BY MS. JONES:
10   Q.   Well, was February of 2025 four months
11 ago?
12   A.   February of '25 was four months ago.
13   Q.   Okay.
14   A.   I do not know the date of that
15 particular talk.
16   Q.   Okay.  We can get that for you.
17        You -- and the statements that were
18 made in Exhibit Number 1, the video clip that we
19 just played for you, those were true statements at
20 the time that you made them; is that right?
21   A.   I made those statements --
22   Q.   Okay.
23   A.   -- at that time.
24   Q.   And one of the things that you said
25 specifically was, "We do need to be a little bit

HIGHLY CONFIDENTIAL

Page 13

1  cautious in making these causal claims," correct?
2    A.   Out of context of being able to see the
3  full talk and who I was giving that to, those
4  statements that I made are correct as seen.
5    Q.   Okay.  And is that statement still true
6  today, that we need to be a little bit cautious in
7  making these causal claims?
8    A.   In any single case, I might say that we
9  need to be cautious.  When looking at the totality
10 of everything that I have reviewed, that is not my
11 full opinion.
12   Q.   And I just want to make sure I'm clear.
13 My question was, simply:  Is it true that what you
14 said in that video clip that we just showed you,
15 "We do need to be a little bit cautious in making
16 these causal claims," is that true today?
17        MS. COUCH:  Objection.  Vague.
18        THE WITNESS:  I would say that that
19 statement that I said -- in the context, I would
20 need to see further.  But in the context of all of
21 the research that I have done, based on my
22 education, based on talking to parents, my
23 conclusion is that we can make causal claims.
24 BY MS. JONES:
25   Q.   Okay.  And the specific causal claims

Page 14

1  that we're talking about today is the causal claim
2  that social media causes certain mental health
3  harms; is that right?
4       A.  I have the opinion, based on my
5  education, based on the research that I reviewed,
6  based on seeing internal documents, based on
7  talking to parents and children across many, many
8  contexts, that social media causes harms to mental
9  health and that this is affecting their brain
10 development.
11      Q.  Okay.  And when you said, "We do" --
12 and let -- let me read the whole sentence just to
13 be fair to you.
14          "And -- and so we're just starting to
15 get there with our science, but we do need to be a
16 little bit cautious in making these causal claims."
17          The specific causal claims that you
18 were referring to there, does that include the
19 claim that social media can cause mental health
20 harms to teens?
21          MS. COUCH:  Objection.  Lack of
22 foundation.
23          THE WITNESS:  Can you repeat the
24 question, please?
25 BY MS. JONES:

Page 15

1       Q.  Sure.
2           Looking back at the sentence that you
3  expressed in that video clip, which was, "And so
4  we're just starting to get there with our science,
5  but we do need to be a little bit cautious in
6  making these causal claims," the specific causal
7  claims that you were referring to there, does that
8  include the claim that social media can cause
9  mental health harms to teens?
10          MS. COUCH:  Same objection.
11          THE WITNESS:  Indicating that we need
12 to be cautious does not in any way say that I do
13 not have the opinion that there are causal links
14 between social media and mental health in
15 adolescents.
16 BY MS. JONES:
17      Q.  Sure.
18          My question -- my question was:  You
19 refer specifically to causal claims, yes?
20      A.  As I said, we always need to be
21 cautious, but that does not change my opinion that
22 social media causes these arms.
23      Q.  Dr. Telzer, one of the other rules of
24 the road for the deposition is that I get to ask
25 you questions, and I'm entitled to have responsive

Page 16

1  answers to my questions.  Your counsel, if they
2  want to ask you questions later, get a chance to do
3  that.
4           My question, very specifically, was:
5  When you were referring to causal claims in that
6  video clip, were you referring to, among other
7  things, the claim that social media can cause
8  mental health harms in teenagers?
9       A.  I was indicating that we need to be
10 cautious as always when we say that there may be
11 causal claims.  And then without seeing the context
12 of this, that does not change my opinion that
13 social media causes these harms.
14      Q.  Do you believe that we need to be
15 cautious with respect to making causal claims about
16 social media causing mental health harms in
17 teenagers?
18      A.  Can you repeat that, please?
19      Q.  Yes.
20          Do you believe that we need to be
21 cautious with respect to making causal claims about
22 social media causing mental health harms in
23 teenagers?
24      A.  I don't believe that we need to be
25 cautious about making that claim based today on my

Page 17

1  review of all the literature in my report.  I can
2  say very confidently that social media causes these
3  harms.
4       Q.  When you made that statement in
5  whatever time frame it was that we need to be a
6  little bit cautious in making causal claims, did
7  you believe then that we needed to be cautious
8  about making the claim that social media can cause
9  mental health harms?
10          MS. COUCH:  Object to form.
11          THE WITNESS:  I don't know in the
12 context of this what my thought was at the time.
13 Today my opinion is, based on all the literature
14 that I have done, that social media causes these
15 harms.
16 BY MS. JONES:
17      Q.  Do you think it's possible that your
18 views have changed from when you made that
19 statement to today?
20          MS. COUCH:  Object to the form.  Calls
21 for speculation.
22          THE WITNESS:  I can't speculate on
23 that.
24 BY MS. JONES:
25      Q.  You can't speculate on whether your

HIGHLY CONFIDENTIAL

Page 18

1  views have changed?
2      A.   My views have not changed.
3      Q.   Okay.  So do you think what you said
4  previously still applies today?
5      A.   What I said previously is taken out of
6  context, and what I believe today is based on a
7  host of research that I have done.  My opinions
8  have been formed by everything that is reported
9  here in my report.
10     Q.   Let's go back to the more general
11 proposition about this notion of being cautious
12 about causal claims.
13          Do you agree with the general
14 proposition that scientists and academic
15 researchers should not make causation claims when
16 they are not sufficiently supported by the science?
17          MS. COUCH:  Objection.  Vague.
18          THE WITNESS:  If I understand your
19 question correctly, you're asking if scientists
20 should never make causal claims?
21 BY MS. JONES:
22     Q.   I didn't say "never" or --
23     A.   Sorry.
24     Q.   -- the rest of that.
25     A.   Please repeat that.

HIGHLY CONFIDENTIAL

Page 19

1      Q.   What I said was:  Do you agree with the
2  general proposition that scientists and academic
3  researchers should not make causation claims when
4  they are not sufficiently supported by the science?
5          MS. COUCH:  Objection.  Vague.
6          THE WITNESS:  I believe that our -- I
7  believe that we can make causal claims when we
8  review the full totality of the research and rely
9  on our strong education and background.
10 BY MS. JONES:
11     Q.   And what you told me earlier is that,
12 sitting here today, you believe that social media
13 can cause mental health harm in teenagers; is that
14 right?
15     A.   I'm not sure if that's exactly what I
16 said.  I believe that social media causes harms,
17 and that is based on the totality of the research
18 that I have done.
19     Q.   Well, let me get you to answer my
20 question.
21          Do you believe, sitting here today,
22 that the science supports the conclusion that
23 social media causes mental health harms in
24 teenagers, yes or no?
25     A.   Yes.

HIGHLY CONFIDENTIAL

Page 20

1          MS. COUCH:  Object to the form.
2          THE WITNESS:  I believe that social
3  media can cause major harms to adolescents in
4  specific ways that are altering adolescents'
5  brains.
6  BY MS. JONES:
7      Q.   And what you just said, that social
8  media can cause major harms to adolescents in
9  specific ways that are altering adolescents'
10 brains, you have never published that statement in
11 any of your peer-reviewed publications, correct?
12     A.   I may have.  I would have to look
13 through all my publications.  But I have made those
14 statements that social media is changing
15 adolescents' brains, absolutely.
16     Q.   Are -- are you testifying today that
17 you believe that in some of the -- in any of the
18 peer-reviewed articles that you've published that
19 somewhere you have said social media can cause
20 major harms to adolescents in specific ways that
21 are altering adolescents' brains?  Can cause?
22     A.   I'm not saying I may have used those
23 specific words.
24     Q.   Have you ever used the word "causation"
25 to describe the relationship between the use of

HIGHLY CONFIDENTIAL

Page 21

1  social media and potential changes in adolescent
2  brains and resulting mental health harms?
3      A.   I'll answer that in a couple ways.
4          Firstly, with all due respect, we use
5  different lexicon in our published research, where
6  we are more cautious in a singular study where we
7  talk about links between things and use the word
8  "causal" differently than I would in a report when
9  going through the totality of the research.
10         When I say "may lead to" or "may
11 contribute to" or "may cause," those are all
12 broadly under the same umbrella, indicating that
13 social media is changing the adolescent brain.
14     Q.   Are you able to answer my question
15 "yes" or "no"?  Have you ever used the word "cause"
16 to describe the relationship between social media
17 use and potential harms to teen mental health?
18         MS. COUCH:  Object to form.
19 BY MS. JONES:
20     Q.   Have you -- have you ever used that in
21 anything that you have published in the
22 peer-reviewed literature?
23     A.   I would need to go through all of my
24 publications --
25     Q.   Do you think, sitting here today, that

HIGHLY CONFIDENTIAL

Page 22

1   you might have and you just don't remember?
2           MS. COUCH:  Calls for speculation.
3           THE WITNESS:  I would have to go
4   through all my publications to see.
5   BY MS. JONES:
6       Q.   So you don't know one way or the other?
7       A.   I can't tell you without going through
8   all of my publications to look.
9       Q.   Okay.  Have you ever, outside of your
10  work in this litigation as an expert, published in
11  any of your peer-reviewed work that social media
12  use causes depression in teenagers?
13      A.   Have I ever published work that social
14  media causes depression in teenagers?
15      Q.   Yes.
16      A.   We have published lots of studies
17  looking at the links between social media and
18  adolescent depression in teenagers, yes.
19      Q.   Yeah.  My question was not that.
20           My question was:  Have you ever,
21  outside your work in this litigation as an expert,
22  published in any of your peer-reviewed work that
23  social media use causes depression in teenagers?
24      A.   Based on the individual studies that we
25  have done and putting the totality of those

HIGHLY CONFIDENTIAL

Page 23

1   together based on the rigorous methods that we use
2   with within-person analyses that control for all
3   kinds of confounding variables, we have published
4   data that shows that adolescent social media use
5   causes depression.
6       Q.   What specific study are you referring
7   to?
8       A.   We have a handful of studies that look
9   at this.
10      Q.   What are they?
11      A.   I can -- if you want to go through my
12  CV, I can pull those up.
13      Q.   There are none that come to mind at the
14  moment where you have said social media use can
15  cause depression in teenagers?
16      A.   If you look at the data in our papers,
17  we have very causal evidence that social media
18  causes depression in the moment that it's
19  happening.
20           Using these within-person analyses with
21  repeated measures over adolescence, we can say very
22  confidently that social media causes depression in
23  adolescents in the moments that it's happening.
24      Q.   Have you said -- did you say that in
25  the paper that you're thinking of?

HIGHLY CONFIDENTIAL

Page 24

1       A.   When you look at the data, it shows
2   these effects very strongly.
3       Q.   Yeah.  My -- I need you to just focus
4   as much as you can, or we're going to be here both
5   today and tomorrow and maybe later --
6       A.   Happy to.
7       Q.   -- on my question.
8           In the paper that you're referring to,
9   did you and your co-authors specifically say:
10  Social media causes or can cause depression in
11  teenagers?  Did you use those words?
12      A.   I would have to look at -- excuse me.
13           I would have to look at a specific
14  publication in order to verify that those words
15  were used.
16      Q.   Let me ask you a different question or
17  about a different outcome.
18           Have you ever in your peer-reviewed
19  literature outside of this litigation offered the
20  opinion that the use of social media causes or can
21  cause anxiety?
22      A.   We have looked at depression more
23  frequently.  So I can -- I would need to look
24  through my publications to look more at the
25  totality of our work on anxiety.

HIGHLY CONFIDENTIAL

Page 25

1           I believe we have links between social
2   media use and anxiety, but I would need to look at
3   the specific publications in order to respond to
4   that.
5       Q.   So you don't know?
6       A.   I would need to look at the
7   publications in detail to be able to respond to
8   that.
9       Q.   Okay.  What about eating disorders?
10  Have you ever in the context of your publications
11  in the peer-reviewed literature said that social
12  media can cause or contribute to cause eating
13  disorders in teenagers?
14      A.   My research has focused on things like
15  body image, which contributes to eating disorders.
16  But I do not study eating disorders themselves.
17      Q.   So is that a -- a "no" to my question?
18           MS. COUCH:  Object to form.
19  BY MS. JONES:
20      Q.   Have you -- have you ever, in any of
21  your peer-reviewed publications, offered the view
22  that the use of social media can cause eating
23  disorders in teenagers?
24      A.   I would have to, again, look through my
25  specific publications to be able to answer that

HIGHLY CONFIDENTIAL

Page 26

1  with confidence.  But I can tell you that we look
2  at body image and we make statements about how body
3  image contributes to eating disorders, but I am not
4  an eating disorders expert who studied that in my
5  work.
6      Q.  Have you ever in your peer-reviewed
7  literature said that social media use can lead to
8  body image issues?
9      A.  We currently have a grant where we make
10 very strong statements in the grant about
11 adolescents.
12     Q.  Hold on a second.
13         MS. JONES:  Can you go around to the
14 other end of the table?
15         THE WITNESS:  Can you repeat your
16 question after --
17 BY MS. JONES:
18     Q.  Yeah.  Have you in your peer-reviewed
19 publications ever offered the view that social
20 media can cause body image issues in teenagers?
21     A.  This is an emerging area that we're
22 working on.
23         So we have ongoing research on this
24 with a federally funded grant where we make in the
25 grant statements about how social media causes

---

HIGHLY CONFIDENTIAL

Page 27

1  changes in adolescents' negative body image that
2  contributes to eating disorders.
3          I would have to go through my
4  peer-reviewed publications to see if that has been
5  said in the publication.
6      Q.  But nothing comes to mind at the
7  moment?
8      A.  I would have to look.
9      Q.  Okay.  What about for teenagers who are
10 suffering with or experiencing suicidal thoughts?
11 Have you ever in your peer-reviewed published work
12 offered the opinion that social media use can cause
13 those teens to become more suicidal?
14     A.  I collaborate with colleagues who study
15 nonsuicide self-injury as well as suicide.  In my
16 own work, that is not a topic that I studied.
17     Q.  And, in fact, in your own work, you
18 have published data that suggest that social media
19 use might be helpful to teenagers who are suicidal,
20 correct?
21     A.  I have a publication with my colleague
22 who is an expert in nonsuicide self-injury that
23 shows that when adolescents who have suicidal
24 thoughts have online-only friends, it can buffer
25 them.  But that does not indicate that there are

---

HIGHLY CONFIDENTIAL

Page 28

1  not also harms of social media.
2      Q.  In -- in your written report in this
3  case, did you talk about the research that you have
4  done that establishes that social media can
5  actually have benefits on certain teenagers?
6          MS. COUCH:  Object to the form.
7  BY MS. JONES:
8      Q.  Did you understand my question?
9      A.  Yeah.  I'm trying to think through the
10 hundreds of pages that I have here.
11     Q.  Well, let me -- let me pause you for a
12 second.  Your report -- why don't we go ahead and
13 mark that.
14         (TELZER EXHIBIT 2, Expert Report of Eva
15 Telzer, Ph.D., April 18, 2025, was marked for
16 identification.)
17 BY MS. JONES:
18     Q.  And I'm just handing you a copy of your
19 JCCP report because I think you're going to get to
20 ask -- or answer questions about your MDL report at
21 another time.
22         This is Exhibit Number 2.  You can also
23 look at your version, but that's your JCCP report.
24         The first part of that Exhibit Number 2
25 is the actual written portion of your report,

---

HIGHLY CONFIDENTIAL

Page 29

1  right?
2      A.  Correct.
3      Q.  And it's about 189, 190 pages, right?
4      A.  Sure.
5      Q.  Do you recall, in any of those 189, 190
6  pages, whether you ever talked about the literature
7  that exists, including your own work, that says
8  that social media can actually be helpful for
9  certain teenagers?  Did you mention that at all in
10 your report?
11     A.  While I did not necessarily discuss the
12 benefits of social media, that does not negate the
13 fact that there are many, many harms of social
14 media.  And that was the focus of my report, to try
15 to understand and do a thorough literature -- a
16 thorough literature search and review of the harms
17 of social media.
18     Q.  And so let me just follow up on that.
19 You understood your role in this litigation to be
20 just to focus on what the literature says about the
21 harms of social media?  Is that what you're saying?
22         MS. COUCH:  Misstates the report.
23         THE WITNESS:  I think if you go to the
24 first page of my report on "Assignment," you can
25 see exactly what my report sought to do.

Page 30

1    BY MS. JONES:
2        Q.    I need you to answer my question.
3        My question was:  Was your
4    understanding that your role -- I'm just following
5    up on your testimony -- that your role in this
6    litigation was to focus on a review of the
7    literature with respect to the harms of social
8    media?
9        MS. COUCH:  Asked and answered.
10       THE WITNESS:  I can read to you what I
11   believe your assignment was.  I've been asked to
12   provide an overview of the adolescent brain, the
13   vulnerabilities that exist that increase the risk
14   of harm for social media and the relationship
15   between social media use and function and
16   structural changes to the adolescent brain.
17   BY MS. JONES:
18       Q.    Did you understand your role as an
19   expert in this case to be to provide a
20   comprehensive overview of the literature, whether
21   it was about harms or benefits, or were you just
22   focused on harms?
23       MS. COUCH:  Object to the form.
24   Misstates the report.
25       THE WITNESS:  As I indicated, my

Page 31

1    assignment was to provide an overview of the
2    adolescent brain, the vulnerabilities that exist
3    that increase the risk of harm for adolescent --
4    for social media and the relationship between
5    social media use and function and structural
6    changes to the adolescent brain.
7    BY MS. JONES:
8        Q.    Do you intend to testify at a trial in
9    this case?
10       A.    If I am asked to and needed, I will.
11       Q.    Do you think part of your role as a
12   testifying expert before a jury is to give a full
13   sense of what the scientific literature says about
14   the role of social media in adolescent and teen
15   development?
16       MS. COUCH:  Objection.  Calls for legal
17   reasoning.  And Dr. Telzer is not a lawyer.
18   BY MS. JONES:
19       Q.    I'm not asking you as a lawyer.  I'm
20   asking you as a person who has signed up to be an
21   expert in these cases and who has said that you
22   would be willing to come and testify before a jury.
23       Do you believe that you have a
24   responsibility to provide a full sense to that jury
25   of what the literature says, whether it's about

Page 32

1    harms or whether it's about benefits?
2        A.    I can't answer that.
3        MS. COUCH:  Object to the form.
4    BY MS. JONES:
5        Q.    You can't answer that question?
6        A.    I don't know the answer to that
7    question.
8        Q.    You don't know if the jury would be
9    entitled to have an assessment of the complete
10   picture of the science?
11       MS. COUCH:  Asked and answered.
12   Argumentative.  I would also point out, for the
13   record, the defense JCCP report is one-sided.
14   BY MS. JONES:
15       Q.    You can answer my question.
16       A.    I cannot speculate about the trial
17   aspects of this.  I don't know.
18       Q.    Okay.  You do not -- in your roughly
19   190-page written report, Exhibit Number 2 for the
20   JCCP, you don't have any portion of that report
21   that's focused on talking about the fact that there
22   may be benefits of social media for certain
23   teenagers, right?
24       MS. COUCH:  Misstates --
25   BY MS. JONES:

Page 33

1        Q.    There's not a section in your report on
2    that, correct?
3        MS. COUCH:  Misstates the report.
4        THE WITNESS:  As I indicated what my
5    specific assignment was, I provide and was asked to
6    provide an overview of the adolescent brain, the
7    vulnerabilities that exist that increase the risk
8    of harm for social media, and the relationship
9    between social media use and function and
10   structural changes to the adolescent brain.
11   BY MS. JONES:
12       Q.    Yeah, I've -- I've heard you read that
13   now three times.  My question was:  Is there a
14   section in that report where you acknowledge that
15   there are, in fact, benefits of social media use
16   for certain adolescents or teenagers?  Do you -- do
17   you know?
18       MS. COUCH:  Asked and answered.
19       THE WITNESS:  As I've indicated to the
20   same question, I've been asked to provide an
21   overview of the adolescent brain, the
22   vulnerabilities that exist that increase the risk
23   of harm for social media, and the relationship
24   between social media use and function and
25   structural changes to the adolescent brain.

Page 34

1  BY MS. JONES:

2      Q.   Outside of the context of this

3  litigation, you have acknowledged that social media

4  can have benefits for certain teenagers, yes?

5      A.   The fact that social media may have

6  some benefits does not negate the fact that there

7  are much more compelling results and significant

8  data that show the harms that completely outweigh

9  any of the benefits of social media.

10     Q.   And that last statement that you just

11 made, that the harms of social media completely

12 outweigh the benefits of social media, have you

13 ever articulated that opinion in any of your

14 published work anywhere?

15     A.   Based on all of the research that I

16 have done in totality, I can make those claims by

17 reviewing all of the literature.

18          And based on my discussions with

19 adolescents, my discussions with parents, my

20 discussions going into schools and reviewing the

21 underlying for the documents of the defense

22 documents, I can say that very confidently.

23     Q.   My -- that wasn't my question.   I

24 recognize you're confident about your view today.

25          My question is:  Have you ever, in your

Page 35

1  published literature, articulated this view that

2  you've now shared with us that the harms of social

3  media for teenagers are -- vastly outweigh any

4  potential benefits for teenagers?

5      A.   I would have to go back --

6          MS. COUCH:  Asked and answered.

7          THE WITNESS:  -- and look through my

8  publications.

9  BY MS. JONES:

10     Q.   Okay.

11     A.   But in any single empirical article,

12 that is not the purpose of the analyses.  And I

13 look at the totality of the research to make that

14 claim.

15 BY MS. JONES:

16     Q.   Before you got ready for your -- you

17 knew when you came for your deposition that you

18 were probably going to be asked about what you have

19 written in your literature, yes?

20     A.   Written in what literature?

21     Q.   The things that you've published in the

22 peer-reviewed literature.

23     A.   Can you say that question again,

24 please?

25     Q.   Did you understand that one of the

Page 36

1  things you might be asked about was the views

2  you've expressed outside of litigation in the

3  peer-reviewed litigation on the subject of social

4  media use and teen mental health?

5      A.   I understand I might be asked about my

6  published literature, if that's the question.

7      Q.   Yeah.

8          And my question is:  Did you actually

9  go back and look at it before you came here for

10 your deposition today?

11     A.   Did I go back and look at my

12 publications?

13     Q.   On the subjects of social media use and

14 teen mental health?

15     A.   I have published extensively on this

16 topic.  I have not gone back and reread every

17 single publication for the purposes of today's

18 discussion.

19     Q.   Okay.  One of the other things that

20 you -- one of the things that you said on the

21 slide -- and if you need to see it again, we can

22 play it again -- in Exhibit 1, in the video that we

23 showed earlier, is -- one of the bullet points was:

24 Causal data are largely unavailable.

25          Do you remember those words from your

Page 37

1  slides, or do you need to see them again?

2      A.   Sorry.  I'm being distracted.  Can you

3  say that again?

4      Q.   Yes.

5          Do you remember seeing the bullet point

6  on your slide from the video clip in Exhibit 1

7  where the bullet point said:  Causal data are

8  largely unavailable?

9      A.   I saw that on the slide.

10     Q.   Okay.  And those were your slides,

11 right?

12     A.   Those are slides that my colleague and

13 I have put together.

14     Q.   Well, you got up and presented them,

15 yes?

16     A.   We present that talk together.

17     Q.   Okay.  And -- well, do you vouch for

18 the contents of the slides?

19          MS. COUCH:  Object to the form.

20          THE WITNESS:  We made those slides

21 together.

22 BY MS. JONES:

23     Q.   Were they accurate as you presented

24 them to whomever the audience was for that

25 particular talk?

HIGHLY CONFIDENTIAL

Page 38

1    A.  I would have to know the details.  You
2  did not provide that to me.
3    Q.  I'm sorry.  Are you suggesting that
4  there might be bullet points in that slide deck
5  that you presented that aren't accurate?
6    A.  I would not say that.
7    Q.  Okay.  One of the bullet points was:
8  Causal data are largely unavailable.
9         You remember that bullet point, yes?
10   A.  I remember that bullet point.
11   Q.  Was that bullet point accurate when you
12 gave that talk?
13   A.  That bullet point was -- without the
14 full context of seeing the talk, which you did not
15 provide, was in the context of prior literature
16 that had not yet established some of the causal
17 claims.
18        And then we go on, if you would show
19 the full context of the talk, to show all of the
20 causal data that we have since been able to provide
21 based on longitudinal methods, within-person
22 designs, brain imaging techniques, and so on.
23   Q.  When you -- you signed the first page
24 of your expert report, Exhibit 2; is that right?
25   A.  Yes.

HIGHLY CONFIDENTIAL

Page 39

1    Q.  When you signed your expert report, did
2  you understand yourself to be committing that you
3  would not come into court and say things to the
4  jury that you had not been willing to say out in
5  your life in the real world?
6         MS. COUCH:  Objection.  Misstates the
7  purpose of the report.
8         THE WITNESS:  I don't understand your
9  question.
10 BY MS. JONES:
11   Q.  Okay.  My question was:  Do you believe
12 that you have a responsibility, when you are
13 testifying before a jury in this case, to be
14 consistent with what you have said outside of this
15 case?
16        MS. COUCH:  Objection.  Calls for
17 speculation.
18        THE WITNESS:  I believe that my report
19 is my opinion, based on the totality of everything
20 that I have done, including based on my education,
21 talking to parents, talking to teenagers, doing a
22 thorough review of the literature, conducting
23 research myself on this topic, as well as seeing
24 the -- the data from defense that this is my
25 opinion.

HIGHLY CONFIDENTIAL

Page 40

1  BY MS. JONES:
2    Q.  And when you -- if you eventually
3  testify as a witness at -- at a trial, are you
4  going to include some of the statements that you
5  said outside of the context of this case?
6         Like:  Causal data are largely
7  unavailable because it is oftentimes hard to say
8  with some of our methods that social media causes
9  some of these outcomes.  Are you going to tell the
10 jury that?
11        MS. COUCH:  Objection.  Dr. Telzer does
12 not know what she'll be asked to talk about at
13 trial if she is asked to go to trial.
14        THE WITNESS:  I cannot tell you what
15 the future trial holds.
16 BY MS. JONES:
17   Q.  Are there any other -- and we'll talk
18 about the materials considered list in a minute.
19 But are there any other documents that you need to
20 offer your opinions in this case?
21   A.  I do not need any further documents to
22 offer my opinions.
23   Q.  Okay.  You've -- you've done all the
24 work you think you need to do in order to testify
25 before a jury?

HIGHLY CONFIDENTIAL

Page 41

1         MS. COUCH:  Object to the form.  Calls
2  for a legal conclusion.  However, her opinion as
3  provided in her reports --
4         MS. JONES:  Counsel, you are -- you are
5  now testifying.  You've made your objection.  I
6  would love for the witness to answer my question.
7  BY MS. JONES:
8    Q.  Let me go back to my question, Doctor.
9  Have you done all the work that you think you need
10 to do to be able to testify before a jury?
11        MS. COUCH:  Objection.  Calls for a
12 legal response.
13        THE WITNESS:  I've done all the work
14 that I need to reach my opinion for the purposes of
15 this report.
16 BY MS. JONES:
17   Q.  Do you anticipate doing any more work
18 before you are called to testify at a trial?
19   A.  I cannot tell you what the future
20 holds.
21   Q.  Have you been asked to do any more work
22 before you testify at a trial?
23   A.  I have not been asked to do anything.
24   Q.  You've already told me you've never
25 been deposed before.  Have you ever testified at a

HIGHLY CONFIDENTIAL

Page 42

1  trial?
2      A.  No.
3      Q.  Have you ever been retained to serve as
4  an expert in any capacity?
5      A.  Not outside of this group, no.
6      Q.  Okay.  Have you ever previously served
7  as a consultant in any capacity with respect to
8  litigation, putting aside what you're doing here?
9      A.  No.
10     Q.  Okay.  Let me ask you.  I think as part
11 of your report we -- your report includes an
12 Exhibit A, which is your resume or CV; is that
13 right?
14     A.  Yes.
15     Q.  Okay.  Is that Exhibit A to your report
16 up-to-date?
17     A.  I don't believe so.
18     Q.  Okay.  What is it missing?
19     MS. COUCH:  For the record, we provided
20 an updated CV either yesterday or the day before.
21     MS. JONES:  It was -- it was yesterday.
22 And it was not clear what was changed, although we
23 asked.
24 BY MS. JONES:
25     Q.  Do you know what your counsel provided

HIGHLY CONFIDENTIAL

Page 43

1  yesterday?
2      A.  My updated CV was provided yesterday.
3      Q.  Okay.  What's the difference between
4  the two?
5      A.  You can see the revision date at the
6  top.  This one was revised in April.  My current
7  one was revised as of a day or two ago.
8      Q.  What's the difference?
9      A.  The difference would be the recent
10 publications that have come out.  I can't speak to
11 the specific differences, but it does have -- more
12 publications have come out since the 1st of April.
13     Q.  Is there anything else in your -- in
14 the Exhibit A to Exhibit Number 2 to the deposition
15 that is missing or otherwise inaccurate, putting
16 aside the additional publications?
17     A.  I don't believe my CV is inaccurate, if
18 that's what you're asking.
19     Q.  Well, my question is simply:  Other
20 than the additional publications, is there anything
21 else that's different between the copy of your CV
22 that we received in April and the copy that we
23 received last night?
24     A.  There may be differences.  I update
25 the -- the totality of my CV, including conferences

HIGHLY CONFIDENTIAL

Page 44

1  and talks and other things.
2      Q.  Right.  So I'm now asking you:  What
3  other differences exist between the CV that we got
4  in April and the one that we got last night?
5      MS. COUCH:  Objection.  Calls for
6  speculation.  She doesn't have the documents in
7  front of her.
8      THE WITNESS:  Hold them in front of me,
9  and we can do a line-by-line comparison --
10 BY MS. JONES:
11     Q.  So you don't know right this moment; is
12 that right?
13     A.  I cannot tell you line by line what is
14 different other than additional publications and
15 presentations and talks that I have done.
16     Q.  Dr. Telzer, you have a master's degree
17 and a Ph.D. in psychology; is that right?
18     A.  Yes.
19     Q.  Do you have any other advanced degrees?
20     A.  No.
21     Q.  You are not a medical doctor; is that
22 right?
23     A.  I'm not a medical doctor, but I
24 collaborate with and advise medical doctors.
25     Q.  Sure.  But my question was about you.

HIGHLY CONFIDENTIAL

Page 45

1  You are not a medical --
2      A.  I am not a medical doctor.
3      Q.  -- doctor, correct?
4      You cannot -- we can't talk at the same
5  time.
6      You are not a medical doctor, correct?
7      A.  Correct.
8      Q.  And that means you're not a
9  psychiatrist, right?
10     A.  I am not a psychiatrist.
11     Q.  You are not authorized to, for example,
12 prescribe medications to treat conditions like
13 depression or anxiety or bipolar disorder or
14 schizophrenia, right?
15     MS. COUCH:  Asked and answered.
16     THE WITNESS:  I am not a medical doctor
17 and I do not prescribe medications.
18 BY MS. JONES:
19     Q.  Okay.  And have you ever treated
20 patients as part of your work?
21     A.  I am not a clinician who treats
22 patients.
23     Q.  So is that a "no," you've never treated
24 patients?
25     A.  No, I have not treated patients.  I am

Page 46

1  not a clinician.
2      Q.   So that means you don't make diagnoses
3  for patients -- actual patients who might have
4  certain mental health disorders, correct?
5          MS. COUCH:  Asked and answered.
6          THE WITNESS:  I am not a medical doctor
7  who makes or diagnoses patients.
8  BY MS. JONES:
9      Q.   And so you have never, for example,
10  diagnosed a patient with clinical depression or
11  clinical anxiety?
12         MS. COUCH:  Asked and answered.
13         THE WITNESS:  I am not a medical doctor
14  or a clinician who diagnoses patients.
15  BY MS. JONES:
16     Q.   Yeah.  And -- and I just need an answer
17  to my specific question.
18         You have never diagnosed a patient with
19  clinical depression or clinical anxiety; is that
20  right?
21         MS. COUCH:  Asked and answered.
22         THE WITNESS:  I am not a medical doctor
23  or a clinician who diagnoses patients.
24  BY MS. JONES:
25     Q.   And that includes conditions like

Page 47

1  depression and anxiety?
2          MS. COUCH:  Asked and answered.
3          THE WITNESS:  I do not make medical
4  diagnoses.
5  BY MS. JONES:
6      Q.   For any age group; is that right?
7          MS. COUCH:  Asked and answered.
8          THE WITNESS:  I am not a medical doctor
9  or a clinician who diagnoses for any age group.
10  BY MS. JONES:
11     Q.   You -- you have as part of your work
12  reviewed brain scans, right?
13     A.   Please clarify what you mean by
14  "reviewed brain scans."
15     Q.   Well, for example, you have papers
16  where you talk about looking at fMRIs, yes?
17     A.   I conduct research using fMRI
18  methodology.
19     Q.   Okay.  Have you ever in any setting
20  reviewed an fMRI to make a clinical diagnosis of
21  some kind?
22     A.   We do not review fMRI scans to make a
23  medical diagnosis of an individual.
24         I conduct fMRI research on large
25  populations to understand relationships among

Page 48

1  different variables of interest, like the effects
2  of social media on brain development in a large
3  sample of adolescents.
4      Q.   Do you -- do you know whether it would
5  be possible to look at a brain scan and actually
6  make a clinical diagnosis of a mental health
7  condition?
8      A.   That is outside of the field in which I
9  conduct this type of research.
10     Q.   So you don't know one way or the other
11  whether that's how brain scans are used?
12     A.   It is not my understanding that we can
13  conduct an fMRI scan on an individual and make,
14  based on an fMRI scan, a diagnosis.
15     Q.   Okay.  And -- and there's not a way on
16  an fMRI scan to, for example, determine what
17  specific external stimuli might have caused a
18  portion of the brain to activate, right?
19     A.   I don't understand your question.
20     Q.   Well, my question is -- for example, on
21  some of your publications, you have images of -- of
22  brain scans, yes?
23     A.   We don't have images of brain scans.
24  We have images of -- of our -- the brain scans are
25  a compilation of hundreds of data points, and we

Page 49

1  show the statistical maps of those brain scans.
2      Q.   Sure.  But sometimes you will show
3  images that actually show certain portions of the
4  brain that seem to have been activated by some
5  stimuli, correct?
6      A.   Yes.
7          MS. COUCH:  Asked and answered.
8          THE WITNESS:  We show the activation
9  maps, the statistical maps of activation of those
10  brain imaging scans that we conduct across a large
11  sample of adolescents.
12  BY MS. JONES:
13     Q.   Right.  That's helpful.
14         So -- but you could not look at one of
15  those scans and determine, I know for sure what it
16  was that caused that activation, could you?
17         MS. COUCH:  Asked and answered.
18         THE WITNESS:  I don't understand your
19  question.  That's not how we run the analysis.
20  BY MS. JONES:
21     Q.   Well, my question is:  There's not a --
22  a -- there's not a specific visual that you get
23  when you're evaluating those scans where you could
24  say, I know that that was the result of social
25  media versus spending time with family versus

Page 50

1  hanging out with friends, right?
2            MS. COUCH:  Asked and answered.
3            THE WITNESS:  We conduct very
4  well-controlled experimental tasks that help us to
5  conduct statistical analyses, and we can state with
6  confidence what we're seeing in the adolescent
7  brain.
8            I don't understand what your question
9  specifically is asking.  But those are very
10 well-controlled studies to be able to -- be able to
11 understand what's happening in the brain.
12 BY MS. JONES:
13       Q.  Well, my -- my question, I guess, is
14 whether there's a way to know, based on those
15 analyses, what the specific thing was that caused
16 what you're saying.
17       A.  Absolutely.  We do very well-controlled
18 studies.  Our fMRI tasks are based on experiments
19 with very strong controls where we know exactly
20 what we are seeing in the brain when it's being
21 activated by controlling and conducting analyses in
22 very controlled ways.
23       Q.  And I take it, from what you said
24 earlier, that you have never, in part of your -- as
25 part of your work, used an fMRI scan of some kind

Page 51

1  to say about a specific individual teenager that
2  that teenager's brain had been somehow affected by
3  social media?
4        A.  Like I said, we don't look at an
5  individual to make a diagnosis of their fMRI scan.
6  We conduct well-controlled studies across hundreds
7  of adolescents to understand activation maps in the
8  brain across a population of adolescents.
9        Q.  So the work that you're doing is not
10 focused on any particular teenager?
11           MS. COUCH:  Object to the form.  Asked
12 and answered.
13 BY MS. JONES:
14       Q.  That's what you mean when you say
15 "population level," yes?
16       A.  What I mean is that we do -- we do
17 research in a sample of adolescents, and we use
18 that sample of adolescents to understand patterns
19 that we can infer or generalize to other
20 adolescents.
21       Q.  If you didn't know what controlled task
22 was being done, you wouldn't be able to identify it
23 from the image, right?
24           MS. COUCH:  Objection.  Incomplete
25 hypothetical.

Page 52

1            THE WITNESS:  I don't know what you're
2  asking.
3  BY MS. JONES:
4        Q.  Well, you said, the way we determine
5  that the results of the scans were caused by some
6  particular input was we have very controlled tasks
7  that we give people, right?
8        A.  Yep.
9        Q.  Yes?
10       A.  Absolutely, we control very good
11 experimental tasks.
12       Q.  Yes.
13           But if you did not know what the
14 controlled task was that was being done, you
15 wouldn't be able to tell just from looking at the
16 image what the --
17       A.  Of course we would know what --
18       Q.  -- task was --
19       A.  -- our control --
20           MS. COUCH:  Dr. Telzer, let me get my
21 objection, okay?  So take just a second.
22           Incomplete hypothetical.  Vague.
23           THE WITNESS:  Can you repeat your
24 question, please?
25 BY MS. JONES:

Page 53

1        Q.  Sure.
2            If you didn't know what the controlled
3  task was that was being done, you wouldn't be able
4  to just look at the image and say, I know what the
5  thing was that the person had been doing?
6            MS. COUCH:  Incomplete hypothetical.
7  Vague.
8            THE WITNESS:  I -- I'm having a hard
9  time speculating on this.  I would need a specific
10 example.
11 BY MS. JONES:
12       Q.  So if you got an image -- let's say --
13 put aside that you've given the participants in
14 your study a set of controlled tasks.  Let's put
15 that to the side.  Let's say you just got the image
16 that you all eventually evaluate, yes?  Are you
17 with me?
18       A.  Maybe.
19       Q.  Okay.
20       A.  I'd like to hear where you're going.
21       Q.  Okay.
22       A.  I don't understand yet.
23       Q.  If you didn't know anything about what
24 the tasks were that the participants had been
25 engaged in, and you just got the image, would you

Page 54

1  be able to make any informed judgments about what
2  had led to what you are able to see on that image?
3          MS. COUCH:  Incomplete hypothetical.
4  Calls for speculation.  Vague.
5          THE WITNESS:  In no context would I not
6  know what the experimental task was.
7  BY MS. JONES:
8      Q.   Well, I'm -- I'm asking you if there's
9  a way, independent of having control over the task,
10 that you could just look at an image and say, "Oh,
11 I know what it was that led to that reaction"?
12     A.   In no --
13         MS. COUCH:  Object to the form.
14         Let me get my objection in, Dr. Telzer.
15         Calls for speculation.  Incomplete
16 hypothetical.
17         THE WITNESS:  In no context would I
18 look at an image without understanding the full
19 experimental task that was done.
20 BY MS. JONES:
21     Q.   Because you would need -- you would
22 need to know the experimental task, it sounds like?
23         MS. COUCH:  Object to the form.  Calls
24 for speculation.
25 BY MS. JONES:

Page 55

1      Q.   To get to the outcomes that you have
2  reported in your studies, right?
3          MS. COUCH:  Same objection.  Calls for
4  speculation.  Incomplete hypothetical.
5          THE WITNESS:  I would need a specific
6  example to be able to answer this.
7  BY MS. JONES:
8      Q.   Well, we may not -- we -- I think we're
9  talking past each other.
10         My question is simply:  Do you have to
11 know information about what the person was doing to
12 be able to know whether it was connected to the
13 image?
14         MS. COUCH:  Asked and answered.  Calls
15 for conjecture.
16         THE WITNESS:  This --
17         MS. COUCH:  Incomplete hypothetical.
18         THE WITNESS:  Yeah, I'm sorry.  This
19 barely makes sense.  So I'm not able to answer it.
20 It's very speculative.
21 BY MS. JONES:
22     Q.   Okay.  And you can't tell me today, it
23 sounds like, because you're struggling with the
24 hypothetical, whether just looking at the image,
25 without knowing the tasks, if you can know what

Page 56

1  might have caused activation in a certain portion
2  of the brain?
3          MS. COUCH:  Asked and answered.  Calls
4  for conjecture.  Incomplete hypothetical.
5          THE WITNESS:  As I said, I cannot
6  speculate on this.  I need a specific example.
7  This does not make sense.
8  BY MS. JONES:
9      Q.   Okay.  Have you ever made a diagnosis
10 of addiction in any patient?
11         MS. COUCH:  Asked and answered.
12         THE WITNESS:  I am not a clinician.  I
13 don't make diagnoses of patients, but my research
14 informs the work of clinicians.
15 BY MS. JONES:
16     Q.   You know that there are healthcare
17 providers and clinicians who do specialize in
18 treating and diagnosing addiction, yes?
19         MS. COUCH:  Asked and answered.
20         THE WITNESS:  I am aware that there are
21 clinicians who diagnose this, and I work with them
22 and talk to them and consult with them all the
23 time.
24 BY MS. JONES:
25     Q.   Sure.  But you don't, as yourself,

Page 57

1  Dr. Telzer, hold yourself out as someone who
2  specializes in treating and diagnosing addiction,
3  do you?
4          MS. COUCH:  Asked and answered.
5          THE WITNESS:  I am not a clinician.  I
6  do not treat and diagnose disorders.
7  BY MS. JONES:
8      Q.   Okay.  And you don't have any special
9  expertise in any individual mental health disorder
10 from a clinical perspective?
11     A.   I am not a clinician --
12         MS. COUCH:  Asked and answered.
13         THE WITNESS:  Whoops.  Sorry.
14         I am not a clinician, but I collaborate
15 with, work with, talk to clinicians.  I work with
16 adolescents and hear about mental health disorders
17 all the time.  I use well-validated measures that
18 are based on clinical disorders.  And so I am
19 well -- I understand and can provide expertise on
20 this topic.
21 BY MS. JONES:
22     Q.   You -- you don't have a degree in
23 epidemiology, do you?
24     A.   I do not have a degree in epidemiology.
25     Q.   Okay.  And you -- in your report and in

Page 58

1  your CV, you don't describe yourself as being an
2  epidemiologist, correct?
3      A.    I am not an epidemiologist.
4      Q.    Okay.  Have you ever designed or
5  conducted a randomized controlled trial?
6      A.    I have not designed and randomized --
7  designed -- I have not designed a randomized
8  controlled trial.
9      Q.    Have you ever designed or conducted a
10 prospective cohort study?
11     A.    A prospective cohort study?  Can you
12 define what you mean by a "prospective cohort
13 study"?
14     Q.    Do you know what a prospective cohort
15 study is?
16     A.    I would like to know your definition of
17 that to be able to answer it.
18     Q.    I actually get to ask you the
19 questions.  Do you know what a prospective cohort
20 study is?
21     A.    Yes.
22     Q.    Okay.
23           MS. COUCH:  Asked and answered.
24 Argumentative.  If she wants to make sure that you
25 guys are on the same page, that's fair.

Page 59

1           MS. JONES:  Sure.
2           MS. COUCH:  Dr. Telzer, just make sure
3  to pause and let me get my objection in because
4  there's a realtime going that's taking the
5  transcript and I can see it's not getting
6  everything.
7  BY MS. JONES:
8      Q.    Do you know what a prospective cohort
9  study is?
10     A.    Yes.
11     Q.    What is your understanding of what a
12 prospective cohort study is?
13     A.    If we're talking about a prospective
14 longitudinal cohort study, it's following a sample
15 of individuals across time.
16     Q.    Okay.  Have you ever been responsible
17 for designing or conducting a prospective cohort
18 study?
19     A.    I have designed and conducted
20 prospective longitudinal cohort designs.
21     Q.    Outside of conducting longitudinal
22 studies, have you ever designed or conducted a
23 prospective cohort study?
24     A.    Can you please give me your definition
25 of a prospective cohort study so I can --

Page 60

1      Q.    I'm -- I want to -- I want to make sure
2  I have an understanding about what you've done.
3  You've talked about doing prospective longitudinal
4  cohort studies.
5      A.    Uh-huh.
6      Q.    Beyond that, have you done any work in
7  terms of designing or conducting a prospective
8  cohort study?
9           MS. COUCH:  Vague.
10          THE WITNESS:  I don't know what you
11 mean by "prospective cohort study."
12 BY MS. JONES:
13     Q.    Are you familiar with what's known as a
14 "Bradford Hill analysis"?
15     A.    I am not familiar with that.
16     Q.    So I take it you've never done a
17 Bradford Hill analysis, yes?
18     A.    I can't tell you if I've done it.  But
19 I don't know what you mean by "Bradford Hill
20 analysis."
21     Q.    Okay.  And I take it you did not do a
22 Bradford Hill analysis for purposes of your work in
23 this case, yes?
24     A.    I cannot tell you what a Bradford Hill
25 analysis is.

Page 61

1      Q.    You don't have a degree in public
2  health, do you?
3      A.    I do not have a degree in public
4  health.
5      Q.    You are being paid by the lawyers for
6  the plaintiffs in this case, correct?
7      A.    Yes.
8      Q.    And -- and just so we're clear, the --
9  the money that you are billing to the lawyers,
10 that's money that you are personally holding on to.
11 You're not giving that back to UNC or giving it to
12 somebody else, are you?
13     A.    This is work I'm doing outside of my
14 work for UNC.
15     Q.    That's not -- actually, my question was
16 different.
17           My question is:  To the extent you have
18 been paid by the lawyers in this case, is that
19 money that you are personally holding on to?
20     A.    Yes.
21     Q.    When were you first retained?
22     A.    I don't have the specific date on top
23 of my head.  I started talking with Matt Bergman in
24 '23, mid '23.  Talked with the -- the -- the
25 broader group perhaps in June of '24.  Retained

Page 62

1  somewhere in between that.
2      Q.   Yeah.  Let me not -- not test your
3  memory too much.
4      A.   Thank you.
5          (TELZER EXHIBIT 3, Invoices of Dr.
6  Telzer, Bates TELZER0001-016, was marked for
7  identification.)
8  BY MS. JONES:
9      Q.   Let me hand you what's been marked as
10 Exhibit Number 3, which is a set of -- just for the
11 record, a set of invoices that were produced to us
12 by your lawyers here today.
13     A.   Uh-huh.
14     Q.   Have you -- have you seen Exhibit 3
15 before?
16     A.   Yes.  I made this.
17     Q.   Okay.  You -- you generated Exhibit
18 Number 3?
19     A.   I believe so.  Let me scroll through
20 the entire thing.  But, yes, these are my invoices.
21     Q.   And does Exhibit Number 3 reflect all
22 of the invoices that you have submitted to the
23 lawyers for the plaintiffs up through June 1st of
24 2025?
25     A.   Yes.

Page 63

1      Q.   Okay.  Have you done work since
2  June 1st of 2025 that's not reflected in Exhibit
3  Number 3?
4      A.   Yes.
5      Q.   How much?  And let me -- I should be
6  more specific.  How much in terms of hours since
7  June the 1st?
8      A.   I've had a few meetings and done a
9  little bit of additional research on documents.
10     Q.   I said "how much in terms of hours."
11 How many hours does that entail?
12     A.   I don't think I can tell you off the
13 top of my head how many hours.  Maybe --
14     Q.   Is it more or less than five?
15     A.   More than five.
16     Q.   Is it more or less than ten?
17     A.   More than ten.
18     Q.   Is it more or less than 20?
19     A.   Less than 20.
20     Q.   So is it somewhere between 10 and 20?
21     A.   Yes.
22     Q.   Is it more or less than 15?
23     A.   I don't think I can get that
24 nitty-gritty.
25     Q.   That's fair.  So between June 1st and

Page 64

1  today -- of 2025, June 1st of 2025, and today,
2  you've done somewhere between 10 and 20 additional
3  hours on top of the hours that are reflected in
4  Exhibit Number 3; is that right?
5      A.   That's correct.
6      Q.   Okay.  And that gets up -- us right up
7  to today; is that right?
8      A.   Uh-huh.
9      Q.   And -- you have to say "yes" or "no"
10 for the court reporter.
11     A.   Yes.
12     Q.   Okay.  Do you -- what did you do to
13 prepare for this deposition?  And then we'll talk
14 about Exhibit 3 and specifics.
15         MS. COUCH:  And, Dr. Telzer, you can
16 tell her if you met with us.  But don't talk about
17 our conversations.
18         THE WITNESS:  Uh-huh.
19 BY MS. JONES:
20     Q.   Yeah.  I don't want to know about your
21 conversations.
22     A.   I've had a few meetings with the
23 attorneys.  I've reviewed my materials.
24     Q.   How many meetings with the attorneys?
25     A.   I believe three meetings.

Page 65

1      Q.   When were those?
2      A.   Monday, Tuesday, Wednesday.
3      Q.   Of this week?
4      A.   Yes.
5      Q.   How long did those last?
6      A.   Between an hour and a half and seven
7  hours.
8      Q.   Help me understand that.  Was it -- how
9  much time did you spend on Monday prepping --
10     A.   An hour and a half.
11     Q.   Okay.  What about Tuesday?
12     A.   Four hours.
13     Q.   And what about Wednesday?
14     A.   Sevenish hours.
15     Q.   Okay.  So just slightly above 12-1/2
16 hours?
17     A.   Uh-huh.
18     Q.   Okay.  You have to say "yes" or "no"
19 for the court reporter.
20     A.   I did not do the math, so I can't say
21 "yes" or "no."  But if -- if you just did the math,
22 sure.
23     Q.   You said one and a half hours on
24 Monday, four hours on Tuesday, seven hours
25 yesterday?

HIGHLY CONFIDENTIAL

Page 66

1    A.   If that adds to about 12-1/2, sure.
2    Q.   Well, I think it adds up to 12-1/2.
3    A.   Okay.
4    Q.   Okay.
5    A.   I did not do the math.
6    Q.   Okay.  We're not going to fight about
7    that, it sounds like.
8         Okay.  You met with counsel.  Did you
9    review any documents in preparation for your
10   deposition?
11   A.   No, I don't believe so.  Not beyond
12   what's in my report.
13   Q.   And before Monday of this week, had you
14   done anything to prepare for your deposition?
15   A.   Before Monday of this week?
16   Q.   Yes.
17   A.   You mean between this date and -- and
18   Monday?
19   Q.   I'm not sure what you mean by "this
20   date."
21   A.   I don't know what you mean by "before
22   Monday."
23   Q.   You told me that, in advance of your
24   deposition, that you prepped with counsel Monday,
25   Tuesday, Wednesday, yes?

HIGHLY CONFIDENTIAL

Page 67

1    A.   Yes.
2    Q.   Of this week, yes?
3    A.   Of this week, yes.
4    Q.   Prior to Monday of this week, was there
5    anything that you did to prepare for your
6    deposition?
7    A.   I had a couple of short meetings with
8    counsel.
9    Q.   So additional meetings?
10   A.   Yes.
11   Q.   Prior to this week?
12   A.   Yes.
13   Q.   Okay.  When were those?
14   A.   In May.
15   Q.   Okay.  When you say "short," how short
16   were they?
17   A.   An hour.
18   Q.   And who were the lawyers you were
19   meeting with?
20   A.   Sara Couch.
21   Q.   Anybody else?
22   A.   These three.
23   Q.   Okay.  I know Mr. Bergman, of course.
24   A.   Nelson.
25   Q.   Nelson, yes.  Okay.  Anybody else?

HIGHLY CONFIDENTIAL

Page 68

1    A.   Yes.  Names are not my -- other people
2    on their team.
3    Q.   You won't be the first witness --
4    A.   Sorry.
5    Q.   -- who forgot the names of their
6    lawyers.  So that's okay if you don't remember.
7         But do you remember roughly how many
8    additional lawyers you met with?
9    A.   One other.
10   Q.   Okay.  Independent of meeting with the
11   lawyers and reviewing what you have in your binder
12   there, was there anything else that you did to
13   prepare for your deposition?
14   A.   Other than meeting with my lawyers and
15   reviewing this?
16   Q.   Yes.
17   A.   Is there anything else that I did?  I
18   don't believe so.
19   Q.   Okay.  When you were first retained in
20   2023 -- just referring back to Exhibit Number 3.
21   The first item that's reflected on that invoice,
22   which is dated June 20th, 2023, is for June the 8th
23   of 2023.
24        Do you see that?
25   A.   Yes.

HIGHLY CONFIDENTIAL

Page 69

1    Q.   And do you remember how far in advance
2    of that first billing you were reached out to by
3    Mr. Bergman?
4    A.   I don't recall.  Probably close to that
5    date.
6    Q.   And without -- I don't want to know the
7    details.  Was the consultation services
8    reflected on the first page of Exhibit Number 3,
9    was that just a call or a meeting with Mr. Bergman?
10   A.   Uh-huh.
11   Q.   You have to say "yes" or "no."
12   A.   Yes.
13   Q.   Do you have any idea -- and again, I
14   don't -- don't share with me any communications
15   you've had with your lawyers.
16        But do you have any sense of how you
17   were identified as a potential expert in the case?
18   A.   I do not.
19   Q.   And you've, obviously, read for me a
20   paragraph from your report.
21        But as of that time in June of 2023,
22   what did you understand your role was going to be
23   as an expert in the litigation?
24   A.   I had no idea at that time nor for
25   probably close to another year what that role would

Page 70

1  be.
2      Q.   Okay.  What happened a year out?  Were
3  you --
4          MS. COUCH:  Object to the form.  I
5  think that's going to get into attorney-client --
6  or attorney confidential communications here.
7  BY MS. JONES:
8      Q.   I don't want to know conversations.
9  But was there a -- a meeting that occurred where
10 somehow you have more full sense of what your role
11 was?
12         MS. COUCH:  Objection.  I'm going to
13 instruct her not to answer because that would
14 necessarily entail communications with client --
15 or excuse me -- with attorney.
16 BY MS. JONES:
17     Q.   Okay.  When you started in June of
18 2023, you didn't really know what your role was
19 going to be?
20     A.   I did not know.
21     Q.   Okay.  And you've already testified
22 that it was not until a year later that you
23 understood what your role was going to be?
24     A.   I may have started to understand it a
25 year later.

Page 71

1      Q.   Okay.  Does Exhibit Number 3 reflect
2  all of your work to date up through June the 1st, I
3  guess?
4      A.   Yes.
5      Q.   And when you were first retained in
6  2023 -- again, I don't want to get into a lot of
7  details about your communications with counsel, but
8  did you have an understanding about what the core
9  claim was in the litigation?
10         MS. COUCH:  Objection.  That calls for
11 communications with the attorney.
12         I'm going to instruct you not to
13 answer.
14 BY MS. JONES:
15     Q.   Well, let me ask you this way:  Did you
16 understand that the core claim in the case was that
17 social media was causing mental health harms for
18 teenagers?
19         MS. COUCH:  Objection.  Calls for
20 communications with the attorney.
21         I'm going to instruct her not to
22 answer.
23 BY MS. JONES:
24     Q.   Is it the case that in -- when you were
25 contacted in June of 2023 by Mr. Bergman, that

Page 72

1  sometime in advance of that you had actually been
2  on the news here in -- I think it was technically
3  WRAL, saying, "We don't yet know that social media
4  is causally linked to depression"?
5          MS. COUCH:  Objection.
6  BY MS. JONES:
7      Q.   Do you recall saying that?
8          MS. COUCH:  Calls for speculation.
9          THE WITNESS:  I'd have to see it.
10 BY MS. JONES:
11     Q.   Okay.  We'll come back to that.  But
12 you don't remember back in 2023 saying that on the
13 news?
14     A.   I'd have to see --
15     Q.   Okay.  You will.
16         Let me ask you about some of the
17 entries in Exhibit Number 3.  Go for me, if you
18 would, to what is marked in the bottom right-hand
19 corner as TELZER0003.  And that is Invoice Number
20 3.
21     A.   Uh-huh.
22     Q.   Yes?
23     A.   Yes.
24     Q.   And as far as I can tell -- although
25 there's not a specific year associated with these

Page 73

1  entries, I think this is for October of 2023.  Does
2  that sound right?
3          MS. COUCH:  Objection.  Misstates the
4  date on the invoice.
5  BY MS. JONES:
6      Q.   Well, I know what -- I know what the
7  invoice date says.  I don't think that would be the
8  right date, if you actually look at the document.
9  You're welcome to flip through the pages, but I
10 think this is October of 2023.  You can tell me if
11 I'm wrong.
12     A.   It looks like the -- yeah, it looks
13 like the -- sorry -- the dates at the top on these
14 got modified.  I think they automatically switched
15 to the day I opened the document.
16     Q.   Well, that's fine.  I -- I had the
17 impression -- but you can tell me that I'm wrong,
18 but the -- the date of the invoice itself doesn't
19 necessarily -- at least for purposes of the year,
20 does not correspond necessarily to the entries in
21 the invoice in terms of the timing of the work.
22         So on Page 3, for example, as I said, I
23 think these are -- these dates from October refer
24 to 2023, but you should tell me if I've gotten that
25 wrong.

Page 74

1    A.   I think they refer to '24, but I'm not
2    positive.
3         Q.   Well, let me -- let me ask you about
4    that, then.  Because if you turn to Page 7, there
5    are a bunch of October dates.
6         A.   Yes.
7         Q.   Did you prepare these invoices,
8    Dr. Telzer?
9         A.   Yeah, I -- I did.  It looks like the --
10   I'm sorry -- the -- the -- when I PDF'd it, the
11   date got modified.  So I'm just grappling with
12   that, but sorry.
13        Q.   No, that's okay.  I, too, was grappling
14   with it.  What I think happened is that the invoice
15   date may not have any -- may not correspond
16   necessarily with the timing of the work reflected
17   on the page.  That was just -- if you flip through
18   it, it's chronological but for that issue.
19        A.   I can tell you that starting at
20   Invoice 4 was with the work for the broader group.
21   Invoices 1 to 3 were for Matt Bergman's --
22        Q.   Just -- just Mr. Bergman's firm?
23        A.   Yeah.
24        Q.   Okay.  That's helpful.
25             So on Page 3, there's a reference to

Page 75

1    meeting with Buffalo group.
2         A.   Yeah.
3         Q.   Which would have still been within
4    the -- what I'll describe as the "Bergman period."
5    What does "Meeting with Buffalo group" refer to?
6         A.   Meeting with Matt's group of folks.
7         Q.   Okay.  And then you said on Page 4 of
8    Exhibit Number 3 is when you started meeting with a
9    different group of attorneys?
10        A.   With what I referred to, perhaps,
11   before understanding the context of JCCP as the
12   MDL.
13        Q.   Okay.  On Page Number 4, there's a
14   reference to "consulting services."  What does that
15   refer to specifically?
16        A.   I can't recall back to that date.
17   Probably reviewing literature.
18        Q.   There's also various references to
19   "prep work."
20        A.   Uh-huh.
21        Q.   What does that refer to?
22        A.   To getting things ready for a meeting.
23        Q.   And when you say "getting things
24   ready," what does that mean?
25        A.   I don't know if I'm able to give

Page 76

1    specifics of what I prepped.
2             MS. COUCH:  If it would go into
3    attorney-client communications, no.  If it's
4    just -- if you're just going to say, "I generally
5    reviewed literature," I think that's okay.  But
6    don't get into any specific details, any questions,
7    any conversations, any communications.
8             THE WITNESS:  Yeah.
9             MS. COUCH:  That's all privileged, and
10   every counsel here is aware of that.
11            THE WITNESS:  Yeah.  Yeah.
12            Reviewing literature, preparing things
13   to discuss and show when I met with them.
14   BY MS. JONES:
15        Q.   Okay.  And then further down on Page 4
16   of Exhibit 3, there's a section that -- at some
17   point, it looks like your colleague, Dr. Burnell --
18        A.   Yes.
19        Q.   -- became part of your work in the
20   case?
21        A.   At that time, I was invited to bring
22   other colleagues of mine to this meeting.
23        Q.   Okay.  And what was her role intended
24   to be?
25             MS. COUCH:  And my objection would be,

Page 77

1    just -- if you know without conveying
2    attorney-client communications, which I don't know
3    that you would, you can answer.  But if it would be
4    because of attorney-client communications, I would
5    instruct you not to answer.
6             THE WITNESS:  Yeah.
7             MS. COUCH:  Excuse me.
8    Attorney-expert.
9             THE WITNESS:  Yep.
10            She, in this context, was helping to
11   pull the literature and prepare as well for some of
12   the topics we were going to discuss.
13   BY MS. JONES:
14        Q.   To the extent that there were -- there
15   are amounts in your invoices that are captured
16   in -- for Dr. Burnell --
17        A.   Uh-huh.
18        Q.   -- are those amounts that are being
19   paid to her personally or are those amounts that
20   are being paid to you?
21        A.   Those are being paid to Burnell
22   directly.
23        Q.   Okay.  I just wanted to ask you about a
24   few more entries in here.  On Page 5 of Exhibit
25   Number 3, there's a reference to "paperwork" on

Page 78

```
 1   July the 8th.  What is that?
 2         MS. COUCH:  I repeat the same
 3   objection.
 4         You can answer, but you can't have
 5   communications.
 6         THE WITNESS:  That would be reading and
 7   signing some paperwork.  I don't recall exactly
 8   what paperwork.
 9   BY MS. JONES:
10      Q.   On Page 8 of Exhibit 3, there are
11   references to analyses by Dr. Burnell.  What was
12   that work?
13      A.   I asked --
14         MS. COUCH:  I would also -- same
15   objections.  Do not answer anything that gets into
16   our communications in regards to report drafts.  At
17   this point, you're working on your report.  That
18   gets into our communications.  At the highest
19   level, I think you can describe Burnell's role.
20   But --
21         THE WITNESS:  Yeah.
22         MS. COUCH:  -- do not get into specific
23   communications or drafts in this report.
24         THE WITNESS:  Yeah.  Yeah.
25         Dr. Burnell -- under my guidance or
```

Page 79

```
 1   under my supervision, I asked for her to run some
 2   analyses.
 3   BY MS. JONES:
 4      Q.   Did you -- how did you communicate with
 5   Dr. Burnell?  And what I'm asking is:  Did you
 6   speak to her live in person?  Did you email with
 7   her?  How did you communicate with her about what
 8   she was doing in connection with your expert work
 9   in this case?
10      A.   Our offices are right next to each
11   other.
12      Q.   Okay.  Well, that's convenient.
13         Did you ever communicate by email about
14   the work that she was helping you with in this
15   case?
16         MS. COUCH:  Objection.
17         THE WITNESS:  We have communicated by
18   email.
19   BY MS. JONES:
20      Q.   Okay.  Were there any communications
21   that you had with Dr. Burnell by email that did not
22   include lawyers --
23         MS. COUCH:  Objection.  Calls for
24   speculation.
25   BY MS. JONES:
```

Page 80

```
 1      Q.   -- about the work that you were doing
 2   in this case?
 3         MS. COUCH:  Same objections.
 4         THE WITNESS:  Were there any emails --
 5   can you repeat your question?  Sorry.
 6   BY MS. JONES:
 7      Q.   Yes.  Sure.
 8         Were there any communications that you
 9   had with Dr. Burnell by email that did not include
10   lawyers on the email thread?
11      A.   Yes.
12         MS. COUCH:  Same objections.
13         THE WITNESS:  Kaitlyn and I -- yes, we
14   email.
15   BY MS. JONES:
16      Q.   Including about the work that you were
17   doing for this case?
18         MS. COUCH:  Objection.  Calls for
19   speculation.
20         THE WITNESS:  Kaitlyn and I email each
21   other, yes.
22   BY MS. JONES:
23      Q.   Yeah, I -- I -- I want to just make
24   sure I understand your testimony.
25         I'm asking specifically for purposes of
```

Page 81

```
 1   the work that you were doing in this case.  Were
 2   there any email communications that you had with
 3   Dr. Burnell that did not include lawyers on the
 4   email?
 5         MS. COUCH:  Objection.  Calls for
 6   speculation.
 7         THE WITNESS:  Yes.
 8   BY MS. JONES:
 9      Q.   Were there any other communications --
10   I suspect probably not if you were next to each
11   other.
12         But were there any other written
13   communications that you had with Dr. Burnell about
14   the work in this case that did not include lawyers?
15      A.   Were there other communications beyond
16   in person or on email?
17      Q.   Yes.
18      A.   There may have been a call.  Like, a
19   phone call.
20      Q.   Okay.  Any texting back and forth about
21   the work?
22      A.   We have texted.
23      Q.   About the work you're doing in this
24   case?
25      A.   Yes.
```

Page 82

1    Q.   And did those text communications
2  include lawyers?
3        A.   No.
4        Q.   Go to Page 11 for me of Exhibit 3.
5        Down at the bottom of the page, there's
6  a reference to "data management" and "reference
7  management."
8        Do you see that?
9        A.   Uh-huh.  Yeah.
10       Q.   What are those -- what does "data
11 management" refer to?
12       A.   I paid somebody to help compile a lot
13 of data for myself.
14       Q.   Who was the person you were paying to
15 do that?
16       A.   You need a name?
17       Q.   Yes.
18       A.   Her first name is Sara.
19       Q.   What is her last name?
20       A.   I would have to look it up.
21       Q.   What is her role?  Is she a student?
22 Does she have some other role at the -- the
23 university?
24       A.   She's a staff member in my lab.
25       Q.   Okay.  "Reference management," what

Page 83

1  does that mean?
2        A.   I paid somebody to help compile all the
3  references for my report.
4        Q.   When you say you paid someone to
5  compile the references in your report, what
6  references are you -- you referring to
7  specifically?
8        A.   In order to pull out the APA-formatted
9  references of each of the things I cite in here.
10       Q.   And are you referring specifically to
11 the -- articles and literature that you cited?
12       A.   Yes.
13       Q.   Okay.  Did you -- and tell me the name
14 of that person.
15       A.   Her first name is Alexis.
16       Q.   What is her last name?
17       A.   I'd have to look it up.
18       Q.   Is this another person in your lab?
19       A.   Yes.
20       Q.   For the data management work that you
21 asked for help with, what data did you have Sara in
22 your lab helping to compile?
23       A.   It was pulling together as part of the
24 data that I included some of the -- that was shared
25 with you all the screenshots of phone usage.

Page 84

1        Q.   And to the extent that "data
2  management" and "reference management" are referred
3  to in other places in your invoices -- for example,
4  on Page 13 -- is that going to be the same thing?
5        A.   I believe so.  Let me look.
6        Q.   On Page 13, Invoice 11.
7        A.   Yeah.
8        Q.   Is that going to be the same work
9  involving the same people?
10       A.   Yep.
11       Q.   Okay.  And to the extent that you
12 had -- I think you said her name was Alexis helping
13 you with pulling together references, did that
14 have -- was she involved at all in things beyond
15 the literature that you cite in your report?
16       A.   No.
17            MS. COUCH:  Misstates her testimony.
18            THE REPORTER:  I'm sorry.  I can't hear
19 you.
20            MS. COUCH:  I said, "Misstates her
21 testimony."
22            THE WITNESS:  Restate the question,
23 please.
24 BY MS. JONES:
25       Q.   Oh.  I thought you had already said --

Page 85

1  I thought you already answered that.  I apologize.
2        A.   I didn't finish my answer because Sara
3  put her objection in.
4        Q.   Okay.
5        A.   So I couldn't finish.
6        Q.   To the extent that Alexis was helping
7  you pull together references -- which I think is
8  what you testified to, correct?
9        A.   Alexis pulled together the APA
10 references for the things cited in here, yes.
11       Q.   Yeah.  And I -- I guess my question was
12 really more focused on you didn't have her helping
13 you with, like, for example, the documents from the
14 defendants that --
15       A.   Oh.  She did not have access to any of
16 that.
17       Q.   Okay.  Just let me finish my question.
18 But I think -- I -- I understand.  Okay.
19            Dr. Telzer, I'm not sure if you've gone
20 through the exercise of summing up the amounts that
21 you spend in terms of time devoted to different
22 things.  Have you?
23       A.   I have not.
24       Q.   Okay.  By our math -- which, you know,
25 you can certainly say doesn't seem right to you --

Page 86

1  it seems like you spent about 32 hours meeting with
2  counsel, at least as reflected in Exhibit Number 3.
3      Does that sound roughly accurate?
4      A.  I'll take your word for it.
5      Q.  Okay.  In terms of Dr. Burnell's role
6  in helping you as an expert in this case, are there
7  any other ways in which she was involved in your
8  work as an expert that are not reflected in Exhibit
9  Number 3 in the invoices?
10     A.  No.  Kaitlyn Burnell's role was to
11 assist me with compiling some of the data and
12 literature.  But beyond that, no.
13     Q.  Was she involved at all in your written
14 report?
15     A.  She was not.
16     Q.  Okay.  Did she review a copy of your
17 written report at any point?
18     A.  I don't believe so.
19     Q.  Okay.  So, again, recognizing you have
20 not done the math on this, by our math, these
21 invoices reflect that you, in collaboration with
22 Dr. Burnell and, it sounds like, a couple of folks
23 in your lab, have billed approximately 331 hours
24 for your work as an expert in this case.
25     Does that sound roughly correct?

Page 87

1      A.  I'll take your word for it.
2      Q.  Okay.  And if we apply -- your billable
3  rate is $750?
4      A.  Correct.
5      Q.  Okay.  I think -- again, subject to
6  your correcting me on the math.  I think, roughly,
7  that's about 175, $176,000.  Does that sound right
8  to you?
9      A.  I have not done the math, but I'll take
10 your word for it.
11     Q.  Okay.  Have you actually been paid for
12 the amounts that you've invoiced up through
13 June the 1st?
14     A.  Well, I don't know if I've received the
15 June --
16     Q.  Yeah.  But in advance of that?
17     A.  Yes.
18     Q.  Okay.  So --
19     A.  I don't know if I've received the May,
20 sorry, because that was submitted in June.
21     Q.  Okay.  Got it.  All right.
22     So it's -- but it sounds like since you
23 were retained as an expert in 2023, you have
24 been -- you have at least billed approximately
25 $175,000; is that right?

Page 88

1      MS. COUCH:  Objection.  Just to
2  clarify, it will be for both JCCP and MDL.
3      MS. JONES:  Well, I -- yeah.  I wasn't
4  differentiating.  Let me ask the question again.
5  BY MS. JONES:
6      Q.  Since you were retained by the lawyers
7  for the plaintiffs in 2023, you have billed roughly
8  $175,000.  Is that right?
9      A.  I'll take your word for it.
10     Q.  Okay.  And I -- I take it that you have
11 confidence that you will eventually be paid for the
12 entirety of the amount that you have invoiced,
13 correct?
14     A.  I do.
15     Q.  All right.  And you have already told
16 me that -- you're going to be deposed again.  You
17 know that, right?  For the MDL?
18     A.  I'm aware that that's probably
19 happening.
20     Q.  Yeah.  And -- and you will bill for all
21 that time, I assume, yes?
22     A.  Yes.
23     Q.  Do you know whether you're going to be
24 involved in other parts of the litigation beyond
25 the JCCP and the MDL?

Page 89

1      A.  I'm not aware.
2      MS. COUCH:  Objection.
3  BY MS. JONES:
4      Q.  And then, if you eventually testify at
5  a trial, you will bill for that time, right?
6      A.  If that were to happen.
7      Q.  Yes.  And you'll bill for the time
8  that's required to prep for such a trial, yes?
9      A.  If that were to happen.
10     Q.  Okay.  And so if there's a trial by the
11 beginning of 2026, there's a real possibility that
12 by the time we get to the end of this year, 2025,
13 you will have at least billed for as much as
14 $200,000?
15     MS. COUCH:  Calls for speculation.
16     THE WITNESS:  I can't determine how
17 much will happen in the future.
18 BY MS. JONES:
19     Q.  Well, I think you already told me that
20 you've billed about $175,000, yes?
21     MS. COUCH:  Asked and answered.
22     THE WITNESS:  I take your word for the
23 amounts that you calculated.
24 BY MS. JONES:
25     Q.  Sure.  And by the time you're deposed

Page 90

1  again and potentially serve as a trial witness in
2  one or two cases, I mean, if I saw you again a year
3  from now, you might be into the
4  quarter-of-a-million-dollars range.  Possible?
5          MS. COUCH:  Calls for speculation.
6          THE WITNESS:  I imagine there will be
7  more bills if there's more work.  But I can't tell
8  you how much.
9  BY MS. JONES:
10         Q.   Okay.  How many hours of the
11  300-and-something hours that you've spent did you
12  spend on preparing your written report?
13         MS. COUCH:  Calls for speculation.
14         THE WITNESS:  I can't tell you.  I
15  think that I indicate in here when I'm working when
16  it is report work.
17  BY MS. JONES:
18         Q.   Okay.  So if we wanted to know that, we
19  could rely on your invoices?
20         A.   I think so.
21         Q.   Do you know how many of your 330 or so
22  hours you've spent on reviewing academic
23  literature?
24         MS. COUCH:  Calls for speculation.
25         THE WITNESS:  I can't tell you.  It was

Page 91

1  all compiled together as part of the report work.
2  BY MS. JONES:
3          Q.   Okay.  You have -- and we'll talk about
4  this in a little bit more detail.
5          You have as part of your report
6  so-called Exhibit B, which is a very, very, very,
7  very, very long list of company -- what I will
8  refer to as "company documents."
9          Do you know that?
10         A.   "Company documents" meaning, like,
11  the --
12         Q.   Documents that --
13         A.   Yes.
14         Q.   -- have been produced by the
15  defendants --
16         A.   Yes.
17         Q.   -- in this case.  Okay.
18         A.   Yes.
19         Q.   Do you know -- and did you read -- do
20  you know roughly how many pages those company
21  documents comprise that are reflected in Exhibit B
22  to your report?
23         A.   Do I know how many pages?  I can't --
24         Q.   Yes.
25         A.   I can't estimate how many pages.

Page 92

1          Q.   Did you read every single one of the
2  company documents that are reflected on Exhibit B?
3          A.   I looked at, at least, every single
4  document.
5          Q.   What does "I looked at" mean?
6          A.   I reviewed.  I skimmed.  I looked at.
7  In some, I read in much more detail.  In others, I
8  read in less detail.
9          Q.   Okay.  And "skim" means what exactly?
10         MS. COUCH:  Objection.
11         THE WITNESS:  "Skim" means I looked
12  through and read at least part of it.
13  BY MS. JONES:
14         Q.   And how did you come to focus on those
15  specific documents in Exhibit B?
16         A.   In doing my own searches on the
17  database, as well as asking counsel for documents
18  that are related to the key outcomes of my
19  interest.  I looked for, searched and identified as
20  many relevant documents as I could find.  They
21  started to be relatively repetitive.  And once I
22  saw those, I didn't need to compile more.
23         Q.   What -- what -- when you say
24  "the database," what database are you talking
25  about?

Page 93

1          A.   I don't know the name of it.
2          Q.   Well, I'm trying to understand what was
3  included in this database that you were searching.
4          A.   Database of millions of documents.
5          Q.   Okay.  So you went into the database
6  and ran searches; is that right?
7          A.   Yes.
8          Q.   Did you use specific terms?
9          A.   I looked at broad themes, particularly
10  related to brain development, fMRI, and things
11  related to the brain as well as those related to
12  problematic social media use, dopaminergic
13  responses in the brain.  I did some pretty -- I did
14  many searches.
15         Q.   And how did you come up with that
16  specific set of search terms?
17         A.   Those weren't my specific search terms
18  per se but the themes that I was looking for.
19         Q.   Do you have anywhere documented what
20  specific search terms you used to go through the
21  database?
22         A.   No, I don't.
23         Q.   And your testimony today is that you
24  think that you looked at every single one of the
25  documents that are reflected on Exhibit B?

HIGHLY CONFIDENTIAL

Page 94

1    MS. COUCH:  Objection.  Misstates the
2  testimony.
3    THE WITNESS:  I said that I -- in terms
4  of the documents considered, I have looked at and
5  reviewed every single one of those documents.
6  BY MS. JONES:
7    Q.   And so tell me -- tell me how your
8  process worked.  You went into the database.  You
9  ran searches.  Did the database include documents
10  for all of the defendants?
11    A.   I believe so.
12    Q.   Do you know?
13    A.   I -- I do know, yes.
14    Q.   So you -- you are confident that the --
15    A.   I saw documents from all of the
16  defendants.
17    Q.   And do you have confidence that it was
18  a comprehensive set of documents?
19    A.   I do.
20    Q.   Okay.  Based on what?
21    A.   Based on the sheer quantity of them,
22  based on reviewing many of them across emails and
23  across depositions, across other documents.  It was
24  very -- it was very thorough.
25    Q.   Okay.  So you went -- you went in and

HIGHLY CONFIDENTIAL

Page 95

1  you ran search terms.  And then how did you keep
2  track of what documents you were going to include
3  on Exhibit B?
4    A.   How did I keep track of documents?
5    Q.   Yeah.  Eventually, what happened is you
6  generated an Exhibit B to your report, right?
7    A.   Uh-huh.
8    Q.   Yes?  You have to say "yes" or "no."
9    A.   Yes.  Yes.  Sorry.
10    Q.   And that Exhibit B includes a bunch of
11  what's known -- what lawyers call "Bates numbers,"
12  yes?  Identifying numbers, right?  Do you need to
13  look at Exhibit B --
14    A.   I don't know --
15    Q.   -- to remind yourself?
16    A.   I don't know what you mean by "Bates
17  numbers."  Sorry.
18    Q.   Well, that's just the term that lawyers
19  use.  It's just the identifying numbers --
20    A.   Okay.
21    Q.   -- of the documents.
22    Why don't you turn to Exhibit B, if
23  that helps you.
24    A.   Is it -- I don't --
25    Q.   If they're both -- they should be

HIGHLY CONFIDENTIAL

Page 96

1  roughly the same.
2    A.   Okay.  I'm not seeing Exhibit B right
3  there.  You mean this right here, B?
4    Q.   No.  I'm -- I'm -- yeah --
5    A.   Yeah.
6    Q.   -- so beginning of that exhibit --
7    A.   Yeah.  Yeah.
8    Q.   -- you see that there are your -- there
9  are specific identifying numbers --
10    A.   Uh-huh.
11    Q.   -- yes?
12    So my question is:  How did you go
13  through the process of memorializing -- you're in
14  the database.  How did you memorialize, okay, this
15  is something I'm going to include in my Exhibit B?
16  Did you keep a list -- a running list somewhere?
17    A.   There's a folder of all the documents.
18    Q.   So a folder that you created?
19    A.   That I created with counsel.
20    Q.   Okay.  And then how was the list
21  actually generated?
22    MS. COUCH:  Objection.
23    I'm going to instruct you not to
24  answer.  That gets into attorney-client work on
25  your report.

HIGHLY CONFIDENTIAL

Page 97

1  BY MS. JONES:
2    Q.   Were you -- were you personally
3  involved in the creation of Exhibit B?
4    A.   Yes.
5    Q.   And did you go through and confirm that
6  it was accurate with respect to the documents that
7  you had reviewed?
8    A.   I looked through --
9    Q.   How -- how many hours did you spend
10  reviewing the company documents that are featured
11  at Exhibit B to your report?
12    MS. COUCH:  Calls for speculation.
13    THE WITNESS:  I can't tell you how many
14  hours off the top of my head.
15  BY MS. JONES:
16    Q.   Was it more or less than 20?
17    A.   More than --
18    MS. COUCH:  Calls for speculation.
19    THE WITNESS:  -- 20.  But I can't tell
20  you how many exactly.
21  BY MS. JONES:
22    Q.   Was it more or less than 50?
23    A.   I cannot speculate --
24    Q.   Okay.
25    A.   -- the specifics.

HIGHLY CONFIDENTIAL

Page 98

1    Q.   Okay.  You also list a number of
2    deposition transcripts --
3        A.   Uh-huh.
4        Q.   -- in your -- associated with your
5    report, yes?
6        A.   Uh-huh.
7        Q.   You have to say "yes" or "no" for
8    the --
9        A.   Sorry.
10       Q.   -- court reporter.
11       A.   Yes.
12       Q.   That's okay.
13            Do you know roughly how many deposition
14   transcripts -- did you read those deposition
15   transcripts in their entirety?
16       A.   Many of them I read in entirety.  All
17   of them I have looked through.
18       Q.   And when you say many of them you read
19   in their entirety, how many did you read in their
20   entirety?
21       A.   Handfuls of them I read thoroughly.
22       Q.   Who?  Whose depositions do you think
23   you read in their entirety?
24       A.   I am not good with names.  I read
25   Zuckerberg's in entirety.

HIGHLY CONFIDENTIAL

Page 99

1        Q.   Okay.  Who else?
2        A.   I -- I'm horrible with names.  There --
3    I can -- we can go through them, if you want.
4        Q.   Well, why don't you flip to the -- that
5    part of your --
6            So in that same Exhibit B, Dr. Telzer,
7    there is a part where it begins with a listing of
8    people and then refers to deposition transcripts.
9            And I wish I could give you a page, but
10   there is no page associated with it.  It just goes
11   from documents to transcripts.
12           It starts with Abby Tran, is the first
13   person listed.
14       A.   I can see it on here, if -- if I can
15   just rely on this.
16       Q.   Yes, you are welcome to rely on that.
17   And Ryan can certainly scroll through for you.
18       A.   Uh-huh.
19       Q.   But I want to just ask you:  Are there
20   specific people, having a chance to see the names,
21   who you say, "I remember reading that whole
22   deposition transcript," other than Mark Zuckerberg?
23       A.   I read so many.  I can't remember.  And
24   I'm bad with names.  So I'm not sure.
25       Q.   So you don't know?

HIGHLY CONFIDENTIAL

Page 100

1            Okay.  And it refers here -- we'll come
2    back to this in a moment.  But it refers here to
3    exhibits as well.
4        A.   Uh-huh.
5        Q.   You have to say "yes" or "no."
6        A.   Yes.
7        Q.   Are you -- did you review every exhibit
8    associated with every one of the transcripts that
9    you have listed in Exhibit B?
10       A.   I looked through the exhibits --
11       Q.   And does that mean --
12       A.   -- and I've read a lot of them in
13   thorough.
14       Q.   When you say you read a lot of them,
15   what does that mean?
16       A.   For some of the exhibits, I read them
17   from cover to cover, so to speak.  For others, I
18   skimmed through.
19       Q.   And how did -- how did you make a
20   judgment about the transcripts you were going to
21   read versus those you were going to -- entirety, in
22   their entirety, versus those you were just going to
23   skim?
24            MS. COUCH:  Objection.
25            I'm going to instruct you not to answer

HIGHLY CONFIDENTIAL

Page 101

1    to the extent it calls for attorney-expert
2    communications.
3    BY MS. JONES:
4        Q.   Did you independently -- putting aside
5    what the lawyers might have told you, did you
6    independently form any judgments about which
7    transcripts you really needed to read in their
8    entirety?
9        A.   I independently went through them and
10   opened them and saw some that were more relevant
11   for my opinions and looked through those.
12       Q.   And what about for the deposition
13   exhibits?  How did you determine, putting aside
14   what you talked about with the lawyers, which
15   exhibits you were going to read from cover to cover
16   and which ones you weren't?
17       A.   Similarly, I would go through and open
18   them and look for the ones that appeared most
19   relevant to the topics that I cover in my report.
20       Q.   Other than -- than, perhaps,
21   Mr. Zuckerberg, were there -- were there any
22   witnesses who were listed in Exhibit B who you know
23   who they are or had some awareness of them?
24       A.   I couldn't tell you.  I don't know.
25       Q.   But you didn't -- when you were

HIGHLY CONFIDENTIAL

Page 102

1  generating this list, you didn't say, "Oh, I know
2  ▓▓▓▓▓▓▓," right?
3       A.   I don't think so.
4       Q.   Okay.  And is it correct to conclude
5  that you have not had any interactions with any of
6  these folks on this list?  You have not spoken to
7  any of them?
8       A.   Not that I know of.
9       MS. COUCH:  If you're done with that
10 section, we've been going about an hour and a half.
11 Can we take a five-minute break?
12      MS. JONES:  Yes.  I'm almost done with
13 this.
14 BY MS. JONES:
15      Q.   If that's okay with you, Dr. Telzer.
16      A.   Sure.
17      Q.   It'll be relatively painless.
18           So, all in, you have invoiced for 330
19 or so hours of time up to June the 1st, right?
20      A.   Uh-huh.
21      Q.   Yes?  You have to say "yes" or "no."
22      A.   Yes.
23      Q.   And within that 330 hours of time, your
24 testimony is that you reviewed the transcripts, in
25 part or in whole, of every person who is identified

HIGHLY CONFIDENTIAL

Page 103

1  in Exhibit B?
2       A.   Uh-huh.  Yes.
3       Q.   And that you reviewed the exhibits that
4  are associated, either in part or in whole, with
5  every single one of those depositions?
6       A.   Yes.
7       Q.   And you understand that that would
8  entail reviewing tens of thousands, maybe closer to
9  100,000, pages' worth of content, all in?
10      A.   I opened and looked at those documents.
11      Q.   Okay.  And you did all of that within
12 the span of 330 hours since 2023?
13      A.   I did all of this work within the
14 billed times in these statements.
15      Q.   And when did -- when did you start
16 actually reviewing deposition transcripts?
17      MS. COUCH:  Calls for speculation.
18      THE WITNESS:  I believe in November or
19 December of '24.
20 BY MS. JONES:
21      Q.   So between November of 2024 and today,
22 June the 1st [sic], you have reviewed thousands and
23 thousands of pages of company witness deposition
24 testimony?
25      A.   Yes.

HIGHLY CONFIDENTIAL

Page 104

1       Q.   Okay.  And you have reviewed the
2  related exhibits for all of those depositions?
3       A.   Yes.
4       Q.   In the last six months?
5       A.   Yes.
6       Q.   Has that impeded on your job
7  responsibility?
8       MS. COUCH:  Objection.  Outside the
9  scope.
10      MS. JONES:  There is not a -- there is
11 not a scope limitation.
12 BY MS. JONES:
13      Q.   You can answer my question.  Has that
14 impeded on your job responsibilities as a professor
15 at UNC that you have reviewed dozens and dozens and
16 dozens of company witness deposition testimony and
17 the related exhibits in the last six months?
18      MS. COUCH:  Objection.  Argumentative.
19      THE WITNESS:  I have done this work
20 outside of my UNC work hours.
21 BY MS. JONES:
22      Q.   And just looking at your invoices --
23 which you prepared, right?
24      A.   Uh-huh.
25      Q.   Yes?

HIGHLY CONFIDENTIAL

Page 105

1       A.   Yes.
2       Q.   -- since November the 1st, you have
3  only billed to these lawyers 65 hours.  Did you
4  know that?
5       A.   I can't without looking at the details.
6  Since November 1st, you're saying, what?
7       Q.   That you have only billed to these
8  lawyers 65 hours.  Did you know that?
9       A.   Sure.
10      Q.   And so your sworn testimony today is
11 that in the span of 65 hours, which also included
12 meetings with lawyers, that you have reviewed the
13 testimony of dozens of company witness employees
14 and all of the related exhibits?
15      A.   Yes.
16      Q.   Which would be into the tens of
17 thousands, and, potentially, 100,000, pages' worth
18 of content.  That's your testimony?
19      A.   That's my testimony.
20      Q.   Okay.  And to the extent -- and you're
21 not doing this during your day job, 9:00 to 5:00?
22      A.   My day job is not 9:00 to 5:00.
23      Q.   Mine isn't either, actually.  What is
24 your -- what are your work hours?
25      A.   My work hours are relatively flexible.

HIGHLY CONFIDENTIAL

Page 106

1      Q.   Okay.  So what part of the day are you
2  spending on this -- or have you been spending on
3  this work since November the 1st?
4      A.   Different times of the day, evenings,
5  weekends.
6      Q.   Okay.  So you've been spending your
7  evenings and weekends reviewing all these company
8  materials?
9      A.   Some.
10      Q.   All right.  Let me finish this last
11  little bit, and then we'll take a break.
12           You're -- you're currently -- are you
13  currently an employee of the University of North
14  Carolina?  Is that that --
15      A.   Yeah.
16      Q.   -- the technical designation?  Okay.
17           Did you have to seek approval from the
18  university to serve as a paid expert for these
19  lawyers?
20      A.   I submitted to UNC that I'm doing
21  out-of-UNC work, yes.
22      Q.   And did you specifically disclose that
23  you were serving as a -- paid litigation expert?
24      A.   Yes.
25      Q.   Okay.  Did the -- did that have to be

HIGHLY CONFIDENTIAL

Page 107

1  approved by the university in this way -- in any
2  way?
3      A.   Yes.
4      Q.   It did?  Okay.
5      A.   If I do out-of-university work, I
6  disclose it and get it approved.
7      Q.   In the course of the -- I guess it's
8  roughly two years now that you have been a retained
9  expert for plaintiffs' counsel, you have published
10  on the issues that are the subject of this
11  litigation, yes?
12      A.   Yes.  I've been publishing on the role
13  of social media and adolescent mental health and
14  brain development --
15      Q.   Okay.
16      A.   -- for years.
17      Q.   And in each one of those circumstances,
18  have you disclosed that you are a paid litigation
19  expert for the plaintiffs in these cases?
20      A.   At least once I was aware of my role,
21  and that was about a year ago, I included very
22  carefully, to the best of my ability, my conflicts
23  of interest.
24      Q.   And what about when you've made -- and
25  you -- you also do kind of nonpublished just

HIGHLY CONFIDENTIAL

Page 108

1  speaking things, as I understand it?
2      A.   Uh-huh.
3      Q.   Yes?
4      A.   Yeah.  All the time.
5      Q.   Have you disclosed in those settings
6  that you are a retained and paid expert working for
7  the plaintiffs in this litigation?
8      A.   Any time it's required to disclose
9  conflicts of interest, I always do.
10      Q.   Putting aside technical requirements of
11  disclosure, do you think that it's important that
12  you communicate with folks that you're sharing
13  the -- your views with that you are, in fact, being
14  paid by lawyers in a lawsuit involving these
15  issues?
16           MS. COUCH:  Objection.  Argumentative.
17           THE WITNESS:  I disclose it whenever it
18  is relevant and required.
19  BY MS. JONES:
20      Q.   Sure.  And my question is:  Putting
21  aside what's required, do you think you should tell
22  people simply in fairness to letting them know what
23  financial interests you might have on these issues?
24           MS. COUCH:  Asked and answered.
25           THE WITNESS:  I disclose my conflicts

HIGHLY CONFIDENTIAL

Page 109

1  of interest when required.
2  BY MS. JONES:
3      Q.   Okay.  But if it's not required, you
4  don't disclose it; is that right?
5      A.   I might.  But I am very careful and
6  thoughtful about doing it when it is required to
7  ensure that I'm ethical in following those rules.
8  When it's not required, I do sometimes.
9      Q.   How do you decide -- when it's not
10  required, how do you decide when you do or you
11  don't?
12           MS. COUCH:  Calls for speculation.
13           THE WITNESS:  I can't tell you off the
14  top of my head.  I would need a specific example.
15  But I always disclose in required circumstances.
16  BY MS. JONES:
17      Q.   Okay.  You -- do you consider yourself
18  to have a financial interest in this litigation
19  since you've been paid roughly $175,000 since 2023?
20      A.   I do not have a financial interest.
21      Q.   Okay.  Is there any amount of money
22  where you would say you did have a financial
23  interest?
24           MS. COUCH:  Object to the form.  Calls
25  for speculation.  Argumentative.

Page 110

1      THE WITNESS:  I do not have a financial
2  interest.
3  BY MS. JONES:
4      Q.  Okay.
5          MS. JONES:  Why don't we take a break.
6          THE VIDEOGRAPHER:  Going off the
7  record.  The time is 10:49 a.m.
8                 * * *
9          (Whereupon, there was a recess in the
10  proceedings from 10:49 a.m. to 11:11 a.m.)
11                 * * *
12         THE VIDEOGRAPHER:  Going back on the
13  record.  The time is 11:11 a.m.
14  BY MS. JONES:
15      Q.  Dr. Telzer, welcome back.
16          I want to correct one thing for the
17  record.  Earlier I had asked about the time you had
18  spent, excluding the work of Dr. Burnell and
19  interactions with attorneys, since November the 1st
20  and said it was 65 hours.
21          We went back and looked at the invoice.
22  It's actually 117 hours.  For whatever that's
23  worth, okay?
24      A.  Okay.
25      Q.  Okay.  I assume that does not change

Page 111

1  anything in terms of your testimony.  All right.
2          MS. JONES:  Let me ask, Ryan, if we can
3  pull up what we are going to mark as Exhibit Number
4  4, Tab 85.
5          (TELZER EXHIBIT 4, Reliance list and
6  materials considered list, was marked for
7  identification.)
8  BY MS. JONES:
9      Q.  And, Dr. Telzer, I will represent to
10  you this is a copy of your reliance list and
11  materials considered list that was provided to us
12  by counsel yesterday evening.
13          So it's 900 pages, so we have not
14  printed out the entire thing.  I don't know if you
15  have the updated version in this binder in front of
16  you.  Do you?
17      A.  I believe so.
18      Q.  Okay.
19      A.  I'm not sure.
20          MS. COUCH:  This is the -- this printed
21  is the one from May 16th.  And then we updated
22  yesterday, and there are about 20 additional new
23  items.  And I'm working on -- I've asked my
24  paralegal to put them into a list, but I have not
25  received that yet.

Page 112

1          MS. JONES:  Okay.
2          MS. COUCH:  Because you guys emailed us
3  and asked us to identify which ones, and so we are
4  trying to do that.  But I have not gotten --
5          MS. JONES:  Well, that would be super
6  helpful because this document went from, like,
7  200 pages to 900 pages.  Maybe we can talk about
8  that --
9          MS. COUCH:  Yeah.
10          MS. JONES:  -- separately.
11          MS. COUCH:  It went that way because we
12  listed out or my paralegal listed out every
13  single --
14          MS. JONES:  -- exhibit.
15          MS. COUCH:  -- exhibit.  So it was like
16  Mark Zuckerberg 1, Mark Zuckerberg 2.  And so --
17          MS. JONES:  Okay.  Let me ask her
18  questions.  I don't want to use time on this.
19          MS. COUCH:  Yeah.
20          MS. JONES:  But we can talk about that
21  on a break.
22          MS. COUCH:  Yeah.
23  BY MS. JONES:
24      Q.  Okay.  Have you seen what we have up in
25  front of you, what we've marked as Exhibit Number

Page 113

1  4, which is the updated list of reliance and
2  materials considered that were provided to us by
3  your counsel yesterday, June the 12th?
4      A.  Yes.
5      Q.  Did you have a chance to go through
6  that entire document?
7      A.  I've gone through all of the things in
8  here, yes.
9      Q.  Okay.  And subject to what sounds like
10  will be some further discussions with counsel about
11  what's been included in the list, do you have an
12  understanding of what was included between what we
13  got in April of this year and this that we received
14  yesterday?
15      A.  Generally speaking.
16      Q.  Okay.  What is your understanding of
17  what got included on Exhibit Number 4?
18      A.  All the additional documents that I
19  have reviewed since.
20      Q.  And did you have an understanding that
21  your original list was, I think, roughly 230 pages
22  and it's now roughly 930 pages?  Did you know that?
23      A.  I don't know the numbers.
24      Q.  Okay.  But to the extent that there is
25  a delta, the delta represents additional things

Page 114

1  that you've reviewed since April?
2      A.   No, that's not the case.  As indicated
3  in the documents, it was listed differently in the
4  two documents.
5      Q.   Okay.  Are -- are you testifying today
6  that -- with respect to what was provided to us
7  yesterday, Exhibit Number 4, that you have
8  reviewed everything that appears on that
9  several-hundred-page supplemental reliance list?
10         MS. COUCH:  Asked and answered.
11         THE WITNESS:  I have reviewed all the
12  documents in my --
13  BY MS. JONES:
14     Q.   Yeah.  And just to --
15     A.   -- list.
16     Q.   -- to respond to counsel's objection,
17  we were earlier discussing your list from April of
18  this year.  So I'm now asking you about what we
19  received yesterday, which is several hundred pages
20  longer.
21         Are you comfortable that anything
22  that's on there you have reviewed --
23     A.   I've --
24     Q.   -- all of it?
25     A.   Sorry.  I've reviewed everything on the

Page 115

1  list.
2      Q.   Okay.
3         MS. COUCH:  Misstates her testimony.
4  BY MS. JONES:
5      Q.   One thing that's on your new list --
6         MS. JONES:  I think this is on
7  Page 710, if we want to take Dr. Telzer to that on
8  the screen.  710.  I think that's the Bates number.
9  Sorry.
10  BY MS. JONES:
11     Q.   One of the things that you included,
12  Dr. Telzer -- you'll see it as we pull it up on the
13  screen -- are expert reports.
14     A.   Yes.
15     Q.   And those are expert reports from --
16  there are a number of folks listed here.
17     A.   Uh-huh.
18     Q.   What do you understand those to be?
19         MS. COUCH:  Objection.  Vague.
20         THE WITNESS:  Expert reports.
21  BY MS. JONES:
22     Q.   And you have listed here over 65 expert
23  reports.  Did you know that?
24     A.   I've listed here the reports that I've
25  reviewed.

Page 116

1      Q.   And did you review all of the expert
2  reports that are reflected at -- I believe this is
3  the Bates number -- 709 to 715 of Exhibit 4?
4      A.   I've reviewed all the documents on my
5  list.
6      Q.   Including all those expert reports?
7      A.   I've reviewed these expert reports.
8      Q.   And you understand that those reports
9  amount to several hundred pages?
10     A.   Sure.
11     Q.   And you've read all that since
12  April when you submitted your first report?
13         MS. COUCH:  Objection.  Misstates her
14  testimony.
15         THE WITNESS:  I've reviewed all these
16  documents.
17  BY MS. JONES:
18     Q.   Well, my question -- I want to be --
19  just want to be very specific about this.
20         Since April, when you signed your
21  initial JCCP report, Exhibit Number 2, have you
22  reviewed the entirety of the expert reports that
23  are reflected in Exhibit Number 4?
24     A.   I have reviewed all of these expert
25  reports.

Page 117

1      Q.   In their entirety?
2      A.   I've at least looked at, if not read,
3  many of them in their entirety.
4      Q.   I want to make sure I understand that.
5  When you say "looked at, if not read, in their
6  entirety," what does that mean?
7      A.   Either skimmed through or read every
8  word of.
9      Q.   Okay.  And skimming through does not
10  mean reading it in its entirety, just to be fair?
11     A.   It means looking over it.
12     Q.   Okay.  Which means you did not read the
13  entire report in some instances?
14     A.   In some instances, I did not read every
15  word.
16     Q.   How did you decide which reports -- and
17  I don't want -- we've now heard this many times.  I
18  don't want to hear about what you talked about with
19  the lawyers.
20         In terms of any independent judgment
21  that you exercised, how did you decide what reports
22  you were going to review in their entirety?
23     A.   I opened and looked for the ones most
24  relevant to my opinions and the outcomes of
25  interest that I was studying.

Page 118

1    Q.  Let me ask you about just a small
2  number of things that appear on this supplemental
3  list that we received.
4        MS. JONES:  Can we go to 705, which I
5  believe is the Bates.
6  BY MS. JONES:
7    Q.  And there's a specific reference on 705
8  to a ██████████ LinkedIn.  Do you see that?
9    A.  Uh-huh.
10   Q.  You have to say "yes" or "no."
11   A.  Yes.
12   Q.  Who is ██████████?
13   A.  ██████████ is, to my understanding,
14  an employee of Meta and somebody who published
15  literature that I've reviewed.
16   Q.  What do you mean to your understanding?
17   A.  Based on the LinkedIn profile.
18   Q.  And let's go to 703.  That's the Bates
19  number.  Was there a reason you were citing
20  Ms. ██████'s LinkedIn page?
21   A.  I reference in my report ██████
22  ██████ research and indicate, to my
23  understanding, that she works for Meta and cite to
24  her LinkedIn.
25   Q.  What specific research do you believe

---

Page 119

1  someone named ██████████ did for Meta?
2    A.  ██████████ published many articles
3  related to adolescent social media use and brain
4  development.
5    Q.  And why were you citing her LinkedIn
6  page?
7    A.  Because I indicate --
8        MS. COUCH:  Asked and answered.
9        THE WITNESS:  Because I indicate in my
10  report that this is important research that I cite
11  and just -- to my understanding, she works for
12  Meta, and I show on her LinkedIn profile.
13  BY MS. JONES:
14   Q.  Let's go to 703.  There's a reference
15  to "Drug Misuse and Addiction."  It's got "(n.d.)"
16  in the left-hand column.  Do you see that?
17   A.  Yeah.
18   Q.  What is that?
19   A.  I'd have to go through my report to
20  find that.
21   Q.  Now, you've -- you've testified that
22  you read everything on this list, yes?
23   A.  Yes.
24   Q.  Okay.  You couldn't tell me today what
25  this is, though?

---

Page 120

1    A.  I would have to go through my report to
2  see where I cite that.
3    Q.  Okay.  Let's go to 702.  And there is a
4  reference to "7 facts about Americans and
5  Instagram" from October 7, 2021.  Do you see that?
6    A.  Uh-huh.
7    Q.  You have to say "yes" or "no."
8    A.  Yes.
9    Q.  What is that?
10   A.  I don't recall every single document in
11  its entirety, but I have looked and reviewed all of
12  these.
13   Q.  Well, understood.  But do you have any
14  recollection of what that is or why you cited it on
15  your materials considered list?
16       MS. COUCH:  Asked and answered.
17       THE WITNESS:  I would have to go back
18  and look through, but I reviewed everything on this
19  document.
20  BY MS. JONES:
21   Q.  Okay.  Let me take you to six -- this
22  is Bates Number 704.  And there's an article
23  described as "His Job Was to Make IG Safe for
24  Teens."  Do you see that?
25   A.  I see that.

---

Page 121

1    Q.  Who does that article refer to; do you
2  know?
3    A.  I don't recall off the top of my head.
4    Q.  You don't know?
5    A.  I don't recall off the top of my head
6  what that specifically refers to.  I've reviewed
7  everything on this document list.
8    Q.  What -- let me take you to 705.  And
9  there's a reference to a LinkedIn by someone named
10  Miki Rothschild down at the bottom of the page.
11  Who is Miki Rothschild?
12   A.  I don't recall off the top of my head.
13   Q.  Why were you referring to Miki
14  Rothschild's LinkedIn?
15   A.  I don't recall.
16   Q.  Immediately below that, there's a
17  reference to "Miki Rothschild Third Amended
18  Deposition Cross-Notice for 11/21/2024."  Do you
19  see that?
20   A.  Yes.
21   Q.  And you still don't know who
22  Mr. Rothschild is, right?
23   A.  I don't recall.
24       MS. COUCH:  Asked and answered.
25  BY MS. JONES:

Page 122

1      Q.   Do you know why you were referring in
2  your materials considered list to a Third Amended
3  Deposition Cross-Notice for 11/21/2024?
4      A.   I don't recall off the top of my head,
5  but I reviewed all of these documents.
6      Q.   Do you -- do you know what an amended
7  deposition cross-notice is?
8      A.   Not off the top of my head.
9      Q.   Would it be relevant to your academic
10 work to know about something like that?
11     A.   I would have to go back and look at it.
12     Q.   Let me ask you to go to 716, which is
13 that listing of deposition transcripts that you
14 said you testified -- you reviewed.
15          Up at the top, there's a reference to
16 an employee named Abby Tran.  Do you see that?  Do
17 you see that?
18     A.   Yes.
19     Q.   Who is Abby Tran?
20     A.   I don't recall off the top of my head.
21     Q.   What is Abby Tran's role at Snap?
22          MS. COUCH:  Calls for speculation.
23          THE WITNESS:  I don't recall.
24 BY MS. JONES:
25     Q.   You don't know?

Page 123

1      A.   I don't recall.
2      Q.   Why was her testimony relevant to your
3  opinions?
4      A.   I don't recall.
5      Q.   Okay.  If I asked you that question as
6  to any person listed here in your deposition
7  listing -- Do you know them and do you know why
8  their testimony was relevant? -- could you answer
9  that question?  Other than Mark Zuckerberg.
10          MS. COUCH:  Compound.  Calls for
11 speculation.
12          MS. JONES:  Well, that -- that's a
13 fair -- that's a fair objection.
14 BY MS. JONES:
15     Q.   For any person on this list other than
16 Mark Zuckerberg, is there any one of them where you
17 could tell me, "I know that person's role at the
18 company"?
19     A.   Not off the top of my head.  But I
20 looked through all of these documents and deemed
21 them relevant and important and looked through
22 them.
23     Q.   Okay.  But you couldn't tell me
24 today -- could you tell me for any one of these
25 people other than Mark Zuckerberg why you thought

Page 124

1  their testimony was relevant?
2      A.   In looking through their -- in looking
3  through the documents, I saw relevant topics being
4  discussed and looked at them further based on that.
5      Q.   Are -- do you know whether these
6  deposition transcripts represent all of the
7  deposition testimony that was taken of the
8  defendants in these cases?
9          MS. COUCH:  Calls for speculation.
10         THE WITNESS:  I couldn't tell you.
11 BY MS. JONES:
12     Q.   Is it possible that there are
13 depositions that you did not cite in your list of
14 materials considered?
15         MS. COUCH:  Calls for speculation.
16         THE WITNESS:  I couldn't tell you.
17 BY MS. JONES:
18     Q.   Are you certain that you have reviewed
19 all of the relevant company deposition testimony --
20         MS. COUCH:  Vague.  Calls for
21 speculation.
22 BY MS. JONES:
23     Q.   -- as part of developing your opinions
24 in this case?
25         MS. COUCH:  Same objection.

Page 125

1          THE WITNESS:  I looked for as many
2  relevant ones as I could.  I didn't necessarily
3  need all of them to reach these conclusions.
4  BY MS. JONES:
5      Q.   As part of your academic research, do
6  you ever rely on deposition testimony from -- I
7  guess the question would be:  anybody?
8          MS. COUCH:  Objection.  Vague.
9          THE WITNESS:  I, to my understanding,
10 have never had access to something like this before
11 to be able to use it in my academic setting.
12 BY MS. JONES:
13     Q.   Yeah, that was -- that's an answer to a
14 different question.
15          My question is:  Do you ever as part of
16 your academic research rely on company witness
17 testimony?
18     A.   To my understanding, I do not have
19 access to this type of information.  So I've never
20 had the opportunity to use it to rely on anything
21 for my academic work.
22     Q.   Dr. Telzer, for a number of these
23 hundreds of -- I mean, we can agree that you have
24 hundreds of company documents listed in Exhibit B
25 to your report.  Is that right?

Page 126

1     A.    Sure.
2     Q.    Okay.  And you have listed, let's say,
3  dozens of transcripts of company witnesses, yes?
4     A.    Sure.
5     Q.    And for the vast majority of those
6  company documents, you do not specifically cite
7  them in connection with your report.  Is that fair
8  to say?
9     A.    Sure.
10    Q.    And same thing with respect to the
11 deposition testimony.  For the vast majority of the
12 deposition testimony, you do not explicitly cite it
13 in connection with any of the opinions that you
14 articulate in your report, right?
15    A.    Correct.
16    Q.    Okay.  And, in fact, you only cite a --
17 a significant minority of the company documents
18 that are listed at Exhibit B to your report, right?
19    A.    There may be a minority that are
20 explicitly cited to in my report.  I don't
21 necessarily rely on those to form my opinions.
22       My opinions were largely based on the
23 literature and my education and my discussions with
24 families and teens to come to these opinions.
25       The depositions and other material

Page 127

1  complemented my opinions but did not necessarily
2  form my opinions.
3     Q.    When you say you didn't necessarily
4  rely on the company documents and deposition
5  testimony to form your opinions, you said
6  "necessarily."  Did you rely on that information at
7  all to form your opinions?
8     A.    I looked through all of these.  They
9  were all very informative.  They complemented what
10 I had learned from the science.  My opinions remain
11 my opinions without those documents, but those
12 supported all of my opinions.
13    Q.    You -- you -- in terms of the
14 literature that you cited in your reliance list --
15       MS. COUCH:  Objection.  Misstates the
16 title of the list.
17       MS. JONES:  Okay.
18 BY MS. JONES:
19    Q.    Well, you've cited in connection with
20 your report a number of pieces of literature,
21 correct?
22    A.    Correct.
23    Q.    And for a significant portion of the
24 literature that you cite, many of those articles
25 include limitations of the research, yes?

Page 128

1        MS. COUCH:  Objection.  Broad.
2        THE WITNESS:  If you identify specific
3  articles, I can certainly answer that more
4  explicitly.  But, generally speaking, our published
5  articles include limitation sections.
6  BY MS. JONES:
7     Q.    Okay.  And you -- you acknowledge the
8  limitations that have been articulated by the
9  authors of those studies, yes?
10       MS. COUCH:  Objection.  Broad.
11       THE WITNESS:  Yeah.  That's too general
12 to answer.
13 BY MS. JONES:
14    Q.    Well, let me ask it a slightly
15 different way.
16       To the extent that you've cited a -- a
17 piece of literature by other academics and experts
18 in the field and those folks identified limits to
19 whatever their findings were -- are you with me?
20    A.    I'm with you.
21    Q.    -- do you accept the limitations that
22 they articulated with respect to their own research
23 and findings?
24       MS. COUCH:  Objection.  Vague.  Calls
25 for speculation.

Page 129

1        THE WITNESS:  I would need a specific
2  example to be able to answer that.
3  BY MS. JONES:
4     Q.    Well, do you -- can you think of a --
5  let me ask in general.  You read a lot of papers
6  of -- published papers as part of your work, yes?
7     A.    Yes.
8     Q.    Including papers that are published as
9  part of the peer-reviewed literature, yes?
10    A.    Yes.
11    Q.    And it is quite common -- maybe it
12 always happens -- that when research is published,
13 there is a section at the end where the authors
14 will acknowledge potential limitations in their
15 research and the findings, yes?
16    A.    There are limitations sections in most
17 empirically published articles.
18    Q.    Yes.  And, in fact, in your own
19 publications -- we'll look at this later -- you
20 include information on the limits of the
21 conclusions that you reach, right?
22    A.    There are limitations sections in
23 empirical papers.
24    Q.    Including yours, yes?
25    A.    Including mine.

Page 130

1    Q.   Okay.  And my question is:  You are not
2  going to come to court and say those authors were
3  wrong about the limitations that they expressed
4  with respect to their own data and findings, right?
5        MS. COUCH:  Objection.  Calls for
6  speculation.  She also doesn't know what she'll be
7  asked to testify to at court.
8        THE WITNESS:  I can't tell you about
9  that.
10 BY MS. JONES:
11   Q.   Well, would you generally do that when
12 you -- when you read the work of some other
13 researcher or academic?  Do you look at their
14 limitations and say, "I think they're wrong about
15 their limitations"?
16       MS. COUCH:  Objection.  Vague.  Broad.
17 Asked and answered.
18       THE WITNESS:  When I look at empirical
19 papers, I usually rely on the methods section and
20 the results section to come to my own conclusions
21 about the strengths of their research.
22 BY MS. JONES:
23   Q.   Do you usually review the limitations
24 section?
25   A.   I will review the limitations section,

Page 131

1  yes.
2    Q.   Do you usually review the conflict of
3  interest section when you review papers?
4    A.   I may or may not.
5    Q.   Is the information that's included in
6  the conflict of interest section, is that useful
7  for you to be aware of?
8        MS. COUCH:  Objection.  Vague.
9        THE WITNESS:  I'm not sure.
10 BY MS. JONES:
11   Q.   There are circumstances where you would
12 not want to know if an author on a paper had a
13 conflict of interest?
14       MS. COUCH:  Objection.  Vague.  Calls
15 for speculation.
16       THE WITNESS:  I'm not sure.
17 BY MS. JONES:
18   Q.   As part of your opinions in the case,
19 you relied on data that you yourself collected
20 as part of your research, right?
21   A.   As one part of my report, I include my
22 own data.
23   Q.   Yeah, understood.  And in your
24 research, you have collected data on social media
25 use at three points in time:  2020, 2021 and 2023.

Page 132

1  Is that right?
2    A.   We have a large longitudinal study that
3  spans now six years of data collection.
4    Q.   Yeah.  My question is:  Did you collect
5  the data in 2020, 2021 and 2023?
6        MS. COUCH:  Objection.  Vague.
7        THE WITNESS:  I have to look back.
8  There are more dates than that.  There's data
9  collected across many years of data, or many --
10 yeah.  There's data collected across many years.
11 BY MS. JONES:
12   Q.   Okay.  Are there other points in time
13 that you can recall collecting objective social
14 media use data?
15       MS. COUCH:  Objection.  Vague.
16       THE WITNESS:  We have been collecting
17 objective social media use data for the past five
18 years or more.
19 BY MS. JONES:
20   Q.   Okay.  And have -- are there instances
21 of collection that you are thinking of other than
22 2020, 2021 and 2023?
23       MS. COUCH:  Objection.  Vague.
24       THE WITNESS:  I'd have to look back at
25 the specific datasets.

Page 133

1  BY MS. JONES:
2    Q.   You don't know, sitting here today?
3        MS. COUCH:  Objection.  Vague.
4        THE WITNESS:  There are other datasets
5  beyond those years.
6  BY MS. JONES:
7    Q.   Well, I understand there are other
8  datasets.  My question was specifically about the
9  collection of objective social media use data and
10 whether there were collections other than in 2020,
11 2021 and 2023.
12       Is your testimony that there may have
13 been other collections of such data and you just
14 don't remember it?
15   A.   We --
16       MS. COUCH:  Objection.  Vague.
17       THE WITNESS:  We continue to collect
18 those data in 2024, 20 -- 2025 and into the future.
19 BY MS. JONES:
20   Q.   Are you relying on data that you say
21 you've collected in 2024 and 2025 in connection
22 with your opinions in this case?
23       MS. COUCH:  Objection.  Calls for a
24 legal response.
25       THE WITNESS:  Am I relying on data

HIGHLY CONFIDENTIAL

Page 134

1  collected in 2024 and 2025?  Is that what you
2  asked?
3  BY MS. JONES:
4      Q.   That is what I asked.
5          MS. COUCH:  Same objection.
6  BY MS. JONES:
7      Q.   Well, let me -- let me be clear about
8  my question.  In connection with the opinions that
9  you're offering in this case, are you relying on
10  data that was collected in 2024 or 2025?
11     A.   My --
12         MS. COUCH:  Objection.
13         THE WITNESS:  My opinions are based on
14 a totality of all the research I have done as well
15 as data collected and reported in the report.
16 BY MS. JONES:
17     Q.   And so I'm not sure if that's a "yes"
18 or a "no" to my question.  You have testified that
19 you think -- that you have also collected data in
20 2024 and 2025.  Did I hear that correctly?
21     A.   We have been collecting data for years,
22 including 2024 and 2025.
23     Q.   Now, focus on my question.  Are you
24 relying on data you collected in 2024 and 2025 for
25 purposes of your opinions in this case?

HIGHLY CONFIDENTIAL

Page 135

1          MS. COUCH:  Objection.  Argumentative.
2  Vague.  The basis of what she is relying upon is
3  listed in her report.
4          THE WITNESS:  I'm relying upon the
5  totality of everything reviewed in my report,
6  including my education, experience, talking to
7  parents, talking with teachers, the research that I
8  have done, the literature that I have reviewed to
9  come to my opinions.
10 BY MS. JONES:
11     Q.   So -- so you can't give me a "yes" or a
12 "no" on 2024 and 2025.  What about 2023?
13         MS. COUCH:  Asked and answered.
14 BY MS. JONES:
15     Q.   Are you -- are you relying on objective
16 social media use data that you collected in 2023 as
17 part of your opinions in this case?
18         MS. COUCH:  Asked and answered.  Vague.
19 Calls for a legal response basis in the report.
20         THE WITNESS:  My opinions are based on
21 the totality of everything included in my report.
22 BY MS. JONES:
23     Q.   Okay.  So you can't give me a "yes" or
24 "no" on that one --
25         MS. COUCH:  Asked and answered.

HIGHLY CONFIDENTIAL

Page 136

1  BY MS. JONES:
2      Q.   -- either.
3          Have you published on the 2025 data
4  that you've testified you collected?
5      A.   The 2025 data are ongoing data
6  collection.
7      Q.   Okay.  For some of the data we've been
8  discussing, you collected data on total screen
9  time, notifications and pickups and app-specific
10 data; is that right?
11     A.   That's correct.
12     Q.   Are you relying on that data in forming
13 your opinions in this case?
14         MS. COUCH:  Objection.  Calls for a
15 legal response.
16         THE WITNESS:  I'm relying on the
17 totality of the research and everything included in
18 my report to reach my opinions.
19 BY MS. JONES:
20     Q.   Okay.  So you can't answer that
21 question for me yes or no?
22         MS. COUCH:  Asked and answered.
23 Argumentative.
24         THE WITNESS:  I'm relying on everything
25 in my report.

HIGHLY CONFIDENTIAL

Page 137

1  BY MS. JONES:
2      Q.   Okay.  So I'll put that down as a
3  "can't answer yes or no."
4          (TELZER EXHIBIT 5, Excel printout
5  titled Smartphone Data, was marked for
6  identification.)
7  BY MS. JONES:
8      Q.   Let me hand you what we'll mark as
9  Exhibit Number 5.
10         MS. COUCH:  Asked and answered.
11         MS. JONES:  And we're also going to
12 mark Exhibit Number 6.
13         (TELZER EXHIBIT 6, Screen time school
14 data, was marked for identification.)
15 BY MS. JONES:
16     Q.   This is 5.
17         MS. JONES:  Are we able to put Tab 4 up
18 on the screen?
19         MS. ANTOINE:  Yeah.
20 BY MS. JONES:
21     Q.   Okay.  Dr. Telzer, you have in front of
22 you as Exhibit Number 5 what was produced to us in
23 an Excel file of -- that was entitled "Smartphone
24 Data."  Do you recognize that data?
25     A.   Yes.

HIGHLY CONFIDENTIAL

Page 138

1    Q.    Okay.  And then what we also will
2  have on the screen is what was produced -- that's
3  Exhibit Number 5.  And then Exhibit Number 6 is
4  what was produced to us as -- also as an
5  Excel MDL 2, which we will put up in a moment.
6        MS. COUCH:  So this one's Exhibit 5,
7  and they are about to show you a separate
8  exhibit they're going to talk about, too.
9  BY MS. JONES:
10    Q.    Yeah, Exhibit 5 is the one in front of
11  you.  So we're putting the other one on the screen
12  just because it's --
13        Okay.  So what we have up on the screen
14  and we have a placeholder for exhibit purposes
15  is Exhibit Number 6, which was produced to us by your
16  lawyers as MDL 2.  Do you recognize Exhibit Number
17  6?
18    A.    Yeah.
19    Q.    And these data, Exhibit Number 5 and
20  Exhibit Number 6, include data on total smartphone
21  screen time, pickups and notifications that you
22  collected, I believe, in 2021; is that right?
23    A.    Yep.
24    Q.    And neither Exhibit Number 5 nor
25  Exhibit Number 6 report data on individual platform

HIGHLY CONFIDENTIAL

Page 139

1  use; is that right?
2    A.    That's correct.
3    Q.    Did you collect that data?
4    A.    We collected the top apps that they
5  were using.  Our preliminary data includes the
6  specific social media data.
7    Q.    Do you know whether the data on
8  specific apps was produced in this case?
9        MS. COUCH:  Object to the form.
10        THE WITNESS:  Yes.  We shared all --
11  all of the data that we had.
12  BY MS. JONES:
13    Q.    Including the 2021 data on specific
14  platforms?
15    A.    That's included.
16        MS. COUCH:  Objection.  Vague.
17  BY MS. JONES:
18    Q.    You think you produced that?
19    A.    The -- can you say what you mean by
20  "specific platforms"?
21    Q.    I mean the data that actually looks at
22  what you gathered broken out by the specific social
23  media platforms --
24    A.    Sorry.  We don't have -- let me --
25    Q.    For 2021.

HIGHLY CONFIDENTIAL

Page 140

1    A.    I need a minute to look through my
2  report.
3    Q.    Okay.
4    A.    I'm trying to recall if we have it by
5  specific platform.
6    Q.    Dr. Telzer, you're obviously welcome to
7  look at whatever you want to, but if you look at
8  Page 121 of your report --
9    A.    Yeah, that's where I am.  Although,
10  1 -- I think 122.  Sorry.  That might be --
11    Q.    Yes, it carries over.
12    A.    Yeah.
13    Q.    Yeah, the section starts on 121.
14    A.    Yes, I shared those data.
15    Q.    Well, I want to be sure we're clear
16  about -- you discussed the data in your report,
17  right?
18    A.    Yes.
19    Q.    The -- the app-specific data for 2021,
20  correct?
21    A.    Yes.  Correct.
22    Q.    Do -- do you know whether that data was
23  provided to defense counsel in connection with your
24  production --
25    A.    Yes.

HIGHLY CONFIDENTIAL

Page 141

1    Q.    -- in this case?
2    A.    Yes, those data were provided.
3    Q.    Okay.  And to the extent that we don't
4  have it, it sounds like you have no objection to it
5  being provided to counsel?
6    A.    I have provided those data.
7    Q.    Well, that's not my question.  If -- if
8  we don't have it, it sounds like you have no
9  problem with us receiving it; is that right?
10        MS. COUCH:  Objection.  That would call
11  for something involving a legal response.  If you
12  have a specific request, specific, send it and
13  we'll respond.
14        MS. JONES:  Well, we -- we've made all
15  kinds of requests.  I just want to make sure that I
16  understand, with respect to Dr. Telzer, you don't
17  have an objection to the production of the specific
18  app data from 2021, which is described at Pages 121
19  to 122 of your report.
20        MS. COUCH:  That calls for a legal
21  objection [sic].  She's not able to make it.  To
22  the extent that there is a specific request, we
23  will work with her.  And if we can provide it, we
24  will.  But we -- she cannot answer that question.
25  BY MS. JONES:

Page 142

1      Q.   I'm not asking you as a lawyer.  I'm
2  asking you, as the person who collected the data
3  and has written about the data, does it give you
4  any concern that we would have access to that data?
5      A.   I've shared those.
6      MS. COUCH:  Objection.
7      THE WITNESS:  Sorry.
8  BY MS. JONES:
9      Q.   You think you've shared the data; is
10  that your testimony?
11      A.   I've shared the data.
12      Q.   Okay.  And when you say you've shared
13  the data, do you believe that the data has been
14  made available to your lawyer so they could give it
15  to us?
16      A.   Correct.
17      Q.   Okay.  Do you know one way or the other
18  whether it was actually produced to us?
19      A.   I don't know what was produced to you.
20      (TELZER EXHIBIT 7, Date showing total
21  screen time and total social media screen time, was
22  marked for identification.)
23  BY MS. JONES:
24      Q.   Okay.  Dr. Telzer, I'm handing you what
25  we've marked as Exhibit Number 7.  And this is --

Page 143

1  Dr. Telzer, you have in front of you a hard copy of
2  a spreadsheet that was produced to us.  I believe
3  the file name was MDL 1.  We also have it up on the
4  screen.
5      A.   Uh-huh.
6      Q.   Do you recognize that data?
7      A.   Yeah.
8      Q.   And that data shows total screen time
9  and total social media screen time, correct?
10      A.   Yes.
11      Q.   And that data was collected, and you're
12  welcome to flip through the hard copy, in 2023 and
13  2024?
14      A.   Yes.
15      Q.   In connection with that data, did
16  you -- strike that.
17      In connection with this particular
18  dataset, did you collect any data on notifications?
19      A.   I don't recall.
20      Q.   You don't know one way or the other?
21      A.   I don't recall.
22      Q.   Do you know whether you collected any
23  data on pickups?
24      A.   I don't recall.
25      Q.   Do you know whether you collected any

Page 144

1  data as part of this dataset on individual apps,
2  whether social media or some other kind of app?
3      A.   I don't recall.
4      Q.   And I take it that if you don't recall
5  whether you collected it or not, you're not --
6  you're not recalling having produced any of that to
7  your lawyers.  Is that fair?
8      A.   I'm confused by the question.  I'm
9  sorry.
10      Q.   Well, and my question is, perhaps, just
11  kind of inferring from your answer.
12      You say you don't recall whether you
13  collected data on notifications, pickups or
14  individual applications as part of this dataset in
15  Exhibit Number 7, right?
16      A.   Correct.
17      Q.   And I would assume by implication you
18  have no recollection of having given that data on
19  those particular items to counsel that you're
20  working with?
21      A.   I gave counsel all -- all the data that
22  is included in here.
23      Q.   Okay.  And when you say "in here," you
24  mean your report?
25      A.   In my report.

Page 145

1      Q.   All right.  Do you know to what extent
2  all that data was then transmitted to defense
3  counsel?
4      MS. COUCH:  Asked and answered.
5  BY MS. JONES:
6      Q.   It's okay if you don't.  I'm just
7  asking.
8      A.   I don't know, no.
9      Q.   Okay.
10      A.   I mean, this is all of the data right
11  here.
12      Q.   You mean Exhibit 7?
13      A.   Exhibit 7 is the data from the
14  2023-2024 that I shared.
15      Q.   Yes.  Right.  Okay.
16      And I guess, just -- just so I
17  understand, does that mean you don't believe that
18  you collected data on notifications, pickups or
19  specific apps?
20      A.   I don't recall what other data we have.
21      (TELZER EXHIBIT 8, Haag cleaned
22  dataset, was marked for identification.)
23  BY MS. JONES:
24      Q.   Okay.  So, Dr. Telzer, what you will
25  see on the screen is what we will mark for purposes

Page 146

```
 1   of the record as Exhibit Number 8.  This was
 2   produced to us, I believe, a couple of days ago by
 3   your counsel.
 4              Do you recognize Exhibit Number 8?
 5        A.   I think so.  Can you scroll to the top,
 6   please?
 7        Q.   Yeah.
 8              MS. JONES:  Could you scroll to the
 9   top, please?
10              THE WITNESS:  I can now see.  Yeah.
11   BY MS. JONES:
12        Q.   Okay.  And these are data on smartphone
13   use, including by app, from 2020; is that right?
14        A.   Yes.
15        Q.   And is what's reflected in
16   Exhibit Number 8 the entirety of the data on
17   objective smartphone use that you collected in
18   2020?
19              MS. COUCH:  Object to the form.  Vague.
20              THE WITNESS:  This is all of the data
21   that was represented in the Haag paper that I cite
22   to in my report.
23   BY MS. JONES:
24        Q.   Okay.  But I just want to make sure
25   I'm -- we're clear on the record.  Was there any
```

Page 147

```
 1   other data that was collected on objective
 2   smartphone use in 2020?
 3              MS. COUCH:  Objection.  Vague.
 4              THE WITNESS:  I couldn't tell you off
 5   the top of my head.
 6   BY MS. JONES:
 7        Q.   This is all you're recalling right now?
 8   Which is fine.  I'm just asking.
 9        A.   Yep.  This is the data that were in the
10   Haag paper, which is what I shared.
11        Q.   Okay.
12        A.   The specific data from that paper.
13        Q.   Dr. Telzer, are you familiar with the
14   names of --
15              MS. JONES:  We can take that down.
16   Thank you.
17   BY MS. JONES:
18        Q.   Are you familiar with the names of any
19   of the specific individual plaintiffs in this
20   litigation?
21        A.   The specific names?  What do you mean
22   by the "specific names"?
23        Q.   Well, do you understand who the
24   plaintiffs are in this litigation?
25        A.   Who the plaintiffs are?  The individual
```

Page 148

```
 1   people?
 2        Q.   Yes.
 3        A.   I may generally know from reading
 4   the -- the -- I don't even know what they're
 5   called.  Sorry.
 6        Q.   The -- like, the -- the complaints or
 7   the pleadings?
 8        A.   Yes.
 9        Q.   Yeah.  Okay.  That -- that's fine.
10              My -- my question was really just:  You
11   have an understanding that there are individual
12   either teenagers or their families who have brought
13   lawsuits against the defendants in the litigation?
14        A.   Uh-huh.
15        Q.   Do you have an understanding of that?
16        A.   I have an understanding of that.
17        Q.   Okay.  And you also understand that
18   there are school districts who -- that have brought
19   claims against the defendants as well?
20        A.   Generally speaking.
21        Q.   Generally speaking.  And I'm -- I'm
22   going to conclude from your reference to "generally
23   speaking" that you don't -- it would be fine if you
24   don't.
25              But you don't know the names of any
```

Page 149

```
 1   specific individual teenager or families who are
 2   bringing claims in these cases; is that right?
 3        A.   I can't tell you the names.
 4        Q.   Okay.  That's fine.  And you don't,
 5   similarly, know the names of any specific school
 6   district that's brought claims in the litigation;
 7   is that right?
 8        A.   I can't tell you the names off the top
 9   of my head.
10        Q.   Okay.  Did you -- and this may just
11   kind of naturally follow from your earlier
12   testimony.
13              But did you review medical records for
14   any of the individual plaintiffs who've brought
15   claims in these cases?
16        A.   No, I have not reviewed medical records
17   of the plaintiffs.
18        Q.   Okay.  And you're not offering opinions
19   on whether any individual plaintiff in the
20   litigation experienced some kind of change in brain
21   development as a result of using social media,
22   correct?
23        A.   I don't necessarily diagnose an
24   individual.  I conduct research that tells us very
25   broadly about some of these connections between
```

Page 150

1  social media use and brain development that we then
2  use to understand these processes in the
3  population.
4      Q.  I totally understand.  And my question
5  is really more -- a little more specific.
6          You are not coming into any individual
7  case and saying, "I know for plaintiff A, B or C
8  that that specific plaintiff experienced brain
9  changes as a result of using social media,"
10 correct?
11         MS. COUCH:  Vague.  Asked and answered.
12         THE WITNESS:  I --
13 BY MS. JONES:
14     Q.  And let -- let me be a little more
15 clear, just to be fair to you.
16         I understand that you have a general
17 opinion about brain changes as a result of social
18 media, yes?
19     A.  Sorry.  Say that again.
20     Q.  I understand that you have a general
21 opinion about brain changes resulting in teenagers
22 and adolescents as a result of using social media,
23 generally speaking, right?
24         MS. COUCH:  Vague.  Calls for legal
25 reasoning.

Page 151

1      THE WITNESS:  I have a very strong
2  opinion that social media is associated with causal
3  changes in the way that the brain is developing --
4  BY MS. JONES:
5      Q.  Sure.
6      A.  -- based on the literature and research
7  that I've conducted.
8      Q.  That's fine.  And my question is:  For
9  any individual teenager who might be a plaintiff in
10 these cases, you have not evaluated whether -- for
11 any individual teenager who is a plaintiff whether
12 social media caused those changes for that
13 particular teenager?
14         MS. COUCH:  Vague.  Asked and answered.
15         THE WITNESS:  I have not reviewed or
16 looked at the specific plaintiffs.  My role in this
17 case is to look at the broader literature and to
18 understand the causal mechanisms by which social
19 media is changing adolescent brain development.
20 BY MS. JONES:
21     Q.  Sure.  Okay.
22         Do you -- do you know, for any specific
23 teenager who might have a claim in these -- in this
24 lawsuit, whether anyone has offered the opinion
25 that social media caused changes to that individual

Page 152

1  teenager's brain?
2          MS. COUCH:  Objection.  Outside the
3  scope.
4          THE WITNESS:  I couldn't tell you.
5  BY MS. JONES:
6      Q.  Are you -- are you aware of how much
7  any specific plaintiff in this case used social
8  media?
9          MS. COUCH:  Objection.  Outside the
10 scope.
11         MS. JONES:  Counsel, I'm not sure I
12 understand what the "scope" objection is.  So I
13 think that's an improper objection.
14 BY MS. JONES:
15     Q.  You can answer my question.  Go ahead.
16         MS. COUCH:  Same objection.
17         THE WITNESS:  That's not within the
18 scope of the research that I've conducted.
19 BY MS. JONES:
20     Q.  Well, I'm not asking you about your
21 research.
22         MS. JONES:  And I am going to object to
23 the speaking objections.
24 BY MS. JONES:
25     Q.  My question is:  Are you aware for any

Page 153

1  of the individual teenagers who are plaintiffs in
2  these cases how much any one of them used social
3  media?
4          MS. COUCH:  Objection.  Outside the
5  scope.
6          THE WITNESS:  I can't speak to that.
7  BY MS. JONES:
8      Q.  Do you have any awareness for any of
9  the individual plaintiffs what specific social
10 media platforms they used?
11         MS. COUCH:  Same objection.
12         THE WITNESS:  I can't speak to that.
13 BY MS. JONES:
14     Q.  Do you know for what purposes any
15 individual plaintiff used social media?
16         MS. COUCH:  Same objection.
17         THE WITNESS:  I can't speak to that.
18 BY MS. JONES:
19     Q.  Can we agree that social media does not
20 change the brain of every teen who uses it?
21         MS. COUCH:  Objection.  Vague.
22         THE WITNESS:  I think there are
23 individual differences.  And my work has shown
24 that, to the extent that one uses social media in
25 more problematic ways, their brains are changing

Page 154

1  more in ways that are becoming hypersensitive to
2  their peer environment that could have lasting
3  effects on their well-being.
4  BY MS. JONES:
5      Q.  Sure.  And just to unpack that a little
6  bit, you said, "To the extent that one uses social
7  media in more problematic ways."  And we'll talk
8  about what you mean by that.
9          There are -- I assume you would
10  acknowledge, even if you accept that your general
11  proposition is true, there are teenagers for whom
12  the use of social media does not change their brain
13  development?
14          MS. COUCH:  Asked and answered.
15          THE WITNESS:  As I said, the ways in
16  which adolescents use social media, the more
17  problematic, that social media use will
18  fundamentally change the way their brain is
19  developing over the long term.
20  BY MS. JONES:
21      Q.  Okay.  But if they're -- and if -- it
22  sounds like embedded in your answer you acknowledge
23  that there are forms of social media use for
24  teenagers that are not problematic, yes?
25          MS. COUCH:  Asked and answered.

Page 155

1  BY MS. JONES:
2      Q.  Can we agree on that basic idea, that
3  social media use is not problematic for all
4  teenagers, right?
5          MS. COUCH:  Vague.
6          THE WITNESS:  There's variability and
7  the extent to which it might be problematic for
8  somebody, with some teens experiencing much more
9  problematic use than others.
10  BY MS. JONES:
11      Q.  Are you -- are you offering the opinion
12  under oath that for every teenager who uses social
13  media that it's always problematic in some form?
14          MS. COUCH:  Asked and answered.
15          THE WITNESS:  As I said, there are
16  individual differences and variability and how
17  problematic it is, ranging from low levels to
18  extremely high levels of problematic use.
19  BY MS. JONES:
20      Q.  Sure.  But for some teenagers, social
21  media use is not problematic -- right? -- even
22  under your theory?
23          MS. COUCH:  Vague.
24  BY MS. JONES:
25      Q.  Right?

Page 156

1          MS. COUCH:  Same objection.
2          THE WITNESS:  There's variability in
3  the population with problematic use, ranging from
4  low levels to extremely high levels of problematic
5  use.
6  BY MS. JONES:
7      Q.  But are you offering the opinion that
8  all use of social media by teenagers is problematic
9  use by definition?
10          MS. COUCH:  Object to the form.
11          THE WITNESS:  The ways in which
12  adolescents use social media based on many of the
13  platform features make it much more harmful for
14  them.  And I discuss in my report all of those
15  features of social media that make it more harmful.
16  BY MS. JONES:
17      Q.  Okay.  Is there anywhere that I would
18  find in your published works where you have said
19  social media use is problematic for all teenagers
20  to some extent?
21          MS. COUCH:  Vague.
22          THE WITNESS:  As I said, there's
23  variability in how problematic social media is,
24  ranging from low levels of problematic use to very
25  high levels of problematic use.

Page 157

1  BY MS. JONES:
2      Q.  Well, let -- let me ask you a kind
3  of -- a more specific question.
4          If a teenager uses social media for
5  15 minutes a day to connect with friends from
6  school and family members, would you characterize
7  that as problematic use under your theory?
8      A.  I would need --
9          MS. COUCH:  Objection --
10          Let me get my objection in.
11          THE WITNESS:  Yeah.
12          MS. COUCH:  Objection.  Incomplete
13  hypothetical.  Vague.
14          THE WITNESS:  I would need to see a
15  specific example and more data to be able to speak
16  to that.
17  BY MS. JONES:
18      Q.  What more would you need to know --
19          MS. COUCH:  Objection.
20  BY MS. JONES:
21      Q.  -- to determine whether that teenager's
22  use is problematic, 15 minutes a day communicating
23  with friends from school and family members?
24          MS. COUCH:  Objection.  Vague.
25  Calls -- incomplete hypothetical.  And calls for

Page 158

1  speculation.
2         THE WITNESS:  In that hypothetical,
3  it's hard to say.  I would need a specific example
4  from data with more understanding of what it is
5  that they -- what features they're using, what
6  they're being -- what they're doing on that
7  platform.
8         Time spent on social media is not the
9  end-all be-all.  It's the features of social media
10 that make it more problematic.
11 BY MS. JONES:
12     Q.  Well, and the content, right?
13         What -- what teens actually see on
14 social media is part of what might create an issue
15 under your theory, right?
16         MS. COUCH:  Objection.  Vague.
17         THE WITNESS:  The content is changed by
18 the features of social media, and those features
19 are what make it harmful.
20 BY MS. JONES:
21     Q.  Okay.  So is there any scenario in
22 which you would say a teen could use social media
23 and it not be problematic?
24         MS. COUCH:  Objection.  Vague.
25         THE WITNESS:  It's difficult to

Page 159

1  speculate in these hypotheticals.
2  BY MS. JONES:
3      Q.  Sure.  But I'm just -- you understand
4  this is our opportunity to understand exactly what
5  the metes and bounds are of your opinions, and I
6  want to make sure I understand.
7          Are you offering the opinion that
8  teen -- any teenager -- any teen use of social
9  media is problematic?
10         MS. COUCH:  Objection.  Vague.
11 BY MS. JONES:
12     Q.  Is that your opinion?
13     A.  My opinion is:  The ways in which the
14 platforms affect those experiences, based on those
15 features, make it more or less risky and harmful
16 for adolescents, and that problematic social media
17 use varies among adolescents from low levels to
18 extremely high levels.
19     Q.  And is it your testimony that every
20 teenager who uses social media experiences brain
21 changes, whether they're big or small?
22         MS. COUCH:  Asked and answered.
23         THE WITNESS:  There are variabilities
24 within the population.  That level of problematic
25 use can determine the ways in which the brain is

Page 160

1  changing.
2  BY MS. JONES:
3      Q.  Okay.  For the specific plaintiffs
4  involved in this litigation, do you know anything
5  about what was going on in their individual lives
6  beyond the fact that they were using social media?
7          MS. COUCH:  Asked and answered.
8          THE WITNESS:  I couldn't tell you.
9  BY MS. JONES:
10     Q.  Could you agree with me that what else
11 is going on in a teenager's life affects that
12 teenager's mental health and well-being, generally
13 speaking?
14         MS. COUCH:  Calls for speculation.
15 Broad.  Vague.
16 BY MS. JONES:
17     Q.  You can't agree with that, or can you?
18     A.  Broadly speaking, there are lots of
19 things that contribute to adolescents' daily lives.
20     Q.  Including things outside of social
21 media, yes?
22         MS. COUCH:  Broad.  Incomplete
23 hypothetical.
24         THE WITNESS:  It's hard to speak on
25 that hypothetical.

Page 161

1  BY MS. JONES:
2      Q.  Yeah.
3          MS. JONES:  Counsel, the speaking
4  objections are inappropriate.
5          MS. COUCH:  You make them in California
6  State Court.  I'm sure you're aware.
7          MS. JONES:  I -- I don't -- frankly, I
8  don't live in California.  I think the -- I think
9  the speaking objections are inappropriate.  If they
10 continue, we might have to get --
11         MS. COUCH:  No.  You make -- I'm sure
12 someone here can tell you, in California State
13 Court, you have to give the opportunity to correct
14 the question --
15         MS. JONES:  Yeah, you can -- I -- I --
16         MS. EHLER:  Just say, "Objection to
17 form."
18         MS. JONES:  I'm -- I --
19         MS. COUCH:  No, you don't.
20         MS. JONES:  Counsel --
21         MS. COUCH:  Not in California State
22 Court.  I have the code.
23         MS. JONES:  You are -- you are welcome
24 to object to form if there is something that I can
25 correct about the question in terms of the form of

Page 162

1  the question.  It's not appropriate for you to be
2  channeling answers to your witness.
3  BY MS. JONES:
4      Q.  Dr. Telzer --
5          MS. COUCH:  I will continue --
6  BY MS. JONES:
7      Q.  -- let me go back --
8          MS. COUCH:  -- to make my objections
9  per California code.
10         MS. JONES:  Well, our objection is
11 noted.  If we need to call the judge on --
12         MS. COUCH:  You're welcome to.
13         MS. JONES:  -- lunch break, we will do
14 that.
15         MS. COUCH:  I have her number.
16 BY MS. JONES:
17     Q.  Dr. Telzer, before the back-and-forth
18 with your lawyer, I think you had agreed that there
19 are other things that affect a teenager's mental
20 health and well-being beyond social media.  Is that
21 fair to say?
22     A.  There are many things that affect
23 adolescents in their daily lives.
24     Q.  Okay.  And that can include what's
25 going with -- on with them at school, right?

Page 163

1      A.  School can impact adolescents.
2      Q.  Okay.  That can include what's going on
3  in their home life, yes?
4      A.  Home can impact adolescents.
5      Q.  Okay.  That can include whether a
6  teenager has suffered any sort of physical abuse or
7  harm, right?
8      A.  Yes.
9      Q.  And you understand that there is data
10 to support the view that the pandemic impacted the
11 well-being of some teenagers, yes?
12     A.  Yes.
13         MS. COUCH:  Lacks foundation.
14         Let me get my objection in, Dr. Telzer.
15 BY MS. JONES:
16     Q.  For any individual plaintiff in these
17 cases, do you know one way or the other whether the
18 claimed harms were caused by anything that any of
19 the defendants did or did not do for the individual
20 plaintiffs in these cases?
21         MS. COUCH:  Objection.  Outside the
22 scope.
23         THE WITNESS:  I couldn't say.
24 BY MS. JONES:
25     Q.  And am I right in understanding that

Page 164

1  part of the reason you couldn't say that is because
2  you don't know anything about the individual
3  plaintiffs' circumstances, family, school, what
4  else was going on with them?
5          MS. COUCH:  Asked and answered.
6  BY MS. JONES:
7      Q.  Is that fair?
8      A.  I don't need to know about those
9  individual circumstances.  That's not the point of
10 my report or opinions.
11     Q.  And -- and just to be very clear what
12 you mean by "that's not the point," it wasn't the
13 point of your report and opinions to draw
14 conclusions about whether for any individual
15 plaintiff something that happened with them was
16 caused by social media, right?
17         MS. COUCH:  Asked and answered.  Calls
18 for a legal reasoning.
19         THE WITNESS:  That's outside of the
20 scope of my role here to understand the broad
21 literature of how social media is causally
22 impacting adolescent brain development.
23 BY MS. JONES:
24     Q.  Dr. Telzer, let me ask you to go to
25 Page 6 of your report.  You can look at whatever

Page 165

1  version of it that you want to.
2          At the very top of your -- of Page 6,
3  there is a bullet point that begins with:  In
4  addition to.
5          Do you see that?
6      A.  Uh-huh.
7      Q.  You have to say "yes" or "no."
8      A.  Yes.
9      Q.  It says:  In addition to these clinical
10 effects, heavy social media use changes the
11 development of the adolescent brain, altering it
12 from what would have been considered typical prior
13 to the advent of social media.
14         Do you see that?
15     A.  Yep.
16     Q.  And I want to ask, before we get into
17 the kind of talking about that a little bit more:
18 Have you ever published that specific position in
19 your peer-reviewed work?
20     A.  This opinion is based on the totality
21 of all the literature review and research that I
22 have done.  Sure.  My question is more specific.
23     Q.  If I looked at everything that you had
24 co-authored --

HIGHLY CONFIDENTIAL

Page 166

1    A.   Uh-huh.

2    Q.   -- or authored on your own and

3  published in the peer-reviewed literature, would I

4  find that opinion expressed anywhere?

5         MS. COUCH:  Objection.  Vague.  Asked

6  and answered.

7         THE WITNESS:  This opinion is based on

8  all of the literature that I reviewed.  These --

9  this specific opinion is based on many different

10  studies that have been conducted and my review of

11  all of that literature.

12  BY MS. JONES:

13    Q.   Okay.  So it sounds like you could not

14  point me to a specific study today where you have

15  used that particular -- offered that particular

16  view that you have published?

17         MS. COUCH:  Asked and answered.

18         THE WITNESS:  This is --

19  BY MS. JONES:

20    Q.   Let me ask the question a different

21  way.

22         We have actually looked at, I think,

23  just about everything you've ever written.  And

24  nowhere in your peer-reviewed publications have I

25  seen you offer the opinion as an academic, as a

HIGHLY CONFIDENTIAL

Page 167

1  researcher that heavy social media use changes the

2  development of the adolescent brain, altering it

3  from what would have been considered typical prior

4  to the advent of social media.

5         I have not seen that, the team has not

6  seen that in any of your published work.

7         Am I missing something in something

8  that you have co-authored or authored in the

9  peer-reviewed literature where you have offered

10  that opinion?

11         MS. COUCH:  Objection.  Misstates --

12  BY MS. JONES:

13    Q.   Are you thinking of something that I

14  have somehow not seen?

15         MS. COUCH:  Objection.  Misstates her

16  testimony.  Lacks foundation.  Asked and answered.

17         MS. JONES:  I don't know how she could

18  lack foundation to answer questions about her own

19  research.

20         MS. COUCH:  Your question lacks the

21  foundation.

22  BY MS. JONES:

23    Q.   Can you answer my question, Dr. Telzer?

24    A.   This opinion is based on the totality

25  of all of the research and the combination of all

HIGHLY CONFIDENTIAL

Page 168

1  of those studies and research together.

2    Q.   Okay.  So you think your research

3  collectively adds up to heavy social media use

4  changes the development of the adolescent brain,

5  altering it from what would have been considered

6  typical prior to the advent of social media?

7         MS. COUCH:  Misstates her answer.

8         THE WITNESS:  My opinion is based on my

9  research as well as the review of all of the

10  literature.  And the totality of that is what is

11  based -- is what my opinion is based on.

12  BY MS. JONES:

13    Q.   But there's not -- there's not a

14  specific article you're thinking of.  I just want

15  to make sure that we have not missed something.

16         There is not a specific article that

17  you're thinking of where you've said that?

18         MS. COUCH:  Asked and answered.

19         THE WITNESS:  Is there?

20  BY MS. JONES:

21    Q.   I'm -- I'm legitimately curious.  Is

22  there a specific article that you're thinking of

23  where you have offered that view?

24         I understand your point about

25  everything all together culminates in that.  My

HIGHLY CONFIDENTIAL

Page 169

1  question is:  Is there a specific article that you

2  have in mind where you've offered that opinion?

3         MS. COUCH:  Argumentative.  Asked and

4  answered.

5         THE WITNESS:  This opinion is based on

6  all of the research together, both my research and

7  the research of other scientists out there.  And

8  the totality of that together is what my opinion is

9  based upon.

10  BY MS. JONES:

11    Q.   Okay.  So I'm not missing something, it

12  sounds like.

13         Do you agree that there's a difference

14  between "association" and "causation"?

15         MS. COUCH:  Vague.

16         THE WITNESS:  I would say that it is --

17  it's tricky to understand that without more

18  context.

19  BY MS. JONES:

20    Q.   In the context of your work as an

21  academic researcher --

22    A.   Uh-huh.

23    Q.   -- are you familiar with the concept of

24  there being a difference between "association" and

25  "causation"?

Page 170

1    A.   The two are often used interchangeably.
2    Q.   Well, that was not my question.
3         My question was:  Are you aware of
4  there being a difference between "association" and
5  "causation"?
6         MS. COUCH:  Asked and answered.
7         THE WITNESS:  Those are two -- those
8  are two different words.
9  BY MS. JONES:
10    Q.   Okay.  And, in fact, they -- they are
11  also two different concepts, right?
12    A.   Not necessarily.  They're used
13  interchangeably often in research.
14    Q.   Okay.  But they are often very
15  expressly treated as different things, right?
16         MS. COUCH:  Vague.
17  BY MS. JONES:
18    Q.   Let me ask you this way.  Two things
19  can be associated with each other, but there might
20  not be a causal relationship between the two; is
21  that right?
22    A.   We often use the word "association" to
23  mean that one is likely to cause the other.
24    Q.   That's -- that's not my question.
25         My question was:  Two things can be

Page 171

1  associated with each other --
2    A.   Uh-huh.
3    Q.   -- but they might not have a causal
4  relationship, right?
5         MS. COUCH:  Objection.  Vague and
6  ambiguous.
7         THE WITNESS:  Without seeing it
8  specifically, it's hard to answer that.
9  BY MS. JONES:
10    Q.   You can't answer the question of
11  whether there are two -- you can have two things
12  that are associated but aren't necessarily causally
13  related?
14         MS. COUCH:  Argumentative.  Asked and
15  answered.
16         THE WITNESS:  I would need a specific
17  example to answer that specifically.
18  BY MS. JONES:
19    Q.   Okay.  Is there a difference between
20  "correlation" and "causation"?
21         MS. COUCH:  Vague.
22         THE WITNESS:  Similarly, we will often
23  use the two terms sometimes interchangeably.
24  BY MS. JONES:
25    Q.   Who is "we"?  You use the terms

Page 172

1  "correlation" and "causation" interchangeably?
2    A.   The two words are often used to mean
3  the same thing.  We know that, I think, a -- a
4  correlation can be causal.
5    Q.   In -- in your -- well, that's certainly
6  true.  It's possible that two things that are
7  correlated may --
8    A.   Uh-huh.
9    Q.   -- also be causal --
10    A.   Uh-huh.
11    Q.   -- causally related.  Yes?
12    A.   Uh-huh.
13    Q.   Yes?  You have to say "yes" or "no."
14    A.   Yes.
15    Q.   But you can have two things that are
16  correlated with each other that are not, in fact,
17  causally related, right?
18    A.   You can have two things that are
19  correlated that are not causal.
20    Q.   Okay.  And, similarly, you can have --
21  you can have two things that are associated with
22  each other where there is a causal relationship,
23  right?
24    A.   Yes.
25    Q.   But you can also have two things that

Page 173

1  are associated with each other that are not
2  causally related, right?
3    A.   Generally speaking.
4    Q.   Okay.  In -- in your -- in your work as
5  an academic researcher and someone who publishes in
6  the peer-reviewed literature --
7    A.   Uh-huh.
8    Q.   -- do you aim to be precise?
9         MS. COUCH:  Objection.  Vague.
10         THE WITNESS:  I mean --
11  BY MS. JONES:
12    Q.   Let me ask more specifically.
13    A.   Yeah.
14    Q.   Do you aim to be precise in your use of
15  terminology when you are publishing in the
16  peer-reviewed literature?
17         MS. COUCH:  Objection.  Vague.
18         THE WITNESS:  Yeah, it's difficult to
19  answer so -- with such a broad stroke.  Of course I
20  want to be precise.
21  BY MS. JONES:
22    Q.   Okay.  You want to be precise.
23         And -- and, in fact, the -- the peer
24  review process, part of the purpose of the peer
25  review process is so people outside of just the

HIGHLY CONFIDENTIAL

Page 174

1  authors have a chance to look at the data and how
2  you've described it and described your findings,
3  right?
4      A.    Correct.
5      Q.    And part of the peer review process is
6  intended to try to encourage precision.  Is that
7  fair to say --
8      A.    Correct.
9      Q.    -- generally speaking?
10     Do you, in your academic research and
11  written work, use the words "association" and
12  causation interchangeably when you submit something
13  for peer review?
14     A.    In my peer review, "association" often
15  means "causal."  For -- with all due respect, in
16  academic language, we often don't use the word
17  "causal" in any specific example and use the word
18  "associate."
19     Q.    Yeah, I'm not sure that was an answer
20  to my question.
21     My question is:  When you submit
22  something for peer review --
23     A.    Uh-huh.
24     Q.    You have to say "yes" or "no."  I'm
25  just letting you know since I hear you "uh-huh,"

HIGHLY CONFIDENTIAL

Page 175

1  which is a natural impulse.
2      When you submit something for peer
3  review, are you using the words "association" and
4  "causation" interchangeably?
5      MS. COUCH:  Vague.
6      THE WITNESS:  We often use the word
7  "association" as a form of causation in our
8  research in a singular empirical article.
9  Depending on the method used, we may use those two
10  words interchangeably.
11  BY MS. JONES:
12     Q.    Have you -- can you think of a specific
13  circumstance where you've done that, where instead
14  of -- where you have used the word "association" to
15  mean "causation"?  Is there something you're
16  thinking of specifically?
17     A.    Not specifically.
18     Q.    Okay.  Same question with respect to
19  "correlation."  When you are submitting your
20  academic written work for peer review, are you
21  using the words "correlation" and "causation"
22  interchangeably?
23     A.    In our peer-reviewed -- or in my
24  peer-reviewed research, we use the word
25  "correlation" very narrowly to mean that we ran a

HIGHLY CONFIDENTIAL

Page 176

1  correlation analysis.  So we would not use those
2  words interchangeably because the statistic is a
3  correlation.
4      Q.    Okay.  I actually want to show you --
5  Ms. Antoine is going to yell at me.
6      I actually want to show you another
7  video.  This is going to be Tab 54.  And -- and I
8  should tell you, Dr. Telzer, we have the full
9  videos.  If your counsel wants to show you the
10  whole thing on the lunch break and you have
11  something -- you know, there's some different thing
12  in there you want to bring up, you can.  But for
13  time purposes, I'm showing you the stuff that we
14  need to ask you about.
15     MS. COUCH:  So will you send us the
16  full video --
17     MS. ANTOINE:  Yes.
18     MS. COUCH:  -- via email?
19     And then, Dr. Telzer, you're welcome to
20  answer the questions, if you can, based upon a
21  selective showing.
22     MS. JONES:  Of course she's permitted
23  to answer the question.  She's under oath.
24     (TELZER EXHIBIT 9, 2023 WRAL-TV News
25  Clip, was marked for identification.)

HIGHLY CONFIDENTIAL

Page 177

1      MS. JONES:  Okay.  Let's play Tab 54.
2  This is going to be Exhibit 9 to the deposition.
3      THE TECHNICIAN:  This is D as in "dog"?
4      MS. JONES:  Yes, please.
5      (Playing video.)
6  BY MS. JONES:
7      Q.    Dr. Telzer, that was you, just to be
8  clear, yes?
9      A.    Correct.
10     Q.    Okay.  And we can get you something
11  separately to kind of establish the date, but I
12  will represent to you that that was an interview
13  that you gave in May of 2023.
14     Do you remember giving that interview
15  to WRAL in May of 2023?
16     A.    Yes.
17     Q.    Okay.  And I want to ask you about a
18  couple of things that you said.  One is, "The data
19  are continuing to come out, and there's just not
20  enough causal evidence yet to make these claims
21  that social media is causing depression."
22     You saw that, yes?
23     A.    Yes.
24     Q.    Was -- let me just ask you generally:
25  When you go on the news and offer your views to the

Page 178

1  public on these issues, you are aiming to be
2  honest, yes?
3      A.  Correct.
4      Q.  You are aiming to be accurate, yes?
5      A.  Correct.
6      Q.  You would not go out on the news and
7  knowingly say something that you did not believe to
8  be true.  Is that fair to say?
9      A.  Yes.
10     Q.  Okay.  And so you said -- and when you
11 said, "The data are continuing to come out and
12 there's just not enough causal evidence yet to make
13 these claims that social media is causing
14 depression," was that what you believed in 2023?
15         MS. COUCH:  Objection.  Vague.
16         THE WITNESS:  The literature has
17 accumulated exponentially.  I can't necessarily
18 speculate on 2023 or recall specifically.  But
19 since then, we can make -- based on the totality of
20 all of the research and all of the emerging studies
21 that have come out, including several this week
22 that are coming out with using these more rigorous
23 methods -- longitudinal designs, within-person
24 designs, experimental designs -- all of those
25 together can really confidently now tell us that

Page 179

1  there are causal links between social media use and
2  depression.
3  BY MS. JONES:
4      Q.  Okay.  And we'll come back to what you
5  think has happened up to today.  My question is:
6  In May of 2023, did Dr. Eva Telzer believe it was
7  true that data are continuing to come out and
8  there's just not enough causal evidence yet to make
9  these claims that social media is causing
10 depression?  Did you believe that when you said it
11 on the news in 2023?
12         MS. COUCH:  Asked and answered.  Calls
13 for speculation.
14         THE WITNESS:  I can't speculate on my
15 beliefs in 2023.  I said that statement, yes.
16 BY MS. JONES:
17     Q.  You said the statement.  And you told
18 me, "I don't go on the news and try to lie to
19 people," right?
20     A.  Uh-huh.
21     Q.  Yes?
22     A.  Yes.
23     Q.  Okay.  And so if you got up on the news
24 and said something, it's probably reasonable to
25 conclude that you were aiming to be accurate, yes?

Page 180

1      A.  Yes.
2      Q.  All right.
3          MS. COUCH:  Objection.  Argumentative.
4  BY MS. JONES:
5      Q.  Even though you can't speculate about
6  what you thought two years ago, we can safely
7  conclude Dr. Telzer in May of 2023 did not go on
8  WRAL and tell the people of this community
9  something she did not believe to be true as an
10 academic, correct?
11         MS. COUCH:  Argumentative.
12 BY MS. JONES:
13     Q.  We can assume that, yes?
14     A.  What I --
15         MS. COUCH:  Same objection.
16 BY MS. JONES:
17     Q.  Let me ask my question again given all
18 the objections.
19         We can assume, based on what you've
20 told me about your desire to be accurate and
21 truthful when you communicate about your views --
22     A.  Uh-huh.
23     Q.  -- that you did not go out on the news
24 in 2023 and tell the people of this community
25 something that you did not believe to be true,

Page 181

1  right?
2          MS. COUCH:  Same objection.
3          THE WITNESS:  I said those sentences
4  that you read.  There's not the broader context of
5  the literature that has come out since then.
6  BY MS. JONES:
7      Q.  Sure.  And I'm just -- I'm just talking
8  about the 2023 version of yourself, okay?
9      A.  Sure.
10     Q.  We were all different people and
11 younger.  But in 2 -- I certainly was.
12         In 2023, Dr. Telzer believed and told
13 the world that data are continuing to come out;
14 there's just not enough causal evidence yet to make
15 these claims that social media is causing
16 depression, right?
17         MS. COUCH:  Argumentative.  Asked and
18 answered.
19         THE WITNESS:  In that interview, I said
20 those words that you've read.
21 BY MS. JONES:
22     Q.  And you believed them, right?
23         MS. COUCH:  Same objection.
24         THE WITNESS:  I can't speculate on my
25 beliefs at the time.

Page 182

1  BY MS. JONES:
2       Q.  You don't know if you believed what you
3  said on the news in 2023?
4            MS. COUCH:  Argumentative.  Asked and
5  answered.
6            THE WITNESS:  I said those statements.
7  I also had a broader -- there's a broader context
8  to that.  I also went on to say that these effects
9  are there; that social media is related to
10 depressive symptoms; there may be bidirectional
11 effects.  But I did not say that social media does
12 not relate to depression.
13 BY MS. JONES:
14      Q.  Well, what you said was, "There's not
15 enough causal evidence yet to make these claims
16 that social media is causing depression."  Those --
17 those are the words you said, yes?
18           MS. COUCH:  Misstates the full
19 interview.
20           THE WITNESS:  I said those statements.
21 BY MS. JONES:
22      Q.  Okay.
23      A.  There's the broader context.
24      Q.  Okay.  That's fine.
25           Have you gone back to WRAL and said,

Page 183

1  "I, Dr. Telzer, have changed my mind, and I now
2  think that social media causes depression"?
3            MS. COUCH:  Misstate --
4  BY MS. JONES:
5       Q.  Yes or no?
6            MS. COUCH:  Misstates her testimony.
7            You don't have to give a "yes" or "no"
8  question -- answer.  You can answer fuller.
9  BY MS. JONES:
10      Q.  My -- my question is actually pretty
11 direct and pretty simple, I think.
12           My question is:  Now that you have
13 determined that social media does cause depressive
14 symptoms or brain changes that lead to depressive
15 symptoms, have you gone back to WRAL and said,
16 "Hey, I've now concluded that, in fact, causation
17 does exist"?
18           MS. COUCH:  Misstates her testimony.
19           THE WITNESS:  There is mounting
20 evidence, and the science is continuing to inform
21 our knowledge.
22           It is an iterative process.  We can't
23 go back and correct every earlier piece that
24 existed.  We continue to build upon what we know
25 and make these...

Page 184

1            The purpose of this, my opinions are
2  here for the purposes of our case, having done all
3  of this research on all of the emerging research
4  that has come out.
5  BY MS. JONES:
6       Q.  Sure.  The -- the -- the long report
7  you generated being paid by the lawyers, I
8  understand, you did that in a specific context.
9            If you had concluded that social media
10 was causing depression in young people, do you not
11 think that's something that you should tell
12 somebody outside of the context of litigation if
13 you really thought that were true?
14           MS. COUCH:  Argumentative.  Misstates
15 her prior testimony.
16           THE WITNESS:  I continue to update and
17 talk to the community and schools and teenagers and
18 teachers all the time about my opinion that social
19 media is causing and disrupting adolescents'
20 well-being.
21 BY MS. JONES:
22      Q.  Okay.  You think you've said that out
23 in the world?
24      A.  Yes.
25      Q.  Okay.

Page 185

1            MS. COUCH:  We need to take a break.  I
2  would think a lunch break would make sense, but --
3  given that it's 12:22 p.m. and I see that it's
4  here.  But if you would like to discuss that
5  otherwise, let me know.
6            MS. JONES:  I don't mind taking a
7  break, but I'd like to finish this one little bit
8  before we do that.
9            MS. COUCH:  I need to take a break now.
10 So I can be back in five minutes.
11           MS. JONES:  Okay.  Can your -- can we
12 otherwise sit here and wait for you to come back if
13 we're breaking for you specifically?
14           MS. COUCH:  You can do whatever.
15           MS. JONES:  I'm sorry.  Can we go off
16 the record, please?  Because I don't want to use my
17 time on this.
18           THE VIDEOGRAPHER:  Going off the
19 record.  The time is 12:22 p.m.
20                   * * *
21           (Whereupon, there was a recess in the
22 proceedings from 12:22 p.m. to 12:27 p.m.)
23                   * * *
24           THE VIDEOGRAPHER:  Going back on the
25 record.  The time is 12:27 p.m.

Page 186

1    (TELZER EXHIBIT 10, Heels Care Network
2  document titled Mental Health Seminar:  Digital
3  Minds, was marked for identification.)
4  BY MS. JONES:
5    Q.   Okay.  Dr. Telzer, I'm going to hand
6  you what we've marked as Exhibit Number 10.
7    And earlier we showed you what I think
8  was our Exhibit Number 1, which is the -- which was
9  the video of you discussing this issue of whether
10 there needs to be caution in making causal claims.
11   Do you remember generally us talking
12 about that video?  If you need to see it again, I
13 can show it to you.
14   A.   I think so, yeah.
15   Q.   Okay.
16   A.   I mean, when you just showed a slide?
17 I'm sorry.  I don't -- maybe I don't recall.
18   Q.   We showed a slide from a larger video.
19   A.   Yep.
20   Q.   Do you remember that?
21   A.   Yep.
22   Q.   Okay.
23   MS. COUCH:  And I would just request
24 again.  Please send us the --
25   MS. JONES:  Yes.

Page 187

1    MS. COUCH:  -- exhibits you are showing
2  her.
3    MS. ANTOINE:  The Wi-Fi makes it very
4  hard to download, so...
5  BY MS. JONES:
6    Q.   Dr. Telzer --
7    MS. JONES:  And, Ryan, do we have the
8  full video that --
9    THE TECHNICIAN:  Yes.
10   MS. JONES:  -- we could show just the
11 beginning part of it?  I just want to -- her to be
12 able to see the first --
13   THE TECHNICIAN:  Of which one?
14   MS. JONES:  78, I'm sorry.  While
15 you're looking for that...
16 BY MS. JONES:
17   Q.   Dr. Telzer, what I've handed you is
18 what we've marked as Exhibit Number 10.
19   Do you see Exhibit Number 10?
20   A.   Uh-huh.
21   Q.   You have to say "yes" or "no."
22   A.   Yes.
23   Q.   And you see that -- this is something
24 that we printed off of a website for the Heels Care
25 Network.

Page 188

1    Do you see that?
2    A.   I see that.
3    Q.   And the heading is "Mental Health
4  Seminar:  Digital Minds," yes?
5    A.   Yes.
6    Q.   And you see the date there is
7  February 18th, 2025, yes?
8    A.   Uh-huh.
9    Q.   You have to say "yes" or "no."
10   A.   Yes.
11   Q.   It goes on to say:  The first seminar
12 in the spring 2025 Mental Health Seminar series,
13 "Digital Minds:  Brain Development in the Age of
14 Technology."
15   Do you see that?
16   A.   Uh-huh.
17   Q.   You have to say "yes" or "no."
18   A.   Yes.
19   Q.   Do you see that you're specifically
20 featured there as the speaker at that seminar in
21 2025?
22   A.   Yep.
23   Q.   Okay.  Do you -- and if you look at the
24 second page of Exhibit Number 10, there is --
25   MS. JONES:  Do we have it?

Page 189

1  BY MS. JONES:
2    Q.   -- there is a specific reference at the
3  bottom to -- there's a picture of you.  Up in the
4  upper right-hand corner, that's you, yes?
5    A.   Yes.
6    Q.   And then at the bottom, it says:  The
7  mental health seminar took place on February 17th,
8  from 12 p.m. to 1:30 p.m. via Zoom.
9    Do you see that?
10   A.   Yeah.
11   Q.   Do you recall participating in that
12 seminar?
13   A.   Yes.
14   Q.   Okay.  Now, I'm going to represent to
15 you that what we showed you at the beginning of the
16 deposition --
17   A.   Uh-huh.
18   Q.   -- was from that seminar.  Does that
19 sound accurate to you, or do I need to show you the
20 first part of it?
21   A.   Do you mean the slide that you put up
22 is from this?
23   Q.   Yes.  Yes.
24   A.   Sure.
25   Q.   Okay.

HIGHLY CONFIDENTIAL

Page 190

1     MS. JONES:  Can we just show the first
2  part of that so she can see the -- the first slide
3  that shows the title of the seminar?
4         (Playing video.)
5     MS. JONES:  Okay.  Can we pause it
6  there, please?
7  BY MS. JONES:
8     Q.  Okay.  Dr. Telzer, you now have in
9  front of you what was the first slide from the
10 presentation that was given in February of 2025.
11    Do you see that?
12    A.  Uh-huh.
13    Q.  You have to say "yes" or "no."
14    A.  Yes.
15    Q.  And the title of the slide matches
16 what's reflected here in Exhibit 10:  "Digital
17 Minds:  Brain Development in the Age of
18 Technology."
19    Do you see that?
20    A.  Yes.
21    Q.  Okay.  Do you now recognize that as the
22 seminar that you participated in just four months
23 ago in 2025?
24    A.  Yes.
25    Q.  Okay.  And so the statements that you

HIGHLY CONFIDENTIAL

Page 191

1  made --
2     MS. JONES:  You can take that down.
3  BY MS. JONES:
4     Q.  The statements that you made at that
5  time with respect to:  We need to be a little bit
6  cautious in making these causal claims, that was
7  just earlier this year, yes?
8     MS. COUCH:  Asked and answered.
9     THE WITNESS:  The -- that's -- are you
10 quoting --
11 BY MS. JONES:
12    Q.  Yes.
13    A.  -- from earlier today from what you
14 pulled up?
15    Q.  Yes.
16    A.  Is that what you said?  Sure.
17    Q.  Yes.  Okay.
18    And so you -- what I think you
19 testified to earlier was that since your news
20 interview in 2023, there's been this accumulation
21 of additional evidence.  Yes?
22    A.  Yes.
23    Q.  Okay.  But in February of 2025, you
24 still -- you said, among other things, to be fair:
25 Causal data are largely unavailable because it is

HIGHLY CONFIDENTIAL

Page 192

1  sometimes hard to say with some of our methods that
2  social media causes some of these outcomes.  Yes?
3     A.  In the beginning of -- sorry.
4     Q.  I apologize.  I don't want to be rude,
5  but I am time limited.
6     My question is simply:  Did you say
7  that?
8     MS. COUCH:  Objection.  Incomplete
9  representation of her interview.
10    THE WITNESS:  In the broader context of
11 that talk, that was a very early slide saying that
12 prior literature suggests that it is difficult to
13 make some of those causal claims if we rely on
14 certain types of studies.
15    I then go on to talk about how the
16 majority of adolescents are addicted to social
17 media, how social media is changing the developing
18 brain, how adolescents are experiencing significant
19 digital stress that is leading to depression a year
20 later.  And I go on to make very -- very consistent
21 claims that I have here in my report.
22    MS. JONES:  Okay.  And I'm -- I don't
23 mean to be rude, but I'm going to move to strike
24 all of that as being nonresponsive to my question.
25 BY MS. JONES:

HIGHLY CONFIDENTIAL

Page 193

1     Q.  My question was, simply:  Did you say
2  those words in February of 2025?
3     MS. COUCH:  Objection.  Argumentative.
4  Asked and answered.
5     THE WITNESS:  I said those words in the
6  broader context of a talk that I gave --
7  BY MS. JONES:
8     Q.  Sure.
9     A.  -- that was over an hour long.
10    Q.  Sure.
11    A.  That was a beginning slide setting the
12 context for some of the earlier work.
13    And we go on to give very detailed
14 examples of how social media is leading to things
15 like social media addiction and changes in the
16 developing brain and depression.
17    Q.  Okay.  Okay.  Earlier I had asked
18 you --
19    (TELZER EXHIBIT 11, Document titled
20 Momentary Links Between Adolescents' Social Media
21 Use and Social Experiences and Motivations:
22 Individual Differences by Peer Susceptibility, was
23 marked for identification.)
24 BY MS. JONES:
25    Q.  Okay.  I'm handing you what we've

Page 194

1  marked as Exhibit Number 11.  Do you recognize
2  Exhibit Number 11?
3      A.  Yes.
4      Q.  Okay.  And Exhibit Number 11 is a paper
5  that was co-authored by you in 2023, yes?
6      A.  Yes.
7      Q.  And, actually, I mostly wanted to ask
8  you about a couple of small points.  On Page --
9          And you remember this paper, yes?
10     A.  Yes.
11     Q.  Okay.  Go to Page 15, if you would,
12  please, of Exhibit Number 11.
13         There's a section down at the bottom of
14  that page that says "Limitations and Future
15  Directions," yes?
16     A.  Yes.
17     Q.  And we were talking earlier about the
18  fact that it's very common that for literature
19  that's published in academic journals or other
20  types of peer-reviewed journals, that authors will
21  include limitations, right?
22     A.  Correct.
23     Q.  And the purpose of the limitation
24  section is to say, we did this work; this is what
25  the data tells us, but you need to also be aware of

Page 195

1  potential limits on the ability to -- limits on how
2  we did the study or limits on the interpretation of
3  the data?  Fair?  Generally speaking.
4      A.  Limitation sections generally try to
5  frame the data for -- including relatively
6  boilerplate things that could be considered
7  limitations to the specific study.
8      Q.  Okay.  And you said the word
9  "boilerplate."
10     A.  Yeah.
11     Q.  When you, in a paper that you are
12  co-author on, include a section on limitations,
13  you're not just making stuff up, are you?
14         MS. COUCH:  Objection.  Argumentative.
15         THE WITNESS:  -- we are not making
16  things up.
17  BY MS. JONES:
18     Q.  Okay.  You would not include something
19  in the limitation section unless you thought that
20  it was a valid statement of the limitations of the
21  study, yes?
22         MS. COUCH:  Objection.  Argumentative.
23         THE WITNESS:  We are making statements
24  in a single publication about that study.
25  BY MS. JONES:

Page 196

1      Q.  Yeah.
2          That -- my question is:  You would not
3  include something in the limitation section of a
4  study that you were a co-author on unless you
5  believed it was a valid statement of the
6  limitations of the study?
7          MS. COUCH:  Asked and answered.
8          THE WITNESS:  Yes.  These limitations
9  are based on our understanding of potential
10  limitations in the singular study that we're
11  reporting here.
12  BY MS. JONES:
13     Q.  And that -- that would be the case --
14  am I right in assuming? -- as to all of your
15  papers?
16         If you have a limitation section in a
17  paper that Dr. Telzer has co-authored and there are
18  limitations laid out, those are valid statements of
19  what you and your co-author colleagues believe to
20  be limits in the study, yes?
21         MS. COUCH:  Objection.  Vague.
22  Compound.
23         THE WITNESS:  I would have to see
24  specific examples of other studies.  But we include
25  limitation sections in publications and would --

Page 197

1  those are the limitations of each singular study.
2  BY MS. JONES:
3      Q.  Okay.  And I want to make very clear --
4  you say, "I would need to see a specific example."
5  Are you thinking -- are there studies that you can
6  think of that you've been a co-author on where you
7  included limitations and you didn't think that the
8  limitations were valid statements?
9      A.  No.  I'm --
10         MS. COUCH:  Objection.  Vague.
11         THE WITNESS:  I'm saying that I don't
12  know of the limitations across every paper,
13  generally speaking, without a specific.
14  BY MS. JONES:
15     Q.  I'm talking about your papers.  If you
16  have put your name on a piece of literature that's
17  published --
18     A.  Uh-huh.
19     Q.  -- in a journal, am I correct in
20  thinking that, if we look at the limitation
21  section, you have had a chance to review that and
22  determine whether you think it's a fair statement
23  of the limits of the study?
24         MS. COUCH:  Asked and answered.  Vague.
25         THE WITNESS:  Yes, these are the

Page 198

1  limitations of the singular study that we're
2  talking about.
3  BY MS. JONES:
4     Q.   Okay.  And the thing I wanted to ask
5  you about is that, in that section on limitations,
6  it says:  We acknowledge limitations and highlight
7  future directions for study --
8     A.   Uh-huh.
9     Q.   -- yes?
10    A.   Yes.
11    Q.   It says:  First, our data were
12 collected during a global pandemic that limited
13 adolescents' in-person interactions.  This timing
14 may influence the generalizability of study
15 findings, yes?
16    A.   Yes.
17    Q.   And then it says:  Second, although we
18 used robust within-subject analyses that accounted
19 for both daily effects and between-subject
20 characteristics, our study is correlational, not
21 causal.
22         Do you see that?
23    A.   I do.
24    Q.   So this is actually a very concrete
25 real-world example of you, Dr. Telzer, drawing a

Page 199

1  distinction between correlation and causation,
2  right?
3     A.   Correct.
4          MS. COUCH:  Objection.  Argumentative.
5          MS. JONES:  I know your counsel wants
6  to take a break, and I think this is a rational
7  time to do so.  So why don't we take a break.
8          THE WITNESS:  Thank you.
9          THE VIDEOGRAPHER:  Going off the
10 record.  The time is 12:38 p.m.
11              * * *
12         (Whereupon, there was a recess in the
13 proceedings from 12:38 p.m. to 1:17 p.m.)
14              * * *
15         THE VIDEOGRAPHER:  Going back on the
16 record.  The time is 1:17 p.m.
17 BY MS. JONES:
18    Q.   Dr. Telzer, you, I think, testified
19 earlier -- and forgive me if I'm misrecalling
20 this -- that the features on social media platforms
21 change the content.  Did you -- did I hear that
22 correctly?  I just want to make sure I heard it
23 right, and then I have some follow-up questions.
24    A.   Yeah.  The --
25         MS. COUCH:  That misstates her

Page 200

1  testimony.  But continue.
2  BY MS. JONES:
3     Q.   Well, you can tell me if I'm -- if I --
4  if you didn't say that.  I just want to make sure.
5     A.   I would say that the features of the
6  social media platforms change the experience of the
7  content.
8     Q.   "Change the experience of the content."
9  Okay.  And what specific features?
10    A.   I talk about these in my report on
11 Page 46, the unique features of social media,
12 including:  the publicness; the visualness; the
13 availability, 24/7 sort of access to these
14 platforms; the quantifiability, so likes, comments;
15 the algorithmic nature of it, in particular; the
16 asynchronicity.
17    Q.   Okay.  I think -- I think I understand
18 what -- I'm recalling what you're referring to.
19         When I -- and so your -- your opinion
20 is that those -- I'll call them "elements" of
21 social media -- you can use a different descriptor
22 if you think it's better -- somehow change the
23 experience of the content for teenagers?
24    A.   Absolutely.  The content that is on
25 social media is -- can be fundamentally changed by

Page 201

1  these features.
2          For example, if that content has lots
3  of likes associated with it, that changes how that
4  content might be experienced by adolescents.  The
5  algorithmic nature of it, which feeds continuous --
6  amplifying specific things that they might be
7  seeing, can change that experience as well.
8     Q.   Okay.  So I just want to make sure that
9  I'm correctly understanding your view here.  So
10 your view is, these elements of social media can
11 change the experience of content on a social media
12 platform for a teenager.  Is that a fair
13 description?
14    A.   These features of social media are what
15 make it especially harmful for adolescents.
16    Q.   Okay.  But I -- I understand your
17 opinion on that.  But I mostly want to just make
18 sure I understand what you're saying about the
19 content and how the content relates to the
20 different features that you've described.
21         When you're -- when you referred to
22 features earlier, you weren't talking about
23 necessarily the specific features of every single
24 platform.  You were talking about there are things
25 about social media that affect the way a teenager

Page 202

1   might experience content?
2          MS. COUCH:  Objection.  Vague.
3          THE WITNESS:  There are features on
4   these platforms shared across all the platforms
5   that make the experience particularly harmful for
6   adolescents.
7   BY MS. JONES:
8      Q.  Sure.  Sure.  Okay.  And I'm sorry for
9   stepping on the end of your sentence.
10         But the features don't change the
11  content itself, correct?
12     A.  The features can change the content,
13  yes.
14     Q.  Well -- and that's -- that's what I
15  wanted to zero in on.
16         So just to take an example, if there is
17  a picture of a birthday party.  Are you with me?  A
18  teenager's birthday party.
19     A.  Sure.
20     Q.  Okay.  A feature of the platform does
21  not change what is reflected in that picture,
22  right?
23         MS. COUCH:  Objection.  Vague.
24         THE WITNESS:  I can't speculate
25  without --

Page 203

1   BY MS. JONES:
2      Q.  Well, I'm trying to understand if
3   you're offering the opinion that the features
4   somehow change what is in the content itself or if
5   what you're saying is, because someone can like
6   that picture, it might affect the experience that
7   an individual teenager has of seeing the content?
8      A.  I mean, I think my statement stands in
9   that these features change those experiences.
10     Q.  Sure.  The experiences.
11         My question is:  Are you offering the
12  opinion that the features change the content
13  itself?  So takes that picture from the birthday
14  party and somehow makes it look different than it
15  looked when it was originally posted?
16         MS. COUCH:  Objection.  Vague.
17         THE WITNESS:  It's hard to say.  That's
18  difficult to speculate on.
19  BY MS. JONES:
20     Q.  Well, some -- some of the elements of
21  social media that you describe in your report are
22  things like the -- the fact that lots of people can
23  see it, right?
24     A.  The publicness of it is --
25     Q.  Yes.  Yes.

Page 204

1      A.  -- one of the -- the things, yes.
2      Q.  The publicness of a picture on social
3   media does not affect the -- what's actually in the
4   picture, right?  It just affects how many people
5   see the picture?
6      A.  The publicness of it increases the
7   number of people who will see the content.
8      Q.  Yes.  And I think we're agreeing on
9   that.
10         But I also want to make sure that we
11  agree that the fact that social media might be more
12  public doesn't mean that the picture itself is
13  somehow different on social media than it might be
14  if you had taken a picture with a disposable
15  camera, that it somehow looks different.
16     A.  It could look different based on some
17  of the filters that are used on social media
18  platforms.
19     Q.  Okay.  Are there other features of
20  social media beyond filters that you believe
21  changes the content in some way?
22         MS. COUCH:  Objection.  Vague.
23         THE WITNESS:  I'm not sure I can answer
24  that without looking more deeply into it and
25  referring more to my report to think about that

Page 205

1   more.
2   BY MS. JONES:
3      Q.  Okay.  At the moment, the thing that's
4   occurring to you, it sounds like, is filters,
5   though; is that right?
6      A.  One of the big things that changes an
7   image based on a camera photo is filters.
8      Q.  Okay.
9      A.  One of the -- the main things, yes.
10     Q.  Okay.  Let me --
11         MS. JONES:  Can we go to -- 78?  78A,
12  please.
13         (TELZER EXHIBIT 12, Video - Healthy
14  Heels Digital Minds:  Brain Development in the Age
15  of Technology, was marked for identification.)
16  BY MS. JONES:
17     Q.  Dr. Telzer, I'm going to hand you what
18  we've marked as Exhibit Number 12.  This is another
19  portion of your seminar in February of 2025.
20         We have now shared the full video with
21  your counsel.  If you want to see it, they have
22  access to that.  I think it's also on YouTube.
23         MS. JONES:  Can -- can we play, please,
24  78-A, which we've marked as Exhibit Number 12?
25         (Playing video.)

HIGHLY CONFIDENTIAL

Page 206

```
1   BY MS. JONES:
2        Q.   Dr. Telzer, that's you, yes?
3        A.   Yes.
4        Q.   And, as I mentioned earlier, this is a
5   portion of a video of a seminar that you did in
6   February of 2025.
7             I want to start with the same question
8   I've asked you earlier.  When you gave this
9   presentation in February of 2025, were you aiming
10  to be truthful about your views?
11       A.   What I said in that video was what I
12  said in that video.
13       Q.   Yeah.  That was not my -- my -- I know
14  what you said is what you said.
15            My question was:  When you did that
16  seminar in February of 2025 --
17       A.   Yeah.
18       Q.   -- were you aiming to be truthful in
19  the views that you were communicating to the
20  public?
21       A.   I can't speculate on what I was
22  specifically aiming for.  But I said those comments
23  because of these nuances that we discussed in
24  detail in this talk.
25       Q.   Well, do -- do you ever do
```

HIGHLY CONFIDENTIAL

Page 207

```
1   presentations that you know are going to be made
2   available to your colleagues and to the public and
3   don't try to be truthful?
4             MS. COUCH:  Objection.  Excuse me.
5   Objection.  Argumentative.
6             THE WITNESS:  I'm always trying to be
7   nuanced and thorough in my presentations.
8   BY MS. JONES:
9        Q.   Sure.  And also truthful, right?
10       A.   Of course.
11       Q.   Okay.  And in February of 2025, when
12  you did this presentation, you were truthful in
13  articulating your views, recognizing that it was a
14  longer presentation and you said other things as
15  well.  Is that true?
16       A.   Those were the statements I made and
17  the caveats.  Like, we always have caveats in the
18  broader context of the talk, yes.
19       Q.   Yes.  And what you said is what you
20  believed just four months ago, right?
21       A.   What I said is the caveats at the
22  beginning of a talk that we need to sort of set the
23  stage for.  And then we go on to give the causal
24  information that we have.
25       Q.   Okay.  And what you specifically said
```

HIGHLY CONFIDENTIAL

Page 208

```
1   in February of 2025 is, "There's been a lot of hype
2   in the news about how social media is creating the
3   mental health crisis that we are seeing today."
4             Do you remember saying that?
5        A.   Uh-huh.
6        Q.   You have to say "yes" or "no."
7        A.   I remember you showing that to me right
8   now.
9        Q.   Right.  Well, my question is:  Do you
10  remember saying that?
11       A.   I don't recall saying that.  I remember
12  from what you showed right here.
13       Q.   Okay.  You have no reason to believe
14  that what I showed you was somehow an inaccurate --
15  I know you think it's not complete.  But it's not
16  an inaccurate recording of what you said?
17       A.   That is what I said.
18       Q.   Okay.  And you went on to say, "So, on
19  the one hand, there is research that does suggest
20  that social media is related to later depression.
21  But there's also research, for example, that shows
22  that more depressed individuals use social media in
23  different ways."
24            Do you recall saying that?
25       A.   Yes.
```

HIGHLY CONFIDENTIAL

Page 209

```
1        Q.   And was that a true statement when you
2   said it in February of 2025?
3        A.   That is supported by the -- that was --
4   that statement, yes, was what I said in that talk.
5        Q.   Yeah.  My question was not was that
6   what you said.  My question was -- let me read the
7   statement again.
8             "So, on the one hand, there's research
9   that does suggest that social media is related to
10  later depression.  But there's also research, for
11  example, that shows that more depressed individuals
12  use social media in different ways."
13            Was that a true statement when you said
14  it in February of this year?
15       A.   Yes.
16       Q.   When you -- and you went on to say, "So
17  what comes first?  The social media or the mental
18  health?" right?
19       A.   Uh-huh.
20       Q.   Question mark.  Yes?
21       A.   Yes.
22       Q.   And then you said, "Similarly to this,
23  correlation does not imply causation," right?
24       A.   Yes.
25       Q.   And we had a discussion about that
```

Page 210

1  earlier. That statement was true when you said it
2  in February of 2025, right?
3        A.   Yes.
4        Q.   That statement is true today, yes?
5        A.   Yes.
6        Q.   And you went on to say, "So just
7  because social media may be related to mental
8  health does not mean that social media necessarily
9  caused that mental health to develop," right?
10       A.   In that context in that clip, I said
11 that, yes.
12       Q.   Yes. And when you said it, was that
13 true?
14            MS. COUCH:  Objection. Incomplete.
15            THE WITNESS:  Without the broader
16 context, it -- we really need the broader context
17 of the talk for that statement.
18 BY MS. JONES:
19       Q.   I promise you we're going to be here
20 for two days. If your counsel wants to show you
21 some other part of the video, she can.
22            My question is:  When you said, "So
23 just because social media may be related to mental
24 health does not mean that social media necessarily
25 caused that mental health to develop," was that a

Page 211

1  true statement when you said it in February of this
2  year?
3            MS. COUCH:  Asked and answered.
4            THE WITNESS:  You can't take one
5  sentence out of an hour-long talk and for that to
6  equal the totality of an opinion.
7  BY MS. JONES:
8        Q.   Is it possible that that statement is
9  not true or wasn't true when you said it?
10            MS. COUCH:  Argumentative.
11            THE WITNESS:  That statement without
12 the broader context does not give the full picture.
13 BY MS. JONES:
14       Q.   Okay. And when you -- two months after
15 this seminar, you signed an expert report in this
16 litigation, right?
17       A.   I don't know the exact timing.
18       Q.   Well, you have the report in front of
19 you. What is the date of your report in the JCCP?
20       A.   Sorry. You meant when I signed this?
21       Q.   Yes.
22       A.   Okay, sure.
23       Q.   Well, I'm asking you. Wasn't it just
24 two months after this seminar in February of 2025
25 that you signed your written report in the JCCP?

Page 212

1        A.   It's true that those are the dates.
2        Q.   Okay. And when you signed your written
3  report, you did not include any of these caveats,
4  for example, that correlation does not imply
5  causation. That does not appear in your written
6  report, correct?
7        A.   I am not necessarily relying on a
8  correlational study in my written report. And I'm
9  relying on much deeper literature that includes
10 experimental designs and longitudinal designs and
11 within-person designs and not a singular
12 correlational analysis.
13       Q.   Sure.
14            MS. JONES:  And I'm -- with respect,
15 I'm going to move to strike as nonresponsive.
16 BY MS. JONES:
17       Q.   My question was:  When you signed your
18 written report two months after doing this talk in
19 February of 2025, did you say in your report what I
20 think you've agreed to today that correlation does
21 not imply causation?
22            MS. COUCH:  Asked and --
23 BY MS. JONES:
24       Q.   Did you say that in your report?
25            MS. COUCH:  Asked and answered.

Page 213

1            THE WITNESS:  That specific sentence is
2  not necessarily in my report.
3  BY MS. JONES:
4        Q.   When -- if you come and testify at
5  trial, will you acknowledge for the jury that
6  correlation does not imply causation?
7            MS. COUCH:  Same objection. Dr. Telzer
8  doesn't know what she's going to be asked at trial.
9            THE WITNESS:  I can't speculate the
10 future.
11 BY MS. JONES:
12       Q.   Well, that's -- none of us can,
13 unfortunately.
14            My question is:  If you were called as
15 a witness, would you be prepared to acknowledge for
16 a jury that correlation does not imply causation?
17            MS. COUCH:  Asked and answered.
18            THE WITNESS:  I can't speculate about
19 the future.
20 BY MS. JONES:
21       Q.   You -- you don't know if you'd be
22 prepared to acknowledge that before a jury of
23 folks?
24            MS. COUCH:  Argumentative. Asked and
25 answered.

Page 214

1    MS. JONES:  Well, asked many times.
2  Not answered.
3        And I'm going to move to strike the
4  last two answers as nonresponsive and coached by
5  counsel.
6  BY MS. JONES:
7    Q.  My question is:  Would you acknowledge
8  that correlation does not imply causation when --
9  if you are eventually a trial witness?
10       MS. COUCH:  Asked and answered.
11       THE WITNESS:  I can't speculate about
12  the future.
13  BY MS. JONES:
14   Q.  Okay.  You -- you also mentioned there
15  is what you described as the "chicken-or-the-egg
16  issue," yes?
17   A.  Yes.
18   Q.  And specifically, you said, "We have
19  research that suggests that social media is related
20  to later depression, but there's also research that
21  shows that more depressed individuals use social
22  media in different ways," right?
23   A.  I said that.
24   Q.  Okay.  And it's -- in that sentence
25  there, "There's research that does suggest that

Page 215

1  social media is related to later depression" --
2        MS. COUCH:  Sorry.
3  BY MS. JONES:
4    Q.  -- you --
5        MS. JONES:  Are you okay?
6        MS. COUCH:  Yeah.  I swallowed wrong.
7  I'm sorry.
8        MS. JONES:  That's okay.
9  BY MS. JONES:
10   Q.  Let me start again.
11       In that sentence, you said, "There's
12  research that does suggest that social media is
13  related to later depression," yes?  You said that?
14   A.  Yes.
15   Q.  And you did not use the word "cause"
16  there, right?
17   A.  Right.
18   Q.  And you go on to say, "But there's also
19  research that shows that more depressed individuals
20  use social media in different ways," right?
21   A.  Yes.
22   Q.  And the chicken-or-the-egg issue that
23  you raised is sometimes referred to in academic
24  literature as kind of "bidirectionality," yes?
25   A.  No, I would not agree with that.

Page 216

1    Q.  Okay.  Well, I may -- I may be misusing
2  the terminology.  But the idea is that you don't
3  really know if the social media is the reason for
4  the mental health issue or if it's the case that
5  the -- the folks with mental health issues might be
6  more likely to use social media, right?
7    A.  In that specific case with the chicken
8  and the egg, that is what that means.
9    Q.  Okay.  And that was true when you said
10  it back in February, right?
11   A.  That statement is what I said and is
12  the case, yes.
13   Q.  And was it -- it's true, yes?
14   A.  It depends on what research you're
15  looking at.  If you're looking at a singular
16  cross-sectional correlational study, you cannot
17  necessarily determine from that singular study the
18  chicken or the egg.  In -- in that instance,
19  "correlation" may not mean "causation."
20       But when you do more rigorous
21  experimental designs and within-person analyses and
22  longitudinal designs, we can definitely infer which
23  came first.
24   Q.  Do you -- do you agree with me that
25  cross-sectional studies cannot show causation?

Page 217

1        MS. COUCH:  Object to the form.  Vague.
2        THE WITNESS:  I would need to see a
3  specific example.  In some cases, you can infer
4  causation from a cross-sectional study.
5  BY MS. JONES:
6    Q.  Is there a cross-sectional study that
7  you're thinking about specifically where you think
8  they were able to find causation?
9    A.  I can't think of a specific example off
10  the top of my head.
11   Q.  Let me ask you to look at your report.
12  Page 111.  Do you recall in your written, signed
13  report in this case actually saying that
14  cross-sectional studies cannot be used to determine
15  causality?
16   A.  Can you point me to the sentence?
17   Q.  Sure.  On Page 111, in the section
18  entitled "Cross-sectional or population-level
19  analyses."
20   A.  I see it.  Yes.
21   Q.  Are you seeing it, Dr. Telzer?
22   A.  Yep.  The first sentence, "they cannot
23  be used to determine causality, track changes or
24  developments over time, or determine the direction
25  of relationships between variables."

Page 218

1    Q.  Okay.  And so you -- you actually --
2  going back to what we were just talking about, you
3  actually seem to acknowledge in your written report
4  that because cross-sectional studies only measure
5  variables at a single point in time, you can't use
6  them to determine causation, right?
7       MS. COUCH:  Objection.  Misstates her
8  report.
9       THE WITNESS:  Yeah.  I mean, in my
10  report I am indicating some of the caveats of
11  cross-sectional designs in that they cannot be used
12  to determine causality.
13       But if given a specific example,
14  sometimes, depending on what those variables are,
15  something may have occurred earlier and something
16  may have occurred later because of those things,
17  and we can potentially infer causality.
18  BY MS. JONES:
19    Q.  Well, that's not a true cross-sectional
20  study -- right? -- because that's not just looking
21  at one point in time?
22       MS. COUCH:  Objection.  Vague.
23       THE WITNESS:  I can't give a specific
24  example off the top of my head, but some things may
25  not have been occurring earlier despite it being

Page 219

1  measured at one time point.
2  BY MS. JONES:
3    Q.  I can't think of an example either.
4  I'm just going -- I have to rely on what you wrote
5  in your report.
6       In your report, which is the basis for
7  your eventual testimony, you said --
8    A.  Uh-huh.
9    Q.  -- cross-sectional analyses and
10  cross-sectional studies cannot be used to determine
11  causality, yes?
12    A.  Yep.  That statement is correct.
13    Q.  And sitting here today, you can't think
14  for me of an actual study that exists where you
15  would say, "Actually, that cross-sectional study
16  establishes causality," right?
17    A.  I can't think of a specific example,
18  and that's why my report relies on a lot of other
19  much more rigorous methods than cross-sectional
20  correlational designs.
21       And I use experimental designs where we
22  can infer causality.  We use longitudinal designs
23  where we can look at things unfolding across
24  development.  And we use ecological momentary
25  assessment designs that are very intensive

Page 220

1  longitudinal designs where we get multiple measures
2  within a person to see how these things unfold in
3  real time.
4       MS. JONES:  Okay.  I'm going to move to
5  strike everything after, "I can't think of a
6  specific example."
7  BY MS. JONES:
8    Q.  You have referred at different points
9  today to totality of the studies.  Do you recall
10  that, generally?  I've heard it a few times, at
11  least.  Does that sound familiar to you?
12    A.  Yes.
13    Q.  You're relying on the totality of the
14  studies, yes?
15    A.  Yes.
16    Q.  How did you go about determining what
17  studies will be captured within your totality of
18  the studies for purposes of concluding that
19  causation had been established with respect to
20  social media use and mental health harms in
21  teenagers?
22    A.  I mean, the totality of that research
23  includes my education, and history of working with
24  adolescents and teachers and educators, as well as
25  my thorough literature review of the published

Page 221

1  research, as well as my review of the underlying
2  defendant documents and depositions.
3       So the thoroughness of all of that
4  helped me to come to my opinions that are in this
5  report.
6    Q.  Okay.  I want to focus in on the third
7  category that you mentioned, your literature
8  review --
9    A.  Sure.
10    Q.  -- and the specific studies that you
11  are relying on.
12       How did you go about deciding what
13  studies you were going to account for in reaching
14  your causation opinion versus which ones you
15  weren't going to focus on?
16    A.  I did similar to what I would do in my
17  sort of academic setting, a literature review of
18  PubMed and Google Scholar, specifically looking for
19  research on the topics and outcomes of interest of
20  social media and the relationship between social
21  media and function and structural changes in the
22  adolescent brain as well as how those relate to
23  adolescents' mental health.
24    Q.  Did you use specific search terms?
25    A.  I did not use -- well, I had lots of

Page 222

1  search terms, broadly speaking, related to that
2  topic.
3        Q.    What does -- I'm -- I'm not sure I know
4  what that means.
5             Did you use search terms to go about
6  identifying the literature that you were going to
7  identify as the studies that, from your point of
8  view, collectively support causation?
9        A.    I looked and searched for research on
10  social media and structural and functional changes
11  in the adolescent brain.  I reviewed all the papers
12  that came up for their relevance, as well as looked
13  within those publications for the references that
14  they referenced in there to try to understand the
15  full story of -- of the research.
16        Q.    So you -- it sounds -- were those
17  search terms that you used, "social media" and
18  "structural and functional changes to the
19  adolescent brain"?
20        A.    Some of many search terms that I used.
21        Q.    What other search terms did you use?
22        A.    I can't tell you off the top of my
23  head.
24        Q.    Did you document anywhere the specific
25  search terms that you used to identify the

Page 223

1  literature that you were going to point to and say,
2  "I think this literature collectively proves
3  causation"?
4        A.    Nope.
5        Q.    So if we wanted to know how did
6  Dr. Telzer do her work on that in terms of the
7  literature, we would not be able to look at
8  anything in particular?
9             MS. COUCH:  Objection.  Argumentative.
10  Vague.
11             THE WITNESS:  I describe how I did my
12  literature search.
13  BY MS. JONES:
14        Q.    Well, what you told me was that you
15  looked for "social media" and "structural and," I
16  think, "functional changes to the adolescent
17  brain," and that you didn't remember the rest of
18  your terms.
19        A.    I used a lot of different terms in a
20  lot of different ways of finding articles as well
21  as looking within the published articles for other
22  papers that had been done on that topic.  So those
23  wouldn't necessarily come up with search terms.
24        Q.    Sure.  But of the search terms, of
25  which you said you used several, the only two that

Page 224

1  you could identify for me are "social media" and
2  "structural and functional changes to the
3  adolescent brain," right?
4        A.    Among many others, yeah.
5        Q.    But could you tell me what the many
6  others are or you don't remember?
7        A.    fMRI, for example.  Neural.
8  Dopaminergic reward systems.  But, like I said,
9  there were handfuls of search terms that I used.
10        Q.    Okay.  Anything else you recall --
11        A.    No.
12        Q.    -- sitting here today?  And you don't
13  anywhere written down:  These are the search terms
14  I used?
15        A.    No.
16             MS. COUCH:  Asked and answered.
17  BY MS. JONES:
18        Q.    Did you -- did you do any specific --
19  did you screen out -- once you kind of gathered
20  everything together, did you document in one place
21  everything that had been pulled up by the search
22  terms that you used?
23        A.    No.
24        Q.    Okay.  Did you go through a process of
25  looking at everything that had been pulled up and

Page 225

1  deciding, I think this is useful or relevant, or,
2  This is not?  Did you kind of sort things in any
3  way?
4        A.    Generally speaking, yeah.
5        Q.    Okay.  And how did you -- what were
6  your sorting criteria?
7        A.    I didn't have specific sorting
8  criteria.
9        Q.    So, for example, sample size.  Did
10  you -- what did you do about studies that had
11  smaller sample sizes?
12        A.    Smaller sample sizes are just as useful
13  to read.
14        Q.    Did you exclude cross-sectional
15  studies?
16        A.    I looked at cross-sectional studies.
17        Q.    But did you -- and -- and I want to be
18  more precise about my question, and I apologize.
19             My question is:  When -- when we're
20  talking about the literature that you eventually
21  gathered up and said, "I think this collective body
22  of literature proves causation," did you have any
23  mechanism by which you said, "We should" -- "I
24  shouldn't focus on cross-sectional studies because
25  those can't prove causality"?  That's my question.

Page 226

1        MS. COUCH:  Asked and answered.
2        THE WITNESS:  I included
3   cross-sectional studies.
4   BY MS. JONES:
5        Q.  So you included cross-sectional
6   studies.  Did you also include studies that had
7   small sample sizes?
8        A.  I included --
9        MS. COUCH:  Asked and answered.
10       THE WITNESS:  Yes.
11  BY MS. JONES:
12       Q.  What did you do about studies -- I
13  guess I should ask a threshold question.
14       Did your research or search exercise
15  pull back any studies that had results that are
16  contrary to your causation opinion, where they
17  found either negative or null results?
18       A.  I can't think of any off the top of my
19  head.
20       Q.  So you didn't identify any -- you know
21  that there's also literature and data that exists
22  that says that, in fact, there's not a relationship
23  between social media use and mental health harms of
24  different sorts, right?
25       MS. COUCH:  Objection.  Broad.  Vague.

Page 227

1        THE WITNESS:  I am aware that there's
2   lots of literature out there.  But some of it is
3   less relevant to my opinions here today.
4   BY MS. JONES:
5        Q.  Yeah.  And I guess my question is:  Was
6   the literature that showed negative or null results
7   relevant to your opinions at all?
8        MS. COUCH:  Objection.  Broad.
9        THE WITNESS:  I don't recall finding
10  any -- let me restate that.
11       I included every single study that I
12  could identify that included the adolescent brain
13  and its links to social media as broadly as I can
14  make it and did not exclude any that I know of.
15  BY MS. JONES:
16       Q.  Okay.  Did you -- did you find any
17  studies with negative or null results?
18       A.  I can't think of any off the top of my
19  head.
20       Q.  None at all?
21       A.  I can't think of any off the top of my
22  head.
23       Q.  So every study you identified, you're
24  testifying, showed some kind of relationship
25  between social media use and either brain changes

Page 228

1   or adverse mental health outcomes of some kind?
2        MS. COUCH:  Asked and answered.
3        THE WITNESS:  I can't think of any off
4   the top of my head.  I included the full list of
5   articles that I considered.  It is possible some of
6   those included null or negative associations as
7   you're mentioning.
8   BY MS. JONES:
9        Q.  You -- you didn't in your written --
10  the written portion of your actual report, you
11  didn't include any discussion -- and you can
12  correct me if I'm wrong about this.
13       But you didn't include any discussion
14  of studies that found negative or null results, did
15  you?
16       A.  I included a thorough review of every
17  single study that I could find linking social media
18  to brain development.
19       Q.  Well, sure.  My question was:  Where
20  there were studies that didn't support that
21  conclusion, did you talk about those in your
22  written report?
23       MS. COUCH:  Objection.  Lacks
24  foundation.
25       THE WITNESS:  As far as I know, I did

Page 229

1   not identify any papers looking at social media and
2   brain development that I did not consider in my
3   report.
4   BY MS. JONES:
5        Q.  Did you include studies that looked at
6   total screen time as opposed to limiting to
7   specific social media platforms?
8        A.  I believe so.  I can't think of a
9   specific example.
10       Q.  You don't know one for sure?
11       A.  I believe so.  I can't think of a
12  specific example.
13       Q.  Did you include studies that looked at
14  total social media use as opposed to limiting
15  themselves to specific platforms?
16       A.  Can you say that again, please?
17       Q.  Sure.  Did you include studies in your
18  review and analysis that looked at total social
19  media use as opposed to limiting themselves to
20  specific platforms?
21       MS. COUCH:  Objection.  Vague.
22       THE WITNESS:  I believe so.
23  BY MS. JONES:
24       Q.  But you don't know?
25       A.  Yeah.  Most of the work that we do is

Page 230

1  more broadly on social media use and not the
2  specific platform, if that's what you're asking.
3      Q.   Well, I'm -- I'm, actually, mostly
4  focused on kind of how you went about your process
5  of including things versus not including things.
6      To the extent that you found studies
7  that had null or negative results, how did you
8  account for them in your overall causation
9  analysis?
10     MS. COUCH:  Objection.  Vague.
11     THE WITNESS:  I don't recall finding
12 those with null or negative associations in the
13 type of research that I was looking at that was
14 central to my opinions here, using more
15 within-person designs as well as looking at the
16 effects of social media on brain development.
17 BY MS. JONES:
18     Q.   And how did you -- we talked about this
19 a little bit earlier.  How did you account for
20 studies or papers that described potential
21 countervailing benefits for adolescents and teens
22 from social media use?
23     MS. COUCH:  Objection.  Vague.
24     THE WITNESS:  Can you say that again,
25 please?

Page 231

1  BY MS. JONES:
2      Q.   Well, I should probably take a step
3  back and ask.  Did you conduct a review to try to
4  identify papers that might have talked about
5  benefits of social media use for adolescents or
6  teens?
7      A.   I did not do a thorough review of that
8  because that was not within the scope of my report.
9      Q.   Okay.  And -- and your report itself
10 doesn't talk about the data that exists on that
11 topic, right?
12     MS. COUCH:  Objection.  Misstates her
13 report.
14     THE WITNESS:  My report specifically
15 examines the relationship between social media
16 function and structure and the adolescent brain.
17     And my assignment was -- nor scope of
18 work was looking at the benefits of social media.
19 BY MS. JONES:
20     Q.   Okay.  You have in -- I think we talked
21 about this earlier.  You have in your own work
22 acknowledged the benefits of social media for some
23 adolescents and teenagers, yes?
24     A.   Yes.  In my own work, I look at both
25 the benefits and the harms of social media use.

Page 232

1      Q.   When you were doing your review of the
2  literature, you didn't limit it to only those
3  studies that looked at social media use as opposed
4  to total screen time, right?
5      MS. COUCH:  Asked and answered.
6      THE WITNESS:  I believe there is some
7  literature on screen time in my report.
8  BY MS. JONES:
9      Q.   But you -- when -- when you were doing
10 your literature collection and review, you did not
11 focus on studies that were specifically about
12 social media use, right?
13     MS. COUCH:  Asked and answered.
14     THE WITNESS:  I believe that I do have
15 some stuff more broadly in there but all relevant
16 to our understanding of social media use.
17 BY MS. JONES:
18     Q.   And just to be clear, when we say "more
19 broadly," we're talking about studies that might be
20 talking about other forms of media beyond social
21 media, yes?
22     MS. COUCH:  Objection.  Vague.
23     THE WITNESS:  I'm not sure.  I focused
24 on social media use.
25 BY MS. JONES:

Page 233

1      Q.   But your review included studies that
2  might have been total screen time?
3      MS. COUCH:  Asked and answered.
4      THE WITNESS:  There is stuff that I
5  considered on screen time.
6  BY MS. JONES:
7      Q.   Okay.  We talked a little bit earlier
8  about problematic use and whether social media use
9  is problematic for all adolescents or teenagers.
10     You -- you would acknowledge that
11 social media use does not for all adolescents and
12 teenagers cause depression, right?
13     MS. COUCH:  Objection.  Vague.
14     THE WITNESS:  It's hard to necessarily
15 answer so broadly about all adolescents.
16     I will say within our work, looking at
17 within-person analyses, in the moments that
18 adolescents use social media, within a person,
19 their depression goes up; suggesting that no matter
20 who you are, your depression and depressed affect
21 is being affected by social media.
22 BY MS. JONES:
23     Q.   What do you mean by "their depression
24 goes up"?
25     A.   We're doing within-person analyses.  So

HIGHLY CONFIDENTIAL

Page 234

1  we are pinging adolescents three times a day over
2  14 days, which gives us dozens of data points.
3          And with that, you have a within-person
4  analysis.  So you can say, compared to this
5  person's average depression, their depressed levels
6  go up in the moments that they use social media.
7       Q.   And in that circumstance, are we
8  talking about adolescents who are already
9  depressed?
10       A.   This controls -- it's not a
11  between-person analysis.  So it controls for
12  anybody's depressed level, because it's looking at
13  an individual relative to themself.
14          It doesn't matter whether you started
15  off as a little depressed or more depressed.  Your
16  depression goes up relative to your average.
17       Q.   And I want to come back to my original
18  question.  But in terms of the dataset that you're
19  relying on for this notion about depression goes up
20  at the moment they're exposed to social media, how
21  many participants are we talking about?
22       A.   I don't recall the sample size.
23       Q.   We're talking about a few hundred,
24  right?
25       A.   Uh-huh.

HIGHLY CONFIDENTIAL

Page 235

1       Q.   You have to say "yes" or "no."
2       A.   Sorry.  Yes.
3       Q.   Okay.  And I think it's -- it's
4  300-and-something; is that right?
5       A.   I can't --
6       Q.   Or am I misremembering that?
7       A.   I can't recall off the top of my head.
8  I don't -- we would need to look at the
9  publication.
10       Q.   Okay.
11       A.   Yeah.
12       Q.   But we can agree that it's a few
13  hundred, right?
14       A.   Yep.  Sure.
15       Q.   Let me go back to my question.
16          You are not offering the opinion that
17  for every teenager/adolescent who uses social media
18  that that will cause depression in that teenager,
19  right?
20          MS. COUCH:  Asked and answered.
21          THE WITNESS:  I'm saying that based on
22  research, looking at these within-person analyses,
23  no matter who you are, your depression goes up in
24  the moments that you use social media.
25  BY MS. JONES:

HIGHLY CONFIDENTIAL

Page 236

1       Q.   What if you didn't have depression to
2  begin with?
3       A.   It doesn't matter your level of
4  depression.  Your depressed affect goes up in the
5  moments that you're using social media relative to
6  your average.
7       Q.   And that's a conclusion based on this
8  sample size of roughly 300 -- not -- I'm sorry -- a
9  few hundred adolescents?
10       A.   This is based on not only one of the
11  papers coming out of my lab, but there are other,
12  what we call, "EMA studies" looking at similar
13  constructs.
14          MS. JONES:  Yeah.  Let me -- let me,
15  again, respectfully, move to strike as
16  nonresponsive.  Because I think you're answering
17  some different question.
18  BY MS. JONES:
19       Q.   My question is:  Are you offering the
20  opinion that every teenager who uses social media
21  eventually develops depression?
22          MS. COUCH:  Objection.  Vague.  Asked
23  and answered.
24          THE WITNESS:  I did not say that.  I
25  said that, within a person in the moments that

HIGHLY CONFIDENTIAL

Page 237

1  you're using social media -- an adolescent is using
2  social media, their depressed affect goes up in
3  those moments.
4  BY MS. JONES:
5       Q.   Sure.  And I didn't think you had said
6  that, but I want to make sure that I'm clear.
7          You are not offering an opinion that
8  for every teenager who uses social media, that
9  teenager is going to develop depression at some
10  point?
11          MS. COUCH:  Asked and answered.
12  BY MS. JONES:
13       Q.   That's not your opinion, right?
14       A.   My opinion is that, within a person,
15  one's depression goes up when they use social
16  media.
17       Q.   I'm not asking you about that.
18          MS. JONES:  I'm going to move to strike
19  as nonresponsive yet again.
20  BY MS. JONES:
21       Q.   My question is:  You are not offering
22  the opinion that every teenager who uses social
23  media eventually is going to develop depression?
24          MS. COUCH:  Objection.  Vague.  Asked
25  and answered.

Page 238

1     THE WITNESS:  Yeah.  My opinion is
2  largely based on these within-person designs where
3  we can look within a person with high confidence
4  where we're not necessarily comparing a depressed
5  to a nondepressed person.
6  BY MS. JONES:
7     Q.  And when you -- when you say
8  "depressed" -- "depression goes up," you mean how
9  someone is feeling at the time, not necessarily
10 that someone is getting a -- kind of a formal
11 clinical diagnosis of depression, right?
12    A.  We're looking at their depressed
13 affect.
14    Q.  Right.  And that is not the same thing
15 as someone being formally diagnosed with
16 depression, right?
17    A.   It is often correlated.  Higher
18 depressed affect is associated or correlated with
19 clinical diagnoses of depression.
20    But, no, in these -- these specific
21 studies, I'm not talking about clinical levels of
22 depression.
23    Q.  Right.
24    And your opinion about the depression
25 going up, that's -- depressed affect going up, is

Page 239

1  that based on your forthcoming paper --
2     MS. COUCH:  Objection.
3  BY MS. JONES:
4     Q.  -- that data?
5     MS. COUCH:  Misstates her prior
6  testimony.
7     THE WITNESS:  I don't know what
8  forthcoming paper you mean.  Sorry.
9  BY MS. JONES:
10    Q.  With Nesi and Burnell.
11    MS. COUCH:  Same objection.
12    THE WITNESS:  I don't recall -- I don't
13 think it's from that paper.
14 BY MS. JONES:
15    Q.  Okay.  Let me ask you the same question
16 with respect to anxiety.  Do you have the opinion
17 that every teenager who uses social media will
18 eventually develop anxiety?
19    MS. COUCH:  Objection.  Vague.
20    THE WITNESS:  I think that this is sort
21 of out of the scope of where my opinions go.  I'm
22 mostly relying on these within-person effects,
23 where we can say -- within a person controlling for
24 all components of their life, their family life,
25 their school life, their own levels of depression

Page 240

1  or anxiety, we can say that using social media is
2  related to increases in those symptoms for those
3  adolescents.
4  BY MS. JONES:
5     Q.  Did your analysis actually look at
6  anxiety or just --
7     A.  I don't recall if my specific analysis
8  did.  I'd have to go back and look through my
9  papers.  But the broader literatures looked at
10 anxiety, yes.
11    Q.  Yeah.  And I'm -- because you keep
12 raising this, I just want to make sure I'm clear on
13 what your data actually show.
14    Your data, I think you said, was
15 focused on depressive affect, yes?
16    MS. COUCH:  Objection.  Misstates her
17 testimony.
18    THE WITNESS:  The specifics that I was
19 talking about were related to how social media is
20 related to depressed affect.
21 BY MS. JONES:
22    Q.  Yes.  It's not about anxiety?
23 You're -- were -- you were not evaluating people's
24 reported feeling of anxiety, right?
25    A.  We have looked at anxiety.

Page 241

1     Q.  I'm asking about the specific dataset
2  that you keep referring to.
3     A.  We have --
4     MS. COUCH:  Object --
5     THE WITNESS:  I'm sorry.
6     MS. COUCH:  Sorry.
7     Objection.  Vague.
8     THE WITNESS:  We have anxiety.
9  BY MS. JONES:
10    Q.  I don't know what that means.  What do
11 you mean, "We have anxiety"?
12    A.  We measure anxiety.  We measure anxious
13 symptomology.
14    Q.  How?
15    A.  Similar to depressed affect.  In our
16 EMAs, we're measuring multiple times a day across
17 two weeks.
18    Q.  Okay.  What else are you measuring?
19 Depression, anxiety.  What else?
20    A.  I'd have to look back at the
21 publications.  We're measuring lots of things.
22    Q.  Okay.  Go back to Page 6 of your
23 report.
24    You indicate in your report at Page 6,
25 at the top of the page:  heavy social media use

Page 242

1  changes the development of the adolescent brain,
2  altering it from what would have been considered
3  typical prior to the advent of social media.  Yes?
4      A.  Yes.
5      Q.  You don't, if I'm reading your report
6  correctly, identify or specify what "heavy" means
7  in that context, right?
8      A.  I don't define it in this sentence.
9      Q.  Do you -- tell me, what are you
10  defining as "heavy social media use" for purposes
11  of this opinion?
12      A.  I think this comes from diverse studies
13  and publications, ranging from habitually checking
14  social media to more problematic forms of social
15  media use.  It's interfering with their daily
16  lives.  I guess I'll leave it at that.
17      Q.  Okay.  So tell me, what is that
18  threshold that gets you into heavy social media use
19  from -- in your perspective?
20      MS. COUCH:  Asked and answered.
21      THE WITNESS:  We are looking at
22  variability in their social media use related to
23  things like habitually checking their social media
24  and higher levels of problematic social media use
25  that's interfering with their daily lives.

Page 243

1  BY MS. JONES:
2      Q.  Are -- are you -- are you defining
3  "heavy use" by time?
4      A.  We are defining it using sort of
5  diverse perspectives here.  There's no one single
6  threshold.  We're not necessarily looking at time.
7  We're more so looking at the ways in which it is
8  used in a more problematic way.
9      Q.  Okay.  So for purposes of your opinion
10  on heavy social media use causing changes in the
11  development of the adolescent brain, you're not
12  defining "heavy" by reference to time?
13      A.  I'm not specifically referring to time.
14      Q.  And when you say "specifically," it
15  makes me wonder if there's something else.
16      Are you -- when you describe "heavy
17  social media use," are you in any way tying that to
18  some amount of time?
19      A.  I'm not specifically tying that to any
20  amount of time per se.  I'm mostly referring to the
21  use of habitually checking and engaging in more
22  problematic social media behaviors that's
23  interfering with their daily lives.
24      Q.  Okay.  So tell me what your opinion is
25  on what "habitual checking" means.

Page 244

1      A.  That comes from one of our publications
2  where we ask adolescents how frequently they're
3  checking their social media accounts.
4      Q.  Was that the Maza paper?
5      A.  Yeah.
6      Q.  In 2023?
7      A.  Yeah.
8      (TELZER EXHIBIT 13, JAMA Pediatrics -
9  Association of Habitual Checking Behaviors on
10  Social Media with Longitudinal Functional Brain
11  Development, was marked for identification.)
12  BY MS. JONES:
13      Q.  Why don't we look at that.
14      MS. JONES:  Which is going to be
15  Tab 44, I think.
16  BY MS. JONES:
17      Q.  Is -- are there -- is there anything
18  else you're relying on in terms of your opinions
19  with respect to habitual checking being an
20  indicator of heavy social media use.
21      A.  That is one of the domains of heavy
22  social media use.
23      Q.  Yeah.  And I'm -- I'm asking you --
24  when I asked you, like, "Okay, you're not focused
25  on time.  So what are you focused on?"

Page 245

1      And you said, "Habitual checking and,"
2  you said, "other forms of problematic use."  And
3  for the moment, I'm just focused on habitual
4  checking.
5      A.  Okay.
6      Q.  And I asked you, "What do you mean by
7  habitual checking," yes?
8      A.  Yes.
9      Q.  And you said, "Well, we've talked about
10  that in connection with one of our papers," yes?
11      A.  Yes.
12      Q.  Is -- I want to just -- just to
13  understand.  Is there anything beyond your paper
14  from 2023, which we will look at, that you're
15  relying on in terms of establishing what "habitual
16  checking" means?
17      A.  That is one of many aspects of heavy
18  use that I'm talking about.  This is one example of
19  habitual checking.
20      Q.  No, I understand.  I'm -- I'm
21  asking you, are there other pieces
22  of literature that you are relying on to support
23  what you think "habitual checking" means beyond
24  your paper in 2023?
25      And if it's just your paper, that's

Page 246

1  fine. I'm just trying to understand.
2      A.    I mean, there's a broad literature
3  looking at habitual social media behaviors, and
4  this is one example of those.
5      Q.    Okay. And I think what I heard you say
6  earlier is that there is no defined amount of time
7  that somehow automatically equates to heavy social
8  media use; is that right?
9      A.    I think that it's difficult to
10  establish a specific quantity of time that
11  establishes it as heavy.
12      I think it is pretty clear that
13  something like eight hours a day is heavy use. But
14  lower hours of use could be potentially problematic
15  as well.
16      Q.    And would it matter what -- how the
17  adolescent or teen is actually spending that time?
18      A.    I think that --
19      MS. COUCH: Objection. Vague.
20      THE WITNESS: I think that the reason
21  time metrics can be a little bit more challenging
22  is because they don't take into consideration all
23  of the features of the social media that may make
24  that experience more or less unhealthy for an
25  adolescent.

Page 247

1  BY MS. JONES:
2      Q.    And if I'm understanding your testimony
3  and also your written report, you have not
4  identified any time threshold above which you would
5  say, "This is heavy social media use that's going
6  to lead to a brain" -- "a change in brain
7  development," right? You've not identified
8  something specific?
9      And that's okay if you haven't. I just
10  want to make sure I understand.
11      A.    If you're asking about specific time?
12      Q.    Yes.
13      A.    We don't necessarily quantify an amount
14  of time or some kind of threshold here.
15      Q.    Okay. And that's the case in your
16  written report. But it's also the case in your
17  writings more generally that you've not identified
18  some threshold where you'd say, "Above this is
19  heavy and it's going to lead to brain changes,"
20  right?
21      MS. COUCH: Objection. Compound and
22  vague.
23      THE WITNESS: I'm not -- I'm not sure
24  exactly. It's possible that we've quantified time
25  a little bit more than what you're saying.

Page 248

1  BY MS. JONES:
2      Q.    Can you -- if you -- if you have, can
3  you recall it?
4      I'm just asking if --
5      A.    Yeah.
6      Q.    I -- I -- you know better what you've
7  said than I do.
8      Have -- do you have any recollection of
9  ever documenting somewhere at this amount of time,
10  heavy and is going to lead to brain change; and
11  below that, maybe it's less likely?
12      MS. COUCH: Objection.
13  BY MS. JONES:
14      Q.    Do you have any recollection of doing
15  that?
16      MS. COUCH: Objection. Compound.
17  Vague.
18      THE WITNESS: Yeah, I think that it's
19  hard to answer that question because we look at
20  individual differences across a continuum.
21      Sometimes for statistical purposes we
22  might sort of create groups at a threshold, but
23  everything is along a continuum.
24  BY MS. JONES:
25      Q.    Okay. And can I ask you before we look

Page 249

1  at your paper specifically.
2      In terms of what qualifies as heavy in
3  your framing of your opinion, heavy social media
4  use that can change the development of the
5  adolescent brain, does it -- does that vary by
6  individual teenager?
7      A.    Does heavy vary by individual teenager?
8      Q.    Yes.
9      MS. COUCH: Objection. Vague.
10      THE WITNESS: This is -- I'm getting a
11  little caught up on the semantics here. I'm sorry.
12  BY MS. JONES:
13      Q.    Which part are you caught up on?
14      A.    I'm just confused by -- it's
15  complicating what I think of as a pretty
16  straightforward metric.
17      Q.    Well, in your report, you said: Heavy
18  social media use changes the development of the
19  adolescent brain, right?
20      A.    Yes.
21      Q.    That's your report?
22      A.    Yep.
23      Q.    Does what qualifies as "heavy social
24  media use that can change the development of the
25  adolescent brain," does that vary by individual

Page 250

1  teenager?
2       A.   Does that vary by individual teenager.
3  I don't understand what you mean by "does that vary
4  by individual teenager."
5       Q.   The extent to which heavy social media
6  use would lead to a change in the development of
7  the brain.
8            MS. COUCH:  Objection.  Vague.
9            THE WITNESS:  I'm sorry.  I'm not
10  understanding.
11  BY MS. JONES:
12       Q.   Okay.  What about:  Does it vary by
13  what a teenager is doing on social media?
14            MS. COUCH:  Objection.  Vague.
15            THE WITNESS:  I think there's two
16  separate things here.  There's problematic use and
17  there's different ways in which problematic use
18  manifests.  And it could look different in
19  different adolescents.
20            And that differs from me saying in an
21  opinion that, based on all of this literature, I
22  believe that heavy social media use is changing the
23  developing brain.
24  BY MS. JONES:
25       Q.   Would it matter -- could it vary based

Page 251

1  on what an individual teenager is actually seeing
2  in terms of content on social media?
3            MS. COUCH:  Objection.  Vague.
4            THE WITNESS:  I -- again, I think
5  there's two separate things here.  There is
6  variance across people and the exposures and
7  experiences that they're having, and that is a
8  different thing than me reviewing the totality of
9  the research and coming to the conclusion that
10  heavy social media use is altering the -- the
11  brain.
12            MS. JONES:  Yeah, I'm going to move to
13  strike as nonresponsive because I don't think that
14  was an answer to my question.
15  BY MS. JONES:
16       Q.   My question was:  When you're talking
17  about your opinion that heavy social media use
18  changes the development of the adolescent brain,
19  does it matter what content the adolescent or
20  teenager is actually getting while using social
21  media?
22       A.   Sure.  That -- thank you for that more
23  straightforward question.
24       Q.   Sure.
25       A.   I can answer that.

Page 252

1            I think that my opinions and the
2  research that I have relied upon is content
3  agnostic.
4            What we're really more interested is
5  the problematic ways adolescents are engaging with
6  social media and the way those features are
7  creating a more harmful experience for adolescents.
8            And this is largely content agnostic.
9  So I'm not relying that opinion on the content that
10  they're being exposed to.
11       Q.   Have you specifically looked at that in
12  connection with your research?
13       A.   Have I specifically looked at what?
14       Q.   I -- I should have said -- been more
15  clear.
16            Have you specifically evaluated not
17  just the fact that a teenager and adolescent was
18  using social media, but also what the teenager or
19  adolescent was actually seeing in terms of content
20  on social media?  Have you looked at that to see
21  whether it would vary?
22            MS. COUCH:  Objection.  Vague.
23            THE WITNESS:  I don't recall looking at
24  specific content because we design our studies to
25  be content agnostic and to look more at these

Page 253

1  features that I am relying upon to discuss some of
2  these harms of social media.
3  BY MS. JONES:
4       Q.   Do you have a recollection of saying --
5  and, in fairness, I think this was before you were
6  engaged with this litigation.
7            But do you have a recollection of
8  saying, "It's not necessarily about the overall
9  time but the content they're exposed to"?
10       A.   I may have said that.
11       Q.   Okay.  Does that ring true to you?
12            MS. COUCH:  Objection.  Vague.
13            THE WITNESS:  Does that ring true to me
14  that I -- I said that?
15  BY MS. JONES:
16       Q.   No.  Does that statement seem right to
17  you?
18       A.   What do you mean by "does that
19  statement seem right" to me?
20       Q.   The statement that I just read you.
21            Why don't we show you the video.
22            MS. JONES:  Can we go to 77?
23            MS. COUCH:  Is this an existing exhibit
24  or a new one?
25            MS. JONES:  It'll be new.

Page 254

1        (TELZER EXHIBIT 14, Video - Alan Hu
2    Foundation Webinar, was marked for identification.)
3        MS. COUCH:  And this is Exhibit 13?
4        MS. JONES:  14.
5        MS. COUCH:  14.
6        MS. JONES:  What number did we put on
7    that one?  I don't remember.
8        THE WITNESS:  14.
9        MS. JONES:  14.  Okay.
10       (Playing video.)
11       MS. JONES:  Can we pause that for a
12   second, please?  Thank you.
13   BY MS. JONES:
14       Q.   Dr. Telzer, you have in front of you
15   what we have marked as Exhibit Number 14 to your
16   deposition.
17            We will make the full thing available
18   to your counsel if they want to review the entire
19   thing, but we've just shown an excerpt because we
20   are limited in time here.
21            I will represent to you that this is a
22   webinar that you participated in in May of 2023.
23   And recognizing that was two years ago, do you have
24   any memory of participating in a webinar in 2023?
25       A.   Yes.

Page 255

1        Q.   Okay.
2        MS. JONES:  Can we go ahead and play
3    that, please.
4        (Playing video.)
5    BY MS. JONES:
6        Q.   Dr. Telzer, that's you, yes?
7        A.   Correct.
8        Q.   Do you recall doing that webinar in
9    May of 2023?
10       A.   Yep.
11       Q.   And just to refer back to your paper of
12   February of 2023, the Maza paper, my -- my
13   impression was that your paper was published, and
14   then you did some amount of press and discussions
15   about the findings in your paper; is that right?
16       A.   This is not press, but --
17       Q.   Well, I don't -- I'm not trying to
18   diminish what you did by saying "press."  But you
19   were having some conversations publicly about the
20   findings from your paper; is that right?
21       A.   This webinar was unrelated to that, but
22   our findings were included in that webinar.
23       Q.   Okay.  Okay.  Fine.
24            And one of the things that you
25   specifically said, as you probably heard, was that

Page 256

1    it's not necessarily about the overall time, but
2    the content that they're exposed to, right?
3        A.   I think you're taking that slightly out
4    of context.  This was the Q and A session where I
5    think somebody -- although, I -- I'm recalling from
6    my memory, since you played one tiny clip at the
7    59 minute of a 60-plus-minute webinar.
8            I think what was happening is, they
9    were asking for a time limit that might be
10   appropriate, and I was responding that we can't
11   necessarily give a time limit --
12       Q.   Sure.
13       A.   -- which --
14       Q.   I heard that, too.
15       A.   Uh-huh.
16       Q.   What I also heard you say was that the
17   content that an adolescent or teen is exposed to
18   also matters.
19       A.   The content can matter, certainly.  But
20   I think that the broader important thing is what I
21   now know from doing a lot more research on this
22   topic, as well as seeing a lot of the underlying
23   documents, understanding these features in a lot
24   more detail now than I did a few years ago, that it
25   really is about these features of social media that

Page 257

1    are -- that are making what that content was even
2    more harmful.
3        Q.   And you -- when you were participating
4    in this webinar, you -- it sounds like somebody
5    might have asked you a question, "Is there a
6    cutoff?"  Right?
7        A.   I think that's what they were asking.
8        Q.   All right.  And I assume that even
9    though it was the Q and A portion of the webinar,
10   you aimed to be accurate and truthful in reciting
11   what your views are -- or were at the time?
12       A.   Yes, I was responding to their
13   questions.
14       Q.   Okay.  Are you testifying that, sitting
15   here today, you no longer think that the content
16   matters?
17            MS. COUCH:  Misstates her testimony.
18            THE WITNESS:  I am not saying that.
19   I'm saying that, a few years ago, I thought -- and
20   I mentioned the content was one component that
21   could be harmful, and today, knowing a lot more
22   about these features, that I now have the opinion
23   that that is exponentially making the harms of
24   social media worse.
25   BY MS. JONES:

Page 258

1      Q.   But the content still matters sitting
2   here today in June of 2025?
3          MS. COUCH:  Asked and answered.
4          THE WITNESS:  I think that content is
5   one small piece of the puzzle amongst much larger
6   concerns and risks associated with the features of
7   these platforms.
8   BY MS. JONES:
9      Q.   When you say the features are making
10  the content exponentially more harmful, are you
11  just referring back to the features of social media
12  that you talked about earlier?
13     A.   I'd like to give a specific example
14  from my report, if I may.
15     Q.   Well, actually, I just want you to
16  focus on my question because we're limited in time.
17         My question is:  When you refer to the
18  features of social media making content
19  exponentially more harmful, are you referring to
20  the features of social media that we talked about
21  earlier?
22         MS. COUCH:  Objection.
23  BY MS. JONES:
24     Q.   And I'm --
25         MS. COUCH:  Vague.

Page 259

1          MS. JONES:  I'm sorry.  Go ahead.
2          MS. COUCH:  Objection.  Vague.  Can't
3   limit her answer.  For the record, we have seven
4   hours left.
5          THE WITNESS:  Yeah, I think that I'd
6   like to give a specific example because it's a lot
7   easier --
8   BY MS. JONES:
9      Q.   Right.  I -- but I --
10     A.   Excuse me.
11     Q.   Doctor -- excuse me, Dr. Telzer.
12     A.   You interrupted me.
13     Q.   I don't mean to be rude, but you -- you
14  actually don't get to volunteer what you'd like to
15  say.  I actually just want you to focus on my
16  question, if you wouldn't mind.
17         My question was:  When you say that the
18  features are making the content exponentially more
19  harmful, are you referring to the features that we
20  talked about already earlier in the deposition?
21         MS. COUCH:  Objection.  Vague.
22         If you can answer without referring,
23  you can.  If you can't, you're entitled to look at
24  your report to answer a question.
25         THE WITNESS:  Yes, I am discussing

Page 260

1   those features.  And as an example, the algorithms
2   in particular are changing the experience of social
3   media.
4          So, for example, with toxic eating
5   behaviors, adolescents with eating disorders are
6   4,000 times more likely to be fed these videos
7   compared to those without an eating disorder.
8          MS. JONES:  Okay.  I'm going to move to
9   strike everything after, "Yes, I am discussing
10  those features."
11  BY MS. JONES:
12     Q.   Under your theory related to potential
13  changes in the brain resulting from heavy social
14  media use, is it your opinion that those changes
15  are always negative versus positive?
16         MS. COUCH:  Objection.  Vague.
17         THE WITNESS:  I think it's a nuanced
18  answer.  We know that social media is fundamentally
19  changing the way the brain is developing.  We need
20  long-term research in some ways to be able to track
21  what those effects mean into longer-term
22  development, as I've discussed.
23  BY MS. JONES:
24     Q.   Oh, was that the end of your answer?
25     A.   I was --

Page 261

1      Q.   I would accept that as the end of your
2   answer.  I just didn't want to interrupt --
3      A.   Yeah, I was --
4      Q.   -- you if you were going to say
5   something else.
6      A.   -- just going back to refer that the --
7   the broader opinion is meant to really underscore
8   that the brain is develop -- that the social media
9   experiences are changing the development of the
10  brain.  I think your question was related to
11  whether those changes in the brain are good or bad.
12     Q.   Yes.  That was my question, is whether
13  you have an opinion on that.
14     A.   I think --
15     Q.   Are they always good, always bad?
16     A.   I think we can't necessarily say that
17  something is always good or always bad when we're
18  talking about these individual differences and how
19  the changes -- and how the brain is changing
20  developmentally.
21         With the broader -- with the broader
22  literature to rely upon and some of our other work
23  showing that changes in the brain predict --
24  predict which adolescents are going to develop
25  problematic social media use, I think we can be

Page 262

1  pretty confident that these changes in the brain
2  are bad.
3        Q.   Well, when you say, "we can be pretty
4  confident that these changes in the brain are bad,"
5  my question was not that.
6        My question was:  Do we know whether
7  it's always bad versus sometimes good?
8        MS. COUCH:  Asked and answered.
9        THE WITNESS:  I think your question is
10  too broad and general, and we need a specific
11  example to say.
12        But I've shown that adolescents who
13  habitually use social media show that their brain
14  is changing, becoming more hypersensitive to their
15  peer environments.  I've also shown that
16  developmental changes in the brain predict
17  problematic social media use.
18        And so these are just two examples that
19  help us to understand the bigger picture, that the
20  brain is changing in response to social media.  And
21  the brain changes can also help us understand
22  vulnerabilities for developing problematic social
23  media use.
24        MS. JONES:  Okay.  I'm going to move to
25  strike as nonresponsive.

Page 263

1  BY MS. JONES:
2        Q.   But the point you've made about "I've
3  shown that adolescents who habitually use social
4  media show that their brain is changing," that's
5  your -- that's the Maza paper from 2023?
6        MS. COUCH:  Objection.  Misstates her
7  report and opinion.
8        THE WITNESS:  That's one example of a
9  paper that uses longitudinal methods to look at
10  brain changes.
11  BY MS. JONES:
12        Q.   Okay.  Let's look at that.  We marked
13  it as Exhibit Number 13, I think.
14        This is -- Exhibit Number 13,
15  Dr. Telzer, is your -- a paper that you co-authored
16  with several other folks and published in the early
17  part of 2023 in "JAMA Pediatrics"; is that right?
18        A.   Correct.
19        Q.   And the title of the article is
20  "Association of Habitual Checking Behaviors on
21  Social Media With Longitudinal Functional Brain
22  Development," right?
23        A.   Yes.
24        Q.   And I'm not going to march you through
25  every element of your paper.  Because you've

Page 264

1  referred to it in a couple of places, I just wanted
2  to ask you about a couple of points.
3        Let's turn to the second page, if you
4  wouldn't mind, and look in the first column.
5        A.   Okay.
6        Q.   And I'm going to ask you to look down
7  at the paragraph that begins with "The current
8  study."  Do you see that?  Towards the bottom --
9        A.   Yeah.
10        Q.   -- on the left-hand side.
11        It says:  The current study aimed to
12  examine whether social media use is associated with
13  longitudinal changes in functional brain
14  development across adolescence, a developmental
15  period characterized by peak social media use and
16  heightened neural sensitivity to social feedback
17  from peers.  Right?
18        A.   Yes.
19        Q.   And then a little further down -- well,
20  and you had a hypothesis, right?
21        A.   Yes.
22        Q.   You hypothesized that if teens more
23  regularly checked social media, they would become
24  increasingly hypersensitive to social feedback
25  anticipation, and that would result in longitudinal

Page 265

1  increases in neural activation, right?
2        A.   Yes.
3        Q.   And that's another way of saying -- I'm
4  going to say this in my simplistic way -- that
5  if -- your theory was if you had adolescents who
6  check their social media a good bit, that they will
7  eventually develop processes that will lead to
8  changes in the brain.
9        Is that the nutshell version?
10        MS. COUCH:  Objection.  Vague.
11        THE WITNESS:  I'm not sure that that
12  nutshell is -- can you say that again?
13  BY MS. JONES:
14        Q.   Sure.  You have -- your theory was that
15  for adolescents who checked their social media
16  habitually --
17        A.   Uh-huh.
18        Q.   -- they would become hypersensitive to
19  social feedback anticipation, right?
20        A.   Yep.  That's -- that's what we said in
21  the paper.
22        Q.   And "social feedback anticipation,"
23  what is the nutshell version of that, just so we're
24  on the same page?
25        A.   It's the idea of -- of anticipating

Page 266

1  feedback.  Sorry.  That's repeating back the same
2  words.
3      Q.   The reason I asked you to define it,
4  yeah.
5      A.   Yeah.  It is the idea that you are
6  anticipating you will either get, using social
7  media as an example, positive feedback in the form
8  of likes, for example, from your peers.
9      Q.   And then what your -- if I understand
10 the theory, the theory was, over time, that would
11 lead to increases in what's described here as
12 "neural activation," right?
13     A.   Yes.
14     Q.   In certain areas of the brain, right?
15     A.   Yes.
16     Q.   Including certain areas that are
17 associated with motivational, affective salience
18 and cognitive control, right?
19     A.   Correct.
20     Q.   And you also had a theory that if you
21 didn't check as much, over time you would see
22 decreases in the activation in those same parts of
23 the brain.  Is that roughly correct?
24     A.   That's what we wrote here.
25     Q.   Okay.  And then you said:  Given the

Page 267

1  limited research exploring longitudinal neural
2  activation in relation to social media behaviors --
3      A.   Uh-huh.
4      Q.   -- we conducted exploratory whole-brain
5  analyses to determine which brain regions showed
6  the greatest differences in neural activation
7  longitudinally.
8           To our knowledge, results from this
9  study would provide the first insight into how
10 habitual social media behaviors may be altering
11 adolescent brain development.  Yes?
12     A.   Uh-huh.  Yes.
13     Q.   You have to say "yes" or "no."
14          Was that a true statement?  Were there
15 earlier studies prior to this one that was
16 published in 2023 on this specific issue?
17     A.   To our knowledge, it was the first.
18     Q.   Okay.  Have there been others since?
19     A.   Other what?
20     Q.   Other studies that look specifically at
21 this question of how habitual social media
22 behaviors may alter adolescent brain development.
23     A.   There probably have been.  I can't
24 think of -- I mean, there's a large amount of
25 literature coming out using longitudinal techniques

Page 268

1  to look at brain development related to social
2  media.
3      Q.   I'm not sure if that's a "yes" or a
4  "no."
5           Are -- can you think -- are there other
6  studies you're thinking of that looked at this same
7  question, or you're not sure?
8      A.   This specific question, not
9  necessarily.  But the broader literature has looked
10 at -- there's been more studies coming out looking
11 at social media and brain development.
12     Q.   Okay.  Let's go to Page 163 in the
13 bottom right-hand corner, the "Discussion" section.
14 And this simply lays out in more general terms the
15 findings from the study, yes?
16     A.   I think it summarizes some of the
17 findings.
18     Q.   Okay.  "Summarizes" -- I can accept
19 that word.
20          And you and your co-authors reported
21 that:  Adolescents who engaged in high (habitual)
22 checking behaviors showed distinct neural
23 trajectories when anticipating social feedback
24 compared with those who engaged in moderate or low
25 or (nonhabitual) checking behaviors, suggesting

Page 269

1  that habitual social media checking early in
2  adolescence is associated with divergent brain
3  development over time.  Yes?
4      A.   Yes.
5      Q.   Then if you go to Page 165, you have a
6  section there entitled -- that starts with:  Our
7  findings on the bottom left-hand side.
8      A.   Uh-huh.
9      Q.   You have to say "yes" or "no."
10     A.   Yes.  Sorry.
11     Q.   It says:  Our findings suggest that
12 checking behaviors on social media in early
13 adolescence may tune the brain's sensitivity to
14 potential social rewards and punishments.  Yes?
15     A.   Yes.
16     Q.   It says:  Whereas individuals with
17 habitual checking behaviors showed initial
18 hypoactivation but increasing sensitivity to
19 potential social cues over time, those with
20 nonhabitual checking behaviors showed initial
21 hyperactivation and decreasing sensitivity over
22 time.  Yes?
23     A.   Yes.
24     Q.   And then, in the next column, you and
25 your co-authors report:  This theory argues that

Page 270

1  repeated exposure to social reward downregulates
2  dopamine receptors and production, which results in
3  decreased sensitivity of reward circuits.  Yes?
4       A.   Yes.
5       Q.   Now, I have one question I wanted to
6  ask you.  In this paper -- published in January of
7  2023, there was a correction in February of 2023 --
8  there is no place in this paper where you or
9  your -- you and your co-authors say:  Heavy social
10  media use changes the development of the adolescent
11  brain, altering it from what would have been
12  considered typical prior to the advent of social
13  media?
14            MS. COUCH:  Objection.  Misstates the
15  paper.
16            THE WITNESS:  That statement that you
17  read is not in this article.
18  BY MS. JONES:
19       Q.   And, in fact, you have a Limitation
20  section -- you have a Limitation section in your
21  study.  And we talked earlier about study
22  limitations, right?
23       A.   Briefly, we talked about study
24  limitations, yeah.
25       Q.   Okay.  And this is another paper on

Page 271

1  which you were a co-author where you all reported
2  on limitations of the -- the study, yes?
3       A.   Correct.
4       Q.   And that's -- this statement of
5  limitations, that's a truthful account of you and
6  your co-authors' views on the limits of your study,
7  yes?
8            MS. COUCH:  Objection.  Vague.
9            THE WITNESS:  We include limitations
10  about our studies in all empirical papers like
11  this --
12  BY MS. JONES:
13       Q.   Sure.
14       A.   Indicating what potential limitations
15  could be.
16       Q.   Sorry to interrupt you.
17            My question was:  Is this an accurate
18  account of you and your co-authors' views on the
19  limitations of the study?
20       A.   This is what we represented in this
21  article as the limitations --
22       Q.   Okay.
23       A.   -- at the time, yeah.
24       Q.   And they're right.  I mean, from
25  you-all's perspective, these are the limitations

Page 272

1  that exist, yes?
2       A.   These are the limitations.
3       Q.   And it says:  Notably, because
4  differences in neural trajectories already existed
5  between participants with habitual and nonhabitual
6  checking behaviors at the start of the study, it is
7  difficult to determine whether social media use
8  prior to data collection caused these distinct
9  neural trajectories or pre-existing differences in
10  neural activation placed some youth at risk for
11  more habitual checking behaviors.  Yes?
12       A.   It says that.
13       Q.   And that's a true statement, right?
14       A.   It says that in Limitations, yeah.
15       Q.   This paper does not establish cause
16  between habitual or nonhabitual social media
17  checking and differences in neural trajectories,
18  right?
19            MS. COUCH:  Objection.  Misstates the
20  paper.
21            THE WITNESS:  I mean, this paper is
22  using longitudinal methods that allow us to be --
23  make meaningful conclusion about how social media
24  is likely changing the developing brain.
25  BY MS. JONES:

Page 273

1       Q.   Well, that wasn't -- my question wasn't
2  about whether it allows you to make meaningful
3  conclusions.
4            My question was:  This paper, Maza and
5  your other co-authors from 2023, does not establish
6  cause between habitual or nonhabitual social media
7  checking and differences in neural trajectories.
8  That's what that says, right?
9            MS. COUCH:  Objection.  Misstates the
10  paper.
11            THE WITNESS:  No.  That is not exactly
12  what that says, no.
13  BY MS. JONES:
14       Q.   Well, was it accurate when you and your
15  co-authors wrote:  It is difficult to determine
16  whether social media use prior to data collection
17  caused these distinct neural trajectories?
18       A.   Yes.
19            THE WITNESS:  Sorry.
20            MS. COUCH:  Objection.  Completeness.
21            Continue.
22            THE WITNESS:  Yes.  As with many
23  studies that we conduct, we always include these
24  caveats that we cannot determine that something
25  collected, for example, before we collected the

Page 274

1  data might be related to what we found.
2  BY MS. JONES:
3      Q.   And you're not testifying that that
4  limitation that you laid out there is incorrect,
5  right?
6          MS. COUCH:  Objection.  Vague.
7          THE WITNESS:  These are the limitations
8  that we laid out here.
9  BY MS. JONES:
10     Q.   Okay.  And this paper does not
11 establish causation?
12         MS. COUCH:  Asked and answered.
13         THE WITNESS:  As I mentioned, using
14 these rigorous longitudinal methods, we can be
15 confident that social media use at an earlier age
16 is meaningfully contributing to these longitudinal
17 increases in adolescents' -- is meaningfully
18 contributing to longitudinal changes in
19 adolescents' brains.
20         MS. JONES:  I'm going to move to strike
21 as nonresponsive.
22 BY MS. JONES:
23     Q.   This paper cannot establish causation,
24 right?
25         MS. COUCH:  Asked -- asked and

---

Page 275

1  answered.
2          THE WITNESS:  The methods that we've
3  used here, these rigorous longitudinal designs in a
4  relatively large sample size, can help us make very
5  meaningful conclusions that social media use is
6  meaningfully contributing to developmental changes
7  in how the brain is developing across time.
8  BY MS. JONES:
9      Q.   Sure.  But you -- what you just said
10 you didn't actually say in your paper, right?
11         MS. COUCH:  Objection.  Argumentative.
12 BY MS. JONES:
13     Q.   What -- what your -- what -- excuse me.
14 What your paper says is:  It's
15 difficult to determine whether social media use
16 prior to data collection caused these sustained
17 neural trajectories.  Right?
18         MS. COUCH:  Objection.  Incomplete.
19         THE WITNESS:  There is one limitation
20 that we mentioned here.  But we can probably read
21 the full discussion, and I would be happy to do so,
22 which will help us to understand the broader
23 context of these findings.
24 BY MS. JONES:
25     Q.   Well, let's go to the "Conclusions"

---

Page 276

1  section.  It says:  Adolescent social media use has
2  proliferated extensively in the past decade.  This
3  longitudinal cohort study suggests that social
4  media behaviors in early adolescence may be
5  associated with changes in adolescents' neural
6  development.
7          Do you see that?
8          THE WITNESS:  Yes.
9  BY MS. JONES:
10     Q.   And you all did not say "are
11 associated."  You said "may be associated," right?
12     A.   That is the way scientists speak in
13 empirical articles.  When we say -- or I'll speak
14 for myself.  In our publication, when I and my
15 colleagues in this paper say "may be," we mean
16 probably, more likely than not, is associated with
17 changes in adolescents' neural development.
18     Q.   Sure, that's what you're saying today.
19 But that's not what the -- the paper doesn't
20 actually say that.  Can we at least agree on that?
21     A.   The way --
22         MS. COUCH:  Objection.  Misstates her
23 answer.
24         THE WITNESS:  The way we use language
25 in the scientific literature, we use the word

---

Page 277

1  "may be" to say that these associations are
2  probably, more likely than not, associated with
3  changes in adolescents' neural development.
4  BY MS. JONES:
5      Q.   You added -- I'm struck by the fact
6  that you just added a lot of words to that sentence
7  that actually appears in the paper from 2023.  Have
8  you done anything to go back and say, we're going
9  to supplement our conclusions on this issue?
10         MS. COUCH:  Objection.  Argumentative.
11         THE WITNESS:  The conclusion has not
12 changed.  I'm merely saying that, in an empirical
13 article, we use the word "may be associated" to
14 indicate that this association is probably, and
15 more likely than not, associated with that outcome.
16 BY MS. JONES:
17     Q.   But we -- we can acknowledge that --
18 that there's a difference between what's written in
19 the article and what you've just said here at your
20 deposition, that those are different words that you
21 just -- you've just described?
22         MS. COUCH:  Objection.  Misstates her
23 testimony.
24         THE WITNESS:  I am saying that we use
25 the word "may be" to indicate that it is probably,

Page 278

```
1   or more likely than not, the case.
2   BY MS. JONES:
3       Q.   Are -- are there other places where
4   you've used the phrase "may be associated" to say
5   "probably" or "more likely than not"?
6       A.   Probably.
7       Q.   And at any point did you say to your
8   co-authors, "You know, actually, the data supports
9   that it's probably, or more likely than not, the
10  case that this is connected?
11      MS. COUCH:  Objection.  Argumentative.
12      THE WITNESS:  In publications and in
13  this type of work, we use the word "may be" in that
14  way.
15  BY MS. JONES:
16      Q.   To say "probably" and "more likely than
17  not"?
18      A.   Yes.
19      THE WITNESS:  I wouldn't mind a quick
20  break.
21      MS. JONES:  Yeah, certainly.  I haven't
22  been watching the clock.
23      MS. COUCH:  Yeah, we've been about an
24  hour and 20 minutes.
25      MS. JONES:  Okay.  Fine.
```

Page 279

```
1       MS. COUCH:  Why don't we take -- it
2   will probably -- because we have to go upstairs, it
3   will probably take like seven or eight minutes to
4   go downstairs --
5       MS. JONES:  We should go off the
6   record.
7       MS. COUCH:  Sorry.
8       THE VIDEOGRAPHER:  Going off the
9   record.  The time is 2:38 p.m.
10              * * *
11  (Whereupon, there was a recess in the
12  proceedings from 2:38 p.m. to 3:05 p.m.)
13              * * *
14      THE VIDEOGRAPHER:  Going back on the
15  record.  The time is 3:05 p.m.
16  BY MS. JONES:
17      Q.   Dr. Telzer, your 2023 Maza paper that
18  we were looking at, which I think is Exhibit 13,
19  was that based on self-reporting of the
20  participating adolescents?
21      A.   Can you specify?  What are you --
22  what -- self-reporting what?
23      Q.   That's a fair question.
24      A.   Yeah.
25      Q.   Self-reported -- self-reports of how
```

Page 280

```
1   often the participants were checking --
2       A.   Yes.
3       Q.   -- social media.
4       A.   Yes, it was based on their self-report.
5       Q.   Okay.  And you agree that
6   self-reporting can be inaccurate?
7       MS. COUCH:  Objection.  Vague.
8       THE WITNESS:  I mean, we rely on
9   self-report measures for many different measures
10  and have shown that self-report measures are
11  correlated with some objective measures.
12  BY MS. JONES:
13      Q.   Sure.  My question was:  Do you agree
14  with me that self-reports can be inaccurate?
15      MS. COUCH:  Objection.  Vague.
16      THE WITNESS:  I don't know what you
17  mean by "inaccurate."
18  BY MS. JONES:
19      Q.   Let me -- do you know that you have, in
20  fact, said that self-reporting of the use of
21  digital technology is notoriously inaccurate?
22      MS. COUCH:  Objection.  Lacks
23  foundation.
24  BY MS. JONES:
25      Q.   Do you recall saying that?
```

Page 281

```
1       A.   I don't recall saying that.
2       Q.   Okay.  Well, let us show that to you.
3       (TELZER EXHIBIT 15, Research Article
4   titled Daily links between objective smartphone use
5   and sleep among adolescents, was marked for
6   identification.)
7   BY MS. JONES:
8       Q.   I'm handing you what we've marked as
9   Exhibit 15.  Dr. Telzer, do you recognize
10  Exhibit Number 15?
11      A.   Yes.
12      Q.   And Exhibit Number -- excuse me.
13  Exhibit Number 15 is a paper on which you are a
14  co-author, correct?
15      A.   Correct.
16      Q.   Do you recall this paper?
17      A.   Yes.
18      Q.   Okay.  And this paper was published in
19  2024, right?  If you look at the first page down in
20  the bottom --
21      A.   Yep.
22      Q.   -- left-hand corner.  Yes?
23      A.   Yes.
24      Q.   And do you stand behind what's written
25  in this paper?
```

Page 282

```
1        A.   Yes.
2        Q.   All right.  Let me ask you to look at
3   Page 1173.  I'm using the pages up in the upper
4   right-hand corner.
5             Down in the bottom -- you're welcome to
6   look at whatever part you want to.  But down in the
7   bottom paragraph of that Section 4, entitled
8   "Utilizing Objective Measures to Determine Within-
9   Versus Between-Person Associations," about midway
10  through the paragraph, there's a sentence that
11  reads:  Self-reports of digital technology use are
12  notoriously inaccurate and may reflect subjective
13  experiences rather than actual use.  Right?
14       A.   I see that, yes.
15       Q.   And that's a true statement, right?
16            MS. COUCH:  Objection.
17            THE WITNESS:  That's what we wrote in
18  this line here, yes.
19  BY MS. JONES:
20       Q.   Well, my question is not just -- I know
21  you wrote it.  My question is:  Is that a true
22  statement?
23            MS. COUCH:  Objection.  Vague.
24            THE WITNESS:  In the specific context
25  of this, that is the case of what we wrote.
```

Page 283

```
1   BY MS. JONES:
2        Q.   Is that statement still true today,
3   that self-reports of digital technology use are
4   notoriously inaccurate and may reflect subjective
5   experiences rather than actual use?
6        A.   I think self-report measures and -- and
7   objective measures are complementary to each other.
8        Q.   Sure.  And I recognize that there are
9   other measures of use that you have talked about in
10  your report.  I'm, for the moment, just focused on
11  subjective self-reporting measures.
12            Your paper from 2023, the Maza paper,
13  relied on self-reporting of social media checking,
14  right?
15       A.   In the context of this paper that you
16  just had me look at, we're saying that self-report
17  measures in the context of measuring time use,
18  which is what we measure here, is -- and that is
19  different from what we measured in the Maza paper,
20  looking at how frequently they're saying that
21  they -- or how frequently they're self-reporting
22  their checking behaviors.
23            MS. JONES:  I'm going to move to strike
24  as nonresponsive.
25  BY MS. JONES:
```

Page 284

```
1        Q.   My question was:  In your 2023 Maza
2   paper, you used self-reporting of social media
3   checking, correct?
4             MS. COUCH:  Asked and answered.
5             THE WITNESS:  Yes.
6   BY MS. JONES:
7        Q.   Now, the other thing we were just
8   talking about before our break with respect to
9   Exhibit Number 14, your 2023 Maza paper, was
10  whether or not your paper showed causation.  Do you
11  remember those questions?
12       A.   Yes.
13       Q.   All right.  And after your paper was
14  published, you actually did an interview where you
15  said that you didn't know; "We cannot make causal
16  claims that social media is changing the brain."
17  Do you recall that?
18            MS. COUCH:  Objection.  Lacks
19  foundation.
20            THE WITNESS:  I need the specific.
21  BY MS. JONES:
22       Q.   Okay.  Without me handing you
23  something, you don't remember saying that about
24  your paper?
25       A.   I would need to see it, please.
```

Page 285

```
1        Q.   Okay.  Let me hand you what we're
2   marking as Exhibit Number 16.  Sorry --
3        A.   Uh-huh.
4        Q.   -- to make you reach.
5             (TELZER EXHIBIT 16, Document titled
6   Social Media Use Is Linked to Brain Changes in
7   Teens, Research Finds, The New York Times, was
8   marked for identification.)
9   BY MS. JONES:
10       Q.   Dr. Telzer, Exhibit Number 16 is a
11  printout of an article from "The New York Times,"
12  entitled "Social Media Use Is Linked to Brain
13  Changes in Teens, Research Finds."  Do you see
14  that?
15       A.   Uh-huh.
16       Q.   You have to say "yes" or "no."
17       A.   Yes.  Sorry.
18       Q.   And the date of the article is
19  January 3rd, 2023 --
20       A.   Yes.
21       Q.   -- yes?
22            And the -- if you look at the actual
23  article, it is describing your 2023 Maza paper on
24  habitual checking behaviors on social media,
25  correct?
```

HIGHLY CONFIDENTIAL

Page 286

1    A.    Yes.  I think it links to that paper.

2    Q.    And in the third paragraph --

3        Well, the first -- the first sentence
4  in the article says:  Teens who frequently checked
5  social media showed an increasing sensitivity to
6  peer feedback, although the cause of the changes
7  was not clear.

8        Do you see that?

9    A.    I see that.

10    Q.    And it goes on to say in the third
11  paragraph:  A new study by neuroscientists at the
12  University of North Carolina tries something new,
13  conducting successive brain scans of middle
14  schoolers between the ages of 12 and 15, a period
15  of especially rapid brain development.

16        Do you see that?

17    A.    I see that.

18    Q.    And that -- that is referring to the
19  group of folks, including yourself, who were
20  involved in the study that eventually was published
21  in "JAMA Pediatrics" in 2023, correct?

22    A.    I don't know what you mean.  So, yes.
23  This study is referring to this paper.

24    Q.    Yes.  Okay.  It goes on to say:  The
25  researchers found that children who habitually

HIGHLY CONFIDENTIAL

Page 287

1  check their social media feeds at around age 12
2  showed a distinct trajectory, with their
3  sensitivity to social rewards from peers
4  heightening over time.  Teenagers with less
5  engagement in social media followed the opposite
6  path, with a declining interest in social rewards.

7        Do you see that?

8    A.    Yes.

9    Q.    It says:  The study, published on
10  Tuesday in "JAMA Pediatrics," is among the first
11  attempts to capture changes to brain function
12  correlated with social media use over a period of
13  years.

14        Do you see that?

15    A.    Yes.

16    Q.    It then goes on to say:  The study has
17  important limitations -- yes?

18    A.    Yes.

19    Q.    -- as the authors acknowledge.  Because
20  adolescence is a period of expanding social
21  relationships, the brain differences could reflect
22  a natural pivot toward fear -- excuse me -- toward
23  peers, which could be driving more frequent social
24  media use.

25        Did I read that correctly?

HIGHLY CONFIDENTIAL

Page 288

1    A.    Yes.

2    Q.    And then it appears that you are quoted
3  in the next paragraph.  Quote, "We can't make
4  causal claims that social media is changing the
5  brain."

6        Did I read that correctly?

7        MS. COUCH:  Objection.  Incomplete.

8  BY MS. JONES:

9    Q.    My question is just:  Did I read that
10  correctly?

11    A.    You read that correctly.  But the
12  broader context of a one-hour interview and pulling
13  out half a sentence does not give the whole picture
14  of what I was talking about here.

15        MS. JONES:  Okay.  I'm going to move to
16  strike everything after "you read that correctly."

17        My question was just:  Did I read that
18  correctly?  It sounds like I did.

19  BY MS. JONES:

20    Q.    My next question is:  When you were
21  interviewed by "The New York Times," did you
22  endeavor to be accurate and truthful in what you
23  said to "The New York Times"?

24    A.    I was certainly accurate in the things
25  I was saying to "The New York Times."  And this was

HIGHLY CONFIDENTIAL

Page 289

1  half of a sentence taken out of a one-hour
2  interview.

3    Q.    Okay.  And it says:  "We can't make
4  causal claims that social media is changing the
5  brain," said Eva -- and let me just pause there.

6        Did you -- recognizing there might be
7  other contexts that you're thinking of, did you say
8  those words:  "We can't make causal claims that
9  social media is changing the brain"?

10    A.    That is half the sentence of a one-hour
11  interview.

12    Q.    Okay.  Was there more of this sentence
13  that you're recalling?

14    A.    I went on to explain the nuance of what
15  our findings meant, including the following, that,
16  "Teens who habitually" -- "teens who are habitually
17  checking their social media are showing these
18  pretty dramatic changes in the way their brains are
19  responding, which could have" -- "which could
20  potentially have long-term consequences well into
21  adulthood, sort of setting the stage for brain
22  development over time."

23        But, again, this is in the context of a
24  whole-hour interview.

25    Q.    Sure.  Okay.  But just -- just so I'm

Page 290

1  very clear, you did say to "The New York Times,"
2  "We can't make causal claims that social media is
3  changing the brain," even though you also talked
4  about the fact that teens seem to be habitually
5  checking their social media.
6        MS. COUCH:  Asked and answered.
7  BY MS. JONES:
8        Q.   Yes?
9        A.   Yes.  I said that half sentence in the
10  context of a larger one-hour interview.
11        Q.   Well, when -- when -- did you read this
12  article when it came out?
13        A.   Yes.
14        Q.   Did you go back to "The New York Times"
15  and say that you were somehow misquoted?
16        MS. COUCH:  Objection.  Argumentative.
17        THE WITNESS:  No, I did not go back to
18  "The New York Times."
19  BY MS. JONES:
20        Q.   Did you go back to them and say,
21  "Actually, what I really meant is maybe a causal
22  claim can be made about social media"?
23        MS. COUCH:  Objection.  Argumentative.
24        THE WITNESS:  I did not go back to "The
25  New York Times."

Page 291

1  BY MS. JONES:
2        Q.   Okay.  And when you said, "We can't
3  make causal claims that social media is changing
4  the brain," recognizing that that is part of a
5  sentence -- you've read the rest of it -- was this
6  a true statement at the time?
7        MS. COUCH:  Objection.  Incomplete.
8        THE WITNESS:  That is half of a
9  sentence of a broader hour-long interview that I
10  gave.
11  BY MS. JONES:
12        Q.   Sure.
13        MS. JONES:  I'm going to move to strike
14  as nonresponsive.
15  BY MS. JONES:
16        Q.   My question was:  Was that a true
17  statement at the time?
18        MS. COUCH:  Objection.  Vague.
19        THE WITNESS:  That was half the
20  statement of a broader conversation of one hour I
21  had with the reporter.
22  BY MS. JONES:
23        Q.   If I read -- if I read the whole
24  sentence -- "We can't make causal claims that
25  social media is changing the brain.  But teens who

Page 292

1  are habitually checking their social media are
2  showing these pretty dramatic changes in the way
3  their brains are responding" -- is that a true
4  statement?
5        A.   Is what -- sorry.  Is what a true
6  statement?
7        Q.   What I just read.
8        A.   I mean, these are quotes from a -- a
9  much larger conversation that I had with the
10  reporter.
11        Q.   And are the entirety of those quotes
12  true or were they true at the time?
13        MS. COUCH:  Objection.  Vague.
14        THE WITNESS:  These are quotes taken
15  slightly out of context from the longer
16  conversation that we had.
17  BY MS. JONES:
18        Q.   Yeah.  My question was:  Were they true
19  statements when you made them?
20        MS. COUCH:  Asked and answered.  Vague.
21        THE WITNESS:  These are the -- these
22  are the statements -- or these are the sentences
23  that were quoted as part of a much larger
24  conversation that we had.
25  BY MS. JONES:

Page 293

1        Q.   You understand I'm asking you
2  something -- do you know that I'm asking you
3  something slightly different, or are we missing
4  something somehow?
5        My question is:  Were these true
6  statements when you made them at the time in 2023?
7        MS. COUCH:  Asked and answered.
8        THE WITNESS:  These statements are
9  taken out of context from a broader long discussion
10  that we had.
11  BY MS. JONES:
12        Q.   Okay.  So you couldn't tell me whether
13  the statements that are reported here by
14  "The New York Times" are true or not?
15        MS. COUCH:  Asked and answered.
16        THE WITNESS:  These statements are
17  taken out of a larger conversation that we had.
18  BY MS. JONES:
19        Q.   Okay.  And so you're not comfortable
20  telling me -- I think you told me you weren't
21  misquoted, right?
22        A.   These are partial quotes taken out of a
23  long conversation that we had.
24        Q.   Sure.  But I -- my question is:  Are
25  you -- did they get the words wrong?

Page 294

1    A.   These sentence or even partial
2  sentences are taken out of a larger one-hour
3  conversation.
4    Q.   Sure.  During the rest of the
5  conversation, at some point did you say, "We can
6  make causal claims that social media is changing
7  the brain"?
8    A.   I don't recall our full conversation.
9    Q.   Okay.  And so it sounds like you don't
10 remember whether you might have said anything
11 contrary to what's reflected in this article?
12     MS. COUCH:  Calls for speculation.
13     THE WITNESS:  I'm saying that these
14 partial sentences are taken out of context of the
15 larger conversation we had.
16 BY MS. JONES:
17   Q.   Let me ask you to look at --
18     (TELZER EXHIBIT 17, The Journal of
19 Child Psychology and Psychiatry - Commentary:  An
20 updated agenda for the study of digital media use
21 and adolescent development - future directions
22 following Odgers & Jensen (2020), was marked for
23 identification.)
24 BY MS. JONES:
25   Q.   I'm handing you what we've marked as

Page 295

1  Exhibit Number 17.  Do you recognize Exhibit
2  Number 17, Dr. Telzer?
3    A.   Yes.
4    Q.   And just to orient ourselves, Exhibit
5  Number 17 is a commentary written by you, Mitchell
6  Prinstein and Jacqueline -- is it Nesi?
7    A.   Yes.
8    Q.   Okay.  And published in 2020; is that
9  right?
10   A.   Yes.
11   Q.   And you were responding at the time to
12 a different piece of writing that had been
13 published by two other experts.
14   A.   Yes.
15   Q.   Is that right?
16   A.   Uh-huh.
17   Q.   I'm going to ask you to look down at
18 the bottom part of the left column --
19   A.   Uh-huh.
20   Q.   -- on the first page of Exhibit
21 Number 17, if you wouldn't mind.
22     That paragraph -- that second paragraph
23 on the left column begins by saying:  Rates of some
24 form of psychopathology, such as suicidal and
25 nonsuicidal self-injurious thoughts and behaviors,

Page 296

1  depression and anxiety, also have increased over
2  the past decade, leading many researchers to
3  suspect a potential link between digital media use
4  and increases in the prevalence of adolescents'
5  psychological symptoms.
6      Do you see that?
7    A.   I do.
8    Q.   And towards the bottom of that same
9  paragraph, you and your co-authors write:
10 Interestingly, however, empirical data supporting
11 the purported link between digital media use and
12 adolescent psychopathology have yielded
13 controversial -- controversially mixed findings.
14     Do you see that?
15   A.   I do.
16   Q.   Was that a true statement when this
17 paper was published?
18     MS. COUCH:  Object to form.  Vague.
19     THE WITNESS:  I mean, this is in 2020,
20 reviewing some of the literature across these
21 links, showing that there are mixed findings in the
22 literature.
23 BY MS. JONES:
24   Q.   Sure.  And my question was:  Was that a
25 true statement that you and your co-authors

Page 297

1  published in 2020?
2    A.   Yes, this is what we wrote in that
3  paper.
4    Q.   All right.  And it was true --
5      MS. COUCH:  Same objection.
6  BY MS. JONES:
7    Q.   -- or not true?
8    A.   This is what we wrote in the paper at
9  the time.
10   Q.   Okay.  And you wouldn't have written it
11 if you didn't believe it to be consistent with your
12 review of the science?
13   A.   At the time of reviewing the
14 literature, there were mixed findings that we were
15 pointing toward.
16   Q.   Got it.
17     And then in the next paragraph, it
18 says:  The review offered by Odgers and Jensen --
19 and then there is a parenthetical (2020) -- thus
20 offers an important and compelling turning point in
21 the literature by demonstrating that the length of
22 time adolescents spend using digital media is not
23 reliably associated with maladaptive outcomes, such
24 as depression, anxiety, and risk behavior.
25     Do you see that?

Page 298

1    A.    Yes.
2    Q.    Do you believe that was a true
3  statement in 2020?
4    A.    Yes.  We indicate we're referring to
5  their publication, that this is what they were
6  showing at the time, yep.
7    Q.    And did -- do you recall whether you
8  agreed with their conclusion that the length of
9  time adolescents spend using digital media is not
10  reliably associated with maladaptive outcomes, such
11  as depression, anxiety, and risk behavior?
12    A.    I don't recall at the time if I agreed
13  with them or not, if that's what you're asking.
14    Q.    Yes, that is what I'm asking.
15    A.    I don't recall.
16    Q.    You did not express disagreement in
17  this commentary, right?
18    A.    I'd have to reread the whole thing.
19  It's been a while.
20    Q.    Well, you're welcome to read the whole
21  thing, but let me show you a specific reference in
22  the next column, same paragraph at the bottom.
23    A.    Okay.
24    Q.    It begins with the word "nevertheless."
25    A.    Uh-huh.

Page 299

1    Q.    It says:  Nevertheless, the data simply
2  do not currently support that the number of hours
3  adolescents spend using digital media is associated
4  with increased risks for psychopathology or
5  maladaptive behavior.
6        Did I read that correctly?
7    A.    You read that correctly.
8    Q.    Okay.  And so this is not just you all
9  reporting on what Odgers and Jensen have said.
10  This is you all actually reporting on your
11  understanding of the data at the time, right?
12    A.    I believe that's the case, that -- that
13  we were indicating at the time that the data don't
14  support specifically examining the number of hours
15  adolescents spend is associated with those risks.
16    Q.    Do you -- is that statement still true
17  today?
18        MS. COUCH:  Objection.  Vague.
19        THE WITNESS:  Is that statement --
20  which statement?
21  BY MS. JONES:
22    Q.    The one we're talking about.
23    A.    This "nevertheless" statement?
24    Q.    Yes.
25    A.    I think that it's complex and nuanced

Page 300

1  because we've moved beyond looking at the number of
2  hours adolescents spend using digital media to try
3  to understand multiple components of that use.
4    Q.    And does that mean -- I'm not sure I
5  understand how your -- that your -- how your answer
6  responds to my question.
7        My question is:  Do you stand behind
8  that sentence as written today in 2025?
9        MS. COUCH:  Objection.  Argumentative.
10  Vague.
11        THE WITNESS:  I don't know what you
12  mean by "stand by that statement today."  At the
13  time of writing this, the data didn't support
14  specifically looking at the number of hours as
15  associated with increased risk for psychopathology
16  or maladaptive behavior.  And most of our work now
17  is not necessarily looking specifically at these
18  broad metrics of the number of hours spent.
19  BY MS. JONES:
20    Q.    And my question about whether you still
21  stand behind it is simply, do you think that
22  continues to be, in 2025, an accurate statement of
23  the state of the data?
24        MS. COUCH:  Objection.  Vague.
25        THE WITNESS:  In 2025 there's been a

Page 301

1  lot more research that has come out.  But, also, I
2  think it's very important to note that we've moved
3  beyond the number of hours on social media to
4  understand many other functions of it.
5  BY MS. JONES:
6    Q.    Do you think in order to find
7  causation -- and this is going to be a general
8  question, so you can tell me if it's too general --
9  in order to find causation, you first -- between
10  two different things, you first need to establish
11  an association?
12        MS. COUCH:  Objection.  Vague.
13        THE WITNESS:  I think that's too
14  general to respond.
15  BY MS. JONES:
16    Q.    Do you think you can have causation
17  without an association?
18        MS. COUCH:  Objection.  Vague.
19        THE WITNESS:  I don't think that that
20  makes sense.  I can't answer that.
21  BY MS. JONES:
22    Q.    You don't know?
23    A.    I -- I don't understand how to answer
24  that.  It doesn't make sense to me.
25    Q.    When you were doing your literature

Page 302

1  review in connection with your work as an expert in
2  this case, did you -- did your search terms pull
3  back the Odgers and Jensen paper from 2020?
4       A.   I don't recall.
5       Q.   Did you think it was worth citing in
6  your long list of reliance materials that you've
7  provided in the case?
8       A.   I --
9       Q.   Let me actually ask it a slightly
10 different way.  We looked at your reliance list --
11      A.   Uh-huh.
12      Q.   -- and Odgers and Jensen from 2020
13 are -- is not on that list.  Is there a reason that
14 it's not on there?
15      A.   No purposeful reason.
16      Q.   Okay.  Do you think it should be?
17      A.   It is an article that I've read, so --
18 it is in my brain, so we can add it to it.
19      Q.   Well, you probably understand that we
20 aren't in your brain.  So our ability to know what
21 you're relying on is based on the list that we get.
22           So do you think that the Odgers and
23 Jensen paper is a paper that you, on reflection,
24 should have on your reliance list?
25           MS. COUCH:  Objection.  Calls for legal

Page 303

1  reasoning.
2           THE WITNESS:  I don't think that it
3  needs to be on there.  There's dozens of papers
4  probably out there that are not on my reliance
5  list.  This includes other things I have read
6  broadly, but I tried to be as thorough as I could
7  for my reliance list.
8           MS. COUCH:  Just clarifying the record,
9  it's materials considered list.
10          THE WITNESS:  Materials.
11 BY MS. JONES:
12      Q.   Dr. Telzer, just to the exchange
13 between you and your counsel, do you have an
14 understanding of what the difference is between a
15 reliance list and a materials considered list?
16          MS. COUCH:  Objection.  Calls for legal
17 reasoning.
18          THE WITNESS:  I'm not sure.
19 BY MS. JONES:
20      Q.   You don't have an understanding?
21      A.   I'm not sure I understand.
22      Q.   What?  The question or -- I'm just
23 trying to make sure I'm clear on what you're not
24 understanding so I can ask a different question.
25      A.   I may understand the difference between

Page 304

1  a reliance list and a materials considered list.
2  I'm not sure.
3       Q.   Okay.  Are those -- are those terms --
4  the difference in those terms meaningful for you in
5  terms of what you considered for purposes of your
6  opinions?
7       A.   I don't think so.
8       Q.   Okay.  I just want to make sure.
9       A.   Yeah.
10      Q.   Let me ask you to turn to Page 57 in
11 your report.  And -- I need to find my spot on the
12 page here.
13          MS. JONES:  Oh, thank you.  Yes.
14 BY MS. JONES:
15      Q.   About midway down the page on Page 57,
16 you have a section entitled "Evidence of the
17 neurobiological effects of social media in
18 adolescents."  Do you see that?
19      A.   Yes.
20      Q.   And you say:  In the following
21 sections, I provide strong evidence from rigorous
22 empirical studies showing -- and then you have a
23 list of items, right?
24      A.   Uh-huh.  Yes.
25      Q.   And the first thing that you list is:

Page 305

1  how heightened reward sensitivity in the brain
2  leads to reward-seeking behaviors, including
3  engaging in digital status-seeking behaviors.
4           Do you see that?
5       A.   Yes.
6       Q.   Now, can we agree that status-seeking
7  occurs both online and offline?
8       A.   Sure.
9       Q.   Okay.  And you've actually published on
10 that topic; is that right?
11      A.   On that topic status-seeking?
12      Q.   Yeah.
13      A.   Perhaps.
14      Q.   Okay.
15          (TELZER EXHIBIT 18, Article titled
16 Dispositional and Social Correlates of Digital
17 Status Seeking Among Adolescents, was marked for
18 identification.)
19 BY MS. JONES:
20      Q.   Well, let me hand you what we've marked
21 as Exhibit Number 18.
22          MS. COUCH:  Did you say 18?
23          THE WITNESS:  Digital status seeking,
24 yep.
25          MS. JONES:  Exhibit 18, yes.

Page 306

1  BY MS. JONES:
2       Q.   And, Dr. Telzer, this is a paper on
3  which you are an author along with Dr. Burnell, who
4  we've spoken about earlier, and Dr. Trekels, Nesi
5  and Prinstein, correct?
6       A.   Yep.
7       Q.   And this article was published in 2024,
8  correct?
9       A.   Yep.
10      Q.   And the article, up in the abstract on
11  the first page --
12      A.   Uh-huh.
13      Q.   And just to -- the article itself is
14  called "Dispositional and Social Correlates of
15  Digital Status Seeking Among Adolescents," correct?
16      A.   Yes.
17      Q.   And in the abstract, you and your
18  co-authors write:  Social media has transformed
19  peer relationships among adolescents, providing new
20  avenues to attain online status indicators such as
21  likes and followers.
22           Do you see that?
23      A.   Yes.
24      Q.   And it also goes on to say:  This study
25  aimed to explore the associations between various

Page 307

1  dispositional and social factors and digital
2  status-seeking behaviors among a sample of
3  adolescents.
4           Do you see that?
5       A.   Yes.
6       Q.   And that sample included an N of 731,
7  right?
8       A.   Uh-huh.
9       Q.   You have to say "yes" or "no."
10      A.   Yes.
11      Q.   In the first -- this is a -- is this --
12  this is a peer-reviewed paper; is that right?
13      A.   Yes.
14      Q.   Okay.  And in the very first paragraph
15  of the introduction, it says:  Social media provide
16  adolescents with valuable opportunities to enhance
17  their social standing and satisfy their
18  self-presentation and relationship formation --
19  formation needs.
20           Do you see that?
21      A.   Yes.
22      Q.   And then it goes on to say:  However,
23  social media can also be a source of alienation and
24  ostracism -- ostracism -- excuse me -- thereby
25  challenging adolescents' psychosocial well-being.

Page 308

1  Correct?
2       A.   Correct.
3       Q.   Now, this paper -- now, one thing I
4  noticed about this paper is that you do acknowledge
5  that social media can have benefits for adolescents
6  in the very first sentence, correct?
7       A.   Yes.
8       Q.   This paper was not -- and you can tell
9  me if I have this wrong -- cited anywhere in the
10  section where you specifically are talking about
11  digital status-seeking behaviors, is that right, in
12  your report?
13      A.   First, I guess, I want to revise my
14  previous comment.  I don't think I say that
15  there -- that there are benefits to social media.
16  I say that it offers them opportunities to enhance
17  their social standing and satisfy their
18  self-presentation.  I don't qualify that as
19  positive.
20      Q.   Okay.  Well, you say:  Social media
21  provides adolescents with valuable opportunities to
22  enhance their social standing and satisfy their
23  self-presentation and relationship formation needs.
24  Yes?
25      A.   Yes.

Page 309

1       Q.   Okay.  And you did not, in your report
2  on Page 57, where you are specifically talking
3  about reward-seeking behaviors, including engaging
4  in digital status-seeking behaviors -- you did not
5  actually refer to your own peer-reviewed paper on
6  that topic?
7       A.   This is just a overview of what the
8  following sections are going to be talking about.
9  So it does not include references, no.
10      Q.   Did -- did you cite this paper anywhere
11  in your report?
12      A.   I don't recall.
13      Q.   Do you think it would have been
14  important to do so?
15           MS. COUCH:  Objection.  Calls for
16  speculation.
17           THE WITNESS:  I think -- not
18  necessarily.  I rely -- it's probably in my
19  reliance -- or not reliance list.  My materials
20  considered list.
21  BY MS. JONES:
22      Q.   Okay.  Do you know whether you cited it
23  in the body of your report?
24      A.   I don't recall.
25      Q.   Okay.  Let's look at the Discussion

HIGHLY CONFIDENTIAL

Page 310

```
 1   section, which is on Page 190 in the upper
 2   left-hand corner.
 3        A.   Uh-huh.
 4            MS. COUCH:  Phyllis, I don't know if
 5   it's helpful, but it is cited in the report, if you
 6   want the reference.
 7            MS. JONES:  She cites it in her -- the
 8   body of her report?
 9            MS. COUCH:  Yeah.
10            MS. JONES:  Sure.  What's the
11   reference?
12            MS. COUCH:  Page 59 on the JCCP, and
13   then it's a different page on the MDL that was
14   incorporated.
15            MS. JONES:  Okay.
16   BY MS. JONES:
17        Q.   Dr. Telzer, I'm going to ask you,
18   actually, to go to Page 191.  I apologize.
19            MS. COUCH:  Exhibit 18?
20            MS. JONES:  Yes.  If that's the 2024
21   paper.
22   BY MS. JONES:
23        Q.   On Page 191, down at the bottom of the
24   first column on the left-hand side, there's a
25   paragraph that begins with the word "further."
```

HIGHLY CONFIDENTIAL

Page 311

```
 1        Q.   Do you see that?
 2        A.   The paragraph that begins with
 3   "Further"?
 4        Q.   It's the bottom paragraph.
 5        A.   Oh, yeah.  "Furthermore," yeah.
 6        Q.   Yeah.  It says -- oh, I apologize.  It
 7   does say "furthermore."
 8            It says:  Furthermore, while existing
 9   literature generally agrees that certain elements
10   of social media, particularly the quantification of
11   peer validation, stimulate the brain's reward
12   system, the present findings did not provide
13   evidence of a connection between reward sensitivity
14   and digital status-seeking.
15            Did I read that correctly?
16        A.   Yes.
17        Q.   And is that an accurate accounting of
18   what your study found in 2024?
19        A.   Is that an accurate -- sorry --
20   accounting of what?
21        Q.   Is that an accurate accounting of what
22   your study found in 2024 with respect to a
23   connection between reward sensitivity and digital
24   status-seeking?
25            MS. COUCH:  Objection.  Incomplete.
```

HIGHLY CONFIDENTIAL

Page 312

```
 1            THE WITNESS:  In this -- in this paper?
 2   BY MS. JONES:
 3        Q.   Yes.  Yeah.
 4        A.   In this paper, we have a self-reported
 5   measure of reward sensitivity did not -- was not
 6   associated with digital status-seeking.
 7        Q.   And then, just to go back to your
 8   point, at the bottom of Page 59 in your report --
 9        A.   Uh-huh.
10        Q.   -- to your counsel's earlier kind
11   reference, there is a citation to Trekels 2024.
12        A.   Yep.
13        Q.   Is there any part of your report -- and
14   if we've missed this, you can certainly tell me.
15            Is there any part of your report where
16   you specifically call out that your findings did
17   not provide evidence of a connection between reward
18   sensitivity and digital status-seeking?
19            MS. COUCH:  Objection.  Incomplete.
20            THE WITNESS:  Yeah, in my report I
21   reviewed a plethora of other research and did not
22   necessarily reference this specific sentence in
23   this paper.
24   BY MS. JONES:
25        Q.   Is -- is that finding still true today?
```

HIGHLY CONFIDENTIAL

Page 313

```
 1        A.   What finding?
 2            MS. COUCH:  Objection.
 3   BY MS. JONES:
 4        Q.   The one we just talked about between
 5   reward sensitivity and digital status-seeking.
 6        A.   There is other evidence that I refer to
 7   in -- in my report showing that things related to
 8   reward sensitivity, including an experimental
 9   design discussed right here, is related to
10   status-seeking we see in other work that I refer to
11   that it is associated with that.
12        Q.   Yeah, my question -- I'm not sure what
13   question you're asking.
14            MS. JONES:  I'm going to move to strike
15   as nonresponsive.
16   BY MS. JONES:
17        Q.   My question was:  Is the finding we
18   were just talking about from your 2024
19   peer-reviewed paper that it did not provide
20   evidence of a connection between reward sensitivity
21   and digital status-seeking, is that finding still
22   true and correct today?
23            MS. COUCH:  Objection.  Incomplete.
24   Asked and answered.
25            THE WITNESS:  In this singular study,
```

Page 314

1   we found that self-reported reward sensitivity was
2   not correlated with digital status-seeking
3   behaviors.  But the broader literature does support
4   connections between reward sensitivity and digital
5   status-seeking.
6        MS. JONES:  Okay.  I'm going to move to
7   strike everything starting at "But the broader
8   literature."
9        Okay.
10       (TELZER EXHIBIT 19, Article titled
11   Youths' sensitivity to social media feedback:  A
12   computational account, was marked for
13   identification.)
14   BY MS. JONES:
15       Q.   I'm going to hand you what we've marked
16   as Exhibit 19.  Dr. Telzer, do you recognize
17   Exhibit Number 19?
18       A.   Uh-huh.  Yes.
19       Q.   And, specifically, do you recognize it
20   as an article entitled "Youths' Sensitivity to
21   Social Media Feedback:  A Computational Account" by
22   four different authors?
23       A.   Yes.
24       Q.   Published in October of 2024?
25       A.   Yes.

Page 315

1        Q.   And this is one of the studies that you
2   cite in your written report on this subject of
3   brain changes -- generally speaking, brain changes
4   resulting from social media use?
5        A.   Yes, I cite this study.
6        Q.   Okay.  Is this -- I'll call it the
7   "Pinho study" that we've marked as Exhibit 19 -- an
8   fMRI study?
9        A.   I have to go back and look through it.
10   This is an MRI -- an MRI study.
11       Q.   Oh.  Did you --
12       A.   It's an MRI study.
13       Q.   An MRI study?
14       A.   Yes.
15       Q.   Okay.  This study, the authors
16   acknowledge, did not actually show direct
17   causation, correct?
18       A.   Can you show me, please?
19       Q.   Sure.  On Page 6 of 11?
20       A.   Did you say "6"?
21       Q.   6, yes.  Sorry.  Oh.  Are you there?
22       A.   Yeah.  I'm there.  Sorry.
23       Q.   There's a -- that's okay.
24           There's a paragraph that begins on the
25   left-hand side, bottom of the page, that says --

Page 316

1   begins with the word "last."
2        Do you see that?
3        A.   Yeah.
4        Q.   And it says:  Last, our analyses
5   revealed that the amygdala is a key region involved
6   in processing social media feedback, and it is
7   related to individual differences in problematic
8   social media use and social anxiety.
9            While our results suggest that the
10   amygdala is involved in these processes, it is
11   important to note that this does not imply direct
12   causation, and these processes were also associated
13   with a distinct network of regions.
14           Did I read that correctly?
15       A.   You read that correct.
16       Q.   Okay.  Did you include that caveat with
17   respect to this study when you cited it in your
18   report?
19       A.   I was discussing the broader results in
20   my report and my interpretations of these various
21   strong computational models and rich data that they
22   have access to, including millions of social media
23   posts that they linked later to the brains of their
24   sample.
25       MS. JONES:  Yeah.  I'm going to

Page 317

1   respectfully move to strike as nonresponsive.
2   BY MS. JONES:
3        Q.   My question was:  Did you include the
4   caveat that was included by the authors of the
5   Pinho paper in 2024 with respect to the fact that
6   their findings do not imply direct causation?
7        MS. COUCH:  Objection.  Asked and
8   answered.
9        THE WITNESS:  I included their very
10   compelling results based on -- and relied on their
11   data and findings showing very compelling results
12   by using these very sophisticated computational
13   models and rich data to map -- rich social media
14   data that they mapped onto their participants'
15   brain development and did not necessarily include
16   every caveat that they included in their
17   limitations section.
18   BY MS. JONES:
19       Q.   Let me just clarify one point,
20   Dr. Telzer, while we're talking about.  On
21   Page -- can I ask you to turn to --
22       MS. JONES:  Thanks to Ms. Antoine.
23   BY MS. JONES:
24       Q.   Could I ask you to turn to Page 160 of
25   your report?

Page 318

1    MS. COUCH:  Did you say 160 or 161?
2    MS. JONES:  160.  Page 160.
3  BY MS. JONES:
4    Q.   Dr. Telzer, as we read your report,
5  there were three studies that you specifically
6  referenced in Section 11.9 related to social media
7  and brain development in terms of your specific
8  opinions.  And I want to ask you about whether
9  there's anything else in terms of studies that you
10 view as being supporting your specific opinions on
11 social media and brain development, okay?  Okay?
12   A.   Okay.
13   Q.   So on Page 160, down at the bottom of
14 160, there's the Armstrong-Carter paper, yes?
15   A.   Yeah.
16   Q.   And you were a co-author on that paper,
17 yes?
18   A.   Yes.
19   Q.   Okay.  And then on Page 161 there's a
20 reference to your paper by Maza, et al., in 2023,
21 yes?
22   A.   Yes.
23   Q.   And we've talked about the Maza paper
24 from 2023, yes?
25   A.   Yes.

Page 319

1    Q.   And then at the bottom of the page,
2  there's a reference to the Haber 2011 paper, yes?
3    A.   Yes.
4    Q.   That paper does not relate to social
5  media and brain development, right?  It just
6  generally describes the anatomy?
7    A.   Correct.
8    Q.   Okay.  And then on Page 162 of that
9  same section, there's a reference to the Maza
10 paper, about two-thirds of the way down --
11   A.   Yes.
12   Q.   -- under the figure note.
13        And then on Page 163, there is a
14 reference to the da Silva Pinho paper --
15   A.   Uh-huh.
16   Q.   -- that we just looked at, right?
17   A.   Correct.
18   Q.   And then 165 refers to a study entitled
19 "Tottenham," yes?
20   A.   Yes.
21   Q.   And that does not relate specifically
22 to social media, correct?
23   A.   Correct.
24   Q.   And then 166 refers to Tottenham and
25 Sheridan from 2009, right?

Page 320

1    A.   Yes.
2    Q.   And that does not relate specifically
3  to social media and brain development, correct?
4    A.   Correct.
5    Q.   So in your Section 11.9 that is titled
6  "Social Media and Brain Development," the three
7  studies that you cite are your own paper,
8  Armstrong-Carter 2023, the Maza paper and the
9  da Silva Pinho paper, correct?
10   A.   That's what I cite.
11   Q.   Okay.  And you then have this
12 underlined statement at the end of that section on
13 Page 166 that says:  These findings provide strong
14 evidence that social media use across the
15 adolescent years predicts different brain
16 development into adulthood underscoring the lasting
17 effects of social media use on the brain in
18 adulthood.
19        Do you see that?
20   A.   I see that.
21   Q.   Now -- that particular conclusion does
22 not appear in Armstrong-Carter or your Maza paper
23 from 2023 or da Silva Pinho.  Is that fair to say?
24   A.   That statement is based on reviewing
25 all the literature and putting together the

Page 321

1  complementary findings across multiple studies.
2    Q.   Okay.  And -- that's -- that's fair
3  enough.  I understand that point.
4        My question is:  Does -- do any of
5  those three studies actually say that social media
6  use across the adolescent years predicts different
7  brain development into adulthood?
8    A.   No singular --
9        MS. COUCH:  Asked and answered.
10       THE WITNESS:  Yeah.  Sorry.
11       No singular study indicates that
12 amongst those three that you indicated.  My
13 statement there is based on putting all of the
14 literature together and understanding these effects
15 across the broader literature that I cite here and
16 considered in my materials.
17 BY MS. JONES:
18   Q.   And I just want to make sure I'm -- I
19 understand your point around kind of all of the
20 literature.  Are there any -- is there any specific
21 paper that you're thinking of that says some
22 version of what you have written and underlined on
23 Page 166 of your report that we haven't otherwise
24 talked about?
25       MS. COUCH:  Asked and answered.

HIGHLY CONFIDENTIAL

Page 322

1    THE WITNESS:  That underlined statement
2  is based on reviewing all of these studies together
3  in their totality and how they help us come to that
4  conclusion by considering all of the studies
5  together.
6  BY MS. JONES:
7    Q.  Fair enough.  But there's not one that
8  you would say, "Oh, I got that from there," right?
9    A.  That statement is not in a singular
10  study but comes from putting all of the studies and
11  all of the findings together that I reviewed here.
12    Q.  Okay.  And you specifically refer to
13  social media use across the adolescent years
14  predicting different brain development into
15  adulthood, right?
16    A.  I say that there, yes.
17    Q.  What -- what study could you point me
18  to where brain development up to and -- into the
19  beginning of young adulthood where that has
20  actually been evaluated in a systematic way?
21    A.  There have been --
22    MS. COUCH:  Objection.  Vague.
23    THE WITNESS:  -- multiple studies that
24  I can refer to; that the da Silva Pinho study shows
25  that their social media use in adolescence is

HIGHLY CONFIDENTIAL

Page 323

1  predicting their brain development in adulthood.
2  BY MS. JONES:
3    Q.  Any others that you're thinking of?
4    A.  I reviewed a lot of literature.  There
5  are others.  I can -- that are included in my
6  materials considered.
7    Q.  But just -- I'm just ask -- to be fair
8  to you, I know you've included a lot of things.
9  But I'm just asking, sitting here today, is there
10  anything else that comes to mind for you as having
11  established that proposition of brain changes in --
12  brain development changes up to adulthood?
13    A.  I can --
14    MS. COUCH:  Asked and answered.
15    Go ahead.
16    THE WITNESS:  I can think of other
17  studies that I included in my materials considered
18  that use longitudinal methods and look at brain
19  development across adolescence to adulthood.
20  BY MS. JONES:
21    Q.  Okay.  Can you name any of them for me
22  other than the one you've mentioned, which is the
23  da Silva Pinho study?
24    A.  There's a handful.  Crone is one author
25  that has done this work.

HIGHLY CONFIDENTIAL

Page 324

1    Q.  Okay.  Any others?
2    A.  I can't think of specific names off the
3  top of my head.
4    Q.  And in your -- in your paper, the Maza
5  2023 paper, you actually said -- I'm sorry.  You
6  were writing something down.
7    In the Maza 2023 paper, you actually --
8  you and your co-authors actually say -- this is
9  Exhibit 18 -- not 18.  I think it's 13, if you want
10  to look at it -- moreover, examination of social
11  media checking behaviors across time is needed to
12  further elucidate associations with development.
13    A.  Sorry.  I didn't hear that.
14    Q.  That's okay.  Exhibit 13, Page 165,
15  down at the bottom.
16    A.  Yeah.
17    Q.  Just in terms of the existence of data
18  that actually tracks into adulthood, one of the
19  limitations of your Maza 2023 study that you and
20  your co-authors call out is:  Examination of social
21  media checking behaviors across time is needed to
22  further elucidate associations with development.
23  Right?
24    A.  We say -- we say that, yes.
25    MS. JONES:  May I suggest a relatively

HIGHLY CONFIDENTIAL

Page 325

1  quick break?  It will help us figure out, like,
2  what it makes sense to do today versus before we
3  finish up.
4    MS. COUCH:  Yeah, we can certainly take
5  a break.  I mean, we would definitely want to keep
6  going since it's only been five hours --
7    MS. JONES:  No, no.  We can certainly
8  keep going, but it will help me be more organized
9  and making use of whatever time we're going to use
10  today --
11    MS. COUCH:  Yeah.  That's fair.
12    MS. JONES:  -- if we take a break.
13    MS. COUCH:  We can take five minutes.
14    THE VIDEOGRAPHER:  Going off the
15  record.  The time is 3:57 p.m.
16    * * *
17    (Whereupon, there was a recess in the
18  proceedings from 3:57 p.m. to 4:09 p.m.)
19    * * *
20    THE VIDEOGRAPHER:  Going back on the
21  record.  The time is 4:09 p.m.
22  BY MS. JONES:
23    Q.  Dr. Telzer, let me ask you to pull out
24  Exhibit Number 11, which is already in your stack.
25  If it helps, it's the Armstrong-Carter paper.

Page 326

1      A.   The momentary links?

2      Q.   Yes.

3      A.   Okay.

4      Q.   This is a paper on which you were a

5  co-author, and it was published in April of 2023;

6  is that right?

7      A.   Yes.

8      Q.   Okay.  And I will not -- just in the

9  interest of time, I will not march you through

10 every element of this paper.

11          But just looking at the abstract

12 quickly, it says:  This longitudinal ecological

13 momentary assessment study examined whether

14 adolescents' use of social media to interact with

15 peers relates to their experiences of social

16 connectedness, social craving, and sensation

17 seeking on an hourly level.

18          Do you see that?

19     A.   Yes.

20     Q.   And it refers to a sample size of 212

21 adolescents, right?

22     A.   Yes.  Sorry.  Yes.

23     Q.   That's okay.

24          And it goes on to say:  Further, we

25 investigated whether these associations differed

Page 327

1  for adolescents who were nominated by their peers

2  as more or less susceptible to social influences,

3  because highly susceptible youth may be more

4  strongly impacted by social media due to heightened

5  focus on peer behaviors and social feedback.

6          Do you see that?

7      A.   Yes.

8      Q.   And that's a true statement, right?

9      A.   That's what we wrote here, yes.

10     Q.   Okay.  And it goes on to say:

11 Controlling for both daily and between-subject

12 effects, we found a consistent pattern of

13 hourly-level results that were robust to

14 sensitivity analyses.  When highly susceptible

15 adolescents used social media to interact with

16 peers in the last hour, they felt less socially

17 connected to others and more strongly craved social

18 connections and novel sensations.

19          Did I read that correctly?

20     A.   You read that correct.

21     Q.   Then it goes on to say:  Youth who are

22 particularly sensitive to social input from peers

23 may feel less connected to others and crave more

24 connections and exciting stimuli within one hour

25 after using social media to interact with peers.

Page 328

1          Is that right?  Did I read that

2  correctly?

3      A.   You read that correctly.

4      Q.   Okay.  And this Armstrong-Carter paper

5  is the Armstrong-Carter paper that we were just

6  discussing in connection with Section 11 -- I

7  think -- .9 of your written report; is that right?

8  You can certainly double-check.  On Page 160, I

9  believe.

10     A.   Yes.  Let me see.  Okay.

11     Q.   Is this Armstrong-Carter paper at

12 Exhibit Number 11 the Armstrong-Carter paper that

13 you cite, for example, on Page 160 of your report?

14     A.   Yes.

15     Q.   Let me ask you just about a couple of

16 points in that paper.  I wanted to ask you to turn

17 to Page 4.

18     A.   Yeah.

19     Q.   Are you on Page 4?

20     A.   I'm on Page 4.

21     Q.   Okay.  Sorry.  I was -- I apologize.  I

22 was looking at the page that your other hand had,

23 and I thought, "That doesn't look like Page 4."

24     A.   Yeah.

25     Q.   Okay.  You're on Page 4.

Page 329

1          About midway down the page, there's a

2  section entitled "Individual Differences by

3  Susceptibility to Peer Influences."  Do you see

4  that?

5      A.   Yes.

6      Q.   Okay.  And the first sentence in that

7  paragraph says:  Social media does not impact all

8  adolescents uniformly; it may be relatively more or

9  less beneficial for some adolescents compared to

10 others.

11          Do you see that?

12     A.   Yes.

13     Q.   And that's a -- that's a statement that

14 you and your co-authors believed to be valid based

15 on the research in 2023 when you published this

16 paper, correct?

17     A.   Yes, that sentence references these two

18 other publications discussing that it is not

19 impacting all adolescents uniformly.

20     Q.   And sitting here today, Dr. Telzer, do

21 you agree with that statement, that social media

22 does not impact all adolescents uniformly?  It may

23 be relatively more or less beneficial for some

24 adolescents compared to others?

25     A.   My work looks at individual differences

Page 330

1  and so that statement suggests, similar to many of
2  the other studies that I've done, that there are
3  these individual differences in that effect.
4      Q.   And, I'm sorry.  I'm not sure if I
5  understood your answer.  Does that mean that you --
6  sitting here today, you still believe that's true
7  or accurate?
8      A.   Social media does not impact all
9  adolescents uniformly is what we said here.  It's
10 generally agreed upon.
11     Q.   Okay.  I wanted to ask you about a
12 portion of this study that we talked about a little
13 bit earlier.  But I want to come back to -- on
14 Page 15, which is the "Limitations and future
15 directions" section.
16     A.   Okay.
17     Q.   Can I use -- just to pause before we
18 talk about the specifics, Dr. Telzer, for any of
19 the papers that we've shown you in our time
20 together so far, are there any where you looked at
21 them and you said, "That's not what I believe
22 anymore," as a scientist, as a researcher, or as an
23 academic?
24          MS. COUCH:  Objection.  Broad.
25          THE WITNESS:  I mean, each publication

Page 331

1  is important and contributes to my understanding,
2  broadly speaking.
3  BY MS. JONES:
4      Q.   But are there any that -- where you
5  were co-author -- a co-author where you thought,
6  "Actually, my -- my thinking has shifted, and I
7  actually have a different view on that subject"?
8          MS. COUCH:  Objection.  Broad.
9          THE WITNESS:  I can't give you a
10 specific example, but my understanding of these
11 effects has evolved as more research has come out.
12 BY MS. JONES:
13     Q.   Okay.  And when you say your
14 understanding of the effects has evolved, what does
15 that mean exactly?
16     A.   It means that my understanding today is
17 built upon the foundation of research that has come
18 out.  There's been lots of foundational research
19 that's come out since this paper.  And so my
20 knowledge has been built upon the continuing
21 foundation that has built up.
22     Q.   Got it.  Okay.
23          But I -- is there anything that I've
24 shown you today so far where you thought, "Doggone
25 it, I don't believe that anymore," as Dr. Eva

Page 332

1  Telzer?
2          MS. COUCH:  Asked and answered.
3          THE WITNESS:  The -- my understanding
4  today has been built and increased over the years
5  with what has come out.  And it is an evolving
6  field, and my opinions have been -- have relied
7  upon all of the emerging literature that's come out
8  since this, since the papers before that, since the
9  papers before that.  It's an iterative process.
10 BY MS. JONES:
11     Q.   Yeah.  Fair enough.
12          But I -- I didn't hear you saying,
13 "Well, there's some element of some of my published
14 work," or, "I have truly turned a corner in terms
15 of thinking, you know, up was up, and now I think
16 up is down."
17     A.   Each publication contributes to my
18 understanding.  They all build on each other.  They
19 all build the foundation for my understanding and
20 my opinions.
21     Q.   Okay.  Is there a mechanism for someone
22 who does what you do, academic research, to
23 actually communicate to the academic community, "I
24 once thought this, but I now think something
25 different than what I might have published"?

Page 333

1          MS. COUCH:  Objection.  Vague.
2          THE WITNESS:  I mean, each publication
3  builds upon the prior and builds those opinions and
4  builds that research base.  So newer research sort
5  of builds upon the past research and tells what the
6  current sort of understanding is.
7          MS. JONES:  And I'm respectfully going
8  to move to strike as nonresponsive, because I think
9  my question was slightly different.
10 BY MS. JONES:
11     Q.   My question was:  In the work that you
12 do, is there a mechanism for someone who does a lot
13 in the world of academic peer-reviewed literature
14 to communicate to colleagues and fellow
15 researchers, "I published this at one point, but
16 I've now" -- you know, "my views have shifted in a
17 meaningful way"?  Is there a mechanism for doing
18 that is my question.
19          MS. COUCH:  Objection.  Vague.  Asked
20 and answered.
21 BY MS. JONES:
22     Q.   And if you don't know, that's fine.
23 I'm just asking.
24     A.   The -- the mechanism is that the
25 research that comes out is building upon prior

Page 334

1  literature and describes the current understanding.
2  And as new research comes out, we build upon that,
3  and that represents the current understanding.
4       Q.  Got it.
5            And so if we -- if we wanted to know
6  what Dr. Telzer thinks today or at least --
7       A.  Uh-huh.
8       Q.  -- relatively proximate to today, we
9  could safely look at your most recent literature
10  and say, "That's a reflection of her views."  Is
11  that fair?
12      A.  I would say any singular study is my
13  view of that sort of singular finding of that
14  publication.  My broad views, my broad
15  understanding are represented in my report.
16      Q.  Sure.  Okay.  So let me ask the
17  question a slightly different way.
18           On -- on the particular -- if we wanted
19  to know what Dr. Telzer thought about the specific
20  subject of any one of the papers we've been talking
21  about, we could comfortably rely on your latest
22  publication on that topic to capture your views; is
23  that right?
24           MS. COUCH:  Objection.  Vague.
25           THE WITNESS:  A current publication

Page 335

1  will not necessarily describe views or opinions but
2  will describe the data and the findings of that
3  particular paper.
4  BY MS. JONES:
5       Q.  Okay.  The -- the broader views that
6  you say are now reflected in the report that you
7  generated for litigation --
8       A.  Uh-huh.
9       Q.  -- have you ever published those
10  broader views anywhere in the peer-reviewed
11  literature?
12      A.  I think that the combination of all my
13  research together comes together to support these
14  views, absolutely.
15           I -- I edited a handbook that
16  represents most of the views in here.  I did a
17  thorough examination of topics related to social
18  media addiction, to body image concerns, to online
19  social communication, to adolescent mental health.
20      Q.  And you think if we add all those
21  things together, it results in the opinion you've
22  expressed in your litigation report that social
23  media use can cause a number of negative mental
24  health harms, including depression, anxiety, and
25  loss of sleep?

Page 336

1            MS. COUCH:  Objection.  Vague.
2            THE WITNESS:  Are you asking if you put
3  together all my publications and everything I've
4  relied upon, who would come to that?
5  BY MS. JONES:
6       Q.  No.  My -- my question is:  You said,
7  "My broader views are reflected in my -- in my
8  report," right?  Yes?
9       A.  Yes.
10      Q.  And your report -- and your report is
11  something that was generated for purposes of
12  litigation, correct?
13      A.  This report is the compilation of all
14  of the review that I've done on the literature, my
15  own work, discussions across many different groups
16  that have helped me to come to these conclusions.
17      Q.  Yeah.  Sure.  But the -- you -- you
18  wrote that report for litigation, yes?
19      A.  I wrote this report for litigation,
20  yes.
21      Q.  Okay.  At the request of lawyers for
22  the plaintiffs in these cases, right?
23      A.  Yep, that was my assignment.
24      Q.  Okay.  And so my question is:  Have
25  you, outside of the setting of litigation,

Page 337

1  published what I heard you describe as your broader
2  views that are captured in your report elsewhere in
3  the peer-reviewed literature?
4            MS. COUCH:  Objection.  Asked and
5  answered.  Vague.
6            THE WITNESS:  I have published
7  extensively on this topic, and all the individual
8  publications together would come to the same
9  conclusions that I include in my report.  And many
10  of the talks that I give, I have given many of the
11  conclusions and general opinions that I include in
12  here.  My handbook that I edited includes topics,
13  all of which are described in this report.  And so
14  the compilation of all of that would come to the
15  same conclusion.
16  BY MS. JONES:
17      Q.  Do you think, based on the existing
18  scientific literature and the data that the
19  academic research community has, that you would
20  feel comfortable submitting for peer review a paper
21  that said social media use can cause negative
22  mental health harms?
23      A.  I would absolutely feel comfortable
24  doing that.
25      Q.  Okay.  You've not done that so far; is

Page 338

1  that right?
2      A.  I cannot recall off the top of my head
3  if that exact statement is in a publication.
4      Q.  Okay.  But you're not remembering it
5  sitting here today?
6      A.  I don't remember it sitting here today.
7  But I would absolutely feel comfortable publishing
8  that and would be thrilled to publish the work that
9  I have done here that all pulls together many of
10  the opinions that I have in this report.
11          MS. COUCH:  Just a reminder, it's
12  confidential.
13          THE WITNESS:  What's confidential?
14          MS. COUCH:  Your report.
15          THE WITNESS:  No, I know.  No, I'm not
16  going to --
17          MS. COUCH:  I'm sure defendants would
18  appreciate that.
19          THE WITNESS:  -- publish this.  The
20  work that I have -- that -- sorry.  Yeah, I'm
21  not -- I'm not publishing the report.
22  BY MS. JONES:
23      Q.  We -- we're not -- we're not worried
24  about that.  That's fine.  That's fine.  But thank
25  you for the reminder.

Page 339

1          Okay.  So let's look at Page 15 of the
2  Armstrong-Carter, which is Exhibit Number 11, the
3  "Limitations and future directions" section.
4          And we talked about the first couple of
5  these limitations.  We won't revisit those.  But at
6  the bottom of the page, there's a sentence that
7  begins "As we have emphasized."  Do you see that?
8      A.  I do.
9      Q.  It says:  As we have emphasized, it is
10  highly likely that the associations between social
11  media use and social well-being are bidirectional.
12          Do you see that?
13      A.  I do.
14      Q.  And give me the nutshell for what you
15  mean by "bidirectional."
16      A.  What I mean or what is inferred here by
17  "bidirectional" is -- and we go on to discuss this
18  in more detail -- that although we asked
19  adolescents about their previous social media use
20  in the last hour and their current feelings of
21  social connection and motivations, it is also
22  possible that these effects are bidirectional in
23  that adolescents' feelings of social connection and
24  motivations are also related to their social media
25  use.

Page 340

1      Q.  Okay.  And what it specifically says
2  is:  Although we asked adolescents about their
3  previous social media use in the last hour and
4  their current feelings of social connections and
5  motivations, it cannot be determined from these
6  data whether feelings of connectedness, social
7  craving, and sensation seeking preceded the use of
8  social media or were affected by the social media
9  use.
10          Do you see that?
11      A.  I see that.
12      Q.  And that's -- that's an accurate
13  statement based on the work done in connection with
14  this study, right?
15      A.  That's one of the caveats that we're
16  describing in the limitations section.
17      Q.  And one of the implications of that
18  caveat is, we don't know whether the feelings that
19  are described here of connectedness, of social
20  craving, of sensation seeking existed before the
21  use of social media?
22      A.  It is saying that it could be
23  bidirectional.  The way we measure these variables,
24  we -- we're confident that the effect was in one
25  direction because we asked them about social media

Page 341

1  in the past hour and their current feelings of
2  social motivations.
3          And so by asking about preceding
4  experiences and current motivations, we believe
5  that the effect is in that direction.
6      Q.  I'm sorry.  You said, "We're confident
7  that the effect was in one direction"?  Was that
8  what you said?
9      A.  If you look at the broader discussion
10  section --
11      Q.  I'm sorry, Dr. Telzer.  I was just
12  asking about your testimony.  Did you say, "We're
13  confident that the effect was in one direction"?
14      A.  I'm saying that we, as researchers, are
15  confident based on the way that we do the
16  research --
17      Q.  Okay.
18      A.  -- and that in a limitations section,
19  we always include these -- these caveats.  They're
20  standard to indicate that we would need to be
21  cautious.  I mean, I'm a cautious researcher.
22      Q.  Okay.  And in your capacity as a
23  cautious researcher, along with your co-authors,
24  you wrote:  As we have emphasized, it is highly
25  likely that the associations between social media

Page 342

1  use and social well-being are bidirectional.
2  Right?
3      A.   I said that, yes.
4      Q.   And "bidirectional" doesn't mean things
5  are running in one direction; it means things are
6  running in two directions, just so we know what
7  that term means, yes?
8      A.   Yes.
9      Q.   Now, the last portion of that
10  limitations section, it says:  To clarify causal
11  pathways, future -- sorry.  Are you there on
12  Page 16?
13     A.   Sorry.  I moved.
14     Q.   That's okay.
15     A.   Yeah.
16     Q.   To clarify causal pathways, future
17  experiments could randomly assign adolescents to
18  use social media (or not) and examine the causal
19  impact on their feelings of connectedness, social
20  craving, and sensation seeking.
21          Do you see that?
22     A.   I do.
23     Q.   Have you been involved in any such
24  future experiments?
25     A.   We have some experiments going on

Page 343

1  currently looking at this kind of question.
2      Q.   Has any of that work been published?
3      A.   We have -- it's ongoing data collection
4  that we just completed.
5      Q.   Has any of that work been published?
6      A.   It has not been published.
7      Q.   And so the data has been collected, but
8  has the data yet been fully analyzed?
9      A.   It has not been fully analyzed.
10     Q.   Okay.  And so it sounds like you've not
11  evaluated it, put it into a manuscript, submitted
12  it for peer review, right?
13     A.   No.
14     Q.   Okay.  So we don't know, sitting here
15  today, what that paper will ultimately look like if
16  and when it's eventually published, right?
17     A.   Nope.
18     Q.   I think you told me earlier we can't
19  predict the future, alas.
20          Okay.  Let me ask you to look at
21  Page 126 of your report.  And that includes a
22  section numbered 11.4, "Neural Vulnerabilities for
23  Problematic Social Media Use and Depression."  Do
24  you see that?
25     A.   I do.

Page 344

1      Q.   There is nothing in your -- well,
2  having reviewed your report, it did not appear that
3  you had offered any opinions about a way to
4  identify a vulnerable subpopulation of adolescents.
5  Am I correct in my read of your report?
6      A.   I don't think I understand the
7  question.
8      Q.   Well, you say in the second line of
9  your report:  Not all adolescents are equally prone
10  to develop problematic social media use.  Correct?
11          It's the second sentence in that
12  paragraph under 11.4.
13     A.   Yes.
14     Q.   And it goes on to say:  Those who do
15  may have individual predispositions, including
16  possible biological vulnerabilities, that increase
17  sensitivity to social media cues.
18          Do you see that?
19     A.   Yes.
20     Q.   Then it goes on to say:  Specifically,
21  adolescents who are more sensitive to social
22  rewards may be particularly likely to seek out
23  social media incentives and thus may be more
24  susceptible to the provocation of continued use.
25          Do you see that?

Page 345

1      A.   I do.
2      Q.   And you conclude that paragraph by
3  saying:  Thus, we sought to examine neural
4  vulnerabilities that may explain which adolescents
5  develop problematic social media use.
6      A.   Yes.
7      Q.   Okay.  My question is:  Are you aware
8  of any way to distinguish or identify this
9  population of adolescents or teenagers who have
10  neural vulnerabilities?
11     A.   We are scanning adolescents' brains and
12  using that understanding and looking at how their
13  change -- how their brain is changing
14  developmentally to predict whether or not they
15  engage in problematic social media use by being
16  able to understand that some adolescents who
17  develop problematic social media use have
18  differences in how their brain is developing.  That
19  would be considered a neural -- neural
20  vulnerability.
21     Q.   I may not have been clear in my
22  question.  Understanding that point, are you aware
23  of any way to identify adolescents or teenagers who
24  might have some kind of neural vulnerability versus
25  those who do not?

Page 346

1    A.   We are scanning their brains, and by
2  being able to look at a large sample of adolescents
3  and predict later -- later problematic social media
4  use, we qualify or consider that that neural
5  profile is a neural vulnerability.
6    Q.   When you -- and when you say, "We
7  consider that neural profile to be a neural
8  vulnerability," what is the neural profile that
9  you're identifying comprised of?
10    A.   If you look at the figure on
11  Page 128 --
12    Q.   Uh-huh.
13    A.   -- we are scanning developmental
14  changes across puberty in their brains.  And we're
15  trying to understand if there are different neural
16  trajectories and how their brains are developing
17  that might help us understand individual
18  differences in who goes on to develop problematic
19  social media use by being able to say that this --
20  it's not colored here.  I don't know if it is in
21  your version.  It might be helpful.  It's upside
22  down.  Yeah, this one is colored.
23    Q.   Oh, is it?  I was going to say it's
24  not.  That's a pleasant surprise.
25    A.   The red line there is showing the

Page 347

1  adolescents who have relatively high problematic
2  social media use.  So we quantify that as a
3  neurobiological vulnerability because that
4  developmental change in the brain is predicting the
5  group of adolescents who go on to develop higher
6  levels of problematic social media use.
7    Q.   And I just want to make sure I have a
8  handle on your testimony here.  So what exactly --
9  when you're trying to understand the neural profile
10  of what you've described as a vulnerable adolescent
11  with respect to social media use, what are you
12  specifically able to identify, if anything, at this
13  point?
14    A.   In this particular study, we were
15  looking at how developmental changes -- changes in
16  the brain of adolescents across puberty -- and this
17  is relatively ages 12 to 16 or so -- how their
18  brains are developmentally changing across that
19  developmental period in ways that may help us
20  identify which adolescents go on to develop social
21  media addiction.
22    Q.   And on that last point, help us
23  identify who might go on, does the science exist
24  today to identify those adolescents?
25    A.   This study is not identifying a

Page 348

1  specific adolescent.  This study is showing that
2  there are differences in the way that the brains of
3  adolescents are developing that can determine who
4  goes on to become or engage in problematic social
5  media use.
6    So adolescents whose brains are showing
7  one certain developmental trajectory are those who
8  are more likely to develop problematic social media
9  use several years later.
10    Q.   Can -- can the -- can the developmental
11  indicators or changes that you're describing be the
12  result of things other than social media?
13    A.   I am not sure I can speculate on that
14  so generally speaking.
15    Q.   Well, I guess my question is:  Could
16  you have an adolescent or a teenager who never uses
17  social media, and nevertheless, based on evaluating
18  their brain developmental trajectory, you might see
19  the same trends that you see in a teenager who did
20  use social media and might show some kind of brain
21  development changes?
22    MS. COUCH:  Objection.  Vague.
23    THE WITNESS:  I'm not sure I could
24  speculate on that hypothetical.  We're looking
25  at -- across a population of adolescents and

Page 349

1  looking at these trends and not at, you know,
2  one -- one adolescent.
3  BY MS. JONES:
4    Q.   And it sounds like, sitting here today,
5  putting aside what might be learned at some point
6  in the future, you have not -- you and your
7  colleagues have not identified a particular
8  vulnerable subpopulation of adolescents who would
9  be more likely to develop what you've described as
10  "problematic use"?
11    MS. COUCH:  Objection.  Vague.
12    THE WITNESS:  I think that based on
13  this study, we can come to the conclusion that
14  adolescents, their brains are developing in very
15  important and unique ways.  And those whose brains
16  are developing in ways demonstrated in this figure
17  with this -- I think it was the blue line, that is
18  considered a neurobiological vulnerability that
19  will tell us that there are differences or,
20  basically, these risk factors in the brain that may
21  make an adolescent more vulnerable to develop
22  social media addiction later in life.
23  BY MS. JONES:
24    Q.   Are there -- putting aside social
25  media, is it your experience, understanding, that

Page 350

1  there are certain adolescents or teenagers who
2  might be more vulnerable to certain mental health
3  diagnoses as they develop?
4       MS. COUCH:  Objection.  Vague.
5       THE WITNESS:  I think that's a pretty
6  general question.  And my understanding of the
7  literature is, there are neural vulnerabilities
8  also for mental health.
9  BY MS. JONES:
10      Q.   Okay.  So neural vulnerabilities can
11 exist whether or not an adolescent is exposed to
12 social media ever?  I just want to make sure I'm
13 kind of understanding your opinion on this.
14      A.   I mean, there are different neural
15 vulnerabilities that predict different outcomes.
16 There are neural vulnerabilities that might predict
17 something like depression or mental health.  And in
18 this particular study, we found that there are
19 neural vulnerabilities that do predict whether an
20 adolescent develops problematic social media use.
21      (TELZER EXHIBIT 20, Article titled
22 Developmental changes in brain function linked with
23 addiction-like social media use two years later,
24 was marked for identification.)
25 BY MS. JONES:

Page 351

1       Q.   I'm going to hand you what we've marked
2  as Exhibit Number 20.  And when we were looking at
3  your report, one of the papers that you cited was
4  what's described as the "Flannery 2024" paper; is
5  that right?
6       A.   Yes.
7       Q.   And Flannery 2024 is actually -- it
8  appears to be the paper that's cited as part of the
9  figure note on Page 128 of your report?
10      A.   Correct.
11      Q.   Okay.
12      A.   That's what I was just referring to.
13      Q.   Okay.  And is what I just handed you --
14 I think Exhibit Number 20 -- is that right?
15      A.   Yes.
16      Q.   Okay.  Is Exhibit Number 20 the
17 Flannery paper that is referred to in your report
18 at Page 128?
19      A.   Yes.
20      Q.   Okay.  And is this the paper that you
21 were just referencing when you said, "We've been
22 able to determine that there are neural
23 vulnerabilities that make some adolescents more
24 prone to problematic social media use"?
25      A.   This was the example in the figure that

Page 352

1  I was using to describe that.
2       Q.   Okay.  Are there other -- and it's fine
3  if the answer is no or you don't remember.  But are
4  there any other papers that you would point to to
5  say that study also supports that specific point?
6       A.   I think that this paper builds on a
7  large body of literature; for example, linking
8  related constructs, like substance use addiction in
9  similar neural and -- neurobiological
10 vulnerabilities to substance use onset.  So it
11 relies on a very large and robust body of
12 literature.
13      Q.   Well, I want to just make sure I
14 understand your answer.  The large body of
15 literature that you're referring to are studies
16 that address neurobiological vulnerabilities in
17 connection with substance use addiction, right?
18      A.   Yes, this builds upon that literature.
19      Q.   Okay.  And substance use addiction -- I
20 just want to make sure we're clear about our terms
21 here.  Substance use addiction is a different thing
22 than social media addiction, as you've described
23 it?
24      A.   They share --
25      MS. COUCH:  Objection.  Vague.

Page 353

1       Go ahead.
2       THE WITNESS:  They share underlying
3  neurobiological processes and systems in the brain,
4  but they are distinct.
5  BY MS. JONES:
6       Q.   And when you say, "They share
7  underlying neurobiological processes," what are you
8  referring to specifically?
9       A.   I can refer specifically to the
10 publication.
11      Q.   You're looking at Flannery --
12      A.   Yeah.
13      Q.   -- in Exhibit 20?  Okay.
14      A.   I believe we reference this literature
15 in here.  If not, it's in my report.
16      Yeah.  I think, for example, if you go
17 to Page 6, the first full paragraph on the right:
18 These results could suggest that some adolescents
19 with premature elevations in neural social feedback
20 sensitivity may initially be more sensitive to the
21 delivery of social feedback via media.  However,
22 pubertal decreases in social feedback --
23      Q.   Dr. Telzer, I bet the court reporter
24 would appreciate you speaking a little bit slower
25 would be my guess.  That's my prediction.

HIGHLY CONFIDENTIAL

Page 354

1      A.    Sure.  I apologize.  I'll start the
2   second -- the second sentence.
3          The -- however, observed pubertal
4   decreases in social feedback in all of the regions
5   identified here -- that's not quoted -- may reflect
6   desensitization to such feedback, possibly through
7   mechanisms similar to those driving tolerance
8   buildup -- repeat -- sorry -- those driving
9   tolerance buildup after repeated administrations of
10  an addictive drug.
11         So that's one example of where we're
12  sort of relying upon that similar neurobiological
13  mechanism.
14     Q.    Could I ask you a question about what
15  you just read, Dr. Telzer?
16     A.    Yes.
17     Q.    I actually want to ask about the next
18  sentence in that paragraph, which you didn't get to
19  read.
20         It says:  As we did not have data on
21  participants' amount of social media exposure over
22  pubertal development, this hypothesis could not be
23  further explored in this sample.
24         Is that also true?
25     A.    That's also true.

HIGHLY CONFIDENTIAL

Page 355

1      Q.    Okay.  And then it goes on to say, just
2   in fairness to your paragraph:  Nonetheless, our
3   findings indicate that developmental changes in
4   brain function previously implicated in social
5   information processing may be associated with
6   individual differences in ASMU susceptibility.
7      A.    Yes.
8      Q.    And, again, the phrase "may be
9   associated."
10     A.    As I --
11     Q.    Let me just ask --
12     A.    Yeah.
13     Q.    -- my question.
14     A.    Okay.
15     Q.    I had not yet gotten to my question.
16     A.    Sorry.
17     Q.    Does that intend to say that there is
18  not yet an association that has been established?
19     A.    Let me get back to that "may be."  Our
20  findings indicate -- may be associated --
21         (Reading to self.)
22         Again, we use the term "may be" to
23  indicate probably, more likely than not, this is
24  the effect that we found.  We believe that there is
25  a strong relationship between these two.

HIGHLY CONFIDENTIAL

Page 356

1   BY MS. JONES:
2      Q.    So this is another place where the
3   words "may be" as written, in fact, in your telling
4   today mean probably, more likely than not?
5      A.    Yeah.  We use the word "may be" to
6   indicate that our findings are likely indicative of
7   this.
8      Q.    Okay.  And -- but those words --
9   "likely indicative of this," "probably," "more
10  likely than not," those words don't appear either
11  in this paragraph we've been looking at or anywhere
12  in this article, do they?
13     A.    I don't know about anywhere else in
14  this article.  These words, it does not -- it's not
15  listed there.
16     Q.    Let me ask you to go to, actually, the
17  first page of the Flannery paper, which is -- we've
18  marked as Exhibit Number 20.
19         And I want to ask you about the first
20  part of your introduction, which says:  Social
21  media serves many functions and it is -- excuse me.
22  Let me start over.
23         Social media serves many functions and
24  is often a part of healthy adolescent development.
25         Did I read that correctly?

HIGHLY CONFIDENTIAL

Page 357

1      A.    Yes.  Sorry.
2      Q.    That's okay.  And then it cites -- one,
3   two, three -- four papers, yes?
4      A.    Yes.
5      Q.    Including another paper authored by
6   your co-author, Dr. Flannery, correct?
7      A.    Yep.
8      Q.    Is that a true statement today still?
9      A.    I --
10         MS. COUCH:  Objection.  Vague.
11         THE WITNESS:  I -- as I indicated here,
12  social media serves parts of healthy adolescent
13  development.  But as we go on to say:  However,
14  addiction-like social media use is becoming
15  increasingly reported.
16  BY MS. JONES:
17     Q.    Sure.  My question was, simply:  Is
18  that statement that social media serves many
19  functions and often is part of a healthy adolescent
20  development, is that still true today?
21         MS. COUCH:  Asked and answered.
22         THE WITNESS:  Social media, as
23  indicated in this paragraph here, may serve some
24  parts of healthy development, but that does not
25  negate the many negative effects.

HIGHLY CONFIDENTIAL

Page 358

1     And, in fact, the negative effects
2 significantly outdo any positive effects, and
3 especially when it comes to something like
4 addiction-like social media use.
5 BY MS. JONES:
6     Q.   Is that -- the -- kind of
7 benefits-negative effects weighing that you've
8 talked about today --
9     A.   Uh-huh.
10     Q.   -- is that -- does that weigh out the
11 same way for every adolescent or teenager?
12         MS. COUCH:  Objection.  Vague.
13         THE WITNESS:  I don't think I should
14 speculate on that.
15 BY MS. JONES:
16     Q.   Well, I'm just trying -- I'm just
17 trying to understand if your ultimate opinion is
18 that for every adolescent or teenager, that the use
19 of social media and any healthy or beneficial
20 effects would be outweighed by negative effects.
21         MS. COUCH:  Objection.  Vague.
22 BY MS. JONES:
23     Q.   Do you believe that's the case for
24 every adolescent or teenager?
25         MS. COUCH:  Same objection.

HIGHLY CONFIDENTIAL

Page 359

1         THE WITNESS:  I believe that the risks
2 and harms of social media outdo any benefits that
3 there could be.  I can't speak to any individual
4 adolescent.
5 BY MS. JONES:
6     Q.   Are you -- is it possible that for some
7 adolescent or teenager, the benefits might outweigh
8 what you have described as potential harms from
9 social media use?
10     A.   I can't speak to any individual
11 adolescent and the weight of those things.  I
12 think, at the larger scale, the harms are extreme
13 and outdo any potential small benefit that social
14 media could provide.
15     Q.   Did -- did you comprehensively, as part
16 of your work as an expert in this case, evaluate
17 the benefits of social media so that you could
18 actually do this weighing that you're describing
19 across all teenagers?
20     A.   I do research in my lab on the benefits
21 of social media.  I am not negating that those
22 don't exist.  But the harms are so extreme that we
23 don't need to do any singular calculation.
24         It's just a very clear pattern that
25 these harms are so harmful that it is not safe to

HIGHLY CONFIDENTIAL

Page 360

1 be on social media for an adolescent.
2     Q.   And would you say the same thing for
3 an -- a teenager who's 14 versus 16?
4         MS. COUCH:  Objection.
5         THE WITNESS:  I can't speculate on a
6 14-year-old versus a 16-year-old, no.
7 BY MS. JONES:
8     Q.   You don't know whether that
9 harm-versus-benefit calculus would be different as
10 a teenager gets older?
11         MS. COUCH:  Objection.  Calls for
12 speculation.
13         THE WITNESS:  There -- it's possible
14 that a 14-year-old is more at risk than a
15 16-year-old, and it's possible that another
16 16-year-old is more at risk than a 14-year-old.  I
17 can't make that claim based on a speculative age
18 cutoff.
19 BY MS. JONES:
20     Q.   Because every teenager is different,
21 yes?
22     A.   There are differences in adolescents.
23 And I talk about individual differences.
24     Q.   Yeah.  You -- is one of your opinions
25 in this case that the risks at a kind of population

HIGHLY CONFIDENTIAL

Page 361

1 level, all-teenager level, that the risks of social
2 media always outweigh the benefits of social media?
3     A.   I don't think I've expressed that as
4 one of my summary opinions.
5     Q.   Okay.  So that's not an opinion that
6 you've offered in this case?
7     A.   I'm not making a -- I'm not weighing
8 those two things in my opinions.
9     Q.   Okay.  And part of the reason you
10 couldn't do that weighing, I suspect, is that you
11 did not, it didn't sound like, actually do any work
12 to gather what the data and the literature say on
13 the benefits of social media for adolescents and
14 teens, right?
15         MS. COUCH:  Objection.  Misstates her
16 testimony and her materials list.
17         THE WITNESS:  I have looked at the
18 benefits of social media.  I have not said that
19 those don't exist.
20         But from my review of all the
21 literature, from my work in the field, from talking
22 to parents about their concerns, from meeting with
23 teens and conducting my own research, I have come
24 to the conclusion that social media is harmful.
25 BY MS. JONES:

Page 362

1      Q.   Well, that -- that part I understand.
2           I guess -- I thought, when we talked
3  about this earlier, you said that you hadn't done a
4  systematic literature search on the benefits of
5  social media for teenagers because you didn't view
6  that as being within the scope of what you were
7  doing for purposes of your opinions.  Is that
8  right?
9           MS. COUCH:  Objection.  Misstates her
10  testimony.
11           THE WITNESS:  No.  I said that I did
12  not include that as part of the report that you
13  were asking about.
14  BY MS. JONES:
15      Q.   So you -- you considered the benefits,
16  but you didn't say anything about the benefits in
17  your written report?
18           MS. COUCH:  Objection.  Misstates the
19  report.
20           THE WITNESS:  I believe I have
21  mentioned the benefits of social media in my
22  report.
23  BY MS. JONES:
24      Q.   You think you have a section in that
25  report about the benefits of social media?

Page 363

1      A.   I think I have mentioned the benefits
2  of social media in here.  But my general opinion is
3  based on all of the other literature that I have
4  included in here.
5      Q.   I'm curious.  Is there a specific thing
6  you're thinking of in your report where you
7  acknowledge the benefits of social media for
8  teenagers?
9      A.   I can't identify a specific sentence
10  off the top of my head, but I believe it's at least
11  mentioned.
12      Q.   Okay.  But you don't know where?
13      A.   Okay.
14      Q.   If I ran a control F search in your
15  report for the word "benefit," would I find it?
16      A.   I believe so.
17      Q.   Okay.
18           MS. COUCH:  Twenty-six times.
19           MS. JONES:  Okay.
20  BY MS. JONES:
21      Q.   In those instances, would you be
22  weighing it?
23           MS. JONES:  Counsel, you shouldn't be
24  testifying for the witness --
25           MS. COUCH:  Sorry.

Page 364

1           MS. JONES:  -- obviously.  I know it's
2  hard to resist the impulse.
3  BY MS. JONES:
4      Q.   Did you explicitly lay out what the
5  benefits of social media are for teenagers and
6  adolescents?
7      A.   I -- my --
8      Q.   Now that your counsel has told us you
9  mentioned it 26 times, what did you say about them?
10      A.   I can't recall what I said about it.
11      Q.   When you come to trial and testify, or
12  if you come to trial and testify, are you going to
13  acknowledge to the jury that there are, in fact,
14  benefits of using social media for teenagers?
15           MS. COUCH:  Objection.  Calls for a
16  legal response and speculation.
17           THE WITNESS:  I can't speculate about
18  the future.
19  BY MS. JONES:
20      Q.   Okay.  But you'll testify truthfully if
21  you come to testify at trial, right?
22      A.   I will tell the truth if it comes to
23  coming.
24      Q.   Okay.  Okay.  I mean, since we're just
25  talking, I'm told that the references to benefits

Page 365

1  in your report are about benefits of study design,
2  not benefits of social media.
3           With that clarification, do you think
4  that you have references to the benefits of social
5  media in that report?
6      A.   I can't tell you off the top of my
7  head.  I believe I have mentioned the benefits of
8  social media.
9           That being said, the purpose of my
10  report is not to talk about the benefits but to lay
11  out the very explicit harms and how social media is
12  related to changes in the developing brain.
13      Q.   Dr. Telzer, on Page 3 of -- of Exhibit
14  Number 20, which is the Flannery 2024 -- excuse
15  me -- Flannery -- I think it is 2024 --
16      A.   Uh-huh.
17      Q.   -- paper on which you were a co-author,
18  if you turn to Page 3, there is a section
19  entitled -- well, there's a section called
20  "Measures."
21           Do you see that?
22      A.   Yes.
23      Q.   And then there's another section
24  entitled "Addiction-like Social Media Use
25  Symptoms."

HIGHLY CONFIDENTIAL

Page 366

1     Do you see that?
2     A.   Yes.
3     Q.   And was that the measure that you used
4  in terms of evaluating potential problematic use or
5  addictive use symptoms, ASMU?
6     A.   Yes.
7     Q.   And in your reference here, it says on
8  Page 3:  ASMU symptoms were also measured at the
9  final time point with a novel seven-item
10  questionnaire.  Right?
11     A.   Yep.
12     Q.   And in that setting, "novel" means what
13  exactly?
14     A.   For the purposes of this study, we
15  developed this measure.
16     Q.   Okay.  Is it used elsewhere?
17     MS. COUCH:  Objection.
18     THE WITNESS:  This is a -- a very
19  similar measure to many of the other social media
20  addiction measures that are also based on the
21  "Diagnostic and Statistical Manual" for substance
22  use.
23  BY MS. JONES:
24     Q.   Okay.  But my question was:  Is ASMU
25  used elsewhere that you know of?

HIGHLY CONFIDENTIAL

Page 367

1     MS. COUCH:  Objection.  Vague.
2     THE WITNESS:  What do you mean by "is
3  ASMU used elsewhere"?
4  BY MS. JONES:
5     Q.   Like, in -- in studies on which you
6  were not a co-author, could I find other studies
7  that use ASMU?
8     A.   Do you mean the acronym "ASMU"?
9     Q.   Well, not ASMU, but the -- the specific
10  questionnaire, the novel seven-item questionnaire
11  that you used in this study, the Flannery 2024
12  paper.
13     A.   No.  Other studies have not used this
14  specific measure.
15     Q.   Okay.  Is this study the one place that
16  that novel seven-item questionnaire has been used?
17     A.   We've used it in other publications.
18     Q.   And by "you," you mean yourself and
19  some of your co-authors?
20     A.   Yes.
21     Q.   So, Dr. Telzer, you -- by the time
22  you -- this is February of 2024, yes?  Accepted
23  February 20 -- 2024?  Down at the bottom of the
24  page on the first page?
25     A.   Yes.

HIGHLY CONFIDENTIAL

Page 368

1     Q.   Okay.  And this journal does have a
2  conflict of interest section in it, right?  On
3  Page 8.
4     A.   Yes.
5     Q.   And there is some discussion of things
6  that were declared.  It says:  The authors declare
7  the following financial interests/personal
8  relationships which may be considered as potential
9  competing interests.
10     Do you see that?
11     A.   Yes.
12     Q.   And it says that you and Dr. -- you and
13  Dr. Prinstein reported receiving private research
14  funds from the Winston Family Foundation during the
15  conduct of the study.  Correct?
16     A.   Correct.
17     Q.   Now, by February of 2024, you had been
18  retained by Mr. Bergman, correct?
19     A.   Yes.
20     Q.   Had you been yet introduced to, I
21  guess, the group that you think of as the MDL
22  lawyers in this litigation?
23     A.   Not that I can recall, no.
24     Q.   When -- when you were -- without
25  telling me about your specific conversations, when

HIGHLY CONFIDENTIAL

Page 369

1  you were retained by Mr. Bergman, did you
2  understand that he was a lawyer representing a
3  party in a lawsuit?
4     A.   I don't think I understood that at that
5  time.
6     Q.   Did you know he was a lawyer?
7     A.   I knew he was a lawyer.
8     Q.   And by the time this article was
9  published in February of 2024, you'd been -- you
10  had been paid by Mr. Bergman, right?
11     A.   I think for a few initial meetings.
12     Q.   Okay.  And if you need to, you can look
13  back at what we've marked as Exhibit Number 3.
14     MS. COUCH:  Can I just object to it's
15  misleading because it says it was received in '23.
16     MS. JONES:  You can object, but you may
17  not coach the witness by testifying yourself.
18     So your objection is noted.  The rest
19  is inappropriate.
20  BY MS. JONES:
21     Q.   Do you have Exhibit 3 in front of you?
22     A.   Yes, I do.
23     Q.   All right.  And if you flip through
24  Pages 1, 2, 3 of Exhibit 23 -- excuse me -- Exhibit
25  Number 3, those were the invoices that were related

Page 370

```
 1   to a period where you were just working with
 2   Mr. Bergman, correct?
 3        A.   Yeah.
 4        Q.   You did not, as part of your disclosure
 5   in -- and by that time, you had -- by the time this
 6   paper was submitted, you had been -- you had at
 7   least invoiced Mr. Bergman for some amount of money
 8   in whatever consulting role you were playing,
 9   correct?
10        A.   That's correct.
11        Q.   Did you --
12             MS. COUCH:   Objection.  Misstates the
13   documents, both of them.
14             MS. JONES:   Well, she's already
15   testified and said it was correct.
16             MS. COUCH:   I'm sure we wouldn't want
17   an inaccurate record.
18             MS. JONES:   Well, you're not -- you're
19   not allowed to make the record accurate by
20   testifying yourself.
21   BY MS. JONES:
22        Q.   By the time that you --
23             MS. COUCH:   The date says June 9th and
24   June 20th.
25             MS. JONES:   Counsel.  Counsel, you are
```

Page 371

```
 1   not -- this is inappropriate.  This is not even a
 2   speaking objection.  This is just you testifying,
 3   which is not your role.
 4   BY MS. JONES:
 5        Q.   Dr. Telzer, by the time that this paper
 6   was published, you did, in fact, have a financial
 7   relationship with Mr. Bergman, correct?
 8        A.   By the time the paper was published in
 9   '24, I had had conversations with Mr. Bergman.
10        Q.   Okay.  Conversations that you
11   eventually billed him for, right?
12        A.   Those were billed.
13        Q.   Okay.  And you -- you did not disclose
14   a conflict of interest with respect to this paper
15   in 2024 -- that was published in 2024?
16        A.   I did not.  And at the time, I did not
17   understand the scope of my work nor what this was
18   sort of leading to in the -- the grander scheme
19   of -- of this case.
20        Q.   Did you -- did you understand, again,
21   generally, that you were consulting on the topic of
22   alleged social media addiction in teenagers?
23             MS. COUCH:   Objection.  Speaks to
24   attorney communications.
25   BY MS. JONES:
```

Page 372

```
 1        Q.   You didn't know.
 2             MS. JONES:   -- -expert communications.
 3   BY MS. JONES:
 4        Q.   You're shaking your head "no."
 5        A.   No.  I think I partly can't speak to
 6   that and partly don't -- didn't understand yet what
 7   the broader scope of this was.
 8        Q.   And your testimony is that the reason
 9   that you didn't disclose that is because you didn't
10   know what you were doing with Mr. Bergman at that
11   point?
12        A.   In part, I didn't yet understand.  And,
13   in part, it's perhaps an oversight and it should be
14   in here.
15        Q.   Okay.
16        A.   And that's fine.  I can look into it.
17        Q.   In your report, you -- and you've said
18   this at various points during your testimony today.
19   You have included discussions of the term
20   "problematic use or addiction-like use," right?
21        A.   Yes.
22        Q.   And one of the things that you have
23   said -- and you can look at Page 189 of your
24   report, if you want to refer to it -- is that:
25   Problematic or addictive use of social media is
```

Page 373

```
 1   well-recognized within the literature and supported
 2   by neuroscience.
 3        A.   Sorry.  What page?
 4        Q.   189.  It's in your conclusion.
 5        A.   I'm sorry.  I'm not seeing it.  Oh.
 6   It's -- well -- yeah.  I see it now.
 7        Q.   If you go to Page 124 of your report,
 8   there's a section entitled, about midway down, that
 9   says, 11.3, "Problematic social media use."
10             Do you see that?
11        A.   Yes.
12        Q.   And you write:  In the literature,
13   problematic social media use is characterized by
14   excessive, compulsive, and poorly regulated
15   engagement with social media that interferes with
16   daily functioning and well-being.
17             Did I read that correctly?
18        A.   Correct.
19        Q.   And it goes on to say:  It shares
20   features with behavioral addictions, including
21   substance use addiction.
22             Do you see that?
23        A.   I do.
24        Q.   And you -- that was -- that's a
25   comparison that you drew in the Flannery paper that
```

Page 374

1  we were just talking about, right?
2       A.  I did.
3       Q.  And you actually acknowledged in the
4  Flannery paper that you all were not able to test
5  that specific hypothesis as part of that work,
6  right?
7            MS. COUCH:  Objection.  Misstates the
8  paper.
9            THE WITNESS:  I think that there was a
10  caveat in that paper that -- in the limitations
11  section.
12  BY MS. JONES:
13       Q.  Okay.
14       A.  That does not necessarily refer to
15  this.
16       Q.  It goes on to say:  In order to
17  understand the rate of problematic social media use
18  in our cohort of adolescents, we adapted items from
19  the Diagnostic Statistical Manual (DSM-5; American
20  Psychiatric Association) substance use disorder
21  checklist, whereby we replaced the wording for
22  substance use for social media use.
23       A.  Yep.
24       Q.  Do you see that?
25            And just to be clear, the DSM-5 is the

Page 375

1  diagnostic manual recognized -- excuse me -- the
2  diagnostic manual of recognized mental disorders
3  published by the American Psychiatric Association?
4       A.  That's what that is.
5       Q.  And, just generally speaking, it
6  provides a standardized means of classifying and
7  diagnosing psychiatric disorders; is that right?
8       A.  I believe that's one way in which it's
9  used.
10       Q.  Do you understand that DSM-5 -- excuse
11  me.  Do you understand the DSM to be the
12  authoritative source for assessment and diagnosis
13  of psychiatric disorders?
14       A.  I don't think that it --
15            MS. COUCH:  Objection.  Foundation.
16            Continue.
17            THE WITNESS:  I don't think it's the
18  single authority, no.
19  BY MS. JONES:
20       Q.  What other authorities do you believe
21  are routinely used by experts in the field in
22  diagnosing psychiatric disorders?
23       A.  I think there are many measures and
24  scales used by clinicians and medical doctors in
25  the field.

Page 376

1       Q.  Are there any in particular that you're
2  thinking of?
3       A.  Not off the top of my head, I am not,
4  no.
5       Q.  Now, the DSM-5 actually does recognize
6  some behavioral addictions; is that right?
7       A.  Some what addictions?  Behavioral?
8       Q.  Behavioral.  Excuse me.  Yes.
9       A.  Yes, I believe so.
10       Q.  Okay.  So, for example, gambling
11  addiction is a recognized behavioral addiction in
12  the DSM-5, right?
13       A.  Yes, it is.
14       Q.  And I assume you know and would
15  acknowledge the DSM-5 does not recognize social
16  media addiction?
17       A.  I think that there is a plethora of
18  other substantial health care providers and broader
19  groups, including the American Psychiatric -- or
20  American Psychological Association that's put out
21  broad statements about agreeing that social media
22  addiction is a real thing and we should be
23  concerned about it.
24            MS. JONES:  Okay.  I'm going to move to
25  strike as nonresponsive.

Page 377

1  BY MS. JONES:
2       Q.  My question was:  I assume you know and
3  would acknowledge that the DSM-5 does not recognize
4  social media addiction?
5       A.  The DSM-5 at this point has not yet
6  been updated to include social media addiction.
7            But it is not the sole indicator of
8  diagnostic criteria, and there are many others in
9  the field who acknowledge and have put forth
10  presentations and statements that social media
11  addiction is a real thing, including the U.S.
12  Surgeon General, the American Psychological
13  Association, and others as well.
14       Q.  Do you -- now, I think you told me
15  earlier --
16            MS. JONES:  And I'm going to move to
17  strike everything after the first reference to
18  social media addiction.
19  BY MS. JONES:
20       Q.  You told me earlier you are not
21  yourself, as part of what you do, qualified to
22  diagnose individuals with any condition, whether
23  it's some form of addiction or some other mental
24  health disorder, right?
25       A.  I'm not a clinician who diagnoses

Page 378

1  mental disorders.
2       Q.   Okay.  And in terms of determining
3  which diagnostic criteria are most appropriate for
4  a particular condition, is that something that you
5  ever do in your work as an academic researcher?
6       A.   As an academic researcher, I'm talking
7  to and engaging with clinicians and psychologists
8  all the time.
9            My work informs diagnostic criteria
10  used in their practices.  Their experiences inform
11  the way that I do my research and informs how we
12  ask different questions.
13       Q.   Sure.  And I understand you work with
14  people who might be trained to determine what is
15  the best diagnostic criteria for diagnosing
16  individuals.
17            My question for you was:  Are you a
18  person who, as part of your day-to-day work, is
19  responsible for making judgments about what
20  diagnostic criteria appropriately apply to a
21  particular condition?
22       MS. COUCH:  Asked and answered.
23       THE WITNESS:  I am not a clinician who
24  makes these diagnoses.  But I interact with, work
25  with, collaborate with psychiatrists and clinicians

Page 379

1  all the time.
2            So my work informs them, and they are
3  oftentimes the ones making those kinds of
4  decisions.
5  BY MS. JONES:
6       Q.   Are -- are there -- are there specific
7  people you're thinking of when you say, "My work
8  informs clinicians' diagnostic decisions with
9  respect to the care of folks who might have
10  addiction or mental health disorders"?
11       A.   I mean, it's large group of people.
12  But I have therapists, for example, calling me,
13  asking for my expertise on this topic, regularly.
14       Q.   They call you and ask you specifically
15  about what is the best diagnostic criteria to use
16  in a particular circumstance?
17       A.   We have discussions broadly about what
18  the research is showing so that that research can
19  inform their decisions in their clinical work.
20       Q.   Okay.  But they -- you don't have
21  clinicians who call you and say, "Dr. Telzer, I
22  have someone I'm caring for.  I want your advice on
23  which diagnostic criteria I should be using with
24  this patient"?
25       A.   I don't advise about a specific or

Page 380

1  particular client or patient.
2            But we have conversations all the time
3  about how the work that I'm doing can inform their
4  clinical practice and how their conversations that
5  they're having with their -- their patients and the
6  patterns that they're seeing can inform the
7  questions that we ask in our research.
8       Q.   There -- is there any accepted set of
9  diagnostic criteria for assessing either social
10  media addiction, which you've described as social
11  media addiction, problematic social -- social media
12  use, or addiction-like social media use?
13       MS. COUCH:  Compound.
14       MS. JONES:  Well, that's a fair
15  objection.  Let me -- and not a speaking objection.
16  A form objection.
17  BY MS. JONES:
18       Q.   Let me ask you a more broken-down form.
19            Is there any accepted set of diagnostic
20  criteria for -- for assessing whether someone has
21  social media addiction?
22       A.   You know, not as somebody who's
23  engaging in diagnoses or looking at these criteria.
24            I can say more broadly that there are
25  lots of validated measures that are used to capture

Page 381

1  social media addiction, and I think that clinicians
2  are using those types of validated scales.
3       Q.   What -- what type of measures are you
4  thinking of specifically?
5       A.   There's a -- a handful of social media
6  addiction scales out there going back to 2012.
7  More recently, scales coming out.
8       Q.   And you said, "I think that clinicians
9  are using those types of validated scales."
10            Is that based on clinicians actually
11  telling you, "I have used this scale with a patient
12  to see if the patient has social media addiction"?
13       A.   Sorry.  You're asking me to speculate,
14  so I'm speculating.
15       Q.   Well, let me ask you a more specific
16  factual question.  I think you were speculating in
17  your answer, but now I actually just want to ask
18  factually.
19            Have you ever had a -- a clinician who
20  said to you, "I am using a validated scale to
21  determine whether a teenager has social media
22  addiction"?
23       A.   I haven't had conversations about
24  specific clients or teenagers in their practice.
25            We more generally are talking about the

Page 382

1  work that I'm doing and how that can inform their
2  understanding of these patterns and how their
3  experiences broadly of being exposed to youths with
4  problematic social media use can inform the
5  questions that we're asking.
6      Q.  Okay.  Let me ask you a slightly
7  different question.
8          Putting aside whether it was any
9  individual patient, have you had a clinician say to
10  you, "I have used a validated scale to evaluate
11  whether my patients, teen patients, have social
12  media addiction"?
13      A.  I can't recall.
14      Q.  Are you aware of any specific validated
15  scale for assessing social media addiction that is
16  used at UNC?
17      A.  I don't know what people at UNC use
18  per se.  This is sort of out of the scope of the
19  opinions I have here.  I'm speculating now about
20  what others are doing.  I don't know how that's --
21      Q.  I think the way this started is that
22  you said, "I think clinicians are using these
23  validated scales."
24      A.  Yeah, you asked -- sorry.
25      Q.  So I'm -- I'm just trying to follow up

Page 383

1  on what you actually know, putting aside what you
2  might have a general impression of.
3      Are you aware of any clinician at UNC,
4  your institution, who uses a validated scale for
5  evaluating whether teenagers have social media
6  addiction?
7      MS. COUCH:  Asked and answered.
8      THE WITNESS:  You've asked me to
9  speculate.  I speculated that I think there are.  I
10  can't tell you a specific example.
11  BY MS. JONES:
12      Q.  You think there are, but you can't tell
13  me a specific example?
14      A.  I've had lots of conversations with
15  clinicians at UNC, also at -- many more outside of
16  UNC as well, so...
17      Q.  And I guess my -- I'm not asking you to
18  speculate.  But I want to make sure that if you are
19  speculating that we at least are clear about that.
20      It sounds like you are not aware of a
21  specific scale for social media addiction that is
22  being used at UNC.
23      MS. COUCH:  Asked and answered.
24      THE WITNESS:  As I indicated, I don't
25  know what specific clinicians or doctors at UNC are

Page 384

1  doing.  But we have had lots of conversations about
2  the use of these scales.
3      I collaborate with a lot of clinicians
4  in psychology, in psychiatry as well, and these
5  types of conversations happen regularly.
6      Therapists call me up to talk about
7  social media addiction.  I don't know of what they
8  are specifically doing in their practice.
9  BY MS. JONES:
10      Q.  What about problematic social media
11  use, which is another term you've used?  Is there
12  an accepted set of diagnostic criteria for
13  problematic social media use?
14      A.  I mean, these are broadly accepted in
15  the academic literature.  I'm not a clinician.  I
16  don't know exactly what clinicians are doing in
17  their practices.
18      Q.  When you say "broadly accepted in the
19  academic literature," I'm not sure what that means
20  exactly.  That someone wrote an article about
21  something?
22      A.  There's lots of literature referring to
23  problematic social media use.  There have been
24  calls put out by the APA and others referring to
25  problematic social media use.

Page 385

1      Myself, I use problematic social media
2  use in a way to discuss addiction, social media
3  addiction.  Whether one uses one word or another, I
4  can't necessarily disentangle that for you.
5      Q.  I suspect your answer is going to be
6  the same as to my earlier question.  But are you
7  aware of any clinicians at UNC who use using any
8  kind of scale or diagnostic criteria to diagnose
9  teenagers with problematic social media use?
10      A.  I don't know what the clinicians are
11  doing in their practices.
12      Q.  Have you ever had a clinician at UNC
13  call you up about something described as
14  "problematic social media use"?
15      A.  I can't recall.
16      Q.  Is that a term that you've ever had one
17  of your clinical colleagues use with you?
18      A.  I can't recall.
19      Q.  Okay.  Sitting here today, you just
20  don't know if that's ever happened?
21      A.  I can't recall the specific terminology
22  that was -- was used.
23      Q.  Okay.  Same question as to -- the
24  phrase that you use in your report is
25  "addiction-like social media use."

Page 386

1      Are there any accepted diagnostic
2  criteria for assessing whether a teenager has
3  addiction-like social media use?
4      A.   The answer is similar to all of the
5  others.  There are these well-validated, well-used
6  scales out there.  I can speculate that clinicians
7  are using them.  I don't know.
8           The -- the research that we do and
9  write about is read by clinicians, so I can assume
10  that it informs their work.
11      Q.   I heard the words "speculation" and
12  "assumption," and I'll come back to that.
13           But were you -- is your testimony that
14  there are validated -- well-validated, well-used
15  scales for addiction-like social media use?
16      A.   No.  I -- I'm not saying that there's a
17  well-validated -- well-validated scale for that
18  specific phrase.
19      Q.   Okay.  And have you ever had any
20  clinician at UNC, or anywhere, for that matter,
21  talk to you about something described as
22  "addiction-like social media use"?
23      A.   I can't recall.
24      Q.   Did -- did you know that the DSM-5,
25  there had actually been a specific consideration of

Page 387

1  whether to include social media addiction in the
2  DSM-5, and there was a decision not to include it
3  because of insufficient peer-reviewed evidence to
4  establish social media addiction?
5           MS. COUCH:  Objection.  Lacks
6  foundation.
7           THE WITNESS:  I'm not sure if I know
8  that about how the DSM was created.
9  BY MS. JONES:
10      Q.   You never -- well, I'm not asking you
11  about how the DSM was created.
12           I'm asking specifically:  Did you know
13  that the -- the folks responsible for the DSM-5 had
14  actually specifically considered whether to include
15  social media addiction and determined not to do
16  that because there was insufficient peer-reviewed
17  evidence to establish social media addiction as a
18  recognized behavioral disorder?
19           MS. COUCH:  Objection.  Lacks
20  foundation.
21           THE WITNESS:  I'm not aware of that
22  specific quote or when that was indicated.
23  BY MS. JONES:
24      Q.   Okay.  So that was -- are you hearing
25  that for the first time today, if it -- if it did

Page 388

1  happen?
2      A.   I'm not sure.  But my broader
3  understanding of social media addiction does not
4  come from just the DSM-5 but from all of the
5  literature at large.
6           From a handbook that I co-edited that
7  has an entire chapter on social media addiction.
8  The broader academic field definitely recognizes
9  social media addiction is a real thing.  So I have
10  no doubt that the foundational research is there.
11           There have been calls put forth by the
12  American Psychological Association, by the Surgeon
13  General of the United States, stating that social
14  media addiction is a problem.
15      Q.   Is it relevant to you -- would it be
16  relevant to you if the American Psychiatric
17  Association had considered whether to include
18  social media addiction in the DSM-5 and had
19  declined to do it?
20           MS. COUCH:  Objection.  Lacks
21  foundation.
22           THE WITNESS:  That does not change my
23  understanding or opinion here.
24           From the broader literature, from tons
25  of publications, from the handbook that I co-edited

Page 389

1  with an entire chapter on social media addiction,
2  this is a -- this is a true and problematic thing
3  that exists.
4           Social media addiction is a real thing.
5  I don't need the Diagnostic Statistical Manual to
6  tell me that for me to know.
7  BY MS. JONES:
8      Q.   You -- you relied -- and when you say,
9  "Social media addiction is a real thing and I don't
10  need the DSM-5 to tell me that to know," just to be
11  clear, that statement is not based on any actual
12  experience treating patients with any kind of
13  psychiatric disorder, right?
14           MS. COUCH:  Asked and answered.
15           THE WITNESS:  I don't -- I don't
16  clinically treat patients.
17  BY MS. JONES:
18      Q.   Okay.  And this is probably implicit in
19  what we already discussed.  But the phrases
20  "problematic social media use" and "addiction-like
21  social media use," those are nowhere in the DSM-5,
22  right?
23      A.   Not that I know of.
24      Q.   Did you look?
25      A.   Those terms I don't believe are in the

HIGHLY CONFIDENTIAL

Page 390

1  DSM-5.
2       Q.   Well, my question was:  Did you look --
3           MS. COUCH:  Objection.  Asked and
4  answered.
5  BY MS. JONES:
6       Q.   -- as part of your work in this case?
7       A.   I don't review the Diagnostic
8  Statistical Manual.
9       Q.   Now, you based your seven-question
10  scale from the Flannery paper, if I'm recalling
11  your papers correctly, on the DSM-5, right?
12       A.   We pulled out the items from that
13  measure on substance use.
14       Q.   So, in that instance, you did consider
15  the DSM-5, yes?
16       A.   We used substance use disorder
17  checklist to transform that phenomenon of substance
18  use disorder into a very relevant thing for us in
19  the context of social media addiction.
20       Q.   Okay.  So you -- you used something
21  that the DSM-5 had recognized to create a scale or
22  a tool for something that the DSM-5 has not
23  recognized?
24           MS. COUCH:  Objection.  Vague.
25           THE WITNESS:  We used the substance use

HIGHLY CONFIDENTIAL

Page 391

1  disorder checklist and used those items to look at,
2  similar to how many other social media addiction
3  scales have been developed relying on the
4  Diagnostic Statistical Manual, items for substance
5  use disorder, social media addiction.
6  BY MS. JONES:
7       Q.   Do you agree that just because a
8  teenager uses a social media platform, that does
9  not mean that the teenager is experiencing social
10  media addiction?
11       A.   I can agree with the broad concept that
12  just because one uses social media does not mean
13  you are addicted.
14       Q.   I -- I suspect your answer is going to
15  be that this is outside what you typically do.
16           But are you aware of any adolescent or
17  teenager who has been diagnosed with social media
18  addiction?
19       A.   I have talked to a lot of adolescents
20  who self-identify as addicted to social media.  I
21  don't know -- it's probably protected -- whether
22  they have been diagnosed by a clinician.
23       Q.   And self-diagnosis -- and I say this as
24  a person who always thinks I have some dreaded
25  disease, so I'm not picking on people.

HIGHLY CONFIDENTIAL

Page 392

1           But self-diagnosis is not a fully
2  reliable way of knowing whether someone actually
3  has a clinical condition, right?
4           MS. COUCH:  Objection.  Misstates her
5  testimony.
6           THE WITNESS:  I regularly interact with
7  adolescents, ranging from informal meetings to --
8  we have a teen advisory board, for example, who
9  helps us understand concepts and how they affect
10  them in their everyday lives, to doing the research
11  that we do where we ask adolescents to -- as
12  included in my report, we ask them their
13  self-report:  Do you think you are addicted to
14  social media?
15           And adolescents are reporting high
16  levels of social media addiction based on those
17  discussions and data that we've collected.
18           MS. JONES:  And I'm -- I'm going to
19  move to strike, again, respectfully, as
20  nonresponsive.
21  BY MS. JONES:
22       Q.   My question was:  Can we agree in
23  general terms that self-diagnosis is not a fully
24  reliable way of knowing whether somebody has a
25  clinical condition or not?  Right?

HIGHLY CONFIDENTIAL

Page 393

1           MS. COUCH:  Asked and answered.  Vague.
2           THE WITNESS:  As I mentioned, I talk to
3  adolescents all the time in many different
4  contexts.
5           We have both informal discussions as
6  well as discussions based on a teen advisory board,
7  and very rigorous -- rigorously conducted research,
8  where we conduct self-report measures that are very
9  strongly supporting the premise that a high
10  percentage of adolescents are reporting high levels
11  of social media addiction.
12  BY MS. JONES:
13       Q.   Other than the -- these self-reports of
14  social media addiction that you have just
15  described, just to go back to my original question,
16  are you aware of any teenager who has been
17  diagnosed by a clinician with social media
18  addiction?
19       A.   I've talked to lots of adolescents who
20  tell me that they are addicted to social media.  I
21  don't have the knowledge of their therapists'
22  diagnoses.
23       Q.   Okay.  Can -- can you agree with me
24  that there are millions of individuals, including
25  teenagers, who use social media without

Page 394

1   experiencing any psychological harm?
2           MS. COUCH:  Objection.  Vague.
3           THE WITNESS:  I don't think I can
4   speculate on that number.
5   BY MS. JONES:
6       Q.  Well, let me take the numbers out of
7   it.  Do you agree with me that there are teenagers
8   who use social media who do not experience mental
9   health injury or harm?
10      A.  I agree with --
11          MS. COUCH:  Objection.  Vague.
12          THE WITNESS:  Sorry.
13          I agree with the premise that there are
14  adolescents who use social media who do not all
15  have harm.
16  BY MS. JONES:
17      Q.  And do you also agree that there are
18  adolescents and teenagers who use social media who
19  do not develop any form of addiction to social
20  media?
21      A.  I can agree with the general premise
22  that there is some adolescents who do not develop
23  social media addiction.
24          MS. COUCH:  Can we take a five-minute
25  bathroom break since you're grabbing a new

Page 395

1   document?
2           MS. JONES:  Yes, of course.  That's
3   fine.
4           MS. COUCH:  Okay.  Thank you.
5           THE VIDEOGRAPHER:  Going off the
6   record.  The time is 5:26 p.m.
7               * * *
8           (Whereupon, there was a recess in the
9   proceedings from 5:26 p.m. to 5:37 p.m.)
10              * * *
11          THE VIDEOGRAPHER:  Going back on the
12  record.  The time is 5:37 p.m.
13  BY MS. JONES:
14      Q.  Dr. Telzer, welcome back.  A few
15  times -- I wanted to just follow up on one quick
16  thing.
17          A few times in your testimony today,
18  you have used the phrase "more likely than not."
19          Do you recall that?
20      A.  Uh-huh.
21      Q.  You have to say "yes" or "no."
22      A.  Yes.  Sorry.
23      Q.  And you said that in the context
24  of potential relationships between social media use
25  and either brain changes, developmental --

Page 396

1       A.  Uh-huh.
2       Q.  -- changes or mental health harms,
3   correct?
4       A.  I don't know when I specifically said
5   it.
6       Q.  That's all right.
7       A.  Sorry.
8       Q.  That's fine.
9       A.  Okay.
10      Q.  My real question was:  Is the phrase
11  "more likely than not" a phrase that you use in
12  your day-to-day work as an academic researcher?
13      A.  It's not necessarily a common phrase
14  that we use in publications.  It is my way of
15  expressing to you what I mean when I say "may."
16      Q.  And does "more likely than not" mean
17  greater than 50/50?
18      A.  I can't give you a percentage for that.
19      Q.  Okay.  What does "more likely than not"
20  mean to you?
21      A.  It means that we have -- it means that
22  we are confident that there's a meaningful effect
23  of what I'm talking about.
24      Q.  And is -- is "more like" -- putting
25  aside whether it's something you put in your own

Page 397

1   publications, is it a -- a phrase that is used in
2   science generally, in your experience?
3       A.  I'm not sure if it's used in science
4   generally.
5       Q.  Okay.  Have you seen it used in other
6   settings of scientific or academic research?
7       A.  I can't recall from science.  I was
8   using it here sort of as a "also known as," AKA.
9   When I say "may," I mean "more likely than not."
10          What I mean is "probably."  These are
11  the words that I'm using here to help you
12  understand what I mean by "may."
13      Q.  Okay.  In circumstances where you
14  didn't say "more likely than not" in the article
15  itself, right?
16      A.  I was using that as an example of what
17  I mean when I say "may" in those particular places
18  that we talked about.
19          (TELZER EXHIBIT 21, Journal of Children
20  and Media - U.S. adolescents' daily social media
21  use and well-being:  Exploring the role of
22  addiction-like social media use, was marked for
23  identification.)
24  BY MS. JONES:
25      Q.  I'm handing you what we've marked as

Page 398

1  Exhibit Number 21.  Have you -- do you recognize
2  Exhibit Number 21, Dr. Telzer?  And you're, of
3  course, welcome to flip through it.
4      A.   Yes.
5      Q.   Exhibit Number 21 is another article
6  that you have co-authored in this case, including
7  with Dr. Burnell, your colleague at UNC, correct?
8      A.   Correct.
9      Q.   And Dr. Burnell is one of the persons
10 that you mentioned who had helped in some of your
11 work related to your role as an expert in this
12 case, right?
13     A.   Dr. Burnell is a research assistant
14 professor in the Winston Center who I collaborate
15 with.
16     Q.   Okay.  And this article was published
17 in 2025; is that right?
18     A.   Yes.
19     Q.   If you look at the upper left-hand
20 corner.
21     A.   Yes.
22     Q.   And you -- you do, I believe, refer to
23 this paper in your report, if I'm recalling
24 correctly.
25     A.   I do discuss this paper in the report.

Page 399

1      Q.   Let me -- I want to ask you about a few
2  things that are in this paper, starting with,
3  actually, the very first paragraph.
4           Now, this was published in 2025, which
5  is a year we're just a little bit into.
6           Is this -- would you describe this, at
7  least with respect to the topics that are reflected
8  in this paper, a recent articulation of your views?
9           MS. COUCH:  Objection.  Vague.
10          THE WITNESS:  I would say that the --
11 this publication, if we look at the data and
12 results and the way that I've described it here,
13 those are accurate, yeah.
14 BY MS. JONES:
15     Q.   Is there any portion of this study
16 where you would say -- or this paper where'd you
17 say, "Actually, that doesn't reflect my view
18 anymore"?
19          MS. COUCH:  Objection.  Vague.
20 BY MS. JONES:
21     Q.   If you know.
22     A.   I think that the collective of this
23 paper reflects the general findings that we found
24 here in this paper.
25     Q.   Okay.  And starting with the very

Page 400

1  introductory paragraph, it says:  Concern about the
2  effects of social media use on youth mental health
3  has resulted in legislative efforts holding social
4  media companies responsible for the impact of their
5  product.
6           Did I read that correctly?
7      A.   Uh-huh.
8      Q.   You have to say "yes" or "no."
9      A.   Yes.
10     Q.   And then the next sentence refers
11 to what you describe -- you and your co-authors
12 describe as:  targeting addictive features and
13 binding [sic] companies to engage in risk
14 assessments of potential negative effects.
15          Did I read that correctly?
16     A.   You left out a word, but otherwise --
17     Q.   All right.  It was not intentional.  I
18 apologize.  Okay.  It was actually the next
19 sentence that I wanted to ask you about.
20          You -- you and your co-authors go on to
21 say in this paper from 2025:  Research examining
22 associations between social media use and mental
23 health remains inconclusive, and scholars have
24 called for studies utilizing objective measures and
25 rigorous methodologies.

Page 401

1           Do you see that?
2      A.   I see that.
3      Q.   And then it cites the Odgers and Jensen
4  paper that we talked about earlier, correct?
5      A.   Correct.
6      Q.   Is that statement still true today:
7  The research examining associations between social
8  media use and mental health remains inconclusive,
9  and scholars have called for studies utilizing
10 objective measures and rigorous methodologies?
11          MS. COUCH:  Objection.  Vague.
12          THE WITNESS:  In the context of this
13 study, it's citing to the Odgers and Jensen.  That
14 statement is correct in that context.
15          But the broader literature that we have
16 talked about today, that is not necessarily
17 included and this statement does not necessarily
18 support all of that.
19 BY MS. JONES:
20     Q.   Do you think that the statement here in
21 this -- well, is this a peer-reviewed paper?
22     A.   This is.
23     Q.   Okay.  So this would have both been put
24 together by yourself and four other academic
25 researchers, Ph.D.s, correct?

HIGHLY CONFIDENTIAL

Page 402

1    A.  Not all of Ph.D.s, but correct.

2    Q.  I apologize.  Four other folks who were

3    involved in academic research; is that right?

4    A.  Correct.

5    Q.  Okay.  Including Dr. Burnell, who is

6    someone with whom you collaborate in different ways

7    in your current role, right?

8    A.  Correct.

9    Q.  All right.  And -- so that meant that

10   the paper, you all drafted it.  And then it had to

11   be submitted to a set of reviewers, who would look

12   at it and say, "Do we think it's right?  Do we

13   think it's wrong?  Do we think they're fairly

14   interpreting their data?" et cetera.  Right?

15   A.  This went out for peer review.

16   Q.  Yes.  And just so we're clear, "peer

17   review" means other people beyond the five of you

18   reviewed the entire manuscript to determine whether

19   it was scientifically sound for purposes of

20   publication, right?

21   A.  Broadly speaking, that is how peer

22   review works, yes.

23   Q.  All right.  And so the five of you

24   collectively wrote:  Research examining -- wrote

25   last year:  Research examining associations between

HIGHLY CONFIDENTIAL

Page 403

1    social media use and mental health remains

2    inconclusive, and scholars have called for studies

3    utilizing objective measures and rigorous

4    methodologies.

5        And that statement also was subjected

6    to the review of other folks who are responsible

7    for evaluating papers that might be included in

8    this "Journal of Children and Media," correct?

9        MS. COUCH:  Objection.  Vague.

10       THE WITNESS:  I mean, the -- the

11   sentence here within this context is referring to

12   the Odgers and Jensen article that indicates that

13   the associations between social media use and

14   mental health remains inconclusive.

15   BY MS. JONES:

16   Q.  In -- in the context of putting this

17   manuscript together for eventual publication, did

18   you or your co-authors ever say, "Actually, we

19   don't think that the research examining

20   associations between social media use and mental

21   health are inconclusive"?

22       MS. COUCH:  Objection.  Vague.

23       THE WITNESS:  I think that this is a

24   broad statement.  And when we get into the more

25   specifics, we are making more causal claims.

HIGHLY CONFIDENTIAL

Page 404

1    BY MS. JONES:

2    Q.  Down -- let's talk about some of the

3    specifics.  If you go down into the next section,

4    Social Media Use and Subjective Well-Being --

5    A.  Uh-huh.

6    Q.  -- there is a discussion of the fact

7    that adolescents are heavy users of social media,

8    correct?

9    A.  Yes.

10   Q.  That's what you say there, right?

11   A.  Yes.

12   Q.  And a little further down, there is a

13   discussion about the fact that prior research

14   generally relied on self-report measurements, and

15   it cites Odgers and Jensen again.

16       Do you see that?

17   A.  Give me one second.

18   Q.  Sure.

19   A.  I see the sentence that says:  However,

20   past research generally relies on self-report

21   measures.  Is that what you're asking me?

22   Q.  Yes.

23   A.  Yep.

24   Q.  Is that a reference to self-report

25   measurements of social media use?  Is that what you

HIGHLY CONFIDENTIAL

Page 405

1    understand that to mean?

2    A.  I think it -- this is generally

3    indicating self-report measures about social media

4    use, I believe.  So...

5    Q.  Okay.  So the whole sentence says:

6    Past research generally relies on self-report

7    measurements which are inaccurate of actual social

8    media use and potentially confounded by

9    dispositional subjective well-being.

10       Do you see that?

11   A.  Yeah, I believe that that is

12   referring -- again, most of the research that we're

13   talking about here and what Odgers referred to in

14   the statement above that you originally had me look

15   at was the association between time spent on social

16   media and mental health.

17       Which was inconclusive and relatively

18   is inconclusive because we now have a much deeper

19   understanding of, when we look at specifics of

20   social media use, how it is impacting mental

21   health.

22   Q.  And when you say "specifics of social

23   media use," based on our conversation earlier, what

24   you're talking about is things like habitual

25   checking?

Page 406

1        MS. COUCH:  Objection.  Misstates her
2   testimony.
3   BY MS. JONES:
4        Q.   Well, let me take a step back.  What do
5   you mean by the "specifics of social media use"?
6        A.   Well, what I mean here is prior
7   research -- referring back to the statement you had
8   me look at before, that is research.  And in the
9   Odgers and Jensen paper, they're largely looking at
10  this retrospective reporting of time spent on
11  social media use.  And there are potentially sort
12  of inconclusive findings from that body of
13  research.
14        But when we look at much more detailed
15  and nuanced understandings of social media use, we
16  get a much better understanding of it if we look at
17  these within-person effects rather than a
18  retrospective report, momentary links.  We see much
19  stronger effects.
20        When we look at some objective measures
21  that complement some of self-report measures and
22  helps us to understand their social media use,
23  there's many ways in which social media use now is
24  studied in ways that weren't in some of that
25  earlier literature that did look at this more

Page 407

1   retrospective self-reported time spent on use.
2        And so when we use these within-person
3   designs, like we're doing in this study, and
4   longitudinal methods, we get a much clearer
5   understanding of how social media is linked to
6   mental health.
7        Q.   I want just to follow up a little bit
8   because I'm not -- I want to focus on my very
9   specific question, which was -- and you just
10  referred to detailed and nuanced ways of looking at
11  social media use, and I want to make sure I
12  understand.  What are you talking about when you
13  say that specifically?
14        A.   I guess what I'm trying to do is
15  contrast the prior work that we were referring to
16  that measured a retrospective report of their
17  overall time spent on social media use to get at
18  more nuanced things.
19        For example, at a within-person level,
20  you can ask them in the moments that it's happening
21  are they using social media.  And by repeatedly
22  asking that over days, we get a much more nuanced
23  understanding of their time spent on social media.
24        We can also look at the ways in which
25  social media is potentially problematic.  So

Page 408

1   looking at problematic social media use, there's
2   lots of different ways now that we are looking at
3   that nuanced perspective of social media use beyond
4   what I was referring to there in that statement you
5   had me read about the inconclusive data that was
6   relying largely on these retrospective measures of
7   overall time use.
8        Q.   Okay.  And then at the bottom of that
9   same page, carrying over to Page 196, it says:
10  Collectively, the question of how daily social
11  media use relates to daily subjective well-being
12  remains poorly understood and continues to be
13  relevant given ongoing legislative efforts that aim
14  for strict social media use among adolescents.
15        Did I read that correctly?
16        A.   Sure.  Yes.
17        Q.   I did.  Okay.  And is that a true
18  statement?
19        MS. COUCH:  Objection.  Vague.
20        THE WITNESS:  That's the statement
21  that's there, yes.  I would say --
22  BY MS. JONES:
23        Q.   I'm sorry.  Let me ask my next
24  question.  Unless you're still answering my
25  question, then let me ask my next question.

Page 409

1        A.   I was going to add to that question --
2   to that answer.
3        Q.   Go for it.
4        A.   So this statement was based on the
5   collective work that -- that, collectively, we'd
6   been reviewing.  But this paper, as well as many
7   others that have come out, mean that we now have --
8   it's not -- no longer poorly understood.  We know
9   these links.
10        Q.   So you think this paper clarified
11  something that had previously been poorly
12  understood?
13        A.   We're stating that, based on the
14  current understanding, there are some things that
15  are poorly understood and so we need to do this
16  research.
17        And other research that has come out
18  means that this is no longer necessarily a poorly
19  understood construct of how social media is
20  relating to adolescents' daily well-being.
21        Q.   Okay.  I just -- but I just wanted to
22  be clear.
23        What you wrote in this paper that was
24  published, I assume, earlier this year in 2025 was:
25  Collectively, the question of how daily social

Page 410

1  media use relates to daily subjective well-being
2  remains poorly understood and continues to be
3  relevant.  Yes?
4       A.   That is what it says.
5            MS. COUCH:  Objection.  Incomplete.
6  BY MS. JONES:
7       Q.   Let me ask you to look at the second --
8  actually, the third page of Exhibit Number 21.
9            Is that Exhibit 21?  I forgot the
10  numbers.  Is that 21?
11       A.   This is 21.
12       Q.   Okay.  Let me ask you to look at the
13  third page of Exhibit Number 21, which is your
14  paper published earlier this year.
15       A.   Sorry.  We're looking at the same
16  document we've --
17       Q.   Yeah.  Yes.
18       A.   -- been looking at?  Okay.
19       Q.   I apologize.  No, no.  I -- I created
20  confusion.
21       A.   "Page 3" meaning "Page 196" of the
22  paper?
23       Q.   Yes.
24       A.   Okay.
25       Q.   And towards the bottom of the page,

Page 411

1  there's a paragraph that begins with:  The first
2  aim of this study.
3            Do you see that?
4       A.   I do.
5       Q.   And it says:  The first aim of this
6  study was to examine daily links between social
7  media use and subjective well-being.
8            Did I read that right?
9       A.   Correct.
10       Q.   And then it describes two different
11  assessments that you did as part of the study,
12  correct?
13       A.   Correct.  Correct.  Sorry.
14       Q.   And then a little further down in that
15  same paragraph, there's a sentence that begins with
16  the word "further."  Do you see that?
17       A.   Further, subjective use?
18       Q.   Yes.
19       A.   Yep.
20       Q.   It says:  Further, subjective use may
21  be affected by the public narrative of social media
22  harm.
23            Do you see that?
24       A.   I see that.
25       Q.   Now, earlier, you told me that when you

Page 412

1  say "may be" in your writings, it means likely --
2  "more likely than not" or "probably."  Is that what
3  "may be" means in this article?
4       A.   What I was referring to is, when I am
5  talking about a result where we are talking about
6  two things linked to each other from data in that
7  paper, that that particular "may be" is where we
8  are saying "probably."
9       Q.   So you use the phrase "may be" in your
10  peer-reviewed work in different ways?  Is that what
11  you're testifying to?
12            MS. COUCH:  Objection.  Vague.
13            THE WITNESS:  I don't think I
14  understand the question.
15  BY MS. JONES:
16       Q.   Well, my -- you -- you told me earlier
17  when we looked at another paper where you -- where
18  you had used the phrase "may be," that what you
19  actually meant was "probably" or "more likely than
20  not."  Do you remember telling me that?
21       A.   I'm telling you --
22            MS. COUCH:  Objection.  Vague.
23            THE WITNESS:  Sorry.
24            I'm telling you, in the context of that
25  sentence that you showed me, when we are linking

Page 413

1  data from our paper, the predictor and the outcome,
2  and discussing that X may be associated with Y, in
3  the context of discussing our data and a variable
4  that we saw was associated with that variable, that
5  we use the word or phrase "may be" to indicate that
6  these are associated with each other.
7  BY MS. JONES:
8       Q.   Yeah, and my --
9            MS. JONES:  I'm going to move to strike
10  as nonresponsive.
11  BY MS. JONES:
12       Q.   My question was, simply:  Earlier, when
13  we were looking at a paper where you used the
14  phrase "may be," you told me that when you write
15  and you write "may be," in those instances that we
16  showed you earlier, you said it meant "probably" or
17  "more likely than not."  Is that what you told me?
18            MS. COUCH:  Asked and answered.
19  Argumentative.
20            THE WITNESS:  In the context of those
21  sentences that you pulled where we are describing
22  that X may be associated with Y with the data that
23  we have, when I say that X may be associated with Y
24  in those two sentences that you pulled, I meant
25  "probably."

Page 414

1  BY MS. JONES:
2      Q.   Okay.  But here, in Exhibit Number 21
3  at the bottom of Page 196, you say:  subjective use
4  may be affected by the public narrative of social
5  media harm.
6          Do you see that?
7      A.   I see that.
8      Q.   In that instance, does the -- do the
9  words "may be" mean "probably, more likely than
10 not"?
11     A.   That is -- sorry.
12     Q.   No.  Go ahead.
13     A.   That is a different way of using
14 "may be."  When I'm talking about data that
15 includes analyses and specific in my paper where we
16 have a result that I am discussing where we have a
17 predictor and an outcome and I am saying the
18 predictor may be associated with the outcome in
19 that context, I'm saying "probably."  "May" can be
20 used in different ways, and that is not necessarily
21 the same use of that word.
22     Q.   So when you say "may be" here, you're
23 not saying "probably, more likely than not"; is
24 that what you're telling me?
25     A.   I'm telling you that this is not a

Page 415

1  predictor and an outcome that can be compared to
2  that.
3      Q.   Well, isn't this -- aren't you saying
4  that subjective use -- that public -- the public
5  narrative of social media harm could affect
6  subjective use reporting?
7      A.   I'm not -- these two things are quite
8  different, in my opinion.
9      Q.   Okay.  Well, let me just ask you this:
10 If -- if I were to read two of your papers by
11 Dr. Telzer where in one place you said the words
12 "may be" and in another place you said the words
13 "may be," how would I understand what you mean at
14 any given time when you say "may be" in a sentence?
15     A.   When I am talking about data that I
16 have published where I have the known statistics in
17 these analyses and you are asking me about that
18 specific line, I can tell you that that means
19 "probably."
20     Q.   What if I'm -- what if I'm a person
21 reading your articles without the benefit of
22 sitting in front of you asking you, "What did you
23 mean by these words?"
24          If I'm just a person in the world
25 reading two different articles by Dr. Telzer where

Page 416

1  in one you've used the phrase "may be," and in the
2  other, you've also used the phrase "may be," how
3  would I know the different ways that you have
4  testified you use the words "may be" in your
5  writing?
6          MS. COUCH:  Objection.  Conjecture.
7          THE WITNESS:  I can't speculate on how
8  people would read my papers.
9  BY MS. JONES:
10     Q.   Would there be any way for someone to
11 know what you meant by the words "may be" without
12 the benefit of getting to depose you and ask you
13 questions under oath, "What did you mean here?"
14         MS. COUCH:  Objection.  Hypothetical.
15         THE WITNESS:  I can't speculate on what
16 people would be able to interpret --
17 BY MS. JONES:
18     Q.   Okay.  But --
19     A.   -- from reading something.
20     Q.   But just so we're clear, you're using
21 the same -- those two same words in different ways
22 in two different articles, right?
23         MS. COUCH:  Objection.  Vague.
24         THE WITNESS:  I think that I indicated
25 how I used it in the context of associations, with

Page 417

1  known data associated with it, with known
2  statistics that we included and how we discuss
3  results in a paper.
4  BY MS. JONES:
5      Q.   And in this paper that we're looking at
6  now on 196, if I were reading this paper, would it
7  be accurate to say that subjective use, probably,
8  more likely than not, has been affected by the
9  public narrative of social media harm?
10     A.   I don't think that that is accurate in
11 this use.  I also don't think it matters if
12 subjective use could be affected by public
13 narrative of social media harm.
14     Q.   Well, wouldn't it matter if the fact
15 that a young person sees a news report about what
16 has been described as a mental health crisis among
17 young people and social media addiction -- wouldn't
18 it be the case that if that kind of public
19 narrative could affect reports of subjective use of
20 social media, that would be relevant?
21         MS. COUCH:  Objection.  Vague.  And
22 hypothetical.
23         THE WITNESS:  I don't know.  It's
24 really hard to speculate on that hypothetical.  I
25 think that most people are -- have seen the public

Page 418

1   narrative of social media harms.  It's widely out
2   there.  The Surgeon General reported it.  The APA
3   has reported it.
4             If every single human has been exposed
5   to those narratives, then this hypothetical would
6   also say that every single human is reporting harms
7   from social media.
8   BY MS. JONES:
9        Q.   Okay.  Well, just -- let's just -- so
10  let me just button this up here.
11            Earlier this year, a paper was reported
12  on which you were a co-author, where you all wrote:
13  Subjective use may be affected by the public
14  narrative of social media harm.  Yes?
15       A.   We wrote that, yes.
16       Q.   Adolescents are well aware of and may
17  internalize this narrative.
18            You also wrote that, right?
19       A.   Yes.
20       Q.   And it goes on to say:  which in turn
21  may influence how they estimate their own time
22  spent using social media and how aspects of their
23  well-being inform this estimation.  Correct?
24       A.   That's what's written there.
25       Q.   Let me ask you to turn to Page 204 in

Page 419

1   that same paper, Exhibit Number 21, your paper
2   published earlier this year.  At the bottom of
3   Page 204 is where the discussion section starts,
4   right?
5        A.   Yes.
6        Q.   And it says here:  There is much
7   concern that social media use is negatively
8   affecting youth, with concerns compounded by fear
9   that young people are falling prey to addictive
10  social media features.  Correct?
11       A.   That's what we say, yes.
12       Q.   And then you go on to report:  The
13  current research found that daily objective, but
14  not subjective, social media use was related to
15  greater negative -- excuse me -- greater depressive
16  negative affect.  Is that right?
17       A.   That's correct.
18       Q.   And what that's referring to
19  specifically is the difference between someone just
20  telling you what their recall was or their
21  awareness was of their social media use versus
22  having a mechanism for collecting that information
23  objectively; is that right?
24       A.   Yeah, this is based on the objective
25  measures from their phones that tell us how long

Page 420

1   they were on social media versus their self-report
2   measures of that.
3        Q.   Right.
4             And the finding that's reported here is
5   that the daily objective use -- social media use
6   was related to greater depressive negative affect?
7   Do you see that?
8        A.   Yes.
9        Q.   Now, that is not a finding by you and
10  your co-authors that the research found that there
11  was a relationship to an actual diagnosis of
12  depression, correct?
13       A.   We are looking within a person.  So
14  regardless of their diagnosis, an adolescent who
15  has low depression on average and an adolescent who
16  has high depression on average show the similar
17  affect; that in the moments that they -- or in the
18  days where they're using social media more, their
19  negative depressed affect is increasing.
20       Q.   And that -- that's based on what they
21  reported on how they were feeling, right?
22       A.   That's based on the daily reports of
23  their depressive negative affect.
24       Q.   And if you go to the next page,
25  Page 205 of Exhibit 21, your paper from earlier

Page 421

1   this year, there's a section entitled "Daily
2   Associations Between Social Media Use and
3   Subjective Well-Being."  Do you see that?
4        A.   Yes.
5        Q.   And it says:  In examining associations
6   with subjective well-being, past research suggests
7   that negative associations would emerge for
8   self-reported social media use and null
9   associations would emerge for objectively recorded
10  social media use.
11            Do you see that?
12       A.   I see that.
13       Q.   What you and your co-authors say is
14  actually counter to those studies:  Daily reported
15  social media use was not associated with subjective
16  well-being at the within- or between-person level,
17  and objectively recorded social media use was
18  associated with greater depressive negative affect
19  at the within-person level.
20            Did I read that correctly?
21       A.   Correct.
22       Q.   Then it goes on to say:  The null
23  associations with self-reported use could be due to
24  methodology differences.  Correct?
25       A.   Correct.

Page 422

1  Q.  And it says:  Past research is mainly
2  cross-sectional, and the few studies examining
3  associations at the daily or momentary level find
4  great heterogeneity in how self-reported social
5  media use may relate to psychosocial adjustment
6  outcomes.
7      Do you see that?
8  A.  Yes.
9  Q.  And that's an accurate statement,
10 correct?
11 A.  I mean, that's what we wrote here.
12 Q.  Yes.
13 A.  Yes.
14 Q.  And you wouldn't have written it if you
15 thought it was inaccurate, right?
16 A.  That's what we wrote here.
17 Q.  Okay.  And on days in which adolescents
18 engage in greater objective social media use
19 relative to their own average, they reported
20 greater depressive negative affect throughout that
21 day.
22      Do you see that?
23 A.  I do.
24 Q.  That's the finding that we were just
25 talking about a moment ago, right?

Page 423

1  A.  Correct.
2  Q.  Okay.  You all go on to say:  This
3  association is not indicative of a cause-and-effect
4  relation.  Right?
5  A.  Yes.
6  Q.  And is that a true statement?
7  A.  That is a sort of caveat and a careful
8  statement that we include in this type of
9  publication.
10 Q.  Is it true is my question.
11     MS. COUCH:  Objection.  Vague.
12     THE WITNESS:  I think I --
13 BY MS. JONES:
14 Q.  Well, hold on a second given the
15 objection.  Do you understand what I'm asking you
16 when I ask is something true?
17 A.  I don't think I do, actually.
18 Q.  Let me try -- what do you understand
19 the word "true" to mean?
20 A.  I mean, I understand truth.  I don't
21 know -- I guess I don't know -- that is the
22 statement that is here.  That is accurate.
23 Q.  Okay.  That -- maybe that's a different
24 way of asking you the question.
25 A.  Yes.

Page 424

1  Q.  This statement here that you and your
2  co-authors published earlier this year, this
3  association is not indicative of a cause-and-effect
4  relation.  Is that accurate?
5  A.  That's accurate.
6  Q.  It goes on to say --
7      And so just looking back at our day
8  together, when I have asked you is something
9  true --
10 A.  Yeah.
11 Q.  -- if I had asked you is that accurate,
12 would that have been easier for you to answer those
13 questions?
14 A.  I think so.
15 Q.  Okay.  Well, I'll know for next time.
16     All right.  Moving on.
17     As outlined above, it is possible that
18 social media use displaces activities critical for
19 adolescent health, including in-person
20 interactions, sleep, and physical activity.
21 Correct?
22 A.  I see that, yes.
23 Q.  Alternatively, it is plausible on days
24 in which adolescents are already experiencing
25 greater depressive symptoms, they are more likely

Page 425

1  to turn to social media, suggesting that social
2  media may be used for mood management.  Is that
3  accurate?
4  A.  I see that, yes.
5  Q.  Well, my question was not did you see
6  it.  Is that an accurate statement?
7  A.  That is accurate as written here.
8  Q.  It goes on to say:  Associations with
9  anxious, negative affect and positive affect were
10 not observed.
11 A.  Uh-huh.
12 Q.  Is that right?
13 A.  Correct.
14 Q.  And additional research is needed
15 before drawing sweeping conclusions on how social
16 media use may be disrupting adolescents' subjective
17 well-being.
18     Is that an accurate statement?
19 A.  That is accurately written.
20 Q.  Now, earlier, I was asking you if, in
21 your research, you had done assessments of
22 whether -- and I might be confusing your research,
23 so you can correct me -- of whether you all had
24 evaluated anxiety or anxiety-related affect.
25     Do you recall my questions on that?

Page 426

1    A.   Yeah.  And I think I recall that I was
2  pretty sure that I had.
3    Q.   Okay.
4    A.   The results that I was talking about
5  were in regards to depressed affect.
6    Q.   Okay.  And I just want to make sure.
7  Is -- is what we were talking about, what you were
8  referring to earlier, is that the same data that's
9  reported on here:  Associations with anxious,
10 negative affect and positive affect were not
11 observed?
12        MS. COUCH:  Objection.  Vague.
13        THE WITNESS:  I don't recall
14 specifically what that was referring to.
15 BY MS. JONES:
16    Q.   Okay.  But it seems like you and your
17 co-authors settled on:  Additional research is
18 needed before drawing sweeping conclusions on how
19 social media use may -- may be disrupting
20 adolescents' subjective well-being.  Correct?
21    A.   It's correct that we noted that.  As in
22 any research, we don't draw sweeping conclusions
23 based on a singular study, but based on our
24 conclusions, based on the -- or at least the
25 broader, larger statements, based on the literature

Page 427

1  writ large.
2    Q.   When you reported on your 2025 paper
3  that we've just been discussing, Exhibit Number 21,
4  in your written report for this litigation --
5    A.   Uh-huh.
6    Q.   -- did you note the fact that you and
7  your co-authors had said that the association that
8  you identified is not indicative of a
9  cause-and-effect relationship?
10    A.   I think I did not indicate that
11 specific -- specific comment because I went on to
12 describe all of the reasons why this research is
13 very rigorous and allows us to make the most causal
14 claims that we can with this intensive longitudinal
15 design, where we have these within-person analyses
16 across multiple time points.
17        I would like to refer to that section
18 in order to discuss all of the benefits of this
19 type of methodology and using that in combination
20 with all of the other research to be able to come
21 to the conclusion that we can say that these are --
22 that these social media experiences are leading to
23 changes in their depressed affect.
24        MS. JONES:  Dr. Telzer, I'm going to
25 move to strike everything after, "I think I did not

Page 428

1  indicate that specific comment."  And I'm going to
2  move on to my next question.
3  BY MS. JONES:
4    Q.   Down at the bottom of the page -- down
5  at the bottom of that same page, 205, there's a
6  paragraph that begins with:  The discrepancies
7  observed.
8    A.   Yes.
9    Q.   And, actually, let me ask you to step
10 up just a sentence into the preceding paragraph.
11        Do you see the sentence that begins
12 with:  Past research?
13    A.   Yes.
14    Q.   It says:  Past research has established
15 that these self-reports are systematically biased.
16        Do you see that?
17    A.   I do.
18    Q.   And that's referring to self-reports of
19 social media use?
20    A.   I think so.
21    Q.   Is that an accurate statement?
22    A.   In this sentence -- sorry.  I'm looking
23 at the broader context of that sentence.
24    Q.   Okay.
25    A.   I mean, I think that this is referring

Page 429

1  to some of the biases that are present in
2  self-report measures.
3    Q.   Okay.  And then a little further down,
4  it says -- well, to finish that sentence, it says:
5  Therefore, these reports are likely capturing an
6  element of social media use that goes beyond actual
7  use.
8        Do you see that?
9    A.   Yes.
10    Q.   Okay.  And then in the next paragraph,
11 it says:  The discrepancies observed between
12 objective and subjective provide further evidence
13 that the variables are measuring two different
14 constructs.
15        Did I read that correctly?
16    A.   Yes.
17    Q.   It says -- and this comes back to
18 something we were talking about earlier:  Negative
19 public messaging on the effects of teen social
20 media use is strong.
21        Do you see that?
22    A.   Yes.
23    Q.   And that's an accurate statement,
24 right?
25    A.   Yes.

Page 430

1    Q.    Negative public messaging on the
2  effects of teen social media use is strong, and the
3  notion of social media being addictive is
4  internalized and voiced by youth.
5         Is that an accurate statement?
6    A.    Yes.  And as I've talked about, many of
7  the teens that I've talked to in our own research,
8  the majority of them are telling us that they are
9  addicted to social media.
10    Q.    Sure.  I remember you saying that, and
11  I want to follow up on that.
12    A.    Uh-huh.
13    Q.    Because I want to direct you to what
14  you and your co-authors said just earlier this year
15  in this published paper.
16         This may lead -- I'm still reading in
17  the same paragraph --
18    A.    Uh-huh.
19    Q.    -- carrying over to Page 206.
20         This may lead them to overestimate
21  their use.  Indeed, adolescents tend to perceive
22  more time spent on social media than is objectively
23  recorded.
24         Is that an accurate statement?
25    A.    There are some papers that do show that

Page 431

1  their estimates are -- that their self-report
2  estimates are higher than objectively recorded.
3         THE WITNESS:  And if you don't mind,
4  since that question has ended, I could use a break.
5         MS. JONES:  I'm very -- I was going to
6  propose concluding in the next probably five to
7  seven minutes.  If you want to take a break before
8  that, I don't have any objection to it.  It's
9  entirely up to you.
10         THE WITNESS:  A quick break, and
11  then --
12         MS. JONES:  Yes.
13         THE WITNESS:  -- we can do the five to
14  ten minutes.
15         MS. JONES:  You can -- you can take a
16  break.
17         THE VIDEOGRAPHER:  Going off the
18  record.  The time is 6:14 p.m.
19              * * *
20         (Whereupon, there was a recess in the
21  proceedings from 6:14 p.m. to 6:21 p.m.)
22              * * *
23         THE VIDEOGRAPHER:  Going back on the
24  record.  The time is 6:21 p.m.
25         MS. COUCH:  And we are going to

Page 432

1  conclude for the day at the witness's request, and
2  we will start back tomorrow at 9 a.m.
3         THE VIDEOGRAPHER:  So, for today, the
4  total time on the record for Meta was 7 hours and 7
5  minutes.
6         MS. JONES:  Okay.  Thank you.
7         THE VIDEOGRAPHER:  That ends this
8  deposition.  The time is 6:21 p.m.
9         (WHEREUPON, the deposition was
10  concluded at 6:21 p.m.)
11         (The witness reserves the right to read
12  and sign this transcript.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 433

1         DEPOSITION ERRATA SHEET
2
3  Our Assignment No:  7396476
4  Case Caption:  Social Media Adolescent Addiction
5  (JCCP No. 5255)
6
7         DECLARATION UNDER PENALTY OF PERJURY
8         I declare under penalty of perjury that I
9  have read the entire transcript of my Deposition
10  taken in the captioned matter or the same has been
11  read to me, and the same is true and accurate, save
12  and except for changes and/or corrections, if any,
13  as indicated by me on the DEPOSITION ERRATA SHEET
14  hereof, with the understanding that I offer these
15  changes as if still under oath.
16         Sign on the _____ day of
17  _____, 20 __.
18
19
20         _____
21         EVA H. TELZER, Ph.D.
22
23
24
25

HIGHLY CONFIDENTIAL

Page 434

```
 1              DEPOSITION ERRATA SHEET
 2
 3    Page No. _____ Line No. _____ Change to: _____
 4    _____
 5    Reason for Change: _____
 6    Page No. _____ Line No. _____ Change to: _____
 7    _____
 8    Reason for Change: _____
 9    Page No. _____ Line No. _____ Change to: _____
10    _____
11    Reason for Change: _____
12    Page No. _____ Line No. _____ Change to: _____
13    _____
14    Reason for Change: _____
15    Page No. _____ Line No. _____ Change to: _____
16    _____
17    Reason for Change: _____
18    Page No. _____ Line No. _____ Change to: _____
19    _____
20    Reason for Change: _____
21
22    SIGNATURE: _____ DATE:_____
23              EVA H. TELZER, Ph.D.
24
25
```

877-370-3377          Golkow Technologies,          www.veritext.com
                      A Veritext Division

HIGHLY CONFIDENTIAL

Page 435

```
 1              DEPOSITION ERRATA SHEET
 2
 3    Page No. _____ Line No. _____ Change to: _____
 4    _____
 5    Reason for Change: _____
 6    Page No. _____ Line No. _____ Change to: _____
 7    _____
 8    Reason for Change: _____
 9    Page No. _____ Line No. _____ Change to: _____
10    _____
11    Reason for Change: _____
12    Page No. _____ Line No. _____ Change to: _____
13    _____
14    Reason for Change: _____
15    Page No. _____ Line No. _____ Change to: _____
16    _____
17    Reason for Change: _____
18    Page No. _____ Line No. _____ Change to: _____
19    _____
20    Reason for Change: _____
21
22
23    SIGNATURE: _____ DATE: _____
24              EVA H. TELZER, Ph.D.
25
```

877-370-3377          Golkow Technologies,          www.veritext.com
                      A Veritext Division

HIGHLY CONFIDENTIAL

Page 436

```
 1              CERTIFICATE OF REPORTER
 2
 3        I, Cindy A. Hayden, Registered Merit
 4    Reporter and Notary Public for the State of North
 5    Carolina at Large, do hereby certify that the
 6    foregoing transcript is a true, accurate, and
 7    complete record.
 8        I further certify that I am neither related
 9    to nor counsel for any party to the cause pending
10    or interested in the events thereof.
11        Witness my hand, I have hereunto affixed my
12    official seal this 13th day of June, 2025 at
13    Charlotte, Cabarrus County, North Carolina.
14
15
16            Cindy A. Hayden
17    _____
18        Cindy A. Hayden, RMR, CRR
          My Commission expires
19        April 7, 2027
20
21
22
23
24
25
```

877-370-3377          Golkow Technologies,          www.veritext.com
                      A Veritext Division

HIGHLY CONFIDENTIAL

Page 437

1       SUPERIOR COURT OF THE STATE OF CALIFORNIA

          FOR THE COUNTY OF LOS ANGELES

2

3  COORDINATION PROCEEDING     ) JCCP No. 5255

   SPECIAL TITLE [Rule 3.400]  ) For Filing Purposes:

4                       ) 22STCV21355

                       )

5  IN RE: SOCIAL MEDIA ADOLESCENT  )

   ADDICTION (JCCP No. 5255)     )

6

7  THIS DOCUMENT RELATES TO:

8  Cristina Arlington Smith, et al.

   V. Meta Platforms, Inc., et al.,

9  Case No. 22STCV21355

10

11    HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDERS

12

13

14

15   VIDEOTAPED DEPOSITION OF EVA H. TELZER, Ph.D.

16

17               JB Duke Hotel

18

19             230 Science Drive

20

21           Durham, North Carolina

22

23

24

25       Friday, June 13, 2025, 9:02 a.m.

HIGHLY CONFIDENTIAL

Page 438

```
1   APPEARANCES:
2   For MDL Plaintiffs:
3            BY:  SARA COUCH, ESQ.
                  NELSON L. DRAKE, ESQ. (Washington, D.C.)
4                 KATY LAWRIMORE (Remotely)
                  JODI W. FLOWERS, ESQ. (Remotely)
5        Motley Rice LLC
6        28 Bridgeside Boulevard
         Mount Pleasant, South Carolina 29464
         843.216.9670
7        scouch@motleyrice.com
8        ndrake@motleyrice.com
         jflowers@motleyrice.com
9
10  For Plaintiffs:
11           BY:  MATTHEW P. BERGMAN, ESQ.
         Social Media Victims Law Center
12       600 1st Avenue, Suite 102 - PMB 2383
         Seattle, Washington 98104
13       206.741.4862
         matt@socialmediavictims.org
14
15  For the Defendants Meta Platforms, Inc., and
    Instagram, LLC:
16           BY:  PHYLLIS A. JONES, ESQ.
                  NICOLE ANTOINE, ESQ.
17                BRIAN T. REISER, ESQ.
                  ALEX KENNEDY, ESQ. (L.A.)
18       Covington & Burling LLP
19       One CityCenter
         850 Tenth Street, NW
20       Washington, DC 20001-4956
         202.662.6000
21       pajones@cov.com
         nantoine@cov.com
22       breiser@cov.com
         akennedy@cov.com
23
24
25       (Appearances continued on next page.)
```

---

HIGHLY CONFIDENTIAL

Page 439

```
1            APPEARANCES CONTINUED:
2
3   For the Defendant Snap:
4            BY:  ROSE LEDA EHLER, ESQ.
                  ARIELLA PARK, ESQ. (Remotely)
         Munger Tolles & Olson LLP
5        350 South Grand Avenue
         50th Floor
6        Los Angeles, California 90071-3426
         213.683.9240
7        rose.ehler@mto.com
         ariella.park@mto.com
8
9   For the Defendants Alphabet Inc., Google LLC, and
    YouTube LLC:
10           BY:  NEELUM J. WADHWANI, ESQ.
11                LYDIA WEIANT, ESQ.
         Williams & Connolly LLP
12       680 Maine Street SW
         Washington, DC 20024
13       202.434.5584
         nwadhwani@wc.com
14       lweiant@wc.com
15
16  For the Defendants TikTok, Ltd.; TikTok, LLC;
    TikTok, Inc.; ByteDance Ltd.; and ByteDance, Inc.:
17           BY:  GREGORY S. CHERNACK, ESQ.
         King & Spalding LLP
18       1700 Pennsylvania Avenue, NW
         Suite 900
19       Washington, DC 20006
         202.626.9227
20       gchernack@KSLAW.com
21
22
23       (Appearances continued on next page.)
24
25
```

---

HIGHLY CONFIDENTIAL

Page 440

```
1            APPEARANCES CONTINUED:
2
                 APPEARING REMOTELY:
3
4   Joseph VanZandt, Esq., Beasley Allen Law Firm
    Tricia L. Campbell, Esq., Wagstaff & Cartmell
5   Kelly McNabb, Esq., Lieff Cabraser
    Lucy Monroe
6
7   Also Present:  Matt Walters, Videographer
                   Ryan Knecht, Exhibit Technician
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

HIGHLY CONFIDENTIAL

Page 441

```
1                  I N D E X
2                                           PAGE
3   EXAMINATION BY MS. JONES                 444
4   EXAMINATION BY MS. EHLER                 543
5   EXAMINATION BY MS. WADHWANI              585
6   EXAMINATION BY MR. CHERNACK              624
7   EXAMINATION BY MS. COUCH                 669
8   EXAMINATION BY MR. CHERNACK              672
9
10               E X H I B I T S
11
    TELZER
12  NUMBER          DESCRIPTION             PAGE
13  EXHIBIT 22   Video - Interview with Eva  480
                 Telzer and Mitch Prinstein at
14               the 2023 BrainMind Summit
15  EXHIBIT 23   Article titled Linking video 489
                 chatting, phone calling, text
16               messaging, and social media
                 with peers to adolescent
17               connectedness
18  EXHIBIT 24   Research Article titled Teens 505
                 on screens:  A daily diary
19               study of objectively-measured
                 smartphone use, social media
20               activity and associations with
                 mood
21
22  EXHIBIT 25   Document titled "Addiction" to 535
                 Facebook:  A Literature
23               Review, Bates
                 META3047MDL-005-00000001-13
24
25
```

HIGHLY CONFIDENTIAL

Page 442

| | | |
|---|---|---|
| 1 | EXHIBIT 26 | Document titled Final Report, | 580 |
| 2 | | Healthy Interactions Research |
| | | Prepared February 2023, Bates |
| 3 | | SNAP0404262-318 |
| 4 | EXHIBIT 27 | Publication titled Social | 597 |
| 5 | | media are many things: |
| | | Addressing the components and |
| | | patterns of adolescent social |
| 6 | | media use |
| 7 | EXHIBIT 28 | Document titled 2023 Constant | 603 |
| | | Companion: A Week in the Life |
| 8 | | of a Young Person's Smartphone |
| | | Use |
| 9 | EXHIBIT 29 | Document titled [MS Leads + | 630 |
| | | Feature Policy] TTN Age |
| 10 | | Alignment, Bates |
| | | TIKTOK3047MDL-036-LARK- |
| 11 | | 00107642-49 |
| 12 | EXHIBIT 30 | Article titled TikTok is axing | 632 |
| 13 | | an in-app feature called |
| | | TikTok Now that mirrored |
| | | BeReal |
| 14 | | |
| 15 | EXHIBIT 31 | Document titled Introducing | 634 |
| | | more ways to create and |
| 16 | | connect with TikTok Now |
| 17 | EXHIBIT 32 | Document titled [TikTank] | 638 |
| | | Wellbeing impacts - research |
| 18 | | report, Bates |
| | | TIKTOK3047MDL-002-00100441-62 |
| 19 | EXHIBIT 33 | Document titled [P&C] Tiktok's | 652 |
| 20 | | Age Appropriate Design |
| | | Guidance, Bates |
| | | TIKTOK3047MDL-006-00326148-95 |
| 21 | | |
| 22 | EXHIBIT 34 | Document titled Start a LIVE | 656 |
| 23 | | match to call on your |
| | | supporters, Updated on Feb 11, |
| 24 | | 2025 |
| 25 | | |

HIGHLY CONFIDENTIAL

Page 443

| | | |
|---|---|---|
| 1 | EXHIBIT 35 | Document titled Rabbit Holes | 664 |
| 2 | | --> No doubt about it; it will |
| | | happen, Bates |
| 3 | | TIKTOK3047MDL-004-00144763-64 |
| 4 | EXHIBIT 36 | Video - Slides for | 671 |
| 5 | | presentation with Eva Telzer |
| | | and Mitch Prinstein - Digital |
| | | Minds: Brain Development in |
| 6 | | the Age of Technology |
| 7 | EXHIBIT 37 | Digital Minds: Brain | 671 |
| 8 | | Development in the Age of |
| | | Technology Rough Transcript |
| 9 | EXHIBIT 38 | #Technology#SocialMedia# | 671 |
| | | AdolescentMentalHealth/Webinar |
| 10 | | with Dr. Mitch Prinstein and |
| | | Dr. Eva Telzer, 5/31/23 Rough |
| 11 | | Transcript |
| 12 | EXHIBIT 39 | Interview with Eva Telzer and | 671 |
| 13 | | Mitch Prinstein at the |
| | | BrainMind Summit Rough |
| 14 | | Transcript |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

HIGHLY CONFIDENTIAL

Page 444

1          P R O C E E D I N G S
2                  * * *
3          THE VIDEOGRAPHER: We are now on
4   record. Today's date is June 13th, 2025. The time
5   is 9:02 a.m. This is the continuation of Eva
6   Telzer. We can proceed.
7                  * * *
8          EVA H. TELZER, Ph.D.,
9   having been previously duly sworn, was examined and
10              testified as follows:
11                  * * *
12              EXAMINATION
13  BY MS. JONES:
14      Q.   Okay. Dr. Telzer, good morning.
15      A.   Good morning.
16      Q.   Did you do anything to prepare for your
17  second day of testimony today?
18      A.   By "prepare," I went back to my room,
19  and I looked at my report again and rereviewed some
20  of the documents in my materials considered, went
21  to bed.
22      Q.   Okay. Looked back at your report. You
23  said you reviewed some of the things on your list
24  of materials considered?
25      A.   Correct.

HIGHLY CONFIDENTIAL

Page 445

1      Q.   And went to bed; is that right?
2      A.   Yeah.
3      Q.   Okay. Of the things on your materials
4   considered list that you rereviewed, what did you
5   review? Last night. Excuse me.
6      A.   I reviewed a handful of documents,
7   rereviewing some of the internal defense documents,
8   looking at some of the publications. Nothing --
9   everything in my materials considered list was
10  things that I looked over.
11      Q.   What's -- what internal documents did
12  you go back and look at again?
13      A.   I opened up lots of them and rereviewed
14  them.
15      Q.   How many is "lots"?
16      A.   Dozens, if not more.
17      Q.   So last night, you reviewed dozens of
18  internal documents; is that your testimony?
19      A.   I relooked at -- yes, I relooked at
20  documents.
21      Q.   From which defendants?
22      A.   I can't recall all of the ones that I
23  looked at. I opened probably some from all the
24  defendants.
25      Q.   And of the additional -- was there a

Page 446

1 reason that you went back and looked at the
2 internal documents that you had cited on your
3 materials considered list?
4      A.   I wanted to remind myself of some of
5 the things that I was considering, given the
6 quantity of things that I considered in there.
7      Q.   And what additional literature did you
8 go back and review last night?
9      A.   I don't recall off the top of my head.
10     Q.   How many pieces of literature did you
11 review last night?
12     A.   I don't recall.
13     Q.   You don't know one way or the other
14 what you were looking at last night?
15     A.   No.
16          MS. COUCH:  Objection.  Asked and
17 answered.
18          THE WITNESS:  I don't recall.  I was
19 pretty brain-dead last night.  I don't remember.
20 BY MS. JONES:
21     Q.   What was -- was it your literature you
22 were rereviewing, or was it publications by others?
23          MS. COUCH:  Asked and answered.
24          THE WITNESS:  I don't recall.
25 BY MS. JONES:

Page 447

1      Q.   How many hours last night did you spend
2 rereviewing your report, rereviewing dozens of
3 internal company documents and rereviewing some
4 unknown number of published papers?
5      A.   An hour or so.
6      Q.   Did you meet with your -- don't tell me
7 what you talked about.  Did you meet with your
8 lawyers last night?
9      A.   We had dinner together.
10     Q.   Okay.  Don't tell me what you talked
11 about specifically, but did you talk about your
12 testimony?
13     A.   Chitchatted.  My brain was dead.  It
14 was a friendly conversation.
15     Q.   All right.  Did you review any of the
16 videos that you were shown yesterday?
17     A.   I don't believe so.
18     Q.   Okay.  So you didn't go back and review
19 the entirety of, for example, the seminar you
20 participated in earlier this year in February 2025?
21     A.   I went back and pulled up the slides.
22     Q.   Did you go back and actually review the
23 video itself?
24     A.   I did not rewatch the video in its
25 entirety.

Page 448

1      Q.   What about for any of the other videos
2 that you were shown yesterday?  Did you go back and
3 rewatch the entirety of any of them?
4      A.   No.
5      Q.   Anything else you did last night -- in
6 terms -- I should --
7      A.   Yeah.
8      Q.   -- say this differently.  I'm sure you
9 did many other things.
10          Is there anything else you did last
11 night in connection with preparation for your
12 testimony today?
13     A.   No.  No.
14     Q.   Okay.  Let me ask you to pull back out
15 what I think is marked as Deposition Exhibit Number
16 21, which we were talking about yesterday before we
17 concluded.
18          And Deposition Exhibit Number 21 is the
19 paper that you, Dr. Burnell and others co-authored,
20 published earlier this year in the "Journal of
21 Children and Media," correct?
22     A.   Yes.
23     Q.   And I wanted to follow -- I wanted to
24 finish what we were talking about before we
25 concluded yesterday.  Let me ask you to go to

Page 449

1 Page 207 of Exhibit 21.
2      A.   Okay.
3      Q.   And there's a section entitled
4 "Links of Daily Subjective Well-Being."
5          Do you see that?
6      A.   Yes.
7      Q.   And then in the second paragraph, it
8 recounts some of the findings from your study; is
9 that right?
10     A.   The paragraph ASMU was associated with?
11     Q.   Yes.
12     A.   Yes, it's discussing those associations
13 that we found.
14     Q.   Okay.  And it says:  Includes, for
15 example, the finding that ASMU --
16          And just so we're kind of reset on our
17 terms, "ASMU" is what?
18     A.   Addiction-like social media use.
19     Q.   Okay.  ASMU was associated with daily
20 anxious-negative affect in the EMA, with this
21 association disappearing when controlling for other
22 factors such as depressive symptoms.
23          Did I read that correctly?
24     A.   You did.
25     Q.   And that -- is that an accurate finding

Page 450

1  from your study?
2          A.    That is what is stated there, yes.
3          Q.    Okay.  And when it says "with this
4  association disappearing when controlling for other
5  factors such as depressive symptoms," that means
6  that once you actually went through the analysis of
7  controlling for depressive symptoms, any
8  association that was shown between daily
9  anxious-negative affect and ASMU disappeared.  Am I
10 reading that correctly?
11         A.    That's what that's saying.
12         Q.    Okay.  And that was one of the findings
13 from this study published earlier this year; is
14 that right?
15         A.    That is one of the findings.
16         Q.    Okay.  If you jump down to the next
17 paragraph on Page 207, it says:  These findings
18 should be considered in the context of the broader
19 theoretical contribution of addictive social media
20 measures.
21               Do you see that?
22         A.    I do.
23         Q.    And when it refers there to "these
24 findings," that's a reference to the findings
25 reflected in your paper published earlier this

Page 451

1  year; is that right?
2               MS. COUCH:  Objection.  Vague.
3  BY MS. JONES:
4          Q.    Let me -- let me ask a more specific
5  question.  That's fair.
6               The findings that are described in this
7  section entitled "Links with Daily Subjective
8  Well-Being," are those the findings that are
9  referred to at this paragraph at the bottom of 207?
10         A.    I'd have to look in more detail of
11 whether it is specifically referring to that single
12 paragraph.
13         Q.    Okay.  Generally, though, this is
14 referring to some findings that are reflected in
15 your paper from 2025?
16         A.    I believe that's likely what that is
17 saying.
18         Q.    Okay.  And it goes on to say -- and
19 this reference to addictive social media measures,
20 that's a reference to measures that have been
21 developed or discussed in the literature around
22 assessing whether or not what has been described in
23 some places as social media addiction might exist
24 in an individual; is that right?
25         A.    I'm not sure I can extrapolate to that

Page 452

1  level.  I think we are talking about broader
2  contributions of other measures.
3          Q.    Well, what it says here is:  Numerous
4  measures exist that describe problematic, dependent,
5  or addictive social media use.
6               Do you see that?
7          A.    Yes.
8          Q.    And it goes on to say:  Most existing
9  measures apply a substance use disorder measurement
10 strategy to assess social media addiction.  Is that
11 right?
12         A.    Uh-huh.
13         Q.    You have to say "yes" or "no."
14         A.    Yes.  Sorry.
15         Q.    And put the word "addiction" in
16 quotation marks, yes?
17         A.    Yes.
18         Q.    When this refers to using a substance
19 use disorder measurement strategy to assess social
20 media addiction, is -- is that the approach that
21 was taken in your 2024 Flannery paper?
22         A.    Can you repeat that question, please?
23         Q.    Sure.
24               When it refers here to using --
25 applying a substance use disorder measurement

Page 453

1  strategy to assess social media addiction, is that
2  the approach that you and your co-authors applied
3  in your 2024 Flannery paper?
4               MS. COUCH:  Objection.  Vague.
5               THE WITNESS:  I'm not sure I can
6  extrapolate to that.
7  BY MS. JONES:
8          Q.    Well, am I recalling correctly from
9  your Flannery paper that you and your -- that you
10 and your -- that in your -- in the Flannery paper
11 from 2024, which was Exhibit 20 from yesterday,
12 that you and your colleagues started with the DSM-5
13 substance use disorder checklist; is that right?
14         A.    We did.
15         Q.    And then you used that to generate what
16 is described in your Flannery 2024 paper as a
17 "novel seven-item questionnaire," right?  You're
18 welcome to look at Exhibit 20.
19         A.    Sure.  We described it as that.  We
20 used those measures.  We used those items from the
21 substance use measure to develop that.
22         Q.    I'm on Page 3 of Exhibit 20.  That's
23 what I'm reading from, if you want to...
24         A.    Yeah.
25         Q.    So just -- just to get ourselves

Page 454

1  situated, in Exhibit 21, you and your co-authors
2  refer to applying a substance use disorder
3  measurement strategy to assess social media
4  addiction, correct?
5        That's what you describe in -- on
6  Page 207, right?
7        A.  Yes.
8        Q.  And -- and that's -- is that what you
9  and your co-authors did in your 2024 paper that you
10 published with Jessica Flannery and others?
11       A.  That is what that measures, as well as
12 other measures have done, yes.
13       Q.  And you're referring to "other
14 measures."  I'm just -- I want to just be very
15 focused with my question.
16       What -- what is described here,
17 applying a substance use disorder measurement
18 strategy to assess social media addiction, that's
19 the approach that you and your co-authors used in
20 your 2024 Flannery paper, correct?
21       A.  Correct.
22       Q.  And what you and your co-authors said
23 earlier this year about that approach is:  This
24 measurement is not without criticism, particularly
25 because of its confirmatory approach in which the

Page 455

1  existing substance use assessment is assumed to
2  apply to behavioral addictions and disagreement
3  among scholars on the applicability of certain
4  criteria to technology-based addictions.
5        Do you see that?
6        A.  I see that.
7        Q.  And I read that correctly, yes?
8        A.  You did.
9        Q.  And if I'm understanding correctly,
10 what that is saying is that the approach that you
11 and your colleagues took in your 2024 Flannery
12 paper has been criticized in part because it
13 assumes that the substance use disorder model is
14 the right approach to take in evaluating what has
15 been described as social media addiction; is that
16 right?
17       MS. COUCH:  Objection.  Vague.
18       THE WITNESS:  I think right here we're
19 just referencing some limitations in the
20 literature.
21 BY MS. JONES:
22       Q.  And -- and not just limitations.
23 You're referencing criticisms that have been
24 applied to the approach that you and your
25 colleagues took in your 2024 Flannery paper,

Page 456

1  correct?
2        MS. COUCH:  Objection.  Vague.
3        THE WITNESS:  We're, here, highlighting
4  some of the limitations of the ways of this
5  measurement.
6  BY MS. JONES:
7        Q.  And you specifically refer to
8  "criticism," right?
9        MS. COUCH:  Objection.  Vague.
10       THE WITNESS:  I think that this is a
11 limitation --
12 BY MS. JONES:
13       Q.  Well --
14       A.  -- that we were referring to.
15       Q.  Sure.  But when the paper was published
16 in 2025, what you all said was:  This measurement
17 is not without criticism.
18       Did I read that correctly?
19       A.  That -- that sentence is correct.
20       Q.  That's an accurate statement.  Okay.
21       And it goes on to say:  And there is
22 disagreement among scholars on the applicability of
23 certain criteria to technology-based addictions.
24       That's also an accurate statement,
25 right?

Page 457

1        A.  That is what that sentence says.
2        Q.  It goes on to say:  In this study, we
3  similarly applied this measurement strategy,
4  although we omitted problematic criteria that
5  cannot cleanly be applied to social media use.  And
6  then it refers to tolerance and withdrawal.
7        Did I read that correctly?
8        A.  You read that correctly.
9        Q.  And what you and your co-authors are
10 saying there in this paper published earlier this
11 year is:  We applied this measurement strategy, but
12 we -- by that, I mean the strategy of taking the
13 DSM-5 substance use disorder model and removing
14 certain criteria in connection with this study; is
15 that right?
16       A.  What do you mean by "removing"?  I'm
17 sorry.  I'm not -- the two pieces of that question,
18 I'm not following.
19       Q.  It was -- it was not a great question.
20       My question was simply:  This refers to
21 the fact that you applied this measurement strategy
22 that's described here in this paragraph in your
23 paper on Page 207, down at the bottom?
24       A.  We are discussing the limitations here,
25 yes.

Page 458

1  Q.  Okay.  And the -- the strategy that's
2  specifically described is taking the DSM-5 criteria
3  for substance use disorders and pulling out or
4  omitting problematic criteria that could not be
5  cleanly applied to social media use, correct?
6  A.  I'm not sure about that, if the
7  omission part is part of that --
8  Q.  Well --
9  A.  -- broader limitation.
10  Q.  Excuse me.  I'm just reading the -- I
11  didn't mean to step on the end of your answer.
12  I'm just reading from what I understand
13  to be the words on the page.
14  Am I correct in understanding, in your
15  paper from 2025, earlier this year, that you and
16  your co-authors reported that you had omitted
17  problematic criteria that cannot cleanly be applied
18  to social media use?  Right?
19  A.  We omitted the -- the -- the sentence
20  right there, yes.  "Although we omitted these
21  criteria."  That's what that is saying, yes.
22  Q.  And yet the criteria that you're
23  omitting from -- you're pulling the criteria from
24  the DSM-5 in the first instance; is that right?
25  A.  We are pulling out certain items that

Page 459

1  don't cleanly map on is what we're saying here.
2  Q.  Sure.  And I'm just -- I just want to
3  make sure.  Your starting point was to look at the
4  DSM-5's listing of criteria for substance use
5  disorders, correct?
6  MS. COUCH:  Asked and answered.
7  THE WITNESS:  We pulled out the items
8  from the DSM-5 substance use measure.
9  BY MS. JONES:
10  Q.  Yeah.  Okay.  And, for example, you
11  didn't apply the tolerance or withdrawal criteria,
12  yes?
13  A.  We omitted those.
14  Q.  Okay.  And you and your co-authors, on
15  Page 208 of Exhibit Number 21, say:  Given that
16  additional research is needed -- excuse me.
17  Given that additional research is
18  needed before determining that problematic social
19  media use can be appropriately given the
20  "addiction" label akin to substance use disorders,
21  we advise the conclusions of this study be
22  considered with this in mind.
23  Did I read that correctly?
24  A.  Yes.
25  Q.  Do -- is it accurate, as reflected here

Page 460

1  in this paper that you are a co-author on published
2  earlier this year, that:  Additional research is
3  needed before determining that problematic social
4  media use can be appropriately given the
5  "addiction" label akin to substance use disorders?
6  MS. COUCH:  Objection.  Vague.
7  THE WITNESS:  This statement is here in
8  this paper, yes.
9  BY MS. JONES:
10  Q.  Yeah.  That part, I know.  My question
11  is:  Is that an accurate statement?
12  A.  That's an accurate statement in this
13  paper.
14  Q.  Let me ask you to go to Page 1 of
15  Exhibit Number 21, please.  There's an abstract
16  section of Exhibit Number 21, your 2025 paper.  And
17  I'm just kind of describing this in layperson's
18  terms.
19  The abstract, generally speaking,
20  provides a snapshot of the study's design, what it
21  was aiming to evaluate, and, at a very high level,
22  the results.  Is that fair?
23  A.  That's generally how abstracts are used
24  is to describe the research questions.
25  Q.  Okay.

Page 461

1  A.  The methods and what we found.
2  Q.  Sure.  And in this abstract for your
3  2025 paper, the first sentence reads:  Associations
4  between adolescent social media use and well-being
5  are inconclusive, and studies using rigorous
6  methodologies and objective measures are needed.
7  Is that an accurate statement?
8  A.  That statement is accurate in that.
9  Q.  And it goes on to say in the same
10  abstract -- and it -- it lays out different things
11  that you and your co-authors looked to test.
12  Do you see that?
13  A.  We tested these four different things,
14  yeah.
15  Q.  Yes.  And it refers to the specific
16  number of adolescents who were in your study, 103;
17  is that right?
18  A.  Yes.
19  Q.  And then it goes on to say in general
20  terms what your findings were, right?
21  A.  It goes on to say -- if I can please
22  read it to be able to answer that.
23  Q.  Yes, of course.  Sure.
24  A.  Okay.
25  Q.  You've had a chance to read that?

Page 462

1      A.   I've had a chance to read it.

2      Q.   Okay.

3      A.   Thank you.

4      Q.   No problem.  Let me just ask my

5  question again.

6      A.   Uh-huh.

7      Q.   At the bottom of that abstract, in

8  general terms, describes the findings from your

9  2025 paper.

10     A.   Yep.

11     Q.   Is that right?

12     A.   Yes, that is correct.

13     Q.   And it specifically says -- excuse me:

14  In a sample of 103 adolescents, ASMU and perceived

15  addiction were highly correlated, but some

16  adolescents' classification differed when

17  cross-referencing.

18          Did I read that correctly?

19     A.   Yes.

20     Q.   And then it goes on to say:  Both were

21  similarly associated with demographics and

22  depressive symptoms.

23          Did I read that correctly?

24     A.   Yes.

25     Q.   And then it goes on to say:

Page 463

1  Self-reported, but not objectively reported, social

2  media use was related to greater ASMU and perceived

3  addiction.

4          Did I read that correctly?

5      A.   Yes.

6      Q.   And is that an accurate account of one

7  of the findings from your study?

8      A.   I would need to go back and reread this

9  to -- I mean, I would -- that's an accurate

10  sentence.

11     Q.   Okay.  And, again, just to be clear,

12  self-reporting of social media use, you mention in

13  your paper here, can be inaccurate of actual social

14  media use, correct?

15          MS. COUCH:  Objection.  Vague.

16          THE WITNESS:  Self-report measures of

17  social media use are complementary to some of the

18  objective measures and tell us different things, as

19  I think is discussed in this article.

20  BY MS. JONES:

21     Q.   Sure.  But do you -- do you recall that

22  this article also says pretty directly that

23  self-report measurements are inaccurate of actual

24  social media use?

25          MS. COUCH:  Objection.

Page 464

1          THE WITNESS:  I need to look for that

2  statement.

3  BY MS. JONES:

4      Q.   Let me show you -- I think we talked

5  about it yesterday.  If you go to 190 -- the bottom

6  of 195.

7      A.   Uh-huh.

8      Q.   There's a reference to:  However, past

9  research?

10     A.   Yeah.

11     Q.   This is referring to the Odgers and

12  Jensen paper that we talked about yesterday,

13  correct?

14     A.   Correct.

15     Q.   And it says:  Past research generally

16  relies on self-report measurements which are

17  inaccurate of actual social media use and

18  potentially confounded by dispositional subjective

19  well-being.

20          Did I read that correctly?

21     A.   That sentence is correct about past

22  research which has looked at large retrospective

23  self-reports --

24     Q.   Okay.

25     A.   -- of self-reported social media use.

Page 465

1      Q.   And in the case of your study as

2  reflected here on Page 1, self-reported social

3  media use was related to greater ASMU and perceived

4  addiction; is that right?

5      A.   Sorry.  Are we back in the abstract?

6      Q.   Yes, we are.

7      A.   Can you say that again now that I'm

8  here?

9      Q.   Sure.

10     Your -- on Page 1 of your -- in the

11  abstract of your paper --

12     A.   Yeah.

13     Q.   -- your colleagues and you earlier this

14  year published:  Self-reported, but not objectively

15  reported, social media use was related to greater

16  ASMU and perceived addiction.  Correct?

17     A.   That's correct.

18     Q.   And perceived addiction is what the

19  adolescents in your study reported about whether

20  they believed themselves to be addicted or not to

21  social media; is that right?

22     A.   Yes, that's correct.

23     Q.   That was not based on an actual

24  clinical diagnosis of social media addiction; is

25  that right?

Page 466

```
1         A.   This was a measure and the methods
2  where we asked adolescents specifically, "Do you
3  think you may be addicted to social media?"
4         Q.   Okay.  Did you ask the adolescents,
5  "Has any clinician diagnosed you with social media
6  addiction?"
7         A.   We did not.
8         Q.   Okay.  And so what we're talking about
9  here when we talk about the relationship between
10 self-reported social media use and greater ASMU and
11 perceived addiction, we're talking about what the
12 adolescents in your study perceived about the
13 possibility that they were addicted to social
14 media; is that right?
15           MS. COUCH:  Objection.  Vague.
16           THE WITNESS:  It is based on their
17 answer to the question -- specifically to the
18 question, "Do you think you may be addicted to
19 social media?"
20 BY MS. JONES:
21        Q.   Okay.  Is ASMU also based on
22 self-reporting?
23        A.   Yeah.
24        Q.   Now, it looks like in that same
25 sentence, that objectively reported social media
```

Page 467

```
1  use was not related to greater ASMU and perceived
2  addiction; is that right?
3         A.   I believe that's correct.  I'm not
4  seeing that sentence.
5         Q.   I'm just reading the same sentence
6  we've been talking about.
7         A.   Yes.  Yeah.
8         Q.   Is that right?
9         A.   That's correct.
10        Q.   And objective -- objectively-recorded
11 social media use would be your team being able to
12 actually draw information about social media use
13 from the adolescents' phone; is that right?
14        A.   That's correct.
15        Q.   Let me ask you to look at the box that
16 appears right under the abstract, if you wouldn't
17 mind, on the same page of your paper from this --
18 published this year.
19        A.   Uh-huh.
20        Q.   It says:  Impact summary.
21        A.   Uh-huh.
22        Q.   You have to say --
23        A.   Yes.
24        Q.   -- "yes" or "no."
25           And there's, first, a section entitled
```

Page 468

```
1  "Prior State of the Knowledge" --
2         A.   Correct.
3         Q.   -- yes?
4         A.   Yes.
5         Q.   And then there's a section entitled
6  "Novel Contributions"; is that right?
7         A.   Yes.
8         Q.   And just to make sure I understand,
9  that section of the paper gives you and your
10 co-authors an opportunity both to kind of give a
11 general sense of what the research to date has told
12 us; is that right?
13        A.   It looks like we are responding to, in
14 one sentence, what the prior state of the knowledge
15 is.
16        Q.   Yes.
17           And then the other section in that
18 impact summary is to give a sense of how your
19 research advances the field in some way, generally
20 speaking; is that right?
21        A.   Generally speaking, to say the novel
22 contribution of this study.
23        Q.   Right.  Right.
24           Here's what we're adding to what we
25 already know, right?
```

Page 469

```
1         A.   Sure.
2         Q.   Okay.  And what you say about the prior
3  state of the knowledge in this paper published
4  earlier this year is:  Much existing evidence on
5  the link between adolescent social media use and
6  subjective well-being relies on retrospective
7  self-reports of social media use, which may
8  inaccurately assess -- excuse me -- assess use,
9  fail to report within-day associations, and not
10 consider individual differences.
11           Did I read that correctly?
12        A.   You read that correctly.
13           MS. COUCH:  Objection.  Misstates the
14 document.
15 BY MS. JONES:
16        Q.   Did I -- did I read it incorrectly?
17        A.   Can you reread it so I can respond?
18 I'm sorry.
19        Q.   Sure.  That's --
20           MS. COUCH:  There was one word -- there
21 was one word off.  Sorry.
22           MS. JONES:  That's okay.  I'll read it
23 again.
24 BY MS. JONES:
25        Q.   What you and your co-authors reported
```

Page 470

1  about the state of the knowledge as of the
2  publication of your paper in 2025 was:  Much
3  existing evidence on the link between adolescent
4  social media use and subjective well-being relies
5  on retrospective self-reports of social media use,
6  which may inaccurately assess use, fail to capture
7  within-day associations, and not consider
8  individual differences.
9       Did I read that correctly?
10      A.   Yes, you read that correctly.
11      Q.   And is that an accurate, again, very
12  general statement of the state of the knowledge as
13  you and your co-authors described it earlier this
14  year in your publication?
15      A.   That's a broad claim largely based on
16  the Odgers paper, trying to underscore that these
17  between-person retrospective reports may have
18  limitations and that we need these within-day,
19  within-person analyses to better capture the nuance
20  of these processes.
21      And this study uses these within-person
22  methods where we're getting dozens -- well, over a
23  dozen data points on individual adolescents in
24  order to really look at this as it's unfolding in
25  their daily life, which has very strong benefits

Page 471

1  relative to some of the retrospective self-report
2  measures that we're saying here prior research has
3  looked upon.
4       Q.   Okay.  Can I ask you just a separate
5  question?  Do -- do you have a good regard for
6  Candice Odgers as a researcher in this area?
7            MS. COUCH:  Objection.  Vague.
8            THE WITNESS:  I have a high regard of
9  Candice Odgers, yes.
10 BY MS. JONES:
11      Q.   Okay.  Do -- do you know her?
12      A.   I do know her.
13      Q.   Okay.  In the novel contribution
14  section of your paper from 2025, you say:  Daily
15  social media use (self or objective report) was not
16  consistently associated with well-being.
17      Do you see that?
18      A.   Daily social media use -- self -- yes.
19      Q.   And is -- is that an accurate general
20  description of one of the findings from your study?
21      A.   That sentence is attempting to indicate
22  that there were differences in the associations
23  that we found.  As we talked about, I think,
24  yesterday, the daily social media use was related
25  to depressed affect.  It was not related to

Page 472

1  positive affect.  And that's what we mean by
2  "not consistently associated with well-being."
3       Q.   Understood.
4       But what you reported here, just
5  reading from the page, was -- was not consistently
6  associated with well-being, right?
7       A.   That's what that one sentence says.
8            MS. COUCH:  Objection.  Vague.  Let me
9  get my objection --
10 BY MS. JONES:
11      Q.   And the next sentence says:
12  Adolescents' reports of -- excuse me.  Let me start
13  again.
14      Adolescents' reports of addiction-like
15  social media use were only linked to self-reported
16  and not objectively-measured social media use, and
17  did not moderate linkages with daily subjective
18  well-being.
19      Did I read that correctly?
20      A.   You read that correctly.
21      Q.   And that is an accurate statement of
22  one of the findings from your study published
23  earlier this year, correct?
24            MS. COUCH:  Objection.  Vague.
25            THE WITNESS:  That is generally

Page 473

1  describing the patterns of associations in this
2  paper.
3  BY MS. JONES:
4       Q.   Dr. Telzer, there were probably two or
5  three occasions yesterday where you -- when we were
6  talking about caveats and limitations that are
7  articulated in some of your published work, that
8  you said, "I'm a cautious researcher."  Did I -- am
9  I recalling that correctly?
10      A.   I don't recall the specific way in
11  which I said that yesterday, but I am a cautious
12  researcher, yes.
13      Q.   Okay.  Well, that's -- I wanted -- let
14  me -- I'm happy to level-set on that basic point.
15  You consider yourself to be a cautious researcher,
16  correct?
17      A.   Correct.
18      Q.   And part of that is that when you
19  publish things in the peer-reviewed literature, you
20  include things like a section on limitations so you
21  can lay out caveats and limits that might be
22  related to your study design and findings; is that
23  right?
24            MS. COUCH:  Objection.  Vague.
25            THE WITNESS:  Limitations sections are

HIGHLY CONFIDENTIAL

Page 474

1  generally used to lay out potential limitations of
2  a study.
3  BY MS. JONES:
4      Q.   And part -- part of the reason that, if
5  we read all of your peer-reviewed literature, that
6  we likely would find you explaining caveats and
7  limitations to your research is because you do that
8  as part of trying to be a cautious researcher; is
9  that right?
10         MS. COUCH:   Objection.   Vague.
11         THE WITNESS:   We do that because that
12  is what science does.   We try to conduct very
13  rigorous, strong science that gets peer-reviewed
14  and published in these high-impact journals.
15         And we always include potential caveats
16  and limitations to any singular study, at least
17  with the examples we're looking at today.
18  BY MS. JONES:
19      Q.   And you -- you used the phrase "what
20  science does."   One of the things that science does
21  is, among other things, lay out what might be
22  potential caveats or limitations with respect to a
23  particular study.   Is that true?
24         MS. COUCH:   Objection.   Vague.
25         THE WITNESS:   In -- in empirical

HIGHLY CONFIDENTIAL

Page 475

1  articles and as researchers in my field, we lay out
2  potential limitations.
3  BY MS. JONES:
4      Q.   Okay.   And -- and that -- can you agree
5  with me that that is, in fact, part of aiming to be
6  or trying to be a cautious researcher is when you
7  publish something, you lay out the caveats and the
8  limitations of that particular study?
9          MS. COUCH:   Objection.   Vague.
10         THE WITNESS:   I think that there are
11  many components to being a cautious researcher.
12  BY MS. JONES:
13      Q.   I would agree with you.
14         Is one of those components that you
15  identify in a particular paper where you're
16  reporting on a study you've done the caveats and
17  the limitations of your study and its findings?
18         MS. COUCH:   Asked and answered.
19         THE WITNESS:   I think that there are
20  many things that makes one a cautious researcher.
21  BY MS. JONES:
22      Q.   Is one of them that you acknowledge
23  caveats and limitations to your research?
24      A.   One of the things that we do as
25  scientists and in empirical articles is include

HIGHLY CONFIDENTIAL

Page 476

1  caveats and limitations in these papers.
2      Q.   What -- what are the other -- you've
3  said, "I think that there are many things that
4  makes one a cautious researcher."   What are the
5  other things you would put on that list of being a
6  cautious researcher?
7          MS. COUCH:   Objection.   Vague.
8          THE WITNESS:   I mean, there's a lot of
9  speculation I can do.   We --
10  BY MS. JONES:
11      Q.   Well, let me be -- I don't want you to
12  speculate.
13         I believe your testimony was, "I think
14  there are many things that make one a cautious
15  researcher."   What are those things?
16      A.   Well, there's many things that make us
17  good researchers.   We do well -- rigorous research.
18  We conduct our research under IRB approval to
19  ensure that we're protecting human subjects.   We
20  submit it to peer review to ensure that others are
21  evaluating the quality of our work.
22         There's many things that go into this.
23      Q.   Anything else you can think of?
24      A.   There's many things.
25      Q.   Okay.   And -- and it sounds like you

HIGHLY CONFIDENTIAL

Page 477

1  would also include on that list, if you're
2  publishing a paper, including information about
3  caveats and limitations of the research?
4          MS. COUCH:   Asked and answered.
5          THE WITNESS:   As I said, that is one of
6  the standard things that we include as researchers
7  in an empirical article.
8  BY MS. JONES:
9      Q.   Okay.   Is it true, when you publish an
10  empirical article as what I think you've described
11  as a "cautious researcher," that you don't want to
12  overstate your findings?
13         MS. COUCH:   Objection.   Vague.
14         THE WITNESS:   I think that, in any
15  empirical singular study, we describe the results
16  that we find and describe what they could mean,
17  broadly speaking, what the implications of those
18  findings could mean.
19  BY MS. JONES:
20      Q.   Sure.   And my -- my question was a
21  little bit different.
22         My question was:   When you are aiming
23  to be a cautious researcher, is it true that you
24  don't want to overstate your findings?
25         MS. COUCH:   Asked and answered.

Page 478

1    THE WITNESS:  I think in any empirical
2  article we're aiming to, in this context or in this
3  particular study, try to describe the findings
4  thoroughly and what they could mean and what the
5  broader implications are in that paper.
6  BY MS. JONES:
7    Q.   Doctor, you, in some of the papers that
8  we've looked at, including the paper that was
9  published just earlier this year, the Flannery
10  paper that we looked at yesterday and this morning,
11  your Maza paper from 2023, your Armstrong-Carter
12  paper -- you have laid out different caveats and
13  limitations to the research, yes?
14    A.   In each paper, we have included caveats
15  and limitations in the discussion section.
16    Q.   And you can -- you said you went back
17  and looked at your report -- your written report
18  for this litigation last night, correct?  Or
19  generally reviewed it last night?
20    A.   Yes.
21    Q.   Did -- did you review your report to
22  see whether the caveats and limitations that are
23  reflected in the papers of yours that you cited in
24  your report, that -- that you included those
25  caveats and limitations in your report?

Page 479

1    A.   I did not look for that, no.
2    Q.   Do you know whether you included in
3  your written report that you generated for
4  litigation the same caveats and limitations about
5  those studies that you referenced that are
6  reflected in the studies themselves?
7    A.   I included in my report a discussion of
8  lots of research studies, not necessarily going
9  into the details of every limitation of that
10  publication because it is not any individual
11  limitation that might contribute to my overall
12  opinion.  It's the totality of all of the research
13  that contributes to these opinions.
14    Q.   And do you know one way or the other
15  whether you included any of the caveats and
16  limitations from your -- the papers themselves in
17  your written report?  Do you know?
18    MS. COUCH:  Asked and answered.
19    THE WITNESS:  Off the top of my head,
20  I'm not sure if I included all of those
21  limitations.
22    But the limitations, as I mentioned,
23  are not necessarily inconclusive with any of my
24  opinions.  And a singular study or a singular
25  limitation is not changing the overall totality of

Page 480

1  what the research findings are showing.
2  BY MS. JONES:
3    Q.   Let me ask you to -- we're actually
4  going to show you another video.
5    MS. JONES:  And we're going to mark
6  this as, I think, Exhibit, Number 22.  Is that
7  right?
8    MS. ANTOINE:  Uh-huh.
9    MS. COUCH:  And just so the record is
10  clear, what's actually being provided as an
11  exhibit?
12    MS. ANTOINE:  This is the slip sheet
13  and then the clip will also be --
14    MS. COUCH:  Just the clip, yes.
15    MS. JONES:  It will be the clip.
16    MS. COUCH:  Can you send that over,
17  please.
18    (TELZER EXHIBIT 22, Video - Interview
19  with Eva Telzer and Mitch Prinstein at the 2023
20  BrainMind Summit, was marked for identification.)
21    MS. JONES:  Can you hold on just a
22  second before you play that one?
23    Okay.  Why don't we go ahead and play
24  Exhibit Number 22, please.
25    (Playing video.)

Page 481

1  BY MS. JONES:
2    Q.   Dr. Telzer, that is you, correct, in
3  that video?
4    A.   Correct.
5    Q.   And also Dr. Mitch Prinstein, correct?
6    A.   Correct.
7    Q.   And you've -- you've published with
8  Dr. Prinstein?
9    A.   Uh-huh.
10    Q.   You have to say "yes" or "no."
11    A.   Yes.
12    Q.   I actually wanted to ask you about a
13  very specific -- do you recall this?  And if you
14  don't, I understand.
15    I will represent to you -- and you can
16  tell me if this resonates with your recall --
17  participating in a -- what's known as a BrainMind
18  Summit in October of 2023?
19    A.   Yes.
20    Q.   Do you specifically recall this talk
21  that you did with Dr. Prinstein?
22    A.   I remember we were interviewed.
23    Q.   Okay.  One of the things that you
24  specifically said in the remarks just a moment ago
25  in Exhibit Number 2 [sic] is, "So if they are" --

Page 482

1   "it really depends what adolescents are doing when
2   they're on social media."
3           Did you hear that?
4       A.   I believe so.
5       Q.   And -- and is that an accurate
6   statement:  It really depends what adolescents are
7   doing when they're on social media?
8           MS. COUCH:  Objection.  Vague.
9           THE WITNESS:  That's what I said in
10  that one-sentence clip.
11  BY MS. JONES:
12      Q.   Yeah.  And then the next sentence says,
13  "So if they're online connecting with their close
14  friends and having good, happy conversations, a few
15  hours is probably not problematic."
16          Do you remember hearing yourself say
17  that?
18      A.   I recall saying -- seeing that in this
19  moment, yes.
20      Q.   And was -- was that an accurate -- I
21  shouldn't -- was that an accurate statement?
22          MS. COUCH:  Objection.  Vague.
23          THE WITNESS:  That statement was what I
24  said there, yes.
25  BY MS. JONES:

Page 483

1       Q.   And, again, I think you told me this
2   generally as to what you aim to do when you're
3   giving talks.  But you -- you aim to be accurate in
4   what you're communicating to whoever your audience
5   happens to be, right?
6           MS. COUCH:  Objection.  Vague.
7           THE WITNESS:  Broadly speaking, I try
8   to be thorough.  This one clip is a quick,
9   out-of-context clip.  I am seeing what you said
10  right there.
11  BY MS. JONES:
12      Q.   Okay.  And I think you said -- you
13  recall saying that.
14          And then the next thing you said was,
15  "If they're online for a few minutes and are
16  exposed to cyberhate or something negative, a few
17  minutes is too much."
18          Do you remember saying that?
19      A.   I saw that, yes.
20      Q.   And was that an accurate statement?
21          MS. COUCH:  Objection.  Vague.
22          THE WITNESS:  That's what I said in
23  that sentence there.
24  BY MS. JONES:
25      Q.   Is that -- is -- are those two

Page 484

1   statements -- "If they are online connecting with
2   their close friends and having good, happy
3   conversations, a few hours is probably not
4   problematic.  And if they're online for a few
5   minutes and are exposed to cyberhate or something
6   negative, a few minutes is too much," are those two
7   statements accurate today?
8           MS. COUCH:  Objection.  Vague.
9   Compound.
10          THE WITNESS:  I said those two
11  statements in the context of this long interview
12  there.
13  BY MS. JONES:
14      Q.   Sure.  I understand.  My question is:
15  Are those two statements accurate today?
16          MS. COUCH:  Objection.  Vague.
17  Compound.
18          THE WITNESS:  I think I said those two
19  statements in the context of that interview at that
20  time.
21  BY MS. JONES:
22      Q.   And does that mean that they're not --
23  you don't view them as being accurate, sitting here
24  today in your deposition under oath?
25      A.   They're accurate in the context of that

Page 485

1   talk that I gave that day.
2       Q.   And what you were drawing a distinction
3   between there was the different content that an
4   adolescent or a teen might actually encounter on
5   social media, right?
6           MS. COUCH:  Objection.  Misstates.
7           THE WITNESS:  If we looked at the
8   broader context of this interview, I believe this
9   was talking about how much time is too much, and I
10  was responding that we cannot determine what amount
11  of time is good or bad.
12  BY MS. JONES:
13      Q.   Sure.
14          And the reason for that is because, as
15  you said there, there's a difference between an
16  adolescent having good, happy conversations with
17  their close friends and an adolescent being exposed
18  to cyberhate or something negative, right?  There's
19  a difference between those two things?
20      A.   The broader context is that it is very
21  complex, and we cannot necessarily make claims
22  about a particular time cutoff that is good or bad.
23      Q.   Understood.  Let me -- let me just ask
24  you the question.
25          Do you agree that there is a difference

Page 486

1  between an adolescent having what you described as
2  good, happy conversations with close friends and an
3  adolescent being exposed to cyberhate on social
4  media?  Do you acknowledge that those two things
5  are different?
6      MS. COUCH:  Objection.  Vague.
7      THE WITNESS:  I acknowledge that that
8  is the statement from that clip.
9  BY MS. JONES:
10     Q.  And do you acknowledge that they're
11 different things?  That if an adolescent
12 experiences friendly interactions with people they
13 know from school, that's different than if they
14 experience cyberhate or some other kind of negative
15 interaction?
16     MS. COUCH:  Objection.  Vague.
17     THE WITNESS:  Those are two examples of
18 things that can occur.
19 BY MS. JONES:
20     Q.  Sure.
21     And that teenager's response to those
22 different experiences might differ based on whether
23 it's a positive, happy, collegial experience or a
24 negative, unpleasant experience, right?
25     MS. COUCH:  Objection.  Vague.

Page 487

1  Hypothetical.
2      THE WITNESS:  It's very hard to
3  speculate beyond the small clip that you showed
4  there.
5  BY MS. JONES:
6      Q.  Okay.  What -- what about the
7  difference between a teen on social media seeing --
8  say, they really like soccer -- seeing clips from
9  the World Cup versus seeing violent content of some
10 kind?
11     A.  I'm sorry.  Go ahead.
12     Q.  Do you -- do you acknowledge that those
13 are different types of content that a teen might
14 experience?
15     MS. COUCH:  Objection.  Vague.
16     THE WITNESS:  I would say this is a
17 hypothetical that I don't think I am going to
18 speculate upon.
19 BY MS. JONES:
20     Q.  You don't -- you don't know if there's
21 a difference between a teen encountering clips of
22 soccer or basketball or some sport that he or she
23 likes versus a teen encountering violent or abusive
24 or hateful content on the Internet?
25     MS. COUCH:  Objection.  Argumentative.

Page 488

1      THE WITNESS:  You're giving me just
2  examples of things that might be seeing on --
3  BY MS. JONES:
4      Q.  I am -- I am doing that.  And I'm
5  asking you, do you acknowledge here today that
6  those two are different experiences?
7      MS. COUCH:  Objection.  Vague.
8      THE WITNESS:  I acknowledge that you
9  are giving me two examples of hypotheticals.
10 BY MS. JONES:
11     Q.  Okay.  And do you acknowledge that it's
12 possible that a teen's reaction to those two forms
13 of content could differ based on the content?
14     MS. COUCH:  Objection.  Vague.
15     THE WITNESS:  I -- I'm not going to
16 speculate about hypotheticals.
17 BY MS. JONES:
18     Q.  Let me ask you:  As part of your
19 academic research, did you actually control for
20 what adolescents were doing with their phone and
21 seeing on their phones?
22     A.  We are looking broadly across lots of
23 different studies about their social media use.
24     MS. JONES:  I'm going to move to strike
25 as nonresponsive, respectfully.

Page 489

1  BY MS. JONES:
2      Q.  My question was:  As part of your
3  academic research, have you actually controlled for
4  what the adolescents who were participating in your
5  study were doing with their phones and seeing on
6  their phones?
7      MS. COUCH:  Objection.  Vague.
8      THE WITNESS:  I mean, we've done a lot
9  of research, looking at lots of different aspects
10 of social media use.  It's hard to answer that
11 specific question without looking at a specific
12 study.
13 BY MS. JONES:
14     Q.  Well, let me hand you what we will mark
15 as Exhibit Number 23.
16     (TELZER EXHIBIT 23, Article titled
17 Linking video chatting, phone calling, text
18 messaging, and social media with peers to
19 adolescent connectedness, was marked for
20 identification.)
21 BY MS. JONES:
22     Q.  Do you recognize Exhibit Number 23,
23 Dr. Telzer?
24     A.  Yes.
25     Q.  And Exhibit Number 23 is a paper

Page 490

1  published by yourself, Dr. Burnell and others in
2  2023, correct?
3      A.   Yes.
4      Q.   And the title of the article is
5  "Linking video chatting, phone calling, text
6  messaging, and social media with peers to
7  adolescent connectedness."
8           Do you see that?
9      A.   Yes.
10     Q.   And in general, your abstract here lays
11 out kind of the findings of the study -- right? --
12 in general terms?
13     A.   Generally speaking, the abstract is
14 describing the study.
15     Q.   I actually want to ask you about a very
16 specific portion of this paper, Page 1232.
17     A.   Okay.
18     Q.   Are you there?
19     A.   Yes.
20     Q.   And this is, again, in that
21 "Limitations and future directions" -- that
22 limitations section that we talked about earlier --
23     A.   Yes.
24     Q.   -- yes?
25          I want to direct your attention to the

Page 491

1  last paragraph in your "Limitations and future
2  directions" section.  Are you there?
3      A.   Future -- the "Future research"
4  paragraph?
5      Q.   Yes.
6      A.   Yes.
7      Q.   It says:  Future research should also
8  explore how engaging in specific digital media
9  behaviors impact adolescents' social connectedness.
10          Did I read that correctly?
11     A.   Yes.
12     Q.   You said:  While we differentiated
13 between four types of digital media, we did not
14 have information about specific digital behaviors,
15 communications, or content exchanged.
16          Did I read that correctly?
17     A.   Yes.
18     Q.   Is that an accurate statement about the
19 work related to this particular study?
20     A.   That statement that you read is
21 accurately written there.
22     Q.   Are there any studies that you can
23 think of where you and your colleagues did, in
24 fact, collect information about specific digital
25 behaviors, communications or content exchanged?

Page 492

1          MS. COUCH:  Objection.
2  BY MS. JONES:
3      Q.   Actually, let me ask you a more
4  specific question.
5           Are there any studies that you can
6  think of that you have been involved in --
7      A.   Uh-huh.
8      Q.   -- where you and your colleagues
9  collected information about the specific content
10 exchanged by the adolescents who were participating
11 in the study?
12     A.   Specific content?  It's likely.  I
13 can't think of it off the top of my head.
14     Q.   When you say it's likely --
15     A.   It's possible.  I don't -- I don't know
16 off the top of my head is what I mean.
17     Q.   Okay.  All right.  You go on to say in
18 the same paper:  For example --
19     A.   Uh-huh.
20     Q.   -- one adolescent may have used a
21 social networking site to passively like pictures
22 posted of a friend, whereas another adolescent may
23 have used the same social networking site to host a
24 video chat with their friend-both of these teens
25 would report using social media to interact with a

Page 493

1  friend in our study.
2           Do you see that?
3      A.   Yes.
4      Q.   And that's an accurate statement?
5      A.   You read that accurately.
6      Q.   Okay.  But was that also an accurate
7  statement?
8      A.   That's what we --
9           MS. COUCH:  Objection.  Vague.
10          THE WITNESS:  That is a statement we
11 have here.
12 BY MS. JONES:
13     Q.   Okay.  And you go on to say:  However,
14 these different digital behaviors may divergently
15 impact adolescents' feelings of social
16 connectedness.
17          Did I read that correctly?
18     A.   Yes.
19     Q.   And is -- is that an accurate statement
20 of your -- you and your co-authors' views as
21 reflected in this 2023 paper?
22          MS. COUCH:  Objection.  Vague.
23          THE WITNESS:  That is an accurate
24 statement that you read that is written in this
25 paper.

Page 494

1  BY MS. JONES:
2      Q.   And what -- what this says is:  These
3  different digital behaviors may divergently impact
4  adolescents' feelings of social connectedness.
5          What that means specifically is the
6  different ways that an adolescent or teenager might
7  be engaging with social media could differently
8  affect how that adolescent felt on this measure of
9  social connectedness that you all were focused on
10 in this study, correct?
11     A.   I guess here we are speculating about
12 these different ways that adolescents are engaging
13 with their friends online --
14     Q.   Okay.
15     A.   -- and how that might divert -- or how
16 these different digital behaviors may divergently
17 impact adolescents' feelings of social
18 connectedness.
19     Q.   And when -- when -- just to kind of
20 talk about it in lay terms --
21     A.   Uh-huh.
22     Q.   -- when it refers to "divergently
23 impact," what that means is "differently affect";
24 is that right?
25     A.   Divergent, yes.  It means it could

Page 495

1  differently impact --
2      Q.   Okay.
3      A.   -- their feelings of social
4  connectedness.
5      Q.   I'm sorry for talking -- for talking
6  over you.
7          Now, you used the word "I guess here we
8  are speculating about these different ways that
9  adolescents are engaging with their friends
10 online."
11         In -- in terms of this kind of effort
12 to be a cautious -- cautious researcher, do you
13 speculate in peer-reviewed publications that you
14 co-author?
15         MS. COUCH:  Objection.  Argumentative.
16         THE WITNESS:  I think discussion
17 sections are an opportunity to discuss and think
18 about how our findings relate to the broader work
19 and what possible, in a limitations and future
20 directions section, what limitations or variables
21 that we might consider.
22         MS. JONES:  I'm, respectfully, going to
23 move to strike as nonresponsive.
24 BY MS. JONES:
25     Q.   My question was:  In terms of your

Page 496

1  efforts to be a cautious researcher, do you
2  speculate in peer -- peer-reviewed publications
3  that you co-author?
4          MS. COUCH:  Objection.  Argumentative.
5          THE WITNESS:  I think in a
6  peer-reviewed publication one of the roles of a
7  discussion is to think about what the results mean
8  and to connect them to broader literature and think
9  about different ways in which there may be
10 limitations or different ways of answering
11 questions.
12 BY MS. JONES:
13     Q.   You talked yesterday and in your report
14 about how different elements or features of social
15 media -- I think the term you used was "exacerbate"
16 potential harm from content on social media.
17         Am I generally recalling that
18 correctly?
19     A.   I don't recall what you're referring
20 to.
21     Q.   Okay.  Well, yesterday we were having a
22 conversation about doesn't content matter in terms
23 of whether or not an adolescent or a teen might
24 have some kind of effect, whether positive or
25 negative, on social media.

Page 497

1          Do you recall that back-and-forth we
2  had?
3      A.   I recall discussing that, yes.
4      Q.   Okay.  And sitting here today, my
5  recollection of your testimony yesterday was you
6  believe that content matters.  But it seems like
7  you have determined that features matter more than
8  the content; is that right?
9      A.   My determination and opinions that I
10 discuss in my report talk about how the features
11 fundamentally change the experience of the content.
12         I gave some explicit examples.  I would
13 be happy to give those examples again of how those
14 features, like the algorithms, the "like" features,
15 can change the experience of the content.
16     Q.   Sure.  And I'm going to ask you about
17 some of those examples, actually.  But I -- I first
18 want to make sure I understand.
19         You -- recognizing your opinions about
20 the importance of the features --
21     A.   Uh-huh.
22     Q.   -- do you also acknowledge that
23 content, whether you see a puppy versus seeing
24 something violent and unpleasant on social media,
25 can affect how you react to what you see?

Page 498

1    MS. COUCH:  Objection.  Vague.
2    THE WITNESS:  I think that my opinions
3  that I discuss in my report rely upon the broader
4  literature that is content agnostic.
5    We are not necessarily examining or
6  focusing on the content when I come to my opinions.
7  We're looking at the broader literature and how
8  especially those features that I discussed could
9  fundamentally change that content, how experiences
10  on social media can be changing adolescents'
11  developing brains.
12    None of that is specifically focusing
13  on these contents that you're discussing.
14  BY MS. JONES:
15    Q.  Well, let me ask you about some of
16  these features that you brought up, including the
17  algorithms.
18    The algorithms on social media
19  platforms are not simply showing blank screens to
20  users, are they?
21    MS. COUCH:  Objection.  Hypothetical.
22    THE WITNESS:  I don't -- I don't know
23  what you mean by "blank screens."
24  BY MS. JONES:
25    Q.  I mean, is the algorithm showing

Page 499

1  teenagers just blank screens?
2    MS. COUCH:  Objection.  Hypothetical.
3    THE WITNESS:  I don't know what you
4  mean by "blank screens."
5  BY MS. JONES:
6    Q.  I mean a black screen with nothing on
7  it.
8    A.  The algorithms are feeding them feeds
9  of what they're seeing on those social media
10  platforms.
11    Q.  And that could include pictures of some
12  kind, right?
13    A.  That can include pictures.
14    Q.  That can include videos of some kind,
15  right?
16    A.  That can include videos.
17    Q.  That could include some kind of, you
18  know, post where there are words that have been
19  communicated by someone, right?
20    A.  A post with words?  I don't know or
21  speculate or -- I -- I would prefer some explicit
22  examples, not --
23    Q.  Are you on social media?
24    A.  I am.
25    Q.  Are you on -- what platforms?

Page 500

1    A.  I have been on all platforms:
2  Facebook, Instagram, YouTube, TikTok, Snapchat.
3    Q.  Okay.  Have you ever encountered, for
4  example, a post on any one of those platforms
5  where, you know, someone posts words where they're
6  offering an inspirational quote or saying something
7  funny or communicating in some way using language?
8    Are you familiar with that as someone
9  who has used all of these platforms?
10    A.  Probably.
11    Q.  Okay.  So I was talking about pictures
12  and videos.  And that third thing that I mentioned
13  was sometimes what the algorithm shows you is, you
14  know, somebody sends some kind of quote or lyrics
15  to a song or something else.
16    A.  Okay.
17    Q.  Yes?
18    A.  Sure.  Yes.
19    Q.  Okay.  I mean, UNC, for example, has an
20  Instagram page, yes?
21    A.  I think so, yes.
22    Q.  And so the university might use that as
23  a way to communicate information about something
24  that's going on at the school, right?
25    A.  Yes.

Page 501

1    Q.  Okay.  And it could use that as a way
2  to show people pictures from graduation or some
3  other event that's exciting for people, yes?
4    A.  Yes.
5    Q.  It could use that as a way to show
6  people videos of some kind, yes?
7    A.  Uh-huh.
8    Q.  Okay.  So as someone who has actually
9  used all these platforms, you know that the
10  algorithm is not just showing you black boxes when
11  you are looking at a -- a feed or a reel of some
12  kind, right?
13    A.  I know that the algorithms are designed
14  to maximize user engagement.  And so it is using
15  those algorithms to feed different content and
16  material to increase the -- the user's likelihood
17  of engaging and spending more time on that app.
18    Q.  Sure.  And have you ever had any
19  experience, as someone who has used these
20  platforms, where you go in and the algorithm as
21  you're scrolling through is just showing you
22  nothing?
23    A.  I have had experiences where I've gone
24  on and algorithms have tailored the content so much
25  that I get sucked in, and I have extreme use of

Page 502

1  social media in moments where I didn't want to.
2      Q.  Okay.  And that -- that's based on
3  seeing something that is, you know, interesting or
4  engaging or in some way something that gets you to
5  look at more of it.  Is that your experience?
6          MS. COUCH:  Objection.  Misstates her
7  testimony.
8          THE WITNESS:  As I said, I have gone on
9  social media and the algorithms have altered the
10 content that I'm seeing in such a way that it sucks
11 me in and I spend more time on social media than I
12 intended.
13 BY MS. JONES:
14     Q.  Yeah.  And just to go back to my
15 original question.  Have you ever gone on social
16 media and looked at your feed and there was just
17 nothing there?
18     A.  No.
19     Q.  You discuss notifications in your
20 report.  Am I recalling that correctly?
21     A.  I discuss notifications.
22     Q.  Okay.  And notifications are not just
23 wordless pings for people, right?
24     A.  They're not what?  Sorry.
25     Q.  They're not just wordless alerts for

Page 503

1  people, right?
2          MS. COUCH:  Objection.  Vague.
3          THE WITNESS:  What is a "word list"?
4  I'm sorry.
5  BY MS. JONES:
6      Q.  Without any content to it.
7          Let me ask you the question this way.
8  Have you gotten notifications as part of being
9  someone who is on some of these social media
10 platforms?
11     A.  No.  I have turned off all
12 notifications.
13     Q.  Okay.  Did you use to have
14 notifications?
15     A.  No.
16     Q.  You've never had notifications on your
17 social media?
18     A.  Not that I recall.
19     Q.  Do you have an awareness of whether,
20 when adolescents or teenagers receive
21 notifications, whether they're getting notified of
22 certain information?
23         MS. COUCH:  Objection.  Vague.
24         THE WITNESS:  I think that that is too
25 vague to be able to understand.

Page 504

1  BY MS. JONES:
2      Q.  Do -- do you think that a notification
3  that reminds a teen to do homework would have the
4  same effect on the teen as a notification that
5  reminds that teen that there's a message from a
6  friend waiting for them to review?
7          MS. COUCH:  Objection.  Outside the
8  scope.
9          THE WITNESS:  I have not thought about
10 or discussed notifications in that way.
11 BY MS. JONES:
12     Q.  So you don't know?
13     A.  I can't answer that.
14     Q.  Are you aware of any study on the
15 effect of notifications for adolescents and teens
16 that attempts to separate out the impact of the
17 content of the notification from the notification
18 itself?
19     A.  I can't think off of the top of my
20 head.
21         MS. COUCH:  Since you've seemed to wrap
22 up that section --
23         MS. JONES:  Yes, I was --
24         MS. COUCH:  -- we've been going an
25 hour.

Page 505

1          MS. JONES:  -- just going to say, we've
2  been going an hour.  So a break would be fine.
3          MS. COUCH:  Thank you.
4          THE VIDEOGRAPHER:  Going off the
5  record.  The time is 10:04 a.m.
6              * * *
7          (Whereupon, there was a recess in the
8  proceedings from 10:04 a.m. to 10:23 a.m.)
9              * * *
10         THE VIDEOGRAPHER:  Going back on the
11 record.  The time is 10:23 a.m.
12         (TELZER EXHIBIT 24, Research Article
13 titled Teens on screens:  A daily diary study of
14 objectively-measured smartphone use, social media
15 activity and associations with mood, was marked for
16 identification.)
17 BY MS. JONES:
18     Q.  Dr. Telzer, I'm going to hand you what
19 we've marked as Deposition Exhibit Number 24.
20         Do you recognize Deposition Exhibit
21 Number 24?
22     A.  Yes.  This is the Haag data or the
23 under review paper.
24     Q.  And just for the record, Deposition
25 Exhibit Number 24 is a paper that was actually

Page 506

1  submitted earlier that is pending final
2  publication; is that right?
3      A.  It's under review edit.
4      Q.  Okay.  Got it.
5          And you were one of the authors on this
6  paper, Exhibit 24, correct?
7      A.  Correct.
8      Q.  The title of the paper is "Teens on
9  screens:  A daily diary study of
10 objectively-measured smartphone use, social media
11 activity and associations with mood," correct?
12     A.  Correct.
13     Q.  And I just had a question for you.
14 Where it says "PDF Generation, April 29th, 2025,"
15 the significance of that date is what; do you know?
16 If you don't, that's fine.  I was just curious.
17     A.  I don't know where you see that.  I'm
18 sorry.
19     Q.  It's -- I'm sorry.  It's up in the kind
20 of top third of the first page.
21     A.  Which --
22     Q.  The very first page.  Do you see where
23 the heading is, the title, and then "Submission
24 ID," "Submission Version," "PDF Generation"?
25     A.  I -- I don't know.  I'm sorry.

Page 507

1      Q.  May I see your copy.  I wonder if
2  we're, perhaps, looking at different -- oh, yeah,
3  right here.  See where it says "PDF Generation"?
4      A.  Yes.
5      Q.  I was just asking -- and I truly am
6  just asking to ask -- do you know what that date
7  signifies?
8      A.  I don't know.
9      Q.  Okay.  This paper, which is under
10 review as of today, is based on objective data
11 collected by you and your colleagues in 2020; is
12 that right?
13     A.  I believe that's the date.  Yes.
14     Q.  And do you rely on this data for -- to
15 support, in part, recognizing that you rely on
16 other data, to support your opinions in your expert
17 report in this case?
18     A.  My opinion does not rely singularly on
19 this paper.  This paper was used to help
20 demonstrate some of the patterns of social media
21 use that are consistent with a host of other
22 publications, like Common Sense Media, The Pew
23 Research, as well as other publications that have
24 shown trends in how much adolescents are using
25 social media.

Page 508

1      Q.  Sure.
2          And my question was not:  Do you rely
3  on it singularly?  My question was:  Is this body
4  of data some of which you rely on as part of your
5  opinions in your written report?
6          MS. COUCH:  Asked and answered.
7          THE WITNESS:  This paper along with a
8  host of our research that shows consistent patterns
9  demonstrating how much adolescents are using social
10 media, including research conducted by Common Sense
11 Media and Pew Research to demonstrate how much
12 adolescents are using social media.
13 BY MS. JONES:
14     Q.  Okay.  I don't want to fuss about this
15 because it's a small point.  Let's go to Page 12 of
16 40.  And I am looking -- there are two sets of page
17 numbers.  I'm looking at the far upper-right ones.
18 So 12 of --
19     A.  Yeah.
20     Q.  Which I was told was the absolute page
21 numbering by someone who knows better than I.
22          There is a section entitled "Measures"
23 on that page; is that right?
24     A.  Yes.
25     Q.  Okay.  And there's a description of

Page 509

1  objective measures of smartphone use, correct?
2      A.  Yes.
3      Q.  And if you look at the second sentence
4  in that section or paragraph, it says:  As in
5  previous studies, participants accessed this data
6  through their iPhone settings app, then selecting
7  "See All Activity" within "Screen Time" and taking
8  three screenshots of their overall screen time,
9  their top three most-used apps and websites, and
10 their top three most-used app categories from the
11 entire day before.
12          Did I read that correctly?
13     A.  Yes.
14     Q.  In the context of gathering this data,
15 did you and your co-authors actually also gather
16 data -- and if you didn't, it's fine -- but did you
17 also gather data on what specific content the
18 participants in the study were seeing?
19          MS. COUCH:  Objection.  Vague.
20          THE WITNESS:  I can't recall off the
21 top of my head.
22 BY MS. JONES:
23     Q.  That's not reflected here, in any
24 event?
25     A.  That's not reflected in these measures?

Page 510

1      Q.   Yes.

2      A.   No.

3      Q.   And you say you can't recall off the

4  top of your head.  Does that mean you think you

5  might have done that and you're just not

6  remembering it today, or you didn't do it?

7      A.   It means we collected lots of different

8  measures, and I don't recall what all of the

9  measures we we collected.

10     Q.   One of the things that you note in this

11 paper under submission for 2025 -- in 2025 is that

12 the data were collected in 2020 during COVID while

13 school were -- schools were closed?

14     A.   Are you referencing something specific?

15     Q.   I'm certainly happy to show you where

16 it says that.

17     A.   Uh-huh.

18     Q.   If you go to Page 8.

19          MS. COUCH:  And, Dr. Telzer --

20 BY MS. JONES:

21     Q.   Actually -- I'm sorry.  It's actually--

22          MS. COUCH:  -- if you need a minute to

23 orient yourself, please take it.

24          THE WITNESS:  Uh-huh.

25 BY MS. JONES:

Page 511

1      Q.   I'm actually -- I gave you the wrong

2  number.  It's Page 11 in --

3      A.   Yeah.

4      Q.   -- the top number.  You know where it

5  is.  Okay.

6      A.   Got it.  Yep.

7      Q.   Under "Procedure," it says:  The

8  current study was conducted virtually during the

9  COVID-19 pandemic in the summer of 2020.  Right?

10     A.   That's when the study started, yes.

11     Q.   And you and your co-authors mention in

12 this manuscript submitted for review that that was

13 an -- that was a limitation of the data?

14     A.   Can you point me to that, please?

15     Q.   Sure.  Go to Page 26 of 40.  Up at the

16 top of the page.

17     A.   Uh-huh.

18     Q.   And I may have said "limitation."  I

19 just simply meant to note that you and your

20 co-authors had noted that.

21          At the top of the page at 26 of 40, it

22 says:  It is important to note the data presented

23 here were collected during the first summer of

24 COVID-19 pandemic --

25     A.   It says that.

Page 512

1      Q.   I'm sorry.  I missed a word.  So I want

2  to read it accurately --

3      A.   Okay.

4      Q.   -- so I can be sure that I can fairly

5  ask you if it's accurate.

6          It is important to note the data

7  presented here were collected during the first

8  summer of the COVID-19 pandemic, and thereby seems

9  in line with recent research revealing increases in

10 smartphone and other media in the U.S. and

11 worldwide among adolescents during this period.

12          Is that an accurate statement?

13     A.   You read that correctly.

14     Q.   Okay.  Let me ask you to go to --

15 excuse me.  I'm just getting to my page.  Let me

16 ask you to go to Page 24 of 40.

17     A.   Okay.

18     Q.   And this reflects an overview of

19 your -- you and your colleagues' findings as to

20 mood and social media use; is that right?

21     A.   The heading there is "Mood and Social

22 Media Use."

23     Q.   And in the second paragraph of that

24 discussion, it says:  Between-person correlations

25 of impacts on mood and objectively assessed social

Page 513

1  media use time are presented in Table 6.

2          These correlations suggest that

3  adolescents who reported that, on average, social

4  media had less of a positive impact on their mood

5  and more of a negative impact on their mood spent

6  more time on social media, on average, across days.

7          Did I read that correctly?

8      A.   You read that correctly.

9      Q.   And is that an accurate statement?

10     A.   That is accurate statement right there.

11     Q.   And then it goes on to say:  However,

12 correlation coefficients indicate only weak

13 associations.

14          Did I read that correctly?

15     A.   You did.

16     Q.   And is that an accurate statement?

17     A.   That's accurate as written there.

18     Q.   And then at the bottom of that same

19 paragraph, it says:  Thus, while we did observe

20 significant between-person associations, contrary

21 to H4a, no significant associations were found at

22 the within-person level.

23          Did I read that correctly?

24     A.   You read that correctly.

25     Q.   And is that -- is that an accurate

Page 514

1   statement --
2           MS. COUCH:  Objection.  Vague.
3   BY MS. JONES:
4       Q.   -- as to that particular finding in
5   your study?
6           MS. COUCH:  Same objection.
7           THE WITNESS:  That is a correct
8   sentence right there that you read, yes.
9   BY MS. JONES:
10      Q.   And so that means that when you were
11  evaluating adolescents participating in the study
12  and evaluating within-person associations in
13  particular, you found nothing; is that right?
14          MS. COUCH:  Object to the form.
15  Misstates the study.
16          THE WITNESS:  Let me look at the
17  results.
18  BY MS. JONES:
19      Q.   Sure.  Please.
20      A.   I think we are referring to Table 6
21  results.  Table 6 results are correlations among
22  time spent on social media and their indication of
23  how much did social media have a positive mood on
24  you and how much did social media have a negative
25  mood on you.  And the within-person correlation

Page 515

1   does not reach statistical significance.
2       Q.   Okay.  And so you all did not have a
3   finding of an association within-person -- in terms
4   of a within-person association between social media
5   use and mood, correct?
6           MS. COUCH:  Objection.  Vague.
7           THE WITNESS:  We did not find a
8   correlation between objectively measured time spent
9   on social media and the question:  How much did
10  social media have a positive impact on your mood?
11  BY MS. JONES:
12      Q.   Okay.  And I just want to make sure.
13  Are we saying different things?
14      A.   It's --
15          MS. COUCH:  Objection.  Vague.
16          THE WITNESS:  -- a slightly different
17  way of asking the question.
18          We're -- I'm being very specific about
19  the full question of what was asked to adolescents,
20  their subjective feeling of whether they think
21  social media had a positive impact or a negative
22  impact on their mood.
23  BY MS. JONES:
24      Q.   And the same question with respect to
25  how much did social media have a negative impact on

Page 516

1   your mood.
2           If we're looking at Page 23 of 40,
3   Table 6, there were questions about how much did
4   social media have a positive impact on your mood,
5   as you've referenced.
6       A.   Uh-huh.
7       Q.   Correct?  Yes?
8       A.   Yes.
9       Q.   And then there was also a question
10  about how much did social media have a negative
11  impact on your mood, correct?
12      A.   Yes.
13      Q.   And did that finding rise to the level
14  of statistical significance?
15      A.   That -- that association is not
16  significant at the within-person level.
17      Q.   Okay.  So there were -- and just the
18  nutshell version just for lay folks.
19      A.   Uh-huh.
20      Q.   When you say "within-person," you mean
21  what, specifically?
22      A.   Yeah.  So when we're talking about
23  between- and within-person analyses,
24  "between-person analyses" mean that we're comparing
25  adolescents -- groups of adolescents to each other.

Page 517

1           So an average, an adolescent -- one
2   adolescent who spends less time on social media
3   compared to an adolescent who spends more time on
4   social media, how much is that related on average
5   to these feelings of how much social media had a
6   positive or negative impact on their mood.
7           When we're talking about "within-person
8   analyses," we're talking about an adolescent
9   relative to themself and how much an increase or
10  decrease in objectively measured time spent on
11  social media across the 14 days of measurement, how
12  much that fluctuates within themselves with that
13  question of:  How much did social media have a
14  positive or a negative impact on your mood?
15      Q.   Okay.  And so as to either positive or
16  negative impact on an individual participant's mood
17  in this study, you all did not find an association,
18  correct?
19      A.   At the within-person level, that
20  analysis does not reach statistical significance.
21      Q.   Now, I know that this was -- was this
22  paper -- when was this paper submitted for review?
23      A.   I don't recall.
24      Q.   Was it before your expert report in the
25  JCCP was signed?

HIGHLIGHTED CONFIDENTIAL

Page 518

1    A.   I don't.

2    Q.   Do you know?

3    A.   I don't recall.

4    Q.   Okay.  Your -- I think your JCCP report

5  dated April 18th, 2025, does not discuss this

6  paper.  Am I recalling that correctly?

7        And just to be fully transparent, I

8  think it's discussed in your MDL report but not in

9  your JCCP report.  Does that --

10   A.   Yeah, I relied upon -- I think I went

11 back and made some corrections, including

12 referencing this citation.  I believe it is in the

13 JCCP report, and it was fixed for the MDL report.

14   Q.   In your JCCP report, did you report on

15 this specific finding from this very recently

16 submitted paper under review right now that there

17 was not a significant within-person association

18 found between objectively reported social media use

19 and positive or negative impact on mood?

20   A.   For the purposes of my report and this

21 specific publication, I was not reporting those

22 specific analyses but looking at the data that

23 helps us to understand how much adolescents are on

24 social media, how much time they spend on the

25 different platforms, how many notifications they're

HIGHLY CONFIDENTIAL

Page 519

1  getting, and how often they're picking up their

2  phones.

3        MS. JONES:  And my -- my question, I

4  think, was different.  So I'm going to move to

5  strike as nonresponsive.

6  BY MS. JONES:

7    Q.   My question was simply:  Did you

8  indicate in your report for the JCCP dated

9  April 18th, 2025, about the findings of this very

10 recently submitted manuscript that, among other

11 things, reports that:  We looked specifically

12 about -- at whether there was an association

13 between objectively measured social media use and

14 whether there was a negative or a positive effect

15 on mood, and the in-person -- the within-person

16 analysis did not find an association?

17       Did you report on that in your written

18 report in this case?

19       MS. COUCH:  Asked and answered.

20       THE WITNESS:  In my report, I relied on

21 this paper to discuss the frequency and quantity

22 with which adolescents are using social media,

23 including how often they're using social media, how

24 many notifications they're getting, and how often

25 they're picking up their phones.

HIGHLY CONFIDENTIAL

Page 520

1  BY MS. JONES:

2    Q.   Do you -- do you think that that

3  additional finding that you and your colleagues in

4  a very recently submitted paper found no

5  association is an important finding to communicate

6  as part of your overall analysis in your written

7  report?

8        MS. COUCH:  Objection.  Misstates the

9  paper.

10       THE WITNESS:  My overall report relies

11 upon all of the totality of the research, my

12 experiences working with adolescents and my teen

13 advisory board, the hundreds of other publications

14 that I have looked at and reviewed, all of the

15 publications that I have had.  This singular

16 finding does not change my opinions.

17 BY MS. JONES:

18   Q.   Well, I understand it doesn't change

19 your opinion.  My question was really:  Do you

20 think it is appropriate to include that finding

21 among the other things that you included in your

22 very expansive report?

23       MS. COUCH:  Asked and answered.

24 Argumentative.

25       THE WITNESS:  For the -- for the

HIGHLY CONFIDENTIAL

Page 521

1  purposes of my report and using this publication, I

2  relied on the publication for the descriptive data

3  showing the quantity with which adolescents are

4  using social media, including how frequently they

5  are picking up their phone, getting notifications

6  and spending time on the different platforms.

7  BY MS. JONES:

8    Q.   So you're not relying on this paper for

9  purposes of trying to determine whether there is an

10 association in either direction, positive or

11 negative, between objectively measured social media

12 use and reporting on mood effects --

13       MS. COUCH:  Objection.

14 BY MS. JONES:

15   Q.   -- in terms of within-person analysis?

16       MS. COUCH:  Objection.  Calls for legal

17 reasoning.

18       THE WITNESS:  All of the things that I

19 have relied upon contribute to my overall opinions.

20 BY MS. JONES:

21   Q.   That -- that -- that finding, that --

22 that's a -- the one that we talked about on Page 24

23 of 40, that is an accurate reporting of what you

24 and your colleagues found in this particular study?

25       MS. COUCH:  Objection.  Vague.

Page 522

1    THE WITNESS:  We accurately report that
2  the association between objective social media use
3  and adolescents' answer to the question of how good
4  or bad did social media make you feel is not
5  statistically significant at the within-person
6  level.
7  BY MS. JONES:
8    Q.  Let me ask you about one other thing in
9  this paper.  On Page 32 of 40 --
10    MS. JONES:  Actually, strike that.
11  BY MS. JONES:
12    Q.  Let me take a step back.
13    You -- when did -- you said you didn't
14  remember when this paper was submitted; is that
15  right?
16    A.  I don't recall, no.
17    Q.  Do you remember when it was kind of
18  finalized for purposes of submission as among you
19  and your co-authors?
20    MS. COUCH:  Objection.  Vague.
21    THE WITNESS:  I believe we -- we
22  submitted this paper, actually, years ago.
23  BY MS. JONES:
24    Q.  What does "years ago" mean?
25    A.  I don't recall the specific date,

Page 523

1  but...
2    Q.  Was it before or after 2023?
3    A.  I don't recall.  But it was years ago
4  when it was first submitted.
5    Q.  Okay.  Well, let me ask you about 32 of
6  40, the Page 32 of 40.  There is a conflict of
7  interest statement section in this manuscript,
8  correct?
9    A.  Correct.
10    Q.  And it says:  The authors declare there
11  is no conflict of interest regarding the
12  publication of this article, right?
13    A.  That's there, yes.
14    Q.  And what you told me yesterday about
15  the Flannery 2024 paper, I believe, if I'm
16  recalling correctly, was that you had not made a
17  conflict of interest disclosure but you probably
18  should have.
19    MS. COUCH:  Objection.  Misstates
20  testimony.
21  BY MS. JONES:
22    Q.  Is that what you told me yesterday?
23    MS. COUCH:  Same objection.
24    THE WITNESS:  I told you yesterday that
25  that paper was submitted and accepted prior to my

Page 524

1  full understanding of the scope of my work on this
2  and that I, in hindsight, should have submitted a
3  conflict of interest.
4  BY MS. JONES:
5    Q.  Okay.  Would you have the same view on
6  reporting on a conflict of interest in terms of
7  your paid litigation work for plaintiffs' counsel
8  in connection with this manuscript?
9    MS. COUCH:  Objection.  Calls for
10  speculation.
11    THE WITNESS:  Once the conflicts of
12  interest forms, when this is accepted at a journal,
13  come out, I will absolutely submit the conflicts of
14  interest.
15  BY MS. JONES:
16    Q.  Well, when you -- when -- do you know
17  if you had been retained by counsel when you filled
18  out this portion of the conflicts of interest
19  statement when it was submitted?
20    MS. COUCH:  Objection.  Calls for
21  speculation.
22    THE WITNESS:  I don't recall.
23  BY MS. JONES:
24    Q.  But it sounds like you're committing
25  today that when you eventually -- when this is

Page 525

1  eventually published somewhere that we are going to
2  see in the conflicts of interest statement that you
3  have disclosed --
4    A.  Absolutely.
5    Q.  -- that you have been retained for
6  litigation?
7    A.  I will absolutely disclose this to the
8  journal when it is accepted for publication.
9    Q.  Let me ask you to go to Page 7 of your
10  report.  And on Page 7 of your report, one of the
11  things that you say -- it's actually the last
12  bullet before your -- your "Professional Background
13  and Experience" section that starts with:
14  Parenting has changed with the advent of social
15  media.
16    A.  Uh-huh.
17    Q.  Do you see that?
18    A.  I do.
19    Q.  And at the end of that bullet, it says:
20  It is critical that tech companies fully inform
21  parents and children of the true risks of their
22  platform so that informed decisions can be made as
23  a family.
24    Do you see that?
25    A.  I do.

HIGHLY CONFIDENTIAL

Page 526

1    Q.   Are you offering -- I just wanted to
2  make sure we understood kind of the nature of your
3  opinions.
4    A.   Uh-huh.
5    Q.   Are you offering the opinion in this
6  case that the social media defendants involved in
7  the case need to provide some kind of warning to
8  parents or teenagers who are using their platforms?
9    A.   Based on discussions with parents and
10  teenagers, as well as much of the data that I
11  include at the end of the report about parent
12  experiences, understanding the risks and harms of
13  social media, not understanding and having the sort
14  of digital gap in their understanding of it,
15  they're coming to me very frequently, quite
16  frankly, fearful and not knowing what to do about
17  it, oftentimes uninformed and not even
18  understanding the scope of the risks.
19         It is my opinion that they need to be
20  informed about the risks and harms of social media
21  so that they can make informed decisions in their
22  parenting.
23    Q.   Sure.
24         And my question, just to be a little
25  bit more granular, is whether you are offering the

HIGHLY CONFIDENTIAL

Page 527

1  opinion that the defendants in this case, Meta,
2  YouTube, Snap, TikTok, need to provide a warning as
3  part of their platforms?
4         MS. COUCH:  Asked and answered.
5         THE WITNESS:  Parents are terrified and
6  don't feel that they have the tools to navigate
7  social media.  Many of them are unaware of the
8  harms, as I've talked about in here and much of the
9  data provided at the end of my report.
10         Parents are scared but don't have the
11  tools, don't have the awareness to navigate these
12  platforms.  And they should absolutely be informed
13  of those risks so that they can navigate their
14  parenting effectively.
15  BY MS. JONES:
16    Q.   Informed by who?
17    A.   It would be great if the tech companies
18  were fully informing parents of all of the risks of
19  their platforms.
20    Q.   And are you offering a specific opinion
21  on that point, that tech companies need to be fully
22  informing parents by way of a warning of all of the
23  risks of their platforms?
24         MS. COUCH:  Asked and answered.
25         THE WITNESS:  I'm saying that parents

HIGHLY CONFIDENTIAL

Page 528

1  are coming to me in discussions terrified about how
2  to navigate social media.  They feel uninformed.
3  They don't know how to navigate it.  They're seeing
4  the risks.
5         The data that I report in the end of my
6  report on parenting shows they don't know what is
7  happening.  And it is my opinion that it is
8  critical that they are fully informed about the
9  risks of these platforms so that they can make
10  informed decisions as parents.
11         MS. JONES:  I'm going to move to strike
12  as nonresponsive, with respect, because we're all
13  on a clock here.
14  BY MS. JONES:
15    Q.   Have you, as part of your work in this
16  case -- I didn't see it in your report -- actually
17  created a specific warning that you think needs to
18  be associated with any of the platforms that are at
19  issue in this litigation?
20    A.   That is out of the scope of my work.
21    Q.   Have you ever had any involvement in
22  creating a warning of any kind for any kind of
23  product?
24    A.   That is out of the scope of my work.
25    Q.   Have you ever worked with any kind of

HIGHLY CONFIDENTIAL

Page 529

1  government agency or regulatory body on developing
2  a warning for any type of product?
3    A.   We're working right now with the entire
4  school districts across North Carolina to collect
5  data across thousands of adolescents in order to
6  work with them to help make guidelines for
7  technology use in schools.
8    Q.   Anything beyond that?
9    A.   Not that I can think of.
10    Q.   Are you aware of any technology
11  company, whether a social media company or some
12  other type of media company, that provides a
13  warning of some sort?
14    A.   I think that's too broad.  I'm not
15  sure.
16    Q.   You don't know?  Okay.  Well, let me
17  give you an example.
18         There are, for example, video-streaming
19  services like Netflix or Amazon Prime or Apple TV
20  that show video content, yes?
21    A.   Can you ask that -- reask that?  I
22  don't know what you're asking.
23    Q.   Are you not aware of the existence of
24  Netflix?
25    A.   I'm aware of the existence of Netflix.

Page 530

```
 1      Q.   And Apple TV?
 2      A.   And Apple TV.
 3      Q.   And Amazon Prime?
 4      A.   Amazon Prime.
 5      Q.   And you understand that all those
 6  platforms show video content of various kinds?
 7      A.   Sure.
 8      Q.   Movies?
 9      A.   Movies.
10      Q.   Television shows?
11      A.   Yes.
12      Q.   And you understand that on platforms,
13  including those, including some others, that there
14  is a way to have an autoplay function; that once
15  you finish one episode of a television show,
16  something else will automatically start playing?
17      A.   I'm aware of that.
18      Q.   Okay.  And some people, including
19  teenagers, spend hours a day watching
20  video-streaming services, correct?
21          MS. COUCH:  Objection.  Assumes facts
22  not in evidence.
23          THE WITNESS:  I would have to see the
24  data.
25  BY MS. JONES:
```

Page 531

```
 1      Q.   Do you know?
 2      A.   Not off the top of my head.
 3      Q.   Okay.  If that were the -- well, if
 4  that were the case, do you think there should be a
 5  warning on that?
 6          MS. COUCH:  Objection.  Calls for
 7  speculation.
 8          THE WITNESS:  I would have to see the
 9  full research in order to determine that.
10  BY MS. JONES:
11      Q.   You're not -- I'm not suggesting
12  that there should be a warning associated with
13  video-streaming services, it sounds like?
14          MS. COUCH:  Same objection.
15          THE WITNESS:  I'm not speculating to
16  what these other platforms or video-, TV-streaming
17  services should do.
18  BY MS. JONES:
19      Q.   Did you know that the three platforms
20  that we are talking about, video-streaming
21  platforms and others like them, use notifications
22  to alert folks who might subscribe to them to new
23  movies or shows or episodes?  Did you know that?
24          MS. COUCH:  Objection.  Calls for
25  conjecture.
```

Page 532

```
 1          THE WITNESS:  Did I know what?  Sorry.
 2  BY MS. JONES:
 3      Q.   Did you know --
 4      A.   That these platforms --
 5      Q.   Let me ask the question again.
 6          Did you know that the three platforms
 7  that we're talking about, video-streaming platforms
 8  and others like them, use notifications to alert
 9  users to new movies and television shows and
10  episodes of different television shows?  Did you
11  know that?
12          MS. COUCH:  Same objection.
13          THE WITNESS:  I'm sorry.  You're --
14  you're asking about, like, Amazon Prime and
15  Netflix?
16  BY MS. JONES:
17      Q.   Yeah.
18      A.   I don't know.
19      Q.   Okay.  Cell phones themselves, do you
20  own a cell phone?
21      A.   I do.
22      Q.   What kind of cell phone?
23      A.   An iPhone.
24      Q.   Okay.  Cell phones provide all kinds of
25  notifications to people who carry them, right?
```

Page 533

```
 1          MS. COUCH:  Objection.  Outside the
 2  scope.
 3          THE WITNESS:  My iPhone has the
 4  possibility of notifications on it.
 5  BY MS. JONES:
 6      Q.   Okay.  Including -- and if a teenager
 7  has an iPhone, that iPhone may well be equipped to
 8  provide text and call notifications, right?
 9      A.   Generally speaking, iPhones can send
10  notifications about texts.
11      Q.   And those -- those notifications could
12  interrupt studying or school or sleeping?
13          MS. COUCH:  Objection.  Calls for
14  conjecture.
15          THE WITNESS:  That's speculative and
16  beyond the scope of what I am talking about in my
17  report.
18  BY MS. JONES:
19      Q.   You don't know?
20      A.   I -- as I said, it's speculative.
21  Phones -- phones certainly have notifications.
22      Q.   All right.  And your own research shows
23  that for some students non-social media smartphone
24  use is equal to or greater than social media
25  smartphone use; isn't that right?
```

Page 534

1      A.   I would have to see the specific
2   example.
3      Q.   You don't know that, sitting here
4   today?
5      A.   In order to confirm what you're saying,
6   I need to see the example.
7      Q.   Cyberbullying can occur on cell phones
8   through text messaging and on Reddit forums and in
9   other platforms beyond social media, correct?
10          MS. COUCH:  Objection.  Compound.
11          THE WITNESS:  You're saying -- you're
12   asking if cyberbullying can occur on other
13   platforms?
14   BY MS. JONES:
15      Q.   Yes.
16      A.   Cyberbullying can occur on other
17   platforms.
18      Q.   Are you offering an opinion that
19   smartphones should carry a warning of some kind?
20      A.   That is not part of my opinion.
21      Q.   Are you offering an opinion that the
22   iMessage app should carry a warning of some kind?
23      A.   I'm not making opinions beyond what are
24   in here, in my report.
25      Q.   What about a forum like Reddit?

Page 535

1      A.   I'm not speculating on other platforms
2   in my report.
3      Q.   Dr. Telzer, let me ask you to go to
4   what we're going to mark as Exhibit Number 25.  I'm
5   going to hand it to you.  I apologize.  You don't
6   have it.
7          (TELZER EXHIBIT 25, Document titled
8   "Addiction" to Facebook:  A Literature Review,
9   Bates META3047MDL-005-00000001-13, was marked for
10   identification.)
11   BY MS. JONES:
12      Q.   And Exhibit Number -- if you remember,
13   Exhibit Number 25 is an example of one of the
14   company documents for Meta platforms that you cite
15   in your written report.
16          And if you -- I'm happy to show you
17   the -- the page, if it's helpful.
18      A.   Yes, I would like to see the page.
19      Q.   Yeah, sure.  Let me get the right page
20   so I can steer you to it.  Oh, 51, Ms. Antoine
21   kindly informs me.
22          And on Page 51, down at the bottom of
23   the page, there's a Footnote Number 10.
24          Do you see that?
25      A.   Yes.

Page 536

1      Q.   And one of the citations is to what I
2   think I described to you yesterday -- this is a
3   lawyer terminology -- a Bates number that starts
4   with "TIKTOK."
5          Do you see that?  In the report, sorry.
6      A.   Yes.
7      Q.   The first item at 10 is "TIKTOK."  And
8   then the second document is the document that I've
9   just showed you, META3074MDL.  And it ends with
10   005, and the last -- very last number is 1, yes?
11      A.   Yes.
12      Q.   And do you recognize that reference at
13   Footnote 10 in your written report to be the
14   document that I've handed you as Exhibit Number 25?
15      A.   Sorry.  I'm having trouble connecting
16   the two with those two numbers.  Can you help me
17   understand?
18      Q.   Sure.  Yeah, yeah, yeah.  Sure.
19          If you look at the number that you cite
20   at Footnote 10 --
21      A.   Yep.
22      Q.   -- of your report.
23      A.   Yeah.
24      Q.   Down at the bottom --
25      A.   Oh, I see.

Page 537

1      Q.   -- of Exhibit Number 25, there is --
2   again, lawyer term -- a Bates number that, if you
3   check it, should correspond to that number.
4      A.   Yes.  I was looking at the wrong
5   number.  I see that now.  Yes.
6      Q.   No, that's fair.  And you specifically
7   cite that document -- I'm just getting myself to
8   the right point.
9          If you look at the reference up earlier
10   in the text itself, you cite that document in
11   support of a sentence that says:  YouTube's
12   internal documents demonstrate that "a feed in a
13   teen session can have a high volume of videos that
14   repeat the same message."  Meta and ByteDance
15   studies reflect similar conclusions as well.
16          Do you see that?
17      A.   Uh-huh.
18      Q.   You have to say "yes" or "no."
19      A.   Yes.  Sorry.
20      Q.   That's okay.  And I want to ask you
21   about your treatment of this particular document,
22   Number -- excuse me -- Exhibit Number 25.
23      A.   Yes.
24      Q.   Do you feel -- actually, let's start
25   with just kind of some level-setting.

Page 538

1       At the top of Exhibit Number 25, you
2  see that that refers to ██████████, yes?
3       A.  Uh-huh.  Yes.
4       Q.  And do you know who ████████
5  is?
6       A.  I don't recall.
7       Q.  Do you know anything about what his
8  role was at the company?
9       A.  I don't recall.
10      Q.  Okay.  And so just so I understand and
11  we generally understand, in terms of this document,
12  you're just reading the words on the page.  You're
13  not saying that you know what ████████████
14  was thinking at the time, right?
15      A.  In the context of this paper, I'd be
16  reading, yes, what's on this paper.
17      Q.  You were just reading the words.  Okay.
18      So let me, actually, talk about a
19  couple of things that you didn't specifically cite
20  in your report, if I could.
21      And you -- you should hold on to your
22  report because I wanted to refer you to what you
23  specifically quote at Footnote 10.
24      You say:  "If algorithms favor content
25  or functionality that encourages people to spend

Page 539

1  more time on Facebook, then it's possible that" --
2  excuse me -- "then it's possible that this will, by
3  its nature, tap into addictive mechanisms."
4  Correct?
5       A.  I see that, yes.
6       Q.  All right.  And then you did not
7  actually include, in terms of fully describing what
8  is reflected in this document, Exhibit Number 25,
9  what Mr. ████████ said, right?
10      A.  I need to rereview the -- the document.
11  I did not include the entire document there.
12      Q.  Well, let -- let me just ask you about
13  a couple of items.  You see that there is a section
14  entitled "Limitations/Notes"?
15      A.  I see that.
16      Q.  And in the second bullet, he says:
17  I'll use "addiction" as a brief term for this
18  spectrum of problematic use of Facebook, but it's
19  not clear that "addiction" is the correct term.
20      Do you see that?
21      A.  I see that.
22      Q.  We may want to adopt a more generic
23  term going forward.
24      Did you include that language anywhere
25  in your report?

Page 540

1       A.  That is not in my report.
2       Q.  Okay.  And then if you go to the third
3  page, under the FAQ section?
4       A.  Uh-huh.
5       Q.  About midway down, it says:  Are
6  algorithms to blame?
7       Do you see that?
8       A.  I do.
9       Q.  And that's where you're pulling this
10  quote from -- that's referred to in Footnote 10,
11  correct?
12      A.  Yes.  Correct.
13      Q.  So -- so Mr. ████████ wrote in
14  this document:  Are algorithms to blame?
15      You included one sentence in his
16  response, but you didn't include the entirety of
17  his response, right?
18      A.  That is correct.
19      Q.  You did not include the first part of
20  his answer, which says?  Research hasn't addressed
21  this.  Correct?
22      A.  Correct.
23      Q.  And you also did not include the part
24  where he said:  The result could be to make
25  addictive/compulsive usage more severe and more

Page 541

1  widespread.  But none of the above studies have
2  examined this in any way.  Right?
3       A.  That is what that says right there,
4  yes.
5       Q.  You did not quote those additional
6  portions of Mr. ████████ answer in the
7  reference that you have in your report, correct?
8       A.  Correct.
9       Q.  Are you certain -- are there other
10  examples of company documents that you have
11  excerpted in that way?
12      MS. COUCH:  Objection.  Broad.
13  Argumentative.
14      THE WITNESS:  I am not sure.
15  BY MS. JONES:
16      Q.  How did you decide what you were going
17  to quote or not quote in your report?
18      A.  I'm not sure.
19      Q.  Let me wrap up because I have to pass
20  you along to my colleagues here, so we'll take a
21  break before we do that.
22      You don't have a degree in computer
23  science; is that right?
24      A.  I do not have a degree in computer
25  science.

Page 542

1    Q.  Have you -- do you have any expertise
2  in reading or understanding code for a social media
3  platform?
4    A.  I do not understand the code of a
5  social media platform.
6    Q.  Have you ever designed an -- an
7  application of any kind?  A digital media
8  application?
9    A.  I have not designed a digital media
10 application.
11   Q.  Have you ever been involved in the
12 design of an algorithm?
13   A.  I have not been involved in the design
14 of an algorithm.
15   Q.  Have you reviewed the source code for
16 the algorithm for -- that's used by any of the
17 defendants in this case?
18   A.  I have not reviewed their source code.
19   Q.  And you don't have the -- in fairness
20 to you, you have qualifications for many things.
21      But you don't have the qualifications
22 necessary to go and look at the underlying source
23 code for the algorithms that might be associated
24 with any of the defendants' platforms, correct?
25   A.  I could not look at source code for an

Page 543

1  algorithm, no.
2       MS. JONES:  Why don't we take a break.
3  I think somebody else is going to be here when we
4  get back.
5       THE WITNESS:  Okay.
6       THE VIDEOGRAPHER:  Going off the
7  record.  The time is 11:02 a.m.
8             * * *
9       (Whereupon, there was a recess in the
10 proceedings from 11:02 a.m. to 11:21 a.m.)
11            * * *
12      THE VIDEOGRAPHER:  Going back on the
13 record.  The time is 11:21 a.m.
14            * * *
15           EXAMINATION
16 BY MS. EHLER:
17   Q.  Hi, Dr. Telzer.  I'm Rose Ehler.  I'm
18 an attorney for Snap in these cases.  Thank you for
19 your time.
20      So we covered this a little bit
21 yesterday.  But I wanted to make sure that as it
22 relates to Snap in particular, your opinions
23 regarding Snapchat and Snap are disclosed in your
24 April 18's JCCP report for purposes of this JCCP
25 case; is that right?

Page 544

1       MS. COUCH:  Objection.  Calls for legal
2  reasoning.
3       THE WITNESS:  I'm not sure what you
4  mean by my opinions on Snap are "disclosed."
5  BY MS. EHLER:
6    Q.  The opinions that you're offering in
7  this case regarding Snapchat, you set those out in
8  writing in that report, right?
9       MS. COUCH:  Objection.  Calls for legal
10 reasoning.
11      THE WITNESS:  All --
12      MS. COUCH:  I don't --
13      THE WITNESS:  Sorry.
14      MS. COUCH:  Let me just make a very
15 quick objection.  I don't want to get into it.
16      I think we know that there is a dispute
17 before the Court on Monday in the CMC statements.
18      MS. EHLER:  Great.  I just want the --
19      MS. COUCH:  Our position is stated
20 there.  And so my objection from here on out, I'll
21 just say, "Objection.  Calls for legal reasoning,"
22 but it would include that.
23      MS. EHLER:  Great.
24      MS. COUCH:  Okay.
25      MS. EHLER:  I'm just asking for the

Page 545

1  witness's testimony as to your understanding of the
2  opinions that you're offering as it relates to
3  Snapchat.
4  BY MS. EHLER:
5    Q.  Do you have any opinions that are not
6  outlined in writing in your report?
7    A.  I'm not sure I understand what you're
8  asking.  All of my opinions are outlined in my
9  report right here.
10   Q.  That's all I'm asking.
11   A.  Okay.
12   Q.  It's not a trick question.
13   A.  Yeah.
14   Q.  Just trying to figure out that if
15 there's -- your report is silent on something or
16 there's not something in your report, there isn't
17 some lurking secret opinion that, sitting here
18 today, you're aware of.
19      MS. COUCH:  Objection.  Vague.
20      THE WITNESS:  I don't have secret
21 opinions, no.
22 BY MS. EHLER:
23   Q.  Great.  That's it.
24      Do you know Dr. Nick Allen at the
25 University of Oregon?

Page 546

```
1        A.   Yes.
2        Q.   Do you hold him in high regard?
3        A.   Yes.
4             MS. COUCH:  Objection.  Vague.
5             THE WITNESS:  Sorry.
6   BY MS. EHLER:
7        Q.   Did you read his expert reports in this
8   case?
9        A.   I looked at them, yes.
10       Q.   This follows from our prior discussion,
11  but you don't have any specific opinions in
12  responding to what he wrote other than what you set
13  forth in your report, correct?
14       A.   I may have specific responses.  I
15  didn't prepare those for today, no.
16       Q.   That's fine.
17            Sitting here today, is there anything
18  in particular you would like to respond to Dr. Nick
19  Allen?
20       A.   Not at this point, no.
21       Q.   What is your salary as a professor at
22  UNC?
23            MS. COUCH:  Objection.
24  BY MS. EHLER:
25       Q.   It can be ballpark --
```

Page 547

```
1             MS. COUCH:  It could be harassment.
2   BY MS. EHLER:
3        Q.   -- amount you make.
4        A.   I have what's called a "nine-month
5   salary"; and on top of that, summer salary; and on
6   top of that, a stipend.
7        Q.   That's very helpful.
8             On an annual basis, about how much of
9   that total?  Too, I'm not trying to get into
10  specifics.  Just trying to get a rough sense.
11            MS. COUCH:  Objection.  Calls for
12  speculation.
13            THE WITNESS:  I can't give you the
14  exact number off the top of my head.
15  BY MS. EHLER:
16       Q.   If somebody asked you, "About how much
17  do you make a year?" what would you tell them?
18       A.   It depends, because I have a nine-month
19  salary, all of which is publicly available, if you
20  looked it up, as well as summer salary and some
21  stipends on top of that.
22       Q.   Okay.  We didn't.  For 2024, do you
23  know about -- about how much you made?
24       A.   I don't.
25       Q.   You have no idea?
```

Page 548

```
1        A.   I don't know.
2        Q.   But we could look that up?
3        A.   You can look that up.
4        Q.   Yesterday, you talked about how your
5   opinions regarding the harms of social media have
6   evolved in recent months, and I think you used the
7   phrase "there was sort of mounting evidence."  Do
8   you recall that testimony?
9        A.   I don't recall --
10            MS. COUCH:  Same objection.
11            THE WITNESS:  I'm sorry.
12            MS. COUCH:  Go ahead.
13            THE WITNESS:  I don't recall exactly
14  that.
15  BY MS. EHLER:
16       Q.   Okay.  But the opinions you hold
17  regarding social media as set forth in your report,
18  you expressed that those had -- you'd become more
19  confident in those in recent time, no?
20       A.   I would say that my opinions in here
21  are based upon a totality of all of this research,
22  which is over a decade of experience in the field,
23  doing the research, talking to adolescents, talking
24  to parents, going into schools, conducting fMRI
25  research, looking at all of the underlying defense
```

Page 549

```
1   documents, as well as looking at the broader
2   literature.  And all of those inform my decision or
3   my opinions put forth in my report.
4        Q.   Okay.  And those have never changed?
5        A.   My opinion --
6             MS. COUCH:  Objection.  Speculative.
7             Go ahead.
8             THE WITNESS:  My opinions are what I
9   have here.
10  BY MS. EHLER:
11       Q.   Okay.  My question was different.
12            My question was whether or not they've
13  evolved or changed in recent months.  And I was
14  just -- that is what I understood you to testify to
15  yesterday.  But if that's not the case, that's
16  fine.
17            Just trying to get an answer to my
18  question of whether your opinions have changed more
19  recently or you've always held those opinions that
20  are set forth in your report.
21            MS. COUCH:  Objection.  Vague.
22  Speculative.
23            THE WITNESS:  The opinions that I set
24  forth in my report are based upon the research that
25  I have done over decades, as well as reading the
```

Page 550

1  literature, as well as looking at the underlying
2  defense documents.  And those informed the opinions
3  that I set forth in this report.
4  BY MS. EHLER:
5       Q.  As of the date of that report?
6       A.  That is the date that that report was
7  submitted.
8       Q.  Okay.  Have you specifically reached
9  out to any public health official or authorities to
10  share the opinions -- not anything that's highly
11  confidential, but the opinions at a general level
12  set forth in your report?
13      A.  I've probably talked to public health
14  individuals, yes.
15      Q.  Who?
16      A.  I've given lots of talks across the
17  nation in medical settings, in school settings
18  where public health individuals may be present and
19  hearing the research that I do.
20          I present very regularly showing that
21  social media is changing the developing brain and
22  have presented that to hundreds of audiences,
23  ranging from medical professionals to public health
24  individuals to adolescents and teachers.
25      Q.  My question is different.

Page 551

1          Do you -- do you specifically reach out
2  to any public health authorities or officials to
3  tell them about the concerns that social media is
4  harming adolescents' mental health?
5          MS. COUCH:  Asked and answered.
6          THE WITNESS:  I have given lots of
7  talks to these communities, ranging from doctors
8  and clinicians to public health individuals to
9  teachers and teenagers, discussing many of the
10  harms of social media, including that social media
11  is changing the developing brain.  And that is a
12  consistent message that I discuss across hundreds
13  of talks and populations and individuals that I
14  communicate with.
15          MS. EHLER:  I'll move to strike as
16  nonresponsive.
17  BY MS. EHLER:
18      Q.  My question is:  Have you specifically
19  reached out to public health authorities for the
20  express purpose -- not that they may have been in
21  the audience of a talk -- for the express purpose
22  of telling them about the conclusions that social
23  media harms mental health -- adolescents' mental
24  health?
25          MS. COUCH:  Asked and answered.  Vague.

Page 552

1          THE WITNESS:  I have given and
2  communicated with and talked to many audiences and
3  expressed that social media causes harms and that,
4  in particular, there are effects of social media in
5  changing the brain across adolescent development.
6  BY MS. EHLER:
7       Q.  You know you're not answering my
8  question, right?
9       A.  I'm answering your question.
10          MS. COUCH:  Objection.  Argumentative.
11  BY MS. EHLER:
12      Q.  I just want to know if -- if you are
13  aware that I asked a different question than the
14  question you keep answering.  Are you aware of
15  that?
16          MS. COUCH:  Objection.  Argumentative.
17          THE WITNESS:  I'm answering your
18  question.
19  BY MS. EHLER:
20      Q.  You're not.
21          MS. COUCH:  Argumentative.  But not a
22  question pending, so I guess no objection.
23  BY MS. EHLER:
24      Q.  Do you have any names of specific
25  public health authorities that you have spoken with

Page 553

1  directly on the issues outlined in your report?
2       A.  Not off the top of my head.
3       Q.  Do you know who the current U.S.
4  Surgeon General is?
5       A.  I don't think I know his name or her
6  name or their name.
7       Q.  So I take it you haven't reached out to
8  that person, correct?
9       A.  I have not talked to that person.
10      Q.  You spoke yesterday about adolescents
11  that have self-reported to you that they're
12  addicted to social media.  Do you remember that
13  testimony?
14      A.  I've had lots of adolescents come and
15  talk to me about social media addiction.
16      Q.  Great.  Those are the people I'm
17  talking about.  Have you told any of those
18  individuals to seek professional treatment for
19  their addiction?
20      A.  I have lots of advice that I have given
21  teenagers, ranging from helping them to identify
22  problematic use that they may have, to using and
23  having better tools to navigate social media in a
24  healthier way, if they can, to completely delaying
25  and not using social media.

Page 554

1    Q.   Is that a "no" to my question, which is
2  whether you've specifically told any of those
3  individuals to seek professional treatment for
4  their addiction?
5    A.   In my role as a scientist, I disclose
6  and discuss the scientific findings and the advice
7  that I can give based on that science, which
8  includes screening tools and advice on problematic
9  social media use and ways of helping them navigate
10 social media in a way that could help them not have
11 such high levels of addiction -- addictive
12 behavior, as well as to avoid it altogether.
13    Q.   Is that a "no" to the answer -- is that
14 a "no" as the answer to my question?
15    MS. COUCH:   Asked and answered.
16    THE WITNESS:   As I said, as a scientist
17 and researcher, my role in talking to adolescents
18 is discussing the science to them and the tools
19 that I can provide them based on the broader
20 literature, including tools for identifying
21 problematic social media use as well as ways to
22 navigate social media use in a way to try to
23 minimize the addictive nature of it and avoiding it
24 altogether.
25    MS. EHLER:   I'll move to strike,

Page 555

1  respectfully, as nonresponsive.
2    And I'll just note for the record and
3  for your counsel that if we do need to seek more
4  time, all of these answers are going before the
5  judge, because it's using up the time that we
6  agreed to, on nonresponsive answers.
7    MS. COUCH:   I'm comfortable with her
8  responses.  I think she is listening to your
9  question.
10    MS. EHLER:   Great.
11    MS. COUCH:   I think she's giving a full
12 answer.  You've had 11 hours.  Go forth.
13 BY MS. EHLER:
14    Q.   Can you answer "yes" or "no" to the
15 question whether you have advised any particular
16 individual of the teens in your studies who
17 self-reported to be addicted to social media that
18 they should seek professional treatment?  Can you
19 answer "yes" or "no" to that question?
20    MS. COUCH:   Objection.  Vague.
21 Misstates her testimony.
22    THE WITNESS:   As a scientist and a
23 researcher, when I am talking to adolescents who
24 express social media addiction, I tell them about
25 the tools and scientific findings that we have and

Page 556

1  ways to identify problematic use to screen for that
2  to avoid some of the addictive features of social
3  media and to avoid social media altogether.
4  BY MS. EHLER:
5    Q.   Great.
6    MS. EHLER:   And I will just note for
7  the record a motion for sanctions on that
8  particular answer.
9    MS. COUCH:   You can make your motion in
10 writing.
11    I think she answered it.  You're asking
12 her what advice she has given to --
13    MS. EHLER:   Well --
14    MS. COUCH:   Well, actually, she never
15 said she gave advice to people in her study.  So
16 that was the misstatement objection.
17    MS. EHLER:   Counsel.  Counsel, there's
18 not a question pending, and that's not an
19 objection.
20    MS. COUCH:   I know.  But I'm
21 entitled --
22 BY MS. EHLER:
23    Q.   Have you --
24    MS. COUCH:   -- to respond to make my
25 record, too.

Page 557

1    MS. EHLER:   Fair enough.
2  BY MS. EHLER:
3    Q.   Have you recommended to any of the
4  teens in your studies who self-reported that
5  they're addicted to social media that they should
6  bring a lawsuit against Snap or the other platforms
7  in this case?
8    A.   I have not discussed that with
9  adolescents.
10    Q.   Do you believe that social media should
11 be banned?
12    A.   I believe, in the current state of
13 social media and the current features that there
14 are, that social media is unsafe for adolescents.
15    In its current state, it is not safe.
16 I don't think it is likely a feasible or possible
17 thing to ban it.  But I don't think that
18 adolescents at any age or for any reason should be
19 on social media.
20    Q.   Is that a "yes"?
21    MS. COUCH:   Objection.  Misstates her
22 answer.
23    THE WITNESS:   As I said, in its current
24 form I believe that social media is unsafe for
25 adolescents given all of the features that make it

Page 558

1  an unhealthy, unsafe environment for them.
2       I don't believe it is necessarily
3  possible to implement bans, and therefore I think
4  no adolescent should be on social media.
5  BY MS. EHLER:
6       Q.   What about adults?  Do you think social
7  media should be banned for adults?
8       A.   I think social media is unhealthy and
9  unsafe at any age, especially for adolescents.  I
10 don't recommend adults to be on it either.
11      Q.   You mentioned earlier that you have a
12 Snapchat account; is that right?
13      A.   Yes.
14      Q.   What is the username or handle or --
15      A.   I don't recall.
16      Q.   You don't recall?
17      A.   I don't recall.
18      Q.   When was the last time you used it?
19      A.   A few days ago.
20      Q.   And you don't recall your name?
21      A.   I don't recall.
22      Q.   How long in total number of hours have
23 you spent using Snapchat?
24      A.   A couple hours.
25      Q.   Total?

Page 559

1       A.   Uh-huh.
2       Q.   Were those in the last few days?
3       A.   Over the last couple weeks.
4       Q.   Before the last couple of weeks, had
5  you never used Snapchat before?
6       A.   No, I had not.
7       Q.   Have you used Snapchat to send a Snap
8  or a chat to someone else?
9       A.   I have not.
10      Q.   Have you used Snapchat to view a story
11 or any other video on Snapchat?
12      A.   I have.
13      Q.   Have you ever used a Snapchat filter?
14      A.   I have.
15      Q.   Have you ever had a Streak with a
16 friend on Snapchat?
17      A.   I have not.
18      Q.   Have you viewed ephemeral content on
19 Snapchat?
20      A.   I have.
21      Q.   What was the ephemeral content you
22 viewed?
23      A.   The stream of -- of -- I looked through
24 the streams of videos that are on there.
25      Q.   And did you believe those to be

Page 560

1  ephemeral?
2       A.   Sure.
3       Q.   Did your use of Snapchat in -- for a
4  few hours in the last couple of weeks harm your
5  mental health?
6            MS. COUCH:  Objection.  Vague.
7            THE WITNESS:  I don't know how Snapchat
8  affected my mental health.
9  BY MS. EHLER:
10      Q.   So then, I take it, you didn't seek any
11 professional help or anything as it related to that
12 usage of Snapchat?
13      A.   I did not seek professional help.
14      Q.   I apologize for the personal question,
15 but I wanted to confirm.  You're not a parent of a
16 teenager, correct?
17      A.   I'm not a parent of a teenager.
18      Q.   Based on your use of Snapchat in the
19 last few weeks, when a -- are you aware of what a
20 user sees when they open the Snapchat app?
21      A.   Based on my exploration of the app
22 myself, I have a general understanding of how and
23 what users see.
24      Q.   What is that when you first open the
25 app?  What does the user see?

Page 561

1       A.   There is the little emoji person,
2  whatever you call them, that you've developed.
3  There is a screen where you can create selfies.
4  There's the geolocation map.  There is, along the
5  bottom, little things to see the videos -- the
6  video streaming.
7       Q.   And you said it opens to a -- something
8  you can create selfies.  By that, do you mean a
9  camera?
10      A.   I believe so.
11      Q.   Do you know why it opens to a camera?
12      A.   I can't speculate on why it opens to a
13 camera.
14      Q.   You said that you haven't used the
15 Snapchat feature "Streaks."  Can you give me a
16 rough sense of how -- how you understand that
17 feature to work?
18      A.   Yeah, sure.  So from my understanding
19 of reading a lot of the internal documents,
20 adolescents are sending each other messages.  Those
21 need to be kept up on a daily basis in order to
22 keep those Streaks.
23           Adolescents are striving for higher
24 Streaks.  I've read internal documents that
25 adolescents who are losing their Streaks are

Page 562

1  writing to Snap indicating that they are suicidal
2  and want those Streaks back.
3      Q.   Are you aware that a user has to
4  initiate and pursue a Streak with another
5  individual, like a friend?
6           MS. COUCH:  Objection.  Vague.
7           THE WITNESS:  I don't know what you
8  mean by that.
9  BY MS. EHLER:
10     Q.   Do you think it just happens
11 automatically?
12          MS. COUCH:  Objection.  Vague.
13          THE WITNESS:  I think that adolescents
14 are striving for those Streaks.  That is a
15 rewarding feature of the design.
16 BY MS. EHLER:
17     Q.   Right.  And my question is about the
18 design.  Do you think it happens automatically when
19 users are communicating with each other, or do you
20 think it's something a user needs to initiate?
21          MS. COUCH:  Objection.  Vague.
22          THE WITNESS:  I don't know if I
23 understand that.
24 BY MS. EHLER:
25     Q.   Okay.  How long does it take for a teen

Page 563

1  to maintain a Streak on any given day?
2      A.   I -- I think -- the broad understanding
3  I have is that they need to send a -- a message on
4  a daily basis.
5      Q.   How much time does that take?
6      A.   I have no idea how much time a message
7  takes.
8      Q.   Seconds?
9      A.   I can't speculate on how much time it
10 takes to send messages.
11     Q.   You said you sent -- oh.  No.  You said
12 you did not send.
13     A.   I did not.
14     Q.   Okay.  So you don't know if it's
15 seconds or minutes or hours?
16     A.   I have no idea how long it takes
17 adolescents to construct a -- a message.
18     Q.   Are you aware of other apps, besides
19 Snapchat and the other defendants in this case,
20 that use Streaks?
21     A.   I don't know about other platforms
22 beyond the ones we're talking about today.
23     Q.   Do you think that if there are other
24 apps that have a similar "Streaks" feature that
25 they would necessarily be harmful in the same way

Page 564

1  that you claim Snapchat is harmful here?
2           MS. COUCH:  Objection.  Vague.
3           THE WITNESS:  I can't speculate.
4  I'm sorry.
5           MS. COUCH:  Go ahead.
6           THE WITNESS:  I can't speculate on
7  things outside of the scope of what we're talking
8  about in these platforms.
9  BY MS. EHLER:
10     Q.   Have you ever used Duolingo?
11     A.   I don't know what that is.
12     Q.   Headspace?
13     A.   I don't know what that is.
14     Q.   Do you know what Spotlight is?
15     A.   I can't recall off the top of my head.
16     Q.   As it relates to Snapchat?
17     A.   It sounds familiar, but I can't recall
18 off the top of my head.
19     Q.   What about the Discover feature?
20     A.   I don't think I could describe it off
21 the top of my head.
22     Q.   Do you know if Snap's -- Snapchat has a
23 "like" feature?
24     A.   It's my understanding Snapchat, similar
25 to all the other platforms we're talking about

Page 565

1  today, share many of the same features, including a
2  feature where there is that quantification.
3      Q.   Do you know if those are publicly
4  visible on Snapchat?
5      A.   I don't know.
6      Q.   Do you know if there are other publicly
7  visible metrics --
8           MS. EHLER:  Strike that.
9  BY MS. EHLER:
10     Q.   Do you know the average age of a
11 Snapchat user?
12     A.   Not off the top of my head.
13     Q.   What do you think it is?
14          MS. COUCH:  Objection.  Calls for
15 speculation.
16          THE WITNESS:  I can't speculate or
17 guesstimate.
18 BY MS. EHLER:
19     Q.   Not relevant to your analysis?
20     A.   I -- I'm not going to make a
21 guesstimate here.
22     Q.   Do you know how much time Snapchat
23 users spend messaging versus engaging with other
24 aspects of the Snapchat platform?
25     A.   I don't know if I could give you a

HIGHLY CONFIDENTIAL

Page 566

1  specific number, no.
2       Q.   That's not something you studied?
3       A.   We've looked at the amount of time that
4  adolescents are spending on Snap.
5       Q.   But you don't have any research that
6  looks at what they're doing on Snapchat, whether
7  it's messaging or engaging with a different feature
8  on the platform?
9       A.   I don't think that we look at the data
10 in that way.  We're looking at our data in
11 social -- our social media much more broadly.  Most
12 of the work that we're doing is looking at these
13 features, very broadly speaking.  We're looking at
14 social media in adolescents' daily lives.  I'm not
15 necessarily looking at a specific feature of a
16 specific platform in my work.
17      Q.   So you don't know whether, as a general
18 matter, adolescents use Snapchat more for messaging
19 and more akin to an iMessage or for other purposes?
20          MS. COUCH:  Objection.  Vague.
21          THE WITNESS:  I don't know that, nor do
22 I think that it matters for my opinions in this
23 case.
24 BY MS. EHLER:
25      Q.   Do you believe that text messaging

HIGHLY CONFIDENTIAL

Page 567

1  negatively impacts teens' mental health?
2       A.   Text messaging as in a text messaging
3  app on a phone or messaging through a platform?
4       Q.   The -- using -- if someone's on an
5  iPhone and the iMessage native text messaging app?
6       A.   I think it probably could have a
7  negative mental health effect on an adolescent.
8       Q.   Do you think it's to the same degree as
9  Snapchat?
10      A.   I mean, I don't think I can speculate
11 about text messaging in this moment.  I'm, really,
12 in my opinions, focusing on the features and how
13 those features are fundamentally shaping
14 adolescents' experiences on these platforms.  I
15 don't think the text messaging is relevant here.
16      Q.   Well, with all due respect, you don't
17 get to decide what's relevant here.
18          And my question was whether you think
19 that text messaging impacts teens' mental health in
20 a negative way to the same degree as you hold the
21 opinion as it relates to Snapchat.  Do you have a
22 view on that question?  It's okay if you don't.
23          MS. COUCH:  Argumentative.  Compound.
24          THE WITNESS:  In the context of my
25 report and my opinions, the text messaging app is

HIGHLY CONFIDENTIAL

Page 568

1  not relevant to my opinions.
2  BY MS. EHLER:
3       Q.   Is that a "you don't have a view on
4  that, sitting here today"?
5       A.   As I indicated, in the context of my
6  report and my opinions, which are specific about
7  these social media apps and the features of those
8  social media apps, I am focusing on that today.
9       Q.   Okay.  Do you believe that online
10 communication has a positive effect on adolescents'
11 mental health?
12          MS. COUCH:  Objection.  Vague.
13          THE WITNESS:  That is a largely vague
14 question that would be hard to answer without more
15 specifics.
16 BY MS. EHLER:
17      Q.   More specifically, do you believe that
18 using an app to communicate with peers could
19 provide adolescents with a sense of social
20 connectedness?
21      A.   We do have data from my own lab showing
22 that in moments when adolescents are using
23 social -- social media to connect with friends,
24 they feel more connected.
25      Q.   And that's a positive thing, right?

HIGHLY CONFIDENTIAL

Page 569

1       A.   It can be a positive thing.  I think in
2  the handbook that I edited, we talk about how
3  social connection can sometimes be positive but it
4  can also be negative.
5       Q.   In the research that you've done on
6  this, which I think is Exhibit 23, the Garrett
7  paper from 2023 that we looked at earlier -- do you
8  recall this one?
9       A.   Yes.
10      Q.   -- did you note any ways in which -- or
11 do you recall, sitting here today, noting any ways
12 in which using social media apps for social
13 connectedness would be a negative thing?
14      A.   I'd have to go back through to see if
15 we qualified anything about social connection
16 beyond saying that the findings show that they're
17 socially connected.
18          MS. COUCH:  And you said Exhibit 23,
19 Rose?
20          MS. EHLER:  Yeah.
21 BY MS. EHLER:
22      Q.   Would you agree that social
23 connectedness provides adolescents with
24 companionship, belonging, a sense of affiliation
25 within the context of their social environment?

Page 570

1        A.   I would say, in the context of this
2   study, we can't speculate to what social connection
3   means in all of those domains.
4        Q.   Is one of the findings of that study
5   that digital communications can be leveraged to
6   support adolescents' social well-being?
7        A.   Can you point me to that?
8        Q.   Sure.  Page 1232.  It's the paragraph
9   on the -- are you on 1232?
10       A.   Yes.
11       Q.   So it's about halfway through the
12  paragraph in the top right -- sorry -- top left of
13  that page.
14            There's a sentence that says:  In line
15  with other recent studies, our results suggest
16  these digital modes of communication may be
17  leveraged to support increased social
18  connectedness.
19       A.   One minute.  I'm not finding that
20  sentence.  It starts with "In line"?  Oh, I see
21  that.  I see it.  Sorry.  I see that.  Yes.
22       Q.   Does that conclusion apply to text
23  messages?
24       A.   I need to read this in the broader
25  context, please.  I feel like there's more nuances

Page 571

1   here that are important to go into.
2        Q.   Your attorney can ask you about those
3   nuances.
4            My question is simply whether the
5   conclusions that we just talked about regarding
6   suggesting that digital modes of communication can
7   be leveraged to support increased social
8   connectedness applied to text messages.
9            MS. COUCH:  Objection.  Argumentative.
10           THE WITNESS:  I mean, I think prior in
11  this paragraph, we're saying that in the moments
12  that adolescents are using social media, they're
13  showing increased social connection but that this
14  is not lasting across their overall daily social
15  well-being.
16           MS. EHLER:  I'll move to strike as
17  nonresponsive.
18  BY MS. EHLER:
19       Q.   I'll just ask the question.
20           Outside of that article, do you agree
21  that text messages could be leveraged to support
22  increased social connectedness with teens?
23       A.   This is outside of the scope of my
24  opinions focusing on these social media platforms.
25           MS. EHLER:  I'll move to strike as

Page 572

1   nonresponsive to my question.
2   BY MS. EHLER:
3        Q.   Do you agree that text messages could
4   be leveraged to support increased social
5   connectedness with teens?
6        A.   These are outside of the scope of the
7   research that I've done for this report.
8        Q.   So you have no opinion on that?
9        A.   Not in the context of my report and
10  opinions today.
11       Q.   Do you think that messaging via
12  Snapchat could be leveraged to support increased
13  social connectedness with teens?
14       A.   I think in this specific paper, we
15  say --
16       Q.   Go ahead.
17       A.   -- we say that social -- we say that
18  sentence that you say:  In line with other recent
19  studies, our results suggest that these digital
20  modes of communication may be leveraged to support
21  increased social connectedness.
22       Q.   Do you hold that as a general view?
23           MS. COUCH:  Objection.  Vague.
24           THE WITNESS:  I hold that in line with
25  the specific finding of this paper in which it

Page 573

1   refers to.
2   BY MS. EHLER:
3        Q.   You can put that down, Dr. Telzer.
4            We've spoken about the research
5   your lab does with a group of teens in rural
6   North Carolina.  And we talked about the data you
7   collected from May to September in 2020.  And I
8   know there have been multiple waves of data
9   collected from that school and that group of teens
10  over time.
11           Does that -- I'm just trying to orient
12  you.  Does that ring a bell, that --
13       A.   Yeah.
14       Q.   -- that discussion?
15       A.   We have a cohort of adolescents we've
16  been following --
17       Q.   Exactly.
18       A.   -- over many waves.
19       Q.   And that research sample you talk about
20  in your report, too.  Is that a "yes"?
21       A.   Yes.
22       Q.   Is there a overall study protocol that
23  governs what you're asking those teens over time?
24           MS. COUCH:  Objection.  Vague.
25           THE WITNESS:  I don't know what you

Page 574

1  mean by an "overall study protocol."
2  BY MS. EHLER:
3      Q.   Are there documents where you set forth
4  the sorts of questions and hypotheses and other
5  research that you're doing with that cohort of
6  teens over time?
7          MS. COUCH:  Objection.  Vague.
8          THE WITNESS:  I -- there are documents
9  that we use to collect our data and make sure that
10 we're collecting it in rigorous and -- so that we
11 can replicate across the different waves of data
12 collection.
13 BY MS. EHLER:
14     Q.   And is there, like, a code book or a
15 data dictionary or something like that that -- that
16 helps people who are new to the research, since
17 it's been going on for several years, understand
18 what you've done and what you're doing?
19         MS. COUCH:  Objection.  Vague.
20 Compound.
21         THE WITNESS:  We have different code
22 books for the data.
23 BY MS. EHLER:
24     Q.   And I believe as part of that data,
25 you're collecting objective screenshot data through

Page 575

1  ExpiWell; is that right?
2      A.   That is the platform that we use to
3  collect the EMAs and for them to submit their
4  screenshots.
5      Q.   Okay.  Is that kept somewhere?
6          MS. COUCH:  Objection.  Vague.
7  BY MS. EHLER:
8      Q.   The data?
9      A.   The data or ExpiWell?
10     Q.   Is ExpiWell the platform on which that
11 data is kept?
12     A.   It is -- is collected on ExpiWell, and
13 then we download it off of ExpiWell.
14     Q.   Got it.
15         And then that data is available to you
16 in your lab?
17     A.   That data is on a server.
18     Q.   And that's the data that you were
19 relying on when you were talking about the research
20 sample and findings in your report?
21         MS. COUCH:  Objection.  Broad.  Vague.
22         THE WITNESS:  There's lots of different
23 pieces of data.
24 BY MS. EHLER:
25     Q.   Was some of that data drawn from that

Page 576

1  same pool of data for purposes of your report in
2  this case?
3          MS. COUCH:  Objection.  Vague.
4          THE WITNESS:  I -- I'd need a more
5  specific question.  Sorry.
6  BY MS. EHLER:
7      Q.   Did the data that you referenced in
8  your research sample and research findings for the
9  JCCP report that came from the same cohort of
10 students in rural North Carolina schools, is that
11 the same data that we were just talking about that
12 you said is downloaded from ExpiWell?
13     A.   There is data that we downloaded on
14 ExpiWell that provides us with the objective
15 measures of social media use that we used in the
16 publications that are in many of these documents.
17     Q.   And so then there's other data, too,
18 right?
19     A.   We have lots of data.
20     Q.   Have you done other statistical
21 analyses on that data that are not published in --
22 that are not in your report or published in the
23 publications we discussed?
24     A.   There may be forthcoming papers that
25 are in prep or current students' master's, for

Page 577

1  example.
2      Q.   Are any of those relevant to this case?
3          MS. COUCH:  And just to be clear to
4  shortchange it, she's only offering opinions based
5  upon --
6          MS. EHLER:  There's a question pending.
7          MS. COUCH:  I'm just trying to be --
8  let me state this for the record.
9          MS. EHLER:  No.  There's a question
10 pending.
11         Are you going to object?
12         MS. COUCH:  Yes.
13         MS. EHLER:  You can object.
14         MS. COUCH:  I'm going to object.  I'm
15 hoping --
16         MS. EHLER:  But you can't coach her
17 what to answer about whether or not it's relevant.
18         MS. COUCH:  I'm not coaching her.  I'm
19 talking to you, the counsel.  And I'm telling you
20 that we're not going to be using any additional
21 forthcoming papers for the report.  I assumed you
22 would appreciate that.
23         MS. EHLER:  Great.
24 BY MS. EHLER:
25     Q.   So there's nothing else that's relevant

Page 578

1  in any of your forthcoming research to the opinions
2  that you've set forth or this case?
3      A.   I don't need any additional data for
4  analyses that we are collecting for the purposes of
5  my report.  We have lots of ongoing studies that
6  are, quote/unquote, relevant because we study
7  social media and the developing brain.
8      Q.   By my count in your report -- I was
9  only able to identify five Snapchat -- Snap
10 internal company documents that are actually cited
11 in the text of your report.
12      I know you looked at it last night and
13 you looked at some company documents.  Does that
14 sound right to you?
15      A.   Regardless of how many I cited within
16 the report itself, I considered all of the
17 documents that are in my materials considered list.
18      MS. EHLER:  Not my question.  And I'll
19 move to strike, respectfully.
20 BY MS. EHLER:
21      Q.   I counted five that you were actually
22 citing in the text of your report out of the other
23 ones on your materials considered list.
24      Does that -- citing five in the text of
25 your report sound right to you?  Or do you think

Page 579

1  you cited more or less or you have no idea?
2      A.   I don't know how many I cited within
3  the body of my report.  But all of the ones that
4  are within my materials considered list are part of
5  and contribute to my overall understanding of Snap
6  and the opinions that I came to.
7      Q.   Okay.  And they're all equally
8  relevant?  So the ones that you cite in your report
9  are no more or less relevant to your opinions than
10 everything else on that materials considered list?
11      MS. COUCH:  Objection.  Calls for legal
12 reasoning.
13      THE WITNESS:  Many of the -- the
14 documents I considered are relevant.
15 BY MS. EHLER:
16      Q.   Okay.  How did you choose the ones you
17 were going to cite in the text of your report
18 versus the ones that were on -- that were just left
19 on the materials considered list?
20      A.   It was a matter of time to submit the
21 report and include a few, but the broader -- those
22 were just examples of a few of the documents that
23 support my opinions.
24      But my opinions are based upon the
25 totality of the research that I did in those

Page 580

1  documents in the materials considered list.
2      Q.   Were they intended to be representative
3  examples or just picked to support the points that
4  you -- --
5      A.   They're just -- sorry.
6      Q.   -- that you were citing them for in the
7  report?
8      A.   They're just a -- a few examples that I
9  used to help support some of my things in the
10 report.
11      (TELZER EXHIBIT 26, Document titled
12 Final Report, Healthy Interactions Research
13 Prepared February 2023, Bates SNAP0404262-318, was
14 marked for identification.)
15 BY MS. EHLER:
16      Q.   Okay.  Let's look at one of those.
17      MS. EHLER:  This will be Exhibit 26.
18 And this is Bates-labeled SNAP0404262.
19 BY MS. EHLER:
20      Q.   Do you recognize this document?
21      A.   It looks -- yes.  I believe so.
22      Q.   Was this one of the ones you reviewed
23 last night?
24      A.   I don't believe this is one of the ones
25 I looked at last night.

Page 581

1      Q.   The ones you looked at last night, were
2  those selected by you or by counsel?
3      A.   By myself.
4      Q.   Excuse me?
5      A.   By myself.
6      Q.   I just didn't hear you.
7      A.   Yeah.
8      Q.   Can you please --
9      MS. EHLER:  Oh.  I'm going to mark this
10 portion of the transcript "Highly Confidential"
11 because this is a internal Snap document that is
12 marked "Highly Confidential."
13 BY MS. EHLER:
14      Q.   Can you please turn to Page -- at the
15 bottom there are numbers.  We call these "Bates
16 labels."  The one -- the one that ends in the
17 number 272.  It's about ten pages into the
18 document.
19      A.   I think I'm there.  It says
20 "Connection?"
21      Q.   Uh-huh.
22      A.   Yeah.
23      Q.   Okay.  Do you see, in the last bullet
24 under "Why It's Positive," it says:  SMEs:
25 Sometimes it's a person's only friend; it can help

Page 582

1  with social anxiety?
2      A.  Yes, I see that.
3      Q.  Online connections can ease transition
4  to face-to-face interaction (already know them)?
5      A.  I see that.
6      Q.  That is not an aspect of this document
7  that you chose to cite in your report, right?
8      A.  I just need a minute to look at the
9  broader paper, please.
10         Okay.  In my report, I don't
11 necessarily quote or refer to a specific page.  But
12 it is in my materials considered list.
13     Q.  Well, this document is actually cited
14 in the text of your report.
15     A.  Okay.
16     Q.  And it might -- and I didn't see any
17 reference to Snapchat internal documents having
18 information that the app can actually be used to
19 help with social anxiety in your report.  And I
20 just want to make sure I didn't miss anything.
21     A.  Can you -- I'm not sure what page
22 you're on in my report to refer to this document.
23     Q.  Yeah, that's fair.  And I don't have it
24 in front of me either.
25         But operating off of your recollection,

Page 583

1  do you think, if there were positive descriptions
2  of Snapchat and its impact on teens' mental health
3  in these internal documents, that you would have
4  cited those in your report?
5          MS. COUCH:  Objection.  Broad.  Calls
6  for conjecture.
7          THE WITNESS:  It's included in my
8  materials considered.  So it is something that
9  contributed to my overall opinions.
10 BY MS. EHLER:
11     Q.  The positive aspects that were reported
12 in internal documents?
13     A.  I reviewed these documents.
14     Q.  Why didn't you specifically mention
15 that there were positive aspects of the platforms
16 reported in internal company documents in the text
17 of your report?
18         MS. COUCH:  Objection.  Broad.  Assumes
19 facts not in evidence.
20         THE WITNESS:  I'd like to be able to
21 look at a specific example to --
22 BY MS. EHLER:
23     Q.  Well, I just -- we just -- we're
24 looking at one at the bottom of Page Bates Label
25 272.

Page 584

1          And you agree with me that this
2  statement's not in your report, right?
3      A.  It's probably not in my report.  But I
4  was trying to look for where I refer to this
5  document.
6      Q.  I can find it for you on a break.  I
7  don't want to take your time.
8          But my question is whether you think
9  you referenced other positive aspects of -- that
10 were reported on the Snapchat platform from the
11 internal documents in your report.
12         MS. COUCH:  Objection.  Vague.  Calls
13 for conjecture.
14         THE WITNESS:  I'm not sure.  I may not
15 have specifically referenced this specific quote in
16 my report.
17 BY MS. EHLER:
18     Q.  Was there a reason for that?
19         MS. COUCH:  Objection.  Vague.  Calls
20 for speculation.
21         THE WITNESS:  Amongst all of the many,
22 many documents I reviewed, I just gave some very
23 small examples.
24 BY MS. EHLER:
25     Q.  But not the positive ones?

Page 585

1          MS. COUCH:  Objection.  Vague.
2  Argumentative.
3          THE WITNESS:  I gave the examples that
4  you can see in my report.
5  BY MS. EHLER:
6      Q.  Great.
7          MS. EHLER:  I am done questioning.  Why
8  don't we go off the record for a minute to play
9  musical chairs.
10         THE VIDEOGRAPHER:  Going off the
11 record.  The time is 12:04 p.m.
12             * * *
13         (Whereupon, there was a recess in the
14 proceedings from 12:04 p.m. to 12:45 p.m.)
15             * * *
16         THE VIDEOGRAPHER:  Going back on the
17 record.  The time is 12:45 p.m.
18             * * *
19             EXAMINATION
20 BY MS. WADHWANI:
21     Q.  Good afternoon, Dr. Telzer.
22     A.  Hi.
23     Q.  My name is Neelum Wadhwani.  We met
24 yesterday.  I represent Google and YouTube.
25         Are you ready to proceed?

Page 586

1      A.   Yes.
2      Q.   Dr. Telzer, do you use YouTube?
3      A.   Yes, I have used YouTube.
4      Q.   For what purposes?
5      A.   I have used it for looking up videos.
6      Q.   Entertainment videos?  News videos?
7   What kind of videos?
8      A.   Lots of different kinds of videos.
9      Q.   How often do you use YouTube?
10     A.   I would say I use it somewhat
11  regularly.
12     Q.   Daily?  Weekly?
13     A.   Weekly.
14     Q.   When did you start using YouTube?
15     A.   I don't think I can recall when I
16  started.
17     Q.   Has it been several years?
18     A.   Yes.
19     Q.   About ten years?
20     A.   I -- I have no idea about ten years.  I
21  don't know.
22     Q.   Okay.  But for a good long while, you
23  would say?
24     A.   Yes, a long time.
25     Q.   Okay.  Do you post videos to YouTube?

Page 587

1      A.   I don't think I've ever posted a video
2   on YouTube.
3      Q.   Do others post videos on your behalf?
4      A.   I've never asked for a video to be
5   posted, if that's what you mean by "on my behalf."
6      Q.   Are you aware that YouTube is the
7   second largest search engine in the world?
8      A.   I don't know if I knew that off the top
9   of my head.
10     Q.   Do you search for information on
11  YouTube?
12     A.   I've probably searched for information
13  on YouTube.
14     Q.   What kind of information?
15     A.   I don't think I can recall off the top
16  of my head.
17     Q.   Did you feel like you found what you
18  were searching for?
19     A.   I don't recall without a specific
20  instance.
21     Q.   When is the last time you searched for
22  something on YouTube?
23     A.   Maybe within the past few weeks.
24     Q.   And what did you search for?
25     A.   I'm trying to recall what I searched

Page 588

1   for, which is why I'm stumbling here to find a
2   specific example.  I don't recall exactly what I
3   searched for.
4      Q.   When is the last time you watched a
5   video on YouTube, outside of the course of this
6   deposition?
7      A.   Perhaps in the last week.
8      Q.   What did you watch?
9      A.   What did I watch?  I don't recall what
10  I watched.
11     Q.   And I say this very gently and not
12  critically.  Do you find that you have any problems
13  with your memory at all?
14     A.   I do not have any problems with my
15  memory.
16     Q.   Are you aware that if you run a search
17  for "Eva Telzer" on YouTube, that there are many
18  videos on YouTube featuring you discussing your
19  research and work?
20     A.   I'm aware that there are videos of
21  myself on YouTube.
22     Q.   And we saw some of those videos
23  yesterday and today?
24     A.   Yes.
25     Q.   Do you know how many videos there are

Page 589

1   on YouTube of you discussing your research and
2   work?
3      A.   I don't know how many.
4      Q.   I stopped counting the number of
5   YouTube videos somewhere around ten or so.  There
6   were more.  You don't think that adolescents
7   watching your YouTube videos would suffer harm, do
8   you?
9          MS. COUCH:  Object to the form.
10         THE WITNESS:  I haven't considered
11  that.
12  BY MS. WADHWANI:
13     Q.   Do you have a view as to whether, if an
14  adolescent sat down and watched your YouTube videos
15  today, they would suffer harm?
16         MS. COUCH:  Asked and answered.
17         THE WITNESS:  Given that the videos of
18  myself on YouTube are of me talking about the harms
19  of social media and how it is affecting their
20  developing brains, I think that they may learn
21  something about how social media is impacting them.
22  BY MS. WADHWANI:
23     Q.   Do you think the watching of your
24  videos would cause those adolescents to suffer
25  harm?

Page 590

```
1           MS. COUCH:  Asked and answered.
2           THE WITNESS:  I think that if
3    adolescents were viewing the videos of myself on
4    YouTube, the videos in which I am talking about the
5    research and the science, they would understand how
6    social media is affecting their adolescent brain.
7    BY MS. WADHWANI:
8        Q.   So is that a "no," you don't think an
9    adolescent watching a YouTube -- your YouTube
10   videos would suffer harm?
11          MS. COUCH:  Objection.  Vague.
12          THE WITNESS:  That is indicating that
13   in the specific instance of watching my videos, I
14   think that they would learn about the role of
15   social media on adolescent brain development.
16   BY MS. WADHWANI:
17       Q.   Is it possible that an adolescent
18   watching your YouTube videos would suffer harm?
19          MS. COUCH:  Objection.  Conjecture.
20          THE WITNESS:  Based on the features and
21   the way in which YouTube works and that the
22   algorithms will likely feed them other potential
23   content, that the video that they watch of me is
24   not the only thing that they will be exposed to.
25   BY MS. WADHWANI:
```

Page 591

```
1        Q.   Can you say that to a reasonable degree
2    of certainty, sitting here today?
3           MS. COUCH:  Objection.  Conjecture.
4           THE WITNESS:  Can I say what?
5    BY MS. WADHWANI:
6        Q.   Your testimony that you just gave me.
7        A.   Can I say what in -- what,
8    specifically?
9        Q.   Can you say that if an adolescent
10   watched your YouTube videos, that the algorithm
11   would give them content that they would be exposed
12   to that could be harmful?
13          MS. COUCH:  Objection.  Conjecture.
14   Vague.
15          THE WITNESS:  I believe that the
16   features of YouTube would likely feed them other
17   content that they may be exposed to, largely based
18   on the algorithms that are shaping what they see.
19   BY MS. WADHWANI:
20       Q.   Do you think that content would be
21   harmful?
22          MS. COUCH:  Objection.  Vague.
23          THE WITNESS:  I can't speculate on what
24   other content they might see.
25   BY MS. WADHWANI:
```

Page 592

```
1        Q.   What if teens watched all of your
2    YouTube videos in one sitting, one after the other?
3    Would that be harmful to them?
4           MS. COUCH:  Objection.  Conjecture.
5           THE WITNESS:  My answer is no different
6    for watching all than watching one.  By watching
7    the videos of me, likely all of them are this
8    similar talk that I've given on the role of social
9    media.  They would learn about how it is affecting
10   adolescent brain development.
11   BY MS. WADHWANI:
12       Q.   And I understand that you think that
13   they would learn something.  Would they also be
14   harmed?
15          MS. COUCH:  Objection.  Conjecture.
16          THE WITNESS:  I can't -- I have not
17   considered that.
18   BY MS. WADHWANI:
19       Q.   So you think it's possible that a
20   teenager watching all your YouTube videos in one
21   sitting could suffer harm?
22          MS. COUCH:  Asked and answered.
23          THE WITNESS:  I have not considered
24   that.
25   BY MS. WADHWANI:
```

Page 593

```
1        Q.   If a teenager watched all your YouTube
2    videos in one sitting, would that lead to brain
3    changes in that teenager?
4        A.   I have not considered that.
5        Q.   You don't have a view on that right
6    now?
7        A.   I have not considered that.
8        Q.   Do you think that teenagers watching
9    three or more of your YouTube videos without
10   pausing would cause them to develop an addiction to
11   YouTube?
12          MS. COUCH:  Objection.  Conjecture.
13          THE WITNESS:  I have not considered
14   that.
15   BY MS. WADHWANI:
16       Q.   So you don't know, you're telling me,
17   if watching your YouTube videos on YouTube would
18   cause a teenager to suffer harm or addiction or
19   brain changes, right?
20          MS. COUCH:  Asked and answered.
21          THE WITNESS:  I have not considered
22   that.
23   BY MS. WADHWANI:
24       Q.   And because you don't know that, how is
25   it that you allow your videos to stay on YouTube
```

Page 594

1  with the risk that they could cause harm to them?
2        MS. COUCH:  Objection.  Argumentative.
3  Conjecture.
4        THE WITNESS:  I have not allowed the
5  videos to stay on or be posted.  The videos are
6  posted there.
7  BY MS. WADHWANI:
8        Q.  Have you requested to the authors that
9  they pull down those videos?
10       A.  I have not.
11       Q.  Why is that?
12       A.  I have not considered pulling them
13  down, nor did I consider posting them up.
14       Q.  Do you think you might go after this
15  deposition and ask for your videos to be pulled
16  down because of a potential risk of harm to
17  teenagers from your YouTube videos?
18       MS. COUCH:  Objection.  Conjecture.
19       THE WITNESS:  I don't think I can
20  speculate about the future.
21  BY MS. WADHWANI:
22       Q.  You can't speculate about what you
23  might do when you go home today?
24       A.  I can't.
25       MS. COUCH:  Objection.  Conjecture.

Page 595

1  Argumentative.
2  BY MS. WADHWANI:
3        Q.  Do you think watching your YouTube
4  videos would cause teens to develop depression?
5        MS. COUCH:  Objection.  Conjecture.
6        THE WITNESS:  I think that the general
7  research that I have conducted shows that social
8  media is -- is causing depression, yes.
9  BY MS. WADHWANI:
10       Q.  I asked, specifically, do you think a
11  teen watching your YouTube videos would suffer
12  depression?
13       A.  Oh, sorry.  I didn't hear that you said
14  "your videos."
15       Q.  That's okay.
16       A.  Sorry.  I cannot speculate on -- on
17  that.
18       Q.  Okay.  So you can testify that you
19  think watching YouTube can cause depression in a
20  teenager, but you can't speculate on whether
21  watching your YouTube videos can cause depression
22  in a teenager; is that your testimony?
23       A.  The opinions that I have are based on
24  broad research on social media and the features of
25  those social media platforms.

Page 596

1        The research that we do examines these
2  across lots of adolescents.  And that research
3  tells us that the ways and features of social media
4  use is resulting in harms like depression.
5        Q.  Would watching three of your YouTube
6  videos in a row on autoplay cause a teenager to
7  develop depression?
8        MS. COUCH:  Asked and answered.
9        THE WITNESS:  I have not considered
10  that.
11  BY MS. WADHWANI:
12       Q.  Why haven't you considered that given
13  your opinions on the alleged harms of YouTube?
14       MS. COUCH:  Objection.  Conjecture.
15       THE WITNESS:  I can't speculate on that
16  broad question.
17  BY MS. WADHWANI:
18       Q.  You knew before you wrote your report
19  that there were videos featuring you on YouTube,
20  correct?
21       A.  I knew that there were videos of myself
22  on YouTube.
23       Q.  And as you wrote your report describing
24  the harms of YouTube's features, as you consider
25  them to be, you didn't consider whether watching

Page 597

1  YouTube videos of you would be harmful?
2        MS. COUCH:  Argumentative.  Asked and
3  answered.
4        THE WITNESS:  I have not considered
5  that.
6  BY MS. WADHWANI:
7        Q.  Do you agree that YouTube arguably
8  should not be considered social media?
9        A.  I do not agree with that.
10       Q.  Do you agree that YouTube is more
11  indicative of traditional media?
12       MS. COUCH:  Objection.  Vague.
13       THE WITNESS:  I -- I believe that
14  YouTube, similar to all the other platforms we're
15  discussing today, have similar features, like the
16  algorithms, like the quantifiability of them, that
17  make this platform just as much as the others a
18  risky context for adolescents.
19       (TELZER EXHIBIT 27, Publication titled
20  Social media are many things:  Addressing the
21  components and patterns of adolescent social media
22  use, was marked for identification.)
23  BY MS. WADHWANI:
24       Q.  I'm handing you what we have marked as
25  Exhibit 27.  Dr. Telzer, please feel free to take a

HIGHLY CONFIDENTIAL

Page 598

1  look at that.
2          Have you seen this document before?
3      A.  Yes.
4      Q.  What is this document?
5      A.  This is a publication.
6      Q.  This is a publication that includes you
7  as an author, correct?
8      A.  Correct.
9      Q.  And the title of this publication is
10 "Social media are many things:  Addressing the
11 components and patterns of adolescent media use,"
12 correct?
13     A.  "Of adolescent social media use."
14     Q.  Sorry.  Thank you.  I was -- my eyes
15 were ahead of me.  Let me say that again.
16          This is an article titled "Social Media
17 are many things:  Addressing the components and
18 patterns of adolescent social media use," right?
19     A.  Correct.
20     Q.  This was published online just last
21 month, in May 2025, correct?
22     A.  Correct.
23     Q.  Can you please turn to the second page.
24 And at the top, it says "Page 25."
25          Do you see that?

HIGHLY CONFIDENTIAL

Page 599

1      A.  Yes.
2      Q.  You stand by this paper?
3          MS. COUCH:  Objection.  Vague.
4          THE WITNESS:  I don't know what you
5  mean by "stand by."
6  BY MS. WADHWANI:
7      Q.  Do you agree with the statements in
8  this paper that you authored?
9      A.  I agree that the content of this
10 article is what we wrote and is accurate.
11     Q.  Okay.  In the second column on Page 25,
12 can you please focus your attention on the second
13 full paragraph?
14     A.  Yes.
15     Q.  Are you there?
16     A.  Yes.
17     Q.  Okay.  And I'm looking in the middle of
18 that paragraph with the sentence that starts "In
19 practice."
20          Do you see that?
21     A.  Sorry.  It's -- what -- what am I
22 looking for?
23     Q.  Sure.  You're looking for --
24     A.  Oh, yeah.  Sorry.
25     Q.  -- the sentence that starts "In

HIGHLY CONFIDENTIAL

Page 600

1  practice."
2      A.  Yes.
3      Q.  Are you there?
4      A.  Yes.
5      Q.  In practice, many tools and experiences
6  that perhaps should be considered social media are
7  excluded --
8      A.  Uh-huh.
9      Q.  -- (e.g., social gaming) and many that
10 arguably should not be considered social media are
11 included (e.g., YouTube, which typically affords
12 solitary content consumption in the one-to-many
13 format indicative of traditional media).
14     A.  I see that.
15     Q.  That's what that article said, right?
16     A.  That says that, yes.
17     Q.  You state here that YouTube arguably
18 should not be considered social media, correct?
19     A.  That's what that says there, yes.
20     Q.  And it's because YouTube provides
21 solitary content consumption?
22     A.  It says it typically -- it typically
23 affords solitary content consumption.
24     Q.  And it also says because YouTube is in
25 the one-to-many format indicative of traditional

HIGHLY CONFIDENTIAL

Page 601

1  media, correct?
2      A.  It says that.
3      Q.  Now, you didn't provide those
4  statements in your report, correct?
5      A.  That statement is not necessarily in my
6  report, no.
7      Q.  It's, in fact, not in your report,
8  right?
9      A.  Well, I think that this paper is likely
10 in my materials considered.
11     Q.  Right.  But the statement itself that
12 YouTube is arguably not social media because it's
13 in a format indicative of traditional media, that
14 is not in your report, correct?
15         MS. COUCH:  Asked and answered.
16         THE WITNESS:  That sentence is not in
17 my report, but the overall paper is in my materials
18 considered.
19 BY MS. WADHWANI:
20     Q.  What is your definition of "traditional
21 media"?
22     A.  I believe that this referred to
23 traditional media in the form, likely, of
24 television.
25     Q.  And you aren't offering opinions in

Page 602

1  this case that traditional media causes harms,
2  correct?
3       A.   I haven't considered that.
4       Q.   It's not in your report, right?
5       A.   I have not considered that in my
6  report.
7       Q.   So you're not offering that opinion in
8  this case, correct?
9       A.   I'm not.  I have not considered
10 traditional media.
11      Q.   Can you please take out your report.
12           One second.  I forgot my copy of the
13 report.
14           And can you please turn to Page 135 of
15 your report.
16      A.   135.
17      Q.   And do you see under those graphs,
18 Dr. Telzer, that you refer to a Common Sense Media
19 report from 2023?
20      A.   I see that.
21      Q.   Okay.  And if you turn in your report
22 to Page 136, you see what's labeled "Figure 6" in
23 the middle of Page 136.
24           Do you see that?
25      A.   I see that, yes.

Page 603

1       Q.   And why did you include this study in
2  your report?
3       A.   I need to look at it more carefully to
4  be able to answer that, please.
5       Q.   Well, let's take a look at the study.
6           (TELZER EXHIBIT 28, Document titled
7  2023 Constant Companion:  A Week in the Life of a
8  Young Person's Smartphone Use, was marked for
9  identification.)
10 BY MS. WADHWANI:
11      Q.   Here you are, Dr. Telzer.
12      A.   Oh.  Thank you.
13      Q.   You're welcome.
14           This is the study that is on Page 135
15 and 136 of your report that we were just talking
16 about, right?
17      A.   Yes, I believe so.
18      Q.   Do you consider this a reliable study?
19      A.   I'm just looking back at their
20 methodology and findings.
21      Q.   I'll withdraw the question.
22           You cited the findings of this report
23 in your study, correct?
24      A.   I cited this in my report, yeah.
25      Q.   Okay.  So let's turn to Page 8 of

Page 604

1  Exhibit 28.
2       A.   Uh-huh.
3       Q.   And on Page 8 of Exhibit 28, there is
4  Figure 6.  Do you see that?
5       A.   I see that.
6       Q.   Is this the same Figure 6 excerpted in
7  your report?
8       A.   Yes.  Well, let me see.  Yes.  There's
9  a part of -- that figure put in my report.
10      Q.   Right.  Your -- your report excerpted a
11 part of --
12      A.   Yes.
13      Q.   -- the figure on Page 8 of Exhibit 28,
14 right?
15      A.   Yes.
16      Q.   And Figure 6, in this report that we've
17 marked as Exhibit 28, shows that, on average,
18 tweens and teens use social media during school
19 nights for less than ten minutes a night, correct?
20      A.   That's the median duration, not the
21 average.
22      Q.   Okay.  Fair enough.  I'll restate the
23 question.
24           Figure 6 shows that the median age --
25 the median duration of use of different smartphone

Page 605

1  app categories during school nights is less than
2  ten minutes a night, right?
3       A.   Yes.  This is showing the median
4  duration of social media is -- unclear on exactly,
5  but less than ten.
6       Q.   Less than ten minutes?
7       A.   Uh-huh.
8       Q.   And then after reporting on the median
9  social media use during school nights, Figure 6
10 then turns to YouTube use, right?
11      A.   Correct.
12      Q.   And Figure 6 reports that the median
13 use of YouTube during school nights by tweens and
14 teens is less than ten minutes a night, correct?
15      A.   Yes.  The median there is also less
16 than ten minutes.
17      Q.   And by "median," that means some teens
18 and tweens watch YouTube on school nights for
19 longer than ten minutes and some watch YouTube for
20 less than ten minutes, right?
21      A.   Yeah.  More specifically, the median is
22 the value where 50 percent of the users are under
23 and 50 percent of the users are higher.
24      Q.   Okay.  And if you focus your attention
25 on the text accompanying this Figure 6 to the left,

Page 606

1  you'll see, in the middle of the second paragraph,
2  there is a discussion of YouTube.
3         And the document says:  YouTube
4  appeared to be the longest-running app due to
5  several participants running it overnight, likely
6  with music or white noise playing.
7         Do you see that?
8     A.   I see that.
9     Q.   Do you have any reason to dispute that
10 finding?
11    A.   That's what it says here.
12    Q.   Do you have any reason to dispute that
13 that's what the authors of the study found?
14    A.   That's what they wrote here.
15    Q.   Do you think they're wrong?
16    A.   This is what they wrote here.
17    Q.   Do you have a problem with saying that
18 you agree or disagree that their findings are
19 accurate as they understand them?
20         MS. COUCH:  Argumentative.  Calls for
21 speculation as to others' beliefs.
22         THE WITNESS:  I am merely saying that
23 that is the statement that they have in this
24 article.
25 BY MS. WADHWANI:

Page 607

1     Q.   And you have no reason to dispute it,
2  do you?
3     A.   This is the statement that they have in
4  their article.
5     Q.   Are you offering the opinion that
6  adolescents engage in heavy use of YouTube?
7     A.   I think I need to look through my
8  report to --
9     Q.   I'm asking as you sit here today.
10    A.   And as I sit here today, I'm
11 representing the opinions in the totality of my
12 report.  So I want to make sure to be accurate.
13    Q.   Well, yesterday, I think you told us
14 that you believe that there is heavy problematic
15 use of social media platforms and YouTube, correct?
16    A.   I have the opinion that social media is
17 heavily used by adolescents.
18    Q.   And you think that leads to harm?
19    A.   I have the opinion that adolescents'
20 social media use is associated with very dramatic
21 changes in their brain development.  Their social
22 media use is associated and leads to mental health
23 problems, like depression, anxiety and body image
24 concerns.
25    Q.   What in your opinion constitutes heavy

Page 608

1  problematic use of YouTube?
2         MS. COUCH:  Asked and answered.
3         THE WITNESS:  As I discuss in my
4  report, I have the opinions that adolescents are
5  engaging in heavy use of social media; that social
6  media is used in very problematic ways; and that
7  social media use is leading to changes in the
8  developing brain and mental health, including
9  depression.
10 BY MS. WADHWANI:
11    Q.   Does that depend on the way YouTube is
12 being used by an adolescent?
13    A.   My opinions are based on many things,
14 including specifically the features of social media
15 and the features of all of the platforms, which
16 share things like the algorithms and the
17 quantifiability and the publicness of it, and all
18 of the things that I detail on Page 99 as well as
19 other places in my report.
20    Q.   If an adolescent in one sitting watches
21 the entire three-and-a-half-hour Taylor Swift Eras
22 Tour concert on YouTube, would that be heavy use?
23    A.   I have not considered that.
24    Q.   Would that be problematic use?
25    A.   I have not considered that.

Page 609

1     Q.   Would that cause brain changes in a
2  teenager, watching the Eras Tour on YouTube?
3     A.   I have not considered that.
4     Q.   Would a teenage girl watching the
5  Eras Tour on YouTube suffer from negative body
6  comparisons?
7     A.   I have not considered that.
8     Q.   So you can't say one way or the other?
9     A.   My research is looking at, broadly, how
10 these patterns are occurring in adolescents.  We
11 have studied hundreds of adolescents.  I have
12 talked to hundreds of adolescents.  I've talked to
13 parents.
14         And the totality of those
15 conversations, as well as understanding the
16 research and the underlying data, I can say that
17 using social media is related to developmental
18 changes in the brain and mental health in
19 adolescents.
20    Q.   And if a teenager used YouTube to watch
21 the entire three-and-a-half-hour Taylor Swift Eras
22 Tour concert, would that lead to brain changes in
23 that teenager?
24         MS. COUCH:  Asked and answered.
25         THE WITNESS:  I have not --

Page 610

1     MS. COUCH:  Incomplete hypothetical.
2     THE WITNESS:  I have not considered
3 that.
4 BY MS. WADHWANI:
5     Q.   Well, I'm a little confused,
6 Dr. Telzer, because you've told us several times,
7 as you've just told me now, that you have talked to
8 scores of teenagers and parents; you've read
9 numerous articles; you've read internal documents;
10 you have talked with colleagues; you have training
11 and education.  And yet, you're not able to tell
12 me, sitting here today, on the basis of all of
13 that, whether or not a teenager who watches the
14 full Eras Tour concert on YouTube would experience
15 brain changes.
16     MS. COUCH:  Asked and answered.
17 Incomplete hypothetical.
18     THE WITNESS:  No, I cannot speculate on
19 that hypothetical.
20 BY MS. WADHWANI:
21     Q.   Well, where is the difference between
22 your ability to answer that question and your
23 opinion that teenagers suffer brain changes from
24 watching YouTube?
25     A.   That is a hypothetical.  And my

Page 611

1 opinions are based on years of -- of education and
2 research and talking to lots of adolescents in the
3 field, and I'm not speculating about a
4 hypothetical.
5     Q.   Has any of the adolescents in the field
6 told you that they suffered brain changes from
7 watching the Eras Tour on YouTube?
8     A.   No, that has not been said.
9     Q.   Has any teenager told you that they
10 suffered negative body comparisons from watching
11 the Eras Tour on YouTube?
12     A.   I have not had that conversation.
13     Q.   How about any parent?
14     A.   I have not had that specific
15 conversation.
16     Q.   Do you think that a teenager who
17 watched the Taylor Swift Eras Tour movie on Disney+
18 would suffer brain changes?
19     MS. COUCH:  Objection.
20     THE WITNESS:  I have not considered
21 that.
22 BY MS. WADHWANI:
23     Q.   Do you know what safety features are
24 available on YouTube for adolescents?
25     A.   I'm aware of safety features.

Page 612

1     Q.   Can you name some?
2     A.   I don't think I can name one off the
3 top of my head.
4     Q.   Do you -- can you name how many safety
5 features there are available on YouTube for
6 adolescents?
7     A.   I cannot give you a specific number,
8 no, not off the top of my head.
9     Q.   Do you know what parental controls
10 YouTube offers to parents?
11     A.   I know as a parent that I have tried to
12 implement parental controls and could not figure it
13 out myself.
14     Q.   Do you know what parental controls
15 YouTube offers to parents?
16     A.   I know that internal documents show
17 that there are safety features that are largely opt
18 in and that many documents show that less than
19 1 percent of individuals are using those safety
20 features.
21     Q.   When you couldn't figure out the safety
22 features, did you do anything to find information
23 to figure that out?
24     A.   I attempted to find lots of
25 information, yes.

Page 613

1     Q.   Did you go to any of the information
2 available on YouTube?
3     A.   I -- I did.
4     Q.   Did you go in a blog post?
5     A.   I can't recall.
6     Q.   Did you go to the help center?
7     A.   I can't recall.
8     Q.   Did you do any Google searches?
9     A.   Probably, but I can't recall
10 specifically.
11     Q.   Do you know what kinds of supervised
12 experience YouTube offers to allow parents to
13 monitor and supervise their children or
14 adolescents' use of YouTube?
15     A.   I can't recall off the top of my head.
16     Q.   Why was it that you wanted to use the
17 parental control features on YouTube?
18     A.   Because I have a young child who I was
19 going to set up YouTube Kids for and wanted to look
20 into making it protected for him.
21     Q.   Okay.  Do you know what safety features
22 YouTube Kids offers?
23     A.   I can't recall off the top of my head.
24     Q.   What's your understanding of the
25 difference between YouTube Kids and YouTube main?

HIGHLY CONFIDENTIAL

Page 614

1      A.   My understanding originally was that
2  this was a platform designed or suggested to be
3  designed to be safe for kids.
4          After seeing the internal documents, I
5  now know that it is not safe for kids.  And I have
6  since immediately deleted it from my child's access
7  and will not allow him to use it.
8      Q.   And what documents are you referring
9  to?
10     A.   I can't specify a specific document.
11 But I reviewed a lot of internal documents
12 identifying many harms of YouTube Kids, including a
13 lot of the features that are optimized to increase
14 engagement and other things that I do not think are
15 safe for a child.
16     Q.   Did those internal documents say that
17 YouTube Kids is harmful to children, or was that
18 just your interpretation?
19     A.   I saw lots of internal documents.  I
20 can't recall a specific one.  I saw documents from
21 YouTube broadly identifying that their platform is
22 used in very problematic ways.
23     Q.   Can you give me an example?
24     A.   I reviewed lots of documents.  I can't
25 give you a specific one.

HIGHLY CONFIDENTIAL

Page 615

1      Q.   Can you give me an example of the
2  alleged harmful ways that YouTube Kids those
3  features work?
4      A.   The algorithms and ways in which the
5  platform is designed to increase engagement is not
6  a way of creating a platform that is safe for a
7  child.
8      Q.   Do you know with certainty, sitting
9  here today, that YouTube designed its platform
10 YouTube Kids to maximize engagement of children?
11     A.   I recall seeing documents indicating
12 that there are features of the platform that are
13 designed in order to maximize engagement.
14     Q.   Which features?
15     A.   Different features, including -- let me
16 refer -- let me try to refer to my report, please.
17     Q.   I don't believe your report refers to
18 YouTube Kids, Dr. Telzer.
19     A.   It refers to the features that I'm
20 trying to talk about.
21     Q.   Right.  But I don't think it refers
22 specifically to YouTube Kids.  And that's what I'm
23 asking you about.
24          Did you refer to YouTube Kids in your
25 report?

HIGHLY CONFIDENTIAL

Page 616

1      A.   I did not specifically refer to
2  YouTube Kids in my report but relied on the
3  materials that I considered in my materials
4  considered list.
5      Q.   Okay.  And I'm focused on YouTube Kids
6  at the moment because that's what you just
7  testified to.
8          Do you know how YouTube developed its
9  safety features and controls?
10     A.   I don't think I can speak to how it did
11 that, no.
12     Q.   Do you know what information YouTube
13 relied on in developing its features and controls?
14     A.   I can't speak to that.
15     Q.   Do you know with whom YouTube
16 consulted?
17     A.   I can't speak to that.
18     Q.   Have you ever studied the impact on
19 adolescents of content on platforms in volume?
20          MS. COUCH:  Objection.  Asked and
21 answered.
22          THE WITNESS:  Have I ever studied
23 for -- say that again, please.
24 BY MS. WADHWANI:
25     Q.   Have you ever studied the impact of

HIGHLY CONFIDENTIAL

Page 617

1  content on platforms in volume?
2          MS. COUCH:  Objection.  Vague.
3          THE WITNESS:  "In volume"?  What do you
4  mean?
5  BY MS. WADHWANI:
6      Q.   Meaning "several."  We'll use YouTube.
7  Several videos in a row.
8      A.   Can you say that again?  I'm not
9  understanding your question.
10     Q.   Sure.  Have you ever studied -- you --
11 you testified yesterday that your research has been
12 content agnostic, correct?
13     A.   I take a very content-agnostic
14 perspective on the research that we're doing.
15     Q.   And -- and so because of that, my
16 question -- which I think I know based on the fact
17 that you've said that your research is content
18 agnostic, but I just want to know for the record.
19          Have you ever studied the impact of
20 contact -- content in volume --
21          MS. COUCH:  Objection.
22 BY MS. WADHWANI:
23     Q.   -- on adolescents in YouTube?
24     A.   I don't believe I've considered that.
25     Q.   Do you know whether students use

Page 618

1  YouTube during school hours?
2       A.   I need to refer to my report where I
3  think I discuss that.
4       Q.   Off the top of your head, do you know?
5       A.   Not off the top of my head.
6       Q.   Do you know whether students use
7  YouTube for educational purposes during school
8  hours?
9       A.   Not off the top of my head.
10      Q.   Are you aware that recent data from an
11 IPSOS study found that 94 percent of teachers
12 globally have used YouTube in their role as a
13 teacher?
14           MS. COUCH:  Objection.  Assumes facts
15 not in evidence.
16           THE WITNESS:  I don't recall that
17 specific statistic.
18 BY MS. WADHWANI:
19      Q.   Do you think those teachers are harming
20 their pupils?
21           MS. COUCH:  Objection.  Calls for
22 speculation.
23           THE WITNESS:  I have not considered
24 that.
25 BY MS. WADHWANI:

Page 619

1       Q.   Now, earlier today, Dr. Telzer, you
2  said that the iMessage feature was not relevant to
3  your opinions there.
4           Do you recall that?
5           MS. COUCH:  Objection.  Misstates her
6  testimony.
7           THE WITNESS:  I have not considered the
8  iMessage in my -- in my opinions here.
9  BY MS. WADHWANI:
10      Q.   Can you please go to Page 122 of your
11 report.
12           Are you there, Dr. Telzer?
13      A.   I am.
14      Q.   Do you see that you note on this page
15 that students in your research study generally went
16 to one of at least 36 apps when they check their
17 phones at school?
18      A.   Sorry.  You're on Page 122?
19      Q.   122, yeah.
20      A.   Can you direct me where on this page,
21 perhaps?
22      Q.   Yes, I can.  Oh.  I'm in the wrong...
23           That information about going to one of
24 36 apps is actually on 121 under "Objectively
25 collected social media use."

Page 620

1           Do you see that?
2       A.   Can you direct me where on the page,
3  please?
4       Q.   It's all right.  We can -- that point's
5  not important -- important.
6           Let me just focus you on the fact on
7  Page 122.  Do you see "Daily pickups"?  That
8  section?
9       A.   I do.
10      Q.   Do you see that you note here:  The
11 second top app used was the default Messages app?
12      A.   Yes.
13      Q.   Do you see that?  And that's basically
14 Apple's own texting app that comes on an iPhone,
15 right?
16      A.   Yes.
17      Q.   And children and teens can use that to
18 socialize with one another, correct?
19      A.   Sure.
20      Q.   It can send messages to one another?
21      A.   Sure.
22      Q.   They can participate in group chats?
23      A.   Sure.
24      Q.   They can share photos and selfies?
25      A.   Sure.

Page 621

1       Q.   They can share videos made by
2  themselves or others?
3       A.   Yes.
4       Q.   Is the Messages app social media?
5       A.   The Messages app does not have the
6  features of social media that make it risky and
7  unsafe for adolescents.
8       Q.   Is the Messages app harming
9  adolescents?
10      A.   I have not considered that.
11      Q.   Is the Messages app causing adolescents
12 to compulsively check their phones during school
13 hours?
14           MS. COUCH:  Objection.  Conjecture.
15           THE WITNESS:  I have not considered
16 that.
17 BY MS. WADHWANI:
18      Q.   Yet you noted that it was the second
19 top app used during school hours in your data.  And
20 you didn't consider that?
21           MS. COUCH:  Objection.  Misstates the
22 report.
23           THE WITNESS:  I'd have to read the
24 full, thorough piece here to be able to comment.
25 BY MS. WADHWANI:

Page 622

1    Q.   You mentioned yesterday that you've
2  looked at parts of some of the internal documents
3  produced by defendants in this case and all of
4  other documents.
5         For YouTube, did you look at every
6  document in full that you listed on your reliance
7  list?
8    A.   I looked at every document that I
9  listed.
10   Q.   Did you look at every page of every
11 document?
12   A.   I pulled up and at least looked at
13 every document.
14   Q.   Did you look at every page?
15   A.   I skimmed through and looked at every
16 document.
17   Q.   My question is "every page,"
18 Dr. Telzer.  I don't know how to ask that any more
19 specifically or precisely.  I'm talking about pages
20 as opposed to documents.
21        Did you look at every single page of
22 every single YouTube document that you cited?
23   A.   I can't recall if I looked at every
24 single page.
25   Q.   How about the deposition testimony of

Page 623

1  the Google and YouTube employees?  Did you read
2  every page of those transcripts?
3    A.   I looked at and skimmed, at least,
4  every single document.
5    Q.   How did you draw lines as to what
6  documents to read every page of and what documents
7  to skim?
8    A.   I looked broadly through the documents.
9  And those that were on topics most relevant to the
10 topic of my report, ranging from problematic social
11 media use to changes in adolescent brain
12 development to school-related and sleep-related
13 disruptions -- if those kinds of topics were
14 represented, those, I spent more time reading.
15   MS. WADHWANI:  Thank you.
16      I'm going to take a break here.
17      THE VIDEOGRAPHER:  Going off the
18 record.  The time is 1:24 p.m.
19      * * *
20      (Whereupon, there was a recess in the
21 proceedings from 1:24 p.m. to 1:35 p.m.)
22      * * *
23      THE VIDEOGRAPHER:  Going back on the
24 record.  The time is 1:35 p.m.
25      * * *

Page 624

1           EXAMINATION
2  BY MR. CHERNACK:
3    Q.   Good afternoon, Dr. Telzer.  My name is
4  Greg Chernack.  We kind of met over the last day or
5  so.  I represent TikTok in this litigation.  I'm
6  last, perhaps least, but I have some questions for
7  you.
8         First, do you have a TikTok account?
9    A.   I do.
10   Q.   When did you set up a TikTok account?
11   A.   I don't recall.  Many years ago,
12 though.
13   Q.   How often do you use TikTok?
14   A.   I used TikTok -- I downloaded TikTok
15 and used it for about an hour, got sucked into the
16 platform, and immediately deleted it.
17   Q.   Suffer from any withdrawal effects
18 after deleting it?
19   A.   I used it that one time.
20   Q.   But you were able to stop?
21   A.   I was able to stop.
22   Q.   You just deleted it and it's still
23 deleted?
24   A.   It is still deleted.
25   Q.   All right.  Have you looked at anything

Page 625

1  on TikTok since you've deleted it?
2    A.   I believe in the past couple weeks I
3  redownload -- or I downloaded it onto my iPad to
4  explore the features of it.
5    Q.   Any specific features you mention in
6  your report?
7    A.   I was just doing a quick look at the
8  interface is what I meant.
9    Q.   So you don't -- you don't discuss any
10 specific features in your report?
11   A.   I discuss lots of features in my report
12 that apply to all of the platforms, including
13 TikTok.
14   Q.   Fair enough.  Any specific TikTok
15 features that you discuss in your report that are
16 unique to TikTok as compared to the other
17 platforms?
18   A.   I believe that all of the features that
19 I discuss in my report generalize to all of the
20 platforms, including TikTok.
21   Q.   Okay.  From the times you viewed any
22 TikTok videos, any adverse effects on your mental
23 health?
24   A.   I did not enjoy being sucked into the
25 platform and spending more time on it than I

Page 626

1  intended to.
2      Q.   Would you say a lack of enjoyment is an
3  injury to someone's mental health?
4          MS. COUCH:  Objection.  Vague.  Calls
5  for legal reasoning.
6          THE WITNESS:  I would say that spending
7  too much time than I intended was not a good
8  outcome.
9  BY MR. CHERNACK:
10     Q.   There are many things people spend more
11 time on than they want to.  Fair enough?
12     A.   Fair enough.
13     Q.   Watching TV?
14     A.   Perhaps.
15     Q.   Reading certain things?
16     A.   I -- I don't know what --
17     Q.   But that's different than having an
18 injury to one's mental health; would you agree with
19 that?
20         MS. COUCH:  Objection.  Vague.  Calls
21 for legal reasoning.
22         THE WITNESS:  Spending more time on
23 something than one intended is one aspect of
24 something being problematic.
25 BY MR. CHERNACK:

Page 627

1      Q.   But it -- it doesn't establish that
2  something is problematic, correct?
3      A.   It is one component of problematic use.
4      Q.   Okay.  So you could say it's necessary
5  but not sufficient to say there's problematic use
6  if you use it for longer than intended?
7          MS. COUCH:  Objection.  Vague.
8          THE WITNESS:  Using a platform for
9  longer than you intended is one feature of
10 problematic use, one aspect of problematic use.
11 BY MR. CHERNACK:
12     Q.   So, in itself, that -- that could be a
13 sign of problematic use?
14     A.   Spending more time on a platform than
15 one intended is one component of problematic use.
16     Q.   And would that apply to anything that
17 one spends more time on than one intended?
18         MS. COUCH:  Objection.  Vague.
19         THE WITNESS:  That's too speculative to
20 comment on.
21 BY MR. CHERNACK:
22     Q.   Okay.  But, again, saying something is
23 problematic use is not the same as saying someone's
24 mental health was harmed; would you agree with
25 that?

Page 628

1          MS. COUCH:  Objection.  Vague.
2          THE WITNESS:  Problematic use is
3  associated with things like mental health,
4  including depression.
5  BY MR. CHERNACK:
6      Q.   But they're different -- correct? --
7  even if there is an association?
8          MS. COUCH:  Objection.  Vague.
9          THE WITNESS:  Problematic social media
10 use is associated with mental health, like
11 depression.
12 BY MR. CHERNACK:
13     Q.   Okay.  As part of your academic work,
14 do you typically review corporate documents?
15     A.   I do not typically review corporate
16 documents in my academic work.
17     Q.   Have you ever in your academic work
18 reviewed corporate documents?
19     A.   Not that I can recall.
20     Q.   Okay.  Now -- and I know some of the
21 other attorneys for the platforms have asked you
22 some questions about the corporate documents of
23 their specific platforms.
24         As I counted, I believe there's only
25 six TikTok documents that are cited in your actual

Page 629

1  report.  Does that sound right to you?
2      A.   I don't recall the specific number, but
3  there's probably six, sure.
4      Q.   Okay.  You don't have any reason to
5  disagree with me.  Fair?
6      A.   I agree there's probably six, but there
7  are many, many more in my materials considered
8  list.
9      Q.   I understand.  But I'm just asking
10 about the report right now, because those are the
11 ones you picked out to cite in your report.  Fair?
12     A.   Those are the ones that I used as
13 examples in my report.
14     Q.   Okay.  So let me start -- if you could
15 go to Page 47 of your report, please.
16         And you -- you have a paragraph -- it's
17 actually the first full paragraph on Page 47,
18 starting:  Defendants' documents provide further
19 support.
20         Do you see that?
21     A.   I see that.
22     Q.   And say:  provide further support that
23 the public nature of social media use can lead to
24 mental health challenges in teens.
25         And then you quote from a Meta document

Page 630

1  about "user research indicates unwanted photos...
2  are a problem for teens -- and there are no real
3  tools to deal with this."
4          Do you see that?
5      A.  I see that.
6      Q.  And you follow that with saying:  Other
7  defendants' documents contained similar findings.
8  Correct?
9      A.  Yes.
10     Q.  And there's a footnote.  And one of the
11 documents cited in the footnote, the last one, is a
12 TikTok document.  Do you see that?
13     A.  I see that.
14         (TELZER EXHIBIT 29, Document titled
15 [MS Leads + Feature Policy] TTN Age Alignment,
16 Bates TIKTOK3047MDL-036-LARK-00107642-49, was
17 marked for identification.)
18 BY MR. CHERNACK:
19     Q.  Okay.  I'm going to hand you what I'm
20 marking as Exhibit 29.
21         MR. CHERNACK:  It's at Tab 5.
22 BY MR. CHERNACK:
23     Q.  You don't need to worry about the tab
24 numbers.
25         Have you seen this document before?

Page 631

1      A.  I need a moment to look at it, please.
2  Okay.
3      Q.  And I apologize, because these do not
4  have the Bates numbers on them for some reason.  I
5  don't know why that is.
6          MS. COUCH:  Ours has the Bates.
7          MR. CHERNACK:  Yours does?
8          MS. COUCH:  Yeah.
9          MR. CHERNACK:  Oh, even better.
10         MS. COUCH:  Yeah.  It's --
11         MR. CHERNACK:  Oh, great.
12         MS. COUCH:  -- one, two, three --
13         MR. CHERNACK:  That makes my life
14 easier.  Not a problem.
15         MS. COUCH:  It's --
16 BY MR. CHERNACK:
17     Q.  So --
18         MS. COUCH:  It's the sixth page, if you
19 need it.
20 BY MR. CHERNACK:
21     Q.  So the document is the same one,
22 correct?
23     A.  Yes.
24     Q.  Okay.  If you look at the top of the
25 first page, do you see it says "TTN"?

Page 632

1      A.  The very -- the title?
2      Q.  Yes.
3      A.  Yes.
4      Q.  Do you know what "TTN" stands for?
5      A.  I can't recall.
6      Q.  Okay.  If you go to the fifth page,
7  which is the Bates number ending 647.
8      A.  64 -- okay.
9      Q.  Do you see at the very top there's a
10 reference to "TikTok Now"?
11     A.  I see that.
12     Q.  Any reason to disagree that "TTN"
13 stands for "TikTok Now"?
14     A.  I have no reason to disagree.
15     Q.  Okay.  Do you know anything about
16 TikTok Now?
17     A.  I'm not recalling the details.
18     Q.  You don't know what -- what that
19 feature was?
20     A.  I don't recall.
21     Q.  Any idea how long TikTok Now existed?
22     A.  I couldn't tell you.
23     Q.  Okay.
24         (TELZER EXHIBIT 30, Article titled
25 TikTok is axing an in-app feature called TikTok Now

Page 633

1  that mirrored BeReal, was marked for
2  identification.)
3  BY MR. CHERNACK:
4      Q.  I'm going to hand you what I'm marking
5  Exhibit 30, which is at Tab Number 12.
6          You see this is an article from the
7  Associated Press?  It says:  TikTok is axing an
8  in-app feature called TikTok Now that mirrored
9  BeReal.
10     A.  Yes.
11     Q.  Okay.  And do you see there's a date on
12 the article, correct?
13     A.  Yes.
14     Q.  And that's June 27, 2023, correct?
15     A.  Yes.
16     Q.  And if you look at the article --
17 excuse me -- second paragraph of the article, it
18 says:  This -- the feature, called TikTok Now, was
19 just launched in September.
20         Do you see that?
21     A.  Uh-huh.
22     Q.  Yes?
23     A.  Yes.  Sorry.
24     Q.  And so September would have been
25 September 2022, correct?

Page 634

1      A.   Was just --
2           (Reading to self.)
3           I --
4           MS. COUCH:   Misstates the document.
5           THE WITNESS:   I don't know if I could
6      say that on that.
7      BY MR. CHERNACK:
8      Q.   Okay.   If you want -- if you're going
9      to question that, I can show you something else.
10          But when it says -- I mean, this is an
11     article from June --
12     A.   Yeah.
13     Q.   -- and it says it was just launched in
14     September, you would think that means the prior
15     September, correct?
16     A.   Sure.
17     Q.   I mean --
18     A.   I don't have reason to disagree with
19     that.
20          (TELZER EXHIBIT 31, Document titled
21     Introducing more ways to create and connect with
22     TikTok Now, was marked for identification.)
23     BY MR. CHERNACK:
24     Q.   All right.   But just so we're clear and
25     there's no question, I'm going to mark as

Page 635

1      Exhibit 31 another piece.   Hand it to you.   And
2      this is at Tab Number 11.
3           And this is a piece from TikTok called
4      "Introducing more ways to create and connect with
5      TikTok Now."   Do you see that?
6      A.   I see that.
7      Q.   Okay.   So this is an introduction.   And
8      if you turn to the fourth page of this document,
9      this is dated September 15th, 2022, correct?
10     A.   Sorry.   You want me to go to Page --
11     Q.   Yeah, right there, at the news.
12     A.   Okay.   Yes.
13     Q.   Do you see the date?
14     A.   I see that.
15     Q.   And -- and if you go back to the first
16     page, it says that this -- if you go to the second
17     paragraph:   TikTok Now is the newest way.
18          Do you see that?
19     A.   I see that.
20     Q.   So it's introducing TikTok Now in
21     September of 2022, correct?
22     A.   Sure, I think --
23     Q.   Okay.   So any reason to disagree that
24     TikTok Now is a feature that existed for less than
25     a year?

Page 636

1      A.   Meaning that from this document, we can
2      see that in June they're saying that they're
3      killing it off when it started in September, and
4      so, therefore, less than a year?
5      Q.   Correct.
6      A.   Yes.
7      Q.   We're in agreement there, right?
8      A.   Sure.
9      Q.   So the quote you cited to about -- in
10     Footnote Number 2 is about a feature that lasted
11     for under a year, correct?
12     A.   I -- I'm not putting all these pieces
13     together.   So returning back to Number 29 now, I
14     think.
15     Q.   Correct.   Which is about TikTok Now,
16     which is what you've cited.
17     A.   Yeah.
18     Q.   And you have a quote.   And the quote is
19     talking about a feature that lasted for less than a
20     year, correct?
21     A.   Correct.
22     Q.   Okay.   You don't know why TikTok axed
23     that feature, correct?
24     A.   I don't recall off the top of my head.
25     Q.   Do you think you ever knew?

Page 637

1      A.   I'm not sure if I knew that or saw
2      anything about that.
3      Q.   Okay.   You can put that aside.
4           If we can move forward to Page 49 of
5      your report, so two pages later.   And you have --
6      excuse me.
7           You talk about constant accessibility,
8      correct?
9      A.   At the end of that first paragraph?   Is
10     that where you're referring to?
11     Q.   Yes.   I'm sorry.
12     A.   I see that.
13     Q.   Okay.   And you go on at Footnote 6 to
14     cite a TikTok document talking about that this
15     finding is further supported by defendants' own
16     research.
17          Do you see that?   The second --
18     A.   The second paragraph?
19     Q.   Yeah.
20     A.   Yes, I see that.
21     Q.   Then it says:   For example, TikTok's
22     internal studies reported -- and then you have a
23     quote.
24          Do you see that?
25     A.   I see that.

Page 638

1    (TELZER EXHIBIT 32, Document titled
2 [TikTank] Wellbeing impacts - research report,
3 Bates TIKTOK3047MDL-002-00100441-62, was marked for
4 identification.)
5    MR. CHERNACK:  Okay.  And, if we could,
6 I'm going to mark as Exhibit 32, and this is at
7 Tab Number 1, a TikTank well-being impact research
8 report.
9 BY MR. CHERNACK:
10    Q.  Now, this is the document you cite in
11 Footnote 6, correct?
12    A.  Yes.
13    Q.  Okay.  And you have seen this document
14 before, right?
15    A.  Yes.
16    Q.  And it's from March of 2020?
17    A.  Yes.
18    Q.  If we go to the second page, first of
19 all, there's a number of bullet points.
20    Do you see that?
21    A.  I do.
22    Q.  All right.  If we look at the first of
23 those bullet points it says:  Two of TikTok's main
24 strengths from a well-being perspective are that it
25 values authenticity rather than encouraging the

Page 639

1 "perfect" image and encourages active creation and
2 engagement rather than passive use.
3    Do you see that?
4    A.  I see that.
5    Q.  You didn't mention that in your report,
6 did you?
7    A.  I did not.
8    Q.  Okay.  And then the next paragraph
9 states:  Our high proportion of younger users mean
10 that we may need to talk more precautions than
11 other platforms with older user bases.  Correct?
12    A.  I'm sorry.  I'm just catching up.
13 Yeah.
14    Q.  I read that correctly, didn't I?
15    A.  Yeah.
16    Q.  And you'd agree that was a good --
17 that's a good thing, correct?
18    MS. COUCH:  Objection.  Vague.
19    THE WITNESS:  I don't know what your
20 question is.  Can you repeat it?
21 BY MR. CHERNACK:
22    Q.  Sure.  Do you agree that it's a good
23 thing that TikTok is considering taking more
24 precautions based upon having a high proportion of
25 younger users?

Page 640

1    MS. COUCH:  Objection.  Vague.
2    THE WITNESS:  Based on my readings of
3 the larger documents, I know that these platforms
4 identified young users as highly vulnerable.  It
5 looks like that is also the case here.
6    Indicating that they want to take
7 precaution does not necessarily -- indicating that
8 those precautions are being taken well.
9 BY MR. CHERNACK:
10    Q.  Let me -- let me ask that question
11 again.
12    Is it a good thing that a company is
13 considering or is looking at taking precautions to
14 protect their user base?
15    A.  Broadly speaking, a company should take
16 precautions.
17    Q.  Okay.  And, as we just looked at,
18 there's a comment you made in your report on
19 Page 49 about TikTok's internal studies.
20    Do you see that?  We just looked at
21 that.
22    A.  Okay.
23    Q.  I'm not going to read it again.  I'm
24 assuming it's in the record.
25    And if we could go to the page that

Page 641

1 ends with 445 on the Bates numbers.
2    A.  Yep.
3    Q.  And if you look at the bottom of the
4 page.  Do you see that?  It's in slightly different
5 colored font, starting in the paragraph with "We"?
6    A.  I see that.
7    Q.  Do you see that?
8    A.  Yes.
9    Q.  And after the "we found that
10 strong," the rest of that is what you quote here:
11 Longitudinal associations between very frequent
12 social media use and mental health and well-being
13 in girls -- and you added, actually, "and boys,"
14 right?
15    That's not in there, right?  It just
16 says "girls," correct?
17    A.  Correct.
18    Q.  So the brackets is just adding
19 language.  But it's not like you're adding language
20 just rephrasing what was in the report.  You've
21 just added that, correct?
22    A.  I mean, that was added.  I don't
23 recall.  I'd have to look through more of this to
24 see --
25    Q.  But you --

Page 642

```
1        A.  -- the context of that.
2            MS. COUCH:  Misstates the document.
3  BY MR. CHERNACK:
4        Q.  But you understand it's different.
5            Sometimes people use brackets just to
6  change a word to make clearer what the language is.
7            So, for example, it could say "she."
8  And the reader may not know who "she" is, so the
9  brackets will put a person's name in.
10           Do you understand what I'm saying?
11           MS. COUCH:  Misstates the document.
12 Argumentative.
13           MR. CHERNACK:  I'm not reading the
14 document.  So I'm not sure how I can misstate it.
15 BY MR. CHERNACK:
16       Q.  Dr. Telzer, what I'm saying is -- do
17 you understand how brackets work in writing?
18       A.  I think that is inserting a -- a caveat
19 or addition to that sentence.
20       Q.  But sometimes it's done -- say you were
21 quoting something that said:  She went to school
22 today.  Okay?  But the reader doesn't know what
23 the -- who "she" is.
24           And you can put brackets in and put:
25 Dr. Telzer went to school today, so it's clear to
```

Page 643

```
1  the reader.  But you haven't changed the meaning.
2            Do you understand that, what I'm
3  saying?
4            MS. COUCH:  Objection.  Vague.
5            THE WITNESS:  I understand using
6  brackets in a sentence.
7  BY MR. CHERNACK:
8        Q.  Okay.  But here, by adding "and boys,"
9  that's not in the sentence.  That's my point.
10           Correct?  There's nothing about boys in
11 the sentence.  You just added that, correct?
12           MS. COUCH:  Objection.  Misstates the
13 document.
14           THE WITNESS:  I need to look into
15 more -- I need to read the document in full to see.
16 BY MR. CHERNACK:
17       Q.  There's nothing in the document in full
18 or the word "and boys" in that sentence or anything
19 that can be interpreted in that particular sentence
20 to include boys.
21           MS. COUCH:  Objection.  Misstates the
22 document.
23           THE WITNESS:  I am not sure I'm
24 following, and I would like to look through the
25 whole document in order to understand the context
```

Page 644

```
1  of being able to add "and boys" in there.
2  BY MR. CHERNACK:
3        Q.  My question is much simpler.  There's
4  nothing in the particular sentence you quoted in
5  your report where you added "and boys" in the
6  original sentence about boys, correct?
7            MS. COUCH:  Argumentative.  Asked and
8  answered.
9            THE WITNESS:  That specific sentence on
10 that page does not have those words.  I wanted to
11 look through the full document.
12 BY MR. CHERNACK:
13       Q.  Okay.  And then, if you go to the next
14 page of Exhibit Number 32, which you're looking at
15 right now, you can see that the language you quoted
16 from is from Viner, et al.
17           Do you see that?
18       A.  I don't think I'm on the right page.
19 Can you --
20       Q.  I think you -- it's page that ends in
21 4 -- 44 --
22       A.  446?
23       Q.  -- 6.
24       A.  Okay.  I see now.
25       Q.  Okay.  So in your report, going back to
```

Page 645

```
1  your report, Page 49, you say:  TikTok's internal
2  studies.
3            Do you see that?
4        A.  I see that.
5        Q.  And then you have a quote, correct?
6        A.  Yep.
7        Q.  Okay.  But the quote is quoting not
8  TikTok but Viner, et al.
9            Do you see that?
10       A.  I don't know if I understand the
11 question.
12       Q.  Sure.  Do you know who Viner is?
13       A.  I don't recall.
14       Q.  Oh.  Do you know if Viner works for
15 TikTok?
16       A.  I don't recall.
17       Q.  Okay.  You understand that the
18 quotation you took is actually a quote from
19 something that this document, Exhibit 32, is
20 quoting from a piece by Viner, et al.?
21           MS. COUCH:  Objection.  Argumentative.
22           THE WITNESS:  I am quoting this
23 document.  The document is quoted and referenced as
24 coming from this document.
25 BY MR. CHERNACK:
```

Page 646

1    Q.   But the document itself is from
2 Viner -- the quote is from Viner, et al., right?
3         MS. COUCH:   Asked and answered.
4         THE WITNESS:   Sure.  I need to read
5 this in -- in totality to understand the broader
6 context.
7         It appears that Viner, et al., that
8 this is being included in here, that this is being
9 quoted in this larger document.
10 BY MR. CHERNACK:
11    Q.   Okay.  So we can agree that the quote
12 is from Viner, et al., right?
13         MS. COUCH:   Asked and answered.
14         THE WITNESS:   Viner, et al.  I think
15 that we can say that that quote comes from there.
16 It appears that there's a quote within this
17 document --
18 BY MR. CHERNACK:
19    Q.   But you --
20    A.   -- that I'm quoting.
21    Q.   But in your report, you're saying
22 that's a TikTok internal study, correct?
23    A.   I think TikTok's internal research is
24 reporting upon this study.
25    Q.   But that's not a TikTok study, is it?

Page 647

1         MS. COUCH:   Objection.  Argumentative.
2         THE WITNESS:   I'm not sure.
3 BY MR. CHERNACK:
4    Q.   You -- you -- all right.  At the
5 minimum, you don't even know if that's a TikTok
6 study, correct?
7         MS. COUCH:   Asked and answered.
8 Argumentative.
9         THE WITNESS:   I need to review this in
10 totality to be able to understand the context of
11 this better.
12 BY MR. CHERNACK:
13    Q.   And then the piece after the quote from
14 Viner, et al., the TikTok piece discusses the Viner
15 study, correct?  The following paragraph.  Do you
16 see that?
17    A.   I see that.
18    Q.   And they said:  Although the
19 researchers said the study was the best available
20 evidence of the effects of social media on
21 teenagers, it still had many limitations.  For
22 example, the data showed how frequently the
23 subjects accessed or checked social media but not
24 how long they spent doing so.
25         Do you see that?

Page 648

1    A.   I see that.
2    Q.   And then:  There's also a lack of
3 evidence to indicate a causal link between social
4 media use and bullying incidence or a deficiency of
5 sleep or physical activity, as explored in the
6 following sections.  Correct?
7    A.   I think I got lost.
8    Q.   The two paragraphs after the --
9    A.   I'm on the wrong page.  "There's also a
10 lack of evidence" -- okay.
11    Q.   Did I read that correctly?
12    A.   "Indicate a causal link between social
13 media use and" --
14         (Reading to self.)
15         I missed the end of your statement as I
16 was looking for -- or the end of your reading of
17 the quote as I was looking for it in the document.
18 BY MR. CHERNACK:
19    Q.   I'll reread the -- do you -- are we
20 okay on the first paragraph beginning with
21 "All [sic] the researchers" -- "although the
22 researchers"?
23    A.   Yes.
24    Q.   Okay.  Then just the second paragraph:
25 There is also a lack of evidence to indicate a

Page 649

1 causal link between social media use and bullying
2 incidence or a deficiency of sleep or physical
3 activity, as explored in the following sections.
4         Did I read that correctly?
5    A.   Yes.
6    Q.   So TikTok's assessment was at least
7 discussing limitations of Viner, et al., correct?
8         MS. COUCH:   Asked and answered.
9         THE WITNESS:   Looks like they are going
10 to discuss that in the following sections.
11 BY MR. CHERNACK:
12    Q.   And they point out some of it here and
13 then have more discussion later, correct?
14    A.   Sure.
15    Q.   But you don't discuss any of that in
16 your report, correct?
17    A.   I refer to the document and rely upon
18 this as well as a host of other documents in my
19 materials considered list, not just the one quote
20 that you're pulling out.
21    Q.   But you mischaracterized this document.
22 What you quoted is saying it's a TikTok study, when
23 it was not a TikTok study, right?
24    A.   I didn't misquote.  I described it as
25 internal studies.  It's internal documents.

HIGHLY CONFIDENTIAL

Page 650

1      Q.   I didn't say you misquoted it.  I said
2  you mischaracterized.  You said it's an internal
3  study.
4      A.   It's internal documents.
5      Q.   It's not an internal study, correct?
6      A.   This specific quote is not an internal
7  study.
8      Q.   Okay.  And then if we could go to the
9  page ending with Bates 449.
10     A.   Uh-huh.
11     Q.   This exhibit also discusses how
12  moderate use of screen time may have slight
13  well-being benefits.  Do you see that?
14     A.   Can you point at me to where you're --
15     Q.   Yeah.  It's --
16     A.   -- seeing that?  Sorry.
17     Q.   It's -- it's the heading in the middle
18  of the page.
19     A.   The "Moderate use"?
20     Q.   Yes.
21     A.   Yep.
22     Q.   Did I read that correctly?
23     A.   "Moderate use of screen time may have
24  slight well-being benefits."  I see that.
25     Q.   Do you know anything about the U.K.'s

HIGHLY CONFIDENTIAL

Page 651

1  Online Harms White Paper that is referenced there?
2      A.   I don't recall.
3      Q.   And it notes:  Most children have a
4  positive experience online.
5           Do you see that?
6      A.   I see that.
7      Q.   It goes on to say:  using the Internet
8  for social networking, educational resources and
9  entertainment.
10          And then it adds:  According to
11  nonacademic literature, potential benefits from
12  social media for young people include:
13          Self-expression:  A study of 2,000 8-
14  to 17-year-olds in the U.K. in December 2019 found
15  that 38 percent find it easier to be themselves
16  online than offline, rising to 54 percent of
17  disabled young people feeling this way.
18          Enhancing relationships:  2018 research
19  report by Ofcom, showed that nine in ten social
20  media users aged 12 to 15 state that social media
21  use has made them feel happy or helped them feel
22  closer to their friends.
23          Do you see all that?
24     A.   I see that.
25     Q.   You didn't discuss any of that in your

HIGHLY CONFIDENTIAL

Page 652

1  report, did you?
2      A.   I did not discuss those specific bullet
3  points.
4      Q.   Have you looked at any of those studies
5  that are cited here?
6      A.   I don't recall.
7      Q.   And sitting here today, you don't have
8  any criticisms of those studies.  Is that fair?
9      A.   I would have to look at them.
10     Q.   So I'm correct that, sitting here
11  today, you don't have any criticisms of those
12  studies, correct?
13          MS. COUCH:  Asked and answered.
14          THE WITNESS:  I can't have a criticism
15  without an opportunity to look at them.
16  BY MR. CHERNACK:
17     Q.   Okay.  And you don't know if you've
18  ever looked at them.  Is that fair?
19     A.   I can't recall.
20          (TELZER EXHIBIT 33, Document titled
21  [P&C] Tiktok's Age Appropriate Design Guidance,
22  Bates TIKTOK3047MDL-006-00326148-95, was marked for
23  identification.)
24  BY MR. CHERNACK:
25     Q.   Okay.  Let's mark as Exhibit 33 another

HIGHLY CONFIDENTIAL

Page 653

1  document you cite.  This is P&C TikTok's Age
2  Appropriate Design Guidelines.
3          MR. CHERNACK:  Did I say Tab 4?  If I
4  didn't, it is.
5  BY MR. CHERNACK:
6      Q.   And if we could start on the first page
7  of the "Overview" section.  Do you see that?
8      A.   Yes.
9      Q.   Okay.  And it says:  We want young
10  people's use of TikTok to support healthy
11  development; and, therefore, we seek to anticipate
12  their evolving needs, capacities and
13  vulnerabilities in the design of our service.
14          We think carefully about what
15  additional support teens need to use TikTok safely
16  and design our platform accordingly.  This means
17  teens experience TikTok differently to adults.
18          Do you see all that?
19     A.   I see that.
20     Q.   Did I read it correctly?
21     A.   Yes.
22     Q.   For the moment, focusing on the last
23  sentence, you agree that teens experience TikTok
24  differently to adults?
25     A.   Do I agree that teens experience TikTok

Page 654

1  differently than adults?

2      Q.   Yeah.

3      A.   I know that adolescents' social media

4  experiences are shaped by their vulnerabilities in

5  their brains that make them experience social media

6  in unique ways and make them especially vulnerable

7  to social media.

8           I think we can then say that that means

9  that teens are going to experience social media in

10 different ways than adults.

11     Q.   And, therefore, it's appropriate for a

12 social media platform to limit certain features

13 away for -- prevent certain features from being

14 accessible to people under a certain age.  Do you

15 agree with that?

16          MS. COUCH:  Objection.  Vague.

17          THE WITNESS:  It's hard to speculate so

18 broadly, but social media platforms should be made

19 safe for teens.

20 BY MR. CHERNACK:

21     Q.   If you can go to the page ending in

22 Bates Number 152.  And this is a table, and it

23 says -- if you see, there are three columns.  Do

24 you see that?

25     A.   Uh-huh.

Page 655

1      Q.   Yes?

2      A.   Yes.

3      Q.   The first one says "Setting" or

4  "Feature."  And then it's divided by early teens,

5  which are ages 13 to 15, and late teens, 16 to 17.

6  Do you see that?

7      A.   I see that.

8      Q.   So there are different settings for

9  particular groups based on the age of the user,

10 correct?

11          MS. COUCH:  Objection.  Vague.

12          THE WITNESS:  It appears that's what

13 that particular line is showing.

14 BY MR. CHERNACK:

15     Q.   Okay.  Now, if we could jump forward

16 for a moment to the page ending in Bates Number

17 181.  Are you with me?

18     A.   I'm on 181.

19     Q.   Okay.  If you look at the bottom, it

20 says:  Participating in a Live Match.

21          Do you see that?

22     A.   "Participating in a Live Match," yes.

23     Q.   Okay.  And it says -- do you know what

24 a live match is?

25     A.   I don't think I recall what that means.

Page 656

1      Q.   Okay.  Let me mark as Exhibit 34 what's

2  at Tab 10.

3           (TELZER EXHIBIT 34, Document titled

4  Start a LIVE match to call on your supporters,

5  Updated on Feb 11, 2025, was marked for

6  identification.)

7  BY MR. CHERNACK:

8      Q.   And if you look at the last paragraph

9  on this page, it describes what a live match is,

10 where it says:  A live match is a feature that

11 allows creators to engage in competitions with each

12 other during a co-hosted live session.

13          Viewers support their favorite creators

14 by sending gifts, with each coin representing one

15 match point and each like representing three match

16 points.  The creator or team with the highest

17 points at the end of the match wins.  This not only

18 enhances viewer engagement, but also boosts the

19 creator's rewards.

20          Do you see that?

21     A.   I see that.

22     Q.   Okay.  You can put that part aside.

23          And if -- if you look, first of all,

24 the setting is "not available" for either early

25 teens or late teens, correct?

Page 657

1      A.   I see that.

2      Q.   And there's also a comment, if you look

3  to the right -- and I realize the writing is very

4  small, which may be more of a problem for me than

5  it is for you.

6           But it says in the last -- it's the

7  bottom quote.  It says:  Putting 16- to

8  17-year-olds in a position where they are required

9  to compete for likes would not be well received,

10 and I would advise against opening up Match for

11 this reason.

12          Do you see that?

13     A.   I see that.

14     Q.   So what we can see here is both that

15 it's not available and a comment from a TikTok

16 employee encouraging that it stays that way,

17 correct?

18     A.   I see that.

19     Q.   Okay.  And even if -- now, you -- you

20 had stated that you thought TikTok is trying to

21 engage -- maximize teenage engagement, correct?

22     A.   My review of documents indicate that

23 the platforms and the algorithms in particular are

24 used to maximize teenager engagement.

25     Q.   But if TikTok thought that this could

Page 658

1  encourage user engagement but nonetheless wasn't
2  making it available to teens, that would not be
3  seeking to maximize engagement, would it?
4       MS. COUCH:  Objection.  Hypothetical.
5  Calls for speculation.
6       THE WITNESS:  I can't speculate on that
7  hypothetical.
8  BY MR. CHERNACK:
9       Q.   Okay.  But at least you're seeing here
10 there's a feature that is being restricted to a
11 certain age group, correct?
12      A.   I see there -- in this context, there's
13 one feature that is saying that it is not
14 available.
15      Q.   Okay.  We're focusing on one.  Do you
16 know if there are other features that TikTok
17 precludes those that are under 18 from accessing?
18      A.   I can't think off -- or I can't produce
19 them off the top of my head, if there are any.
20      Q.   But you aren't saying there aren't any,
21 correct?
22      A.   I can't recall.
23      Q.   Okay.  If we look at Page 50 of your
24 report, you're talking about quantifiability in
25 this section at the top of 50, correct?

Page 659

1       A.   Yes.
2       Q.   And the second paragraph talks about --
3  starts with:  All of the defendants' internal
4  documents reflect this phenomenon.  Correct?
5       A.   Yes.
6       Q.   And then, going down about four lines,
7  you say:  A similar phenomenon was observed with
8  respect to likes, comments, and notifications.
9  Correct?
10      A.   Yes.
11      Q.   And what you're citing from TikTok is
12 the language we just looked at in that comment,
13 correct?  If you look in Footnote 8.
14      A.   This is talking about the
15 quantifiability.
16      Q.   Right.  But look at Footnote 8.
17      A.   Yeah.
18      Q.   And the language I quoted -- excuse me.
19      The language you quoted is what I just
20 read to you, correct?
21      A.   That is correct.
22      Q.   Okay.  So what you quoted here is
23 language encouraging TikTok not to change the
24 settings to make a feature that it was already
25 blocking to those under the age of 18, correct?

Page 660

1       A.   I think it's acknowledging one example
2  where they identify knowing that competing for
3  likes would not be good.
4       Q.   But the point is --
5       A.   That the --
6       Q.   I'm sorry.  I didn't mean to cut you
7  off.
8       A.   Sorry.  That the quantifiability in
9  this like feature is likely not a good thing that
10 they should do.
11      Q.   But it's talking about competing for
12 likes, correct?
13      A.   That is one domain, I think, of the
14 quantifiability here of the likes.
15      Q.   But you're talking about a thing that
16 TikTok wasn't doing because of the very concern
17 you're expressing, correct?
18      MS. COUCH:  Argumentative.
19      THE WITNESS:  I think that they are
20 discussing the quantifiability of likes; and,
21 therefore, it's quoted there.
22 BY MR. CHERNACK:
23      Q.   Okay.  And then if we go to the page
24 ending in 161 on the exhibit in front of you, which
25 I believe is Number 33.

Page 661

1       And do you see on the left-hand column
2  the feature now being looked at is:  Allow others
3  to download teens' videos?
4       Do you see that?
5       A.   I see that.
6       Q.   And looking at the early teens, the 13-
7  to 15-year-olds, what does it say about that
8  feature?
9       A.   Sorry.  I don't see how to identify the
10 13 to 15.
11      Q.   It's just one column to the right, as
12 we saw back on the first page we looked at where it
13 sets out the columns.  That's back on the -- I
14 think it's the fifth page of this document.
15      A.   Oh, I see.  Okay.
16      Q.   What does it say about early teens in
17 that feature?
18      A.   Permanently disabled?
19      Q.   Yes.  Okay.  And then about older
20 teens?
21      A.   Off by default with the option to
22 change to on.
23      Q.   Which is different from what you said
24 about many features.  This one is, at least at this
25 time, is set to off, correct?

Page 662

1    A.   I don't think I refer to features as --
2   I don't think I've referred to allowing others to
3   download teens' videos.
4        What I'm talking --
5        Q.   I'm sorry.  It was a bad question.  I
6   was talking more generally.
7        You were talking, I believe, with
8   counsel for YouTube, and you made a comment that,
9   basically, these safety features were set to off
10  and you had to turn them on, correct?  In many --
11  in most cases, generally speaking?
12       A.   I recall seeing a lot of documents
13  where some safety features were opt-in --
14       Q.   And -- and my --
15       A.   -- rather than turn off.
16       Q.   And I don't think your comment was
17  focused on YouTube, and my question wasn't.
18       I just -- you made a general comment.
19  And here you're seeing this is the opposite of
20  that, correct?
21       A.   In this case, there is an example of
22  a -- a default with an opt-to-change-on option.
23       Q.   Okay.  And in discussing why it's
24  permanently disabled for younger teens, the
25  document states -- and correct me if I'm reading

Page 663

1   this incorrectly:  Early teens are less likely to
2   understand the long-term consequence of not being
3   able to retain control of a video once it has been
4   downloaded.
5        Do you see that?
6        A.   I do.
7        Q.   Any criticism of TikTok's decision to
8   permanently disable that feature for 13- to
9   15-year-olds?
10       A.   I don't have a criticism of disabling
11  that.
12       Q.   Okay.  In your experience as a
13  professor and a researcher, when you publish a
14  research study, are there common elements of it?
15       A.   There's an abstract.  There's an
16  introduction.  There's a methods.  There's a
17  discussion.  There's references.
18       Q.   Okay.  Let's turn to Page 51, which
19  I -- actually, counsel for Meta talked to you about
20  this a little bit.
21       A.   51 of this --
22       Q.   Of your report.  I'm sorry.
23       A.   Sorry.  Okay.
24       Q.   And if you look at the -- it's the
25  paragraph before the asynchronicity section.

Page 664

1        A.   Uh-huh.
2        Q.   It talks about YouTube internal
3   documents, about how a high volume of video -- that
4   the high volume of videos that can repeat the same
5   message.  And you say there:  Meta and ByteDance
6   studies reflect similar conclusions as well.
7        Did I read that correctly?
8        A.   Yes.
9        Q.   Do you know what ByteDance is?
10       A.   I don't think I recall what that means.
11       Q.   Okay.  Let me show you what's at Tab 3.
12       MR. CHERNACK:  I'm going to mark it as
13  Exhibit 35.
14       (TELZER EXHIBIT 35, Document titled
15  Rabbit Holes --> No doubt about it; it will happen,
16  Bates TIKTOK3047MDL-004-00144763-64, was marked for
17  identification.)
18  BY MR. CHERNACK:
19       Q.   Am I correct this is the document you
20  cite --
21       A.   Yes.
22       Q.   -- in your report?
23       A.   Yes.
24       Q.   Is there an abstract?
25       A.   To what?

Page 665

1        Q.   To Exhibit 35?
2        A.   There's not an abstract.
3        Q.   Introduction?
4        A.   There's not an introduction.
5        Q.   Description of methodology?
6        A.   There's not a description of the
7   methodology.
8        Q.   A literature review?
9        A.   I mean, this is just a list of bullet
10  points.
11       Q.   Okay.  You describe it as a study in
12  your report, don't you?
13       A.   I think I give an example of one
14  document that helps us to reflect upon this broader
15  conclusion.
16       Q.   If you have a statement in something
17  you wrote and dropped a footnote to something that
18  was totally different, would that be proper?
19       MS. COUCH:  Argumentative.
20       THE WITNESS:  I gave an example of one
21  among many documents that I reviewed --
22  BY MR. CHERNACK:
23       Q.   But this --
24       A.   -- amongst here.
25       Q.   -- this sentence says:  Meta and

Page 666

1  ByteDance studies reflect similar conclusions as
2  well.
3            And what you cite is not a study,
4  correct?
5            MS. COUCH:  Argumentative.
6            THE WITNESS:  I provide one footnote to
7  a document amongst many other documents that I
8  reviewed that do provide that and that are in my
9  materials considered list.
10 BY MR. CHERNACK:
11      Q.   You did not cite a ByteDance study in
12 Footnote 10, did you?
13           MS. COUCH:  Asked and answered.
14           THE WITNESS:  I reference one example
15 here amongst many that I considered and reviewed in
16 the materials considered list.
17 BY MR. CHERNACK:
18      Q.   You're not answering my question,
19 Doctor.
20           First of all, you agree Exhibit 35 is
21 not a study, correct?
22      A.   I need to review this, but it looks
23 like a list of bullet points.
24      Q.   It's a page and -- not even a page and
25 a half.  Is this a study?

Page 667

1       A.   This looks like a list of bullet
2  points.
3       Q.   So that's not a study, correct?
4       A.   It does not look like a study.
5       Q.   All right.  Is there any mention of
6  ByteDance?
7       A.   Not in this document.
8       Q.   Okay.  All right.  You -- you can put
9  that aside.
10           Am I correct you wrote your report
11 yourself?
12      A.   I wrote my report.
13      Q.   Okay.  I just have one last question,
14 and maybe I'm missing something.
15           If you go to Page 7, the last
16 paragraph.
17           You say you received your undergrad
18 degree in psychology at Mount Holyoke in 2004,
19 correct?
20      A.   Uh-huh.
21      Q.   And it says:  where I graduated
22 magna cum laude with highest honors.  Is that
23 correct?
24      A.   That's correct.
25      Q.   So "magna cum laude" means "highest

Page 668

1  honors"?
2       A.   I graduated with two honors magna cum
3  laude as well as highest honors in my psychology
4  degree.
5       Q.   Okay.  I just wanted to make sure that
6  was clear.  Is that on your CV, though, in --
7  online saying that?
8       A.   I'm not sure, but I'm happy to look at
9  it.
10      Q.   All right.  I just wanted to make sure
11 it was clear, and I just -- if that's the case,
12 that's fine.  I'm just -- want to make sure I was
13 right.
14           MR. CHERNACK:  All right.  I don't have
15 anything else right now.  Thank you very much for
16 your time.
17           THE WITNESS:  Okay.  Thank you.
18           MS. COUCH:  Are the defendants done?
19 You guys have five minutes.  I mean, I'm not
20 encouraging it, but this is the moment.  I don't
21 want anyone to say that they were rushed.
22           MS. JONES:  Well --
23           MS. COUCH:  I'm being silly, Phyllis.
24 Let's not respond.
25           MS. EHLER:  There's probably not --

Page 669

1  there's probably not anything we can --
2           MS. JONES:  We can go off the record.
3           MS. EHLER:  -- effectively use those
4  five minutes for right now, so --
5           THE REPORTER:  Are we going off the
6  record?
7           MR. CHERNACK:  Yes.
8           THE VIDEOGRAPHER:  Going off the
9  record.  The time is 2:21 p.m.
10                   * * *
11           (Whereupon, there was a recess in the
12 proceedings from 2:21 p.m. to 2:50 p.m.)
13                   * * *
14           THE VIDEOGRAPHER:  Going back on the
15 record.  The time is 2:50 p.m.
16           MR. CHERNACK:  Can we confirm we have
17 agreement that if I object, that it will be an
18 objection for all defendants and we do not have to
19 each one separately object?
20           MS. COUCH:  Confirmed.
21           MR. CHERNACK:  Thank you.
22                   * * *
23              EXAMINATION
24 BY MS. COUCH:
25      Q.   Dr. Telzer, as a scientist, would it be

HIGHLY CONFIDENTIAL

Page 670

1  widely accepted in your field to cherry-pick
2  singular sentences from a handful of studies to
3  reach a conclusion?
4      A.   No.
5      Q.   And did you rely upon your review of
6  over 1500 studies, your education, fieldwork,
7  defendant documents to support your opinions as
8  stated in your report?
9      A.   Yes.
10     Q.   Did your report and opinions
11 incorporate all of these studies, including the
12 limitations, data and methods as stated in your
13 report?
14     A.   Yes.
15          MR. CHERNACK:  Objection.
16 Mischaracterizes the record.
17 BY MS. COUCH:
18     Q.   In forming your opinions, did you
19 consider the benefits of social media?
20     A.   Yes.
21     Q.   And have you previously published on
22 the benefits of social media?
23     A.   Yes.
24     Q.   And in reviewing all of the materials
25 considered, is it still your opinion as stated on

HIGHLY CONFIDENTIAL

Page 671

1  Page 65 of your report that the perceived
2  short-term benefits are likely outweighed by the
3  risk of long-term negative outcomes?
4      A.   Yes.
5      Q.   And yesterday and today, do you recall
6  being shown various clips and slides from
7  interviews and presentations that you have given?
8      A.   Yes.
9          (TELZER EXHIBIT 36, Video - Slides for
10 presentation with Eva Telzer and Mitch Prinstein -
11 Digital Minds:  Brain Development in the Age of
12 Technology, was marked for identification.)
13          (TELZER EXHIBIT 37, Digital Minds:
14 Brain Development in the Age of Technology Rough
15 Transcript, was marked for identification.)
16          (TELZER EXHIBIT 38,
17 #Technology#SocialMedia#AdolescentMentalHealth/
18 Webinar with Dr. Mitch Prinstein and Dr. Eva
19 Telzer, 5/31/23 Rough Transcript, was marked for
20 identification.)
21          (TELZER EXHIBIT 39, Interview with
22 Eva Telzer and Mitch Prinstein at the BrainMind
23 Summit Rough Transcript, was marked for
24 identification.)
25 BY MS. COUCH:

HIGHLY CONFIDENTIAL

Page 672

1      Q.   And I'm going to put in front of you
2  what I have marked as Exhibits 36, 37, 38 and 39.
3          And in looking at these exhibits, do
4  these appear to be true and accurate copies of
5  your interview and slides as previously reviewed?
6      A.   Yes.
7          MS. COUCH:  That's all my questions.
8          MR. CHERNACK:  We're going to need a
9  moment to discuss.
10         THE VIDEOGRAPHER:  All right.  Going
11 off the record.  The time is 2:52 p.m.
12                  * * *
13         (Whereupon, there was a recess in the
14 proceedings from 2:52 p.m. to 2:59 p.m.)
15                  * * *
16         THE VIDEOGRAPHER:  Going back on the
17 record.  The time is 2:59 p.m.
18                  * * *
19               EXAMINATION
20 BY MR. CHERNACK:
21     Q.   I just have a few quick questions.
22         Talking about Exhibits 36 to 39, is
23 there anything in any of those four exhibits that
24 you were just handed by plaintiffs' counsel that
25 adolescents should stay off social media entirely?

HIGHLY CONFIDENTIAL

Page 673

1          MS. COUCH:  Objection.  Compound.
2          THE WITNESS:  I can review in detail if
3  you like, but I don't think that these documents
4  indicated to stay off entirely.  They cite to limit
5  that -- limit social media use.
6  BY MR. CHERNACK:
7      Q.   Is there anything in Exhibits 36 to 39
8  stating that it's been established that social
9  media use in adolescents causes any mental health
10 condition?
11         MS. COUCH:  Objection.  Compound.
12         THE WITNESS:  I would have to review
13 every sentence of that in order to indicate whether
14 that is said in any of these documents.
15 BY MR. CHERNACK:
16     Q.   You can't identify right now any such
17 statement, can you?
18     A.   I cannot.
19     Q.   Is there any statement in Exhibits 36
20 to 39 about any conflict of interest you have based
21 upon your work for plaintiffs in this litigation?
22         MS. COUCH:  Objection.  Compound.
23         THE WITNESS:  I don't believe so.
24 BY MR. CHERNACK:
25     Q.   And then you -- you were asked a

HIGHLY CONFIDENTIAL

Page 674

1  question about -- talking about in your report that
2  you evaluated the benefits of social media.  What
3  methodology did you use to evaluate those benefits?
4      A.   I've done broad literature review of
5  published articles.  I have also published articles
6  on it myself.  I have looked at that broad
7  literature to understand the benefits.
8      Q.   But other than --
9      MS. COUCH:  I think we're done.  No.
10  We're done.  Time is up.
11      MR. CHERNACK:  Well, that's debatable.
12  Then we still have five minutes left from before.
13      MS. COUCH:  That was not our agreement.
14  Our agreement was redirect would be limited to my
15  redirect.  We went a minute and 42 seconds, so I
16  actually allowed extra time to finish.
17      MR. CHERNACK:  Well, I just will note
18  that we reserve our rights on the record to reopen
19  this based upon additional documents we believe we
20  had asked for previously and that we're entitled
21  to.
22      But other than that, thank you very
23  much for your time, Dr. Telzer.  I know it's been a
24  long two days.  And I think we're done.
25      MS. COUCH:  And I would just note for

HIGHLY CONFIDENTIAL

Page 675

1  the record, our objections are noted, and the
2  response and objections to the deposition notice.
3      And other than that, I'm good to go off
4  the record.
5      THE VIDEOGRAPHER:  Before we go off the
6  record, the total time for today is:  Meta had
7  1 hour and 41 minutes.  Snap, 43 minutes.  YouTube,
8  39 minutes.  TikTok, 48 minutes.  And plaintiffs
9  had 2 minutes.
10      That ends this deposition.  The time is
11  3:01 p.m.
12      (WHEREUPON, the deposition was
13  concluded at 3:01 p.m.)
14      (The witness reserves the right to read
15  and sign this transcript.)
16
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL

Page 676

1          DEPOSITION ERRATA SHEET
2
3  Our Assignment No:  7396484
4  Case Caption:  Social Media Adolescent Addiction
5  (JCCP No. 5255)
6
7      DECLARATION UNDER PENALTY OF PERJURY
8      I declare under penalty of perjury that I
9  have read the entire transcript of my Deposition
10  taken in the captioned matter or the same has been
11  read to me, and the same is true and accurate, save
12  and except for changes and/or corrections, if any,
13  as indicated by me on the DEPOSITION ERRATA SHEET
14  hereof, with the understanding that I offer these
15  changes as if still under oath.
16      Sign on the _____ day of
17  _____, 20 __.
18
19
20          _____
21          EVA H. TELZER, Ph.D.
22
23
24
25

HIGHLY CONFIDENTIAL

Page 677

1          DEPOSITION ERRATA SHEET
2
3  Page No. _____ Line No. _____ Change to: _____
4  _____
5  Reason for Change: _____
6  Page No. _____ Line No. _____ Change to: _____
7  _____
8  Reason for Change: _____
9  Page No. _____ Line No. _____ Change to: _____
10  _____
11  Reason for Change: _____
12  Page No. _____ Line No. _____ Change to: _____
13  _____
14  Reason for Change: _____
15  Page No. _____ Line No. _____ Change to: _____
16  _____
17  Reason for Change: _____
18  Page No. _____ Line No. _____ Change to: _____
19  _____
20  Reason for Change: _____
21
22  SIGNATURE: _____  DATE:_____
23          EVA H. TELZER, Ph.D.
24
25

HIGHLY CONFIDENTIAL

Page 678

DEPOSITION ERRATA SHEET

1

2

3  Page No. _____ Line No. _____ Change to: _____

4  _____

5  Reason for Change: _____

6  Page No. _____ Line No. _____ Change to: _____

7  _____

8  Reason for Change: _____

9  Page No. _____ Line No. _____ Change to: _____

10 _____

11 Reason for Change: _____

12 Page No. _____ Line No. _____ Change to: _____

13 _____

14 Reason for Change: _____

15 Page No. _____ Line No. _____ Change to: _____

16 _____

17 Reason for Change: _____

18 Page No. _____ Line No. _____ Change to: _____

19 _____

20 Reason for Change: _____

21

22

23 SIGNATURE: _____ DATE: _____

24            EVA H. TELZER, Ph.D.

25

HIGHLY CONFIDENTIAL

Page 679

CERTIFICATE OF REPORTER

1

2

3       I, Cindy A. Hayden, Registered Merit

4  Reporter and Notary Public for the State of North

5  Carolina at Large, do hereby certify that the

6  foregoing transcript is a true, accurate, and

7  complete record.

8       I further certify that I am neither related

9  to nor counsel for any party to the cause pending

10 or interested in the events thereof.

11      Witness my hand, I have hereunto affixed my

12 official seal this 16th day of June, 2025 at

13 Charlotte, Cabarrus County, North Carolina.

14

15

16

17 _____

18      Cindy A. Hayden, RMR, CRR

   My Commission expires

19 April 7, 2027

20

21

22

23

24

25