**Exhibit 3**

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE GENERAL CAUSATION TESTIMONY OF PLAINTIFFS' EXPERTS**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3    IN RE: SOCIAL MEDIA ADOLESCENT ) Case No.

     ADDICTION/PERSONAL INJURY      ) 4:22-MD-03047-YGR (PHK)

4    PRODUCTS LIABILITY LITIGATION  )

                                    ) MDL No. 3047

5                                   )

     THIS DOCUMENT RELATES TO:      )

6                                   )

     People of the State of         )

7    California, et al. v. Meta      )

     Platforms, Inc., et al.        )

8    _____ )

9

10      VIDEOTAPED DEPOSITION OF MITCH PRINSTEIN, PH.D.

11   _____

12

13        PURSUANT TO NOTICE, the above-entitled deposition

14   was taken on behalf of the Defendants at Washington Duke

15   Inn & Golf Club, 3001 Cameron Blvd., Durham, North

16   Carolina 27705, on Friday, September 26, 2025, at

17   9:09 a.m., before Sophie Brock, Registered Diplomate

18   Reporter, Certified Realtime Reporter, and Notary Public

19   in and for the State of North Carolina.

20

21

22

23

24

25      Job No. MDLG7611271

Page 1

```
1              UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF CALIFORNIA
3   IN RE: SOCIAL MEDIA ADOLESCENT ) Case No.
    ADDICTION/PERSONAL INJURY      ) 4:22-MD-03047-YGR (PHK)
4   PRODUCTS LIABILITY LITIGATION  )
                                   ) MDL No. 3047
5                                  )
    THIS DOCUMENT RELATES TO:      )
6                                  )
    People of the State of         )
7   California, et al. v. Meta     )
    Platforms, Inc., et al.        )
8   _____)
9
10       VIDEOTAPED DEPOSITION OF MITCH PRINSTEIN, PH.D.
11   _____
12
13       PURSUANT TO NOTICE, the above-entitled deposition
14   was taken on behalf of the Defendants at Washington Duke
15   Inn & Golf Club, 3001 Cameron Blvd., Durham, North
16   Carolina 27705, on Friday, September 26, 2025, at
17   9:09 a.m., before Sophie Brock, Registered Diplomate
18   Reporter, Certified Realtime Reporter, and Notary Public
19   in and for the State of North Carolina.
20
21
22
23
24
25   Job No. MDLG7611271
```

Page 2

```
1              A P P E A R A N C E S
2   ON BEHALF OF THE DEFENDANTS META PLATFORMS, INC., ET AL:
3       COVINGTON & BURLING LLP
        One CityCenter
4       850 Tenth Street, NW
        Washington, D.C. 20001-4956
5       Telephone: (202) 662-5868
        By:   PHYLLIS A. JONES, ESQ.
6             pajones@cov.com
              BRIAN REISER, ESQ.
7             breiser@cov.com
              ALEX KENNEDY, ESQ.
8             akennedy@cov.com
        (In Person)
9
10  ON BEHALF OF THE PLAINTIFFS:
11      OFFICE OF THE ATTORNEY GENERAL OF KENTUCKY
        1024 Capital Center Drive
12      Suite 200
        Frankfort, Kentucky 40601
13      Telephone: (502) 696-5519
        By:   ZACHARY J. RICHARDS, ESQ.
14            zach.richards@ky.gov
        (In Person)
15            GARY THOMPSON, ESQ.
              gary.thompson@ky.gov
16            PHILIP R. HELERINGER, ESQ.
              philip.heleringer@ky.gov
17
18
        OFFICE OF THE ATTORNEY GENERAL OF COLORADO
19      Colorado Department of Law
        Ralph L. Carr Judicial Building
20      1300 Broadway, 10th Floor
        Denver, Colorado 80203
21      Telephone: 720) 508-6000
        By:   JASON SLOTHOUBER, ESQ.
22            jason.slothouber@coag.gov
        (In Person)
23            KRISTA BATCHELDER, ESQ.
              krista.batchelder@coag.gov
24            SHAHEEN SHEIKH, ESQ.
              shaheen.sheikh@coag.gov
25      (Via Zoom)
```

Page 3

```
1              A P P E A R A N C E S (Continued)
2   ON BEHALF OF THE PLAINTIFFS:
3       OFFICE OF THE ATTORNEY GENERAL OF
        MASSACHUSETTS
4       1 Ashburton Place, 20th Floor
        Boston, Massachusetts 02108
5       Telephone: (617)-963-2062
        By:   DOUGLAS S. MARTLAND, ESQ.
6             douglas.martland@mass.gov
        (In Person)
7
8   CONNECTICUT OFFICE OF THE ATTORNEY GENERAL
        165 Capitol Avenue
9       Hartford, Connecticut 06106
        Telephone: (860) 808-5318
10      By:   TESS SCHNEIDER, ESQ.
              tess.schneider@ct.gov
11      (In Person)
12
    N.C. DEPARTMENT OF JUSTICE
13  OFFICE OF THE ATTORNEY GENERAL
        114 W. Edenton Street
14      Raleigh, North Carolina 27603
        Telephone: (919) 716-6015
15      By:   JOSH ABRAM, ESQ.
              jabram@ncdoj.gov
16            CHARLES WHITE, ESQ.
              cwhite@ncdoj.gov
17      (Via Zoom)
18
    WASHINGTON STATE ATTORNEY GENERAL S OFFICE
19      800 Fifth Avenue, Suite 2000
        Seattle, Washington 98104
20      Telephone: (206) 442-4486
        By:   WILL O CONNOR, ESQ.
21            will.oconnor@atg.wa.gov
        (Via Zoom)
22
23
24
25
```

Page 4

```
1              A P P E A R A N C E S (Continued)
2   OFFICE OF THE WEST VIRGINIA ATTORNEY
    GENERAL
3       Eastern Panhandle Consumer Protection
        Office
4       269 Aikens Center
        Martinsburg, West Virginia 25404
5       Telephone: (304) 267-0239
        By:   LAUREL K LACKEY, ESQ.
6       (Via Zoom)
7
8   NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
        Richard J. Hughes Justice Complex
        25 Market Street
9       Trenton, New Jersey 08611
        Telephone: (609) 292-4925
10      By:   VERNA PRADAXAY, ESQ.
              Verna.Pradaxay@law.njoag.gov
11            MANDY WANG, ESQ.
              Mandy.Wang@law.njoag.gov
12      (Via Zoom)
13
    STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
14  OFFICE OF THE ATTORNEY GENERAL
        By:   NAYHA ARORA, ESQ.
15            Nayha.Arora@doj.ca.gov
        (Via Zoom)
16
17      ON BEHALF OF THE PLAINTIFF TEXAS SCHOOL
    DISTRICTS:
18
        EILAND & BONNIN, PC
19      2200 Market Street, Suite 501
        Galveston, Texas 77550
20      Telephone: (409) 763-3260
        By:   DAVID BONNIN, ESQ.
21            dbonnin@eilandlaw.com
              CRAIG EILAND, ESQ.
22            ceiland@eilandlaw.com
        (Via Zoom)
23
24
25
```

## Page 5

```
1              A P P E A R A N C E S  (Continued)
2   EXHIBITS TECH:
3         Eddie Flick
4
5   VIDEOGRAPHER:
6         Matthew Walters
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 6

```
1              INDEX OF EXAMINATIONS
2                                              PAGE
3   BY MS. JONES . . . . . . . . . . . . . . . . .  8
4
5              INDEX OF EXHIBITS
6   NUMBER          DESCRIPTION          MARKED
7   Exhibit 1   Trial Report of Mitch Prinstein,  . . .13
                Ph.D.
8
                Appendix A: Materials Considered  . . .13
9   Exhibit 2
10  Exhibit 3   Appendix B: Curriculum Vitae of  . . . .13
                Mitch Prinstein, Ph.D.
11  Exhibit 4   Rebuttal Trial Report of Mitch  . . . .13
                Prinstein, Ph.D., dated July 30,
12              2025
13  Exhibit 5   Meta Defendants' Amended Notice . . . .13
                of Deposition of State
14              Plaintiffs' Retained Expert Mitch
                Prinstein and Request for
15              Production of Documents
16  Exhibit 6   Written Testimony of Mitch  . . . . . 127
                Prinstein, Ph.D. before the U.S.
17              Senate Committee on Judiciary,
                dated February 14, 2023
18
19  Exhibit 7   Kaitlyn Burnell paper titled "The . . 135
                effects of social media
20              restriction: Meta-analytic
                evidence from randomized
                controlled trials"
21
22  Exhibit 8   APA Health Advisory on Social . . . . 135
                Media Use in Adolescence
23
24
25
```

## Page 7

```
1              INDEX OF EXHIBITS (Continued)
2   NUMBER          DESCRIPTION          MARKED
3   Exhibit 9   Maheux Article titled "Annual . . . . 189
                Research Review: Adolescent
4               social media use is not a
                monolith: toward the study of
5               specific social media components
                and individual differences"
6
7   Exhibit 10  Burnell Article titled "U.S. . . . . 246
                adolescents' daily social media
8               use and well-being: Exploring the
                role of addiction-like social
9               media use"
10  Exhibit 11  Carter Paper titled "A . . . . . . . 266
                meta-analysis of the effect of
                media devices on sleep outcomes"
11
12  Exhibit 12  Burnell Research Article titled . . . 273
                "Daily links between objective
13              smartphone use and sleep among
                adolescents"
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 8

```
1              P R O C E E D I N G S
2        THE VIDEOGRAPHER:  We are now on
3   record.  Today's date is September 26th, 2025.  The
4   time is 9:09 a.m.
5        This is the video deposition in the matter
6   In Regarding: Social Media Adolescent Addiction
7   Personal Injury Products Liability Litigation, heard
8   in the United States District Court, Northern District
9   of California, MDL No. 3047.
10       Counsel will be noted on the stenographic
11  record.
12       And can the court reporter please swear in
13  the witness.
14  Whereupon,
15            MITCH PRINSTEIN, PH.D.
16       having first been duly sworn/affirmed,
17       was examined and testified as follows:
18  EXAMINATION BY COUNSEL FOR THE DEFENDANTS
19  BY MS. JONES:
20       Q.  Dr. Prinstein, good morning.
21       A.  Good morning.
22       Q.  We met before we went on the record.  My name
23  is Phyllis Jones.  I am one of the lawyers for Meta
24  Platforms in this particular litigation.
25       As I understood your report, you have never
```

Page 9

1  testified in either a deposition or a trial setting;
2  is that right?
3      A.  I've not -- as an adult, I have not been in a
4  trial setting before.
5      Q.  Okay.  Which intrigues me, so I'm going to
6  have to follow up on that.  When you were not an
7  adult, have you participated in a trial setting --
8      A.  I testified in my parents' divorce trial.
9      Q.  Oh, interesting.  Okay.
10      Other than the testimony that you provided
11  in your parents' divorce trial, have you ever provided
12  any testimony in litigation either in a deposition or
13  in a trial setting?
14      A.  No.
15      Q.  I will give you a very top-line -- actually,
16  let me pause for a second.
17      Counsel for the Commonwealth of
18  Massachusetts, I believe, had something he wanted to
19  say, and I neglected to give him an entry point.  Go
20  ahead.
21          MR. MARTLAND:  Thank you, Phyllis.
22  Massachusetts has a reservation for the record.
23      Massachusetts states for the record that
24  prior to today's deposition, opening and rebuttal
25  reports from Dr. Prinstein in the Commonwealth's case

Page 10

1  against Meta were timely served on Defendants and that
2  both reports were substantively identical to
3  Dr. Prinstein's opening and rebuttal expert reports
4  served by the MDL in this matter.
5      Because Dr. Prinstein's expert reports in
6  both cases are substantively identical, for purposes
7  of efficiency and to avoid duplicative efforts,
8  Massachusetts previously provided notice to Defendants
9  that Massachusetts would be participating in today's
10  deposition.  Massachusetts opposes Defendants' efforts
11  to further depose Dr. Prinstein on this basis.
12      Massachusetts understands that Defendants
13  have taken the position that Massachusetts is not
14  barred from attending today's deposition but that
15  Massachusetts's participation in today's deposition
16  will be improper.  Massachusetts disagrees and remains
17  willing to meet and confirm with Defendants to discuss
18  the appropriateness of a further deposition of
19  Dr. Prinstein in the Massachusetts case at an
20  appropriate time.
21          MS. JONES:  Okay.
22          MR. MARTLAND:  Thank you.
23          MS. JONES:  I think it goes without
24  saying that Meta is not foregoing its opportunity
25  depose Dr. Prinstein in connection with his report in

Page 11

1  the Massachusetts AG proceeding, but we are, of
2  course, happy to meet and confer about whether that
3  happens or not.
4  BY MS. JONES:
5      Q.  Dr. Prinstein, so let me give you just
6  a little bit of a snapshot of the rules of the road
7  for a deposition insofar as they are helpful to you.
8      One is, because our court reporter is taking
9  down every word that we say for purposes of a written
10  record down the road, it's important that she have
11  verbal responses for you.  So the natural tendency is
12  to nod or say "hmm."  So if you give an answer, it has
13  to be a verbal answer.  So that's one request that
14  I would make of you.  Is that clear?
15      A.  Sure.
16      Q.  Okay.  The second request is, similarly to
17  keep us out of trouble with the court reporter, we
18  have to be sure that we don't speak over each other.
19  So I will do my very best to let you finish all of
20  your answers before I ask you the next question, and
21  I would just ask that you let me finish my question
22  before you start answering.  Is that okay?
23      A.  Sounds good.
24      Q.  Okay.  If you need a break, that is not a
25  problem.  We will take breaks whether you ask for one

Page 12

1  or not.  We're not going to make you go through this
2  without a break.  My only request is that, if there is
3  a question pending, that we go ahead and have you
4  answer that question before we take any break.  Does
5  that work for you?
6      A.  Sure.
7      Q.  Okay.  Terrific.
8      You have in front of you, Dr. Prinstein,
9  what we have marked as the first five exhibits to your
10  deposition.  Actually, before we get to those, you
11  have in front of you a folder, which I'd like to ask
12  about --
13      A.  Oh.
14      Q.  -- what did you bring with you to your
15  deposition today?
16      A.  Well, my own copies of what you just handed
17  me, so -- yeah.
18      Q.  Okay.  Are the copies that you have in your
19  folder there marked up in any way?
20      A.  No.
21      Q.  Okay.  With permission of your counsel, on a
22  break, we might just flip through them, but otherwise
23  you can keep those to the side.
24      A.  Sure.
25      Q.  All right.

Page 13

1    (Exhibit Nos. 1-5 were marked for identification.)
2  BY MS. JONES:
3    Q.  So what we have marked as the first set of
4  exhibits to your deposition should be:  Marked as
5  Exhibit No. 1, your MDL -- your report served in the
6  federal MDL proceeding, dated May 16th, 2025.  Is that
7  what you have as Exhibit No. 1?
8    A.  It is.
9    Q.  Okay.  And then Exhibit No. 2 to your
10  deposition should be a document entitled
11  "Appendix A: Materials Considered."  Is that what you
12  have?
13    A.  Yes.
14    Q.  Okay.  And then Exhibit No. 3 to your
15  deposition should be what is entitled
16  "Appendix B: Curriculum Vitae of Mitch Prinstein,
17  PhD"; is that correct?
18    A.  Yes.
19    Q.  And then Exhibit No. 4 should be a copy of
20  your -- what is entitled your Rebuttal Trial Report,
21  dated July 30th, 2025, in the MDL proceeding.  Is that
22  right?
23    A.  That's what I have too.
24    Q.  Okay.  And then Exhibit No. 5 should be a
25  document entitled -- it's a little bit of a long

Page 14

1  title.  It's dated September 26th, 2025.  It's
2  entitled "Meta Defendants' Amended Notice of
3  Deposition of State Plaintiffs' Retained Expert Mitch
4  Prinstein and Request for Production of Documents."
5  Is that what you have as Exhibit 5?
6    A.  Yes.
7    Q.  I am assuming that Exhibits 1 through 4 you
8  have seen before?
9    A.  Yes.
10    Q.  Had you ever seen Exhibit No. 5 before
11  I handed it to you this morning?
12    A.  Let's see.
13    Q.  Okay.
14    A.  I don't think so.  No, I don't believe so.
15    Q.  Okay.  Well, we may come back to
16  Exhibit No. 5 in connection with some of the questions
17  that I have for you today, but you can put that to the
18  side for the moment.  All right?
19    A.  Okay.
20    Q.  You've already told me that you have never --
21  other than when you testified previously as a minor,
22  that you have never testified in a deposition or a
23  trial.  Have you ever before -- and you don't need to
24  give me the details for the moment -- but other than
25  this litigation, have you ever been retained as an

Page 15

1  expert in a litigation matter where you didn't
2  eventually testify?
3    A.  I think so.
4    Q.  Okay.  Can you -- are you able to tell me
5  what the litigation was, generally speaking?
6    A.  There was a case regarding -- well, that was
7  an amicus.  There was a case where I was asked to
8  speak to -- I believe it was peer influence and the
9  factors that might lead someone to engage in behaviors
10  they otherwise wouldn't have engaged in -- a teen.
11  But I think shortly after I was asked to participate,
12  the case was settled or dismissed or something.
13    Q.  Do you remember roughly how far back in time
14  that case was?
15    A.  Five, seven, ten years ago.  A while ago.
16    Q.  Do you remember whether it was a civil or a
17  criminal case?  And if you want me to explain that
18  distinction, I'm happy to, but you may already be
19  sensitive to it.
20    A.  I know the difference, I think, but I don't
21  remember which one it was.
22    Q.  Okay.  Do you have any recollection of what
23  the specific claim was in the case?
24    A.  No.  I think that just the idea that peer --
25  just there were some questions about the science

Page 16

1  regarding peer influence and how powerfully that might
2  affect adolescents' behavior.
3    Q.  Did it have anything to do with social media
4  in any way?
5    A.  No.
6    Q.  Okay.  Any other occasions where you have
7  been retained to serve as an expert in a litigation
8  matter but didn't eventually testify?
9    A.  I don't think so.
10    Q.  For the one occasion that you've mentioned
11  where the subject matter was peer influence and how
12  that might affect adolescent behavior, do you remember
13  who it was who reached out and gout involved in the
14  first place?
15    A.  You mean the name of the firm?
16    Q.  Yeah.
17    A.  Oh, no.
18    Q.  Okay.
19     Did you do anything to prepare for your
20  deposition today?
21    A.  Yes.
22    Q.  Tell me what that was.
23    A.  I read over my reports, and I went over some
24  of the pieces cited within the reports.
25    Q.  Anything else?

Page 17

```
 1      A.  You mean, like, what I did last night?  Like,
 2  what I did to prepare recently?
 3      Q.  Well, let me break it down a little bit.
 4          You said that you read over your reports and
 5  you went over some of the pieces cited within the
 6  reports.  When did you do those things?
 7      A.  Over the last 24 hours.
 8      Q.  Okay.  Prior to the last 24 hours, had you
 9  done anything to prepare for your deposition?
10      A.  Yeah.  I -- very much the same kind of thing.
11      Q.  Okay.  Did you meet with counsel -- any of
12  the lawyers here today or any other lawyers -- to
13  prepare for your deposition?
14      A.  Yes.
15      Q.  When did that happen?
16      A.  We also chatted yesterday.
17      Q.  Did you have any communications with counsel
18  prior to yesterday in connection with preparing for
19  your deposition?
20      A.  Yes.
21      Q.  When was that?
22      A.  A few times spread out over the last few
23  weeks.
24      Q.  When you say "a few times," can you help me
25  pin down whether that's more or less than five times?
```

Page 18

```
 1      A.  I'm going to guess, like, five to seven
 2  times.
 3      Q.  Who did you meet with?
 4      A.  The folks sitting right here.
 5      Q.  Each of the four lawyers who are here
 6  representing Massachusetts, Connecticut, Colorado, and
 7  Kentucky?
 8      A.  Yes, together in one group.
 9      Q.  Okay.  Did you all meet in person, or did you
10  meet by Zoom?
11      A.  It was Zoom.
12      Q.  Were there any other lawyers involved in
13  those discussions?
14      A.  There were other Zoom boxes.  I don't know if
15  they were all attorneys or not.
16      Q.  Do you know roughly how long those five to
17  seven sessions lasted?
18      A.  I mean, an average of, like, an hour, 90
19  minutes maybe.
20      Q.  Have you spoken with anyone else about
21  your -- the fact that you were being deposed in this
22  litigation?
23      A.  I mean, other than my wife and a friend, no.
24      Q.  Okay.  Who was the friend that you've spoken
25  with about it?
```

Page 19

```
 1      A.  My friend Adam.
 2      Q.  What is Adam's last name?
 3      A.  Golden.
 4      Q.  Okay.  And what have you talked about with
 5  Adam?
 6      A.  I said that I was going to be deposed.
 7      Q.  Anything more, in terms of detail?
 8      A.  No.
 9      Q.  Okay.  And what about with your wife?  What
10  did you all discuss with respect to your deposition?
11      A.  I told her that this was about social media
12  and the work that we've been doing, and I told her
13  that I believed I was meeting with attorneys from
14  Meta.
15      Q.  Okay.  You were right about that.
16          You are colleagues with Eva Telzer; is that
17  right?
18      A.  Oh.  Yes.
19      Q.  Okay.  Have you spoken to Dr. -- and you know
20  she is a retained expert in certain components of the
21  litigation?
22      A.  Yeah.  Well, that was a point of slight
23  confusion, but we did discuss that, yeah.
24      Q.  Okay.  And so when have you spoken with
25  Dr. Telzer about your respective roles in the case?
```

Page 20

```
 1          MR. RICHARDS:  Object to form.
 2          THE WITNESS:  Sorry?
 3          MR. RICHARDS:  Object to form.  You can
 4  answer the question.
 5          THE WITNESS:  I think that at the point
 6  at which we both learned that we were going to
 7  participate at this level, we sent each other a note
 8  to ask whether we had been mutually contacted.  And
 9  then there have been, I would say, two more times that
10  we've talked to say, "Oh, you know, that's happening
11  for me next week" or "Mine is the week after that,"
12  and that's it.
13  BY MS. JONES:
14      Q.  Just to unpack that a little bit, you said
15  that at some point you both learned that you were
16  going to participate at this level.  What did that
17  mean exactly?  That you were just going to be deposed?
18      A.  Oh, to testify.
19      Q.  Okay.  And when was that interaction?
20      A.  It was probably, like, nine to twelve months
21  ago.  I'm guessing.
22      Q.  And what -- do you recall specifically what
23  you all discussed in that setting nine to twelve
24  months ago?
25      A.  Not much.  I think that -- I think that we
```

Page 21

1  said, "I was just contacted. Were you as well?"
2        "Yes."
3        And that was pretty much it --
4  Q. When you say, "I was just contacted," by whom
5  were you contacted?
6  A. Oh, state attorneys general.
7  Q. And then you said that you and Dr. Telzer had
8  spoken two more times; is that right?
9  A. About this?
10 Q. Yes.
11 A. Yeah, probably two more times.
12 Q. Okay. And what did you talk about in this
13 context?
14 A. That a deposition was coming, or that we were
15 being asked to, you know, engage in this kind of an
16 activity.
17 Q. And do you -- you're aware -- maybe you're
18 not -- do you know that Dr. Telzer has been deposed,
19 at this point, I think, twice?
20 A. Yes.
21 Q. Okay. Did you talk with her at all after her
22 deposition?
23 A. I think that she briefly said that it was
24 done --
25 Q. Okay --

Page 22

1  A. -- yeah.
2  Q. -- did she talk to you about the substance of
3  the deposition?
4  A. No. We've been very clear on that.
5  Q. In the course of preparing your written
6  report in the case, have you had any communications
7  with Dr. Telzer about the substance of your report?
8  A. No.
9  Q. What about vice versa? Did she have any
10 communications with you about the substance of her
11 report as she was preparing it?
12 A. No.
13 Q. Have you reviewed her expert reports?
14 A. No.
15 Q. Have you reviewed her deposition testimony?
16 A. No.
17 Q. Do you recall, was she retained before you
18 were retained? Or are you recalling that it was
19 roughly the same time frame?
20 MR. RICHARDS: Object to form.
21 THE WITNESS: I don't know, actually.
22 BY MS. JONES:
23 Q. Let me ask you to look, if you would, Doctor,
24 at Exhibit No. 3, which is the copy of your curriculum
25 vitae that was submitted with your May 16, 2025,

Page 23

1  report.
2  A. Okay.
3  Q. Is Exhibit No. 3 up to date?
4        And I guess in fairness to you, I know that
5  you testified before Congress quite recently, so
6  I acknowledge that it's possible that's not on here.
7  But are there any other things that you can think of
8  that would not be reflected on Exhibit No. 3?
9  MR. RICHARDS: I'll just object to
10 form.
11 THE WITNESS: Not that I can think of.
12 I may have things that I need to put on here that
13 I haven't gotten to do so yet.
14 BY MS. JONES:
15 Q. But nothing is coming to mind?
16 A. No.
17 Q. Dr. Prinstein, you have a master's degree and
18 a PhD in clinical child psychology; is that right?
19 A. In clinical psychology.
20 Q. Okay. Do you have any other advanced
21 degrees?
22 A. I'm board-certified in clinical child and
23 adolescent psychology as well.
24 Q. Any other advanced degrees or certifications?
25 A. No.

Page 24

1  Q. You are not a medical doctor; is that right?
2  A. Correct.
3  Q. So you are not a psychiatrist who, for
4  example, prescribes medications?
5  A. No. Psychologist.
6  Q. Okay. As part of your work, do you treat
7  patients?
8  A. I haven't done direct treatment, but I do
9  engage clinical work as part of the research I do on
10 suicide.
11 Q. Okay. I want to make sure I understand your
12 answer there. So you said you don't -- you haven't
13 done direct treatment, but you engage clinical work as
14 part of the research you do on suicide. Let me just
15 take those in two pieces.
16      When you say, "I haven't done direct
17 treatment," what does that mean?
18 A. I don't work with patients who have asked me
19 to provide them with psychological services for pay.
20 Q. And when you say that you do engage in
21 clinical work as part of the research that you do,
22 what does that mean exactly?
23 A. When you do research on an issue like
24 suicide, it's a responsibility of the investigator to
25 assess and triage for imminent risk and sometimes to

Page 25

1  engage emergency action with those participants, and
2  that requires clinical skill and credentials.
3      Q.  Okay.  So just so I'm clear, as part of your
4  day-to-day work, you are not providing patient care to
5  individuals; is that right?
6      A.  Right.
7      Q.  Okay.  But it also sounds like, as part of
8  some of your research on suicide in particular, there
9  might be emergent circumstances that require you to be
10 involved with a particular individual who might
11 present with certain issues or concerns; is that
12 right?
13     A.  Pretty much.
14     Q.  Okay.  But on any given day, you're not
15 spending the vast majority of your time directly
16 interfacing with children or adolescents who might
17 require psychiatric or psychological care; is that
18 right?
19          MR. RICHARDS:  Object to form.
20          THE WITNESS:  That's correct.
21 BY MS. JONES:
22     Q.  Okay.  And so if I were to ask you if you
23 treat conditions like depression or anxiety or bipolar
24 disorder, would the answer to that be no?
25     A.  I haven't for a number of years now.

Page 26

1      Q.  And it sounds like you don't make diagnoses
2  for patients as part of your regular everyday work; is
3  that right?
4      A.  In our research, we do diagnostic
5  interviewing, but not in a patient care setting.
6      Q.  And you said a moment ago you haven't treated
7  a condition like depression or anxiety or bipolar
8  disorder for a number of years.  Was there some period
9  of time earlier in your professional trajectory when
10 you were treating those types of conditions?
11     A.  Yes.
12     Q.  When was that?
13     A.  From the beginning of my training through
14 about 2004-ish.
15     Q.  So it's been about 20 years or so since
16 you've been on a day-to-day basis treating conditions
17 like depression or anxiety or bipolar disorder or
18 other conditions; is that right?
19          MR. RICHARDS:  Object to form.
20          THE WITNESS:  That's correct.  My
21 responsibilities over the last 20 years have been to
22 train students how to engage in those services
23 instead.
24 BY MS. JONES:
25     Q.  Have you in the last 20 years had occasion --

Page 27

1  we talked about treating conditions, but have you had
2  occasion in the last 20 years to diagnose a patient
3  with depression?
4          MR. RICHARDS:  Object to form.
5          THE WITNESS:  Yes.
6  BY MS. JONES:
7      Q.  What was that?  In what setting?
8      A.  So in a -- so in our research, we are doing
9  diagnostic interviews of youth -- hundreds and
10 hundreds of youth, and often the information that we
11 get, we need to talk with their provider, and we need
12 to share our results.  And what we're doing is a
13 clinical assessment that allows us to make diagnoses.
14     Q.  Outside of the research that you're
15 describing where you all are doing diagnostic
16 interviews, have you had occasion to diagnose patients
17 with depression in the last 20 years or so?
18          MR. RICHARDS:  Object to the form.
19          THE WITNESS:  Yes.  I serve as a
20 supervisor of students' clinical activities; so they
21 are the person that is the direct provider, and then
22 I am guiding their treatment work, including their
23 assessment, their diagnosis, and their treatment, in
24 supervision settings.
25

Page 28

1  BY MS. JONES:
2      Q.  What about clinical anxiety?  Would the
3  answer be the same?
4          MR. RICHARDS:  Object to form.
5          THE WITNESS:  Yes.
6  BY MS. JONES:
7      Q.  What about bipolar disorder?  Would the
8  answer be the same?
9          MR. RICHARDS:  Object to form.
10          THE WITNESS:  Yes.
11 BY MS. JONES:
12     Q.  Have you had experience with diagnosing or
13 treating eating disorders of any kind?
14          MR. RICHARDS:  Object to form.
15          THE WITNESS:  Yes.
16 BY MS. JONES:
17     Q.  And would the circumstances of that be the
18 same as what you've already described?
19          MR. RICHARDS:  Object to form.
20          THE WITNESS:  Yes.
21 BY MS. JONES:
22     Q.  Have you had -- and I want to put to the side
23 for the moment the work that you do in connection with
24 your academic research and ask in terms of any
25 clinical work that you do.

Page 29

1   Have you, as part of your day-to-day work,
2   had occasion to review brain scans for adolescents or
3   teens to determine the effect of some external
4   exposure?
5           MR. RICHARDS:  Object to form.
6           THE WITNESS:  Outside of research, did
7   you say?
8   BY MS. JONES:
9       Q.  Yes.
10      A.  No.
11      Q.  Is it possible to look at a brain scan and
12  make a clinical diagnosis of a mental health
13  condition, in your view?
14      A.  I can't answer that.  I'm not a
15  neuroscientist.
16      Q.  Okay.  Have you ever -- mindful of what you
17  just said about not being a neuroscientist, have you
18  ever reviewed a brain scan and informed a parent that
19  a child's brain had been affected in some way by
20  social media exposure?
21          MR. RICHARDS:  Object to form.
22          THE WITNESS:  No.
23  BY MS. JONES:
24      Q.  There are, I suspect, in the professional
25  ecosystem in which you spend your days, healthcare

Page 30

1   providers who specialize in diagnosing and treating
2   addiction and addictive behaviors; is that right?
3           MR. RICHARDS:  Object to form.
4           THE WITNESS:  Yes.
5   BY MS. JONES:
6       Q.  Do you, in your day-to-day work, hold
7   yourself out as someone who specializes in diagnosing
8   and treating addiction?
9       A.  That would be hard to say.  My expertise and
10  my background is in clinical child and adolescent
11  psychology broadly, so it would be inclusive of that.
12      Q.  Have you ever made a formal diagnosis of any
13  patient with -- strike that.
14          Have you ever diagnosed any patient with
15  something known as social media addiction?
16      A.  Have I -- no, I have not.
17      Q.  Dr. Prinstein, you don't have a degree in
18  epidemiology; is that right?
19      A.  Correct.
20      Q.  And recognizing that you're many other
21  things, you're not formally recognized as an
22  epidemiologist in terms of your field of expertise; is
23  that right?
24      A.  That's correct.
25      Q.  Have you ever designed or conducted a

Page 31

1   randomized controlled trial?
2           MR. RICHARDS:  Object to form.
3           THE WITNESS:  Yes.
4   BY MS. JONES:
5       Q.  On what occasions?
6       A.  We have looked at a variety of interventions
7   over the years, anything from parent education to
8   treatment of mental health diagnoses, and also in
9   research where we're looking at how we can control and
10  manipulate factors to effect risk behavior outcomes.
11      Q.  Have you ever conducted or designed a
12  randomized controlled trial that aimed to evaluate the
13  effects of social media use on particular mental
14  health outcomes?
15          MR. RICHARDS:  Object to form.
16          THE WITNESS:  No.
17  BY MS. JONES:
18      Q.  Have you ever designed or conducted a
19  prospective cohort study?
20          MR. RICHARDS:  Object to form.
21          THE WITNESS:  Can you define that more?
22  BY MS. JONES:
23      Q.  Are you familiar with what a cohort study is?
24      A.  I am --
25      Q.  Okay.

Page 32

1       A.  -- but people talk about that in different
2   ways, so I want to make sure I'm being accurate.
3       Q.  Okay.  Well, what is your understanding of
4   what a cohort study is?
5       A.  It could be looking at natural ways in which
6   individuals are exposed to a risk or protective
7   factor, that are designed based on, let's say, an age
8   group or a time period in which environmental
9   conditions changed for a subset of youth but not
10  others.
11      Q.  Okay.  That's exactly what I had in mind.
12          Have you ever designed or conducted a cohort
13  study?  And you should feel free to apply the
14  definition that you just used.
15      A.  So I am a collaborator on studies that have
16  done that.
17      Q.  What specific studies are you thinking of?
18      A.  I am the representative to the ABCD Study,
19  which is a national study of adolescent development.
20  I have been a collaborator with my students on the
21  National Comorbidity Study findings -- as examples.
22      Q.  Are you familiar with what a Bradford Hill
23  analysis is?
24      A.  No.
25      Q.  Okay.  And you don't have any degrees in

1  public health; is that right?

2      A.  That's correct.

3      Q.  You are testifying today in your role as an

4  expert in cases that have been brought by certain

5  state attorneys general against Meta; is that your

6  understanding?

7              MR. RICHARDS:  Object to form.

8              THE WITNESS:  It is.

9  BY MS. JONES:

10     Q.  Do you happen to know which state AGs are

11  involved in the litigation?

12     A.  I believe there are many.  I've had most

13  contacts with folks from Kentucky and Massachusetts,

14  Colorado.

15     Q.  Do you have any sense of what specific legal

16  claims are being brought by the different state

17  attorneys general?

18              MR. RICHARDS:  Object to form.

19              THE WITNESS:  Not really.

20  BY MS. JONES:

21     Q.  Have you ever -- and if the answer is no,

22  that's okay, but I'm just inquiring.  Have you ever

23  reviewed the actual complaints that have been filed by

24  the state attorneys general with whom you are working?

25     A.  I did briefly, but it's a lot of legal

1  language so -- yeah.

2      Q.  What is your understanding of the claims?

3              MR. RICHARDS:  Object to form.

4              THE WITNESS:  I believe -- I was asked

5  to opine on the ways in which social media may be

6  creating risk for adolescents' mental health, and also

7  the ways in which social media may be designed in a

8  way that is increasing clinical dependency on social

9  media in ways that have implications for impairing

10  kids' social and educational functioning and

11  psychological functioning.

12          I know that there's been discussion about

13  the ways in which social media is designed and the

14  features and the functions that are both creating risk

15  for youth and also changing the effects of the content

16  that kids might see on their adjustment.

17  BY MS. JONES:

18     Q.  Do you -- just so I understand, do you

19  consider yourself to be an expert in the way that

20  social media is designed?

21              MR. RICHARDS:  Object to form.

22              THE WITNESS:  In some ways, yes.

23  BY MS. JONES:

24     Q.  What ways are those?

25     A.  So my expertise has been on understanding

1  scientifically how it is that kids' experience with

2  social media, including the ways in which they receive

3  stimuli online, the behaviors/attitudes that they have

4  while they're online, and the ways that the

5  construction of the platform is interacting with their

6  own -- is affecting their own behavior.

7          I cannot speak to the way that, let's say,

8  an algorithm is built from a computer science

9  perspective, however.

10     Q.  Let me actually ask a more fundamental

11  question, perhaps, that maybe I should have started

12  with.

13          When you say "social media," what are you

14  including in that category?

15              MR. RICHARDS:  Object to form.

16              THE WITNESS:  So there's a matter of

17  debate about the best definition of social media, but

18  the -- a lot of work that's being done in this

19  area has been focusing on platforms that allow for

20  interaction with others, initially -- now mostly bots

21  and advertisements and other content -- in the context

22  of a -- well, it's a complicated definition.

23          I will say that most of our research and the

24  research that's out there has talked about platforms

25  including Meta's platforms, and some have also

1  included platforms like, let's say, TikTok or Snap.

2  BY MS. JONES:

3      Q.  So there are -- in your definition of social

4  media, there are platforms other than just, for

5  example, Instagram and Facebook; correct?

6      A.  There are other platforms.

7      Q.  And when you talk about the effect of social

8  media on potentially adolescent mental health, you are

9  not limiting yourself just to Instagram and Facebook,

10  are you?

11              MR. RICHARDS:  Object to form.

12              THE WITNESS:  The findings that we have

13  are specific to Meta's products, and some of those

14  findings are also applicable to other companies'

15  products.

16  BY MS. JONES:

17     Q.  When you say "the findings that we have are

18  specific to Meta's products," what findings,

19  specifically, are you referring to?

20     A.  Our research in our lab, and also the

21  research that's in the literature, is focused on

22  specific features, functions, and in some cases

23  platforms, including Meta's platforms.

24     Q.  But not exclusively Meta's platforms?

25     A.  Well, some articles are exclusive to Meta's

Page 37

1  platforms, but others are broader.
2      Q.  Yeah, and I just want to make sure that we're
3  not misunderstanding each other.
4          You're not suggesting that the research on
5  potential relationship between social media use and
6  mental health outcomes in adolescents is limited to
7  Meta's platforms, are you?
8          MR. RICHARDS:  Object to form.
9  Compound.
10         THE WITNESS:  I think that there are
11 findings that extend beyond Meta and aren't inclusive
12 of Meta.
13 BY MS. JONES:
14     Q.  Okay.  Are you offering opinions that are
15 specific to any particular effect of social media use
16 on specific populations of young people in specific
17 states?
18         And if that question is unclear, I
19 understand and I'll try to ask it in a better way, but
20 you tell me.
21         MR. RICHARDS:  Object to form.
22 Compound.
23         THE WITNESS:  Yeah, can you rephrase
24 that, please?  Thanks.
25

Page 38

1  BY MS. JONES:
2      Q.  Sure.  I guess the question really is, are
3  you offering state-specific opinions?
4      A.  Yes, in some cases.
5      Q.  And what are those specific states where you
6  are offering state-specific opinions?
7      A.  I would have to review the articles again to
8  look at where those findings were collected from, but
9  many of the samples that we've looked at -- sorry,
10 that are in the literature have been conducted within
11 specific states and give information that's relevant
12 to kids in that state.
13     Q.  Independent of the research that you're
14 describing, have you done any work to evaluate mental
15 health outcomes statewide for adolescents in any
16 specific state?
17         MR. RICHARDS:  Object to form.
18         THE WITNESS:  Sorry, I'm a little bit
19 confused on that one --
20 BY MS. JONES:
21     Q.  Sure.  Let me take a step back.
22         So as I understand what you just said, some
23 of the research that you have either cited in your
24 report or that you have carried out in your lab has
25 involved young people from particular states; yes?

Page 39

1      A.  Correct.
2      Q.  Okay.  My question is, putting that to the
3  side, have you done any other analysis of mental
4  health outcomes statewide on a state-specific basis?
5          MR. RICHARDS:  Object to form.
6          THE WITNESS:  There is some research
7  that's looked at natural experiments for social media
8  that has been offered in one state versus another at
9  different times.  I would have to look up some
10 information to remind me exactly what state that was,
11 however.
12 BY MS. JONES:
13     Q.  Do you have any awareness of how -- the
14 amount of social media use by adolescents in specific
15 states?
16         MR. RICHARDS:  Object to form.
17         THE WITNESS:  Sorry, do I -- can you
18 say that again?
19 BY MS. JONES:
20     Q.  Yeah.  It was not a very well done question.
21         Do you know how much adolescents and
22 teenagers use social media in any particular state?
23     A.  Yes.
24     Q.  Based on what?
25     A.  There are some findings that have been done

Page 40

1  by others looking at specific states, and I've been
2  asked to work with different states that are passing
3  state laws -- the legislative bodies of different
4  states -- where they have collected data and asked me
5  to help them to understand the data in each of those
6  states.
7      Q.  Are you offering opinions about the
8  experience of any specific individual adolescent or
9  teenager --
10         MR. RICHARDS:  Object to form.
11 BY MS. JONES:
12     Q.  -- in terms of social media use and mental
13 health outcomes?
14         MR. RICHARDS:  Sorry.  Object to form.
15         THE WITNESS:  I believe that my report
16 is focused on the effects on large cohorts of youth or
17 subsets of the population of youth rather than on an
18 individual person.
19 BY MS. JONES:
20     Q.  Sure.  That was also my understanding of your
21 report.  So my question is, it sounds like we're
22 agreeing that you are not offering opinions on any
23 specific individual adolescent or teenager in terms of
24 that individual's experience with social media and
25 mental health outcomes?

Page 41

1    MR. RICHARDS: Object to form.
2    THE WITNESS: That's hard to say. I've
3    had a lot of experience meeting with and talking with
4    individuals around the country about their specific
5    experiences and been asked to help them understand
6    what's happening with their child or with specific
7    children, and I've applied the psychological science
8    findings in that work with them. So that information
9    has been part of the general knowledge that, you know,
10   informs my opinions.
11   BY MS. JONES:
12   Q. When were you first retained as an expert in
13   the litigation?
14   A. It could be a year or two ago. I don't
15   remember exactly.
16   Q. Okay. Well, let me pause on that. Can you
17   tell me whether it was in 2024?
18   A. It probably was. It might have been in '23.
19   I believe it was after APA put out its social media
20   health advisory.
21   Q. And why is that a landmark for you in terms
22   of remembering when you might have been retained?
23   MR. RICHARDS: Object to form.
24   THE WITNESS: There was a lot of -- we
25   provided a tremendous amount of education to folks

Page 42

1    about the health advisory afterwards -- after it came
2    out -- and I believe that the conversations that we
3    had with attorneys general started in the context of
4    talking about our health advisory.
5    BY MS. JONES:
6    Q. Okay. Who first engaged with you about the
7    prospect of serving as an expert for the state
8    attorneys general?
9    A. So that's a little fuzzy for me because we
10   started by talking about the health advisory, as I
11   mentioned, and kind of talking about what it meant
12   and, you know, what our consensus panel found.
13   I believe that from that conversation, it
14   might have been the same folks who ultimately asked me
15   to serve in an expert capacity, and that was folks
16   from Tennessee. I think Chris Dunbar was the first
17   person.
18   Q. And when you say, "we started by talking
19   about the health advisory," is the "we" in that
20   sentence you and representatives from one or more of
21   the state attorneys general's offices?
22   MR. RICHARDS: I just object to
23   privilege. The witness can answer, but I just caution
24   him not to reveal privileged communications with
25   attorneys.

Page 43

1    THE WITNESS: No, sorry, the "we" is
2    APA colleagues and me.
3    BY MS. JONES:
4    Q. Okay. Who is the -- I'm thinking AAP.
5    Who are the APA colleagues you're thinking
6    of?
7    A. Primarily, my colleague Corbin Evans.
8    Q. Okay. And you said Chris -- your
9    recollection, at least, is that Chris Dunbar from the
10   Tennessee Attorneys General -- Attorney General's
11   Office was the first person to reach out to you? Is
12   that what your recollection is?
13   A. To the best of my recollection.
14   Q. Okay. And my colleague has reminded me that
15   the APA's advisory was in May of 2023.
16   A. Yes.
17   Q. Okay. So with that stake in the ground, kind
18   of chronologically, is it your -- can you give me
19   a little bit more specificity around when you likely
20   would have been retained to serve as an expert?
21   MR. RICHARDS: Object to form.
22   THE WITNESS: Most likely in '24.
23   BY MS. JONES:
24   Q. Okay. So the advisory came out in May of
25   2023, and you think you were not retained until

Page 44

1    several months later, in 2024?
2    A. To the best of my recollection.
3    Q. Okay. When was the first conversation -- and
4    counsel is correct; at the moment, I'm not asking
5    about specifics of those interactions -- but what was
6    the first conversation that you had with someone from
7    the state attorneys general?
8    MR. RICHARDS: Just same objections on
9    privilege, but you can answer the question.
10   THE WITNESS: I think the one
11   I already -- what I already told you about, talking
12   with Chris Dunbar.
13   BY MS. JONES:
14   Q. Okay. And my question was when did that
15   conversation happen?
16   A. In '24.
17   Q. Do you know if it was --
18   A. That would be my best guess.
19   Q. Okay. Do you know if it was the first
20   quarter of 2024? The second quarter? When?
21   MR. RICHARDS: Object to form.
22   THE WITNESS: I honestly just don't
23   remember --
24   BY MS. JONES:
25   Q. Okay --

Page 45

```
1        A.  -- saw a lot of activity.
2        Q.  Okay.  That's fair.  But it sounds like
3   between May of 2023, when the APA's advisory came out,
4   and the end of 2023, you had not had any contact with
5   the state attorneys general; is that right?
6            MR. RICHARDS:  Object.  Speculation.
7   Asked and answered.
8            THE WITNESS:  Sorry, so we -- you mean
9   with regard to serving in this capacity?  Or any
10  contact at all?
11  BY MS. JONES:
12       Q.  Any -- that's fair.
13           When was the -- let me ask you this question
14  as kind of a threshold question.  Outside of the
15  context of interactions you might have had with the
16  state attorneys general after the advisory, had you
17  otherwise had interactions with state attorneys
18  general for any reason?
19           MR. RICHARDS:  Object to form.
20           THE WITNESS:  Sorry, say it again.
21  After the -- that advisory --
22  BY MS. JONES:
23       Q.  So I think we've established --
24       A.  Yeah.
25       Q.  -- that after the advisory in May of 2023 --
```

Page 46

```
1        A.  Yeah.
2        Q.  -- at some point after that, you had some
3   kind of interaction with the state attorneys general;
4   right?
5        A.  Yeah.
6        Q.  Okay.  Let's put that time period to the
7   side.
8        A.  Okay.
9        Q.  I'm asking you before May of 2023, had you
10  ever had any interactions with any state attorneys
11  general, for any reason?
12           MR. RICHARDS:  Object to form.
13           THE WITNESS:  Possibly.  My student won
14  an award from the North Carolina Attorney General's
15  Office for her role on a paper that we all wrote
16  together, and I believe that they contacted us with
17  the good news she was winning an award.
18  BY MS. JONES:
19       Q.  Okay.  When would that have happened?
20       A.  Probably after that article was published
21  in -- and that was an article in JAMA Pediatrics.
22       Q.  Can you give me a year?
23       A.  I don't recall the date.
24       Q.  Okay.  That's fine.
25       A.  Yeah.
```

Page 47

```
1        Q.  So it sounds like before May of 2023, you had
2   at least that one interaction where a student at the
3   time had gotten an award of some kind, and you were in
4   touch with the North Carolina Attorney General about
5   that award; is that right?
6            MR. RICHARDS:  Object to form.
7            THE WITNESS:  Yes.
8   BY MS. JONES:
9        Q.  Okay.  Other than that interaction -- did the
10  paper have anything to do with social media, if you
11  recall?
12       A.  Yes.
13       Q.  Okay.  Other than that interaction --
14  actually, staying with that interaction for a moment,
15  was the extent of that interaction simply to convey
16  the good news about the paper?
17       A.  Yes.
18       Q.  Okay.  Other than that interaction, prior to
19  May 2023, had you had any interactions with any state
20  attorney general --
21           MR. RICHARDS:  Object to form.
22  BY MS. JONES:
23       Q.  -- or representatives of a state attorney
24  general's office?
25           MR. RICHARDS:  Objection.
```

Page 48

```
1            THE WITNESS:  I can't remember any.
2   BY MS. JONES:
3        Q.  Okay.  So it sounds like, other than the
4   interaction related to the award, it was only after
5   May of 2023 that you started engaging, at some point,
6   with representatives of the state attorneys general's
7   offices; is that right?
8            MR. RICHARDS:  Object to form.  Asked
9   and answered.
10           THE WITNESS:  I think that's right.
11  BY MS. JONES:
12       Q.  Okay.  That's helpful.  Thank you for bearing
13  with me on that.  That helps me focus in terms of time
14  frame.
15           So at some point after May of 2023, it
16  sounds like the APA, your colleague Corbin Evans and
17  yourself, had some degree of interaction with
18  representatives of the state attorneys general about
19  the APA social media advisory; is that right?
20           MR. RICHARDS:  Object to form.
21  Speculation.
22           THE WITNESS:  I think that timeline
23  sounds right.
24  BY MS. JONES:
25       Q.  Okay.  Before -- and I was getting the
```

Page 49

1  impression that there may have been discussions about
2  the advisory generally before you ever had a
3  discussion about being retained.  Is that right?
4           MR. RICHARDS:  Object to form.
5           THE WITNESS:  That's correct.
6  BY MS. JONES:
7     Q.  Okay.  Do you have a memory of the nature of
8  the discussions that you had before you were retained
9  by the state attorneys general?
10    A.  Vaguely.
11    Q.  What is that?
12    A.  We were asked questions about our findings:
13 You know, what did the consensus panel say, and what
14 do we mean by the different things that were found
15 based on the consensus of the literature.
16    Q.  And who from the APA, other than you,
17 participated in those discussions -- the ones that
18 preceded your actual formal retention?
19          MR. RICHARDS:  Object to form.  Vague.
20          THE WITNESS:  Corbin Evans.
21 BY MS. JONES:
22    Q.  At any point in those conversations that you
23 had with state attorneys general representatives prior
24 to being retained, did you ever communicate a
25 conclusion that social media causes mental health

Page 50

1  harms in teenagers?
2           MR. RICHARDS:  Object to form.  And
3  I'll just instruct the witness not to provide
4  privileged communications.
5  BY MS. JONES:
6     Q.  I'm asking you about the time frame before
7  you had been retained.
8     A.  Okay.  Let me see if I understand.
9     Q.  Yes.
10    A.  So before the time I had been retained --
11    Q.  Yes.
12    A.  -- did they ask me what?  Or did I say --
13 yeah.  Okay.  Can you just go over that again?
14    Q.  Yes.  Before the time that you were retained,
15 did you communicate, in form or substance, to
16 representatives from the state attorney generals'
17 offices that you believe that social media causes
18 mental health harms in teenagers?
19          MR. RICHARDS:  I'll object to form.
20 And I'll also instruct the witness not to disclose
21 privileged communications.
22          THE WITNESS:  I would say just what
23 I said before.  We discussed the social media health
24 advisory and what it said in the advisory.
25

Page 51

1  BY MS. JONES:
2     Q.  Did the social -- we can check on a break.
3  Does the advisory say anything about cause --
4  causation between social media use and mental health
5  harms?
6     A.  So I believe that it talks about cause in a
7  way that's really important to discuss.  I probably
8  should ask you first what you mean by "cause," because
9  that's defined very differently in different contexts.
10    Q.  Yeah.  We will probably come back to this --
11    A.  Okay.
12    Q.  -- and you don't get to ask me questions,
13 unfortunately.  I get to ask you the questions.  We'll
14 probably come back to this point --
15    A.  Okay.
16    Q.  -- I want to make sure we kind of get through
17 these preliminaries.
18         Okay.  So at some point, you are engaged
19 by -- you are formally retained by the state attorneys
20 general, and it sounds like you think that happened in
21 2024.
22         Your expert report, which you're welcome to
23 look at -- it's Exhibit No. 1 -- I'm going to ask you
24 to look at page 5, if you don't mind.
25         Are you there, Dr. Prinstein?

Page 52

1     A.  Yes.
2     Q.  I'm going to focus you on paragraph 14, if
3  you see that there towards the bottom of the page.
4     A.  I do.
5     Q.  It says (as read):
6           "I am submitting this testimony as
7           part of my work at APA, which
8           includes a duty to disseminate
9           psychological science."
10        Do you see that?
11    A.  I do.
12    Q.  Okay.  And just to be clear, you are -- you
13 were the Chief Science Officer at APA from 2021 to
14 2024; correct?
15    A.  Correct.
16    Q.  And you are currently -- this is a very long
17 and fancy title -- you are currently the Chief of
18 Psychology, Integration and Strategy; is that right?
19    A.  Pretty much.
20    Q.  Okay.  And when you say, "I am submitting
21 this testimony as part of my work at APA," is that a
22 reference to the role that you currently hold with the
23 APA or some other role?
24    A.  Both of the roles you just mentioned.
25    Q.  Okay.  When you say you're submitting this

Page 53

1  testimony as part of your work at APA, what does that
2  mean exactly?
3      MR. RICHARDS:  Object to form.  Vague.
4      THE WITNESS:  My job at APA, consistent
5  with APA's mission, is to communicate and apply
6  psychological science it improve people's lives.
7  That's what I am doing in my role here.
8  BY MS. JONES:
9      Q.  Did the APA ask you to serve as an expert for
10  the state attorneys general?
11      A.  The attorneys asked me to serve.
12      Q.  Right.  So I want to go back to my
13  question --
14      A.  Yeah.
15      Q.  -- did the American -- is it Psychology or
16  Psychological Association? --
17      A.  Psychological.
18      Q.  -- I want to say it correctly.  My apologies.
19      Did the American Psychological Association
20  ask you to serve as a retained expert for the state
21  attorneys general?
22      A.  The APA asked me to serve as part of my job.
23  They believed that this activity was consistent with
24  my job description, and they asked me to do it as part
25  of my job.

Page 54

1      Q.  Well, my question was who was the first
2  individual who say, "Dr. Prinstein, we want you to
3  serve as an expert"?  Was it someone at the APA, or
4  was it a state attorney general representative?
5      MR. RICHARDS:  Object to form.
6      THE WITNESS:  It was the state
7  attorneys general.
8  BY MS. JONES:
9      Q.  Okay.  And I take it you had to get some kind
10  of clearance from the APA to be allowed to serve as a
11  litigation expert; is that right?
12      A.  That's correct.
13      Q.  Okay.  And did you get that kind of approval
14  from the APA?
15      A.  I did.
16      Q.  Is there any kind of written documentation
17  that memorializes the APA saying, "Yes, Dr. Prinstein,
18  it's acceptable for you to play this role for the
19  state attorneys general"?
20      A.  There is nothing written, and that was all
21  based on my conversations with the general counsel at
22  APA.
23      Q.  Who was the general counsel at APA?
24      A.  Deanne Ottaviano.
25      Q.  Are you compensated in any way for the role

Page 55

1  that you're playing with the APA right now?
2      MR. RICHARDS:  Object to form.  Vague.
3  BY MS. JONES:
4      Q.  Well, let me be more specific.
5      You are currently the Chief of Psychology,
6  Integration and Strategy for the APA; yes.
7      A.  I think it's strategy and integration, but
8  yeah, all those words are part of it.
9      Q.  Oh, I thought I said "integration."  Well,
10  I'm just reading from your report --
11      A.  Yeah.
12      Q.  -- it says you were promoted in November 2024
13  to Chief of Psychology, Integration and Strategy.
14  Yes?
15      A.  Yes.  We just refer to it as the Chief of
16  Psychology.
17      Q.  Oh, I see.  Okay.  Well --
18      A.  Okay.
19      Q.  Got it.
20      A.  Yeah.
21      Q.  I don't want to short-change you in terms of
22  your --
23      A.  No, no, it's --
24      Q.  All right.  So you were promoted in November
25  of 2024 to what you say is just referred to as the

Page 56

1  Chief of Psychology; correct?
2      A.  Correct.
3      Q.  All right.  Do you -- are you compensated as
4  part of your role at -- are you compensated by the APA
5  as part of your role serving as the Chief of
6  Psychology?
7      MR. RICHARDS:  Object to form.
8      THE WITNESS:  Yes, it's a full-time
9  job.
10  BY MS. JONES:
11      Q.  Okay.  What is your compensation as the Chief
12  of Psychology for the APA?
13      A.  What's my current salary?
14      Q.  Yes.
15      A.  $470,000.
16      Q.  A year?
17      A.  Correct.
18      Q.  What was your salary as the Chief Science
19  Officer at the APA?
20      A.  350, 70.
21      Q.  And just so I understand how that role
22  intersects with your role at UNC, does serving in that
23  role with the APA mean that you essentially take a
24  sabbatical of some kind from your role at UNC?
25      MR. RICHARDS:  Object to form.

Page 57

1     THE WITNESS: I am on unpaid leave from
2  UNC.
3  BY MS. JONES:
4     Q. Is there documentation anywhere that lays
5  out, in your role as Chief of Psychology, the dos and
6  don'ts, in terms of what you're able to do as a
7  representative for the APA?
8     MR. RICHARDS: Object to form.
9     THE WITNESS: Not really. We -- these
10 are ever-changing kinds of discussions at APA,
11 especially given the current world we live in. So we
12 don't -- we don't have -- it's usually in-person
13 discussions with our supervisors or general counsel.
14 BY MS. JONES:
15    Q. Who do you report in to or up to at the APA?
16    A. The Deputy CEO.
17    Q. Who is that?
18    A. Dr. Jim Diaz-Granados.
19    Q. And you said, "these are ever-changing kinds
20 of discussions given the current world we live in."
21 What does that mean?
22    A. Well, given the current administration and
23 the kinds of activities that APA has been trying to
24 grow into over time, we have engaged in a lot of
25 conversations about, you know, what is the best way to

Page 58

1  utilize the skill sets of the C-suite employees.
2     Q. You're not acting -- and you can tell me if
3  I've got this wrong. You are not acting as a
4  spokesperson for the APA in this litigation, are you?
5     A. I'm not speaking on behalf of APA. My
6  opinions were informed by the work that APA has done
7  with our consensus groups.
8     Q. Certainly. Understood that completely. But
9  you are not saying, "In my role as a litigation
10 expert, I am offering views on behalf of the
11 organization"; right?
12    A. That's correct.
13    Q. You -- going back to paragraph 14 in your
14 expert report, the second sentence of that paragraph
15 says (as read):
16       "I am not receiving financial
17       compensation for the completion of
18       this report."
19       Do you see that?
20    A. I do.
21    Q. And just because I'm a lawyer, that caused me
22 to ask, are you receiving some kind of nonfinancial
23 compensation for the completion of the report?
24    MR. RICHARDS: Object to form.
25    THE WITNESS: What was a nonfinancial

Page 59

1  compensation?
2  BY MS. JONES:
3     Q. I have no idea. I'm just asking you. Have
4  you been compensated in some other way beyond money?
5     A. No.
6     Q. Okay.
7     A. My -- if it's helpful, my salary at APA is
8  based on the role that I play managing not only a very
9  large team across the practice, education, and science
10 and applied psychology sectors of APA, but also the
11 ways in which APA intersects with issues on climate
12 change and misinformation and the way in which we
13 address issues facing federal funding for scientists'
14 work or reimbursement for clinicians' work. So that's
15 my role at the APA, and helping to communicate and
16 disseminate science, as I said, for the public good.
17       This -- my work on this report is not the
18 basis of my compensation, you know, at APA.
19    Q. Yeah, understood. It sounds like they are --
20 even though your work as a litigation expert might be
21 informed by your work for the APA, they are distinct
22 roles; yes?
23    MR. RICHARDS: Object to form.
24    THE WITNESS: I think so. Can you say
25 more about the distinct roles? Like --

Page 60

1  BY MS. JONES:
2     Q. Sure. You are serving as a litigation expert
3  who happens to also have experience based on working
4  with the APA, and then you separately are the Chief of
5  Psychology for the APA; correct?
6     MR. RICHARDS: Object to form.
7  Ambiguous.
8     THE WITNESS: Mostly. But I am
9  speaking based on the work that APA has done, and so
10 that is informing the opinions and the things that I'm
11 saying. And APA sees the work that I'm doing as being
12 consistent with its mission.
13 BY MS. JONES:
14    Q. Who has told you that APA sees the work that
15 you're doing as a litigation expert as being
16 consistent with its mission?
17    MR. RICHARDS: Object to form.
18    THE WITNESS: So those were
19 conversations with our general counsel. I can say
20 that our CEO and deputy CEO are also involved.
21 BY MS. JONES:
22    Q. And who said, specifically, what you're doing
23 as a litigation expert is consistent with the mission
24 of the APA?
25    MR. RICHARDS: Object to form.

1        And I'll just instruct the witness you can
2  answer the question but to not disclose privileged
3  communications with counsel for the APA.
4        THE WITNESS:  Yeah, I think that, in
5  the conversations that we had with our general
6  counsel, those were considered privileged and
7  confidential.
8  BY MS. JONES:
9     Q.  Okay.  And so you're -- are you declining to
10  answer my question on that basis?  And if you are,
11  that's fine.  I just need to understand that for the
12  record.
13     A.  I am.
14     Q.  Okay.  So to the extent that someone said
15  this is consistent with the mission of the APA, you
16  are not going to confirm for me who told you that?
17        MR. RICHARDS:  Object to form.
18  Mischaracterizes --
19  BY MS. JONES:
20     Q.  Which is okay.  I just need to understand.
21     A.  That's correct.
22     Q.  Okay.  So your report goes on to say, in
23  paragraph 14 (as read):
24        "I will complete my role at APA
25        and return to UNC on January 1,

1        2026, after which I will charge
2        $750 per hour for any additional
3        work on this matter."
4     Do you see that?
5     A.  I do.
6     Q.  So you will cease to be the Chief of
7  Psychology at the end of this year; is that right?
8     A.  Yes.
9     Q.  And then you will go back to your faculty
10  position at UNC full-time; is that right?
11     A.  Correct.
12     Q.  Okay.  And at that point, you are going to
13  start charging these lawyers for the time that you're
14  spending working as a litigation expert; is that
15  right?
16     A.  Correct.
17     Q.  Tell me why it is exactly that you are
18  charging them for work after January 1 but have not
19  charged them so far.
20     A.  Because it is part of my work
21  responsibilities at APA to do this, and at UNC it will
22  not be.
23     Q.  And you're talking about work
24  responsibilities that have been -- you could not point
25  me to any document that says part of your work

1  responsibilities is to do this; is that right?
2        MR. RICHARDS:  Object to form.  Asked
3  and answered.
4        THE WITNESS:  That's correct.
5  BY MS. JONES:
6     Q.  Okay.  And it sounds like you are not
7  prepared to tell me who told you this would be part of
8  your role serving the APA's mission; is that right?
9        MR. RICHARDS:  Object to form.
10        THE WITNESS:  Sorry, I can't.
11  BY MS. JONES:
12     Q.  Okay.  When you start back up at UNC in
13  January, are you going to bill for the time that you
14  devoted to the preparation of your report?
15     A.  No.
16        MS. JONES:  Why don't we -- well, let
17  me actually just finish this little bit and then we'll
18  break, if that's okay with you.  We've been going
19  a little bit over an hour.
20     I take it you -- in your role with the APA,
21  you make public remarks, give talks, give speeches; is
22  that right?
23        MR. RICHARDS:  Object to form.
24        THE WITNESS:  That's correct.
25

1  BY MS. JONES:
2     Q.  Okay.  When you speak in that role, do you
3  ever disclose that, in addition to what you're doing
4  as the Chief of Psychology from the APA, that you have
5  been retained by lawyers who are bringing a lawsuit,
6  related to the same topics that might be the subject
7  of what you're talking about?
8        MR. RICHARDS:  Object to form.
9        THE WITNESS:  Sorry, you said do I
10  ever, and you can you narrow this down a little bit?
11  Like, in what --
12  BY MS. JONES:
13     Q.  Yeah, let me be a little more clear.
14     So you give talks in your APA role on, among
15  other things, I take it, topics like the possible
16  effect of social media on teen mental health; yes?
17     A.  Correct.
18     Q.  And you understand, broadly speaking, that is
19  the subject matter of this litigation; correct?
20     A.  Correct.
21     Q.  And you have been retained by lawyers in that
22  litigation; correct?
23     A.  Correct.
24     Q.  When you go out into the world in your role
25  as someone from the APA and talk about the subject of

1  social media use and teen mental health, the subject
2  of this litigation, do you tell people "You should
3  also know that I have been retained by lawyers who are
4  prosecuting claims against a social media company"?
5             MR. RICHARDS:  Object to form.
6  Ambiguous.
7             THE WITNESS:  Those talks are to review
8  our social media health advisories, so no, I don't.
9  BY MS. JONES:
10     Q.  Have you ever considered the possibility that
11 perhaps you should?
12            MR. RICHARDS:  Object to form.
13            THE WITNESS:  No, because I'm not
14 receiving any financial benefit or remuneration for
15 this work.  There's nothing to disclose.
16 BY MS. JONES:
17     Q.  Well, you have -- I take it you have an
18 understanding that as of January the 1st, you will
19 start charging lawyers for your work in the
20 litigation; correct?
21     A.  I don't know how all of this works in the
22 legal world, so I don't know --
23     Q.  That's fair.
24     A.  -- know what might happen starting January 1
25 and whether there will be anything going on at that

1  point.
2      Q.  Okay.  I suspect there might be some things
3  going on.
4          What it says in your report is, after
5  January 1st, you will charge 750 an hour for any
6  additional work on this matter; is that right?
7             MR. RICHARDS:  Object to form.
8             THE WITNESS:  Yes.
9  BY MS. JONES:
10     Q.  And I take it that's a billing rate that
11 you've communicated to the lawyers with whom you're
12 working?
13     A.  I did.
14     Q.  Okay.  And you don't think it's -- if the
15 answer is no, that's okay, but when you go out and
16 speak on issues that are relevant to the litigation,
17 you have elected not to share with people that you
18 also have this working relationship with state
19 attorneys general who are bringing lawsuits related to
20 the same topic; is that right?
21            MR. RICHARDS:  Object to form.  Vague.
22 Compound.  Asked and answered.
23            THE WITNESS:  Yeah, I have no financial
24 disclosures to make.  The content that I am discussing
25 is based on our social media health advisories.  So

1  that's why I have not said that.
2  BY MS. JONES:
3      Q.  And you -- your deposition is being defended,
4  quite ably, by a lawyer from the Kentucky Attorney
5  General's Office; yes?
6             MR. RICHARDS:  Thank you, Phyllis.
7             THE WITNESS:  Yes.
8  BY MS. JONES:
9      Q.  And you met with these lawyers in preparation
10 for your deposition; yes?
11            MR. RICHARDS:  Object to form.  Asked
12 and answered.
13 BY MS. JONES:
14     Q.  Yes?
15     A.  Yes.
16     Q.  Okay.  And assuming there's stuff going on in
17 2026, you will start billing these lawyers when you
18 move back into your UNC role; yes?
19            MR. RICHARDS:  Object to form.  Asked
20 and answered.
21            THE WITNESS:  Yes.
22 BY MS. JONES:
23     Q.  And you understand that these lawyers are
24 suing Meta for money damages among other things?  Did
25 you know that?

1             MR. RICHARDS:  Object to form.
2  Speculation.  Asked and answered.
3             THE WITNESS:  I don't actually know
4  what the terms are.
5  BY MS. JONES:
6      Q.  But you know they're suing Meta; yes?
7      A.  Yes.
8      Q.  Do you intend to testify at any trial in this
9  matter, if there is a trial in the case?
10            MR. RICHARDS:  Object to form.
11 Speculation.
12            THE WITNESS:  I don't know.
13 BY MS. JONES:
14     Q.  Would you be willing to testify in a trial?
15     A.  I guess, if that -- if that was asked of me
16 and it was for the purposes that are consistent with
17 expressing these opinions, I suppose so.
18     Q.  And by that time you'll be back at UNC and
19 you will be charging for your time; yes?
20            MR. RICHARDS:  Object to form.  Asked
21 and answered.
22            THE WITNESS:  Unless the trial happens
23 in the next three months.
24 BY MS. JONES:
25     Q.  It will not --

1    A.  Okay.

2    Q.  -- which will probably give you some relief.

3        Okay.  Why don't we take a break.

4            THE VIDEOGRAPHER:  Going off the

5    record.  The time is 10:20 a.m.

6    (Recess taken from 10:20 a.m. to 10:37 a.m.)

7            THE VIDEOGRAPHER:  Going back on the

8    record.  The time is 10:37 a.m.

9    BY MS. JONES:

10    Q.  Dr. Prinstein, you were -- you testified

11    before Congress last week; is that right?

12    A.  Correct.

13    Q.  I believe the date was September the 16th;

14    yes?

15    A.  If that was Tuesday, then yeah.

16    Q.  Okay.  And you -- specifically, you testified

17    at the Senate Judiciary Committee's hearing to examine

18    AI chatbots; is that right?

19    A.  Yeah, but it was a subcommittee of the Senate

20    Judiciary, the Crime and something or other

21    Subcommittee.

22    Q.  Okay.  Do you have any understanding of how

23    you were selected to be a witness at that hearing?

24    A.  Yes.  I had previously testified for -- after

25    being -- Senator Durbin's office reached out to do

1    testimony back in '23, and they remembered us and

2    appreciated APA's input and came back to us.

3    Q.  When did you first learn that you were going

4    to be testifying at that hearing?

5    A.  Very soon before the testifying happened.

6    Q.  Do you remember who contacted you about it?

7    A.  It was someone from Senator Durbin's office.

8    Q.  Do you consider yourself to be an expert in

9    artificial intelligence?

10            MR. RICHARDS:  Object to form.

11            THE WITNESS:  What aspects of

12    artificial intelligence?

13    BY MS. JONES:

14    Q.  Just -- any aspect of it.

15    A.  APA released a health advisory on AI and

16    adolescents' well-being, and we convened a consensus

17    group to work on that, and I was one of the leaders of

18    that process; and through that experience, we --

19    I believe that we had very relevant expertise for

20    their hearing.

21    Q.  Other than the advisory that you just

22    mentioned, have you ever published anything in your

23    own academic or scientific work about AI or AI

24    chatbots?

25    A.  We are collecting data right now on AI.

1    I can't remember if any of it's been published or

2    presented yet.

3    Q.  Okay.  Collecting data right now.  Have

4    you -- has anything -- it sounds like you don't know

5    if anything's been published?

6    A.  I don't remember.

7    Q.  Okay.  What specific data are you collecting

8    right now?

9    A.  We are collecting data on adolescents' use of

10    AI for both educational and for companion or

11    recreational purposes.  We're looking attitudes,

12    behaviors, attachment, displacement related to AI use.

13    We're getting information on adolescents' feelings of

14    AI and how their behaviors or attitudes may have been

15    modeled by other adults, like teachers and parents.

16    Those are a few examples.

17    Q.  And how are you collecting data,

18    specifically?  By what mechanism?

19    A.  We are doing broad survey data with kids

20    throughout the state of North Carolina.  And I've also

21    been a collaborator on a collection of data from

22    teachers and superintendents in Alberta, Canada.

23    Q.  How many -- for the survey that you're

24    conducting of kids in North Carolina, how many kids

25    does that include?

1    A.  It's in progress.  I mean, we expect --

2    Q.  You're still enrolling?

3    A.  In some cases we are, so -- but between

4    Alberta and North Carolina, thousands.

5    Q.  Okay.  And what about just -- put Alberta to

6    the side for just a second.  North Carolina, how many

7    are you talking about?

8    A.  I mean, it's kind of a guess because it's

9    still in progress, but a thousand.

10    Q.  Okay.  When you testified before Congress

11    last week, did you disclose that you are a retained

12    expert in a lawsuit against Meta?

13    A.  No, I did not.

14    Q.  Let me ask you to go back to Exhibit No. 1,

15    which is your expert report, and I'm going to ask you

16    to look at page 3 of the report, the summary of

17    opinions.

18        Now, the very first opinion that's

19    identified there at Opinion No. 1 is (as read):

20        "Youth (beginning ages 10 careers

21        until the mid-twenties) are

22        hypersensitive to social feedback,

23        automatic behaviors, and have

24        underdeveloped impulse control."

25        Did I read that right?

Page 73

1    A.  You did.
2    Q.  Okay.  And it goes on to say (as read):
3         "The features and functions
4         embedded within Meta's social
5         media platforms exploit these
6         vulnerabilities in potentially
7         harmful ways."
8         Do you see that?
9    A.  I do.
10   Q.  What specific features and functions are you
11   referring to there?
12   A.  So the adolescent brain is developing in a
13   particular sequence, and one of the things that's
14   developing first is an area of the brain that is
15   having a rapid proliferation of receptors for oxytocin
16   and dopamine.  So that makes kids really interested in
17   feedback from peers, any kind of positive attention
18   from peers, and it makes it feel really good when they
19   get it.
20        So the features and functions that are
21   particularly important are things like notifications,
22   likes, comments, beauty filters, as examples, because
23   that has a direct way in which it's allowing for those
24   hyperresponsive kind of neural -- hyper- -- excuse me,
25   a neural hyperresponse that's based on their

Page 74

1    development.  Now, the reason why this is concerning
2    is because their prefrontal cortex is not able to be
3    used for full executive control until the
4    mid-twenties.
5    Q.  Are there any other features and functions
6    that you are referring to in that sentence in the
7    first item under your summary of opinions?
8         MR. RICHARDS:  Object to form.
9         THE WITNESS:  I've mentioned
10   notifications; right?  And likes, comments, beauty
11   filters.  I think that the algorithm that is
12   prioritizing in what order people see information
13   posted from others would also be relevant.  The like
14   counts, the follower counts.  There are many.  Those
15   are the ones that are jumping to mind right off the
16   bat.
17   BY MS. JONES:
18   Q.  Now, the first item here that we've been
19   talking about in your summary of opinions refers to
20   the features and functions embedded within Meta's
21   social media platforms.  Those features and functions
22   are not unique to Meta's social media platforms; is
23   that right?
24        MR. RICHARDS:  Object to form.
25        THE WITNESS:  Well, I mean, some of

Page 75

1    them may be.  We don't really know how the algorithm
2    works, and how Meta has kind of programmed what they
3    do compared to others.
4    Q.  Okay.  What's important with Instagram is that
5    it's a more visual medium than some of the others, and
6    people have been very concerned about the use of
7    filters or whatnot specifically because the platform
8    emphasizes the use of photos.
9    BY MS. JONES:
10   Q.  When you say we don't -- let me ask the
11   question in a couple of parts.
12        You understand that there are other social
13   media platforms and web-based services that use
14   algorithms; right?
15   A.  Yes.
16   Q.  And, in fact, algorithms are in some way kind
17   of how the internet works; yes?
18        MR. RICHARDS:  Object to form.  Scope.
19        THE WITNESS:  The algorithms are pretty
20   opaque, so we don't really know how they work or which
21   things they're embedded in.
22   BY MS. JONES:
23   Q.  Sure.  That's fair.  And you're not --
24   independent of your research on a particular set of
25   issues, you're not a -- I think you told me earlier,

Page 76

1    "I've not examined the code for any particular
2    platforms' algorithms"; right?
3    A.  That's correct.
4    Q.  Okay.  So you couldn't tell me today that
5    Meta's algorithms -- Meta's -- let me start that
6    again.
7         You could not tell me today that Meta's
8    algorithm for Instagram is somehow different or more
9    harmful than the algorithm for a different social
10   media platform; right?
11        MR. RICHARDS:  Object to form.
12   Speculation.  Compound.
13        THE WITNESS:  Well, I think that, if we
14   kind of unpack that a little bit, we do know that
15   there are some problems that are leading to health
16   concerns for Meta products; but as -- whether it is
17   worse or better than other products, that would be
18   hard to say at the algorithm level, just because, you
19   know, we don't know how the algorithm works, so --
20   BY MS. JONES:
21   Q.  Understood.  And for the moment, I'm just
22   focused on the algorithm in particular because, of the
23   different features and functions you mentioned, one of
24   them was the algorithm; yes?
25   A.  Yes.

1    Q.  Okay.  And I just want to make sure, going
2  back to my question, you could not tell me today that
3  Meta's algorithm for Instagram is somehow different or
4  more harmful than the algorithm for a different social
5  media platform; right?
6           MR. RICHARDS:  Object to form.
7  Compound.  Speculation.  Asked and answered.
8           THE WITNESS:  I can't speak to that.
9  BY MS. JONES:
10   Q.  When you say -- you said you can or you
11  can't?
12   A.  I cannot speak to that.  Yeah.
13   Q.  Okay.  I think you also said that -- forgive
14  me because my memory is not what it used to be.
15  I think you also said that Instagram is somehow
16  different because it is a more visual medium.  Did
17  I hear that correctly?
18   A.  Correct.
19   Q.  More visual relative to what?
20           MR. RICHARDS:  Object to form.  Scope.
21           THE WITNESS:  So in the psychological
22  science literature, when people have contrasted, let's
23  say, Reddit or, you know, the original version of
24  Facebook, then there's more of an emphasis on posting
25  photos in Instagram or other visual kind of stimuli

1  that might be with others where you can put just a
2  post with words.
3  BY MS. JONES:
4    Q.  Okay.  So you're comparing Instagram to
5  platforms that might be more text-based; is that
6  right?
7           MR. RICHARDS:  Object to form.
8           THE WITNESS:  That's correct.
9  BY MS. JONES:
10   Q.  You're not offering the opinion that
11  Instagram is a more visual medium than, for example,
12  TikTok, are you?
13           MR. RICHARDS:  Object to form.  Scope.
14           THE WITNESS:  What I'm saying is that,
15  in the literature, people talk about Instagram's harms
16  differently because there is such a focus on the use
17  of images.  So kids, for instance, are very often
18  pressured to feel -- pressured to post selfies and
19  things that will give them feedback on their own
20  visual -- you know, on their own physical
21  attractiveness; and that's less likely to happen on a
22  text-based platform.
23  BY MS. JONES:
24   Q.  Right.  I guess I'm now asking you about
25  TikTok -- let's take TikTok, just to be a little more

1  concrete.  Have you evaluated the extent to which
2  Instagram is more or less visual than TikTok?
3           MR. RICHARDS:  Object to form.  Scope.
4           THE WITNESS:  So what we're hearing in
5  the literature is that TikTok is a little bit more
6  based on videos that may not be about oneself; but the
7  pressure on Instagram is to create, like, your tiles
8  of photos that are showing your best self, so the body
9  image pressures are equal, perhaps greater, on Meta --
10  on Instagram compared to TikTok.
11  BY MS. JONES:
12   Q.  And my question was, have you evaluated the
13  extent to which Instagram is more or less visual than
14  TikTok?  Have you done some kind of systematic
15  analysis of that?
16           MR. RICHARDS:  Object to form.  Asked
17  and answered.
18           THE WITNESS:  I think the discussion in
19  the literature is that the video-based versus the
20  still photo-based pulls on different concerns for
21  adolescents.
22  BY MS. JONES:
23   Q.  Have you -- you understand that there are
24  videos on Instagram; right?
25           MR. RICHARDS:  Object to form.

1           THE WITNESS:  I do.
2  BY MS. JONES:
3    Q.  Have you evaluated the extent to which the
4  content on Instagram is more photos versus video?
5           MR. RICHARDS:  Object to form.
6           THE WITNESS:  I believe that the work
7  that's out there has thought of Instagram as being
8  more photo-based on Instagram, more video-based on
9  TikTok.
10  BY MS. JONES:
11   Q.  Yeah, my question was a little bit different.
12  My question was, have you, Dr. Prinstein, evaluated
13  the extent to which the content on Instagram is more
14  photo versus video?
15           MR. RICHARDS:  Same objection.
16           THE WITNESS:  Have I evaluated whether
17  it's more photo versus video on Instagram?
18  BY MS. JONES:
19   Q.  Yes.
20   A.  Yes.
21   Q.  And what's -- how did you evaluate that?
22   A.  So in our lab at UNC, we had participants
23  that agreed to give us both their Instagram data as
24  well as to let us go to their profile and take
25  screenshots.  We then analyzed those data.

**Page 81**

```
1    Q.  How many people participated in this?
2    A.  Several hundred.
3    Q.  Okay.  And the process that you're describing
4  is you went in and took screenshots of their Instagram
5  feeds?  Is that what you're saying?
6    A.  Their Instagram profiles, feeds, and also
7  downloading their data.
8    Q.  And did you -- was that done as part of an
9  exercise in evaluating whether Instagram, as a whole,
10 is more photo versus video based?
11       MR. RICHARDS:  Object to form.
12       THE WITNESS:  It was done as a way --
13 it was done to examine the visual emphasis and also
14 the body image emphasis that's promoted within
15 Instagram.
16 BY MS. JONES:
17   Q.  Sure.  My question was, was your objective to
18 evaluate the volume of video versus photo content?
19       MR. RICHARDS:  Object to form.
20       THE WITNESS:  We did -- we did code
21 that, yeah.
22 BY MS. JONES:
23   Q.  But was that the purpose of the exercise?
24   A.  I mean, we coded a lot of the data from that.
25 That was one of the things we coded because it was one
```

**Page 82**

```
1  of the -- it was one of the goals of the study.
2    Q.  And to what extent did you all determine
3  whether that was representative of Instagram usage
4  across what's now into the billions of users?
5       MR. RICHARDS:  Object to form.
6       THE WITNESS:  Yeah, so the way that we
7  did our study, and the way that we think about the
8  generalizability of those findings, was pretty
9  consistent with standard practices for research.  You
10 know, we were able to compare what we had done with
11 other samples.  We were also able to compare the
12 sample that we were looking at to see if it was
13 representative of the nation.  And it was good.
14 BY MS. JONES:
15   Q.  When you say "it was good," what does that
16 mean?
17   A.  So the variability in demographic factors --
18 socioeconomic status, gender, race ethnicity,
19 rural/urban -- was generally considered to meet the
20 scientific standard for being able to generalize
21 beyond just the kids enrolled in our study.
22   Q.  Are you offering the opinion that Instagram
23 is a more visual medium than Snapchat?
24       MR. RICHARDS:  Object to form.  Scope.
25       THE WITNESS:  I can't speak to that.
```

**Page 83**

```
1  BY MS. JONES:
2    Q.  Are you offering the opinion that Instagram
3  is a more visual medium than YouTube?
4       MR. RICHARDS:  Object to form.  Scope.
5       THE WITNESS:  YouTube is not -- we do
6  not get findings on YouTube about image stills or
7  images of oneself the way that we see that on
8  Instagram.
9  BY MS. JONES:
10   Q.  And I apologize because I may not have
11 understood the answer and how it related to my
12 question.
13       My question was, are you offering the
14 opinion that Instagram is a more visual medium than
15 YouTube?
16       MR. RICHARDS:  Same objections.
17       THE WITNESS:  I think it would be
18 important to clarify the "visual medium" bit.  So
19 I think that it does have a video component on
20 YouTube, but the images on Instagram tend to be more
21 focused on images of oneself, and they're more often
22 still images, than what we see on YouTube feeds for
23 adolescents.
24 BY MS. JONES:
25   Q.  Okay.  So when you say "visual medium," are
```

**Page 84**

```
1  you talking about still photos?
2    A.  When we talk about visual medium, we're
3  talking about the extent to which there's video-based
4  content.  But then an interesting piece of that is
5  then deconstructing what that means and how that might
6  vary per platform, as you're asking.  So that's where
7  we would say, "Okay, this is where we can make
8  conclusions about what Instagram -- how it's different
9  from YouTube in terms of its video-based or
10 non-text-based content."
11   Q.  Understood.  And I guess my question was,
12 going back to what you said earlier about Instagram
13 being a more visual medium, are you offering the
14 opinion that Instagram is a more visual medium than
15 YouTube is?
16       MR. RICHARDS:  Object to form.
17 BY MS. JONES:
18   Q.  Let me ask you a slightly different question.
19       You have offered the opinion that Instagram,
20 in your view, may have more still photos than a
21 platform like YouTube; yes?
22       MR. RICHARDS:  Object to form.
23       THE WITNESS:  I believe that it does,
24 and it also pulls for more of an emphasis on body
25 image concerns.
```

Page 85

1  BY MS. JONES:
2      Q.  Okay.  Understood.  My question is, going
3  back to your earlier statement about Instagram being a
4  more visual medium, is whether you're offering the
5  opinion that Instagram is a more visual medium than
6  YouTube?
7              MR. RICHARDS:  Object to form.  Scope.
8  Asked and answered.
9              THE WITNESS:  I get what you're asking.
10  I think the visual medium part is funny because I'm
11  kind of now going a level down from that and saying,
12  within the non-text-based kind of platforms, then we
13  would start saying in what way are those non-textual
14  stimuli -- you know, how do those differ.  And while
15  both YouTube and Instagram present visual clues and
16  cues, they differ in the kinds of visual cues and
17  clues.
18              As a result, things like the beauty filters,
19  which tend not to exist on YouTube but they do on
20  Instagram, combined with the emphasis of putting up
21  images of oneself, that's directly concerning for
22  girls', in particular -- but also males' -- body image
23  concerns over time.
24  BY MS. JONES:
25      Q.  And you understand my question is actually on

Page 86

1  that slightly higher level of generality; right?
2      A.  Are they both -- yeah, I believe I do, but if
3  you can ask it again.
4      Q.  On that higher level of generality of visual
5  medium -- media -- are you offering the opinion that
6  Instagram is a more visual media than YouTube is?
7              MR. RICHARDS:  Object to form.  Asked
8  and answered.
9              THE WITNESS:  I think -- I think what
10  I said is the best way that I can say is at this
11  point.
12  BY MS. JONES:
13      Q.  They're both visual -- well, let me say this.
14  YouTube and Instagram are both visual media; right?
15      A.  They both -- they both seem to emphasize
16  non-textual input.  They differ considerably in what
17  kind of nonvisual [sic] input and the tools that are
18  particularly relevant to kids' mental health, however.
19      Q.  What about notifications?  Are notifications
20  unique to Meta's platforms?
21      A.  There are other platforms that have
22  notifications.  The frequency and way in which -- and
23  what seems to trigger the notifications definitely
24  seems to differ across platforms.
25      Q.  And have you specifically evaluated the

Page 87

1  frequency of notifications across social media
2  platforms?
3              MR. RICHARDS:  Object to form.
4              THE WITNESS:  We -- the research that
5  we've done and others have done has looked at the
6  frequency and types of notifications across platforms.
7  BY MS. JONES:
8      Q.  And are you able to rank order how platforms
9  compare to each other?
10              MR. RICHARDS:  Object to form.  Scope.
11              THE WITNESS:  I think a rank order
12  would be important -- I mean, compared on what; right?
13  So I think a rank order would be a little bit tricky.
14              But it does seem like -- probably most
15  relevant for here -- that the way in which Meta's
16  products sends out notifications, that's concerning;
17  that's leading to significant digital stress for kids.
18  And we're seeing that the more digital stress kids are
19  reporting, the more depression they're reporting over
20  the course of the next year.
21  BY MS. JONES:
22      Q.  When you say the way that Meta's platform
23  sends out notifications, what do you mean
24  specifically?
25      A.  So in Meta's platforms, notifications might

Page 88

1  be tagged to a specific content or to a specific
2  photo.  So in other words, imagine that you're a
3  13-year-old, and you get a notification that pretty
4  much says, you know, the most popular girl in school
5  just posted a video or a photo with you in it and made
6  a comment about you.  That's particularly pernicious
7  and concerning when it comes to adolescents because
8  it's preying on those vulnerabilities we talked about
9  regarding the oxytocin and dopamine receptors that
10  make them highly susceptible to social feedback.
11              Other platforms don't necessarily do that in
12  quite the same way.  So we're hearing that kids are
13  experiencing a significant amount of digital stress
14  when they're on Meta's platforms because of the way
15  that they're being tagged, referencing their image,
16  their reputation, their friends as having recently
17  commented about them and whatnot.
18      Q.  Do you know how other platforms provide
19  notifications?
20              MR. RICHARDS:  Object to form.
21  BY MS. JONES:
22      Q.  And by that I mean with what frequency and as
23  triggered by what?
24              MR. RICHARDS:  Same objection.
25  Compound.

Page 89

1    THE WITNESS:  We -- I can't speak to
2  how the algorithm is built, obviously, from the
3  behind-the-scenes part, but we do know about the
4  number of notifications that come across platforms and
5  what's contained within that notification.  Does it
6  mention a post, or does it simply say, "You have a
7  message"?
8  BY MS. JONES:
9    Q.  On the last element that you flagged, what is
10  said in the notification, what is the answer to that
11  question for Snap?
12    MR. RICHARDS:  Object to form.  Scope.
13  BY MS. JONES:
14    Q.  What does the Snap notification say to you?
15    MR. RICHARDS:  Same objection.
16    THE WITNESS:  What we've learned from
17  kids is that Snap has an emphasis on maintaining a
18  streak over time, and keeping up that someone has
19  contributed to that and it's your turn to contribute.
20  BY MS. JONES:
21    Q.  And are you offering the opinion that these
22  different gradations of types of notifications somehow
23  make Instagram worse than other social media
24  platforms?
25    MR. RICHARDS:  Object to form.  Scope.

Page 90

1    THE WITNESS:  I think the -- I think
2  the best way to address that is to say that what we
3  know is what Meta is -- the way that Meta's
4  notifications work is a direct -- the way that Meta's
5  notifications work is causing kids digital stress, and
6  that digital stress is impairing their ability to get
7  their daily roles and routines done, interfering with
8  sleep, homework, attention.  It's also contributing to
9  body image-related issues.
10  BY MS. JONES:
11    Q.  And I just want to make sure I understand.
12  Are you offering the opinion that it is only Meta's
13  platforms that is contributing to digital stress, and
14  no other social media platform?
15    MR. RICHARDS:  Object to form.  Scope.
16    THE WITNESS:  I am just talking about
17  Meta.  I'm not making comparisons.  I wasn't asked to
18  make comparisons.
19  BY MS. JONES:
20    Q.  So your opinions -- it sounds like -- you can
21  tell me if I have this wrong -- that you did not
22  evaluate the extent to which other types of social
23  media platforms might have been -- to the point you
24  were raising earlier -- causing digital stress and
25  impairing the ability of kids to get their daily roles

Page 91

1  and routines done.  You didn't evaluate that for other
2  social media platforms; is that right?
3    MR. RICHARDS:  Object to form.
4  Compound.  Misstates testimony.
5    THE WITNESS:  So in the literature
6  that's out there, including our own science, we do
7  assess kids' participation on multiple platforms, but
8  then we have the ability to go in and look at which
9  platforms kids are spending most of their time on, and
10  we can statistically test whether those who are
11  spending the vast majority of their time on Instagram
12  versus those that are spending, let's say, the vast
13  majority of their time on Snap or TikTok, as you
14  mentioned -- whether they're showing different
15  outcomes.
16    We do not necessarily find that there are
17  differences in those outcomes, but we do find that
18  digital -- that there are many kids who are only
19  reporting that they're on Meta products, and those
20  kids are showing negative outcomes as a result of
21  their participation on Meta's products.
22    So we feel comfortable concluding that the
23  problems that are embedded within Meta's platforms are
24  needing to be addressed and are concerning about,
25  specifically, Meta's platforms.

Page 92

1  BY MS. JONES:
2    Q.  Respectfully, I'm going to move to strike
3  that as nonresponsive because I'm trying to get to the
4  nub of my question.  And I understand what you said,
5  but I'm not sure it was fully responsive to my
6  question.
7    My question was, are you offering the
8  opinion that it is only Meta's platforms that is
9  contributing to digital stress among adolescents and
10  teenagers and no other social media platform?
11    MR. RICHARDS:  Object to form.  And
12  I'll object to the preamble.  Asked and answered.
13    THE WITNESS:  I would say that Meta is
14  one of several platforms that are -- that are
15  potentially contributing to -- that are contributing
16  harm to adolescents.
17  BY MS. JONES:
18    Q.  But for purposes of your role in this case,
19  am I right in understanding you focused on Meta?
20    A.  Yes.
21    Q.  And is that consistent with the remit that
22  you have as the Chief of Psychology at the APA, to
23  only focus on one platform --
24    MR. RICHARDS:  Object to form.
25

Page 93

1  BY MS. JONES:
2      Q.  -- in offering opinions?
3          MR. RICHARDS:  Object to form.
4          THE WITNESS:  Yes.  Within APA, we are
5  trying to disseminate the best available science; so
6  the science that we have is equally applicable and
7  relevant to discussing the products that kids are
8  using or discussing the class of products as a whole.
9  BY MS. JONES:
10     Q.  But in your expert report, as I read it, you
11  only talked about Meta's platforms; yes?
12     A.  I did.
13     Q.  Okay.  And I take it that your role as the
14  Chief of Psychology for the APA is not to focus on any
15  particular company; right?
16         MR. RICHARDS:  Object to form.
17  BY MS. JONES:
18     Q.  Let me ask you a different question.
19     A.  Okay.
20     Q.  You focused on Meta in this case because you
21  were hired by lawyers who are bringing a lawsuit
22  against Meta; yes?
23         MR. RICHARDS:  Object to form.
24  Compound.
25         THE WITNESS:  I was asked to describe

Page 94

1  the science that would pertain to this case on Meta.
2  BY MS. JONES:
3      Q.  And in your role as the Chief of Psychology
4  for APA, you did not at any point say, "Well, if we're
5  really going to give a clear picture of what's going
6  on on these issues, we have to look at more than just
7  the platforms owned by Meta"?
8          MR. RICHARDS:  Object to form.
9          THE WITNESS:  I don't think it's a
10  relevant distinction.  I mean, APA put out its
11  findings with regard to social media.  We were then
12  asked to -- or I was asked to then talk about the
13  scientific findings that are relevant to this case,
14  which is Meta.
15         The findings that we have -- those that are
16  applicable and relevant are in my report.  It all
17  feels like the same request.  We're just describing
18  the -- I'm just describing the science to benefit the
19  public.
20  BY MS. JONES:
21     Q.  When you go back to UNC, and you actually
22  start billing for your time, will you still view that
23  work as sharing the science to benefit the public?
24         MR. RICHARDS:  Object to form.
25  Speculation.

Page 95

1          THE WITNESS:  I hope that my whole
2  career has been focused on creating and disseminating
3  science to benefit the public.  That's why scientists
4  do what they do.  I've been unique in having the
5  opportunity to both apply and translate science in a
6  way that's not typical among most academics.
7  BY MS. JONES:
8      Q.  Okay.  Just to finish going through this list
9  here, it sounds like you would agree with me --
10  recognizing there may be nuances in the way that they
11  happen and the frequency with which they happen, you
12  would agree with me that notifications occur on other
13  social media platforms beyond Meta's; yes?
14         MR. RICHARDS:  Object to form.
15         THE WITNESS:  I would say that there
16  are notifications across different platforms that seem
17  to differ in terms of how they work and when they
18  happen and what they include.
19  BY MS. JONES:
20     Q.  Is the answer the same for likes?  That you
21  will find the opportunity to like or signal approval
22  for something on social media platforms beyond
23  Instagram?
24         MR. RICHARDS:  Object to form.  Scope.
25         THE WITNESS:  Platforms -- many

Page 96

1  platforms have -- I think what's important is that
2  there are many platforms that have a "like" feature,
3  but the placement of the "like" feature, the reminders
4  to focus on the "like" feature, and the ways that the
5  "like" feature changes the ordering of how you then
6  see others' posts, that seems to differ across
7  platforms.
8  BY MS. JONES:
9      Q.  Sure.  Understood.  But you can find a "like"
10  feature on lots of different social media platforms;
11  can we agree on that?
12         MR. RICHARDS:  Object to form.  Asked
13  and answered.
14         THE WITNESS:  I mean, I would say that
15  there are other platforms that have a "like" feature.
16  Some of them are more innocuous than others, the
17  concern is the way that it's kind of built in and
18  affecting kids on, let's say, the Meta platforms.
19  BY MS. JONES:
20     Q.  And for purposes of this case, you have only
21  focused on the effect of Meta's platforms; is that
22  right?
23         MR. RICHARDS:  Object to form.  Asked
24  and answered.
25         THE WITNESS:  I was asked to opine on

Page 97

1  the Meta pieces.
2  BY MS. JONES:
3      Q.  Yeah.
4          Comments.  The ability to comment on
5  someone's post exists on social media platforms other
6  than just Meta's platforms; yes?
7              MR. RICHARDS:  Object to form.  Scope.
8              THE WITNESS:  I would say the same
9  thing.  Some other platforms have comments.  But the
10 way in which they're placed and emphasized and what
11 have you seems to differ across platforms.
12 BY MS. JONES:
13     Q.  Is the answer the same -- recognizing there
14 might be a little bit more variation here, but would
15 the answer be the same for beauty filters?  There are
16 other platforms beyond Meta's platforms that have
17 beauty and cosmetic filters of different types?
18             MR. RICHARDS:  Object to form.  Scope.
19             THE WITNESS:  Actually, we've only
20 heard about the beauty filters on Meta as being
21 particularly concerning.  There may be other platforms
22 that have that.  I can't speak to that.  The emphasis
23 has been on the beauty filters on Meta.
24 BY MS. JONES:
25     Q.  Okay.  And that's what you focused on in this

Page 98

1  lawsuit; yes?  In your role as an expert in this case;
2  is that right?
3      A.  Correct.
4      Q.  All right.
5          You mention in your report that -- I'm now
6  looking at paragraph 2.  And we're not going to go
7  through every single paragraph, I will share with you.
8  But Exhibit No. 1, paragraph 2 in your summary of
9  opinions.
10     A.  Okay.
11     Q.  You write (as read):
12             "Meta platform features encourage
13             problematic social media use
14             consistent with clinical
15             dependency."
16         Do you see that?
17     A.  I do.
18     Q.  And it goes on to say (as read):
19             "There is considerable overlap in
20             the regions of the brain activated
21             by social media use and those
22             involved in addictions to illegal
23             and dangerous substances."
24         Do you see that?
25     A.  I do.

Page 99

1      Q.  Okay.  And the specific regions you're
2  talking about, I believe you go on to describe later
3  in your summary of opinions; correct?
4      A.  I do.
5      Q.  What other activities activate those areas of
6  the brain --
7              MR. RICHARDS:  Object to form.
8  BY MS. JONES:
9      Q.  -- beyond social media use?
10             MR. RICHARDS:  Sorry, Phyllis.
11         Object to form.
12             THE WITNESS:  Social feedback, broadly
13 speaking, and monetary rewards seem to be the biggest
14 activators of those regions, in addition to the way
15 that they might -- some of those regions are relevant
16 to illegal substances.
17 BY MS. JONES:
18     Q.  And you told me earlier that you're not a
19 neuroscientist, but when we talk about this idea of
20 certain portions of the brain being activated, the way
21 that neuroscientists or others are able to see that is
22 that there are -- I'm going to say it in a layperson's
23 way -- there are scans that allow you to see the
24 actual activation visually; is that right?
25             MR. RICHARDS:  Object to form.

Page 100

1  Compound.
2              THE WITNESS:  That's one of the ways.
3  BY MS. JONES:
4      Q.  Okay.  If you look at a brain scan and see
5  activation of one of these regions of the brain that
6  we've been talking about, can you tell what led to the
7  activation just by looking at the scan?  Do you know?
8      A.  Yes.  The way that this research is done is
9  that kids are put into a scanner and then presented
10 with specific stimuli, in a repetitive way, so you can
11 really identify exactly what stimulus is leading to
12 that activation.
13     Q.  But other than knowing that the study
14 participant may have been encountering at that moment,
15 is there anything about the visual itself that allows
16 you to say, "Oh, that's social feedback versus
17 monetary rewards versus something else"?
18             MR. RICHARDS:  Object to form.
19             THE WITNESS:  I'm pausing on the
20 hypothetical a bit because I don't know a situation in
21 which we would have a brain scan of somebody without
22 it being under controlled conditions where we were
23 presenting the stimulus.  So we would know what led to
24 the activation because it happened under our
25 experimental control.

Page 101

BY MS. JONES:

Q. Okay. And I'm asking you -- and maybe I'm asking you about a scenario that virtually never presents itself -- but if you were simply shown a brain scan that showed some kind of activation, I take it you could not look at that and say, "Well, that was caused by someone getting an attaboy for doing something well at a sporting activity"?

MR. RICHARDS: Object to form.

THE WITNESS: I agree with your first part, that this is a hypothetical that would probably never actually happen in real life --

BY MS. JONES:

Q. Yeah.

A. I don't -- I don't know that I can comment on how one would interpret a brain scan in such a hypothetical because I can't even envision that hypothetical.

Q. On page 4 of your report, paragraph 5 at the top, the end of your list of -- summary of opinions, it says (as read):

"Psychological science demonstrates that exposure to the environments created by platforms like Instagram is associated with

Page 102

lower self-image and distorted body perceptions among young people."

Do you see that?

A. I do.

Q. Okay. You use the term "associated with" -- the phrase "associated with"; yes?

A. I have.

Q. And, Dr. Prinstein, just as a basic principle, can we agree that association and causation are distinct things?

A. Oh, so we need to have that causation conversation, then, because -- you were talking about. That's a funny word. So how are you meaning that?

Q. Yes -- fair enough. My question -- before we get into a philosophical discussion about the meaning of the word "cause," my question is, do you agree that association and causation are different things?

MR. RICHARDS: Object to form.

THE WITNESS: Sometimes they are the same and sometimes they are different.

BY MS. JONES:

Q. Okay. Something can be both associated and caused by another thing; right?

A. Depending on the situation, that's possible.

Page 103

Q. You can also have things that are associated with each other that are not causally related; true?

A. It is -- sometimes association refers to a causal link and sometimes it does not.

Q. Well, let me go back to my question. My question was, you can have two things that are associated with each other that are not causally related; true?

MR. RICHARDS: Object to form. Asked and answered.

THE WITNESS: Sometimes association implies cause and sometimes it does not.

BY MS. JONES:

Q. Okay. And you can have two things that are associated with each other that are not causally related; correct?

MR. RICHARDS: Same objections.

THE WITNESS: Sorry, is that the same as the previous question?

BY MS. JONES:

Q. I'm trying to get a clean answer to my actual question, which is, you could have two things that are associated with each other that are not causally related; true?

MR. RICHARDS: Same objections.

Page 104

THE WITNESS: I -- sorry, I think I'll just stick to the way I said it before.

BY MS. JONES:

Q. Well, you have to answer my question.

A. I would say that sometimes association implies -- is reflecting a causal relationship and sometimes it's not.

Q. Okay. And in circumstances where it is not reflecting a causal relationship, it would not be appropriate to say association equals cause; right?

MR. RICHARDS: Object to form. Compound.

THE WITNESS: Can you say more about it? Like, it wouldn't be appropriate for whom? In what situation?

BY MS. JONES:

Q. Well, let me ask you about the specific language that you've used in your report. When you said that Instagram is associated with lower self-image, were you intending the word "associated" there to mean "cause" or were you intending it to mean "associated"?

MR. RICHARDS: Object to form.

THE WITNESS: So I don't speak about cause in this report. But what I do instead is I --

1  reflecting what we've done in our consensus reports --
2  is really reflect on the factors that have been
3  identified so far in science that we need to know and
4  attend to to address public welfare.
5        So when we know that there is something that
6  is linked with a public welfare outcome, I want to
7  make sure that we are discussing and highlighting
8  those things that might be preventable risks.
9  BY MS. JONES:
10     Q.  Okay.  Would it be accurate to say Dr. Mitch
11  Prinstein believes that Instagram causes lower
12  self-image and distorted body perceptions among young
13  people?  Would that be a true statement about your
14  views or an untrue statement?
15             MR. RICHARDS:  Object to form.
16             THE WITNESS:  A true statement about my
17  views would be that the environments created by
18  platforms like Instagram are a significant contributor
19  to lower self-image and distorted body perceptions
20  among young people.
21  BY MS. JONES:
22     Q.  And help me understand.  Is there a specific
23  reason that you have chosen not to use "cause" in your
24  report, and it sounds like you wouldn't use the word
25  "cause" in the answer that you just gave me?

1             MR. RICHARDS:  Object to form.
2  Compound.
3             THE WITNESS:  Yeah, so as you
4  established earlier, I am -- I have expertise in both
5  the creation of science and the communication of that
6  science within academic journals, which is primarily
7  to other scientists, as well as in the application and
8  translation of science to benefit the public good.
9        In academic journals, when we talk about
10  causation, we are applying a standard of
11  mechanistic-level causation that is -- you know, it
12  is, in this case, unrealistic and impossible.  In
13  addition, it's an unnecessary standard.  And what
14  I mean by that is that -- well, I mean, we don't yet,
15  based on the way we talk about it in academic
16  journals, have the connection between smoking and lung
17  cancer.
18        But in the application and translation of
19  science, we take what we have from our knowledge and
20  we apply the best available evidence that we have
21  today to identify what are possible harms that we need
22  to prevent or stop or hold accountable to address the
23  public good.  And in that way, my report is meant to
24  highlight the application and translation of science,
25  because we absolutely have enough information to say

1  that there are aspects to the features and functions
2  of Instagram, for instance, and Meta products that are
3  contributing substantially to harm for youth, and we
4  need to address those today.
5  BY MS. JONES:
6     Q.  Did I hear you say -- do you believe, sitting
7  here today, that we don't know that smoking causes
8  lung cancer?
9             MR. RICHARDS:  Object to form.
10  Misstates testimony.
11             THE WITNESS:  The ways in which we
12  would look at the best possible scientific evidence to
13  create a statement about cause, those criteria have
14  not yet been met within the scientific literature.
15  And yet we have enough available evidence to make
16  policies to prevent smoking, to hold companies
17  accountable for the ways that they have created
18  addictions to smoking.  And most of us in our bones
19  know that smoking causes lung cancer.  But the
20  standard that would be used in an academic journal to
21  get at the mechanistic level or to look at a
22  randomized prospective controlled trial have not been
23  met even for that.
24  BY MS. JONES:
25     Q.  When you say "mechanistic level," I want to

1  make sure I understand what you mean by that.  What
2  does that mean?
3     A.  So a mechanistic level would be that we can
4  understand each step of the process by which an
5  independent variable through many mediators leads to
6  the outcome variable, and we can demonstrate how each
7  of those steps is occurring.
8     Q.  And sitting here -- I'm not giving you a hard
9  time, but sitting here today, you don't think that
10  exists for smoking and lung cancer?
11             MR. RICHARDS:  Object to form.
12             THE WITNESS:  We don't have a full
13  understanding of that, nor have there been the
14  prospective randomized clinical trials, because they
15  would be highly unethical, just like the way it would
16  be highly unethical to do that for social media.
17  BY MS. JONES:
18     Q.  So sitting here today, it sounds like your
19  opinion is that Instagram contributes to lower
20  self-image and distorted body perceptions among young
21  people; is that right?
22             MR. RICHARDS:  Object to form.
23             THE WITNESS:  Correct.
24  BY MS. JONES:
25     Q.  But it also sounds like you would be

Page 109

1  comfortable using the word "cause" in that same
2  sentence -- that Instagram causes lower self-image and
3  distorted body perceptions among young people -- for
4  the reasons you've said?
5          MR. RICHARDS:  Object to form.  Asked
6  and answered.
7          THE WITNESS:  I didn't use the word
8  "cause" because it means different things in different
9  contexts and I don't want to be unclear about that.
10 BY MS. JONES:
11     Q.  Are there settings in which you have, in your
12 academic work or otherwise, used the word "cause" to
13 explain a relationship between some exposure and an
14 outcome?
15         MR. RICHARDS:  Object to form.
16         THE WITNESS:  Yes.
17 BY MS. JONES:
18     Q.  What are those situations?
19     A.  We have conducted some randomized controlled
20 trials and also manipulated independent variables in a
21 randomized way that has allowed us to talk about cause
22 on the outcome.
23     Q.  What are the specific variables that you were
24 looking at?  And what were the outcomes you were
25 looking at?

Page 110

1          MR. RICHARDS:  Object to form.
2          THE WITNESS:  We were studying peer
3  influence on adolescents' risk behaviors under
4  conditions of varying those peers' popularity and peer
5  status.
6  BY MS. JONES:
7      Q.  Okay.  And it sounds like you, based on that
8  work, were able to reach a conclusion that peer
9  influence can cause adolescents' risk behaviors?
10         MR. RICHARDS:  Object to form.
11         THE WITNESS:  We concluded that peers
12 are more likely to be influenced -- that the exposure
13 to popular peers caused socialization towards health
14 risk behaviors more than socialization towards
15 unpopular peers.
16 BY MS. JONES:
17     Q.  Okay.  So it's not your -- it's not the case
18 that Dr. Prinstein just never uses the word "cause";
19 is that right?
20         MR. RICHARDS:  Object to form.
21         THE WITNESS:  The -- again, I think the
22 important piece here is that there are different ways
23 that people talk about cause in academic journal
24 writing to a scientific audience, and that's a
25 different use of the term than the way that we would

Page 111

1  talk about it in the application and translation of
2  science to nonscientists.
3  BY MS. JONES:
4      Q.  Sure.  Understood.  My question was, it's not
5  the case that you, Dr. Prinstein, never use the word
6  "cause"; right?
7          MR. RICHARDS:  Object to form.
8          THE WITNESS:  I have used the word
9  "cause."
10 BY MS. JONES:
11     Q.  Okay.  As have I.
12         Is there -- you have -- in Exhibit No. 3,
13 which I'm not going to make you plow through, we have
14 a copy of your CV; yes?
15     A.  Yes.
16     Q.  And that includes, among other things, the
17 many, many, many articles that you have been an author
18 or a coauthor on; yes?
19     A.  Correct.
20     Q.  I believe it also includes information about
21 speeches that you've given in various settings; right?
22     A.  Yes.
23     Q.  It includes information about interviews and
24 public remarks that you've made in other settings;
25 yes.

Page 112

1      A.  Some of them, yes.
2      Q.  And I have not gone back and looked at the
3  exact time frame, but I take it this goes back at
4  least into the early 2000s?  Not to age you.  You look
5  fresh as a daisy.  But at least the first date that
6  I see on here is the year 2000.
7      A.  It does go back to the '90s and 2000s.
8      Q.  Yeah, so we're looking at roughly a
9  quarter-century of work in your role as an academic
10 and professional of various sorts; right?
11         MR. RICHARDS:  Object to form.
12         THE WITNESS:  Correct.
13 BY MS. JONES:
14     Q.  If we reviewed everything that's reflected in
15 Exhibit No. 3, would we find anywhere where you,
16 Dr. Prinstein, have said that social media causes
17 mental health harms of any kind in adolescents or
18 teenagers?
19         MR. RICHARDS:  Object to form.
20         THE WITNESS:  Because all of those
21 documents and talks and papers that you refer to are
22 to academic audiences, you would probably not find the
23 word "cause" in that context.
24 BY MS. JONES:
25     Q.  Are you recalling an occasion where you might

1  have used -- you might have offered the view that
2  social media causes mental health harms in teenagers
3  in some lay setting?
4           MR. RICHARDS:  Object to form.
5           THE WITNESS:  I believe so.
6  BY MS. JONES:
7      Q.  What are those that you're recalling?
8      A.  So for the last five years, in my role as the
9  Chief Science Officer and now Chief of Psychology at
10 APA, I've been asked to explain how our findings are
11 relevant in work with policymakers, working with
12 attorneys, not -- not necessarily the attorneys
13 sitting here -- also with educators; and in those
14 contexts, they have talked about some of the concerns,
15 and they've used the term "cause," and I've
16 corroborated that the way that they're thinking about
17 it was true.
18     Q.  Are there specific occasions that you have in
19 mind where that's happened?
20     A.  That would be very hard to access in my
21 memory, but I -- I can remember some specific
22 instances.  I don't know that I can tell you where and
23 when I was standing at that moment.
24     Q.  And just so I understand, it sounds like you
25 have had other people use the word "cause" and you've

1  corroborated their thinking.  Is that right?
2      A.  Yes.
3      Q.  Okay.  Have you ever, yourself, affirmatively
4  offered that view, as opposed to responding to someone
5  else who said, "I think social media might be causing
6  mental health harms"?
7           MR. RICHARDS:  Object to form.
8           THE WITNESS:  I think the only trouble
9  with answering that is that I just can't remember,
10 like, everything I've ever said in every single talk
11 I've ever given.  So it's very possible that I did --
12 BY MS. JONES:
13     Q.  Do you remember it sitting here today?
14     A.  I believe that I have discussed the
15 notifications and the likes and comments emphasis as
16 causing digital stress.  I believe I have said that.
17     Q.  Where?
18     A.  I told you I'm not going to be able to remember
19 exactly where I was, but -- I've done so many talks in
20 front of so many different audiences, they're kind of
21 a blur at this point.
22     Q.  Okay.  So sitting here today, you could not
23 tell me of a specific -- you think I might have;
24 right?
25     A.  Yes.

1      Q.  Okay.  But sitting here today, you could not
2  tell me of a particular occasion where you
3  affirmatively offered that view, that some feature or
4  element of a social media platform was causing mental
5  health harms; is that right?
6           MR. RICHARDS:  Object to form.
7           THE WITNESS:  I mean, I think that
8  the -- I think that the most accurate summary of this
9  is that I have not used the word "cause" when talking
10 with scientists, in academic journals, or in talks
11 among academic scientists, for the reasons we
12 discussed: cause means something different, and it's a
13 different kind of set of criteria that we use.
14          But I have frequently discussed the
15 contribution that is clearly being made by kids'
16 engagement with the features and functions on social
17 media on kids' mental health; and I think that there's
18 more evidence that not demonstrating that that
19 contribution is substantial and affecting a
20 substantial number of kids.
21 BY MS. JONES:
22     Q.  Okay.  I heard the last bit of your answer --
23 I heard the first bit of your answer to be, in a
24 scientific/academic writing setting, you would not
25 have been using the word "cause"; is that right?

1           MR. RICHARDS:  Object to --
2  BY MS. JONES:
3      Q.  And you've explained why; yes?
4           MR. RICHARDS:  Object to form.  Asked
5  and answered.
6           THE WITNESS:  I think I have, yes.
7  BY MS. JONES:
8      Q.  Okay.  And then what I understand you to
9  separately be saying is that you have frequently
10 discussed the contribution that is being made by kids'
11 engagement with the features and functions on social
12 media on kids' mental health.
13          Now, even there, you used the word
14 "contribution."  And you understand what I'm asking
15 about is any occasion where you have, in your lay
16 remarks, gone into a setting, whether with lawmakers,
17 parents, teachers, others, and said, "I believe that
18 social media's features and functions are causing
19 mental health harms in some universe of teenagers."
20 That's what I'm asking.
21           MR. RICHARDS:  Object to form.  Asked
22 and answered multiple times now.
23           THE WITNESS:  Sorry, your question is
24 very specific about the use of a single word in a
25 specific context, so I'm just taking a moment to try

Page 117

1  and understand --
2  BY MS. JONES:
3      Q.  In fairness to you, Dr. Prinstein, the -- do
4  you have an understanding that the concept of
5  causation is relevant in the setting of the lawsuit in
6  which you have agreed to be an expert?
7      A.  Yes.
8      Q.  Okay.  So recognizing that, that is why I'm
9  asking you a pretty specific question.  So let me ask
10  the question.
11          Outside of a scientific setting, where it
12  sounds like you have not offered the view that social
13  media's features and functions is causing mental
14  health harms, have you ever articulated that view to
15  anyone?  A group of parents?  A group of educators?
16  Legislators?  Anybody?
17          MR. RICHARDS:  Object to form.
18  Compound.  Asked and answered.
19          THE WITNESS:  Yes.
20  BY MS. JONES:
21      Q.  When?
22      A.  That's what we just talked about.
23      Q.  And my question was, sitting here today, can
24  you specify a particular occasion?  That's all.
25          MR. RICHARDS:  Object to form.

Page 118

1          THE WITNESS:  Okay.
2  BY MS. JONES:
3      Q.  If the answer is no, that's okay.  I'm just
4  making sure I understand your testimony sitting here
5  today.
6      A.  Yeah.  I -- let me just take a moment to
7  gather my thoughts here.
8      Q.  Please.
9      A.  Thank you for creating a space to talk about
10  this in a situation where, as you say, you know, what
11  have I said or what might we say outside of an
12  academic journal.
13          In response to your question, providing that
14  space, I would say that, particularly based on the
15  recent data, using a randomized chronological trial,
16  looking at kids who are withdrawing from social media
17  for a period of time versus not, I am comfortable
18  saying that social media is causing harms among youth,
19  particularly because of the features and the functions
20  based in platforms including Meta's platforms.
21          I would go on to say that the challenge in
22  my discussion of the word "cause" is because my job is
23  to portray the science in a way that is helpful for
24  the public welfare, and in that way, I want to be
25  responsible to the way that scientists talk, but

Page 119

1  I also want to make sure that we're using the science
2  that we need to for the public welfare, to protect
3  kids.
4          I would say that we absolutely have enough
5  data right now, and we absolutely know for certain,
6  more than not, that there is a direct and clear and,
7  yes, causal relationship between what adolescents are
8  engaging with on the features and functions on social
9  media and their own mental health problems down the
10  line.
11          I do want to make clear, though, that I use
12  that term in a way that honors and respects that
13  scientists talk about cause in a way that is sometimes
14  different, and I want to make room and space for both
15  of those ways of talking about the data to be true, in
16  the same way that we would when it comes to smoking
17  and lung cancer.  We can simultaneously talk about
18  cause and we can struggle with the scientific
19  questions remaining to be asked.
20      Q.  You're welcome for the space.  I'm going to
21  move to strike all that as nonresponsive.
22          I understand that sitting here today -- it
23  sounds like sitting here today, and, in fact, just
24  now, you are prepared to offer the view that there is
25  a causal relationship between engaging with certain

Page 120

1  social media features and functions and certain mental
2  health harms.  Did I hear that correctly?
3          MR. RICHARDS:  Object to --
4          THE WITNESS:  We now have data from
5  meta-analyses of randomized controlled withdrawal
6  trials that support that.
7  BY MS. JONES:
8      Q.  Okay.  And you did not say that,
9  specifically, in your written report anywhere --
10  "causal relationship" -- did you?
11      A.  Well, as I mentioned, there are reasons why
12  I did not use the word "cause" that I just
13  articulated.  I'm happy to articulate them again,
14  given my role and responsibility of balancing the
15  scientific literature and its application.
16          But I'll also mention that it was actually
17  since the publication of this report that one of those
18  meta-analyses came out that offered a summary of
19  withdrawal randomized clinical trials.
20      Q.  And I am going to come back to my original
21  question, which was have you ever said that before
22  today?  By let me focus in now.
23          When did you decide or determine, between
24  the date of your expert report, which was May 16th,
25  2025, and today, that there was, in fact, a causal

Page 121

1  relationship between the use of the features and
2  functions of certain social media platforms and mental
3  health harms?
4          MR. RICHARDS:  Object to form.
5  Mischaracterizes testimony.
6          THE WITNESS:  I think it would be
7  important to clarify, I'm not changing my mind or
8  changing my opinion, but you're asking me a question
9  about a semantic distinction, and I'm trying to
10  clarify that, given the conditions and the space that
11  you are asking me to speak about, in those conditions,
12  and within the space that you have created, your
13  definition of the -- your questions regarding the way
14  in which "cause" might be used would apply, especially
15  to very recent data.
16          So I'm not -- yeah, I'm not changing my
17  mind.  I'm just kind of trying to follow with the
18  semantic argument that you're making.
19  BY MS. JONES:
20     Q.  Okay.  And I'm not going to fuss with you
21  over the use of the word "semantic."
22          Let me just make sure I understand.  Nowhere
23  in your expert report, either the opening report or
24  your rebuttal report, do you actually invoke the
25  phrase "causal relationship" to explain the potential

Page 122

1  connection between social media and mental health
2  harms; is that correct?
3     A.  I think the better way to say that would be
4  the data that has come out since I submitted this
5  report in May has now demonstrated a link between
6  social media and mental health harms based on
7  randomized clinical trials.
8     Q.  What specific data are you talking about
9  that's come out since May?
10     A.  There have been one or two papers.  I believe
11  one of them came out in June that was a meta-analysis
12  looking at the -- across a series of independent
13  studies looking at kids' withdrawal from social media.
14  The kids that were asked to stay off of social media
15  got better; the kids who stayed on social media got
16  worse.
17     Q.  Who was the lead author on that paper?
18     A.  I believe that I have it cited in here.
19     Q.  Dr. Prinstein?
20     A.  Yeah.
21     Q.  I absolutely want to give you an opportunity
22  look for this --
23     A.  Oh, yeah.
24     Q.  -- but I'm on a clock today --
25     A.  Oh, okay.

Page 123

1     Q.  -- so if we need to take a break so you could
2  look, we can do that.  I just would want to go off the
3  record.  You tell me.
4     A.  Well, I can tell you that one of the authors
5  was Kaitlyn Burnell, but I don't remember the first
6  author, which is what you asked for, so I can't -- I'm
7  just trying to find it, but if you want to -- if you
8  want, I can find that later.
9     Q.  We can do it later.
10     A.  Okay.
11     Q.  So it sounds like post -- is the Burnell
12  paper the paper you were describing in terms of the
13  meta-analysis?
14     A.  Yes.
15     Q.  Okay.  Was there anything else after your
16  May 2025 expert report that you would say contributes
17  to your view on a causal relationship?
18          MR. RICHARDS:  Object to form.
19          THE WITNESS:  Was there anything else
20  that contributed to -- well --
21  BY MS. JONES:
22     Q.  Let me be more clear.
23     A.  Yeah.
24     Q.  It sounded like you were saying:  After
25  I actually did my report in May of 2025, when I signed

Page 124

1  that, there were some additional research findings
2  that came out after that report that informed what
3  I heard you say earlier about there being a causal
4  relationship between social media use and certain
5  mental health harms.  So I just want to make sure I've
6  exhausted what those things are that happened post-May
7  of 2025.
8          MR. RICHARDS:  Object to form.
9          THE WITNESS:  Yeah, the scientific
10  articles that have come out since, I don't believe
11  that there are others.
12          Again, to be clear, the ways in which we
13  talk about cause among scientists -- yes, that recent
14  article does allow scientists to make more of a causal
15  conclusion.  But your question about cause, I have
16  intentionally used the terms regarding the
17  contributions that were made, given the confusion
18  around that term.
19  BY MS. JONES:
20     Q.  Okay.  And it sounded like you could not
21  identify for me an occasion in a lay setting -- in a
22  setting where you're talking to nonscientists -- where
23  you have articulated the view that there is a causal
24  relationship between social media and mental health
25  harms; is that right?

Page 125

1    MR. RICHARDS: Object to form.
2    THE WITNESS: I believe I likely have
3  said that in a lay setting. I can't tell you the
4  specific date, though, or place.
5  BY MS. JONES:
6    Q.  Okay.  Got it.
7    A.  There was just too many of those talks to
8  differentiate them in my mind from one another at this
9  point.
10   Q.  Okay.  You -- you've testified before
11 Congress -- I'm aware of at least two times.  There
12 might be other times.  But you have testified before
13 Congress before; yes?
14   A.  Yes.
15   Q.  Including as recently as last week; correct?
16   A.  Correct.
17   Q.  And you also testified before Congress in
18 February of 2023; do you recall that?
19   A.  I do.
20   Q.  All right.  And when you were testifying
21 before Congress, do you view that as a scientific
22 audience or a lay audience?
23   MR. RICHARDS: Object to form.
24   THE WITNESS: Well, I would say
25 probably a combination of both are invested in that

Page 126

1  forum.
2  BY MS. JONES:
3    Q.  And so in that setting, is that a setting
4  where you would use causal language if you thought
5  cause had been established?
6    MR. RICHARDS: Object to form.
7    THE WITNESS: I much prefer to talk
8  about the significant contribution that is being made.
9  I think that's the most responsible and accurate way
10 to talk about it that blends both the scientific --
11 the science that I represent and the needs to
12 translate the science in my current job.
13 BY MS. JONES:
14   Q.  Okay.  And -- let me show you, actually, a
15 copy of your --
16   MR. RICHARDS: Counsel, if I could, if
17 it's a good time -- we've been going for over an
18 hour -- would it be okay to take a break?
19   MS. JONES: I think that is a
20 reasonable enough -- let me just make sure I'm not at
21 a point where it would --
22   MR. RICHARDS: Understood.
23   MS. JONES: -- make more sense for me
24 to ask a few more questions and then finish up.
25   MR. RICHARDS: Sure.  Are you doing

Page 127

1  okay, Mitch?
2    THE WITNESS: Yeah, thanks.
3    MS. JONES: I'm told that we'll have
4  lunch in 15 minutes --
5    MR. RICHARDS: Okay.  That's --
6    MS. JONES: -- so if we can go 12 more
7  minutes, we can release you to eat --
8    (Over-speaking.)
9    THE WITNESS: I'm pro-eating.  Yes.
10 I'm good.
11   MS. JONES: I mean, can you survive
12 another 12 minutes before we break for lunch?
13   THE WITNESS: I think so.  Thank you.
14   MS. JONES: You seem hardy.
15   (Exhibit No. 6 was marked for identification.)
16 BY MS. JONES:
17   Q.  So I'm going to hand you what we've marked as
18 Exhibit No. 6, and we have a copy for counsel as well.
19   Doctor, you have in front of you a copy of
20 your written testimony before the U.S. Senate
21 Committee on the Judiciary, submitted February 14th,
22 2023.  Do you recognize that?
23   A.  It looks like it, yeah.
24   Q.  Okay.  And this would have been before the
25 APA social media advisory came out; correct?

Page 128

1    A.  Correct.
2    Q.  And it would have been before -- if I'm
3  recalling our chronology earlier, it would have been
4  before you'd had any contacts with the state attorneys
5  general about what they might have reacted to in the
6  advisory and whether you might serve as an expert;
7  right?
8    A.  Yes.
9    Q.  Okay.  So -- and this testimony, which
10 includes the APA's, I guess, letterhead or insignia at
11 the top, this was -- this is testimony that you
12 prepared and that was submitted for you; is that
13 right?
14   MR. RICHARDS: Object to form.
15   THE WITNESS: I wrote this.
16 BY MS. JONES:
17   Q.  Okay.  So if we flip to page 4 of this --
18 your written testimony -- and I take it,
19 Dr. Prinstein, when you testified before Congress,
20 your goal was to be accurate and honest; yes?
21   A.  Of course.
22   Q.  Okay.  And your goal would be not to
23 overstate the state of the science; yes?
24   A.  Yes.
25   Q.  Okay.  And in the second -- I'm going to ask

1  you to look at the second -- actually, it's the first
2  full paragraph on page 4 of Exhibit No. 6, beginning
3  with the word "Before."  Do you see that?
4      A.  Yes.
5      Q.  It says (as read):
6              "Before we discuss specific
7          impacts of online platforms or
8          solutions, it is important to
9          acknowledge that causal data are
10         not available for many of these
11         issues, since the experimental
12         designs needed to make
13         cause-and-effect statements would
14         be considered unethical or require
15         access to currently inaccessible
16         data."
17         Do you see that?
18     A.  I do.
19     Q.  And that was an accurate statement when you
20  drafted it up and submitted it to the U.S. Senate at
21  the time; correct?
22     A.  It was.
23     Q.  Okay.  And then it goes on to say (as read):
24             "This underscores the need for
25          increased access to data and

1              funding for high-quality
2          research."
3          Yes?
4      A.  It does say that.
5      Q.  And then you go on to say (as read):
6              "However, as with noncausal
7          research revealing the effects of
8          childhood adversity on mental
9          health, or the effects of combat
10         on PTSD among veterans, extant,
11         rigorous science can nevertheless
12         allow us to reach reasonable
13         conclusions that can shape
14         policy."
15         Do you see that?
16     A.  I do.
17     Q.  It goes on to talk about, in the next
18  paragraph, that there are some nuances in terms of the
19  extent to which technology and social media may or may
20  not be problematic for development; correct?
21     A.  Can I just take a second to look at that
22  paragraph?  It's been a long time.
23     Q.  Yes, of course.
24         (Witness reviews the document.)
25         THE WITNESS:  Yeah.

1  BY MS. JONES:
2      Q.  All right.  And what you say here is
3  (as read):
4              "It also is important to
5          acknowledge that technology and
6          social media may not, in
7          themselves, be problematic for
8          child development, as each device
9          and platform offers a multitude of
10         features and communication
11         opportunities that users can
12         choose from."
13         Do you see that?
14     A.  I see that.
15     Q.  And that was a true statement as it was
16  submitted by you to the U.S. Senate?
17     A.  That was true at the time.
18     Q.  Okay.  And (as read):
19             "Extensive research has
20          demonstrated that the amount of
21          screen time alone is not likely
22          associated with negative
23          psychological outcomes among
24          youth."
25          That's also a true statement; correct?

1      A.  That was also true at the time.
2      Q.  Has it changed?
3      A.  Yeah, it has a little bit.  So those recent
4  findings are showing that even just reducing screen
5  time seems to lead to an improvement in mental health.
6      Q.  What specific recent findings are you talking
7  about?
8      A.  Oh, the Burnell paper we just talked about.
9      Q.  The same Burnell paper?
10     A.  Yes.
11     Q.  Okay.  It goes on to say (as read):
12             "Moreover, not all youth exposed
13          to identical stimuli are affected
14          the same ways."
15          That's true; right?
16     A.  That is true.
17     Q.  (As read):
18             "Thus, the most appropriate
19          question is: what specific online
20          behaviors, features, or content
21          may be associated with benefit or
22          risk to which youth."
23          I think there might be a part of that --
24     A.  Oh.
25     Q.  -- sentence missing.  That's okay.

Page 133

1    A. Yes, there is.
2    Q. There's also an "l" missing from
3  "Psychological" at the top. (As read:
4              "This is the focus of the most
5              recent work among psychological
6              scientists, yielding some
7              comforting, but also some worrying
8              results."
9              Correct?
10   A. That's what it says.
11   Q. Having looked at the entirety of this written
12  testimony that you submitted to the U.S. Senate back
13  in 2023, you did not at any point -- you can tell me
14  if we've missed something -- articulate the view that
15  there is a recognized causal relationship between
16  social media use and mental health harms amongst
17  adolescents, did you?
18              MR. RICHARDS: I'll just object to the
19  form because I don't believe the witness has reviewed
20  the entire document. He can answer, but I just wanted
21  to object on that basis.
22  BY MS. JONES:
23   Q. Sure. And you're welcome to review it over
24  lunch if you are inclined to spend your lunch that
25  way. But let me go back to my question.

Page 134

1              And I meant we had looked at it. I did not
2  mean to suggest that you had looked at the whole thing
3  while we've been sitting here for the last five
4  minutes.
5              Did you, at any point in your written
6  testimony to the U.S. Senate in February of 2023,
7  articulate the view that there is a recognized causal
8  relationship between social media use and mental
9  health harms in teenagers?
10             MR. RICHARDS: Object to form.
11             THE WITNESS: I would have to read over
12  the whole thing to remind myself of what was said in
13  here. I think pertinent to your question, though, as
14  you just asked, is that the data as of 2023 summarized
15  in this report did not include data published recently
16  in 2025 that looked at randomized clinical trial data.
17             MS. JONES: Okay.
18             Why don't we go ahead and take our break
19  now. How much time do y'all want for lunch?
20             We can go off the record.
21             THE VIDEOGRAPHER: Going off the
22  record. The time is 11:52 a.m.
23             (Recess taken from 11:52 a.m. to 12:37 p.m.)
24             THE VIDEOGRAPHER: Going back on the
25  record. The time is 12:37 p.m.

Page 135

1  (Exhibit Nos. 7 and 8 were marked for identification.)
2  BY MS. JONES:
3    Q. Dr. Prinstein, let me hand you what we've --
4  we'll hand counsel copies as well -- what we've marked
5  as Exhibits Nos. 7 and 8. And we'll come back to
6  those, but I just wanted to make sure that we had
7  grabbed the rights items.
8              Exhibit No. 7 should be -- is what we think
9  is the Burnell meta-analysis that you had mentioned
10  earlier, but we wanted to ask if we'd grabbed the
11  right thing.
12   A. Yeah, let me -- can I take a look at the
13  abstracts?
14   Q. Yeah, of course you can.
15   A. Thanks.
16             (Witness reviews the document.)
17             THE WITNESS: Yeah, I think this is
18  right.
19  BY MS. JONES:
20   Q. Okay. And by "this," what we're talking
21  about is Exhibit No. 7, which is the meta-analysis
22  that included Dr. Burnell and others that you were
23  referring to earlier that postdated your May 2025
24  report?
25   A. Yeah, I believe this is the one.

Page 136

1    Q. Okay. And then, again just to make sure we
2  have the right items here, Exhibit No. 8 -- we'll come
3  back to that -- but Exhibit No. 8, this is the APA's
4  Health Advisory on Social Media Use in Adolescence
5  that you had referred to earlier; is that right?
6    A. This is the first one, yes.
7    Q. Okay. Is there another one that you're
8  thinking of?
9    A. There was another one a year later.
10   Q. Okay. Got it.
11             Let me take you back to your report, if you
12  don't mind, and go to page 6. Under -- there's a
13  section entitled "Meta's alleged unfair and deceptive
14  practices"; do you see that?
15   A. Yes.
16   Q. And paragraph 18 says (as read):
17             "I understand that certain
18             Plaintiffs allege that Meta has
19             engaged in unfair and
20             unconscionable acts and practices
21             related to the health and safety
22             of its young users on social media
23             platforms."
24             Do you see that?
25   A. I do.

Page 137

1    Q.  Do you -- and if you don't, it's okay, but do
2  you have an understanding of what that refers to
3  specifically?
4    A.  I mean, I understand what the words mean, but
5  I don't know what the specific charge is in, like, lay
6  language.
7    Q.  Okay.  I have the same question with respect
8  to paragraph 19.  (As read):
9             "I also understand that certain
10            Plaintiffs allege that Meta has
11            engaged in deceptive acts and
12            practices regarding its social
13            media platforms."
14       Do you see that?
15    A.  I do.
16    Q.  Would the answer be essentially the same in
17  terms of if you have an understanding of what exactly
18  that means in the context of this case?
19             MR. RICHARDS:  Just object to form.
20             THE WITNESS:  Yeah, the same.
21  BY MS. JONES:
22    Q.  Okay.  On page 9 of your report, there is a
23  discussion to some of the brain activity that you were
24  describing earlier, and in paragraph 26
25  specifically -- well, there's a section entitled

Page 138

1  "Youth hypersensitivity to social feedback and
2  'automatic' behaviors"; do you see that?
3    A.  Yes.
4             MR. RICHARDS:  Just object to form.
5  BY MS. JONES:
6    Q.  And in paragraph 26, it says (as read):
7             "One of the first regions of the
8             brain that undergoes substantial
9             reorganization at the outset of
10            puberty is referred to as the
11            ventral striatum."
12       Is that right?
13    A.  Yes.
14    Q.  And it goes on to describe the development of
15  neuronal receptors within that brain region, starting
16  around the ages of 10 or 11; right?
17    A.  Correct.
18    Q.  And then there's a discussion of two
19  different substances, one known as oxytocin; yes?
20    A.  Yes.
21    Q.  Which you report here is "generally
22  associated with social bonding, especially with peers
23  around our own age"; correct?
24    A.  Correct.
25    Q.  And (as read):

Page 139

1             "The second is Dopamine, which is
2             associated with feelings of
3             pleasure, when we experience
4             attention, feedback, and
5             reinforcement, or gain power and
6             influence among our peers."
7        Correct?
8    A.  Correct.
9    Q.  And those activations of regions of the brain
10  that have a lot of dopamine and oxytocin receptors,
11  that activation can occur in the absence of exposure
12  to social media; is that right?
13             MR. RICHARDS:  Just object to form.
14             THE WITNESS:  That's correct.
15  BY MS. JONES:
16    Q.  Let me ask you to go to page 36 of your
17  report.
18    A.  36?
19    Q.  Yes.  Oh, sorry, 35.  I'm sorry, 35.
20    A.  Okay.
21    Q.  And that page is the conclusion of the
22  substantive portion of your report, and it includes a
23  certification that you signed on -- it looks like
24  May 16th, 2025.  Do you see that at the top of the
25  page?

Page 140

1    A.  Yeah.
2    Q.  I will spare you reading the entirety of
3  certification, but do you have an understanding of why
4  you made that certification?
5    A.  Let me take a look.
6        Yes.
7    Q.  What is your understanding?
8    A.  That I'm doing what I can to promote justice,
9  and I am not wasting anyone's time, and I'm doing it
10  with integrity.
11    Q.  Could you go to Exhibit No. 4, which we
12  marked earlier, Dr. Prinstein.
13        Exhibit No. 4 is your rebuttal report, dated
14  July 30th, 2025; correct?
15    A.  Yes.
16    Q.  And this report includes your responses to
17  certain of the reports submitted by experts retained
18  by Meta; is that right?
19    A.  Yes.
20    Q.  Does this report include all of the rebuttal
21  opinions that you have with respect to the views and
22  opinions that have been expressed by Meta's experts?
23             MR. RICHARDS:  Object to form.
24             THE WITNESS:  I think so.  There was
25  a lot in the rebuttal reports -- sorry.  Theirs is the

1  rebuttal, and this is the response to the rebuttal?
2  BY MS. JONES:
3       Q.  Mm-hmm.
4       A.  Okay.  Yeah.  There was a lot in the rebuttal
5  reports.  There were some things discussed in there
6  that weren't directed towards me or my reports, so
7  I kind of, you know, may or may not have had some
8  thoughts about that, but I really focused on the stuff
9  focused on me.
10      Q.  Okay.  But sitting here right now, you're not
11  thinking, "Oh, I have a very specific response to one
12  of Meta's experts" that you haven't otherwise shared
13  in your rebuttal report?
14      A.  Not --
15                MR. RICHARDS:  Object to form.
16                THE WITNESS:  Not that I can think of,
17  yeah.
18  BY MS. JONES:
19      Q.  Okay.  Let me ask to take a look at
20  Exhibit No. 2, which is Appendix A to your report.
21      A.  Yeah.
22      Q.  Exhibit 2 is entitled "Appendix A: Materials
23  Considered"?
24      A.  Yes.
25      Q.  And one question I had was, does this list,

1  in combination with your report, include everything
2  that you reviewed or relied upon in connection with
3  forming your opinions in the case?
4                MR. RICHARDS:  Object to form.
5                THE WITNESS:  So there's a -- I mean,
6  I guess if you, like, divided up the things that
7  I relied on into the categories of, like, my general
8  understanding and knowledge and expertise in this
9  area, versus the things that I specifically, like,
10  read and cited in the report, then this does reflect
11  the latter.
12                But obviously, you know, there's a lot of
13  data -- there are a lot of other articles, including
14  articles relevant, that I did not cite.  As I said in
15  my report, I offered some sample articles to support
16  my points, but I didn't write my report to be
17  exhaustive of every article.
18  BY MS. JONES:
19      Q.  Okay.  Let me ask you this way:  Are there
20  articles that you did not include on your list that
21  you would say are somehow offering distinct points or
22  conclusions from what is included?
23                And by that I mean is there something out
24  there that supports some opinion you have that we
25  wouldn't find reflected otherwise in what is listed

1  here on your Materials Considered list?
2                MR. RICHARDS:  Object to form.  Vague.
3                THE WITNESS:  I don't think -- to your
4  point about a distinct point of view, I don't think
5  there's any new or different piece, you know, just at
6  the time of this writing; right?  So, like, other
7  things came out, obviously, since this report.
8  BY MS. JONES:
9       Q.  Under the section entitled "Legal and other
10  case documents," there are five bullets; yes?
11      A.  Yes.
12      Q.  Do you know -- without sharing conversations
13  you might have had with counsel, do you have any sense
14  of why these are the things that ended up on your
15  Materials Considered list?
16                MR. RICHARDS:  Object to form.
17                THE WITNESS:  I reviewed -- I reviewed
18  the reports that were relevant to the piece that
19  I wrote and that were speaking to the psychological
20  science and the questions that I was asked to have an
21  opinion on.
22  BY MS. JONES:
23      Q.  Yeah, and so the "Legal and other case
24  documents" section, as I read it, Dr. Prinstein,
25  actually is not referring to reports; it's referring

1  to filings in the case and written discovery that
2  might have been done in the case.  And my question
3  was -- I guess, actually, my first question is, did
4  you read all of the five items that are listed here?
5                MR. RICHARDS:  Just object to form.
6                THE WITNESS:  Yes.  Although I'm a
7  little confused which items these are because they all
8  read, like, almost the same to me, so I couldn't tell
9  you which is which here.
10  BY MS. JONES:
11      Q.  Yeah, so that's a fair point.  So there are
12  parts of each of these that will look very similar,
13  because there's a case caption that identifies the
14  party bringing the suit and then identifies Meta as
15  the defendant in the case, so that might be what
16  you're seeing in terms of similarities.
17      A.  Uh-huh.
18      Q.  But let's take them one by one.  That might
19  be easier.
20      A.  Okay.
21      Q.  The Complaint for Objective and Other Relief
22  in the People of the State of California v. Meta: did
23  you review that complaint?
24      A.  I don't remember which one that is.  If it's
25  on here then I did --

## Page 145

1  Q.  Okay.
2  A.  -- but I don't know them by this call number
3  thing here.
4  Q.  There's no reason you would need to --
5  A.  Yeah, okay.
6  Q.  -- that's just how it's tracked in the court
7  system.
8  A.  Okay.
9  Q.  Okay.  What about these other bullets --
10  second, third, fourth, and fifth bullets -- that refer
11  to objections and responses to interrogatories?
12       MR. RICHARDS:  Just object to form.
13  BY MS. JONES:
14  Q.  My question is did you read those?
15  A.  Same answer.
16  Q.  And the answer was what?  That you think you
17  did read them?
18  A.  Yeah, I think I did.  But I don't actually
19  know what these documents specifically are because the
20  only differentiators are these numbers, so I can't
21  speak very knowledgeably about what these documents
22  are right now.
23  Q.  Okay.  Do you have any specific recall of
24  relying, for purposes of your opinions, on written
25  discovery responses by Meta?

## Page 146

1       MR. RICHARDS:  Object to form.
2       THE WITNESS:  So the materials that
3  came from Meta, and then, like, also the depositions,
4  they did not play a very big role in the basis of my
5  opinions, which is largely based on the science.
6       Mostly, though, reading all of that -- and
7  again, I don't know the difference between the
8  interrogatory versus the Meta documents, whatever --
9  but mostly reading that, it just became clear that
10  Meta knew about what a lot of the concerns were and
11  did all this anyway.
12       And then it's interesting that a lot of what
13  the documents suggested is that they corroborated some
14  of the scientific findings in a way that made it seem
15  like, even when using a much, much larger sample, the
16  same basic findings came out.
17       That was my main takeaway.
18  BY MS. JONES:
19  Q.  Okay.  Did you speak -- and I suspect I know
20  the answer to this, but did you actually speak to
21  anyone from Meta?
22       MR. RICHARDS:  Object to form.
23  BY MS. JONES:
24  Q.  As part of your role as an expert.  Excuse
25  me.

## Page 147

1  A.  Yeah.  No, no, no.
2  Q.  Then there is a section in Exhibit 2 called
3  "Books and academic papers," which goes on for a few
4  pages.  Correct?
5  A.  Yeah.
6  Q.  I'm actually going to take you back to A-10,
7  which is a section entitled "Depositions."
8  A.  Do you mean this A-4?  Oh, I see the
9  page A-10.
10  Q.  Yes.
11  A.  Got it.  Yeah, "Depositions."
12  Q.  You're right, there are different
13  conventions --
14  A.  Yeah --
15  Q.  -- that would include the letter A.
16  A.  -- no, I got it now.
17  Q.  A.4, which is in page A-10 of Exhibit 2,
18  there's a list of depositions.  I -- let's say it's
19  several.  I have not counted up the total number, but
20  several depositions.
21       Do you know who these individuals are?
22       MR. RICHARDS:  Object to form.
23       THE WITNESS:  When I read them I did,
24  but I'm not going to be able to remember which one was
25  which.

## Page 148

1  BY MS. JONES:
2  Q.  Okay.  Did you review the depositions of all
3  of these individuals listed here?
4  A.  Yes, I did.
5  Q.  And how was it that you came to review these
6  particular depositions versus some other?
7  A.  Oh.  Well, so I had, you know, access to
8  everything and kind of went into a lot of stuff, and
9  there's a lot, and I asked for help on identifying
10  which were most specific to kind of the psychological
11  science and mental health questions, because some of
12  the other stuff was pertaining to what must be parts
13  of the case that are not really relevant to
14  psychology.
15  Q.  Did you review the exhibits associated with
16  all these depositions?  Do you remember?
17  A.  I did.
18  Q.  And then Section A.5, which is on page A-11,
19  refers to "Discovery," and then there's a list of
20  numbers; do you see that?
21  A.  I do.
22  Q.  Do you know what that list is of?
23  A.  I think that these are referring to the
24  documents that came from Meta.  But again, I can't
25  tell you which number is which here, of course.

Page 149

1    Q.  And how did you determine which documents you
2  were going to include on this list?
3    A.  Oh.  Same exact answer.  Yeah.  I had access
4  to all of them.  I went in and looked around.  It was
5  a bit overwhelming, as you can imagine, because there
6  were so, so many.  I asked for some help on
7  identifying all of the ones that were specific to
8  psychological science, mental health, and -- yeah.
9    Q.  And of the documents that are listed here,
10  did you review all of them?
11    A.  Yes.
12    Q.  Do you have a sense of how many documents
13  have been produced by Meta overall?
14        MR. RICHARDS:  Object to form.
15  Speculation.
16        THE WITNESS:  Yeah, it's totally a
17  guess.  I mean, the portal that I had access to had
18  hundreds and hundreds and hundreds of documents.
19  I can't give you a specific guess.
20  BY MS. JONES:
21    Q.  Okay.  So you know that the list of documents
22  that you have here is a pretty limited fraction of
23  those documents?
24        MR. RICHARDS:  Object to form.
25        THE WITNESS:  My understanding is that

Page 150

1  these are all the documents relevant to psychological
2  science/mental health.
3  BY MS. JONES:
4    Q.  You think that this list at A.5 represents
5  all of the documents relevant to psychological science
6  and mental health that are included in the production
7  from Meta?
8    A.  Substantively.
9    Q.  What does that mean, "substantively"?
10    A.  Well, I'm sure there are -- I mean, I saw
11  others that had a trivial mention, but, I mean,
12  they're not useful documents for my purposes in
13  preparing this report.
14    Q.  And you said you had access to a portal and
15  that you went in and looked around?
16    A.  Mm-hmm.
17    Q.  How exactly did you go about looking around?
18    A.  What do you mean?  I just clicked on it.
19    Q.  Well, I mean, how did you find the documents
20  that you ultimately determined that were going to be
21  put on this list?
22    A.  Oh.  I -- sorry, I thought I told you.  So
23  I went in, and I was looking at many, many, and, you
24  know, there were a lot of things in there that were
25  just not relevant to what I was asked to do here, so

Page 151

1  I asked for help:  You know, "Can you help me find the
2  subset of these that are relevant to psychology or
3  mental health?"
4    Q.  Okay.  And this is the subset, in A.5?
5    A.  Correct.
6    Q.  All right.  Did you run search terms?  When
7  you were in the -- you described it as a portal, or
8  database, or whatever it was, did you run search terms
9  of any kind?
10    A.  I did not.  I don't think that there was a
11  search function available -- at least not that I knew
12  of.
13    Q.  So it sounds like you went into the system
14  and recognized that there was a lot of stuff in there,
15  some of which was not relevant to you; right?
16    A.  Yeah, I opened a lot of documents and saw
17  stuff that was clearly not relevant to me.
18    Q.  Sure.  And so you then inquired for
19  assistance from counsel, I assume; is that right?
20        MR. RICHARDS:  Object to form.
21        THE WITNESS:  I -- there was a team
22  that was kind of hired to be a helper, so they helped.
23  BY MS. JONES:
24    Q.  Okay.  And this -- I think you actually talk
25  about that team in your report; is that right?

Page 152

1    A.  Yeah.  Bates, maybe, is the team.  It was
2  Mathis and Angela.  I remember the people but not the
3  name of their firm.
4    Q.  So those were the -- when you say you
5  went to somebody and said, "Give me some help," that's
6  who you went to?
7    A.  Yes.
8    Q.  Okay.  And then did those folks then give
9  you -- you said, "I'm interested" -- what did you say
10  you were looking for, specifically?
11    A.  I said, "Can you help me find which of these
12  materials are the ones that I should -- you know, are
13  the ones most relevant to psychology and mental
14  health."
15    Q.  Okay.  And then is the list of documents
16  reflected at A.5 in your Materials Considered list --
17  are those the documents that you were given?
18        MR. RICHARDS:  Object to form.
19        THE WITNESS:  So they identified more
20  than these, but so many of them were just not terribly
21  relevant or important.  So the ones here are the ones
22  that were -- sorry.
23        There are some that were cited in the
24  document -- I'm a little bit confused on which thing
25  we're looking at here.

Page 153

1  BY MS. JONES:
2      Q.  You don't need to look at anything on that
3  left-hand side.  I think it's just that document in
4  front of you.
5      A.  These are all the ones that I looked at.  The
6  ones in the document are the ones that were cited in
7  the document.
8      Q.  You mean your report?  "The document"?
9      A.  In the report.  Excuse me.
10     Q.  Okay.  Got it.  So there are Meta documents
11 that are cited in your expert report, Exhibit 1; yes?
12     A.  Right.
13     Q.  And then there might be other documents not
14 cited in your report that are reflected in
15 Exhibit No. 2; is that right?
16     A.  Yes --
17     Q.  Okay.
18     A.  -- I believe so.
19     Q.  Okay.  Got it.  But collectively, that
20 represents some universe of the documents that when
21 you asked for "Give me what's most relevant," that's
22 what you got; is that right?
23          MR. RICHARDS:  Object to form.
24          THE WITNESS:  In -- well, I also had
25 access to all of them, and looked at a lot of others

Page 154

1  that are not in here, but were not -- those were not
2  relevant.  So yeah.
3  BY MS. JONES:
4      Q.  Okay.  And my colleague has reminded me of
5  the paragraph in your report, if you wanted to look at
6  it.  Page 6 in Exhibit 1.
7      A.  Going back to No. 1.
8      Q.  Paragraph 20.
9      A.  Page 6, paragraph 20.
10     Q.  Yeah.  So you say (as read):
11          "I was retained by Plaintiffs to
12          opine on the effects of social
13          media, including Instagram and
14          Facebook, on the developing
15          adolescent brain and how specific
16          social media features impact
17          developmental and mental health
18          outcomes."
19          Yes?
20     A.  Yes.
21     Q.  And then you go on to say (as read):
22          "In preparing this report, I was
23          assisted by staff from the
24          consulting firm Bates White."
25          Yes?

Page 155

1      A.  Correct.
2      Q.  And then it goes on to say (as read):
3          "While engaged in this matter,
4          I directed the activities of the
5          team, made all final decisions,
6          and prepared this report."
7          Is that right?
8      A.  That's what it says.
9      Q.  Is the firm Bates White the firm that you
10 were referring to just now?
11     A.  Yes, it was.
12     Q.  Who got Bates White involved?
13          MR. RICHARDS:  Object to form.
14          THE WITNESS:  I assume the attorneys.
15 BY MS. JONES:
16     Q.  Okay.  Bates White was not a firm that you
17 were dealing with before --
18     A.  I didn't go find them myself.
19     Q.  Okay.  How much time did you spend in
20 reviewing all of the materials that are reflected in
21 your report and your Materials Considered list?
22          MR. RICHARDS:  Object to form.
23          THE WITNESS:  That varied quite a bit
24 by which materials.  You mean, like, cumulatively?
25

Page 156

1  BY MS. JONES:
2      Q.  Yes.
3      A.  Totally just a guess?  I can't -- I have no
4  idea.  But if I'm guessing --
5          MR. RICHARDS:  I'll just object based
6  on speculation.  But you can answer, Dr. Prinstein.
7          THE WITNESS:  20 hours, 30 hours,
8  somewhere in that ballpark.
9  BY MS. JONES:
10     Q.  You think you spent 20 or -- and I recognize
11 you've basically admitted that you probably don't
12 remember, but --
13     A.  Yeah.
14     Q.  Let me ask you this:  Did you keep track in
15 any way of the time you were spending on these various
16 review projects?
17     A.  No.
18     Q.  Okay.  Did you keep track in any way of the
19 time you were spending in the drafting of the expert
20 report?
21     A.  No.
22     Q.  Off the top of your head, you're, it sounds
23 like, guessing it might have been 20 to 30 hours?
24          MR. RICHARDS:  Object to form.
25 Speculation.  Asked and answered.

Page 157

1          THE WITNESS:  That would be my guess.
2    BY MS. JONES:
3          Q.   Okay.  If I told you that some of the
4    depositions that you've testified you read in their
5    entirety were, collectively, thousands of pages
6    long --
7          A.   Yeah.
8          Q.   -- would that affect your estimate of how
9    much time you spent reviewing things?
10          MR. RICHARDS:  Object to form.
11          THE WITNESS:  No, because, as I
12    mentioned before, I really relied -- I did not rely
13    very substantially on the documents from Meta or the
14    depositions in forming my opinions.  I used the
15    science to form my opinions -- the science from
16    academic literature and from my general knowledge.
17          The information from the depositions and the
18    Meta documents were more shocking to see how much Meta
19    was aware of the whole time and engaged in wrongdoing,
20    in my opinion, anyway.  And really, most of what I saw
21    in there corroborated what the science had already
22    shown.
23    BY MS. JONES:
24          Q.   In terms of the Meta documents that you
25    reviewed, would you say, all in, that it was 100

Page 158

1    documents?
2          MR. RICHARDS:  Object to form.
3    Speculation.
4          THE WITNESS:  You mean including the
5    ones on this list and not on this list?
6    BY MS. JONES:
7          Q.   Yes.
8          A.   I mean, honestly, I would like to offer a
9    guess because I hear you asking, but it's kind of
10    impossible for me to speculate at this point.  Like,
11    this is months ago, and these are many, many
12    documents.
13          Q.   Sure.  Well, your list has a certain number
14    of documents --
15          A.   Yeah.
16          Q.   -- which is well under 100 documents; yes?
17          A.   Yes.
18          Q.   In Exhibit No. 2?
19          A.   I looked at least that many, if not four
20    times as many, as what's on that list.
21          Q.   Okay.  Is there any possibility that you
22    reviewed more than 100 Meta documents as part of your
23    work in this case?
24          MR. RICHARDS:  Object to form.
25    Speculation.  Asked and answered.

Page 159

1          THE WITNESS:  Sorry, I honestly cannot
2    guess --
3    BY MS. JONES:
4          Q.   Okay.
5          A.   -- this is a long time ago.
6          Q.   You do not know and you did not keep track?
7          MR. RICHARDS:  Object to form.
8          THE WITNESS:  I did not keep track.
9    BY MS. JONES:
10          Q.   And the documents -- after you went through
11    the process of kind of opening up various things and
12    determined that was not the most efficient way, the
13    documents you ultimately focused in on that were
14    provided to you were provided to you by Bates White;
15    is that right?
16          MR. RICHARDS:  Object to form.
17    Compound.
18          THE WITNESS:  I mean, I -- some of
19    these I had obviously identified in my search, but
20    I asked them to help me in creating a subset that was
21    most relevant, and so the rest of them would be the
22    ones that they had found.
23    BY MS. JONES:
24          Q.   Based on the documents that were given to you
25    by Bates White, did you say, "I want follow-up on this

Page 160

1    particular thing that I see here"?
2          A.   All the time.
3          Q.   Did you personally do any follow-up in the
4    database for things?
5          A.   Yes.
6          Q.   And did that yield some additional universe
7    of documents that you reviewed?
8          A.   They did a really good job, so I don't know
9    that after they had provided me with the information,
10    and after I went back and looked, I don't think
11    I found anything else relevant.
12          Q.   In your academic research work, do you
13    typically review subsets of internal company materials
14    to draw scientific conclusions?
15          MR. RICHARDS:  Object to form.
16          THE WITNESS:  In my -- sorry, in my
17    scientific work, do I -- I don't --
18    BY MS. JONES:
19          Q.   In your academic research work.
20          A.   Yeah, these are confidential, my
21    understanding, so I don't have access to them usually.
22          Q.   And it sounds like your scientific
23    conclusions were not really driven by the company
24    documents.  They might have been, in your view,
25    reinforced by the company documents; is that right?

1    MR. RICHARDS: Object to form.
2  Misstates testimony.
3    THE WITNESS: Yeah, I -- I mean, it
4  was -- it mostly informed my knowledge of what Meta
5  knew all along, and it seemed to corroborate the
6  scientific findings in most cases. That's what
7  I mostly got out of reading those documents.
8  BY MS. JONES:
9    Q. You're not proposing, in your role as an
10 expert in this case, to be an expert on what Meta knew
11 or meant when it said certain things in documents, are
12 you?
13    MR. RICHARDS: Object to form.
14    THE WITNESS: In my role as a human and
15 a parent, I was pretty aghast and disappointed to see
16 them.
17 BY MS. JONES:
18    Q. That -- yeah, that was a different -- that
19 was an answer to a different question.
20    A. Okay.
21    Q. My question is, in your role as a retained
22 and eventually-to-be-paid expert for lawyers, are you
23 proposing to be an expert on what Meta knew or what
24 Meta meant in any particular document you might have
25 seen?

1    MR. RICHARDS: Just object to the
2  preamble.
3    THE WITNESS: Well, as you noted in the
4  report, there's a section that talks about, you know,
5  the deceptive nature of the practices, so I certainly
6  tuned into that when I saw that these were pretty
7  deceptive.
8  BY MS. JONES:
9    Q. Yeah, but my question is less about what you
10 as a human might think. My question is, as an expert,
11 are you purporting to have expert insights into what a
12 particular document said or didn't say, or meant?
13    MR. RICHARDS: Object to form. Calls
14 for a legal conclusion.
15    THE WITNESS: I was asked to be a
16 scientific expert and review the science.
17 BY MS. JONES:
18    Q. I'm not sure that's an answer to my question.
19    My question was, are you acting as an expert
20 on what a particular document signals in terms of
21 Meta's intent or purpose?
22    MR. RICHARDS: Same objection. Asked
23 and answered.
24    THE WITNESS: So I -- the way that
25 you're asking your question seems to demarcate a line

1  between my role as a psychologist and scientist in
2  being able to talk about deception or not being able
3  to talk about deception; and I would say that that's
4  not the way that I approached the task or engaged in
5  the task.
6    To me, I -- I am an expert in thinking about
7  how kids are confronted with a stimulus, how
8  psychologists and psychological knowledge was used to
9  create change, revise, or protect kids from that
10 stimulus, and how children would respond in the
11 context of seeing that stimulus anyway.
12    Some of the documents spoke specifically to
13 psychological advice that was given to Meta employees
14 based on the science, and Meta's decision to go
15 against the best psychological science advice and do
16 things that they knew very well would hurt kids
17 anyway, so that felt pretty relevant to me.
18 BY MS. JONES:
19    Q. When you say "decision to go against the best
20 psychological advice," what specifically are you
21 referring to?
22    A. If I recall correctly, there was a piece on
23 body image filters that psychologists said absolutely
24 should not be used; this will cause damage to kids.
25 It was temporarily taken away, off the platform, and

1  I think it was Mark Zuckerberg himself who said
2  something to the tune of "We are being too
3  paternalistic, and you should put those beauty filters
4  back on." And to me, that was -- I read that both as
5  a human, a parent, but also as a psychologist with
6  scientific expertise on what my colleagues had clearly
7  said to Meta and how they responded and then reversed
8  their decision to those experts.
9    Q. It doesn't look like you actually reviewed
10 Mr. Zuckerberg's deposition; is that right?
11    A. No, I don't believe that I did.
12    Q. And you've not had any conversations about
13 Mr. Zuckerberg about what might have been informing
14 his decision on that particular issue, have you?
15    MR. RICHARDS: Object to form.
16    THE WITNESS: The document that I read
17 said that psychologists that they had hired told him
18 to do one thing, and then they quoted him, so --
19 BY MS. JONES:
20    Q. That wasn't my question. My question was,
21 you have not had any conversations with Mark
22 Zuckerberg about what might have been informing his
23 decision with respect to cosmetic filters; right?
24    A. I have not had any conversations with Mark
25 Zuckerberg.

Page 165

1    Q. Of the expert reports that you reviewed,
2   Dr. Prinstein, how did you determine which reports you
3   would review?
4    A. Can you say that again? It sounds like --
5   I feel like that's what we just talked about, so you
6   probably mean something more specific and I'm not
7   getting it.
8    Q. It's possible.
9    A. Okay.
10    Q. So we've talked about you reviewing
11   deposition testimony from Meta witnesses; correct?
12    A. Yeah.
13    Q. And we've talked about you reviewing various
14   articles; correct?
15    A. Yes.
16    Q. And we've talked about filings in the case
17   and discovery responses that you testified that you
18   reviewed; correct?
19    A. Okay, I kind of don't know what all that
20   means, but yeah.
21    Q. That's fair.
22    A. Okay.
23    Q. And then we talked about Meta documents just
24   now; yes?
25    A. Yes.

Page 166

1    Q. So there are also experts who have been
2   retained by Meta --
3    A. Oh.
4    Q. -- who did expert reports?
5    A. Yeah.
6    Q. Okay. Are you with me now?
7    A. Yes, I am. Thank you.
8    Q. Okay. How did you determine which expert
9   reports you were going to review?
10    MR. RICHARDS: Object to form.
11    THE WITNESS: I was -- sorry.
12    MR. RICHARDS: I just said "object to
13   form." You can answer.
14    THE WITNESS: Oh. I was provided the
15   reports that were relevant to my testimony -- or my
16   report.
17   BY MS. JONES:
18    Q. Okay. Provided by whom?
19    A. The Bates White team.
20    Q. Have you reviewed any deposition testimony
21   from any expert, whether retained by Meta or retained
22   by the state AGs?
23    A. Yes -- well, no. The -- I think that what
24   I was reading was the rebuttal reports. Wait.
25    Q. Let me clarify because I might be creating

Page 167

1   confusion.
2    So people who did expert reports also did
3   this, someone came and asked them questions --
4    A. Yes.
5    Q. -- which was turned into a transcript.
6    A. Right.
7    Q. Do you recall reviewing any transcripts from
8   experts?
9    A. Oh. No. If you mean the people who wrote
10   the rebuttal reports, no, I haven't read those
11   transcripts.
12    Q. Okay.
13    A. Yeah.
14    Q. In connection with reviewing the expert
15   reports that you did review, did you go and review the
16   materials that those experts had cited?
17    A. There were some -- there were some documents
18   and materials cited in the rebuttal reports. I did go
19   and look at what they were looking at when they made
20   those statements, yeah.
21    Q. Dr. Prinstein, do you agree that a
22   cross-sectional study cannot establish causation?
23    A. Usually that is true, but it's not always
24   true.
25    Q. Okay. That was a dramatic recitation of the

Page 168

1   word "usually."
2    When you say usually that's not but it's not
3   always true, help me understand when it's not true.
4    A. So -- so there -- again, this goes back to
5   our conversation about causation; right --
6    Q. Yeah.
7    A. -- and what we know about, you know, the
8   difference of when we can say that. Taking that into
9   account, there are times that it's not possible to do
10   anything more than cross-sectional. So we reach -- we
11   often reach causal conclusions. We can sometimes
12   reach causal conclusions based on cross-sectional data
13   in certain circumstances.
14    Q. What are those circumstances?
15    A. So, for instance, we were talking before
16   about how we get neural images, and we don't yet have
17   the technology available to get to the temporal
18   sequencing of a stimulus and the activation of a
19   certain brain area in a way that will allow us to talk
20   about temporal precedence or an antecedent, so we
21   think of that as cross-sectional data, but, in fact,
22   we can make a causal conclusion that the activation of
23   that brain area was caused by exposure to that
24   stimulus.
25    So that would be cross-sectional, but it

Page 169

```
1    would not be -- sorry, that would be cross-sectional,
2    but it would not be -- sorry.  I'm distracted because
3    I see that you have a copy of our edited book there.
4         Yes --
5         Q.  That was not intended to --
6              (Over-speaking.)
7         A.  No.  That's fine.
8              What we have found is that, yes, there are
9    certain times when we do need -- and can -- make
10   causal conclusions based on cross-sectional data.
11   It's not common, but it absolutely can happen.
12        Q.  Okay.  What about in the context of
13   evaluating a potential relationship between social
14   media use and mental health outcomes?  Can a
15   cross-sectional study tell you whether there is a
16   causal relationship or not?
17             MR. RICHARDS:  Just object to form.
18             THE WITNESS:  And we're talking about
19   the ways in which academics would talk to an academic
20   audience about causation?
21   BY MS. JONES:
22        Q.  Sure -- if there are difference answers, then
23   yes, let's start with that.
24        A.  Okay.  In the academic -- in academia, we
25   often will talk about -- we will often talk about
```

Page 170

```
1    cross-sectional data as not being used, typically, to
2    look at the relationship between social media exposure
3    and mental health with exceptions.  And those
4    exceptions are when we are collecting data with a time
5    period, where we are collecting data that clearly has
6    an antecedent and a consequence, but they were both
7    collected at the same time.  So that means it's
8    cross-sectional data, because we asked you the
9    questions twice, but we asked you about something that
10   clearly happened before the outcome.
11        Q.  So that's what you would say to a scientific
12   audience: usually not, but sometimes?
13        A.  Well, to a scientific audience --
14             MR. RICHARDS:  Object to form.
15   Misstates testimony.
16             THE WITNESS:  Sorry, I didn't hear what
17   you --
18             (Over-speaking.)
19             MR. RICHARDS:  I just objected to form.
20   Misstates testimony.  But you can continue.
21             THE WITNESS:  No, that's not what
22   I would say to a scientific audience.  I think a
23   scientific audience would not be interested in getting
24   to that level of detail 99 out of 100 time points.
25   I would probably say that we don't rely on
```

Page 171

```
1    cross-sectional evidence for causal data.  But that's
2    not the context that we're in right now, and that's
3    not the basis for which you're asking me this
4    question.
5    BY MS. JONES:
6         Q.  Well, I guess my question is, what context do
7    you think we're in right now, relative to being in
8    a -- let me stop with that question.
9              What context --
10        A.  Okay.
11        Q.  -- do you think that we're in right now that
12   would call for a different analysis --
13             MR. RICHARDS:  Object to form.
14   BY MS. JONES:
15        Q.  -- or way of communicating?
16             MR. RICHARDS:  Sorry, Phyllis.
17        Object to form.  Calls for a legal
18   conclusion.
19             THE WITNESS:  Several things.
20             Number one:  This is not a context in which
21   we are academic scientists debating things for
22   academic purposes; and if we are, then we're doing
23   this wrong, because, number two, we are engaged in a
24   debate through this dialogue, in my opinion, to take
25   the best available evidence that we have to determine
```

Page 172

```
1    whether, more likely than not, we have a preventable
2    risk that is harming kids; and I believe the answer is
3    yes.
4              I believe also that in academic debates we
5    tend to talk about general, broad conclusions that we
6    can use to teach one another the general standards of
7    science, but a good scientist always knows that there
8    is never a "never," and there is never an "always,"
9    and there are always exceptions and situations in
10   which we have to think about the changing nature of
11   science and the changing way that we have to ask
12   questions, particularly when there are concerns about
13   ethics or methodological constraints.
14   BY MS. JONES:
15        Q.  And when you're contrasting what we're doing
16   here with the scientific setting, how are you
17   understanding what we're doing here?
18             MR. RICHARDS:  Object to form --
19   BY MS. JONES:
20        Q.  Let me ask a better question.
21        A.  Yeah.  Sorry, I think I just said that.
22        Q.  No, no, no.  Let me ask a better question.
23   That was bad question -- which I acknowledge.
24             Are you suggesting that you are applying a
25   different approach in the context of your role as an
```

Page 173

1  expert in this litigation, in terms of how you're
2  communicating about what the data shows us, than you
3  might if you were communicating to an audience of your
4  peers at the APA's annual meeting?
5          MR. RICHARDS:  Object to form.  Vague.
6  Compound.
7          THE WITNESS:  I am suggesting that the
8  words that we use and the meaning of those words
9  differ across those two contexts.
10 BY MS. JONES:
11     Q.  So in the context -- if you were at -- let's
12 say you're presenting at the APA's -- I don't know if
13 you all have an annual meeting; I'm assuming that you
14 do.  Let's assume that you're presenting at the APA's
15 annual meeting --
16     A.  Mm-hmm.
17     Q.  -- it sounds like, in that setting, with that
18 audience, you would not necessarily say, "The
19 available data allows us to conclude that social media
20 use causes mental health harms"; is that right?
21          MR. RICHARDS:  Object to form.
22 Ambiguous.  Compound.
23          THE WITNESS:  Sorry, there are a lot of
24 what ifs that would be embedded in my response to you.
25 So let me just say that I -- I am here in a unique

Page 174

1  role, in that, unlike most scientists, who primarily
2  spend their time debating science, talking about
3  science, communicating science in academic journals,
4  I have had the opportunity over the last five years to
5  dedicate most of my time to being -- to fulfilling
6  APA's mission, which is to communicate, translate, and
7  apply science to benefit the public well-being.
8          My testimony is based on my expertise in
9  both of those capacities, which is different from
10 experts who primarily or exclusively have experience
11 only in the capacity of talking about science in a way
12 that would be relevant to other scientists, primarily
13 in academic journals.
14 BY MS. JONES:
15     Q.  With respect, I'm going to move to strike
16 that as nonresponsive.
17          My question was, in the context of a talk
18 that you might give to the members of the American
19 Psychological Association, would you ever get up and
20 say, "The data allows us to conclude that social media
21 causes mental health harms in certain adolescents and
22 teenagers"?
23          MR. RICHARDS:  Object to form.  Vague.
24 Compound.  Speculation.
25          THE WITNESS:  So, again, there's a lot

Page 175

1  of what ifs here, but I will just say, you know, am
2  I getting up as the Chief of Psychology at said APA
3  convention?  Or am I getting up to be asked for my
4  scientific opinion as -- because I'm speaking to a
5  room of scientists?  These are very different issues.
6          Regardless, I do think that if I was asked
7  to do this today, I would feel comfortable saying that
8  the emerging data from randomized clinical trials
9  allows us to now make more causal statements about the
10 relationship between social media exposure and youth
11 mental health.
12 BY MS. JONES:
13     Q.  And you said, "the emerging data from
14 randomized clinical trials allows us to make more
15 causal statements."  Did I hear that correctly?
16     A.  That's what I said.
17     Q.  Okay.  What's -- we talked about the Burnell
18 paper.  Is that part of the data that you're thinking
19 of?
20     A.  Very much so.
21     Q.  Okay.  What other emerging data are you
22 thinking of from randomized clinical trials that allow
23 us to make more causal statements about the
24 relationship between social media exposure and youth
25 mental health, beyond the Burnell paper that you've

Page 176

1  already told us about?
2          MR. RICHARDS:  Just object to form.
3          THE WITNESS:  The Burnell paper is a
4  meta-analysis that reviews effect sizes across a whole
5  body of literature; so I'm referring to that broad
6  body of literature.
7  BY MS. JONES:
8      Q.  Okay.  Anything beyond the studies that are
9  included within the Burnell paper that you are
10 thinking of as this emerging data?
11     A.  My general knowledge from conversations with
12 investigators and data that they're beginning to
13 collect or have collected or are beginning to analyze.
14     Q.  Unpublished data?
15     A.  Yeah.
16     Q.  Okay.  And in general, those investigators --
17 that data would need to go -- need to be collected and
18 analyzed; right?
19          MR. RICHARDS:  Object to form.
20 BY MS. JONES:
21     Q.  As part of the process towards getting it
22 published; yes?
23          MR. RICHARDS:  Same objection.
24          THE WITNESS:  The people that I talked
25 to?  Or just in general is that how papers get

Page 177

1    published?
2    BY MS. JONES:
3        Q.   Well, let me take this in pieces.
4            Who are these investigators that you've
5    talked to?
6        A.   A great many people.  I don't know how to
7    possibly say that -- respond to that precisely.
8        Q.   Well, your testimony was (as read):
9                "My general knowledge -- beyond
10                the Burnell paper, my general
11                knowledge from conversations with
12                investigators and data that
13                they're beginning to collect or
14                have collected or are beginning to
15                analyze."
16            Who are the investigators that you're
17    thinking of?
18        A.   So there are at least 100 or 200
19    investigators studying this topic very, very actively
20    within the field.  I know many of them.  In fact,
21    we've hosted a conference where we had them all come
22    here to Chapel Hill and talk about their ongoing work.
23            I also had the opportunity, through my work
24    at APA, to collect a deliberately diverse group of
25    folks -- and by that I mean coming from different

Page 178

1    backgrounds of professional experience and
2    knowledge -- where we spoke candidly about the -- what
3    we thought rose to the level of requiring public
4    knowledge and action to protect youth; and in that
5    conversation, we relied both on our published data,
6    our unpublished and progress studies, and the things
7    that each of them knew from they're general knowledge.
8            Let me be clear, there's no doubt that there
9    are problems with social media on youth mental health;
10    there's no doubt that the features and functions
11    embedded in products, including Meta's, are
12    contributing heavily to harm.  And yes, we can now
13    also say that there are data that would meet different
14    standards where we can use the word "cause."  That's
15    clear.  That's coming from our work -- not only
16    conversations that I've had with hundreds of
17    investigators in this area, but also from a panel
18    explicitly put together to obtain consensus and decide
19    what do we know enough about to sound the concern and
20    protect the public.
21            And that's what came out in our two social
22    media health advisories.
23        Q.   Okay.  So you've mentioned Burnell.  You've
24    mentioned some grouping of investigators who are
25    collecting and analyzing data.  When was this panel

Page 179

1    that you're describing?
2        A.   The social media health advisory was
3    published in May 2023.  We worked on it for
4    approximately two months in advance of that.  We also
5    held a conference -- I don't remember -- it was
6    probably '22 -- that included about 100 to 200
7    investigators studying this from around the world.
8        Q.   2022?
9        A.   I can't commit to that year, but I remember
10    that it was after the pandemic lockdown, and I believe
11    that it was before the -- or close in time to the
12    advisory.
13        Q.   And it was here in North Carolina?
14        A.   Yes.  It was in Chapel Hill.
15        Q.   All right.  And the health advisory in May of
16    2023 does not say, "We now have enough information to
17    conclude causation exists between social media use and
18    mental health harms"?
19        A.   No.  To be clear, the information that we're
20    using to talk about cause in a scientific audience, we
21    would probably -- the emerging data that allows us to
22    talk about cause in a scientific audience would come
23    from the randomized clinical trials which were only
24    just recently summarized.
25            I think it's very important that -- to get

Page 180

1    off of the -- I think it's very important to reiterate
2    that the way that we're talking about cause is very
3    different.  The social media advisory -- both of
4    them -- and the work and conclusions of scientists are
5    very clear.  We have enough data to be concerned about
6    what Meta's products are doing to kids' mental health.
7        Q.   Sure.  And I -- I understand your position on
8    that.  My point -- I'm just trying to pin down what
9    exactly you're pointing to when you say the emerging
10    data allows us to -- let me finish my question,
11    please.
12        A.   Of course.
13        Q.   -- to conclude that a causal relationship
14    exists.
15            You have mentioned the Burnell paper, the
16    meta-analysis; you have mentioned data that's been
17    collected and analyzed by investigators; and you have
18    mentioned the Health Advisory on Social Media Use in
19    Adolescence.  Is there any other emerging data that
20    you are thinking of that allows you, seated here
21    today, to say causation exists between social media
22    use and mental health harms in adolescents and teens?
23            MR. RICHARDS:  Just object to form.
24            THE WITNESS:  So just so I understand
25    your question, beyond the Burnell paper and the papers

Page 181

1  cited within it, the social media advisory, what
2  other -- what else is the emerging evidence --
3  BY MS. JONES:
4      Q.  Yes.
5      A.  -- that I'm relying on when I say that?
6      Q.  Yes.
7      A.  Okay.  I would say that those are the primary
8  factors.  I can also say that it's simply an emerging
9  consensus within the scientific community.
10     Q.  Okay.  Is that reflected somewhere where
11 I could look and see the emerging consensus among the
12 scientific community is that social media causes
13 mental health harms in adolescents and teens?
14         MR. RICHARDS:  Just object to form.
15         THE WITNESS:  No, unfortunately,
16 I don't think that there's a -- I don't think that
17 that's documented in any kind of a way other than, as
18 a scientist, you know, who's been studying this and
19 who has been a scientist for many years, it's very
20 clear that the field has moved from one research
21 question to another, and there are new questions being
22 asked, and the new research questions asked are
23 clearly reflecting an acceptance of problematic
24 aspects of social media use that are recognized as
25 being concerning.

Page 182

1  BY MS. JONES:
2      Q.  Anything else?  I just want to make sure
3  we've run through everything else that you would
4  document as part of your answer on the emerging data
5  that supports a causal relationship between social
6  media use and mental health harms.
7          MR. RICHARDS:  Just object to form.
8          THE WITNESS:  That's all I can think of
9  at this moment.
10 BY MS. JONES:
11     Q.  When you testified before Congress last week,
12 did you say, "There is an emerging consensus that the
13 use of digital media causes mental health harms in
14 adolescents and teens"?
15     A.  The testimony was on AI chatbots, actually.
16     Q.  Sure.  Did you say what I just asked you
17 about while you were there?
18     A.  I wasn't asked any questions where that would
19 be an appropriate or relevant response.
20     Q.  And when you were before Congress in 2023,
21 you also did not say that; right?
22     A.  Well, in 2023, the state of the literature
23 was different.  So not only were the findings or this
24 advisory or the panels that I just discussed -- none
25 of them had happened yet, first of all.

Page 183

1          And second of all, it's important to think
2  about that testimony in Congress in context.  The
3  statements about --
4      Q.  I'm sorry, Dr. Prinstein, I don't want to be
5  rude.  My question was just did you say that when you
6  testified before Congress in 2023?
7      A.  I didn't speak to things that happened after
8  2023 in 2023 --
9      Q.  Okay.  So --
10     A.  -- it would be impossible to do so.
11     Q.  Okay.  And so when, from your perspective,
12 did this emerging consensus crystallize?
13         MR. RICHARDS:  Object to form.
14 BY MS. JONES:
15     Q.  After you testified before Congress, when
16 would you have said, "I think we've crossed that
17 threshold"?
18         MR. RICHARDS:  Same objection.
19         THE WITNESS:  I think that the social
20 media health advisory makes very clear where we were
21 in 2023.  I think that that clearly indicates that
22 there are things that are very concerning, more likely
23 not are creating risk for adolescents.
24 BY MS. JONES:
25     Q.  You're familiar with the DSM-5, I assume?

Page 184

1      A.  I am.
2      Q.  Okay.  And that is the diagnostic manual of
3  recognized mental disorders published by the American
4  Psychiatric Association?
5      A.  It is.
6      Q.  And it provides a standardized means of
7  classifying and diagnosing psychiatric disorders; is
8  that right?
9          MR. RICHARDS:  Object to form.
10         THE WITNESS:  With great criticisms
11 among many about it, yes, it is currently recognized
12 as a limited but available resource.
13 BY MS. JONES:
14     Q.  The DSM-5 recognizes some behavioral
15 addictions; correct?
16     A.  Incorrect.  The DSM talks about abuse and
17 dependency; it doesn't talk about addictions.
18     Q.  Okay.  Well, it recognizes abuse and
19 dependencies, to use your terminology?
20     A.  It does.
21     Q.  Okay.  And among other things, it recognizes,
22 for example, compulsive or problematic use of --
23 excuse me -- compulsive or problematic gambling
24 behaviors; yes?
25     A.  Yes, it does.

Page 185

1  Q. Okay. At the moment, the DSM-5 does not
2  recognize something known as social media addiction;
3  correct?
4  A. Well, social media didn't exist in its form
5  when the DSM came out.
6  Q. Well, you know that the -- I'm sure you do
7  know this -- that the American Psychiatric Association
8  considered the possibility of adding social media
9  addiction to the DSM-5?
10  MR. RICHARDS: Object to form.
11  Speculation.
12  THE WITNESS: There is an internet
13  overuse disorder in there, but the data are being
14  collected now for its inclusion in the next DSM.
15  BY MS. JONES:
16  Q. Well, my question was different. My question
17  is did you understand that the DSM-5 -- excuse me.
18  Did you understand that the American Psychiatric
19  Association actually considered including social media
20  addiction and elected not to include it?
21  MR. RICHARDS: Same objections.
22  THE WITNESS: That's not consistent
23  with my understanding. The DSM committee did not feel
24  that the data were available yet, at the time that the
25  DSM was collected, because that was a long time ago

Page 186

1  and we didn't have as much research on this as we do
2  now.
3  BY MS. JONES:
4  Q. And I think you told me this earlier, but
5  you've not had an experience actually either
6  diagnosing or treating patients for something known as
7  social media addiction; is that right?
8  A. Have I personally diagnosed somebody with
9  social media addiction?
10  Q. Yes.
11  A. No, I have not.
12  My research has collected data on hundreds
13  of folks who are clearly meeting criteria for
14  problematic social media use --
15  Q. Dr. Prinstein, again, I don't want to be
16  rude. My question was pretty specific --
17  A. Well, I didn't feel like I fully answered
18  your question, and I just wanted to, like, offer the
19  whole truth about it.
20  Q. I appreciate it. And my question was very
21  specifically limited to have you personal diagnosed
22  someone with social media addiction; and I think your
23  answer was "no." Is that answer truthful?
24  A. Well, I don't use the term "social media
25  addiction," so it's kind of a funny question because

Page 187

1  that's not -- like, that's not possible for me to have
2  done.
3  Probably the better answer would have been
4  to say that, you know, we have collected data on
5  hundreds and hundreds of kids now, and we've also
6  reviewed the data collected on folks all around the
7  world who had been exposed to Meta's products. The
8  way that we talk about it is problematic social media
9  use.
10  Relevant to your question, we actually use
11  the diagnostic criteria from the DSM-5 --
12  (Over-speaking.)
13  MS. JONES: I'm sorry, Dr. Prinstein --
14  MR. RICHARDS: Counsel, just let him
15  finish his answer. He's providing an answer, and I'm
16  going to request that you let him finish --
17  (Over-speaking.)
18  MS. JONES: He's providing an answer to
19  a question that I haven't asked, and I'm on the
20  clock --
21  THE WITNESS: I'm sorry, but the
22  question you asked doesn't make sense as a question --
23  BY MS. JONES:
24  Q. That's okay. Then I'll ask a different
25  question. That's okay --

Page 188

1  A. If it's okay, I think this is really relevant
2  to the question you just asked, and I swore to tell
3  the whole truth, so I feel like I need to tell you
4  what I'm saying.
5  Q. Let me ask my next question, and what you're
6  wanting to say may well be responsive to that
7  question, but I need to keep us focused on the
8  questions that I've asked you, if that's okay.
9  MR. RICHARDS: Well, Counsel, he was
10  providing a response that he thought was relevant to
11  your question and answering your question, so while
12  you're looking for your next question I'll just
13  instruct Dr. Prinstein to finish his answer.
14  MS. JONES: You're not allowed to --
15  respectfully, you're not allowed to invite your
16  witness to just start talking. I need to get to my
17  next question. I'm trying to flip through pages to
18  move us along, but he doesn't actually get to just
19  spontaneously talk about what he's inclined to talk
20  about. So if you give me a minute, I'll give him
21  another question, but I do want to keep us focused on
22  the actual questions that I need to ask.
23  MR. RICHARDS: Well, respectfully,
24  I didn't initiate this further answer, he did, because
25  he thought it was relevant.

Page 189

```
1         THE WITNESS:  Sorry, it's not a
2  spontaneous response; it's actually the answer to your
3  question.
4  BY MS. JONES:
5      Q.  I understand --
6      A.  Okay.  If you don't want me to answer your
7  question, that's okay.
8      Q.  I don't want to fuss with you --
9      A.  Okay.
10         MS. JONES:  -- or you.  Okay?
11         MR. RICHARDS:  Understood.
12      (Document was handed to the witness.)
13      (Exhibit No. 9 was marked for identification.)
14  BY MS. JONES:
15      Q.  Dr. Prinstein, you have in front of you what
16  we have marked as Exhibit No. 9.  Do you recognize
17  Exhibit No. 9?
18      A.  I do.
19      Q.  Exhibit No. 9 is a paper that was published
20  in The Journal of Child Psychology and Psychiatry, and
21  was published, I believe, earlier this year, in 2025;
22  is that right?
23      A.  Correct.
24      Q.  And you are a coauthor on that paper along
25  with various others including Dr. Burnell and
```

Page 190

```
1  Dr. Telzer; is that right?
2      A.  Correct.
3      Q.  All right.  Now, this paper that was
4  published earlier this year is entitled "Adolescent
5  social media use is not a monolith"; do you see that?
6      A.  That's part of the title.
7      Q.  You're right.  After the colon, it says,
8  "toward the study of specific social media components
9  and individual differences."  Do you see that?
10      A.  I do.
11      Q.  And this is -- and you can correct me if
12  I have this wrong -- this is an annual review of
13  academic literature on social media; is that right?
14      A.  Kind of --
15      Q.  Okay.
16      A.  -- it's an invited opportunity to move the
17  field forward into new directions.  And they called
18  that series the Annual Review Series.
19      Q.  Okay.  So let's look at just a couple of
20  elements of this paper, starting with the very first
21  page, in the introduction.  On the right-hand side --
22  let's start at the top, actually, of that right-hand
23  side column.
24         "In just 20 years"; do you see that?
25      A.  No.  Sorry.
```

Page 191

```
1      Q.  I apologize --
2      A.  Oh, there it is.  Okay.
3      Q.  It says (as read):
4             "In just 20 years, online social
5             media platforms have dramatically
6             transformed the social context in
7             which adolescents develop, with
8             peer interactions now frequently
9             mediated by technological
10             devices."
11         Do you see that?
12      A.  I do.
13      Q.  And then there is a description of usage of
14  various forms of media with -- excuse me, among
15  teenagers and adolescents; is that right?
16      A.  Correct.
17      Q.  And then a little further down in that same
18  paragraph, it says (as read):
19             "Notably, social media are
20             diverse, and thus difficult to
21             consistently define."
22         That's a true statement; correct?
23         MR. RICHARDS:  Object to form.
24         THE WITNESS:  Well, it depends.  So the
25  context here is -- that sentence is within a context.
```

Page 192

```
1  Can you be more specific?
2  BY MS. JONES:
3      Q.  Well, I may have said "Is it a true
4  statement?"  I should have said "Is it an accurate
5  statement, as it's reflected there?"
6         MR. RICHARDS:  Object to form.
7         THE WITNESS:  There are different kinds
8  of social media, and the definition is changing over
9  time.
10  BY MS. JONES:
11      Q.  Okay.  It goes on to say, to that point
12  (as read):
13             "Widely accepted definitions
14             conceptualize social media as
15             computer-mediated, internet-based
16             communication channels that allow
17             for selective self-presentation
18             and online social interaction with
19             both broad and narrow audiences."
20         Do you see that?
21      A.  I see it.
22      Q.  Is that a definition with which you agree,
23  Dr. Prinstein?  Just asking.
24      A.  I mean, there's a lot of debate in the
25  scientific literature about exactly how to define
```

Page 193

1  social media, but that's a reasonable definition.
2     Q.  Okay.  And then a little further down, it
3  says (as read):
4           "The role of social media in
5           adolescent well-being remains
6           unsettled."
7        Do you see that?
8     A.  Yes.
9     Q.  Was that an accurate statement as reflected
10 in this paper published earlier this year?
11          MR. RICHARDS:  Object to form.
12          THE WITNESS:  So yes and no.  It really
13 depends on the context.  So I'd like to explain the
14 context in which that statement is being made in the
15 paper.
16 BY MS. JONES:
17    Q.  Okay.  So you said "yes and" -- it's accurate
18 and inaccurate.  So tell me how it's inaccurate, based
19 on the context.
20    A.  Well, the rest of the paper, as it goes on to
21 explain, is that, if we think about social media, the
22 individual components within it, there are some pieces
23 that are quite settled.
24    Q.  Okay.  I'm not sure I understand.  When you
25 say "there are some pieces that are quite settled,"

Page 194

1  what does that mean?
2     A.  So the early research on social media was
3  focused almost exclusively on screen time.  The
4  debates around social media for many years and among
5  academics -- and again, I want to emphasize the
6  academic audience -- really were focused on whether
7  screen time as a predictor is that something that
8  might be good or bad or statistically and reliably
9  associated with negative outcomes.
10          The purpose of this paper, as you can see --
11 this sentence you pulled out is in the introduction --
12 is to bridge into a discussion of how we're moving
13 beyond screen time and we're starting to talk about
14 specific features and functions embedded within
15 platforms that kids encounter when they're on social
16 media.  And when it comes to that, there are some
17 features and functions that are not unsettled -- sorry
18 for the double-negative -- they are quite settled --
19 there is a consensus that they are harmful.  And
20 that's the context in which that sentence appears.
21    Q.  Okay.  If we move a little further down, it
22 says (as read):
23          "Many researchers, parents,
24          educators, policymakers, and youth
25          themselves disagree about the

Page 195

1           links between social media use and
2           adolescent adjustment."
3        Do you see that?
4     A.  I see that sentence.
5     Q.  Is that an accurate sentence?
6           MR. RICHARDS:  Object to form.
7           THE WITNESS:  So the sentence's
8  accuracy is dependent on the context in which that
9  sentence is placed.  Again, the debates that are being
10 referred to here are debates based on old research
11 referring to screen time.  In the introduction of the
12 article, we're bridging between the past and the
13 future, so we're first reviewing what were some of the
14 past debates and why the literature has now moved
15 beyond those past debates by looking at things other
16 than screen time.
17 BY MS. JONES:
18    Q.  Okay.  And it goes on to say (as read):
19          "Some suggest that social media
20          may be the predominant cause of
21          the current youth mental health
22          crisis" --
23        And then it cites certain authors.
24 (As read):
25          "... whereas others describe this

Page 196

1           fear as unnecessary moral panic."
2        Do you see that?
3     A.  Yes.
4     Q.  And it then cites to particular papers with
5  respect to both of those two positions; do you see
6  that?
7     A.  Yes.
8     Q.  Okay.  And in terms of those who cite social
9  media as the possibly predominant cause of the current
10 youth mental health crisis, there is someone named
11 Jane Twenge; correct?
12    A.  Yes.
13    Q.  Do you know Dr. Twenge?
14    A.  Not personally.
15    Q.  Okay.  Do you know her work?
16    A.  A little.
17    Q.  There's Dr. Jonathan Haidt?
18    A.  Haidt.
19    Q.  Haidt, excuse me.
20        And then Drs. Joiner and Campbell do you see
21 that?
22    A.  Correct.
23    Q.  And there are others on the other side
24 of that debate where "others describe this fear as
25 unnecessary moral panic"; do you see that?

1    A.  I do.

2    Q.  Within that framework that you and your

3  coauthors laid out in your paper here, where would you

4  group yourself?

5    A.  I believe that there are -- as I've said

6  before, there are certain features and functions --

7  and this is exactly what we said in our health

8  advisory, and I've said in every talk that I've given,

9  to my recollection -- there are certain features and

10  functions that quite clearly are contributing to

11  mental health problems for youth.  So we neither talk

12  about it in an omnibus way nor do we talk about it as

13  unnecessary panic.  We are at the features and

14  functions level, and we make very clear that those

15  features and functions are indeed contributing to

16  mental health difficulties.

17    Q.  Okay.  Well, let's look at the -- in the

18  interests of time, we'll go back to page 454 of that

19  same paper.

20    A.  Why can I not find page numbers on here?

21    Q.  Mine is on the left-hand side -- at least in

22  my copy.

23    A.  Got it.  Thank you.

24    Q.  Okay.  And let me actually ask you to look at

25  the section entitled "Conclusion" on the right-hand

1  side.  Do you see that?

2    A.  Yes.

3    Q.  It says (as read):

4        "The context of adolescent

5        development today is fundamentally

6        transformed by social media,

7        though the role of social media in

8        adolescent well-being is not fully

9        understood."

10      Do you see that?

11    A.  I do.

12    Q.  Was that statement an accurate statement as

13  reflected in this paper that was published earlier

14  this year?

15        MR. RICHARDS:  Object to form.

16        THE WITNESS:  It depends.  So there's a

17  context in which that sentence occurs, of course.  So,

18  in some cases, we do have a very developed

19  understanding -- we never have a full understanding in

20  science, obviously -- and in some cases, more research

21  is needed.

22  BY MS. JONES:

23    Q.  All right.  And it goes on to say -- it

24  essentially kind of draws this distinction between

25  these different eras of research, talking about the

1  association between time on social media and

2  adolescent psychosocial outcomes as one area of

3  research once upon a time; right?  Or focus of

4  research once upon a time?

5        MR. RICHARDS:  Object to form.

6        THE WITNESS:  I don't think I'd exactly

7  say it the way you're saying it, but it sounds like

8  you're asking whether the first sentence is referring

9  to the prior research on screen time?

10  BY MS. JONES:

11    Q.  Yes.

12    A.  Yeah, it is, it seems.

13    Q.  And then it goes on to say -- it suggests, as

14  I think you've already suggested, (as read):

15        "Researchers must move away from

16        conceptualizing social media as a

17        monolith and instead of focus on

18        what components of social media

19        may affect development and for

20        whom."

21      Do you see that?

22    A.  I do.

23    Q.  And that's the point that you've been making,

24  is what are the features and functions of social media

25  that might affect development and in what particular

1  adolescents and teens; is that right?

2        MR. RICHARDS:  Object to form.

3        THE WITNESS:  I agree.

4  BY MS. JONES:

5    Q.  Okay.  And then at the conclusion of the

6  paper, it says (as read):

7        "In this annual review, we

8        synthesized the emerging

9        literature taking this nuanced

10        approach, arguing that specific

11        social media content, features,

12        and functions may interact with

13        adolescents' pre-existing

14        individual differences and offline

15        experiences to influence

16        development."

17      Do you see that?

18    A.  I do see it.

19    Q.  Okay.  And is this the most recent literature

20  review on this issue that you have been personally

21  involved in, in terms of things that have been

22  published?

23        MR. RICHARDS:  Object to form.

24        THE WITNESS:  No.  No.

25

Page 201

1  BY MS. JONES:
2      Q.  Okay.  What else has come out since this
3  paper that was published earlier this year that has
4  grappled with this question of features and functions
5  and the extent to which they might be affecting
6  adolescent development?
7      A.  Since this?
8      Q.  Yes.
9          MR. RICHARDS:  Object to form.
10 BY MS. JONES:
11     Q.  In which you were involved -- excuse me.  In
12 which you might have been a coauthor.
13         MR. RICHARDS:  Same objection.
14         THE WITNESS:  There is another paper
15 that came out in the New York Academies, I believe, on
16 a similar topic.
17 BY MS. JONES:
18     Q.  This paper -- and you can correct me if
19 I have this wrong -- I don't read this paper to reach
20 any definitive conclusions around causal relationships
21 between certain features and functions and any
22 specific mental health harm in adolescents.  Am
23 I correct in that?
24         MR. RICHARDS:  Object to form.
25         THE WITNESS:  This paper would not be a

Page 202

1  place where that would be discussed.
2  BY MS. JONES:
3      Q.  Okay.  And then in the acknowledgments
4  section of the paper, Dr. Telzer and Dr. Burnell
5  disclose that they have been retained as an expert
6  witness -- that's what Dr. Telzer says.  And
7  Dr. Burnell says she has served as a paid consultant
8  in US social media litigation.
9          It goes on to -- you see that; correct?
10     A.  I do.
11     Q.  It goes on to say (as read):
12         "The remaining authors have
13         declared that they have no
14         competing or potential conflicts
15         of interest."
16         Do you remember if, by the time you had
17 submitted this paper, whether you had been retained by
18 these lawyers to serve as an expert in litigation?
19         MR. RICHARDS:  Object to form.
20         THE WITNESS:  I believe that I had.
21 BY MS. JONES:
22     Q.  Okay.  And is there a reason that you did not
23 similarly disclose your retention, as Dr. Telzer did,
24 as an expert witness?
25     A.  Yes.

Page 203

1      Q.  Why is that?
2      A.  When we are asked to complete this section
3  and the paperwork that comes along with journal
4  publications, we're specifically asked about our
5  financial conflicts of interest and whether we've been
6  paid, and I answered no to those, so it was determined
7  that I wasn't supposed to put anything in there.
8      Q.  Okay.  And so is it the case that in any
9  publication on which you would have been a coauthor,
10 since the time of your -- if a paper like that had
11 been submitted since the time of your retention by
12 these lawyers, you would not have been making conflict
13 of interest disclosures because you have not been paid
14 by them; is that right?
15         MR. RICHARDS:  Object to form.
16         THE WITNESS:  When we're asked about
17 those disclosures, they are always about financial
18 conflicts of interest, and we're always asked to
19 disclose whether we're receiving payment.
20 BY MS. JONES:
21     Q.  And so absent payment, you don't think it's
22 something you need to disclose?  Is that what I'm
23 understanding correctly?
24         MR. RICHARDS:  Object to form.
25         THE WITNESS:  Absent payment, I'm not

Page 204

1  supposed to.  Yeah.  It's part of the way that
2  articles are published.
3  BY MS. JONES:
4      Q.  When you say you're not supposed to, do you
5  mean someone would tell you "No, don't disclose the
6  fact that you've been retained as a witness in
7  litigation"?
8          MR. RICHARDS:  Object to form.
9          THE WITNESS:  It's my understanding
10 from all my years publishing and all the times that
11 I've filled out these forms that they have always made
12 clear that they're interested in disclosing paid
13 engagement.  I've never heard of a case in which one
14 discloses a situation where there's not payment.
15         MS. JONES:  Okay.  All right.
16         I don't know how long we've been going.  We
17 could take a break -- yeah, why don't we take a break.
18         THE VIDEOGRAPHER:  Going off the
19 record.  The time is 1:57 p.m.
20         (Recess taken from 1:57 p.m. to 2:19 p.m.)
21         THE VIDEOGRAPHER:  Going back on the
22 record.  The time is 2:19 p.m.
23 BY MS. JONES:
24     Q.  Dr. Prinstein, let me ask you to go to
25 Exhibit No. 7, if you would, please, which is the

Page 205

1   Burnell paper.
2        And this -- when we were talking earlier
3   about what you described as an emerging -- excuse me,
4   emerging data that has allowed you to conclude that
5   there is a causal relationship between social media
6   use and mental health harms in adolescents and teens,
7   and you cited the Burnell paper in particular,
8   meta-analysis of certain randomized controlled trials;
9   correct?
10     A.  Yes.
11     Q.  And that paper is what we have marked as
12   Exhibit No. 7 to your deposition; correct?
13     A.  Yes.
14     Q.  All right.  And just so we're all clear about
15   what we're talking about here -- and I'm going to say
16   this in a layperson's way -- a meta-analysis
17   essentially evaluates the results of a number of
18   different studies; right?
19        MR. RICHARDS:  Object to form.
20        THE WITNESS:  Yeah, it's a pooled study
21   of studies.
22   BY MS. JONES:
23     Q.  Okay.  And this particular meta-analysis that
24   you cited earlier in terms of being emerging data on
25   causation includes 32 different articles that they --

Page 206

1   that the authors of the paper included; correct?
2     A.  Correct.
3     Q.  All right.  And the studies that were part of
4   the meta-analysis did not actually include adolescents
5   or teenagers; correct?
6        MR. RICHARDS:  Object to form.
7        THE WITNESS:  I can't respond to that
8   without reviewing these more carefully.  Do you want
9   me to do that now?
10   BY MS. JONES:
11     Q.  Well, let me ask you a couple follow-up
12   questions, and we may get to the answer.
13        In the middle of the abstract, it says
14   (as read):
15        "Thirty-two articles fit our
16        criteria and were included in
17        analyses."
18     Do you see that?
19     A.  Yes.
20     Q.  And then the next sentence says (as read):
21        "All studies included college
22        student or adult samples."
23     Do you see that?
24     A.  I do.
25     Q.  Okay.  And so these studies included in the

Page 207

1   Burnell paper would not have included an adolescent,
2   unless those adolescents were somehow remarkably in
3   college; is that right?
4     A.  Are you defining adolescents as under the age
5   of 18?
6     Q.  I am --
7     A.  Okay.
8     Q.  -- but to be fair, I recognize that there
9   might be some different definition of that
10   terminology --
11        (Over-speaking.)
12     A.  Yeah, I would think of it differently.
13     Q.  That's fair.  Okay.  Well, let me ask you the
14   question a different way.
15        This Burnell paper that you cited earlier as
16   emerging data on causation did not include
17   participants who were not college students or adults;
18   correct?
19        MR. RICHARDS:  Object to form.
20        THE WITNESS:  That's what it says here.
21   But, again, I would have to read all these studies
22   over myself.  I don't know what the range was or if
23   they're just looking at the average.
24   BY MS. JONES:
25     Q.  Okay.  Let me just ask you a few questions

Page 208

1   about this paper that you mentioned earlier.
2        Turn to the next page, if you would for me,
3   please.  Down at the bottom of page 2 of
4   Exhibit No. 7, there is a paragraph that begins with
5   "Although"; do you see that?
6     A.  I think so.
7     Q.  On the left-hand side at the bottom?
8     A.  Yeah.
9     Q.  Okay.  It says (as read):
10        "Although the association between
11        social media use and well-being is
12        often assumed to be negative, the
13        effects of restricting social
14        media use are mixed."
15     Do you see that?
16     A.  I see that.
17     Q.  And the reason that they were focused on that
18   in particular is because this paper was, as I think
19   you described earlier, looking particularly at how
20   does it improve someone's well-being -- subjective
21   well-being -- if that person limits the use of social
22   media; is that right?
23        MR. RICHARDS:  Object to form.
24   Compound.  Speculation.
25        THE WITNESS:  So this paper is -- and

Page 209

```
 1   again, I would need to review the specific papers in
 2   much more detail -- but this paper is discussing those
 3   that have used withdrawal randomized clinical trial
 4   design, which means that they are looking at those who
 5   have stayed off of social media for a period of time.
 6   All the papers involved probably used somewhat
 7   different methods in doing so, though.
 8   BY MS. JONES:
 9        Q.  Okay.  And when they refer to "subjective
10   well-being," what they're specifically talking about
11   is what does someone report about his or her or their
12   well-being; right?
13                MR. RICHARDS:  Object to form.
14                THE WITNESS:  It's usually looking at
15   self-reported indices of well-being.
16   BY MS. JONES:
17        Q.  Okay.  And by "indices," you just mean
18   indicators; yes?
19        A.  Yes.
20        Q.  Okay.  All right.  So let's look -- just to
21   clarify a couple of points, let's look at page 5.  We
22   were talking earlier about who was included in the
23   study, and there's a section entitled "Results" on the
24   right-hand side; do you see that?
25        A.  I do.
```

Page 210

```
 1        Q.  And then there's a reference to "3.1.
 2   Descriptive statistics of included studies" --
 3        A.  Yes --
 4        Q.  -- right underneath that?
 5        A.  -- I see that.
 6        Q.  Yeah.  And it says (as read):
 7                "Participants included 5544
 8                individuals across 32 studies,
 9                with 91 total effect sizes
10                included."
11            Do you see that?
12        A.  I do.
13        Q.  And there's some additional information about
14   the study population, but I actually want to refer you
15   to the -- I think it's the fourth sentence that begins
16   with "The average age..."
17            It's at the end of the fourth line in that
18   paragraph.
19        A.  Oh, I see.  You mean "with only two studies
20   having an average sample over 30"?  That part?
21        Q.  No, I don't see -- we're now looking at
22   completely -- no.  A little earlier up.
23        A.  Oh.
24        Q.  So if you go four lines into the paragraph,
25   there's a "The" at the end of that fourth line.
```

Page 211

```
 1        A.  Uh-huh.
 2        Q.  It says, "The average age across studies" --
 3        A.  Yes.
 4        Q.  Do you see that?
 5        A.  Yes.
 6        Q.  Okay.  (As read):
 7                "The average age across studies
 8                was limited to emerging/early
 9                adulthood."
10            Do you see that?
11        A.  I do.
12        Q.  And it says that the minimum age was 18.80;
13   do you see that?
14        A.  I do.
15        Q.  And the maximum was 34; do you see that?
16        A.  I do.
17        Q.  It says (as read):
18                "Of the 32 studies, 18 used
19                college student samples and 14
20                studies used adult samples."
21            Do you see that?
22        A.  I do.
23        Q.  It says (as read):
24                "No studies used community youth
25                samples."
```

Page 212

```
 1            Do you see that?
 2        A.  I do see that.
 3        Q.  Okay.  Does that clarify for you that the
 4   study population for this Burnell study that you cited
 5   earlier did not include participants who were not
 6   college age, at least?
 7                MR. RICHARDS:  Object to form.
 8                THE WITNESS:  Well, not necessarily.
 9   They're talking about the mean -- oh, they do say a
10   minimum.
11            Yeah, we don't know if they -- any of these
12   kids might have been in high school who are 18.8 as
13   the minimum.  But -- anyway, yeah, these were younger
14   adolescents going up until early adults.
15   BY MS. JONES:
16        Q.  Well, when you say --
17        A.  Excuse me, later adolescents going into early
18   adulthood.
19        Q.  Okay.  And at least what they suggest here is
20   the youngest person was probably in the 17- to
21   18-year-old range; right?
22        A.  That might be.
23        Q.  Okay.  And the maximum age was 34; right?
24        A.  Yes.
25        Q.  And we can agree that's well beyond
```

Page 213

```
1   adolescence; right?
2        A.  34 is.  But it's important that emerging
3   adulthood is considered a period of adolescence.
4        Q.  Okay.  And you know that the authors
5   themselves actually said: we don't know whether our
6   conclusions would be generalizable more broadly to
7   adolescents?
8             MR. RICHARDS:  Object to form.
9             THE WITNESS:  I don't know if the
10  authors said that.  I'd have to read that through.
11  BY MS. JONES:
12       Q.  Okay.  Well, let's go to page 8 --
13       A.  Okay.
14       Q.  -- of this paper.  Down at the bottom of
15  page 8, there's a section entitled "Future directions:
16  where we go from here," and then "4.2.1.
17  Methodological advancements"; do you see that?
18       A.  I do.
19       Q.  It says (as read):
20            "Although positive improvements in
21            subjective well-being were
22            observed, associations were small
23            and inconsistent across individual
24            outcomes."
25       Do you see that?
```

Page 214

```
1        A.  I do.
2        Q.  And then at the bottom of the page, it says
3   (as read):
4            "From a methodological standpoint,
5            more must be done to recruit
6            larger, representative samples
7            that sample from all genders and
8            multiple age groups."
9       Do you see that?
10       A.  I do see that.
11       Q.  And they say (as read):
12            "The focus on age is perhaps
13            especially important."
14       Do you see that?
15       A.  Can I just get a chance to read this
16  paragraph?
17       Q.  Yes, of course.
18       A.  Okay.
19       (Witness reviews the document.)
20            THE WITNESS:  Okay, yes.
21  BY MS. JONES:
22       Q.  Okay.  So let's go back to where we were at
23  the very bottom of page 8 (as read):
24            "From a methodological standpoint,
25            more must be done to recruit
```

Page 215

```
1            larger, representative samples
2            that sample from all genders and
3            multiple age groups."
4       Do you see that?
5        A.  Was that on page --
6        Q.  It started on page 8.
7        A.  Yeah, I see that.
8        Q.  And it says (as read):
9            "The focus on age is perhaps
10           especially important."
11      Yes?
12       A.  I see that.
13       Q.  Do you agree with that statement, that the
14  focus on age is perhaps especially important?
15            MR. RICHARDS:  Object to form.
16            THE WITNESS:  In what way?  What do you
17  mean?
18  BY MS. JONES:
19       Q.  Well, in the context in which they're
20  discussing the data.
21       A.  That's not the way I read this paragraph.
22       Q.  Okay.  Well, let's move on.  (As read):
23            "Meta-analytic" --
24       Well, let me actually ask you, did you read
25  this paper in connection with preparing for your
```

Page 216

```
1   deposition?
2        A.  Not in the last day, but I have read it in
3   the past, yes.
4        Q.  Okay.  Got it.  It says (as read):
5            "Meta-analytic evidence suggests
6            limited support for the
7            correlation between social media
8            use and mental health varying by
9            age."
10      Do you see that?
11       A.  I do.
12       Q.  Is that an accurate statement of the
13  meta-analytic evidence in your assessment?
14            MR. RICHARDS:  Object to form.
15            THE WITNESS:  Actually, that statement
16  is referring to the screen time issue as a measurement
17  of -- when they're talking about that, that paper is
18  talking about screen time.  So that's not an accurate
19  statement with regard to what we know about the
20  effects of social media --
21  BY MS. JONES:
22       Q.  In general?
23       A.  -- overall --
24       Q.  Okay.
25       A.  -- but they're just talking about old
```

1    research that used screen time.
2        Q.   Okay.  (As read):
3             "Therefore, it is plausible that
4             our findings may generalize to
5             adolescents.  However, without any
6             representation of adolescents in
7             the current research, it is
8             difficult to conclude that the
9             observed effects would generalize
10            to this population."
11       Do you see that?
12       A.   I see that sentence.
13       Q.   Okay.  And do you understand that sentence to
14   be the authors of the paper actually communicating at
15   least one limitation on the ability to generalize the
16   findings of their paper to a broader universe of
17   adolescents?
18            MR. RICHARDS:  Object to form.
19            THE WITNESS:  Kind of.  I mean, this is
20   the limitations section of the article, so -- we all
21   have to put this in the limitations sections of our
22   articles.  This is just a compulsory part of how we do
23   science.
24            But what I'm reading is that they're
25   actually asserting that they think that there's good

1    reason to think that they would generalize to
2    adolescents because that's what's consistent with the
3    science in this area.  We know that brain development
4    doesn't complete until 25 in the areas of the
5    prefrontal cortex that are relevant to some of the
6    issues that they talk about.
7             We also know that a lot of the concerns that
8    might have affected the sample would be augmented
9    among younger kids.
10            So what I'm reading, and given my knowledge
11   and the way that most -- I believe that this is
12   appropriately interpreted, is they're saying:  We have
13   to put this statement because it's the limitations
14   section, but we assert this is likely the case for
15   younger adolescents too.
16   BY MS. JONES:
17       Q.   Well, there's nowhere in here where they say,
18   "We're just saying this is a limitation because we
19   have to say it's a limitation"; right?
20            MR. RICHARDS:  Object to form.
21            THE WITNESS:  No, of course not.
22   That's not the way we write articles.
23   BY MS. JONES:
24       Q.   Well, you're not suggesting that they're
25   saying that but don't actually believe it?

1             MR. RICHARDS:  Object to form.
2    Speculation.
3             THE WITNESS:  I can't speak to what
4    they believe or not.  I can just tell you that this is
5    very boilerplate of how we do science, and this does
6    not change my conclusions or change the meaning or the
7    assessment of risks in any way for me.
8    BY MS. JONES:
9        Q.   Okay.  And Dr. Burnell is a colleague of
10   yours at UNC, isn't she?
11       A.   She is.
12       Q.   Okay.  Have you talked to her about this
13   paper?
14       A.   Actually, we've never talked about this
15   paper.
16       Q.   Okay.  But when we were talking earlier, you
17   cited this paper as -- I think it was the one paper
18   that you cited in terms of emerging data on causation
19   between social media use and mental health harms;
20   correct?
21            MR. RICHARDS:  Object to form.
22   Compound.
23            THE WITNESS:  To be fair, I was saying
24   that this article and the citations within this
25   article -- all the effect sizes they're talking about.

1    BY MS. JONES:
2        Q.   Sure.  And what these authors actually say
3    about the papers that are described in this
4    meta-analysis is "We didn't look at a certain segment
5    of the adolescent population"; right?
6             MR. RICHARDS:  Object to form.
7             THE WITNESS:  They said that this
8    includes emerging adults.  Emerging adulthood is part
9    of adolescence.  That's a term that we use to refer to
10   the latter part of the adolescent period, so --
11   BY MS. JONES:
12       Q.   Okay.  That's fair.  But what they said --
13   I think I'm reading it correctly, unless you tell me
14   I'm reading it incorrectly -- that "without any
15   representation of adolescents in the current research,
16   it is difficult to conclude that the observed effects
17   would generalize to this population."
18            Are you saying that what they said there not
19   what they meant or that I'm reading it incorrectly?
20            MR. RICHARDS:  Object to form.
21            THE WITNESS:  I would say that taking
22   out one or two sentences in the way that you are and
23   using it to reach the conclusions that you are would
24   be faulty.  You know, in the context of how we write
25   articles, what's standardly in limitations sections,

Page 221

1   what they clearly have said here, and what's known in
2   science, that would be an inappropriate use of those
3   two sentences to characterize this entire article.
4   BY MS. JONES:
5       Q.  Okay.  Well, let's look at some other
6   sentences in this article that you invoked earlier.
7           Go to page 10, if you would, please.  There
8   is a paragraph that begins with the word "Finally"; do
9   you see that?
10      A.  The left side?
11      Q.  Yes.  Sorry.
12      A.  Yeah.
13      Q.  And then immediately after that paragraph,
14  there is a statement that says (as read):
15          "We conclude with several
16          recommendations."
17          Do you see that?
18      A.  Yes.
19      Q.  And the first recommendation relates to
20  multiple assessments of subjective well-being;
21  correct?
22      A.  Can I just take a second to read these?
23  Or --
24      Q.  Of course you can.
25      A.  Okay.

Page 222

1           (Witness reviews the document.)
2           THE WITNESS:  Okay.
3   BY MS. JONES:
4       Q.  All right.  You've had a chance to read that
5   list on page 10?
6       A.  Quickly, yes.
7       Q.  Okay.  Fair enough.  Item number 2 says
8   (as read):
9           "Before conclusions are drawn
10          about specific age groups and
11          genders, research must be
12          conducted that represents the
13          population of interest."
14          Did I read that correctly?
15      A.  That's what it says.
16      Q.  And it goes on to say (as read):
17          "For example, adolescents may
18          experience social media
19          differently relative to older
20          ages."
21          Do you see that?
22      A.  I see that.
23      Q.  (As read):
24          "Because of this, it may not be
25          appropriate to draw causal

Page 223

1           conclusions on how social media
2           affects adolescent subjective
3           well-being when these studies
4           remain absent."
5           And then they cite a relevant exception in
6   Roberts et al., 2022.  Do you see that?
7       A.  I do see that.
8       Q.  And this paper that you cited earlier as part
9   of the emerging data on causation, there is not any
10  point in this paper where the authors themselves say,
11  "We are able to conclude, based on this meta-analysis,
12  that there is a causal relationship between social
13  media use and mental health harms"?
14      A.  No, that would not --
15          MR. RICHARDS:  Object to form.
16          THE WITNESS:  That would not be the
17  kind of thing that one would write in an article.
18  BY MS. JONES:
19      Q.  Well, my question wasn't whether it would be
20  something that one would write.  My question was,
21  nowhere in this paper do the authors say that?
22          MR. RICHARDS:  Object to form.
23          THE WITNESS:  I'm confused.  I mean,
24  they also don't include the recipe for chicken soup,
25  but they wouldn't say that in here either.  Like --

Page 224

1   BY MS. JONES:
2       Q.  Well, Dr. Prinstein --
3       A.  Sorry.  I just mean, like, that's not the
4   kind of thing that we do in scientific articles.
5       Q.  Let's not talk about chicken soup.  That's
6   not what the case is about, or this paper.
7           My question was, am I correct that these
8   authors do not say, "You can draw a conclusion from
9   the meta-analysis that we've conducted that there is a
10  causal relationship between use of social media and
11  mental health harms in adolescents"?
12          MR. RICHARDS:  Object to form.
13  Compound.
14          THE WITNESS:  I can't answer that
15  unless you want me to read the article right now.
16  BY MS. JONES:
17      Q.  You think it might be in there and you just
18  haven't seen it?
19      A.  I would be surprised if it was in there
20  because that's not what we put in articles.  But if
21  you're asking me to specifically tell you whether or
22  not that's in here, I need to read it.
23      Q.  Okay.  And, in fact, what they say is it may
24  not be appropriate to draw causal conclusions on how
25  social media affects adolescent subjective well-being

Page 225

```
 1   when certain studies have not been done; right?
 2                MR. RICHARDS:  Object to form.  Asked
 3   and answered.
 4                THE WITNESS:  Sorry, I -- I'm happy to
 5   read the article and talk with you more about it, but
 6   I also want to reiterate that this is the limitations
 7   section of the paper; this is compulsory text to put
 8   in the limitations section; this is not changing my
 9   conclusions nor the conclusions of people in the
10   field.  These caveats that you're pulling out one
11   sentence at a time, they're not relevant to the
12   conclusions that I read.
13   BY MS. JONES:
14        Q.  Dr. Prinstein, you know that nothing I've
15   been asking you about is actually in the limitations
16   section of the paper; right?
17        A.  It is.
18        Q.  Well, the limitations section of the paper is
19   actually 4.3.  I haven't asked you a thing about
20   limitations --
21        A.  Oh, sorry.  The future directions and
22   limitations section are considered synonymous.
23        Q.  Okay.  So now -- well, let's just take a beat
24   and make sure we're clear on what we're talking about.
25                The elements of the paper that I have been
```

Page 226

```
 1   be asking you about are not in the section entitled
 2   "Limitations"; right?
 3        A.  It is unusual for articles to have separate
 4   future directions and limitations sections.  Those are
 5   considered the same section in the vast majority of
 6   the research literature.
 7        Q.  Okay.  Well, that's --
 8        A.  I'm referring to those two things
 9   synonymously.
10        Q.  Well, you are.  These authors separated those
11   things out; right?
12        A.  No, I do not know that they did versus the
13   copy editor decided to call that section "Future
14   directions."
15        Q.  You understand -- but you understand
16   I haven't asked you a single question about the
17   limitations section.  You know that; right?
18                MR. RICHARDS:  Object to form.
19                THE WITNESS:  I mean, it's important to
20   know that this is information that is standard to put
21   in all scientific articles.  The way in which they've
22   talked about it, the way in which it reflects common
23   reviewer comments that are compulsory to put in, there
24   is no reasonable -- it would be unreasonable to use
25   those sentences in either the future directions or the
```

Page 227

```
 1   limitations section to negate the conclusions from the
 2   data that are presented in this article.
 3                Nor does any of that change my opinion based
 4   on, not just this article, but the articles that are
 5   cited within it, and the consensus emerging within the
 6   field from discussions with others doing similar
 7   research.
 8   BY MS. JONES:
 9        Q.  Okay, I'm going to move to strike all that as
10   nonresponsive.
11                Dr. Prinstein, just focusing on the article
12   itself, not what might be implicit in the article, the
13   section on limitations is numbered 4.3; right?
14                MR. RICHARDS:  Object to form.
15                THE WITNESS:  Yes, I see that.
16   BY MS. JONES:
17        Q.  And although we've talked about other parts
18   of the article, we have not yet had a chance to talk
19   about Section 4.3 entitled "Limitations"; right?
20                MR. RICHARDS:  Object to form.
21                THE WITNESS:  Sorry, again, I am
22   thinking of the limitations and future directions
23   section similarly, but it is correct that the points
24   that you've raised are above "4.3 Limitations."
25
```

Page 228

```
 1   BY MS. JONES:
 2        Q.  All right.  And I just want to make sure
 3   I understand.  You're not -- are you suggesting that
 4   these authors might actually believe that there is a
 5   causal relationship between social media use and
 6   mental health harms and they simply have not said it
 7   in the paper?
 8                MR. RICHARDS:  Object to form.
 9   Speculation.  Asked and answered.
10                THE WITNESS:  I can't tell you what the
11   authors actually think or feel.
12   BY MS. JONES:
13        Q.  Okay.  Well, that seems fair.  All right.
14                Other than this Burnell paper, is there
15   anything else that's occurred to you as emerging data
16   on causation that you would cite for me today?
17                MR. RICHARDS:  Object to form.
18   BY MS. JONES:
19        Q.  Other than the things you've already talked
20   about.
21                MR. RICHARDS:  Asked and answered.
22                THE WITNESS:  As I said, this article,
23   the articles cited within it, and ongoing research
24   that I've discussed with folks who are experts in the
25   field.
```

Page 229

1  BY MS. JONES:
2      Q.  And the ongoing research is -- that's
3  research that's being -- where the data is being
4  collected and analyzed currently; is that right?
5              MR. RICHARDS:  Object to form.
6  Compound.  Asked and answered.
7              THE WITNESS:  I mean, it's at all
8  stages of the research process.
9  BY MS. JONES:
10     Q.  And the way that, for example, I would know
11  what that research shows, one way or the other, is
12  that it will eventually result in a paper, if it's
13  published; is that right?
14             MR. RICHARDS:  Object to form.
15  Speculation.
16             THE WITNESS:  No.  They don't all
17  result in publications.
18  BY MS. JONES:
19     Q.  Okay.  Okay, I'm going to skip to something
20  else.
21          Dr. Prinstein, you, in your report -- and
22  you've testified to this today -- have focused on
23  features and functions of social media, and Meta's
24  platforms in particular, as sources of potential harm
25  for adolescents, generally speaking; is that right?

Page 230

1              MR. RICHARDS:  Object to form.
2              THE WITNESS:  I think so, yes.
3  BY MS. JONES:
4      Q.  Okay.  To the extent that you have relied on
5  studies that you say support that proposition, which
6  of those studies actually separate out the features
7  and the functions from what someone might see --
8  otherwise known as the content -- on a platform?
9              MR. RICHARDS:  I'll object to form.
10             THE WITNESS:  There are a number of
11  studies that ask specifically about things like
12  notifications, likes, beauty filters.  There's also
13  been some research that's experimentally controlled
14  for content with those functions included or content
15  without.
16  BY MS. JONES:
17     Q.  And let me just -- just to understand your
18  view on the topic, what in your thinking constitutes
19  content versus being a feature or a function?
20          So let me start with content.  What would
21  you put on the list of content?
22             MR. RICHARDS:  Object to form.  Scope.
23             THE WITNESS:  I suppose the content
24  would be the text/audiovisual stimulus in isolation.
25

Page 231

1  BY MS. JONES:
2      Q.  Okay.  So content would be if you -- let's
3  stick with Instagram -- went on Instagram and you saw
4  that someone had posted either an inspirational
5  message or something funny or something else; right?
6              MR. RICHARDS:  Object to --
7  BY MS. JONES:
8      Q.  In terms of text?
9              MR. RICHARDS:  Object to form.  Calls
10  for a legal conclusion.  Incomplete hypothetical.
11             THE WITNESS:  Well, your question makes
12  me recognize that it depends on where that content is
13  from.  If it's from someone that someone has, for
14  instance, asked to follow, and have invited that
15  content, versus content that was pushed from a company
16  or an advertiser via the company, then I would think
17  that that's -- the latter is part of the features and
18  the functions and not just content.
19  BY MS. JONES:
20     Q.  Okay.  Let me take a step back.
21          When I asked you earlier -- I just want to
22  be sure I'm clear.  When I asked you earlier what
23  falls into the content category, you said
24  text/audiovisual stimulus in isolation.  Generally
25  speaking, that's what you said.  What did you mean by

Page 232

1  say "text," specifically?
2              MR. RICHARDS:  Object to form.
3              THE WITNESS:  Sorry, your follow-up
4  question allowed me to clarify that there's a
5  difference between solicited and unsolicited text.
6  One of them is a function of being on the platform,
7  therefore it's a function or a feature of the
8  platform; and the other would be text, in the same way
9  that you might receive that text through a different
10  channel or context.
11  BY MS. JONES:
12     Q.  I want to just make sure I understand.
13          What, in your mind, qualifies as solicited
14  text that would be content?
15     A.  I mean, I guess if asked to think of that off
16  the top of my head, I would suggest if you follow a
17  friend, and they post something, and you have agreed
18  to receive their posts, then that would be -- and the
19  post is text -- then that would be the text content
20  that you got based on the -- in a way that would be
21  quite similar to how you might get it off of social
22  media.
23     Q.  Okay.  So that would be content.
24          What would -- when you say "unsolicited
25  text," what are you talking about specifically?

Page 233

1   A. So it seems like, from what I recently read
2 in the paper, that the vast majority of what kids are
3 now seeing on social media -- and I think this is what
4 Mark Zuckerberg said -- is actually not content from
5 their friends. They're now seeing content from people
6 that they did not ask to see content from; and that,
7 then, is clearly a feature of the platform, and that's
8 not the content that they're being exposed to based on
9 their selection into friends and their feeds.
10   Q. So you would say something is a feature
11 rather than content if it is text that was not
12 solicited? Is that what you're -- I want to just make
13 sure I understand. Is that what you're saying?
14          MR. RICHARDS: Object to form. Scope.
15 Calls for a legal conclusion.
16          THE WITNESS: I guess what I'm saying
17 in my expertise is that, you know, if you sign on to a
18 product to follow your friends, and then you get
19 information that's not from your friends, that would
20 be something that is what the product is giving you.
21 It's not what the -- it's not what you got onto the
22 product to interact with.
23 BY MS. JONES:
24   Q. Sure. But would that still be content?
25          If you got a textual message of some kind --

Page 234

1 let's say it's an advertisement -- and it was not
2 based on you following anyone or actively seeking out
3 information about something, but it arrived in the
4 form of text, would that qualify as content, in your
5 mind, even though it was unsolicited?
6          MR. RICHARDS: Same objections.
7          THE WITNESS: No. In the literature,
8 we talk about those as being part of the features and
9 the functions of social media because it's things that
10 usually are regulated and protected for kids, but
11 they're not in this case.
12 BY MS. JONES:
13   Q. So if, for example, I am a big soccer fan --
14 which I confess I'm not -- but if I were a big soccer
15 fan, and I got an advertisement for an upcoming game,
16 would that advertisement itself, in your mind, be
17 content or would it be a feature?
18          MR. RICHARDS: Object to form. Scope.
19 Speculation. Incomplete hypothetical.
20          THE WITNESS: To the best of what I can
21 surmise, if you are getting content that you didn't
22 ask for, in the form of an advertisement, then that is
23 coming to you through the way that the platform was
24 built, and therefore it's a feature or a function of
25 the platform.

Page 235

1 BY MS. JONES:
2   Q. You said earlier that based on what you read
3 in the paper, that teens who use Instagram are seeing
4 less of what they might get through their friends and
5 seeing other types of information on the platform. Is
6 that what I heard you say?
7   A. Yeah.
8   Q. And that -- I just wanted to make sure
9 I understood the basis for that understanding. You
10 said it's based on something you read in the
11 newspaper?
12   A. Yeah. There was an article in the paper,
13 like, two weeks ago maybe, and it talked about a
14 hearing that was happening, and Meta employees,
15 I guess, kind of talked about -- or maybe Mark
16 Zuckerberg it was -- said that social media is not
17 about talking with your friends anymore. And it
18 specifically talked about data with the percentage of
19 folks who -- the percentage of content that kids are
20 seeing now that's actually not from their friends.
21          And within that article, there was, like, a
22 click, and it took you, like, right to this -- and
23 forgive me, I don't know if it was, like, a deposition
24 or a testimony or whatever lawyers call it, but it was
25 like a whole thing -- a dialogue -- so I look a look

Page 236

1 at that and, yeah, that's what it said.
2   Q. Were you reading that in your capacity as an
3 expert or in your capacity as just a person in the
4 world who's interested in these issues?
5          MR. RICHARDS: Object to form. Calls
6 for a legal conclusion.
7          THE WITNESS: Well, I started reading
8 it because I was quite interested in it personally,
9 but as I read it, I was, like, wow, that seems pretty
10 important, because here we're trying to talk about,
11 you know, what could be potential benefits or
12 potential harms for social media, and Meta itself is
13 saying that they are actively taking away the benefits
14 and they're, you know, giving kids more of what is
15 harmful.
16 BY MS. JONES:
17   Q. Is that what you read someone from Meta
18 saying? That they were taking away benefits and
19 giving kids more of what's harmful?
20          MR. RICHARDS: Object to form.
21          THE WITNESS: No. My expertise and my
22 knowledge of the science tells us that some of the
23 things that have the potential to be helpful are
24 things that might cultivate emotionally vulnerable
25 relationships with known others that are identifiable

Page 237

1   and not, like, predators and whatnot.
2        So it is -- it logically follows that if
3   you're taking away those pieces of the interaction,
4   you're taking away the parts that science has shown
5   might have had some benefit.  And those benefits were
6   already being outweighed by many of the negatives, but
7   this was just even more sad to see that even that is
8   now a very uncommon experience among kids using Meta's
9   products.
10  BY MS. JONES:
11       Q.  Is the basis for that view on the extent to
12  which that's an element of teens' experience or not --
13  is it entirely reading this article?
14       A.  No.
15       Q.  Okay.  What else are you relying on for that?
16            MR. RICHARDS:  Object to form.
17            THE WITNESS:  So the research that's
18  looked at the effects of social media and mental
19  health talks about, you know, what are the aspects
20  that are particularly concerning, as we've been
21  talking about.  It was sad to see that there seems to
22  be more of that now.
23  BY MS. JONES:
24       Q.  Okay.  Let's go back to what's content and
25  what's feature.

Page 238

1        What about a photograph?  Is that content or
2   a feature?
3            MR. RICHARDS:  Object to form.  Calls
4   for a legal conclusion.
5            THE WITNESS:  It depends on who sent
6   that photograph and what it's of.
7   BY MS. JONES:
8        Q.  So for your -- from your point of view,
9   whether or not something is content or a feature
10  depends on -- at least in part, on from what source
11  the material comes; is that right?
12            MR. RICHARDS:  Object to form.
13  Misstates testimony.
14            THE WITNESS:  I believe that the --
15  I believe that there are things that kids are
16  experiencing on social media that are not what is
17  understood to be part of, for most children, what
18  they're going on social media for.  In other words,
19  they go on to interact with kids that they know and
20  that they want to interact with.  They're getting
21  material from people or bots that they don't know.
22            In addition, the lack of guardrails is part
23  of the features in these products.  So the expectation
24  that they're going to view media that has been
25  regulated or looked at to make sure that it's suitable

Page 239

1   for adults versus children is not true when it comes
2   to Meta, and that feature -- lack of a guardrail in
3   this case -- causes harm.
4   BY MS. JONES:
5        Q.  Do you use social media?
6        A.  A little.
7        Q.  Which platforms do you use?
8        A.  Right now, almost exclusively LinkedIn.
9        Q.  Okay.  That's the -- I also use LinkedIn.
10  It's like the middle-aged to older person's version of
11  social media.  No offense, but I'm also middle-aged to
12  old.
13            What else?  What other platforms?
14       A.  Well, because of my research, I've logged in
15  and created a profile on a number of things, but
16  they're not active.  I, in many cases, haven't posted
17  a thing.
18            I haven't been on -- I had a Twitter feed
19  after I published a book, and the PR rep asked me to
20  cultivate a Twitter feed.  And I had a Facebook
21  profile.  But the Twitter and the Facebook profiles
22  I have not logged in to since the election.
23       Q.  The presidential election of 2024, you mean?
24       A.  Correct.
25       Q.  Okay.  Have you done -- in connection with

Page 240

1   your work as an expert, have you spent any time on
2   Instagram, evaluating the platform?
3        A.  I have been on Instagram for that purpose.
4   I have also -- as we talked about before, I've been
5   part of the coding of many, many Instagram profiles of
6   our research participants to scrape and code the data.
7        Q.  Aside from the time you spent on -- in
8   connection with coding data from study participants'
9   Instagram accounts, what have you done as an expert to
10  evaluate the Instagram platform?
11            MR. RICHARDS:  Object to form.
12            THE WITNESS:  Apart from coding -- you
13  said apart from the coding?
14  BY MS. JONES:
15       Q.  Yes.
16       A.  Yeah.  Most has been discussions within --
17  with heavy Instagram users.  For myself personally,
18  I haven't been on there very much.
19       Q.  Okay.  Have you personally spent any time
20  evaluating features that exist on Instagram that are
21  specific to teen users?
22            MR. RICHARDS:  Object to form.
23            THE WITNESS:  Can you clarify what you
24  mean a little bit?
25

```
                                            Page 241
1    BY MS. JONES:
2         Q.  Well, are you familiar with teen accounts,
3    for example?
4         A.  Not with personal experience.
5         Q.  Okay.  Putting aside personal experience, are
6    you generally -- do you have any awareness of the
7    different elements of teen accounts?
8              MR. RICHARDS:  Object to form.
9              THE WITNESS:  Just a little.  Yeah,
10   I've heard of it.
11   BY MS. JONES:
12        Q.  Okay.  What have you heard about it?
13        A.  Just that it exists.
14        Q.  Okay.  But you couldn't tell me, for example,
15   what are the different elements or tools that are
16   available through teen accounts?
17             MR. RICHARDS:  Object to form.
18   BY MS. JONES:
19        Q.  It's okay if the answer is no.  I'm just
20   trying to understand.
21        A.  No, that's not been a part of our research.
22        Q.  All right.  In terms of other things that
23   might qualify as content, would your answer be the
24   same for videos --
25             MR. RICHARDS:  Object to form --
```

```
                                            Page 242
1    BY MS. JONES:
2         Q.  And by that I mean -- I'm sorry.
3              MR. RICHARDS:  I'm so sorry.  You
4    finish, Phyllis.
5    BY MS. JONES:
6         Q.  I was about to ask you a compound question
7    anyway, so the objection was appropriate.
8              But I was basically clarifying to say, would
9    the answer be the same in terms of it depends on
10   whether it was something that you had actively
11   solicited by virtue of a connection with someone
12   versus getting it without solicitation?
13             MR. RICHARDS:  Object to form.
14   Compound.  Calls for a legal conclusion.
15             THE WITNESS:  Yes, sorry, that's a lot.
16   I would say the same for videos.
17   BY MS. JONES:
18        Q.  Okay.  What about comments?  Are those
19   content or are those features?
20             MR. RICHARDS:  Same objections.
21             THE WITNESS:  That's features.
22   BY MS. JONES:
23        Q.  What about likes?  Are those content or are
24   those features?
25             MR. RICHARDS:  Objection.  Calls for a
```

```
                                            Page 243
1    legal conclusion.
2              THE WITNESS:  We talk about them
3    scientifically as features.
4    BY MS. JONES:
5         Q.  What about notifications?  Are those content
6    or are those features?
7              MR. RICHARDS:  Same objection.
8              THE WITNESS:  Same answer.
9    BY MS. JONES:
10        Q.  Same answer that it's features?
11        A.  Yeah.  That's in the -- scientists talk about
12   that as features, in my experience.
13        Q.  Is there anything else that you would put
14   into the category of content, beyond the things we've
15   already talked about?
16             MR. RICHARDS:  Objection.  Calls for a
17   legal conclusion.
18             THE WITNESS:  We sometimes talk about
19   the direct message feature as being similar to what
20   could be on texting.  So sometimes that can count as
21   content, sometimes that can count as features.
22   BY MS. JONES:
23        Q.  And how do you differentiate in that
24   instance?
25             MR. RICHARDS:  Same objection.
```

```
                                            Page 244
1              THE WITNESS:  Because most scientists
2    say -- because many scientists explore -- when they
3    look at direct messaging, it seems to be quite similar
4    in how it functions to text messages.  It might not be
5    considered a function that's unique to social media.
6    BY MS. JONES:
7         Q.  Forgive me, Dr. Prinstein, I am flipping to
8    try to move us along.
9         A.  Sure.
10        Q.  It is time-saving, although...
11             Dr. Prinstein, let me ask you, just so
12   I understand, are you offering any opinions that
13   social media companies, and Meta in particular, needs
14   to provide any kind of warnings or textual information
15   on its platforms to provide information to parents and
16   teenagers?
17             MR. RICHARDS:  Object to form.
18   Compound.
19             THE WITNESS:  Sorry, I couldn't hear
20   you.  That does what for parents and teenagers?
21   BY MS. JONES:
22        Q.  Provides information to parents and teenagers
23   about use of the platform.
24             MR. RICHARDS:  Same objection.
25             THE WITNESS:  Sorry, am I testifying
```

Page 245

1   that that should happen?
2   BY MS. JONES:
3       Q.  Is that an opinion that you hold in the case?
4       A.  Oh.
5       Q.  And if it's not, that's okay.  I just need to
6   make sure one way or the other.
7       A.  Can you say it again?  Sorry.
8       Q.  That's okay.  Are you offering an opinion in
9   this case that Meta should require some kind of
10  warning about the use of its platforms for adolescents
11  or teenagers?
12          MR. RICHARDS:  Object to form.  Calls
13  for a legal conclusion.
14          THE WITNESS:  Yeah, I don't know that
15  I spoke to that directly.
16          MS. JONES:  Could I suggest that we
17  take, like, a seven- to ten-minute break?  So that
18  will give me a chance to flip through and see what
19  I have left and not have people sitting while I do
20  that.
21          MR. RICHARDS:  That's fine.
22          THE VIDEOGRAPHER:  Going off the
23  record.  The time is 3:08 p.m.
24      (Recess taken from 3:08 p.m. to 3:26 p.m.)
25          THE VIDEOGRAPHER:  Going back on the

Page 246

1   record.  The time is 3:26 p.m.
2       (Exhibit No. 10 was marked for identification.)
3   BY MS. JONES:
4       Q.  Dr. Prinstein, I'm handing you what we've
5   marked as Exhibit No. 10 to your deposition.
6          MR. RICHARDS:  Can we please have a
7   copy?
8          MR. REISER:  I'm so sorry.
9          MR. RICHARDS:  No.  Thank you so much.
10  BY MS. JONES:
11      Q.  Doctor, have you seen Exhibit No. 10 before?
12      A.  I have.
13      Q.  Okay.  Exhibit No. 10 is another article
14  published by yourself, Dr. Burnell, Dr. Telzer, and
15  others; correct?
16      A.  Correct.
17      Q.  And it was published in 2025; right?
18      A.  I think so.
19      Q.  If you look under the -- if you look at the
20  "To cite this article" reference --
21      A.  Yeah.
22      Q.  -- on the second line, after Dr. Telzer's
23  name.
24      A.  Yeah.
25      Q.  Okay.  So the title of the article is "U.S.

Page 247

1   adolescents' daily social media use and well-being:
2   Exploring the role of addiction-like social media
3   use."
4          Did I read that correctly?
5       A.  You did.
6       Q.  Okay.  In this paper, just broadly speaking,
7   you evaluated both objectively and subjectively
8   recorded social media use as well as self-report
9   addiction scales and self-reported mood; is that
10  right?
11          MR. RICHARDS:  Object to form.
12          THE WITNESS:  I think -- can I look
13  over the abstract?
14  BY MS. JONES:
15      Q.  Yes, of course you can.
16      (Witness reviews the document.)
17          THE WITNESS:  Okay.
18  BY MS. JONES:
19      Q.  Do you want me to ask the question again?
20  Let me ask the question again.
21      A.  Sorry.
22      Q.  No, that's okay.
23          Generally, just broadly speaking, you and
24  your coauthors, in this paper, were evaluating
25  objectively and subjectively measured social media use

Page 248

1   and considering that relative to certain measures of
2   mood and using certain addiction scales; is that
3   right?
4          MR. RICHARDS:  Object to form.
5   Compound.
6          THE WITNESS:  I -- this is studying
7   many of the constructs you just mentioned.
8   BY MS. JONES:
9       Q.  Okay.  The study included, I believe, if my
10  memory is serving me, roughly 100 or so participants;
11  is that right?
12          MR. RICHARDS:  Object to form.
13          THE WITNESS:  Yes, I believe so.
14  BY MS. JONES:
15      Q.  Okay.  And if you want to confirm it on
16  page 199, there's the method section --
17      A.  Yeah.
18      Q.  -- that describes the number of adolescents.
19      A.  Yeah.
20      Q.  And in the -- I guess it's the fifth line of
21  that participants section, it says (as read):
22          "The current sample consisted of
23          103 adolescents aged 15 to 18."
24          Correct?
25      A.  It does.

Page 249

1    Q.  And then a little further down, it looks like
2  you and your coauthors reported that, of that overall
3  grouping, "94 had at least one day of ecologic
4  momentary assessment data on self-report social media
5  use"; correct -- "and subjective well-being," the next
6  paragraph?
7    A.  Yes.
8    Q.  And then of those 94, 71 had at least one day
9  of objective social media data?
10    A.  That's what it says.
11    Q.  All right.  And I think you and your
12  coauthors acknowledged in the limitations -- the now
13  much-discussed limitations section of the paper that
14  the overall sample size for the study was small?
15              MR. RICHARDS:  Object to form.
16          You can answer.
17              THE WITNESS:  Oh.  I mean, I'd have to
18  take a look, but probably did.
19  BY MS. JONES:
20    Q.  Yeah.  If you go to page 208 of the paper,
21  and look at just the very first item that you all
22  reference there.
23    A.  Yes, I see that.
24    Q.  All right.  And that's an accurate --
25  recognizing what you've told me about limitations and

Page 250

1  how they're used in academic papers, that's an
2  accurate statement by you and your coauthors?
3              MR. RICHARDS:  Object to form.
4              THE WITNESS:  It depends on the
5  methods.  For an EMA sample, it's actually not so bad,
6  but there are other studies, obviously, that have
7  more.
8  BY MS. JONES:
9    Q.  Well, my question was, did you and your
10  coauthors accurately report as a limitation of the
11  study that the overall sample size was small?
12              MR. RICHARDS:  Object to form.  Asked
13  and answered.
14              THE WITNESS:  Although it says that
15  here in the thing, if I had written this paragraph,
16  I probably would not have said that.  I think for an
17  EMA study, it's not too bad.
18  BY MS. JONES:
19    Q.  Okay.  Well, you are a coauthor on the paper;
20  is that right?
21    A.  I am.
22    Q.  And I take it from your testimony that you
23  didn't -- well, let me take a step back.
24          Are you suggesting that you do not agree
25  with certain of the limitations that are articulated

Page 251

1  in this paper on which your name appears?
2              MR. RICHARDS:  Object to form.  Asked
3  and answered.
4              THE WITNESS:  I'm just saying that if
5  I had written each of these sentences, I might have
6  written them a bit differently.
7  BY MS. JONES:
8    Q.  Okay.  Well, that part I understood.  I guess
9  my question was, are you now -- are you telling me
10  that you disagree with that statement?
11              MR. RICHARDS:  Same objections.
12              THE WITNESS:  I partially agree with
13  that statement.
14  BY MS. JONES:
15    Q.  Okay.  But not fully?
16    A.  I would quibble with that statement.
17    Q.  Okay.  Are there other elements of this paper
18  with which you would quibble?
19              MR. RICHARDS:  Object to form.
20              THE WITNESS:  I -- I would need to go
21  through and rewrite this paper and show you how
22  I would have written it, so that's going to take a
23  while.
24  BY MS. JONES:
25    Q.  Well, let me -- help me understand the

Page 252

1  process by which you determine that you will put your
2  name on a paper or not.
3    A.  Mm-hmm.
4    Q.  When you appear as a coauthor on a paper, can
5  someone reading that paper conclude that it is fairly
6  reflective of your views?
7              MR. RICHARDS:  Object to form.
8              THE WITNESS:  Fairly.
9  BY MS. JONES:
10    Q.  Let me ask -- I also paused on that adverb --
11    A.  Okay.
12    Q.  -- so let me see if I can do a little better.
13    A.  Sure.
14    Q.  When you, Dr. Prinstein, appear as a coauthor
15  on a paper, can someone reading that paper conclude
16  that it is reflective of your views?
17              MR. RICHARDS:  Object to form.
18              THE WITNESS:  No.
19  BY MS. JONES:
20    Q.  Okay.
21    A.  That is not necessarily reflective of one's
22  views, if they're a coauthor.
23    Q.  Are there other papers that you can think of
24  on think you have appeared where you would say, "There
25  are parts of that that I just don't really agree

1 with"?

2 　　　　MR. RICHARDS:  Object to form.

3 　　　　THE WITNESS:  Most every paper has at

4 least some piece in there that represents a compromise

5 between the editor, the reviewers, and the

6 investigators, and/or a compromise among the

7 coauthors.

8 BY MS. JONES:

9 　Q.  Do you remember there being a specific -- I'm

10 sure it was very civil, but a specific disagreement

11 among you and your coauthors about whether or not it

12 would be an acknowledgment of the small sample size

13 for this particular study?

14 　　　　MR. RICHARDS:  Object to form.

15 　　　　THE WITNESS:  I don't recall any

16 conversation about it.

17 BY MS. JONES:

18 　Q.  All right.  Let me ask you to go to page 195,

19 please.  And I'm going to ask you to go down to the

20 section entitled "Social Media Use and Subjective

21 Well-Being."  Do you see that?

22 　A.  I do.

23 　Q.  Okay.  And the first sentence of that

24 paragraph says (as read):

25 　　　　"Adolescents are heavy users of

1 　　　　social media."

2 　　　　Then it cites to an Andersen paper from

3 2023; you see that?

4 　A.  I see it.

5 　Q.  And it says (as read):

6 　　　　"In the current study, we define

7 　　　　social media broadly, encompassing

8 　　　　platforms that allow for the

9 　　　　consumption and creation of

10 　　　　content that can be broadcasted to

11 　　　　both broad and narrow audiences,

12 　　　　including messaging applications."

13 　　　　Do you see that?

14 　A.  I see that.

15 　Q.  All right.  And so, for example, that would

16 include platforms like Instagram; yes?

17 　　　　MR. RICHARDS:  Object to form.

18 　　　　THE WITNESS:  Yes, that would be

19 included.

20 BY MS. JONES:

21 　Q.  That definition would also include other

22 platforms beyond Meta's platforms; correct?

23 　　　　MR. RICHARDS:  Object to form.

24 　　　　THE WITNESS:  It could.

25

1 BY MS. JONES:

2 　Q.  Let me ask you to look a little further down

3 in that same paragraph.  It's eight lines up from the

4 bottom.  It's a sentence that begins with the word

5 "However."

6 　A.  Yes.

7 　Q.  It says (as read):

8 　　　　"However, past research generally

9 　　　　relies on self-report

10 　　　　measurements, which are inaccurate

11 　　　　of actual social media use and

12 　　　　potentially confounded by

13 　　　　dispositional subjective

14 　　　　well-being."

15 　　　　You see that?

16 　A.  I see that sentence.

17 　Q.  Okay.  Do you agree that self-report

18 measurements of social media use can be inaccurate of

19 actual social media use?

20 　　　　MR. RICHARDS:  Object to form.

21 　　　　THE WITNESS:  Sorry.  Do I agree that

22 it could be an inaccurate -- I would say that there

23 can be discrepancies between both of those approaches

24 of studying social media use.

25

1 BY MS. JONES:

2 　Q.  I'm sorry, I'm not sure what you mean by

3 "both of those approaches."  What are you referring

4 to?

5 　A.  Ways that look at tracking within an app or

6 on a phone, which I believe in this article is

7 referred to as "actual social media use," versus

8 self-report of social media use.

9 　Q.  I see.  I got you.  We're on the same page.

10 Okay.

11 　　　　And do you agree with this statement that

12 appears in the paper on which you are a coauthor as

13 recently as -- I guess it's a publication this year --

14 that self-report measurements of social media use can

15 be inaccurate of actual social media use?

16 　　　　MR. RICHARDS:  Object to form.

17 　　　　THE WITNESS:  Sorry, can you say more

18 about -- it feels like that's the same question you

19 just asked.  What do you mean this time?

20 BY MS. JONES:

21 　Q.  Well, I'm not sure I mean anything different

22 than the first time, but I might have misunderstood

23 your answer, in which case I apologize.

24 　A.  Oh.

25 　Q.  Well, let's take a step back from the paper

Page 257

1   itself.  Do you agree that self-reported measures of
2   social media can be inaccurate?
3        MR. RICHARDS:  Object to form.
4        THE WITNESS:  I would not put it that
5   way.  Self-report measures and looking at one's device
6   provide two different metrics, and both of those
7   variables are important for understanding kids'
8   experience.  Those measures may not say the same
9   thing, but they're both important.
10  BY MS. JONES:
11       Q.  Okay.  Let me ask you -- I understand and
12  appreciate that.  Let me ask you a slightly different
13  question, which I think goes back to this sentence in
14  the paper.
15           You could have a young person who reports a
16  certain amount of social media use, and that report
17  could be higher than what the phone would actually
18  show if you looked at the different mechanisms that
19  allow you to track how much time has been spent on an
20  app; right?
21       MR. RICHARDS:  Object to form.
22  Incomplete hypothetical.  Speculation.
23       THE WITNESS:  One of the reasons why
24  you might see a discrepancy there is because
25  self-report takes into account kids' usage across

Page 258

1   devices, and most devices only take into account usage
2   on that device.  So, you know, we would look at both
3   of those as being important metrics.
4   BY MS. JONES:
5        Q.  Yeah, I understand the point about them both
6   being important.  My question is, is it possible that
7   self-report -- self-reported social media use could be
8   either higher or, to be fair, lower than what the
9   actual devices might reflect in terms of how much time
10  has been spent on a social media platform?
11       MR. RICHARDS:  Object to form.  Asked
12  and answered.
13       THE WITNESS:  They could be higher or
14  lower or the same.
15  BY MS. JONES:
16       Q.  Let me ask you to go to page 205.
17           I'm sorry, Dr. Prinstein, just so
18  I understand, that sentence that we were just talking
19  about, you agree with that sentence, sitting here
20  today; is that right?
21       MR. RICHARDS:  Object to form.
22       THE WITNESS:  I would not write that
23  sentence today, nor would I have written it back then.
24  BY MS. JONES:
25       Q.  Okay.  So this is another sentence in this

Page 259

1   paper that was published earlier this year where you
2   would say, "That's not how I would have said it"?
3        A.  That's not how I would have said it.
4        Q.  Okay.  How are those -- do you remember there
5   being any discussion amongst you and your coauthors
6   about that particular point in the paper?
7        A.  No.
8        Q.  When there -- I'm sorry, go ahead.
9        A.  So, just for your knowledge, a person can be
10  a coauthor on a paper because they were part of the --
11  building the infrastructure that made it possible to
12  do the research, or may have generated a hypothesis
13  early on in the research process.  It doesn't mean
14  that every sentence was vetted by every coauthor or
15  that every coauthor agrees or would have stated those
16  sentences the same way themselves.
17       Q.  So before a paper -- there is a process by
18  which these types of papers would be submitted to a
19  journal for review and consideration; right?
20       MR. RICHARDS:  Object to form.
21       THE WITNESS:  Correct.
22  BY MS. JONES:
23       Q.  Before that submission is made for any paper
24  where your name is going to appear, do you review
25  every word of the paper?

Page 260

1        A.  Not always.
2        Q.  Do you read any part of -- let me ask you
3   this way:  Are there papers on which your name appears
4   where you would say, "Actually, I didn't read that
5   manuscript before it went into the journal for review
6   and consideration"?
7        A.  I mean, there's probably been an instance or
8   two where that's happened.  But at what point you read
9   it is very different.  You might read a very early
10  draft; you might read a late draft; you might read a
11  draft after reviewer comments.  It varies so much from
12  paper to paper.
13       Q.  Do you remember whether you -- I'm sorry if
14  I asked you this and I just don't remember the answer.
15  Do you remember whether this was a paper where you
16  actually reviewed the manuscript before it went into
17  the journal?
18       A.  I was not personally very heavily involved in
19  this one.  We wrote it way before 2025, and I had just
20  started my role at APA.
21       Q.  Okay.  Well, let me ask you about a couple of
22  other points that are reflected in the paper to see if
23  you recall them being here and whether you agree or
24  not.
25           On page 205, there's a section entitled

Page 261

1  "Daily associations between social media use and
2  subjective well-being"; you see that?
3      A.  I see that.
4      Q.  And it says, at the beginning of that section
5  (as read):
6              "In examining associations with
7              subjective well-being, past
8              research suggests that negative
9              associations would emerge for
10             self-reported social media use and
11             null associations would emerge for
12             objectively reported social media
13             use."
14          Do you see that?
15     A.  I do see that.
16     Q.  And it goes on to say (as read):
17             "Counter to these studies, daily
18             self-reported social media use was
19             not associated with subjective
20             well-being at the within- or
21             between-person level, and
22             objectively recorded social media
23             use was associated with greater
24             depressive negative affect at the
25             within-person level."

Page 262

1          You see that?
2      A.  I do.
3      Q.  And when it says here, "within- or
4  between-person level," what does that mean,
5  specifically?
6              MR. RICHARDS:  Object to form.
7              THE WITNESS:  Between-personal effects
8  are suggesting that if your use is higher than the
9  person sitting next to you, within-person effect
10 suggests that your use is higher than your own use on
11 a different day.
12 BY MS. JONES:
13     Q.  In the next paragraph, it says (as read):
14             "On days in which adolescents
15             engaged in greater (objective)
16             social media use relative to their
17             own average" --
18          So that would be within-person; correct?
19     A.  Yeah.
20     Q.  Okay.  (As read):
21             "On days in which adolescents
22             engaged in greater (objective)
23             social media use relative to their
24             own average, they reported greater
25             depressive negative affect

Page 263

1          throughout that day."
2          Did I read that correctly?
3      A.  You did.
4      Q.  Is that an accurate recitation of the
5  findings of this study?
6              MR. RICHARDS:  Object to form.
7              THE WITNESS:  I would have to read this
8  one over again and look at the results.  I can do that
9  now.
10 BY MS. JONES:
11     Q.  No, no, no.  I don't want to push you to
12 that.  If you're not sure, that's okay.  I was just
13 asking if you knew one way or the other.
14     A.  Oh.  I don't feel like I can comment on that
15 right now.
16     Q.  Okay.
17     A.  I could read it and comment on it, but --
18     Q.  It may not be necessary for our purposes.
19          It goes on to say (as read):
20             "This association is not
21             indicative of a cause-and-effect
22             relation."
23          Do you see that?
24     A.  I do.
25     Q.  All right.  Same question.  Do you know

Page 264

1  whether that is an accurate recitation of the results
2  of this research?
3              MR. RICHARDS:  Object to form.
4              THE WITNESS:  I can't speak to that.
5  BY MS. JONES:
6      Q.  Let me ask you to go to 208 -- page 208, and
7  to the conclusions section in particular.
8          Dr. Prinstein, did you review this paper
9  after it was published in its final form?
10     A.  I did read it over at some point.
11     Q.  Okay.  In the conclusions section, it says
12 (as read):
13             "This study found some support
14             that objectively measured social
15             media use may be linked with
16             facets of subjective well-being,
17             with these associations not
18             moderated by adolescents' trait
19             levels of addiction-like social
20             media use."
21          Then it goes on to say (as read):
22             "As this study cannot attest to
23             the directionality of these
24             associations, future research
25             should probe this further."

Page 265

1     Do you see that?
2     A.  I do see it.
3     Q.  Now, that sentence about the study's ability
4  to attest to the directionality of these associations,
5  is that a statement that you agree with, one way or
6  the other?
7          MR. RICHARDS:  Object to form.
8          THE WITNESS:  I actually thought that
9  there were temporal findings here, so I'm not sure
10 what that sentence is referring to, specifically, out
11 of context.
12         But there are temporal associations that are
13 discussed here which would speak to direct of effects.
14 I can pull some out if you want.
15 BY MS. JONES:
16     Q.  Well, I guess my question is, are you saying
17 that you think that this statement in the conclusion
18 doesn't accurately reflect the actual findings of the
19 study?
20         MR. RICHARDS:  Object to form.
21 Speculation.
22         Dr. Prinstein, if you need to review the
23 document to answer, you can.
24         THE WITNESS:  I should probably review
25 this.

Page 266

1  BY MS. JONES:
2     Q.  Well, if you need to read the entire thing,
3  I would probably give you a break to do that.  But my
4  question is just, do you know whether that statement
5  is an accurate recitation of the findings of the
6  study?
7          MR. RICHARDS:  Same objection.
8  BY MS. JONES:
9     Q.  If you don't know, that's okay.  I'm just
10 asking.
11    A.  Yeah, I can't answer that right now.  I would
12 be surprised if any sentence in the conclusions
13 accurately represents all of the results in any study.
14 The conclusions are usually pretty broad-brush
15 summaries that do not get to the intricacies and
16 nuances of the study.
17    (Exhibit No. 11 was marked for identification.)
18         THE WITNESS:  Another one?
19 BY MS. JONES:
20    Q.  Yes.
21         One of the things, Dr. Prinstein, that your
22 report specifically refers to is the effect of social
23 media use and the extent to which it disrupts things
24 like sleep in adolescents.  Am I generally describing
25 one of the points you address in your report?

Page 267

1     A.  I believe so.
2     Q.  Okay.  I want to look at at least one of the
3  papers that you cite on that point.  At Exhibit No. 11
4  to your deposition, you have the Carter paper, which
5  is cited in your May 16, 2025, report.  Do you
6  recognize that?
7     A.  Yes.
8     Q.  And just to get ourselves situated relative
9  to your report itself, if you wanted to, you could go
10 to page 23, paragraph 52.
11    A.  Okay.
12    Q.  Okay.  And you, in paragraph 52, say -- the
13 subject heading of this section is "Problematic social
14 media use disrupts opportunities to engage in offline,
15 healthy, necessary activities"; correct?
16    A.  That's what it says.
17    Q.  And the paragraph begins with (as read):
18         "Research has consistently
19         demonstrated that inadequate sleep
20         changes" --
21         Let me start over.  (As read):
22         "Research has consistently
23         demonstrated that inadequate sleep
24         changes how adolescent brains
25         develop, as described above.

Page 268

1         Recent meta-analyses (i.e.,
2         studies that synthesize a large
3         group of studies) have revealed
4         that screen time is the main
5         reason for low sleep duration,
6         disrupted sleep, and poor quality
7         sleep, with a recent study of
8         12-19-year-olds finding an average
9         of 79 minutes of self-reported
10        time on screen devices after
11        9:00 p.m. on school evenings."
12        Did I read that correctly?
13    A.  You did.
14    Q.  And the studies that you cite in connection
15 with that particular statement in your report, those
16 studies are focused on screen time generally as
17 opposed to social media or Meta platforms
18 specifically; is that right?
19         MR. RICHARDS:  Object to form.
20 Compound.
21         THE WITNESS:  I believe some of them do
22 look at social media.  I would have to review these
23 again.
24 BY MS. JONES:
25    Q.  Okay.  Sitting here today, could you point me

Page 269

1  to one that specifically speaks to social media
2  specifically as opposed to device time more generally?
3              MR. RICHARDS:  Object to form.
4  Speculation.  Asked and answered.
5              THE WITNESS:  I'd have to look at this
6  some more, but I think that the Han, Zhou, and Liu
7  article is talking about social media use, if I recall
8  correctly.
9  BY MS. JONES:
10     Q.  Okay.  Are there any others?
11             MR. RICHARDS:  Same objections.
12             THE WITNESS:  I would need to review
13  these articles to remember what they included.
14  BY MS. JONES:
15     Q.  Okay.  Well, why don't we look at at least
16  one.  We probably won't march through all of them.
17     A.  Okay.
18     Q.  But you should have in front of you
19  Exhibit No. 11, which is the Carter paper referenced
20  at Footnote 81 in your expert report.
21     A.  Okay.
22     Q.  Do you recognize that, Dr. Prinstein, as that
23  paper?
24     A.  Yes.
25     Q.  Okay.  And this was a paper that was also a

Page 270

1  meta-analysis; yes?
2     A.  Yes.
3     Q.  And specifically a meta-analysis of the
4  effect of portable media devices on sleep outcomes;
5  correct?
6              MR. RICHARDS:  Object to form.
7              THE WITNESS:  I believe so, to the best
8  I can recall.
9  BY MS. JONES:
10     Q.  And your -- you're welcome to look at
11  whatever parts of this that you would like or need to,
12  but this study does not actually speak to social media
13  specifically as opposed to device use in general;
14  right?
15             MR. RICHARDS:  Object to form.
16         Dr. Prinstein, if you need to review, you
17  should take that chance.
18             THE WITNESS:  Yeah, I need to review.
19         (Witness reviews the document.)
20             THE WITNESS:  So as this article is a
21  meta-analysis, it would be necessary to look at all of
22  the studies that were included.  Undoubtedly some of
23  them looked at social media and some of them did not,
24  and the authors had to make omnibus conclusions across
25  all of those.

Page 271

1  BY MS. JONES:
2     Q.  Now, you cited the Carter paper in your
3  expert report at Footnote 81; correct?
4     A.  I did.
5     Q.  At that time when you cited it, did you go
6  and look at all of the underlying papers that were the
7  component parts of the meta-analysis?
8     A.  At the time that I cited it, two things led
9  to my use of this paper.
10         One is that, yeah, some of the papers,
11  I believe, do include social media, as I -- if
12  I recall correctly.
13         And the second is that we have data
14  indicating that what most kids do on their devices,
15  including tablets, that's listed on here as being one
16  of the main inclusion criteria, is social media use.
17  So it's very safe to conclude that media device use,
18  when kids are using media devices mostly for social
19  media, means that social media is a prime reason as to
20  why sleep is deprived or disrupted.
21     Q.  Do you remember what my question was,
22  Dr. Prinstein?
23     A.  Yes.  You asked me if I read all of the
24  articles in here to look at social media use, if
25  I recall.

Page 272

1     Q.  Yes.  My question was, when you cited this in
2  connection with your report, did you go and look at
3  the underlying studies that made up the meta-analysis?
4              MR. RICHARDS:  Object to form.  Asked
5  and answered.
6              THE WITNESS:  Sorry, I thought
7  I already answered.  I did look up enough to believe
8  that it was an appropriate cite.
9  BY MS. JONES:
10     Q.  What do you mean you looked up enough?
11     A.  I saw that several of them did include social
12  media, and, like I said, that combined with our
13  knowledge of what kids use their devices for, this is
14  a relevant citation.
15     Q.  When you say you saw that several of them
16  dealt with social media, did you go and pull the
17  papers and look at them?  Or did you just look at the
18  list of references at the back of the paper?
19             MR. RICHARDS:  Object to form.
20             THE WITNESS:  No, I said that I went
21  and I looked at these -- the papers.
22  BY MS. JONES:
23     Q.  Which ones?
24     A.  I don't remember.
25     Q.  Okay.  So you couldn't tell me that today?

Page 273

1    A.  I can't today.
2    Q.  Let me ask you to look at what we're going to
3  mark as Exhibit No. 12.
4    (Exhibit No. 12 was marked for identification.)
5  BY MS. JONES:
6    Q.  Dr. Prinstein, Exhibit No. 12 is a paper on
7  which you are again a coauthor.  Do you recognize
8  Exhibit No. 12?
9    A.  I do recognize it.
10    Q.  Okay.  Is this a paper on which you recall --
11  scratch that.
12        Is this a paper for which you actually
13  conducted a review of the manuscript before it was
14  submitted to the journal for consideration?
15    A.  Not very much.  This is the same sample as
16  the other paper, and I wasn't involved in data
17  collection on that sample, so I was more at arm's
18  length from the papers that came from this one.
19    Q.  Okay.  Do you know -- and you're welcome to
20  look if you want to -- do you know whether this paper
21  specifically looked at social media use in terms of
22  how the study participants were making use of their
23  phones?
24        MR. RICHARDS:  Object to form.
25        Dr. Prinstein, if you need to review, you

Page 274

1  should take that time.
2        THE WITNESS:  No.  Thank you.
3        I do know that we looked at the specific
4  apps that kids were using on their devices.  Instagram
5  was one of the most frequent.
6  BY MS. JONES:
7    Q.  How do you know that based on looking at this
8  paper?
9        MR. RICHARDS:  Object to form.
10        THE WITNESS:  I know this dataset, and
11  I know what we did, and we got the screenshot -- if
12  you look on your device, it doesn't just give you a
13  read-out of what times and how long you spent, but it
14  also tells you what apps you used for each pickup, how
15  long you spend on each app, and all of that is part of
16  the data.
17        And we looked at this to make sure that what
18  we were talking about was going to be relevant to
19  other studies that we're doing and serve as relevant
20  background for other work, and we confirmed that the
21  top three apps that kids were using included -- well,
22  in this case relevant, Instagram, but were primarily
23  social media.
24  BY MS. JONES:
25    Q.  Okay.  Well, let's look at what the study

Page 275

1  actually says.  This is described as report on "Daily
2  links between objective smartphone use and sleep among
3  adolescents"; correct?
4        MR. RICHARDS:  I'm sorry, Counsel,
5  could I ask where you're looking?
6        MS. JONES:  I apologize.  The first
7  page, just the title.
8        THE WITNESS:  Okay.
9  BY MS. JONES:
10    Q.  Are you there, Dr. Prinstein?
11    A.  I am.
12    Q.  Okay.  And this was published in 2024; right?
13    A.  Oh, sorry, yes, '24.
14    Q.  Okay.  And it says in the abstract -- in the
15  introduction for the abstract, it says (as read):
16        "Concerns abound on how digital
17        technology such as smartphone use
18        may impair adolescent sleep.
19        Although these linkages are
20        supported in cross-sectional
21        studies, research involving
22        intensive longitudinal assessments
23        and objective measures has called
24        into question the robustness of
25        associations."

Page 276

1        Do you see that?
2    A.  I see that.
3    Q.  Is that an accurate statement?
4        MR. RICHARDS:  Object to form.
5        THE WITNESS:  No.  This is an area
6  where there's been such extensive research that's been
7  going on, not only in our field but also in sleep
8  medicine.  It's also something we talked about at
9  great length within our advisory panel.  And I would
10  say that it is extremely and strongly agreed upon
11  among scientists that the link between social media
12  use specifically and sleep disruptions has been
13  extremely well established.
14        So I understand we're talking about just
15  this paper, and there may be some sentences here and
16  there in this paper, but I just wanted to provide you
17  the broader context that this paper, written in 2022,
18  submitted in '23, just taking us up to today, like,
19  this is an area where there is very, very little
20  question about the effects on sleep.  In fact, I've
21  been -- I've talked with many different professionals
22  outside of psychology about their primary concern for
23  this in pediatric sleep medicine and so on.
24  BY MS. JONES:
25    Q.  I'm going to move to strike all of that after

Page 277

1  the word "no."
2           Did I correctly understand you to say that
3  the very first -- the second sentence in the abstract
4  of this paper is incorrect?
5           MR. RICHARDS:  Object to form.  Asked
6  and answered.
7           THE WITNESS:  Sorry, to clarify, what
8  I'm saying is that that sentence out of context would
9  not be correct today.
10 BY MS. JONES:
11     Q.  Okay.  And then in the results section of the
12 abstract, it says (as read):
13           "On days when adolescents engaged
14           in greater nighttime screen time
15           and, to some extent, pickups
16           relative to their own average,
17           they also had poorer sleep
18           outcomes that night."
19        Do you see that?
20     A.  No.  Sorry, I'm not there yet.
21     Q.  I'm still in the abstract --
22     A.  Oh, you're in the abstract still.  Oh, the
23 results section of the abstract.
24     Q.  Yes.  I apologize, I wasn't clear about that.
25     A.  Okay.  I see it, yeah.

Page 278

1     Q.  And then in the results section, it says
2  (as read):
3           "On days when adolescents engaged
4           in greater nighttime screen time
5           and, to some extent, pickups
6           relative to their own average,
7           they also had poorer sleep
8           outcomes that night."
9        Do you see that?
10     A.  Yes, sorry, I'm catching up with you.
11     Q.  It's okay.
12     A.  Yes, I see that.
13     Q.  It says (as read):
14           "Greater screen time was
15           associated with later
16           self-reported and Fitbit-recorded
17           sleep onset and poorer
18           self-reported sleep quality.
19           Greater pickups was associated
20           with later self-reported and
21           Fitbit-recorded sleep onset."
22        Do you see that?
23     A.  I see that.
24     Q.  And then it says (as read):
25           "Smartphone use during the day did

Page 279

1           not relate to sleep outcomes,
2           indicating the importance of
3           distinguishing nighttime from
4           daytime use."
5     A.  That's correct.  It says that.
6     Q.  All right.  And then if we go back to the
7  section that you have previously referred to as
8  "Limitations and Future Directions," which is on
9  page 1178, the very first section of that -- very
10 first sentence of that section says (as read):
11           "Study conclusions must be made in
12           the context of several
13           limitations."
14        Do you see that?
15     A.  I do.
16     Q.  Is that an accurate statement?
17     A.  I think that sentence is in almost every
18 article that I have ever written exactly as it is.
19 That's the standard beginning to one's limitations
20 section irregardless of the content or the topic of
21 the paper.
22     Q.  Sure.  And my question wasn't, is it commonly
23 used?  My question was, is it accurate as reflected
24 here?
25           MR. RICHARDS:  Object to form.

Page 280

1           THE WITNESS:  I guess I would say that
2  every study must be considered in light of its
3  limitations.
4        The point that we were discussing earlier is
5  that there's no sentence in this study, or no finding
6  in this study, that is, frankly, really relevant at
7  all compared to what we now know from the general
8  consensus of far more research and far more recent
9  research.
10 BY MS. JONES:
11     Q.  Well, let me just pause you for a second
12 there.  When you say there's nothing in this study
13 that is, frankly, really relevant at all, what does
14 that mean exactly?
15           MR. RICHARDS:  Object to form.
16           THE WITNESS:  So the way that science
17 works is that not only is any one sentence not going
18 to really be very meaningful in the scientific
19 literature when taken in isolation, there are not that
20 many studies that by themselves might kind of advance
21 the literature.  Now, some do, to be fair.  But what
22 we usually do, and the reason why we've been talking
23 about meta-analyses so much, is that we look at
24 general consensus and correspondence across many
25 studies.

Page 281

1    And again, I mean, we can -- you know, I'm
2  happy to continue talking about this study, but it's
3  important to recognize this is an area where there's
4  very strong consensus within the literature across
5  many, many articles that have clearly concluded that
6  social media use, including Instagram in particular,
7  is disrupting sleep; and that disrupted sleep is
8  leading to a host of long-term and short-term -- the
9  next day, as well as long-term difficulties.
10    Those include things like emotional
11  volatility, increased driving accidents, obesity,
12  depression, anxiety.  And for long-term, it's
13  disrupting the development of white matter in the
14  brain and actually changing the size of white matter
15  within the brain over time.
16    These are clear conclusions that have been
17  reached in the literature.  Each one of the studies
18  that have been used to talk about that are considered
19  in the context of their limitations together.  There's
20  clear consensus on this point.
21  BY MS. JONES:
22    Q.  Well, let me ask you about one specific
23  limitation, going back to something we talked about
24  earlier in terms of whether there was a specific
25  analysis of what was being done on the smartphones by

Page 282

1  the study participants.
2    You see at the bottom of "Limitations and
3  Future Directions," there's a reference to the fifth
4  limitation?  It begins with the word "Fifth" in the
5  sentence?
6    MR. RICHARDS:  I'll just object to the
7  preamble.
8    THE WITNESS:  I do see that.
9  BY MS. JONES:
10    Q.  Okay.  It says (as read):
11    "Fifth, our data can only attest
12    to general links between
13    smartphone use and sleep
14    outcomes."
15    Do you see that?
16    A.  I do see that sentence.
17    Q.  And it goes on to say (as read):
18    "For example, it is unclear if and
19    how specific types of smartphone
20    content may relate to sleep
21    outcomes."
22    Do you see that?
23    A.  I do, but that's no longer accurate.
24    Q.  Okay.  When did it cease to be accurate, in
25  your view?

Page 283

1    A.  Shortly after writing that sentence, and we
2  went back to our data to look at, as I mentioned, the
3  data that we have that looked specifically at what
4  apps kids were using on the screenshot within the
5  screen time piece; and, as I mentioned, it was clear
6  that the primary drivers of this effect were social
7  media, with Instagram being one of them.
8    Q.  Is there a specific paper that you are
9  thinking of that was published following this paper in
10  2024?
11    A.  No.  We didn't publish that finding.  That
12  would be what we would call piecemeal publication in
13  the literature.  We're not allowed to publish
14  substantially the same finding over.
15    Q.  Okay.  I just want to make sure I'm clear on
16  kind of the sequence of events here.  So the paper
17  that we have that was submitted a year or two ago but
18  was published last year includes among its statement
19  of limitations a statement that it is unclear if and
20  how specific types of smartphone content may relate to
21  sleep outcomes.  Those words appear in the study;
22  correct?
23    MR. RICHARDS:  Object to form.
24    THE WITNESS:  Those words appear in the
25  study.

Page 284

1  BY MS. JONES:
2    Q.  Okay.  And then if I understand your
3  testimony, you said that ceased to be correct almost
4  right after -- when?  The publication of the study
5  itself in 2024?
6    A.  After the acceptance of the paper.
7    Q.  Okay.  So that would have been -- just
8  looking at the first page -- October of 2023?
9    Oh, sorry, "Accepted March of 2024."  So
10  March 28th, 2024, is when it was accepted, according
11  to page 1171.
12    A.  Yeah, I see that date.  Yes, it was probably
13  right around then that we did supplementary analyses.
14    Q.  All right.  So your testimony is that you
15  submitted a paper for publication in March of 2024
16  that said, "We would need to" -- it's unclear if and
17  how specific types of smartphone content may relate to
18  sleep outcomes.  And then you all went back and looked
19  at the data that you had sometime after March of 2024;
20  is that right?
21    A.  I can't attest to the specific dates that
22  you're talking about.  But generally speaking, yeah.
23  That's how science works.  It's very cool.  And we get
24  to dig even deeper into our own data that informs our
25  next studies, and that's a normal, common thing that

Page 285

1  we do when we publish papers in science.
2      Q.  Yeah.  How science works is not what I'm
3  focused on.  I'm just focused on the sequence of
4  events here.
5          So you submitted the paper that included
6  that language, and sometime thereafter, you all went
7  back and looked at your data again; is that right?
8              MR. RICHARDS:  Object to form.  Asked
9  and answered.
10             THE WITNESS:  Yeah, I believe that that
11 is the case.  That's what I said, yeah.
12 BY MS. JONES:
13     Q.  And what did the new look at your data
14 reveal --
15             MR. RICHARDS:  Object to form.
16 BY MS. JONES:
17     Q.  -- that had not been reflected in this
18 manuscript that you had just submitted?
19             MR. RICHARDS:  Object to form.  Vague.
20             THE WITNESS:  Oh, sorry, I thought
21 I answered that.
22          We, in fact, did go back to look at what
23 were the apps that kids were using during those times
24 of night, and we were able to determine which were the
25 top apps, and Instagram was one of them.

Page 286

1  BY MS. JONES:
2      Q.  And my question is, if I wanted to confirm
3  that --
4      A.  Yeah.
5      Q.  -- where could I find that?
6      A.  I'm telling you, under oath.  I'm telling you
7  right now.
8      Q.  And that is meaningful to me, Dr. Prinstein.
9  However -- and I am interested to know whether I could
10 find anywhere in publicly available sources, including
11 the peer-reviewed literature, where you and your
12 coresearchers and authors have said, "Actually, we
13 looked back at our data and we determined that we know
14 how the phones were used, and it was Instagram" --
15             MR. RICHARDS:  Object to form.
16 BY MS. JONES:
17     Q.  -- could I find that if I was looking at
18 publicly available sources?
19          Sorry.
20             MR. RICHARDS:  No, I'm sorry.  Object
21 to form.
22          You can answer, Dr. Prinstein.
23             THE WITNESS:  Yeah.  Even I have done
24 talks where we referenced these and other data so many
25 times, and we talk about it in those talks.

Page 287

1  BY MS. JONES:
2      Q.  Okay.  Anywhere else I could find that?
3      A.  Unfortunately, we're not allowed to republish
4  findings like that.  That would be considered
5  piecemeal publication.
6      Q.  Are you permitted to do addenda or
7  supplements to existing research?
8              MR. RICHARDS:  Object to form.
9              THE WITNESS:  No -- I don't know of a
10 case where people add on an addendum in the
11 psychological science literature like that.
12 BY MS. JONES:
13     Q.  Okay.
14     A.  To be fair, like, I know that you all,
15 sitting right here, think that the distinction between
16 general smartphone use and social media is an
17 extremely big deal and is probably pivotal for the way
18 that you want to talk about this, but in the
19 scientific literature, just going back to say, "By the
20 way, we looked that up, and that one sentence, we can
21 now add another sentence," that wouldn't be enough to
22 write up a whole addendum.
23     Q.  Okay.  I'm going to move to strike all of
24 that.
25          Make no assumptions about what we think is a

Page 288

1  big deal or not --
2      A.  Okay.
3      Q.  -- okay?  Don't assume anything.  I'm just
4  trying to understand the facts, in terms of what
5  you've told me about what you've said in the
6  peer-reviewed literature and what you've also said you
7  did that I could not find anywhere in the
8  peer-reviewed literature.  That's all I'm trying to --
9      A.  Oh, okay.
10     Q.  -- that's all I'm trying to sort.
11     A.  Well, the facts are that both in this dataset
12 and in the general consensus, social media, including
13 Instagram's products, are directly responsible for
14 disrupting sleep in multiple ways, not just delayed
15 sleep onset, but leading to sleep disruptions and
16 leading to changes in the stages of sleep.
17          So there's been a lot of research on this,
18 and each and every one of those things has various
19 kind of sequelae that are damaging to kids'
20 development, as I said, both short-term and in terms
21 of long-term for brain development.
22     Q.  Is there another paper that you're thinking
23 of at this moment that makes that specific point as to
24 Instagram?
25             MR. RICHARDS:  Object to form.

Page 289

1        THE WITNESS:  As you noted in the
2   papers -- so because people sometimes assess it at the
3   platform level and sometimes don't, the papers are
4   likely to cut across and use a broad generalized
5   statement about, in this case, device use or something
6   like that.
7        So the data are -- there are data that speak
8   to that, and again, as part of my general knowledge,
9   this is exactly the kind of thing scientists talk
10  about, but it's unlikely to be published because that
11  would be a small kind of molecular look at this, which
12  is generally not the way that science looks at it.
13  We're not doing the science by platform, although we
14  have those data and we talk about them.
15  BY MS. JONES:
16      Q.  But you're offering specific opinions about
17  Meta's particular platforms in your role as a
18  litigation expert; correct?
19      A.  I am because --
20      Q.  Okay.
21      A.  -- I've talked with investigators about their
22  data, we've looked specifically at what products, and
23  we also have that data ourself, as we've just talked
24  about.
25      Q.  Understood.  My question is simply, sitting

Page 290

1   here today, as a person who does not have access to
2   all these other repositories of data, could you point
3   me to any study that makes the point that I've heard
4   you make now repeatedly today, that there is some kind
5   of consensus view that Instagram use is negatively
6   affecting sleep?
7        MR. RICHARDS:  Object to form.
8   Compound.  Asked and answered.
9        THE WITNESS:  I don't know that I can
10  answer that any more than I have without, like, a real
11  second deep dive into the literature.
12       The papers that I cited in my report
13  reflecting the concerns about Meta are based on my
14  general knowledge and the citations in here.
15  BY MS. JONES:
16      Q.  Sure.  My -- that's okay --
17      A.  Yeah.
18      Q.  -- I'm not -- this is not criticism.  I'm
19  just trying to understand.  If there is a study that
20  you're relying on that is related to Instagram and
21  effects on sleep, I need to understand what that study
22  is that is publicly available and published in the
23  peer-reviewed literature.
24       MR. RICHARDS:  Same objections.
25       THE WITNESS:  I would need to look

Page 291

1   through the literature -- maybe.  I just can't answer
2   that right now.
3   BY MS. JONES:
4       Q.  Okay.
5        Dr. Prinstein, do you agree that social
6   media, including Meta's platforms, can play a positive
7   role in people's lives?
8        MR. RICHARDS:  Object to form.
9        THE WITNESS:  There have been some data
10  about possible positives.  I think the question ends
11  up being how they're outweighed by possible negatives,
12  and whether those positives are even possible anymore
13  given how the platforms have changed.
14  BY MS. JONES:
15      Q.  Okay.  So my question is -- was probably more
16  simple than was entirely clear.  My question is
17  simply, do you acknowledge the possibility that social
18  media can be a positive element of certain people's
19  lives?
20       MR. RICHARDS:  Object to form.  Asked
21  and answered.
22       THE WITNESS:  I used to think that that
23  was possible, but I'm now -- I'm now seeing that the
24  negatives tend to, more often than not, outweigh the
25  positives.

Page 292

1   BY MS. JONES:
2       Q.  Are you an advocate for a ban on the use of
3   social media for adolescents and teenagers?
4        MR. RICHARDS:  Object to form.
5        THE WITNESS:  I'm not an advocate one
6   way or the other on that.
7   BY MS. JONES:
8       Q.  Let me ask you to go back to what I think was
9   Exhibit 6, your 2023 Congressional testimony, which
10  will be in your pile.
11      A.  Exhibit 6?
12      Q.  Yes.  You recognize that as your
13  February 2023 written testimony?
14      A.  Looks like it probably is, yeah.
15      Q.  Okay.  Let me ask you to go to page 14.
16       On page 14, there's a section of your
17  written testimony entitled "Potentially Beneficial
18  Effects of Social Media Use"; correct?
19      A.  I see that.
20      Q.  All right.  You write here (as read):
21           "It is important to acknowledge
22            that research on social media use
23            and adolescent development is
24            relatively new, as are many social
25            media platforms."

Page 293

1      Correct?
2      A.  It does say that.
3      Q.  All right.  And (as read):
4          "In addition, there has been
5          remarkably little funding
6          designated for research on this
7          topic."
8      Correct?
9      A.  It says that.
10     Q.  And (as read):
11         "Consequently, the long-term
12         effects of social media use on
13         youth development is relatively
14         uncharted."
15     Do you see that?
16     A.  I see that.
17     Q.  Is that a true statement?
18     A.  Well, it's less true now than it was in 2023;
19  but, of course, we can't know the long-term effects
20  beyond the length of time that social media has
21  existed.
22     Q.  And, in fact, what you go on to say in that
23  same paragraph is (as read):
24         "It is unknown whether adolescent
25         brain development, known for its

Page 294

1      plasticity, may 'correct' some of
2      the alter-"
3      I think that's supposed to say
4  "alterations."
5          "... in brain structure or
6          function, whether compensatory
7          neural processes may develop, or
8          whether these alterations may
9          confer unknown future strengths."
10     Do you see that?
11     A.  I see that.
12     Q.  And when you wrote it at the time, and
13  submitted it to the United States Senate, was that an
14  accurate recitation of your views?
15     A.  At the time, that was what I believed.
16     Q.  If you go down to the next paragraph on
17  page 14 of your 2023 Congressional testimony, it says
18  (as read):
19         "In addition, there is some
20         research demonstrating that social
21         media use is linked with positive
22         outcomes that may benefit
23         psychological development among
24         youth."
25     Do you see that?

Page 295

1      A.  I do see that.
2      Q.  Is that an accurate statement?
3      A.  So let me digest these sentences that you're
4  asking me to look at.
5      Q.  Sure.
6      A.  In twenty-twenty- -- a couple of things have
7  been really critical to consider here.  One is that
8  research has evolved.  The second is that social media
9  has changed, in and of itself, over time.
10     In 2023, we -- we now know that the changes
11  to the brain are actually setting kids up for more
12  clinical dependence, which leads to more problematic
13  social media use, which sets the stage for no
14  opportunity for correction, as it says.
15     And then the piece about the positive
16  outcomes, we also -- in 2023, there wasn't as much AI
17  that was going on, and there wasn't as much research
18  on some of the cyber hate that was going on as well;
19  so we also know this to be now updated.
20     There are other things, too, that have
21  changed, of course.  I'm just giving a couple of
22  examples.
23     Q.  When you refer to cyber hate, would you put
24  that into the category of content or features?
25         MR. RICHARDS:  Object to form.  Calls

Page 296

1  for a legal conclusion.
2          THE WITNESS:  I can't speak, you know,
3  legally to what's content or features.  But here's the
4  concern:  Kids are logging in to talk with their
5  friends, and they're getting porn, predators, exposure
6  to discrimination based on race, ethnicity, religion,
7  sexual/gender identity; and the research demonstrates
8  that -- and this is all because things are being
9  pushed to them, so I would call that a feature; right?
10  It's getting pushed to them.  And the research shows
11  that that cyber hate is damaging because of the
12  features.  And let me explain what I mean.
13         The research is showing that kids who
14  experience cyber hate -- excuse me, hate or
15  discrimination offline, the experience of what's
16  happening online is not only incrementally harming
17  them, but it is harming them worse; and the reason why
18  is because of the likes and the comments and the
19  re-posting.  It creates an add-on.
20         In fact, the research has clearly
21  demonstrated that even kids who are vicariously
22  watching others experience cyber hate are having
23  anxiety and depressive symptoms longitudinally
24  following that exposure.  And you don't see that with
25  offline.

Page 297

1    So to me, it's a really clear instance of
2  where the features that are on social media are
3  changing how people consume the content and are
4  actually creating the harm in a way that goes well
5  beyond what kids are already experiencing
6  discriminatory offline, and that's been really
7  concerning within the scientific community.
8  BY MS. JONES:
9    Q.  I'm not -- I may have heard an answer to my
10  original question, but my original question was just,
11  when you're talking about things like cyber hate or
12  porn or exposure to discriminatory interactions, is
13  that content or is that features?
14    MR. RICHARDS:  Object to form.  Calls
15  for a legal conclusion.  Asked and answered.
16    THE WITNESS:  If -- I mean, I can't
17  speak to how others might think of the difference
18  between content and features --
19  BY MS. JONES:
20    Q.  Sure.  I'm just asking you what you think.
21    MR. RICHARDS:  Same objections.
22    THE WITNESS:  What I think is that if
23  Meta does not have guardrails to protect kids from
24  offensive content, and if they include features like
25  likes, comments, pushing out the content, allowing

Page 298

1  them to see content they didn't ask for, that's the
2  responsibility of Meta and the way that the platform
3  is designed.  That's different than the way that they
4  think about content on, let's say, TV.
5  BY MS. JONES:
6    Q.  How -- to what extent, as part of your role
7  as an expert, have you actually specifically evaluated
8  whether Meta has guardrails for addressing some of
9  these issues that you've raised?
10    MR. RICHARDS:  Object to form.  Scope.
11    THE WITNESS:  So that's been a
12  significant part of my work at APA and working with
13  the advocacy team at APA, where together we have been
14  looking at the guardrails, as you say, or the ways in
15  which Meta has created protections or not, or in some
16  ways actually incentivized people to -- incentivized a
17  system that has led kids to be exposed to things that
18  are harmful to them.
19  BY MS. JONES:
20    Q.  As I read your expert reports, I don't
21  actually see any specific discussion of guardrails
22  that the company might have implemented.  Am I -- did
23  I miss that, or is that in there somewhere?
24    MR. RICHARDS:  Object to form.
25    THE WITNESS:  I don't believe that

Page 299

1  I discussed them except in, I think, one section,
2  where we talked about some of the performative
3  measures that it's clear that Meta has proposed, maybe
4  used in a subsample at some other time, that within
5  our conversations and our work on this we've kind of
6  thought of as tissue paper barriers that seem to
7  create the illusion that there's something being put
8  in place that might help kids, but in fact are pretty
9  weak and effectively don't stop many kids at all and
10  doesn't really solve any of the problems that we're
11  facing right now because of Meta.
12  BY MS. JONES:
13    Q.  Let me -- let me ask you a related question,
14  which is, to what extent have you evaluated guardrails
15  that have been put in place by other social media
16  companies to protect adolescents and teenagers?
17    MR. RICHARDS:  Object to form.  Scope.
18    THE WITNESS:  Yeah, that's been a big
19  part of the discussions we've had at APA.  My -- the
20  person we talked about before, Corbin Evans, and I,
21  we've been doing a lot of work on this topic, and he
22  is the advocacy and legal piece of this, and I'm the
23  scientific piece of this, so I've -- together we've
24  learned quite a lot about exactly those things.
25

Page 300

1  BY MS. JONES:
2    Q.  Well, I want to make sure we're talking about
3  the same things.  When you have -- what you just said
4  about Meta's guardrails that it has implemented for
5  adolescents and teenagers, have you conducted a
6  similar assessment of guardrails or tools or
7  protections that other social media companies have
8  implemented --
9    MR. RICHARDS:  Object to form --
10    MS. JONES:  -- for teenagers?
11    MR. RICHARDS:  Object to form.
12  Compound.  And scope.
13    THE WITNESS:  Yes, we've discussed that
14  across multiple companies.
15  BY MS. JONES:
16    Q.  Because your role at the -- putting aside
17  what you might be doing as an expert, your role at the
18  APA is not intended to be just about Meta; is that
19  right?
20    MR. RICHARDS:  Object to form.
21    THE WITNESS:  I mean, the role at
22  APA -- my -- you know, what we do at APA is we try and
23  use science to improve people's lives.
24  BY MS. JONES:
25    Q.  Well, sure.  And doing that is not just about

Page 301

1  focusing on one specific company; right?
2           MR. RICHARDS:  Object to form.
3           THE WITNESS:  It's not restricted to
4  Meta.
5  BY MS. JONES:
6      Q.  Okay.  Your -- the criticisms you've offered
7  in your expert role have been focused on Meta,
8  however; right?
9           MR. RICHARDS:  Object to form.
10          THE WITNESS:  I've been asked to write
11  a report to focus on Meta.
12  BY MS. JONES:
13      Q.  Okay.  Asked by lawyers who are suing the
14  company; correct?
15          MR. RICHARDS:  Object to form.
16          THE WITNESS:  I'm not sure
17  I understand.  It feels irrelevant to talk about
18  something that I wasn't asked to talk about, so --
19  BY MS. JONES:
20      Q.  You don't have to adjudicate what's relevant
21  or not.  My question is just --
22      A.  Oh, no, I'm saying, for me, it did not feel
23  appropriate to talk about something -- I was asked to
24  talk about the science of what we know about Meta, and
25  that's what I did.

Page 302

1      Q.  Sure.  My question was simply that your
2  report in this case focuses on Meta because the
3  lawyers who hired you asked you to focus on Meta;
4  right?
5           MR. RICHARDS:  Object to form.
6           THE WITNESS:  I restricted my
7  conversation to Meta in this report because I believed
8  that that was what was being asked of me.
9  BY MS. JONES:
10      Q.  By the lawyers who hired you; yes?
11          MR. RICHARDS:  Object to form.
12          THE WITNESS:  I guess so.  My
13  understanding of the complaints, yeah.
14  BY MS. JONES:
15      Q.  Yeah.  And the lawyers who hired you, you
16  know are bringing a lawsuit against Meta; right?
17          MR. RICHARDS:  Object to form.
18          THE WITNESS:  I am aware that there's a
19  lawsuit.
20  BY MS. JONES:
21      Q.  Let's go back to Exhibit No. 6, page 14.
22      A.  Yeah.
23      Q.  Towards the bottom of that same page, there's
24  a sentence that begins with "Perhaps most notably"; do
25  you see that?  Towards the bottom.  The last

Page 303

1  sentence -- the last paragraph that begins with --
2      A.  Yeah, I got it.
3      Q.  (As read):
4             "Perhaps most notably,
5             psychological research suggests
6             that young people form and
7             maintain friendships online."
8      Do you see that?
9      A.  I see thatness.
10      Q.  Is that a true statement?  Let me not say
11  "true."  Is that an accurate statement?
12          MR. RICHARDS:  Object to form.
13          THE WITNESS:  Sadly, not anymore.  Not
14  after the comments that were made about kids barely
15  being exposed to their own friends' content anymore;
16  they're seeing more content from people they're not
17  friends with.  I think the quote was something like
18  "social media isn't social anymore" -- is what I read
19  in the paper.
20  BY MS. JONES:
21      Q.  This is the quote from Mark Zuckerberg?
22      A.  Yeah.
23      Q.  Okay.  It goes on to say (as read):
24             "These relation-" --
25      Let me just pause for a second.

Page 304

1      Is your exclusive basis for saying that this
2  statement in your written testimony is not true the
3  comment that you read from Mr. Zuckerberg?
4           MR. RICHARDS:  Object to form.
5  Misstates testimony.
6           THE WITNESS:  No, it's not.  So
7  obviously we're collecting data all the time to learn
8  about kids' experiences online, and what he said
9  corroborates what we've been seeing in the data and
10  hearing from kids for a long time.  Just can't believe
11  that he was so explicit in making clear that, you
12  know, kids are being fed content that they're not
13  asking for and that content is often harmful.
14  BY MS. JONES:
15      Q.  So between your testimony in February of 2023
16  and today, you determined that this statement that you
17  provided to the US Congress was no longer correct; is
18  that right?
19          MR. RICHARDS:  Object to form.  Asked
20  and answered.
21          THE WITNESS:  I don't think that's the
22  way that I would put it.  I think I would say that
23  while there is potential for there to be a benefit to
24  form and maintain friendships online, it seems that
25  that potential has been thwarted by the ways that the

Page 305

1   company has set up their platform, and that bears out
2   in the data over the last two years, too.
3       I don't know of many areas of science that
4   have so rapidly addressed a topic as we've seen
5   attention to this topic in the science, and I've been
6   doing this for 25, 30 years.  So the span of two years
7   is a long time, and the products have changed very
8   rapidly as well.  So I would caution against anything
9   from even a year ago or six months ago as being
10  representative of, you know, exactly what we know
11  today.
12  BY MS. JONES:
13      Q.  Sure.  That's fine.  I'm just trying to
14  understand at what point you went from what's
15  reflected here in your written testimony to thinking
16  that that potential for maintaining friendships online
17  had been thwarted in a way that was perhaps
18  irretrievable?
19          MR. RICHARDS:  Object to form.
20  Compound.  Asked and answered.
21          THE WITNESS:  I think that a reading of
22  this document from 2023 itself would -- in full
23  context, would make very clear that the negatives are
24  offsetting these positives.  So you're asking me
25  about, like, one sentence in isolation, but if you

Page 306

1   look at the whole report, I mean, it's clear that that
2   sentence is not representative even of what this said
3   in 2023.
4   BY MS. JONES:
5       Q.  Well, what it says as, in the next sentence,
6   (as read):
7               "These relationships often afford
8               opportunities to interact with a
9               more diverse peer group than
10              offline, and the relationships are
11              close and meaningful and provide
12              important support to youth in
13              times of stress."
14      Do you see that?
15      A.  I see that sentence.
16      Q.  And then you have a number of citations at
17  Footnote No. 30; correct?
18      A.  I do.
19      Q.  And then it goes on to say (as read):
20              "The buffering effect of social
21              support from peers has been well
22              documented in the psychological
23              literature.  This may be
24              especially important for youth
25              with marginalized identities,

Page 307

1               including racial, ethnic, sexual,
2               and gender minorities.  Digital
3               platforms provide an important
4               space for self-discovery and
5               expression for LGBTQ+ youth."
6       Did I read all that correctly?
7       A.  Yes, that's what it says in here.
8       Q.  Okay.  Let's just take that paragraph.
9   Sitting here today, would you say that is still
10  accurate or it's no longer accurate?
11          MR. RICHARDS:  Object to form.
12          THE WITNESS:  Yeah, I would -- in 2023,
13  in this report, you will see that those positives are
14  offset by the negatives to those same minoritized
15  groups.
16      Today, it is still the case, as it said in
17  this report, that there is a potential for positives,
18  but the negatives -- and actually what we're hearing
19  in data over the last two years is that the negatives
20  have overtaken the positives for minoritized -- many
21  minoritized youth.
22  BY MS. JONES:
23      Q.  Okay.  And I don't -- you can tell me if I'm
24  misunderstanding the report.  I don't see in this --
25  excuse me, not report, your testimony -- I don't see

Page 308

1   in your testimony where you said, "I think the
2   negatives are overtaking the positives for youths who
3   might be in underrepresented or marginalized groups."
4       A.  I think that a -- in my opinion, I think that
5   a reading of this whole report, and the context of the
6   whole report, makes that clear.
7           MS. JONES:  Why don't we take a break.
8   I may be done or very close to being done.
9           THE VIDEOGRAPHER:  Going off the
10  record.  The time is 4:39 p.m.
11      (Recess taken from 4:39 p.m. to 4:54 p.m.)
12          THE VIDEOGRAPHER:  Going back on the
13  record.  The time is 4:54 p.m.
14  BY MS. JONES:
15      Q.  Dr. Prinstein, do you have any personal
16  knowledge about why Meta designed its platforms in a
17  particular way?
18          MR. RICHARDS:  Object to form.
19          THE WITNESS:  I don't think I have any
20  personal knowledge.
21  BY MS. JONES:
22      Q.  To the extent that you have any visibility
23  into that topic, is it based on the materials that
24  you've been provided in the context of your role as an
25  expert in this case?

Page 309

1          MR. RICHARDS:  Object to form.
2          THE WITNESS:  I don't think I saw any
3  of those materials.
4  BY MS. JONES:
5      Q.  Okay.  And I think this is correct, but
6  you're not an expert in just how social media platforms are
7  designed, generally, are you?
8          MR. RICHARDS:  Object to form.
9          THE WITNESS:  I wouldn't say I was.
10  Yeah.
11  BY MS. JONES:
12      Q.  And forgive me if I'm repeating a question
13  I already asked you.  You did not undertake any kind
14  of review of the code for any of the algorithms that
15  are associated with any of Meta's platforms, did you?
16      A.  No, I didn't review that.
17      Q.  Okay.  Do you have any personal knowledge of
18  why Meta implemented certain designs or features in
19  its platforms -- social media platforms?
20          MR. RICHARDS:  Object to form.
21          THE WITNESS:  Other than an impression,
22  I don't have any direct knowledge.
23  BY MS. JONES:
24      Q.  Were some of the Meta documents that you
25  reviewed as part of your work as an expert in this

Page 310

1  case the survey research that the company had done
2  about teen users of its platforms?
3          MR. RICHARDS:  Object to form.
4          THE WITNESS:  Yes.
5  BY MS. JONES:
6      Q.  Do you have a view, based on your own work as
7  a scientist, of whether survey research of that type
8  can establish a causal relationship between an
9  exposure and an outcome?
10          MR. RICHARDS:  Object to form.
11          THE WITNESS:  I didn't have enough
12  information about the methodology used for those
13  surveys to be able to evaluate it.
14  BY MS. JONES:
15      Q.  Do you have an understanding that sometimes
16  the research team at Meta would propose changes to the
17  company's platforms as a result of findings in their
18  research?
19          MR. RICHARDS:  Object to form.
20  Speculation.
21          THE WITNESS:  I don't know whether they
22  did or not.  I am aware that sometimes practices that
23  were meant to keep kids healthy were overturned, or
24  sometimes findings were kind of kept concealed from
25  those higher up in the association for plausible

Page 311

1  deniability.
2  BY MS. JONES:
3      Q.  Well, let me kind of deconstruct that
4  a little bit.
5          You said practices that were meant to keep
6  kids healthy were overturned.  What practices,
7  specifically, are you talking about?
8          Are you talking about the cosmetic filters
9  decision?
10      A.  Yes.
11      Q.  Okay.  Were there any other practices that
12  you were referring to just now in your testimony?
13          MR. RICHARDS:  Object to form.
14          THE WITNESS:  I can't -- I can't
15  remember it in great detail, but my sense of it is
16  changes to the platform features that ended up
17  decreasing engagement in the platform that were then
18  reversed to ensure ongoing engagement with the
19  platform.
20  BY MS. JONES:
21      Q.  What are you referring to, specifically?
22      A.  Like I said, I'm not sure I remember
23  completely, but I think there were things like whether
24  like counts were visible or whether preference was
25  given to comments in the feed or posts from friends or

Page 312

1  highly liked posts versus in chronological order.
2      Q.  Do you know what the dataset was that the
3  company evaluated in making a judgment about how likes
4  would be displayed or not?
5          MR. RICHARDS:  Object to form.
6          THE WITNESS:  Do I know the dataset?
7  BY MS. JONES:
8      Q.  Yes.
9      A.  I don't -- I don't think I understand.
10  I don't know of a dataset.
11      Q.  Okay.  Well, and I may not have been fully
12  clear on my question.  My question was simply, to the
13  extent that you are testifying that there was a
14  decision made around the visibility of like counts --
15  which I think is what you were referring to earlier;
16  is that right?
17      A.  That's one of the things I said.
18      Q.  Do you know, one way or the other, what
19  universe of information or data the company actually
20  considered and weighed in deciding how it was going to
21  proceed on that decision?
22          MR. RICHARDS:  Object to form.
23          THE WITNESS:  I don't know all of the
24  factors that -- or data points that were used to make
25  those decisions.  It did have information, I believe,

Page 313

1  about things being changed -- I don't know.  It didn't
2  seem -- there was no reference to other data or
3  justifiable reasons for why it was changed.
4  BY MS. JONES:
5      Q.  Are you thinking of a specific -- when you
6  say it didn't have a reference to other data or
7  justifiable reasons, what is the "it" in that
8  sentence?  Are you thinking of a particular document
9  that you saw?
10     A.  When I saw in the documents, like with the
11 beauty filters, for instance, that the decision to
12 take them away had been reversed, my memory of why it
13 was being reversed did not refer to any other sources
14 of data or scientifically based rationale to explain
15 that decision.
16     Q.  Do you understand that the -- Meta has, in
17 fact, produced many, many, many, many thousands of
18 pages of documents as part of its discovery
19 obligations in this litigation?
20         MR. RICHARDS:  Object to form.
21 Speculation.
22         THE WITNESS:  I believe that they have.
23 BY MS. JONES:
24     Q.  Okay.  Are you comfortable -- let's just take
25 cosmetic filters, for example.  Are you comfortable

Page 314

1  that you have seen every document that you would need
2  to see to be fully informed on how Meta went about
3  making its decision with respect to the availability
4  of filters on Instagram?
5          MR. RICHARDS:  Object to form.
6  Speculation.
7          THE WITNESS:  I -- there are things
8  that I have seen in those documents that no amount of
9  pages would undo or justify or make acceptable.
10 BY MS. JONES:
11     Q.  That wasn't my question.
12     A.  I know, but I can't answer that question.
13 I stand by my opinions and my concerns based on the
14 information that I did see, even though I recognize
15 that there may be other things in other documents that
16 I might not have seen, because what I have seen is
17 egregious, damaging, insensitive to youth, and
18 contrary to expert opinions --
19     Q.  Okay --
20     A.  -- that they weren't aware of.
21     Q.  -- let me go back to my question.
22         My question was -- some version of -- are
23 you comfortable that you have seen the full scope of
24 documentation related to the company's evaluation of
25 the cosmetic filter issue that you have now mentioned

Page 315

1  a few times today?
2          MR. RICHARDS:  Object to form.
3  Speculation.  Asked and answered.
4          THE WITNESS:  Sorry, I don't know what
5  else to say beyond what I said.  I --
6  BY MS. JONES:
7      Q.  Let me ask you a different question.
8      A.  Yeah, sure.
9      Q.  Who at the company -- who were all of the
10 people at the company who were involved in the
11 decision around the availability of cosmetic filters
12 on Instagram?
13         MR. RICHARDS:  Object to form.
14 Speculation.
15         THE WITNESS:  I definitely don't
16 remember.
17 BY MS. JONES:
18     Q.  Okay.  You have a recollection of
19 Mr. Zuckerberg weighing in at some point, it sounds
20 like; is that right?
21     A.  I do.
22     Q.  Do you have any awareness of who else might
23 have been involved in the discussions around that
24 topic?
25         MR. RICHARDS:  Object to form.

Page 316

1          THE WITNESS:  I do.  A panel of
2  scientific experts and seemingly a bunch of Meta staff
3  whose titles I don't know or remember.
4  BY MS. JONES:
5      Q.  Do you remember the names of any of those
6  Meta personnel?
7      A.  No.
8          MR. RICHARDS:  Object to form.
9  BY MS. JONES:
10     Q.  Do you know the names of any of the panel of
11 scientific experts that you just referred to?
12     A.  Actually, I don't know if the names of the
13 experts were in that document --
14     Q.  Okay.
15     A.  -- I can't remember.
16     Q.  So the only name that you know is
17 Mr. Zuckerberg's name, in terms of the people who were
18 actually involved in the discussions around that
19 issue?
20         MR. RICHARDS:  Object to form.
21 Misstates testimony.
22         THE WITNESS:  It was the only
23 recognizable name to me, which is the reason why it
24 was the only one that stuck.
25

Page 317

1  BY MS. JONES:
2      Q.  With respect to the issue of whether or not
3  like counts would be visible on Instagram, do you know
4  who was involved in that decision-making at the
5  company?
6          MR. RICHARDS:  Object to form.
7  Speculation.  Asked and answered.
8          THE WITNESS:  As I mentioned, that one
9  is a bit more vague, so I certainly don't remember.
10 BY MS. JONES:
11     Q.  Okay.  Do you know what the various factors
12 were that the company weighed in reaching a decision
13 about whether or not like counts would be visible to
14 teen users on Instagram?
15         MR. RICHARDS:  Same objections.
16         THE WITNESS:  Sorry, do I remember the
17 various factors that were used to make that decision?
18 BY MS. JONES:
19     Q.  Yes.
20     A.  I don't remember.
21     Q.  Do you know what the state of the world is on
22 Instagram today in terms of whether or not teens are
23 able to disable seeing like counts or not?
24         MR. RICHARDS:  Object to form.  Scope.
25         THE WITNESS:  Actually, as for what it

Page 318

1  looks like today, I don't know, no.
2  BY MS. JONES:
3      Q.  And I apologize if you answered this
4  question; I'm just forgetting.
5          Are there specific tools or features that
6  you are aware of the company implementing as a result
7  of research that was done internally at Meta?
8          MR. RICHARDS:  Object to form.  Asked
9  and answered.
10         THE WITNESS:  Sorry, any tools based on
11 any research?
12 BY MS. JONES:
13     Q.  Are you aware one way or the other of that?
14         MR. RICHARDS:  Same objections.
15         THE WITNESS:  I -- my understanding is
16 that there have been different tools that have been
17 used, sometimes temporarily here and there, but
18 I don't believe, from what we know in the data, that
19 any of them have been meaningful in reducing
20 problematic social media use.
21 BY MS. JONES:
22     Q.  And the specific data you're referring to is
23 what, exactly?
24     A.  So we collect data on problematic social
25 media use, as do many labs around the world, and that

Page 319

1  does focus, not just on social media, but on specific
2  platforms as well.  And we use the criteria directly
3  from the DSM-5 for substance dependency that's used
4  for other substances, but we swap out the word of the
5  substance -- let's say "cocaine" -- for "Instagram" or
6  "social media," and then we're able to take an
7  assessment -- you know, a diagnostic assessment of how
8  much kids are experiencing a dependency, a clinical
9  dependency, to social media, including Meta's
10 products.
11         This has been done now in samples all over,
12 and the rates of those who are meeting and exceeding
13 diagnostic thresholds are remarkably high.  Over
14 50 percent report at least one symptom of clinical
15 dependency, and I believe we have at least 25 percent
16 to 33 percent or so that are reporting moderate to
17 severe symptoms of clinical dependency; and that would
18 meet threshold for a formal diagnosis.
19     Q.  Can I just pause you for a second?
20         You said that criteria for evaluating
21 problematic social media use was what exactly?
22     A.  So different studies have looked at that in
23 different ways.  That's a construct that's been used
24 within the literature across the world, as I
25 mentioned.

Page 320

1          In our research, we have used the DSM
2  criteria for substance dependence, but we've swapped
3  out the word of the illegal substance and instead
4  we've put in words like "social media" or sometimes
5  even the name of a specific product.
6      Q.  Are you -- when you say "our research," what
7  are you referring to specifically?
8      A.  We have and still are collecting data with
9  this approach.
10     Q.  Has any of that been published?
11     A.  I believe some of it was in the article that
12 you had as one of your exhibits.
13     Q.  Let me wrap up one point, and then I want to
14 come back to a question or two more on this issue.
15         You also described earlier that you thought
16 you had seen in the documents that were provided to
17 you, as produced from the company, that there were
18 research findings that were kept concealed from those
19 higher up to preserve deniability.  That's a rough
20 estimation of what I think I heard you say.  Is that
21 right?  Did I hear you say that?
22         MR. RICHARDS:  Object to form.
23 Misstates testimony.
24         THE WITNESS:  Some of that's correct,
25 but some of that's incorrect.  I didn't ascertain that

Page 321

1  from reviewing the documents.
2  BY MS. JONES:
3      Q.  Okay.  Did I correctly understand you to say
4  that -- to make that claim that that had happened?
5  That people had concealed research findings to protect
6  more senior folks --
7          MR. RICHARDS:  Same objections --
8  BY MS. JONES:
9      Q.  -- from knowing about the results?
10         Excuse me.
11         MR. RICHARDS:  No, excuse me.  Same
12  objections.
13         THE WITNESS:  Yes, research findings
14  and other information that is relevant to kids'
15  safety.
16  BY MS. JONES:
17     Q.  Okay.  What specifically are you talking
18  about?
19     A.  This was told to me by former Meta employees,
20  and also it's something I read in the paper with a
21  recent whistleblower.
22     Q.  Okay.  Told to you by former Meta employees.
23  What former Meta employees are you talking about?
24     A.  I've talked to a number of former Meta
25  employees.  I don't remember all their names.

Page 322

1      Q.  Do you remember any of their names?
2      A.  I don't.  It was at a large conference, and
3  there was discussion about this from a group of
4  panelists, and I don't know that I remember the
5  panelists.
6      Q.  What was the conference?
7      A.  It was a meeting.  It was a meeting in
8  New York State.
9      Q.  And when did this happen?
10     A.  Possibly '23 or '24.
11     Q.  And how many -- forgive me if I am going to
12  misrecall slightly what you said, but how many former
13  employees are you recalling talked to you about this
14  issue?
15         MR. RICHARDS:  Object to form.
16  BY MS. JONES:
17     Q.  And to be more specific of what you said
18  earlier, research findings being somehow concealed to
19  preserve deniability from more senior people at the
20  company.
21         MR. RICHARDS:  Object to form.
22  Misstates testimony.
23         THE WITNESS:  I heard from three people
24  individually, as well as read in the paper, that there
25  were numerous instances in which decisions,

Page 323

1  information, and/or the results of internal studies
2  that could have protected youth, or had revealed
3  concerns about youth well-being, were instructed to be
4  buried, so that way they -- rather than sending it up
5  the chain, to ensure plausibility deniability among
6  people higher in the organization.
7  BY MS. JONES:
8      Q.  Okay.  You heard that from three people
9  individually?  Is that what I heard you say?
10     A.  Yes.
11     Q.  Were all three of those people on a panel of
12  some kind?  Or you did interact with them in some
13  different way at that meeting?
14     A.  At a panel, and then there was a happy hour
15  afterwards and some discussion.
16     Q.  All right.  And then you said you read
17  something in the paper.  What were you referring to
18  there?
19     A.  I think it was just in the last couple of
20  weeks, there was a whistleblower report about this.
21  I think maybe first week of September.
22     Q.  This is -- are you referring to the two
23  individuals who testified before Congress?  Or are you
24  referring to other people?
25     A.  It might have been the testifying before

Page 324

1  Congress.
2      Q.  Okay.  What specific research findings,
3  according to what you were testifying to, were kept
4  concealed from more senior people at the company?
5          MR. RICHARDS:  Object to form.
6          THE WITNESS:  I don't know.
7  BY MS. JONES:
8      Q.  Do you know who was involved in those bodies
9  of research at the company?
10     A.  I don't know.
11     Q.  Dr. Prinstein, just because you've mentioned
12  it, could I ask you to go back to Exhibit No. 10,
13  please.
14     A.  Yeah.
15     Q.  I just wanted to check something with you.
16  So I think you told me earlier that you all had done
17  research on problematic social media use using a set
18  of criteria based on the DSM-5.
19     A.  Correct.  We -- based on the substance
20  dependency criteria in DSM-5.
21     Q.  Okay.  And I just want to make sure
22  I understand.
23         If you go to page 201 of Exhibit 10, which
24  you might already be there.
25     A.  I am.

Page 325

1    Q. Is that what you're referring to, is Table 1
2  in that article?
3    A. Generally, yes.
4    Q. Okay. Is there some other set of criteria
5  that you're thinking of? Or is this what you're
6  referring to when you said you just took the DSM-5 and
7  replaced the word -- whatever the substance was --
8  with the reference to social media?
9        MR. RICHARDS: Object to form.
10       THE WITNESS: Different research groups
11 do it in different ways, but these items are one of
12 the ways in which we've adapted the DSM-5 criteria for
13 substance dependence on -- to understand problematic
14 social media use. As you can see, there are
15 super-high percentages endorsing.
16 BY MS. JONES:
17   Q. Let me ask you to turn to page 207. And this
18 is the section entitled "Links with daily subjective
19 well-being." Do you see that?
20   A. I do.
21   Q. Down at the bottom of that section, there is
22 a paragraph that begins with "These findings"; do you
23 see that?
24   A. I do.
25   Q. It says (as read):

Page 326

1        "These findings should be
2        considered in the context of the
3        broader theoretical contribution
4        of 'addictive' social media
5        measures."
6    Do you see that?
7    A. I see it.
8    Q. And it says (as read):
9        "Numerous measures exist that
10       assess problematic, dependent, or
11       addictive social media use."
12   Do you see that?
13   A. I see it.
14   Q. And it says (as read):
15       "Most existing measures apply to
16       substance use disorder measurement
17       strategy to assess social media
18       addiction."
19   Correct?
20   A. Yes, I see that.
21   Q. And it goes on to say (as read):
22       "This measurement" --
23       Well, let me just ask this question. That
24 sentence that we just looked at, that's -- that would
25 be inclusive of what appears in Table 1 in this paper;

Page 327

1  right -- at Exhibit No. 10?
2    A. I think that's accurate.
3    Q. Okay. And the same paper says (as read):
4        "This measurement is not without
5        criticism, particularly because of
6        its confirmatory approach in which
7        the existing substance use
8        assessment is assumed to apply to
9        behavioral addictions, and
10       disagreement among scholars on the
11       applicability of certain criteria
12       to technology-based addictions."
13   Do you see that?
14   A. I see that.
15   Q. Is that an accurate -- and this is -- again,
16 this is a paper you were a coauthor on; correct?
17       MR. RICHARDS: Object to form.
18       THE WITNESS: I am a coauthor on this
19 paper.
20 BY MS. JONES:
21   Q. All right. And this paper was published --
22 I know it would have been submitted earlier than 2025,
23 but this paper was published earlier this year;
24 correct?
25   A. Is that correct? I forgot.

Page 328

1    Q. Yeah, we had this conversation earlier --
2        (Over-speaking.)
3    A. Yeah, it looks like it came out in '25.
4    Q. It's hidden a little bit, but yes.
5    A. This one was written a long time ago, but it
6  just came out.
7    Q. Okay. And so this measurement criteria
8  that's reflected in -- that you were describing
9  earlier and that's reflected in Table 1, you and your
10 coauthors appear to be acknowledging that that
11 measurement approach is not without criticism because
12 it assumes that the substance use assessment in the
13 DSM-5 is equally applicable to behavioral addictions;
14 right?
15       MR. RICHARDS: Object to form.
16 Misstates testimony. And I'll just note that this is
17 one sentence out of a larger paper.
18       MS. JONES: He has said that many
19 times. I'm sure he knows that it's one sentence out
20 of a longer paper.
21 BY MS. JONES:
22   Q. My question is about this specific sentence,
23 Dr. Prinstein.
24       The evaluative approach reflected at
25 Table 1, which we looked at just a moment ago, has

1  been, according to you and your coauthors, criticized
2  in part because it assumes that the existing substance
3  use assessment applies to behavioral addictions;
4  right?
5            MR. RICHARDS:  Same objections.
6            THE WITNESS:  That statement is not
7  accurate.  And it would no longer be something that
8  would be written about this, for a couple different
9  reasons.
10           Number one is that -- and I remember this
11  well -- there was one single reviewer of this paper
12  that insisted that we put something like that on
13  there, so of course we did, because it's required for
14  publication.  And it's fair to note that there have
15  been some past criticisms, but that's not something
16  that is currently considered concerning today.
17           Second of all, our measurement has now been
18  adapted by several other research groups as being the
19  appropriate measurement to look at problematic social
20  media use, so that statement would not be considered
21  accurate today.
22  BY MS. JONES:
23     Q.  Okay.  So let me just make sure I understand.
24           This is another statement in a paper on
25  which you're a coauthor that you tell me today not to

1  anymore; is that right?
2            MR. RICHARDS:  Object to form.
3  Misstates testimony.
4            THE WITNESS:  That's definitely not
5  characterizing what I'm saying the right way.
6  BY MS. JONES:
7     Q.  Well, does it accurately reflect your views
8  or does it not accurately reflect your views,
9  Dr. Prinstein?
10           MR. RICHARDS:  Same objections.
11           THE WITNESS:  I -- sorry, but I have to
12  unpack that a little bit because your question
13  includes a few assumptions that I don't think are
14  accurate.
15  BY MS. JONES:
16     Q.  Well, just to move us along, let me ask you
17  my next question.
18           In the next sentence, it says (as read):
19              "In this study, we similarly
20              applied this measurement strategy,
21              although we omitted problematic
22              criteria that cannot cleanly be
23              applied to social media use."
24           And then it references tolerance and
25  withdrawal.  Do you see that?

1     A.  I do see that.
2     Q.  So you told me earlier that when you all did
3  your set of criteria, you used -- you just took the
4  DSM-5 and you just changed out the name of the
5  particular substance or intake, essentially, and left
6  everything the same; right?
7            MR. RICHARDS:  Object to form.
8  Misstates testimony.
9            THE WITNESS:  That's not exactly what
10  I said, but --
11  BY MS. JONES:
12     Q.  Well, let me see if I can ask a slightly
13  better question.
14           You said earlier that when you all developed
15  your approach to evaluating problematic social media
16  use, that you took the DSM-5 criteria for substance
17  abuse disorders and just replaced the reference to the
18  substance with a reference to social media.  Did
19  I hear that correctly?
20     A.  That is an approach that we've --
21              (Over-speaking) --
22           MR. RICHARDS:  Same objections.  Sorry.
23  Same objections.
24           THE WITNESS:  We -- sorry.
25

1  BY MS. JONES:
2     Q.  I just want to make sure I understood what
3  you said earlier.  Is that what you said earlier?
4     A.  I believe that earlier I did talk about the
5  ways that we adapted the substance dependency
6  criteria.
7     Q.  Okay.  But in this paper at least, you did
8  more than just switch out the word "substance" for
9  "social media"; right?
10           MR. RICHARDS:  Object to form.
11           THE WITNESS:  No, that's not correct.
12  We did assess it using all the items, and we did
13  include them all and adapt them in that way.
14  BY MS. JONES:
15     Q.  Well, I want to make sure that we're not
16  reading the same words in different ways.  This says
17  (as read):
18              "We applied this measurement
19              strategy, although we omitted
20              problematic criteria that cannot
21              cleanly be applied to social media
22              use."
23           Did I read that correctly?
24     A.  You read it correctly.
25     Q.  Okay.  Is that an accurate description of

Page 333

1   what you all did?
2              MR. RICHARDS:  Object to form.
3              THE WITNESS:  So let me try and
4   clarify.  No, that's not what we did.  That's what
5   we're reporting in this paper because a reviewer asked
6   us to run the analyses with and without those items.
7              Our traditional way of doing this, in fact,
8   does include measures on tolerance and withdrawal and,
9   as I mentioned, has become a standard by which people
10  across the field are looking at this.
11  BY MS. JONES:
12     Q.  So I want to just make sure I'm clear.
13         Your testimony is that the way you actually
14  did it is not the way that's described in the paper
15  that we've marked as Exhibit No. 10?
16             MR. RICHARDS:  Object to form.
17  Misstates testimony.
18             THE WITNESS:  Indeed, what I'm trying
19  to say -- and I'll try and say it more clearly -- is
20  that it's common practice that when you submit an
21  article for review, and it's evaluated by others, they
22  ask for specific changes for the publication, and
23  those changes are then run both ways, so you can look
24  at that and make sure that your findings hold up.
25             In this case, the approach that we used was

Page 334

1   to include all items.  We did collect data on all of
2   the items.  We were asked by the reviewer to report
3   the data without those items, and that's why the
4   report discusses it in that way.
5   BY MS. JONES:
6      Q.  Who was the reviewer who asked you to
7   describe it in this way?
8      A.  They're anonymous reviewers.  We can't -- we
9   don't know.
10     Q.  Oh, you don't know who the reviewer is for
11  purposes of your --
12     A.  The peer-review process is an anonymous
13  peer-review process.
14     Q.  Okay.  So this -- but this recitation of how
15  it was done is, you're telling us today, not accurate?
16             MR. RICHARDS:  Object to form.
17  Misstates testimony.
18             THE WITNESS:  No, that's not what
19  I said.  What I'm saying is that, at this reviewer's
20  request, we were asked to report the data without
21  those items, so we wrote up the data to indicate that
22  those items were not included for this set of
23  analyses.
24  BY MS. JONES:
25     Q.  Okay.  I didn't see anywhere in this paper --

Page 335

1   and you can tell me if I have it wrong -- I didn't see
2   anywhere in this paper where you actually said, "We
3   just took the DSM-5 and we switched out the -- we took
4   the DSM-5 criteria for substance use disorders and
5   just switched out the reference to substance and
6   replaced it with social media."
7              MR. RICHARDS:  Is there a --
8              THE WITNESS:  You can find that on
9   page 200, the bottom paragraph.
10  BY MS. JONES:
11     Q.  Okay.  Where does it say that?
12     A.  At the bottom of the page 200, it says that
13  we based the items on the DSM-5 substance use disorder
14  checklist.  It's the first three lines under the
15  heading "Addiction-like Social Media Use."
16     Q.  Do you know how many items there actually
17  are, or criteria there are, for substance use disorder
18  in the DSM-5?
19             MR. RICHARDS:  Object to form.
20             THE WITNESS:  Off the top of my head, I
21  can't give you the exact number.
22  BY MS. JONES:
23     Q.  Do you know that it's more than seven?
24             MR. RICHARDS:  Object to form.  Asked
25  and answered.

Page 336

1              THE WITNESS:  Off the top of my head,
2   I can't remember the exact number.  And the things
3   that you're calling criteria are not the same ways
4   that we talk about criteria here.
5              There are general criteria with every
6   diagnosis that are -- about functional impairment,
7   et cetera, that are consistent, so I don't know if
8   you're including that or not.
9   BY MS. JONES:
10     Q.  Yeah, my question is not about what I know
11  about it.  My question is, do you know how many
12  diagnostic criteria there are in the DSM-5 for
13  substance abuse -- or substance use disorder?
14     A.  Oh --
15             MR. RICHARDS:  Object to form.  Asked
16  and answered.
17             THE WITNESS:  Yeah, I already answered
18  that.
19  BY MS. JONES:
20     Q.  If you did, I missed it.  Do you know how
21  many diagnostic criteria there are?
22             MR. RICHARDS:  Same objections.
23             THE WITNESS:  I don't remember the
24  exact number off the top of my head.
25             MS. JONES:  Okay.  All right.

Page 337

```
1        Give me three minutes.  I think I'm done,
2   but give me a chance to just consult.
3            THE VIDEOGRAPHER:  Going off the
4   record.  The time is 5:27 p.m.
5        (Recess taken from 5:27 p.m. to 5:31 p.m.)
6            THE VIDEOGRAPHER:  Going back on the
7   record.  The time is 5:31 p.m.
8            MS. JONES:  Dr. Prinstein, I'm all
9   done.  Thank you for your time.  Your counsel might
10  have questions for you.
11           MR. RICHARDS:  Ready to hand it over?
12           MS. JONES:  Yes.  Go for it.
13           MR. RICHARDS:  Dr. Prinstein, I just
14  want to thank you for your time today.  We have no
15  questions for you.
16           THE WITNESS:  Okay.
17           MS. JONES:  Okay.  Then we're done.
18           THE WITNESS:  Okay.
19           THE VIDEOGRAPHER:  Before we go off the
20  record, the total time on the record for Meta today
21  was 6 hours and 21 minutes.
22        This concludes this deposition.  The time is
23  5:32 p.m.
24     (Whereupon, at 5:32 p.m., the deposition ceased.
25           Signature was reserved.)
```

Page 338

```
1            ACKNOWLEDGMENT OF DEPONENT
2        I, MITCH PRINSTEIN, PH.D., do hereby
3   acknowledge that I have read and examined the foregoing
4   testimony, and the same is a true, correct, and complete
5   transcription of the testimony given by me, and any
6   corrections appear on the attached errata sheet signed
7   by me.
8
9   _____  _____
10     (DATE)                    (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 339

```
1            E R R A T A
2   CASE NAME:  IN RE: SOCIAL MEDIA ADOLESCENT
3   ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION
4   WITNESS NAME: MITCH PRINSTEIN, PH.D.
5   CASE NUMBER:  4:22-MD-03047-YGR / MDL NO. 3047
6   PAGE  LINE      READS            SHOULD READ
7   ____  ____  _____  _____
8   ____  ____  _____  _____
9   ____  ____  _____  _____
10  ____  ____  _____  _____
11  ____  ____  _____  _____
12  ____  ____  _____  _____
13  ____  ____  _____  _____
14  ____  ____  _____  _____
15  ____  ____  _____  _____
16  ____  ____  _____  _____
17  ____  ____  _____  _____
18  ____  ____  _____  _____
19  ____  ____  _____  _____
20  ____  ____  _____  _____
21  ____  ____  _____  _____
22
23
24  _____  _____
25     (DATE)                    (SIGNATURE)
```

Page 340

```
1   STATE OF NORTH CAROLINA  )
2                            ) C E R T I F I C A T E
    COUNTY OF ORANGE         )
3        I, Sophie Brock, Registered Diplomate
    Reporter, Certified Realtime Reporter, and Notary Public
4   of North Carolina, the officer before whom the foregoing
5   proceeding was conducted, do hereby certify that the
6   witness whose testimony appears in the foregoing
7   proceeding was duly sworn by me; that the testimony of
8   said witness was taken by me to the best of my ability
9   and thereafter transcribed under my supervision; and
10  that the foregoing pages, inclusive, constitute a true
11  and accurate transcription of the testimony of the
12  witness.
13
14       I do further certify that I am neither counsel
15  for, related to, nor employed by any of the parties to
16  this action, and further, that I am not a relative or
17  employee of any attorney or counsel employed by the
18  parties thereof, nor financially or otherwise interested
19  in the outcome of said action.
20       This, the 2nd day of October, 2025.
21
22
23            Sophie Brock
24       _____
25            Sophie Brock, RDR, CRR
              Notary Number: 200834000001
```