**Exhibit 4**


**PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION TO EXCLUDE GENERAL CAUSATION
TESTIMONY OF PLAINTIFFS' EXPERTS**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE: SOCIAL MEDIA          Case No. 4:22-MD-03047-YGR

5    ADOLESCENT                   MDL No. 3047

6    ADDICTION/PERSONAL INJURY

7    PRODUCTS LIABILITY LITIGATION

8    _____

                                 |

9    This document Relates to:   |

                                 |

10   ALL ACTIONS                 |

     _____|

11

12

13                   CONFIDENTIAL

14

15     VIDEOTAPED DEPOSITION OF BRADLEY ZICHERMAN, MD

16              PALO ALTO, CALIFORNIA

17               AUGUST 27, 2025

18                 9:16 A.M.

19

20

21

22

23   Job No. MDLG7553548

24   Stenographically reported by:

     JENNY L. GRIFFIN, RMR, CSR, CRR, CCRR, CRC

25   CSR No. 3969

CONFIDENTIAL

Page 2

```
 1
 2
 3
 4
 5
 6
 7
 8
 9          Videotaped deposition of BRADLEY ZICHERMAN, MD,
10   taken on behalf of the Plaintiffs, at Covington &
11   Burling LLP, 3000 El Camino Real, Palo Alto, California,
12   on Wednesday, August 27, 2025, beginning at 9:16 a.m.
13   and ending at 7:16 p.m., before Jenny L. Griffin, a
14   Certified Shorthand Reporter, Registered Merit Reporter,
15   Certified Realtime Reporter, California Certified
16   Realtime Reporter, Certified Realtime Captioner.
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 3

```
 1            A P P E A R A N C E S :
 2
 3   ON BEHALF OF THE PEOPLE OF THE STATE OF CALIFORNIA:
 4          CALIFORNIA DEPARTMENT OF JUSTICE
 5          OFFICE OF THE ATTORNEY GENERAL
 6          BY:  MEGAN O'NEILL, ESQ.
 7               NAYHA ARORA, ESQ.
 8          455 Golden Gate Ave., Suite 11000
 9          San Francisco, California 94102-7004
10          415-510-4400
11          megan.oneill@doj.ca.gov
12          nayha.arora@doj.ca.gov
13
14   ON BEHALF OF THE COMMONWEALTH OF MASSACHUSETTS ATTORNEY
15   GENERAL'S OFFICE:
16          THE COMMONWEALTH OF MASSACHUSETTS,
17          OFFICE OF THE ATTORNEY GENERAL
18          BY:  ASHANTHI MEENA SERALATHAN, ESQ.
19          One Ashburton Place, 18th Floor
20          Boston, Massachusetts 02108
21          617-727-2200
22          meena.seralathan@mass.gov
23
24
25
```

CONFIDENTIAL

Page 4

```
 1            A P P E A R A N C E S :  (Continued)
 2
 3   ON BEHALF OF THE STATE OF CONNECTICUT, OFFICE OF THE
 4   ATTORNEY GENERAL:
 5          OFFICE OF THE ATTORNEY GENERAL, CONNECTICUT
 6          BY: TESS SCHNEIDER, ESQ.        (Via Zoom)
 7              KRISLYN LAUNER, ESQ.        (Via Zoom)
 8          165 Capitol Avenue
 9          Hartford, Connecticut 06106-1659
10          860-808-5400 - Schneider
11          860-808-5450 - Launer
12          tess.schneider@ct.gov
13          krislyn.launer@ct.gov
14
15   ON BEHALF OF THE STATE OF KENTUCKY, OFFICE OF THE
16   ATTORNEY GENERAL:
17          KENTUCKY OFFICE OF THE ATTORNEY GENERAL
18          BY: ZACHARY J. RICHARDS, ESQ.    (Via Zoom)
19          1024 Capital Center Drive, Suite 200
20          Frankfort, Kentucky 40601
21          502-696-5519
22          zach.richards@ky.gov
23
24
25
```

CONFIDENTIAL

Page 5

```
 1            A P P E A R A N C E S :  (Continued)
 2
 3   ON BEHALF OF THE STATE OF COLORADO, OFFICE OF THE
 4   ATTORNEY GENERAL:
 5          COLORADO ATTORNEY GENERAL'S OFFICE
 6          BY: ELIZABETH OREM, ESQ.         (Via Zoom)
 7              STEVEN KAUFMANN, ESQ.        (Via Zoom)
 8              SHAHEEN SHEIKH, ESQ.         (Via Zoom)
 9              CORIN STIGALL, Paralegal     (Via Zoom)
10          1300 Broadway, 9th Floor
11          Denver, Colorado 80203
12          720-508-6120
13          elizabeth.orem@coag.gov
14          steven.kaufmann@coag.gov
15          shaheen.sheikh@coag.gov
16
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 6

1        A P P E A R A N C E S: (Continued)
2
3    ON BEHALF OF THE NEW JERSEY ATTORNEY GENERAL'S OFFICE:
4        OFFICE OF THE ATTORNEY GENERAL,
5        STATE OF NEW JERSEY
6        BY:  MANDY K. WANG, ESQ.        (Via Zoom)
7             VERNA J. PRADAXAY, ESQ.    (Via Zoom)
8        124 Halsey Street, 5th Floor
9        Newark, New Jersey 07102
10       973-504-6200 - Wang
11       609-712-2828 - Pradaxay
12       mandy.wang@law.njoag.gov
13       Verna.Pradaxay@law.njoag.gov.
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

Page 7

1        A P P E A R A N C E S: (Continued)
2
3    ON BEHALF OF THE META DEFENDANTS:
4        COVINGTON & BURLING LLP
5        BY:  LINDSEY BARNHART, ESQ.
6             DOMINIC BOOTH, ESQ.
7             ISAAC LaGRAND, ESQ. (New York)
8             PAUL SCHMIDT, ESQ.  (New York)
9        3000 El Camino Real
10       Palo Alto, California, 94306
11       650-632-4706 - Barnhart
12       650-632-4714 - Booth
13       212-841-1171 - Schmidt
14       lbarnhart@cov.com
15       dbooth@cov.com
16       ilagrand@cov.com
17       pschmidt@cov.com
18
19
20
21   VIDEOGRAPHER:  Tommy Madueña
22   Golkow, a Veritext Division
23
24   TRIAL TECH:  Edward Flick
25   Golkow, a Veritext Division

CONFIDENTIAL

Page 8

1            C O N T E N T S
2
3    WITNESS: BRADLEY ZICHERMAN, MD          PAGE
4    EXAMINATION BY MS. BARNHART:            14
5    EXAMINATION BY MS. O'NEILL:             370
6    EXAMINATION BY MS. BARNHART:            372
7    STENOGRAPHER'S CERTIFICATE:             382
8    DECLARATION:                            383
9    DEPOSITION ERRATA SHEET:                384
10
11           E X H I B I T S
12       (Attached to Transcript)
13   EXHIBIT NUMBER    DESCRIPTION          PAGE
14   Exhibit 1    Trial Report of Bradley       27
15               Zicherman, MD, dated 5/16/25; (No
16               Bates - 27 pages)
17   Exhibit 2    Trial Report of Bradley       27
18               Zicherman, MD, Appendix A.
19               Materials Considered; (No Bates -
20               7 pages)
21   Exhibit 3    Trial Report of Bradley       27
22               Zicherman, MD, Appendix B.
23               Curriculum Vitae of Bradley
24               Zicherman, MD; (No Bates - 9
25               pages)

CONFIDENTIAL

Page 9

1        E X H I B I T S   C O N T I N U E D
2    EXHIBIT NUMBER    DESCRIPTION          PAGE
3    Exhibit 4    Rebuttal Trial Report of Bradley   27
4               Zicherman, MD, dated 7/30/25; (No
5               Bates - 18 pages)
6    Exhibit 5    Trial Report of Bradley       27
7               Zicherman, MD, dated 5/16/25; (No
8               Bates - 67 pages)
9    Exhibit 6    Curriculum Vitae of Bradley   36
10               Zicherman, MD; (No Bates - 8
11               pages)
12   Exhibit 7    Webpage - Stanford University -    73
13               Conflict of Interest - Frequently
14               Asked Questions; (No Bates - 3
15               pages)
16   Exhibit 8    Professional profile of Bradley   76
17               Aaron Zicherman; (No Bates - 1
18               page)
19   Exhibit 9    Stanford University - Policy on   81
20               Conflict of Interest and Conflict
21               of Commitment - DoReasearch;
22               dated 2/20/25; (No Bates - 29
23               pages)
24
25

Page 10

1     E X H I B I T S   C O N T I N U E D
2   EXHIBIT NUMBER     DESCRIPTION                    PAGE
3     Exhibit 10   Stanford Medicine - School of      93
4                  Medicine Faculty Handbook -
5                  3.7.D. Conflicts of Interest and
6                  Commitment; (No Bates - 2 pages)
7     Exhibit 11   Stanford Medicine - School of      93
8                  Medicine Faculty Handbook 3.3.E.
9                  Specific/Supplemental Criteria
10                 for Clinical Associate
11                 Professors; (No Bates - 2 pages)
12    Exhibit 12   Invoice:  I certify that I        160
13                 performed all work described
14                 below during the dates below; (No
15                 Bates - 1 page)
16    Exhibit 13   Invoice:  I certify that I        160
17                 performed all work described
18                 below during the dates below; (No
19                 Bates - 1 page)
20    Exhibit 14   Billing:  I certify that I        160
21                 performed all work described
22                 below during the dates below; (No
23                 Bates - 1 page)
24
25

Page 11

1     E X H I B I T S   C O N T I N U E D
2   EXHIBIT NUMBER     DESCRIPTION                    PAGE
3     Exhibit 15   National Academies - Sciences,    196
4                  Engineering, Medicine - Social
5                  Media and Adolescent Health
6                  (2024); (No Bates - 275 pages)
7     Exhibit 16   Excerpts:  Screen Time Stories    215
8                  Podcast, "Screens and Suicide in
9                  Youth"
10    Exhibit 17   American Psychiatric Association   237
11                 Press Release: APA Releases
12                 Diagnostic and Statistical Manual
13                 of Mental Disorders, Fifth
14                 Edition, Text Revision
15                 (DSM-5-TR), dated 3/18/22; (No
16                 Bates - 2 pages)
17    Exhibit 18   Excerpts: Fifth Edition Text      242
18                 Revision - DSM-5-TRTm; (No Bates
19                 - 26 pages)
20    Exhibit 19   Statista.com: Share of online     272
21                 users in the United States who
22                 report being addicted to social
23                 media as of April 2019, by age
24                 group; (No Bates - 4 pages)
25

Page 12

1     E X H I B I T S   C O N T I N U E D
2   EXHIBIT NUMBER     DESCRIPTION                    PAGE
3     Exhibit 20   (Number skipped - does not exist)
4     Exhibit 21   Westbrook et al., iScience 24,    328
5                  102497, dated May 21, 2021:
6                  Striatal dopamine synthesis
7                  capacity reflects smartphone
8                  social activity; (No Bates - 9
9                  pages)
10
11        REQUESTED MARKED BY MS. BARNHART
12              PAGE        LINE
13               97          19
14              101           3
15              134           4
16              191          17
17
18     DIRECTION TO WITNESS NOT TO ANSWER
19              PAGE        LINE
20              167           5
21              184           7
22
23
24
25

Page 13

1          P R O C E E D I N G S
2        THE VIDEOGRAPHER:  We are now on the
3   record.  My name is Tommy Madueña.  I am a
4   videographer for Golkow, a Veritext division.
5        Today's date is August 27th, 2025, and the
6   time is 9:16 a.m.  This video deposition is being
7   held in 3000 El Camino Real, Palo Alto Square,
8   Palo Alto, California 94306 in the matter of Social
9   Media Adolescent Addiction/Personal Injury Products
10  for the United States District Court, Northern
11  District of California.
12        The deponent is Dr. Bradley Zicherman.
13        Will all counsel present in person please
14  identify themselves, beginning with the noticing
15  attorney.
16        MS. BARNHART:  Lindsey Barnhart,
17  Covington & Burling, on behalf of Meta.  I'm joined
18  by my colleagues Isaac LaGrand and Dominic Booth.
19        MS. O'NEILL:  Megan O'Neill for the People
20  of the State of California.
21        MS. ARORA:  Nayha Arora for the People of
22  the State of California.
23        MS. SERALATHAN:  Meena Seralathan on behalf
24  of the Commonwealth of Massachusetts Attorney
25  General's Office.

CONFIDENTIAL

Page 14

1     THE VIDEOGRAPHER:  The court reporter is
2  Jenny Griffin, and will now swear in the witness.
3     THE STENOGRAPHER:  My name is Jenny
4  Griffin.  My CSR number is 3969.
5             - - -
6        BRADLEY ZICHERMAN, MD,
7  having been first duly sworn and/or affirmed by the
8  Certified Shorthand Reporter to tell the truth, the
9  whole truth, and nothing but the truth, testified as
10          follows:
11         EXAMINATION
12  BY MS. BARNHART:
13    Q.  Good morning, Dr. Zicherman.
14    A.  Good morning.
15    Q.  I'm -- we just met.  I'm Lindsay Barnhart
16  here on behalf of Meta.  Thank you for being here
17  today.
18     Have you ever been deposed before?
19    A.  I have not.
20    Q.  Okay.  So I'll go over quickly some ground
21  rules.  As you know, the court reporter is taking a
22  transcript of today's proceeding.  And in order for
23  her to receive an accurate transcript, I'll ask that
24  you provide verbal answers to my questions.  So no
25  nodding of your head or shaking of your head.

CONFIDENTIAL

Page 15

1    A.  Understood.
2    Q.  Okay.  Also, in the interests of having an
3  accurate record, can you agree that we won't talk
4  over each other, meaning I'll finish my questions
5  before you answer and vice versa?
6    A.  Sure.
7    Q.  Okay.  Unless you say otherwise, I'm going
8  to assume you understand my questions.
9     Is that fair?
10    A.  That's fair.
11    Q.  All right.  If at any point you need a
12  break, that's totally fine.  Just let me know.  All
13  I'd ask is, if there's a question pending, you
14  answer that question before we take a break.
15     Sounds good?
16    A.  Okay.  Yep.
17    Q.  Okay.  You understand that you're here
18  today to testify about the expert reports that you
19  submitted in a lawsuit brought by several state
20  attorneys general?
21    A.  I do.
22    Q.  And that lawsuit that you're here today for
23  is pending in federal court in Oakland; correct?
24    A.  Yes.  That is my understanding.
25    Q.  All right.  And what's your understanding

CONFIDENTIAL

Page 16

1  of the allegations in that lawsuit?
2    A.  I would like to reference my report to
3  fully answer that.  Will that be okay?
4    Q.  You don't have a separate understanding of
5  the allegations in the lawsuit?
6    A.  Well, I do, but I want to answer this
7  accurately.
8    Q.  Okay.  Well, we're not going to spend time
9  looking through your report.  I'm just -- you don't
10  have an understanding separate and apart from your
11  report; is that correct?
12    MS. O'NEILL:  Objection.  Mischaracterizes
13  his testimony.
14    THE WITNESS:  I have an understanding, but
15  in order to accurately --
16  BY MS. BARNHART:
17    Q.  Well, what's that understanding?
18    A.  In order to accurately answer the question,
19  I would like to refer to the report.
20    Q.  This is going to be a really, really long
21  day if we're flipping through your report for basic
22  questions like this.
23     So all I'm asking is, separate and apart
24  from what's in your report, what's your
25  understanding of the allegations in the lawsuit?

CONFIDENTIAL

Page 17

1    MS. O'NEILL:  And I'll just say he's
2  entitled to look at the report if he needs to.
3    THE WITNESS:  Okay.  Well, then I would
4  like to look at my report to fully answer the
5  question.
6  BY MS. BARNHART:
7    Q.  I'm not asking about what's in your report;
8  I'm asking about your understanding separate and
9  apart from what's in the report.
10    Do you have such an understanding?
11    A.  I have an understanding; but, again, I
12  would like to fully and accurately answer the
13  question.
14    Q.  Okay.  Just tell me what your understanding
15  is separate and apart from your report.
16    You can answer that without looking at your
17  report.
18    A.  I would choose to answer the question
19  looking at my report.
20    Q.  I'm not asking you what's in your report;
21  I'm asking you what is your understanding separate
22  and apart from what's in your report of the
23  allegations in the lawsuit.
24    Are you going to answer the question?
25    A.  Well, I would like to answer the question

CONFIDENTIAL

Page 18

1   by looking at my report.
2       Q.   I'm not asking you what's in your report,
3   Dr. Zicherman.
4           Do you understand my question?
5           What is your understanding, separate and
6   apart from what the lawyers have written for you in
7   your report, of what the allegations in this lawsuit
8   are?
9           MS. O'NEILL:  Objection.
10  Mischaracterization.  Argumentative.  Form.
11          THE WITNESS:  If you would like an answer
12  that is accurate, without me misspeaking,
13  misrepresenting anything involved in the case, a
14  technical point, I would like to look at my report
15  to answer that.
16  BY MS. BARNHART:
17      Q.   So I'm going to understand from that
18  nonresponse that you do not have an understanding,
19  separate and apart from what's in your report, of
20  the allegations in the lawsuit; is that right?
21          MS. O'NEILL:  Objection.
22  Mischaracterization.
23          THE WITNESS:  I have an understanding.  To
24  accurately answer the question, I would like to
25  reference the report.

CONFIDENTIAL

Page 19

1   BY MS. BARNHART:
2       Q.   So that made no sense.  You have no
3   understanding -- without looking at your report, you
4   can't answer the question; is that true?
5           MS. O'NEILL:  Objection --
6           (Stenographer interrupted for
7           clarification of the record.)
8           THE STENOGRAPHER:  Ms. Barnhart, your
9   question was:  So that made no sense.  You have no
10  understanding without looking at your report" --
11  BY MS. BARNHART:
12      Q.   -- of what the allegations in the lawsuit
13  are; is that true?
14          MS. O'NEILL:  Objection.
15  Mischaracterization.  Argumentative.
16          THE WITNESS:  I would again prefer to look
17  at the report to answer the question accurately.
18          MS. O'NEILL:  He's entitled --
19  BY MS. BARNHART:
20      Q.   That's not my question.
21          MS. O'NEILL:  He's entitled to look at the
22  report --
23  BY MS. BARNHART:
24      Q.   My question --
25          MS. O'NEILL:  -- to help answer the

CONFIDENTIAL

Page 20

1   question.
2   BY MS. BARNHART:
3       Q.   And my question for you is, without looking
4   at your report, can you or can you not provide me an
5   understanding of your allegations -- understanding
6   of the allegations in this lawsuit?
7       A.   And I would prefer to answer the question
8   accurately by looking at my report.
9       Q.   That's not my question.
10          My question is can you or can you not
11  answer the question without looking at your report?
12  It's a yes or no.
13      A.   Well, I don't believe that's a yes-or-no
14  question.
15      Q.   So you cannot answer my question without
16  looking at the report.  That's what you're saying?
17          MS. O'NEILL:  Objection.
18  Mischaracterization.
19          THE WITNESS:  I can answer it accurately by
20  looking at my report.
21  BY MS. BARNHART:
22      Q.   Can you answer the question at all without
23  looking at your report?
24      A.   I can answer the question most accurately
25  by looking at my report.

CONFIDENTIAL

Page 21

1       Q.   Do you understand that's not my question?
2           I'm asking can you answer what your
3   understanding of the allegations in this lawsuit is
4   without looking at your report?  If the answer is
5   no --
6       A.   I'm sorry.  I find your question confusing
7   at this point.
8       Q.   Right, because you're not listening to it.
9           My question is, without looking at the
10  report, can you answer my question of what is your
11  understanding of the allegations in this lawsuit?
12      A.   Well, I can answer it; but I would want to
13  be as accurate as possible.  In order to do that, I
14  would need to reference my report.
15      Q.   So you're not going to answer that question
16  for me without looking at your report?
17      A.   I believe I have answered the question.
18      Q.   No.  This is a new question.
19          You are not going to answer my question
20  without looking at the report; is that fair?
21          MS. O'NEILL:  Objection.  Argumentative.
22          THE WITNESS:  Again, I'm a little confused
23  by your question at this point.  I'm sorry.
24  BY MS. BARNHART:
25      Q.   My question is do you have any

CONFIDENTIAL

Page 22

1  understanding of what the allegations are in this
2  lawsuit?
3      A.    Of course I have an understanding of the
4  allegations.
5      Q.    But you are not willing to share that
6  understanding with me without looking at your
7  report; is that correct?
8      A.    Well, I think there are likely technical
9  points related to your question.  And in order to
10 speak accurately, I would prefer to answer that by
11 looking at my report.
12     Q.    So then the answer is no, you are not
13 willing to share your understanding of the
14 allegations in this lawsuit without looking at your
15 report?
16           MS. O'NEILL:  Objection.  Form.
17           THE WITNESS:  I'm a little confused by that
18 question.
19 BY MS. BARNHART:
20     Q.    You are not willing to share your
21 understanding of the allegations in this lawsuit
22 without looking at your report?
23           MS. O'NEILL:  Same objection.
24 BY MS. BARNHART:
25     Q.    Yes or no?

CONFIDENTIAL

Page 23

1      A.    I would prefer to look at my report to
2  answer the question.  That's how I'm answering it.
3      Q.    All right.  That's not an answer.
4            It's going to be a long day; so buckle up.
5      A.    Okay.
6      Q.    What do you have in front of you right now?
7      A.    I have my report.
8      Q.    What report?
9      A.    My report that I'm here to discuss
10 regarding the case.
11     Q.    It's a single report?
12     A.    There's the report plus the rebuttal.  And
13 there are appendices with materials considered.
14     Q.    So there are two reports in front of you
15 right now?
16     A.    My curriculum vitae is also a part of
17 this --
18     Q.    Okay.  What's behind Tab 1?
19     A.    -- package of information.
20           (Stenographer interrupted for
21            clarification of the record.)
22 BY MS. BARNHART:
23     Q.    What's behind Tab 1?
24           (Stenographer interrupted for
25            clarification of the record.)

CONFIDENTIAL

Page 24

1  BY MS. BARNHART:
2      Q.    You have a binder in front of you.  There
3  are three tabs.  What's behind Tab 1?
4      A.    Behind Tab 1 is the trial report.
5      Q.    Your trial report in the federal lawsuit
6  pending in Oakland; correct?
7      A.    Correct.
8      Q.    Okay.  What's behind Tab 2?
9      A.    The rebuttal trial report.
10     Q.    What's behind Tab 3?
11     A.    This is the Meta defendants' notice of
12 deposition.
13     Q.    Okay.  Why did you bring these documents
14 with you to the deposition?
15     A.    Because I believed I would be asked
16 questions about these documents.
17     Q.    Have you annotated these documents at all?
18     A.    I have not.
19           MS. BARNHART:  Okay.  We'll mark this as
20 Exhibit 5 probably eventually, but we'll do that at
21 a break.
22 BY MS. BARNHART:
23     Q.    So there's no need for you to be looking at
24 the binder in front of you as opposed to the copy of
25 your report that I give to you; correct?

CONFIDENTIAL

Page 25

1      A.    They should be the same, but I would prefer
2  to look at what I have in front of me.
3            I don't know what you're about to give me;
4  I would want to compare it side by side.
5            MS. BARNHART:  All right.  Well, then let's
6  go off the record, please.
7            THE VIDEOGRAPHER:  Stand by.  The time
8  is 9:26 a.m., and we're going off the record.
9            (Recess taken.)
10           THE VIDEOGRAPHER:  The time is 9:40 a.m.,
11 and we are back on the record.
12           MS. O'NEILL:  Counsel, I just wanted to
13 allow Massachusetts the time to put their
14 reservation of rights on the record before we get
15 started back.
16           MS. BARNHART:  Okay.
17           MS. SERALATHAN:  It's the understanding of
18 the Commonwealth of Massachusetts that the
19 defendants take the position that Massachusetts
20 cannot participate in this deposition.
21           The Commonwealth of Massachusetts states
22 for the record that we have timely served, prior to
23 today's deposition, opening and rebuttal reports
24 from Dr. Zicherman in our litigation Commonwealth of
25 Massachusetts v. Meta Platforms, Inc., and Instagram

CONFIDENTIAL

Page 26

1 LLC, Suffolk Superior Court, Civil Action
2 Number 2384CV02397, and that these reports are
3 substantially identical to those served by the MDL
4 plaintiffs.
5        Because they are substantively identical,
6 Massachusetts, for purposes of coordination and
7 efficiency, issued a cross-notice for today's
8 deposition.  The Commonwealth opposes any efforts to
9 further depose Dr. Zicherman based on such
10 disclosures, but are happy to meet and confer with
11 the defendants at the appropriate time on this issue
12 if and/or when it becomes ripe.
13        MS. BARNHART:  Noted.
14        I will also note we have a Court order from
15 the MDL.  It's ECF2157 that says that the deposition
16 in Massachusetts, which is a non-MDL AG case, is to
17 be taken separately.
18        You know, we've had offline correspondence
19 about this issue.  I will note for the record I
20 don't believe I've seen any cross-notice for this
21 deposition by the Commonwealth of Massachusetts.  I
22 could be mistaken on that, but I don't believe we've
23 seen one.
24        And, in any event, we would reserve all
25 rights to seek Dr. Zicherman's deposition in that

CONFIDENTIAL

Page 27

1 separate case, as we're entitled to do.
2 BY MS. BARNHART:
3    Q.   So, Dr. Zicherman, you originally submitted
4 an expert report in the MDL on May 16, 2025;
5 correct?
6    A.   That date sounds accurate.
7    Q.   And you submitted a rebuttal report on
8 July 30th, 2025; correct?
9    A.   I again believe that date sounds accurate.
10        (Exhibits 1 through 5 were marked for
11        identification and are attached to the
12        transcript.)
13 BY MS. BARNHART:
14    Q.   You have in front of you what have been
15 marked as Exhibits 1 through 5.  And just for the
16 record, we'll take you through them.
17        Exhibit 1 --
18    A.   Are they here?  Okay.
19    Q.   Yes.
20        Exhibit 1 on the top, that's your opening
21 May 16th, report; correct?
22    A.   It appears to be my opening report.
23    Q.   Okay.  Exhibit 2, this is Appendix A to
24 your opening report, your materials considered list;
25 correct?

CONFIDENTIAL

Page 28

1    A.   That appears correct.
2    Q.   Exhibit 3 -- that's Appendix B to your
3 opening MDL report -- that's your CV as of May 16th;
4 correct?
5    A.   I do believe this is my CV through May of
6 2025.
7    Q.   Okay.  Exhibit 4 is a copy of your rebuttal
8 report in the MDL dated July 30th, 2025; correct?
9    A.   It appears correct.
10    Q.   All right.  And Exhibit 5 we've marked as
11 the binder that you brought with you today.
12        You can refer to whatever you're most
13 comfortable with; I'll be referring to the
14 Exhibits 1 through 4 when I'm discussing your
15 report.
16    A.   Okay.
17    Q.   Is there anything you wish to correct or
18 amend in either of your reports?
19    A.   There's nothing I wish to amend or correct.
20    Q.   Are you prepared to fully testify about all
21 of your opinions today?
22    A.   I am.
23    Q.   Is there any reason you cannot testify
24 fully and accurately about your opinions today?
25    A.   No.

CONFIDENTIAL

Page 29

1    Q.   Have you done all the work you need to do
2 in order to be able to testify at a trial in this
3 case?
4        MS. O'NEILL:  Objection.  Form.
5        THE WITNESS:  Have I done -- can you repeat
6 that question for me.
7 BY MS. BARNHART:
8    Q.   Have you done all the work you need to do
9 in order to be able to testify at a trial in this
10 case?
11        MS. O'NEILL:  Same objection.
12        THE WITNESS:  Well, this isn't -- are we
13 talking about potentially, like, a court appearance?
14 I'm sure there are other -- there's more work that
15 could be done in the future of the case, but up to
16 date?  Is that the question?
17        Am I understanding that correctly?
18 BY MS. BARNHART:
19    Q.   Do you need to do any further work in order
20 to be able to testify at trial about your opinions
21 in this case?
22        MS. O'NEILL:  Same objection.
23        THE WITNESS:  Yes, I find the question a
24 bit confusing.  I don't know if there are
25 technicalities I'm not aware of for the future of

CONFIDENTIAL

Page 30

1  the case.
2        But to date, being here, there's no other
3  work that I need to do.
4  BY MS. BARNHART:
5     Q.   Okay.  If trial were tomorrow, you'd be
6  fully prepared to testify about your opinions at
7  trial; right?
8     A.   That would be a pretty short turnaround.  I
9  don't have much experience going to court.  But
10  sure, I'd be prepared to talk about my opinions and
11  report.
12    Q.   Okay.  You've not been asked to perform any
13  further work before trial that you have not yet
14  performed; correct?
15    A.   Performed further work before trial I have
16  not yet performed?  I don't believe so.
17    Q.   Are you married, Dr. Zicherman?
18    A.   I'm married.
19    Q.   What does your spouse do for work?
20    A.   She works for Salesforce.
21    Q.   Okay.  What does she do at Salesforce?
22    A.   She is a director of analytics for a
23  Salesforce product.
24    Q.   What product?
25    A.   It is called Heroku.

CONFIDENTIAL

Page 31

1     Q.   What is Heroku?
2     A.   Not being in the tech world, I wish I can
3  understand it more.  It's not my area, but it has
4  some integration with Salesforce at large.
5     Q.   Is that all you know about Heroku?
6     A.   My understanding of Heroku is it's a tech
7  product.  I'm not in a tech field.  When it comes to
8  coding, computers, it's a bit of a foreign language
9  to me; so I don't know all the details of the work
10  she does.
11    Q.   Do you know if she works with user data in
12  her role as director of analytics?
13         MS. O'NEILL:  Objection.  Foundation.
14         THE WITNESS:  I really don't know.
15  BY MS. BARNHART:
16    Q.   Have you talked to your wife about this
17  case?
18    A.   I have not had any substantial discussions
19  with my wife about this case.
20    Q.   Do you have any children?
21    A.   I do.
22    Q.   How many children do you have?
23    A.   I have one child.
24    Q.   How old is that child?
25    A.   He is 20 months as of today.

CONFIDENTIAL

Page 32

1     Q.   Where did you grow up?
2     A.   I grew up in West Bloomfield, Michigan.
3     Q.   What brought you to the Bay Area?
4     A.   I initially came to the Bay Area for my
5  addiction psychiatry fellowship in -- I believe it
6  was the summer of 2017.
7     Q.   How long have you been married?
8     A.   (No response.)
9     Q.   I'm going to send your wife this clip.
10    A.   Go for it.
11         We've been together for five years.  We've
12  been married for -- we're going on two years now.
13    Q.   And you said you haven't been deposed
14  before.  Have you ever testified at trial?
15    A.   I have testified at trial.
16    Q.   In paragraph 12 of your report, you say you
17  have not previously testified as an expert at a
18  trial or by deposition.
19    A.   This is in paragraph 12?
20    Q.   Correct.
21    A.   Of what exhibit?
22    Q.   Of -- excuse me.  Yeah, of Exhibit 1, which
23  is your opening report, paragraph 12.
24    A.   Correct.  I have not previously testified
25  as an expert at a trial or by deposition.

CONFIDENTIAL

Page 33

1     Q.   Okay.  So when you said earlier you
2  testified at trial, that was not in an expert
3  capacity; correct?
4     A.   I'm not sure of the technical designation.
5  I don't believe I was considered an expert.  This
6  was a case in Oregon.  They -- rules that I can't
7  quite remember, but it was for an NGRI case.  I'm
8  not sure if technically I was considered an expert.
9  I don't believe I was.
10    Q.   NGRI means not guilty by reason of
11  insanity; correct?
12    A.   Correct.
13    Q.   Surely, if you thought you were considered
14  an expert, you would not have stated in your report
15  that you've never previously testified as an expert;
16  right?
17         MS. O'NEILL:  Objection.  Form.  And
18  argumentative.
19         THE WITNESS:  Can you repeat the question.
20  BY MS. BARNHART:
21    Q.   Well, maybe I'll ask it this way:
22         Is this statement in your report,
23  paragraph 12, true or not true, that you have not
24  previously testified as an expert at a trial or by
25  deposition?

CONFIDENTIAL

Page 34

1    A.   Well, I believe it to be true.  It's my
2    understanding I was not considered an expert in that
3    case.
4        Q.   You've never been qualified as an expert by
5    a court; correct?
6        A.   I don't believe that to be the case.  This
7    is -- the only case that that might have been in
8    question, again, I don't believe it was the case.
9        Q.   Have you ever served as a consulting expert
10   in litigation?
11       A.   No.  I have not.
12       Q.   You submitted another copy of your CV last
13   week in advance of this deposition; correct?
14       A.   Correct.
15       Q.   Do you know offhand what the differences
16   are between the CV that you submitted last week and
17   the one you submitted with your report on May 16?
18       A.   I would certainly prefer to answer that
19   question looking at both CVs.  I believe there was
20   the addition of -- I'm trying to remember what -- I
21   believe I added an engagement I had with the
22   Stanford Parenting Center to the CV.
23       Q.   What kind of engagement?
24       A.   I was asked to provide a lecture or
25   didactic aimed at parents discussing my beliefs and

CONFIDENTIAL

Page 35

1    considerations regarding social media use and
2    potential interventions that parents could maybe
3    implement if they think their child is having
4    concerning use of social media, for instance.
5        Q.   Is it fair to say you were presenting your
6    medical views on the issue of the effects of social
7    media use as part of that lecture?
8            MS. O'NEILL:  Objection.  Characterization.
9            THE WITNESS:  Can you repeat the question
10   again for me.
11   BY MS. BARNHART:
12       Q.   Is it fair to say you were presenting your
13   medical views on the issue of the effects of social
14   media use as part of that lecture?
15           MS. O'NEILL:  Same objection.
16           THE WITNESS:  I mean, I've given many
17   lectures.  You know, I can give you a global
18   understanding of what I remember; but I'd be happy
19   to answer questions about it if I -- if you had any
20   excerpts or any sort of video of it, I honestly
21   would be happy to answer questions about it.
22   BY MS. BARNHART:
23       Q.   Well, I'm happy to hear that.
24           So can you answer my question of is it fair
25   to say that in the lecture you just referred to, you

CONFIDENTIAL

Page 36

1    were presenting your medical views on the issue of
2    the effects of social media use?
3        A.   If I remember correctly, that was among the
4    views that I presented in that lecture.
5            MS. BARNHART:  Okay.
6            (Exhibit 6 was marked for
7            identification and is attached to the
8            transcript.)
9    BY MS. BARNHART:
10       Q.   I'll hand you what's been marked as
11   Exhibit 6, which is a copy of your August 2025 CV.
12           Well, maybe I'll ask you.
13           Is this a copy of your August 2025 CV?
14       A.   That does appear correct.
15       Q.   And is Exhibit 6 the most up-to-date
16   version of your CV as of today?
17       A.   It should be, to my knowledge.
18       Q.   No changes since you sent this to us last
19   week; correct?
20       A.   Correct.
21       Q.   All right.  Let's go through some of your
22   educational history.
23           You attended undergrad at the University of
24   Michigan; is that correct?
25       A.   That is correct.

CONFIDENTIAL

Page 37

1        Q.   And your major was general studies?
2        A.   That's correct.  I did major in general
3    studies.
4        Q.   What is general studies?
5        A.   Well, this is a long time ago now.  I
6    believe I can still answer this correctly, but I
7    believe the requirements for general studies
8    included essentially half of your credits being
9    upper-level coursework in essentially any
10   discipline.
11       Q.   So this was not a premed major; correct?
12       A.   It essentially was for me.  So you can --
13   it's sort a design your own major in a way.  The
14   designation is general studies; but you can
15   predominantly take premed coursework, for instance,
16   if you want.
17       Q.   Was there a separate premed track at the
18   University of Michigan?
19       A.   I don't believe so.
20       Q.   There was not a premed major specifically?
21       A.   To my knowledge, I don't recall there being
22   a premed major.
23       Q.   Did you have the option to major in
24   biology?
25       A.   I had the option to major in many different

Page 38

```
 1   fields.
 2       Q.   Right, including a number of hard sciences
 3   that you did not choose to major in; correct?
 4       A.   Correct.  I chose not to major in a hard
 5   science.
 6       Q.   What was your GPA?
 7       A.   I do not recall.
 8       Q.   Do you remember approximately what it was?
 9       A.   This was a long time ago.  I would have to
10   look in my transcripts to answer that accurately.
11       Q.   Did you go straight to medical school after
12   graduating college?
13       A.   What do you mean by "straight through"?
14       Q.   Okay.  What did you do after graduating
15   college?
16       A.   Well, I -- if I recall correctly, I did
17   have a quick turnaround between undergrad and
18   attending med school.
19       Q.   It looks like you graduated college in
20   2005; is that right?
21       A.   That is correct.
22       Q.   I presume that was spring of 2005; correct?
23       A.   I believe that's correct.
24       Q.   And you did not start med school until fall
25   of 2006; correct?
```

Page 39

```
 1       A.   That is not correct.  I began, if I
 2   remember correctly, winter of 2006.
 3       Q.   So January of 2006?
 4       A.   I believe that was when I started.
 5       Q.   That's not the typical start date for med
 6   school, is it?
 7       A.   Well, for the med school that I went to, it
 8   had several starting dates, including the January
 9   start date.
10       Q.   Why did you choose to start in January as
11   opposed to the fall of 2005?
12       A.   As opposed to the fall of 2005?
13            I don't really recall.  I don't recall if I
14   was accepted at that point.  There could have been a
15   variety of reasons I chose a January start date.
16            You're asking me a question about something
17   19 years ago.  Yeah, I don't remember all the
18   details about why I started in January as opposed to
19   the fall.
20       Q.   Well, I'm asking you questions about your
21   medical training, which I think is relevant to your
22   purported expertise.
23            So what did you do between the spring of
24   2005 and January of 2006?
25            MS. O'NEILL:  Object to the preamble.
```

Page 40

```
 1            THE WITNESS:  Between the spring of 2005
 2   and?
 3   BY MS. BARNHART:
 4       Q.   January of 2006.
 5            Were you employed?
 6       A.   I don't recall.  I don't believe I was
 7   employed.
 8       Q.   Where did you live during that time period?
 9       A.   You're really jogging my memory here, 20
10   years ago now.  I believe I was living in West
11   Bloomfield, where I grew up the time between
12   finishing undergrad and beginning med school.
13       Q.   When did you first begin applying to
14   medical school?
15       A.   I really don't remember.
16       Q.   How many medical schools did you apply to?
17       A.   I don't remember.
18       Q.   Did you apply to more than five medical
19   schools?
20       A.   I don't recall.
21       Q.   You can't give me any estimate of the
22   number of medical schools that you applied to?
23            MS. O'NEILL:  Objection.  Asked and
24   answered.
25            THE WITNESS:  So this -- we're approaching
```

Page 41

```
 1   about 20 years ago.  I just -- I don't remember how
 2   many med schools I applied to.
 3   BY MS. BARNHART:
 4       Q.   Is your memory not that great generally?
 5            MS. O'NEILL:  Objection.  Argumentative.
 6            THE WITNESS:  You're asking me a question
 7   about something 20 years ago; I'm answering to the
 8   best of my abilities.  I've had a lot of education.
 9   I've been a lot of different places.  I'm sorry if I
10   don't quite remember how many med schools I applied
11   to.
12   BY MS. BARNHART:
13       Q.   Okay.  And I'm not asking you for a precise
14   number.  You can't give me any estimate whatsoever
15   of the number of med schools you applied to?
16            MS. O'NEILL:  Objection.  Asked and
17   answered.
18            THE WITNESS:  I really don't remember how
19   many I applied to.
20   BY MS. BARNHART:
21       Q.   Okay.  I remember the number of law schools
22   I applied to 20 years ago, but -- understood -- you
23   don't remember.
24            Did you apply to any medical schools in the
25   United States?
```

CONFIDENTIAL

Page 42

1    A.    I don't recall applying to med schools in
2  the United States.
3    Q.    Did you only apply to the American
4  University of the Caribbean?
5    A.    I believe I applied to more than the
6  American University of the Caribbean.
7    Q.    And what other schools do you recall
8  applying to?
9    A.    I don't recall all the other schools.  I
10  remember I also applied to one called Ross.  But
11  beyond that, I really don't recall other schools I
12  might have applied to.
13    Q.    Why didn't you apply to any medical schools
14  in the United States?
15    A.    Well, I had colleagues -- I knew people
16  that were going to this particular medical school.
17  I liked the fact that it was a quick turnaround.
18  And I did my research into the school, and it felt
19  like it was a right fit for me.
20    Q.    What do you mean by "quick turnaround"?
21    A.    The fact that they had a January start as
22  opposed to waiting even longer -- which US med
23  schools traditionally start, like, a spring or
24  summer term.  So I was able to start several months
25  sooner.

CONFIDENTIAL

Page 43

1    Q.    Well, you could have applied to med school
2  while you were still in college and started that
3  fall; right?
4    A.    I don't recall when I applied.  Perhaps I
5  could have done that.  If I didn't, I really
6  couldn't tell you.
7    Q.    Okay.  You were not accepted into any
8  medical schools in the United States; correct?
9        MS. O'NEILL:  Objection.  Form.
10        THE WITNESS:  If I went through the
11  application process, perhaps I would have been
12  accepted; but I was accepted to American University
13  of the Caribbean.
14  BY MS. BARNHART:
15    Q.    That was not my question.  Were you or were
16  you not accepted into any medical schools in the
17  United States?
18        MS. O'NEILL:  Objection.  Form.
19        THE WITNESS:  Sure.  I was not accepted
20  into any medical schools at the United States as I
21  did not go through the application process.
22  BY MS. BARNHART:
23    Q.    Where is the American University of the
24  Caribbean?
25    A.    It's on the island of Saint Martin.

CONFIDENTIAL

Page 44

1    Q.    That is not in the United States; correct?
2    A.    That is not in the United States.
3    Q.    And the American University of the
4  Caribbean is easier to get into than an American
5  medical school; correct?
6        MS. O'NEILL:  Objection.  Form.
7        THE WITNESS:  I don't know what it's like
8  now; but yeah, that was an advantage of going to a
9  Caribbean med school at least when I was going.  The
10  admission process was a quicker turnaround.  It was
11  easier to get into.  It was also much harder to stay
12  in school.  The attrition rate was much higher than
13  any American school.
14  BY MS. BARNHART:
15    Q.    The attrition rate is higher because the
16  American University of the Caribbean accepts a lower
17  quality of student; correct?
18        MS. O'NEILL:  Objection.  Form.
19        THE WITNESS:  I would absolutely disagree
20  with that.
21  BY MS. BARNHART:
22    Q.    Are you familiar with the "US News and
23  World Report"?
24    A.    The entity of the "US News and World
25  Report"?  Sure.

CONFIDENTIAL

Page 45

1    Q.    You understand that "US News and World
2  Report" publishes school rankings across various
3  disciplines?
4    A.    Sure.
5    Q.    You understand that "US News and World
6  Report" publishes medical school rankings?
7    A.    I am aware that they publish rankings for
8  med schools.
9    Q.    Are you aware that the American University
10  of the Caribbean Medical School is not even included
11  in the "US News and World Report" rankings?
12        MS. O'NEILL:  Objection.  Form.
13        THE WITNESS:  I wouldn't know as I haven't
14  looked at those rankings in a very long time if I
15  even really ever looked closely at those rankings.
16  BY MS. BARNHART:
17    Q.    Do you have any reason to dispute that the
18  American University of the Caribbean does not even
19  appear in the list of the top 200 medical schools
20  ranked by "US News and World Report"?
21        MS. O'NEILL:  You know, objection.  Form.
22        THE WITNESS:  Does the list only look at US
23  medical schools?  I'd have to take a closer look at
24  it.  I -- it says US medical school rankings.  I
25  would say there are plenty of exceptional medical

CONFIDENTIAL

Page 46

1  schools around the world.
2  BY MS. BARNHART:
3      Q.   So no, you have no reason to dispute that
4  the American University of the Caribbean does not
5  even appear in the list of the top 200 medical
6  schools ranked by "US News and World Report"?
7          MS. O'NEILL:  Objection.  Form.
8  Foundation.
9          THE WITNESS:  You know, I'd have to take a
10  look at the list; but, again, I would say I don't
11  believe that really matters, considering there are
12  excellent medical schools throughout the world.
13  BY MS. BARNHART:
14      Q.   I'm not asking you whether it matters; I'm
15  asking you whether you know if it appears on that
16  list.
17          Do you know or do you not know?
18          MS. O'NEILL:  Same objections.
19          THE WITNESS:  You're saying it doesn't
20  appear; so I -- that's -- if you're being truthful,
21  then, you know, we can say it doesn't appear.
22          But I would say to completely and
23  thoroughly answer that question, there are many
24  great medical schools around the world that are not
25  in the United States.

CONFIDENTIAL

Page 47

1  BY MS. BARNHART:
2      Q.   Are you familiar with an organization
3  called EduRank?
4      A.   I don't believe I'm familiar with that.
5      Q.   Are you aware that EduRank ranks medical
6  schools across the world?
7      A.   Again, I'm not familiar with this
8  organization.
9      Q.   Are you aware that EduRank ranks American
10  University of the Caribbean as number 5,855 in the
11  world based on, quote/unquote, alumni impact?
12          MS. O'NEILL:  Objection.  Foundation.
13          THE WITNESS:  I've never looked at this
14  list, and I don't know what criteria they use to
15  rank a med school.
16  BY MS. BARNHART:
17      Q.   You're an alumnus of that medical school;
18  right?
19      A.   Correct.
20      Q.   Did your education at the American
21  University of the Caribbean give you the same
22  licensing access within the United States that an
23  American medical school would have?
24          MS. O'NEILL:  Objection.  Form.
25          THE WITNESS:  I believe it did.

CONFIDENTIAL

Page 48

1  BY MS. BARNHART:
2      Q.   With your degree from the American
3  University of the Caribbean Medical School, could
4  you have worked in any US state?
5      A.   I believe that was an advantage to
6  specifically going to that medical school.
7      Q.   Meaning yes, you could have been certified
8  in any -- certified and licensed in any US state
9  with that degree?
10      A.   That's my understanding.
11      Q.   What's that understanding based on?
12      A.   Based on word of mouth from alumni, the
13  school itself, doing my own research into the school
14  prior to attending.
15      Q.   Did you take any addiction courses in
16  medical school?
17      A.   Did I take any addiction courses in medical
18  school?  You're talking about, like, basic science
19  classes?  Is that what you're getting at, actual
20  classroom-based coursework?
21      Q.   I don't know what distinction you're trying
22  to make, but can you answer my question.
23          Did you take any addiction courses in
24  medical school?
25          MS. O'NEILL:  Objection.  Form.

CONFIDENTIAL

Page 49

1          THE WITNESS:  I would say that addictions
2  are covered through several different courses in
3  basic sciences.  I don't believe there's any -- at
4  least to my knowledge, any med school offering a
5  basic science course in addictions.
6          It would be great if they do, but a lot of
7  that material is covered in other courses.
8  BY MS. BARNHART:
9      Q.   So you did not take any courses that were
10  specific to addiction in medical school; correct?
11          MS. O'NEILL:  Objection.  Form.
12          THE WITNESS:  Well, again, I wouldn't agree
13  with that.  A course might not be called addictions,
14  but, you know, you learn about the nature of
15  addictions and patients with addictions throughout
16  different kinds of courses.  We learn about
17  addiction pharmacotherapy treatment in a
18  pharmacotherapy class, for instance.
19  BY MS. BARNHART:
20      Q.   Did any of the coursework that you took in
21  medical school cover technology addiction?
22          MS. O'NEILL:  Objection.  Form.
23          THE WITNESS:  I would say that coursework
24  covered concepts of addictions whether they are
25  behavioral- or substance-related.

Page 50

1  BY MS. BARNHART:
2      Q.  That wasn't my question.
3          Did any of the courses that you took in
4  medical school cover technology addiction
5  specifically?
6      MS. O'NEILL:  Same objection.
7      THE WITNESS:  I believe that the idea of an
8  addiction like that is covered in coursework that we
9  would be taking in a basic science class.
10 BY MS. BARNHART:
11     Q.  Do you recall a professor in medical school
12 ever saying to you the phrase "technology
13 addiction"?
14     A.  I don't recall that specific phrase 20
15 years ago.
16     Q.  What did you do between your graduation
17 from medical school in 2011 and your residency
18 beginning in 2012?
19     A.  Can you repeat the time frame.
20     Q.  You graduated from medical school in 2011;
21 correct?
22     A.  Correct.
23     Q.  And you didn't begin your residency at
24 Texas Tech until July 2012; correct?
25     A.  Correct.

Page 51

1      Q.  So what did you do between your graduation
2  from medical school and starting your residency?
3      A.  If I remember correctly, I did a lot of
4  reading and preparing myself for internship and
5  residency.
6      Q.  Did your internship -- by "internship," do
7  you mean your psychiatry residency at Texas Tech?
8      A.  Right.  You can refer to the first year of
9  residency training as an internship.  We can call it
10 residency, though.  I think either designation is
11 fine.  I guess I prefer to call it residency for
12 three years, though.
13     Q.  Was Texas Tech your first choice in the
14 match process?
15     MS. O'NEILL:  Objection.  Form.
16     THE WITNESS:  I do recall being it my first
17 choice.
18 BY MS. BARNHART:
19     Q.  And did you match in the first round of
20 applying to residencies?
21     A.  I did.
22     Q.  And over the course of your training, you
23 did four residencies and fellowships?
24     A.  So I did one residency and three
25 fellowships.

Page 52

1      Q.  Did you complete all of those residencies
2  and fellowships?
3      A.  I did.
4      Q.  Were any of those positions research
5  positions as opposed to clinical?
6      A.  I mean, there's an expected research
7  element in training of all the programs I went to,
8  but these were primarily clinic-driven and -focused
9  programs.
10     Q.  When you say there's an expected research
11 element in training, does that mean you expected to
12 publish research?
13     A.  Not necessarily.
14     Q.  So what do you mean "expected research
15 element"?
16     A.  Well, you can engage in research in a lot
17 of different ways.  It could also be engaging in
18 some sort of quality -- qualitative improvement
19 project that isn't published, for instance.  I mean,
20 it could even be researching a topic and providing
21 some form of a high-quality grand rounds.
22         (Stenographer interrupted for
23          clarification of the record.)
24 BY MS. BARNHART:
25     Q.  You completed your addiction psychiatry

Page 53

1  fellowship at UCSF in June 2018; correct?
2      A.  I believe that's correct.
3      Q.  At any point during your addiction
4  psychiatry fellowship, did you apply to permanent
5  positions at hospitals or medical schools?
6      A.  Can you repeat the question for me.
7      Q.  At any point during your addiction
8  psychiatry fellowship, did you apply to permanent
9  positions at hospitals or medical schools or private
10 clinics?
11     A.  I don't recall applying to permanent
12 positions while I was in that fellowship.
13     Q.  So while you were doing your fellowship
14 training at University of South Florida and UCSF,
15 you did not apply to any jobs outside of other
16 fellowships?
17     A.  You're talking about permanent jobs?
18     Q.  Any job other than a fellowship.
19     A.  Yeah, I did have what you would consider
20 moonlighting experience listed in my CV.
21     Q.  Okay.  But you -- well, anyway -- forget
22 that.
23         Have you -- one of your fellowships was in
24 forensic psychiatry; correct?
25     A.  Correct.

CONFIDENTIAL

Page 54

1    Q.    You completed that in June of 2019; is that
2  right?
3    A.    I believe that's correct.
4    Q.    You're not board certified in forensic
5  psychiatry; right?
6    A.    I'm not.
7    Q.    Have you ever attempted to become board
8  certified in forensic psychiatry?
9    A.    I did take the test once.
10   Q.    You did not pass?
11   A.    I am not board certified.  I did not
12 prepare for that test.  And I do not plan on taking
13 it again.
14   Q.    All right.  Can you answer my question,
15 please.
16         Did you fail the board certification exam
17 in forensic psychiatry?
18   A.    Well, I didn't pass it; so I think that
19 answers your question.
20   Q.    So you failed the board certification exam
21 in forensic psychiatry?
22   A.    You can say that's accurate.
23   Q.    Can you say that's accurate?
24   A.    Yes.  Yes.
25   Q.    Okay.  Have you failed any other board

CONFIDENTIAL

Page 55

1  certification exams in your career?
2    A.    I've taken lots of exams.  I don't recall
3  all my marks.  That was a recent one, though; so I
4  do remember that one.
5    Q.    You said you don't recall your marks.  Do
6  you recall failing any other board certification
7  exams in your career?
8    A.    I don't recall.
9    Q.    Okay.  You became board certified in
10 addiction psychiatry in October of 2020; correct?
11   A.    In addiction psychiatry in 2020?
12         I would need to reference my CV to look at
13 the exact date.  Board certified in addiction
14 psychiatry, October 2020.  You said addiction
15 psychiatry?
16   Q.    Correct.
17   A.    Correct.
18   Q.    Okay.  And you finished your addiction
19 psychiatry fellowship in June of 2018; correct?
20   A.    Correct.
21   Q.    Did you take the board -- the addiction
22 psychiatry board certification exam more than once?
23   A.    I don't recall taking that more than once.
24   Q.    So as far as you can remember, you passed
25 that on the first try?

CONFIDENTIAL

Page 56

1    A.    I believe that is correct.
2    Q.    And why did it take you so long after
3  completing your fellowship to become board
4  certified?
5         MS. O'NEILL:  Objection.  Form.
6         THE WITNESS:  If I recall correctly,
7  addiction psychiatry might only be offered every
8  other year.
9  BY MS. BARNHART:
10   Q.    Well, it took you two years to become board
11 certified; right?
12   A.    Again, I believe I took it as soon as I was
13 able to.  That's the best of my recollection.  I
14 also -- if I remember correctly again, it was
15 offered every other year; so it might just not have
16 lined up with when I completed the program.
17   Q.    You're also board certified in child and
18 adolescent psychiatry; is that right?
19   A.    Correct.
20   Q.    Did you take that board examination more
21 than once?
22   A.    I remember passing that.  I don't recall if
23 I had to take that one more than once.
24   Q.    Okay.  So it is possible that you failed
25 that the first time?

CONFIDENTIAL

Page 57

1         MS. O'NEILL:  Objection.  Form.
2  Mischaracterization.
3         THE WITNESS:  I've taken a lot of exams.
4  I'm sorry if I don't remember all my scores on every
5  exam that I've taken.
6  BY MS. BARNHART:
7    Q.    Well, how many board certification exams
8  have you taken?
9    A.    Well, I've taken board certification exams
10 in several subjects, including general psychiatry,
11 child and adolescent psychiatry, addiction
12 psychiatry, forensic psychiatry.  And I believe I'm
13 also about to be eligible to take the addiction
14 medicine board exam.
15   Q.    So you've only taken four board
16 certification exams; correct?
17   A.    I believe that's correct.
18   Q.    It's a pretty big deal to fail your boards;
19 right?
20         MS. O'NEILL:  Objection.  Form.
21         THE WITNESS:  Well, you can take them
22 again.
23 BY MS. BARNHART:
24   Q.    But would you agree --
25   A.    The pass rates are not very high for these

CONFIDENTIAL

Page 58

1  boards.  I don't believe it's an issue.  At the end
2  of the day, I have three board certifications,
3  likely to be a fourth when I'm eligible and take the
4  addiction medicine board exam.
5      Q.   So it's your testimony today that it is not
6  a big deal to fail your board certification exam as
7  a medical doctor?
8          MS. O'NEILL:  Objection.  Form.
9  Characterization.  Argumentative.
10         THE WITNESS:  Well, again, I think it's
11  important to note that I have passed three board
12  exams.  And yeah, you can take these more than once.
13  BY MS. BARNHART:
14     Q.   So not a big deal to fail one?
15         MS. O'NEILL:  Same objection.
16         THE WITNESS:  I don't really agree with --
17  you're saying it's not a big deal; but, again, you
18  have opportunities to take these exams multiple
19  times if needed, which many very high-quality and
20  respected psychiatrists have done.
21  BY MS. BARNHART:
22     Q.   How many times have you taken the forensic
23  psychiatry board exam?
24     A.   I recall taking it the one time.
25     Q.   And you haven't tried again?

CONFIDENTIAL

Page 59

1      A.   I don't recall taking it again.
2      Q.   Do you have any intent to try again?
3          MS. O'NEILL:  Objection.  Speculation.
4          THE WITNESS:  I really probably don't have
5  intention to take it again.  I guess I might.  But I
6  don't really have plans as of now to take it again.
7  BY MS. BARNHART:
8      Q.   So despite having the opportunity to take
9  that exam multiple times if needed, you chose not to
10  take it again after failing; correct?
11         MS. O'NEILL:  Objection.  Form.
12         THE WITNESS:  I don't do much forensic work
13  and I don't really find much utility for it, and it
14  also costs a lot of money to be board certified and
15  continue to renew these certifications.
16  BY MS. BARNHART:
17     Q.   What is forensic psychiatry?
18     A.   You're asking for a definition of forensic
19  psychiatry?
20         Well, I think to completely and accurately
21  answer that question that it would be worth
22  searching the term; but it's my understanding that
23  forensic is a Greek term meaning of an open forum,
24  and it's the idea of performing psychiatric
25  evaluations in a nonclinical capacity that are often

CONFIDENTIAL

Page 60

1  for the court system.
2          It also involves potentially the treatment
3  of individuals who are in a -- incarcerated-type
4  environment.
5      Q.   And you can't -- sitting here today, having
6  completed a forensic psychiatry fellowship, you
7  can't completely and accurately define forensic
8  psychiatry without googling it?
9          MS. O'NEILL:  Objection.  Form.
10  Argumentative.
11         THE WITNESS:  I think for most definitions,
12  it would be helpful to be able to reference an exact
13  definition, but I think I answered it clearly.
14  BY MS. BARNHART:
15     Q.   As -- do forensic psychiatrists seek to
16  understand legal causes of a given mental -- or --
17  yeah, of a given mental health outcome?
18     A.   "Legal causes of a given mental health
19  outcome."
20         MS. O'NEILL:  I'll object to form.
21         THE WITNESS:  I think that's -- can you
22  rephrase that question.
23  BY MS. BARNHART:
24     Q.   No.  Can you answer the question?
25         Do forensic psychiatrists seek to

CONFIDENTIAL

Page 61

1  understand legal causes of a given mental health
2  outcome?
3      A.   "Legal causes."  I don't know if I would
4  accurately be able to answer that.  I find that a
5  confusing question.
6      Q.   What's confusing about it?
7      A.   Seek a -- can you repeat it for me one more
8  time, please.
9      Q.   Do forensic psychiatrists seek to
10  understand legal causes of a given mental health
11  outcome?
12     A.   Do forensic psychiatrists seek to
13  understand a legal explanation?
14     Q.   Legal cause, Dr. Zicherman.
15         Do forensic psychiatrists seek to
16  understand legal causes of a given mental health
17  condition?
18     A.   I think that you can say that's part of
19  what goes into forensic psychiatry.
20     Q.   But you don't do much of that, if any;
21  correct?
22         MS. O'NEILL:  Object to form.
23         THE WITNESS:  I do not engage in much
24  forensic psychiatry.
25  ///

CONFIDENTIAL

Page 62

```
 1   BY MS. BARNHART:
 2      Q.   Let's talk about your role at Stanford.
 3           You first joined Stanford in November 2019;
 4   correct?
 5      A.   What was the exact date you mentioned?
 6      Q.   November 2019.
 7      A.   Yes, that's correct.
 8      Q.   Your first position was as a clinical
 9   assistant professor; correct?
10      A.   Correct.
11      Q.   Was that a full-time position?
12      A.   That would be considered a full-time
13   position.
14      Q.   How many hours a week -- how many hours per
15   week did you work as a clinical assistant professor
16   at Stanford?
17      A.   I think the expectation is that it would be
18   roughly 36 clinic-facing hours a week, but my work
19   responsibilities certainly exceeded that.
20      Q.   How did you come to be employed at
21   Stanford?
22      A.   After finishing my final fellowship, I was
23   searching for employment.  And I wanted to work in
24   the space of youth with addictions, and there was an
25   open position advertised at Stanford that was the
```

CONFIDENTIAL

Page 63

```
 1   exact fit I was looking for.
 2      Q.   So there was an existing -- did the youth
 3   recovery clinic exist when you applied to work at
 4   Stanford?
 5      A.   It did not.
 6      Q.   So what was the open position that you
 7   applied for?
 8      A.   Well, yeah, I would have to reference the
 9   exact recruitment packet that existed at the time.
10           To my recollection, the job was looking for
11   someone to establish a youth addiction clinic.
12      Q.   Did you work at any clinic other than the
13   youth recovery clinic during your time at Stanford?
14      A.   You're talking about through Stanford or
15   outside of Stanford?
16      Q.   Through Stanford.
17      A.   I have done some work for other smaller
18   clinical entities.  But almost all my work has been
19   with the recovery clinic.
20      Q.   Who hired you for the role at Stanford?
21      A.   Who hired me for the role at Stanford?  I
22   don't know who exactly made a final decision.
23      Q.   Who was your supervisor at Stanford when
24   you first joined?
25      A.   When I first joined, I'd say I technically
```

CONFIDENTIAL

Page 64

```
 1   had two supervisors:  Antonio Hardan and Anna
 2   Lembke.
 3      Q.   Did you know Dr. Lembke before you applied
 4   to work at Stanford?
 5      A.   I believe I had some limited interaction
 6   with her when I was in addiction psychiatry
 7   training.
 8      Q.   Had you read any of her -- any of her
 9   publications before applying to work with her at
10   Stanford?
11      A.   I don't recall whether I read her
12   publications prior to or after I started working at
13   Stanford.
14      Q.   And so when you first joined Stanford, what
15   was the name of the clinic you were working in with
16   Dr. Lembke?
17      A.   When I first joined Stanford?  So I didn't
18   work with her in the clinic.  I didn't -- it was
19   just me.
20      Q.   And by "in the clinic," you mean the youth
21   recovery clinic?
22      A.   Yes.
23      Q.   Okay.  So it was just you from the
24   beginning of that clinic?
25      A.   Correct.
```

CONFIDENTIAL

Page 65

```
 1      Q.   I noticed your CV said you didn't become
 2   director of that clinic until July 2023; is that
 3   right?
 4      A.   That's correct.
 5      Q.   Was there a director before you became the
 6   director?
 7      A.   There was not a director.
 8      Q.   Okay.  So you describe Dr. Lembke as your
 9   supervisor.  How did she supervise you?
10      A.   Well, I would say she technically might be
11   a supervisor as far as someone over me or leading
12   the grant initiative.  Maybe that would be the most
13   appropriate way to answer.  She's the director of
14   the grant initiative that I was hired through.
15           But between her and Antonio Hardan, who is
16   really my direct superior as the division chief of
17   the child and adolescent psychiatry department, I
18   was seeing patients independently as a, you know,
19   licensed, practicing psychiatrist with the title of
20   clinical assistant professor when I was hired.
21      Q.   Would you say that Dr. Lembke influenced
22   your views on addiction?
23           MS. O'NEILL:  Objection.  Form.
24           THE WITNESS:  Yeah, I have read some of her
25   writings, but that is among many materials that I've
```

CONFIDENTIAL

Page 66

1  reviewed over the years that has led to my opinion
2  being formed, which, of course, is also primarily
3  informed by my direct treatment of patients.
4  BY MS. BARNHART:
5      Q.  Do you think highly of Dr. Lembke?
6      A.  I do.
7      Q.  Are you aware that Dr. Lembke is also a
8  paid plaintiffs' expert in this litigation?
9      A.  I'm aware that she's involved in
10  litigation.  I don't really know the extent of what
11  that involves beyond that.
12      Q.  So you don't have any awareness that she's
13  being paid to do exactly what you're doing in this
14  case, serve as an expert witness?
15      MS. O'NEILL:  Objection.  Form.  Asked and
16  answered.
17      THE WITNESS:  I am not aware of payment
18  structures or how she is involved with specific
19  lawsuits involving this.
20  BY MS. BARNHART:
21      Q.  You understand there's a number of lawsuits
22  concerning the same subject matter as the one you've
23  been retained for; right?
24      A.  I do understand there are other lawsuits.
25      Q.  Okay.  Are you aware that Dr. Lembke has

CONFIDENTIAL

Page 67

1  been retained as an expert in every single other
2  lawsuit concerning the same subject matter other
3  than the one you've been retained for?
4      MS. O'NEILL:  Objection.  Form.
5  Foundation.
6      THE WITNESS:  I was not aware of that.
7  BY MS. BARNHART:
8      Q.  Do you have any understanding for why
9  Dr. Lembke is not serving as an expert witness in
10  this litigation?
11      MS. O'NEILL:  Objection.  Form.  Outside
12  the scope.
13      THE WITNESS:  I do not have an
14  understanding.
15  BY MS. BARNHART:
16      Q.  Do you understand that the AG plaintiffs
17  sought to retain Dr. Lembke and came to you as a
18  backup option?
19      MS. O'NEILL:  Objection.  Form.
20  Argumentative.  Outside the scope.
21      THE WITNESS:  I don't know those details.
22  BY MS. BARNHART:
23      Q.  Have you spoken to Dr. Lembke at all about
24  this case or the subject matter of this case?
25      A.  I have not had substantive discussions

CONFIDENTIAL

Page 68

1  about this case with Dr. Lembke.
2      Q.  Have you ever discussed the subject of
3  social media addiction with Dr. Lembke?
4      A.  I have discussed the idea of social media
5  addiction with Dr. Lembke.
6      Q.  When was the last time you talked about
7  social media addiction with Dr. Lembke?
8      A.  I don't recall exactly.  Maybe a few months
9  ago.
10      Q.  What was the nature of that discussion?
11      A.  I really couldn't tell you.  I can't recall
12  exactly what we might have discussed.
13      Q.  Have you ever disagreed with anything
14  Dr. Lembke has said about the concept of social
15  media addiction?
16      MS. O'NEILL:  Objection.  Form.
17      THE WITNESS:  I don't recall if she has
18  said anything I would particularly object to.
19  BY MS. BARNHART:
20      Q.  You've not read the expert reports that she
21  submitted in this general litigation, have you?
22      A.  I have not.
23      Q.  You said you haven't had substantive
24  discussions with Dr. Lembke about this case.  What
25  other discussions -- nonsubstantive discussions have

CONFIDENTIAL

Page 69

1  you had with Dr. Lembke?
2      A.  Nonsubstantive discussions?
3      Q.  Well, I asked you earlier have you talked
4  to Dr. Lembke at all about this case?  And you said
5  you have not had substantive discussions about this
6  case.
7      I'm asking have you had nonsubstantive
8  discussions about the case with Dr. Lembke?
9      A.  What would be a nonsubstantive discussion?
10      Q.  Well, you tell me.  You were the one that
11  used the word "substantive."
12      Have you had any discussions at all with
13  Dr. Lembke about this case?
14      A.  I would say I have not had discussions with
15  her about details of this case.
16      Q.  Is she aware that you're an expert in this
17  case?  Have you told her that?
18      MS. O'NEILL:  Objection.  Foundation.
19      THE WITNESS:  She might be aware.  I'm not
20  sure all the details that she's aware of.
21  BY MS. BARNHART:
22      Q.  Have you told her that you're an expert in
23  this case?
24      A.  I believe she -- I really -- I'm not sure
25  of what she knows, to be honest.

CONFIDENTIAL

Page 70

1    Q.   I'm not asking you what she knows; I'm
2  asking you have you told her that you're an expert
3  in this case?
4    A.   I don't recall my conversations exactly
5  that I've had with her about that.  You know, I'm
6  aware that we both have depositions involved with
7  cases on similar dates, but that's really the extent
8  of what I am aware of.
9    Q.   So you're aware she's being deposed right
10 now about this subject matter?
11   MS. O'NEILL:  Objection.  Form.
12   THE WITNESS:  I don't really know what the
13 case is or really what her positions are on this
14 entirely or what she's being asked to discuss during
15 her deposition.
16 BY MS. BARNHART:
17   Q.   So how did you become aware that you both
18 have depositions involved with cases on similar
19 days?
20   A.   I do meet with her with some frequency.
21   Q.   How frequent do you meet with Dr. Lembke --
22 or frequently do you meet with Dr. Lembke?
23   A.   We have official meetings typically once a
24 month, but we do break for the summer typically.
25   Q.   What do you discuss at these official

CONFIDENTIAL

Page 71

1  meetings?
2    A.   It's usually details about how the clinic
3  operations are running.  We talk about the grant
4  that I was hired through.  If I feel like I need any
5  additional support, we talk about the research that
6  we are attempting to engage in through the recovery
7  clinic.
8        Those are topics that we typically engage
9  in.  It's not very didactic, though.  We don't
10 typically discuss our thoughts on, you know, social
11 media during those sessions.
12   Q.   Do you take any notes of those meetings?
13   A.   I typically do not take notes during those
14 meetings.
15   Q.   Do you sometimes take notes at those
16 meetings?
17   A.   I don't recall taking notes during those
18 meetings.
19   Q.   Okay.  And you also discuss your deposition
20 schedules during these meetings; is that right?
21   MS. O'NEILL:  Objection.
22 Mischaracterization.
23   THE WITNESS:  I don't know what her exact
24 schedule is.
25 ///

CONFIDENTIAL

Page 72

1  BY MS. BARNHART:
2    Q.   But the fact that she was being deposed and
3  that you were being deposed came up at one of these
4  meetings; right?
5    A.   That -- sure.  That did come up.
6    Q.   As of October 2024, your current position
7  at Stanford is clinical associate professor;
8  correct?
9    A.   That is correct.
10   Q.   Is that a full-time position?
11   A.   That is considered a full-time position.
12   Q.   And, again, with the -- is it the same
13 expectation of 36 clinic hours per week?
14   A.   I think expectations have shifted somewhat.
15 I have my own patient panel.  I have a lot of
16 responsibilities for supervising other child and
17 adolescent psychiatry fellows, psychology trainees,
18 addiction medicine fellows.
19      We are trying to establish a research
20 component of the recovery clinic, which takes time.
21      So I have several responsibilities, not all
22 fully clinical; but the majority of my work is
23 clinical and directly seeing patients.
24   Q.   So if not 36, how many clinic hours per
25 week do you have?

CONFIDENTIAL

Page 73

1    A.   It's -- it could be in the 30s, but it
2  could also be a little bit lower at times as well,
3  perhaps in the mid 20 hours of actual patient time.
4        There is some fluctuation, though.
5    Q.   Just so I'm clear, this -- the Stanford
6  recovery clinic was started -- let me start over.
7        The Stanford youth recovery clinic was
8  started in 2019; is that right?
9    A.   Correct.
10   Q.   And you became the director in 2023;
11 correct?
12   A.   Correct.
13       (Exhibit 7 was marked for
14       identification and is attached to the
15       transcript.)
16   MS. BARNHART:  Let's mark Tab 21.
17 BY MS. BARNHART:
18   Q.   I'll hand you what's been marked as
19 Exhibit 7.
20   MS. O'NEILL:  Do we have any copies?
21   MS. BARNHART:  Yes.
22   MS. O'NEILL:  Thank you.
23 BY MS. BARNHART:
24   Q.   Dr. Zicherman, this is a copy of the
25 webpage for the Stanford youth recovery clinic;

CONFIDENTIAL

Page 74

1  correct?
2      A.   That appears to be the case.
3      Q.   You're listed as the sole faculty of the
4  clinic; is that right?
5      A.   Correct.
6      Q.   The only specific behavioral addiction
7  referenced on this webpage is video game addictions;
8  correct?
9          MS. O'NEILL:  Objection.  Form.
10         THE WITNESS:  It does say video game
11 addictions are among the many behavioral addictions
12 treated in the clinic.
13         I would like to get this changed.  It is
14 not easy to get a website changed through Stanford,
15 though.
16 BY MS. BARNHART:
17     Q.   There's no mention of social media
18 addiction on this website; correct?
19     A.   There's no specific mention to the words
20 "social media addiction" on the website.
21     Q.   Okay.
22     A.   Yeah, I would reference that that
23 absolutely falls within the other behavioral
24 additions treated, though.
25     Q.   Right.  All I'm asking you is how you

CONFIDENTIAL

Page 75

1  advertise and describe the recovery clinic.
2          You do not list social media addictions on
3  this web page; correct?
4          MS. O'NEILL:  Objection.  Form.
5          THE WITNESS:  Well, I don't really
6  advertise much.  Patients find us pretty readily.
7  BY MS. BARNHART:
8      Q.   Did you -- are you going to answer my
9  question?
10         You do not list social media addictions on
11 this web page; correct?
12     A.   The specific term "social media addiction"
13 are not on the website currently.  That will change
14 in the future.  And it's not easy to change the
15 website.  I don't have control over the website.
16     Q.   You are listed as the sole -- sorry.  I
17 already asked you that, but -- so you're listed as
18 the sole faculty member.
19         Are you, in fact, the sole faculty member
20 of this recovery clinic?
21     A.   It depends on your designation of faculty.
22 I do work closely with another therapist who's an
23 LCSW who was recently hired to the clinic and works,
24 often directly, with the other patients in the --
25 with the patients in the recovery clinic.

CONFIDENTIAL

Page 76

1      Q.   Who is that therapist?
2      A.   His name is Garret Forshee.
3          And there was a therapist before him that I
4  also worked with closely.
5      Q.   Who was that therapist?
6      A.   Her name was Karen Parsons.
7      Q.   Neither of those individuals is a medical
8  doctor; correct?
9      A.   They are not medical doctors.
10         MS. BARNHART:  If you click on your name on
11 Exhibit 7, it takes you to your Stanford profile,
12 which we'll mark as Exhibit 8.
13         (Exhibit 8 was marked for
14         identification and is attached to the
15         transcript.)
16 BY MS. BARNHART:
17     Q.   Is this a true and correct copy of your
18 Stanford web bio?
19     A.   I haven't looked at this in a long time.
20 It looks on a glance to be correct to my knowledge.
21     Q.   Your Stanford web profile does not list any
22 specialty in social media addiction; correct?
23     A.   It lists my board certification and
24 specialty in addiction psychiatry.
25         If you're asking do the words "social

CONFIDENTIAL

Page 77

1  media" exist on this profile, they do not.
2      Q.   And that is what I was asking.  So let's
3  focus on what I'm asking.
4          There's only one publication listed on your
5  Stanford web profile; correct?
6      A.   That appears to be correct.
7      Q.   Is this the only publication you've ever
8  published in your career?
9      A.   There have been others.
10     Q.   How many others?
11     A.   To my knowledge, there are, I believe, two
12 other publications that I can recall.
13     Q.   Your Stanford web profile does not list any
14 publications about social media addiction or social
15 media in general; correct?
16         MS. O'NEILL:  Objection.  Form.
17         THE WITNESS:  It does not list any
18 publications about social media addiction.
19 BY MS. BARNHART:
20     Q.   And the publication that is listed is a
21 vaping toolkit; is that right?
22     A.   Correct.
23     Q.   So that -- am I correct in understanding
24 this is not an empirical research study?
25     A.   Technically, this is a publication; but it

CONFIDENTIAL

Page 78

1  is more intended as an online dynamic toolkit.
2     Q.   So no, it is not an empirical research
3  study?
4     A.   It is based on empirical research, but it's
5  not an empirical research study.
6     Q.   Was this online dynamic toolkit
7  peer-reviewed?
8     A.   I don't believe -- sorry.  I don't recall
9  the exact peer review process that the toolkit
10  undertook.
11     Q.   So you don't know one way or the other
12  whether this toolkit underwent peer review?
13     A.   I don't recall the peer review process.
14     Q.   The first author listed on this toolkit is
15  Bonnie Halpern-Felsher; correct?
16     A.   Correct.
17     Q.   Who is that?
18     A.   She is a research focus PhD, I believe, in
19  psychology; but I could be wrong about that.  But
20  she is in charge of a lab at Stanford within the
21  adolescent medicine division, and a lot of her work
22  is focused on vaping.
23     Q.   She's also a paid plaintiffs' expert in
24  this litigation; correct?
25          MS. O'NEILL:  Objection.  Foundation.

CONFIDENTIAL

Page 79

1          THE WITNESS:  I am not aware of that.
2  BY MS. BARNHART:
3     Q.   She's never told that -- she's never told
4  you that she's working with the plaintiffs' lawyers
5  in this litigation?
6     A.   She -- I have not been informed of that.
7     Q.   Are you aware that she's served as an
8  expert witness in other litigation?
9     A.   I am aware she has served as an expert
10  witness in litigation.
11     Q.   Okay.  Do you collaborate with
12  Dr. Halpern-Felsher frequently?
13          MS. O'NEILL:  Objection.  Form.
14          THE WITNESS:  We did.  I had some funding
15  to work with her lab several years ago, but that
16  funding I don't believe existed in 2024.
17          But I will be collaborating with her, I
18  believe, on this toolkit again starting in
19  September.  That is my understanding.
20          I have not had much interaction with Bonnie
21  over the past -- Dr. Halpern-Felsher for the past
22  one to two years.
23  BY MS. BARNHART:
24     Q.   Have you ever discussed the subject of
25  social media addiction with Dr. Halpern-Felsher?

CONFIDENTIAL

Page 80

1     A.   I don't recall discussing the topic.
2     Q.   All right.  You can put that to the side.
3          Dr. Zicherman, you understand that your
4  employer, Stanford, requires disclosure of expert
5  witness work in litigation; correct?
6     A.   I am not aware of the technicalities of
7  what they require.
8     Q.   Have you disclosed your work as an expert
9  witness in this litigation to Stanford?
10     A.   I would have to review what I have
11  disclosed or not disclosed.  I cannot recall at this
12  time.
13     Q.   Sitting here today, you do not know one way
14  or the other whether you've disclosed this potential
15  conflict of interest to Stanford?
16          MS. O'NEILL:  Objection.  Asked and
17  answered.
18          THE WITNESS:  I believe I've answered the
19  question.  I would have to refresh my memory and see
20  if I -- you know, what I have disclosed.
21  BY MS. BARNHART:
22     Q.   Will you agree to do that on the next
23  break?
24     A.   That could take some time.  I'm not even --
25  I would have to familiarize myself with the

CONFIDENTIAL

Page 81

1  mechanisms that I would have to research and log in
2  to figure out what exactly I would need to search
3  for.
4          I guess I'm a little confused of this line
5  of questioning, to be honest, and what exactly
6  you're asking me to do as far as disclosure to
7  Stanford.
8     Q.   Well, I think if you had disclosed this as
9  a potential conflict of interest to Stanford, you'd
10  probably have a little bit better idea of what I'm
11  talking about; right?
12          MS. O'NEILL:  Objection.  Form.
13  Argumentative.
14          THE WITNESS:  I don't see where the
15  conflict of interest is.
16          MS. BARNHART:  All right.  Let's -- Tab 4.
17          (Exhibit 9 was marked for
18          identification and is attached to the
19          transcript.)
20  BY MS. BARNHART:
21     Q.   We'll show you what's been marked as
22  Exhibit 9, which is a web page from the Stanford
23  University conflict of interest website.
24          Have you ever visited the conflict of
25  interest website, Dr. Zicherman?

CONFIDENTIAL

Page 82

1   A.   I probably have.
2   Q.   Are you aware that it is required of you as
3   an employee at Stanford to disclose any potential
4   conflicts of interest to the university?
5        MS. O'NEILL:   Objection.  Form.
6        THE WITNESS:   I do have an understanding of
7   that.
8   BY MS. BARNHART:
9   Q.   Okay.  What is your understanding of those
10  requirements?
11  A.   I would have to look very closely and
12  carefully at this document, I think, to accurately
13  answer that question.
14  Q.   So you do not have an understanding outside
15  of the document that I just handed you?
16       MS. O'NEILL:   Objection.
17  Mischaracterization.
18       THE WITNESS:   Well, this seems very
19  technical.  And I think to fully answer that
20  question, I would want to carefully review this
21  document.
22  BY MS. BARNHART:
23  Q.   Does that mean you have not carefully
24  reviewed this document before today?
25       MS. O'NEILL:   Same objection.

CONFIDENTIAL

Page 83

1        THE WITNESS:   Like I said, I have
2   encountered this before; but I would need to fully
3   refamiliarize myself with this.
4   BY MS. BARNHART:
5   Q.   All right.  Well, let me direct you to the
6   question -- this is a frequently asked questions web
7   page of the Stanford conflict of interest website;
8   correct?
9   A.   That appears to be correct.
10  Q.   If you look at the third frequently asked
11  question, this question says:
12           "I am occasionally asked to serve
13       as an expert witness in legal
14       proceedings and am compensated for that
15       service."
16       Do you see that?
17  A.   I do see that.
18  Q.   And am I correct that you are serving as an
19  expert witness in legal proceedings and you're
20  compensated for that service?
21  A.   That is correct.
22  Q.   So this frequently asked question applies
23  directly to you; correct?
24       MS. O'NEILL:   Objection.  Form.
25       THE WITNESS:   That is a question I would

CONFIDENTIAL

Page 84

1   have to see if this is in reference to a clinical
2   professor or someone who is not on a clinical line
3   of work at Stanford.
4        It may or may not specifically apply to me
5   in this case.
6   BY MS. BARNHART:
7   Q.   So you think the rules don't apply to you
8   because you're a clinical professor?
9        MS. O'NEILL:   Objection.  Form.
10       THE WITNESS:   Well, there are different
11  rules governing different lines of employment at
12  Stanford.
13  BY MS. BARNHART:
14  Q.   Why would conflict of interest rules that
15  apply to all Stanford University employees not apply
16  to you as a clinical professor?
17       MS. O'NEILL:   Objection.  Form.
18       THE WITNESS:   There just might be some
19  different technicalities and rules governing this.
20  BY MS. BARNHART:
21  Q.   Okay.  But you don't know that; right?
22  You're just speculating?
23       MS. O'NEILL:   Objection.  Form.
24       THE WITNESS:   You know, I would need to
25  carefully review this in its entirety.

CONFIDENTIAL

Page 85

1   BY MS. BARNHART:
2   Q.   Can you answer my question?
3        You're just speculating that these rules
4   might not apply to you; correct?
5        MS. O'NEILL:   Same objection.
6        THE WITNESS:   I think I'm asking a fair
7   question.
8   BY MS. BARNHART:
9   Q.   You're not here to ask questions,
10  Dr. Zicherman; you're here to answer them.
11       So my question is do you know for certain
12  whether or not these rules apply to you?
13  A.   I think I -- I believe I answered that
14  question to the best of my abilities.
15  Q.   Which is "I don't know"; correct?
16  A.   I would need to, again, review this
17  carefully to fully and accurately answer that
18  question.
19  Q.   All right.  Well, I'm trying to review it
20  carefully with you.  And if you look at the
21  frequently asked question that I just directed to
22  you, the question asks:
23           "Does serving as an expert witness
24       in legal proceedings and being
25       compensated for that service count as

Page 86

1        consulting?"
2            Do you see that question?
3    A.    I do see that.
4    Q.    And the answer is:
5            "Since service as an expert
6        witness does take time away from your
7        primary responsibilities as a Stanford
8        faculty member, if that service is
9        compensated, the time devoted should be
10       considered and reported as outside
11       consulting."
12           Do you see that?
13   A.    I do see that.
14   Q.    (Reading):
15           "If the service is not
16       compensated, it may fall under the
17       definition of pro bono public service
18       and therefore not qualify."
19           Do you see that?
20   A.    I do see that.
21   Q.    And your service is compensated.  We
22   established that; correct?
23   A.    Correct.
24   Q.    Okay.  So because your service is
25   compensated, this web page clearly states the time

Page 87

1    devoted to your expert witness work should be
2    considered and reported as outside consulting.
3            MS. O'NEILL:  Objection.  Form.
4    BY MS. BARNHART:
5    Q.    Do you see that?
6    A.    There's a caveat also that I am
7    full-time -- technically full-time.  I am 0.9 FTE.
8    And, again, there are different rules that govern
9    being a clinical professor versus someone who is on
10   a more research or research hybrid line of work.
11           If you are less than 0.9 FTE, which is
12   still considered full-time when I'm 0.9 FTE, you are
13   allowed to do outside work and be compensated for
14   it.
15           So, again, that is why I'm asking -- this
16   document, everything in it, it might not entirely
17   refer to me.  It would have to be clarified exactly
18   what kind of employee this is specifically aimed at,
19   and there are different rules governing different
20   kinds of employees.
21   Q.    I don't think you understand the gravity of
22   the situation, Dr. Zicherman.  I'm not saying --
23   neither is this document saying -- that you're
24   prohibited from doing outside work and being
25   compensated for it.

Page 88

1            This document is saying that you have to
2    disclose that as a potential conflict to Stanford
3    University.
4            Do you understand that?  You understand
5    that concept?  Conflicts of interest --
6            MS. O'NEILL:  Objection.  Form.
7            THE WITNESS:  I understand what you're
8    saying.
9    BY MS. BARNHART:
10   Q.    Okay.  And so what you just said is
11   entirely unresponsive to that point.
12           Is it your testimony today that, simply
13   because you're a clinical professor, you do not have
14   to disclose potential conflicts of interest?
15           MS. O'NEILL:  Objection.  Form.
16   Mischaracterizes his testimony.
17           THE WITNESS:  I think there could be
18   nuances there.  And, again, I would have to fully
19   review and -- this document and figure out if what
20   you have provided to me is relevant to me or
21   someone who is not on my employment line.
22   BY MS. BARNHART:
23   Q.    You don't know that, sitting here today,
24   whether or not these rules apply to you?
25   A.    I think you're asking a complicated

Page 89

1    question, and I would need to take some time to
2    review and answer appropriately.
3    Q.    It's really not complicated, Dr. Zicherman.
4            I'm asking you did you or did you not
5    disclose your expert witness work as a potential
6    conflict of interest to your employer, as you were
7    required to do?
8            MS. O'NEILL:  Objection.  Form.
9            THE WITNESS:  And I will again answer what
10   you were saying is a requirement, I'm saying I don't
11   know if that is actually correct.
12   BY MS. BARNHART:
13   Q.    All right.  Let's break it down.
14           You do not know if you are required to
15   disclose your expert witness work; fair?
16           That's what you just said.
17   A.    Again, I think to fully and accurately
18   answer that, I would need to consult with Stanford
19   and also see what I have or have not disclosed.
20   Q.    Dr. Zicherman, I'm not asking you to go
21   figure it out now that I've raised this for you.
22           I'm asking you do you know, sitting in this
23   chair today, are you required to disclose conflicts
24   of interest such as your work as an expert witness
25   in this litigation?

CONFIDENTIAL

Page 90

1      MS. O'NEILL:  Objection.  Form.
2  Foundation.
3      THE WITNESS:  And based on reviewing this,
4  my answer would be technically I'm not sure.  I
5  would have to consult with Stanford to ask their
6  opinion on this.
7  BY MS. BARNHART:
8      Q.  Okay.  So you're not sure.  That's all I
9  was asking for.
10     You don't know one way or the other?  You
11  haven't considered doing this because you don't know
12  if these rules apply to you?
13     MS. O'NEILL:  Objection.  Form.
14  Mischaracterization.
15     THE WITNESS:  Again, I think there are
16  technicalities at play here, and I think it's really
17  almost impossible to answer your question accurately
18  without understanding all these technicalities and
19  whether these apply to me as a clinical associate
20  professor.
21  BY MS. BARNHART:
22     Q.  And you do not know, sitting here today,
23  that you have actually disclosed your work as an
24  expert witness in litigation pursuant to this
25  policy?

CONFIDENTIAL

Page 91

1      A.  I can't recall if I have disclosed it or
2  not.
3      MS. BARNHART:  Okay.  We're going to take a
4  break, and I'd like you to investigate that question
5  further for us.  Okay?
6      So we can go off the record.
7      MS. O'NEILL:  And I'll just say I don't
8  think there's a duty for him to do that.
9      THE VIDEOGRAPHER:  Stand by.
10     The time is 10:56 a.m.  We're going off the
11  record.
12     (Recess taken.)
13     THE VIDEOGRAPHER:  The time is 11:21 a.m.,
14  and we are back on the record.
15  BY MS. BARNHART:
16     Q.  Okay.  Dr. Zicherman, we've taken a pretty
17  lengthy break.
18     Were you able to look into the question of
19  whether or not you have disclosed your work as an
20  expert witness in this litigation to Stanford?
21     MS. O'NEILL:  And I'm just going to note
22  that he's not under an obligation to do research.
23     THE WITNESS:  Well, I've thought about the
24  question more.  I'm not logging into any system
25  today, though, to determine whether or not I have

CONFIDENTIAL

Page 92

1  reported that information or not.
2  BY MS. BARNHART:
3      Q.  Why not?
4      A.  Well, that would involve knowing logins,
5  using a personal computer that has secure
6  information on it.  I would not feel comfortable
7  doing that.
8      Q.  Okay.  You're not interested in knowing
9  whether or not you're in breach of Stanford's
10  conflicts policies?
11     MS. O'NEILL:  Objection.  Form.
12  Mischaracterization.
13     THE WITNESS:  Well, I will comply with
14  whatever I need to with Stanford.  I believe you
15  sent me an -- a snapshot of an FAQ document.  I
16  would want to review that and the rest of the
17  website clearly, consult with who I need to at
18  Stanford, and understand if I need to disclose
19  this -- this annually, which is what it says in the
20  FAQ, that there's annual disclosure of financial
21  interests.
22     And when this annual date might be, I only
23  just recently began being compensated.
24  BY MS. BARNHART:
25     Q.  So are you suggesting you have not made any

CONFIDENTIAL

Page 93

1  disclosures so far, and it's just a question of
2  whether you need to do it?
3      A.  I can't recall, to be honest.  I would have
4  to log into the system.  But if I have to, and I
5  have not, then I am not opposed to doing that.
6      Q.  Is it still your position that these rules
7  don't apply to you because you're a clinical
8  educator?
9      MS. O'NEILL:  Objection.  Form.
10  Mischaracterizes his testimony.
11     THE WITNESS:  I would have to review all
12  the documents relating to the OPAC website carefully
13  to see which ones are in relation to me versus
14  someone who was hired under a different pathway.
15     (Exhibits 10 and 11 were marked for
16        identification and are attached to the
17        transcript.)
18  BY MS. BARNHART:
19     Q.  All right.  I'm handing you what's been
20  marked as Exhibits 10 and 11.
21     These are excerpts of the school of --
22  Stanford School of Medicine Faculty Handbook.
23  Exhibit 10 is Section 3.3.E [sic] of the Stanford
24  School of Medicine Faculty Handbook, and Exhibit 11
25  is Section 3.7.D [sic] of the Stanford School of

CONFIDENTIAL

Page 94

1  Medicine Faculty Handbook.
2      MS. O'NEILL:  And I'll just object that --
3  to the extent that this is not the full document but
4  just portions of the document.
5      MS. BARNHART:  These are the full sections
6  that we've printed out from the website.
7  BY MS. BARNHART:
8      Q.   Do you have any reason to dispute that,
9  Dr. Zicherman?
10     A.   I would have to go to the website myself to
11 verify.
12     Q.   And you have no reason to dispute that
13 we've clicked "print" from the website as it
14 appeared to us on our computers; right?
15     A.   I'm not sure exactly what you did.  You
16 know, I'm looking at two pages of information here.
17     Q.   Have you read and reviewed the Stanford
18 School of Medicine Faculty Handbook previously?
19     A.   I have reviewed the handbook.
20     Q.   Okay.  So Section 3.3.E is titled
21 "Specific/Supplemental Criteria for Clinical
22 Associate Professors."
23          Do you see that?
24     A.   Yes.
25     Q.   You are a clinical associate professor;

CONFIDENTIAL

Page 95

1  correct?
2      A.   I'm a clinical associate professor.
3      Q.   And that is an appointment that is in the
4  clinician educator line at Stanford School of
5  Medicine; correct?
6      A.   Correct.
7      Q.   Okay.  If you turn to Exhibit 11, this web
8  page, this section, is titled "3.7.D.  Conflicts of
9  Interest and Commitment."
10          Do you see that?
11     A.   I think you said Exhibit 11, but you're
12 referencing Exhibit 10 right now?
13     Q.   What do you have as Exhibit 10?  Sorry.
14     A.   "Conflicts of Interest and Commitment."
15     Q.   Okay.  So then I was confused.
16          Okay.  So we were just looking at
17 Exhibit 11 to confirm that you are in the clinician
18 educator line; correct?
19     A.   Correct.
20     Q.   Okay.  So now let's look at Exhibit 10.
21 This is Section 3.7.D, "Conflicts of Interest and
22 Commitment."
23          Is that right?
24     A.   Correct.
25     Q.   Okay.  And the first paragraph of this

CONFIDENTIAL

Page 96

1  section of the Stanford School of Medicine Faculty
2  Handbook states that:
3              "The Stanford University faculty
4          policy on conflicts of interest and
5          commitment and the policies pertaining
6          to consulting and other outside
7          professional activities by members of
8          the professorate apply to clinician
9          educators."
10         Do you see that?
11     A.   I do see that.
12     Q.   So do you understand that this conflicts of
13 interest policy applies to you as a clinician
14 educator?
15     MS. O'NEILL:  Objection.  Form.
16 Foundation.
17     THE WITNESS:  There also is a consideration
18 that technically I believe I am primarily employed
19 through Stanford Children's Lucile Packard Hospital.
20         So that might also lead to some differences
21 here.
22 BY MS. BARNHART:
23     Q.   Dr. Zicherman, do you know that to be true?
24         Do you know that you are exempt from the
25 Stanford University School of Medicine conflicts of

CONFIDENTIAL

Page 97

1  interest policy?
2      A.   I'm not saying I'm exempt; I would say I
3  certainly would need to review all the documents
4  relating to this thoroughly and think about this and
5  consult with anyone at Stanford that I might need
6  to.
7      Q.   And you have not yet done any of that?  You
8  have not done what you need to do to assure yourself
9  that you are exempt from this policy?
10     MS. O'NEILL:  Objection.  Form.
11     THE WITNESS:  Well, I'm not saying I'm
12 exempt from the policy.  I may have, in fact,
13 disclosed this; but it's something that I think I
14 will have to give, you know, consideration to, of
15 course.
16         I'm not opposed to disclosing my work, if
17 that is what I need to do, when I have to annually
18 submit my disclosures.
19 ***    MS. BARNHART:  Let's mark this part of the
20 transcript for nonresponsiveness.
21 BY MS. BARNHART:
22     Q.   Dr. Zicherman, I'll give you one more
23 chance here, and let's break this down.
24         Did you or did you not disclose your work
25 as an expert witness in this litigation to Stanford?

CONFIDENTIAL

Page 98

1  A.   I believe I've answered that question.

2  Q.   Then you should answer it again.

3  A.   I would have to check with the OPAC system.

4  I may or may not have.

5  Q.   So sitting here today, you cannot

6  confidently tell me under oath that you have

7  disclosed your work as an expert witness in this

8  litigation to Stanford?

9  MS. O'NEILL:  Objection.  Form.  Asked and

10  answered.

11  THE WITNESS:  In order to accurately

12  recall, I would have to look at disclosures within

13  the system.

14  BY MS. BARNHART:

15  Q.   So the answer is no, you do not, sitting

16  here today, recall disclosing your work as an expert

17  witness in this litigation to Stanford?

18  MS. O'NEILL:  Same objection.

19  THE WITNESS:  I do not recall either way

20  whether I disclosed it or did not disclose.

21  BY MS. BARNHART:

22  Q.   Okay.  And is it your testimony today that

23  you are not subject to these conflicts of interest

24  policies?

25  MS. O'NEILL:  Objection.  Form.

CONFIDENTIAL

Page 99

1  Mischaracterizes his testimony.

2  THE WITNESS:  That is not my testimony.

3  BY MS. BARNHART:

4  Q.   Is it your testimony that you are subject

5  to these conflicts of interest policies?

6  MS. O'NEILL:  Objection.  Form.

7  THE WITNESS:  My testimony is that I would

8  have to do more research to understand if I, in

9  fact, am subject to these policies.

10  BY MS. BARNHART:

11  Q.   So you do not know -- sitting here today in

12  this room under oath, you do not know whether or not

13  you are subject to these conflict of interest

14  policies?

15  MS. O'NEILL:  Objection.  Asked and

16  answered.

17  THE WITNESS:  Yeah, I feel like I'm

18  providing the same answer, but I would have to do my

19  own research, consult with individuals as necessary

20  at Stanford, to understand, you know, what has to be

21  disclosed or not disclosed.

22  BY MS. BARNHART:

23  Q.   So no, you don't know?

24  MS. O'NEILL:  Objection.  Asked and

25  answered.

CONFIDENTIAL

Page 100

1  BY MS. BARNHART:

2  Q.   Without doing that additional investigation

3  which you've refused to do on a break, you don't

4  know, sitting here today at this deposition?

5  MS. O'NEILL:  Objection.  Form.  Asked and

6  answered.

7  THE WITNESS:  I don't know in reference

8  with --

9  BY MS. BARNHART:

10  Q.   You don't know whether or not you are

11  subject to the Stanford conflict of interest

12  policies?

13  A.   I would want to provide an accurate answer.

14  And as of now, I would have to do more research and

15  consult with individuals at Stanford to understand

16  whether or not disclosures have to be made.

17  Q.   Without doing that additional research and

18  consultation, which you have not yet done, you do

19  not know, sitting here today, whether or not you're

20  subject to Stanford's conflict of interest policies?

21  MS. O'NEILL:  Objection.  Form.  Asked and

22  answered.

23  THE WITNESS:  Yeah, I have been answering

24  this question.  I'll answer it the same way.  I

25  would have to do my research and consult with

CONFIDENTIAL

Page 101

1  individuals as necessary to understand whether this

2  has to be disclosed or not disclosed.

3  ***    MS. BARNHART:  All right.  Counsel, you've

4  got to tell your witness to be responsive.  He's not

5  answering these questions.  This has been a problem

6  from minute one of the deposition.

7  This is -- you know, we're marking the

8  transcript.  We'll take it to the judge if we have

9  to, but this is not responsive testimony.

10  MS. O'NEILL:  He's answering the question

11  to the best of his ability.  And that's what he's

12  been doing consistently.  And he's giving you an

13  answer.

14  BY MS. BARNHART:

15  Q.   And I just want the record to be clear,

16  Dr. Zicherman.  You are not willing to investigate

17  today whether or not, A, you are subject to these

18  conflicts of interest policies or, B, you have

19  actually complied with them?

20  MS. O'NEILL:  And, again, I don't think

21  he's under an obligation --

22  MS. BARNHART:  You can -- the speaking

23  objections have to stop.  You can make an objection.

24  That's not an objection.

25  ///

CONFIDENTIAL

Page 102

1  BY MS. BARNHART:
2      Q.  Go ahead, Dr. Zicherman.
3      A.  This is a process that I would want to do
4  correctly.  And in order to do that, again, I would
5  want to do my own thorough research into this
6  matter, consult with individuals as necessary, and
7  determine whether or not I have already or not
8  disclosed this to the necessary individuals.
9      Q.  Okay.  So when are you going to complete
10  that process?
11      A.  I don't have a time frame at the moment.
12  I'm not sure how lengthy of a process this will be.
13      Q.  And when you do complete that process, will
14  you let us know the results of your investigation?
15      A.  I don't see any reason I would not be able
16  to do that.
17      Q.  So that's a "yes"?  You will?  That's -- if
18  I can interpret that double negative, yes, you will
19  let us know the results of your investigation?
20      A.  If Stanford is okay with me disclosing that
21  information, then I believe I wouldn't have a
22  problem with it.
23      MS. BARNHART:  Okay.  So we'll make a
24  formal request on the record for any documentation
25  of Dr. Zicherman's disclosure of a conflict of

CONFIDENTIAL

Page 103

1  interest in compliance with the Stanford conflicts
2  of interest policy.
3      MS. O'NEILL:  We may have objections to
4  that, but we can discuss that off the record.
5      MS. BARNHART:  Dr. Zicherman doesn't seem
6  to have any objection.
7  BY MS. BARNHART:
8      Q.  So do you understand that request,
9  Dr. Zicherman?
10      A.  I understand the request.
11      Q.  All right.  In addition to working at
12  Stanford, you're also the medical director for the
13  Quest Intensive Outpatient Program at El Camino
14  Health; correct?
15      A.  Correct.
16      Q.  Is that a part-time position?
17      A.  You can call it a part-time position.
18      Q.  How many hours a week do you -- how many
19  hours per week do you spend on that work?
20      A.  It could be -- it's variable.  It could be
21  anywhere -- it could be four to eight hours of work,
22  I would say.
23      Q.  You say in your report that this program at
24  El Camino Health treats people with technology
25  addictions; is that right?

CONFIDENTIAL

Page 104

1      A.  That's correct.
2      Q.  Would it surprise you that the website for
3  the Quest Intensive Outpatient Program at El Camino
4  Health does not say anything about technology
5  addiction?
6      MS. O'NEILL:  Objection.  Form.
7      THE WITNESS:  I can't recall what the
8  website mentions or does not mention.  Whether it
9  mentions it or not, it's something we certainly are
10  treating.
11  BY MS. BARNHART:
12      Q.  Okay.  In addition to your work at Stanford
13  and El Camino Health, you are also a consulting
14  psychiatrist at Alta Mira Recovery center; is that
15  right?
16      A.  Correct.
17      Q.  Is that a part-time position?
18      A.  Yeah, you can call it a part-time position.
19      Q.  How many hours per week do you spend at
20  Alta Mira?
21      A.  It could be -- I'd have to think about an
22  estimate.
23      I'd say on average maybe two to four hours.
24      Q.  And Alta Mira Recovery center is a
25  residential treatment center specializing in the

CONFIDENTIAL

Page 105

1  treatment of substance addiction disorders for
2  adults; correct?
3      A.  That's correct.
4      Q.  Okay.  You don't treat adolescents for
5  social media addiction at Alta Mira; correct?
6      A.  It is 18 and up.
7      Q.  So no services provided at all to
8  adolescents; correct?
9      A.  No.  There are no adolescent patients
10  there.
11      Q.  Are you aware that Alta Mira costs $50,000
12  a week for patients?
13      A.  I am not aware of the financial
14  considerations if someone pays out of pocket, but
15  many insurances are -- have recently been accepted
16  by Alta Mira.
17      Q.  Are you aware that Alta Mira's website
18  indicates that it does not accept any insurance?
19      A.  I'm not responsible for the website.  This
20  is also, I believe, a relatively new development.
21      Q.  Is Alta Mira owned by a venture capital
22  company?
23      A.  I am not aware of who actually owns them.
24      Q.  Would it surprise you that they're owned by
25  a venture capital company?

CONFIDENTIAL

Page 106

1      MS. O'NEILL:  Objection.  Form.
2      THE WITNESS:  Again, I don't know what to
3   expect.  I'm not entirely sure who owns Alta Mira.
4   BY MS. BARNHART:
5      Q.   Prior to moving to the Bay Area, you worked
6   as a psychiatrist at a private for-profit prison
7   company; correct?
8      A.   I did do some work for a company, yes.
9      Q.   That company was NaphCare?
10     A.   Yes.
11     Q.   You worked in Oregon and California jails
12  as part of that role; correct?
13     A.   That is correct.
14     Q.   You provided psychiatry services to
15  prisoners; is that right?
16     A.   That is correct.
17     Q.   Did you ever medicate people against their
18  consent as part of that work?
19     MS. O'NEILL:  Objection.  Form.
20     THE WITNESS:  I don't recall that.
21  BY MS. BARNHART:
22     Q.   Did you ever otherwise provide any medical
23  treatment against prisoners' consent while you
24  worked for NaphCare?
25     MS. O'NEILL:  Same objection.

CONFIDENTIAL

Page 107

1      THE WITNESS:  I don't recall providing
2   medications against consent.
3   BY MS. BARNHART:
4      Q.   Is it possible that you medicated people
5   against their consent and you just don't recall?
6      MS. O'NEILL:  Objection.  Form.
7      THE WITNESS:  Can you repeat the question.
8   BY MS. BARNHART:
9      Q.   Is it possible that you medicated people
10  against your [sic] consent, and you just don't
11  recall?
12     MS. O'NEILL:  Same objection.
13     THE WITNESS:  My recollection is that that
14  was not the case, that I did not provide any
15  medications against the will of patients there.
16  BY MS. BARNHART:
17     Q.   Did you ever testify at any hearings
18  justifying medication against anyone's consent?
19     A.   I do not believe that was a part of any
20  testimony.
21     Q.   Social media use was not permitted in the
22  prisons you worked in; correct?
23     A.   I don't recall.
24     Q.   Did you ever treat anyone for social media
25  withdrawal when you were working for NaphCare?

CONFIDENTIAL

Page 108

1      A.   I don't believe that was a focus of my work
2   with NaphCare.
3      Q.   Was it any aspect of your work at NaphCare?
4      MS. O'NEILL:  Objection.  Form.
5      THE WITNESS:  I certainly treated
6   addictions.  I don't recall, you know, technology
7   addictions being a substantial part of the work I
8   did at NaphCare.
9   BY MS. BARNHART:
10     Q.   During what time period did you work at
11  NaphCare?
12     A.   I would have to reference my CV for the
13  exact time frame.
14     Q.   Does January 2019 to January 2020 sound
15  correct?
16     A.   January 2019 to?
17     Q.   January 2020.
18     A.   That sounds roughly correct.
19     Q.   During that time period, are you aware that
20  NaphCare faced several lawsuits claiming inadequate
21  medical treatment at its facilities?
22     MS. O'NEILL:  Objection.  Foundation.
23     THE WITNESS:  I'm not aware of any lawsuits
24  that were facing NaphCare.
25  ///

CONFIDENTIAL

Page 109

1   BY MS. BARNHART:
2      Q.   Do you know whether you've been mentioned
3   in any of those lawsuits?
4      MS. O'NEILL:  Objection.  Foundation.
5      THE WITNESS:  I do not believe I have been
6   mentioned in any lawsuits.
7   BY MS. BARNHART:
8      Q.   But you don't know because you weren't
9   aware of those lawsuits; correct?
10     A.   I imagine I would have been informed if I
11  was a part of any lawsuits, and I have not been.  So
12  to my understanding, I have not been a part of --
13  mentioned in lawsuits.
14     Q.   Okay.  In your current role or roles, your
15  primary work is clinical practice; correct?
16     A.   Correct.
17     Q.   And I believe, adding up what you've told
18  me before, you spend approximately 40 to 45 hours a
19  week on clinical work across the various clinics you
20  worked in -- work in?
21     A.   That can be an estimate.  I mean, of
22  course, week to week, month to month, the work
23  changes.  But there are weeks when, sure, I'm seeing
24  maybe 40 hours of patients.
25     Q.   What would a low week be?

CONFIDENTIAL

Page 110

1    A.   A low week could be closer to the 20s.

2    Q.   How many patients did you see at the
3  Stanford recovery clinic last week?

4    A.   I don't feel comfortable answering exact
5  numbers of patients.  I think that goes into
6  specific patient information.

7         I mean, I'm happy to give estimates as far
8  as generally what I've seen over a lengthier period
9  of time.

10   Q.   It's your position that the number of
11 patients you saw last week violates HIPAA?

12   A.   Well, I'm not sure if answering a question
13 with that kind of recency would open up any sort of
14 HIPAA violations.

15   Q.   Yeah, but it wouldn't.  I can guarantee you
16 it would not.

17        So are you willing to answer my question?

18        How many patients did you see at the
19 Stanford recovery clinic last week?

20        MS. O'NEILL:  Object to the preamble.

21        THE WITNESS:  I would say that I have a
22 pretty standard template which involves four new
23 patients roughly per month -- sometimes it's more --
24 plus follow-ups.  I believe that would be consistent
25 with my work this past week.

CONFIDENTIAL

Page 111

1  BY MS. BARNHART:

2    Q.   So how many patients did you see at the
3  Stanford recovery clinic last week?

4    A.   Really, I would have to, unfortunately,
5  probably reference my clinic templates exactly, but
6  if I had to estimate -- I have to think about this.

7         You know, I hope I'm estimating this
8  accurately.  It's probably around maybe 15 to 20
9  patients.

10   Q.   Just last week you saw 15 to 20 patients?

11   A.   I think that's an accurate estimate.

12   Q.   Okay.  Of those 15 to 20 patients, how many
13 have you diagnosed with social media addiction?

14   A.   You know, I'm trying to recall, you know,
15 exactly my patient load last week.  But I would say
16 it was no different from a typical patient load,
17 where, you know, at least half of the patients I
18 work with had concerning social media use habits.

19   Q.   And are you -- do you specifically recall
20 the 15 -- the 8 to 10 patients you saw last week
21 that have, in your words, specific -- excuse me --
22 concerning social media use habits?

23   A.   I see lots of patients.  To jog my memory,
24 the only way to really do that would be to look at
25 my actual clinic template.

CONFIDENTIAL

Page 112

1    Q.   So you can't recall off the top of your
2  head the specific nature of your work with patients
3  just last week?

4         MS. O'NEILL:  Objection.  Form.  Asked and
5  answered.

6         THE WITNESS:  I would have to jog my memory
7  and look at my actual workflow from the previous
8  week.

9  BY MS. BARNHART:

10   Q.   In addition to your clinical work, do you
11 spend time on research?

12   A.   I do spend some time on research.

13   Q.   How much time per week do you spend on
14 research?

15   A.   Maybe one to three hours, if I had to
16 estimate.

17   Q.   Is all of that time spent on the
18 ScreenSense survey research?

19        MS. O'NEILL:  Objection.  Form.

20        THE WITNESS:  Not all of it.

21 BY MS. BARNHART:

22   Q.   What other research are you working on?

23   A.   Well, I might have to review a proposal for
24 a research project from a child and adolescent
25 psychiatry fellow, for instance.  Projects like that

CONFIDENTIAL

Page 113

1  come up from time to time, and I would be involved
2  in a research estimate.

3    Q.   Okay.  So that's not your research; that's
4  a research project that a fellow is working on that
5  you might review?

6    A.   Well, I would potentially be a lead
7  supervisor on a project, for instance.

8    Q.   Okay.  The only specific research project
9  you mentioned in your report is the ScreenSense
10 survey.

11        Are there any other specific projects
12 you're actively working on at the moment?

13   A.   That's the active project that I'm working
14 on at the moment.

15   Q.   Okay.  And, in fact, the ScreenSense survey
16 is not active; right?  It's currently in IRB review?

17   A.   It is currently in IRB review.

18   Q.   When did you first submit it in the IRB
19 process?

20   A.   I believe it was maybe two months ago.  It
21 might have been longer.  Actually, I believe it was
22 longer.

23   Q.   When do you think you submitted it?

24   A.   I really can't recall.  I think it was at
25 least several months ago, honestly, in thinking

Page 114

1   about it more.  But I don't know the exact date.
2       Q.   Would it surprise you that that IRB
3   approval has been pending for almost a year?
4           MS. O'NEILL:  Objection.  Form.
5           THE WITNESS:  Oh, that IRB approval has not
6   been pending for almost a year.
7   BY MS. BARNHART:
8       Q.   Your CV says, "Stanford ScreenSense study
9   currently in IRB review 2024 to present."
10          So what does that 2024 indicate?
11      A.   2024 to present?  I thought maybe it was
12  months ago.  Maybe it was even longer than that.
13  Maybe when I put 2024, we were in the process of
14  thinking about submitting to the IRB, and maybe
15  there was a delay.
16          But that is my recollection.  It could have
17  been months to maybe end of 2024.
18      Q.   Okay.  But in any event, that research
19  hasn't actually started because it cannot start
20  until the IRB approval is received; right?
21      A.   There's a lot of work that goes into
22  developing a project before it begins and before
23  it's fully approved by IRB.
24      Q.   But you've not launched the research
25  project?  You are not actively surveying anyone

Page 115

1   about ScreenSense or doing any other parts of the
2   research?
3       A.   We have not actively been able to survey
4   anyone.  We will as soon as it completes the IRB
5   process.
6       Q.   Is it possible that you might not get IRB
7   approval?
8           MS. O'NEILL:  Objection.  Form.  Calls for
9   speculation.
10          THE WITNESS:  I think that would be very
11  unlikely.
12  BY MS. BARNHART:
13      Q.   But it's possible; right?
14          MS. O'NEILL:  Same objections.
15          THE WITNESS:  Yeah, I believe that would be
16  extraordinarily unlikely that we would not get
17  approval.
18  BY MS. BARNHART:
19      Q.   Have you ever conducted empirical --
20  original empirical research?
21          MS. O'NEILL:  Objection.  Form.
22          THE WITNESS:  I have not conducted
23  empirical research.
24  BY MS. BARNHART:
25      Q.   You've never conducted functional or

Page 116

1   structural MRI research; correct?
2       A.   I have not.
3       Q.   You've never conducted research on the
4   release of dopamine in the brain; correct?
5       A.   I have not personally conducted research on
6   how dopamine works in the brain.
7       Q.   Do you know what methods are possible to --
8   let me start over.
9           Do you know what methods can be used to
10  directly measure dopamine release in the brain?
11          MS. O'NEILL:  Objection.  Form.
12          THE WITNESS:  I think you're asking very
13  neuroscience-specific questions.  I believe I have
14  an understanding of how dopamine works at a level of
15  a medical doctor who is working with patients with
16  addictions.
17          If you're asking for really detailed level
18  questions about how dopamine is measured, reference
19  someone who has a PhD in neuroscience.
20  BY MS. BARNHART:
21      Q.   And that someone is not you; correct?  You
22  do not have a PhD in neuroscience?
23      A.   I do not have a PhD in neuroscience.
24      Q.   So you do not know what methods can be used
25  to directly measure dopamine release in the brain?

Page 117

1           MS. O'NEILL:  Objection.  Form.
2   Mischaracterization.
3           THE WITNESS:  I am not familiar with the
4   methods that measure dopamine in the brain.
5   BY MS. BARNHART:
6       Q.   I believe you said just a little while ago
7   you typically see four new patients per month; is
8   that right?
9       A.   That's a rough estimate.  It can sometimes
10  be more if there's a special exception kind of
11  needed to fit into the -- my schedule more quickly.
12      Q.   In your report you say that approximately
13  25 percent of new intake requests are for technology
14  addiction; is that right?
15      A.   I believe it was 25 to 35 percent that I've
16  referenced.  I would like to look at the report to
17  make sure we are accurate.
18      Q.   All right.
19          If you want to look at Exhibit 1,
20  paragraph 13.
21      A.   Right.  So I do say that approximately 25
22  to 35 percent of my new intake requests are for
23  technology addiction concerns.
24      Q.   Okay.  And some subset of those technology
25  addiction concerns relate specifically to social

CONFIDENTIAL

Page 118

1  media; correct?

2      A.   That is correct.

3      Q.   So that's approximately one new intake

4  request per month that you evaluate for social media

5  addiction.

6      MS. O'NEILL:  Objection.  Form.

7      THE WITNESS:  That's not always the case.

8  But sure, there are times when, specifically for

9  social media addiction, there's one case that might

10  be seen per month.  It is often significantly more

11  than that.

12      And then also, you know, you have to factor

13  in the patients I see for substance use addictions

14  who often have -- and I say here at least 50 percent

15  of those individuals have concerning social media

16  use habits as well.

17      So between the patients with substance

18  addictions and the requests I get for working with

19  individuals with technology addiction concerns, it

20  is a substantial part of my practice, working with

21  patients with social media use concerns.

22      Q.   So you don't say anywhere in your report

23  that you often see significantly more than one case

24  of social media addiction per month; correct?

25      MS. O'NEILL:  Objection.  Form.

CONFIDENTIAL

Page 119

1      THE WITNESS:  Well, again, I've referenced

2  that approximately 25 to 35 percent of my new intake

3  requests are for technology addiction concerns, of

4  which most of those are for social media addiction

5  concerns.

6  BY MS. BARNHART:

7      Q.   And that would be one per month if you do

8  the math; correct?

9      A.   Sometimes it's one per month.  It is often

10  more than that.

11      Q.   It is typically one per month; correct?

12      A.   I don't believe I would say typically.

13      Q.   That's the word you used in your report.

14  You typically see four new patients per month.

15  Approximately 25 to 35 percent of those are for

16  addiction concerns; so 1.5.  And some subset of that

17  is social media; right?

18      MS. O'NEILL:  Objection.  Form.

19      THE WITNESS:  If you want to say 1.5, I

20  think that's more accurate than saying it's

21  typically 1.

22      I also would say I think these are

23  conservative estimates, and I absolutely am seeing

24  an uptake in requests to work with patients who have

25  significant social media use addiction concerns.

CONFIDENTIAL

Page 120

1  BY MS. BARNHART:

2      Q.   How did you arrive at these numbers that

3  you state in paragraph 13 of your report?

4      A.   Thinking about my clinic templates and the

5  patients that I treat.

6      Q.   So you just sat down and thought about it?

7      MS. O'NEILL:  Objection.  Form.

8      THE WITNESS:  To provide an estimate?

9  Yeah, that's essentially what I needed to do to

10  arrive at this estimate.

11  BY MS. BARNHART:

12      Q.   Did you go back and review any of your

13  clinical notes or clinical templates to determine

14  how many people you have actually treated for social

15  media addiction?

16      A.   I'm always actively reviewing my notes, and

17  I have an extensive follow-up panel who struggle to

18  actually at times find timely follow-ups because of

19  how busy I am.

20      So sure, I review my records.  And that

21  does inform, in addition to just thinking about my

22  templates, these estimates.

23      Q.   So I'm asking about, for purposes of your

24  report, did you go back and review your clinical

25  notes and your templates in order to arrive at your

CONFIDENTIAL

Page 121

1  opinions about -- that are based on your clinical

2  experience?

3      A.   My -- my opinions on this and my estimates

4  were primarily driven by knowing my clinic templates

5  and having familiarity with my patients who often

6  require very frequent follow-up.

7      Q.   Just a little while ago you couldn't even

8  tell me how many patients you treated specifically

9  for social media addiction last week; right?

10      MS. O'NEILL:  Objection.  Form.

11  Mischaracterization.

12      THE WITNESS:  I would have to jog my memory

13  to recall exactly what patients I saw last week.

14  BY MS. BARNHART:

15      Q.   And you would do that by reviewing your

16  clinical notes and templates; correct?

17      A.   Correct.

18      Q.   What is a clinical template, just so I

19  understand what that means.

20      A.   Okay.  So when I refer to template, that's

21  what they -- Stanford just refers to as your

22  schedule.

23      Q.   Okay.  So separate and apart from the

24  template, which is the schedule, you also have

25  clinical notes for each patient, I assume?

CONFIDENTIAL

Page 122

1    A.   Of course.
2    Q.   Okay.  And so we're clear, you did not
3  review or rely on any of those clinical notes that
4  you have for each patient in developing your
5  opinions in this litigation; correct?
6    A.   Well, most -- again, close recollection and
7  understanding of my patients, I can't recall exactly
8  which patients I saw last week, but I know my
9  patient panel.  And I'm able to estimate based off
10  of knowing my template -- or I should say schedule,
11  and having recollection of patients that I see often
12  very frequently.
13    Q.   That was not my question.
14        Did you review or rely on any of your
15  clinical notes that you have for every patient when
16  you developed your opinions in this litigation?
17    A.   Well, I'm always referencing notes.  It's
18  hard to separate that from -- it's hard to separate
19  that from maybe the question you're asking about
20  providing estimates, again, because I am always
21  reviewing records of my patients.
22    Q.   If you were to -- if you were to ask -- or
23  excuse me.
24        Do you have any backup -- documentary
25  backup for the claims you're making, the estimates

CONFIDENTIAL

Page 123

1  you're making, in paragraph 13 of your report?
2        MS. O'NEILL:  Objection.  Form.
3        THE WITNESS:  I'm not about to disclose
4  patient information which is in, of course, clinical
5  records.
6  BY MS. BARNHART:
7    Q.   All right.  I want you to focus on my
8  question.
9        My question is not will you give it to me;
10  my first question right now is do you have backup or
11  other evidence to support the claims that you're
12  making in paragraph 13 of your report?
13        MS. O'NEILL:  Same objection.
14        THE WITNESS:  Well, I'm not sure what you
15  mean by "backup."
16  BY MS. BARNHART:
17    Q.   Do you have any evidence to support the
18  statements that are made in paragraph 13 of your
19  report?
20    A.   Well, the evidence is being able to
21  estimate with a patient population that I know well
22  and frequently have to see for follow-ups because of
23  how sick they are.
24    Q.   So the evidence is simply your memory?
25        MS. O'NEILL:  Objection --

CONFIDENTIAL

Page 124

1  BY MS. BARNHART:
2    Q.   What's inside of your head; correct?
3        MS. O'NEILL:  Objection.  Form.
4  Mischaracterization.
5        THE WITNESS:  It's not just memory, but I
6  also said that I am reviewing my notes consistently.
7  BY MS. BARNHART:
8    Q.   Well, that's what I'm trying to understand,
9  Dr. Zicherman.  I'm trying to understand are your
10  opinions in this case based on your recall of your
11  clinical experience, or are they also based on these
12  clinical notes and other documentation that you have
13  for each patient?
14    A.   Well, it's hard to separate out the
15  clinical notes from recollection when I see patients
16  every day.
17    Q.   That's not answering my question.
18        Your opinions here, will you come to trial
19  and say, "These opinions are based on my review of
20  clinical notes and other information I have about
21  each of my patients"?
22        MS. O'NEILL:  Objection.  Form.
23        THE WITNESS:  It's fair to say clinical
24  review.  But, again, I'm mostly arriving at this
25  space off of a general knowledge of working with my

CONFIDENTIAL

Page 125

1  patients, having a consistent schedule, and working
2  with patients who are so sick that they require very
3  close and frequent follow-up.
4  BY MS. BARNHART:
5    Q.   So you are not relying on anything written
6  down when developing these opinions?
7        MS. O'NEILL:  Objection.  Form.  Asked and
8  answered.
9        THE WITNESS:  Having a consistent schedule
10  makes it so that I believe I can accurately provide
11  these -- provide solid estimates without necessarily
12  having to look at the specific notes.
13  BY MS. BARNHART:
14    Q.   Your materials considered list, which I
15  believe is Exhibit 2 that you have in front of you,
16  that materials considered list does not list any
17  clinical templates or clinical notes; correct?
18    A.   Correct.
19    Q.   And had you considered those materials in
20  developing your opinions, you would have disclosed
21  that to us on your materials considered list;
22  correct?
23    A.   I don't believe I would have disclosed
24  patient records or -- again, I think the question
25  is -- you know, this is what I'm saying.

CONFIDENTIAL

Page 126

1  I predominantly develop my opinion based
2  off of recollection of my schedule and memory of
3  working with patients I see really frequently
4  because they are so sick.
5      Q.   Is your materials considered list a
6  complete and accurate list of all of the materials
7  you considered in developing your opinions for this
8  litigation?
9      A.   I believe it to be accurate.
10     Q.   And these clinical notes and clinical
11 templates do not appear on that list; correct?
12     A.   Correct.
13     Q.   So to the extent you considered your
14 clinical notes or clinical template or relied on
15 those materials, you'll produce those to us;
16 correct?
17         MS. O'NEILL:  Objection.  Form.
18         THE WITNESS:  I'm not going to provide
19 information relating to specific patients.
20 BY MS. BARNHART:
21     Q.   Okay.  You can talk to your counsel about
22 this, but you are under an obligation as an expert
23 witness in this case to produce all of the materials
24 that you relied upon and considered in forming your
25 opinions.

CONFIDENTIAL

Page 127

1      Do you understand that obligation?
2      A.   I understand that.
3      Q.   Okay.  So because you are not going to
4  produce these clinical notes or clinical templates
5  to us, I understand from you that you did not
6  consider or rely on those materials in forming your
7  opinions.
8      Is that right?
9         MS. O'NEILL:  Objection.  Form.
10        THE WITNESS:  I certainly rely on my memory
11 of working with these patients every day.  I don't
12 need to look at my notes to recall an estimate of
13 the number of patients I'm seeing or the severity of
14 the illness that they have.
15 BY MS. BARNHART:
16     Q.   Okay.  So you don't need to look at the
17 notes to jog your memory about the patients that you
18 treated last week?
19        MS. O'NEILL:  Objection.  Form.
20        THE WITNESS:  The specific patients and
21 names?  Sure, I would need to know exactly what time
22 slot they're in.
23        But globally, again, I don't need to
24 reference clinical documents to arrive at an
25 estimate of number of patients I've seen or severity

CONFIDENTIAL

Page 128

1  of the cases.
2  BY MS. BARNHART:
3      Q.   What is the total number of patients you
4  have seen and diagnosed with social media addiction
5  during your time at Stanford?
6      A.   Well, I think it's fair to extrapolate what
7  I've stated in the report over the course of several
8  years.
9      Q.   Dr. Zicherman, I'll try again.
10     What is the total number of patients you
11 have seen and diagnosed with social media addiction
12 during your time at Stanford?
13     A.   I would really have to think about that to
14 jog my memory in the moment.
15     I'm happy to think about that, though.
16     Q.   Yeah, why don't you think about that.
17     Extrapolating, as you encouraged me to do,
18 based on what you said in your report, I get to 60
19 patients over the five-year life of the clinic that
20 you've diagnosed with social media addiction.
21     Does that sound right?
22     A.   Perhaps patients who came in with that as
23 the primary concern, but there have been more
24 patients that have been diagnosed with social media
25 addiction concerns, including patients that I'm

CONFIDENTIAL

Page 129

1  seeing for substance addictions.
2      Q.   And you can't tell me that total number
3  that you have diagnosed with social media addiction
4  over the course of your career at Stanford?
5         MS. O'NEILL:  Objection.  Form.
6         THE WITNESS:  Well, I do see lots of
7  patients.  It's likely in the hundreds, if I had to
8  estimate.
9  BY MS. BARNHART:
10     Q.   Okay.  I'm going to ask you one more time
11 because I don't think we got a clear record on this.
12     Did you consider or rely on clinical notes
13 or other documentation in arriving at the opinions
14 that are stated in your report?
15        MS. O'NEILL:  Objection.  Asked and
16 answered.
17        THE WITNESS:  Yeah, I didn't need to look
18 at clinical notes to have an understanding globally
19 of the patient population that I'm working with.
20 BY MS. BARNHART:
21     Q.   Because you didn't need to, that means you
22 did not actually consider or rely on clinical notes
23 or other documentation in arriving at the opinions
24 that are stated in your report?
25        MS. O'NEILL:  Same objection.

CONFIDENTIAL

Page 130

1  THE WITNESS:  I didn't have to look at the
2  notes.
3  BY MS. BARNHART:
4  Q.  I understand you're saying you didn't have
5  to.  Did you?  Did you look at the notes in forming
6  your opinions?
7  MS. O'NEILL:  Objection.  Form.  Asked and
8  answered.
9  THE WITNESS:  I don't believe I had to look
10  at my actual notes to form my opinion.
11  BY MS. BARNHART:
12  Q.  Dr. Zicherman, do you understand that
13  you're not answering my question?
14  I'm asking did you actually look at them?
15  Not whether you needed to; not whether you had to.
16  Did you actually consider and rely on your
17  clinical notes or other documentation in forming
18  your opinions in this litigation?
19  MS. O'NEILL:  Objection.  Asked and
20  answered.
21  THE WITNESS:  I've relied on my clinical
22  experience, but that involves more than just notes
23  on paper.  I have a memory of these patients.
24  BY MS. BARNHART:
25  Q.  That again doesn't answer my question.

CONFIDENTIAL

Page 131

1  Separate and apart from your memory --
2  that's a different thing -- did you in this case
3  consider or rely on clinical notes or other
4  documentation in forming your opinions?
5  MS. O'NEILL:  Same objection.
6  THE WITNESS:  And I'm going to provide the
7  same answer.  I relied on my clinical knowledge,
8  which involves more than just looking at records of
9  the patients I'm seeing every day.
10  I see patients very frequently.  I'm
11  familiar with my patient panel.  I'm able to
12  estimate the number of patients I have and the
13  severity of presentations based off of memory of a
14  consistent schedule.
15  BY MS. BARNHART:
16  Q.  When you say you relied on your clinical
17  knowledge, "which involves more than just looking at
18  records of the patients I'm seeing every day," does
19  that mean that, as part of your reliance on your
20  clinical knowledge, you did go back and look at
21  records of your patients in forming these opinions?
22  MS. O'NEILL:  Objection.  Asked and
23  answered.
24  BY MS. BARNHART:
25  Q.  I just need a clean answer on this.  I'm

CONFIDENTIAL

Page 132

1  entitled to the materials that you considered and
2  relied on in forming your opinions.  You're welcome
3  to talk to your --
4  A.  I don't believe I --
5  Q.  Hold on.
6  You're welcome to talk to your counsel
7  about that, but I am entitled to these materials.
8  If you simply didn't consider them or rely on them,
9  tell me that and I can move on.
10  But I need a clean answer to this question.
11  MS. O'NEILL:  Objection.  Form.
12  THE WITNESS:  I don't believe you're
13  answering -- you're asking a simple question, and I
14  believe the best I can answer is that I relied upon
15  my clinical knowledge, which involves more than just
16  a specific patient encounter and looking at a note.
17  BY MS. BARNHART:
18  Q.  But you did rely on looking at notes in
19  forming your opinions?  Is that what you're saying?
20  MS. O'NEILL:  Objection.  Form.
21  THE WITNESS:  That is not what I'm saying.
22  BY MS. BARNHART:
23  Q.  So you did not rely on looking at notes or
24  other documentation in forming your opinions?
25  A.  I relied on my knowledge of -- schedule and

CONFIDENTIAL

Page 133

1  working with patients I see very frequently who are
2  very sick.
3  Q.  So you did not rely on notes or other
4  documentation in forming your opinions?
5  MS. O'NEILL:  Objection.  Asked and
6  answered.
7  THE WITNESS:  Working with patients is
8  important, but that's just one aspect of clinical
9  knowledge.
10  BY MS. BARNHART:
11  Q.  Do you remember what my question was?
12  What was my question?
13  A.  I'm happy for you to restate it.
14  Q.  Well, what -- do you remember it?
15  A.  I'd like you to --
16  MS. O'NEILL:  Objection.  Argumentative.
17  THE WITNESS:  -- restate the question if
18  you want me to --
19  BY MS. BARNHART:
20  Q.  Did you rely on notes or other
21  documentation in forming your opinions in this case?
22  MS. O'NEILL:  Asked and answered.
23  THE WITNESS:  I believe I've stated again
24  that I've relied on my clinical knowledge and
25  understanding of the patients I work with.

Page 134

1    I don't have to reference the charts, the
2  notes to develop estimates of the number of patients
3  that I see and the kinds of patients I'm seeing.
4  ***    MS. BARNHART:  Counsel, this is not a clean
5  answer.  We need a clean answer to this.
6         So I'll put in a formal request for all
7  documents, notes, templates, otherwise that
8  Dr. Zicherman considered or relied on in forming his
9  opinions in this case.
10        MS. O'NEILL:  I'm going to acknowledge your
11 request.  I think we can talk separately about this.
12        MS. BARNHART:  Okay.
13 BY MS. BARNHART:
14    Q.    Dr. Zicherman, if it is determined that you
15 did consider or rely on those materials, will you
16 produce them to us?
17        MS. O'NEILL:  Objection.  Form.  Calls for
18 a legal conclusion.
19        THE WITNESS:  Yeah, I would have to discuss
20 this with counsel.
21 BY MS. BARNHART:
22    Q.    Have you diagnosed any patients with
23 generalized technology addiction?
24    A.    With generalized technology addiction?  I'm
25 usually more specific.

Page 135

1    Q.    So you have not diagnosed any patients with
2  technology addiction?
3    A.    To the best of my recollection, if I've
4  diagnosed someone with a specific technology
5  addiction, I will reference that specific addiction
6  concern.
7    Q.    What are some of the specific technology --
8  well, we'll just go down the list.
9         Have you diagnosed anyone with internet
10 addiction?
11    A.    That can be a potential diagnosis if
12 someone globally is addicted to the internet, sure.
13    Q.    I'm not asking about potential; I'm saying
14 have you actually diagnosed anyone with internet
15 addiction?
16    A.    I might have referenced that in -- at
17 times.
18    Q.    Did you?
19        I'm not asking if you might have.  Did you
20 actually diagnose anyone with internet addiction in
21 the course of your career?
22    A.    I probably have.
23    Q.    You can't tell me yes or no, I have
24 definitely diagnosed someone with internet
25 addiction?

Page 136

1    A.    Well, it would be unusual.  I think I'm,
2  again, far more likely to diagnose someone with
3  social media addiction or potentially gaming
4  addiction.
5    Q.    Okay.  So sitting here today, you cannot
6  specifically recall diagnosing someone with internet
7  addiction?
8         MS. O'NEILL:  Objection.  Asked and
9  answered.
10        THE WITNESS:  That's -- I'm generally more
11 specific.
12 BY MS. BARNHART:
13    Q.    So that's a "no"?
14        MS. O'NEILL:  Objection.  Asked and
15 answered.
16        THE WITNESS:  I would have to review notes
17 to recall.
18 BY MS. BARNHART:
19    Q.    Sitting here today, can you specifically
20 recall diagnosing someone with a smartphone
21 addiction?
22    A.    I -- I may have.  I do not recall.
23    Q.    Sitting here today, can you specifically
24 recall diagnosing someone with a television
25 addiction?

Page 137

1    A.    I may have, but I do not recall.
2    Q.    Sitting here today, can you specifically
3  recall diagnosing someone with a Snapchat addiction?
4    A.    I may have.  But, again, I do not recall.
5    Q.    Sitting here today, can you specifically
6  recall diagnosing someone with a TikTok addiction?
7         MS. O'NEILL:  Objection.  Form.
8         THE WITNESS:  I believe I have considered
9  that as a diagnosis for some individuals.
10 BY MS. BARNHART:
11    Q.    Have you actually diagnosed anyone with a
12 TikTok addiction?
13    A.    I cannot recall offhand.  I'd have to jog
14 my memory.
15    Q.    Sitting here today, can you specifically
16 recall diagnosing someone with a YouTube addiction?
17    A.    I believe it's likely that I have
18 considered that as a diagnosis.
19    Q.    Have you actually diagnosed anyone with a
20 YouTube addiction?
21    A.    I would have to jog my memory.
22    Q.    Have you actually diagnosed anyone with a
23 Facebook addiction?
24    A.    I do not recall.  I'd have to jog my
25 memory.

CONFIDENTIAL

Page 138

1    Q.  Have you actually diagnosed anyone with an
2  addiction to dating apps?
3    A.  I don't believe I have diagnosed someone
4  with an addiction to dating apps.
5    Q.  Have you actually diagnosed anyone with an
6  addiction to online shopping?
7    A.  I don't recall if I've diagnosed anyone
8  with an addiction to online shopping.
9    Q.  Have you actually diagnosed anyone with an
10  addiction to texting?
11    A.  I don't recall diagnosing anyone with an
12  addiction to texting.
13    Q.  Have you actually diagnosed anyone with an
14  addiction to email?
15    A.  I don't recall diagnosing anyone with an
16  addiction to email.
17    Q.  Have you actually diagnosed anyone with an
18  addiction to Reddit?
19    A.  I don't recall diagnosing anyone with
20  Reddit addiction.
21    Q.  Have you actually diagnosed anyone with an
22  addiction to Tumblr?
23    A.  I don't believe I diagnosed anyone with an
24  addiction to Tumblr.
25    Q.  Have you actually diagnosed anyone with an

CONFIDENTIAL

Page 139

1  addiction to Spotify?
2    A.  I do not believe so.
3    Q.  Have you actually diagnosed anyone with an
4  addiction to video games?
5    A.  I believe I have considered diagnosis of
6  video games.
7    Q.  Have you actually diagnosed anyone with an
8  addiction to video games?
9    A.  I believe I likely have.
10    Q.  And have you actually diagnosed anyone with
11  an addiction to Instagram?
12    A.  I believe I have used that as a diagnosis.
13    Q.  You have diagnosed someone with Instagram
14  addiction specifically?
15    MS. O'NEILL:  Objection.  Asked and
16  answered.
17    THE WITNESS:  Well, I generally will say
18  social media addiction.  But sure, I will reference
19  if it is Instagram that is the concerning addiction.
20  I will make note of that.
21  BY MS. BARNHART:
22    Q.  Okay.  So you have not actually diagnosed
23  someone with something called "Instagram addiction"?
24    MS. O'NEILL:  Objection.  Form.
25    THE WITNESS:  I think it's fair to say that

CONFIDENTIAL

Page 140

1  I have stated in my notes that someone has social
2  media addictions.  And the, you know, predominant
3  addiction or app of choice is Instagram.
4  BY MS. BARNHART:
5    Q.  So you remember saying that about
6  Instagram; you don't remember saying that about any
7  other social media app?
8    A.  Well, it turns out that the majority of my
9  patients that come in with a social media addiction
10  concern, they're using Instagram, and they identify
11  Instagram as their platform of choice.
12    Q.  Do you remember what my question was?
13    A.  Please restate it.
14    Q.  It does seem like you're having a hard time
15  remembering my questions, which makes me call into
16  question your memory generally.
17    But I'll say it again.
18    You don't remember saying anything in your
19  notes about any other social media app besides
20  Instagram?
21    MS. O'NEILL:  Objection.  Form.
22    THE WITNESS:  What do you mean by "notes"?
23  BY MS. BARNHART:
24    Q.  You know what I'm -- clinical notes.
25    A.  My clinical notes?

CONFIDENTIAL

Page 141

1    Q.  The clinical notes we've been talking
2  about, yeah.
3    A.  I mean, there are lots of notes here.
4    Q.  Let me ask the question again so it's
5  clear.
6    What other notes do we have?
7    A.  Well, there are --
8    MS. O'NEILL:  Objection.  Argumentative.
9    THE WITNESS:  -- lots of documents here.
10    (Stenographer interrupted for
11    clarification of the record.)
12  BY MS. BARNHART:
13    Q.  Okay.  Let's start that again.
14    You testified earlier that when you
15  diagnose patients with social media addiction, you
16  sometimes reference specific apps in your clinical
17  notes for that patient; correct?
18    A.  Correct.
19    Q.  Sitting here today, you don't recall
20  specifically referencing any other app besides
21  Instagram?
22    MS. O'NEILL:  Objection.  Form.
23    THE WITNESS:  Well, I can't say that's
24  true.  Of course, teenagers I work with will use
25  other apps, but Instagram is the predominant app

CONFIDENTIAL

Page 142

1  that I come across in my clinic.
2  BY MS. BARNHART:
3      Q.   Why don't you mention any of those other
4  apps in your report?
5          MS. O'NEILL:  Objection.  Form.
6          THE WITNESS:  Well, I believe I was asked
7  to comment about Instagram.
8  BY MS. BARNHART:
9      Q.   So the scope of your assignment was limited
10 to Instagram; is that correct?
11     A.   Meta-based products which is, I believe,
12 Instagram.
13     Q.   So you didn't form any opinions about
14 Facebook; correct?
15     A.   My opinions are predominantly addressed at
16 Instagram.
17     Q.   Do you have any opinions -- whether
18 predominantly or not, do you have any opinions about
19 Facebook?
20     A.   Well, it's my understanding there might be
21 some similar mechanisms that they use.  There might
22 be some similar attempts at safety features.  But,
23 again, my opinion is directed at Instagram when that
24 is the predominant platform that the patients I work
25 with are using.

CONFIDENTIAL

Page 143

1      Q.   Have you ever been addicted to anything?
2          MS. O'NEILL:  Objection.  Form.
3          THE WITNESS:  I don't believe I have
4  addictions.
5  BY MS. BARNHART:
6      Q.   Okay.  Have you ever diagnosed anyone with
7  an addiction to romance novels?
8      A.   I don't believe I've diagnosed anyone with
9  an addiction to romance novels.
10     Q.   Do you think an erotic fiction addiction is
11 valid?
12         MS. O'NEILL:  Objection.  Form.  Calls for
13 speculation.
14         THE WITNESS:  It could maybe be considered
15 a behavioral addiction, and I would need to know
16 more about whether it's causing some form of
17 functional impairment.
18 BY MS. BARNHART:
19     Q.   Are you aware of any literature supporting
20 the idea that erotic fiction addiction is valid?
21         MS. O'NEILL:  Objection.  Form.
22         THE WITNESS:  I am not familiar with
23 literature on that.  But, again, globally -- I
24 guess, potentially, in theory, it could be a form of
25 a behavioral addiction.

CONFIDENTIAL

Page 144

1  BY MS. BARNHART:
2      Q.   By that logic, could anything in theory be
3  a form of a behavioral addiction?
4          MS. O'NEILL:  Objection.  Form.  Calls for
5  speculation.
6          THE WITNESS:  I don't believe that would be
7  the case.  Again, I think you'd have to provide me
8  with specific examples to fully answer that
9  question.
10 BY MS. BARNHART:
11     Q.   Can someone be addicted to water?
12         MS. O'NEILL:  Objection.  Form.
13         THE WITNESS:  I don't believe that
14 coincides with the clinical application of how we
15 diagnose addictions.
16 BY MS. BARNHART:
17     Q.   Are you aware that Dr. Anna Lembke has
18 testified in this litigation that water addiction is
19 real?
20         MS. O'NEILL:  Objection.  Foundation.
21         THE WITNESS:  Well, there are certain
22 mental health conditions that can lead to someone
23 potentially overconsuming water, and it can be a
24 life-threatening condition.
25         You know, I don't believe I would

CONFIDENTIAL

Page 145

1  personally consider that within the clinical
2  application of what we have for an addiction
3  disorder.
4  BY MS. BARNHART:
5      Q.   Okay.  So you do not believe that
6  Dr. Lembke's testimony on that point is credible?
7          MS. O'NEILL:  Objection.  Form.
8          THE WITNESS:  I don't know her testimony.
9  BY MS. BARNHART:
10     Q.   Do you believe that someone can be addicted
11 to dancing?
12         MS. O'NEILL:  Objection.  Form.
13         THE WITNESS:  It's interesting.  Again, I
14 think I would answer that like I would most of these
15 examples, saying is it causing some form of
16 functional impairment?
17 BY MS. BARNHART:
18     Q.   So as long as something causes functional
19 impairment, that's the sort of marker of an
20 addiction?
21         MS. O'NEILL:  Objection.  Form.
22 Mischaracterizes the testimony.
23         THE WITNESS:  I think you can consider that
24 as part of what goes into an addiction.
25 ///

Page 146

BY MS. BARNHART:

1 BY MS. BARNHART:

2     Q.   Okay.  But -- so if dancing does not cause

3 a functional impairment, it's not addictive.  Is

4 that your testimony?

5         I'm trying to make sense of it.

6         MS. O'NEILL:  Objection.  Form.

7 Mischaracterization.

8         THE WITNESS:  If dancing isn't causing

9 disruptions in one's life, it's not causing --

10 again, I could describe functional impairment.

11        But if it's not causing some sort of

12 functional impairment, it's not impacting education,

13 family relationships, sleep schedule, nutrition --

14 if it's not impacting that, then I'd say it's not an

15 addiction.  And if it is, then, you know, you'd have

16 to consider it.

17 BY MS. BARNHART:

18    Q.   So for someone who's training to be a

19 competitive swimmer, if they don't attend school

20 because they're training for competition or they're

21 attending competitions, and their school performance

22 suffers, is that person addicted to swimming?

23        MS. O'NEILL:  Objection.  Form.  Calls for

24 speculation.

25        THE WITNESS:  School is just one aspect of

Page 147

1 someone's life.  In the case of a competitive

2 swimmer, you know, if they need to dedicate time to

3 competitive swimming, and that takes time away from

4 academics but it allows them to thrive and develop a

5 career, then I think you can say perhaps it's not a

6 functional impairment or addiction.

7 BY MS. BARNHART:

8     Q.   So if a teenager is a social media

9 influencer, and that social media influencing takes

10 time away from academics but allows them to thrive

11 and develop a career, you would say that's not

12 functional impairment or addiction; correct?

13        MS. O'NEILL:  Objection.  Form.

14 Mischaracterization.  Calls for speculation.

15        THE WITNESS:  I can't sit here and say

16 everyone that uses an app like Instagram as a

17 teenager is going to develop an addiction or

18 problems with it.

19        Of course, I see lots of problems and lots

20 of addiction concerns every day with who I work

21 with, but there's going to be a spectrum and a range

22 of people who use the product.

23 BY MS. BARNHART:

24    Q.   You're not an expert in epidemiology;

25 correct?

Page 148

1     A.   I have an understanding of some

2 epidemiologic concepts, but I'm not an

3 epidemiologist.

4     Q.   And you're not an expert in epidemiology;

5 right?

6     A.   Sure.  I don't have a PhD in epidemiology.

7 I have an understanding, I'd say, consistent with a

8 medical doctor who works with patients daily.

9     Q.   And that's not epidemiology, right?

10 Working with patients daily is not the field of

11 epidemiology?

12    A.   Well, I believe that clinical work

13 absolutely can inform epidemiology.  But, again, I'm

14 not an epidemiologist; I'm a medical doctor.

15    Q.   Okay.  You're also not a statistician;

16 correct?

17    A.   I do not have a degree in statistics.  But,

18 again, as a medical doctor, you have to have pretty

19 high-level understanding of statistics to interpret

20 literature.  And I think that helps to inform what

21 is going on clinically when we work with patients.

22    Q.   In this case you are not holding yourself

23 out as an expert in epidemiology or statistics;

24 correct?

25    A.   Yeah, I'm not -- I do not have a PhD in

Page 149

1 epidemiology or statistics.

2     Q.   Are you familiar with Bradford Hill

3 analysis?

4     A.   I have come across the Bradford Hill

5 analysis.  Don't ask me questions about it.  I would

6 need to review it beforehand.

7     Q.   Have you ever performed a Bradford Hill

8 analysis?

9     A.   I have not formally performed a Bradford

10 Hill analysis.

11    Q.   You don't have a degree in public health;

12 correct?

13    A.   I do not.

14    Q.   You don't have a degree in computer

15 science; correct?

16    A.   I do not.

17    Q.   You don't have any training in software

18 engineering?

19    A.   I do not.

20    Q.   And you don't hold yourself out as an

21 expert in technology app design; correct?

22    A.   I -- sure, I do not consider myself an

23 expert in the nuances and technicalities of app

24 design.

25    Q.   You've never designed an app of any kind;

CONFIDENTIAL

Page 150

1  right?
2      A.  I have not.
3      Q.  You've never designed an algorithm?
4      A.  I have not.
5      Q.  Have you ever worked at a social media
6  company?
7      A.  I have not.
8      Q.  Have you ever worked at a tech company?
9      A.  I have not.
10     Q.  Has your wife ever worked at a social media
11 company?
12     A.  I don't believe so.
13     Q.  You don't consider Salesforce to be social
14 media?
15     A.  I mean, they have a -- they have social
16 media, but I don't believe they would be considered
17 a social media platform or company.
18     Q.  Who's paying you for your expert opinions
19 in this case?
20     A.  I am paid for by a pact of several states.
21     Q.  How many states?
22     A.  There are several.  To most accurately
23 answer the question, I would need to reference my
24 report, which lists all the states that are involved
25 in the suit.

CONFIDENTIAL

Page 151

1      Q.  Does 29 sound right?
2      A.  That could be correct.
3      Q.  Offhand, you don't know the identity of all
4  29 of those states, do you?
5          MS. O'NEILL:  Objection.  Form.
6          THE WITNESS:  I know the identity of
7  several states, but I would have to look at my
8  report again to refresh my memory what specific
9  states.
10 BY MS. BARNHART:
11     Q.  When were you first retained in this case?
12     A.  I don't recall when we had a formal
13 agreement in place.
14     Q.  Was it in 2025 or before 2025?
15     A.  I believe it was before 2025.  I could be
16 wrong as far as formal agreements, but I believe it
17 was before 2025.
18     Q.  Okay.  We can look at your invoices in a
19 little bit to help jog your memory, but were you
20 first contacted -- how far -- let me put it this
21 way:
22          How long after you were first contacted did
23 you set up the formal agreement?
24     A.  I believe it was many months after I was
25 first contacted.

CONFIDENTIAL

Page 152

1      Q.  Do you remember when you were first
2  contacted about this case?
3      A.  I do not.
4      Q.  Do you remember who first contacted you?
5      A.  I do not.
6      Q.  Did a lawyer contact you?
7      A.  I believe it was an attorney, yes.
8      Q.  Do you remember what you discussed at that
9  first meeting?
10     A.  I do not remember the details of the
11 meeting.
12     Q.  Why did it take many months after that
13 first meeting before you agreed to serve as an
14 expert in this case?
15         MS. O'NEILL:  Objection.  Form.
16 Mischaracterization.
17         THE WITNESS:  I don't recall the specifics
18 of what actually led to the formal agreement at the
19 specific time that it happened.
20 BY MS. BARNHART:
21     Q.  Did you orally agree to serve as an expert
22 witness during that first meeting?
23     A.  I don't recall that.
24     Q.  Which lawyers or lawyer have you primarily
25 communicated with during the course of your

CONFIDENTIAL

Page 153

1  engagement?
2          MS. O'NEILL:  Objection.  Form.
3          THE WITNESS:  There have been several,
4  including Megan O'Neill.
5  BY MS. BARNHART:
6      Q.  Who else besides Ms. O'Neill?
7      A.  I would say Ms. O'Neill was the primary
8  point of contact and consistent throughout the
9  meetings.
10     Q.  Do you understand what state Ms. O'Neill
11 represents?
12     A.  Yes.
13     Q.  Which one?
14     A.  California.
15     Q.  And do you know how Ms. O'Neill identified
16 you as a potential expert witness in this case?
17     A.  I am not aware.
18     Q.  You are working with the consulting firm
19 Bates White in this litigation; correct?
20     A.  Correct.
21     Q.  What is Bates White?
22     A.  It's my understanding they're a consulting
23 firm.
24     Q.  Did you have any preexisting relationship
25 with Bates White before this litigation?

CONFIDENTIAL

Page 154

1      A.   I did not.

2      Q.   How did you connect with Bates White?

3      A.   I believe the connection was through the

4  attorney generals.

5      Q.   Okay.  So you did not choose to work with

6  Bates White; you were assigned to work with them?

7           MS. O'NEILL:  Objection.  Form.

8           THE WITNESS:  Well, I was asked if it would

9  be helpful to have assistance --

10          MS. O'NEILL:  And I'll just object and

11 instruct the witness to not divulge the substance of

12 communications between attorneys and you.

13          THE WITNESS:  Okay.

14      I've been advised not to answer that

15 question by counsel.

16 BY MS. BARNHART:

17      Q.   Well, what's protected is the substance of

18 draft reports; it's not any communication.

19      So I'm asking you about why you decided to

20 work with Bates White.  Can you tell me more about

21 that.

22      Did you do anything to learn anything about

23 Bates White before you decided to work with them?

24          MS. O'NEILL:  Objection.  Form.

25          THE WITNESS:  I am very busy clinically

CONFIDENTIAL

Page 155

1  working with patients every day.  I think to develop

2  the report to the best of my abilities, it was

3  helpful to work with a consulting firm.

4  BY MS. BARNHART:

5      Q.   What did Bates White do in connection with

6  supporting your -- your work in this case?

7      A.   This is my report.  I absolutely had the

8  ultimate direction of the report.  They helped

9  organize the report, the drafting, the appendix

10 materials.  They helped with grammatical choices and

11 with my -- again, under my direction.  They assisted

12 with research reviews when I found it necessary and

13 helpful.

14      Q.   What are the credentials of the people at

15 Bates White that you worked with?

16      A.   I believe that the main individuals I

17 worked with both have PhDs.

18      Q.   PhDs in what?

19      A.   I believe one is psychology.  The other

20 one -- I don't want to misspeak -- I believe a PhD

21 in economics.  I could be wrong.

22      Q.   What are the names of the people that you

23 worked with at Bates White?

24      A.   Mathis -- Mathis Wagner, I believe, and

25 Angela Rockwell.

CONFIDENTIAL

Page 156

1      Q.   Do you recall when exactly you began

2  working with Mr. Wagner and Ms. Rockwell?

3      A.   I do not recall the exact dates when I

4  started working with them.

5      Q.   Do you recall approximately what month or

6  season of the year?

7      A.   I can't recall offhand without jogging my

8  memory and looking at documents.

9           MS. BARNHART:  Well, why don't we go ahead

10 and mark those documents, the invoices.

11          MS. O'NEILL:  Yes.  And, Counsel, I'll just

12 note we've been going for over an hour.  So if

13 there's a moment that's a good time for a break.

14          MS. BARNHART:  Yeah, if we can go -- let's

15 not mark those yet.  Let's just go five or ten more

16 minutes.

17          MS. O'NEILL:  That's fine, yeah, if that

18 works for you.

19          THE WITNESS:  Sure.

20 BY MS. BARNHART:

21      Q.   Okay.  Do you know the rates of the

22 individuals at Bates White who assisted you in

23 preparing this report?

24      A.   I do not.

25      Q.   Do you know how much money Bates White has

CONFIDENTIAL

Page 157

1  been paid in connection with their assistance to

2  you?

3      A.   I do not.

4      Q.   Are you aware that several other paid

5  plaintiffs' experts are also working with Bates

6  White in connection with this litigation?

7           MS. O'NEILL:  Objection.  Foundation.

8           THE WITNESS:  I have limited knowledge

9  about their involvement with other experts.

10 BY MS. BARNHART:

11      Q.   What is that knowledge?

12      A.   That they may work with other experts.

13 That's really all I know.  I really don't know much

14 more beyond that.

15      Q.   Are you familiar with Dr. Mitch Prinstein?

16      A.   I am familiar with -- with the name.

17      Q.   Are you aware that he's a paid plaintiffs'

18 expert in this litigation?

19      A.   I am aware that he is a plaintiff.

20      Q.   He's a plaintiff?

21      A.   Sorry.  A paid plaintiff expert.

22      Q.   Okay.  And are you aware that Dr. Prinstein

23 is working with Bates White as an expert?

24      A.   I might have been informed of that at some

25 point, or it might have come across my knowledge

Page 158

1  stream at some point.
2      Q.   Are you familiar with any of Drs. Melissa
3  Hunt, Lauren Hale, Parker Houston, or Ravi Iyer?
4      A.   I might be familiar with those names if you
5  gave me some context.  But offhand, it doesn't ring
6  a bell.
7      Q.   Okay.  Are you aware that each of those
8  four individuals is also a paid plaintiffs' expert
9  in this litigation?
10     A.   I am not.
11     Q.   Are you aware that each of those paid
12 plaintiffs' experts are also working with Bates
13 White in connection with this litigation?
14     A.   I am not.
15     Q.   Do you know how much money Bates White has
16 made across all six experts it's supporting in this
17 litigation?
18     A.   I am not aware.
19     Q.   Would you be interested to know how much
20 money Bates White has made off of this litigation?
21         MS. O'NEILL:   Objection.  Form.
22         THE WITNESS:   It doesn't really matter to
23 me.
24 BY MS. BARNHART:
25     Q.   Why not?

Page 159

1          MS. O'NEILL:   Objection.  Form.
2          THE WITNESS:   It's no impact on the work
3  that I've done.
4  BY MS. BARNHART:
5      Q.   You don't think that Bates White has any
6  sort of bias given their work with six different
7  paid plaintiffs' experts in this case?
8          MS. O'NEILL:   Objection.  Form.
9          THE WITNESS:   I don't believe so.  I'm not
10 familiar with the specific work they've done with
11 other plaintiff experts.
12 BY MS. BARNHART:
13     Q.   All right.  Let me ask you just a couple
14 more questions, and then we can take a break.
15         How much time did you spend preparing for
16 this deposition?
17     A.   I would have to reference invoices.  If you
18 give me a minute, though, I can try and estimate
19 this.
20         MS. BARNHART:   That's okay.  We can just do
21 it when we go through the invoices.
22         Let's just take a break.
23         THE WITNESS:   Okay.
24         THE VIDEOGRAPHER:   Stand by.
25         The time is 12:38 p.m., and we're going off

Page 160

1  the record.
2          (Luncheon recess taken.)
3          THE VIDEOGRAPHER:   The time is 1:35 p.m.,
4  and we are back on the record.
5          (Exhibits 12, 13, and 14 were marked
6          for identification and are attached to
7          the transcript.)
8  BY MS. BARNHART:
9      Q.   Dr. Zicherman, I'm handing you what's been
10 marked as Exhibits 12, 13, and 14.  These are your
11 invoices that you have created in the context of
12 this litigation; correct?
13     A.   That appears correct.
14     Q.   If you look first at Exhibit 12, the first
15 entry on here is December 24th, 2024.
16         Do you see that?
17     A.   Yes.
18     Q.   Does that refresh your recollection of when
19 you entered into a formal engagement in this matter?
20     A.   There might have been a formal engagement
21 before, and then there might have been a pause
22 before I did actual work relating to the case.
23         (Whereupon Paul Schmidt entered the
24         deposition room.)
25 ///

Page 161

1  BY MS. BARNHART:
2      Q.   Okay.  You didn't do any work before
3  Christmas Eve 2024; correct?
4      A.   I don't believe I did any work that would
5  be considered before the contract which, you know,
6  was established.  I'd have to look, but before this
7  date at some point.
8      Q.   Do these three invoices reflect all the
9  work you've done in this case?
10     A.   I believe they reflect the work that I've
11 done in this case, yes.
12     Q.   Is your billing rate $500 an hour?
13     A.   That is correct.
14     Q.   So if you add up all of the amounts billed
15 across all three of these invoices, that totals
16 $42,500.
17         Does that sound right?
18     A.   Sounds accurate.
19     Q.   And that works out to 85 hours total that
20 you've spent on expert witness work in this
21 litigation; correct?
22     A.   (No audible response.)
23     Q.   Dr. Zicherman, 85 times $500 is 42,500.
24         Do you dispute that?
25     A.   Appears correct.

Page 162

1  Q.  All right.  If you look at just the time
2  billed prior to May 16th, which was the date of your
3  opening report, I add that up to 70 hours.
4      Were those 70 hours all spent researching
5  and drafting your opening report?
6  A.  That time would be spent researching and
7  organizing the report.
8  Q.  Your opening report is 25 pages.  So that
9  works out to almost three hours per page that you
10 spent?
11     MS. O'NEILL:  Objection.  Form.
12     THE WITNESS:  I don't believe that would be
13 a good way of looking at the work performed.
14 BY MS. BARNHART:
15 Q.  Do you dispute the math?
16     MS. O'NEILL:  Objection.  Form.
17     THE WITNESS:  I don't dispute what I've
18 billed for.
19 BY MS. BARNHART:
20 Q.  All right.  So you spent about three hours
21 per page of your report.
22     Do these invoices reflect time billed on
23 other matters for which you're serving as an expert
24 witness?
25     MS. O'NEILL:  Objection to the preamble.

Page 163

1      THE WITNESS:  Can you repeat the question.
2  BY MS. BARNHART:
3  Q.  Do these invoices reflect any time you've
4  billed on other related matters for which you're
5  serving as an expert witness?
6  A.  So in addition to researching and report
7  drafting?  Is that the question?
8  Q.  You understand, Dr. Zicherman, that you've
9  also been disclosed as an expert witness in
10 litigation brought by the Commonwealth of
11 Massachusetts?
12 A.  Correct.
13 Q.  Do these invoices, Exhibits 12, 13, and 14,
14 reflect the work that you've performed in connection
15 with that expert engagement?
16 A.  I believe they reflect the work that I
17 performed for the engagements.
18 Q.  Okay.  So you haven't issued separate
19 invoices to Massachusetts for expert work performed?
20 A.  I've not issued separate invoices.
21 Q.  Okay.  And you issued these invoices to
22 Ms. O'Neill; is that correct?
23 A.  That is typically who the invoice goes to.
24 Q.  And you're paid by the State of California?
25 A.  I would have to reference the check, but

Page 164

1  I -- it might be the State of California.  I know
2  there are other states involved with the lawsuit.
3  Q.  You haven't received payment directly from
4  the Commonwealth of Massachusetts, have you?
5  A.  I would have to look and see if the checks
6  were from the State of Massachusetts, but I don't
7  believe that was the case.  But I would have to
8  reference that.
9  Q.  Did you consult or meet with Bates White
10 during the drafting process for your report?
11 A.  During the drafting process, I did.
12 Q.  And none of your time entries reflect any
13 meetings with Bates White; is that correct?
14     MS. O'NEILL:  Object to form.
15     THE WITNESS:  Some of that time might be in
16 these invoices.
17 BY MS. BARNHART:
18 Q.  Okay.  That wasn't my question.
19     My question was whether any of these
20 invoices reflect any time entries relating to your
21 meetings or consultations with Bate White -- Bates
22 White.
23 A.  I believe that some of these references
24 might have included time spent with meeting with
25 Bates White.

Page 165

1  Q.  How often did you meet with Bates White?
2  A.  If I had to estimate, I -- it depends on
3  where I was in the report drafting and research
4  process.  It could have been monthly to several
5  times a month.
6  Q.  How many hours total did you spend meeting
7  with Bates White in connection with your preparation
8  of your expert report?
9  A.  I do not recall exactly how many hours I
10 spent in that capacity.
11 Q.  Was it more than 15 hours?
12 A.  Was it more than 15 hours?
13     That could potentially be accurate.  You
14 know, there were lots of meetings and lots of work
15 performed on the case.  I, you know, would have to
16 really jog my memory to think about that.
17     But that might be a fair estimate.
18 Q.  How would you jog your memory?
19 A.  Thinking longer about how long I spent with
20 Bates White.  But I would say the 15 hours is fair.
21 Q.  Okay.  And did you separately meet with
22 Ms. O'Neill or any other lawyers during the drafting
23 process?
24 A.  There might have been a meeting.  I cannot
25 recall.

CONFIDENTIAL

Page 166

1    Q.   Did Ms. O'Neill offer you any direct
2  feedback on the draft report?
3        MS. O'NEILL:  I'm going to object to the
4  extent that this calls for --
5  BY MS. BARNHART:
6    Q.   You can say yes or no.
7        MS. O'NEILL:  -- privileged information.
8        THE WITNESS:  Sounds like I've been
9  instructed to not answer that question by counsel.
10        MS. BARNHART:  I don't think that's right.
11       Is that right, Ms. O'Neill?  Are you
12  instructing the witness not to answer?
13       MS. O'NEILL:  Can you repeat the question,
14  please.
15  BY MS. BARNHART:
16    Q.   Did Ms. O'Neill -- this is a yes or no; I
17  don't want to know about the substance.
18       But did Ms. O'Neill offer you any direct
19  feedback on your draft report?
20       MS. O'NEILL:  You can answer.
21       THE WITNESS:  I believe there was --
22  there's been feedback about the report-drafting
23  process.
24  BY MS. BARNHART:
25    Q.   From the lawyers?

CONFIDENTIAL

Page 167

1    A.   Sure.  The lawyers have been able to review
2  the drafts.
3    Q.   And have they provided substantive edits to
4  your report?
5        MS. O'NEILL:  Objection.  I'm going to
6  instruct the witness not to answer this.  This is
7  getting into privileged information.
8        THE WITNESS:  I've been instructed by
9  counsel not to answer the question.
10  BY MS. BARNHART:
11    Q.   And you're following that instruction?
12    A.   Yes.
13    Q.   Who wrote the first draft of your report,
14  the very first one?
15    A.   Well, I've been responsible for the draft
16  writing.  I cannot recall if Bates White was
17  involved in the first draft or not offhand.
18    Q.   Is it your testimony that you wrote the
19  original draft of the report?
20       You typed the words of the original draft
21  of the report?
22       MS. O'NEILL:  Objection.  Form.
23       THE WITNESS:  Well, I've been responsible
24  for all forms of the draft.  And I cannot recall if
25  Bates White was a part of the first draft report.

CONFIDENTIAL

Page 168

1  BY MS. BARNHART:
2    Q.   Did Bates White write any sections of your
3  report?
4    A.   They assisted with language; but the
5  drafting was ultimately my words, my thoughts.  And
6  sure, at times they helped with sentence structure,
7  paragraph structure, grammatical choices.
8    Q.   Is your primary income through your
9  clinical practice?
10    A.   That would be correct.  That's my primary
11  income.
12    Q.   What was your income in 2024, total income?
13    A.   I do not know.
14    Q.   Do you have any ballpark estimate?
15    A.   I really am not sure how much I made in
16  total in 2024.  It depends how accurate you want me
17  to get.
18    Q.   I want your best estimate, which is what
19  I'm entitled to.
20    A.   Okay.
21       MS. O'NEILL:  Objection.  Form.
22       THE WITNESS:  I'll just have to think about
23  that for a minute.
24       This is 2024?
25  ///

CONFIDENTIAL

Page 169

1  BY MS. BARNHART:
2    Q.   Correct.
3    A.   Somewhere in the 300,000 range.
4    Q.   And that was $300,000 from your social
5  media addiction clinical practice?
6        MS. O'NEILL:  Objection.  Form.
7        THE WITNESS:  Sorry.  Can you -- are you
8  asking for my primary income from Stanford or all
9  the work that I've done in 2024?
10       Can you repeat that.
11  BY MS. BARNHART:
12    Q.   Well, you tell me.  $300,000 was your total
13  income in 2024; correct?
14    A.   In that range in 2024.
15    Q.   And how much of that came from your
16  work at the Stanford recovery clinic?
17    A.   Maybe 75 percent of that.
18    Q.   Okay.  And then the rest came from your
19  other clinical practices at El Camino Health and
20  Alta Mira?
21    A.   Correct.
22    Q.   And all of your practices except for Alta
23  Mira relate to addiction -- youth addiction;
24  correct?
25    A.   Well, they all relate to addiction; but

CONFIDENTIAL

Page 170

1 yes, the clinical practice at Stanford and El Camino
2 are in relation to youth addiction.
3 Q. Okay. And as you state in your report and
4 as you've told me repeatedly today, you treat
5 adolescents that you believe suffer from social
6 media addiction; correct?
7 A. That's correct.
8 Q. Does your compensation depend on the number
9 of patients you see?
10 A. Through what entity?
11 Q. Well, let's start with Stanford.
12 If you see more patients at the recovery
13 clinic, do you make more money at Stanford?
14 A. I have a salary. It's not going to be
15 dependent off of -- my salary is not going to be
16 dependent off of patient value. I mean, I have
17 expected target goals, but that's -- it's not a
18 situation where, you know, I'm going to see more
19 patients; I'm going to get more money.
20 Q. What are your expected target goals at
21 Stanford?
22 A. So we work off of -- it's called an RVU
23 system. It's very complicated. It essentially
24 equates how we bill to a certain number or fraction
25 of a number. And those patient encounters equate to

CONFIDENTIAL

Page 171

1 a certain overall RVU number that I'm supposed to
2 roughly reach.
3 Q. What happens if you do not meet the RVU?
4 A. I'm not sure. I haven't been in that
5 situation.
6 Q. What happens if you exceed the RVU? Do you
7 get a bonus?
8 A. There are bonuses that Stanford provides.
9 I'm not entirely sure the metrics that they use to
10 provide those bonuses.
11 Q. Have you received a bonus from Stanford in
12 addition to your salary?
13 A. I do receive bonuses from Stanford.
14 Q. And you understand that that bonus is tied
15 to that RVU number and whether or not it's
16 surpassed?
17 MS. O'NEILL: Objection. Form.
18 THE WITNESS: I don't actually believe that
19 to necessarily be true. I think there's several
20 metrics that Stanford uses to determine whether we
21 receive a bonus or not.
22 BY MS. BARNHART:
23 Q. You're not tenured; right?
24 A. I don't believe the clinical track is
25 considered tenured.

CONFIDENTIAL

Page 172

1 Q. Okay. So you only have a five-year term in
2 the current position you're in; correct?
3 A. That's a way of looking at it.
4 Q. Right. You're only guaranteed a five-year
5 position. That's the contract you have with
6 Stanford?
7 A. I believe that the contracts at Stanford
8 are, like, a five-year renewal system.
9 Q. Is it fair to say in order to get your
10 contract renewed, you would need to show, you know,
11 growth to your clinic -- clinical practice?
12 MS. O'NEILL: Objection. Form.
13 THE WITNESS: I -- I'm sure there are a lot
14 of factors that go into what it means to be retained
15 and promoted.
16 BY MS. BARNHART:
17 Q. Do you agree that if a judge or a jury were
18 to reject your views on social media addiction in
19 this case, that could hurt your reputation and
20 therefore your clinical practice?
21 MS. O'NEILL: Objection. Form. Calls for
22 speculation.
23 THE WITNESS: Whatever happens in front of
24 a judge or jury, I know what I see every day in
25 clinic. I treat very sick kids who I believe are

CONFIDENTIAL

Page 173

1 afflicted with social media addictions. That's not
2 going to change based on an outcome of a case.
3 BY MS. BARNHART:
4 Q. That wasn't my question.
5 I was -- my question was if a judge or a
6 jury rejects your views on social media addiction
7 and appropriate treatment for that purported
8 addiction, that could hurt your reputation.
9 Do you agree with that?
10 MS. O'NEILL: Same objection.
11 THE WITNESS: You know, regardless of
12 outcome of a case, I have these patients coming to
13 me. I have lots of patients, parents who are
14 requesting evaluations due to social media concerns.
15 And regardless of outcome, if, you know, a
16 trial ended up in a certain direction, I do not
17 believe that would affect my clinical practice, and
18 I will continue to treat these kids who I see that
19 are very sick.
20 BY MS. BARNHART:
21 Q. If a judge or a jury were to endorse your
22 views on social media addiction, could that benefit
23 your reputation?
24 MS. O'NEILL: Objection. Form. Calls for
25 speculation.

CONFIDENTIAL

Page 174

1    THE WITNESS:  I think that would involve
2  speculation.  I'm not sure.
3  BY MS. BARNHART:
4    Q.   You certainly don't think it would hurt
5  your reputation if a judge or a jury endorsed your
6  expert views in this case?
7    MS. O'NEILL:  Objection.  Form.
8    THE WITNESS:  It probably wouldn't hurt.  I
9  think that's fair.
10  BY MS. BARNHART:
11    Q.   If you can turn to your report, Exhibit 1
12  that we were looking at earlier, and specifically
13  Section I.A, this is your summary of opinions.
14    Are you there?
15    A.   Yes.
16    Q.   Is this a complete list of the opinions
17  that you seek to present at trial in this case?
18    A.   Correct.
19    Q.   So you won't present any opinions at trial
20  other than the four you've listed here; correct?
21    A.   These are the opinions that I have.
22    Q.   If you look at Section I.E. of your
23  report -- this is on page 6 -- this section is
24  titled "Meta's alleged unfair and deceptive
25  practices."

CONFIDENTIAL

Page 175

1    Do you see that?
2    A.   I do see that.
3    Q.   You're not offering any expert opinion on
4  whether any of Meta's acts or practices were unfair;
5  correct?
6    A.   I don't believe I reference "unfair" in my
7  opinions, but this is my understanding of the
8  alleged unfair and deceptive practices.
9    Q.   Well, you don't describe any specific
10  practices here.  I'm just trying to get a sense of
11  what the scope of your opinions is.
12    So I understand you are not offering any
13  expert opinion on whether any of Meta's specific
14  acts or practices were unfair; is that true?
15    A.   Well, if you consider unfair be harm that
16  is caused, in my opinion -- my clinical opinion, by
17  the app, then it's certainly linked.
18    Q.   You don't have any expert opinion on what
19  constitutes unfair, unconscionable, or deceptive
20  acts or practices under the law; correct?
21    A.   I think I would prefer to answer that by
22  looking at the specific laws that you might be
23  referencing; but, again, my opinion globally would
24  be that there are -- we'd agree there are unfair and
25  unconscionable acts involved in how Meta has

CONFIDENTIAL

Page 176

1  deployed the Instagram app.
2    Q.   Well, you don't even know what laws I'm
3  referencing; right?  You're not a legal expert.  You
4  don't understand what the law requires; right,
5  Dr. Zicherman?
6    A.   I'm not --
7    MS. O'NEILL:  Objection.  Form.
8    THE WITNESS:  I'm not a legal expert.
9  BY MS. BARNHART:
10    Q.   Okay.  So you're not going to offer any
11  legal expert opinions on what constitutes an unfair,
12  unconscionable or deceptive act or practice under
13  the legal standard?
14    A.   Perhaps from a legal perspective.  I will
15  offer that from a clinical perspective.
16    Q.   Let's look at paragraph 19 of your report,
17  which is under "Assignment and materials
18  considered."
19    Your assignment was to opine on the effects
20  of excessive use of social media.
21    Do you see that?
22    A.   Yes.
23    Q.   What is excessive use of social media?
24    A.   Sorry.  You're referring to paragraph 19?
25    Q.   Correct.

CONFIDENTIAL

Page 177

1    A.   Okay.  And which sentence?
2    Q.   The very first one.
3    "I was retained by plaintiffs to
4    opine on the effects of excessive use
5    of social media, including Instagram."
6    A.   And then what is your question in relation
7  to that again?
8    Q.   What do you mean by "excessive use"?
9    A.   Well, excessive use, to me, ties into --
10  I've used this term before today -- the idea of a
11  functional impairment.  Excessive use could
12  potentially be different amounts of use.
13    But essentially it means that excessive use
14  is causing functional impairment; some form of harm
15  in a child or teenager's life, whether it's related
16  to academic achievement, relationships with family,
17  the ability to get good, restful sleep, among other
18  considerations.
19    Q.   So you can't make a determination of
20  what -- let me start over.
21    You can't make a determination of whether a
22  teenager is excessively using social media based
23  simply on the amount of time that they use social
24  media every day; correct?
25    MS. O'NEILL:  Objection.  Form.

Page 178

1  Mischaracterization.
2          THE WITNESS:  Time is one element that
3  certainly goes into the clinical evaluation process.
4  BY MS. BARNHART:
5      Q.  If all you knew was that a teenager was
6  spending one hour per day on Instagram, you would
7  not be able to determine whether that was excessive;
8  correct?
9          MS. O'NEILL:  Objection.  Form.  Incomplete
10  hypothetical.
11  BY MS. BARNHART:
12      Q.  Under your definition.
13      A.  That I would -- the only information I
14  would have is one hour.  I mean, that's a
15  hypothetical that I think would be just not possible
16  to answer; but if that's all that I had in front of
17  me, that they were just using one hour of use, I
18  would need to know more information.
19      Q.  Okay.  The same goes for if all you knew
20  was that a teenager was spending three hours per day
21  on Instagram, you would not be able to determine
22  whether that was excessive under your definition?
23          MS. O'NEILL:  Same objections.
24          THE WITNESS:  I would still need to know
25  more details about the specific case to comment on

Page 179

1  that.
2  BY MS. BARNHART:
3      Q.  Okay.  I want to talk about the methodology
4  that you used to arrive at your opinions.  Can you
5  describe that methodology for me?
6      A.  Methodology that I used to arrive at my
7  opinions?
8          It's based, first and foremost, on the
9  clinical practice and treating for years patients
10  who have serious problems associated with their use
11  of social media platforms like Instagram.
12      Q.  And is that a complete statement of your
13  methodology is your clinical practice?
14      A.  Clinical practice.  Of course, I am a
15  medical doctor who has been practicing for many
16  years and working with addictions for many years.
17          I've reviewed lots of material relevant to
18  the idea of addictions and social media addictions.
19  And the combination of clinical practice as a
20  medical doctor reviewing the preponderance of the
21  material available has led me to my decisions and
22  opinions.
23      Q.  All right.  Well, I'm going to need to
24  break that down.
25          But first I want to clarify.  Is it your

Page 180

1  testimony that you have reviewed a preponderance of
2  the material available on the question of the
3  effects of excessive use of social media, if any?
4          MS. O'NEILL:  Objection.  Form.
5          THE WITNESS:  I have reviewed thousands of
6  pieces of material relating to this topic.
7  BY MS. BARNHART:
8      Q.  Well, I can -- I will note, if you want to
9  take a look at Exhibit 2, which is your materials
10  considered list, there's only 43 books and academic
11  papers listed on this.
12          Does that surprise you?
13          MS. O'NEILL:  Objection.  Form.
14          THE WITNESS:  Can you repeat that, please.
15  BY MS. BARNHART:
16      Q.  Well, I'm confused.  You said you've
17  reviewed thousands of pieces of material relating to
18  this topic.  There are not thousands of pieces of
19  material listed on your materials considered list;
20  correct?
21      A.  I listed and used materials that I believe,
22  of the thousands that I have reviewed, would be
23  relevant to this case.
24      Q.  So you did not -- earlier I asked you is
25  your materials considered list a complete and

Page 181

1  accurate statement of the materials that you've
2  considered in developing your opinions in this case?
3      A.  I -- okay.  I will rephrase and say --
4      Q.  And let me finish my question.
5          Earlier you testified that yes, it was.  So
6  are you now changing that testimony?
7          MS. O'NEILL:  Objection.  Form.
8          THE WITNESS:  I have reviewed thousands of
9  materials over the years, including prior to being
10  retained on this case.  I have not reviewed
11  thousands of documents since I was retained in 2024;
12  but, in sum, I have reviewed a substantial amount of
13  information on this subject.
14  BY MS. BARNHART:
15      Q.  Do you understand it's your obligation to
16  disclose all of the materials that you considered in
17  relying -- in developing your opinions in this case?
18      A.  I developed my opinion in relation to this
19  case specifically off of the materials that I have
20  listed.
21      Q.  All right.  I just wanted to be clear on
22  that.
23          Okay.  So let's take this one part at a
24  time.
25          First, you've got -- first and foremost,

Page 182

1  your clinical experience is the basis for your
2  opinions?
3      A.  Yes.
4      Q.  Okay.  We'll talk a bit more about that in
5  a little bit.
6      But is it true that you based your opinions
7  in some small part on other materials, including
8  academic research studies?
9      MS. O'NEILL:  Objection.  Form.
10     THE WITNESS:  Sure.  I have based my
11 opinions also on research studies.  Again, the
12 essence, the -- what's the word I'm looking for? --
13 the preponderance of my opinion is based off of my
14 clinical experience.
15 BY MS. BARNHART:
16     Q.  We'll come back to that, but I want to
17 focus first on the methodology you used to identify
18 research studies or other documents that form the
19 basis of your opinions, if any.
20     If the answer is ever "No, I didn't
21 consider those materials and they didn't form the
22 basis of my opinions," please just tell me.  That
23 will speed this along.
24     So what methodology did you use to
25 determine what research, studies, or other documents

Page 183

1  to review?
2      A.  Sure.  I didn't do a systematic review or a
3  meta-analysis of the studies.  And after I was
4  retained, in order to develop the report, I
5  referenced in this -- in this report the studies and
6  materials that I felt were most relevant to
7  supporting my opinions.
8      Q.  So how did you identify the studies if you
9  did not conduct -- I mean, did you run search terms?
10 How did you identify these studies that you relied
11 on?
12     A.  There were searches.  I did reference that
13 in the report.  Some studies were just from my own
14 knowledge.  Some were in conjunction with Bates
15 White helping with -- assisting with a literature
16 review on topics that I would direct.
17     Q.  Did Bates White identify the sources that
18 are listed on your materials considered list under
19 books and academic papers?
20     A.  They identified -- helped to identify some
21 sources with my direction.
22     Q.  What direction did you provide?
23     A.  It would be different for different parts
24 of the report, but there have been examples, I'm
25 sure, throughout the report where there was a

Page 184

1  thought that I would have and I would ask Bates
2  White to help search for a paper that either I knew
3  existed or I had encountered previously.
4      Q.  Did the lawyers ever help you identify any
5  pieces of literature to consider?
6      A.  I --
7      MS. O'NEILL:  Objection.  I'm going to
8  instruct the witness not to answer on the basis of
9  privilege.
10     THE WITNESS:  Okay.  I've been instructed
11 not to answer that question by counsel.
12 BY MS. BARNHART:
13     Q.  Did the lawyers for the State of California
14 provide you any of the sources that are identified
15 on your materials considered list?
16     A.  I don't recall being provided by the
17 attorneys with research materials in the report.
18     Q.  Did the lawyers provide you search terms to
19 use to identify pieces of literature to consider?
20     A.  I don't recall the lawyers providing me
21 with search terms to use.
22     Q.  Did Dr. Anna Lembke refer you to any
23 particular materials to consider in connection with
24 your report?
25     A.  I do not recall Anna Lembke directing me

Page 185

1  towards any materials.
2      Q.  You referenced some search terms that you
3  ran just a little while ago.  In paragraph 24 of
4  your report, you note that over 10,000 articles were
5  returned for just one of those searches; is that
6  right?
7      A.  That is correct.
8      Q.  You did not read all 10,000 of those
9  articles; correct?
10     A.  In the moment that I performed that search,
11 I did not read all 10,000 articles.
12     Q.  And, in fact, you only considered 48 books
13 and academic papers in connection with preparing
14 your reports; correct?
15     A.  I felt that I relied on and referenced
16 enough material that supports my opinion, which is
17 primarily based off of my clinical work.
18     Q.  You only considered material that supports
19 your opinion?
20     A.  I have come across studies that might not
21 support my opinion.
22     Q.  You don't list any of those in your
23 materials considered list; right?
24     A.  They aren't relevant to my opinion and what
25 I see every day in my office.

Page 186

1    Q.   So you don't think they're relevant because
2    they don't support your opinion?
3         MS. O'NEILL:  Objection.  Form.
4         THE WITNESS:  I think they are not relevant
5    to what I'm seeing every day in my practice.
6    BY MS. BARNHART:
7         Q.   Because they don't support your opinions;
8    right?  They don't align with your views?
9         MS. O'NEILL:  Objection.  Form.
10        THE WITNESS:  They don't align with what's
11   happening to the patients I'm seeing.
12   BY MS. BARNHART:
13        Q.   So you considered less than 0.5 percent of
14   the articles that you think could be potentially
15   relevant to your opinions; right?
16        MS. O'NEILL:  Objection.  Form.
17   Mischaracterization.
18        THE WITNESS:  I think I considered
19   certainly enough of the literature and include
20   enough references to support my opinion, which is,
21   again, based primarily off of the work I do as a
22   medical doctor in my practice.
23   BY MS. BARNHART:
24        Q.   Do you believe that your report provides a
25   representative and balanced subset of the overall

Page 187

1    literature?
2         MS. O'NEILL:  Objection.  Form.
3         THE WITNESS:  I don't -- can you repeat the
4    question again for me.
5    BY MS. BARNHART:
6         Q.   Do you believe that the literature that is
7    discussed and cited in your report provides a
8    representative and balanced view of the overall
9    universe of scientific literature on the subject of
10   social media addiction?
11        MS. O'NEILL:  Same objection.
12        THE WITNESS:  I think it is supporting what
13   is actually happening in real life in my office.
14   BY MS. BARNHART:
15        Q.   That's not my question, Dr. Zicherman.
16        My question is whether -- you conceded
17   earlier you have come across studies that actually
18   don't align with what you believe is happening in
19   real life; is that right?
20        A.   That's correct.
21        Q.   Okay.  But you did not -- you chose not to
22   consider those studies for purposes of developing
23   your report in this case; correct?
24        MS. O'NEILL:  Objection.  Form.
25        THE WITNESS:  Well, they don't support what

Page 188

1    is actually happening in the real world with my
2    patients.
3    BY MS. BARNHART:
4         Q.   And so on that basis, you chose not to
5    consider them in your report; correct?
6         MS. O'NEILL:  Objection.  Form.
7         THE WITNESS:  I did not include them in my
8    report as they did not support what I'm seeing in my
9    office.
10   BY MS. BARNHART:
11        Q.   Are you familiar with the concept of a
12   consensus report?
13        A.   You can refresh my memory.
14        Q.   Fair to say that a consensus report
15   represents the scientific consensus on a particular
16   scientific question based on a systematic and
17   thorough review of the relevant scientific
18   literature.
19        A.   Okay.
20        MS. O'NEILL:  Objection.  Form.
21   BY MS. BARNHART:
22        Q.   Do you agree with that?
23        A.   Sounds likely accurate.
24        Q.   Okay.  You do not list any consensus
25   reports on your materials considered list; correct?

Page 189

1         A.   I would have to review my materials, but I
2    do not believe it included what you are stating.
3         Q.   Let me give you an example.
4         Are you familiar with the National
5    Academies of Sciences, Engineering, and Medicine?
6         A.   I have come across that report.
7         Q.   Which report?  I didn't mention the report
8    yet.
9         A.   Okay.  Well, continue.
10        Q.   No.  Go ahead.  Which report?
11        A.   Well, I believe you're about to reference a
12   report, but I -- go ahead.
13        Q.   What report did you have in mind?
14        A.   I -- you tell me.
15        Q.   No, that's my question for you.  What
16   report did you have in mind just now?
17        A.   I don't know.  I can't read your mind,
18   actually, so --
19        Q.   I'm not asking you to read my mind,
20   Dr. Zicherman; I'm asking you what's in your mind.
21        What report were you just referring to?
22        A.   I believe, to fully answer your question, I
23   should wait to see -- discuss or provide the report
24   that you are about to mention.
25        Q.   Dr. Zicherman, when you testified under

CONFIDENTIAL

Page 190

```
 1   oath "I have come across that report," what report
 2   did you have in mind?
 3       A.  I -- perhaps I spoke too soon, and I would
 4   need to listen to what report you were referencing.
 5       Q.  What was in your mind when you said that,
 6   Dr. Zicherman?
 7           MS. O'NEILL:  Objection.  Asked and
 8   answered.
 9           THE WITNESS:  You're going to have to tell
10   me.  I've answered the question.
11   BY MS. BARNHART:
12       Q.  Did you not have any report in mind when
13   you've said "I have come across that report"?
14       A.  Again, I think to accurately answer the
15   question, I'm going to need to see the report that
16   you might discuss.
17       Q.  Do you remember what my question was?
18       A.  Can you state the question again.
19       Q.  Do you remember what it was?
20       A.  You can refresh my memory.
21       Q.  So that's no, you don't remember what my
22   question was?
23           MS. O'NEILL:  Objection.  Asked and
24   answered.  Argumentative.
25           THE WITNESS:  If you have a question, I
```

CONFIDENTIAL

Page 191

```
 1   would like to be able to answer it accurately, which
 2   would involve you repeating it.
 3   BY MS. BARNHART:
 4       Q.  All right.  Listen carefully,
 5   Dr. Zicherman.
 6           Earlier today you testified under oath, "I
 7   have come across that report."
 8           My question to you right now is what report
 9   are you referring to?
10       A.  You know, to answer that question
11   accurately this morning, I would need to reference
12   whatever report you were about to mention.
13       Q.  Dr. Zicherman, this is -- this is what's
14   called being evasive and nonresponsive.  And
15   that's -- you know, we'll go to the court on it if
16   we have to.
17   ***     MS. BARNHART:  I'll mark the transcript again.
18   BY MS. BARNHART:
19       Q.  You testified -- I'm asking you about your
20   testimony, not about my questions.
21           Your testimony was, "I have come across
22   that report."
23           What did you mean by "that report"?
24           MS. O'NEILL:  Objection.  Asked and
25   answered.  Argumentative.
```

CONFIDENTIAL

Page 192

```
 1           THE WITNESS:  I believe at this point, to
 2   accurately and appropriately answer that question, I
 3   would need to hear you state the report.
 4   BY MS. BARNHART:
 5       Q.  I don't know what report you were referring
 6   to; so I can't do that for you.
 7       A.  Or organization, whatever it is.  I --
 8   perhaps I spoke too soon.
 9       Q.  Okay.  We'll try this again.
10           Here's how it went:
11               "Are you familiar with the
12           National Academies of Sciences,
13           Engineering, and Medicine?"
14           That was my question to you.
15           And your response under oath was:
16               "I have come across that report."
17       A.  I am familiar with the organization.
18       Q.  What did you mean by "I have come across
19   that report"?
20           MS. O'NEILL:  Objection.  Asked and
21   answered.
22           THE WITNESS:  I believe I've answered that
23   question.
24   BY MS. BARNHART:
25       Q.  You -- I still have no clue what you meant
```

CONFIDENTIAL

Page 193

```
 1   by "that report" because you refuse to tell me.
 2           Are you willing to tell me what you meant
 3   by "that report"?
 4       A.  I believe that organization has produced a
 5   report on -- in regards to social media.
 6       Q.  And have you reviewed that report?
 7       A.  I have at one point.  I would need to jog
 8   my memory to accurately answer questions about it.
 9       Q.  I can represent to you it's not listed on
10   your materials considered list.
11       A.  Okay.
12       Q.  Why did you choose not to consider it in
13   connection with developing your opinions in this
14   case?
15       A.  Well, again, I listed materials that I
16   believe supported what I'm seeing every day in my
17   office.
18       Q.  So you believe that National Academies of
19   Sciences, Engineering, and Medicine consensus report
20   doesn't support your views?
21           MS. O'NEILL:  Objection.  Form.
22           THE WITNESS:  It might not.  I would have
23   to review the report.
24   BY MS. BARNHART:
25       Q.  Are you generally familiar with the
```

CONFIDENTIAL

Page 194

1  National Academies?
2      A.   Again, I would have to refresh my memory on
3  who they are and any reports that they might have
4  generated to fully and accurately answer questions
5  about it.
6      Q.   Do you have any reason to dispute that the
7  National Academy of Medicine was established in 1970
8  to advise the nation on medical and health issues?
9          MS. O'NEILL:  Objection.  Form.
10  Foundation.
11         THE WITNESS:  I don't have a reason to
12  dispute that.
13  BY MS. BARNHART:
14      Q.   Do you have any reason to dispute that
15  members of the National Academy of Medicine are
16  elected by their peers for distinguished
17  contributions to medicine and health?
18         MS. O'NEILL:  Same objections.
19         THE WITNESS:  I have no reason to disagree.
20  BY MS. BARNHART:
21      Q.   Are you a member of the National Academy of
22  Medicine?
23      A.   I don't believe I am.
24      Q.   Do you have any reason to dispute that the
25  National Academies of Sciences, Engineering, and

CONFIDENTIAL

Page 195

1  Medicine work together to provide independent,
2  objective analysis and advice to the nation?
3          MS. O'NEILL:  Objection.  Foundation.
4          THE WITNESS:  I don't know enough about
5  their background to fully comment, but I'll take
6  your word for it.
7  BY MS. BARNHART:
8      Q.   Do you have any reason to dispute that
9  National Academies Consensus Study Reports document
10  the evidence-based consensus on the study's
11  statement of task by an authoring committee of
12  experts?
13         MS. O'NEILL:  Objection.  Foundation.
14         THE WITNESS:  I have no reason to dispute
15  that.
16  BY MS. BARNHART:
17      Q.   Do you have any reason to dispute that
18  National Academies Consensus Study Reports are
19  subjected to a rigorous and independent peer-review
20  process?
21         MS. O'NEILL:  Same objection.
22         THE WITNESS:  I don't have a dispute there.
23  BY MS. BARNHART:
24      Q.   And it sounds like you are aware that in
25  2024 the National Academies of Sciences,

CONFIDENTIAL

Page 196

1  Engineering, and Medicine published a report called
2  "Social Media and Adolescent Health"; correct?
3      A.   I'm aware that they published a report.
4      Q.   Are you aware that the National Academies
5  had open meetings where researchers could present
6  their views on this topic?
7          MS. O'NEILL:  Objection.  Foundation.
8          THE WITNESS:  I am not familiar with -- I
9  would have to jog my memory on how they reached any
10  conclusions.
11  BY MS. BARNHART:
12      Q.   Were you invited to present your views on
13  social media by the National Academies?
14      A.   Not that I'm aware of.
15         MS. BARNHART:  Let's go ahead and mark that
16  report, which should be Exhibit 15.
17         (Exhibit 15 was marked for
18         identification and is attached to the
19         transcript.)
20  BY MS. BARNHART:
21      Q.   So, Dr. Zicherman, you have in front of you
22  the 2024 National Academies Consensus Study Report
23  you've been discussing.
24         If you can turn to the preface at romanette
25  15 to 16.

CONFIDENTIAL

Page 197

1          Are you there?
2      A.   I believe so.
3      Q.   Okay.  Do you see the last paragraph on
4  this page reads:
5          "The committee recognized that the
6          temptation to draw causal inference and
7          to call for rapid action around social
8          media is strong, and heard during
9          public session from a range of
10         academics and activists who feel
11         strongly that causal links between
12         social media and mental health have
13         been unequivocally established and that
14         there is an urgent need for action."
15         Do you see that?
16      A.   I see that.
17      Q.   Do you have any reason to dispute that the
18  committee heard from a range of academics and
19  activists who do believe, like yourself, that causal
20  links between social media and mental health have
21  been established?
22      A.   I mean, I don't know exactly who they heard
23  from.  I don't know if that includes medical doctors
24  with an addiction training background.
25      Q.   But you have no reason to dispute what I

CONFIDENTIAL

Page 198

1 just said?
2     A.  I simply do not know who the academics and
3 activists were that they heard from during public
4 sessions.
5     Q.  And do you consider yourself to be an
6 activist who feels strongly that causal links
7 between social media and mental health have been
8 unequivocally established?
9         MS. O'NEILL:  Objection.  Form.
10        THE WITNESS:  I do not believe I am an
11 activist; I believe I'm here under an ethical and
12 moral obligation to report on harms I'm seeing.  But
13 beyond that, I would not say I'm an activist.
14 BY MS. BARNHART:
15    Q.  You see the committee goes on to write:
16        "And yet, in careful deliberation
17        and review of the published literature,
18        the committee arrived at more measured
19        conclusions."
20        Do you see that?
21    A.  I see that.
22    Q.  So, unlike you, the committee did consider
23 a range of opinions on this subject; correct?
24        MS. O'NEILL:  Objection.  Form.
25 Foundation.

CONFIDENTIAL

Page 199

1        THE WITNESS:  I mean, I don't know whose
2 opinions they relied on.  I don't know who they
3 spoke with in regards to this report that was
4 generated.
5 BY MS. BARNHART:
6    Q.  You have no reason to dispute that they
7 heard from a range of viewpoints about this issue?
8        MS. O'NEILL:  Same objections.
9        THE WITNESS:  I simply do not know.  I have
10 no idea if they spoke with experts in addiction,
11 evaluation, and treatment, for instance.
12 BY MS. BARNHART:
13    Q.  If you go to the page 94.  The page numbers
14 are in the upper left.
15        Are you there?
16    A.  I'm there.
17    Q.  Sorry.  I am not.  I'm all turned around.
18        Okay.  So if you look at the second full
19 paragraph on page 94, you see that the National
20 Academies wrote:
21        "The committee's review of the
22        literature presented in this chapter
23        and Appendix C did not support the
24        conclusion that social media causes
25        changes in adolescent health at the

CONFIDENTIAL

Page 200

1        population level."
2        Do you see that?
3    A.  I do see that.
4    Q.  Are you aware that the committee considered
5 hundreds of studies on this subject in reaching that
6 conclusion?
7        MS. O'NEILL:  Objection.  Foundation.
8        THE WITNESS:  I would have to refresh
9 myself on all the studies that they relied upon.
10 BY MS. BARNHART:
11    Q.  Well, you're welcome to do that by looking
12 at Appendix C if you'd like.
13        And in the meantime, I'll ask you are you
14 familiar with someone named Megan Moreno?
15    A.  I may be.  I would have to jog my memory.
16        And can I ask what page the appendixes are.
17    Q.  It's at the end, the very end.
18        MS. O'NEILL:  Page 237.
19 BY MS. BARNHART:
20    Q.  And this is just a subset of what they
21 reviewed.
22        Would you have any reason to dispute that
23 the committee considered hundreds of studies on this
24 subject in reaching their conclusion?
25        MS. O'NEILL:  Objection.  Foundation.

CONFIDENTIAL

Page 201

1        THE WITNESS:  I'm still trying to sort
2 through this here.
3 BY MS. BARNHART:
4    Q.  Well, I'm not asking you to count the
5 number of studies in Appendix C; I'm just asking if
6 you have any reason to dispute that the committee
7 considered hundreds of studies in reaching their
8 conclusion that no causation has been established.
9        MS. O'NEILL:  Objection.  Foundation.
10 Calls for speculation.
11        THE WITNESS:  Can you repeat the question.
12 I was looking through this.
13 BY MS. BARNHART:
14    Q.  Do you have any reason to dispute that the
15 committee considered hundreds of studies in reaching
16 their conclusion that no causation has been
17 established?
18        MS. O'NEILL:  Same objections.
19        THE WITNESS:  They might have reached their
20 conclusions, although I would question who was on
21 their committee and if they had any actual medical
22 doctors treating addictions actively on their
23 committee.
24 BY MS. BARNHART:
25    Q.  You don't know one way or the other; right?

CONFIDENTIAL

Page 202

1    A.   I believe I have looked into this before,
2  and I did not come across anyone with that
3  particular background.
4         I'm happy to go through this and see if I'm
5  wrong, but I believe I'm accurate in saying that
6  there was not active treating clinicians in the
7  addiction psychiatry space that are actually also
8  focusing on social media addictions.
9    Q.   All right.  Well, you can look at
10 Appendix B if you want, but I will represent to you
11 that Appendix B reflects the outside researchers and
12 doctors that the committee heard from, as we
13 discussed earlier.
14        And Appendix B reflects that the following
15 people presented to the committee:  Frances Haugen,
16 Jean Twenge, Jonathan Haidt --
17   A.   Uh-huh.
18   Q.   -- Lauren Hale, Damon McCoy.
19        Do you understand that all of the people
20 that I just mentioned are paid plaintiffs' experts?
21        MS. O'NEILL:  Objection.  Foundation.
22        THE WITNESS:  I don't know everyone who's
23 been retained in this case.
24 BY MS. BARNHART:
25   Q.   You have no reason to dispute that, though;

CONFIDENTIAL

Page 203

1  correct?
2         MS. O'NEILL:  Same objection.
3         THE WITNESS:  I simply do not know every
4  expert that's been retained.
5  BY MS. BARNHART:
6    Q.   If you look at page 206 of this National
7  Academies report.
8    A.   Starting to lose track of these pages here.
9  206?
10   Q.   Correct.
11   A.   Okay.
12   Q.   Are you there?
13   A.   Yes.  I just need to organize.  Sorry.
14        Okay.
15   Q.   If you look at the second sentence at the
16 very top of the page, it starts:
17        "Despite widespread public concern
18        about the addictive potential of social
19        media, scientific research on the topic
20        is more guarded."
21        Do you see that?
22   A.   I do see that.
23   Q.   And then the committee cites four studies,
24 none of which appears on your materials considered
25 list; correct?

CONFIDENTIAL

Page 204

1    A.   Were you referencing the study cited,
2  Doucleff, 2023, beginning there?
3    Q.   Correct.
4    A.   I would have to reference, but I do not
5  believe these were in the materials cited.
6    Q.   The committee goes on to say:
7         "A better understanding of
8         patterns of overuse would be a
9         necessary precursor to any efforts to
10        include discussion of problematic use
11        at the meetings to update diagnostic
12        guides, such as the Diagnostic and
13        Statistical Manual of Mental
14        Disorders."
15        Do you see that?
16   A.   I see that.
17   Q.   You can put that to the side.
18        And, again, you don't mention the National
19 Academies report anywhere in your report; correct?
20   A.   Correct.
21   Q.   You do list a book called "Dopamine Nation"
22 by Dr. Lembke on your materials considered list;
23 correct?
24   A.   Correct.
25   Q.   So you chose to read 304 pages of pop

CONFIDENTIAL

Page 205

1  science written by a paid plaintiffs' expert instead
2  of reading a consensus report by the foremost
3  institution on science and medicine in the country;
4  correct?
5         MS. O'NEILL:  Objection.  Form.
6         THE WITNESS:  I believe that Dr. Lembke's
7  book provides valuable insight into addictions that
8  coincides with what I see every day in my office.
9  BY MS. BARNHART:
10   Q.   And that is not a scientific, peer-reviewed
11 report, "Dopamine Nation"; correct?  That's a book?
12   A.   She might have cited peer-reviewed
13 literature, but it is her book.
14   Q.   You don't know that she cited any
15 peer-reviewed literature; correct?
16   A.   I would have to review --
17        MS. O'NEILL:  Objection to form.
18        THE WITNESS:  I would have to review the
19 references.
20 BY MS. BARNHART:
21   Q.   And she is a paid plaintiffs' expert in
22 this litigation; correct?
23        MS. O'NEILL:  Objection.  Foundation.
24        THE WITNESS:  We've had discussions about
25 that today.  It appears to be the case.

Page 206

1  BY MS. BARNHART:

2      Q.   Your materials considered list also lists

3  articles by Melissa Hunt, Eva Telzer, Mark

4  Griffiths, and Mitch Prinstein; correct?

5      A.   I believe that to be correct.

6      Q.   Your materials considered list lists seven

7  articles by those individuals, who are also all paid

8  plaintiffs' experts; correct?

9          MS. O'NEILL:  Objection.  Foundation.

10          THE WITNESS:  Again, I don't know all the

11  details of everyone who has been retained in this

12  case.

13  BY MS. BARNHART:

14      Q.   So you did not -- well, let me just ask it

15  this way:

16          Do you agree with me, Dr. Zicherman, that

17  the scientific literature presented in your

18  materials considered list and in your report is not

19  an evenhanded and balanced representation of that

20  broader universe of literature?

21          MS. O'NEILL:  Objection.  Form.

22          THE WITNESS:  Yeah, I reached my

23  conclusions primarily based off of my clinical work.

24  And the references that I utilize are in support of

25  what I see every day working with very sick children

Page 207

1  and teenagers.

2  BY MS. BARNHART:

3      Q.   And that's all I'm trying to understand is

4  you didn't set out to do a separate and independent,

5  evenhanded, balanced review of the literature; you

6  simply sought to identify literature that supported

7  your clinical experience.  Correct?

8          MS. O'NEILL:  Objection.  Form.

9          THE WITNESS:  I stated before I did not do

10  a meta-analysis or a complex statistical -- formal

11  statistical study evaluating all of the information

12  that is out there in regards to this.  I found

13  studies that support what I see every day in

14  practice.

15  BY MS. BARNHART:

16      Q.   Okay.  And you did not look for studies

17  that might be at odds with what you see every day in

18  your clinical practice.

19          MS. O'NEILL:  Objection.  Form.

20          THE WITNESS:  They would be at odds with

21  what is actually happening in the real world.

22  BY MS. BARNHART:

23      Q.   So can you answer my question?

24          You did not seek out studies that might be

25  at odds with what you see every day in your clinical

Page 208

1  practice?

2          MS. O'NEILL:  Objection.  Form.

3          THE WITNESS:  Again, I reference studies

4  that are relevant to supporting my opinion, which is

5  primarily driven and developed based off of actually

6  working with kids that I see with significant social

7  media addictions.

8  BY MS. BARNHART:

9      Q.   You did not consider any documents produced

10  by any of the parties in this litigation in

11  developing your opinions; correct?

12      A.   Documents produced by parties in this

13  litigation?

14      Q.   Are you aware that Meta has produced

15  millions of documents in this litigation?

16      A.   I am not familiar with how many documents

17  Meta has produced in this litigation.

18      Q.   Are you aware that Meta has produced

19  documents in this litigation?

20      A.   I am aware that documents have been

21  produced.

22      Q.   And you did not consider those -- any of

23  those documents in forming your opinions; correct?

24      A.   I did not consider internal documents in my

25  opinion.

Page 209

1      Q.   Because you didn't think that Meta's

2  internal documents would be relevant to your

3  opinions; correct?

4          MS. O'NEILL:  Objection.  Form.

5          THE WITNESS:  Well, yeah, I'm here to

6  primarily discuss -- well, I'm here to discuss my

7  opinion, which is, again, primarily driven by

8  working with patients every day who are very, very

9  sick.

10  BY MS. BARNHART:

11      Q.   I don't think I got an answer to my

12  question.

13          You didn't believe that Meta's internal

14  documents would be relevant to your opinions;

15  correct?

16      A.   You know, I'm not sure what internal

17  documents you might be referencing, but what was

18  relevant to my opinion was the research that I cited

19  and primarily my clinic work.

20      Q.   You also didn't consider any documents

21  produced by any of the states that you represent;

22  correct?

23      A.   Documents produced by the states that are

24  involved in this litigation?

25      Q.   Correct.

CONFIDENTIAL

Page 210

1  A.  I believe -- again, I relied upon the
2  research that I referenced and my clinical work.
3  Q.  You didn't consider any deposition
4  transcripts in forming your opinions; correct?
5  A.  Deposition transcripts are not important --
6  or, I believe, relevant to my report, which is,
7  again, primarily driven by my work with patients.
8  Q.  Do you understand that all of the states
9  that you represent have public health agencies?
10  A.  Sounds correct.
11  Q.  And you understand that all of those state
12  public health agencies are concerned with the mental
13  health of adolescents who reside in that state?
14        MS. O'NEILL:  Objection.  Foundation.
15        THE WITNESS:  I would hope that to be the
16  case.
17  BY MS. BARNHART:
18  Q.  Do you have any idea whether your expert
19  opinions in this case are consistent with those of
20  public health experts in each of the 29 states you
21  represent?
22        MS. O'NEILL:  Objection.  Form.
23        THE WITNESS:  I would have to see what is
24  written and what has been provided in regards to
25  these public health departments.

CONFIDENTIAL

Page 211

1  BY MS. BARNHART:
2  Q.  And you have not done that.  You did not
3  consider any materials from those public health
4  agencies in forming your opinions; correct?
5  A.  Well, I considered, again, what I have
6  referenced in support of what I see in my office.
7  Q.  So I take that that's a "no."
8        You didn't consider any materials from any
9  of the state public health agencies in this
10  litigation when forming your opinions?
11  A.  Again, I would have to jog my memory, you
12  know, what is out there.  And I'm happy to review
13  public health records from various states, but that
14  was not any substantial part of what led to my
15  opinion and report.
16  Q.  Dr. Zicherman, do you agree that
17  preexisting psychiatric disorders can cause
18  adolescents to use social media for longer periods
19  of time?
20        MS. O'NEILL:  Objection.  Form.
21        THE WITNESS:  Sure.  I can't sit here and
22  say social media is always the driver of depression.
23        It's like -- sorry.  I can't say that
24  someone with mental health concerns who had
25  depression and that led to a cascade of use of an

CONFIDENTIAL

Page 212

1  app like Instagram.  That can happen.  That can
2  certainly happen.
3        But what I am seeing is that kids are
4  coming in who I believe would not have otherwise
5  been depressed -- anxious, issues with insomnia,
6  family, academics -- if their social media use was
7  not the primary driver of what is happening.
8  BY MS. BARNHART:
9  Q.  When your teen patients present to you,
10  they present to you in a dual diagnosis clinic;
11  correct?
12  A.  Yeah.  It's considered a dual diagnosis
13  clinic.
14  Q.  And that means that when these teen
15  patients present to you, they already have both some
16  form of addictive behavior as well as some other
17  psychiatric disorder; correct?
18  A.  That is often the case, but even though we
19  call it a dual diagnosis clinic, potentially someone
20  could come in just with an addiction concern.
21  Q.  That's not what your report says, is it?
22        MS. O'NEILL:  Objection.  Form.
23        THE WITNESS:  In theory, someone could
24  potentially have just an addiction diagnosis; but,
25  primarily, just about all of the patients I work

CONFIDENTIAL

Page 213

1  with do have a dual diagnosis.
2  BY MS. BARNHART:
3  Q.  Okay.  I'm not talking about theoretical;
4  I'm talking about what you believe to be your
5  clinical experience.
6        So you operate a dual diagnosis clinic
7  where your patients have both addiction concerns and
8  other mental health concerns; correct?
9  A.  That is generally the case.
10  Q.  Okay.  In that case, there could be at
11  least three possible explanations of the
12  relationship between those two things; right?
13        MS. O'NEILL:  Objection.
14  BY MS. BARNHART:
15  Q.  Let me try three of them with you.
16        One possible explanation of someone
17  presenting with both a mental health concern and an
18  addiction concern is that the addiction caused the
19  mental health concern; right?
20  A.  Well, that is what I am seeing in regards
21  to social media in my office.
22  Q.  Yeah, we're going to go through three
23  possible explanations.
24  A.  Okay.
25  Q.  So that's one; right?  One explanation is

CONFIDENTIAL

Page 214

1  that the addiction causes the mental health concern.
2      A.   And that's the most likely explanation and
3  the most likely outcome of what I'm seeing in my
4  office.
5      Q.   Yeah, we're going to get to that,
6  Dr. Zicherman.  One thing at a time.
7      A.   Okay.
8      Q.   Another -- a second possible explanation is
9  that the mental health concern causes the addictive
10  behavior; correct?
11      A.   Unlikely.  It's possible but not probable
12  with the patients that I'm working with.
13      Q.   Do you recall appearing on a podcast called
14  "Screen Stories"?
15      A.   I believe I did appear on a podcast called
16  "Screen Stories."
17      Q.   What is that podcast?
18      A.   I remember the name.  I honestly would have
19  to jog my memory to recall exactly the details of
20  the podcast.
21      Q.   I have that you appeared on September 28,
22  2022.  Does that sound about right?
23      A.   It sounds like -- reasonably accurate.
24      Q.   And that was before you were a paid expert
25  in this litigation; correct?

CONFIDENTIAL

Page 215

1      A.   Correct.
2      Q.   All right.  We're going to play you a
3  couple of excerpts from that podcast.
4           MS. BARNHART:  We'll mark this as tab -- or
5  excuse me -- we'll mark this as Exhibit 16.
6           (Exhibit 16 was marked for
7           identification and is attached to the
8           transcript.)
9           MS. O'NEILL:  Counsel, do you have a
10  transcript of those videos?
11           MS. BARNHART:  We'll hand you the
12  slipsheet.
13           MS. O'NEILL:  I'm just going to object for
14  the record that we're not getting a transcript, and
15  I think we should.
16           MS. BARNHART:  Well, I don't think you've
17  been giving us transcripts as a matter of course
18  across these depositions.  You've got the link that
19  we pulled this from.  You can go play it to your
20  witness if you'd like.
21           So we'll go ahead and play the first clip.
22           (Podcast playing.)
23           MS. O'NEILL:  Can we see the video?
24           MS. BARNHART:  Can we pause?
25           We'll start again.  This is a podcast.

CONFIDENTIAL

Page 216

1           MS. O'NEILL:  Oh, I'm sorry.  No video.
2           MS. BARNHART:  There's not a video.
3           MS. O'NEILL:  I apologize.
4           MS. BARNHART:  So let's start it over.
5           Yeah, can you turn it up just a little bit
6  more.
7           (Podcast playing.)
8  BY MS. BARNHART:
9      Q.   What you're saying there -- that was you;
10  correct?
11      A.   It sounds like me.
12           MS. BARNHART:  Okay.
13           MS. O'NEILL:  And I'm just going to object
14  for the record for the use of a shortened clip
15  instead of the entire recording.
16  BY MS. BARNHART:
17      Q.   What you're saying there, Dr. Zicherman, is
18  that suicidal ideation comes first and then the
19  social media use comes second; correct?
20           MS. O'NEILL:  Objection.
21  Mischaracterization.
22           THE WITNESS:  I believe this is likely
23  taken out of context.  And to most accurately answer
24  your question, I would need to hear more of this
25  podcast.

CONFIDENTIAL

Page 217

1  BY MS. BARNHART:
2      Q.   All right.  But you said those words that
3  we just heard; correct?
4      A.   It sounds like it's taken out of context.
5  It's hard for me to answer your question without
6  knowing what I said before or after.
7      Q.   Well, do you stand by your statement that
8  patients who might have frequent and chronic
9  suicidal thinking could cope with that mental health
10  concern by using social media; in other words,
11  social media might alleviate their mental health
12  concerns?
13      A.   Well, again, to most accurately answer that
14  question, I need to hear more of the podcast.  This
15  was several years ago.  We'll say I'm entitled to
16  have evolving thoughts and opinions on this.
17           And the idea I think you're saying is that
18  kids with chronic suicidal ideation might resolve to
19  their phone or their social media accounts?  Is
20  that -- is that what I said?  I honestly would
21  almost need this repeated.
22      Q.   Do you remember my question, Dr. Zicherman?
23      A.   You can repeat it.
24      Q.   All right.  Let's try to keep my questions
25  in mind.  I'm repeating a lot of questions, and

Page 218

1  that's leading to an extended deposition. We're
2  going to have to keep the deposition open if I have
3  to keep repeating my questions.
4      So just focus on answering my questions.
5      My question was do you stand by your
6  statement that patients who might have frequent and
7  chronic suicidal thinking could cope with that
8  mental health concern by using social media?
9      A.  I believe -- this is the summer of 2025
10 now. I've worked with enough patients to say that I
11 believe it is more likely that someone with suicidal
12 ideation will look at social media, and that
13 suicidal ideation is likely to only worsen.
14     Q.  And the basis for your statement is simply
15 your memory over the last three years?
16     A.  Working --
17     MS. O'NEILL:  Objection. Form.
18     THE WITNESS:  Working with enough patients
19 over the years, the problem has become more and more
20 apparent and clear to me.
21 BY MS. BARNHART:
22     Q.  So you are -- you no longer stand by your
23 statement in September of 2022 on this podcast?
24     A.  Well, I think there can be situations where
25 maybe there's an outlier and a patient finds some

Page 219

1  sort of salvation in social media.
2      This is a spectrum. But the majority of
3  patients that I'm working with, the case will be
4  that they will use social media, and the mental
5  health component will only worsen, and often
6  significantly worsen, whether it's the development
7  and severity of suicidal ideation, depression,
8  anxiety, insomnia, so on and so forth.
9      Q.  Did you believe this statement to be true
10 when you made it in September 2022?
11     A.  I really would need to accurately answer
12 that question by listening to the entire podcast
13 segment. So this is handicapping me in answering
14 the question, but maybe there's a scenario where
15 that can be possible.
16     Q.  You're welcome to listen to it on your own
17 free time, but I have very limited time today, which
18 is why I'm trying to speed this along.
19     You don't have a habit of saying untrue
20 statements on podcasts, do you?
21     MS. O'NEILL:  Objection. Form.
22     THE WITNESS:  I go on podcasts and state
23 what I believe to be the truth of what I am seeing
24 and what I'm working with.
25     MS. BARNHART:  Okay. Then let's play

Page 220

1  another statement that you said on that same
2  podcast.
3      (Podcast playing.)
4  BY MS. BARNHART:
5      Q.  So there you're saying that the causal link
6  in your view between mental health disorders and
7  excessive use of technology could just as easily go
8  in the direction of mental health disorder causing
9  excessive use of technology; correct?
10     MS. O'NEILL:  Objection. Characterization.
11     THE WITNESS:  I don't believe I can
12 accurately answer your question listening to a very,
13 very brief snippet of the podcast. I'm happy to
14 listen to the entire podcast while we're here,
15 comment more on it. This was in 2022.
16     And also, honestly, I would need that
17 replayed to fully and accurately comment on it
18 again. I didn't hear --
19     MS. BARNHART:  All right. We can replay
20 it. Listen carefully, please.
21     (Podcast playing.)
22     THE WITNESS:  Yeah, I feel like I can't
23 really fully accurately answer that question without
24 hearing the rest of the -- the podcast.
25 ///

Page 221

1  BY MS. BARNHART:
2      Q.  So do you or do you not -- it's a yes-or-no
3  question.
4      Do you agree today with the statement that:
5          "It is just as likely that
6          excessive use of technology causes
7          mental health disorders as mental
8          health disorders cause excessive use of
9          technology"?
10     MS. O'NEILL:  Objection.
11 Mischaracterization.
12     THE WITNESS:  Yeah, I believe all I said
13 was "It does."
14 BY MS. BARNHART:
15     Q.  Just as easily go in the other direction?
16     MS. O'NEILL:  Same objection.
17     THE WITNESS:  Play it again. I believe all
18 I said at the end was "It does."
19 BY MS. BARNHART:
20     Q.  In response to the questioner's question?
21     A.  You can play it again. I mean, I want to
22 provide an accurate answer.
23     Q.  I'm concerned about your faculty and
24 memory, sir, because I'm having to repeat things
25 over and over and over again, which doesn't reflect

CONFIDENTIAL

Page 222

```
 1  well on your personal memory abilities.
 2          If you would like to play it again, you can
 3  listen to it on the next break.  I'm not going to
 4  waste my time on the record.
 5      A.   Okay.
 6      Q.   But I want to know do you or do you not
 7  agree, sitting here today, with the statement that
 8  it is just as likely that mental health disorders
 9  can cause excessive use of technology?
10      A.   I mean, I believe that that is pulling a
11  statement out of context.
12          I will -- and I did say this earlier.
13          There's a chance that someone's mental
14  health can trigger use of -- or maybe excessive use
15  of a platform.  But what I'm seeing in 2025, the
16  summer of 2025 leading up to this day, is that it is
17  a situation where use of the app -- of the Instagram
18  platform is what I see driving primarily mental
19  health concerns in the patients that come to my
20  clinic.
21      Q.   Do you make any effort -- when a patient
22  presents with both mental health concerns and
23  purported Instagram addiction, do you make any
24  effort to determine whether the mental health
25  concern is driving the Instagram use?
```

CONFIDENTIAL

Page 223

```
 1          MS. O'NEILL:  Objection.  Form.
 2          THE WITNESS:  I do a comprehensive
 3  evaluation of every patient that comes through the
 4  door, including an extensive mental health history
 5  and a history of using social media platforms or
 6  other technology, whatever it might be.  I want as
 7  much information as I can have to make an accurate
 8  assessment and diagnosis and plan.
 9  BY MS. BARNHART:
10      Q.   And by "comprehensive evaluation," you mean
11  you're just asking these patients questions;
12  correct?
13          MS. O'NEILL:  Objection.
14  Mischaracterization.
15          THE WITNESS:  That's what seeing a patient
16  is.  It's asking questions.
17  BY MS. BARNHART:
18      Q.   You're relying on the patient's recall and
19  the parents of the patient's recall; correct?
20      A.   Well, that's what we do in medicine.  We
21  talk to patients.  And when we work with children,
22  adolescents, teenagers, we rely on parents.  So we
23  get two different accounts.
24      Q.   So your opinions in this case not only rely
25  on your own memory faculties but also the memories
```

CONFIDENTIAL

Page 224

```
 1  of your patients and the parents of the patients;
 2  correct?
 3          MS. O'NEILL:  Objection.  Form.
 4          THE WITNESS:  Well, seeing a patient in a
 5  doctor's office is a product of conversation and
 6  interview that -- you know, for me, I believe is
 7  quite thorough and takes quite a significant amount
 8  of time.
 9  BY MS. BARNHART:
10      Q.   You didn't answer my question,
11  Dr. Zicherman.
12          Do you remember it?
13      A.   Well, you can rephrase that.  I want to
14  answer your question as accurately as I can.
15      Q.   Do you remember it?
16      A.   Can you restate it, please.
17      Q.   Did you forget it?
18      A.   Well, restate it.
19          MS. O'NEILL:  Objection.  Argumentative.
20  BY MS. BARNHART:
21      Q.   All right.  This is probably the 20th
22  question you forgot today, just for the record.  We
23  can do a count at the end.
24          MS. O'NEILL:  Objection to that preamble.
25  ///
```

CONFIDENTIAL

Page 225

```
 1  BY MS. BARNHART:
 2      Q.   My question was your opinions in this case
 3  not only rely on your own memory abilities, which
 4  have been called into question today, but also the
 5  memories of your patients and the parents of those
 6  patients; correct?
 7          MS. O'NEILL:  Objection.  Form.
 8  Argumentative.
 9          THE WITNESS:  Well, yeah.  A significant
10  part of a clinical assessment is a patient and
11  parent recollection, which involves memory.
12          MS. BARNHART:  Why don't we go off the
13  record.
14          THE VIDEOGRAPHER:  Stand by.  The time
15  is 2:53 p.m.  We're going off the record.
16          (Recess taken.)
17          THE VIDEOGRAPHER:  The time is 3:15 p.m.,
18  and we are back on the record.
19  BY MS. BARNHART:
20      Q.   Dr. Zicherman, if you can look at your
21  report, which is Exhibit 1.  And I'm on page 8.
22          I'm sorry.  I'm not on page 8.  Hold on one
23  second.  I am at paragraph 1 at the introduction
24  under your summary of opinions.
25          Let me know when you're there.
```

CONFIDENTIAL

Page 226

1    A.   So page 2?
2    Q.   Correct.
3         Your first opinion under your summary of
4    opinions starts:
5              "Social media addiction is a
6         serious concern acknowledged by mental
7         health professionals."
8         Do you see that?
9    A.   I do see that.
10   Q.   When you say "acknowledged by mental health
11   professionals," you do not mean that all mental
12   health professionals accept the view that social
13   media addiction is a serious concern; correct?
14   A.   I believe that many do accept this, but
15   there might be some mental health professionals out
16   there that are not aware of this problem or in
17   agreement yet.
18        But I'd say those that are working in this
19   space are in agreement that this is a significant
20   concern.
21   Q.   In fact, you know that a significant number
22   of psychiatrists working in this space do not
23   believe that social media addiction is a serious
24   concern; correct?
25        MS. O'NEILL:  Objection.  Form.

CONFIDENTIAL

Page 227

1         THE WITNESS:  There might be psychiatrists
2    that don't agree, but I believe that most do agree.
3    And most psychiatrists with a subspecialty in child
4    and adolescent psychiatry and addiction psychiatry
5    would agree with this.
6    BY MS. BARNHART:
7    Q.   Are you familiar with the Diagnostic and
8    Statistical Manual of Mental Disorders?
9    A.   I am.
10   Q.   That's often referred to as the DSM?
11   A.   I am familiar.
12   Q.   And do you understand that the DSM provides
13   a standardized means of classifying and diagnosing
14   psychiatric disorders?
15   A.   That's intended to be a purpose of it.
16   Q.   Okay.  If you look at paragraph 25 of your
17   report -- we'll use your own words.
18             "The DSM is a standardized
19        classification of mental disorders used
20        by mental health professionals in the
21        United States."
22        Do you see that?
23   A.   Sorry.  You said paragraph 25?
24   Q.   Correct.
25   A.   Okay.

CONFIDENTIAL

Page 228

1    Q.   Starting at the end of page 9, it starts
2    "The DSM."
3         Do you see that?
4    A.   Okay.  I see it.
5    Q.   And it goes on to the next page.  I'll read
6    it again.
7              "The DSM is a standardized
8         classification of mental disorders used
9         by mental health professionals in the
10        United States."
11        Do you see that?
12   A.   Yes.
13   Q.   And you stand by that statement in your
14   report?
15   A.   Yes.
16   Q.   Okay.  Are you aware of any means of
17   classifying and diagnosing psychiatric disorders
18   that's more authoritative than the DSM in the United
19   States?
20        MS. O'NEILL:  Objection.  Form.
21        THE WITNESS:  More authoritative as far as
22   diagnosing?  Oh, there are, you know, ways that you
23   can diagnose an individual beyond just the DSM,
24   which I would say is a pretty flawed entity in many
25   ways and often has significant lag time when it

CONFIDENTIAL

Page 229

1    comes to the actual development and publication of
2    particular ailments from the time that we actually
3    recognize a problem.
4    BY MS. BARNHART:
5    Q.   You don't say anything about there being
6    flaws in the DSM in your report, do you?
7    A.   Well, I believe that a concern about the
8    DSM is that it has a -- often, I would say,
9    problematic lag time from the time of, you know,
10   clinicians recognizing a condition that they are
11   seeing and treating to the time that a condition
12   arrives in the DSM.
13   Q.   Do you remember my question, Dr. Zicherman?
14   A.   Can you please repeat it.
15   Q.   Did you forget it?
16   A.   Well, I'd like to answer your questions
17   accurately; so I would love to hear you repeat the
18   question.
19   Q.   Okay.  That's because you've forgotten it
20   in the 10 seconds since I asked it; correct?
21        MS. O'NEILL:  Objection.  Argumentative.
22   BY MS. BARNHART:
23   Q.   You've forgotten it?
24   A.   If you have the question, I'm happy to
25   answer it.

CONFIDENTIAL

Page 230

1    Q.   Okay.  Please pay attention to my
2  questions.
3        You don't say anything about there being
4  flaws in the DSM in your report, do you?
5    A.   Okay.  I don't know if I necessarily say
6  "flaws," but there are certainly issues with the
7  DSM, like I mentioned, including lag time and the
8  fact that this is primarily a tool that helps
9  actuaries and researchers.
10       And there are plenty of conditions
11 acknowledged within mental health that we know
12 exist, we treat, that are not actually in the DSM at
13 this point.
14   Q.   You can't, sitting here right now, point me
15 to anything in your report that describes purported
16 flaws in the DSM; correct?
17   A.   Well, in the report, I reference that --
18 excuse me -- that it has not yet recognized
19 specifically social media addiction.  And I believe
20 that is due to the lengthy lag time that they've
21 demonstrated historically.
22   Q.   Do you remember my question, Dr. Zicherman?
23   A.   About flaws.
24   Q.   Yeah.  What did I ask you?
25   A.   Again, if you want to repeat the actual

CONFIDENTIAL

Page 231

1  question, I'm happy to hear you repeat it.
2    Q.   I said you can't, sitting here right now,
3  point me to anything in your report -- and I'm
4  talking specific paragraph number -- that describes
5  purported flaws in the DSM.
6    A.   Well, again, if you want to call it a flaw,
7  if that's the language you want to use, I would say
8  that lag time is a concern which I have referenced
9  in my report.
10   Q.   "Flaw" was your word, Dr. Zicherman.  So
11 where in your report do you reference lag time?
12   A.   Well, for instance, I do reference that the
13 DSM-5 was last published in 2013.
14   Q.   Okay.  Let's talk about that.
15       You're talking about paragraph 25, top of
16 page 10; right?
17   A.   Correct.
18   Q.   And as you noted, you say the current
19 edition is the DSM-5, published in 2013.
20   A.   Correct.
21   Q.   You repeat that same statement in your
22 rebuttal report; correct?
23   A.   I believe I did.
24   Q.   Do you believe that the statement is a true
25 and accurate statement?

CONFIDENTIAL

Page 232

1    A.   That the current edition was published in
2  2013?
3    Q.   Correct.
4    A.   Yes.  That's accurate.
5    Q.   Okay.  In the sentence, the way you wrote
6  this, you said DSM-5, but you used a Roman
7  numeral V.
8        Do you see that?
9    A.   I do see that.
10   Q.   Do you agree with me that any serious
11 psychiatrist knows that the DSM-5 was the first
12 edition of the DSM to use Arabic as opposed to Roman
13 numerals?
14       MS. O'NEILL:  Objection.  Form.
15       THE WITNESS:  Okay.  That's interesting to
16 note.
17 BY MS. BARNHART:
18   Q.   You didn't know that?
19   A.   Sorry.  I have, you know, very important
20 things to pay attention to in clinic and working
21 with patients that the nomenclature for 5 -- sorry.
22 I don't find that all that important to my work.
23   Q.   Have you actually opened the DSM-5 ever in
24 your career?
25   A.   I have.

CONFIDENTIAL

Page 233

1        MS. O'NEILL:  Objection to form.
2  BY MS. BARNHART:
3    Q.   Okay.  So you use the DSM-5 in your work;
4  right?
5    A.   The DSM-5 is a part of my work.
6    Q.   Do you have a hard copy of the DSM-5 in
7  your office?
8    A.   It depends on which office I'm in on which
9  day.
10   Q.   Do you have a hard copy anywhere?  Do you
11 possess a hard copy of the DSM 5?
12   A.   Yes.
13   Q.   You have seen the cover of the DSM-5 many
14 times?
15   A.   I've seen the cover.
16   Q.   Probably every day; right?
17   A.   Well, maybe not every day.
18   Q.   How often do you look at the cover of the
19 DSM 5?
20   A.   Hard to answer -- to estimate that.  Again,
21 it depends on which office I'm in, which day, and if
22 it has a copy of the DSM in it.
23   Q.   Are you aware of any credentialed
24 psychiatrist who uses Roman numerals to refer to the
25 DSM-5?

CONFIDENTIAL

Page 234

1    MS. O'NEILL:  Objection.  Foundation.
2    THE WITNESS:  There probably are
3  professionals out there that use -- reference it
4  with Roman numerals or not.
5  BY MS. BARNHART:
6    Q.   Can you name any other professional that
7  uses a Roman numeral to reference DSM-5?
8    A.   Not offhand.  I would have to think about
9  it.
10   Q.   All right.  Let me know if it comes to you
11 at any point today.
12   A.   Okay.
13   Q.   It's also true that the DSM-5 is not the
14 current edition of the DSM; correct?
15   MS. O'NEILL:  Objection.  Form.
16   THE WITNESS:  Well, it's technically the
17 most recent form.
18 BY MS. BARNHART:
19   Q.   What do you mean by "technically"?
20   A.   Well, I believe they did come out with an
21 update a few years later, but it's not considered
22 DSM-6.
23   Q.   That's correct.  What was the update?
24   A.   I -- without looking at it, I'd want to
25 refresh my memory on the exact title of it.

CONFIDENTIAL

Page 235

1    Q.   You understand there was an update called
2  the DSM-5 Text Revision in 2022?
3    A.   That sounds like the correct name of it.
4    Q.   And that's the current version of the DSM;
5  right?
6    A.   That is the most recent update that they
7  have published.
8    Q.   And why didn't you mention that update in
9  your report?
10   MS. O'NEILL:  Objection.  Form.
11 Mischaracterizes the report.
12   THE WITNESS:  I reference criteria for
13 substance use disorders in particular, which is in
14 DSM-5.
15 BY MS. BARNHART:
16   Q.   Well, you go out of your way in your report
17 to say that the current edition of the DSM-5 was
18 published when social media was only in its infancy;
19 right?
20   MS. O'NEILL:  Objection.  Form.
21   THE WITNESS:  Well, DSM-5 was published in
22 2013, which is certainly the very early stages of
23 the Instagram platform.
24 BY MS. BARNHART:
25   Q.   You don't mention that the DSM-5-TR was

CONFIDENTIAL

Page 236

1  just published three years ago; right?
2    MS. O'NEILL:  Objection.  Form.
3  Mischaracterization.
4    THE WITNESS:  I do not believe I reference
5  that in the report.
6  BY MS. BARNHART:
7    Q.   Social media was not in its infancy in
8  2022; correct?
9    A.   I would say that social media has evolved,
10 and there certainly are more users over time, I'm
11 sure.  And, you know, there can be significant lag
12 time between seeing a condition in a doctor's office
13 and seeing that condition actually listed in the
14 DSM.
15   Q.   All right.  Do you remember my question,
16 Dr. Zicherman?
17   A.   I'm happy to hear you repeat it.
18   Q.   Did you forget it again?
19   A.   Well, I'd like to answer your questions
20 accurately.
21   Q.   Okay.  I really would like you to pay
22 attention.
23   A.   I'm trying my best.
24   Q.   Do you agree with me that social media was
25 not in its infancy in 2022?

CONFIDENTIAL

Page 237

1    A.   I think the word "infancy" is relative.
2  You know, even if you say it's been around for 10 or
3  so years now, I think you can still say that that's
4  infancy.
5    Q.   A 10-year-old is an infant in your view?
6    A.   So I would not equate the development of an
7  app with the development of a child.
8    MS. BARNHART:  All right.  I'm going to
9  show you what's been marked as Exhibit 17.
10   (Exhibit 17 was marked for
11   identification and is attached to the
12   transcript.)
13 BY MS. BARNHART:
14   Q.   So Exhibit 17 is a press release from the
15 American Psychiatric Association dated March 18th,
16 2022.
17   Do you see that?
18   A.   I do.
19   Q.   Have you seen this document before?
20   A.   It appears familiar.
21   Q.   This is a press release discussing the
22 release of the DSM-5-TR in 2022; correct?
23   A.   That appears correct.
24   Q.   And do you see the second paragraph --
25 well, let me start with the first paragraph.  The

Page 238

1  second sentence of the first paragraph says:
2        "The DSM, which the American
3        Psychiatric Association has published
4        and updated since 1952" --
5  A.   Second sentence, first paragraph?
6  Q.   Correct.
7  A.   Okay.
8  Q.   (Reading):
9        "The DSM, which the American
10       Psychiatric Association has published
11       and updated since 1952, defines and
12       classifies mental disorders in order to
13       improve diagnosis, treatment, and
14       research."
15       Do you see that?
16  A.   I do see that.
17  Q.   You don't have any reason to dispute that
18  description, do you?
19  A.   I don't have any reason to dispute that
20  description.
21  Q.   If you look at the next paragraph, it says
22  that the DSM-5-TR was developed with the help of
23  more than 200 subject matter experts.
24       Do you see that?
25  A.   I do see that.

Page 239

1  Q.   Do you have any reason to dispute that?
2  A.   I do not.
3  Q.   In the third paragraph, this press release
4  says that:
5        "The DSM-5-TR incorporated
6        feedback from 29 global experts in
7        cultural psychiatry, psychology, and
8        anthropology."
9        Any reason to dispute that?
10  A.   I have no reason to dispute that.
11  Q.   The paragraph goes on to say that the
12  DSM-5-TR incorporated feedback from an additional 14
13  mental health practitioners from diverse backgrounds
14  with expertise in disparity-reduction practices.
15       Any reason to dispute that?
16  A.   I do not have reason to dispute that.
17  Q.   Do you understand that since the DSM-5-TR
18  was released in March of 2022, the DSM has also been
19  updated through an online process on an annual
20  basis?
21  A.   I am aware that there can be some update
22  processes involved with the DSM.
23  Q.   Are you aware that researchers who wish to
24  propose updates to the DSM can submit proposals
25  through the online portal?

Page 240

1  A.   I was not aware of the exact mechanism that
2  changes can be proposed.
3  Q.   Have you ever submitted a proposal to add
4  social media addiction to the DSM-5?
5  A.   I have not; but now that you've made me
6  aware, maybe I should be involved with that.
7  Q.   You should.  You weren't aware before?
8  A.   I was not aware that was the mechanism to
9  submit potential changes.
10  Q.   Are you aware that online proposals undergo
11  an extensive multistage review process by panels of
12  experts before final approval and inclusion if
13  appropriate?
14       MS. O'NEILL:  Objection.  Foundation.
15       THE WITNESS:  That sounds like it could be
16  accurate.
17  BY MS. BARNHART:
18  Q.   Dr. Zicherman, if you do submit an online
19  proposal to add social media addiction to the DSM-5,
20  will you give us a copy of that proposal?
21  A.   I don't see why I would not be able to.
22  Q.   Okay.  Thank you.
23       Am I correct, Dr. Zicherman, that the DSM-5
24  does not recognize a condition called social media
25  addiction?

Page 241

1  A.   It is not currently listed in the DSM; but
2  I would, of course, add, to fully answer that
3  question, whether it's in the DSM or not, it's not
4  really relevant to what I see and what I do.
5       I see kids who are very sick with, often,
6  severe social media use concerns.  And whether that
7  is listed as a condition or not, I'd have to -- I
8  have to evaluate and treat those individuals.
9  Q.   Do you remember what my question was?
10  A.   If the DSM-5 currently lists social media
11  use disorder, I believe.
12  Q.   That was a pretty good recollection.  One
13  for a hundred.
14       Let's just keep to my questions.  Your
15  counsel can ask you whatever questions she wants at
16  the end of this if she wants to talk more about your
17  clinical experience.  Okay?
18  A.   Okay.
19       MS. BARNHART:  Okay.  So let's take a look
20  at what the DSM-5-TR does say about behavioral
21  disorders.
22       I'm going to mark as Exhibit 18 some
23  excerpts from the DSM-5-TR.
24  ///
25  ///

CONFIDENTIAL

```
 1          (Exhibit 18 was marked for
 2      identification and is attached to the
 3      transcript.)
 4  BY MS. BARNHART:
 5      Q.   So as I'm sure you understand, the DSM-5-TR
 6  is an extremely long book.  So we've just given you
 7  excerpts.  If you need to reference the full book,
 8  you're welcome to.  We have a copy.  Just let me
 9  know.
10      A.   Okay.
11      Q.   So the first page -- the second page in
12  this document that you have in front of you is
13  page 543 of the DSM-5-TR.
14          And this is a section titled
15  "Substance-Related and Addictive Disorders."
16          Do you see that?
17      A.   I see that.
18      Q.   I assume you've read this section before?
19      A.   I have seen this section before.
20      Q.   Okay.  And is it your understanding that
21  this section of the DSM-5-TR recognizes only
22  gambling disorder as a behavioral addiction?
23          MS. O'NEILL:  Objection.  Form.
24          THE WITNESS:  Can you rephrase the
25  question.
```

CONFIDENTIAL

```
 1  BY MS. BARNHART:
 2      Q.   Sure.
 3          Am I correct that gambling disorder is the
 4  only behavioral addiction recognized by the American
 5  Psychiatric Association in the DSM-5-TR?
 6      A.   I believe it is considered an impulse
 7  control disorder with significant overlap with
 8  addiction disorders.
 9      Q.   Are there any other impulse -- well, I'm
10  not really following your answer, but I'll ask it a
11  different way.
12          If you look four pages into this document,
13  which is page 661 of the DSM-5-TR, there's a section
14  called "Non-Substance-Related Disorders."
15      A.   Yes.
16      Q.   And gambling disorder is listed here?
17      A.   Yes.
18      Q.   Are you aware of any other
19  non-substance-related disorders that are listed in
20  the substance-related and addictive disorders
21  section of the DSM-5-TR?
22      A.   I'm familiar with substance disorders and
23  gambling disorders.  I'd have to refresh my
24  recollection of the rest of the DSM to fully
25  accurately answer that question; but, sure, I'm
```

CONFIDENTIAL

```
 1  familiar with substance disorders and gambling
 2  disorders.
 3      Q.   And, sitting here today, you can't identify
 4  any other non-substance-related disorder that is
 5  listed in the substance-related and addictive
 6  disorders section?
 7      A.   It might be accurate that gambling
 8  disorders is the one non-substance disorder that is
 9  listed in the section.
10      Q.   Okay.  If you'd turn to page 903 of the
11  DSM-5-TR, which is a few pages in.
12          Do you see that?
13      A.   I see that.
14      Q.   This is a section of the DSM-5-TR called
15  "Conditions for Further Study"; correct?
16      A.   Correct.
17      Q.   And as described here, these are conditions
18  "on which future research is encouraged to allow the
19  field to better understand these conditions and
20  inform future decisions about possible placement in
21  forthcoming editions of DSM."
22          Do you see that?
23      A.   Correct.
24      Q.   And for those conditions that are listed
25  for further study, this section says that:
```

CONFIDENTIAL

```
 1          "The research criteria sets were
 2      set by expert consensus informed by
 3      literature review, data reanalysis, and
 4      field trial results."
 5          Do you see that?
 6      A.   Where was that specific reference?
 7      Q.   The first sentence of the second paragraph.
 8      A.   Okay.  I see that.
 9      Q.   And you don't have any reason to dispute
10  that statement; right?
11      A.   I have no reason to dispute that statement.
12      Q.   Do you have any reason to dispute that "The
13  DSM-5 task force and work groups subjected each of
14  these proposed criteria sets to a careful empirical
15  review and invited wide commentary from the field as
16  well as from the general public"?
17          MS. O'NEILL:  Objection.  Foundation.
18          THE WITNESS:  I have no reason to dispute
19  how the DSM arrives at their updates.
20  BY MS. BARNHART:
21      Q.   Okay.  And the DSM-5 task force "ultimately
22  determined that there was insufficient evidence to
23  warrant inclusion of these conditions for further
24  study as official mental disorder diagnoses."
25          Correct?
```

CONFIDENTIAL

Page 246

```
1     A.   I believe that is correct.
2     Q.   One of the conditions for further study
3  identified in the DSM-5-TR is internet gaming
4  disorder; correct?
5     A.   Correct.
6     Q.   If you look at page 914, this is the
7  section describing internet gaming disorder.  And if
8  you look at the second -- the last full paragraph on
9  page 914, it says:
10              "Internet gaming disorder has
11           achieved significant public health
12           importance, and additional research may
13           eventually lead to evidence that
14           internet gaming disorder (also commonly
15           referred to as internet use disorder,
16           internet addiction, or gaming
17           addiction) has merit as an independent
18           disorder."
19         Do you see that?
20    A.   I see that.
21    Q.   And social media addiction is not
22  identified anywhere in the DSM-5-TR as a condition
23  for further study; correct?
24    A.   Those words do not appear, to my knowledge.
25    Q.   And, in fact, the DSM-5-TR expressly says
```

CONFIDENTIAL

Page 247

```
1  that social media addiction should not be analogized
2  to internet addiction; correct?
3     A.   Where is this reference?
4     Q.   You don't know that offhand?
5     A.   Well, I would need to refresh myself of the
6  specific reference.
7     Q.   Sure.
8         If you look at page 916, under
9  "Differential Diagnosis," it says:
10              "Excessive use of the internet not
11           involving playing of online games
12           (e.g., excessive use of social media
13           such as Facebook or viewing pornography
14           online) is not considered analogous to
15           internet gaming disorder, and future
16           research on other excessive uses of the
17           internet would need to follow similar
18           guidelines as suggested herein."
19         Do you see that?
20    A.   I do see that.
21    Q.   So the DSM is expressly saying that
22  excessive use of social media is not considered
23  analogous to internet gaming disorder; correct?
24    A.   Well, I believe there is a common shared
25  mechanism of how addictions work.  And there are
```

CONFIDENTIAL

Page 248

```
1  certainly similarities between a social media
2  addiction and a gaming addiction and a substance use
3  addiction.
4         But the exact words that you were
5  referencing, as far as similarities, I see this
6  here.
7     Q.   All right.  My question was not about what
8  you believe; my question was about what the 200
9  subject matter experts who arrived at the DSM-5-TR
10  consensus wrote.
11         And they wrote:
12              "Excessive use of the internet not
13           involving playing of online games, such
14           as excessive use of social media, is
15           not considered analogous to internet
16           gaming disorder."
17         Correct?
18    MS. O'NEILL:  Objection.  Form.
19    THE WITNESS:  I believe this is a rapidly
20  evolving field.  But, sure, I see the statement that
21  is listed here.
22  BY MS. BARNHART:
23    Q.   So do you agree with me that at least 200
24  subject matter experts have rejected your opinion
25  that social media addiction is a valid and reliable
```

CONFIDENTIAL

Page 249

```
1  diagnosis?
2     MS. O'NEILL:  Objection.  Form.
3     THE WITNESS:  Well, I would agree that the
4  DSM appears to believe they need more time to
5  potentially reach a diagnosis of social media
6  addiction.
7         And, again, this is -- as I stated earlier,
8  this is an evolving field.  And I do believe it is
9  my opinion that eventually the DSM will acknowledge
10  social media use addiction.
11  BY MS. BARNHART:
12    Q.   Are you aware that another paid plaintiffs'
13  expert in this litigation is on a committee relating
14  to social media addiction and the DSM-5?
15    A.   I'm not aware.
16    Q.   Do you know Dr. Dimitri Christakis?
17    A.   The name sounds familiar.
18    Q.   You said you agree that the DSM appears to
19  believe they need more time to potentially reach a
20  diagnosis of social media addictions; but, in fact,
21  the DSM hasn't even listed it as a condition for
22  further study.  Correct?
23    A.   It took 40 years from the genesis and idea
24  of autism spectrum disorder to the point it was
25  recognized in the DSM.  DSM has a history of
```

CONFIDENTIAL

Page 250

1  demonstrating that they take a long line -- a long
2  time to recognize a condition.
3      Q.   Do you remember my question, Dr. Zicherman?
4      A.   Please repeat it.
5      Q.   You forgot again?
6      A.   Well, again --
7           MS. O'NEILL:  Objection.  Argumentative.
8           THE WITNESS:  -- I would like to answer
9  your questions accurately.
10 BY MS. BARNHART:
11     Q.   Well, one way to do that is to listen to my
12 questions and remember them and answer them.
13          So my question was social media addiction
14 is not even listed by the DSM as a condition for
15 further study; correct?
16     A.   That does not appear listed, to my
17 knowledge, as a condition for further study at the
18 time of this DSM.
19     Q.   Nor has it been added as a condition for
20 further study in any of the annual updates since
21 2022; correct?
22     A.   Well, I again believe it will be added to
23 the DSM.  And it's also my understanding that there
24 will be potentially a DSM-6 in the next four to
25 five years.

CONFIDENTIAL

Page 251

1      Q.   So you say a similar thing in your report
2  at paragraph 25, Exhibit 1.  You state:
3           "In my professional opinion,
4           although the DSM-6 has an unknown
5           release date, it is likely that the
6           DSM-6 will have new official diagnoses
7           for various technology addictions."
8           Do you see that?
9      A.   I do see that.
10     Q.   My first question is do you think that
11 DSM-6 will revert to Roman numerals?
12     A.   I don't know.
13          MS. O'NEILL:  Objection.  Form.
14 BY MS. BARNHART:
15     Q.   You don't have any view on that, do you?
16     A.   Maybe they will; maybe they don't.
17     Q.   Okay.  You don't have any reason to think
18 they will, do you?
19          MS. O'NEILL:  Objection.  Form.
20 Argumentative.
21          THE WITNESS:  I am not on the DSM formation
22 committee.
23 BY MS. BARNHART:
24     Q.   What's the basis for your professional
25 opinion -- well, first of all, let me just -- let me

CONFIDENTIAL

Page 252

1  backtrack.
2           You just testified that -- here today that
3  you think the DSM-6 is going to come out in the next
4  four to five years; right?
5      A.   There was a recent update I became aware
6  of, a press release, that indicated it might come
7  out in the next -- I believe it was referenced four
8  or five years.
9      Q.   Who issued that press release?
10     A.   I believe it was the APA.
11     Q.   And that press release came out after your
12 report was submitted?
13     A.   I don't remember exactly when it came out,
14 but I came across that after my reports were
15 submitted.
16     Q.   What is the basis for your professional
17 opinion stated here?
18     A.   My opinion that the DSM-6 is likely to have
19 official diagnoses for various technology
20 addictions?
21     Q.   Correct.
22     A.   Based on the fact that not just myself but
23 clinicians who work in this space, in this area, are
24 seeing significant concerns in relation to
25 technology use, specifically, social media, and the

CONFIDENTIAL

Page 253

1  effects that it is causing on the mental health and
2  lives of children, teenagers, and adolescents that
3  we work with.
4           It feels like an epidemic when you're in
5  the office and actually seeing and evaluating and
6  treating these kids.
7      Q.   And by epidemic you mean the one patient
8  per month that presents with social media addiction
9  concerns?
10          MS. O'NEILL:  Objection.  Form.
11          THE WITNESS:  It adds up over the years.  I
12 have a very full patient panel.
13 BY MS. BARNHART:
14     Q.   But you can't tell me how many, though,
15 right, sitting here today?
16          MS. O'NEILL:  Objection.  Form.
17 Mischaracterization.
18          THE WITNESS:  I believe we discussed that
19 earlier about estimates of patients.
20 BY MS. BARNHART:
21     Q.   Sure.  Okay.  I'll refer to your earlier
22 testimony, then.
23          Are you aware -- I know you testified
24 earlier that you yourself have not submitted an
25 online proposal relating to social media addiction

CONFIDENTIAL

Page 254

1  to the DSM; correct?
2      A.    Correct.
3      Q.    Are you aware of anybody who has submitted
4  such an online proposal relating to social media
5  addiction to the DSM?
6      A.    I am not aware of anyone.
7      Q.    You also said -- you referred to other
8  clinicians who work in this space who share your
9  views.  Can you name any of those clinicians?
10     A.    When the idea of harms of social media use
11 comes up clinically or in didactics, I don't believe
12 I've had pushback from anyone that I work with as a
13 colleague or trainee.
14     Q.    Okay.  That didn't answer my question.
15           Do you remember it?
16     MS. O'NEILL:  Counsel, I'm just going to
17 object to the constant references to memory.
18     MS. BARNHART:  Well, I'm going to object to
19 the constant nonresponses.
20     MS. O'NEILL:  Well --
21     MS. BARNHART:  It's getting ridiculous,
22 Counsel.  I mean, he's not answering my questions;
23 so I worry about his ability to remember them.
24     MS. O'NEILL:  Well, to be fair, when you're
25 reading back the questions, you were actually

CONFIDENTIAL

Page 255

1  reading them back.  He doesn't have the realtime in
2  front of him.  It's not a memory test.
3      MS. BARNHART:  It is -- it is a little bit
4  of a memory test.  That's what his whole opinion is
5  based on.  It shouldn't be this difficult to
6  remember a question I asked five seconds ago.
7  BY MS. BARNHART:
8      Q.    But since you forgot it --
9      MS. O'NEILL:  Okay.  Well, my objection is
10 there for the record.
11 BY MS. BARNHART:
12     Q.    Since you forgot it, Dr. Zicherman, I'll
13 ask it again.
14           You said -- earlier you referred to other
15 clinicians who work in this space who share your
16 views.  Can you name any of those clinicians?
17     A.    I'm not here to name other colleagues that
18 I am -- discuss social media use disorder with.
19     Q.    So no, you are unwilling to name any other
20 clinicians who work in this space who share your
21 views?
22     A.    I would say that all colleagues that I
23 discuss this with -- clinic -- in my clinical
24 practice at Stanford agree with me.
25           I cannot recall any pushback from my

CONFIDENTIAL

Page 256

1  colleagues or even John Ellis in psychiatry or
2  addiction psychiatry trainees that I work with.
3      Q.    I'll try one more time.
4            Are you willing to name any other
5  clinicians who work in this space who share your
6  views on social media addiction?
7      A.    You know, you're welcome to go through the
8  roster of child and adolescent psychiatrists at
9  Stanford and ask them that question.  I would not
10 want to speak or share the opinion of other
11 individuals specifically without asking them.
12     Q.    Well, you just did that, Dr. Zicherman; so
13 you've dug -- backed yourself into a bit of a
14 corner.
15           If you're not willing to share the names,
16 that's fine.  Just say that we'll move on.  Is
17 that --
18     A.    Okay.  Well, then I would say I'm not
19 willing to share the names of individuals.
20     Q.    Okay.  Have you developed any opinions on
21 the prevalence of purported social media addiction
22 among US teenagers?
23     A.    Have I developed opinions on the prevalence
24 of social media use disorders?
25     Q.    Well, hold on.  Let me just stop you, then.

CONFIDENTIAL

Page 257

1            You -- I said "social media addiction,"
2  which is the phrase that appears throughout your
3  report.
4      A.    Okay.
5      Q.    Do you prefer the term "social media use
6  disorder"?
7      A.    No, we can use "addictions."
8      Q.    Well, I'm just using it because you use it.
9  So I'm -- do you use "social media addiction" in
10 your clinical practice?
11     A.    I use that term in practice.
12     Q.    So if you do eventually produce your
13 clinical notes in this litigation, you would expect
14 for me to see "social media addiction" written all
15 over your clinical notes; is that right?
16     MS. O'NEILL:  Objection.  Form.
17     THE WITNESS:  I don't believe it's
18 appropriate for me to answer questions about my
19 notes.
20 BY MS. BARNHART:
21     Q.    On what basis, Dr. Zicherman?
22     A.    Well, I believe I say that that was not
23 what I relied on to form my opinion earlier.
24     Q.    That's news to me.
25           So you did not -- let me ask that question

CONFIDENTIAL

Page 258

1  again because I don't think we got a clear answer.
2         You did not consider or rely on any of your
3  clinical notes or clinical templates in forming your
4  opinions in this case; is that accurate?
5     A.  I have to review notes every day that I'm
6  in the office.  That's what it is to work with
7  patients.  Specific notes and encounters were not
8  used to develop my opinion in the matter.
9     Q.  And when you review those notes every day
10 that you're in the office, do you see the phrase
11 "social media addiction" in those notes, or do you
12 see another phrase like "social media use disorder"
13 or "problematic social media use"?
14    A.  Well, I think that terms can be
15 interchangeable, and I've seen it stated different
16 ways across records.
17    Q.  So you use different terms across your
18 different records?
19    A.  Sometimes I use different terms.
20    Q.  Do you sometimes use "social media
21 addiction"?
22    A.  I have referenced that term.
23    Q.  How many times have you specifically
24 diagnosed someone with social media addiction
25 specifically, that disorder?

CONFIDENTIAL

Page 259

1     A.  Again, I think that goes into privileged
2  patient information.  Again, I can estimate that --
3  you know, we've gone through this -- the percentage
4  of patients that I believe have concerning social
5  media use -- social media use concerns and the
6  percentage of patients presenting for those
7  evaluations that I end up utilizing a diagnosis for.
8     Q.  So you're unwilling to answer my question
9  of how many times you have specifically diagnosed
10 someone with social media addiction?
11       MS. O'NEILL:  Objection.  Form.
12       THE WITNESS:  Well, I'm mean, I'm happy to
13 provide estimates again which coincide with our
14 discussions earlier about percentage of patients
15 that present with concerning social media use for
16 that reason and percentage of patients that end up
17 with a potential diagnosis within my estimation in
18 the clinic.
19 BY MS. BARNHART:
20    Q.  I'm just trying to understand why you're
21 resisting my question.  Is it that you do not know
22 the number of times that you have specifically
23 diagnosed someone with social media addiction, or
24 are you just not willing to answer it for privacy
25 reasons?

CONFIDENTIAL

Page 260

1     A.  Well, I believe I have answered the
2  question to the best of my abilities based on
3  working with patients in this clinic for many, many
4  years.
5     Q.  Well, then I need you to answer it again
6  because I didn't get an answer to my question.
7         What is the number of times that you have
8  diagnosed someone specifically with social media
9  addiction?
10    A.  For patients presenting to the clinic with
11 social media use concern -- disorder concerns or
12 addiction concerns, the preponderance of those
13 patients end up with a diagnosis.
14    Q.  So how many patients have you diagnosed
15 specifically with social media addiction?
16    A.  So if we reference again the number of
17 patients presenting to the clinic for concerns for
18 technology use, which I reference 25 to 35 percent,
19 the majority of those will end up meeting what I
20 would state is criteria for a social media use
21 addiction or disorder.
22    Q.  Can you or can you not give me a number in
23 response to my question how many patients have you
24 diagnosed specifically with social media addiction?
25       MS. O'NEILL:  Objection.  Asked and

CONFIDENTIAL

Page 261

1  answered.
2         THE WITNESS:  I believe I've answered that
3  question --
4  BY MS. BARNHART:
5     Q.  Tell me again.
6     A.  -- several times.
7     Q.  I'm looking for a number.  Okay?  I'm not
8  looking for a speech; I'm looking for a number.
9         How many patients have you diagnosed
10 specifically with social media addiction.
11       MS. O'NEILL:  Same objection.
12       THE WITNESS:  We've discussed that there
13 are hundreds of patients that have come in over the
14 course of years.  Roughly somewhere in that range
15 would be the number that I would say meet criteria
16 for a social media use addiction disorder.
17 BY MS. BARNHART:
18    Q.  Nowhere in that answer did you give me a
19 number of patients that you have actually diagnosed
20 specifically with social media addiction.
21    A.  I'm sorry.  I believe I've answered the
22 question.
23    Q.  What's the number, Dr. Zicherman?
24       MS. O'NEILL:  Objection.  Asked and
25 answered.

CONFIDENTIAL

Page 262

1    THE WITNESS:  Again, I believe it's in the
2  hundreds, going back to, you know, the genesis of
3  the clinic.
4  BY MS. BARNHART:
5    Q.  That you've actually diagnosed with social
6  media addiction?
7    A.  I think that's -- you know, if we do the
8  math, I think that's probably a fair estimate.
9    Q.  I did the math, and I came up with 60.  We
10  talked about this earlier.
11    A.  60 over the course of one year.
12    Q.  No, over the course of five years,
13  Dr. Zicherman.  That's what we talked about earlier.
14    A.  Well --
15    Q.  Let's do it this way.
16    A.  Sure.
17    Q.  You have not actually gone back through --
18  I just want to confirm.
19    You have not gone back through all of your
20  clinical notes in a systematic way to determine the
21  number of people that you've actually diagnosed with
22  social media addiction; correct?
23    A.  I have not done that as far as report
24  process.
25    Q.  Okay.  So we got a little off topic.  I'll

CONFIDENTIAL

Page 263

1  circle back to where I think we were.
2    Have you developed any opinion on the
3  prevalence of purported social media addiction among
4  US teenagers?
5    MS. O'NEILL:  Objection.  Form.
6    THE WITNESS:  I've developed opinions on
7  prevalence.
8  BY MS. BARNHART:
9    Q.  What is your opinion -- in your opinion,
10  what is the prevalence of purported social media
11  addiction among US teenagers?
12    A.  It's absolutely increasing across our
13  population; but to answer that question, you're
14  getting into population epidemiologic
15  considerations.  And I'm not here to provide a
16  specific answer on the specific number, but I can
17  tell you it's absolutely increasing.  And I'm seeing
18  that within the clinic as well.
19    Q.  So you have no opinion on what is the
20  prevalence of purported social media addiction among
21  US teenagers?
22    MS. O'NEILL:  Objection.  Form.
23    THE WITNESS:  I believe it's fair to say
24  that the prevalence is significant and concerning,
25  but ask a epidemiologist or someone who is an expert

CONFIDENTIAL

Page 264

1  in population-level studies to answer that question.
2  BY MS. BARNHART:
3    Q.  So you cannot answer that question?  That's
4  what I need to be made clear.  I need to know the
5  scope of your opinions, Dr. Zicherman.
6    So you cannot answer that question;
7  correct?
8    A.  I can answer questions in relation to my
9  clinical work.
10    Q.  Okay.  You cannot answer questions about
11  prevalence across the United States; correct?
12    A.  I think you would be better served asking
13  an expert who has a background in epidemiologic
14  studies and statistical measures to answer that
15  question.
16    Q.  You can only answer this question in
17  relation to your clinical work in Stanford,
18  California, in the Bay Area; correct?
19    A.  This is what I see.
20    MS. O'NEILL:  Objection.  Form.
21  BY MS. BARNHART:
22    Q.  Okay.  And, again, I just want to clarify.
23  This is what you see in the Bay Area in Stanford,
24  California; correct?
25    A.  Correct.

CONFIDENTIAL

Page 265

1    Q.  Okay.  You do not know the prevalence
2  across the entire state of California, do you?
3    A.  I can't answer that question.  Again, I
4  made reference to you would be better served
5  asking an expert with a background in epidemiologic
6  studies.
7    Q.  You don't think your clinical population in
8  Stanford, California, is representative of the
9  entire state of California, do you?
10    MS. O'NEILL:  Objection.  Form.
11  Mischaracterization.
12    THE WITNESS:  I'm certainly seeing the most
13  severe presentations in clinic.
14  BY MS. BARNHART:
15    Q.  You also don't think that your clinical
16  population in Stanford, California, is
17  representative of the teen population across the
18  state of Kentucky, do you?
19    MS. O'NEILL:  Objection.  Form.
20  Mischaracterization.
21    THE WITNESS:  I don't know much about the
22  population of the state of Kentucky.  And I think if
23  you're asking a question like that, you can ask
24  someone else who has that information on
25  epidemiologic studies.

CONFIDENTIAL

Page 266

BY MS. BARNHART:

1  Q.  You don't know much about the population of

2  any of the 27 other states that you represent in

3  this case, do you?

4       MS. O'NEILL:  Objection.  Form.

5       THE WITNESS:  I can comment on my clinic

6  population.  I also understand that it is going to

7  be a population with a more severe presentation than

8  likely what we're seeing in the community.  Not

9  everyone in the community needs to come in and see

10  me for treatment.

11  BY MS. BARNHART:

12  Q.  So you don't have a view on what the

13  prevalence is -- even in the community of the Bay

14  Area, you don't have a view on what the prevalence

15  of social media addiction among teens is; correct?

16       MS. O'NEILL:  Objection.  Form.

17       THE WITNESS:  I'm not aware of the exact

18  data and statistics in relation to prevalence of

19  social media use disorder in the Bay Area.

20  BY MS. BARNHART:

21  Q.  Okay.  You also have no opinions on the

22  exact data and statistics in relation to the

23  prevalence of social media use disorder of any

24  population aside from the clinical population that

CONFIDENTIAL

Page 267

1  you treat in your clinic?

2  A.  Can you repeat or rephrase that.

3  Q.  I was just trying to use your words.

4  Okay.  So please --

5  Q.  I'm just making clear the only population

6  about which you have any views on prevalence of

7  social media addiction is your clinical population

8  that you treat in Stanford, California?

9  A.  Well, it is the population that I used to

10  primarily base my opinion on.

11  Q.  Right.  And so any other population,

12  including the broader population of the Bay Area,

13  you don't have any views on the prevalence of social

14  media addiction among teens in the Bay Area?

15       MS. O'NEILL:  Objection.  Form.

16       THE WITNESS:  I believe it's likely to also

17  be a significant problem.  Again, I am relying on my

18  clinical work with patients I see every day in my

19  practice primarily.

20  BY MS. BARNHART:

21  Q.  Do you know how many teens live in the Bay

22  Area?

23  A.  I am not familiar with the exact number of

24  teens in the Bay Area.

25  Q.  Have you performed any investigation or

CONFIDENTIAL

Page 268

1  other work to determine if the people that present

2  at your clinic are representative of the teen

3  population in the broader Bay Area?

4  A.  I have not done any formal statistical

5  surveys into that question.

6  Q.  So you have no basis to believe that social

7  media addiction is a significant problem among the

8  teen population in the Bay Area?

9       MS. O'NEILL:  Objection.  Form.

10  Mischaracterization.

11       THE WITNESS:  I believe it's absolutely

12  relevant to say that a clinic population is

13  informative of a population at large.

14       But, again, I would reference that my

15  opinion is primarily driven by what I'm seeing every

16  day in my practice.

17  BY MS. BARNHART:

18  Q.  You also -- in your report, in

19  paragraph 37, you say:

20       "Research studies also support the

21       idea that social media addictions are

22       far more prevalent in younger

23       individuals."

24       Do you see that?

25  A.  I do see that.

CONFIDENTIAL

Page 269

1  Q.  Neither of the studies -- or neither of the

2  items that you cite to support that statement

3  actually determined any prevalence of social media

4  addiction among teenagers, did they?

5  A.  That might be the case.  I would have to

6  reference and jog my memory of the specific studies

7  to fully answer that question.

8  Q.  You also cite to a Statista survey that you

9  claim indicates that 40 percent of US respondents

10  aged 18 to 22 reported feeling addicted to social

11  media; correct?

12  A.  Correct.

13  Q.  You don't believe that is an accurate

14  prevalence rate for social media addiction among the

15  teen population of the 29 states you represent, do

16  you?

17  A.  I believe it was a simple survey asking, I

18  believe, one question about this.  And this is not

19  intended to diagnose anyone, but I think it is

20  important to reference that there is a survey that

21  indicates 40 percent of US responders age 18 to 22

22  report feeling addicted to social media.

23  Q.  Well, in fact, only 5 percent of the 18- to

24  22-year-old respondents said that the statement "I

25  am addicted to social media" described them

CONFIDENTIAL

Page 270

1  completely; correct?
2         MS. O'NEILL:  Objection.  Form.
3         THE WITNESS:  I would have to review and
4  jog my memory of the study.
5  BY MS. BARNHART:
6     Q.   Have you actually seen the study that's --
7  that underlies that number that you cite in your
8  report?
9     A.   I have.
10    Q.   Is it your understanding that Statista ran
11 that study?
12    A.   I would have to review the study to fully
13 answer that question and jog my memory.
14    Q.   What is Statista?
15    A.   You know, I would have to jog my memory to
16 fully understand Statista's role in the survey.
17    Q.   Do you believe Statista is a reliable
18 source?
19    A.   And I believe I would have to review the
20 information material on Statista to continue
21 answering that question accurately; but, you know, I
22 thought this was a important survey to include.
23    Q.   Did you identify this Statista metric or
24 did Bates White identify it or your lawyers?
25    A.   I again would have to jog my memory.  I

CONFIDENTIAL

Page 271

1  believe I identified it.  I could be mistaken,
2  though.
3     Q.   How did you identify it?
4     A.   I don't recall exactly how I identified it.
5     Q.   You didn't search any reputable scientific
6  source for it, I assume?
7         MS. O'NEILL:  Objection.  Form.
8         THE WITNESS:  I would have to really jog my
9  memory to recall exactly how I came across this
10 study -- survey.
11 BY MS. BARNHART:
12    Q.   If you want to take the time at a break to
13 go back and refresh yourself, that's fine.  I again
14 have limited time here.
15         Sitting here today right now, do you have
16 any basis to believe that this Statista data is
17 reliable?
18         MS. O'NEILL:  Objection.  Form.
19         THE WITNESS:  I recall reviewing the
20 survey, believing it was an interesting and reliable
21 survey; but to fully answer that question, I would
22 need to carefully, again, jog my memory and review
23 the survey.
24         MS. BARNHART:  Okay.  I'm going to hand you
25 what's been marked as Exhibit 19.

CONFIDENTIAL

Page 272

1         (Exhibit 19 was marked for
2          identification and is attached to the
3          transcript.)
4  BY MS. BARNHART:
5     Q.   Does this refresh your recollection of how
6  you found this Statista metric?
7     A.   Of how I found it?
8     Q.   Correct.
9     A.   I don't believe this is any reference to
10 how I found it.
11    Q.   So no, you don't remember how you found
12 this?
13    A.   I do not recall how I found the survey at
14 this time.
15    Q.   Okay.  With the benefit of this document,
16 can you tell me who ran this survey?
17        MS. O'NEILL:  Objection.  Form.
18        THE WITNESS:  You know, I would need to see
19 the full documents, I think, to fully and accurately
20 answer that question.
21 BY MS. BARNHART:
22    Q.   This is the full document, Dr. Zicherman.
23    A.   Well, I believe you referenced the company
24 of statistic -- of Statista.  I believe I would want
25 to -- again, to accurately answer your question --

CONFIDENTIAL

Page 273

1  know more information.
2     Q.   This is all the information you gave us.
3  In your report in that footnote, this is the URL
4  that you cite to.
5         Did you consider other information about
6  this metric when you were forming your opinions?
7     A.   About this metric?
8     Q.   Correct.  Other than this website, which is
9  what your report directed us to.
10    A.   Well, I certainly reference other
11 information in the report.
12    Q.   What information?  Not about this metric.
13 This is the only thing you cite in support of this
14 40 percent number.
15         And I'm asking you, based on this document,
16 which is what you cited, can you tell me who ran
17 this survey?
18    A.   And I would have to go to the Statista
19 website to fully clarify that information.
20    Q.   So you can't tell based on this document,
21 which is the website that you cited -- you cannot
22 answer my question who ran this survey?
23        MS. O'NEILL:  Objection.  Form.
24        THE WITNESS:  It may have, in fact, been
25 Statista; but I would need to, again, reference

CONFIDENTIAL

Page 274

1  Statista to know the exact details that went into
2  the actual company that ran this survey.
3  BY MS. BARNHART:
4      Q.  How many participants were in the survey?
5      A.  I do not recall offhand.  I would have to,
6  again, go back to the source and find that
7  information.
8      Q.  Okay.  Dr. Zicherman, to be clear, this is
9  the source.  This is the source that you cited.  So
10 I'll ask you -- I'm not going to waste my time with
11 more questions about this at this point.
12         On the next break, if you have any other
13 source besides the one that you cited in your report
14 that you're referring to, I'd ask that you produce
15 it to us.
16         Okay?  Will you do that?
17         MS. O'NEILL:  Objection.  Form.
18         THE WITNESS:  I understand what you're
19 saying.
20         MS. BARNHART:  Okay.  Let's take a break.
21         THE VIDEOGRAPHER:  Stand by.
22         The time is 4:11 p.m., and we're going off
23 the record.
24         (Recess taken.)
25         THE VIDEOGRAPHER:  The time is 4:36 p.m.,

CONFIDENTIAL

Page 275

1  and we're back on the record.
2  BY MS. BARNHART:
3      Q.  Okay.  Dr. Zicherman, I'm looking at your
4  report, which is Exhibit 1, and I'm on paragraph 4.
5         Let me know when you're there.
6      A.  Yes.
7      Q.  And, actually, before I ask you any
8  questions about this, were you able to find any
9  other sources for that Statista metric we were
10 discussing earlier?
11     A.  I did not.
12     Q.  Okay.
13        Paragraph 4 under your summary of opinions
14 states:
15            "Many Instagram features are
16            harmful to teen and youth mental
17            health, and Meta's teen accounts are
18            often ineffective at addressing those
19            harms."
20        Do you see that?
21     A.  Correct.
22     Q.  Is your Opinion Number 4 here, is that
23 limited to Instagram?
24     A.  It is, first and foremost, primarily driven
25 at Instagram as that is the predominant app that my

CONFIDENTIAL

Page 276

1  patient population is using.
2      Q.  And if you turn to page 16 of your report,
3  which is Section 4, is this the section of your
4  report that describes the bases for this fourth
5  opinion that you have?
6      A.  That is --
7      MS. O'NEILL:  Objection.
8  Mischaracterization.
9      MS. BARNHART:  Let me -- I'll withdraw the
10 question.
11 BY MS. BARNHART:
12     Q.  All I'm trying to do is line up the opinion
13 you state in paragraph 4 with the heading in
14 Section 4.  They appear to be the same to me.
15     A.  Paragraph 4 and Heading 4?
16     Q.  I'm sorry.  Am I confused?
17     MS. O'NEILL:  I think it's Section 5 --
18 just if it's helpful, I think it's Section 5 in the
19 report.
20     MS. BARNHART:  My bad.
21     Yes.  I'm sorry.
22     Thank you, Counsel.
23 BY MS. BARNHART:
24     Q.  So now, if we're looking at page 23,
25 Section 5 --

CONFIDENTIAL

Page 277

1      A.  Yes.
2      Q.  -- is this the section of your report that
3  describes the bases for your fourth opinion?
4      A.  I believe that is correct.
5      Q.  Okay.  And I've read this section of your
6  report, and I -- well, it appears to me that the
7  primary, if not sole, basis for this opinion is your
8  clinical experience; correct?
9      A.  That does remain the primary basis of my
10 opinion.
11     Q.  Are you aware of any peer-reviewed studies
12 that support your opinion?
13     A.  Regarding the specific harms of these
14 specific features that I listed?
15     Q.  Yeah, let me rephrase.
16        Are you aware of any peer-reviewed study
17 that isolates the effects of Instagram features on
18 teen mental health from any effect of content
19 exposure on Instagram?
20     MS. O'NEILL:  Objection.  Form.
21     THE WITNESS:  I'm aware of reports that
22 might detail certain mechanisms that are involved in
23 the Instagram app.
24 BY MS. BARNHART:
25     Q.  And I'm asking are you aware of any

CONFIDENTIAL

Page 278

1  peer-reviewed study that seeks to isolate the effect
2  of any particular Instagram feature on teen mental
3  health?
4        MS. O'NEILL:  Objection.  Form.
5        THE WITNESS:  I would have to kind of
6  carefully review the data again.  I don't believe
7  there are many reports that specifically might look
8  at the Instagram app specifically.
9  BY MS. BARNHART:
10     Q.  In your clinical practice when you're
11  working with patients, do you consider and rule out
12  exposure to content on Instagram as a primary
13  contributor?
14        MS. O'NEILL:  Objection.  Form.
15        THE WITNESS:  Can you rephrase the
16  question.
17  BY MS. BARNHART:
18     Q.  Sure.
19        So your opinion, as I understand it, is
20  that many Instagram features are harmful to teen
21  mental health; correct?
22     A.  Correct.
23     Q.  And my question is, basically, how did you
24  figure that out through your clinical experience?
25        So how did you go about isolating the

CONFIDENTIAL

Page 279

1  effects of any Instagram features on teen and youth
2  mental health?
3     A.  I do try and assess for specifics of the
4  Instagram use of the patients that I am working
5  with.
6        I would say what I would take away as most
7  important for developing my opinion, though, is that
8  these features exist.  They supposedly exist,
9  according to Meta.  And whether they're there or
10  not, they're clearly not effective with the patients
11  that I am working with.
12        And I get that report from parents.  And I
13  get the report from the patients themselves that
14  they're not really doing anything to change their
15  use.
16     Q.  When you're referring -- in your answer
17  just now, when you're referring to features, are you
18  talking about the teen accounts feature?
19     A.  It's my understanding that teens are
20  supposed to be in teen accounts at this point.
21        I will say, though, that I encounter many
22  teenagers who have -- and I've referenced this in
23  the report -- have burner accounts, accounts parents
24  aren't aware of -- that do not have teen accounts.
25        But, you know, we can talk about them

CONFIDENTIAL

Page 280

1  separately or together.
2     Q.  All right.  Well, let me just back up
3  because I'm talking about the first part of your
4  opinion here, which is just the part where you say:
5        "Many Instagram features are
6        harmful to teen and youth mental
7        health."
8        What features are you referring to there?
9     A.  Features that are harmful to health?
10    Q.  Correct.
11        So am I correct that your opinion is that
12  many Instagram features are harmful to teen and
13  youth mental health?
14    A.  Yes.
15    Q.  Okay.  What features do you mean?
16    A.  Well, I did list the features that I
17  believe are problematic, which I can point to.
18        Some include Sleep Mode, the idea of time
19  limit reminders.  Sure, the idea that -- it's not
20  clear to me working with patients if sensitive
21  content is actually restricted in conversations with
22  teens.
23        Globally, though, I would again reference
24  the point that, when I talk to families and
25  patients, it's more that they just tell me --

CONFIDENTIAL

Page 281

1  parents will tell me, "None of this works," that
2  there are tremendous amounts of harms that these
3  patients are facing.
4        Parents might have attempted limits and
5  restrictions, but these patients that I'm working
6  with will often act out violently.  They might claim
7  to -- or actually develop suicidal ideation, maybe
8  homicidal ideation in regards to parents attempting
9  to limit accounts.
10        And, again, parents telling me that these
11  features don't seem to actually make a difference in
12  the amount of time that their teenagers -- children
13  or teenagers are on the apps -- or on the app.
14    Q.  Okay.  So I'm just trying to understand
15  what features you are going to opine are harmful to
16  teen and youth mental health.
17        Is it your opinion that Instagram's Sleep
18  Mode feature is harmful to teen mental health?
19        MS. O'NEILL:  Objection.  Form.
20        THE WITNESS:  I believe that it could be
21  taken certainly a step further in that -- it's my
22  understanding that Sleep Mode goes into effect at
23  10:00 p.m.
24        Well, there are several psychological,
25  psychiatric organizations -- I believe the surgeon

CONFIDENTIAL

Page 282

1  general as well -- have recommended that teenagers
2  should be asleep -- sorry -- should be off of their
3  electronic devices an hour before bedtime.
4      And if the app shuts off at 10:00 p.m., for
5  instance, 11:00 p.m. can be a late bedtime
6  potentially for a teenager.
7  BY MS. BARNHART:
8      Q.   Okay.  We're going to come back to my
9  question, but just on the point that you just
10  raised, in Footnote 40 of your report, you cite a
11  2015 Stanford news article titled "Among teens,
12  sleep deprivation is an epidemic."
13     A.   Correct.
14     Q.   And do you recall that that article
15  actually found that teenagers' circadian rhythm,
16  their internal biological clock, shifts to a later
17  time, making it difficult for them to fall asleep
18  before 11:00 p.m.?
19         MS. O'NEILL:  Objection.  Form.
20         THE WITNESS:  I would have to refresh my
21  memory and recollection of what you're referencing
22  in that study.
23  BY MS. BARNHART:
24     Q.   You're not a sleep specialist; right,
25  Dr. Zicherman?

CONFIDENTIAL

Page 283

1      A.   I do not have a fellowship in sleep
2  medicine; but as a psychiatrist -- child analyst and
3  psychiatrist, addiction psychiatrist, sleep concerns
4  come up all the time in clinical practice.
5      Q.   Do you have any reason to dispute the
6  finding in this study or in an article that you cite
7  in your own report that teenagers have difficulty
8  falling asleep before 11:00 p.m. because of their
9  natural circadian rhythm?
10         MS. O'NEILL:  Objection.  Form.
11         THE WITNESS:  You know, I think to
12  accurately answer that question, I would need to
13  refresh my memory of the article in question.
14  BY MS. BARNHART:
15     Q.   All right.  You can do that on the next
16  break and let me know if that changes your view.
17         Now, going back to my question, I think
18  we're talking past each other.  I'm interested in
19  what features you believe are actively harmful to
20  teen and youth mental health.
21         Is it your view that Sleep Mode is actually
22  harming teen and youth mental health or simply that
23  it's not doing enough?
24     A.   Well, I believe it's not doing enough, and
25  it might potentially lead to some harm with the

CONFIDENTIAL

Page 284

1  limits that are currently set.
2      Q.   How?  What's the causal mechanism there?
3      A.   There are potentially teenagers who need to
4  be asleep well before 10:00 p.m.  And I think it's
5  going to be difficult for a child or teenager to
6  stop using electronics and -- according -- in
7  accordance with recommendations from several
8  important organizations we have within psychiatry,
9  psychology and get restful sleep.
10     Q.   Is it your understanding that the states
11  that you represent allege that Sleep Mode is a
12  harmful feature of Instagram?
13         MS. O'NEILL:  Objection.  Form.
14         THE WITNESS:  I would have to, again,
15  consult about the specifics of every aspect of the
16  app, but I do believe that that is one of the
17  aspects that is considered harmful in this case.
18  BY MS. BARNHART:
19     Q.   Okay.  Besides Sleep Mode, you referenced
20  time limit reminders.
21     A.   Correct.
22     Q.   And you're referring to the time limit
23  reminders that are built into the teen accounts
24  feature on Instagram?
25     A.   Correct.

CONFIDENTIAL

Page 285

1      Q.   Okay.  So those time limit reminders
2  provide options to users to self-restrict their time
3  used on Instagram; correct?
4      A.   Time limit reminders provide an option to
5  self-restrict.  It's my understanding that -- again,
6  we might be having some semantic issues here, but
7  that time limit reminders will periodically alert
8  someone that they've been on the app for a certain
9  period of time.
10     Q.   Okay.  And how do you believe those
11  reminders are causing harm?
12     A.   I believe that it serves as just another
13  reminder that these kids are on the app.  It serves
14  as another potential -- maybe even hit of dopamine.
15  And it's also really easy to just swipe away and
16  say, "I'm staying on the app."
17         It's not a hard-set feature that shuts the
18  app off.  I believe that it serves as a tool that
19  could potentially even reinforce a child or
20  teenager's use if they are on the app.
21     Q.   And what is the basis for your belief?
22     A.   An understanding of mechanisms of how
23  addictions work, how -- my understanding of
24  dopamine, and also asking patients -- primarily
25  asking patients in my practice if a tool that Meta

CONFIDENTIAL

Page 286

1  is trying to implement like that is actually
2  effective or not.
3      Q.  Whether a tool is effective or not is
4  different from whether it's actively causing harm.
5      Has any teenage patient or parent of a
6  teenaged patient ever told you "Instagram's teen
7  account time limit reminder is harmful to me"?
8      MS. O'NEILL:  Objection.  Form.
9      THE WITNESS:  Well, again, I would say that
10 the harm comes in the form of the fact that it
11 appears, when I ask patients about that particular
12 tool, that they are not getting off the app.  And
13 they easily swipe away, and it serves to continue to
14 remind them that they are engaging with the
15 Instagram platform.
16 BY MS. BARNHART:
17     Q.  So you believe that providing an option to
18 users to self-restrict time used on a platform is
19 harmful in and of itself?
20     A.  Well, I don't believe it's actually a form
21 of self-restricting if you can just swipe away and
22 continue using the app.
23     Q.  Well, it's providing an option to users to
24 self-restrict; right?  It's a reminder?
25     A.  It serves as a reminder that you can easily

CONFIDENTIAL

Page 287

1  dismiss.
2      Q.  Okay.  You could easily not dismiss it;
3  right?
4      MS. O'NEILL:  Objection.  Form.
5      THE WITNESS:  Sure.  There could be a
6  patient out there -- a child out there that -- or
7  teenager that might see the reminder and actually
8  stop using the app.
9      But in my clinic and my experience, that is
10 not what is happening or being reported to me.
11 BY MS. BARNHART:
12     Q.  And, again, I don't think you ever answered
13 my question of have you ever had a teenage patient
14 or parent of a teenage patient tell you that
15 Instagram's teen accounts time limit reminder is
16 harmful to them.
17     MS. O'NEILL:  Objection.  Form.
18     THE WITNESS:  In those exact words, I've
19 not had that repeated to me.  But, again, I do
20 believe in other ways that information has been
21 conveyed to me.
22 BY MS. BARNHART:
23     Q.  Can you describe to me without revealing
24 any personal identifying information a patient who's
25 presented in a way that made you believe Instagram's

CONFIDENTIAL

Page 288

1  time limit reminders are harming that patient?
2      MS. O'NEILL:  Objection.  Form.
3      THE WITNESS:  Yeah, I -- again, I think I
4  would have to refrain from specifics about a
5  patient.
6  BY MS. BARNHART:
7      Q.  I didn't ask for any personal identifying
8  information.  I just asked for basically a case
9  report, which I assume you do frequently; correct?
10     A.  A case report?
11     Q.  Correct.  I mean, at grand rounds with
12 other of your colleagues, you're talking about
13 patients without revealing personal identifying
14 information; correct?
15     A.  Sometimes.
16     Q.  Okay.  So how about can you do that for me
17 now?  Can you describe to me without revealing any
18 personal identifying information any specific
19 presentation that has led you to conclude that
20 Instagram's time limits reminders are causing harm
21 to teenage mental health?
22     A.  Well, yeah, I think the best way I can
23 answer that is by saying that I inquire about
24 features of the app such as time limit restrictions
25 and if they are effective, if my patients are

CONFIDENTIAL

Page 289

1  actually using them and getting off the app or if it
2  just serves them as a reminder that they're on it.
3      And, you know, the answer I usually get is,
4  "Yeah, you know, I tend to just dismiss it."  And I
5  believe it does therefore lead to harm considering
6  that it's not aiding these kids get off the app.
7      Q.  Okay.  So we've got Sleep Mode, time limit
8  reminders, and then you mentioned sensitive content.
9      A.  Yes.
10     Q.  Can you describe to me a specific patient
11 encounter, without revealing any personal
12 identifying information, that led you to believe
13 sensitive content viewed on Instagram was causing
14 that teenager mental health harm?
15     MS. O'NEILL:  Objection.  Form.
16     THE WITNESS:  It's a pretty common refrain
17 from patients that they tell me they are exposed to
18 content relating to eating disorders, self-harm,
19 potentially methods of suicide, and also information
20 about -- well, drug glorification, and also how to
21 actually procure substances through the app.
22     I would consider that sensitive content.
23 BY MS. BARNHART:
24     Q.  Okay.  Do you have any understanding of the
25 distinction between features and content as is

CONFIDENTIAL

Page 290

1  relevant to this litigation?
2      A.   Between --
3          MS. O'NEILL:  Objection.  Form.
4          THE WITNESS:  Between features and content.
5      It's my understanding that there is
6  separation there between features and content.
7  BY MS. BARNHART:
8      Q.   What is your understanding of that
9  separation?
10          MS. O'NEILL:  Objection.  Form.  Calls for
11  a legal conclusion.
12          THE WITNESS:  That features are separate
13  from content.  Sleep time is not -- Sleep Mode is
14  not content.
15  BY MS. BARNHART:
16      Q.   Okay.  But sensitive content is content;
17  right?
18          MS. O'NEILL:  Objection.  Form.
19          THE WITNESS:  It's a form of content.
20  BY MS. BARNHART:
21      Q.   Okay.  And in your report -- or in your
22  clinical practice -- I guess we'll start with that.
23          In your clinical practice, when you're
24  assessing a patient, do you consider and rule out
25  content as opposed to features in terms of how the

CONFIDENTIAL

Page 291

1  Instagram app is affecting your patients?
2          MS. O'NEILL:  Objection.  Form.
3          THE WITNESS:  I certainly think about
4  content.  From my experience, the majority of cases
5  I'm working with, it appears that the app features
6  are really responsible for the problems I'm seeing;
7  but, sure, content and features, I have to say
8  honestly, can go hand in hand.
9  BY MS. BARNHART:
10      Q.   And if you were to produce your clinical
11  notes to us in this case, would you expect that
12  there would be specific notations of specific
13  features of Instagram that you believe to be causing
14  harm to your patients?
15          MS. O'NEILL:  Objection.  Form.
16          THE WITNESS:  Well, I believe I already
17  referenced that I did not rely on my clinical notes
18  in forming my opinion.
19  BY MS. BARNHART:
20      Q.   Can you answer my question?
21          MS. O'NEILL:  Objection.  Argumentative.
22          THE WITNESS:  Again, you're asking me to
23  reference clinical notes.  Clinical notes are
24  dynamic.  And I'd have to, you know, carefully
25  review for material.  And, again, I did not rely on

CONFIDENTIAL

Page 292

1  notes for developing my report.
2  BY MS. BARNHART:
3      Q.   Do you have any recollection, sitting here
4  today, of ever writing down in a clinical note that
5  a specific feature of Instagram, separate and apart
6  from content, caused mental health harm to one of
7  your patients?
8          MS. O'NEILL:  Objection.  Form.
9          THE WITNESS:  I cannot recall at this
10  moment.
11  BY MS. BARNHART:
12      Q.   So we've got Sleep Mode, time limit
13  reminders.  Are there any other features that you
14  will opine cause harm to teen mental health?
15      A.   I would like to -- what section was that
16  again?  Paragraph?
17      Q.   I was looking at the heading in Section 5:
18          "Many Instagram features are
19          harmful to teen and youth mental
20          health."
21      A.   Right.  I reference, for instance, the idea
22  that Instagram is supposedly prohibiting users under
23  ages 16 from going live and automatically blurring
24  images.  I hope that's happening.
25          I know that maybe some of these features

CONFIDENTIAL

Page 293

1  that were mentioned in Meta reports have not
2  actually been implemented.  I don't have all of that
3  information.
4          I certainly hope that accounts are
5  considered private and there are messaging
6  restrictions.  But I also hear from my patients that
7  in various ways these restrictions are easy to
8  bypass.
9      Q.   Okay.  At this point, I think you're
10  basically reading me your report.  So I want you to
11  just tell me -- I mean, I'm just looking for the
12  names of features.
13          What are specific features that you believe
14  are causing harm to teen mental health?
15          MS. O'NEILL:  Objection.  Form.
16          THE WITNESS:  I believe I have answered
17  that question.  I think, to some extent, all the
18  features I've listed in the report can potentially
19  amount to harm -- at the minimum, are just not
20  effective.  If they're not effective, then I think
21  you can argue that there's harm.
22  BY MS. BARNHART:
23      Q.   Let's do it this way.  You tell me if I
24  miss anything.  Okay?
25      A.   Okay.

Page 294

1    Q.   In paragraph 36 of your report -- this is
2  in a different section, but I just want to ask you
3  about it.
4        And it's actually paragraph 36 but at the
5  top of page 15.
6        You say in the sentence starting "They do
7  not know" --
8    A.   Uh-huh.
9    Q.   You say:
10           "They do not know" -- "they" being
11         adolescents -- "do not know when they
12         check a social media account if there
13         will be a new post, a new like, a new
14         subscriber or follower, or targeted
15         content that will trigger a dopamine
16         release."
17       Do you see that?
18   A.   Correct.
19   Q.   Is it your opinion that posts on Instagram
20  are a feature that causes teen mental health harm?
21       MS. O'NEILL:   Objection.   Form.
22  Mischaracterization.
23       THE WITNESS:   Well, I think you're asking
24  about maybe content, but the act of a post isn't
25  what necessarily causes harm; it's the act of

Page 295

1  developing an addiction process through constant
2  dopamine release that is what's concerning, which
3  amounts to checking if there is a new post, a new
4  subscriber, a new video, et cetera, which, again,
5  triggers a dopamine cascade and is responsible for
6  an addiction process and goes along with the lines
7  of the fact that it's clear to me that the Instagram
8  app functions very much like a slot machine with a
9  variable reward mechanism.
10  BY MS. BARNHART:
11   Q.   Okay.   That was not answering my question,
12  but I think maybe buried in there there is an
13  answer.   So let me just read this.
14       You say that it's the dopamine -- the
15  constant dopamine release that is causing harm.   Is
16  that your opinion?
17       MS. O'NEILL:   Objection.   Form.
18       THE WITNESS:   The dopamine release is
19  associated with -- it's part of the mechanism that
20  does, in fact, lead to harm from the use of the app.
21  BY MS. BARNHART:
22   Q.   And dopamine is released when users view
23  new posts, new likes, a new subscriber or follower
24  or targeted content; correct?
25   A.   Correct.

Page 296

1    Q.   Okay.   And you -- so aside from those
2  things we just listed, are there any other things
3  that you believe are features of Instagram that
4  cause harm to teen mental health?
5    A.   The way that I can best answer that is that
6  these restrictions sound nice.   They sound like
7  maybe they should be helpful.
8        And what I can tell you is that when I work
9  with my patients, I work with the parents of my
10  patients, they tell me that these restrictions that
11  are supposed to be built into the app are not
12  working and are not effective.   They tell me they
13  have tried measures to restrict access, to limit
14  access, and it just isn't working.
15   Q.   Okay.   For now, Dr. Zicherman, I'll ask you
16  to set aside the teen accounts protections that
17  Instagram has implemented, and I want you to think
18  of an account that has no teen accounts protections
19  to it.
20       What features of Instagram in that scenario
21  do you believe are causing harm to teen mental
22  health?
23   A.   Well, I believe the general mechanism of
24  the app would cause harm, as well as I believe with
25  a general Instagram account, that would mean that a

Page 297

1  parent does not have the ability to regulate or
2  potentially moderate content or amount of time spent
3  on the app.
4    Q.   What do you mean by "the general mechanism
5  of the app"?
6    A.   Meaning how -- if in theory, say, a
7  teenager had a regular Instagram account, that there
8  would be no potential protective mechanisms in
9  place.   That would lead to potentially significant
10  overuse of the app.
11       In addition to other concerns regarding
12  unregulated content, I have to mention both of those
13  factors.
14       And, again, I would have to say that these
15  restrictions might supposedly exist, but they do not
16  work with the patients that I am working with.
17   Q.   So is the harm you're identifying
18  potentially significant overuse of the app?
19   A.   Time is a factor in problems with the app.
20   Q.   I want to direct you to paragraph 57 of
21  your report.   The first sentence of this paragraph
22  says:
23           "There are many features of
24         Instagram that are harmful to youth
25         based on my clinical experiences."

CONFIDENTIAL

Page 298

```
 1        Do you see that?
 2    A.  I do.
 3    Q.  And you don't cite any support for that
 4 statement other than your clinical experiences;
 5 correct?
 6    A.  That's correct.
 7    Q.  And we don't have access to your clinical
 8 experiences other than what you're telling me here
 9 today and what you've written in your report;
10 correct?
11    A.  That's correct.
12        MS. O'NEILL:  Objection.  Form.
13        THE WITNESS:  That's -- that's correct.
14 BY MS. BARNHART:
15    Q.  And then you go on to list "Instagram
16 features that increase app time use in youth."
17        And I just want to understand before we get
18 into those features that you list, are you saying
19 that any Instagram feature that increases app time
20 use in youth is harmful to mental health?
21        MS. O'NEILL:  Objection.  Form.
22 Mischaracterization.
23        THE WITNESS:  It can potentially be
24 harmful.  Of course, there is a spectrum of
25 teenagers out there.  I am working with teenagers
```

CONFIDENTIAL

Page 299

```
 1 who have significant mental health problems because
 2 of, I believe, how the app is designed.
 3 BY MS. BARNHART:
 4    Q.  Okay.  But you agree that there are
 5 millions of teenagers that use Instagram every day
 6 who do not experience any harm; correct?
 7        MS. O'NEILL:  Objection.  Form.
 8 Foundation.
 9        THE WITNESS:  I'm not polling millions of
10 teenagers.  I think it's reasonable to say that
11 there is a significant number of teenagers that
12 likely are experiencing harm with this.  I can most
13 accurately comment on the patients that I am working
14 with.
15 BY MS. BARNHART:
16    Q.  You're certainly not seeing millions of
17 teenagers come through your clinic claiming they
18 have social media addiction; correct?
19    A.  I am certainly not seeing millions of
20 teenagers in my clinic.
21    Q.  And you go on to list some features in
22 paragraph 57 of Instagram features that increase app
23 time use in youth.
24        So the first one you say is push
25 notifications.
```

CONFIDENTIAL

Page 300

```
 1        Do you see that?
 2    A.  Yes.
 3    Q.  And you have a smartphone, I assume?
 4    A.  I have a smartphone.
 5    Q.  And you have apps on that smartphone?
 6    A.  I have apps on my phone.
 7    Q.  You understand that notifications are
 8 optional with almost any app that's available on a
 9 smartphone?
10        MS. O'NEILL:  Objection.  Form.
11        THE WITNESS:  I'm not an expert on the
12 technicalities of how my phone might work.
13 BY MS. BARNHART:
14    Q.  You do understand, though, that push
15 notifications are not a feature that is unique to
16 Instagram; right?
17    A.  There are other apps that surely use push
18 notifications.
19    Q.  In your clinical work with teenage
20 patients, do you make any attempt to consider or
21 rule out the effects of push notifications from
22 other apps besides Instagram?
23        MS. O'NEILL:  Objection.  Form.
24        THE WITNESS:  I try and assess for this as
25 accurately as possible.  Also, most of the patients
```

CONFIDENTIAL

Page 301

```
 1 that come in and work with me, they don't really
 2 want to share much information about their use of
 3 the app and platform, but it consistently is a
 4 significant problem among the patients that I'm
 5 working with.
 6 BY MS. BARNHART:
 7    Q.  How do you know it's a significant problem
 8 if your patients don't share information about their
 9 use of the app and platform?
10        MS. O'NEILL:  Objection.  Form.
11        THE WITNESS:  I think it's common for
12 patients to acknowledge that they have a problem
13 with their use and also maybe not want to make a
14 change, which is a pretty common feature of an
15 addiction.
16        And I will have parents come into the
17 clinical evaluation saying they believe that it's
18 the app that is causing all this harm and disruption
19 and dysregulation in their lives.
20 BY MS. BARNHART:
21    Q.  Have you ever had a teenage patient or
22 their parent tell you, "Push notifications on
23 Instagram are causing harm and disruption and
24 dysregulation in my life"?
25        MS. O'NEILL:  Objection.  Form.
```

CONFIDENTIAL

Page 302

1      THE WITNESS:  They don't have to tell me
2  that for me to understand that it's harmful; but no,
3  teens are typically not telling me that the push
4  notification is, you know, harmful.
5  BY MS. BARNHART:
6      Q.   And you've listed a number of other
7  features here:  automatically play video, infinite
8  scrolling, gamification, autoplay, and reels, and
9  recommendation algorithms.
10      Do you see those features?
11      A.   Yes.
12      Q.   Have you read the judge's order on Meta's
13  motion to dismiss in this litigation?
14      A.   On Meta's motion to dismiss?  I'd have to
15  refresh my recollection of --
16      Q.   It's not on your materials considered list.
17      A.   Okay.  All right.
18      Q.   Maybe we can just cut to the chase.
19      If it's not there, you probably didn't read
20  it; right?
21      A.   That sounds correct.
22      Q.   Did counsel provide you any sort of
23  assumptions or other information based on that order
24  as to what features are at issue in this case?
25      A.   I'd have to refresh my recollection with

CONFIDENTIAL

Page 303

1  documents provided by counsel.
2      Q.   Okay.  In your report at paragraph 56, you
3  claim that teen accounts were not implemented until
4  September 2024; is that right?
5      A.   I do state that.
6      Q.   Are you aware that all of the protections
7  included in teen accounts were available to teen
8  users prior to September 2024 and in some cases many
9  years prior?
10      MS. O'NEILL:  Objection.  Form.
11      THE WITNESS:  I would have to carefully
12  review the Meta documents in relation to
13  restrictions they have regarding the app and
14  timeline.  This is my understanding.
15  BY MS. BARNHART:
16      Q.   And you didn't seek to investigate that
17  issue?
18      A.   I tried to investigate to the best of my
19  abilities, but it's challenging at times to keep all
20  this information straight in Meta's release enabled
21  2025, which I do reference.  That's a claim that, in
22  the next couple of months, to begin prohibiting
23  Instagram users under 16 from going live, for
24  instance.
25      Has that happened?  I mean, it's difficult

CONFIDENTIAL

Page 304

1  to keep up with the time frame of when and if these
2  features have been implemented.
3      Q.   And probably the best people to answer that
4  question of when and if these features have been
5  implemented are employees of Meta; right?  Not you?
6      MS. O'NEILL:  Objection.  Form.
7  Foundation.
8      THE WITNESS:  An employee of Meta probably
9  knows, depending on the role at Meta, when certain
10  features might be implemented.
11  BY MS. BARNHART:
12      Q.   We've been talking a lot today about your
13  clinical experience and how that forms the basis of
14  your opinions in this case.  I know you're aware of
15  that.  I have a few more questions about that.
16      If someone wanted to evaluate whether you
17  had drawn reliable scientific inferences based on
18  your clinical experience, how would that person do
19  that?
20      MS. O'NEILL:  Objection.  Form.
21      THE WITNESS:  I believe that my clinical
22  work is a reliable scientific inference.  Clinical
23  work is -- it informs research, and it's also based
24  on research.
25      And here again, I'll continue to say this,

CONFIDENTIAL

Page 305

1  that I'm seeing a significant problem with the
2  patients I'm working with.  I believe that the
3  Instagram app is a primary contributor to what I'm
4  seeing.
5  BY MS. BARNHART:
6      Q.   My question is -- I understand you're going
7  to come to trial and say that.  How is a jury
8  supposed to evaluate whether your say-so is
9  reliable?
10      MS. O'NEILL:  Objection.  Form.
11      THE WITNESS:  I can talk about what I know
12  and how I reached my opinion, which is, again,
13  primarily based off of the work that I do as a
14  medical doctor with many years of experience and
15  many fellowships behind my training working with
16  this population that has significant concerns.
17  BY MS. BARNHART:
18      Q.   So there's no way for -- well, let me ask
19  you this:
20      Are you familiar with the concept of
21  replication in scientific research?
22      A.   You have to jog my memory.
23      Q.   Okay.  So in science the concept of
24  replication is the process of repeating a study or
25  experiment to see if the original results can be

CONFIDENTIAL

Page 306

1  obtained again, which is a measure of reliability.
2      A.   Okay.
3      Q.   Does that sound right to you?
4      A.   That sounds accurate.
5      Q.   Okay.  Are you -- do you agree with me that
6  your conclusions in this case, your opinions, which
7  are based on your personal memories and clinical
8  experience, can't be replicated by a third party?
9          MS. O'NEILL:  Objection.  Form.  Calls for
10 a legal conclusion.
11         THE WITNESS:  Replicated by a third party?
12 What would that third party be?  Are we talking
13 about another physician?  What are we talking about?
14 BY MS. BARNHART:
15     Q.   I'm talking about me.  How would I
16 replicate your methodology that you used to arrive
17 at your opinions in this case?
18         MS. O'NEILL:  Same objections.
19         THE WITNESS:  Go to med school.  Do
20 residency, several fellowships, and find yourself
21 working with a population of youth with addictions
22 many years down the road.
23 BY MS. BARNHART:
24     Q.   Okay.  Is there any other way to replicate
25 your -- the methodology that you used to arrive at

CONFIDENTIAL

Page 307

1  your opinions here?
2          MS. O'NEILL:  Objection.  Form.
3          THE WITNESS:  I believe, again, if you have
4  my training and experience, background with this
5  clinic population, that would be how you can
6  replicate this.  Unfortunately, there aren't a whole
7  lot of trained child and adolescent psychiatrists
8  and trained addiction psychiatrists out there.
9  BY MS. BARNHART:
10     Q.   How could I ensure that your memories of
11 your clinical experience align with reality?
12         MS. O'NEILL:  Objection.  Form.
13         THE WITNESS:  Again, I am here to report
14 on -- to opine on -- I am here to discuss my report,
15 my opinions.  And as a medical doctor with many
16 years of training behind me and work beyond training
17 as a clinical associate professor, I would hope that
18 that would be considered, you know, a reliable
19 background to evaluate patients who I believe suffer
20 from this problem.
21 BY MS. BARNHART:
22     Q.   So it's your view that your credentials
23 show -- demonstrate -- let me start over.
24         It's your view that your credentials on
25 their own demonstrate the reliability of your memory

CONFIDENTIAL

Page 308

1  of your clinical experience?
2          MS. O'NEILL:  Objection.  Form.
3  Mischaracterization.
4          THE WITNESS:  I think they certainly are a
5  substantial part of what goes into my work.  And if
6  you want to call it reliability, okay.
7  BY MS. BARNHART:
8      Q.   Can you point me to anything else that
9  demonstrates the reliability of your memory of your
10 clinical experience?
11         MS. O'NEILL:  Objection.  Form.
12         THE WITNESS:  I can point to what I've
13 referenced and discussed today, which is I have a
14 clinic population that suffers, I believe, from
15 significant concerns regarding social media use and
16 addictions.
17         And I have a background that I believe is
18 unique as a trained child and adolescent
19 psychiatrist and addiction psychiatrist.  There's
20 not a whole lot of us out there.
21 BY MS. BARNHART:
22     Q.   Yeah, but there's nothing -- there's no
23 spreadsheet or summary memo or some other
24 documentation of contemporaneous recordings of your
25 clinical experience that you could point to and say,

CONFIDENTIAL

Page 309

1  "Look, I'm remembering correctly"; right?
2          You haven't produced anything like that to
3  us?
4          MS. O'NEILL:  Objection.  Form.
5          THE WITNESS:  Yeah, I've stated that I did
6  not rely on clinical records to form my opinion.
7  BY MS. BARNHART:
8      Q.   Okay.  So we're supposed to trust your
9  opinions simply based on your say-so; correct?
10         MS. O'NEILL:  Objection.  Form.
11 Argumentative.
12         THE WITNESS:  I'm here to provide my
13 opinion whether someone wants to believe it or not.
14 BY MS. BARNHART:
15     Q.   And it's -- you're asking us to believe
16 your opinions simply because you say that they
17 reflect your clinical experience; right?
18         MS. O'NEILL:  Objection.  Form.
19 Mischaracterization.
20         THE WITNESS:  You can choose to believe
21 what I'm saying or not; but I'm here to report on,
22 again, what I believe I'm seeing daily within my
23 clinical practice.  Well, my opinions are formed by
24 my clinical practice primarily.
25 ///

CONFIDENTIAL

Page 310

BY MS. BARNHART:

1
2    Q.   In paragraph 53 of your report, you
3    describe some of your treatment practices.
4         Am I correct in understanding that one
5    treatment that you provide for social media
6    addiction is enforcing restricted phone and internet
7    use?
8    A.   I certainly do work with families on trying
9    to build healthy family media use habits and
10   planning.
11   Q.   Okay. So if you believed -- if you believe
12   Instagram is a primary contributor to a given
13   patient's mental health concerns, do you ever
14   recommend that that patient not use Instagram but
15   continue to use their phone and the internet as they
16   otherwise would?
17        MS. O'NEILL:  Objection.  Form.
18        THE WITNESS:  I can see scenarios where
19   there are times it's the Instagram platform, of
20   course, and not the ability -- the idea of
21   restricting phone otherwise that occurs.
22   BY MS. BARNHART:
23   Q.   My question is, sitting here today, can you
24   specifically recall treating any patient by telling
25   them to delete the Instagram app but use all other

CONFIDENTIAL

Page 311

1    technology as normal?
2         MS. O'NEILL:  Objection.  Form.
3         THE WITNESS:  I can't recall that
4    particular scenario.
5    BY MS. BARNHART:
6    Q.   You also in your report say that you treat
7    youth with social media addictions using
8    motivational interviewing, cognitive behavioral
9    therapy, and family-focused therapy; correct?
10   A.   Correct.
11   Q.   Those are tools that can be used to treat
12   depression, anxiety, and other nonaddiction mental
13   health disorders; correct?
14        MS. O'NEILL:  Objection.  Form.
15        THE WITNESS:  Correct.
16   BY MS. BARNHART:
17   Q.   And if I'm understanding your opinions
18   correctly, you believe that you can determine that
19   social media addiction is causing these other mental
20   health disorders because the treatment for social
21   media addiction improves the other conditions;
22   correct?
23        MS. O'NEILL:  Objection.  Form.
24   Mischaracterization.
25        THE WITNESS:  I do see frequently in my

CONFIDENTIAL

Page 312

1    practice that focusing primary efforts at improving
2    the social media aspect of a patient's life leads to
3    significant and sometimes complete resolution of the
4    other presenting concerns.
5    BY MS. BARNHART:
6    Q.   Motivational interviewing, cognitive
7    behavioral therapy, and family-focused therapy are
8    effective at treating other mental health disorders
9    as well; correct?
10   A.   That's correct.
11   Q.   So how, if at all, can you just aggregate
12   the effect of motivational interviewing, cognitive
13   behavioral therapy, and family-focused therapy on
14   the mental health disorder as opposed to the
15   purported social media addiction?
16        MS. O'NEILL:  Objection.  Form.
17        THE WITNESS:  So I'm a little confused by
18   the question.  If you can repeat or potentially
19   rephrase it.
20   BY MS. BARNHART:
21   Q.   Let's just try it this way.
22        If a teenager in your clinic reported
23   having an eating disorder and also spending a lot of
24   time on social media, how would you treat that
25   patient?

CONFIDENTIAL

Page 313

1         Would you try to treat the eating disorder
2    first?
3         MS. O'NEILL:  Objection.  Incomplete
4    hypothetical.
5         THE WITNESS:  Yeah, and I'm not -- I don't
6    work in an eating disorder treatment program; so
7    that scenario would not really apply to, generally,
8    the work that I'm -- that I'm doing.
9    BY MS. BARNHART:
10   Q.   Okay. So you're not offering any opinions
11   about eating disorders?
12        MS. O'NEILL:  Objection.  Form.
13   Mischaracterization.
14        THE WITNESS:  Well, in regards to
15   treating -- in regards to a patient who has met the
16   medical criteria for an inpatient -- say, an eating
17   disorder treatment program and who also might have
18   concerning social media use? Yeah, I think you need
19   to probably address both and, certainly, the
20   medically compromising situation in the moment,
21   which is the eating disorder.
22        Sure, in that scenario, you need to treat
23   both.
24   BY MS. BARNHART:
25   Q.   You would never simply take this teenager's

Page 314

1  phone away thinking that would solve the problem of
2  their eating disorder; right?
3       MS. O'NEILL:  Objection.  Form.
4       THE WITNESS:  In that scenario, no.  More
5  would need to be done.
6  BY MS. BARNHART:
7       Q.  In paragraph 15 of your report, you suggest
8  that there are some situations where --
9       A.  Which paragraph?
10      Q.  15.
11          You suggest that there are some situations
12  where teenage patients with purported social media
13  addiction should be considered for residential
14  treatment center programs; is that correct?
15      A.  Correct.
16      Q.  Do you agree with me that residential
17  treatment center programs were developed for
18  substance disorders?
19      MS. O'NEILL:  Objection.  Form.
20      THE WITNESS:  I'm not actually sure, among
21  the history of residential treatment centers, that
22  they were developed for substance use; but there are
23  many that exist today for primary mental health
24  treatment.
25  ///

Page 315

1  BY MS. BARNHART:
2       Q.  And residential treatment center programs
3  typically last 30 to 90 days; is that right?
4       A.  That's a typical time frame.
5       Q.  Have you ever recommended to a parent that
6  they send their child away from home for 30 to 90
7  days specifically to treat social media addiction?
8       A.  That can be a scenario encountered with
9  patients that I work with.
10      Q.  Have you ever actually recommended to a
11  parent that they send their child away from home for
12  30 to 90 days specifically to treat social media
13  addiction?
14      A.  I have discussed that as an option if they
15  feel like there's no other option left and the
16  family simply needs a separation and reset, and the
17  parents then need the ability over 30 or 90 days to
18  reset their home regulations and restrictions,
19  particularly when it comes to technology use and,
20  you can say, social media use.
21      Q.  Have any patients of yours actually entered
22  a residential treatment program to specifically
23  treat their social media addiction?
24      MS. O'NEILL:  Objection.  Form.
25      THE WITNESS:  I have patients, for a

Page 316

1  variety of reasons, that have entered residential
2  treatment programs.  That is not an unexpected
3  occurrence working with patients with addictions.
4  BY MS. BARNHART:
5       Q.  Do you remember my question, Dr. Zicherman?
6       A.  You can rephrase it or restate it.
7       Q.  Have any patients of yours actually entered
8  a residential treatment program specifically to
9  treat their social media addiction?
10      MS. O'NEILL:  Objection.  Form.
11      THE WITNESS:  Well, I would say again it's
12  not -- whether that was an outcome, it's not
13  necessarily relevant to the genesis of the report.
14          But, again, I have had patients for a
15  variety of reasons, which you can say can include
16  behavioral addictions, that have ended up at
17  residential treatment.
18  BY MS. BARNHART:
19      Q.  Do you remember my question?
20      A.  I'm happy to hear you state it again.
21      Q.  Did you forget it a second time?
22      A.  Well, I believe I answered your question to
23  the best of my abilities.
24      Q.  You didn't.  You're not -- you're not.  So
25  please listen to it.

Page 317

1           Have you ever -- let me start over.
2           Have any patients of yours actually entered
3  a residential treatment program specifically to
4  treat their social media addiction?
5       MS. O'NEILL:  Objection.  Form.
6       THE WITNESS:  I think that goes towards
7  patient specifics, but, again, I can globally say,
8  working as a child and adolescent psychiatrist with
9  a background in addictions, that I certainly have
10  seen patients end up at residential for a variety of
11  reasons, including concerns regarding technology
12  use, which can include social media use.
13  BY MS. BARNHART:
14      Q.  Do you have a specific patient in mind who
15  has been sent to a residential treatment facility
16  for 30 to 90 days because of social media addiction?
17      MS. O'NEILL:  Objection.  Form.
18      THE WITNESS:  I'm not here to comment about
19  specifics of my patients.  I can comment generally
20  that this is a part of treatment that sometimes is
21  necessary.
22  BY MS. BARNHART:
23      Q.  So I'm going to take that as a no.  I'll
24  frame it that way.
25          You have never sent a teenage patient of

CONFIDENTIAL

Page 318

1  yours to a residential treatment facility for 30 to
2  90 days because of social media addiction; correct?
3      MS. O'NEILL:  Objection.  Form.
4      THE WITNESS:  I've never sent anyone to
5  residential.  It can be part of a recommendation,
6  and a family may choose to admit their child to a
7  voluntary residential treatment program, which is
8  what exists in the state of California.
9  BY MS. BARNHART:
10     Q.   You have never recommended to a parent of a
11 teenage patient that they institutionalize their
12 teenager for 30 to 90 days because of social media
13 addiction; correct?
14     MS. O'NEILL:  Objection.  Form.
15     THE WITNESS:  It might be among concerns
16 that have come up in -- again, patients that are --
17 that end up at residentials.
18     Again, the nature of my work, I work with
19 lots of patients.  Patients can end up in a
20 residential setting.  This is not an uncommon
21 occurrence.  And I also work at a residential
22 setting.
23 BY MS. BARNHART:
24     Q.   That has nothing to do with social media
25 addiction; right?

CONFIDENTIAL

Page 319

1      A.   My work at Alta Mira?
2      Q.   Correct.
3      A.   There are patients that could potentially
4  have technology use concerns, but they're also
5  adults.
6      Q.   And it's a substance use residential
7  treatment facility?  That's what it advertises
8  itself as?
9      A.   That's true.  It is primarily a substance
10 use treatment program.
11     Q.   All right.  Can you name any adolescent
12 residential treatment programs that your patients
13 have attended because of social media addiction?
14     MS. O'NEILL:  Objection.  Form.
15     THE WITNESS:  I can't recall that
16 information offhand.
17     MS. BARNHART:  All right.  Let's take a
18 break.
19     THE VIDEOGRAPHER:  Stand by.  The time
20 is 5:32 p.m., and we're going off the record.
21     (Recess taken.)
22     THE VIDEOGRAPHER:  The time is 5:57 p.m.,
23 and we are back on the record.
24 BY MS. BARNHART:
25     Q.   Dr. Zicherman, returning to something we

CONFIDENTIAL

Page 320

1  were talking about earlier, if a teenage patient in
2  your clinic was experiencing suicidal ideation and
3  self-harm behavior and also reported spending a lot
4  of time on social media, you would treat the
5  suicidal ideation and self-harm first; correct?
6      MS. O'NEILL:  Objection.  Form.  Incomplete
7  hypothetical.
8      THE WITNESS:  Yeah, I would agree that that
9  is a challenging hypothetical and an incomplete
10 hypothetical to work through; but in a vacuum, yeah,
11 of course you have to treat primarily an acute
12 condition like suicidality.
13 BY MS. BARNHART:
14     Q.   You wouldn't simply take that teenager's
15 phone away and expect that to cure their
16 suicidality; correct?
17     MS. O'NEILL:  Objection.  Form.
18     THE WITNESS:  No.  I do not believe that to
19 be the case.  And I think, in your scenario,
20 actually giving power to the idea of an addiction, I
21 think that if you have someone who has suicidality,
22 maybe they already had concerning social media use.
23 Take away their ability to access that when they're
24 suicidal, you could get an extinction burst, which
25 means things could get worse before they get better.

CONFIDENTIAL

Page 321

1      (Stenographer interrupted for
2      clarification of the record.)
3  BY MS. BARNHART:
4      Q.   What about the situation of a teenager in
5  your clinic who presents with clinical depression
6  and also reports spending a lot of time on social
7  media?  Would you treat the clinical depression
8  first?
9      MS. O'NEILL:  Objection.  Form.  Incomplete
10 hypothetical.
11     THE WITNESS:  Well, I think if you -- in
12 that scenario, you know, you need to know more about
13 severity of the depression presentation, or you
14 believe that -- you know, I'm working with patients
15 in my clinic who I believe have a primary social
16 media addiction concern, which means they also might
17 come in with certain elements of depression.
18     And in order to address those depressive
19 symptoms, I find that just directly addressing, in
20 so many cases, the concerning social media use ends
21 up either completely resolving or remitting the
22 symptoms of depression.
23 BY MS. BARNHART:
24     Q.   You wouldn't simply take the phone away
25 from that teenager and expect their clinical

CONFIDENTIAL

Page 322

1  depression to get better, would you?
2          MS. O'NEILL:  Objection.  Form.
3          THE WITNESS:  Well, you're asking about a
4  phone now.  It depends on -- it depends on a
5  situation.  I would really need more details about a
6  scenario.
7  BY MS. BARNHART:
8      Q.   You wouldn't simply tell that teenager,
9  "Delete the Instagram app; that will cure your
10  clinical depression," would you?
11          MS. O'NEILL:  Objection.  Form.
12          THE WITNESS:  In certain situations, that
13  might eventually be the answer.  But if you have
14  someone especially who's coming in with high acuity
15  concerns, I think you have to delicately navigate
16  those concerns, at least initially, when you meet
17  with the patient.
18  BY MS. BARNHART:
19      Q.   What if a teenager presented at your clinic
20  with clinical anxiety and also reported spending a
21  lot of time on social media?
22          Similarly, you wouldn't simply tell that
23  teenager to delete the Instagram app, you -- sorry.
24  Let me start that again.
25          If a teenager presented at your clinic with

CONFIDENTIAL

Page 323

1  clinical anxiety and also reported spending a lot of
2  time on social media, you wouldn't simply tell that
3  teenager to delete the Instagram app, would you?
4          MS. O'NEILL:  Objection.  Form.
5          THE WITNESS:  Well, again, in that
6  scenario, I would need it -- I would need more
7  details, and I need to, you know, understand
8  more information about the severity of the anxiety,
9  how long it's been going on for, and try to
10  understand the intersection of anxiety and their
11  social media use.
12  BY MS. BARNHART:
13      Q.   Is it your opinion as a medical
14  practitioner that having a teenager delete their
15  Instagram app could potentially cure clinical
16  anxiety?
17          MS. O'NEILL:  Objection.  Form.
18  BY MS. BARNHART:
19      Q.   That and that alone?
20      A.   There are certain situations and scenarios
21  where I do believe that could be the case.
22      Q.   Have you ever treated a patient where the
23  only thing you did for the treatment of the patient
24  was to tell the patient to delete an Instagram app
25  off of their phone?

CONFIDENTIAL

Page 324

1      A.   I don't recall any scenarios where the
2  first thing I did and the only thing I did was say
3  delete -- or direct the teenager to delete the app.
4      Q.   That's because you also use treatments like
5  CBT, talk therapy, family therapy to treat social
6  media addiction and clinical mental health
7  disorders; correct?
8          MS. O'NEILL:  Objection.  Form.
9          THE WITNESS:  These are broadly applicable
10  forms of treatment, and it's the best we have right
11  now when we have an emerging significant concern
12  which is social media addiction in youth.
13  BY MS. BARNHART:
14      Q.   Okay.  We've talked a lot about dopamine
15  today.  I have a few more questions for you on that
16  point.
17          If you can turn to paragraph 21 of your
18  rebuttal report, which I believe is Exhibit 3.
19          MR. BOOTH:  4.
20  BY MS. BARNHART:
21      Q.   4.  Sorry.
22      A.   And which page?
23      Q.   It's paragraph 21, which is on page 10.
24          Okay.  So in paragraph 21 of your rebuttal
25  report, you say:

CONFIDENTIAL

Page 325

1          "First, the role of dopamine in
2          both substance and behavioral
3          addictions is well established."
4          Do you see that?
5      A.   Yes.
6      Q.   And you cite three -- you cite three things
7  to support that statement; correct?
8      A.   I believe that is -- I certainly cite 39,
9  40 --
10      Q.   Well, I'm just asking about this first
11  sentence.
12      A.   Okay.
13      Q.   And so that's -- Footnote 39 corresponds to
14  that first sentence; right?
15      A.   Yes.
16      Q.   Okay.  So the basis for this statement are
17  these -- the sources that are cited in Footnote 39;
18  right?  You're not basing this statement on your
19  clinical experience?
20      A.   That is correct.  That statement is
21  attributable to the material in Reference 39.
22      Q.   Okay.  The first item that you reference --
23  or that you cite in Footnote 39 is a 2005 article by
24  Eric Nestler; correct?
25      A.   Correct.

CONFIDENTIAL

Page 326

1    Q.   In 2005, social media didn't exist;
2  correct?
3        MS. O'NEILL:  Objection.  Form.
4        THE WITNESS:  I'm not sure if that is
5  correct or not.  There have been several social
6  media platforms that have existed before Instagram.
7  BY MS. BARNHART:
8    Q.   Okay.  Well, Instagram certainly didn't
9  exist in 2005; correct?
10   A.   I believe that is correct.
11   Q.   You earlier told me that social media was
12 only in its infancy when the DSM-5 was published in
13 2013; correct?
14   A.   Correct.
15   Q.   And this is eight years before that; right?
16   A.   That would be correct.
17   Q.   Okay.  So this 2005 article does not say
18 anything about social media addiction and the role
19 of dopamine, if any, in that; correct?
20       MS. O'NEILL:  Objection.  Form.
21       THE WITNESS:  I would have to refer back to
22 the article to see if there's a specific mention of
23 social media.
24 BY MS. BARNHART:
25   Q.   Okay.  Would it surprise you if I told you

CONFIDENTIAL

Page 327

1  there was no specific mention of social media
2  addiction in a 2005 article?
3        MS. O'NEILL:  Objection.  Form.
4        THE WITNESS:  That might be the case.
5  BY MS. BARNHART:
6    Q.   The second item you cite is a 2021 article
7  by Andrew Westbrook and a number of others.
8        Do you see that?
9    A.   Yes.
10   Q.   This article is titled "Striatal Dopamine
11 Synthesis Capacity Reflects Smartphone Social
12 Activity."  Correct?
13   A.   Correct.
14   Q.   Am I correct that this study did not
15 actually assess any -- any people who have been
16 diagnosed with any form of addiction?
17       MS. O'NEILL:  Objection.  Form.
18       THE WITNESS:  Can you repeat that.  I just
19 got distracted by the screen there.
20 BY MS. BARNHART:
21   Q.   Oh, sure.
22       What's on your screen?
23   A.   I just -- I think there's some changes with
24 the highlighting I was looking at.
25   Q.   Is it your report?  I just want to make

CONFIDENTIAL

Page 328

1  sure you're looking at the right thing.
2    A.   Yeah.  Well, I was kind of flipping between
3  two to make sure that it was the same.  Sorry.
4    Q.   No, no worries.  Let me say that again, if
5  I can remember what I said.
6        Am I correct that this 2021 Westbrook study
7  did not actually assess any individuals diagnosed
8  with any form of addiction?
9        MS. O'NEILL:  Objection.  Form.
10       THE WITNESS:  I would have to jog my
11 memory, looking at the report to fully answer that.
12       MS. BARNHART:  All right.  Well, why don't
13 we go ahead and mark that.
14       (Exhibit 21 was marked for
15       identification and is attached to the
16       transcript.)
17       MS. BARNHART:  What exhibit is this?
18       MR. LaGRAND:  21.
19 BY MS. BARNHART:
20   Q.   You've been handed what's been marked as
21 Exhibit 1.  This is a copy of the -- sorry --
22 Exhibit 21, which is a copy of the Westbrook article
23 we've been talking about; correct?
24   A.   Correct.
25   Q.   And if you -- you can feel free to take a

CONFIDENTIAL

Page 329

1  look if you'd like, but my question for you is
2  whether you agree that the participants in this
3  study were healthy individuals with no diagnosis of
4  addiction.
5        MS. O'NEILL:  Objection.  Form.
6        THE WITNESS:  I would have to spend some
7  time refreshing my memory regarding this study and
8  your question of healthy individuals, I believe it
9  was, or healthy subjects.
10 BY MS. BARNHART:
11   Q.   Okay.  Well, you can set that to the side.
12 If you'd like to review it in detail during a break,
13 that's fine.  And you can let me know if you dispute
14 my summary of this as a study that did not assess
15 any individuals who were actually diagnosed with
16 addiction.  Okay?
17   A.   Okay.
18   Q.   Okay.  And then the third thing that you
19 cite in this footnote is an article by Min Liu dated
20 in 2015.
21       Do you see that?
22   A.   Where's -- where are you referencing?
23   Q.   The Footnote 39.
24   A.   Yes.
25   Q.   And the title of that article is

Page 330

1  "Relationship Between Peripheral Blood Dopamine
2  Level and Internet Addiction Order in Adolescent --
3  Internet Addiction Disorder in Adolescents."
4       Do you see that?
5  A.  I do.
6  Q.  So this is a study of dopamine outside of
7  the brain; right?  In the blood?
8  A.  I believe that is correct.
9  Q.  And dopamine -- in your understanding, can
10  dopamine readily cross the blood-brain barrier?
11  A.  I would have to refresh myself with the
12  study and information on whether it crosses the
13  blood-brain barrier.
14  Q.  Well, I'm just asking you, as a general
15  matter of anatomy, does dopamine cross the
16  blood-brain barrier?
17  A.  To accurately answer that question, I would
18  want to reference that study.
19       Also, that might be a question for a
20  neuroscientist to answer.
21  Q.  Okay.  I can represent to you the study
22  does not answer this question, which is why I was
23  asking you.
24       But you don't feel equipped to answer
25  whether dopamine can cross the blood-brain barrier?

Page 331

1       MS. O'NEILL:  Objection.  Form.
2       THE WITNESS:  The mechanism of dopamine is
3  far less important to me than what I'm actually
4  seeing in my clinical practice.
5       Whether the mechanism is the dopamine
6  pathway that is described or not, that is not a
7  substantial part -- or wasn't for my clinical
8  practice.
9  BY MS. BARNHART:
10  Q.  Okay.  Well, we'll get to that in a second,
11  but I'm asking you about the basis for your
12  statement that the role of dopamine in both
13  substance and behavioral addictions is well
14  established.
15       I assume you still stand by that statement;
16  correct?
17  A.  Correct.
18  Q.  And I'm asking you about the bases for that
19  statement.
20       We've talked about an article that was
21  published before social media existed, another
22  article that didn't actually assess addicted
23  participants, and we're now talking about a third
24  article that looked at blood dopamine levels;
25  correct?

Page 332

1       MS. O'NEILL:  Objection.  Form.
2       THE WITNESS:  There's a chance -- again, I
3  have to look at time frames that social media did
4  exist prior to that one article that you cited,
5  perhaps not Instagram but other platforms.
6  BY MS. BARNHART:
7  Q.  Is it your understanding that peripheral
8  blood dopamine can be used as a measure of dopamine
9  activity in the brain?
10  A.  I would have to reference the study in
11  question.
12  Q.  I can represent to you there's no -- any
13  answer to that question in this study.
14  A.  Okay.
15  Q.  So can you answer that based on your
16  medical knowledge?
17       Does peripheral blood dopamine reflect a
18  measure of dopamine activity in the brain?
19       MS. O'NEILL:  Objection.  Form.
20       THE WITNESS:  You can ask a neuroscientist
21  who specializes in dopamine that question.  And the
22  mechanism of how dopamine is leading this cascade of
23  what I believe is significant social media use
24  concerns, regardless of the mechanism, I'm seeing
25  what I'm seeing in my clinical work.  And that is

Page 333

1  what primarily has informed my opinion in this
2  matter.
3  BY MS. BARNHART:
4  Q.  Okay.  You said earlier -- you testified
5  earlier today that you have a doctor's understanding
6  of dopamine.
7       Do you recall that testimony?
8  A.  I do.
9  Q.  So that doctor's understanding of dopamine
10  doesn't include an understanding of whether dopamine
11  can cross the blood-brain barrier; correct?
12  A.  I doubt most physicians have an
13  understanding of whether dopamine can cross the
14  blood-brain barrier.
15       Again, feel free to ask a neuroscientist.
16  Q.  Okay.  I don't have one in the room with me
17  today, which is why I'm asking you.
18       So, sitting here today as -- with a
19  doctor's understanding of dopamine, can you tell me
20  why this Liu 2015 article about peripheral blood
21  dopamine levels would be at all relevant to the
22  question of whether behavioral addictions release
23  dopamine in the brain?
24       MS. O'NEILL:  Objection.  Form.
25       THE WITNESS:  I would have to again

CONFIDENTIAL

Page 334

1  carefully review the article to appropriately and
2  thoroughly answer that question.
3  BY MS. BARNHART:
4      Q.   So you cannot, sitting here today, answer
5  that question?
6      A.   Without --
7           MS. O'NEILL:  Objection.  Asked and
8  answered.
9           THE WITNESS:  Without having the chance to,
10 again, sit down thoroughly, read the article, I
11 cannot appropriately answer that question.
12 BY MS. BARNHART:
13     Q.   Okay.  Then you -- the next sentence in
14 paragraph 21 of your rebuttal report says:
15               "I also cited evidence of other
16          researchers in the field describing
17          this potential dopamine mechanism as
18          applied to social media addiction and
19          there has been some empirical research
20          on this general topic."
21          Do you see that?
22     A.   I'm catching up here.
23          I see that.
24     Q.   Okay.  And you again cite, to support that
25 statement, this Westbrook 2021 article; correct?

CONFIDENTIAL

Page 335

1      A.   Correct.
2      Q.   And, again, that article did not measure
3  any dopamine release relating to individuals with
4  social media addiction; correct?
5           MS. O'NEILL:  Objection.  Form.
6           THE WITNESS:  So to fully and properly
7  answer that question, I'd have to jog my memory of
8  the study and review it.
9  BY MS. BARNHART:
10     Q.   Okay.  So after the next break, you can let
11 me know if that jogged your memory at all.
12          And am I correct, Dr. Zicherman, that this
13 rebuttal report that we're looking at -- this is
14 dated July 30th, 2025; right?
15     A.   I believe that is the correct date.
16     Q.   Okay.  So you submitted this report less
17 than a month ago; correct?
18     A.   Correct.
19     Q.   And presumably you reviewed the materials
20 that you cite in support for the statements that you
21 make in this report at or around the time that you
22 submitted it; right?
23     A.   Correct.
24     Q.   And you don't recall, less than four weeks
25 later, why you cited these particular studies or

CONFIDENTIAL

Page 336

1  what they say?
2           MS. O'NEILL:  Objection.  Form.
3           THE WITNESS:  I believe I've referenced
4  lots of studies and, again, accurately answered
5  questions about specific studies.
6           I would want a chance to review those
7  studies carefully before answering specific
8  questions related to them.
9  BY MS. BARNHART:
10     Q.   Would it surprise you to learn that, in
11 fact, you referenced less than 10 academic studies
12 in your rebuttal report?
13          MS. O'NEILL:  Objection.  Form.
14 BY MS. BARNHART:
15     Q.   I'm talking about actually cite in your
16 rebuttal report.
17     A.   As far as books and academic papers in the
18 rebuttal report, it appears there are less than ten
19 citations.
20     Q.   Let me ask you about the next sentence in
21 paragraph 21, where you say -- I think this is where
22 you were going earlier.
23          You write:
24               "However, establishing the role of
25          dopamine in social media addiction is

CONFIDENTIAL

Page 337

1               not necessary for my opinion that
2          social media use is a substantial
3          contributor to youth mental health
4          issues.  My opinion holds regardless of
5          the specific neurological or
6          psychological mechanisms by which
7          social media use impacts mental
8          health."
9          Is that correct?
10     A.   Correct.
11     Q.   So are you -- do you plan to offer an
12 opinion in this case about the specific neurological
13 or psychological mechanism by which you believe
14 social media use impacts mental health?
15     A.   That is part of my opinion in the initial
16 report; so yes.
17          I also would add again that I've been
18 saying that it is not a substantial part of what led
19 to my opinion on the topic.
20     Q.   Yeah, I'm just trying to understand if it
21 has any part in your opinion on the topic.
22          So whether or not it is true that dopamine
23 plays a role in social media addiction, you would
24 continue to hold your opinion that Instagram causes
25 social media addiction through dopamine release?

Page 338

```
1        MS. O'NEILL:  Objection.  Form.
2        THE WITNESS:  It's important to understand,
3   sure, the mechanism this is working through.  Again,
4   regardless of what the specifics of the mechanism
5   are, that is not going to affect the patients that
6   are showing up and needing significant treatment for
7   social media addiction concerns.
8   BY MS. BARNHART:
9        Q.  If a jury were to determine that use of
10  Instagram has no impact on development of purported
11  social media addiction because the jury rejects your
12  opinions about this mechanism, then how does the
13  rest of your opinion hold that Instagram causes
14  social media addiction and harm?
15       MS. O'NEILL:  Objection.  Form.  Calls for
16  speculation.
17       THE WITNESS:  A jury can choose to agree
18  with me or not.  That's not going to affect the
19  patients showing up at my office and having to treat
20  them for a very serious condition, which, again, is
21  social media addiction.
22  BY MS. BARNHART:
23       Q.  It could be -- as we've discussed earlier,
24  it could be that things other than Instagram
25  features are causing the social media addiction you
```

Page 339

```
1   claim to see in your clinic; correct?
2        MS. O'NEILL:  Objection.  Form.
3        THE WITNESS:  It's a substantial part of
4   what I believe is causing the social media addiction
5   concerns.
6   BY MS. BARNHART:
7        Q.  And what I'm asking you is if this
8   mechanism of dopamine release caused by Instagram
9   features doesn't hold as a matter of science, then
10  what is the mechanism that you believe leads
11  Instagram features to cause addiction or harm?
12       MS. O'NEILL:  Objection.  Form.
13       THE WITNESS:  I believe it does hold.
14  There is evidence about this in literature.  I've
15  cited references in relation to that.
16       Again, I will say that, regardless of the
17  mechanism of action, it's not going to affect the
18  patients that are showing up at my office every day.
19  BY MS. BARNHART:
20       Q.  Do you have any opinions on any other
21  possible mechanism -- causal mechanism aside from
22  this dopamine release theory?
23       MS. O'NEILL:  Objection.  Form.
24  BY MS. BARNHART:
25       Q.  Let me rephrase because it's not very
```

Page 340

```
1   clean.
2        Do you have any opinion about any other
3   possible mechanism by which use of Instagram causes
4   addiction or mental health harm aside from your
5   dopamine release theory?
6        MS. O'NEILL:  Objection.  Form.
7        THE WITNESS:  The dopamine release theory
8   is the primary mechanism that I am opining on.
9        And, again, I will say, regardless of the
10  mechanism specifics, it's not affecting the patients
11  that are coming into my office.
12  BY MS. BARNHART:
13       Q.  Dr. Zicherman, I understand what you're
14  saying about it not affecting the patients, but I'm
15  talking about this causal mechanism.  That's what
16  I'm trying to understand.  And I did not get a clean
17  answer to my question.
18       You said, "The dopamine release theory is
19  the primary mechanism that I'm opining on."
20       Does that mean you have no other
21  mechanisms -- you have no other opinions about any
22  other mechanism?
23       MS. O'NEILL:  Objection.  Form.
24       THE WITNESS:  Well, that's my understanding
25  of how an app like Instagram leads to addiction
```

Page 341

```
1   concerns in a youth.
2   BY MS. BARNHART:
3        Q.  Okay.  So if the jury or judge rejects your
4   dopamine release mechanism as a matter of science,
5   you will not testify at trial about any other
6   possible causal mechanisms?  That's what I hear.
7        MS. O'NEILL:  Objection.  Form.  Calls for
8   speculation.
9        THE WITNESS:  That's -- and I'm not quite
10  sure how to answer that hypothetical.  I'm not sure
11  what would happen at trial.  I am opining on this
12  causal mechanism.
13  BY MS. BARNHART:
14       Q.  Okay.  I'm just -- I'm entitled to know
15  what your opinions are now.  I don't have to wait
16  until trial to figure out what those are going to
17  be.
18       So I'm asking you do you have any opinions
19  on any other causal mechanisms aside from your
20  dopamine release theory?
21       A.  I believe that's the theory that I'm
22  working on that led to my -- in part, my opinion
23  that I presented.
24       Q.  Okay.  So no -- no, you do not have any
25  opinions on any other causal mechanisms that you
```

CONFIDENTIAL

Page 342

1  intend to present as an expert in this case?
2      A.   At a molecular level, I don't believe there
3  are plans to present other areas of a potential
4  causal mechanism beyond the dopamine response
5  pathway.
6      Q.   And I'm talking about at any level.
7           Do you have any expert opinions on any
8  other potential causal mechanisms aside from your
9  dopamine release theory?
10     A.   Well, I've talked about the app itself as
11 part of a causal mechanism leading to harm. So I
12 would have to include that beyond just the dopamine
13 mechanism that I report on.
14     Q.   How does -- in your view -- because I don't
15 see this explained anywhere in your report -- how do
16 you believe that the app itself causes harm aside
17 from through this dopamine release mechanism?
18     A.   Yeah, so I have families, patients that
19 come in every week that I'm in my office who have
20 significant concerns about -- about social media
21 addictions.
22          These patients, these -- well, the families
23 will come in often believing that social media use
24 is destroying the lives of their children, their
25 teenagers, their adolescents.

CONFIDENTIAL

Page 343

1           Is that answering your question?
2      Q.   No, but --
3      A.   Okay.
4      Q.   -- if that's your answer, that's fine.
5           Is that a complete answer to my question?
6      A.   You could restate the question again -- I
7  can see if I would add on to it -- if you want.
8      Q.   Aside from hearing from -- aside from your
9  discussions with patients and families and your
10 belief in this dopamine release theory, do you have
11 any opinions about any other mechanisms of harm for
12 Instagram addiction or mental health concerns?
13          MS. O'NEILL:  Objection.  Form.
14          THE WITNESS:  I think my clinical work and
15 my understanding of dopamine and its interaction
16 with the app are primary considerations of my
17 opinion.
18 BY MS. BARNHART:
19     Q.   I'm asking are they the entire
20 considerations as opposed to the primary
21 considerations?
22          Can you think of any other mechanisms?
23     A.   Well, we've talked about what I see
24 clinically.  We've talked about the dopamine
25 mechanisms.  We've talked about features of the

CONFIDENTIAL

Page 344

1  actual app and design that are potentially causal.
2           I think that summarizes pretty well my
3  opinions.
4      Q.   Do you agree with me, Dr. Zicherman, that
5  natural rewards do not affect the brain in the same
6  way that chemical rewards do?
7           MS. O'NEILL:  Objection.  Form.
8           THE WITNESS:  I believe there's enough
9  evidence out there suggesting that there is a shared
10 mechanism of both -- I believe you're referencing
11 substance addictions and, potentially, behavioral
12 addiction concerns.
13 BY MS. BARNHART:
14     Q.   Do you agree that natural rewards such as
15 eating, drinking, and socializing are necessary for
16 survival and maintenance of a species?
17     A.   Of course.
18     Q.   Do you agree that substances of abuse
19 hijack the mesolimbic system by offering a reward
20 without any obvious biological function?
21          MS. O'NEILL:  Objection.  Form.
22          THE WITNESS:  Well, I'm not sure that's
23 necessarily true.  Someone can abuse opioids, for
24 instance, but also be prescribed an opioid for pain.
25 ///

CONFIDENTIAL

Page 345

1  BY MS. BARNHART:
2      Q.   But do you agree with me that opioids as
3  well as other substances of abuse chemically
4  circumvent satiation and increase dopamine levels
5  artificially?
6           MS. O'NEILL:  Objection.  Form.
7           THE WITNESS:  That is how many substances
8  of abuse do work.
9  BY MS. BARNHART:
10     Q.   And you understand that natural rewards do
11 not have those same effects; correct?
12          MS. O'NEILL:  Objection.  Form.
13          THE WITNESS:  They might affect dopamine
14 levels, but -- they might affect dopamine levels,
15 but in different nonconcerning ways.
16 BY MS. BARNHART:
17     Q.   You're not aware of any evidence that
18 social media use drives dopamine responses that are
19 any stronger than any other natural social activity
20 does; correct?
21          MS. O'NEILL:  Objection.  Form.
22          THE WITNESS:  I mentioned before, you can
23 ask a neuroscientist about the measurement of
24 dopamine levels.
25 ///

CONFIDENTIAL

Page 346

1  BY MS. BARNHART:
2      Q.   Meaning you yourself are not aware of any
3  evidence that using social media drives stronger
4  dopamine responses than any other natural social
5  activity; correct?
6          MS. O'NEILL:  Same objection.
7          THE WITNESS:  I believe you're referencing
8  measurement of levels.  That would be area of
9  expertise of a neuroscientist.
10 BY MS. BARNHART:
11     Q.   And that's outside your area of expertise;
12 correct?
13     A.   Sure.  Measurement of dopamine is outside
14 my scope of practice.
15     Q.   So you have no basis, sitting here today,
16 to opine that social media drives stronger dopamine
17 responses than being around friends in person;
18 correct?
19         MS. O'NEILL:  Objection.  Form.
20         THE WITNESS:  I do not measure dopamine
21 levels in my clinical practice.  I do not know
22 anyone who does that.
23 BY MS. BARNHART:
24     Q.   Did you understand my question,
25 Dr. Zicherman?

CONFIDENTIAL

Page 347

1      A.   I believe I did, but please repeat or
2  rephrase.
3      Q.   You have no basis, sitting here today, to
4  opine that social media drives stronger dopamine
5  responses than socializing with friends in person;
6  correct?
7          MS. O'NEILL:  Objection.  Form.
8          THE WITNESS:  Well, I believe it does drive
9  concerning levels of dopamine use.  I'm not here to
10 opine on the specific levels and ways that dopamine
11 ends up cascading throughout the brain in response
12 to rewards.
13 BY MS. BARNHART:
14     Q.   What is the basis for your belief that
15 social media drives concerning levels of dopamine
16 use?
17     A.   I have encountered many studies that have
18 indicated that that is the mechanism.
19     Q.   Can you name one such study?
20     A.   Again, I would have to carefully review the
21 studies to name a specific study.
22     Q.   You believe that there's a study cited in
23 your report that concludes that social media drives
24 concerning levels of dopamine?
25     A.   I believe that that is a topic discussed in

CONFIDENTIAL

Page 348

1  literature that I've cited in the report.
2          But, also, there are studies that I'm sure
3  are not in my report that have also detailed that as
4  a mechanism.
5      Q.   But you -- sitting here right now, you
6  cannot name me one such study; correct?
7          MS. O'NEILL:  Objection.  Asked and
8  answered.
9          THE WITNESS:  I would have to carefully
10 review the literature to accurately answer that
11 question.
12 BY MS. BARNHART:
13     Q.   So you're convinced that such a study
14 exists, but you can't actually identify one for me
15 right now?
16         MS. O'NEILL:  Objection.  Form.
17         THE WITNESS:  I've come across lots of
18 studies over the years.  To jog my memory and
19 accurately answer that question, I would have to
20 review the literature.
21 BY MS. BARNHART:
22     Q.   Okay.  Well, then I assume you won't show
23 up at trial saying you've got such a study since you
24 can't identify one for me now; correct?
25         MS. O'NEILL:  Objection.  Form.

CONFIDENTIAL

Page 349

1          THE WITNESS:  I have stated that,
2  regardless of the actual mechanism of action, it's
3  not going to change, and it doesn't change, the fact
4  that these patients are showing up at my office very
5  sick.
6  BY MS. BARNHART:
7      Q.   That's not my question, Dr. Zicherman.
8          I'm talking about literature that you claim
9  exists to show that social media drives concerning
10 levels of dopamine.
11         You're not prepared to identify one for me
12 today; correct?
13         MS. O'NEILL:  Objection.  Asked and
14 answered.
15         THE WITNESS:  Yeah, I think you're asking a
16 question that I would have to carefully review all
17 my citations again to answer your, I think, pretty
18 specific question.  And there are also studies that
19 are not, surely, in the report that are on that
20 topic.
21 BY MS. BARNHART:
22     Q.   You're just speculating on that because
23 you -- you cannot identify one for me right now; so
24 you're just speculating that they exist.  Right?
25         MS. O'NEILL:  Objection.  Form.

CONFIDENTIAL

Page 350

```
1        THE WITNESS:  I believe I've come across
2    literature of that nature; but, again, that's not
3    the primary basis for my opinion.
4    BY MS. BARNHART:
5        Q.   In paragraph -- well, let me just ask you
6    this way.
7             Is there any such thing medically as a
8    dopamine fast?
9        MS. O'NEILL:  Objection.  Form.
10       THE WITNESS:  I believe you can consider
11   that a form of a medical intervention, the idea of
12   taking a dopamine fast, which would be in relation
13   to detoxing from a social media platform or
14   potentially a substance.
15   BY MS. BARNHART:
16       Q.   It's not possible for a human being to
17   inhibit dopamine release in their brain; correct?
18       A.   Not in its entirety.  I don't believe that
19   is how dopamine works.
20       Q.   Do you understand the term "fast" means
21   completely doing away with whatever it is that
22   you're fasting from?
23       A.   I think the clinical application of a
24   dopamine fast is not to stop eating, not to engage
25   in romantic relations; it's in relation to fasting
```

CONFIDENTIAL

Page 351

```
1    from a concerning addiction such as a social media
2    addiction, the other technology addictions too, or a
3    substance addiction.
4        Q.   And you agree with me that a complete fast
5    from dopamine would be unhealthy; correct?
6        A.   If that involves not eating and not
7    engaging in other activities to preserve life, then
8    sure.  In theory, sure.
9        Q.   A complete absence of dopamine would not be
10   a healthy person; correct?
11       MS. O'NEILL:  Objection.  Form.
12       THE WITNESS:  Again, I think I explained
13   the clinical application of a dopamine fast is
14   not -- don't starve yourself, don't engage in other
15   potentially -- potential important activities to
16   sustain your life.
17            The clinical application of the idea of a
18   dopamine fast is abstain from a concerning substance
19   or a potentially behavioral addiction concern.
20   BY MS. BARNHART:
21       Q.   Are you aware of any study that has
22   measured how much less dopamine is released in a
23   human brain as a result of a technology dopamine
24   fast, for example?
25       A.   I would have to review the literature to
```

CONFIDENTIAL

Page 352

```
1    see if those studies exist.
2        Q.   So, sitting here today, you don't actually
3    know that dopamine levels in the brain would go down
4    were someone to engage in a technology fast, for
5    example?
6        MS. O'NEILL:  Objection.  Form.
7        THE WITNESS:  I think the understanding of
8    a dopamine cascade triggered by social media use is
9    that levels would likely change if someone suddenly
10   abstained from use or even slowly abstained or
11   changed their use levels.
12   BY MS. BARNHART:
13       Q.   You have no empirical evidence to support
14   that claim; correct?
15       A.   I'm not currently referencing empirical
16   evidence to support that.
17       Q.   You don't know that whatever dopamine is
18   released by social media use wouldn't just be
19   replaced by some other dopamine-releasing activity
20   that the person chooses to engage in?
21       MS. O'NEILL:  Objection.  Form.  Calls for
22   speculation.
23       THE WITNESS:  There can be the concept of
24   cross-addictions.  We see that.
25   ///
```

CONFIDENTIAL

Page 353

```
1    BY MS. BARNHART:
2        Q.   You don't know -- let's say that one of
3    your patients did an Instagram fast and they
4    restricted their use of Instagram for a week.
5             You don't know that they wouldn't receive
6    the same amount of dopamine that they received on
7    Instagram from interacting with their family and
8    friends in real life; correct?
9        MS. O'NEILL:  Objection.  Form.
10       THE WITNESS:  I'm not measuring dopamine in
11   my practice; so that makes that question difficult
12   to answer.
13   BY MS. BARNHART:
14       Q.   Okay.  So you're not talking about a
15   dopamine fast; you're just talking about restricting
16   use of Instagram or other technologies; right?
17       A.   I think you're asking about restricting
18   Instagram or other technologies?  Maybe you can
19   rephrase or repeat the question.
20       Q.   You keep talking about dopamine and
21   dopamine fasts and how that's necessary to treat
22   social media addiction.
23            But you can't testify truthfully today that
24   you know that restricting use of Instagram would
25   actually reduce dopamine levels in someone's brain?
```

CONFIDENTIAL

Page 354

1      MS. O'NEILL:  Objection.  Form.
2  Mischaracterization.
3      THE WITNESS:  Well, again, I'm not in a
4  research lab measuring the dopamine levels of my
5  patients.  It is my understanding, though, that this
6  is the mechanism through which dopamine works.
7  BY MS. BARNHART:
8      Q.  Even though you don't have a neuroscience
9  understanding of dopamine release or how dopamine
10  works; correct?
11      MS. O'NEILL:  Objection.  Form.
12      THE WITNESS:  I have an understanding that
13  I believe is acceptable of a medical doctor with a
14  background in psychiatry -- child and adolescent
15  psychiatry and addiction psychiatry.
16  BY MS. BARNHART:
17      Q.  You would want to talk to a neuroscientist
18  to really understand how dopamine is released in
19  the -- released in the brain and how dopamine works;
20  correct?
21      MS. O'NEILL:  Objection.  Form.
22  Mischaracterization.
23      THE WITNESS:  A neuroscientist, I would
24  suspect, would have a good understanding of the
25  mechanisms of dopamine, at least the nuances of how

CONFIDENTIAL

Page 355

1  it works throughout the body.  It is complicated.
2      You know, I have said before, reference a
3  neuroscientist if you want to know all the
4  nitty-gritty details of how dopamine works
5  throughout the body.
6  BY MS. BARNHART:
7      Q.  You would expect that someone with formal
8  training in neuroscience would have a better
9  understanding of the mechanisms of dopamine than you
10  do; correct?
11      MS. O'NEILL:  Objection.  Form.
12      THE WITNESS:  Someone with a PhD in
13  neuroscience might have a better understanding of
14  the mechanisms of dopamine.
15  BY MS. BARNHART:
16      Q.  Well, someone with any formal training in
17  neuroscience would have a better understanding of
18  the mechanisms of dopamine than you, right, because
19  you don't have any formal training in neuroscience?
20      MS. O'NEILL:  Objection.  Form.
21      THE WITNESS:  I do not have a PhD in
22  neuroscience.
23  BY MS. BARNHART:
24      Q.  You don't have any -- any degree in
25  neuroscience; right?

CONFIDENTIAL

Page 356

1      A.  I have a medical degree.  I do not have a
2  PhD in neuroscience.
3      Q.  You don't consider yourself any kind of
4  neuroscience expert; right?
5      A.  I don't call myself a neuroscientist; I
6  call myself a medical doctor.
7      Q.  Do you agree, Dr. Zicherman, that social
8  media can have benefits for teenagers?
9      A.  This is a spectrum.  I'm sure there's some
10  circumstances where it's not always harmful.
11      Q.  Let me ask my question again.
12      Do you agree, Dr. Zicherman that social
13  media can have benefits for teenagers?
14      MS. O'NEILL:  Objection.  Asked and
15  answered.
16      THE WITNESS:  There can be some situations
17  where potentially there could be some benefit; but
18  what I see, and my belief, is that the opposite is
19  what is typically true.
20  BY MS. BARNHART:
21      Q.  Well, teenagers probably wouldn't come see
22  you if they were receiving life-changing benefits
23  from using social media; correct?
24      MS. O'NEILL:  Objection.  Form.
25      THE WITNESS:  Well, live-changing could be

CONFIDENTIAL

Page 357

1  good or problematic, and you might have to clarify
2  that question for me.
3  BY MS. BARNHART:
4      Q.  Do you think a life-changing benefit could
5  be a bad thing?
6      A.  What do you mean by -- okay.  Life-changing
7  benefit.  Okay.  That might have been how you
8  phrased it at first.
9      A life-changing -- can you repeat the
10  question for me.
11      Q.  Teenagers probably wouldn't come to see you
12  if they were receiving life-changing benefits from
13  using social media; correct?
14      MS. O'NEILL:  Objection.  Form.
15      THE WITNESS:  If they're benefiting from
16  the app, I'm probably not going to see them in
17  clinic, although this could be a matter of
18  perspective.  And a child or teenager might believe
19  they were benefiting, and a parent might believe
20  that the app is causing harm.  That could happen.
21  BY MS. BARNHART:
22      Q.  Nowhere in your report do you talk about
23  the potential benefits of using Instagram; correct?
24      A.  I'd have to reference my report.  I don't
25  believe I really discuss potential benefits as I

Page 358

1  don't see those in my clinical practice.
2      Q.   And you haven't otherwise done any
3  investigation of the potential benefits of Instagram
4  use for teenagers; right?
5      A.   Can you clarify what you mean by "further
6  investigation"?
7      Q.   I asked if you've done any investigation of
8  the potential benefits of Instagram use for
9  teenagers.
10     A.   What do you mean by "investigation"?
11     Q.   Have you considered the potential benefits
12  of Instagram for teenagers when forming your
13  opinions in this case?
14     A.   My opinions are based on years of clinical
15  practice working with patients that I see have lives
16  that can be devastated by social media use.
17     Q.   And so you have no opinion -- because you
18  don't have any experience with them, you don't have
19  any opinion on teenagers whose lives can be changed
20  for the better by social media use; correct?
21          MS. O'NEILL:  Objection.  Form.
22          THE WITNESS:  There can be circumstances
23  where, potentially, a teenager is not harmed and may
24  have certain forms of benefit.  This is a spectrum.
25  ///

Page 359

1  BY MS. BARNHART:
2      Q.   Do you agree that digital platforms,
3  including Instagram, provide an important space for
4  self-discovery and expression for LGBTQ+ youth?
5          MS. O'NEILL:  Objection.  Form.
6          THE WITNESS:  That could potentially be
7  true.
8  BY MS. BARNHART:
9      Q.   Do you agree that Instagram can be
10  life-saving for certain marginalized youth?
11          MS. O'NEILL:  Objection.  Form.
12          THE WITNESS:  That can potentially be true
13  in certain limited situations and scenarios.
14  BY MS. BARNHART:
15     Q.   Why do you say "certain limited situations
16  and scenarios"?
17     A.   Well, I think you brought up a scenario
18  where it could potentially not cause harm.
19     Q.   I didn't ask you if it could not cause
20  harm; I asked you do you agree that Instagram can be
21  life-saving for certain teenagers?
22          MS. O'NEILL:  Objection.  Form.
23          THE WITNESS:  That is not the case with the
24  patients that I work with.  In theory, maybe there's
25  a teen out there who has received some form of

Page 360

1  benefit from being on the app.
2          Again, this is a spectrum.  I do recognize
3  that.
4  BY MS. BARNHART:
5      Q.   But you advocate to take away that lifeline
6  from that teenager; right?
7          MS. O'NEILL:  Objection.  Form.
8  Mischaracterization.
9          THE WITNESS:  Sometimes.
10  BY MS. BARNHART:
11     Q.   You would take away a lifeline from a
12  teenager if it happened to be in the form of
13  Instagram?
14          MS. O'NEILL:  Same objections.
15          THE WITNESS:  In the scenario that you
16  mention where it could be potentially, in theory, a
17  helpful tool, I'm not going to take away something
18  from someone who is finding help or benefit.
19          Again, that is, I believe, not what
20  typically -- well, I can say that is not the case
21  with the clinic population that I am working with.
22  BY MS. BARNHART:
23     Q.   Well, you have recommended to parents in
24  public webinar settings that parents not allow their
25  children any access to social media platforms.

Page 361

1          MS. O'NEILL:  Objection.  Form.
2  BY MS. BARNHART:
3      Q.   Correct?
4          And by "children," I mean teenagers.
5          Have you or have you not recommended to
6  parents that they not allow their children and
7  teenagers any access to social media platforms?
8          MS. O'NEILL:  Objection.  Form.
9          THE WITNESS:  There are certain
10  circumstances where I do believe it is unsafe for
11  certain individuals to use a social media platform
12  like Instagram.
13  BY MS. BARNHART:
14     Q.   But you also acknowledge that there are
15  circumstances where it is healthy and life-saving
16  for certain individuals to use a social media
17  platform like Instagram?
18          MS. O'NEILL:  Objection.  Form.
19          THE WITNESS:  You're providing
20  hypotheticals.
21          In reality, of course -- again, this is a
22  spectrum -- and there are going to be some
23  individuals who might potentially receive benefit.
24  BY MS. BARNHART:
25     Q.   Okay.  So you're not aware of any situation

CONFIDENTIAL

Page 362

```
 1   where a trans 14-year-old girl in the middle of
 2   Wyoming might view Instagram as a life-saving thing?
 3          MS. O'NEILL:  Objection.  Form.  Incomplete
 4   hypothetical.  And calls for speculation.
 5          THE WITNESS:  Can you provide the example
 6   again.
 7   BY MS. BARNHART:
 8      Q.  Yes.  My hypothetical was a transgender
 9   14-year-old girl living in the middle of Wyoming in
10   a conservative community that tells her, hey, you're
11   transgender; you should go kill yourself.
12          You think Instagram might be a lifeline for
13   that girl?
14          MS. O'NEILL:  Same objections.
15          THE WITNESS:  I don't know.  I don't work
16   with patients in Wyoming like that.  But,
17   potentially -- again, I'm not here to say that every
18   situation, every teenager who is on the platform is
19   going to have harms.
20   BY MS. BARNHART:
21      Q.  And you can't -- you can't envision a
22   situation where being on the platform could be
23   life-saving?
24      A.  Well, I think you've provided an example
25   where, theoretically, maybe that person has -- is
```

CONFIDENTIAL

Page 363

```
 1   not being harmed and has some benefit for being on
 2   the app.  But I think these scenarios are pretty
 3   limited.  You should recognize them, though.
 4      Q.  Okay.  But you don't recognize them in your
 5   public statements to parents when you tell parents,
 6   "Keep your kids off social media, keep your
 7   teenagers off social media; they will be completely
 8   fine"; correct?
 9          MS. O'NEILL:  Objection.  Form.
10          THE WITNESS:  And I'm not sure what you're
11   referencing exactly.  That would be helpful to have
12   full context.
13   BY MS. BARNHART:
14      Q.  I'm referencing the webinar from June 26th
15   of this year that you just recently added to your
16   CV.
17          MS. O'NEILL:  And I'll object that he
18   doesn't have that before him and can't look at it.
19          THE WITNESS:  I can't really answer a
20   question without looking at the video.
21   BY MS. BARNHART:
22      Q.  So this was exactly two months ago,
23   June 26th, and you can't remember medical advice
24   that you provided to parents two months ago?
25          MS. O'NEILL:  Objection.  Form.
```

CONFIDENTIAL

Page 364

```
 1   Argumentative.
 2          THE WITNESS:  Two months ago, I think, is a
 3   substantial amount of time, and I can't recall the
 4   specifics of what I stated during that webinar.  I'm
 5   happy to discuss if you want to play it.
 6   BY MS. BARNHART:
 7      Q.  Let's talk about some other potential
 8   benefits of social media.
 9          Do you agree that social media use supports
10   social connection and positive mental health?
11          MS. O'NEILL:  Objection.  Form.
12          THE WITNESS:  I believe that the opposite
13   holds more true; but, again, I'm here to say that
14   there is a spectrum of teenagers and presentations.
15   I'm working with a very concerning, problematic
16   population.
17   BY MS. BARNHART:
18      Q.  Do you agree that using social media can
19   help combat isolation?
20      A.  I believe it is more likely to serve to
21   compound and increase isolation in most teenagers
22   using the app.
23      Q.  You have not in your clinic served most
24   teenagers using the app; correct?
25          MS. O'NEILL:  Objection.  Form.
```

CONFIDENTIAL

Page 365

```
 1          THE WITNESS:  I have not served?
 2   BY MS. BARNHART:
 3      Q.  Correct.  You just -- you just testified
 4   you believe it is more likely to serve to compound
 5   and increase isolation in most teenagers using the
 6   app, but you don't have any basis to opine on what
 7   most teenagers using the app experience; right?
 8          MS. O'NEILL:  Objection.  Form.
 9          THE WITNESS:  I'm sorry.  Is there any way
10   to address this glare here?  I'm blinded.
11          MS. BARNHART:  Let's go off the record.
12          THE VIDEOGRAPHER:  Stand by.  The time
13   is 6:49 p.m., and we're going off the record.
14          (Recess taken.)
15          THE VIDEOGRAPHER:  The time is 6:50 p.m.,
16   and we're back on the record.
17   BY MS. BARNHART:
18      Q.  So, Dr. Zicherman, if I'm understanding you
19   correctly -- well, hold on one second.
20          So you just testified you believe it is
21   more likely that Instagram serves to compound and
22   increase isolation in most teenagers than to not; is
23   that correct?
24      A.  I believe that is, the best of my
25   estimation, most likely.
```

CONFIDENTIAL

Page 366

1    Q.   And what's that based on?

2    A.   Based on my understanding of working with

3  my clinic population and review of the mechanism of

4  action of the app and also following the --

5  following many materials related to social media

6  use, and teenagers and harms over the years as a

7  practicing physician.

8    Q.   Can you cite to me any empirical study of

9  most -- of all teenagers using the Instagram app

10  that found that most of them, Instagram use makes

11  isolation worse rather than improving isolation?

12        MS. O'NEILL:  Objection.  Form.

13        THE WITNESS:  I would have to carefully

14  review the available literature to appropriately

15  answer that question.

16  BY MS. BARNHART:

17    Q.   And you have not done that and are not

18  prepared to testify about that here today; correct?

19        MS. O'NEILL:  Objection.  Form.

20        THE WITNESS:  I'm prepared to testify about

21  my opinion and the references in my opinion.

22  BY MS. BARNHART:

23    Q.   And you don't have any such references in

24  your opinion that indicate social media makes things

25  worse for teens in terms of isolation than better;

---

CONFIDENTIAL

Page 367

1  correct?

2    A.   Well, I would have to carefully review even

3  my citations to see if that specific phrase -- to

4  jog my memory if that was in any of my references.

5    Q.   Earlier today we were talking about

6  prevalence.  Do you have any data or other evidence

7  indicating that the prevalence of teens who benefit

8  from using social media is less than the prevalence

9  of teens who are harmed by using social media?

10        MS. O'NEILL:  Objection.  Form.

11        THE WITNESS:  Can you repeat the question,

12  please.

13  BY MS. BARNHART:

14    Q.   Do you have any data or other evidence

15  indicating that the prevalence of teens who benefit

16  from using social media is less than the prevalence

17  of teens who are harmed by using social media?

18        MS. O'NEILL:  Same objection.

19        THE WITNESS:  Again, I'm here to comment on

20  my report, references in my report.  There might be

21  other references out there regarding your specific

22  question.  I would have to review the literature to

23  appropriately answer that.

24  BY MS. BARNHART:

25    Q.   Right.  I'm only talking about what you

---

CONFIDENTIAL

Page 368

1  know sitting here today.  I'm not interested in what

2  you might be able to go find out if you actually

3  conducted a thorough literature review.

4        I'm asking you, sitting here today, whether

5  it's in your report or in your head or otherwise, do

6  you have any data or other evidence indicating that

7  the prevalence of teens who benefit from using

8  social media is less than the prevalence of teens

9  who are harmed by using social media?

10        MS. O'NEILL:  Objection.  Form.

11        THE WITNESS:  Yeah, I think you're asking a

12  narrow question.

13        To answer that question, I would need to

14  review the literature to provide you an appropriate

15  answer.

16  BY MS. BARNHART:

17    Q.   So you cannot -- so you do not have an

18  answer to that question today; correct?

19    A.   I think -- the same.  My answer is that I

20  think you're asking a narrow question.  And to

21  answer that, I would have to carefully review the

22  literature.

23    Q.   And sitting here today, you can't testify

24  truthfully and confidently that more teens are

25  harmed by Instagram than benefited by using

---

CONFIDENTIAL

Page 369

1  Instagram?

2        MS. O'NEILL:  Objection.  Form.

3        THE WITNESS:  Well, I believe that to be

4  true, that more are harmed.  And that is based off

5  of, again, my clinical experience and review of

6  thousands of pieces of material over the past

7  several years in relation to social media and

8  potential harms.

9        MS. BARNHART:  All right.  Well, that's in

10  contradiction with your testimony earlier today.

11  But we'll let the record speak for itself.

12        Dr. Zicherman, I don't have any further

13  questions for now.

14        I can pass the witness.

15        And I may have additional questions if your

16  counsel asks you any.

17        MS. O'NEILL:  Should we just go off the

18  record?

19        THE VIDEOGRAPHER:  Stand by.

20        The time is 6:55 p.m., and we're going off

21  the record.

22        (Recess taken.)

23        THE VIDEOGRAPHER:  The time is 7:04 p.m.,

24  and we are back on the record.

25  ///

Page 370

1                 EXAMINATION

2   BY MS. O'NEILL:

3        Q.   Good evening, Dr. Zicherman.  I just have a

4   few questions for you.

5             Do you remember speaking earlier today with

6   Meta's counsel about your clinic template and notes?

7        A.   I do.

8        Q.   How often do you consult your clinic notes

9   as part of your clinical work?

10       A.   I like to reference my notes on a daily

11  basis to prepare for working with patients that day.

12       Q.   And how often do you consult your clinic

13  template as part of your clinical work?

14       A.   Well, again, it would be daily.  It's

15  really an integrated sort of function along with our

16  notes.  So I have to consult both on a daily basis

17  to work with my patients.

18       Q.   Were there any differences in how often you

19  consulted your clinic notes and template during the

20  period when you were drafting your expert reports

21  and periods when you were not?

22            MS. BARNHART:  Objection.

23            THE WITNESS:  There were no differences.

24  BY MS. O'NEILL:

25       Q.   Now, as you discussed with Meta's counsel

Page 371

1   earlier, your clinic template and notes are not on

2   your materials considered list; is that correct?

3        A.   Correct.

4        Q.   Why not?

5        A.   I did not need to rely on that information

6   to form my opinion.

7        Q.   Dr. Zicherman, do you remember discussing

8   residential treatment programs with Meta's counsel?

9        A.   Yes.

10       Q.   And just for clarity, have you ever

11  recommended any patients for a residential treatment

12  program?

13       A.   I have recommended patients for residential

14  treatment.

15       Q.   And what kinds of mental health conditions

16  have those patients suffered from?

17       A.   These tend to be patients who have

18  essentially failed lower levels of care, and they --

19  also, in order for insurance to pay for residential

20  programs, they do have to have a qualifying DSM

21  diagnosis, which could be severe major depressive

22  disorder, severe anxiety, OCD, psychotic disorder.

23  It could be bipolar, something that attempts were

24  made at treatment and failed at lower levels.

25       Q.   And have you recommended patients with

Page 372

1   social media use disorders for residential

2   treatment?

3        A.   Yes.  I have recommended that.  Those

4   patients do typically, again, need to have that dual

5   diagnosis -- sorry -- that DSM diagnosis in order to

6   qualify for insurance to pay for treatment.

7             But there have been instances where I have

8   recommended residential treatment for concerning

9   social media use.

10            MS. O'NEILL:  That's all the questions I

11  have for you.

12            THE VIDEOGRAPHER:  Stand by.

13            The time is 7:07 p.m., and we're going off

14  the record.

15            (Brief discussion held off the

16            stenographic record.)

17            THE VIDEOGRAPHER:  The time is 7:08 p.m.,

18  and we are back on the record.

19                 EXAMINATION

20  BY MS. BARNHART:

21       Q.   Dr. Zicherman, you just testified that you

22  consult your clinic notes and clinic template on a

23  daily basis as part of your clinical work; correct?

24       A.   Well, you have to look at the records to

25  treat patients; so yes.

Page 373

1        Q.   Fair to say that your clinic notes and

2   clinic template are inextricable from your clinical

3   experience?

4            MS. O'NEILL:  Objection.  Form.

5   Mischaracterization.

6            THE WITNESS:  I wouldn't agree with that.

7   BY MS. BARNHART:

8        Q.   Do you have any clinical experience

9   separate and apart from what's in those clinic notes

10  and clinic template?

11            MS. O'NEILL:  Same objections.

12            THE WITNESS:  Clinical experience, I

13  believe, can also include knowledge obtained through

14  materials reviewed and discussions with other

15  clinicians and providing presentations.

16  BY MS. BARNHART:

17       Q.   But in this case the clinical experience

18  you're relying on to -- as the basis for your

19  opinions is based on your daily review of the clinic

20  template and your clinic notes as well as everything

21  else you just listed; correct?

22            MS. O'NEILL:  Objection.  Form.

23  Mischaracterization.

24            THE WITNESS:  My opinion is not based on my

25  patient records or template.

CONFIDENTIAL

Page 374

```
 1   BY MS. BARNHART:
 2       Q.   It's based on your daily review of your
 3   clinic template and notes because that is part of
 4   your clinical experience; correct?
 5            MS. O'NEILL:  Same objections.
 6            THE WITNESS:  I believe I've answered that
 7   question.  My opinion is not based off of my -- my
 8   clinical records or template.
 9   BY MS. BARNHART:
10       Q.   If you did not look at your clinic template
11   or clinical notes at all, would you have any
12   clinical experience on which to base the opinions
13   that you offer in this case?
14            MS. O'NEILL:  Objection.  Form.  Calls for
15   speculation.
16            THE WITNESS:  Can you please repeat the
17   question.
18   BY MS. BARNHART:
19       Q.   You testified earlier that you have to look
20   at your clinic template and clinic notes every day
21   in order to effectively treat your patients;
22   correct?
23       A.   Correct.
24       Q.   So without that clinic template and without
25   those clinical notes, you have no clinical knowledge
```

CONFIDENTIAL

Page 375

```
 1   or clinical experience on which to base your
 2   opinions in this case; correct?
 3            MS. O'NEILL:  Same objections.  And asked
 4   and answered.
 5            THE WITNESS:  I believe I've answered that
 6   question.
 7   BY MS. BARNHART:
 8       Q.   And you're not limiting the basis for your
 9   opinions on the clinical experience that you have
10   separate and apart from your daily review of your
11   clinic notes and clinic template; correct?
12            MS. O'NEILL:  Objection.  Form.
13            THE WITNESS:  I found that question
14   confusing.
15   BY MS. BARNHART:
16       Q.   I'll say it again.
17            In this case, you're not limiting the basis
18   for your opinions to the clinical experience that
19   you have separate and independent from your daily
20   review of your clinic notes and clinic template;
21   correct?
22            MS. O'NEILL:  Same objection.
23            THE WITNESS:  I would need that rephrased.
24   BY MS. BARNHART:
25       Q.   I'm going to try it one more time.  Listen
```

CONFIDENTIAL

Page 376

```
 1   carefully.
 2            In this case, you're not limiting the basis
 3   for your opinions to the clinical experience that
 4   you have separate and independent from your daily
 5   review of your clinic notes and clinic template;
 6   correct?
 7            MS. O'NEILL:  Same objection.
 8            THE WITNESS:  I think you're going to have
 9   to rephrase that question for me.
10   BY MS. BARNHART:
11       Q.   You can't answer my question?
12       A.   I find it confusing.  I'm sorry.
13       Q.   Okay.  Well, then let's break it down for
14   you.
15            You have clinical experience that is based
16   on your daily review of your clinic notes and clinic
17   template; correct?
18            MS. O'NEILL:  Objection.  Form.
19   Mischaracterization.
20            THE WITNESS:  Yeah, I work with patients
21   daily, and I have to review my records to work with
22   my patients.
23   BY MS. BARNHART:
24       Q.   And that daily review forms a prominent
25   part of your clinical experience; correct?
```

CONFIDENTIAL

Page 377

```
 1            MS. O'NEILL:  Objection.  Form.
 2   Mischaracterization.
 3            THE WITNESS:  I believe I've explained this
 4   and answered this; but in order to work with
 5   patients, I have to review their records.
 6   BY MS. BARNHART:
 7       Q.   Okay.  You would not be able to operate
 8   your clinic without your daily review of these
 9   clinical notes and clinical template; correct?
10       A.   Sure --
11            MS. O'NEILL:  Objection.  Form.
12            THE WITNESS:  A clinic cannot operate
13   without review of patient records.
14   BY MS. BARNHART:
15       Q.   Okay.  And in this case you are basing your
16   opinions, at least in part, on the clinical
17   experience you have as a result of reviewing your
18   patient records on a daily basis; correct?
19            MS. O'NEILL:  Objection.  Form.
20   Mischaracterization.
21            THE WITNESS:  Again, I believe I've stated
22   this, but my opinion is not based off of my clinical
23   notes or template.
24   BY MS. BARNHART:
25       Q.   So you are saying that -- that was my
```

CONFIDENTIAL

Page 378

1  question earlier.
2          You are limiting the basis for your
3  opinions in this case to clinical knowledge and
4  clinical experience you have separate and
5  independent from your daily review of clinical notes
6  and your clinic template?
7          MS. O'NEILL:  Objection.  Form.
8  Mischaracterization.
9          THE WITNESS:  Again, I find that a
10 confusing question.
11 BY MS. BARNHART:
12     Q.   Well, I find your testimony confusing,
13 Dr. Zicherman.  So let's try one more time.
14          In this case, you're offering opinions on
15 the basis of your clinical knowledge and clinical
16 experience; correct?
17     A.   Correct.
18     Q.   And a good part of your clinical knowledge
19 and clinical experience is derived from your daily
20 review of your clinic template and your clinic
21 notes; correct?
22          MS. O'NEILL:  Objection.  Form.
23          THE WITNESS:  I am not basing my opinion
24 off of what is in my patient records or the template
25 schedule that I have.

CONFIDENTIAL

Page 379

1  BY MS. BARNHART:
2      Q.   But you have not excluded the information
3  that is in your head that you have -- that has come
4  to your head as a result of that daily review of
5  your clinic notes and template?  You're not
6  excluding that from the basis for your opinions in
7  this case; right?
8      A.   Can you repeat the question.
9      Q.   Do you agree with me that a good part of
10 your clinical knowledge and clinical experience is
11 derived from your daily review of your clinic
12 template and your clinic notes?
13          MS. O'NEILL:  Objection.  Form.
14          THE WITNESS:  Again, I would say that I
15 have to review and write records on my patients as
16 part of my day-to-day responsibilities.  But that is
17 not a part of what went into my opinion.
18 BY MS. BARNHART:
19     Q.   All of your clinical knowledge and clinical
20 experience forms the basis of your opinions in this
21 case; correct?
22     A.   I did not include my template or patient
23 notes as part of my references that led to my
24 opinion.
25     Q.   All right.  You've got to answer my

CONFIDENTIAL

Page 380

1  questions if we're going to finish.
2          The basis of your opinions in this case is
3  the entirety of your clinical knowledge and clinical
4  experience; correct?  So you're not limiting that in
5  some way?
6      A.   A global aspect of my clinical knowledge,
7  which involves, you know, beyond working with
8  patients.
9      Q.   And also involves working with patients;
10 right?  That is part of the basis of your opinions
11 in this case; correct?
12     A.    Well, I have to work with patients to form
13 an opinion about -- about the work I do; but, again,
14 I did not have to reference specific records or
15 schedule templates to form my opinion.
16          MS. BARNHART:  Okay.  No further questions.
17 Thank you.
18          THE VIDEOGRAPHER:  Stand by.
19          This concludes the deposition of
20 Dr. Bradley Zicherman.
21          The total time on the record for defendants
22 is 6 hours and 51 minutes.
23          The total time on record for plaintiff is 2
24 minutes and 51 seconds.
25          The time is 7:16 p.m., and we are going off

CONFIDENTIAL

Page 381

1  the record.
2          (Time:  7:16 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

Page 382

1          ---oOo---

2

3      I, JENNY L. GRIFFIN, hereby certify:

4      That I am a certified shorthand reporter in and for

5   the County of Alameda, State of California;

6      Prior to being examined, BRADLEY ZICHERMAN, MD, the

7   witness named in the foregoing deposition, was by me

8   duly sworn to testify to the truth, the whole truth, and

9   nothing but the truth; that said deposition was taken

10  pursuant to notice at the time and place therein set

11  forth, and was taken down by me in stenotype and

12  thereafter transcribed by means of computer-aided

13  transcription, and that said deposition is a true record

14  of the testimony given by the witness.

15     I further certify that I am neither counsel for nor

16  related in any way to any party to said action, nor

17  otherwise interested in the outcome thereof.

18     In witness whereof, I have hereunto subscribed my

19  name September 9, 2025.

20

21  _____

22

23     JENNY L. GRIFFIN, CSR #3969

24     Certified Shorthand Reporter

25

CONFIDENTIAL

Page 383

1      DECLARATION UNDER PENALTY OF PERJURY

2   Case Name:  Social Media Litigation/CA MDL 3047 (People
    of the State of California v. Meta)

3

4   Name of Witness:  BRADLEY ZICHERMAN, MD

5   Date of Deposition:  August 27, 2025

6   Job No.: 7553548

7

8          I, BRADLEY ZICHERMAN, MD, hereby certify

9   under penalty of perjury under the laws of the State of

10  California that the foregoing is true and correct.

11     Executed this _____ day of

12  _____, 2025, at _____.

13

14

15  _____

16

17     BRADLEY ZICHERMAN, MD

18

19

20

21

22

23

24

25