**Exhibit 5**

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION TO EXCLUDE GENERAL CAUSATION
TESTIMONY OF PLAINTIFFS' EXPERTS**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

```
 1        SUPERIOR COURT OF THE STATE OF CALIFORNIA
               FOR THE COUNTY OF LOS ANGELES
 2
    COORDINATION PROCEEDING    )   JUDICIAL COUNCIL
 3  SPECIAL                    )   COORDINATION
    TITLE [RULE 3.400]         )   PROCEEDING NO. 5255
 4  SOCIAL MEDIA CASES         )
    _____)   For Filing
 5                             )   Purposes:
    THIS DOCUMENT RELATES      )   22STCV21355
 6  TO:                        )
                               )   Judge: Hon.
 7  Cristina Arlington         )   Carolyn B. Kuhl
    Smith, et al., v. TikTok   )   SSC-12
 8  Inc., et al.,             )
    Case No. 22STCV21355       )
 9  _____)
10
11
12
13           Wednesday, June 4, 2025
14    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
15
16
17        Video-Recorded Oral Deposition of RAMIN
    MOJTABAI, MD, PhD, MPH held at the offices of
18  Irwin Fritchie Urquhart Moore & Daniels LLC,
    400 Poydras Street, Suite 2700, New Orleans,
19  Louisiana, commencing at 9:05 a.m. CDT on the
    above date, before Michael E. Miller, Fellow
20  of the Academy of Professional Reporters,
    Certified Court Reporter, Registered
21  Diplomate Reporter, and Louisiana Certified
    Court Reporter #27009.
22
23                  __ __ __
24            GOLKOW - VERITEXT
        877.370.DEPS | fax 917.591.5672
25             deps@golkow.com
```

CONFIDENTIAL

Page 2

1  A P P E A R A N C E S :
2     BEASLEY ALLEN LAW FIRM
        BY: JENNIFER EMMEL, ESQUIRE
3         jennifer.emmel@beasleyallen.com
        218 Commerce Street
4     Montgomery, Alabama 36104
        (334)269-2343
5
        -and-
6
     LIEFF CABRASER HEIMANN & BERNSTEIN LLP
7     BY: KELLY K. MCNABB, ESQUIRE
        kmcnabb@lchb.com
8     250 Hudson Street
        8th Floor
9     New York, New York 10013
        (212)355-9500
10
        -and-
11
     LIEFF CABRASER HEIMANN & BERNSTEIN LLP
12    BY: LEXI J. HAZAM, ESQUIRE (via Zoom)
        lhazam@lchb.com
13    LIVIA JARAMILLO, ESQUIRE (via Zoom)
        ljaramillo@lchb.com
14    Embarcadero Center West
        275 Battery Street, 29th Floor
15    San Francisco, California 94111
        (415)956-1000
16
        -and-
17
     MOTLEY RICE LLC
18    BY: SARA O. COUCH, ESQUIRE (via Zoom)
        scouch@motleyrice.com
19    ANNIE E. KOUBA, ESQUIRE (via Zoom)
        akouba@motleyrice.com
20    28 Bridgeside Boulevard
        Mt. Pleasant, South Carolina 29464
21    (843)216-9000
22        -and-
23
24
25

Page 3

1  A P P E A R A N C E S :
2     MOTLEY RICE LLC
        BY: PREVIN WARREN, ESQUIRE (via Zoom)
3         pwarren@motleyrice.com
        401 9th Street NW
4     Suite 630
        Washington, DC 20004
5     (202)232-5504
6         -and-
7     WAGSTAFF & CARTMELL LLP
        BY: TRICIA L. CAMPBELL, ESQUIRE (via Zoom)
8         tcampbell@wcllp.com
        LINDSEY SCARCELLO, ESQUIRE (via Zoom)
9         lscarcell@wcllp.com
        4740 Grand Avenue
10    Suite 300
        Kansas City, Missouri 64112
11    (816)701-1100
12        -and-
13    THE LANIER LAW FIRM
        BY: CATHERINE HEACOX, ESQUIRE (via Zoom)
14        catherine.heacox@lanierlawfirm.com
        535 Madison Avenue
15    New York, New York 10022
        (212)421-2800
16
        -and-
17
     GOZA HONNOLD LLC
18    BY: KIRK J. GOZA, ESQUIRE (via Zoom)
        kgoza@gohonlaw.com
19    9500 Nall Avenue
        Suite 400
20    Overland Park, Kansas 66207
        (913)451-3433
21    Counsel for Plaintiffs
22
23
24
25

Page 4

1  A P P E A R A N C E S :
2     KING & SPALDING LLP
        BY: TODD P. DAVIS, ESQUIRE
3         tdavis@kslaw.com
        1180 Peachtree Street NE
4     Suite 1600
        Atlanta, Georgia 30309
5     (404)572-4600
        Counsel for Defendants TikTok Inc. and
6     ByteDance Inc.
7
     MUNGER TOLLES & OLSON LLP
8     BY: JOHN B. MAJOR, ESQUIRE
        john.major@mto.com
9     CORDELL A. BROWN, ESQUIRE (via Zoom)
        cordell.brown@mto.com
10    350 South Grand Avenue
        50th Floor
11    Los Angeles, California 90071
        (213)683-9100
12    Counsel for Defendant Snap Inc.
13
     MORGAN LEWIS & BOCKIUS LLP
14    BY: MELISSA M. COATES, ESQUIRE
        melissa.coates@morganlewis.com
15    600 Brickell Avenue
        Suite 1600
16    Miami, Florida 33131
        (305)415-3000
17
        -and-
18
        BY: EVAN K. JACOBS, ESQUIRE
19        evan.jacobs@morganlewis.com
        2222 Market Street
20    Philadelphia, Pennsylvania 19103
        (215)963-5000
21    Counsel for Defendants YouTube LLC and
        Google, LLC
22
23
24
25

Page 5

1  A P P E A R A N C E S :
2     COVINGTON & BURLING LLP
        BY: AMBER CHARLES, ESQUIRE
3         acharles@cov.com
        One City Center
4     850 Tenth Street NW
        Washington, DC 20001
5     (202)662-6000
        Counsel for Defendants Meta Platforms, Inc.
6     f/k/a Facebook, Inc.; Facebook Holdings, LLC;
        Facebook Operations, LLC; Facebook Payments, Inc.;
7     Facebook Technologies, LLC; Instagram, LLC;
        Siculus, Inc.; and Mark Elliot Zuckerberg
8
9  ALSO PRESENT:
10    KATY LAWRIMORE, PARALEGAL (via Zoom)
        Motley Rice LLP
11
12    RICHARD CASHON (via Zoom)
13
14 VIDEOGRAPHER:
15    DAVID NUNN
        GOLKOW - VERITEXT
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

1          INDEX
2      RAMIN MOJTABAI, MD, PhD, MPH
3        June 4, 2025
4
5 APPEARANCES           2
6 PROCEEDINGS          12
7
8 EXAMINATION OF RAMIN MOJTABAI, MD, PhD, MPH:
9     BY MR. DAVIS       13
10
11 CERTIFICATE          430
12 ERRATA            432
13 ACKNOWLEDGMENT OF DEPONENT      433
14 LAWYER'S NOTES         434
15
16
17
18
19
20
21
22
23
24
25

Page 8

DEPOSITION EXHIBITS

1
2 Mojtabai-9    Cross-Sectional Studies Cited    205
3       in Dr. Mojtabai's Expert
4       Report
5 Mojtabai-10   Excerpt From Reference Manual    211
6       on Scientific Evidence, Third
7       Edition
8 Mojtabai-11    Adverse childhood experiences    258
9       and comorbidity in a cohort of
10      people who have injected
11      drugs, by Sosnowski et al
12 Mojtabai-12   Video Clip on Self-Reports    276
13 Mojtabai-13   Using Social Media for Social    283
14       Comparison and
15       Feedback-Seeking: Gender and
16       Popularity Moderate
17       Associations with Depressive
18       Symptoms, by Nesi et al
19 Mojtabai-14   Time Spent on Social Media and    288
20       Risk of Depression in
21       Adolescents: A Dose-Response
22       Meta-Analysis, by Liu et al
23
24
25

Page 7

DEPOSITION EXHIBITS

1
2   NUMBER               MARKED
3 Mojtabai-1    Defendants' Joint Notice of    18
4       Deposition of Plaintiff's
5       Retained Expert Ramin Mojtabai
6       and Request for Production of
7       Documents
8 Mojtabai-2    Materials Considered,      23
9        MOJTABAI0087 - MOJTABAI0172
10 Mojtabai-3    Folder Containing Exhibit 2,    24
11       Materials Considered
12 Mojtabai-4    Invoices,           26
13        MOJTABAI0173 - MOJTABAI0176
14 Mojtabai-5    4/18/25 Mojtabai Expert Report    37
15 Mojtabai-6    Pyramid of Evidence      165
16 Mojtabai-7    Problematic social media use    183
17       and psychological symptoms in
18       adolescents, by Mojtabai
19 Mojtabai-8    Social network, recovery    187
20       attitudes and internal stigma
21       among those with serious
22       mental illness, by Cullen
23       et al
24
25

Page 9

DEPOSITION EXHIBITS

1
2 Mojtabai-15    Does TikTok contribute to     303
3       eating disorders? A
4       comparison of the TikTok
5       algorithms belonging to
6       individuals with eating
7       disorders versus healthy
8       controls, by Griffiths et al
9 Mojtabai-16    Use of social media is     317
10      associated with short sleep
11      duration in a dose-response
12      manner in students aged 11 to
13      20 years, by Sampasa-Kanyinga
14      et al
15 Mojtabai-17    Association Between Social    321
16      Media use and Depression Among
17      US Young Adults, by Lin et al
18 Mojtabai-18    The association between screen    329
19      time and reported depressive
20      symptoms among adolescents in
21      Sweden, by Ma et al
22
23
24
25

3 (Pages 6 - 9)

CONFIDENTIAL

Page 10

DEPOSITION EXHIBITS

2  Mojtabai-19   Associations Between Time    340
3              Spent Using Social Media and
4              Internalizing and
5              Externalizing Problems Among
6              US Youth, by Riehm et al
7  Mojtabai-20   Comment & Response: Is there   375
8              an Association Between Social
9              Media Use and Mental Health?
10             The Timing of Confounding
11             Measurement Matters, by Keyes
12             and Kreski
13 Mojtabai-21   Letter to JAMA Psychiatry by   378
14             Feder et al
15 Mojtabai-22   Riehm Interview Clip        386
16 Mojtabai-23   Online media consumption and  414
17             depression in young people: A
18             systematic review and
19             Meta-Analysis, by Shin et al
20 Mojtabai-24   Is social network site usage   424
21             related to depression?  A
22             meta-analysis of
23             Facebook-depression relations,
24             by Yoon et al
25

Page 11

DEPOSITION EXHIBITS

2  Mojtabai-25   The association between      403
3              self-reported depressive
4              symptoms and the use of social
5              networking sites (SNS): A
6              Meta-Analysis, by Vahedi et al
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 12

1              ------------
2              P R O C E E D I N G S
3           June 4, 2025, 9:05 a.m. CDT
4              ------------
5              THE VIDEOGRAPHER:  We're now on
6  the record.  My name is David Nunn.
7  I'm a videographer for Golkow
8  Litigation, a Veritext division.
9  Today's date is June 4th, 2025, and
10 the time is 9:05 a.m.  This is the
11 beginning of Media 1.
12             This video deposition is being
13 held in New Orleans, Louisiana, in the
14 matter of Social Media Adolescent
15 Addiction before the Superior Court of
16 the State of California for the County
17 of Los Angeles.
18             The deponent is Dr. Ramin
19 Mojtabai.
20             Counsel will be noted on the
21 stenographic record.  The court
22 reporter is Mike Miller, and will now
23 swear in the witness.
24             ///
25             ///

Page 13

1              ------------
2           RAMIN MOJTABAI, MD, PhD, MPH,
3              having been duly sworn,
4              testified as follows:
5              ------------
6              EXAMINATION
7              ------------
8  BY MR. DAVIS:
9      Q.    Good morning, Dr. Mojtabai.  My
10 name is Todd Davis.  How are you doing?
11     A.    Good, thank you.
12     Q.    We met briefly before the start
13 of the deposition, right?
14     A.    Yes.
15     Q.    Now, you understand that you
16 have been identified by plaintiffs' counsel
17 as an expert who will offer opinions at the
18 trial of this case, right?
19     A.    Yes.
20     Q.    And you understand that the
21 defendants are here today to find out the
22 bases for your opinions and what your
23 opinions are, right?
24     A.    Correct.
25     Q.    Okay.  Now, if you don't

Golkow Technologies,
A Veritext Division

877-370-3377                                                    www.veritext.com

CONFIDENTIAL

Page 14

1 understand one of my questions, will you
2 please let me know?
3     A.    I will.
4     Q.    If you answer my question, I
5 will assume that you heard it, you understood
6 it, and you answered the question that I
7 asked.
8           Is that acceptable to you?
9     A.    It is.
10    Q.    Now, are you on any medication
11 or have any type of medical condition that
12 would prevent you from testifying truthfully
13 and accurately today?
14    A.    No.
15    Q.    You're doing a great job so far
16 in terms of waiting for me to finish my
17 question before you start your answer, and
18 also, not shaking your head or nodding.  So I
19 would just ask you to keep that up because
20 you're doing a great job, all right?
21    A.    Will do.
22    Q.    Great.
23          Now, if at any time you need a
24 break, I would just ask that if there's a
25 question pending, that you answer my question

Page 15

1 that's pending before we have a break.
2           Is that acceptable to you?
3     A.    It is.
4     Q.    Great.
5           Now, I want to have a couple
6 definitions, if you will, so that we can
7 understand that we're on the same page about
8 a couple of issues, okay?
9     A.    Okay.
10    Q.    When I'm referring to a social
11 media platform, I'm referring and including
12 the app that is downloaded on people's phones
13 for that platform.  And when I'm talking
14 about the app, I'm also including the social
15 media platform.
16          Is that acceptable to you?
17    A.    It is.
18    Q.    And when I use "psychiatric
19 disorders" and "mental health disorders," I
20 mean the same thing.
21          Is that acceptable to you?
22    A.    Yes.
23    Q.    And when I reference
24 psychiatric disorders, I mean any depressive
25 disorder, any anxiety-related disorder, any

Page 16

1 eating disorder and body dysmorphic disorder.
2           Is that acceptable to you?
3     A.    I have a question.
4     Q.    Yes, sir.
5     A.    When you say any disorder, what
6 do you mean?
7     Q.    Well, when I'm talking -- you
8 understand that there are disorders,
9 anxiety-related disorders --
10    A.    Correct.
11    Q.    -- such as general anxiety
12 disorder, posttraumatic stress disorder,
13 social anxiety disorder, right?  Those are
14 anxiety-related disorders, right?
15    A.    Correct.
16    Q.    And I'm also -- there's also a
17 number of other anxiety disorders that are
18 identified in the Diagnostic and Statistical
19 Manual or DSM, right?
20    A.    Correct.
21    Q.    Okay.  So I'm trying to capture
22 all of them, okay?  So let me ask my question
23 again.
24          When I reference psychiatric
25 disorders, I mean any depressive disorder,

Page 17

1 anxiety-related disorder, eating disorder and
2 body dysmorphic disorder.
3           Is that acceptable to you?
4     A.    It is.
5     Q.    Thank you.
6           Now --
7           MS. EMMEL:  I'm likely going to
8     object to those, when we get to them,
9     as being vague.  So maybe if you could
10    specify at the time you ask, that
11    would be helpful.
12 BY MR. DAVIS:
13    Q.    I'm going to go ahead and also
14 ask you, if I use the term "randomized
15 controlled trial" or RCT, that we're talking
16 about the same thing.
17          Is that acceptable to you?
18    A.    It is.
19    Q.    Okay.  And if I use the term
20 "experimental study," I'm also including that
21 to mean an RCT.
22          Is that acceptable to you?
23    A.    It is.
24    Q.    Okay.  All right.  Let me go
25 ahead and mark as Exhibit 1 the notice for

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

1 your deposition.
2           (Whereupon, Mojtabai-1,
3     Defendants' Joint Notice of Deposition
4     of Plaintiff's Retained Expert Ramin
5     Mojtabai and Request for Production of
6     Documents, was marked for
7     identification.)
8 BY MR. DAVIS:
9     Q.    Here, let me go ahead and hand
10 you Exhibit 1, Dr. Mojtabai.
11          Now, did you have an
12 opportunity in advance of the deposition to
13 look through this deposition notice and the
14 document requests that are included in it?
15    A.    Yes.
16    Q.    Now, did you bring any
17 materials with you to the deposition?
18    A.    I didn't, but my attorneys, I
19 think.
20    Q.    Counsel for plaintiff --
21    A.    Yes.
22    Q.    -- collected some materials and
23 brought it to the deposition?
24    A.    Correct.
25    Q.    Okay.  Let's talk about what

Page 19

1 you brought to the deposition, all right.
2           I see to your left you have a
3 black-and-white notebook, right?
4     A.    Correct.
5     Q.    Okay.  And what's in the
6 black-and-white notebook?
7     A.    The black notebook includes my
8 report, Exhibits A to E, and I believe one of
9 them is my CV.
10    Q.    All right.  Thank you.
11          And what's underneath the black
12 notebook?
13    A.    These are exhibits from
14 different people who have had depositions in
15 the matter.
16    Q.    Okay.  So when you say
17 depositions in the matter, you're talking
18 about company depositions?
19    A.    Correct.
20    Q.    Okay.  And when did you first
21 read through that deposition notebook?
22    A.    I didn't read it in a notebook
23 format, but online.  I don't recall when
24 exactly it became available to me and I had a
25 chance to read them.  But I think my

Page 20

1 invoices, that you guys should have it,
2 notices when I had a chance to review these
3 documents.
4     Q.    So were the materials -- the
5 deposition exhibits or internal company
6 documents, are those something that you had
7 read before your April 18, 2025 report?
8     A.    I believe so.  There are a lot
9 of depositions here, so I can't be sure.  But
10 I believe the names are familiar.
11    Q.    All right.  Do you have any
12 handwriting or notes on either the materials
13 in the white notebook that has the company
14 deposition and documents, or the black
15 notebook that contains your report?
16    A.    With me, you mean?
17    Q.    On them, actually what you
18 brought.
19    A.    No.
20    Q.    Okay.  You also brought, I
21 think, a folder as well that's in that stack
22 of material?
23    A.    You mean this one?
24    Q.    Yes, sir.
25    A.    Yes.

Page 21

1     Q.    Okay.  What's in the folder?
2           THE WITNESS:  Is it --
3           MS. EMMEL:  Yes, that's yours.
4     A.    Materials Considered After May
5 Report.
6 BY MR. DAVIS:
7     Q.    Okay.  And when you say after
8 May report, what May report are you referring
9 to?
10    A.    My report on social media and
11 mental health.
12    Q.    Okay.
13    A.    The one that is contained in
14 this folder.
15    Q.    Okay.  Well, that one, I think,
16 and your black notebook that you just
17 referred to, that's dated April 18, 2025,
18 right?
19    A.    I believe it was updated.
20 There were some minor errors, corrections
21 that I made.  That's my understanding.
22    Q.    Okay.  So when -- do you
23 understand that there's two separate
24 litigations that are going on?  There's a
25 state court --

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

1    A.    And a federal.
2    Q.    -- and a federal, right?
3    A.    Yes.
4    Q.    Okay. And you understand, here
5  today, we're talking about your report in the
6  state court proceeding, right?
7    A.    I understand, but I'm not sure
8  which one of these -- whether the updated
9  report was given to you guys or the original
10  one.
11    Q.    Okay. Let me ask you about --
12  on the folder.
13    A.    Uh-huh.
14    Q.    What's the title of the folder?
15    A.    The title, Materials Considered
16  After May Report.
17    Q.    Okay. So the materials that
18  you have -- there's a document that's in the
19  folder entitled Materials Considered After
20  May Report, right?
21    A.    Correct.
22    Q.    And that document has some
23  highlighting on it, right?
24    A.    Correct.
25    Q.    Okay. And are the highlights

Page 23

1  the one -- the documents that you considered
2  after your May 2025 report?
3    A.    There are a lot of them, but I
4  can recognize some of them as papers that I
5  found later and added. So, for example,
6  Nagata. I can't be sure about the other
7  ones, because they were all, you know, a mix
8  in my head.
9    Q.    Let me ask you this way.
10  What's the significance of the
11  highlighting in the document?
12    A.    I believe they were added or
13  considered after the report was finalized.
14    Q.    Okay. Considered by you?
15    A.    Yes.
16    Q.    Okay. Let me go ahead and I'm
17  going to mark that as Exhibit 2.
18    (Whereupon, Mojtabai-2,
19    Materials Considered, MOJTABAI0087 -
20    MOJTABAI0172, was marked for
21    identification.)
22    MR. DAVIS: Tell you what --
23    yeah. Okay.
24    THE WITNESS: Okay.
25    ///

Page 24

1  BY MR. DAVIS:
2    Q.    And we'll put the folder
3  itself, we'll mark that as Exhibit 3, okay?
4    (Whereupon, Mojtabai-3, Folder
5    Containing Exhibit 2, Materials
6    Considered, was marked for
7    identification.)
8    A.    Okay.
9  BY MR. DAVIS:
10    Q.    And then you also have with you
11  a box of material that's sitting behind you,
12  right?
13    A.    Correct.
14    Q.    Those are studies that you've
15  cited in your expert report from April of
16  2025?
17    A.    Cited, and I believe some of
18  them are these studies that I considered
19  after the report was completed.
20    Q.    In terms of any of the studies
21  that you considered after your April 2025
22  report --
23    A.    Right.
24    Q.    -- have you written up any
25  document that summarizes or sets out your

Page 25

1  opinions about those studies?
2    A.    I haven't.
3    Q.    Okay. And --
4    MS. EMMEL: Counsel, for the
5    record, I would like to state that he
6    adopted, in his May 16th rebuttal,
7    that -- it was not a rebuttal, it was
8    just an announcement that he adopted
9    his MDL report as an updated version
10    of his JCCP report.
11    MR. DAVIS: I'm not sure that I
12    know what that means, but let me just
13    ask my next question.
14  BY MR. DAVIS:
15    Q.    Dr. Mojtabai, did you
16  understand that in terms of the state court
17  litigation, you had an opportunity to write
18  up a rebuttal report for that litigation?
19    A.    I didn't know that I had an
20  opportunity to write a rebuttal report.
21    Q.    Okay.
22    A.    Rebuttal to what, I'm not sure.
23    Q.    Okay. You did look at -- and I
24  can hand you your invoices if you need to see
25  them.

CONFIDENTIAL

Page 26

1     Let's do it this way.  Let me
2 mark as Exhibit 4 a copy of the invoices that
3 we received last night from plaintiffs'
4 counsel.
5     (Whereupon, Mojtabai-4,
6     Invoices, MOJTABAI0173 - MOJTABAI0176,
7     was marked for identification.)
8 BY MR. DAVIS:
9     Q.    Do you see that's what
10 Exhibit 4 is?
11     A.    I do.
12     Q.    Okay.  And if you turn to
13 page -- the last page, you see that there are
14 references in -- in your invoice for April of
15 2025, that talk about different defense
16 expert reports that you've reviewed and
17 analyzed in April, right?
18     A.    Dr. Platt's report, yes,
19 drafting.  Dr. Patten's report, Dr. Gibbons'
20 report, yes.
21     Q.    Right.  And so you had an
22 opportunity in April --
23     A.    Right.
24     Q.    -- to look at defense expert
25 reports, correct?

Page 27

1     A.    I did.
2     Q.    And after reviewing any defense
3 expert report, did you ever put together
4 what's called a rebuttal report that counters
5 the opinions that were set out in the defense
6 expert reports?
7     MS. EMMEL:  Objection.  This is
8     getting into legal conclusions.
9     It has been represented to
10     defendants that his May 16th report
11     was a supplemental report to his JCCP
12     report in April.
13     MR. DAVIS:  Okay.
14 BY MR. DAVIS:
15     Q.    Dr. Mojtabai, after reviewing
16 any defense expert reports, did you ever put
17 together what's called a rebuttal report or
18 any type of report that counters the opinions
19 that were set out in the defense expert
20 reports?
21     A.    I was asked to look at these.
22 They were not rebuttal of my report
23 specifically.  They mentioned sometimes my
24 report.  But I had a chance to look at these
25 reports and put down -- drafted a very --

Page 28

1     MS. EMMEL:  Don't get into
2     attorney work product or anything that
3     is privileged.
4 BY MR. DAVIS:
5     Q.    Okay.  Let me -- are you
6 finished with your answer?
7     A.    Yeah.
8     Q.    Okay.  Let's -- after looking
9 at the defense expert reports in the JCCP
10 litigation --
11     A.    Uh-huh.
12     Q.    -- did you ever put together a
13 report that discussed your opinions about the
14 defense expert reports?
15     A.    I did.
16     Q.    I'm sorry?
17     A.    I did.
18     Q.    You did?
19     MS. EMMEL:  Again, this is --
20     this is not work product that you're
21     discussing.  It is anything that was
22     submitted that he's referring to.
23     Do not discuss work product.
24     THE WITNESS:  Okay.
25     ///

Page 29

1 BY MR. DAVIS:
2     Q.    Okay.  So without asking you
3 about the substance, you did -- you did
4 prepare a report to address some of the
5 issues that are issues that had been raised
6 by defense expert reports, right?
7     MS. EMMEL:  I object to that
8     based on I think you're getting into
9     work product and, I mean, perhaps if
10     you could rephrase it to have you
11     submitted a report?
12     MR. DAVIS:  My question stands.
13 BY MR. DAVIS:
14     Q.    Dr. Mojtabai, did you prepare a
15 report that addressed issues raised by the
16 defense experts?
17     A.    Some of the issues.
18     MS. EMMEL:  Again, do not -- do
19     not discuss work product.
20     THE WITNESS:  Okay.
21     MS. EMMEL:  It's only reports
22     that were submitted as a rebuttal
23     report.
24 BY MR. DAVIS:
25     Q.    Do you know whether or not that

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 30

1 report was ever provided to the defendants?
2         MS. EMMEL: Objection,
3 mischaracterizes testimony.
4     A.    I don't know.
5 BY MR. DAVIS:
6     Q.    You don't know.
7         Did you provide it to counsel?
8         MS. EMMEL: Objection. Do not
9 discuss work product. Don't answer
10 the question.
11         THE WITNESS: Yes.
12 BY MR. DAVIS:
13     Q.    You're going to follow
14 counsel's advice?
15         MS. EMMEL: Do not answer the
16 question.
17         MR. DAVIS: I'm not asking him
18 to answer the question. I'm asking if
19 he's going to follow your advice not
20 to answer the question.
21         MS. EMMEL: I objected to that
22 as work product.
23         MR. DAVIS: Dr. Mojtabai, are
24 you going to follow counsel's
25 instructions? And it's okay. I'm not

Page 31

1     going to have a fight with you about
2     it if you do, but are you going to
3     follow counsel's instructions and not
4     answer the question about whether or
5     not you're going to follow counsel's
6     instructions?
7         MS. EMMEL: I'm instructing you
8     not to answer the question.
9 BY MR. DAVIS:
10     Q.    And you're going to follow that
11 advice, Dr. Mojtabai?
12     A.    I'm following her advice, yes.
13     Q.    Okay. Thank you. All right.
14         So let's talk about your
15 invoices, okay?
16     A.    Okay.
17     Q.    My calculation is that you've
18 spent 780 -- excuse me, 287 hours of time as
19 reflected in those invoices.
20         Does that sound about right to
21 you?
22     A.    The last one doesn't have the
23 total hours. Oh, yeah, it does. 119, 118.
24         What was the number? Can you
25 repeat, please?

Page 32

1     Q.    Sure, absolutely.
2         My question is: I added up
3 your hours that you spent, and I come up with
4 287 hours that you've spent that's reflected
5 in the invoices.
6         Does that sound about right to
7 you?
8     A.    Yeah, sounds right.
9     Q.    And I also have that your fees
10 were from basically -- your invoices are
11 dated from November 8, 2024 to June 1, 2025,
12 and they total $143,000, about.
13         Does that sound about right?
14     A.    How much was it? I'm sorry.
15     Q.    143,000?
16     A.    Sounds right.
17     Q.    Okay. Now, if you look at the
18 first page of the invoice -- of the exhibit
19 of invoices, you see that the first date is
20 June 6th, 2024, right?
21     A.    Correct.
22     Q.    Now, was that the first time
23 that you had any contact with plaintiffs'
24 counsel about serving as an expert in this
25 litigation?

Page 33

1     A.    In this litigation, yes.
2     Q.    Okay. For the time that's
3 reflected on these invoices, does that
4 include time as well for the federal MDL
5 proceeding or is it just this state court
6 proceeding?
7     A.    Well, in my mind -- and the
8 report is -- it was the same.
9     Q.    Okay. So it's a combination of
10 your time between the two litigations?
11     A.    Correct.
12     Q.    Okay. Now, you mentioned
13 that -- well, do you know how plaintiff --
14 well, let me start again.
15         How did plaintiffs' counsel
16 reach out to you to ask about whether or not
17 you'd be interested in serving as an expert
18 in this case?
19     A.    I had been involved in prior
20 litigations related to social media.
21     Q.    Which litigations are those?
22     A.    Some, I believe, litigations
23 involving TikTok and Meta, to my best recall.
24     Q.    Were those litigations in
25 Canada?

9 (Pages 30 - 33)

CONFIDENTIAL

1    A.    Yeah.
2    Q.    All right.  And so any --
3  besides those two litigations in Canada, have
4  you had any other involvement in social media
5  litigation?
6    A.    I don't recall, but this is
7  going back to 2022, and so don't have good
8  memory of that.
9    Q.    And you've actually submitted
10  an affidavit in both Canadian litigations,
11  right?
12    A.    I believe there was -- again,
13  in my mind, they were the same, so I recall
14  actually submitting an affidavit, but whether
15  it was separate or just one, I'm not exactly
16  sure.
17    Q.    But regardless, it was for the
18  Canadian litigation?
19    A.    Yeah.
20    Q.    One of them, at least, right?
21    A.    Yes.
22    Q.    Okay.  And when were you first
23  retained as an expert in either of the
24  Canadian lawsuits?
25    A.    Again, my memory is not very

1  clear, but could be '22-23.
2    Q.    Okay.  Is that your best
3  estimate of the time?
4    A.    Yeah.
5    Q.    Now, have you given any
6  deposition or trial testimony in any --
7    A.    No.
8    Q.    -- litigation other than this
9  one?
10    A.    No.
11    Q.    Okay.  So let's go back to the
12  first reach-out for the Canadian litigation.
13    Who reached out to you?
14    A.    I believe it was the counsel,
15  Tony Leoni.  I remember his name.  I don't
16  recall the name of the firm or the firms, if
17  there were multiple.
18    Q.    Was it a Canadian lawyer?
19    A.    I believe so.
20    Q.    And you agreed to serve as an
21  expert witness in the Canadian litigation
22  against social media companies?
23    A.    I was asked to prepare a
24  report, an affidavit.
25    Q.    And you did that?

1    A.    Yes.
2    Q.    Okay.  Now, do your invoices at
3  all that you've identified for this -- that
4  have been produced to us for this deposition,
5  do they include any time that you spent on
6  the Canadian litigation?
7    A.    No.  That Canadian litigation
8  was -- ended before -- from my understanding,
9  before this.
10    Q.    How many hours -- what's your
11  estimate of hours that you've spent on either
12  of the two Canadian litigations?
13    MS. EMMEL:  Objection, beyond
14  the scope of this deposition.
15    A.    It should be something
16  comparable to this.
17  BY MR. DAVIS:
18    Q.    So something in the order of
19  about a hundred and -- $143,000 and then
20  about 280 hours?
21    MS. EMMEL:  Objection, beyond
22  the scope of this deposition.
23    A.    I'm not sure about the dollar
24  amount or the hours, exactly.  But it was
25  on -- in terms of length of time that I was

1  involved in preparing the report, might have
2  been similar, except -- yeah, except I had
3  more material for this deposition.
4  BY MR. DAVIS:
5    Q.    All right.  So something -- the
6  Canadian litigation time and the charges for
7  that were something comparable to what you
8  did for this -- for the US litigation?
9    MS. EMMEL:  Objection, beyond
10  the scope of the deposition.
11    A.    I believe it was -- my memory
12  is not exactly good about that, but it's
13  possible.
14  BY MR. DAVIS:
15    Q.    All right.  Let me hand you
16  what I'm going to mark as Exhibit 5.
17    (Whereupon, Mojtabai-5, 4/18/25
18  Mojtabai Expert Report, was marked for
19  identification.)
20  BY MR. DAVIS:
21    Q.    Do you see, Dr. Mojtabai, that
22  this is a copy of your April 18, 2025 expert
23  report in the JCCP litigation?
24    A.    Yes.
25    Q.    Okay.  And if you look at -- if

CONFIDENTIAL

Page 38

1 you look at the very first page of the
2 report, you say: I have been retained by
3 counsel to prepare an expert report on what
4 relationship there is, if any, between social
5 media use and adverse mental health outcomes
6 in adolescents and youth.
7         Do you see that?
8     A.   Yes.
9     Q.   Okay.  Is that the charge that
10 you were given by plaintiffs' counsel in this
11 case?
12    A.   Yes.
13    Q.   Okay.  Now, your time -- you
14 charge at -- let me back up.  Sorry.
15        Your time is $500 per hour for
16 everything except deposition and trial
17 testimony, right?
18    A.   Correct.
19    Q.   And for deposition and trial
20 testimony, you charge a thousand dollars an
21 hour, right?
22    A.   Correct.
23    Q.   Now -- and when you -- let's
24 say if you're preparing for a deposition or
25 for trial testimony, do you -- what do you

Page 39

1 charge?
2     A.   We honestly haven't even
3 thought about it, but it's probably the $500
4 that I charge.
5     Q.   Okay.  And so in terms of the
6 time like when you start allocating for your
7 time, like, for example, when you left your
8 house this morning --
9     A.   Yes.
10    Q.   -- right, and you came and --
11 came to the deposition, do you kind of keep
12 track of that so you put that into the
13 charge?
14        MS. EMMEL:  Objection, vague.
15    A.   To be honest with you, again, I
16 haven't considered that, like, time and
17 transportation or commuting as keeping track
18 of it.  I haven't considered that.
19 BY MR. DAVIS:
20    Q.   Okay.  So let me just ask it an
21 easier way.
22        Do you charge for travel time?
23    A.   Can I qualify that answer?
24 This -- preparing these and meeting with
25 counsel did not involve travel.  Most of the

Page 40

1 meetings were via Zoom.
2     Q.   Sure.
3     A.   So it's not something I have
4 considered.
5     Q.   So, for example, if you travel
6 from New Orleans to California to testify in
7 the trial of the case, are you going to
8 charge for your travel time?
9     A.   Now that you mention it, yes.
10    Q.   Okay.  And what's the charge
11 going to be?
12    A.   It's going to be --
13        MS. EMMEL:  Objection,
14 speculation.
15        THE WITNESS:  Yeah.
16    A.   I haven't considered, but it
17 could be exactly $500 per hour.
18 BY MR. DAVIS:
19    Q.   Okay.  Other than the time
20 that's reflected on the invoices that have
21 been marked as an exhibit --
22    A.   Right.
23    Q.   -- is there any additional time
24 that you have incurred in connection with
25 social media litigation?

Page 41

1     A.   Can you specify --
2     Q.   Sure.
3     A.   -- what do you mean by time
4 that I have incurred?
5     Q.   Sure.
6         If you look at the last time
7 entry on the last page, it's May 30 --
8     A.   Yes.
9     Q.   -- 2025, right?
10    A.   Correct.
11    Q.   Okay.  Since May 30, 2025, have
12 you spent any additional time on this matter?
13    A.   Yeah, June 1st and June 2nd,
14 and then I had meeting with the counsel in
15 person also yesterday.  So yeah.
16    Q.   And was the June -- were the
17 June 1 and June -- other than June 1 and June
18 2, did you have any other meetings with
19 counsel?
20    A.   And I mentioned yesterday,
21 which was June 3rd.
22    Q.   Okay.  Other than those three
23 dates, any other meeting?
24    A.   I have to make a correction.
25        I didn't meet with counsel on

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

1 June 1st or 2nd. I just worked on the...
2    Q.    I'm sorry, I couldn't hear you.
3    A.    I prepared for the deposition.
4    Q.    Okay.
5    A.    I did not meet. But yesterday
6 I did meet with counsel.
7    Q.    Thank you for that
8 clarification.
9    A.    Sure.
10   Q.    So June 1 and June 2, you spent
11 time preparing for the deposition by
12 yourself?
13   A.    Correct, correct.
14   Q.    How much time on each day?
15   A.    I would say six, seven hours a
16 day.
17   Q.    Okay. And then for June 3,
18 what amount of time did you spend preparing
19 for the deposition?
20   A.    June -- yesterday?
21   Q.    Yes, sir.
22   A.    Well, we met from 9:00 until
23 1:00, so it's about four hours.
24   Q.    That was in person or by
25 remote?

Page 43

1    A.    The last one was in person.
2    Q.    Okay. Had there been other
3 times that you have met, either in person or
4 remotely, with counsel to prepare for the
5 deposition?
6    A.    No. In person, no, but on
7 Zoom, yes.
8    Q.    Okay. How many times, before
9 June 3, did you meet with counsel to prepare
10 for the deposition?
11   A.    You mean on Zoom?
12   Q.    On Zoom, yeah.
13   A.    I can count those, actually. I
14 have charged for those. One, two, three...
15       I see 12 --
16   Q.    Okay.
17   A.    -- occasions.
18   Q.    All right. Do you have any
19 additional work planned?
20       MS. EMMEL: Objection,
21   speculation.
22   A.    Not work planned, not that I'm
23 aware of.
24 BY MR. DAVIS:
25   Q.    Okay. Now, have you ever

Page 44

1 been -- I'm going to switch gears a little
2 bit on you, all right.
3       Have you ever been a defendant
4 or a plaintiff in any lawsuit?
5    A.    No.
6    Q.    Now, I'm going to switch gears
7 again and get a little bit more information
8 about your background, all right?
9    A.    Okay, sure.
10   Q.    Now, you did your medical
11 training and obtained your medical degree in
12 Iran, right?
13   A.    Correct.
14   Q.    And have you obtained a medical
15 degree in the US?
16   A.    No, but I have ECFMG
17 certification, which testifies to the
18 equivalence of my medical degree to American
19 degrees.
20   Q.    So you went through a process
21 here in the US to allow you to practice
22 medicine, right?
23   A.    Correct.
24   Q.    And you -- and does that --
25 that process involves meeting certain

Page 45

1 requirements, right?
2    A.    Correct.
3    Q.    Does it also require taking an
4 exam?
5    A.    Yes.
6    Q.    And how many times did you take
7 the exam?
8    A.    I believe four times; this
9 USMLE has four sections, so USMLE 1, USMLE 2,
10 which has two sections also, and USMLE 3. So
11 overall, three parts of the USMLE.
12   Q.    Okay. Did you pass any of the
13 sections of the exam every time you took it?
14   A.    I did.
15   Q.    Now, you are board certified in
16 psychiatry, right?
17   A.    Correct.
18   Q.    Do you have board certification
19 in any other area?
20   A.    No.
21   Q.    How many times have you sat for
22 your board certification exam?
23   A.    Once.
24   Q.    And you received a master's in
25 public health in 2002, right?

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

1    A.    Correct.
2    Q.    Was that a one-year program?
3    A.    One and a half year or two
4    years.  I don't recall exactly.
5    Q.    Other than your master's in
6    public health, have you undertaken any
7    additional coursework in either epidemiology
8    or biostatistics?
9    A.    During my PhD in clinical
10    psychology, I took courses in biostats.
11    Q.    How about epidemiology?
12    A.    Not epidemiology.
13    Q.    Do you hold any degrees in
14    epidemiology or statistics?
15    A.    No.
16    Q.    Have you ever attempted to
17    obtain either of those degrees?
18    A.    I have not.
19    Q.    Have you ever done a residency
20    or a fellowship in either epidemiology or
21    biostatistics?
22    A.    No.
23    Q.    Now, there are certifications
24    that epidemiologists can receive, right?
25    A.    There is a -- to get a PhD

Page 47

1    usually in epidemiology, PhD is usually in
2    the School of Multiple Health, and they get
3    their PhD in the Department of Epidemiology.
4    Some schools have biostats and epidemiology
5    combined.
6    Q.    Do you have a PhD in
7    epidemiology?
8    A.    I don't.
9    Q.    Do you have a PhD in statistics
10    or biostatistics?
11    A.    I do not.
12    Q.    There's something that's called
13    a certification test where someone who
14    specializes in epidemiology can take.
15        Are you familiar with that?
16    A.    I've heard of something like
17    that.  It's not a requirement for people who
18    are working in biostats or epidemiology, but
19    I've heard that they have something like
20    that.
21    Q.    Have you ever tried to obtain
22    any kind of certification like that?
23    A.    No.
24    Q.    Now, I noticed in your report
25    and in your CV, you don't describe yourself

Page 48

1    as an epidemiologist; is that fair?
2    A.    I have to qualify that.  My
3    work has, over the past 20-some years, been
4    in the area of psychiatric epidemiology and
5    mental health services.  So does it qualify
6    for what you're asking, whether or not, I'm
7    not sure.
8    Q.    Okay.  Let me ask it a
9    different way.
10    A.    Okay.
11    Q.    When you stand up in front of
12    your peers and you introduce yourself --
13    A.    Yes.
14    Q.    -- do you describe yourself as
15    an epidemiologist to other researchers,
16    doctors or scientists?
17        MS. EMMEL:  Objection, vague.
18    A.    I do not identify myself as an
19    epidemiologist or biostatistician.
20    BY MR. DAVIS:
21    Q.    Okay.  Now, other than the
22    Riehm, R-I-E-H-M, 2019 study that you were a
23    coauthor on --
24    A.    Yes.
25    Q.    -- have you ever designed or

Page 49

1    conducted a longitudinal or experimental
2    study about social media?
3    A.    No.
4    Q.    Have you ever designed or
5    conducted a longitudinal study that's either
6    lagged or cross-lagged?
7    A.    Can you specify what you mean
8    by designed a study?  Because a study could
9    be analysis of data.
10    Q.    Yeah.  I'm looking for where
11    you had input into how the study was put
12    together, how -- what the methodology was for
13    collecting data, how it was going to be
14    analyzed and assessed.
15        MS. EMMEL:  Objection,
16        compound.
17    BY MR. DAVIS:
18    Q.    So with that in mind, have you
19    ever designed or conducted a longitudinal
20    study that was either lagged or cross-lagged?
21        MS. EMMEL:  Objection,
22        compound.
23    A.    I mean, cross-lagged and -- I
24    have been involved in designing longitudinal
25    studies if that qualifies, longitudinal

13 (Pages 46 - 49)

CONFIDENTIAL

1  studies with multiple waves.  So that could
2  be analyzed as a cross-lagged analysis.
3        So that's why I was asking:
4  Are you talking about -- what do you mean
5  exactly by designing?
6     Q.   Yeah.  And I won't spend much
7  more time on this, but it really is where the
8  design of the longitudinal study actually did
9  a lagged or cross-lagged analysis and you had
10  involvement in the design, construction and
11  interpretation as a researcher, study
12  researcher, into that longitudinal study.
13        MS. EMMEL:  Objection,
14     compound.
15     A.   Again, I have to qualify:
16  Longitudinal data can be analyzed as
17  cross-lagged, or random intercept
18  cross-lagged.
19        So it's not something inherent
20  in the design of the study that it's going to
21  be analyzed as a cross-lagged.
22        You could analyze a
23  longitudinal study as a longitudinal study
24  without considering the lagging.  You could
25  include that lags, which means that you're

1  including the other regressive terms into the
2  analysis.
3        So it's a matter of analysis.
4  There is design of the study and then there's
5  the analysis.  Many of the studies that are
6  analyzed as cross-lagged were not designed as
7  a cross-lagged study specifically.  They were
8  designed as multiwave longitudinal studies.
9     Q.   Let me see if I can ask it:
10  Have you ever had involvement where you
11  designed a lagged or cross-lagged
12  longitudinal study?
13        MS. EMMEL:  Objection, vague.
14     A.   Again, I'm sorry I'm going back
15  to that thing; that is, I have designed and
16  been involved in designing longitudinal
17  studies with multiple waves.  You can analyze
18  those.
19        So it's a mixing of design of
20  various study and how it is analyzed.  That's
21  the part that is not clear in my mind.  And I
22  don't think people who design longitudinal
23  studies necessarily design it as a
24  cross-lagged or a lagged.
25     Q.   Thank you.

1        Dr. Mojtabai, have you ever
2  published anything that states that social
3  media causes addiction?
4     A.   So can you define to me
5  "causes," what causes means.
6     Q.   It's the same definition that
7  you use in your expert report, okay?
8        MS. EMMEL:  Objection, vague.
9     A.   If you have read the report,
10  you realize that definition of cause or
11  causal factors is not a black and white.
12  Causes or contributing factors are determined
13  based on number of factors.
14  BY MR. DAVIS:
15     Q.   Let's see if I can narrow it
16  down.
17        Have you ever stated in a
18  publication, writing or any lecture that you
19  believe that social media causes or
20  substantially contributes in some way to
21  addiction?
22        MS. EMMEL:  Objection, vague
23     and ambiguous, compound.
24     A.   Yeah, and also, I'm not sure
25  what addiction, again, you have to define

1  what addiction --
2  BY MR. DAVIS:
3     Q.   I'm using the definition that
4  you use in your report.
5        With that in mind, have you
6  ever made any publication or statement along
7  those lines?
8        MS. EMMEL:  Objection, vague,
9     compound.
10     A.   That social media causes
11  addiction or can you -- it's not a question
12  that I can answer like that.  I have
13  published -- I can qualify or --
14  BY MR. DAVIS:
15     Q.   I want to know if you've ever
16  said publicly in any place in your writings,
17  in your lectures, or state -- where you have
18  said that social media causes addiction.
19        Have you made such a statement?
20        MS. EMMEL:  Objection, vague,
21     compound.
22     A.   I have made the statement that
23  is it a substantial contributing factor or
24  cause to social -- to adverse mental health.
25        ///

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

1  BY MR. DAVIS:
2      Q.    Where have you made that
3  statement?
4      A.    I believe that in the Riehm
5  paper that you mentioned, that's one of the
6  claims we make.  There is also a more recent
7  paper, 2024, in which I talk about social
8  media use explaining increase in
9  internalizing symptoms in more recent years
10 among adolescents.
11     Q.    Okay.  So when we go to the
12 Riehm 2019 paper and your 2024 paper, we're
13 going to find a statement that says social
14 media causes addiction?
15          MS. EMMEL:  Objection, vague.
16     A.    That statement?
17 BY MR. DAVIS:
18     Q.    Yes.
19     A.    Causes?
20     Q.    Yes.
21     A.    You may not find that statement
22 stated like that.
23     Q.    Have you ever published
24 anything to your scientific peers or given a
25 lecture where you have stated that social

Page 55

1  media causes psychiatric disorders of any
2  kind?
3          MS. EMMEL:  Objection, vague.
4      A.    So what you are asking, no
5  epidemiologist, no scientist -- I would
6  think -- there might be some -- none that I
7  know -- would make such a statement about any
8  causal factors in those terms.
9          If it was that clear that it
10 causes, why do we do research?  We do
11 research because we have questions, and our
12 answers are often probabilistic, to say that
13 more likely than not, social media is a
14 contributing cause to adverse mental health
15 outcomes.
16 BY MR. DAVIS:
17     Q.    Have you ever said that
18 statement in any publication or in any
19 lecture that you've given to other
20 scientists, researchers or doctors?
21          MS. EMMEL:  Objection, vague
22 and compound.
23     A.    I have implied in my writing,
24 and if you read it, you know, it is in the
25 scientific -- it's couched in scientific

Page 56

1  terminology, in terms of epidemiology
2  research.
3  BY MR. DAVIS:
4      Q.    So if I looked at your
5  writings --
6      A.    Yes.
7      Q.    -- and I looked at your
8  presentations that you give to other doctors
9  and scientists --
10     A.    Yes.
11     Q.    -- I won't find a statement
12 from you that says that social media causes
13 any psychiatric disorder, fair?
14          MS. EMMEL:  Objection, vague
15 and compound.
16     A.    Not in those terms.
17 BY MR. DAVIS:
18     Q.    I won't find a statement either
19 that says that social media contributes to
20 psychiatric disorders either, will I?
21          MS. EMMEL:  Objection, vague.
22     A.    You would find that in terms
23 of -- in what is implied in the statement.
24 BY MR. DAVIS:
25     Q.    So I'll find some implied

Page 57

1  statement, but I won't find an explicit
2  statement that social media causes or
3  contributes to any psychiatric disorder; is
4  that fair?
5          MS. EMMEL:  Objection, vague
6  and compound.
7      A.    As I said, that's not the
8  standard of research.  We don't make
9  statements as X causes Y, because it won't be
10 accepted in scientific community.
11 BY MR. DAVIS:
12     Q.    Okay.  So -- and I won't find a
13 statement from you, in your publications or
14 in lectures that you've given to other
15 scientists or doctors, that social media
16 contributes to a psychiatric disorder?
17          MS. EMMEL:  Objection, vague
18 and compound.
19     A.    You would find that --
20 BY MR. DAVIS:
21     Q.    That it contributes?
22     A.    Yeah, it's a contributing
23 factor.
24     Q.    Where -- what publication have
25 you ever authored or what presentation that

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

1  you have ever given that says that social
2  media contributes in a causal way to
3  psychiatric disorders?
4       MS. EMMEL:  Objection, vague
5    and compound.
6       A.   I believe that, for example,
7  the publication that I said in 2024.
8  BY MR. DAVIS:
9       Q.   Okay.  We'll find that in 2024?
10      A.   Yeah.
11      Q.   Any other place?
12      A.   I'm thinking.
13          We might actually have -- we
14  might have said something like that in the
15  Riehm paper.  I'm not sure exactly.
16      Q.   Any other place that you can
17  think of besides your 2024 paper and the
18  Riehm 2019 article?
19      MS. EMMEL:  Objection, vague
20    and compound.
21      A.   I'm thinking about publications
22  that I might have had or presentations.
23          I don't recall at this time.
24  BY MR. DAVIS:
25      Q.   Okay.  Now, are you currently

Page 59

1  seeing patients?
2       A.   Not currently.
3       Q.   When is the last time you
4  treated patients clinically?
5       A.   About a year and a half ago.
6       Q.   And over the course of your
7  career, what's been the percentage of your
8  clinical practice?
9       A.   It has varied over time.  Most
10  recently, year and a half ago, it was about
11  20%.
12      Q.   Okay.  Have you ever diagnosed
13  any patient of any age with either social
14  media addiction or something that you would
15  consider to fall into that category?
16      MS. EMMEL:  Objection, vague.
17      A.   I've seen patients who have had
18  problems with social media which I thought
19  were contributing to their psychiatric
20  problems, mental health problems.
21  BY MR. DAVIS:
22      Q.   Okay.  I'm specifically asking
23  you:  Have you ever diagnosed a patient with
24  social media addiction or something that you
25  would say would fit that description?

Page 60

1       MS. EMMEL:  Objection, vague
2    and ambiguous.
3       A.   In my practice of adults -- I
4  didn't see adolescents and children -- I
5  haven't made that diagnosis.
6  BY MR. DAVIS:
7       Q.   Okay.  You haven't made that
8  diagnosis in a pediatric patient, fair?
9       A.   I don't see patients --
10  children and adolescent patients.
11      Q.   So you haven't made that
12  diagnosis, right?
13      A.   I have not.
14      Q.   Okay.  Have you made that
15  diagnosis of social media addiction in any
16  adult patient?
17      MS. EMMEL:  Objection,
18    foundation.
19      A.   So there is no official
20  diagnosis of social media addiction, but I
21  have -- as I mentioned, I have seen patients
22  who spent a large amount of time on social
23  media, and at the time, my opinion was that
24  it was a contributing factor to their mental
25  health problems.

Page 61

1  BY MR. DAVIS:
2       Q.   Did you write in their chart
3  for those patients that they had a diagnosis
4  of social media addiction?
5       A.   As I mentioned, there's no
6  diagnosis of social media addiction.
7       Q.   So you wouldn't have written it
8  in the chart; is that fair?
9       A.   I have probably written that
10  social media overuse or excessive use or
11  addictive use of social media is a
12  contributing factor to their mental health
13  problems.
14      Q.   Okay.  And how many patients
15  have you done that in?
16      MS. EMMEL:  Objection,
17    speculation.
18      A.   As I said, it's over a year and
19  a half I haven't seen patients, and I saw
20  patients for 20 years, so I can't recall
21  exactly how many.
22  BY MR. DAVIS:
23      Q.   How many patients, with
24  certainty, can you say that you actually made
25  that statement or made that assessment for

CONFIDENTIAL

1 those patients?
2        MS. EMMEL: Objection, vague.
3     A.    What I recall is two patients
4 that I recall I did do that.
5 BY MR. DAVIS:
6     Q.    Now, Dr. Mojtabai, you don't
7 hold yourself out as an expert in digital
8 technology, do you?
9     A.    No.
10    Q.    And you don't hold yourself out
11 as an expert in social media platforms or how
12 to use them, do you?
13    A.    No.
14    Q.    And you don't hold yourself out
15 as an expert on how or why people may engage
16 in social media use or other forms of digital
17 technology; is that fair?
18        MS. EMMEL: Objection,
19    compound.
20    A.    That is a -- that's a -- I'm
21 not sure what it means, how and why people
22 engage in social media. I don't know what
23 expertise it falls into.
24 BY MR. DAVIS:
25    Q.    Do you have expertise in the

1 area of how and why people engage in social
2 media use?
3        MS. EMMEL: Objection,
4    compound.
5     A.    I don't exactly -- is it a
6 biostat expertise? Is it an epidemiology
7 expertise? Is it knowledge of methods of
8 research that engage that? I don't know if
9 there is an expert in how and why people
10 engage in social media. What is that person
11 called?
12 BY MR. DAVIS:
13    Q.    Do you hold yourself out as
14 such a person to your scientific colleagues?
15        MS. EMMEL: Objection, vague.
16    A.    Since I don't know what it is
17 that we're talking about, I can't tell you if
18 I hold myself --
19 BY MR. DAVIS:
20    Q.    All right. Do you hold
21 yourself out as an expert in sleep disorders?
22    A.    No.
23    Q.    Do you hold yourself out as an
24 expert in any eating disorder?
25    A.    No.

1     Q.    Do you hold yourself out as an
2 expert in body dysmorphic disorder?
3     A.    To the extent that I'm a
4 psychiatrist, psychologist, and I have
5 knowledge of both eating disorders and body
6 dysmorphic disorders as mental health
7 problems, I can say that I have some
8 knowledge of that.
9     Q.    Sure.
10        But are you holding yourself
11 out as an expert to your scientific
12 colleagues as an expert in either eating
13 disorders or body dysmorphic disorders?
14        MS. EMMEL: Objection,
15    compound.
16    A.    As a -- not as a psychiatrist
17 who focuses on eating disorder or body
18 dysmorphic disorder.
19 BY MR. DAVIS:
20    Q.    And is it okay with you if I
21 call body dysmorphic disorder at times BDD
22 for --
23    A.    That's fine.
24    Q.    Okay. Thanks.
25        Do you hold yourself out as an

1 expert in either suicidal thoughts, behavior
2 or completed suicides?
3     A.    I have published on suicide as
4 an outcome of mental health problems, and I
5 have done some research on that.
6     Q.    Do you hold yourself out as an
7 expert on reading and interpreting fMRI
8 studies?
9     A.    No.
10    Q.    Do you hold yourself out as an
11 expert in dopamine?
12    A.    Again, I don't -- you know,
13 it's not clear to me what an expert in
14 dopamine is. Is it a biochemist you're
15 talking about or is it a neurochemist you're
16 talking about?
17        Are these -- yeah.
18    Q.    Have you done any research on
19 dopamine?
20    A.    I have not.
21    Q.    Have you done any -- do you
22 have any publications on dopamine?
23    A.    I cannot recall.
24    Q.    Have you ever done any
25 assessment of the role of dopamine in

17 (Pages 62 - 65)

CONFIDENTIAL

1  addiction?
2      A.    So I have been involved in
3  research for 30 years and collaborated on
4  projects. I cannot, with certainty, say that
5  I have not. So it's in my CV if there is
6  any.
7      Q.    Okay. But anything that comes
8  to mind today?
9      A.    Not today.
10     Q.    Okay. And there are -- there
11 are people in the addiction field who
12 specialize in addiction and treating
13 addictive disorders, right?
14     A.    Correct.
15     Q.    Are you one of those people?
16     A.    I do not -- I am not an
17 addiction psychiatrist, if your question is
18 that.
19     Q.    And do you hold yourself -- and
20 in terms of the clinical practice that you've
21 had over your career, what percentage of
22 people who you -- who you were the primary
23 doctor for treating a substance abuse
24 disorder or a behavioral addiction?
25     A.    A large proportion, I would

1  say, of any psychiatric population would have
2  a substance use disorder --
3      Q.    Sure.
4            But I'm asking, of that
5  percentage of your patients, which of
6  those -- that percentage that were -- had
7  substance abuse disorder or behavioral
8  addiction, of that patient population, what
9  percentage were you the primary treater for
10 those patients?
11         MS. EMMEL: Objection,
12     compound, speculation.
13     A.    I would say about 30%. I mean,
14 it's just a guess. I don't know if making
15 guesses is -- so I would say about 30% had
16 either primary -- that was their primary
17 problem or secondary problem.
18 BY MR. DAVIS:
19     Q.    And were you the person who was
20 primarily treating them for their psychiatric
21 addiction --
22     A.    Yeah.
23     Q.    -- or disorder or were you
24 referring it out?
25     A.    No, I was --

1          MS. EMMEL: Objection,
2      speculation.
3      A.    Well, I was treating them as
4  primary provider.
5  BY MR. DAVIS:
6      Q.    Have you ever analyzed --
7  strike that.
8            Outside of your work in social
9  media litigation, have you ever analyzed the
10 scientific literature on a topic or issue
11 using the Bradford Hill criteria?
12         MS. EMMEL: Objection, vague.
13     A.    So Bradford Hill criteria are
14 means of establishing or strengthening causal
15 beliefs, so much of my work, my research
16 work, involves exploring causal beliefs or
17 causes of various mental health conditions.
18         So I would say that even if I'm
19 not mentioning Bradford Hill in my
20 publications, I am following his guidelines
21 in spirit.
22     Q.    Now, you're not offering any
23 opinions in this case on the actual design of
24 the defendants' social media platforms, are
25 you? In terms of how they were designed,

1  aspects -- in terms of actual design of what
2  they -- let me back up.
3            You're not offering any
4  opinions in the case about the actual design
5  of the defendants' social media platforms,
6  are you?
7          MS. EMMEL: Objection, compound
8      and vague.
9      A.    Well, actual design, I don't
10 know what exactly is meant.
11 BY MR. DAVIS:
12     Q.    In terms of how the algorithm,
13 how the platform was put together, that's not
14 something you're offering opinions on, are
15 you?
16     A.    I'm not a software engineer, if
17 you're asking that question --
18     Q.    Yeah.
19     A.    -- of what is involved in
20 designing apps.
21     Q.    You haven't been asked in this
22 case and you're not offering any opinions
23 about how the defendants' platforms should be
24 designed differently; is that fair?
25         MS. EMMEL: Objection, vague.

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

1    A.    Again, that should be designed
2  is -- I mean, I have opinions about the harms
3  associated with some of those features, and
4  so when you have an opinion about the harms
5  associated with a feature or algorithm, so
6  you have some opinion about how it should be
7  designed also implied there.
8  BY MR. DAVIS:
9    Q.    Okay.  But you haven't set out
10 in your report in any way any specific design
11 that any of the defendants' platforms should
12 utilize in order to mitigate, reduce or
13 eliminate any mental health outcome; is that
14 fair?
15        MS. EMMEL:  Objection, compound
16    and vague.
17    A.    I have not explicitly advised
18 or opined on how they should change the apps.
19 BY MR. DAVIS:
20    Q.    Okay.  You don't have any
21 opinions also on any of the defendants'
22 conduct or business practices, do you?
23        MS. EMMEL:  Objection.
24    A.    I don't have -- I don't have
25 any opinions on that.

Page 71

1        MS. EMMEL:  Vague.
2  BY MR. DAVIS:
3    Q.    You don't have -- you're not
4  offering any opinions in the case about any
5  warnings that should or should not accompany
6  the use of social media, do you?
7        MS. EMMEL:  Objection, vague
8    and compound.
9    A.    Well, I have opinions about the
10 harms associated with these features, and
11 that implies that there should be warning or
12 those features should be mitigated in some
13 ways.
14 BY MR. DAVIS:
15    Q.    You don't set out in your
16 report in any way what warnings should or
17 should not accompany the use of social media,
18 do you?
19    A.    I do not.
20        MS. EMMEL:  Objection.
21 BY MR. DAVIS:
22    Q.    And you haven't developed
23 yourself any warnings that should or should
24 not be given with respect to social media,
25 have you?

Page 72

1        MS. EMMEL:  Objection, vague
2    and compound.
3    A.    I have not.
4  BY MR. DAVIS:
5    Q.    Okay.  And you're not offering
6  any opinions about the motive of any of the
7  defendants' actions or conduct, are you?
8        MS. EMMEL:  Objection,
9    compound.
10    A.    I might have -- now that I
11 think about it, I might have.  And I talk
12 about some of the features and some of the
13 internal documents that we're talking about
14 specific features that, for example,
15 engagement was given priority over potential
16 harms of some features.
17 BY MR. DAVIS:
18    Q.    Okay.
19    A.    But it has been based on what
20 was stated in the internal reports or --
21    Q.    So your views about any motives
22 that any of the defendants had about aspects
23 or features of social media come from your
24 review of depositions or documents of the
25 companies?

Page 73

1        MS. EMMEL:  Objection,
2    compound, vague.
3    A.    Correct.
4  BY MR. DAVIS:
5    Q.    Okay.  Now, as part of your own
6  research, you don't do work where you
7  actually look at internal company documents
8  or testimony to determine whether or not
9  there's a causal assessment, do you?
10    A.    I don't routinely.
11    Q.    You never have done that
12 outside of -- outside of this litigation,
13 have you?
14    A.    I don't recall having done
15 that.
16    Q.    Right.
17        And is it fair to say that the
18 internal documents and the deposition
19 testimony that you reviewed for your opinions
20 are -- they're not the type of information
21 that you would use as someone who works in
22 observational studies or experimental
23 studies?
24        MS. EMMEL:  Objection, compound
25    and vague.

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

1    A.    There were a number of elements
2  in your question.
3          You said somebody like -- or
4  type of documents somebody like you would
5  use.  So I recall some of my colleagues have
6  used internal depositions of -- in the case
7  of opioid use disorders, at the university
8  where I worked before, at Johns Hopkins, they
9  were using these documents.
10          So it is a legitimate approach
11  to some questions.
12  BY MR. DAVIS:
13    Q.    Let me ask you this:  Outside
14  of litigation, have you ever used internal
15  company documents or deposition testimony to
16  make an assessment of whether or not an
17  exposure results -- has a causal effect on an
18  outcome?
19          MS. EMMEL:  Objection, compound
20    and vague.
21    A.    I do not recall having done
22  that.
23  BY MR. DAVIS:
24    Q.    Nothing comes to mind today,
25  does it?

Page 75

1    A.    It doesn't come to my mind.
2    Q.    And, of course, the internal
3  documents and the deposition testimony, they
4  are not observational studies or RCTs, are
5  they?
6          MS. EMMEL:  Objection,
7    compound.
8    A.    Some of them were observational
9  studies.
10  BY MR. DAVIS:
11    Q.    None of -- let me rephrase.
12          None of the documents that you
13  looked at, none of the deposition testimony
14  that you looked at discussed longitudinal or
15  RCTs, did they?
16          MS. EMMEL:  Objection,
17    compound.
18    A.    I believe -- I mean, I'm vague
19  now, but there might have been experiments
20  like changing features.  I'm not exactly sure
21  right now.
22  BY MR. DAVIS:
23    Q.    What are you referring to where
24  there's some document that changes features
25  that was part of an RCT?

Page 76

1    A.    I have to go back to the report
2  to see if those were reflected in my report
3  or not.
4          But I recall there were some --
5  because not everything I reviewed ended up in
6  my report.
7    Q.    There's no discussion in your
8  report of an internal document or deposition
9  testimony that is an experimental study from
10  an internal company -- from one of the
11  internal company documents, is there?
12          MS. EMMEL:  Objection,
13    compound.
14    A.    I don't recall.  As I said, I'm
15  not exactly sure.  But I have seen in -- I
16  recall in the depositions mention of A-B
17  design manipulations of some features and
18  looking at the impact of those.
19  BY MR. DAVIS:
20    Q.    All right.  When we get to a
21  break, I'm going to ask you what you're --
22  see if you can take a look at that at the
23  break, but let's keep going until then.
24    A.    Sure.
25    Q.    Going back to what you're --

Page 77

1  what you were asked to do, back to page 1.
2    A.    Okay.
3    Q.    Where you were retained by
4  counsel to prepare an expert report on what
5  relationship there is, if any, between social
6  media use and adverse mental health outcomes
7  in adolescents and youth.
8          Do you see that?
9    A.    I have been retained, yes --
10  yes.
11    Q.    Okay.  And you agree that to
12  assess the causal relationship, if any,
13  between social media use and adverse mental
14  health outcomes, you must look at studies
15  that specifically assess social media use and
16  not other forms of screen usage, such as
17  television, smartphones or Internet use,
18  right?
19          MS. EMMEL:  Objection,
20    misstates the report.
21    A.    That is, yeah, my
22  understanding, and I focused my research
23  on -- for this report on social media.
24  BY MR. DAVIS:
25    Q.    And also in order to answer

CONFIDENTIAL

Page 78

1 that question, you must also assess the
2 specific outcome that's being investigated,
3 right?
4    A.    Correct.
5    Q.    And you agree that to assess a
6 particular platform's causal relationship, if
7 any, with an adverse mental health outcome,
8 you must assess the specific platform and the
9 specific mental condition, correct?
10    MS. EMMEL:  Objection, vague
11    and ambiguous, compound.
12    A.    I do not agree with that.  The
13 reason is that it's hard to identify which
14 platform adolescents are using these days.
15    The peer research shows that an
16 average adolescent is using three or more
17 platforms.  And so there are also many
18 similarities in features and algorithms
19 across different platforms.
20    So as a result, you could look
21 at the effect of social media use overall as
22 its -- its association with mental health
23 outcomes.
24 BY MR. DAVIS:
25    Q.    For your causal assessment that

Page 79

1 you did in this case, you didn't separate out
2 each defendant's platform -- each defendant
3 platform to make a causal assessment as to
4 that specific platform, did you?
5    A.    Where there was --
6    MS. EMMEL:  Objection,
7    compound.
8    A.    Where there was literature that
9 allowed me to do that, I tried to do that.
10 BY MR. DAVIS:
11    Q.    No, I understand that you
12 reviewed different literature that had
13 discussed different platforms, but my
14 question was a little bit different, which
15 is: In your causal assessment, you did not
16 separate out each defendant's platforms and
17 make a causal assessment specific to that
18 platform, did you?
19    MS. EMMEL:  Objection,
20    compound.
21    A.    As I said, it's not possible in
22 much of the research to specifically
23 attribute the harms to a specific platform
24 because they are assessing overall use of
25 social media.

Page 80

1 BY MR. DAVIS:
2    Q.    And because of that, you did
3 not separate out each defendant's platform to
4 make a causal assessment for that specific
5 platform?
6    MS. EMMEL:  Objection,
7    compound.
8    A.    As I said, if there were data
9 on separate platforms, I looked at those.
10 BY MR. DAVIS:
11    Q.    Right.
12    But again, I know you looked at
13 data on different platforms, but your causal
14 assessment didn't separate out each
15 defendant's platforms to make a causal
16 assessment, did you?
17    A.    So you're asking, for example,
18 did I say Snapchat is -- meets these
19 criteria.  If there were data, I would have
20 done that.  But -- and I might have attempted
21 to do that.
22    For example, I tried to do that
23 with short video platforms that are
24 associated with social comparison.  So there
25 are places where you can separate specific

Page 81

1 media.
2    Q.    So, for example, you know that
3 there are four defendants in this case,
4 right?
5    A.    Correct.
6    Q.    Right?
7    For example, you didn't take
8 Snap's -- a study specific to Snap or the
9 study specific to TikTok or Meta or YouTube,
10 separate them out and say I'm going to
11 analyze these studies with the specific
12 studies that looked at each specific platform
13 and make a causal assessment?
14    MS. EMMEL:  Objection, compound
15    and vague.
16    A.    Where there were -- I'm not
17 exactly sure where I talk about specific
18 platforms, which I do in the report.  I make
19 specific analysis of this platform is
20 associated, for example -- or is causally
21 related to the outcomes.
22    However, I say that I look at
23 features, specific features of platforms that
24 might be associated with outcomes.
25    For example, I talk about Snap

21 (Pages 78 - 81)

Page 82

1 Maps and how it is contributing to FOMO, and
2 that is associated -- FOMO is fear of missing
3 out.  And that might be associated with
4 mental health outcomes.
5        So I wouldn't say, like, I
6 haven't tried or haven't done this in this
7 report.  There are places that I have done it
8 when data allowed me.
9 BY MR. DAVIS:
10    Q.    Let's look at your Bradford
11 Hill analysis, right?  If you look at
12 pages 77 through 79.
13        That sets out your Bradford
14 Hill analysis with respect to your opinions
15 in the case, right?
16        (Sotto voce document review.)
17    A.    77 to 79, correct?
18 BY MR. DAVIS:
19    Q.    Right.  Those pages set out
20 your Bradford Hill analysis for the case,
21 right?
22    A.    Correct.
23    Q.    And the Bradford Hill analysis,
24 so we're talking about the same thing, is
25 that's a set of -- you call them guidelines,

Page 83

1 other people call them criteria, where --
2 that are used to make causal assessments,
3 right?
4    A.    Correct.
5        MS. EMMEL:  Objection, compound
6    and vague.
7 BY MR. DAVIS:
8    Q.    And with respect to the causal
9 assessment that you made using the Bradford
10 Hill criteria, you did not go through each
11 individual platform or features of a specific
12 platform to analyze those for a causal
13 assessment, did you?
14        MS. EMMEL:  Objection, compound
15    and foundation.
16    A.    At places I did.  For example,
17 on page 78, I say:  Nevertheless, some
18 findings point to specificity of
19 relationship.  For example, the finding that
20 use of more "visual" media has a stronger
21 relationship with body image dissatisfaction.
22        So I think there I'm talking
23 about some of these apps that are more
24 visual.
25        ///

Page 84

1 BY MR. DAVIS:
2    Q.    I think we're miscommunicating.
3 Let me see if I can ask a better question.
4        In your Bradford Hill criteria,
5 you didn't set out an analysis specific to
6 Snap, specific to Meta, specific to TikTok or
7 specific to YouTube, did you?
8        MS. EMMEL:  Objection,
9    foundation and compound.
10    A.    I do not -- I did not because
11 there was not enough data --
12 BY MR. DAVIS:
13    Q.    Okay.
14    A.    -- to do that for each specific
15 app.  And I don't think it is appropriate,
16 even, for the reasons I said.
17    Q.    Okay.  Now, if you look at
18 page 28, second-to-last paragraph in your
19 report, you state that:  The group of most
20 interest to me is adolescents and young
21 adults.
22        Do you see that?
23    A.    Which paragraph on page 28?
24    Q.    Page 28, second-to-last
25 paragraph.

Page 85

1    A.    Second-to-last.
2        The group of most interest to
3 me is adolescents and young -- yes.
4    Q.    Do you see that?
5    A.    Yes.
6    Q.    Now -- and so, by adolescents,
7 what age range is that?
8    A.    Well, I mean, you could -- I
9 don't think there is a clear definition.  For
10 teenage there is, but -- go from 13 to 19.  I
11 would say it's overlapping, yeah, that age
12 group, teenage group.
13    Q.    13 to 19?
14    A.    I would say.
15    Q.    And for young adults, what's
16 that age range?
17    A.    I would go up to 25.
18    Q.    Okay.  Did you assess any age
19 range outside of that -- of those two age
20 ranges?
21    A.    Some of the studies I looked at
22 did not separate the age groups, and reported
23 on a range of age, and some of them I did
24 refer to the studies I referred to.
25    Q.    Let me ask it a different way.

Page 86

1  A.  Okay.
2  Q.  For purposes of a causal
3  assessment, you believe that the 13 to 15 --
4  excuse me.  Strike that.
5       For purposes of a causal
6  assessment, you believe that the most
7  significant age ranges are 13 to 19 and up --
8  and for young adults, up to 25, right?
9       MS. EMMEL:  Objection,
10  foundation, compound, misstates
11  testimony.
12  A.  Can you repeat the question?
13  BY MR. DAVIS:
14  Q.  Sure, I'll ask it again.
15       For making a causal assessment,
16  you believe that the most important age range
17  is 13 to 19 for adolescents, and for young
18  adults, 18 and up to 25?
19       MS. EMMEL:  Same objections.
20  A.  This was my interest group, the
21  group that is, I believe, most vulnerable to
22  the adverse effects of social media.
23  BY MR. DAVIS:
24  Q.  Okay.  And that's why you
25  looked at that specific age range, right?

Page 87

1  A.  Correct.
2  Q.  Okay.  Now, for purposes of --
3  you recognize that a number of the studies
4  you rely upon have study participants that
5  fall outside of those age ranges, right?
6       MS. EMMEL:  Objection, vague.
7  A.  And including those age ranges.
8  And some of them might actually fall outside.
9  BY MR. DAVIS:
10  Q.  Yeah.
11       So nonetheless, despite that,
12  you included them in your analysis, right?
13  A.  I might have, some.
14  Q.  Now, if you look at -- turn to
15  page 73.
16       MS. EMMEL:  We've been going
17  for over an hour, just when --
18       MR. DAVIS:  Yeah, I'm almost
19  wrapped up with a topic, and then we
20  can take a break, if that's okay with
21  you.
22       MS. EMMEL:  All right.
23  BY MR. DAVIS:
24  Q.  You see on page 73 the third
25  paragraph, Dr. Mojtabai, you say:  The topic

Page 88

1  of my report is the association of
2  maladaptive use of social media (excessive
3  use, addictive use, social comparison) with
4  mental health outcomes.
5       Did I read that correctly?
6  A.  Correct.
7  Q.  That is, in fact, the topic and
8  the subject matter of your report, right?
9  A.  Correct.
10  Q.  Okay.  And now, if you look
11  at -- there were several outcomes you looked
12  at, correct?  You looked at depression,
13  anxiety symptoms, correct?
14  A.  Correct.
15  Q.  You looked at suicide, suicidal
16  ideation and attempts, right?
17  A.  Correct.
18  Q.  You looked at body image
19  dissatisfaction or eating disorder symptoms,
20  right?
21  A.  Correct.
22  Q.  You looked at sleep problems,
23  right?
24  A.  Correct.
25  Q.  Are there any others that you

Page 89

1  looked at that you're going to offer an
2  opinion on that there's a causal
3  relationship?
4       MS. EMMEL:  Objection, vague.
5  A.  I'm thinking to -- if there are
6  other outcomes that I probably mention or
7  discuss, but those are the main outcomes.
8  BY MR. DAVIS:
9  Q.  Any others come to mind?
10  Because I just want to make sure I leave here
11  with a complete list.
12       Any others that you know of?
13       MS. EMMEL:  Objection, vague.
14  A.  To the extent that social
15  comparison is distressful by itself, that
16  also comes to mind.
17       Also you mentioned depression.
18  Much of this research on depressive symptoms
19  overlap or are used synonymously,
20  internalizing symptoms.  So that, I also want
21  to make a point about.
22  BY MR. DAVIS:
23  Q.  Other than internalizing
24  symptoms or social comparisons, any others
25  that I need to add to the list?

23 (Pages 86 - 89)

Page 90

1    MS. EMMEL: Objection, vague.
2    A.    Doesn't come to my mind right
3  now.
4  BY MR. DAVIS:
5    Q.    Okay.  You didn't include
6  well-being, like general well-being, because
7  you thought that was too loose of a
8  definition?
9    MS. EMMEL: Objection,
10  foundation.
11    A.    That was one reason.  It is not
12  very clearly defined.  It could be
13  satisfaction with life.  I've seen different
14  definitions in different -- in different
15  reports.
16    And also, another reason is
17  that my focus was on mental health -- adverse
18  mental health outcomes, so I mostly focused
19  on those outcomes you mentioned.
20    I may have mentioned a study
21  that looked at well-being, but I don't think
22  many.
23  BY MR. DAVIS:
24    Q.    You mentioned earlier FOMO or
25  fear of missing out, right?

Page 91

1    A.    Right.
2    Q.    That's not a psychiatric
3  disorder, is it?
4    A.    No, it's not.
5    MS. EMMEL: Objection, vague.
6  BY MR. DAVIS:
7    Q.    All right.  With respect to --
8  if you look at page 5 -- look at Section 5.5.
9  That's on page 39.
10    A.    Yes.
11    Oh, can I make an addition?
12  One of the things I don't know if you
13  mentioned it was addictive use of social
14  media as an outcome.  Was it in your list?
15    Q.    Okay.  Your view is that the
16  addictive nature of social media leads to
17  these different mental health outcomes,
18  right?
19    MS. EMMEL: Objection,
20  foundation.
21    A.    As well as addictive use of
22  social media itself.  The features lead to
23  addictive use.  Addictive use could lead to
24  other problems or excessive use of social
25  media itself could lead to adverse mental

Page 92

1  health outcomes.
2  BY MR. DAVIS:
3    Q.    So in terms of addictive use
4  that doesn't lead to -- help me out here.
5    I think you agree with me that
6  your view is that addictive use of social
7  media leads to these different mental health
8  outcomes that we just talked about, right?
9    MS. EMMEL: Objection,
10  foundation, vague.
11    A.    That could contribute to that,
12  yes.
13  BY MR. DAVIS:
14    Q.    Okay.  And so outside of those,
15  show me in your -- where in your report do
16  you discuss other mental health outcomes that
17  result from what you view as addictive use?
18    MS. EMMEL: Objection, vague.
19    A.    I think where I talk about
20  addictive use, I talk about relationship of
21  addictive use or problematic use.  These two
22  terms are used interchangeably in the
23  literature -- and their association with
24  depressive symptoms or anxiety symptoms or
25  internalizing symptoms.  I do believe that I

Page 93

1  do that.
2    And in my research in my 2024
3  paper, I look at both amount of use as for
4  less problematic use contributing to
5  internalizing symptoms.
6  BY MR. DAVIS:
7    Q.    I'm going to unpack that answer
8  a little bit because it was helpful --
9    A.    Sure.
10    Q.    -- to me to understand where
11  you're coming from.
12    A.    Sure.
13    Q.    Your view is that problematic
14  social media use is the same as social media
15  addiction, right?
16    MS. EMMEL: Objection,
17  misstates testimony.
18    A.    What I said is that different
19  reports use different terms, and some -- some
20  of the literature identifies problematic use
21  as a less severe form of addictive use, but
22  it's not consistent.
23  BY MR. DAVIS:
24    Q.    You're using the term "social
25  media addiction" to be synonymous with

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

1  problematic social media use?
2       MS. EMMEL: Objection,
3    misstates testimony.
4       A.   I use it interchangeable with
5  addictive use of medication -- of social
6  media.
7  BY MR. DAVIS:
8       Q.   Okay. So other than depressive
9  or anxiety symptoms resulting from addictive
10  use of social media, do you identify any
11  other mental -- any other outcomes that you
12  connect addiction with?
13       MS. EMMEL: Objection, vague.
14       A.   Can you rephrase your question?
15  BY MR. DAVIS:
16       Q.   Right.
17       In your report, other than
18  anxiety symptoms and depressive symptoms --
19       A.   Right.
20       Q.   -- do you identify any other
21  outcomes, health outcomes that result from
22  what you say is social media addiction?
23       MS. EMMEL: Objection, vague.
24       A.   I don't exactly recall, but it
25  might be -- I have to look at the report --

Page 95

1  where I talk about dissatisfaction with body
2  shape, dissatisfaction with body also being
3  related to addictive use.
4  BY MR. DAVIS:
5       Q.   Anything else?
6       A.   I talk about academic outcomes
7  also being related to addictive use.
8       Q.   Anything else?
9       MS. EMMEL: Objection, vague.
10       A.   And those come to my mind.
11  BY MR. DAVIS:
12       Q.   Anything else I need to add to
13  the list?
14       MS. EMMEL: Objection, vague.
15       A.   I'm thinking about others that
16  might be.
17       I have to look at the suicidal
18  ideations; that might be also another that I
19  have talked about.
20  BY MR. DAVIS:
21       Q.   Okay.
22       A.   I have to look again.
23       Q.   Got that one now on the list.
24       What others?
25       MS. EMMEL: Objection, vague.

Page 96

1       A.   You may want to add that to the
2  list of the outcomes that I'm discussing in
3  my report also, suicidal ideations.
4       I can't think of any at this
5  time.
6  BY MR. DAVIS:
7       Q.   Okay. If you look at
8  section -- page 39, 5.5 --
9       A.   Yes.
10       Q.   -- you say -- sorry.
11       Page 42 -- sorry, I'm on the
12  wrong page. Page 42, 5.6.1 of your report.
13       A.   Yes.
14       Q.   Okay. You state that, in the
15  header: Unhealthy use of social media may be
16  related to body dysmorphic disorder and
17  eating disorders.
18       Do you see that?
19       A.   Yeah.
20       Q.   I just want to be clear: Is it
21  your opinion to a reasonable degree of
22  medical or scientific probability that social
23  media causes body dysmorphic disorder or any
24  eating disorder?
25       MS. EMMEL: Objection, vague,

Page 97

1    compound.
2       A.   It is a substantial
3  contributing factor or cause.
4  BY MR. DAVIS:
5       Q.   And when you're using the term
6  "substantial contributing factor or cause,"
7  what does that mean to you?
8       A.   That means that meaningful
9  relationship exists. More likely than not,
10  this is contributing to outcomes for a
11  sizable group of people in the population
12  that is impacted.
13       Q.   When you say more likely than
14  not, what percentage is that?
15       MS. EMMEL: Objection, vague.
16       A.   I can't put percentages on
17  that. It's context dependent. Because let's
18  say an exposure is, like, all adolescents in
19  the United States are using them, then the
20  effect would be magnified by the number of
21  people who are exposed, so...
22  BY MR. DAVIS:
23       Q.   Is it fair to say that for a
24  substantial contributing factor or cause, you
25  can't put a percentage on what that is in

25 (Pages 94 - 97)

CONFIDENTIAL

1  terms of zero to a hundred in terms of an
2  impact that it's having on a population of
3  people; is that fair?
4      MS. EMMEL: Objection, vague,
5      speculation, compound.
6      A.   Well, zero to a hundred is a
7  very broad range. You would need -- zero
8  means no impact, 100% means that everybody
9  who is exposed experiences the outcome and
10 nobody who does not experience the outcome
11 is -- who experiences the outcome is not sort
12 of among those who are not exposed.
13     So those are very extremes, but
14 that includes everything.
15 BY MR. DAVIS:
16     Q.   And I'm asking you: On a
17 population basis --
18     A.   Right.
19     Q.   -- using the term "substantial
20 contributing factor or cause," where does
21 social media fall in terms of zero to a
22 hundred percent for causing any mental health
23 outcome?
24     MS. EMMEL: Objection, vague,
25     speculation, compound.

1      A.   I believe I do make some
2  calculations in the report that give a sense,
3  at least one -- and that's on page 39. I do
4  make some calculations for the odds ratio of
5  1.55. So some research would suggest the
6  odds ratio is about that.
7  BY MR. DAVIS:
8      Q.   And I'm not asking about some
9  research. I'm asking for your overall
10 opinion.
11     When you're using the term
12 "substantial contributing factor or cause" as
13 it relates to social media causing or having
14 some effect on a population of people, can
15 you say it falls within this range or that
16 range?
17     MS. EMMEL: Objection, vague,
18     speculation, compound.
19     A.   I cannot, but I cannot say this
20 is the exact number because it's context
21 dependent.
22 BY MR. DAVIS:
23     Q.   So, for example, if I said,
24 Dr. Mojtabai, I want you to put that number
25 somewhere between zero and a hundred percent,

1  could you put it anywhere on that scale?
2      A.   Between zero and a hundred
3  percent? I would say show me the evidence,
4  show me the study that has been done and
5  let's compute the odds ratio, let's compute
6  the Pearson's correlation and let's see what
7  is the extent of prevalence of exposure to
8  that outcome.
9      Then we decide if it's an
10 important factor or not.
11     Q.   But I'm asking you in terms of
12 how you use the term "substantial
13 contributing factor or cause," okay? Because
14 that's your overall opinion in the case, is
15 that there's -- that that has been shown with
16 the scientific evidence with respect to
17 social media and different mental health
18 outcomes, right?
19     MS. EMMEL: Objection, vague,
20     asked and answered.
21     A.   I said it's context dependent.
22 So you have to give me all those parameters,
23 and I say it's a substantial factor or not.
24 BY MR. DAVIS:
25     Q.   I'm asking you for any mental

1  health outcome that you identify in your
2  report that you connect up with social media,
3  where do you put social media on the scale
4  between zero and a hundred?
5      MS. EMMEL: Objection, asked
6      and answered multiple times.
7      A.   Yeah, I believe this is coming
8  from my own research, page 39. I do believe
9  that is a substantial cause -- causal factor
10 based on these calculations.
11     Now, if you are talking about a
12 different outcome, a different exposure, a
13 different population, my response would be
14 different.
15 BY MR. DAVIS:
16     Q.   Does substantial contributing
17 factor or cause mean to you 30%?
18     MS. EMMEL: Objection.
19 BY MR. DAVIS:
20     Q.   40%, 70%? What does it mean to
21 you?
22     MS. EMMEL: Objection,
23     compound, asked and answered.
24     A.   Context dependent.
25     ///

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

1  BY MR. DAVIS:
2      Q.   You can't answer that today?
3          MS. EMMEL: Objection,
4  misstates testimony.
5      A.   I cannot -- I cannot put a
6  specific number without knowing the context.
7  BY MR. DAVIS:
8      Q.   I'm talking about the context
9  is your overall opinion in the case.  That's
10  the context.
11         Can you put a number on it
12  using that as the context?
13         MS. EMMEL:  Objection, asked
14  and answered.
15      A.   So this study is based on
16  exposure to social media in more than three
17  hours of social media and more than six hours
18  of social media, and then looks at
19  internalizing symptoms in US adolescents.
20         And so that's why I did the
21  computation, because if I knew beforehand
22  that there is a number, let's say, an odds
23  ratio of 2 means substantial, or an odds
24  ratio of 1.1 means substantial, then I
25  wouldn't do the computations.

Page 103

1          I do the computations to show
2  the impact, the population impact of that.
3  BY MR. DAVIS:
4      Q.   What's the study you're
5  referring to, Dr. Mojtabai?
6      A.   That's at page 39.  That's the
7  study that Riehm and I were involved in and
8  looked at the more than three hours per day
9  of social media use and also six and more.
10  And then we -- I took those numbers and did
11  the computations.
12         Based on that, came up with a
13  number, so number, percentage, what you may
14  call percentage.
15         What percent more people would
16  be -- it's 9.1% more of adolescents if they
17  use more than three hours, versus less than
18  three hours, would experience severe
19  internalizing symptoms.
20      Q.   Yeah.  But I'm not asking about
21  specifics today.  I'm asking about after
22  you've looked at every piece of data that you
23  have available to you in this case, and
24  you've come to the conclusion that social
25  media is a substantial contributing factor or

Page 104

1  cause --
2      A.   Right.
3      Q.   -- to different mental health
4  outcomes and addiction, and my question to
5  you is -- that's your opinion.  Where on the
6  scale between zero and a hundred percent do
7  you place the percentage with scientific
8  certainty?
9          MS. EMMEL:  Objection.
10  Counsel, the questioning is becoming
11  harassing, so object on harassment and
12  asked and answered.
13      A.   Again, it depends.  I repeat my
14  answer:  Depends on the outcome and the
15  exposure, the population prevalence of the
16  exposure.
17  BY MR. DAVIS:
18      Q.   Can you give me a percentage
19  today?
20      A.   I cannot.
21         MS. EMMEL:  Objection, asked
22  and answered.
23         MR. DAVIS:  All right.  Let's
24  take a break.
25         THE VIDEOGRAPHER:  All right.

Page 105

1  We're off the record at 10:35 a.m.
2  That's the end of Media 1.
3          (Recess taken, 10:35 a.m. to
4  10:50 a.m. CDT)
5          THE VIDEOGRAPHER:  We're back
6  on the record at 10:50 a.m.  This is
7  the beginning of Media 2.
8  BY MR. DAVIS:
9      Q.   Dr. Mojtabai, are you ready to
10  continue?
11      A.   Yes.
12      Q.   Great.  Okay.
13         If you can look at Exhibit 5,
14  which is your expert report.  You understood
15  as part of you participating as an expert in
16  the litigation that you had to do a written
17  report, right?
18      A.   Yes.
19      Q.   And you understood that the
20  purpose of the report was to allow the
21  defendants to know what your opinions were
22  and the bases of those opinions, right?
23         MS. EMMEL:  Objection,
24  speculation.
25         Also just, for the record, the

27 (Pages 102 - 105)

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 106

1    May report is the operative report as
2    it's a supplemental report to the
3    April 18th report, which is marked as
4    the exhibit.
5        A.    I also like that, because it
6    has numbering before --
7    BY MR. DAVIS:
8        Q.    Let me ask you this,
9    Dr. Mojtabai.  Let's focus on -- go back to
10   my question.
11       You understood the purpose for
12   doing a report in the case was -- the purpose
13   was to set out your opinions that you would
14   offer at trial and also so that the
15   defendants could know what your opinions were
16   and the bases for them, right?
17       MS. EMMEL:  Objection,
18   foundation, misstates testimony.
19       A.    Can you rephrase it, please.
20   BY MR. DAVIS:
21       Q.    Sure.
22       You understood that the purpose
23   of the report was to set out your opinions
24   and the bases for them, right?
25       MS. EMMEL:  Objection,

Page 107

1    misstates testimony.
2        A.    It is to reflect my views and
3    opinions based on the totality of evidence.
4    BY MR. DAVIS:
5        Q.    Right.
6        And it's also to reflect your
7    opinions based upon the material you reviewed
8    and what you reviewed, right?
9        MS. EMMEL:  Objection.
10       Counsel, let's go off the
11   record for a second.  I'd like to
12   discuss the questioning.
13       MR. DAVIS:  I'm not agreeing to
14   go off.
15       Dr. Mojtabai, can you answer my
16   question?
17       MS. EMMEL:  Objection, this is
18   not -- this is not a line of
19   questioning for the witness to answer.
20   He does not -- he does not understand
21   the legal proceedings.
22       MR. DAVIS:  I'm just asking for
23   his understanding.  I don't think
24   that's controversial.
25       MS. McNABB:  We can have the

Page 108

1    witness step out of the room, but I
2    think this is a point of clarification
3    that counsel needs to address without
4    the -- we can have Dr. Mojtabai step
5    out.
6        MR. DAVIS:  That's fine.  Okay.
7    Let's go off the record.
8        THE VIDEOGRAPHER:  All right.
9    We're off the record at 10:53 a.m.
10   That's the end of Media 2.
11       (Recess taken, 10:53 a.m. to
12   10:56 a.m. CDT)
13       THE VIDEOGRAPHER:  We're back
14   on the record at 10:56 a.m.  This is
15   the beginning of Media 3.
16   BY MR. DAVIS:
17       Q.    Dr. Mojtabai, you're back.  Are
18   you ready to continue?
19       A.    Yes.
20       Q.    Awesome.  All right.  I'm going
21   to pick up where I left off.
22       Exhibit 5 is your April 18,
23   2025 report, right?
24       A.    Correct.
25       Q.    Now, your understanding was you

Page 109

1    had to do a written report for the case,
2    right?
3        MS. EMMEL:  Objection,
4    foundation.
5        A.    Yes.
6    BY MR. DAVIS:
7        Q.    Right.
8        And you understood that the
9    purpose was for you to set out your opinions
10   and the materials that you were using to rely
11   on -- to form those opinions, right?
12       MS. EMMEL:  Objection,
13   foundation, vague.
14       A.    So some of the materials I
15   relied on, those are the empirical studies.
16   There are some internal documents that I also
17   considered, but my opinions rely on the
18   empirical evidence that comes from published
19   literature.
20   BY MR. DAVIS:
21       Q.    Right.
22       And just so I'm understanding
23   what you're saying, when you put together
24   your report for the case, you set out the
25   literature and whatever documents that you

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

1  had reviewed and considered to form your
2  opinions, right?
3          MS. EMMEL:  Objection,
4      compound.
5      A.   Yes, I considered some evidence
6  and relied on some other.
7  BY MR. DAVIS:
8      Q.   Right.
9          And your -- when you finished
10  that report on April 18, 2025, you considered
11  that that -- those were what your opinions
12  were going to be in the case, right?
13          MS. EMMEL:  Objection, vague,
14      compound.
15      A.   So literature in this area is
16  evolving very fast, so I didn't consider that
17  to be, you know, my ongoing opinion on the
18  case.
19  BY MR. DAVIS:
20      Q.   All I'm asking for:  When you
21  finished that report, it reflected your
22  opinions as of April 18, 2025, right -- or --
23  yeah, April 18, 2025, right?
24      A.   Yeah.
25      Q.   And so the opinions that you --

Page 111

1  anything in that report, other than typos,
2  that you want to change?
3          MS. EMMEL:  Objection.
4          He has submitted a supplemental
5      report since this report.  That
6      question is not -- is not accurate,
7      and it misrepresents the nature of
8      this report.  This is an old report.
9  BY MR. DAVIS:
10      Q.   Dr. Mojtabai, my question
11  stands:  Anything from that April 18, 2025
12  report that you think is inaccurate and you
13  want to change, other than typos?
14          MS. EMMEL:  Objection.  This
15      report has been changed.  Misstates
16      the situation of -- and the nature of
17      this report.  This is not a current
18      report.
19      A.   And I believe there were some
20  calculations that had minor errors and I
21  corrected them in more recent --
22  BY MR. DAVIS:
23      Q.   Other than that, anything else
24  you -- you want to tell me that you want to
25  change from your April 18, 2025 report or

Page 112

1  other opinions that you have?
2          MS. EMMEL:  Objection.  This is
3      harassing, and at this point it's
4      clearly misleading.  It's referring to
5      the wrong report as the current
6      report.
7      A.   Yeah, I think -- I don't know.
8  I have to compare, put them on a Word
9  document -- Word software and see what are
10  the changes, because there might have been
11  minor changes, edits, rewordings, moving
12  parts.
13          So -- so it doesn't have the
14  same structure as the May, and that's why
15  we -- I drafted the May report.
16  BY MR. DAVIS:
17      Q.   Yeah.  The May report, the
18  May 2025 report, did you draft that for the
19  federal litigation?
20      A.   So I have to make this
21  clarification:  In my mind, they are the
22  same, because I know that the litigation
23  might be different.  The courts might be
24  different.  If you notice, I was reimbursed
25  for work on both at the same time.

Page 113

1          I was working on one report.  I
2  wasn't preparing a separate report for
3  federal versus state.
4      Q.   I'll ask it this way.
5          Other than the April 2025
6  report and the May 2025 report that you
7  authored, is there any other opinions that
8  you have in the case?
9          MS. EMMEL:  Objection, vague.
10      A.   Well --
11          MS. EMMEL:  Foundation.
12      A.   -- I think, as you saw, there
13  is some material considered since May, and so
14  some of those studies, one of them
15  specifically stands in mind -- so supported
16  some of my views.  So there are that changing
17  support level for my opinions, so...
18  BY MR. DAVIS:
19      Q.   I'm only asking if there's
20  anything from the April -- is there any
21  opinion that's not in the April or the
22  May 2025 report that you authored?
23          MS. EMMEL:  Objection, asked
24      and answered.
25      A.   I can't recall except for the

Golkow Technologies,
A Veritext Division

Page 114

1 fact that there is some of the new evidence
2 might have modified, strengthened or weakened
3 some of my earlier opinions.
4 BY MR. DAVIS:
5     Q.    Of the -- let's separate out
6 the -- like, anything that was published
7 after your April 2025 report, okay?  Let's
8 separate that out for the next question.
9         Any opinion -- if we separate
10 that out -- separate that out, is there any
11 new opinions or different opinions that you
12 have from the April 2025 report?
13        MS. EMMEL:  Objection, asked
14     and answered.
15     A.    I have to clarify.  You said --
16 mentioned published.  Some of these papers
17 that were considered since May are published
18 earlier.  I found them later or I looked at
19 them again and changed my mind.
20 BY MR. DAVIS:
21     Q.    Okay.  Other than what's in
22 your April 2025 report and your May 2025
23 report, are there any other opinions that you
24 would offer at the trial of this case?
25        MS. EMMEL:  Objection, asked

Page 115

1     and answered, exact question,
2     harassing.
3     A.    So your question is about the
4 trial, the trial that I don't know when it's
5 going to happen, but it's in future?
6         I'm sure this is a very
7 fast-evolving field, and there is new
8 research coming out all the time, and I
9 cannot, you know, speculate about what my
10 opinion would be.
11 BY MR. DAVIS:
12     Q.    I'll rephrase the question.
13     A.    Okay.
14     Q.    Sitting here today, other than
15 what's in the April 2025 report and the
16 May 2025 report, are there any other opinions
17 that you have in the case?
18        MS. EMMEL:  Asked and answered,
19     harassing the witness.
20     A.    No.
21 BY MR. DAVIS:
22     Q.    Okay.  Now, if you have an
23 experimental or an observational study and
24 you assess all eating disorders combined,
25 does that study tell you whether or not there

Page 116

1 is an increased risk for any individual
2 eating disorder?
3     A.    Again, it's an empirical
4 question for different disorders.  I can only
5 make this comment, that there is considerable
6 overlap between eating disorders, and so that
7 would suggest to me that there is good chance
8 that all of those disorders -- good chance
9 means that there's high probability that all
10 of those disorders have changed.
11        You're talking about trends
12 over time, I assume.
13     Q.    So in your view, you can take a
14 study of bulimia, anorexia or ARFID,
15 A-R-F-I-D, and binge eating disorder, put
16 them all together, and that study would tell
17 you that there's an increased risk for every
18 individual eating disorder?
19        MS. EMMEL:  Objection,
20     misstates testimony, compound.
21     A.    I'm not sure -- if you have
22 them separately, you could put them
23 separately.  The way you said it implies that
24 you have data on individual disorders.
25        So you could put them all

Page 117

1 together, analyze them, make a comment about
2 trends in eating disorders.  You can then
3 analyze them separately and say that the
4 trends were similar across most disorders
5 but, for example, one of those disorders,
6 anorexia nervosa, for example, did not follow
7 that general trend.
8 BY MR. DAVIS:
9     Q.    Do you agree that the better
10 practice is not to group all eating disorders
11 together in an observational or experimental
12 study, but rather to separate them out and
13 study them individually?
14        MS. EMMEL:  Objection,
15     compound, vague --
16     A.    What is -- I mean, I have to
17 ask for explaining to me what better means in
18 this context.
19 BY MR. DAVIS:
20     Q.    More reliable.
21     A.    Reliability means that the --
22 what you're doing can be repeated later on.
23 That's what you mean?
24     Q.    No, more -- is it -- let me
25 just -- I've got a different question.

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

1    A.    Okay.
2    Q.    Is it your opinion that if you
3  take all eating disorders and you put them
4  together in a single study, that -- and you
5  just do a combined outcome for all eating
6  disorders combined, does that give you
7  reliable scientific data to say that whatever
8  the exposure is, that it's increasing each
9  individual eating disorder?
10        MS. EMMEL: Objection, vague,
11    calls for speculation.
12    A.    You can say that eating
13  disorders are increasing, and if the
14  prevalence of each eating disorder is very
15  low, then I would argue that the better
16  approach is to combine them. Because it
17  gives you exactly what you said, more
18  reliable estimates in terms of accuracy and
19  precision of estimate of the temporal trends
20  for any risk factors.
21  BY MR. DAVIS:
22    Q.    When you take all eating
23  disorders combined and you put them in a
24  single study and measure that as the single
25  outcome measure for an exposure --

Page 119

1    A.    Right.
2    Q.    -- that study doesn't tell you
3  anything in a reliable way about individual
4  risks for individual eating disorders, does
5  it?
6        MS. EMMEL: Objection,
7    speculation, vague, compound.
8    A.    To the extent that eating
9  disorders share commonalities and they do
10  merge together, morph together, we know that
11  for bulimia disorder and binge disorder, for
12  example, there is a lot of back-and-forth.
13  People sometimes have the purging, sometimes
14  they don't have the purging.
15        For an epidemiological study,
16  we often do that. We don't look at
17  individual studies because the prevalence in
18  the community might be too low. We talk
19  about prevalence of eating disorders.
20        If you go to the literature,
21  you will see epidemiological studies of
22  eating disorders, and whether or not it
23  applies to individual studies is a different
24  question.
25        ///

Page 120

1  BY MR. DAVIS:
2    Q.    Prevalence is different from
3  incidence, right?
4    A.    Prevalence is different from
5  incidence.
6    Q.    Incidence tells you whether or
7  not there are new cases --
8    A.    Right.
9    Q.    -- of a certain disorder or
10  disease after an exposure, right?
11    A.    Right.
12        MS. EMMEL: Objection,
13    compound.
14  BY MR. DAVIS:
15    Q.    Incidence, not prevalence,
16  tells you whether or not there's an increased
17  risk in a population that you're studying,
18  right?
19    A.    No, it's not correct what you
20  said. Incidence tells you about rate. It's
21  not a measure of risk.
22    Q.    Okay. We'll talk about that.
23        Dr. Mojtabai, you put in
24  your -- any of the studies that you put in
25  your report, do you disagree with any of the

Page 121

1  findings?
2        MS. EMMEL: Objection, vague.
3    Does not clarify which report is being
4    referred to.
5  BY MR. DAVIS:
6    Q.    Any of them.
7    A.    Well, again, disagree with any
8  of the findings? What is -- there is --
9  there are two different parts to your
10  question. Can you please clarify?
11    Q.    Sure.
12    A.    One is I disagree with the way
13  they analyzed the data, I disagree with their
14  analysis reports, I disagree with
15  interpretation of the results, I disagree
16  with the implications they're drawing from
17  those -- can you...
18    Q.    Let me ask it a different way.
19        The studies that you rely upon,
20  you accept them as they are, whatever
21  methodological design or limitations that
22  they have, right?
23        MS. EMMEL: Objection, vague,
24    foundation.
25    A.    What's accept --

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

1  accepting is --
2  BY MR. DAVIS:
3      Q.    Not accepting.  Let me ask it a
4  different way.
5          The studies that you rely upon
6  have limitations in them, right?
7      A.    Every research study has
8  limitations.
9      Q.    And the limitations that are
10 identified in the studies are something that
11 you have to take into consideration and
12 factor in and accept when evaluating their
13 impact into a causal assessment, right?
14     A.    Accept -- I mean, there are so
15 many different parts of it in what you said,
16 and the last one was accept.  I'm not sure
17 what acceptance means.
18     Q.    I'll rephrase it.  I'll take
19 out the word "accept."
20         The limitations that are
21 identified in the studies are something that
22 you have to take into consideration and
23 factor in when evaluating their impact for a
24 causal assessment, right?
25         MS. EMMEL:  Objection,

Page 123

1      compound, vague.
2      A.    I think you have to consider
3  every part of the study, limitations as well
4  as the strengths in assessing.  And so it
5  is -- again, it's case by case.  Some studies
6  have more strengths, some have more
7  limitations.  Some the design is more limited
8  in contributing to causal understanding, and
9  so some more -- so there are nuances.  It's
10 not a...
11 BY MR. DAVIS:
12     Q.    You use the DSM-5 in your
13 clinical practice?
14     A.    I do.
15     Q.    And you agree that it's the
16 authoritative source for assessment of
17 treatment and diagnosis of psychiatric
18 disorders?
19         MS. EMMEL:  Objection, vague,
20     foundation.
21     A.    Again, authoritative source has
22 to be clarified.  There are conditions that
23 are not in DSM-IV, were added to DSM-5.
24 150 disorders were added to DSM-5.  So
25 "authoritative" here becomes a little bit --

Page 124

1  BY MR. DAVIS:
2      Q.    The current DSM-5, you're
3  currently using the DSM-5-TR, right?
4      A.    Correct.
5      Q.    Right?
6          And you consider that to be a
7  reliable source of information for the
8  treatment and diagnosis of psychiatric
9  disorders, fair?
10         MS. EMMEL:  Objection, vague,
11     compound.
12     A.    It doesn't provide guidance for
13 treatment.  It provides -- it's an index of
14 diagnoses that have been recognized to the
15 time -- to the time of when it was published
16 in 2013.
17 BY MR. DAVIS:
18     Q.    Social media addiction is not
19 recognized as a psychiatric disorder or
20 disorder of any kind in DSM-5-TR, is it?
21     A.    It's not included among the
22 disorders that are categorized, but --
23     Q.    I'm sorry, I couldn't hear you.
24     A.    It's not categorized among the
25 disorders in DSM-5.

Page 125

1      Q.    That are recognized?
2      A.    That are included in DSM-5.
3  "Recognized" is a -- again, a loaded word.
4      Q.    DSM-5 does not have a diagnosis
5  of social media addiction, does it?
6      A.    That's a better question.  It
7  doesn't.
8      Q.    Right.
9          ICD, whatever version of ICD,
10 right -- which is the International
11 Classification of Disease, right?
12     A.    Right.
13     Q.    The ICD doesn't have a
14 recognized diagnosis of social media
15 addiction, does it?
16     A.    ICD does not either.
17     Q.    Okay.  Do you know -- and you
18 use ICD even today in assess -- in diagnosing
19 patients, right?
20     A.    Yeah, it is used.  ICD-10 now.
21     Q.    Okay.  There's no formal
22 diagnostic criteria that's been generally
23 accepted for what you call social media
24 addiction, is there?
25         MS. EMMEL:  Objection, vague,

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

1    compound.
2        A.    Again, there, "generally
3    defined" is a vague statement.  There are
4    different criteria proposed, and they overlap
5    quite a bit.  There are some major
6    commonalities among these criteria proposed.
7    BY MR. DAVIS:
8        Q.    There's no diagnostic criteria
9    for social media addiction that has been
10   formally accepted or adopted by any
11   psychiatric organization, true?
12           MS. EMMEL:  Objection, asked
13       and answered.
14       A.    I believe that the Chinese
15   classification of diseases has a social
16   media -- an Internet addiction category.
17   BY MR. DAVIS:
18       Q.    Okay.  They don't have a social
19   media addiction category, do they?
20       A.    Not to my knowledge.
21       Q.    All right.  So let's go back to
22   my question.
23           There's no diagnostic criteria
24   for social media addiction that has been
25   formally accepted or recognized by any

Page 127

1    psychiatric organization, true?
2            MS. EMMEL:  Objection, asked
3        and answered, vague.
4        A.    Again, I have to clarify.
5    These are not set in stone.  The criteria
6    evolve between DSM-IV, DSM-5, a hundred
7    new -- 150 new disorders were added.
8            If you go to the section of the
9    gaming disorder, which is conditions to be
10   considered for future in the DSM-5, in the
11   part they talk about suicidal ideation, they
12   mention nongaming disorder problems,
13   pathological use of Internet.
14           So they -- it is implied.  It
15   is there.  But it's -- and it may be in the
16   future versions of the DSM.
17   BY MR. DAVIS:
18       Q.    Okay.  Just try to stay with my
19   question, Dr. Mojtabai.  I know you're trying
20   to help, but...
21           There's no diagnostic criteria
22   for social media addiction that has been
23   formally accepted or recognized by any
24   psychiatric organization, true?
25           MS. EMMEL:  Objection, asked

Page 128

1    and answered, vague.
2        A.    To my knowledge, no.
3    BY MR. DAVIS:
4        Q.    Would you agree that there's
5    not even general consensus about what
6    criteria should or should not be included
7    within what you call social media addiction?
8            MS. EMMEL:  Objection, vague
9        and ambiguous, compound.
10       A.    I believe there is quite a bit
11   of consensus about what should be included in
12   those criteria.
13   BY MR. DAVIS:
14       Q.    Okay.  And what's the basis?
15   What source are you referring to?
16       A.    I'm referring to what's
17   published regarding Bergen Instruments --
18   Social Media Addiction Scale, and even I saw
19   a paper published by Chen that was media -- I
20   think it's -- they work for Meta, using
21   Meta data, and they are proposing some
22   criteria that have overlapped with the
23   Bergen, with the addiction, with the Social
24   Media Addiction Scale.
25           So there is quite a bit of

Page 129

1    overlap.
2        Q.    There's no consensus yet, no
3    agreement upon professionals about what
4    diagnostic criteria should or should not be
5    included in social media addiction, right?
6            MS. EMMEL:  Objection, vague
7        and ambiguous.
8        A.    Yeah, I don't know what that
9    means, what consensus among professionals.
10   There are people who look at the evidence and
11   believe that there is quite a bit of overlap,
12   and there is consensus that loss of control,
13   overuse, salience, preoccupation with the
14   device, giving up activities, other
15   activities, essential activities of life.
16           These are elements of addictive
17   use that are common across these different
18   instruments and different definitions that
19   have been proposed.
20   BY MR. DAVIS:
21       Q.    There is debate within the
22   scientific community about whether or not
23   social media addiction is a real diagnosis,
24   right?
25           MS. EMMEL:  Objection, asked

33 (Pages 126 - 129)

Page 130

1    and answered, vague.
2        A.    There's debate about everything
3    in scientific community.  That's the whole
4    point of science.  People talk.  We have new
5    literature coming, new studies coming
6    supporting points, and that is how each one
7    of those disorders that are included in DSM-5
8    and ICD-11, they're added, by -- not
9    everybody agreed, not everybody still agrees
10   on some of those definitions, but it's based
11   on the accumulated evidence over time.
12   BY MR. DAVIS:
13       Q.    Yeah, I'm not asking about
14   something general.
15       A.    I know.
16       Q.    I'm very specific in my
17   question, which is:  There is debate within
18   the scientific community about whether or not
19   social media addiction is a real diagnosis or
20   not, true?
21           MS. EMMEL:  Objection, asked
22       and answered, vague.
23       A.    The majority of people who work
24   on social media -- problematic use of social
25   media research, I would say in psychology/

Page 131

1    psychiatry-related fields, epidemiology, they
2    would agree that there is a construct of
3    problematic use of social media that includes
4    those elements I was mentioning.
5    BY MR. DAVIS:
6        Q.    Yeah.  There are people who
7    believe that social media addiction exists
8    and there's people, scientists in the field,
9    who believe it doesn't exist, right?  It
10   hasn't been established, right?
11           MS. EMMEL:  Objection, asked
12       and answered.
13       A.    I believe there is a minority
14   that still may argue about the existence.
15   There might be some debate about what
16   specific criteria are included, but there is
17   a majority who believe that there is such a
18   construct.
19   BY MR. DAVIS:
20       Q.    The Bergen Social Media
21   Addiction Scale or variations of it --
22       A.    Yeah.
23       Q.    -- or other scales on social
24   media addiction, those have not undergone, to
25   your knowledge, any clinical trial studies to

Page 132

1    determine whether or not they are valid,
2    right?
3        A.    Oh, there is a meta-analysis,
4    actually recently to 2025, by Bottaro and
5    colleagues, they looked at 28 validations
6    that is of the Bergen, and they're all
7    very -- very supportive of the validity.
8    They validate it against different disorders,
9    they validate it against different scales.
10       Q.    The meta-analysis is not -- or
11   were not comprised of randomized controlled
12   trials for the purpose of determining whether
13   or not social media addiction can be
14   diagnosed using the Bergen addiction scale or
15   something similar to it, right?
16           MS. EMMEL:  Objection, vague
17       and ambiguous, compound, foundation.
18       A.    I have to clarify.  To validate
19   a scale, you do not engage in randomized
20   controlled trials.
21   BY MR. DAVIS:
22       Q.    I'm not asking you that
23   question, Dr. Mojtabai.  You've got to hang
24   with me on the question, okay.  Focus on my
25   question.

Page 133

1        The meta-analysis that you
2    mentioned was not comprised of randomized
3    controlled trials for the purpose of
4    determining whether or not social media
5    addiction can be diagnosed using the Bergen
6    addiction scale or something similar to it,
7    right?
8            MS. EMMEL:  Objection, asked
9        and answered, foundation.
10       A.    The question has several
11   problems.  The question you say randomized
12   controlled trials were not utilized to
13   validate this --
14   BY MR. DAVIS:
15       Q.    I haven't asked that.  I
16   haven't asked -- you've got to focus -- you
17   have -- stay with my question.
18       A.    Okay.
19       Q.    The meta-analysis that you
20   mentioned was not comprised of randomized
21   controlled trials for the purpose of
22   determining whether or not social media
23   addiction can be diagnosed using the Bergen
24   addiction scale or something similar to it?
25           MS. EMMEL:  Objection, asked

CONFIDENTIAL

1    and answered.
2         Counsel, he's answered this
3    three times now.
4         MR. DAVIS: He's not. He's not
5    answered it yet.
6    A.    The purpose -- the word
7    "purpose" you put in in that question, that
8    is misspecified. That's misstated.
9         The purpose -- randomized
10   controlled trials are not used for the
11   purpose of what you are describing as
12   clinical validation of the scale.
13   BY MR. DAVIS:
14   Q.    I haven't asked about clinical
15   validation.
16        Something can be -- there's
17   a -- the Bergen screening tool and other
18   screening tools like it are screening tools.
19   They're not diagnostic, right?
20   A.    They are used for screening for
21   what?
22   Q.    Well, I think you -- I'm asking
23   you a very straightforward question.
24        The Bergen addiction --
25   A.    Right.

1    Q.    -- scale and others like it,
2    they're not used in clinical work to make a
3    diagnosis, right?
4    A.    Well, since there is no -- I
5    should clarify, because you mentioned
6    screening. Screening is used when you have a
7    disorder, like, let's say hypertension, and
8    you use a screening measure to capture it.
9         Bergen and other scales are in
10   some ways measures of the construct of
11   problematic use of social media or addictive
12   use of social media.
13   Q.    The Bergen addiction scale and
14   others like it are not used in clinical
15   research for purposes of making a diagnosis,
16   right?
17        MS. EMMEL: Counsel, this has
18        been asked and answered. It's
19        harassing at this point.
20   A.    We talked about that. There
21   is -- when you say diagnosis, are you talking
22   about the DSM diagnosis?
23   BY MR. DAVIS:
24   Q.    Yes.
25   A.    I think I answered that

1    question. There's no DSM category of social
2    media addiction.
3    Q.    Right. The Bergen addiction
4    scale and others like it --
5    A.    Right.
6    Q.    -- have not been used to make
7    diagnoses of patients on whether or not
8    they're addicted to social media, right?
9         MS. EMMEL: Objection, asked
10        and answered.
11   A.    Some of those studies actually
12   might have used them in a clinical setting to
13   identify patients who have problematic use of
14   social media.
15   BY MR. DAVIS:
16   Q.    The Bergen addiction scale and
17   others like it identified patients who may or
18   may not have what you call social media
19   addiction, right?
20   A.    Well, if they don't have it,
21   they would not score high on the -- so you're
22   saying is it a valid measure or is it not a
23   valid measure? Has validity been established
24   against other scales or conditions?
25   Q.    The Bergen addiction scale and

1    others like it are not used in clinical
2    practice to diagnose patients with what you
3    call social media addiction, right?
4         MS. EMMEL: Objection, asked
5         and answered.
6    A.    So I -- yeah, I think I did
7    answer it. There is no disorder named social
8    media disorder in the DSM-5. So if you
9    are -- when you say diagnose, are you
10   referring to make a determination of
11   something that doesn't exist? It doesn't
12   exist in the DSM-5.
13   BY MR. DAVIS:
14   Q.    Right.
15   A.    But is there such a thing, a
16   clinical problem, and is the Bergen scale
17   used to identify patients who have that
18   problem, that's a different question.
19   Q.    Are you aware of anyone on your
20   own personal knowledge who has used the
21   Bergen addiction scale or something like it
22   to make an assessment of whether someone is
23   addicted to social media?
24        MS. EMMEL: Objection, asked
25        and answered.

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

1     A.    So I should say -- when you say
2  personal, is it do I know the person like
3  personally?
4  BY MR. DAVIS:
5     Q.    Yes.
6     A.    I'm interacting with that
7  person?
8     Q.    Yes.
9     A.    I don't interact with many
10  child mental health providers, so I can't
11  really, you know, put my finger and say,
12  well, John does use it, or Jill.
13     Q.    You're not aware of anybody who
14  uses the Bergen addiction scale or something
15  like it to make a diagnosis of what you call
16  social media addiction, fair?
17        MS. EMMEL:  Objection, asked
18     and answered, harassing.
19     A.    I have seen studies of people
20  reporting when using Bergen in their practice
21  to make this identification.
22  BY MR. DAVIS:
23     Q.    I'm talking about -- focus on
24  my question, Dr. Mojtabai.
25        You're not aware of anyone in

Page 139

1  clinical practice who uses the Bergen
2  addiction scale to make an assessment of
3  whether someone is -- falls into the category
4  of what you call social media addiction,
5  right?
6     A.    You change --
7        MS. EMMEL:  Objection, asked
8     and answered, harassing.
9     A.    Yeah, I think the question --
10  you said are you aware of, do you know the
11  person in person?  So those are different
12  things.
13        I'm aware of, based on my
14  reading of the literature.
15  BY MR. DAVIS:
16     Q.    I'm talking -- I'm asking about
17  are you aware -- you have to please listen to
18  my question.
19     A.    Yes.
20     Q.    Are you aware of anyone in
21  clinical practice that's using the Bergen
22  addiction scale or something like it to make
23  a diagnosis of something that you call social
24  media addiction?
25        MS. EMMEL:  Objection,

Page 140

1  harassing.  This is the third time the
2  exact question has been asked and
3  answered.
4     A.    Right.  And I'm going to answer
5  the same way:  I'm aware, by reading
6  literature, that there are clinicians who --
7  and researchers who use Bergen in clinical
8  settings for identifying people with
9  problematic social media use.
10  BY MR. DAVIS:
11     Q.    The people you're talking about
12  are involved in clinical research studies,
13  right?
14     A.    Those who publish are involved
15  in clinical research studies, by definition.
16     Q.    Do you, Ramin Mojtabai, know of
17  any clinician that you work with, that you
18  know, who is actually using the Bergen
19  addiction scale or something like it to make
20  a diagnosis of social media addiction?
21        MS. EMMEL:  Objection,
22     harassing, asked and answered for the
23     fourth time.
24     A.    Yeah, I'm not a child
25  psychiatrist or child psychologist.  I don't

Page 141

1  interact with them a lot, so I don't -- I'm
2  not aware of people who, in their practice,
3  mainly work with children and adolescents.
4  BY MR. DAVIS:
5     Q.    And you're not aware of someone
6  in the adult situation who you have personal
7  knowledge of that's using the Bergen
8  addiction scale or something similar to it to
9  make a diagnosis of social media addiction,
10  are you?
11        MS. EMMEL:  Objection, asked
12     and answered, harassing.
13     A.    Again, in my personal -- in my
14  limited clinical encounters, I don't know
15  anybody personally, individually, who is
16  using that.
17  BY MR. DAVIS:
18     Q.    You've never used it in that
19  way, have you?
20     A.    I have to think about it,
21  because it's -- I have vague memory, as I
22  mentioned, in my practice, I have seen people
23  with mental health problems that social media
24  use was a contributing factor.  So I have
25  asked questions related or from the Bergen

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

1 probably in those cases.
2 Q. I'm not asking whether you've
3 asked questions that may be similar to the
4 Bergen.
5 I'm actually asking you, have
6 you, Dr. Mojtabai, used the Bergen addiction
7 scale or something similar to make an
8 assessment of whether someone is addicted to
9 social media, in your clinical practice?
10 MS. EMMEL: Objection, asked
11 and answered.
12 A. I don't have a recollection of
13 that.
14 BY MR. DAVIS:
15 Q. Do you agree that there are
16 tens of millions of individuals who use
17 social media daily without experiencing any
18 of the mental health outcomes that you
19 outline in your report?
20 MS. EMMEL: Objection,
21 foundation.
22 A. Yeah.
23 BY MR. DAVIS:
24 Q. Do you agree that there are
25 tens of millions of individuals who use

Page 143

1 social media daily without experiencing what
2 you call social media addiction?
3 MS. EMMEL: Objection,
4 foundation, vague.
5 A. The answer is -- has two
6 prongs. There are also thousands and
7 hundreds of thousands of people who have
8 different degrees of social media problems.
9 BY MR. DAVIS:
10 Q. Yeah. Just -- let's stick with
11 my question.
12 Do you agree that there are
13 tens of millions of people who use social
14 media use daily without developing what you
15 call social media addiction?
16 MS. EMMEL: Objection, vague.
17 A. That is probably true, yeah.
18 BY MR. DAVIS:
19 Q. And if you look at page 22 of
20 your report, up at the top -- top of the
21 page --
22 A. Right.
23 Q. -- it says: --
24 MS. EMMEL: Again, Counsel, are
25 you referring to the -- the April

Page 144

1 report or the May report?
2 THE WITNESS: Yeah.
3 BY MR. DAVIS:
4 Q. Dr. Mojtabai, are you with me?
5 Are you with me? You're on page 22 of your
6 report -- of your report marked as Exhibit 5?
7 A. Exhibit 5, yeah. Yeah.
8 Q. Okay. You say at the top of
9 the page: While data indicate that many
10 adolescents spend large amounts of time on
11 social media, not all can be considered
12 problematic users.
13 Did I read that correctly?
14 A. I think what you read may --
15 which version are you reading?
16 So what I read is: While data
17 indicate that many adolescents nowadays spend
18 large amounts of time on social media, not
19 all of these adolescents can be considered as
20 problematic user.
21 Is that the sentence that you
22 read?
23 Q. Yes, sir.
24 And so you agree that spending
25 large amounts of time on social media or

Page 145

1 being engaged with social media for large
2 amounts of time is not alone sufficient to
3 make a diagnosis of what you call social
4 media addiction, right?
5 MS. EMMEL: Objection,
6 compound, foundation.
7 A. So again, it may, if they're
8 spending all their waking hours on social
9 media, not doing anything else, not being
10 able to give up the app, not sleeping enough.
11 BY MR. DAVIS:
12 Q. I'm focused solely on amount of
13 time and engagement.
14 A. Yeah, the time can be the
15 whole -- as I mentioned, if they spend their
16 whole waking hours, I would still consider it
17 a problematic -- a type of problematic or
18 maladaptive use of social media.
19 Q. So amount of time alone on
20 social media is enough for you to make a
21 diagnosis of social media addiction?
22 MS. EMMEL: Objection,
23 foundation, misstates testimony.
24 A. Again, I don't -- it's not a
25 diagnosis. I think we established that.

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

1  It's not a diagnosis in DSM, and I don't
2  think I anywhere talk about a diagnosis of
3  social media in -- social media addiction in
4  my report.
5         I talk about problematic use or
6  addictive use, or if I mention it, addiction.
7  It's not necessarily a diagnosis.
8  BY MR. DAVIS:
9      Q.    Is time alone sufficient for
10 you to conclude that someone has social media
11 addiction?
12        MS. EMMEL: Objection, vague,
13 compound.
14     A.    Going back to what I said.  If
15 they spend all their waking hours -- and
16 there are kids who do that apparently -- then
17 I would be very concerned that there is other
18 problems that are --
19 BY MR. DAVIS:
20     Q.    No, not that you're concerned.
21     A.    Yeah.
22     Q.    You've got to focus on my
23 question.
24        Not that you're concerned, but
25 is time -- or engagement alone, for a large

Page 147

1  number of hours, sufficient by itself for you
2  to say that someone is -- has social media
3  addiction?
4         MS. EMMEL: Objection, vague,
5  compound, asked and answered.
6      A.    So again, going back to what I
7  said, if the whole waking hours of the
8  adolescent is spent on social media, that
9  means that a lot of the other criteria are
10 also met, other factors that we consider,
11 other features we include.
12        Like foregoing other
13 activities, not being able to control their
14 behavior, impact on -- on work and school and
15 relationships, having difficulty -- sort of
16 dependence on the measures.
17        So these are indicative of that
18 problem, and some of them are actually
19 including that problem.  If the child is on
20 the app all the time, they can't go to --
21 they can't take care of their homework.
22 BY MR. DAVIS:
23     Q.    But I'm saying you don't know
24 any of that information.  All you know is the
25 number of hours that someone is spending on

Page 148

1  social media.
2      A.    Yeah.
3      Q.    Is that number of hours alone
4  sufficient for you to say that that person
5  has what you call social media addiction?
6         MS. EMMEL: Objection,
7  incomplete hypothesis, vague,
8  compound.
9      A.    I have to ask what other
10 problems, and especially things that would be
11 affected if the child is spending all of
12 their time on this -- on the app.
13 BY MR. DAVIS:
14     Q.    Now, to make a diagnosis of
15 addiction, that involves a clinical
16 evaluation and an interview, right?
17     A.    Addiction -- can you define
18 addiction?  We don't have addiction in DSM-5.
19     Q.    Well, you talked about in your
20 report behavioral addictions, right?
21     A.    Right.  Well, yeah, that's one
22 way of describing them.  But they're all
23 called disorders in the DSM-5.
24     Q.    To make a diagnosis of a
25 substance abuse disorder, right --

Page 149

1      A.    Okay.
2      Q.    -- or a behavioral disorder,
3  you have to have a clinical interview and an
4  evaluation of the patient, right?
5         MS. EMMEL: Objection,
6  compound.
7      A.    For a diagnosis, yes, it is the
8  same.
9  BY MR. DAVIS:
10     Q.    Are you aware of any study with
11 respect to social media where there was a
12 clinical evaluation and an interview to make
13 a diagnosis of a study participant?
14        MS. EMMEL: Objection, vague,
15 compound.
16     A.    Diagnosis of what?  Can you --
17 diagnosis -- diagnosis means a disorder
18 identified.
19 BY MR. DAVIS:
20     Q.    Right.
21        So is it your view that social
22 media addiction is not a diagnosis?
23     A.    I believe it's a problematic
24 behavioral construct.
25     Q.    Does it rise to the level of a

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

1  diagnosis?
2      A.    Diagnosis in the DSM or...
3      Q.    Any diagnosis.
4      A.    What is the -- again, that's a
5  very broad question.
6      Q.    Do you make diagnoses of
7  psychiatric disorders which are not
8  identified in the DSM?
9      A.    I have, yes.
10     Q.    Okay.  And so my question to
11 you is:  With that in mind, is it your view
12 that social media addiction is a diagnosis or
13 is it not a diagnosis?
14         MS. EMMEL:  Objection, vague.
15     A.    So your question is that --
16 does it qualify, does it impair the person to
17 the same extent as some of the disorders that
18 are in DSM and does it cause as much
19 distress.
20         Those are the two major
21 criteria we consider whether a disorder is a
22 pathological -- it's a condition that is --
23 that meets the -- I'd say criteria, mental
24 criteria for a disorder.
25         So if it is causing disability,

Page 151

1  impairment in functioning, and distress, yes.
2  BY MR. DAVIS:
3      Q.    So in your mind, does social
4  media addiction cause or result in those two
5  impairments that you identified?
6         MS. EMMEL:  Objection, vague,
7      calls for speculation.
8      A.    It's my opinion based on
9  readings that some of those people who have
10 major issues with social media -- problematic
11 use of social media would be distressed or
12 disabled to an extent that is considered
13 pathological.
14 BY MR. DAVIS:
15     Q.    Okay.  So with that in mind, is
16 there any study that assessed study
17 participants' use of social media where they
18 were able to do a clinical interview and
19 evaluation to determine that they had
20 disability, an impairment in functioning and
21 distress?
22         MS. EMMEL:  Objection, vague,
23     vague and ambiguous, compound,
24     requires speculation.
25     A.    So since most studies use

Page 152

1  scales, I'm aware of numerous studies that
2  have looked at the association of social
3  media problems with problems in other areas.
4         One of the criteria of Bergen,
5  if you look at it, is actually the impairment
6  it causes in workers who -- so it is implicit
7  in the criteria and the construct that it is
8  impairing and it is distressful, and other
9  measures that you use for measuring distress
10 and impairment are also confirming that.
11         MR. DAVIS:  I move to strike as
12     nonresponsive.
13 BY MR. DAVIS:
14     Q.    Dr. Mojtabai, can you identify
15 a single study that's either experimental or
16 longitudinal where there was a clinical
17 evaluation done of study participants to
18 assess them under the Bergen addiction scale
19 or some other similar scale?
20         MS. EMMEL:  Objection, vague
21     and ambiguous, compound.
22     A.    Yeah, I have to go through each
23 one of the studies that I have reported.  But
24 as I mentioned, there is compelling evidence
25 that the problematic use of social media is

Page 153

1  associated with significant impairment and
2  distress.
3         And it's not common for
4  epidemiological studies to have a clinical
5  evaluator to evaluate or diagnose patients.
6  I mean, that is not a common practice.
7         We use measure -- even in
8  clinical settings for establishing disability
9  and impairment, for example, we use GAF
10 score, which is a scale.  These scales have
11 been evaluated and they're reflective of
12 impairment and distress.
13         MR. DAVIS:  Sorry, that's not
14     the answer to my question.  I move to
15     strike as nonresponsive.
16 BY MR. DAVIS:
17     Q.    Can you identify a single study
18 that's either experimental or longitudinal
19 where there was a clinical evaluation done of
20 study participants to assess them under the
21 Bergen addiction scale or some other similar
22 scale?
23         MS. EMMEL:  Objection,
24     compound, vague and ambiguous.
25     A.    Again, I -- if I go through the

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

1  list, I'm sure I would identify studies that
2  have looked at impairment and distress, as we
3  mentioned, or --
4  BY MR. DAVIS:
5      Q.   I'm asking specifically about a
6  clinical evaluation. Can you identify any
7  such study sitting here today?
8          MS. EMMEL: Same objections.
9      A.   Yeah, clinical evaluations
10  is -- is not a -- it's not clear in my mind
11  what is a clinical evaluation means even. Is
12  it having a psychiatrist evaluate people?
13  BY MR. DAVIS:
14     Q.   Let me ask you the question
15  again so you have it fresh in your mind,
16  okay.
17     A.   Okay.
18     Q.   I think it's clear, but I'll
19  ask it again.
20         Can you identify a single study
21  that's either experimental or longitudinal
22  where there was a clinical evaluation done by
23  a trained professional where the study
24  participants were assessed in a clinical
25  evaluation using the Bergen addiction scale

Page 155

1  or some other similar scale?
2          MS. EMMEL: Objection, vague
3      and ambiguous, compound.
4      A.   So Bergen is often used as a
5  self-report.
6          I think the premise of this
7  question is -- is somewhat unclear. It's not
8  a clinical interview. It's not SCID. It's
9  not CIDI. It's not built to be used in a
10  clinical setting as an evaluation form. It
11  is, as you mentioned, a screening instrument.
12  BY MR. DAVIS:
13     Q.   Thank you.
14         Let's turn to -- real quickly,
15  dopamine, the release of dopamine --
16     A.   Yes.
17     Q.   -- happens anytime there's a
18  pleasurable activity or even the anticipation
19  of a pleasurable activity, right?
20     A.   Right.
21     Q.   So you and I may be releasing
22  dopamine right now as we have this
23  conversation during this deposition, right?
24     A.   About you, I'm not sure. But
25  myself, I'm sure I'm not.

Page 156

1      Q.   Okay. Well, when you read
2  it -- well, when people read a good book or
3  they see a good movie --
4      A.   Right.
5      Q.   -- that releases dopamine,
6  right?
7      A.   Correct.
8      Q.   And if they're talking with
9  friends or e-mailing or texting friends or
10  family or coworkers or classmates, that can
11  release dopamine, right?
12     A.   It could.
13     Q.   Right.
14         And you understand that every
15  form of communication --
16     A.   Right.
17     Q.   -- whether digital or
18  nondigital, can give a dopamine release,
19  right?
20         MS. EMMEL: Objection,
21     compound.
22     A.   Every form of it? Well, if it
23  is pleasurable, as you said.
24  BY MR. DAVIS:
25     Q.   Yes.

Page 157

1      A.   Yeah, if it is pleasurable,
2  that's a pleasure neurotransmitter.
3      Q.   And you're not aware of any
4  studies in humans that show that the release
5  of dopamine is more when social media use
6  occurs than some other form of communication,
7  are you?
8          MS. EMMEL: Objection, vague.
9      A.   Can you repeat the question?
10  I'm sorry.
11  BY MR. DAVIS:
12     Q.   Are you aware of any study that
13  has determined the amount of release of
14  dopamine that occurs in humans from using
15  social media versus any other form of
16  communication or entertainment?
17         MS. EMMEL: Objection, vague.
18     A.   I'm not sure that they have the
19  studies that -- some of them I referred to
20  here have compared social media use
21  specifically with another type of pleasurable
22  activity.
23  BY MR. DAVIS:
24     Q.   You're not aware of any
25  evidence that the use of social media causes

40 (Pages 154 - 157)

CONFIDENTIAL

Page 158

1  more dopamine to be released or more intense
2  form of dopamine to be released in humans,
3  are you?
4        MS. EMMEL: Objection, vague,
5     compound.
6     A.    I'm aware of studies that look
7  at differential patterns of activation of
8  dopaminergic systems in the brain among
9  people with problematic use of social media
10 and those who are not problematic users.
11 BY MR. DAVIS:
12    Q.    You're talking about the fMRI
13 studies that you reference in your report?
14    A.    Right.
15    Q.    None of those fMRI studies
16 determine whether or not there's some
17 pathologic disorder that the person has as a
18 result of release of dopamine or the brain
19 activity that's shown on the fMRI, true?
20        MS. EMMEL: Objection, vague
21     and ambiguous, compound.
22    A.    I don't know what pathological
23 in this context means, but there are
24 similarities between activation of different
25 brain centers in people with problematic use

Page 159

1  of social media and those who use substances.
2  BY MR. DAVIS:
3     Q.    None of the fMRI studies that
4  you mention in your report determine that the
5  person, when the brain activity happens or
6  the dopamine release happens, actually shows
7  that they have a psychiatric disorder as a
8  result of that brain activity or that
9  dopamine release, right?
10        MS. EMMEL: Objection, vague
11     and ambiguous, compound.
12    A.    So, yeah, this question is a
13 bit ambiguous. I tell you why. Because I
14 don't think we even to this day have a fMRI
15 signature of specific mental disorders that
16 we could base a diagnosis on.
17        So -- but I understand we have
18 an expert on fMRI who knows more and she does
19 this type of research --
20 BY MR. DAVIS:
21    Q.    Okay.
22    A.    -- regularly who can answer
23 this question better than I.
24    Q.    Okay. So you're not aware of a
25 way to look at an fMRI study and to make --

Page 160

1  based upon just the findings on the fMRI
2  study, to link it up with some psychiatric
3  disorder in patients, are you?
4     A.    Link it up is different than
5  diagnose patients --
6     Q.    Let me rephrase it.
7        You're not aware of a way today
8  to establish a diagnosis of a psychiatric
9  disorder in a patient based upon what is seen
10 on fMRI?
11        MS. EMMEL: Objection,
12     speculation, vague.
13    A.    Yeah, I don't think I talk in
14 my report or have done an extensive review of
15 that. That was not in the purview of my
16 report, to look at that.
17        And that research is also, like
18 social media, very fast moving, so --
19 BY MR. DAVIS:
20    Q.    I'm just --
21    A.    -- I cannot speculate on that.
22    Q.    Yeah. I'm just saying, are you
23 aware of a way today to establish a diagnosis
24 of a psychiatric disorder in a patient based
25 upon what is seen in an fMRI result?

Page 161

1        MS. EMMEL: Objection, vague.
2     A.    As I said, I haven't done an
3  extensive recent review, and I wouldn't
4  speculate on something that I don't -- that I
5  haven't reviewed.
6  BY MR. DAVIS:
7     Q.    Now, look at page 7 of your
8  report, Dr. Mojtabai.
9        MS. EMMEL: For clarification,
10     is this the April version of the
11     report?
12 BY MR. DAVIS:
13    Q.    If you can turn to paragraph
14 number 4 -- it has number 4, there's a
15 section called Temporality.
16        Do you see that?
17    A.    I see that.
18    Q.    And you write: Temporality is
19 probably the oldest and best-known criterion
20 for causality.
21        Is that right?
22    A.    Right.
23    Q.    Right.
24        And you even say later on: It
25 is impossible to imagine a causal

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1  relationship where the cause does not precede
2  the outcome in time.
3          Right?
4      A.  Yes.
5      Q.  Okay.  And that's really what
6  temporality is.  It is establishing that the
7  exposure happens before the outcome, right?
8          MS. EMMEL:  Objection,
9      foundation.
10     A.  It is, but I go on to say:
11  However, Hill noted that establishing
12  temporal order may be difficult for slowly
13  developing outcomes.
14  BY MR. DAVIS:
15     Q.  Sure, I understand that.  But
16  not to lose the point, temporality is
17  establishing that the exposure happens before
18  the outcome, right?
19     A.  Correct.
20     Q.  Okay.  And it's necessary --
21  it's a necessary requirement to establish a
22  true association between a claimed cause and
23  a claimed effect, right?
24     A.  None of the criteria that -- he
25  calls them guidelines.  None of the

Page 163

1  guidelines that Hill sets out are necessary
2  in those terms.  As he says here, it is
3  difficult to establish some of them.
4      Q.  I'm not asking you about Hill's
5  view.  I'm asking about your view.
6          Your view -- do you agree that
7  temporality is a necessary requirement to
8  establish a true association between a
9  claimed cause and a claimed effect?
10     A.  Again, I say it's not
11  necessary, and I can give you examples if you
12  want.
13     Q.  So, for example, is it your
14  opinion that you don't have to establish that
15  social media use occurs -- strike that.
16          Is it your opinion that
17  temporality doesn't have to be established in
18  the studies that you assess for whether or
19  not social media use causes any of the mental
20  health outcomes that you identified in your
21  reports?
22         MS. EMMEL:  Objection, vague,
23     compound.
24     A.  So can you repeat your
25  question?  Because it has several --

Page 164

1  BY MR. DAVIS:
2      Q.  Is it your opinion that
3  temporality does not have to be established
4  in the studies that you assessed for whether
5  or not social media use causes any of the
6  mental health outcomes that you identified in
7  your reports?
8          MS. EMMEL:  Objection, vague,
9      compound.
10     A.  So I have -- the issue I have
11  is with the implied part, and you -- the
12  question implies that temporality has to be
13  established in every study.
14  BY MR. DAVIS:
15     Q.  I'm asking you, does it have to
16  be established in every study?
17     A.  No, it doesn't.
18     Q.  Okay.  So if you use a study --
19     A.  Yeah.
20     Q.  -- that does -- let me strike
21  that.
22          If you use a study in your
23  report for a causal assessment that doesn't
24  establish temporality, you still use that
25  study to make a causal assessment?

Page 165

1      A.  Again, causal assessment is --
2  all of these studies, there are hundreds of
3  studies here.  They all contribute pieces to
4  the puzzle.  And some of them are
5  cross-sectional, it might very difficult to
6  establish causality.
7          As Hill says, some of the
8  causes are very slow to develop.  Some of the
9  causes you even don't have to establish.
10  I'll give you an example of sex in this
11  study.
12          Sex is clearly preceding any
13  outcome, so if it's associated with --
14     Q.  I'm listening.
15     A.  If it's associated with some
16  mental health outcome, we can unambiguously
17  say that it is related causally to that
18  outcome.
19         (Whereupon, Mojtabai-6, Pyramid
20     of Evidence, was marked for
21     identification.)
22  BY MR. DAVIS:
23     Q.  Dr. Mojtabai, this is
24  Exhibit 6.
25     A.  Right.

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

1    Q.    And this is a figure -- what's
2   in Exhibit 6 is Figure 3 taken from your
3   report, right?
4    A.    Correct.
5    Q.    And what you did is for the
6   figure that we have on Exhibit 3 is called
7   the Pyramid of evidence, right?
8    A.    Right.
9    Q.    Is that right?
10    A.    Correct.
11    Q.    Okay.  And in this pyramid,
12   what you did is you ranked different type of
13   study designs from lowest quality on the
14   bottom of the pyramid to the highest quality
15   to top the pyramid, right?
16    A.    Yes.
17    Q.    And you say that -- in your
18   report, that:  Researchers generally agree on
19   a ranking of research designs based on the
20   vulnerability of these studies to
21   confounding.
22        Right?
23    A.    Correct.
24    Q.    And that's how you ranked these
25   different studies in your pyramid of

Page 167

1   evidence, right?
2        MS. EMMEL:  Objection,
3    foundation.
4    A.    Right.
5   BY MR. DAVIS:
6    Q.    And at the bottom of the
7   pyramid is Expert Opinion/Expert Consensus.
8        Correct?
9    A.    Yes.
10    Q.    That is the form of evidence
11   that is most prone to confounding, and thus,
12   is potentially biased, correct?
13    A.    Potentially.
14    Q.    Okay.  And the type of
15   scientific data above that is called case
16   series and case reports, right?
17    A.    Correct.
18    Q.    And case reports and case
19   series are not controlled studies, are they?
20        MS. EMMEL:  Objection,
21    compound.
22    A.    By controlled, what do you
23   mean?  I'm sorry.
24   BY MR. DAVIS:
25    Q.    That there's a control group.

Page 168

1    A.    No, there is no control group.
2   All case -- you could have -- I can think of
3   case series that might have a control group,
4   but typically they don't.
5    Q.    Case reports and case series
6   can be selectively reported?
7    A.    Right.
8    Q.    And the investigators could
9   have biases about why they chose to report
10   them, right?
11        MS. EMMEL:  Objection,
12    compound.
13    A.    Correct.
14   BY MR. DAVIS:
15    Q.    And case series and case
16   reports also do not assess potential
17   confounders that could be causal, correct?
18        MS. EMMEL:  Objection,
19    compound.
20    A.    Correct.
21   BY MR. DAVIS:
22    Q.    And case series and case
23   reports generally and typically raise
24   questions or hypotheses, but they don't
25   answer them, right?

Page 169

1        MS. EMMEL:  Objection, vague.
2    A.    Well, typically that's the
3    case.
4   BY MR. DAVIS:
5    Q.    And typically, the cases the
6   case reports or case series don't establish
7   causation, right?
8        MS. EMMEL:  Objection, vague
9    and ambiguous.
10    A.    I have to qualify this, because
11   there are case series that raise significant
12   causal questions or even try to answer them.
13   And I can give you examples if you want.
14   BY MR. DAVIS:
15    Q.    You're talking about a
16   situation like a rare exposure or a common
17   exposure such as like -- like thalidomide,
18   where there's a specific outcome that's
19   resulting from a specific exposure, right?
20    A.    Or antidepressant use in
21   adolescents and suicidal ideations.  It was
22   based on the case series and ended up
23   actually going to FDA, end up being on -- a
24   black box warning on antidepressants.
25        Now you open any antidepressant

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

1  medication insert and it says it is dangerous
2  for children and adolescents.  Consider that.
3      Q.    Dr. Mojtabai, you're not
4  suggesting that the black box warning that
5  went into effect with --
6      A.    Antidepressants.
7      Q.    -- with antidepressants was
8  based on case series or case reports, are
9  you?
10      A.    No, but it started that.
11      Q.    No, no.  You understand that
12  what the FDA looked at was controlled studies
13  that had been submitted to it and made an
14  assessment to change the labeling, right?
15          MS. EMMEL:  Objection,
16      foundation.
17      A.    After the case series came out.
18          MS. EMMEL:  Speculation.
19  BY MR. DAVIS:
20      Q.    The FDA made its decision about
21  the black box warning based upon the
22  controlled studies, not on the case series,
23  right?
24          MS. EMMEL:  Objection,
25      foundation, speculation.

Page 171

1      A.    As I said --
2          MS. EMMEL:  Just give me a
3      chance to get my objection in.
4      Foundation, speculation.
5      A.    The study that came out, case
6  series studies, is pretty famous in
7  epidemiology, was motivation for everything
8  else that happened after that, including FDA
9  going back to all the studies that were
10  submitted to them to look at the --
11  BY MR. DAVIS:
12      Q.    What case series are you
13  talking about?
14      A.    The study by Cole.  It's
15  actually in the American Journal of
16  Psychiatry I think in 1990.
17      Q.    Well, wait a minute.
18          The black box warning went into
19  effect in April of 2004, right?
20      A.    Yeah.
21          MS. EMMEL:  Objection,
22      relevance.
23  BY MR. DAVIS:
24      Q.    You're talking about something
25  that happened in 1990, right?

Page 172

1      A.    It started it.  Everything
2  moves very slowly in research.
3          MS. EMMEL:  Object to relevance
4      of this line of questioning.
5  BY MR. DAVIS:
6      Q.    All right.  Dr. Mojtabai,
7  ecological studies measure both exposure and
8  outcomes at the group level and not at the
9  individual level, right?
10      A.    Yeah, that's correct.
11      Q.    And ecological studies track
12  groups of people over time, right?
13      A.    Ecological studies do not
14  necessarily track people over time.  They
15  could be geographical.
16      Q.    Okay.
17      A.    Studies talking about suicide
18  in adolescents and antidepressants, there are
19  ecological studies that look at different
20  counties in the country.
21      Q.    Sure.
22          But in that situation, again,
23  the ecological studies are tracking groups of
24  people, right?
25      A.    Tracking over time, you mean?

Page 173

1      Q.    Just tracking them.  They are
2  assessing groups of people?
3      A.    Assessing, yes.
4          MS. EMMEL:  Objection, vague.
5  BY MR. DAVIS:
6      Q.    And ecological studies or
7  surveys do not follow individual patients
8  over time, right?
9      A.    Ecological studies do not --
10      Q.    For example, Monitoring the
11  Future, Youth Risk Behavior Surveillance, UK
12  Millennium survey, those are not tracking
13  individual patients over time, but rather,
14  groups of patients over time, right?
15      A.    No.
16          MS. EMMEL:  Objection,
17      compound.
18      A.    That's wrong.  These are
19  individual surveys.  These are not ecological
20  studies.  You may use them -- again, you can
21  use data to do ecological studies.  You could
22  use individual-level data, put them in bins
23  geographically, put them in longitudinal
24  studies and then look at them ecologically,
25  you could do that.

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

1    But those surveys you
2  mentioned, these are individual participant
3  surveys, youth --
4  BY MR. DAVIS:
5    Q.    Yeah, but what's happening, for
6  example, with the Monitoring the Future or
7  the Youth Risk Behavior Surveillance is
8  they're assessing group -- one group in one
9  year and another group in the second year,
10  right?
11    MS. EMMEL:  Objection,
12    compound, vague, speculation.
13    A.    That's not ecological.  If
14  you're --
15  BY MR. DAVIS:
16    Q.    I'm not asking you whether it
17  is.  I'm just asking you if that's what they
18  do.
19    A.    Well, you started the question
20  with "ecological."  This is a different --
21  it's mixing survey data --
22    Q.    It's not important.  It's not
23  important.
24    (Simultaneous discussion
25    interrupted by the stenographer.)

Page 175

1    MR. DAVIS:  It's not important.
2  BY MR. DAVIS:
3    Q.    Surveys do not have a control
4  group, do they?
5    A.    So again, control group is not
6  inherently something different.  You could do
7  a case-controlled study nested within a
8  survey.  You could do a cohort study nested
9  within a survey so you would have people who
10  are exposed and not exposed.
11    And so that nonexposed group is
12  equivalent to control group you're talking
13  about.
14    Q.    Let me give you an example so
15  we're on the same page of what survey we're
16  talking about.
17    A.    Okay.
18    Q.    There are customer service
19  surveys that companies do, right, when they
20  reach out to customers and they ask them
21  about their experience with the product or
22  their service, right?
23    A.    Right.
24    Q.    Those are not -- they don't
25  have a control group, do they?

Page 176

1    A.    I'm not familiar with customer
2  service.  I don't know if they do or not.
3    Q.    You agree that ecological
4  surveys and -- excuse me.  Strike that.
5    Ecological studies and surveys
6  do not establish temporality, do they?
7    A.    Again, I said -- as I said,
8  within a survey, you could have a case
9  control or a cohort, and cohorts could be,
10  actually, looking at the same people over
11  time.
12    Q.    Yeah.  And I'm not asking about
13  a cohort study.  I'm asking about an
14  ecological study, right?
15    An ecological study and a
16  survey does not establish temporality, does
17  it?
18    A.    Well, you're saying ecological
19  study and survey so --
20    Q.    I'll break it up for you.
21  Ecological studies do not establish
22  temporality, do they?
23    A.    Ecological studies could
24  establish temporality at a different level.
25  It's not individual level.  It's a group

Page 177

1  level.  You could establish that.
2    So I can give -- do you want
3  examples --
4    Q.    No, that's fine.  No, I've got
5  an answer.  Thank you.
6    Ecological studies do not
7  establish temporality at the individual
8  level, fair?
9    A.    Correct.  Yes.
10    Q.    Okay.  Customer surveys, to
11  your knowledge, don't establish temporality,
12  do they?
13    A.    I don't -- I'm not familiar
14  with customer surveys, if they -- if they're
15  done over time, so the product is introduced,
16  the customer survey is done one time.  Then
17  next time they establish temporality, again,
18  at the customer level.
19    Q.    They establish temporality
20  based upon self-report, right?
21    A.    It might be patterns of -- I
22  mean, I'm just -- I shouldn't be speculating
23  really.  I haven't done any customer surveys.
24    Q.    Okay.  Ecological studies can't
25  distinguish between correlation and

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

1  causation, can they?
2          MS. EMMEL: Objection, vague.
3      A.   So, first of all, every
4  causation involves correlation. This is one
5  thing. And different studies contribute
6  different degrees of evidence to support
7  causation.
8          So a well-designed ecological
9  study, I would say, is -- contributes to
10  causal knowledge.
11  BY MR. DAVIS:
12      Q.   Yeah. I'm not asking that
13  question, though.
14          My question simply is that:
15  Ecological studies can't distinguish between
16  correlation and causation, can they?
17          MS. EMMEL: Objection, vague.
18      A.   I have to think about it.
19      So -- so they could imply
20  causation to the extent that confounding
21  factors can be considered.
22  BY MR. DAVIS:
23      Q.   Okay. Ecological studies can
24  imply causation, but that may not be a valid
25  assessment of the causation, fair?

Page 179

1          MS. EMMEL: Objection, vague,
2      speculation.
3      A.   Yeah, I would -- I would say
4  that for any study there is that risk. Any
5  research study, there is that risk, the issue
6  of validity, you're saying.
7      So the different -- that's why
8  we have criteria and that's why we have
9  different -- the pyramid. The pyramid
10  doesn't mean that some of them are out of the
11  pyramid. They're still in the pyramid.
12  BY MR. DAVIS:
13      Q.   If you had only ecological
14  studies --
15      A.   Right.
16      Q.   -- could you establish
17  causation?
18          MS. EMMEL: Objection,
19      speculation.
20      A.   It is suggestive -- I have to
21  see the ecological studies. Some of the
22  ecological studies could be at the level of
23  granularity that support causation.
24      So let's say that level is
25  household or it's a neighborhood. So in that

Page 180

1  case, I would -- the level of -- that's
2  different than a county or state or a
3  country.
4          So ecological studies are also
5  different --
6  BY MR. DAVIS:
7      Q.   If you -- yeah. If you had
8  only ecological studies, could you establish
9  causation at the individual level?
10          MS. EMMEL: Objection, asked
11      and answered.
12      A.   I'm going to -- again,
13  "establish" is a very strong word. Establish
14  means what? Can you...
15  BY MR. DAVIS:
16      Q.   If you only had ecological
17  studies to look at, could you determine
18  causation at the individual level?
19      A.   Typically, no.
20      Q.   Okay. Next section you've got
21  are -- above case series and case reports are
22  cross-sectional and case-control studies,
23  right?
24      A.   Right.
25      Q.   Now, cross-sectional studies

Page 181

1  measure two or more variables at one time
2  point and examine the association of those
3  variables at that one time point, right?
4      A.   Correct.
5      Q.   And you put in your report that
6  if A and B are related in a cross-sectional
7  study, it is equally possible that A causes
8  B, B causes A, or the relationship is
9  reciprocal.
10          Correct?
11      A.   Correct.
12      Q.   And by that, you mean that you
13  don't know which one is more likely to be
14  occurring, right?
15      A.   That's what it implies, yes.
16      Q.   Okay. And a cross-sectional
17  study can establish correlations, but it
18  cannot determine if there's a valid
19  association, true?
20      A.   Valid association? Correlation
21  is a valid association.
22      Q.   Well, there are associations
23  that are valid and not spurious, right?
24          MS. EMMEL: Objection, vague.
25      A.   "Spurious" is a very broad

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

1  term.  You mean confounded by a third
2  variable; is that -- I shouldn't say what you
3  mean, but you may mean --
4  BY MR. DAVIS:
5      Q.    Well, you're taking -- let's be
6  clear.
7          Cross-sectional studies don't
8  establish whether or not the exposure happens
9  before the outcome being studied, right?
10     A.    Sometimes they do.  As I
11  mentioned the example of sex, genetics is
12  another example, race is another.  There
13  are -- cross-sectional studies with those
14  variables in the model are very strong
15  causal -- you can draw a causal inference
16  from that.
17     Q.    Is it fair to say that with
18  respect to social media studies that you
19  evaluated, those don't establish whether or
20  not the social media use occurred before or
21  after the outcome with respect to the
22  cross-sectional studies?
23     A.    The ones that I have looked at
24  may not have -- I have to think about all of
25  them.  There are huge numbers of social media

Page 183

1  cross-sectional studies, and some of them ask
2  about the timing of social media use.
3      Q.    You yourself have said that
4  cross-sectional studies cannot be used for a
5  causal inference, right?
6      A.    I have said those words?
7      Q.    You've said those words,
8  haven't you?
9          MS. EMMEL:  Objection, vague.
10     A.    I do not recall.  They cannot
11  be used for causal?  I don't recall having
12  said...
13  BY MR. DAVIS:
14     Q.    I'm going to hand you what's
15  been marked as Exhibit 7.
16          (Whereupon, Mojtabai-7,
17          Problematic social media use and
18          psychological symptoms in adolescents,
19          by Mojtabai, was marked for
20          identification.)
21     A.    Okay.  Yes.
22  BY MR. DAVIS:
23     Q.    This is an article that you
24  coauthored -- that you authored, right?
25     A.    Yes.

Page 184

1      Q.    It's titled Problematic Social
2  Media Use and Psychological Symptoms, right?
3      A.    Uh-huh.
4      Q.    And this was published in 2024,
5  right?
6      A.    Correct.
7      Q.    This was the study that you
8  mentioned earlier where you claimed that
9  there was some causal language about social
10  media use in one of your publications, right?
11     A.    Right.
12     Q.    And if you look at this
13  publication, you look at page 7, last
14  sentence before the conclusion --
15     A.    Pages -- I don't see the page
16  numbers.  The page numbers...
17     Q.    Go to the last page.
18     A.    Last page?  Okay.  This one?
19     Q.    Yes.  Right above Conclusions.
20     A.    Okay.
21     Q.    You say, quote:  Because of the
22  cross-sectional nature of the data, change in
23  adolescents' mental health as a result of
24  change in social media use could not be
25  examined.

Page 185

1          Did I read that correctly?
2      A.    Uh-huh.
3      Q.    That's -- yes?
4      A.    Yes.
5      Q.    You agree that cross-sectional
6  data can't be used to assess whether a change
7  in adolescents' mental health results in a --
8  is a result of change in social media use,
9  right?
10     A.    So this was multiple cross
11  sections.
12     Q.    Do you agree with that, Doctor?
13     A.    Can you repeat your sentence?
14     Q.    Yeah.
15          You agree that the
16  cross-sectional nature of the data --
17     A.    Uh-huh.
18     Q.    -- you can't say that the
19  change in adolescent mental health is a
20  result of change in social media use, right?
21     A.    Again, because it's
22  cross-sectional, we cannot establish if
23  they -- if the change -- if let's say
24  adolescents reduce social media use, but if
25  their internalizing symptoms change the same

47 (Pages 182 - 185)

CONFIDENTIAL

Page 186

1 degree or if they increase their social media
2 use, their internalizing symptoms increase.
3          So change here is a different
4 construct than causation you're talking
5 about.  It is -- there is causation -- it's
6 between person, really, causation.  Is there
7 between person differences, people who are
8 using more social media or more -- have more
9 internalizing symptoms or -- and that's the
10 "within" example, when you look at change
11 within the person in one and its association
12 with change in the other.
13          So since this is multiple waves
14 of cross-sectional, we can't establish
15 within-person change.
16     Q.    Let's be very clear.  You said,
17 in this 2024 publication, that because of the
18 cross-sectional nature of the data --
19     A.    Yes.
20     Q.    -- the change in adolescents'
21 mental health as a result of change in social
22 media use could not be examined.
23          Did I read that correctly?
24     A.    You read -- you read it
25 correctly, but the context is -- has to be

Page 187

1 considered.
2          This is talking about change,
3 not talking about causation.
4     Q.    I'm going to get to that in a
5 second, I promise.
6     A.    Okay.
7     Q.    But you agree that you wrote
8 this in 2024 and you stand by your statement,
9 right?
10     A.    Within-person -- this was a
11 cross-sectional study; you cannot establish
12 within-person change.
13          (Whereupon, Mojtabai-8, Social
14          network, recovery attitudes and
15          internal stigma among those with
16          serious mental illness, by Cullen
17          et al, was marked for identification.)
18 BY MR. DAVIS:
19     Q.    What's marked as Exhibit 8 is
20 another publication that you authored called
21 Social Network Recovery Attitudes and
22 Internal Stigma Among Those With Serious
23 Mental Illness, right?
24     A.    Right.
25     Q.    And this was published in 2017,

Page 188

1 right?
2     A.    Yes.
3     Q.    And if you look at page 10...
4     A.    The numbers are 400 --
5     Q.    Yeah, if you look at -- I think
6 it's page 457.
7     A.    Yeah.
8     Q.    Left-hand column, first --
9 excuse me, second full paragraph.
10          Do you see that?
11     A.    Yes.
12     Q.    This is what you wrote:  The
13 study has some limitations.  The data are
14 cross-sectional in nature, preventing causal
15 inference.
16          Did I read that correctly?
17     A.    I'm looking for it.  The second
18 paragraph, and which line is it?
19     Q.    It's the second full paragraph,
20 the first two sentences.
21     A.    Okay.
22          (Sotto voce document review.)
23 BY MR. DAVIS:
24     Q.    Look at the second full
25 paragraph.

Page 189

1     A.    Yes.  The majority of
2 participants with disabled -- second full
3 paragraph --
4     Q.    Here, let me help you,
5 Dr. Mojtabai.
6     A.    Yes.
7     Q.    The one right here
8 (indicating).
9     A.    Okay.  Full paragraph.
10     Q.    Okay?
11     A.    Okay.
12     Q.    You state in this publication:
13 The study has some limitations.
14     A.    Yeah.
15     Q.    The data are cross-sectional in
16 nature, preventing causal inference.
17          Right?
18     A.    Yeah, that's what it says.
19     Q.    That's what you said, right?
20     A.    Uh-huh.
21     Q.    And you fully recognize that
22 cross-sectional data prevents causal
23 inference, correct?
24     A.    In this study, I think it did
25 because of the nature of the variables

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

1 with --
2    Q.    Well, let's be clear --
3        MS. EMMEL:  Excuse me, Counsel,
4    he wasn't finished with his
5    question -- or with his answer.  I'm
6    sorry.
7    A.    Yeah, it is context dependent.
8 As I was giving the example of some
9 cross-sectional studies, you may actually
10 even infer causation.
11 BY MR. DAVIS:
12    Q.    You know that virtually every
13 single one of the cross-sectional studies
14 that you rely on -- just let me finish.
15    A.    Yes.
16    Q.    You recognize that almost every
17 single one of the cross-sectional studies
18 that you rely upon has a statement in it
19 saying that cross-sectional studies can't be
20 used for causal inference or they can't know
21 whether or not -- the direction of the
22 association, right?
23    A.    They cannot be the sole basis
24 for causal inference.  Most of them can't.
25    Q.    Let's make sure I understand

Page 191

1 what you're saying.
2    A.    Yeah.
3    Q.    You agree that cross-sectional
4 studies cannot be the sole basis of a
5 causal --
6    A.    Correct.
7    Q.    -- determination, right?
8    A.    Sole.  Yes.
9    Q.    Okay.  If you only had the
10 cross-sectional data --
11    A.    Right.
12    Q.    -- on social media use and
13 adverse mental health outcomes, you couldn't
14 reach a causal determination that social
15 media causes any mental health outcome, fair?
16    A.    There is a qualification.  If
17 you have a large number of them -- so first I
18 should go back to this, why we can't base the
19 causal inference on one study is the risk
20 possibility -- it's not definitive.  The
21 possibility of confounding.
22        But if you have a multitude of
23 cross-sectional studies in different contexts
24 done by different people in different
25 countries using different measures, and they

Page 192

1 all tell you the same thing, your level of
2 confidence in causal conclusions from those
3 studies increases.
4        MR. DAVIS:  Okay.  Move to
5    strike as nonresponsive.  I don't
6    think that was my question,
7    Dr. Mojtabai.
8 BY MR. DAVIS:
9    Q.    My question simply was this:
10 If you only had cross-sectional data to rely
11 upon, you couldn't form the opinion to a
12 reasonable degree of medical or scientific
13 certainty that social media use causes any
14 mental health outcome, true?
15        MS. EMMEL:  Objection, vague
16    and compound.
17    A.    Again, I go back to this is --
18 first of all, it is if.  It is a
19 hypothetical.  And as I mentioned, if you
20 have a large number of cross-sectional
21 studies all telling you the same thing, done
22 by different people, different contexts,
23 different settings, that qualifies the
24 consistency guideline of Hill.
25        So that supports -- supports a

Page 193

1 causal inference.  It supports more than a
2 sole study, than one study.
3        MR. DAVIS:  Move to strike as
4    nonresponsive.
5 BY MR. DAVIS:
6    Q.    Doctor, please listen closely
7 to my question.
8        If you only had the
9 cross-sectional data on social media use and
10 adverse mental health outcomes, you could not
11 form an opinion to a reasonable degree of
12 scientific certainty that social media use
13 causes those mental health outcomes, true?
14        MS. EMMEL:  Objection, the
15    question has been asked and answered.
16    A.    Yeah, I think you are proposing
17 a hypothetical situation.  I can't imagine a
18 setting -- I mean, I'm speculating.
19        You have a large number of
20 studies, different settings, different
21 investigators, different countries, done
22 different times, there is a -- and this is
23 all you have to depend your causal inference
24 on -- if the evidence is consistent, it gives
25 me much more evidence than a single study.

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

1  BY MR. DAVIS:
2      Q.   I'm not asking that question,
3  Dr. Mojtabai.  I'm going to put it to you
4  again because I think I deserve an answer.
5          If you only had the
6  cross-sectional data to rely upon about
7  social media use and adverse mental health
8  outcomes, you could not reach an opinion to a
9  reasonable degree of medical or scientific
10 certainty that social media use caused those
11 mental health outcomes, true?
12         MS. EMMEL:  Objection, the
13     question has been asked and answered.
14     A.   Since it's a hypothetical
15 question, I cannot answer.
16 BY MR. DAVIS:
17     Q.   You -- I'm allowed to ask you
18 hypotheticals, Dr. Mojtabai.  Counsel is
19 going to be able to tell you that I'm allowed
20 to ask you hypotheticals.
21         So with that hypothetical on
22 the table, if you only had the
23 cross-sectional data to rely upon, could you
24 form the opinions to a reasonable degree of
25 medical or scientific certainty that social

Page 195

1  media use causes any of the mental health
2  outcomes you've outlined in your reports?
3          MS. EMMEL:  Objection.  It's a
4      hypothetical question, it's been asked
5      and answered.
6      A.   Again, hypothetical means that
7  I can speculate on what I would like to have
8  in those cross-sectional studies.  I would
9  have a very large number --
10 BY MR. DAVIS:
11     Q.   I'm not asking you what you --
12 what you may have.
13     A.   Right.
14     Q.   I'm asking you what you have in
15 hand today, with the studies that you've
16 relied upon, with the studies that you've
17 looked at that are cross-sectional in nature,
18 if you only had them --
19     A.   Right.
20     Q.   -- could you form an opinion to
21 a reasonable degree of medical or scientific
22 certainty that social media causes those
23 adverse mental health outcomes?
24         MS. EMMEL:  Objection, asked
25     and answered three times, harassing.

Page 196

1      A.   So, first of all, this is
2  not -- this opinion, my opinion on causation,
3  is not based only on -- solely on
4  cross-sectional studies.
5  BY MR. DAVIS:
6      Q.   I haven't asked you that.  I
7  haven't asked you that.  I'm asking you, look
8  solely at the cross-sectional studies.
9          Can you form an opinion to a
10 reasonable degree of medical or scientific
11 certainty that social media causes the
12 adverse mental health outcomes that are in
13 your reports?
14         MS. EMMEL:  Objection, asked
15     and answered, harassing.
16     A.   A large number of
17 cross-sectional studies would strengthen my
18 opinion, and added to that, there are
19 longitudinal and --
20 BY MR. DAVIS:
21     Q.   No, no, Dr. Mojtabai.  No, no.
22 I'm not --
23         MS. EMMEL:  Let him answer the
24     question.
25         MR. DAVIS:  No, no, no.  He's

Page 197

1  not answering my question.
2          MS. EMMEL:  He is answering
3      your question.
4          MR. DAVIS:  No, he's not and
5      everybody in this room knows he's not.
6          MS. EMMEL:  You can move to
7      strike; that is your option.  You have
8      to let him continue with his answers.
9          MR. DAVIS:  No, he's giving me
10     the same nonresponsive answer six
11     times in a row, and I think we all
12     know why, but I'm going to get an
13     answer to this question.
14 BY MR. DAVIS:
15     Q.   Dr. Mojtabai --
16         MS. EMMEL:  He can clarify the
17     answer to his question if it can't be
18     answered in a yes-or-no manner.
19         MR. DAVIS:  No, no, no.  That's
20     not true --
21         MS. EMMEL:  It is, too.  He can
22     clarify --
23         (Simultaneous discussion
24     interrupted by the stenographer.)
25         MR. DAVIS:  I'm going to ask

CONFIDENTIAL

1    you the question.  I think I deserve
2    an answer to it.
3  BY MR. DAVIS:
4    Q.   If you only had the
5  cross-sectional data to rely upon, could you
6  form an opinion to a reasonable degree of
7  medical or scientific certainty that social
8  media use causes the adverse mental health
9  outcomes in your reports?
10       MS. EMMEL:  Objection, asked
11       and answered, harassing.
12    A.   So based on the cross-sectional
13  studies that I have and multiple
14  meta-analyses of those studies that have also
15  conducted meta-regression, which helps to
16  identify potential confounding factors, I
17  would have a stronger opinion than if I had
18  only one single study.
19       Having had longitudinal and
20  experimental studies further strengthened
21  me -- my opinion.
22       MR. DAVIS:  I move to strike,
23       nonresponsive.
24  BY MR. DAVIS:
25    Q.   Dr. Mojtabai, I haven't asked

1  you about longitudinal.  I haven't asked you
2  about experimental.  I'm focused solely on
3  the cross-sectional.  I'm going to give it
4  one more time and then we're going to get the
5  judge on the line because I deserve an answer
6  to this question.
7    A.   Okay.
8    Q.   Number one, if you only had the
9  cross-sectional data to rely upon, could you
10  form an opinion to a reasonable degree of
11  medical or scientific certainty that social
12  media causes the mental health outcomes in
13  your report?
14       MS. EMMEL:  Objection,
15       hypothetical, asked and answered,
16       harassing.
17    A.   Yeah, I have to see those
18  cross-sectional studies.  But generally --
19  BY MR. DAVIS:
20    Q.   Dr. Mojtabai, you've seen them.
21       MS. EMMEL:  Counsel, you're
22       interrupting his answer.
23  BY MR. DAVIS:
24    Q.   You've looked at them.  You've
25  analyzed them.

1       My question to you is:  With
2  everything you have in your head today --
3    A.   Yeah.
4  BY MR. DAVIS:
5    Q.   -- using only cross-sectional
6  data, can you form an opinion to a reasonable
7  degree of medical or scientific certainty
8  that social media use causes or contributes
9  in any way to social -- to the adverse mental
10  health outcomes in your reports?
11       MS. EMMEL:  Objection, asked
12       and answered, harassing.  This is the
13       sixth time.
14    A.   So I'm looking at the totality
15  of this data.  In my mind, I cannot separate.
16       So can I base on only
17  experimental studies, for example, make a
18  decision, can I only base my decision on
19  longitudinals.  I have difficulty separating
20  in my mind these because I look at the
21  totality of the data.
22       MR. DAVIS:  Move to strike,
23       nonresponsive.
24  BY MR. DAVIS:
25    Q.   Dr. Mojtabai, so is it your

1  opinion that you need the cross-sectional
2  studies in order to form an opinion that
3  social media use causes adverse mental health
4  outcomes?
5    A.   I don't need them, but they
6  contribute --
7    Q.   Okay.  You don't need them?
8    A.   -- to my opinion.
9    Q.   So if you only had them, could
10  you form the opinion -- if you only had
11  cross-sectional studies, could you form the
12  opinion that social media use, to a
13  reasonable degree of medical or scientific
14  certainty, causes or contributes to the
15  adverse mental health outcomes in your
16  report?
17       MS. EMMEL:  Counsel, this is
18       the sixth time.  Please move on.  This
19       is harassment at this point.
20    A.   So I have to -- yeah, this
21  is -- yeah, this is because your definition
22  of cross-sectional is very limited.
23       I have this study that you
24  mentioned.  It's the study of six --
25       MR. DAVIS:  Let's get the judge

51 (Pages 198 - 201)

CONFIDENTIAL

Page 202

1      on the phone.
2      A.    -- five waves of
3   cross-sectional data and it's different than
4   one cross-sectional study.
5          But here he has a study of
6   Facebook rollout in colleges.  It is -- you
7   may call it a cross-sectional study, multiple
8   waves.  It's different than one
9   cross-sectional study.
10         So cross-sectional studies are
11   not all one; it doesn't -- one size fits all.
12   So if I have a number of those good
13   cross-sectional studies, multiple waves,
14   large samples -- this is one -- over
15   1 million, I would be -- and I have only
16   those to make a decision, I would say, more
17   likely than not, that it may meet my
18   criteria.
19   BY MR. DAVIS:
20      Q.    I'm not asking you may.  I'm
21   asking you does it -- can you form the
22   opinion to a reasonable degree of medical and
23   scientific certainty that social media use
24   causes adverse mental health outcomes in your
25   report to a reasonable degree of medical or

Page 203

1   scientific certainty?
2          MS. EMMEL:  Counsel, we're done
3      with this at this point.  If you'd
4      like to get the judge on the phone --
5          MR. DAVIS:  We're going to do
6      it.  Let's take a break.
7          MS. EMMEL:  You've already
8      asked this question seven or eight
9      times.
10         MR. DAVIS:  Let's take a break.
11      We're going to get the judge on the
12      phone.
13         THE VIDEOGRAPHER:  All right.
14      We're off the record at 12:28 p.m.
15         MR. DAVIS:  No, no, no, stay on
16      the record for a second.
17         And I'm putting you on notice,
18      too, we're bringing him back, because
19      this is not what we were promised.  We
20      were promised answers to direct
21      questions.
22         These are not difficult
23      questions.  These are straightforward
24      questions.  We were promised that we
25      would get responsive answers.  That's

Page 204

1   in an e-mail to us.
2          So if you want to -- if you
3      want to have the situation where we're
4      bringing Dr. Mojtabai back, we're
5      going to do it, because these -- this
6      is just ridiculous.
7          Where there's straightforward
8      questions, I know he knows the answer
9      to these, and what we're getting is a
10      filibuster.  And I'm not going to --
11      we're not going to do that.
12         MS. EMMEL:  He is answering the
13      question --
14         MR. DAVIS:  He's not.
15         MS. EMMEL:  -- in a
16      straightforward manner --
17         Let me finish.
18         He cannot answer a yes-or-no
19      question to this particular answer,
20      and he's trying to clarify why not.
21      He is giving you an answer.
22         MR. DAVIS:  No, he's not giving
23      me an answer.
24         And no disrespect to you.
25         THE WITNESS:  There's none

Page 205

1      taken.
2          MR. DAVIS:  There's a very
3      straightforward answer.  I think he
4      knows what the answer is, and he
5      doesn't want to give it.
6          All right.  Let's take a break
7      for lunch.
8          THE VIDEOGRAPHER:  All right.
9      We're off the record at 12:29 p.m.
10      That's the end of Media 3.
11         (Recess taken, 12:29 p.m. to
12      1:26 p.m. CDT)
13         THE VIDEOGRAPHER:  We're back
14      on the record at 1:26 p.m.  This is
15      the beginning of Media 4.
16   BY MR. DAVIS:
17      Q.    Dr. Mojtabai, did you have a
18   nice lunch?
19      A.    Yes.
20      Q.    Are you ready to continue?
21      A.    I am.
22         (Whereupon, Mojtabai-9,
23      Cross-Sectional Studies Cited in
24      Dr. Mojtabai's Expert Report, was
25      marked for identification.)

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

1  BY MR. DAVIS:
2      Q.    All right.  I'm going to hand
3  you what's been marked as Exhibit 9.
4          Do you see that this is a chart
5  of studies that you cite in your expert
6  report and quotes from those studies about
7  the use of cross-sectional data?
8          MS. EMMEL:  Can I also get --
9          MR. DAVIS:  I lost my folder,
10  so I don't know where --
11          MS. COATES:  It's in the other
12      room.
13          MR. DAVIS:  Do you want to go
14      off the record and take a look at
15      that, Jennifer?
16          MS. EMMEL:  Let me just glance
17      at it real quick.
18          (Document review.)
19          MS. EMMEL:  All right.  Go
20      ahead.
21          (Document review.)
22  BY MR. DAVIS:
23      Q.    Dr. Mojtabai, do you see that
24  that chart has quotes in it from the studies
25  that are cross-sectional which you rely upon?

Page 207

1      A.    I see.  I trust they are from
2  the studies.  I haven't examined them.
3      Q.    Do you see --
4          MS. EMMEL:  I'd like to make an
5      objection that we did not get a chance
6      to compare those to the actual
7      reports.
8  BY MR. DAVIS:
9      Q.    Do you see, Dr. Mojtabai, that
10  every one of the studies that I have in that
11  chart would say that for cross-sectional
12  studies, that either causal inferences can't
13  be determined or they're uncertain about
14  which direction the association goes in?
15          MS. EMMEL:  Object to form,
16      vague and compound.
17      A.    I see for individual studies,
18  yes, they -- assuming they -- there's no
19  error in citing, yes.
20  BY MR. DAVIS:
21      Q.    Well, it's also -- that caveat
22  and that limitation also applies to
23  meta-analyses too, right?
24          MS. EMMEL:  Objection,
25      speculation.

Page 208

1      A.    It is -- if it -- well, you
2  can't make generalized statements about
3  meta-analysis, but if there are multiple
4  meta-analyses -- so here is the -- the issue
5  is strength in numbers.
6          If you have number of
7  meta-analyses, more confidence in the causal
8  inference increases.
9  BY MR. DAVIS:
10      Q.    Well, you understand that the
11  meta-analyses that you rely upon --
12      A.    Right.
13      Q.    -- that are -- that include
14  cross-sectional data say that causal
15  inferences can't be determined or they don't
16  know which way the association goes between
17  social media use and adverse mental health
18  outcomes or adverse mental health outcomes in
19  social media use, right?
20          MS. EMMEL:  Objection,
21      compound, vague.
22      A.    It determined -- the
23  determination -- determination means there is
24  a night-and-day difference between a
25  relationship that's causal and one that is

Page 209

1  not.  Establishing causation is a process
2  based on evidence that accumulates.
3  BY MR. DAVIS:
4      Q.    Look at page 6 of your report.
5      A.    Page 6.  Okay.  Yes.
6      Q.    Underneath Section 3.2.
7      A.    Yes.
8      Q.    You say:  It is commonly stated
9  that correlation is not the same as
10  causation.
11          Did I read that correctly?
12      A.    Uh-huh.
13      Q.    Yes?
14      A.    Yes.
15      Q.    That's true, right?
16      A.    That is correct.
17      Q.    Correct.
18          Another way to say that is an
19  association is not the same as causation,
20  correct?
21      A.    It could be causation.  It
22  could be something else, spurious, like they
23  say.
24      Q.    Correct.
25          So an association may or may

CONFIDENTIAL

Page 210

1 not be causal, right?
2    A.    May or may not be.  That's more
3 accurate.
4    Q.    And that's because, as you say
5 in your expert report, many correlations are
6 incidental or spurious, right?
7    A.    Yeah.
8    Q.    By spurious, you mean
9 inaccurate or not real, right?
10    MS. EMMEL:  Objection, vague.
11    A.    I meant they are confounded, so
12 two things could be related, by A causing,
13 like they say A and B, A causing B, B causing
14 A, or another variable, C, causing both.
15 BY MR. DAVIS:
16    Q.    Okay.  So another way to say
17 that is that an association or correlation,
18 even a statistically significant one, may or
19 may not be causal?
20    A.    If it's only a correlation,
21 yes.  I have to qualify that "yes" also.  One
22 of the studies that you mentioned is my
23 study.  I conducted a LiNGAM analysis, which
24 can, with certain stipulations and
25 assumptions, show the direction of affect,

Page 211

1 but if A is causing B or B causing A, without
2 having the longitudinal or experimental study
3 design.
4    MR. DAVIS:  I'm sorry, move to
5 strike as nonresponsive.
6 BY MR. DAVIS:
7    Q.    My question simply was,
8 Dr. Mojtabai:  Another way to say, is
9 basically, you agree that an association or
10 correlation, even a statistically significant
11 one, may or may not be causal?
12    MS. EMMEL:  Objection, vague.
13    A.    Yeah, that's correct.
14 BY MR. DAVIS:
15    Q.    Okay.  And you also agree that
16 even saying that there's an increased risk,
17 that does not mean there is, in fact, a
18 causal relationship, right?
19    A.    That's the same -- increased
20 risk is a different way of saying there is
21 correlation.
22    Q.    Let me hand you what's been
23 marked as Exhibit 10.
24    (Whereupon, Mojtabai-10,
25    Excerpt From Reference Manual on

Page 212

1 Scientific Evidence, Third Edition,
2 was marked for identification.)
3    MS. EMMEL:  Could I also get
4 the Exhibit 9?
5    MR. DAVIS:  I don't have it.  I
6 don't have an extra copy, but we'll
7 find it.
8    MS. EMMEL:  All right.
9 BY MR. DAVIS:
10    Q.    Dr. Mojtabai, I've handed you
11 Exhibit 10, which are portions of the
12 Reference Manual on Scientific Evidence.
13    Do you see that?
14    A.    Yes.
15    Q.    Have you ever seen this before?
16    A.    Looks familiar to me, but --
17    Q.    Is this something that you
18 evaluated and considered in the past?
19    MS. EMMEL:  Objection, vague.
20    A.    I don't recall.  Might have
21 been, but I don't recall.
22 BY MR. DAVIS:
23    Q.    Okay.  It's certainly something
24 that you're familiar with, right?
25    A.    Not much, but I have seen it

Page 213

1 referenced or maybe used the reference in
2 some of my work.
3    Q.    If you look at page 560, it
4 says, quote:  Cross-sectional studies
5 determine the presence (prevalence) of both
6 exposure and disease in the subjects and do
7 not determine the development of disease or
8 risk of disease (incidence).
9    Did I read that correctly?
10    A.    Correct.
11    Q.    You agree with that statement,
12 right?
13    A.    I agree with that, yes.
14    Q.    Okay.  And cross-sectional
15 studies, I think we've talked about before,
16 are unable to determine the direction by
17 which the association may be going, right?
18    A.    I think I mentioned to you the
19 LiNGAM analysis I did.  There are -- there
20 are scenarios where you can use them to get
21 more than just the correlation.  You can get
22 the direction of effect from some analysis.
23    Q.    In your 2024 paper that we
24 marked as an exhibit --
25    A.    Yes.

54 (Pages 210 - 213)

CONFIDENTIAL

Page 214

1    Q.    -- is there anywhere in that
2  paper where you say that your study from 2024
3  shows a causal effect between social media
4  use and adverse mental health outcomes in
5  adolescents?
6    A.    What I say here, I can quote:
7  LiNGAM analysis supported the direction of
8  effect going from social media use and
9  problematic social media use to psychological
10 symptoms.
11   Q.    Do you say the word "cause"
12 anywhere in that paper?
13   A.    Direction of effect, in my
14 mind, is causation because we talked about A
15 causing B, that's one direction, B causing A,
16 that's another direction, and then C causing
17 both, that's a sort of two directions going
18 between the two.
19        So directionality of effect is
20 about the same thing as causation.
21   Q.    Right.  We know you said in
22 your paper:  Because of the cross-sectional
23 nature of the data, change in adolescents'
24 mental health as a result of change in social
25 media use could not be determined.

Page 215

1        Correct?
2    A.    That refers to within-person
3  effects, not between effects.
4    Q.    Well, your -- your 2024 study
5  was cross-sectional.  It was not
6  longitudinal, true?
7    A.    It was multiple cross sections,
8  correct.
9    Q.    Right.  When you say multiple
10 cross sections, what you're describing is at
11 different points in time --
12   A.    Yes.
13   Q.    -- for each wave, you drew out
14 at the same time the exposure and the
15 outcome, correct?
16   A.    Correct.
17   Q.    Your study was not lagged, was
18 it?
19   A.    No.
20   Q.    Correct.
21        So what you're describing is at
22 multiple points along the way for your study,
23 you're assessing exposure and outcome at the
24 same time, correct?
25   A.    That is correct.

Page 216

1    Q.    Right.  That is not a
2  longitudinal study, correct?
3    A.    And that's why I couldn't
4  establish within-person effects, that's
5  correct.
6    Q.    Well, you're not establishing
7  between-person effects either because
8  you're -- you're only looking -- well, let me
9  back up.
10        Your study doesn't, for
11 example, look at -- I'll strike that.  I'll
12 strike it.
13        You agree that any -- one of
14 the limitations of cross-sectional studies is
15 that any association between the two
16 variables may be related to a third variable
17 that is not captured in the study, correct?
18        MS. EMMEL:  Objection, vague,
19 speculation.
20   A.    That is a possibility, yes.
21 That's --
22 BY MR. DAVIS:
23   Q.    Well, it's not a possibility.
24 It's a statement that you made in your
25 report, isn't it?

Page 217

1        Look at page 12.
2    A.    Yeah.  Where do you want me to
3  look at?
4    Q.    First full paragraph.
5    A.    Okay.
6    Q.    Six lines down:  Another
7  limitation of these studies is that any
8  association between the two variables may be
9  related to a third variable that is not
10 captured in the study.
11        Did I read that correctly?
12   A.    That is correct.
13   Q.    Right.  And what you're talking
14 about there is a confounder, right?
15   A.    Correct.
16   Q.    Right?
17        And just so people know what
18 confounders are, confounders are potential
19 explanations or reasons for why there may be
20 an association, right?
21   A.    That's correct.
22   Q.    Right.
23        And confounders are not -- are
24 not accounted for in cross-sectional studies,
25 correct?

55 (Pages 214 - 217)

CONFIDENTIAL

Page 218

1    A.    Some cross-sectional studies
2  account for the confounders.  It's not a
3  blanket statement that --
4    Q.    Confounders -- let me ask it a
5  different way.
6        In a cross-sectional study,
7  confounders can't be ruled out as the reason
8  for why there may be a statistically
9  significant association, right?
10    A.    Again, it's a -- it's a case by
11  case, can be ruled out or cannot be ruled
12  out.  If you consider all the potential
13  confounders of a relationship, and you adjust
14  for them in the analysis, then you have
15  adjusted for them.  In effect, you have
16  accounted for them.
17    Q.    Yeah, I'm simply asking that:
18  Are you aware -- well, let me back up.
19        A confounder is -- do you agree
20  that in order to determine whether there is a
21  nonspurious association --
22    A.    Yeah.
23    Q.    -- that bias and confounding
24  have to be ruled out?
25    A.    You have to define bias.  What

Page 219

1  do you mean by bias?
2    Q.    Well, you're familiar with
3  reporting bias, right?
4    A.    Right.  But different biases --
5    Q.    Yes.  But I want to capture in
6  every bias you can think of for a study,
7  okay?
8        Do you agree that in order to
9  make sure that you do not have a spurious
10  association, that bias and confounding have
11  to be ruled out?
12    A.    Again, it's a -- yeah, it --
13  I'm not sure exactly what bias is meant here.
14  Confounding can cause bias.  Bias is when
15  your findings deviate from the true value, so
16  the multiple factors that can contribute in
17  any type of study to bias, and that has to be
18  adjusted to the extent possible in this
19  study.
20    Q.    Right.  But --
21    A.    Confounding is one of them.
22  You can adjust for different confounding
23  variables in the model and you can do a good
24  job depending on what you have, or not.
25    Q.    But irrespective of how you

Page 220

1  view bias, bias or confounding have to be
2  ruled out to make sure you're not dealing
3  with a spurious association, right?
4        MS. EMMEL:  Objection,
5        compound.
6    A.    There could be bias in a study
7  and the causal relationship could still be
8  seen there, observed.
9        So it doesn't exactly work
10  with -- you know, work against your causal
11  inference.
12        Let's say your measurement is
13  biased.  You're somewhat getting a different
14  reading on your measures than the realities,
15  but in your analysis, you see that it's both
16  groups, let's say, those who are exposed and
17  not.
18        In that case, that bias
19  necessarily does not work against the causal
20  deduction.
21  BY MR. DAVIS:
22    Q.    Okay.
23    A.    So bias is different.  That's
24  why I'm hedging my --
25    Q.    Okay.  You agree that

Page 221

1  confounding has to be ruled out to --
2    A.    Yeah.
3    Q.    -- to determine that you're not
4  dealing with a spurious association?
5    A.    It has to be adjusted for -- to
6  the extent possible for whatever factors you
7  think are confounding your association.
8    Q.    Right.
9        And if a study doesn't account
10  for potential known confounders, it may
11  produce a spurious association, right?
12    A.    Or may, on the other hand,
13  produce no association when one exists.
14    Q.    Okay.  And you agree that in
15  order to establish that you're dealing with
16  an association that's not spurious, you also
17  have to rule out reverse causation, right?
18    A.    Again, reverse causation may
19  mean different things.  If you're talking
20  about reciprocal causation, it's possible
21  that A causes B, B causes A.
22        In that case, ruling -- you
23  don't need to rule out, you need to establish
24  that one of these causes, that is, your
25  interest, is happening.

56 (Pages 218 - 221)

CONFIDENTIAL

Page 222

1    A lot of relationships are
2  reciprocal.
3    Q.    In order to assess whether
4  reciprocal causation is taking place --
5    A.    Yeah.
6    Q.    -- you have to assess at the
7  same time whether A causes B and B causes A,
8  right?
9    A.    You could do that, yes.
10    Q.    Yes. Okay.
11    So for here, in this situation
12  for social media, it would be assessing in
13  your study that adverse mental health
14  outcomes like depression or anxiety can be
15  the reason why people are on social media,
16  and in the reverse, that social media use is
17  why people have symptoms of anxiety or
18  depression, right?
19    MS. EMMEL:  Objection, vague
20    and compound.
21    A.    Can be, yes.
22  BY MR. DAVIS:
23    Q.    Is that right?
24    A.    Your question is -- can you
25  repeat, I'm sorry.

Page 223

1    Q.    Yeah.  I'm just trying to get
2  reciprocal causation in the context of social
3  media, right?
4    A.    Yes.  Yeah.
5    Q.    What that means is that you
6  want to make sure that in assessing your
7  study, that social -- strike that.
8    In the context of social media,
9  reciprocal causation means that you need to
10  assess in your study that depression, anxiety
11  or some other mental health situation is --
12  whether or not that's leading to social media
13  use as well as whether or not social media
14  use then results in depression, anxiety or
15  some other mental health outcome, right?
16    MS. EMMEL:  Objection,
17    compound.
18    A.    That's the definition of
19  reciprocal causation.
20  BY MR. DAVIS:
21    Q.    Okay.  And you agree that in
22  terms of your hierarchy, the pyramid of
23  evidence, you put longitudinal studies above
24  cross-sectional studies, right?
25    A.    I did, yes.

Page 224

1    Q.    And you say that longitudinal
2  studies are designed to capture the temporal
3  order of cause and effect, right?
4    A.    Correct.
5    Q.    And the reason you say that is
6  because cross-sectional studies are not
7  designed to do that, correct?
8    A.    They are -- I'm going to have
9  to qualify.  There are cross-sectional
10  studies, multiple waves, that could be
11  looking at trends of one variable versus the
12  other variable.
13    And so saying that they are not
14  designed to do that is -- I don't think it's
15  accurate in every case.  In most cases, I
16  would agree.
17    Q.    Yeah.  You say: A major
18  advantage of longitudinal studies is that
19  they allow researchers to examine -- examine
20  the temporal order --
21    A.    Right.
22    Q.    -- of events, which is one of
23  the Hill guidelines for causal associations.
24    Correct?
25    A.    Correct.

Page 225

1    Q.    You don't say that about
2  cross-sectional studies in your report, do
3  you?
4    A.    Typically not.
5    Q.    Okay.  You agree that
6  longitudinal studies take precedent over
7  cross-sectional studies with respect to a
8  causal assessment, right?
9    MS. EMMEL:  Objection, vague.
10    A.    Yeah, that's implied in the
11  pyramid that I put there.
12  BY MR. DAVIS:
13    Q.    Okay.  And you agree that if a
14  longitudinal study assesses the exposure and
15  the outcome at the same time, it is really
16  doing a cross-sectional analysis, right?
17    A.    By definition, longitudinal
18  studies have more than one wave, so the
19  assessments are done at different --
20    Q.    Let me ask it a different way.
21    A.    Yes.
22    Q.    Tell us what lagging is.
23  Lagging in a longitudinal study, what is it?
24    A.    That's a way of analyzing the
25  data, if you have longitudinal data that are

57 (Pages 222 - 225)

CONFIDENTIAL

Page 226

1  spaced -- the assessments are spaced at
2  regular intervals or even irregular.
3  Nowadays they can do it with irregular
4  intervals.
5          And you can look at the effect
6  of two variables or more, A at one time
7  impacting B at time two, and B at time one
8  impacting A at time two.
9          So you could do that, and you
10 have to take into account auto-regression,
11 which means that association of the same
12 variable measured over time.
13     Q.   Right.
14          And if a longitudinal study
15 doesn't do that type of lagging, and instead,
16 takes out and measures outcome and exposure
17 at the same time --
18     A.   Right.
19     Q.   -- what it's really doing is
20 doing cross-sectional analysis at multiple
21 points along the longitudinal study, right?
22     A.   I'm not familiar with a
23 longitudinal study that does that.
24     Q.   All right.  You've got -- at
25 the top of the pyramid, you've got

Page 227

1  experimental studies, right?
2      A.   Right.
3      Q.   And you agree that they are
4  generally referred to as the gold standard
5  when it comes to making causal assessments,
6  right?  Yes?
7      A.   Yes, that is correct.
8      Q.   And you don't believe it's
9  practical to actually assign participants in
10 an experimental study when it comes to social
11 media use, correct?
12     A.   I don't think it is practical
13 or even ethical to assign adolescents, for
14 example, to use social media or not use
15 social media for long time -- long period of
16 time and look at its impact.
17     Q.   Well, irrespective of -- you
18 understand that there are experimental
19 studies that have been done with respect to
20 social media use, right?
21     A.   There have been studies that
22 have limited or restricted social media use
23 for a few weeks at most, or some of them
24 maybe a couple of months, and then looked at
25 the impact on the outcomes.

Page 228

1      Q.   Okay.  And you agree that if
2  you're going to do a randomized controlled
3  trial for social media use, you ought to make
4  sure that the study participants are blinded,
5  right?
6      A.   Blinding is coming -- comes
7  from the pharmaceutical randomized controlled
8  trials, where you can have a placebo pill
9  that looks exactly like the medication,
10 active medication.
11         I don't think it is even
12 feasible to blind people.  You're telling
13 them to not use their social media for -- or
14 use it less, how could you blind them?
15     Q.   What's the effect of not
16 blinding them for the -- with respect to the
17 RCTs for social media use?
18         MS. EMMEL:  Objection, vague.
19     A.   What's the advantage of
20 blinding?
21 BY MR. DAVIS:
22     Q.   No, what's -- yeah.  Let me --
23     A.   Yeah.
24     Q.   Given that you agree that
25 almost all of the studies, experimental

Page 229

1  studies on social media use, are not blinded,
2  right?
3      A.   They cannot.  It's almost
4  impossible to tell them to do something and
5  then forget about what I told you to do.
6      Q.   So what's the limitation from
7  doing that?
8      A.   It could create some
9  expectation in the subjects that -- if they
10 know what the purpose of the study is.
11     Q.   You're talking about a demand
12 effect?
13     A.   In effect.
14     Q.   So, for example, the study
15 participants know what the study is about,
16 and then, consciously or subconsciously, mold
17 answers to questions they get in the study
18 about how they feel to what they think the
19 answer ought to be?
20     A.   It's a potential.
21     Q.   It's a potential limitation?
22     A.   Yes.
23     Q.   Right.
24         And in your mind, did you look
25 at any of the experimental studies to

58 (Pages 226 - 229)

CONFIDENTIAL

Page 230

1 determine whether they adequately control for
2 demand effects?
3     A.    The one study that I looked at
4 described the -- so assigned the subjects to
5 different arms.  One of them, I think, was
6 water restriction and the other, social media
7 restriction, and they didn't specifically
8 tell them what the purpose of this study was.
9     Q.    Yeah.  I think you may have
10 missed my question.
11        My question was:  When you
12 looked at each of the experimental studies on
13 social media, did you analyze them
14 specifically for the issue of the impact of
15 demand effects on the study findings?
16     A.    As I said, it's almost
17 impossible to blind this study, so there's
18 no -- you know, there's nothing to look at
19 or --
20     Q.    I'm just asking you:  Did you
21 take -- when you looked at the randomized
22 controlled trials or experimental studies on
23 social media, did you analyze them
24 specifically for how demand effect could have
25 impacted the study findings?

Page 231

1        MS. EMMEL:  Objection, asked
2     and answered.
3     A.    There is -- I could say yes.  I
4 had an eye on that, and there's one study
5 specifically, the meta-analysis by --
6 through -- I think that was published in
7 2025, and they divided the sample into those
8 who had restrictions in social media use for
9 less than one week and some, more than one
10 week.
11        And they found that social
12 media restrictions was actually causing
13 negative effect in those who were exposed to
14 less than one week whereas it was protective
15 or improved their mental health in the longer
16 studies.
17        This tells me that the
18 demand -- if there is an effect of demand, it
19 is small.  It's not impacting causal
20 inference based on these studies.
21 BY MR. DAVIS:
22     Q.    In your report, you never set
23 out any analysis of the demand effects in the
24 experimental studies, do you?
25     A.    I don't recall that I have done

Page 232

1 that in my report.
2     Q.    Right.
3     A.    I don't know I've -- maybe in
4 the May report I talked about it or--
5     Q.    I didn't find it, so if you
6 know of it, I want you to tell me now.
7     A.    Well, as I told you, the Thrul
8 study gave me -- I think it was published --
9 may have been published after my April report
10 at least.  So gave me the idea.
11        You said in my -- looking at
12 evidence, did I see some, and that's
13 everything -- good evidence in my mind that
14 demand is not a major factor.
15     Q.    Let me make sure I understand
16 what you're saying.
17     A.    Yes.
18     Q.    What study are you referring to
19 from 2025?
20     A.    Johannes Thrul and colleagues.
21 I don't know if it is in the list of the
22 studies here, but it's -- I'm sure it's in
23 the material considered.
24        MR. DAVIS:  Let's go off the
25     record so you can find it.

Page 233

1        THE WITNESS:  Sure.
2        THE VIDEOGRAPHER:  All right.
3     We're off the record at 1:55 p.m.
4     That's the end of Media 4.
5        (Recess taken, 1:55 p.m. to
6     1:55 p.m. CDT)
7        THE VIDEOGRAPHER:  We're back
8     on the record at 1:55 p.m.  This is
9     the beginning of Media 5.
10 BY MR. DAVIS:
11     Q.    All right.  You were able to
12 identify the 2025 study as the Thrul,
13 T-H-R-U-L, study, right?
14     A.    Yes.
15     Q.    Okay.  And that was a study
16 that you added to your MDL federal report in
17 May of 2025, right?
18     A.    Actually, it was in this one.
19 So this is the April report.
20     Q.    Okay.  So help me out again.
21        Other than looking at the Thrul
22 2025 meta-analysis, did you do any other type
23 of analysis to assess demand effects in any
24 of the experimental studies on social media?
25     A.    I didn't see any -- any

59 (Pages 230 - 233)

Page 234

1  variables that could actually help me examine
2  whether there was differences in demand or
3  not.
4       Q.    Okay.  So another way of saying
5  it is that the studies themselves didn't
6  specifically assess demand effect so that you
7  couldn't either?
8       A.    If they had assessed it, maybe
9  they did, I can't speculate.  Maybe they --
10      Q.    I'm just only asking about what
11  they reported.
12            You didn't see any assessment
13  in the RCTs on social media use where they
14  specifically analyzed demand effects in those
15  studies, right?
16      A.    I personally did not.
17      Q.    Okay.  And you agree that if
18  you're going to -- none of the experimental
19  studies on social media use actually look at
20  diagnosed disorders, correct, diagnosed
21  psychiatric disorders?
22            MS. EMMEL:  Objection, vague.
23      A.    I should say that there are
24  some studies that look at the restriction in
25  social media use in children/adolescents with

Page 235

1  preexisting mental health problems, so that's
2  a diagnosed disorder.
3  BY MR. DAVIS:
4       Q.    I'm asking about experimental
5  studies.
6       A.    Yeah.  Well, experimental
7  studies, they -- restrictions for
8  children/adolescents with mental health
9  problems, I believe there is.
10      Q.    Which study?
11      A.    I have to look at it and find
12  it.  Let's see where they talk about
13  preexisting...
14            (Document review.)
15            MR. DAVIS:  Why don't we go off
16  the record while you look.
17            THE WITNESS:  Sure.
18            THE VIDEOGRAPHER:  We're off
19  the record at 1:59 p.m.  That's the
20  end of Media 5.
21            (Recess taken, 1:59 p.m. to
22  2:02 p.m. CDT)
23            THE VIDEOGRAPHER:  We're back
24  on the record at 2:02 p.m.  This is
25  the beginning of Media 6.

Page 236

1  BY MR. DAVIS:
2       Q.    Dr. Mojtabai, did you find the
3  RCT that you say actually assessed diagnosed
4  disorders as an outcome?
5            MS. EMMEL:  Objection,
6  misstates testimony.
7       A.    As an outcome of -- no, I
8  didn't say that.
9  BY MR. DAVIS:
10      Q.    Let me clarify my question,
11  then.
12      A.    Right.
13      Q.    Is there any experimental study
14  that you analyzed that had an outcome of a
15  diagnosed psychiatric disorder?
16      A.    So outcome of psychiatric --
17  diagnosed psychiatric disorder.
18            There are so many elements in
19  this.  Diagnosed, you mean by clinician
20  diagnosed?
21      Q.    Yes.  Where there was some -- a
22  clinical evaluation and an assessment that
23  someone had a psychiatric disorder, that that
24  was the outcome that was measured.
25      A.    So let me see if I understand.

Page 237

1            So you're saying they take
2  children and some of them are reducing use of
3  social media, some of them are not reducing
4  use of their social media, and then after the
5  experiment, at the end of the experiment,
6  they look at the incidence or prevalence of
7  diagnosed-by-clinician mental disorders?
8            Is that your question?
9       Q.    Yeah.
10      A.    Is that the design you're
11  thinking about?
12      Q.    Yeah.  I'm looking at it where
13  there's an experimental study where there's
14  some intervention, either social media use is
15  not -- is discontinued, stopped overall, or
16  reduced in some way, and then the outcome
17  that they're analyzing is psychiatric -- a
18  psychiatric disorder.
19            Is there such an animal?
20      A.    That animal, if it exists, has
21  to be very large and infeasible to conduct.
22      Q.    I'm not asking whether it's
23  feasible or large.  I'm just simply asking:
24  Is there such a study that fits that
25  description?

60 (Pages 234 - 237)

CONFIDENTIAL

Page 238

1    A.    If it's not feasible, it
2  doesn't exist.
3        Q.    You don't know of one, do you?
4        A.    I don't know of.
5        Q.    Do you know of any longitudinal
6  study where the outcome that was being
7  measured was a diagnosed psychiatric
8  disorder?
9        A.    I think we established that
10 there are not many studies in psychology or
11 in psychiatric epidemiology where the outcome
12 is a diagnosed psychiatric disorder by a
13 clinician. I mean, it just doesn't happen
14 because --
15       Q.    That's not my question. I'm
16 not asking what someone else does.
17            I'm asking for the studies that
18 you looked at --
19       A.    Yeah.
20       Q.    -- was there any longitudinal
21 study that actually assessed a diagnosed
22 psychiatric disorder as an outcome measure?
23       A.    I'm not aware of one.
24       Q.    Are you aware of any
25 cross-sectional study that used a diagnosed

Page 239

1  psychiatric disorder as an outcome measure?
2        A.    Again, diagnosed, you mean the
3  same thing that we talked about, which is
4  a -- can you define diagnosed again for me?
5        Q.    You diagnose people all the
6  time, right?
7        A.    By a clinician you mean?
8        Q.    Correct, a clinician or other
9  specialist, right?
10       A.    Is there any -- some specialist
11 or professional -- okay, let me ask the
12 question again.
13       A.    All right.
14       Q.    Is there any cross-sectional
15 study that you know of that assessed
16 diagnosed psychiatric disorder -- I'm sorry,
17 I butchered that. Let me start again.
18            Is there any cross-sectional
19 study that you know of that assessed as an
20 outcome measure a diagnosed psychiatric
21 disorder?
22       A.    By a clinician?
23       Q.    Or other professional.
24       A.    Or other professional.
25            That's not the standard of

Page 240

1  research in mental health field, so --
2        Q.    Do you know of one?
3        A.    I don't know of any.
4        Q.    Okay. Now, let's go back to
5  talking about confounders real quick, okay?
6  Wait a minute. Okay. Never mind. We...
7            You agree that the studies that
8  you're relying upon almost exclusively rely
9  upon self-reports of their symptoms?
10           MS. EMMEL:  Objection, vague.
11       A.    Some of these studies have
12 looked at other outcomes like suicide,
13 suicidal behavior. Some have report -- have
14 relied on behavioral outcomes, like eating
15 disorder symptoms, like dieting or using
16 laxatives, et cetera.
17           But in general, in mental
18 health research and psychiatric epidemiology,
19 we rely on validated self-report measures.
20 Even clinical assessments that you're
21 mentioning as a standard, it relies on
22 self-report.
23           You ask patients questions
24 about their sleep, their mood, their
25 activities, impairment in functioning. These

Page 241

1  are all self-report.
2            MR. DAVIS:  I move to strike as
3  nonresponsive.
4  BY MR. DAVIS:
5        Q.    Dr. Mojtabai, the suicidality
6  studies that you mentioned, those were based
7  upon self-reports of self-harm or suicidal
8  thoughts or behavior, right?
9        A.    Or parental reports.
10       Q.    Right. But again,
11 self-reports, right?
12       A.    Well, we don't know. You're
13 assuming that the parents are relying on...
14       Q.    And the eating disorder
15 symptoms studies that you mentioned, those
16 are also based upon self-report by the
17 patient or by parents as opposed to an actual
18 diagnosis, correct?
19       A.    Or scales, questionnaires that
20 developed -- are developed for assessment of
21 these outcomes.
22       Q.    The scales are based upon
23 self-reports by the patients, right?
24       A.    The way we get data from our
25 subjects in our field is self-report, mainly.

61 (Pages 238 - 241)

CONFIDENTIAL

Page 242

1    Q.    Let me go back to my question.
2        The eating disorder symptom
3  studies that you mentioned are based upon
4  self-reports, including screening scales or
5  tools that the patients or the parents
6  complete, correct?
7    A.    I wouldn't call them screening.
8  They're -- the measures are to replicate the
9  way a diagnostician would go about asking
10  questions.  They would standardize and
11  replicate.  In that way, they ask the same
12  question from every person.
13        And that's why we don't use
14  clinicians, because clinicians are
15  individual.  They could ask different
16  questions.  Their judgment would get in the
17  way -- subjective judgment would get into the
18  way, and the results would be unreliable.
19        MR. DAVIS:  Move to strike as
20      nonresponsive.
21  BY MR. DAVIS:
22    Q.    My question simply was:  For
23  the eating disorder symptom -- strike that.
24        For the studies that you
25  discussed about eating disorder symptoms,

Page 243

1  those were based upon either self-report or
2  questionnaire that patients or parents had
3  filled out, and not an actual diagnosis of an
4  eating disorder, fair?
5    A.    I think it's a fair statement.
6    Q.    Okay.  Now, you agree that
7  people -- look at page 12 of your report.
8        You say that people are -- will
9  you agree that people are generally not good
10  at accurately recalling past events and the
11  temporal order of past experiences, right?
12    A.    Which one are we talking about,
13  the second full paragraph?
14    Q.    Yes.
15    A.    Yeah?
16        (Document review.)
17    A.    Yeah, I see that.
18  BY MR. DAVIS:
19    Q.    And you agree with my
20  statement, then?  You agree, right?
21        You agree that people are
22  generally not good at accurately recalling
23  past events and the temporal order of past
24  experiences, correct?
25    A.    No, I don't agree with that.

Page 244

1  Because it's out of context.  I'm talking
2  about case-control studies.  Case-control
3  studies go years behind, so you go -- you
4  ask -- so in school, was the -- were you --
5  did you fail that subject, and 20 years
6  later, people cannot remember that.
7        There is good evidence that if
8  you ask about recent events, people have
9  better memories.
10        We all remember what we ate for
11  lunch today and we all remember what we ate
12  for breakfast, but maybe two weeks before, we
13  won't remember.
14    Q.    You have said that a major
15  limitation of psychiatric research is the
16  fact that it's built on self-reports,
17  correct?
18        MS. EMMEL:  Objection,
19      misstates testimony.
20    A.    Where did I say?  I'm sorry.
21  BY MR. DAVIS:
22    Q.    Is it your testimony you've
23  never said that?
24    A.    What did I --
25    Q.    Is it your -- you have said

Page 245

1  publicly --
2    A.    Uh-huh.
3    Q.    -- that a major limitation of
4  psychiatric research is that it's built on
5  self-report, correct?
6    A.    I said it here?
7    Q.    Have --
8    A.    No, I didn't -- I don't recall
9  that.
10    Q.    Let me play you a clip of what
11  you said at a presentation.
12    A.    Okay.
13        ----------
14        (Whereupon, Exhibit 12 was
15      played in the deposition room,
16      transcribed as follows.)
17        DR. MOJTABAI:  We rely on
18      self-report.  We do not have objective
19      measures of disorders, and that is a
20      major limitation.
21        (Transcription ends.)
22        ----------
23  BY MR. DAVIS:
24    Q.    You agree with that, right?
25    A.    I have to contextualize it.

62 (Pages 242 - 245)

CONFIDENTIAL

1    Q.   Do you -- let me ask my
2    question first.
3         Do you agree with that
4    statement?
5    A.   Well, I mean, when you take it
6    out of the context, how could I agree with it
7    or disagree with it?  I have to contextualize
8    it.
9         I'm talking about the problem
10   with mental health in general, in general, is
11   that we don't have measures like blood
12   pressure, blood sugar, and that's a major
13   limitation of the field.
14        MS. EMMEL:  Also, Counsel, we
15   would like that introduced as an
16   exhibit, and we would like to know
17   where that clip came from.
18        MR. DAVIS:  Noted.
19   BY MR. DAVIS:
20   Q.   Now, you agree that the
21   relationship of social media use with
22   depressive symptoms may be related to poor
23   peer relationships, correct?
24   A.   It could be related to a host
25   of other risk factors, right.

1    Q.   Such as what?
2    A.   Depression, you mean?  Can you
3    ask me again what specific...
4    Q.   Yeah.  I said the relationship
5    of social media use with depressive symptoms
6    may be related to poor peer relationships.
7    A.   Right.
8    Q.   And then you agreed, and I
9    said -- you said it could be related to a
10   number of things.  And I said:  What are the
11   other things?
12   A.   So I didn't hear the first part
13   of it.  You're talking about social media.
14   So it can't be related to -- it can't be
15   related to a very large host of things, but
16   it could be -- I'm thinking what it could be
17   related to.
18        It could be related to the way
19   that children interact with social media or
20   it could be related to the fact that they're
21   not engaging in other things because they're
22   not able.  They're spending all their time on
23   social media so they don't have time to hang
24   out with their friends, to socialize.
25        So it could be...

1        MR. DAVIS:  Move to strike as
2    nonresponsive.
3    BY MR. DAVIS:
4    Q.   You agree that -- I want to go
5    back to experimental studies for a moment,
6    okay?
7    A.   Sure.
8    Q.   Do you agree that virtually all
9    of the experimental studies on social media
10   did not have a patient population focused on
11   either adolescents or children younger than
12   12?
13        MS. EMMEL:  Objection,
14   speculation, vague.
15   A.   I have to go through the list
16   to see if the ages of some of those studies
17   were inclusive of 12 or not.
18   BY MR. DAVIS:
19   Q.   Can you think of any today that
20   had -- that exclusively looked at an age
21   range of 10 to 19?
22   A.   In social media experiments,
23   you mean?
24   Q.   Yes.
25   A.   I recall there was one study, I

1    think, where I talk about the experimental
2    studies that was inclusive of only
3    adolescents, but it's -- I remember that one
4    study.  The name of the author, I have to
5    look.
6    Q.   Do you know of more than one
7    study?
8    A.   Other studies included
9    adolescents --
10   Q.   Yeah.  I'm asking a different
11   question.
12        Do you know of more than one
13   study that looked at -- of experimental
14   studies that looked at the age range from 12
15   to 19?
16   A.   Exclusively those ages?
17   Q.   Somewhere in that range, yes.
18   A.   Nothing outside of that range?
19   Q.   That's right.
20   A.   That one study comes to my
21   mind.  I don't remember the author, but I
22   have referenced it and have made this point
23   that this study is --
24   Q.   Do you agree that for most of
25   the experimental studies, what they did was

63 (Pages 246 - 249)

CONFIDENTIAL

1  what are called convenience samples?
2      A.    Well, convenience sample --
3  sampling is -- again, is a very broad term.
4  It could mean that right now everybody is in
5  this room, I pass out a questionnaire, that's
6  a convenience sample.  But then it's possible
7  that people are recruited through online.
8  Some of these studies recruited online.
9          I wouldn't call that
10  necessarily a convenience sample.  Online
11  sampling or even sample in a school could
12  be -- or in a college -- I wouldn't
13  necessarily call it a convenience sampling
14  unless it is a specific class.  If it's a
15  Psychology 101, I go and administer the
16  question to them because it's a captive
17  audience.  It's very convenient.
18      Q.    I'm just simply asking:  Do you
19  agree that most of the studies, the
20  experimental studies, were convenience
21  samples of college students?
22          MS. EMMEL:  Objection,
23  foundation.
24      A.    I do not agree with that
25  because I can't -- I don't -- I don't know if

1  they were from the same class or they were
2  sample -- representative sample of college
3  students.
4  BY MR. DAVIS:
5      Q.    If you only had the
6  experimental studies --
7      A.    Right.
8      Q.    -- on social media use --
9      A.    Uh-huh.
10      Q.    -- and adverse mental health
11  outcomes, could you reach an opinion to a
12  reasonable degree of medical or scientific
13  certainty that social media use causes the
14  adverse mental health outcomes you've
15  identified in your reports?
16          MS. EMMEL:  Objection,
17  speculation.
18      A.    Yeah, it's again -- I go back
19  to your first question.  In my mind, I look
20  at the totality of these studies.  I cannot
21  in my mind separate them, say, well, can I
22  base my judgment on just experimental studies
23  or just longitudinal studies or just
24  cross-sectional studies.
25          I have to consider all of them

1  because each one of them have limitations.
2  BY MR. DAVIS:
3      Q.    Well, I'm asking you --
4      A.    Right.
5      Q.    -- as an expert -- I'm allowed
6  to ask you hypothetical questions.  And my
7  hypothetical to you is:  If you only had the
8  experimental studies, could you form an
9  opinion to a reasonable degree of medical or
10  scientific certainty that social media use
11  causes the adverse mental health outcomes in
12  your report?
13      A.    You can ask hypothetical
14  questions, but I don't have to answer
15  hypothetical --
16      Q.    You don't have to answer for me
17  today?
18      A.    I cannot, based on just
19  separating those, make a decision or make an
20  opinion sort of like a partial opinion based
21  on that.  I look at all of these studies.
22      Q.    So you need the -- do you need
23  the experimental studies to form --
24      A.    They help.  They all help.
25      Q.    Just let me -- do you need them

1  to form an opinion to a reasonable degree of
2  medical or scientific certainty?
3      A.    Those are parts of this puzzle.
4  I was talking about this puzzle that we're
5  putting together.  They're part of the puzzle
6  too.
7      Q.    And my question is:  If they
8  weren't part of the puzzle, could you form an
9  opinion to a reasonable degree of medical or
10  scientific certainty that social media use
11  causes the adverse mental health outcomes
12  that you identified in your reports?
13          MS. EMMEL:  Objection,
14  speculation.
15      A.    Yeah, I -- it's hard for me to
16  separate them in my mind.  They are part of
17  the -- you have a body of evidence and you
18  can't say, okay, take this part out and would
19  you be able to make that decision?  It's hard
20  for me to do that.
21  BY MR. DAVIS:
22      Q.    On your Pyramid of Evidence --
23      A.    Right.
24      Q.    -- you don't have meta-analyses
25  anywhere on the list, do you?

64 (Pages 250 - 253)

CONFIDENTIAL

1    A.    I don't.
2    Q.    Okay. So, for example, you
3  didn't put meta-analyses at the top of the
4  pyramid, did you?
5    A.    I did not.
6    Q.    And you didn't put
7  meta-analyses of -- strike that.
8        Is it fair to say that when you
9  put together your Pyramid of Evidence, you
10  decided that meta-analyses did not belong in
11  the pyramid?
12    A.    This pyramid was based on
13  another study that was published, an opinion
14  piece, and they had a good point that in the
15  past, meta-analyses were limited to
16  experimental studies, and they would confer a
17  higher degree of evidence or support for
18  causal attributions than individual
19  experimental studies.
20        But nowadays we have
21  meta-analysis of cross-sectional studies, of
22  longitudinal studies and experimental
23  studies. So he, the author, suggested
24  that -- I think it's -- I agree with that,
25  that it's a lens that you could use to look

1  at the totality of these different studies.
2  And so it's not a type of study like --
3    Q.    Where would you put a
4  meta-analysis consisting entirely of
5  cross-sectional data on the Pyramid of
6  Evidence?
7    A.    It's definitely higher than
8  individual single cross-sectional studies
9  that I -- that we talked about.
10    Q.    Would you put it ahead of
11  longitudinal studies?
12    A.    It's like asking do you choose
13  your daughter or your son. It's hard
14  decision. It is -- depends on the -- it
15  depends on the cross -- on the meta-analysis,
16  how large it is, how many studies are
17  included, are the studies for diverse
18  setting, different authors, large samples?
19  Are they using validated measures? Yeah, all
20  of that.
21    Q.    So is it fair to say that
22  sitting here today, you don't know where
23  you'd put cross-sectional studies that
24  were -- strike that.
25        Fair to say you don't know

1  sitting here today where you would put a
2  meta-analysis consisting solely of
3  cross-sectional data on your Pyramid of
4  Evidence?
5    A.    I don't think that it even fits
6  in the pyramid. It's a lens. That's why
7  he's talking about a lens and doesn't put it
8  anywhere in this. He could have put it
9  between cross-sectional and longitudinal,
10  longitudinal and experimental. Again, it's a
11  lens. It magnifies. A lens does that. It
12  magnifies.
13    Q.    But the meta-analyses, just so
14  we're clear, meta-analyses don't -- strike
15  that.
16        If there's a limitation in a
17  group of cross-sectional studies --
18    A.    Yeah.
19    Q.    -- that are in a meta-analysis,
20  the meta-analysis doesn't cure that
21  limitation, does it? It just carries it
22  forward, right?
23    A.    That's why I said if it comes
24  from different authors, different settings,
25  different samples, different times, different

1  locations, those confounding variables are
2  not -- it's very hard to imagine a setting
3  where the same confounder is in every
4  setting, every study, every author, every
5  sample, every country.
6        So it changes. It's more -- it
7  provides more support than individual
8  studies.
9    Q.    Right. But the meta-analysis
10  of cross-sectional data doesn't fix the
11  limitations that the -- each individual
12  cross-sectional study has that's included in
13  the meta-analysis, right?
14        MS. EMMEL: Objection, asked
15    and answered.
16    A.    It doesn't fix that study's
17  limitation, but the results you get from a
18  meta-analysis would be more reliable than
19  what you would get from an individual study,
20  or from tallying the individual studies,
21  saying, okay, this one said yes, this one
22  said no.
23  BY MR. DAVIS:
24    Q.    All right. Let me show you an
25  article that you've coauthored.

65 (Pages 254 - 257)

CONFIDENTIAL

Page 258

1            (Whereupon, Mojtabai-11,
2        Adverse childhood experiences and
3        comorbidity in a cohort of people who
4        have injected drugs, by Sosnowski
5        et al, was marked for identification.)
6        A.    Sure.
7    BY MR. DAVIS:
8        Q.    It's Exhibit 11.  Do you see
9    that this is an article entitled Adverse
10   Child Experiences and Comorbidity in a Cohort
11   of People Who Have Injected Drugs.
12           Right?
13       A.    Correct.
14       Q.    And if you turn to page --
15   page 2.
16       A.    Page 2, yes.
17       Q.    Sorry.  End of page 1.
18       A.    Yes.
19       Q.    It says at the end of page 1:
20   Seminal research in 1998 established that
21   adverse childhood experiences are a risk
22   factor for a wide range of mental, behavioral
23   and physical health problems, including many
24   of the leading causes of death.
25           Did I read that correctly?

Page 259

1        A.    Correct.
2        Q.    And you agree with that, right?
3        A.    Yeah.
4        Q.    And the next sentence says:
5    Subsequent research found that the type of
6    health problems most strongly and
7    consistently linked to a history of childhood
8    adversity are substance use problems and
9    substance use disorders, specifically opioid
10   use disorder.
11           Correct?
12       A.    Yes.
13       Q.    Okay.  And you agree that
14   adverse childhood experiences are a potential
15   confounder for every psychiatric disorder and
16   every mental health outcome that you
17   attribute to social media use, right?
18           MS. EMMEL:  Objection, vague.
19       A.    Yeah, I -- it's -- can you
20   repeat your question?  What is the question?
21   BY MR. DAVIS:
22       Q.    Social -- adverse childhood
23   experiences are a potential confounder for
24   depression, right?
25       A.    Yeah.

Page 260

1        Q.    For anxiety, right?
2        A.    Correct.
3        Q.    For suicidality, right?
4        A.    Correct.
5        Q.    For eating disorders, right?
6        A.    Sure, yeah.
7        Q.    For disordered eating or body
8    imaging issues, correct?
9        A.    Yes.
10       Q.    Okay.  And are you aware of any
11   experimental or longitudinal study that
12   assessed childhood -- adverse childhood
13   experiences as a potential confounder in the
14   study on social media use?
15       A.    So, first of all, can you
16   define for me -- because I don't know where
17   you're going -- what is confounder in your
18   mind?  What is a confounding variable?
19       Q.    Confounder how you've defined
20   it.
21       A.    Okay.
22       Q.    Okay?
23       A.    Confounder is a variable that
24   is cause of both A and B.
25       Q.    That's right.

Page 261

1        A.    Okay.
2        Q.    So you agree that adverse
3    childhood experiences can, one, lead to
4    social -- more social media use, right?
5        A.    I haven't seen any evidence of
6    that.
7        Q.    Well, if a child is having
8    trauma at home, they feel isolated at home,
9    they're having difficulty in school or having
10   family problems or friend problems, or have
11   physical or emotional trauma, all of that can
12   lead to more social media use, right?
13           MS. EMMEL:  Objection,
14       compound.
15       A.    Yeah, this is a lot of --
16   adverse childhood experiences are very
17   specific here.  You --
18   BY MR. DAVIS:
19       Q.    But --
20       A.    -- might have trouble in
21   school --
22       Q.    I'm sorry, go ahead,
23   Dr. Mojtabai.
24       A.    Yeah, yeah.  You put trouble in
25   school, trouble at home, this, that.  These

66 (Pages 258 - 261)

CONFIDENTIAL

Page 262

1  are not all adverse social -- adverse
2  childhood experiences.
3      Q.    Physical and emotional trauma
4  at home is an adverse childhood experience,
5  right?
6      A.    That could be an adverse
7  childhood experience.
8      Q.    It is, right?
9      A.    If it is caused by something
10 happening -- so give you an example.  If like
11 a child lives in a war region and there is
12 bombing all the time, that's a stressor.
13     Q.    We don't need bombing at
14 home --
15     A.    Right.
16     Q.    -- to have an adverse childhood
17 experience, right?
18     A.    It's being physically abused,
19 neglected, being sexually abused, those are
20 the factors that --
21     Q.    Okay.  Can you identify any --
22 as you define in that definition of adverse
23 child experiences, can you identify any
24 longitudinal or experimental study on social
25 media that included that as a confounder?

Page 263

1      A.    First we have to establish that
2  it is a cause for social media use, increased
3  social media use.  A confounder is a variable
4  to both -- is related to both exposure and
5  the outcome.
6          We know these variables are
7  related to the outcome, but we don't know
8  that they're related to social media.
9      Q.    It's a potential confounder,
10 right?
11     A.    It has to be based on research.
12     Q.    But wait a minute.  Wait a
13 minute.  When you do potential confounder --
14 let me strike that.
15          You agree that when you have an
16 abuse at home, neglect at home, physical or
17 emotional trauma to a child at home, that's a
18 risk factor for psychiatric disorders,
19 correct?
20     A.    That part -- that arrow, we
21 know.
22     Q.    Yes.  Right.
23          And so for any of the studies
24 that you rely upon for social media use, did
25 any of them specifically account for that

Page 264

1  risk factor as a potential confounder?
2      A.    That's -- I don't know where
3  you're getting the potential confounders,
4  because that -- the second leg of this
5  argument, that these social -- or social
6  childhood problems are related to social
7  media use, I haven't seen much evidence for
8  it.
9      Q.    Well, you agree that if some --
10 if a child has physical, emotional or other
11 abuse at home, they become more isolated,
12 correct?
13     A.    They may.  Some of them
14 become --
15     Q.    Yeah.
16     A.    They present more externalizing
17 behaviors.  They join gangs.  They maybe
18 engage in rule-breaking behavior.
19     Q.    They become isolated too,
20 right?
21     A.    That could happen too.
22     Q.    And when they become isolated,
23 one thing they can do is to use social media
24 use -- to do social media more, right?
25     A.    I can't agree or not agree

Page 265

1  based on having seen no research on that.
2      Q.    Setting aside whether or not
3  you think it is a potential confounder, have
4  you -- can you identify any longitudinal or
5  experimental study on social media that took
6  into account as a potential confounder
7  adverse childhood experiences?
8      A.    So you mentioned certain
9  behaviors that result from adverse childhood
10 experiences.  Adverse childhood experiences
11 by themselves do not lead to increased use of
12 social media.
13          So you mentioned maybe child is
14 more isolative, may have more depressive
15 symptoms maybe, and that could -- there is
16 some evidence suggesting that there is an
17 association between increased depressive
18 symptoms and use of social -- increased use
19 of social media.  That's the reciprocal
20 causation we were talking about.
21          MR. DAVIS:  I move to strike as
22 nonresponsive.  That's not the
23 question I asked you, Dr. Mojtabai.
24          THE WITNESS:  Okay.
25          ///

67 (Pages 262 - 265)

CONFIDENTIAL

1  BY MR. DAVIS:
2      Q.    I'm asking you, setting aside
3  whether or not you think it's a potential
4  confounder, can you identify any longitudinal
5  or experimental study of social media that
6  took into account adverse childhood
7  experiences as a potential confounder?
8      A.    Again, when we talk about
9  causation, there is a sort of first source of
10  causation, or second, and then like the --
11  what you're saying is that adverse childhood
12  experiences lead to certain behaviors, like
13  depressive symptoms or isolating themselves,
14  social anxiety, maybe, right?  And those kids
15  are more likely to then use social media.
16          If you adjust for those
17  variables, intermediary variables, you have
18  broken this backdoor way of causation.  So
19  if -- if -- if we agree, and there's no
20  evidence that I have seen, that adverse
21  childhood experiences are associated with
22  increased social media use or -- or addictive
23  social media use, even if we assume that
24  there is this relationship -- direct
25  relationship, it is indirect; and it is true

1  other behaviors we talked, internalizing
2  behaviors.
3          And I've seen studies that
4  adjusted for those.  As such, they have
5  broken that factor.
6          MR. DAVIS:  I move to strike as
7      nonresponsive.
8  BY MR. DAVIS:
9      Q.    Dr. Mojtabai, name one study,
10  longitudinal or experimental --
11      A.    Right.
12      Q.    -- that specified that it was
13  using adverse childhood experiences as a
14  potential confounder when assessing social
15  media use.
16      A.    Again, I have to go back to
17  this -- your -- I don't think there is
18  evidence for it to be confounding variables.
19      Q.    You've made that clear.  I'm
20  asking you -- this is my chance to ask you a
21  question about your opinions you're going to
22  offer in the case.
23      A.    Yes.
24      Q.    Name one study that did that.
25      A.    You're asking my opinion or--

1      Q.    Name one study --
2          MS. EMMEL:  Objection --
3  BY MR. DAVIS:
4      Q.    -- that assessed childhood --
5  adverse childhood experiences as a potential
6  confounder.
7          MS. EMMEL:  Objection, asked
8      and answered.
9      A.    I have not looked at the
10  studies specifically for this variable
11  because I don't consider there is strong
12  evidence that it is a confounding variable.
13  BY MR. DAVIS:
14      Q.    Can you identify any
15  experimental or longitudinal study that used
16  as a potential confounder the history of
17  family psychiatric disorder?
18      A.    I have to look at the
19  individual studies and see if they have
20  considered that or not.  I'm not --
21      Q.    Can you name one today?
22      A.    I'm sorry?
23      Q.    Can you name one today?
24      A.    If I can't remember, I can't
25  name them.

1      Q.    Okay.  Can you identify any
2  longitudinal or experimental study that
3  assessed as a potential confounder the study
4  participants' past psychiatric diagnoses and
5  history?
6      A.    Well, even the longitudinal
7  study that Riehm and I were involved in
8  looked at internalizing symptoms year one,
9  looked at marijuana and alcohol use disorder
10  in the lifetime.  We may have also looked at
11  family history, and certainly home
12  environment factors, we looked at those.
13          MR. DAVIS:  Okay.  I don't
14      think you -- object as
15      nonresponsiveness.
16      A.    We have that study --
17  BY MR. DAVIS:
18      Q.    Can you identify any
19  longitudinal or experimental study that
20  assessed as a potential confounder the study
21  participants' past psychiatric diagnoses or
22  history?
23          MS. EMMEL:  Objection, asked
24      and answered.
25      A.    I haven't looked at the studies

68 (Pages 266 - 269)

CONFIDENTIAL

Page 270

1  to -- I don't have the list of the
2  confounding variables in different studies.
3  BY MR. DAVIS:
4     Q.   You can't name one for me
5  today, can you?
6         MS. EMMEL:  Objection, asked
7     and answered.
8     A.   I have to look within the
9  studies to see what variables they adjusted
10  for.
11  BY MR. DAVIS:
12     Q.   Now, you agree that a past
13  psychiatric history and family history of
14  psychiatric disorders are -- both of those
15  place a person at an increased risk for
16  having symptoms of a psychiatric disorder or
17  an actual diagnosis of a psychiatric
18  disorder, right?
19     A.   That is, yes, reasonable
20  assumption.
21     Q.   And you agree that past --
22  someone who has a psychiatric disorder may
23  turn to social media use more frequently
24  because of that psychiatric disorder?
25         MS. EMMEL:  Objection, vague.

Page 271

1     A.   There are studies that show
2  that actually children/adolescents with
3  higher levels of depressive symptoms are more
4  likely to use social media.
5  BY MR. DAVIS:
6     Q.   And that's also true for other
7  psychiatric symptoms too, right, besides
8  depressive disorders?
9     A.   There is also some data showing
10  that children/adolescents with symptoms of
11  eating disorders or who are prone to make
12  social comparisons are more likely to use
13  social media.
14     Q.   Right.
15         Do you agree that personality
16  traits such as negative temperament or
17  negative affectivity can place someone at an
18  increased risk for developing psychiatric
19  disorders or symptoms?
20     A.   They could, yes.
21     Q.   And can you identify any
22  experimental or longitudinal study that
23  assessed negative temperament or negative
24  affectivity as a potential confounder --
25     A.   Well, I --

Page 272

1     Q.   -- for social media use?
2         MS. EMMEL:  Objection,
3     compound.
4     A.   First of all, can you define to
5  me negative affectivity means?  What is meant
6  by it?
7  BY MR. DAVIS:
8     Q.   Negative temperament.
9     A.   What is negative temperament?
10     Q.   You -- well, someone who has a
11  negative outlook on the world.
12     A.   Okay.  In general, people with
13  a more negative outlook on the world are more
14  likely to experience depression, yes.
15     Q.   And other psychiatric disorders
16  too, right?
17     A.   Yeah.
18     Q.   And so my question is:  Can you
19  identify any longitudinal or experimental
20  study that assessed as a potential confounder
21  the study participants' negative temperament
22  or negative affectivity?
23     A.   I think the Millennium study
24  did look at the personality factor,
25  Millennium study of UK.

Page 273

1     Q.   Any others?
2     A.   I would suspect the British
3  studies because they're more likely to
4  include those measures.
5     Q.   Which British studies?
6     A.   Well, Millennium is one of
7  them.
8     Q.   What's the other, if any?
9     A.   Yeah, I can't specifically name
10  them, but I have seen studies adjusting for
11  this.
12     Q.   Can you identify any here for
13  me here today besides the Millennium study?
14     A.   I have to look, if you want.  I
15  have to look at the individual studies if you
16  want -- individual longitudinal studies,
17  because I haven't done that as something that
18  I needed to do for report.
19     Q.   Okay.
20         (Document review.)
21  BY MR. DAVIS:
22     Q.   Let me turn your attention to
23  Section 4.1 of your report, right?
24         This is -- there are two places
25  in your report that you discuss your opinions

69 (Pages 270 - 273)

CONFIDENTIAL

1  about vulnerability of adolescents or
2  subpopulations.
3       One is Section 4.1 and the
4  other is 5.8, correct?
5       A.   For adolescents -- yes.
6       Q.   Okay.  You haven't been able to
7  identify in any of the literature any
8  criteria for a way to identify a subgroup of
9  adolescents that may be more vulnerable to
10 social media use, have you?
11      MS. EMMEL:  Objection, vague
12   and compound.
13      A.   There are studies that show
14 that certain groups are more vulnerable to
15 social media -- to experiencing, for example,
16 comparison, social comparisons on social
17 media, and then experience a negative mood.
18 BY MR. DAVIS:
19      Q.   But in terms of identifying who
20 those people may be in advance, you're -- you
21 don't know of a set of criteria that allows
22 somebody to identify who those are, right?
23      A.   Well, as I mentioned, different
24 studies have -- have used measures of sort
25 of, like, people's -- you're talking about

1  personality, or other vulnerabilities that
2  might predispose them to develop adverse
3  mental health outcomes when exposed to social
4  media.
5       Q.   Changing topics just slightly.
6       A.   Okay.
7       Q.   You haven't been asked to
8  assess and give opinions on any of the
9  individual plaintiffs that are involved in
10 this litigation, have you?
11      A.   No.
12      Q.   You don't have any opinions
13 about whether or not a specific or particular
14 plaintiff involved in this litigation either
15 has social media addiction or has some
16 adverse mental health outcome from that
17 claimed addiction, correct?
18      A.   Correct.
19      MR. DAVIS:  Okay.  Why don't we
20 take a break.
21      THE WITNESS:  Okay.
22      THE VIDEOGRAPHER:  We're off
23 the record at 2:44 p.m.  That's the
24 end of Media 6.
25      (Recess taken, 2:44 p.m. to

1  3:02 p.m. CDT)
2       THE VIDEOGRAPHER:  We're back
3  on the record at 3:02 p.m.  This is
4  the beginning of Media 7.
5       MR. DAVIS:  Yes.  In connection
6  with discussions with plaintiffs'
7  counsel during the break, we've marked
8  as Exhibit 12 the video clip on
9  self-reports that Dr.  -- that I
10 played for Dr. Mojtabai, and so we're
11 going to have that as Exhibit 12, and
12 I will send a copy to plaintiffs'
13 counsels.
14      (Whereupon, Mojtabai-12, Video
15 Clip on Self-Reports, was marked for
16 identification.)
17 BY MR. DAVIS:
18      Q.   Dr. Mojtabai, are you ready to
19 continue?
20      A.   Yes.
21      Q.   All right.  If you turn to
22 page 20 of your report, last paragraph, first
23 sentence.
24      A.   Page 20, last paragraph -- last
25 paragraph, I'm sorry?

1       Q.   You see that?
2       A.   Last paragraph --
3       Q.   Page 20, last paragraph, first
4  sentence.
5       A.   First sentence.
6       Q.   Okay.  Do you see where you
7  say:  There is scant research on heritability
8  and genetic influences of problematic social
9  media use specifically.
10      Right?  Do you see that?
11      A.   Yes.
12      Q.   Do you agree that there's no
13 known genetic influence or susceptibility to
14 what you call social media addiction that's
15 been established?
16      A.   To my knowledge, yes.
17      Q.   Okay.  You also state on
18 page 18 -- if you go to page 18 of your
19 report.
20      A.   Yes.
21      Q.   Second-to-last paragraph.
22      A.   Uh-huh.
23      Q.   Middle of the paragraph you
24 say:  In other studies, impulsivity, low
25 self-esteem, and social anxiety were

CONFIDENTIAL

Page 278

1  identified as predictors of social media
2  addiction.
3        Do you see that?
4     A.  Uh-huh, yes.
5     Q.  Yes?
6     A.  Yes.
7     Q.  And by that, by predictor, you
8  mean that if someone had impulsivity,
9  self-esteem or social anxiety, they were more
10 likely to be using social media than other
11 people?
12    A.  I say social media addiction,
13 not using social media.  Those are different
14 constructs.
15    Q.  Okay.  So use of social media
16 alone doesn't establish addiction, right?
17    A.  The amount of use of social
18 media could be an indicator, as we talked
19 about, if the child is using social media all
20 day and not doing other activities, that by
21 itself already, you know, has some symptoms
22 of addictive use.
23    Q.  I guess in your mind, time
24 spent on social media is something to be
25 looked at but is not alone dispositive of

Page 279

1  whether or not someone has social media
2  addiction?
3     A.  Correct.
4     Q.  Okay.
5     A.  Unless it is excessive.
6     Q.  Okay.  In other -- so in terms
7  of impulsivity, low self-esteem and social
8  anxiety --
9     A.  Yeah.
10    Q.  -- as predictors of social
11 media addiction, do you agree that
12 impulsivity, low self-esteem, and social
13 anxiety can also lead to increased use of
14 social media that doesn't rise to the level
15 of what you call social media addiction?
16    MS. EMMEL:  Objection,
17        compound, vague.
18    A.  So nowadays, every child is
19 using social media, so use of social media as
20 an outcome is, by itself, not very
21 meaningful.  It's like children who go to
22 school.  So everybody -- every child goes to
23 school.  It's something that everybody does.
24 BY MR. DAVIS:
25    Q.  Why do you believe that use of

Page 280

1  social media as an outcome is not very useful
2  or reliable?
3     A.  I didn't say it's not useful or
4  reliable.  I'm saying a measure of what?  As
5  an outcome of what?
6        And if it is a -- use of social
7  media is ubiquitous.  Everybody is using it,
8  and what is it an outcome of?
9     Q.  Okay.  So is social media use
10 generally just too -- too loose of an outcome
11 to assess?
12    A.  I don't think use of social
13 media by itself is a symptom of anything or a
14 problematic issue by itself.  So -- and it's
15 a -- it's part of the normative behavior of
16 adolescence nowadays.  According to Pew
17 reports, almost all of the kids use some form
18 of social media.
19    Q.  Do you agree that impulsivity,
20 low self-esteem and social anxiety --
21    A.  Right.
22    Q.  -- can increase the likelihood
23 that a child or adolescent is using more
24 social media?
25    A.  More -- the sentence here --

Page 281

1     Q.  I'm not focused on the
2  sentence.  I'm on a different issue.  So let
3  me come back to my question so you'll have it
4  in your mind, okay?
5     A.  Okay.
6     Q.  Do you agree that impulsivity,
7  low self-esteem and social anxiety in
8  children or adolescents can lead to more
9  social media use?
10    A.  I haven't seen studies of that.
11 I have seen studies as here referenced that
12 show these are related to problematic use of
13 social media.
14    Q.  But just as a matter of common
15 sense, right, just knowing how the world
16 works, you factored that in as somebody who
17 is an expert, right?
18    A.  Expert in what?
19    Q.  Sure.  Just -- the fact that
20 somebody has low self-esteem or impulsivity
21 or social anxiety, knowing a child or
22 adolescent has that, it stands to reason that
23 those individuals are more likely to spend --
24 doing something with more screen time, right?
25    A.  No, I can't -- I haven't seen

71 (Pages 278 - 281)

CONFIDENTIAL

Page 282

1  evidence of that.
2      Q.    All right.  Now, on page 18 of
3  your report, you claim that adolescent girls
4  are more vulnerable to the negative effects
5  of social media than boys, especially
6  appearance-based comparisons, correct?
7      A.    Uh-huh.
8      Q.    Yes?
9      A.    Yes.
10     Q.    And you cite, in support of
11  that opinion, Nesi and Prinstein 2015, and
12  Liu, L-I-U, 2022, correct?
13     A.    Correct.
14     Q.    You agree that the Nesi and
15  Prinstein 2015 study actually found there was
16  no association between concurrent technology
17  use and depressive symptoms after adjustments
18  for confounding were made?
19         MS. EMMEL:  Objection,
20     foundation.
21     A.    This is -- if you read the
22  sentence, I can read it again if you want.
23  Have found a number -- for example, a number
24  of research studies have found that
25  adolescent girls are more vulnerable to the

Page 283

1  negative effects of social media than boys,
2  especially appearance-based
3  social comparison.
4  BY MR. DAVIS:
5      Q.    Okay.  I've put in front of you
6  Exhibit 13, which is the Nesi and Prinstein
7  2015 study that you cite, correct?
8         (Whereupon, Mojtabai-13, Using
9     Social Media for Social Comparison and
10    Feedback-Seeking: Gender and
11    Popularity Moderate Associations with
12    Depressive Symptoms, by Nesi et al,
13    was marked for identification.)
14     A.    It looks like it is.  Let me
15  just make sure that it is Nesi and Prinstein.
16         Nesi and Prinstein, this is...
17         (Sotto voce document review.)
18  BY MR. DAVIS:
19     Q.    It's the same study, correct?
20     A.    Correct.
21     Q.    Okay.  If you look at page 9 --
22     A.    Okay.
23     Q.    -- first paragraph, last
24  sentence.
25     A.    Page 9 --

Page 284

1      Q.    It says:  Interestingly,
2  although depressive symptoms were positively
3  correlated with concurrent technology use
4  frequency, this association was no longer
5  significant after accounting for other
6  variables in the full regression model, as
7  discussed below.
8         Correct?
9      A.    That is what it says.
10     Q.    So what these authors are
11  saying is that the adjusted analyses found
12  that there was no association between use of
13  social media and depressive symptoms,
14  correct?
15     A.    That is what is implied, yes.
16     Q.    It's not -- okay.
17         Not implied, it's stated,
18  right?
19     A.    Yes.
20     Q.    And they also -- if you turn to
21  page 430 -- can you look at page 10,
22  paragraph 4.
23         So: --
24     A.    Yeah.  I need to come back to
25  this.

Page 285

1      Q.    Just a minute.  I've got my
2  question pending, okay?
3      A.    Okay.  Page 4.  Yes.
4      Q.    Page 10, paragraph 4.  It says
5  down at the bottom paragraph, under
6  Discussion:  Although results are preliminary
7  and no strong conclusions about
8  directionality can be made --
9      A.    I'm sorry, which page you
10  are --
11     Q.    I'm on page 10.
12     A.    Okay.  Yes, on Discussion.
13     Q.    Right?
14     A.    Where on --
15     Q.    Look under Discussion, second
16  paragraph.
17     A.    Second, okay.
18     Q.    These authors say:  Although
19  results are preliminary and no strong
20  conclusions about directionality can be made,
21  given the concurrent nature of the data, the
22  current investigation provides a valuable
23  contribution to the literature.
24         Did I read that correctly?
25     A.    Correct.

72 (Pages 282 - 285)

CONFIDENTIAL

Page 286

1    Q.    And by concurrent nature of the
2  data, what they're talking about is that this
3  is a cross-sectional study, correct?
4    A.    Correct.
5    Q.    Okay.  And so they don't
6  know -- they can't form strong conclusions
7  about the directionality of whether social
8  media use is leading to depressive symptoms
9  or depressive symptoms are leading to social
10  media use, correct?
11    A.    Yeah, that's -- that is -- we
12  talked about cross-sectional studies, and
13  that's one of the limitations.
14    Q.    Yep.
15        And let's go -- fair to say
16  that this study cannot rule out that
17  depressive symptoms actually led to social
18  media use, social comparisons and feedback
19  seeking?
20    A.    Results --
21        MS. EMMEL:  Objection,
22  compound.
23    A.    I'm sorry, where are we again?
24  BY MR. DAVIS:
25    Q.    I'm asking you:  Based upon the

Page 287

1  study itself, the overall findings of the
2  study, do you agree that it cannot rule out
3  that depressive symptoms actually lead to
4  social media use, social comparisons and
5  feedback seeking?
6        MS. EMMEL:  Objection,
7  compound, speculation.
8    A.    That is -- so they talk about
9  bidirectional associations, so it could be
10  either way.
11  BY MR. DAVIS:
12    Q.    Okay.  And in terms of which
13  one it actually is, this study doesn't
14  provide the answer, correct?
15    A.    This study does not -- from
16  what I remember...
17    Q.    Okay.  Let me ask you the next
18  question.
19    A.    Yeah.
20    Q.    You rely on the Liu study,
21  right?  That's 2022?
22    A.    I want to make a comment about
23  this study.
24    Q.    Your counsel is going to be
25  able to ask you whatever question they want

Page 288

1  to ask you.
2    A.    Okay.
3        (Whereupon, Mojtabai-14, Time
4  Spent on Social Media and Risk of
5  Depression in Adolescents:  A
6  Dose-Response Meta-Analysis, by Liu
7  et al, was marked for identification.)
8  BY MR. DAVIS:
9    Q.    Here is Exhibit 14.  This is
10  the Liu, L-I-U, 2022 meta-analysis that you
11  rely upon, correct?
12    A.    Correct.
13    Q.    This meta-analysis combined
14  cross-sectional with longitudinal studies,
15  correct?
16    A.    Correct.
17    Q.    And not all the --
18    A.    Again, this is...
19    Q.    So the studies that were being
20  combined in this study included those that
21  could establish temporality and those that
22  could not, correct?
23    A.    That is correct.
24    Q.    Okay.  And so in terms of --
25  because of that, that's a limitation of the

Page 289

1  study in terms of establishing whether
2  there's actually a causal inference that can
3  be drawn from that data, correct?
4    A.    Are you talking about this
5  specific meta-analysis?
6    Q.    Yes.
7    A.    Or you're talking about
8  cross-sectional studies in general?
9    Q.    I'm talking about this
10  meta-analysis.
11    A.    This meta-analysis, I think it
12  is pretty strong because it has both
13  cross-sectional and longitudinal studies, as
14  you said.
15    Q.    Well, I've asked you --
16        MR. DAVIS:  Move to strike as
17  nonresponsive.
18  BY MR. DAVIS:
19    Q.    I asked you that because it
20  combined longitudinal and cross-sectional
21  data, that that's a limitation in terms of
22  establishing whether or not there's actually
23  a causal inference that can be drawn from the
24  data, right?
25    A.    That is not a cause for it

CONFIDENTIAL

Page 290

1   being limited.  That's not a reason for
2   limitation, the fact that they include both
3   cross-sectional and longitudinal study.
4       That's -- yeah.
5       Q.   So do you know -- you haven't
6   taken the Liu 2022 meta-analysis and stripped
7   out the cross-sectional studies to determine
8   whether or not there's an increased risk from
9   the longitudinal studies, have you?
10      A.   I haven't, but -- no, I
11  haven't.
12      Q.   Okay.  And in terms of the
13  impact that the cross-sectional studies are
14  having on the reported results from the Liu
15  study, you haven't done that analysis, have
16  you?
17      A.   I didn't need to do that
18  because if you look at Figure 2, they have
19  separated the longitudinal and
20  cross-sectional studies.
21      Q.   Well, the longitudinal -- well,
22  the longitudinal studies in Liu -- well, they
23  don't -- they don't -- hold on a second.
24          Look at page 13 of 17, third
25  paragraph.

Page 291

1       A.   Yes.
2       Q.   It says first -- it talks
3   about -- this paragraph is talking about
4   important limitations of the study, correct?
5       A.   Right.
6       Q.   Yes?
7       A.   Yes.
8       Q.   And it says:  First, all
9   included studies were observational, in which
10  the results may be influenced by other
11  potential covariates not yet considered.
12  Hence, we cannot speak to causality in the
13  interpretation of the results.
14          Did I read that correctly?
15      A.   That's a boilerplate statement
16  that you would find in a lot of your studies
17  that we have here.  They do that.  They say
18  that.
19      Q.   It's not boilerplate.  This is
20  an accepted assessment of what you can do
21  with the data, correct?
22      A.   It's not the same degree of
23  concern that you would have for a study that
24  was only limited to cross-sectional studies,
25  a meta-analysis, or just an individual

Page 292

1   cross-sectional study.
2       Q.   Let me ask you this, Doctor:
3   Do you accept that this is -- that when they
4   say that we cannot speak to causality in the
5   interpretation of the results, you accept
6   that as a limitation of the study, correct?
7           MS. EMMEL:  Objection,
8   misstates the study.
9       A.   I have my opinion on this
10  study.
11  BY MR. DAVIS:
12      Q.   I asked you if you accept that
13  as a limitation of the study.
14          MS. EMMEL:  Same objection.
15      A.   I don't accept this as a major
16  limitation of this study.
17  BY MR. DAVIS:
18      Q.   You accept it as a limitation
19  of the study?
20      A.   As one of the limitations
21  regarding the cross-sectional studies that
22  are included, especially here.
23      Q.   Well, they don't limit this
24  statement to cross-sectional studies, do
25  they?

Page 293

1       A.   You asked my opinion.
2       Q.   Do they limit this statement to
3   cross-sectional studies?
4       A.   They don't.
5       Q.   Okay.  And in terms of all
6   the -- remember I showed you Exhibit 9?
7       A.   Yes.
8       Q.   That had all the quotes from
9   cross-sectional studies about how causal
10  inferences can't be made?
11      A.   Uh-huh.
12      Q.   Do you remember that?
13      A.   That's what I mean by
14  boilerplate.
15      Q.   You think every one of those
16  statements is just a boilerplate statement
17  that the scientists picked out and put in
18  there for no reason?
19          MS. EMMEL:  Objection, vague.
20      A.   No, it's not for no reason.
21  BY MR. DAVIS:
22      Q.   It's an important limitation in
23  the data itself, correct?
24      A.   It is a limitation in general
25  about cross-sectional studies.  So when we

Golkow Technologies,
A Veritext Division
877-370-3377                                      www.veritext.com

CONFIDENTIAL

Page 294

1  submit articles to journals that have
2  cross-sectional design, we are obliged to say
3  that, that there is a limitation.
4      Q.    You're -- you're obliged to say
5  that because it's a recognition of what the
6  cross-sectional data can and cannot do,
7  right?
8      A.    But they all talk to --
9  cross-sectional studies do talk to causality.
10 That's the point I want to make.  It's not
11 that they're not -- you can't make any causal
12 inferences based on cross-sectional studies.
13     Q.    You're obliged to say
14 statements along the lines of what is in --
15     A.    Yeah.
16     Q.    -- Exhibit 9 because it's a
17 recognition of what cross-sectional data can
18 and cannot do, correct?
19     A.    It's a statement of their
20 limitation, potential limitations.
21     Q.    Right.
22           And if you look at those
23 statements on Exhibit 9, they don't say it's
24 a potential limitation, do they?
25     A.    Some of them may actually say.

Page 295

1  If they don't, it is, in my opinion, it's a
2  potential limitation because it varies
3  depending on what confounding variables they
4  adjust for.
5      Q.    Did any study that you're aware
6  of say that causation can be established
7  using cross-sectional data, any study that
8  you relied upon?
9      A.    Not even a longitudinal study
10 or experimental study would say that the
11 causation can be established based on our
12 study.  This is not -- that's not what we do
13 in science.
14     Q.    All right.  Look at the --
15 page 53.
16           Let me back up for a second.
17     A.    Sure.
18     Q.    Are you aware of any study of
19 social media use in patients with diagnosed
20 psychiatric disorders in which use of social
21 media made the psychiatric disorder worse in
22 the patients in the study?
23     A.    Can you -- this was a lot of
24 elements.  Can you repeat it?
25     Q.    Sure.  Sure.

Page 296

1          Are you aware of any study of
2  social media use in patients with diagnosed
3  psychiatric disorders in which use of social
4  media made the psychiatric disorder worse --
5      MS. EMMEL:  Objection,
6  compound.
7  BY MR. DAVIS:
8      Q.    -- in the patients who were
9  involved in the study?
10     MS. EMMEL:  Objection,
11 compound.
12     A.    I believe I have some studies
13 that I refer to in the section on preexisting
14 conditions.
15 BY MR. DAVIS:
16     Q.    What are the names of those
17 studies?
18           Remember, we're talking about
19 diagnosed psychiatric disorders and that the
20 social media use made those psychiatric
21 disorders worse.
22     A.    That's why I want to look at
23 it, to refresh my memory.
24           So --
25           (Technical recess requested by

Page 297

1  the stenographer.)
2      MR. DAVIS:  Let's go off the
3  record and fix it, and that will let
4  Dr. Mojtabai find his study, if that
5  exists.
6      THE VIDEOGRAPHER:  We're off
7  the record at 3:24 p.m.  That's the
8  end of Media 7.
9          (Recess taken, 3:24 p.m. to
10 3:28 p.m. CDT)
11     THE VIDEOGRAPHER:  We're back
12 on the record at 3:28 p.m.  This is
13 the beginning of Media 8.
14 BY MR. DAVIS:
15     Q.    What page are you on,
16 Dr. Mojtabai?
17     A.    54.
18     Q.    Okay.  Let me ask you a
19 question.
20           Did you find a study in your
21 report --
22     A.    Yeah.
23     Q.    -- that assessed diagnosed
24 psychiatric disorders in which social media
25 use made the diagnosed disorder worse?

75 (Pages 294 - 297)

CONFIDENTIAL

1    A.    I found one study, Mullen,
2  Dowling and O'Reilly 2018.  In total, 299
3  young people.
4        So they included -- so they
5  were people who were receiving care.  They
6  were hospitalized adolescents, and compared
7  them to community-dwelling participants who
8  screened negative for mental health problems,
9  and those who screened positive and those
10 attending inpatient or outpatient mental
11 health services had more problematic social
12 media use and reported more
13 cyber-victimization.
14    Q.    Okay.  The study that you're
15 identifying, that is a survey that was done
16 of patients, correct?
17    A.    Well, compared patients and
18 nonpatients --
19    Q.    Correct.
20    A.    -- it meant to do.
21    Q.    Yes.
22          And this survey is
23 cross-sectional, right?
24    A.    It was cross-sectional, yes.
25    Q.    Okay.  Can you identify any

1  longitudinal or experimental study that shows
2  that if someone who has a diagnosed
3  psychiatric disorder uses social media, that
4  the diagnosed psychiatric disorder gets
5  worse?
6          MS. EMMEL:  Objection,
7     compound.
8     A.    So the number of issues there
9  that -- first of all, everybody nowadays,
10 almost every kid, whether psychiatrically or
11 not, uses social media.  So I don't know how
12 you can identify kids who use and don't use
13 social media.  It's not an exposure that can
14 be assigned randomly to kids.
15          So there is -- there's problem
16 in the -- this hypothetical scenario of this
17 study.
18 BY MR. DAVIS:
19    Q.    I'm just asking:  Can you
20 identify any longitudinal or experimental
21 study on social media where the study
22 assessed diagnosed psychiatric disorders and
23 the use of social media made those
24 psychiatric disorders worse?
25          MS. EMMEL:  Objection, asked

1  and answered.
2     A.    Yeah, I cannot, off the top of
3  my head, think of any.
4  BY MR. DAVIS:
5     Q.    Okay.  In respect to Section
6  4.1 and 5.8 of your --
7     A.    4.8 and?
8     Q.    4.1 and 5.8.
9          Are there any longitudinal
10 studies that are identified at either of
11 those sections?
12    A.    Adolescents aren't equally
13 vulnerable.
14          (Clarification requested by the
15     stenographer.)
16    A.    So your section -- this
17 Section 4.1 is:  Adolescents are not equally
18 vulnerable to the adverse effects of social
19 media.
20          And 5.8, you said, correct?
21 BY MR. DAVIS:
22    Q.    Yeah.  Let's take 4.1 since
23 you've got it in front of you.
24    A.    Okay.
25    Q.    In Section 4.1, were you --

1  which is entitled "Adolescents are not
2  equally vulnerable to the adverse effects of
3  social media."
4          My question to you is:  Can you
5  identify any longitudinal study that's
6  included in that section?
7     A.    I'm looking to see if there is
8  any studies in this section.
9          (Document review.)
10    A.    I don't -- I'm not sure about
11 that Ontario Student Drug Use and Health
12 Survey, but I assume this is a
13 cross-sectional one.
14 BY MR. DAVIS:
15    Q.    Okay.  Are you aware -- so are
16 you able to identify any longitudinal study
17 in Section 4.1?
18    A.    As I said, without looking at
19 the individual studies, I cannot.
20    Q.    You don't know of one today, do
21 you?
22    A.    I cannot identify any one of
23 these studies, whether they are longitudinal
24 or not.
25    Q.    Okay.  Can you identify any

CONFIDENTIAL

Page 302

1  study -- any experimental study in
2  Section 4.1 that's an experimental study?
3      A.    This is not a section that
4  talks about exposure being randomized or
5  exposure -- differences in exposure. It's
6  talking about vulnerability. So it's not
7  relevant, but I don't see any.
8      Q.    Okay. Let's turn to 5.8.
9          This is a section that's
10 entitled "Youth with preexisting mental
11 health problems are openly vulnerable to
12 adverse effects of social media."
13         Do you see that?
14     A.    Yeah.
15     Q.    Can you identify any
16 longitudinal study that you discuss or
17 analyzed in this section of your report?
18     A.    Again, without looking at these
19 studies with that eye, I cannot.
20     Q.    You're not aware of one today,
21 are you?
22     A.    I'm not.
23     Q.    And are you aware of any
24 experimental study that you identify or
25 discuss in Section 5.8 of your report about

Page 303

1  youth with preexisting mental health problems
2  being vulnerable to adverse effects of social
3  media?
4      A.    I don't think it's relevant for
5  this section, experimental designs, because
6  it's talking about impact of preexisting
7  mental health conditions. You cannot
8  randomly assign that.
9      Q.    So no experimental studies
10 discussed in this Section 5.8, correct?
11     A.    I don't see any. I don't see
12 any, correct.
13     Q.    Okay. So fair to say that
14 sitting here today, all the studies that you
15 discuss in Section 4.1 and Section 5.8 of
16 your report are cross-sectional studies or
17 surveys, correct?
18     A.    It looks like that, yes.
19     Q.    Okay. Let's take a look at...
20         (Whereupon, Mojtabai-15, Does
21     TikTok contribute to eating disorders?
22     A comparison of the TikTok algorithms
23     belonging to individuals with eating
24     disorders versus healthy controls, by
25     Griffiths et al, was marked for

Page 304

1      identification.)
2  BY MR. DAVIS:
3      Q.    I made a mistake, Dr. Mojtabai.
4  Let me put an exhibit on that. This is
5  Exhibit 15, and this is an article by
6  Griffiths entitled: Does TikTok contribute
7  to eating disorders? A comparison of the
8  TikTok algorithms belonging to individuals
9  and eating disorders versus healthy controls.
10         Do you see that?
11     A.    Right.
12     Q.    Right?
13         Now, you discussed this report
14 on page -- you discussed this article on
15 page 54 of your report, correct?
16     A.    Let me go there.
17         Yeah.
18     Q.    If you look at Table 6 -- well,
19 let me back up.
20         Go to page 9, right-hand
21 column, Section 4.3.
22     A.    4 point -- can you repeat
23 what --
24     Q.    Sure.
25         Go to page 9 --

Page 305

1      A.    Right, yes.
2      Q.    -- Section 4.3, where it says:
3  Other findings.
4      A.    Right.
5      Q.    All right?
6          And if you go to the
7  second-to-the-last sentence, it says that:
8  Notably, we found no associations between the
9  number of TikTok videos delivered and eating
10 disorder symptoms, and no difference in
11 self-reported frequency of TikTok use between
12 users with eating disorders and healthy
13 controls.
14         Correct?
15     A.    Let me find that. I'm sorry.
16 Notably, we found...
17         (Document review.)
18     A.    Yes.
19 BY MR. DAVIS:
20     Q.    Okay. I read that correctly?
21     A.    Yes.
22     Q.    And so, in other words, the
23 volume of the videos and the frequency by
24 which they were viewed were no different
25 between those with eating disorder symptoms

77 (Pages 302 - 305)

Page 306

1  and those who did not have eating disorder
2  symptoms, correct?
3      A.   Right.
4      Q.   And it was, rather, what the
5  individuals were motivated to do with what
6  they viewed, correct?
7      A.   Repeat what you said.
8      Q.   Yeah.
9           It was, rather, what the
10  individuals were motivated to do with what
11  they viewed that was a difference in the
12  study, correct?
13         MS. EMMEL:  Objection,
14      speculation.
15      A.   It's what they were getting,
16  the messages or the videos they were getting
17  that is different.
18  BY MR. DAVIS:
19      Q.   So in terms of -- yes.
20           What they were getting was
21  different in terms of what they were seeking,
22  the information they were seeking on the
23  platforms, correct?
24         MS. EMMEL:  Objection,
25      foundation, speculation.

Page 307

1      A.   Either actively seeking or the
2  algorithm might identify that they are
3  lingering on one type of video or interacting
4  with that video more, giving likes,
5  et cetera, to it.
6  BY MR. DAVIS:
7      Q.   And between those two
8  potentials, you don't know which one it was,
9  do you?
10      A.   I don't.
11      Q.   Okay.
12      A.   I haven't --
13      Q.   Now, you also realize that what
14  they're -- what they're -- the study is
15  assessing how people are looking at videos
16  and responding to what they're seeing and
17  hearing on the videos that they view,
18  correct?
19         MS. EMMEL:  Objection,
20      speculation, foundation.
21      A.   Can you repeat your question?
22  BY MR. DAVIS:
23      Q.   Yeah.
24           This study is assessing how
25  individuals with eating disorders are looking

Page 308

1  at videos and responding to what they're
2  seeing and hearing on the videos, correct?
3         MS. EMMEL:  Objection,
4      foundation, speculation.
5      A.   That is the exposure of the
6  study.  What they're getting is the outcome
7  of the study.
8  BY MR. DAVIS:
9      Q.   Okay.  And -- yes.
10           And the authors in this study,
11  if you go to the Limitations section, which
12  is on page 10 --
13      A.   Yes.
14      Q.   -- under Study Limitations, if
15  you go six lines down it says:  Third, our
16  study is cross-sectional and nonexperimental
17  and therefore does not permit causal claims.
18           Do you see that?
19      A.   I see.
20      Q.   You agree with that, correct?
21      A.   Again, I think this study is a
22  pretty strong study.  I don't agree with the
23  claim they make that it doesn't support
24  causal claims.  I think it's one of those
25  boilerplate limitations that we're always,

Page 309

1  when we submit to journal article --
2  journals, we are asked to put in.
3      Q.   So your view is that these
4  researchers put something in that's
5  boilerplate that they didn't really believe?
6      A.   They may have believed it.  I
7  don't believe it.  You asked my opinion.  My
8  opinion is this is a pretty strong study.
9      Q.   And while you say that it's a
10  strong study, these researchers who crunched
11  the data, analyzed it, assessed it, they said
12  this -- our study is cross-sectional and
13  nonexperimental and, therefore, does not
14  permit causal claims, right?
15           That's what they conclude?
16      A.   That's what they say, but
17  that's not what I think about this study.
18      Q.   Yes.
19      A.   This study is looking at --
20  it's actually -- that's where the
21  cross-sectional studies I said it's
22  contextual.  You have to look at the context.
23           This is a cross-sectional study
24  where it's examining the responses of these
25  participants and the outcome is the videos

78 (Pages 306 - 309)

CONFIDENTIAL

Page 310

1  they're seeing.
2          So it is -- it has a built,
3  sort of like longitudinal, you may call it,
4  element in it, because the responses they're
5  getting is not cause -- cannot cause -- it
6  can't be reverse causation.
7      Q.   Show me where in the study
8  these researchers say that there's an element
9  of a longitudinal analysis?
10     A.   That's my opinion, that's not
11 what they're saying.
12     Q.   Right.  They're saying the
13 exact opposite, right?
14     A.   I didn't say that --
15     Q.   They're saying the exact
16 opposite, right?
17     A.   No.
18     Q.   They're saying it's
19 cross-sectional, not longitudinal, right?
20     A.   Cross-sectional is not --
21         MS. EMMEL:  Objection,
22 argumentative.
23         THE WITNESS:  Sorry, go ahead.
24         MS. EMMEL:  Go ahead.
25     A.   Cross-sectional is not opposite

Page 311

1  of longitudinal.
2  BY MR. DAVIS:
3      Q.   They're saying it's
4  cross-sectional and not longitudinal, right?
5          MS. EMMEL:  Objection, asked
6      and answered, harassing.
7      A.   They're saying it's
8  cross-sectional.  They don't say anything
9  about longitudinal.
10 BY MR. DAVIS:
11     Q.   All right.  Now, with respect
12 to all the statements that are in Exhibit 9
13 that talk about how cross-sectional data
14 cannot be used to make a causal inference, is
15 it your testimony, Dr. Mojtabai, that every
16 one of those researchers in these studies is
17 just putting in a boilerplate statement that
18 they don't believe in?
19     A.   I didn't say that.  I said
20 there is a boilerplate statement that, when
21 people submit a cross-sectional study to a
22 journal, they're asked to put in.
23     Q.   Well, some of them are not --
24 some of them -- you have no evidence that any
25 journal asked them to put in as opposed to

Page 312

1  them actually putting it in themselves
2  because they believed that's what the
3  limitation of the data was, correct?
4      A.   I don't know if it is what they
5  believed or what they were asked by the
6  journal or the reviewers.  The reviewers
7  sometimes ask you to put in a statement like
8  that.
9          We see it in this study, very
10 clearly in this study.
11     Q.   Would you agree that typically
12 what happens at a journal is that if a
13 statement like what's in Exhibit 9 is not put
14 in a cross-sectional study that's submitted
15 for publication, that the journal reviewers
16 will say you need to include this because
17 this is a limit --
18         MS. EMMEL:  Objection --
19 BY MR. DAVIS:
20     Q.   -- a limitation of this type of
21 data?
22         MS. EMMEL:  Objection,
23 speculation.
24     A.   Yeah, it is speculative, but
25 from my own experience, I can talk about

Page 313

1  that.  It happens a lot that the reviewers
2  ask for that.
3  BY MR. DAVIS:
4      Q.   Okay.  If you look at the --
5  one of the other limitations, it's the
6  number 7 one down the list.  And it says --
7      A.   Number 7?
8      Q.   Yeah.  7.
9      A.   On this page here?
10     Q.   Yeah.
11     A.   Yeah.  Okay.
12     Q.   On page 10, right-hand side.
13     A.   7?
14     Q.   7:  Most participants in our
15 eating disorders group are diagnosed with
16 anorexia nervosa, and our findings may not
17 generalize to other eating disorders,
18 particularly those that do not involve body
19 image concerns; example, avoidant and
20 restrictive food intake disorder.
21         Did I read that correctly?
22     A.   Can you point me here?
23     Q.   Yes.  It's right there.
24     A.   7, okay.
25     Q.   Did I read it correctly?

79 (Pages 310 - 313)

CONFIDENTIAL

Page 314

1    A.    Correct.
2    Q.    Right.
3          And so what they're saying is
4    another limitation of the study is that it --
5    it's not certain that it actually generalizes
6    to other eating disorders because of how many
7    patients in the study actually had anorexia
8    nervosa as opposed to some other eating
9    disorder, right?  Right?
10   A.    Yeah.
11   Q.    And you agree with that?
12   A.    Again, it's a -- it could -- it
13   could apply to them, generalize to them or
14   not, but it's a -- it's an empirical
15   question.
16   Q.    And I'm just simply asking if
17   you agree that -- with the limitation that
18   this study -- this study's results, it's not
19   certain that it generalizes to patients other
20   than those with anorexia nervosa?
21   A.    It may or may not.
22   Q.    You don't know which one?
23   A.    Yeah.
24   Q.    Okay.  All right.
25         Dr. Mojtabai, let's turn to

Page 315

1    page 75 and 76 of your expert report.
2    A.    Yes.
3    Q.    If you look at page -- at the
4    bottom of the page, you discuss your overall
5    assessment of the literature that you
6    reviewed, correct?
7    A.    You mean the last bullet point:
8    In studies examining --
9    Q.    Yeah.
10   A.    -- the association between
11   quantity of exposure and -- to social media,
12   et cetera?
13   Q.    Yeah.  All my point is:  On
14   this page, on pages 75 through 76, you're
15   just summarizing your review and assessment
16   of the literature that you analyzed, correct?
17   A.    Correct.
18   Q.    Now, down at the bottom of
19   page 75, you talk about how there's a
20   dose-dependent relationship that exists
21   between the quantity of exposure to social
22   media and mental health problems.
23         Do you see that?
24   A.    Yeah.
25   Q.    You rely on three studies to

Page 316

1    support that claim, right?
2    A.    The dose-response -- the
3    dose-dependent relationship, yes.
4    Q.    Okay.  One of those is the
5    Riehm study, right?
6    A.    Correct.
7    Q.    The other two are
8    Sampasa-Kanyinga and Lin, L-I-N, correct?
9    A.    Correct.  Correct.
10   Q.    Okay.  Those are the three
11   studies that you identify in your report as
12   supporting a dose-response relationship,
13   correct?
14   A.    In addition to the Liu
15   meta-analysis, the sentence goes on to say
16   that.
17   Q.    You are correct.  You do also
18   identify the Liu 2022 study, meta-analysis,
19   correct?
20   A.    Yes, correct.
21   Q.    Okay.  So we have four articles
22   that you rely upon in this case for
23   dose-response relationship, correct?
24   A.    Correct.
25   Q.    Okay.  So let's talk about the

Page 317

1    Sampasa-Kanyinga, okay, and the Lin study.
2          MR. DAVIS:  Sorry, I'm going to
3          get a little organized here.
4          (Whereupon, Mojtabai-16, Use of
5          social media is associated with short
6          sleep duration in a dose-response
7          manner in students aged 11 to 20
8          years, by Sampasa-Kanyinga et al, was
9          marked for identification.)
10   BY MR. DAVIS:
11   Q.    I'll give you what's been
12   marked as Exhibit 16, which will be the
13   Sampasa-Kanyinga.
14         Is it okay if I just say
15   Sampasa so it's a little bit easier to talk
16   about?
17   A.    Sure.  Sure.
18   Q.    Okay.  This was a
19   cross-sectional study, correct?
20         (Sotto voce document review.)
21   A.    Looks like that, yes.
22   BY MR. DAVIS:
23   Q.    And this study only assessed
24   sleep disorders, correct?
25   A.    It's looking at social media

80 (Pages 314 - 317)

CONFIDENTIAL

Page 318

1  and sleep duration.
2      Q.    Right.
3          So it only looked at sleep
4  duration, correct?
5      A.    Correct.
6      Q.    So it didn't look at any other
7  outcome, including no psychiatric disorder,
8  correct?
9      A.    I'm reading it.
10     Q.    That was a terrible question.
11         It didn't look at any other
12  outcome, including any type of psychiatric
13  disorder, correct?
14     A.    It adjusted for self-rated
15  mental health, substance use, immigration
16  status, racial/ethnic group, et cetera.
17     Q.    Those were adjusted for
18  confounders, right?
19     A.    Correct.
20     Q.    Okay.  The psychiatric disorder
21  was not an outcome, correct?
22     A.    Correct.
23     Q.    Suicidal thoughts or behavior
24  was not an outcome, correct?
25     A.    Not in this study, I don't see.

Page 319

1      Q.    Okay.  So, in fact, these
2  authors specifically say, if you turn to
3  page 6 --
4      A.    There's no 6.
5      Q.    Yeah, you're right.  Just give
6  me a second.
7      A.    Sure.  I can count, one, two,
8  three, four, five, six.
9      Q.    If you look on page 698,
10  right-hand column.
11     A.    Yes.
12     Q.    Okay.  You see there's a
13  paragraph that says:  Strengths of this
14  study?
15     A.    Yes.
16     Q.    And then later on, down about
17  seven lines, it says:  There are also several
18  limitations worth mentioning.
19         Did I read that correctly?
20     A.    Yes.
21     Q.    And then it says:  First, the
22  cross-sectional nature of our study precludes
23  any causal inference about the observed
24  association between the use of social media
25  and sleep duration.

Page 320

1          Correct?
2      A.    Correct.
3      Q.    You agree with that limitation,
4  right?
5      A.    I would agree.
6      Q.    Yep.
7          And so this -- in other words,
8  this study is saying it doesn't know which --
9  whether sleep is leading to more social media
10  use or social media use is leading to less
11  sleep, correct?
12     A.    It is correct literally,
13  however, it's not plausible.  There's an
14  issue of plausibility.
15         What is more likely to be the
16  cause of the other is sleep -- I can't
17  plausibly think of a scenario where shorter
18  sleep would lead to more use of social media.
19         MR. DAVIS:  I move to strike as
20         nonresponsive after "It is correct
21         literally."
22  BY MR. DAVIS:
23     Q.    Let's talk about the Liu,
24  L-I -- oops, Lin.  Let's talk about Lin.
25     A.    Do you have the paper?

Page 321

1      Q.    I do.  Just a second.
2          Let me look at -- let me give
3  you this.
4          (Whereupon, Mojtabai-17,
5          Association Between Social Media use
6          and Depression Among US Young Adults,
7          by Lin et al, was marked for
8          identification.)
9  BY MR. DAVIS:
10     Q.    This is Exhibit 17.  This study
11  is another cross-sectional study, right?
12     A.    It appears so, yes.
13     Q.    Yep.
14         And if you look at page 6,
15  which is actually page 329.
16     A.    Okay.
17     Q.    Second paragraph -- oops.  Let
18  me find it here.  Oh, it's actually the third
19  paragraph -- the second full paragraph.  Well
20  I'm not finding the quote.  Anyway, let's go
21  to the next question.
22         Do you agree that because it's
23  a cross-sectional study, the directionality
24  of association is not confirmed?
25         MS. EMMEL:  Objection,

81 (Pages 318 - 321)

CONFIDENTIAL

1    foundation.
2         (Sotto voce document review.)
3    A.    In general, yes, I would --
4    with mood, mood symptoms --
5    BY MR. DAVIS:
6    Q.    Okay.
7    A.    -- there could be bidirectional
8    relationship.
9    Q.    Okay.  So -- and this study is
10   not providing data on anxiety disorders or
11   other psychiatric disorders or symptoms other
12   than symptoms of depression, correct?
13   A.    It's using the Patient-Reported
14   Outcome Measurement Information System,
15   PROMIS, which is NIH measure for depression,
16   and validated against a number of other
17   measures.
18         MR. DAVIS:  I object, move to
19   strike as nonresponsive.
20   BY MR. DAVIS:
21   Q.    I was simply asking that this
22   study is focused on symptoms of depression,
23   right?
24   A.    It appears to me that it is,
25   yes.

1    Q.    It's not assessing any other
2    psychiatric disorder or symptoms of a
3    psychiatric disorder, correct?
4    A.    It appears so.
5    Q.    And it's not assessing suicidal
6    thoughts or behavior either, is it?
7    A.    No, I don't have the PROMIS in
8    front of me, so I cannot -- I cannot tell you
9    about if there are questions about suicidal
10   ideations included in PROMIS or not.
11   Q.    Well, if you look under
12   Measures --
13   A.    Yes.
14   Q.    -- under -- on page 324,
15   suicidal ideation or thoughts or behavior is
16   not included, is it?
17   A.    So as I said, like they
18   mentioned PHQ-9, PHQ-9 has one item.
19   Question No. 9 asks about suicidal ideation.
20   Q.    There's no analysis in this
21   article speaking to suicidal thoughts or
22   behavior, is there, Dr. Mojtabai?
23   A.    That is my understanding, yes.
24   Q.    Okay.  Let's look at the Liu
25   study.

1    A.    Do you have a copy?
2    Q.    I think we already have it
3    marked as an exhibit.
4    A.    Yes, yes, you're right.  I have
5    a lot of stuff in front of me.  Yes.  Liu,
6    yes.
7    Q.    Okay.  The dose-response --
8    let's turn to page 11 of 17.
9    A.    Yes.
10   Q.    Right?  Are you there?
11   A.    Yes.
12   Q.    And that's -- that contains a
13   section called 3.5, Dose-Response Association
14   between TSSM -- which is time spent on social
15   media -- and Risk of Depression.
16         Do you see that?
17   A.    Yes.
18   Q.    Okay.  So they identify five
19   studies that were included in the
20   dose-response analysis, correct?
21   A.    Right.
22   Q.    And if you look at -- you agree
23   that those are identified by numbers, 6, 7,
24   19, 20 and 54, correct?
25   A.    Yes, the studies.  Yes,

1    correct.
2    Q.    And you know from looking at
3    those studies that every single one of those
4    studies is a cross-sectional study, correct?
5    A.    I have to look at each one of
6    them, but --
7    Q.    Well, let's look at them.
8         Because they're identified in
9    the study.
10   A.    Yes.
11   Q.    Look, I'm going to point them
12   out.  Here, let me see your paper, and I'll
13   make this fast.
14   A.    Okay.
15   Q.    Let me see if I got them all...
16         (Document review.)
17   BY MR. DAVIS:
18   Q.    Okay.  If you look back at the
19   reference chart, okay?
20   A.    Yes.
21   Q.    I've highlighted the studies
22   that are identified as being in the
23   cross-sectional -- excuse me, in the
24   dose-response analysis, right?
25         (Sotto voce document review.)

CONFIDENTIAL

Page 326

1    MS. EMMEL: Could you identify
2    the page, please?
3        MR. DAVIS: It's on pages 14
4    and 15.
5        MS. EMMEL: Thank you.
6    A.   So I see here, the Kelly study
7    is Social Media Use and Adolescent Mental
8    Health: Findings from the UK Millennium
9    Cohort Study. That might be an actually --
10   BY MR. DAVIS:
11   Q.   Well, look at table -- go back
12   to Table 1 in the study.
13   A.   Okay. That was the Kelly.
14   Q.   Right.
15       Kelly is identified as a
16   cross-sectional study, correct?
17       (Sotto voce document review.)
18   A.   Yeah, I don't know without
19   looking at it how they have analyzed it or
20   whether it is correct -- correctly noted,
21   because I know that the Millennium study is a
22   longitudinal study. I know that.
23   BY MR. DAVIS:
24   Q.   It's identified as a
25   cross-sectional study in this analysis,

Page 327

1    correct?
2    A.   In this study, it is -- it has
3    a CS, yes.
4    Q.   Okay. And so are the other
5    ones that were identified with -- number 6,
6    right? That's the Twenge article?
7        (Sotto voce document review.)
8    BY MR. DAVIS:
9    Q.   That's a cross-sectional study
10   based on Table 1, too, right?
11       (Sotto voce document review.)
12   A.   I assume so. I -- yeah.
13   Twenge is number 6. Let's see.
14   BY MR. DAVIS:
15   Q.   Right?
16   A.   Twenge, cross-sectional --
17   yeah, Twenge is also.
18   Q.   Correct?
19   A.   They have identified them as
20   such.
21   Q.   Okay. And then if you look at
22   the Tamura, which is number 17, that's also a
23   cross-sectional study.
24   A.   From Japan. Yes.
25   Q.   Right?

Page 328

1    A.   They have identified it as a
2    cross-sectional study.
3    Q.   And then we've already talked
4    about Kelly being identified as a
5    cross-sectional study. That's -- Kelly is
6    number 19 in the reference, right?
7    A.   Kelly is number 19 in that,
8    yes. Kelly, I can see this.
9        Yeah, it's identified as a
10   cross-sectional study, but it might be
11   because it's based on the Millennium. I'm
12   not sure.
13   Q.   Okay.
14   A.   But I trust you.
15   Q.   And so four of the five studies
16   are identified as cross-sectional studies in
17   this paper, correct?
18   A.   Okay.
19   Q.   Right?
20   A.   Right. The four that you
21   talked about right now, right.
22   Q.   Right.
23       And then they also identify
24   number 54, which is the Ma study, correct?
25   A.   Yes.

Page 329

1    Q.   And Ma is identified as a
2    longitudinal study in Table 1, correct?
3    A.   Correct.
4    Q.   Okay. Let's take a look at Ma.
5    We'll mark that as Exhibit 18.
6        (Whereupon, Mojtabai-18,
7    The association between screen time
8    and reported depressive symptoms among
9    adolescents in Sweden, by Ma et al,
10   was marked for identification.)
11       MR. DAVIS: I think I gave you
12   two.
13       THE WITNESS: Two, yes.
14       MR. DAVIS: There you go.
15   Okay.
16   BY MR. DAVIS:
17   Q.   Look at last -- look at the
18   Discussion section.
19   A.   Discussion section, yes.
20   Uh-huh.
21   Q.   And if you look at page 777,
22   the second-to-last paragraph on that page, do
23   you see they say, quote: Our study was
24   cross-sectional, therefore we could not
25   determine the direction of effects.

CONFIDENTIAL

1    Do you see that?
2    A.    Uh-huh.
3    Q.    Yes?
4    A.    I see that.
5    Q.    So there's no question that the
6    Ma study was cross-sectional, right?
7    A.    They identify their study as
8    cross-sectional.
9    Q.    Right.
10    And so every single one of the
11    studies that you used -- strike that.
12    Every single one of the studies
13    in the Liu dose-response analysis is
14    identified as a cross-sectional study,
15    correct?
16    A.    I wouldn't say so.  I mean, I'm
17    referring to Figure 2.  First of all, it's
18    not only five studies in Liu --
19    Q.    Dr. Mojtabai, you've got to
20    follow my question.
21    Look at -- the dose-response
22    analysis only had five studies, right?  We
23    already went over that.
24    MS. EMMEL:  Objection,
25    argumentative.

1    A.    So here it says:  Figure 2,
2    Forest plot of the association between time
3    spent on social media and risk of depression.
4    So they're looking at time.
5    BY MR. DAVIS:
6    Q.    Dr. Mojtabai, look back at
7    page 11.
8    A.    Okay.
9    Q.    You see Section 3.5 that says:
10    Dose-Response Association between Time Spent
11    on Social Media and Risk of Depression?
12    Do you see that section?
13    A.    Uh-huh.
14    Q.    Yes?
15    A.    Yes.
16    Q.    And it says:  Five studies were
17    included for the dose-response analysis.
18    Did I read that correctly?
19    A.    Correct.
20    Q.    And then those five studies, we
21    just went over, correct?
22    A.    Right.
23    Q.    So the dose-response analysis
24    didn't include longitudinal studies, did it?
25    A.    Unless they have made a mistake

1    on the Kelly study as well.  You identified
2    one error.  It's possible they have made an
3    error --
4    Q.    Sitting here today, do you know
5    whether or not there's any longitudinal
6    studies included in this dose-response
7    analysis?
8    A.    I don't.
9    Q.    Okay.  Before today and me
10    showing you these studies and this
11    information, did you know that only
12    cross-sectional studies were included in the
13    dose-response analysis in the Liu 2022 paper?
14    A.    First of all, I -- this is
15    looking at -- so if you go to Section 3.2,
16    they're talking about association between
17    time spent on social media and depression
18    risk.
19    So --
20    Q.    Dr. Mojtabai, my question is
21    simply:  Before today and me showing it to
22    you, did you know that all five studies in
23    the dose-response analysis were, in fact,
24    cross-sectional studies?
25    MS. EMMEL:  Objection,

1    argumentative.
2    A.    Yeah, what I see -- I have to
3    look more carefully at what they mean by
4    dose-response.
5    BY MR. DAVIS:
6    Q.    Did you know, before me asking
7    you these questions and showing you this
8    information, that all five studies included
9    in the dose-response analysis were
10    cross-sectional?
11    MS. EMMEL:  Objection,
12    argumentative.
13    A.    As I said, I don't know if
14    they're -- as you identified one study.  I
15    don't know if their identification of Kelly
16    study as a cross-sectional.  I would have
17    thought that this is a longitudinal study.
18    BY MR. DAVIS:
19    Q.    So before today, you thought
20    all five studies were longitudinal?
21    A.    Not all five, but the Kelly
22    one.
23    Q.    Okay.  So you -- so you knew
24    that four of the five were cross-sectional
25    before today?  Or you didn't know any of them

Golkow Technologies,
A Veritext Division
877-370-3377                                    www.veritext.com

CONFIDENTIAL

Page 334

1  were cross-sectional before today?
2      A.    No, I actually believed one of
3  them was longitudinal.
4      Q.    Okay.  So the dose-response
5  analysis that's in the Liu 2022 paper --
6      A.    Yeah.
7      Q.    -- doesn't know which direction
8  the association is going, correct?
9      A.    This study, they cross -- what
10  you showed me is dose-response analysis.
11  That's different than looking at the
12  association.  It's looking at whether the
13  association is a dose-response-type
14  association or not.
15         So it's not even asking that
16  question that --
17      Q.    I'm not asking you about the
18  overall analysis, Dr. Mojtabai.  You've got
19  to focus on my question.
20         I'm asking you about the
21  dose-response analysis in Liu.
22      A.    Right.
23      Q.    That analysis cannot establish
24  which direction of the association for the
25  dose-response analysis, correct?

Page 335

1         MS. EMMEL:  Objection.
2      A.    To the extent that these
3  cross-sectional studies might have
4  limitations in establishing direction of
5  causation, yes, I would agree with you.
6  BY MR. DAVIS:
7      Q.    You agree with me.  Okay.
8         Fair to say that all the
9  studies in the dose-response analysis in Liu
10  could not definitively rule out that the
11  mental health outcome study was why the study
12  participants were using social media?
13         MS. EMMEL:  Objection,
14      compound, speculation.
15      A.    What's your question?
16  BY MR. DAVIS:
17      Q.    Yeah.  The dose-response
18  analysis that was done in Liu cannot rule out
19  that the reason why the study participants in
20  those five studies were using social media
21  was because they had depressive symptoms that
22  then led to social media use, right?
23         MS. EMMEL:  Objection,
24      compound, speculation.
25      A.    Again, I go back.  This -- the

Page 336

1  purpose of it was to establish whether the
2  relationship is dose-response.  It wasn't a
3  causal question that they're asking.
4  BY MR. DAVIS:
5      Q.    Right.
6         But this analysis, each of the
7  studies in this analysis doesn't establish
8  temporality, fair?
9      A.    The studies, as far as I know,
10  with the proviso that I haven't seen Kelly's
11  study myself --
12      Q.    Okay.
13      A.    -- firsthand, yes, I agree with
14  you.
15      Q.    Okay.  And, in fact, if you
16  look at the Liu study -- we've already gone
17  over that.  Okay.
18         So you're not claiming that the
19  Kampasa [sic] study, the Lin study or the Liu
20  study establish a dose-response relationship
21  for anything other -- other than symptoms of
22  depression, correct?
23      A.    Dose-response, that's the
24  question they're actually looking at,
25  dose-response association with symptoms of

Page 337

1  depression.
2      Q.    Correct.  I just want to make
3  sure you have my question in your mind.
4      A.    Okay.
5      Q.    Because we've talked about the
6  Kampasa -- excuse me.  We've talked about the
7  Sampasa study, we've talked about the Lin
8  study, and we've talked about the Liu
9  meta-analysis, correct?
10      A.    Correct.
11      Q.    And you're not claiming that
12  those studies, individually or combined,
13  establish a dose-response relationship for
14  anything other than symptoms of depression,
15  correct?
16      A.    I have seen the evidence for
17  symptoms of depression.
18      Q.    Yeah.  For example, those --
19  you're not claiming that those three studies
20  establish a dose-response relationship for
21  anxiety-related disorder and symptoms of
22  anxiety-related disorders, suicidal thoughts
23  or behavior, or eating disorders or BDD,
24  fair?
25      A.    So you ask about those specific

85 (Pages 334 - 337)

CONFIDENTIAL

Page 338

1  studies.  The symptoms that I saw in these
2  studies that you showed me, they were only
3  looking at depression.
4      Q.    And none of the others that I
5  mentioned, correct?
6      A.    The other ones I haven't seen
7  specifically.  It's possible they have other
8  measures that I haven't seen so --
9      Q.    I'm only asking what your
10  opinions are in the case, okay?
11      A.    Okay.
12      Q.    When it comes to a
13  dose-response claim -- excuse me.
14          When it comes to your
15  dose-response opinions in the case, you're
16  not claiming those three studies or articles
17  establish a dose-response relationship for
18  anything other than symptoms of depression,
19  right?
20      A.    Based on those studies, I don't
21  make that claim.
22      Q.    Okay.  Now -- and the other
23  study that you -- the only other study we
24  haven't talked about is the Riehm 2019 study,
25  correct?

Page 339

1      A.    Correct.
2      Q.    That study only looked at
3  symptoms of depression or internalizing,
4  slash, externalizing symptoms, correct?
5      A.    Correct.  Correct.
6      Q.    That study -- you're not
7  claiming the Riehm 2019 study establishes a
8  dose-response relationship between anything
9  other than symptoms of depression, correct?
10      A.    Right.
11      Q.    Okay.
12      A.    And social media -- so
13  dose-response is the dose of social media use
14  and its association with depressive symptoms.
15  I just may clarify that.
16      Q.    Okay.  Now, let's talk about
17  the Riehm study.
18      A.    Sure.
19          MR. DAVIS:  Are you doing okay?
20  Do you need a break or anything?
21          THE WITNESS:  No, I'm doing
22  fine.
23          MR. DAVIS:  Just give me a
24  second.
25          THE WITNESS:  Sure.

Page 340

1          (Whereupon, Mojtabai-19,
2      Associations Between Time Spent Using
3      Social Media and Internalizing and
4      Externalizing Problems Among US Youth,
5      by Riehm et al, was marked for
6      identification.)
7  BY MR. DAVIS:
8      Q.    Dr. Mojtabai, I'm going to hand
9  you what's marked as Exhibit 19, which is a
10  copy of the Riehm study.
11      A.    Yeah.
12      Q.    Now, this is an article that
13  you were a coauthor on in 2019, correct?
14      A.    Correct.
15      Q.    And you had an active role in
16  drafting this manuscript, right?
17      A.    Correct.
18      Q.    You made sure that it was
19  accurate and truthful in every respect,
20  correct?
21      A.    I did my best.
22      Q.    Right.
23          You don't know of any
24  inaccuracies in the article, do you?
25      A.    I'm not aware of any.

Page 341

1      Q.    Okay.  And you made sure that
2  you chose the words that you chose because
3  you wanted to be careful about how your study
4  was described and to make sure it was
5  accurately described, right?
6      A.    To the extent I recall, yes.
7      Q.    That's your normal practice,
8  right?
9      A.    Yeah.
10      Q.    So let's look at -- you're
11  using -- in this study what you did is you
12  used internalizing and externalizing symptoms
13  as a proxy or substitute for symptoms of
14  depression, correct?
15      A.    Well, externalizing symptoms
16  are, by themselves, a sort of construct that
17  is not necessarily related to depression.
18  It's more related to substance use,
19  rule-breaking behavior, conduct disorder.
20      Q.    So the externalizing symptoms
21  may or may not be related to symptoms of
22  depression, correct?
23      A.    That's correct.
24      Q.    And in terms of internalizing
25  symptoms, do you know, in terms of your --

86 (Pages 338 - 341)

CONFIDENTIAL

1  strike that.
2       In terms of internalizing
3  symptoms versus symptoms of depression, do
4  you know what the rate of error is between
5  the two, the difference between the two?
6       A.   What is rate of error again?
7  Define it.
8       Q.   Sure.
9            Out of the people who have --
10  individuals who have externalizing
11  symptoms --
12       A.   Right.
13       Q.   -- that actually have symptoms
14  of depression --
15       A.   Externalizing and depression?
16       Q.   Uh-huh.
17       A.   I don't know off the top of my
18  head, no.
19       Q.   Okay.  So, for example, if you
20  have a patient population -- excuse me.
21           If you have a group of
22  individuals that have internalizing symptoms,
23  some of that group actually doesn't have
24  symptoms of depression, right?
25       A.   You're talking about

1  internalizing symptoms now?
2       Q.   Yes.
3       A.   Oh, I thought you were talking
4  about the externalizing.
5       Q.   Let me ask the question so
6  you -- it's fresh in your mind, okay?
7       A.   Yes.
8       Q.   With respect to internalizing
9  symptoms --
10       A.   Right.
11       Q.   -- and how that group of
12  patients who has that, how many of those
13  actually have depressive symptoms?
14       A.   Depressive symptoms, again,
15  because you're talking about symptoms, you
16  can't say how many.  You can ask how --
17  what's percentage of those who have
18  significant internalizing symptoms also have
19  depressive symptoms or meet the criteria for
20  depression.  That's the way usually we ask
21  the --
22       Q.   Okay.  So let me see if I
23  understand that.
24           So for those patients who have
25  externalizing symptoms --

1       A.   Externalizing?
2       Q.   Thank you for correcting me.
3       A.   Sure.
4       Q.   Those patients who have
5  internalizing symptoms --
6       A.   Right.
7       Q.   -- some of those patients will
8  not have actual symptoms of depression,
9  right?
10       A.   With any measure, whether it's
11  depression or internalizing symptoms, if you
12  cross the two measures, there will be some
13  people who meet the criteria based on one
14  measure and not the other, and vice versa.
15       Q.   What's the percentage of
16  overlap between internalizing symptoms and
17  symptoms of depression?
18       A.   And depressive symptoms.
19           I can't tell you off the top of
20  my head, but this is a validated instrument
21  that we use, so it's possible to find it in
22  the literature.
23       Q.   Is it fair to say that that
24  overlap could be anywhere between 30 and 70%?
25           MS. EMMEL:  Objection,

1  speculation.
2       A.   Yeah, it is speculation.  I --
3  BY MR. DAVIS:
4       Q.   Do you know the percentage?
5       A.   Not off the top of my head.
6       Q.   Okay.  In terms of the patients
7  in your -- in the Riehm study who had
8  internalizing symptoms, do you know how many,
9  if any, ever developed a diagnosed depressive
10  disorder or other psychiatric disorder?
11           MS. EMMEL:  Objection,
12  compound.
13       A.   I -- off the top of my head,
14  again, I don't know.  This is a cohort study,
15  the PATH cohort study that has been following
16  these kids in life, so it's possible to --
17  that there are reports about association of
18  internalizing symptoms with future
19  psychopathology.
20  BY MR. DAVIS:
21       Q.   So, for example, in the Riehm
22  study, you can't look at the number of
23  patients who had internalizing symptoms that
24  you equate with symptoms of depression and
25  tell us how many of those patients actually

CONFIDENTIAL

Page 346

1  developed a clinically significant or
2  diagnosed condition, can you?
3       A.    It is possible in the PATH,
4  again, study to do that, but we haven't
5  looked at it as we did here.
6       Q.    Let me ask you a broader
7  question.
8       A.    Okay.
9       Q.    About all the studies that
10  you've looked at that assessed symptoms of
11  depression or symptoms of anxiety or eating
12  disorder symptoms --
13       A.    Right.
14       Q.    -- is there any way, looking at
15  that -- those studies, to be able to
16  definitively say, okay, of those patients who
17  had those symptoms, they actually went on to
18  develop an actual clinically significant
19  disorder?
20       MS. EMMEL:  Objection, vague
21       and ambiguous.
22       A.    There are studies in --
23  population studies in epidemiology, in
24  psychiatric epidemiology, that follow
25  adolescents with internalizing symptoms and

Page 347

1  externalizing symptoms to see what percentage
2  of them develop, as you say, diagnosable or
3  more severe forms of mental health problems.
4       And there is a strong
5  correlation.  There is a study by Rose and
6  Day that says there is a strong correlation
7  between mean on these questionnaires and the
8  number of people who develop significant --
9  clinically significant disorder later on.
10  BY MR. DAVIS:
11       Q.    Yeah, but I'm not focused just
12  on Riehm.  I'm focused on all the studies
13  that you've looked at for your assignment as
14  an expert in this case.
15       Is there any way to look at
16  those studies and say, you know what, I see
17  that they are -- there's people who are
18  reporting increased symptoms of anxiety or
19  depression or perhaps an eating disorder or
20  suicidal thoughts or behavior.
21       Is there any way to go on and
22  then determine, out of those people, how many
23  actually developed a clinically significant
24  disorder from social media use?
25       MS. EMMEL:  Objection, asked

Page 348

1  and answered.
2       A.    You're saying is there any way
3  of doing this, and as I mentioned, this is,
4  like, for example, a cohort study, so it's
5  possible to go into the data, future waves of
6  the data, and look to see what percentage of
7  these children who had increased
8  internalizing symptoms or externalizing
9  symptoms later on developed problems.
10  BY MR. DAVIS:
11       Q.    But for any of the studies that
12  have been done on social media, has that
13  analysis actually been done?
14       A.    I'm not aware of any specific
15  studies that did that.
16       Q.    Okay.  All right.  So there are
17  going -- let's turn back to Riehm and
18  internalizing symptoms.
19       There are going to be patients
20  who have significant internalizing symptoms
21  that will be false positives in terms of
22  whether or not they actually have symptoms of
23  depression, correct?
24       A.    That is correct.
25       Q.    Okay.  And that's also going to

Page 349

1  be true for any anxiety symptoms, right?
2       A.    That is correct both ways.  You
3  could have false positive, false negative.
4       Q.    And you don't know what the
5  percentage of that is for either depression
6  or anxiety for the Riehm study, do you?
7       A.    I'm actually looking at the
8  outcomes to see if the GAIN-SS, which is a
9  screening measure intended to identify a
10  probable mental health disorder, what are
11  the, maybe, psychometric properties of this
12  specific instrument in -- in those outcomes.
13       And I think -- I don't have it
14  here, but it's -- it's referenced, reference
15  number 18.
16       Q.    Okay.  Do you -- again, do you
17  know what the percentage is for either
18  depression or anxiety, from the Riehm study,
19  of those who had false positives or false
20  negatives?
21       A.    I do not off the top of my
22  head.
23       Q.    Okay.  Did you -- was that data
24  even collected for Riehm?
25       A.    Not for Riehm.

CONFIDENTIAL

1     Q.    Okay.
2     A.    But the measure is validated
3  and that's --
4     Q.    Now, you --
5     A.    -- the Dennis study, yeah.
6     Q.    You claim that this -- that the
7  Riehm study shows a dose-response
8  relationship between use of social media and
9  depressive symptoms, correct?
10    A.    Correct.
11    Q.    Doctor, the words
12 "dose-response" don't appear anywhere in the
13 Riehm article, do they?
14    A.    They don't need to appear.  You
15 can see it in the Figure 2 and in the
16 analysis.
17    Q.    Doctor --
18    A.    Table 3.
19    Q.    -- I want you to turn to the
20 camera and I want you to look right into the
21 camera, and I want you to show the jury where
22 you actually said, in the Riehm article, that
23 there's, in fact, a dose-response
24 relationship that show in this study.
25           MS. EMMEL:  Objection, asked

1     and answered, harassing.
2     A.    So if you read the paper, it
3  says:  Compared with adolescents who did not
4  use social media, the use of social media for
5  more than 30 minutes per day was associated
6  with greater risk of internalizing symptoms
7  alone.  And there is a comparison with less
8  than 30 minutes, and that is their risk ratio
9  is 1.3.
10 BY MR. DAVIS:
11    Q.    You don't claim anywhere in the
12 Riehm article that that establishes a
13 dose-response relationship, do you?
14           MS. EMMEL:  Objection, asked
15    and answered.
16    A.    We do not need to do that
17 because it's shown here.
18 BY MR. DAVIS:
19    Q.    You think it's shown by the --
20 like, the figure that you have --
21    A.    And the analysis, and the risk
22 ratios that are reported there.
23    Q.    But that would be an important
24 finding, if there was a dose-response
25 relationship established by your study,

1  correct?
2     A.    Yeah, I think it is an
3  interesting, important finding.
4     Q.    And despite it being an
5  important and an interesting finding, you
6  don't mention anywhere in the Riehm article
7  that that, in fact, is what Riehm shows,
8  right?
9            MS. EMMEL:  Objection,
10    argumentative, asked and answered.
11    A.    We don't use the terms
12 "dose-response relationship," but we talk
13 about this linear relationship.
14 BY MR. DAVIS:
15    Q.    Okay.  And if you look at --
16 look at your expert report.
17    A.    Here, I'm sorry.  Can I
18 interrupt you?  Here we say linear trend.
19 That is a dose-response relationship.
20    Q.    A linear trend?
21    A.    Yes.
22    Q.    Well, linear trend may or may
23 not be a dose-response relationship, true?
24    A.    If it's significant, it's a
25 dose-response relationship, I would argue.

1     Q.    You would argue?
2     A.    Yes.
3     Q.    Okay.  But you agree that if
4  there's a trend, that may or may not be a
5  dose-response relationship?
6     A.    Well, if it is as I mentioned,
7  statistically significant, it is
8  statistically significant.
9            Linear trend means that hours
10 of increasing use of social media is linearly
11 related to the outcome.  That is
12 dose-response relationship.  We may use the
13 word or not, but it is there.
14    Q.    Your analysis --
15    A.    Yeah.
16    Q.    -- with respect to -- if you
17 look at the figure that you have in your
18 expert report.  It's Figure 2.
19    A.    Correct.
20    Q.    It's on page -- it's actually
21 Figure 7 on page 35 of your report.  Why
22 don't you get your report out.
23    A.    Okay.  35?
24    Q.    Page 35.
25    A.    Yes.

CONFIDENTIAL

1    Q.    Right?
2         And that -- in that -- in your
3    report, you claim that there's a
4    dose-response shown from that figure,
5    correct?
6    A.    Yes.
7    Q.    And that figure is pulled
8    exactly right out of your Riehm article,
9    correct?
10   A.    Yes.
11   Q.    The Riehm article, however,
12   when it's the figure that you -- underneath
13   the figure in the Riehm article, you don't
14   claim that it shows a dose-response
15   relationship, do you?
16       MS. EMMEL:  Objection, asked
17       and answered.
18   A.    As I mentioned, there's -- we
19   observed a significant linear trend in the
20   coefficients for both internalizing and
21   comorbid problems.  And both of them are
22   significant.  And we say as time on social
23   media increased, the odds of these outcomes
24   increased proportionately.
25       So I think if this is not

1    dose-response relationship, I don't know what
2    it is.
3    BY MR. DAVIS:
4    Q.    Do you know of any longitudinal
5    study that has replicated your finding of a
6    claim of a dose-response relationship with
7    social media use and depressive symptoms?
8        MS. EMMEL:  Objection, vague,
9        compound.
10   A.    Yeah, I believe that the Zhang
11   study that actually replicated this with the
12   PATH data.  It might be in my materials
13   considered.
14       I believe they also had -- they
15   looked at different levels, and looked at the
16   association between different levels.
17   Q.    Zhang is not a longitudinal
18   study, is it?
19   A.    It is a longitudinal.  It's
20   looking at third wave of the PATH and fourth
21   wave of the PATH.
22   Q.    All right.
23   A.    So maybe --
24   Q.    How do you spell that?
25   A.    Zhang, Z-H-A-N-G.

1        Zhang is 2023.  I don't see it
2    here.
3    Q.    Is it in your materials
4    considered?
5    A.    It might be in the materials --
6    this is not materials considered.  This is --
7    no, it is materials considered.
8    Q.    Yeah.  That's what we got from
9    your counsel last night.
10   A.    Yeah.  So let's see if the
11   Zhang is there.
12       (Document review.)
13   A.    Yeah, it's not in the list of
14   my -- but it's a '23 study, a 2023 study that
15   replicated this study --
16   BY MR. DAVIS:
17   Q.    Well, I can't ask you a
18   question about a study I don't know about.
19   A.    If you don't have it, yes.
20   Q.    Right?
21       Doctor -- and we've confirmed
22   it's not on your materials considered list,
23   correct?
24   A.    Correct.
25   Q.    Okay.  Now, let's talk about --

1    let's look at Table 2 on page 1270.
2    A.    Table 2, yes.
3    Q.    All right.  So your finding for
4    internal problems alone, there was no
5    association between social media use and
6    internalizing problems at 30 minutes or less,
7    correct?
8    A.    Correct.
9    Q.    And if you look at -- then you
10   also looked at greater than 30 minutes up to
11   three hours, correct?
12   A.    Uh-huh.
13   Q.    Yes?
14   A.    Yes.
15   Q.    You also looked at greater than
16   3 hours up to 6 hours, correct?
17   A.    Correct.
18   Q.    And then you looked at greater
19   than 6 hours, correct?
20   A.    Correct.
21   Q.    And if you look at the
22   confidence intervals, for those three -- for
23   those three categories, the confidence
24   intervals are overlapping, correct?
25   A.    They are overlapping, yes.

CONFIDENTIAL

Page 358

1    Q.    And when you have confidence
2  intervals that are overlapping, that is
3  consistent with a single underlying
4  population value, correct?
5    A.    No, that's incorrect.
6          Overlapping confidence
7  intervals do not imply that the difference
8  between the two estimates are different.
9  Nonoverlapping means that they're different,
10 but if they might be overlapping and if
11 they're overlapping, there could be a
12 statistically significant difference between
13 the two or not.
14   Q.    Okay.
15   A.    That's a common mistake.
16   Q.    Okay.  So overlapping
17 confidence intervals like you see in
18 Table 2 --
19   A.    Yes.
20   Q.    -- those are not consistent
21 with a dose-response effect, are they?
22   A.    I wouldn't say they
23 contradicted a dose-response.  Dose-response
24 is not measured by looking at the confidence
25 intervals of individual steps.  It is looking

Page 359

1  at the trend of -- the overall trend that you
2  see.
3    Q.    If you look at your article,
4  there's a section that discusses
5  population-attributable fraction, correct?
6    A.    Yes.
7    Q.    I just want to make sure I'm
8  understanding what you're doing there.
9    A.    Yes.
10   Q.    You're not using the
11 population-attributable fraction analysis in
12 the Riehm article to say that there's a
13 dose-response relationship, are you?
14   A.    I'm look -- where are you
15 referring to?  Can I...
16         Okay.  Estimates given in
17 Table 3...
18         (Sotto voce document review.)
19   A.    So it says that -- so it also
20 supports the -- as you said, the
21 dose-response or the linear association.
22 BY MR. DAVIS:
23   Q.    Yeah.  I'm just asking:  The
24 population-attributable fraction analysis in
25 the Riehm article, you're not using that to

Page 360

1  say that this shows a dose-response
2  relationship, fair?
3    A.    It supports the dose-response
4  relationship.
5    Q.    So -- but that type of analysis
6  doesn't establish on its own a dose-response
7  relationship, right?
8    A.    But the data that goes into a
9  PAF comes from the model, so if the model
10 shows it, then you can -- it's a different
11 way of looking at the same data.  To say that
12 if you remove the effect of over 6 hours of
13 use, what would be the reduction in
14 percentage of adolescents with these
15 problems.
16         What if you model it, we can
17 say, what if we reduce more than 3 hours,
18 what if you reduce more than 30 minutes, and
19 so it shows, again, that gradation is another
20 way of saying dose-response.
21   Q.    Look --
22         MR. DAVIS:  Move to strike as
23 nonresponsive.
24 BY MR. DAVIS:
25   Q.    Look at page 1271, last line.

Page 361

1    A.    1271, last line.
2    Q.    In that paragraph, the last
3  paragraph on 1271, you discuss your
4  population-attributable fraction analysis,
5  correct?
6    A.    Uh-huh.
7    Q.    Yes?
8    A.    I'm reading it, yes.
9    Q.    And you say:  Of importance,
10 this is not meant to imply that reductions in
11 mental health problems would definitively
12 happen if social media use were reduced or
13 that all social media use is harmful.
14         Did I read that correctly?
15   A.    That is correct.
16   Q.    And you stand by that statement
17 today, right?
18   A.    That's one piece of evidence.
19   Q.    You agree --
20   A.    It's not definite -- no study
21 is definitive.
22   Q.    You stand by that statement
23 today, correct?
24   A.    That one study is not
25 definitive.

Golkow Technologies,
A Veritext Division

Page 362

1    Q.   I'm not asking about the study.
2        You stand by that statement
3  today, correct?
4    A.   That's -- that is about this
5  study.  This is not meant -- this is talking
6  about this study.
7    Q.   Yes.
8    A.   It's meant to imply the
9  reduction in mental health problems would
10 definitely happen if social media were
11 reduced or that all social media use is
12 harmful.
13   Q.   You stand by that statement as
14 to this study today, correct?
15   A.   This study, yes, that's a
16 qualified --
17   Q.   Okay.  And, in fact, in order
18 to make this analysis, to do this type of
19 population-attributable fraction analysis,
20 you had to assume that there was a causal
21 relationship, correct?
22   A.   You have to assume.  You have
23 to -- because you're talking about reduction,
24 and reduction assumes that this is -- there
25 is a causal relationship.

Page 363

1    Q.   Okay.  So the assumption is any
2  time you're doing that type of analysis, you
3  have to make an assumption that there's a
4  causal relationship?
5    A.   Any analysis includes --
6  involves assumptions.
7    Q.   Okay.  So is it fair to say
8  that you have openly admitted that there's no
9  causal relationship between social media use
10 and the findings in the Riehm study?
11       MS. EMMEL:  Objection,
12   misstates testimony.
13   A.   That is -- can you repeat what
14 you said?
15 BY MR. DAVIS:
16   Q.   You have stated publicly that
17 there's no relationship -- no causal
18 relationship between social media use and the
19 findings in the Riehm study?
20       MS. EMMEL:  Objection,
21   foundation, misstates the document.
22   A.   I have not stated that, no.
23   I can read it again, if you
24 want.  It doesn't say anywhere what you --
25       ///

Page 364

1  BY MR. DAVIS:
2    Q.   There's no place in the Riehm
3  study that says that there's a causal
4  relationship established between depressive
5  symptoms and social media use, right?
6    A.   Very few studies would say
7  that.  There is -- our study definitively
8  establishes a causal relationship between
9  social media use and mental health outcomes.
10 You wouldn't find it anywhere about cigarette
11 smoking, about alcohol use and harms --
12   Q.   I'm just asking what your study
13 says.  There's no statement about cause and
14 effect in Riehm, correct?
15   A.   I haven't read it recently,
16 so -- but the sentence is there, the
17 statements we make.  We say:  Adolescents who
18 spend more than 3 hours per day using social
19 media may be at heightened risk of mental
20 health problems.
21   Q.   May be, right?
22   A.   Yes.
23   Q.   Right?  May be?
24   A.   It's not definitive.
25   Q.   Correct.

Page 365

1        And so you say at the
2  Conclusions -- look at your Conclusions
3  section.
4    A.   Uh-huh.
5    Q.   You say:  This study suggests
6  that increased time spent on social media may
7  be a risk factor for internalizing problems
8  in adolescents.
9        Correct?
10   A.   Correct.
11   Q.   Not definitive, right?
12   A.   It's not definitive.
13   Q.   Okay.  So let's look at --
14 let's look at what you said publicly.
15       MS. EMMEL:  Counsel, I assume
16   that we are going to mark this also as
17   an exhibit and you'll get me the cite
18   for that?
19       MR. DAVIS:  Yep.
20 BY MR. DAVIS:
21   Q.   You were interviewed by
22 JAMA Psychiatry about the Riehm 2019 study
23 after it was published, correct?
24   A.   I don't think I was
25 interviewed.  I think Kira herself was

CONFIDENTIAL

Page 366

1 interviewed.
2    Q.    In the interview you said:  One
3 thing that we don't know for sure is that
4 there is a causal relationship between
5 exposure to social media and internalizing
6 symptoms.
7        You said that, didn't you?
8    A.   I don't --
9        MS. EMMEL:  Foundation.  We
10 have no basis for this question.
11    A.   Yeah.  As I said, I didn't
12 interview with JAMA Psychiatry.
13 BY MR. DAVIS:
14    Q.    Did you say that or not,
15 Doctor?
16        MS. EMMEL:  Objection,
17 foundation.
18    A.    You have to show me evidence
19 that I said it in an interview.
20        ----------
21        (Whereupon, Exhibit 22 was
22 played in the deposition room,
23 transcribed as follows.)
24        INTERVIEWER:  With these
25 results, how would you want clinicians

Page 367

1    listening to this podcast and reading
2    the paper to think differently or kind
3    of change or kind of implement this as
4    they're working with patients who are
5    certainly using social media?
6        DR. MOJTABAI:  Well, one thing
7    that especially
8    pediatricians should --
9        (Transcription ends.)
10        ----------
11        MR. DAVIS:  Let's stop the
12    audio for a second.
13 BY MR. DAVIS:
14    Q.    That's your voice that's
15 answering that question, right?
16    A.    Yeah.  Yeah.  But that's not
17 JAMA Psychiatry.
18    Q.    Okay.  What -- what -- who
19 interviewed you?
20    A.    I have no idea.
21    Q.    But you got interviewed about
22 the Riehm study, correct?
23    A.    I might have.  I mean, I have
24 gotten a lot of interviews, and this is from
25 2019 or so.  It's possible.

Page 368

1    Q.    Let me start your answer again,
2 okay?
3    A.    Okay.
4        ----------
5        (Whereupon, Exhibit 22 was
6    played in the deposition room,
7    transcribed as follows.)
8        DR. MOJTABAI:  Well, one thing,
9    especially pediatricians should
10    consider when dealing with adolescents
11    who present with internalizing
12    problems or depressive symptoms is to
13    consider this as a risk factor and ask
14    about it and investigate the amount
15    and the nature of the social media use
16    in their patient.
17        Also, this is a conversation
18    that may be brought up to both
19    adolescents and parents of these
20    adolescents who are seen regularly in
21    pediatrician offices or child
22    psychiatry offices.
23        One thing we don't know for
24    sure is that there's a causal
25    relationship between exposure to

Page 369

1    social media and internalizing
2    symptom, but we also know that the
3    time spent on social media is the time
4    that's spent in social interactions
5    with peers, with family, in physical
6    activity; and those are all important
7    factors in the social-emotional
8    development of young people.
9        (Transcription ends.)
10        ----------
11 BY MR. DAVIS:
12    Q.    Okay.  So one of the things
13 that you said in that interview is that:  One
14 thing we don't know for sure is that there is
15 a causal relationship between exposure to
16 social media and internalizing symptoms.
17        Right?
18        MS. EMMEL:  Objection,
19 foundation.
20    A.    That's what I said in that
21 interview.
22        But I also said that it is a
23 factor, a risk factor.
24 BY MR. DAVIS:
25    Q.    And in your article, you say it

93 (Pages 366 - 369)

CONFIDENTIAL

Page 370

1    may be a risk factor, right?
2        A.    Well, here -- we're talking
3    about here or the article?
4        Q.    In your article you say:  This
5    data suggests it may be a risk factor, right?
6        A.    Do you -- I don't -- I'm
7    looking to see if the "may be" word was here.
8        Q.    Conclusions, quote --
9        A.    May be a risk factor, yeah.
10       Q.    Okay.
11       A.    Yeah.
12       Q.    Thank you.
13            You got criticisms about the
14   Riehm study, right?
15       A.    Correct.
16       Q.    Dr. Keyes and Dr. Kreski wrote
17   in an article, a letter to the editor, about
18   your study, correct?
19       A.    Correct.
20       Q.    And one of the things they said
21   is that your study's analytic strategy is
22   vulnerable to substantial residual
23   confounding, right?
24       A.    That's what they said.
25       Q.    And they said -- and residual

Page 371

1    confounding, if not properly controlled for,
2    can result in findings of an association
3    that's spurious, right?
4        MS. EMMEL:  Objection,
5    foundation, compound.
6        A.    We talked about confounding.
7    Confounding cannot either produce or imply
8    results or hide, sometimes, results.  There's
9    negative confounding too.  So it could go
10   either way.
11   BY MR. DAVIS:
12       Q.    Okay.  And Drs. Keyes and
13   Kreski found that there was no association
14   between social media use and -- let me back
15   up.
16            What those two doctors did,
17   those two researchers, they have published on
18   social media, correct?
19       A.    Correct.
20       Q.    And they are individuals and
21   scientists who have actually done a number of
22   different studies on social media use, right?
23       A.    They have done some.
24       Q.    Yep.
25            And they actually reanalyzed

Page 372

1    the data from your study, correct?
2        A.    That is correct.
3        Q.    And they found no association
4    between social media use and symptoms of
5    depression or anxiety when social media use
6    was less than 6 hours a day, correct?
7        A.    Their analysis had major
8    limitations.
9        Q.    I'm just asking you what the
10   analysis showed.
11            It showed that, correct?
12       A.    Their analysis showed, despite
13   these limitations, despite their
14   overadjustment, that the 6 hours or more of
15   social media use is associated with outcomes.
16       Q.    But one thing that they found
17   that was in contrast to what you found is
18   that when they reanalyzed the data to adjust
19   for what they believe needed to be adjusted
20   for in your study that wasn't, they found
21   that there was no association between use of
22   social media and symptoms of depression when
23   social media was used for 6 hours or less,
24   correct?
25       MS. EMMEL:  Objection,

Page 373

1        compound.
2        A.    Right now you said it, and that
3    is -- the thing that you said first is
4    correct.  They found an association for 6
5    hours and more.
6    BY MR. DAVIS:
7        Q.    But not for 6 hours or less,
8    correct?
9        A.    Because they overadjusted the
10   analysis for a potential mediator.
11       Q.    You thought -- you claim that
12   they overadjusted, correct?
13       A.    Correct.
14       Q.    They thought you
15   underadjusted --
16       A.    Correct.
17       Q.    -- correct?
18       A.    That's correct.
19       Q.    And so they also stated that
20   when examined as continuous scales, social
21   media use of more than 6 hours per day
22   increased internalizing, slash, externalizing
23   symptoms just 0.38 points and explained 0.08%
24   of symptom variance.
25            Correct?

94 (Pages 370 - 373)

Page 374

1    MS. EMMEL: Objection,
2 foundation.
3    A.    That is in their reports, but
4 the percent of the variance explained, that's
5 the r-squared that they had reported, it has
6 major limitations brought up by numerous
7 investigators. It's not a good measure of
8 outcome, including Gary King, and Twenge has
9 a paper that refers to this problem also.
10 BY MR. DAVIS:
11    Q.    Their point in that statement
12 was essentially that less than 1% of the
13 change in symptoms may be attributable to
14 social media, correct?
15    MS. EMMEL: Objection,
16 foundation.
17    Do you have something for him
18 to look at?
19    MR. DAVIS: I'm simply asking
20 if that's the point of what we just
21 talked about.
22    A.    What are you referring to? Can
23 you repeat or show me --
24 BY MR. DAVIS:
25    Q.    Yeah. Sure.

Page 375

1    A.    -- whatever...
2    Q.    I'll hand you what's been
3 marked as Exhibit 20.
4    (Whereupon, Mojtabai-20,
5    Comment & Response: Is there an
6    Association Between Social Media Use
7    and Mental Health? The Timing of
8    Confounding Measurement Matters, by
9    Keyes and Kreski, was marked for
10    identification.)
11    (Interruption by the
12    stenographer.)
13 BY MR. DAVIS:
14    Q.    You see on the right-hand
15 column, first full paragraph, they say: When
16 examined as continuous scales, social media
17 use of more than 6 hours per day increased
18 internalizing, slash, externalizing symptoms
19 just 0.38 points and explained 0.08% of
20 symptom variance.
21    Do you see that?
22    A.    I see that.
23    Q.    Their point in making that was
24 essentially that less than 1% of the change
25 in symptoms may be attributable to social

Page 376

1 media, correct?
2    A.    You have to look at the
3 standard deviation to make sense of what
4 is -- what does it mean.
5    Q.    Their point was that there was
6 a very slight change in symptoms that could
7 be attributable to social media, correct?
8    A.    I debate that for the reasons I
9 said. They are overadjusting the analysis
10 and they are using the percent of variance
11 explained, which is a faulty measure.
12    Q.    I understand you disagree with
13 them. But their point was that there was a
14 very small change in symptoms that could be
15 attributable to social media, correct?
16    MS. EMMEL: Objection, asked
17    and answered.
18    A.    As I mentioned, in their faulty
19 analysis in my opinion, I think we said it in
20 response to them. In their faulty analysis,
21 based on an assumption, untestable
22 assumption, they made this calculation.
23 BY MR. DAVIS:
24    Q.    They made this calculation, and
25 their point is that there's a very small

Page 377

1 percentage of change in symptoms that could
2 be attributable to social media, right?
3    MS. EMMEL: Objection, asked
4    and answered.
5    A.    Based on their faulty, as I
6 said, calculations, yes.
7 BY MR. DAVIS:
8    Q.    Okay. And, in other words,
9 their point was social media use is not a
10 substantial factor for the change over time
11 in their view, correct?
12    A.    Their point has been
13 disvalidated or disqualified by that journal
14 article that replicated this study. But you
15 are correct in what you say about their
16 report.
17    Q.    And, in fact, they warned
18 readers of your study that caution should be
19 taken in interpretation of your study
20 results, correct?
21    MS. EMMEL: Objection.
22    A.    They were --
23    MS. EMMEL: Foundation.
24    A.    What are you -- oh, caution
25 should be taken in interpretation of this.

95 (Pages 374 - 377)

CONFIDENTIAL

Page 378

1     They say that, yes.
2  BY MR. DAVIS:
3     Q.    Okay.  And you and your
4  coauthors had a chance to respond to
5  Drs. Keyes and Kreski in a reply letter,
6  right?
7     A.    Uh-huh.
8          MS. EMMEL:  Objection,
9     foundation.
10         (Whereupon, Mojtabai-21, Letter
11    to JAMA Psychiatry by Feder et al, was
12    marked for identification.)
13  BY MR. DAVIS:
14    Q.    Let me hand you what's been
15  marked as Exhibit 21.
16         Exhibit 21 is your reply
17  letter, correct?
18    A.    Uh-huh.
19    Q.    Yes?  Yes?
20    A.    Yes.
21    Q.    And you stated in the left-hand
22  column, second paragraph:  Our collective
23  findings have two possible explanations.
24         We're talking about the
25  Keyes-Kreski explanation and analysis in

Page 379

1  yours, correct?
2     A.    Sorry, where are you referring
3  to?  It's not a long -- but which paragraph
4  are you referring to?
5     Q.    I'm looking at the second
6  paragraph on the left-hand side.
7     A.    Okay.
8     Q.    And you say:  Therefore, our
9  collective findings have two possible
10  explanations.
11    A.    Right.
12    Q.    1, frequency -- excuse me,
13  frequently using social media causes
14  contemporaneous psychopathology, which then
15  causes feature psychopathology, i.e.,
16  mediation; or 2, psychopathology causes more
17  frequent social media use and also causes
18  future psychopathology, i.e., residual
19  confounding.
20         Did I read that correctly?
21    A.    Correct.
22    Q.    And you say that -- those were
23  two assumptions that you had to choose
24  from --
25    A.    Uh-huh.

Page 380

1     Q.    -- because of the study data,
2  correct?  Right?
3     A.    Correct.
4     Q.    Because the study data didn't
5  have information you needed in order to
6  decide which assumption was a more valid one,
7  right?
8     A.    Correct.
9     Q.    And you could not test the
10  second explanation or assumption, right?
11    A.    Or the first one.
12    Q.    Okay.  And you even said:  The
13  truth is, the Population Assessment of
14  Tobacco and Health study -- which is the
15  study you used, right?  Right?
16    A.    Yes.
17    Q.    -- do not allow us to test
18  which assumptions about the relationship
19  between social media use and concurrent
20  psychopathology are correct.
21         Right?
22    A.    Correct.
23    Q.    And so the Riehm study does not
24  rule out that psychopathology causes more
25  frequent social media use and also causes

Page 381

1  future psychopathology, correct?
2     A.    It's not exactly correct
3  because even if their analysis, even in their
4  faulty overadjusted analysis, they find still
5  association between 6 hours of use and
6  internalizing symptoms.
7     Q.    But the bottom line is the
8  Riehm study does not rule out that
9  psychopathology causes more frequent social
10  media use and also causes future
11  psychopathology, right?
12         MS. EMMEL:  Objection,
13    compound.
14    A.    Can you repeat again?  I'm
15  sorry.
16  BY MR. DAVIS:
17    Q.    Sure.
18         The Riehm study does not rule
19  out that psychopathology, such as depression
20  or anxiety, causes more frequent social media
21  use and also causes future psychopathology,
22  right?
23         MS. EMMEL:  Objection,
24    compound.
25    A.    So if we assume even if they

96 (Pages 378 - 381)

CONFIDENTIAL

Page 382

1  are right, and psychopathology at wave 3 is a
2  confounder, which means it is the cause of
3  both social media use and -- and also
4  psychopathology, so psychopathology at wave
5  3. So we are -- we haven't overadjusted for
6  that.
7        But even after doing this, if
8  you still see an association, which they did
9  see, that association, I would suggest -- and
10  their odds ratio, I think, was 1.5. That
11  would suggest that social media is causally
12  related, supports that. I mean, it's not
13  definitive. Nothing is definitive in
14  science. Yeah.
15  BY MR. DAVIS:
16     Q.  Go ahead. Are you finished?
17     A.  And so I would argue that our
18  study is vindicated, both by their analysis
19  as well as the replication by Zhang.
20     Q.  The Zhang study that I don't
21  know about, correct?
22     A.  Well, we could share with you.
23  I don't know if we --
24     Q.  I didn't prepare for Zhang so
25  let me ask you the next question.

Page 383

1     A.  Sure.
2     Q.  When you have a statistically
3  significant result --
4     A.  Right.
5     Q.  -- that's 1.5, is it fair to
6  say that that result can't be ruled out as a
7  result of confounders that were not included
8  in the study?
9        MS. EMMEL: Objection,
10  speculation.
11     A.  I don't think you can make that
12  judgment based on the size of the
13  association. Air pollution is related to
14  cancers, the odds ratio is 1.1. Smoking is
15  related to cancers, odds ratio is 1.5. Lead
16  exposure is associated with lower IQ. Again,
17  the odds ratio is 1.5.
18        So based on those, if we're
19  throwing out odds ratios of 1.5 as
20  unreliable, then we're -- we're left with --
21  BY MR. DAVIS:
22     Q.  Well, if you have a study --
23     A.  Yes.
24     Q.  -- that has a statistically
25  significant finding of odds ratio relative

Page 384

1  risk of less than 2, right, that study is
2  more susceptible to having a confounder that
3  could actually explain the statistically
4  significant result, right?
5        MS. EMMEL: Objection,
6  speculation.
7     A.  It's very -- it's very
8  context -- it's very -- it depends, as -- you
9  have to tell me the context, the scenario,
10  what is the exposure, what's the -- what's
11  the measure that has been used, what's the
12  prevalence of outcome, what's the prevalence
13  of exposure --
14  BY MR. DAVIS:
15     Q.  When you concluded your letter
16  to Drs. Keyes and Kreski --
17     A.  Right.
18     Q.  -- you stated that you could
19  not test both hypotheses -- which are the two
20  hypotheses we discussed earlier, right?
21     A.  Correct.
22     Q.  And you were forced to choose
23  one set of assumptions, right?
24     A.  Correct.
25     Q.  And you told them -- you said

Page 385

1  in your reply letter that: Rather because
2  Keyes and Kreski show our observational
3  findings depend on untestable assumptions,
4  this should further motivate experimental
5  studies on social media use and mental health
6  that do not rely on these assumptions.
7        Correct?
8     A.  It's idea that studies like
9  that are conducted, yes.
10     Q.  Yeah.
11        And so you had to -- you
12  recognize that there were untested
13  assumptions that were part of your study that
14  you couldn't verify one way or the other,
15  correct?
16     A.  That was -- that was part of --
17  I mean, we said here experimental studies.
18  At that time, we didn't think about a
19  follow-up study that would use multiple waves
20  of PATH. That also could provide
21  replication. Replication is really the
22  engine of science.
23     Q.  And I'm just asking that you
24  recognized in your letter response that there
25  were untested assumptions that were part of

97 (Pages 382 - 385)

CONFIDENTIAL

Page 386

1  your study that you couldn't verify one way
2  or the other, correct?
3      A.    Like any other studies in
4  science, yes, we had untested assumptions --
5  or untestable, let's put it this way.  Not
6  untested.
7      MR. DAVIS:  Right.  Okay.
8  Let's take a break.
9      THE VIDEOGRAPHER:  We're off
10  the record at 5:00 p.m.  That's the
11  end of Media 8.
12      (Recess taken, 5:00 p.m. to
13  5:15 p.m. CDT)
14      (Whereupon, Mojtabai-22, Riehm
15  Interview Clip, was marked for
16  identification.)
17      THE VIDEOGRAPHER:  We're back
18  on the record at 5:15 p.m.  This is
19  the beginning of Media 9.
20  BY MR. DAVIS:
21      Q.    Dr. Mojtabai, I just have a
22  handful of questions left on the Riehm study,
23  okay?
24      A.    Sure.
25      Q.    If you turn to Table 2.

Page 387

1      A.    Let me find it.  I'm sorry.
2  Riehm study.
3      MR. DAVIS:  While you're
4  looking for that, Dr. Mojtabai, I'm
5  going to put on the record that we
6  marked as Exhibit 22 a piece of paper
7  that says Riehm Interview Clip, and
8  that will be for the video clip that I
9  showed Dr. Mojtabai.
10      A.    I can't find the Riehm paper.
11  I don't know where it's -- oh, here it is.
12  BY MR. DAVIS:
13      Q.    You're getting like me,
14  Dr. Mojtabai.  We can't find anything.
15      A.    It was on the other side, okay.
16      Q.    All right.  Turn to Table 2.
17      A.    Table 2.  Yes.
18      Q.    You report out both relative
19  risk ratios and adjusted relative risk
20  ratios, right?
21      A.    Correct.
22      Q.    And your practice is to go with
23  the adjusted relative risk ratios or odds
24  ratios or relative risk ratios, correct?
25      A.    Correct.

Page 388

1      Q.    And the reason you go with the
2  adjusted versus the unadjusted in any study
3  is because that takes into account potential
4  confounders, correct?
5      A.    That is correct.
6      Q.    Okay.  Now, if you look at
7  Table 1270 -- for the externalizing problems
8  alone, you report adjusted relative risk
9  ratios where the relative risk ratios cross
10  1.0, correct?
11      A.    Correct.
12      Q.    And when a confidence interval
13  or a correlation coefficient -- let me back
14  up.  Let me stick with confidence interval.
15      When a confidence interval
16  crosses 1.0, that means it's not a
17  statistically significant result, right?
18      A.    For odds ratios and risk
19  ratios, you're correct.
20      Q.    Okay.
21      A.    But for R, that is Pearson's
22  correlation, it's 0 if it crosses to 0.
23      Q.    You anticipated my next
24  question.  When you're doing a coefficient
25  correlation -- excuse me -- yeah, a

Page 389

1  correlation coefficient, if it crosses 0.0,
2  if the confidence intervals cross 0.0, it's
3  not statistically significant, right?
4      A.    That is correct.
5      Q.    And, for example, you found in
6  your study that there were no -- for
7  externalizing problems alone, there was no
8  statistically significant association between
9  use of social media and externalizing
10  problems alone, correct?
11      A.    Correct.
12      Q.    And you report that out on
13  page 1271, left-hand column.
14      A.    Left-hand column.  Okay.
15      Q.    First full paragraph, you
16  say -- last sentence says:  In contrast, we
17  observed no association for externalizing
18  problems.
19      Correct?
20      A.    That is correct.
21      Q.    And the reason you report out
22  no association is because you didn't find a
23  statistically significant association,
24  correct?
25      A.    That is correct.

98 (Pages 386 - 389)

CONFIDENTIAL

Page 390

1    Q.    And your practice is that in
2  order to be able to establish an association,
3  it has to be a statistically significant
4  result, right?
5    A.    I have to qualify this.  Again,
6  it depends on the context.  It is possible,
7  for example, you are including a large number
8  of studies in a meta-analysis, and some of
9  them have -- a lot of them actually might
10  have nonsignificant results.  You still put
11  them in the meta-analysis.  That's the point
12  of doing a meta-analysis, so you don't throw
13  them out.
14        And it's possible that in
15  aggregate, those studies, when pooled, they
16  would have a significant association.
17    Q.    Yeah.  And I'm not suggesting
18  you throw out for a meta-analysis
19  nonsignificant results.
20        My only point was that whether
21  it's an individual study or a meta-analysis,
22  for you to find an association, it has to be
23  a statistically significant result, fair?
24    A.    It is a -- one of the
25  indicators of an association.

Page 391

1    Q.    Yeah.  And it's -- and for you,
2  it's what you typically use.
3    A.    Yes.
4    Q.    Statistical significance is
5  what you typically use to determine whether
6  or not there's an actual association,
7  correct?
8    A.    Typically, yes.
9    Q.    Okay.  And in terms of the data
10  on -- the studies on social media use, are
11  you going to point to any nonstatistically
12  significant results and say, oh, this shows
13  there's actual -- an association here?
14        MS. EMMEL:  Objection,
15    speculation.
16    A.    Yeah, as I said, I have to look
17  at it.  I mean, it might be the case in a
18  meta-analysis you have a forest plot and you
19  see a number of the studies crossing that 1
20  line or 0 line, depending on what the outcome
21  measure is, and you still conclude that when
22  you aggregate the results, there's a
23  significant association.
24  BY MR. DAVIS:
25    Q.    Right.

Page 392

1    A.    Each one of those studies have
2  contributed to that result.
3    Q.    Let's set aside meta-analysis
4  for a second.
5        When you're looking at an
6  individual study to assess whether or not
7  it's -- there's an association or not, for
8  the social media studies, you're not going to
9  come in in this case and say, oh, this
10  individual study showed a nonsignificant
11  association, but it actually -- but I'm
12  interpreting that to mean there's actually a
13  causal association?
14    A.    No, I wouldn't.
15        MS. EMMEL:  Objection,
16    speculation, vague.
17  BY MR. DAVIS:
18    Q.    I'm sorry?
19    A.    I wouldn't --
20    Q.    Okay.
21    A.    -- interpret that result --
22    Q.    Okay.
23    A.    -- as supporting the causal
24  association.
25    Q.    Okay.  And if you had a

Page 393

1  meta-analysis, where you combined a bunch of
2  studies, some that had nonsignificant results
3  and some with significant results, and the
4  meta-analysis found no significant
5  association, you would say there was no
6  association, fair?
7        MS. EMMEL:  Objection,
8    compound.
9    A.    With meta-analysis, you may
10  want to actually conduct further analysis by
11  subgroups of studies.  Let's say you were
12  combining longitudinal and cross-sectional
13  and you don't find a significant result based
14  on the combined studies, so you may break it
15  down and say, okay, let's see if the
16  longitudinal studies, for example, show an
17  association and the other ones don't.
18        So it is context dependent, or
19  case by case, you would treat the results.
20  BY MR. DAVIS:
21    Q.    Let me see if I got what you're
22  saying.
23        You're saying that if you
24  got -- you had a meta-analysis result that --
25  strike that.

99 (Pages 390 - 393)

CONFIDENTIAL

Page 394

1    If you had a result from a
2  meta-analysis that was not statistically
3  significant, you would say there's no
4  association, but you would also say we need
5  to do -- we may need to do further testing or
6  analysis to see whether or not that changes?
7        MS. EMMEL:  Objection,
8    compound, vague.
9    A.    Again, I would look at the
10  results.  Some of the results might be
11  actually what we call statistical trend,
12  which is larger than .05, typically less
13  than .1, because .05 is a convention we have
14  all agreed.  Let's take one in 20 chance for
15  a chance result as indicating there is
16  actually a finding.
17        So I have seen people do that,
18  look at results saying that there is a trend
19  here and report it also.
20  BY MR. DAVIS:
21    Q.    Right.  But I'm just asking you
22  about what Dr. Mojtabai would do.
23        If you got a nonstatistically
24  significant result in a meta-analysis, you
25  wouldn't call that an association, would you?

Page 395

1    A.    If it's not a trend level.  I
2  would call it -- if there is a trend level, I
3  would call it a trend-level association and
4  be candid about it.  But if it is not even
5  trend level, I wouldn't call it necessarily
6  that.
7    Q.    So if you got a situation where
8  it was a trend level, but not statistically
9  significant, you would call it a trend level,
10  correct?  Is that right?
11    A.    Typically, yes.
12    Q.    You wouldn't say that it was a
13  trend level showing or establishing an
14  association, would you?
15    A.    First of all, I wouldn't use
16  the term "establishing" association, and I
17  may -- if the size of the -- again, it is
18  very case dependent.  Let's say you have five
19  cases and the five cases' correlation is very
20  strong, and it's not statistically
21  significant because statistical significance
22  is dependent on the sample size.
23    Q.    Okay.
24    A.    I would say that it is
25  indicative of a possible association,

Page 396

1  although the statistical test is not
2  significant.
3    Q.    Okay.  Fair enough.  Okay.
4        In any of the studies that were
5  done on social media use that you analyzed,
6  any of the observation studies -- let me
7  start again, sorry.
8        Any -- for any of the
9  observational studies that you analyzed for
10  social media use and any adverse mental
11  health outcome, did you analyze in your
12  report -- either of your reports -- whether
13  the association was a result of multiple
14  comparisons?
15        MS. EMMEL:  Objection, vague,
16    foundation.
17    A.    I personally, like many other
18  people in the field, don't believe in
19  adjusting for multiple comparisons, and there
20  are -- Rothman is the major reference on
21  that, very respected Harvard epidemiologist
22  and biostatistician.
23        So it is not a clear-cut
24  standard that multiple testing should be
25  adjusted.

Page 397

1  BY MR. DAVIS:
2    Q.    But even if multiple
3  comparisons are not done or adjusted for in a
4  study, you still recognize that if there are
5  a number of analyses that are done in a
6  study, that increases the likelihood that
7  you're going to get a spurious association,
8  right?
9        MS. EMMEL:  Objection, vague,
10    speculation.
11    A.    The reverse of it is if you
12  adjust it, you may lose sight of associations
13  that exist.
14  BY MR. DAVIS:
15    Q.    Yeah, I'm not asking about what
16  if it happens.  I'm just saying that you
17  recognize that if there are -- there's a
18  study that does a host of different analyses,
19  that it increases the likelihood that one or
20  more of those results will show an
21  association when there's not one, right?
22        MS. EMMEL:  Objection, vague.
23    A.    Again, I would say that the
24  standards in biostats and epidemiology is --
25  is -- it's not established.  There are

CONFIDENTIAL

Page 398

1  people, very prominent people, who advocate
2  not adjusting for multiple testing.
3       So it's not a practice that is
4  universally endorsed, let's put it this way.
5  BY MR. DAVIS:
6      Q.   Yeah, I'm not trying to get to
7  the merits of it. I'm just trying to get to
8  what can happen if you -- right? Like if
9  you're doing -- there's a study that does
10  multiple comparison -- analyses --
11     A.   Right.
12     Q.   -- right? And there's no
13  adjustment for multiple comparisons, what
14  happens is that that increases the likelihood
15  in a number of people's minds that that
16  result is producing an association where
17  there's not one, correct?
18         MS. EMMEL:  Objection, vague,
19  compound.
20     A.   Again, it's context dependent.
21  Because if you are -- let's say you're
22  looking at different measures of depression
23  and you test them, and all of them show a
24  statistically significant result. Then you
25  adjust for multiple testing and then you find

Page 399

1  that the effect completely disappears, I
2  would say that's a bad practice because those
3  measures are not totally independent.
4       So it is context dependent. I
5  wouldn't have a blanket statement that
6  multiple testing should be adjusted.
7       And there are various different
8  ways of adjusting for it. There's Bonferroni
9  that is very conservative and generally kills
10  all the significant results in a study if
11  there are a number of comparisons. There are
12  better ways of doing -- like using a more
13  conservative p value.
14  BY MR. DAVIS:
15     Q.   Let's look at Section 5.3,
16  which is on page 24.
17         In the section that's entitled
18  5.3, Addictive use of social media -- excuse
19  me -- Addictive use of social media is
20  associated with other adverse outcomes, you
21  agree that every one of the studies that you
22  identify in that section is a cross-sectional
23  study, right?
24         (Sotto voce document review.)
25         MR. DAVIS:  Let me rephrase.

Page 400

1         THE WITNESS:  Yes.
2  BY MR. DAVIS:
3      Q.   For Section 5.3, Addictive use
4  of social media is associated with adverse --
5  other adverse outcomes, every one of the
6  articles that you identify in this section is
7  either a cross-sectional study or a review
8  article without original data, right?
9      A.   Yeah. One of them, for
10  example, is the Yigiter study, is a
11  meta-analysis. I can't know -- I don't know
12  off the top of my head if they are
13  longitudinal or cross-sectional, so if that's
14  your question.
15     Q.   Okay. Let -- you're referring
16  to the 38 studies of the Turkish population?
17     A.   Yeah.
18     Q.   Okay. You don't know whether
19  those are cross-sectional or longitudinal, do
20  you?
21     A.   I don't know. There were 38
22  studies that are included, off the top of my
23  head, they were --
24     Q.   I will tell you, I pulled all
25  of those studies.

Page 401

1      A.   Uh-huh.
2      Q.   Okay? I couldn't identify a
3  single one that was not cross-sectional.
4      A.   Okay.
5      Q.   Do you have any evidence today
6  to say that there is a study in that group
7  that was, in fact, not cross-sectional?
8      A.   I have no evidence, and if you
9  have done it, good for you. Kudos.
10     Q.   For the other studies that are
11  identified in Section 5.3 of your report --
12     A.   Uh-huh.
13     Q.   -- fair to say that those are
14  either cross-sectional studies or review
15  articles without original data?
16     A.   So Cunningham is a review
17  article. And Duradoni and Rachubinska, I
18  don't -- and Mamun and Griffiths,
19  Brailovskaia, and you're telling me that
20  they're are all cross-sectional?
21     Q.   I'm asking you, can you
22  identify any study in Section 5.3 that is a
23  longitudinal or experimental study?
24     A.   Off the top of my head, no.
25     Q.   You don't know of one today, do

101 (Pages 398 - 401)

CONFIDENTIAL

Page 402

1    you?
2        A.    I don't know of any.
3        Q.    Okay.  Let's look at
4    Section 5.4.1.  This is a section entitled
5    Meta-analyses that support causal link for
6    social media use and depressive symptoms.
7        Correct?
8        A.    Can you read it again?
9        Q.    Yes.
10       This section is entitled
11   Meta-analyses support the link between social
12   media use and depressive symptoms.
13       A.    This is correct, as you said.
14   You are correct.
15       Q.    And you chose these studies
16   because you believed that they provided
17   reasonable analysis of the data that they
18   analyzed, right?
19       A.    Correct.
20       Q.    And one of the studies that you
21   identify is the Vahedi and Zannella 2021
22   study, correct?
23       A.    Vahedi and Zannella, yes, I see
24   that.  Vahedi and Zannella, yes.
25       Q.    Let me grab that study.

Page 403

1        (Whereupon, Mojtabai-25,
2        The association between self-reported
3        depressive symptoms and the use of
4        social networking sites (SNS): A
5        Meta-Analysis, by Vahedi et al, was
6        marked for identification.)
7    BY MR. DAVIS:
8        Q.    I'll mark as Exhibit 25 a copy
9    of that study for you, Dr. Mojtabai.
10       A.    Thank you.
11       Q.    This is an article entitled
12   "The association between self-reported
13   depressive symptoms and the use of social
14   networking sites:  A meta-analysis."
15       Right?
16       A.    That's correct.
17       Q.    Okay.  And any findings in the
18   Vahedi-Zannella study that you have -- strike
19   that.  That's a terrible question.
20       Are there any findings in the
21   Vahedi study that you disagree with?
22       MS. EMMEL:  Objection, vague.
23       A.    Off the top of my head, I
24   cannot identify anything that I'm
25   specifically disagreeing with.  But as we go

Page 404

1    on, there might be.
2    BY MR. DAVIS:
3        Q.    Okay.  This analysis included
4    both cross-sectional and longitudinal
5    studies, right?
6        A.    Uh-huh.
7        Q.    Yes?
8        A.    Seems like that.
9        Q.    Okay.
10       A.    Yes.
11       Q.    And if you turn to page 2171.
12       A.    2171.  There is no 2171.  I
13   don't have --
14       Q.    I'm sorry, look at -- look at
15   the abstract.  Look at page 1.
16       A.    Oh, okay.
17       Q.    Right?
18       It says about seven lines down
19   or six lines down:  Limitations of this
20   meta-analysis include the use of mainly
21   cross-sectional studies - limiting the
22   potential for causal claims - as well as the
23   subjective categorization of certain
24   moderator subgroups.
25       Did I read that correctly?

Page 405

1        A.    That's correct.
2        Q.    So you agree that this study
3    mostly contained cross-sectional -- excuse
4    me.
5        This meta-analysis mainly
6    included cross-sectional studies, right?
7        A.    Yes.  I don't see the numbers,
8    though, what number of the studies were
9    cross-sectional, what number is...
10       I'm just searching through it.
11       Q.    But we know it from the
12   author's statement, it included mainly
13   cross-sectional studies, correct?
14       A.    Okay.  Yeah.
15       Q.    Okay.
16       A.    It implies.
17       Q.    And if you look at 2186.
18       A.    2186.  Yes.
19       Q.    There's a section called
20   Limitations, correct?
21       A.    Yes.
22       Q.    And it says one of the
23   limitations, quote:  First, most included
24   studies were cross-sectional and it is
25   therefore not possible to determine the

102 (Pages 402 - 405)

CONFIDENTIAL

Page 406

1  causal direction of the relationship between
2  social networking site use and depressive
3  symptoms.
4           Did I read that correctly?
5      A.   That's correct.
6      Q.   You agree with that limitation,
7  correct?
8      A.   That is a fair statement about
9  cross-sectional studies, yes.
10     Q.   Yep.
11          And it says:  As such, the
12 obtained results cannot determine which of
13 the following hypotheses are most likely:  1,
14 that increased social networking site use
15 causes increased depression symptoms; 2, that
16 certain symptoms of depression might cause
17 increased social networking site use, or 3,
18 there is a third factor that explains the
19 relationship between these two constructs.
20          Did I read that correctly?
21     A.   That's correct.
22     Q.   And you agree that that is a
23 limitation of this study that combined
24 cross-sectional and longitudinal data,
25 correct?

Page 407

1      A.   That is -- no, I do not agree.
2  I think that's a general limitation of
3  cross-sectional studies, not this study
4  specifically.  They're talking about
5  cross-sectional studies.
6      Q.   No, no.  It says -- look here,
7  Dr. Mojtabai.  It says:  As such, the
8  obtained results -- right?
9           They're talking about the
10 obtained results of the study, correct?
11     A.   Well, if it is longitudinal,
12 then that issue is less relevant.  Wouldn't
13 you think so?  I would think so.
14     Q.   I'm not asking what you think.
15          I'm saying these authors, after
16 analyzing and doing the meta-analysis of
17 cross-sectional and longitudinal studies, say
18 the obtained results, right -- that's what
19 they're saying, the obtained results,
20 correct?
21     A.   Uh-huh.
22     Q.   Yes?
23     A.   Yes.
24     Q.   And the obtained results
25 include both cross-sectional and longitudinal

Page 408

1  studies, right?
2      A.   I assume so.
3      Q.   Yep.
4           And it says there are three
5  hypotheses that can be taken away from --
6  strike that.
7           They say there are three
8  hypotheses, but they can't determine which of
9  the following three that I read out are most
10 likely, correct?
11     A.   That is what they say.
12     Q.   Correct.  And you disagree with
13 that, right?
14     A.   I -- I disagree with that.
15     Q.   Right.
16          They even say:  Therefore,
17 given these results, the only claim that can
18 be made confidently is that there is a
19 positive association between self-reported
20 social networking site use and depressive
21 symptoms, and that the causal direction of
22 this relationship is currently unknown.
23          Did I read that correctly?
24     A.   You read it correctly.
25     Q.   And you agree, that's a

Page 409

1  limitation of this study, correct?
2      A.   Again, I don't agree because
3  there are longitudinal studies included in
4  the analysis as well.
5      Q.   So you disagree with the
6  assessment of the researchers who actually
7  conducted this meta-analysis, correct?
8      A.   I think they are underselling
9  their results because if they're including
10 longitudinal studies -- and I don't know the
11 number of longitudinal studies -- they confer
12 a stronger -- a stronger -- I didn't say
13 conclusive.  I didn't say definitive -- a
14 stronger causal claim.
15     Q.   So fair to say that, in your
16 view, a meta-analysis that includes both
17 longitudinal and cross-sectional studies can
18 provide a stronger, but not conclusive,
19 assessment of causality?
20     A.   I would -- I would say so based
21 on the Hill's criteria of consistency.  He
22 says if there are studies of the different
23 designs, different investigators, different
24 locations, all support the same conclusion,
25 and that you can see here in the chart -- the

103 (Pages 406 - 409)

CONFIDENTIAL

1   forest plot that they actually printed, there
2   is considerable consistency across these,
3   almost all of them --
4       Q.   Sir --
5       A.   -- across these, yeah.
6       Q.   Are you done?
7       A.   Yeah.
8       Q.   Sir Bradford Hill never, ever
9   stated anywhere that it was appropriate for a
10  causal assessment to combine cross-sectional
11  and longitudinal data, did he?
12      A.   He stated that if there is
13  consistency across results of these studies,
14  that increases your confidence in causal
15  claims.
16      Q.   But he never said that
17  consistency can be assessed using
18  meta-analyses that combine cross-sectional
19  and longitudinal data, did he?
20      A.   Sir Bradford Hill predated the
21  invention of meta-analysis.
22      Q.   So he could not have possibly
23  spoken to whether or not using
24  cross-sectional and longitudinal data
25  combined in a meta-analysis could support a

1   causal inference, correct?
2       A.   It was not possible for him.
3   He died too soon.
4       Q.   Correct.
5           So he didn't say -- ever say
6   that that was, in fact, that you could use
7   mixed -- a mix of cross-sectional and
8   longitudinal data to support a causal
9   inference, right?
10      A.   Since it didn't exist, the meta
11  didn't exist at the time he was alive, no, he
12  could not have said it.
13      Q.   Have you ever published a
14  cross-sectional -- excuse me.
15          Have you ever published a
16  meta-analysis that combined cross-sectional
17  and longitudinal data where you say in the
18  publication that this supports a causal
19  inference?
20      A.   I have not.
21      Q.   Let's look at the other studies
22  that you identify in Section 5.4.1, okay?
23      A.   Okay.
24      Q.   Is it fair to say that the only
25  study that did a longitudinal -- excuse me.

1           That if you look at that first
2   paragraph of 5.4.1, you identify a number of
3   different studies, correct?
4       A.   Correct.
5       Q.   Let's run through them.
6           The Cunningham 2021 study,
7   that's a cross-sectional study, right?
8       A.   Again, I know some of these
9   studies included longitudinal studies, like
10  the one that you identified.
11      Q.   Can you -- those meta-analyses
12  that are in Section 5.4.1, can you identify
13  any one that did a meta-analysis, where they
14  did a specific analysis limited to
15  longitudinal studies?
16      A.   I cannot, no.
17      Q.   You discuss the Shin study on
18  page 30.  The Shin, S-H-I-N, meta-analysis,
19  right?
20      A.   Where -- what page are you
21  talking?
22      Q.   Page 30.
23      A.   Page 3?
24      Q.   Three-zero.
25      A.   Three-zero.  Yes.

1       Q.   This meta-analysis included an
2   analysis of cross-sectional studies, correct?
3       A.   It's 530 studies.  It says
4   cross-sectional, so -- and longitudinal.  So
5   it's a mix of studies.
6       Q.   Let's be clear what we're
7   talking about.
8           The Shin study did an analysis,
9   a meta-analysis, of cross-sectional studies
10  separately, and then it did an analysis of
11  longitudinal studies separately, right?
12          (Sotto voce document review.)
13          (Clarification requested by the
14          stenographer.)
15      A.   They reported a correlation of
16  r equal to 0.25 between social media use and
17  depression in cross-sectional studies and a
18  correlation of r equal to 0.12 between
19  baseline social media use and follow-up
20  depression in longitudinal studies.
21  BY MR. DAVIS:
22      Q.   So do you agree that Shin did a
23  meta-analysis of only cross-sectional studies
24  and it also did a meta-analysis of only
25  longitudinal studies?

CONFIDENTIAL

1    A.    He conducted separate analyses
2  for longitudinal and cross-sectional studies.
3    Q.    Let me show you Exhibit 23,
4  which is a copy of the Shin article.
5        (Whereupon, Mojtabai-23, Online
6      media consumption and depression in
7      young people: A systematic review and
8      Meta-Analysis, by Shin et al, was
9      marked for identification.)
10 BY MR. DAVIS:
11    Q.    If you look at page 11.
12    A.    Page 11.  Yeah.
13    Q.    And under Section 4.4, first
14 sentence, correct?  You see that?
15    A.    Yes.
16    Q.    And it says:  We observed a
17 small bidirectional correlational
18 relationship between online media use and
19 depressive symptoms in the longitudinal
20 studies.
21        Did I read that correctly?
22    A.    You read it correctly.
23    Q.    And they also state that:  The
24 current result should not be interpreted as a
25 bidirectional causational relationship

1  between online media use and depressive
2  symptoms as not all longitudinal studies in
3  the current meta-analysis took into
4  consideration any mediators that may affect
5  the cross-lagged association between media
6  use and depressive symptoms.
7    A.    I'm sorry, can you point me to
8  place where you're reading?
9    Q.    Sure.
10        If you go eight lines down --
11    A.    Okay.
12    Q.    -- in Section 4.4.
13        You there?
14        (Sotto voce document review.)
15    A.    Yes.
16 BY MR. DAVIS:
17    Q.    It begins with "However."
18        It says:  However, the current
19 result should not be interpreted as a
20 bidirectional causal relationship between
21 online media use and depressive symptoms as
22 not all longitudinal studies in the current
23 meta-analysis took into consideration any
24 mediators that may affect the cross-lagged
25 association between online media use and

1  depressive symptoms.
2        Did I read that correctly?
3    A.    You did.
4    Q.    So these -- these authors who
5  did the study, who crunched the data, who
6  analyzed the results, they are saying that
7  they cannot say there's a causal effect shown
8  by their longitudinal meta-analysis, right?
9    A.    So what they say is:  The
10 current results should not be interpreted as
11 a bidirectional causation -- causation.
12    Q.    Right.
13    A.    They don't talk about
14 unidirectional.
15    Q.    Well, bidirectional means that
16 they found results going both ways, correct?
17    A.    Correct.  But --
18    Q.    And they're saying that those
19 results can't be interpreted as causal,
20 correct?
21    A.    Well, I didn't see -- first of
22 all, they say:  We observed a small
23 bidirectional correlational relationship
24 between online media use and depressive
25 symptoms in the longitudinal studies.

1        So they have observed that.
2        So they're saying because they
3  didn't include mediators, which I don't see
4  the relevance of it in the bidirectional
5  analysis, you don't need to include mediators
6  to establish bidirectional associations.
7    Q.    They're saying that their
8  findings should not be interpreted as causal
9  because of the limitations that they
10 outlined, correct?
11    A.    Because of not having mediation
12 in the model, and that, I don't understand.
13 That is -- that may affect a cross-lagged
14 association.
15        A cross-lagged association, a
16 cross-lagged analysis, do not need to include
17 mediation to establish bidirectional
18 associations.
19    Q.    So you disagree with these
20 researchers' own analysis of their own data?
21    A.    I don't see the reasoning.  I
22 don't understand the reasoning.
23    Q.    You disagree with them?
24    A.    I didn't say I -- I may agree
25 after they explain the results.  I can't --

CONFIDENTIAL

1    Q.    You can't agree with them here
2  today, right?
3    A.    I can't assume whether they --
4  what they meant by that.
5    Q.    You can't agree with them here
6  today, right?
7        MS. EMMEL:  Asked and answered.
8    A.    I cannot agree or disagree.  I
9  don't have any opinion without knowing --
10  BY MR. DAVIS:
11    Q.    Okay.  Now, you state in your
12  report at page 30 --
13    A.    Yes.
14    Q.    -- that this meta-analysis
15  found a correlation of r equals 0.12 between
16  social media use and depression.
17        Do you see that?
18    A.    Yes.
19    Q.    Okay.  That's wrong, isn't it?
20    A.    Why is it wrong?
21    Q.    You got -- it's wrong based
22  upon the study in Shin, the Shin analysis.
23    A.    You're showing -- can you show
24  me where they report the correlation and it's
25  not there?

1    Q.    Look at the right-hand
2  column --
3    A.    Okay.
4    Q.    -- on page 8.
5    A.    Okay.  Yes.
6    Q.    Look at the second full
7  paragraph.
8    A.    Second full --
9    Q.    Okay.  It says:  The weighted
10  effect size r on the relationship between
11  depressive symptoms at baseline and online
12  media use at follow-up was .12, indicating a
13  small effect.
14        Do you see that?
15    A.    Right.
16    Q.    That's the 0.12 that you cite
17  in your report, correct?
18    A.    Right.
19    Q.    And first off, this study
20  didn't analyze depression, but symptoms of
21  depression, correct?
22    A.    That's my sense of it, yes.
23  Usually the studies include measures of
24  depression or questionnaires that measure
25  depression.

1    Q.    So when you say in your report
2  that this study looked at depression, it's
3  actually looking at symptoms of depression,
4  correct?
5    A.    I'm using their term "and
6  depression."  They say online media
7  consumption and depression, but they are
8  talking about depressive symptoms.
9    Q.    Correct.
10        And so -- and if you look at --
11  so in terms of the actual exposure that was
12  being assessed --
13    A.    Right.
14    Q.    -- it wasn't entirely accurate
15  in your report, fair?
16    A.    Because it's called depression
17  rather than depressive symptoms?
18    Q.    That's right.
19    A.    Well, I think I have used it
20  interchangeably several places like they have
21  used it.  We rely on their statements, and
22  when I say --
23    Q.    But we know --
24        MS. EMMEL:  He's still
25    finishing his answer.

1  BY MR. DAVIS:
2    Q.    We know for certain,
3  Dr. Mojtabai --
4        MS. EMMEL:  He still didn't
5    finish his answer.
6        MR. DAVIS:  Are you finished?
7        THE WITNESS:  I'm finished now.
8  BY MR. DAVIS:
9    Q.    We know for certain that the
10  Shin study did not analyze depression, but
11  rather, symptoms of depression, correct?
12    A.    They tell me they analyzed
13  depression, and so I used their term.
14    Q.    What do they say in the results
15  that you quote?  It's symptoms of depression,
16  right?
17    A.    Yeah, so --
18    Q.    Okay.  Now, if you look at
19  Table 8 and Table 10, they actually analyze
20  specific -- they actually broke out the --
21  let me back up.
22    A.    Right.
23    Q.    This study was actually looking
24  at -- at all different types of online
25  digital technology, correct?

106 (Pages 418 - 421)

CONFIDENTIAL

1    A.    Correct.
2    Q.    And so it wasn't specific to
3  social media, correct?
4    A.    Correct.
5    Q.    In Table 8 and Table 10, they
6  actually broke down and did an analysis
7  specific to social media use, correct?
8    A.    Correct.  That is correct.
9    Q.    And in those -- in those
10  analyses, they found no association between
11  use of social media and depressive symptoms,
12  correct?
13    A.    No.  Wrong.
14    Q.    In Table 8 --
15    A.    Yes.
16    Q.    -- all of the results for
17  social media use are not statistically
18  significant.
19    A.    Each one of them is compared to
20  the baseline.  They intercept in the model.
21  They're saying:  Are these different than the
22  overall use of social media?
23    Q.    But look at the confidence
24  interval for social media.
25    A.    Doesn't matter.  The fact that

1  it is not -- that includes 0 suggests to
2  you -- to me that the Internet use is --
3  overall, has the effect size of 0.13, and
4  social media is not different than overall
5  Internet use.
6    Q.    Let's not lose the point.
7    When you look at Table 8 and
8  you look at Table 10 specific as to social
9  media, the confidence intervals for the
10  analysis both cross 0.0, correct?
11    A.    That means -- well, you have to
12  be --
13    Q.    Is that true first?  Just
14  answer my question.
15    A.    Yes, it is.
16    Q.    Right.
17    And so if you look at the p
18  values for social media use --
19    A.    Right.
20    Q.    -- none of them reach
21  statistical significance, correct?
22    A.    So --
23    Q.    Is that right?
24    A.    It is correct.
25    Q.    Okay.

1    A.    But it is interpreted in the
2  wrong way.  They are comparing each one of
3  them with the overall social media use, and
4  if they're not significantly different from
5  that overall, it means that they are like
6  overall use.
7    So -- and it's said in the --
8  if you read the section about the -- it's
9  really, they're looking whether these
10  different types of social media use are
11  different among themselves and different from
12  overall use, and they don't find any
13  significant differences.
14    But the overall effect
15  permeates into each one of them.
16    MR. DAVIS:  I'll move to strike
17    as nonresponsive after "It is
18    correct."
19  BY MR. DAVIS:
20    Q.    All right.  You agree that...
21    (Whereupon, Mojtabai-24, Is
22    social network site usage related to
23    depression?  A meta-analysis of
24    Facebook-depression relations, by Yoon
25    et al, was marked for identification.)

1  BY MR. DAVIS:
2    Q.    Let me hand you what's been
3  marked as Exhibit 24.  I think I went out of
4  order.
5    A.    I have two of them.
6    Q.    Thank you.
7    This is the Yoon, Y-O-O-N,
8  meta-analysis that you cite in your report,
9  correct?
10    A.    Correct.
11    Q.    Is that right, Dr. Mojtabai?
12    A.    Yes, it's correct.
13    Q.    Turn to page 71.  Look at the
14  last paragraph on the right-hand column.
15  Second-to-last -- it's in the second-to-last
16  paragraph -- oh, excuse me.
17    A.    Second-to-last -- I'm sorry.
18    Q.    Yes, second-to-last paragraph
19  on --
20    A.    Yes.
21    Q.    Again, this paragraph is
22  studying -- is discussing the study
23  limitations, correct?
24    A.    Uh-huh, correct.
25    Q.    And it says:  Third, we could

CONFIDENTIAL

Page 426

1  not test causal relations due to the dearth
2  of longitudinal and experimental studies.
3      Do you see that?
4      A.   Yes.
5      Q.   You agree with that assessment
6  for this study, this meta-analysis, correct?
7      A.   No. I'm not sure how many
8  studies are longitudinal and how many were
9  cross-sectional here in this meta-analysis.
10 I don't recall.
11     I can't determine from just
12 reading.
13     (Document review.)
14 BY MR. DAVIS:
15     Q.   Irrespective of how many
16 cross-sectional or longitudinal studies there
17 were --
18     A.   Yes.
19     Q.   -- these authors said:  We
20 could not test causal relations due to the
21 dearth -- meaning absence, right?  Yes?
22     A.   Means paucity.  It's not --
23     Q.   Absent.  Dearth means they're
24 not there, correct?
25     A.   Well, we can check in the

Page 427

1  dictionary.  English is not my first
2  language, but you could check.  Dearth, I
3  thought, means that very few or --
4      Q.   Very few.
5      We could not test causal
6  relations due to the dearth or there being
7  very few longitudinal and experimental
8  studies.
9      That's what they're saying,
10 correct?
11     A.   Okay.
12     Q.   Yes?
13     A.   Yes.
14     Q.   Right?  And you agree with that
15 limitation, correct?
16     (Sotto voce document review.)
17     A.   That is a -- if there are very
18 few longitudinal studies, I would say that
19 is -- I would explain that as that is a
20 limitation.
21 BY MR. DAVIS:
22     Q.   Okay.
23     MS. EMMEL:  So I think we've
24 been going about seven hours on the
25 record today.  So if now is a good

Page 428

1  place to take a break and assess
2  continuing.  Is that -- is this a good
3  point?
4      MR. DAVIS:  That's fine.
5      THE VIDEOGRAPHER:  Off the
6  record?  All right.  We're off the
7  record at 6:02 p.m.  That's the end of
8  Media 9.
9      (Recess taken, 6:02 p.m. to
10 6:03 p.m. CDT)
11     (The following proceedings were
12 conducted off the video-recorded
13 record.)
14     THE STENOGRAPHER:  On the
15 record.
16     MR. DAVIS:  All right.  We've
17 had a conversation off the record.  We
18 are going to reconvene tomorrow at
19 9:00 a.m. New Orleans time.
20     And counsel has kindly agreed
21 to bring back the materials that
22 Dr. Mojtabai brought with him to the
23 deposition in case we want to mark the
24 exhibits.  Thank you.
25     THE STENOGRAPHER:  Off the

Page 429

1  record.
2      Time on the record for TikTok
3  is 7 hours today.
4      (Time noted: 6:04 p.m. CDT)
5      --o0o--

108 (Pages 426 - 429)

Page 430

```
 1          CERTIFICATE
 2     I, MICHAEL E. MILLER, Fellow of
     the Academy of Professional Reporters,
 3   Registered Diplomate Reporter, Certified
     Realtime Reporter, Certified Court Reporter
 4   and Notary Public, do hereby certify that
     prior to the commencement of the examination,
 5   RAMIN MOJTABAI, MD, PhD, MPH was duly sworn
     by me to testify to the truth, the whole
 6   truth and nothing but the truth.
 7        I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
 8   testimony as taken stenographically by and
     before me at the time, place and on the date
 9   hereinbefore set forth, to the best of my
     ability.
10
          I DO FURTHER CERTIFY that pursuant
11   to FRCP Rule 30, signature of the witness was
     not requested by the witness or other party
12   before the conclusion of the deposition.
13        I DO FURTHER CERTIFY that I am
     neither a relative nor employee nor attorney
14   nor counsel of any of the parties to this
     action, and that I am neither a relative nor
15   employee of such attorney or counsel, and
     that I am not financially interested in the
16   action.
17
18
     MICHAEL E. MILLER, FAPR, RDR, CRR
19   Fellow of the Academy of Professional Reporters
     NCRA Registered Diplomate Reporter
20   NCRA Certified Realtime Reporter
     LA Certified Court Reporter #27009
21
22   Dated: June 6, 2025
23
24
25
```

Page 432

```
 1              ERRATA
 2   PAGE LINE CHANGE
 3   ____ ____ _____
 4      REASON: _____
 5   ____ ____ _____
 6      REASON: _____
 7   ____ ____ _____
 8      REASON: _____
 9   ____ ____ _____
10      REASON: _____
11   ____ ____ _____
12      REASON: _____
13   ____ ____ _____
14      REASON: _____
15   ____ ____ _____
16      REASON: _____
17   ____ ____ _____
18      REASON: _____
19   ____ ____ _____
20      REASON: _____
21   ____ ____ _____
22      REASON: _____
23   ____ ____ _____
24      REASON: _____
25
```

Page 431

```
 1        INSTRUCTIONS TO WITNESS
 2
 3        Please read your deposition over
 4   carefully and make any necessary corrections.
 5   You should state the reason in the
 6   appropriate space on the errata sheet for any
 7   corrections that are made.
 8        After doing so, please sign the
 9   errata sheet and date it.
10        You are signing same subject to
11   the changes you have noted on the errata
12   sheet, which will be attached to your
13   deposition.
14        It is imperative that you return
15   the original errata sheet to the deposing
16   attorney within thirty (30) days of receipt
17   of the deposition transcript by you.  If you
18   fail to do so, the deposition transcript may
19   be deemed to be accurate and may be used in
20   court.
21
22
23
24
25
```

Page 433

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2
 3
 4        I, RAMIN MOJTABAI, MD, PhD, MPH,
     do hereby certify that I have read the
 5   foregoing pages and that the same is a
     correct transcription of the answers given by
 6   me to the questions therein propounded,
     except for the corrections or changes in form
 7   or substance, if any, noted in the attached
     Errata Sheet.
 8
 9
10
11
12   _____
     RAMIN MOJTABAI, MD, PhD, MPH        DATE
13
14
15   Subscribed and sworn to before me this
16   _____ day of _____, 20 _____.
17   My commission expires: _____
18
19   _____
20   Notary Public
21
22
23
24
25
```

CONFIDENTIAL

```
 1       SUPERIOR COURT OF THE STATE OF CALIFORNIA
             FOR THE COUNTY OF LOS ANGELES
 2
    COORDINATION PROCEEDING     )   JUDICIAL COUNCIL
 3  SPECIAL                     )   COORDINATION
    TITLE [RULE 3.400]          )   PROCEEDING NO. 5255
 4  SOCIAL MEDIA CASES          )
    _____ )   For Filing
 5                              )   Purposes:
    THIS DOCUMENT RELATES       )   22STCV21355
 6  TO:                         )
                                )   Judge: Hon.
 7  Cristina Arlington          )   Carolyn B. Kuhl
    Smith, et al., v. TikTok    )   SSC-12
 8  Inc., et al.,               )
    Case No. 22STCV21355        )
 9  _____ )
10
11
12
13              Thursday, June 5, 2025
14     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
15
16
17       Video-Recorded Oral Deposition of RAMIN
    MOJTABAI, MD, PhD, MPH, VOLUME 2, held at the
18  offices of Irwin Fritchie Urquhart Moore &
    Daniels LLC, 400 Poydras Street, Suite 2700,
19  New Orleans, Louisiana, commencing at
            a.m. CDT on the above date, before      9:07
20  Michael E. Miller, Fellow of the Academy of
    Professional Reporters, Certified Court
21  Reporter, Registered Diplomate Reporter, and
    Louisiana Certified Court Reporter #27009.
22
23                  __ __ __
24              GOLKOW - VERITEXT
          877.370.DEPS | fax 917.591.5672
25              deps@golkow.com
```

CONFIDENTIAL

Page 436

```
1  APPEARANCES:
2  BEASLEY ALLEN LAW FIRM
     BY: JENNIFER EMMEL, ESQUIRE
3      jennifer.emmel@beasleyallen.com
     218 Commerce Street
4  Montgomery, Alabama 36104
     (334)269-2343
5
     -and-
6
   LIEFF CABRASER HEIMANN & BERNSTEIN LLP
7  BY: KELLY K. MCNABB, ESQUIRE
     kmcnabb@lchb.com
8  250 Hudson Street
     8th Floor
9  New York, New York 10013
     (212)355-9500
10
     -and
11
   LIEFF CABRASER HEIMANN & BERNSTEIN LLP
12 BY: LEXI J. HAZAM, ESQUIRE (via Zoom)
     lhazam@lchb.com
13   LIVIA JARAMILLO, ESQUIRE (via Zoom)
     ljaramillo@lchb.com
14 Embarcadero Center West
     275 Battery Street, 29th Floor
15 San Francisco, California 94111
     (415)956-1000
16
     -and-
17
   MOTLEY RICE LLC
18 BY: SARA O. COUCH, ESQUIRE (via Zoom)
     scouch@motleyrice.com
19   ANNIE E. KOUBA, ESQUIRE (via Zoom)
     akouba@motleyrice.com
20 28 Bridgeside Boulevard
     Mt. Pleasant, South Carolina 29464
21   (843)216-9000
22   -and-
23
24
25
```

Page 437

```
1  APPEARANCES:
2  MOTLEY RICE LLC
     BY: PREVIN WARREN, ESQUIRE (via Zoom)
3      pwarren@motleyrice.com
     401 9th Street NW
4  Suite 630
     Washington, DC 20004
5  (202)232-5504
6    -and-
7  WAGSTAFF & CARTMELL LLP
     BY: TRICIA L. CAMPBELL, ESQUIRE (via Zoom)
8      tcampbell@wcllp.com
       LINDSEY SCARCELLO, ESQUIRE (via Zoom)
9      lscarcell@wcllp.com
     4740 Grand Avenue
10 Suite 300
     Kansas City, Missouri 64112
11   (816)701-1100
12   -and-
13 THE LANIER LAW FIRM
     BY: CATHERINE HEACOX, ESQUIRE (via Zoom)
14   catherine.heacox@lanierlawfirm.com
     535 Madison Avenue
15 New York, New York 10022
     (212)421-2800
16
     -and-
17
   GOZA HONNOLD LLC
18 BY: KIRK J. GOZA, ESQUIRE (via Zoom)
     kgoza@gohonlaw.com
19 9500 Nall Avenue
     Suite 400
20 Overland Park, Kansas 66207
     (913)451-3433
21 Counsel for Plaintiffs
22
23
24
25
```

Page 438

```
1  APPEARANCES:
2  KING & SPALDING LLP
     BY: TODD P. DAVIS, ESQUIRE
3      tdavis@kslaw.com
     1180 Peachtree Street NE
4  Suite 1600
     Atlanta, Georgia 30309
5  (404)572-4600
     Counsel for Defendants TikTok Inc. and
6  ByteDance Inc.
7
   MUNGER TOLLES & OLSON LLP
8  BY: JOHN B. MAJOR, ESQUIRE
     john.major@mto.com
9      CORDELL A. BROWN, ESQUIRE (via Zoom)
     cordell.brown@mto.com
10 350 South Grand Avenue
     50th Floor
11 Los Angeles, California 90071
     (213)683-9100
12 Counsel for Defendant Snap Inc.
13 MORGAN LEWIS & BOCKIUS LLP
     BY: MELISSA M. COATES, ESQUIRE
14   melissa.coates@morganlewis.com
15 600 Brickell Avenue
     Suite 1600
16 Miami, Florida 33131
     (305)415-3000
17
     -and-
18
     BY: EVAN K. JACOBS, ESQUIRE
19   evan.jacobs@morganlewis.com
     2222 Market Street
20 Philadelphia, Pennsylvania 19103
     (215)963-5000
21 Counsel for Defendants YouTube LLC and
     Google, LLC
22
23
24
25
```

Page 439

```
1  APPEARANCES:
2  COVINGTON & BURLING LLP
     BY: AMBER CHARLES, ESQUIRE
3      acharles@cov.com
     One City Center
4  850 Tenth Street NW
     Washington, DC 20001
5  (202)662-6000
     Counsel for Defendants Meta Platforms, Inc.
6  f/k/a Facebook, Inc.; Facebook Holdings, LLC;
     Facebook Operations, LLC; Facebook Payments, Inc.;
7  Facebook Technologies, LLC; Instagram, LLC;
     Siculus, Inc.; and Mark Elliot Zuckerberg
8
9  ALSO PRESENT:
10   KATY LAWRIMORE, PARALEGAL (via Zoom)
     Motley Rice LLP
11
12   RICHARD CASHON (via Zoom)
13
14 VIDEOGRAPHER:
15   DAVID NUNN
       GOLKOW - VERITEXT
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 436 - 439)

CONFIDENTIAL

Page 440

1           INDEX
2      RAMIN MOJTABAI, MD, PhD, MPH
3           June 5, 2025
4
5   APPEARANCES                    436
6   PROCEEDINGS                    450
7
8   EXAMINATION OF RAMIN MOJTABAI, MD, PhD, MPH:
9      BY MR. DAVIS            450
10     BY MS. COATES           599
11     BY MR. MAJOR            625
12     BY MS. CHARLES          655
13     BY MR. DAVIS            676
14     BY MS. EMMEL            694
15     BY MR. DAVIS            719
16
17  CERTIFICATE                750
18  ERRATA                     752
19  ACKNOWLEDGMENT OF DEPONENT      753
20  LAWYER'S NOTES             754
21
22
23
24
25

Page 442

1        DEPOSITION EXHIBITS
2   Mojtabai-32   Longitudinal relationship      463
3        between social media and
4        e-cigarette use among
5        adolescents: The roles of
6        internalizing problems and
7        academic performance, by Zhang
8        et al
9   Mojtabai-33   Social networking and symptoms   474
10       of depression and anxiety in
11       early adolescence, by Mundy
12       et al
13  Mojtabai-34   Association of Screen Time and   477
14       Depression in Adolescence, by
15       Boers et al
16  Mojtabai-35   National Trends in the        481
17       Prevalence and Treatment of
18       Depression in Adolescents and
19       Young Adults, by Mojtabai
20       et al
21
22
23
24
25

Page 441

1        DEPOSITION EXHIBITS
2   NUMBER                    MARKED
3   Mojtabai-26   5/16/25 Mojtabai Expert Report   453
4   Mojtabai-27   White Notebook of Deposition    453
5        Exhibits Reviewed by
6        Dr. Mojtabai
7   Mojtabai-28   Documents Reviewed by       453
8        Dr. Mojtabai, A-O
9        Alphabetically
10  Mojtabai-29   Documents Reviewed by       453
11       Dr. Mojtabai, P-Z
12       Alphabetically
13  Mojtabai-30   Amended Materials Considered   454
14       List
15  Mojtabai-31   Social Media Use and        461
16       Adolescent Mental Health:
17       Findings From the UK
18       Millennium Cohort Study, by
19       Kelly et al
20
21
22
23
24
25

Page 443

1        DEPOSITION EXHIBITS
2   Mojtabai-36   Which social media platforms   485
3        matter and for whom? Examining
4        moderators of links between
5        adolescents' social media use
6        and depressive symptoms, by
7        Gentzler et al
8   Mojtabai-37   Bored and online: Reasons for   488
9        using social media,
10       problematic social networking
11       site use, and behavioral
12       outcomes across the transition
13       from adolescence to emerging
14       adulthood, by Stockdale et al
15  Mojtabai-38   Social Media and Mental      506
16       Health, by Braghieri et al
17  Mojtabai-39   A nationwide study on time    512
18       spent on social media and
19       self-harm among adolescents,
20       by Tørmoen et al
21  Mojtabai-40   Social media use and        513
22       self-injurious thoughts and
23       behaviors: A systematic review
24       and meta-analysis, by Nesi
25       et al

Page 444

DEPOSITION EXHIBITS

Mojtabai-41   Screen time and suicidal       516
          behaviors among US children
          9-11 years old: A prospective
          cohort study, by Chu et al
Mojtabai-42   Picture Perfect: The Direct     559
          Effect of Manipulated
          Instagram Photos on Body Image
          in Adolescent Girls, by
          Kleemans et al
Mojtabai-43   The effect of Instagram        562
          "likes" on women's social
          comparison and body
          dissatisfaction, by Tiggemann
          et al
Mojtabai-44   Uploading your best self:      568
          Selfie editing and body
          dissatisfaction, by Tiggemann
          et al
Mojtabai-45   The impact of posting selfies   574
          and gaining feedback ("likes")
          on the psychological
          well-being of 16-25 year olds:
          An experimental study, by
          Coulthard et al

Page 445

DEPOSITION EXHIBITS

Mojtabai-46   Social media behaviors and     580
          symptoms of anxiety and
          depression. A four-wave
          cohort study from age 10-16
          years, by Steinsbekk et al
Mojtabai-47   The Impact of YouTube on       602
          Loneliness and Mental Health,
          by Balcombe et al
Mojtabai-48   The relations between YouTube  606
          addiction, social anxiety and
          parasocial relationships with
          YouTubers: A
          moderated-mediation model
          based on a
          cognitive-behavioral
          framework, by de Béral et al
Mojtabai-49   Compulsive YouTube usage: A    615
          comparison of use motivation
          and personality effects, by
          Klobas et al

Page 446

DEPOSITION EXHIBITS

Mojtabai-50   The relationship between       622
          short-form video use and
          depression among Chinese
          adolescents: Examining the
          mediating roles of need
          gratification and short-form
          video addiction, by Zhu et al
Mojtabai-51   The Relationship Between       622
          Social Short-Form Videos and
          Youth's Well-Being: It Depends
          on Usage Types and Content
          Categories, by Wu et al
Mojtabai-52   The association between        622
          problematic short video use
          and suicidal ideation and
          self-injurious behaviors: The
          mediating roles of sleep
          disturbance and depression, by
          Yu et al
Mojtabai-53   "Oh Snap!": A Mixed-Methods    624
          Approach to Analyzing the Dark
          Side of Snapchat, by Dunn
          et al

Page 447

DEPOSITION EXHIBITS

Mojtabai-54   Digital stress within early    624
          adolescents' friendships - A
          focus group study from
          Belgium, by De Groote et al
Mojtabai-55   Duplicate of Exhibit 54        624
Mojtabai-56   Transforming Society and       624
          Organizations through
          Gamification, by Spanellis
          et al
Mojtabai-57   How It Feels to Be "Left on    624
          Read": Social Surveillance on
          Snapchat and Young
          Individuals' Mental Health, by
          Vanherle et al
Mojtabai-58   Snapchat Streaks - How are     625
          these forms of gamified
          interactions associated with
          problematic smartphone use and
          fear of missing out among
          early adolescents, by
          van Essen

Golkow Technologies,
A Veritext Division

877-370-3377                                                  www.veritext.com

Page 448

DEPOSITION EXHIBITS

1         DEPOSITION EXHIBITS
2  Mojtabai-59    Snapchat Elicits More Jealousy    625
3            than Facebook: A Comparison of
4            Snapchat and Facebook Use, by
5            Utz et al
6  Mojtabai-60    Presentation Hard Life Moments    664
7            - Mental Health Deep Dive,
8            META3047MDL-033-00095008 -
9            META3047MDL-033-00095034
10 Mojtabai-61    An integrative literature    678
11            review of birth cohort and
12            time period trends in
13            adolescent depression in the
14            United States, by Askari et al
15 Mojtabai-62    5/7/24 Affidavit of Dr. Ramin    680
16            Mojtabai, Peters v. ByteDance
17 Mojtabai-63    Curriculum Vitae    694
18 Mojtabai-64    An integrative literature    719
19            review of birth cohort and
20            time period trends in
21            adolescent depression in the
22            United States, by Saiphoo
23            et al
24 Mojtabai-65    Skipped in Series
25

Page 449

1         DEPOSITION EXHIBITS
2  Mojtabai-66    Beyond Social Media: A    738
3            Cross-Sectional Survey of
4            Other Internet and Mobile
5            Phone Applications in a
6            Community, by Carras et al
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 450

1    ------------
2         P R O C E E D I N G S
3    June 5, 2025, 9:07 a.m. CDT
4    ------------
5         THE VIDEOGRAPHER:  We're now on
6    the record.  Today's date is June 5th,
7    2025, and the time is 9:07 a.m.  This
8    is the continuation of Dr. Mojtabai.
9    ------------
10        RAMIN MOJTABAI, MD, PhD, MPH,
11   having been previously duly sworn,
12        testified as follows:
13   ------------
14        EXAMINATION
15   ------------
16   BY MR. DAVIS:
17        Q.    Good morning, Dr. Mojtabai.
18        A.    Good morning.
19        Q.    How are you doing today?
20        A.    Good.
21        Q.    Great.
22             I'm going to pick up where we
23   left off yesterday.
24        A.    All right.
25        Q.    Can you please turn to

Page 451

1    Exhibit 24, which is the Yoon study.
2             I'm sorry, before I ask you
3    that, look at Exhibit 5, page 31 of your
4    report.
5         A.    Yes.
6         Q.    Last paragraph, first sentence.
7             Do you see in that paragraph
8    you're talking about how there is a high
9    heterogeneity among study results in many
10   meta-analyses?
11        A.    Uh-huh.
12        Q.    You see that?
13        A.    Uh-huh.
14        Q.    You have to answer out loud.
15        A.    I'm looking at it.  Page 31,
16   last sentence, you said?
17        Q.    First sentence of the last
18   paragraph.
19        A.    Oh, first sentence.  Yes.
20        Q.    Do you see where in that
21   paragraph you discuss the high heterogeneity
22   in many of the meta-analyses that you rely
23   upon?
24        A.    Yes, I do.
25             MS. EMMEL:  Objection,

Page 452

1    misstates the document.
2 BY MR. DAVIS:
3    Q.    And high heterogeneity -- well,
4 excuse me.  Heterogeneity is an
5 epidemiological term that talks about how the
6 studies are dissimilar, right?
7    A.    It's not an epidemiological
8 term.
9    Q.    It's a -- heterogeneity is a
10 term that is used to describe the
11 dissimilarity of the study -- of studies,
12 right?
13    A.    In the context of
14 meta-analysis.
15    Q.    Yes.  What they're describing
16 is that the studies themselves have different
17 ways in which they measured outcomes and
18 different ways that they collected exposure?
19    A.    No, not in the context of
20 meta-analysis.  In the context of
21 meta-analysis it has a specific meaning.  The
22 meaning is that the outcomes are not exactly
23 the same.
24    MR. DAVIS:  Okay.  Let's talk
25 about -- oh, a couple of housekeeping

Page 453

1 issues.  Sorry, I should have led off
2 with that.
3    The white notebook that you
4 mentioned yesterday at the beginning
5 of the deposition, that's been marked
6 as Exhibit 26.
7    (Whereupon, Mojtabai-26,
8 5/16/25 Mojtabai Expert Report, was
9 marked for identification.)
10    MR. DAVIS:  The black notebook
11 that we mentioned yesterday is marked
12 as Exhibit 27.
13    (Whereupon, Mojtabai-27, White
14 Notebook of Deposition Exhibits
15 Reviewed by Dr. Mojtabai, was marked
16 for identification.)
17    MR. DAVIS:  The two boxes that
18 you brought to the deposition are
19 marked as Exhibit 28 and Exhibit 29.
20    (Whereupon, Mojtabai-28,
21 Documents Reviewed by Dr. Mojtabai,
22 A-O Alphabetically, was marked for
23 identification.)
24    (Whereupon, Mojtabai-29,
25 Documents Reviewed by Dr. Mojtabai,

Page 454

1 P-Z Alphabetically, was marked for
2 identification.)
3    MR. DAVIS:  And then Exhibit 30
4 is the materials considered -- the
5 amended materials considered list that
6 I got sent to me last night by
7 plaintiffs' counsel.  Okay.
8    (Whereupon, Mojtabai-30,
9 Amended Materials Considered List, was
10 marked for identification.)
11 BY MR. DAVIS:
12    Q.    If you look at the Yoon
13 study -- it's marked as Exhibit 14.
14    Have you got that?
15    A.    24.
16    Q.    24, right.
17    And if you look at page 70 --
18    A.    Okay.
19    Q.    -- the last paragraph.
20    A.    The last full paragraph or?
21    Q.    Yes, last full paragraph.
22    A.    Yes.
23    Q.    Excuse me.  The last paragraph
24 on the page.
25    A.    Okay.

Page 455

1    Q.    You see there's a sentence that
2 says:  However, there was significant
3 heterogeneity in the effect sizes, indicating
4 that for some studies, the true relationship
5 between social networking site usage and
6 depression may be negligible.
7    Did I read that correctly?
8    A.    You read it correctly.
9    Q.    And do you agree that therefore
10 a number of the studies that are included in
11 this meta-analysis, that the true
12 relationship between social media use and
13 depressive symptoms may be negligible?
14    MS. EMMEL:  Objection,
15 compound.
16    A.    I'm looking at Figure 2 that's
17 a forest plot.  That's the best way of
18 looking at -- of the lineup of the studies.
19 And I see that the effect sizes for some of
20 them are negligible and for some of them are
21 sizable or large.
22 BY MR. DAVIS:
23    Q.    You agree that for a majority
24 of the studies included in this
25 meta-analysis that are analyzed in Figure 2,

6 (Pages 452 - 455)

CONFIDENTIAL

Page 456

1 that they -- the confidence intervals cross
2 over 0.0, right?
3    A.   That is what you would see in
4 meta-analysis. That's why you --
5    Q.   I'm just asking if that's what
6 you see. I'm just asking what you see in
7 Figure 2?
8        MS. EMMEL: Let him finish his
9    answer. Let him finish his answer.
10   A.   I was saying that in -- that's
11 why we're doing meta-analysis. If each one
12 of them crossed that -- was not crossing the
13 line, we wouldn't do meta-analysis.
14 BY MR. DAVIS:
15   Q.   Let's come back to my question.
16 For the studies that are
17 reflected in Figure 2 of this meta-analyses,
18 that the majority of them cross -- have
19 confidence intervals that cross 0, right?
20   A.   Well, that's not the first
21 thing I look at in a meta-analysis.
22   Q.   Dr. Mojtabai, I'm not asking
23 you if that's the first thing. I'm asking
24 you if, in fact, the majority of the studies
25 reflected in Figure 2 cross 0.0 for

Page 457

1 confidence intervals.
2    A.   I have to count to see if it is
3 the majority or not. But again, this is not
4 something that I look at.
5    Q.   I'm just asking --
6    A.   I'm looking at the forest plot.
7    Q.   Can we agree that there's a
8 significant number?
9        Strike that.
10       Can we agree that there's a
11 number of studies --
12   A.   Sure.
13   Q.   -- in Figure 2 that -- where
14 the confidence interval crosses 0, right?
15   A.   I haven't counted them, but for
16 a number of them it doesn't, as you said.
17   Q.   Yeah.
18   A.   It crosses the line, yes.
19   Q.   Which reflects that there's no
20 association, right?
21   A.   Again, this is a
22 misrepresenting of meta-analysis.
23 Meta-analysis is not looking at individual
24 studies. It's looking at the aggregate
25 results.

Page 458

1        So you have to look at the
2 diamond-shaped figure at the bottom that is
3 not crossing the line.
4    Q.   My point is simply --
5        MR. DAVIS: Move to strike as
6    nonresponsive.
7 BY MR. DAVIS:
8    Q.   I simply asked you whether or
9 not, when the confidence intervals crosses 0
10 in Figure 2 of this meta-analysis for
11 individual studies, that means there's no
12 association, correct?
13       MS. EMMEL: Objection, asked
14    and answered.
15   A.   Again, I say that this is a
16 meta-analysis. We don't look at a
17 meta-analysis like that.
18 BY MR. DAVIS:
19   Q.   I'm not asking you about the
20 meta-analysis. I'm asking you about the
21 individual studies.
22       The individual studies in
23 Figure 2, that are reflected in Figure 2, a
24 number of them have confidence intervals that
25 cross 0, right?

Page 459

1    A.   So if you --
2        MS. EMMEL: Asked and answered.
3    A.   If you break the meta-analysis
4 and you go back to individual studies and
5 look at them, you may be right, yes.
6 BY MR. DAVIS:
7    Q.   And so there are some studies
8 that -- in Figure 2, when you're just looking
9 at the individual study results, right, not
10 the meta-analysis world, but the individual
11 study results, you have some that show an
12 association and some that do not, correct?
13   A.   Some that show a significant
14 association and some don't. I have to
15 correct you -- what you said.
16   Q.   Okay. And so there is not --
17 and because of that, these individual
18 studies, looking at them individually, don't
19 show consistency, do they?
20       MS. EMMEL: Objection, vague.
21   A.   As the authors of the paper
22 say, there is heterogeneity, and that's not
23 something that would make me think that these
24 results are showing different things, because
25 all the lines, all the dots line up on the

7 (Pages 456 - 459)

CONFIDENTIAL

Page 460

1  right-hand side, almost all of them -- not
2  all of them literally.  Maybe two of them
3  don't line up on the left side.
4          But the majority, large
5  majority line up on the right side of the 0
6  line.
7          And if I look at the median,
8  that's the middle value, it's around 0.1,
9  0.11.  That's the value for the median value
10  of the --
11         MR. DAVIS:  I move to strike as
12     nonresponsive.
13  BY MR. DAVIS:
14     Q.    Dr. Mojtabai, did you have an
15  opportunity last night to speak with counsel
16  about the substance of your testimony?
17     A.    Last night?
18     Q.    Either last night or this
19  morning?
20     A.    The substance of my testimony?
21     Q.    Yes.
22     A.    No.  We were talking about the
23  process of the questions, what type of
24  questions were going to be asked.  She's
25  going to apparently ask me some questions.  I

Page 461

1  learned that.
2      Q.    All right.  But in terms of
3  anything about the substance of your
4  testimony, did you discuss that with counsel
5  after your deposition ended last night?
6      A.    No, we didn't.
7      Q.    Okay.  You mentioned yesterday
8  the -- we discussed the Kelly study that was
9  from the UK Millennium study, right?
10     A.    Yeah.
11         (Whereupon, Mojtabai-31, Social
12     Media Use and Adolescent Mental
13     Health: Findings From the UK
14     Millennium Cohort Study, by Kelly
15     et al, was marked for identification.)
16  BY MR. DAVIS:
17     Q.    Let me show you Exhibit 31.
18     A.    Uh-huh.
19     Q.    If you look in the abstract...
20     A.    Yes.  Yes.
21     Q.    Oh, I'm sorry.  I'm sorry.
22         Go to the Discussion section.
23  It's on page 66.  Left-hand column --
24     A.    66?
25     Q.    Here, let me show you.  I'll

Page 462

1  hand you exactly what I want you to see.
2          I put an arrow there for you.
3          Do you see that?
4      A.    Yes.
5      Q.    It says:  However -- the study
6  authors say:  However, caution is needed when
7  interpreting our finding as the data used in
8  this paper were, for the most part,
9  cross-sectional, and the direction of
10  association, and therefore, causality, cannot
11  be inferred.
12         Did I read that correctly?
13     A.    You did.
14     Q.    So there's no question that the
15  Kelly study actually had cross-sectional data
16  in it, correct?
17     A.    That is correct.
18     Q.    Okay.  Let's put that aside.
19         You also mentioned yesterday
20  the Zhang, Z-H-A-N-G study --
21     A.    Yes.
22     Q.    -- that you said replicated the
23  findings from your dose-response analysis --
24  what you say is a dose-response analysis in
25  Riehm, right?

Page 463

1      A.    I don't --
2          MS. EMMEL:  Objection,
3      mischaracterizes testimony.
4      A.    Yeah, I didn't think I -- I
5  don't recall talking about dose-response with
6  regard to this paper.  I said it replicates
7  our study.
8  BY MR. DAVIS:
9      Q.    Okay.  Let's get clarity on
10  that, then.
11     A.    Okay.
12     Q.    You're not testifying in this
13  case that -- strike that.
14         You're -- you don't view Zhang
15  as replicating what you say is a
16  dose-response effect in the Riehm study, do
17  you?
18     A.    I don't recall them looking at
19  dose-response.
20     Q.    Well, let me look at -- here's
21  Exhibit 32, which is a copy of the Zhang
22  study.
23         (Whereupon, Mojtabai-32,
24     Longitudinal relationship between
25     social media and e-cigarette use among

8 (Pages 460 - 463)

Page 464

1    adolescents: The roles of
2    internalizing problems and academic
3    performance, by Zhang et al, was
4    marked for identification.)
5        A.    Yeah.  Yes.
6  BY MR. DAVIS:
7        Q.    Do you need time to look at
8  that paper?
9        A.    I can look at it?
10       Q.    Yeah.
11             MR. DAVIS:  Let's go off the
12  record.
13             THE VIDEOGRAPHER:  We're off
14  the record at 9:19 a.m.  That's the
15  end of Media 1.
16             (Recess taken, 9:19 a.m. to
17  9:22 a.m. CDT)
18             THE VIDEOGRAPHER:  We're back
19  on the record at 9:22 a.m.  This is
20  the beginning of Media 2.
21  BY MR. DAVIS:
22       Q.    Dr. Mojtabai, have you had a
23  chance to look at the Zhang paper?
24       A.    Yes, I did.
25       Q.    And do you agree that it did

Page 465

1  not do a dose-response analysis?
2        A.    Not in those words.  But what
3  they do is to put a measure that has
4  different levels of social media use in the
5  model, and they look at its linear effect on
6  the internalizing symptoms.
7        Q.    What are you referring to?
8        A.    I'm talking about the measure
9  that they're using, measure of social media
10  use.  Frequency of social media use.  I'm
11  looking at --
12       Q.    What page?
13       A.    -- page 4 of 10.  The
14  independent variable social media use in wave
15  3 measures the frequency of social media use.
16  The response was a 7 point Likert scale that
17  included never, less often, every few weeks,
18  one to two days a week, three to five days a
19  week, and above once a day.
20             And then they put that in the
21  model and looked at its association with
22  internalizing symptoms at wave 3 adjusting --
23  at wave 4, adjusting for wave 3 mental health
24  problems that replicates our study, and they
25  found significant results that replicates the

Page 466

1  results of our study, saying, first of all,
2  that the association of social media use with
3  future mental health outcomes persists even
4  after adjusting for contemporaneous
5  associations at wave 3.
6             And also that there is a linear
7  relationship between social media use and
8  mental health outcomes.
9        Q.    Okay.  Dr. Mojtabai, the Zhang
10  study doesn't break out and report on -- let
11  me back up.
12             You said that they broke out
13  different time periods for social media use,
14  correct?
15       A.    Correct.
16       Q.    But they don't break out in the
17  study any results for any of those time
18  periods, do they?
19       A.    They put it in a linear
20  regression and they --
21       Q.    No, no.  They don't report out
22  on any of the results for any of those
23  individual time periods, do they?
24       A.    They do not break it down,
25  but --

Page 467

1        Q.    Right.  For example --
2             MS. EMMEL:  Wait, let him
3  answer the question.
4             MR. DAVIS:  Go ahead,
5  Dr. Mojtabai.
6        A.    What they do is they put this
7  ordinal measure in the linear regression and
8  they find a significant regression
9  coefficient, which supports a linear
10  relationship.
11             If there wasn't a linear
12  relationship there, you wouldn't see a
13  significant coefficient in the regression
14  model.
15  BY MR. DAVIS:
16       Q.    But they don't show you the
17  results of any individual period of time to
18  see -- do they?
19       A.    Again, dose-response
20  relationship does not require that you show
21  each of them.
22             What we did, for example, in
23  our study was to do a linear test.  We never
24  mentioned even the term "dose-response
25  relationship" in our study.

9 (Pages 464 - 467)

CONFIDENTIAL

1    Q.   This paper doesn't say anywhere
2  in it that there's a dose-response
3  relationship between use of social media and
4  any symptoms, does it?
5          MS. EMMEL:  Asked and answered.
6    A.   Our study also doesn't say
7  that, so it's -- it's implied.  And then you
8  have a linear relationship.  When you have a
9  test of trend, of linear trend, that is, in
10 spirit, a dose-response relationship.  It's a
11 linear relationship.
12 BY MR. DAVIS:
13   Q.   So in your view, the
14 dose-response relationship is reflected in
15 spirit, but not words, in the Zhang study?
16   A.   In content and spirit, it is --
17   Q.   But not stated, correct?
18   A.   In those words, it is not.
19   Q.   Well, there's no words that --
20 in the Zhang study that say that the --
21 explicitly say that the researchers found a
22 dose-response relationship between use of
23 social media and any symptoms, correct?
24         MS. EMMEL:  Objection, asked
25     and answered.

1    A.   Yeah.  As I answered before,
2  there is nowhere, either in this study or our
3  study, that we used the term "dose-response."
4  BY MR. DAVIS:
5    Q.   Okay.  Thank you.
6          If you turn to page 32 of your
7  report, Section 5.4.3.
8    A.   Page 32.
9    Q.   Are you there?
10   A.   5.4.3, yes.
11   Q.   And very first sentence it
12 says:  While a majority of studies of the
13 association of social media use -- and it
14 goes on, right?
15   A.   Uh-huh.
16   Q.   So you agree that there's a --
17 the majority of the studies showing an
18 association between social media use and
19 depression are cross-sectional studies,
20 correct?
21   A.   That is correct.
22         MS. EMMEL:  Objection,
23     misstates the document.
24 BY MR. DAVIS:
25   Q.   Now, you talk about in this

1  section there are three well-constructed
2  longitudinal studies about an association
3  between problematic social media use and
4  depressive symptoms, correct?
5    A.   Correct.
6    Q.   The three longitudinal studies
7  are Mundy, 2021; Boers, B-O-E-R-S, 2019; and
8  your Riehm study, correct?
9    A.   That's correct.  But in
10 addition, there have been newer studies that
11 have come on board since I published,
12 since --
13   Q.   You don't discuss those studies
14 in either your April report or your May
15 report, do you?
16   A.   They have been published after
17 that time.
18   Q.   But you don't discuss them.
19 You haven't submitted a supplement discussing
20 your opinions of them, have you?
21         MS. EMMEL:  Asked and answered.
22   A.   I haven't.
23 BY MR. DAVIS:
24   Q.   Okay.  If you -- you discuss
25 that these studies attempted to adjust for

1  preexisting mental health problems, correct?
2    A.   That's correct.
3    Q.   You said that they try to
4  eliminate the effect of these problems on
5  social media use and thus examine the causal
6  effect of excessive social media use on
7  depressive symptoms at a future time
8  point, i.e., ruling out reverse causation.
9          Correct?
10   A.   Can you point me where you are
11 reading from?
12   Q.   It's on page 32.
13   A.   32.
14   Q.   It's the third paragraph under
15 5.4.3.
16   A.   Okay.  3.
17   Q.   Did I read that correctly?
18   A.   By adjusting for preexisting
19 mental health problems, these studies try to
20 eliminate the effect of these problems on
21 social media use and thus examine the causal
22 effect of excessive social media use on
23 depressive symptoms at a future time point.
24 That means ruling out reverse causation.
25         Yes.

10 (Pages 468 - 471)

CONFIDENTIAL

Page 472

1    Q.   Okay.  And because that's --
2  reverse causation is something that needs to
3  be factored into and considered for purposes
4  of establishing that, in fact, social media
5  use is resulting in causal effects for mental
6  health outcomes, right?
7          MS. EMMEL:  Objection, vague,
8    compound.
9    A.   Can you repeat the question?
10  BY MR. DAVIS:
11    Q.   Sure.
12          Reverse causation has to be
13  considered for purposes of determining
14  whether or not there's a causal effect
15  between use of social media and any mental
16  health outcome?
17          MS. EMMEL:  Same objections.
18    A.   It has to be considered.  It is
19  one of the factors that has to be considered
20  when you're looking at --
21  BY MR. DAVIS:
22    Q.   Okay.
23    A.   -- data.
24    Q.   For example --
25          MS. EMMEL:  You're cutting him

Page 473

1  off again.  Let him finish.
2          MR. DAVIS:  You have a very low
3    voice, Dr. Mojtabai.
4          THE WITNESS:  Sorry about that.
5    A.   Yeah, you have to consider that
6  for, as you were saying, interpreting data or
7  studies, study designs.
8  BY MR. DAVIS:
9    Q.   For example, a teen might be
10  depressed or down, then isolate and spend
11  more time on social media because they are
12  depressed or have depressive symptoms, right?
13    A.   It is possible, yes.
14    Q.   Yes.  That's something you have
15  to consider?
16    A.   Yes.
17    Q.   And a teen might be anxious or
18  stressed about a family situation, school or
19  friends, and spend more time on social media
20  because of that, right?
21    A.   For different reasons, they
22  might be anxious or depressed and spend more
23  time on social media.
24    Q.   Okay.  We've already talked
25  about Riehm.

Page 474

1    A.   Uh-huh.
2    Q.   Let's talk about Mundy.  Mundy
3  focuses on subclinical levels -- let me hand
4  it to you.
5          (Whereupon, Mojtabai-33, Social
6    networking and symptoms of depression
7    and anxiety in early adolescence, by
8    Mundy et al, was marked for
9    identification.)
10  BY MR. DAVIS:
11    Q.   Exhibit 33 is Mundy.  If you go
12  to page 32.
13    A.   It doesn't have page 32.
14    Q.   Sorry, 549.  Okay.
15          Right-hand column, last
16  paragraph, and about -- about ten lines down,
17  there's a sentence that begins "Our study
18  focuses."
19    A.   Yes.
20    Q.   It says:  Our study focuses on
21  subclinical levels of symptoms and not
22  clinically significant levels of depression
23  and anxiety.
24          Do you see that?
25    A.   Yes.

Page 475

1    Q.   Right.
2          And so this -- that's exactly
3  what the Mundy study was looking at, right?
4    A.   I have to look at the measure
5  they have used and the weighting on that
6  measure.
7    Q.   Can we agree that --
8  Dr. Mojtabai, can we agree that that's what
9  the study authors said about their study?
10    A.   That's what they said in this.
11    Q.   Okay.  Let's go to the -- in
12  other words, they -- these -- this study
13  wasn't assessing diagnosed disorders or what
14  the researchers considered as clinically
15  significant, correct?
16          MS. EMMEL:  Objection,
17    speculation.
18    A.   On these scales, higher scores,
19  severe levels of symptomatology are strongly
20  correlated with clinically significant --
21  BY MR. DAVIS:
22    Q.   Dr. Mojtabai, these
23  researchers --
24          MS. EMMEL:  Excuse me.  You
25    interrupted him again.

11 (Pages 472 - 475)

CONFIDENTIAL

1    MR. DAVIS: I didn't.
2    MS. EMMEL: You did. He was
3    not finished.
4    MR. DAVIS: Are you finished,
5    Dr. Mojtabai?
6    A.    No, I wanted to say that
7    measures of these types of scales in a
8    sample, the mean -- changing mean is also
9    strongly correlated with extreme values,
10   which are measures of clinically significant
11   outcomes.
12          MR. DAVIS: Okay. Move to
13   strike as nonresponsive.
14   BY MR. DAVIS:
15   Q.    Doctor, these researchers said
16   that they were not looking at clinically
17   significant symptoms, such as diagnosed
18   disorders, correct?
19   A.    That is what they say --
20   Q.    Okay.
21   A.    -- in this paper.
22   Q.    Now -- and, in fact, if you
23   look at 550, left-hand column.
24   A.    Yes.
25   Q.    In the first paragraph, they

1    say: Although we found associations between
2    social network usage and mental health
3    symptoms, the effect size of these
4    associations were small to moderate,
5    especially when adjusting for prior symptoms,
6    and smaller than well-established risk
7    factors such as prior symptoms.
8          Do you see that?
9    A.    I see this sentence, yes.
10   Q.    You don't disagree with that,
11   do you?
12   A.    I disagree with that.
13   Q.    All right. Let's talk about
14   the Boers study.
15          (Whereupon, Mojtabai-34,
16   Association of Screen Time and
17   Depression in Adolescence, by Boers
18   et al, was marked for identification.)
19   BY MR. DAVIS:
20   Q.    Exhibit 34 is the Boers study.
21   A.    Uh-huh.
22   Q.    If you look at the Measure
23   section that's on page 855.
24   A.    855, yes.
25   Q.    If you look at -- on the

1    right-hand side of 855, second full
2    paragraph -- excuse me, third full
3    paragraph -- or third paragraph, it says:
4    Each multilevel model controlled for baseline
5    socioeconomic status and sex.
6          Correct?
7    A.    That is correct.
8    Q.    Those are the two confounders
9    that they -- that they assessed for, correct?
10   A.    It appears so, yes.
11   Q.    Okay. They didn't assess for
12   prior psychiatric symptoms or disorders,
13   adverse childhood experiences or known
14   confounders for depression and anxiety, did
15   they?
16          MS. EMMEL: Objection,
17   compound.
18   A.    If you give me a moment to look
19   at it.
20          (Document review.)
21   BY MR. DAVIS:
22   Q.    Dr. Mojtabai, do you have any
23   question in mind?
24   A.    I'm looking at it because it
25   appears to me it's a multi-wave study.

1          MR. DAVIS: Okay. Let's go off
2    the record so you can look at it.
3          THE VIDEOGRAPHER: We're off
4    the record at 9:38 a.m. This is the
5    end of Media 2.
6          (Recess taken, 9:38 a.m. to
7    9:41 a.m. CDT)
8          THE VIDEOGRAPHER: We're back
9    on the record at 9:41 a.m. This is
10   the beginning of Media 3.
11   BY MR. DAVIS:
12   Q.    Dr. Mojtabai, the Boers study
13   didn't assess for prior psychiatric symptoms
14   or disorders, adverse childhood experiences
15   or other known confounders for depression and
16   anxiety, did it?
17          MS. EMMEL: Objection,
18   compound.
19   A.    This is a multi -- according to
20   what they say, a multi-wave study, and they
21   are using a within-person association based
22   on repeated measures, which implies to me
23   that they adjusted for mental health problems
24   in the prior wave for the next wave.
25          ///

12 (Pages 476 - 479)

CONFIDENTIAL

Page 480

1  BY MR. DAVIS:
2      Q.    At baseline, the Boers study
3  did not assess for prior psychiatric symptoms
4  or disorders, adverse childhood experiences
5  or other known risk factors for depression or
6  anxiety, did it?
7          MS. EMMEL:  Objection,
8      speculation.
9      A.    I do not -- yeah, I do not know
10  that.
11  BY MR. DAVIS:
12      Q.    You don't see it in the paper
13  that they did such an adjustment, do you?
14      A.    They -- they describe their
15  design as a design that would imply adjusting
16  for prior waves in future waves, so that's my
17  assumption of the --
18      Q.    It's an assumption, but the
19  paper doesn't say it, does it?
20      A.    It's an assumption based on
21  what they describe as their design.
22      Q.    It's an assumption, but the
23  paper doesn't say it, true?
24      A.    The paper doesn't say it in so
25  many words --

Page 481

1      Q.    Okay.
2      A.    -- but it has the design that
3  would allow to do that.
4          MR. DAVIS:  Move to strike
5      after "The paper doesn't say it."  All
6      right.
7  BY MR. DAVIS:
8      Q.    Dr. Mojtabai, let me hand you
9  what's been marked as Exhibit 35.
10          (Whereupon, Mojtabai-35,
11      National Trends in the Prevalence and
12      Treatment of Depression in Adolescents
13      and Young Adults, by Mojtabai et al,
14      was marked for identification.)
15  BY MR. DAVIS:
16      Q.    This is an article that you
17  wrote entitled National Trends in the
18  Prevalence and Treatment of Depression in
19  Adolescents and Young Adults, right?
20      A.    Correct.
21      Q.    Turn to page 2, top left-hand
22  corner.  Do you see you state in this
23  article:  The risk of depression sharply
24  rises as children transition to adolescence.
25          Do you agree with that?

Page 482

1      A.    I agree, yes.
2      Q.    Yeah.  And that's a statement
3  that you agree with, right?
4      A.    Correct.
5      Q.    And there's a natural baseline,
6  if you will, of -- for adolescents where, as
7  they get older, their risk for depression, or
8  anxiety for that matter, increases with time,
9  right?
10          MS. EMMEL:  Objection,
11      compound.
12      A.    Yeah, I'm not sure what you
13  mean by "natural baseline," the term that you
14  used.
15  BY MR. DAVIS:
16      Q.    Let me rephrase it.
17          As an adolescent gets older,
18  their risk for depression or anxiety
19  increases, correct?
20      A.    That is correct.
21      Q.    Okay.  And changing family
22  dynamics or personality traits can all have
23  a -- play some role in that, right?
24      A.    That is correct.
25      Q.    Problems at school, problems

Page 483

1  with friends, all of those can play a role in
2  that, right?
3      A.    Yeah, they could play a role in
4  depression.
5      Q.    And if you look at -- back to
6  the Boers study.
7      A.    Yes.
8      Q.    This study, if you look in the
9  Results section -- excuse me.  It says --
10  under the Main Outcomes and Measures on the
11  very first page, it says:  Symptoms of
12  depression was the outcome.
13          Correct?
14      A.    Where?  I'm sorry, where --
15      Q.    First page.
16      A.    Okay.
17      Q.    In the abstract, Main Outcomes
18  and Measures, it says:  Symptoms of
19  depression was the outcome.
20          Do you see that?
21      A.    Symptoms of depression,
22  first -- can you point?
23      Q.    I underlined it in red.
24      A.    Okay.  Yep.
25      Q.    Do you agree with that?

13 (Pages 480 - 483)

CONFIDENTIAL

Page 484

1    A.    Yep.
2    Q.    Okay.
3    A.    Based on what they say.
4    Q.    Again, it wasn't assessing
5 diagnosed disorders, correct?
6    A.    It was using a scale, a
7 validated scale to assess --
8    Q.    Symptoms.
9    A.    Symptoms that are of a mental
10 disorder.
11    Q.    I'm sorry, you have to keep
12 your voice up.
13    A.    Symptoms of depressive
14 disorder, yes.
15    Q.    Okay.  If you look at page 34
16 of your report.
17    A.    34?
18    Q.    Yep.
19    A.    Yep.
20    Q.    And you look at the -- your top
21 sentence it says:  While the Boers and
22 colleagues' study did not specifically
23 examine different social media platforms --
24        Right?
25    A.    Uh-huh.

Page 485

1    Q.    Right, you see that?
2    A.    Yes.
3    Q.    So this study was not analyzing
4 specifically different social media
5 platforms, correct?
6    A.    It did not.
7    Q.    Okay.  If you look at -- let's
8 look at the next...
9    A.    Are we done with 35?
10    Q.    Yes.
11        (Whereupon, Mojtabai-36, Which
12        social media platforms matter and for
13        whom? Examining moderators of links
14        between adolescents' social media use
15        and depressive symptoms, by Gentzler
16        et al, was marked for identification.)
17 BY MR. DAVIS:
18    Q.    I'm going to hand you what's
19 been marked as Exhibit 36.  This is the
20 Gentzler study that you cite in your report,
21 right?
22    A.    Uh-huh.
23    Q.    Yes?
24    A.    Yes.
25    Q.    And if you go down to

Page 486

1 page 1743.
2    A.    Yes.
3    Q.    Go to the first paragraph,
4 fourth sentence -- well, the fifth sentence.
5 It says:  Second -- this is the section
6 discussing the limitations of the study,
7 correct?
8    A.    Limitations and -- yes --
9    Q.    And it says:  The correlational
10 design limits causal conclusions.
11        Correct?
12    A.    Let me find -- which line are
13 you on?
14    Q.    1743, six lines down.
15        (Sotto voce document review.)
16        THE WITNESS:  Again, can you
17    please mark it?
18    A.    Yes.
19 BY MR. DAVIS:
20    Q.    Do you see that that's -- so
21 that's reflective of why that this is a
22 cross-sectional study, correct?
23    A.    Correct.
24    Q.    This study doesn't know which
25 way the association is going in terms of

Page 487

1 whether social media use is increasing
2 symptoms or the symptoms are increasing
3 social media use, right?
4    A.    If you give me a moment, again,
5 to refresh my memory.
6        (Document review.)
7    A.    Yes, I'm ready.
8 BY MR. DAVIS:
9    Q.    Okay.
10    A.    What's the question?  Can you
11 repeat the question?
12    Q.    Sure.
13        This study was unable to
14 establish which way the association was
15 going, whether it was social media use leads
16 to increased symptoms or increased depressive
17 or anxiety or other symptoms lead to social
18 media use, right?
19        MS. EMMEL:  Objection,
20    compound.
21    A.    It was a cross-sectional study
22 and has the limitations of cross-sectional
23 studies.
24 BY MR. DAVIS:
25    Q.    Which means it can't answer

14 (Pages 484 - 487)

CONFIDENTIAL

1 that question that I asked you, right?
2     A.    It cannot establish the causal
3 relationship, the direction of causation.
4     Q.    Thank you.
5         (Whereupon, Mojtabai-37, Bored
6     and online: Reasons for using social
7     media, problematic social networking
8     site use, and behavioral outcomes
9     across the transition from adolescence
10    to emerging adulthood, by Stockdale
11    et al, was marked for identification.)
12 BY MR. DAVIS:
13    Q.    I've handed you what's marked
14 as Exhibit 37, which is the Stockdale and
15 Coyne study you cite in your report.
16        If you look at the abstract,
17 the very first sentence it says:  The current
18 study examined motivations for social
19 networking site use across three years during
20 the transition from late adolescence to
21 emerging adulthood.
22        Do you see that?
23    A.    Yes.
24    Q.    And if you look at -- so that's
25 what it's actually looking at.  It's looking

1 at motivations for using social media,
2 correct?
3     A.    That's what it says.
4     Q.    Right.  And it -- if you turn
5 to page 182, 7.3 has Limitations and
6 Conclusion, correct?
7     A.    Correct.
8     Q.    And the third sentence --
9     A.    Yes.
10    Q.    -- it says --
11        I'm sorry, third-to-last
12 sentence of the paragraph.
13    A.    Third-to-last sentence.
14    Q.    It says:  Finally, the current
15 study did not adjust for baseline levels of
16 outcome variables.
17        Do you see that?
18    A.    Yes.
19    Q.    As a result, direction of
20 effects is difficult to determine.
21        Do you see that?
22    A.    I see that.
23    Q.    Right.
24        They're saying that they're not
25 sure which direction the association is going

1 for the -- any of the outcomes and findings
2 that they have, correct?
3         MS. EMMEL:  Objection,
4     compound, vague.
5     A.    What they say is it is
6 difficult to determine.
7 BY MR. DAVIS:
8     Q.    Correct.
9         And so they're saying that they
10 don't know whether or not the actual
11 association that's seen is valid or not,
12 correct?
13    A.    I think --
14        MS. EMMEL:  Objection, vague.
15    A.    Yeah, it's vague.  It's not
16 exactly what they say.
17 BY MR. DAVIS:
18    Q.    But we do know that they did
19 not adjust for baseline levels of the outcome
20 variables, correct?
21    A.    That, we know.
22    Q.    Yeah.
23    A.    They say that.
24    Q.    Right.
25        And so they're not adjusting

1 for potential confounders, correct?
2         MS. EMMEL:  Objection,
3     speculation.
4     A.    That is -- yeah, that is --
5 whether -- they're looking at motivation.
6 Whether prior mental health conditions could
7 impact motivation is -- motivation for use of
8 different apps, I don't think it's
9 established in the literature.
10        So saying that it is a
11 confounding variable is -- requires more.
12 BY MR. DAVIS:
13    Q.    But they say that they didn't
14 adjust at baseline for potential confounders,
15 correct?
16        MS. EMMEL:  Objection,
17    misstates the document.
18    A.    They don't say anything
19 about -- they say they did not adjust for
20 prior mental health conditions.  That's what
21 they say, I think.
22 BY MR. DAVIS:
23    Q.    All right.  Well, the study did
24 not -- if you look at the methods...
25        Well, let's go to -- let's go

15 (Pages 488 - 491)

Page 492

1  back to your report for a second.
2      A.  Okay.
3      Q.  Page 32, paragraph -- third
4  paragraph.
5      A.  You mean bullet point or under?
6      Q.  If you look at Section 5.4.3 --
7      A.  Yes.
8      Q.  -- second full paragraph.
9      A.  Yes.
10     Q.  You identify several studies
11 that didn't find an association between use
12 of social media and depressive symptoms,
13 correct?
14     A.  Yes.  I say -- yes.
15     Q.  For example, Stockdale and
16 Coyne didn't find one, correct?
17     A.  That's what I say here, yes.
18     Q.  The Coyne 2020 didn't find an
19 association, correct?
20     A.  I'm looking -- reading it again
21 to see what I say here.
22         (Sotto voce document review.)
23     A.  Coyne 2020, Erevik 2021, Beeres
24 2021, Puukko 2020, I say found no significant
25 effect.

Page 493

1  BY MR. DAVIS:
2      Q.  Yes, and it's Beeres,
3  B-E-E-R-E-S?
4      A.  Correct.
5      Q.  Okay.  And so you recognize
6  that there are studies that found no
7  association between use of social media and
8  depressive symptoms, correct?
9      A.  There are correlational studies
10 or cross-sectional studies that found no
11 associations, that's correct.  There are
12 longitudinal studies that found no
13 association, and there are experimental
14 studies that found no association.
15         But the majority of these
16 studies -- of each one of these categories
17 found an association.
18     Q.  Dr. Mojtabai, is it your
19 testimony that your methodology is simply
20 counting up the number of studies that found
21 an association versus those that did not, and
22 that's how you arrive at a causal conclusion?
23     A.  No, I'm responding to your
24 question whether these studies found an
25 association or not.  I'm saying there are

Page 494

1  studies that did not found a -- find an
2  association, and there are studies that found
3  an association.
4          My methodology is look at all
5  of them, at the totality of evidence.  I
6  don't pick studies and count and tally them,
7  whether they support it or did not support.
8      Q.  Right.  There's more to it --
9  there's more to a causal assessment than just
10 counting up the number of studies that found
11 an association versus those that did not,
12 correct?
13     A.  I think that's the -- what the
14 counsel has been doing so far, counting
15 studies that have limitations that do not
16 support a causal association.
17         MR. DAVIS:  I move to strike as
18 nonresponsive.
19 BY MR. DAVIS:
20     Q.  I'm asking you that a causal
21 assessment is not done simply by counting up
22 the number of studies that have an
23 association versus those that don't have an
24 association, correct?
25     A.  That's -- that is correct.

Page 495

1      Q.  Yeah.
2          And what you have to do is
3  instead, you have to look at the quality and
4  rigor of each individual study to make an
5  assessment about whether or not that study is
6  appropriate to include in a causal analysis,
7  correct?
8      A.  You have to look at that as
9  well as the totality of the research.  So
10 individual -- there are individual studies
11 that are very small, and they do not find a
12 finding.  There are studies that have a
13 limitation in one aspect; they have strengths
14 in other aspects.
15         That's why we do a
16 meta-analysis.  We combine the studies that
17 have limitations, are done by different
18 people, and we look at the consistency of the
19 evidence across longitudinal and individual
20 correlational studies and as well as
21 experimental studies.  We put them all
22 together.  It's a -- it's like a jigsaw
23 puzzle; you fill it in.
24     Q.  Yeah.  In your reports, you
25 didn't take the studies that you found to be

16 (Pages 492 - 495)

Page 496

1  higher quality or more rigorous and do an
2  analysis specific to them, did you?
3          MS. EMMEL: Objection, vague.
4      A.    I think I have picked some
5  studies, some example studies that are
6  larger. I thought that they were more
7  appropriate, more clearly address the issue,
8  and mentioned them and talked about them at
9  more detail.
10         But most of my study is based
11  on meta-analysis and aggregate data.
12  BY MR. DAVIS:
13     Q.    Right. I think you were
14  talking about that yesterday, that you
15  focused a lot on the meta-analyses that were
16  done and placed emphasis on those, those
17  meta-analyses, in reaching your opinions.
18         MS. EMMEL: Objection,
19     misstates testimony.
20     A.    That is one element, not all.
21  I have looked at --
22  BY MR. DAVIS:
23     Q.    Sure.
24     A.    -- experimental studies. I
25  have -- actually, I think I have about over

Page 497

1  30 longitudinal studies mentioned in this
2  report, nine experimental studies, six
3  meta-analyses of experimental studies, and
4  numerous meta-analyses of mixed correlation
5  and longitudinal studies as well as a lot of
6  individual studies that larger --
7  larger-scale and answer -- address the
8  question.
9      Q.    Okay. You haven't, though,
10  done an analysis where you've taken the more
11  robust studies that find an association and
12  compare those to the more robust studies that
13  find no association, have you?
14         MS. EMMEL: Objection --
15  BY MR. DAVIS:
16     Q.    You haven't done that analysis
17  in your report?
18         MS. EMMEL: Objection, vague.
19     A.    There's a lot of -- first of
20  all, I don't know what robust means, and that
21  there is an element of subjectivity if we do
22  that; we just pick some studies that we think
23  are more robust and compare them to other
24  studies that are not as robust, as you
25  suggest.

Page 498

1          I don't think anybody does that
2  in scientific literature or anywhere that I
3  have seen.
4  BY MR. DAVIS:
5      Q.    You didn't take, for example,
6  all the studies that looked -- that satisfy
7  temporality, that adjusted appropriately for
8  confounders, and do an analysis of those
9  studies to determine whether or not there's
10  an association between use of social media
11  and any adverse mental health outcome, did
12  you?
13         MS. EMMEL: Objection,
14     compound.
15     A.    There is a -- as I mentioned
16  there is some subjectivity in quality
17  assessments, what you say appropriately
18  adjusted for this or that confounder.
19  BY MR. DAVIS:
20     Q.    But you didn't do the analysis
21  that I just asked you about, did you?
22     A.    To look at those -- can you
23  repeat the question?
24     Q.    Yeah.
25         You didn't take the studies

Page 499

1  that satisfied temporality and also
2  appropriately adjusted for confounders and do
3  an analysis specific to those studies, did
4  you?
5      A.    I don't know what appropriately
6  adjusted means. Any adjustment is incomplete
7  because we don't have all the data that we
8  need.
9          So I did not do an analysis, as
10  you say, that includes or involves such a
11  level of subjectivity.
12     Q.    Okay. But you didn't even do
13  an analysis where you just separated out the
14  studies that actually satisfy temporality,
15  did you?
16     A.    In effect, you're asking me did
17  I limit my studies to longitudinal studies.
18     Q.    Yes.
19     A.    I did not limit my analysis to
20  longitudinal studies. I looked at the
21  totality of evidence. There are
22  cross-sectional studies that are better
23  than -- some are better than others. Some
24  have more limitations than others.
25         There are experimental studies

17 (Pages 496 - 499)

CONFIDENTIAL

Page 500

1  that some of them are better, some of them
2  have more limitations. And there are
3  longitudinal studies that have different
4  levels of limitation and strengths.
5        So I didn't limit myself to a
6  type of study.
7    Q.    You didn't -- for example, if
8  there was an experimental study that was
9  affected by attrition rates or demand effects
10  or lack of randomization, you didn't carve
11  those out of your causation analysis, did
12  you?
13        MS. EMMEL: Objection,
14        incomplete hypothesis.
15    A.    If there were studies that had
16  so many limitations, as you said, that had
17  all of those limitations that you said, first
18  of all, they wouldn't get published. They
19  wouldn't pass the peer-review standards.
20        And I don't think that I
21  specifically used a quality -- subjective
22  quality index like you're saying of
23  attrition -- an arbitrary attrition rate.
24  What is the attrition rate that is accepted
25  in this field? There is no standard that we

Page 501

1  could use.
2        You have to use some subjective
3  measure, and that would make my analysis
4  subjective.
5  BY MR. DAVIS:
6    Q.    Now, Dr. Mojtabai, let me
7  circle back to something about the Riehm
8  study, okay?
9    A.    Okay.
10    Q.    The Riehm study only looked at
11  symptoms of depression or what you call
12  internalizing symptoms, right?
13    A.    That is correct.
14    Q.    Okay. And you're not claiming
15  that --
16    A.    I have to make a correction.
17  It also looks at externalizing symptoms.
18    Q.    Yes, sir. Yeah, it did.
19        But you're not claiming that
20  the Riehm study establishes a dose-response
21  effect for anything other than symptoms of
22  depression, are you?
23    A.    The outcome measure there is
24  symptoms of depression.
25    Q.    So it doesn't apply to other

Page 502

1  psychiatric disorders or symptoms, other than
2  symptoms of depression?
3        MS. EMMEL: Objection, vague.
4    A.    To the extent that that outcome
5  measure extends to other mental health
6  problems, like anxiety, there is -- there are
7  questions about anxiety in the -- in the
8  internalizing symptom scale.
9  BY MR. DAVIS:
10    Q.    But you're not claiming, for
11  example, that the Riehm study shows a
12  dose-response effect for anxiety or anxiety
13  symptoms, are you?
14        MS. EMMEL: Objection,
15        compound.
16    A.    I think internalizing symptoms
17  people would understand, it's a cross between
18  depression and anxiety symptoms.
19  BY MR. DAVIS:
20    Q.    All right. You're not claiming
21  that the Riehm study shows a dose-response
22  effect for any eating disorder, are you?
23    A.    That study -- that wasn't one
24  of the outcomes of that study.
25    Q.    So you're not making that claim

Page 503

1  in the case, right?
2        MS. EMMEL: Objection,
3        misstates testimony.
4    A.    Not based on the Riehm study,
5  correct.
6  BY MR. DAVIS:
7    Q.    You're not claiming that the
8  Riehm study shows a dose-response effect for
9  suicidal thoughts or behavior, are you?
10    A.    I don't think that any of the
11  items on the Riehm question -- on the
12  questionnaire used in the Riehm study
13  actually measures suicidal ideations.
14    Q.    So you're not saying that
15  there's a dose-response effect in Riehm for
16  suicidal thoughts and behavior, fair?
17    A.    In that study, I -- no, we
18  didn't think that.
19    Q.    You're not claiming that
20  there's a dose-response effect seen in the
21  Riehm study for body dysmorphia or body
22  dysmorphic disorder, are you?
23    A.    To the extent that depressive
24  symptoms are related to other mental health
25  outcomes, that question comes up. But it's

18 (Pages 500 - 503)

CONFIDENTIAL

Page 504

1    not answered in this study; it is suggested.
2        Q.    Okay.  Look at the -- I'm going
3    to hand you what's been marked -- I'm going
4    to hand you -- go back to your report.
5        A.    Yes.
6        Q.    You talked about the Braghieri
7    2022 study on page 35 of your report.
8        A.    Yes.
9        Q.    If you go down to the very last
10   page -- the very last sentence on the page it
11   says:  This -- you're talking about the
12   Braghieri 2022 study, correct?
13       A.    Correct.
14       Q.    You say:  This type of analysis
15   is generally known as ecological as it is not
16   based on individual participants, but rather,
17   based on exposures and outcomes, both
18   measured at aggregate level.
19           Correct?
20       A.    That is correct.
21       Q.    And Braghieri did not follow
22   the same individuals over time, correct?
23       A.    That is correct.  It did not
24   measure individuals.
25       Q.    Right.

Page 505

1            And you agree that that is true
2    for other ecological studies as well,
3    correct?
4        A.    By nature, ecological studies
5    look at aggregate or groups of people, not
6    individual people.
7        Q.    Ecological studies are not
8    assessing increase in risk at the individual
9    level, right?
10           MS. EMMEL:  Objection, vague.
11       A.    There are methods to
12   extrapolate from ecological studies -- as
13   Gary King at Harvard has spoke on that, to
14   extrapolate from ecological studies to
15   individual participants and the effect on
16   individuals.
17   BY MR. DAVIS:
18       Q.    You haven't done that analysis
19   for any ecological study for social media
20   use, have you?
21       A.    I have not.
22       Q.    You're not aware of anyone who
23   has done such an analysis for an ecological
24   study in social media use, right?
25       A.    I am not aware of any.

Page 506

1        Q.    Okay.  And the Braghieri, if
2    you look at -- let me hand you what's been
3    marked as Exhibit 38.
4            (Whereupon, Mojtabai-38, Social
5        Media and Mental Health, by Braghieri
6        et al, was marked for identification.)
7    BY MR. DAVIS:
8        Q.    If you go to page 29.
9        A.    There's no page 29 here.  What
10   page do you want me...
11       Q.    If you go under Discussion --
12       A.    Yes.
13       Q.    -- the very last sentence says:
14   For instance, our estimates cannot shed light
15   on whether the increased reliance on Facebook
16   for news consumption has exacerbated or
17   mitigated the effects of Facebook on mental
18   health.
19           Did I read that correctly?
20       A.    Yes.
21       Q.    And you agree with that
22   limitation, right?
23       A.    This study looks at the use of
24   Facebook.  It doesn't look at the content of
25   what is seen on Facebook.

Page 507

1        Q.    That's not my question.
2            They set out a limitation here
3    in their article that says:  Our estimates
4    cannot shed light on whether the increased
5    reliance on Facebook for news consumption has
6    exacerbated or mitigated the effects of
7    Facebook on mental health.
8            Correct?
9        A.    That is what they said.
10       Q.    You agree with that limitation
11   for this study, correct?
12       A.    I do agree, yes.
13           MR. DAVIS:  You doing okay?
14           THE WITNESS:  No, I'm good.
15   After I finish this bottle, I may need
16   a break.
17           (Recess requested by the
18   stenographer.)
19           MR. DAVIS:  Let's do that now.
20   Let's go off the record.
21           THE VIDEOGRAPHER:  We're off
22   the record at 10:12 a.m.  That's the
23   end of Media 3.
24           (Recess taken, 10:12 a.m. to
25   10:27 a.m. CDT)

19 (Pages 504 - 507)

Page 508

1     THE VIDEOGRAPHER:  We're back
2  on the record at 10:27 a.m.  This is
3  beginning of Media 4.
4  BY MR. DAVIS:
5     Q.   Dr. Mojtabai, let's turn to
6  Section 5.5 of your report that deals with
7  suicidal behavior.
8     A.   Yes.
9     Q.   Dr. Mojtabai, is it your -- are
10  you -- strike that.
11        Is it your opinion to a
12  reasonable degree of medical and scientific
13  certainty that use of social media causes or
14  substantially contributes to suicidal
15  thoughts or behavior?
16     A.   Not use by itself, so that
17  statement, I don't agree with that.
18     Q.   So use of social media by
19  itself does not cause or contribute to
20  suicidal thoughts or behavior?
21     A.   Use of social media by itself
22  doesn't.
23     Q.   Okay.  So when you say by
24  itself it doesn't, what's the...
25     A.   Excessive or problematic use of

Page 509

1  social media --
2     Q.   Okay.
3     A.   -- is a risk factor for
4  suicidal ideation.
5     Q.   What's -- how much time does a
6  person have to spend on social media in order
7  to have suicidal thoughts or behavior that
8  are caused or substantially contributed to by
9  the use of social media?
10        MS. EMMEL:  Objection,
11     compound, vague.
12     A.   Putting a number on it is not
13  really, I don't think, appropriate.  It's
14  also the way they engage in the social media,
15  is a factor.
16  BY MR. DAVIS:
17     Q.   Okay.
18     A.   But the number -- excessive use
19  is a use that exceeds that the person intends
20  to do or wishes to do and is associated with
21  forgoing other activities, is impairing in
22  functioning, is -- has distress associated
23  with it, is associated with loss of control.
24     Q.   For any use of social media and
25  any adverse mental health outcome that you

Page 510

1  claim is caused by social media, what's the
2  amount of hours or what's the amount of time
3  per day, per week or per month, or however
4  you want to describe it, that would qualify
5  as excessive media use that would result in
6  social media causing the adverse mental
7  health outcomes identified in your reports?
8        MS. EMMEL:  Objection,
9     compound, vague, asked and answered.
10     A.   Yeah, I don't think you can put
11  an actual number on it because I said the way
12  people engage with it, how they use it, how
13  they interact with the medium and its
14  consequences for their life, that would
15  constitute excessive.
16        De Angelis reports that, on
17  average, nowadays, adolescents use social
18  media for five hours a day, so we can't set a
19  time for what is excessive, first of all,
20  because it changes over time.
21        And also, it's not the amount
22  by itself.  It's the way people engage with
23  social media and the consequences of
24  excessive use, excessive hours of use that is
25  associated with harm.

Page 511

1  BY MR. DAVIS:
2     Q.   So you haven't set a time
3  period of any kind when you say -- when
4  you're defining excessive social media use,
5  have you?
6        MS. EMMEL:  Objection,
7     argumentative.
8     A.   I haven't set a time, but there
9  are other reports by Twenge and others who
10  have suggested times cutoffs.
11  BY MR. DAVIS:
12     Q.   Have you reached an opinion to
13  a reasonable degree of medical or scientific
14  certainty where you can say this amount of
15  time equals excessive social media use that
16  will then result in one or more of the
17  adverse mental health outcomes you've
18  identified in your expert reports?
19        MS. EMMEL:  Objection, asked
20     and answered.
21     A.   As I said, an hour, number of
22  hours measure I don't think reflects the
23  harms we're talking about --
24  BY MR. DAVIS:
25     Q.   So you haven't set a time?

20 (Pages 508 - 511)

Page 512

1    A.    As I said, I haven't.  I
2  haven't.
3    Q.    Okay.  Let's look at -- you
4  discuss three studies in this section, Huang
5  2022, Nesi 2021, Tørmoen 2023, right?
6    A.    Correct.
7    Q.    You also discuss the Chu 2023
8  study, correct?
9    A.    Chu...
10    I also talk about the Macry- --
11    Q.    Yeah, I'm going to get to all
12  those.
13    Here, let me hand you Tørmoen,
14  right?  I've opened up to the Limitation
15  section of that study.  That study is now
16  marked as Exhibit 39.
17    (Whereupon, Mojtabai-39,
18    A nationwide study on time spent on
19    social media and self-harm among
20    adolescents, by Tørmoen et al, was
21    marked for identification.)
22    MS. EMMEL:  Can I get one also?
23  BY MR. DAVIS:
24    Q.    Do you see that that's a
25  cross-sectional study?

Page 513

1    (Document review.)
2  BY MR. DAVIS:
3    Q.    Dr. Mojtabai?
4    A.    Yes.
5    Q.    And, in fact, the authors say:
6  Of course, in a cross-sectional study,
7  conclusions about mediation or causality
8  cannot be drawn.
9    Correct?
10    A.    As in most cross-sectional
11  studies, yeah, they caution the readers about
12  drawing causal inference.
13    Q.    Let's look at the Nesi study,
14  which is going to be marked as Exhibit 40.
15    (Whereupon, Mojtabai-40, Social
16    media use and self-injurious thoughts
17    and behaviors: A systematic review and
18    meta-analysis, by Nesi et al, was
19    marked for identification.)
20  BY MR. DAVIS:
21    Q.    This is a study that
22  assessed -- it's actually a meta-analysis
23  that looked at social media use and
24  self-injurious thoughts and behaviors,
25  correct?

Page 514

1    A.    That is correct.
2    Q.    Okay.  This meta-analysis
3  mainly includes cross-sectional data,
4  correct?
5    MS. EMMEL:  Objection, vague.
6    A.    I don't know what percent of
7  the studies included are cross-sectional and
8  what percent are longitudinal.
9    I'm now looking at Table 1 that
10  identifies studies as cross-sectional or
11  longitudinal, and that is correct.  The
12  majority of studies are cross-sectional.
13  BY MR. DAVIS:
14    Q.    Right.
15    This study did not do a
16  separate analysis of just longitudinal
17  studies, correct?
18    A.    I have to look at it to see if
19  they separated the longitudinal from
20  nonlongitudinal and did analysis of them.
21    (Document review.)
22    MR. DAVIS:  Let's go off the
23  record while you review.
24    THE WITNESS:  Yeah, sure.
25    THE VIDEOGRAPHER:  All right.

Page 515

1    We're off the record at 10:34 a.m.
2  That's the end of Media 4.
3    (Recess taken, 10:34 a.m. to
4  10:35 a.m. CDT)
5    THE VIDEOGRAPHER:  We're back
6  on the record at 10:35 a.m.  This is
7  the beginning of Media 5.
8  BY MR. DAVIS:
9    Q.    Dr. Mojtabai, this study did
10  not do a separate analysis of only
11  longitudinal studies, correct?
12    A.    I do not see them doing that.
13    Q.    Right.
14    And if you look at the abstract
15  on page 1, five lines up from the bottom of
16  the abstract it says: There was no
17  association between frequency of social media
18  use and self-injurious thoughts and
19  behaviors.
20    Correct?
21    A.    That is what they say.
22    Q.    So this study found no such
23  association, correct?
24    A.    They say specifically, no
25  association between frequency of social --

21 (Pages 512 - 515)

Page 516

1          MS. EMMEL:  Misstates the
2    document.
3          A.    They say no association between
4    frequency of social media use.
5    BY MR. DAVIS:
6          Q.    Okay.  And if you look at
7    page 13, the very -- down at the back.
8          A.    I have to --
9          Q.    Here you go.
10         A.    -- complete my statement that
11   they say results largely suggested medium
12   effect sizes for association between specific
13   social media constructs and SITB.
14         Q.    Correct.
15               But they're reporting that in
16   terms of the frequency of use of social
17   media, they don't find an association,
18   correct?
19         A.    That's what they state.
20         Q.    Let's look at the Chu study.
21   That's going to be marked as Exhibit 41.
22               (Whereupon, Mojtabai-41, Screen
23         time and suicidal behaviors among US
24         children 9-11 years old: A prospective
25         cohort study, by Chu et al, was marked

Page 517

1          for identification.)
2    BY MR. DAVIS:
3          Q.    The Chu 2023 study was a cohort
4    study, correct?
5          A.    Again, if you give me a minute,
6    I can look at that.
7                Yes, it is ABCD cohort study.
8          Q.    Okay.  Go to page 3 of the
9    study.
10         A.    Yes.
11         Q.    Do you see that?
12         A.    Yes.
13         Q.    Last full paragraph, six lines
14   up from the bottom of the paragraph, there's
15   a sentence that starts "It is important."
16               Do you see that?
17         A.    Yes.
18         Q.    It says:  It is important to
19   highlight that in fully adjusted models,
20   social media was not associated with suicidal
21   behaviors at two-year follow-up.
22               Did I read that correctly?
23         A.    You read it correctly.
24         Q.    So over time, the more time
25   that was looked at in the study, there was no

Page 518

1    association between use of social media and
2    suicidal behavior, correct?
3          A.    That's one of the findings of
4    this study.
5          Q.    So this study, are you claiming
6    that this study shows a statistically
7    significant association between social media
8    use and suicidal thoughts or behavior?
9          A.    What I'm seeing is, in Table 2,
10   association between baseline screen time and
11   suicidal behaviors at two-year follow-up.
12   And the odds ratios are significant for total
13   screen time.  And for social networking at --
14   in unadjusted analysis, there is significant.
15               And there's a trend level
16   association with the odds ratio of 1.27 in
17   the adjusted analysis, and the p level is
18   0.076.
19         Q.    Okay.  So this -- this study on
20   the fully adjusted analysis found no
21   statistically significant association between
22   use of social media and suicidal behaviors,
23   correct?
24               MS. EMMEL:  Objection,
25         misstates testimony.

Page 519

1          A.    When you say statistical
2    association, it -- you have a limit at mind,
3    a p level.
4    BY MR. DAVIS:
5          Q.    I didn't ask you that,
6    Dr. Mojtabai.
7                This study, under the fully
8    adjusted analysis, found no statistically
9    significant association between use of social
10   media and suicidal behavior, true?
11               MS. EMMEL:  Objection, asked
12         and answered.
13         A.    Can you specify statistical --
14   can you clarify?  What do you mean by
15   statistical significant?
16   BY MR. DAVIS:
17         Q.    Dr. Mojtabai, we've been
18   talking about statistical significance for
19   two days.
20         A.    Yeah.  I want to understand
21   what you mean here.
22         Q.    Dr. Mojtabai, the results that
23   are shown in Table 2 for use of social media
24   and suicidal behavior do not show
25   statistically significant association, fair?

CONFIDENTIAL

Page 520

1        MS. EMMEL: Objection, asked
2    and answered.
3        A.    You have to complete your
4    sentence. Statistically significant
5    association at, dot, dot, dot. And that is
6    not there. Can you please tell me?
7    BY MR. DAVIS:
8        Q.    There was no statistically
9    significant association between use of social
10   media and suicidal behaviors at the two-year
11   follow-up, true?
12       A.    I think statistically
13   significant has to be specified, what is
14   meant by. If you mean .05, no. If you mean
15   a trend level association, I would say there
16   is a trend level significant association.
17   Trend level.
18       Q.    A trend level but not a
19   statistically significant association that
20   rejects the null hypothesis, correct?
21       MS. EMMEL: Objection, vague,
22    asked and answered.
23       A.    Yeah, I think I did answer
24   that.
25       If you set the --

Page 521

1    BY MR. DAVIS:
2        Q.    Listen to my question.
3        A.    Yes.
4        Q.    It shows a statistically -- it
5    shows no statistically significant
6    association; in other words, this finding
7    does not reject the null hypothesis, correct?
8        A.    If their null hypothesis was --
9    they said that -- beforehand, they say that,
10   we want to reject this null hypothesis of no
11   statistically significant association at .05
12   p level, then you are correct.
13       But if they didn't say that, I
14   can't assume that that was their hypothesis.
15       Q.    You're not claiming that the
16   Chu 2023 study shows a statistically
17   significant association between use of social
18   media and suicidal behavior, are you?
19       MS. EMMEL: Objection, asked
20    and answered.
21       A.    This is what I would say.
22       The study showed statistically
23   significant findings at -- in unadjusted
24   analysis, and a trend level association,
25   trend level association, at -- in the

Page 522

1    adjusted analysis.
2        MR. DAVIS: Move to strike,
3    nonresponsive.
4    BY MR. DAVIS:
5        Q.    Doctor --
6        MR. DAVIS: I'm just giving you
7    fair warning, I'm bringing him back if
8    this continues. This is just not
9    appropriate for him to be able to be
10   on record about what his opinions are,
11   what the meaning of statistical
12   significance, and then not answer my
13   questions that are directly on point
14   to his own testimony.
15       I'll ask it again.
16       MS. EMMEL: Again --
17       MR. DAVIS: I'll ask it again.
18       MS. EMMEL: I'm going to
19   respond to your statement. He has
20   answered your question. He said
21   that -- he said when there was
22   statistically significant findings, he
23   qualified when it was. And so he did
24   respond to your question.
25       MR. DAVIS: It's just games

Page 523

1    playing.
2    BY MR. DAVIS:
3        Q.    Dr. Mojtabai, the fully
4    adjusted analysis in Chu did not find a
5    statistically significant association between
6    use of social media and suicidal behavior,
7    true?
8        MS. EMMEL: Objection, asked
9    and answered, harassing.
10       A.    I think I did answer. If you
11   set the significance level -- you could set
12   the significance level at an arbitrary level,
13   and you say, at this level, did it reject the
14   null hypothesis or not, then you can say
15   that.
16       So I think the statement that
17   is made -- the question that's asked me is
18   incomplete.
19   BY MR. DAVIS:
20       Q.    Dr. Mojtabai, can you identify
21   a single longitudinal study that identified a
22   statistically significant association between
23   use of social media and suicidal thoughts or
24   behavior?
25       MS. EMMEL: Objection, vague.

23 (Pages 520 - 523)

CONFIDENTIAL

Page 524

1    A.    Yeah, I think there's -- there
2   are lots of elements in it.  Use of social
3   media, you again said.
4         One of the studies looked at
5   the content of social media and showed a
6   significant association.
7         So I don't remember which one
8   it was, one of the studies that you asked me
9   to look at.
10  BY MR. DAVIS:
11   Q.    Okay.
12   A.    And I would again go back to
13  saying this study, the ABCD study, shows a
14  trend level association between -- in an
15  adjusted analysis between social media use
16  and suicidal ideation, and in unadjusted
17  analysis shows statistically significant
18  at .05 level.
19   Q.    But no association at the .05
20  level, right?
21   A.    And no association at .05
22  statistical significance level.
23   Q.    Correct.
24   A.    That's what I've stated.
25   Q.    And identify for me any

Page 525

1   longitudinal study that showed a
2   statistically significant association at
3   the .05 level between use of social media and
4   suicidal thoughts or behavior.
5         MS. EMMEL:  Objection, vague
6      and ambiguous, compound.
7      A.    And I think I responded.  One
8   of the studies we talked about --
9   BY MR. DAVIS:
10   Q.    There's just one.
11   A.    Yeah.
12   Q.    You don't know of another?
13   A.    The ones that I found for this
14  report is the one.
15   Q.    What are they?
16   A.    Well, this one that you talked
17  about, and -- you want me to look at it
18  again?  I can do that.
19         MR. DAVIS:  Let's go off the
20      record.
21         THE WITNESS:  Yeah.
22         THE VIDEOGRAPHER:  All right,
23      we're off the record at 10:46 a.m.
24      That's the end of Media 5.
25         (Recess taken, 10:46 a.m. to

Page 526

1      10:47 a.m. CDT)
2         THE VIDEOGRAPHER:  We're back
3      on the record at 10:47 a.m.  This is
4      the beginning of Media 6.
5      A.    So looking at the Nesi
6   meta-analysis, if you go to Table 2, there
7   are a number of associations, statistically
8   significant association at p level of .001.
9   BY MR. DAVIS:
10   Q.    I think you've missed my
11  question.
12         My question was:  Identify any
13  longitudinal study that shows a statistically
14  significant association at the .05 level
15  between use of social media and suicidal
16  thoughts or behavior.
17         MS. EMMEL:  Objection, asked
18      and answered.
19      A.    Use has to be defined.  Use of
20  social media by itself, as I've --
21  BY MR. DAVIS:
22   Q.    Any use of social media,
23  Dr. Mojtabai.  Any use.
24   A.    There are studies that look at
25  depressive symptoms that are associated and

Page 527

1   major risk factor for suicidal ideations and
2   behaviors, and some of the measures also
3   include suicidal ideations.
4         But I cannot, off the top of my
5   head, remember a study that sets this -- what
6   you say, longitudinal study and looks at
7   the --
8      Q.    There's not one, is there?
9      A.    I do not know.
10   Q.    You don't know of an
11  experimental study that shows a statistically
12  significant association between use of social
13  media and suicidal thoughts or behavior, do
14  you?
15   A.    I can't think of one at this
16  time.
17   Q.    All right.  Let's -- your
18  report in Section 5.6, including the
19  subsections, deal with negative comparisons,
20  body image disturbance, eating disorder
21  symptoms and body dysmorphic disorder or body
22  dysmorphia, right?
23   A.    Correct.
24         MS. EMMEL:  Objection,
25      compound.

24 (Pages 524 - 527)

CONFIDENTIAL

1 BY MR. DAVIS:
2    Q.   I'm sorry, Dr. Mojtabai, what
3 did you say?
4        THE WITNESS:  She had an
5    objection.
6        MS. EMMEL:  Go ahead and
7    answer.
8    A.   Yes.
9 BY MR. DAVIS:
10    Q.   Okay.  Now, when you say body
11 disturbance, do you mean body
12 dissatisfaction?
13    A.   Body image dissatisfaction,
14 yeah.
15    Q.   And you understand that having
16 body dissatisfaction in the adult and
17 pediatric population, regardless of social
18 media use, is common?
19        MS. EMMEL:  Objection, vague.
20    A.   Yeah, what do you mean by
21 common?  What's the prevalence?
22 BY MR. DAVIS:
23    Q.   Well, you know of -- are you
24 aware that studies show that body
25 dissatisfaction in adult or pediatric

1 patients is as high as 80%?
2        MS. EMMEL:  Objection,
3    foundation.
4    A.   I'm not -- I'm not aware of
5    80%.
6 BY MR. DAVIS:
7    Q.   Have you investigated the issue
8 of how prevalent or common body
9 dissatisfaction is in adult or pediatric
10 patients to form your opinions in this case?
11    A.   From what I reviewed for this
12 report, I haven't encountered a prevalence of
13 80%.
14    Q.   Did you -- that's not my
15 question.
16        My question was:  Did you
17 assess and analyze, for purposes of your
18 opinions in this case, the prevalence of body
19 dissatisfaction in adult or pediatric
20 patients?
21    A.   As I mentioned, it is -- first
22 of all, there are different ways of defining
23 and measuring it, and that impacts the
24 prevalence.  And based on the studies that I
25 have looked at for this report, I did not see

1 any prevalence estimate of 80%.
2    Q.   We're not communicating.  I
3 haven't asked you that.
4        I just simply asked you:  Have
5    you gone and looked at the literature to see
6    what the prevalence rate is for adult or
7    pediatric patients when it comes to body
8 dissatisfaction?
9    A.   In the context of this report?
10    Q.   In the context of social media,
11 right?
12    A.   In the context of social media.
13    Q.   But you haven't gone out and
14 looked at it to see what the background rate
15 for body dissatisfaction in adult or
16 pediatric patients in the general population,
17 have you?
18        MS. EMMEL:  Objection, asked
19    and answered.
20    A.   Not separate from what is in
21 the report.
22 BY MR. DAVIS:
23    Q.   And you agree that neither body
24 dissatisfaction nor disordered eating is
25 alone enough to diagnose somebody with an

1 eating disorder or BDD, right?
2        MS. EMMEL:  Objection,
3    compound, vague.
4    A.   These are symptoms of, as you
5    said, eating disorders or of body dysmorphic
6    disorder.
7 BY MR. DAVIS:
8    Q.   But they're not enough for a
9 diagnosis, correct?
10        MS. EMMEL:  Same objections.
11    A.   Yeah, we need a lot more to
12 make a diagnosis.
13 BY MR. DAVIS:
14    Q.   All right.  Now, any --
15        MS. EMMEL:  I think he wasn't
16    finished.
17    A.   Yeah.  We have to get a measure
18 of symptoms, disability, impairment, impact
19 of the behavior in the person's life.  So for
20 diagnosis, we would need a lot more.
21        But these scales are suggested
22 and they're used in clinical settings to --
23 to identify and screen for -- for body
24 dysmorphic disorder or eating disorder.
25        ///

25 (Pages 528 - 531)

CONFIDENTIAL

1 BY MR. DAVIS:
2     Q.    The scales that are used to
3 assess body dissatisfaction, disordered
4 eating or symptoms of eating disorders were
5 all screening tools and not diagnostic
6 measures, correct?
7         MS. EMMEL:  Objection,
8     speculation.
9     A.    Yeah, they are validated by --
10 by clinical scales or clinicians' diagnosis.
11 BY MR. DAVIS:
12    Q.    You haven't answered my
13 question, Dr. Mojtabai.
14        The screening scales that were
15 used in the body imaging studies, the eating
16 disorder symptom studies, and the disordered
17 eating studies are all screening tools;
18 they're not diagnostic tools, correct?
19        MS. EMMEL:  Objection,
20     speculation, vague.
21    A.    As you said and I said, there
22 are screening measures to identify people who
23 are at risk of disordered eating.
24 BY MR. DAVIS:
25    Q.    They identify who may be at

1 risk, but they don't determine who actually
2 has either an eating disorder or body
3 dysmorphia or BDD, right?
4         MS. EMMEL:  Objection,
5     compound.
6     A.    They identify who might be --
7 who is a probable case.
8 BY MR. DAVIS:
9     Q.    Not someone who actually has
10 either of those disorders, correct?
11        MS. EMMEL:  Objection,
12     argumentative.
13    A.    If somebody scores high on
14 these scales, it's highly probable that they
15 would be suffering from eating disorder or
16 body dysmorphia --
17 BY MR. DAVIS:
18    Q.    Dr. Mojtabai, you're missing my
19 question. The screening tools --
20        MS. EMMEL:  He was still not
21     finished with his answer.
22 BY MR. DAVIS:
23    Q.    The screening tools that are
24 used for body dysmorphia, body imaging
25 studies, eating disorder symptoms, disordered

1 eating, they are not diagnostic of whether or
2 not someone actually has an eating disorder
3 or BDD, right?
4     A.    They are used for identifying
5 people who are highly likely to have those
6 disorders.
7     Q.    Well, they may be highly
8 likely, but it's not confirmed whether or not
9 they actually have them, correct?
10        MS. EMMEL:  Objection,
11     argumentative, asked and answered.
12    A.    They are not, by themselves,
13 diagnostic.
14 BY MR. DAVIS:
15    Q.    Okay.  And you also know that
16 there -- have you done any analysis for any
17 of the screening tools to determine the
18 predictive value of those screening tools to
19 determine whether or not someone has an
20 eating disorder or BDD?
21    A.    I haven't done that, but I'm
22 sure there is literature on this.
23    Q.    Okay.  Can you identify any
24 study on social media use of any kind that's
25 a longitudinal or an experimental study that

1 actually looked at diagnosed eating disorders
2 or BDD?
3     A.    That's not the standard of
4 epidemiological studies.  We don't use
5 clinicians to identify cases.  We use scales,
6 questionnaires, as you mentioned, screening
7 measures.  And they are highly correlated
8 with the other clinical outcomes that you are
9 talking about or may be interested in.
10        MR. DAVIS:  Move to strike,
11     nonresponsive.
12 BY MR. DAVIS:
13    Q.    Dr. Mojtabai, can you identify
14 any study on social media use of any kind
15 that's actually looked at diagnosed eating
16 disorders or BDD?
17        MS. EMMEL:  Objection, asked
18     and answered.
19    A.    As I said, this is not the
20 standard --
21 BY MR. DAVIS:
22    Q.    I'm not asking for the
23 standard. I'm asking, can you identify one?
24    A.    Even if I had identified one, I
25 would be suspicious about the results because

CONFIDENTIAL

1 they haven't used a standardized measure
2 to -- that is validated to measure an
3 outcome. It's based on a clinician's -- some
4 clinicians making a diagnosis.
5          MR. DAVIS: Move to strike,
6     nonresponsive.
7 BY MR. DAVIS:
8     Q.    Dr. Mojtabai, identify one such
9 study.
10          MS. EMMEL: Objection, asked
11     and answered.
12     A.    As I said, it's not a standard
13 of -- of research in this field.
14 BY MR. DAVIS:
15     Q.    I'm not asking if it's a
16 standard. I'm asking you to identify a
17 single study that looked at either eating
18 disorders that were diagnosed or BDD that was
19 diagnosed as an outcome measure in any of the
20 studies on social media use.
21          MS. EMMEL: Asked and answered
22     multiple times.
23     A.    If it's not a standard, it's
24 not done and I wouldn't be identifying
25 them --

1 BY MR. DAVIS:
2     Q.    So you don't know of one,
3 right?
4          MS. EMMEL: Wait. You cut him
5     off. Please let him finish.
6          Finish with your answer,
7     Dr. Mojtabai.
8     A.    Yeah, as I was saying, if it is
9 not done, if it is not the standard, even if
10 I identify one, I would not pay attention to
11 it because the validity of the outcome is not
12 clear in my mind.
13 BY MR. DAVIS:
14     Q.    Okay. So for you, you haven't
15 identified one because you don't think that's
16 a valid endpoint?
17     A.    I don't think by itself it's a
18 valid endpoint to put in the study and not
19 use any structured interview or
20 semistructured interview or a scale or a
21 questionnaire to measure the outcome.
22     Q.    None of the studies that you
23 discuss in your expert reports analyze
24 outcomes -- strike that.
25          None of the studies that you

1 identify or discuss in your reports have used
2 diagnosed eating disorder or BDD as an
3 outcome measure, fair?
4          MS. EMMEL: Objection, asked
5     and answered, harassing.
6     A.    The standard of research in the
7 field and what I would consider a respectable
8 research is to use an outcome measure that is
9 standardized, that has established
10 reliability and validity.
11          Clinician diagnosis are not
12 commonly used in this type of research --
13 BY MR. DAVIS:
14     Q.    Dr. Mojtabai, I've not asked
15 you that question. I've not asked you that
16 question, and I've been very kind and polite
17 to you, and I'm asking you again. Please
18 identify -- strike that.
19          None of the studies that you
20 identify in your expert reports used BDD or
21 an eating disorder as an outcome measure,
22 right?
23          MS. EMMEL: Objection,
24     harassing, asked and answered.
25          Last time on this question.

1     A.    My report is based on data that
2 I consider replicable and reliable, so
3 studies that would use a measure that is not
4 replicable, standardized, validated with
5 established reliability and validity data, I
6 would not even consider to --
7 BY MR. DAVIS:
8     Q.    But I'm not asking you that.
9 I'm not asking you whether you would consider
10 or not.
11          I'm just asking you that
12 whether any of your studies in your report
13 actually identify a diagnosed eating disorder
14 or BDD as an outcome measure. That's all.
15     A.    I think in my response, it's
16 included. The response to your question
17 is --
18     Q.    You don't identify one, do you?
19     A.    Because it's not the standard
20 in this field.
21     Q.    Okay. You keep saying that
22 it's not the standard in this field.
23          You don't practice in the area
24 of eating disorders or BDD, do you?
25     A.    I practice in psychiatric

27 (Pages 536 - 539)

Page 540

1  epidemiology, and I have published a lot in
2  psychiatric epidemiology. I review articles,
3  I review grants.
4      Q.    You --
5          MS. EMMEL: Wait, let him
6      finish.
7      A.    This is my field. I know
8  psychiatric epidemiology. I have been
9  practicing it for more than 20 years. I know
10  what's the standard.
11 BY MR. DAVIS:
12     Q.    You have never published any
13  article on what the standard of research is
14  on eating disorders or BDD, have you?
15     A.    I haven't done a study or set
16  of guidelines for the standard. I'm telling
17  you what the practice is, what the standard
18  in this field of research is.
19     Q.    And you've never discussed that
20  standard -- you've never discussed with any
21  researchers whether or not it's appropriate
22  to have BDD or eating disorders as a valid
23  outcome measure, have you?
24          MS. EMMEL: Objection, vague,
25      asked and answered.

Page 541

1      A.    My practice of conducting
2  research in psychiatric epidemiology in my
3  practice, I have used standardized measures.
4  I have used validated and reliable measures,
5  questionnaires, scales, and that outcome, a
6  clinician --
7  BY MR. DAVIS:
8      Q.    You've never --
9      A.    -- assessment by itself is not
10  a measure that I would consider in my
11  research.
12          So it's not my practice. It's
13  not practice of most epidemiologists,
14  psychiatric epidemiologists who do this type
15  of research.
16     Q.    You've never had --
17          MS. EMMEL: Wait.
18 BY MR. DAVIS:
19     Q.    You've never had a discussion
20  with any researchers that focus on eating
21  disorders or BDD about what's the appropriate
22  outcome measure for an observational or
23  experimental study, have you?
24          MS. EMMEL: Asked and answered,
25      harassing.

Page 542

1      A.    I don't recall.
2  BY MR. DAVIS:
3      Q.    Yeah. You've never published
4  any research where you identify what the
5  appropriate standard is for an outcome
6  measure in eating disorders research or BDD
7  research, have you?
8          MS. EMMEL: Objection,
9      compound.
10     A.    I haven't published anything on
11  the -- what's the appropriate standard.
12 BY MR. DAVIS:
13     Q.    And your focus -- your focus of
14  epidemiological research --
15     A.    Yeah.
16     Q.    -- over time, all the articles
17  and publications and lectures you've given,
18  you've never published a single thing on
19  eating disorders or body dysmorphic disorder
20  or what should or should not be used as a
21  valid outcome measure in such research, have
22  you?
23     A.    I have published on eating
24  disorders.
25     Q.    As what's a valid outcome

Page 543

1  measure?
2      A.    No, that's not a -- I have
3  published empirical research. I haven't
4  published standards for other researchers.
5      Q.    Can you identify a single
6  patient in any of the studies that looked at
7  eating disorder symptoms, body dysmorphia,
8  BDD, disordered eating or body imaging
9  disturbances or body dissatisfaction, where
10  one of those patients, just one, went on to
11  develop either an eating disorder or body
12  dysmorphic disorder?
13          MS. EMMEL: Objection, vague,
14      compound, calls for speculation.
15     A.    Can you repeat that question?
16 BY MR. DAVIS:
17     Q.    Sure.
18          Can you identify a single
19  patient in any of the studies that you looked
20  at for eating disorder symptoms, body
21  dysmorphia, BDD, disordered eating, body
22  dissatisfaction, where one of those patients
23  went on to develop either an eating disorder
24  or body dysmorphic disorder?
25          MS. EMMEL: Same objections.

28 (Pages 540 - 543)

CONFIDENTIAL

Page 544

1    A.    You start with have you
2    identified a single patient.  Well, these
3    studies do not identify individual patients.
4    These are epidemiological studies or --
5    BY MR. DAVIS:
6    Q.    I think you're missing the
7    point.
8          MS. EMMEL:  Wait, you didn't
9    let him finish.  No, he wasn't
10   finished.
11         MR. DAVIS:  Yeah, he's told
12   me --
13         MS. EMMEL:  He wasn't finished.
14         MR. DAVIS:  He's taken issue
15   with the question.  I'm rephrasing the
16   question.
17         MS. EMMEL:  He was answering.
18         MR. DAVIS:  I'll withdraw the
19   question.
20         MS. EMMEL:  Okay.
21   BY MR. DAVIS:
22   Q.    Doctor, for any of the study
23   participants in any of the studies that
24   looked at eating disorder symptoms, body
25   dysmorphia, BDD, disordered eating, body

Page 545

1    dissatisfaction, can you identify one study
2    participant, just one, that actually
3    developed an eating disorder or body
4    dysmorphic disorder as a result of social
5    media use?
6          MS. EMMEL:  Vague, compound,
7    calls for speculation.
8    A.    As I mentioned, these studies
9    are not looking at the outcome, clinical
10   outcome in those terms, that they ended up
11   going to a hospital or being seen by a
12   provider.
13         They use scales and
14   questionnaires that measure symptoms of
15   eating disorder, and they are -- those
16   measures are standard -- standardized,
17   replicable, high reliability and validity.
18   They are associated with clinical outcomes.
19         If you have those measures, you
20   do not need or it's not even possible for
21   most studies to go and follow people to see
22   whether they end up going to a clinic or
23   hospital or are they hospitalized later on,
24   and follow them individually later on.
25         MR. DAVIS:  Move to strike as

Page 546

1    nonresponsive as -- after "As I
2    mentioned, these studies are not
3    looking at the outcome -- clinical
4    outcome in those terms."
5    BY MR. DAVIS:
6    Q.    Dr. Mojtabai, can you identify
7    any study participant -- study participant of
8    a study involving eating disorder symptoms,
9    BDD, body dysmorphia or body dissatisfaction
10   or disordered eating where the -- there was
11   an actual assessment in the study that the --
12   that the study participant actually had a
13   diagnosed eating disorder or BDD?
14         MS. EMMEL:  Objection, asked
15   and answered.
16   A.    Yeah, as I mentioned, this is
17   not the standard of research to go within the
18   study and then see if this person -- people
19   who respond to these measures are clinically
20   evaluated by a clinician to make a diagnosis.
21         These scales are standardized
22   on clinical samples.  They are
23   standardized -- there is psychometric data
24   showing that these measures are associated
25   with outcomes, disability, impairment in

Page 547

1    functioning and with other measures of eating
2    disorder.
3          MR. DAVIS:  Move to strike as
4    nonresponsive.
5    BY MR. DAVIS:
6    Q.    Is it -- Doctor, is it fair to
7    say that sitting here today, you can't
8    identify a single study participant in any of
9    the body imaging, eating disorder symptoms,
10   disordered eating or BDD or body dysmorphy
11   studies that you identify that actually had a
12   diagnosed condition of any of those?
13         MS. EMMEL:  Objection --
14   BY MR. DAVIS:
15   Q.    Right?  Any of those medical
16   conditions.
17         MS. EMMEL:  Asked and answered.
18         MR. DAVIS:  I'll withdraw the
19   question.
20   BY MR. DAVIS:
21   Q.    Doctor, you understand that the
22   screening tools that are used in these
23   studies for eating disorders or body
24   dissatisfaction or BDD, that they have what's
25   called a probable predictive value, correct?

29 (Pages 544 - 547)

CONFIDENTIAL

Page 548

1    A.    Yep.
2    Q.    Right?
3         And what a probable predictive
4    value is, is that it's an estimate for those
5    who score high, or certain numbers on a
6    screening tool, that they will actually have
7    a diagnosed condition, correct?
8         Correct?
9    A.    That is --
10        MS. EMMEL:  Objection,
11   speculation.
12   A.    -- correct.
13   BY MR. DAVIS:
14   Q.    And so have you gone back
15   and -- have you analyzed at all the probable
16   predictive value for any of the screening
17   tools that were used in the eating disorder
18   symptom studies, the body dysmorphic studies,
19   the disordered eating or the body
20   dissatisfaction studies?
21        MS. EMMEL:  Objection, vague,
22   compound.
23   A.    First of all, predictive value,
24   positive predictive value, which as you said
25   identifies whether this person is going to

Page 549

1    have the condition that -- or probable
2    condition that we are talking about, is very
3    dependent on the context.
4         So in the context of an eating
5    disorder clinic, the positive predictive
6    value would be very different than a
7    community sample -- than a community
8    sample -- high-risk community sample.
9         So positive predictive value by
10   itself is not a good measure that we use
11   across contexts, across different prevalence
12   estimates for the condition.
13   BY MR. DAVIS:
14   Q.    Have you done any analysis on
15   any of the questionnaires used in the eating
16   disorder symptom studies, the body
17   dissatisfaction studies, the studies that
18   looked at body dysmorphia or disordered
19   eating to say what's the error rate from the
20   screening tools or the screening scales that
21   were used and, of those people, how many
22   are -- actually have a diagnosis?
23        Have you done that analysis
24   specific to the scales used in those studies?
25        MS. EMMEL:  Objection, vague,

Page 550

1    compound, asked and answered.
2    A.    Error goes both ways.  So these
3    measures identify some and fail to identify
4    some who have --
5    BY MR. DAVIS:
6    Q.    I'm not asking you that.  I'm
7    asking if you've done the analysis.
8    A.    Sir, let me finish.
9         When you use these scales, you
10   are -- you are relying on the fact that they
11   have positive predictive value more than
12   chance, and then you look -- compare the
13   groups, group who is using a lot of social
14   media and the group that is using less social
15   media.  So the errors, in effect, balance
16   out.
17        What you're interested in is
18   the effect size.  Is it associated with
19   higher risk, higher prevalence?
20        So positive predictive value in
21   this context is really not a -- is not a
22   deal-breaker.  It's not something that
23   anybody would focus on, especially since
24   positive predictive value is very dependent
25   on the base rate of the disorder in different

Page 551

1    settings.
2         MR. DAVIS:  I move to strike as
3    nonresponsive.
4    BY MR. DAVIS:
5    Q.    I didn't ask you that question,
6    Dr. Mojtabai.  You've got to follow my
7    questions, okay.  I have limited time with
8    you today.  Please follow -- please answer
9    the question I ask, okay?
10   A.    I tried to be response --
11   Q.    You really need to focus on my
12   question.
13        My question is -- I didn't ask
14   about positive predictive value.
15        I asked:  Have you done any
16   analysis on any of the questionnaires or
17   screening tools used in the eating disorder
18   symptom studies, the body dissatisfaction
19   studies, the studies that looked at
20   disordered eating or body dysmorphia, to see
21   what the error rate is from the screening
22   tools to whether those individuals who filled
23   out the screening tools actually had a
24   diagnosed condition?
25        MS. EMMEL:  Same objections,

CONFIDENTIAL

Page 552

1 vague, compound, asked and answered.
2 A. Yeah, positive -- error rate,
3 what you're saying, is one minus positive
4 predictive value.
5 BY MR. DAVIS:
6 Q. What -- what analysis -- wait a
7 minute, Doctor.
8 Have you done an analysis or
9 not? That's what I'm asking you.
10 A. No, sir. When I'm talking
11 about positive predictive value, I'm
12 responding to your question.
13 Q. I'm not -- no.
14 MR. DAVIS: I'm not asking --
15 let's go off the record.
16 MS. EMMEL: Can we take a break
17 for a minute?
18 MR. DAVIS: Yeah, we're going
19 to take a break.
20 THE VIDEOGRAPHER: We're off
21 the record at 11:11 a.m. That's the
22 end of Media 6.
23 (Recess taken, 11:11 a.m. to
24 11:19 a.m. CDT)
25 THE VIDEOGRAPHER: We're back

Page 553

1 on the record at is 11:19 a.m. This
2 is the beginning of Media 7.
3 BY MR. DAVIS:
4 Q. Are you ready to continue,
5 Dr. Mojtabai?
6 A. Sure.
7 Q. Okay. I'm going to pick up
8 where we left off, all right?
9 A. Okay.
10 Q. Have you done any analysis of
11 the screening scales or questionnaires that
12 were used in the eating disorder symptom
13 studies, the disordered eating studies, the
14 body imaging or body dissatisfaction studies,
15 or the body dysmorphia studies when you
16 looked at the questionnaire and you --
17 analysis of the questionnaire, compared to
18 whether the scores on the questionnaires
19 actually meant that there was a confirmed
20 diagnosis when that patient was actually
21 evaluated?
22 Have you done that analysis?
23 MS. EMMEL: Objection, asked
24 and answered.
25 A. It's not the standard of

Page 554

1 care -- standard of research in my field, in
2 psychiatric epidemiology, but I haven't done
3 that.
4 BY MR. DAVIS:
5 Q. Thank you.
6 A. Sure.
7 Q. Look at page 70 of your report.
8 A. Yes.
9 Q. There's a Section 8.
10 Do you see that?
11 A. Yes.
12 Q. And it's entitled Both Quantity
13 and Quality of Social Media Use Impact Mental
14 Health.
15 Right?
16 A. I see that.
17 Q. And underneath, in the -- you
18 quote from the Fassi 2024 study, correct?
19 A. Correct.
20 Q. And what you say -- you adopt
21 the quote in your report that says that
22 there's a, quote, "need to move beyond time
23 spent measures of social media use" -- well,
24 let me start again. Sorry.
25 You agree that there's a need

Page 555

1 to move beyond time spent measures of social
2 media use because that's been -- which has
3 been widely acknowledged, correct?
4 MS. EMMEL: Objection, vague
5 misstates testimony.
6 MR. DAVIS: Let me rephrase.
7 THE WITNESS: Yes.
8 BY MR. DAVIS:
9 Q. There's a quote in your report
10 from the Fassi article that says: The need
11 to move beyond time spent measures of social
12 media use has been widely acknowledged, as
13 these measures are simplistic and fail to
14 distinguish between types of activities or
15 content that can differentially relate to
16 mental health.
17 Did I read that correctly?
18 A. You read it correctly.
19 Q. You agree with that, right?
20 A. Not fully. I have to
21 contextualize this because if you look at the
22 title of this section, it says both quantity
23 and quality. Moving beyond, in my
24 interpretation of this is that not only
25 relying on the quantity but also looking at

CONFIDENTIAL

Page 556

1  the quality of interaction with the social
2  media.
3      Q.   Okay.  But you do agree that --
4  with Fassi that the measures of just looking
5  at time spent on social media are simplistic
6  and fail to distinguish between types of
7  activities or content that can differentially
8  relate to mental health?
9          MS. EMMEL:  Objection,
10  compound.
11      A.   I have to say that time alone
12  is not -- and I think I have said it before.
13  Time alone is not sufficient, unless it is
14  very excessive, like all of the waking hours
15  of the adolescent is spent on social media,
16  in which case, other consequences are
17  included in that.
18  BY MR. DAVIS:
19      Q.   Right.
20      A.   Forgoing other activities, not
21  being able to give up social media, sleep
22  impairments.
23      Q.   But you would agree, almost all
24  the studies on social media use focused and
25  analyzed time spent on social media use as a

Page 557

1  measure, correct?
2      A.   I would say most of them rely
3  on time, but some include other activities or
4  ways interacting with the social media.
5      Q.   The vast majority of them,
6  though, focus on time?
7      A.   I haven't counted them, but it
8  sounds right, the majority.  I don't know if
9  it's vast majority.
10      Q.   And you agree that time alone
11  spent on social media cannot distinguish
12  between what's viewed or heard on social
13  media between other types of activities or
14  features of social media apps, correct?
15      A.   As I said, it could be an
16  indicator, if it is excessive.  If it is
17  beyond like 6 hours in our study, in the
18  Riehm study, for example, I think 6 hours is
19  excessive.  I would say that that cuts down
20  on the other activities that kids engage in.
21      Q.   Yeah, I think you lost my
22  question.
23          I was simply asking you that
24  time alone spent on social media can't
25  distinguish between what's being viewed and

Page 558

1  how it's being viewed and other types of
2  activity that takes place on social media,
3  correct?
4      A.   Again, excessive use of social
5  media, I think, hours, means that they are
6  engaging with material that is algorithmic,
7  in other words, the social media is keeping
8  them focused on certain content.
9      Q.   Well, okay.
10          And you don't know of a study,
11  do you, that kind of separates out use of
12  algorithms from -- well, let me back up.
13          You don't know -- I'll come
14  back to that.
15          In your study -- in your
16  reports, I've been able to identify five
17  longitudinal or experimental studies in your
18  reports that analyzed features of social
19  media platforms, okay?
20      A.   Okay.
21      Q.   These are the Kleemans 2018
22  study, the Tiggemann 2018 study, the
23  Tiggemann 2022 study, the Steinsbekk 2023
24  study, and the Coulthard 2018 study, okay?
25          And my question to you is:  Are

Page 559

1  there any others?
2          MS. EMMEL:  Objection, vague.
3      A.   I'm sure new studies are coming
4  out all the time.  So are there other studies
5  now, I don't know.  I haven't done a
6  literature review recently that I've looked
7  at it, so I can't answer that.
8  BY MR. DAVIS:
9      Q.   Do you know of any other, other
10  than the five that I identified, from your
11  expert reports?
12      A.   I don't, no.
13      Q.   Okay.  Let's talk about --
14  let's talk about those.
15          (Whereupon, Mojtabai-42,
16          Picture Perfect: The Direct Effect of
17          Manipulated Instagram Photos on Body
18          Image in Adolescent Girls, by Kleemans
19          et al, was marked for identification.)
20  BY MR. DAVIS:
21      Q.   This is Exhibit 42, which is
22  the Kleemans 2018 paper, okay?
23          MR. DAVIS:  Can we go off the
24  record?
25          THE VIDEOGRAPHER:  We're off

32 (Pages 556 - 559)

Page 560

```
1     the record at 11:28 a.m.  That's the
2     end of Media 7.
3          (Recess taken, 11:28 a.m. to
4     11:29 a.m. CDT)
5          THE VIDEOGRAPHER:  We're back
6     on the record at 11:29 a.m.  This is
7     the beginning of Media 8.
8  BY MR. DAVIS:
9     Q.   All right.  Dr. Mojtabai, do
10 you see that what's marked as Exhibit 42 is
11 the Kleemans 2018 paper that's referenced in
12 your expert report?
13    A.   I do.
14    Q.   Okay.  And this was a very
15 small study in terms of a sample size with
16 only 144 study participants, right?
17         It's on the abstract.
18    A.   Yes, I see that.
19    Q.   And what this study did was it
20 used manipulated Instagram photos and
21 assessed the impact of how those were
22 visually responded to, right?
23    A.   That's correct.
24    Q.   And what they did is they took
25 manipulated and unmanipulated images and saw
```

Page 561

```
1  how study participants reacted to those
2  images, correct?
3     A.   That is correct.
4     Q.   Right.
5          And the reaction was basically,
6  it was -- there were ten selfie photos that
7  were used by the study participants and
8  reviewed, right?
9     A.   Either ten original Instagram
10 photos or ten manipulated photos, so there
11 are two conditions.
12    Q.   Right.
13         And what they did was they were
14 assessing the immediate reaction to what the
15 participant saw, correct?
16    A.   That's my understanding from
17 reading this.
18    Q.   Right.
19         There wasn't any type of
20 long-term assessment to see how those
21 reactions may have impacted mental health
22 over time, correct?
23    A.   I don't know the context, but
24 it's -- it's an experimental study, so I
25 assume it was after the intervention, they
```

Page 562

```
1  measured the outcomes.
2     Q.   Right.
3          But there wasn't -- other than
4  the momentary assessment of the reaction to
5  the images, the study participants weren't
6  followed up to see if that ended up having
7  any type of clinically significant or
8  diagnosed disorder, correct?
9     A.   That is my understanding, yes.
10    Q.   Okay.  Let's look at -- let's
11 look at the next one, which is Tiggemann
12 2018.  We'll mark that as Exhibit 43.
13         (Whereupon, Mojtabai-43, The
14    effect of Instagram "likes" on women's
15    social comparison and body
16    dissatisfaction, by Tiggemann et al,
17    was marked for identification.)
18 BY MR. DAVIS:
19    Q.   This is an article that's
20 entitled "The effect of Instagram 'likes' on
21 women's social comparison and body
22 dissatisfaction."
23         Right?
24    A.   Yep.
25    Q.   Again, it was a very small
```

Page 563

```
1  sample size of only 220 female undergraduate
2  students, correct?
3     A.   Well, small -- I have to
4  qualify that.  You have different sample
5  sizes for different types of studies.
6          For a survey, you would have
7  thousands of people.  For a study like this,
8  you may actually have smaller, and that would
9  be sufficient.
10    Q.   Right.
11    A.   So identifying it as small, I'm
12 not sure in this category of studies, if it's
13 small or not.
14    Q.   Okay.  You wouldn't describe it
15 as a small study?
16    A.   Depends on what type of -- what
17 design it is.
18    Q.   It's an experimental study.
19    A.   Well, then I wouldn't identify
20 it as small.
21    Q.   Okay.  Well, you've got 220
22 female undergraduate students.
23         These aren't -- these aren't
24 teens, children or adolescents, are they?
25    A.   Undergraduate students are
```

33 (Pages 560 - 563)

CONFIDENTIAL

Page 564

1  young adults, I would say, or emerging
2  adults.
3      Q.    Okay.  And what they did here
4  is -- if you look at page 93, on the
5  left-hand column under Section 2.3.1.
6      A.    3.1, yes.
7      Q.    Oops.  Oh, it's actually on
8  page 92.  Sorry.
9          What they did is they said two
10  sets of stimulus material were constructed
11  for the study, each containing 15 Instagram
12  images of thin, ideal or average women,
13  respectively, correct?
14      A.    Uh-huh.
15      Q.    Yes?
16      A.    That's correct, that's what
17  they have.
18      Q.    So what they're doing in this
19  experimental study is they're showing images
20  to the study participants --
21      A.    Right.
22      Q.    -- and getting their reaction
23  to what the -- what the study participants
24  see in the images, right?
25      A.    That's correct.

Page 565

1      Q.    Okay.  And they also put in
2  more likes for a group and less likes for
3  another group with respect to the images,
4  correct?
5      A.    Right.
6      Q.    And then they measured how the
7  study participants reacted to what they were
8  seeing in the images and the number of likes
9  that went along with the images, correct?
10      A.    That is my understanding from
11  reading it.
12      Q.    Yeah.  This study found no
13  effect on the number of likes with respect to
14  body dissatisfaction, true?
15      A.    I have to look at the results.
16      Q.    Look at the abstract on page --
17  third-to-last sentence, it says, quote:
18  While the number of likes had no effect on
19  body dissatisfaction or appearance
20  comparison, it had a positive effect on
21  facial dissatisfaction.
22          Do you see that?
23      A.    Yes.
24      Q.    So for body dissatisfaction,
25  this study found no effect with respect to

Page 566

1  the likes, correct?
2          MS. EMMEL:  Objection,
3      misstates the document.
4      A.    Yeah, the -- but they did find
5  one for facial dissatisfaction.
6  BY MR. DAVIS:
7      Q.    Yeah.  I promise you, we're
8  going to get there.
9      A.    Okay.
10      Q.    But this study found no effect
11  between use of social media and likes with
12  respect to body dissatisfaction, right?
13      A.    That is what they state.
14      Q.    And for the facial
15  dissatisfaction, what this -- what these
16  researchers found is that when the images
17  were shown and the study participants
18  responded to what they saw about the images,
19  some had an effect with respect to facial
20  dissatisfaction, right?
21      A.    That is what they state, yes.
22      Q.    Right.
23          And this -- these were also
24  momentary assessments of reactions by the
25  study participants, correct?

Page 567

1      A.    To the extent you can call
2  responses to a -- or results of an experiment
3  like this -- because momentary could mean
4  that it disappears --
5      Q.    No, no, I meant like the time
6  period.
7          MS. EMMEL:  Wait, wait, he
8      wasn't finished.
9  BY MR. DAVIS:
10      Q.    I'm talking about the time
11  period by which the images were shown and the
12  reaction to them.
13          That process was very
14  momentary, right?
15      A.    So I would restate it:  Shortly
16  after the trial.  We don't know if it's
17  momentary.  Momentary means that it
18  disappears after time.
19      Q.    Right.
20      A.    It is not necessarily
21  momentary.
22      Q.    Right.
23          But this study, then, didn't
24  follow study participants to determine
25  whether any of the patient -- or the

34 (Pages 564 - 567)

CONFIDENTIAL

Page 568

1  participants who reported facial
2  dissatisfaction went on to develop any eating
3  disorder or BDD, did it?
4      A.    I wouldn't expect a study like
5  this to do that because that's not the
6  standard.  But you're -- you're correct.
7      Q.    Right.
8      A.    They didn't do that.
9      Q.    And so in terms of whether or
10 not the facial dissatisfaction rose to the
11 level of some clinically significant problem,
12 that wasn't assessed in this study, was it?
13     MS. EMMEL:  Objection, vague.
14     A.    It wasn't one of the aims of
15 this study.
16 BY MR. DAVIS:
17     Q.    Right.  This wasn't looked at?
18     A.    It wasn't the aim of the study,
19 as I said, yeah.
20     Q.    Let's look at -- let's look at
21 Tiggemann 2020.
22         (Whereupon, Mojtabai-44,
23         Uploading your best self:  Selfie
24         editing and body dissatisfaction, by
25         Tiggemann et al, was marked for

Page 569

1      identification.)
2  BY MR. DAVIS:
3      Q.    This is an article that's
4  entitled "Unloading your best self:  Selfie
5  editing and body dissatisfaction."
6         Do you see that?
7      A.    It says "Uploading."  That's --
8  Uploading your best self.  Is that the paper?
9      Q.    Yes, sir.
10     A.    The selfie editing, yes.
11     Q.    Okay.  And if you look at
12 page 176.
13     A.    Yes.
14     Q.    Right-hand column,
15 Section 2.2.1.
16     A.    Right.
17     Q.    What they did in this study is
18 that it exposed participants in the study to
19 one set of 15 Instagram images constructed by
20 the researchers that contained thin or
21 average size women, right?
22     A.    That's my understanding,
23 reading this.
24     MS. EMMEL:  Objection,
25     misstates the document.

Page 570

1  BY MR. DAVIS:
2      Q.    Right.
3         And what they -- what they did
4  is they were then showed these two sets of
5  images to the study participants and recorded
6  or documented how they responded to what they
7  saw in the images, right?
8         MS. EMMEL:  Objection,
9      compound, vague.
10     A.    First of all, the images had
11 initially been sourced from public Instagram
12 profiles using hashtags, so they're not just
13 images.  They're -- they're images taken
14 from --
15 BY MR. DAVIS:
16     Q.    Yeah, I'm not suggesting
17 otherwise.  I'm just saying that they took
18 two sets of 15 Immigran- -- 15 Instagram
19 images --
20     A.    Right.
21     Q.    -- and they showed them to the
22 study participants, and then they got the
23 reactions of the study participants to what
24 they saw, right?
25     A.    That is my understanding.

Page 571

1      Q.    Right.
2         And they, again, made an
3  assessment, like the moment -- strike that.
4         They then did a momentary
5  assessment of whether or not they had body
6  dissatisfaction, facial dissatisfaction or
7  negative mood, right?
8      A.    Again, momentary is -- implies
9  transient.  We don't know if it was transient
10 or not.  So I would say immediately after the
11 intervention, they looked at these outcomes.
12     Q.    But the -- but as you point
13 out, that this study doesn't have data
14 showing that the reactions to the images were
15 more than transient, right?
16     A.    They don't show any evidence
17 either way, whether they were transient or
18 more than transient.  So we don't know that.
19     Q.    Okay.  And this study assessed
20 the reaction to selfie editing by study
21 participants on body image concerns, right?
22     A.    That is my understanding, yes.
23     Q.    Okay.  And if you look at
24 page 180 under Discussion.
25     A.    Yes.

35 (Pages 568 - 571)

Page 572

1    Q.    First paragraph, second
2  sentence, it says:  The findings are
3  relatively clear.  In contrast to prediction,
4  induced state body and facial dissatisfaction
5  did not affect any selfie behavior and, in
6  particular, did not result in increased
7  editing of the taken selfies.
8         Do you see that?
9    A.    I see that.
10    Q.    So this study didn't find an
11  effect between selfie behavior and body
12  dissatisfaction or facial dissatisfaction,
13  right?
14    A.    It's -- the next sentence talks
15  about --
16    Q.    I'll get to the next sentence,
17  I promise.
18         But that's what it found,
19  right?
20    A.    Yes.
21    Q.    Yes?
22    A.    Yes.
23    Q.    Okay.  And then the next
24  sentence says:  However, as predicted, the
25  taking and editing of selfies led to

Page 573

1  increased negative mood and state facial
2  dissatisfaction, regardless of experimental
3  condition.
4         Correct?
5    A.    That's what it says.
6    Q.    So what they were saying is
7  that regardless of whether you were in one of
8  the two groups, you had a similar reaction to
9  the -- what you were seeing in the images,
10  right?
11         MS. EMMEL:  Objection, vague.
12    A.    The taking -- to the, yeah,
13  taking and editing of selfies specifically.
14  BY MR. DAVIS:
15    Q.    And there's no evidence from
16  this study, because it doesn't provide the
17  data, about whether the body dissatisfaction
18  or the facial dissatisfaction or the negative
19  mood resulted in clinically significant
20  symptoms, right?
21         MS. EMMEL:  Objection,
22  misstates the document.
23    A.    I have to look at the state
24  facial dissatisfaction measure that they
25  used, and it might actually be significantly

Page 574

1  related to -- and I suspect it is, to body --
2  or facial dysmorphophobia.
3  BY MR. DAVIS:
4    Q.    I don't think --
5         MR. DAVIS:  Move to strike as
6    nonresponsive.
7  BY MR. DAVIS:
8    Q.    I don't think you're following
9  my question.
10         There's no evidence from this
11  study that whatever reaction that the study
12  participants had to what they saw, that that
13  resulted in them having to be treated
14  clinically for body dissatisfaction, facial
15  dissatisfaction or negative mood, right?
16         MS. EMMEL:  Objection,
17    compound.
18    A.    Not from this --
19         MR. DAVIS:  Go ahead.
20    A.    Not from this study.
21  BY MR. DAVIS:
22    Q.    Right.
23         Let's look at Coulthard.  This
24  is Exhibit 45.
25         (Whereupon, Mojtabai-45, The

Page 575

1    impact of posting selfies and gaining
2    feedback ("likes") on the
3    psychological well-being of 16-25 year
4    olds: An experimental study, by
5    Coulthard et al, was marked for
6    identification.)
7  BY MR. DAVIS:
8    Q.    This is a study entitled "The
9  impact of posting selfies and gaining
10  feedback ('likes') on the psychological
11  well-being of 16-25-year-olds: an
12  experimental study."
13         Correct?
14    A.    Correct.
15    Q.    And there were only 59
16  participants in this study, correct?
17    A.    That is correct.
18    Q.    And what they did in this
19  study, if you look at the abstract, they
20  assessed the impact of posting selfies and
21  receiving feedback ('likes') on Instagram on
22  broader aspects of the psychological
23  well-being of young people.
24         Right?
25    A.    Right.

36 (Pages 572 - 575)

CONFIDENTIAL

Page 576

1    Q.    And what they did is they did
2  three conditions.  They had a condition for a
3  7-day intervention where there was no selfie
4  posting.
5    A.    Yes.
6    Q.    Then they did posting selfies
7  without feedback, and then they did posting
8  selfies with feedback, correct?
9    A.    That is correct.
10    Q.    Okay.  And then they did a
11  one-week follow-up afterwards, correct?
12  Right?
13    A.    That's what they say.
14    Q.    So the length of the study is a
15  week, right?
16    A.    That is what they say.
17    Q.    Okay.  And if you turn to
18  page 218 -- excuse me, page 7.
19    A.    They're not numbered.  I'm
20  sorry.
21    Q.    Here, if you hand me your page,
22  I'll find it for you.
23    A.    Thank you.
24    Q.    Okay.  Do you see in the
25  Discussion section, this study showed:  No

Page 577

1  impact of either posting selfies or receiving
2  feedback on measures of self-esteem or
3  positive or negative mood.
4        Did I read that correctly?
5    A.    You read it correctly.
6    Q.    So this study doesn't show that
7  posting selfies or receiving or posting likes
8  had an effect on the study participants,
9  correct?
10    A.    An effect -- I mean, they talk
11  about other effect that they get posting, so
12  posting no selfies resulted in a greater
13  improvement in appearance satisfaction over
14  the study compared to posting selfies.
15    Q.    But these results -- let's
16  just -- I'll get to that in a second.
17        That this study showed that
18  there was no impact of either posting selfies
19  or receiving feedback on measures of
20  self-esteem or positive or negative mood,
21  correct?
22    A.    That is what they state, yes.
23    Q.    And you mentioned --
24  again, this study doesn't provide any data
25  about whether whatever reaction the study

Page 578

1  participants had, that any of the feelings or
2  reactions that they had to the images
3  resulted in clinically significant symptoms,
4  right?
5    A.    That is my understanding.  I
6  don't think that that was what they were
7  studying.
8    Q.    Okay.  All right.  Let's look
9  at the next study, which is Exhibit 46.
10        And -- and I guess just -- just
11  to be clear about Coulthard, right?
12        What's happening in that study
13  is that people are responding to what they're
14  seeing about likes or postings, and they're
15  reacting to what they're seeing, right?
16    A.    They are also posting selfies.
17    Q.    Yes, they're posting -- which
18  would be --
19    A.    Or not.
20    Q.    Right.  They're responding to
21  what they're seeing and then adding postings
22  themselves in terms of responding to what
23  they're seeing.
24        MS. EMMEL:  Objection, vague.
25    A.    Well, what they do -- let's

Page 579

1  just read the method again.
2        (Document review.)
3    A.    So there are three arms, no
4  selfie control.  They don't post any selfies,
5  and then there are selfies with no feedback
6  and selfies with feedback.  So feedback comes
7  after selfies, if their selfie receives a lot
8  of likes or not.  And those are the three
9  arms they're comparing.  That's my
10  understanding of this --
11  BY MR. DAVIS:
12    Q.    Right.  And so what they're
13  doing is if they get a like or not --
14    A.    After this --
15    Q.    -- after they visualize what
16  they see, right, in the images, then they
17  respond to it?
18    A.    I don't think it's only
19  visualizing.  When you post a selfie, it's a
20  selfie of the person themselves.  They take a
21  picture of themselves and post it.
22    Q.    Right.  And so -- and so what
23  they're doing is they're choosing whether or
24  not to post something to others, right?
25    A.    Well, they -- it's one of the

37 (Pages 576 - 579)

CONFIDENTIAL

1  intervention arms.  They don't have a choice.
2  They are either assigned to an intervention
3  arm where they post selfies or to another
4  intervention arm where they do not.
5      Q.    Okay.  I've handed you what's
6  been marked as Steinsbekk 2023.  That's --
7          (Whereupon, Mojtabai-46, Social
8          media behaviors and symptoms of
9          anxiety and depression.  A four-wave
10         cohort study from age 10-16 years, by
11         Steinsbekk et al, was marked for
12         identification.)
13  BY MR. DAVIS:
14      Q.    This was a longitudinal study
15  that followed adolescents over six years,
16  correct?
17      A.    If you give me a...
18          I'm looking at it to see.  It's
19  a random intercept cross-lagged panel model,
20  yes.
21          (Document review.)
22          MR. DAVIS:  Let's go off the
23  record while Dr. Mojtabai reviews
24  that.
25          THE WITNESS:  Yeah.

1          THE VIDEOGRAPHER:  All right.
2  We're off the record at 11:51 a.m.
3  That's the end of Media 8.
4          (Recess taken, 11:51 a.m. to
5  11:54 a.m. CDT)
6          THE VIDEOGRAPHER:  We're back
7  on the record at 11:54 a.m.  This is
8  the beginning of Media 9.
9  BY MR. DAVIS:
10      Q.    Dr. Mojtabai, my question was:
11  This is a longitudinal study that followed
12  adolescents over six years, correct?
13      A.    That is -- that's my
14  understanding, yes.
15      Q.    And this study actually did
16  structured clinical interviews of study
17  participants and parents using actual DSM
18  criteria to assess for symptoms of depression
19  or anxiety, right?
20      A.    They apparently did, yes.
21      Q.    And are you aware of any other
22  observational study or experimental study
23  that used structured clinical interviews to
24  assess study participants?
25      A.    As I said, it's not common.

1  It's not a standard in the field.  We usually
2  use scales or questionnaires.
3      Q.    You're not aware of one, right?
4      A.    I'm not aware of this.
5      Q.    And do you agree that this is a
6  well-designed study?
7      A.    I don't see any fatal flaws in
8  the design of the study.
9      Q.    You don't set out any
10  criticisms of Steinsbekk in either of your
11  reports, do you?
12      A.    I don't recall having brought
13  up any.
14      Q.    You don't know of any criticism
15  that you put in your report, right?
16      A.    If -- looking at this, if I
17  have any criticism, it's about the
18  cross-lagged models.
19      Q.    Okay.  Now, this study found
20  that -- if you look at the abstract, this
21  study found that:  Frequency of posting,
22  liking and commenting is unrelated to future
23  symptoms of depression and anxiety.
24          Correct?
25      A.    This is what they state.

1      Q.    Right?
2          In other words, they didn't
3  find any causal effect or relation between
4  those features of social media and any
5  symptoms of depression or anxiety, correct?
6      A.    I disagree with that, because
7  this is a cross-lagged study.  They are only
8  looking at within-person change.
9  Within-person change is dependent on
10  fluctuations.
11          If you have a measure that is
12  reflecting of a state, like depression, you
13  wouldn't expect much variation or fluctuation
14  across the different waves of assessment.
15          MR. DAVIS:  I move to strike as
16  nonresponsive.
17  BY MR. DAVIS:
18      Q.    I wasn't asking you if you
19  agreed with it or not.
20          I'm just saying that these
21  study authors didn't report out any causal
22  effect or relation between the features of
23  social media that they analyzed and any
24  symptoms of depression or anxiety, correct?
25          MS. EMMEL:  Objection,

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 584

1    misstates the document.
2       A.    Yeah, I'm going to read what
3    they say.  They say:  The frequency of
4    posting, liking and commenting is unrelated
5    to future symptoms of depression and anxiety.
6    BY MR. DAVIS:
7       Q.    So they didn't find an
8    association between the features that they
9    analyzed and symptoms of anxiety or
10   depression, correct?
11      A.    No within-person change or
12   association, you may say.
13      Q.    Okay.  Now, with respect to
14   each of the five studies that we went over,
15   right --
16      A.    Uh-huh.
17      Q.    -- none of them specifically
18   analyzed the effect of algorithms on effects
19   for study participants, correct?
20      A.    The studies that we looked at?
21      Q.    Yes, the five we just went
22   over.
23      A.    Well, I wouldn't -- I would
24   argue that the study that looked at the
25   likes, number of likes that people received

Page 585

1    on their doctored postings, doctored selfies,
2    for example, or selfies, even, that is
3    indicative of an algorithmic feature of
4    the -- of the apps that allows the likes to
5    surface.
6       Q.    What -- what study are you
7    referencing?
8       A.    I'm talking about the study we
9    talked about, about feedbacks and posting --
10   feedbacks on post -- selfie posting by Naomi
11   Coulthard and Jane Ogden.
12      Q.    Okay.  But in the article,
13   right, in the article itself, we're not going
14   to find any discussion of -- or analysis by
15   the study authors about the impact of
16   algorithms on their study, correct?
17      A.    I haven't memorized the paper.
18   I don't know if they talk about algorithm or
19   not or algorithm --
20      MR. DAVIS:  Let's go off the
21      record, if you want to take a look at
22      it.
23      THE VIDEOGRAPHER:  We're off
24      the record at 11:58 a.m.  That's the
25      end of Media 9.

Page 586

1       (Recess taken, 11:58 a.m. to
2    12:00 p.m.)
3       THE VIDEOGRAPHER:  We're back
4    on the record at 12:00 p.m., beginning
5    Media 10.
6       A.    So I don't see any specific
7    reference to algorithms, but they talk about
8    all the selfie -- selfies have become an
9    integral part of social media.
10   BY MR. DAVIS:
11      Q.    Okay.  So in Coulthard and --
12   doesn't specifically analyze algorithms,
13   correct?
14      A.    It does not specifically
15   analyze algorithms.
16      Q.    And none of the other studies
17   do either, right?
18      A.    None of the studies we talked
19   about --
20      Q.    None of the other four.
21      A.    Yes.
22      Q.    Okay.  For any of the
23   experimental studies that you analyzed, did
24   any of them follow patients to see whether --
25   strike that.

Page 587

1       For any of the experimental
2    studies that you analyzed, did any of them --
3    and I'm not -- let me back up.
4       I'm not talking about these
5    five that we just went over, okay, because
6    we've already covered those.
7       A.    Okay.
8       Q.    But any of the other studies,
9    experimental studies that you analyzed, did
10   any of them determine that the reactions to
11   either using social media or reducing social
12   media or having a limited use of social media
13   result in symptoms that they had to go get
14   treatment for?
15      MS. EMMEL:  Objection, vague
16      and ambiguous, compound.
17      A.    Well, this is not, again, the
18   purpose or the design of these experimental
19   studies.  They're assessing the outcomes
20   after the experiment or looking at the effect
21   of restrictions on use of social media and --
22   in terms of, again, mood or other outcomes,
23   social comparison, that is measured using
24   standardized scales.
25      ///

39 (Pages 584 - 587)

CONFIDENTIAL

1  BY MR. DAVIS:
2      Q.    But did any of the experimental
3  studies determine that any of the study
4  participants had clinically significant
5  symptoms?
6      A.    The studies I looked at, they
7  didn't state that that was the aim of their
8  study, to examine the association with the
9  clinical outcomes.  As a result, I haven't
10 seen any.
11     Q.    So they just didn't have -- all
12 the studies just didn't have data on that?
13     A.    That wasn't part of their
14 design or analysis.
15     Q.    Right.
16           So they didn't have the data on
17 it?
18     A.    I assume they did not collect
19 the data.
20     Q.    Right.
21           And you haven't seen it, have
22 you?
23     A.    I have not.
24     Q.    Okay.  Was there any study that
25 you analyzed for either of your reports that

1  was able to separate out the impact of what
2  was viewed or heard on social media platforms
3  by the participants in the study?
4           MS. EMMEL:  Objection, vague.
5      A.    Can you rephrase it?
6  BY MR. DAVIS:
7      Q.    Right.
8           The studies that you looked
9  at --
10     A.    Yes.
11     Q.    -- right?  All of the ones in
12 your expert reports, analyzed how study
13 participants are reacting to what they see or
14 hear on social media, right?
15     A.    Or how they interact with the
16 social media.
17     Q.    Right, but mostly -- right.
18           I think we went over the ones
19 in terms of how they interact, right?  Okay.
20 But set aside those five, okay?  Set aside
21 those five studies.
22           Any other study in your report
23 that specifically -- strike that.
24           Other than the five studies
25 we've already gone over, any other study

1  identified in either of your reports that
2  separated out from the study results how the
3  study participants responded or reacted to
4  what they saw or heard on social media?
5           MS. EMMEL:  Objection, vague,
6      asked and answered.
7      A.    Again, I would ask for
8  clarification.  Are we talking about the
9  content of what they saw on social media or
10 how they reacted to --
11 BY MR. DAVIS:
12     Q.    I'm just asking you -- I'll
13 rephrase the question.
14           Other than the five studies
15 that we all -- that we went over --
16     A.    Yeah.
17     Q.    -- were there any studies that
18 were able to separate out through the design
19 of the study the impact of what the
20 participants were seeing and viewing on
21 social media and how that impacted the
22 results of the study findings?
23           MS. EMMEL:  Objection, vague.
24     A.    Well, there are experimental
25 studies that use material and change the

1  content or expose participants to different
2  contents and then measure their -- their
3  reaction or outcomes --
4  BY MR. DAVIS:
5      Q.    Right.
6      A.    -- what they see on that -- on
7  their tablet or phone or --
8      Q.    Sure.
9           And then the observational
10 studies essentially did the same thing,
11 right?
12     A.    Well, some observational
13 studies are -- as we talked about, they
14 looked at the hours that people spent with
15 social media.
16     Q.    Right.
17     A.    Some of them looked at the
18 problematic use of social media, how
19 pervasive and how salient and how loss of
20 control is associated with use of social
21 media.
22           So -- and some of them looked
23 at -- especially experimental studies exposed
24 participants to different types of content
25 and then assessed whether mood change or

CONFIDENTIAL

Page 592

1  change in social comparison is induced by
2  that.
3      Q.    Right.
4      A.    I don't know if I answered your
5  question.
6      Q.    You're helping.  I think I'm
7  following you.
8          What you're talking about is in
9  your reports, what you're talking about when
10  it comes to the observational data is that
11  you assessed how study participants reacted
12  to what they were seeing, right, the content
13  on the social media platforms, and they
14  responded to that, and that's -- that was a
15  part -- an integral part of what the study
16  results showed?
17          MS. EMMEL:  Objection,
18      misstates testimony and reports.
19      A.    I would say some of the studies
20  are as you described them, but not all of
21  them.
22  BY MR. DAVIS:
23      Q.    Can you identify any
24  observational study that doesn't fall into
25  that category?

Page 593

1      A.    Can you -- you have to be more
2  specific, I'm sorry.  What that category,
3  what is -- is it the content that they saw
4  that they reacted to?
5      Q.    Yeah.
6          Is there -- are there any
7  observational studies that you're aware of
8  that did not include some measure of a
9  response or reaction to what was being seen
10  or heard by the study participants to social
11  media and how they responded or what they saw
12  or heard?
13          MS. EMMEL:  Objection, vague,
14      compound.
15      A.    Again, I try to, in my mind,
16  like, set this study -- what that study would
17  look like that you're describing, and I'm not
18  sure what they saw, what it -- what's meant
19  by what they saw.
20  BY MR. DAVIS:
21      Q.    Sure.  So let me see if I can
22  rephrase.
23      A.    Yeah.
24      Q.    Is there any observational
25  study in your mind that didn't -- let me

Page 594

1  strike that.
2          All the observational studies
3  that you're aware of, what they did is they
4  were assessing how participants in the study
5  reacted and responded to content on social
6  media and whether or not that was impacting
7  them in terms of adverse mental health
8  outcomes, right?
9      A.    Right.
10      Q.    Okay.
11      A.    Yes.
12      Q.    Okay.  All righty.  Let me --
13  let me ask you some questions about your
14  Bradford Hill criteria.
15      A.    Okay.
16      Q.    You didn't do --
17          If you want to look at it,
18  you've got it.  I think it's at the back end
19  of your report, right?
20      A.    Sure.
21      Q.    To make your causal assessment
22  in this case, you used the Bradford Hill
23  factors, correct?
24      A.    Or perspectives, what he calls
25  factors, maybe.  It's not criteria.  Yeah.

Page 595

1      Q.    Let's just use factors, okay?
2      A.    Okay.
3      Q.    Is that all right with you?
4      A.    That's fine.
5      Q.    Okay.  And your expert report
6  doesn't do a Bradford Hill causation analysis
7  specific to eating disorders, does it?
8      A.    It doesn't do a Bradford Hill
9  analysis specific to any of the outcomes.  It
10  does it for all outcomes.
11      Q.    Okay.  So what you did is when
12  you did your Bradford Hill causation --
13  strike that.
14          When you did your causation
15  analysis --
16      A.    Yes.
17      Q.    -- you put all the outcomes
18  together in a pot and you did your analysis
19  from there, correct?
20      A.    That is, yes, correct.
21      Q.    Okay.  And you didn't
22  separate -- in your causation analysis, you
23  didn't separate out any of the individual
24  defendants in this case and look at the data
25  specific to their platforms and usage of

41 (Pages 592 - 595)

CONFIDENTIAL

1  their platforms and make the causation
2  assessment about each individual defendant,
3  did you?
4      A.    There is not sufficient data
5  for each individual platform, and besides,
6  children nowadays are using three or more
7  platforms on average.  So it's not really
8  feasible to do that for each individual
9  platform.
10     Q.    So in terms of your causation
11 assessment, what you did is you took data on
12 each of the individual defendants, you
13 combined it, right, and made an assessment of
14 causation based upon that combined data?
15     A.    By defendant, you mean
16 platforms, different --
17     Q.    Yes.
18     A.    Yeah, I wasn't thinking about
19 individual platforms when I was doing the
20 causal analysis because there is a lot of
21 commonality across social media, and children
22 use multiple social media platforms, so it's
23 not really feasible to separate.
24         Although I have a section in my
25 report that talks about specific features and

1  some studies that have investigated
2  association of those features with the
3  outcomes.
4      Q.    Right.  Right.  I understand.
5          But just so we're clear, when
6  you did your causation assessment for this
7  case as reflected in both of your reports,
8  what you did is you combined the data as to
9  each individual defendant and the individual
10 defendant's platforms, and you combined all
11 that data together to get to your causation
12 opinion, right?
13         MS. EMMEL:  Objection, asked
14     and answered, misstates testimony.
15     A.    For the reason I specified
16 before, my causal analysis is inclusive of
17 all social media platforms.
18 BY MR. DAVIS:
19     Q.    Yeah.  And I -- I think I'm
20 just -- I just wanted clarity.
21         It's -- you combined all of the
22 data with respect to each of the individual
23 defendant's platforms into your causation
24 analysis, correct?
25         MS. EMMEL:  Objection, asked

1  and answered.
2      A.    I think a better way to say is
3  that I did not separate them.
4  BY MR. DAVIS:
5      Q.    And -- hold on one second.
6          You didn't -- in your causation
7  assessment for this case and as reflected in
8  your expert reports, you didn't separate out
9  individual psychiatric disorders and do a
10 Bradford Hill causation analysis with respect
11 to each individual disorder that's identified
12 in your report, did you?
13         MS. EMMEL:  Objection, asked
14     and answered.
15     A.    Again, I think I did not
16 separately conduct a Bradford Hill assessment
17 for each individual outcome, if that's your
18 question.
19 BY MR. DAVIS:
20     Q.    Yeah.  Thank you.  Okay.
21         So then the other thing is --
22         MR. DAVIS:  Why don't we do
23     this.  It's 12:00.  Why don't we take
24     a break for lunch.
25         THE WITNESS:  Okay.  Let's do.

1          THE VIDEOGRAPHER:  Off the
2      record at 12:14 p.m.  That's the end
3      of Media 2.
4          (Recess taken, 12:14 p.m. to
5      1:03 p.m. CDT)
6          THE VIDEOGRAPHER:  We're back
7      on the record at 1:03 p.m.  This is
8      the beginning of Media 11.
9              ------------
10             EXAMINATION
11             ------------
12 BY MS. COATES:
13     Q.    Good afternoon, Dr. Mojtabai.
14     A.    Yes, ma'am.
15     Q.    We've been sitting in the same
16 room for a day and a half, but I don't think
17 we've been introduced.  My name is Melissa
18 Coates, and I represent Google and YouTube in
19 this litigation.
20         So I'm going to ask you some
21 questions -- further questions about your
22 report, but I'm going to focus my questions
23 specifically on Google and YouTube.  And I
24 have very limited time, so if you could
25 listen to my questions and answer the

CONFIDENTIAL

Page 600

1  question asked, it would be greatly
2  appreciated so I can get through everything I
3  have.
4          To start with, what is YouTube?
5      A.   My understanding of YouTube is
6  a social media site where people can post
7  videos and also interact with each other,
8  share videos and receive also feedback on
9  comments or videos they put in.
10     Q.   Okay.  And when you say that
11 they can interact with each other, how do
12 they do that on YouTube?
13     A.   Usually through comments that
14 they write or likes that they give to each
15 other's comments.
16     Q.   To the specific video that's --
17     A.   To the specific video or --
18     Q.   -- on the platforms?
19     A.   -- previous comments.
20     Q.   Okay.  Thank you.
21          And focusing on what's been
22 marked as Exhibit 5, your -- we can continue
23 using that, your April 18th report.
24     A.   Right.
25     Q.   Under Section 6, which was

Page 601

1  entitled Potentially Harmful Features of
2  Specific Social Media Platforms --
3      A.   Yes.
4      Q.   -- you only reference YouTube
5  in Section 6.12, correct?
6      A.   Yeah.  Each subsection focuses
7  on one of the platforms for which I could
8  find data.
9      Q.   And the studies cited here in
10 Section 6.12 are the only YouTube-specific
11 studies cited in your report, correct?
12     A.   I believe that to be the case.
13         MS. EMMEL:  Objection,
14 misstates the report.
15 BY MS. COATES:
16     Q.   And you don't reference any
17 features of YouTube in this section, do you?
18     A.   If you give me a moment to look
19 at what I say here and what I talk -- the
20 studies that I talk...
21         (Document review.)
22         MS. COATES:  If you need to
23 look at your report, we can go off the
24 record.
25         THE VIDEOGRAPHER:  All right.

Page 602

1  We're off the record at 1:06 p.m.
2  That's the end of Media 11.
3          (Recess taken, 1:06 p.m. to
4  1:06 p.m. CDT)
5          THE VIDEOGRAPHER:  Back on the
6  record at 1:06 p.m.  This is the
7  beginning of Media 12.
8      A.   In response to your question, I
9  don't see any mention of specific features of
10 YouTube in this section on YouTube.
11 BY MS. COATES:
12     Q.   Thank you.
13         And so let's look at the
14 studies that you do cite in this section.
15         I'll mark as Exhibit 47 the
16 Balcombe study that you reference on page 67.
17         (Whereupon, Mojtabai-47, The
18 Impact of YouTube on Loneliness and
19 Mental Health, by Balcombe et al, was
20 marked for identification.)
21     A.   Thank you.
22 BY MS. COATES:
23     Q.   And this is Balcombe et al
24 2023, The Impact of YouTube on Loneliness and
25 Mental Health, Informatics.

Page 603

1          You said in your report at
2  page 67, for the proposition that YouTube is
3  the world's most used streaming platform and
4  hosts numeral [sic] social media communities,
5  correct?
6      A.   That is correct.
7      Q.   And if you turn within the
8  report -- or the study itself, on page 14 of
9  20, Section 6.2 is Limitations.
10         Do you see that?
11     A.   Yes.
12     Q.   And here, the study authors
13 note:  No causal association was established
14 between the use of YouTube and loneliness,
15 slash, mental health issues because of the
16 heterogenous findings and the difficulties of
17 quantifying mental health.
18         Do you see that?
19     A.   I see that sentence.
20     Q.   And heterogenous findings here
21 in this -- as it's used in this study refers
22 that the study they examined found some
23 negative associations between YouTube and
24 mental health, but also some positive
25 associations between YouTube and mental

43 (Pages 600 - 603)

CONFIDENTIAL

Page 604

1  health, particularly as a source of education
2  about mental health and a resource for
3  individuals.
4      Correct?
5      A.   You're reading, I'm sorry, from
6  someplace in the paper?
7      Q.   No.  I'm asking you your
8  understanding of the study and its
9  heterogenous findings.
10      MS. EMMEL:  Objection, compound
11  question.
12      A.   Without reading it, I can't
13  tell if this is what they meant when they
14  said heterogenous findings or looking at the
15  specific section where they talk about.  If
16  you could point me to that, I would
17  appreciate it.
18  BY MS. COATES:
19      Q.   Okay.  If we look in the
20  paragraph above Limitations.
21      A.   Yes.
22      Q.   In the second sentence, the
23  authors write:  There is also support for the
24  potential of YouTube to increase awareness of
25  and access to mental health screening and

Page 605

1  services for vulnerable adolescents.
2  However, there is no evidence to suggest an
3  association between adolescents' digital
4  technology use and an increase in mental
5  health problems.
6      Do you see that?
7      A.   I see that.
8      Q.   And you don't disagree with
9  that statement, correct?
10      MS. EMMEL:  Objection, vague.
11      A.   I do not agree as a blanket
12  statement as it is stated here.
13  BY MS. COATES:
14      Q.   And you cited this study in
15  your report, correct?
16      A.   I did.
17      Q.   And you did not note in your
18  report your disagreement with this study,
19  correct?
20      A.   I did not specify my
21  disagreement or agreement with each
22  individual study in the report.  You are
23  correct.
24      Q.   Okay.  In the next paragraph of
25  your report in Section 6.12, you cite the

Page 606

1  de Bérail 2019 study.
2      Do you see that?
3      A.   I see that.
4      Q.   I'll give you a copy of the
5  de Bérail study.  We can mark it Exhibit 48.
6      (Whereupon, Mojtabai-48, The
7      relations between YouTube addiction,
8      social anxiety and parasocial
9      relationships with YouTubers: A
10      moderated-mediation model based on a
11      cognitive-behavioral framework, by
12      de Bérail et al, was marked for
13      identification.)
14  BY MS. COATES:
15      Q.   This article is titled "The
16  relations between YouTube addiction, social
17  anxiety and parasocial relationships with
18  YouTubers:  A moderated-mediation model based
19  on a cognitive-behavioral framework."
20      Correct?
21      A.   That is correct.
22      Q.   And on page 67 of your report,
23  you described the de Bérail study as:  An
24  international survey study of over 900
25  adolescents and young adults (mean age 21

Page 607

1  years) found that they spend an average of
2  6.3 hours per week on YouTube.
3      Do you see that?
4      A.   Yes.
5      Q.   So the average study
6  participant spent less than an hour a day on
7  YouTube, correct?
8      A.   If you divide it by seven, this
9  is correct.
10      Q.   And do you know how that
11  compared to the amount of time they spent
12  doing other daily activities?
13      A.   If they have stated in the
14  paper, I don't recall.
15      Q.   Okay.  And if you look on that
16  first page, in the column on the right under
17  the abstract.
18      A.   Yes.
19      Q.   The paragraph starts:  YouTube
20  does not possess all the social networking
21  functionalities and is best characterized as
22  a content community within the scope of
23  social media sites.  Whereas SNS -- and
24  that's described -- defined earlier as social
25  networking sites -- are more focused on

44 (Pages 604 - 607)

CONFIDENTIAL

Page 608

1 relationships between users, YouTube is
2 focused on content viewing.
3          Do you see that?
4      A.    I see that.
5      Q.    And you don't dispute the
6 authors' description of YouTube, do you?
7      A.    I think it is vague in saying
8 that -- possess all the social networking
9 functionalities. I mean, what are the all?
10 That is not very clear to me, what they're
11 talking about in terms of social network
12 functionalities.
13          So it says all -- it does not
14 possess all the social network
15 functionalities. It doesn't say what it
16 doesn't include specifically.
17      Q.    And do you know?
18      A.    Well, there are some features
19 on specific social media that I know that are
20 specific to those, like Snapchat has the
21 Snapchat Maps or Streaks, and so those are
22 specific to certain apps.
23          But I don't know when they say
24 all social network functionalities, do they
25 refer to those, or are they -- I don't know.

Page 609

1      Q.    And does YouTube have functions
2 like Snap Maps or Streaks?
3      A.    It doesn't have those.
4      Q.    You cited this study in the
5 report, correct?
6      A.    I did, yes. That report is in
7 my -- that study is on my -- in my report.
8      Q.    And you didn't note in your
9 report any disagreement with the description
10 of YouTube in this study, correct?
11      A.    I did not specify the specifics
12 of each one of the studies in my report, no.
13      Q.    Did you do anything to assess
14 the differences between YouTube and the other
15 social media platforms in this litigation?
16      A.    To the extent of familiarizing
17 myself with the most important features of
18 each one of the platforms and studies that
19 have specifically looked at those specific
20 features, I have.
21      Q.    And where is that analysis in
22 your report?
23      A.    Well, where I talk about -- I
24 mentioned the Snapchat, where I talk about
25 the Snap Maps or Streaks, I talk about that.

Page 610

1          I talk also about the visual
2 nature of Instagram and TikTok, so
3 short-video addiction. Where I talk about
4 that, I talk about those features.
5          So -- and also personalizing of
6 the content for TikTok, I talk about that in
7 the report.
8          So there are places where I
9 specifically talk about specific features of
10 some of these social media apps that are --
11 especially have been studied in terms of the
12 relationship with mental health outcomes.
13      Q.    Okay. So in your answer you
14 just mentioned Snapchat, TikTok, but you did
15 not mention YouTube, correct?
16      A.    I didn't mention YouTube,
17 correct.
18          (Pause.)
19          MS. COATES: I'll come back to
20 it, I can't find it.
21 BY MS. COATES:
22      Q.    And if you turn to page 193 of
23 this study, the de Bérail study --
24      A.    Yes.
25      Q.    -- Section 2.2.1.

Page 611

1      A.    Yes.
2      Q.    And here the authors state:
3 There is currently no specific validated
4 scale to measure YouTube addiction severity.
5          Did I read that correctly?
6      A.    You read it correctly.
7      Q.    Do you disagree with this
8 statement?
9      A.    This study was published in
10 2019. I think there are studies validating
11 the Bergen -- well, I take it back.
12          I'm not aware of any
13 specifically for YouTube.
14      Q.    Thank you.
15          And this study examined social
16 anxiety, parasocial relationships and YouTube
17 addiction that was based on those unvalidated
18 scales, correct?
19      A.    I'm looking at...
20          Can you repeat your question?
21      Q.    The study examined social
22 anxiety, parasocial relationships and YouTube
23 addiction that was based on those unvalidated
24 scales, correct?
25          MS. EMMEL: Objection,

45 (Pages 608 - 611)

CONFIDENTIAL

Page 612

1  foundation.
2      A.   Yeah, I don't think the social
3  anxiety measures are -- they don't talk about
4  social anxiety measures or parasocial
5  relationships as measures that have -- or
6  attachment style as measures that haven't
7  been validated.  They talk about only YouTube
8  severity measures not being validated.
9  BY MS. COATES:
10     Q.   Yes.  My -- okay.  Let me ask.
11         The study examined social
12  anxiety, parasocial relationships, and
13  YouTube addiction where the YouTube addiction
14  was based on the unvalidated scales, correct?
15     A.   That is my understanding.
16     Q.   It does not analyze depression,
17  correct?
18     A.   It's not one of the measures
19  included.
20     Q.   It does not analyze generalized
21  anxiety disorder, correct?
22     A.   To the extent that social
23  anxiety overlaps with generalized anxiety, it
24  might generalize to that condition also,
25  symptoms of generalized anxiety, but it does

Page 613

1  not specifically measure generalized anxiety.
2      Q.   It does not analyze anxiety
3  apart from social anxiety, correct?
4      A.   I don't see any other measures
5  of anxiety besides that measure of social
6  anxiety, the Liebowitz.
7      Q.   It did not analyze any eating
8  disorders, correct?
9      A.   In -- not in this paper, no.
10     Q.   And it did not analyze any
11  suicidal behaviors, suicidal ideation or
12  suicidality, correct?
13     A.   Looking at it...
14         I don't see any measures of
15  suicidality separate from what might be
16  related to social anxiety, so no, I don't see
17  any measures of suicidality.
18     Q.   Thank you.
19         And the authors hypothesized
20  that social anxiety was a driver of what they
21  termed "YouTube addiction," correct?
22     A.   That is -- if you point me to
23  that hypothesis -- oh, yeah.
24         I read the page 1, and just
25  tell me if that's what you mean:  Social

Page 614

1  anxiety will be positively associated with
2  YouTube addiction.
3         That was their first
4  hypothesis.
5      Q.   Thank you.
6         The authors of the de Bérail
7  study stated that participants must be over
8  18 to complete the questionnaire, correct?
9         That's back in Section 2.1 on
10  page 193.
11     A.   2.1 -- okay.  Yeah.
12         (Document review.)
13     A.   Participants must be over 18 to
14  complete the questionnaire, yes.
15  BY MS. COATES:
16     Q.   And if we turn to page 199,
17  Section 4.3.
18     A.   Yes.
19     Q.   Under Section 4.3, the second
20  paragraph, the authors noted, as a
21  limitation, that future research should be
22  conducted among adolescents and middle and
23  high schools to enhance the generalizability
24  of the findings -- of the current findings,
25  correct?

Page 615

1      A.   That's what they state.
2      Q.   And if you look at the last
3  paragraph before Section 4.4, the authors
4  also note that the study uses only
5  cross-sectional data, correct?
6      A.   That is correct.
7      Q.   Okay.  We can put that one
8  aside, and I'm going to mark the next study
9  that you looked at as -- Klobas 2018 as
10  Exhibit 49.
11         (Whereupon, Mojtabai-49,
12     Compulsive YouTube usage: A comparison
13     of use motivation and personality
14     effects, by Klobas et al, was marked
15     for identification.)
16     A.   Thank you.
17  BY MS. COATES:
18     Q.   This article is titled
19  "Compulsive YouTube usage:  A comparison of
20  use motivation and personality effects."
21         The study administered a survey
22  questionnaire to a convenience sample of
23  Malaysian university students, correct?
24     A.   The description of the sample
25  you provided is -- I'm looking for -- to find

46 (Pages 612 - 615)

CONFIDENTIAL

Page 616

1  that.
2         Participants...
3         (Document review.)
4  BY MS. COATES:
5     Q.    It's under Section 3.2.
6     A.    Yeah.  They don't mention, as
7  you said, convenience --
8     Q.    If you look in the second
9  paragraph.
10    A.    Yeah.
11    Q.    A convenience sample was taken
12  in person --
13    A.    I see that.
14    Q.    -- from students at different
15  locations across the university.
16        Do you see that?
17    A.    I see that.  Yes, I see that.
18    Q.    Okay.  And in your report on
19  page 67, you write:  These authors
20  distinguished between "compulsive use" of
21  YouTube and "YouTube addiction."  Compulsive
22  use was defined by users' inability to limit
23  their use, while addictive use was defined by
24  the need to increase interactions for
25  gratification, and experiencing significant

Page 617

1  negative effects of such use on physical or
2  mental health, relationships, or other
3  aspects of their life in addition to
4  compulsive use.  Thus, compulsive use is part
5  of addictive use, but addictive use
6  encompasses a much more extensive involvement
7  with the platform and its adverse outcomes.
8        Correct?
9     A.    That's what I write here.
10    Q.    Okay.  And while the authors do
11  make that distinction in the section on
12  compulsive use, 2.2, the study itself reports
13  only on compulsive use and does not report on
14  addiction, correct?
15    A.    If you give me a moment to look
16  at it.
17        MS. COATES:  Go off the record,
18  please.
19        THE WITNESS:  Sure.
20        THE VIDEOGRAPHER:  We're off
21  the record at 1:28 p.m.  This is the
22  end of Media 12.
23        (Recess taken, 1:28 p.m. to
24  1:30 p.m. CDT)
25        THE VIDEOGRAPHER:  We're back

Page 618

1  on the record at 1:30 p.m.  This is
2  the beginning of Media 13.
3     A.    Here, I was looking to see if
4  they have entered this measure as a
5  continuous measure into the analysis, in
6  which case they're looking at to see the
7  different levels of severity; they would be
8  able to examine that association with the
9  outcomes.  That was why I was looking at
10  this.
11  BY MS. COATES:
12    Q.    And did they do that?
13    A.    It seems to me that they have
14  actually analyzed it as continuous because
15  they talk about linear regression.
16    Q.    They only report on --
17  compulsive use as an outcome, correct?
18    A.    A measure of compulsive use,
19  but they have attempted to do some
20  psychometrics for here to --
21    Q.    This study explored the
22  association with motivated -- of what
23  motivated someone to use YouTube and what the
24  authors identified as a compulsive use,
25  correct?

Page 619

1     A.    Yeah, it is compulsive use.
2  That's what they mention.
3     Q.    And the study also explored the
4  association of different personality traits
5  and what the authors identified as compulsive
6  use, correct?
7     A.    That is correct.
8     Q.    And the study also explored the
9  association of what the authors identified as
10  compulsive use with academic motivation,
11  correct?
12    A.    That's another, that's correct.
13    Q.    And the study did not explore
14  any association of any mental health outcome
15  and what the authors identified as compulsive
16  use, correct?
17    A.    I'm looking at to see if they
18  have included any measures of mental health.
19        I don't see any measures of
20  mental health, so that's correct.
21    Q.    Okay.  And lastly, you cite a
22  series of studies for the proposition --
23        This is on page 68 of your
24  report.
25    A.    Yes.

47 (Pages 616 - 619)

CONFIDENTIAL

Page 620

1    Q.    That much of the past research
2  on the mental health impact of YouTube
3  exposure examined the impact of this app
4  along with other short-form videos.  And you
5  cite three studies, Zhu 2024, Wu 2021 -- four
6  studies, I'm sorry -- Yu -- oh, no, three --
7  and Yu et al 2024.
8         Did you do anything to verify
9  that the study participants examined the
10  impact of YouTube along with other -- the
11  study authors examined the impact of YouTube
12  along with other short-form video apps as
13  part of these studies that you cited here?
14        MS. EMMEL:  Objection, vague
15     and compound.
16    A.    Yeah, can you paraphrase
17  what -- the question?
18  BY MS. COATES:
19    Q.    Did any of these -- did you do
20  anything to verify that these studies
21  actually looked at the impact of YouTube
22  along with other short-form video apps as
23  part of these studies as you say in your
24  report on page 68?
25        MS. EMMEL:  Same objections.

Page 621

1    A.    I believe they report
2  short-term -- short-form video apps, and they
3  include these four apps -- three apps,
4  TikTok, Instagram and YouTube, in their
5  studies.
6         Here I say that they look at
7  the short-form video use, but I don't recall
8  if I looked at each one of them to see what
9  they had --
10  BY MS. COATES:
11    Q.    Okay.  I'm going to mark these
12  and give them --
13        MS. EMMEL:  Excuse me, you
14     didn't let him finish his answer.
15    A.    Yeah, I didn't look to see
16  if -- verify, as you say, that each one of
17  them have identified YouTube as one of those
18  short-video apps.
19        MS. COATES:  Okay.  I'm very
20     short on time, so I'm going to mark
21     these as three exhibits, and I just
22     have two questions.
23         So why don't we go off the
24     record so you can look at these.
25        THE WITNESS:  Sure.

Page 622

1        MS. COATES:  And then once
2  you're done with them, I'll finish my
3  questions.
4        THE VIDEOGRAPHER:  All right.
5  We're off the record at 1:34 p.m.
6  That's the end of Media 13.
7        (Recess taken, 1:34 p.m. to
8  1:39 p.m.)
9        (Whereupon, Mojtabai-50, The
10  relationship between short-form video
11  use and depression among Chinese
12  adolescents: Examining the mediating
13  roles of need gratification and
14  short-form video addiction, by Zhu
15  et al, was marked for identification.)
16        (Whereupon, Mojtabai-51, The
17  Relationship Between Social Short-Form
18  Videos and Youth's Well-Being: It
19  Depends on Usage Types and Content
20  Categories, by Wu et al, was marked
21  for identification.)
22        (Whereupon, Mojtabai-52, The
23  association between problematic short
24  video use and suicidal ideation and
25  self-injurious behaviors: The

Page 623

1  mediating roles of sleep disturbance
2  and depression, by Yu et al, was
3  marked for identification.)
4        THE VIDEOGRAPHER:  We're back
5  on the record at 1:39 p.m.  This is
6  the beginning of Media 14.
7  BY MS. COATES:
8    Q.    Dr. Mojtabai, all of these
9  studies on short-form video apps, the Zhu, Wu
10  and Yu studies, were conducted in China,
11  correct?
12    A.    That is correct.
13        MS. EMMEL:  Objection,
14     compound.
15  BY MS. COATES:
16    Q.    Do you know if YouTube is
17  available in China?
18    A.    That is a good question.  I
19  don't have the answer.  I don't know the
20  answer.
21        MS. COATES:  Okay.  Thank you
22     very much.  Those are all my questions
23     for you today.  Let's go off the
24     record.
25        THE VIDEOGRAPHER:  We're off

48 (Pages 620 - 623)

Page 624

1  record at 1:39 p.m.  This is the end
2  of Media 15.
3         (Recess taken, 1:39 p.m. to
4  1:47 p.m.)
5         (Whereupon, Mojtabai-53, "Oh
6  Snap!": A Mixed-Methods Approach to
7  Analyzing the Dark Side of Snapchat,
8  by Dunn et al, was marked for
9  identification.)
10        (Whereupon, Mojtabai-54,
11  Digital stress within early
12  adolescents' friendships - A focus
13  group study from Belgium, by De Groote
14  et al, was marked for identification.)
15        (Whereupon, Mojtabai-55,
16  Duplicate of Exhibit 54, was marked
17  for identification.)
18        (Whereupon, Mojtabai-56,
19  Transforming Society and Organizations
20  through Gamification, by Spanellis
21  et al, was marked for identification.)
22        (Whereupon, Mojtabai-57, How It
23  Feels to Be "Left on Read": Social
24  Surveillance on Snapchat and Young
25  Individuals' Mental Health, by

Page 625

1  Vanherle et al, was marked for
2  identification.)
3         (Whereupon, Mojtabai-58,
4  Snapchat Streaks - How are these forms
5  of gamified interactions associated
6  with problematic smartphone use and
7  fear of missing out among early
8  adolescents, by van Essen, was marked
9  for identification.)
10        (Whereupon, Mojtabai-59,
11  Snapchat Elicits More Jealousy than
12  Facebook: A Comparison of Snapchat and
13  Facebook Use, by Utz et al, was marked
14  for identification.)
15        THE VIDEOGRAPHER:  We're back
16  on the record at 1:47 p.m.  It's the
17  beginning of Media 15.
18        ------------
19         EXAMINATION
20        ------------
21  BY MR. MAJOR:
22     Q.    Good afternoon, Dr. Mojtabai.
23  My name is John Major.  I'm from Munger
24  Tolles & Olson.  I'm from Snap Inc., the
25  maker of Snapchat.  I have just a few

Page 626

1  questions for you.
2     A.    Sure.
3     Q.    Dr. Mojtabai, do you personally
4  have a Snapchat account?
5     A.    I don't.
6     Q.    Have you ever used Snapchat?
7     A.    I have not.
8     Q.    In forming your opinions in
9  this case about Snapchat, did you conduct any
10  hands-on testing of the Snapchat app?
11     A.    I have not, but I have seen
12  YouTube videos of it and read about it.
13     Q.    What did you do to learn about
14  how Snapchat works in connection with
15  providing your opinions in this case?
16     A.    As I said, I looked at YouTube
17  videos on how Snapchat works and I have read
18  the literature, including those that are
19  here.
20     Q.    Anything else?
21     A.    I can't think of anything else
22  that -- that's about it.
23     Q.    About how long did you spend
24  watching YouTube videos of Snapchat?
25     A.    I really can't put a time on

Page 627

1  it.  Not very long.
2     Q.    Under ten minutes?
3     A.    No, no, it was more than that.
4     Q.    Under an hour?
5     A.    I would say an hour or so.
6     Q.    Okay.
7     A.    Or maybe a little bit more,
8  because there are different videos you can
9  find on YouTube.
10     Q.    Sure.
11        When a user opens Snapchat on
12  their phone, what part of the app do they
13  initially see?
14     A.    I'm not sure.
15     Q.    And could you explain to me at
16  a high level the different tabs or sections
17  of the Snapchat app?
18     A.    From what I have seen on
19  YouTube, I think there is a My section or
20  what is called My Page or something that's
21  specific to the user.  And then there are
22  other feeds.
23     Q.    Do you know how much time
24  Snapchat users, on average, spend using
25  different features of the Snapchat app?

49 (Pages 624 - 627)

CONFIDENTIAL

Page 628

1    A.    I don't know the time.
2    Q.    Did you ask for that
3  information in connection with presenting
4  your opinions?
5    A.    I did not ask for that
6  information, nor did I see any literature
7  specifically separating different uses.
8    Q.    Do you know how much time
9  Snapchat users spend messaging with friends
10  versus engaging with other parts of the
11  Snapchat platform?
12    A.    I do not because that's a
13  use -- I didn't specifically look for this
14  breakdown.  I don't know if the company
15  probably has it or provides information on
16  that, but I haven't seen that.
17    Q.    What percentage of your annual
18  income in 2024 came from expert witness work?
19    A.    I'm going to give you an
20  estimate because I'm not sure exactly.  But
21  it should be about 10 to 15%.
22    Q.    And then what percentage of
23  your income so far this year has come from
24  expert witness work?
25    A.    Well, I have submitted one --

Page 629

1  my last invoice, and I haven't received any
2  payment for that.  I would say around 8, 7%
3  or so.
4    Q.    Are you affiliated with any
5  organizations or firms that try to find you
6  other expert witness work?
7    A.    Any firms that find expert
8  witness?  No, I'm not familiar with them.
9    Q.    There are firms that sort of
10  you'll affiliate with and then they'll try to
11  help you find assignments as an expert.
12       Are you affiliated with any of
13  those?
14    A.    I'm not familiar even with
15  firms like that.
16    Q.    One of your opinions in this
17  case is that problematic social media use and
18  social media addiction are substantial
19  contributing causes of adverse mental health
20  outcomes.
21       Is that a fair high-level
22  overview of one of your opinions?
23    A.    That is fair representation,
24  yes.
25    Q.    Have you reached out to any

Page 630

1  public health authorities to alert them to
2  that opinion?
3    A.    I think there are plenty of
4  advisories and warnings or messages from
5  public health agencies, including Surgeon
6  General, American Psychological Association
7  regarding this.
8       MR. MAJOR:  Move to strike as
9    nonresponsive.
10  BY MR. MAJOR:
11    Q.    I'm asking you a slightly
12  different question, which is:  Have you
13  personally reached out to any public health
14  authorities to alert them to the opinions
15  you've reached in this case?
16       MS. EMMEL:  Asked and answered.
17    A.    No.
18  BY MR. MAJOR:
19    Q.    Have you reached out to any
20  media organization to alert them to the
21  opinions you've reached in this case?
22    A.    I don't think it's appropriate,
23  since I'm engaged in a legal case, to reach
24  out to media or public outlets.  I considered
25  that not something that I should be even

Page 631

1  doing.
2    Q.    So the answer is no?
3    A.    No.
4    Q.    Have you recommended that any
5  of your patients bring a lawsuit alleging
6  they were harmed as a result of using social
7  media?
8    A.    No.
9    Q.    You didn't recommend that any
10  particular plaintiff in this lawsuit should
11  bring claims relating to their use of social
12  media; is that fair?
13    A.    I don't know of any of the
14  plaintiffs, and as such, no.
15    Q.    In the course of your career,
16  have you become familiar with Surgeon General
17  reports?
18    A.    Yes.
19    Q.    You don't rely on Surgeon
20  General reports in the course of your
21  everyday psychiatry practice, do you?
22    A.    I don't rely on them, but I
23  look at them and read them.  They provide
24  overviews of concerns that are public health
25  concerns for the population, so yes.

CONFIDENTIAL

Page 632

1    Q.    And we touched on this briefly
2 a moment ago.  You didn't review any
3 materials relating to the specific plaintiffs
4 in this litigation, correct?
5    A.    No.  That's correct, yes.
6    Q.    You never examined or treated
7 any of the individual plaintiffs in this
8 litigation?
9    A.    No, I didn't.
10    Q.    Your opinions aren't based in
11 any way on any specific information relating
12 to the individual plaintiffs in this case; is
13 that fair?
14    A.    No, I don't know any of the --
15 or I'm not privy to any of the information.
16    Q.    You would agree with me, I
17 think, that social media can serve positive
18 functions in certain circumstances, such as
19 staying connected with friends and family; is
20 that fair?
21    A.    In certain circumstances, yes,
22 and in certain people, groups of people, yes.
23    Q.    And you believe that in
24 moderation and with guidance, social media
25 can be a healthy part of adolescent

Page 633

1 development; is that fair?
2        MS. EMMEL:  Objection, vague
3    and ambiguous.
4    A.    Again, for the proportion of
5 adolescents, I believe that is the case.
6 BY MR. MAJOR:
7    Q.    You don't believe social media
8 should be banned entirely, do you?
9    A.    Oh, I don't think it's even
10 possible.
11    Q.    But you don't believe social
12 media should be banned entirely?
13    A.    No, I don't believe that.
14    Q.    So, Dr. Mojtabai, in your
15 report you discuss certain research studies
16 that focus specifically on individual social
17 media platforms; is that right?
18    A.    Yeah.
19    Q.    And as YouTube's counsel asked
20 you, you discussed those platform-specific
21 studies in Section 6 of your report that
22 starts on page 55 of Exhibit 5, correct?
23    A.    That's correct.
24    Q.    And if you could turn in your
25 report to Section 6.11, which is titled "The

Page 634

1 'dark side' of Snapchat."
2    A.    Yes.
3    Q.    That's a section where you
4 specifically talk about Snapchat, right?
5    A.    That is correct.
6    Q.    And that section includes all
7 of the Snapchat-specific studies that you
8 relied on in forming your opinions, correct?
9        MS. EMMEL:  Objection, vague.
10    A.    Yeah, the studies that I
11 reviewed and I thought were relevant, I
12 included here.
13 BY MR. MAJOR:
14    Q.    Okay.  So the only studies that
15 you relied on that focused specifically on
16 Snapchat that you decided were relevant are
17 the ones discussed in Section 6.11 of your
18 report; is that true?
19        MS. EMMEL:  Objection, vague,
20    misstates testimony.
21    A.    As I mentioned, I have
22 considered a lot of studies.  I've looked at
23 different -- considered also a lot of other
24 material, including company documents.  But I
25 relied on these studies for writing this

Page 635

1 section.
2 BY MR. MAJOR:
3    Q.    So the only Snapchat-specific
4 studies that you cite and discuss in your
5 report are in Section 6.11 of the report; is
6 that fair?
7        MS. EMMEL:  Objection,
8    misstates testimony.
9    A.    There might be other sections
10 where I talk about specific features of
11 Snapchat or studies that included or
12 mentioned specifically that we looked at
13 Snapchat.
14 BY MR. MAJOR:
15    Q.    Sure.
16    A.    But I'm not right now -- I
17 don't know where they would be in this
18 report.
19    Q.    So the Snapchat-specific
20 studies that you're aware of as you sit here
21 today would be discussed in Section 6.11?
22    A.    I would think so, yes.  Yes.
23 There might be, as I said, other studies that
24 include Snapchat or refer to it, and they're
25 in other parts of the report.

51 (Pages 632 - 635)

Page 636

1    Q.    That's fair.
2         But the ones that are specific
3    to Snapchat would be discussed here?
4    A.    That's correct.
5    Q.    And we've marked the studies
6    that are discussed in that section of the
7    report as Exhibits 53 through Exhibit 59.
8    I'd note that the De Groote study was marked
9    twice as Exhibit 54 and Exhibit 55.
10   A.    Yes.
11   Q.    You had an opportunity to
12   review those briefly off the record.
13        Would you agree with me all of
14   those studies are either qualitative focus
15   group studies or cross-sectional studies?
16   A.    I would say that most of them
17   were cross-sectional studies, and a few --
18   just one of them maybe was focus group and
19   another one was a qualitative.  So most were
20   quantitative studies.
21   Q.    And as we've talked about,
22   cross-sectional studies generally can't
23   establish directionality or causation,
24   correct?
25   A.    They can support it, but they

Page 637

1    cannot establish, generally.
2    Q.    And studies involving focus
3    group interviews like the studies in this
4    group also cannot establish directionality or
5    causation; is that fair?
6    A.    I don't think that focus groups
7    are exploring directionality or causation
8    specifically.  They provide information that
9    can be used in future studies, support what
10   you find in other studies, like in these
11   studies, one of them is a mixed method, or
12   illuminate what you have found in a
13   quantitative study.  They can be very
14   helpful, and they're essential in the
15   research.
16   Q.    Thank you, that's helpful.
17        So none of the six studies that
18   we've had marked that are discussed in
19   Section 6.11 are able to establish
20   directionality or causation in terms of
21   Snapchat potentially causing mental health
22   harms.
23        Is that a fair statement about
24   those studies?
25        MS. EMMEL:  Objection, vague,

Page 638

1    compound.
2    A.    So they do provide --
3    specifically, studies that look at the
4    features of Snapchat, like Snap Map or
5    Streaks, they do provide evidence that is
6    beyond just a cross-sectional study because
7    they highlight a mechanism -- a potential
8    mechanism of harm.
9         So that is going with what
10   Bradford Hill would say is specificity.  The
11   specificity is you identify two variables
12   that are related, but you identify, for
13   example, a mechanism or a subgroup of people
14   who are specifically affected by that -- by
15   that cause, causal factor.
16        And some of the studies do
17   provide information like that about specific
18   features of Snapchat.
19        MR. MAJOR:  I'll move to strike
20        as nonresponsive.
21   BY MR. MAJOR:
22   Q.    My question is a little bit
23   different, which is:  I understand they may
24   establish a mechanism, but these studies that
25   we're talking about here don't establish

Page 639

1    directionality or causation on their own.
2    They may establish the mechanism, but they
3    don't establish causation, fair?
4         MS. EMMEL:  Objection, vague,
5         compound.
6    A.    The mechanism is part of the
7    causation.  When we look at causation, we see
8    the two variables are related, first of all.
9    Then we look at the other elements that help
10   us establish a causal relationship.
11        As I mentioned, Bradford Hill
12   has a set of criteria or guidelines, really.
13   There are other guidelines as well.
14        But this is one of -- one of
15   the guidelines.
16        But mechanisms provide
17   specifically how variable A is related to
18   variable B, and sometimes mechanisms make it
19   more plausible that the cause of direction is
20   going from one to the other.
21        So not all cross-sectional
22   studies are the same.  Some of them establish
23   mechanisms and they provide more causal
24   information.
25        Do they establish causal --

52 (Pages 636 - 639)

CONFIDENTIAL

Page 640

1  causation?  I don't think one study can ever
2  establish beyond a doubt or be definitive
3  proof of causality.  It's the aggregate.
4  BY MR. MAJOR:
5      Q.    Let's actually talk about some
6  of the specific studies.  So I'd ask you to
7  get Exhibit 53 in front of you.
8      A.    Right.
9      Q.    It's the Dunn and Langlais
10  study.
11      A.    Uh-huh.
12      Q.    So this is a 2021 article by
13  Dunn and Langlais.  It's titled A
14  Mixed-Methods Approach to Analyzing the Dark
15  Side of Snapchat.
16          Do you see that?
17      A.    Yes, I do.
18      Q.    And it involved a qualitative
19  and quantitative analysis of the dark side of
20  Snapchat, right?
21      A.    Yes, it is.
22      Q.    And then I'd ask you to look at
23  page 97 of the study, hence the heading of
24  Limitations.
25      A.    97, yes.

Page 641

1      Q.    And a few lines down, fourth
2  line down, it says:  Second, a one-time
3  online survey, while informative, is limited.
4          Do you see that?
5      A.    Yes.
6      Q.    And then if you turn back to
7  page 83, the authors write, third line
8  towards the end --
9      A.    83, I'm sorry.
10      Q.    Yeah, go ahead.
11      A.    Okay.
12      Q.    From the regression results, it
13  appears that spending time on Snapchat is
14  related to lower levels of mental health,
15  regardless of age, gender, ethnicity, and
16  sexual orientation.  It could also be that
17  individuals with lower levels of mental
18  health spend more time on Snapchat.
19          Do you see that?
20      A.    That is -- I do see that.
21      Q.    So what the authors are saying
22  there is based on the study design, they
23  couldn't tell whether more time on Snapchat
24  caused lower levels of mental health or
25  whether individuals with preexisting lower

Page 642

1  levels of mental health spent more time on
2  Snapchat; is that fair?
3          MS. EMMEL:  Objection,
4      compound.
5      A.    Here they're talking about the
6  amount of time on Snapchat.  They're not
7  talking about specific mechanisms.
8  BY MR. MAJOR:
9      Q.    Correct.  And they're saying
10  they couldn't tell whether individuals that
11  spent more time had lower -- caused lower
12  levels of mental health or individuals with
13  lower levels of mental health spent more
14  time.  They couldn't tell directionality,
15  correct?
16      A.    That is what they are saying,
17  yes.
18      Q.    Let's turn to De Groote.
19  That's Exhibit 54 and Exhibit 55, but we'll
20  just use 54.
21      A.    Okay.
22      Q.    Looking at page 1 in the
23  abstract, this study involved 51 secondary
24  school students in the Dutch-speaking
25  community in Belgium; is that right?

Page 643

1      A.    That's correct.
2      Q.    And if you go to page 9, under
3  Limitations.
4      A.    Yes.
5      Q.    The authors -- the authors
6  write, the fourth line:  Second, our
7  participants were recruited in two high
8  schools in Flanders, Belgium.  Therefore, the
9  results of the study are not generalizable to
10  the entire population of youth.
11          Do you see that?
12      A.    I see that.
13      Q.    Any reason to disagree with
14  that statement?
15      A.    I think it could be qualified
16  more, or looking at it, we could identify
17  whether recruitment from these schools was,
18  like, in a random manner so that the samples
19  are representative of those schools or not.
20          Because if they are, then one
21  could argue that they may be generalizable to
22  students in schools.
23      Q.    And I'll back you up just one
24  sentence in Section 6, the second line there.
25  It says:  First, we conducted our study among

53 (Pages 640 - 643)

CONFIDENTIAL

Page 644

1  a convenience sample of adolescents who
2  self-selected to participate in this study on
3  social media.
4          Do you see that?
5      A.   Yeah.
6      Q.   You'd agree that's not a
7  randomized sample, right?
8      A.   As in focus groups, that is not
9  a randomized sample, no.
10     Q.   And so you'd agree that the
11 results of this study are not generalizable,
12 correct?
13     A.   Focus groups are not producing
14 generalizable results in general and
15 typically. So as much, I agree with you.
16     Q.   Thank you.
17          Let's go to Exhibit 56. It
18 should be the book chapter by Hristova and
19 Lieberoth that you cite in Section 6.11 of
20 your report.
21     A.   I think I lost that one.
22     Q.   This is the cover, if it helps.
23     A.   Let me see. Oh, yeah.
24     Q.   So this is more of a conceptual
25 theoretical analysis rather than an empirical

Page 645

1  study, right?
2      A.   That's correct.
3      Q.   There's no data sample or
4  participant sample or statistical analysis,
5  correct?
6      A.   That is correct, but they do
7  review features, like gamification of social
8  media and studies that have looked at that.
9      Q.   Yes. And nowhere in this
10 chapter, at least, do the authors claim that
11 features like Snapchat Streaks caused
12 depression or anxiety or addiction or any
13 other mental health disorder, correct?
14          MS. EMMEL: Objection,
15      compound.
16     A.   I'm looking at the place where
17 they talk about Streaks. Quick look.
18          (Document review.)
19     A.   So here: However,
20 psychological research -- they talk about a
21 Meshi article on page 231 -- psychological
22 research has hinted that, through their daily
23 iterative reward structure, Streaks reinforce
24 repeated and potentially problematic use of
25 the platform.

Page 646

1          Indeed -- it goes on: Indeed,
2  research among Viennese adolescents reveals
3  that keeping a Streak alive may be perceived
4  as stressful -- and they refer to Hristova, I
5  think it's in my pile of studies, Salomon and
6  Hristova.
7          So that is --
8  BY MR. MAJOR:
9      Q.   And let me --
10         MS. EMMEL: He wasn't finished.
11     A.   Yeah, that is -- what I was
12 going to suggest is that they talk about what
13 they know or the literature that they know
14 about mental health outcomes associated
15 with -- with some specific features of
16 Snapchat.
17 BY MR. MAJOR:
18     Q.   That's helpful.
19         And let me just go back to my
20 question, narrow it a little bit.
21         Nowhere in the chapter do the
22 authors claim that features like Snapchat
23 Streaks caused mental disorders; is that
24 fair?
25     A.   Again, I don't see anywhere

Page 647

1  where they make that statement.
2      Q.   Let's go to Exhibit 57.
3      A.   Yes.
4      Q.   This is a Vanherle study titled
5  How it Feels to be "Left on Read."
6          Do you see that?
7      A.   On read, yes.
8      Q.   Let's turn to page 12. It's
9  actually -- it's not numbered, but it's
10 towards the end of the substance. I'm going
11 to the Limitations section.
12     A.   Limitations, yes.
13     Q.   And under Limitations, it says:
14 First, this study used a snowball sampling
15 approach to recruit participants, and
16 although this approach eases the sampling
17 process, it remains impossible to determine
18 sampling errors and generalize the results
19 across a population.
20         Do you see that?
21     A.   I see.
22     Q.   Any reason to disagree with
23 that statement?
24     A.   I just want to say that
25 snowball sampling is a recognized method for

54 (Pages 644 - 647)

CONFIDENTIAL

Page 648

1 sampling, especially for hard-to-sample
2 populations.
3     Q.    Understood.
4         But going back to my question:
5 Any reason to disagree with this statement
6 that, at least here in this study, the
7 snowball sampling approach made it impossible
8 to determine sampling errors and generalize
9 the results across a population?
10     A.    Again, they could have looked
11 at the generalizability or whether it's a
12 representative sample -- is an empirical
13 question.  So you could also look at the
14 population of students in that sampling frame
15 to see if they are similar to those who are
16 sampled or not.
17         So it doesn't necessarily make
18 it impossible.  They were not able to do
19 that.
20     Q.    Understood.
21         So in this study, they were not
22 able to do that?
23     A.    Yeah.
24     Q.    And then in the second
25 paragraph here towards the middle, there's a

Page 649

1 sentence that reads:  Moreover, given that
2 ESM, experience sampling methods, consist of
3 multiple assessments per day, it would be
4 possible to specify the directions of the
5 tested associations and prove causality,
6 which was impossible in our cross-sectional
7 design.
8         Do you see that?
9     A.    Proving causality, I agree with
10 that statement.  It is not possible to do it
11 in one study even if it doesn't have
12 limitations that they mention.
13     Q.    Okay.  Let's go to Exhibit 58.
14 This is an article by Christina M. van Essen
15 and Joris Van Ouytsel titled "Snapchat
16 streaks - How are these forms of gamified
17 interactions associated with problematic
18 smartphone use and fear of missing out among
19 early adolescents?"
20         Do you have that in front of
21 you?
22     A.    Yes.
23     Q.    Are you familiar with the
24 authors here?
25     A.    Van Essen and Ouytsel, no, I'm

Page 650

1 not.
2     Q.    But you did choose to cite this
3 in your report; is that fair?
4     A.    Yeah, it is -- it is
5 referenced.
6     Q.    Anything in the study that you
7 disagree with that you know of?
8         (Sotto voce document review.)
9     A.    I do not disagree with anything
10 that is stated here in the -- at least in
11 what I read right now.
12 BY MR. MAJOR:
13     Q.    Okay.  But --
14     A.    But I want to make this point
15 that this is actually one of those studies
16 that has looked at the specific features.  So
17 it goes beyond just the cross-sectional
18 study.
19     Q.    Sure.
20         Let's go to page 4 towards the
21 bottom of the right-hand column.
22     A.    Yes.
23     Q.    And there the authors write:
24 The engagement in Snapchat streaks might, in
25 fact, be part of a normative communication

Page 651

1 process of the adolescent population -- it
2 continues on to page 5 -- not necessarily
3 driven, in strong degrees, by FOMO,
4 problematic smartphone use, and social media
5 self-control.  Our study does contribute to
6 the cumulative evidence that these novel
7 forms of interpersonal communication do not
8 necessarily have to be understood from a risk
9 perspective and that the public concern about
10 these gamified forms of interpersonal
11 communication may be overstated.
12         Do you see that?
13     A.    I see that.
14     Q.    Any reason to disagree with
15 that statement?
16     A.    I believe, going back to what
17 they found, I'm going to read.  They say
18 problematic smartphone use was associated
19 with the engagement in Snapchat Streaks.
20 Lastly, FOMO, problematic smartphone use and
21 social media self-control were correlated
22 with the number of people and the number of
23 days adolescents maintained Snapchat Streaks
24 with, albeit being a weak relationship.
25         So that found some things, some

55 (Pages 648 - 651)

Page 652

1 associations specifically with the Streaks,
2 and although Streaks might be beneficial for
3 some adolescents, I think the likelihood of
4 harm is found in their study. I don't know
5 what they would say, it's just a part of
6 normal development.
7    Q.   I understand.
8        So they conducted the study,
9 they saw their data, and then they wrote that
10 their study contributes to the cumulative
11 evidence that novel forms of interpersonal
12 communication do not necessarily have to be
13 understood from a risk perspective, and the
14 public concern about these gamified forms of
15 interpersonal communication may be
16 overstated.
17        That's what they said, right?
18    A.   What I'm saying is that their
19 findings are not consistent with their
20 overall conclusions.
21    Q.   So you disagree with the
22 authors' interpretation of their own data; is
23 that fair?
24    A.   I do.
25    Q.   Let's go to Exhibit 59. This

Page 653

1 is the Utz study.
2        MS. EMMEL: I don't believe I
3    have that one.
4        MR. MAJOR: Oh, I'm sorry.
5    There you go.
6        MS. EMMEL: Thank you.
7 BY MR. MAJOR:
8    Q.   This is a 2015 study that
9 compares Snapchat and Facebook in terms of
10 romantic jealousy; is that right?
11    A.   It is.
12    Q.   It involved, if you look at
13 page 143 under Method and Participants, 77
14 participants, mostly from Europe; is that
15 right?
16    A.   I'm looking at the
17 participants, was -- yes.
18    Q.   Average age, 22 years old?
19    A.   Yes.
20    Q.   That sort of sample is not
21 representative of adolescents in general or
22 adolescents in the US; is that fair?
23    A.   It is more representative of
24 emerging adults or young adults, as you say.
25    Q.   And you can take a moment to

Page 654

1 look at it if you need to. If we need to go
2 off the record, we can. But nowhere in this
3 paper do the authors suggest that Snapchat
4 use leads to anxiety, depression or any other
5 diagnosable psychological condition; is that
6 fair?
7        MS. EMMEL: And for the record,
8    we don't need to go off the record.
9    He takes very little time to review
10    these things. I understand time is
11    running short, but he can review on
12    the record.
13        THE WITNESS: I'm sorry, can
14    you repeat your question?
15 BY MR. MAJOR:
16    Q.   Nowhere in this paper do the
17 authors suggest that Snapchat use leads to
18 anxiety, depression or any other diagnosable
19 mental disorder, correct?
20        (Document review.)
21    A.   The outcome they were examining
22 was jealousy, was not mental health.
23 BY MR. MAJOR:
24    Q.   So the answer to my question --
25 let me just ask the question again.

Page 655

1        Nowhere in this paper do the
2 authors suggest that Snapchat use leads to
3 anxiety, depression or any other diagnosable
4 mental disorder; is that right?
5        MS. EMMEL: Asked and answered.
6    A.   As I said, this is a study of
7 jealousy, and as such, it does not assess
8 depression, anxiety or other mental health
9 outcomes.
10        MR. MAJOR: Go off the record.
11        THE VIDEOGRAPHER: We're off
12    the record at 2:17 p.m. That's the
13    end of Media 15.
14        (Recess taken, 2:17 p.m. to
15    2:21 p.m. CDT)
16        THE VIDEOGRAPHER: We're back
17    on the record at 2:22 p.m., this is
18    the beginning of Media 16.
19        ------------
20        EXAMINATION
21        ------------
22 BY MS. CHARLES:
23    Q.   Dr. Mojtabai, my name is Amber
24 Charles. I represent Meta Platforms, and I
25 want to thank you for your time. I know it's

56 (Pages 652 - 655)

CONFIDENTIAL

Page 656

1  been a long day and we appreciate the
2  patience, and I'll try to be as quick as
3  possible.
4         I know when we were off the
5  record you pulled out Exhibit 30. Could you
6  take a look at that?
7     A.    Yes.
8     Q.    Exhibit 30 is your materials
9  considered list?
10    A.    Yes.
11    Q.    Okay. And this is the most
12 recent version that your counsel shared with
13 us last night?
14    A.    If so, that is the most recent.
15    Q.    Okay. I'll trust your
16 counsel's representation on that. I think
17 that's what we marked it as.
18        Could you turn to entry
19 number 983. I don't believe the document has
20 page numbers, but those numbers help.
21    A.    83. Yes.
22    Q.    Okay. You see entry 983?
23    A.    Yes.
24    Q.    It's identified as a
25 Meta-produced document?

Page 657

1     A.    It states so.
2     Q.    Okay. And if you flip through,
3  you've got about 14 pages to flip through,
4  can you flip through to entry 1630?
5     A.    1630, yes.
6     Q.    Do you have that in front of
7  you?
8     A.    Yes.
9     Q.    That's another Meta-produced
10 document?
11    A.    Yes.
12    Q.    That's the last document on
13 your list that's identified as a
14 Meta-produced document?
15    A.    Yes. After that it goes to
16 MT-IG, which I don't know if it is also Meta
17 or not.
18    Q.    Okay. So if I've done my math
19 right, that's 648 documents between 1630 and
20 983?
21    A.    983 and 16 -- yes.
22    Q.    How many of those 650 documents
23 produced by Meta have you read?
24    A.    I should say many of them are
25 brief e-mails. I may have just looked at

Page 658

1  them and, you know, because I didn't pay much
2  attention to e-mails or internal documents.
3  I didn't look at them.
4         So the ones that included data
5  or a survey or a survey result, I read, but
6  not -- I didn't read everything.
7     Q.    Okay. So you actually cite in
8  your report approximately 20 Meta documents.
9         Did you -- after reviewing, did
10 you identify the other 630 were not relevant
11 to your analysis?
12    A.    As I said, I mean, reviewing is
13 a broad term. I skimmed a lot of them, just
14 opened it. Some of them are repetitive or
15 responses to previous e-mails or -- I don't
16 know if they're e-mails. They're internal
17 communications, if that's called -- qualifies
18 as an e-mail.
19        But I just didn't read much of
20 those.
21    Q.    Okay. So you looked at them,
22 determined they weren't relevant and moved
23 on?
24    A.    Yeah.
25        MS. EMMEL: Objection,

Page 659

1  mischaracterizes testimony.
2  BY MS. CHARLES:
3     Q.    How did you identify the 650
4  documents you've included on your materials
5  considered list?
6     A.    They were provided to me. You
7  mean I -- I'm not sure I understand, how do I
8  identify them?
9     Q.    Sure.
10        Did you select the documents to
11 review yourself?
12    A.    Yeah, I mean, they were
13 provided to me. Like, the Haugen ones, for
14 example, by the counsel, and I looked at
15 them.
16    Q.    Okay. Did you give counsel any
17 criteria for how they should select the
18 documents they chose to provide to you?
19    A.    No. No, I didn't. No.
20    Q.    Of all of the Meta-produced
21 documents you reviewed, were any of them
22 longitudinal studies?
23    A.    I have to think about that. I
24 don't believe I saw a longitudinal study
25 that -- and I don't -- if I had come across

57 (Pages 656 - 659)

CONFIDENTIAL

1  it, I would have referred to it in my
2  reports.
3      Q.    You also reviewed some internal
4  documents from the other defendants, Snap,
5  TikTok and YouTube, correct?
6      A.    I think I was -- at the time, I
7  was -- and I'm looking at this.  This is
8  mostly almost 1634, so it's all Meta.
9      Q.    Okay.
10      A.    You see there's not other --
11  many others.
12      Q.    Okay.  I can maybe shortcut
13  this.
14          To the extent you reviewed
15  other defendants' documents, did you identify
16  any longitudinal studies within the documents
17  you reviewed?
18      A.    I don't recall.
19      Q.    Okay.  Your materials
20  considered list also includes some
21  depositions of current and former Meta
22  employees?
23      A.    Yes.
24      Q.    Okay.  Were those depositions
25  selected for you by counsel or did you select

1  which depositions to read?
2      A.    I didn't have any selection
3  on --
4      Q.    Okay.  Counsel gave you the
5  depositions that you read?
6      A.    Yeah, yeah.  I didn't know
7  beforehand whose deposition I was going to
8  see, so not --
9      Q.    Did you give counsel any
10  criteria for which types of depositions you'd
11  like to read?
12      A.    No.
13      Q.    Okay.  Do you believe it would
14  have been relevant to review the deposition
15  of Instagram's head of research?
16      A.    That was whose?  I mean, I
17  forgot.  I looked at the number of the
18  depositions.  Can you provide the name to
19  this?
20      Q.    Kristin Hendrix, it's not on
21  your list.
22      A.    So it's in here?
23      Q.    No, my question is a little bit
24  different.
25          Do you believe that reviewing

1  the deposition of Instagram's head of
2  research would have been relevant to your
3  work here, the opinions you're offering?
4      A.    Depends on what was in the
5  deposition, because she talked about studies
6  that were done internally, reported on the
7  outcomes of those studies that were not
8  included in what I had seen before.
9      Q.    Sure.
10          And you don't know what was in
11  her deposition because it wasn't one of the
12  depositions your counsel provided you?
13      A.    No.  That is correct.
14      Q.    Okay.  Yesterday you were asked
15  when it would be appropriate to rely on
16  deposition testimony or internal e-mails, and
17  you gave the example of some former
18  colleagues at Johns Hopkins who considered
19  those materials in the context of the opioid
20  epidemic.
21          Do you recall that example?
22      A.    Yeah, I do.
23      Q.    Okay.  Your colleagues at Johns
24  Hopkins were giving -- the opinions they gave
25  about the opioid epidemic, they were giving

1  those in the context of litigation, correct?
2      A.    I don't know --
3      Q.    You don't know?
4      A.    -- about those documents.  And
5  they're available online, I think, now.  We
6  could go online.  And they were using those
7  depositions for research.  I think -- I
8  believe it's research nowadays.
9      Q.    You don't know if they were
10  paid experts in the City of Baltimore's
11  opioid litigation?
12      A.    I have no idea.
13      Q.    Okay.  If you look at
14  Exhibit 5, and you can turn to page 47.  You
15  have a section in your report, which is
16  Exhibit 5 in front of you, that discusses a
17  handful of internal studies conducted by
18  researchers at Instagram, correct?
19      A.    Okay.  Yes.
20      Q.    Okay.  And these are studies
21  that were selected for your review by
22  counsel?
23      A.    The studies were not selected
24  for me.  They provided all this material, and
25  when I was going through them, I was trying

58 (Pages 660 - 663)

CONFIDENTIAL

Page 664

1  to identify studies that would be relevant,
2  internal studies that would be relevant to
3  the topic that I'm writing the report on. So
4  I noted that they were relevant.
5      Q.  So they came from the larger
6  set of 650 documents?
7      A.  Correct.
8      Q.  Okay. I'm going to hand you
9  what's been marked as Exhibit 16.
10         (Interruption by the
11     stenographer.)
12         MS. CHARLES:  I'm sorry, 60,
13     thank you.
14         (Whereupon, Mojtabai-60,
15     Presentation Hard Life Moments -
16     Mental Health Deep Dive,
17     META3047MDL-033-00095008 -
18     META3047MDL-033-00095034, was marked
19     for identification.)
20  BY MS. CHARLES:
21      Q.  Doctor, do you recognize
22  Exhibit 60 as one of the internal studies you
23  referenced?
24      A.  It looks very familiar, yes.
25  I've noticed also some of these reports are,

Page 665

1  like, newer editions or newer versions of
2  what was previously presented, so I'm not
3  sure if that is the version that I looked at.
4      Q.  Okay. This is a PowerPoint
5  deck, correct?
6      A.  Correct.
7      Q.  It's not a peer-reviewed study?
8      A.  That is my understanding. I
9  don't know if it has been published or not.
10  I haven't seen it.
11      Q.  And understanding you're not a
12  lawyer, do you know what a Bates number is?
13      A.  The --
14      Q.  Do you see these long numbers
15  in the bottom right-hand corner?
16      A.  I thought that they were just
17  to identify where they are in the deck.
18      Q.  Correct. I was just going to
19  do exactly that.
20         I was going to ask you to turn
21  to the Bates number that ends in 5011 in
22  Exhibit 60 in front of you. Oh, no, I'm
23  sorry, sir. On Exhibit 60.
24      A.  Okay.
25      Q.  Do you see at the bottom

Page 666

1  right-hand corner there's a long number?
2      A.  Yes. Yes.
3      Q.  Can you turn to slide 4. It's
4  the page that ends in 5011.
5      A.  Yes.
6      Q.  Okay. This slide discusses the
7  design of Instagram's internal study?
8      A.  Yes.
9      Q.  More than 22,000 users were
10  surveyed in this study?
11      A.  Yes.
12      Q.  There's no information provided
13  about how those 22,000 users were selected?
14      A.  I don't see it here. Maybe in
15  the prior sections they have described it,
16  but I don't see it here.
17      Q.  Okay. You don't know if they
18  were randomly chosen?
19      A.  I have no idea about -- based
20  on what I have in my hand.
21         There probably is the
22  description in this 1600 documents that are
23  in this pile, but off the top of my head, I
24  don't.
25      Q.  You don't know how old the

Page 667

1  respondents were?
2      A.  They say ages 13 to 65-plus.
3      Q.  Okay. You don't know the
4  gender breakdown?
5      A.  They do not mention that here.
6  I don't see.
7         (Document review.)
8      A.  I don't see it here.
9  BY MS. CHARLES:
10      Q.  All right. And you don't know
11  any participants' mental health history or
12  diagnoses?
13      A.  No.
14      Q.  Okay. This study relies on
15  self-report data; is that fair?
16      A.  I believe it does, yes.
17      Q.  And if you look at page 48 of
18  your report --
19      A.  Right.
20      Q.  -- you have a statement. It's
21  in the second-to-last paragraph on page 48.
22      A.  Yes.
23      Q.  You -- in discussing the study,
24  you acknowledge that it relies on self-report
25  data and that it measures individuals who had

59 (Pages 664 - 667)

CONFIDENTIAL

Page 668

1  these experiences, not whether Instagram
2  caused these experiences.
3          And then you write:  These
4  criticisms are beside the point.  Most
5  research and behavioral health is based on
6  self-reporting by individuals on their
7  experiences.  Most of the diagnostic
8  categories in the DSM-5 are based on
9  experiences of symptoms.
10         Do you see that language?
11     A.    Yes.
12     Q.    Okay.  In a clinical setting, a
13 person reports their symptoms to a trained
14 psychiatrist like you?
15     A.    Correct.
16     Q.    As the psychiatrist, you have
17 the ability to evaluate their self-report?
18     A.    Evaluate means get more
19 information.
20     Q.    Uh-huh.
21     A.    You don't have -- they can deny
22 their experiences.  They'll say -- if the
23 person says, I have been feeling depressed
24 all day most days the past two weeks, we do
25 not, you know, say, no, you don't --

Page 669

1      Q.    Sure.
2      A.    -- or I don't believe that you
3  do.
4      Q.    Fair enough.  But you get to
5  ask follow-up questions?
6      A.    Yes.
7      Q.    You get to explore the
8  duration?
9      A.    Yes.
10     Q.    You get to explore the
11 severity?
12     A.    Yes.
13     Q.    You get to explore other life
14 events that may be occurring at the time?
15     A.    We do.
16     Q.    And then you get to make a
17 diagnosis?
18     A.    That is correct.
19     Q.    Individuals do not -- cannot
20 give themselves a diagnosis based on the
21 DSM-5?
22     A.    That is correct.
23     Q.    Okay.  You are not opining that
24 this study is able to show a causal
25 relationship between Instagram use and mental

Page 670

1  health outcomes, correct?
2      A.    What I was saying, that the
3  objection of this study being based on
4  self-report is besides the point because in
5  psychological research, in epidemiological
6  research, we rely on self-report.
7      Q.    I understand.  So my question
8  is different.
9          Are you using the study, in
10 your opinion, to -- to opine that there is a
11 causal relationship between Instagram use and
12 mental health outcomes?
13     A.    I'm not using it.  I'm
14 considering it.  My argument is based on
15 published peer-reviewed research.
16     Q.    Let's stick with Exhibit 5.
17 Can you look at page 49 of your report?
18     A.    Exhibit 5.  Yes.
19     Q.    Okay.  On page 49, you discuss
20 internal documents related to social
21 comparison and body image dissatisfaction?
22     A.    Correct.
23     Q.    Okay.  And you refer to
24 augmented reality filters or beauty filters?
25     A.    Yes.

Page 671

1      Q.    Okay.  Do you see that there's
2  a block quote about halfway down the page,
3  page 49?
4      A.    Yes.
5      Q.    And that is -- you chose to
6  insert this block quote in your report.  It's
7  from a literature review, correct?
8          That's how you describe it?
9      A.    I'm looking at it.
10     Q.    Sure.
11     A.    Deposition -- no, it's actually
12 based on Dr. -- I believe Dr. Stewart's
13 testimony.  Oh, and the -- I'm sorry, yes,
14 yes.
15         It's referring to a number of
16 articles there.
17     Q.    Okay.  And this literature
18 review cites two studies, Thompson and Grabe?
19     A.    Yes.
20     Q.    Okay.  You've reviewed both of
21 those studies?
22     A.    I'm sorry, which one is your --
23 Thompson and -- oh, yes, down there.
24         No, I'm just quoting what was
25 in the deposition --

CONFIDENTIAL

Page 672

1    Q.    Sure.
2    A.    -- in that report.
3    Q.    Both Thompson and Grabe appear
4   on your materials considered list, but I'll
5   move on.
6          To your knowledge, neither of
7   the studies cited there discuss any Instagram
8   photo filters or other Instagram effects,
9   correct?
10   A.    As I said, I may have looked at
11  them, but I haven't considered them in the
12  context of your question.  If you want, I can
13  look at them.
14   Q.    Unfortunately, I'm a little
15  short on time.
16   A.    Understood.
17   Q.    But I'll try to simplify this.
18         Thompson was published in 1999.
19  Do you see that there?
20   A.    Yes.
21   Q.    And Grabe was published in
22  2008.
23         Do you see that there?
24   A.    Yes, they are -- predate
25  Instagram.

Page 673

1    Q.    Okay.
2          MS. CHARLES:  Can I get a time
3   check?
4          THE STENOGRAPHER:  15 minutes.
5   BY MS. CHARLES:
6    Q.    Dr. Mojtabai, in your clinical
7   practice, have you ever told a patient to
8   stop using social media in order to address a
9   diagnosed mental health harm?
10   A.    I haven't said to stop, but to
11  make it -- you know, use it more in
12  moderation.  There have been patients that I
13  have advised them to limit it or use it in
14  moderation.
15   Q.    How many patients?
16   A.    This is hard for me to
17  remember.  I mean, if patients complained
18  about it and had problems with managing their
19  social media use, I would have suggested to
20  them.
21   Q.    Okay.
22   A.    Maybe two patients.  We were
23  talking about it yesterday.  I do recall two
24  patients with problematic use of social
25  media, and I probably advised them to

Page 674

1   moderate.
2    Q.    So if a patient came to you and
3   self-reported problematic use, you might
4   advise them to reduce their social media use?
5    A.    If it's a problem that they're
6   bringing up and I feel that it is
7   contributing to their mental health problems,
8   I would.
9    Q.    Okay.  And you have given that
10  advice maybe up to two times?
11   A.    Maybe, yeah.
12   Q.    Okay.  Do you have an Instagram
13  account?
14   A.    No.
15   Q.    Okay.  Have you ever used
16  Instagram?
17   A.    I have been sent links to
18  Instagram by, you know, other apps.
19   Q.    Okay.  Did you open those
20  links?
21   A.    I have, but sometimes they say
22  we can't get in because you don't have an
23  account.
24   Q.    In relation to this case, did
25  you conduct any testing of Instagram?

Page 675

1    A.    I did not, but I looked at
2   videos, YouTube videos, similar to the
3   Snapchat chat, to get a familiarity, at least
4   a little -- become a little bit familiar with
5   the --
6    Q.    I think you said you looked at
7   about ten minutes of videos on Snapchat.  Is
8   that about the same --
9    A.    No, more than that.
10   Q.    More than that?
11   A.    More than an hour both for
12  Snapchat and also for Instagram.
13   Q.    Okay.  So an hour -- you looked
14  at videos for approximately an hour?
15   A.    I thought so.  I mean, they
16  were on YouTube, so some of them you have to
17  look at a number of them to see like one hour
18  of video.
19   Q.    Do you have a TikTok account?
20   A.    I don't.
21   Q.    Have you ever used TikTok?
22   A.    I have never used TikTok.
23   Q.    Have you conducted any testing
24  of TikTok in relation to this litigation?
25   A.    Again, I have done -- just

61 (Pages 672 - 675)

Page 676

1 familiarized myself to know what I'm writing
2 about. I have looked at YouTube videos about
3 TikTok and read about it.
4      MS. CHARLES: Let's go off the
5 record.
6      THE VIDEOGRAPHER: We're off
7 the record at 2:40 p.m. That's the
8 end of Media 16.
9      (Recess taken, 2:40 p.m. to
10 2:50 p.m. CDT)
11      THE VIDEOGRAPHER: We're back
12 on the record at 2:50 p.m. This is
13 the beginning of Media 17.
14      ------------
15      EXAMINATION
16      ------------
17 BY MR. DAVIS:
18      Q.   Dr. Mojtabai, it's Todd Davis
19 again representing TikTok. I just have a
20 handful of questions left, all right?
21      A.   Okay.
22      Q.   In your expert reports, you
23 claim that there's a rise in the prevalence
24 of mental health problems in children and
25 adolescents, correct?

Page 677

1      A.   That is correct.
2      Q.   And do you claim that there's a
3 causal link between that increase in the
4 prevalence of depression or mental health
5 problems in children and adolescents that's
6 the result of social media?
7      A.   Among different potential
8 possible candidate factors that may have
9 contributed to this rise, I think social
10 media is the most plausible.
11      Q.   Okay. And in terms of the
12 percentage of the increase that you attribute
13 to social media versus all the other
14 potential causes, have you done any type of
15 breakdown to determine the percentage of
16 which potential cause is contributing to the
17 increase?
18      A.   Well, my 2024 paper, I put in,
19 in the analysis, the social media use and
20 problematic use, and it explained the rise in
21 that survey at least.
22      To the extent that that survey
23 is representative of the population, I would
24 say that it's an at least sizable proportion
25 of the -- of the variance is due to social

Page 678

1 media.
2      Q.   Can you put a percentage on it?
3      MS. EMMEL: Objection, vague.
4      A.   I can't put a percentage on it,
5 no.
6 BY MR. DAVIS:
7      Q.   Okay. Here, let me hand you
8 what's been marked as Exhibit 61.
9      (Whereupon, Mojtabai-61, An
10 integrative literature review of birth
11 cohort and time period trends in
12 adolescent depression in the United
13 States, by Askari et al, was marked
14 for identification.)
15 BY MR. DAVIS:
16      Q.   This is the Askari 2023 paper
17 that you just discussed, right?
18      A.   Yes. Yeah, it is.
19      Q.   And, in fact, this Askari paper
20 has the very same graphic in it that is in
21 your expert report, correct?
22      A.   Yeah, I've taken it from that
23 paper.
24      Q.   Right.
25      Now, you agree that an expert

Page 679

1 shouldn't give contradictory sworn testimony
2 in different cases, right?
3      A.   That is correct.
4      Q.   Yeah.
5      A.   Unless their view changes. I
6 mean...
7      Q.   You've given sworn testimony in
8 a TikTok case where you were retained by
9 plaintiffs' lawyers where you said it was
10 unknown, what the cause of the increase in
11 mental health problems, correct?
12      MS. EMMEL: Objection,
13 misstates testimony.
14      THE WITNESS: First of all, do
15 you have that testimony?
16 BY MR. DAVIS:
17      Q.   I'm just asking you --
18      MS. EMMEL: Foundation.
19      MR. DAVIS: Just a minute.
20 BY MR. DAVIS:
21      Q.   I'm asking if you've given that
22 sworn testimony.
23      A.   I don't recall giving testimony
24 that it is unknown.
25      Q.   Let me hand you what's been

62 (Pages 676 - 679)

CONFIDENTIAL

1  marked as your affidavit in the Canadian
2  TikTok litigation.
3          (Whereupon, Mojtabai-62, 5/7/24
4          Affidavit of Dr. Ramin Mojtabai,
5          Peters v. ByteDance, was marked for
6          identification.)
7      A.    Sure.
8  BY MR. DAVIS:
9      Q.    You see that this is an
10  affidavit that you swore under oath on
11  May 7th, 2024, correct?  Yes?
12     A.    Yes.
13     Q.    And you were swearing in this
14  affidavit that the information that was
15  contained in your expert report in the
16  Canadian litigation was true and accurate,
17  correct?
18     A.    That is true, yes.
19     Q.    Right?
20          And if you look at page 49, you
21  discuss:  The rise and prevalence of
22  depression and depressive symptoms in
23  children and adolescents in the US and other
24  industrialized countries in the past decade
25  is well documented.

1          Do you see that?
2      A.    That is true, yeah.
3      Q.    And you say -- and I'm quoting
4  you:  While the reasons for these trends are
5  not known, the parallels between these time
6  trends and the trends in spread of social
7  media use are highly suggestive of a causal
8  link.
9          Correct?
10     A.    That is correct.
11     Q.    So under sworn testimony in
12  Canada, you said that the -- that the actual
13  cause of the rise was unknown, true?
14     A.    I have said the rest of it
15  too --
16     Q.    You said it was -- you said it
17  was unknown, correct?
18     A.    Yeah.
19     Q.    Yes?
20     A.    I have said the whole
21  paragraph.  You're just taking one part of it
22  and -- out of the context of the whole
23  statement.
24     Q.    Let's read the whole statement,
25  then.

1      A.    Okay.
2      Q.    You said:  While the reasons
3  for these trends are not known, the parallels
4  between these time trends and the trends in
5  spread of social media use are highly
6  suggestive of a causal link.
7          Correct?
8      A.    That's true.
9      Q.    You did not say that there was
10  an established causal link in your affidavit
11  that you submitted in Canada, did you?
12     A.    That is correct.
13     Q.    Okay.  Now --
14     A.    And I did not say that it is an
15  established causal link here also.
16     Q.    Now, in your -- in your
17  article, the Askari article, you actually
18  identify ten articles that offered possible
19  explanations for the increase in adolescent
20  mental health outcomes, right?
21     A.    That's correct.
22     Q.    Six of the papers proposed
23  social media might be a possible explanation,
24  right?
25     A.    Yes.

1      Q.    And there were at least four
2  other papers that looked at other possible or
3  potential explanations, which were economics,
4  the opioid epidemic, and the rise in parental
5  supervision, correct?
6      A.    That's correct.
7      Q.    And each of those remains a
8  likely explain for -- as to contributing to
9  the rise in youth and adolescent mental
10  health problems that has been seen over the
11  last decade and a half, right?
12          MS. EMMEL:  Objection, vague
13          and compound.
14     A.    So, first of all, I should say
15  about the 2022 affidavit, they're, like,
16  three years since then.  I have published on
17  it.  Others have published on these trends.
18  And so --
19  BY MR. DAVIS:
20     Q.    Yeah.  Dr. Mojtabai --
21     A.    Yes.
22     Q.    -- it's a May 2024 affidavit,
23  right?
24     A.    Which one is that, you're
25  talking?

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 684

1    Q.    Right?  That's a May 2024.  You
2  signed it on May 2024.
3    A.    In any case --
4    Q.    Let's just stick with the
5  question.
6          You signed that affidavit on
7  May of 2024, right?
8    A.    Okay.  But the --
9    Q.    Just a minute.
10   A.    Okay.
11   Q.    You agree with me, yes?
12   A.    Yes, it is -- it says that.
13   Q.    And you signed that affidavit
14 after you had been retained as an expert for
15 the plaintiffs in this litigation, correct?
16   A.    I assume that May -- I don't
17 know exactly the date that I was retained for
18 this --
19   Q.    Turn to page 911 of the
20 article.
21   A.    No, I want to -- because you
22 brought up something that is important.
23   Q.    I don't have a question
24 pending, Doctor.  I have --
25   A.    Well, I have a response that I

Page 685

1  want to continue.
2    Q.    Your counsel may ask you that.
3    A.    Okay.
4    Q.    Page 911.  If you look at the
5  top --
6    A.    Page 911?
7    Q.    Yeah, top left-hand column,
8  first paragraph, third sentence.
9    A.    I'm sorry, can you point it out
10 for efficiency?
11   Q.    Yes, sir.
12         You see in this article --
13   A.    Yes.
14   Q.    -- that you published in 2023,
15 you said:  Several hypothesized mechanisms
16 have been proposed as contributing to these
17 increases in time period and birth cohort
18 effects, including social media,
19 economic-related factors, changes to mental
20 health screening and diagnosis, and the
21 opioid epidemic.
22         Did I read that correctly?
23   A.    That's correct.
24   Q.    However, there was little --
25 and then you continue.

Page 686

1    A.    Yes.
2    Q.    However, there was little
3  consensus across studies about the main
4  driver of these trends, and studies lacked
5  rigorous research design that would have
6  enabled identification of causal effects of
7  drivers.
8          Do you see that?
9    A.    Yes, I see that.
10   Q.    And what I read to you out of
11 your own study is a truthful and accurate
12 statement about the quality of the data,
13 correct?
14         That's right?
15   A.    Can you repeat your question?
16   Q.    What I read from your study,
17 those two statements --
18   A.    Right.
19   Q.    -- are truthful and accurate,
20 correct?
21   A.    They are not current.
22   Q.    So your own paper now -- your
23 paper in 2023 is wrong?
24   A.    It's 2022 when it was
25 submitted, and at the time, for example, it

Page 687

1  did not include my own 2024 research, and it
2  did not include other research by Twenge and
3  others.
4          So they support the evidence.
5  They do not prove a causal link.
6    Q.    But when you wrote this
7  statement in this peer-reviewed publication,
8  it was true and accurate, correct?
9    A.    At the time, in 2022.
10   Q.    And when you wrote that paper,
11 right, this was before you got retained as a
12 litigation expert for the plaintiffs'
13 lawyers, right?
14   A.    I -- I don't know when it was
15 published in 2022.  They -- or the sequence,
16 I'm not sure, because I don't know when it
17 was that I was retained for -- I might have
18 been retained before this date.  This is end
19 of 2022.
20   Q.    So you think you got retained
21 before that publication got published?
22   A.    I assume.  Because I'm looking
23 at the date, November 2022.
24   Q.    So you think you were retained
25 or might have been retained before this date

64 (Pages 684 - 687)

CONFIDENTIAL

Page 688

1 that this was published?
2     A.    I think I might have been
3 retained, yes.
4     Q.    Why don't you look at the
5 conflict disclosure.
6     A.    Yes.
7     Q.    It says Declarations, right?
8 There's a place where you have to declare
9 whether you have a conflict of interest,
10 right?
11     A.    Right.
12     Q.    It says:  Conflict of interest.
13 All authors have no competing interests to
14 declare.
15         Do you see that?
16     A.    Yeah, I see that.
17     Q.    You didn't declare that you
18 were working in some way, shape or form for
19 plaintiffs' lawyers in social media
20 litigation, did you?
21     A.    I have not at this time, no.
22     Q.    In your 2024 paper, you didn't
23 declare that you had been retained by
24 plaintiffs' counsel, did you?
25     A.    This actually was brought to my

Page 689

1 attention, and I have since sent a letter to
2 the editor to correct that.  It's possible --
3     Q.    Who brought that to your
4 attention?
5     A.    The counsel was -- looked at my
6 paper and said that you have not disclosed
7 this.
8     Q.    And so the publication that's
9 available to everybody publicly --
10     A.    Yes.
11     Q.    -- currently does not say that
12 you have been retained as an expert
13 consultant or an expert witness on behalf of
14 plaintiffs' lawyers, true?
15     A.    As I said, I have sent in a
16 letter to the editor --
17     Q.    The current available one
18 doesn't say that, does it?
19     A.    The one that is available
20 online, no, it doesn't.
21     Q.    When did you send the letter
22 in?
23     A.    When it was brought to my
24 attention.
25     Q.    When did you send the letter

Page 690

1 in?  When?  What month, what year?
2     A.    I...
3     Q.    2024?
4         MS. EMMEL:  Compound question.
5 BY MR. DAVIS:
6     Q.    2025?  When did you send the
7 letter in?
8         THE WITNESS:  I'm sorry, I
9     just -- you said something?
10         MS. EMMEL:  I just objected as
11     compound.
12         THE WITNESS:  Oh.  Compound
13     question.
14     A.    No, it was recent actually.
15 BY MR. DAVIS:
16     Q.    How recent?
17     A.    As it was brought to my
18 attention.
19     Q.    When?
20     A.    In the past --
21         MS. EMMEL:  Doctor, don't
22     disclose privileged conversations.
23 BY MR. DAVIS:
24     Q.    When did you send the letter
25 in?

Page 691

1     A.    I was told that I'm not
2 supposed to disclose.
3     Q.    I'm not asking what was
4 discussed.  I'm asking when you sent the
5 letter in.
6     A.    You could actually ask my
7 counsel about --
8     Q.    She's not telling you not to
9 answer the question, Doctor.
10         Was it this year?
11     A.    She's asking me not to disclose
12 anything.
13     Q.    She's not --
14         MS. EMMEL:  We're out of time,
15     I believe, with this deposition.
16         MR. DAVIS:  No, we're not.  No,
17     no.
18         MS. EMMEL:  Are we out of time?
19         MR. DAVIS:  No, we're -- I'm
20     getting -- we're closing the loop on
21     this.  I have a handful of questions,
22     and then we'll reserve on the
23     remainder.
24 BY MR. DAVIS:
25     Q.    Dr. Mojtabai, I'm simply

65 (Pages 688 - 691)

CONFIDENTIAL

Page 692

1 asking: Did you send the letter in this year
2 to the editor?
3     A.    It's within this year, yes.
4     Q.    Okay. And you recognize now --
5         MS. EMMEL: You finished your
6 question, Counsel. We're finished.
7         MR. DAVIS: I said I've got a
8 handful of questions. I've got one or
9 two left and I'm done.
10        MS. EMMEL: Well, we are out of
11 time, I believe.
12        Are we out of time?
13        MR. DAVIS: No. I've asked
14 Dr. Mojtabai several questions. You
15 raised objections about the timing --
16 about whether there's some work
17 product. I've got two questions left,
18 okay? Two. If he answers them, I'm
19 done, okay?
20 BY MR. DAVIS:
21    Q.    Dr. Mojtabai, if you submit in
22 any further article about social media use
23 and any analysis of data for publication, you
24 recognize that you have to declare a conflict
25 of interest --

Page 693

1     A.    I'm aware of that.
2     Q.    -- because you're serving as an
3 expert witness in litigation, correct?
4     A.    That's correct.
5     Q.    And when a conflict of interest
6 is declared, it's letting readers know that
7 an author has a bias, a potential bias, about
8 how they view the data, right?
9     A.    A potential bias, yes. It
10 should be disclosed, I agree with you.
11    Q.    Okay. And you only recently
12 disclosed that --
13    A.    It was brought to my attention,
14 yes.
15        MR. DAVIS: Okay. I would ask
16 for a copy of the letter that
17 Dr. Mojtabai submitted to the journal,
18 and I'm reserving on other questions
19 on behalf of the defendants based upon
20 good cause.
21        THE VIDEOGRAPHER: Want to go
22 off?
23        MR. DAVIS: I don't know. Do
24 you want to go off? Do you want to
25 switch spots?

Page 694

1         MS. EMMEL: Yeah, let's go off
2 for -- give us five minutes.
3         THE VIDEOGRAPHER: All right.
4 We're off the record at 3:05 p.m.
5 That's the end of Media 17.
6         (Recess taken, 3:05 p.m. to
7 3:08 p.m. CDT)
8         THE VIDEOGRAPHER: We're back
9 on the record at 3:08 p.m. This is
10 the beginning of Media 18.
11        ------------
12        EXAMINATION
13        ------------
14 BY MS. EMMEL:
15    Q.    Hi, Dr. Mojtabai.
16    A.    Hello.
17    Q.    Are you able to go on for a
18 little bit longer?
19    A.    Sure. I have my coffee.
20    Q.    All right. I am going to hand
21 you what is being marked as Exhibit 63.
22        (Whereupon, Mojtabai-63,
23 Curriculum Vitae, was marked for
24 identification.)
25        ///

Page 695

1 BY MS. EMMEL:
2     Q.    That's your CV.
3     A.    Uh-huh.
4     Q.    Dr. Mojtabai, what is your
5 education?
6     A.    I have a medical degree. I'm
7 trained as a psychiatrist, also as a clinical
8 psychologist, and I have an MPH in public
9 health and have done postdoc research
10 fellowship.
11    Q.    Thank you.
12        Do you recall questions
13 yesterday about how you introduce yourself?
14    A.    Yes, I do.
15    Q.    How do you introduce yourself?
16    A.    I introduce myself as a mental
17 health and -- mental health researcher and a
18 psychiatric epidemiologist.
19    Q.    Does that include the
20 application of biostatistics?
21    A.    Indeed, it does.
22    Q.    Describe the type of research
23 you do.
24    A.    I -- most of my research is
25 focused on psychiatric epidemiology using

66 (Pages 692 - 695)

CONFIDENTIAL

Page 696

1  survey or administrative data and drawing
2  conclusions that are relevant for services or
3  epidemiology from these data using the
4  methods of biostatistics.
5      Q.    And have you published
6  epidemiological studies?
7      A.    Yes, I have.
8      Q.    Approximately how many studies
9  have you published in epidemiology?
10     A.    I would say at least 60 or 70
11  papers I've published can be categorized as
12  psychiatric epidemiology.  Some of them are
13  specifically in journals of psychiatric
14  epidemiology.  Some of them are in journals
15  of epidemiology or public health and other
16  journals.
17     Q.    Do you analyze the results of
18  your studies using biostatistics?
19     A.    I do.
20     Q.    Do you -- do you design
21  epidemiological studies?
22     A.    I do.
23     Q.    What types of studies in
24  epidemiology have you designed?
25     A.    Cross-sectional cohort studies,

Page 697

1  I have designed.  I have also designed
2  longitudinal studies with multiple waves of
3  data as well as experimental studies.
4      Q.    And have you been a reviewer
5  for grants that include epidemiological
6  studies?
7      A.    I have.
8      Q.    Are you an expert in the field
9  of epidemiology?
10         MR. DAVIS:  Object to form.
11     A.    I would characterize myself as
12  an expert in those two areas where I
13  mentioned, mental health services and
14  psychiatric epidemiology.
15  BY MS. EMMEL:
16     Q.    Do you recall earlier that -- I
17  believe it was yesterday, where you had
18  stated that it is not the standard of
19  research to say that X causes Y because it
20  won't be accepted in the scientific
21  community?
22         Do you recall that?
23         MR. DAVIS:  Object to form.
24     A.    I recall having said that,
25  that's correct.

Page 698

1  BY MS. EMMEL:
2      Q.    Can causation be determined
3  between causal factors and mental health
4  effects?
5          MR. DAVIS:  Object to form.
6      A.    It can be established using
7  multiple methods -- types of methods,
8  multiple types of data.
9  BY MS. EMMEL:
10     Q.    And what is the process for
11  that?
12     A.    The process is usually
13  conducting studies of different sort,
14  cross-sectional, longitudinal, experimental,
15  as well as meta-analytic reviews of all these
16  data to -- and to put it all together to
17  contribute to a causal understanding.
18     Q.    And what factors into that type
19  of an analysis?
20     A.    There are different ways of
21  looking at causation and different sets of
22  criteria that may be used.
23         In my report, I use the
24  Bradford Hill set of guidelines for
25  establishing causation, and there are

Page 699

1  different elements of that.  But that's not
2  the only -- the only approach.  There are
3  more recent approaches.
4          Bradford Hill was published in
5  the 1960s.  It's still valid and still a very
6  solid way of approaching causal questions,
7  but that's not the only one.
8      Q.    And when you have all of the
9  evidence available, would you use any of
10  those components independently to reach
11  conclusions on causation?
12         MR. DAVIS:  Object to form.
13     A.    If you're talking about the
14  Bradford Hill, for example, as an example of
15  an approach to causal questions, it's -- it
16  is based on the aggregate of data, the
17  aggregate of -- or looking at all these
18  different guidelines, consistency of
19  associations, plausibility, biological
20  plausibility, analogy, experimental data.
21  They all contribute.
22         And it's, like, looking at the
23  same problem from different angles using
24  different -- using different lenses.
25         ///

67 (Pages 696 - 699)

CONFIDENTIAL

1  BY MS. EMMEL:
2      Q.    And the different pieces of
3  your puzzle, to use your analogy, consists of
4  different types of studies; is that correct?
5          MR. DAVIS:  Object to form.
6      A.    That's true.
7          Cross-sectional studies,
8  they're not all the same.  They have
9  limitations.  Each individual study,
10  cross-sectional, longitudinal, experimental,
11  has faults.  But we do not discard them.
12          We consider them in looking at
13  this, as you said, jigsaw puzzle, putting it
14  all together.  Some of them fit better, some
15  of them don't fit well, but overall, it's the
16  overall picture that's suggestive of a causal
17  association.
18          MR. DAVIS:  Object to the
19      responsiveness after the word -- the
20      answer "That's true."
21  BY MS. EMMEL:
22      Q.    Would you ever use just one
23  type of study to make a causal analysis?
24      A.    No, I don't think that is even
25  appropriate to just section out part of the

1  data or evidence and based on the type of
2  study and say this part of the evidence we're
3  going to consider, and what is our causal
4  conclusion based on this abstraction, based
5  on this artificial selection of studies.
6      Q.    In your analysis, did you
7  consider all the evidence available?
8      A.    I did.
9      Q.    Do you recall being asked
10  yesterday about whether cross-sectional
11  studies can establish causation?
12      A.    I do.
13      Q.    What role do cross-sectional
14  studies have in a causal analysis?
15      A.    First I have to make --
16          MR. DAVIS:  Excuse me.
17          Object to form.
18      A.    No type of studies can
19  establish causation.  It is an aggregate that
20  would tell us more likely than not one factor
21  is the cause of the other.  So that is the --
22  that's the standard we go by when we're
23  looking at aggregate data.
24          And cross-sectional studies
25  provide important information.  We were

1  talking about, for example, the dose-response
2  relationship; that could come from causal --
3  from cross-sectional data.  Bradford Hill
4  never said that dose-response relationships
5  have to come from longitudinal data.
6          So they contribute important
7  information, and they can provide information
8  about the plausibility of the association,
9  the strength of the association, and some of
10  them may suggest mechanisms, specific
11  mechanisms that are talking to the
12  specificity of the effect.  That's one of the
13  Bradford Hill criteria.
14          MR. DAVIS:  Object to the
15      responsiveness, move to strike.
16  BY MS. EMMEL:
17      Q.    Did you also review internal
18  defendants' documents?
19      A.    I did.  Not all of them at the
20  same degree of attention as others.
21      Q.    What role did those documents
22  play in forming your causation opinions?
23      A.    I considered them in forming my
24  opinion, but I did not rely on them.  My
25  reliance was on empirical peer-reviewed

1  publications.
2      Q.    When looking at causal
3  relationships in the area of mental
4  disorders, is it common for the study designs
5  to include questions on symptoms?
6          MR. DAVIS:  Object to form.
7      A.    That's actually the main way
8  that we approach assessing outcomes in
9  psychiatric epidemiology.
10  BY MS. EMMEL:
11      Q.    And why is that?
12      A.    Well, symptoms, scales,
13  questionnaires provide standardized
14  replicable data, and there is data showing
15  that they are more reliable and valid than
16  dichotomous diagnosis that might be derived
17  or dichotomous outcomes measured.
18          And also, they're -- because
19  they are standardized, because -- because
20  they're replicable, they are immune to the
21  vagaries of individual clinicians who might
22  be doing the assessments, who might vary
23  quite a bit based on their training or
24  experience.
25      Q.    Did you recall -- do you recall

68 (Pages 700 - 703)

CONFIDENTIAL

Page 704

1  discussing the DSM yesterday?
2      A.   Yes, I do.  Yes.
3      Q.   Is the DSM the only diagnostic
4  tool you use as a clinician?
5      A.   The DSM itself says that it
6  shouldn't be, you know, the only -- the only
7  diagnostic tool, as you said, and clinicians
8  should use their judgment in their clinical
9  work.
10         And there are other indexes of
11  diagnosis, like, ICD, ICD-11 nowadays that
12  are used also.  And clinicians use, based on
13  their clinical experience or interest,
14  different measures or scales in their
15  practices that might be helpful for their
16  diagnosis and treatment of conditions.
17         MR. DAVIS:  Object to the
18     responsiveness, move to strike.
19  BY MS. EMMEL:
20     Q.   Is it the only tool in
21  assessing clinically relevant diagnoses and
22  treatment of diseases?
23     A.   I wouldn't say that it is the
24  only, no.  I wouldn't characterize it as the
25  only tool.

Page 705

1      Q.   Are all mental health
2  conditions that receive treatment in the DSM?
3      A.   Oh, definitely not.  The
4  large -- the large group of people who seek
5  treatment every day in every clinical
6  setting -- and this is borne by evidence --
7  might not carry a formal diagnosis in the
8  DSM.
9         They are presenting for maybe
10  minor conditions, conditions that do not meet
11  the criteria for a mental disorder according
12  to DSM, but there are still issues that
13  require help and treatment because they cause
14  disability and impairment in functioning.
15         MR. DAVIS:  Object to the
16     responsiveness, move to strike.
17  BY MS. EMMEL:
18     Q.   Dr. Mojtabai, do you recall
19  discussing the design of the observational
20  studies that you reviewed earlier today with
21  Mr. Davis?
22     A.   It's -- it's vague in my
23  memory.  Can you remind me?
24     Q.   Did the -- let me phrase it
25  this way.

Page 706

1         Did the designs -- did the
2  observational study designs of the majority
3  of the studies looking at social media
4  include time spent, nature of use and
5  content?
6         MR. DAVIS:  Object to the form.
7      A.   They -- they do.  Many of them
8  include actual measures of time spent, as you
9  said, and some of them, specific forms.  But
10  it's really not easy to separate these
11  because time spent is linked to mechanisms
12  that -- or algorithms that might hold the
13  attention of the user, and they may be linked
14  to content because some content is more
15  absorbing, more engaging than some that is
16  not.
17         So I think they're all related
18  to each other.
19         MR. DAVIS:  Object to the
20     responsiveness.
21         Is it all right, an objection
22     by one will cover all defendants?  Is
23     that fine with you?
24         MS. EMMEL:  That's fine.
25         MR. DAVIS:  Okay.  I assume

Page 707

1      that that applies to the objections
2      I've made?
3         MS. EMMEL:  That's fine.
4         MR. DAVIS:  Thank you.
5  BY MS. EMMEL:
6      Q.   Did you include -- did you
7  consider all of the factors that went into
8  these types of studies when reaching your
9  opinions?
10         MR. DAVIS:  Object to the form.
11     A.   I tried to include -- consider
12  all those factors to the extent possible, to
13  the extent the data allows me to do that.
14  BY MS. EMMEL:
15     Q.   In addition, as we've discussed
16  at length and stated in your report, many
17  other studies found social media use was
18  related to adverse mental health outcomes; is
19  that right?
20         MR. DAVIS:  Object to the form.
21     A.   Can you repeat the question?
22  I'm sorry.
23  BY MS. EMMEL:
24     Q.   We were talking about
25  observational studies.

CONFIDENTIAL

Page 708

1     A.    Yes.
2     Q.    And in addition to those, other
3  types of studies found that social media use
4  was related to adverse mental health
5  outcomes, correct?
6     A.    Correct.
7        MR. DAVIS:  Object to form.
8        I'm sorry, go ahead and answer.
9     A.    Yes, experimental studies.
10  Observational, of course, includes
11  longitudinal and cross-sectional, and also
12  ecological studies, but the experimental
13  studies also support that.
14  BY MS. EMMEL:
15    Q.    Would you agree that the mental
16  health outcomes found in the majority of the
17  studies were found regardless of the content
18  the participants were viewing on the
19  platforms?
20        MR. DAVIS:  Object to the form,
21    also leading.
22    A.    Can you again rephrase your
23  question?
24  BY MS. EMMEL:
25    Q.    Were the -- were the majority

Page 709

1  of the studies -- were the majority of the
2  results found in the studies regardless of
3  content that the participants were viewing?
4     A.    Yes.
5        MR. DAVIS:  Object to the form
6    and also leading.
7     A.    I would say that a large
8  proportion.  I don't know what the
9  proportion, what the number is, are based on
10  the extent of use.
11        But as I said, extent of use is
12  intimately related to the content, the
13  engagement caused by the algorithms.  So
14  separating these is not easy, the content and
15  the extent of use.
16        But most of the studies used
17  length of use or time -- length of time the
18  person is on the social media as a measure of
19  exposure.
20  BY MS. EMMEL:
21    Q.    What are some of the
22  characteristics of social media platforms?
23        MR. DAVIS:  Object to form.
24    A.    So there are some commonalities
25  among them.  Do you want me to talk about

Page 710

1  those commonalities?
2  BY MS. EMMEL:
3     Q.    Just in general, yes, please.
4     A.    They provide very engaging --
5  especially the visual ones, the ones that are
6  heavily visual, like Instagram, Snapchat,
7  TikTok, they provide very engaging content
8  for viewers.
9        And based on the responses of
10  the viewers, which means lingering on some
11  content or receiving likes or viewing more of
12  that content, they -- the media do provide
13  further -- further posts of that same
14  content, which creates a continuous
15  engagement of the person with the -- with the
16  media and a flow state, in effect.
17        But it has been called a rabbit
18  hole by somebody, some investigators.  And
19  that is one.
20        They also, by showing videos of
21  other people or pictures of other people who
22  might have doctored their videos, they are --
23  they contribute based on some research that I
24  have also looked at, a sense of social
25  comparison -- negative social comparison and

Page 711

1  fear of missing out.
2        So there are -- I think there
3  are commonalities in algorithms across
4  different media that encourage engagement by
5  using those features.
6        MR. DAVIS:  Object to the
7    responsiveness, move to strike.
8  BY MS. EMMEL:
9     Q.    Have you looked at what the
10  most prevalently used social media platforms
11  are by children and adolescents?
12    A.    I have looked at the Pew report
13  that actually reports on the different
14  platforms, and I believe YouTube, Snapchat,
15  TikTok, Instagram and Facebook are the most
16  common.  I'm not sure if that ranking is
17  exactly accurate, but YouTube is, of course,
18  at the top.
19        MR. DAVIS:  Object to the
20    responsiveness and move to strike
21    after "I have looked at the Pew
22    report."
23  BY MS. EMMEL:
24    Q.    To your knowledge, do users use
25  multiple platforms or single platforms?

CONFIDENTIAL

Page 712

1    A.    When you add up the percentage
2 of viewers that are on these platforms, the
3 average is above three.  So on average,
4 adolescents is on three of these platforms.
5        And more -- or about half,
6 slightly more than half, report being
7 constantly on one of these apps that I
8 mentioned.
9        MR. DAVIS:  Object to the
10    responsiveness, move to strike.
11 BY MS. EMMEL:
12    Q.    And as such, do all of those
13 platforms use -- all of the platforms used
14 affect their mental health outcomes?
15        MR. DAVIS:  Object to the form.
16    A.    So as I mentioned, the
17 research is -- most of the research is based
18 on social media as a group because children
19 are on multiple platforms, and also because
20 the features are very similar or similar -- I
21 can't say they are exactly the same.  They're
22 similar across these platforms.
23        As such, the research has
24 focused on the group of social media.  There
25 are individual studies that were brought up

Page 713

1 today for specific platforms, but most
2 research is about all of them.
3        MR. DAVIS:  Object to the
4    responsiveness, move to strike.
5 BY MS. EMMEL:
6    Q.    Dr. Mojtabai, could you take
7 out your report, which is Exhibit 5.
8    A.    Yes.
9    Q.    And could you turn to page 1.
10    A.    Yes.
11    Q.    And look at where it says --
12 under Retainer, which is 2.1?
13    A.    Yes.
14    Q.    It says:  I have been retained
15 by counsel to prepare an expert report on
16 what relationship there is, if any, between
17 social media use and adverse mental health
18 outcomes in adolescents and youth.
19        Is that correct?
20    A.    That is correct.
21    Q.    And have you done that?
22    A.    To the best of my ability, I
23 have.
24    Q.    And then you -- as a matter of
25 fact, you completed the report, this report,

Page 714

1 in response to that mandate; is that correct?
2    A.    Correct.
3    Q.    Now look at the top of the page
4 under Summary of Opinions --
5    A.    Yes.
6    Q.    -- where you have got opinions
7 1 through 6?
8    A.    Correct.
9    Q.    Could you please read the first
10 opinion?
11    A.    Problematic social media use
12 and social media addiction are substantial
13 contributing causes of adverse mental health
14 outcomes, including depressive and anxiety
15 symptoms, body image disturbance, eating
16 disorders, and suicidality, in children,
17 adolescents, and young people.
18    Q.    And as you sit here today, is
19 that opinion still correct?
20        MR. DAVIS:  Object to form.
21    A.    It is my opinion still.
22 BY MS. EMMEL:
23    Q.    And you stand by that opinion
24 today, correct?
25    A.    Correct.

Page 715

1    Q.    And could you please read
2 opinion number 2?
3    A.    Children --
4        MR. DAVIS:  Can I just have a
5    standing objection to him just reading
6    his report into the record?  Because I
7    don't think that's appropriate
8    questions for direct -- a redirect.
9        MS. EMMEL:  I'm asking him his
10    opinions, and if anything has changed
11    those opinions and if he stands by
12    them.
13        MR. DAVIS:  Can I just have a
14    standing objection?
15        MS. EMMEL:  You can have a
16    standing objection, yes.
17        MR. DAVIS:  Thank you.  Thank
18    you.
19 BY MS. EMMEL:
20    Q.    Dr. Mojtabai, could you please
21 read your second opinion on the first page?
22    A.    Sure.
23        Children, adolescents, and
24 young people are more vulnerable to
25 problematic social media use and addiction

71 (Pages 712 - 715)

CONFIDENTIAL

Page 716

1  than adults. Individuals with preexisting
2  mental health problems are especially
3  vulnerable to harms resulting from social
4  media use.
5      Q.    And as you sit here today, do
6  you stand by that opinion?
7      A.    I do.
8      Q.    Could you please read your
9  third opinion?
10     A.    Multiple features built into
11 the design of social media platforms are
12 conducive to their excessive and problematic
13 use by youth, and these features increase the
14 risk of addictive use of the apps -- app and
15 other adverse mental health outcomes. These
16 include incentive salience, quote/unquote,
17 and in parentheses, highly pleasurable
18 stimuli such as searching "likes" or positive
19 comments on the posts, the immersive nature
20 of these media -- immersive is in quotes --
21 and the, quote/unquote, algorithmic nature of
22 some of social media apps.
23     Q.    And do you still hold that
24 opinion?
25     A.    I do.

Page 717

1      Q.    And could you read number 4,
2  please.
3      A.    Both a greater degree of
4  exposure to social media platforms and the
5  nature of the use, for example, addictive
6  use, social comparison, FOMO, contribute to
7  the adverse mental health effects of social
8  media in children and adolescents.
9      Q.    Is that still your opinion?
10     A.    Yes.
11     Q.    Could you read number 5.
12     A.    Problematic social media use
13 causes adverse mental health outcomes in
14 children and adolescents in part by fomenting
15 negative social comparison and sleep
16 problems.
17     Q.    And is that still your opinion?
18     A.    Yes.
19     Q.    And read number 6, please.
20     A.    Given the ubiquity of social
21 media use and the large amount of time that
22 youth spend on these media at the cost of
23 other activities, the population burden of
24 associated mental health problems is
25 significant.

Page 718

1      Q.    And do you still hold that
2  opinion?
3      A.    Yes.
4      Q.    And did you use the totality of
5  the evidence available to reach those
6  opinions?
7      A.    Yes, I did, the totality that
8  was available to me.
9          MS. EMMEL: I don't have
10 anything else.
11         MR. DAVIS: Why don't we take a
12 two-minute, five-minute break, and
13 we'll caucus to see how we can get
14 this thing wrapped up.
15         THE VIDEOGRAPHER: Off the
16 record at 3:34 p.m. That's the end of
17 Media 18.
18         (Recess taken, 3:34 p.m. to
19 3:45 p.m. CDT)
20         THE VIDEOGRAPHER: We're back
21 on the record at 3:45 p.m. It's the
22 beginning of Media 19.
23 ///
24 ///
25 ///

Page 719

1 ------------
2          EXAMINATION
3 ------------
4  BY MR. DAVIS:
5      Q.    Dr. Mojtabai, are you ready to
6  continue?
7      A.    Yes.
8      Q.    All righty. Let me hand you
9  what's been marked as Exhibit 64.
10         (Whereupon, Mojtabai-64, An
11 integrative literature review of birth
12 cohort and time period trends in
13 adolescent depression in the United
14 States, by Saiphoo et al, was marked
15 for identification.)
16 BY MR. DAVIS:
17     Q.    Do you see this is the Saiphoo
18 and Vahedi meta-analysis that you cite in
19 your expert report?
20     A.    I do.
21     Q.    Yes.
22         And if you look at the
23 abstract --
24     A.    Yes.
25     Q.    -- you see that this -- it

72 (Pages 716 - 719)

CONFIDENTIAL

Page 720

1  says -- oh, I'm sorry.
2        It says:  This meta-analysis
3  aimed to provide a quantitative review of
4  cross-sectional research on this topic to
5  provide clarification on the relationship
6  between social media use and body image.
7        Do you see that?
8     A.    I see that.
9     Q.    Okay.  And so this is a
10  meta-analysis comprised entirely of
11  cross-sectional studies, correct?
12     A.    That is my understanding.
13     Q.    And this is the study that you
14  then used to conduct your own meta-analysis
15  in your expert reports, correct?
16     A.    That is correct.
17     Q.    And so your meta-analysis that
18  you did is entirely consisting of
19  cross-sectional data, right?
20     A.    That is correct because it's
21  based on this.
22     Q.    Okay.  Now -- you can set that
23  aside.
24     A.    Okay.
25     Q.    So let me just clarify.

Page 721

1        So the Saiphoo and Vahedi
2  meta-analysis of cross-sectional studies
3  doesn't establish the direction of the
4  association, does it?
5        MS. EMMEL:  Object to the
6     questioning based on outside the scope
7     of my direct.
8     A.    I -- it does -- by itself it
9  doesn't, no.  It contributes.  It's part of
10  that puzzle that we were talking about.
11  BY MR. DAVIS:
12     Q.    Right.
13        So it -- but it doesn't
14  establish whether or not there's an
15  association between use of social media that
16  leads to body imaging concerns or whether
17  body imaging concerns lead to more social
18  media use, right?
19        MS. EMMEL:  Object to the
20     questioning as beyond the scope.
21     A.    As such, yes.
22  BY MR. DAVIS:
23     Q.    Okay.
24     A.    You're correct.
25     Q.    Okay.  So let's turn to

Page 722

1  Section 5.7, where you deal with sleep
2  disturbances at page -- at report -- at
3  page 53.
4     A.    You said 5 point what?
5     Q.    It's Section 5.7, sleep
6  disturbances.
7     A.    Oh, in my report?
8     Q.    Yes.
9     A.    Oh, yes.  And what was the page
10  again?  Sorry.
11        THE STENOGRAPHER:  53.
12        THE WITNESS:  Oh, 53.  No,
13     it's -- oh, yeah, 52.
14  BY MR. DAVIS:
15     Q.    In your report, you say that --
16  and I'm quoting you:  Studies consistently
17  show the negative impact of social media use
18  on sleep quality and quantity.
19        Did I read that correctly?
20        MS. EMMEL:  Object to the
21     scope.  Counsel, these are not within
22     the purview of my direct.
23        MR. DAVIS:  You just had him
24     readopt his entire opinions in your
25     questioning, and you asked him whether

Page 723

1  or not those are his opinions today.
2        You've opened up the entire
3     floor for questioning about his entire
4     report, so I just disagree.
5        MS. EMMEL:  I'm going to
6     object.  A standing objection --
7        MR. DAVIS:  Of course.
8        MS. EMMEL:  -- to the line of
9     questioning.
10        MR. DAVIS:  Of course.  We
11     won't resolve that today.
12        THE WITNESS:  Can you point me
13     to the line?
14  BY MR. DAVIS:
15     Q.    Sure, yeah.
16        It's the last paragraph of
17  Section 5.7.
18     A.    Last paragraph on page 53, yes.
19     Q.    Do you want to hand it to me
20  and I'll find it for you?
21        Yeah, it's the very last
22  paragraph, first sentence.
23     A.    Yes.
24     Q.    Because what your Section 5.7
25  deals with is it deals with sleep

73 (Pages 720 - 723)

CONFIDENTIAL

1  disturbances and social media use, right?
2      A.    Yes.
3      Q.    And you end up -- you summarize
4  a number of different studies on that issue,
5  and you end with the statement that the
6  studies, quote: Consistently show the
7  negative impact of social media use on sleep
8  quality and quantity.
9          Correct?
10     A.    That is what I have written.
11     Q.    Now, when you did your analysis
12 of sleep quality and quantity or sleep
13 disturbances, you didn't do a comprehensive
14 analysis of all social media -- all studies
15 involving social media use, did you?
16     A.    It's not clear to me what you
17 mean -- what you mean --
18     Q.    You didn't find all -- when you
19 did your analysis for the effect of social
20 media use on sleep disturbances or sleep
21 quality or sleep quantity, you didn't pull
22 every study that had been done on the issue
23 of social media use and sleep issues, did
24 you?
25         MS. EMMEL:  Objection, vague.

1      A.    I used some meta-analyses, and
2  they draw on a large number of studies.
3  BY MR. DAVIS:
4      Q.    Well, you -- go ahead.  I'm
5  sorry.
6      A.    Clearly -- I mean, it's -- the
7  total section is one page on sleep, and so it
8  wouldn't include all -- it wouldn't be a
9  comprehensive review of this literature.
10     Q.    Maybe I can short-circuit this.
11     A.    Okay.
12     Q.    You don't hold an opinion to a
13 reasonable degree of medical or scientific
14 certainty that social media use causes or
15 substantially contributes to sleep disorders,
16 do you?
17     A.    I hold the view to a certain --
18 to the degree of certainty that is more
19 likely than not, it contributes to shortened
20 period of sleep.  It impacts sleep.
21         Now, does it lead to sleep
22 disorders, because sleep disorders are very
23 specific conditions.  Does it sleep -- lead
24 to sleep disorders is a different question.
25     Q.    Okay.  And I appreciate that,

1  because I think that will short-circuit this.
2          But you haven't reached an
3  opinion to a reasonable deal of medical or
4  scientific certainty that use of social media
5  causes or substantially contributes to any
6  sleep disorder, right?
7          MS. EMMEL:  Objection, vague.
8      A.    Yeah, I think the section is
9  clear, social media use causes sleep
10 disturbance.
11 BY MR. DAVIS:
12     Q.    Yeah, and that's what I'm
13 getting at.
14         Your opinion is -- if I can
15 kind of -- your opinion is that social media
16 contributes to a shortened period of sleep,
17 right?
18     A.    That's correct.
19     Q.    Okay.  You don't hold the
20 opinion to a reasonable degree of medical or
21 scientific certainty that use of social media
22 causes or substantially contributes to an
23 actual sleep disorder, do you?
24         MS. EMMEL:  Objection, vague.
25     A.    To the extent that it

1  contributes to sleep -- shortened sleep
2  period and some studies also suggest quality
3  of sleep, to that extent, some of these
4  people in future might -- or currently might
5  actually suffer from insomnia or a degree of
6  sleep disorder that meets the clinical --
7  BY MR. DAVIS:
8      Q.    None of the studies that you --
9      A.    -- criteria.
10     Q.    -- analyzed actually looked at
11 social media use and the outcome measure of
12 insomnia, true?
13     A.    I'm looking at them to see.
14 Sleep problems, sleep problems, sleep
15 problems.  Mostly they're looking at sleep
16 problems, shortened duration of sleep and
17 sleep problems.
18     Q.    Okay.  But there's no study
19 that you've analyzed that assessed whether or
20 not social media caused or contributed to
21 actual insomnia, correct?
22     A.    Not in this section, no.
23     Q.    Okay.  And there are other
24 diagnosed and clinically recognized sleep
25 disorders, correct?

CONFIDENTIAL

Page 728

1    A.    Correct.
2    Q.    What are some of them?
3    A.    Well, sleep apnea is one, and
4  then -- so there is sleep terror.  There is a
5  number of -- the nightmare disorder in
6  children, adolescents.  So there are a number
7  of sleep conditions.
8    Q.    And you don't hold an opinion
9  to a reasonable degree of medical certainty
10  that social media use results in either sleep
11  terror or sleep apnea, do you?
12    A.    I haven't reviewed any evidence
13  for that or seen the evidence when I was
14  conducting this review.
15    Q.    Okay.  And you don't hold an
16  opinion to a reasonable degree of medical or
17  scientific certainty that use of social media
18  causes or substantially contributes to some
19  other diagnosed sleep disorder, do you?
20        MS. EMMEL:  Objection, vague.
21    A.    Can you repeat the question?
22  The question is --
23  BY MR. DAVIS:
24    Q.    Right.
25        You don't hold an opinion --

Page 729

1  none of the studies that you looked at
2  analyzed a sleep disorder outside of sleep
3  apnea or sleep terror, right?
4    A.    Uh-huh.
5    Q.    Correct?
6    A.    Yeah, there are two
7  mentioned -- there are a number.  There's a
8  list of sleep disorders and --
9    Q.    Right.
10    A.    -- in excess --
11    Q.    You're not offering an opinion
12  in the case that social media causes or
13  substantially contributes to some diagnosed
14  sleep disorder, are you?
15    A.    I'm not saying that in this
16  report.
17    Q.    Okay.  You're saying that --
18  simply that your view is that use of social
19  media can result in shortened duration of
20  sleep, right?
21    A.    And other sleep problems.  Some
22  of them are in the papers.  We could look at
23  them.
24    Q.    Like what?
25    A.    Well, we could look at the

Page 730

1  Viner study, for example, see what are the
2  sleep problems.  I didn't break it down.  But
3  we could look at some of those studies to
4  see.
5    Q.    Can you tell me -- give me the
6  list of what sleep problems you --
7    A.    Delayed -- delayed initiation
8  of sleep is one they talk about.
9    Q.    That's the same as shortened
10  duration of sleep, right?
11    A.    Well, delayed initiation might
12  be related to social -- to shortened duration
13  or not, but it's by itself a problem, a sleep
14  problem.
15    Q.    Any others?  Delayed initiation
16  of sleep and duration of sleep are two you've
17  identified.
18        What else?
19    A.    I'm looking at my report.
20        (Document review.)
21    A.    Yeah, I have to look at the
22  individual studies, if you want.
23        Inadequate sleep -- well,
24  that's also related to that --
25        ///

Page 731

1  BY MR. DAVIS:
2    Q.    Okay.
3    A.    -- to the shortened duration of
4  sleep.
5    Q.    And did any of the studies
6  provide evidence that, regardless of whatever
7  sleep problems you think may be a result of
8  social media, that those then resulted in
9  clinically significant symptoms that required
10  treatment?
11    A.    The requirement of treatment
12  was not -- I mean, the studies don't look at
13  mental health complaints that require -- do
14  or do not require treatment.
15    Q.    Okay.
16    A.    They're usually looking at
17  elevated scores on the scale, symptomatology
18  that is increased.
19    Q.    And none of those studies that
20  you analyzed to assess social media use and
21  sleep problems assessed or analyzed whether
22  individuals had problems functioning during
23  the day, right?
24    A.    I believe at least some of the
25  studies I looked at looked at the academic

75 (Pages 728 - 731)

CONFIDENTIAL

Page 732

1  performance of children, and there was a
2  relationship, mediation by sleep, so...
3      Q.    Are you referring to the
4  Chinese study that was a cross-sectional
5  study?
6      A.    Yeah. Yeah.
7      Q.    Okay. Any others?
8      A.    That one came to mind. There
9  might be others. I don't recall any --
10     Q.    You don't know of others today,
11 do you?
12     A.    Right now talking to you, no.
13     Q.    Do you know of any of the
14 studies that actually analyzed whether or not
15 any sleep problems supposedly from social
16 media impacted job performance or function --
17 day-to-day functionality?
18     A.    The study that you have been
19 mentioning, the Chinese one.
20     Q.    Other than that, are you aware
21 of one?
22     A.    Off the top of my head, no.
23     Q.    Okay. And it's also fair to
24 say that -- is there any study besides the
25 Viner study that was not cross-sectional?

Page 733

1      A.    Again, this is a -- this is --
2  this is not the right page.
3            I don't recall, and I have to
4  look at it to be able to tell you that.
5            MR. DAVIS: How much time do I
6      have left?
7            THE VIDEOGRAPHER: Looks like
8      you've got ten minutes.
9            MR. DAVIS: Okay. That's good
10     enough.
11           Let's go off the record because
12     I lost the place in my outline where I
13     wanted to ask.
14           THE VIDEOGRAPHER: Off the
15     record at 3:59 p.m. That's the end of
16     Media 19.
17           (Recess taken, 3:59 p.m. to
18     4:00 p.m. CDT)
19           THE VIDEOGRAPHER: We're back
20     on the record at 4:00 p.m. This is
21     the beginning of Media 20.
22 BY MR. DAVIS:
23     Q.    If you go to your report at
24 page 13, Section 3.5.2.
25     A.    Page 13, 3.5.2, yes.

Page 734

1      Q.    If you look at the first
2  paragraph, the last sentence, you say: Many
3  adolescents depend on social media
4  platform --
5      A.    Can you --
6      Q.    Sure.
7      A.    This is page 13.
8      Q.    Yeah. It's the last sentence
9  here.
10     A.    Okay. Thank you.
11     Q.    Right there, okay?
12           You say in that paragraph,
13 quote: Many adolescents depend on social
14 media platforms to communicate and socialize
15 with their peers or to fulfill academic
16 requirements.
17           Correct?
18     A.    Yes.
19     Q.    Right.
20           So you recognize that there are
21 a number of benefits to social media,
22 correct?
23     A.    It is used in beneficial ways
24 by adolescents, yes.
25     Q.    One of the beneficial ways is

Page 735

1  they communicate with friends and family,
2  correct?
3      A.    That's correct.
4      Q.    One of the ways that they use
5  social media is to educate themselves for
6  schoolwork or for other news events that are
7  happening around the world, right?
8      A.    I'm not denying the benefits of
9  social media. I'm talking about the harms in
10 this report.
11     Q.    Right. But let's focus on the
12 benefits, okay.
13           What other benefits have you
14 seen from social media --
15           MS. EMMEL: Objection, vague.
16 BY MR. DAVIS:
17     Q.    -- in teens and young adults?
18           MS. EMMEL: Objection, vague.
19     A.    There are, as you said,
20 multiple benefits. Socializing,
21 communicating. I talk about peer
22 relationships. And some of the YouTubes are
23 used educationally. It is useful. It has
24 some very useful educational material.
25           ///

76 (Pages 732 - 735)

CONFIDENTIAL

1 BY MR. DAVIS:
2    Q.   Right.
3         Every social media platform,
4 including all the defendants' social media
5 platforms in this case provide educational
6 benefits to teen and adolescents and young
7 adults, right?
8         MS. EMMEL:  Objection,
9    foundation.
10    A.   Again, I'm not denying the
11 benefits for large group of adolescents and
12 kids.  And we talked about it.  I don't
13 advocate banning social media.
14         I'm just talking about some
15 vulnerable kids who might be affected
16 negatively and be harmed by social media.
17 BY MR. DAVIS:
18    Q.   Right.
19         And you recognize that even
20 patients who have serious psychiatric
21 disorders, both -- who are both pediatric and
22 adult patients, can benefit from social
23 media, right?
24         MS. EMMEL:  Objection,
25    speculation.

1    A.   As you said, it -- "can" is a
2 very large word, so they may benefit.  They
3 can benefit.  And they can be harmed.  They
4 can be harmed by the content or the
5 algorithms of the media.
6 BY MR. DAVIS:
7    Q.   I got your views on harm.
8 We've talked about them for two days.
9    A.   Okay.
10    Q.   I want to focus on benefits,
11 okay?
12         You recognize that even
13 pediatric and adult patients with serious
14 psychiatric disorders or other medical
15 conditions can receive significant benefits
16 from the use of social media, right?
17         MS. EMMEL:  Objection,
18    speculation.
19    A.   I haven't done this research.
20 This wasn't part of my report, so to answer
21 that question, I think, I have to do a
22 similar survey or a report on -- which I'd be
23 happy to do -- for positive effect of social
24 media.
25         ///

1 BY MR. DAVIS:
2    Q.   Well, you're not denying that
3 even adult or pediatric patients with serious
4 psychiatric disorders or other medical
5 conditions can benefit from use of social
6 media, right?
7         You're not denying that?
8         MS. EMMEL:  Objection,
9    speculation, asked and answered.
10    A.   Yeah, it's an empirical
11 question.  I wouldn't speculate on that
12 because I haven't done the review.
13 BY MR. DAVIS:
14    Q.   You've published on that,
15 Dr. Mojtabai.
16    A.   I have published in the past in
17 stating that --
18    Q.   You have --
19    A.   -- some people benefit from it.
20    Q.   Let me give you Exhibit 66,
21 which is my publication on that very issue.
22         (Whereupon, Mojtabai-66, Beyond
23         Social Media: A Cross-Sectional Survey
24         of Other Internet and Mobile Phone
25         Applications in a Community, by Carras

1    et al, was marked for identification.)
2    A.   That is true.  I have published
3 on that.  I don't --
4 BY MR. DAVIS:
5    Q.   In fact, you wrote an article
6 for the Practitioner's Corner right?
7    A.   I didn't author that, but I
8 might actually be in the list of the authors.
9    Q.   Your name's on the article,
10 right?
11    A.   Can I see that?
12    Q.   Right there.  It's in front of
13 you.
14    A.   Oh, yeah, this one.
15    Q.   Exhibit 66, your name's right
16 on that article, correct?
17    A.   Yeah, this is not -- it's not a
18 journal's name.  The journal is Journal of
19 Psychiatric Practice.
20    Q.   Let's just make sure the record
21 is clear.  You're a coauthor on an article
22 about social media that appeared in the
23 Practitioner's Corner for the Journal of
24 Psychiatric Practice, right?
25    A.   That is correct.

77 (Pages 736 - 739)

Page 740

1    Q.    And what you did is you were
2  analyzing and looking at Internet and mobile
3  phone apps in a community of -- of -- a
4  psychiatric community population, correct?
5    A.    That is correct.
6    Q.    And if you look at page 127.
7    A.    Right.
8    Q.    The left-hand -- the top
9  left-hand corner you state in this article:
10  Popular media applications have shown to
11  benefit people with severe mental illness by
12  facilitating communication and social
13  support, helping patients cope with or manage
14  symptoms, and providing a way to monitor or
15  predict mental health states.
16         Did I read that correctly?
17    A.    That is correct.
18    Q.    That was true then and it's
19  true today, right?
20    A.    I don't --
21         MS. EMMEL:  Objection,
22  misstates testimony.
23    A.    Yeah, I don't know if it is
24  true today.  It's seven years ago it was
25  published.

Page 741

1         And I -- as I said, I haven't
2  done a review of literature on that to be --
3  to have an updated current opinion on that to
4  say if it's substantially beneficial or not.
5  BY MR. DAVIS:
6    Q.    Let's see if I can get -- make
7  sure I understand this correctly.
8    A.    Okay.
9    Q.    For the purposes of preparing
10  your opinions in this case --
11    A.    Right.
12    Q.    -- you did not do an in-depth
13  analysis to determine what the benefits of
14  social media were, did you?
15    A.    I was not doing a harm-benefit
16  or benefit-harm -- cost.
17    Q.    Right.  But the plaintiffs'
18  lawyers -- the plaintiff's lawyers only asked
19  you to look at the harm side of the coin,
20  correct?
21    A.    They asked me if there is a
22  causal relationship between harms that
23  children and adolescents who use these media
24  experience and whether the evidence
25  supports -- "supports" does not establish a

Page 742

1  causal relationship.
2    Q.    They didn't ask you -- the
3  plaintiffs' lawyers didn't ask you to look at
4  the benefits of social media and give a
5  report and assessment of that, did they?
6         MS. EMMEL:  Objection, asked
7  and answered.
8    A.    They -- it is explicitly stated
9  in this report that -- what was the report
10  doing.
11  BY MR. DAVIS:
12    Q.    Correct.
13         And the plaintiffs' lawyers
14  didn't ask you to assess and analyze the
15  benefits of social media, did they?
16    A.    Again, they didn't.
17    Q.    Okay.
18    A.    It's in the report, what I was
19  told to do for --
20    Q.    Look at page 128.
21    A.    -- what they wanted me to look
22  at.
23         Which one?
24    Q.    128.
25    A.    This one?

Page 743

1    Q.    Yeah.
2         Left-hand column, first full
3  paragraph, line 6.  You wrote in this
4  article:  Studies of social media use by
5  people with SMI.
6         SMI is serious medical illness,
7  right?
8    A.    No, serious mental illness.
9    Q.    Yes.  Studies of social media
10  use by people with serious mental illness
11  indicate the benefits of seeking and
12  providing support, developing new
13  relationships and maintaining existing ones
14  and seeking information about illness through
15  online interactions about -- on social media
16  platforms, message boards or chat
17  applications.
18         Correct?
19    A.    This is what is --
20    Q.    That's what you wrote in this
21  article?
22    A.    Yes.
23    Q.    And then you went on and say, a
24  couple lines down from that, there's a
25  sentence that begins "The value."

78 (Pages 740 - 743)

CONFIDENTIAL

Page 744

1        Do you see that?
2    A.    "The value." Okay.
3    Q.    The value placed -- quote: The
4 value placed on social networking by
5 individuals with serious mental illness is
6 high.  In a recent review of the
7 acceptability of mobile phone and online
8 interventions by people with serious mental
9 illness, individuals in several studies
10 indicated a desire for social networking or
11 peer support as part of the intervention.
12        Did I read that correctly?
13    A.    That is correct.
14    Q.    Right.
15        So what you're saying in this
16 article is that individuals with serious
17 mental illness are benefiting from social
18 networking and that social media apps provide
19 that benefit, right?
20    A.    This paper was about social
21 benefits of, as you said, networking social.
22    Q.    So --
23    A.    So the focus of this one was
24 the benefit, not the harm.
25    Q.    Okay.  And then you come on --

Page 745

1 later on you say, on 129, right-hand column,
2 first full paragraph, line 3.
3    A.    Can you point to it?
4    Q.    Okay.  It's right here.
5    A.    Okay.  Thank you.
6    Q.    You say:  Whatever -- quote:
7 Whatever through social interactions and
8 connection or the productive and creative
9 work of leveling video game characters or
10 creating content on blogs or wikis, digital
11 technology use may allow people with serious
12 mental illness to communicate and connect,
13 provide and receive support, and see clear
14 evidence of success in a way that they may
15 not in face-to-face interactions, quote.
16        That's what you wrote then,
17 right?
18    A.    Yes.
19    Q.    And when you wrote that, you
20 weren't serving as an expert for the
21 plaintiffs' lawyers, were you?
22    A.    That's 2018.  No, I wasn't.
23    Q.    And you also say -- and so
24 the -- okay.
25        So one of the things, in fact,

Page 746

1 for this case, in order to educate yourself
2 about something to do with the case,
3 specifically the use of social media, you
4 went on social media to learn about it,
5 right?
6    A.    I did.
7    Q.    You went on a social media
8 platform and said, hey, I'm going to educate
9 myself about social media, right?
10        You did, right?
11    A.    Yes, I did.
12    Q.    And you went on the platform
13 YouTube, right?
14    A.    I did.
15    Q.    And YouTube was helpful to you
16 and it was beneficial to you, and you've
17 learned information, right?
18    A.    I did.
19    Q.    You didn't have any mental --
20        MS. EMMEL:  Excuse me.  I
21 believe our time is up; is that
22 correct?
23        MR. DAVIS:  Okay.  I've got one
24 more question.
25        MS. EMMEL:  Our time is up,

Page 747

1 we're done.
2        MR. DAVIS:  No, I've got one
3 more question.
4        MS. EMMEL:  That's fine, but
5 the time is up so you can't ask the
6 question because the time is up and
7 the deposition is over.
8        MR. DAVIS:  I don't think so.
9 BY MR. DAVIS:
10    Q.    Dr. Mojtabai --
11        MS. EMMEL:  Dr. Mojtabai, don't
12 answer the question.  The deposition
13 is over.
14        MR. DAVIS:  I have one more
15 question.  I have one more question.
16        MS. EMMEL:  I'm sorry about
17 that, but the time is up.
18        MR. DAVIS:  I have one more
19 question.  Are you okay with that,
20 Dr. Mojtabai?
21        MS. EMMEL:  One more question,
22 that's it.
23 BY MR. DAVIS:
24    Q.    Dr. Mojtabai, you fully
25 recognize that for every other defendants'

79 (Pages 744 - 747)

CONFIDENTIAL

Page 748

1  platform in this case, YouTube, Meta, Snap
2  and TikTok, they all provide helpful,
3  beneficial information to people, adult or
4  pediatric, that go on and use those
5  platforms, right?
6          MS. EMMEL:  Objection.  The
7  time is up on the deposition.
8      A.    As I said, there are groups
9  that are harmed by it, and many people
10 benefit from it, including myself.  I go on
11 YouTube and I use the material there.
12         MR. DAVIS:  Thank you,
13 Dr. Mojtabai.
14         THE WITNESS:  Thank you.
15         THE VIDEOGRAPHER:  All right.
16 Done?  All right.
17         That concludes Dr. Mojtabai's
18 deposition.
19         Snap --
20         MR. DAVIS:  Yep.  We're just
21 going to -- something for the record.
22 Defendants reserve on additional
23 questions for the exchange of
24 communications that we've had with
25 plaintiffs' counsel.

Page 749

1          THE VIDEOGRAPHER:  Snapchat
2  used 30 minutes; YouTube used 28
3  minutes; TikTok used 10 hours, 16;
4  Meta used 18; and Ms. Emmel used 26.
5          We're now off the record at
6  4:13 p.m.  That's the end of Media 20.
7          (Time noted: 4:13 p.m. CDT)
8              --o0o--
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 750

1            CERTIFICATE
2      I, MICHAEL E. MILLER, Fellow of
   the Academy of Professional Reporters,
3  Registered Diplomate Reporter, Certified
   Realtime Reporter, Certified Court Reporter
4  and Notary Public, do hereby certify that
   prior to the commencement of the examination,
5  RAMIN MOJTABAI, MD, PhD, MPH was duly sworn
   by me to testify to the truth, the whole
6  truth and nothing but the truth.
7      I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
   before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
   ability.
10
       I DO FURTHER CERTIFY that pursuant
11 to FRCP Rule 30, signature of the witness was
   not requested by the witness or other party
12 before the conclusion of the deposition.
13     I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor attorney
14 nor counsel of any of the parties to this
   action, and that I am neither a relative nor
15 employee of such attorney or counsel, and
   that I am not financially interested in the
16 action.
17
18 _____
   MICHAEL E. MILLER, FAPR, RDR, CRR
19 Fellow of the Academy of Professional Reporters
   NCRA Registered Diplomate Reporter
20 NCRA Certified Realtime Reporter
   LA Certified Court Reporter #27009
21
22 Dated: June 6, 2025
23
24
25

Page 751

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8          After doing so, please sign the
9  errata sheet and date it.
10         You are signing same subject to
11 the changes you have noted on the errata
12 sheet, which will be attached to your
13 deposition.
14         It is imperative that you return
15 the original errata sheet to the deposing
16 attorney within thirty (30) days of receipt
17 of the deposition transcript by you.  If you
18 fail to do so, the deposition transcript may
19 be deemed to be accurate and may be used in
20 court.
21
22
23
24
25

80 (Pages 748 - 751)

CONFIDENTIAL

1              ERRATA
2  PAGE  LINE  CHANGE
3  ____  ____  _____
4        REASON: _____
5  ____  ____  _____
6        REASON: _____
7  ____  ____  _____
8        REASON: _____
9  ____  ____  _____
10       REASON: _____
11 ____  ____  _____
12       REASON: _____
13 ____  ____  _____
14       REASON: _____
15 ____  ____  _____
16       REASON: _____
17 ____  ____  _____
18       REASON: _____
19 ____  ____  _____
20       REASON: _____
21 ____  ____  _____
22       REASON: _____
23 ____  ____  _____
24       REASON: _____
25

1              LAWYER'S NOTES
2
3  PAGE   LINE
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____
25

1         ACKNOWLEDGMENT OF DEPONENT
2
3
4       I, RAMIN MOJTABAI, MD, PhD, MPH,
   do hereby certify that I have read the
5  foregoing pages and that the same is a
   correct transcription of the answers given by
6  me to the questions therein propounded,
   except for the corrections or changes in form
7  or substance, if any, noted in the attached
   Errata Sheet.
8
9
10
11
12 _____
   RAMIN MOJTABAI, MD, PhD, MPH        DATE
13
14
15 Subscribed and sworn to before me this
16 _____ day of _____, 20 _____.
17 My commission expires: _____
18
19 _____
20 Notary Public
21
22
23
24
25

81 (Pages 752 - 754)