**Exhibit 16**


**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE GENERAL CAUSATION TESTIMONY OF PLAINTIFFS' EXPERTS**


Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 1

```
 1        SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2             FOR THE COUNTY OF LOS ANGELES
 3               SPRING STREET COURTHOUSE
 4
 5    COORDINATION PROCEEDING      )
      SPECIAL TITLE [RULE          )
 6    3.400]                       )
                                   )   JCCP No. 5255
 7    IN RE: SOCIAL MEDIA          )
      ADOLESCENT ADDICTION         )   For Filing Purposes
 8    (JCCP No. 5255)              )   22STCV21355
                                   )
 9    _____  )
                                   )
10    THIS DOCUMENT RELATES TO:    )
                                   )
11    Cristina Arlington Smith,    )
      et al. TikTok Inc., et       )
12    al, Case No. 22stcv21355     )
      Los Angeles Superior         )
13    Court                        )
                                   )
14                   - - - -
15       CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
16                  VIDEO-RECORDED
17             EXPERT WITNESS TESTIMONY OF
18              DREW PATRICK CINGEL, Ph.D.
19                 (Pages 1 - 409)
20          Held at the Kimpton Sawyer Hotel
21        500 J Street, Sacramento, California
22        Wednesday, July 9, 2025, 9:04 a.m.
23                   - - - -
24
25    REPORTED BY:  ELAINA BULDA-JONES, CSR 11720
```

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 2

```
1              APPEARANCES
2
3  For the Plaintiffs and the Witness:
4     BY: JONATHAN P. KIEFFER, ESQ.
         Wagstaff & Cartmell LLP
5      4740 Grand Avenue, Suite 300
         Kansas City, Missouri 64112
6      816.701.1100
         Jpkieffer@wcllp.com
7
         BY: SARA O. COUCH, ESQ. (VIA ZOOM)
8      Motley Rice LLC
         28 Bridgeside Boulevard
9      Mount Pleasant, South Carolina 29464
         843.216.9000
10     Scouch@motleyrice.com
11
12 For the Defendants TikTok Inc., and ByteDance, Inc.:
13    BY: KEVIN BOYCE, ESQ.
         King & Spalding LLP
14     Southeast Financial Center
         200 S. Biscayne Boulevard, Suite 4700
15     Miami, Florida 33131
         305.462.6039
16     Kboyce@kslaw.com
17
18 For the Defendant Snap, Inc.:
19    BY: JONATHAN H. BLAVIN, ESQ.
         BY: ALBERTO De DIEGO-HABEL, ESQ. (VIA ZOOM)
20     Munger, Tolles & Olson LLP
         560 Mission Street, 27th Floor
21     San Francisco, California 94105
         415.512.4011
22     Jonathan.blavin@mto.com
23
24
25
```

Page 3

```
1  For the Defendants Google LLC and YouTube LLC:
2     BY: CHRISTOPHER CHIOU, ESQ.
         BY: JENNA STOKES, ESQ.
3     BY: CALLIE DAVIDSON, ESQ. (VIA ZOOM)
         Wilson Sonsini Goodrich & Rosati
4      935 East Third Street, Suite 100
         Los Angeles, California 90013
5      323.210.2987
         Cchiou@wsgr.com
6      Jenna.stokes@wsgr.com
7     BY: KATHERINE VAKY, ESQ. (VIA ZOOM)
         Morgan, Lewis & Bockius LLP
8      One Oxford Centre, 32nd Floor
         Pittsburgh, Pennsylvania 15219-6401
9      412.560.7474
         Katherine.vaky@morganlewis.com
10
11
   For the Defendants Meta Platforms, Inc., f/k/a
12 Facebook, Inc.; Instagram, LLC, Facebook Payments,
   Inc.; Facebook Operations, LLC; and Siculus, Inc.:
13
      BY: ISAAC CHAPUT, ESQ.
14    BY: ALEXANDER KENNEDY, ESQ. (VIA ZOOM)
         Covington & Burling LLP
15     415 Mission Street, Suite 5400
         San Francisco, California 94105-2533
16     415.591.7020
         Ichaput@cov.com
17
18
   Also present:
19
      Angela Priest, Wagstaff (VIA ZOOM)
20    Alejandro Zamora-Ruiz, videographer
         Daniel Lawlor, trial technician
21    Narmeen Nkeiti (VIA ZOOM)
22
23
24
25
```

Page 4

```
1           INDEX OF EXAMINATIONS
2
3  EXAMINATIONS                    PAGE
4  MR. CHIOU                        9
5  MR. CHAPUT                      261
6  MR. BLAVIN                      318
7  MR. BOYCE                       364
8  MR. KIEFFER                     399
9  MR. CHIOU                       404
10
11
12
13          INDEX OF EXHIBITS
14   NO.       DESCRIPTION        PAGE
15 Cingel      Defendants' Joint Notice of    20
   Exhibit 1  Deposition of Plaintiffs'
16            Retained Expert Drew Patrick
              Cingel, Ph.D., and Request for
17            Production of Documents
18 Cingel      Expert Report of Drew P.       25
   Exhibit 2  Cingel, Ph.D., April 18, 2025
19
   Cingel      Expert Report of Drew P.       78
20 Exhibit 3  Cingel, Ph.D., May 16, 2025
21 Cingel      National Academies Press,      82
   Exhibit 4  Social Media and Adolescent
22            Health, Consensus Study Report
23
24
25
```

Page 5

```
1  Cingel      Korean Children's YouTube Use  165
   Exhibit 5  and Social Skills: A Linkage
2             Analysis with Negative
              Interactions in Favorite
3             YouTube Content, Min Jung Kim,
              et al.
4
   Cingel      Longitudinal Association       165
5  Exhibit 6  Between Social Media Use and
              Psychological Distress Among
6             Adolescents, Ingibjorg
              Thorisdottir, et al.
7
   Cingel      Emotional Responses to Social  177
8  Exhibit 7  Media Experiences Among
              Adolescents: Longitudinal
9             Associations with Depressive
              Symptoms
10
   Cingel      The Longitudinal Association   184
11 Exhibit 8  Between Social-Media Use and
              Depressive Symptoms Among
12            Adolescents and Young Adults:
              An Empirical Reply to Twenge
13            et al., (2018), Taylor Heffer,
              et al.
14
   Cingel      Reciprocal Relationships       186
15 Exhibit 9  Between Trajectories of
              Depressive Symptoms and Screen
16            Media use During Adolescence,
              Stephen Houghton, et al.
17
   Cingel      Longitudinal Associations      189
18 Exhibit 10  between Problematic Social
              Media Use and Depressive
19            Symptoms in Adolescent Girls,
              Lennart Raudsepp, et al.
20
   Cingel      Social Media and Depression    193
21 Exhibit 11  Symptoms: A Meta-Analysis,
              Simone Cunningham, et al.
22
   Cingel      Cultural Background and        197
23 Exhibit 12  Measurement of Usage Moderate
              the Association Between Social
24            Networking Sites (SNSs) Usage
              and Mental Health: A
25            Meta-Analysis, Xue Qin Yin
```

Golkow Technologies,
A Veritext Division

877-370-3377                                        www.veritext.com

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 6

1  Cingel       The Association Between        203
   Exhibit 13   Self-Reported Depressive
2               Symptoms and the Use of Social
                Networking Sites (SNS): A
3               Meta-Analysis, Zahra Vahedi
4  Cingel       A Systematic Review: The       205
   Exhibit 14   Influence of Social Media on
5               Depression, Anxiety, and
                Psychological Distress in
6               Adolescents, Betul Keles, et
                al.
7
   Cingel       Cingel Response to Certain     230
8  Exhibit 15   Defense Expert Critiques
9  Cingel       Making the Moral of the Story  253
   Exhibit 16   Stick - A Media Psychologist
10              Explains the Research Behind
                Sesame Street, Arthur, and
11              Other Children's TV, Drew
                Cingel, et al.
12
   Cingel       Hard Life Moments - Mental     281
13 Exhibit 17   Health Deep Dive,
                META3047MDL-003-00095008
14
   Cingel       Time & Control, Crystine Gray  289
15 Exhibit 18   UX Research,
                META3047MDL-044-00171345
16
   Cingel       Daisy Global network Test      299
17 Exhibit 19   Survey Report,
                META3047MDL-004-00014837
18
   Cingel       Problematic Facebook Use: When 304
19 Exhibit 20   People Feel Like Facebook
                Negatively Affects Their Life,
20              Moira Burke and Justin Cheng,
                META3047MDL-039-00000058
21
   Cingel       Understanding Perceptions of   305
22 Exhibit 21   Problematic Facebook Use,
                Justin Cheng, et al.
23
   Cingel       Teen Mental Health, Creatures  311
24 Exhibit 22   of Habit - Aug/Sep 2019,
                META3047MDL-003-00091414
25

Page 7

1  Cingel       Social Media Use Leads to      336
   Exhibit 23   Negative Mental Health
2               Outcomes for Most Adolescents,
                Amber van der Wal, et al.
3
   Cingel       Adolescents' Selfie-Activities 343
4  Exhibit 24   and Idealized Online
                Self-Presentation: An
5               Application of the
                Sociocultural Model, Ann
6               Rousseau
7  Cingel       Snapchat is More Personal: An  346
   Exhibit 25   Exploratory Study on Snapchat
8               Behaviors and Young Adults
                Interpersonal Relationships,
9               J. Mitchell Vaterlaus
10 Cingel       Streaks User Research, August  352
   Exhibit 26   2018, SNAP0000008
11
   Cingel       Final Report, Healthy          355
12 Exhibit 27   Interactions Research February
                2023, SNAP0404262
13
   Cingel       Connecting with Young People   361
14 Exhibit 28   on Mental Health & well-being,
                SNAP0933703
15
   Cingel       TikTok for Business,           370
16 Exhibit 29   TIKTOK3047MDL-080-LARK-
                02714281
17
   Cingel       [TikTank] well-being Impacts - 376
18 Exhibit 30   Research Report,
                TIKTOK3047MDL-111-LARK-
19              05821067
20 Cingel       TikTok History 101 - US,       386
   Exhibit 31   TIKTOK3047MDL-056-00965196
21
   Cingel       Screen Time Management One     388
22 Exhibit 32   Pager,
                TIKTOK3047MDL-047-LARK-
23              00510814
24 Cingel       Screen Time Restrictions for   393
   Exhibit 33   Minors,
25              TIKTOK3047MDL-004-00151118

Page 8

1       THE VIDEOGRAPHER:  We are now on the
2  record.  My name is Alejandro Zamora-Ruiz.  I am the
3  videographer for Golkow.  Today's date is July 9,
4  2025, and the time is 9:04 a.m. Pacific time.
5       This video deposition is being held at
6  Kimpton Sawyer Hotel at 500 J Street, Sacramento,
7  California 95814, in the matter of Cristina
8  Arlington Smith, et al., versus TikTok Incorporated,
9  et al., for the Superior Court of the State of
10 California, County of Los Angeles.
11      The deponent is Dr. Drew Patrick Cingel.
12      Will counsel please identify themselves.
13      MR. KIEFFER:  Jon Kieffer on behalf of the
14 plaintiffs and for the witness.
15      MR. CHIOU:  Christopher Chiou of Wilson
16 Sonsini on behalf of Google and YouTube.
17      MS. STOKES:  Jenna Stokes, Wilson Sonsini,
18 on behalf of Google and YouTube.
19      MR. BLAVIN:  Jonathan Blavin from Munger,
20 Tolles & Olson on behalf of Snap.
21      MR. CHAPUT:  Isaac Chaput, Covington &
22 Burling on behalf of the Meta defendants.
23      MR. BOYCE:  Kevin Boyce from King &
24 Spalding on behalf of TikTok.
25      THE VIDEOGRAPHER:  The court reporter will

Page 9

1  now introduce herself and swear in the witness.
2       THE REPORTER:  I'm Elaina Bulda-Jones.  I
3  get to be the court reporter today.  My CSR Number
4  is 11720.
5       DREW PATRICK CINGEL, PH.D.,
6  called as a witness by the Defendants herein, being
7  first duly sworn by the Certified Shorthand Reporter
8  was thereupon examined and testified as is
9  hereinafter set forth.
10      EXAMINATION
11 BY MR. CHIOU:
12      Q.  Good morning, Dr. Cingel.
13      A.  Good morning.
14      Q.  Could you please introduce yourself for
15 the record.
16      A.  My name is Drew Cingel.  I'm an associate
17 professor of communication at the University of
18 California, Davis.
19      Q.  Do you understand that the oath you just
20 took to tell the truth is just as binding in this
21 deposition as if you were testifying in front of a
22 jury?
23      A.  I do.
24      Q.  Any reason you can't give full and
25 complete testimony today?

3 (Pages 6 - 9)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 10

1    A.  No.
2    Q.  Dr. Cingel, how do you define social
3  media?
4    A.  I define social media as websites where
5  there are social aspects to it.  I detail it in my
6  report.  I use the definition of Carr and Hayes in
7  2015 where there is -- there's the opportunity for
8  user-generated content, communication between
9  multiple people, the opportunity for mass personal
10  communication where one person can communicate to a
11  wide array but also communicate one on one with
12  individual users through things like direct
13  messaging, for example.
14        There are also many features that are
15  common to social media platforms.  I detail those in
16  my report as well.  And those features cut across
17  most of the defendant companies that we are dealing
18  with today.
19    Q.  So you consider Facebook, Instagram,
20  TikTok, Snap, YouTube, they're all social media
21  platforms?
22    A.  Correct, under that definition, yes.
23    Q.  In your view, is there a difference
24  between social media platforms and digital media
25  platforms?

Page 11

1    A.  Yes.  Social media platforms are a
2  specific subset of digital media platforms.  Again,
3  what sets them apart are these features that allow
4  for sociality.  Not all digital platforms allow for
5  that in the same way that these five in particular
6  do.
7    Q.  So do you think Reddit is a social media
8  platform?
9    A.  Reddit has some of the features but it --
10  I would not consider it at the same level.  You can
11  certainly communicate one on one.  You can
12  communicate mass personally.  To my knowledge,
13  though, it lacks many of the features that I'm
14  talking about here that, again, set these apart as
15  social media.
16    Q.  Maybe you could help me understand this.
17        The way I think of Reddit, it's designed
18  for people to chat about specific topics, to talk to
19  each other.
20    A.  Sure.
21    Q.  And it -- would you agree it seems like
22  users can post videos or photos on Reddit as well,
23  right?
24    A.  I don't use Reddit.  But to my knowledge,
25  those are things that you could do.

Page 12

1        However, Reddit does not have many --
2  again, many of the features that I detail in my
3  report.  Things like endless scroll.  Doesn't have
4  that.  I don't believe that you can manipulate
5  images and things like that.  I don't believe
6  that -- there is no age verification.  I think
7  anybody can be on Reddit regardless of age.  There
8  are many other things.  I can go through each piece,
9  if you'd like me to.
10    Q.  Yeah, that actually would be helpful.  So
11  let's talk about why you think Reddit is not a
12  social media platform, like the differences.
13    A.  Uh-huh.
14    Q.  So, Dr. Cingel, you mentioned Reddit
15  doesn't have infinite scroll.  That's one reason why
16  you don't think Reddit's a social media platform,
17  right?
18    A.  Correct.  Well, and it's -- and that's one
19  thing that sets it apart from the other five
20  platforms that we're discussing today.
21    Q.  Uh-huh.
22    A.  I'm sorry, I'm just trying to find it
23  here.
24    Q.  If I heard you correctly, Dr. Cingel, a
25  second thing you mentioned is that the -- Reddit

Page 13

1  itself doesn't offer a way to alter images.
2        Did I understand that right?
3    A.  To my knowledge, yes.
4    Q.  And so to be a social media platform, in
5  your opinion, there's got to be a way on the
6  platform to alter an image.
7        Does that sound right?
8    A.  That's one of --
9        MR. KIEFFER:  Object to -- hang on.
10        THE WITNESS:  Sorry.
11        MR. KIEFFER:  Object to the form.
12  Misstates his testimony.
13        Go ahead.
14        THE WITNESS:  Sorry, can you repeat the
15  question?
16  BY MR. CHIOU:
17    Q.  Sure.
18        Is it correct that, in your view,
19  Dr. Cingel, for a platform to be considered social
20  media, there has to be a way on the platform,
21  integrated into the platform, to be able to alter
22  images?
23    A.  That is one --
24        MR. KIEFFER:  Object to the form.
25  Misstates his testimony.

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 14

1        THE WITNESS: That is one component.
2 BY MR. CHIOU:
3     Q.  So any other reasons why you don't think
4 Reddit is a social media platform?
5     A.  Yeah, to my knowledge, it does not have
6 algorithmically recommended content.  It does not --
7 it does not send information to the user based on
8 what they have done in the past, what they have
9 liked.  It doesn't -- you can go searching yourself
10 for things, of course.  But it is not sending things
11 to you based on what you've done in the past.
12     Q.  Any other reasons come to mind why you
13 think Reddit is not a social media platform?
14     A.  I think the difference -- another
15 difference is that you can -- I'm not sure if you
16 can follow individual people, like can see when they
17 post content.  Again, that's something that you can
18 do across all of the five defendant platforms here.
19 I don't believe that that's something that you can
20 do on Reddit, which, again, would set it apart from
21 these.
22     Q.  If you could follow certain threads on
23 Reddit or certain individual posters on Reddit,
24 would that change your view about Reddit as a social
25 media platform?

Page 15

1     A.  Along -- if it did all those things along
2 with all the other things that I have done, then
3 we're starting to move in that direction, but we're
4 talking about, you know, one individual change at a
5 time.
6     Q.  So we've gone through four different
7 factors to differentiate Reddit from social media
8 platforms.
9        Anything else come to mind?
10     A.  I can keep going.  Hold on, please.
11        It does not have, to my knowledge, push
12 notifications.  To my knowledge, it does not have
13 Autoplay.  I mentioned infinite scroll.  I mentioned
14 recommender algorithms.  I do believe it has social
15 cues.  I think it would show how many people have
16 read something.  I mentioned filters and other image
17 augmentation.
18        Unlike Snapchat, for example, my -- to my
19 knowledge, doesn't have ephemeral content.  Doesn't
20 have location sharing.  I don't believe it has any
21 time controls or a lack of time controls.  You --
22 like I said, you don't follow someone in particular.
23 There's maybe eight things that I think set it apart
24 from being fundamentally different from what we're
25 talking about today.

Page 16

1     Q.  Out of the eight factors you mentioned, is
2 there a specific number in your mind at which you
3 would -- of some platform would cross the threshold
4 into social media platform, in your opinion?
5        THE WITNESS: I don't --
6        MR. KIEFFER: Object.  Object to the form
7 to the extent it misstates his testimony.
8        THE WITNESS: I don't think that there
9 is -- I think about it as a continuum.  I don't
10 think that there is a -- I don't see there is like a
11 threshold where it -- where we have a tipping point.
12 BY MR. CHIOU:
13     Q.  So if on Reddit you are actually able to
14 get push notifications, does that start to move
15 along the continuum towards social media platforms?
16        MR. KIEFFER: Object to the form to the
17 extent it misstates his testimony.
18        THE WITNESS: Sorry, can you repeat?
19 BY MR. CHIOU:
20     Q.  Sure.
21        If Reddit has the capacity to send users
22 push notification, would that be just another step,
23 in your view, towards making something a social
24 media platform?
25        MR. KIEFFER: Object to the form.

Page 17

1 Misstates testimony.
2        THE WITNESS: In terms of the continuum,
3 yes.
4 BY MR. CHIOU:
5     Q.  And conversely, if Reddit lacks certain
6 other features that you mentioned, such as Autoplay,
7 that pushes it further away from the social media
8 platform category, in your view?
9        MR. KIEFFER: Object to the form to the
10 extent it misstates his testimony.
11        THE WITNESS: I think that as it lacks
12 these things, it becomes less and less social.
13 BY MR. CHIOU:
14     Q.  So do you consider Netflix to be a social
15 media platform?
16     A.  No.  I think it lacks many, many, many of
17 the things that we're talking about.
18     Q.  So getting back to the Reddit example for
19 a moment, Dr. Cingel, am I understanding right that
20 it's akin to a judgment call of how many of these
21 factors a platform meets before you consider it to
22 be a social media platform?
23        MR. KIEFFER: Object to the form.
24 Misstates testimony.
25        THE WITNESS: I think there's two --

5 (Pages 14 - 17)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 18

1 when -- yeah, so my expertise is in social media
2 use, adolescent development and mental health. And
3 I think that there is a clear consensus in people
4 who do what I do that the five platforms that we're
5 talking about here are very clearly social media
6 under the definition put forth by Carr and Hayes in
7 2015.
8        I -- we can go back and forth all day but
9 I don't think that there is a threshold that you
10 would hit. I don't think that I am out of step with
11 my colleagues in saying that Reddit isn't --
12 wouldn't be considered a social media platform, that
13 Netflix wouldn't be considered a social media
14 platform, among others.
15 BY MR. CHIOU:
16    Q. Without reference to any specific
17 platform, Dr. Cingel, am I understanding correctly
18 that there's not a specific objective number of
19 criteria that a platform hits, it's a judgment call
20 on whether you consider a platform to be a social
21 media platform?
22        MR. KIEFFER: Object to the form. Asked
23 and answered. And misstates his testimony.
24        THE WITNESS: I don't -- sorry, one more
25 time.

Page 19

1 BY MR. CHIOU:
2    Q. Sure. Let me rephrase the question,
3 Dr. Cingel.
4        Is it accurate that there's no specific
5 number of factors that would lead you to consider
6 whether a platform is a social media platform,
7 rather it's more akin to a judgment call based on
8 how many of these factors a platform meets?
9        MR. KIEFFER: Object to the form. Asked
10 and answered. Misstates his testimony.
11        THE WITNESS: And to me -- to me, a
12 judgment call would imply that we're -- we're
13 flipping a coin, like -- and that's why I talk about
14 consensus. I don't think that anyone is arguing
15 that these things aren't social media and that these
16 things are social media. It has been -- like, it's
17 pretty clear in the literature that these are things
18 that we as a field consider to be social media.
19        I don't know of anyone that's sitting
20 there counting the number of features and things or
21 aspects of the definition that it meets because --
22 we've covered that.
23 BY MR. CHIOU:
24    Q. Yeah. There's just no number of factors
25 that there's a consensus on that says boom --

Page 20

1    A. Five --
2    Q. -- this platform is social media?
3    A. No, I don't believe that we have ever
4 talked about that.
5    Q. Let's start with the first exhibit that
6 I'll mark. It's the notice of your deposition.
7        We'll mark it as Exhibit Number 1.
8        (Whereupon, Cingel Exhibit 1 was marked
9 for identification.)
10 BY MR. CHIOU:
11    Q. Do you recognize this document,
12 Dr. Cingel?
13    A. I do.
14    Q. Before this deposition, did you get a
15 chance to look through this deposition notice and
16 the document requests that are included in it?
17    A. I did.
18    Q. Did you bring anything with you to this
19 deposition?
20    A. I do. You can see some of the things in
21 front of me. I brought my report for the JCCP dated
22 April 18th, 2025. My report for the MDL dated
23 May 16th, 2025. In each there is my report in its
24 entirety. There are three exhibits, I believe. My
25 current and most updated curriculum vitae. My

Page 21

1 materials considered, I believe that's what they're
2 called. And a notice of my charges for my invoices.
3        I also have my invoices here. Another
4 copy of my updated curriculum vitae. And some notes
5 that I made with respect to some of the critiques of
6 my report made by defendant expert witnesses.
7    Q. Anything else?
8    A. No, I think that's everything.
9    Q. And you mentioned you brought notes with
10 you?
11    A. Correct.
12    Q. When did you prepare these notes?
13    A. I've been preparing them probably over the
14 past week or so as I saw that, you know, people made
15 comments about -- about my reports, and I just
16 wanted to get that down on paper so that I had a
17 memory of my reaction to those comments.
18    Q. Am I understanding correctly that these
19 are notes that you prepared in response to defense
20 experts' critiques of your work?
21    A. Correct. And I'm sorry, I don't even know
22 if I would -- they are comments that reference my
23 work.
24    Q. Do you know whether these notes have been
25 shared with defense counsel before?

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 22

1    A.  I do not.
2    Q.  Dr. Cingel, when were you first contacted
3  about the social media adolescent litigation?
4    A.  My first memory would have been in fall of
5  2022 where I met Matt Bergman and just simply spoke
6  with him for a bit about my expertise and research
7  in this area.  And then I believe that I -- you
8  know, after that was over, I believe I was connected
9  with Jon, and Tom Cartmell, and that may have been
10  sometime in 2023.  And I have been working off and
11  on on this since that time.
12    Q.  Do you remember if the contact with
13  plaintiffs' counsel in 2023 was early 2023, late
14  2023?  What's your best recollection?
15    A.  If I had -- I really don't recall.  If I
16  had to guess, it was late 2023.
17    Q.  When you were speaking with Mr. Bergman in
18  the fall of 2022, was it to explore whether you
19  would serve as an expert in this case?
20    A.  That's not my recollection of it.  My
21  recollection is more that he was just interested in
22  my expertise, what I knew, what I studied, how I
23  studied it.  And that's the information that -- that
24  I provided to him.
25    Q.  Did you know him before fall of 2022?

Page 23

1    A.  No, I did not.
2    Q.  What was the event that you met him at; do
3  you remember?
4    A.  It was actually through another colleague
5  at UC Davis.  My colleague met him somewhere, I
6  don't recall.  And, you know, Matt said that he was
7  interested in people who studied adolescent social
8  media use and mental health.  My colleague said, I
9  got someone for you.  And made that introduction.
10    Q.  What's the name of your colleague?
11    A.  Dr. Martin Hilbert.
12    Q.  So am I understanding right that your
13  colleague passed along your name and contact
14  information then to Mr. Bergman?
15    A.  That's my understanding, yes.
16    Q.  And then Mr. Bergman passed along your
17  contact information after you spoke to his
18  plaintiffs' counsel colleagues?
19    A.  That's my understanding.
20    Q.  So fast-forwarding to 2023, is that when
21  you were asked to serve as an expert witness in this
22  case?
23    A.  I'm not sure if that was the time when I
24  was explicitly asked to serve as an expert witness.
25  Again, I believe that it was more of what do you do,

Page 24

1  you know, making introductions, what do you do, what
2  do you study, how do you study what you study.
3        I honestly do not recall at what point I
4  officially said yes, I will serve as an expert
5  witness.
6    Q.  Sometime in 2023 sound right?
7    A.  If I had to guess, it would be more closer
8  to 2024.
9    Q.  Okay.  What's your understanding of your
10  assignment in this litigation?
11    A.  My understanding is that I am to bring my
12  training, my background, my expertise, my knowledge
13  of the literature in this area, to provide a report
14  of my analysis of the effects of social media use on
15  adolescent mental health and well-being.
16    Q.  Is it your understanding that you are
17  being deposed today in the context of a series of
18  cases brought by individuals that were consolidated
19  in California State Court referred to as the JCCP
20  personal injury litigation?
21    A.  That is my understanding.
22    Q.  Is it your understanding that the purpose
23  of today's deposition is to allow the defendants to
24  know what opinions you intend to offer at the trial
25  of the JCCP case?

Page 25

1    A.  That is my understanding.
2    Q.  And as you mentioned earlier, you
3  submitted a report on April 18th of this year in the
4  JCCP actions; is that right?
5    A.  Correct.
6        MR. CHIOU:  Let's go ahead and mark that.
7        (Whereupon, Cingel Exhibit 2 was marked
8  for identification.)
9  BY MR. CHIOU:
10    Q.  Dr. Cingel, is that your report for the
11  JCCP?
12    A.  It appears to be, yes.
13    Q.  When I use the term "JCCP report" or "your
14  report," do you understand that I'm referring to
15  what's been marked as Exhibit 2, your report dated
16  April 18, 2025?
17    A.  Yes, uh-huh.
18    Q.  Do you understand that for the JCCP you
19  had an opportunity to submit a rebuttal report?
20    A.  I do, yes.
21    Q.  You did not submit a rebuttal report in
22  the JCCP actions, right?
23        MR. KIEFFER:  Object to the form to the
24  extent it calls for a legal conclusion.
25        THE WITNESS:  I don't believe that I did.

7 (Pages 22 - 25)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 26

1 BY MR. CHIOU:
2     Q.  Putting it another way, Exhibit 2 is the
3 only report you've submitted in the JCCP, right?
4     A.  In the JCCP, yes, to my knowledge.
5     Q.  You spent two hours working on a rebuttal
6 report on about May 12th, right?
7     A.  Yes.
8     Q.  Was that rebuttal report for the JCCP?
9     A.  I don't -- it was -- there are some -- to
10 my knowledge, there's some slight changes in the MDL
11 report dated May 16th, which is why that would have
12 been on May 12th.
13     Q.  Got it.
14         We'll go over your invoices in a moment.
15 I'll represent to you that there is an entry for two
16 hours on May 12th described as "Rebuttal Document."
17     MR. KIEFFER:  Object to the form.
18 BY MR. CHIOU:
19     Q.  I'm going to ask, what were you doing for
20 those two hours on May 12th for a rebuttal document?
21     A.  Let me think back two months.
22     Q.  Uh-huh.
23     A.  There are a couple things, frankly.  You
24 might understand that in this area research is
25 coming out all the time.  I wanted to make sure that

Page 27

1 this -- the second report had any relevant and
2 updated citations that came out in the month or so
3 between the two.
4         There were also some -- there were also
5 some slight tweaks that I made to it.  I mean,
6 that's why it was only two hours.  I don't believe
7 that there are many substantive changes whatsoever
8 between the two reports.
9     Q.  Going back to the late April, early May
10 time frame, were you planning to submit a rebuttal
11 report in the JCCP?
12     MR. KIEFFER:  Object to the form.
13     THE WITNESS:  No.
14 BY MR. CHIOU:
15     Q.  And if I'm understanding you right, the
16 May 12th entry titled "Rebuttal Document" was
17 actually for your May 16th MDL report, then?
18     A.  To my recollection, yes.
19     Q.  Do you have any recollection of why you
20 would have titled that time entry "Rebuttal
21 Document"?
22     A.  No.  It could be a misnomer, to be honest
23 with you.  This is my first time doing this.
24 Sometimes the law language I am not familiar with.
25     Q.  Well, could I ask you to turn to page 9 of

Page 28

1 Exhibit 2, please.
2         Do you see where it says "Summary of
3 Opinions," Dr. Cingel, in the middle of page 9?
4     A.  I do.
5     Q.  Starting in this summary of opinions on
6 page 9 through page -- the top of page 13, is that a
7 complete list of your opinions in this case,
8 Dr. Cingel?
9     MR. KIEFFER:  Object to the form.
10 BY MR. CHIOU:
11     Q.  In the JCCP case?
12     MR. KIEFFER:  Object to the form.
13     THE WITNESS:  It is a -- as of when I
14 wrote this, yes, that is a complete list of the
15 opinions that I put forth in the JCCP case.
16 BY MR. CHIOU:
17     Q.  What defense expert reports, if any, have
18 you reviewed in this case?
19     A.  Defense expert reports?  I have reviewed a
20 few.  I don't, to be honest, remember all of the
21 names of them.  As I mentioned earlier, I do have
22 some comments based on -- some notes based on
23 some of the things that were said about my report
24 which I saw through reading through there, the
25 defendant reports.

Page 29

1     Q.  When you say you read a few defense expert
2 reports, do you have a rough estimate?  Are we
3 talking three, ten?
4     A.  Somewhere upwards of ten.
5     Q.  How did you select which defense expert
6 reports to review?
7     A.  To my knowledge, they were all made
8 accessible to me.  I, to be honest, only recognized
9 one of the names, one of the names of the -- one of
10 the defense experts, which I read.  Then I just went
11 through and looked at them for whether they were
12 topically related to my expertise, whether they were
13 topically related to my report, and read those.
14     Q.  Who was the expert that you recognized?
15     A.  Dr. Jeffrey Hall.
16     Q.  What is your impression of Dr. Jeffrey
17 Hall?
18     A.  I have met him.  I think he is a nice man.
19 I think he's a good scientist.
20     Q.  Any other views about Dr. Hall?
21     A.  No.  I don't know him that well, to be
22 honest.
23     Q.  Have you read his work?
24     A.  I have.
25     Q.  Are your views about his work incorporated

8 (Pages 26 - 29)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 30

1 into the notes that you brought with you today?
2    A.   About his personal -- his own research?
3    Q.   Correct.
4    A.   No.
5    Q.   Do you have notes about Dr. Hall's
6 references to your work?
7    A.   Correct, yes, I do.
8    Q.   Did you form any new opinions for the JCCP
9 not contained in your April 18th report in response
10 to seeing the defense expert reports?
11    A.   No.
12    Q.   So the notes that you brought with you
13 are -- is this the layman's way to put it, those
14 notes reflect your responses to what defense experts
15 have said about your work?
16    A.   I don't know if I would call it a
17 response. It's -- I made contemporaneous notes as I
18 read them, just what I was thinking, and wanted to
19 get that down on paper so that I didn't forget.
20    Q.   Do you expect to do additional work in
21 order to be able to testify at trial of the JCCP
22 case?
23    A.   I would expect to, yes.
24    Q.   Do you know what that work would be?
25    A.   Having given that I have never testified

Page 31

1 before, I think I'd like to practice that a little
2 bit and learn a little bit more about the mechanics
3 of doing that.
4    Q.   Have you been asked to do any additional
5 work before trial that you haven't completed yet?
6    A.   No.
7    Q.   Did you ever speak with any individuals
8 who are plaintiffs or the parents of plaintiffs in
9 the JCCP?
10    A.   No.
11    Q.   Did you review any medical records of any
12 individual who's a plaintiff in the JCCP?
13    A.   No.
14    Q.   Have you ever reviewed any social media
15 posts or social media activity by any individual
16 who's a plaintiff in the JCCP?
17    A.   No.
18    Q.   Is there anything in your report that
19 you'd like to correct?
20    A.   To my knowledge, it is truthful and
21 written to the best of my ability.
22    Q.   Staying on your JCCP report, did you write
23 the whole thing?
24    A.   I did.
25    Q.   What support, if any, did you have to

Page 32

1 prepare your report?
2    A.   Support from whom or what?
3    Q.   For example, support from a colleague,
4 support from grad students, support from counsel.
5        MR. KIEFFER:  Object.
6        Cautioning you not to reveal discussions
7 with counsel.
8        THE WITNESS:  I received no support from
9 graduate students, from other colleagues.  The
10 report is written based on my review of the
11 literature, based on my expertise and knowledge of
12 the literature, based on the documents that were
13 made available to me by counsel.
14 BY MR. CHIOU:
15    Q.   We'll get to the documents in a bit.
16        Let's talk about the writing of your
17 report.
18        Does it sound right that you've spent
19 about 70-something hours writing your JCCP report?
20        MR. KIEFFER:  Object to the form. Lacks
21 foundation.  Assumes facts not in evidence.
22        THE WITNESS:  Seems reasonable.
23 BY MR. CHIOU:
24    Q.   And if we turn to Exhibit B of your
25 report, please, I think that's page...

Page 33

1    A.   Do you mean -- oh.
2    Q.   You know what, let me ask you a different
3 question, Dr. Cingel, if I may.
4        Could you please turn to Exhibit B of your
5 JCCP report.
6    A.   What page is that?
7        TRIAL TECHNICIAN:  123.
8        THE WITNESS:  123. I don't -- the first
9 part -- oh, Exhibit B, okay.  Sorry.
10        That's the "Materials Considered"?
11 BY MR. CHIOU:
12    Q.   Yes, it is.
13    A.   Okay.
14    Q.   Dr. Cingel, this is a -- Exhibit B is --
15 starts with a list of hundreds of internal documents
16 that the defendants produced in this case; is that
17 right?
18    A.   Correct, yes.
19    Q.   How did you select which documents
20 produced by defendants you would review?
21    A.   Sure.
22        So I was given access to DISCO, I believe,
23 which clearly means millions of documents.  I did
24 a variety of keyword searches that were consistent
25 with other keyword searches that I did using Google

9 (Pages 30 - 33)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 34

1  Scholar and other databases for the scholarly
2  literature that I considered. I've pulled those
3  documents, read them, skimmed them to see whether
4  they were relevant to my report.
5       I also asked for assistance in compiling
6  documents that were relevant to my report. But,
7  again, when I received those, I went through them as
8  quickly as I could to determine whether they had any
9  relevance to the report that I was working on.
10  Q.  What kind of keywords -- how did you
11  select what keyword searches to run through DISCO?
12  A.  In DISCO? Like I said, they were very
13  consistent with what I was looking for in the
14  scholarly literature. So these would be things
15  pertaining to -- if you do -- if you want some, for
16  example, these would be things like looking at
17  problematic use, which is a key part of my report.
18  Different mental health diagnoses or ways of
19  describing mental health. Ensuring that it was
20  about adolescents and not other populations, given
21  that I focus primarily on adolescents in my report.
22      I wanted to make sure that I was being
23  able to go through and look at documents from each
24  of the defendant companies. So those would have
25  been some keywords as well.

Page 35

1  Q.  Yeah, do you keep a list of the keyword
2  search terms that you ran?
3  A.  No.
4  Q.  Did you do it off the top of your head,
5  then, and try to remember what search terms you did
6  and didn't run?
7  A.  I may have written it down somewhere to
8  ensure that I wasn't repeating myself. But to my
9  knowledge, I don't have that document anymore.
10  Q.  You mentioned you had assistance compiling
11  these internal documents, right?
12  A.  Yeah, I took the first pass at going
13  through, I think, 6.7 million documents. I pulled
14  out the ones that I thought were important. I gave
15  the Bates number to counsel. And then I wanted --
16  you know, I wanted to make sure that I was giving a
17  full assessment of the documents that existed. And
18  so there were other documents provided to me in
19  addition to the ones that I had pulled.
20  Q.  When you say you had assistance compiling
21  documents, are you referring to counsel providing
22  those other documents to you; is that --
23  A.  Some. Some documents, yes.
24  Q.  Any other kind of assistance compiling
25  documents that you recall?

Page 36

1  A.  No. No.
2  Q.  Did you ask for certain types of
3  documents?
4  A.  Certain types, no. I may have given my
5  keywords that I had been looking for and making --
6  making sure that I was getting a fulsome picture of
7  what existed. Again, it's my first time using DISCO
8  so I wanted to make sure that I was using it
9  correctly and to the fullest capability.
10  Q.  Did you try to obtain -- you know, let me
11  ask a different question, Dr. Cingel. Is that all
12  right?
13  A.  Yeah.
14  Q.  Did you request any kinds of documents
15  that were ultimately not provided to you?
16  A.  In that they said they couldn't or that
17  they didn't exist or what do you mean by "not
18  provided"?
19  Q.  In any way.
20  A.  I -- to my knowledge, I don't believe so.
21  Q.  Do you know whether you were given the
22  full and complete versions for every document listed
23  here under materials considered?
24  A.  To the best of my knowledge, yes.
25  Q.  Did you review every document on this

Page 37

1  list?
2  A.  In at least some small way, yes, I think
3  that's fair to say.
4  Q.  Am I understanding correctly that you
5  didn't read every page of every document listed
6  here, right?
7  A.  No.
8  Q.  How did you decide which documents you
9  would read in more detail?
10  A.  I started -- well, the first thing is I
11  went through and just made sure that it was, again,
12  relevant to my JCCP report. Clearly, there -- of
13  the 6.7 million documents there are many that are
14  not relevant to my expertise and my report. So
15  those -- that was pretty quick and easy.
16      There were others where I would skim the
17  first few paragraphs, pages, whatever it might be,
18  made the determination about the relevance to my
19  report. If it was particularly salient or relevant,
20  then I would continue to read in more detail.
21  Q.  Could you please turn to page 57 of
22  Exhibit B, please.
23      Dr. Cingel, you would agree this portion
24  of Exhibit B lists over 50 depositions, that
25  includes transcripts and exhibits; is that right?

10 (Pages 34 - 37)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 38

1    A.  It appears that way, yes.
2    Q.  How did you select which depositions from
3  the social media litigation you would review?
4    A.  Similar to my previous answer, I would
5  look at the person, their title.  Again, whether it
6  was relevant to my report.  I tended to focus on
7  ones that were, you know, people that were working
8  in wellness, on child and adolescent wellness teams,
9  and things of that nature.
10   Q.  Did you have any assistance identifying
11  what depositions to review?
12   A.  No.  It's -- you know, within the first
13  few pages, it gives that type of information that I
14  was looking for.
15   Q.  Did you request any certain types of
16  testimony?
17   A.  What do you mean by "certain types of
18  testimony"?
19   Q.  Sure.  I'll give you an example.
20       Did you request to see testimony about a
21  certain subject?
22   A.  By "subject," do you mean, like,
23  depression or -- what do you mean by "subject"?
24   Q.  Sure.
25       Did you request to see any types of

Page 39

1  deposition testimony about a particular document,
2  about a particular area?
3    A.  Not to my recollection, no.
4    Q.  Do you know whether you were given the
5  complete transcript for every deposition listed?
6    A.  To the best of my knowledge, yes.  They
7  certainly seemed long enough.
8    Q.  Sounds like you didn't read every page of
9  every transcript listed, right?
10   A.  I -- if they -- if I deemed that they were
11  relevant, I at least skimmed through.  I have --
12  through -- through doing this now, I have become
13  more adept at working my way through these long
14  documents and pulling out the -- most relevant
15  information.
16   Q.  Could you please turn to page 59 of
17  Exhibit B, please.
18       Dr. Cingel, these are public materials and
19  filings in the JCCP case?
20   A.  Uh-huh.
21   Q.  And the MDL case; is that right?
22   A.  Yes, they appear to be.
23   Q.  How did you select which public documents
24  and filings from the social media litigation that
25  you would review?

Page 40

1    A.  Well, many of them are related to some of
2  these other documents.  I am a very big news reader.
3  I often come across these things on my own volition
4  where I'm going through and just pulled them out in
5  my own document and read them then.
6    Q.  Did you have any assistance compiling
7  these like you did for the company internal
8  documents?
9    A.  There may be some where it is a -- you
10  know, I don't subscribe to the New York -- I'm
11  sorry, to the Washington Post.  So those may have
12  been sent my way.  Ones from the New York Times,
13  other news entities that I subscribe to and have
14  access to, I receive -- I receive myself.
15   Q.  Did you read every document on this list?
16   A.  I would expect that I at least skimmed.
17  Skimmed some of them.  Most of these, if they're in
18  the popular press, are fairly short.  But I don't --
19  I don't know by looking at all of them right off the
20  top of my head.
21   Q.  If you could turn to page 66, please, of
22  Exhibit B.
23   A.  Uh-huh.
24   Q.  This section starts listing various
25  publications, including scientific and academic

Page 41

1  studies, right?
2    A.  Yes.
3    Q.  How did you choose the ones on this list?
4    A.  My -- you know, as I mentioned before, I
5  think, my unique expertise here is that I, for
6  15 years, have studied adolescent social media use
7  and mental health, which is the crux of this
8  litigation.  So these are papers that I am familiar
9  with because they're just in -- in what I do every
10  day.
11       I keep running lists.  As I mentioned
12  earlier, new papers come out day after day after day
13  that are relevant to this and as they come out in
14  the journals that I read, I pull them, I read them,
15  I at least skim them to see if they're, again,
16  relevant.  And those would be added to this list.
17   Q.  Were there any publications you reviewed
18  in the process of creating your JCCP report that you
19  omitted from the materials considered?
20   A.  To my knowledge, there's not -- by
21  "omitted," where I looked at it and said I don't
22  want that added?
23   Q.  Uh-huh.
24   A.  No.
25   Q.  Turning back to the notes you mentioned

11 (Pages 38 - 41)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 42

1 you brought with you.
2       May I ask, who are the defense experts
3 that are accounted for in the notes you brought with
4 you today?
5    A.  Would you just like me to read their last
6 names?
7    Q.  Sure.
8       MR. KIEFFER:  Would you like a copy?
9       MR. CHIOU:  Thank you.
10       MR. KIEFFER:  There you go.
11       THE WITNESS:  Do you want me to read them
12 or now you can see them?
13 BY MR. CHIOU:
14    Q.  I can see them.  Thank you, Doctor.
15    A.  Okay.
16       (Whereupon, a brief discussion off the
17 record.)
18 BY MR. CHIOU:
19    Q.  Dr. Cingel, would you mind turning to
20 page 87 of Exhibit B, please.
21    A.  Uh-huh.  This is still the materials
22 considered, right?
23    Q.  Yes, please.
24    A.  Okay.
25    Q.  Do you see that your list of materials

Page 43

1 considered includes the National Academies of
2 Sciences 2023 report titled "Social Media and
3 Adolescent Health."  Right?
4    A.  Uh-huh.
5    Q.  You read this report, right?
6    A.  I believe so, yes.
7    Q.  Is it your understanding that it was
8 peer-reviewed?
9       MR. KIEFFER:  Object to the form.  Lacks
10 foundation.
11       THE WITNESS:  I don't recall if it was
12 peer-reviewed but the National Academy of Science is
13 a very respected academy within what I do.  And I
14 have no reason to expect that it wouldn't be of the
15 highest quality.
16 BY MR. CHIOU:
17    Q.  Does it sound right to you that this
18 report was authored by about 11 committee members?
19       MR. KIEFFER:  Object to the form.  Lacks
20 foundation.  The witness doesn't have the document.
21       THE WITNESS:  I don't really know.
22 BY MR. CHIOU:
23    Q.  You would agree that if you are a member
24 of the -- committee member of the National Academy
25 of Sciences you've got expertise in mental health,

Page 44

1 adolescent brain, social media, and child learning,
2 right?
3       MR. KIEFFER:  Object to the form.  Lacks
4 foundation.
5       THE WITNESS:  I don't know the answer to
6 that question.  I don't know how you'd get selected
7 to such a thing.
8 BY MR. CHIOU:
9    Q.  Is it correct that the National Academies'
10 report reached a -- the following consensus finding:
11       "The committee recognized that the
12 temptation to draw causal inference and to call for
13 rapid action around social media is strong, and
14 heard, during public session, from a range of
15 academics and activists who feel strongly that
16 causal links between social media and mental health
17 have been unequivocally established and there is
18 urgent need for action.  And yet, in careful
19 deliberation and review of the published literature,
20 the committee arrived at more measured conclusions."
21       Does that sound correct to you?
22       MR. KIEFFER:  Object to the form.  It's
23 compound.  It's complex.  It lacks foundation.
24 Counsel is purporting to read -- to be reading from
25 something that he has not shown the witness.

Page 45

1       THE WITNESS:  I would like to see that, if
2 I may, but I'd also be curious to see it in the
3 entirety of the -- of what I presume to be a very
4 long report.
5 BY MR. CHIOU:
6    Q.  So your report doesn't address the
7 National Academies' consensus findings at all,
8 right?
9       MR. KIEFFER:  Object to the form.
10       THE WITNESS:  Did I -- sorry, Jon.
11       Did I cite it, is that the question, in my
12 report?
13 BY MR. CHIOU:
14    Q.  Let me break it down a little bit.
15       Your report doesn't address the National
16 Academies' report at all, right?
17       MR. KIEFFER:  Objection.  Vague.
18 Ambiguous.  Lacks foundation.
19       THE WITNESS:  I don't recall if -- it
20 might be in there or it might not.  I don't know.
21 BY MR. CHIOU:
22    Q.  Your report doesn't discuss the National
23 Academies' consensus findings, right?
24       MR. KIEFFER:  Object to the form.  Asked
25 and answered.  Lacks foundation.

12 (Pages 42 - 45)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 46

1      THE WITNESS:  Yeah, I -- same.  Same
2  answer.
3  BY MR. CHIOU:
4      Q.   Would you like to -- would it be helpful
5  for you to flip through the report?  What would help
6  you recall whether your report addressed the
7  National Academies' consensus findings?
8      A.   I mean, if you want me to take time and go
9  through and look at all of my citations, I can do
10  that.  It's 90-some pages with hundreds of
11  citations.  I don't recall every single thing that I
12  cited in the report.
13      Q.   I guess I could shortcut it this way,
14  Dr. Cingel.
15          You don't have a recollection of
16  addressing the National Academies' consensus
17  findings in your report, right?
18      MR. KIEFFER:  Object to form.  Asked and
19  answered.
20      THE WITNESS:  I don't recall.
21  BY MR. CHIOU:
22      Q.   And you would agree if your report doesn't
23  discuss the National Academies' consensus findings,
24  that would mean your report didn't address it,
25  right?

Page 47

1      MR. KIEFFER:  Objection.  Vague.
2  Ambiguous.  Calls for a legal conclusion.
3      THE WITNESS:  The report itself -- if
4  it's -- the report -- it was considered as it is on
5  my materials considered list.  Again, I do not have
6  a recollection of whether it is in the report,
7  explicitly cited.
8  BY MR. CHIOU:
9      Q.   Is there any update you'd like to make to
10  your materials considered list?
11      A.   To my knowledge, no.
12      MR. KIEFFER:  Beyond the one that was
13  served recently?  Okay.
14  BY MR. CHIOU:
15      Q.   Have you reviewed any of the plaintiffs'
16  expert reports in this case?
17      A.   What do you mean by "reviewed"?  Read?
18      Q.   Read.
19      A.   I have -- I have had access to them, and I
20  have seen some of them.
21      Q.   Which ones?
22      A.   The ones that are, again, more within my
23  area of expertise.  So that would be Drs. Telzer,
24  Christakis.  Those are two that come to mind
25  immediately.

Page 48

1      Q.   Any other plaintiffs' expert reports that
2  you do recall?
3      A.   That I can recall at all or that I can
4  recall having reviewed in some manner?
5      Q.   That you can recall having read.
6      A.   Dr. Twenge.
7      Q.   Do you recall reading any plaintiffs'
8  experts' reports other than those three experts?
9      A.   I do think that I read more than three --
10  or at least, again, considered more than three.  I
11  don't recall the names, as I sit here now.
12      Q.   Are you relying on the opinions or
13  analyses of any other plaintiffs' expert for your
14  own opinions?
15      A.   Not at all.
16      Q.   In this matter, are you charging
17  plaintiffs about $650 an hour for the time spent in
18  depositions and in trial?
19      A.   I believe that's the number.
20      Q.   Does $500 an hour sound right for time
21  spent writing your report and reviewing documents?
22      A.   I believe that's the number.
23      Q.   Based on your invoices, is it accurate to
24  say that through June 30th you spent about 43 hours
25  preparing for your deposition?

Page 49

1      A.   If you have it in front of you, I will
2  take you at your word.
3      Q.   Have you prepared an invoice for July yet?
4      A.   No.
5      Q.   How much time would you say you spent
6  preparing for the deposition in July?
7      A.   A handful of hours, maybe -- what's today,
8  June -- July 9th.  15, 20, somewhere in there.
9      Q.   Does the total time spent preparing for
10  this deposition, about 55 to 60 hours, sounds about
11  right to you?
12      MR. KIEFFER:  Object to form.  Lacks
13  foundation.
14      THE WITNESS:  Sure, I think those numbers
15  add up.
16  BY MR. CHIOU:
17      Q.   What did you do to prepare for this
18  deposition in those 55 to 60 hours?
19      A.   Sure.
20          As I mentioned, this is the first time I
21  am getting deposed so I wanted to make sure that I
22  was prepared to the fullest extent possible.
23          I reread my report.  I reread all of
24  the -- I reread the documents that I cite in the
25  report.  I went back through the literature that

13 (Pages 46 - 49)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 50

1 many of the -- much of the literature that I cite in
2 my report. Just rereading, making sure that I have
3 it down as best as I can. I reread the internal
4 documents that I cite in my report. Things of that
5 nature.
6     Q.  So let's break it down together, then,
7 those 55 to 60 hours.
8         One component, if I'm understanding you
9 right, is rereading the materials, including your
10 report and the stuff you relied on?
11     A.  Correct, yes.
12     Q.  Anything else you did to prepare for this
13 deposition?
14     A.  I think it'd show -- it should show on the
15 invoice that I had some meetings with counsel
16 discussing what to expect at a deposition. Simple
17 logistics of what a deposition looks like. Things
18 of that nature.
19     Q.  Other than reviewing materials and
20 meetings with counsel, did do you anything else to
21 prepare for the deposition?
22     A.  I continued to stay on top of the new
23 literature that comes out just so I'm aware of where
24 the field continues to go. As I mentioned earlier,
25 this is a particularly timely topic that many, many

Page 51

1 people around the world are studying, and I want to
2 make sure that I'm aware of the most cutting-edge
3 and new research that's coming out on these topics.
4     Q.  Anything else you've done to prepare for
5 this deposition?
6     A.  To my knowledge, no.
7     Q.  So would you mind turning to Exhibit 1 of
8 your JCCP report, please.
9     A.  You mean Exhibit A?
10     Q.  That's correct.
11     A.  Okay.
12     Q.  Exhibit A, please, Dr. Cingel.
13     A.  Which is my curriculum vitae?
14     Q.  That's correct.
15     A.  Okay.
16     Q.  Could you go to page 2, please, under
17 Grants and Funded Research.
18     A.  Uh-huh.
19     Q.  Now, Dr. Cingel, the first entry for
20 funding is from the National Research Foundation of
21 Korea; is that correct?
22     A.  Correct.
23     Q.  What's the status of this project?
24     A.  It is in year -- it was originally funded
25 for three years. Then was refunded for an

Page 52

1 additional three years. I believe we're in year two
2 of that second cycle.
3     Q.  What are you studying?
4     A.  We are studying, very broadly, media use
5 as it relates to Korean children and adolescents.
6 And so we are doing a lot of work. It's really
7 running the gamut from age three, that's most of the
8 work that I'm doing with it right now, is very young
9 children. My understanding is that we'll go for --
10 to reapply for an additional four years and as -- as
11 we go on, we are studying across childhood and
12 adolescence.
13     Q.  Is this project connected to your
14 April 22nd, 2025, publication titled "Korean
15 Children's YouTube Use"?
16     A.  Yes, but it has more of a title than that,
17 right?
18     Q.  Yes.
19     A.  Okay. But it's --
20     Q.  It's a complete title, so...
21     A.  -- in -- published in Media Psychology, I
22 believe?
23     Q.  Correct, Dr. Cingel.
24     A.  Yes.
25     Q.  Could we go to the third entry for funding

Page 53

1 by the Susan Crown Exchange.
2     A.  Yes.
3     Q.  Do you see that?
4     A.  The third one down from the -- yes, I see
5 it, number 9.
6     Q.  Correct.
7         What's the status of this project?
8     A.  That is completed.
9     Q.  What were you studying?
10     A.  In that, we were considering how
11 adolescents used media, particularly during the
12 COVID-19 pandemic.
13     Q.  Did any of the defendants' platforms in
14 this case come up during your research?
15     A.  In that particular grant?
16     Q.  Correct.
17     A.  I'm sure they did.
18     Q.  Do you remember which ones?
19     A.  I would expect all of them given that they
20 are the most popular platforms used by adolescents.
21     Q.  Did you end up publishing any findings as
22 a result of this project?
23     A.  Yes, I believe that I published one paper
24 in PLOS One, if I remember correctly. I also
25 believe we used some of those data in conjunction

14 (Pages 50 - 53)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 54

1  with data that we collected in Korea.
2      Q.  What were the high-level findings from
3  this project?
4      A.  From the data collected in the grant
5  number 9 on this list?
6      Q.  Correct.
7      MR. KIEFFER:  Object to the form.
8      THE WITNESS:  The high-level findings are
9  that adolescents' media use, including social media
10  use, including problematic social media use,
11  increased markedly during the COVID-19 pandemic.
12      We also measured aspects related to mental
13  health.  I don't -- I'm not sure if in that paper
14  that I'm describing we connected social media use to
15  mental health.
16      But in the paper that we published in
17  conjunction with the data in Korea, we did look at
18  social media use as it related to different
19  indicators of mental health; additionally,
20  problematic social media use as it relates to
21  different indicators of mental health among
22  adolescents in both the United States and South
23  Korea.
24  BY MR. CHIOU:
25      Q.  What was the time frame of what you were

Page 55

1  looking at for this project?
2      A.  What do you mean by "time frame"?
3      Q.  If I heard you right, you said media use
4  went up during the pandemic, right?
5      A.  Correct.  Well, I don't -- sorry, I don't
6  know if I would -- we did not measure before the
7  pandemic.  So to be more precise, media use was
8  extraordinarily high during the pandemic.
9      Q.  Were you looking at data from basically
10  2021 through the end of 2022?
11      Does that sound right?
12      A.  I believe that we collected data from
13  adolescents in the United States in spring of 2021,
14  fall of 2021, spring of 2022, and then collected
15  data using the same survey instrument from South
16  Korean adolescents in spring of 2022.
17      Q.  And did I hear you right that this project
18  didn't lead you to draw any conclusions about
19  purported adverse mental health effects on
20  adolescents due to social media?
21      MR. KIEFFER:  Object to the form.
22  Misstates his testimony.
23      THE WITNESS:  It depends on which one
24  you're talking about.
25      The one where we combined the data from

Page 56

1  the grant in line number 9 here with the grant in
2  line number 11 does look at social media use,
3  problematic social media use and mental health among
4  American and Korean adolescents.
5  BY MR. CHIOU:
6      Q.  Are you referring to the April 22nd, 2025,
7  publication?
8      A.  Which one's that again?  The one in Media
9  Psychology?
10      Q.  The one titled "Korean Children's
11  YouTube" --
12      A.  No.
13      Q.  -- "Use and Social Skills."
14      A.  No, that's not the one that I'm referring
15  to.
16      Q.  What is the publication you're referring
17  to?
18      A.  It would be number 46 on page 3, published
19  in Communication Research.
20      Q.  Would you mind going down to the bottom of
21  page 2.
22      Do you see a funding by the Delaney Fund
23  for Research and Communication, Dr. Cingel?
24      A.  Correct, yes.
25      Q.  That's for a project called "Developing a

Page 57

1  measure of adolescent social media use."  Right?
2      A.  Yes.
3      Q.  What were you studying here?
4      A.  That was a focus group study of 59
5  adolescents where we had them describe -- discuss
6  and describe their social media environments, the
7  features that they use on social media, with the
8  intention of understanding how different adolescents
9  conceptualize social media, the features that they
10  use across different platforms.
11      As you might imagine, the platforms that
12  were discussed most often among the adolescents
13  themselves are the five defendants' platforms that
14  we're discussing today.
15      Q.  Is this project ongoing?
16      A.  No, it is complete.
17      Q.  Did it result in a publication?
18      A.  It did.
19      Q.  Which one?
20      A.  One moment.
21      Number 37 on page 4.
22      Bless you.
23      Did you hear number 37 on page 4?
24      Q.  Thank you, Doctor.
25      Was this peer-reviewed?

15 (Pages 54 - 57)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 58

1    A.  It was.
2    Q.  What were the top-line findings from this
3 publication?
4    A.  The top-line findings are that there are
5 features -- sorry -- features of social media that
6 cut across different platforms and that we can use
7 to measure how adolescents use and are exposed to
8 social media.
9    Q.  Have you received any other funding that
10 relates to studying social or digital media besides
11 what's listed on your CV?
12    A.  Sorry, funding that -- that's not on my
13 CV?
14    Q.  Funding relating to studying social or
15 digital media that's not on your CV?
16    A.  I believe this is the most updated list of
17 my grants and funded research.
18    Q.  So turning to page 1 of your CV, please.
19    Dr. Cingel --
20    MR. KIEFFER:  Just to be clear, we did
21 serve a revised CV last night.  I think there's -- I
22 don't want to step on your questions, but just so
23 you're aware, I think there's some minor
24 modifications to that, so...
25    MR. CHIOU:  I appreciate that.  You're

Page 59

1 correct, Jon.
2    MR. KIEFFER:  Yeah.  It may not matter to
3 you.  I just wanted to make sure you're aware of
4 that.
5 BY MR. CHIOU:
6    Q.  Dr. Cingel, you're a communications
7 professor, right?
8    A.  Correct.
9    Q.  You specialize in media studies?
10    A.  I wouldn't say that.  In our field, media
11 studies would be more like theater or the -- like
12 actually making television or something like that.
13    Q.  Who doesn't like theater, though,
14 Dr. Cingel.
15    A.  Well, I do like theater, I have to say,
16 but I don't study it.
17    Q.  What would you say you specialize in?
18    A.  My specialty is in the quantitative study
19 of communication science with a particular emphasis
20 in adolescent social media use and adolescent
21 development and mental health.
22    Q.  You're not a software engineer, right?
23    A.  I am not.
24    Q.  You've never designed a user interface; is
25 that right?

Page 60

1    A.  I am in the process of working with my
2 graduate student to design an app.  But I am not the
3 primary leader of that project.  That is for her
4 dissertation.
5    Q.  What is the app that you're in the process
6 of designing?
7    A.  It's for very young children.  It's a
8 flower shop to teach counting and patterns.
9    Q.  Was the app your idea or the grad
10 student's idea?
11    A.  The grad student's idea.  But it was in
12 consultation with me as her primary advisor for
13 Study 2 of her dissertation.
14    Q.  Would the app run on a tablet, PC --
15    A.  A tablet.
16    Q.  -- smartphone?
17    And did you say it was -- the purpose is
18 to teach children how to count?
19    A.  Yes, and very young children.
20    Q.  Is the app intended to accomplish anything
21 else?
22    A.  No.
23    Q.  What stage of development is the app at?
24    A.  We are meeting on Friday to discuss.  I
25 don't know, I've been on vacation, and I will see on

Page 61

1 Friday when I'm back in the office.
2    Q.  So you're working with software engineers
3 as part of that project to develop the app?
4    A.  Correct.
5    Q.  So you're -- you've never designed an
6 algorithm, right?
7    A.  I have not.
8    Q.  You've never reviewed an algorithm, right?
9    A.  I have not.  Well, excuse me, what do you
10 mean by "reviewed"?
11    Q.  Analyzed how the algorithm works in the
12 mechanics of how it recommends content.
13    A.  I have.
14    Q.  In what way?
15    A.  We did -- I don't know if this is what
16 you're -- what you're getting at, but to me it is.
17    We have done an experiment where we
18 created 132 accounts on YouTube, TikTok, and
19 Instagram.  We then, in consultation with interviews
20 that I have done with children and adolescents, we
21 took the -- we took the baseline algorithmically
22 recommended content.  We then made experimental
23 manipulations in terms of the way that we interacted
24 with the platforms.
25    We came back one week later and took the

16 (Pages 58 - 61)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 62

1 recommended content again. Came back a week after
2 that, so now two weeks out, took the recommended
3 content again. Content, analyzed that content, and
4 we have a paper that I believe is in review right
5 now based on those data.
6    Q.   When were you conducting this research?
7    A.   When it -- like year? I think we started
8 in 2022. I don't recall exactly.
9    Q.   Am I understanding correctly that you
10 haven't published your findings yet?
11    A.   We have not yet.
12    Q.   What were your findings from what you were
13 doing?
14    A.   Sure.
15       The findings were -- so we -- we
16 experimentally manipulated gender, the gender of the
17 participant, the age of the participant -- I'm
18 sorry, I'm using the word "participant," but humans
19 were not used. So the age of the account, whether
20 it was female or male, 8 -- approximately 8 or
21 16 years of age, and among the 16-year-old accounts
22 whether they were struggling with their mental
23 health.
24       What we found is that within a week,
25 certainly within two weeks, the amount of

Page 63

1 recommended content for children went up
2 significantly for those child accounts.
3       We found that the amount of mentally
4 triggering content went up significantly, very, very
5 markedly, among the 16-year-old accounts of people
6 that interacted with the platform as if they were
7 struggling with their mental health.
8       I think those are the two main top-line
9 findings, among many others.
10    Q.   When you say "132 accounts," do you mean
11 that these were not tied to actual human beings?
12    A.   Correct.
13    Q.   These were accounts you created?
14    A.   Correct.
15    Q.   What do you mean by "triggering content"
16 for 16-year-olds?
17    A.   Yeah. So this is content that we defined
18 as indicating that there is something wrong with you
19 or something not right with you the way that you
20 are.
21       So to just give you an operationalization
22 of that, some of that content, frankly, it was
23 incredibly dark to the point where I had to
24 intervene with the undergraduate students that were
25 coding it because I was worried about their mental

Page 64

1 health. It would be images of people crying in the
2 dark by a window that is raining and saying that
3 life doesn't matter.
4    Q.   Any other examples?
5    A.   I mean, I -- hundreds of examples like
6 that. Many fitness challenges and things of that
7 nature. Things about weight loss, things that
8 were -- that I would consider to be
9 anxiety-provoking.
10    Q.   What's an example of content that's
11 anxiety-provoking?
12    A.   Well, I would consider it -- if you have
13 a -- if you are concerned with your weight, as I
14 write in my report, adolescents' weight and body
15 image and the way that you look is already a very
16 salient concern, if you're looking at someone
17 engaging in a weight loss challenge, that could be
18 very anxiety-provoking.
19    Q.   And did you say that some of the content
20 was so dark that you almost had to intervene with
21 the people coding that content?
22    A.   Correct.
23    Q.   That the dark content was affecting how
24 the people working with you who watched it, how they
25 were feeling?

Page 65

1    A.   Possibly. I don't know. But I think the
2 key point here is that it is content but it was
3 content that was only recommended by the algorithms
4 to those certain accounts. Not every account got
5 that content.
6    Q.   And you were concerned that the -- the
7 content could be affecting your colleagues, right?
8       MR. KIEFFER: Object to the form.
9 Misstates his testimony.
10       THE WITNESS: I was concerned because of
11 the nature of the content. But, again, that was
12 only content for certain accounts, not all accounts.
13 BY MR. CHIOU:
14    Q.   The nature of the dark content could have
15 been impacting your colleagues' mental health,
16 right?
17       MR. KIEFFER: Object to form. Misstates
18 his testimony.
19       THE WITNESS: I don't know.
20 BY MR. CHIOU:
21    Q.   But that was your concern, right, that
22 they -- the nature of the dark content would --
23 could be affecting your colleagues' mental health?
24    A.   That they were --
25       MR. KIEFFER: Object to the form.

17 (Pages 62 - 65)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 66

1 Misstates his testimony.
2       THE WITNESS: That they were seeing as a
3 function of the algorithmic recommendations.
4 BY MR. CHIOU:
5    Q. And am I understanding you right that
6 viewing the nature of dark content can impact a
7 viewer's mental health?
8       MR. KIEFFER: Object to the form. Lacks
9 foundation. Misstates his testimony.
10      THE WITNESS: And once again, I would say
11 they're only seeing that content because it was
12 recommended to those accounts based on how those
13 accounts were interacting with the platform.
14 BY MR. CHIOU:
15    Q. I think I'm asking maybe a more basic
16 question, Dr. Cingel.
17      Let me try to rephrase that.
18      When someone's watching a video, if it's
19 dark content, violent content, that could affect how
20 the person feels after watching it, right?
21      MR. KIEFFER: Object to the form. It's
22 vague. Ambiguous. Lacks foundation. To the extent
23 it's a hypothetical, it's an incomplete
24 hypothetical.
25      THE WITNESS: I think about these things

Page 67

1 in terms of a hierarchy. They are not seeing that
2 content without the algorithmically recommended --
3 the recommender system that is sending it to them.
4 BY MR. CHIOU:
5    Q. However someone gets to a particular
6 video, I'm just asking, there's a -- what the
7 person's watching can make a difference in how that
8 person feels while watching or after watching the
9 video, right?
10      MR. KIEFFER: Object to the form. Vague.
11 Ambiguous. Incomplete hypothetical. Asked and
12 answered.
13      THE WITNESS: I feel like I've answered
14 this question a couple of times now.
15 BY MR. CHIOU:
16    Q. Do you think someone would -- it's
17 reasonable to believe that someone would feel
18 differently after watching a video about math
19 lessons compared to watching a video containing the
20 dark content that you mentioned?
21      MR. KIEFFER: Object to form. Vague and
22 ambiguous. Incomplete hypothetical.
23      THE WITNESS: I don't know. To my
24 knowledge, that hasn't been studied.
25 ///

Page 68

1 BY MR. CHIOU:
2    Q. Do you think it's reasonable, in your
3 view, Dr. Cingel, that someone who watches six hours
4 of educational videos would have a different
5 emotional impact compared to six hours of extremely
6 violent beheading videos?
7       MR. KIEFFER: Object. Object to the form.
8 Vague. Ambiguous. Incomplete hypothetical.
9       THE WITNESS: I would be most concerned
10 about the six hours, frankly.
11 BY MR. CHIOU:
12    Q. So in that example, you'd be more
13 concerned about the six hours than the six -- than
14 the fact that it would be violent beheading videos?
15      MR. KIEFFER: Object to the form. Asked
16 and answered.
17      THE WITNESS: We can -- I mean, we can get
18 into all the different options, but the fact of the
19 matter is, in a 24-hour day you're spending six
20 hours watching something that's taking up time. I
21 don't know the nature of this math content or, you
22 know, whatever it is, so I don't know if I can
23 answer that any -- beyond what I have.
24 BY MR. CHIOU:
25    Q. Is it your view that it doesn't make a

Page 69

1 difference on the person's mental health whether she
2 or he spends a particular amount of time watching
3 math lessons compared to extremely violent content?
4       MR. KIEFFER: Object. Object to the form.
5 Vague and ambiguous. Misstates his testimony.
6       THE WITNESS: I think it also depends on
7 the person doing it, the context in which they're
8 doing it, whether it's something that they do often.
9 There are many different variables beyond what you
10 have offered in this hypothetical.
11 BY MR. CHIOU:
12    Q. What are the other variables?
13    A. I think I just named them. The context in
14 which you're doing it. Are you watching -- are you
15 staying up late watching math videos until
16 3:00 a.m., right. Are you using social media so
17 much that you're getting into conflicts with your
18 parents, with your peers, where you feel like you
19 can't stop, right.
20      Those are -- that's that context of use,
21 that's that problematic context of use that we study
22 quite often in the literature. And that's -- when I
23 reference a context of use, that's what -- that's
24 what I mean.
25    Q. So using your example of staying up late

18 (Pages 66 - 69)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 70

1  until 3:00 a.m., does it make a difference on the
2  user's mental health whether that person is staying
3  up late until 3:00 a.m. watching math lessons or
4  watching disturbing dark content?
5        MR. KIEFFER:  Object to the form.  Vague.
6  Ambiguous.  And incomplete hypothetical.
7        THE WITNESS:  In that case, if you're
8  staying up until 3:00 a.m., that's cutting into your
9  sleep.  We know that sleep is connected with
10  day-to-day functioning, mental health, all those
11  things.  To me, that's the more concerning thing.
12  That alarm's going to ring at 6:30 the next morning
13  on a school day regardless.
14  BY MR. CHIOU:
15     Q.  At a more fundamental level, would you
16  agree that what someone is watching makes a
17  difference in how that person feels while watching
18  the video?
19        MR. KIEFFER:  Object to the form.  It's
20  vague.  Ambiguous.  Incomplete hypothetical.  And
21  it's been asked and answered.
22        THE WITNESS:  I don't know.
23  BY MR. CHIOU:
24     Q.  Would you agree that watching --
25  Dr. Cingel, let me break it down a little bit.  Is

Page 71

1  that all right?
2        Would you agree that watching something
3  like cute cat videos could make someone feel happy?
4        MR. KIEFFER:  Object to the form.
5  Incomplete hypothetical.
6        THE WITNESS:  Could make them feel happy.
7  Could make them feel sad if their cat just died.
8  That's why, again, I come back to the context in
9  which you are using the media, the individual
10  differences between people.
11  BY MR. CHIOU:
12     Q.  Would you agree that, in general, watching
13  something like a cat video would make the viewer
14  feel different than watching a beheading video?
15        MR. KIEFFER:  Object to the form.  It's an
16  incomplete hypothetical.
17        THE WITNESS:  I don't know.  To my
18  knowledge, it hasn't been studied.
19  BY MR. CHIOU:
20     Q.  You have no view on whether it's more
21  likely that someone watching a cat video would feel
22  differently than watching a beheading video?
23     A.  I can't answer.
24        I'm sorry, Jon.
25        MR. KIEFFER:  Object to the form.  It's an

Page 72

1  incomplete hypothetical.  It's been asked and
2  answered.
3        THE WITNESS:  I can't answer that question
4  without knowing all of the other context that's
5  going around this.  It's simply not as simple as
6  that.
7  BY MR. CHIOU:
8     Q.  Would you feel differently while watching
9  a cute cat video compared to watching a beheading
10  video?
11        MR. KIEFFER:  Object to the form.  It's an
12  incomplete hypothetical.  It's been asked and
13  answered.
14        THE WITNESS:  I have never watched either.
15  BY MR. CHIOU:
16     Q.  What kind of videos have you watched?
17     A.  Videos -- what do you mean by "videos"?
18  Or videos where?
19     Q.  You've used YouTube before, for example,
20  right?
21     A.  Minimally, yes.
22     Q.  Was it to watch a video on YouTube?
23     A.  It was to find representative content to
24  exemplify something in my class.
25     Q.  What were you trying to exemplify?

Page 73

1     A.  Based on just what we've been talking
2  about.  Maybe a TED talk on what happens in your
3  brain when you sleep.
4     Q.  Do you have a rough estimate of how long
5  that TED talk was that you showed to your class?
6     A.  Well, I don't show -- I don't show the
7  entire thing.  I show parts of it.  Five minutes,
8  seven minutes.
9     Q.  When -- do you have a recollection of what
10  time frame it is that you showed the five to
11  seven minutes of videos to your class?
12     A.  What do you mean, "time frame"?
13     Q.  When did that happen?  This year?  Last
14  year?
15     A.  I teach the class multiple times a year,
16  so...
17     Q.  Do you personally use YouTube for
18  anything?
19     A.  Beyond that, no.
20     Q.  When you showed the five minutes of the
21  TED talk to your class, do you think it helped
22  illustrate whatever educational point you were
23  trying to make at that time?
24     A.  It depends on context.  If they're not
25  paying attention, no.  For some, maybe.  For some,

19 (Pages 70 - 73)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 74
1 maybe not.
2    Q.   So if they were paying attention it likely
3 helped them understand what you were trying to get
4 across, right?
5        MR. KIEFFER:  Object to the form.
6        THE WITNESS:  Maybe.  I don't know.  I
7 don't -- I don't -- I guess I measure it in terms of
8 an exam, but I don't connect it to the content or
9 the video specifically.
10 BY MR. CHIOU:
11    Q.   You've shown these excerpts of the TED
12 talk in your class in different years, right?
13    A.   Uh-huh.
14    Q.   So you've continued to do it, right?
15    A.   I have, yeah.
16    Q.   Do you think the -- you'd have a different
17 effect on your students if you had shown them five
18 to seven minutes of extremely violent content
19 compared to the five to seven minutes of a TED talk?
20        MR. KIEFFER:  Object to the form.  It's
21 vague and ambiguous.  It's an incomplete
22 hypothetical.
23        THE WITNESS:  And it's something I
24 wouldn't do.
25 ///

Page 75
1 BY MR. CHIOU:
2    Q.   Do you think it'd have a different effect
3 on your students if you had shown them five to
4 seven minutes of extremely violent content instead
5 of the five to seven minutes of the TED talk?
6        MR. KIEFFER:  Object to the form.  Vague
7 and ambiguous.  Incomplete hypothetical.  It's been
8 asked and answered.
9        THE WITNESS:  Once again, I think it
10 depends on the context in which I'm showing it, for
11 how long I'm showing it, to whom I'm showing it,
12 things of that nature.
13 BY MR. CHIOU:
14    Q.   At the end of April, something like
15 April 22nd, that's when you published the article
16 titled "Korean Children's YouTube Use and Social
17 Skills."  Right?
18    A.   Sounds about right.
19    Q.   That was a cross-sectional study, right?
20    A.   Correct.
21    Q.   You studied young children's YouTube
22 viewing in Korea.
23        Does that sound right?
24    A.   Uh-huh, yes.
25    Q.   And you were looking at how much time

Page 76
1 children spent watching YouTube, right?
2    A.   I believe we also measured some other
3 things related to it.  But that is one of the
4 variables.
5    Q.   And one of the key things you were looking
6 at was whether children were watching negative or
7 positive interactions, right?
8    A.   That sounds right.
9    Q.   Does it sound right that the negative
10 interactions consisted of five categories of verbal
11 and nonverbal behavior that interfere with
12 interacting with others?
13    A.   Yes.
14    Q.   Like physical attacks, right?
15    A.   Uh-huh.
16    Q.   Negative interaction would be a verbal
17 attack, right?
18    A.   Possibly.
19    Q.   It would be a refusal to help someone when
20 they're in need, right?
21    A.   Possibly.
22    Q.   You found that children's YouTube viewing
23 time was not directly associated with their social
24 skills, right?
25    A.   But I -- if my recollection serves, it was

Page 77
1 associated with, I believe, increased anxiety -- you
2 have the paper in front of you, perhaps -- increased
3 anxiety.  And there was one other mediating variable
4 in between there.
5    Q.   So let's break that down a little bit.
6        So first, children's YouTube viewing time
7 was not directly associated with their social
8 skills; is that right?
9        MR. KIEFFER:  Object to the form.  Lacks
10 foundation.
11        THE WITNESS:  I don't recall.  I can -- if
12 you'd like me, I can find it, I'm sure, and look at
13 the figure and look at the results.  But I don't
14 recall off the top of my head.
15        And if I may, I would point out that I
16 believe these are four- to six-year-old children,
17 which is -- which are very developmentally different
18 than the adolescents that we are talking about in
19 this litigation and that I reference in my report.
20 BY MR. CHIOU:
21    Q.   Let's turn back to your report for a
22 moment.
23    A.   Uh-huh.
24        MR. CHIOU:  Could we mark Exhibit 3 for
25 his May 16th federal report.

20 (Pages 74 - 77)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 78

1    (Whereupon, Cingel Exhibit 3 was marked
2 for identification.)
3    (Whereupon, a brief discussion off the
4 record.)
5 BY MR. CHIOU:
6    Q.  Dr. Cingel, you've been handed what's been
7 marked as Exhibit 3.  Is this a copy of the -- your
8 MDL report dated May 16, 2025?
9    A.  It appears to be, yes.
10    MR. CHIOU:  Counsel, would you like to
11 take a break at this point?
12    MR. KIEFFER:  If you don't mind.
13    MR. CHIOU:  Go off the record, please.
14    THE VIDEOGRAPHER:  The time is 10:21 a.m.
15 Pacific time.  We're going off the record.
16    (Whereupon, a brief recess was taken.)
17    THE VIDEOGRAPHER:  The time is 10:46 a.m.
18 Pacific time.  We're back on the record.
19 BY MR. CHIOU:
20    Q.  Dr. Cingel, did you get a chance to talk
21 to counsel during the break?
22    A.  I did.
23    Q.  Is there anything you'd like to correct in
24 your testimony so far?
25    A.  To correct?  No.

Page 79

1    Q.  Anything to clarify?
2    A.  Not in particular, no.
3    Q.  Do you remember earlier this morning we
4 were talking about your invoices for this matter?
5    A.  Yeah.
6    Q.  Is it accurate that you have billed about
7 $87,000 in fees so far to plaintiffs' counsel for
8 your work in this matter?
9    A.  I trust that that number is correct.
10    Q.  How does that compare to your annual
11 salary from the university without getting into
12 specific numbers?  Is it pretty much the same?  Is
13 it more?  Is it a little less?  Just...
14    A.  It's a decent amount less.
15    Q.  Do you have kids, Dr. Cingel?
16    A.  I do not.
17    Q.  Nieces and nephews?
18    A.  Many.
19    Q.  What's the age range for the nieces and
20 nephews?
21    A.  Between the ages of 2 and 27.
22    Q.  Any nieces and nephews in the adolescent
23 range?
24    A.  Yes.
25    Q.  How many?

Page 80

1    A.  Let's see,    -- sorry.  One of them is,
2 I believe, 12.  Oh, and another.  So that would be
3 two.
4    Q.  So at least one is a 12-year-old male?
5    A.  Correct.
6    Q.  And I'll represent to you we will strike
7 the name from the record.
8    A.  Oh.  Thank you.
9    Q.  So could we use 12-year-old male as the
10 example?
11    A.  Sure.
12    Q.  You ever babysit this 12-year-old male?
13    A.  I do not.
14    Q.  Do you think there'd be a difference in
15 the 12-year-old male's reaction to how he feels
16 between watching a one-hour math video and a
17 one-hour extremely violent video, like a beheading
18 video?
19    MR. KIEFFER:  Object to the form.  Vague.
20 Ambiguous.  And incomplete hypothetical.
21    THE WITNESS:  What do you mean by
22 "reaction"?
23 BY MR. CHIOU:
24    Q.  Well, do you think this 12-year-old male
25 would feel differently after watching a one-hour

Page 81

1 math video compared to a one-hour extremely violent
2 video, like a beheading video?
3    MR. KIEFFER:  Same objections.  It's vague
4 and ambiguous.  Incomplete hypothetical.
5    THE WITNESS:  I appreciate that you tied
6 it to a person.  There are still many other
7 contextual factors that make it difficult to answer
8 that type of question.
9 BY MR. CHIOU:
10    Q.  So if I'm understanding right, you can't
11 say for sure that watching a one-hour math video
12 would have a different effect on your 12-year-old
13 nephew compared to a beheading video?
14    MR. KIEFFER:  Object to the form.  Vague
15 and ambiguous.  Incomplete hypothetical.  It's been
16 asked and answered.
17    THE WITNESS:  If he's watching it at
18 3:00 a.m., if he's displacing sleep because of it,
19 if he's doing it in school, regardless of, you know,
20 what he's watching, if he's, you know, doing it on a
21 day where he's feeling a certain way, all of these
22 things I think would play a role in his reaction to
23 it.  Again, which is what makes a hypothetical like
24 this difficult to answer.
25 ///

21 (Pages 78 - 81)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 82

1 BY MR. CHIOU:
2    Q.  Would you be giving the same kind of "it
3 depends" answer if the jury were here right now?
4    A.  I think so.  I don't know if I can
5 speculate on what I will do when I get to that
6 level.  But I don't think that answer would change.
7    Q.  Do you remember earlier this morning,
8 Dr. Cingel, we were talking about the National
9 Academy of Sciences 2023 report?
10    A.  I do.
11        (Whereupon, Cingel Exhibit 4 was marked
12 for identification.)
13 BY MR. CHIOU:
14    Q.  Dr. Cingel, do you recognize Exhibit 4 to
15 be the National Academies of Sciences' report titled
16 "Social Media and Adolescent Health" that was on
17 your materials considered list?
18    A.  I do.
19    Q.  You've previously read this report; is
20 that right?
21    A.  Correct.
22    Q.  Could I ask you to turn to the preface
23 with Roman numeral 15, please.
24    A.  Uh-huh.
25    Q.  Do you see the third paragraph that starts

Page 83

1 with the words, "The committee recognized."
2        Do you see that paragraph?
3    A.  "That the temptation to draw" -- that one?
4    Q.  Yes, sir.
5        Dr. Cingel, is it correct that the
6 National Academies' report reached the following
7 consensus finding:
8        "The committee recognized that the
9 temptation to draw causal inference and to call for
10 rapid action around social media is strong, and
11 heard, during public session, from a range of
12 academics and activists who feel strongly that
13 causal links between social media and mental health
14 have been unequivocally established and that there
15 is urgent need for action.  And yet, in careful
16 deliberation and review of the published literature,
17 the committee arrived at more measured conclusions."
18        Is that correct?
19        MR. KIEFFER:  Object to the form.
20 Particularly the use of the term "consensus
21 finding."
22        THE WITNESS:  I'm sorry, the question is,
23 do -- is that what that says?
24 BY MR. CHIOU:
25    Q.  Is that the conclusion of the National

Page 84

1 Academies' report?
2        MR. KIEFFER:  Object to the form.
3        THE WITNESS:  I don't know if that --
4        MR. KIEFFER:  And the characterization of
5 the document and what counsel just read.
6        THE WITNESS:  It doesn't say that this is
7 the consensus.  Everything else -- I recognize that
8 you read it the way it is written.  But it does not
9 say that this -- to my reading, it does not say that
10 this is the consensus of the committee or whatever
11 the organization was.
12 BY MR. CHIOU:
13    Q.  You would agree that the findings we just
14 went over contradict the opinions in your report,
15 right?
16        MR. KIEFFER:  Object to the form.
17 Mischaracterizes the document specifically as
18 findings when this is on a page that says "Preface."
19 And as vague and undefined with respect to what
20 portions -- what findings are being referenced, what
21 portions of his report are being referenced.
22        THE WITNESS:  And to answer your question,
23 I actually don't.
24        The next sentence is, "The science
25 suggests that some features of social media function

Page 85

1 can harm some young people's mental health."
2        I think that's very consistent with my
3 report.  And it goes on from there to discuss some
4 of the features that I do reference in my report.
5 BY MR. CHIOU:
6    Q.  Is there anywhere that can you point to in
7 your JCCP report, off the top of your head right
8 now, that you address the National Academies'
9 report?
10        MR. KIEFFER:  Object to the form to the
11 extent it's vague and ambiguous.
12        THE WITNESS:  I believe you asked a
13 similar question the first part of the day.
14        I cannot point to it right now.  I don't
15 know where it might be.
16 BY MR. CHIOU:
17    Q.  If I were to represent that we took a
18 double-check and your report didn't reference the
19 National Academies' report findings, would you have
20 any reason to disagree with that?
21        MR. KIEFFER:  I'm going to object to the
22 extent it mischaracterizes the report.  And it's
23 vague as to reference.
24        Are you talking about beyond his materials
25 considered list?

22 (Pages 82 - 85)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 86

1      MR. CHIOU:  Correct, Mr. Kieffer, that
2  Dr. Cingel's report doesn't address the National
3  Academies' findings in the substantive portion of
4  his report.
5      MR. KIEFFER:  Okay.  My objection stands.
6      THE WITNESS:  I will trust that you combed
7  through it.
8  BY MR. CHIOU:
9      Q.  If you could put that next to you for a
10  moment, Exhibit 4, we'll get back to that.
11      A.  Okay.
12      Q.  Dr. Cingel, in your own research, by which
13  I mean research that you've personally conducted,
14  have you studied infinite scroll?
15      A.  Have I specifically measured how much time
16  someone spends on infinite scroll?
17      Q.  Correct, or analyzed infinite scroll in
18  any way?
19      A.  I don't -- I don't know what you mean by
20  "analyzed infinite scroll."
21      Q.  Sure.
22          Taking a careful look at how it's
23  programmed, how it works, anything like that?
24      A.  No.  Have I -- have I looked at how --
25  like, the mechanics behind how infinite scroll works

Page 87

1  in my research?
2      Q.  Uh-huh.
3      A.  No, that would be beyond my research
4  program.
5      Q.  What about in your own research, so
6  research you've conducted, have you studied push
7  notifications?
8      A.  Again, how they work?
9      Q.  Correct.
10      A.  No.  Again, the mechanics of how to design
11  a thing to make a push notification show up on a
12  phone?  No.
13      Q.  What about in your own research, have you
14  studied how likes work?
15      A.  In the same way that we've been discussing
16  the other features, how they -- how to design a
17  like, no.
18      Q.  What about ephemeral content?
19      A.  How to design ephemeral content?  No.
20      Q.  How it works?
21      A.  No.
22      Q.  What about location sharing?
23      A.  I mean, what I study is how exposure to
24  these things, how time spent using these things
25  relates to mental health.

Page 88

1      Q.  Have -- in your own research, have you
2  authored any publications about the effects of
3  location sharing?
4      A.  About the effects of location sharing on
5  anything?
6      Q.  That's right.
7      A.  On that feature specifically, no.
8      Q.  What about in your own research that
9  you've authored or conducted, anything on ephemeral
10  content?
11      A.  In my own research, no.
12      Q.  Beauty filters in your own research?
13      A.  Yes.
14      Q.  Likes?
15      A.  Yes.
16      Q.  Push notifications?
17      A.  Specifically, no.
18      Q.  Infinite scroll?
19      A.  I'm not even sure how you could --
20  infinite scroll is inherent in, I believe, all five
21  of the defendant platforms.  I don't know how you
22  could pull it out in a particular design.
23      Q.  Referring to your own research, if I heard
24  you correctly, you said yes to beauty filters and
25  likes; is that right?

Page 89

1      A.  Yes.
2      Q.  What were the studies that you've authored
3  on likes, to the best of your recollection?
4      A.  My memory is that we -- I've -- there have
5  been a few, I believe, where we manipulated the
6  number of likes that people received and looked at
7  resulting effects from that.
8      Q.  Do you recall what studies they are?
9      A.  Off the top of my head, no.
10      Q.  What about for beauty filters?
11      A.  Same.  We manipulated the beauty filter,
12  applied to an image, and looked at resultant
13  effects.
14      Q.  Do you recall which studies those are?
15      A.  I don't, off the top of my head.
16      Q.  It's fair to say you're not a
17  psychologist, right?
18      A.  I have training in psychology.
19      Q.  You have an undergrad degree in
20  psychology, right?
21      A.  And I have taken classes through my
22  graduate training in various aspects of psychology
23  as well.
24      Q.  Are you a certified psychologist in any
25  way?

23 (Pages 86 - 89)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 90

1  A.  I am not certified.
2  Q.  You don't consider yourself a professional
3 psychologist?
4  A.  I am not a practicing psychologist.
5  Q.  Are you a psychiatrist, Dr. Cingel?
6  A.  I am not.
7  Q.  You don't diagnose individuals with mental
8 health issues, right?
9  A.  I do not diagnose.
10  Q.  You don't diagnose individuals with
11 physical health issues, right?
12  A.  No.
13  Q.  Do you diagnose individuals with sleep
14 disorders?
15  A.  No.
16  Q.  Are you an expert at evaluating the
17 processes for software development?
18  A.  No.
19  Q.  You're not offering an opinion on whether
20 warnings should accompany the use of any social
21 media platform, right?
22  A.  I don't believe that I have a specific
23 opinion in my report with respect to warnings.  I do
24 think that -- given the analysis of my report, that
25 communicating the potential harms of these platforms

Page 91

1 to the public is important.
2  Q.  You're not offering an opinion on whether
3 any of the defendants' social media platforms in
4 this case did or didn't meet industry standards,
5 right?
6  A.  Industry standards in terms of?
7  Q.  Any industry standards that come to mind?
8  A.  No.
9  Q.  You're not offering an opinion on whether
10 any of the defendants' platforms in this case should
11 be banned, right?
12  A.  I'm sorry, not offering an opinion on
13 that?  Not as part of this, no.
14  Q.  So we'll get back to the warnings later,
15 Dr. Cingel.
16  A.  Okay.
17  Q.  Have you ever testified at trial or
18 arbitration before?  I think you mentioned it was
19 your first time?
20  A.  It is.
21  Q.  I want to make sure I got that right.
22     Before your JCCP report, have you ever
23 issued an expert report in any matter before?
24  A.  An expert report in terms of litigation?
25  Q.  Correct.

Page 92

1  A.  No.
2  Q.  In litigation.
3     Have you ever testified before a
4 legislative body before?
5  A.  I don't know what you mean by "testify"
6 exactly.  But I do work with public health advocates
7 and agencies here in the state of California.  I've
8 worked with assembly members and state senators on
9 different legislation related to adolescent social
10 media use and mental health.  And I have spoken
11 in -- in the Legislature.
12  Q.  What do you mean by you've spoken in the
13 Legislature?
14  A.  I have spoken about my expertise in terms
15 of my knowledge and training and background on
16 adolescent social media use and mental health.
17  Q.  What were the circumstances of those
18 speaking, for example, were you invited to speak at
19 the capitol --
20  A.  Correct, yes.
21  Q.  -- or something?
22     When was that?
23  A.  Sometime a year or two ago.
24  Q.  What was the top line of what you were
25 speaking about before the Legislature?

Page 93

1  A.  Well, I was -- I believe I was speaking in
2 front of the Legislature about -- I don't remember
3 what the bill was specifically.  As I mentioned, I
4 have spoken more informally to assembly members and
5 state senators and their various aides.
6  Q.  When you were speaking before the
7 Legislature, sounds like that was in connection with
8 a specific bill, right?
9  A.  I believe so.
10  Q.  What do you remember about the bill at
11 issue?
12  A.  That one may have been -- I mean, there
13 have been a few.  We've -- that one might have been
14 on a bill to establish a peer-to-peer mentorship or
15 monies for peer-to-peer mentorship for adolescents
16 to speak to other adolescents about social media use
17 and provide information about that.
18  Q.  Other than that instance, do you have any
19 recollection of speaking before the Legislature?
20  A.  When it's in session?
21  Q.  That's correct.
22  A.  No.
23  Q.  What kind of bills have you worked with
24 assembly members and representatives on?
25  A.  That one in particular.  There was a bill

24 (Pages 90 - 93)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 94

1 about establishing a commission on social media in
2 the state of California. Bills pertaining to
3 social -- I'm sorry, excuse me -- phone restrictions
4 in schools, age verification, things of that nature.
5     Q.   What was the substance of your guidance to
6 the representatives or assembly folks?
7     A.   They asked me for my expertise, what I --
8 what I know about the literature. And I often just
9 speak to them about what the literature says about
10 these topics. That I think it's very consistent
11 with what I put in my report.
12     Q.   Before this case, have you ever been
13 retained as an expert in litigation whether or not
14 it resulted in a report?
15     A.   No.
16     Q.   Would you mind turning to Exhibit 3,
17 please, which I believe is your MDL report.
18         Could I ask you to please turn to page 51,
19 paragraph 135.
20     A.   Sorry, 51? And 135?
21     Q.   That's correct, Dr. Cingel.
22     A.   Okay.
23     Q.   You see where you wrote there is ample
24 evidence discussed through this report that social
25 media features contribute to adolescent mental harms

Page 95

1 and that these harms are not caused by content
2 alone?
3         Is that accurate?
4     A.   Uh-huh, yes.
5     Q.   Am I understanding correctly that your
6 view is features cause some harms and content causes
7 some harms but it's not content alone; is that
8 right?
9         MR. KIEFFER: Object to the form.
10 Mischaracterizes his report.
11         THE WITNESS: Yeah, I don't think that
12 that's what that says. And as I mentioned before, I
13 think about it in terms of a hierarchy, that you --
14 given that there is algorithmically recommender
15 algorithms on all of these social media platforms,
16 you don't see content without that feature.
17 BY MR. CHIOU:
18     Q.   So maybe you could help me understand that
19 sentence, then, if we break it down.
20         You believe social media features
21 contribute to adolescent mental harms, right?
22     A.   Correct.
23     Q.   And you believe these harms are not caused
24 by content alone, right?
25     A.   Correct.

Page 96

1     Q.   So content causes some, but not all, of
2 the harm, that's what "alone" means, right?
3         MR. KIEFFER: Object to the form.
4 Mischaracterizes his report and his testimony.
5         THE WITNESS: Again, that's not what --
6 that's not how I read this.
7 BY MR. CHIOU:
8     Q.   How is it that you read it?
9     A.   I read that the features contribute to
10 adolescent mental health harms and the features are
11 what -- as I'm saying, the features are what drive
12 exposure to any sort of content.
13     Q.   Is it your testimony, Dr. Cingel, when you
14 wrote "these harms are not caused by content alone,"
15 what you really meant is that content isn't causing
16 any harm?
17     A.   Like --
18         MR. KIEFFER: Object to the form to the
19 extent it's argumentative. It misstates his report
20 and testimony.
21         THE WITNESS: I mean, you're -- I think
22 you're pulling -- I don't know how many words this
23 document is. You're talking about one word in a
24 however long document. I think that what I have
25 said is consistent with the entirety of this report.

Page 97

1 BY MR. CHIOU:
2     Q.   Is it your testimony, Dr. Cingel, that
3 content is -- does not contribute to adolescent
4 mental health harms?
5     A.   That content alone? I get that, like, I
6 cannot separate these two things from one another.
7 They're intricately tied together.
8     Q.   Okay. Does content contribute to
9 adolescent mental health harms?
10         MR. KIEFFER: Object to the form to the
11 extent it's vague and ambiguous.
12         THE WITNESS: I think most of the time the
13 research shows that it's time spent using social
14 media, it's problematic social media use, so that
15 specific context of use, or it's certain features.
16 I'd say that's the most common evidence that we
17 have.
18         MR. CHIOU: Move to strike as
19 nonresponsive.
20     Q.   I guess, Dr. Cingel, maybe my question is
21 more simple.
22         In your view, does content contribute --
23 does the nature of the content contribute to
24 adolescent mental health harms?
25         MR. KIEFFER: Object to -- it's vague.

25 (Pages 94 - 97)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 98

1 It's ambiguous. It's uses undefined terms. And
2 it's been asked and answered.
3        THE WITNESS: I think my answer is the
4 same as that I've been giving.
5 BY MR. CHIOU:
6    Q. Is that a yes, a no?
7        MR. KIEFFER: Same objections.
8        THE WITNESS: What, Jon?
9        MR. KIEFFER: Same objections.
10       THE WITNESS: Oh, sorry.
11       I cannot answer that question as asked.
12 BY MR. CHIOU:
13   Q. Am I understanding right, you can't answer
14 yes or no to whether the nature of content
15 contributes to adolescent mental health harms?
16       MR. KIEFFER: Object to the form. It's
17 vague. It's ambiguous. Uses undefined terms. And
18 it's been asked and answered.
19       THE WITNESS: I don't think that there is
20 much research that focuses on content alone that
21 shows -- the bulk of the research, as I testified,
22 is on time spent, problematic media use -- social
23 media use, excuse me, and features.
24 BY MR. CHIOU:
25   Q. Are you aware of any research that

Page 99

1 disentangles the effects of content on mental health
2 compared to the effects of features on mental
3 health? Can you cite any of that research?
4    A. Where it's -- puts -- where it looks at
5 them separately?
6    Q. Correct.
7    A. The Kleemans study that's cited right
8 there looks at the -- looks at the effect of beauty
9 filters on adolescent females' body image. The
10 content is exactly the same in both -- I'm sorry,
11 excuse me -- in both experimental cases.
12       That would be one example right there.
13 Where it is the effect, the negative effect, the
14 negative experimental effect on adolescent females'
15 body images coming as a function of filters and
16 other image augmentation.
17   Q. Any other studies that come to mind?
18   A. Where it's separated out like that?
19   Q. Correct. Can you cite to any other
20 scientific studies that isolate the effects of
21 content of social media on mental health outcomes
22 from the effects of features of social media?
23   A. Not off the top of my head, no. There
24 might be some in this report.
25   Q. Speaking of your report, it's primarily

Page 100

1 site studies assessing the time users spend on
2 social media, not focusing on the content they're
3 viewing, right?
4        MR. KIEFFER: Object to the form to the
5 extent it mischaracterizes his report and the
6 citations therein.
7        THE WITNESS: I believe most -- many
8 studies, as I have been mentioning, measure time
9 spent on social media, the context of use, such as
10 whether it's problematic, yes.
11 BY MR. CHIOU:
12   Q. Would you mind looking at the second
13 sentence of paragraph 135, please.
14   A. One thirty what?
15   Q. 135 of your MDL report that starts with,
16 "Research recognizes."
17   A. Uh-huh.
18   Q. And you say that, "Research recognizes
19 that some social media features are harmful in and
20 of themselves."
21       Do you see that?
22   A. Uh-huh.
23   Q. And the example you give for a feature
24 harmful in and of itself is "visible like counts and
25 Snapstreaks promote social comparison." Right?

Page 101

1    A. Correct.
2    Q. And in the following sentence of
3 paragraph 135 you wrote, "that social comparison
4 (and features that promote social comparison) is the
5 key mechanism that explains negative outcomes from
6 social media use."
7        Is that accurate?
8    A. That is what I wrote.
9    Q. Social comparison theory indicates that
10 people value their personal and social worth by
11 assessing how they compare to others, right?
12       MR. KIEFFER: Object to the form. Vague
13 and ambiguous.
14       THE WITNESS: At a basic level, yes.
15 BY MR. CHIOU:
16   Q. Like how their accomplishments compare to
17 others, right?
18   A. That could be one of many things.
19   Q. Like how wealth -- how their wealth
20 compares to others would be another example, right?
21   A. Possibly.
22   Q. So am I understanding correctly at a basic
23 level, according to social comparison theory, when
24 you see another person on a -- as an example, an
25 exotic vacation you can't afford, you could make an

26 (Pages 98 - 101)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 102

1 upward social comparison and feel bad about
2 yourself?
3        MR. KIEFFER: Object to the form. Vague
4 and ambiguous. Incomplete hypothetical.
5        THE WITNESS: I actually think the
6 research would show more that you'd pay attention to
7 these other social indicators, like likes, for
8 example.
9 BY MR. CHIOU:
10     Q.   But under social comparison theory, if --
11 at a basic level, if I see someone flaunting a super
12 fancy car, that can -- could make me, in comparison
13 with my own life, feel worse, right?
14        MR. KIEFFER: Object to the form.
15 Incomplete hypothetical.
16        THE WITNESS: I think the theory would --
17 it would have to be excessive exposure to such
18 messages over and over and over again.
19 BY MR. CHIOU:
20     Q.   Yeah. That when I'm seeing a bunch of
21 these photos of fancy things posted by other people,
22 I feel bad or envious, or whatever word you want to
23 use, worse about my own life, right; is that --
24     A.   Again, that would come, though, as a
25 function of a lot of time spent, you know, looking

Page 103

1 at the -- a lot of time spent anywhere where these
2 images are.
3     Q.   And when you say "images," it's -- it's
4 photos, right?
5        MR. KIEFFER: Object to the form.
6 BY MR. CHIOU:
7     Q.   It's one -- it's one thing?
8        MR. KIEFFER: Object to form.
9 Mischaracterizes testimony.
10        THE WITNESS: It -- it depends.
11 BY MR. CHIOU:
12     Q.   Of videos would be another, right, videos
13 of fancy cars, vacations, et cetera, right?
14        MR. KIEFFER: Object to the form.
15 Mischaracterizes testimony.
16        THE WITNESS: I don't know of research
17 that looks at social comparison with respect to any
18 video content.
19 BY MR. CHIOU:
20     Q.   At a basic level, when we're talking about
21 upward social comparison, so setting aside videos,
22 then, as you just mentioned, you would be seeing
23 photos of -- posted by other users that lead the
24 user to make the upward social comparison, right?
25        MR. KIEFFER: Object to the form.

Page 104

1 Incomplete hypothetical. And misstates his
2 testimony.
3        THE WITNESS: And that you would see
4 because that has been algorithmically recommended to
5 you.
6 BY MR. CHIOU:
7     Q.   However you end up seeing it, that's --
8 you see these photos of things like expensive cars,
9 exotic vacations, and that would lead you to make
10 the upward social comparison and feel worse about
11 yourself?
12        MR. KIEFFER: Object to the form. It's
13 been asked and answered. Incomplete hypothetical.
14        THE WITNESS: As I've said, it doesn't
15 happen with -- you don't see the content without the
16 algorithm in this case.
17 BY MR. CHIOU:
18     Q.   However you see the content, that's what
19 you would see and feel worse about yourself, right?
20        MR. KIEFFER: Object to the form.
21 Mischaracterizes his testimony.
22        THE WITNESS: I think I've -- again, I
23 keep -- you cannot -- you cannot separate those two
24 things out.
25 ///

Page 105

1 BY MR. CHIOU:
2     Q.   If all you were seeing were photos of cute
3 cats, for example, you're not making an upward
4 social comparison or a downward social comparison
5 based on that, right?
6        MR. KIEFFER: Object to the form.
7 Incomplete hypothetical.
8        THE WITNESS: I truly don't know.
9 BY MR. CHIOU:
10     Q.   It's your testimony that you don't know
11 whether someone could make an upward or downward
12 social comparison just from viewing cute cat videos?
13     A.   No, because, once again, this comes back
14 to all the context that surrounds you as an
15 individual, when you're viewing it, how you're
16 viewing it, with whom you're viewing it. There's
17 just many, many other things.
18     Q.   So if I'm understanding you correctly, to
19 make an assessment of whether a user can make an
20 upward or downward social comparison, you would have
21 to know numerous factors, right?
22     A.   In the hypothetical that you are giving
23 me, yes.
24     Q.   Factors like background information about
25 the individual, right?

27 (Pages 102 - 105)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 106

1    A.  Yeah, as I -- you know, as I talk about in
2  my report, there are large groups of at-risk
3  adolescents that we know some things about that are
4  more at risk for the negative effects of social
5  media on mental health.  Knowing things like that,
6  that's some -- that's one aspect of context.
7    Q.  Sitting here right now, can you think of
8  any kind of content that you think would be fairly
9  innocuous on a viewer's mental health?
10    MR. KIEFFER:  Object to the form to the
11  extent it's an incomplete hypothetical.
12    THE WITNESS:  Is there any content that is
13  innocuous devoid of any context surrounding it?
14  BY MR. CHIOU:
15    Q.  Correct.
16    A.  I would -- to really answer and truly
17  answer your question, I'd like to see more context.
18    Q.  So, for example, I've been using cute cat
19  videos --
20    A.  Yeah.
21    Q.  -- as the example, right.
22    To understand whether you think a cute cat
23  video could have an adverse mental health effect on
24  a viewer, you're saying you would still need to
25  understand more context?

Page 107

1    A.  I would like to, yeah.
2    Q.  Would you need more context to say, in
3  general, whether a beheading video is likely to have
4  an adverse mental health effect on a viewer?
5    A.  I think my answer stands across content.
6    Q.  And is it your testimony that you still
7  need more context to say whether, in general, a
8  beheading video would have more of an adverse mental
9  health effect on a viewer than a cute cat video?
10    MR. KIEFFER:  Object to the form.  It's
11  been asked and answered.
12    THE WITNESS:  I think in terms of -- if
13  you are used to watching that sort of -- or
14  consuming that sort of content, I think it would
15  have a very different effect.
16  BY MR. CHIOU:
17    Q.  Can we go back to the second sentence of
18  paragraph 135 for a moment, please.
19    You wrote that "Snapstreaks promote social
20  comparison."  Right?
21    A.  Uh-huh.
22    Q.  What's your understanding, Dr. Cingel, of
23  how Snapstreaks work?
24    A.  It is a -- it's an indicator of snapping a
25  friend or a connection and it shows how many days, I

Page 108

1  believe, that that has occurred.
2    Q.  Is it accurate that means you exchanged,
3  both sent and received, Snaps with a friend on your
4  friends list for at least three consecutive 24-hour
5  periods?  Does that sound right?
6    A.  I'm not sure what the minimum number is.
7    Q.  When a user receives a Snap from a person
8  on his or her friends list, a social comparison
9  could happen if the other person is sending
10  pictures, for example, of an exotic vacation or a
11  fancy car, right?
12    MR. KIEFFER:  Object to the form.  It's an
13  incomplete hypothetical.
14    THE WITNESS:  I'm sorry, can you repeat
15  the question?
16  BY MR. CHIOU:
17    Q.  Sure.
18    When a user receives Snaps from a person
19  on his or her friends list, a social comparison
20  could end up happening if the other person is
21  sending pictures of expensive clothes, cars, or
22  vacations that the user can't afford, right?
23    MR. KIEFFER:  Object to the form.  It's an
24  incomplete hypothetical.
25    THE WITNESS:  I'm not sure, to be honest

Page 109

1  with you.  I don't know if there's research that
2  shows that exact hypothetical.  There is -- I have
3  seen that the number itself that you see of the
4  Snapstreak in many ways causes the social comparison
5  or whether it's upward or downward.
6  BY MR. CHIOU:
7    Q.  So you're saying the number itself on the
8  Snapstreak is how the Snapstreak promotes social
9  comparison?
10    A.  It's one of the ways.
11    Q.  What are --
12    A.  I'm sorry, primarily the way.
13    Q.  Primarily the way.
14    Are there any other ways that you think
15  Snapstreaks promote social comparison?
16    A.  Probably through the number that you have
17  with -- with different people.
18    Q.  What do you mean by that?
19    A.  If you have -- my understanding is that
20  you -- and my understanding is that you can have
21  multiple Snapstreaks with different people.  If you
22  are someone that has many with many people and I'm
23  an outsider looking at that, that could cause social
24  comparison.
25    Q.  When you say the "outsider looking at

28 (Pages 106 - 109)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 110

1 that," by "that," do you mean the number?
2    A.  The number.
3    Q.  Anything other than the number that comes
4 to mind for why a Snapstreak would promote social
5 comparison?
6    A.  Would promote social comparison?  Not off
7 the top of my head.
8    Q.  I'm going to turn back to that study about
9 Korean children that we were discussing --
10    A.  Okay.
11    Q.  -- earlier this morning.
12       And, Mr. Kieffer, I apologize, we don't
13 have it in hard copy.  We have it electronically.
14 This is one of these publications we found out about
15 last night.
16       MR. KIEFFER:  Okay.  Yeah.  If he wants to
17 take a look through it, you can make that available
18 electronically to do that.
19       MR. CHIOU:  Sure.
20       I'll represent to you, Mr. Kieffer, this
21 is one of the publications that Dr. Cingel authored
22 that was published April 22nd of this year.
23    Q.  Dr. Cingel, you wrote this article, right?
24    A.  I'm a co-author on it, yes.
25    Q.  You're one of three authors of this

Page 111

1 article?
2    A.  Correct.
3    Q.  Do you see in the middle of the Abstract,
4 sir, that children's -- "Additionally, children's
5 YouTube viewing time was not directly associated
6 with social skills, but negative interactions on
7 YouTube was negatively correlated with social
8 skills."
9       Do you see that?
10    A.  I do.
11    Q.  So you found that what the children were
12 watching when they saw negative interactions was
13 correlated with the effects on their social skills,
14 right?
15    A.  That is one finding.
16    Q.  But the time they spent watching videos on
17 YouTube did not have a statistically significant
18 correlation with their social skills.
19       Am I understanding that sentence
20 correctly?
21    A.  Not directly.  But you'll see the next
22 sentence says, "YouTube viewing time was related to
23 social skills" -- I'm adding parenthetically --
24 indirectly through self-regulation.  And that would
25 be decreased self-regulation and anxiety.

Page 112

1    Q.  I'm understanding correctly that the
2 negative interactions within the content they were
3 watching was correlated with the effects on their
4 social skills.  Is that what that means?
5    A.  Directly, but if your question is does --
6 if you are saying that time spent doesn't matter, it
7 does not have a direct effect, but it does matter
8 for social skills through those other two variables
9 that I reference, self-regulation and anxiety.
10    Q.  Let's talk about that.
11       You see the sentence that says children's
12 anxiety -- actually -- could you go to page 20,
13 please.
14       Dr. Cingel, you found that "children's
15 anxiety was found to be more related to the
16 consumption of content with more negative
17 interactions than viewing time itself."  Is that
18 correct?
19    A.  Could -- could we go to the figure?  I
20 think it's Figure 1 in this paper.  It would be --
21 well, actually, it would be embedded somewhere so
22 it's probably a few pages above.
23    Q.  Dr. Cingel, we'll get to the figure
24 shortly.
25       It's fair to say you found that

Page 113

1 "children's anxiety was found to be more related to
2 the consumption of content with more negative
3 interactions than viewing time itself."  Right?
4    A.  That is what that says.  And that is more
5 in terms of the absolute value of the coefficient
6 but I don't recall how many more.  And I do recall
7 that it -- that time was still significantly related
8 to anxiety.  Just that the number in terms of
9 absolute value is slightly smaller.
10       And I would also add, if I may, that
11 that -- that's not a statistic -- we didn't test for
12 whether it was statistically significantly larger or
13 smaller.  So that is just a qualitative comment
14 about the fact that the number is at least somewhat
15 bigger.
16    Q.  So in layman's terms, the negative
17 interaction content of video had a stronger
18 correlation with anxiety and we're not sure yet how
19 much bigger?
20    A.  Correct.  And I don't recall it being much
21 bigger.
22    Q.  Compared to the correlation between the
23 amount of time watching videos and anxiety, right?
24    A.  Correct.  But they are both -- they are
25 both significantly related to anxiety.

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 114

1    Q.  When you say "both," you mean the time
2  spent -- amount of time spent watching videos and
3  the negative interaction content videos; is that
4  right?
5    A.  That's my recollection.  If I can see the
6  figure, it will be very clear.
7    Q.  Sure.  Would you mind turning to Figure 1,
8  please.
9    A.  I think it's Figure 1.  Apologies if I
10  missed the number.
11    MS. STOKES:  17.
12    THE WITNESS:  That's Table 1.  There we
13  go.
14    Kenya, there we go, thank you.
15  BY MR. CHIOU:
16    Q.  Dr. Cingel, could we go to page 20,
17  please.
18    In this section you wrote that the
19  findings of your study "suggest that parents should
20  consider what content their children are consuming
21  when they watch YouTube, beyond simply controlling
22  the amount of time they spend."  Right?
23    A.  I -- yes, that is written there.  If you
24  could highlight where that is, I cannot find it.
25  It's a big paragraph.

Page 115

1    Q.  And you stand by that statement, right?
2    A.  I do, but I stand by it in conjunction
3  with everything else that is in here.  We still say
4  that they should pay attention to time.  We -- I can
5  read right here -- sheer amount of time negatively
6  relates to young children's self-regulation not
7  because they're modeling negative --
8    (Whereupon, a brief discussion off the
9  record.)
10    THE WITNESS:  "Sheer amount of time
11  viewing may negatively relate to young children's
12  self-regulation not because they are modeling
13  negative behaviors, but rather, it is displacing
14  time that could be spent practicing
15  self-regulation."
16    So that's -- that's one.
17    We say, "Children's anxiety was found to
18  be more related to the consumption of content with
19  negative interactions than viewing time."
20    But, again, if you look at the -- that
21  Figure 1 that was up there, time spent on YouTube
22  was still significantly related to anxiety.  I
23  believe the coefficient was .17 relative to .31.
24  BY MR. CHIOU:
25    Q.  So to make sure I'm understanding your

Page 116

1  findings correctly, you believe the findings suggest
2  that parents should consider what content their
3  children are consuming when they watch YouTube.
4  That's part one, right?
5    MR. KIEFFER:  Object to the form to the
6  extent that mischaracterizes his study and his
7  testimony.
8    THE WITNESS:  Once again, that's part of
9  it.
10  BY MR. CHIOU:
11    Q.  And the other part is beyond simply
12  controlling the amount of time they spend, right?
13    A.  It's the two things in relation to one
14  another, yes.
15    Q.  And you also believe, Dr. Cingel, it's
16  "important to assess when exposure to certain
17  content, rather than simply the amount of time spent
18  viewing media, becomes a stronger predictor of
19  developmental correlates."  Right?
20    A.  Where is that written in here?
21    Q.  Page 19, Dr. Cingel.
22    A.  Yeah, if -- I think that's what we're on
23  but if you could highlight, that would be helpful to
24  me.  Or even which -- which paragraph?  Is it the
25  "In addition" paragraph?

Page 117

1    Q.  Dr. Cingel, it's the last sentence of the
2  first paragraph under Theoretical Implications
3  starting with the word "Further."
4    Do you see that, sir?
5    A.  Oh, I see now, thank you.
6    Q.  So let me ask the question again,
7  Dr. Cingel, if that's all right with you.
8    You found that it would be "important to
9  assess when exposure to certain content, rather than
10  simply the amount of time spent viewing media,
11  becomes a stronger predictor of developmental
12  correlates."  Right?
13    MR. KIEFFER:  Object to the extent it
14  mischaracterizes the study.
15    THE WITNESS:  Yeah, if I remember
16  correctly -- I mean, again, I want to point out that
17  this is a study conducted on parents of four- to
18  six-year-olds.  And four- to six-year-olds
19  developmentally are remarkably different, of course,
20  than adolescents.
21    Bless you.
22    Remarkably different developmentally,
23  right.  So I think what we're getting at here is,
24  are children -- given that we did find that content
25  relates, in addition to time, is there a time when

30 (Pages 114 - 117)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 118

1  it's just time spent across the developmental --
2  from across the developmental span from childhood
3  into adolescence. But I would be careful about
4  drawing generalizations from this because we're
5  talking about four- to six-year-olds.
6  BY MR. CHIOU:
7      Q. Let's break that down a little bit.
8          So for four- to six-year-olds, you found
9  that parents should consider what content their
10  children are consuming when they watch YouTube
11  beyond simply controlling the amount of time they
12  spend, that's for four- to six-year-olds, right?
13     A. We say consider. I read that to be in
14  conjunction with the amount of time that they spent.
15     Q. Do you think parents should -- parents of
16  an adolescent should consider what content their
17  adolescents are consuming when they watch YouTube
18  beyond simply controlling the amount of time they
19  spent?
20     A. I actually think with adolescents, given
21  that they're developmentally different, that there
22  you want to be more cognizant of time, frankly.
23  Time and context, again. Because adolescents
24  developmentally are able to handle more content, a
25  wider variety of content. I don't think content

Page 119

1  matters as much for adolescents as it does time in
2  the context in which you're spending that time.
3      Q. For adolescents, if I'm understanding you
4  right, you don't have to -- parents don't have to
5  consider content as much because they can handle a
6  wider variety of content?
7      MR. KIEFFER: Object to the form to the
8  extent it misstates his testimony.
9      THE WITNESS: Did -- you said "as much"?
10  BY MR. CHIOU:
11     Q. That's right.
12     A. I think that is fair.
13     Q. But parents shouldn't disregard content
14  for adolescents, right?
15     A. Once again, these two things are linked
16  together, right. Time and content. When I talk to
17  parents of adolescents, it is the time and it is the
18  context of use that they are most concerned about.
19     Q. In your view, Dr. Cingel, should parents
20  consider what content their adolescents are
21  consuming?
22     A. Should they at all? I would say secondary
23  to time and context.
24     Q. We could keep this study up as an exhibit
25  for now. We'll be coming back to it shortly.

Page 120

1      Dr. Cingel, in your own academic research,
2  what research designs do you use?
3      A. I typically use surveys, content analyses,
4  experiments, and we are now using short-term
5  longitudinal designs, what might be called
6  ecological momentary assessment designs. There may
7  be a few others but I would say that those are the
8  primary ones that we use in my lab.
9      Q. So let's go through some of those starting
10  with experimental design.
11         Am I understanding correctly that an
12  experimental design involves planning and
13  controlling experiments to test hypotheses, at a
14  basic level?
15     A. Yes.
16     Q. It involves planning and controlling
17  experiments to minimize bias, right?
18     A. As best as you can, yes.
19     Q. To establish causal relationships, right?
20     A. That can be one thing.
21     Q. And would you say independent variables
22  are a key component of experimental design?
23     A. Independent variables are key components
24  of any design.
25     Q. For experimental design you also have

Page 121

1  dependent variables, as with many other types of
2  studies, right?
3      A. Correct.
4      Q. And experimental designs, you need control
5  groups, right?
6      A. You don't necessarily need what might be
7  called a control group. You need at least two
8  groups where you are manipulating one variable.
9      Q. And so an experimental design is basically
10  a structured approach to conducting research
11  specifically designed to investigate relationships
12  between variables, right?
13     A. I would say that for almost any design.
14     Q. And would you say from a researcher
15  perspective, experimental design is generally the
16  preferred method for making claims of causality?
17     A. No, I don't -- I don't know if I would say
18  "preferred." There are many ways of doing that.
19     Q. Would you say -- off the top of your head,
20  can you name any other methods that you would prefer
21  over an experimental design in order to make a claim
22  of causality?
23     A. There -- again, that I would prefer, no.
24  There are many that, in conjunction with
25  experiments, do the same thing.

31 (Pages 118 - 121)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 122

1    Q.  So experimental design is the preferred
2  method for making claims of causality, right?
3        MR. KIEFFER:  Object to the form.
4  Mischaracterizes his testimony.
5        THE WITNESS:  Yeah, that's -- sorry,
6  that's not what I said.
7        I said there are many.  And I would not
8  say it's preferred.
9  BY MR. CHIOU:
10    Q.  Are there any types of studies that you
11  think would be superior to experimental design to
12  make a claim of causality?
13    A.  I don't really think about it.  It sounds
14  like you're asking about some sort of hierarchy,
15  right, like this is better, that's better.  I think
16  about it in terms of there are many, many different
17  designs.  Some of -- you know, like you said, there
18  are experiments.  They're -- I named four that I do
19  in my lab.  All of those things contribute to
20  science.  All of those things contribute to what we
21  know about adolescent social media use and mental
22  health.  I don't rank one above another.
23    Q.  You mentioned surveys is something you
24  use, right?
25    A.  Correct.

Page 123

1    Q.  There's limitations to surveys, right?
2    A.  There are limitations to everything.
3    Q.  So sticking on surveys for a moment, you
4  agree that study participants may not remember
5  things accurately, right?
6    A.  You could make that limitation for any
7  design.
8    Q.  And that's true for surveys, right?
9    A.  As one design that exists, yes.
10    Q.  And for surveys, a participant might not
11  remember when they did things, right?
12    A.  Depends on how you ask the question.  I
13  mean, again, this is very context-dependent.  It
14  depends on what type of survey you're asking, too.
15  It depends on the time horizon that you're asking
16  about.  There are many things that would influence
17  my answer to that question.
18    Q.  There's limits to human memory in how
19  accurately survey participants report things, right?
20    A.  It's possible.
21    Q.  Yeah.  So, for example, when participants
22  are asked how much time they spend doing something
23  like texting friends or sleeping, they could
24  underestimate, right?
25    A.  It -- again, it depends on how you're

Page 124

1  asking the question, the context in which you're
2  asking the question.
3    Q.  Uh-huh.  They could overestimate, right?
4    A.  Again, it is possible based on the
5  context, how you're asking the question, when you're
6  asking the question.
7    Q.  By definition, a self-report survey
8  requires effort on the part of participants to fill
9  them out, right?
10    A.  Yes.
11    Q.  And they're generally collected at
12  infrequent levels, right?
13    A.  What do you mean by "infrequent levels"?
14    Q.  That was a terrible question.  Can I start
15  over, Dr. Cingel?
16    A.  Sure.
17    Q.  They are generally collected at infrequent
18  intervals, right?
19        MR. KIEFFER:  Object to the form to the
20  extent that it is vague, ambiguous, and perhaps an
21  incomplete hypothetical.
22        THE WITNESS:  I don't know what you mean
23  by various intervals or -- I forget the word you
24  used.
25  ///

Page 125

1  BY MR. CHIOU:
2    Q.  Well, in the surveys -- in the studies
3  that you've conducted involving self-reporting
4  surveys, you're not asking participants to fill out
5  surveys every hour, every day, right?
6    A.  In some we are, yes.
7    Q.  But that's more of a rarity.  And in
8  general, it's more of a less frequent interval.
9  That's all I'm saying.
10    A.  In terms of how often those types of
11  studies are conducted?
12    Q.  In terms of how often you're asking study
13  participants to fill out a self-reporting survey.
14    A.  I'm sorry.  I don't understand the
15  question.
16    Q.  In general, participants are not asked to
17  fill out self-report surveys every hour, right?
18    A.  We do.
19    Q.  That's your general practice to ask?
20    A.  It is a practice.  It's one of the more
21  common practices in terms of the most current
22  research.  I don't know if I would say every hour.
23  But every three hours, that's common.
24    Q.  And that's your standard practice, to ask
25  survey participants, study participants, to fill out

32 (Pages 122 - 125)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 126

1 self-report surveys about every three hours?
2     A.   As I said, it is a practice and a common
3 practice that we use in our lab, as well as many
4 other labs around the world.
5     Q.   Are you familiar with the term "ecological
6 study," Professor?
7     A.   With the term "ecological study"?  Well,
8 as I mentioned, what I'm describing is known as an
9 ecological momentary assessment.  So I'm not sure if
10 that's what you are referencing or not.
11     Q.   Do you know if ecological momentary
12 assessment is the same thing as an ecological study?
13     A.   I do not.  I've -- in my field, I don't
14 believe ecological study is something that we talk
15 about.
16     Q.   We'll get back to the ecological
17 assessment in a moment.
18        I want to ask about, to make sure we're on
19 common understanding, about temporality.
20        Inside scientific research, temporality
21 refers to the way time and its passage are
22 conceptualized, measured, and experienced within a
23 study; is that right?
24     A.   Yes.
25     Q.   Temporality encompasses the duration of

Page 127

1 events, their sequence, and how those temporal
2 aspects influence the research topic and chronology,
3 right?
4     A.   Yes.
5     Q.   And you agree that understanding
6 temporality is critical for designing studies,
7 interpreting results, and drawing meaningful
8 conclusions in any field where time plays a role in
9 human behavior, right?
10     A.   It is a part of many things that go into
11 designing a study.
12     Q.   It's an important part, right?
13     A.   There are many, many things that are an
14 important part of conducting good science.
15     Q.   That's right.  And temporality is one of
16 those?  Am I right?
17     A.   Oh, I -- sorry, I did not know that was a
18 question.
19     Q.   And temporality is one of those important
20 components?
21     A.   It is one of many things.
22     Q.   Surveys don't establish temporality,
23 right?
24     A.   They can.
25     Q.   How would a survey establish temporality?

Page 128

1     A.   Well, it depends on what -- what you mean
2 by "survey," I suppose.  There are many different
3 types of survey designs.  There are many different
4 types of ways of asking survey questions that can
5 address temporality.
6     Q.   How would a survey question address
7 temporality?
8     A.   A question itself.
9     Q.   Or how would a study involving -- relying
10 on self-reported surveys establish temporality?
11     A.   Well, for example, I mean, an ecological
12 momentary assessment study you are tracking people
13 over time.  That can establish temporality.
14 Anything that has longitudinal component can
15 establish temporality.
16     Q.   When you're referring to ecological
17 momentary assessments, that tracks groups of people
18 over time, not individuals over time; is that right?
19     A.   No, it does track individuals.
20     Q.   We'll turn back to the ecological
21 assessments in a moment.
22        Would you agree that it's a basic
23 scientific principle that correlation is not the
24 same as causation, right?
25     A.   That is a common saying, yes.

Page 129

1     Q.   Now, for example, you've got a high
2 correlation between people who are in pain and
3 people who take Tylenol but Tylenol isn't causing
4 the pain, right?
5        MR. KIEFFER:  Object to the form to the
6 extent it's an incomplete hypothetical.
7        THE WITNESS:  Well, it -- correlation is a
8 statistical term.  So there's, I think, a difference
9 between what we're talking about here.
10 BY MR. CHIOU:
11     Q.   A correlation doesn't show the direction
12 of an effect, right?
13     A.   It can, depending on the design of the
14 study.
15     Q.   You're saying a correlation -- depending
16 on the design of a study, a correlation can show the
17 direction of an effect?
18     A.   The statistical correlation, yes.
19     Q.   By definition, a statistical correlation
20 isn't the same thing as causation, right?
21     A.   Again, it depends on the design of the
22 study whether you can speak to that.
23     Q.   Well, what are the situations where a
24 statistical correlation, in your view, is the same
25 thing as causation?

33 (Pages 126 - 129)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 130

1      A.  It's the same thing as causation?  So in
2  an ecological momentary assessment design that I
3  reference a lot in my report, what you're looking at
4  is the correlation -- well, you can control for
5  mental health ahead of time, look for social media
6  use on one day or one moment, look at mental health
7  subsequent to that while controlling for where your
8  mental health started.  That is a statistical
9  correlation.  But you have established temporality.
10     Q.  Any other situations where, in your view,
11  a statistical correlation is the same thing as
12  causation?
13     A.  A longitudinal design of any kind,
14  experimental designs.
15     Q.  You believe that a longitudinal study --
16  let me start over, Dr. Cingel.
17         When you refer to longitudinal studies,
18  that involves repeated observations of the same
19  variables over time; is that right?
20     A.  At a basic level, yes.
21     Q.  They don't control for dynamic
22  confounders, right?
23     A.  They can.
24     Q.  How would a longitudinal study control for
25  a dynamic confounder?

Page 131

1      A.  What do you mean by "a dynamic"?  Can you
2  give me an example?
3      Q.  Sure.
4          Would you agree that an adverse childhood
5  experiences, that could be a dynamic confounder?
6      A.  I don't know how that would be dynamic.
7      Q.  You're right.  That would just be a
8  confounding variable, right?
9      A.  That could be easily accounted for.
10     Q.  Are you aware of any studies, longitudinal
11  studies, that have addressed the confounder of
12  adverse childhood experiences?
13     A.  In their designs, off the top of my head,
14  I don't know.
15     Q.  You're not aware of any studies that
16  addressed the confounder of preexisting psychiatric
17  disorders, right?
18     A.  Well, that's kind of where I mentioned
19  where you can control for that.  So yes, those do
20  exist.
21     Q.  Your report doesn't address the absence of
22  any known confounders from any studies, right?
23     A.  What do you mean by that?
24     Q.  When you're going -- your report looks at
25  numerous studies --

Page 132

1      A.  Sure.
2      Q.  -- in the field, right?
3      A.  Yeah.
4      Q.  Your report doesn't discuss how any of the
5  studies you looked at could be lacking certain -- or
6  failing to address certain known confounders, right?
7      A.  I don't know if I reference that in my
8  report or not.
9      Q.  Would you agree that confounders can
10  increase certain symptoms over time?
11     A.  Symptoms of?
12     Q.  Symptoms of mental health issues or
13  physical health issues?
14         MR. KIEFFER:  I am going to object to the
15  extent it's vague, ambiguous, undefined, and an
16  incomplete hypothetical.
17         THE WITNESS:  Can you repeat the question,
18  please?
19  BY MR. CHIOU:
20     Q.  Would you agree, Dr. Cingel, that
21  confounders can increase certain symptoms of mental
22  health issues over time?
23         MR. KIEFFER:  Object to the form.  Vague
24  and ambiguous.  Undefined.  And an incomplete
25  hypothetical.

Page 133

1          THE WITNESS:  It would depend on what
2  you're talking about.
3  BY MR. CHIOU:
4      Q.  Do you think a confounder can result in a
5  person using more social media?
6          MR. KIEFFER:  Same objection.  Vague and
7  ambiguous.  Incomplete hypothetical.
8          THE WITNESS:  And what confounder are you
9  talking about?
10  BY MR. CHIOU:
11     Q.  Any sort of confounder.  Let's use
12  preexisting psychiatric disorder.  Could that result
13  in a person using more social media?
14     A.  There's a recent study out where we
15  have -- sorry, not we -- where they looked at a
16  diagnosis of depression.  There was no difference in
17  how depressed and nondepressed adolescents use
18  social media.
19     Q.  Do you believe that confounders could
20  result in a person using more social media?
21         MR. KIEFFER:  Object.  Vague and
22  ambiguous.  Undefined.  And an incomplete
23  hypothetical.
24         THE WITNESS:  That study would indicate in
25  the context of depression at least, no.

34 (Pages 130 - 133)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 134

1  BY MR. CHIOU:
2      Q.  What about life stressors?
3      A.  Like, such as?
4      Q.  Any sort of life stressor.
5          MR. KIEFFER:  Object to the form.  Vague.
6  Ambiguous.  Undefined.  And an incomplete
7  hypothetical.
8          THE WITNESS:  They're -- a life stressor
9  could be very minimal or -- and I don't know what
10  you're referencing.
11  BY MR. CHIOU:
12      Q.  Off the top of my head, let's use divorce
13  as an example.
14          Do you believe a life stressor -- a
15  significant life stressor such as divorce could
16  result in a person using more social media?
17          MR. KIEFFER:  Object to the form.  It's an
18  incomplete hypothetical.
19          THE WITNESS:  Do you mean the divorce of
20  parents for an adolescent?
21  BY MR. CHIOU:
22      Q.  Sure.
23      A.  Because I don't think adolescents are
24  hopefully getting divorced.
25      Q.  That's right.  Sure.  Let's use the

Page 135

1  example of a divorce of a parent.
2      A.  I don't know.  I don't know.
3      Q.  Am I understanding right that an
4  association is not the same thing as causation in
5  scientific research, right?
6      A.  I don't think that's the case.  Different
7  people describe different relationships with
8  different words.
9      Q.  Well, would you say that, in general, it's
10  a basic scientific principle that two variables can
11  be associated without one causing the other one?
12      A.  It could be that or it could be that they
13  are -- that one is causing another.  And I believe
14  many people would use the same word, "association,"
15  in both cases.
16      Q.  You have to figure out whether an
17  association is valid?
18      A.  You mean "accurate" by the word "valid"?
19      Q.  Let me rephrase that question, Dr. Cingel.
20          To figure out whether an association is
21  valid or accurate, you have to rule out bias and
22  confounding factors, right?
23      A.  To the best that you can.
24      Q.  Is one kind of bias self-reporting bias?
25      A.  Again, it can be.  Not all self -- it

Page 136

1  depends on, again, how you're asking the question,
2  the context in which you're asking it, and so on.
3      Q.  Turning back to confounding variables, is
4  it correct that's a hidden variable that can
5  distort the relationship between variables you're
6  actually studying?
7      A.  Or it could moderate the effect.  It could
8  show for whom the association or under what
9  conditions the association or the effect exists.
10      Q.  And one possibility is that a confounder
11  is a potential reason why an association observed in
12  a study may actually be unrelated to the exposure
13  being studied, right?
14      A.  I -- sorry, I don't know what you mean by
15  that.
16      Q.  Sure.
17          A confounder is a potential reason why, if
18  a study observes an association, it may actually be
19  unrelated to the exposure being studied?
20          MR. KIEFFER:  Object to the form.  Vague
21  and ambiguous.  And undefined.
22          THE WITNESS:  It could also show for whom
23  the association exists.
24  BY MR. CHIOU:
25      Q.  If a study -- whenever a study doesn't

Page 137

1  account for potential confounders, it's possible
2  that a third variable could be the reason why an
3  association is found, right?
4          MR. KIEFFER:  Object to the form.  Vague
5  and ambiguous.  Undefined terms.
6          THE WITNESS:  I think it depends.
7  BY MR. CHIOU:
8      Q.  In your research, when you say there's an
9  increased risk of something, that doesn't
10  necessarily mean there's a causal relationship,
11  right?
12      A.  It does not necessarily mean that.
13      Q.  Increased risk is a different way of
14  saying correlation or association, right?
15      A.  It depends on the design.
16      Q.  In your practice, when you say variable A
17  is linked to a physical or mental health issue, for
18  example, you're generally meaning that that's an
19  association, not a causation, right, when you use
20  the term "linked to"?
21      A.  Again, I think it depends.  I think that
22  would be a common practice in the field.  I can't
23  think of really any study that, no matter what the
24  design is, that would say X causes B -- or, sorry, X
25  causes Y.

35 (Pages 134 - 137)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 138

1    Q.  That's a good way to put it, Dr. Cingel.
2 Let me go back and use that term, "common practice
3 in the field."
4          It's common practice in the field when
5 something -- variable A is linked to variable B,
6 common practice in the field is that there's an
7 association, not causation, right?
8          MR. KIEFFER:  Object to the form.
9 Misstates his testimony.
10         THE WITNESS:  Yeah, no, that's --
11 that's -- they might use that term which could mean
12 many different things.
13 BY MR. CHIOU:
14    Q.  And it's your testimony that's not
15 necessarily causation, right?
16         MR. KIEFFER:  Object to the form.
17 Misstates his testimony.
18         THE WITNESS:  For any one individual
19 study, perhaps.
20 BY MR. CHIOU:
21    Q.  Is it your testimony that it's common
22 practice in the field that when research finds
23 there's an association between variable A and
24 variable B sometimes they mean there's causation?
25         MR. KIEFFER:  Object to the form.

Page 139

1 Misstates his testimony.
2          THE WITNESS:  And I don't want to speak
3 for individual authors on papers.  I'm just saying
4 it can -- it can depend.  It's not a one size fits
5 all.
6 BY MR. CHIOU:
7    Q.  Are you aware of any studies where the
8 authors are saying there's an association between
9 two variables and drawing the conclusion that
10 there's causation?
11         MR. KIEFFER:  Object to the form.  Vague
12 and ambiguous.
13         THE WITNESS:  As I mentioned, I don't know
14 if there's a single study that I can think of where
15 you would just -- where you would use the term
16 "causation" no matter what you did.  We're trained
17 to be cautious.  We're trained to be conservative.
18 I don't think any one singular study would come out
19 and say that.
20 BY MR. CHIOU:
21    Q.  It's common practice in the field to be
22 careful about distinguishing between associations
23 and causation, right?
24         MR. KIEFFER:  Object to the form.
25 Mischaracterizes his testimony.

Page 140

1          THE WITNESS:  Can you repeat the question,
2 please?
3 BY MR. CHIOU:
4    Q.  Sure.
5          It's common practice in your field to be
6 careful about distinguishing between associations
7 and causation, right?
8          MR. KIEFFER:  Same objection.
9          THE WITNESS:  It's common practice to be
10 careful in general.
11 BY MR. CHIOU:
12    Q.  And it's common practice in your field to
13 be careful about distinguishing correlation and
14 causation, right?
15         MR. KIEFFER:  Object to the form.
16         THE WITNESS:  I feel like I've answered
17 this, this question.
18 BY MR. CHIOU:
19    Q.  Is that a yes, it's common practice in
20 your field to be careful about distinguishing
21 correlation and causation?
22         MR. KIEFFER:  Object to the form.
23 Misstates his testimony.
24         THE WITNESS:  It is common practice to be
25 careful in how we describe our findings.

Page 141

1 BY MR. CHIOU:
2    Q.  Have you explained to your students at any
3 point the difference between correlation and
4 causation?
5    A.  We talk about the different aspects --
6 well, again, correlation can be -- we can talk about
7 it in terms of the definition of correlation or the
8 statistical coefficient that is an R, which is a
9 correlation coefficient.  We talk about that.  We
10 talk about different designs.  We talk about the use
11 of words in our academic writing.
12    Q.  In the classes you've taught, you've made
13 clear to your students that there's a difference
14 between association, correlation, and causation,
15 right?
16    A.  We talk about different statistical
17 techniques, what they mean.  We talk about what
18 words mean.  We talk about how to communicate that
19 to -- in our journal articles that we submit to
20 reviewers, to editors, and things of that nature.
21    Q.  One type of study that you've conducted is
22 called cross-sectional study, right?
23    A.  Yes.
24    Q.  Cross-sectional study that measures two or
25 more variables at one point and then examines the

36 (Pages 138 - 141)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 142

1  associations of those variables at that one time
2  point, right?
3      A.  Correct.
4      Q.  They don't change -- let me start over,
5  Dr. Cingel, if that's okay.
6          Cross-sectional studies can't track
7  changes or developments over time, right?
8      A.  I would classify you can have a
9  cross-sectional experiment, right, that that can
10 show changes over time.
11     Q.  A cross-sectional study doesn't determine
12 the direction of relationships between variables,
13 right?
14     A.  Again, in terms of -- in terms of some
15 cross-sectional designs it can.
16     Q.  How would a cross-sectional study
17 determine the direction of relationships between
18 variables?
19     A.  Well, there -- I mean, there are some
20 things that can't change, right.  So in -- for
21 example, social media use cannot cause a change in
22 gender.  It cannot cause a change in race.  So you
23 kind of know the direction of that relationship.
24         As I mentioned, with a cross-sectional
25 experiment, you can -- if you have pretests and

Page 143

1  posttests you can still determine these things.  So,
2  again, it's dependent.  There are a lot of different
3  designs and a lot of different ways in looking at
4  this.
5      Q.  Would you agree, Dr. Cingel, that, in
6  general, one of the limitations of the
7  cross-sectional studies is that they can't determine
8  the direction of relationships between variables?
9      MR. KIEFFER:  Object to the form.
10 Misstates his testimony.
11     THE WITNESS:  Again, I think it depends on
12 what cross-section -- what type of cross-sectional
13 study you're talking about.
14 BY MR. CHIOU:
15     Q.  Maybe your study could help illustrate
16 this point.
17         Can we pull up -- is it Exhibit 4 that is
18 the Korean children's study?
19         Exhibit 5, please.
20         (Whereupon, a brief discussion off the
21 record.)
22     MR. CHIOU:  Mr. Kieffer, why don't I
23 finish just a couple questions about this and then
24 we can take a break?
25     MR. KIEFFER:  Either way.  I was just

Page 144

1  checking to see how he was doing.
2  BY MR. CHIOU:
3      Q.  Are you doing all right?
4      A.  Yeah, I can make it 15 minutes or however
5  long you got.
6      Q.  Do you see on page 21 where --
7      A.  I'm sorry to interrupt.  What study are we
8  talking about?
9      Q.  Your study about the Korean children that
10 you published --
11     A.  Oh, sure.
12     Q.  -- on April 22nd, 2025.
13     A.  Thank you.
14     Q.  Sure.
15         You wrote that "while the model in this
16 study suggests that YouTube viewing time is
17 associated with higher anxiety, it is also possible
18 that the opposite case: children with higher anxiety
19 spend more time on YouTube."
20         You wrote that, right?
21     A.  It is written in this paper, yes.
22     Q.  And that illustrates the limitation we
23 were just talking about of cross-sectional studies,
24 right, it can't determine the direction of
25 relationships between variables?

Page 145

1      A.  I think you would find that this is common
2  language in any limitations section that you would
3  see, yeah.
4      Q.  For cross-sectional studies, right?
5      A.  For many different types of studies.
6      Q.  That the determination of relationships
7  between variables, you're saying that language is
8  common in many different types of studies?
9      A.  The -- the limitations section in general
10 is -- you know, we have it in almost every published
11 study.  And there is some language that almost every
12 author would put in there in an effort to be, you
13 know, conservative and cautious in the
14 interpretations that can be drawn from any one
15 singular study.
16     Q.  So we're talking about this study
17 specifically.  You stand by the statement that you
18 believe the results show it's possible that children
19 with higher anxiety are spending more time on
20 YouTube?
21     A.  I'm sorry, say that one more time.
22     Q.  Sure.
23         You believe the results of this study show
24 it's possible that children with higher anxiety are
25 spending more time on YouTube?

37 (Pages 142 - 145)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 146

1    A.  From this one study, yes, but I think, as
2  I mentioned before, there is some evidence that that
3  may not be the case, some additional evidence.
4    Q.  And you see where you also wrote there may
5  be -- "there may certainly be other factors that are
6  not included in this model, so we must be cautious
7  in our interpretation of the findings, including
8  their directionality."
9      Do you see that, Dr. Cingel?
10    A.  I do.
11    Q.  And so your study is illustrating another
12  underlying scientific principle we're talking about,
13  right, the need to account for confounding factors?
14    A.  That that is important to do, yes.
15      MR. CHIOU:  So we can take a break here,
16  Mr. Kieffer, if you'd like.
17      MR. KIEFFER:  Yeah, go off the record.
18      THE VIDEOGRAPHER:  The time is 12:09 p.m.
19  Pacific time.  We're going off the record.
20      (Whereupon, a brief recess was taken.)
21      THE VIDEOGRAPHER:  The time is 12:28 p.m.
22  Pacific time.  We're back on the record.
23  BY MR. CHIOU:
24    Q.  Good afternoon, Dr. Cingel.
25    A.  Good afternoon.

Page 147

1    Q.  During the break did you have -- get the
2  chance to speak with your counsel?
3    A.  We spoke, yes.
4    Q.  Is there anything about your testimony
5  that you'd like to correct?
6    A.  No.
7    Q.  Anything that you want to clarify?
8    A.  Clarify, no.
9    Q.  Dr. Cingel, in your view, how do you
10  define addictive use of social media?
11    A.  In what I do, I tend not to use the term
12  "addictive."  I tend to use the word "problematic."
13      To me, problematic use refers to a context
14  of use where the individual, whomever it is, is
15  using late at night, displacing sleep, getting into
16  conflicts with parents, in the case of adolescents,
17  getting into conflicts with parents and peers
18  because of their use, has a feeling where I can't
19  put the device down or can't stop using social media
20  or I feel, you know, the sense where I just -- I
21  want to be on there and be using it.
22      And that's the -- that's the definition
23  that I use in my research.
24    Q.  The factors you just mentioned such as
25  conflicts with parents in the case of adolescents,

Page 148

1  that goes towards your definition of problematic
2  use, correct?
3    A.  Right.  So the -- you are using so much,
4  or in a particular context, like at the dinner
5  table, or things like that.  Or where your parent
6  says, you know, stop using, and you can't -- you
7  feel like you can't, right.  That's the context that
8  then is causing those sorts of conflicts with
9  parents.  Or peers might feel like, hey, we're
10  sitting here together, why are you, you know, doing
11  whatever on whatever social media platform instead
12  of communicating with me.
13    Q.  How did you arrive at your definition of
14  problematic use of social media?
15    A.  It's a fairly common definition that is
16  used in the literature.
17    Q.  Which -- are you able to identify any
18  studies that use that -- your definition of
19  problematic use?  Where did you get it from?
20    A.  Yeah, I mean, there are many different
21  measures of problematic social media use.  It has
22  come from measures of problematic internet use and
23  other problematic forms of digital media use.
24      A common one, I'm pretty -- Sarah Domoff,
25  I think she's at Albany, she has a measure that I

Page 149

1  believe that we have used in the past that has
2  the -- those indications or those items that I
3  referenced in my definition.  She has it for both,
4  you know, asking the adolescent themselves, as well
5  as the parent of the adolescents.
6    Q.  Sarah at Albany, you just mentioned?
7    A.  Yeah, Sarah Domoff.
8    Q.  Domoff?  I'm going to ask you to spell
9  that.
10    A.  D-O-M-O-F-F, I believe.
11    Q.  Other than Ms. Domoff, can you think of
12  any other researchers who used the same definition
13  of problematic use as you do?
14    A.  That use the same definition?  I mean,
15  Sarah Coyne would use those similar measures.  I
16  could name many.  Like I said, it is a fairly common
17  construct and variable that -- in my field that we
18  use.
19    Q.  Your report doesn't define problematic
20  use, right?
21    A.  I don't recall if I give a specific
22  definition of it.
23    Q.  Let's shift back to addictive for a
24  second.
25      Did I understand right that you do not use

38 (Pages 146 - 149)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 150

1 the term "addictive" use of social media?
2    A.  I tend not to in my work.  I think that
3 the two are related.  One component of problematic
4 use is that you do have that addictive-like feeling
5 where you can't put it down, you can't stop using,
6 you feel upset when you're not using it.  But I use
7 "problematic" in my -- in my work.
8    Q.  So your report doesn't define "addictive"?
9    A.  I don't believe so.  I'm not sure if I use
10 the word "addictive."
11    Q.  Would you agree that there's not a
12 scientific consensus on the concept of social media
13 addiction?
14    A.  I'm not sure I would agree with that.
15 There are people that -- there are certainly people
16 that have expertise in addiction that consider
17 social media addiction to be a valid construct.
18    Q.  Are you saying there is a scientific
19 consensus on the concept of social media addiction?
20    A.  The use of the term "addiction"?  I don't
21 know.  Again, there's clear consensus in what I do
22 about problematic social media use and that's what I
23 can speak to.
24    Q.  So how would you define, Dr. Cingel,
25 excessive use of social media?

Page 151

1    A.  It's to the point where it's -- your use
2 is taking away from other things in your life.  And
3 that can be different for different adolescents.
4    Q.  When you say "taking away from other
5 things in your life," do you mean that's from the
6 perspective of the adolescent, that social media use
7 is excessive, the adolescent believes it's taking
8 time away from spending time outdoors, for example?
9    A.  That could be one thing among, again,
10 many, many others.  And it would depend on the
11 individual adolescent as well.
12    Q.  It's when the individual adolescent
13 believes it's taking time spending -- can I start
14 over, Dr. Cingel?
15    A.  Sure.
16    Q.  Excessive use, under your definition, is
17 when the individual adolescent believes social media
18 is taking time away from a variety of activities,
19 such as spending time outdoors?
20    A.  And among other things, too, right, like
21 you are -- excessive use -- again, excessive use
22 would fall under the definition of -- or it could
23 fall under the definition of problematic social
24 media use to the point where, again, it's not taking
25 time away necessarily, but you're getting into

Page 152

1 conflicts with people as a function of it.
2    Q.  How would you assess when a certain amount
3 of social media use is starting to cause conflicts
4 with people as a function?
5    A.  How would you assess it?
6    Q.  How would you measure it?  How would you
7 assess it?
8    A.  These are -- those -- those types of items
9 are often embedded in any measure of problematic
10 social media use.
11    Q.  And none of these are quantitative
12 measures, right?
13    A.  What do you mean by "quantitative"?
14    Q.  Sure.
15       There's no certain amount of hours spent
16 on social media that, based on that quantity, you
17 would consider it to be problematic, right?
18    A.  There's not, like, a threshold of time,
19 right, because it involves time.  It involves
20 excessive time.  But it also involves the when and
21 the how and those sorts of things.  It's more than
22 just -- you know, I can't say it's at this hour that
23 it tips one way or the other.
24    Q.  So going -- let's go platform by platform
25 for the defendants in this case.

Page 153

1       Dr. Cingel, is there any amount of use of
2 YouTube per day that you would agree is not harmful
3 for children or teens?
4    A.  I don't know because, again, it depends
5 when you're using it.  If you're using -- if you're
6 using at 3:00 a.m., that's potentially harmful.
7    Q.  Could we agree, Dr. Cingel, that
8 15 minutes of YouTube usage per day is not harmful
9 for children or teens?
10       MR. KIEFFER:  Object to the form.  It's an
11 incomplete hypothetical.
12       THE WITNESS:  Once again, it depends when
13 that is happening.
14 BY MR. CHIOU:
15    Q.  Are you willing to say, without the sort
16 of hedging language, that two minutes per day of
17 YouTube usage is not harmful for children or teens?
18       MR. KIEFFER:  Object to the form.  It's an
19 incomplete hypothetical.  Argumentative.  And
20 mischaracterizes his testimony.
21       THE WITNESS:  I think even two minutes, if
22 you're waking up to use it two minutes and that --
23 and you're displacing sleep, that would be one
24 example where I'd have a concern for that child.
25 ///

39 (Pages 150 - 153)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 154

1 BY MR. CHIOU:
2     Q.  Are you willing to say that you've got no
3 concerns if a child or teen is using YouTube for one
4 minute a day?
5         MR. KIEFFER:  Object to the form.
6 Incomplete hypothetical.
7         THE WITNESS:  Same thing, same answer.
8 BY MR. CHIOU:
9     Q.  Would you agree that a child or teen using
10 Instagram for ten minutes a day, that's not harmful?
11        MR. KIEFFER:  Object to the form.
12 Incomplete hypothetical.
13        THE WITNESS:  Same answer.
14        One thing I would point out is ten minutes
15 is well below the average of what a -- what your
16 average adolescent in the United States spends using
17 any of these platforms.
18 BY MR. CHIOU:
19     Q.  So just to make sure I'm understanding
20 correctly.
21        You would still -- it's your testimony
22 that you would still need more information and more
23 context to determine if ten minutes of Instagram use
24 per day is harmful for a child or a teen?
25     A.  I think one thing that I set out in my

Page 155

1 report is that there -- that we need to take
2 individual differences and context into account.
3 That's one thing that I try to have shine through
4 the report.  And that's what's driving my answers to
5 your questions right now.
6     Q.  Can we agree, Dr. Cingel, that one minute
7 per day of TikTok use is not harmful for a child or
8 a teen?
9     A.  I would say the same -- sorry, Jon.
10        MR. KIEFFER:  Object to the form.  It was
11 an incomplete hypothetical.
12        THE WITNESS:  And that would be the same
13 answer I have to one minute of YouTube, one minute
14 of anything.
15 BY MR. CHIOU:
16     Q.  Would you agree as a general principle
17 that an expert should not state a position or a view
18 in a lawsuit that's different from what the expert
19 has stated outside of the lawsuit?
20        MR. KIEFFER:  Object to the form.
21 Argumentative.  Incomplete hypothetical.  May call
22 for a legal conclusion.
23        THE WITNESS:  I think it would depend.
24 BY MR. CHIOU:
25     Q.  Would you agree that an expert's position

Page 156

1 for the plaintiffs in a lawsuit should be consistent
2 with what the expert has published in his or her own
3 academic research?
4         MR. KIEFFER:  Object.  Object to the form.
5 It's argumentative.  Incomplete hypothetical.  Calls
6 for a legal conclusion.
7         THE WITNESS:  Again, I think it depends.
8 As I mentioned earlier, research comes out literally
9 every day in this aspect.
10 BY MR. CHIOU:
11     Q.  So your own research has found that a
12 certain amount of social media can be beneficial for
13 users' well-being, right?
14        MR. KIEFFER:  Object to the form.
15 Mischaracterizes his research.
16        THE WITNESS:  And which -- which paper are
17 you referencing?
18 BY MR. CHIOU:
19     Q.  Your 2018 paper titled "Getting Over the
20 Hump: Examining Curvilinear Relationships between
21 Adolescent Self-Esteem and Facebook Use."
22     A.  I remember that article.  I would be
23 curious to see what you're referencing in it.
24     Q.  I'm happy to go through that in a moment.
25        But that's an author you studied -- that

Page 157

1 is a study you authored in 2018, right?
2     A.  Correct.
3     Q.  And you found an inverted U-curvilinear
4 relationship between Facebook use and adolescent
5 self-esteem, right?
6     A.  Correct.
7     Q.  And if I'm understanding right, that means
8 that higher Facebook use was associated with
9 moderate self-esteem and that adolescents with the
10 lowest self-esteem use Facebook the least, right?
11     A.  In that study, yes.
12     Q.  So based on the correlational rationale,
13 for nonusers of Facebook it would actually improve
14 their self-esteem if they used Facebook a little
15 more frequently, right?
16        MR. KIEFFER:  Object to the form.  It's
17 vague.  Ambiguous.  And mischaracterizes the study.
18        THE WITNESS:  I think that is correct.
19        One key point here is that is data
20 collected in 2013, to my recollection, on Facebook,
21 which is not a platform that is the most popular
22 these days by adolescents.  And I think that what
23 Facebook looked like in 2013 when those data were
24 collected is quite different than today.
25 ///

40 (Pages 154 - 157)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 158

1 BY MR. CHIOU:
2    Q.  Could I ask you to turn to Exhibit 2,
3 please, Dr. Cingel, an April 18, 2025, JCCP report.
4    A.  Exhibit 2, you said?
5    Q.  Yes, please.
6    A.  At B?
7    Q.  Page 20, paragraph 36, please.
8    A.  Oh.  I'm sorry, can you repeat the number
9 again?
10    Q.  Sure.
11        Could you please turn to Exhibit 2,
12 page 20, paragraph 36, please.
13    A.  36.  Identity Development?
14    Q.  Correct.
15        Dr. Cingel, you would agree that,
16 "Identity development is a key developmental task of
17 adolescence, and it develops slowly but
18 systematically across adolescence and into early
19 adulthood."  Right?
20    A.  Correct.
21    Q.  And you believe that, "The task of
22 identity development is for the individual to first
23 question their identity and then experiment and
24 explore their identity, prior to committing to a
25 cohesive identity."  Right?

Page 159

1    A.  Correct.
2    Q.  Am I understanding that identity
3 development, it's an important developmental
4 milestone for adolescents, right?
5    A.  It is.
6    Q.  And social media can help adolescents
7 explore their identity, right?
8    A.  It is one thing that social media could
9 do.
10    Q.  Social media can help adolescents
11 understand themselves, right?
12    A.  That is one possibility.
13    Q.  Social media can help adolescents
14 understand others, right?
15        MR. KIEFFER:  Object to the form to the
16 extent it's vague, ambiguous, and incomplete
17 hypothetical.
18        THE WITNESS:  So to answer your question,
19 yes.  And I wrote a paper very early on in my career
20 on that.  I think I reference -- might reference it
21 in here.
22        I think that the concern that I have, as I
23 lay out in the rest of my report, is that as it is
24 currently designed, my opinion is that social media
25 doesn't live up to the promise that you're putting

Page 160

1 forth in your questions.
2 BY MR. CHIOU:
3    Q.  But social media, you would agree, can
4 help adolescents understand others, right?
5        MR. KIEFFER:  Object to the form.  It's
6 vague and ambiguous and an incomplete hypothetical.
7        THE WITNESS:  In theory it could.  I don't
8 believe that we see much evidence of that.
9 BY MR. CHIOU:
10    Q.  Adolescents, you would agree, socialize on
11 social media, right?
12    A.  They do.
13    Q.  As part of their identity development,
14 adolescents can interact with friends on social
15 media, right?
16    A.  As part of their identity or social
17 development, yes.
18    Q.  Adolescents can chat with friends on
19 social media, right?
20    A.  That is one functionality.
21    Q.  You agree social media provides a forum
22 for adolescents to express themselves, right?
23    A.  Once again, that is the promise of it,
24 that it was, to my understanding, the original
25 intention of it once.  And I do mention that in my

Page 161

1 report.  On the whole, on the basis of all the
2 evidence, I don't think it lives up to that
3 currently.
4    Q.  Dr. Cingel, one way for adolescents to
5 express themselves on social media is by posting
6 photos and videos, right?
7    A.  Of many others, yes.
8    Q.  Another way for adolescents to express
9 themselves on social media is posting written
10 statements, right?
11    A.  Posting what?
12    Q.  Written statements, right?
13    A.  Sure.
14    Q.  Would you agree that social media gives
15 certain vulnerable and marginalized youth the
16 potential to build community and find support?
17    A.  That's an interesting question, actually.
18 I do reference that in my report.  There are maybe
19 two studies about that.
20        The one that's interesting and that I --
21 that I think about is that LGBTQ adolescents can
22 find community.  But it also -- that same study also
23 shows that they need to engage in what the author, I
24 believe it's Sarah Coyne, calls social media
25 curation where they have to be very mindful about

41 (Pages 158 - 161)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 162

1 their use, very mindful of who they follow, very
2 mindful of the features that they use.
3        So to answer your question, yes, it is a
4 possibility. But to my other comment, it doesn't
5 seem like it's particularly easy for this group of
6 marginalized adolescents to do.
7    Q.   So to use your example, LGBTQ youth living
8 in unsupportive households -- let's call it that --
9    A.   Sure.
10    Q.   -- would be one example of a vulnerable
11 and marginalized youth that benefit from access to
12 social media?
13        MR. KIEFFER: Object to the form to the
14 extent that it mischaracterizes his previous answer.
15        THE WITNESS: And I know nothing about
16 whether -- I don't think the science says anything
17 about whether they live in a house where their
18 parents are supportive or not.
19 BY MR. CHIOU:
20    Q.   Okay. Can you think of any other examples
21 of vulnerable and marginalized youth who would
22 benefit from access to social media?
23    A.   That has been demonstrated in the existing
24 literature?
25    Q.   Sure. Or otherwise, that you can think

Page 163

1 of?
2    A.   That currently in my field is the group of
3 marginalized individuals that we have seen some
4 small indications that they can derive benefits.
5 Again, with that mindful type of use.
6    Q.   I want to switch gears for a second to
7 educational content for a moment. Let's use YouTube
8 as an example.
9        Would you agree that there's educational
10 content available on YouTube?
11    A.   There -- there is an open question among
12 people who do what I do about how educational it
13 actually is. There is -- there is information that
14 purports to be educational, yes.
15    Q.   So adolescents can learn to cook by
16 watching YouTube videos, right?
17    A.   Possibly.
18    Q.   Adolescents can learn to draw by watching
19 YouTube videos, right?
20    A.   I presume.
21    Q.   Adolescents can view math tutorials on
22 YouTube, right?
23    A.   Possibly.
24    Q.   Adolescents can learn to cook by watching
25 videos on Instagram, right?

Page 164

1    A.   Possibly.
2    Q.   On Snap, right?
3    A.   I'm not familiar with whether cooking
4 information is common on Snap.
5    Q.   On TikTok, right?
6    A.   Same answer. I'm not sure.
7    Q.   All right. You mentioned earlier this
8 morning that you have shown excerpts of YouTube
9 videos in classes you've taught, right?
10    A.   Correct.
11    Q.   You're aware that teachers across the
12 country use YouTube in class to help them teach,
13 right?
14    A.   I suspect that that is the case.
15    Q.   YouTube can be used to help with homework,
16 right?
17    A.   Possibly.
18    Q.   You're aware that teachers post lessons to
19 YouTube, right?
20    A.   I don't know.
21    Q.   Would you agree that therapists use
22 YouTube to share information and techniques with
23 their patients?
24        MR. KIEFFER: Object to the form. Assumes
25 facts not in evidence.

Page 165

1        THE WITNESS: And I don't know.
2 BY MR. CHIOU:
3    Q.   Do you know whether therapists are using
4 Instagram to share information and techniques with
5 their patients?
6    A.   I do not know.
7        (Whereupon, Cingel Exhibit 5 was marked
8 for identification.)
9 BY MR. CHIOU:
10    Q.   Dr. Cingel, you'll be handed an exhibit
11 being marked Exhibit 5.
12        (Whereupon, a brief discussion off the
13 record.)
14        MR. CHIOU: Could we go off the record for
15 one moment?
16        THE VIDEOGRAPHER: The time is 12:49 p.m.
17 Pacific time. We're going off the record.
18        (Whereupon, a brief recess was taken.)
19        (Whereupon, Cingel Exhibit 6 was marked
20 for identification.)
21        THE VIDEOGRAPHER: The time is 12:50
22 Pacific time. We're back on the record.
23        MR. CHIOU: Mr. Kieffer, as we just
24 discussed, we'd like to mark Dr. Cingel's
25 publication dated April 22nd, 2025, regarding Korean

42 (Pages 162 - 165)

1 children's use of YouTube as Exhibit 5. Is that all
2 right?
3        MR. KIEFFER: Sure.
4        MR. CHIOU: Okay.
5        Q. Dr. Cingel, you've been handed a document
6 marked as Exhibit 6.
7        Do you recognize that this is one of the
8 studies on your materials considered list?
9        A. I recognize this, yes.
10       Q. And do you recognize this to be one of the
11 studies discussed in your report?
12       A. I suspect that I cited it, yes.
13       Q. So if -- let's turn to page 65 of
14 Exhibit 2, please. That's your JCCP report.
15       A. 65, you said?
16       Q. Page 65, please.
17       Do you see paragraph 150 on that page?
18       A. I do.
19       Q. Do you see where you wrote that this study
20 "found that Icelandic adolescents who overused
21 multiple social media platforms (which may be
22 brought about by social media design, as I have
23 described) were more likely to experience depressive
24 symptoms and panic disorder over the course of the
25 following two years."

1        You see that, right?
2        A. I do.
3        Q. And those were your conclusions -- or your
4 interpretation of this Icelandic study, right?
5        A. Yes.
6        Q. And this study that's been marked as
7 Exhibit 6, it didn't include YouTube, just to be
8 clear, right?
9        A. Let me -- give me a moment, please.
10       The measure of time on social media says,
11 "On average how much time do you spend on social
12 media each day," for example, I -- yeah, for
13 example, "Facebook, Snapchat, Twitter, and
14 Instagram."
15       So YouTube is not referenced explicitly in
16 that measure.
17       Q. If we look at the abstract, Dr. Cingel, in
18 the middle, do you see where -- it's fair to say the
19 authors explicitly acknowledge that "the effect size
20 of these relationships suggest they may not be of
21 clinical relevance." Right?
22       A. I see where that is noted.
23       Q. And, in fact, the study recognizes "it is
24 not known if this relationship is causal." Right?
25       A. I see that, yes. I'm not sure why it

1 appears to be -- I'm curious as to why they would
2 write that.
3        Q. And you would disagree -- are you saying
4 you would disagree with the authors' caveat that
5 they don't know if the relationship is causal?
6        A. No, I'm not -- I wouldn't say I'm
7 disagreeing with them. I'm questioning why they
8 would write that. I'd like to look more and see why
9 they would say that.
10       Q. You have no reason to believe that they're
11 mistaken about their own study, right?
12       A. Like I said before, I wouldn't be
13 surprised if they were being cautious and
14 downplaying their findings. That's a common thing
15 that happens in the literature.
16       Q. Could I ask you to turn to page 6 of this
17 study, sir.
18       A. Uh-huh.
19       Q. Do you see in the first paragraph in the
20 upper left-hand corner, "Furthermore, it is also
21 very possible that adolescents that have poorer
22 mental health turn to social media to feel better."
23       You see that, right?
24       A. I see that.
25       Q. And you have no reason to believe that the

1 authors are misinterpreting their own findings when
2 they account for that possibility, right?
3        A. Give me just a minute to read what is
4 right before that.
5        Q. Sure.
6        A. So I see that they say it is possible.
7 I'm curious, though, that could have been addressed
8 based on what I believe to know about the design of
9 this.
10       Q. Are you saying that you have found a way
11 to address that possibility, that the authors did
12 not when they wrote this?
13       A. No, I'm not necessarily saying that. But,
14 you know, when you have a longitudinal design like
15 this, if you measured mental health at all three
16 times you could control for that in the analysis
17 which would separate out any effect of social media
18 use on subsequent mental health. And that's a
19 possibility. Whether they did that here I'm not
20 sure immediately.
21       Q. If you could stay in the same left-hand
22 column, Dr. Cingel.
23       A. Yep.
24       Q. Do you see the paragraph that starts with,
25 "There is a lack of consensus in the literature on

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 170

1 the role of social media in mental health."
2        Do you see that sentence?
3     A.  I see that.
4     Q.  You see where the authors say, "We believe
5 that in order to reach a better understanding of how
6 and if social media is related to mental health the
7 focus needs to be on the different aspects of social
8 media and potential positive as well as negative
9 effects."
10       You see that, right?
11    A.  I see that.
12    Q.  Let's break that down a little bit.
13       You would agree there is a lack of
14 consensus in the literature on the role of social
15 media and mental health, right?
16       MR. KIEFFER:  Object.  Object to the form.
17 Misstates his previous testimony.
18       THE WITNESS:  I wouldn't -- I would not
19 say there is a consensus.  And I would also note
20 that this was published five years ago now.
21 BY MR. CHIOU:
22    Q.  You'd agree that there's different aspects
23 of social media, right?
24    A.  I don't really -- it's a very vague term.
25 I don't really know what they mean by that or what

Page 171

1 you mean by that.
2     Q.  You would agree social media has potential
3 positive as well as negative effects, right?
4     A.  As I mentioned earlier, I think there is a
5 promise that it's not living up to in terms of
6 positive effects.
7     Q.  Do you see the excerpt -- the following
8 excerpt, Dr. Cingel, in the paragraph starting with
9 "several limitations."
10       Do you see that paragraph?
11    A.  Uh-huh.
12    Q.  Let's talk about the first limitation.
13       Do you see where it says, "First, we used
14 a single question to examine average social media
15 use and did not include measures on different
16 platforms or different types of social media use,
17 such as active or passive use."
18    A.  I see that.
19    Q.  Is it your understanding that this means
20 that the -- this study didn't measure how much time
21 was spent on the different platforms?
22    A.  This one individual study does not appear
23 to have done that, no.
24    Q.  And do you see the additional limitation
25 of, "Finally, we did not test for the directionality

Page 172

1 of effects."
2        Do you see that paragraph?
3     A.  I see that.
4     Q.  Do you see the sentence that says, "Recent
5 studies have begun to do so with one longitudinal
6 finding" -- "study finding that social media use did
7 not predict later depressive symptoms, but rather
8 that greater depressive symptoms predicted more
9 frequent social media use."
10       You see that, right?
11    A.  I see that.
12    Q.  Yep.  And this study that you have in your
13 hand identifies a correlation, not a causation,
14 right?
15       MR. KIEFFER:  Object to form.
16       THE WITNESS:  And, again, I'm not sure.
17 I'd have to analyze more their -- what they did
18 statistically.  It strikes me given that this is --
19 appears to be a three-way longitudinal design, I'm
20 not sure why they would say that it cannot speak to
21 causality at all.
22 BY MR. CHIOU:
23    Q.  Dr. Cingel, you're not disputing the
24 authors when they say they didn't test for the
25 directionality of effects, right?

Page 173

1     A.  I don't understand how they couldn't have
2 given that it's a three-way longitudinal design.
3     Q.  You have no reason to believe the authors
4 were lying when they said they didn't test for
5 directionality of effects, right?
6       MR. KIEFFER:  Object to the form.
7 Argumentative.
8       THE WITNESS:  I don't think -- I don't
9 think they're lying.  But, you know, one thing you
10 have to always be mindful of in these types of
11 studies, it goes out for peer review, reviewers ask
12 you to put stuff in, often in the limitation
13 section.  I'm not sure where that line came from.
14       Again, based on my review here, I'm not
15 sure why they would have written that as they did,
16 but I do not dispute that they wrote it.
17 BY MR. CHIOU:
18    Q.  So let's break it down a little bit, then,
19 first starting with what they wrote.
20    A.  Uh-huh.
21    Q.  If you take it at face value what they
22 wrote, this study identifies a correlation, not a
23 causation, right?
24       MR. KIEFFER:  Object to the form.
25 Mischaracterizes.

44 (Pages 170 - 173)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 174

1    THE WITNESS: Hold, please. And we're
2 talking about the "Finally, we did not test for the
3 directionality of effects"?
4 BY MR. CHIOU:
5    Q.  Correct.
6    A.  That actually doesn't say anything about
7 whether it's correlational or causal.
8    Q.  Do you believe that without testing for
9 the directionality of effects you could find a
10 causal relationship?
11    A.  Yeah, because you have three waves. You
12 could see if social media use at time one
13 establishing temporality is having some sort of
14 effect on whatever mental health variables they
15 measured at time two and time three.
16    That is independent from testing the
17 reverse pathway, but it still is a valid, to my
18 view, a valid and reasonable finding.
19    Q.  Is it your testimony, Dr. Cingel, that
20 despite the limitations and caveats the authors have
21 put on their own findings you could interpret their
22 findings to find causality?
23    MR. KIEFFER: Object to the form.
24 Mischaracterizes the study and his testimony.
25    THE WITNESS: I'd like to spend -- if you

Page 175

1 want me to answer that on the record, I'd like to
2 spend more time looking at it.
3 BY MR. CHIOU:
4    Q.  There's no need to spend more time looking
5 at it. I appreciate the offer, Dr. Cingel.
6    Is it your testimony that you could take a
7 closer look to come up with causality despite what
8 the authors are saying about their own limitations?
9    MR. KIEFFER: Object to the form.
10 Mischaracterizes his testimony. And he specifically
11 said if you want an answer to that question he needs
12 time to look at the study, so...
13    MR. CHIOU: Are you instructing him not to
14 answer, Mr. Kieffer?
15    MR. KIEFFER: No, not at all, but I think
16 he made the position clear.
17    THE WITNESS: I'm sorry, I didn't know
18 there was still a pending question.
19    MR. KIEFFER: Can you answer that without
20 looking at the study?
21    THE WITNESS: No.
22    MR. CHIOU: Would you like to go off the
23 record given the time of 1:00?
24    MR. KIEFFER: No, I don't want to go off
25 the record. I mean, if you want to show him studies

Page 176

1 and ask him technical questions about them, he's
2 entitled to view them, but we're not going off the
3 record for that.
4    MR. CHIOU: That was a courtesy question
5 to ask if you want to go to lunch now.
6    MR. KIEFFER: Oh, I'm sorry. I mis --
7 forgive me for mistaking your courtesy.
8    MR. CHIOU: I did not expect --
9    MR. KIEFFER: That's on me.
10    MR. CHIOU: I did not expect that answer
11 from you to that question.
12    MR. KIEFFER: Your courtesy is noted along
13 with my apologies for misjudging you.
14    You want to take a break for lunch?
15    THE WITNESS: What time are we at?
16 1 o'clock?
17    MR. KIEFFER: Yeah, 1 o'clock.
18    THE WITNESS: Yeah, let's go.
19    MR. KIEFFER: Thank you.
20    THE VIDEOGRAPHER: Time is 1:03 p.m.
21 Pacific time. We're going off the record.
22    (Whereupon, a brief recess was taken.)
23    THE VIDEOGRAPHER: The time is 2:00 p.m.
24 Pacific time. We're back on the record.
25 ///

Page 177

1 BY MR. CHIOU:
2    Q.  Good afternoon, Dr. Cingel.
3    A.  Good afternoon.
4    Q.  During the lunch break did you have a
5 chance to talk with your counsel?
6    A.  I did.
7    Q.  Is there anything in your prior testimony
8 that you'd like to correct or clarify?
9    A.  I don't believe so.
10    MR. CHIOU: Okay. So we'll mark a study
11 as Exhibit Number 7.
12    (Whereupon, Cingel Exhibit 7 was marked
13 for identification.)
14 BY MR. CHIOU:
15    Q.  Dr. Cingel, do you recognize this document
16 you've been handed as Exhibit 7 to be one of the
17 studies listed in your materials considered?
18    A.  I believe so, yes.
19    Q.  And this study did not include TikTok or
20 YouTube; is that right, sir?
21    A.  If you'll give me a moment, I can look.
22    It looks like the measure of social media
23 use says, "How often did you check social media like
24 Instagram, Snapchat, or Facebook?"
25    Again, those are examples. They're not --

45 (Pages 174 - 177)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 178

1  TikTok and YouTube are not explicitly stated.
2      Q.  Could you turn to page 15 of the article,
3  please.
4      A.  I don't have -- I have 912 up in the
5  upper --
6      Q.  Referring to the upper left-hand pages,
7  page 918, please.
8      A.  918, okay.
9      Q.  Dr. Cingel, do you see the section titled
10  "Limitations and Future Directions"?
11      A.  I do.
12      Q.  Do you see where, under the second
13  paragraph, the authors wrote that it's difficult to
14  disentangle actual social media behaviors and
15  experiences from subjective emotional responses in a
16  self-report measure, right?
17      A.  I think it -- yes, I see that.
18      Q.  And you also see that the authors' caveat
19  that adolescents may self-report, for example, that
20  they feel upset about getting too many likes but
21  this is inherently subjective and it's not clear
22  whether that is a factual report about true
23  experiences or an emotional appraisal of their own
24  perception.  Is that right?
25      A.  Where is that second part?  I saw the

Page 179

1  first part but I don't see the part about likes and
2  things like that.  Has it gone over to the next
3  page?  Yes, it -- it looks like it does carry over.
4      Q.  That's correct, Dr. Cingel.
5      A.  Okay.
6      Q.  You see that?
7      A.  I do see that, yes.
8      Q.  And so this is -- illustrates how a
9  self-report study could be inherently limited that
10  there's no objective measure of the participants'
11  actual experience, right?
12      MR. KIEFFER:  Object to the form to the
13  extent it mischaracterizes the study.
14      THE WITNESS:  And what do you mean by --
15  what do you mean by subjective experiences?  Is that
16  what you said?
17  BY MR. CHIOU:
18      Q.  Sure.  Let me rephrase that question,
19  Dr. Cingel.
20      A.  Oh, I'm sorry.  The actual experience.
21  I'm seeing it here.
22      Q.  That's correct.
23      A.  What do you mean by "actual experience"?
24      Q.  Got it.
25      Dr. Cingel, this self-report study

Page 180

1  illustrates one of the limitations of this kind of
2  research that there's no objective measure of the
3  participants' actual experience, right?
4      MR. KIEFFER:  Object to the form to the
5  extent it mischaracterizes the study.
6      THE WITNESS:  I agree that that is what
7  they are saying here.  I just want to take a quick
8  look about what the design of this study actually
9  is.
10      In this study there is no objective
11  measure.  That is correct.
12  BY MR. CHIOU:
13      Q.  Dr. Cingel, would you mind turning to the
14  page 917 --
15      A.  Uh-huh.
16      Q.  -- in the upper right-hand corner.
17      Do you see the section, sir, titled
18  "Negative Emotional Responses Social Media
19  Experiences and Depressive Symptoms"?
20      A.  I do.
21      Q.  Do you see the sentence that states,
22  "According to cognitive models, adolescents already
23  experiencing depressive symptoms may be more likely
24  to attend to negative information and perceive
25  experiences more negatively in their social

Page 181

1  environments"?
2      A.  I see that.
3      Q.  And this means that the participants may
4  already have been experiencing depression resulting
5  in their negative perceptions of social media
6  experiences, right?
7      MR. KIEFFER:  Object to the form to the
8  extent it mischaracterizes the study.
9      THE WITNESS:  I'm not sure if it -- if
10  they measured depression at time one and factored
11  that into their model.  I'm not sure, based on my
12  initial view of this manuscript.
13  BY MR. CHIOU:
14      Q.  Could you turn to page 919 in the upper
15  right-hand corner.
16      A.  Uh-huh.
17      Q.  Do you see the section titled "Clinical
18  Implications"?
19      A.  I do.
20      Q.  Do you see where the authors write that
21  adolescents reporting positive experiences on social
22  media may be at higher risk for depressive symptoms
23  over time?
24      A.  Where is that in that paragraph?
25      Q.  It's in the middle of the paragraph

46 (Pages 178 - 181)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 182

1 starting with the sentence, "Further."
2      A.  I see it.
3      Q.  And you would agree that that finding
4 would be counterintuitive, right?
5          MR. KIEFFER:  Object to the form.
6          THE WITNESS:  I take them at their word
7 that they found it counterintuitive.  And based on
8 my brief reading of it, it seems somewhat
9 counterintuitive.
10 BY MR. CHIOU:
11      Q.  And that would be counterintuitive given
12 your opinions in this case, right, that an
13 adolescent experiencing positive experiences on
14 social media would be at higher risk for depressive
15 symptoms over time?
16          MR. KIEFFER:  Object to the form.
17 Compound.  Vague.  Ambiguous.
18          THE WITNESS:  I'm not sure that it's
19 counter to my report, no.
20 BY MR. CHIOU:
21      Q.  Could you turn back to page 917, please.
22          Do you see the end of the third paragraph
23 talking about how "adolescents' reports of positive
24 emotional responses to social media may be a result
25 of utilizing social media in an effort to cope with

Page 183

1 loneliness or increase social connection."
2          Do you see that?
3      A.  The third paragraph of the positive
4 emotional response section, is that what you're --
5      Q.  That's correct.  It's in the right-hand
6 column, Dr. Cingel.
7      A.  Yeah, okay.  Thank you.
8          I see that.  It's the last sentence,
9 right?
10      Q.  That's right.
11      A.  Yeah.
12      Q.  And this means that some of these
13 individuals were experiencing loneliness before they
14 used social media obviously, right?
15          MR. KIEFFER:  Object to the form to the
16 extent it mischaracterizes the study.
17          THE WITNESS:  It's possible.  Again, I'd
18 have to look at the design of -- about whether they
19 measured that -- whether they measured loneliness,
20 sense of social connection, and things of that
21 nature before the study -- or before they
22 collected -- before they collected these data.
23 BY MR. CHIOU:
24      Q.  Is it your interpretation of what the
25 authors are saying here, taking them at face value,

Page 184

1 that some of these individuals would benefit from
2 using social media to connect with others?
3          MR. KIEFFER:  Object to the form.  Calls
4 for speculation.
5          THE WITNESS:  That may be the case.
6 BY MR. CHIOU:
7      Q.  Could I ask you to turn to Exhibit 2,
8 please, your report.
9      A.  Is that the JCCP one?
10      Q.  Yes, sir.
11      A.  Okay.
12      Q.  Do you see how in paragraph 151 you noted
13 that, "Other longitudinal studies have found some
14 support for a direct association between the
15 frequency of social media use and depression"?
16      A.  I see that.
17      Q.  And one of the studies you cited to
18 support that proposition is Heffer, right?
19      A.  Is which one?
20      Q.  The study by Mark Heffer in 2019?
21      A.  I see that, yes.
22      Q.  Thank you.
23          (Whereupon, Cingel Exhibit 8 was marked
24 for identification.)
25 ///

Page 185

1 BY MR. CHIOU:
2      Q.  I apologize, Dr. Cingel.  The author's
3 name should be Taylor Heffer, not Mark Heffer.
4      A.  Yeah.
5      Q.  Do you recognize what's been marked as
6 Exhibit...
7      A.  8.
8      Q.  -- 8 to be the study that you cited to
9 support that proposition in paragraph 151?
10      A.  Yes.  And I would just note it's one of
11 multiple studies that I cited there.
12      Q.  That's right.
13          And this study relates to Facebook use,
14 right?
15      A.  I don't see that immediately, no.  It
16 looks like their measure of social media use is, "On
17 an average weekday, and day on the weekend, how many
18 hours do you spend going on social media?"
19      Q.  We'll get back to that in a moment.
20          Could I ask you to please turn to page 469
21 of this study, using the pages in the upper
22 right-hand corner.
23      A.  Uh-huh.
24      Q.  Do you see in the right-hand column, the
25 second paragraph, the authors write, "Among young

47 (Pages 182 - 185)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 186

1 adults, we found no evidence of a relationship
2 between social media use and depressive symptoms
3 over time.  Furthermore, adolescent girls with
4 higher depressive symptoms reported greater social
5 media use over time.  Thus, while it may be common
6 in popular media to suggest that social media use
7 might cause depression, our results suggest that
8 this claim may be premature."
9        You see that, right?
10    A.  I do see that.
11    Q.  So it's fair to say the authors do not
12 believe that their results show that social media
13 causes depressive symptoms, right?
14        MR. KIEFFER:  Object to the form to the
15 extent it mischaracterizes the study.
16        THE WITNESS:  That is what they say, yes.
17 BY MR. CHIOU:
18    Q.  Another study that you use to support the
19 proposition in paragraph 151 that we had talked with
20 is study by Houghton, right?
21    A.  Uh-huh.
22        MR. CHIOU:  And we'll go ahead and mark
23 that as Exhibit Number 9, please.
24        (Whereupon, Cingel Exhibit 9 was marked
25 for identification.)

Page 187

1 BY MR. CHIOU:
2    Q.  Dr. Cingel, do you recognize Exhibit 9 to
3 be the Houghton study that you cited in
4 paragraph 151?
5    A.  I do.
6    Q.  And this is a study related to screen time
7 generally, right?
8    A.  That appears to be correct, yes.
9    Q.  Could I ask you to turn to page 2465 in
10 the upper right-hand corner, please.
11        Do you see where in the first sentence of
12 the first full paragraph on the left-hand column the
13 authors acknowledge they found "No substantial
14 evidence for a longitudinal association between
15 screen use and depressive symptoms."
16        Do you see that?
17    A.  Uh-huh.
18    Q.  And the authors note that this undermines
19 the likelihood that there's any causal link between
20 screen use and subsequent changes in depression, or
21 vice versa, right?
22    A.  I don't see where they use the word
23 "undermine."
24    Q.  I'll let you read it.
25    A.  How far down is it?

Page 188

1    Q.  "Undermining the likelihood that there is
2 a causal link between screen use and subsequent
3 changes in depression, or vice versa."
4        It's the same sentence, Dr. Cingel.
5    A.  Oh, I'm sorry.  I was on the wrong
6 sentence, then.
7    Q.  No worries.
8    A.  I do see that on my screen now.
9    Q.  So if I'm understanding the study
10 correctly, the results do not show a causal link
11 between screen use and changes in depression, right?
12        MR. KIEFFER:  Object to the form to the
13 extent it mischaracterizes the study.
14        THE WITNESS:  Yeah, I don't know if I
15 would go that far.
16        Right here, it says there was, however, a
17 temporal association between depressive symptoms and
18 screen use among young people who developed
19 depression over the course of the study.  As such,
20 significant increases in screen time may indicate a
21 young person's mental health is deteriorating.
22 BY MR. CHIOU:
23    Q.  You would agree that the authors found
24 that the lack of substantial evidence for a
25 longitudinal association between screen use and

Page 189

1 depressive symptoms undermined the likelihood that
2 there's a causal link, right?
3        MR. KIEFFER:  Object to the form to the
4 extent it mischaracterizes the study.
5        THE WITNESS:  In --
6        MR. KIEFFER:  Taken out of context.
7        THE WITNESS:  In this one study that is --
8 that appears to be what they wrote, yes.
9 BY MR. CHIOU:
10    Q.  And sitting here now, you have no reason
11 to believe the authors are mistaken about
12 interpreting their own results, right?
13    A.  No.
14    Q.  Could I ask you to please look at the last
15 sentence of paragraph 151 in your JCCP report,
16 Exhibit 2, please.
17    A.  Uh-huh.
18    Q.  Do you see where that -- you wrote that
19 the R and K study "found longitudinal associations
20 between problematic social media use and adolescent
21 female depression."  Right?
22    A.  Uh-huh.
23        MR. CHIOU:  And we'll mark that as
24 Exhibit 10, please.
25        (Whereupon, Cingel Exhibit 10 was marked

48 (Pages 186 - 189)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 190

1 for identification.)
2 BY MR. CHIOU:
3    Q.   Dr. Cingel, do you recognize what's been
4 handed to you as Exhibit 10 to be the study you
5 cited in -- in the final sentence of paragraph 151
6 in your report?
7    A.   Yes.
8    Q.   And I direct you to the second page of the
9 study under Measures.
10       You would agree this is a study related to
11 Facebook, Twitter, and Instagram, right?
12    A.   I'm not sure.  It says "with social media
13 defined in the scale instructions as," quote,
14 "Facebook, Twitter, Instagram, et cetera."
15       So those are the three that are named but
16 the "et cetera" would leave it open to the
17 participants' interpretation.
18    Q.   You would agree that the three main
19 platforms in this study are Facebook, Twitter, and
20 Instagram, right?
21    A.   Those are the three that are named.
22    Q.   And if I ask you to turn to page 4,
23 please.
24       In the right-hand column do you see the
25 section titled "Limitations"?

Page 191

1    A.   I do.
2    Q.   Do you see the final sentence on that page
3 stating, "Second, the relatively small sample size
4 reduces the degree to which we can be confident that
5 the results generalize to a broader population of
6 adolescent girls."
7       You see that?
8    A.   I do see that.
9    Q.   And the sample being referenced in this
10 study is fewer than 400 girls from a handful of
11 schools in a single city in Estonia, right?
12    A.   I see that.
13    Q.   And the authors also note they didn't
14 focus on the particular social media activities
15 engaged in, right?
16    A.   Do they say that in the Limitations
17 section that you are referencing?
18    Q.   That's correct.  I'm looking at page 5,
19 Dr. Cingel.
20    A.   I see that.
21    Q.   And another limitation noted by the
22 authors was they didn't focus on the frequency of
23 engagement, right?
24    A.   I would -- I'm a little surprised by that.
25 I mean, they didn't measure time.  To me, time is

Page 192

1 inherently part of problematic social media use.
2 But I see what you're saying.
3    Q.   And if you stay in that same paragraph,
4 Dr. Cingel, you see that the authors also
5 acknowledge that unmeasured variables could explain
6 changes in both social media use and depressive
7 symptoms such as factors related to development,
8 environment, and genetics; is that right?
9    A.   I see where you are referencing.
10    Q.   And sitting here right now, you have no
11 reason to believe that the authors have
12 misinterpreted the results of their own study,
13 right?
14    A.   No, but I would say that these are -- this
15 is fairly standard language that you would see in a
16 limitation section.
17    Q.   And presumably the authors wrote what they
18 believe about their own results and study, right?
19       MR. KIEFFER:  Object to the form to the
20 extent it calls for speculation.
21       THE WITNESS:  And as I mentioned earlier,
22 this is -- these are common things that perhaps were
23 requested by a reviewer that you would do for the
24 purposes of satisfying that reviewer's comments.
25 ///

Page 193

1 BY MR. CHIOU:
2    Q.   Could I ask you to turn to page 67,
3 paragraph 155, of your JCCP report, please.
4    A.   Uh-huh.
5    Q.   Do you see in the final sentence you wrote
6 "it is important to note that time on social media
7 has been consistently linked with adverse mental
8 health outcomes as well"?
9    A.   I do.
10       (Whereupon, Cingel Exhibit 11 was marked
11 for identification.)
12 BY MR. CHIOU:
13    Q.   Dr. Cingel, do you recognize Exhibit 11 to
14 be the Cunningham study that you cited to support
15 that proposition in paragraph 155?
16    A.   I do.
17    Q.   And I'll direct you to page 244 of this
18 study.
19       Dr. Cingel, is it fair to say that this
20 study is a meta-analysis based on a search for
21 studies that include Facebook, Twitter, Instagram,
22 Snapchat, and LinkedIn; is that right?
23    A.   Are you seeing that under The Current
24 Study section or the Literature Search -- oh, I see
25 it now.

49 (Pages 190 - 193)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 194

1    It lists Facebook, Twitter, Instagram,
2 Snapchat, LinkedIn.
3    Q.   And I'll direct you to page 251, please.
4 The last paragraph, the last column -- of the left
5 column.
6    A.   The last paragraph of the left column?
7    Q.   That's right, sir.
8    Do you see where the authors wrote in this
9 meta-analysis we detected -- I'm sorry.
10    The authors note that "associations with
11 time spent using SNSs and intensity of use were
12 weak, suggesting they may not be clinically
13 meaningful." Right?
14    A.   I see that.
15    Q.   You understand that SNS here refers to the
16 platforms that we just mentioned, right?
17    A.   I believe so, yes.
18    Q.   Staying on page 251 and the second
19 paragraph in the left column.
20    Do you see where the authors wrote, "In
21 this meta-analysis we detected evidence for a 'file
22 drawer' effect for studies that assessed time spent
23 using SNSs, such that the published literature may
24 overestimate the strength of the relation between
25 depression symptoms and SNS use"?

Page 195

1    A.   I see where they wrote that.
2    Q.   And this means that the authors believe
3 there's studies that did not show statistically
4 significant or positive results were ultimately not
5 published, right?
6    MR. KIEFFER:  Object to the extent it
7 mischaracterizes the study.
8    THE WITNESS:  That -- that is -- that is
9 the case.  They could not be published for a variety
10 of reasons.
11 BY MR. CHIOU:
12    Q.   And if a study isn't published it wouldn't
13 be part of this meta-analysis, right?
14    A.   Well, I -- you know, I don't know because
15 oftentimes what you do in a meta-analysis is you do
16 get studies that aren't published and you do include
17 them in your meta-analysis.  So I'm not sure if
18 that's what they did here or not.
19    Q.   Well, looking at what the authors are
20 explaining, they're saying that in this
21 meta-analysis, that the Cunningham study, there's an
22 under -- it's actually an underestimate of
23 publication bias in this field, right?
24    MR. KIEFFER:  Object to the extent it
25 mischaracterizes this study.

Page 196

1    THE WITNESS:  Where do they say that
2 there's a publication bias in this field?
3 BY MR. CHIOU:
4    Q.   Is that what they're referring to with the
5 file drawer effect?
6    MR. KIEFFER:  Object to the extent it
7 calls for speculation.
8    THE WITNESS:  Yeah, I don't know.  I don't
9 know if I would go so far as to say it's biased.
10 Like I said, they could be not published for any
11 variety of reasons.
12 BY MR. CHIOU:
13    Q.   So let me switch to page 68,
14 paragraph 161, of your JCCP report, please.
15    Do you see where you wrote that the Yin
16 study "found that social media use was correlated
17 with both positive and negative indicators of mental
18 health." Right?
19    A.   The "Yoon"? Which paragraph are we
20 talking about on 68?
21    Q.   Paragraph 161 referring to --
22    A.   Oh, Yin.  Sorry, I heard "Yoon."
23    Yes, I see this.
24    MR. CHIOU:  We'll mark that as Exhibit 12,
25 please.

Page 197

1    (Whereupon, Cingel Exhibit 12 was marked
2 for identification.)
3 BY MR. CHIOU:
4    Q.   Do you recognize what's been handed to you
5 as Exhibit 12, Dr. Cingel, as the Yin study you
6 relied on?
7    A.   Yes.
8    Q.   While using the numbers at the top right
9 corner and top left corners of the page, I'll direct
10 you to page 635.
11    Dr. Cingel, this meta-analysis is based on
12 search for studies that include Facebook, Twitter,
13 MySpace, WeChat, or Qzone; is that right?
14    A.   In addition to online social networking
15 and social media.
16    Q.   The platforms that I just mentioned are
17 the ones that are named in this study, right?
18    A.   They are the ones that are named, but it
19 would have picked up anything that -- that uses
20 social media or online social networking, which
21 would impossibly, potentially, likely include other
22 platforms not listed here by name.
23    Q.   If I could ask you to please go to 642,
24 the last paragraph of the Research Strengths and
25 Limitations section.

50 (Pages 194 - 197)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 198

1      Do you see where the authors wrote "this
2  meta-analysis was mainly based on cross-sectional
3  studies.  Therefore, we cannot make any conclusions
4  about the direction of effects and whether SNSs
5  affect mental health or vice versa."
6      Do you see that?
7      A.  I see that.
8      Q.  So let's go to page -- paragraph 154 of
9  your JCCP report, please.
10      It's accurate that you wrote meta-analyses
11  show a significant meta-analytical effect of social
12  media use on aspects related to mental health,
13  right?
14      A.  Uh-huh.
15      Q.  And that's not consistent with the
16  findings in this Yin study, right?
17      MR. KIEFFER:  Object to the extent it
18  mischaracterizes the study.
19      THE WITNESS:  I don't think -- no, I --
20  I -- they found that there's a significant
21  meta-analytical of social media use on aspects
22  related to --
23      (Whereupon, a brief discussion off the
24  record.)
25      THE WITNESS:  They found that there is

Page 199

1  a -- that there are significant meta-analytical
2  effects of social media use on aspects related to
3  mental health.
4  BY MR. CHIOU:
5      Q.  What would you say their caveat is about
6  that?
7      A.  What caveat?
8      Q.  The caveat about the end of the last
9  paragraph in the Research Strengths and Limitations.
10      What do the authors mean, in your view,
11  when they say "we cannot make any conclusions about
12  the direction of effects and whether SNSs affect
13  mental health or vice versa"?
14      MR. KIEFFER:  Object to the extent it
15  calls for speculation.
16      THE WITNESS:  What do I make of that?
17  BY MR. CHIOU:
18      Q.  That's right.  What's your interpretation
19  as you're going through these studies and relying on
20  these for your opinion?
21      A.  That there is a link between social media
22  use and mental health and the aspects of mental
23  health.
24      Q.  But the authors couldn't make any
25  conclusions about the direction of effects, right?

Page 200

1      A.  In this one study, that is what they say.
2      Q.  Again, according to the authors, it's
3  possible that SNSs affect mental health, right?
4      MR. KIEFFER:  Object to the extent it
5  mischaracterizes the study.
6      THE WITNESS:  I'm sorry, say that one more
7  time.
8  BY MR. CHIOU:
9      Q.  Sure.
10      According to the authors, one
11  interpretation of the results could be that SNSs
12  affect mental health, right?
13      A.  Correct.
14      Q.  According to the authors, another
15  interpretation of the results could be that mental
16  health drives SNS use, right?  That what's the vice
17  versa means, right?
18      MR. KIEFFER:  Object to the extent it
19  mischaracterizes the study.
20      THE WITNESS:  That is what they write.
21  BY MR. CHIOU:
22      Q.  And so let's turn to 154 again of your
23  report, Exhibit 2, please.
24      When you say that meta-analyses show "a
25  significant meta-analytical effect of social media

Page 201

1  use on aspects related to mental health," you had
2  said that's consistent, your statement is consistent
3  with the conclusions of this study, right?
4      A.  Yes.
5      Q.  That means that your conclusions are that
6  either social media use could be having an effect on
7  mental health, right?
8      A.  It could be, yes.
9      Q.  Or conversely, mental health could be
10  driving social media use, right?
11      MR. KIEFFER:  Object to the extent it
12  misstates his report.
13      THE WITNESS:  And I'm not using just this
14  one study to draw that conclusion.
15  BY MR. CHIOU:
16      Q.  So let's start over there.  Let me make
17  sure I'm understanding your sentence in
18  paragraph 154 correctly.
19      When you say a significant meta -- that
20  meta-analyses show "a significant meta-analytical
21  effect of social media use on aspects related to
22  mental health," you think that's consistent with
23  this Yin study, right?
24      A.  I do.
25      Q.  So one possibility -- one interpretation

51 (Pages 198 - 201)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 202

1 of how you read the various studies is that social
2 media use could be having an effect on mental
3 health?
4    A. I do. And I use the word "effect" here
5 with respect to a meta-analytical statistical
6 effect.
7    Q. Got it.
8        And so another interpretation, based on
9 how you read the various studies, is that mental
10 health could be having an effect on social media
11 use?
12       MR. KIEFFER: Object to the form to the
13 extent it misstates his testimony and his record.
14       THE WITNESS: That is what this one -- one
15 singular meta-analysis says in their limitation
16 section.
17 BY MR. CHIOU:
18    Q. So let's go to page 69 of your JCCP
19 report, please. Paragraph 162.
20       Do you see where you cite to the V and Z
21 report, that they "found a small to moderate effect
22 of social media use on depression"?
23    A. I do.
24       MR. CHIOU: So we'll mark that as
25 Exhibit 13, please.

Page 203

1        (Whereupon, Cingel Exhibit 13 was marked
2 for identification.)
3 BY MR. CHIOU:
4    Q. Dr. Cingel, do you recognize what's been
5 marked as Exhibit 13 to be the Vahedi study?
6    A. I do.
7    Q. And this is a meta-analysis focused on
8 studies that include Facebook, Twitter, or
9 Instagram; is that right?
10    A. Similar to the last one, they also include
11 social networking site, SNS, social media. So that
12 would include other studies beyond those.
13    Q. But the three platforms that are named are
14 Facebook, Twitter, and Instagram, right?
15    A. That is correct. That are named.
16        If you look at Table 1, there are many
17 that show that it's, you know, nonspecific in terms
18 of the type of SNS.
19    Q. Could I direct you to page 2186, please,
20 using the little numbers at the top left.
21    A. 86. Okay.
22    Q. Do you see the Limitations section,
23 Dr. Cingel?
24    A. I do.
25    Q. Do you see where the doctors wrote -- the

Page 204

1 authors wrote, "First, most included studies were
2 cross-sectional and it is therefore not possible to
3 determine the causal direction of the relationship
4 between SNS use and depressive symptoms." Right?
5    A. I do see that.
6    Q. So this study, the authors are saying the
7 results of this study can't be used to show
8 causation, right?
9        MR. KIEFFER: Object to the extent it
10 mischaracterizes the study.
11       THE WITNESS: I'm sorry, let me look.
12       This -- again, this is common language in
13 a limitation section for one individual study. But
14 that is what they are saying, yes.
15 BY MR. CHIOU:
16    Q. And you're not interpreting this study as
17 supporting some causal relationship, right?
18       MR. KIEFFER: Object to the extent that
19 misstates his report.
20       THE WITNESS: It is one study. All of
21 these are one study in a wide array of things that I
22 considered in my analysis.
23 BY MR. CHIOU:
24    Q. I guess maybe my question is more basic
25 than that.

Page 205

1        You're not saying that this -- the results
2 of this study are showing causation, right?
3        MR. KIEFFER: Object to form.
4        THE WITNESS: This one singular study, no,
5 I would not rely on any singular study to form such
6 an opinion.
7 BY MR. CHIOU:
8    Q. Could I ask you to turn to page 166 in
9 your report, please. I'm sorry. Paragraph 166.
10       You see where you wrote that the Keles
11 study reported a relationship between time spent on
12 social media, specific activities, investment in
13 social media addiction were all related to various
14 mental health effects, right?
15    A. Uh-huh.
16        (Whereupon, Cingel Exhibit 14 was marked
17 for identification.)
18 BY MR. CHIOU:
19    Q. Dr. Cingel, do you recognize what's been
20 handed to you as Exhibit 14 as the Keles study that
21 you cited?
22    A. I do.
23    Q. And if I ask you to please turn to page 82
24 and look at Table 1.
25        This meta-analysis appears to be based on

52 (Pages 202 - 205)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 206

1 a search for studies that include the search term
2 "social network" and names Facebook, Instagram, and
3 Twitter as three platforms, right?
4    A.  In addition to social networking and
5 social media.
6    Q.  I'll ask you to turn to page 89, the
7 Limitations section, please.
8        Dr. Cingel, it's accurate to say that this
9 study was a review of 13 studies, 12 of which were
10 cross-sectional, right?
11    A.  That appears to be what they said, yes.
12    Q.  And the authors acknowledge that they're
13 unable to determine a causal relationship between
14 the variables of interest under those 12
15 cross-sectional studies, right?
16    A.  Under the ones included in this review,
17 yes.
18    Q.  And there is one longitudinal study that
19 was part of this Keles study, right?
20    A.  It appears that way.
21    Q.  So I ask you to please turn to page 86 of
22 Exhibit 14.
23       Do you see Table 3, Dr. Cingel?
24    A.  I do.
25    Q.  And do you see how the authors of the

Page 207

1 Keles study rated the underlying -- the 13
2 underlying studies from poor to fair to good.
3       Do you see that?
4    A.  Uh-huh.
5    Q.  The one longitudinal study is Vernon,
6 et al., right, on the left-hand side?
7    A.  Uh-huh.
8    Q.  And that was rated as fair, right?
9    A.  I see that, yes.
10    Q.  And so if we turn back to page 89, please.
11       Do you see where the authors note as one
12 of the limitations the lack of a control group and
13 comparison group?
14    A.  I see that.  I find that a very odd thing
15 to include, given that -- when was this -- when was
16 that study conducted?  In 2017.  I think it would be
17 very hard to find, given that 95 percent of
18 adolescents use social media, it would be very hard
19 to find a group of people that don't use social
20 media in that population.
21    Q.  You have no reason to believe that authors
22 were incorrect when they noted that Vernon did not
23 use a control and a comparison group, right?
24    A.  I don't know.  I haven't evaluated or I
25 don't have the Vernon study right in front of me

Page 208

1 here.
2       Again, as I've said, we can go through all
3 of these limitation sections.  That might have been
4 something that was requested by a reviewer, that you
5 make -- like, to me, it's an odd.  It's an odd line
6 to include.
7    Q.  Sitting here right now, based on the work
8 you've put into reviewing these studies and writing
9 your report, nothing comes to mind for why the
10 authors would be wrong, right?
11       MR. KIEFFER:  Object to the form.
12 Misstates his testimony.
13       THE WITNESS:  I don't know.
14 BY MR. CHIOU:
15    Q.  Could I ask you to turn to page 30,
16 paragraph 60.
17    A.  In my?
18    Q.  JCCP report, please.
19    A.  30, paragraph 60?
20    Q.  That's right.
21       Do you see where you wrote that, "Infinite
22 scroll takes advantage of adolescents' social
23 development, as they want to continue to consume
24 content to keep up with what their peers are doing
25 and saying on social media"?

Page 209

1    A.  Uh-huh.
2    Q.  You don't cite any studies in your report
3 to support that statement, right?
4    A.  That statement comes based on my expertise
5 and knowledge of adolescent development, like
6 communication in talking to adolescents.
7    Q.  So you haven't diagnosed any adolescents
8 with any mental disorders before, right?
9    A.  As I stated before, no, I have not.
10    Q.  Other than talking to adolescents, do you
11 have any basis for the statement in paragraph 60
12 about infinite scroll?
13       MR. KIEFFER:  Object to the form to the
14 extent it's been asked and answered.
15       THE WITNESS:  When you -- you know, before
16 you referenced a study that we did where we did
17 focus groups with adolescents.  It's a common thing
18 that comes up when you actually talk to adolescents
19 that they say they don't want to miss out.  They
20 want to stay up to date with what their friends are
21 doing, with what their friends are saying.  That
22 draws them back to social media platforms.  So I
23 think this is consistent with -- with what I have
24 seen and studies that I have conducted.
25 ///

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 210

1 BY MR. CHIOU:
2    Q.  Which studies have you published would you
3 say support this proposition that infinite scroll
4 takes advantage of adolescents' social development?
5    A.  That would have been data that came from
6 the focus groups that I referenced earlier in this
7 deposition.
8    Q.  Do you have any published studies
9 supporting the proposition that infinite scroll
10 takes advantage of adolescents' social development?
11    A.  I don't know if it's in that -- the
12 publication that came from that.  It's certainly in
13 the data that was collected from that.  It's also
14 based on my expertise and based on my knowledge of
15 adolescents and adolescents' social development.
16    Q.  Sitting here right now, can you name any
17 published studies supporting the proposition that
18 infinite scroll takes advantage of adolescents'
19 social development?
20    A.  No.
21    Q.  In the same paragraph, Dr. Cingel, you see
22 where you wrote, "Infinite scroll also takes
23 advantage of adolescent egocentrism."
24       Do you see that?
25    A.  Uh-huh.

Page 211

1    Q.  And you don't cite any studies to support
2 that assertion, right?
3    A.  Once again, this comes from my expertise
4 and my talking with adolescents over the course of
5 the past 15 years.
6    Q.  Sitting here now, are you aware of any
7 published studies to support the proposition that
8 infinite scroll takes advantage of adolescent
9 egocentrism?
10    A.  Well, I think all of these at a more
11 general level, infinite scroll contributes to more
12 time spent on social media in an effort to see how
13 friends and peers are interacting.  So I think more
14 general studies of the time spent -- the amount of
15 time that adolescents spend on social media, as well
16 as problematic social media use, would kind of be
17 subsumed here.
18    Q.  Are you aware of any studies specifically
19 identifying infinite scroll as something that takes
20 advantage of adolescent social development --
21 egocentrism?
22    A.  I have -- there -- actually, I was kind of
23 surprised in some of the internal documents that I
24 saw.  Adolescent egocentrism was something that I
25 kind of became interested in while working on my

Page 212

1 master's.  It's what my master's thesis is about.
2       There are two components of it.  Imaginary
3 audience and personal fable ideation.  And in going
4 through some of the defendant companies' own
5 documents, you can see that they were aware of those
6 things and talk about it in ways of how to design
7 the -- their platforms.  I know that that document
8 exists.  I remember that specifically.  Whether it
9 dealt with infinite scroll specifically or other
10 design features of social media platforms, I'm not
11 sure.
12    Q.  We'll get to the internal documents
13 momentarily.  Let's close the loop on published
14 studies.
15       Sitting here right now, are you aware of
16 any published studies specifically identifying
17 infinite scroll as taking advantage of adolescent
18 egocentrism?
19    A.  Once --
20       MR. KIEFFER:  Object to the extent it's
21 been asked and answered.
22       THE WITNESS:  Once again, I would say that
23 this measures of general social media use, as well
24 as problematic social media use, would include this
25 in it because infinite scroll is a core aspect, a

Page 213

1 core feature of, I believe, all five defendant
2 platforms.
3 BY MR. CHIOU:
4    Q.  But no publication specifically about
5 infinite scroll, right?
6    A.  That only looks at -- that only measures
7 infinite scroll?
8    Q.  Or that measures infinite scroll
9 specifically?
10    A.  I don't even know how you could
11 potentially measure infinite scroll.  I mean, you
12 know, when you ask someone how much time they spend
13 on social media, inherent in that is continuous
14 scrolling.
15    Q.  Could I ask you to please turn to page 32
16 of your JCCP report.  Look at paragraph 65.
17       Fair to say paragraph 65 you outline
18 several effects that you think push notifications
19 have on adolescents, right?
20    A.  Yeah.
21    Q.  You don't cite any studies here in your
22 report to support those alleged effects, right?
23    A.  Not here, no.  Again, it's similar to the
24 previous paragraph.  It's based on talking to
25 adolescents.  It's based on my expertise.  It's

54 (Pages 210 - 213)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 214

1 based on my, you know, training and development. I
2 don't think -- I'll leave it at that.
3     Q.   Based on other -- what we've seen from
4 other portions of your report, is it accurate to say
5 if you were aware of published studies supporting
6 these propositions you would have cited them, right?
7     MR. KIEFFER:  Object to the form.
8     THE WITNESS:  I'm not sure that I would in
9 this specific area.  My point was to try and lay
10 out -- and I lead up to the one figure that's in
11 here somewhere where it's -- you know, it's kind of
12 remarkable how there are these different aspects of
13 adolescent development that we know about, that
14 we've known about for a long time.
15     We know that adolescents are
16 developmentally different from children and young
17 adults.  And these various features, I think I list
18 ten, you know, just based on theory, based on what
19 we know about adolescent development, it is not a
20 stretch at all to say they take advantage of
21 different aspects of adolescent development.
22 BY MR. CHIOU:
23     Q.   So let's go over some of these effects.
24     Do you see the first one is you wrote that
25 push notifications exploit adolescents' less

Page 215

1 developed self-regulation, right?
2     A.   Yes.
3     Q.   What is your basis for this effect?  Are
4 you aware of any published studies to support this?
5     A.   Again, there are -- this is -- what's
6 interesting about push notifications, right, is that
7 you have someone that struggles -- you have an
8 adolescent that just doesn't have the same developed
9 self-regulation that anyone in this room does
10 because we're more cognitively developed adults.
11     You have an adolescent who is very
12 interested in socially what's going on.  You receive
13 a push notification.  Like I said, it is not a
14 stretch that that's going to bring you back to the
15 platform where you're going to spend time.  Those
16 are things that are picked up in problematic use
17 measures and general time-based measures.
18     Q.   Would you agree that in your field of
19 scientific research there's a difference between
20 thinking something is not a stretch and thinking --
21 and knowing that there's a published study
22 confirming such results?
23     A.   Well, in what we do, we -- you don't do
24 anything without theory, right.  You have a theory
25 about why this would occur.  And there are many

Page 216

1 studies -- many, many studies about self-regulation,
2 adolescents' less developed self-regulation.  And I
3 feel like -- well, I'm sorry, maybe I was a little
4 trite when I said not a stretch to.  There is a lot
5 of theory that would support this contention.
6     Q.   Got it.
7     And when you say "this contention," you
8 mean there's a lot of theory that supports that push
9 notifications take advantage of multiple aspects of
10 adolescent development?
11     A.   Among many other features, yes.
12     Q.   Could I ask you to turn to page 35,
13 paragraph 72, please.
14     A.   72?
15     Q.   Yes, please.
16     Do you see where you wrote that,
17 "Adolescents are particularly susceptible" --
18     A.   Yes.
19     Q.   -- "to overusing such features given their
20 less developed self-regulation and given their brain
21 developed in the areas of risk/reward and dopamine
22 pathways"?
23     A.   Yes.
24     Q.   Now, we'll get to dopamine later on, just
25 in a moment.

Page 217

1     But sticking on this paragraph, you don't
2 cite any studies to support that assertion, right?
3     A.   Well, the next sentence I say this
4 contributes to excessive time on the platform and
5 other forms of problematic use.
6     Q.   Uh-huh.
7     A.   With a citation to a Bates number.
8     Q.   Sure.
9     Oh, and that Bates number, you understand,
10 represents an internal company document, not a
11 study, right?
12     A.   It could be a study conducted by the
13 company.  I don't know off the top of my head.
14     Q.   So in the interest of expediency, we can
15 agree that if that document you cite in footnote 67
16 is not a study, then you didn't cite any studies to
17 support this proposition, right?
18     A.   I don't know what that is.
19     Q.   Are you aware of any published studies
20 supporting the proposition that, "Adolescents are
21 particularly susceptible to overusing such features
22 given their less developed self-regulations and
23 given their brain development in the areas of
24 risk/reward and dopamine pathways"?
25     A.   There are some studies looking at how --

55 (Pages 214 - 217)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 218

1  there's I believe one that I can think of that's
2  looking at how social media contributes to less
3  developed self-regulation.
4      Q.   Did that study also state that presenting
5  users, adolescents with content that's unpredictable
6  and unknown, that adolescents are particularly
7  susceptible to that?
8      A.   I don't know if they would have said that
9  specifically.
10     Q.   Any other studies you can think of?
11     A.   Not off the top of my head.
12     Q.   So if you could turn to page 38, please,
13  paragraph 80.
14         In that paragraph, you discuss dopamine,
15  social cues, and peer feedback, correct?
16     A.   It appears that way, yes.
17     Q.   Is it correct that dopamine is a
18  neurotransmitter?
19     A.   That is my understanding of it, yes.
20     Q.   It plays a role in reward and motivation,
21  right?
22     A.   Yes.
23     Q.   Is it your understanding that something
24  like listening to music can increase dopamine?
25         MR. KIEFFER:  Object to the extent that it

Page 219

1  is an incomplete hypothetical.
2         THE WITNESS:  I do -- I don't know.
3  BY MR. CHIOU:
4      Q.   Do you know whether watching an exciting
5  basketball game can increase dopamine?
6         MR. KIEFFER:  Same objection.  Incomplete
7  hypothetical.
8         THE WITNESS:  I would expect that that
9  might be the case.
10  BY MR. CHIOU:
11     Q.   Would you agree that meditation can
12  increase dopamine?
13         MR. KIEFFER:  Same objection.  Incomplete
14  hypothetical.
15         THE WITNESS:  I don't know.
16  BY MR. CHIOU:
17     Q.   At a more basic level, would you agree
18  that various kinds of day-to-day activities can
19  increase dopamine?
20         MR. KIEFFER:  Object.  Vague and
21  ambiguous.  Incomplete hypothetical.
22         THE WITNESS:  I suspect that that might be
23  the case.
24  BY MR. CHIOU:
25     Q.   To be clear, you're not suggesting that

Page 220

1  increases in dopamine are inherently harmful, right?
2      A.   I think the concern comes when you are
3  spending an excessive -- or just a lot of time on
4  something where you are consistently seeing likes,
5  consistently engaging with other features, that I
6  believe some studies have indicated relate to the
7  release of dopamine.
8      Q.   You would agree that increases in dopamine
9  are not inherently harmful, right?
10     A.   One --
11         MR. KIEFFER:  Object to the extent it's
12  been asked and answered.
13         THE WITNESS:  One singular release of
14  dopamine is unlikely to be harmful.  But I don't
15  know the context that you're discussing exactly.
16  BY MR. CHIOU:
17     Q.   It would be correct to say that there are
18  no studies indicating that the release of dopamine
19  from social media use is harmful, right?
20         MR. KIEFFER:  Object to the form.
21         THE WITNESS:  I don't know if that's the
22  case.  There are some studies that I'm aware of -- I
23  would have -- I don't know if I cite them in this
24  report -- that do look at brain imaging while using
25  social media platforms.

Page 221

1  BY MR. CHIOU:
2      Q.   Can you name a single study indicating
3  that the release of dopamine from social media use
4  is harmful?
5      A.   Like I said, I'd have to look at them in
6  more specificity.
7      Q.   Let's talk about peer feedback.
8         You're not claiming that peer feedback is
9  inherently harmful, right?
10     A.   Well, it depends on what you mean.
11  Someone saying good job to you, probably not.
12     Q.   Asking for feedback from peers happens in
13  all sorts of contexts, right?
14     A.   Asking for?  I suppose.
15     Q.   And receiving feedback from peers isn't
16  inherently --
17     A.   But what I'm talking about here --
18         (Whereupon, a brief discussion off the
19  record.)
20  BY MR. CHIOU:
21     Q.   And receiving feedback from peers isn't
22  inherently harmful, right?
23     A.   Well, it depends.  If someone gives you
24  negative feedback, I suppose that that would be
25  potentially harmful.  There's a lot of context here,

56 (Pages 218 - 221)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 222

1 again, that really matters in terms of the extent to
2 which I can answer these questions.
3     Q.   Sticking on paragraph 80 for a second,
4 Dr. Cingel.
5         You outline several effects that you
6 believe social cues such as likes have on
7 adolescents, right?
8     A.   It appears that way.
9     Q.   And you don't study -- you don't cite any
10 studies to support those purported effects, right?
11     A.   I believe I do elsewhere in the document.
12 I'm not sure where exactly.  There are some studies
13 on likes specifically as one form of feedback and
14 social cues as a feature of the social media
15 platforms that I believe is associated with negative
16 outcomes with respect to mental health.
17     Q.   Can you name a single study supporting the
18 proposition that likes take advantage of adolescent
19 brain development?
20     A.   Of adolescent brain -- I believe that one
21 of the studies -- I can -- I can look it up, too, if
22 you want me to answer for sure.  I believe that
23 there are some studies with brain imaging that would
24 look at the reception of likes in terms -- or the
25 viewing likes and resultant effects on what's

Page 223

1 happening in the brain.
2     Q.   Any other bases for the propositions in
3 this paragraph?
4     A.   Other than theory, other than my
5 background, other than my training, other than
6 talking to adolescents, no.
7     Q.   Let's move to page 45, paragraph 97,
8 please.
9         And in this paragraph, you're outlining
10 several effects that you believe beauty filters have
11 on adolescents, right?
12     A.   Correct.
13     Q.   You don't cite any studies in this
14 paragraph to support those alleged effects, right?
15     A.   In paragraph 97 there are no citations.
16     Q.   Well, let's walk through this, then.
17         In the middle of the paragraph, do you see
18 where you say, "Beauty filters and other image
19 manipulations take advantage of this susceptibility
20 by calling attention to body shape, size, and
21 looks"?
22     A.   Yeah.
23     Q.   Do -- what's your basis for that opinion?
24     A.   I would say that the Kleemans study that
25 we discussed earlier would speak to that.

Page 224

1     Q.   Anything else?
2     A.   That's the one that immediately comes to
3 mind.
4         The next sentence where it says "given the
5 positivity bias that occurs on social media," that
6 would be Schreurs and Vandenbosch, 2021, I believe.
7     Q.   Any other bases for the next -- for that
8 sentence?
9     A.   Not that immediately come to mind.
10     Q.   Any other studies come to mind as serving
11 as bases for the assertions in this paragraph?
12     A.   Like I just said, not that immediately
13 come to mind.
14     Q.   So we'll go to page 50, please,
15 paragraph 109.
16         And in this paragraph, Dr. Cingel, you
17 outline effects that you believe ephemeral content
18 has on adolescents, right?
19     A.   Yes.
20     Q.   You don't cite any studies in this
21 paragraph, right?
22     A.   Not in that paragraph.
23     Q.   So you see where you wrote in the second
24 sentence "ephemeral content takes advantage of
25 social development"?

Page 225

1     A.   Correct.
2     Q.   What's your basis for that?
3     A.   There are many studies that look at FOMO
4 specifically.  And in addition to social comparison,
5 FOMO is a common mechanism that explains effects and
6 relationships between social media use and negative
7 mental health outcomes.  And given that ephemeral
8 content by definition does disappear, my
9 understanding is that it has been linked to feelings
10 of FOMO among adolescent and young adult users.
11     Q.   Other than studies about FOMO, do you have
12 any bases for the view that ephemeral content takes
13 advantage of social development?
14     A.   Other than the many studies that exist on
15 FOMO, not off the top of my head.
16     Q.   Do you see where you wrote in this
17 paragraph that "ephemeral content can take advantage
18 of adolescents' brain development"?
19     A.   Uh-huh.
20     Q.   What's the basis for your view?
21     A.   On taking advantage of brain development?
22 Let me read what I wrote.
23         I think that comes based on what we know
24 about risk/reward sensitivity.  There is -- there
25 are studies about sexting in particular where

57 (Pages 222 - 225)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 226

1 adolescents aren't aware -- well, I'm sorry, they
2 overestimate the reward of engaging in such a
3 behavior and minimize any risks that might be
4 associated with such a behavior.
5     Q.  Other than studies about sexting can you
6 think of any other bases to support the proposition
7 that ephemeral content can take advantage of
8 adolescents' brain development?
9     A.  Again, I -- there's quite a large amount
10 of research on sexting, particularly among
11 adolescents.  Beyond sexting specifically, not that
12 immediately comes to mind.
13    Q.  Could you turn to page 51, paragraph 111,
14 please.
15        And in this paragraph you outline effects
16 that you believe location sharing has on
17 adolescents, right?
18    A.  Uh-huh.
19    Q.  You don't cite any studies in this
20 paragraph to support your opinions, right?
21    A.  Once again, I cite theory, social
22 comparison theory, which we talked about earlier.
23 In addition to FOMO, as I just mentioned, social
24 comparison is a common explanation, a mechanism that
25 explains relationships' effects, and so on, of

Page 227

1 social media use on various outcomes.
2     Q.  Other than theory and studies about FOMO,
3 are there any other bases for your opinions here --
4     A.  For all of -- sorry.
5     Q.  I'll start over, Dr. Cingel.  Is that all
6 right?
7     A.  Yeah.
8     Q.  Other than theory and studies about FOMO,
9 are there any other bases for your opinion that
10 location sharing has effects on adolescents?
11    A.  My training, my expertise, talking to
12 adolescents consistently over the course of years,
13 all of those things apply to all of -- all the --
14 everything that I wrote in these sections and beyond
15 in this report.
16    Q.  Anything else?
17    A.  Not that I can think of right now.
18    MR. CHIOU:  Instead of starting the next
19 module, Mr. Kieffer, would you like to take a five-
20 or ten-minute break at this point?
21    THE WITNESS:  It doesn't matter to me.
22    MR. CHIOU:  Sure.  We'll go off the
23 record, then.
24    THE VIDEOGRAPHER:  The time is 3:03 p.m.
25 Pacific time.  We're going off the record.

Page 228

1        (Whereupon, a brief recess was taken.)
2        THE VIDEOGRAPHER:  The time is 3:19 p.m.
3 Pacific time.  We're back on the record.
4 BY MR. CHIOU:
5     Q.  Good afternoon, Dr. Cingel.
6        During the break did you have a chance to
7 talk to your counsel?
8     A.  I did.
9     Q.  Is there anything about your prior
10 testimony that you'd like to correct or clarify?
11    A.  There is not.
12    Q.  Dr. Cingel, do you remember earlier this
13 morning you handed me some typewritten notes that
14 you had prepared?
15    A.  Correct.
16    Q.  And the title of that document was "Cingel
17 Response to Certain Defense Expert Critiques."
18 Right?
19    A.  Yes.
20    Q.  Does this document summarize all of your
21 responses to these defense expert critiques?
22    A.  As I currently have them, yes.  Well --
23 and I'm sorry, I don't know if it's -- I don't know
24 about the word "summarize."  It is thoughts, notes
25 that I made to myself with respect to at least some

Page 229

1 of the critiques that I saw in the defendant expert
2 documents.
3     Q.  Do you have any opinions about other
4 defense expert opinions that are not captured in
5 these notes?  That's what I'm trying to get at so
6 that we're not surprised.
7     MR. KIEFFER:  Let me just object to the
8 extent it's vague and ambiguous.
9        May I ask a question of you?
10    MR. CHIOU:  Of course.
11    MR. KIEFFER:  Do you mean does he have
12 opinions about other experts not listed here or do
13 you mean would he potentially expand on a given
14 point a little or more than a little if asked a
15 question about that particular point?
16    MR. CHIOU:  Whether he has -- like, for
17 example, using -- let's just use Allen as an
18 example, right, page 21 is not listed.  Would he
19 come up with some opinion about something that's on
20 Allen page 21?  That's what I mean.
21    THE WITNESS:  I don't know.  These are --
22 these are responses to pages within the documents
23 where my work was referenced.
24 BY MR. CHIOU:
25    Q.  Do you have opinions about defense expert

58 (Pages 226 - 229)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 230

1  opinions that are not reflected in these notes?
2      A.  At this time, no.  But I'm not sure --
3  again, I haven't done this before.  I'm not sure if
4  I will in -- over the coming months.
5          MR. CHIOU:  Could we please mark this as
6  Exhibit Number 15, just for the record.
7          (Whereupon, Cingel Exhibit 15 was marked
8  for identification.)
9          MR. CHIOU:  Could we go off the record for
10  a second?
11          MR. KIEFFER:  Sure.
12          THE VIDEOGRAPHER:  The time is 3:22 p.m.
13  Pacific time.  We're going off the record.
14          (Whereupon, a brief recess was taken.)
15          THE VIDEOGRAPHER:  The time is 3:22 p.m.
16  Pacific time.  We're back on the record.
17  BY MR. CHIOU:
18      Q.  Dr. Cingel, in Opinions 3, 4, 5, and 12,
19  and Section 9 of your JCCP report, you analyze
20  various features that are on the defendants'
21  platforms, right?
22      A.  I'm sorry, are we talking about this or my
23  report now?
24      Q.  Apologies.  Let's start over, Dr. Cingel,
25  if that's all right?

Page 231

1      A.  Yeah.
2      Q.  Could you please turn to Exhibit Number 2,
3  which is your JCCP report, right?
4      A.  Yes.  On page?
5      Q.  Let's go to Opinions 3 to 5 and 12, and
6  Section 9.  I'm just asking the high-level question,
7  you're analyzing various features on the platforms,
8  right?
9      A.  Apologies.  What opinions are we -- which
10  numbers?  2, 3, 4, 5?
11      Q.  Sure.
12          3, 4, 5, 12, and Section 9.
13      A.  What is Section 9?  You mean later, later
14  in the report?
15      Q.  That's correct.
16      A.  Okay.  I see what you're talking about.
17          Opinion 12 you had said about features
18  specifically.  I don't think it has -- I don't use
19  the word "features" in that opinion.  I don't use
20  the word "features," but I -- in some of these other
21  ones, in Opinion 4, I lay out each of the features.
22      Q.  I'll ask a more general question.
23          As part of your report and your opinions
24  in this case, you look at various features on the
25  defendants' platforms, right?

Page 232

1      A.  I consider them, yes.
2      Q.  And as part of your work in this case, you
3  analyzed what you understand to be the
4  acknowledgment of negative mental health effects by
5  each defendant, right?
6      A.  In their -- in what?  By each defendant?
7  In what or where?
8      Q.  By each defendant regarding alleged mental
9  health effects?
10      A.  Sorry, I don't understand the question.
11          By each defendant platform or in studies
12  that are considering the defendant platforms?
13      Q.  It's your view that each defendant in this
14  case had knowledge about alleged negative mental
15  health effects, right?
16      A.  Correct.
17      Q.  And it's your opinion that each defendant
18  in this case failed to act reasonably, right?
19      A.  I believe so.  I believe that is one of
20  the opinions, yes.
21      Q.  And those opinions are based off your
22  review of internal company documents in part, right?
23          MR. KIEFFER:  Object to the extent it
24  misstates his report.
25          But go ahead.

Page 233

1          THE WITNESS:  In part.
2  BY MR. CHIOU:
3      Q.  And these -- those opinions are also based
4  on your review of deposition testimony of witnesses
5  in this litigation, right?
6      A.  What I would say is that my opinions are
7  primarily based on my analysis and synthesis of the
8  scholarly literature, based on my training, based on
9  my background, based on my expertise, based on
10  working with hundreds of adolescents over the years.
11          I -- just to be clear about that, I
12  commonly talk to tens, hundreds of adolescents about
13  these things.  That's the main basis for these
14  opinions.  As part of this litigation, I was able
15  to, for the first time, see internal company
16  documents which I find to be consistent with the
17  opinions that I set forth.
18      Q.  So let me be more specific about two
19  opinions.
20          Your opinions about each defendant
21  supposedly knowing about negative mental health
22  effects, and your opinion that each defendant failed
23  to act reasonably, the basis for those two opinions
24  are your review of internal documents and deposition
25  testimony of witnesses, right?

59 (Pages 230 - 233)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 234

1    A.  As part of those, yes.
2    Q.  Sitting here right now, you're not aware
3  and can't identify any of the internal documents you
4  reviewed of the defendants' that were observational
5  studies or randomized controls trials, right?
6    A.  What do you -- I can't identify which --
7  which of the Bates numbers those are?
8    Q.  That's right.
9        Putting it another way, Dr. Cingel, none
10  of the internal company documents you reviewed
11  addressed the randomized controlled trial, right?
12    A.  I'm not sure if that's the case or not.
13    Q.  You can't -- but you don't recall seeing
14  any randomized control trials among the internal
15  company documents, right?
16    A.  That they refer to in that way, not to my
17  recollection.
18    Q.  And to your recollection, none of the
19  internal company documents were observational
20  studies, right?
21    A.  I think that there were certainly some
22  that I would consider to be observational studies.
23    Q.  Which ones?
24    A.  Well, first of all, I'd like you -- if you
25  can define what you mean by an observational study.

Page 235

1    Q.  Well, we can go about this another way.
2        None of the internal documents you
3  reviewed were longitudinal studies, right?
4    A.  I'm not sure.  I honestly don't know.
5    Q.  You believe that certain internal company
6  documents in this case show that the company had an
7  intent to take advantage of adolescent development,
8  right?
9    A.  That is -- I'm not sure about the word
10  "intent."  But there were many documents that I
11  reviewed where it was clear that defendant companies
12  were aware of different aspects of adolescent
13  development that I reference throughout my report.
14        And those were often discussed in tandem
15  with promoting engagement on platforms as a function
16  of those aspects of development and communicating
17  those aspects of development and how it could relate
18  to engagement across the company.
19    Q.  So you're offering opinions about the
20  motives of certain companies, such as promoting
21  engagement on platforms, right?
22        MR. KIEFFER:  Object to the form.  I think
23  that mischaracterizes his testimony.
24        THE WITNESS:  I don't know if I said
25  anything about the motives.  I'm saying these things

Page 236

1  happened in tandem, often within the same document.
2  BY MR. CHIOU:
3    Q.  In your own academic research you
4  generally haven't relied on internal documents
5  before, right?
6    A.  No, I would love to.  This is the first
7  time -- you know, companies are notoriously reticent
8  about sharing this information with researchers,
9  sharing data with researchers, which is something
10  that we have been asking for for a very long time.
11    Q.  In the course of your preparing your
12  opinions in this case, you didn't talk to anyone
13  employed by Snap, right?
14    A.  Speak with them directly?
15    Q.  Correct.
16    A.  No.
17    Q.  In the course of preparing your opinions
18  in this case, you didn't talk to anyone employed by
19  YouTube, right?
20    A.  No.
21    Q.  You haven't talked to anyone employed by
22  any of the four defendants in the course of
23  preparing your defendants -- your opinions, right?
24    A.  I have not explicitly spoken face-to-face
25  or mediated to an employee.

Page 237

1    Q.  So let's -- let me ask you about the
2  Google documents.  When I say "Google documents," I
3  mean also the YouTube documents.
4    A.  Sure.
5    Q.  Does that make sense?
6        We could look at it, if you want, but does
7  it sound right that there's over 200 documents on
8  your materials considered list that were produced by
9  Google in this litigation?
10        MR. KIEFFER:  Object to the extent it
11  calls for speculation.
12        THE WITNESS:  I take you at your word that
13  there are 200, or around 200.
14  BY MR. CHIOU:
15    Q.  Sound right to you, roughly?
16    A.  Sure.
17    Q.  And your report cites about 18 of those
18  internal Google documents, right?
19    A.  I don't know.
20    Q.  Without going through and counting, does
21  about 18 sound right to you?
22        MR. KIEFFER:  Calls for speculation.
23        Don't speculate.
24        THE WITNESS:  I don't know.
25        MR. KIEFFER:  If you know, answer.

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 238

1      THE WITNESS:  I don't know.
2 BY MR. CHIOU:
3      Q.   How did you determine which of the
4 internal documents cited in your materials list that
5 you would end up discussing in the body of your
6 report?
7      A.   This morning I mentioned how I would go
8 through and, you know, scan them for relevance to
9 the sorts of things that I was writing about in this
10 document.  As I noted, there are very many of them
11 and so I would look for the ones that seemed
12 relevant to aspects of my report.  And those I
13 expect are the ones I cited.
14      Q.   For each Google document cited in your
15 materials considered list, you didn't ask the
16 authors what they meant by any statements, right?
17      A.   No.
18      Q.   For each internal Google document in your
19 materials considered list, you didn't analyze
20 whether there were additional communications in the
21 company about the purpose of that document, right?
22      A.   I'm not -- I'm not sure, what do you mean,
23 like, following -- what do you mean by that?
24      Q.   Oh.  You didn't analyze any additional
25 communications about what that particular document

Page 239

1 would be used for, right?
2      A.   It might have been stated within the
3 document.  And if that's the case, then yes.
4      Q.   And for each Google document cited in your
5 materials considered list you don't have knowledge
6 about how that document was created unless it was
7 stated on the face of the document, right?
8      A.   Correct.
9      Q.   Would you agree, Dr. Cingel, that there's
10 no scientific study that analyzes whether YouTube
11 specifically causes or contributes to mental health
12 disorders?
13      A.   I don't -- no, I don't know if I would
14 agree with that.  As I mentioned, the features of
15 these platforms are fairly common across them.
16 YouTube is one of the most commonly used platforms
17 by children and adolescents.  I think that YouTube
18 would be picked up in any measure of social media
19 use or problematic social media use.
20      Q.   So you would agree, though, that there's
21 no scientific study that specifically analyzes
22 whether YouTube causes or contributes to mental
23 health disorders?
24      A.   I don't know if there is one specifically
25 on YouTube and only YouTube.

Page 240

1      Q.   Are you aware of any study that analyzes
2 whether YouTube specifically causes or
3 contributes -- you know what, strike that.
4      Can I start over, Dr. Cingel?
5      A.   Uh-huh.
6      Q.   Would you agree there's no validated
7 diagnostic test for YouTube addiction?
8      A.   For YouTube addiction specifically, not to
9 my knowledge.  But, again, given that it is a social
10 media platform, there are validated measures of
11 problematic social media use, social media
12 addiction, so on.
13      Q.   Just not specifically designed for
14 YouTube, right?
15      A.   To my knowledge, yes.
16      Q.   Would you agree there's no scientific
17 study that analyzes whether YouTube specifically
18 causes addiction?
19      A.   Again, it would be picked up in a measure
20 of problematic social media use.  Is there a measure
21 on problematic YouTube use specifically?  I'm not
22 sure.
23      Q.   You're aware that YouTube does not offer a
24 private messaging feature, right?
25      A.   I believe it used to.  I don't believe

Page 241

1 that it does currently.
2      Q.   You're aware that YouTube doesn't offer
3 something like ephemeral content, right?
4      A.   Not in the same way that something like
5 Snapchat would be ephemeral.
6      Q.   You're aware that YouTube doesn't allow
7 users to share location, right?
8      A.   That is correct.
9      Q.   Fair to say users don't post selfies to
10 YouTube, right?
11      A.   I don't know.
12      Q.   Would you agree users don't post photos to
13 YouTube?
14      A.   Static photos?  I'm not sure.
15      Q.   What's your understanding, Dr. Cingel, of
16 how the watch next feature works on YouTube?
17      A.   The watch -- excuse me.  The watch next
18 feature on YouTube?  My understanding of that is
19 that it is like -- are you talking about you have
20 the video that you're watching, and the bank of
21 videos sits on, I believe, the right-hand side, my
22 understanding is that those are algorithmically
23 recommended based on various information collected.
24      Q.   You understand that users obviously aren't
25 required to watch any of the recommended videos,

61 (Pages 238 - 241)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 242

1 right?
2     A.  They're not required, but I would expect
3 that they often do given that it's algorithmically
4 recommended based on other things that they're
5 watching and doing on the platform.
6     Q.  You would agree that to watch a video
7 recommended by the watch next feature the user has
8 to click on something, right?
9     A.  What?  -- they have to click on something?
10     Q.  A recommended video doesn't play without
11 input from the user, right?
12     A.  I think that that -- I'm not sure I
13 believe that's the case.
14     Q.  What's your understanding of how Autoplay
15 works on YouTube?
16     A.  I believe -- well, on YouTube or on -- I
17 think it's -- is it YouTube Shorts, my understanding
18 is that it will automatically start to play if you
19 hover over it for -- at least on YouTube Shorts --
20 for a period of time.
21     Q.  What's your understanding of how Autoplay
22 works on YouTube main?
23     (Whereupon, a brief discussion off the
24 record.)
25     THE WITNESS:  How Autoplay works on

Page 243

1 YouTube main?  I believe that in that case -- I'm
2 not sure if the video automatically starts to play
3 or if you have to click the play button.
4 BY MR. CHIOU:
5     Q.  You're aware that users can turn off
6 Autoplay, right?
7     A.  I imagine that that might be the case.  I
8 would -- I don't know how easy that is or whether
9 that is default.
10     Q.  So you don't know how big the toggle is or
11 where it's located to turn off Autoplay?
12     A.  No.
13     Q.  You're aware that users can customize the
14 notifications they receive or don't receive on
15 YouTube, right?
16     A.  That might be the case.  Again, I would
17 question whether it's default, where it's -- how
18 easy it is to navigate to, and things of that
19 nature.
20     Q.  You are aware that users can turn off
21 notifications entirely on YouTube, right?
22     A.  I do not know.
23     Q.  Well, remember earlier this morning I was
24 asking you whether you use YouTube personally and
25 one example you gave was showing the five- to

Page 244

1 seven-minute excerpt in your class of the TED talk,
2 right?
3     A.  Uh-huh.
4     Q.  Do you use YouTube in any other ways, like
5 watching videos for entertainment?
6     A.  Not in particular, no.
7     Q.  You ever watch a video on YouTube before
8 to learn something like how to fix an overflowing
9 toilet, anything like that?
10     A.  I don't believe so, no.
11     Q.  You ever uploaded a video to YouTube?
12     A.  I have not.
13     Q.  Are you aware that videos of talks you've
14 given have been uploaded to YouTube?
15     A.  That doesn't surprise me.  I try not to
16 Google myself.
17     Q.  Why doesn't it surprise you?
18     A.  Because that is -- I might have been told
19 that this is what's going to happen if I give a
20 talk.
21     Q.  Are you aware that a May 20th, 2025, talk
22 you gave very recently called Adding Nuance in the
23 Debate on Adolescent Social Media Use and Mental
24 Health has been uploaded to YouTube?
25     A.  That does not surprise me.

Page 245

1     Q.  Would you agree that watching the video of
2 your talk on YouTube wouldn't cause teens to develop
3 depression?
4     A.  I would hope not.  But I don't also know
5 if an adolescent would watch it.
6     Q.  If an adolescent did watch that video of
7 your May 20th, 2025, talk, it wouldn't cause the
8 teen to develop anxiety, right?
9     MR. KIEFFER:  Object.  Argumentative.
10 Calls for speculation.
11     THE WITNESS:  I don't know.
12 BY MR. CHIOU:
13     Q.  Would you agree that an adolescent
14 watching the video of your May 20th talk wouldn't
15 develop suicidal ideation?
16     MR. KIEFFER:  Object to the form.
17 Incomplete hypothetical.
18     THE WITNESS:  I don't know.  It depends on
19 what -- how long they're spending.  Is that the only
20 thing that they're doing?  Again, all the context
21 surrounding it.
22 BY MR. CHIOU:
23     Q.  All right.  Let's -- I'm just really
24 curious.  What are the ways that a teen watching
25 your May 20th talk, what would lead him or her to

62 (Pages 242 - 245)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 246

1 develop suicidal ideation?
2        MR. KIEFFER: Object to the form. Calls
3 for speculation. Incomplete hypothetical.
4        THE WITNESS: If they continued to watch
5 additional videos, depending on what is
6 algorithmically recommended to them, depending on
7 when they're watching it, how long, what period of
8 time.
9 BY MR. CHIOU:
10    Q. Would you agree that a teen who watches
11 your May 20th talk after school on a weekday, and
12 doesn't watch anything else on YouTube, couldn't
13 possibly develop depression as a result of watching
14 your video?
15        MR. KIEFFER: Object to the form. Calls
16 for speculation. Incomplete hypothetical.
17        THE WITNESS: I would not use language
18 that precise. "Couldn't possibly."
19 BY MR. CHIOU:
20    Q. Okay. So you think -- you know, can I
21 start over, Dr. Cingel?
22        You think there is a possibility that a
23 teen watching your May 20th talk after school
24 without watching any other videos afterwards could
25 possibly develop depression as a result of having

Page 247

1 viewed your May 20th talk?
2        MR. KIEFFER: Object to the form. Calls
3 for speculation. Incomplete hypothetical.
4        THE WITNESS: It's a -- I mean, it's a
5 hypothetical. I don't know.
6 BY MR. CHIOU:
7    Q. As in, you're unable to just say no, that
8 couldn't possibly happen?
9    A. I try not to say anything that it couldn't
10 possibly.
11    Q. Would you say that's highly unlikely?
12        MR. KIEFFER: Object to the form.
13 Incomplete hypothetical. Calls for speculation.
14        THE WITNESS: I don't know where you would
15 want me to put a threshold.
16 BY MR. CHIOU:
17    Q. Are you willing to say that a teen
18 watching the video of your May 20th talk after
19 school on a weekday is very unlikely to be harmed by
20 watching that video?
21        MR. KIEFFER: Object to the form. It's an
22 incomplete hypothetical. Calls for speculation.
23        THE WITNESS: I think I've given you an
24 answer. I think the other thing is that I would --
25 the thing that I would say is highly unlikely is

Page 248

1 that they're choosing to watch my video.
2 BY MR. CHIOU:
3    Q. And it's highly unlikely they're suffering
4 any harm from watching your talks, right?
5        MR. KIEFFER: Object to the form. It's
6 been asked and answered. It's an incomplete
7 hypothetical. And calls for speculation.
8        THE WITNESS: If they're not watching it,
9 then no.
10 BY MR. CHIOU:
11    Q. If a teen were to watch several of your
12 talks on YouTube in a row, that wouldn't cause a
13 teen to develop depression, right?
14        MR. KIEFFER: Object to the form. Calls
15 for speculation. It's an incomplete hypothetical.
16        THE WITNESS: If we're getting into more
17 time spent on YouTube, the possibility exists.
18 BY MR. CHIOU:
19    Q. Do you think the possibility exists for a
20 teen watching several of your talks on YouTube in a
21 row to develop anxiety?
22        MR. KIEFFER: Calls for speculation.
23 Incomplete hypothetical.
24        THE WITNESS: Possibly.
25 ///

Page 249

1 BY MR. CHIOU:
2    Q. Do you think it's -- is that your
3 testimony, for a teen who watches several talks of
4 yours on YouTube in a row to develop suicidal
5 ideation?
6        MR. KIEFFER: Object to the form. It's
7 been asked and answered. It's an incomplete
8 hypothetical.
9        THE WITNESS: I don't know.
10 BY MR. CHIOU:
11    Q. Do you think it's highly unlikely that a
12 teen watching several videos of your talks on
13 YouTube would develop suicidal ideation?
14        MR. KIEFFER: Object to the form. Asked
15 and answered. Incomplete hypothetical.
16        THE WITNESS: I don't even know if there's
17 several of my videos to watch.
18 BY MR. CHIOU:
19    Q. But we can agree, a teen watching one of
20 your talks on YouTube after school on a weekday
21 pretty much wouldn't develop suicidal ideation.
22 You'll give that, right?
23        MR. KIEFFER: Object to the form. It's
24 been asked and answered repeatedly. It calls for
25 speculation. And it's an incomplete hypothetical.

63 (Pages 246 - 249)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 250

1      THE WITNESS:  I don't know.
2 BY MR. CHIOU:
3      Q.   Would you be willing to tell the jury that
4 a teen watching a video of one of your talks
5 wouldn't develop body image issues as a result of
6 that?
7      MR. KIEFFER:  Object to the form.
8 Incomplete hypothetical.  Calls for speculation.
9      THE WITNESS:  I think it's the same answer
10 across any indicator of mental health, I don't know.
11 BY MR. CHIOU:
12     Q.   If a teen who watched videos of your talks
13 on YouTube developed depression, do you think the
14 parents should be able to sue you?
15     MR. KIEFFER:  Objection.  Argumentative.
16     THE WITNESS:  I don't know.
17 BY MR. CHIOU:
18     Q.   How would you feel if you got sued by the
19 parent of a teen who developed depression as a
20 result of watching your talks on YouTube?
21     MR. KIEFFER:  Objection.  Argumentative.
22 Completely irrelevant to any issue in this case.
23     THE WITNESS:  I wouldn't be happy to be
24 sued by anyone for anything.
25 ///

Page 251

1 BY MR. CHIOU:
2      Q.   On that video we just talked about, that
3 talk originally, Adding Nuance in the Debate on
4 Adolescent Social Media Use, was delivered May 20th,
5 right, about -- less than a month and a half ago?
6      A.   Correct.
7      Q.   And the JCCP report we've been talking
8 about, that was submitted on April 18, 2025, right?
9      A.   Correct.
10     Q.   So you gave the talk about adding nuance
11 about a month after your JCCP report, right?
12     A.   Correct.
13     Q.   And in that talk, you gave a list of
14 platforms that you considered to be social media,
15 right?
16     A.   I don't recall.
17     Q.   You don't recall that you didn't include
18 YouTube in the list of platforms that you mentioned
19 were social media, right?
20     MR. KIEFFER:  Object to the form.  Lacks
21 foundation.
22     THE WITNESS:  I don't recall where I
23 listed out social media platforms and which ones I
24 was talking about.
25 ///

Page 252

1 BY MR. CHIOU:
2      Q.   You have no basis to disagree if I
3 represent to you that in that talk, when you listed
4 platforms that you considered to be social media,
5 you didn't include YouTube?
6      MR. KIEFFER:  Object to the form.  It
7 lacks foundation.  He's not been presented with the
8 evidence you're referring to.
9      THE WITNESS:  I can -- yeah, I can look at
10 it, if you'd like me to.  I also don't expect that I
11 said this is a definitive list of things that I
12 consider to be social media.
13 BY MR. CHIOU:
14     Q.   If a teen were to watch a video of one of
15 your talks on YouTube, do you think it's more likely
16 that the effect on the teen would be that it's
17 beneficial and educational, or that it's likely to
18 cause suicidal ideation?  Which do you think is more
19 likely?
20     MR. KIEFFER:  Object to the form.  Calls
21 for speculation.  It's an incomplete hypothetical.
22     THE WITNESS:  I think it's dependent on
23 other -- whether it's one or the other, I think it's
24 dependent on other contextual factors that I've been
25 talking about all day today.

Page 253

1 BY MR. CHIOU:
2      Q.   So if I'm understanding you right, you're
3 not willing to say, oh, it's probably more likely to
4 be beneficial for the teen to have watched my talk
5 on YouTube?
6      A.   I don't --
7      MR. KIEFFER:  Object to the form.
8      THE WITNESS:  I don't know.
9 BY MR. CHIOU:
10     Q.   Equally likely that it would cause
11 suicidal ideation?
12     MR. KIEFFER:  Object to the form.
13 Misstates his testimony.
14     THE WITNESS:  Without additional
15 information, I do not know.
16     MR. CHIOU:  Dr. Cingel, you'll be handed
17 an -- a document marked Exhibit 16.
18     (Whereupon, Cingel Exhibit 16 was marked
19 for identification.)
20 BY MR. CHIOU:
21     Q.   Dr. Cingel, do you recognize what's been
22 handed to you as Exhibit 16 as an article you wrote?
23     A.   I do.
24     Q.   And this article was not listed on your CV
25 that was attached as Exhibit 1 to your JCCP report,

Golkow Technologies,
A Veritext Division

877-370-3377                                          www.veritext.com

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 254

1 right?
2    A.  I'm not sure.  I take -- it doesn't strike
3 me as something I'd put on my CV.
4    Q.  Why not?
5    A.  Because -- well, I might have listed the
6 conversation.  I think I have a section that says
7 where my work has been picked up in the popular
8 press.  That's not a common place that you would --
9 that's not a common thing that most people would
10 have on their CV.
11    Q.  So would you say that this article has
12 never been listed on your CV?  What I'm trying to
13 get at is whether it was removed at some point.
14    A.  No, I would assume that it has never been
15 on there.
16    Q.  You believe, Dr. Cingel, that there's
17 relatively simple strategies parents and supportive
18 adults can use to leverage media to support their
19 child's healthy development and future, right?
20    A.  I think I talk about that here.  I also
21 tend to talk -- we're talking about now a different
22 population.  This is my other line of research that
23 I do on preschool and early elementary school-age
24 children.
25    Q.  You believe, Dr. Cingel, that parents and

Page 255

1 other adults can help children learn from media by
2 watching alongside them and answering their
3 questions, right?
4    A.  That is one possibility, yes.
5    Q.  They can also read reviews of media to
6 determine its quality and age-appropriateness; you
7 believe that, right?
8    A.  That is one possible thing that they can
9 do, yes.
10    Q.  You also believe that with just a little
11 effort parents can model healthy ways to use media
12 for their children, right?
13    A.  I don't know if I would say "little
14 effort."  When I -- similar to my work with
15 adolescents, I have spoken to hundreds, if not
16 thousands, of parents, and one thing that is pretty
17 consistent in those conversations is how difficult
18 it is to manage the media landscape for children and
19 adolescents, and in particular, the social media
20 landscape for adolescents.
21    Q.  Dr. Cingel, I direct you to page 5 of your
22 article, if you don't mind.
23    A.  That's the last page?
24    Q.  That's right.
25        Would you agree, Dr. Cingel, that with

Page 256

1 just a little effort parents can model healthy ways
2 to use media for their children?
3    A.  That is what that says, yes.
4    Q.  And when you say that's what that says,
5 that's what you wrote, right?
6    A.  I don't know.  This -- there was an editor
7 that helped a lot with this to make it accessible
8 for, you know, a lay audience.  I also don't think
9 if you said it's really difficult to do this, that's
10 not very conducive to making parents think that
11 there's anything that they can do.
12    Q.  Are you disavowing the sentence in the
13 article that bears your name?
14    A.  I'm sorry?
15    Q.  Are you disavowing the sentence in the
16 article that bears your name?
17    A.  I'm not disavowing it.  I'm just saying
18 there's more context behind this and we're talking
19 about a -- an article that I wrote for a lay
20 audience.
21    Q.  Could I ask you to please turn to page 3
22 of 5 in the article.
23        Do you see how this article embeds a
24 Blue's Clues episode that was posted on YouTube?
25    A.  I see this.

Page 257

1    Q.  Would you agree that parents who are
2 reading this article, if they're watching -- reading
3 it with their kids end up watching this Blue's Clues
4 episode on YouTube it wouldn't harm them?
5    A.  I don't know.  It -- I suspect that would
6 be -- we're talking, again, about a very different
7 population relative to adolescents.  It might not
8 hurt them.
9    Q.  So you think there is a population that
10 might not be hurt if they're watching this Blue's
11 Clues episode with their parents?
12        MR. KIEFFER:  Object to the form.
13 Incomplete hypothetical.  Vague.  Ambiguous.
14        THE WITNESS:  I mean, we're talking about
15 a show that's intended for, I believe, three- to
16 five-year-old children.  That's fundamentally
17 different than the type of things that an adolescent
18 might be engaged with on YouTube.
19 BY MR. CHIOU:
20    Q.  So someone who is watching this YouTube
21 video as their -- embedded in the article is just
22 not going to be harmed by it, right?
23        MR. KIEFFER:  Object to the form.
24 Misstates his testimony.  Calls for speculation.
25        THE WITNESS:  Harmed in what way?

65 (Pages 254 - 257)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 258

1  BY MR. CHIOU:
2      Q.  Won't suffer any adverse mental health
3  effects from reading your article and then clicking
4  on the video embedded in it?
5      A.  I don't actually -- I don't know if this
6  is actually embedded in the article.  I -- my
7  understanding is that this is a screenshot and this
8  is not something that I included in the article.
9  Again, this came from the editor.  All the images in
10 here are from the editor, whomever it was at the
11 conversation.
12     Q.  For the sake of time, I'll represent to
13 you, if it -- we'll just ask it this way or we could
14 pull it up, whatever you prefer.
15         Dr. Cingel, if we assume that this video
16 was embedded in your article, would you give the
17 same answer?
18     A.  To what question?
19     Q.  That a child or adolescent reading this
20 article and then clicking on the video couldn't
21 possibly be harmed, right?
22         MR. KIEFFER:  Object to the form.
23 Incomplete hypothetical.  And calls for speculation.
24         THE WITNESS:  I actually don't know
25 because now the person that would be more likely to

Page 259

1  click on this would be a child, younger child, who
2  is even more developmentally susceptible to spending
3  more time on the platform, to watching more videos.
4  I don't know.
5  BY MR. CHIOU:
6      Q.  If an adolescent were to read this article
7  and click on the embedded video, do you believe it's
8  likely that he or she would be harmed?
9          MR. KIEFFER:  Objection.  Calls for
10 speculation.  Incomplete hypothetical.
11         THE WITNESS:  I think my answer is
12 similar.  Adolescents are still at risk and
13 developmentally susceptible to all the things that I
14 just talked with reference to children.
15 BY MR. CHIOU:
16     Q.  Blue's Clues is one of the shows that you
17 believe contains participatory cues, right?
18     A.  It does.
19     Q.  And it's your view that shows with
20 participatory cues are actually linked to increased
21 vocabulary learning, right?
22     A.  Among young children.
23     Q.  It's also linked to content comprehension
24 among young children, right?
25     A.  Correct.

Page 260

1      Q.  It's your view that shows with
2  participatory cues also increase children's
3  engagement with educational content, right?
4      A.  I believe that has been shown in the
5  literature, yes.
6      Q.  Those are benefits, not harms, right?
7      A.  Those are benefits that come from a design
8  choice that is common in very young children's
9  programming.
10     Q.  And are you saying that an adolescent
11 watching the exact same content may well suffer harm
12 from watching this video on YouTube?
13     A.  Well, I don't know because they're not
14 really -- they will have learned everything in the
15 video.  You know, they're 16-year-olds, they know
16 vocabulary, right.  So if that's the case, then
17 they're wasting their time that could be spent doing
18 other things, learning other things, practicing
19 other developmental capabilities.  So I'm not sure.
20         MR. CHIOU:  Mr. Kieffer, would you like to
21 go off the record for just one moment?
22         MR. KIEFFER:  I don't need to go off the
23 record.
24         THE WITNESS:  I don't need to.  I'm fine.
25         MR. CHIOU:  Okay.  Then at this point,

Page 261

1  I'll reserve some time for recross.  I believe that
2  the other defendants in this matter have questions
3  for you, Dr. Cingel.
4          And subject to discussion with my
5  co-counsel, we may have additional questions for
6  Dr. Cingel.  That's why I asked to go off the
7  record.
8          MR. KIEFFER:  Okay.
9          THE VIDEOGRAPHER:  The time is 3:57 p.m.
10 Pacific time.  We're going off the record.
11         (Whereupon, a brief recess was taken.)
12         THE VIDEOGRAPHER:  The time is 4:08 p.m.
13 Pacific time.  We're back on the record.
14              EXAMINATION
15 BY MR. CHAPUT:
16     Q.  Good afternoon, Dr. Cingel.  As you heard
17 this morning, my name's Isaac Chaput.  I represent
18 the Meta defendants in this case and I'm going to
19 have some questions for you specifically about your
20 opinions with respect to the Meta defendants, all
21 right?
22     A.  Okay.
23     Q.  First, you reviewed internal Meta
24 documents in preparing your report, correct?
25     A.  Among others, yes.

66 (Pages 258 - 261)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 262

1    Q.  Yes.  And you cited internal Meta
2  documents in your report?
3    A.  Yes.
4    Q.  Do you recall that you cited around 50
5  Meta documents across the entirety of your report?
6    MR. KIEFFER:  Object to the form.  Calls
7  for speculation.
8    THE WITNESS:  I don't recall the exact
9  number.
10  BY MR. CHAPUT:
11    Q.  Okay.  For the Meta documents that you did
12  cite in your report, did you review each of those
13  documents in their entirety?
14    A.  In some form, yes.
15    Q.  What do you mean when you say "in some
16  form"?
17    A.  I went through the entirety of them,
18  whether that was through, you know, heavy skim or
19  reading every word, word by word by word, one of
20  those two.
21    Q.  Okay.  And then in addition to the
22  documents that are cited in your report, you also
23  reviewed other Meta documents that are listed in
24  your materials considered list, correct?
25    A.  Correct.

Page 263

1    Q.  Are you aware there are more than 900 Meta
2  documents listed in your materials considered?
3    A.  Not aware of that exact number, but if
4  they're there, I trust that that's how many there
5  are.
6    Q.  Does 900 sound about right based on your
7  recollection of how many documents you skimmed in
8  the course of your preparation for the report?
9    MR. KIEFFER:  Object to the extent it
10  misstates his testimony.
11    THE WITNESS:  There were a lot of Meta
12  documents.
13  BY MR. CHAPUT:
14    Q.  And that means that you considered each of
15  those 900 documents in the course of drafting your
16  report, correct?
17    A.  In some form, yes.
18    Q.  Now, I know that you've testified that for
19  some of the documents you just skimmed them to see
20  if they were relevant.
21    How long would it take you to skim the
22  average internal company document to make that
23  assessment?
24    A.  I don't know if I could speak to average
25  because they're all different, right.  There are

Page 264

1  many different forms of what they look like.  Some
2  took more time than others.  Some it's very clear
3  from, you know, if it's a PowerPoint deck or
4  something like that from the title, something
5  shorter.  I can't really speak to an average.
6    Q.  Can you give us a range for how long it
7  would take you to make an assessment for each
8  document of whether it might be relevant to your
9  analysis?
10    MR. KIEFFER:  Object to the form to the
11  extent it's been asked and answered.
12    THE WITNESS:  Some might take a few
13  seconds.  Some might take a few minutes to make that
14  initial assessment.
15  BY MR. CHAPUT:
16    Q.  Okay.  How many hours did you spend
17  specifically on reviewing Meta's documents?
18    A.  I don't recall.  I don't -- I didn't think
19  about breaking it down in a particular way like
20  that, based on the defendant companies.
21    Q.  When you were performing your searches,
22  though, were you searching just Meta's documents and
23  then you would search documents for the other
24  defendants or were you searching all of the
25  company's documents at the same time?

Page 265

1    A.  Probably a little bit of both.  Sometimes
2  I might put "Meta" in as a -- you know, as a keyword
3  or as a kind of filter.  In other cases it might
4  just -- like, if I put in "problematic use" and Meta
5  came up then I would set that aside as a Meta
6  document.  Or if it came up for Snapchat, I'd set it
7  aside as a Snapchat document.
8    Q.  Okay.  Some of the Meta documents that you
9  reviewed in the course of your work were studies
10  performed by internal Meta researchers; is that
11  right?
12    A.  I believe so, yes.
13    Q.  Are you aware that Meta researchers from
14  time to time send studies they've conducted to other
15  Meta employees?
16    A.  I believe that, if memory serves, there
17  were -- there was some of that that I saw.
18    Q.  They also discussed that research they
19  have conducted in e-mails with other Meta employees?
20    A.  I think so, yes.
21    Q.  They discuss it in Chat messages as well,
22  right?
23    A.  Yes.
24    Q.  When reviewing a Meta study, did you also
25  search for other documents related to that study

67 (Pages 262 - 265)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 266

1  such as the e-mails and Chat threads discussing it?
2      A.  I don't recall -- or not -- I don't recall
3  for each of the ones that I reviewed.
4      Q.  Okay.  So it wasn't part of your search
5  practice to look for those related e-mails and Chat
6  threads; is that fair to say?
7      A.  Yes.
8      Q.  Okay.  Do you understand that the outcome
9  of the Meta internal research that you reviewed
10 would sometimes be a proposal for a product change?
11     MR. KIEFFER:  Object to the extent that
12 it's vague, ambiguous, and an incomplete
13 hypothetical.
14     THE WITNESS:  I'm sorry, I'm just reading
15 back your question.
16     What do you mean by "a proposal for a
17 product change"?
18 BY MR. CHAPUT:
19     Q.  I can revise.
20     Do you understand that Meta's internal
21 researchers, as part of their research, would
22 sometimes propose product changes?
23     A.  As a function of the research that they
24 did and what they found?
25     Q.  Yeah.

Page 267

1      A.  Sometimes, yes.
2      Q.  Okay.  When you read through a research
3  document and there was a product change proposal
4  reflected in that research document, what searches
5  did you do to confirm whether or not that change or
6  something like it was implemented?
7      MR. KIEFFER:  Object to the extent it
8  assumes facts not in evidence and is an incomplete
9  hypothetical.
10     THE WITNESS:  I don't -- I don't know.  At
11 times, I would then actually go outside of the
12 documents to just do searches on the internet about
13 whether those changes that they were discussing came
14 to be.
15 BY MR. CHAPUT:
16     Q.  Did you ask plaintiffs' counsel if there
17 were documents related to those product change
18 proposals that they were aware of so that you could
19 understand how the product had been changed in
20 response to research?
21     MR. KIEFFER:  Object to the extent it
22 assumes facts not in evidence about supposed product
23 change proposals.
24     THE WITNESS:  I don't recall if I asked
25 that specific question.

Page 268

1  BY MR. CHAPUT:
2      Q.  Was it part of your general practice in
3  reviewing studies in preparation for your report to
4  look for evidence of product changes that were made
5  in response to the research?
6      MR. KIEFFER:  Object to the extent it
7  assumes facts not in evidence that there were
8  product changes made in response to research.
9      THE WITNESS:  Like I said, I would try
10 to -- when it was specifically calling for a change,
11 I would then try to see whether that change occurred
12 and the lag period between when the document I was
13 reading was published or written and when that
14 change may have occurred.
15 BY MR. CHAPUT:
16     Q.  And you did that exclusively by searching
17 publicly, not by searching Meta's production of
18 documents in this case; is that right?
19     MR. KIEFFER:  Object to the extent that
20 misstates his testimony.
21     THE WITNESS:  Searching publicly is one
22 thing that I distinctly recall.  Searching
23 internally, I'm not -- I don't recall.  Searching --
24 sorry.  Searching specifically for that, I don't
25 recall.  There were instances where I did find

Page 269

1  whether or not that change had been made.
2  BY MR. CHAPUT:
3      Q.  So you were able to, from your public
4  searching, determine definitively that changes had
5  not been made that had been proposed in the research
6  you reviewed?
7      MR. KIEFFER:  Object.  It misstates his
8  testimony.
9      THE WITNESS:  I don't -- I don't recall
10 if -- for -- what was the word that you used?
11 "Definitively"?
12 BY MR. CHAPUT:
13     Q.  You don't recall one way or the other?
14     A.  Sorry, can you repeat the question?  What
15 don't I recall?
16     Q.  You don't recall from your public
17 searching whether you were able to determine that
18 changes had, in fact, been made in response to the
19 proposals?
20     A.  For every single one?  No.
21     Q.  You understand that the authors of many of
22 the studies discussed in your report were deposed in
23 these cases?
24     A.  That is my understanding.
25     Q.  Okay.  Did you review those authors'

68 (Pages 266 - 269)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 270

1 testimony?
2    A.  In the depositions?
3    Q.  Yes.
4    A.  Some, yes.
5    Q.  After reviewing a study, was it your
6 practice to look at any deposition testimony
7 specifically related to that study?
8    A.  Well, it was unclear to me whether -- to
9 my knowledge, there's no way of knowing whether that
10 study would then be discussed in the deposition.
11    Q.  How is there no way of knowing whether the
12 study is --
13    A.  As I --
14       THE REPORTER:  Wait.  Wait.
15 BY MR. CHAPUT:
16    Q.  Can you please let me finish my question
17 before you start to answer, sir.
18       How is there no way of knowing whether a
19 study was discussed in a deposition when you had
20 access to that deposition transcript and the
21 exhibits to the deposition?
22    A.  I did keyword searches in the depositions.
23 I might have put the title of the study in.  But I
24 don't know if they would discuss it in that exact
25 same way.  I tried to go through the depositions and

Page 271

1 see if it was there.  But I'm not sure.
2    Q.  Did you do that for each and every study
3 that was discussed in your report?
4    A.  Probably not, no.
5    Q.  Were there any documents that you reviewed
6 in the course of your research that were not listed
7 on your materials considered list?
8    A.  I don't believe so.
9    Q.  Okay.  But there were documents that you
10 reviewed and did not cite in your report, correct?
11    A.  Yes.
12    Q.  And you purposely decided not to cite
13 those documents in your report?
14       MR. KIEFFER:  Object to the extent that
15 misstates his testimony.
16       THE WITNESS:  Purposefully, perhaps.
17 BY MR. CHAPUT:
18    Q.  Are there documents that you didn't cite
19 in your report but intended to?
20    A.  No.  No.
21    Q.  Okay.  Earlier today in your testimony,
22 you referred to peer-reviewed research.
23       Do you recall that?
24    A.  Yes.
25    Q.  What does peer-reviewed research mean?

Page 272

1    A.  In the academy it means that you would
2 submit an article to a journal, it would be reviewed
3 by two experts, at least two experts that are in the
4 content area, in the design area, what have you,
5 they are blind to the authors of the study.  They
6 provide their assessment of the manuscript.
7       It goes to the editor, the editor makes a
8 decision about whether the article will be revised
9 or rejected.  If it's revised the authors have the
10 opportunity to make those revisions and then it goes
11 back out for review, and so on, until an ultimate
12 decision is made.
13    Q.  An ultimate decision of whether or not the
14 research should be published, correct?
15    A.  Would be published in that -- in that
16 journal, in that one singular journal.
17    Q.  Thank you.
18       Are there benefits to the peer review
19 process?
20    A.  Yes.
21    Q.  What are the benefits of peer review?
22    A.  The benefits of peer review are generally
23 in strengthening the article, although I would argue
24 that that's not always the case.  You get two
25 separate -- two separate sets of eyes, at a minimum,

Page 273

1 on it, as well as the editor, the editor's eyes.
2 It's all in view of strengthening the article and
3 making sure that the conclusions are valid.
4    Q.  In your own publications -- let me
5 rephrase.
6       In your own academic publications you cite
7 research that is peer-reviewed, correct?
8    A.  Not exclusively, but yes.
9    Q.  Would you say predominantly you cite
10 peer-reviewed research in your academic
11 publications?
12    A.  Sure.
13    Q.  Okay.  And your own academic research,
14 before being published, is subject to peer review,
15 correct?
16    A.  Correct.
17    Q.  Okay.  Can you tell me the name of any
18 academic publication you made in which you cited
19 research none of which was peer-reviewed?
20    A.  None of which in a published journal
21 article?  No, they're -- that's not the case.
22    Q.  Can you identify for me any publication
23 you've made where you cited research that
24 predominantly had not gone through peer review?
25    A.  No.

69 (Pages 270 - 273)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 274

1    Q.  Okay.  But in your report in this matter,
2 you cite dozens of documents from the defendant that
3 are research that was not published, correct?
4    A.  I suppose it -- I don't know what you mean
5 by "published" in this sense.  It wasn't published
6 in a journal, I don't believe.
7    Q.  And it didn't go through a journal's peer
8 review process therefore, correct?
9    A.  Through a journal's peer review process,
10 no, if it wasn't published in the journal.
11    Q.  Do you know if it went through any peer
12 review process?
13    A.  Not explicitly.  I would assume that it
14 was not solely conducted by just one person.
15    Q.  But you don't know what review process was
16 performed at Meta, for example, for purely internal
17 research?
18    A.  I'm not aware of what their process is but
19 it does seem like there are at least, you know,
20 different stages of people that are agreeing to
21 whether the research should be done in the first
22 place that have a hand in talking about the design.
23 That is, to me, some form of review.
24    Q.  When you say it seems like those things
25 happen, what are you basing that testimony on?

Page 275

1    A.  On some of the internal documents I read,
2 some of the depositions, where they talk about the
3 process of conducting research at Meta.
4    Q.  Was your own expert report in this matter
5 subject to any form of peer review?
6    A.  It was not.
7    Q.  In order to demonstrate causality, do you
8 agree that a study needs to be designed specifically
9 to answer that question?
10    A.  To answer what question?
11    Q.  The question of causality?
12    A.  I agree.  And there are multiple ways of
13 designing a study to do that.
14    Q.  Do you understand that Meta researchers
15 typically conduct something called user experience
16 research?
17    A.  I do.
18    Q.  What is user experience research?
19    A.  To me, user experience research is
20 understanding -- well, it's kind of in the name.
21 It's understanding how users of the product,
22 whatever that product may be, use it.  There's
23 often, to my knowledge, A/B testing where you -- you
24 know, it's essentially an experiment where you are
25 testing different forms of the product, seeing how

Page 276

1 people use it, seeing how people respond to it.
2    Q.  Did all of the user experience research
3 that Meta produced that you cite in your report
4 involve A/B testing?
5    A.  I don't believe so.  I believe that -- I
6 believe I read some of those things.  There were
7 some large-scale surveys, and I could be wrong if it
8 was Meta-specific and if so, I apologize.  As well
9 as focus groups and other sorts of communication
10 with adolescents and users, you know, kind of
11 one-on-one or in small groups.
12    Q.  I think there was some discussion earlier
13 today about cross-sectional research; is that right?
14    A.  I recall that, yes.
15    Q.  Okay.  And cross-sectional refers to
16 research that occurs at a specific point in time,
17 correct?
18    A.  Correct.
19    Q.  Okay.  As opposed to research that follows
20 participants over a longer period of time, correct?
21    A.  Correct.
22    Q.  And so cross-sectional research therefore
23 provides data at that given time when it's
24 conducted, right?
25    A.  When the data is collected, yes.

Page 277

1    Q.  Okay.  One way of conducting a study is to
2 ask participants to do something and then report how
3 doing that thing made them feel; is that true?
4    A.  Could you give a more specific example,
5 please?
6    Q.  So I'm just trying to understand at the
7 level of designing a study one way you can do that
8 is by asking the participant to take some action and
9 then report how taking that action made them feel;
10 is that true?
11    A.  That is one thing you could do.  I'm not
12 sure of a study that does that.  But I don't know.
13    Q.  Okay.  Could that kind of study be
14 valuable in any way?
15        MR. KIEFFER:  Object to the extent it is
16 vague and ambiguous as to what "that kind of study"
17 refers to.
18        THE WITNESS:  I honestly think all studies
19 in a particular area are valuable.  They're all
20 parts of -- they're all puzzle pieces that together
21 can speak to a larger picture.
22 BY MR. CHAPUT:
23    Q.  When a study asks participants about how
24 they feel about something, there's some limitations
25 to that approach, though, right?

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 278

1    A.  I'm not -- I'm not sure.  It depends on
2  how long after you are asking them to recall that.
3  I mean, there's a lot of variables that would
4  influence my answer.
5    Q.  Sure.
6        And some of those variables could mean
7  that there are limitations to the approach that was
8  taken, right?
9        MR. KIEFFER:  Object to the form.  It's
10  vague.  Ambiguous.  And incomplete hypothetical.
11        THE WITNESS:  Possibly.  If you can give
12  me a more specific example, I could speak to that.
13  BY MR. CHAPUT:
14    Q.  Sure.
15        For example, the phrasing of a question
16  could prime the -- the respondent to give a certain
17  response simply because of the way the question is
18  phrased, correct?
19    A.  That is a possibility, which is why we
20  tend to use validated measures and multiple items
21  within those measures to account for that.
22    Q.  And in order to understand whether there's
23  a risk of that priming you have to look at the
24  actual questions that the participants answered,
25  right?

Page 279

1        MR. KIEFFER:  Object to the extent that it
2  is vague, ambiguous, and an incomplete hypothetical.
3        THE WITNESS:  Look at the specific wording
4  of those?
5  BY MR. CHAPUT:
6    Q.  Correct.
7    A.  That would be one thing, yes.
8    Q.  Can you think of another way to understand
9  if there was a risk of that sort of priming other
10  than using a validated set of questions or reading
11  the text of the questions?
12    A.  Other ways that we often do it in the
13  scholarly literature would be to randomize the order
14  that questions are asked.  That's pretty common.
15  Particularly with online surveys and things of that
16  nature.
17    Q.  Will randomizing a survey eliminate all
18  risk that the wording of a question is priming a
19  respondent to give a particular answer?
20        MR. KIEFFER:  Object as to it's an
21  incomplete hypothetical.
22        THE WITNESS:  I think the bigger question
23  is whether there would be something systematic where
24  it is priming only certain people based on some
25  variable.  That -- I think that's why you draw a

Page 280

1  large samples.  That's why you ask multiple
2  questions.  That's why you ask in multiple different
3  ways.  That's why you randomize to account for
4  that -- to overcome any potential for systematic
5  bias.
6  BY MR. CHAPUT:
7    Q.  One of the study designs you mentioned
8  having seen in Meta's work was focus groups, right?
9    A.  Uh-huh.
10    Q.  Just remind you to make sure you give
11  verbal answers, please.
12    A.  Yes.
13    Q.  Thank you.
14        In a focus group, the participants are
15  hearing the responses of other participants,
16  correct?
17    A.  That is correct.  Well, yes, I believe
18  that is the case.
19    Q.  Okay.  When a participant hears what
20  someone else says, that could impact their own
21  responses or feelings about that same subject
22  matter, correct?
23    A.  That's a possibility.  That's why you tend
24  do more than one focus group.
25    Q.  Now, you're not a medical professional and

Page 281

1  so you're not able to say if study participants are
2  capable of making a clinical self-diagnosis, right?
3        MR. KIEFFER:  Object to the form.  It's
4  vague and ambiguous.
5        THE WITNESS:  We -- in research,
6  participants often complete clinical screeners of
7  depression, anxiety, and other things.  Whether -- I
8  mean, they're not going to self-diagnose themselves,
9  no.
10        MR. CHAPUT:  Let's take a look at one of
11  the documents you cite.
12        This is going to be Meta Tab 1.  We're
13  marking this as Exhibit 17.
14        (Whereupon, Cingel Exhibit 17 was marked
15  for identification.)
16        (Whereupon, a brief discussion off the
17  record.)
18  BY MR. CHAPUT:
19    Q.  Dr. Cingel, do you recognize what we've
20  marked as Exhibit 17 as one of the studies that you
21  cite in your report?
22    A.  Yes.
23    Q.  Okay.  And this has the title "Hard Life
24  Moments - Mental Health Deep Dive."  Is that right?
25    A.  That is correct.

71 (Pages 278 - 281)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 282

1   Q.  Okay.  How long did you spend reading the
2 Hard Life Moments study before citing it in your
3 report?
4   A.  I do not know.
5   Q.  Okay.  If you would turn with me to the
6 Bates ending 5011 in the bottom right corner.
7     Are you there?
8   A.  Yeah.
9   Q.  You see this has the heading "What We
10 Did"?
11   A.  Yes.
12   Q.  This slide is describing at a high level
13 how the Hard Life Moments study was conducted,
14 right?
15   A.  It appears that way.
16   Q.  More than 22,000 users were surveyed?
17   A.  Correct.
18   Q.  Under General Reach Questions, it says,
19 "In the last 30 days have you experienced" -- and
20 then there's a parenthetical -- "6 randomly selected
21 experiences out of 23."
22     Do you see that?
23   A.  I do.
24   Q.  So do you understand that this survey
25 started by asking users whether in the last 30 days

Page 283

1 they had experienced a difficult life moment?
2   A.  Hold on one moment, please.
3     Are they -- are they out of these 23 that
4 are listed on the Bates number ending 012?
5   Q.  Yes.  So the next page lists the 23 issues
6 ranging from mental health to interpersonal issues
7 and life events.
8   A.  Yes.
9   Q.  Do you see that?
10   A.  Yes.  And they randomly picked six for
11 each, presumably, of the 22,000-plus.
12   Q.  So the initial screening question was
13 whether a user had a -- one of these 23 hard life
14 moments.
15     Do you understand that?
16   A.  I don't know if I'd say that's the
17 screening. It's asking just if you had one of those
18 six randomly selected ones.
19   Q.  So is it your understanding that if a
20 survey respondent in the Hard Life Moments survey
21 said, no, I haven't experienced any of these things
22 in the last 30 days, they would still go into the
23 next phase that's described here of the deep dive
24 with one experience?
25   A.  I don't know.  To me, it would -- based on

Page 284

1 this document, it wouldn't make sense to because
2 it's asking how bad this experience make you feel,
3 what impact did it have on this experience.  If they
4 didn't have an experience, then it can't make them
5 feel anything or has nothing to do with Instagram.
6   Q.  Right.  So the General Reach question was
7 a screener and if someone had had no bad experiences
8 in the last 30 days, they would not move forward in
9 this survey, correct?
10   A.  I understand -- that -- that seems to be
11 the case, yes, I understand.
12   Q.  Thank you.
13     If you turn forward to the page ending
14 020.
15   A.  I'm there.
16   Q.  You see there is a heading "Instagram Is
17 More Likely To Make Things Better Than Worse."
18   A.  Uh-huh.
19   Q.  Do you agree with me that "make things
20 better" is causal language?
21   A.  I don't know.  In all honesty, it's not
22 language that we would use in scholarly literature.
23 But I don't know if they meant it to be causal or
24 not.
25   Q.  Okay.  Do you, sitting here today, read it

Page 285

1 and understand "make things better" to be causal?
2   A.  That's the way that they describe it.  I'm
3 now looking at "no impact."  Impact to me is
4 implying that something is causing that.
5   Q.  So if you look at the bottom of the page
6 here in small text, do you see the question, "What
7 impact did using Instagram have on this experience?"
8     Do you see that?
9   A.  Uh-huh, uh-huh.
10   Q.  Just remind you to --
11   A.  Yes.
12   Q.  -- give me verbal answers.
13   A.  Sorry.  Sorry.
14   Q.  Thank you.
15   A.  I was doing well.  Now I'm...
16   Q.  So, Dr. Cingel, do you think asking a user
17 the question "What impact did using Instagram have
18 on this experience," can answer the question of
19 whether Instagram has caused that user's experience
20 to be better or worse?
21   A.  It certainly gets at the individual user's
22 perception of whether it caused something.
23   Q.  Is the perception of causation the same
24 thing as causation?
25   A.  I think it -- well, in terms of to the

Golkow Technologies,
A Veritext Division

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 286

1 participant themselves or in terms of statistical
2 causation?
3    Q.   In terms of statistical causation, is the
4 perception of causation by a participant the same
5 thing as actual statistical causation?
6    A.   No.
7    Q.   Okay.  And so you agree with me that the
8 data that's reported on page 020 does not establish
9 that Instagram is generally more likely to make
10 things better than worse for users, right?
11        MR. KIEFFER:  Object to the form.
12 Misstates the document.
13        THE WITNESS:  What it establishes to me is
14 that you have three -- in many cases, three fairly
15 equal groups of people.  One of whom thinks,
16 perceives that Instagram makes various things
17 better.  Another fairly equal group that thinks that
18 it makes it worse.  And one that says it has no
19 impact.
20 BY MR. CHAPUT:
21    Q.   Okay.  So let's look at sadness, for an
22 example.  It's four up from the bottom.
23        Do you see that?
24    A.   Yes.
25    Q.   For sadness, 10.8 percent of users

Page 287

1 perceived that Instagram made their sadness worse?
2    A.   That's what that implies, yes.
3    Q.   40.3 percent indicated that Instagram made
4 their sadness -- had no impact on their sadness?
5    A.   40.3, yes.
6    Q.   And then 48.9 percent indicated that using
7 Instagram made their sadness better, right?
8    A.   It's very hard to see.  But I think so.
9    Q.   Okay.  Do you agree with me that that data
10 establishes that Instagram is more likely to make
11 people happy than sad?
12        MR. KIEFFER:  Objection.  Misstates the
13 document.
14        THE WITNESS:  You know what, what I would
15 focus on here, and what I talk about in my report,
16 is that we're still talking about almost 11 percent
17 of people of users out of 22,000 here who are saying
18 that it makes it worse.
19 BY MR. CHAPUT:
20    Q.   Well, but it wasn't 22,000, right, it was
21 whatever slice of the 22,000 reported that they had
22 had a bad life experience over the last 30 days,
23 correct?
24    A.   That is correct.
25    Q.   And then within those respondents who had

Page 288

1 had a bad life experience, it was those who were
2 randomly selected to do a deep dive on sadness,
3 correct?
4    A.   That is correct.
5    Q.   And you don't know how many people that
6 actually was?
7    A.   It does not -- I don't see that data in
8 this -- in this report here.
9    Q.   So it could have been 30 respondents?
10    A.   I don't know.  Yes.
11    Q.   And if we turn to the next page, it has
12 the heading "But, We Make Body Image Issues Worse
13 For 1 In 3 Teen Girls."
14        Do you see that?
15    A.   I do.
16    Q.   Everything we were just talking about on
17 the last page is true of this page as well, right?
18    A.   I would think so, yes.
19    Q.   Okay.  Do you recall saying in your report
20 that internal Meta presentations describe how push
21 notifications impact feelings of control and lead
22 people to use Facebook more often than they want?
23    A.   I remember seeing documents that would
24 support that statement, yes.  If you can point me to
25 it, I can look exactly.

Page 289

1    Q.   Happy to point you to the document.
2        This will be Exhibit 18.
3        (Whereupon, Cingel Exhibit 18 was marked
4 for identification.)
5        (Whereupon, a brief discussion off the
6 record.)
7 BY MR. CHAPUT:
8    Q.   Do you recognize this study with the title
9 "Time & Control" as a document you reviewed in
10 preparing your report?
11    A.   I believe so.
12    Q.   Okay.  And if we turn forward to the first
13 substantive page.
14        Are you there?
15    A.   I don't know what you mean by
16 "substantive," sorry.
17    Q.   It is the first page after the cover.
18    A.   Got it.
19    Q.   Ending 346.
20    A.   I see that.
21    Q.   The top line says, "We've been working on
22 a multipart research project to understand
23 perceptions of time well spent on Facebook, real
24 life consequences that arise from using Facebook,
25 and the role notifications plays."

73 (Pages 286 - 289)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 290

1    Is that right?
2    A.  I see that.
3    Q.  And the first step there is, "Interviews
4 on perceptions of time spent and control."  Correct?
5    A.  That is number one.
6    Q.  Okay.  So this study was based on users --
7 interviews with users of those users' perceptions on
8 time spent and control, correct?
9    A.  I'd have to look because it does say it's
10 part of a multipart research project.  So I am
11 assuming that the subsequent findings in this
12 paper -- or, sorry, in this document are based on
13 interviews with individuals on perceptions of time.
14    Q.  Okay.  Let's take a look at Exhibit 2,
15 which is your JCCP report.  I'd like you to go to
16 page 34, paragraph 70, please.
17    A.  I am there.
18    Q.  Okay.  The first sentence there reads,
19 "Internal Meta presentations describe how push
20 notifications," quote, "impact feelings of control
21 and lead [people] to use FB [Facebook] more often
22 than they want."
23    Did I read that correctly?
24    A.  That is correct.
25    Q.  All right.  And you cite there to

Page 291

1 page 71360 which is in this document that we've
2 marked as Exhibit 18.  If you turn forward to that
3 page.
4    A.  Uh-huh.
5    Q.  Do you have it?
6    A.  I am there.
7    Q.  Okay.  And what the page actually reads
8 is, "Notifications can also impact feelings of
9 control."  Correct?
10    A.  Yes.
11    Q.  Okay.  You left out the word "can"?
12    A.  Yes.
13    Q.  Okay.  You just said "notifications impact
14 feelings of control."  Correct?
15    A.  Yes, because for 31 percent of the people
16 in this sample, they reported that when they opened
17 Facebook due to a push notification, they lose track
18 of time.  So to me, that is indicative of it
19 impacting feelings of control.
20    Q.  For 31 percent of the users in this
21 interview-based study, right?
22    A.  Correct.
23    Q.  Okay.  And you don't mention in your
24 report that 37 percent of people said they don't
25 feel this way, right?

Page 292

1    A.  I do not mention that, no.
2    Q.  Okay.  And in the next line it says,
3 "29 percent reported that notifications lead them to
4 use Facebook more often than they want, 39 percent
5 don't feel this way."  Right?
6    A.  That's what that says, yes.
7    Q.  And you don't mention anywhere in your
8 report that 39 percent of people did not feel that
9 notifications led them to use Facebook more often
10 than they want, correct?
11    A.  Not for this particular document.  But for
12 other things that I cite, these numbers are fairly
13 consistent with scholarly research that shows about
14 that number demonstrate negative effects of social
15 media use on aspects of mental health.
16    Q.  And, Dr. Cingel, what I'm interested in is
17 the fact that there are positive effects reported
18 here which are not mentioned in your report; isn't
19 that true?
20    A.  I don't know if I would classify "don't
21 feel this way" as a positive effect.
22    Q.  Okay.  There are neutral effects described
23 in this document that you do not mention in your
24 report, correct?
25    MR. KIEFFER:  Objection.  Mischaracterizes

Page 293

1 the document.
2    THE WITNESS:  That is correct.
3 BY MR. CHAPUT:
4    Q.  Instead, your summation of this research
5 is that notifications impact feelings of control,
6 correct?
7    A.  For a significant number of users.
8    Q.  Where in your report does it say "for a
9 significant number of users"?
10    A.  I think throughout the report I talk about
11 how the research, you know, the totality of the
12 research shows that there are significant numbers of
13 people that demonstrate negative outcomes from
14 social media use.
15    Q.  I'm looking at paragraph 70.  There is no
16 qualification on how you wrote that, is there?  It
17 says, "Notifications 'impact feelings of control'"?
18 Correct?
19    A.  In that one singular paragraph, correct.
20    Q.  Okay.  If we turn back -- or, excuse me,
21 forward a few pages to the page ending 365.
22    A.  365, okay.
23    Q.  Here the question is, "Overall, how much
24 of your time spent on Facebook would you consider to
25 be 'time well spent'"?

74 (Pages 290 - 293)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 294

1    A.  Uh-huh.
2    Q.  Yes?
3    A.  Yes.
4    Q.  And 58 percent of respondents indicated
5  that they felt it was the right amount of time,
6  correct?
7    A.  Correct.
8    Q.  And you don't mention that in your report,
9  correct?
10    A.  I don't.  I don't think so, no.
11    Q.  Okay.  And what is the relationship
12  between, quote, time well spent and your conception
13  of problematic use as discussed in your report?
14    A.  What is the --
15    Q.  Relationship between time well spent and
16  problematic use as defined in your report?
17    A.  I don't know.  I don't know of research
18  that has considered that.  I imagine that there are
19  adolescents that might write or might report that
20  they spend the right amount of time, but that it
21  would still be classified as problematic use and be
22  picked up that way in a particular measure of
23  problematic use.
24    Q.  When you say there -- imagine there
25  might -- "there are adolescents," you don't have any

Page 295

1  basis for that statement, correct?
2    A.  Well, I think, as I have mentioned
3  throughout, when you -- when I talk to adolescents,
4  we talked to adolescents before every study that we
5  do in order to make sure we're designing studies
6  appropriately for adolescents.
7      I would -- I have had adolescents tell me
8  that, I don't think that there is a problem, and
9  then I say, well, when are you -- you know, when are
10  you using, and they say, oh, you know, sometimes I
11  stay up until 2:00 a.m., and that -- I don't call it
12  that way in front of them, but in a measure, that
13  would -- that would be picked up as problematic use.
14    Q.  Okay.  So sometimes staying up until
15  2:00 a.m. would be picked up as problematic use in
16  your measurements of problematic use?
17    A.  In many measurements of problematic use,
18  yes.
19    Q.  Are like -- excuse me.
20      Is a like a piece of content?
21    A.  I don't think so.  I don't know of anyone
22  that would conceptualize it that way.
23    Q.  Okay.  You don't think likes are
24  communicating any information from one user to
25  another?

Page 296

1    A.  It is a feature of many social media
2  platforms that communicate something.
3    Q.  Is a comment content?
4    A.  I would argue that the comment
5  functionality is a feature.  The exact text I could
6  see as content.
7    Q.  Do you recall discussing in your report
8  the possibility of removing like counts and the
9  potential impact of that on social comparison?
10    A.  I do recall that, yes.
11    Q.  Okay.  Do you want to turn to page 40,
12  looking at paragraph 84.
13    A.  Uh-huh.
14    Q.  Towards the end you have -- you reference
15  Jennifer Guadagno.
16      Do you see that?
17    A.  Yes.
18    Q.  And the quote there that you have from
19  Ms. Guadagno is "removing like counts is one of, if
20  [not] the, most significant levers FB has to reduce
21  social comparison.  From a well-being perspective, a
22  ship decision for both IG and FB is recommended."
23  Correct?
24    A.  Correct.
25    Q.  And you say, "Meta ultimately decided not

Page 297

1  to do so"?
2    A.  I believe that that is the case.
3    Q.  Are you aware that users on Instagram can
4  turn off like counts?
5    A.  I am aware that they -- can they still do
6  that?  I know there was a period of time where they
7  could.  I don't remember exactly the toggle back and
8  forth.  And I don't believe that it is the default.
9    Q.  So when you said "Meta decided not to do
10  so," you were ignoring the fact that Meta had
11  launched the ability for users to turn like counts
12  off?
13      MR. KIEFFER:  Object to the form.  It's
14  argumentative.  And it misstates the testimony.
15      THE WITNESS:  I don't think I was ignoring
16  the fact.  I think -- I would actually be curious to
17  see what percentage of people do turn it off given
18  that it's not the default.
19  BY MR. CHAPUT:
20    Q.  So I'm trying to understand what you meant
21  when you said, "Meta ultimately decided not to do
22  so."  Because I think you just acknowledged that
23  users have control over the like count feature.
24      MR. KIEFFER:  Object to the form.  It
25  misstates his testimony.

75 (Pages 294 - 297)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 298

1    THE WITNESS:  The way I read this is, when
2 they say "removing like counts is one of the most
3 significant levers," I take that to mean removing
4 them.  Like, actually -- you wouldn't see them, they
5 don't exist anymore, right.
6    What you just said is that they exist.  I
7 would imagine that they exist for the majority of
8 users.  They're -- they may be able to turn them
9 off.
10 BY MR. CHAPUT:
11    Q.  You don't have any data on how many users
12 have turned them off, correct?
13    A.  I suspect that Meta has that data.  And
14 I'd love to see it.  I do not have it myself.
15    Q.  So if I can just get a direct answer to my
16 question.
17    You do not have data on how many users
18 have turned like counts off, correct?
19    A.  In speaking with hundreds of adolescents
20 over the years, I do not know of one who has said
21 that they have turned it off.  Beyond that, no.
22    Q.  And when you say -- when you wrote in your
23 report "Meta ultimately decided not to do so," that
24 was based on your interpretation of what
25 Ms. Guadagno meant when she wrote this -- wrote

Page 299

1 these sentences, correct?
2    MR. KIEFFER:  Object to the form.
3 Mischaracterizes his testimony.
4    THE WITNESS:  I'm not sure I would
5 classify it as an interpretation.  To me, removing
6 like counts implies that they are not there.
7 BY MR. CHAPUT:
8    Q.  Okay.  Are you aware that the projects to
9 access whether to hide like counts was referred to
10 as Project Daisy at Meta?
11    A.  I believes that's the case.
12    MR. CHAPUT:  Okay.  We'll mark this as
13 Exhibit 19.
14    (Whereupon, Cingel Exhibit 19 was marked
15 for identification.)
16 BY MR. CHAPUT:
17    Q.  This is a document with the title "Daisy
18 Global Network Test Survey Report."
19    Do you see that?
20    A.  I do.
21    Q.  Now, you do not cite this document in your
22 report.  But it is listed on your materials
23 considered list.  If you want to confirm that, I'm
24 happy to point you to the page.
25    A.  I will trust you on that.

Page 300

1    Q.  Okay.  If you look at the -- there are two
2 levels of bullets here.  And on the outermost level,
3 the final bullet, "Finally, there is no clear
4 evidence."
5    Do you see that?
6    A.  I do.
7    Q.  That bullet reads, "Finally, there is no
8 clear evidence that reducing the amount of social
9 comparison via likes has had any impact on feeling
10 good, feeling free to express yourself, sense of
11 belonging, meaningful interactions, or meaningful
12 time spent."
13    Do you see that?
14    A.  I do.
15    Q.  And so that is a statement that's in a
16 Meta document that you considered in the course of
17 forming your opinions, correct?
18    A.  It is.
19    Q.  And you disregarded that evidence and
20 instead cited Ms. Guadagno's statement about her
21 impression of the importance of removing like
22 counts, correct?
23    MR. KIEFFER:  Object to the form.  It's
24 argumentative.  And it misstates his testimony.
25    THE WITNESS:  I would say the next

Page 301

1 sub-indentation does say, "We should be careful not
2 to interpret the absence of evidence as evidence of
3 absence."
4    To me, you know, they're -- like some of
5 the other documents that we've looked at today, they
6 are kind of hedging, you know, on what it actually
7 means.  I don't recall if that's the reason I did
8 not include this.  But I would just note that that's
9 right there.
10 BY MR. CHAPUT:
11    Q.  Okay.  So your testimony is you may have
12 excluded this because there was some hedging
13 language about the neutrality of the finding in this
14 study?
15    MR. KIEFFER:  Object to the form.
16 Misstates testimony and specifically as to
17 exclusion.
18    THE WITNESS:  I'm also -- I'm not sure.
19 This was months ago and I can't recall my thinking
20 at that time.
21 BY MR. CHAPUT:
22    Q.  Okay.  Let's turn to page 65 of your
23 report, if you would.  I'm focusing on page --
24 excuse me, paragraph 147, which starts on 64 and
25 carries over onto 65.

76 (Pages 298 - 301)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 302

1      Do you see that?
2      A.  Correct.
3      Q.  I'm looking at the final sentence of this
4  paragraph.  "Across many indicators."
5      Do you see that?
6      A.  Hold on, please.  The final sentence of?
7      Q.  147.
8      A.  147.  But that is at the top of 65?
9      Q.  Yes.
10     A.  Yes, I see this.
11     Q.  And it reads, "Across many indicators of
12  mental health, including depression, suicidal
13  ideation, anxiety, self-esteem, and body image, a
14  multitude of between-subjects, cross-sectional
15  studies find social media consistently relates to
16  worse mental health among adolescent users, and once
17  more, this is further consistent with what social
18  media companies were finding in their own internal
19  studies and analyses, which, I note, were not
20  communicated to the public."  Correct?
21     A.  That is what that says, yes.
22     Q.  What -- how did you confirm that the
23  studies you reviewed were not communicated to the
24  public?
25     A.  That's based on -- to my -- to my

Page 303

1  recollection, it wasn't until the Frances Haugen
2  documents came out that the public learned about the
3  concerns that were being discussed internally of the
4  defendant companies.
5      Q.  And what is that recollection based on?
6      A.  Based on me reading the news and being
7  very involved in keeping up with these kinds of
8  topics in the popular press.
9      Q.  During the course of reviewing the
10  internal Meta studies that you got access to in the
11  course of this litigation, did you look to see
12  whether any of those studies had ever been published
13  externally?
14     A.  Not published in what way?  In a journal?
15  Published in --
16     Q.  In a journal.
17     A.  I know that there are some.  I'm not sure
18  if it's the same ones.  I do know that there are
19  some published in some of the more computer-based
20  proceedings that are based on internal Facebook
21  data.  Again, I don't know if they're the same ones.
22     Q.  Okay.  If we look at the footnote to this
23  statement about internal studies that were not
24  communicated to the public, the second document
25  there, the parenthetical refers to a 2018

Page 304

1  Problematic Use Survey.
2      Do you see that?
3      A.  I see that.
4      Q.  Has the Bates 039 and then a whole bunch
5  of zeros 58, right?
6      A.  Yes.
7      MR. CHAPUT:  All right.  Let's take a look
8  at Exhibit 20.
9      (Whereupon, Cingel Exhibit 20 was marked
10  for identification.)
11     MR. CHAPUT:  This is Tab 6, Meta Tab 6.
12     Q.  All right.  This is a note by Moira Burke
13  and Justin Cheng titled "Problematic Use:  When
14  people feel like Facebook negatively affects their
15  life."  Correct?
16     A.  Yes.
17     Q.  And if you look at the bottom right corner
18  you see that it has the same Bates number as appears
19  in your footnote 178?
20     A.  I do.
21     Q.  Okay.  So this is the study you were
22  referring to, though, right?
23     A.  In that -- of that big block, yes, that is
24  that one study.
25     Q.  Okay.  Are you aware that the final

Page 305

1  version of this study was published externally?
2      A.  Not --
3      MR. KIEFFER:  Object -- excuse me.
4      Object to the extent it assumes facts not
5  in evidence.
6      MR. CHAPUT:  I am happy to put it into
7  evidence, Counsel.
8      Here's Exhibit 21.
9      (Whereupon, Cingel Exhibit 21 was marked
10  for identification.)
11     MR. CHAPUT:  This is Tab 7.
12     Q.  Doctor, you have in front of you a
13  published article by Justin Cheng, Moira Burke, and
14  Elena Goetz Davis with the title "Understanding
15  Perceptions of Problematic Use When People
16  Experience Negative Life Impact and a Lack of
17  Control."
18     Do you see that?
19     A.  I do.
20     Q.  Do you see, if we look at the bottom left
21  column, there's a reference to CHI 2019, May 4th
22  through 9th, 2019.
23     Do you know what that is?
24     A.  Yeah, that's -- that's the type of
25  conference that I was referencing earlier.  I think

77 (Pages 302 - 305)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 306

1 it stands for computers and human interaction?
2    Q.   And is it your understanding that the
3 computer-human interaction conference is a public
4 conference?
5    A.   Public in that anyone can go to it?
6    Q.   Yes.
7    A.   I've never been myself, so I don't really
8 know.
9    Q.   Okay.  And certainly, this article that
10 was published in the proceedings of the CHI
11 conference is publicly available, correct?
12    A.   I would -- if it's published as
13 proceedings in CHI, it would be, yes.
14    Q.   Okay.  And do you agree with me that what
15 we've marked as Exhibit 21 is a published version of
16 the internal research that we marked as Exhibit 20?
17       MR. KIEFFER:  Object to the extent it
18 misstates the document.  Are you asking if it's the
19 same research or the same studies because there's
20 different authors and different titles?
21       THE WITNESS:  I -- it seems like it's
22 connected.  I don't know if it's -- I don't know if
23 the findings are the same.  I don't know if the way
24 it's written up is the same.
25 ///

Page 307

1 BY MR. CHAPUT:
2    Q.   Okay.  On -- in Exhibit 20, let's look at
3 the second page.  The heading "Method."
4    A.   Yes, I see it.
5    Q.   Reads, "We paired a survey of 20,000 US
6 Facebook users measuring perception of problematic
7 use with demographic and behavioral data for the
8 prior month.  In the survey, we asked questions
9 adapted from existing literature on Internet
10 addiction and problematic use cases."
11       Do you see that?
12    A.   I do.
13    Q.   Okay.  And on the first page of the same
14 document, in the second paragraph, reads -- first
15 page, second paragraph, sir.
16    A.   Thank you.
17    Q.   It reads, "In this study, we find that
18 3.1 percent of Facebook users in the US experience
19 serious problems with sleep, work performance, or
20 relationships that they attribute to Facebook and
21 find difficult to change.  We refer to this as
22 'problematic Facebook use.'"
23       Do you see that?
24    A.   I see that.
25    Q.   Now let's look at Exhibit 21, please.

Page 308

1    A.   Yes.
2    Q.   In the Introduction, third paragraph --
3 are you with me?
4    A.   Yes.
5    Q.   Reads, "We pair a survey of 20,000
6 Facebook users in the US measuring perceived
7 problematic Facebook use with server logs of
8 aggregated behavioral data for the previous four
9 weeks, such as the amount of time respondents spent
10 on the site and counts of interactions with close
11 friends."  Correct?
12    A.   I see that.
13    Q.   On the -- if you turn the page, the first
14 full paragraph.
15       "Under this broad definition of
16 problematic Facebook use - negative life impact and
17 difficulty with control - we estimate (as an upper
18 bound) that 3.1 percent of Facebook users in the US
19 experience problematic use."
20       Do you see that?
21    A.   I do.
22    Q.   Okay.  Having looked at the method and the
23 top-line conclusion, does it now appear to you that
24 the CHI paper is a published version of the internal
25 research that we have marked as Exhibit 20?

Page 309

1       MR. KIEFFER:  Object to the form of the
2 question.  Misstates the documents.
3       THE WITNESS:  It does appear that way.
4 BY MR. CHAPUT:
5    Q.   Okay.  So for this study that's cited in
6 your report it was, in fact, communicated to the
7 public in 2019, correct?
8       MR. KIEFFER:  Object to the form.  Assumes
9 facts not in evidence.
10       THE WITNESS:  Having presented at many,
11 many, many conferences, I don't think it's a fair
12 characterization to say that publishing it at CHI is
13 communicating it to the public.
14 BY MR. CHAPUT:
15    Q.   It was certainly available to you when you
16 were searching on Google Scholar for research
17 related to problematic use and social media,
18 correct?
19    A.   To my knowledge, the average person that
20 isn't an expert in adolescent social media use and
21 mental health, A, isn't using Google Scholar, and,
22 B, isn't searching for this type of thing.
23    Q.   And, sir, I'm not asking for what the
24 average user is doing.  I'm asking if this was
25 available to you as an expert in the space when you

78 (Pages 306 - 309)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 310

1 searched Google Scholar for research related to
2 problematic use and social media?
3    A.  It is.
4    Q.  Okay.  And it is not cited in your
5 materials considered list, correct?
6    A.  I don't know.  I take you at your word for
7 that.
8    Q.  Let's go to page 79 of your report,
9 please.  Excuse me.  This is 80.
10    A.  Page 80?
11    Q.  Yes.
12       And I'm looking at footnote 180, the
13 sentence that has that footnote on it.
14       Do you see that?
15    A.  I do.
16    Q.  It reads, "Internal documents show an
17 emphasis on increasing user engagement, although
18 overuse of social media is consistently cited by
19 adolescent users as a problem."  Correct?
20    A.  Correct.
21    Q.  And then there's a footnote and in the
22 quotation in the footnote, it reads, "Teens talk of
23 Instagram in terms of an 'addicts narrative'
24 spending too much time indulging in a compulsive
25 behavior that they know is negative but feel

Page 311

1 powerless to resist."  Correct?
2    A.  Correct.
3    Q.  Do you have any recollection of the design
4 of the study that you are citing in that footnote?
5    A.  Off the top of my head, no.
6    MR. CHAPUT:  Okay.  Tab 8.  Mark this as
7 Exhibit 22.
8       (Whereupon, Cingel Exhibit 22 was marked
9 for identification.)
10 BY MR. CHAPUT:
11    Q.  This is a presentation with the title
12 "Teen Mental Health."
13       Do you see that?
14    A.  I do.
15    Q.  Do you recognize this as the study that is
16 cited in footnote 180 of your report?
17    A.  I do recognize it now, yes.
18    Q.  Okay.  Let's turn to the Methodology page.
19 It's internal page 4, Bates 417.
20    A.  I'm there.
21    Q.  Okay.  You see Stage 1 is "Mini-groups -
22 Creative exercises"?
23    A.  Yes.
24    Q.  It says, "Using creative techniques to
25 build an environment where four strangers could

Page 312

1 share insights about their mental health."  Correct?
2    A.  Correct.
3    Q.  Now, if you look at the Sample on the next
4 page, it says, "5x groups in each territory, split
5 across gender, age, and theme."  Correct?
6    A.  Correct.
7    Q.  And if you look at the Themes, they're
8 listed down below.  "Body image, self-esteem, social
9 pressure to be perfect, weight issues.
10       "Negative mood, anxiety, feeling down or a
11 bit depressed.
12       "Loneliness, isolation, unpopularity."
13 Correct?
14    A.  Correct.
15    Q.  So this study was specifically designed to
16 focus on individuals who were experiencing those
17 types of mental health challenges, correct?
18    MR. KIEFFER:  Object to the extent it
19 mischaracterizes the document and the underlying
20 study.
21    THE WITNESS:  I'm not sure if that's the
22 case.  My understanding, I can look more, I would
23 read that as in these focus groups they are
24 discussing those things and presumably Instagram.
25 ///

Page 313

1 BY MR. CHAPUT:
2    Q.  But this study is based on users reporting
3 how they feel, correct?
4    A.  That seems to be the case.
5    Q.  Okay.  I would like to -- what is your
6 definition of a beauty filter?
7    A.  My definition of a beauty filter, I'm not
8 sure if I have this in the report or not, would be
9 any sort of filter that can be applied to an image
10 for the purposes of making it look better, making it
11 look more physically attractive, making it look more
12 beautiful.
13    Q.  Would that include, for example, a, like,
14 sepia tone filter like existed in early era
15 Instagram?
16    A.  I think it -- I think it could if it has
17 that -- if it has that effect of making the image
18 look nicer, more beautiful, more attractive.
19    Q.  Nicer or more beautiful to whom?
20    A.  To the person being exposed to it.
21    Q.  Okay.  So the intent in designing it is
22 irrelevant to whether it's a beauty filter as long
23 as the person who's consuming the filter perceives
24 it as making the image look better?
25    A.  You mean whether the engineer, whomever it

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 314

1 was, that designed it, if that wasn't their
2 intention? Is that what you're saying?
3     Q.   Correct.
4     A.   I think it depends more on how it's being
5 perceived by the user.
6     Q.   You also refer at times to cosmetic
7 surgery effects. What is your definition of a
8 cosmetic surgery effect?
9     A.   There are filters or there were filters
10 where you could -- I can immediately think of some
11 where you could -- where the filter would do
12 something to the image that typically in the real
13 world would need cosmetic surgery in order to do.
14     Q.   Okay. You refer -- this is pages 44 and
15 45 of your report, if you wanted to turn there.
16         You refer to "third-party augmented
17 reality effects known as 'Spark filters.'"  Correct?
18     A.   Correct.
19     Q.   Okay. And so those third-party augmented
20 reality effects, those filters were not created by
21 Meta, they were created by other users or
22 developers, correct?
23         MR. KIEFFER: Object to the form of the
24 question to the extent it misstates the evidence.
25         THE WITNESS: I believe that's the case.

Page 315

1 But it was allowed by Meta.
2 BY MR. CHAPUT:
3     Q.   Okay. And so would you define those
4 third-party augmented reality effects as content of
5 the user who created the effect?
6     A.   I'm sorry, what part is the content,
7 the --
8     Q.   The filter itself that is created by a
9 third-party user, would you define that as content?
10     A.   No, that is a feature.
11     Q.   But it's a feature that was created by a
12 third party and not by Meta, correct?
13         MR. KIEFFER: Object to the form.
14 Misstates the evidence.
15         THE WITNESS: In this particular case.
16 BY MR. CHAPUT:
17     Q.   Okay. And you acknowledge in your report
18 that Meta has since discontinued the Spark filters,
19 correct?
20     A.   I believe so, yes.
21     Q.   Okay. You also say that "the platforms do
22 not require users to identify when they have
23 utilized such filters." Correct?
24     A.   I believe so, yes.
25     Q.   Okay. It's paragraph 95.

Page 316

1     A.   Thank you.
2     Q.   If you want to confirm.
3     A.   Thank you.
4     Q.   What did you do to confirm that it's true
5 across all of the different surfaces of Instagram,
6 you know, Stories and feed and other types of
7 content?
8     A.   I don't know if I went through every
9 single surface or every single filter that exists.
10 But I believe that generally is the case.
11     Q.   Okay. For -- if a particular feature has
12 on an image a link to the filter and the name of the
13 filter as part of what is displayed to the user,
14 would you consider that the user identifying when
15 they had utilized a filter?
16     A.   It depends on -- well, that might be the
17 intent of the user. Then you would have to see if
18 it's perceived that way by the person seeing that
19 image.
20     Q.   What if it is uniformly displayed on every
21 image that is posted on that surface that has a
22 filter applied?
23         MR. KIEFFER: Object to the form. Assumes
24 facts not in evidence. It's an incomplete
25 hypothetical.

Page 317

1         THE WITNESS: I'm sorry, I don't actually
2 know what the question is.
3 BY MR. CHAPUT:
4     Q.   I can rephrase.
5     A.   Thank you.
6     Q.   So if there -- if there's a surface where
7 each time a user applies a filter within that
8 surface, part of what is displayed to the receiving
9 user is the name of the filter and a link to the
10 filter.
11         Would you consider that an identification
12 that a filter had been used?
13         MR. KIEFFER: Object to the form of the
14 question. It assumes facts not in evidence. And
15 it's an incomplete hypothetical.
16         THE WITNESS: I'm not sure. I think so.
17         MR. CHAPUT: Dr. Cingel, I appreciate your
18 time today. I don't have any further questions. I
19 may depending on if your counsel has questions.
20         THE WITNESS: All right. Thank you.
21         MR. KIEFFER: Should we break?
22         MR. CHAPUT: Go off the record.
23         THE VIDEOGRAPHER: The time is 5:10 p.m.
24 Pacific time. We're going off the record.
25         (Whereupon, a brief recess was taken.)

80 (Pages 314 - 317)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 318

1       THE VIDEOGRAPHER: The time is 5:22 p.m.
2  Pacific time. We're back on the record.
3              EXAMINATION
4  BY MR. BLAVIN:
5    Q.  Good evening, Dr. Cingel.
6    A.  Yes, good evening.
7    Q.  I know. It's been a long day.
8       My name is Jonathan Blavin. I'm here on
9  behalf of Snap, the maker of Snapchat. Thank you
10 for your time today.
11      I'm going to ask you some questions today
12 about your opinions relating specifically to
13 Snapchat and if anything's unclear at any point in
14 time, please let me know.
15   A.  Okay. Thank you.
16   Q.  So sitting here today, are you offering
17 any opinions regarding Snapchat that are not
18 disclosed in your report?
19   A.  No.
20   Q.  Okay. So if your report is silent on a
21 particular feature or attribute of Snapchat, you
22 don't intend to offer any opinions on that attribute
23 or feature in this litigation?
24   A.  At this time, no.
25   Q.  I believe you testified earlier,

Page 319

1  Dr. Cingel, that you personally do not use social
2  media; is that right?
3    A.  I do not.
4    Q.  Okay. So you do not have a Snapchat
5  account?
6    A.  I do not.
7    Q.  Have you ever used Snapchat?
8    A.  Depends on what you mean by "used." As
9  I've alluded to throughout the day, before we do a
10 study, I usually -- we sit in a room like this with
11 all of the graduate students in my lab. We have
12 about 20 undergraduate students so we try to get as
13 many of those in as well.
14      We go through each of the platforms that
15 we intend to ask about. We go through the
16 platforms, as best we can, looking at the different
17 features and just the -- you know, the general
18 environment of each of the platforms. And the last
19 time that we would have done that was last year, I
20 believe.
21   Q.  Okay. And when you did that, did it
22 include Snapchat?
23   A.  It did.
24   Q.  Okay. And that was sometime last year?
25   A.  To my recollection, yes.

Page 320

1    Q.  Okay. But other than those types of
2  events in which you and a group of graduate students
3  are overviewing types of social media platforms, you
4  don't recall specifically using Snapchat?
5    A.  It is not something that I personally do,
6  no.
7    Q.  Okay. Now, you note in your report that
8  when a user opens Snapchat on their phone they're
9  directed to the camera part of the app, correct?
10   A.  I believe that is the case, yes.
11   Q.  Okay. In other words, the users are not
12 initially directed to a different part of the app
13 such as a content surface or a never-ending feed of
14 content, correct?
15   A.  When they first open the app, yes.
16   Q.  They're prompted to create a Snap when
17 using the camera and share it privately with their
18 friends; is that correct?
19   A.  I think so, yes.
20   Q.  And on page 17 of your report,
21 paragraph 27, and this is the JCCP report,
22 Exhibit 2.
23   A.  Yep.
24   Q.  You specifically note in paragraph 27
25 that, "Snapchat is a photo-sharing application with

Page 321

1  messages that are available for a limited time and
2  disappear after being viewed." Correct?
3    A.  Correct.
4    Q.  And later in that same paragraph you write
5  that this distinguished Snapchat from other social
6  media platforms, correct?
7    A.  The fact that it disappears and that
8  ephemeral nature, yes. But it -- excuse me,
9  sorry -- that is one feature that distinguishes it.
10 There are other features that are consistent across.
11   Q.  Okay. And one other feature that
12 distinguishes Snapchat from the other social media
13 platforms you discuss in your report is that it
14 opens to a camera; is that correct?
15   A.  I believe so, yes. But other -- well, no,
16 that's -- that is the case, yes.
17   Q.  Thank you.
18      And you also say in that same paragraph
19 that Snapchat offered a novel form of communication;
20 is that correct?
21   A.  That is what it says, yes.
22   Q.  Now, Snapchat, sending Snaps back and
23 forth with users, that's comparable, similar in
24 certain respects, to sending messages on iMessage on
25 your iPhone; is that right?

81 (Pages 318 - 321)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 322

1    A.  I'm not sure about that.  I mean, it's --
2  sending something via iMessage on a phone would be
3  more text-based than visual-based in this case.
4    Q.  Okay.  But on your phone you can send
5  images, emojis, et cetera, using, for example,
6  iMessage?
7    A.  You can also do those kinds of things on
8  Instagram, for example, too.
9    Q.  Correct, but that is a -- the messaging
10  functionality itself, in certain respects, is
11  similar to what you could just do using basic
12  texting on your iPhone?
13    A.  I don't know if I would classify it as a
14  messaging function.  But I understand what you're
15  saying.
16    Q.  Now, you go on to say in this same
17  paragraph that, "By continuously implementing
18  additional features, Snapchat has quickly evolved
19  into a multifaceted social media application and is
20  now much more than a simple photo-sharing
21  application."  Correct?
22    A.  Correct.
23    Q.  Now, Dr. Cingel, do you know how much time
24  Snapchat users on average spend using different
25  features or surfaces of the app?

Page 323

1    A.  Breaking it apart by each, I don't know if
2  we have that data.
3    Q.  Okay.  So you don't know, sitting here
4  today, or when you prepared your report, for
5  example, if users spend most of their time using the
6  messaging surface of the app versus viewing content
7  on surfaces like Discover or Spotlight?
8    A.  Same answer.  I don't believe we have that
9  data.
10    Q.  Okay.  Did you ask for that data?
11    A.  From whom?
12    Q.  From the lawyers you're working with,
13  saying this would be relevant to my conclusions in
14  my report.
15    A.  Oh.  I suspect that data is internal to
16  the company and is not something that they would
17  share.
18    Q.  Did you at all inquire into whether or
19  not --
20    A.  I --
21        (Whereupon, a brief discussion off the
22  record.)
23  BY MR. BLAVIN:
24    Q.  Let me re-ask the question.
25        Did you at all inquire into whether that

Page 324

1  data had been provided in the litigation by Snap?
2    A.  I did not.
3    Q.  Do you think that data could have been
4  important to the opinions that you reach in your
5  report?
6    A.  I'm not sure because it -- it's consistent
7  with the overall time spent and the problematic use
8  of these things that the literature show are
9  consistently linked with adverse mental health
10  outcomes.
11    Q.  Okay.  Well, we'll talk about the
12  literature later.
13        But, for example, if users spent
14  90 percent of their time using Snapchat to message
15  with their friends back and forth, versus viewing
16  content on feeds, wouldn't that have been a relevant
17  consideration that you would want to think about in
18  preparing your report?
19        MR. KIEFFER:  Object to the form.  Assumes
20  facts not in evidence.
21        THE WITNESS:  It may have been.
22  BY MR. BLAVIN:
23    Q.  Okay.  And why do you think it may have
24  been?
25    A.  Well, I mean, you're asking me to -- you

Page 325

1  know, it's kind of a hypothetical.  So it may have
2  been important.  It may not have been.
3    Q.  Well, is that -- is it because in your
4  report when you're analyzing various mental health
5  effects of the platforms they're tied to particular
6  features or surfaces of the platforms?
7    A.  Some are.  And some, like I said, are tied
8  to the time spent with the platform overall, or
9  the --
10    Q.  Okay.
11    A.  -- or the context of that use of time.
12    Q.  If a user spends, let's say, two hours a
13  day sending messages back and forth with their
14  friends on iMessage, do you consider that
15  problematic social -- problematic use of an iPhone?
16    A.  It could be.  Again, depending on the
17  context, the time.
18    Q.  So are you --
19    A.  What they're saying, things of that
20  nature.
21    Q.  Are you offering opinions that texting
22  with your friends is -- has adverse mental health
23  effects?
24    A.  I do not include that in my report.
25    Q.  Now, you testified a little bit earlier

82 (Pages 322 - 325)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 326

1 today about Snapstreaks on Snapchat?
2    A.  Correct.
3    Q.  Do you understand that a user must choose
4 to initiate and pursue a Streak before actually
5 engaging in one?
6    A.  What do you mean by "initiate"?
7    Q.  That they need to opt-in to doing a
8 Streak. It's not something which is -- default, an
9 aspect of the platform.
10    A.  Okay.
11    Q.  Do you understand that?
12    A.  I do.
13    Q.  Okay.  And I think you testified earlier
14 today that you understand that you can maintain a
15 Streak by sending one message per day?
16    A.  That is my understanding, yes.
17    Q.  Okay.  And that may only take a few
18 seconds, correct?
19    A.  It -- that one thing may only take a few
20 seconds, yes.
21    Q.  Are you aware of any other apps that have
22 Streaks on them?
23    A.  No.
24    Q.  Okay.  Have you ever used Duolingo?
25    A.  Yes, I have.

Page 327

1    Q.  And Duolingo has Streaks, doesn't it?
2    A.  I'm not sure if it does currently or not.
3 At the time that I used it years ago, I think it
4 did.
5    Q.  Okay.  And are those Streaks harmful on
6 Duolingo?
7    A.  I don't think so because it -- you don't
8 have all of the other features that Snapchat might
9 have that's -- you know, we're talking about one
10 specific feature to Duolingo.
11    Q.  Okay.  So just to take what you just said
12 and apply it to Snapchat, it's your opinion that
13 Streaks on Snapchat cause harm because they're tied
14 into other features of the app, it's not just the
15 Streaks in isolation?
16    A.  That is -- yes.  What I think -- where I
17 think Streaks are concerning is, like you said, it's
18 just maybe -- it can be up one minute to do it.  But
19 then you're in the platform, you are engaging with
20 other features that are in the platform, you're an
21 adolescent who's at risk, as we talked about
22 earlier, you don't have as developed
23 self-regulation, so it got you in.
24        And we know the -- I think from Common
25 Sense Media data that adolescents on average are

Page 328

1 spending far more than one minute on Snapchat on
2 average.
3    Q.  So just to confirm, you are then not
4 opining that Streaks in isolation, in and of
5 themselves, cause harm?
6    A.  They are one component of many different
7 features that collectively do.
8    Q.  Okay.  You testified earlier today -- and
9 I believe this was discussing a paragraph in the MDL
10 report.
11    A.  Okay.
12    Q.  -- that Snapstreaks cause social
13 comparison harm because outsiders could see
14 someone's Snapstreaks with other people, like on
15 their profile; is that correct?
16    A.  I believe so, yes.
17    Q.  Okay.  And that you couldn't think of
18 anything other than that which would be a way that
19 Snapstreaks caused social comparison harms; is that
20 right?
21    A.  That caused social comparison harms
22 specifically?  Yes.
23    Q.  That's what you testified to earlier
24 today.
25        Now, are you aware that a user's

Page 329

1 Snapstreaks are not publicly available?
2    A.  I don't recall -- I don't know.
3    Q.  Okay.  So if you became aware that, in
4 fact, Snapstreaks -- a user's Snapstreaks are not
5 publicly disclosed to others on Snapchat, would that
6 cause you to change your opinion about whether or
7 not they cause social comparison harms?
8        MR. KIEFFER:  Object to the form of the
9 question.  Assumes facts not in evidence.  And it's
10 an incomplete hypothetical.
11        THE WITNESS:  I'm not sure that's the
12 case.  Again, when I talked to adolescents, they
13 often talk about how they face-to-face talk about
14 their Snapstreaks with each other.  So even if
15 they're not seen on the platform they're still
16 talking about them.  The potential for that social
17 comparison to occur is still there.
18 BY MR. BLAVIN:
19    Q.  Okay.  So that's different than what you
20 testified before earlier today.  You referenced
21 strangers going onto Snapchat.  Third parties going
22 onto Snapchat and seeing someone's Snapstreaks.
23        You're now saying that even if that's not
24 a feature of the app, that a third party can
25 actually see someone's Snapstreaks, your opinion is

83 (Pages 326 - 329)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 330

1 it could still cause social comparison harm because
2 people talk about their Snapstreaks with one
3 another?
4    A.  Potentially, yes, and, again, in the
5 specific context of social comparison.
6    Q.  Okay.  And have you seen any studies or
7 evidence to substantiate that opinion?
8    A.  Other than talking -- again, talking to
9 adolescents and talking -- and seeing how social
10 media use is linked to social comparison and
11 resultant effects on mental health, no.
12    Q.  Okay.  How many adolescents have you
13 talked to about Snapstreaks?
14    A.  Over the past five years, a few hundred.
15    Q.  About Snapstreaks specifically?
16    A.  I don't know if it's -- again, I don't
17 know if it comes up in every conversation that we
18 have with them.  But Snapchat is a very commonly
19 used platform among adolescents.
20    Q.  You've discussed a few times today that
21 you talk to hundreds of adolescents over the past
22 few years.  Is this a function of your work at
23 UC Davis that you have focus groups come in and
24 that's why you're talking to these adolescents?
25 What is the nature --

Page 331

1    A.  Yes.
2    Q.  -- of why you're talking to so many
3 adolescents?
4    A.  Like I mentioned earlier, the point of
5 talking to adolescents is to make sure that we are
6 measuring all the things that are relevant to their
7 social media lives.  That we are measuring things
8 and using the words that they would use and that
9 they would feel comfortable and that they would
10 understand to make sure that we are measuring things
11 that they are -- that they tell us, you know,
12 happened and that occur with at least some
13 regularity.  That's the purpose.  So that we can
14 design the best research studies that we can.
15    Q.  Okay.  So these are -- this is part of
16 your research efforts --
17    A.  Yes.
18    Q.  -- at the university, that these
19 individuals are coming in and you're discussing
20 social media platforms with them?
21    A.  They're not necessarily coming in.  These
22 can be things like phone calls, these can be things
23 like Zooms, things of that nature, but we are
24 communicating directly with adolescents.
25    Q.  Are you aware that Snap does not have

Page 332

1 public likes on its platform?
2    A.  Public what?
3    Q.  Likes.
4    A.  Likes, yes.
5    Q.  Okay.  So your opinions about social
6 comparison harm that are caused by others seeing
7 likes on various social media platforms wouldn't
8 apply in the same way to Snapchat; is that correct?
9    A.  That is correct.  I do think there are
10 different things that show, you know, social
11 feedback in general.  But likes specifically, no.
12    Q.  And are you aware that when users post a
13 public story on Snapchat the number of times that
14 the story has been viewed is also not available
15 publicly?
16    A.  I'm not sure.
17    Q.  You didn't determine that when you were
18 preparing your report?
19    A.  I don't recall that, no.
20    Q.  Okay.  Now, in your report, Dr. Cingel,
21 you cite numerous peer-reviewed studies about social
22 media and mental health, correct?
23    A.  I do.
24    Q.  Okay.  Isn't it true that none of those
25 studies that you cite analyze Snapchat specifically

Page 333

1 in a way that isolates its effects from other social
2 media platforms that could be analyzed at the same
3 time?
4    A.  I'm not sure that's the case.  I can
5 immediately think of one study.  And I'd be happy to
6 look at it and to confirm.  I can immediately think
7 of one study that looked at -- it looked at social
8 media use generally and its resultant effects on, I
9 want to say, self-esteem, and then I believe broke
10 it apart by different platforms.
11        And I think Snapchat was one of those but
12 I do not know that for certain.
13    Q.  Okay.  Is that the van der Wal study?
14    A.  Oh, that -- sorry.  That is one that does
15 that.  That's not actually the one I was thinking
16 of.  I was thinking of Valkenburg, et al., 2021.
17    Q.  And do you discuss that in your report?
18    A.  I believe so.  I'm almost certain I do.
19    Q.  Okay.  Other than the Valkenburg study and
20 the van der Wal study, are you aware of any other
21 studies that you discuss in your report that
22 specifically consider the impacts of Snapchat?
23    A.  There might be.  I can go and look and
24 confirm that.  Those are coming from a research
25 team.  If that's -- if they are doing that in those

84 (Pages 330 - 333)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 334

1 two studies, I would hypothesize that perhaps
2 they're doing it in some of the other ones that I
3 cite in my report.
4      Q.   Okay.  Now, if the study is not engaging
5 in that type of individualized analysis but is
6 considering, for example, adolescents' use of social
7 media across several platforms and analyzing the
8 impacts of that, you would agree, wouldn't you, that
9 the study by its very nature can't reach a
10 conclusion as to whether or not one of the platforms
11 itself caused a perceived mental health outcome as
12 opposed to another platform?
13      MR. KIEFFER:  Object to the form of the
14 question.  Compound.  Complex.  And incomplete
15 hypothetical.
16      THE WITNESS:  I'm not sure that I would
17 agree with that necessarily.  It depends, you
18 know -- like, as I've mentioned many times today,
19 there are many common features that cut across these
20 defendant platforms which I think make more general
21 measures of social media use generalizable to those
22 platforms.  And I also cannot take it without the
23 fact that, you know, that van der Wal study, for
24 example, does look at Snapchat specifically.
25 ///

Page 335

1 BY MR. BLAVIN:
2      Q.   Okay.
3      A.   Among others.
4      Q.   Let's take a look at the van der Wal
5 study.  And you cite this on page 75 of your report,
6 I believe.
7      A.   Okay.
8      Q.   Right.  Pages 75 to 76.  This is
9 paragraph 187, correct?
10      A.   Yes.
11      Q.   Okay.  You note in paragraph 187 -- and
12 I'm three -- three rows from the bottom -- that,
13 "Similar to the person-specific findings presented
14 above, they found large groups of adolescents that
15 experienced negative effects on well-being,
16 (64.3 percent of sample), self-esteem
17 (71.8 percent), and friendship closeness
18 (58 percent).  Notably, however, this study examined
19 whether adolescents experienced negative, null, or
20 positive effects across the three variables of
21 well-being measured."
22      And if you go a little bit further down.
23      It says, "Overall, 72.2 percent of the
24 sample experienced only negative effects of social
25 media use on at least one of the three measured

Page 336

1 variables, while only 10.6 percent of the sample
2 experienced only positive effects on at least one of
3 the three variables."
4      Do you see that?
5      A.   I do.
6      MR. BLAVIN:  Okay.  I'll introduce as
7 Exhibit 23 the van der Wal study.
8      (Whereupon, Cingel Exhibit 23 was marked
9 for identification.)
10      (Whereupon, a brief discussion off the
11 record.)
12 BY MR. BLAVIN:
13      Q.   This is a copy of the van der Wal study
14 that you were citing?
15      A.   Yes.
16      Q.   Okay.  And if we can go to page 12 of the
17 study.
18      A.   Oh, of the...
19      Q.   In that, at least part of the first
20 paragraph, do you see the line starting with,
21 "Conversely"?
22      A.   The first -- yes, thank you.
23      Q.   Okay.  It says, "Conversely, spending time
24 on Snapchat positively affected friendship closeness
25 and well-being but had no significant effect on

Page 337

1 self-esteem."
2      Do you see that?
3      A.   I do see that.
4      Q.   Okay.  Do you have any reason to disagree
5 with the findings that the van der Wal study made?
6      A.   In that particular case, no.  But I do
7 reference this -- I forget what exhibit it is now, I
8 don't know what we're -- what we're calling it, but
9 my comments, my notes, based on what some of the
10 defendant expert witnesses said about this.
11      Q.   Okay.  And if you go a bit further below
12 on page 12, towards the bottom of that paragraph
13 where it says, "In contrast."
14      Do you see that?
15      A.   I do.
16      Q.   It says, "In contrast, time spent on
17 Snapchat positively impacted friendship closeness
18 for 71.5 percent of adolescents, well-being for
19 41.4 percent, and self-esteem for 23.7 percent."
20      Do you see that?
21      A.   I do.
22      Q.   And similarly, you don't have any reason
23 to disagree with the finding in this study that
24 reached -- the finding in this study as to that
25 conclusion?

85 (Pages 334 - 337)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 338

1    A.  Not to that conclusion specifically.  The
2  point I make in my other document is that if you
3  turn to Figure 2D, there are still significant
4  groups of adolescents that when you look at it at
5  the individual level, so a related but different
6  analysis, that shows between 6.6 and 17.1 percent
7  are negatively affected across those three
8  variables.
9    Q.  Now, with respect to these findings in the
10  van der Wal study that you cited and relied upon,
11  you did not report either of them in your report,
12  correct?
13    A.  Did not report either what?
14    Q.  Of those two findings we just went over?
15    A.  I don't -- I don't know if I specifically
16  call out those two different findings, no.
17    Q.  Okay.  And, in fact, in paragraph 187, you
18  note at the end on page 76 of your report that they
19  found negative effects stemmed largely from
20  adolescents' use of TikTok and Instagram and
21  YouTube, correct?
22    A.  That is what I write there, yes.
23    Q.  You did not mention Snapchat?
24    A.  In that sentence, no.
25    Q.  Okay.  Now, if you go to page 18 of this

Page 339

1  report, you'll see in the middle of that first
2  paragraph it says, "Conversely, Snapchat positively
3  affected adolescents' well-being and friendship
4  closeness and had no significant impact on
5  self-esteem."
6      Do you see that?
7    A.  At the group level, yes, I do.
8    Q.  Okay.  Now, again, at the group level, do
9  you have any reason to disagree with the finding in
10  this report?
11    A.  No.
12    Q.  And you're here to testify with respect to
13  general causation, correct?
14    A.  Correct.
15    Q.  So you're not testifying as to how any
16  individual, particular individual, could be impacted
17  one way or another with respect to social media
18  platforms?
19    A.  A particular individual involved in this
20  case?
21    Q.  In this case or just any individual in
22  particular.
23    A.  Well, I think with these N-of-1 studies
24  that is what it is showing.  I can't point to one
25  individual and say that they are the one that's

Page 340

1  affected.  But these N-of-1 studies do show that
2  significant groups of individuals are negatively
3  affected by social media.
4    Q.  Now, if you go to that same paragraph on
5  page 18 of the van der Wal study, it says, in the
6  last sentence, "The positive and null effects
7  associated with Snapchat and WhatsApp indicate that
8  we should avoid a blanket condemnation of all social
9  media platforms."
10      Do you see that?
11    A.  I see that, yes.
12    Q.  Okay.  Do you have any reason to disagree
13  with that statement?
14    A.  No.  I think it could be qualified, again,
15  by the fact that there's a significant group that is
16  at risk when they use Snapchat, not at the same
17  level as the other three that they reference, but 6
18  to 17 percent of individuals -- of adolescents in
19  the sample that are negatively affected.  Still, I
20  think, a meaningful number.
21    Q.  Okay.  You would agree that we have to
22  study each platform individually to determine
23  whether or not it has harmful effects, correct?
24    A.  No, I don't -- I don't believe that that's
25  the case, as I have been mentioning.  I think that

Page 341

1  those general measures of social media use, given
2  the commonalities and similarities across, do -- are
3  generalizable to different social media platforms.
4    Q.  But you acknowledged earlier today that
5  Snapchat does have significant differences from
6  other platforms, correct?  It opens to a camera, you
7  acknowledged that, correct?
8    A.  Yeah.
9    Q.  Does not open to a feed of content,
10  correct?
11    A.  Does not open to it, no.
12    Q.  Okay.
13    A.  But I don't know -- sorry.  I don't know
14  if I would say "significant differences."  There are
15  some differences.
16    Q.  Okay.  But you also acknowledge that you,
17  at the time you prepared this report and sitting
18  here today, have no idea whether or not users are
19  primarily or overwhelmingly engaging with the
20  messaging component of Snapchat versus the content
21  surfaces of Snapchat, correct?
22      MR. KIEFFER:  Object to the form of the
23  question.  It misstates his testimony.
24  Argumentative.
25      THE WITNESS:  Just -- that is correct.

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 342

1 BY MR. BLAVIN:
2    Q.  Okay.  And, again, you chose not to cite
3 or reflect any of the studies positive and favorable
4 of Snapchat findings in your report, correct?
5        MR. KIEFFER:  Object to the form of the
6 question.  Misstates his report.
7        THE WITNESS:  To me, saying they found
8 negative -- the negative effects stem largely from
9 adolescents' use of TikTok, Instagram, and YouTube
10 covers that.
11 BY MR. BLAVIN:
12    Q.  We can go to page 60 of your April 18th
13 report.  Paragraph 136.
14    A.  Uh-huh.  I see it.
15    Q.  On body image, right, you're discussing
16 body image issues on social media platforms,
17 correct?
18    A.  Correct.
19    Q.  And you note in this paragraph -- and I'm
20 looking at, I believe, at the third sentence
21 starting with, "For example."
22    A.  Yes.
23    Q.  Do you see that?
24        "For example, Rousseau (2021) found that
25 appearance-related social media use was related to

Page 343

1 increased selfie-taking and posting via increases in
2 internalization of the thin-ideal and social media
3 self-comparison."
4        Do you see that?
5    A.  I do.
6    Q.  Okay.  And on the next page, page 61 in
7 paragraph 137, you say, "Taken together, these
8 findings suggest reciprocal relationships, where the
9 ability to manipulate one's photos (which is clearly
10 prompted when using Instagram and Snapchap)" --
11        I think you meant "Snapchat" there?
12    A.  Yes.
13    Q.  -- "for example, leads to increased taking
14 and posting of appearance-related content."
15        You again cite Rousseau, 2021?
16    A.  Yes.
17        MR. BLAVIN:  Okay.  Let's mark as
18 Exhibit 24, the Rousseau study.
19        (Whereupon, Cingel Exhibit 24 was marked
20 for identification.)
21 BY MR. BLAVIN:
22    Q.  Okay.  Let's look at page 19 of this study
23 under the subsection 2.3.2.  "Appearance comparison
24 on social media."
25        Do you see that?

Page 344

1    A.  I do.
2    Q.  Okay.  And if you look there, it says in
3 the sentence that's in the last line of that
4 paragraph under that subsection, "Individuals use
5 Snapchat more private (oftentimes snaps are sent to
6 only one person, making issues of social approval
7 less salient) and 'for fun' (e.g., sending funny
8 pictures of oneself that do not correspond to
9 sociocultural appearance ideals).  Due to these
10 differences, appearance-related comparisons on
11 Snapchat may elicit different outcomes than
12 appearance-related comparisons on Facebook or
13 Instagram."
14        Do you see that?
15    A.  I do.
16    Q.  Okay.  So the authors of this report are
17 acknowledging that Snapchat, given the way that it's
18 designed, may lend itself less to issues of social
19 comparison or approval than other platforms; is that
20 correct?
21    A.  May, yes.
22    Q.  Okay.  And you didn't cite this part of
23 the study anywhere in your report where you were
24 discussing it, did you?
25    A.  I don't believe so.

Page 345

1    Q.  Okay.  In your reliance materials, you do
2 reference other studies that analyze Snapchat
3 specifically that you didn't ultimately cite in your
4 report.  Are you aware of that?
5    A.  If you can point me to those.
6    Q.  Okay.  In your reliance materials, and if
7 you want to check, I think it's page 102 of the
8 Exhibit B in the discussion of the literature in
9 your JCCP report.  At page 102, there is a reference
10 to a report by Vaterlaus.  I think I'm pronouncing
11 that correctly.
12    A.  Oh, let's see.  Yes.
13    Q.  You see that?
14    A.  I do.
15    Q.  Okay.  And this report is entitled
16 "'Snapchat is more personal': An exploratory study
17 on Snapchat behaviors and young adult's
18 interpersonal relationships."  Correct?
19    A.  Correct.
20    Q.  Okay.  And this is a peer-reviewed
21 article?
22    A.  It appears that way, yes.
23    Q.  Okay.
24        I'm sorry, can we go off the record for a
25 second?

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 346

1    THE VIDEOGRAPHER: The time is 5:55 p.m.
2  Pacific time. We're going off the record.
3    (Whereupon, a brief recess was taken.)
4    THE VIDEOGRAPHER: The time is 5:56 p.m.
5  Pacific time. We're back on the record.
6  BY MR. BLAVIN:
7    Q. All right. Dr. Cingel, I'm marking as
8  Exhibit 26 the Vaterlaus report that we were just
9  discussing.
10    This is Exhibit 25. 25. Sorry about
11  that.
12    (Whereupon, Cingel Exhibit 25 was marked
13  for identification.)
14  BY MR. BLAVIN:
15    Q. Okay. If you can go to page 599 of this
16  report.
17    I should -- before I ask you specifically
18  about this report, I believe you testified earlier
19  today that with respect to the materials considered
20  list, that you reviewed the materials for relevance
21  to see if they were relevant or not and worth
22  including in your report; is that correct?
23    A. Correct.
24    Q. If we can go to page 599 of this study,
25  and specifically, the Section 7.3, "Enhance

Page 347

1  connection in existing interpersonal relationships."
2    Do you see that?
3    A. I do.
4    Q. And do you see the line that says, around
5  the middle of that paragraph, "Young adults"?
6    A. I do.
7    Q. It says, "Young adults perceived that
8  Snapchat could enhance connection within their
9  relationships with family, friends, and romantic
10  partners. Some young adults even suggested Snapchat
11  could strengthen their interpersonal relationships."
12    Do you see that?
13    A. I do.
14    Q. And if you go to page 600, in the same
15  paragraph, it goes on to note that, "Snapchat was
16  viewed as a personal form of communication reserved
17  for young adults' closest interpersonal
18  relationships - not random people."
19    Do you see that?
20    A. I do.
21    Q. Now, you did not cite, quote, or discuss
22  any of these findings from the Vaterlaus study in
23  your report, did you?
24    A. I do not.
25    Q. Did you find them not relevant to the

Page 348

1  conclusions you were reaching in your report?
2    A. Actually, in some ways, yes. I tried to
3  limit my report and the studies cited in my report
4  to adolescents, as a key part of my report is about
5  the developmental differences of adolescents, why
6  adolescents are uniquely at risk.
7    Looking at the abstract here, this is a
8  study of 18- to 23-year-olds, which would be
9  commonly referred to as young adults or emerging
10  adults. It's a different developmental period in
11  the lifespan.
12    Q. Do you realize that there are plaintiffs
13  in this litigation who are between the ages of 18
14  and 23?
15    A. I do not know the ages of the plaintiffs.
16    Q. Okay. I believe you testified earlier,
17  Dr. Cingel, in terms of your consideration of a
18  company's internal documents, that those don't form
19  the primary bases for the conclusions you've reached
20  in your report, correct?
21    A. Correct.
22    Q. I think you said that they were
23  confirmatory of studies, literature, that you
24  examined in forming the conclusions in your report?
25    A. In most cases, yes.

Page 349

1    Q. Okay. Now, would you agree that many of
2  the Snapchat-specific conclusions that you reach in
3  your opinions, or at least discuss, cite to internal
4  Snapchat documents?
5    A. I'm sure some do, yes.
6    Q. Okay. And it's fair to say that none of
7  those documents that you cite were peer-reviewed?
8    A. Off the top of my head, I'm not sure if
9  that's the case.
10    Q. Okay. Can you think of any Snapchat
11  internal document that you cited which was
12  peer-reviewed?
13    A. No.
14    Q. Okay. Can you think of any internal
15  Snapchat document that you cited which was
16  independently validated by scientists?
17    A. Kind of like what I was talking about
18  before, I imagine that there are multiple eyes on
19  the paper. I imagine that some of those people are
20  scientists or have training in science. Which is
21  some form of review.
22    Q. Are you aware of any documents that you
23  cited that were from Snapchat that were published in
24  any type of scientific journal?
25    A. To my recollection right now, I'm not

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 350

1  aware.
2      Q.  Okay.  And did you -- we discussed a
3  little bit before whether or not you requested data
4  relating to how people use the various surfaces on
5  Snapchat and you said that you did not.
6          Were there any other types of outside
7  datasets that you may have requested as part of your
8  analysis relating to Snapchat?
9      A.  No.
10     Q.  Okay.  If we go to page 10, paragraph 5,
11 of your report, in terms of the conclusions that you
12 list -- I'm sorry, it's actually page 12.  No,
13 sorry, it's on page 10.  I apologize.
14         It's above -- it's a conclusion under
15 paragraph 5, subpart J.  "Direct messaging with
16 outside contacts."
17         Do you see that?
18     A.  Yes.
19     Q.  It says, "Direct messaging with outside
20 contacts, including previously unknown contacts
21 (which could include sexual predators and other bad
22 actors), takes advantage of social development,
23 identity development, and adolescent egocentrism."
24     A.  Yes.
25     Q.  Do you see that?

Page 351

1      A.  I do.
2      Q.  Are you aware of any studies or reports
3  that you cited in your report to support that
4  conclusion that you've reached?
5      A.  That -- specific studies that look at
6  direct messaging --
7      Q.  Yeah.
8      A.  -- with outside contacts?
9      Q.  And that it takes advantage of social
10 development, identity development, and adolescent
11 egocentrism.
12     A.  No, and, again, this would come back to
13 what I said earlier, that these -- these opinions
14 are based on my years of expertise in adolescent
15 development and mental health and social media.
16     Q.  I believe you testified before that you
17 are not a licensed psychiatrist?
18     A.  I'm not.
19     Q.  And you are not a licensed psychologist?
20     A.  I am not.
21     Q.  Okay.  We can go in your JCCP report to
22 page 41.  And this is in your discussion of
23 Snapstreaks.  Paragraph 88.
24         Do you see you are citing a June 2018
25 study.  It's -- the Bates number is included in

Page 352

1  footnote 104.
2          Do you see that?
3      A.  I do.
4      Q.  And that citation relates to your
5  conclusions concerning the effect of Snapstreaks; is
6  that correct?
7      A.  Did you say "relates to"?
8      Q.  Yeah.
9      A.  Yes.
10         MR. BLAVIN:  Okay.  Mark this as, I
11 believe, Exhibit 26.
12         (Whereupon, Cingel Exhibit 26 was marked
13 for identification.)
14 BY MR. BLAVIN:
15     Q.  You'll see in footnote 104, there's a "see
16 also," and it references a document, SNAP, lots of
17 zeros and an 8.  August 2018.
18         Do you see that?
19     A.  I do.
20     Q.  And the document that I've handed you is,
21 in fact, that document you cite in your report,
22 correct?
23     A.  Okay.  Yes, it is.
24     Q.  And this is a document entitled "Streaks
25 User Research."  Survey N equals 790 and in-person

Page 353

1  interviews N equals 8.
2          Do you see that?
3      A.  I do.
4      Q.  Does that mean that Snap surveyed 790
5  people for purposes of this report?
6      A.  That is my understanding.
7      Q.  Okay.  And did in-person interviews with
8  eight?
9      A.  That is my understanding, yeah.
10     Q.  And this was Snapchat users age 13 to 24,
11 correct?
12     A.  Correct.
13     Q.  And the "Topline," do you see that, the
14 conclusion reached at the top, is user research
15 demonstrates that Snap -- that users maintain [sic]
16 motivation to continue Streaks is to see how high
17 they can get their Streak number.
18         Do you see that?
19     A.  I do.
20     Q.  And then it says, "However, on a spectrum
21 from fun to stressful, users feel that streaks are a
22 fun way to stay in touch with people."
23         Do you see that?
24     A.  I see that.
25     Q.  Okay.  And the study further below, under

89 (Pages 350 - 353)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 354

1 "Quant results," quantitative results, considers the
2 survey results, correct?
3    A.  That would be my interpretation of that.
4    Q.  Okay.  And you'll see that "Stress Level
5 for Streaks."  It notes that 2 percent of the survey
6 results found that Streaks created intolerable
7 stress and 4 percent of the survey results showed
8 that Streaks create large amounts of stress.
9       Do you see that?
10    A.  I do.
11    Q.  Okay.  For a total of 6 percent.
12       And that 48 percent in total thought that
13 Streaks created little or moderate stress and no
14 stress at all was 46 percent, correct?
15    A.  Yes.
16    Q.  Now, in your report, you don't mention the
17 language from this study in terms of the top-line
18 results, that on a spectrum from fun to stressful
19 users feel that Streaks are a fun way to stay in
20 touch with people, correct?
21    A.  I'm not sure where exact -- like, which
22 data they are using of this to draw that conclusion.
23    Q.  Okay.  But that -- that language is not
24 referenced in your report; that's all I'm asking.
25    A.  That is correct.

Page 355

1    Q.  Okay.  And in terms of the percentage
2 levels that we went through with respect to stress
3 levels for Streaks, that -- those specific
4 statistics are not referenced in your report either,
5 are they?
6    A.  They are not.
7    Q.  Okay.  Now, if you go to page 91 of your
8 report, you cite in paragraph 228, and this is in
9 footnote 256, a document with the Bates ending
10 404286.
11       Do you see that?
12    A.  Yes, it's the first one, right?
13    Q.  Yes.
14    A.  In that line?
15    Q.  Yes, correct.
16       I'll introduce this document as
17 Exhibit 27.
18       (Whereupon, Cingel Exhibit 27 was marked
19 for identification.)
20 BY MR. BLAVIN:
21    Q.  Okay.  And if you look through this
22 document you'll see that it includes the Bates
23 number that we just went over, SNAP0404286.
24    A.  Where is that?  I see 0426.
25    Q.  That's the first page.  But if you go --

Page 356

1    A.  Oh, got it.  Thank you.  Thank you.
2    Q.  Yes.  I think you were citing to a
3 specific page in this study.
4    A.  286.
5    Q.  Is that right?
6    A.  Yes, and I'm on that page.
7    Q.  Okay.  We don't need to stay on that
8 specific page.  I was just confirming this is the
9 document that you were citing in your report,
10 correct?
11    A.  Yes.  Yes.
12    Q.  And you remember seeing this document
13 before?
14    A.  I do, yes.
15    Q.  Okay.  And this is a document entitled
16 "Healthy Interactions Research.  Final Report."  It
17 was prepared by the organization Clearworks.
18       Do you see that on the first page?
19    A.  Oh, yes, I see that.
20    Q.  Okay.  It was prepared for Snap in
21 February 2023, correct?
22    A.  Yes.
23    Q.  Okay.  Now, if you look at page 4 of this
24 study under Research Plan, in the middle column,
25 Objectives, you'll see one of the objectives, the

Page 357

1 one listed second to the bottom, is, "Understand the
2 impact social media has on teens - positive &
3 negative."  Correct?
4    A.  Uh-huh, yes.
5    Q.  And, in fact, the study devotes entire
6 sections to various positive themes of social media.
7       So if you look at starting at page with
8 the Bates stamp ending 4271, do you see it says
9 "Positive Themes"?
10    A.  I do.
11    Q.  On the next page, 4272, 1 is "Connection.
12 Social media is a great way to stay connected to
13 communicate with friends, family and people who live
14 far away."
15       Do you see that?
16    A.  I do.
17    Q.  Okay.
18    A.  Yes.
19    Q.  And it includes additional themes on these
20 pages such as education, entertainment, and
21 community, correct?
22    A.  On -- not on this one page but on other --
23 I see where it says education.
24    Q.  Yes.
25    A.  I see connection.  I see entertainment.

90 (Pages 354 - 357)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 358

1    Q.   Okay.  And just to confirm in your report,
2  and referencing this document, you did not discuss
3  any of those positive themes that the report
4  discusses, correct?
5    A.   No, because it's used to reference the
6  statement that they were aware of the problem of
7  compulsive use, which is what it references to.
8    Q.   And that's -- are you talking about 04286?
9    A.   Yes.
10    Q.   Okay.  Now, before we get to that page, if
11  you look at page 04280, in the Takeaway column, the
12  last takeaway is, "Teens and YAs," I believe that's
13  young adults, "typically use Snapchat with close
14  friends, but finding people with similar interests
15  and experiences online can help them 'feel less
16  alone.'"
17      Do you see that?
18    A.   I do.
19    Q.   And you didn't cite that finding anywhere
20  in your report, correct?
21    A.   I'm not sure, but I don't think so.
22    Q.   Okay.  On the page referencing -- this is
23  page ending 04290.  "What We Heard About Snapchat."
24      Do you see that page?
25    A.   I do.

Page 359

1    Q.   Okay.  Do you see it says at the top,
2  "Teens and YAs are very positive about Snap.  They
3  primarily use it with friends, which provides them
4  with the more positive aspects of social media."
5      Do you see that?
6    A.   I do.
7    Q.   Okay.  And under Positives, it notes, for
8  example, in the column, the first line, "You can be
9  yourself because it's close friends."
10      Do you see that?
11    A.   I do.
12    Q.   And it mentions in, for example, the last
13  line, "Feels more genuine - posting every day versus
14  just posting the ideal."
15      Do you see that?
16    A.   I do see that.
17    Q.   Okay.  And you did not discuss any of
18  those positive findings of Snapchat in your report,
19  did you?
20    A.   I don't believe so.  But I do -- you know,
21  I think it's interesting -- I don't -- I don't know
22  how you could look at this and draw the conclusion
23  that they're very positive about Snap when,
24  honestly, you have -- they list more negatives than
25  positives.  I -- just looking at it quickly.

Page 360

1    Q.   So is it your opinion that the folks who
2  prepared this study did not understand their
3  findings in reaching their bottom-line conclusion
4  that teens and young adults are very positive about
5  Snap?
6    A.   I can't speak to what they were thinking
7  or doing.  It's -- just looking at the face of this,
8  it's not the conclusion that I would draw.
9    Q.   But nonetheless, you didn't discuss or
10  reference any of the positive findings they made in
11  your report, correct?
12    A.   In this particular document, no.
13    Q.   If we go to page 92 of your report, this
14  is in paragraph 230.
15    A.   Yes.
16    Q.   In this paragraph, you're discussing
17  beautification lenses impact on user mental health.
18  And you reference something called "Snapchat
19  dysmorphia."
20      Do you see that?
21    A.   I do.
22    Q.   Okay.  And in paragraph -- in footnote 262
23  cited there you reference a document with the Bates
24  stamp SNAP0933724.
25      Do you see that?

Page 361

1    A.   Oh, yes.
2    Q.   Okay.
3      (Whereupon, Cingel Exhibit 28 was marked
4  for identification.)
5  BY MR. BLAVIN:
6    Q.   Okay.  Just to confirm, Dr. Cingel, this
7  is the study that you were citing when you
8  referenced SNAP0933724?
9    A.   It -- it seems that, yes.
10    Q.   Okay.  Now, if we go to the first page of
11  the study, it says, "Connecting with Young People on
12  Mental Health & well-being.  Research Findings
13  Prepared by Global Strategy Group for Snapchat."
14      Do you see that?
15    A.   I do.
16    Q.   And if you go to slide one -- that was
17  slide one, I apologize.
18      If you go to slide two, under Methodology.
19  The methodology lists Phase 1: Triads with 13- to
20  17-year-old teens and 18 to 24 young adults.
21  Phase 2: Online Discussion Boards.  Phase 3: Online
22  Survey.
23      Do you see that?
24    A.   I do.
25    Q.   Okay.  Now, you cite specifically to the

91 (Pages 358 - 361)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 362

1 page ending in 724 in your report.
2     A.  Would you like me to turn there?
3     Q.  Yeah, if you could.
4         This slide says that, "Young people want
5 to see Snapchat address depression, anxiety, and
6 suicidal feelings.  Body image is a top priority
7 among young women."
8         Do you see that?
9     A.  I do.
10    Q.  And it says, "Below is a list of potential
11 issues that Snapchat could try to address."
12 Correct?
13    A.  I see that.
14    Q.  But this slide doesn't say anything about
15 whether Snapchat or its features caused any of these
16 particular issues, correct?
17    A.  Not specifically, no.
18    Q.  Okay.  If you go to slide 18 of this
19 document -- sorry, going back a bit.
20        It says at the top, "Snapchat is used as a
21 fun way for teens and young adults to connect with
22 their close friends and have fun."
23        Do you see that?
24    A.  I do.
25    Q.  And if you go to the next page, slide 19,

Page 363

1 it says, "Young people have an overwhelmingly
2 positive reaction to Snapchat engaging on these
3 issues."  Correct?
4     A.  That is what that says, yes.
5     Q.  And you did not cite or reference to the
6 language from either of these slides in your report,
7 did you?
8     A.  From either the slides that we just
9 covered?
10    Q.  Yes.
11    A.  No.
12    Q.  Okay.
13    A.  Once again, though, we do still have a
14 substantial number of people that are experiencing
15 negatives, I'd just point out.
16    Q.  Right.  But I believe you testified
17 earlier that the slide that you referenced does not
18 indicate one way or the other whether Snapchat
19 caused those issues versus young people just having
20 those issues while they were on Snapchat?
21    A.  That one particular slide at 73724, yes.
22    MR. BLAVIN:  Okay.  If we can go off the
23 record for just five minutes, I'm just going to see
24 if I have any further questions, but if not, we'll
25 just wrap it up.  Just give me five minutes, if you

Page 364

1 wouldn't mind.
2     THE VIDEOGRAPHER:  The time is 6:22 p.m.
3 Pacific time.  We're going off the record.
4     (Whereupon, a brief recess was taken.)
5     THE VIDEOGRAPHER:  The time is 6:31 p.m.
6 Pacific time.  We're back on the record.
7     MR. BLAVIN:  No further questions for me
8 at this time, Dr. Cingel.  Thank you for your time.
9     THE WITNESS:  Thank you.
10    MR. BOYCE:  All right.
11    (Whereupon, a brief discussion off the
12 record.)
13        EXAMINATION
14 BY MR. BOYCE:
15    Q.  Good afternoon, Dr. Cingel.  My name's
16 Kevin Boyce.  We may have met earlier this morning,
17 but I represent TikTok in this matter.  A few
18 questions for you here.
19        First, are all the opinions that you have
20 about TikTok and the TikTok platform contained in
21 your report that's been marked as Exhibit 2 to this
22 deposition?
23    A.  I believe that is the case, yes.
24    Q.  Okay.  And have you personally ever
25 published a peer-reviewed study that addresses

Page 365

1 TikTok specifically?
2     A.  I don't believe so.
3     Q.  Okay.  And have you ever worked on a study
4 that addresses TikTok specifically?
5     A.  As one platform, yes.
6     Q.  Okay.  And what study was that?
7     A.  It's not published yet.  It's data that we
8 have collected and that we are analyzing right now.
9     Q.  Okay.  So that's a study that's in -- has
10 it been written?  Is it under review?  Or is it
11 still being worked on?
12    A.  It's still being worked on.
13    Q.  Got it.
14        And so in your report, which we've marked
15 as Exhibit 2, if you would look at page 4,
16 paragraph -- I'll tell you what, let's look at
17 page 5, paragraph 6.
18    A.  Yes.
19    Q.  And you note there that you have -- over
20 the last 15 years, you've authored or co-authored 56
21 peer-reviewed journal articles with approximately an
22 additional 20 in revision, review, or writing stage
23 at the time of writing this document.
24        Do you see where you wrote that?
25    A.  Yes.

92 (Pages 362 - 365)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 366

1    Q. Okay. So out of those 56 peer-reviewed
2 articles and the 20 additional articles, there's one
3 of those that addresses TikTok specifically that's
4 in the writing stage?
5    A. Again, it looks at TikTok specifically
6 among other defendant platforms. There might be
7 more than one. I'd have to check with my graduate
8 students that -- what they're -- what they're
9 working on at this time. But they would all be at
10 the writing stage or somewhere along that way.
11    Q. Okay. And for -- to reach your opinions
12 here, I take it you've never -- I take it you don't
13 use the TikTok platform on a regular basis?
14    A. I do not.
15    Q. Have you ever used TikTok?
16    A. Similar to my response regarding Snapchat
17 and all of them, TikTok is something that we -- when
18 we sit down and we go over -- when we go over all
19 the platforms, that is something that I talk about
20 with my graduate students, undergraduate students.
21 It's not something that I personally use.
22    Q. Okay. And other than talking with your
23 graduate students, did you do any other type of
24 research into the TikTok platform before writing
25 your report in this case?

Page 367

1    A. In terms of how it works or things like
2 that?
3    Q. Yes.
4    A. Beyond what I've testified, no.
5    Q. Okay. And so you didn't interview or
6 speak with any employees of TikTok?
7    A. Correct.
8    Q. And I know that you've cited a few
9 documents from TikTok in your report.
10    I'm going to ask you, where did you get
11 the TikTok documents that you cited in your report?
12    A. I would imagine that they came from where
13 I got all of the defendant company documents that
14 were provided to me via DISCO and the various
15 searches that I did and requests for documents and
16 things of that nature.
17    Q. And so if we -- you've got a certain
18 amount of TikTok documents cited in your report. I
19 just want to understand the methodology here.
20    Did you have a large universe of
21 defendants' documents that you were given?
22    A. Well, I was given access to the DISCO
23 platform which, to my understanding, has 6.7 million
24 documents that cut across all the defendant
25 companies.

Page 368

1    Q. And then you ran searches in that DISCO
2 platform for various topics?
3    A. Correct.
4    Q. Okay. Now, in your report, you list the
5 methodology that you employed with respect to
6 published literature and peer-reviewed articles. I
7 think that's on page -- page 13 there in
8 paragraph 18?
9    A. Yes.
10    Q. Okay. And now, I didn't see anything in
11 that methodology that talks about how you went about
12 searching the defendants' company documents. Did I
13 miss a section that explains how you went about
14 searching the company documents?
15    A. No, I don't believe that you did.
16    Q. All right. And did you save the searches
17 that you ran in the DISCO platform for -- to
18 identify the TikTok documents that you cited in your
19 report?
20    A. No.
21    Q. Okay. Did you use keywords when you did
22 those searches?
23    A. Yes.
24    Q. Did you save a list of the keywords that
25 you used when you searched those documents?

Page 369

1    A. No.
2    Q. Okay. What did you do to make sure that
3 you were getting the full picture of company
4 documents given that there's 6 million of them in
5 that platform?
6    A. I -- I used a variety of keyword searches.
7 There's probably a decent amount of overlap between
8 what I list here and what I would have searched for
9 in DISCO. Because, again, I'm trying to look for
10 documents that are relevant to my report and makes
11 logical sense to me that I would be looking for
12 internal documents that would address the things
13 that I'm talking about in this report.
14    Q. Okay. And if you ran a keyword search in
15 the document database and you got a hit for a TikTok
16 document, what did you do next?
17    A. I think I mentioned this earlier in the
18 day, and I would have done this for TikTok or any of
19 the platforms, review the document as quickly as I
20 can to just ensure that it is relevant to my report
21 in some particular way. Then once that
22 determination has been made, read it in more detail.
23 Set -- if it's for TikTok specifically, set it aside
24 as a TikTok-specific document. Things of that
25 nature.

93 (Pages 366 - 369)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 370

1    Q.  Would you endeavor to run searches
2  specific to that document after you got a hit, for
3  example, did you search for other documents by a
4  particular author?
5    A.  I may have done that, particularly if I
6  was seeing that there was some individual working in
7  an area that was relevant.
8    Q.  And -- but the only materials that exist
9  from that effort today are the documents cited in
10  your report; is that fair?
11    A.  And on the materials considered list.
12    Q.  And the materials considered list, okay.
13      But the searches themselves, the keywords,
14  that kind of stuff, you don't have?
15    A.  No.
16      (Whereupon, a brief discussion off the
17  record.)
18  BY MR. BOYCE:
19    Q.  I'm going to show you a document that's
20  cited in your report.
21      We'll go ahead and mark this as Exhibit
22  Number 29.
23      (Whereupon, Cingel Exhibit 29 was marked
24  for identification.)
25  ///

Page 371

1  BY MR. BOYCE:
2    Q.  Okay.  Dr. Cingel, I handed you a document
3  that's been marked as Exhibit 29.  This is a TikTok
4  document that ends in the Bates numbers 14281.
5      Do you see that in the bottom right-hand
6  corner there?
7    A.  I do.
8    Q.  Okay.  And this -- I'll represent to you
9  this is a document that you cite in your report
10  under the -- I believe it's in footnote 228 with
11  respect to hashtag challenges.  But I wanted to ask
12  you a couple of questions about this document.
13    A.  I'm sorry, could you just tell me what
14  page 228 is on so I could be on --
15    Q.  Page 228 I believe is on page 87.  It's at
16  the very bottom of page 87 there.  Footnote 228.
17  And you can see the TikTok and then the Bates
18  numbers ending 14281.
19    A.  Yes, I see that.
20    Q.  Okay.  And so if you would turn with me to
21  the page that ends in Bates number 14286.
22      Okay.  And you see there, the text there
23  that reads, "Everyone belongs to the community and
24  is accepted.  You are not only accepted but
25  celebrated for being yourself by your viewers and

Page 372

1  fellows, creators.  It's a place to be real and
2  authentic with no artifice and that is true for even
3  our most popular creators on TikTok.  TikTok's
4  community is a positive environment that values
5  joyful experiences and authentic self-expression.
6  It reflects who we all are."
7      Do you see where I read that?
8    A.  I do.
9    Q.  Okay.  And then if you would turn to
10  page 14289.
11      And you see in the middle of the page
12  there, there's that paragraph that begins "TikTok
13  allows millions of people to discover joyful
14  content, join in, and create"?
15    A.  I see that.
16    Q.  And then a couple lines down it says,
17  "We're known for lighthearted positive content and
18  we're also starting to see learning content that has
19  both utility and inspiration such as Tabitha
20  example."
21      Do you see where I read that?
22    A.  I do.
23    Q.  Do you know what the "Tabitha example" is?
24    A.  I do not.  In general, I -- from this
25  document I don't see where the data's coming from to

Page 373

1  support any of the statements that you read.
2    Q.  That's my question.
3      Did you endeavor to figure out what the
4  Tabitha example was when you got a hit for this
5  document?
6    A.  I don't -- excuse me.  I don't recall
7  specifically for the Tabitha example, no.
8    Q.  Do you recall running any searches for
9  "Tabitha" after you got a hit for Exhibit Number 29?
10    A.  No.
11    Q.  When you read Exhibit Number 29 before
12  citing it in your report, were you curious as to
13  what the Tabitha example might be?
14    A.  I don't recall.  I'm looking to see if
15  it's listed -- you know, it's one word in this
16  entire document.  I'm not sure if it's listed
17  anywhere else, if it's something that would have
18  caught my eye or not.
19    Q.  As you sit here today, you don't recall
20  running a keyword search for "Tabitha" or the
21  "Tabitha example" before citing this document in
22  your report?
23    A.  No.
24    Q.  Okay.  And then the next line down says,
25  "We're also seeing TikTok enable shared experiences

94 (Pages 370 - 373)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 374

1 across generations. McFarland example."
2      Do you know what the "McFarland example"
3 is?
4    A. I do not.
5    Q. Okay. Do you remember doing a keyword
6 search to try to figure out what the McFarland
7 example was before citing this in your report?
8    A. No. It seems like shorthand. I don't
9 know what it would even mean.
10    Q. Okay. All right.
11      Do you recall doing any research into
12 TikTok's content moderation features?
13    A. I remember reading documents about that.
14    Q. Do you have any opinions on TikTok's
15 content moderation features?
16    A. Beyond what I -- beyond how I discussed
17 them in my report, no.
18    Q. Okay. And so to the extent that
19 there's -- everything that you would say about
20 TikTok's content moderation features is reflected in
21 your report?
22    A. I think so. I can -- we can go through
23 and I can look at everything that I said about them
24 in here.
25    Q. Let me ask you this.

Page 375

1      Do you have any opinions about automated
2 classifiers as used on the TikTok platform?
3    A. Any opinions today or in my report?
4    Q. Yeah. Both.
5    A. What -- I can speak more generally about
6 this unless there is a specific document. I
7 remember reading a lot of internal documents
8 pertaining to TikTok specifically where people
9 brought up concerns with respect to a whole variety
10 of things over use and problematic use and so on. I
11 remember things about content moderation and things
12 like that.
13      My recollection of those documents, what
14 struck me about it, and I think that's why it sticks
15 in my memory, is that it seemed in terms of the time
16 span to take a very long time or a relatively long
17 time, I should say, for those things to come online.
18 And I remember that there was a lot of -- there were
19 many problems with those sort of content moderation
20 features maybe not working in the way that they were
21 intended to work.
22    Q. Okay. And do you know what an automated
23 classifier is on the TikTok platform?
24    A. An automated classifier of content?
25    Q. Yeah.

Page 376

1    A. I could -- I have a vague understanding, I
2 think, of what that would be.
3    Q. Do you understand what that is as it
4 relates to the TikTok platform?
5    A. I would imagine that it's -- if it's
6 something built into the system that is going
7 through all the content that is there, it's probably
8 based on machine learning or something like that
9 that is classifying content.
10    Q. Okay.
11    A. In some -- in some respect.
12    Q. All right. Let me ask you this.
13      Do you know whether TikTok uses machine
14 learning in content moderation or not?
15    A. I do not know.
16    Q. Do you know what TikTok Tips are?
17    A. Off the top of my head, no.
18    Q. Okay. Let me go ahead and hand you what
19 we'll mark as Exhibit Number 30.
20      (Whereupon, Cingel Exhibit 30 was marked
21 for identification.)
22 BY MR. BOYCE:
23    Q. Dr. Cingel, I've handed you what I've
24 marked as Exhibit Number 30. This is a TikTok
25 document that you cite in your report. And as you

Page 377

1 can see there in the bottom right-hand corner, it
2 ends with the Bates number 21067.
3      And give me a second here. I'll tell you
4 where you cite it.
5      Okay. I believe you cite this on page 33
6 of your report in footnote 53. And I wanted to ask
7 you a couple of questions about this document.
8      As you can see there on the first page,
9 that's Bates number 21067, the title of the document
10 is "[TikTank] well-being Impacts - Research Report."
11      Do you see where I read that from?
12    A. Yes.
13    Q. And it's dated March 11th, 2020, right?
14    A. Yes.
15    Q. Okay. And then the objectives of this
16 report on the first page are to increase
17 understanding among GR/PR and senior leaders of the
18 evidence on the links between screen time/online
19 platforms and young people's well-being to increase
20 confidence when responding to questions on this
21 topic from external stakeholders.
22      And number two, the second objective, to
23 consider what more we could or should do to ensure
24 that TikTok makes positive impact and prevents harm,
25 platform principles number three and number five.

95 (Pages 374 - 377)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 378

1     Do you see where I read that?
2     A.   Yes.
3     Q.   Okay.  Now, in the middle of that page
4  there under the executive summary, Dr. Cingel, do
5  you see the paragraph that begins, "Two of TikTok's
6  main strengths"?
7     A.   I do.
8     Q.   And there it says, "Two of TikTok's main
9  strengths from a well-being perspective are that it
10 values authenticity rather than encouraging the
11 perfect image and encourages active creation and
12 engagement rather than passive use.  We should
13 continue to play to these strengths."
14     Do you see where I read that?
15     A.   I do.
16     Q.   And then at the bottom of that page, the
17 last line on the first page here is that one of the
18 initiatives here is to maintain our position as a
19 content platform rather than a social media company.
20     Do you see where I read that from?
21     A.   I do.
22     Q.   Okay.  Now, it's true, isn't it, that in
23 this document TikTok also took a look at some of the
24 scientific literature looking at whether the use of
25 social media was impacting adolescents' mental

Page 379

1  health in a negative way?
2     MR. KIEFFER:  Object to the form.  Assumes
3  facts not in evidence.
4     THE WITNESS:  It appears that they looked
5  at a few studies.
6  BY MR. BOYCE:
7     Q.   Okay.  And if you look there on the page
8  that's Bates number 21069, under heading three,
9  where it says, "There is not evidence of a causal
10 relationship between screen-based activities and
11 mental health problems."
12     Do you see where I read that from?
13     A.   I do see that.
14     Q.   So in this TikTok document here, we've got
15 the -- objectives are the report to figure out if
16 there's a link between adolescent well-being and
17 social media use and to consider what we could or
18 should do to ensure that TikTok makes a positive
19 impact and prevents harm, right?
20     A.   That is an objective of the report.
21     Q.   Okay.  And then for the study that we just
22 looked at there, if you look at the page that is
23 Bates number 21070, you'll see that quote, that
24 there's not evidence of a causal relationship
25 between screen-based activities and mental health

Page 380

1  problems, comes from the United Kingdom's chief
2  medical officer.
3     Do you see that?
4     A.   I'm sorry.  The paragraph at the end of
5  1069 that then goes over to --
6     Q.   Correct.
7     A.   -- 1070?
8     Q.   Yep, correct.  I'll just read it for you
9  so you can follow along.
10     TikTok's reporting internally here that,
11 "There are mixed opinions and research results on
12 whether social media is damaging to the mental
13 health of teens.  This is in part due to a lack of
14 evidence and a confusion between correlation and
15 causation.  The following presents a good summary."
16     And then it reads, "A review of the
17 evidence does not present evidence of a causal
18 relationship between screen-based activities and
19 mental health problems.  Some research has found
20 associations between screen-based activities and
21 negative effects such as increased risk of anxiety
22 or depression.
23     "This means that we do not have clear
24 evidence.  It means that an association has been
25 observed but cause and effect are not yet fully

Page 381

1  understood.  It could be, for example, that children
2  and young people who already have mental health
3  problems are more likely to spend time on social
4  media" -- and then when we continue over to the page
5  it's citing to the United Kingdom chief medical
6  officer in an article from February of 2019.
7     Do you see that there?
8     A.   I do.
9     Q.   Okay.  Now, you don't have a problem with
10 TikTok looking to people like the United Kingdom's
11 chief medical officer to try to analyze whether
12 there's a connection between adolescents' mental
13 well-being and the use of screen-based activities,
14 do you?
15     A.   I don't have a problem with going to the
16 UK's chief medical officer.  But I point out --
17 well, I point out two things with this document.
18     It was published in March, March 11th of
19 2020, so there's been five years of evidence since
20 that time.  And it offers one citation, to my read
21 of the document, for that claim.
22     Q.   Okay.  Now, after this report, what
23 well-being initiatives did TikTok take in 2020 as --
24 in response to the scientific review that's
25 conducted in the first part of this document?

96 (Pages 378 - 381)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 382

1    A.  I'm not sure of the -- I don't have a
2  memory of the timeline of events.
3    Q.   Okay.  Do you dispute that TikTok
4  implemented well-being initiatives in 2020?
5       MR. KIEFFER:  Object to the form.  It's
6  vague, ambiguous, and assumes facts not in evidence.
7       THE WITNESS:  I don't know --
8  BY MR. BOYCE:
9    Q.   Okay.
10    A.   -- if they did it in 2020, or when.
11    Q.   Before you wrote your report on TikTok,
12  did you check to see whether TikTok had implemented
13  well-being initiatives for teens way back in 2020?
14    A.   I don't know if I went back to 2020.  I
15  don't know what -- you know, what part of the
16  chronology I looked at.
17    Q.   Okay.  Do you know when TikTok implemented
18  its anti-addiction videos?
19    A.   I remember reading about those.  But I
20  don't know the exact year.
21    Q.   Did you endeavor to do any research in the
22  DISCO database to learn about TikTok's
23  anti-addiction videos when they went on the platform
24  and what they said?
25    A.   Yes, I did try to -- well, I -- like I

Page 383

1  said, I remember reading some of that, as I sit here
2  today.  I can't tell you what year it was.
3    Q.   And you don't dispute, do you, that there
4  is nothing in your report about TikTok's well-being
5  initiatives, including the use of anti-addiction
6  videos?
7    A.   That there's nothing in my report about
8  those things?  I'm not sure.
9       Again, what I do remember, what kind of
10  stuck out to me, and I mentioned it before, was
11  reading documents over and over where people would
12  bring up concerns related to TikTok.  Where changes
13  were slow to take effect, where people would go back
14  and forth, it didn't seem like it worked, certainly,
15  as intended.  That's what I recall from those
16  documents.  That's the overarching theme that I saw
17  from those.
18    Q.   Do you recall in your research finding any
19  evidence that TikTok used popular influencers to
20  deliver messages about user safety and well-being?
21    A.   I don't recall.
22    Q.   Do you recall doing any searches to see
23  whether TikTok did use popular influencers to
24  deliver messages about user well-being and
25  responsible screen time management?

Page 384

1    A.   I don't recall.
2    Q.   Okay.  Do you know when TikTok started
3  sending videos to people that had been on the
4  platform for an hour straight?
5    A.   Started sending videos?
6    Q.   Yeah.
7    A.   I don't recall when.
8    Q.   Okay.  Does the TikTok platform break in
9  and give users a warning or a message after a
10  certain amount of time of use?
11    A.   I recall that it did at one point.  I'm
12  not sure if it does it presently.
13    Q.   Do you know when TikTok started using
14  password-controlled screen time management?
15       MR. KIEFFER:  Object to the form.  Assumes
16  facts not in evidence.
17       THE WITNESS:  The year, no.
18  BY MR. BOYCE:
19    Q.   Okay.  Do you know when TikTok started
20  using the restricted mode?
21    A.   The exact year, no.  Again, I believe it's
22  within the last five years.
23    Q.   Okay.  And do you know when TikTok started
24  using family safety mode?
25    A.   No.

Page 385

1    Q.   You don't dispute, do you, that your
2  report doesn't contain anything about TikTok's use
3  of password-controlled screen time management,
4  restricted mode, or family safety mode?
5    A.   I'm not sure.  I don't -- I don't know.
6    Q.   Okay.  In your review of the TikTok
7  documents, did you see any references where TikTok
8  reported internally that they considered content to
9  be essential to the viability of the TikTok
10  platform?
11    A.   Content, I'm not sure.  I remember many
12  documents that talk about engagement.  That seemed
13  to be a key thing that different stakeholders within
14  the company saw as essential to the company.
15    Q.   Let me ask you if you agree with this
16  statement.
17       "The success of the platform depends upon
18  the total number of recommendable videos, making the
19  content creation process essential to the platform's
20  survival."
21       Do you agree with that statement with
22  respect to TikTok?
23       MR. KIEFFER:  Object to the form.  Beyond
24  the scope of his opinions.
25       THE WITNESS:  And I'm not sure where that

97 (Pages 382 - 385)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 386

1 is being derived from.
2 BY MR. BOYCE:
3    Q.  Okay.  And let me ask you this.
4       If that's from a TikTok document, would it
5 change your opinion?
6       MR. KIEFFER:  Same objection.
7       MR. BOYCE:  Let's take a look.
8       I'm going to show you what we're marking
9 as Exhibit 31.
10      (Whereupon, Cingel Exhibit 31 was marked
11 for identification.)
12 BY MR. BOYCE:
13   Q.  Exhibit 31 is a TikTok document you cite
14 in your report.  You cite this on -- in paragraph 66
15 of your report and I think also again in -- on
16 page 33, footnote 53.  And let me ask you if you
17 would -- do you see the Bates numbers here on the
18 right-hand corner end in 5196 on the first page?
19   A.  I do.
20   Q.  Okay.  If you would flip to page 206, and
21 that first full paragraph there reads, "The success
22 of the platform depends upon the total number of
23 recommendable videos, making the content creation
24 process essential to the platform's survival."
25      Do you see where I read that?

Page 387

1    A.  I do.
2    Q.  Okay.  Do you recall seeing any other
3 documents from TikTok where TikTok was reporting
4 internally content creation is essential to the
5 platform's viability?
6    A.  I don't recall.  As I mentioned, the ones
7 that I consistently saw were about engagement.  And
8 that would probably be engagement in a variety of
9 different ways with content.
10   Q.  Okay.  Now, let me ask you, it's true,
11 isn't it, Dr. Cingel, that TikTok has also
12 implemented a variety of screen time management
13 features in its platform?
14      MR. KIEFFER:  Object to the form to the
15 extent that it is vague, ambiguous, and assumes
16 facts not in evidence.
17      MR. BOYCE:  That's fair.
18   Q.  Do you know if TikTok has implemented any
19 screen time management features in its platform?
20   A.  I believe that is the case at some point.
21   Q.  And would you agree that implementing
22 screen time management features is a good thing for
23 TikTok to have done?
24      MR. KIEFFER:  Object to the form of the
25 question.  It's vague, ambiguous, and unlimited to

Page 388

1 time.  And assumes facts not in evidence.
2       THE WITNESS:  I agree it's a good thing to
3 have done.  I would also note, though, that the --
4 that the van der Wal study that we've been talking
5 about with data collected very recently shows large
6 groups of adolescents are experiencing negative
7 effects from TikTok specifically.
8 BY MR. BOYCE:
9    Q.  Okay.  Let me hand you -- we're up to --
10      (Whereupon, a brief discussion off the
11 record.)
12      (Whereupon, Cingel Exhibit 32 was marked
13 for identification.)
14 BY MR. BOYCE:
15   Q.  Dr. Cingel, I'm handing you what we've
16 marked as Exhibit 32.  This is a document that
17 you've cited in your report.  As you can see, it
18 ends in Bates number 10814 on the first page there.
19   A.  I see that.
20   Q.  Okay.  And the title is, "Screen Time
21 Management One Pager."
22      Do you see where I'm reading that from the
23 top of the first page there?
24   A.  I do see that.
25   Q.  Okay.  And I'd like you to turn to the

Page 389

1 next page with me, which is Bates number 0815.  And
2 we've got that heading, description, colon, what is
3 it?  And right under there it says, "Screen time
4 management is a primary investment area within our
5 agency pillar in the digital well-being product
6 strategy."
7       Do you see where I read that?
8    A.  I do.
9    Q.  Okay.  And I apologize.  On page 814
10 there, if you flip back, you'll see that this
11 document's dated July 6, 2022.
12   A.  I see that, yes.
13   Q.  Okay.  Now, if you'll turn with me here,
14 now, Dr. Cingel, it's true, isn't it, that this
15 document reflects that TikTok reached the conclusion
16 that screen time management actually increased --
17      Bless you.
18   A.  Thank you.
19   Q.  Isn't it true that this document reflects
20 TikTok reached the conclusion that screen time
21 management actually increased the retention rate of
22 its users?
23      MR. KIEFFER:  Object to the form.
24 Mischaracterizes the document.
25      THE WITNESS:  Is there something that

98 (Pages 386 - 389)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 390

1 you're referring to specifically?
2 BY MR. BOYCE:
3     Q.  Well, again, -- this is cited in your
4 report.
5     A.  Yeah.
6     Q.  As you sit here today, do you recall that
7 being part of this document?
8         THE WITNESS:  I see it here now.
9 BY MR. BOYCE:
10    Q.  Okay.  And you -- in your report, you
11 don't dispute that -- you don't have any statements
12 in there referencing this document and its
13 conclusion that implementing these screen time
14 management protocols actually increased retention of
15 users?
16    A.  Well, I'm just checking your question.
17    Q.  Yeah.
18    A.  No, I don't think I have statements with
19 regard to increasing retention.
20    Q.  Okay.  Now, Dr. Cingel, let me ask you,
21 you don't dispute that TikTok has, as a screen time
22 management feature, something called a screen time
23 alert, do you?
24        MR. KIEFFER:  Object to the form of the
25 question.  Assumes facts not in evidence.

Page 391

1         MR. BOYCE:  That's fair.
2     Q.  Let me ask you.
3         Do you know whether TikTok uses something
4 called a screen time alert or not?
5     A.  I do not know.
6     Q.  Okay.  Do you know whether TikTok uses
7 something called take a break videos or not?
8     A.  I do recall seeing that in internal
9 documents, yes.
10    Q.  And when did TikTok start using take a
11 break videos?
12    A.  I do not know.
13    Q.  Okay.  What is a take a break video?
14    A.  My recollection is that, as you've
15 referenced earlier, I'm not sure at what point, but
16 at some point of use, a video will pop up and says
17 exactly what you said, or something along those
18 lines, to take a break.
19    Q.  Okay.  Now, you don't dispute with me that
20 there's nothing in your report that talks about
21 TikTok's take a break videos?
22        MR. KIEFFER:  Object to the form to the
23 extent it mischaracterizes his report.
24        THE WITNESS:  I don't know if it's in
25 there or not.

Page 392

1 BY MR. BOYCE:
2     Q.  Okay.  Do you know if TikTok uses
3 something called family pairing?
4     A.  I believe I recall that from reading
5 documents.
6     Q.  Okay.  What is family pairing on the
7 TikTok platform?
8     A.  I don't -- I don't know it well enough to
9 speak on the record about it.
10    Q.  Okay.  Are TikTok users able to mute push
11 notifications?
12    A.  I'm not sure.  I believe so.  And I don't
13 believe that it's the default.
14    Q.  Okay.  Do you know for certain, as you sit
15 here, whether it's the default or not?
16    A.  No.
17    Q.  Okay.  Do you know whether TikTok uses
18 something called screen time breaks?
19    A.  That is different from the take a break
20 video that we referenced?
21    Q.  Yes.
22    A.  I'm not aware.
23    Q.  Okay.  Do you know if TikTok uses
24 something called a screen time dashboard?
25    A.  I believe I recall seeing that in

Page 393

1 documents.
2     Q.  Okay.  What is the TikTok screen time
3 dashboard?
4     A.  I don't know.
5     Q.  Okay.  Do you know if there's anything in
6 your report that talks about the impact of the
7 TikTok screen time dashboard on adolescents' mental
8 well-being?
9     A.  No.
10    Q.  Okay.  And last, do you know if TikTok
11 uses something called the 60-minute limit?
12    A.  I do not know.
13    Q.  Okay.  And do you know if TikTok uses
14 something called sleep reminders?
15    A.  I'm not sure.
16    Q.  Okay.  Last one here, Dr. Cingel.
17        Thank you for your patience.  I know it's
18 been a long day here, guys.
19        33?
20        I'm going to hand you what we've marked as
21 Exhibit 33.
22        (Whereupon, Cingel Exhibit 33 was marked
23 for identification.)
24 BY MR. BOYCE:
25    Q.  Dr. Cingel, Exhibit 33 is a TikTok

99 (Pages 390 - 393)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 394

1  document that ends in Bates number 51118.
2       Do you see where I am reading that from,
3  the bottom right-hand corner of the document there?
4       A.  I do.
5       Q.  Okay.  And you cite this document in your
6  report on page -- on page 90 in paragraph 225.
7       And I'll give you a chance to get there.
8       A.  Thank you.  225, you said?
9       Q.  Yep.  It's page 90, paragraph 225, and
10  it's footnote 249.
11      A.  Yes.
12      Q.  And you see there in footnote 249, it's
13  got the same Bates number there that ends in that
14  5118?
15      A.  Yeah.
16      Q.  Okay.  And you said, just for the quote,
17  it says, "Notably, internal TikTok documents show
18  differences in design safety in China compared to
19  the United States, noting much stronger safety
20  measures for under 14-year-old users on Douyin, and
21  stating," quote, "We give spinach to kids in China
22  and opium to kids in America."
23      Do you see where I read that?
24      A.  Yes.
25      Q.  Okay.  Now, if you would turn to

Page 395

1  Exhibit 33, and you see there on the first page
2  under Objective, it says, "Identify opportunities to
3  improve stakeholders' perception of TikTok as safe
4  for teenagers."
5       And then it says, "In the US, TikTok is
6  facing significant and impactful criticism that" --
7  do you see where I'm reading that?
8       A.  I do.
9       Q.  This is where you get that quote from,
10  correct?
11      A.  Yes.  What -- if I may add, though, my
12  recollection of this is that we clarified this in
13  the MDL report because I do recognize that this came
14  from, I believe, a former TikTok employee speaking
15  outside.
16      Q.  Okay.  The -- and I'll get to that in a
17  second.
18      And I apologize, I do not have your MDL
19  report here.  I'll take your representation.  That's
20  fine with me.
21      But the first thing I want you to read is
22  under -- in the document you quote, it says, "We
23  give spinach to kids in China and," quote, "optium
24  to kids in America."
25      Do you see where I read that from?

Page 396

1       A.  I see that.
2       Q.  Did you change "optium" to "opium" in your
3  report?
4       A.  I may -- I did not change it.
5       Q.  Well, you see the document you're quoting
6  from says "optium"?
7       A.  I assume that that is a typo.
8       Q.  You're familiar with the grammatical thing
9  where --
10      A.  Yes.
11      Q.  -- people would put "sic" --
12      A.  Yes.
13      Q.  -- or something in?
14      THE REPORTER:  Wait.
15  BY MR. BOYCE:
16      Q.  You're familiar with the grammatical or
17  the editorial thing where people use "sic"?  They
18  want to make sure the quote is accurate.  And then
19  they would put, "sic," maybe, opium, correct?
20      A.  Correct.
21      Q.  Okay.  But when you wrote your report, for
22  starters, it's true, isn't it, that in the document
23  that ends Bates number 1118, this line is not
24  bolded?
25      A.  No.

Page 397

1       Q.  Okay.  And you have bolded it in your
2  report, correct?
3       A.  Yes.  Again, though, this might be what we
4  corrected in the MDL.
5       Q.  Okay.  And then you have changed "optium"
6  to "opium."  Correct?
7       A.  I don't know if I changed it.  That is
8  what is written here.
9       Q.  Okay.  Your report says "opium."  The
10  source document says "optium."
11      A.  Again, in this particular case, yes.
12      Q.  Okay.
13      A.  In the MDL, I believe we changed it to
14  when the, I believe, gentleman said "opium" in a
15  different document.
16      Q.  And in the MDL report did you reflect that
17  the gentleman who made that statement does not work
18  for TikTok?
19      A.  I am not sure.  I thought that he used to.
20  But I'm not sure.
21      Q.  Are you familiar with a gentleman named
22  Tristan Harris?
23      A.  That name sounds familiar to me.
24      Q.  And if you look at Exhibit 33 there, the
25  hyperlink citation for this quotation looks like it

100 (Pages 394 - 397)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 398

1 comes from a 60 Minutes news video?
2    A.  Yes.
3    Q.  Did you watch that 60 Minutes news video
4 before preparing your JCCP report?
5    A.  I may have.  I don't recall specifically.
6    Q.  Do you recall if Tristan Harris was
7 interviewed on that 60 Minutes program?
8    A.  I'm not sure.
9    Q.  Okay.  And do you know whether that quote
10 is actually what Mr. Harris said in that interview,
11 or not?
12    A.  I'm not sure.
13    Q.  Okay.  You would acknowledge with me that
14 paragraph 225 in your JCCP report needed some
15 updating and explanation in the MDL report?
16    A.  That is my recollection of the process
17 that occurred.
18        MR. BOYCE:  Thank you for your time and
19 patience, sir.  That's all the questions I have for
20 you.
21        THE WITNESS:  Thank you.
22        THE VIDEOGRAPHER:  The time is 7:13 p.m.
23 Pacific time.  We're going off the record.
24        (Whereupon, a brief recess was taken.)
25        THE VIDEOGRAPHER:  The time is 7:15 p.m.

Page 399

1 Pacific time.  We're back on the record.
2            EXAMINATION
3 BY MR. KIEFFER:
4    Q.  Good evening, Professor Cingel.
5    A.  Hi.
6    Q.  You have been on the record today,
7 according to my count, for something in excess of
8 seven and a half hours, correct?
9    A.  Seems right.
10    Q.  Okay.  You have answered questions from
11 four lawyers, one for each of the defendants, also,
12 correct?
13    A.  Correct.
14    Q.  All right.  You have been questioned about
15 something in excess of, I think, maybe 30 different
16 exhibits?
17    A.  33.
18    Q.  Okay.  My questions at the moment pertain
19 to just one of those, Exhibit 15.
20        Do you have Exhibit 15 in front of you?
21    A.  I do.
22    Q.  Exhibit 15 is entitled "Cingel Response to
23 Certain Defense Expert Critiques."  Is that correct?
24    A.  It is.
25    Q.  Did you prepare this document?

Page 400

1    A.  I did.
2    Q.  Is it your understanding that after you
3 tendered your report in the JCCP there were certain
4 other expert witnesses who tendered reports on
5 behalf or some of all of the defendants?
6    A.  It is my understanding.
7    Q.  Okay.  You were furnished with a number of
8 defense expert reports?
9    A.  I was.
10    Q.  You reviewed at least some of those?
11    A.  I did.
12    Q.  Did you see that some of those defense
13 experts raised critiques or criticisms of your work
14 and/or your conclusions?
15    A.  I did.
16    Q.  And this document that is entitled "Cingel
17 Response," is that your response to certain of the
18 critiques that were raised against you?
19    A.  It is some of my response.  It's notes
20 based on my response.
21    Q.  Okay.  And let's talk about that.
22        Just in terms of format, there are names
23 here, for example, the first one is Allen, page 12,
24 correct?
25    A.  Yes.

Page 401

1    Q.  You understand there's a Dr. Allen that
2 was identified for the defendants?
3    A.  I do.
4    Q.  And does page 12 reference page 12 of
5 Dr. Allen's report?
6    A.  Yes.
7    Q.  And is that where you found, for example,
8 a critique or a criticism of your work?
9    A.  Yes.
10    Q.  And so the entry on the first page of
11 Exhibit 15 is your response to Dr. Allen's critique
12 of you at page 12 of his report?
13    A.  It is.
14    Q.  You heard one or more lawyers use the term
15 "rebuttal"?
16    A.  Yes.
17    Q.  Is that a word that you use in your
18 day-to-day work?
19    A.  No.
20    Q.  Okay.  "Response" is the word you would
21 use as a synonym, correct?
22    A.  Yeah, yes.
23    Q.  All right.  And these different response
24 points, they are identified according to the
25 different experts' last names, correct?

Golkow Technologies,
A Veritext Division

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 402

1    A.  Yes.
2    Q.  All right.  And for each -- I'm going to
3  call these individual response points, for example,
4  Allen, page 12, is a response point.  Allen,
5  page 13, is a response point.  You follow?
6    A.  Yes.
7    Q.  Okay.  Are each of these response points
8  intended to be exhaustive and all-encompassing in
9  terms of the verbiage you have corresponding to each
10  point?
11    A.  No.
12    Q.  Okay.  What's the point of the verbiage
13  you have?
14    A.  The point of the verbiage is to just
15  really give myself a reminder of what was said about
16  my report.  My initial thoughts in response to that.
17  And that's what I have down on this paper.
18    Q.  So that if anybody wanted to ask you about
19  your response document, for example, at today's
20  deposition, this would be a trigger for the
21  overarching point that you wanted to make, correct?
22    A.  Yeah, it would give me information to be
23  able to begin to answer that question.
24    Q.  Okay.  And you came here today ready,
25  willing, and able to respond to any questions that

Page 403

1  you might be asked about on your various response
2  points on Exhibit 15 if any of the lawyers want to
3  ask you about that, correct?
4    MR. CHAPUT:  Object to the form.
5    THE REPORTER:  I'm sorry?
6    MR. CHAPUT:  Object to the form.
7    THE WITNESS:  I did come prepared to do
8  that, yes.
9  BY MR. KIEFFER:
10    Q.  And no lawyers asked you any substantive
11  questions today about any of these response points
12  on Exhibit 15 other than asking you what the
13  document was, what it represented, correct?
14    MR. CHIOU:  Objection to form.
15    You can answer, Dr. Cingel.
16    THE WITNESS:  I do not believe so.
17    MR. KIEFFER:  Okay.  Those are all the
18  questions I have.  Thank you.
19    THE WITNESS:  Thank you.
20    MR. CHIOU:  Can we go off the record for
21  three minutes?
22    MR. KIEFFER:  Yeah.
23    MR. CHIOU:  Thank you.
24    THE VIDEOGRAPHER:  The time is 7:19
25  Pacific time.  We're going off the record.

Page 404

1    (Whereupon, a brief recess was taken.)
2    THE VIDEOGRAPHER:  The time is 7:27 p.m.
3  Pacific time.  We're back on the record.
4    EXAMINATION
5  BY MR. CHIOU:
6    Q.  Good evening, Dr. Cingel.
7    A.  Hi, again.
8    Q.  Mr. Kieffer just asked you a series of
9  questions about Exhibit 15, right?
10    A.  Yes.
11    Q.  You remember you and I had discussed
12  Exhibit 15 earlier today, right?
13    A.  My -- a long time ago, but my
14  recollection, it was fairly brief.
15    Q.  Dr. Cingel, other than extra verbiage or
16  expanding on certain points, do you have any
17  response to defense expert critiques that are not
18  reflected in Exhibit 15?
19    A.  At this time, no.  And with those
20  qualifications.
21    MR. CHIOU:  No further questions.
22    MR. CHAPUT:  We're all done.
23    (Whereupon, a brief discussion off the
24  record.)
25    THE VIDEOGRAPHER:  This concludes the

Page 405

1  deposition of Dr. Drew Patrick Cingel.  Total time
2  on the record is 7 hours 44 minutes.
3    Defendants at 7 hours 40 minutes.
4    And plaintiffs at 7 hours and -- or not
5  7 hours -- 4 minutes.  4 minutes.  Sorry about that.
6    I, Alejandro Zamora-Ruiz, the videographer
7  for the deposition of Dr. Drew Patrick Cingel on
8  July 9, 2025, certify the correctness, completeness,
9  and accuracy of the video recording.
10    Going off the record at 7:29 p.m. Pacific
11  time.
12    (Whereupon, the deposition was concluded
13  at 7:29 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

102 (Pages 402 - 405)

CONFIDENTIAL - PURSSUANT TO PROTECTIVE ORDER

Page 406

INSTRUCTIONS TO WITNESS

1
2
3       Please read your deposition over carefully
4  and make any necessary corrections.  You should
5  state the reason in the appropriate space on the
6  errata sheet for any corrections that are made.
7       After doing so, please sign the errata
8  sheet and date it.
9       You are signing same subject to the
10  changes you have noted on the errata sheet, which
11  will be attached to your deposition.
12       It is imperative that you return the
13  original errata sheet to the deposing attorney
14  within forty-five (45) days of receipt of the deposition
15  transcript by you.  If you fail to do so, the
16  deposition transcript may be deemed to be accurate
17  and may be used in court.
18
19
20
21
22
23
24
25

Page 408

ACKNOWLEDGMENT OF DEPONENT

1
2
3
4
5       I,_____, do hereby certify
6  that I have read the foregoing pages, and that the
7  same is a correct transcription of the answers given
8  by me to the questions therein propounded, except
9  for the corrections or changes in form or substance,
10  if any, noted in the attached Errata Sheet.
11
12
13  _____ _____
14  DREW PATRICK CINGEL, Ph.D.     DATE
15
16
17
18
19
20
21
22
23
24
25

Page 407

ERRATA SHEET

1
2
3  PAGE  LINE    CHANGE
4  ____  ____ _____
5       REASON:_____
6  PAGE  LINE    CHANGE
7  ____  ____ _____
8       REASON:_____
9  PAGE  LINE    CHANGE
10  ____  ____ _____
11       REASON:_____
12  PAGE  LINE    CHANGE
13  ____  ____ _____
14       REASON:_____
15  PAGE  LINE    CHANGE
16  ____  ____ _____
17       REASON:_____
18  PAGE  LINE    CHANGE
19  ____  ____ _____
20       REASON:_____
21  PAGE  LINE    CHANGE
22  ____  ____ _____
23       REASON:_____
24
25

Page 409

1  STATE OF CALIFORNIA  )
2  COUNTY OF YOLO      )
3       I, ELAINA BULDA-JONES, a Certified Shorthand
4  Reporter of the State of California, duly authorized
5  to administer oaths pursuant to Section 2025 of the
6  California Code of Civil Procedure, do hereby
7  certify that
8       DREW PATRICK CINGEL, Ph.D.,
9  the witness in the foregoing deposition, was by me
10  duly sworn to testify the truth, the whole truth and
11  nothing but the truth in the within-entitled cause;
12  that said testimony of said witness was reported by
13  me, a disinterested person, and was thereafter
14  transcribed under my direction into typewriting and
15  is a true and correct transcription of said
16  proceedings.
17       I further certify that I am not of counsel or
18  attorney for either or any of the parties in the
19  foregoing deposition and caption named, nor in any
20  way interested in the outcome of the cause named in
21  said deposition dated the 14th day of July, 2025.
22
23
24
25  ELAINA BULDA-JONES, CSR 11720

103 (Pages 406 - 409)