**Exhibit 17**

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE GENERAL CAUSATION TESTIMONY OF PLAINTIFFS' EXPERTS**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES


COORDINATION PROCEEDING　　　　　) JCCP No. 5255

SPECIAL TITLE [RULE 3.400]　　　) For Filing

　　　　　　　　　　　　　　　　　) Purposes:

IN RE: SOCIAL MEDIA　　　　　　　) 22STCV21355

ADOLESCENT ADDICTION　　　　　　　) Judge Carolyn Kuhl

_____ )

THIS DOCUMENT RELATES TO:　　　　)

Christina Arlington Smith,　　　 )

et al. v. TikTok Inc., et al., )

Case No. 22STCV21355, Los　　　　)

Angeles Superior Court　　　　　　)

_____ )




VIDEOTAPED DEPOSITION OF JEAN M. TWENGE, Ph.D.

JUNE 26, 2025

9:06 A.M.




Job No.: 7396586

Pages: 1 - 508

Reported by: Leslie A. Todd, CSR No. 5129 and RPR

CONFIDENTIAL

Page 2

Videotaped deposition of JEAN M. TWENGE, Ph.D., held pursuant to notice, before Leslie Anne Todd, California Certified Shorthand Reporter in and for the State of California, who officiated in administering the oath to the witness, at the:

COURTYARD SAN DIEGO RANCHO BERNARDO

LAKESIDE ROOM

11611 Bernardo Plaza Court

San Diego, California 92182

(858) 613-2000

Page 4

APPEARANCES (Continued):

TRICIA L. CAMPBELL, ESQUIRE (via Zoom)
LUCY R. MALONE, ESQUIRE (via Zoom)
WAGSTAFF & CARTMELL, LLP
4740 Grand Avenue
Suite 300
Kansas City, Missouri 64112
(816) 701-1135

PREVIN WARREN, ESQUIRE (via Zoom)
MOTLEY RICE, LLP
401 9th Street NW
Suite 630
Washington, DC 20004
(202) 232-5504

ON BEHALF OF THE TIKTOK DEFENDANTS:
KATHRYN S. LEHMAN, ESQUIRE
KEVIN BOYCE, ESQUIRE
KING & SPALDING LLP
1180 Peachtree Street, NE
Suite 1600
Atlanta, Georgia 30309
(404) 572-4600

Page 3

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:
KELLY K. McNABB, ESQUIRE
LIVIA JARAMILLO, ESQUIRE
LEXI J. HAZAM, ESQUIRE (via Zoom)
MATIAS BUSTAMANTE, ESQUIRE (via Zoom)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street
8th Floor
New York, New York 10013-1413
(212) 355-9500

MARIANA A. McCONNELL, ESQUIRE
KIESEL LAW, LLP
8648 Wilshire Boulevard
Beverly Hills, California 90211-2910
(310) 854-4444

NARMEEN K. NKEITI, ESQUIRE (via Zoom)
MORGAN & MORGAN
20 N Orange Avenue
Suite 1600
Orlando, Florida 32801-4624
(877) 667-4265

Page 5

APPEARANCES (Continued):

ON BEHALF OF THE META DEFENDANTS
GREGORY L. HALPERIN, ESQUIRE
BRIAN REISER, ESQUIRE
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, New York 10018-1405
(212) 841-1166

ON BEHALF OF THE GOOGLE AND YOUTUBE DEFENDANTS:
MATTHEW DONOHUE, ESQUIRE
WILSON SONSINI GOODRICH & ROSATI, LLP
953 East Third Street
Suite 100
Los Angeles, California 90013-1955
(323) 210-2939

ON BEHALF OF THE SNAP DEFENDANTS:
JOHN B. MAJOR, ESQUIRE
MUNGER TOLLES & OLSON, LLP
350 South Grand Avenue
50th Floor
Los Angeles, California 90071-3426
(213) 683-9100

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

APPEARANCES (Continued):

ALSO PRESENT:
      TIM HUNTER, Videographer

Page 7

C O N T E N T S

EXAMINATION OF JEAN M. TWENGE, Ph.D.        PAGE

By Ms. Lehman                14, 491
By Mr. Halperin              399
By Mr. Major                 436
By Mr. Donohue               459

E X H I B I T S
      (Attached to transcript)

TWENGE DEPOSITION EXHIBITS              PAGE
No. 1    Defendants' Joint Notice of
         Deposition of Plaintiffs' Retained
         Expert Jean Twenge and Request for
         Production of Documents      25
No. 2    Invoices - Jean Twenge           42
No. 3    Curriculum Vitae of Jean M.
         Twenge, beginning Bates No.
         TWENGE000001                 106
No. 4    Article entitled "The Age of
         Anxiety? Birth Cohort Change in
         Anxiety and Neuroticism, 1952-
         1993"                   171

Page 8

E X H I B I T S (Continued)
      (Attached to transcript)

TWENGE DEPOSITION EXHIBITS              PAGE
No. 5    Article entitled, "Birth cohort
         increases in psychopathology
         among young Americans, 1938-2007:
         A cross-temporal meta-analysis
         of the MMPI"             176
No. 6    Article entitled, "Social
         Media Use and Adolescent
         Mental Health: Findings
         from the UK Millennium
         Cohort Study"            187
No. 7    "Social Media and Mental
         Health:  A Collaborative
         Review"                  199
No. 8    Article entitled, "Time Spent
         on Social Media and Risk of
         Depression in Adolescents:
         A Dose-Response Meta-Analysis"     211
No. 9    Article entitled, "Not all screen
         time is created equal:
         associations with mental health
         vary by activity and gender"       221

Page 9

E X H I B I T S (Continued)
      (Attached to transcript)

TWENGE DEPOSITION EXHIBITS              PAGE
No. 10   Article entitled, "Gender
         differences in associations
         between media use and
         psychological well-being:
         Evidence from three large datasets"  228
No. 11   Article entitled, "Windows of
         developmental sensitivity to
         social media"            236
No. 12   Article entitled, "A meta-analytic
         review of the relationship between
         social media use and body image
         disturbance"             241
No. 13   Article entitled, "Decreases in
         self-reported sleep duration among
         U.S. adolescents 2009-2015 and
         links to new media screen time"     254
No. 14   Article entitled, "Associations
         between screen time and short
         sleep duration among adolescents
         varies by media type: Evidence
         from a cohort study"      256

3 (Pages 6 - 9)

CONFIDENTIAL

Page 10

E X H I B I T S (Continued)

(Attached to transcript)

TWENGE DEPOSITION EXHIBITS          PAGE

No. 15    Article entitled, "Less in-person social interaction with peers among U.S. adolescents in the 21st century and links to loneliness"          259

No. 16    Article entitled, "Decreases in Psychological Well-Being Among American Adolescents After 2012 and Links to Screen Time During the Rise of Smartphone Technology"          271

No. 17    Graph showing "Teen (15-19) suicide rate per 100K          289

No. 18    Article entitled, "School shootings jumped 124% between the 2021-21 and 2021-22 school years"          295

No. 19    Article entitled, "Parent drug overdoses: The true cause of the adolescent mental health crisis?"    298

Page 12

E X H I B I T S (Continued)

(Attached to transcript)

TWENGE DEPOSITION EXHIBITS          PAGE

No. 26    Article entitled, "Passive Facebook Usage Undermines Affective Well-Being Experimental and Longitudinal Evidence"          370

No. 27    Article entitled, "Association of Screen Time and Depression in Adolescence"          374

No. 28    Working draft - TikTok Minor Safety, Keeping our youth safe on and off TikTok, beginning Bates No. TIKTOK3047MD-001-00002937          381

No. 29    Trust and Safety: Issue Domain Brief - Minor Safety, beginning Bates No. TIKTOK3047MDL-001-00060856          391

No. 30    Article entitled, "Teen Mental Health Deep Dive," beginning Bates No. META3047MDL-003-00109173    427

No. 31    "Teens blame Instagram for increases in the rates of anxiety and depression among teens," beginning Bates No. META3047MDL-003-00109196    428

Page 11

E X H I B I T S (Continued)

(Attached to transcript)

TWENGE DEPOSITION EXHIBITS          PAGE

No. 20    Article entitled, "Climate anxiety in children and young people and their beliefs about government responses to climate change: A global study"          303

No. 21    Article entitled, "Decline in Independent Activity as a Cause of Decline in Children's Mental Well-Being: Summary of the Evidence"          310

No. 22    Article entitled, "Social Media and Adolescent Health (2023)"          328

No. 23    Article entitled, "Teenagers, screens and social media: A narrative review of reviews and key studies"          342

No. 24    Article entitled, "Social Media and Mental Health"          358

No. 25    Article entitled, "Facebook Use Predicts Declines in Subjective Well-Being in Young Adults"          364

Page 13

E X H I B I T S (Continued)

(Attached to transcript)

TWENGE DEPOSITION EXHIBITS          PAGE

No. 32    Preprint version of the manuscript: Social Media Use Leads to Negative Mental Health Outcomes for Most Adolescents"          447

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

PROCEEDINGS
-------------------

THE VIDEOGRAPHER: We are now on the record. My name is Tim Hunter. I'm your legal videographer with Golkow, a Veritext Division.

Today's date is June 26, 2025. The time on the record is 9:06 a.m. This deposition is being held at 11611 Bernardo Plaza Court, San Diego, California 92182.

Our deponent today is Jean Twenge.

Madam Reporter, would you please swear in the witness, and we can start the deposition.

THE REPORTER: Hi, I'm Leslie Todd, California CSR 5129.

JEAN M. TWENGE, Ph.D., having first been duly sworn, was examined and testified as follows:

EXAMINATION
BY MS. LEHMAN:

Q. Good morning.

A. Good morning.

Page 15

Q. How are you today?

A. I'm doing all right.

Q. All right. What is your full name, please?

A. Jean Marie Twenge.

Q. All right. I'm going to confess to you that in my mind, I've been calling you Dr. Twenge for several weeks.

A. I answer to anything, including, Hey, you.

Q. Well, I won't go there, but I just want to apologize in advance if I slip and call you Twenge. It's because that is what's in my mind, and what you have been for a while.

A. Okay. Just remember it should have an "A" in the middle.

Q. Twenge, yes.

A. Twenge, like "twangy" guitar.

Q. All right. Well, I have a southern accent, so maybe that'll come through, and --

A. There you go. That'll work.

Q. All right. Good morning.

We haven't met before. My name

Page 16

is Katy Lehman. I represent TikTok.

And are you prepared to discuss your final opinions today?

A. I am.

Q. Do you anticipate doing any additional work before trial other than perhaps reviewing your reports?

A. I have some comments on the defendant experts' reports. So I may be writing a rebuttal report. And if you have any questions about those opinions on those defendant expert reports, I can answer them today.

Q. Okay. And we'll certainly get to that. Have you already written that rebuttal report?

A. I have not.

Q. Have you -- which are the defense experts that you have reviewed?

A. So I have mostly focused on Gottlieb, Hampton, and then Baiocchi. So a similar problem with my own last name, I'm not sure how to pronounce it.

Q. And I will confess that I've heard it pronounced, but I keep butchering

Page 17

his name as well.

All right. So I know that you have been deposed before. So if you don't understand any of my questions, please let me know, and I'm happy to rephrase them, okay?

A. All right.

Q. Now, Tim is making a video, but we also have a court reporter. So if you can avoid saying "mm-hmm" or "uh-huh," that will make her job much easier, and it will mean that you and I don't get a talking to at the break.

A. Okay.

Q. All right. And to that end, if I start my next question before you finish your answer, or you start an answer before I finish my question, we should feel free to let each other know that, I'm not being rude, just making sure that we have a clean record.

A. Okay.

Q. Now, I tend to take a break about every 90 minutes to two hours, but sometimes I just lose track of time. So if, at any point, you need a break, please do let me know, and I'm happy to take a break.

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

A.    Okay.

Q.    All right.  Are you on any medications or suffering from any illnesses that would interfere with your ability to testify accurately today?

A.    No.

Q.    Is there any health reason or any other reason why you cannot provide your best and most complete opinions today?

A.    No.

Q.    Now, when I refer to a social media platform or social media today, I just want to clarify that I'm including both the online version and any downloadable app on a user's phone, okay?

A.    All right.

Q.    And I may also today use the terminology RCT to mean a randomized control trial.

A.    Okay.  And in psychology, we would usually refer to that as a random assignment experiment, and you're using that to mean the same, correct?

Q.    Yes, I am.  And so if -- but if at any point, you have a question about my

Page 19

terminology, please let me know.

A.    Okay.

Q.    I may also use the term experimental studies to refer to randomized control trials.

A.    Okay.

Q.    And finally, I may use psychiatric disorders and mental health disorders to mean the same thing.

A.    Okay.

MS. McNABB:  And I will say, if it becomes an issue on clarification later with the specific question, I may object.

MS. LEHMAN:  Absolutely.

BY MS. LEHMAN:

Q.    All right.  Now, how many times have you been deposed in the past?

A.    Once.  Well, twice.  Once as an expert.  Once in another case.

Q.    Okay.  And so when you testified as an expert, was that in Computer and Communications Industry Association and NetChoice versus Moody?

A.    Yes.

Page 20

Q.    And that was in January of this year?

A.    Yes.

Q.    So have you been deposed since your deposition in that case?

A.    No.

Q.    And in your deposition in the -- we'll call it "the computer case" for shorthand, did you take an oath to tell the truth, just as you have just done here today?

A.    Yes.

Q.    Have you ever testified before any legislators?

A.    Yes.

Q.    How many times?

A.    I don't recall exactly.  I testified in front of the Florida legislature.  And then recently, a subcommittee of the U.S. House of Representatives.  Those are the two I recall.

Q.    When did you testify before the Florida legislature?

A.    I don't recall exactly.  It was at least two years ago.

Q.    What was the topic of that

Page 21

testimony?

A.    I believe it was the same law that I was deposed on in January.

Q.    And who invited you to speak before the Florida legislature?

A.    I don't recall the name of the person.

Q.    How long was your testimony before the Florida legislature?

A.    So I believe I presented for about 20 minutes, but then the legislators had questions.  So I think the total may have been closer to two hours with the questions and so on.

Q.    Was that before the entire legislature or was that a committee or subcommittee?

A.    I don't recall.

Q.    And which subcommittee did you testify before in the U.S. House?

A.    So I'm not going to get the name verbatim.

Q.    As best as you can remember?

A.    Yeah, but it was about education.

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

Q. What about education?

A. So they asked me specifically to address phones in schools. That's what the hearing was about.

Q. How long was your presentation?

A. Three minutes.

Q. Was there some specific part of the topic of phones in schools that you addressed in that testimony?

A. It was about impacts on academic performance, loneliness in schools. And then I also covered teacher morale, and a few other topics that don't come to mind immediately.

Q. Did you also submit a written version of your testimony?

A. I did.

Q. Who invited you to speak before the House subcommittee?

A. So I'm blanking on her name. Forgive me. But it was a fellow working for that subcommittee, who in her usual life, is a middle school teacher. She was spending some time with the subcommittee, helping them out.

Page 23

Q. And do you know her, personally?

A. No, I do not.

Q. Do you remember her name?

A. I don't.

Q. Beyond the two events that we just talked about, the Florida legislature and the U.S. House committee, have you made any other presentations to legislators?

A. Not that I recall.

Q. Have you provided any testimony by affidavit, declaration, or other sworn statement?

A. Can you clarify what you mean by that, like to whom?

Q. In any other court case.

A. So I was deposed in something, where I was not an expert, if that's relevant.

Q. Was that, like, a family law or divorce type proceeding?

A. No, it was a contract dispute with a textbook publisher.

Q. Did that relate to the payment of royalties?

Page 24

A. It did.

Q. And so putting aside the computer case and the contract dispute with the textbook publisher, have you submitted any other affidavits or declarations in other lawsuits?

A. So I mean, I have done background work, but not -- I don't know which cases in which I have been announced as an expert or disclosed as an expert.

So I -- for example, I have worked with the Attorneys General of Tennessee, and I believe I have been declared as -- disclosed as an expert in that case, as well as Utah.

Q. And when you say Utah, are you working with the Attorney General of Utah?

A. Yes.

Q. And are those cases brought by the attorneys general against social media companies?

A. I believe so, yes.

Q. And I understand that you have been disclosed in -- obviously, we're here in the JCCP proceeding, but also in the MDL

Page 25

proceeding.

A. Correct.

Q. And are there any other lawsuits where you're aware that you've been disclosed as an expert?

A. Not that -- not that I can recall, though there's many that I have worked with. And so I'm not entirely clear on which ones I've been disclosed on. So the ones I shared are those that I know for sure.

Q. Okay. Do you have any depositions scheduled? I believe you're in the process of scheduling an MDL deposition. Do you have any other depositions scheduled?

A. No.

Q. I'm going to hand you what I've marked as Exhibit No. 1.

(Exhibit No. 1 was marked for identification.)

BY MS. LEHMAN:

Q. And can you confirm that this is Defendants' Joint Notice of Deposition of Plaintiffs' Retained Expert, Jean Twenge, and Request For Production of Documents?

A. Yes.

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

Q. Have you seen this document before?

A. Yes.

Q. And did you review the document requests that start on page 3?

A. Yes.

Q. Did you bring all of the documents that you have that are responsive to this request or provide them to counsel to provide them to us?

A. I did provide them to counsel.

MS. McNABB: I will note that we have served responses and objections to this request to -- there are objections on the record for these requests.

MS. LEHMAN: Thank you.

BY MS. LEHMAN:

Q. And what documents did you provide to counsel that were responsive to this notice of deposition?

A. I provided, number one, a copy of your current resume or curriculum vitae. The list of publications is already in the CV. The list of cases in which I've

Page 27

testified. And then I think -- so the rest -- okay, so four -- I think there are objections on the record about most of the rest. So I'm not sure what I can speak to.

Q. Okay. Well, let me ask you some follow-up questions.

A. Okay.

Q. All right. Do you have a clinical practice?

A. I do not.

Q. Have you ever had a clinical practice?

A. No.

Q. All right. And so based on your response to my last two questions, would it be accurate that you have never used a patient intake form or questionnaire?

A. Correct, I have not.

Q. Have you ever prepared any patient or family handouts or pamphlets to be provided to patients for someone else's clinical practice?

A. No.

Q. Have you ever prepared a video or other material to be used in someone

Page 28

else's clinical practice?

A. No.

Q. Have you previously provided copies to counsel of presentations that you have given with respect to COVID?

MS. McNABB: I will object to the extent that we have provided objections to that request.

But you can go ahead and answer the question. I won't tell you -- I won't instruct you not to answer.

THE WITNESS: So I have not given them copies of my presentation slides, no.

BY MS. LEHMAN:

Q. Okay. Have you previously made presentations, so that there are -- strike that. Let me start again.

Do you have written presentations or presentation materials that address COVID?

MS. McNABB: Same objection.

THE WITNESS: Yes.

BY MS. LEHMAN:

Q. When was the last time that you

Page 29

gave that presentation that discussed COVID?

A. Difficult to recall. Probably 2021, but it could have been 2022.

Q. Do you have presentation materials that discuss the impact of economic recessions on adolescents?

MS. McNABB: Objection, based on our responses and objections that were provided to counsel.

THE WITNESS: Perhaps it would have been one slide. And that's not usually something that I include a slide on.

BY MS. LEHMAN:

Q. Okay. Do you have presentation materials that discuss the impact of school shootings on adolescents?

MS. McNABB: Same objection.

THE WITNESS: I don't have any slides on that, no. I have discussed that in written publications, but I don't have slides on that in my presentations.

BY MS. LEHMAN:

Q. Have you ever given a

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

presentation that focused solely on the impact of school shootings on adolescents?

A. No.

MS. McNABB: Same objection.

BY MS. LEHMAN:

Q. What are the publications that you're referring to when you say that you have written in publications about the impact of school shootings?

A. They have been mentioned -- so let me begin again.

So in the discussion of the very large and sudden rise in adolescent depression, school shootings have been mentioned as a possible explanation. So I have discussed them in that context.

Q. Have you ever conducted a study focused on evaluating the impact of school shootings on adolescents?

A. No.

Q. Have you published any articles in peer-reviewed journals that discussed the impact of school shootings on adolescents?

A. No. And let me give one clarification, just, you know, to be thorough.

Page 31

I did, in the early 2000s, examine the combination of social rejection and narcissism on aggression, and then in those papers, made some connections to school shootings. However, I don't see that as the same as your question, in terms of the impact of school shootings on adolescents, if that makes sense.

Q. Let me ask a clarifying question, because I think I understand.

A. Okay.

Q. So in the article that you're talking about, about social regression --

A. Social rejection.

Q. -- social rejection and aggression, were you talking about how that would impact someone who may engage in a social shooting type behavior?

A. Yeah, it's more focused on the perpetrators, yes.

Q. That's what I understood.

A. Yes.

Q. And thank you for that clarification.

A. Yes.

Q. Have you conducted any studies

Page 32

that look at the impact of economic recessions or economic hardships on adolescents?

A. So I have examined the -- in a time series analysis, I have examined the possible role of, for example, the unemployment rate or other indicators of an economic recession, and how that correlates or does not with the rise in adolescent depression.

Q. And is that one article or more than one article? What is that --

A. It's probably more than one.

Q. Do you recall the name of it?

A. So my, I think, 2018 paper in Emotion definitely did that. And I have certainly discussed it in other publications as a -- because I considered it as a possible explanation for the rise in adolescent depression after 2012.

Q. All right. I expect that we'll talk about that paper later today.

A. All right.

Q. Have you -- have you -- strike that.

Do you have any written

Page 33

presentation materials that address the impact of the opioid epidemic on adolescents?

A. No.

MS. McNABB: Objection to the extent that we submitted objections to these requests.

BY MS. LEHMAN:

Q. Have you conducted any studies that are published in any peer-reviewed journal that address the impact of the opioid epidemic on adolescents?

A. To my recollection, I may have mentioned the opioid epidemic in a publication or two, as a -- again, a possible alternative explanation for the rise in adolescent depression.

Q. Other than a possible mention in a larger article, have you published any articles that are focused on the impact of the opioid epidemic on adolescents?

A. No.

Q. Do you have any presentation materials that discuss the impact of climate change on adolescents?

MS. McNABB: Objection to the

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

extent that we provided objections to this request.

THE WITNESS: And you asked about presentations; is that correct?

BY MS. LEHMAN:

Q. Yes.

A. No.

Q. Okay. Have you conducted any studies that look at the impact of climate change on adolescents?

A. No.

Q. Have you published any articles in peer-reviewed journals that look at the impact of climate change on adolescents?

A. I believe, again, it has been mentioned as an alternative explanation that I have considered for the rise in adolescent depression after 2012.

Q. Putting aside a mention in a larger article, have you published any articles in peer-reviewed journals that are focused on the impact of climate change on adolescents?

A. No.

Q. Do you have any presentation materials that address the impact of academic

Page 35

pressures on adolescents?

MS. McNABB: Same objection.

THE WITNESS: Presentations?

BY MS. LEHMAN:

Q. Yes.

A. No.

Q. Have you conducted any studies that look at the impact of academic pressures on adolescents?

A. So it depends on how you define study. I have had several Substack posts that have been focused on that, that dig into some of the empirical research on that topic.

Q. Have you conducted any unique research -- and so by that, I'm distinguishing between reviewing research by others, but, in fact, conducting a study yourself, that look at the impact of academic pressures on adolescents?

A. Yes, if you count the Substack posts.

Q. Okay. And so what kind of study did you do, aside from looking at the research of others, to support that Substack post?

A. I looked at the trends in time

Page 36

spent on homework, and questions about academic pressure on competition for grades in the -- monitoring the future dataset.

Q. When did you publish those Substack posts?

A. So one was recently, maybe a few months ago. The other was -- I'm trying to recall -- I want to say the end of 2023, perhaps.

Q. And do you -- well, strike that. Are Substack posts peer-reviewed?

A. No.

Q. Have you published any peer-reviewed articles on the impact of academic pressures on adolescents?

A. In one publication, I did look at trends in homework time.

Q. Which publication was that?

A. So that was the one in Child Development. I'm -- I'm forgetting the year. It may be 2018 or 2019.

Q. Any others?

A. So in that publication in Emotion, I believe that I did look at the link or the correlation between time spent on

Page 37

homework and happiness. And I also did so in my book, iGen.

Q. Now, your book, iGen, is that a book that's written for academics, or is that a book written for the general population?

A. It's written for the general population.

Q. Now, I see that you have a notebook in front of you. What is in your notebook?

A. So this is my expert reports at the beginning. That's most of it. And then here are the various legal documents and my vitae.

Q. When you say various legal documents, what are those?

A. Well, let's take a look. Okay. So these are the objections to the document requests that we were just discussing.

Q. Okay. Any other, what you termed, legal documents in the notebook?

A. No.

Q. Okay. You also mentioned that they were your expert reports. Which expert

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

reports are in the notebook?

A.  Okay.  So the first is April.

Q.  So let me -- before you turn, let me just ask.  Is that the report dated April 18th, 2025?

A.  Yes.

Q.  Okay.  All right.

A.  Then the next is that dated June 17th; and then the next is that dated May 16th.  And then we've got the objections to the documents.  And then my CV.  And that's it.

Q.  And with the reports, do you have the attachments or just the report up to your signature?

A.  So we've got materials considered, so we have the exhibits.

Q.  Okay.  All right.

When were -- did you bring anything else with you today, other than the notebook of materials we just discussed?

A.  I brought snacks and water.

Q.  We have snacks and water, too.  So if you want to change out your plan on the snacks, you're welcome to.

Page 39

A.  Thank you.

Q.  All right.  When were you first contacted in connection with this litigation?

A.  July 2024.

Q.  Who contacted you?

A.  I don't recall.

Q.  And when were you first retained?

A.  I believe that was the date, July 2024.

Q.  Were you retained during the first, initial conversation?

A.  It was soon after.

Q.  Okay.  What was the nature of that initial contact?

A.  I don't recall.

Q.  Did you know the person who was contacting you, or was that the first time you had had any communication with that individual, or individuals?

A.  I don't recall.

Q.  Well, how did -- during that conversation, did it come up, Well, how did -- you know, How did you guys find me?  How did you -- what made you decide to reach out to me?  Anything like that?

Page 40

MS. McNABB:  Objection.  That's speculation.

THE WITNESS:  I don't recall.  I don't believe I asked that question, no.

BY MS. LEHMAN:

Q.  So even sitting here today, do you have an understanding for how -- how counsel came to contact you to retain you to be a witness in this litigation?

MS. McNABB:  Same objection.

THE WITNESS:  Given how much I've published on this topic, I'm guessing that's why.

BY MS. LEHMAN:

Q.  Have you worked with any of the plaintiffs' counsel in this litigation in any other litigation?

A.  Other than the federal action?

Q.  Correct.

A.  No.

Q.  What were you asked to do as an expert in this litigation?

A.  So it is right at the top of my report:  To provide my expert opinion on the

Page 41

relationship between social media and mental health in adolescents.

Q.  Okay.  Were you asked to address any other topics beyond the relationship between social media and mental health in adolescents?

A.  No.

Q.  Are you charging $500 an hour for reviewing materials and writing your report?

A.  Yes.

Q.  Are you charging $500 an hour for consultations with plaintiffs' counsel?

A.  Yes.

Q.  Charging $500 an hour for testifying in depositions and at trial?

A.  That's more.  And I don't recall the amount.

Q.  Okay.  So you're charging more than $500 an hour for your deposition today?

A.  Yes.

Q.  Okay.  And you're charging more for any time spent testifying at trial?

A.  Yes.

Q.  And does that higher hourly rate, does that apply for trial preparation or just

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

the actual testimony?

A.   Just the actual testimony.

Q.   And do you charge for travel time?

A.   I don't recall if we settled that, yeah.

Q.   Okay.  If you had to -- let's say you have to go to, you know, another state to testify at trial, would you charge for your transit time?

A.   I assume so.

Q.   And would that be $500 an hour or the higher rate?

A.   It'd probably be the 500, or if not less for travel time.

Q.   All right.  I want to mark the invoices that we received as Exhibit No. 2.

(Exhibit No. 2 was marked for identification.)

BY MS. LEHMAN:

Q.   Do you recognize these as your invoices?

A.   I do.

Q.   And I have six invoices.

A.   Okay.

Page 43

Q.   Have you submitted more than six invoices?

A.   No.

Q.   And so I want you to check my math.  But by my math, these invoices represent $53,250; is that correct?

A.   I believe so.

Q.   And since all of your time has been at the $500 rate so far, that makes it easy.  You'll billed -- is it accurate that you have billed 106 and a half hours so far in this litigation?

A.   Yes.

Q.   Now, the most recent date that I have on these invoices is October 1, 2024.  Have you submitted any invoices since then?

A.   So I think there's a -- I think I made a dumb mistake on the last few of these.  It should be 2025.

Q.   Okay.  All right.

A.   Yeah.

Q.   So then let's -- we have these Bates numbers down at the bottom.  So then are the Bates number 49, 50, and 51, should those dates have been 2025 instead of 2024?

Page 44

A.   So, like, if you look at the last invoice, it says, April 25, 2024 at the top of it, but then it says, "Expert witness consulting, March 1st, 2025 to April 5th, 2025."  So that was my mistake.

Q.   Okay.  So just a typo in the date --

A.   Correct.

Q.   Okay.  And so would that -- would that correction also be made to the preceding invoice dated March 2nd, 2024?

A.   Yes.  And to the one dated January 6th -- no, sorry, the January 6th one, yes -- actually, yes, January 6th should be 2025 as well.  It was for time spent in 2024, however.

Q.   Have you submitted any invoices in this litigation since April 25th, 2025?

A.   I may have.  I don't recall.

Q.   Have you worked on this litigation since April 25th, 2025?

A.   Yes.

Q.   How many hours have you spent in the interim?

A.   I don't recall.

Page 45

Q.   Is it more than 50?

A.   I don't think so.

Q.   Okay.  How many hours have you spent in the last month on the litigation, so that would be June of 2025?

A.   I don't know.

Q.   How many hours did you spend in May of 2025?

A.   I don't know.

Q.   Okay.  And when you include the time that you have spent, both that has been invoiced and has not been invoiced, does that include the work that you have done reviewing the defense expert reports and developing rebuttal opinions?

A.   Yeah.

Q.   Did you prepare for your deposition today?

A.   I did.

Q.   And how much time did you spend preparing for your deposition?

A.   It depends on how you define that.  About ten hours.

Q.   Over what period of time?

A.   The last week.

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

Q.    And what did you do to prepare for your deposition today?

A.    I reread my report. I reread some studies. I spoke to the attorneys.

Q.    How much time did you spend speaking to the attorneys?

A.    Five or six hours. Well, if you include virtual, maybe more like eight.

Q.    And that's over the last week?

A.    Yes. Which means I should amend my previous answer. It's probably more than ten. Probably more like 15 or 20. I lose track of these things, which is why I write them down.

Q.    And so do you have notes that reflect the time that you have worked on this litigation but have not yet invoiced?

A.    I have notes, yes.

Q.    And do you -- are they handwritten notes or are they on your computer? Where are they?

A.    They're on the computer.

Q.    And which studies did you review in preparation for your deposition?

A.    Let's see, there's so many. Let

Page 47

me see if I can recall. Yeah, I -- I don't recall.

Q.    When you say that you reviewed your report, did you review all of them, or did you review just one of them?

A.    It was the one that you have dated June, which is otherwise dated May. That is the one that I reviewed.

Q.    Okay. Have you spoken to any other experts that have been retained to testify on behalf of plaintiffs in this litigation?

A.    No.

Q.    Have you reviewed the reports of any other experts retained to testify on behalf of plaintiffs in this litigation?

A.    No.

Q.    And so is it correct that the only reports of other experts in this litigation that you have reviewed are Drs. Gottlieb, Hampton, and Baiocchi?

A.    Yes.

Q.    Has any judge in this country ever addressed the admissibility of the substance of any expert opinion that you've

Page 48

proposed to provide?

A.    I don't know if I know what that means.

Q.    Okay. So has any judge ever ruled on whether you are, in fact, qualified to testify as an expert in any given area?

A.    I -- I don't think so.

Q.    Are you currently employed in the Department of Psychology at San Diego State University?

A.    Yes.

Q.    And have you been employed in the Department of Psychology at San Diego State University continuously since 2001?

A.    Yes.

Q.    So 24 years?

A.    Yes.

Q.    All right. Even lawyers can do basic math like that. What is your current compensation at San Diego State University?

A.    So counting is not my strong suit. I believe it is approximately $150,000 a year.

Q.    Okay. And is that -- does that include any bonuses or that you may be eligible

Page 49

for?

A.    I'm at a public university. We do not receive bonuses.

Q.    Fair enough. Now, you have also authored several editions of two undergraduate textbooks; is that correct?

A.    Yes.

Q.    One is titled Social Psychology and the other is titled Personality Psychology?

A.    Yes.

Q.    Have you written any other textbooks?

A.    Not that are published, no.

Q.    Are you -- have you written other textbooks that are not published?

A.    I've been working on an intro to psychology textbook for a while. But we're not at the stage of publication.

Q.    Are you at the stage of submitting it to publishers?

A.    It depends on how you define submitting. We're in the draft stage.

Q.    If all goes according to plan, what would be the timeline when you would

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

expect it to be published?

A. I would love to know the answer to that question myself. We've been going back and forth on that for a while.

Q. Okay. And so do you have an estimate for when you hope it would be published?

A. I don't.

Q. And did you -- has it been -- strike that. Let me start again.

Is that new introductory to psychology textbook, has that been accepted by a publisher for publication?

A. Not yet, no.

Q. How much compensation do you receive annually for your Social Psychology textbook?

A. It's approximately $150,000 a year.

Q. When was the last update to the Social Psychology textbook?

A. It was pretty recently. The new edition just came out a few months ago.

Q. How often do you update the Social Psychology textbook?

Page 51

A. Every three years.

Q. And how much compensation do you receive annually for your Personality Psychology textbook?

A. Approximately $30,000 a year.

Q. When did the last edition come out of the Social Psychology -- I'm sorry, I asked the wrong textbook. When did the last edition come out for the Personality Psychology textbook?

A. So the last published edition was the second edition. I think that was 2021. The third edition is set to come out in the next six months. We have been working on it over the last year.

Q. When you update a textbook like this new edition of the Personality Psychology textbook, how many hours does that take you?

A. I have no idea. It's a lot. The Social textbook is more than the Personality textbook, because Social Psychology tends to be a little bit more timely, tends to have more updates.

I'm also responsible for all of the updates now in the Social Psychology

Page 52

textbook, because my coauthor is more or less retired, although he does still participate. Mostly voluntarily. But the Personality Psychology textbook is -- I have a coauthor who deals with -- or does the first draft of a third of the chapters, so that one takes fewer hours.

Q. All right. As someone who has never written or edited a textbook, are we talking, like, hundreds and hundreds of hours?

A. I would be very hard-pressed to come up with a number.

Q. In addition to the textbooks, and we've sort of mentioned this earlier, you've also authored a number of books for the general public?

A. Yes.

Q. How many books for the general public have you written?

A. Well, let me count. So Generation Me. I don't know if my counting has to be out loud. Let me just try to keep track. Six.

Q. All right. So my count was different. So let's go through them again.

Page 53

All right. So you published Generation Me.

A. Yep.

Q. You published The Narcissism Epidemic?

A. Yes.

Q. You published the Impatient Woman's Guide to Getting Pregnant?

A. Yes.

Q. You published the second generation -- or second edition of Generation Me.

A. I wasn't counting that one, but yes.

Q. Okay. You published iGen?

A. Yes.

Q. You published Generations?

A. Yes.

Q. There was a second edition of Generations?

A. Yes.

Q. Okay. And then you published Ten Rules for Raising Kids in a High-Tech World?

A. Yes, although that hasn't come out yet. It's scheduled to be published on September the 2nd.

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

Q. Are you -- have you had any other books that you have submitted that have been accepted for publication?

A. No.

Q. Are you in the process of drafting any books, other than the new intro to psychology textbook?

A. No.

Q. And on an annual basis, how much compensation do you receive for the books that you have published for the general public?

A. So that's really hard to say, because it varies a lot from one year to the next, and whether it's an advance or the regular royalties. So I could not say.

Q. Okay. How much did you receive in compensation so far in 2024 for the books that you have published for the public?

A. I don't know.

Q. Did you receive an advance for Ten Rules for Raising Kids in a High-Tech World?

A. I did.

Q. What was the advance?

A. I'm not sure I can give you the

Page 55

exact number, but it was about 200,000.

Q. Okay. And when you receive an advance, is that -- do the royalties, then -- sort of the first 200 go back to essentially catch up for the advance, and then you start receiving checks?

A. Yeah, so it's called earning out. So when you're paid an advance, the technical name is an advance against royalties. So as the book sells, you don't get any additional money until your book has sold enough to pay for that advance.

Q. Okay. Do you anticipate -- or strike that.

Are you working on any updated editions for any of the books that you've published for the general public?

A. No.

Q. Is there one of the books that has resulted in more royalties than the other books?

A. I'm not entirely sure. But iGen probably, also because it's been out the longest.

Q. And are you able to estimate what

Page 56

your royalties have been from iGen?

A. No.

Q. Is it accurate that a significant part of your research has focused on issues concerning generations and differences in generations?

A. A significant part, yes.

Q. And is it accurate that, traditionally, generational differences were believed to be due to major life events that impacted a generation?

A. Those are the classic theories, yes.

Q. And your -- your theory is a little bit different, and it is that generations are impacted by technology, correct?

A. Technology and many other forces, and the downstream effects of technology. And major events do still have an impact, but that many of the generational differences can be traced back to technology as the root cause.

Q. Would it be accurate that there are a number of people, including academics, who still adhere to the traditional view that

Page 57

world events are the primary shaping factors for generations?

MS. McNABB: Objection. Vague.

THE WITNESS: That's not really -- so the theories about generations being caused -- generational differences being caused by major events, most -- was not mostly academics. That was just some classic theories in sociology from a hundred or more years ago, and then some popular press books. It's not something that has been really explored in the academic literature per se.

BY MS. LEHMAN:

Q. Okay. So then let me make sure I understand.

Is it accurate that the academic literature has largely not explored what are the driving forces in changes between generations?

MS. McNABB: Objection. Vague.

THE WITNESS: I would say that it hasn't done so on, like, a large

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

theoretical basis very much. But there's certainly lots of papers out there on generational differences that explore possible causes, just not in this broader way of, you know, coming up with a more universal theory.

BY MS. LEHMAN:

Q. Okay. Let me make sure I understand that. So just to use an example.

A. Yes.

Q. If someone was looking at the birth cohort between 1920 and 1930, they might look at economic factors, they might look at world politics, and say, these are the factors that shaped that generation. But there are not papers that say, Let's look across ten different generations, and see if there are thematic things that impact all generations; is that correct?

MS. McNABB: Objection. Vague. Compound.

THE WITNESS: Yeah, I'm not sure I understand the question.

BY MS. LEHMAN:

Q. Sure. Can you better explain

Page 59

what you mean when you say that there are lots of people out there that look at generational differences, that explore possible causes, just not in this broader way of coming up with a more universal theory?

A. So I mean, an example is the work of Sara Konrath looking at changes in empathy. So she's published two papers on that, along with coauthors. And in the discussion section usually is where this is done, she and her coauthors have explored possible causes for those trends in empathy.

But it's usually not done as -- like, for example, I don't know of a paper in Psychological Review, which is where these, like, large theory papers are published, that has explored this question.

Q. Are you a psychiatrist?

A. No.

Q. Are you a medical doctor?

A. No.

Q. You're a psychologist?

A. Yes.

Q. Is it accurate that only a subset of psychologists diagnose and treat people with

Page 60

psychological or behavioral problems?

A. Correct.

Q. And are those psychologists referred to as clinical counseling, help, or school psychologists?

A. Yes.

Q. Do you identify as a clinical counseling, a help, or a school psychologist?

A. No.

Q. Is it correct that licensure from the appropriate state license board is required to diagnose and treat people with psychological or behavioral problems, as a psychologist?

A. Yes.

Q. And do you have such a license?

A. No.

Q. And is it also correct that postgraduate clinical experience is generally required to diagnose and treat people with psychological or behavioral problems as a psychologist?

A. Yes.

Q. And do you have any postgraduate clinical experience?

A. No.

Page 61

Q. And just to round out the conversation that we had earlier, is it accurate that you've never had a clinical practice, where you diagnosed and treated patients, including children or adolescents with psychological or behavioral problems?

A. I have not.

Q. And have you ever been licensed by any state to diagnose or treat patients for mental health issues?

A. No.

Q. Can you lawfully diagnose a patient with a mental health condition?

A. No.

Q. Have you ever diagnosed a patient with a mental health condition under the DSM?

A. No.

Q. And when I say the DSM, do you understand me to mean the Diagnostic and Statistical Manual from the APA?

A. Yes.

Q. Do you own a copy of the DSM?

A. No.

Q. Do you know what the current version of the DSM is?

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

A. It's the DSM-5.

Q. Have you ever been asked to provide input on the contents of the DSM?

A. No.

Q. Are you a member of the American Psychiatric Association?

A. No.

Q. Are you eligible to be a member of the American Psychiatric Association?

A. I don't know what their requirements are.

Q. Have you ever been authorized under law to diagnose a patient?

A. No.

Q. Can you lawfully prescribe medication to a mental health patient?

A. No.

Q. Have you ever prescribed medication to a patient?

A. No.

Q. Have you ever been authorized under law to prescribe medication?

A. No.

Q. While you were studying for your master's or Ph.D., did you focus or specialize

Page 63

in child or adolescent psychology?

A. So my Ph.D. is in personality psychology. We were asked to choose a second subfield, and I chose developmental psychology, so yes.

Q. And what does it mean to be a second subfield?

A. Just that you have taken classes in that area. So for example, I took a graduate class in developmental psychology.

Q. How many classes did you take in developmental psychology?

A. In graduate school?

Q. In graduate school.

A. One.

Q. How many hours was that class?

A. Not really how we did it.

Q. Okay. How did you -- how many classes would you take in a semester in graduate school?

A. It varied by semester, so I can't tell you.

Q. How many classes were you taking the semester that you took the class in developmental psychology?

Page 64

A. Probably two others, but it could be three. I can't recall.

Q. And was the developmental psychology class that you took, was that a survey course or was it more focused on a particular aspect of developmental psychology?

A. The faculty member who taught it looked at adolescents, so it was more focused on adolescents than I'd say your average developmental psychology class.

Q. When you use the term adolescents, what age range are you referring to?

A. Definitions of that vary, but generally, 10 to 19.

Q. Have you ever provided talk therapy to a patient?

A. No.

Q. Have you ever been able to legally provide talk therapy to a patient?

A. No.

Q. Do you have any degrees in public health?

A. No.

Q. Are you an educational

Page 65

psychologist?

A. No.

Q. Do you have any degrees in epidemiology?

A. No.

Q. What is your definition of social psychology?

A. That's a tough one.
The effect of the situation on the individual. That's probably too narrow, but that's a lot of it.

Q. Well, if you were to explain it to a layperson, is that how you would explain social psychology?

A. I would probably also include how the individual interacts with society.

Q. Have you ever worked for a technology company?

A. No.

Q. Have you ever developed a technology product?

A. No.

Q. Have you ever consulted with anyone who is developing a technology product?

A. It depends on how you define

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

consulted.

Q.    Okay.  What have you done that you're considering could be consulting with someone who is developing a technology product?

A.    So someone I know who is developing a -- an app called Do Curious.

Q.    Did you say Dude Curious?

A.    No.  Do, D-O.

Q.    What is -- what kind of app is Do Curious?

A.    It's something that encourages people to go out and do things in the real world.

Q.    Can you give me an example?

A.    It's still in development, so I can't.

Q.    Okay.  What -- might it be something like go take a walk --

A.    Yeah.

Q.    -- along the Pacific Ocean?

A.    Sure.  That's probably one of them.

Q.    Okay.  And what kind of consulting work have you done for that acquaintance?

Page 67

A.    So far it's been minimal.  So, yeah, and I have not been paid yet.

Q.    Okay.  Well, that was going to be my next question is, have you been paid or do you have an ownership stake?

A.    So it's an ownership stake, but very small, but yes.

Q.    Have you ever worked for a social media company?

A.    No.

Q.    When is Do Curious supposed to hit app stores?

A.    I don't know.

Q.    Is it in app stores now?

A.    I don't think so.

Q.    And are you -- are you consulting with, is it, an individual or a company on Do Curious?

A.    I believe it's an individual.

Q.    Is that the only time you've ever done any consulting like that, to help someone develop --

A.    To develop, yes.

Q.    Okay.  And have you ever consulted with somebody or a company that

Page 68

already has an existing app?

A.    App, no.

Q.    Okay.  What about sort of another technology product?

A.    I did have one conversation with the owner of Troomi, which is a phone designed for children.

Q.    Were you compensated for that time?

A.    Yes.

Q.    Was that with equity or with -- just regular payment?

A.    Regular payment.

Q.    Okay.  Have you ever consulted with a social media company?

A.    No.

Q.    Do you know the name of any individual plaintiff in this lawsuit?

A.    No.

Q.    Have you ever talked to one of the plaintiffs in this lawsuit?

A.    No.

Q.    Have you ever reviewed any of the medical records for any plaintiff in this lawsuit?

Page 69

A.    No.

Q.    Do you know which social media platforms any individual plaintiff in this lawsuit uses?

A.    I know who the defendants are in the case.

Q.    Okay.  Other than knowing who the defendants are, do you know which platforms any individual plaintiff actually used?

A.    No.

Q.    Okay.  Do you know how much time any individual plaintiff spent on social media?

A.    No.

Q.    Do you know how much time any individual plaintiff spent on any specific social media platform?

A.    No.

Q.    Do you know how much -- strike that.  Let me start again.

Do you know how any individual plaintiff in this lawsuit would spend their time when they were on social media?

A.    No.

Q.    And do you know what features any individual plaintiffs in this lawsuit would use

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

while they were on social media?

A.   No.

Q.   What is your definition of social media?

A.   I -- because I work with publicly available data, my definition mostly comes from the way the question is asked in those national datasets -- national or international datasets.

Most of the time, they mention social networking websites, sometimes they will give an example or two.  So Monitoring the Future, for example, has changed which examples they use.  Facebook is usually mentioned, Instagram, and Twitter are usually mentioned as well.

Q.   If you were talking to -- giving a presentation to a group, and someone in the audience raised their hand and said, Dr. Twenge, you know, I'm new to this topic, what is social media, what would you tell them?

A.   I don't think I've ever gotten that question from an audience.  It would be a difficult question to answer, because there's different -- there's definitely different

Page 71

definitions.

I would say that a key element is that it has an algorithm that is designed to have users spend as much time as possible and come back to the app as often as possible.

Q.   And so how, from the outside, do you make a determination as to how an algorithm is designed?

A.   I don't understand the question.

Q.   Sure.  Have you ever looked at the source code for any algorithm that a social media company is using?

A.   No.

Q.   And so having not looked at the source code, how do you determine that an algorithm is designed to have users spend as much time as possible and come back to the app as often as possible?

A.   So it's just an understanding of how the apps work from people who have used them.

Q.   Is Twitter or X social media?

A.   Yes.

Q.   Is Pinterest social media?

A.   That one is more in a gray area,

Page 72

but yes.

Q.   Is Reddit social media?

A.   I would say Reddit is more message boards.

Q.   And do you -- is it your opinion that message boards are social media, or are they different?

A.   I think they're different, because they don't have the algorithm.

Q.   Is LinkedIn social media?

A.   That one is also much more in a gray area, and I don't have as much understanding of how LinkedIn works, in terms of algorithms.  I don't believe it uses them, but I'm not as familiar with how that platform works.

Q.   Is WhatsApp social media?

A.   No.

Q.   Is texting social media?

A.   No.

Q.   Can texting be addictive?

A.   How would you define addictive?

Q.   You tell me.  What's your definition of addictive?

A.   It's not really something I

Page 73

consider much.  So can texting be compulsive?  Yes.  Can it sometimes compel people to grab their phone?  Yes.  But it doesn't have the algorithms.  And it is not specifically designed to keep people using it as long as possible.

Q.   All right.  And so against that backdrop, can texting be addictive?

A.   I think it really depends on how you're defining addictive, and I don't know what the consensus is on that, especially around texting.

Q.   Is there a difference between compulsive behavior and addiction?

A.   There is certainly overlap between the two.

Q.   Is the overlap 100 percent?

A.   I couldn't put a number on it.

Q.   Okay.  If I am compulsively looking at my phone, or one of my colleagues to my left is compulsively looking at their phone, checking e-mail, would you say that they're addicted to checking e-mail on their phone?

A.   I couldn't say, especially for any one individual.

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

Q. What additional information would you need to have in order to assess whether someone is addicted to looking at e-mail on their phone?

A. That's not really what I'm focusing on here. You know, I'm mostly here to talk about my report. And my report doesn't really go into those matters.

Q. Is WeChat social media?

A. I'm not familiar with WeChat.

MS. McNABB: Hold on. Can we just take a little break? Let's go off the record.

THE VIDEOGRAPHER: Going off the record at 10:06 a.m.

(Recess.)

THE VIDEOGRAPHER: Back on the record at 10:16 a.m.

BY MS. LEHMAN:

Q. Is Clubhouse social media?

A. I'm not familiar with that.

Q. Is Discord social media?

A. That's another one that's in a gray area, but -- so maybe.

Q. Okay. Why is Discord in a gray

Page 75

area?

A. To my understanding, I have not used the app, is that it's -- it doesn't have algorithms.

Q. And what's your basis -- or the basis for your understanding that Discord does not have algorithms?

A. Things I've read about the app.

Q. Where did you read them?

A. Online. I couldn't tell you the specific website.

Q. Is Telegram social media?

A. I'm not familiar with that app.

Q. Have you ever taken a class in algorithm design?

A. No.

Q. Have you ever taught a class in algorithm design?

A. No.

Q. Have you ever designed an algorithm?

A. No.

Q. Have you ever spoken to anyone who has designed an algorithm?

A. No.

Page 76

Q. Have you ever evaluated an algorithm outside of the context of social media?

A. No.

Q. Have you ever reviewed the source code for any algorithm?

A. No.

Q. Do you have or are you familiar with any ability -- strike that.

Do you know what part of an algorithm would drive people to stay on an application?

MS. McNABB: Objection. Speculation.

BY MS. LEHMAN:

Q. Whether it's social media or otherwise.

A. So my understanding would be, one thing would be push notifications. It would also be the content that is served up to the user.

Q. Do you have a website?

A. I do.

Q. Do you have more than one?

A. So in the past, I had separate

Page 77

websites for different books, and then I consolidated them. So now I have one website. And then, of course, there's a page on the university website.

Q. And so is your website JeanTwenge.com?

A. Yes.

Q. Do you maintain the website?

A. I have someone who maintains it for me.

Q. Do you make the decisions about what will be posted on the website?

A. Yes.

Q. How often do you post new content or updates to the website?

A. Not often enough. Every six months or so, I will contact the -- my website guy to do updates.

Q. Do you maintain a blog?

A. I have Substack, if that's what you mean.

Q. Well, other than Substack, do you maintain any other blogs?

A. No.

Q. And Substack is a subscription

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

website where people can post content?

A.    Yes, although you can also post things for free.

Q.    When did you start posting on Substack?

A.    2023.

Q.    Before 2023, were you regularly posting anywhere else?

A.    I did some guest posts on Jon Haidt's Substack, but I wouldn't call it regular.

Q.    Is your -- do you have an individual Substack or do you share your Substack with anyone else?

A.    It's individual.

Q.    Have you ever used any of the defendants' social media platforms or apps?

A.    So remind me of the defendants.

Q.    Okay.  Let me just -- I'll ask you separately.  Have you ever used TikTok?

A.    No.

Q.    Have you ever used YouTube?

A.    Yes.

Q.    When was the last time you used YouTube?

Page 79

A.    Probably a few days ago.

Q.    How often do you use YouTube?

A.    It really varies quite a bit.  I use it occasionally in my teaching.  On my website, I post videos from interviews and things like that that are usually on YouTube.  I'll occasionally watch something, you know, for my own personal interest, or show something to my children.  It's very hard to put a number on exactly how often I use it.

Q.    When you do use YouTube, how much time do you spend on it?

A.    It's usually pretty brief.  But again, it depends.  If there is something I'm interested in over a weekend, it may be up to an hour, but it would pretty much never be more than that.

Q.    And what about -- would the one-hour mark, would that be unusual that it would be that high?

A.    Yes.

Q.    Okay.  Is it usually more, like, in the neighborhood of five minutes or so?

A.    Yeah, although over the course of a day, it might add up to more like 20, but

Page 80

yes.

Q.    Have you used Instagram?

A.    No.

Q.    Have you used Facebook?

A.    No.

Q.    Have you used Snapchat?

A.    No.

Q.    Have you used Twitter?

A.    Yes.

Q.    How often do you use Twitter?

A.    Again, it varies quite a bit.  When I'm travelling, I often don't look at my page at all.  On a day when I'm home, I would say, on average, between a half an hour and an hour and a half, tops.  Sometimes it is more like five or ten minutes a day.

Q.    When was the last time you were on Twitter?

A.    Probably yesterday.

Q.    Have you ever thought that -- strike that.

Do you use any other social media apps?

A.    I do have a LinkedIn page.  I don't do much with it.

Page 81

Q.    When was the last time you were on LinkedIn?

A.    I get the notices for connections on my e-mail quite frequently, but clicking through the page, it's probably been a month.

Q.    Do you use any other social media platforms?

A.    No.

Q.    Do you have children?

A.    I do.

Q.    How many children?

A.    I have three children.

Q.    What are their ages?

A.    18, 15, and 13.

Q.    Do your children use social media?

A.    So just for clarification, my oldest is a legal adult and is now in the Navy, so I can't speak to what she is doing.

My 15- and 13-year-old are not allowed to use social media apps, although because there is no parental permission required, and age isn't verified, and the age limit is way too low as it is, and parental controls don't work perfectly, they very well

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

might have social media accounts, and I might not know anything about it. But they know that they are not supposed to, and I do put parental controls in place to prevent that.

Q. Have you ever caught any of your children with a social media account that they're not allowed to have?

A. I have.

Q. Which child?

A. So both the 13-year-old and the 15-year-old ended up with Snapchat, but the parental controls alerted me to that, and I shut it down.

Q. Are there any other occasions where you have found out that one of your offspring has a social media account?

A. Yeah, my 15-year-old tried to open Instagram, pretty much the second she got a new laptop, but the laptop had parental controls on it, and blocked it.

Q. Are you aware of any of your children ever successfully opening any other social media account that wasn't either blocked or that you weren't alerted based on parental controls?

Page 83

A. I think my middle one also did open a TikTok account on my husband's desktop when she was not supposed to.

Q. And how did you find out about -- well, let me back up.

Are you for certain that your middle child opened a TikTok account on your husband's computer?

A. Yeah.

Q. Okay. When was that?

A. I don't recall. A year or two ago.

Q. And how did you find out about the TikTok account?

A. One child snitched on the other.

Q. And did you shut down the account?

A. I don't believe the account is shut down, but she can't -- so because it's my husband's computer, I'm not sure exactly what happened with it. But it is blocked on her devices.

Q. Have you ever caught any of your children using social media, like, physically walked up, and they were looking at social

Page 84

media?

A. No.

Q. Do you charge for speaking engagements?

A. Yes.

Q. How much do you charge?

A. It varies quite a bit, depending on the particular organization, how far I have to travel, and whether it's virtual or in person.

Q. What is the minimum that you charge for speaking engagements?

A. That's really broad. Can you narrow it to a time -- a time sequence? Because when I first started, it was very little. And that was a long time ago.

Q. Well, let me ask you this.

In the last two years, have you had any unpaid speaking engagements about issues related to social media and mental health?

A. Yes.

Q. How many?

A. I mean, the one I can recall was at the University of Florida, I gave a talk,

Page 85

and that was mostly focused on my book, Generations, but it did have slides on social media and on mental health.

Q. In the last two years, have you had any speaking engagements concerning social media and mental health that was not primarily a speech about one of your books?

A. I'm not sure I understand the question. Can you word it differently?

Q. Sure. I understood you to say that your presentation at the University of Florida was really about your book, Generations.

A. Yes.

Q. But then during that speech, you mentioned social media --

A. Yes.

Q. -- and mental health. And so setting aside any presentations that you may give regarding the books that you have published --

A. Mm-hmm.

Q. -- have you had any other unpaid presentations about social media and mental health in the last two years?

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

A.    Not that I can recall.

Q.    All right.  So same question, but broadening that time period out to the last five years.

A.    Probably not, although it's -- it's hard to say, because certainly I've gone to conferences and to other universities and given talks, where that may have been mentioned.  But I don't believe I have done that since the pandemic.

Q.    Okay.  In your book that's getting ready to come out, and I apologize, I'm going to get the title a little bit wrong, but something about Raising Kids in a High-Tech World?

A.    Yeah, the title is Ten Rules for Raising Kids in a High-Tech World.

Q.    Do any of those rules relate to social media?

A.    Yes.

Q.    How many of them?

A.    Directly, one.  Indirectly, several.

Q.    Okay.  What is the one rule that directly relates to social media?

Page 87

A.    No social media until age 16 or later.

Q.    And how did you come up with age 16?

A.    So there's different schools of thought on this.  Some people have advocated for 18 because it's legal adulthood.  And I can completely see that argument, which is why I put "or later" in that rule.

At age 16, we trust teens to drive.  They are more mature than they were at, say, 13.  They are beyond middle school, they are beyond that first year of high school, and they are just better able to handle something that's really designed for adults, like social media.

Q.    Are there any peer-reviewed studies that look at the impact on having social media starting at 13 as opposed to 16?

A.    So there are studies that look at the link between social media use and life satisfaction at different ages.  So one of Amy Orben's articles is a good example of that.

Q.    Okay.  And are there any articles in peer-reviewed journals that have been

Page 88

published that make a recommendation about what age that adolescents should be allowed to have social media?

A.    I'm not sure, because there's so many articles out there.  It would be very difficult for me to answer that question.

Q.    You're not -- as you sit here today, you're not familiar with an article that makes that kind of recommendations?

A.    I mean, I'm familiar with articles and reports that address age as a moderator in this area, if that's what you're asking.

Q.    No, slightly different.  I was looking for any peer-reviewed articles that make the recommendation about the age at which adolescents should be granted access to social media?

A.    It's not usually what peer-reviewed articles are doing.

Q.    Now, you mentioned several of the rules in your new book --

A.    Yes.

Q.    -- directly relate to social media.  What are those rules?

Page 89

A.    So one of them is, first phones should be basic phones.  And there, I'm referring to when you give a child, say, 15 or under their first phone, that it not be a smartphone.

So I'm using smartphone to mean internet enabled.  So to instead give them a flip phone or a phone designed for children that does not have internet access, and does not allow social media apps.

Q.    Are there any other rules that indirectly relate to social media in your new book?

A.    Those are really the two.  The others are indirectly related, in that they refer to the use of electronic devices, which for a lot of teens, much of that time is spent on social media.

Q.    Are you offering any opinions about what warnings should accompany social media platforms?

A.    So I don't address that in Ten Rules, if that's what you're asking.

Q.    No, good clarification.

A.    Okay.

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

Q. So moving now to the opinions that you intend to offer in this litigation.

A. Yes.

Q. Do you intend to offer any opinions that warnings should accompany the use of any social media platform?

A. That's not covered in my report.

Q. Okay. Do you intend to offer any opinions about the actual design of defendants' social media platforms or apps?

A. Not in my report, no.

Q. Okay. And we're going to talk about your reports in detail, but do your reports accurately and fully reflect the opinions that you intend to offer in this litigation?

A. Yes.

MS. McNABB: Objection. Just -- I'll just lay my objection to speculation on the future, up to trial.

BY MS. LEHMAN:

Q. Do the three reports that we have discussed today, to date, that you identified as in your notebook, do they fully and

Page 91

completely and accurately reflect the opinions that you hold as of today in this litigation?

A. Yes, although I've certainly -- you know, new studies are coming out all the time, and I have read those, plus I may be writing a rebuttal, you know, based on defendants' expert reports. And not all of that is reflected here.

Q. Okay. And we'll talk about the rebuttal piece.

A. Okay.

Q. Do you intend to offer any opinions in this litigation about how defendants' algorithms work?

A. No.

Q. Do you intend to offer any opinions in this litigation about any of the defendants' conduct or their business practices?

A. No.

Q. Do you intend to offer any opinions about whether any of the defendants' social media platforms or apps did or did not meet industry standards?

A. No.

Page 92

Q. Do you intend to offer any opinions in this litigation about whether there is a safer alternative design for social media?

A. No.

Q. Do you intend to offer any opinions about how defendants responded to any concerns about their platform?

A. No.

Q. Do you intend to offer any opinions about whether defendants should have implemented different responses to any concerns about their platforms?

A. No.

Q. Do you intend to offer any opinions about whether defendants' actions were appropriate as it relates to addressing concerns about their platforms?

A. No.

Q. Do you intend to offer any opinions about any of defendants' motives in taking actions or their conduct?

A. No.

Q. Do you intend to offer any opinions about what factors came into play for defendants, in terms of implementing any

Page 93

changes to their platforms?

MS. McNABB: Objection. Vague.

THE WITNESS: I mean, I have read some of the internal reports, if that's what you're referring to.

BY MS. LEHMAN:

Q. Okay. Well, let me ask you this. Are the internal reports that you have reviewed, are those the types of information that you would normally review outside of litigation?

A. I'm not sure I understand your question.

Q. Sure. Is -- the types of information that was contained in those internal documents that you reviewed, are those the types of information that you would typically review outside of litigation?

A. What do you mean by outside of litigation?

Q. I mean that if you were not developing an opinion to put in your expert report, and then testify about, would you have reviewed that type of information?

A. Yes.

Golkow Technologies,
877-370-3377        A Veritext Division        www.veritext.com

CONFIDENTIAL

Page 94

Q. Why?

A. I -- it provides another type of evidence. It gives context. I don't do qualitative research myself, but some of the qualitative research shares the views of teen girls, which I think are very important to take into account.

Q. Do you intend to offer any opinions in this litigation about whether any of defendants' platforms should be banned?

A. No.

Q. Are you offering any opinions about the design, development, or function of any feature on a social media platform?

MS. McNABB: Objection. Compound.

THE WITNESS: I'm not sure I understand the question.

BY MS. LEHMAN:

Q. Sure. Do you intend -- let me break it down.

Are you offering any opinion about the function of any feature on a social media app or platform?

A. To the extent that those features

Page 95

lead to more time spent, perhaps. Although I'm not a coder or computer scientist, so the nitty-gritty of how they're designed is beyond my expertise.

Q. Were any of the internal company documents that you reviewed, observational studies or random control trials?

A. So I don't know what's meant by observational studies.

Q. Okay. Let me ask you this. Did any of the internal company documents that you reviewed contain or reflect random control trials?

A. The ones I reviewed, I don't believe so.

Q. All right. Did any of the internal documents that you reviewed contain information that was published in any peer-reviewed journal?

A. I don't believe so, no.

Q. Were any of the internal company documents that you reviewed -- all right. Let me withdraw that question.

As part of your work doing research, have you ever reviewed internal

Page 96

company documents other than the documents that you reviewed in this litigation as part of your research?

A. How do you define research in this case -- I mean, in your question?

Q. Yes.

A. How are you defining research?

Q. In any of your professional work outside of this litigation, have you ever had another scenario where you reviewed internal company documents?

A. So those that were published on the Wall Street Journal web page, yes.

Q. Which -- what are the documents published on the Wall Street Journal web page?

A. So some of those were the internal presentations, the ones that were provided to the Wall Street Journal by Frances Haugen. I reviewed those in writing Ten Rules.

Q. Were there any other scenarios in your professional work where you have reviewed internal company documents?

A. No.

Q. Did the internal company

Page 97

documents that you have reviewed change any of your opinions or impact them in this litigation?

A. They were further information that provided more evidence for the opinions in my report.

Q. If you had not reviewed the internal company documents, would your opinions still have been -- been the same?

A. I mean, there are quotes from the internal documents in the reports, so in that way, they would have been different.

Q. But would the substance of your opinions have been the same?

A. Yes.

Q. Did any of the internal documents that you reviewed assess confounders or bias in any studies?

A. What do you mean by any studies? You mean the studies themselves?

Q. Right. Well, let me back up. In the internal company documents that you reviewed, were there any studies or survey results?

A. I believe so, yes.

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

Q. And were those documents that included studies or survey results, did they address or assess confounders or bias in those results?

A. I'm not sure what you mean by bias in this context. Did they address confounders, such as controls you would use in a correlational analysis, I would have to go back and look at them to be sure. I'm not sure.

Q. Okay. And just so we're clear, by bias, I'm referring to any types of bias that could impact survey results, whether it is attrition or some other form of bias?

A. Okay.

Q. So with that clarification, did any of the study or survey results that you saw in any internal company document address the presence or lack of presence of bias in the results?

A. I'd have to have those in front of me to say for sure.

Q. If social media did not contain posts from other users, whether they are text posts or videos, would social media still be

Page 99

addictive?

MS. McNABB: Objection. Speculation.

THE WITNESS: Well, what would it contain if it didn't contain those?

BY MS. LEHMAN:

Q. I mean, whatever else is left, right, from the different platforms. But if there's nothing posted from other users, would it still be addictive?

A. So, first, you know, I'm not focusing on addiction in my report. And hold on just a second.

But if -- so no matter what the content is, if the algorithm and the design lead to more time spent, especially excessive time spent, then, yes, it could have an impact.

Q. Okay. If there were no posts from other users, texts or videos, would any of the social media platforms still lead to excessive time spent?

A. If they were designed the way that they are now, yes.

Q. What about their designs now

Page 100

would drive that?

A. So that, again, is more of a question for someone who is an expert in computer science or the design, you know, of these platforms.

But I can tell you that if a teen is, for example, spending eight hours on social media, they are much more likely to be depressed than someone who spends less time.

Q. Okay. All right. All right. I want to talk about your three reports.

A. Okay.

Q. And the three that we've talked about, there's one from April, one from May, and one from June.

A. Yes.

Q. Okay. What revisions, if any, did you make between the three reports?

A. So my understanding is that the May and June are virtually identical. Between the April and May, I added some material in response to some of the defendants' expert reports, and I also went through and clarified a few things.

Q. What are the things that you

Page 101

clarified?

A. There's a long list, if you look at the redline. But there were a few things -- so one important part -- let me see if I can find the page. There was a discussion of correlational research, where there was just a miscommunication with the attorney. So I corrected, because the April version said something about there being a causal link and I corrected that, because correlational studies, although they can point to a causation, cannot prove it.

Q. And when you say they can't prove it, you're saying correlational studies cannot prove causation?

A. So let me be really clear on this, because it's important. So correlational studies can be part of the body of evidence that can prove causation, but especially an individual correlational study cannot prove scientific causation in the way that, for example, an experiment can.

It's still possible that there is causation, and it contributes -- and it can contribute to that body of evidence. But the

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

way we think about it in, you know, research methods and science is that it isn't as definitive as an experiment. But then experiments are rare, and more difficult to do, and usually have lower sample size.

Q. Right. And we talked -- you mentioned correlation. Are correlational studies the same as cross-sectional studies?

A. Effectively, yes. So I've seen that term used in, you know, other reports. I use the term correlational studies.

Q. Okay. And correlational studies only reflect correlations or associations between two variables, correct?

A. I'm not sure I'd put the word "only" in there, but, yes, they are looking at an association between two variables, although you can include more variables as controls.

Q. So for example, correlational studies assess both the exposure, such as social media, and any outcomes, such as mental health, at the same point in time, correct?

A. Yes.

Q. And do you agree that correlational studies cannot establish

Page 103

temporality; namely, which event came first?

A. Correct.

Q. And as a result of that, correlational or cross-sectional data, standing alone, cannot be used to make causal inferences?

A. Standing alone, that would be the usual argument, yes. But they can still be used in the body of evidence to prove causation. So the Bradford Hill criteria are a great example of that, where in Bradford Hill, they say, Hey, look, experiments are really rare, so we have to take the body of evidence that we have. And correlational studies are part of the body of evidence.

Q. Distinguishing from a situation where correlational studies are part of a host of evidence, so, you know, not this situation, but looking solely at correlational studies, you would agree that correlational or cross-sectional data alone cannot be used to make a causal determination?

A. Yes.

Q. Do you agree that correlation, even a statistically significant one, is not

Page 104

causation?

A. I would qualify that, so -- and I know this from teaching this to students. When you say correlation is not causation, some students can get confused and think that that means it never is. And that's not the case. It just means that it's one of the possibilities.

So if you're thinking about variables A, B, and C, in a correlational study, A can cause B, B could cause A, or C, a third variable, could cause both. Those are the three possibilities. So causation from A to B is one of the possibilities. It's not that it's never causation from A to B.

Q. But correlations can be incidental or spurious?

A. So you're going to have to tell me what you mean by those terms.

Q. Okay. Well, so I think to round out our conversation, it means that correlation -- you said one possibility is a causation, but other causations is that it is not causation, so it's the correlation between the variables is incidental.

Page 105

MS. McNABB: Objection. Vague.

THE WITNESS: Yeah, so I would -- I'm not sure how you're using those terms. So I'll just have to guess that that may refer to, say, a third variable, C, causing both A and B.

BY MS. LEHMAN:

Q. Okay. Well, you could say, saying it a different way, correlations can be inaccurate as to causation, correct?

A. I would not put it in that way. I would not use the word "inaccurate," no.

Q. Do you agree that correlations can be caused by confounding?

A. So confounding are those third variables, C, so yes.

Q. Do you agree that just because something increases the risk for an event that that does not mean there is a causal relationship?

A. It means a causal relationship is one of the possibilities.

Q. Do you agree that an association, even a statistically significant association,

27 (Pages 102 - 105)

CONFIDENTIAL

Page 106

is not the same as causation?

A.    Correct.

Q.    I'm going to mark as Exhibit Number -- Number 3, some of the materials that we received from counsel in advance of the deposition.

A.    Okay.

(Exhibit No. 3 was marked for identification.)

BY MS. LEHMAN:

Q.    So can you confirm that at the front of Exhibit Number 3 is your most recent CV?

A.    Yes.

Q.    And the date on that is May 2025?

A.    Yes.

Q.    Is there anything that you need to do to bring your CV up to date?

A.    I do not keep all the presentations up to date. So there may be a thing or two that's not on here, but that's -- also, I don't usually do that. I don't usually include all of my presentations.

Q.    When you say it doesn't include all of the presentations, is there a specific

Page 107

type of presentation that you do not include in your CV?

A.    Usually ones for private corporations don't end up here.

Q.    What about podcasts?

A.    I don't put podcasts on my CV, no.

Q.    With that exception of presentations such as private corporations or podcasts, is your CV otherwise up to date and accurate?

A.    Yes.

Q.    And then following that, there are the invoices that we've already looked at separately.

A.    Mm-hmm.

Q.    And then there is an Exhibit D, materials considered.

A.    Yep.

Q.    Is your materials considered list up to date and complete?

A.    Yes.

Q.    Did you review all of the articles identified in your materials considered?

Page 108

A.    Yes.

Q.    Did you take any notes or create any documents when you were reviewing the materials considered?

MS. McNABB:  Objection.  Only to the extent it's protected by attorney/expert privilege for draft report protection.

THE WITNESS:  Yes, I took notes on some of these articles.

BY MS. LEHMAN:

Q.    And was that as part of a draft report, or was that separate?

A.    It was in a separate file, if that's what you mean.

Q.    Okay.  And so are those -- those notes were not part of your drafting process for the report.  It was a separate exercise?

A.    No, it was part -- I mean, it was part -- yes, it was part of the drafting process, to understand the articles and take notes on them.

Q.    Did you select all of the materials on your materials considered list?

A.    Yes, although the internal

Page 109

documents, of course, went through the attorneys.

Q.    For internal documents, did you request certain types of internal documents?

A.    I mean, we had a discussion about what would be the most helpful.  And that was things about mental health, and things about time spent.

Q.    Did you request -- after you reviewed some set of internal company documents, did you request any additional company documents?

A.    No.

Q.    Did you request any documents of any sort from counsel that you did not receive?

A.    No.

Q.    There is a section in your materials considered list that's titled Production Bates Numbered Documents.

A.    Mm-hmm.

Q.    Is that the complete set of internal company documents that you have reviewed?

A.    Yes.

Q.    Did you consider an article by

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

Steinbeck in 2023 titled, Social Media Behavior and Symptoms of Depression and Anxiety, a Four-Year Cohort Study From Ages 10 to 16, as part of your work in this case?

A.    I don't see it on the list, unless I'm missing it.

Q.    I will represent to you, I did not see it either. I just wanted to confirm.

A.    I'd have to see the article to know for sure.

Q.    You don't have any memory of reviewing that article, correct?

A.    Give me the title again.

Q.    Sure. Social Media Behaviors and Symptoms of Depression and Anxiety, a Four-Year Cohort Study From Age 10 to 16.

A.    I don't believe so. But that title is similar to some others, so it's hard to say.

Q.    You're not aware of any articles that you reviewed in developing your opinions that are not included on the materials considered list, correct?

MS. McNABB: Objection. Vague.

THE WITNESS: So there's a few

Page 111

that have come out in the last few weeks that I have read, but they are not part of the report.

BY MS. LEHMAN:

Q.    Okay. What are the -- okay. But those are articles that would have come out in June of 2025?

A.    Yeah, or late May. Yes.

Q.    Did you review a 2024 article by Maheux entitled, Longitudinal Change in Appearance Related to Social Media Consciousness and Depressive Symptoms, a Within-Person Analysis During Early to Middle Adolescents in developing your opinions in this case?

A.    What's the first author again?

Q.    Maheux, M-A-H-E-U-X?

A.    There's an "X" at the end?

Q.    Yes.

A.    I don't think so. It sounds similar to something I may have read at some point, but it's hard to say.

Q.    The titles in many of these can be similar.

A.    Yes.

Page 112

Q.    That's why I gave the author's name.

A.    I know, I know. Exactly.

Q.    In forming your opinions in this case, did you review a 2022 article by Sewall titled, Does Objectively Measured Social Media or Smartphone Use Predict Depression and Anxiety or Social Isolation Among Young Adults?

A.    So I may have seen that article at some point, but it would probably have been before I was retained in this case.

Q.    So that was not something that impacted your opinions in this case?

A.    No.

MS. McNABB: Objection.

BY MS. LEHMAN:

Q.    In developing your opinions in this case, did you review a 2021 article by Boer titled, Social Media Use Intensity, Social Media Problems, and Mental Health Among Adolescents in Investigating Directionality and Mediating Processes?

A.    Okay. So that author sounds familiar, so I have to look.

No, that is not on the list, so

Page 113

no.

Q.    Okay. Yes, and please do look. I mean, I -- I don't want this to be anything less than accurate.

In developing your opinions in this case, did you consider a 2021 article by Beeres, titled, Social Media and Mental Health Among Early Adolescents in Sweden, a Longitudinal Study With Two-Year Follow-Up?

A.    So what's the first author on that again?

Q.    Beeres, B-E-E-R-E-S.

A.    I don't believe so, no.

Q.    In developing your opinions in this case, did you review a 2020 article by Puukko, and that's spelled P-U-U-K-K-O, titled, Social Media Use and Depressive Symptoms, a Longitudinal Study From Early to Late Adolescence?

A.    Spell it again, please.

Q.    P-U-U-K-K-O.

A.    I don't believe so, no.

Q.    In developing your opinions in this litigation, did you review a 2018 article by George titled, Concurrent and Subsequent

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

Associations Between Daily Digital Technology Use and High Risk Adolescent Neuro Health Symptoms?

A.   No.

Q.   In developing your opinions in this litigation, did you review a 2019 article by Jensen titled, Youth Adolescents' Digital Technology Use and Mental Health Symptoms, Little Evidence of Longitudinal or Daily Linkages?

A.   The author sounds somewhat familiar, but I don't believe so.

Q.   Okay.  In developing your opinions in this litigation, did you review a 2018 article by Houghton entitled, Reciprocal Relationships Between Trajectories of Depressive Symptoms and Screen Media Use During Adolescence?

A.   What's that first author again?

Q.   Houghton, H-O-U-G-H-T-O-N.

A.   I don't think so, no.

Q.   In developing your opinions for this litigation, did you review a 2023 article by Leggett-James entitled, The Consequences of Social Media Use Across the Transition Into

Page 115

Adolescence, Body Image and Physical Activity?

A.   I'm guessing, no, because I didn't focus very much on body image.

Q.   Okay.  In developing your opinions in this litigation, did you review a 2022 article by Maes entitled -- and that's M-A-E-S -- entitled, Adolescent Girls' Instagram and TikTok Use:  Examining Relations With Body Image Related Constructs Over Time Using Random Interpretation Cross-Lagged Models?

A.   Again, I didn't focus very much on body image.  My focus was on mental health, so no.

Q.   In developing your opinions in this case, did you review a 2017 article by Russo titled, The Reciprocal and Indirect Relationship Between Facebook Use, Comparison on Facebook, and Adolescents' Body Dissatisfaction?

A.   No.

Q.   In preparing your opinions in this case, did you review a 2023 article by Chu titled, Screen Time and Suicidal Behavior Among U.S. Children 9 to 11 Years of Age, a

Page 116

Prospective Cohort Study?

A.   Spell the first author's name, please.

Q.   C-H-U.

A.   I don't believe so, no.

Q.   If we discuss your May 2025 report, will that cover all of the opinions that you intend to offer in this matter?

A.   Yeah -- well, yes, except for the rebuttal reports, which I may still write.

Q.   And I appreciate that clarification.

I was asking because I interpreted the May and June reports to be virtually identical as well.  And I wanted to make sure that if I refer to that report, that I wasn't going to miss an important distinction.

A.   Yes.

Q.   Okay.  All right.  I want to look at your report, and I'm going to look at the June report.  It says, Introduction and Summary of Findings on page 1.

And your first opinion is, and I quote, "I've been asked by counsel to provide

Page 117

my expert opinions on the relationship between social media use and mental health among adolescents," and then it continues.

A.   Yes.

Q.   In your opinions, are you using that 10-to-19 age group that we talked about earlier for adolescents?

A.   Yes, although there are some instances where I'm also looking at young adults, when there's not as much research available on adolescents.

Q.   Okay.  And when you refer to young adults, what age is that?

A.   In this case, it's going to be roughly 18 to 25.  There may be a few participants who are older than that.

Q.   Appreciating that your report is much longer, and so offers enriching detail, do the opinions outlined in paragraphs 1 through 7 of your report accurately summarize your overarching opinions?

A.   They summarize.  So they don't go into all the detail, but yes.

Q.   In paragraph number 7 on that same page, you refer to a clear causal path.

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

A. Yes.

Q. What do you mean by causal path?

A. So in this case, meaning that if you take the totality of the evidence, that there's a causal path from social media use to low psychological wellbeing, depression, and so on.

Q. And when -- so when you talk about causal path, what does that terminology mean to you?

A. It means that spending more time on social media causes issues such as depression and low psychological wellbeing.

Q. Are you relying on time series studies, correlational studies, longitudinal studies, and experimental studies to reach your opinions?

A. Yes.

Q. Do you rely equally on each type of study?

A. I could not put a number on it, or really answer that question, because they're all different types of evidence.

Q. Do you agree that in order to assess the causal relationship between social

Page 119

media use and adverse mental health outcomes, that you must look at studies that specifically address social media use and not other forms of screen usage, such as television, video games, smartphones, or internet use?

A. Certainly that's the most useful, especially for correlational, longitudinal, and experimental studies. We don't always have that luxury for time series studies of being able to separate out the influences of different technologies, although we do try.

Q. Do you agree that in order to assess a particular platform's causal relationship with any adverse mental health outcome, one must assess that specific platform and the specific mental health outcome?

MS. McNABB: Objection. Compound.

THE WITNESS: So there's two questions there. So the first is, you know, does it have to be on a specific platform? I don't think so, because there's a good amount of overlap between the platforms.

And the specific outcome, as

Page 120

the second question, generally speaking, depression, anxiety, unhappiness, low life satisfaction, correlate pretty highly with each other. So low psychological wellbeing is going to include all of those. And most of the time, those outcomes or associations are going to be fairly similar, if not really similar.

BY MS. LEHMAN:

Q. All right. Is it accurate that the specific mental health outcomes that you assess are depression, self-harm, suicide, unhappiness, loneliness, and low psychological wellbeing?

A. Life satisfaction and happiness should be in there as well. They are often included under low psychological wellbeing, but so are those others. So I would definitely add unhappiness and low life satisfaction to that list.

Q. Okay. And so, then, by my count, then that's seven factors?

A. Yes, although there could certainly be more. So I've looked at

Page 121

self-esteem as well. I forget if you mentioned that.

Q. Okay. And so are there any other factors -- mental health factors that you assess?

A. So there's several time series studies that have looked at -- I know you mentioned self-harm and suicide, but also -- I mean, just different types of self-harm: Suicide attempts, suicidal thoughts as well.

Q. And that was going to be one of my questions. So when you talk about suicide, you're also -- are you also including suicide attempts and suicidal thoughts?

A. I mean, those are different things, so -- and they are certainly measured in different ways. But you could say -- for example, you could say that suicidal thoughts and suicide attempts are suicide risk factors. So they are related to each other, but clearly different -- different things. And usually the questions are different.

Q. In your report, is it accurate that you use the more precise terminology to offer your opinions. You're not using suicide

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

as some sort of, like, umbrella term to also include suicidal attempts and ideation?

A. No. I would not say that, no.

Q. Okay. When we talk about self-harm, what do you mean?

A. So it would -- for my purposes, it's based on the CDC database. And so usually, self-harm, the definition of that can be used differently. So sometimes it includes suicide attempts. Many times, it does not. So self-harm can also be -- let me see if I can get this precise -- nonsuicidal self-injury is sometimes used as a specific term to distinguish self-harm that is not a suicide attempt.

But the self part is important. It needs to be deliberate and done by the person themselves.

Q. Okay. And similarly, when we talk about suicide, does that have to be deliberate and done by the person themselves?

A. Yes.

Q. By adolescent depression, are you referring to major depressive disorders for adolescents under the DSM?

Page 123

A. In some cases, yes, although I've also analyzed symptoms of depression based on survey questionnaires. Sometimes those are screening studies or -- sorry, screening measures that are -- have overlap with the DSM sometimes. Sometimes they are, you know, other measures of depressive symptoms.

Q. Would you agree that unhappiness is not a psychiatric disorder under the DSM?

A. Correct.

Q. And do you agree that all or nearly all adolescents and adults experience unhappiness in their lives?

MS. McNABB: Objection. Speculation.

THE WITNESS: That is really pretty much impossible to answer.

BY MS. LEHMAN:

Q. Okay. It's impossible to say whether all or nearly all adolescents experience unhappiness?

MS. McNABB: Objection. Speculation.

THE WITNESS: Yes. I don't have data on all adolescents, and

Page 124

"nearly all" is vague.

BY MS. LEHMAN:

Q. Okay. Do you agree that loneliness is not a psychiatric disorder under the DSM?

A. Correct.

Q. Do you agree that all or nearly all adolescents and young adults experience loneliness in their lives?

MS. McNABB: Objection. Speculation. And vague.

THE WITNESS: Same answer, that that's really impossible to answer.

BY MS. LEHMAN:

Q. What measure of happiness -- or strike that.

What definition of happiness or unhappiness are you using?

A. So again, it's going to mostly be based on the survey datasets that I work with, and how they ask the question.

Q. And if you were giving a presentation, and somebody in the audience raised their hands and says, You know, you talked a lot about happiness and unhappiness,

Page 125

Dr. Twenge, what does that mean?

A. Yeah, and no one has ever asked me that question. So I would probably, if I could, recite how it's asked on the questionnaire that was used in the dataset that I'm referring to.

Q. And how was it asked in the questionnaire of the dataset you're referring to?

A. So Monitoring the Future, for example, and I may not get this exactly verbatim, but it's something like, taking all things together, how happy are you these days? And then it gives three response choices.

Q. And when you talk about loneliness, how are you defining that term?

A. So that would, again, be defined based on how it's asked on Monitoring the Future. It's six items, some of which are very straightforward, like, I often feel lonely. Others go into more detail about having friends and feeling left out, and so on.

Q. Do you agree that low psychological wellbeing is not a psychiatric

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

disorder under the DSM?

A.    Correct.

Q.    Do you agree that wellbeing is not a psychiatric disorder under the DSM?

A.    Correct.

Q.    And when you talk about -- when you talk about psychological wellbeing, what are the different aspects to psychological wellbeing?

A.    So I think most would agree that it -- that psychological wellbeing would include many things we've been discussing.  So happiness and life satisfaction, but because they are so closely correlated, it may also include things like depression, including DSM-defined depression, loneliness, self-esteem, many of these other factors.

Q.    When I reference psychiatric disorders or mental health disorders, I mean to include depressive disorder, anxiety-related disorder, self-harm-related disorder, and suicide-related disorder and/or any other mental health diagnosis recognized under the DSM-5, okay?

A.    Okay.

Page 127

MS. McNABB:  I may object to the specific question, including that lengthy list of definitions for psychiatric disorder or mental health disorders.

BY MS. LEHMAN:

Q.    With that broad definition that I have just laid out, when talking about psychiatric disorders, would that cover all of the recognized mental health disorders that are, in your opinion, associated with or caused by social media?

A.    It doesn't cover everything in my report, no, because as we just discussed, there's many indicators of psychological wellbeing that are not in the DSM.

Q.    Okay.  If you have an experimental or observational study that assesses various mental health disorders, combined, so as an umbrella approach, do you agree that that study does not tell you whether or not there is an increased risk for any individual specific mental health disorder?

MS. McNABB:  Objection.  Compound.  Vague.

Page 128

THE WITNESS:  I don't really understand the question.

BY MS. LEHMAN:

Q.    Okay.  Sure.  So if an experimental or observational study looks broadly at mental health disorders, okay, do you agree that that study does not tell you whether or not there is an increased risk for a specific mental health disorder?

MS. McNABB:  Same objection.

THE WITNESS:  And in the previous version, you mentioned the individual, which, no, because the way the results are going to be reported is going to be, on average, for the experimental and the control group.  It's not going to tell you anything about individuals necessarily.

I mean, although the average, obviously, is made up of individuals, it's not usually the way we think about those things.  Because if it's looking at an umbrella, and an overall, then a lot of times, what these studies use is questionnaires

Page 129

that are used as screening for -- the next step would be, you know, clinical interview to see if it would be -- rise to the level of a DSM diagnosis.

BY MS. LEHMAN:

Q.    When you say that what they use is questionnaires that are used for screening, are you -- do you mean questionnaires that are used for screening broadly for a possible mental health condition?

MS. McNABB:  Objection.  Vague.

THE WITNESS:  I am mostly referring to those that would screen for major depressive disorders and related conditions.  So anxiety is very closely related, for example.  Suicidal ideation is part of the criteria for major depressive disorder, so, you know, these things are closely related to each other.  Would it screen for schizophrenia?  No, generally.

BY MS. LEHMAN:

Q.    But the screening tools that we're talking about, the next step would be for

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

a clinical interview to assess whether that individual has specific mental health disorders, right?

MS. McNABB: Objection. Vague.

THE WITNESS: And that's not what these studies are designed to do. That's not their goal.

BY MS. LEHMAN:

Q. Okay. Do you agree that in order to draw reliable conclusions about specific mental health disorders, that you need epidemiological data specific to the mental health disorders you're looking at?

A. That's tough to answer in the way that you phrased it, because if you get a rise in depressive symptoms based on questionnaire responses, say at the population level, it's going to be pretty likely that you're also going to see a rise in major depressive episode as defined by the DSM.

So the screening questionnaires do a pretty good job in, you know, pointing in that direction. So it's very common for those things to end up being consistent, if that's what you're asking.

Page 131

Q. Do any of the studies that you rely on include a clinical assessment conducted by a qualified professional at the beginning and the end of the study for mental health disorders?

A. At the beginning and the end? So I don't think so, in the way that you're asking it. Although certainly there is time series data that uses the DSM clinical interview for major depressive episode. And there's at least one correlational study that I know of that uses an abbreviated version of a clinical interview to assess disorders.

Q. And what is the correlational study that uses an abbreviated version of a clinical interview?

A. The first author is Robertson. And I'm one of the later authors on that paper.

Q. Okay. And what time series data are you referring to that uses the DSM clinical interview for major depressive episode?

A. That is the NSDUH.

Q. Do any of the studies that you rely on assess whether a specific feature of a

Page 132

social media platform is associated with anxiety, depression, self-harm, suicide, suicidal thoughts, suicidal ideation, or any other mental health disorder?

MS. McNABB: Objection. Compound.

THE WITNESS: If those specific features, such as an algorithm, lead teens to spend more time on social media, then, yes, given that that was the focus of my report was primarily looking at time spent.

BY MS. LEHMAN:

Q. Is there any study that assesses specific features of social media as distinct from the measure of time spent, and whether that feature causes anxiety, depression, self-harm, suicide, suicidal thoughts, suicidal attempts, or any other mental health disorder?

MS. McNABB: Objection. Compound. Vague.

THE WITNESS: I believe I already answered that, that if those features contribute to more time spent, then, yes. But examining --

Page 133

again, I'm not a computer scientist or a coder, and again, I was focused on time spent and mental health in the report.

BY MS. LEHMAN:

Q. Now, one of the documents that you're relying on is an open source document that you co-authored with Jonathan Haidt and Zach Rausch, titled Social Media and Mental Health: A Collaborative Review, correct?

A. Yes. Yes.

Q. And you actually rely on a number of different items written by Jonathan Haidt and Zach Rausch, correct?

A. Yes.

Q. Do you consider Jonathan Haidt to be an authority on social media and mental health?

MS. McNABB: Objection. Vague.

THE WITNESS: Yes.

BY MS. LEHMAN:

Q. Do you consider Zach Rausch to be an authority on social media and mental health?

MS. McNABB: Objection. Vague.

THE WITNESS: Yes.

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

BY MS. LEHMAN:

Q.   Do you agree that the open source document titled Social Media and Mental Health: A Collaborative Review was not peer-reviewed?

A.   Yes, although it depends on how you define peer-reviewed.  It wasn't published in a journal.  However, it was opened up for comment and criticism to other academics, and they did so.  So in that way, it was peer-reviewed.

Q.   Okay.  When we talk about the peer-review process, that term traditionally refers to the process of a journal article vetting and revising an article before publication?

A.   Correct.  So in that way, then, no.

Q.   Were any parts of that open source document removed or deleted following comments from other academics?

A.   Removed or deleted?  I don't believe so.  I know that fellow academics made comments on the document.

Q.   Does Substack have any sort of editorial control over what is published on its

Page 135

site?

A.   I don't believe so, no.

Q.   Are there any limitations about who can publish on Substack?

A.   I don't work for the company, so I don't know.

Q.   Do you agree that a causal event, such as an exposure, must precede the effect for it to be a cause?

A.   Can you word that in a different way?

Q.   Sure.  Do you agree that a causal event always precedes the effect that it causes?

A.   Yes, although I'll also give the qualification that you didn't give an exact time in that question, but yes.

Q.   On the other hand, just because one event precedes a second event, that does not mean that the first event caused the second event, correct?

A.   It means it might.

Q.   Sure.  It just does not necessarily mean that it caused it?

A.   Correct.

Page 136

Q.   Do you agree that it is a logical fallacy to imply causation simply because one thing comes before another?

MS. McNABB:  Objection.  Vague.

THE WITNESS:  Can you word that in a different way?

BY MS. LEHMAN:

Q.   Yes.  Do you agree that simply because event number 1 comes before event number 2, that it would be illogical causation without more information to assert that event 1 caused event 2?

MS. McNABB:  Objection.  Vague.

THE WITNESS:  I think that can contribute to evidence of causation, but you would need to consider other information as well.

BY MS. LEHMAN:

Q.   Timing alone is not sufficient to determine causation, agree?

A.   Yes.

Q.   Do you agree that a study can have a positive association when there is no true association?

MS. McNABB:  Objection.  Vague.

Page 137

THE WITNESS:  I have no idea what you mean by true association.

BY MS. LEHMAN:

Q.   Okay.  Do you agree that a study can have a relative risk greater than 1.0, but there is no true association?

MS. McNABB:  Objection.  Vague.

THE WITNESS:  I don't know what you mean by true association.

BY MS. LEHMAN:

Q.   Okay.  Do you agree that there can be an erroneous positive association?

MS. McNABB:  Objection.  Vague.

THE WITNESS:  I'm not sure what you mean by erroneous.

BY MS. LEHMAN:

Q.   You don't understand the word erroneous?

A.   In this context, no.

Q.   Okay.  Do you agree that an association can be caused by chance?

A.   Yes.

Q.   Do you agree that an association can be the result of confounding?

A.   Yes.

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

Q.    Do you agree that association can be the result of bias?

A.    Tell me what you mean by bias.

Q.    Well, what types of bias are you familiar with?

A.    In terms of association, I mean, we've already talked about confounds. In a longitudinal study, for example, if you have a really significant amount of attrition between time 1 and time 2, and that the people who dropped out have specific characteristics that are related to the study topic, that might be a form of bias.

Q.    Is that the only form of bias you're familiar with?

A.    No, there's many others, but it would take a very long time to go through them all.

Q.    Okay. Are you familiar with selection bias?

A.    Tell me how you would define that.

Q.    Okay. Well, when you hear the term selection bias, what does that mean to you?

Page 139

A.    I've heard it defined in different ways, so I couldn't tell you.

Q.    Okay. Would you agree that selection bias occurs when there is a difference between the intervention group and the control group?

MS. McNABB: Objection. Vague.

THE WITNESS: So if we're talking about an experimental study?

BY MS. LEHMAN:

Q.    Yes.

A.    Yes, but I'm not sure how that -- how selection bias would be defined in that context.

Q.    Okay.

A.    I'd need to know more.

Q.    Do you agree there can be selection bias when study participants differ from those in the target population who are not study participants?

MS. McNABB: Objection. Vague.

THE WITNESS: Okay. So here we're talking about whether the sample is representative or not. And there you're talking about generalizability.

Page 140

So sometimes the results can generalize, and sometimes they don't.

So if you have a sample of college students, and they are in a specific class, they may not generalize to all college students. If a particular campus has odd characteristics, that may not generalize to all college students.

If you have a sample of college students, that may not generalize to the entire population, but in many studies, it actually does. They find the same results in a sample of college students, say, compared to a nationally representative sample of the whole population.

MS. McNABB: Katy, do you care if we take a break soon?

MS. LEHMAN: Sure. No problem. We can take a break now.

THE VIDEOGRAPHER: Going off the record at 11:28.

(Recess.)

THE VIDEOGRAPHER: We're back

Page 141

on the record at 11:41 a.m.

BY MS. LEHMAN:

Q.    Dr. Twenge, what are the ten rules for raising a child in a high-tech world?

A.    Now you want me to rattle them off --

Q.    Yeah, just rattle them off.

A.    -- off the top of my head?

Q.    Yes.

A.    Number one is you're in charge. Number two is no devices in the bedroom overnight. Number -- I may get these out of order. Number three is first phones should be basic phones. Then no social media until age 16 or later. You get the first smartphone with a driver's license. Use parental controls. Create no phone zones. Encourage real world freedom for your kids. Beware of the laptop and the gaming console, and dot dot dot. And advocate for no phones during the school day.

I think I flipped the order on two of those, but that's the ten.

Q.    When you say advocate for no phones during the school day, what do you mean

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

by that?

A.    I mean that parents should, you know, alone or collectively, speak to school administrators about adopting a policy of no access to smartphones from bell to bell.

Q.    Do you mean morning bell to afternoon bell?

A.    Yes.

Q.    Okay.  And so would you also -- not would you -- let me start again.

In your book, do you advocate that an alternative to that would be the phone lockers or Yondr pouches?

A.    There's a number of solutions to that, but, yeah, Yondr pouches are one, or anyplace where students can physically put their phone, so they don't have access to it during the school day.

Q.    You say beware of the laptop. What do you warn about with respect to the laptop?

A.    So school laptops don't allow parental controls, so they're often a total wild card.  Many of them allow YouTube on them.

Page 143

And it's kind of a black box for parents, but kids often use a school laptop to do homework, so it makes it difficult for parents.

And then also that it's tempting for parents to think mostly about the phone when it comes to social media apps or internet access, but, of course, that can also happen on a laptop as well, to be aware of that, to understand how the parental controls work on that.

And just, overall, it's very tempting to think of the laptop as a work device, if you do that in your own work, but that for kids, it's often also an entertainment device.

Q.    And what do you warn parents about with respect to gaming consoles?

A.    So with gaming, the basic recommendation is to set time limits.  And also, especially depending on the age of your child, to think about what games they're playing.

Q.    What time limits do you recommend?

Page 144

A.    So there's different schools of thought on this.  So there's some parents who say, nothing on the weekdays, and then you can use it as much as you want on the weekends.  I think that goes a little too far.  I would say a limit of, say, three hours a day if you're doing that plan.

If you're doing the plan of, you know, limits every day, so on a weekday, you know, you could say no more than an hour a day or you could say no more than two hours a day. So around that.

Q.    Do you make any recommendations for rule number 6, use parental controls?

A.    Yeah, so there's a number of recommendations.  One of them is to not allow app downloads without parental permission. And to be clear, you know, we're talking about minors here.

And then the other would be to shut down the -- most applications on the phone during sleep time.

Q.    Any others?

A.    That if your child does have social media, to put a time limit on it of --

Page 145

you know, exactly how much depends on how many apps they're using.  But no more than an hour on each one app, and no more than about two or three hours, total.

Q.    Is that per day?

A.    Yes.

Q.    So essentially, the same general amount of time that you recommend for the gaming apps?

A.    Well, it depends, because games are a little bit different, because there's -- you know, people can -- kids can play different games, say, on one gaming console. So with social media, it would have to be that you have a good understanding of how many apps they have, so it's a little more complicated.

Q.    What features in social media cause users to spend an increased amount of time on the platforms?

A.    That really wasn't the focus of my report.  It was instead on how that time spent is related to mental health.

Q.    Okay.  So then is it -- I want to make sure I understand.

Is it correct that you do not

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

intend to offer an opinion as to what features cause users to spend increased amounts of time on social media platforms?

A. I mean, it's not as simple as that, because, obviously, there are features that lead to more time spent, but I'm not going to go into detail on the features, no.

Q. Okay. So that raises some more questions for me. Do you intend to offer an opinion as to which features cause users to spend increased amounts of time on social media platforms?

A. No.

Q. Okay. Do you agree that information bias occurs when the information from study participants differs from actual underlying information?

MS. McNABB: Objection. Vague.

THE WITNESS: That's not a concept that I've been exposed to before. Information bias, that's not a phrase I've heard before.

BY MS. LEHMAN:

Q. Okay. Have you heard the phrase recall bias?

Page 147

A. Yes, but I'm not sure how you mean it in this context.

Q. Okay. Are you familiar with the definition of recall bias as something that occurs when study participants fail to accurately recall information they report in the study?

A. Well, I mean, that's not always bias. Sometimes it's just error.

Q. Okay. But that can -- if a study participant, whether through bias or error, inaccurately reports information as part of the study, that can insert error or bias into the study results, correct?

MS. McNABB: Objection. Vague.

THE WITNESS: So it's more complicated than the way you're putting it.

BY MS. LEHMAN:

Q. How so?

A. Well, I mean, the most important thing is, does that -- is that linked to the outcomes you're trying to study? If it's not, it may not make any difference.

Q. Okay. But what if it is linked

Page 148

to the outcomes?

A. Then it could potentially make a difference, but I'd have to see the particular case you were referring to.

Q. Okay. Do you agree that when a study is based on self-reported information, that that information can be incorrect due to either participants' bias, perceptions, or recalls, or erroneous perceptions or recalls?

MS. McNABB: Objection. Compound. Vague.

THE WITNESS: So I think it depends heavily on what you're measuring with self-report.

BY MS. LEHMAN:

Q. Okay. But do you agree that that can happen?

MS. McNABB: Same objection.

THE WITNESS: Yes, but I also think it has to be qualified by saying that self-report is a very common method, and it is -- in many cases, it's the only method that can be used to measure certain things.

BY MS. LEHMAN:

Page 149

Q. Okay. Well, many of the studies that you relied on use self-reported information concerning participants' time on digital media, phones, social media screens, or devices, correct?

MS. McNABB: Objection. Compound.

THE WITNESS: Yes. Yes.

BY MS. LEHMAN:

Q. And many of the studies you relied on use self-reported information that was collected through questionnaires, surveys, or interviews, correct?

A. Yes.

Q. Okay. And studies have found that self-reports of screen time or time on social media differ significantly from time determined through objective measures, correct?

A. That's not my understanding of what most of the literature shows. And so I've been doing this for a while, you know, a good decade, and I've seen several studies showing that the -- say, the average amount of time that someone spends, through retrospective self-report, is, you know,

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

virtually identical to a more objective measure. There's at least one study I know of showing that.

Q. What study is that?

A. It may not be published yet.

Q. Okay. Are you familiar with the studies that show that self-report screen time on social media -- strike that. Let me start again.

Are you familiar with the studies that show that self-reports of screen time or time on social media differ significantly?

MS. McNABB: Objection. Compound.

THE WITNESS: Significantly is -- you know, statistically significantly? Yeah, I don't know. I mean, I would have to have the study in front of me to judge that.

BY MS. LEHMAN:

Q. Okay. What is the name of the study that you're familiar with, even if it's not yet published, or who is the author?

A. So the first author is Lisa Walsh. I couldn't tell you the title, but it

Page 151

looked at objective and self-reported time spent on certain apps, and the average was actually exactly the same.

Q. You haven't seen that article in published form -- format, then?

A. No, I don't -- I don't believe so. I need to get an update on that, but I don't believe it's published yet, no.

Q. Okay. Have you heard the term confirmation bias?

A. I have heard the term, yes.

Q. Okay. And what is your understanding of confirmation bias?

A. So confirmation bias happens when someone, in any context, is more likely to remember things that verify an opinion they already have.

Q. Would you also agree that confirmation bias is the tendency to look for information that supports rather than rejects one's existing opinions?

A. Yes, that is one definition.

Q. Okay. Do you agree that due to confirmation bias, people often choose information that supports their hypothesis and

Page 152

reject contradictory information?

MS. McNABB: Objection. Asked and answered.

THE WITNESS: That does happen, but the goal in science is usually to try to avoid that.

BY MS. LEHMAN:

Q. Have you heard the phrase demand characteristics?

A. I have.

Q. Okay. And do you agree that demand characteristics or demand effects occur when participants form a belief about the study's purpose and change their behavior?

A. That is one definition of demand characteristics, yes.

Q. And they can do so either intentionally or unintentionally?

A. Yes.

Q. Now, if a study is subject to demand effects, the study's findings cannot be generalized to populations outside of the study participants, correct?

A. I would disagree with that, because there's a lot of studies, including

Page 153

those in this field, where participants cannot be blind to condition. It's impossible.

Q. And so in that circumstance, do you agree that demand effects still exist and still affect the outcome of the surveys or the studies?

A. It's hard to know that. You'd have to try to measure that.

Q. Have you seen any study that affects the impact of demand characteristics or demand effects on social media studies?

A. I don't know if I understand the question.

Q. Sure. Have you reviewed any peer-reviewed study that evaluates the impact of demand characteristics on the studies that you rely on?

MS. McNABB: Objection. Vague.

THE WITNESS: Yeah, I'm still not sure I understand the question.

BY MS. LEHMAN:

Q. Sure. Are you able to evaluate the impact of demand effect on the studies that you rely on in forming your opinions in this litigation?

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

MS. McNABB: Objection. Vague.

THE WITNESS: I don't think it's possible to do that, given that people can't be blind to conditions.

BY MS. LEHMAN:

Q. Do you agree that study validity is the extent to which results from a study can be relied on?

A. Yes.

Q. Okay. Do you agree that study validity has two aspects, both internal and external?

A. Yes.

Q. Okay. And do you agree that internal validity is about the specifics of a particular study?

A. Well, specific what?

Q. Well, it assesses whether the study's conclusions hold under the study's conditions and parameters?

A. Yes.

Q. Okay. And external validity involves whether a particular study can be used to reach more general conclusions beyond the study?

Page 155

MS. McNABB: Objection.

THE WITNESS: Yes.

BY MS. LEHMAN:

Q. Do you agree that a study with high internal validity but low external validity is not useful to make assessments about people outside of the study?

A. I'm not sure I would agree with that.

Q. Why?

A. So just to make sure I have it straight, you said low external validity?

Q. Yes, high internal validity and low external validity.

A. So I think it depends on -- you know, we talked about what external validity means. But just like, as an example, if you're measuring aggression through, say, blasting someone with noise, I think it would be debatable how much external validity that has to real world aggression. And so I think judging external validity can be really difficult, so I think it's hard to answer that question.

Q. All right. Are you familiar with

Page 156

the phrase measurement validity?

A. No.

Q. Okay. Are any of the studies that you rely on based on diagnosed mental health disorders?

A. So if we're talking about time series studies, not for depression, depending on how you define diagnosis, perhaps for self-harm or suicide effects -- sorry, excuse me, suicide attempts.

Q. Okay. What would be the definition of diagnosis under which you would say, no, my studies do not?

A. Well, okay, so for example, figure 1, a major depressive episode is not based on diagnoses from physicians, so that would be an example where it's not based on diagnoses, where it might be, depending on how you define that, would be emergency department admissions for self-harm behavior, say figure 2, where because there are, you know, physicians involved in that process, obviously, when you show up at the emergency room. You know, it depends on how you're defining diagnosis, but it may be involved in

Page 157

that case.

Q. Okay. So distinguishing between showing up and being seen at the emergency room and actually looking at a diagnosis made by a healthcare provider, it would be correct that none of the studies that you rely on were based on a formal diagnosis of a mental health disorder, correct?

MS. McNABB: Objection. Vague.

THE WITNESS: So it depends on how you define formal diagnosis, because in the National Survey on Drug Use and Health, those -- that is done through an interview, and it is based on the DSM criteria for a major depressive episode. Plus, as I mentioned before, you know, I think this is kind of a false distinction, that the diagnosis by a mental health professional would be wildly different from, say, self-reports of depressive symptoms. They're not. There's a lot of overlap between those. That's why those questionnaires are used as screenings for possible diagnosis.

40 (Pages 154 - 157)

CONFIDENTIAL

Page 158

BY MS. LEHMAN:

Q. Do any of the studies that you rely on distinguish between social media use and social media content?

A. I'm not sure I understand what you mean.

Q. Sure. Sure. Do any of the studies that you rely on distinguish from actual use of social media or time spent on social media as compared to specific activities on social media?

MS. McNABB: Objection. Vague.

THE WITNESS: So in the report, I'm focusing on time spent. There are, you know, a few other articles that I've read, which may or may not be on the list, that sometimes is distinguished between active and passive use of social media, so that might be the only one where -- that's not -- that's not content specific necessarily, though. It's how the individual is using the app.

BY MS. LEHMAN:

Q. And in your opinions, do you

Page 159

distinguish between active use and passive use of social media?

A. In this report, I did not discuss that. But I'm working on research that looks at that distinction. And there are other articles that I've read in the 10 years I've been doing this that look at that.

Q. Okay. And that's something I didn't ask you about. Are you actively involved in any research right now?

A. Yes.

Q. Okay. What research are you involved in right now?

A. So the project on active versus passive social media use. I have a paper with a revision under review that is looking at school loneliness, an international sample. I'm working with some undergraduate students on trends over time in basic problems around cognition in one of the national datasets. Those are the ones that come to mind.

Q. And your research about active versus passive social media use, what are you looking at?

A. So that's an international

Page 160

dataset, and it asks questions about more active -- you know, it has two different questions about social media use -- one is much more about active use, and one is much more about passive use -- and looking at the link or the association between those two types of use, and two questions about anxiety.

Q. Okay. And how do you define active use of social media?

A. So I would go back to the way it is asked in that dataset. And I don't have the exact wording in front of me, but it's basically looking at posting or communicating -- well, the passive social media use is much more about scrolling through other people's content, for example. But I would want to go back to the exact wording, which I don't have in front of me, to more precisely answer your question.

Q. And do you have a theory or hypothesis that you're testing in your active versus passive internet research study?

A. So we could have a very long discussion about this. I'll be brief. I'm not a fan of the hypothesis

Page 161

model in research, even though it is frequently used. I mean, there's different schools of thought on this.

I didn't really go into it with one hypothesis or another. My purpose was to look at what the analyses told us.

Q. Okay. Do you agree that anecdotal information is based on descriptions or reports of individual personal experiences or observations?

A. Yes, although it can also be not just of the individual, but, you know, things they've heard from other people.

Q. Do you agree that anecdotal information cannot establish causation?

A. I think it would be difficult to say. Are we talking about general causation or are we talking about specific causation?

Q. We're talking about general causation.

A. Then, no.

Q. And a meta-analysis is an analysis of a number of existing studies, correct?

A. Yes.

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

Q. Okay. And do you agree that a meta-analysis is most appropriate when used in pooling randomized experimental trials?

A. No. A meta-analysis can be used for any type of study.

Q. Okay. Do you agree that in a meta-analysis of observational studies, the weaknesses of the individual studies get carried into the meta-analysis?

MS. McNABB: Objection. Vague.

THE WITNESS: What do you mean by an observational study? Because that's not a term that I use in my report.

BY MS. LEHMAN:

Q. Okay. Well, then let's just use it more broadly. Do you agree that in a meta-analysis of different studies, that the weaknesses of the individual studies get carried into the meta-analysis?

MS. McNABB: Objection. Vague. Speculation.

THE WITNESS: Yes, although there are ways around that. So for example, you can look at quality of

Page 163

the study as a moderator variable, which is often done in meta-analysis.

BY MS. LEHMAN:

Q. All right. When you use the phrase moderator variable, what do you mean?

A. I mean, for example, in a meta-analysis, you can see if the effect size differs based on different characteristics. So the quality of the study, whether the study is published or unpublished, whether the study included males, females, or both. Things like that.

Q. Okay. Do you agree that a relative risk of 1.0 indicates no association between the event and the outcome?

MS. McNABB: Objection. Vague.

THE WITNESS: I wouldn't necessarily phrase it myself as event and outcome, but between the two variables, yes, relative risk of 1.0 usually indicates that there's no relationship or no association that we can discern.

BY MS. LEHMAN:

Q. Okay. Do you agree that if a

Page 164

confidence interval includes 1.0, the results are not statistically significant, because the results may be due to chance?

A. Roughly, yes. And I'm glad you put the qualification of statistically significant, because you can have, say, a smaller sample size. And then you may get a relative risk, which is higher, but not statistically significant, that might have been statistically significant if you had a larger sample or if you had a larger base rate for the particular outcome that you're examining.

Q. Okay. Do you agree that the fact that a study's results are statistically significant says nothing about the magnitude of the association?

A. It's not that it says nothing. It's that -- it's a combination of the magnitude and the sample size.

Q. Okay. Do you agree that statistical significance is not about the size of the risk found in the study?

MS. McNABB: Objection. Vague.

THE WITNESS: That's one

Page 165

element of it. So statistical significance generally is a combination of the effect size, and relative risk is an effect size, and the sample size, so those are things that are included in the formula.

BY MS. LEHMAN:

Q. Are you familiar with the phrase Granger causality?

A. Yes.

Q. Okay. And what does Granger causality measure?

A. So it is a statistical technique developed quite a long time ago, in the late '60s, that can be used in time series analysis, to see what happens before -- you know, whether outcome A happens before outcome B.

Q. Do you agree that Granger causality does not assess individual risk?

MS. McNABB: Objection. Vague.

THE WITNESS: What do you mean by individual risk?

BY MS. LEHMAN:

Q. It doesn't assess risk for a

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

specific individual?

A.    No.

Q.    You do not agree?

A.    Well, I'm still not exactly sure what you mean by individual risk, because Granger causality analysis is used for population level, so that definitely isn't going to be about individuals, just by what it's intended to do.

Q.    Well, that's exactly where I was going, so -- just so we're clear.  I think you and I agree, Granger causality looks at data for populations?

A.    Yes.

Q.    Correct?  So it does not look at data at an individual level.

A.    I mean, it uses the individual data as part of the population level data.  But it can't tell us anything about one specific individual.

Q.    Okay.  And do you agree that -- strike that.  Never mind.

Okay.  Other than requiring adolescents to use social media for eight hours a day to the exclusion of all other activities,

Page 167

are there any other study designs that you would not support for a social media study because it would be unethical?

A.    That's so open-ended, I don't think I could answer it.  Could you be more specific?

Q.    Sure.

In your report, you mention that a study design would be unethical if it basically forced someone to say, I'm going to use social media eight hours a day; I'm not going to do anything else for that period.  Are there any other designs that you would say, this would be a design of a study for social media that would be unethical?

A.    So, I mean, anything -- so trying to decide what is ethical and unethical usually isn't my purview.  That's usually going to be the Institutional Review Board, the IRB, is going to, you know, make a judgment on that, and you'd have to do through, you know, the specific requirements.

Under my personal opinion, I'm not sure it would be ethical to randomly assign adolescents to spend any time on a

Page 168

particular social media platform where they weren't doing that in their normal lives.  Even if they were, as part of a study, I'm not certain that that would be ethical.

Q.    All right.  Looking at your report in paragraph 31, it starts on page 8.

MS. McNABB:  We're looking at the June 17th --

MS. LEHMAN:  Yes, the June 17, 2025.

BY MS. LEHMAN:

Q.    All right.  You say that these trends in adolescent mental health are best understood in the context of changes over many decades, correct?

A.    Yes.

Q.    All right.  And then on page 9, the same paragraph, you state that "Mental health issues among adolescents and young adults grew steadily worse between the 1950s and the early 1990s, likely due to factors such as family instability, increases in the crime rate, and an emphasis on extrinsic goals," correct?

A.    Yes.

Page 169

Q.    All right.  And you refer to Klerman & Weissman, 1989; Lewinsohn, 1993; Newsom, 2003; and Twenge, 2000, correct?

A.    Yes.

Q.    All right.  You would agree that mental health issues among adolescents and young adults grew steadily worse between the 1950s and the early 1990s, right?

A.    Yes.

Q.    And you agree that was likely due to factors such as family instability, increases in the crime rate, and emphasis on extrinsic goals, correct?

A.    Yes.

Q.    And you agree that factors such as family instability, increases in the crime rate, and an emphasis on extrinsic goals can adversely impact the mental health of adolescents and young adults, correct?

A.    Yes, and that's actually why it's so remarkable we get such a large increase in depression after 2012, because none of those factors are going up.

Q.    But family instability, crime rates, and emphasis on extrinsic goals are not

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

the only factors that can adversely impact the mental health of adolescents and young adults, correct?

A.    Correct.  Although I want to make sure that we're on the same page about what we're discussing, because there's often confusion between two fairly different questions, which is, what are all of the causes of mental health issues, and then what are the causes of the increase in depression, say, after 2012, you know, or the increase between the '50s and the '90s.

So the population level, what are those causes?  That's a different question from saying, What are all of the different things that can cause mental health issues?

Q.    Okay.  So the two questions that we just looked at from paragraph 31, and those supporting references, are not in your April 2025 report, correct?

A.    Mm-hmm.

Q.    That's a "yes"?

A.    That's a "yes."

Q.    Okay.  And your April 2025 report focused on changes to mental health after 2012,

Page 171

correct?

A.    Yes.

Q.    And your April 2025 report did not reference Twenge, 2000, correct?

A.    I believe that's correct, yes.

Q.    And your April 2025 report did not reference Twenge, 2015, correct?

A.    '15 -- let me make sure I understand which one that is.  Yes.

MR. LEHMAN:  Can you get tab 301?

I'm going to hand you what I'm marking as Exhibit 4.

(Exhibit No. 4 was marked for identification.)

BY MS. LEHMAN:

Q.    And can you confirm this is an article that you wrote in 2000 titled, The Age of Anxiety?  Birth Cohort Change in Anxiety and Neuroticism, 1952 to 1993?

A.    Yes.

Q.    Okay.  And this article was published in the Journal of Personality and Social Psychology?

A.    Yes.

Page 172

Q.    Okay.  And you didn't just publish the article, you also presented this at the annual meeting of the Society For Personality and Social Psychology?

A.    Yes.

Q.    Okay.  And this is -- you're the sole author on this article, correct?

A.    Yes.

Q.    All right.  And as the title reflects, it analyzed data for the years 1952 to 1993, correct?

A.    Yes.

Q.    All right.  Now, in the abstract, you state that the average American child in the 1980s reported more anxiety than child psychiatric patients in the 1950s, correct?

A.    Yes.

Q.    All right.  And so then it's accurate that in 2000, you said that the average American child in the 1980s reported more anxiety than child psychiatric patients in the 1950s, correct?

A.    Yes, although I will point out that that 1950s comparison was based on a single study.

Page 173

Q.    Certainly you wouldn't have published that in this article, and then presented on it at a professional society, unless you thought that information was accurate, correct?

A.    I did.  But I also made clear that that child psychiatric patient study was one study.

Q.    Okay.  Let's turn to page 1009, looking at the right column under Empirical Evidence For Change.

A.    Okay.

Q.    All right.  In that first paragraph, the article that you wrote reads, "First, large panel studies have consistently found that younger cohorts show more and longer episodes of depression (Klerman & Weissman, 1989; Lewinsohn, et al., 1993.)  Some psychologists have gone so far as to label this effect a modern epidemic of depression, Seligman, 1988 and 1995, or age of melancholy (Hagnell, Lanke, Rorsman) --

A.    And who knows, 1982.

Q.    1982.  Did I read that essentially correctly?

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

A.    Yeah.
Q.    Okay.  Now, you agree that the modern epidemic of depression that psychologists were discussing in the 1980s and the 1990s predated social media, correct?
A.    Yes.
Q.    Now, if you'll turn to page 1011, looking under the header Results, your article says, "Have college students" --
MS. McNABB:  Sorry.  Can you just give us a minute to get --
MS. LEHMAN:  Sure.
MS. McNABB:  Okay.  Thank you.
MS. LEHMAN:  Sure, Dr. Twenge has got it.
BY MS. LEHMAN:
Q.    Looking under Results, your article says, "Have college students' self-reported levels of anxiety and neuroticism increased from 1952 to 1993?  The results show unequivocally that they have."  Did I read that correctly?
A.    Yes.
Q.    Okay.  And you believed that to be accurate when you published this in 2000,

Page 175

correct?
A.    Yes.
Q.    Now, in 2000, you also said that by the 1980s, normal children were scoring higher than 1950s child psychiatric patients on self-reported anxiety, correct?
A.    Yes.
MS. McNABB:  Katy, are you reading that?
MS. LEHMAN:  I was just asking her.
MS. McNABB:  Oh, sorry.  Okay.
THE WITNESS:  But, yeah, and as I mentioned before, that child psychiatric patient study was one study.
BY MS. LEHMAN:
Q.    And then if you'll turn to page 2000 -- or I'm sorry, turn to page 1017.
And just look right above the header, The Effects of Low Social Connectedness and High Threat.
A.    Okay.
Q.    Okay.  And the article that you published says, "Contrary to views that

Page 176

children have nothing to worry about except bullies and Oedipal dynamics, these findings indicate that children's anxiety strongly reflects what is happening in the society at large.  Theories of personality development may benefit from incorporating some understanding that children live in a society as a whole, rather than a narrow, circumscribed world."
Did I read that correctly?
A.    Yes.
Q.    You also wrote in 2000 that "Anxiety is so high now that normal samples of children from the 1980s outscore psychiatric populations from the 1950s," with a citation to the Lovett study from 1959, correct?
A.    Yes.
Q.    I'm going to hand you what I've marked as Exhibit Number 5.
(Exhibit No. 5 was marked for identification.)
BY MS. LEHMAN:
Q.    Can you confirm that this is an article that you co-authored and published in 2010 entitled Birth Cohort Increases in Psychopathology Among Young Americans,

Page 177

1938-2007:  A Cross-Temporal Meta-Analysis of the MMPI?
A.    Yes.
Q.    And is it okay with you if we refer to this as Twenge, 2010?
A.    Sure.
Q.    All right.  And if you turn to the last page on page 153 under Conclusions, the article that you published in 2010 says, "Over time, American culture has increasingly shifted towards an environment in which more and more young people experience poor mental health and psychopathology possibly due to an increased focus on money, appearance and status, rather than on community and close relationships."
Did I read that correctly?
A.    Yes.
Q.    And was it accurate in 2010, when you published this article, that more young people were experiencing poor mental health and psychopathology, possibly due to increased focus on money, appearance and status, as opposed to community and close relationships?
A.    Yes, although I think it is

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

important to mention some of the details here, which was that there was not a lot of data on the MMPI in the 2000s, and that the MMPI tilts toward looking at more psychosomatic symptoms compared to other measures.

Q.    And when we talk about the MMPI, you're talking about the Minnesota Multiphasic Personality Inventory?

A.    Yes. And the title is a misnomer. It doesn't actually look at personality. It's a questionnaire that is supposed to measure psychopathology.

Q.    And it's a questionnaire that is administered to high school and college students across the country?

A.    It is also administered to many other populations, but yes.

Q.    And the MMPI has been in use since at least the 1930s, if not before then?

A.    Correct.

Q.    Okay. All right. I know we were going to take a break around 12:30 for lunch. And I'm at a good stopping point, so if that works for everybody, we'll take our lunch break.

Page 179

A.    Okay.

MS. McNABB:  Sure.

THE VIDEOGRAPHER:  Going off the record at 12:22 p.m.

(Lunch recess.)

THE VIDEOGRAPHER:  We're back on the record at 1:04 p.m.

BY MS. LEHMAN:

Q.    Did you have a nice lunch?

A.    Yes. You?

Q.    I did. Thank you.

We were talking before we broke about the accuracy of self-reported data about social media and screen usage.

We talked about the unpublished study by the author named Lisa Walsh. Can you name any published studies that report that self-reported data as to screen time or social media usage is accurate?

MS. McNABB:  Objection. Compound. Vague.

THE WITNESS:  I reviewed a lot of studies for this, and since that wasn't one of the primary focuses of my report, it's hard for me to say.

Page 180

There are not a lot of studies that have done that.

BY MS. LEHMAN:

Q.    We also talked before the break about your three children, and I know that you mentioned you have an adult daughter who is now in the Navy.

A.    Yes.

Q.    Okay. Do you have any information about her current social media use?

A.    I believe she has a Discord account, but that's, I think, the only one among those we discussed.

Q.    Now that she is an adult, have you given her any advice about social media use?

A.    We certainly had discussions about it. And she had some early experiences herself with friends that use social media and posted pictures and videos of her without her permission when she was nine years. So she has strong opinions on social media herself, even apart from discussions I've had with her.

Q.    And have you given her any advice as to time limits or other limits that she

Page 181

might place on her social media use?

A.    At the moment, that's not very relevant, because she's in the Navy, and she has very little free time.

Q.    And so is she onboard ship in the Navy?

A.    She is not. She's in training right now to be a corpsman or a medic, and they are in class many, many hours a day, and then have watch duty and other things. And when she's in class and on watch duty, she does not have access to her phone.

Q.    Well, good luck to her in the Navy and with her training.

A.    Thank you.

Q.    Do -- we talked also before break about your upcoming Ten Rules book.

A.    Yes.

Q.    And do the rules end when the child turns 18 or do they continue past 18?

A.    That's a good question that I didn't really consider, because I'm mostly writing for parents who have minor children.

I think those discussions definitely continue. I think a lot of those

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

rules, and I make this clear, like, no devices in the bedroom overnight, that that's a good rule for adults, as well, of any age.

And not spending too much time on social media, however that's defined, particularly for leisure purposes. I think that's a good rule for everyone. That's a discussion you can have with an adult child that I have had with my own adult child.

Q. In the Ten Rules book, do you define social media for parents, so they understand the scope of what you're talking about?

A. I discuss specific platforms, yes.

Q. What specific platforms do you discuss within the book?

A. Let's see. So this is from memory, it's not in front of me. Instagram, TikTok, Snapchat, Twitter, YouTube. I discuss WhatsApp, but to say that it's pretty similar to texting, and so I wouldn't put it necessarily in the same category of social media.

I believe that's it. I went

Page 183

partially on the Pew Center For Research and other sources about the most popular platforms when deciding what to discuss. I think I may obliquely mention, or briefly mention -- no, wait, I do mention -- Discord. Yes, I do have a section on Discord as well.

Q. Okay. And do you have -- when you say that you talk about these various platforms in the Ten Rules book, what do you talk about with respect to the individual platforms?

A. So I go through some of the -- so it's a number of things. So I discuss some of the design and features of the platforms, how they work. Some of the pitfalls, where kids and teens can end up in trouble. And that's based on journalism. And I also discuss some of the cases that have been covered in the media of specific harms to children from these platforms.

So there's a Bloomberg Businessweek story on Snapchat and drug dealers, and the families who have sued on that basis. And that story includes an interview with one of the few survivors. So

Page 184

there's 40 some plaintiffs, and there are only two who are living, the rest died from the opioid overdoses. So one of the few that survived is one of the key plaintiffs, so that article goes into that.

Then a lot of the journalism and other things that, say, legislators have done, in terms of testing out Instagram with, you know, an account of a 13-year-old, and seeing what happens to that feed, and searching for healthy diet ends up -- can end up with -- you know, down a rabbit hole of negative content for pro-anorexia sites, things like that.

TikTok, that the algorithm can't reset, so then you can end up down a wormhole of negative content, that the algorithm is very sticky. That it's very common for kids to say that they want to spend a half hour on it, and end up spending two hours. I go over some of the reviews from the App Store, where kids and teens have said things just like that.

So covering a lot of the dangers, and I make it clear that these are certainly extreme outcomes. They're not going to happen

Page 185

to every kid, but they're things that parents should keep in mind have happened.

Q. Do you have an estimate of the percentage of adolescents who use social media who have a negative mental health outcome, any of the negative mental health outcomes that you address in your report?

MS. McNABB: Objection. Vague. Speculation.

THE WITNESS: So, wait, ask that again, because I'm not sure I understand what you're asking.

BY MS. LEHMAN:

Q. Sure. What percentage of social media -- of adolescent social media users have one of the negative mental health outcomes that you address in your report?

MS. McNABB: Same objection.

THE WITNESS: Okay. So I'm still not a hundred percent sure I know what you're asking. But I can go back to one of the better designed studies, where I'm going to bring in front of me -- that was in my report. So I'm thinking of Kelly, et al. 2019.

47 (Pages 182 - 185)

CONFIDENTIAL

Page 186

So that's a good example.

So it's not -- so, sure, it's social media users, overall. But one of the key factors is time spent. And that's what I focused on in the report. So figure 10 here could give one answer to that question, if I'm understanding your question correctly.

So say, for example, among girls, that the heaviest users of social media, which in this case is five hours a day or more, that the percentage who are -- whose levels of depressive symptoms reach a level of clinical significance is about 37 percent among the heaviest users, as opposed to those who are not social media users at all, it's about 11 or 12 percent.

BY MS. LEHMAN:

Q. Okay. And what percentage -- so if the denominator is not heavy social media users, right, but the denominator is all social media users, what percentage are experiencing the negative mental health outcomes that you

Page 187

address?

MS. McNABB: Objection. Vague.

THE WITNESS: I mean, you'd have to do the math to see what that is. But like on this figure, it would be everybody, but those who say they don't use social media at all, who are in the none category. You would have to average that together, so it would depend on the sample size within each group. I'd have to have the -- I'd have to calculate the numbers to be able to answer that.

BY MS. LEHMAN:

Q. Okay. All right. So let's look at Kelly, and we'll mark this as Exhibit No. 6.

(Exhibit No. 6 was marked for identification.)

BY MS. LEHMAN:

Q. Can you confirm that I have handed you the article with the lead author Yvonne Kelly that was published in 2018 titled, Social Media Use in Adolescent Mental Health: Findings From the UK Millennium Cohort Study?

A. Yes, I believe I cite this as

Page 188

2019. You're correct that this version says 2018, but I believe it was released at the beginning of January of 2019. So a detail, but I just want to make clear that we're talking about the same paper that I'm referring to it as 2019.

Q. Okay. But we are talking about the same paper?

A. We are, yes. I just wanted to make that clear, because it's important that we're on the same page.

Q. I agree. And I'm glad that we are.

And do you agree that -- and we can call it Kelly 2019 to avoid confusion --

A. Good idea.

Q. -- since that's how you refer to it in your report.

A. Yes.

Q. Do you agree that Kelly 2019 is a cross-sectional correlational study that used preexisting data from the Millennium Cohort study?

A. Not exactly, because they do use previous depression from a previous

Page 189

administration of this survey as a control. So although what's graphed here is from one time, it does use a control from a previous data collection. So in that way, it has elements of a longitudinal study.

Q. Okay. Well, okay, so let's unpack that. Do you agree that Kelly 2019 used preexisting data from the Millennium Cohort study?

A. Yes.

Q. Okay. And what is the source of the previous data collection that you were referring to?

A. It's also from the Millennium Cohort study, because the Millennium Cohort study is a longitudinal study, which can be analyzed, you know, as one time, but they use two of the data collections.

Q. Okay. And what are the two data collection points that they use?

A. All right. So let's take a look. Because I think I know the answer, but I don't want to get it wrong.

So they are using the age 14 data, which I believe is from about 2015. And

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

then they also then use that control -- the control of previous -- I think it's depressive symptoms at age 11 -- wait, sorry, it's the parent completed strengths and difficulties questionnaire from earlier in adolescence when participants were aged 11. So this is on -- this is the bottom of page 61 under confounders. So that's a measure of psychological wellbeing.

Q. And so just to round out the conversation we had, at age 11, there was self-reported information by the adolescents, parents, or guardians?

A. Yes.

Q. Okay. And then there was subsequent data collected when they were 14 or 15, correct?

A. Yes.

Q. Okay. Now, if you look -- and let's look on page 66 -- and look under Discussion, the last sentence in the long paragraph, so it starts, "However."

A. I'm not finding where you're referring to -- wait, it's the first column, "However, caution is needed"?

Page 191

Q. Yes.

A. Yes.

Q. Yes. And so the authors of Kelly 2019 warn, "Caution is needed when interpreting our findings as the data used in this paper were, for the most part, cross-sectional in the direction of association, and therefore, causality cannot be inferred," correct?

A. This is the type of limitation that is put into almost every single paper published into a journal that uses this type of method. And I'll also point out that it says, "for the most part" because it did use that earlier data collection as well. That's why they have to put that qualifier in there, is it did have that strength of using that earlier data collection which helps rule out reverse causation.

Q. Okay. Well, you're not saying that -- let me understand.

Are you disagreeing with the authors with their caution regarding causation here?

A. No, not at all.

Q. Now, if we also look on page

Page 192

68 -- I'm sorry, I said 68. I should have said 66. Stay on that same page.

A. Okay.

Q. Just look in the first paragraph under Discussion. We're going to look at the last sentence. And do you see there, the author of Kelly 2019 warned, "Findings are based largely on cross-sectional data, and thus causality cannot be inferred." Do you see that?

A. Yep, it's very similar to the other sentence. And it's based largely, meaning because they did have that longitudinal component. And again, this is the type of limitation that is put into almost every journal article using this type of method.

Q. And the reason that limitations like this are put into almost every journal article is because that is a very valid limitation on the way that cross-sectional data can be interpreted, correct?

MS. McNABB: Objection. Misleading.

THE WITNESS: So it is. And as

Page 193

we have discussed earlier, that is the limitation of correlational or cross-sectional studies, although those studies have other strengths, and they have to be considered within the totality of the evidence. They can point towards possible causation, but, no, they can't prove scientific causation in the way that a random assignment experiment can. But that doesn't mean they tell us nothing. They still tell us interesting information that needs to be considered.

BY MS. LEHMAN:

Q. Now, the participants in Kelly self-reported on the amount of time that they spent on social networking and messaging sites or apps, correct?

A. Yes.

Q. The participants did not report how much time they spent on any specific social media platform, correct?

A. Let's look at the question, because that's always the best thing to do, is

CONFIDENTIAL

Page 194

to see how it was measured.

Okay. So page 61, the box Social Media Use gives the wording, the question, "On a normal weekday during term time," and this is UK, so what they mean is school, "how many hours do you spend on social networking or messaging sites, or apps on the internet, such as Facebook, Twitter, and WhatsApp?"

So what's interesting there is they've got three examples, only two of them are what I would consider to be social media. But it does mention social networking. Thus, this is almost always treated as a measure of social media use.

Q.    Okay. But there's no question asking respondents to identify how much time they spent on any particular platform, correct?

A.    Correct.

Q.    Okay. Now, if you'll turn to page 66, and look on the right column, and 14 lines from the bottom. There's a sentence that starts, "There is a risk."

A.    Yes.

Q.    All right. Do you see that?

A.    Yeah, I do.

Page 195

Q.    All right. And here Kelly 2019 says, "There is a risk that self-reported data of time spent on social media use might lack accuracy. Use may be especially difficult for young people to estimate in time categories, as social media is not clearly delineated, unlike other forms of screen based on media, including TV viewing and playing games." Do you see that?

A.    I do.

Q.    Do you agree that the reported data relied on by Kelly 2019 is subject to inaccurate recall?

A.    Yes, although I don't think that's particularly relevant unless we know for sure that it's related to the outcomes in question.

Q.    Okay. Well, you would agree that if the reported data as to hours of time spent on social networking is inaccurate, that that would impact the outcome of Kelly 2019?

A.    No, only if it -- only if that was strongly correlated with their outcome variable of depressive symptoms. Otherwise, it's just random error, and it would kind of

Page 196

make it more remarkable they found anything at all.

Q.    Okay. Do you agree that Kelly 2019 did not adjust for all confounders?

A.    I don't know of a single study out there that can adjust for every single confounder out there. They addressed for many important confounders, and I would argue that this study is pretty much above average, in terms of the confounders that it adjusted for. It was a pretty comprehensive list.

Q.    Okay. What confounders did Kelly 2019 adjust for?

A.    All right. Okay. So it has the list on page 61, first -- left-hand side, at the bottom. It says, "We controlled for the following confounders in our analyses: Family income, equivalized fifths, family structure, two versus one parent, age in years."

And then what I think really makes this study stand out is its control for the parent reported strengths and difficulties questionnaire of psychological wellbeing from three years prior.

And I should also point out, they

Page 197

did not need to adjust for gender as a confounder, because they analyzed the data separately for boys and girls.

Q.    Now, is it correct that they controlled for symptoms of depression at age 11, but not at age 14 or 15?

A.    Well, you can't do that, because you can't control for something that's your outcome variable.

Q.    Okay. So does this study, in any way, control for any other causes of depression?

MS. McNABB: Objection. Vague.

THE WITNESS: What do you mean by any other causes? I'm not sure I understand.

BY MS. LEHMAN:

Q.    Right. Well, so is the study evaluating -- so we -- let me back up.

You and I would agree, I think, that not everyone who has depression who is an adolescent has depression caused by social media. Do we agree? Or maybe you don't agree.

A.    There are many, many, many different causes of depression. And even for

50 (Pages 194 - 197)

CONFIDENTIAL

Page 198

one person, there can be multiple causes, so it's difficult to answer the question.

Q. Okay. And so does this study, in any way, adjust its data for other causes of depression, aside from social media?

A. Well, it adjusts for family income, so if poverty is one of the causes, it's controlled for that. It adjusts for family structure, so if family structure is one of the causes, it's adjusted for that. If prior depression is one of the causes, then it's adjusted for that. If gender is one of the causes, which it appears to be, they have analyzed the data separately, so they have taken that into account.

Q. Does Kelly 2019 distinguish between content and features on social media?

A. So it looks at social media use, which in this case, it's time spent. So it is pretty agnostic in terms of content.

Q. Does Kelly 2019 use any clinical mental health assessment to diagnose for depression or other mental health disorder?

A. Not diagnose. However, the measure of depressive symptoms is one where

Page 199

there is a recognized cutoff for clinically relevant depression. This is another one of the questionnaires that's used as screening or as something that will highly correlate with that type of diagnosis. But, no, it's not a diagnosis itself. That's not how these studies are done.

Q. All right. We started talking previously about the open source literature review that you and Jonathan Haidt and Zach Rausch prepared. And I believe you cite that in your report as Haidt 2025; is that correct?

A. I'd have to look.

Q. Yeah, it's paragraph 63.

A. Okay. It's "et al." That's why I was confused. Yes.

Q. Okay. You cite it as Haidt, et al. 2025?

A. Yes.

Q. Okay. Thank you for that clarification. So I want to look -- and we'll mark this as Exhibit Number 7.

(Exhibit No. 7 was marked for identification.)

BY MS. LEHMAN:

Page 200

Q. And I will tell you in advance that we didn't print the entire document.

A. Thank you for saving the trees.

Q. Yeah, it's 400 pages long, so we just printed part of it.

MS. McNABB: I will, however, object that to the extent that the entire document is not in front of Dr. Twenge at this moment, and she is entitled to review the entire document in its entirety. But I'm fine -- you can answer questions on this. I agree it's best not to print out hundreds of pages.

BY MS. LEHMAN:

Q. Well, and let me just tell you, if your answer to my question is, I can't tell you looking at what you provided me, just tell me that.

A. Okay.

Q. Okay?

A. Fair enough.

Q. All right. So can you confirm that the document I've put in front of you is titled, Social Media and Mental Health, a

Page 201

Collaborative Review?

A. Yes.

Q. All right. And is it okay with you if I either call this the collaborative review document or Haidt, et al., 2025?

A. That's fine, although I kind of, in my own mind, think about it as the Google doc.

Q. We can call it the Google doc.

A. Okay.

Q. Yeah, that is actually easier. So let's do that.

Now, you coauthored this document with Jonathan Haidt and Zach Rausch, correct?

A. Yes.

Q. All right. And do you all have, like, a division of labor in terms of who edits it? Or how does that work?

A. These days, Zach is primarily responsible for that. Early on, Jon and I pretty much divided it equally in adding studies and responding to comments.

Q. And when was the last time that you edited the Google doc?

A. It's been a while. I don't think

51 (Pages 198 - 201)

CONFIDENTIAL

Page 202

I could give you an exact date.

Q. If you look at the last bullet on page 2, and it's printed on both sides, do you see it says, "Last Updated: December 30th, 2024"?

A. Yes.

Q. Do you recall editing it after December 30th, 2024?

A. I don't believe I have, no.

Q. Okay. Would it be fair to say that the Google document does not reflect an exhaustive list of articles on social media and mental health?

A. It depends on how you define exhaustive. We tried our best to include everything that we could find, and that other people suggested if it fell within the scope.

Q. Is it accurate that the Google document only contains articles published in or after 2014?

A. No, there's lots of stuff before -- sorry, 2014? Yes, sorry, I thought you said 2024. Yes, in or after 2014 was correct.

Q. So any articles before 2014 that

Page 203

do not support your hypothesis are not included in the Google document; is that right?

MS. McNABB: Calls for speculation.

THE WITNESS: Those that do support it are also not here. We chose that date just given that that's when you could clearly start to see the increase in adolescent depression.

BY MS. LEHMAN:

Q. Okay. Now, looking at the Google document on page 1, it says on the face of it that "We are not unbiased," correct?

A. Yes, it does say that.

Q. Okay. And so if we remove the double negatives, that would mean we are biased, correct?

A. So the point here comes later in the paragraph. "Like all people, we suffer from confirmation bias. But we take J.S. Mill seriously, and we know that we need help from critics to improve our thinking."

So Jon wrote this, not me, this particular piece. And it's on his philosophy, which I agree with, for the most part, that

Page 204

you always have to acknowledge that there's the possibility that you have confirmation bias. And that's one reason that we put this as a Google doc, and opened it up to critics, and allowed them to comment.

Q. Okay. Do you have any plans to update the bias section in the Google document to reflect your expert work and your fees received in this litigation?

A. Do you mean like a disclaimer or something like that?

Q. Yes.

A. That's something that Jon and I could discuss. It's usually my practice to have disclosures. Because this isn't a peer-reviewed paper, I think it's not as clear that that would need to go there. But I think that might be a good idea, yes.

Q. Okay. Now, on that same page, it says -- of the Google document, it says, "Haidt came to the tentative conclusion that there is a causal link, and said so in his book, The Coddling of the American Mind, with Greg --

A. Lukianoff.

Q. -- "Lukianoff. Twenge said the

Page 205

same thing in her book, iGen." Do you see that?

A. Yes.

Q. All right. Is it correct that you reached the conclusion that there is a causal link in your book, iGen?

A. So iGen was published in 2017. I finished writing it in 2016, for the most part. There was not as much research then. We've learned a lot since then.

But the idea of the tentative conclusion, I think is correct. And to be clear, when I first started writing that book and started doing research in this area, I really had no opinion about social media and mental health. It really came from seeing the very large increases in depression among adolescents and trying to figure out why it happened, because, at first, I had no idea why that was happening.

Q. And was it in 2016, when you reached the tentative conclusion that it was because of social media?

A. I think that's about correct. With -- so there's a delay in the data coming

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

out. So these increases started to show up around 2012 or 2013, but 18 months, two years of a delay. So I started trying to figure this out in approximately 2015.

Q. Okay. All right. If you'll turn to page 7 under Cautions and Caveats.

I want to look at the last sentence on that page that wraps to page 8. And here in your Google doc, it says, "Unfortunately, nearly all of the published research simply asks teens or parents to estimate the number of hours per day or week that the teen spends in various screen-based activities, and these estimates are often inaccurate."

Do you see that?

A. I do.

Q. Okay. And who -- did you write this section of the cautions and caveats?

A. I did not.

Q. Who wrote this section of the cautions and caveats?

A. I believe that Jon wrote it, but I'm not positive.

Q. Have you suggested -- and when

Page 207

you say Jon, Jonathan Haidt?

A. Jonathan Haidt, yes.

Q. Okay, okay. And have you suggested any revisions to the cautions and caveats to Mr. Haidt -- or to Dr. Haidt?

A. That would be a discussion that we might want to have, because you notice that there was that last update at the end of 2024. Most of the updates have been to the studies. This section has not been updated, I believe, five years, and it would be probably a good idea to revisit some of this.

Q. All right. If you'll keep turning, I want to look at page 11. And on page 11, I want to look in the first paragraph under the question 1, "Is there an association between social media use and bad mental health outcomes?" Do you see the Google doc says, "These correlational studies cannot prove causality. We cannot assume that social media use caused any bad outcomes that go along with it." Do you see that?

A. I do.

Q. And did you write the answer to question number 1?

Page 208

A. I don't know -- I don't believe so. I believe it was Jon or Zach who wrote this portion.

Q. Have you recommended any changes to the answer to question 1?

A. I don't think that that necessarily requires a change. It's very similar to what we have been discussing, that correlational studies cannot prove causation, but they are part of the totality of the evidence.

So as it says at the end of this paragraph, for example, "But these studies are common and important first steps in the quest to answer many social science puzzles, what goes with what, and for whom."

Q. I want to turn back to your report. And in Section 4.2, you discuss correlational studies, correct?

A. Yes.

Q. And the correlational studies that you discuss in Section 4.2 of your May or June report are Liu 2022, Kelly 2019, Twenge and Farley 2020, Twenge and Martin 2020, Borman 2022, Rodman 2017, and Saiphoo 2019, correct?

Page 209

A. There are -- there's also a whole section on opposing correlational research as well, so there's a whole other list of studies in that section, too, may I point out.

Q. And thank you for that clarification, and we're going to talk about those separately. But in Section 4.2, when you're talking about supporting correlational studies, did I correctly list the seven studies that you refer to?

A. Yes, although I should qualify that Liu, et al. 2022 is a meta-analysis that included 21 correlational studies and five longitudinal. So the total studies here is much higher than that.

Q. Okay. And we're going -- we're going to talk about Liu, so I appreciate that clarification.

And these are the correlational studies that you rely on in forming your opinions that you're going to -- in this case, correct?

A. These are some of the studies. So I've been doing this for a decade. I obviously read a lot more correlational

53 (Pages 206 - 209)

CONFIDENTIAL

Page 210

studies than are here. That Google doc we were just talking about has -- gosh, I've lost track -- 50, a lot of correlational studies. So I've read many, many, many, many of these studies. And so the report isn't excessively long, I highlighted some of the best designed studies with the best samples here.

So one of the reasons that Kelly is highlighted here is it's a nationally representative sample, it's a large sample. They used really solid measures of both depressive symptoms and social media use. And that isn't true of every single study in this area. So that's one reason I highlighted it here.

Q.   Okay. So then would it be accurate that the seven correlational studies that you highlight in Section 4.2 are, in your mind, the best of the best in terms of supporting your opinions for the correlational studies?

MS. McNABB:  Objection. Mischaracterizes testimony.

THE WITNESS:  I wouldn't say it's necessarily the best for

Page 211

supporting my opinion. I would say they are some of the best studies out there, in terms of their method and sample size.

(Exhibit No. 8 was marked for identification.)

BY MS. LEHMAN:

Q.   I'm going to hand you what I've marked as Exhibit No. 8.

Can you confirm that I have handed you the Liu study from 2022 titled, Time Spent on Social Media and Risk of Depression in Adolescents: A Dose-Response Meta-Analysis?

A.   Yes.

Q.   And as you said, this is a meta-analysis of 21 correlational studies and five longitudinal studies?

A.   That's what it says in the abstract, yes.

Q.   Now, if we look on -- at Figure 2 in Liu, you can see the list of correlational studies and longitudinal studies, correct?

A.   Okay. Well, Table 1 is the list. Figure 2 is the forest plot.

Q.   Okay. Well, Table -- the forest

Page 212

plot is the list of all the studies, correct?

A.   I mean, it has the short citation to it, and the results. So I would characterize Table 1 as being the list, but fair enough.

Q.   Okay. All right. We'll be clear. Table 1 is the list of correlational and longitudinal studies that are included in Liu, correct?

A.   Yes.

Q.   And Table 2 is the forest plot that shows --

A.   Figure 2.

Q.   I'm sorry, thank you. Figure 2 is the list or the forest plot showing the risk and confidence interval for those studies, correct?

A.   It's odds ratio, which is related to relative risk, but yes.

Q.   Okay. And do you agree that if the confidence interval for an odds ratio crosses 1, that that study is not statistically significant?

A.   That's the usual use. I'm just -- odds ratio is somewhat different from

Page 213

relative risk, and I don't work with odds ratio very much, so give me just a sec, because I want to make sure I get this correct.

So, yes, I believe that's the case.

Q.   Okay. What is the difference between odds ratio and relative risk?

A.   I'd have to look up the formula. It's a really complicated and really boring mathematical thing. Relative risk, it's just much more intuitive, and easy to explain and understand, which is one reason why I use it more.

Q.   Okay. In layman's terms, are you able to explain the difference between odds ratio and relative risk?

A.   Not really, no. Yeah.

Q.   All right. So just going back to the forest plot in Figure 2, it's correct that 11 of the 21 studies have a confidence interval that crosses 1, correct?

A.   You'd have to tell me. I would have to sit down and go through these to be able to do it.

54 (Pages 210 - 213)

CONFIDENTIAL

Page 214

Q.    Okay.  Well, we can -- we can just go through it, all right?  So the confidence interval for Banjanin crosses 1, correct?  That's 2015.  And I can tell you, I'm just going to go straight down the list, if that helps you.  So I'm starting at the top.

A.    Right.  And just to be clear, that confidence interval is not just based on the effect size.  It's also based on the sample size.  And that's one of the reasons why meta-analysis can be helpful, is then you're looking at a bunch of studies, which then ratchets up your sample size.  And so that's more reliable.

So if these are a bunch of small studies, that could be one of the reasons that there's not as many that are statistically significant.  And we're not going to count.  Generally, that's not what a meta-analysis does.  They don't count which ones go which direction, which ones are statistically significant.  They put everything together, and then calculate an overall effect size.

Q.    Okay.  And so just looking at Figure 2, Banjanin 2015 has a confidence -- is

Page 215

not statistically significant, correct?

A.    Right.

Q.    Okay.  Coyne 2019 is not statistically significant?

A.    Right.

Q.    Kelly (m) from 2018 is not statistically significant?

A.    I assume that means males, but --

Q.    Yeah, because there is an (f) -- a Kelly (f) right above it, correct?

A.    Yeah.

Q.    Right.  McAllister 2021, for males, not statistically significant, correct?

A.    Yeah.  And the male/female breakdown here is pretty consistent with other research as well.

Q.    Morin-Major from 2015 is not statistically significant?

A.    Mm-hmm.

Q.    That's a "yes"?

A.    Yep.

Q.    Okay.  I'm not trying to be rude.  Just helping us get a clean record.

A.    Sure.

Q.    Pantic 2012, not statistically

Page 216

significant?

A.    Right.

Q.    Story 2021, not statistically significant?

A.    Correct.

Q.    And I can't tell if that's "Sefa" or "Seta" or Sela, but for 2020, not statistically significant, correct?

A.    Correct.

Q.    Tamura from 2017, not statistically significant?

A.    Correct.

Q.    Zielenski from 2021, not statistically significant?

A.    It looks like Zielenski, but yeah.

Q.    Okay.  Thank you for the pronunciation help.  I appreciate it.

And then Ma from 2021 is not statistically significant, correct?

A.    Yeah, but this is one of the reasons we do meta-analysis, because it's not just a -- that's not just a product of the effect size, it's a product of the smaller sample size that you're not necessarily going

Page 217

to get statistical significance, even though -- like, if you notice in some cases, some of these that were not statistically significant have a fairly high odds ratio.

Q.    All right.  So if we look on Liu at page 13, we're going to look at the last paragraph, the first sentence, just let me know when you're there.

A.    Yes.

Q.    And the Liu authors of 2022 warn, "There are also important limitations to this study, making it necessary to interpret the findings with caution.  First, all included studies were observational, in which the results may be influenced by other potential covariates not yet considered.  Hence, we cannot speak to causality in the interpretation of the results."

Did I read that correctly?

A.    Yes.

Q.    Do you agree with the authors of Liu that they cannot speak to causality in the interpretation of their results?

A.    So very similar to the other studies we've been discussing, this is

55 (Pages 214 - 217)

CONFIDENTIAL

Page 218

mostly -- yeah, some of it, they did have some longitudinal here. But, yeah, these are not experiments. So from the scientific perspective, they can't prove causation, but that doesn't mean that causation isn't one of the possibilities or -- and it also doesn't mean that these studies aren't important. They are. They just have to be considered in the totality of the evidence.

Q. Okay. Now, if you'll turn to page 3, still on Liu.

A. So we're going back?

Q. Correct. And I want to look immediately above the word "methods." Do you see that above "methods," the authors of Liu state, "However, because of its nonexperimental nature, no causal inferences can be drawn in the current study." Do you see that?

A. I do.

Q. Does the Liu study assess any individual features from a social media platform?

A. Well, let's take a look. Okay. Sorry, I'm taking a minute, because they're using an acronym here.

Page 219

Okay. So it looks like they're focusing on time spent, that's what TSSM means, time spent on social media.

So as I've said before, I think it's that if there are features that lead to more time spent, then they're relevant, but, no, it did not look at specific features, and because it's concentrating on time spent.

Q. And did Liu make any assessment as to any specific social media platform?

A. So in their search strategy, they list several specific social media platforms. So all of these were included. They list Facebook, Twitter, Instagram, YouTube, Snapchat, LinkedIn, WhatsApp, Pinterest, blog. So any meta-analysis, you have to take a look at this to see what they included and what they did not. So then we've got to go look at inclusion and exclusion criteria.

So this is another thing that you always have to do with meta-analyses is, are there some studies in here that actually -- you know, that maybe looked just at WhatsApp. If so, did they separate those out.

And we'd have to take a look to

Page 220

see if they did that, if they looked at specific platforms. So forgive me, I haven't read this article closely in a few months, and I want to get this right.

So it looks like they break it down by total and specific amount of time spent. I'm not sure what they mean by that. And then different measures of depression. I am not immediately seeing any breakdown by platform.

Q. Okay. And just when we talk about the search terms, you're talking about the search terms that they did to potentially identify studies to evaluate for inclusion in the analysis?

A. Correct.

Q. Okay. And so, like, for example, under the methods discussion, there's a long list of terms that they searched. And they included things like Flickr, Skype, podcasts. They're casting a wide net in order to look for studies to include?

A. They are. And then they exclude some of them, if you look at Figure 1. And I would assume they would exclude some, based

Page 221

on, you know, measuring, you know, TV use instead, or something like that. Or something that doesn't -- is not included under social media, and that would be done by the authors.

Q. All right. I'm going to hand you another document which we've marked as Exhibit Number 9.

(Exhibit No. 9 was marked for identification.)

BY MS. LEHMAN:

Q. And can you confirm that I have handed you a 2020 article that you coauthored with Eric Farley titled, Not All Screen Time is Created Equal: Associations With Mental Health Vary By Activity and Gender?

A. Yes.

Q. And the data that you used to write this article was collected in 2015 from individuals in the UK, correct?

A. Yes.

Q. And as you say in your report, Twenge & Farley 2020 is a correlational analysis using data from the Millennium Cohort study?

A. Yes.

56 (Pages 218 - 221)

CONFIDENTIAL

Page 222

Q. And as you say in the article itself, "As with all cross-sectional studies, we cannot determine if screen media use causes low wellbeing, low wellbeing causes screen media use, or third variables are operating."

A. Right. So this is, once again, an example of one of those limitations that is included in almost all articles using this type of method.

Q. Okay. Well, and you include -- you included the limitation with your coauthor because it's accurate, correct?

A. Point me to where this is, just so I can make sure to get this right.

Q. Sure. We were looking at -- this is the first full sentence on page 212.

A. Okay. I see it. So, yes, this is a text version of what I said earlier about A causing B, B causing A, or C causing both, being the three possibilities for a correlational or cross-sectional study. And it's followed by a statement about random assignment experiments.

Q. And it's also followed by a statement that although you were able to

Page 223

control for a number of possible confounders, unmeasured third variables may also be present.

A. That is true for pretty much every correlational study.

Q. Now, in Twenge & Farley 2020, the respondents self-reported the amount of time they spent on a normal day on social networking or messaging sites or apps on the internet, such as Facebook, Twitter, and WhatsApp, correct?

A. That's how the question is worded, I believe, yes, because it's the same question as in Kelly.

Q. Okay. And so Twenge & Farley relies on self-reported data, correct?

A. Yes.

Q. The respondents to the -- or let me start again.

The Twenge & Farley 2020 respondents did not provide information about how much time they spent on any specific social media platforms, correct?

A. Correct. It's a more general question.

Q. Okay. And Twenge & Farley did

Page 224

not use any clinical assessment for depression, anxiety, or any other mental health disorder, correct?

A. I would dispute that, depending on the definition of clinical in what you're asking, because the questionnaire on depressive symptoms, a score above 12 indicates a clinically relevant level of depressive symptoms. So it is validated for that.

Q. Did Twenge & Farley 2020 rely on any clinicians or healthcare providers' assessment for depression, anxiety, or any other mental health disorder?

A. I don't believe so, but then I didn't collect the data. So it would probably be a question for the administrators of the Millennium Cohort study, but to my understanding, no.

Q. And did Twenge & Farley 2020 assess features, as opposed to content, in evaluating social media?

A. So as we've been discussing, it assessed time spent. And that time spent can be heavily influenced by features, if it

Page 225

encourages spending as much time on the app as possible.

Q. I would like to turn now to Table 4. All right. And so does Table 4 -- first off, does Table 4 use an adjusted relative risk ratio instead of an odds ratio?

A. Yes.

Q. Okay. And so Table 4 is the "Percent with problematic mental health by hours spent per day on specific screen media activity and gender, adjusted for covariates and adjusted relative risk ratio"?

A. Yes.

Q. Okay. And so, for example, if we look -- looking at girls and self-harm.

A. Yes.

Q. Okay. So is it correct that for a girl using five plus hours of social media, she would have a relative risk of 2.22 for engaging in self-harm?

A. Well, yes, but we have to make sure we know who we're comparing that to, because relative risk is a comparison.

Q. Well, that was going to be my question.

57 (Pages 222 - 225)

CONFIDENTIAL

Page 226

A. Yes.

Q. Who is the 1.0 in this situation?

A. It is those using social media less than an hour a day. So if you see in the table, it says, "reference," that's the comparison group.

Q. Okay. And so to make sure we understand, compared to a person using social media for less than an hour a day, a girl using more than five hours of social media would have a relative risk of 2.22 for engaging in self-harm, correct?

A. Yes. And five or more hours a day, just to be clear.

Q. Okay. And so then if we look, instead of social media, if we look at internet.

A. Yes.

Q. A girl using -- let me back up. In this study, is internet different from social media?

A. So that's a really good question, and we have to look at the wording. So let's look back at the wording for the specific screen media activities, page 209, first

Page 227

column.

So it's 3 -- so under specific screen media activities, first paragraph:

"3. Using the internet. Remember to include time spent using the internet on tablets, smartphones, and other mobile devices, as well as computers and laptops. Please do not include time spent using the internet at school. Remember to include time before and after school."

So the way this question is worded, it very well could include time spent on social media while using the internet. So there's -- in this particular study, with the way it's worded, internet use could absolutely overlap with social media use.

Q. Okay. And did Twenge & Farley make any effort to separate social media and internet, so that this internet category actually provides a relative risk, independent of the use of social media?

A. Given that we were using data that was already available, we were not able to do that, no.

Q. Okay. All right. And then if we

Page 228

turn back to -- I want to look at another document, actually. I'm going to hand you what I am marking as Exhibit Number 10.

(Exhibit No. 10 was marked for identification.)

BY MS. LEHMAN:

Q. Can you confirm that this is an article that you coauthored with Gabriel Martin published in 2020 called Gender Differences and Associations Between Digital Media Use and Psychological Wellbeing: Evidence From Three Large Datasets?

A. Yes, that's correct.

Q. All right. And this is a correlational study that used prior survey data from three sources?

A. Yes.

Q. Okay. And so one was the dataset from the UK, one was Monitoring the Future, and one was the Youth Risk Behavior Surveillance System?

A. Let me confirm that. Just to refresh my memory. Yes, that's correct.

Q. Okay. And if you look at page 100, I want to look under the header,

Page 229

Strength and Limitations. Looking at the first sentence of the second paragraph in Twenge & Martin 2020, you write, "The time use items in these surveys have limitations. First, they are retrospective, asking participants to reflect on past activities, rather than contemporaneous time diary studies, the gold standard in time-use research."

Did I read that correctly?

A. Yes.

Q. And is it correct that contemporaneously created time diary studies are the gold standard in time-use research?

A. Yes.

Q. And we talk about time-use research, what is that?

A. Just looking at how people spend their time.

Q. And is there -- do you -- do you agree that the longer the period of time between when the participant is asked to provide information and the time of the activity at issue, the longer that lag period, the less reliable the information?

MS. McNABB: Objection. Vague.

58 (Pages 226 - 229)

CONFIDENTIAL

Page 230

THE WITNESS: I'm not really sure how that's relevant here, because they're asked about their time use -- well, here, let's look at the wording again. So I mean, I think they're asked to reflect, on average, how much time. So it's not really a question of when they are asked, and if they're asked to recall, you know, what they did two years ago. That -- I'm not sure that's really relevant here, given the way that these questions are worded.

BY MS. LEHMAN:

Q. Okay. And what is the time period that they're asked to reflect on?

A. Well, I mean, here, I've got the wording in front of me for the Youth Risk Behavior, and it's on an average school day. That's how it's worded.

Q. If the study, instead of just saying, "on an average school day," if it said, for the period five years ago, how much time did you spend, would you be willing to rely on a survey that had much of a lag time between

Page 231

when the question was asked and when the activity happened?

MS. McNABB: Objection. Speculation.

THE WITNESS: It's really hard to say. I don't know of a study that's done that. I'd have to see that study to then judge, because it depends on the activity you're asking about and the level of precision that you require in the question.

BY MS. LEHMAN:

Q. So that's fair. So maybe you would rely on that, if it said, did you buy a car, but you might not rely on it if it said, how many minutes per day did you engage in X activity?

A. Maybe. But it depends on what that activity is. It depends on how memorable it is, what age group we're talking about. All kinds of other factors.

Q. Okay. Did Twenge & Martin 2020 use a diagnosis from any clinician or healthcare provider as to any mental health disorder?

Page 232

A. All right. Well, let's look at the measures. So these are, again, examples of the types of measures, either psychological, wellbeing, or screening that are using.

So the Youth Risk Behavior Surveillance System questions are especially good examples of screening, where, for example, they say, "Did you ever feel so sad or hopeless almost every day for two weeks or more in a row that you stopped doing some of your usual activities."

That's based on the DSM definition of a major depressive episode. So, no, they are not bringing in a clinician for every single one of these thousands of people, but they are relying on things that are screening indicators of possible mental health issues that might rise to the level of a DSM diagnosis.

Q. This data is based on self-reports, answering screening questions, correct?

A. Yes.

Q. Okay. Now, if you turn to

Page 233

page 95, I want to look under header number 4, "Discussion."

A. Mm-hmm.

Q. And there, do you see that you and Martin wrote in 2020, "Correlational analyses such as these cannot determine whether digital media use causes low wellbeing or if low wellbeing causes digital media use." Did I read that correctly?

A. Yes.

Q. All right. Now if you'll turn to page 100, do you see there's a declaration of competing interests?

A. Yes.

Q. And here there is a notation that you have received speaking, honorary and consulting fees presenting research, and is the author of several books, most recently iGen?

A. Yes.

Q. To whom did you provide consulting services?

A. Well, this is a while ago. So it was not a legal firm. Given the time period here, I believe that refers to market research interviews.

59 (Pages 230 - 233)

CONFIDENTIAL

Page 234

Q.   What kind of market research interviews were you doing?

A.   Since this was a good six, seven years ago, because it takes a while for things to get published, it would be very difficult for me to say.

Q.   Did you publish any articles in journals between April 2017 and January 2020 that did not disclose your conflicting or competing interests?

A.   I'd have to have them in front of me.  It is my standard practice to do that, but some journals don't require it, especially in psychology.  It's more common in medicine.  And some didn't require it at that time, in 2017, and did later.  So it's very difficult for me to say.

Q.   Did you only include those types of disclaimers if it was required by the journal?

A.   So I should clarify what I mean by required.  When you submit a paper, sometimes, especially back then, psychology journals, in particular, didn't even have a place where you could put that in.

Page 235

Q.   Okay.  Do you agree that the purpose for disclosing competing or conflicting interest is to permit readers to assess the author's bias?

A.   It's one of the purposes.  I mean, those conflict of interest statements were really originally designed for medical journals, where they wanted to make sure that people writing them disclosed whether the company's products they were studying funded the research, or if they had been paid by that company.  That's what they were originally intended to do.

And in the years since, they've evolved and changed.  And in psychology journals, they didn't used to be the standard, and now they are.  But I think it's for the reader to know any context or other work that the author has done, that might be relevant.

Q.   Well, wouldn't the purpose, whether it's a medical journal, a psychological journal, or some others, isn't it really to allow the reader to assess the credibility of the article and the authors?

MS. McNABB: Objection.  Asked

Page 236

and answered.

THE WITNESS:  I don't think it's about credibility necessarily.  It's about letting the readership know of those relationships that may exist.

BY MS. LEHMAN:

Q.   Okay.  I'm going to hand you what we're marking as Exhibit Number 11.

(Exhibit No. 11 was marked for identification.)

BY MS. LEHMAN:

Q.   Can you confirm that this is the Orben study titled Windows of Developmental Sensitivity to Social Media?

A.   Yes.

Q.   And this was published in 2022?

A.   I believe so, yes.

Q.   And Orben 2022 is a correlational study, correct?

A.   Well, it is based on longitudinal data, so it's both longitudinal and correlational.

Q.   Okay.  And is it based on data from the UK Understanding Society Household Survey?

Page 237

A.   Yes.

Q.   Does it analyze time spent on social media and life satisfaction?

A.   Yes.

Q.   Do you agree that life satisfaction is not a psychiatric disorder under the DSM?

A.   So it's very similar to the things we've been discussing before.  Life satisfaction is an indicator of psychological wellbeing.  And psychological wellbeing is a very strong predictor of DSM diagnoses, especially major depressive disorder.

Q.   If you'll turn to page 5, please.  And we're going to look on the second column, that is the right column, the first full paragraph starting, "The study has multiple limitations."

A.   Okay.

Q.   Okay.  And so do you see in Orben 2022, it says, "The study has multiple limitations that need to be considered.  First, to interpret the parameters from our analysis as estimates of causal effects, one would need to adopt the following assumptions:  (a) there

60 (Pages 234 - 237)

CONFIDENTIAL

Page 238

are no time-varying unobserved confounders that impact the relation between social media use and life satisfaction; (b) the model adequately accounts for unobserved time-invariant confounding through the inclusion of a random intersect; (c) there is no measurement error in the variables; (d) the time intervals between studies, one year, is the right link to capture the effects of interest; and (e) the bidirectional links estimated by our longitudinal model are linear in nature."

Do you see that?

A. Yes.

Q. And do you agree that those are the assumptions that must be accepted in order to interpret the parameters in their analysis as estimates of causal effects?

A. I don't really. I think this is a really odd way to put this particular limitation. I think the way it was stated in the previous article is more accurate, that you can't take correlational data alone and say that that definitively proves causation, and that it has to be considered, you know, among other evidence. And these seem like

Page 239

more extreme qualifications than I have seen in most other papers.

Q. Okay. All right. You also cite in Section 4.2, the Rodman -- no, I think you don't cite Rodman in 4.2, so strike that.

The correlational study, Rodman 2017, is cited in your report at paragraph 128. Is that right?

A. No, I don't think so.

Q. No. All right. I'm misreading my notes. All right. Hold on just one second. Okay. Here we go. Paragraph 72 of your report.

A. Okay.

Q. You cite the Rodman 2017 study.

A. Mm-hmm.

Q. Now, the correlational study, Rodman 2017, is entitled, Development of Self-Protective Biases in Response to Social Evaluative Feedback, correct?

A. Yes.

Q. Okay. And Rodman 2017 examined differences in how adults and adolescents react to feedback, correct?

A. Yes.

Page 240

Q. Okay. And that included whether one was more likely to predict whether they would be liked by others or not; is that correct?

A. Right. So it's the response to social rejection. So what were the outcomes, the outcomes -- decreases in self-esteem, predicting that they wouldn't be liked, and that those effects were stronger among adolescents than among adults.

Q. Did Rodman 2017 assess a psychiatric disorder recognized under DSM?

A. I would need a copy of it in front of me. I don't believe that was the focus of the study, but I would have to see it.

Q. All right. I got sidetracked from our list in Section 4.2. I think the last study under Section 4.2 that we talked about, or close to the last, is the Saiphoo study. How do you say that last name?

A. I have no idea.

Q. Okay.

A. We can stick with Saiphoo.

Q. I don't want to say the wrong

Page 241

name if you know, but --

A. I don't.

Q. We'll stick with that, okay. I'm going to hand you what I'm marking as Exhibit Number 12.

(Exhibit No. 12 was marked for identification.)

BY MS. LEHMAN:

Q. Can you confirm that I've handed you a Saiphoo study titled, A Meta-Analytic Review of the Relationship Between Social Media Use and Body Image Disturbance?

A. You have, although I have to point out, this does not appear to be the final version, this is from ResearchGate, so this is not the printed version that appeared in Computers and Human Behavior. So it may have differences from the final printed version.

Q. Okay. So I will -- if you turn to page 1 -- it's actually the second page of the printout, but it says page 1. All right. And do you see that that actually states that the article has been published in Body Image.

A. Oh, then why does it say

61 (Pages 238 - 241)

CONFIDENTIAL

Page 242

Computers and Human Behavior on the cover page?

Q.    Well, I was going to ask you if you actually knew for sure where this was published.

A.    That's a good question, given the discrepant information here.

What do we have in the citation list? Let's look. So the citation list, as I have it, it says, Computers and Human Behavior. So anybody's guess.

Q.    All right. And that's consistent with the front page of this printout that I've handed you --

A.    Right.

Q.    -- for Exhibit 12?

A.    Right. But the fact that this is from ResearchGate means it may or may not be the final printed version or --

Q.    A Meta-Analytic Review of the Relationship Between Social Media Use and Body Image.

A.    -- and, you know, it's possible I got the citation wrong here. I'd have to go and look. But just so we know that this may

Page 243

not be the final print.

Q.    But certainly the title is the same, and this is a printout from ResearchGate.

A.    Yeah.

Q.    We agree on that?

A.    Yeah.

Q.    Okay. And Saiphoo 2019 is a meta-analysis of correlational studies involving social media and body image and dissatisfaction, correct?

A.    Well, let's look. Okay. So inclusion criteria number 4 says, "Studies must have been cross-sectional in design." So that would mean that the answer to your question is yes.

Q.    Okay. And if we turn to page 20, looking at the last sentence of the first full paragraph. It says, "One may have expected the effect size obtained in this meta-analysis to be larger compared to those focused on traditional media, given that social media use may give rise to even more frequent and more harmful types of social comparisons than traditional media exposure."

Did I read that correctly?

Page 244

A.    Yes, although I disagree with their conclusion.

Q.    Okay. Well, that was what I was going to ask you about, because here they're concluding that social media use may not be as strongly associated with body image disturbance as traditional media.

MS. McNABB:  I'll just lay an objection that this may not be the final paper, so --

THE WITNESS:  Yeah. So, you know, a couple of things to say here, without belaboring the point too much. You know, body image was not the main focus of my report, first.

Also, the way they are interpreting this effect size is strange to me. This is actually a rather large effect size. And I'm also trying to see to refresh my memory where they have the effect size of traditional media, and I don't see that number in here -- or wait, hold on. Okay, yeah, I see it here.

So I think they have made a

Page 245

mathematical mistake here. Because -- okay, so they say, the traditional media exposure, and they have a list of these Ds. So 28, 29, 30, the mathematical formula, they used R. And they're looking at traditional media using D, two different stats. If you take their R, .169, let's just call it .17, you have to double that to get to D, so --

BY MS. LEHMAN:

Q.    So you think there's just a fundamental error in their article?

A.    It looks to me like there is. They may not have interpreted the Ds and Rs correctly here.

Q.    All right. Well, let's turn to page 28, and look under the heading Limitations and Future Directions. And there, Saiphoo and her coauthors state, "First, our analysis only included cross-sectional studies. This, of course, limited our ability to make causal claims. On other words, we are unable to say, based on this analysis, whether increased use of social media results in body image

62 (Pages 242 - 245)

CONFIDENTIAL

Page 246

disturbance, or if preexisting body image disturbance causes individuals to use social media at a higher frequency."

Do you see that?

A. Yes.

MS. McNABB: So, Katy, I'll just have a standing objection on the use of this article, because it's not the final copy.

MS. LEHMAN: That's fine.

BY MS. LEHMAN:

Q. All right. So do you -- do you have any reason to disagree with the limitation in the Saiphoo article?

A. I don't think so. And I should make clear that that criticism of mine on the math referred to that comparison with traditional media, not their analysis overall.

Q. Okay. And then if we further just keep reading on page 28, Saiphoo continues, "Further, the estimate of a relationship provided in cross-sectional studies cannot take potential third variables into account."

Do you see that?

Page 247

A. I do.

Q. And is it correct that all cross-sectional studies cannot take potential third variables into account?

A. So I disagree with the way they have worded this here. That's not the way that I would word it. I'm not sure why they're going to such an extreme, "cannot take potential third variables into account." Absolutely, you can. You control for them. And that's very frequently done in the studies we've been discussing thus far. Many third variables were accounted for. So I think this is a little bit of a strange statement.

MS. McNABB: Katy, if you're moving on to the next thing, can we take a break and see if we can get the light flickering to stop?

MS. LEHMAN: That's no problem. We'll go off the record.

THE VIDEOGRAPHER: We're going off the record at 2:22 p.m.

(Recess.)

THE VIDEOGRAPHER: Back on the record at 2:35 p.m.

Page 248

BY MS. LEHMAN:

Q. In your report, you also talk about time series studies, correct?

A. Yes.

Q. Okay. And time series studies are repeated cross-sectional studies that are basically snapshots or data taken from different groups of people at different times, correct?

A. That's not the wording how -- that I would use to describe it, but that's more or less correct.

Q. Okay. Well, do you agree that time series studies are repeated cross-sectional studies?

A. They are repeated surveys. I think the reason I don't like repeated cross-sectional studies is that, in this field, there's a distinction made between longitudinal cross-sectional and time series or time lag studies. And cross-sectional studies and time lag or time series studies are two very different designs. So I think that's why I don't really like that wording, is I think it's confusing.

Page 249

So I would say that the time series or time lag are repeated surveys, and, yes, you are correct, of different people at different times.

Q. Do you agree that time series studies, another term for that would be ecological studies?

A. That's not a term that I have used, and I've been doing this work for about 30 years.

Q. Okay. So are you familiar with the term ecological studies?

A. No.

Q. Okay.

A. I've heard of the ecological fallacy, but that's a different discussion.

Q. So time -- is it correct that time series studies do not track the same group of people over time?

A. Correct. And that's by design, because what they're trying to do is take age out the equation. So you're looking at different groups of the same age in different years. So that can help capture birth cohort or time period differences.

63 (Pages 246 - 249)

CONFIDENTIAL

Page 250

Q. And the point of the time series study is to collect data from different points in time from a group as a whole, correct?

A. That's the intention, yes. And so, ideally, what you want is a nationally representative study, although there are time series studies that are not necessarily nationally representative that, say, look at certain people from a certain college in each year. That would also be a time series study.

Q. Is Monitoring the Future an example of a time series study?

A. By my definition, yes.

Q. Is YRBSS, or the Youth Risk Behavior Surveillance System, a times series study?

A. Yes.

Q. Is the National Survey on Drug Use and Health a time series study?

A. Yes.

Q. Is the UK Millennium Cohort study a time series study?

A. No.

Q. Okay. Why not?

A. Because it's a longitudinal study

Page 251

that follows the same people over time. That's a different design.

Q. Okay. Is it correct that time series studies measure both exposure and outcomes at the population level, and not at the individual level?

A. I would word it a little differently, but, basically, yeah, that the time series studies are looking at the changes in the population over time, over different years.

Q. Do you agree that, standing alone, time series studies or surveys cannot distinguish between correlation and causation?

A. So again, I'd word it a little bit differently. Sometimes time series studies are referred to as natural experiments. However, it is true, you can't do a random assignment of two conditions as you would in a true experiment. Because, basically, you can't randomly assign people to be born at different times. It is not possible.

So in this case, you're looking at what changes over time at -- at the level

Page 252

of the group or the population.

Q. Do you agree that time series studies are not capable of providing risk assessments for an individual?

MS. McNABB: Objection. Vague.

THE WITNESS: That's not the -- that's not what they're designed to do. That's not the type of data that they are. They are more -- they're designed to look at changes in the population. Now, that population is made up of individuals. So if, on -- you know, on average, say, the depression rate goes up, that means more individuals have depression.

BY MS. LEHMAN:

Q. Okay. Do you agree that one of the limitations of time series studies is that they cannot establish temporality?

A. I would disagree with that, because you can often, in time series studies, see what happened first, and next, or what happened at the same time.

Q. Okay. So let me give you an example. All right. So the way the deposition

Page 253

has been working so far is, I ask a question and you give an answer, correct?

A. Yes.

Q. Okay. But if we take a transcript of this deposition later, and I just take one random snapshot of something I said, and one random snapshot of something you said, no one could tell if my statement caused your specific statement, correct?

A. I don't think I understand what you're doing. I'm sorry.

Q. Okay. Yeah, sure. Sure.

A. It doesn't sound like a time series study to me. So I don't know what we're talking about.

Q. Well, I guess that's what I'm trying to say is, like, just because we established that I said one thing today, and you said another thing today, that doesn't mean that what I said caused what you said, correct?

A. If you're getting at the idea that two things can change at the same time, and not be related, that's true, because that's only one consideration in a time series study, to see what might be causing what.

64 (Pages 250 - 253)

CONFIDENTIAL

Page 254

It's not just that they occur together. It's also many other factors.

Q. All right. Well so let's look at --

MS, LEHMAN: Can I see tab 17?

BY MS. LEHMAN:

Q. I'm going to hand you what I'm marking as Exhibit Number 13.

(Exhibit No. 13 was marked for identification.)

BY MS. LEHMAN:

Q. And can you confirm that this is an article that you co-wrote and published in 2017 entitled, Decreases in Self-Reported Sleep Duration Among U.S. Adolescents, 2009-2015, and Association With New Media Screen Time?

A. Yes.

Q. And in -- we'll call this Twenge 2017. Twenge -- I'm sorry. I'm sorry, I knew it would happen. I'm so sorry.

A. That's okay.

Q. Twenge 2017 considered self-reported sleep duration among U.S. adolescents from 2009 to 2015, correct?

A. Yes.

Page 255

Q. And in Twenge 2017, you were using data from Monitoring the Future and the Youth Risk Behavior Surveillance System, correct?

A. Yes.

Q. And these two surveys include different participants every year using a time lag design, correct?

A. Yes.

Q. And in Twenge 2017, you said, "Lagged analyses examining which increased first were not possible," correct?

A. Yes.

Q. Okay. And due to the limitations of the Monitoring the Future and the Youth Risk Behavior Surveillance System survey data, analyses examining which occurred first were not possible, correct?

A. Yes.

Q. And that's because Monitoring the Future and the Youth Risk Behavior Surveillance System surveys do not follow the same people, correct?

A. Yes.

Q. And that fundamental limitation

Page 256

applies to all other time series studies, correct?

MS. McNABB: Objection. Mischaracterizes testimony.

THE WITNESS: So I think that's not necessarily true. So in another paper of mine, say, in Emotion, we did look at what happened first, say, the rise in internet use at that average level, and then on happiness and low life satisfaction.

So you can use that design. Just we did not do that here. But it is possible to take a look at that in some circumstances, in time series analysis. It can be done.

BY MS. LEHMAN:

Q. Okay. Well, let's look at --

MS. LEHMAN: Tab 18?

BY MS. LEHMAN:

Q. I'm going to hand you what I'm going to mark as Exhibit Number 14.

(Exhibit No. 14 was marked for identification.)

BY MS. LEHMAN:

Page 257

Q. And can you confirm that this is an article that you co-wrote and published in 2020 entitled, Associations Between Screen Time and Short Sleep Duration Among Adolescents Varies By Media Type: Evidence From a Cohort Study?

A. Yes.

Q. And is it Hisler?

A. I think it's Hisler.

Q. Hisler, okay. Since Hisler is the lead author, is it okay with you if we call this Hisler & Twenge 2020?

A. I would say Hisler, et al., because there's three authors.

Q. Okay. So in Hisler, et al. 2020, the article analyzed data from 14-year-olds from the Millennium Cohort study, correct?

A. The abstract says 13 to 15, but yes.

Q. Okay. And if we turn to page 98, under 4.1 -- and let me ask you this: What kind of -- how would you describe the Millennium Cohort study?

A. So the Millennium Cohort study is a longitudinal design. However, in this

65 (Pages 254 - 257)

CONFIDENTIAL

Page 258

study, we were only using one of the waves, so it's effectively cross-sectional.

Q. Okay. All right. And so one of the things that you discussed in this study is how different people have different sleep chronotypes, correct?

A. Yes.

Q. Okay. And some people are morning oriented and go to bed early and wake up earlier, correct?

A. Yes.

Q. Some people are evening oriented, and they go to bed later and wake up later, correct?

A. Yes.

Q. And do you agree that screen time is not the only reason that adolescents stay up late?

A. No, I mean, it's one of the reasons, that's for sure, but it's not the only one, no.

Q. All right. And this article, like all of the other articles that we have reviewed that uses data -- has correlational data, includes a limitation about not using it

Page 259

to draw conclusions as to causation, correct?

MS. McNABB: Objection.

THE WITNESS: Yes. And within the context that we've been discussing, that that means it has to be considered among all of the evidence, and that that type of limitation is nearly always given in articles of this type using this design.

BY MS. LEHMAN:

Q. Okay. I'm going to hand you what we have marked as Exhibit Number 15.

(Exhibit No. 15 was marked for identification.)

BY MS. LEHMAN:

Q. Can you confirm that this is an article that you coauthored and published in 2019 entitled, Less In-Person Social Interaction With Peers Among U.S. Adolescents in the 21st Century and Links to Loneliness?

A. Yes.

Q. And this is one of the articles that you cite in your report?

A. Yes.

Page 260

Q. And in fact, you cite it in your report for the proposition that the effects of social media operate at the group level?

A. As well as the individual level, but yes, it operates at both levels.

Q. Okay. And we can look, but if you recall -- do you recall that you refer to this article as Twenge 2019C in your report?

A. We should find a different name for it. We can call it the social interaction paper.

Q. Okay.

A. If you want.

Q. That's just fine with me. I just want to make sure that you and I, when we talk about this paper, we know which one we're talking about from your report as well.

A. Yes.

Q. Okay. So the newly renamed social interaction paper.

A. Yes.

Q. It says that "The primary goal was to examine birth cohort differences and the frequency of in-person social interaction with

Page 261

peers during leisure time among U.S. adolescents," correct?

A. Yes.

Q. When we talk about a birth cohort, that's a group of people born during the same time period, correct?

A. It's often used for people born in the same year. In this case, because we're looking at, you know, adolescent surveyed in the spring, it's going to include people born in a 12-month period. It depends on the school district, but roughly, one September to another.

Q. Okay. So you were analyzing certain age groups at different periods of time, correct?

A. Yes.

Q. All right. And to do that, you were using the Monitoring the Future data?

A. Yes, and the American Freshman study in this case.

Q. And we haven't talked about it today, I don't think. So just to clarify, the American Freshman Survey is an annual repeated study survey out of UCLA, correct?

66 (Pages 258 - 261)

CONFIDENTIAL

Page 262

A.    Yes, although it gets a nationwide sample of entering college students that is nationally representative.

Q.    And is the American Freshman Survey, is that a time series study?

A.    It is. Yeah, it is that design that it gets a sample of different people in every year.

Q.    Okay. And looking in the article, this is on page 1894.

A.    So early on. Got it.

Q.    Yes. In the article, you write, "Individual level versus cohort level analyses may produce different results," correct?

A.    Yes.

Q.    All right. And the social interaction paper did not assess individual results -- individual level results or infer causation, based on the data used in that study, correct?

MS. McNABB: Objection. Compound. Vague.

THE WITNESS: Yeah, we've got to separate those two.

BY MS. LEHMAN:

Page 263

Q.    Okay. Let's separate it out, then.

A.    So, no, it's not an experiment, so we're not talking about that type of design. However, it did look at both the individual level and the cohort or group level. Both of those levels were considered here.

So that's, you know, one of the main focuses of the paper, that over time, what are the trends in, say, social media use compared with in-person social interaction. And then at the individual level, what is the relationship between those two variables.

Q.    Okay. Let's break this down, then.

So is it correct that Monitoring the Future began asking questions about social media use in 2008?

A.    Yes.

Q.    And from 2008 to 2011, the Monitoring the Future question actually used the example of MySpace, correct?

A.    I believe so, yes.

Q.    And you're welcome to look. I'm

Page 264

looking at page 1897 in this study.

A.    All right. Yes, correct.

Q.    And then the example from Monitoring the Future was changed to "like Facebook" from 2012 to 2013, correct?

A.    Yes.

Q.    And then it changed again in 2014, so that it says, "like Facebook, Twitter, Instagram," et cetera."

A.    Yes.

Q.    Okay. And the response choices were never, a few times a year -- or let me ask this a better way.

The response choices were, one, never, two, a few times a year, three, once or twice a month, at least once a week, or four, almost every day, correct?

A.    Yes. And I should note, because this may come up again, that this measure worked okay in 2008, maybe 2009. But very quickly, as almost every high school student ended up using social media every day, it became, by the end, something that lacked variance. But in this case, and that's more relevant for the individual level, at the

Page 265

group level, it's still a decent measure that shows the growth of the use of social media. So that limitation is mostly at the individual level.

Q.    All right. Then if we look at page 1907, still in the social interaction article.

A.    Okay.

Q.    The second paragraph -- the first paragraph, the second sentence on that page says, "Of course, as this research is correlational rather than experimental, we cannot determine whether the increase in digital media use is the cause of the declines in the time spent on in-person social interaction," correct?

A.    Yes, although I think it's only fair to include the next sentence that, "However, some alternative explanations seem unlikely, given available data." And then we go into the detail of that. But for example, "The decline in in-person social interaction over time can be due to paid work, homework, or extracurricular activities, because adolescents actually have more leisure time in

67 (Pages 262 - 265)

CONFIDENTIAL

Page 266

later years."

Q. Well, and it's not just here, but there is another place in the social interaction article where you discuss limitations of the study results, correct?

A. On the next page, there's a limitations section, yes.

Q. Right. And a limitation of the Monitoring the Future surveys is that they are retrospective, asking participants to reflect on past activities, rather than contemporaneous time diary studies, correct?

A. Yes.

Q. And the retrospective self-reported nature of the survey responses introduces bias, including self-reporting and recall bias, correct?

MS. McNABB: Objection. Compound.

THE WITNESS: So, yes. However, I think it has to be noted that that is much more -- that that's a limitation that really only is serious if it correlates with the outcome variable at the individual

Page 267

level.

And that at the group level, that it's not as relevant as a limitation, because if you expect the error to be roughly the same from one year to the next, we can have good confidence that, for example, it really is true that more recent adolescents spend less time hanging out with their friends in-person. So it's just not as serious a limitation, I think, at that group level.

BY MS. LEHMAN:

Q. You also noted in the social interactions paper that another limitation of the Monitoring the Future data is that the 8th, 10th, and 12th grade surveys used broad response categories, for example, at least once a month, almost every day, for many time use items, correct?

A. Yeah, so this is what I was referring to earlier with this particular item, that it would have been much better if it had hours a day. That's a much better measure.

Page 268

And again, though, that's mostly a limitation for the individual level, because it ends up lacking variance. But if you're going to look over time, then what's the growth in social media use at a group level, that limitation isn't as important. It's at that individual level, where that becomes a more serious limitation.

It's probably why, you know, a lot of studies that use that measure, and it's not just me, there's other studies that have done that, too, don't find as high of an effect size at the individual level, when that measure of social media is used when you're looking at correlation with loneliness or depressive symptoms or unhappiness, because especially as more years go on, such a high percentage of teens are using social media that it ends up lacking variance.

And I have a bunch of other published papers that discuss that specific limitation of that measure.

Q. And have you seen any peer-reviewed study that looks at, and draws the conclusion that you were just talking

Page 269

about, that using these broader categories of answers, rather than a precise measure like minutes or hours, that that equates to finding a higher effect size?

A. I would have to go look, but I know that we had at least a couple of replies in the Journal of Clinical Psychological Science, where we specifically discussed that. And if you put those results against ones looking at hours per day, you consistently do see that pattern.

So I don't know if it's been done exactly back to back in a published article, but there are certainly articles with hours per day versus those using this measure. And you put them together, and, yes, you can see that difference.

Q. All right. I want to look -- if you turn to page 1894. And I want to look under the header, "Possible Links to Loneliness."

A. Okay.

Q. And do you see that there is a discussion here that there's a disagreement between studies about whether increases in

68 (Pages 266 - 269)

CONFIDENTIAL

Page 270

digital media use might offset any increase in loneliness linked to declines in in-person social interaction.

A. Yes. And so this is where we had to get really in the weeds with this discussion about displacement, and how things may be different at the individual level versus the group level. So this is an area where, you know, you really have to make that distinction between the individual level and the group or cohort level.

Q. So for example, at the individual level, more sociable individuals, who spend more time on social media, may also spend more time on in-person social interaction and thus be less lonely?

A. Correct, right. So -- and particularly for teens, you know, there are some teens who kind of major on their social life in high school, and they're spending a lot of time on social media. They're also spending a lot of time with their friends in person.

So that's at the individual level, where you're going to get that

Page 271

relationship. But at the group level, you see exactly the opposite. At the time that social media became more popular, in-person social interaction among teens declined precipitously.

Q. I'm going to hand you another exhibit which I am marking as Exhibit Number 16.

(Exhibit No. 16 was marked for identification.)

BY MS. LEHMAN:

Q. Can you confirm that this is an article that you coauthored and published in 2018 entitled, Decreases in Psychological Wellbeing Among American Adolescents After 2012, and Links to Screen Time During the Rise of Smartphone Technology?

A. Yes. And let me save you time. We can refer to this as the Emotion paper.

Q. Emotion paper. Okay. I was going to ask you if this is the one you had referred to previously as Emotion. So thank you.

A. Yes. Which is the name of the journal, just to be clear.

Page 272

Q. Okay. But in your report, you don't refer to this as the Emotion paper. You refer to this as Twenge 2018B, correct?

A. Probably. I lose track of some of the citations, but yes.

Q. Okay. And so the Emotion paper, it analyzed self-esteem, self-satisfaction, domain satisfaction, life satisfaction, and happiness, correct?

A. It's been a while, so let's look. Yes.

Q. And you used the phrase "psychological wellbeing" as an umbrella term for these constructs, correct?

A. Yes.

Q. All right. And do you agree that self-satisfaction, domain satisfaction, life satisfaction, and happiness are not mental health disorders?

A. Yes, although like many of the indicators in this area, you would be -- it would be very unusual to find someone who has a DSM major depressive episode who would also describe themselves as happy. There's a lot of correlation and link between these

Page 273

concepts.

Q. Well, but the flip side of that is that there would be many people who may describe themselves as unhappy, or not describe themselves as happy, but who would not have a major depressive disorder, correct?

A. That is true.

Q. And the Emotion paper did not involve having participants go through a clinical evaluation by a healthcare provider, correct?

A. Correct, it did not.

Q. Okay. Now, in the paper that you published -- in the Emotion paper, you observed that "A large body of research has documented that unemployment has a negative effect on psychological wellbeing of adults and children," correct?

MS. McNABB: Katy, can you point us to where you're reading?

MS. LEHMAN: Sure, of course. I'm sorry. It's page 766.

THE WITNESS: Is it "Influence of Economic Factors"?

BY MS. LEHMAN:

69 (Pages 270 - 273)

CONFIDENTIAL

Page 274

Q.    It is under "Influence of Economic Factors." It's the second sentence.

A.    Yes, I see it.

Q.    Okay. And so do you see that in the Emotion paper, it says, "A large body of research has documented that unemployment has a negative effect on psychological wellbeing"?

A.    Yes.

Q.    And then the paper continues, "Children and adolescents' psychological wellbeing is often indirectly affected as unemployment can strain relationships with parents"?

A.    Yes.

Q.    And do you agree with that, that unemployment and financial security can impact adolescents' psychological wellbeing?

MS. McNABB:  Objection. Compound.

THE WITNESS:  So this is a little difficult to summarize quickly, but unemployment is going to have the biggest effect on adults, on the person who is unemployed. But, yes, that can have some indirect effects on

Page 275

children and adolescents.

So the reason this is here is because we wanted to look at those economic factors and see if they explained the decline in happiness, life satisfaction, and self-esteem, and they did not.

BY MS. LEHMAN:

Q.    If you look -- if you flip to page 2 -- or not 2 -- if you look at page 765 in the abstract, you observe in the Emotion paper that "Adolescents spending a small amount of time on electronic communication were the happiest," correct?

A.    Yes.

Q.    Okay. And then if you look at page 772 -- and this is under "Results and Discussion."

A.    Okay.

Q.    You observe that TV watching, an older screen activity, was also linked to lower psychological wellbeing, correct?

A.    Yes, although those correlations are considerably smaller than those for social media or internet.

Page 276

Q.    And if you turn to the next page, page 773, and looking in the paragraph labeled, "The Role of in-Person Social Interaction."

A.    Yes.

Q.    Okay. In the Emotion paper, you wrote, "Likely due to individual differences in sociability, adolescents who spent more time interacting with friends in person also spent more time interacting with them online."

A.    Yes, very similar to the social interaction paper. As we were just discussing, this is the individual level.

Q.    Right. And in the Emotion paper, you said that you observed that other variables not assessed could play a role, correct?

A.    Can you point me to where that is?

Q.    Yes, it will be on page 776.

A.    Okay. So I see where it is. The last full paragraph on the right. "These conclusions come with several caveats," that part?

Q.    Correct.

A.    Okay.

Q.    All right. And do you see that

Page 277

you observed that the first caveat to the paper is that other variables not assessed here could play a role?

A.    Yeah. So this is the type of caveat that are very frequently included in papers of this type. If memory serves, this one was at a specific request of a reviewer/editor, which is common, to have them suggest caveats to put in there, that it's the general scientific caveat of, Hey, there could be other things that we didn't measure that might take into account.

But I personally think in this case, you know, we really did our best to try to look at as many alternative explanations as we could.

Q.    Okay. And the second caveat says, "Some assessed variables may play a more complex or indirect role."

A.    Yeah, it's always difficult to figure out, you know, exactly, you know, how -- what role these things are playing in a time series study. There's definitely, you know, indirect things or complex things that would be going on. And that's why that caveat

70 (Pages 274 - 277)

CONFIDENTIAL

Page 278

is there. It's, again, another very standard limitation statement.

Q.   And was the second caveat requested by an editor or reviewer?

A.   That one, I don't recall.  I believe so.

Q.   Okay.  And the third caveat that's listed here is that "These correlational data cannot definitively uncover causal evidence"?

A.   Yeah, so that one is pretty similar to the caveat in many of the other papers like this, because that's true.  In time series studies, you cannot be randomly assigned to be born at a different time.  You can't do an RCT for a cohort study.

Q.   And finally, in the Emotion paper, you write that -- and this is still on the same page -- "With current research methods, it is very challenging to confidently pinpoint causal forces and cultural change," correct?

A.   Yeah.  And, you know, I would -- if I rewrote that today, I think I would amend that.

Page 279

Q.   What would you say today?

A.   I would -- I would say that it's still challenging, but given what we know now, that pinpointing -- just basing it on evidence that we have now, that you can make the much stronger case, as we did here, but now that we have so much other data, that the rise of social media and smartphones was a significant and meaningful cause of the increase in unhappiness and low life satisfaction.

Q.   Okay.  Do you agree that the Emotion paper that you published in 2018, do you stand by the statements that you made at the time, as accurate?

A.   Yeah, at the time, yes.

Q.   All right.  We've spoken today about longitudinal studies, and I want to talk about that for a moment.  Longitudinal studies follow the same people at two or more points in time, correct?

A.   Yes.

Q.   Okay.  And longitudinal studies examine variables on the same people at different times?

A.   Yes.

Page 280

Q.   Do you agree that many studies do not adjust for preexisting mental health conditions or risk factors for those conditions?

MS. McNABB:  Objection. Compound.

THE WITNESS:  Are we still speaking about longitudinal studies?

BY MS. LEHMAN:

Q.   Yes.

A.   Let me put this with the caveat that, although I've read many longitudinal studies, I have not conducted one myself. That's not usually a significant limitation for a longitudinal study, because you're looking at changes from one time to another. So the third variable limitation in a cross-sectional or correlational study is not a series or longitudinal study, because you're following the same people over time.

Q.   Okay.  Not limiting it to longitudinal studies, do you agree that risk factors can be confounders?

MS. McNABB:  Objection. Vague.

THE WITNESS:  You're going to

Page 281

have to be more precise for me to answer that.

BY MS. LEHMAN:

Q.   Sure.  So let me give you an example.  Do you agree, for example, that preexisting depression or anxiety could be confounders in a study on social media and mental health?

A.   Let me think this through. Possibly, but I'd have to think more carefully about how that was measured.

Q.   Do you agree that it is normal for a human to experience a range of emotions?

MS. McNABB:  Objection. Vague.

THE WITNESS:  Yeah, you're going to have to reword that, because I think it's too broad for me to be able to answer.

BY MS. LEHMAN:

Q.   Okay.  Do you agree that momentary or short-term emotions are not necessarily diagnosed -- diagnostic, and may simply be within the normal range of emotions?

MS. McNABB:  Objection. Vague.

THE WITNESS:  Yes, although I

Golkow Technologies,

877-370-3377          A Veritext Division          www.veritext.com

CONFIDENTIAL

Page 282

think that also falls in the category we've been discussing, where someone who is depressed is probably not going to feel happy at every moment. So there's going to be a link between the two.

BY MS. LEHMAN:

Q. We've talked today about analyses that are performed on preexisting data or existing datasets.

A. Yes.

Q. And studies that are -- analyzed preexisting data, are those sometimes called secondary studies?

A. They're sometimes called secondary analyses, or analyses of archival data.

Q. All right. Do you agree that secondary analyses or analyses of archival data are less expensive to conduct?

A. Yes.

Q. Because you don't have to go out and collect the data yourself?

A. Correct.

Q. And do you agree that secondary

Page 283

analyses or analyses on archival data are easier to conduct and can be conducted in a shorter period of time, because there is not that data collection period?

A. So that would be an "it depends" answer. Usually, yes. However, as one example, the Monitoring the Future data, which is publicly available, is posted year by year. So when I've done time series analyses, it has literally taken months sometimes to merge those datasets, because they change variable names, and so on. So most of the time, yes, but not always.

Q. Okay. And that actually -- what you're pointing out as one of the limitations, which is right, that you can't tailor the questions or the data collection --

A. That is another limitation.

Q. Okay. Because someone else is making those decisions?

A. Yes.

Q. Okay. Are you familiar with the phrase publication bias?

A. Yes.

Q. Okay. And what is publication

Page 284

bias?

A. Often used in the context of a meta-analysis, and it generally refers to the tendency, especially in the past, of significant results being more likely to be published than statistically insignificant results.

So a meta-analysis, for example, might examine publication -- published papers versus unpublished papers as a moderator, to discover if there is a publication bias in the literature.

Q. And one of the ways to limit publication bias is to preregister the study, correct?

A. I -- no.

Q. Okay. Tell me why you disagree with that.

A. Not exactly. Well, okay, so this is a whole debate, which I don't want to bore everybody with. I mean, preregistration doesn't protect against all bias. It doesn't protect even necessarily against publication bias. You can preregister a study and not publish it.

Page 285

Q. Is a preregistered study more likely to be published, even if it doesn't find statistically significant results?

A. I think you can't -- I mean, I would have to see stats on that, because there's so many other factors in whether a paper gets published or not, like the quality of the writing or the particular topic.

Q. All right. I want to change to a new topic.

A. Okay.

Q. I want to look at the section of your report, 4.1.2, entitled, "Other Suggested Causes."

A. Okay. That's in the time series section, correct?

Q. I don't -- will admit to you, I can't remember if it's in the time series or not.

A. Yeah, so page 14, beginning with paragraph 43?

Q. That's exactly where I want to look.

A. Right.

Q. All right. And now, when you

72 (Pages 282 - 285)

CONFIDENTIAL

Page 286

were assessing possible causes of increases in poor mental health, you focus on population level factors, rather than individual factors, correct?

A.   Yes.

Q.   Okay.  And when discussing other possible causes, you were relying on what you refer to as time series studies, correct?

A.   In this case, yes, that's what we're talking about in this -- that's what I was referring to in this section.

Q.   Okay.  And is it correct that time series studies are not concerned with the cause of mental health among individuals?

MS. McNABB:  Objection.  Vague. And I'm pretty sure it was asked and answered.

THE WITNESS:  So that's not how I would phrase it, because the time series studies, for example, might look at the increase in the rate of depression.  And if there is an increase in the rate of depression, that's an increase in the rate of depression among individuals.

Page 287

So what I meant as the qualification here is that if you're going to look at possible causes for, say, the rise in depression, that we're going to look at things that have an effect on a lot of people. And we're going to look at things that vary over time.

So there's -- again, there's two different questions.  There's what are all of the possible causes of depression, and then what are the possible causes of the increase since 2012.  And those are two different questions.  So that first one, what are all of the possible causes, there are going to be a lot of individual causes on that list that are not going to make it to the list of what explains the excess cases, or the increase after 2012.

BY MS. LEHMAN:

Q.   Okay.  And you were focused on the population level changes since 2012, correct?

Page 288

A.   Yes.

Q.   Okay.  Now, in paragraph 46, you discuss physicians' willingness to diagnose and diagnostic coding, correct?

A.   Yes.

Q.   All right.  And you say that the Corredor-Waldron and Currie from 2024 argue that a change in diagnostic coding in 2015 to '16 is the cause of the increase in one statistic, emergency room admissions for self-harm, citing data from New Jersey, correct?

A.   Yes.

Q.   All right.  And then you go on to say that the early 2010s is the inflection point, not 2015 to 2016?

A.   Yes.

Q.   And as you've already told us, you believe that 2012 is the inflection point because mental health issues were stable before then?

A.   Roughly, yes.  I mean, early 2010s, yes, I'm using 2012 as shorthand.  It varies a little bit, based on one measure versus another.

Page 289

Q.   All right.  I'm going to hand you what I have marked as Exhibit No. 17.

THE WITNESS:  Okay.  I have to say at the outset, that this graph is wrong.

(Exhibit No. 17 was marked for identification.)

BY MS. LEHMAN:

Q.   Okay.

A.   It is wrong.

Q.   Why is the graph wrong?

A.   So there's a whole thing on this. So these authors used the wrong data here. This is well-documented online.

Q.   Okay.

A.   This is incorrect right here, this part is incorrect.

Q.   Tell me where -- tell me where it's well-documented.

A.   On the After Babel Substack. David Stein went into this.  You know, and the authors have refused to change it, even though it's clearly wrong, because this is a real easy to use, publicly available dataset.  You can just use the portal online from the CDC.

73 (Pages 286 - 289)

CONFIDENTIAL

Page 290

So this, where they show that the rates of suicide were higher here in the '90s than in 2018, that is incorrect. If you go into the -- to use the correct numbers.

Q. Okay. All right. So let's -- do you agree that the Centers for Disease Control is an authoritative source of data about suicide rates?

A. Yeah, but they didn't use the right data.

Q. Okay. Yeah, and my question is just asking, generally --

A. Generally, yes.

Q. You would feel comfortable, if it's accurately reflected, with data from the Centers for Disease Control about suicide rates?

A. But it's not. So if we went on it right now online, yes, it's a reliable source, and you would see that these numbers aren't right.

Q. Okay. And what is -- I will confess to you that I have not read the Babel Substack that you're talking about. So let me ask you this --

Page 291

A. That's Jon Haidt's Substack, just to be clear.

Q. Jon Haidt's Substack, okay.

A. Yeah.

Q. What is the time period that it's your understanding is incorrect on this chart?

A. I would have to go back and look, but I know that those numbers from the '80s and '90s are incorrect. That they used -- they did something wrong when they were using -- when they were using the dataset.

Q. Okay.

A. And I wish I could go on right now on someone's computer and show you, but these are not the right numbers.

Q. Okay. Well, we will take a look at that, but thank you.

A. Okay.

Q. All right. So now in paragraph 14, you talk about school shootings, correct?

A. Yes.

Q. All right. And what you say is that school shootings became prevalent beginning in the late 1990s, a time when adolescent depression was declining, thus you

Page 292

conclude that school shootings are unlikely to be the primary or sole factor in declining --

A. That's only one factor. There's also other factors why I ruled that out as an explanation.

Q. Okay. Just in terms of timing, Columbine happened in 1999, correct?

A. Yes, but there were several high profile school shootings before that.

Q. Right. And unfortunately, since the late '90s, our country has had an increasing number of school shootings.

A. I think there's a -- I don't know. I'd have to see the numbers on the number of school shootings and so on. I believe so. But I think I've seen mixed data on whether they have actually increased or not, because it depends on how they're counting.

Q. We'll pull out the data, but while he's getting that, do you agree that schools across the country have adopted various safety enhancements out of concern for school shootings?

MS. McNABB: Objection.

Page 293

Foundation.

THE WITNESS: It depends on what you mean.

BY MS. LEHMAN:

Q. Okay. Do you agree that schools across the country have instituted active shooter lockdown drills?

MS. McNABB: Objection. Foundation.

THE WITNESS: So I don't know if we have great data on that, on whether there's been an increase in school lockdown drills. Certainly anecdotally, people talk about that, but I don't know if we have actual data on what percentage of schools do that now versus what percentage of schools did that in 1990, or '95, or 2000.

BY MS. LEHMAN:

Q. Okay. Do you agree that there has been an increase in zero tolerance policies with respect to weapons in schools across the country?

MS. McNABB: Objection.

74 (Pages 290 - 293)

CONFIDENTIAL

Page 294

Foundation.

THE WITNESS: That I'm not sure of. I also know that these things haven't happened in other countries. And we've also seen the increase in depression and adolescent anxiety and loneliness in other countries, where school shootings are uncommon.

BY MS. LEHMAN:

Q. Do you agree that there has been an increase in policing on school campuses since the late 1990s?

MS. McNABB: Objection. Foundation.

THE WITNESS: That's something else I'd have to see data on to know for sure.

BY MS. LEHMAN:

Q. Okay. Do you agree that there has been increased surveillance on school campuses since the late 1990?

MS. McNABB: Objection. Foundation.

THE WITNESS: That's something else I'd like to see empirical data

Page 295

on.

BY MS. LEHMAN:

Q. Okay. Do you agree that active shooter lockdown drills could increase anxiety and depression in students going through those drills?

MS. McNABB: Objection. Speculation.

THE WITNESS: I'd have to see -- I'd have to see if there was research evidence to show that.

BY MS. LEHMAN:

Q. Okay. Do you agree that -- well, hold on. Let me strike that.

I'm going to show you what we will mark as Exhibit Number 18.

(Exhibit No. 18 was marked for identification.)

BY MS. LEHMAN:

Q. Can you confirm that the title here is School Shootings Jumped 124 Percent Between the 2020-21 and 2021-22 School Years?

A. Yes, I see that.

MS. McNABB: I'll just object that it's unclear where this is

Page 296

getting pulled from.

THE WITNESS: It says National Center for Education Statistics. But I would also say that, where did they get their data, and how did they define school shootings is a crucial question for this.

BY MS. LEHMAN:

Q. Okay. Are you familiar with the National Center for Education Statistics?

A. Yes, although I'm not familiar with how they measured school shootings in this case.

Q. And so are you aware that the National Center for Education Statistics is the primary federal agency charged with collecting and analyzing data related to education, both in the United States and internationally?

MS. McNABB: Objection. Foundation.

THE WITNESS: Yes. I have used some of their other data, like, on, say, the percentage of high school students who go to college, and things like that. But I have not seen these

Page 297

numbers from them.

BY MS. LEHMAN:

Q. All right. And based on this data from the National Center for Educational Statistics, the number of school shootings by public and private elementary and secondary schools increased from 2012 to 2022, correct?

A. That's what this seems to suggest, but the pattern is not at all uniform.

Q. Sure. It's an overall trend of increasing. It's not necessarily a linear increase every year, correct?

A. Well, it's not. And it's pretty curvilinear, when you look at it all the way back to 2000. It shows that there is an increase between 2000 and 2007, for example, when suicide rates and depression rates among teens were going down.

Q. We talked about Substack, and I wanted to follow up with you on a couple of things. Can subscribers on Substack like posts?

A. I am not sure.

Q. Okay. Can users reply or comment

75 (Pages 294 - 297)

CONFIDENTIAL

Page 298

on posts?

A.    They can comment, yes.

Q.    Okay.  Does Substack have options that allow users to monetize content?

A.    Yes.

Q.    Does Substack allow users to live stream?

A.    I have not used that function, so I'm not sure.

Q.    Okay.  Can users chat directly or message each other directly on Substack?

A.    I don't believe so.

Q.    Is Substack social media?

A.    I would say no, partially because it's not algorithmic.

Q.    All right.  In paragraph 51, you talk about the opioid epidemic.

A.    Mm-hmm.

Q.    All right.  I want to hand you what I have marked as Exhibit No. 19.

(Exhibit No. 19 was marked for identification.)

BY MS. LEHMAN:

Q.    Can you confirm that this is a post by you entitled, Parent Drug Overdoses,

Page 299

the True Cause of the Adolescent Mental Health Crisis?

A.    Yes.

Q.    All right.  And the date on this is November 15th, 2023?

A.    Yes.

Q.    All right.  And in your report, you refer to this as Twenge 2024B, correct?

A.    Yes.

Q.    All right.

MS. McNABB:  I'll just put an objection in that the printout doesn't have the figures that were --

THE WITNESS:  Yeah, which are pretty important to this post.

MS. McNABB:  Included in this Substack.

THE WITNESS:  Yeah, they somehow didn't end up in here.

MS. McNABB:  Just to the extent that this is not an accurate reflection of what is actually on the Substack, I'll object to this line of questioning on the document.  Just a standing objection.

Page 300

BY MS. LEHMAN:

Q.    Okay.  Well, if you're unable to answer any questions that I ask here, you just let me know, okay?

A.    That may be the case without the figures in front of me.

Q.    Okay.  Well, so if we look at the Substack, you point to two papers that were published in the Journal of the American Medical Association that concluded that more American children are losing their parents to drug overdoses, correct?

A.    That was their conclusion, but as the post goes into, those -- that conclusion was based on estimates, and not actual counts of children who lose a parent.  So there were some significant limitations in the data, not even just -- and the design of those studies, which is why I wrote the post.

Q.    And one article was by Benjamin-Samuel Schluter, and the second was by Christopher Jones, correct?

A.    Yes.

Q.    All right.  And as you say in this Substack post, "The findings made

Page 301

headlines, with experts noting the negative effects of parental death on children's mental health.  Not surprisingly, losing a parent increases the likelihood of depression," correct?

A.    Yes.

Q.    And you would agree, wouldn't you, that losing a parent has negative effects on a child's mental health, including increasing their chances of depression?

A.    Yes.

Q.    All right.  In paragraph 52 of your report, you talk about climate change, correct?

A.    Yes.

Q.    All right.  And you say that climate change is not a factor in increased depression or other mental health issues for adolescents, correct?

A.    I say that it can't explain the increase over time at the population or group level.

Q.    Do you agree that climate change could affect an individual adolescent's mental health?

76 (Pages 298 - 301)

CONFIDENTIAL

Page 302

MS. McNABB: Objection. Speculation.

THE WITNESS: So that's something where we would have to, you know, pull up more data, and studies. I think, as a general conclusion, what most research shows is, causes of depression are usually more proximal. They're usually things that affect an adolescent's day-to-day life, rather than things that they read about in the news, like climate change. That's a pretty general agreed upon conclusion.

So, not going to be a huge factor for the vast majority of adolescents, although are people who worry about climate change, the same people who worry about everything? Yes. But that's a different research question than what we're talking about here.

BY MS. LEHMAN:

Q. Okay. I'm going to hand you what I've marked as Exhibit No. 20.

Page 303

(Exhibit No. 20 was marked for identification.)

BY MS. LEHMAN:

Q. All right. And can you confirm that this is an article titled, Climate Anxiety in Children and Young People and Their Beliefs About Government's Responses to Climate Change: A Global Survey?

A. Yes.

Q. Okay. And this was published in The Lancet?

A. It appears to be so, yes, although it's hard to tell that from -- actually, it's not The Lancet, per se. It's The Lancet Planet Health, so that's a different journal.

Q. Are you familiar with The Lancet Planet Health?

A. No, although I have seen this article before. It's been a few years, but I have seen it before.

Q. Okay. And what were the circumstances when you read this article?

A. I think I saw a news story about it, and then sought out the exact article.

Page 304

But, you know, it came out in 2021, so it was a few years ago.

Q. Okay. And under background, the article says that, "Climate change has important implications for the health and futures of children and young people, yet they have little power to limit its harm, making them vulnerable to climate anxiety," correct?

A. That's what it says, yes.

Q. Okay. And in this article, they surveyed 10,000 young people, age 16 to 25, in ten countries, with 1,000 participants per country, correct?

A. Yes.

Q. And if we look under findings, it says, "Respondents across all countries were worried about climate change. 59 percent were very or extremely worried, and 84 percent were at least moderately worried," correct?

A. That's what it says, yes.

Q. Okay. Do you have any reason to disagree with that data?

A. Well, I have a reason to disagree with their reasoning, which is that, well, let's say more teens start spending a lot less

Page 305

time with each other in person, and a lot more time in their bedrooms alone on social media, that's going to make them more likely to be anxious and depressed, and that's going to make them worry about everything. So the causes here could very well be exactly the same thing we've been discussing.

Q. Have you seen any peer-reviewed articles that lay out that chronology that you've just set out, which is that teenagers start spending less time with each other in person, and a lot more time in their bedroom alone, and that makes them worry about everything?

A. I mean, that's pretty close to the premise of several chapters of iGen, and some of my other articles on the topic.

Q. Okay. All right. If we continue looking at the Hickman article, just continuing where we were, it says, "More than 50 percent reported each of the following emotions: Sad, anxious, angry, powerless, helpless, and guilty," correct?

A. Yes, although it's unclear from this abstract if that's in the context of

77 (Pages 302 - 305)

CONFIDENTIAL

Page 306

climate change or overall.

Q. Okay. Well, if we continue reading, it says, "More than 45 percent of respondents said their feelings about climate change negatively affected their daily life and functioning, and many reported a high number of negative thoughts about climate change," correct?

A. Yeah. So, I mean, here's another thing that's interesting. We don't have that same data. They did that at one particular time. Were people saying that in the early '90s, when we had the first Earth Day in 1990, when Time Magazine put the Earth on the cover as planet of the year, and there was a ton of concern about climate change, or in 2006, when Al Gore's book, An Inconvenient Truth, and the documentary came out? And those were times when there was better adolescent mental health. So this has been a concern for quite a long time, and here we have one time period.

Q. All right. If you'll look at Figure 1 on page E866, all right, do you see that Figure 1 reflects worry about climate change and impact on functioning in different

Page 307

countries?

A. Yes.

Q. All right. And do you see down at the bottom, there's a breakdown for the United States?

A. Yes.

Q. Okay. And the data in the article reports that in the United States, 19 percent of young people were extremely worried about climate change, correct?

A. Yes.

Q. 27 percent were very worried about climate change?

A. Mm-hmm.

Q. So that's a "yes"?

A. Yes.

Q. Okay. And 29 percent were moderately worried about climate change, correct?

A. Yes.

Q. All right. And so just doing the math, this data shows that 75 percent of young people in the United States were somewhere between moderately to extremely worried about climate change?

Page 308

A. Yes.

Q. And only 9 percent reported that they were not worried about climate change, correct?

A. That's what they found, yes.

Q. Okay. If you'll look, then, at -- flip to page E872, looking at the first column at the bottom of the paragraph starting, "To conclude." Do you see that?

A. Yes.

Q. All right. And this article from 2021 concludes that "Our findings suggest that climate change, climate anxiety, and inadequate government response are all chronic stressors that could threaten the mental health and wellbeing of children and young people around the world," correct?

A. Yes.

MS. LEHMAN: All right. I can't recall what time we took our last break, so I wanted to offer you, if you'd like to take a break, to do so now.

MS. McNABB: Sure. We can take a break.

THE VIDEOGRAPHER: We're going

Page 309

off record at 3:37 p.m.

(Recess.)

THE VIDEOGRAPHER: We're back on the record at 3:47 p.m.

BY MS. LEHMAN:

Q. All right. Now, in paragraph 56 of your report, you say that "Some have argued that adolescent mental wellbeing worsened because children and teens now have less independence," citing Gray 2023, right?

A. So this is a more complex argument.

Q. Okay.

A. So this is, you know, among the alternative explanations, one that goes hand in hand with smartphones and social media. So the thing is the changes in children and teens having less independence started a lot earlier. They began in the 1990s, and early 2000s.

And at that time, you know, indicators of adolescent depression were either not changing or actually going down. So they didn't really seem to kind of have their biggest impact until the early 2010s,

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

CONFIDENTIAL

Page 310

when also smartphones and social media began to accelerate.

Q. And let's look, then, at the Gray article.

A. Okay.

Q. Which is Exhibit 21.

(Exhibit No. 21 was marked for identification.)

BY MS. LEHMAN:

Q. All right. Can you confirm that I've handed you an article by Gray and others entitled, Decline in Independent Activity as a Cause of Decline in Children's Mental Wellbeing: Summary of the Evidence?

A. Yes.

Q. Okay. And this was published in 2023?

A. Yes.

Q. Okay. And looking on page 1, at the second paragraph, Gray observes that, "Although most current discussions of the decline in young mental health emphasize that which has occurred over the past 10 to 15 years, research indicates that the decline has been continuous over at least the five or six

Page 311

decades," correct?

A. Yes. And I'm trying to see -- okay. So here, he is -- that's an incorrect statement by my knowledge of this research literature. It's much more curvilinear. So, yes, adolescent mental health got worse between roughly the 1950s and the early 1990s. But between the early 1990s and 2012, it's a more mixed picture.

The suicide rate among adolescents went down during that period. When entering college students were asked, are you -- have you been depressed in the last year? Those indicators went down during that period.

Depressive symptoms in Monitoring the Future went slightly down during that period. Other things like psychosomatic symptoms went up. So it's not continuous. That's not a correct statement by the generational research on mental health trends.

Q. Do you know Dr. Peter Gray?

A. I have heard of him. I have not met him personally or interacted with him.

Q. And he's at the Department of

Page 312

Psychology and Neuroscience at Boston College?

A. That's what it says here.

Q. If you turn to page 2, at the bottom of the first column, the authors write, "For example, one such analysis revealed the average scores on the Children's Manifest Anxiety Scale for children mostly ages 9 to 11 years increased a full standard deviation between 1956 and the late 1980s."

A. So that, I believe, is a citation to Twenge 2000 that we discussed earlier.

Q. I was actually going to say, it's note 17, which is Twenge 2000, correct?

A. Yeah.

Q. All right. And then the article continues, "A change this large means that roughly 85 percent of children by the late 1980s were more anxious than the average child in 1956," correct?

A. Right. So this is -- you know, with the limitation we discussed earlier, that that 1956 is one study. But, yes, that's from Twenge 2000.

MS. McNABB: Katy, can we just take a tiny break, and take the mute

Page 313

off the Zoom? Thank you. Okay, we're good.

MS. LEHMAN: No problem.

MS. McNABB: Thanks, Tim.

BY MS. LEHMAN:

Q. All right. If you'll turn to page 3 still in the Gray article.

A. Okay.

Q. The paragraph above the heading entitled -- for long-term effects of independent activity on mental wellbeing?

A. Yes.

Q. All right. And here, Gray says that "A 2014 study called Stress in America conducted by the American Psychological Association found that teenagers in schools were the most stressed people in the U.S., and 83 percent of them attributed their stress, at least partly, if not fully to school," correct?

A. Yeah, I see that. So that's a one-time study. So teenagers in school being the most stressed could be due to age, and not the cohort. We've always got to keep that in mind.

Q. But you don't disagree that those

79 (Pages 310 - 313)

CONFIDENTIAL

Page 314

were the results of the study conducted by the American Psychological Association in 2014, correct?

A. That's not a study that I cite in my report. I have heard of this, but I don't think I have read it fully. So I would have to read it fully to be able to answer that.

Q. Well, the article continues, "When the survey was conducted during summer vacation, the percentage reporting recent severe stress was cut in half, compared to when school was in session."

Do you see that?

A. I do.

Q. And do you have any reason to disagree with that data?

A. Again, I'd have to read it in detail to really offer an opinion, but I think it's not surprising that people are less stressed when they're on vacation. I think the same is true of adults as well.

Q. And the article then continues in the next sentence, "Other research reveals that for young people of school age, but no other age group, the rates of emergency mental health

Page 315

admissions, attempted suicides, and actual suicides are roughly twice as high during weeks when school is in session compared with vacation weeks."

A. Yeah, so I see that. I think that's yet another thing where we have to separate what are all of the possible causes of depression from what are the possible causes of depression rising after 2012. There was really no change in teenagers going to school that happened suddenly around 2012, and kept going in the same direction to 2019. So this is yet another that, yes, there are a lot of individual causes of depression.

Q. Now, let's discuss paragraph 53, about academic pressure.

A. Okay.

Q. Do you believe that adolescents are now more depressed because of academic pressure?

A. No.

Q. When was No Child Left Behind enacted?

A. So since that's not in my report, I am not sure.

Page 316

Q. Okay. Do you know when common core standards were introduced?

A. I don't know the exact year, no.

Q. Okay. Do you agree that the common core standards amplified some aspects of the No Child Left Behind Act?

MS. McNABB: Objection. Foundation.

THE WITNESS: I would have to read a lot more about that to make any kind of conclusion.

BY MS. LEHMAN:

Q. Okay. Do you agree that following No Child Left Behind and the enactment of common core, that there was increased focus on math and English and language arts at the expense of other subjects and activities?

MS. McNABB: Objection. Foundation.

THE WITNESS: Not something I examined closely. I mean, what I can tell you is that homework time, especially among 8th and 10th graders has gone down in that period. So if

Page 317

there was an increased emphasis on those core subjects, it did not show up in homework time.

BY MS. LEHMAN:

Q. And what was the period over which homework time for 8th and 10th graders has gone down?

A. So I was mostly focused on after 2012, so 2011 to 2023 is what I looked at in the Substack post, or analyzed that data, although I had looked at it before in peer-reviewed publications as well. So homework time was first -- was measured among 8th and 10th graders from the beginning of the survey in 1991 for that -- those age groups.

Q. Is that the Monitoring the Future survey?

A. It is.

Q. And I know that you referenced the Substack that you wrote about homework time. Can you cite to any other peer-reviewed articles that track the amount of time that students spend on homework?

A. There may have been other publications looking at time spent on homework

80 (Pages 314 - 317)

CONFIDENTIAL

Page 318

in the American Freshman Survey, because those entering college students are asked to reflect on their last year of high school.

So I believe there have been other publications that have looked at that, especially in relation to grade inflation, showing the somewhat paradoxical result that more high school students have gotten As, but they're spending less time on homework.

Q.    As we sit here today, are you able to direct me to any of those articles?

A.    I don't think I could tell you those off the top of my head, no.

Q.    Do you agree that researchers believe that adolescents are more likely to be depressed if their parents are depressed?

MS. McNABB:  Objection.  Vague.

THE WITNESS:  So I have certainly seen reviews of that, including in the Surgeon General's advisory, and I would be hard-pressed to tell you specific articles, but there's many reasons that connection may exist, including genetic predisposition.

Page 319

BY MS. LEHMAN:

Q.    Well, do you agree that if a parent is depressed, that their adolescent child is more likely to be depressed?

A.    Yes, although I -- I don't know how big that effect size is.  So that, more likely, it might be small, medium, or large, or you know, debatable how large that effect size is.

Q.    Would you stop using Substack if you found out that it was algorithmic?

A.    That's very hypothetical.  It's something I'd have to think about.

Q.    All right.  I want to turn to the Bradford Hill analysis that you outline in your report.

A.    Okay.

Q.    Have you ever used Bradford Hill -- strike that.

Have you ever conducted a Bradford Hill analysis prior to this litigation?

A.    No.

Q.    Okay.  Have you ever conducted a Bradford Hill analysis for any topic, other

Page 320

than whether social media impacts adolescent mental health?

A.    No.

Q.    Did you know what the Bradford Hill criteria were before this litigation?

A.    Well, you know, it depends on what time sequence we're talking about.  But I learned about it by reading a Substack post.

Q.    When did you read that Substack post?

A.    Oh, it was this year, 2025.  But I -- I believe it might have been late 2024.

Q.    Who wrote the Substack post about the Bradford Hill analysis that you read?

A.    I think it was Anna Lembke.

Q.    Do you know Anna Lembke?

A.    No.

Q.    Have you ever talked to her?

A.    No.

Q.    Have you ever interacted with her in any way, other than reading her Substack post?

A.    Other than the Substack post, no.  And I know that she has written an expert report, but that's about -- and I know she's

Page 321

written books, but I have not interacted with her.

Q.    Do you hold yourself out to your colleagues at San Diego State University as an expert in the application of Bradford Hill criteria?

A.    So I would say that I'm an expert in many of the individual criteria, even though, yes, this is my first time applying all of them together.

Q.    Do you agree that no single Bradford Hill criteria is sufficient to establish causation?

A.    I mean, I think that's their purpose, is to say, let's consider the totality of the evidence.

Q.    How many Bradford Hill criteria are necessary to be satisfied in order to establish causation?

A.    Well, my understanding of it, that was not its intention was to vote count.  That it was to say, Let's look at all of these criteria together, and see what fits and what doesn't.

Q.    Do you agree that before Bradford

81 (Pages 318 - 321)

CONFIDENTIAL

Page 322

Hill criteria can be applied, there must first be a valid association between the exposure and the outcome?

MS. McNABB: Objection. Foundation.

THE WITNESS: Define valid association, because I'm not sure what's meant by that.

BY MS. LEHMAN:

Q.   Sure. An association that has been established and accepted by peer-reviewed science.

A.   And if that's including also, say, correlational studies and cross-sectional studies, yes, you have to have some evidence of some association before you can apply these criteria.

Q.   Okay. Do you agree that in order to determine whether or not an association is valid, reverse causation must be ruled out?

MS. McNABB: Objection. Vague.

THE WITNESS: Say that one more time?

BY MS. LEHMAN:

Q.   Sure. Do you agree that in order

Page 323

to determine whether or not an association is valid, reverse causation must be ruled out?

A.   I don't, because an association simply means two things are associated. And again, A could cause B, B could cause A, or C could cause both. You still have an association.

Again, I don't know how you're defining valid. But you can have an association that is peer-reviewed uses, good measures, but does not necessarily rule out reverse causation.

Q.   In your amended report, your Bradford Hill analysis is outlined in pages 35 to 37, correct?

A.   I believe so.

Q.   Okay. And your discussion of the Bradford Hill criteria on pages 35 to 37, is that a complete summary of your Bradford Hill analysis?

A.   Yes.

Q.   Do you conduct a Bradford Hill analysis specific to, and isolated to adolescent depression?

MS. McNABB: Objection.

Page 324

Compound. Vague.

THE WITNESS: So in the report, my focus was on adolescents. However, in some cases, such as criteria 8, I needed to include studies that were done on adults as well, because there's not as much done on children and adolescents in that category.

BY MS. LEHMAN:

Q.   And so let me ask my question this way.

I see that the Bradford Hill analysis, at least the way I read it, and you tell me if this is wrong, it relates to mental health, right? So mental health, generally.

And so I'm asking, like, did you do a separate analysis -- a separate Bradford Hill analysis for depression, and a separate one for self-harm, and a separate one for suicide, or did you group everything together into this single Bradford Hill analysis?

A.   It's grouped together under the umbrella of, you know, mental health, psychological wellbeing, you know, suicidal ideation, you know, because these things are

Page 325

relatively highly correlated with each other.

Q.   Did you conduct a separate Bradford Hill analysis for each of the defendants' social media platforms, or did you group them all into a single Bradford Hill analysis?

A.   It's a single analysis.

Q.   In your Bradford Hill analysis, did you perform any unique -- strike that. Let me start again.

Did you conduct a separate Bradford Hill analysis for any individual feature or group of features on social media, or did you conduct this single Bradford Hill analysis looking at social media, generally?

A.   So like the rest of the report, this is primarily focused on social media use or time spent. And it would be relevant to those features if they increased time spent or intended to increase time spent.

Q.   Okay. But there's not -- there's not sort of one Bradford Hill analysis about any individual feature on a social media platform, correct?

A.   Correct.

82 (Pages 322 - 325)

CONFIDENTIAL

Page 326

Q. Okay. And what is the -- is it correct that your Bradford Hill analysis relates to individuals in that adolescent, 10-to-19 age range?

A. For the most part, yes, although I drew on research on adults as well.

Q. And, you know, I appreciate that you pointed out that especially on criteria 8, there's some research that relates to people who are outside that 10-to-19 age range. Are your causal opinions in this case related to individual only in that 10-to-19 age range?

A. Well, I mean, that was the focus of the report, was that age range. But do these conclusions also apply to adults? Probably. But that might be another report to look into all of that research.

Q. That would be something you would have to look into separately?

A. Yes, although I'm pretty familiar with that research, since I've been doing this for about a decade, that are similar, say, cross-sectional studies on adults showing similar relationships. So I mean, it's not something I was focused on here, but I would

Page 327

expect there would be some of the same conclusions, if not all.

Q. Okay. Do you agree that biological plausibility means that something is biologically possible?

A. Which criteria are we looking at? 6?

Q. Dose response.

A. Dose response. So 5, the biological gradient. Is that right?

Q. Well, so let's look at -- you call it, yeah, the biological gradient.

A. Yep.

Q. And what's your understanding about what dose response or biological gradient means?

A. So my understanding is that it's about having a dose response curve. So in other words, the more the exposure, the more risk of the outcome.

Q. And what's your understanding about the meaning of criteria number 6?

A. So 6 is plausibility, biological plausibility. So some sort of biological mechanism, and in this case, the example that

Page 328

I offer is changes in brain structure and development.

Q. Do you agree that to draw reliable conclusions about causation, an expert should consider the totality of relevant epidemiological studies?

A. Yes.

Q. Are you familiar with the National Academies of Sciences, Engineering, and Medicine?

A. Yes.

Q. And that's part of the National Institute of Health, or NIH?

A. I don't think so, no.

Q. Okay.

A. But I could be mistaken. It's not something I'm tremendously familiar with.

Q. You were a speaker at their committee meeting on January 6th, 2023?

A. That was a while ago, but yes.

Q. I'm going to hand you what I have marked as Exhibit No. 22.

(Exhibit No. 22 was marked for identification.)

BY MS. LEHMAN:

Page 329

Q. And can you confirm that this is a document from the National Academies of Sciences, Engineering, and Medicine titled Social Media and Adolescent Health, 2023?

A. Yes.

Q. And now if you turn to page -- and I will also represent to you, this is a many hundred page document, so I printed just parts of it. So if you're unable to answer my questions with what I've given you, just let me know, okay?

A. Okay.

MS. McNABB: And I'll put an objection on the record that it's not the complete document.

BY MS. LEHMAN:

Q. And then if you'll turn to page 90 to 91.

A. Okay.

Q. All right. And do you see the big header is The Committee's Approach to the Evidence Review, on page 90?

A. Yes.

Q. All right. And then if you turn to page 91, there's a header for Inferring

83 (Pages 326 - 329)

CONFIDENTIAL

Page 330

Causation?

A. Yes.

Q. All right. And the committee first talks about that they have reviewed the literature?

A. Yes. And so one thing that I have to point out is it says, prepublication copy, uncorrected proof. So this isn't the final version. Just so that's noted for the record.

Q. All right. So then on page 21, in the last paragraph --

A. We're on 21 now?

Q. I'm sorry, 91. 91, I'm sorry. That's my mistake. Let me start again.

Looking at the last paragraph on page 91, do you see it says, "The committee recognizes that studies showing that a social media exposure preceded changes in mental health or wellbeing are not necessarily evidence that social media caused the changes. Especially in mental health epidemiology, the true onset of psychological problems can be difficult to ascertain, even in clinical settings."

Page 331

Do you see that?

A. Yes.

Q. And do you agree with that statement, that in mental health epidemiology, the true onset of psychological problems can be difficult to ascertain, even in clinical settings?

A. I mean, that seems to be more of a statement about individuals, and we're discussing general causation here.

Q. So you disagree with the National Academies?

A. Actually, I do. I have a lot of disagreement with this report, on many different levels, which we can go into, if you so desire.

Q. Okay. Well, if you will turn to page 195. So we're going to look at the second to the last paragraph, the paragraph that starts, "Much of the committee's assessment."

A. Mm-hmm.

Q. Okay. And if you look at the second sentence in that paragraph, the National Academies found that "Problems of reverse causation are particularly vexing when studying

Page 332

mental health outcomes. It is difficult to say if a problem such as depression is the cause or the effect of spending excessive amounts of time on social media."

Do you see that?

A. I see it. And it's odd to me in this that they're not covering the experimental studies, which can do that. They're not covering the large sample size longitudinal studies that can do that. And they're also not really considering the time series studies, where a reverse causation argument is completely illogical, to say that depression increased for some unknown reason, and then that's why teens started using social media and buying smartphones.

So they seem to be going on the idea that almost everything is cross-sectional and correlational, which is not the case.

Q. So this is another place where you disagree with the National Academies?

A. Correct.

Q. All right. If you'll turn to page 196, and look at under the heading Measuring Exposure and Outcomes, the second

Page 333

paragraph.

A. Okay.

Q. Okay. And the National Academies writes, "In the absence of validated measurement tools, the field has developed an overreliance on self-reported frequency and duration of social media use," citation to Hancock, et al. 2022. "While this work has been useful in generating hypotheses, its use is limited as a way of guiding policy more precisely."

Did I read that correctly?

A. Yes, I see that.

Q. And do you also disagree with these statements from the National Academies?

A. So you know, I agree that, in general, that you have to consider the limitations of self-report. On the other hand, again, as just one example, the time series studies don't have this limitation. And neither do the experiments.

So they're looking at only a limited number of studies here. They're not considering the totality of the evidence.

Q. Okay. When you talked and gave

84 (Pages 330 - 333)

CONFIDENTIAL

Page 334

your presentation at the National Academies, how long was the presentation?

A.   Oh, that was a while ago.  Twenty minutes, perhaps.  I really can't -- I can't recall the exact amount.  20 or 30 minutes, I think.

Q.   And during your presentation, did you talk about the totality of the evidence, or did you only talk about one specific type of study?

A.   I know I talked about time series.  I know I talked about correlational.  There weren't as many experiments, at that point.  It's difficult for me to recall if I discussed the experiments.  I believe that I did.

Q.   All right.  If you'll turn to page 198.  And I want to look at the first full paragraph.  And do you see there the National Academies writes, "More long-term cohort studies are needed to understand the risks and benefits of social media, and to determine how social media exposures influence development over the life course."

Do you see that?

Page 335

A.   Yeah, I think they're referring to longitudinal studies here.

Q.   And is this another place where you disagree with the National Academies?

A.   Yes and no.

So, yes, it would be great to have more large longitudinal studies.  However, you know, I disagree with some of their language here, because they seem to be implying that we don't know much.  That, you know, there's not a lot of research on this.  You know, we need a lot more to really understand causation.  We really need a lot more to understand, you know, whether social media is causing depression in adolescents.

And I disagree with that conclusion.  I think we have a lot of data.  And I think the totality of the evidence, that's what it points to.  It points to social media being a significant and meaningful cause of depression and low mental wellbeing among adolescents.

Q.   If you'll turn to page 11 under A Research Agenda.

A.   Okay.

Page 336

Q.   Okay.  And do you see here, the National Academies writes, "The standard of evidence needed to establish a causal relation between an outcome and exposure is high.  Most of the research on this topic has established only an association between social media use and different mental and physical health outcomes.  Evidence of such associations is useful and can drive hypothesis formation and further inquiry, but it is not sufficient, on balance, to lead this committee to recommend additional restrictions on young people's access to social media.  A stronger evidence base on certain key questions would remove much uncertainty from the work of policy makers."

Do you see that?

A.   I do.

Q.   Okay.  And just as you've been saying, is this another statement where you disagree with the National Academies?

A.   I do, strongly.  I mean, it's a very standard scientific statement for people to say, we need more research.  Anybody who needs to fill in their discussion section will put that.

Page 337

But we have a lot of evidence.  We've got a lot of evidence already.  And as a researcher and a parent, and my view of the research literature, we waited too long already; that we have a lot of evidence, and it's enough to act on.

Q.   In your presentation to the National Academies, did you encourage them that the evidence was insufficient or that more research was needed?

A.   I don't believe I said that, no.  I mean, it's very possible that I said, Yeah, it would be great to have more research of X or Y type.  That is a very, very common statement to make in presentations and in journal articles, so that's possible.

But I would be very surprised if I had said that the evidence was insufficient.  That was definitely not my message when I spoke to them.

Q.   Okay.  Now, if you'll turn to page 4, under the header The Potential Benefits of Social Media.

A.   Mm-hmm.

Q.   All right.  Looking at the third

85 (Pages 334 - 337)

CONFIDENTIAL

Page 338

paragraph, the National Academies observes, "Social media has the potential to connect friends and family. It may also be valuable to teens who otherwise feel excluded or lack offline support."

Do you see that?

A. Yes.

Q. And do you agree with that statement?

A. I do, but with several significant qualifications. So I think it's really interesting, there is no citations in this section. They just take it for granted that it's true.

And when harms are mentioned, the immediate demand is for citations and RCTs. Plus, the statement about LGBTQ+ teens, okay, if there were so many benefits to that group, then why hasn't their mental health gotten better instead of worse? And it's gotten worse.

Q. Well, I think -- are you referring to the following sentence, where it says, "Lesbian, gay, bisexual, trans, questioning, and other, LGBTQ+, teenagers may

Page 339

find support online that they do not have in their offline world, as do young people coping with serious illness, bereavement, and mental health problems."

A. So that very well may be true, and that may be a benefit that they get. But those benefits are not outweighed by the risks. And I believe that's why, in that group and other vulnerable groups, mental health has also gotten worse. And that in many vulnerable groups, you also see the same link between time spent on social media and negative mental health outcomes that you see in groups that are not as vulnerable.

Q. Well, you're not attributing any decline in mental -- strike that.

You're not attributing all of the decline in mental health outcomes for vulnerable groups to social media, are you?

A. I'm saying that social media is a significant and meaningful factor in that decline in mental health.

Q. All right. Let's continue -- but it's not the only factor, correct?

A. Hard to determine. Is social

Page 340

media the only factor? Probably not. But it is a significant and meaningful factor.

Q. What are the other factors that you would consider as responsible for the decline in mental health for vulnerable populations?

MS. McNABB: Objection. Misstates testimony.

THE WITNESS: So there, it's not just vulnerable groups. We have to look at the overall causes that are impacting all or most teens. So that's going to be not just social media, but having a smartphone in your pocket all of the time, for example.

BY MS. LEHMAN:

Q. What else?

A. The way that digital media also is connected to sleep deprivation, and that sleep deprivation has gone up. That it's also connected to that decline in seeing friends in-person. So there's these downstream effects, not just direct ones.

Q. Now, if we continue with the document from the National Academies, right

Page 341

where we left off, it says, "Online communities can be a valuable venue for learning." Do you agree with that?

A. There's no citation here, so it's hard to judge.

Q. Well, I'm just asking your opinion. Do you agree that online communities can be a valuable venue for learning?

A. It's so vague, it's hard to answer that question for me.

Q. Okay. Do you agree that online networks can support various hobbies and interests, no matter how niche they might be?

A. Yes.

Q. Do you agree that for some personality types, social media platforms can be a useful creative outlet?

MS. McNABB: Objection. Vague.

THE WITNESS: Perhaps, but I think we always have to come back to the risks versus benefits. That's certainly how I think about it as a parent.

BY MS. LEHMAN:

Q. All right. I want to talk about

86 (Pages 338 - 341)

CONFIDENTIAL

Page 342

strength of association.

A.    Okay.

Q.    And in your analysis for strength of association --

A.    Criteria 1 in Bradford Hill?

Q.    Yeah, that's paragraphs 95 through 98, correct?

A.    Correct.

Q.    And so you cite to Kelly 2019, Liu 2022, Twenge & Hamilton '22, Orben 2020, Twenge & Farley 2020, Ruben 2017.

A.    Yes.

Q.    Is that the full list -- oh, and Twenge, et al. 2022?

A.    Right, which is a different paper, yes.

Q.    Okay.  I'm going to hand you what I have marked as Exhibit No. 23.

        (Exhibit No. 23 was marked for identification.)

BY MS. LEHMAN:

Q.    And can you confirm that this is Orben 2020?

A.    Yes.

Q.    Okay.  And the title on this is

Page 343

Teenagers, Screens, and Social Media:  A Narrative Review of Reviews and Key Studies?

A.    Yes.

Q.    Okay.  And this is one of the studies that you were citing in your report?

A.    Yes.

Q.    Okay.  And is it true that Dr. Orben is a researcher who has published a number of articles on whether or not social media use in adolescents and young adults is associated with mental health symptoms?

A.    Yes.

Q.    Okay.  And Orben 2020 is a narrative review and analysis of about 80 systematic reviews and meta-analyses, correct?

A.    That's what the abstract states.

Q.    All right.  If you turn to page 409.

A.    Mm-hmm.

Q.    Do you see that Orben states that "Reviews have found small correlations between social media use and depressive symptoms that, if numerically provided, range from R equals 0.11 and R equals 0.13 to R equals 0.17"?

A.    Yes, I see that.

Page 344

Q.    Okay.  And so Orben 2020 found a range from 0.11 or 0.13 to 0.17 for depressive symptoms, correct?

A.    Yes, for depressive symptoms.  And that's from reviews, yes.

Q.    And it's based on approximately 80 studies that Dr. Orben reviewed, correct?

A.    Although in this case, there's only two citations, so it's hard to know -- well, wait, there's five.  So that's probably not all 80, because not all 80 would have looked at depressive symptoms.

Q.    Okay.  On page 1, under Results --

A.    Are we still looking at Orben?

Q.    Yes, we're still looking at Orben, I'm sorry.

A.    You're probably looking at the abstract.

Q.    I was looking at the abstract, except what I want to do -- but let's -- if you -- look at -- I'm trying to -- yeah, okay, it's the first page.  It's page 407.  That's why I was getting confused.  Page 1 is page 407.

Page 345

A.    Okay.  Got it.

Q.    All right.  So if you look in the right column, in the penultimate sentence, it starts, "What becomes"?

A.    Yes, I see it.

Q.    Okay.  And so do you see that here, Dr. Orben says, "What becomes evident when reviewing the literature is the lack of clearcut evidence for a link between digital technology used and the wellbeing, partly driven by a lack of high quality research in the area."

        Do you see that?

A.    I do.  And that completely contradicts the section that we were just discussing.

Q.    All right.  So then if you look -- let's turn to the next page, so that's page 408, under Current Evidence.

A.    Mm-hmm.

Q.    And do you see here, Orben says, "There is as yet no scientific consensus on the impact of screen-based lifestyles on the mental health of young people; yet there have been well over 80 systematic reviews and

87 (Pages 342 - 345)

CONFIDENTIAL

Page 346

meta-analyses published that examine this link in a range of populations."

Do you see that?

A. I do.

Q. All right. Do you disagree with that statement?

A. So this statement, "There is as yet no scientific consensus" is from a single author paper in 2017. So by the standards of this literature, that was a long time ago. And apparently, it's just one guy.

And so she is saying, yeah, there's 80 systematic reviews and meta-analyses, so how can we say there is no consensus? And then she gives her consensus on the top of page 409, which is pretty consistent with -- I mean, that summary on page 409, I think is pretty accurate, in terms of the range of the effect sizes in this area, in terms of the linear R. Relative risk is another question. But in terms of the linear R, that's pretty consistent with what I've seen in my review of the literature.

Q. Okay. Well, let's turn, then, to page 409.

Page 347

A. Okay.

Q. And let's look on the right-hand column, the last long paragraph under the Systematic Reviews and Meta-Analyses Social Media section.

A. Okay.

Q. Okay. And do you see here that Orben says, "It is important to note here that other reviews have highlighted positive effects of social media. Some find that social media increases wellbeing, social communication, social support, social capital, authentic self-preservation, and social connectedness, while decreasing loneliness, even though these reviews routinely note that other studies have found exactly the opposite."

A. Yeah, and there's one cite there. So if we're talking about things that disagree, why is there not more than one cite? It's strange.

Q. Okay. Well, but what follows after that sentence is, there is a discussion about one review this, other meta-analyses that.

A. Okay.

Page 348

Q. Correct?

A. Fair enough.

MS. McNABB: Hold on. Just so you guys make sure the record is clear, one at a time.

MS. LEHMAN: Thank you.

THE WITNESS: Okay.

BY MS. LEHMAN:

Q. All right. So my question is, you know, I just read that sentence, "It's important to note here," et cetera. Do you disagree with that statement?

A. Which statement? Say it again.

Q. Yeah, so "It is important to note here that other reviews have highlighted positive effects of social media. Some find that social media increases social wellbeing, social communication, social support, social capital, authentic self-preservation, and social connectedness, while decreasing loneliness."

Do you disagree with that?

A. I do. So here is an example. "One review concluded that those users who go to Facebook to promote social support and

Page 349

connections show lower levels of depressive symptoms." It's so circular. It's a very strange statement. Oh, I'm in a great mood, I'm going to go, you know, talk with my friends, and then they're going to have lower levels of depressive symptoms.

It's very, very strange, as a statement, that that would be, you know, a conclusion of a review. That social media increases wellbeing? What study has randomly assigned people to spend more time on social media, and showed that it made them happier. I wasn't able to find that.

Social support, capital, authentic -- I mean, some of these -- social connectedness, to an extent, sure. But decreasing loneliness, I don't know.

There's just -- there's not enough citation here for me to really put this in context. And I do disagree with that, in terms of its, you know, overall summary. I don't think that's accurate, according to the literature I was able to review.

Q. Okay. Well, the sentence that you just pointed out, "One review concluded

88 (Pages 346 - 349)

CONFIDENTIAL

Page 350

that users go to Facebook to promote social support and connection," that cites to note number 24, correct?

A.    Yes.

Q.    And 24 is an article by Frost & Rickwood titled, A Systemic Review of the Mental Health Outcomes Associated With Facebook Use, correct?

A.    Right.  So, again, 2017 is a while ago.  We didn't know as much then.

Q.    And did you consider and evaluate the Frost article as part of developing your opinions in this case?

A.    I don't believe so.

Q.    I will represent to you, I did not see it in your materials considered list, but --

A.    And some of that, too, and again, because it was a while ago, you know, in some cases, I had to rely on things that were about Facebook use alone, but, you know, teens aren't using Facebook as much as they're using Instagram and TikTok and Snapchat these days.

Q.    Now, just continuing on after the sentence that you pointed out in the Orben

Page 351

2020, she writes, "Other meta-analyses have also found that social media increases social support and that online media use increases perceived social resources."  Do you see that?

A.    Yes.

Q.    Okay.  And the citations for that sentence are to note 16 and 36, correct?

A.    Yes.

Q.    All right.  And so note 16 cites to a 2018 article by Domahidi titled, The Associations Between Online Media Use and Users' Perceived Social Resources:  A Meta-Analysis, correct?

A.    Mm-hmm.

Q.    Did you consider Domahidi in developing your opinions in this case?

A.    I believe no.

Q.    Okay.  And note number 36 refers to Liu, et al., 2016 titled, Dose-Response Association of Screen Time-Based Sedentary Behavior in Children and Adolescents and Depression:  A Meta-Analysis of Observational Studies.  Did you consider Liu at al. in developing your opinions in this case?

A.    I may have read that article, at

Page 352

some point.  It looks familiar, but I couldn't tell you for sure.

Q.    Is it on your materials considered list?

A.    I don't think so, but I have been doing work in this area for about a decade, so there's probably plenty of articles I've read that weren't necessarily on the list.

Q.    All right.  And then if we turn to page 410, looking at the penultimate sentence on this page, do you see that Orben 2020 writes, "The same kind of effect size has, however, also been found bidirectionally for social media use decreasing wellbeing and wellbeing decreasing social media use."

Do you see that?

A.    Yes.

Q.    And do you agree with that statement?

A.    So I think in that case -- I mean, I'd have to look back at the specific studies to be sure, but some longitudinal studies find this, some do not.  There's plenty of longitudinal studies that do not show bidirectionality.  But, yes, some of them

Page 353

do say that both things are happening:  That social media use leads to depression, depression leads to social media use.  It depends.  Not every longitudinal study is showing that.

Q.    All right.  And if you'll turn to page 412, and look in the Conclusions section.

A.    Mm-hmm.

Q.    Halfway down the paragraph, on the left column starting "Across."

A.    Yes.

Q.    All right.  Do you see that Orben 2020 writes, "Across the board, a small negative correlation between digital technology use and adolescent wellbeing can be located, but it is not clear whether this represents a clear causal relationship or an association driven by third factors."

Did I read that correctly?

A.    Yes.

Q.    All right.  And do you disagree with that statement?

A.    I do, on a couple of levels.  So she, again, seems to only be considering correlational or cross-sectional evidence,

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

CONFIDENTIAL

Page 354

when there's many other types of evidence.

And a small negative correlation? What does she mean by small? That's very subjective. And again, just looking at linear R, not looking at relative risk, these are correlations that correspond to relative risks often of two, meaning a doubling of risk, which I think most reasonable people would say that's not small.

And then the part about causation, yeah, she's not looking at a lot of the other evidence. And that may partially be because it was five years ago, or it could be that she was concentrating only on the correlational studies, not on time series, longitudinal, or experimental.

Q. What is your understanding about criteria number 2, consistency?

A. So consistency is a -- we've seen it in different people in different places. So I think here, one important consideration is that the link between heavy social media use and depression appears across racial groups, it appears across socioeconomic status groups.

Page 355

That the time series effects, say, and the increase in depression among adolescents since 2012, that that has appeared across racial groups, across socioeconomic status. And importantly for explaining reasons behind it, that it's appeared among many regions of the world.

So that, for example, if school shootings were the primary cause, we would expect to only see those increases in depression and loneliness in the United States. And that's not what the data looks like. Instead, we see them across Europe, English-speaking countries, and Latin America as well.

Q. And what is your understanding about the definition of criteria number 3, specificity?

A. So here, it's mostly referring to, for example, the time series studies. That if we consider lots of different explanations, that one stands out as the most likely. And I think that is definitely the case for the increase in adolescent depression after 2012, that the other possible

Page 356

explanations do not fit the data as well.

Q. Do you agree that obesity can impact adolescent mental health?

A. I agree that it's associated.

Q. What do you mean associated?

A. So I mean they're correlated.

Q. Okay. And what is your understanding of the significance of their association or correlation?

A. So I looked at this in one paper, where in the same dataset, you could look at the correlation between, say, social media use and poor mental health and other factors. And in that dataset, the correlation between poor mental health and obesity was a linear R of .10.

Q. Do you hold yourself out as an expert in body dysmorphia, body dissatisfaction, or disordered eating?

A. No.

Q. Are you an expert in the treatment or diagnosis of personality disorders?

A. No.

Q. Are you an expert in the

Page 357

diagnosis or treatment of disruptive impulse control and conduct disorders?

A. No.

Q. Are you an expert in the diagnosis or treatment of somatic symptoms and related disorders?

A. No.

Q. Are you an expert in reading and interpreting functional MRI studies?

A. No.

Q. Are you an expert in reading and interpreting structural MRI studies?

A. No.

Q. Are you an expert in the screening tools used to assess whether someone has a psychiatric disorder?

A. Yes.

Q. Okay. Is that all screening tools or certain screening tools?

A. I would say, in particular, those screening for depression and anxiety.

Q. One of the articles that you cite in your analysis for temporality, criteria number 4, is Braghieri, et al. 2021, correct?

A. Yes.

90 (Pages 354 - 357)

CONFIDENTIAL

Page 358

Q. All right. I want to look at that article. And we'll mark that as Exhibit No. 24.

(Exhibit No. 24 was marked for identification.)

BY MS. LEHMAN:

Q. All right. Can you confirm that I have handed you, the title -- an article titled, Social Media and Mental Health by Braghieri, et al.?

A. Yes.

Q. Okay. And is this the article that you -- you reference?

A. Yes.

Q. And Braghieri did not analyze any social media platform other than Facebook, correct?

A. Correct.

Q. Okay. And Braghieri 2021 surveyed different college students at different times, correct?

A. Yes.

Q. And the authors of Braghieri warned that the results presented in the paper need to be interpreted with caution, correct?

Page 359

A. That is a very standard limitation in a scientific paper.

Q. But they did, in fact, include that language, didn't they?

A. Can you point me to that statement in the paper?

Q. Sure. All right. So while he pulls that out, let me ask you these. Do you know whether Facebook had a "like" button when Braghieri's data was collected?

A. Well, remind me when his data was collected.

Q. All right. Well, you tell me. You relied on the survey, so when was his data collected?

A. Okay. It looks like it's 2004 to 2006. And I believe the answer to that is no. But I'm not positive.

Q. All right. Did Facebook have an algorithmic news feed when this data was collected?

A. I don't know.

Q. Okay. In fact, are you aware that Facebook did not have a news feed at all when this data was collected?

Page 360

MS. McNABB: Objection. Foundation.

THE WITNESS: I don't know.

BY MS. LEHMAN:

Q. Okay. Are you aware that Facebook did not have any notifications during the period when this data was collected?

MS. McNABB: Objection. Foundation.

THE WITNESS: Okay.

BY MS. LEHMAN:

Q. And in support of your Bradford Hill analysis related to temporality, the only other article you site, in addition to Braghieri, was Twenge, et al. 2018B, correct?

A. It is, although, you know, this is a quick summary. And I think there are other things that are in support of the temporality.

Q. Okay. Do you agree that for a study to establish a dose-response relationship, the study must have found a valid association, free from confounding and bias?

MS. McNABB: Objection. Compound.

Page 361

THE WITNESS: So for confounding -- okay, so it's difficult to answer, because it's not that simple.

That, again, I'm not exactly sure what is meant by a valid association. But, yes, to look at dose-response, ideally, you want to control for important confounders. And limitation sections will always say, you can't control for every confounder, because of course you can't. But you need to control for the important ones. And then once you do that, yes, then you can see what the dose-response or dose exposure curve looks like.

BY MS. LEHMAN:

Q. Okay. Do you agree that for a study to establish a dose-response relationship for adolescents, the study must have studied adolescents?

MS. McNABB: Objection. Vague.

THE WITNESS: So that -- say that one more time, just so I get your

91 (Pages 358 - 361)

CONFIDENTIAL

Page 362

wording.

BY MS. LEHMAN:

Q.   Yes.

Do you agree that in order for a study to establish a dose-response relationship in adolescents, the study must have studied adolescents?

A.   We're talking about dose-response; we're talking about associations. Yes, although if it's done on adults, it doesn't necessarily mean it doesn't apply to adolescents. It very well might. But ideally, yes, if you're going to be looking at adolescents, you want the dose-response association to be established among adolescents.

Q.   Do you agree that in order for a study to establish a dose-response relationship for a specific mental health disorder, the study must have data on whether the participants were clinically diagnosed with that mental health disorder?

MS. McNABB: Objection. Vague.

THE WITNESS: Probably not, given the overlap between the

Page 363

screening questionnaires, and the -- you know, the DSM mental health disorders, so -- and it's just not practical to do a clinical interview of large sample sizes.

BY MS. LEHMAN:

Q.   Do you agree that -- well, let me ask this: Did any of the studies that you rely on to support your Bradford -- the dose-response criteria of Bradford Hill study only adolescents?

A.   Yes.

Q.   Okay. Which ones?

A.   Kelly, for example.

Q.   Okay.

A.   Most of my publications that are the cross-sectional or correlational studies used Monitoring the Future and Millennium Cohort as well. And those are just of adolescents. So those are some examples.

MS. McNABB: Katy, if you're at a good time for a break in the near-ish future.

MS. LEHMAN: Hold on. Let me see. Yeah, this is as good a time as

Page 364

any. Yeah, that's fine.

THE VIDEOGRAPHER: We're going off the record at 4:50 p.m.

(Recess.)

THE VIDEOGRAPHER: Okay. We're back on the record at 4:58 p.m.

BY MS. LEHMAN:

Q.   Okay. We talked briefly about longitudinal studies which you evaluate in Section 4.3 of your report.

A.   Mm-hmm.

Q.   Can you form an opinion to a reasonable degree of scientific probability that social media causes the adverse mental health outcomes outlined in your report based solely on the longitudinal studies referenced in your reports?

A.   I certainly wouldn't want to do that. I would want to consider all of the evidence together, if at all possible. I think that's true for any of the sections.

Q.   All right. I'm going to -- we're going to mark this as Exhibit No. 25.

(Exhibit No. 25 was marked for identification.)

Page 365

BY MS. LEHMAN:

Q.   All right. And can you confirm that I have handed you the study by Kross, et al., from 2013, entitled Facebook Use Predicts Declines in Subjective Wellbeing in Young Adults?

A.   Yes, I see that.

Q.   Okay. And this is one of the articles that you reviewed in developing your opinions in this case?

A.   Yes.

Q.   Okay. And this is -- it's actually the first longitudinal study that you cite to -- or maybe I should say, this is one of the longitudinal studies that you discuss in your report. Correct?

A.   It is, yes.

Q.   Okay. And the authors recruited 82 people through flyers posted around Ann Arbor, Michigan. Correct?

A.   Let's take a look at the methods. (Peruses document.) Yes.

Q.   And the participants needed to have a Facebook account and a touchscreen smartphone to qualify for the study. Correct?

92 (Pages 362 - 365)

CONFIDENTIAL

Page 366

A. Yes.

Q. The participants received $20 and were entered into a raffle to receive an iPad 2 for participating. Correct?

A. Yes.

Q. All right. And the participants in Kross 2013 self-selected into the study. Correct?

A. Yes. Very -- very common and accepted method, not ideal, but it happens plenty in psychological studies.

Q. Okay. And in fact, self-selecting participants that can lead to confounding due to self-selection.

A. Not exactly. It means that it's not as generalizable.

Q. Okay.

A. They had to self-select in terms of needing a Facebook account; otherwise, they couldn't do the study.

Q. Okay. And just when we talk about whether a study is generalizable, that means whether it has broader application to the population. Correct?

A. Yes.

Page 367

Q. Okay. Now, three participants did not complete the study. Correct?

A. Okay. Tell me where that is.

Q. It's on page 2.

A. Okay.

Q. Now, where is it? If you go down under "Attrition and Compliance," it says -- the first sentence says, "Three participants did not complete the study."

A. Correct. So, you know, out of 80 some, that's actually pretty good. That's a pretty low amount of attrition.

Q. Okay. And then two participants were excluded from the study. Correct?

A. Okay. And where does it say that?

Q. So that actually comes from a different place. That comes from -- if you look in the second column --

A. Okay.

Q. -- the one, two, three -- the fourth paragraph under "Analyses Overview."

A. Okay.

Q. Do you see where it says "Data from one person who scored..."?

Page 368

A. Yes.

Q. All right. And so "Data from one person who scored for standard deviations above the sample mean on the BDI were excluded, and data from another person who scored for standard deviations above the sample mean was excluded." Correct?

A. Right. So this is the exclusion of outliers, which is a fairly standard practice.

Q. Okay. And so that means that there were 77 participants who completed the study?

A. And where does it say that?

Q. Well, that's doing the math, right: 82 minus 2 minus 3 equals 77.

A. If 82 is -- was the total at the beginning, which it looks like it was, so more than likely, yes.

Q. Now, in Kross 2013, the researchers texted the study participants a survey five times per day over two weeks about how they felt and how much they had used Facebook since the last time they asked. Correct?

Page 369

A. Right. So remind me where that is.

Q. So that will be page 2 under phase two.

A. Okay. Mm-hmm. Yup.

Q. Okay. And do you agree that Kross 2013 studied wellbeing?

A. All right. Well, let's look.

So they asked questions like how do you feel right now? How worried are you right now? How lonely do you feel right now? So those are measures of wellbeing, yes.

Q. Okay.

A. Psychological wellbeing, to be clear.

Q. All right. And do you see that Kross 2013 concentrated on young adults, not adolescents?

A. Yes.

Q. Okay. And if you look under the heading "Future Research," the Kross author stated that "Examining whether these findings generalize to additional age groups is important. Future research should also examine whether these findings generalize to other

93 (Pages 366 - 369)

CONFIDENTIAL

Page 370

online social networks." Correct?

A. Yes.

Q. Okay. And you agree that the Kross 2013 authors did not assert that their findings applied to adolescents. Correct?

A. I would have to read it in detail, but I don't believe so, no, because they were studying young adults. However, I -- I think that these experiments on adults, just by my reading of all the literature and knowing what I know about adolescents and brain development and their wellbeing, I would expect the same results in experiments done with adolescents if not even stronger results.

Q. All right. I'm going to show you an article that we'll mark as Exhibit No. 26.

(Exhibit No. 26 was marked for identification.)

BY MS. LEHMAN:

Q. Can you confirm that I have handed you the article by Verduyn, et al., from 2015, entitled "Passive Facebook Usage Undermines Effective Wellbeing: Experimental and Longitudinal Evidence"?

A. Yes.

Page 371

Q. Okay. And this was a longitudinal study. Correct?

A. So there's several studies in the paper, and it's been a little bit since I read this one in its entirety.

So yes, some of -- one of the studies here, at least, was longitudinal.

Q. Okay. Well, if you look on page 483, and look under the description of methods --

A. Mm-hmm.

Q. -- do you see that 89 people were recruited for the study through flyers posted around Ann Arbor?

A. Yes.

Q. And, again, to qualify for the study, the participants had to possess a Facebook account and touchscreen smartphone?

A. Yes.

Q. Is this the same dataset from the Kross article that we just looked at?

A. It doesn't look like it is the same. I mean, clearly, they're using some of the same methods. But they say, "We determine our target sample size by referencing a recent

Page 372

experience sampling study on Facebook on well-being which consisted of 82 participants." So that suggests to me that this is a different dataset.

Q. Okay. All right. So in this study, the participants received up to $40 and were entered into a raffle to receive an iPod Nano for participating. Correct?

A. Right.

Q. All right. And the participants in the Verduyn 2015 study self-selected into the study?

A. Yes. Similar to the Kross study. So, again, though, they had to have the Facebook page for them to be able to do the study.

Q. Okay. And participants were text messaged five times per day between 9 a.m. and midnight for six consecutive days.

A. Okay. So where is that? That's in phase two; is that right?

Q. That's correct.

A. Okay. Yes.

Q. And that's outlined on page 283.

A. 284.

Page 373

Q. Yes, you're right.

A. 484 -- geez. Late in the day.

Q. Yeah.

A. Yes.

Q. All right. And so it says -- do you see the description of the methods as what I described?

A. Yes.

Q. Okay. And then each text message contained a link to an online survey with questions about wellbeing and loneliness at the moment.

A. Yes.

Q. Now, the Verduyn 2015 study -- and this is outlined on page 487 -- the authors concluded, quote, "Finally, participants in the current study were young adults."

Do you see that?

A. I do.

Q. Okay. And they go on, "Future research is needed to examine whether the current findings generalize to other populations, including older or younger Facebook users" --

A. Mm-hmm --

94 (Pages 370 - 373)

CONFIDENTIAL

Page 374

Q.    -- "people who use Facebook exclusively and individuals from other cultures."  Correct?

A.    Yes.  And later in my own report, there are longitudinal studies on adolescent populations and in countries other than the U.S.

Q.    I'm going to hand you what I'm marking as Exhibit No. 27.

(Exhibit No. 27 was marked for identification.)

BY MS. LEHMAN:

Q.    And can you confirm that this -- I have handed you an article by Boer, et al., in 2019 entitled "Association of Screen Time and Depression in Adolescence"?

A.    Yes.  And I think the last name is Boers.

Q.    Boers?

A.    With an "s."

Q.    Okay.  Boers it is.  Thank you.  All right.  And in the Boers 2019 study, the only confounders that were controlled for were baseline socioeconomic status and sex.  Correct?

Page 375

A.    Well, let's take a look.  So where is it that that's what they controlled for?  Oh, wait.  Hold on.  I see it.  Each multilevel model on page 855.

Q.    Yes.  It's on page 855.

A.    Yeah.  I see that.

Q.    Okay.  And -- and what they -- that they state that they -- the only confounders that they controlled for were the baseline socioeconomic status and sex, correct?

A.    Yes.

Q.    Okay.  And do you agree that Boers 2019 did not fully or adequately address the issue of confounding?

A.    That's hard to say.  Certainly sex is the most important confounder to include because it has the most -- the strongest correlation with social media use and depression.  However, am I correct that this is the one that was done -- yeah.  So this is a Canadian sample, so race and ethnicity is not going to be as crucial as it was in a -- would be in a U.S. sample.  Socioeconomic status and sex are two of the most important, so I think that's

Page 376

pretty good; certainly better than not controlling for anything.  You can always say it's better to have more controls than -- than less, but there's a limit to that.  Those are two of the most important demographic controls, so I think this is decent.

Q.    What is a dynamic confounder?

A.    Not sure what you mean by that.

Q.    Okay.  Is that a term that you've heard before?

A.    I don't believe so.

Q.    Okay.  Did Boers 2019 evaluate any specific feature of social media or total screen time?

A.    All right.  So let's look at the methods.  So according to the result section in the abstract, they did look at screen time, but they also separated out social media and they also separated out television and video gaming and computer use.

Q.    Okay.  Do they separate out individual social media platforms?

A.    I don't believe so.  So they mention them, very similar to other studies in

Page 377

this area.  It looks like they mentioned Facebook and Twitter specifically, but I don't believe they separated the effects of those, no.

Q.    Okay.  And if you look on page 855 under Strengths and Limitations --

A.    Mm-hmm.

Q.    -- in the left-hand column.

A.    855 or another page?  It's 858.

Q.    858.  Sorry.  My eyes are -- they're going apparently.  All right.  So if we look under 858, in that first paragraph, do you see the sentence starting "First"?

A.    Yes.

Q.    Okay.  And do you see that it says, quote, "First, although we distinguish between various types of screen time, we do not distinguish within.  For example, it remains unclear which types of social media, types and genres of television and content are associated with depression."  Do you see that?

A.    Yes.

Q.    Okay.  And do you agree that

95 (Pages 374 - 377)

CONFIDENTIAL

Page 378

that's an accurate limitation on the results of Boers 2019?

A.    That it doesn't separate out, you know, different types or platforms of social media?

Q.    Well, not only that it doesn't separate out different types of social media but it also doesn't separate out types of content.

A.    I don't think that's a significant limitation, no.

Q.    Okay.  But do you agree that that's an accurate representation of the Boers data?

A.    Yes.  That they didn't separate those things out, correct.  But I don't think that's a significant limitation.

Q.    Okay.  All right.  I think that I'm close to done so why don't we take a break, let me make sure.

A.    Okay.

THE VIDEOGRAPHER:  Going off the record at 5:15 p.m.

(Recess.)

THE VIDEOGRAPHER:  Back on the

Page 379

record at 5:24.

BY MS. LEHMAN:

Q.    Okay.  Have you personally conducted any study of TikTok?

A.    Of TikTok specifically, no.  Although I have looked at data from Monitoring the Future on watching videos.

Q.    But even data on watching videos would not be unique to TikTok.  Correct?

A.    Correct.

Q.    Okay.  What is the single best scientific peer-reviewed literature that supports your opinions that TikTok, specifically, negatively impacts adolescent mental health?

A.    Can you repeat the first part of that question again, please.

Q.    Yes.

What is the single best scientific peer-reviewed piece of literature that supports your opinions that TikTok, specifically, negatively impacts adolescent mental health?

A.    I really don't think I can answer that given that my report's about the totality

Page 380

of the evidence.

Q.    Okay.  Can you point to any of the articles that you rely on that are specific to TikTok?

A.    Because I'm relying on ones that are looking at large national datasets or experiments where it's usually about all or most social media, no.

Q.    Have you reviewed any internal TikTok documents other than the documents that are listed in your materials considered that have a Bates number that starts T-I-K-T-O-K?

A.    So I know there's some of those here.

I have seen some other internal documents in other cases where I'm not sure I've been disclosed as an expert, so I don't know if I can talk about those.

Q.    Okay.  And were -- were those documents that you reviewed in the other cases, were they TikTok documents?

A.    Yes.

Q.    Okay.  And so you're not sure if those documents are on the materials considered list that you provided?

Page 381

A.    I am not sure, no.

Q.    Okay.  Would you say that in totality you have reviewed more than 15 internal TikTok documents?

A.    Let's take a look at the list.  So help me out as to where that would be.

Q.    It would be in -- it's at the very end of your materials considered list.

A.    Got it.  It looks like it is approximately 15 or so here, and then those ones in the other case that I'm -- I'm not confident I can discuss.

Q.    Okay.  Are you able to estimate how many other TikTok documents there are that you have reviewed?

A.    Three or four, perhaps.  But it's hard to say.

Q.    Okay.  All right.  So I want to -- and we'll mark this as Exhibit No. 28.

(Exhibit No. 28 was marked for identification.)

BY MS. LEHMAN:

Q.    All right.  Can you confirm that the Bates number at the bottom of this document ends in 002937?

96 (Pages 378 - 381)

CONFIDENTIAL

Page 382

A. Yes.

Q. Okay. And on the very front page of it, it says, "The following is a working draft as intended for select internal review only."

A. Yes.

Q. And then if you open to the second -- the third page, do you see that it says, TikTok Minor Safety: Keeping Our Youth Safe on and Off TikTok?

A. Yes.

Q. Okay. All right. And if you turn to -- do you ---- can you -- can you tell that this is a slide deck or a PowerPoint-type presentation?

A. It appears to be, but -- yes.

Q. Okay. And is this one of the documents that you reviewed?

A. Not sure. Give me a moment.

Q. No problem.

A. So it is -- it is on my list, but I haven't read through it thoroughly in a while.

Q. Okay. And what was your purpose in reviewing this document initially?

Page 383

A. To see what TikTok had to say about the safety of minors.

Q. Okay. Let's turn to -- it's page 10 and the Bates number ends 2946. And do you see that this says, "Age Restrictions: 13 plus"?

A. I do.

Q. Okay. And you see it says that TikTok is only for people 13 years old and over?

A. Forgive me. I have to keep myself from laughing because I know that by many, many surveys and anecdotal reports that that is not true.

Q. Okay. When you say "many, many surveys," what surveys are you referring to?

A. So there's one that was done by Institute for Family Studies. There's several that have been done by Common Sense Media that show that many children 12 and under have used TikTok.

Q. You said Common Sense Media, and what was the other one that you said?

A. The Institute for Family Studies, so that was a report that I was involved in a

Page 384

few years ago.

Q. Okay. Have you seen any articles in peer-reviewed journals that talk about individuals under 13 using TikTok?

A. So the Common Sense Media reports, they're not journals, but they are reviewed by academics, so they may not strictly fit your criteria but they are reviewed.

There very well may be academic articles finding that, given that's -- that's such a well-known finding.

Q. Okay. But you're not able to name those peer-reviewed studies as we sit here today?

A. No.

Q. Okay. Are you familiar with TikTok's artificial intelligence-based age assurance program?

MS. McNABB: Objection. Foundation.

THE WITNESS: Not really.

BY MS. LEHMAN:

Q. Okay. All right. So if you'll turn a few more pages to page 16, and it's

Page 385

Bates ending 2952.

And do you see that the title on this is "Age Appropriate Settings"?

A. So my question is how is age determined? Is it -- is it based on them putting in -- checking a box or giving their birthday?

Q. Okay. Well, you -- you -- you -- I'm not -- I'm not -- I'm not asking you a question about those. I'm just saying, do you see --

A. Okay.

Q. -- do you see the -- the -- the title there?

A. I see it.

Q. Okay. And you've just told me that you don't know about AI -- you don't know about TikTok's age assurance program. Correct?

MS. McNABB: Objection. Misstates the testimony.

BY MS. LEHMAN:

Q. Sure. And I don't want to misstate your testimony.

So do you know about TikTok's age assurance program?

97 (Pages 382 - 385)

CONFIDENTIAL

Page 386

A.    How recent is that?

Q.    I'm talking -- no. I'm talking about right now. Do you know about TikTok's age assurance program?

A.    No.

Q.    Okay. Have you been familiar with AI's age assurance program at any point in time?

A.    I don't believe so, no.

Q.    Okay. So going back to the -- the -- oh, thank you.

Have you been familiar with TikTok's age assurance program at any point in time?

A.    So I know that -- and for a very long time -- it was either checking a box or giving your birthday. And if there are recent developments in that area, no, I'm not familiar with them.

Q.    Okay. And are you familiar with the protocols that TikTok has in place following the provision of a birth date to confirm that there are no users under 13 on their platform?

MS. McNABB: Objection.

Page 387

Foundation.

THE WITNESS: I mean, so my -- my question would be, when were those put into place?

BY MS. LEHMAN:

Q.    Okay. Do you know?

A.    I don't.

Q.    Okay. Have you done anything to find out?

A.    No.

Q.    Okay. Have you asked to look at any of the expert reports that talk about the various safety mechanisms that TikTok has in place on its platform for minors?

MS. McNABB: Objection. Foundation.

THE WITNESS: So I would imagine that's something that I would do going forward.

BY MS. LEHMAN:

Q.    Okay. That's not something you've done before today?

A.    No.

Q.    Okay. Have you made any effort to research the various safety mechanisms that

Page 388

TikTok has in place on its platform for minors?

A.    No. And that's partially because that was not the subject of my report.

Q.    Okay. Well, do you intend to offer any opinions about what mechanisms should be in place on social media platforms like TikTok as it relates to adolescents?

A.    I mean, in the con- --

MS. McNABB: Objection. Vague. Sorry.

THE WITNESS: That's all right. Yeah, in the -- in this context, you know, that was not what I was charged to do.

BY MS. LEHMAN:

Q.    Okay. Now, if you keep -- and turn to -- it's page 19, and the slide -- or the Bates number ends 2955. It says "Family Pairing."

All right. Do you see the slide?

A.    Yes.

Q.    Okay. And are you familiar with the parental controls that TikTok has available through its family pairing program?

A.    So I'm familiar with the concept

Page 389

of family pairing, but because I do not allow my children to use TikTok I have not used this product.

Q.    Okay. Are you familiar with the age limitations that TikTok has on who can participate in live streaming?

MS. McNABB: Objection. Foundation.

THE WITNESS: So my -- my question would be: How is age determined?

BY MS. LEHMAN:

Q.    Okay. All right. So you've -- you've asked that several times.

A.    Mm-hmm.

Q.    Do you know how TikTok determines age?

A.    I don't --

Q.    Okay.

A.    -- currently. And in the past, my understanding was it was checking a box or giving your birthday.

Q.    Okay. Are you aware that TikTok requires users to be 16 years old or older to access a live stream?

98 (Pages 386 - 389)

CONFIDENTIAL

Page 390

A.    Does that mean they've --
MS. McNABB: Objection. Foundation.
THE WITNESS: Does that mean they've shown their driver's license?
BY MS. LEHMAN:
Q.    Okay, ma'am. Are you -- it's not my job to answer your questions. Okay?
A.    Okay. Well, okay. Let me -- let me rephrase then. So I would need to know more about how age was actually verified --
Q.    Okay.
A.    -- to be able to answer that question.
Q.    All right. And are you familiar -- you're aware that TikTok has a policy that users who are under 16 cannot access livestreams?
MS. McNABB: Objection. Foundation.
THE WITNESS: If you say so, but my, again, question would be, if age was only from checking a box or giving a birthday as opposed to a more reliable method, I would have

Page 391

questions about how effective that was.
BY MS. LEHMAN:
Q.    Okay. Are you aware of TikTok's policies regard- -- stating that you have to be 18 or older to livestream?
MS. McNABB: Objection. Foundation.
THE WITNESS: So it'd be the -- the -- the same thing. Did they just check a box saying they're 18? Do they choose a birthday saying they're 18? Or is there something more involved?
BY MS. LEHMAN:
Q.    All right. I'm going to hand you another document which we'll mark as Exhibit No. 29.
(Exhibit No. 29 was marked for identification.)
BY MS. LEHMAN:
Q.    All right. And can you confirm that the title of this document is "Trust and Safety: Issue Domain Brief - Minor Safety"?
A.    I see that, yes.

Page 392

Q.    Okay. And can you confirm that the Bates number down at the bottom of this document ends in 060856?
A.    Yes.
Q.    Okay. And is this one of the TikTok documents that you reviewed?
A.    I don't believe so, no.
Q.    Okay. So did you review all of the documents that are on your materials considered list?
A.    So let me rephrase that. So I -- this -- this is one that's on the list, but I have not seen it in a while.
Q.    Okay. All right. Looking under the introduction, do you see that this TikTok document says, quote, "Minor safety is one of the highest priority areas for TikTok"?
A.    I see that, yes.
Q.    Okay. And do you see that it goes on to state that "We have two experiences on the platform: One dedicated to users under the age of 13 and one for an audience age 13 plus"?
A.    I see that, but it should be rephrased as "those who say that they're 13,

Page 393

under 13, and those who say that they're over 13, because it's based on what they say.
Q.    Okay. What data do you have about the number of users under 13 who are using TikTok?
A.    So there's -- there's two studies that I mentioned earlier.
Q.    Okay. Those -- are those the only sources for that data?
A.    Excuse me. I think there's several -- there's several studies that have done that. Those are the two that come -- come to mind --
Q.    Okay.
A.    -- that talk about young -- users under the age of 13 being on TikTok.
Q.    Okay. If you'll turn to the second page under "Mitigation Strategies."
And do you see that this document states, quote, "We rely on machine learning product features, policy content moderation, and external research and partnerships to inform our strategy relating to minor safety"?
A.    I see that.
Q.    Okay. Do you have any reason to

99 (Pages 390 - 393)

CONFIDENTIAL

Page 394

disagree that TikTok employs machine learning to inform their strategy relating to minor safety?

A.    That's what it says here, but I have no way to independently verify it.

Q.    Okay.  You're unable to say one way or the other?

A.    Correct.

Q.    Okay.

All right.  If you'll look at the next page, do you see there's a header "Internal Partnerships Engagements"?

A.    You mean "External Partnerships"?

Q.    I'm sorry.  Thank you.  Do you see --

A.    Yes.

Q.    -- there's a header "External Partnerships and Engagements"?

A.    I do.

Q.    Okay.  And do you see that there's a discussion then of, for example, TikTok joining the Internet Watch Foundation in 2019 and entering a formal partnership with the NCMEC in April of 2020?

A.    I see that, yes.

Page 395

Q.    Okay.  Do you know what the NCMEC is?

A.    I do not.

Q.    Okay.  Do you see that there's a discussion about an active conversation with Thorn and finalizing a deal to use their keyword hub?

A.    I see that.

Q.    Do you know what Thorn is?

A.    I do not.

Q.    Okay.  Ma'am, have we discussed all of your opinions about TikTok today?

A.    Yes.  Although, you know, there's always the rebuttal reports to the defense expert reports.

Q.    Okay.  And that was going to be my last set of questions.

You told me earlier today about the defense expert reports that you had reviewed and that you had rebuttal opinions to.  What are the opinions that you have about those reports?

A.    Well, obviously, those are going to evolve as I read them more carefully and write my response to them.

Page 396

But I think much of those -- that rebuttal will focus on their characterization of the alternative explanations for the time series trends, because I think that many -- a lot of what they say in those -- in those reports is either wrong or doesn't line up with what the data says in terms of those -- some of those alternative explanations.

And that's a start.  I mean, there -- there very well may be more.

Q.    Okay.  Other than that -- that, sort of, general category that you've just given me, do you have any other specific areas where you disagree with Dr. Gottlieb's opinions?

A.    So I have not read his report in a while.  I would have to go through it more carefully to tell you.

Q.    Okay.  Have you fully developed your rebuttal opinions to Dr. Gottlieb's report?

A.    No.

Q.    Other than that broad category, are there any other opinions that you have in response to Dr. Hampton's report?

Page 397

A.    So, yeah, his is another where I'm going to go through carefully those alternative explanations, consider them, and see how they fit.

Q.    Okay.  Have you fully developed your rebuttal opinions that you have to Dr. Hampton's report?

A.    No.

Q.    Okay.  Have you fully developed your opinions that you have in response to Dr. Baiocchi's report?

A.    No.

Q.    Okay.  And other than that broad category relating to the time studies, do you have any other responsive opinions to Dr. Baiocchi's opinions?

A.    So I think in his -- in the case of his report, I will go through that even more carefully, because he discusses a lot about methods and statistics that I think are important to get right.  So there'll be a fair amount in my rebuttal, probably, on those issues.

Q.    Have you ever met Dr. Gottlieb?

A.    No.

Golkow Technologies,
A Veritext Division
877-370-3377                                                www.veritext.com

CONFIDENTIAL

Page 398

Q. Have you ever read any peer-reviewed study that he wrote?

A. No.

Q. Okay. Have you ever met Dr. Hampton?

A. No.

Q. Have you ever read any peer-reviewed study that he wrote?

A. No.

Q. Have you ever read -- met Dr. Baiocchi?

A. No.

Q. Have you ever read any peer-reviewed study that he wrote?

A. No.

Q. Okay.

MS. LEHMAN: All right. I think at this time we'll go off the record.

I believe my colleagues have other questions. Thank you.

THE WITNESS: All right. Thank you.

THE VIDEOGRAPHER: We're going off the record at 5:44 p.m.

Page 399

(Recess.)

THE VIDEOGRAPHER: We're back on the record at 5:53 p.m.

EXAMINATION

BY MR. HALPERIN:

Q. Good afternoon, Dr. Twenge. You and I met this morning before we started; is that right?

A. Yes.

Q. If all you knew about -- strike that.

You offer opinions in this case about the relationship between time spent and various harms, correct?

A. Yes.

Q. If all you knew about someone was that they spent more than five hours on Facebook or Instagram over the course of one day, could you say that that amount of time poses a risk of the harms you discuss in your report?

MS. McNABB: Objection.

THE WITNESS: A risk, yes.

BY MR. HALPERIN:

Q. Could you say that it necessarily

Page 400

will cause the harms discussed in your report?

A. It could.

Q. Can you say that it would cause those harms, or is it merely a possibility?

A. Well, it's always going to merely be a possibility because there's -- when you -- when you're talking about risk, some people will have the outcome and some will not. But there is an increased risk, yes.

Q. If all you knew about someone is that they spent more than five hours over the course of just one day on Facebook or Instagram, could you say, more likely than not, that they would suffer the harms discussed in your report?

A. That's not really how it works. You can't really assign a specific percentage, but I could say that that would significantly and meaningfully increase the risk.

Q. So you can't say that it more likely than not would lead to the harms discussed in your report; is that correct?

A. I mean, I think it depends on how you're looking at it. But I could say that they would have, especially among adolescents,

Page 401

double the risk of -- of depression as if they used social media only a little.

Q. And so it's your opinion that if someone spent more than five hours on one day and never again they would have more than double the risk of depression?

MS. McNABB: Objection. Misstates testimony.

THE WITNESS: So that does -- that's not -- the research that I'm looking at isn't looking at one day. It is looking at averages and people's reports of what they usually do and what they habitually do.

BY MR. HALPERIN:

Q. And that was my question, though. If all you knew about someone is that on a single day they spent more than five hours a day, could you say that more likely than -- than not they would suffer the harms discussed in your report?

MS. McNABB: Same objection. Also calls for a legal conclusion.

THE WITNESS: So a single day may be indicative of what they usually

101 (Pages 398 - 401)

CONFIDENTIAL

Page 402

do. So it just depends on that. So, again, that's not -- the studies that I'm talking about, that's not what they did. They are looking at what people do on average across most days. And sometimes, yes, someone who spends five hours on a single day, that may be their habitual routine. In other cases it may not be.

BY MR. HALPERIN:

Q. So if you don't know whether it is or isn't their habitual routine, you can't say from a single day, whether they spent one hour or five hours or seven hours, any amount of time that -- over the course of a single day, it more likely than not would lead to the harms discussed in your report, correct?

A. Given that --

MS. McNABB: Same objection. Also compound.

THE WITNESS: So given that that's not how the studies were done, -- my conclusions are based on how the studies were done and the questions that they asked, and they're generally

Page 403

not saying, Hey, what did you just do on one random day? They are usually looking at what people usually do, and, on average, how much time they spend on weekdays versus weekends or most days.

BY MR. HALPERIN:

Q. And because the studies aren't set up that way, you can't say from any amount of time over the course of just one day that, more likely than not, would lead to harm, correct?

MS. McNABB: Objection. Asked and answered.

THE WITNESS: I mean, there's -- there's -- there are a few studies that look at time diaries that do look at a single day and they do find effects. So, you know, but that's one study. And we're talking about the totality of the evidence here, and most of the studies have looked at habitual use.

BY MR. HALPERIN:

Q. And because most of the studies

Page 404

have looked at habitual use, you can't draw conclusions from a user's single day, correct?

MS. McNABB: Same ob- --

BY MR. HALPERIN:

Q. You're not offering those opinions in this court. Correct?

MS. McNABB: Same objection.

THE WITNESS: I mean, it's just not that simple, you know, because someone's single day use may be indicative of their habitual use. So it's difficult to answer that question as it's stated.

BY MR. HALPERIN:

Q. Let me try it this way: If all you knew about a person was that on a course of a single day -- let's say, June 26, 2025 -- they spent five hours a day on Facebook or Instagram, that's all you knew about them --

A. Mm-hmm.

Q. -- could you say that that person was at an increased risk of the harms discussed in your report?

A. At an increased risk, and we're not saying at a specific level, yes.

Page 405

Q. If all you knew about that person is that on June 26, 2025, they spent five hours a day on Facebook or Instagram, could you say, more likely than not, they would experience the harms discussed in your report?

MS. McNABB: Objection. Calls for a legal conclusion.

THE WITNESS: So the -- the more likely or not is just not generally how these types of research studies work. That's -- putting a number on something like that is generally not how it works.

BY MR. HALPERIN:

Q. So you couldn't offer that opinion, correct?

MS. McNABB: Same objection.

THE WITNESS: I mean, it's just not what my report was generally about so it's really hard for me to answer that question specifically.

BY MR. HALPERIN:

Q. If all you knew about a person was that over the course of a single month they spent, on average, more than three hours a

102 (Pages 402 - 405)

CONFIDENTIAL

Page 406

day --

A. Mm-hmm.

Q. -- you didn't know what their usage was any other month, could you say, more likely than not, they would suffer the harms discussed in your report?

MS. McNABB: Same objection.

THE WITNESS: In terms of would they have an increased risk?

BY MR. HALPERIN:

Q. I asked more likely than not.

MS. McNABB: Same objection.

THE WITNESS: So, again, the more likely than not is not really the way these research studies are -- are set up.

BY MR. HALPERIN:

Q. And so you're -- you couldn't offer that opinion, correct?

MS. McNABB: Same objection.

THE WITNESS: I just -- I can't answer the question as stated.

BY MR. HALPERIN:

Q. Okay. All right. And same answer, if someone spent more than five hours a

Page 407

day and you don't know what their usage was any other month?

MS. McNABB: Same objection. And also vague.

THE WITNESS: So I'm going to go back to one of the studies to try to answer your question. So Kelly, et al., is a good example. So they're, on average, spending five or more hours on social media, for girls, tripled the risk.

BY MR. HALPERIN:

Q. And was that over a single or multiple months?

A. So I'd have to look at the exact wording of the question. But I think it asks, you know, on -- on average. So the time scale may be somewhat different. But there's -- so at five hours a day, 37 percent were depressed; not 100. So there's clearly other factors. There are some, absolutely, you can spend that much time and not have this outcome. But the increased risk is a factor of three.

Q. And so you can't say for someone

Page 408

who spent more than five hours a day in a single month, without knowing how much time they spent in other months, that, more likely than not, they would suffer the harms discussed in your report, true?

MS. McNABB: Objection. Calls for a legal conclusion, also vague.

THE WITNESS: So the -- the other months part is not as relevant as -- that's just not what these studies are really designed to do. They're -- what I'm looking at is what's the increased risk.

BY MR. HALPERIN:

Q. And because the studies aren't set up that way, you are not offering that opinion, correct?

MS. McNABB: Same objections.

THE WITNESS: So what -- the opinion that I'm offering, based on the literature, is that that heavy use of social media, especially habitually, significantly and meaningfully increases the risk of depression and other mental health

Page 409

harms.

BY MR. HALPERIN:

Q. How do you define "habitually"?

A. I go back again to how these studies are set up, and it would be, you know, how -- what they're asking about, about what the -- people's usual use.

Q. Are you offering any opinion about the risks posed by seeing certain content on Facebook or Instagram?

A. No.

Q. You're not offering opinions about whether seeing someone, for instance, insult or disrespect someone on Facebook or Instagram could lead to harm?

MS. McNABB: Objection. Compound.

THE WITNESS: No.

BY MR. HALPERIN:

Q. You're not offering opinion about whether seeing someone contact someone else in an inappropriate way could lead to harm, correct?

A. That's not what the report was about, no.

103 (Pages 406 - 409)

CONFIDENTIAL

Page 410

Q. There's no content, that you are offering, could lead to the harms discussed in your report, correct?

A. So the report focused on social media use or time spent agnostic to content.

Q. You're not offering opinions about whether seeing someone damage your reputation on Facebook or Instagram could lead to harm, correct?

A. No.

Q. Or whether seeing someone threaten someone else could lead to harm on Facebook or -- seeing someone threaten someone else on Facebook or Instagram could lead to harm, correct?

A. No.

MS. McNABB: Objection. Vague.

THE WITNESS: No.

BY MR. HALPERIN:

Q. Not offering opinions about whether seeing someone exclude someone else on Facebook or Instagram could lead to harm?

A. Correct.

Q. Not offering opinions about whether seeing nudity or sexual images could

Page 411

lead to harm, correct?

A. Correct.

Q. Or whether receiving unwanted sexual advances could lead to harm, correct?

MS. McNABB: Objection. Vague.

THE WITNESS: Correct.

BY MR. HALPERIN:

Q. Or whether seeing someone harm themselves or threaten to harm themselves could lead to harm, correct?

MS. McNABB: Same objection.

THE WITNESS: Correct.

BY MR. HALPERIN:

Q. You said earlier today that body image was not the main focus of your report.

Do you recall that?

A. Yes.

Q. Are you offering opinions about body image?

A. I do mention a few studies about that, but that's not the main focus of the report, no.

Q. I'm not asking whether it's the main focus of your report.

A. Mm-hmm.

Page 412

Q. I'm asking whether you're going to come to trial and offer opinions about body image.

A. No.

Q. Are you going to come to trial and offer opinions about addiction?

A. No.

Q. Do you have any opinion that notifications cause harm to users on Facebook or Instagram separate and apart from any increase they may lead to in time spent?

A. So I think it's difficult to separate those two. I think notifications are one of the reasons why teens end up spending more time. So it's difficult for me to separate those two.

Q. And my question is: Other than the increased amount of time, is there some other harm that you think notifications are causing?

MS. McNABB: Objection. Vague.

THE WITNESS: That's really not what I was focused on here.

BY MR. HALPERIN:

Q. So you're not offering any

Page 413

opinions that notifications cause harm separate and apart from notifications increase time spent and time spent increases harm; is that right?

MS. McNABB: Objection.

THE WITNESS: I mean, I think I disagree with the premise. I think the two are related.

BY MR. HALPERIN:

Q. But the only harm that you are offering opinions from when it comes to notifications is the increase in time spent; is that true?

A. Yes.

Q. The only harm you identify from filters is related to time spent, correct?

MS. McNABB: Objection. Vague. Also, there's an objection from the prior question too.

But anyway, objection. Vague.

You can answer.

THE WITNESS: Can you repeat it? I'm sorry.

BY MR. HALPERIN:

Q. Are you offering any opinions

104 (Pages 410 - 413)

CONFIDENTIAL

Page 414

about the role of filters?

A. No.

Q. Are you offering any opinions about the role of disappearing content?

A. Well, disappearing content may be one of the reasons why teens keep coming back to the app many times a day which increases time spent.

Q. And so is the only harm you're opining on from disappearing content, that disappearing content leads to more time spent which leads to harm?

MS. McNABB: Objection. Vague.

THE WITNESS: So I -- I don't deny that content may sometimes play a role in the harm. But my focus was on time spent, and those features play a role in time spent.

BY MR. HALPERIN:

Q. And so the only harm you're identifying from disappearing content is that disappearing content increases time spent, true?

MS. McNABB: Objection. Vague and misstates testimony.

Page 415

THE WITNESS: So again, my charge in this report was not to look at those specific features; it was to review the literature mostly on time spent.

BY MR. HALPERIN:

Q. Sitting here today, can you identify any harm from disappearing content separate and apart from increasing time spent?

MS. McNABB: Objection.

THE WITNESS: Not --

MS. McNABB: Misstates testimony.

THE WITNESS: Not what I was supposed to do in this report.

BY MR. HALPERIN:

Q. Are you offering any opinions about like counts?

A. In this report, no.

Q. Do you intend to offer opinions about like counts at trial?

A. No.

Q. Do you offer any opinions about autoplay of video?

A. So that's another case where that

Page 416

may increase time spent. Apart from that, no.

Q. Do you have any opinion that video autoplay leads to harm separate and apart from increasing time spent?

A. No.

Q. Do you have any opinion that endless scroll leads to harm separate and apart from increasing time spent?

A. No.

Q. What --

MS. McNABB: Just objection to that. Objection. Vague.

BY MR. HALPERIN:

Q. What material do you rely on for your opinion that notifications increases time spent?

A. So, again, that was not what I was charged to do here.

Q. Have you looked at -- have you seen evidence, other than your own personal beliefs, that notifications increase time spent?

A. That was not something I researched in relation to this report. That was not what I was charged to do.

Page 417

Q. Have you seen evidence, other than your own personal belief, that disappearing content increases time spent?

A. Again, not what I was charged to do here.

Q. Have you seen evidence that autoplay of videos, independent of your own personal belief, increases time spent?

A. Not the focus of the report.

Q. Have you seen evidence, independent of your own personal belief, that endless scroll increases time spent?

A. Not the focus of the report.

Q. You testified earlier that you spent about 106 hours to date in this case. Is that correct?

A. Yes.

Q. How much of that time did you spend reviewing documents produced by Meta?

A. Two or three hours, perhaps.

Q. Two to three hours total?

A. That's about right.

Q. Did you review all of the documents produced by Meta listed in Appendix D to your report?

105 (Pages 414 - 417)

CONFIDENTIAL

Page 418

A. I did. Although with several, it's been a while since I've read them in detail.

Q. Did you review all of them cover to cover?

A. I believe I skimmed some of them. So no.

Q. You did not read every page of every one of those documents, correct?

A. Correct.

Q. By my count, there are 186 documents that are Meta documents listed in Appendix D. Does that sound about right to you?

A. Yes.

Q. If you spent three hours reviewing Meta's documents, that translates to about one minute per document on average, correct?

A. Right.

MS. McNABB: Objection. Vague and misstates testimony.

THE WITNESS: So two things that are relevant here. As I mentioned, I did not review all of

Page 419

them in detail or every page, and I am a fast reader.

BY MR. HALPERIN:

Q. And so are you relying for your -- strike that.

There are several Meta-produced documents that are identified in the body of your report and cited, correct?

A. Yes, yes.

Q. Are you relying on any other Meta-produced documents for your opinions in this case?

A. I have read in detail those that were published by the Wall Street Journal so they -- they were certainly background. But the ones that I cite and quote from are the ones I primarily relied upon.

Q. I'm asking if you're going to rely on any other article that's not cited in the body of your report at trial.

A. Say at trial?

MS. McNABB: Calls for speculation.

THE WITNESS: Yeah. I mean, I have to reserve that right, given, you

Page 420

know, further developments, rebuttal reports, et cetera.

BY MR. HALPERIN:

Q. Sitting -- separate -- strike that.

Unless a document is cited in the body of your rebuttal report, do you have any intention of relying on that document at trial?

MS. McNABB: Objection. Calls for speculation.

THE WITNESS: I think that's very -- that's very hard to say. Hard to predict the future.

BY MR. HALPERIN:

Q. Well, you understand that this is my opportunity to understand what opinions you're going to offer at trial and the bases for those opinions?

A. Yes.

Q. So can you tell me for any of the 182 documents that are not cited in the body of your report what opinions you have about those documents?

A. Not at this time. And, you know, the internal documents were really not a

Page 421

primary focus here, so they were not things that were going to change my opinions as expressed in the report.

Q. And so none of the 182 documents that you didn't cite in your report are going to change the opinions expressed in your report, correct?

A. So that's very speculative, and, you know, as I work on rebuttal reports, I may refer to them. So it's hard to say.

Q. Do you have an understanding of how many documents Meta's produced in this litigation?

A. I'm sure it's many.

Q. If I told you it was more than 2.5 million documents, do you have any reason to disagree with that?

MS. McNABB: Objection. Foundation.

THE WITNESS: That's something I don't know. I don't know.

BY MR. HALPERIN:

Q. I take it you haven't reviewed all of the documents Meta produced in this case?

106 (Pages 418 - 421)

CONFIDENTIAL

Page 422

A.    I have not.

Q.    How did you identify the 186 documents that are listed in Appendix D?

A.    So I asked for -- to be able to see anything that looked at time spent in mental health.

Q.    Did you do any searches of Meta's documents yourself to find those documents?

A.    No.

Q.    Were all the documents produced by Meta on Appendix D given to you by the lawyers?

A.    Yes.  Although I reserve -- if some of those were -- those published by the Wall Street Journal in the fall of 2021, I have read those as well and they may or may not be on this list.

Q.    Are any of those cited in the body of your report?

A.    I believe at least one of them is, so there's the one I know is a -- that was published by the Wall Street Journal but I'd have to go through to see exactly where that was.  But it's something that I cite often where the focus group of teen girls said that

Page 423

they blamed social media for the rise in teen depression and anxiety and that response was unprompted and consistent across all groups.

Q.    And that document, when you cited it in your report, was cited with a number of Meta 3047 MDL and then a bunch of numbers; is that right?

A.    I don't have those all memorized, so you would have to tell me.

Q.    And those documents were given to you by the plaintiff lawyers, not the version that was cited in the Wall Street Journal, right?

MS. McNABB:  Objection.  Sorry.  Just -- objection that it misstates the testimony.

But go ahead.

THE WITNESS:  So, I mean, I -- my understanding is that those are the same, that the one that was published in the Wall Street Journal for those slides, that there weren't any modifications made to it, no.

BY MR. HALPERIN:

Q.    Did the one in the Wall Street

Page 424

Journal have a Meta 3047 MDL number at the bottom of it?

A.    No.

MS. McNABB:  Objection.

BY MR. HALPERIN:

Q.    And so the one that's cited in your report is the version that was given to you by the lawyers, correct?

A.    I would assume so.

Q.    Do you know why the lawyers -- strike that.

Do you know whether the plaintiff lawyers were balanced in the documents they gave you?

MS. McNABB:  Objection.  Calls for speculation.

THE WITNESS:  So I asked for anything looking at time spent or mental health.  And that did not specify the way that it would go, so that's something I can't speak to.  I can't speak to their motivation or the way that they did it.

BY MR. HALPERIN:

Q.    You can't speak to whether they

Page 425

gave you documents that don't support the opinions you want to reach?

A.    You'd have --

MS. McNABB:  Objection.  Speculation and argumentative.

THE WITNESS:  You'd have to ask them.

BY MR. HALPERIN:

Q.    So you can't testify that the documents you were given are a balanced set of documents on the topic you asked for, correct?

MS. McNABB:  Objection.  Speculation; argumentative.

THE WITNESS:  I can't tell you that.

BY MR. HALPERIN:

Q.    You can't testify that the plaintiff lawyers gave you opposing viewpoints where they exist?

MS. McNABB:  Same objections.

THE WITNESS:  So the internal documents were a very small part of this report.  That was not the primary focus that I had.  It was mostly on the academic research of these four

107 (Pages 422 - 425)

CONFIDENTIAL

Page 426

different types of studies.

BY MR. HALPERIN:

Q. Did you ask the lawyers, to the extent the authors of the Meta documents that you were shown were deposed in this case, did you ask to see their testimony?

A. No.

Q. Would that be relevant to evaluating those documents?

A. It depends on what you mean by "evaluating."

Q. Well, some of the internal documents that you have on Exhibit D are research studies, correct?

A. Yes.

Q. To the extent the employee who conducted that research was deposed and asked about how they did that research, would that be relevant to you in evaluating the studies?

MS. McNABB: Objection. Speculation.

THE WITNESS: I mean, most of it's already in the documents. And asking a researcher how it's done wouldn't be particularly informative.

Page 427

What would be really informative would be to get the underlying dataset which I would love to have been provided.

BY MR. HALPERIN:

Q. Did you ask the plaintiff lawyers to give you that data?

A. At some point I had that discussion, but I don't know if that was available or not. I have said many times that that's what I would ideally like to see.

Q. You didn't receive that data from the plaintiff lawyers?

A. No.

(Exhibit No. 30 was marked for identification.)

BY MR. HALPERIN:

Q. I've marked as Exhibit D -- or excuse me, Exhibit 30, what I believe is the research deck that you referenced being from the Wall Street Journal?

A. It is one of them, yes. There are several that were published along with the Facebook papers. But this is one of them.

Q. I'm going to hand you one more document.

Page 428

(Exhibit No. 31 was marked for identification.)

BY MR. HALPERIN:

Q. I've marked as Exhibit 31, and I'll represent to you that what we did is excerpt the two pages you've cited in your report and highlighted the quotes from your report just to help us all reference the document.

MS. McNABB: And I'll object to the extent that this wasn't something Jean put together, and it's just a tiny bit of the entirety of the document.

MR. HALPERIN: And she's welcome to look at the entire document which I handed her as well.

BY MR. HALPERIN:

Q. Do you have any reason to disagree with me that Exhibit 31 are the portions of this document that you quote in your report?

A. I believe that's correct. It's not the only -- it's not the only internal document I cite, just to be clear.

Page 429

Q. Understood. From -- from this document, these are the portions you quote, correct?

A. Yes.

Q. What methodology did the study authors use to generate the material that you quoted in your report from this document?

A. Okay. So we got to be clear about what we're talking about. So if we're talking about the page that is titled, "Teens Blame Instagram for Increases in the Rates of Anxiety and Depression Among Teens," so if I understand correctly, this was from the qualitative focus groups.

Q. How many people were -- participated in those qualitative focus groups?

A. According to them, 40.

Q. Do you have any reason to disagree with that?

A. No.

Q. Were those 40 participants a representative sample of teens who use Instagram?

A. That is how it's described. As under "recruitment," it says "regionally

108 (Pages 426 - 429)

Page 430

representative third-party panels."

Q. And you're looking at the page ending in 9175?

A. Correct.

Q. Do you see where it says, "Recruited around themes: Body image, self-esteem, negative mood, depression, lonely, isolated"?

A. Yes.

Q. Do you have an understanding of whether the individuals who were recruited into this 40-person qualitative study had to have one or more of those issues?

A. Well, it says "themes," so that's unclear in its meaning.

Q. Do you know that the author, the employee who conducted this qualitative research, Dr. Wendy Gross, was deposed in this case?

A. If you say so.

Q. If she testified that the way they recruited those 40 people was it was people who had one or more of these issues, do you have any reason to disagree with that?

MS. McNABB: Objection.

Page 431

Foundation.

THE WITNESS: No.

BY MR. HALPERIN:

Q. Looking at -- let's go to page 21 of your report, please. And let me know if you need a copy. And I'm talking about the most recent report --

A. Okay.

Q. -- the May report.

A. Page 21?

Q. Yes.

A. Okay.

Q. In paragraph 59, bottom of the page, you say: "In fact, that was the conclusion of a focus group of adolescent girls convened, in part, by Meta as part of its internal research." And then you cite the document we're looking at.

A. Yes.

Q. Do you see that?

A. Yes.

Q. What was the conclusion of this focus group of adolescent girls?

A. So "Teens blame Instagram for increases in the rate of anxiety and

Page 432

depression among teens. This reaction was unprompted and consistent across all groups."

Q. You say "that was," I'm trying to understand what the "that" is.

A. "This reaction" is what it says, if that's what you're referring to.

Q. I'm looking --

A. And that's straight from this document.

Q. I'm sorry. I'm looking at the first sentence of paragraph 59. At least in my report it says, "In fact, that was the conclusion."

A. Okay. So --

Q. Do you see that?

A. Yes. And what I'm referring to is the quote that comes next. That the teens in this focus group concluded that the rise in anxiety and depression among teens was because of Instagram. That's what this says.

Q. You're not offering the opinion that the conclusion of this report is that Instagram causes anxiety or depression among teens, are you?

A. Can you restate that? I'm not

Page 433

sure I understand the question.

Q. Are you offering the opinion that the conclusion of this report is that Instagram causes anxiety or depression among teens?

A. So "this report," are you referring to my report --

Q. No.

A. -- or this one?

Q. I'm referring to the document that you have in front of you.

A. So this?

Q. Exhibit 30, which is excerpted in Exhibit 31.

Let me ask the question again so we have a clean question and answer.

A. Okay.

Q. Are you offering the opinion that the conclusion of Exhibit 30 is that Instagram causes anxiety or depression among teens?

A. I'm offering the opinion that the focus group that that was -- that Facebook convened came to that conclusion.

Q. Where on Exhibit 30 does it say that Instagram causes anxiety or depression?

A. So to be clear, I'm going from

109 (Pages 430 - 433)

CONFIDENTIAL

Page 434

this, this quote. That's what I'm referring to.

Q. Are you able to say from the fact that teens blame Instagram that Instagram actually is the cause of their anxiety and depression?

A. So those --

MS. McNABB: Objection. Asked and answered.

THE WITNESS: Those are two different questions. Here it is the conclusion of the focus group. And in my report, I'm going through all of the academic evidence around time spent on social media and mental health among adolescents.

BY MR. HALPERIN:

Q. Are you offering the opinion that Meta reached any causal conclusion from the teen mental health deep dive, Exhibit 30?

MS. McNABB: Objection. Asked and answered.

THE WITNESS: Again, I think it's the conclusion that the teens reached in the focus group.

Page 435

BY MR. HALPERIN:

Q. I'm not asking what the teens reached. I'm asking did -- are you offering an opinion about Meta's conclusion from Exhibit 30?

A. So I don't know what Meta's conclusion was because these reports tend not to do that. They tend to have a lot of graphs and figures and so on, but not really come to clear conclusion. So it's difficult to say.

Q. Are you offering any causal conclusion from the teen mental health deep dive?

A. I'm offering my conclusions from the body of the evidence I reviewed in my report, and the internal documents were a small part of that.

Q. Does Exhibit 30, standing alone, prove causation?

A. No.

MR. HALPERIN: Those are all the questions I have for you at this time. I'll pass to one of my colleagues.

THE VIDEOGRAPHER: Go off the record?

Page 436

MS. McNABB: Yeah, we can go off the record.

THE VIDEOGRAPHER: Going off the record at 6:23 p.m.

(Recess.)

EXAMINATION

BY MR. MAJOR:

Q. My name is John Major. I'm a lawyer for Munger, Tolles & Olsen. I'm attorney for Snapchat in this case.

I want to direct your attention to page 21, paragraph 58, of your report.

A. Yes.

Q. Do you have that in front of you?

A. Yes.

Q. And you see the first sentence of paragraph 58 reads, "Thus, among the potential factors that have been cited above, the rise of social media on smartphones in the early 2010s is the most plausible cause of the adolescent mental health crisis."

Did I read that correctly?

A. Yes.

Q. And when you say "social media" in that sentence, what do you mean?

Page 437

A. So I'm usually defining social media based on, you know, the data that we have available. And it's usually going to refer to social networking, or sometimes it'll mention specific platforms. By -- you know, and there's varying schools of thought about, you know, which specific apps, you know, would be included under the definition, but I mostly go from what's in the datasets.

Q. And so when you use "social media" in that sentence, you're not limiting it just to defendants' social media platforms; is that fair?

A. That's fair.

Q. Have you undertaken any analysis of the extent to which just the defendants' platforms have caused the adolescent mental health crisis?

A. That's difficult to do given the data that we have. However, those platforms are the ones that are most frequently used by teens, according to sources such as the Pew Research Center.

Q. But have you personally undertaken any analysis of the extent to which

110 (Pages 434 - 437)

CONFIDENTIAL

Page 438

just the defendants' platforms have caused the adolescent mental health crisis?

MS. McNABB: Objection. Vague and asked and answered.

THE WITNESS: I mean, I was focused on social media more generally because that's where the academic literature is more focused.

BY MR. MAJOR:

Q. So your report focuses more generally on social media and not specifically on the defendants' platforms; is that a fair way to put it?

A. I wouldn't put it in exactly in that way, because a very large percentage of social media use among teens is on the defendants' platforms.

Q. Do you remember earlier we talked about how you define social media, and you said that one key element is an algorithm that is designed to have users spend as much time as possible and come back to the app as often as possible.

Do you remember that testimony from what feels like a long time ago?

Page 439

A. Yes, I do.

Q. So to know if a platform is social media under your definition, you need to know something about how the platform actually functions and operates, fair?

A. Yes.

Q. And you don't consider WhatsApp social media?

A. No.

Q. That's because WhatsApp is mostly focused on messaging?

A. Not exactly. It is partially because it's focused on messaging. It's also because you have to have another person's phone number to use it. So there's not as much interaction with strangers, and there are not features like Streaks, for example, on WhatsApp in the way there is on Snapchat.

Q. So just so I make sure I understand the definition of social media. One aspect of it is there needs to be an algorithm involved, and then another aspect of it is this phone number to use at point, and then another aspect is potentially gamification-type features?

Page 440

A. So to be clear, you know, my main focus here wasn't to define social media or to break it down; just given that it's general social media use that is measured in these datasets. But, you know, given other -- you know, things I've considered, you know, there are -- there are several factors that seem to, you know, lead to that category. So it's not that any of them is the be-all and end-all. So it's all of those things tend to point in that direction of saying, yes, this app is social media.

Q. So what if you took WhatsApp, just as it exists today, and you added a section that had an algorithmic content feed, is -- would WhatsApp then be social media?

MS. McNABB: Objection. Speculation.

THE WITNESS: Hard to say. But probably yes. Although, you know, I would have to see it in its entirety and, you know, consider everything that -- you know, how that changed the app.

BY MR. MAJOR:

Page 441

Q. Okay. Same hypothetical but a little different. What if WhatsApp exists as it exists today, added a section with an algorithmic content feed, but no one actually used that portion of the app, they never went there or used it at all --

MS. McNABB: Same objection.

BY MR. MAJOR:

Q. -- then social media?

MS. McNABB: Same objection.

THE WITNESS: So, yeah, really difficult to answer.

Because, you know, part -- part of the thing about the feed or the algorithm is that that is one of the mechanisms that increases time spent. Same thing with gamification and Streaks and so on, you know, that's why it's relevant to what I'm discussing in -- in the report. So if nobody's using it and it's not increasing time spent, it may not be as relevant.

BY MR. MAJOR:

Q. Okay. So if there's an app that

111 (Pages 438 - 441)

CONFIDENTIAL

Page 442

has a messaging function and an algorithmic content viewing function and the messaging function is used the vast majority of the time, that would cut towards that app not being within your definition of social media?

MS. McNABB: Objection. Speculation.

THE WITNESS: Really hard to say because that's such a hypothetical.

BY MR. MAJOR:

Q. And how -- how do you draw the line? I guess what I'm trying to understand is, if I had an app that I was looking at, and I wanted to say, for Dr. Twenge's analysis, is this social media or not, how would I go about figuring that out?

A. So I think it would be, you know, consideration holistically of several factors: So does it have gamification like Streaks? Does it have algorithms? Is it used to consume content or contact people who you don't know in real life or don't have their phone number? So those would be some elements that would be included in that.

Page 443

But I also want -- you know, just to qualify that again, that that -- answering that in that realm was not my main focus here.

Q. Any other factors that would go into that holistic evaluation that you can think of sitting here today?

A. I think those are the primary ones.

Q. I think we touched on this earlier, but do you personally have a Snapchat account?

A. I do not.

Q. And you've never used Snapchat, right?

A. Correct.

Q. When a user opens Snapchat on their phone, what part of the app do they initially see?

A. I don't know.

Q. Could you explain to me just at a high level the different sections or tabs within the Snapchat app?

A. So my knowledge of that is secondhand. I know some of the features within the app. But the tab specifically,

Page 444

I'm -- I'm not sure I could answer that. I'm familiar with Snapstreaks. I'm familiar with the "for your eyes only." I'm familiar with -- and forgive me, I forget the name -- but that, for example, there have been cases where, you know, teens have been recommended to connect with people who are geographically close to them who are adult strangers, including drug dealers. So those are the things I'm familiar with.

Q. Fair to say you're not familiar with every feature of the Snapchat app?

A. Correct.

Q. Not familiar with the layout of the Snapchat app?

A. Right.

Q. Do you know the average age of a Snapchat user?

A. No.

Q. Do you know how much time on average Snapchat users spend using different features within the app?

A. No.

Q. Did you ask for that information in connection with providing your opinions?

Page 445

A. No.

Q. Do you know how much time Snapchat users spend messaging with friends as opposed to engaging with other aspects of the platform?

A. No, I don't.

Q. Are you aware that Snapchat is used primarily for direct messaging between users?

MS. McNABB: Objection. Foundation.

THE WITNESS: Yes. Although I'm also aware of it having other features that are -- are not about direct messaging.

BY MR. MAJOR:

Q. Do you know how much those other features that are not about direct messaging are actually used?

A. No.

Q. Could you tell me everything you did in connection with your report to learn about Snapchat and its features?

A. So it wasn't as much my report but other work that I've done including my

112 (Pages 442 - 445)

CONFIDENTIAL

Page 446

upcoming book. I did read a number of news stories and other sources to learn about how Snapchat worked. So I mentioned earlier the Bloomberg Business article. There were -- there was at least a few other articles on sexual exploitation and -- forgive me, it's late in the day -- but some -- some of these issues that have come up where Snapchat has acknowledged that there are -- that they get lots of -- you know, thousands, 10,000 reports a month about sexploitation and then they acknowledge that that's the tip of the iceberg of that issue.

Q. Understood. So, just broadly, what you did to learn about Snapchat in connection with your report is you read a number of articles?

MS. McNABB: Objection. Misstates testimony.

THE WITNESS: So that reading that I did was mostly for my upcoming book and not for this report because for the report what I was charged was primarily to look at the academic literature.

Page 447

BY MR. MAJOR:

Q. Understood. So in connection with the report, you didn't do anything in particular to learn about the functionality of Snapchat, but you had some prior knowledge about Snapchat's functionality based on some articles you read in connection with the book?

A. Yes.

Q. Okay. I'm going to direct your attention to paragraph 81 of your report.

MR. MAJOR: I'm going to mark an exhibit. Do we have the stickers?

BY MR. MAJOR:

Q. I'm going to mark as Exhibit 32 a study that you talk about there --

A. Okay.

Q. -- by Dr. Amber van der Wal and colleagues.

(Exhibit No. 32 was marked for identification.)

BY MR. MAJOR:

Q. It's a preprint. Do you have it in front of you? Oh, wait.

A. Yeah.

Q. I -- sorry. I didn't give you a

Page 448

copy.

A. I know the study that you're referencing, and I know where you're going.

Q. That's terrifying. Maybe I should stop now.

So let's go to page 12.

A. Yep. You're going right here.

Q. We'll see. So fourth line reads, "Spending time on Snapchat positively affected friendship closeness and well-being, but had no significant effect on self-esteem."

Do you see that?

A. I do.

Q. And then if you go down the -- and did I read that correctly?

A. Yes.

Q. And then if you go down the page, second-to-last line, it says, "Time spent on Snapchat positively impacted friendship closeness for 71.5 percent of adolescents, well-being for" -- and then you go to the next page -- "41.4 percent, and self-esteem for 23.7 percent."

Did I read that correctly?

A. Yes.

Page 449

Q. You don't note those facts -- those aspects of this study in your report, do you?

A. I don't. But I did read this study in detail, which is why I, you know, was a little bit of a smart one there trying to say I knew where you were going. So I am -- I am familiar with this.

I think it didn't have a major impact on, for example, how I describe and consider Snapchat in my book, or in my own life, as a parent, because I'm still of the belief that the risks outweigh the benefits.

Q. Understood. And -- and I'm going to direct you now to page 18. If I'm actually -- I'm going to ask you a slightly different question.

A. Okay.

Q. On the first line, the authors write, "Our exploratory analyses of the five most popular social media platforms among adolescents in our sample: Tiktok, Snapchat, WhatsApp, Instagram, and YouTube reveal that the impact of social media is not only person specific but also platform specific."

113 (Pages 446 - 449)

CONFIDENTIAL

Page 450

Do you see that?

A.    Yes.

Q.    Do you agree with that statement?

A.    In this particular study, yes. But, you know, one study, not going to be the be-all and end-all. It'd be more informative if we had more studies like this. But this study is unique in looking at it being platform specific. So it would be -- I would need to see this replicated maybe a few more times and see more studies to be more confident in this result.

But yes, I see that, and I agree that that is the proper interpretation of what they did here in this one study.

Q.    And then stepping back from the study -- we'll go back to it in just a second -- but stepping back from the study, just more broadly, you agree with me that different social media platforms operate differently, right, some, from others?

A.    Yes. You know, although there's some similarities. And, you know, because I was mostly focused on time spent rather than the specific things people were doing, you

Page 451

know, I still think spending eight hours a day, no matter what the platform is, is not healthy.

Q.    Understood. But you agree with me that different platforms have different specific features?

A.    Yes.

Q.    Those different specific features can have different effects on users; is that fair?

MS. McNABB:  Objection. Speculation.

THE WITNESS:  The different effects part is hard to say given the data that we've got. But there are different features. And teens, thus, use the platforms differently.

But, you know, this is a place where, you know, it would be great to know more and have more studies that have looked platform specific.

BY MR. MAJOR:

Q.    And then looking at the middle of the first paragraph on page 18, it says, "Snapchat positively affected adolescents'

Page 452

well-being in friendship closeness and had no significant impact on self-esteem." WhatsApp -- "WhatsApp exhibited a strong positive effect on friendship closeness without significantly affecting well-being or self-esteem. The positive and null effects associated with Snapchat and WhatsApp indicate that we should avoid a blanket condemnation of all social media platforms."

Did I read that correctly?

A.    Yes.

Q.    You don't have any reason to disagree with that statement, do you?

A.    I would not go that far. If I'd been writing this paper, I don't think I would have written that sentence.

Because I -- I deal -- I do still -- you know, based on the other research, I do still think that spending an excessive amount of time on any social media platform can still have negative effects apart from what people are doing. And that's, you know, based on all the things discussed in -- in the report, as well as those time series studies showing that the time these -- -- at the time these

Page 453

platforms became popular, the adolescent depression increased so much.

So I -- I would not write that sentence. And it's also based on my evaluation of benefit versus risk. That maybe this one study, for example, shows these effects on friendship closeness, but then with Snapchat, there's other risks involved such as getting drugs or getting addicted to Snapstreaks.

Q.    I want to go back to appendix D to your report. It's your materials considered list.

A.    Okay.

Q.    If you turn to the very last page, you'll see there that there are five documents that say "Snap" and then they're followed by some numbers. Do you see that?

A.    Mm-hmm.

Q.    Do you know, sitting here today, what those documents are?

A.    No. You would have to show me because these numbers all blend together.

Q.    Fair enough. So you don't recall what those documents talk about sitting here

114 (Pages 450 - 453)

CONFIDENTIAL

Page 454

today?

A.    Off the top of my head, no.

Q.    Did you review those documents in preparing your report?

A.    At some point, yes.  But a lot of this was early on.  So I would have to see them again.

Q.    And that set of five documents, the lawyers selected those five documents for you?

A.    Yeah.

MS. McNABB:  Objection. Misstates prior testimony.

THE WITNESS:  It's not so much that they selected that.  They knew what my report was about, and there was the idea that I might want to see relevant internal documents even though that was a very small part of the report.

BY MR. MAJOR:

Q.    Give me just a minute.

Going back to the exhibit that we marked, the van der Wal study, you don't mention anywhere in your report that this study

Page 455

came to different conclusions for different platforms, do you?

A.    I do not, because that was not my primary focus.

Q.    And this study reaches specific conclusions about Snapchat.

Do you cite any other study in your report that reaches conclusions specific to Snapchat that you can recall sitting here today?

A.    I don't believe so, no.

Q.    Do you cite any study that made an effort to separate out the impact of content on social media as opposed to features of social media?

A.    So, you know, both of those play a role.  And the features are important such that they are often designed to lead to more time spent.  And that was my primary focus.

Q.    Sure.  But -- and my question is just a little bit different.

Do you cite any study in your report that made an effort to actually separate out the impact of the content on social media from the features?

Page 456

A.    I don't believe so.  I'm not -- and I'm not sure how that could be done.

Q.    And when you say you're not sure how that could be done, what do you mean by that?

A.    Well, okay, you know, both -- both content and features are -- have an impact.  And, I mean, I mostly focused on the features in the role that they cause time spent.  And it's just very -- it's very difficult for studies, especially survey studies, to look at content, because content is so complex and teens do so many other things, and I think that's why we have more data on things like time spent which are often driven by features.  So that's what I mean.

Q.    I understand.

And so it's very difficult for survey studies to disentangle the effect that features are having versus the effect that content is having?

A.    Well, it's --

MS. McNABB:  Sorry.  Objection. Go ahead.

THE WITNESS:  Yeah.  So it's --

Page 457

it's -- it's that they can't dig into the specific content because that's very complicated to do.  So some of the harm may be driven by content. But I think my -- you know, one of my conclusions is some of the harm is clearly driven by time spent with, for example, if it displaces sleep, if it displaces face-to-face social interaction, you know, clearly, that's gonna have -- that's one of the mechanisms, right?  And so that's going to be maybe partially driven by content, but it's also primarily going to be driven by the features designed to increase time spent.

BY MR. MAJOR:

Q.    I got it.

So some of the harm is being driven by content, some of the harm's being driven by time spent, but based on the studies, it's not possible to tell the extent of the harm that's driven by the content versus the time spent, just based on limitations of conducting these types of studies?

115 (Pages 454 - 457)

CONFIDENTIAL

Page 458

MS. McNABB: Objection. Asked and answered.

You can answer.

THE WITNESS: So you can't put a number on it. But given that the studies look at time spent agnostic to content, clearly, the time spent is playing some kind of role.

BY MR. MAJOR:

Q. In your role as an expert in this case, are you offering any opinions that relate specifically to Snapchat?

A. Specifically to Snapchat? I mean, given that Snapchat is one of the more popular social media apps for teens and that my focus is on time spent across all social media, yes. But specifically, most of the studies have not separated that out, no.

Q. It's -- it's a very fair clarification. And so your -- your report focuses on social media. And to the extent it focuses on social media broadly, it necessarily offers some opinions on Snapchat; is that fair?

A. Yes.

Q. But you don't offer any opinions

Page 459

specific to Snapchat?

A. I wouldn't put it in that way, given that Snapchat is one of the more popular apps among teens.

Q. And sitting here today, are you offering any opinions about Snapchat that are not disclosed in your report?

A. No.

Q. I can stop there. Thank you.

A. Okay. Thank you.

MS. LEHMAN: Off record?

MR. MAJOR: Yeah, we can go off the record.

THE VIDEOGRAPHER: We're going off record at 6:53 p.m.

(Brief recess.)

THE VIDEOGRAPHER: Back on the record at 6:55 p.m.

EXAMINATION

BY MR. DONOHUE:

Q. Hello, Dr. Twenge. My name is Matt Donohue. I just have a few more questions.

I just -- I want to circle back and clear up something about your testimony

Page 460

about the definition of social media, because if I'm understanding, I'm hearing two different definitions.

On the one hand, you've been saying that your definition derives primarily from the studies and literature that you rely on, correct?

A. Yes.

Q. And then I just heard you testifying about how you also talk about things like whether there's a recommendation algorithm, whether it allows you to interact with people whose phone numbers you don't know, right?

A. Yes.

Q. For purposes of the opinions you're offering in your report, which of those definitions should I apply?

A. Tough question to answer. So with the report, it would be, because we're talking about the academic literature here, it's going to be however it's measured in the studies that I discuss.

Q. Okay. So if -- if -- if the studies you discuss do not define social media

Page 461

by reference to whether they use a recommendation algorithm, that is not the definition I should use to interpret your study -- to interpret your report?

A. The report. Fair.

Q. Okay. Do you consider Netflix to be social media?

A. No.

Q. Hulu?

A. No.

Q. Disney+?

A. No.

Q. Paramount+?

A. No.

Q. What about music streaming services like Spotify?

A. Probably not. But maybe.

Q. And what about YouTube, do you have an opinion on whether YouTube is social media?

A. So that is debated quite a bit. Some of the studies have put YouTube as social media. So, for example, the Gallup poll that found the average teen spends five or more hours a day on social media

116 (Pages 458 - 461)

CONFIDENTIAL

Page 462

included YouTube. Pew Research Center usually includes YouTube when they ask about social media.

In many of the studies that I'm discussing here, some of them, it's sep- -- it's separated out into watching videos. So it just depends on the particular dataset.

Q. Okay. And so, for example, we talked a lot earlier about the Millennium Cohort study?

A. Yes.

Q. That does not include YouTube in its definition of social media, right?

A. Well, we'd have to go back. I'd have to grab something out of this large stack here to remind myself. That'll do.

MS. McNABB: Well, I think she was looking for Kelly. I have pulled it out already because I knew we --

THE WITNESS: Yes.

MS. McNABB: -- were going here so --

THE WITNESS: Yes.

MS. McNABB: -- if -- if -- if it's helpful for you --

Page 463

THE WITNESS: It may -

MS. McNABB: -- for you to see it, you can see it but I did not --

BY MR. DONOHUE:

Q. That' -- that's fine. If you can find the definition easily there. I can also point you to your own, Twenge and Martin -- or, sorry, Twenge and Martin, Exhibit 10, I think, at page 209.

A. Right. Because the -- there in the Millennium Cohort study they ask another question about videos so they've separated it out.

Q. Correct.

A. Yeah.

Q. One of the questions in the Millennium Cohort study is how many -- how much time a respondent spends, quote, watching television, programs, or films. Please remember to include time spent watching programs or films on a computer or mobile device as well as a TV, DVD, et cetera, correct?

A. Yeah. Yeah. And I should qualify this 'cause I think one of the issues

Page 464

in -- in -- the definitions in this area is that that's from 2015. Ten years later there's much more of a blurring of videos in social media than there used to be.

Q. But you're still using data from the Millennium Cohort study?

A. Yes. In -- in this report, but there are certainly more recent things like that Gallup poll that are including videos partially because that line is blurred because that was done only last year, I believe.

Q. I understand. I just want to -- I just want to be clear.

So when you're talking about data from the Millennium Cohort study --

A. Mm-hmm.

Q. -- the -- what you are referring to as "social media watch time" within that study, that is the answer that respondents gave to how much time they spend on social networking or messaging sites or apps such as Facebook, Twitter, or WhatsApp, correct?

A. Correct. Correct.

Q. So that would not include YouTube?

Page 465

A. I -- I believe the answer to that is no. You know, it's always hard to know how people are gonna interpret a question. But given that there's a separate question on videos, most likely no.

Q. Another dataset you use is the -- the -- I've gone out of order and I've lost it.

Let me -- let me -- let me loop back to something I was going to ask earlier.

So what is -- is it your opinion that all of the conclusions that you draw in your report about social media are applicable to YouTube?

A. Tough question to answer. The time series data, I think, is more broadly applicable to digital media overall. The correlational studies, it depends on how the question was worded. The experimental studies, that's a place where I'd have to go and look. I mean, I can tell you that one of the few experimental studies that includes children did include reducing all screen time. So there, I think, it would be relevant. So some and not others is the point.

Q. So I guess I was asking a

117 (Pages 462 - 465)

CONFIDENTIAL

Page 466

slightly different question --

A. Okay.

Q. -- which is about -- about your conclusions.

A. Okay.

Q. Do you think that all of your conclusions in your report are equally applicable to YouTube given the data you've relied on?

A. Some to many are. All hard to say.

Q. What about your Bradford Hill analysis?

A. All right. Well, let's go to that.

So, I mean, I can go through by the criteria. Strength of association, mostly yes.

Q. Are the studies you cite for strength of association in your report talking about YouTube?

A. So most of them, no. But I'm -- I'm also thinking of some more recent analyses that aren't here, so that I can probably leave those out because we're just focusing on the

Page 467

report at the moment.

Okay. So --

Q. Do you intend to rely on those studies that are not in the report to offer an opinion as to YouTube at trial?

A. That's -- I -- I don't know. That's something I -- I would have to figure out if that's, for example, going to go in a rebuttal report. So it might.

Consistency --

Q. So let me -- let me just ask. It's fair to say that as you sit here today, you have not done an analysis of the Bradford Hill factors as to YouTube?

A. Not specifically on YouTube, no.

Q. And you're aware that many of the studies that you cite for your analysis of the Bradford Hill factors do not include YouTube in their definition of social media?

A. Or they don't seemingly include it based on the way the questions are asked.

Q. And if you wanted to conduct a full and accurate analysis of the Bradford Hill factors for YouTube, you'd agree that you would want to focus on studies that talk about

Page 468

YouTube and not studies that do not?

A. I would want to focus more on the items that ask about watching videos, yes.

Q. So getting back to the question about watching videos. One of the Bradford Hill factors that you talked about is a -- is a dose response, correct?

A. Yes.

Q. And the idea of that is if you have more of the thing, it causes more of the -- the effect or the harm --

A. Yes.

Q. -- correct?

Is it your opinion that there is a dose response relationship between watching videos on YouTube and negative well-being outcomes?

A. Yes.

Q. Does that depend on what the individual is watching on YouTube?

A. Well, given that the time spent studies are agnostic to content, and, again, as I've said before, you know, the content may play some role, but the time spent is -- is clearly having an impact as well.

Page 469

Q. If an adolescent were to start watching a daily meditation video for 60 minutes a day on YouTube, is it your view that that would contribute to a negative mental health outcome?

A. No. Because usually an hour a day is not linked to negative mental health outcomes. It would have to be more than that.

Q. So -- but you -- but you think there's a dose response. Correct?

A. Yes.

Q. So one hour is not enough to cause a dose response in your opinion?

A. So what I'm referring to is that in many of these datasets -- and I'm sorry, I'm going to gesture -- but no use goes like this. So the best outcomes are often at half an hour or an hour a day not at zero. And that's not true in Kelly, but it's true in a few other -- in some other big datasets where you get the best outcomes at a small amount of use like half an hour or an hour a day. And then from there you get the clear dose response.

Q. So would it depend what other

118 (Pages 466 - 469)

CONFIDENTIAL

Page 470

social media the individual was using other than YouTube, assuming we're defining YouTube as social media?

A. And what other -- you know, how much other time they were spending watching videos as well, yes.

Q. So to be clear, your -- your report never talks about YouTube by name, right?

A. I'd have to do a search to see if that's true for a keyword.

Q. Okay. Did you make any effort when making your report to look specifically at issues related to YouTube?

A. No.

Q. Did you review any documents related to YouTube when preparing your report?

A. I don't believe so, but we can look at the list, because, again, I looked at those internal documents a while ago.

Q. I can tell you I didn't see any.

A. Okay. Then no.

Q. Why not?

A. I'm not sure. It may partially be because the way those studies were

Page 471

designed, they were not primarily focusing on YouTube.

Q. So we talked about the Millennium Cohort study. Another study you've regularly drawn data from is the Monitoring the Future study. Right?

A. Yes.

Q. And the question of the Monitoring the Future study that you used to quantify time on social media is, quote, about how many hours a week do you spend visiting social networking sites like Facebook, end quote. Right?

A. That's one of the ways it was worded. The wording changed a little bit, but yes.

Q. And you'd agree that would not include YouTube?

A. Hard to say how an individual teen would interpret it. I would not interpret it that way.

Q. Do you think an individual teen social networks on YouTube?

A. Hard to say. I mean, sometimes they make comments and watch influencer

Page 472

videos, so perhaps.

Q. And so in drawing the conclusions in your report that you've drawn about YouTube, have you, in -- have you assumed that teens answering that question about how many hours a week do you spend visiting social networking sites like You- -- Facebook, excuse me, are including YouTube in that count?

A. Yeah, it's hard to say, you know, how they're thinking as they answer that. I'm guessing no, but it'd be great to do a study to find out.

Q. Are there any such studies that you have relied on in your report that look specifically at YouTube's individual effect on adolescent mental health?

MS. McNABB: Objection. Vague.

THE WITNESS: Specifically, no.

BY MR. DONOHUE:

Q. Are there any studies that you're aware of that attempt to isolate YouTube's effect on mental health from other online services or apps?

A. I don't believe so. I'm going to confirm that with this one since it's the one

Page 473

of the few I know that's platform specific.

Q. And just for the record, what document are you looking at?

A. All right. So I'm looking at Exhibit 32. So I do cite this in the report, although I don't go into the details that we have here, but in page 12, Table 3, it does show a negative correlation between YouTube and well-being, self-esteem, and friendship closeness. So this document is one of the few that does separate out platforms.

Q. Okay.

A. So in that way, I may have to amend a previous statement that given that I did rely on this document, this is one that does separate out the platforms and this is specific to YouTube.

Q. Okay. And is there any other document you can think of that you cite in your report that is specific --

A. I think this is -- I believe that this is the only one.

Q. Okay.

A. Yeah.

Q. Just the one.

119 (Pages 470 - 473)

CONFIDENTIAL

Page 474

So just to be clear, most of the studies that you relied on did not investigate YouTube specifically?

A.    Correct.

Q.    And at least two of the large datasets that you rely on do not include YouTube in their definition of social media?

A.    They don't mention it specifically and they ask separate questions about watching videos and I don't have those analyses here in this report. That would be something I may include in rebuttals.

Q.    Okay. And you've made the point in your research that not all screen time is created equal. Right?

A.    Yes.

Q.    In fact, that's the title of one of your papers?

A.    Yes.

Q.    And is the opinion that you're offering today that time spent on social media is worse than other kinds of screen time?

A.    So that was the conclusion of that paper. But I think that based on that data being 10 years old, it needs to be

Page 475

revised with more recent data. And that's something that I -- I might do in the rebuttal reports potentially.

Q.    So I -- I guess I'm not clear. So my question is: Is the opinion that you're offering in your report that time spent on social media is worse for adolescent mental health than screen time generally?

A.    So screen time generally, if we're not talking just about short videos and we're also including TV and streaming, other times spent on a computer, then yes. But I think there is a need for an update about video watching in particular.

Q.    So when drawing your conclusions about YouTube for purposes of your report, is it your assumption that whatever effect social media generally has on adolescent mental health, you can conclude that YouTube has the same effect?

A.    I think that, again, would mean going back to that data especially more recent data, preferably on watching videos. That's what I would want to do.

So, you know, I know that there

Page 476

are constraints here from what I have in the report, but as a scientist, that's how I would answer that question is, let's go to that more recent data that we've got, and that's not here, but it may be in the future.

Q.    Is there anything that stopped you, in preparing your report, from doing that kind of analysis for YouTube?

A.    I think mostly that my charge was to look at social media and mental health.

Q.    So it was -- it was just a choice not to look at YouTube specifically?

MS. McNABB: Objection. Misstates testimony.

THE WITNESS: So it's mostly that there are very few studies that separate out platforms that -- this study, Exhibit 32, is one of the few that separates out platforms. So that most of the time in the big datasets, the platforms are not separated out.

BY MR. DONOHUE:

Q.    But there are studies that separate out watching videos from social media?

A.    Correct. But those are -- that's

Page 477

older data and I think it'd be great to update that.

Q.    And in your report, you chose to rely on a portion of that data that talks about time on social media?

MS. McNABB: Objection. Misstates testimony.

THE WITNESS: So I relied on the published literature. That newer stuff isn't published yet so that's one of the other reasons why I was not able to include it.

BY MR. DONOHUE:

Q.    Well, in your "Not All Screen Time is Created Equal" paper, you talk about viewing videos, right?

A.    Yes.

Q.    And you compare that to social media?

A.    Yes.

Q.    So there is research on the effect of viewing videos as distinct from the effect of social media, right?

A.    Yes. But that is data that was collected ten years ago and I think things may

120 (Pages 474 - 477)

CONFIDENTIAL

Page 478

have changed and that deserves looking into. It's just that hasn't been published. I had to rely mostly on what had been published.

Q. Do you use YouTube yourself?

A. Yes.

Q. For what?

A. Primarily for teaching, so finding YouTube videos to show in class. And then sometimes I will search out YouTube videos on a specific topic.

Q. Have you ever posted a video on YouTube?

A. I think a very long time ago I did and it was something where I had taken a video of my kids and I wanted to show it in class but it, you know, was -- it was private.

Q. When you choose to show your students YouTube videos in class, is it your view that doing that is going to have a negative effect on their well-being?

A. No.

Q. Why not?

A. For one thing, it's brief. For another, it's not -- it's one video, it's not auto play and where someone is alone by

Page 479

themselves watching video after video after video. It's usually YouTube, not YouTube shorts. That's another consideration. It's just a -- it's a different experience, watching a video at the front of the room in a class with 300 other people compared to being alone in a room and video after video.

Q. So if you were trying to assess the effect that watching YouTube would have on an individual, you'd want to know the context of where they were watching?

A. So what I would probably want to do is what a lot of the studies have done is say something like -- to separate out leisure use versus use for educational purposes, you know, specifically for homework or for work as opposed for entertainment and on your own time. That that might potentially make a difference. And most -- some of the datasets word the question that way.

Q. Would you want to look at time spent listening to music as opposed to watching videos?

A. So I think that's pretty much beyond the scope of what we're talking about

Page 480

here. That's an interesting empirical question to say, what's the link between number of hours somebody listens to music and their mental health, but that's not what I was looking at here.

Q. But I want to pause on that because you say that there's a dose relationship --

A. Mm-hmm.

Q. -- between YouTube and negative mental health outcomes, right?

A. So in the report, I was focusing on social media as defined in the datasets and the dose response. And then some studies, like this one, show that dose response for YouTube specifically, yes.

Q. So it -- so to be clear, is it your view that whatever an individual is watching on YouTube, there is this dose response relationship?

A. Do you mean is it -- is time spent agnostic to content in the way it's measured, usually yes.

Q. So I understand in -- in the way it's measured. If -- if the study -- if a

Page 481

study does not look at content then it's not measuring content, right?

MS. McNABB: Objection. Vague and misstates prior testimony.

BY MR. DONOHUE:

Q. But does that -- does the fact that the study does not -- is not looking at content, you would agree, does not prove that the conclusions it's drawing could be -- would apply if you did look at content?

MS. McNABB: Objection. Vague.

THE WITNESS: So I think there you just have to consider the literature as a whole and say that, yes, content may have some impact, but that clearly the features and the time spent have an impact according to the research that we have.

BY MR. DONOHUE:

Q. And does the effect of the time spent depend on what an individual is watching?

MS. McNABB: Objection. Asked and answered.

THE WITNESS: Since the questions are agnostic to content, I

121 (Pages 478 - 481)

CONFIDENTIAL

Page 482

don't think so.

BY MR. DONOHUE:

Q.    So it's your opinion that the studies that you rely on allow you to conclude that the effect would be the same regardless of what an individual was watching?

MS. McNABB: Objection. Asked and answered.

THE WITNESS: That's not really what I was charged to do here, so --

BY MR. DONOHUE:

Q.    So if it's not what you were charged to do, does that mean you're not offering that opinion?

MS. McNABB: Objection. Misstates testimony.

THE WITNESS: So I think we just have to go back to what the studies did and what they asked, and they're not asking about content. So no, I am not talking about specific pieces of content and how they have an effect on well-being. I'm talking about use and time spent.

BY MR. DONOHUE:

Page 483

Q.    Did any of the studies that you rely on control for the effect of content?

A.    Not that I recall.

Q.    If you -- if somebody was trying to assess whether the content that an individual views affects the outcomes on mental health, would you want to control for the effect of content?

A.    I'd want to measure it which is something different. So that's how you -- you would have to do it. You wouldn't control for it, per se. You would have some measurement of the content and some measurement of the time spent and then of well-being in one way or another.

Q.    Sorry. I -- I -- I phrased my question backwards. What I meant to ask is: If you wanted to -- if you wanted to draw the conclusion that the effects of watching a video are content agnostic --

A.    Mm-hmm.

Q.    -- then you would need to control for content, correct?

MS. McNABB: Objection. Vague.

THE WITNESS: I'm not sure I

Page 484

understand what you're asking but, I mean, I think the question's already agnostic to content. They don't ask about content.

BY MR. DONOHUE:

Q.    So let me -- let me ask you this way: If I -- if I was studying the effect of drinking bottled beverages on a person's blood sugar, and I found that there was a positive correlation between the number of bottled beverages that a person has had to drink and their blood sugar, would that allow me to conclude that drinking bottled water increases an individual's blood sugar?

A.    I don't think that analogy really works.

Q.    Because it would depend on the content of the beverage?

A.    I don't -- I don't think that's really how this works because bottled beverages are not going to displace sleep or in-person social interaction which are things that time spent does agnostic to content.

Q.    So I guess what I'm trying to say is, how do you know that time spent is the only

Page 485

factor that matters --

MS. McNABB: Objection.

Q.    -- for negative outcomes?

MS. McNABB: Objection. Misstates prior testimony.

THE WITNESS: So that's not what I'm -- I'm saying. I have said that content may play some role but that what I was mostly focused on was time spent.

BY MR. DONOHUE:

Q.    So have you drawn any conclusions about whether time spent on YouTube is harmful aside from the displacement effects?

A.    So I think there's -- there are many mechanisms. Displacement is one. And there are others. Some relate to content, some relate to the design. There may be impacts on well-being and attention span from that compulsion to always be grabbing the phone or watching the next video.

Q.    So you -- you mentioned earlier that you have a website, right?

A.    Yes.

Q.    And it has a videos page?

122 (Pages 482 - 485)

CONFIDENTIAL

Page 486

A.    Yes.

Q.    And that contains a number of links to YouTube videos of you giving interviews, right?

A.    Yes.

Q.    Do you believe that watching those videos would be harmful to the viewers' mental health?

A.    It would depend on how many videos, the age of the person, and how many hours they spent doing it at a time. So if someone, for some bizarre reason, wanted to watch those videos on an endless loop for eight hours a day, every single day, yes, I believe that would be harmful.

Q.    So other than the time displacement effects, do you -- is it your view that watching those videos on YouTube would be harmful to an individual's mental health?

MS. McNABB: Objection. Asked and answered. And vague.

THE WITNESS: So exactly -- the exact mechanisms are always a little hard to determine but an excessive amount of time is pretty consistently

Page 487

correlated with low well-being and excessive amount of time on digital media is -- is consistently linked.

BY MR. DONOHUE:

Q.    You say digital media. Would your answer be different if they were watching VHS recordings of your interviews?

MS. McNABB: Objection. Calls for speculation.

THE WITNESS: So that depends. Because that endless loop is a lot more likely to happen on a platform like YouTube compared to a VHS tape. A VHS tape ends and they have to rewind it. There's no autoplay function. It's a different setup.

BY MR. DONOHUE:

Q.    So -- but my hypothetical is they are watching them, that the time spent watching is the same.

A.    True. But they'd be less likely to keep going because of the design.

Q.    But if -- if the time spent watching was the same, do you have any reason to think that watching the video on YouTube

Page 488

would be more harmful?

MS. McNABB: Objection. Calls for speculation.

THE WITNESS: It is -- it is hard to answer that, partially because on a VHS tape that's much more likely to be on a TV where other people are present, and that may play a role in -- in well-being. Because when it's on a phone, people are more likely to be alone and in a -- in a room by themselves as opposed to a TV in a public space in the house, so who knows.

BY MR. DONOHUE:

Q.    So I -- I -- I'm not sure that answered my question, though. If -- if the same watching environment, a -- watching your interviews on a VHS tape versus watching them on YouTube, is it your opinion that you're offering that the time spent on YouTube is more harmful?

MS. McNABB: Objection. Misstates testimony.

THE WITNESS: So I think it's

Page 489

not as simple as that, because the features of the platform are related to the time spent. So that's where I think that the difference is. So, yeah, the time is completely -- but there's -- there's no reason to expect in this hypothetical that the time spent would be equal, I guess is my objection to the question.

BY MR. DONOHUE:

Q.    So I understand that, and I just -- I just want to be clear. You're -- if the time spent is equal, which you object to, it is not your opinion that watching on Netflix or Hulu, the same interviews, is going to be more harmful or less harmful than watching them on YouTube?

MS. McNABB: Objection. Asked and answered.

THE WITNESS: So I think you're changing -- I think you're moving the goalpost a little bit because that's not the type of thing that Netflix has. I mean, they have movies and documentaries. It's a longer form.

123 (Pages 486 - 489)

CONFIDENTIAL

Page 490

It's a different setup.

BY MR. DONOHUE:

Q.   Are there movies and documentaries on YouTube?

A.   Yes.  However, much of what people, especially teens, are watching are much shorter videos.

Q.   And so does your opinion depend on whether an individual is watching the longer videos or the shorter videos?

A.   So I think that's a great question that we need to look into more empirically.  What we have so far suggests that longer form videos, so traditional television, for example, is not as strongly correlated with depression and low well-being as the shorter video formats.

Q.   So just to wrap up a bit.  Are there any opinions that you intend to offer in this case about YouTube that we have not discussed?

A.   I think we've discussed them.

Q.   Sitting here today, is there any additional research or review related to YouTube that you intend to do to inform your

Page 491

opinions at trial that you have not performed?

MS. McNABB:  Objection.  Calls for speculation.

THE WITNESS:  So I do think there's a possibility in the rebuttal reports that I may look into the more recent data on video watching as I mentioned earlier.

MR. DONOHUE:  Thank you. That's all I have.

THE WITNESS:  All right.

MS. McNABB:  We'll take a break.  We can go off the record.

THE VIDEOGRAPHER:  Going off the record at 7:26 p.m.

(Recess.)

THE VIDEOGRAPHER:  Back on the record at 7:33 p.m.

THE WITNESS:  Okay.  So I just need to clarify the rebuttal report that I've been discussing that is for the federal action.

FURTHER EXAMINATION

BY MS. LEHMAN:

Q.   Okay.  So does that mean that you

Page 492

are not working on a rebuttal report for this lawsuit?

A.   No.  Although, I did incorporate some rebuttal to defendant experts' reports within the May or June version.

Q.   Okay.  And so then let me ask this:  We -- we've talked about how the May and June reports are essentially identical --

A.   Yes.

Q.   -- with very few changes.

Do the May and June reports fully reflect your rebuttal opinions to the defense experts?

A.   Only -- only partially not -- not completely.

Q.   Okay.  And is it correct that you had outlined for me already, the last time we were talking, the extent to which you have already developed rebuttal opinions to the defense experts:  Dr. Gottlieb, Hampton, and Baiocchi?

A.   But I may still develop those as I write the rebuttal for the federal case.

Q.   Okay.  And so let me -- let me make sure that I understand.

Page 493

Is it correct that as you write the rebuttal report for the federal case, you may develop additional opinions related to rebutting the expert opinions of Drs. Gottlieb, Hampton, and Baiocchi?

A.   As I dig into those, perhaps.

Q.   Okay.  But as you sit here today, you have not developed them; is that correct?

A.   Not fully.  I mean, I've thought about a few things, but I have not fully developed them, no.

Q.   Okay.  And the few things that you have thought about, are those the things that you told me about earlier?

A.   Yes.

Q.   Okay.  Did you have any rebuttal opinions regarding Drs. Gottlieb, Hampton, or Baiocchi that you have not already told me about?

A.   I don't believe so.  And I did mention to the other attorney about, you know, looking at videos.  That is something else that I -- I plan to look into more in the federal action.

Q.   Okay.  And when you say that you

Golkow Technologies,
A Veritext Division
877-370-3377                                                                    www.veritext.com

CONFIDENTIAL

Page 494

plan to look at videos, is there something in particular that you plan to look at?

A.    I want to try to find if there is more recent data in the large datasets.

Q.    Okay.  You also -- in -- in talking about the data on -- I think you used the term longer-form videos?

A.    Yes.

Q.    And is that -- is that a defined term, "longer-form videos"?

A.    I mean, I think -- I think that it's usually used to refer to TV and streaming like Netflix and Hulu as opposed to shorter-form like TikTok and YouTube.  That's my understanding of that definition.

Q.    Okay.  And have you specifically done any research prior to coming here today looking into the impact of length of video on the health effects of those videos?

A.    So TV versus, say, social media, yes.  Some of the datasets dis- -- have distinguished between those two in -- in the past.  In older data, they have looked at those two things separately.  So I've been able to look at that.

Page 495

Q.    Okay.  And do you have an opinion as to whether there is a difference in the health impacts of videos based on the length of videos if those videos are all on social media?

MS. McNABB:  Objection.  Vague.

THE WITNESS:  I don't think I can answer that the way you asked it based on the datasets, because the way they asked it, for example, in Monitoring the Future, they asked about watching TV -- and this is in the older data -- versus social media.  So it's both the platform and the length is different, and that was also back when social media didn't have as many videos on it, so it was -- there was a more clear distinction in that older data.

BY MS. LEHMAN:

Q.    Okay.  And so just -- just so I'm clear, you haven't seen any data comparing the impacts of length of video if all of the video evaluated is on social media?

A.    No, I have not seen that.

Q.    Okay.  Is it correct that you do

Page 496

not intend to offer any rebuttal opinions in the California State Court case beyond those that are in the May and June report that we have already discussed today?

MS. McNABB:  Objection.  Asked and answered.

THE WITNESS:  I believe that's correct.

BY MS. LEHMAN:

Q.    All right.  Let me ask you this: If every time a user posted on social media it was blank, so the video, it was blank, a text-type post, it was blank, would that social media platform cause the negative health impacts that you've talked about today?

MS. McNABB:  Objection.  Calls for speculation.  Vague.

THE WITNESS:  That's a strange hypothetical, so it's very difficult to answer.

I can't see why teens would want to stare at a blank page.  But if they did and the features of the platform still kept them on for the same amount of time, then yes.

Page 497

BY MS. LEHMAN:

Q.    But you can't imagine that that would be the circumstance, correct?

MS. McNABB:  Objection.  Asked and answered.

THE WITNESS:  I mean, it's very speculative.

Who knows?  I mean, it would -- it would be difficult to imagine that people would stare at a blank page. But if that strange hypothetical did happen, and they were still spending that same excessive amount of time, then it could have some impacts.

BY MS. LEHMAN:

Q.    Okay.  Have you ever read any book or article explaining general algorithmic design?

A.    Specifically on that topic --

Q.    Yes.

A.    -- No.  I have read parts of Adam Alter's "Irresistible," which has some discussion of that, but it's not exactly on that.

Q.    Okay.  And what -- what -- what

125 (Pages 494 - 497)

CONFIDENTIAL

Page 498

is the focus of that book, "Irresistible"?

A. It is about addictive design and how that interacts with attention span and mental health and digital media use.

Q. And is that a book for the general population, or is that an academic book?

A. That's for the general population.

Q. Have you read any other books that talk about algorithm design other than "Irresistible"?

A. No.

Q. When you give presentations or speak at podcasts, are those presentations publicized by the host?

A. Well, they are doing the publicizing so I don't know. I would assume so, but I don't have direct knowledge of that.

Q. Okay. So are -- are there occasions when, let's say, for example, you go and speak on a podcast, and your appearance on that podcast is publicized on social media?

A. Yes. That's happened.

Q. Okay. Have you ever asked when

Page 499

you're going onto a podcast, Hey, please don't publicize my appearance on social media?

A. I don't think I've said that, no.

Q. Okay. Are there occasions when you go on a podcast and part of that podcast is posted on social media?

A. Yes, that's happened.

Q. Have you ever asked, Hey, please don't post my part of the podcast on social media?

A. So I have not said that for podcasts. I have said that for presentations. But you're asking about podcasts, and I don't believe that's happened with podcasts.

Q. Okay. Have you ever asked, after a part of a podcast that you were on, after that's posted on social media, have you ever asked that it be taken down?

A. No.

Q. Okay. You said that there has been at least one occasion where a presentation -- part of a presentation you gave was posted on social media, and you ask that it not be posted.

A. I regularly ask that my entire

Page 500

presentation is not posted online, and I will sometimes approve small clips. But it has happened more than once that a presentation has been posted without my permission and I have asked for it to be taken down.

Q. Okay. So let -- let me unpack that. When you say that there has -- you asked that your entire presentation not be posted?

A. Yes.

Q. Does that mean that you have asked, please don't post any part of my presentation, or have you asked, please do not post my presentation in its entirety?

A. Both have happened.

Q. Okay. But which have you asked them not to do in advance?

A. The whole presentation.

Q. Okay. Don't ask -- don't post it in its --

A. Don't post the --

Q. -- entirety?

A. Yes, correct.

Q. Okay. Have you -- have you ever asked in advance, Hey, please don't post any part of my presentation on social media?

Page 501

A. Yes.

Q. Okay. Why did you ask that?

A. It varies. Sometimes it's because what I'm showing is unpublished. Maybe I'm showing an audience that for the first time, and I may want to publish that data before it is publicly available online. So that's one example.

Q. Okay. But you're not asking that because you have a broad opposition to the mere idea that part of your presentation could be posted on social media, correct?

A. I mean, I do have an objection to that. I don't want the presentation to be publicly available, especially in its entirety, and sometimes at all.

Q. All right. And why -- why do you not want your entire presentation to be available to the public in its entirety?

A. So there's issues around unpublished data; there's issues of intellectual property; there's issues of -- you know, and this is debated, but if it's all publicly available, why would anyone hire me to come speak? And then there's also the

126 (Pages 498 - 501)

CONFIDENTIAL

Page 502

question which I have experienced of, am I going to get comments on this YouTube video about my physical appearance?

Q.   Let me ask you this:  If a social media platform adds friction to playing videos, does that decrease usage?

A.   So that's not something that I'm an expert in.  I would imagine so.  However, that is not what I was charged to do.

Q.   Okay.  If a social media platform institutes a notification to users about how long they have been on the platform, does that decrease usage?

A.   So I did not examine that for my report.  I believe in the time I have done this research, I believe I have seen data suggesting that that does not work.

Q.   Okay.  But that's not -- that's not an opinion that you've per- --

A.   That is not something that is included in my report or that I was charged to look at.  But I think I have read something about that at some point.

Q.   Okay.  When social media platforms give their users a reminder to take a

Page 503

break or to stop using the platform for a time period, does that decrease usage?

A.   So what I have read on that is that it does not.

Q.   Okay.  Have you developed an expert opinion on that topic?

MS. McNABB:  Counsel, you're out of time.

THE VIDEOGRAPHER:  Yes, you are.

MS. LEHMAN:  Is that correct?

THE VIDEOGRAPHER:  Yes.

MS. LEHMAN:  Okay.

BY MS. LEHMAN:

Q.   Just please answer this question and then --

A.   Okay.  Looking into that was not part of my report.

MS. LEHMAN:  Okay.  Thank you, ma'am.  I understand we're out of time so your coun- -- your -- your attorney may have additional questions.

MS. McNABB:  I have no questions at this time.

MS. LEHMAN:  Okay.  All right.

Page 504

Then that means we're done for today.

THE VIDEOGRAPHER:  This concludes today's videotaped deposition.  The total time on the record is 8 hours, 31 minutes.  We're going off the record at 7:46 p.m.

(Whereupon, the deposition of JEAN M. TWENGE, Ph.D. was concluded at 7:46 p.m.)

Page 505

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

The undersigned Certified Shorthand Reporter does hereby certify:

That the foregoing proceeding was taken before me at the place and time therein set forth, at which time the witness was duly sworn; That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of my shorthand notes thereof; That the dismantling of the original transcript will void the reporter's certificate.

In witness thereof, I have subscribed my name this date:  June 28, 2025.

_____

LESLIE A. TODD, CSR, RPR
Certificate No. 5129

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

CONFIDENTIAL

Page 506

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition. It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 508

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____

JEAN M. TWENGE, Ph.D.          DATE

Subscribed and sworn to before me this _____day of_____,20___.

My commission expires:_____

_____

Notary Public

Page 507

- - - - - -

E R R A T A

- - - - - -

PAGE LINE CHANGE

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

128 (Pages 506 - 508)