# Exhibit 18

# PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE GENERAL CAUSATION TESTIMONY OF PLAINTIFFS' EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

HIGHLY CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT    MDL No. 3047
ADDICTION/PERSONAL INJURY         Case No. 4:22-md-
PRODUCTS LIABILITY LITIGATION     -03047-YGR
This Document Relates to:
ALL ACTIONS

_____

VIDEOTAPED DEPOSITION OF

ANNA LEMBKE, M.D.

HIGHLY CONFIDENTIAL

WEDNESDAY, AUGUST 27, 2025

SAN FRANCISCO, CALIFORNIA

Reported By:
KATHLEEN A. MALTBIE, STENOGRAPHIC REPORTER
California CSR 10068, Nevada CCR 995, Texas CSR
12212, RPR-RMR-CRR-CCRR-CLR-CRC-RDR

HIGHLY CONFIDENTIAL

Page 2

VIDEOTAPED DEPOSITION OF ANNA LEMBKE, M.D.

BE IT REMEMBERED that on Wednesday, August 27, 2025, commencing at the hour of 8:36 a.m. thereof, before me, Kathleen A. Maltbie, RPR-RMR-CRR-CCRR-CLR-CRC-RDR, a Certified Stenographic Shorthand Reporter, in and for the State of California, Nevada and Texas, personally appeared ANNA LEMBKE, M.D., a witness in the above-entitled court and cause, who, being by me first duly sworn, was thereupon examined as a witness in said action.

Page 3

APPEARANCES OF COUNSEL

FOR THE PLAINTIFFS:

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York 10013-1413
BY: KELLY MCNABB, ESQ.
Telephone: (212) 355-9500
Email: Kmcnabb@lchb.com

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
BY: CAITLIN M. WOODS, ESQ.
MATIAS BUSTAMANTE, ESQ.
LEXI J. HAZAM, ESQ. (Zoom)
DONALD C. ARBITBLIT, ESQ. (Zoom)
Telephone: (415) 956-1000
Email: cwoods@lchb.com
Mbustamante@lchb.com
Lhazam@lchb.com
darbitblit@lchb.com

MOTLEY RICE LLC
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina 29464
BY: ANN K. RITTER, ESQ.
JODI FLOWERS, ESQ. (Zoom)
Telephone: (843) 216-9166
Email: Aritter@motleyrice.com
jflowers@motleyrice.com

WAGSTAFF & CARTMELL
4740 Grand Avenue Suite 300
Kansas City, MO 64112
BY: THOMAS P. CARTMELL, ESQ. (Zoom)
Telephone: (816) 701-1102
Email: tcartmell@wcllp.com

GST LLP
Watergate Building
2600 Virginia Avenue N.W., #205
Washington, DC 20037
BY: BETHEL KASSA, ESQ. (Zoom)
Telephone: (202) 758-2057

Page 4

APPEARANCES OF COUNSEL (Continued)

FOR THE PLAINTIFFS (Continued):

MORGAN & MORGAN
350 5th Avenue, Suite 6705
New York, New York 10118-6705
BY: BETH ANN BILSBORROW, ESQ. (Zoom)

MORGAN & MORGAN
12300 Wilshire Boulevard, Suite 200
Los Angeles, California 90025
BY: KIMBERLY HORSLEY, ESQ. (Zoom)
Telephone: (877) 667-4265
Email: Khorsley@forthepeople.com

ON BEHALF OF THE STATE OF TENNESSEE OFFICE OF THE ATTORNEY GENERAL & REPORTER:

TENNESSEE ATTORNEY GENERAL'S OFFICE
P.O. Box 20207
Nashville, Tennessee 37202-0207
BY: ELIZABETH SPICA, ESQ.
Telephone: (615) 741-3491
Email: Elizabeth.spica@ag.tn.gov

ON BEHALF OF THE STATE OF ARKANSAS PLAINTIFFS:

ROBBINS GELLER RUDMAN & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, California 94104
By: AELISH MARIE BAIG, ESQ.
ALEX N. JILIZIAN, ESQ. (Zoom)
Telephone: (415) 288-4545
Email: aelishb@rgrdlaw.com

ON BEHALF OF THE COMMONWEALTH OF MASSACHUSETTS ATTORNEY GENERAL'S OFFICE:

COMMONWEALTH OF MASSACHUSETTS OFFICE OF THE ATTORNEY GENERAL:
One Ashburton Place
Boston, Massachusetts 02108
BY: CHRISTINA CHAN, ESQ.
Telephone: (617) 963-2912
Email: Christina.chan@mass.gov

Page 5

APPEARANCES OF COUNSEL (Continued)

ON BEHALF OF THE STATE OF NEW MEXICO:

MOTLEY RICE LLC
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina 29464
BY: ANN K. RITTER, ESQ.
Telephone: (843) 216-9166
Email: Aritter@motleyrice.com

ON BEHALF OF THE DEFENDANTS, META PLATFORMS, INC. F/K/A FACEBOOK, INC.; INSTAGRAM, LLC; FACEBOOK PAYMENTS, INC.,; FACEBOOK OPERATIONS, LLC; AND SICULUS, INC.:

COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
BY: MEGAN L. RODGERS, ESQ.
Telephone: (650) 632-4734
Email: Mrodgers@cov.com

COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
BY: MARCELA INTERIANO, ESQ.
Telephone: (424) 332-4800
Email: Einteriano@cov.com

ON BEHALF OF THE DEFENDANT, GOOGLE LLC AND YOUTUBE LLC:

MORGAN LEWIS
One Oxford Centre, 32nd Floor
Pittsburgh, Pennsylvania 15219-6401
BY: KATHERINE A. VAKY, ESQ.
Telephone: (412) 560-7474
Email: Katherine.vaky@morganlewis.com

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 6

APPEARANCES OF COUNSEL (Continued)

ON BEHALF OF THE DEFENDANTS, TIKTOK INC.:

KING & SPALDING LLP
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4700
Miami, Florida 33131
1180 Peachtree Street, NE
Suite 1600
Atlanta, Georgia 30309
By: KATHRYN S. LEHMAN, ESQ.
Telephone: Miami: (305) 462-6020
Atlanta: (404) 572-2716
Email: Klehman@kslaw.com

ON BEHALF OF THE DEFENDANT, SNAP, INC.:

(Via Zoom videoconference)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, DC 20001
BY: LYNDSEY FRANKLIN, ESQ.
Telephone: (202) 220-1109
Lyndsey.franklin@mto.com

ALSO PRESENT:

James Von Wiegan, Videographer
Trop Sanchez, Exhibit tech

Page 7

INDEX

INDEX OF EXAMINATIONS

| | PAGE |
|---|---|
| Morning Session | 12 |
| Examination By Ms. Vaky | 13 |
| Examination By Ms. Rodgers | 197 |
| Examination By Ms. Vaky | 301 |
| Examination By Ms. Franklin | 335 |

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Document entitled, "Video-recorded Deposition of Anna Lembke, M.D., Wednesday, June 18, 2025" (Not Bates stamped) | 12 |
| Exhibit 2 | Document entitled, "ERRATA SHEET, Cristina Arlington Smith, ct al., v. TikTok, Inc., ct al., Case No. 22STCV21355, Deponent: Anna Lembke, Deposition date: June 18, 2025" (Not Bates stamped) | 12 |
| Exhibit 3 | Document entitled, "EXPERT REPORT, ANNA LEMBKE, M.D., May 16,2025, RELATING TO: SOCIAL MEDIA LITIGATION" (Not Bates stamped) | 12 |
| Exhibit 4 | Document entitled, "EXPERT REBUTTAL REPORT, ANNA LEMBKE, M.D., July 30, 2025, RELATING TO: SOCIAL MEDIA LITIGATION" (Not Bates stamped) | 12 |

Page 8

INDEX OF EXHIBITS (Continued)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 5 | Document entitled, "PLAINTIFFS' RESPONSE AND OBJECTIONS TO DEFENDANTS' JOINT NOTICE OF DEPOSITION OF PLAINTIFFS' RETAINED EXPERT ANNA LEMBKE, M.D." (Not Bates stamped) | 12 |
| Exhibit 6 | Video | 114 |
| Exhibit 7 | Article entitled, "The future of addiction" (Not Bates stamped) | 121 |
| Exhibit 8 | Document entitled, "Expert Report of Anna Lembke, M.D., June 6, 2025" (Not Bates stamped) | 197 |
| Exhibit 9 | Document entitled, "EXPERT REBUTTAL REPORT, ANNA LEMBKE, M.D., August 20, 2025," (Not Bates stamped) | 197 |
| Exhibit 10 | Document entitled, "RESPONSES AND OBJECTIONS TO THE NOTICE OF DEPOSITION OF STATE'S RETAINED EXPERT DR. ANNA LEMBKE AND REQUEST FOR PRODUCTION OF DOCUMENTS" (Not Bates stamped) | 197 |

Page 9

INDEX OF EXHIBITS (Continued)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 11 | Document entitled, "EXPERT REPORT, ANNA LEMBKE, M.D., July 11,2025, RELATING TO: State of New Mexico Ex Rel, Raul Torrezy Attorney General v. Meta Platforms, Inc.; Instagram, LLC; Meta Payments, Inc.; and Meta Platforms Technologies, LLC" (Not Bates stamped) | 204 |
| Exhibit 12 | PowerPoint presentation entitled, "Problematic Use On-Platform Measurement Concentration survey results for IG, Dec 2022-Jan 2023, ███ and ███████, X-Meta Well-being" (Not Bates stamped) | 258 |
| Exhibit 13 | Document entitled, "Developmental changes in brain function linked with addiction-like social media use two years later" (Not Bates stamped) | 273 |
| Exhibit 14 | Document entitled, "Reduced striatal dopamine D2 receptors in people with Internet addiction, Sang Hee Kim, Sang-Hyun Baik, Chang Soo Park'd, Su Jin Kim, Sung Won Choi, and Sang Eun Kim" (Not Bates stamped) | 276 |

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL

Page 10

INDEX OF EXHIBITS (Continued)
EXHIBIT          DESCRIPTION                    PAGE
Exhibit 15    Article entitled, "The          279
              Power of the Like in
              Adolescence: Effects of
              Peer Influence on Neural
              and Behavioral Responses
              to Social Media" (Not
              Bates stamped)
Exhibit 16    Document produced in            317
              native format, Bates
              stamped
              GOOG-3047MDL-00284728

Exhibit 17    Document produced in            318
              native format, Bates
              stamped
              GOOG-3047MDL-00874191
Exhibit 18    Document entitled,              338
              "Combating Fear of
              Missing Out (FoMO) on
              Social Media: The FoMO-R
              Method" (Not Bates
              stamped)

Exhibit 19    Document entitled,              342
              "Snapchat streaks—How are
              these forms of gamified
              interactions associated
              with problematic
              smartphone use and fear
              of missing out among
              early adolescents" (Not
              Bates stamped)

Exhibit 20    Document Bates stamped          356
              SNAP5486213 through
              SNAP5486215

Page 11

INDEX OF EXHIBITS (Continued)
EXHIBIT          DESCRIPTION                    PAGE
Exhibit 21    Article entitled,               370
              "Viewing personalized
              video clips recommended
              by TikTok activates
              default mode network and
              ventral tegmental area"
              (Not Bates stamped)
Exhibit 22    Article entitled, "The          376
              impact of beauty and
              self-compassion TikTok
              videos on young women's
              appearance, shame and
              anxiety, self-compassion,
              mood and comparison
              processes" (Not Bates
              stamped)
Exhibit 23    Document entitled,              382
              "TikTok use and body
              dissatisfaction:
              Examining direct,
              indirect, and moderated
              relations" (Not Bates
              stamped)

Page 12

AUGUST 27, 2025          8:36 A.M. PACIFIC TIME
               P R O C E E D I N G S

               MORNING SESSION
          (Whereupon, Deposition Exhibit 1,
          Exhibit 2, Exhibit 3, Exhibit 4 and
          Exhibit 5 were marked for
          identification.)
          THE VIDEOGRAPHER:  We're now on the
record.  My name is James Von Wiegen, the
videographer for Golkow.  Today's date is
August 27th, 2025, and the time is 8:36 a.m.  The
video deposition is being held in San Francisco,
California, in the matter of Social Media
Adolescents Addiction Personal Injury Products
Liability Litigation versus TikTok, for the United
States District Court, Northern District of
California.
          The deponent is Anna Lembke.
          Counsel will be noted on the stenographic
record.  The court reporter is Kathleen Maltbie and
will now swear in the witness.
          THE REPORTER:  Good morning.  My name is
Kathleen Maltbie.  Today's date is August 27, 2025.
My court reporter license number is 10068.

Page 13

          Would you raise your right hand, please?

               ANNA LEMBKE, M.D.,
               having been duly sworn,
          was examined and testified as follows:
               EXAMINATION BY MS. VAKY
BY MS. VAKY:
     Q.  Dr. Lembke, my name is Catherine Vaky.  I
represent YouTube and Google in the MDL litigation.
          Before we begin, I understand a few other
counsel would like to make statements.
          MS. CHANG:  Thank you.
          The Commonwealth of Massachusetts states
for the record that we've timely served prior to
today's deposition an opening report and rebuttal
report from Dr. Lembke in our litigation
Commonwealth V. Meta, Mass. Superior Court, Civil
Action Number 2384CV02397 that is substantively
identical as that served by the MDL plaintiffs, and
thus for purposes of coordination and efficiency,
issued across notice into today's deposition,
further because defendants have already deposed
Dr. Lembke for 8.5 hours in the JCCP in addition to
the eight hours slated for today's deposition on
substantially similar opinions, the Commonwealth

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

Page 14

opposes any efforts to further depose Dr. Lembke in the Massachusetts litigation, but are happy to meet and confer on that issue at the appropriate time if or when it becomes ripe.

MS. RODGERS:  Thank you.  This is Megan Rodgers for Meta.  Meta notes that counsel for the Arkansas Attorney General and Massachusetts Attorney General are in attendance at today's deposition, and this deposition is not coordinated with either of those two cases, per Judge Kang's order.  We'll permit, of course, counsel for the Arkansas AG and Massachusetts AG to attend today's deposition, but we'll be asking no questions about those states.

And our position, consistent with the Court's order, is that the depositions in the Arkansas AG and Massachusetts AG cases are to be taken separately, and we're happy to meet and confer on that later as well.  Thank you.

MS. BAIG:  Arkansas has sued in state court and is not subject to federal MDL jurisdiction.  As per the agreement with Meta's counsel on July 23rd, 2025, Arkansas is attending this deposition and has timely served the report of Anna Lembke on defendants in the Arkansas case.  We

Page 15

would oppose further time for the deposition of Anna Lembke, but we will meet and confer with defendants at the appropriate time.

BY MS. VAKY:

Q.  We're back.

Dr. Lembke, could you please introduce yourself for the record?

A.  My name is Anna Lembke.

Q.  And you have just taken an oath that requires you to tell the truth.

Do you understand that?

A.  Yes, I do.

Q.  And do you understand that the oath you just took is just as binding as it would be as if you were sitting in front of a jury?

A.  Yes, I do.

Q.  If I ever ask you a question that you don't understand, will you let me know so I can rephrase it?

A.  Yes, I will.

Q.  If you answer a question, I'm going to assume that you both heard and understand it, okay?

A.  Yes.

Q.  This is a routine question I have to ask.

Are you taking any medications or drugs of

Page 16

any kind or alcohol that might make it difficult for you to understand and answer my questions today?

A.  No.

Q.  Is there any reason why you cannot give full, complete, accurate testimony today?

A.  No.

Q.  Did you bring any materials with you today?

A.  No.

Q.  You understand your deposition today is being taken in the federal MDL social media litigation, correct?

MS. MCNABB:  Objection.  Form.

THE WITNESS:  Sorry, what was that?

MS. MCNABB:  I just objected to form.

THE WITNESS:  Okay.

I'm sorry, can you restate the question?

BY MS. VAKY:

Q.  You understand your deposition today, at least for my questions, are for the federal Meta social media litigation?

A.  Yes, I do.

Q.  And you were deposed in June with respect to your opinions in the JCCP or California State Court social media litigation, right?

Page 17

A.  That's correct.

Q.  You have in front of you what's been marked as Exhibit 1.

This is a transcript of your June 25th JCCP deposition, correct?

A.  Yes.

Q.  And you had an opportunity to review your testimony and make any corrections, right?

A.  Yes.

Q.  Which you did by submitting an errata to that transcript, correct?

A.  That is correct.

Q.  There should be a copy of that errata as Exhibit 2 in front of you.

Do you see that?

A.  Yes, I do.

MS. VAKY:  Counsel, did that make it over to you as well?  It's a skinny little folder.

BY MS. VAKY:

Q.  Sitting here today, are there any additional corrections you would like to make to your JCCP deposition testimony?

A.  No.

Q.  You submitted two reports in the MDL, correct?

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

A. Yes.

Q. The first was an opening report dated May 16, 2025, which should be marked in front of you as Exhibit 3; is that right?

A. Yes.

Q. The second is a rebuttal report that's dated July 30, 2025, which should be marked in front of you as Exhibit 4.

Do you see that?

A. Yes, I do.

Q. Last one on August 22nd, your counsel made a production that contained responses and objections to your notice of deposition, an updated CV, updated materials considered and invoices.

Were you aware of that?

A. Yes.

Q. A copy of those documents have been marked as Exhibit 5 in front of you.

Can you confirm that is what Exhibit 5 is for me, please?

A. Yes, I can confirm that.

Q. You testified in June, quote (as read):

I have not looked at any documents related to any individual plaintiffs. I have not looked at

Page 19

their personal histories or diagnoses or medical documentation. I have not evaluated those documents.

Do you recall that testimony?

A. Yes, I do.

Q. Is that still an accurate statement today for both JCCP and MDL plaintiffs?

A. Yes, it is.

Q. Have you learned any facts about the specific plaintiffs in the MDL or JCCP through any other means?

A. No.

Q. Are you familiar with the field of forensic psychiatry?

A. Yes.

Q. Are you an expert in forensic psychiatry?

A. I have expertise in litigation based on experience. I have not done a forensic psychiatry fellowship.

Q. Have you ever assessed an individual for the purposes of providing an opinion in a legal proceeding?

A. Yes.

Q. Do you have any specific training in

Page 20

forensic psychiatry?

A. I have on-the-ground training. As I said, I haven't done a forensic psychiatry fellowship, but I have experiential training and experience doing forensic-type evaluations.

Q. Have you ever conducted a medical exam as part of an assessment for purposes of litigation?

A. Yes.

Q. What litigation was that assessment done for?

If it helps, your last exhibit of your opening report contains a list of prior testimony.

A. I was involved in a case where I did a forensic evaluation of a patient and provided a report, but I am not recalling that there was any official testimony, which is why I believe it's not on this list.

Q. Was the patient for whom you conducted a forensic evaluation under 18 at the time of that evaluation?

A. No.

Q. Was the evaluation related to addiction?

A. Yes, it was.

Q. Are you able to share what kind of addiction was at issue in that proceeding?

Page 21

A. Poly substance addiction.

Q. Poly substance meaning more than one substance addiction?

A. Yes.

Q. What were those substances?

A. Opioids, alcohol, nicotine. There may have been others. I'm not recalling them now.

Q. Do you recall any behavioral addictions at issue in that situation?

A. No.

Q. Did you audio record your mental examination?

A. No.

Q. We're going to start with Appendix B of your rebuttal report, which is Exhibit 4, and that has the pagination beginning with B, and I'd like to start at B22, please.

Real quickly, just to go back to the mental examination, were you retained by counsel as part of your role in that mental examination?

A. What do you mean, "retained by counsel"?

Q. Did you perform the examination in a capacity as an expert -- a retained expert in a matter?

A. Yes, I was a retained expert.

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

Page 22

Q. Were you retained by the individual you were examining?

A. I was retained by the lawyer who was representing that individual.

Q. And that's the only mental examination that you've done; is that right, for purposes of litigation?

A. I have done other mental examinations for purposes of court proceedings or other legal matters. So I guess I would need you to clarify what you mean by "litigation."

Q. Have there been other times when you have been retained for the purposes of examining a party to a lawsuit?

A. Not that I'm recalling right now.

Q. So back to Exhibit B of your rebuttal report, here, under the caption "expert reports," you list the expert reports by the following defense experts.

I see Galvan; is that right?

A. Yes.

Q. Auerbach?

A. Yes.

Q. Kishida?

A. Yes.

Page 23

Q. Tucker?

A. Yes.

Q. Gotlib, number 321?

A. Yes.

Q. Platt?

A. Yes.

Q. Allen?

A. Yes.

Q. And Pfeifer?

A. Yes.

Q. Did I miss any defense expert names on this list?

A. I don't believe so.

Q. Was this list of defense expert reports complete as of the date of your rebuttal report?

A. Yes.

Q. Besides counsel, was any other individual involved in the preparation of your rebuttal report?

A. No.

Q. Besides counsel, was any other individual involved in the preparation of your opening MDL report?

A. No.

Q. Besides counsel, no one else saw any drafts of your MDL reports, right?

Page 24

A. That's correct.

Q. Let's talk briefly about your CVs. In your opening MDL report, you have an entry listed for a publication by Douglas Harris, et al., entitled The State of the Nation, 2025 report from Tulane University.

Are you familiar with that publication?

A. Yes.

Q. That entry was removed from your rebuttal CV.

Were you aware of that?

A. No.

Q. Was that an inadvertent omission, if it's not on your rebuttal CV?

A. I believe so, yes.

Q. In your June deposition, you had testified that you were involved in the beginning stages of a study in your recovery clinic, but it's just getting underway, and you were still getting IRB approval.

Do you remember that testimony?

A. Yes.

Q. Have there been any status changes in that study?

A. No.

Q. Have you ever had an appointment at

Page 25

Stanford terminated or discontinued because you were not able to devote the amount of time to the appointment that was expected of you?

A. No.

Q. Do you know whether Stanford imposes any specific time limits on outside consulting work, such as work you were performing for the plaintiffs in the social media litigation?

A. I'm recalling there are some limits. I don't remember if it's time-based. There are limits, mainly the limit is that the consulting work not interfere with our responsibilities at Stanford.

Q. Sitting here today, you don't know if there are any concrete time restrictions that exist?

A. Not that I recall.

Q. Is it possible then that you're in violation of those restrictions?

MS. MCNABB: Objection. Foundation.

BY MS. VAKY:

Q. It could be, right?

A. No. Because when I fill out the various forms, I attest to what I'm doing, and I wouldn't do anything that was in violation of those restrictions. I'm just simply, right now, not recalling what those restrictions are.

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

Q.  Do you have to get approval from anyone at Stanford for taking on the role of an expert in a litigation?

A.  No.

Q.  You did fill out forms with Stanford in conjunction with your engagement here; is that right?

A.  I fill out forms annually, attesting to any consulting work outside of my Stanford role. And I fill out the questions truthfully that they pose, and then they have a committee that reviews that.  I've never had anybody come back to me and say that they were concerned.

Q.  Those forms being forms by Stanford?

A.  Those are Stanford online forms, yes.

Q.  They have a committee being a Stanford committee?

A.  I'm not exactly sure what their process is.  These are conflict of interest attestation forms.

Q.  I'm trying to get the pronouns.
When you say "they," "they" being Stanford?

A.  "They" being Stanford, that's right.

Q.  Did you sign an engagement letter with

Page 27

plaintiffs' counsel when you were retained as an expert in the social media litigation?

A.  Yes.

Q.  Have you shared that engagement letter with anyone at Stanford?

A.  No.  I don't believe so.

Q.  Are you familiar with the term "human factors"?

A.  I mean, I -- I know what human means, and I know what factors mean.  I'm not sure I specifically know what that term refers to.

Q.  So I'll give you a definition for the next few questions.  (As read):

An applied field focused on understanding human abilities, limitations and behaviors to design systems and products that are safer, more intuitive and more effective for users.

That's how I'm defining human factors for my next questions.
Got it?

A.  Can you say that again?

Q.  Yes.
(As read):

Page 28

An applied field focused on understanding human abilities, limitations, and behaviors to design systems and products that are safer, more intuitive and more effective for users.
Let me know when you're ready for the next question.

A.  It was safer, more intuitive and more effective.

Q.  More effective for users.

A.  Okay.

Q.  Essentially it's a term of art that refers to an applied field of study.
Do you have any formal training in human factors?

A.  I mean, I have lots of formal training in human behavior, and I have expertise in commercially driven epidemics specifically related to product safety.  So I have training and expertise in that general area.

Q.  Do you consider yourself an expert in the applied field of human factors?

A.  I guess I would want to know a little bit more about what kinds of training there is for

Page 29

people who have expertise in that area, and then I would be better able to tell you whether I've had that kind of training.

Q.  Have you ever been retained by an individual or company to consult on how to make that individual or company's product safer?

A.  I have not been retained by companies to do that, but I have been retained as a consultant in opioid litigation and by many, many medically affiliated bodies and groups around opioid safety, prescription opioid safety and safe opioid prescribing.

Q.  When you've been retained as a consultant in the opioid litigation, all of those retentions have been by plaintiffs who were suing the product, makers or downstream industry of that product, correct?

A.  That's my paid experience.  I have loads of unpaid experience helping build better, safer delivery mechanisms in the healthcare system for safe prescribing of controlled substances.

Q.  Let's put prescriptions to the side.
Any other experience, retention by an individual company to consult on how to make a consumer product safer?

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL

Page 30

A. I volunteer a lot of my time to helping people think about how to make medically related products safer, going beyond the actual pharmaceutical itself. For example, I've had companies I've worked with free to help advise them on things like how to make a prescription bottle that is -- works as a kind of delivery mechanism to help people take their medications as prescribed.

And that's just one of many examples.

I've consulted, again, gratis -- I don't typically ask to be paid for this work -- with lots of start-ups in Silicon Valley who are trying to figure out how to help people manage and moderate their consumption of social media and other digital media because some people are struggling with social media addiction and other forms of compulsive overconsumption of digital media. So I've done a lot of that kind of consulting work.

Q. Let's take those in pieces.

Focusing on products, absent the pharmaceutical and medical product sphere, any other products that you have been financially compensated for to advise how to make the product safer or more effective?

A. Not that I've been financially compensated

Page 31

for, although I've been offered repeatedly to be compensated for that work, to sit on advisory committees, et cetera. But I chose not to do that because I want to avoid a conflict of interest.

But I've done lots of consulting and advising for all kinds of companies who are trying to create products to help people detach from compulsive overuse of digital media, including social media.

Q. Okay. Let's move into the uncompensated sphere of your consulting work.

Can you tell me about a specific product that you've consulted for gratis in which you were consulting on how to make the product more safer or more effective?

A. I can, but I'd have to go back and look at my records. I probably get one or two emails a week of people asking me to advise them on how to make safer products. Actually, I can -- one that I got recently -- there's a long list. I'm going to give you one example.

For example, I have given free consulting to a company called Yondr, which makes a pouch for school-aged kids to put their phones in so that their phone doesn't transmit or receive during

Page 32

school hours as a way to combat problematic social media use and other digital media use during school hours so kids are free to learn. And I have consulted for other similar companies making products to try to help kids not be addicted to social media during schooltime hours. I do a lot of that kind of work as a public service.

Q. If I wanted to get a list of all of the companies with which you had actually consulted, not just that solicited your consultation, but that you went ahead and consulted, is there anywhere I could go to get that list?

A. I've never created a formal list. I'd really have to go back into my email and sort of generate that de novo.

Q. Have you ever consulted with any of the defendants in this litigation?

A. No. I have been at academic conventions where representatives from defendants' companies have been present, and the order of business was social media addiction and talking about how we can possibly work together to combat that problem.

Q. I might follow up on that a little later.

Have you published any literature that addresses the impact of a product warning on

Page 33

consumer behavior? I'm using consumer behavior to exclude pharmaceutical products and medical products.

A. I'm sorry, can you repeat the question?

Q. Have you published any literature that address its impact of a product warning on consumer behavior?

A. Outside of medical products, I'm not recalling anything right now.

Q. Have you ever conducted a study that analyzes the effect of a warning on consumer behavior, again, excluding pharmaceutical work?

A. Not that I'm recalling right now.

Q. Have you ever analyzed the impact of a non-pharmaceutical product warning on human behavior in your professional capacity in any manner?

A. Can you repeat that question?

Q. Have you ever analyzed the impact of a non-pharmaceutical product warning on human behavior in your professional capacity?

A. Generally speaking, I recommend warning about the addictive nature of social media, and in a lot of my educational talks that I give to the public and to parents and to kids and to my own patients, I talk about the addictive nature. I have

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

Page 34

interviewed Vivek Murthy, the former Surgeon General, to highlight his writings on the need for warnings in social media litigation, how important those are.

So those are some examples of my work specifically in that area.

Q. Okay. I'm going to ask my question again.

Have you ever analyzed the impact of an existing non-pharmaceutical product warning on human behavior?

MS. MCNABB: Objection. Asked and answered.

THE WITNESS: I have specifically analyzed the impact of warnings on vaping in teens in conjunction with my clinical work, and also my colleague, Bonnie Halpern-Felsher, who created a smoking cessation toolkit, which I advised on.

BY MS. VAKY:

Q. You have not published on vaping warnings; is that right?

A. That's correct. Not to my recollection, anyway.

Q. In what way have you answered the impact of warnings on vaping and teens?

A. My colleague, Bonnie Halpern-Felsher, who

Page 35

is a Stanford faculty member, has done a lot of work in this area, and I have provided her with consultation on her smoking cessation toolkit. As the director of the Toby Youth Addiction Initiative at Stanford, I also evaluated her application to be a Toby scholar and was involved in the process of selecting her as a Toby scholar based on her work in this space.

Q. When you "provided her with consultation," what does that mean?

A. In this case, it meant that she sought out my expertise on her smoking cessation toolkit and asked me to provide a comment.

Q. I see you have notes in front of you.

Are those a way to see the words of the questions I'm asking you on paper?

A. Yes.

Q. I'll ask you to hold on to that. We might want to see that at the end of the deposition.

The word "warning" does not appear anywhere in your opening MDL report, correct?

MS. MCNABB: Objection. Foundation. Form.

THE WITNESS: I believe the word "warning" does appear in my MDL report. Certainly it's in the

Page 36

rebuttal report, and I do believe it appears in the section on TikTok in the MDL report.

BY MS. VAKY:

Q. There are no discussions of affirmative warnings with respect to any defendants in your opening report, right?

MS. MCNABB: Objection. Form.

THE WITNESS: In my opening report, I cite to Vivek Murthy's publication in which he says that social media should have a warning on its addictive nature. And I agree with that.

BY MS. VAKY:

Q. Are you able to identify what of Dr. Murthy's publications you're referring to?

A. Can I look at my report?

Q. Absolutely.

A. Yeah. Okay --

Q. Are you in your opening report?

A. Yes.

Q. Okay.

A. So under "materials considered," Exhibit B-9, Number 122, I mention Vivek Murthy's --

Q. Hold on. Hold on. B-9?

A. Yeah. B-9, Number 122, I list Murthy, V, Surgeon General, the New York Times opinion piece

Page 37

that he wrote called "Why I'm calling for a warning label on social media platforms."

Q. Are you able to identify any other citation on your materials considered list where you opine that defendants should warn adolescents or their parents about the addictive nature of their platforms?

A. On Exhibit B-10, Number 133, I list the Office of the Surgeon General, 2023. This was their -- the official statement put out by the Surgeon General. It was entitled "Social Media and Youth Mental Health, The U.S. Surgeon General's Advisory," and I believe that in that advisory, they also mention the need for warning labels on social media.

Q. It's your testimony today that the Surgeon General's 2023 Social Media and Youth Mental Health General Advisory discusses warnings?

A. I'm not specifically recalling if it's discussed in that general advisory or another general advisory, but I know -- I believe that there is a general advisory that was issued by the Surgeon General calling for warnings in addition to the New York Times opinion piece that I mention in my materials considered.

10 (Pages 34 - 37)

Page 38

Q. Are you able to point me to anything in the body of your opening MDL report where you opine that defendants should warn adolescents or their parents about the addictive nature of their platforms?

A. On page 78 of my report, I state that (as read):

The defendants never warned their youth consumers or their parents about the addictive potential of their products.

Q. Give me a moment to find where you are. What paragraph are you in?

A. This is paragraph Romanette v on page 78 of my report.

Q. What's the language you're quoting?

A. I'm just reading the second half because of some instruction that you gave me earlier, before we started the deposition, not to name specific defendants. But the gist of it applies to all the defendants. I can tell you that what I write here applies to all the defendants, that namely they never warned their youth consumers or their parents about the addictive potential of their products.

Q. I'm looking for the actual language where

Page 39

you --

A. At the end of Romanette v.

Q. On page 78?

A. Page 78, the actual language is, quote (as read):

Never warned their youth consumers or their parents about the addictive potential of their products, unquote.

Q. Can you identify where in your opening report you opine that defendants affirmatively should warn adolescents or their parents about the addictive nature of their platforms?

MS. MCNABB: Objection. Form. Asked and answered.

THE WITNESS: It's implying in this statement that they should have warned.

BY MS. VAKY:

Q. Other than what you've identified here, any other portion of your report that you'd like to identify in response to my question?

A. There is my rebuttal report, which I can refer to if you'd like.

Q. Let's stick with the opening report for now.

Page 40

A. I don't have anything to add to what I've already said.

Q. So let's go to your rebuttal report. Page 1. Opinion Number 4. The last sentence.

A. Sorry.

Q. That's fine.

A. Which exhibit number is this?

Q. Should be Exhibit 4.

A. Exhibit 4.

Q. Okay. Hopefully, you can probably put the JCCP deposition and the errata to the side. We're going to be dealing mostly with your report and your rebuttal report.

A. Those are which?

Q. 1, 2 and Exhibit 5, just to help keep your desk clean.

All right. So in your rebuttal report, page 1. Last sentence of paragraph numbered 4. Are you with me?

A. Yes.

Q. It reads (as read):

Given the known risks, Defendants should warn adolescents and their parents about the addictive nature of their platform.

Page 41

Did I read that correctly?

A. Yes.

Q. Let's go to page 11. Bolded paragraph number 4, last sentence, that's the exact same sentence that I just read from page 1, right?

A. Yes.

Q. Go to page 22. Romanette n (as read):

Given the known potential for harm of social media to youth, Defendants should warn youth consumers and their parents about the risks, which include but are not limited to addiction, depression and suicidal ideation.

Do you see that?

A. Yes.

Q. I didn't see anywhere else in your report where you discuss a concept of affirmative warnings by social media companies.

Did I read any other language besides the three sentences we just discussed?

A. I don't think so.

Q. Let's focus on the sentence on page 22. The first part (as read):

Given the known potential for

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 42

harm of social media to youth.

In that phrase, is the term "social media" referring only to the defendants' platform in this case or would that term include any other social media platform?

A. That term would include any social media platform that has the addictive design features that increase the access, quantity, potency, novelty and uncertainty that make the platform addictive.

Q. The last part of this sentence reads (as read):

Which include but are not limited to.

Then you provide an addiction, depression, and suicidal ideation, right?

A. Yes, that's what it says.

Q. Sitting here today, are you able to articulate a complete set of risks that you opine defendants should warn adolescents and their parents about with respect to harms to social media?

MS. MCNABB: Objection. Form.

THE WITNESS: I wouldn't want to truncate the potential list of harms. There can be many different types of harms from social media addiction and social media more broadly. I don't -- I

Page 43

wouldn't want to say that I could, sitting here today, just generate the complete list, although the list is longer than what I have written here.

BY MS. VAKY:

Q. In your mind, that list has not been solidified for purposes of your opinions; is that fair?

MS. MCNABB: Objection. Form.

THE WITNESS: Well, my report and the report of other experts in this case detail much more than what I've included here, and I agree with what they've included, and as you know, I've included other things in the body of my report.

What I'm saying is that I think it would be incorrect and presumptuous to think that I could say that that's it, that that's all there ever was.

BY MS. VAKY:

Q. You're not opining in your MDL rebuttal report as to how defendants should go about warning adolescents and their parents about such risks, correct?

A. I know there are other experts in this litigation who talk about how those warnings should be implemented and what they should say and what kinds of images and such should be on them. That's

Page 44

outside of the scope of what I'm opining on for this litigation.

Q. And you're not opining in your MDL rebuttal report as to where defendants should warn adolescents and their parents about such risks, correct?

A. As many places as possible is what I would say.

Q. That's not in your report, right?

A. No.

Q. You're not opining as to what any warnings by defendants to adolescents and their parents should specifically state, right?

A. I think I have -- would have opinions on that. I think that the warning should specifically state that the platform is addictive. And that can -- the platforms can cause mental health harms, and there's a strong evidence base for addiction, depression, suicidal ideation, et cetera.

So I think those are things I would definitely include.

Q. The content of what a warning by defendants should state is beyond the scope of your opinions set forth in your report; is that fair?

A. Yes.

Page 45

Q. Whether such warnings should be the same for adolescents as warnings directed at parents is beyond the scope of your reports in the MDL; is that right?

A. Yeah. My opinion is that there should be warnings for adolescents, kids and for parents, but I am not opining on what those warnings should look like. That's out of the scope of what I was asked to do for this litigation.

Q. Whether the warnings should be the same between defendant platforms is beyond the scope of your opinions in the MDL litigation, right?

A. Yes.

Q. And you personally have conducted no studies that analyze how effective any warning would be on any social media platform, correct?

A. That is correct.

Q. Can you state with a reasonable degree of scientific certainty that a warning on a social media platform would change any adolescent or parent behavior?

A. My knowledge of warnings on addictive products is that they do make a difference, and when done right, can be very effective in reducing harm.

Q. And that knowledge of warnings comes from

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

Page 46

your work with respect to opioids, correct?

A.  Opioids, nicotine products directed at teens, black box warnings, I have extensive experience in black box warnings and other such experience.

Q.  The nicotine products directed at teens, that relates to the vaping that we discussed earlier, right?

A.  Yes.

Q.  Any other consulting work related to warnings outside of the pharmaceutical context besides the vaping that we discussed?

A.  Not that I'm recalling right now.

Q.  You use the term "black box warnings."  I think we're on the same page.

You're referring to the literal black box on medical or pharmaceutical products indication or packaging insert?

A.  Yes.

Q.  Those black box warnings are meant to be directed towards prescribers, correct?

A.  Primarily, they are directed at consumers and prescribers, which is why they're on the little insert that comes with the medication.

Q.  You understand that in this litigation,

Page 47

the MDL, a small group of cases have been brought by adolescents and their families that have been selected for trial, correct?

MS. MCNABB:  Objection.  Form.

MS. VAKY:  I can rephrase that.  That was a scrambled question.

THE WITNESS:  Sure, if you would rephrase that, that would be great.

BY MS. VAKY:

Q.  In the MDL, the court has selected a subset of cases for trial.

Do you understand?

A.  I am aware that there are numerous plaintiffs in this litigation, including kids and their families, as well as over 100 school districts, cities, counties, states.  Some tribal groups.  That's the -- that's what I'm aware of regarding who the plaintiffs are.

Q.  Thank you.

For the kids and their families subset of the litigation, you don't know whether a warning would have made a difference to any of those plaintiffs in those parents, do you?

MS. MCNABB:  Objection.  Form.

THE WITNESS:  Well, I believe a warning

Page 48

would have made a difference.

BY MS. VAKY:

Q.  But you haven't evaluated any case-specific facts to reach that conclusion, correct?

A.  I'm here opining on general causation.  I have not evaluated any individual plaintiffs' circumstance.

Q.  Can you identify any materials that you considered in the preparation of your reports that specifically show warnings on social media platforms that would have any impact on adolescent mental health?

A.  I believe I've answered that with reference to Vivek Murthy's writings on that topic.

Q.  And so I understand the reference to Dr. Murthy's writings include a New York Times opinion piece and the 2023 advisory.

Is that a complete description of your references to Vivek Murthy's writings?

A.  Yes.  Assuming that the 2023 advisory is the one that includes his statement on the need for warnings on social media, I'm not -- I assume that's the one I included.  If I didn't include that one, it was in error, but that's the one I'm referring

Page 49

to.  I would really probably have to see that one.  Happy to look at it again right now to affirm that.

Q.  My bag was a little small.  I don't have that copy.  You're welcome to look at it on a break and let me know if you'd like to change any of your testimony.

Let's talk about the New York Times opinion piece.

That was the one entitled "The Surgeon General Calls for Warning Labels on Social Media Platforms," correct?

A.  Yes.

Q.  That was actually an interview by someone at the New York Times with Dr. Murthy, correct?

A.  I'm not specifically recalling.  Happy to look at it.

Q.  Based on your recollection today, Dr. Murthy was expressing his view to the New York Times that he doesn't -- but he doesn't share any evidence to support that view.

A.  I'm not recalling specifically.  I'd be happy to look at the article again.

Q.  Do you believe the Office of the Surgeon General is an authoritative source of information for public health?

13 (Pages 46 - 49)

Page 50

A. Generally, yes.

Q. Are you familiar with President Trump's current nominee for Surgeon General Dr. Casey Means?

A. Yes.

Q. Dr. Means is a Stanford School of Medicine graduate like yourself, right?

A. I believe so.

Q. Are you familiar with her views on social media and mental health?

A. Not particularly familiar, no.

Q. To the best of your knowledge, Dr. Casey Means has never publicly addressed where she believes warnings should be added to social media platforms, correct?

A. I haven't seen anything to that effect.

Q. You're aware that Dr. Means is very active on social media, right?

MS. MCNABB: Objection. Foundation.

THE WITNESS: I was not aware of that. I can't say that I know all that much about her.

BY MS. VAKY:

Q. Were you aware some have described Dr. Means as a social media influencer?

A. I was not aware.

Q. Were you aware that Dr. Means has

Page 51

leveraged social media features that you opine are addictive to increase her own profile in social media?

MS. MCNABB: Objection. Foundation.

THE WITNESS: I can't really answer that question yes or no.

BY MS. VAKY:

Q. You don't know whether she invites people to follow her or subscribe on her various social media accounts?

MS. MCNABB: Objection. Foundation.

THE WITNESS: Again, not familiar.

BY MS. VAKY:

Q. You don't know whether she creates short form content on various platforms?

MS. MCNABB: Same objection.

THE WITNESS: I'm not familiar with what she does on social media.

BY MS. VAKY:

Q. If Dr. Means is confirmed as the next Surgeon General and tells a newspaper journalist she does not believe social media features have a causal relationship to addiction or mental health harms in adolescents, would that cause you to reconsider any of your opinions?

Page 52

A. I highly doubt she will say that.

Q. Have you spoken with Dr. Means about her views on social media features?

A. No, I have not.

Q. If she did share that, she does not believe social media platforms should have affirmative warnings on them, would that cause you to reconsider any of your opinions?

A. That's a hypothetical that I just don't think would ever happen.

Q. What if it did happen?

A. I would evaluate the circumstances at that time.

Q. You would look at what authority she cited for her opinion?

A. Again, I -- I really wouldn't want to speculate on an event that I don't think would occur.

Q. I'm trying to understand your view of the Office on the Surgeon Generals as an authoritative source for information for public health.

Is your view of the Office of Surgeon General dependent on who is in that office?

MS. MCNABB: Objection. Form.

THE WITNESS: Obviously the person in the

Page 53

role is important, and if I didn't have confidence in that person, I wouldn't consider them an authoritative source, but in general, the individuals filling that role are responding to public health crises, which declare themselves as problems in our society long before they issue any kind of statements.

BY MS. VAKY:

Q. You're not opining as to whether the defendants have a legal duty to warn of the risks of addiction or psychiatric harms, correct?

A. I'm not sure what you mean by that.

Q. You don't know whether the defendants have a legal duty to warn of the risks of addiction or psychiatric harms on their platforms; is that fair?

A. I guess I would need more clarity from you on what you mean by a "legal duty."

Q. You don't know whether the law requires the defendants to place a warning on their platforms; fair?

A. I mean, my understanding is that the hope of participating in this litigation is that there would be such laws that would require them to include warnings on their platforms, that would be a positive outcome of this litigation.

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL

Page 54

Q.  The scope of your opinion is not that the law does, in fact, require them to do so; is that fair?

MS. MCNABB: Objection. Form. Scope.

THE WITNESS: There are lots of states issuing lots of legislation now vis-a-vis social media addiction and protecting youth. There may well be a state that has now passed legislation to that effect. I'm not specifically aware of any legislation, but I wouldn't want to sit here and opine that there's no law in any state in the union right now that's stating that social media should have a warning. What I can tell you is I believe that the evidence supports a warning for kids and parents.

BY MS. VAKY:

Q.  Your belief is that the scientific and medical literature supports that a warning for kids and parents would be a helpful thing; is that right?

A.  As I've said, there's overwhelming evidence that social media platforms that include the addictive design features that I detail in my report are addictive and harmful for kids, and those social media warnings, including defendants' platforms, should include a warning to kids and

Page 55

their parents about the addictive nature of those platforms.

Q.  And your opinion that the platforms should include a warning, is that based in the underlying belief that a warning would make a difference?

MS. MCNABB: Objection.

THE WITNESS: Yes.

MS. MCNABB: Asked and asked.

THE WITNESS: I believe a warning would make a difference.

BY MS. VAKY:

Q.  And you can't identify any scientific study that shows what difference a warning would make?

A.  There's lots of science out there showing that warnings for addictive products make a difference, especially when targeting youth consumers.

Q.  Let's narrow it to the science out there showing that a warning for addictive social media products makes a difference.

Can you point me to anything there?

A.  I'm not aware of anything as I sit here today, but that doesn't mean there isn't anything.

Q.  Can you identify any materials in your

Page 56

reports, for example, of the science out there for warnings for addictive products generally?

A.  I'm sorry, can you say that again?

Q.  Can you identify the science that you cite in your reports showing that warnings for addictive products make a difference?

A.  I don't specifically cite that in my report.

Q.  I did not see any social media platforms' terms of use or terms of service on your materials considered.

Did you review such documents for any of the defendants' platforms? And just yes or no for now.

A.  Can you clarify what you mean by "terms of use" or "terms of service"?

Q.  Sticking with those words, those phrases, terms of use, terms of service, do any documents come to mind that you would have reviewed for the defendants' platforms?

A.  Yes.

Q.  Any other than Meta?

A.  Yes.

Q.  We'll come back to those.

Have you studied any addiction warnings

Page 57

related to visiting online pornography cites?

A.  Not beyond my study of warnings more generally, no.

Q.  Do you have an opinion as to whether pornography websites should warn of addiction?

A.  Yes.

Q.  What is your opinion there?

A.  Should be warnings.

Q.  Have you studied any addiction warnings specific to online gambling sites?

A.  No.

Q.  Do you have an opinion as to whether online gambling companies should warn of addiction on their platforms?

A.  Yes.

Q.  What is your opinion?

A.  There should be warnings.

Q.  Have you studied any addiction warnings related to online retail shopping websites?

A.  No.

Q.  Do you have an opinion as to whether online retail companies should warn of the risk of addiction?

A.  To any example you might suggest, I would just answer that if those platforms contain the

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL

Page 58

addictive design features that I talk about in my report related to access, quantity, potency, novelty and uncertainty, then there should be a warning.

MS. MCNABB: I'll just put an objection on the record as to scope with respect to these various online systems that are not part of this litigation.

BY MS. VAKY:

Q. You testified that your answer depends on whether the platforms contain the same addictive design features that you discuss with respect to the social media platforms, right?

A. Yes.

Q. Is it just one addictive design feature, and then that should trigger the need for a warning, or would you have to look at the individual website and the totality of the features?

MS. MCNABB: Objection. Form.

THE WITNESS: It's not any one feature. It's the totality of the features, and specifically in my report, I don't list them as individual features, but I group them under these broader categories of access, quantity, potency, novelty and uncertainty, which are routed in well-known understanding of what makes something addictive, whether it's a substance or it's a behavior.

Page 59

BY MS. VAKY:

Q. Have you studied any addiction warning specific to video games?

MS. MCNABB: Objection. Scope.

THE WITNESS: Yeah. In general, I would say the same thing, you know, that wherever there are these addictive design features, there should be warnings. I haven't specifically looked at that with video games, but happy to do so.

BY MS. VAKY:

Q. You don't feel you're knowledgeable about the design features of video games with respect to the risk of addiction?

A. No. That's not what I said. If that's what you heard, let me rephrase it.

Q. Please.

A. I -- you asked me if I had specifically studied warnings about video games, and I haven't specifically studied warnings, but I have obviously extensively studied video games.

Q. That's fair. Thank you.

In your study of video games specifically, do you have an opinion as to whether video games should warn of the risk of addiction?

MS. MCNABB: Objection. Form.

Page 60

THE WITNESS: Yes, I do.

BY MS. VAKY:

Q. What's your opinion?

A. That there should be warnings. There's clear evidence that video games have the potential for addiction. That's based on my clinical experience, the clinical experience of many other people, expert consensus, the DSM criteria, the ICD criteria.

So there's plenty of evidence out there. But even in the absence of sort of official diagnostic criteria, if there's enough clinical evidence and enough of a public health concern, which we're obviously seeing now, we are seeing these cases in clinical practice. You know, that speaks to the product liability and the need for warnings. Especially for kids, again, emphasizing that we're talking about kids here.

Q. That's a good point.

If we're talking about 18 and up, do you believe that there should be warnings on video games?

A. I still think there should be warnings, but this litigation is about kids.

Q. Same for social media, 18 and up.

Page 61

Should social media platforms have warnings if, let's assume, whoever is going on the social media platforms are only 18 and up?

A. I think so.

Q. You've treated patients and you've spoken publicly, or at least in books, about patients who have struggled with fantasy football leagues; is that right?

A. Probably. I'm not specifically remembering.

Q. Are you familiar with the concept of fantasy football leagues?

A. Yes.

Q. We're coming up on them, aren't we?

Should fantasy football leagues have warnings about the risk of addiction to gambling or gaming?

MS. MCNABB: Objection. Scope.

THE WITNESS: Again, I would say for any given platform, there would be the need for evaluating the addictive design elements and whether or not consumption of that platform leads to the criteria for addiction, which I outline in my report, the four Cs, tolerance, withdrawal, not any one criteria is, you know, required, but, again,

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

Page 62

these are all the sort of pattern of behavior that is easily recognized as addictive. And if enough people on a given platform are struggling with that problem, then yes, there should probably be a warning.

BY MS. VAKY:

Q. Should romance novels come with warnings of risk of addiction?

MS. MCNABB: Objection. Asked and answered. Scope.

THE WITNESS: I think it's important to clarify that it's not about the genre of romance novels per se, it's the application of technology to any substance of behavior that increases access, quantity, potency, novelty, uncertainty that then makes that substance or behavior addictive. And you'd really have to evaluate, you know, a specific substance or behavior in order to make that determination.

BY MS. VAKY:

Q. So let's talk about the Kindle tablet, which is an application through which one accesses the genres.

Should Kindle tablets come with a warning of the risk of addiction?

Page 63

MS. MCNABB: Objection. Scope.

THE WITNESS: No, because it's not the device. The device is the portal, but it's really the platform where those -- where those addictive digital media are available.

BY MS. VAKY:

Q. Kindle also functions as an app on different devices, right?

MS. MCNABB: Objection. Scope.

THE WITNESS: Yes.

BY MS. VAKY:

Q. Should the Kindle platform come with warnings of the risk of addiction?

MS. MCNABB: Same objection.

THE WITNESS: I have not specifically evaluated the Kindle platform for that.

BY MS. VAKY:

Q. Few more.

Should Dr. Pimple Popper videos have a warning of addiction displayed on the screen before showing the contcontent?

MS. MCNABB: Objection. Asked and answered. Scope.

THE WITNESS: If the content is irrelevant, or it's at least not the primary issue.

Page 64

The primary issue is the medium itself, which creates the addiction. And that is, again, the specific design features that I've talked about.

BY MS. VAKY:

Q. Should soda cans have a warning of addiction to sugar on the can?

A. That happens, actually, in various places throughout the world. And when you're dealing with sugar, which is known to be addictive, there are instances in which that makes sense to have a warning for people who may not be aware that sugar is addictive.

Q. Should companies that make sexually pleasurable products warn of addiction to sex?

MS. MCNABB: Objection. Scope. Asked and answered.

THE WITNESS: I think it's really important to remember that we're talking about kids here. We're not talking about, you know, free-consenting adults in a free and democratic society. We're talking about protecting kids' brains.

BY MS. VAKY:

Q. For purposes of my question -- I promise this is the last one -- we'll move on.

Page 65

Should companies that make sexually pleasurable products warn of addiction to sex?

MS. MCNABB: Objection. Scope.

BY MS. VAKY:

Q. Assuming those products aren't restricted to 18 and up.

A. I'm sorry, can you say the question again?

Q. Sure.

So for products that are available to anyone on the shelf, sexually pleasurable products, should those products carry a warning of addiction to sex?

MS. MCNABB: Objection. Scope.

THE WITNESS: I think it's really important to remember that this litigation, and my report, is specifically directed to the vulnerable population of kids and teens. And when it comes to kids and teens and their developing brains, what may be okay for an adult is not necessarily okay for a kid.

BY MS. VAKY:

Q. Is it your understanding that certain sexually pleasurable products are not accessible to people under 18 years old?

MS. MCNABB: Objection. Scope.

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

THE WITNESS: I don't really want to, you know, opine on something that's, I think, a little far afield from what we're talking about here.

BY MS. VAKY:

Q. Okay. Let's talk about anxiety and depression.

There are many risk factors for anxiety and depression, right?

A. Yes.

Q. Higher salt intake has been linked to an increased risk of depression, right?

A. I'm not familiar with that literature.

Q. Schools can be a significant source of eating disorder for adolescents, right?

MS. MCNABB: Objection. Form.

THE WITNESS: Yes.

BY MS. VAKY:

Q. Should middle school teachers warn of the risk of anxiety before starting class each day?

MS. MCNABB: Objection. Scope. Form.

THE WITNESS: That question presumes that school itself is the cause of anxiety. I don't think that's -- that's certainly not what I mean when I talk about school being a source of anxiety. There are many factors in a school environment that

Page 67

can contribute to anxiety, including social media.

BY MS. VAKY:

Q. You don't believe that school itself is a source of anxiety for adolescents?

MS. MCNABB: Objection. Scope.

THE WITNESS: I would really need you to clarify what aspect of school you're talking about. There's so many different experiences that kids have at school and so many different contexts.

BY MS. VAKY:

Q. The school experience, we can even narrow it, the middle school experience and everything that goes into the middle school experience, that could be a source of anxiety for adolescents, right?

MS. MCNABB: Objection. Form.

THE WITNESS: I mean, that's like saying life can be a source of anxiety for adolescents. I just don't think I can answer that question without something more specific and substantive.

BY MS. VAKY:

Q. Social interactions outside of social media in middle school can cause anxiety for adolescents; fair?

MS. MCNABB: Objection. Form.

THE WITNESS: Social interactions can be a

Page 68

source of anxiety, yes.

BY MS. VAKY:

Q. Should middle school teachers warn of the risk of anxiety from social interactions at school before starting class each day?

MS. MCNABB: Objection. Form.

THE WITNESS: Middle school teachers don't produce social interactions by kids and don't profit from those social interactions. So middle school teachers are not responsible for warning kids about anxiety-provoking interactions at middle school, unlike defendants in this case, who both make and profit from their products that are causing harm.

BY MS. VAKY:

Q. You don't think teachers are responsible for warning kids about interactions among their own pupils?

MS. MCNABB: Objection. Form.

THE WITNESS: I think that's a very weird question.

BY MS. VAKY:

Q. Do your best.

MS. MCNABB: Same objection.

THE WITNESS: Again, I wouldn't even really know how to answer that. It just presumes

Page 69

all kinds of things that I'm not even really sure, you know, what you're getting at with that.

BY MS. VAKY:

Q. Should teachers provide warnings to students about the contents of books that are on their syllabus?

MS. MCNABB: Objection. Form. Incomplete hypothetical.

THE WITNESS: Yeah, again, I sort of feel like this is far afield of what we're talking about here.

BY MS. VAKY:

Q. It's my time.

A. Yeah.

I don't really have an answer for that.

MS. MCNABB: Katherine, we've been going for over an hour. Do you want to take a break?

MS. VAKY: Absolutely.

THE VIDEOGRAPHER: Time is 9:47. We're off the record.

(Whereupon, a recess was taken from 9:47 a.m. 9:59 a.m.)

THE VIDEOGRAPHER: The time is 9:59, we're back on the record.

//

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

BY MS. VAKY:

Q. Welcome back, Dr. Lembke.

Did you discuss the substance of your testimony with counsel over the break?

A. They told me I was doing a good job.

Q. Any testimony you'd like to change?

A. No.

Q. Other than telling you that you did a good job, did you otherwise discuss any substance of your testimony before the break?

A. Counsel told me not to worry about all the hypotheses.

Q. Anything else?

MS. MCNABB: Sorry. Objection to privilege information. Not the substance. You can say, like, if you talked about anything, but with respect to what was discussed is privileged.

THE WITNESS: Okay.

BY MS. VAKY:

Q. Let's go back to discussing school.

Teachers are the ones that decide what grade a child will get in a particular class, right?

A. Yes.

Q. You'd agree that grades can be a source of anxiety for students?

Page 71

A. Yes.

MS. MCNABB: Objection. Form.

BY MS. VAKY:

Q. You teach at Stanford University, correct?

A. Yes.

Q. One of the most competitive universities in the country?

You don't know whether it's difficult to get admitted to Stanford University?

A. It's difficult to get admitted.

Q. Have you seen students face severe anxiety or depression over whether they'll be admitted to Stanford?

MS. MCNABB: Objection. Form. Scope.

THE WITNESS: I've certainly seen students experience anxiety over the whole college application process, not just to Stanford.

BY MS. VAKY:

Q. The college admission process, whether someone is successful being admitted to any college, depends in large part on their grades in high school, right?

MS. MCNABB: Objection. Form. Scope. Foundation.

THE WITNESS: That's part of how they're

Page 72

evaluated, yes.

BY MS. VAKY:

Q. Do you think teachers should warn of the risk of anxiety before handing out report cards?

MS. MCNABB: Objection. Form.

THE WITNESS: Again --

MS. MCNABB: Scope.

THE WITNESS: -- I think the obvious distinction here is that teachers are teaching. They are not creating products that they then profit from. Unlike defendants, who have made addictive products that are harming kids and failed to warn kids and their parents about the harm of those products, even though they had all the data showing that the products are harmful.

BY MS. VAKY:

Q. Teachers produce report cards for students, right?

MS. MCNABB: Objection. Form. Scope.

THE WITNESS: Yes. They do.

BY MS. VAKY:

Q. And the content of those report cards can be a major source of anxiety for students?

MS. MCNABB: Objection. Form. Scope.

THE WITNESS: Probably depends on the

Page 73

students. Some students care, others don't.

BY MS. VAKY:

Q. And a teacher has no duty to warn of the risk of anxiety when handing out those report cards?

MS. MCNABB: Objection. Form. Scope.

THE WITNESS: Again, we're talking about very different scenarios here. They couldn't be further apart, really.

BY MS. VAKY:

Q. I --

A. Teachers -- the role of teachers is to teach and evaluate performance. And teachers and students have been around for thousands and thousands of years. And the problems that come up are not similar to what we're talking about in this case where we're talking about defendants have created addictive social media products that harm kids, they -- there's overwhelming data to show that social media is addictive and harms kids, and yet defendants have not put a warning label on their product, even though our own Surgeon General and others have called for such a label.

MS. VAKY: Motion to strike as nonresponsive.

I understand you might not see the

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 74

connection, but you still have to answer my question.

BY MS. VAKY:

Q. Should teachers provide warnings of the risk have of anxiety when handing out report cards?

MS. MCNABB: Objection. Asked and answered. And objection to the soliloquy. She did answer your question the first time you asked it.

You can go ahead if you have anything else to add.

THE WITNESS: I don't have anything else to add.

BY MS. VAKY:

Q. You won't answer my question?

MS. MCNABB: Objection. Asked and answered. She has answered your question.

MS. VAKY: It's my time. If I want to ask again, we'll try again.

BY MS. VAKY:

Q. Yes or no, should teachers provide warnings for the risk of anxiety when handing out report cards?

MS. MCNABB: Objection. Asked and answered.

THE WITNESS: I don't see a connection

Page 75

between the responsibility of defendants to warning kids and their parents about the addictive nature of social media and other harms, and the interactions that teachers have with their students.

BY MS. VAKY:

Q. I didn't ask about whether you saw a connection in the hypothetical.

I asked whether you believe, as someone who believes they're qualified to issue opinions about warnings, do teachers have an obligation to warn of the risk of anxiety for giving out a report card?

MS. MCNABB: Objection. Asked and answered.

THE WITNESS: I don't have another answer.

BY MS. VAKY:

Q. Do you believe parents bear any responsibility to investigate whether a particular activity is a healthy activity for their child?

MS. MCNABB: Objection. Form.

THE WITNESS: Yes. But the defendants' products have made it almost impossible for parents to monitor their kids' use on social media.

BY MS. VAKY:

Q. So parents have a responsibility to

Page 76

investigate whether a particular activity is healthy for their child, yet there's no way for them to do so?

MS. MCNABB: Objection. Asked and answered.

THE WITNESS: When it comes to social media, it has become almost impossible for parents to know what their kids are doing on defendants' platforms and to monitor that use.

BY MS. VAKY:

Q. Parents don't know what content their kids are looking at?

MS. MCNABB: Objection. Form.

THE WITNESS: Very often, parents have limited control over what their kids are doing online.

BY MS. VAKY:

Q. The issue of control between a parent and child -- strike that.

A parent has a responsibility to exert control in the best interest of their child.

Would you agree with that?

MS. MCNABB: Objection. Form. Scope.

THE WITNESS: A parent can only exert control to the extent that they are, number one,

Page 77

aware of what their child is doing, and number two, particular guardrails or means by which they can exert control.

BY MS. VAKY:

Q. Do you think a parent has an obligation to be aware of what their child is doing?

MS. MCNABB: Objection. Form. Scope.

THE WITNESS: I think every invested parent does their best to be aware of what they're child is doing, but I think any parent will tell you that it's impossible to know everything that your child is doing, and especially when it comes to consumption of social media because the experiences that kids are having online if out of the visibility of parents. This is a huge part of the problem.

BY MS. VAKY:

Q. Is it your view that kids are viewing social media solely out of the purview of their parents?

MS. MCNABB: Objection. Form.

THE WITNESS: I did not use the word "solely." You interjected that.

BY MS. VAKY:

Q. It's a new question.

A. Yeah. It's very clear that most of what

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

Page 78

kids are doing online, parents have limited ability to be aware of what's happening there.

Q. Parents can see that their child is on a device, right?

MS. MCNABB: Objection. Form. Scope. Incomplete hypothetical.

THE WITNESS: Sometimes the parents can see that their child is on a device, sometimes their child is on a device when they don't see that.

BY MS. VAKY:

Q. If a parent discovers a certain activity not healthy for their child, they should take action to separate that child from the unhealthy activity, right?

MS. MCNABB: Objection. Form. Scope.

THE WITNESS: In the case of defendants' platforms, I would say that many parents are not aware of the harmful nature of those platforms because defendants haven't warned them about the harmful nature of those platforms. And even if parents are able to determine for themselves that defendants' platforms are harmful, they don't necessarily have the ability to change their child's consumption of those platforms.

//

Page 79

BY MS. VAKY:

Q. So my question is, once a parent discovers, makes that connection that a certain activity is not healthy for their child, they should take efforts to find actions to separate their child from that unhealthy activity.

Would you agree?

MS. MCNABB: Objection. Form. Scope. Asked and answered.

THE WITNESS: I would probably want to know more about the specific circumstance. Even when parents make efforts, they won't necessarily succeed, especially when it comes to social media, because there are so many places and times and means by which kids go back to that activity without their parents' awareness.

BY MS. VAKY:

Q. If a parent discovers that a certain activity is not healthy for their child, they should try to do something, right?

MS. MCNABB: Objection. Asked and answered. Form. Scope.

THE WITNESS: A parent can only do something about a child's unhealthy activity if they understand the nature of the harm of that activity.

Page 80

If they haven't been educated or warned about the harm of that product, then they may not even know to intervene.

BY MS. VAKY:

Q. Right.

And my questions are asking, you've got a parent who sees a problem, they should try to find a solution, right?

MS. MCNABB: Objection. Asked and answered. Form. Scope.

THE WITNESS: I think most parents, when it comes to the harm of social media, have tried, and most of us have failed because it's very, very difficult to have an influence on teens' consumption and use of social media given the access, quantity, potency, novelty, uncertainty, the ubiquity of access makes it very difficult for parents to intervene.

BY MS. VAKY:

Q. So should parents give up?

MS. MCNABB: Objection. Asked and answered.

THE WITNESS: Parents shouldn't give up, but the state of the problem right now is that parents have very limited means in many of these

Page 81

situations, especially as kids get older.

BY MS. VAKY:

Q. Parents aren't helpless to help their child and social media?

MS. MCNABB: Objection.

THE WITNESS: They're practically helpless in this day and age.

BY MS. VAKY:

Q. Have you offered suggestions to parents on how they can create friction between their child and smartphones?

A. Yes. I've offered suggestions, also while knowing that it's nearly impossible to make a difference in the case of kids who have become addicted to social media.

Q. It's near impossible to what?

A. It has become nearly impossible for parents to intervene in their own kids' social media addiction.

Q. Parents have no ability to take their child's phone away?

MS. MCNABB: Objection. Form.

THE WITNESS: Even if a parent took their child's phone away, that child would have the ability, as many of them do who become addicted, to

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

get another phone, to keep it secret, to access from other devices.

BY MS. VAKY:

Q. Parents have the ability to take all the devices away that they know about?

MS. MCNABB: Objection. Form. Incomplete hypothetical.

THE WITNESS: Even that has become almost impossible to do because of the ways in which kids are now dependent on their devices to know their class schedule, to know what their homework is.

BY MS. VAKY:

Q. So you're saying it's nearly impossible for a parent to confiscate their own children's devices?

MS. MCNABB: Objection. Asked and answered.

THE WITNESS: It's very difficult to do, most parents don't have the awareness or the knowledge to even do that in the first place. And for those who do, it's very, very difficult.

BY MS. VAKY:

Q. Most parents don't have the awareness or knowledge to take a device away from their own child?

Page 83

MS. MCNABB: Objection. Mischaracterizes testimony.

THE WITNESS: Most parents are not aware of the extent to which the harms of digital media, social media outweigh the benefits.

MS. VAKY: Motion to strike as nonresponsive.

BY MS. VAKY:

Q. I'm simply asking if a parent has made the connection between their child and time spent on their device, they don't know what they're doing on the device, but they see their nose in the device all the time, parents don't have the knowledge or ability to just take the device away from their kid?

MS. MCNABB: Objection. Form. Incomplete hypothetical.

THE WITNESS: These are very difficult judgment calls for most parents because they are convinced that their child needs the device to be socially integrated and connected, to be able to be successful at school with QR codes, which are now often required to access homework or, you know, turn in homework, et cetera.

So they are making a judgment call based on benefits versus harms. And because defendants

Page 84

haven't warned parents and properly educated them about the harms of their products, parents are making these judgment calls in the absence of sufficient knowledge and information.

If they had the knowledge and information about just how addictive defendants' products are, I think parents would be more -- more likely to take the devices away if they are able to. But even in that context, it's very, very challenging because when you take devices away from kids who are addicted to social media, they often experience very extreme emotional reactions, severe emotional dysregulation, some of them threatening suicide, flinging themselves on the floor against the wall. I mean, really extreme situations. We see this in clinical care.

And most parents don't have the psychological support or access to professional help that would allow them to actually follow through with, you know, the sort of intervention that would help a kid who was addicted to social media.

BY MS. VAKY:

Q. Parents have generally the physical ability.

I understand putting to the side their

Page 85

judgment call, but they have the physical ability as the parents to take something away from their child, right?

MS. MCNABB: Objection. Form. Incomplete hypothetical.

THE WITNESS: I feel like your question doesn't appreciate the reality of the situation, the complexity, you know, what it's like to parent in this day and age.

BY MS. VAKY:

Q. Please do not criticize what I think how to parent this day and age. I am a parent too. So whatever you think about my question, you still have to answer it.

Have you offered suggestions to parents on how to create friction between their child and smartphones?

MS. MCNABB: Katherine, she has answered her question.

MS. VAKY: This is a new question. I've never asked about how she's offered suggestions to parents in her clinical practice.

BY MS. VAKY:

Q. Have you offered suggestions to parents how they can create friction between their child and

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

their child's smartphone?

A. I have offered suggestions how they can do that, yes.

Q. Have you ever advised a parent to take away their child's devices?

A. Yes, I have. And the important distinction there is that this is a parent or a family that has the means to get psychological and psychiatric help and support to do that, 'cause that's just how hard it is.

Q. Does every parent need psychiatric support to be able to help their child manage social media?

MS. MCNABB: Objection. Form.

THE WITNESS: If a family is struggling with a child who is addicted to social media, in the majority of those cases, they will need professional support to make a difference in that child's life. That's just how difficult it is.

BY MS. VAKY:

Q. So a child who is currently addicted to social media is unlikely to be able to manage that addiction without professional psychiatric help; is that your testimony?

MS. MCNABB: Objection form.

THE WITNESS: In most cases, a child with

Page 87

a social media addiction would need professional help, and the family would need professional help as well.

BY MS. VAKY:

Q. When you're using the term "addiction," are you incorporating the full spectrum from mild to severe?

A. Addiction is a spectrum disorder, so, you know, there is mild, moderate and severe addiction.

There are also pre-addiction states. So I'm not exactly sure what you're asking.

Q. Let me try it again then.

If a child has a mild addiction to social media, is it unlikely that the parents would be able to help their child manage their addiction without professional psychiatric help?

MS. MCNABB: Objection to form.

THE WITNESS: Once the child crosses the threshold to meeting criteria for an actual addiction, I think most families will need some form of professional help.

BY MS. VAKY:

Q. In your experience dealing with parents who are struggling with their child's social media, are the parents eager to find ways they can help

Page 88

their child distance themselves from social media?

MS. MCNABB: Objection. Form. Speculation.

THE WITNESS: I think most parents are desperate for help in this regard. I think most parents today are beginning to observe, if they haven't already, that social media addiction is a serious and growing problem. But I can't speak to the experience of every single parent.

BY MS. VAKY:

Q. If a parent has already made the connection between social media and harms to their child, would you ever recommend the parents give their child a new phone that has access to social media?

MS. MCNABB: Objection. Form.

THE WITNESS: I'm going to guess I'd have to know more about the circumstance. That doesn't make much sense on the face of it, but I'd want to know more.

BY MS. VAKY:

Q. If a parent has already made the connection between social media and harms to their child, you would not recommend increasing that child's access to social media platforms, correct?

Page 89

MS. MCNABB: Objection.

THE WITNESS: I would not recommend that, and I would look at a family's system approach and wonder if the parent themselves was addicted to social media or addicted to digital media or had some other kind of problem, which, by the way, doesn't absolve defendants in this case just because you have a troubled family. A family where addiction is multigenerational, including social media addiction, it doesn't absolve defendants of their responsibility in causing harm.

(Reporter clarification.)

MS. VAKY: Motion to strike everything after "which, by the way."

BY MS. VAKY:

Q. Have you ever recommended that a parent place a television in a child's bedroom where you believe the child was struggling with social media?

A. I've never recommended that, no.

Q. Have you ever recommended that a parent take away a bedroom television if you believe the child was struggling with social media?

A. I have recommended taking screens away of all sorts, including television screens.

Q. You've recommended taking screens away of

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 90

all sorts in order to treat social media addiction?

A.   In order to treat -- so social media is one set of digital media addiction, or more broadly, screen addiction.  So I've recommended taking all screens away in certain families where severe social media addiction and screen addiction is -- is present.

Q.   Do you see social media addiction coinciding with screen addiction?

A.   Those are terms that sometimes mean the same thing and sometimes don't.

Q.   Do you use them, social media addiction and screen addiction, to mean the same thing?

A.   I generally try to specify.  I broadly use the term "digital media addiction" because I really think we're talking about digital media and addictive platforms that have the specific design features that make them addictive.  There are many forms of being on screens that are not addictive, so I generally try to parse those things out.

Q.   Did you ever use the term "screen addiction"?

A.   I may have used it, but I'm not specifically recalling now.

Q.   Do you believe there's such a thing as

Page 91

screen addiction?

A.   So the language here -- because we're dealing with a brand new public health crisis, the language is evolving.  And as it has evolved, people have come up with different terminologies, sometimes they're talking about social media addiction and they're talking about screen addiction, sometimes they're broadly just talking about the amount of time people spend on screens and how that can be problematic.

So, you know, teen-specific language is evolving.  Most of the time, when we're talking about addiction to these platforms, you know, we're talking about the same basic pattern of behavior.

Q.   Were you aware that since 2013, the American Academy of Pediatrics has recommended a pediatrician inquire about social media use at every well child visit?

A.   I'm not specifically recalling that that was the year, but I am aware that pediatricians are advised to ask about social media use in kids, and I think that's great.

Q.   Are you aware that they've been advised to do so for over a decade?

MS. MCNABB:  Objection.  Asked and

Page 92

answered.

THE WITNESS:  Again, I don't specifically recall the date.

BY MS. VAKY:

Q.   You've opined that doctors bore some blame in the opioid crises, right?

A.   Yes.

Q.   Do pediatricians bear some responsibility for what you described as a rise in social media addiction among adolescents?

A.   Very different things.

Q.   I understand you think they're different.  You still to have answer my question.

A.   I'm about to.

Q.   I will repeat the question so we get a clean record.

Do pediatricians bear some responsibility for what you've described as a rise in social media addiction among adolescents?

A.   A doctor prescribing an opioid to a patient and that patient getting addicted to opioids is very different from what happens with social media because pediatricians are not prescribing social media to their teen patients.

Q.   So pediatricians do not bear any blame for

Page 93

the rise in social media addiction among adolescents; is that right?

A.   Again, I wouldn't even really know -- the whole question just seems absurd to me.

Q.   The question is do pediatricians bear any responsibility for the rise in mental health harms that you attributed to social media?

MS. MCNABB:  Objection.  Asked and answered.

THE WITNESS:  I'm not even sure how a pediatrician could be responsible for the rise in social media.

BY MS. VAKY:

Q.   I'm not asking about the rise in social media.

A.   The rise in social media addiction.  Sorry.

Q.   So you don't have an answer or your answer is no?

A.   Well, that was my answer.

Q.   Okay.  Let me -- let's get a clean record.

Do you believe pediatricians bear any responsibility for the rise in social media addiction among adolescents?

MS. MCNABB:  Objection.  Asked and

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL

Page 94

answered.

THE WITNESS: Yeah, I feel like I answered that.

BY MS. VAKY:

Q. Try again.

MS. MCNABB: Objection. Asked and answered.

(Simultaneous speakers - inaudible.)

BY MS. VAKY:

Q. You will not answer my question? It's my time. I can ask you the same question for seven straight hours.

MS. MCNABB: She has answered the question. Objection.

MS. VAKY: Try it one more time.

BY MS. VAKY:

Q. Do pediatricians bear any blame for what you described as a rise in social media addiction among adolescents?

MS. MCNABB: Same objections.

THE WITNESS: I really do feel like I answered that.

BY MS. VAKY:

Q. Help me again. Tell me your answer again so I can make sure I understand it.

Page 95

A. Can you say the question again?

Q. Do pediatricians bear some responsibility for what you've described as a rise in social media addiction among adolescents?

A. Again, the question to me doesn't make sense, so I can't answer it yes or no.

Q. Do you put any blame with pediatricians for the mental health harms among adolescents that you now are attributing to social media?

MS. MCNABB: Objection. Asked and answered.

BY MS. VAKY:

Q. Sitting here today, do you put any blame at the feet of American pediatricians?

A. I can't answer that question yes or no.

Q. Do you think teachers bear any responsibility for the rise in social media addiction among adolescents?

A. I would give the same answer.

Q. What's that answer?

A. I can't answer that question yes or no.

Q. Why not?

A. 'Cause it's not a yes-or-no question.

Q. Why not?

A. Because the question itself doesn't make

Page 96

any sense for the reasons that I stated.

Q. State them again.

MS. MCNABB: Objection.

THE WITNESS: Teachers do not produce social media platforms, nor do they target kids and sell social media platforms to them, nor do they profit from those social media platforms. It's a very different situation.

BY MS. VAKY:

Q. Then why isn't the answer, no, teachers bear no responsibility?

MS. MCNABB: Objection. Asked and answered.

THE WITNESS: It's just not a question that I would ask -- answer yes or no to.

BY MS. VAKY:

Q. Why can't -- you don't know for sure that teachers bear zero responsibility for the rise in mental health harms among adolescents that you've attributed to social media?

MS. MCNABB: Objection. Asked and answered. Kathleen, you've asked --

(Simultaneous speakers - inaudible.)

THE WITNESS: I feel like I've answered these questions to the best of my ability.

Page 97

MS. VAKY: Are you instructing her not to answer?

MS. MCNABB: I'm not instructing her not to answer. I'm asking to move on because she's answered your question many times.

MS. VAKY: I appreciate that.

I think the objections --

BY MS. VAKY:

Q. Sitting here today, you cannot say that teachers are blameless for the rise in mental health harms among adolescents that you've attributed to social media?

MS. MCNABB: Objection. Asked and answered.

THE WITNESS: Yeah. I feel like I answered that question. I don't have another answer for that question. I'm sorry.

BY MS. VAKY:

Q. What was your answer?

A. The frame of the question is not something that I can answer yes or no to 'cause the frame of the question doesn't make any sense to me for the reasons that I stated. I can restate those reasons, but I really did already state those reasons. It's talking about apples and oranges.

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL

Page 98

Defendants make an addictive product, they promote it to kids, they sell it to kids, they profit from it. That is not what teachers do.

Q. You've talked a lot about the role of access in increasing the risk of addiction to social media, correct?

A. Yes.

Q. Teachers play a role in students' access to social media during the school hours.

Would you agree with that?

MS. MCNABB: Objection. Form.

THE WITNESS: I would say that teachers have, like parents, minimal ability to control kids' access to social media during school hours. And that is a big part of the problem.

BY MS. VAKY:

Q. Teachers don't have the ability, the physical ability to take a device away when they see a device in their classroom?

A. When was the last time you talked to a teacher?

Q. Dr. Lembke, not my question.

Do teachers have the physical ability, if they see a phone in class, to take the phone away?

MS. MCNABB: Objection. Form. Incomplete

Page 99

hypothetical.

THE WITNESS: In talking to teachers, I know that teachers are very limited in their ability to, number 1, even identify if kids are on their devices engaging in social media, and number two, take those devices away.

MS. VAKY: Motion to strike as nonresponsive.

BY MS. VAKY:

Q. Does a teacher have the ability to take away a phone that they see in the classroom?

MS. MCNABB: Objection. Asked and answered. She literally answered your question.

BY MS. VAKY:

Q. Are you answering the question, are you refusing to answer?

A. I feel like I did answer the question. I don't have another answer, I don't have a new answer.

Q. Do schools have the ability to turn off the Wi-Fi for students?

MS. MCNABB: Objection. Form. Incomplete hypothetical.

THE WITNESS: I think turning off the Wi-Fi is probably technically not even going to do

Page 100

the trick because kids have their phone and they have data so I'm not sure that would make a difference either.

BY MS. VAKY:

Q. Schools that issue devices to students have the ability to block certain websites on those school-issued devices, right?

MS. MCNABB: Objection. Foundation.

THE WITNESS: To my knowledge, there are many schools looking at those types of options and trying to implement those types of options.

BY MS. VAKY:

Q. Schools have some ability to control the access to social media for their students during the school day.

Would you agree with that?

A. They're desperately trying, I would agree with that.

Q. Are schools -- do schools have any ability to control the access to social media during the school day?

Any ability at all right now?

MS. MCNABB: Objection. Asked and answered.

THE WITNESS: Right now, I think schools

Page 101

are experimenting with attempts to create guardrails and limit access, but it is extremely difficult.

BY MS. VAKY:

Q. Are there any guardrails that currently exist now that schools can use to limit the access to social media during the school day?

MS. MCNABB: Objection. Asked and answered.

THE WITNESS: There are some schools that have been able to implement, for example, smartphone restrictions, and those schools are generally seeing improvements in student emotional and physical wellbeing, but those are also typically very well-funded small private schools. In general, in the public school system, almost impossible to do that right now. That would required an influx -- an enormous influx of resources to support schools in those endeavors.

BY MS. VAKY:

Q. So it's your testimony today that it is extremely difficult for a teacher to take away a device from a student; is that correct?

MS. MCNABB: Objection. Asked and answered. Misstates prior testimony.

THE WITNESS: As I said, it's, number one,

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

Page 102

extremely difficult for a teacher to even know if this student is on social media. And then number two, difficult to take away the devices, yes.

BY MS. VAKY:

Q. You don't think teachers know when their student is not engaged in a lesson and has their face in a device?

MS. MCNABB: Objection. Form. Scope.

THE WITNESS: I know for a fact that it's almost impossible for teachers to know because kids will access social media from their laptops, and they will toggle between social media and the lesson at hand in a way that makes it almost impossible for teachers to know that they are doing it.

BY MS. VAKY:

Q. And teachers have no way to limit the access to social media on laptops at school; that's your testimony?

MS. MCNABB: Objection. Asked and answered. Form. Scope.

THE WITNESS: These kids are very, very good at working around any kind of restrictions that are implemented. If you've got a kid who is addicted to social media, it is easy for them right now to find a way to be on their devices either

Page 103

without their teachers knowing or in a way that is just impervious to school intervention.

BY MS. VAKY:

Q. Do you think parents bear any blame for what you've described as a rise in social media addiction among adolescents?

A. I think parents have been basically hoodwinked by social media companies into believing that their kids needed to be on social media to be socially popular, well adjusted, also into believing that social media's educational. Parents have not been adequately warned about the risks of social media, and as such, have not been able to exercise parental judgment vis-a-vis children who get addicted to social media.

Q. Where in your report do you opine that parents have been hoodwinked by social media companies?

A. I don't use that exact language. But what I'm saying there is that the failure to warn parents is part of parents being hoodwinked.

Q. Besides the failure to warn, what other conduct can you identify that you attribute to social media platforms hoodwinking parents?

A. The attempts that defendants have made to

Page 104

promote their platforms as educational or fostering and improving social connection when, in the case of social media addiction, they actually do the opposite.

Q. Do you discuss the promotion and marketing of social media in your reports?

A. Yes.

Q. Where? You can just give me page numbers, and if it's defendant specific, we'll save that for later.

I'm looking for any portion of your report that specifically addresses social media platforms' promotion and marketing to parents.

A. Yeah.

So one instance is on page 46.

MS. MCNABB: Just --

MS. VAKY: Give --

THE WITNESS: A, B, C, D, that general area.

(Simultaneous speakers - inaudible.)

THE WITNESS: Page 56.

BY MS. VAKY:

Q. Just paragraph numbers, please.

A. Well --

Q. Or footnotes.

Page 105

A. I mean, I can read the whole page and give you paragraph numbers or I can just give you the page and you can find it for yourself.

What would you prefer?

Q. Tell me what paragraph specifically discusses efforts to market directly to parents about the positive uses of social media so parents will let their child be on it.

A. Oh, sorry, I misunderstood your question.

Q. Yeah.

You had testified that you believe social media platforms promoted the positive uses of their platforms directly to parents.

Am I misunderstanding your testimony?

A. I believe that's what I said. I think I misunderstood the question and thought you were asking for places in my report where they talk about explicit marketing to kids.

Q. Okay. Then maybe we can short circuit this.

A. Okay.

Q. You are not opining that social media platforms made a direct outreach to parents in attempts to hoodwink parents into allowing their children to get on defendants' platforms?

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL

Page 106

A.  Can you give me one second to look at one thing here?

Q.  Sure.

Do you want the question?

A.  No.  I remember the question now.  I can't find the specific place in my report, but what I am specifically thinking of is I think that the parental controls that these companies promoted have given parents a false sense that they are able to monitor what their kids are doing, and then more broadly, YouTube in particular.

Q.  Okay.  Let's --

A.  Yeah.  You're YouTube, right?

Q.  Yes.  But because we have other folks in the room in cases that do not involve YouTube, we have to be careful and honor the protective order.  So we can put a plug in that one.

But I just generally -- do you discuss in your report specific outward promotional materials that any platform directs at parents?

A.  Not specifically in my report, no.  At least not that I'm remembering right now.

Q.  Nothing sitting here today --

A.  Right.

Q.  -- that you can point out?

Page 107

Okay.  Let's go back to B-22 of your rebuttal report of your materials considered list, that category for expert reports.

A.  Okay.

Q.  Okay.  So the list of defense reports are from 309 to about 324.

Can you identify for me which of these defense reports discusses warnings?

A.  I'm not recalling.

Q.  You don't know one way or the other or sitting here you can't identify one that does?

A.  I just can't remember right now.

Q.  Do you have any reason to dispute -- strike that.

Sitting here today, do you have any knowledge that any of these defense experts address warnings in their reports?

A.  I just don't remember sitting here today.

Q.  Your opinion that defense platforms should affirmatively warn is responding to what defense expert opinions?

MS. MCNABB:  Objection.  Foundation.  Form.

THE WITNESS:  I don't know that my opinion to affirmatively warn has to respond to a defense

Page 108

experts' opinion.  I'm not really sure I understand the question.

BY MS. VAKY:

Q.  I'm not saying it does or doesn't.

I'm just asking, do your affirmative warning opinions respond to any particular defense experts' report?

MS. MCNABB:  Objection.  Asked and answered.

THE WITNESS:  I don't really understand the question.

BY MS. VAKY:

Q.  Were you -- did you have a specific defense experts' report in mind where you're responding to any of their opinions when you wrote your opinions in your rebuttal report about defenses' duty to warn?

A.  In my opinion about duty to warn is in my original report, and I just elaborate on it a little more in the rebuttal report.  So I haven't changed my opinion or added to my opinion.  My duty to warn opinion has been there from the beginning.

MS. VAKY:  Motion to strike.

BY MS. VAKY:

Q.  I'm not asking if it was there or not.

Page 109

I'm trying to figure out.  You understand the MDL, you issued your report in May, defense issued reports thereafter and then you came in with a rebuttal report.

You understand that sequence, right?

A.  Yes.

Q.  When you were writing your warning opinions in your rebuttal report, were you -- the answer could be no, were you specifically responding to any statements in the defense expert reports that you've listed on your materials considered list?

MS. MCNABB:  Objection.  Asked and answered.

THE WITNESS:  I don't understand the question because I don't understand, my rebuttal report is a response to defense experts and all the ways in which they are incorrect about the addictive nature of social media.  So I'm not really sure what you're asking.

BY MS. VAKY:

Q.  Can you identify any of the expert reports between 309 to 324 that address whether or not defendants' platforms should contain warnings?

MS. MCNABB:  Objection.  Asked and answered.

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

Page 110

THE WITNESS: I'm not specifically recalling.

BY MS. VAKY:

Q. Does your MDL rebuttal and opening report encapsulate all of your expert opinions to date as of today in the MDL litigation?

A. Yes.

Q. Moving to a different topic, does anybody need a break?

Okay. Your MDL report does not analyze what role social media content plays in adolescent mental health, right?

A. Well, the issue of content versus process is a distinction that I've held in mind in this litigation, and in writing my reports. And I try to address that in both my original report and my rebuttal report. My main message being that it is the medium itself, and its addictive design features, which cause the harm of social media addiction independent of content.

Q. Is it your view that social media content causes zero harm?

A. It is my view that although the content may be the initial gateway into why somebody goes to a particular defendants' platform, that very

Page 111

quickly, it's the design features and the medium itself that plays the larger role on how they behave on that platform. And it is the medium itself and the addictive design features which create the harms.

Q. Okay. So in your answer, you use the phrase "features have a larger role" and then the "features create the harms." So is it the features create zero percent of the harm -- strike that.

The features create 100 percent of the harm or the features create a majority of the harm?

MS. MCNABB: Objection. Asked and answered.

THE WITNESS: I really believe that it is the features themselves that are at the heart of the harm that's being caused. It's the features that create more access, more potency, more quantity, more novelty and more uncertainty or unpredictability in rewards that cause the social media addiction. It's not the content.

BY MS. VAKY:

Q. The content does not factor in at all to the access, potency, quantity, novelty, uncertainty, unpredictability of social media addiction?

A. It factors into a very limited degree.

Page 112

And I think what supports that is that you see the same addictive behaviors across many different types of content. It's not the content itself. It's these addictive design features that are causing people to become addicted to social media.

Q. You don't quantify the role of content anywhere in your reports, correct?

A. I think it's clear in my report that it's the medium and the addictive design features and not the content that is creating the harm.

Q. You just said that content can play a very limited role, right?

A. I think content is much, much less important than the design features.

Q. And I'm simply asking, you've qualified it with very limited, you haven't put a number on it; is that fair?

A. Well, I would even probably go further to say, if we're talking specifically about social media addiction and the addiction behaviors, we're talking 100 percent about the medium. We're not talking about the content.

Q. When we're talking about social media addiction, content is zero percent of the equation?

A. Yeah.

Page 113

MS. MCNABB: Objection. Asked and answered.

BY MS. VAKY:

Q. Nobody goes around saying I'm addicted to YouTube autoplay, right?

A. What do you mean by that?

Q. People say I'm addicted to videos of guys taking apart watches.

They talk about the content, don't they?

MS. MCNABB: Objection.

THE WITNESS: I'd like to refer to my report.

So on page 31 of my report.

BY MS. VAKY:

Q. Just a second. Okay.

A. This is just one of many examples of how the addicted design features themselves are causing the harm, not the content. This is an individual who was part of a Meta study, and he said, quote (as read):

People liking things can be addictive. I feel compelled to see who liked it. I think it's a bad habit because I'm always checking. And so the key here is that this person

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL

Page 114

continues to go back to the platform because of the like feature and the numeration that comes with the like feature. He's there to check on the number of likes. It's not about the content.

Q. You don't think the list of people who liked your post is content?

A. Specifically not, no. The number of likes is a design feature. It's a number.

Q. It's a number that represents how many third parties on the app liked particular content, right?

A. It -- it is a design feature that speaks to that, yeah.

Q. You don't think the content is the poison?

A. No. It's the number of likes, and that's, I think, well-articulated. It's the number that he's going for. He's checking the number of likes, not -- not the content of their opinions. It's divorced from content.

MS. VAKY: We're going to mark a video. We'll have it as Exhibit 6.

(Whereupon, Deposition Exhibit 6 was marked for identification.)

MS. VAKY: Pull up the video, please. This is -- well, I'll give the description after

Page 115

they play it. We're going to start at time stamp 1300, and we're going to play one point in 1400.

MS. MCNABB: I'll just object to the extent this is not the entirety of the video.

MS. VAKY: Do we need to do anything for the Zoom?

THE VIDEOGRAPHER: Depends, are you playing through your laptop?

EXHIBIT TECH: Hang on a second.

BY MS. VAKY:

Q. While we're getting the video uploaded, do you recognize the person on the screen?

A. Yeah.

Q. So this is a podcast called The Future of Everything with Russ Altman, correct?

A. Yes.

Q. The date of this video is April 5, 2024?

A. 2024?

Q. Yes.

(Video played.)

BY MS. VAKY:

Q. Okay. You recall this interview, Dr. Lembke?

Hold on. Let's get rid of the echo. There we go.

Page 116

Dr. Lembke, do you recall this interview?

A. Yes.

Q. Is Dr. Pimple Popper a poison for you?

A. Dr. Pimple Popper is a video that once I start watching, it's difficult for me to stop.

Q. Is that because of the content of the video?

A. In that case, it is because of the content of the video, but I would argue that when we're talking about severe -- let's just say social media addiction, like, I don't think I'm addicted to Dr. Pimple Popper, but if we're talking about kids and we're talking about addiction to social media, we're talking about being addicted to those design features that take human connection and "drugify" it.

This human connection at heart is a healthy and adaptive quality, but what social media has done is created design features that make the platforms addictive separate from meaningful human connection and even actually impeding and interfering with human connection.

MS. VAKY: Motion to strike "I would argue" everything that follows.

//

Page 117

BY MS. VAKY:

Q. Dr. Altman shared that his poison was particular content about mechanical watches, right?

MS. MCNABB: Objection. Misstates the video.

THE WITNESS: That's what he said. I didn't hear you.

MS. MCNABB: That's okay.

BY MS. VAKY:

Q. In this conversation, you and Mr. Altman were discussing particular content as being poison, right?

A. I mean, yes, we use that terminology.

Q. You also discussed a social contagion element too, right?

A. Yes.

Q. There is a social contagion phenomenon that people want to do what other people are doing, right?

A. Yes.

Q. That phenomenon is not unique to social media?

A. I think social media is one of the major ways that that contagion phenomenon happens.

Q. The phenomenon is not unique to social

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL

Page 118

media, right?

A. It's not unique to social media, but social media has really accelerated that phenomenon.

Q. Have you ever seen the movie Mean Girls?

A. No.

Q. You can look up Army pants and flip-flops later.

The social contagion element in this case was linked to the content of the watch repair guy, right?

A. I'm sorry, say that again.

Q. The social contagion element that you were highlighting in that clip was linked to the watch repair guy content, right?

A. I think I was referring to Dr. Pimple Popper when I talked about -- I have a hard time imagining that other people would be as interested in watches as Russ is, but ...

Q. Your report does not address what role the social contagion element plays in social media addiction for psychiatric harms, right?

MS. MCNABB: Objection.

THE WITNESS: I think indirectly it does. Right. It is those quantifications, the rankings, all the ways in which people are comparing their

Page 119

social ranking on social media, what they're watching, who liked it, how many people followed it.

It is the numerification or giving the numbers to the views, the followers, the likes, those are all the features that have a huge role in social contagion, as well as the algorithm, right, pushing to users what other people have liked and viewed before that promotes then a social contagion dissemination of certain content over others, et cetera.

BY MS. VAKY:

Q. Algorithms exacerbate the social contagion phenomenon; is that fair?

A. Like I said, the algorithms and the other addictive design features exacerbate the social contagion phenomenon.

Q. Social media companies did not develop the social contagion phenomenon, correct?

A. They have accelerated that phenomenon through their platforms.

Q. Through specifically the algorithms; is that right?

A. Not just the algorithms. The other addictive design features.

Q. Such as?

Page 120

A. Well, I list a lot of them. All of the quantifications, the number of likes, the number of views, number of followers, the number of comments, the number of BFFs, trophies, rankings, all those things which represent how many people have been there before.

Q. Your report didn't isolate each individual feature, it looked at the totality of all the features you've identified; is that right?

MS. MCNABB: Objection. Form. Foundation.

THE WITNESS: My report looked at both the individual features for individual defendants as well as the totality of features in general, causation.

BY MS. VAKY:

Q. You don't do a feature-by-feature causal analysis, correct?

MS. MCNABB: Objection. Form.

BY MS. VAKY:

Q. You do a defendant-by-defendant causal analysis?

A. The features are very similar, if not identical, across the platforms. And it's the features in aggregate, if that's what you're asking.

Page 121

Q. Not a single social media feature was mentioned in that clip, right?

A. Not in the little clip you showed me. I don't know about the rest of the interview.

Q. We'll go ahead and mark Exhibit 6. This should be Tab 6.

MS. VAKY: Let's do that 6, and let's do the printout of the transcript as Exhibit 7, but it will still be Tab 6. There should be a PDF you have. This is a full transcript of the interview.

(Whereupon, Deposition Exhibit 7 was marked for identification.)

BY MS. VAKY:

Q. It will take you a bit of time to review this, right?

A. Yes, it would.

Q. If you find a feature on there, you can let me know.

In order to treat social media addiction, you do advise individuals to abstain from social media completely for a period of time, right?

A. Yes.

Q. Have you ever advised them just to turn off the features that you opine are the addictive components of the platform?

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 122

A. Yes.

Q. Do you --

A. It's hard to do.

Q. Why is it hard to do?

A. Well, navigating these platforms to turn off certain features, you have to be pretty technologically sophisticated, and many people struggle to turn off the features. And even once you turn off something like notifications, it can -- you can still get notifications through various others means.

Q. Okay. So you advise some of your patients to turn off features that you characterize as addictive components of the platform, right?

A. Yes.

Q. Do you personally know how to turn off the features in all the defendants' platforms?

A. I don't personally know how to do that in all the defendants' platforms.

Q. But you instruct your patients to do it?

A. Yes.

Q. You don't think you have an obligation to spend time learning how to do it so you can show your patients?

A. No. Just like I don't think I have an

Page 123

obligation to learn how to roll a joint in order to advise my patients, you know, not to use cannabis.

Q. Turning off features on social media is the equivalent of rolling a joint?

MS. MCNABB: Objection. Misstates testimony.

MS. VAKY: It probably does.

BY MS. VAKY:

Q. I'm trying to understand, what's the parallel between rolling a joint and turning off addictive features of social media as you've defined them?

A. My point is just that I don't have to have -- I don't have to have my own accounts on social media in order to have an expert opinion on the harms of social media. Likewise, I don't feel like I have to know the technical ins and outs of how to turn off notifications on every platform in order to advise my patients to turn off notifications.

Q. So you advise them to turn it off and then leave them to their own devices to figure out how to do that; is that fair?

A. Well, when we're dealing with children, that would not be the case. With adults, yes, I do

Page 124

leave them to their own devices.

Q. You don't treat children in your practice, correct?

A. Well, I -- I am the director of the Toby Youth Addiction Initiative. I work very closely with the treatment providers in our child clinic. I have treated children and families and consulted for children and families. As a general rule, my patients tend to be 18 and older. So most of my patients are not children. But many of my patients struggled with social media addiction in childhood and are now -- I'm now seeing them as adults.

Q. I'm pretty sure these are going to be yes-or-no questions, but if we're going to go into the world where we need to, just give me a heads up.

Do you know how to turn off the features on YouTube that you've identified as addictive?

A. Some of them, I do, yeah.

Q. What about TikTok?

A. I don't.

Q. What about Snap?

A. No.

Q. What about Instagram?

A. No.

Q. What about Facebook?

Page 125

A. No.

Q. Have you made any efforts to learn how to turn off features that you've advised your patients to turn off?

A. I haven't made a tremendous amount of effort in that regard, no.

Q. Okay. So let's -- do you want to take a break? We've been going a little bit of time.

MS. MCNABB: Do you want a break?

THE WITNESS: I'm okay.

MS. VAKY: Madam Court Reporter, you okay?

BY MS. VAKY:

Q. Let's go to your opening report starting on page 17, talk about paragraph G.

We've touched on a little bit of this before.

You identify social media features that increase the risk of addiction by grouping them into what I would call risk categories. If you have a better term, let me know, those being access, quantity, potency, novelty, and uncertainty, right?

A. Yes.

Q. Were you given a list of what features to analyze prior to issuing your reports?

A. No.

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

Page 126

Q. Were you given a list of features that are not at issue in this litigation?

A. I wasn't given a list of features.

Q. Let me make sure I understand. You were not given a list of features to analyze, right?

A. That's right.

Q. You were not given a list of features to avoid analyzing, right?

A. Right.

Q. Are you aware that certain social media features cannot form the basis of claims because they're immunized by a law called Section 230?

MS. MCNABB: Objection. Foundation. Form.

THE WITNESS: I am familiar with Section 230.

BY MS. VAKY:

Q. Do you know whether any of the features you discuss in your MDL reports are immunized by Section 230?

MS. MCNABB: Objection. Foundation. Form. Outside the scope.

THE WITNESS: I am familiar with the judge's injunction, if that's what you call it, about that. But I wouldn't want to quote it from

Page 127

memory. I really would want to see it again.

BY MS. VAKY:

Q. Okay. And are you using the word "injunction" as a synonym of order?

A. Thank you. Yes.

Q. Did you read the judge's order?

A. I've read sections of the judge's order, yes.

Q. Is that order listed on your materials considered list?

A. I don't know.

Q. I'll represent to you I didn't see it.

A. I didn't see it. Okay, you didn't see it.

Q. I didn't.

A. Okay. I believe you.

Q. Whether a feature might be immunized by Section 230 did not play a factor in opinion 4 of your MDL opening report, correct?

A. Can you say that again?

Q. Sure.

Whether a feature may be immunized by Section 230 did not play a factor in opinion 4 of your MDL opening report?

A. It did not play a factor, no.

Q. Is that the same for all of the other

Page 128

opinions in your report, 1, 2, 3, 5?

A. I mean, I kept Section 230 in mind. I was aware of Section 230. So to that extent, you know, it did play a role, but --

Q. How did it play a role?

A. Well, I was aware that part of what I was being asked to opine on was whether or not content played a role separate from these design features, and I tried to address that in my report.

Q. How did you address the separation of content from features in your report?

A. Even before issuing this report, I have written on these "drugified" features, these features that make digital media addictive.

And I'm sorry, what was your question again?

Q. Sure.

Let me maybe try and make it a little clearer.

A. Yeah.

Q. If you had not known about Section 230 or the judge's order, would I be looking at a different report?

A. No.

Q. Thank you.

Page 129

Were you given a list of which platforms have which features?

A. I mean, I studied the platforms. That's part of what I did for this litigation, to study the various platforms, to study the features, to see how the features impact users.

Q. As part of your study for your report, were you the one that decided which of the features you were going to discuss for each of the four platforms?

A. Yes.

Q. Nobody gave you a list saying here's what Instagram has, here's what Meta has?

A. No.

Q. Under the category of access, you include the lack of features that serve as guardrails for accessing the platforms, right?

A. Yes.

Q. And the guardrails that you opine in your report include age verification, right?

A. Yes.

Q. Placing limits on the length and frequency of a session on a given platform?

A. I'm sorry, could you say that again?

Q. Sure.

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

Page 130

Is an example of a guardrail that you discuss in your report placing limits on the length and frequency of a session on a given platform?

A. I mean, I do discuss that, but I think I also qualify it by saying that it's not clear that alerting people to time spent actually helps them.

Q. So you don't have an opinion about whether alerting someone to the amount of time they spent on the platform total would help that person?

Am I understanding your testimony?

MS. MCNABB: Objection.

BY MS. VAKY:

Q. Okay. You testified -- I think I also qualify it by saying that it's not clear that alerting people to time spent actually helps them.

Are you referring to having someone see what their total amount of time on a platform is?

A. So I think there are more and more tools around alerting users to time spent in the hopes that it will help people use more moderately or engage in a healthier way. But I'm not aware of any specific evidence that I've had access to showing that it actually works. It might well work, but I have not reviewed any evidence, and I'm not aware of any evidence to that effect.

Page 131

Q. Okay. So you are not opining that any platform should place limits on what time of day an adolescent could access a platform?

MS. MCNABB: Objection.

Sorry, objection form.

THE WITNESS: No, that's not true.

BY MS. VAKY:

Q. I'm just trying to understand examples of guardrails that you highlight in your report. So let's talk about limits on what time of day someone could access a platform.

Was that an example of a guardrail?

A. Yes. That was --

Q. Sorry, were you -- okay.

A. Yeah.

Q. Is that an example of a guardrail that you opine about in your report?

Is that within the scope of your report?

A. I can't remember specifically if I talk about that in this report. I can look for it. But there is legislation in California that would require social media companies to limit access of children to social media to times of the day when they're not in school and times of the day when they are not sleeping, and I support that legislation.

Page 132

Q. You just don't recall sitting here today whether or not it's in your report?

A. I don't recall sitting here today whether or not it's in my report. I'm sorry.

Q. That's okay.

A. My -- my report -- I was not asked to list what guardrails should be implemented. It's implied in my report, but I was actually not asked to do that.

Q. Okay. That's a fair question. Let me rephrase it and see if maybe I can help jog your memory.

Under the category of access, do you include a lack of limit on what time an adolescent could access a platform to fall within what you would define as lack of features that serve as guardrails?

Is that within the scope of your report?

A. I'm sorry, can you say that again?

Q. Sure.

We're in the category of access.

A. Mm-hmm.

Q. And you have opined that the platforms lack features that serve as guardrails, right?

Is one -- is a lack of guardrail a lack of

Page 133

placing limits on what time of day an adolescent can access the platform?

A. Okay. So it's not just about what guardrails are there. It's also about whether or not there -- the default and whether or not you can opt out of them. I'm getting to your answer, just give me a moment here.

So placing limits on access to times of day makes sense and sounds good to me, and as I said, is part of California legislation that I support. But even before you get there, I think there needs to be much more robust age verification for even having access to the platforms.

Q. I think I can simplify my question. I appreciate you bearing with me.

Is the failure of the platform to put limits on what time of day an adolescent could access the platform increasing the risk of addiction, but increasing the risk of access?

A. I mean, it's an example of --

Q. It's --

A. It's an example of how the 24/7 access contributes to the harm.

Q. Is the failure to place limits on the length and frequency of a session an example of the

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

Page 134

increased access to the platform that contributes to addiction?

A.   It's an example of something that might be a guardrail if it were actually the default and mandatory and enforced and not easily opted out of.

Q.   Thank you.

Let's move on to the category of quantity.

You include endless scroll and infinite scroll, right?

A.   Yes.

Q.   Are those terms synonymous?

A.   Pretty much.

Q.   They're both referring to when there's no end to the content that a user sees in their feed?

A.   Yes.

Q.   And you include autoplay?

A.   Yes.

Q.   And notifications?

A.   I think notifications is more in novelty, but yes, it's all part of the addictive design features.

Q.   A feature could fall under more than one category?

A.   Yes.

Q.   Just so we're on the same page,

Page 135

notification is some sort of alert that's generated by the platform to notify the user about some action being taken on -- with respect to the content of the third party, right?

A.   I think --

MS. MCNABB:  Objection.  Foundation.

THE WITNESS:  I would say that --

MS. VAKY:  You need to move your mic up a little higher.

THE WITNESS:  I would characterize notifications as going beyond what you've just stated there.

BY MS. VAKY:

Q.   Can you give me your definition of notifications?

A.   Well, let's --

Q.   You can find it for me.

A.   Yeah.

Q.   I want to make sure we're talking about the same thing.

If you want, we can come back to it, if you want.

A.   I'm happy to talk about it now, but I don't know if I can because of the constraints of this litigation, but pages 68 and 69.

Page 136

Q.   Were you able, without looking at your report to kind of give me a working definition for notifications we can use for a few more of my questions?

A.   The use of notifications is so expansive that I -- I'd rather give you a specific definition based on my report.

Q.   Okay.  We'll put a pause in that and come back to it if we need to.

Is it fair to say at least notifications by the platforms are alerting users of content that has happened on the platform?

MS. MCNABB:  Object.

BY MS. VAKY:

Q.   Can we agree to that definition?

MS. MCNABB:  Objection.  Form. Foundation.

BY MS. VAKY:

Q.   Do you want me to read that definition again?

A.   No.  Just give me a moment.

Q.   Sure.

A.   Okay.  Sorry, what was your question again?

Q.   Yeah.

Page 137

I just want to make sure we're using notifications in the same way.

A.   Yeah.

Q.   So I've offered a definition of notifications to be an alert by the platform to the user of content that has happened on the platform.

MS. MCNABB:  Same objection.

BY MS. VAKY:

Q.   Are we on the same page with the definition of notifications?

A.   I -- I wouldn't use that exact wording.  I would say that notifications are an addictive design feature that encourage the user to spend more time on the platform than they would otherwise, or even to go on to the platform when they are doing something else.  So to me, the content is not particularly relevant.  It's the tactic of getting people to become more immersively engaged with the platform, spend more time or, again, return to the platform even when they've moved away from it.

Q.   So if we have a juror who has never heard of social media, they lived under a rock and they don't know what a notification is, we can agree it's an alert, right?

A.   Yes.

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL

Page 138

Q.   That's reaching the user outside of the platform, or inside the platform?

A.   Okay.

Q.   And it's the mechanism of pushing out an alert that creates an addictive response; is that fair?

A.   That's fair.

Q.   Is it the timing and the clustering of when those notifications are pushed out that contribute to the addictive design feature?

A.   That's one element of it, yeah.

Q.   You use the phrase "targeted recommendations."

A targeted recommendation is the pushing out of curated content that the platform's algorithm detects may be more enticing to a particular user; is that a fair definition?

MS. MCNABB:  Objection.  Form.

THE WITNESS:  Yeah.  I mean, the algorithm, you know, learns what the viewer has liked before, and then continues to push content to them that's similar, but slightly novel as a way to keep them engaged on the platform.

BY MS. VAKY:

Q.   When you use the term "targeted

Page 139

recommendations," is that term contemplating the targeting is done by the algorithm?

A.   I mean, yes, that is what I think that the targeting is -- is based on the algorithm or whatever the software is, knowing what that person has done before, essentially learning their habits, their likes and dislikes, and then trying to promote ongoing engagement.  It's all about promoting more engagement, more time on the platform.

Q.   I was really wondering what work the word "targeted" was doing versus just random recommendations that go to everybody regardless of their previous activity on the platform.

So the word "targeted" is what's kind of bringing in the role of the algorithm and the personalized experience in your phrase "targeted recommendations," right?

A.   The targeted recommendations, the tailored for you, all of that is -- has been tested by defendants and determined to be a way to keep those individuals on the platform longer.

So it's -- it's not really even necessarily about what that individual likes or doesn't like to look at.  It's what they can't stop looking at.

Page 140

Q.   The next category is potency, right?

A.   Yeah.

Q.   Here you discuss a rapid feedback of loop of posts, likes, shares and comments enumerated at scale.

Do you see that language?

A.   Yeah.

Q.   The next sentence uses the phrase "algorithmic feed."

Do you see that?

A.   Yeah.

Q.   Is that a shorthand for the rapid feedback loop of posts, likes, shares and comments, or is that something different?

A.   Again, it's what we were talking about before, how the algorithm learns the user and then pushes to them whatever will keep them on the platform longer.  I can -- give me a moment.

Q.   That answers my question.

A.   Okay.

Q.   The novelty section, here's where you talk about notifications, right?

A.   Mm-hmm, yeah.

Q.   And the uncertainty section, you, again, include the mystery of the algorithm, right?

Page 141

A.   Yes.

Q.   Is that the same concept as how you discussed it in the potency section, it's the algorithm's curating of content to reinforce engagement, or is the mystery of algorithm different than the algorithmic feed?

A.   Mystery of the algorithm, by the way, is not my language, it's defendants' language.  But this speaks to the ways in which intermittent or unpredictable rewards are even more reinforcing than predictable rewards.  And defendants have leveraged design features that create an element of uncertainty to keep people on the platform.

Q.   Those unpredictable rewards, would an example of an unpredictable reward be the amount of likes, the amount of shares, the comments, are all those examples of what you're talking --

A.   Those could be examples, you know, the unpredictable nature of the interactions or the responses.  But also the ephemeral content, the ways in which, for example, stories are only there for a limited amount of time, there's, you know -- there's a kind of a gamification or gamblification, which creates the uncertainty of who is going to win, who is going to be up, who is going to be down.

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL

Page 142

The pull to refresh function, which many patients with social media addiction will talk about how they don't even like what they're watching, they want to get off, but they can't, and then they just sort of refresh the page as a way to just sort of see what will be offered to them and how that element, that uncertainty is also driving the ongoing addictive engagement.

Q. So in the hypothetical that you gave, or anecdote maybe, you talked about there's different elements that are at play that are working at the same time to increase the risks of addiction; is that fair?

A. I mean, I try to divide it into these different categories, but there's probably overlap.

Q. Your report discusses short form videos. Would you put that under the potency category?

A. Probably, yes. And I think I did do that. I think I mention that specifically.

Q. Okay. Then your report performs a defendant-specific causal analysis through the lens of those categories, right?

A. That's correct.

Q. Are there any one feature that alone,

Page 143

without any of the other features, you would consider render a platform addictive and unsafe?

A. I haven't really given thought to that.

Q. You've only looked at the platform and what features are there to determine whether that combination renders that platform addictive and unsafe, right?

A. I would phrase it a little differently. I would say I've looked at each of the defendants' platforms, I've analyzed the features and the platform in general, and then I've identified the specific features on each platform that I think contribute to its addictiveness.

Q. And you haven't gone through the exercise in your report of would this platform still be addicted and unsafe if I removed one feature? You haven't done that exercise, right?

A. I haven't, and my observation of the platforms as they've evolved over time is that they've just adopted the most addictive features from each other as a way to optimize for addiction.

MS. VAKY: Motion strike for nonresponsive.

Now is a good time for a break for lunch?

MS. MCNABB: Yeah. It's what you want.

Page 144

Lunch is going to be ready soon, so we can take a short break --

THE WITNESS: Or we can keep going. Maybe keep going and then stop for lunch.

BY MS. VAKY:

Q. Let's go to page 4 of your rebuttal. Paragraph K. I think this is where you were picking up that last sentence (as read):

Defendants' platforms are more similar than not, each copying each others' addictive designs.

Do you see that language?

A. Yes.

Q. You at least agree that the defendants' platforms have some differences between them, right?

A. Yes.

Q. It wouldn't surprise you to learn that some plaintiffs in this litigation prefer some platforms over others, right?

A. That wouldn't surprise me.

Q. Wouldn't surprise you to learn that some plaintiffs don't use all the defendants' platforms, right?

A. That wouldn't surprise me.

Q. The use of specific features that you've

Page 145

identified as addicted design features are not features that are unique to social media platforms, right?

A. That's right.

Q. Many companies or products use notifications to reach consumers, right?

MS. MCNABB: Objection. Scope.

MS. VAKY: I need an answer, verbal.

THE WITNESS: Yeah, I haven't studied other platforms for this litigation. I've studied these platforms, so I can speak to these platforms.

BY MS. VAKY:

Q. Social -- shopping retailers send consumers emails and fliers in the mail about upcoming sales, right?

MS. MCNABB: Objection. Scope.

THE WITNESS: Again, I haven't studied shopping or retailer platforms for this litigation.

BY MS. VAKY:

Q. I'm not asking whether you studied them. You're aware that shopping retailers can send consumers emails about sales, right?

MS. MCNABB: Same objection.

THE WITNESS: I -- I'm not specifically aware of specific shopping platforms and their

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 146

process of notifications.

BY MS. VAKY:

Q. Never gotten a flier in the mail about a Black Friday sale?

A. Not to my knowledge.

Q. You've never gotten an ad in your mailbox about any store that's having a sale?

A. Not that I'm recalling.

Q. Are you aware that fitness studios utilize a form of streaks to incentive clients to come to more classes?

MS. MCNABB: Objection. Scope.

THE WITNESS: I'm not aware of that specifically, no.

BY MS. VAKY:

Q. You've never seen someone hold a sign that said 100 classes at a fitness studio?

A. Nope.

Q. Are you aware that airlines offer frequent flier miles for every flight?

MS. MCNABB: Objection. Scope.

THE WITNESS: That, I am aware.

BY MS. VAKY:

Q. Is the act of frequent flier miles a mechanism of gamifying?

Page 147

MS. MCNABB: Objection. Scope.

THE WITNESS: Just because somebody is using an incentive to get somebody to consume a particular product doesn't necessarily mean that that's the same thing as what defendants have done in this case.

BY MS. VAKY:

Q. I understand. I'm not asking if it's the same.

I'm just asking whether, in other industries, other companies, they utilize some similar mechanic, right?

A. Well, I guess I would want to know more about exactly what those mechanisms are because what I'm talking about here with social media is specifically the medium itself, the medium is the mechanism.

So it's different if you get something, like, in the mail or see an ad in the newspaper. The digital medium, the social -- social media, addicted social media products are really unique in terms of the fact that the content is really superfluous to the addictive nature of the platform itself.

MS. VAKY: Move to strike everything after

Page 148

"so it's different."

BY MS. VAKY:

Q. Let's take the airline example.

You get miles that go into your account for every flight you take, right?

A. Yes.

Q. You can cash in those miles for a free flight?

A. Yes.

Q. You can reach different tiers that give you status on the airline, right?

A. Yes.

Q. You can get other rewards if you reach certain milestones, right?

A. Yes.

Q. Would you consider that construct to be an example of gamification --

MS. MCNABB: Object.

BY MS. VAKY:

Q. -- as you use the word "gamification" in your report?

MS. MCNABB: Objection. Scope.

THE WITNESS: I'm not sure I would.

BY MS. VAKY:

Q. What's the difference?

Page 149

A. There are a lot of differences. One is just the rapidity of the interactive nature of social media. Another is the algorithm that learns where people have been hanging out, and then pushes content to them to keep them on the platform.

Q. Okay. Do you ever go to Starbucks?

A. Nope.

Q. Have you heard of coffee shops offering reward points for every cup of coffee you buy?

A. Yes.

Q. You can use those free points to get free coffee?

A. Yeah.

Q. Those coffee shops can send you emails with certain promotions, right?

MS. MCNABB: Objection.

THE WITNESS: Again, I'm not familiar with that.

MS. MCNABB: I'll object to the line of questioning. Beyond the scope.

BY MS. VAKY:

Q. Is this concept of gamification, have you ever seen gamification in any other product besides social media platforms and -- I'll just stop there.

A. I mean, the kind of gamification and

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL

Page 150

gamblification that I see on the social media platforms is really in a whole different universe in terms of the way that it manipulates users to stay on the platform longer. I really cannot think about an equivalent outside of that context of digital media.

Q. Companies of products and services do exploit behavioral reward mechanisms to capture more business, right?

MS. MCNABB: Objection. Scope. Form.

THE WITNESS: Again --

BY MS. VAKY:

Q. I understand you might think they're different scales, but just the concept of utilizing the behavioral reward mechanisms, that is not unique to social media, can we agree on that?

MS. MCNABB: Same objection.

THE WITNESS: I would say that behavioral rewards and punishments to shape behavior is something that is well-known, but, again, what we're talking about with social media and the defendants' platforms in particular is the specific very potent design features that are the drug itself.

BY MS. VAKY:

Q. Okay.

Page 151

MS. VAKY: Move to strike everything after "again."

BY MS. VAKY:

Q. I understand your counsel's objection about scope, but I'm really not asking about the social media platforms, so please listen to my question.

Utilizing behavioral reward mechanisms to capture business is at the core of marketing generally.

Do you agree with that?

MS. MCNABB: Objection. Scope.

THE WITNESS: You know, most marketing happens in the context of having to sell their products for money. Social media has created such -- the defendants' platforms are so addictive that there's no -- it's the medium itself.

BY MS. VAKY:

Q. Again, I'm not asking about social media specifically. I'm asking whether the core of marketing generally, as a practice, it utilizes behavioral reward mechanisms in order to capture business.

That's the goal of marketing, right?

MS. MCNABB: Same objection. And asked

Page 152

and answered.

THE WITNESS: Again, I think that, as I said, you know, behavioral reward mechanisms to shape behavior is well understood. Does it happen more broadly in marketing any product, sure. But the extent to which these mechanisms are the drug itself in defendants' products is really the essential point here.

BY MS. VAKY:

Q. Okay. You've held yourself out to courts as an expert in marketing, right?

A. Mm-hmm.

Q. Okay. And the core goal of marketing is to capture more business for your product, right?

A. Yes.

Q. The concept of companies competing for user's time is fundamental to a capitalist society, right?

MS. MCNABB: Objection. Foundation. Form. Scope.

THE WITNESS: I think, you know, again, what we're talking about here is really a public health crisis in kids. And the ways in which the marketing strategies of defendants are directly contributing to mental health harms in kids.

Page 153

We do not market or sell alcohol and nicotine products to kids. We do not allow kids to go into the casinos and gamble. We as a society have determined that there are certain products that kids just simply shouldn't have access to. And so in my opinion, defendants' social media products are analogous to those kinds of products, which we as a society have determined kids shouldn't have access to because they are so addictive and so potentially harmful.

MS. VAKY: Okay. Move to strike that response.

BY MS. VAKY:

Q. Do you understand the basic principles of capitalism?

MS. MCNABB: Objection. Form. Scope.

THE WITNESS: That's a very broad question.

BY MS. VAKY:

Q. Do you believe we're in a dark age of capitalism?

MS. MCNABB: Objection. Scope.

THE WITNESS: I have said that.

BY MS. VAKY:

Q. Let's go to page 6 of your report.

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL

Page 154

Paragraph G, last sentence again.

(As read):

By deploying a highly personalized and algorithmic tailored feed, social media ensures that each user receives the stimuli that the individual person finds rewarding and not those they don't find rewarding.

Do you see that?

A. Sorry, which paragraph is that?

Q. Sure.

On page 6 of your rebuttal, paragraph G, last sentence.

A. Yes, I see that.

Q. You use -- strike that.

You refer to the algorithm repeatedly throughout your report, right?

A. I do refer to it in my report.

Q. Is the algorithm the culmination of all the individual features that you also discuss, or is the algorithm completely divorced from notifications?

A. I think of the algorithm as separate from those other features. The algorithm is really at

Page 155

the heart of the tailored for you function, that is to say, the algorithm learns what the user has spent time on before, and then tries to keep the user on the platform longer. And the algorithm through maybe testing and whatnot figures out how to do that.

Q. The tailored for you function, would that include notifications?

A. I mean, notifications are another feature. But specifically when I think about the algorithm and talk about the algorithm, I'm distinguishing it, for example, from a chronological feed. It's not a chronological feed. It's a feed of where that person has been, what they've liked, and also importantly, what other people have liked, what other people have viewed.

Q. Could you isolate the causal effects of the algorithm from the causal effects of a feature like autoplay?

A. I think you can isolate those things out.

Q. You did not isolate out the causal effect of each of the features in the report, right?

A. I looked at them in aggregate.

Q. Have you analyzed whether social media platforms can cause addiction or other forms of harm

Page 156

if third-party posts and comments can't be considered in the causal analysis?

MS. MCNABB: Objection. Form.

THE WITNESS: I think my report makes clear that it's not about the content, it's about the addictive design features.

BY MS. VAKY:

Q. In the context of discussing the addictive design features, you have referenced comments, likes and posts, right?

A. Yes.

Q. If you exclude comments, likes and posts, can you analyze whether social media platforms can cause addiction?

A. Yes.

Q. You did not do that causal analysis in this report, right?

A. I didn't isolate comments, likes and posts, but there's plenty more in my report to support my opinions, even without relying on comments, likes and posts.

Q. Have you analyzed whether social media platforms can cause addiction or harm if private messaging is not considered?

MS. MCNABB: Objection to form.

Page 157

THE WITNESS: What do you mean by "private messaging"?

BY MS. VAKY:

Q. User-to-user messaging on a platform that is not public for everyone else to see.

A. Right. So my opinion is that defendants have "drugified" user-to-user communication with their design features. So this is not just people exchanging messages. This is a "drugified" version of that.

Q. You have not performed an analysis about whether the platforms can cause addiction or harms if we remove the user-to-user communication feature, right?

A. My report provides plenty of evidence of the addictive nature of these platforms even outside the user-to-user communication.

Q. You didn't perform a specific analysis that strategically removed a feature and then analyzed whether that platform, without that feature, would still qualify as addictive and harmful, right?

MS. MCNABB: Objection. Asked and answered.

THE WITNESS: Again, I looked at this at

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL

Page 158

each defendants' platform that stood on its own and I evaluated the potential for addiction, the addictiveness, the evidence that they are addictive based on the criteria for addiction for each individual platform, looking at each individual platforms' addictive design features and the evidence showing they are addicted and kids are actively being harmed by those platforms.

BY MS. VAKY:

Q. Did you identify any feature of any platforms -- if the answer is yes, just stop there and we'll pick it up later. Let me start over.

Did you identify any feature in any of the platforms that you determined was not addictive?

A. I looked at the platforms holistically, each individual platform holistically for whether or not the platform is addictive.

So I wasn't -- it wasn't part of my -- I just looked at them holistically. That's all I can really say.

Q. In that holistic analysis, you refer to specific feature that support your ultimate conclusion, right?

A. Yes.

Q. You don't identify in your report any

Page 159

feature that you officially ruled out as contributing to the addictive nature of a platform; is that fair?

A. Well, I disagree with that statement.

Q. Okay. How do you disagree with that statement?

A. I looked at a variety of so-called wellbeing features that have been implemented or that, you know, are going to be implemented. And I talk about that in my report as well, so the sort of anti-addiction features that the companies have claimed to create and implement on their platforms.

Q. You've previously testified in your JCCP deposition that you think there's a distinction between addictive social media and social media platforms that don't have the same design features that make them addictive.

Does that sound familiar?

A. Yes.

Q. Can you name a social media platform that does not have the same addictive design features that you opine make a platform addictive?

A. Yes.

Q. Tell me those platforms.

A. Zoom.

Page 160

Q. You consider Zoom to be social media?

A. Yeah.

Q. Okay. Any others?

A. I don't have a list coming to mind now, but ...

Q. Does Zoom utilize notifications?

A. I haven't specifically evaluated Zoom for the purposes of this litigation. Sitting here today, I have never seen a case of Zoom addiction.

Q. When you say, "a case of Zoom addiction," are you referring to you've never had a patient come into your office in your clinical work and say I believe I'm addicted to Zoom?

A. In my research, I've never encountered that description of somebody addicted to Zoom.

Q. Okay. Do you know whether Zoom has notifications?

A. I don't.

Q. Do you know whether Zoom has private messaging?

A. I don't.

Q. Do you know whether Zoom has ephemeral content?

A. I don't.

Q. Do you know whether Zoom has reactions?

Page 161

Do you understand what I mean by reactions?

A. Yes. It has reactions, yes.

Q. Do you know whether Zoom offers likes?

A. I don't remember.

Q. Do you know whether Zoom offers filters?

A. I think it does, but I can't quite remember.

Q. So if Zoom has filters, notifications, private messaging, reactions, ephemeral content, that still does not qualify the platform as addictive in your mind?

MS. MCNABB: Objection. Misstates testimony. Form.

THE WITNESS: Yes. Those designs features are necessary, but not sufficient to call a platform addictive.

BY MS. VAKY:

Q. Why not?

A. Because one must also show that there is a population of users who become addicted based on the four Cs, tolerance, withdraw and the other very commonly understood core criteria for diagnosing addiction.

Q. Zoom exploded in 2020 with the pandemic;

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL

Page 162

is that fair?

A. (Nods head.)

Q. So is it possible we just haven't seen an addiction to Zoom percolate in the population at this point in time in 2025?

A. It's possible, but doubtful. I would think in five years, if people were going to be addicted to Zoom at a large scale, I would have seen them in the clinic or I would have heard about them in my research, read a case report.

Q. When's the earliest you recall case reports about social media problematic use?

MS. MCNABB: Objection. Asked and answered.

THE WITNESS: I mean, I first started seeing it in my clinic around 2015, 2016, among 18, 19, 20, 21 year olds who reported getting addicted to social media around 2010, 2011. So there was a delay in terms of my seeing it in the clinic, but I was aware, you know, very early on of the potential for addiction to social media.

BY MS. VAKY:

Q. Addiction is a spectrum disorder. We've already talked about that, right?

A. (Nods head.)

Page 163

Q. The spectrum is characterized usually by mild, moderate, self-reporting, those three benchmarks?

A. (Nods head.)

Q. Can you give a "yes" for our court reporter?

A. Yes.

Q. Someone's score -- back up. You're familiar with the Bergen Social Media Addiction Scale?

A. Yes.

Q. Is someone's score on the Bergen Social Media Addiction Scale alone determinative of the severity of their social media addiction?

A. I think that a score on the social media scale could point to the severity.

Q. Is the Bergen Social Media Addiction Scale intended to determine the severity of the social media addiction?

A. I'm not recalling specifically, but I don't remember that being the case. I think it's just for identifying if people have social media addiction or not.

Q. If someone's problematic social media use does not rise to the level where you would deem that

Page 164

person to have a psychiatric disorder, you would still use the term "addiction" to describe their current social media behavior?

A. When I use the term "addiction," I am saying that they met threshold criteria for having a psychiatric disorder, but I'm well aware that in the general population, it's not always used that way. And there are many synonyms for addiction, like problematic use, unbalanced use, toxic use.

Q. The language of addiction medicine is currently in flux, you said that, right?

A. Yes.

Q. Is one of the reasons it's influx because addiction medicine experts don't agree on a set lexicon?

A. There is disagreement about a set lexicon, but there's not disagreement about the basic criteria and the patterns of behavior that denote addiction. That's pretty well agreed on and has been around for a long time.

Q. So what else do you attribute to the language, the terminology being in flux?

A. A big part of the terminology being in flux is the recognition that to diagnose somebody with addiction is stigmatizing. So wanting to use

Page 165

language that is less stigmatizing, specifically the word "abuse," which used to be in the DSM-IV, to diagnose an addiction was thought to be too similar to domestic abuse. So there were individuals who didn't want to use that language anymore.

Terms that originate in alcoholics unanimous, like alcoholic that were used for a long time by medical professionals was thought to be nonmedical enough, so wanting to kind of create more medicalized language. Also terms to describe things like urine toxicology screens, calling them -- calling a positive screen a dirty screen, again, thought to be stigmatizing, and so there was a movement, there is a movement in the medical community to get away from that language.

But the construct hasn't changed. We diagnose and define addiction the same way we have for many decades.

Q. Your rebuttal report, page 2, paragraph 1, includes the sentence, second to last (as read):

I further disagree that the Bergen Social Media Scale and other similar scales are an invalid way to access for social media addiction.

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL

Page 166

Do you see that language?

A. Yes.

Q. Is the Bergen Social Media Scale and similar scales a valid way to diagnose social media addiction?

A. Yes.

Q. Has the Bergen Social Media Scale been validated for use in adolescent population?

A. I'm not recalling a particular study. I believe that the primary studies are in adults, but the Social Media Use Disorder Scale has been used in an adolescent population and validated across different countries.

Q. So you don't know sitting here today whether the Bergen Social Media Scale has been validated for use in the adolescent population?

MS. MCNABB: Objection. Asked and answered.

THE WITNESS: Yeah. I feel like my answer is the same, but I will say that the -- that Meta's problematic use research is partially based on the Bergen Social Media Scale, which speaks to it being, you know, a valid and reliable source.

BY MS. VAKY:

Q. For use in adolescent populations?

Page 167

A. Mm-hmm, yeah.

Q. Other than Meta's research, any other literature that you can point me to for the Bergen Social Media Scale being validated for the use in adolescent populations?

A. Not that I'm aware of right now.

Q. The Bergen Social Media Scale instructs the taker to consider the time period of the last year to the present, right?

A. I'm not specifically recalling.

Q. Do you know whether the Bergen Social Media Scale has been validated for use in the forensic setting?

A. I don't know.

MS. MCNABB: Katherine, we've been going for about another hour. Lunch is here.

MS. VAKY: Fabulous. Let's take a break.

THE VIDEOGRAPHER: Time is 11:55. We're off the record.

(Whereupon, a recess was taken from 11:55 a.m. to 12:43 p.m.)

THE VIDEOGRAPHER: Time is 12:43. We're back on the record.

BY MS. VAKY:

Q. Dr. Lembke, did you discuss the substance

Page 168

of your testimony with your counsel over the lunch break?

A. No.

Q. Is there any testimony from this morning that you'd like to change or correct?

A. Is it possible for you to remind me what the last question was before we took a break? I felt like there was something I wanted to add, but I don't remember now what it was.

Q. Unless you thought you said an incorrect statement, I'll let your counsel decide if they want to revisit that issue.

A. Okay. I don't feel I made an incorrect statement.

Q. When you deal with device use with families in your practices, one or your first interventions you make is getting the parents off their device, right?

MS. VAKY: Can we go off the record, please?

THE VIDEOGRAPHER: Time is 12:44. We're off the record.

(Off the record.)

THE VIDEOGRAPHER: Time is 12:44. Back on the record.

Page 169

BY MS. VAKY:

Q. Dr. Lembke, when you deal with device use with families in your practice, one of the first interventions you make is getting the parents off their devices, right?

A. It really depends on the family. If it's a family where the parents are modeling the kind of behaviors we don't want to see in the child, then I will encourage a family systems approach where we make interventions for the whole family, not just for the child, to try to create an environment where the parents are modeling the behaviors that they want to see in their kids.

Q. Kids are going to model what they see their parents do, right?

A. That is a powerful factor in what kids do, yes, especially younger kids.

Q. You testified in June that your own children use their own money to purchase their own smartphones and pay for their own smartphone plans. Do you recall that testimony?

A. Yes, I do.

Q. I'm guessing that was an intentional decision by you to make them pay for their devices and their plans, right?

43 (Pages 166 - 169)

HIGHLY CONFIDENTIAL

Page 170

A.  Well, it wasn't even really discussed. Our kids just went out and got their own phones and paid for their own plans and informed us that they had phones.

Q.  It was your rule in your house that you were not going to pay for their device, right?

A.  That is correct.

Q.  And it was a rule in your house that you were not going to pay for a data plan, right?

A.  That is correct.

Q.  Those parenting decisions were your way of creating friction between them and their devices, right?

A.  That is true, but I will add that I'm highly knowledgeable in this arena.  I also coparent with a very involved husband.  We have cultivated these values from early on.  We have the education and the recreation and the financial wherewithal to implement all that, which is not the case for a lot of parents out there.  People who are poor, people with single-family homes, people who are stretched beyond their limit as it is.

Q.  Okay.

MS. VAKY:  I'll move to strike, but I will add "and everything thereafter."

Page 171

BY MS. VAKY:

Q.  The reality is the smartphone makes social media more accessible, right?

A.  It does make it more accessible, but it's still highly accessible even without a smartphone.

Q.  None of the defendants have any control over whether any particular adolescent has access to a smartphone, right?

MS. MCNABB:  Objection.  Form.

THE WITNESS:  I mean, I guess I would say that's true, yes.

BY MS. VAKY:

Q.  Social media platforms are inaccessible without the internet, right?

MS. MCNABB:  Objection.  Form.

THE WITNESS:  That's true.

BY MS. VAKY:

Q.  None of the defendants have any control over whether parents or schools make the internet accessible to a particular kid, right?

A.  Well, I'm not sure I agree with that statement.

Q.  What part don't you agree with?

A.  The -- some of the defendants have lobbied schools very heavily to incorporate their products

Page 172

in the curriculum.

Q.  Is there anywhere in your report where you detail your opinion that any of the defendants have lobbied schools to incorporate their products in the curriculum?

Dr. Lembke, depending how much more time we need, I can go off the record or we can come back to it.

A.  Well, I'm not sure how much more time I need to find the particular thing I'm looking for.

MS. VAKY:  Let's go off the record, and you can take as much time as you need.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  Time is 12:49.  We're off the record.

(Whereupon, a recess was taken from 12:49 p.m. to 12:51 p.m.)

THE VIDEOGRAPHER:  Time is 12:51.  We're back on the record.

BY MS. VAKY:

Q.  Dr. Lembke, we went off the record to give you time to go through your report.

Do you want me to repeat the question?

A.  Please.

Q.  Is there anywhere in your report where you

Page 173

detail your opinion that any defendants have lobbied schools to incorporate their products in the curriculum?  And I'd advise you again, page number maybe would be the best place to start if you've identified something.

A.  Okay.  So I don't have anything in my report specifically about lobbying, but I feel that I have evidence in my report that lobbying can be inferred, and specifically that's for YouTube.

Q.  Let's stop there, please.

A.  Okay.

Q.  Again, this is another example where if it's going beyond Meta, we need to not disclose that in the record in the presence of counsel for the AG.

MS. RITTER:  It's a confidential document. Ann Ritter for New Mexico.

MS. VAKY:  Let the record reflect that she's going to identify a portion of her report that would be redacted if provided to the Attorney Generals.

BY MS. VAKY:

Q.  So besides whatever you were about to identify, anything else?

We'll come back to it, we just won't do it right now.

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL

Page 174

A. That's fine. We can come back to it.

Q. Is it just that one place in your report you are going to direct me to or multiple places?

A. I found one place. I think there are other places, but I found one place.

Q. Give me the page number.

A. This is my rebuttal report, page 21.

Q. Okay. That's all I need.

Any other places you're able to identify in either of your reports pertaining to lobbying, just page numbers?

A. If I had more time, maybe if there's a break, I can take a look.

Q. I'll let you do that on a break so we can keep things moving.

A. Yeah.

Q. Is there any reference in your report to any defendant lobbying for increased internet access at homes or schools?

A. No.

Q. Cellular data allows one to access the internet without being connected to a Wi-Fi network, right?

A. Yes.

Q. Cellular data makes social media more

Page 175

accessible, right?

A. Yes.

Q. None of the defendants have any control over whether a child has a data plan on their device, right?

A. I don't know.

Q. You don't know whether a defendant controls whether a child's cell phone plan includes data usage?

A. I don't have any knowledge to that effect. Whether or not defendants are working with companies that offer data to teens to collaborate to make it easier, I believe that could be happening. I'm not aware of that.

Q. Do you have any basis for your belief -- strike that.

Are there any materials in either of your reports that would support your theory that defendants are working with companies that offer data plans to teens in collaborating to make data plans easier to access?

MS. MCNABB: Objection. Misstates testimony.

THE WITNESS: So I don't address that specifically in my report, but as a part of general

Page 176

knowledge about how these companies work and collaborate, what I'm saying is I'm not specifically aware of any collaboration. But it wouldn't surprise me if those collaborations were happening.

BY MS. VAKY:

Q. It's outside the scope of your opinions in this case whether any defendant is collaborating with any cellular usage companies to increase access; is that fair?

A. It's not in my report.

Q. Okay. You testified at your June deposition that understanding the defendants' platforms should be totally inaccessible for children 13 and under.

Do you recall that testimony?

A. Yes.

Q. Is it still your view today that no person 13 and under should be able to access YouTube, Facebook, Instagram, TikTok or Snap at all?

A. That's my testimony, yes.

Q. Should parents be able to decide whether their child can access any of the platforms for their 13 and under children?

A. Social media addiction is a growing public health crisis. Kids under the age of 13 are

Page 177

particularly vulnerable because of developing brains. We, as a society, often make judgments about what kids can and cannot consume based on what we determine to be harmful to them, and so my opinion about that still -- still stands.

Q. And that opinion is that parents should not be able to decide whether their child will have access to any of the defendants' platforms under 13 years old?

A. That children under 13 should not have access to those platforms.

Q. Regardless of whether their parents would like them to or not?

A. That's my opinion, yes.

Q. Don't we want to give parents the freedom to choose how they want their children to interact with the online world?

A. It depends what age the child is.

Q. Don't we want to give parents the freedom to choose how they want their children under 13 to interact with the online world?

A. Social media platforms, the defendants' social media platforms, are -- there's sufficient evidence of the harm for kids engaging on defendants' social media platforms. I think we can

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL

Page 178

determine as a society that kids under the age of 13 should not be accessing those platforms.

Q. So in your view, as a society -- strike that.

Societal's views should trump the rules of the individual parents; is that fair?

MS. MCNABB: Objection.

THE WITNESS: We don't allow children to buy cigarettes, to purchase alcohol, to go into casinos and gamble. Social media rises to the levels of harm for kids as those other addictive products.

Sorry, by the way, when I say "social media," I mean defendants' social media products.

BY MS. VAKY:

Q. So in your view, no child under 13 should be able to access YouTube under any circumstances?

A. I feel like I answered that question. I don't have another answer.

Q. I'm asking it specifically as to YouTube now.

A. I have the same answer.

Q. And what's the answer?

A. That children under the age of 13 should not have access to defendants' platforms because the

Page 179

harms outweigh the benefits.

Q. And because we've got a bit of a dual case caption here, I want to make sure because "defendants" is a bit of a problematic term, so I'm going to go platform by platform.

Children under the age of 13 should not have access to YouTube's platforms, that's your view, right?

A. Again, when I say "access," I mean that children under the age of 13 should not be able to have their own accounts on any of defendants' platforms and should not have unsupervised access to any of defendants' platforms.

Q. Okay. So that's a little different than not being able to access at all, right?

A. Yes. It is.

Q. Okay. So you do believe that children under 13 should be able to access defendants' platforms so long as they don't have their own accounts and they are being supervised; is that fair?

A. I don't want to generalize to that because I think there's so much harm for kids on these platforms, but I can imagine a scenario where there might be something on one of these platforms that

Page 180

could be shown to a child under 13 that wouldn't be harmful.

Q. Is there ever a time where a child can legally buy cigarettes?

A. No.

Q. Okay. So social media is a little different than cigarettes?

A. Well, I don't think it is different.

Q. The regulations, there are under no circumstances can someone under 18 purchase cigarettes legally, right?

A. Yes, that's true.

Q. And your view of social media is that there are some circumstances where someone under 13 should be allowed to access a particular platform?

A. Erring on the side of caution, I would probably go back to saying that kids shouldn't be able to access the defendants' platforms 'cause I just don't think -- there are no guardrails in place. There are no sufficient guardrails to access those platforms.

Q. Let's put a little bow on it, and then we'll move on.

Kids, you're defining as children under 13, right?

Page 181

A. I mean, minors are children under the age of 18, right?

Q. Right.

A. But I think that we can specifically carve out under 13 as kids who should not have access to defendants' platforms.

Q. Thank you.

Sorry to go back to this.

When you are saying "defendants' platforms" in that case, are you referring to Facebook, Instagram, TikTok, YouTube and Snapchat?

A. Yes. The ones that I name in my MDL report.

Q. Thank you.

Okay. Let's go to your rebuttal report, page 5, paragraph C. This is your MDL rebuttal report. We're going to stick with these last sentences.

The last sentence (as read):

Without treatment or engagement in recovery activities, addiction is progressive and can result in disability or premature death.

Do you see that sentence?

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL

Page 182

A. Page 5, what paragraph?

Q. C.

A. Oh.

Q. Romanette c, the very last sentence.

A. Yes.

Q. (As read):

Without treatment or engaging in recovery activities, a social media addiction will only get worse.

Right?

A. I'm quoting the ASEM definition here.

Q. Is that not your opinion too?

A. That is my opinion, but there are cases of addiction, at least in adults, where there is spontaneous recovery without treatment.

Q. In social media addiction?

A. I have seen that in social media addiction in adults, yes.

Q. How frequent do you see spontaneous recovery without treatment?

A. It's pretty infrequent, but I have seen it.

Q. Are you able to further characterize what you mean by "infrequent," like, very, very, very

Page 183

rare?

A. Very, very, very rare.

Q. Count on one hand the amount of times you've personally seen it?

A. Sure. Yeah.

Q. If you have someone who has spontaneous recovery without treatment, do they have any signs of withdrawal?

A. Yeah. I mean, spontaneous recovery from addiction, including social media addiction, is not easy. What is meant -- what I mean by spontaneous recovery is they are able to recover without seeking the help of a trained medical professional.

Q. Okay. So they were engaging in some sort of recovery activity, just without the assistance of a healthcare provider?

A. That's it.

Q. Okay. Thank you.

In your opinion, without self-treatment or engaging in any recovery activity with professional help or not, a social media addiction will only get worse, right?

A. It really depends on the severity of the case. Some will only get worse, and some will get better. It would really depend on the case.

Page 184

Q. Can an addiction magically disappear on its own?

A. Again, there is such a thing as spontaneous recovery where people get better. It's not magic. They have to work at it.

Q. Isn't the act of working at it not spontaneous?

A. Okay. If you don't like the word "spontaneous," I can rephrase that to just say that people can -- most addictions, including severe addictions, will progress over time, but there are some people who are able to pull themselves out of that addiction cycle with a lot of determination and typically a lot of social support without necessarily going to see an addiction specialist. And that social support can be a faith-based organization, it can be a 12-step group or other mutual help group, it can be friends and family, it can be other activities that they engage in, healthier, more adaptive communities and activities.

Q. A person suffering from an addiction will have to make some sort of change in their life to stop the progression of the addiction; is that fair?

A. The diagnosis of addiction is based on behaviors, so the definition of recovery is that

Page 185

there is improvement in behaviors, healthier behaviors, cessation of the addictive behaviors.

Q. Would anybody accidentally cure their addiction without knowing it?

A. To the extent that somebody was aware of their social media addiction, they would be aware when that had resolved.

Q. If someone just woke up and stopped using social media without any symptoms of withdraw, that would indicate to you that there might not have been an addiction to begin with; is that fair?

A. Not necessarily. Many people don't make the link between stopping social media and the withdrawal symptoms that they are having since common symptoms of withdrawal are actually psychological symptoms, like anxiety, irritability, insomnia, inattention. So they might be experiencing withdrawal and not know it. We see this commonly with some types of addictions, especially behavior addictions.

Q. In your book Dopamine Nation, you provide suggestions for recovery activities one can do on their own, right?

A. Yes.

Q. Those activities are just as applicable to

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL

Page 186

adolescents as adults, right?

A. Yes.

Q. Was one of your goals in writing Dopamine Nation to provide people with the tools to successfully treat a social media addiction?

A. Well, I specifically used the term "compulsive over consumption" repeatedly in my book to capture individuals who are at risk for addiction, but may not have crossed over into the threshold of addiction. And I think those individuals are especially amenable to reading something, a book like mine and making behavior change. Once people cross into addiction, it's a lot harder to use those sort of self-discipline and self-binding strategies to make those changes. As I said before, typically those individuals will need some kind of professional support.

Q. You did not intend in your book Dopamine Nation to serve as a replacement for medical treatment of a social media addiction, right?

A. That's correct.

Q. Is there a point at which someone would -- someone suffering from a social media addiction would need to skip your book and go straight to a medical licensed professional?

Page 187

A. Yes. Although I hear from a lot of readers who are in residential treatment programs for severe addictions who appreciate my book because it gives them an understanding of the process of addiction, what happened to them, gives them a framework for understanding, you know, how it is that they became addicted without even realizing what was happening.

Q. Do you warn your reader anywhere in Dopamine Nation about when to seek medical help?

A. I don't remember if I explicitly talk about that in the book. I might well do. I don't remember, but I certainly do talk about that in a lot of the interviews that I do and also in the workbook.

Q. Do you have any warnings in Dopamine Nation that your work is not a replacement for care provided by a licensed medical professional?

A. I don't remember.

Q. And the last time I checked on Amazon, Dopamine Nation paperback was listed for sale for $9.16.

Does that sound right to you?

A. I have no idea.

Q. Do you know who Cara Bagot (phonetic) is?

Page 188

A. I don't recollect the name.

Q. What about Stewart Murray?

A. I don't -- the name doesn't bring anything up for me.

Q. Okay. FOMO, is the acronym for fear of missing out, right?

A. Yeah.

Q. FOMO is not the same as withdrawal, right?

A. I think FOMO is a form of withdrawal.

Q. Is FOMO alone sufficient evidence of withdraw from a behavior?

A. It might be in a particular case. Withdrawal can manifest in different ways, and I think fear of missing out is the way that some people experience social media withdraw. It's that fear of missing out that then propels them to want to reengage even though they were determined to stop using.

Q. If the fear of missing out is a momentary sensation, is that still a form of withdrawal?

A. Sure. I mean, most symptoms of withdrawal kind of come and go, ebb and flow.

Q. So if the fear of missing out is just a momentary thought and then the person has no other harms, would you consider that a symptom of withdraw

Page 189

indicating addiction?

A. The diagnosis of withdraw -- the diagnosis of addiction is not based on any one criterion. It's a pattern of behavior that progresses over time and ultimately becomes obvious.

Q. Is some symptom of withdraw critical to any diagnosis of addiction?

A. No.

Q. Someone can have an addiction without any withdrawal symptoms?

A. Yes.

Q. One of the key factors that you do need to diagnose addiction is some sort of harm, correct?

A. Yes.

Q. And if you stop a behavior with no symptoms of withdrawal, you could still characterize that behavior as an addiction?

A. Yes.

Q. Some habits can be harmful, right?

A. Yes.

Q. What's the difference between a harmful habit and an addiction?

A. It really depends on who is using that word and in what context.

Q. Why?

48 (Pages 186 - 189)

HIGHLY CONFIDENTIAL

Page 190

A. I have a long explication in my report about ███████ ' use of that term "habit." And I'm happy to go through that section of my report.

Q. I'll review that and follow up if I have any questions.

A. Okay. Great.

Q. You testified in June that you anticipate 15 percent of your income this year will be from expert witness work.

Do you recall that testimony?

A. Yes.

Q. You've been deposed, produced a few more reports, in several social media-related litigation.

Do you think 15 percent is still a pretty good estimate for 2025?

A. Probably closer to 20 percent at this point.

Q. Okay. Your expert work to date has generated invoices for $230,500 through July of this year.

Does that sound about right?

A. I haven't added it up, but that sounds about right.

Q. So about -- if that's 20 percent of your income, you're looking at a little over $1.5 million

Page 191

of income in 2025; is that about right?

MS. MCNABB: Objection. Form.

THE WITNESS: That sounds about right, but, you know, I haven't added it up.

BY MS. VAKY:

Q. Your Stanford faculty position accounts for about $300,000 in 2025; is that --

A. How do you get to $1.5 million from that? I'm not --

Q. 230,000 is 20 percent of about 1.5.

A. Oh, okay. I see how you got there.

Yeah. Well, I don't know my income for 2025. I -- it is not that high.

Q. Okay. So you think your expert work might be a larger percent of your take-home, then?

A. I think when I testified to that, I wasn't talking about 2025; I was talking about since I started social media litigation. So probably it would be helpful to go back to that original testimony.

Q. You started social media litigation in 2023?

A. Yeah.

Q. So between 2023 and July of 2025, your total income, you would attribute 15 percent of that

Page 192

to date to your expert work; is that right?

A. I mean, again, I think I did a sort of quick calculation for that deposition.

Q. Sure.

A. I -- I haven't done another calculation. But just to clarify from your original question, the 200,000 or whatever it is at this point is, I believe, for all of the work I've done in social media litigation, not just my 2025 invoices.

Q. Okay. So I'll represent to you, when I did the math, your 2025 invoices only add up to $230,500.

A. Okay.

Q. That doesn't sound right to you? We can pull the invoices if you want.

A. That could be right. I'm really not remembering.

Q. All right. So I understand that the actual percentages are a little fuzzy, but if we think about your income as a pie graph, we've got a section for expert work, right, we've got a section for your standard faculty position, right?

A. (Nods head.)

Q. That slice of the pie is roughly $300,000 a year?

Page 193

A. Right.

Q. Do we have a slice of the pie for your clinical work?

A. That's part of any faculty work. What I'm trying --

Q. Hold on. I got to get my question.

A. Sorry.

Q. Thank you.

Do we have a slice of the pie that's income from books, like Dopamine Nation and Drug Dealer, MD?

A. There is a slice of the pie for that, yeah.

Q. What other slices of the pie am I missing?

A. I am occasionally paid for speaking invitations. I do a lot of pro bono speaking, but I do occasionally take an honorarium.

Q. Pro bono means you're not getting paid?

A. Right.

Q. Per honorarium means you are getting paid?

A. That's right.

Q. Between now and 2023, what's the most you've ever been paid as an honorarium for a speaking engagement?

A. Maybe 20,000.

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL

Page 194

Q. For one engagement?

A. Yeah.

Q. Who was that engagement with?

A. I don't remember.

Q. You don't remember who gave you $20,000?

A. I think it was a talk I gave in Brazil.

Q. How big of a slice of the pie are honorarium speaking engagements?

A. I don't know. I haven't added it up.

Q. Big piece of the pie, little piece of the pie?

A. I would say a smaller piece of the pie.

Q. Smaller than your Stanford faculty position, right?

A. Oh, yes.

Q. Smaller than your expert work, right?

A. Yes.

Q. Any other pieces of the pie?

A. Not that I'm aware of.

Can I go back to clarify something earlier?

So that 15 percent in the JCCP deposition, I was referring to the invoices that I had to date at that time.

Q. So if I understand the numerator and the

Page 195

denominator there, 15 percent of your income from February of 2023 to, at that point, June of 2025 was 15 percent of your overall income from that same time frame?

A. Can we look back at the original deposition testimony?

Q. Sure.

A. Yeah. 'Cause I don't remember the exact --

Q. 68, page 68.

A. Page 68.

Q. Lines 14/16. I'll read it into the record here. Question (as read):

What percent of your income this year will be from expert witness work?

Answer: About 15 percent.

A. Yeah. Okay. Great. Thank you. So that was just to date, what I had done at that point to date.

Q. The question asked this year, you understood that to be 2025, right?

A. Yes.

Q. And to date would be the date of the deposition, which was June 18, 2025?

Page 196

A. Yes.

Q. Okay. Do you have a rough estimate for any year about how much you bring in in speaking honorariums?

A. No. It varies a lot.

Q. Would it ever be over $100,000 for the whole year?

A. I don't think so.

Q. Have you done a lot of speaking engagements in 2025?

A. Yes.

Q. To date, do you know what you've collected in honorariums?

A. No.

Q. Do you have a set rate for your honorariums?

A. Not really. I adjusted it for -- first of all, I give a lot of talks for free. And I adjust it whether it's a nonprofit, if they have resources or whether it's a -- like a for-profit conference where they are charging participants and making money on the conference.

MS. VAKY: Can we go off the record, please?

THE VIDEOGRAPHER: Time is 1:18. We're

Page 197

off the record.

(Whereupon, a recess was taken from 1:18 p.m. to 1:20 p.m.)

(Whereupon, Deposition Exhibit 8, Exhibit 9 and Exhibit 10 were marked for identification.)

THE VIDEOGRAPHER: Time is 1:20. We're back on the record.

EXAMINATION BY MS. RODGERS

BY MS. RODGERS:

Q. Good morning, Dr. Lembke. My name is Megan Rogers, and I represent the Meta defendants.

You testified back in June about your expert report in the JCCP case, correct?

A. Yes.

Q. And this morning you were testifying about your MDL reports, correct?

A. Yes.

Q. I want to spend a little bit of time looking at your Tennessee Attorney General reports and New Mexico Attorney General reports.

First, I'm going to hand you what I've marked as Exhibit 8 and Exhibit 9.

Do you recognize these as your opening expert report in the Tennessee Attorney General

Golkow Technologies,
877-370-3377        A Veritext Division        www.veritext.com

HIGHLY CONFIDENTIAL

Page 198

action and your rebuttal report in the Tennessee Attorney General action?

A. Yes.

Q. Okay. Did you make any new opinions in your Tennessee Attorney General reports that were not contained in your JCCP and MDL reports?

A. No.

Q. What was the difference, if any, between your Tennessee reports and the JCCP report, for example?

A. Almost no differences. I think included maybe a handful of items from internal documents for further support of the same opinions. I think might have added some studies, a couple of studies that had just come out, but essentially no difference.

Q. And is the same true between your Tennessee reports and the MDL reports you submitted?

A. Yes.

Q. Okay. You're not offering any opinions in the Tennessee Attorney General case other than what is encapsulated in Exhibits 8 and 9, correct?

A. That's correct. Unless I get asked to opine on something else.

Q. Sitting here today, you have no plans to offer any additional opinions that aren't contained

Page 199

in those reports?

A. That is correct.

Q. You didn't do any research into social media use specifically in Tennessee before compiling those reports, did you?

A. Not specifically for those reports, but I have been involved in research of social media use in Tennessee.

Q. When was that?

A. I'm part of an ongoing research project with colleagues at Stanford looking at using social media specifically in Tennessee to track addiction, specifically opioid addiction and opioid overdose death.

Q. So tell me what that research entails.

A. That research involves using social media platforms, including some of the defendants' platforms in this case, but -- to see if that can be a more timely way to measure opioid addiction and overdose than the data that the CDC has access to.

Q. When did you start that research?

A. That research has been ongoing for some time, probably a couple of years.

Q. Have you reached any conclusions?

A. Yes.

Page 200

Q. What are your conclusions?

A. That, indeed, social media is a reliable way to monitor opioid addiction and overdose deaths geo located to specific regions.

Q. In this case, social media is helpful in monitoring opioid addiction and overdose deaths in Tennessee?

A. Yeah. Not because social media itself is helping to do that or designed to do that, but because people who are addicted are talking about their addiction and ways to get drugs online and that can then be used as a signal to track the intensity of a problem in a given location.

Q. Are you also seeing people seeking help for their opioid addictions in the state of Tennessee on social media?

A. Certainly there are postings of people getting into recovery and getting some support from that, yeah.

Q. You agree that's a good thing, right?

A. That is a good thing.

Q. Okay. Apart from that research that you've done on opioid addiction and recovery in using social media, have you done any other research into social media use in Tennessee?

Page 201

A. No.

Q. Okay. Have you done any research into mental health issues specific to Tennessee?

A. I don't believe so, no.

Q. Okay. If you look at Exhibit C in -- in -- sorry. This is going to be confusing. If you look at Exhibit 8, within Exhibit 8, there is an Exhibit C. If you turn to that, there is a chart that I believe you prepared about your compensation for that report. Let me know when you're there.

A. Okay. I'm there.

Q. Okay. At the time you served the Tennessee report, Exhibit 8, you had been paid $172,000 for your opinions in the PISD cases, correct?

A. I don't specifically recall, but yes, I added it up, and if that's what I said, then that's what I said.

Q. You submitted this chart?

A. Yeah. Yes.

Q. You intended it to be accurate?

A. Yes.

Q. It was accurate as far as -- to the best of your understanding at the time you submitted it?

51 (Pages 198 - 201)

HIGHLY CONFIDENTIAL

Page 202

A. Yes.

Q. Okay. And you spent one hour on Tennessee-specific work related to the expert report that you submitted in that case, correct?

A. Yes. At the time that I prepared this document, yes.

Q. What did that one hour entail?

A. I don't specifically remember since there are essentially no differences between my MDL report and the Tennessee report. It might have been something as simple as just re-reviewing the report to make sure it was the same as the MDL report.

Q. Okay. I want to hand you what I've marked as Exhibit 10. These are your responses and objections to the notice of deposition of states-retained expert Dr. Anna Lembke served in the Tennessee case.

Does this look familiar to you?

A. Yes.

Q. And we actually received this document yesterday.

Are you aware of that?

A. I'm not aware of when you received it, no.

Q. Okay. If you turn to the last page, I believe. We see an updated statement of

Page 203

compensation. Let me know when you're there.

A. Yes.

Q. Okay. And so this reflects all the work that you've done in Tennessee to date, correct?

A. Yes.

Q. Okay. And it says that you have now billed $205,600 in the PISD cases, right?

A. Yes.

Q. And you have billed five and a half hours of Tennessee-specific work, correct?

A. Yes.

Q. What did that entail?

A. That was mostly working on the rebuttal report. The defense experts in the Tennessee case are not identical to defense experts in the MDL case, so it was a matter of adapting the rebuttal report for the specific defense experts in that case, not changing anything about the opinions or contents, but just redacting the parts that weren't applicable.

Q. Okay. So all told, between your expert report, Exhibit 8, your rebuttal report, Exhibit 9 and preparing for your deposition today, you spent a total of five and a half hours on your expert work in Tennessee?

Page 204

A. Well, keep in mind that the work that I put into the MDL report is also the work that I put into the Tennessee report. It's just work that I did only for Tennessee is encompassed by these documents here.

Q. Five and a half hours of work only on Tennessee?

A. Only on Tennessee, yeah.

Q. Understood. Thank you.

I want to mark your New Mexico report.

(Whereupon, Deposition Exhibit 11 was marked for identification.)

BY MS. RODGERS:

Q. I'll mark that as Exhibit 11.

Do you recognize Exhibit 11 as the expert report you served in the New Mexico Attorney General litigation?

A. Yes.

Q. Okay. You may have already said this. I'm sorry if I'm asking again.

But did you make any new opinions in your New Mexico Attorney General report that were not contained in your JCCP report?

A. No.

Q. Okay. And the same is true of your MDL

Page 205

reports as well?

A. Correct.

Q. So what was the difference between your New Mexico Attorney General report and the MDL report, if any?

A. Again, as I said before, I might have included a few more documents obtained in discovery. I might have clarified a few sections that I felt could benefit from clarification, but substantively there were no differences.

Q. Okay. You're not offering any opinions in the Mexico Attorney General case other than what's encapsulated in Exhibit 11, correct?

A. Correct.

Q. Are you aware that Meta has served some expert reports in the New Mexico Attorney General litigation?

A. I don't know what you mean by "served."

Q. They have -- well, I'll put it this way. When we received that report from you, that report was served on us.

So are you aware that Meta has served certain expert reports in the New Mexico Attorney General litigation?

A. Are you asking me am I aware that the

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL

Page 206

defense in the New Mexico litigation has their own experts?

Q. And produced reports for those experts.

A. Yes. Yes.

Q. Have you reviewed any of those reports?

A. If it's in my materials considered, I reviewed it. If it isn't, then I didn't.

Q. I'll represent that it's -- there are no Meta experts identified in your materials considered list.

Did you ask to -- I should also say, your materials considered list was -- a supplemental version of that was actually served yesterday.

Are you aware of that?

A. I am aware because the other counsel made me aware of that.

Q. Okay. Have you asked to see any expert reports served by Meta that might bear on issues that you discuss in your report?

A. I rely on my lawyers to tell me whether or not there are expert reports that I need to review. I don't really assume anything in that regard.

Q. So you weren't told that there were reports that you should review in the New Mexico Attorney General case?

Page 207

A. I'm not recollecting anything to that effect.

Q. Okay. How much time did you spend on New Mexico-specific work related to your expert report in the New Mexico case?

A. I mean, I'd have to guess. It's in my records. I could look it up for you. Eight to ten hours, something like that.

Q. Is it about comparable to the amount of time you spent on Tennessee-specific work?

A. Probably, yes.

Q. Did you do any research about social media use specific to New Mexico?

A. No.

Q. Did you do any research into mental health issues specific to New Mexico?

A. I did read Dr. Cain's report, who is -- I believe is a mental health expert in New Mexico, and gleaned some information about New Mexico's specific issues from that. But I didn't do any separate research into New Mexico.

Q. Okay. Did your lawyers suggest that you read Dr. Cain's report?

A. Yes.

Q. You didn't read any abatement plans

Page 208

submitted by other experts in the New Mexico litigation, right?

A. That is correct.

Q. Okay. In both your Tennessee rebuttal report and your New Mexico report, you offer the same opinion we talked about a little earlier today, which is that Meta should warn adolescents and their parents about the addictive nature of its platforms and the mental health risks to adolescents from use of the platforms, right?

A. Yes.

Q. Okay. Just like we talked about earlier today in the MDL report, the specific warnings that Meta should include on its products are beyond the scope of what you were asked to opine on, correct?

A. That is correct.

Q. And the same is true for how those warnings should be shown?

A. That is correct.

Q. And where they should be shown?

A. Yes.

Q. And when they should be shown?

A. Yes.

Q. Are there warnings for any specific consumer website that you think are appropriate and

Page 209

effective?

MS. MCNABB: Objection. Form.

THE WITNESS: As mentioned, I have talked about warnings about vaping and nicotine, especially for youth. I'm not, as I sit here today, recalling any specific website with warnings.

BY MS. RODGERS:

Q. And so when you worked on the vaping warnings, that was kind of a pack warning on the actual box; is that right?

A. That's right. Or just in terms of educational outreach and the smoking cessation toolkit, which is also designed for schools.

Q. Okay. Is it your opinion that those warnings are effective?

A. I haven't specifically researched those -- the implementation or outcomes of those warnings.

Q. Okay. So you haven't looked at whether there has been a decrease in vaping as a result of any warning put on the package of the product?

A. I am aware generally that when warnings are well done, they are effective. But I haven't done any specific research on those warnings on vaping.

Q. You haven't looked at any data?

53 (Pages 206 - 209)

HIGHLY CONFIDENTIAL

Page 210

A. No. I have not.

Q. You testified in the JCCP back in June that you were not giving an opinion on whether or not defendants' social media platforms did or did not meet industry standards.

Do you recall that?

A. No. I just don't remember it.

Q. Okay. You have the transcript in front of you, right?

A. Yes.

Q. If you want to look at page 165.

A. Yeah.

Q. Line 9 to 12.

A. Oh, wait.

Q. You see the question was (as read):

You're not giving an opinion on whether or not defendants' social media platforms did or did not meet industry standards, right?

And your answer was (as read):

That's correct.

Do you see that?

A. Yes. Thank you.

Q. The same is true in the New Mexico Attorney General case, correct?

Page 211

A. Yes.

Q. And the same is true in the Tennessee Attorney General case, correct?

A. Yes.

Q. Okay. If you can look at Exhibit 11, which if I am keeping track of things, is your New Mexico Attorney General report.

And turn to Exhibit B-19. You'll see part of your materials considered list. Just let me know when you're there.

A. I'm sorry, this is Exhibit 11?

Q. Is that the New Mexico report? I don't have my glasses on.

Yes.

MS. MCNABB: I'm sorry, which -- where are we looking, Exhibit B?

MS. RODGERS: B-19. The materials considered list.

MS. MCNABB: We don't have a 19. Just the prior testimony. A-19 maybe, materials considered?

MS. RODGERS: The bottom is labeled B for me.

MS. MCNABB: From the New Mexico?

MS. RODGERS: I believe so. Do you have a materials considered list attached to that?

Page 212

MS. MCNABB: Yeah. But it's Appendix A, or Exhibit A.

MS. RODGERS: That's fine.

Can you look at the materials considered list where the deposition testimony is listed?

MS. MCNABB: Yeah. That starts at A-16.

MS. RODGERS: Okay.

BY MS. RODGERS:

Q. Let me know when you're at A-16.

Are you there?

A. Yes.

Q. Okay. You identify -- if my count was correct -- over 40 transcripts of depositions of current and former Meta employees, correct?

A. Yeah. I mean, whatever is in my materials considered is what I looked at.

Q. Okay. Did you read every one of those transcripts?

A. I perused every one of them. I read some more in depth than others.

Q. How did you select these transcripts?

A. Some of them were because I asked for -- I asked to review them. Others were because my lawyers suggested that I review home.

Q. Did you rely on these deposition

Page 213

transcripts to form your opinions in the case?

A. They are part of what I relied on, yes.

Q. You cite some of these deposition transcripts in your report, right?

A. Yes.

Q. But not all of them, right?

A. Yes.

Q. In fact, by my count, you cite to three Meta depositions.

Does that sound right to you?

A. I honestly don't know.

Q. I can show you which ones. If you look at page 17, footnote 47.

You cite to Anna Raskin, right?

A. Aza Raskin?

Q. Yes. Sorry. Aza Raskin.

A. Yeah.

Q. Page 26, footnote 87, you cite to the day one deposition transcript of Mark Zuckerberg, right?

A. Yes.

Q. And then page 48, note 186; and 49, notes 187 to 189, you cite to ███████, correct?

A. Yeah.

Q. You understand that none of these three deponents conducts research on problematic use at

54 (Pages 210 - 213)

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

HIGHLY CONFIDENTIAL

Page 214

Meta, right?

A. Yes.

Q. You understand that none of these three deponents conduct research on any wellbeing issues at Meta, right?

MS. MCNABB: Objection. Foundation.

THE WITNESS: So I guess I would refer to my report, page 49, where Ms. ▮▮▮▮▮ shares the addiction cycle and the hook model, which to me is evidence that she was aware of the research that was going on at Meta. Perhaps she was not involved in doing that research. But she was certainly aware of it.

BY MS. RODGERS:

Q. You read her deposition transcript, though, right?

A. Yes.

Q. So you understand her job responsibilities based on that deposition transcript?

A. Yes.

Q. And you know that she didn't actually conduct research on wellbeing issues at Meta, right?

A. But she was aware of the wellbeing research at Meta.

Q. She was aware, in your view, of what other

Page 215

people were doing at Meta?

A. The research at Meta on social media addiction problematic use was widely disseminated throughout the -- the company. So yes, she was aware even if she wasn't involved in it.

Q. You choose ultimately not to cite to the deposition transcript of the people at Meta who actually conducted the research on problematic use, right?

A. I didn't feel it was necessary. I read their actual research.

Q. You didn't cite ▮▮▮▮▮▮ in your report?

A. No.

Q. Or ▮▮▮▮▮▮?

A. No.

Q. Or ▮▮▮▮▮▮?

A. No.

Q. You don't have a Facebook account, right?

A. That is correct.

Q. And you never have?

A. That is correct.

Q. You've never personally used Facebook?

A. What do you mean by "personally used"?

Q. Have you ever logged on and personally

Page 216

used Facebook?

A. Well, I don't have an account, so I've never personally logged on to Facebook, but I have seen and studied the Facebook interface.

Q. When you say you've seen it, have you actually manipulated the Facebook interface?

A. I have -- if not manipulated, I've certainly watched other people do it, seen how it's used.

Q. About how much time do you think you've watched other people use Facebook?

A. I mean, I -- I'm not exactly sure. You know, on the order of hours.

Q. That can mean a lot of things.

A. Yeah.

Q. Can you be a bit more specific?

A. You know, I researched Meta's platforms in many different ways. One of the things I did was evaluate the various addictive design features, which don't necessarily require me to be personally interacting with the platform.

So, you know, the amount of time that I've actually personally interacted with the platform, I don't know. A handful of hours.

Q. Okay. You also don't have an Instagram

Page 217

account, right?

A. That's correct.

Q. And you never have?

A. That is correct.

Q. So you've never personally logged on to Instagram?

A. Not personally.

Q. And same question about have you ever personally -- have you ever interacted with the platform?

A. Yes.

Q. When?

A. Primarily my patients showing me what they are doing on the platform, my kids showing me the platform, my own independent research of the platform.

Q. Okay. And about how many hours have you spent, do you think, if any, watching your patients or your kids show you what they are doing on Instagram?

A. It's hard for me to judge the hours because it's really over many years, intermittently over many years, so it's hard for me to really say, you know, what the exact number of hours is.

But, you know, seeing many patients who

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL

Page 218

are addicted to Instagram, it might be within a session them showing me five or ten minutes of what they are doing on Instagram, it might be me at home spending an hour with one of my kids looking at what they are doing on Instagram intermittently over many years. So it's hard for me to add it up.

Q. How long are your sessions with your patients?

A. Usually sessions are 30 to 50 minutes.

Q. So a patient might spend ten minutes showing you what they're doing on Instagram?

A. If they are struggling with a social media addiction, we will take a long time to explore what they are using, how much, how often, how it's impacting them, yeah.

Q. And during that time, are you looking to see kind of what they are looking at on Instagram?

A. It's more how they are using -- how they are using it, how they are interacting with the platform, what problems it's causing in their lives, why they are having difficulty disengaging from the platform, what are some of the design features that keep them on the platform beyond when they want to be on the platform, what are some of the notifications that pull them back in, even when

Page 219

they're not on the platform.

Q. Do you also look at what they are looking at on the platform?

A. Yes. But not so much in terms of the specific content as much as whether it's the stories, the reels, the posts, things like that, where on the platform they tend to get stuck.

Q. Do you ever tell your patients, I don't -- it doesn't matter to me what you're looking at on the platform, I want to know if you are looking at reels or something else, don't tell me what you're looking at?

A. Well, my patients volunteer that information. They'll say things like reels is just completely addictive for me, once I'm looking at reels, I just can't get off.

Q. Does your advice to your patients ever vary based on what they are looking at?

A. Not really.

Q. So if they are looking at content that you think could be harmful versus content that is a puppy, for example, your advice to them is the same?

A. Pretty much, because when people are showing signs and symptoms of addiction to the platform, it doesn't matter what they are looking

Page 220

at, it's the medium itself, it's the platform that they are addicted to.

Q. So you could -- you could put on blinders to what content -- in your view, what content a patient is looking at on a platform and help them the -- equal amounts?

A. Absolutely, yes.

Q. Okay. You don't deny, do you, Dr. Lembke, that Facebook can provide certain benefits to people?

A. I don't deny that, but I would qualify that to say that it's not clear to me that in kids, in general, on a population level, that the benefits outweigh the harms, especially to younger kids.

Q. Well, that was going to be my next question.

When you say "kids," you don't deny, for example, that Facebook can provide benefits to people under the age of 18, right?

A. I think that some people can get some benefit if they are able to withstand the addictive nature of the platform. But the platform is still inherently addictive.

Q. So, for example, in -- do you ever see LGBTQ+ people in your practice?

Page 221

A. Yes, I do.

Q. An LGBTQ+ person under the age of 18 who lives in a family that might not be open to that might be able to find a supportive community on Facebook, right?

A. They might be, and they might also be able to get into a situation where they are being exploited in some way on the same platform, which is what I see much more often.

Q. And I know you want to make your points, Dr. Lembke, but this is going to go a lot faster if you just answer the questions. You'll have an opportunity to make all the points you want on redirect.

MS. MCNABB: I'll just object to that. She's answering the questions to the best of her ability.

BY MS. RODGERS:

Q. In addition to a person with a specific disability or a disease who is under the age of 18 might be able to connect with people going through the same thing on Facebook, right?

A. Yes, I appreciate that that's possible, but that is not what we see in practice. We see people who are being harmed, including people with

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL

Page 222

disabilities who are being harmed by the platform.

Q. You're also not looking for people who are being helped on the platforms in your practice, are you?

A. By definition, people who come into our practice are struggling.

Q. And my questions -- I'm not trying to be repetitive. My questions are just about Facebook, the ones I just asked you.

A. Okay.

Q. The same is true of Instagram, right, you don't deny Instagram can provide certain benefits to people, right?

A. Again, I am so persuaded by the addictive nature of Instagram that I'm hard pressed to think that the benefits outweigh the risk, especially for kids.

Q. I'm not asking you to do a weighing. I know you believe that in your core. I'm not asking you to do that weighing for me. I'm asking a much -- a simpler question in a way, which is you don't deny that Instagram provides or can provide certain benefits to people, correct?

A. I mean, if we're including in benefits things like recreation and fun, then yes, it can be

Page 223

recreational and fun.

Q. Including benefits to people under the age of 18?

A. Again, it is very reinforcing, and if we're counting the pleasure that comes from ingesting any highly reinforcing drug as a benefit, you know, we could say the same thing for alcohol. There are benefits to alcohol for some people, right. There are benefits to all kinds of drugs, but it doesn't mean that we should expose kids. I know that's a longer answer than you want, but that's my answer.

Q. Alcohol is illegal for people under the age of 21, right?

A. Yes.

Q. Okay. And so are illicit drugs, they're illegal for everyone, right?

A. That's correct.

Q. Okay. We've talked a little bit about your practice, and I want to circle back to that, your clinical practice.

A. Yeah.

Q. You have never seen a patient under the age of 18 and diagnosed that patient with social media addiction, correct?

Page 224

A. I can't answer that question yes or no. It's not as simple as that.

Q. Why not?

A. Because I see patients 18 and older who I do diagnose with social media addiction who developed their social media addiction when they were younger than 18.

Q. Okay. That's fine.

That's what they tell you looking backwards, correct?

A. Well, it's not just what they tell me. I have a lot of collateral information from parents and others to support that diagnosis.

Q. You weren't treating those people who were 18 or over when they were under 18, correct?

A. That is correct, but I am treating their social media addiction that's been present since before they were 18.

Q. That they have told you and others have told you was present before the age of 18?

A. Yes.

Q. Okay. My question -- I think you can answer my question, though, because I'm not -- it's a pretty straightforward question.

You have never seen a patient under the

Page 225

age of 18, so seen that person when they were under the age of 18 and diagnosed them with social media addiction, correct?

A. That is incorrect.

Q. When did you -- tell me about when you did that.

A. I have evaluated kids and diagnosed them with social media addiction when they were 13, 14, 15.

Q. When was that?

A. That was usually in the context of individual consultations of families outside of my addiction medicine dual diagnosis clinic.

Q. Where was that?

A. That was in the course of my usual practice. Occasionally I will do consultations outside of the clinic.

Q. In a private practice?

A. Not a private practice. As part of my Stanford practice.

Q. About how many people have you seen, when they were under the age of 18 and diagnosed them with social media addiction?

A. Two or three.

Q. When was that?

57 (Pages 222 - 225)

HIGHLY CONFIDENTIAL

Page 226

A. In the last five years. I'm not remembering the exact dates.

Q. Do you ask those individuals or did you ask them what social media platforms they were using?

A. Yes.

Q. And what was the answer?

A. Defendants' platforms. Sorry. Meta. Instagram, typically, Instagram is really the primary culprit in terms of what I've seen with Meta's products and kids.

Q. And did those individuals use platforms other than Instagram?

A. Yes.

Q. Which ones?

A. Snapchat, YouTube, TikTok.

Q. What did you recommend to those individuals in terms of treatment?

A. I recommended a family systems approach of trying to take away the devices for a period of time long enough to get that kid out of the cycle of addiction, while also addressing other issues that might have come up, depression, anxiety, giving the family support, recommending other sources of support outside of the clinical care that I provide;

Page 227

talking to teachers, try to help with that process, classroom, et cetera. A lot of coaching and encouragement of those families. And then when it comes time to reintroduce the device, talking about guardrails that they might consider implementing to prevent the child from going back on to those social media platforms.

Q. Were those individuals your patients -- for how long had those individuals been your patients?

A. It really varies, sometimes I do a one-time consultation, you know, when it's outside of my usual clinic. Sometimes the consultations continue over a number of years.

Q. So you mentioned two to three people.

Can you tell me anything more about those people?

How old were they?

A. I can't really tell you anything more because of, you know, confidentiality, but they were young teens.

Q. I don't want to know their names for sure.

A. Yeah.

Q. Can you tell me their ages?

A. I'm trying to remember. I think 12, 13.

Page 228

In that age range.

Q. For the 12-year-old, how long had that person been your patient?

A. Again, I'm not remembering exactly the age. This was a one-time -- or a multiple-time consultation I did for a family over a series of months, making recommendations about what they -- how they might intervene and then following up later on how things were going. So maybe meeting with the family two or three or four times.

Q. And did that individual suffer from any other issues, mental health issues?

A. Not that I know of, no.

Q. You said you recommended taking away the phone for a period of time.

How did that person's treatment progress?

A. You know, initially, the child went into quite significant withdrawal with a lot of emotional dysregulation and rage attacks, dysphoria, extreme anxiety, but eventually after, you know, two or three months of not having his phone and not accessing those social media platforms, he was doing much better at home and at school.

Q. Was the individual also using video games?

A. I can't quite remember.

Page 229

Q. And what about the 13-year-old, can you tell me how long that person had been your patient for?

A. So this -- this is somebody who was also a content creator posting a lot of videos on all defendants' -- defendants' various platforms. I can't remember specifically, but certainly Instagram and TikTok and YouTube. I don't know about Snapchat in that case. And developed a severe body dysmorphia related to their social media addiction. So that treatment involved targeting both the social media addiction and the body dysmorphia.

Q. You said this individual was a content creator.

So you mean not only were they using the platforms, they were affirmatively posting content and being compensated for that on the platforms?

A. They weren't being paid as far as I know. They were getting a lot of likes and followers and views, which was very reinforcing for this child, but I don't know about specific monetary gain.

Q. And how did the -- you recommended also a period of abstention from the phone?

A. Yes. Really from all devices and all access to social media for a period of time.

58 (Pages 226 - 229)

HIGHLY CONFIDENTIAL

Page 230

Q. And how did that treatment go?

A. It went very well.

Q. How long did the individual abstain?

A. This individual, to this day, is using a flip phone and doing much better than he had been before.

Q. You stay in contact with this person?

A. Yeah.

Q. We talked a little bit earlier about your opinion that social media platforms should be banned for individuals under the age of 13, right?

A. Yes.

Q. And you're aware that Meta's policy is that people under the age of 13 are not permitted on the platforms, right?

A. I am aware that that's what their policy states, but I am also aware that plenty of their users are under the age of 13.

Q. You support Meta's policy that users under the age of 13 are not allowed on the platforms, right?

A. Yes.

Q. And you agree that age verification is a challenging problem, right?

A. I agree it's somewhat challenging, but not

Page 231

insurmountable.

Q. You testified earlier today that when a parent tries to take away the phone of one of their children, it can be difficult because kids will be kids and they'll try to get around that, right?

A. Yes.

Q. And the same is true with age verification and age lying, right?

MS. MCNABB: Objection. Form. Foundation.

THE WITNESS: There will always be people who can get around the various restrictions, but at the very least, those restrictions should be robust and enforceable.

BY MS. RODGERS:

Q. And age verification -- strike that. I'll say something else.

Many websites, not just social media, actually have to contend with users who lie about their age, right?

A. Yes.

MS. MCNABB: Objection. Foundation.

BY MS. RODGERS:

Q. And some businesses that aren't even online platforms have to deal with this as well,

Page 232

right?

MS. MCNABB: Same objection.

THE WITNESS: I mean, I haven't specifically studied that, but ...

BY MS. RODGERS:

Q. You're aware that teens lie about their age to see an R-rated movie, right?

MS. MCNABB: Objection. Form.

BY MS. RODGERS:

Q. Did you answer? I didn't hear you.

A. I mean, I haven't specifically studied kids lying about their age to see R-rated movies.

Q. I didn't ask you if you studied about -- if you studied it, which is raising the bar a little bit. I'm asking a different question.

You're aware that teens lie about their age to see an R-rated movie, right? It's a tail as old as time.

MS. MCNABB: Objection.

THE WITNESS: Yes, there are probably kids who lie to see R-rated movies.

BY MS. RODGERS:

Q. And do you agree that it's not possible to implement perfect age verification on websites, right?

Page 233

MS. MCNABB: Objection. Foundation. Form.

THE WITNESS: Well, what exists now is far from perfect. It's -- there's not even really any effort made to ensure that kids under the age of 13 are not going on Meta's platforms.

MS. RODGERS: I'm going to move to strike that answer as nonresponsive. I'll ask my question again.

BY MS. RODGERS:

Q. You agree that it's not possible to implement perfect age verification on a website, right?

MS. MCNABB: Objection. Foundation. Scope.

THE WITNESS: I don't think any system is perfect, but we're so far from having any kind of reasonable robust age verification that to talk about a perfect system is moot.

BY MS. RODGERS:

Q. When you try to make an account on Instagram, do you have an understanding as to what age or year, date of birth is preselected when you create your Instagram account?

A. I know that when you create an Instagram

59 (Pages 230 - 233)

HIGHLY CONFIDENTIAL

Page 234

account, you have to verify that you are over 13, but I don't know the specifics of that process.

Q. You don't know whether a year -- a birth year is preselected in that process?

A. I don't know.

Q. So when I tell you that Instagram actually has a neutral age declaration for sign-up, that's new information for you?

A. Yeah. I don't know what a neutral age declaration sign-up means.

Q. Neutral meaning that Meta hasn't preselected a birth year.

A. Okay.

Q. And that's news to you?

A. Yes. I don't know the specifics. I do know that kids can basically go online and say whatever age they want and get an account.

Q. You agree it's a good thing, though, right, you would -- you would want Meta not to preselect a birth year that would render the user over the age of 13?

MS. MCNABB: Objection. Scope. Form.

THE WITNESS: I -- I wouldn't agree with that. I'm not really sure what you're asking. 'Cause I'm not familiar with what you're talking

Page 235

about.

BY MS. RODGERS:

Q. Okay. Well, I guess my question is -- and I understand that you're not familiar with it. But imagine you're logging on to Instagram for the first time and trying to create an account.

You agree it's a good thing that Instagram requires the person trying to create the account to select their birthday from scratch without nudging them, you have to be over 13, for example?

MS. MCNABB: Objection. Form. Scope.

THE WITNESS: I mean, not necessarily. I mean, a nudge like that might be really helpful.

BY MS. RODGERS:

Q. You think it would be helpful to tell people what age they need to be in order for their account verification to be successful?

A. I think it would be really helpful if you had to be over 13 to get an account on a Meta product. That would be really helpful.

Q. Oh, I see -- I see what you're saying.

So to be clear, you understand that if a user enters a birthday that renders them under 13, they are not allowed to go any further in the setup process.

Page 236

You understand that, right?

A. Yes.

MS. MCNABB: Objection.

BY MS. RODGERS:

Q. And that's a good thing?

A. That is a good thing, but unfortunately, a lot of kids under the age of 13 are getting accounts anyway.

Q. And would you agree it's a good thing that Instagram, when you go to create an account, doesn't pre-populate a birth year of, let's say, 1984?

That's a good thing, right?

MS. MCNABB: Objection. Scope.

THE WITNESS: Yeah, I -- I can't answer that yes or no. It's a lot more complicated than that.

BY MS. RODGERS:

Q. I'm surprised.

Like, do you think it would be a good thing for Meta to prompt people signing up for accounts to be over the age of 13 or over the age of 21 or over the age of 40?

MS. MCNABB: Objection.

THE WITNESS: I think it would be a really good thing for Meta to set up a system so that you

Page 237

had to actually prove that you were over the age of 13 in order to access their products.

BY MS. RODGERS:

Q. What would that look like?

A. Well --

MS. MCNABB: Objection. Scope.

THE WITNESS: -- there is -- there are many different ways in which that can happen, and, again, it's out of the scope of my report to talk about what a robust age verification system would look like. But it's clear that Meta doesn't have one.

BY MS. RODGERS:

Q. That you're aware of?

A. That I'm aware of.

Q. There are a number of things in the world that have the potential to be addictive, right?

A. Yes.

Q. Things like opioids?

A. Sure.

Q. And alcohol?

A. (Nods head.) Yes.

Q. Exercise?

A. It can be.

Q. Shopping?

60 (Pages 234 - 237)

HIGHLY CONFIDENTIAL

Page 238

A. Yes.

Q. Sugar?

A. Yes.

Q. All of those things have the possibility of addicting people, correct?

A. I have seen cases of addiction in all those instances, yes.

Q. And they all have the possibility of addicting people under the age of 18, right?

A. Yes.

Q. Now, the four Cs criteria that you set out in your reports could be met with any of these things that have the potential to be addictive, right?

A. Yes.

Q. Is it your opinion that all of these items or activities should be banned for people under the age of 13?

A. That is not my opinion.

Q. Are you familiar with Khan Academy for math?

A. Yes.

Q. Now, that's an educational program, right, online?

A. (Nods head.)

Page 239

Q. And a kid who really likes math might find it quite rewarding, right?

MS. MCNABB: Objection. Form.

THE WITNESS: Hypothetically, yes.

BY MS. RODGERS:

Q. Khan Academy gives unlimited access to kids, right?

A. I really haven't studied Khan Academy or their platform so it would be difficult for me to comment on. I'm aware of it, but I haven't studied it.

Q. Are you aware of Duolingo?

A. Yes.

Q. Do you use Duolingo?

A. No.

Q. A kid who really likes languages might find Duolingo rewarding, right?

MS. MCNABB: Objection. Form.

THE WITNESS: Yeah, they -- I mean, a kid might find a lot of things rewarding that they find online.

BY MS. RODGERS:

Q. And Duolingo also gives kids unlimited access, right?

A. I really don't know. I haven't studied

Page 240

the platform.

Q. We'll assume for the purposes of this hypothetical that Duolingo does give unlimited access, okay?

A. (Nods head.)

Q. And a kid who spends every day after school doing Duolingo might find some social opportunity costs, right?

A. What do you mean by "social opportunity costs"?

Q. In your report, I think you use the phrase "social consequences"; is that right?

A. Probably. I'm not specifically remembering. Do you want to point me to a specific session?

Q. Sure.

Exhibit 11 on page 6. Romanette iv, I believe.

A. 11, page 6.

Q. Do you see the Romanette iv?

A. Yes.

Q. It's labeled "Consequences"?

A. Yeah.

Q. And it talks about social consequences in this paragraph?

Page 241

A. Yes.

Q. Now, social consequences can include opportunity costs, right?

A. Yes.

Q. That means you're missing out on one thing because you're doing something else?

A. That's right.

Q. So a kid who comes home from school every day and all excited to learn language and logs on to Duolingo and does that every day after school all day may suffer -- may face some social opportunity costs or consequences, right?

A. I wouldn't phrase it that way. You know, when we talk about harm from addictive behaviors, it's not just like trading one behavior for another behavior. When we talk about opportunity costs, what we're talking about is that the child is not doing other things that they need to be doing for their social, emotional and physical development because they are spending all of their time on social media.

So that's really distinct and different from the scenario that you're -- you're describing.

Q. But in this case -- in this hypothetical, right, a kid is coming home, logging on to some kind

61 (Pages 238 - 241)

HIGHLY CONFIDENTIAL

Page 242

of device and doing Duolingo all afternoon instead of physical activity, right?

That's a social consequence, right?

A. Well, no. I would call that a physical consequence --

Q. You're right.

A. -- to introduce--

Q. You're right. Yeah.

A. So I've been very clear that I am not claiming that any kind of consumption of digital media is bad. I am saying that the evidence is sufficient to show that for kids, the defendants' social media platforms are inherently addictive, putting those kids at risk for addiction such that they will experience harms. I'm not making claims that any digital media platform. I'm talking about defendants' products.

MS. MCNABB: We've been going for about an hour and a half, do you want to take a break?

MS. RODGERS: In just a -- I'm almost at a breaking point, in just a minute if you're okay going just a few more questions.

BY MS. RODGERS:

Q. So if a kid came to your clinic and said -- or their parents probably more likely -- and

Page 243

said, you know, I'm really worried about my kid, he comes home from school every day, all he does is Duolingo, he's not playing sports, he's not, you know, interacting with other kids, would you evaluate further for an addiction to that platform?

A. I would be curious about the platform, but, again, it's not -- just because a kid is spending a lot of time on the platform doesn't mean either that the platform is addictive or that they're addicted to the platform. You need to have those drugified design elements, access quantity, potency, novelty, uncertainty, and then you have to have the harms related to that use.

Q. And does your assessment depend on the social utility you place on the activity that that child is doing?

A. There's always an interplay in the field of addiction between culture and behavior. But it's very clear with regards to social media addiction, which purports to enhance social connection between kids that, in fact, it does the exact opposite and interferes with their ability to cultivate strong bonds with others, in particular for kids who are addicted to those platforms.

Q. Do you personally think it's a good thing

Page 244

for people to learn other languages?

A. Sure.

Q. So would that come into play in your assessment of whether that child had an addiction to Duolingo?

A. No, I don't think it would. I would specifically be looking at that platform and whether that child's experience on the platform involved how to control use, compulsive use, cravings, continued use despite consequences, tolerance, withdrawal and then whether or not that platform was causing harm in those lives.

So those are very distinct and well-defined criteria. They're not my criteria, they're criteria that existed for decades and that we use to diagnose very specific type of psychopathology, which is continued compulsive use despite harm.

Q. If that individual's behavior met the four Cs of your test, you would conclude that he may have social -- he may have addiction to Duolingo; is that right?

A. I would certainly want to explore further the possibility of that, yeah.

MS. RODGERS: Okay. Thank you, we can

Page 245

take a break. Go off the record.

THE VIDEOGRAPHER: Time is 2:16. We're off the record.

(Whereupon, a recess was taken from 2:16 p.m. to 2:30 p.m.)

THE VIDEOGRAPHER: Time is 2:30. We're back on the record.

BY MS. RODGERS:

Q. Dr. Lembke, I have two -- just two quick followups for you based on our earlier discussion.

And the first is, do you recall testifying about two individuals that you met with who were under the age of 18 that you diagnosed with social media addiction?

A. Yes.

Q. Is either of those individuals a plaintiff in this case?

A. No.

Q. Okay. And then the second question I had is, before break, right before break, we were talking about how you might evaluate a person under the age of 18 who came in to your clinic and was talking about some concerns with platform use.

Do you recall that?

A. You mean your hypothetical with the

62 (Pages 242 - 245)

HIGHLY CONFIDENTIAL

Page 246

Duolingo?

Q.  Yes.  Yes.

A.  Okay.

Q.  And my question for you is, is there a certain amount of time on a platform, whether it's a social media platform or anything else, that would trigger additional followup for you?

MS. MCNABB:  Objection.  Asked and answered.

THE WITNESS:  I mean, time matters, so we do not base the diagnosis on time spent alone, but it certainly is important.  And the more time that a child spends on social media, the more we are concerned about social media addiction.

I wouldn't say, though, that there is a specific amount of time that's going to, you know, trigger an investigation in every single case.  It really -- you have to look, again, holistically at the entire pattern of behavior.

The other thing I think it's really important to emphasize is that in my entire career, I have never had a family who brought a child in because of Duolingo or because of -- was it Kumon, is that the other one you mentioned?

MS. MCNABB:  Khan --

Page 247

THE WITNESS:  Khan Academy.  Right.

So, you know, to make that -- I think it's kind of -- I just want to emphasize, I think it's a specious comparison.  Whereas, you know, in our youth recovery clinic, for which I am the Toby director, about 20 to 30 percent of our kids are coming in specifically for social media addiction and the referrals --

BY MS. RODGERS:

Q.  I'm going to go ahead and interrupt you, because my question was not at all about this.  And, again, if you want to clarify or expand on your answers, your attorney will have the opportunity to ask you those questions.

My question -- and I'll just ask it again -- is if there is a certain amount of time on a platform that would trigger additional followup for you?

MS. MCNABB:  Objection.  And objection to interrupting the witness when she had not completed her answer.

Anna -- Dr. Lembke, you can finish your answer as you want to finish it, to the prior question, and then you can answer this question if you so choose.

Page 248

THE WITNESS:  Yeah.  Thanks.

Yeah, so just finish -- you know, just to finish my -- my answer, you know, we're seeing kids come into clinic about 20 percent to 30 percent of them in our youth clinic is social media addiction, including to defendants' platforms, and that -- that rate is only growing.  I have never seen a kid brought in because they were addicted to Duolingo.  I just think that's important to get on the record.  And I think I already answered the question about the time.

MS. RODGERS:  I'm going to move to strike that entire answer as completely nonresponsive.

BY MS. RODGERS:

Q.  You said that time does matter, correct?  Time spent on a platform does matter, right?

A.  Yes.  And it's clear that defendants have the data to show that time matters as well, their own data supports that.

Q.  Is there a threshold under which you think this individual probably doesn't have social media addiction?

A.  No.  Because the diagnosis is not based on time; it's based on out of control use, compulsive use, cravings, continued use despite consequences,

Page 249

tolerance, withdrawal and, in particular, continued use, again, despite consequences.

So normally, that correlates with more time spent, but there are individuals who, even with very minimal exposure to defendants' platforms can be harmed by those platforms, feel out of control in their use of those platforms and meet criteria for social media addiction.

Q.  What is the lowest amount of daily use for a patient that you've diagnosed with social media addiction?

A.  I don't have a particular number, but I will say that in particular, your noting daily use is important.  I do think that that sort of repetition every day, even for short amounts of time, does increase the risk.

Q.  Have you ever diagnosed a patient who spent five minutes or less a day on social media with social media addiction?

A.  I've never seen a patient who spent five minutes or less a day on social media.

Q.  What about 20 minutes or less a day, have you ever diagnosed a patient who spent 20 minutes or less a day on social media platforms with social media addiction?

63 (Pages 246 - 249)

HIGHLY CONFIDENTIAL

Page 250

A.  By the time patients are coming to see us, they've reached a threshold of problematic addictive use where we are seeing much higher volumes of consumption than that.

Q.  Okay.  And I'm just trying to understand what that threshold is.

What is the average amount of time that somebody who comes to your clinic spends on social media a day?

A.  There's no average, it varies individual to individual.  For some individuals, even a little bit of time on social media can be harmful.  For other individuals, they could use social media a lot and not necessarily develop the addiction, the stigmata, the behavioral signs and symptoms of addiction.  So, again, we -- we don't base it on time.

Q.  Have you ever diagnosed a patient who spent 30 minutes or less a day on social media platforms with social media addiction?

MS. MCNABB:  Objection.

THE WITNESS:  I feel like I already answered that question.  I don't have a different answer.

//

Page 251

BY MS. RODGERS:

Q.  I haven't asked that question before so I don't think you've answered it.

A.  Yeah.  But to the broader question, are there specific times, you know, again, we don't base it on time.  We base it on the core patterns of behavior that denote a social media addiction, and those are, again, well established.  They're not my criteria.  They're well established criteria that have been around for a long time.

Q.  My question isn't what you base your diagnosis on, though, which is how you're interpreting it.  So I want to be very -- make sure you understand my question.  Okay?

A.  Okay.

Q.  Have you ever diagnosed somebody with social media addiction who came into your office and said that they watched -- they spent 30 minutes a day on social media?

A.  First of all, people's consumption, patients who are addicted to social media, their consumption can vary.  Some days it might be very little, some days it might be much more.  People can have binge patterns of use where they can go many days at a time where they are not on social media,

Page 252

and then they have a binge use where they're all day and all night using social media.  So yes, I've seen patients who have come in and said I spent 30 minutes on this social media platform.

But that alone would not either rule in or rule out a diagnosis of social media addiction.  You have to look at the pattern of behavior over time, the four Cs, tolerance, withdrawal, and put it all together.

Q.  And if a patient came in and said my pattern is five minutes a day on social media, what would your response be?

A.  It would be unusual to see somebody meet criteria for social media addiction if they only ever used social media for five minutes a day, but, again, that's, like, a hypothetical that doesn't happen.

You know, we -- we know from the Pew Research study that almost 50 percent of kids are continuously online, that the top four platforms that they are using when they are online are defendants' products.  And even those who are not continuously online are spending lots of time on defendants' products.

So those are hypotheticals that, you know,

Page 253

are pretty irrelevant to what is actually happening in the world.

MS. RODGERS:  I'm going to move to strike the speech that started at, "You know, we know."

BY MS. RODGERS:

Q.  Your model of addiction includes the four Cs, control, compulsion, cravings and consequences as well as tolerance and withdrawal.

We've talked about that, right?

MS. MCNABB:  Objection to the argumentative statement.

THE WITNESS:  Sorry.

MS. MCNABB:  Go ahead.

THE WITNESS:  It's not my model of addiction.  It's a well-established shorthand for the core criteria that we use to make the diagnosis of addiction.

BY MS. RODGERS:

Q.  And you -- you embrace that rubric, right, in your report?

A.  Well, I embrace it and so does the field of addiction medicine.

Q.  Okay.  Under your -- under that rubric, I won't call it yours.

Under that rubric, if someone satisfies

64 (Pages 250 - 253)

HIGHLY CONFIDENTIAL

Page 254

two of those criteria, they could have a mild addiction, right?

A. That's an incorrect reading of my report. That came up last time in the JCCP deposition. I did my best to clarify. I'll try again today.

But what I was referring to when I talked about meeting a minimum of two criteria was the 11 DSM criteria to diagnose addiction. You need two of 11 of the DSM criteria to meet threshold for diagnosing addiction according to the DSM. The four Cs, and tolerance and withdraw, are a shorthand condensed version of those 11 criteria, a mnemonic, easier way to remember them, but those should not be extrapolated to mean or to be interpreted as now you need two of the four Cs or a C and a tolerance. That's not what I say in my report, it's not what I'm saying here.

Q. So when you say in your report -- and I'm looking at Exhibit 11 at page -- at page 6, paragraph F (as read):

At least two criteria must be met to support a diagnosis of a use disorder.

Do you see that?

A. Yes. And the reference is to --

Page 255

Q. I haven't asked a question yet.

A. I'm still answering your -- you posed a question and I'm answering it.

Q. I said, "Do you see that?"

A. And I said, "Yes and," and then I didn't get to finish.

Q. The answer is -- do you see that is a yes-or-no question, Dr. Lembke?

A. Well, but my answer was longer than yes or no. Do I get to finish what I was saying?

Q. Today, I suppose so. In a courtroom, I don't think you'll get away with that. But sure, go ahead.

A. Okay.

MS. MCNABB: Object to the extent it's argumentative, but go ahead.

THE WITNESS: Yes. And the footnote to that statement, number 10, is (as read):

Specifically to the diagnostic and statistical manual of mental disorders.

BY MS. RODGERS:

Q. Okay. So it's your opinion that two of the 11 criteria, is it, of the DSM must be met to support a diagnosis of social media addiction,

Page 256

correct?

A. At this point in the report, I'm broadly characterizing addiction for the reader.

And I'm talking about a shorthand version to remember the 11 criteria from the DSM. That's for addiction more broadly defined in the DSM, not specifically social media addiction.

As I said before, there's no one criteria that counts or that can be relied upon to make a diagnosis of addiction, including social media addiction. It's a maladaptive pattern of behavior over time.

Q. So two of the 11 criteria from the DSM must be met to support a diagnosis of mild addiction; is that right?

A. Of a use disorder, yes.

Q. Thank you.

On page 35 of your report, the same report, go to that page.

I want to direct your attention to paragraph G.

Do you see that?

A. Yes.

Q. And the second sentence reads (as read):

The fact that some users may

Page 257

deactivate their Facebook accounts does not negate the fact that a substantial population of users is incapable of doing so due to the addictive nature and design of the platform.

Do you see that?

A. Yes.

Q. There is no citation for that sentence, correct?

A. That's correct.

Q. The next sentence reads (as read):

Teens are more likely to deactivate their Facebook accounts than adults.

That's a true statement, right?

A. I believe it to be a true statement, yes.

Q. And the same is true for Instagram?

A. I'm not sure.

Q. There's a difference, Dr. Lembke, between association and causation, right?

A. Yes.

Q. On page 23, at the header with B, you say (as read):

Meta's definition of

65 (Pages 254 - 257)

HIGHLY CONFIDENTIAL

Page 258

problematic use also acknowledges multiple adverse life impacts as related to low control, drawing a causal connection between problematic addictive use and negative life consequences.

Do you see that?

A. Yes.

Q. I'm going to hand you the document that you are discussing there and mark it Exhibit 12.

(Whereupon, Deposition Exhibit 12 was marked for identification.)

MS. RODGERS: For the record, it's META3047MDL-074-00027496.

MS. MCNABB: Just for the record, in Exhibit 11, it looks like there's a New Mexico-specific Bates. So are we taking your representation that it's the same document?

MS. RODGERS: Yes. Apologies. Too many versions.

BY MS. RODGERS:

Q. Okay. If you flip first to slide 22 of this, doc- -- you've seen it before, right?

A. Yes.

Q. Okay. If you flip to slide 22, I want to

Page 259

direct your attention to the asterisk at the bottom where it states (as read):

All associations in this report are noncausal, i.e., there can be no conclusions drawn about the direction of how behavior and perception may impact each other.

Do you see that?

A. Yes, I do.

Q. So the authors of this presentation actually state that their findings are not causal, correct?

A. Well, they are making a sort of boilerplate statement about the limitations of statistical analyses that look at correlations. But I think there's plenty of other material in this document that supports the idea that Meta's own research understood that there was a causal association between perceived lack of control and negative life impacts.

Q. Dr. Lembke, do you do research in your own work?

A. Yes.

Q. And when you publish, are you careful about the words that you use?

Page 260

A. Yes.

Q. So when you say "associations," you mean associations?

A. Again, that is a qualifying limitation that you will see in all correlational analyses. But it doesn't necessarily mean that the authors haven't come to some kind of conclusion about causality.

Q. With -- except when an author says specifically that they are not coming to a conclusion about causality, that -- that does say something about whether the authors came to a conclusion about causality, right?

A. Well, that's what it says on this page. But if you look at page 23 of my report, which I believe is the same document here.

Q. It is.

A. Are you there?

Q. I'm -- at your report?

A. Yes.

Q. Yeah. Absolutely.

A. Okay. If you look at this image here --

Q. Yes.

A. -- and if you see between the circle where it says, "Perceived lack of control over social

Page 261

media use" --

Q. Mm-hmm.

A. -- and the square that says, "negative life impacts," there are the words "perceived to contribute to."

Q. Yep.

A. Which is as good as having a directional arrow showing causality. Furthermore, the statement under negative life impacts in the square says, quote (as read):

Negative life impacts must be related to low control to be problematic use.

So that's causality.

Q. So you are interpreting this author's words where they say, "perceived to contribute to" and "related to" to be causation; is that right?

A. This image makes it clear that Meta's own research sees a causal relationship between perceived lack of control over social media use that's perceived to contribute to negative life impacts. That was -- that's definitional for problematic use.

Q. You're reaching that conclusion notwithstanding the people who drafted this

66 (Pages 258 - 261)

HIGHLY CONFIDENTIAL

Page 262

PowerPoint deck clearly stating all associations in this report are noncausal?

You're disregarding that?

A. I'm not disregarding that. What I'm telling you is that that is a kind of pro forma boilerplate statement that you will read in almost any statistical analysis of correlation qualifying those findings.

Yet it's very clear, when you take the evidence in its totality, that you can make a causal inference, which not only have I done that, but Meta has done that. There is a ton of evidence showing that Meta's own researchers see a clear link between out-of-control use, excessive time spent on the platform, their design features, and negative life impacts. That it's unambiguous.

Q. When you publish your research and you use a word like "association," are you comfortable with people taking that and changing it to causation and how they interpret your findings?

A. I'm not changing any words here. I'm -- I'm saying that this starred footnote in tiny print that you found on one slide does not negate the overwhelming evidence that Meta itself recognizes that perceived lack of control over their products

Page 263

leads to negative life impacts.

Q. Well, I didn't just find it on one page. So let's look at page 36 as well.

Do you see the title of this page?

A. Yes, I do.

Q. And it says (as read):

    Facebook product usage
    associated with lower perceived
    control (noncausal).

Do you see that?

A. Yes, I do.

Q. And you disregarded that noncausal statement there as well --

MS. MCNABB: Objection --

BY MS. RODGERS:

Q. -- in summarizing this document, correct?

MS. MCNABB: Objection. Misstates.

THE WITNESS: I didn't disregard it, but it's clear that this entire report is saying both of those things. It's acknowledging causality at the same time that it's qualifying, that their statistical analyses are not, in and of themselves, sufficient evidence for causality. And I agree that a single study that just looks at correlation is insufficient, but if you have other evidence and

Page 264

other forms of evidence, including qualitative studies, then you can use that to make a holistic determination of causality, which I have done and which I believe Meta's own researchers have done.

BY MS. RODGERS:

Q. I didn't just find it on two slides either.

A. Okay.

Q. Let's look at slide 91.

A. You're going to find the same thing, you know, in multiple places. And I can show you multiple places that causality is shown as well, so we can do this where we go back and forth. Happy to do that if you want.

Q. Please look at slide 91. I do want to do that.

The title of this slide also is (as read):

    Instagram usage, noncausal,
    associations with perceived
    control.

Do you see that?

A. Yes, I do.

Q. Now, when you talk about this report, in your report, and I think it was page 23, you use the word "causal connection," but it's not in

Page 265

quotations, is it?

A. I don't.

Q. That's because it's not actually a quote that is taken from this PowerPoint deck, is it?

A. Probably not.

Q. You're aware of what a Bradford Hill's analysis is, aren't you, Dr. Lembke?

A. Yes.

Q. It's a method for assessing causality?

A. Yes.

Q. How do you assess causality using a Bradford Hills analysis?

A. There are multiple factors that you look at in a Bradford Hills analysis in order to determine whether, holistically, causality can be interpreted.

Q. You didn't do a Bradford Hills analysis in your Tennessee or New Mexico Attorney General reports, right?

A. I have done my own Bradford Hills -- Bradford-Hills analysis, but I did not do that for this report. My understanding is other experts are being relied upon for the Bradford Hills analysis.

Q. So that's outside the scope of any of your opinions that you plan to offer in these cases?

67 (Pages 262 - 265)

HIGHLY CONFIDENTIAL

Page 266

A.  I mean, per our discussion just a few moments ago, it's clearly not completely outside my opinions.  I do have opinions regarding causality, so I will be speaking to causality and I do take a holistic approach that, you know, looks at some of the Bradford Hill criteria.

Q.  What is the Bradford Hills analysis that you conducted?

A.  One of the Bradford Hill criteria is experimentation that is actually making a change and seeing whether or not the condition improves.  And I talk about how, in my own practice, when they take away social media, kids' mental health gets better.

I also cite to literature looking at the outcomes when schools ban devices that give access to defendants' platforms or when experimental studies reduce or eliminate access to social media and show improvements in social emotional wellbeing, so that's one example.

Q.  I'm trying to understand.  I asked you if you did a Bradford Hills analysis, and you said you did, but it's not in your report, correct?

A.  So I have done my own Bradford Hills analysis, right, on social media, but I didn't formally do one for this report.

Page 267

Q.  And the reason you didn't is because the attorneys told you not to?

A.  Essentially, yes.

Q.  You don't cite in your reports any peer-reviewed study that shows that infinite scroll on Instagram causes social media addiction, correct?

A.  Let me look at my materials considered list.  I'm not recalling anything as I sit here right now to that level of specificity, no, but I do cite to Instagram-specific design features and studies that have looked specifically at Instagram.

Q.  But there is nothing you can point to, sitting here today, in terms of a peer-reviewed study that shows that infinite scroll on Instagram causes social media addiction, correct?

A.  Give me a moment to look at my report.

Q.  Okay.

MS. RODGERS:  Do you want to go off the record, Dr. Lembke?

THE WITNESS:  I'd like to look at my materials considered list so it's just for a moment.  I can't remember if this is it.

Do you know which exhibit has my materials considered list in it?

MS. RODGERS:  I believe Exhibit 11 has a

Page 268

copy of that attached.

THE WITNESS:  Okay.  At the end?

MS. RODGERS:  Mm-hmm.

THE WITNESS:  I mean, I'm not, right now, recalling a specific citation.  But I have reviewed studies that have specifically looked at Instagram's platform and the design features and how they're harmful.  But I'm not specifically remembering the study or if they invoked endless scroll.  So I just can't, right now, remember one way or another.

BY MS. RODGERS:

Q.  You don't cite any peer-reviewed studies that show that autoplay on Instagram causes social media addiction, do you?

A.  I mean, I think that the -- Meta's own internal studies on problematic use specifically reference the design features that contribute to social media addiction.

Q.  Can you listen -- listen to my question, Dr. Lembke?

A.  Okay.

Q.  You don't cite to any peer-reviewed studies that show that autoplay on Instagram cause social media addiction, do you?

A.  I can't really answer that question yes or

Page 269

no.

Q.  It's a yes-or-no question.

A.  I'm not sure it is because, again, it's not going to be based on -- causality is probably not going to be based on a single study; it's going to be based on a holistic view of all of the literature, including Meta's own data.

Q.  You need more than one study to establish causation?

A.  Yeah.

Q.  And sitting here today, you don't know if -- how many or if you've cited any peer-reviewed studies that show that autoplay and Instagram cause social media addiction?

A.  I would refer you to page 37 of my report where Meta's own researchers identified ten-plus triggers contributing to social media addiction.

Q.  Aside from the internal slide decks that you say show causation, you don't cite to any peer-reviewed studies that show that auto plan [sic] and Instagram causes social media addiction?

A.  I don't cite to any studies that specifically frame it that way, but there are certainly publications that speak to the design features more broadly, including things like

68 (Pages 266 - 269)

HIGHLY CONFIDENTIAL

Page 270

infinite scroll and autoplay.

Q. You don't cite to any peer-reviewed studies that show that notifications on Meta's platform cause social media addiction, do you?

A. I disagree with that statement.

Q. Which -- which peer-reviewed studies are you referring to?

A. So Meta has its own peer-reviewed studies including, again, page 37, where it says -- lists notifications as the top -- as one of the main triggers contributing to problematic use or social media addiction, getting too many minor, irrelevant notifications, try to only look at important ones but get sucked into longer sessions.

Q. And, again, aside from this internal Meta document that you assert shows causation, you haven't cited to any peer-reviewed studies that show that notifications cause social media addiction, right?

A. I disagree with that statement.

Q. What else?

A. Okay. I'm looking for the NASEM report, if somebody can tell me what page that's on, that would be appreciated.

Q. The what report?

Page 271

A. My review of the NASEM report, the National Academy of Science, Engineering and Medicine.

MS. RITTER: Page 20 of the New Mexico report.

THE WITNESS: Right.

So I'm going to quote from the NASEM report on page 20, quote (as read):

Social media include a broad range of features that facilitate social interaction online, a platform is very widely in their target audience, purposes and design. For this reason, it is important to understand platform features, often called affordances and how they interact with different developmental stages. Some affordances are powered by computational algorithms, a set of instructions that a program follows to solve a problem or perform a task. Algorithms are used for generating recommendations and determining the rank in which

Page 272

content is displayed for targeting ads and for content moderation. In a larger sense -- almost done -- algorithms which are generally proprietary serve the end goals of keeping users engaged for as long as possible and generating revenue.

And then in the next Romanette, again, a quote from the NASEM report.

Q. I see the -- I see the quote, Dr. Lembke.

A. Okay.

Q. I see what page you're looking at.

This is the same report that states that the literature does not support the conclusion that social media is harmful at the population level, right?

A. Yes. And it's also the same report that clearly identifies problematic social media use as a disorder.

Q. It's your opinion, Dr. Lembke, that social media can lead to brain changes consistent with addiction; is that right?

A. Yes.

Q. And is that a causal claim that you make?

A. What do you mean?

Page 273

Q. Is it your opinion that social media causes brain changes?

A. Yes.

Q. If you look at page 39 of your New Mexico report, paragraph G.

Do you see you cite to two studies to support that point, Flannery and Kim?

A. Yes. I cite to those two studies here, but there are other studies as well.

Q. Let's look at the Flannery one. I'm going to mark it as Exhibit 13.

(Whereupon, Deposition Exhibit 13 was marked for identification.)

BY MS. RODGERS:

Q. Did you read the study from top to bottom?

A. Yes.

Q. If you look at the limitations study, Dr. Lembke.

A. Limitations --

Q. Sorry, the limitations section.

A. Yeah.

Q. Yeah.

Do you see that the last two sentences say (as read):

Finally information on social

69 (Pages 270 - 273)

HIGHLY CONFIDENTIAL

Page 274

media exposure and use behaviors before and across pubertal development was not available, as such, we could not explore hypotheses regarding neural desensitization to social feedback due to accumulating exposure via social media use.

Do you see that?

A. Yes.

Q. So the authors specifically say that they can't draw the conclusion that social media use causes brain changes, right?

A. Well, that's not how I interpret this study. I mean, the conclusions state (as read):

Our findings suggest that before puberty onset, hyper responsivity deposit social feedback in four brain regions. Associative social information processing may represent a risk factor for addictive social media use in later adolescents. In contrast, decreases in this neural response over pubertal development

Page 275

could suggest atypical development of social feedback processing that is also linked with addictive social media use.

Q. These authors state that they couldn't measure desensitization in teens longitudinally, right?

A. They do state that, but their conclusions suggest that their findings show desensitization.

So a limitation section is, you know, where authors consider all of the ways in which their methodology is limited, but it doesn't mean that they didn't find conclusions that could speak to causality or to brain changes in this case.

Q. Limitations section, as you just stated, is where an author states the ways in which their methodology is limited, right?

A. It's a place where they state the ways in which their methodology is limited, but not necessarily refuting certain conclusions.

Q. So before saying what a paper stands for, it's important to read that limitation section, right?

A. They wrote the limitation section, and then they wrote the conclusion, and the

Page 276

conclusions -- my read of their conclusion is that they think that there are brain changes associated with addictive social media use.

So I don't know what to tell you.

Q. And you have to read a conclusion section of a scientific article in conjunction with the limitation section, right?

A. Yes. I mean, I think in all of peer-reviewed literature, people are going to qualify their statements and their findings with limitations. But it doesn't mean that their findings aren't their findings.

Q. You also cite in that same paragraph in your report a study by Kim.

Do you recall that?

A. Yes.

MS. RODGERS: I'm going to mark that as Exhibit 14.

(Whereupon, Deposition Exhibit 14 was marked for identification.)

BY MS. RODGERS:

Q. And for this study, I want to take a look at the methods section.

There were 12 subjects in this study, right?

Page 277

A. Yes.

Q. They were all men?

A. I believe so, yes.

Q. They were all in their early 20s?

A. Yes.

Q. They all purportedly had something called internet addiction, right?

A. Yes.

Q. How is that measured?

A. It was assessed using something called Young's Internet Addiction Test, and Goldberg's Internet Addictive Disorder Diagnostic criteria.

Q. Do you use those criteria in your practice?

A. When I'm reviewing these types of studies, I like to see what addiction criteria the researchers used.

I don't use these in my practice, but I usually would have wanted to see the criteria. I don't remember specifically what they were, but if I cited this study, most likely they were consistent with the criteria that are generally used in the field.

Q. But you don't recall sitting here today what those criteria were?

HIGHLY CONFIDENTIAL

Page 278

A. No. But I'd be happy to have you pull those and we'll take a look at them. I could go through them and tell you whether or not they're consistent with generally accepted criteria.

Q. Do you know what behaviors these 12 men in their early 20s were exhibiting?

A. Addictive behaviors based on the criteria that were used in these various tests.

Q. Can you say anything more about what those behaviors were?

A. I'm not specifically recalling, but I'd be happy to look at those and tell you how they map onto the four Cs, tolerance and withdraw.

Q. Well, this is your -- the study that you cite for support of your opinions in your report, Dr. Lembke, right?

A. Yes. Which makes me think that I did look at those criteria, that they were consistent with the four Cs, withdrawal and tolerance. But as I sit here today having reviewed a lot of studies and other documents, I'm not specifically remembering.

Q. On your -- in your report, the same report on page 15, you cite a study by someone named ▇▇▇ Let me get it out. ▇▇▇▇▇▇▇.
Do you see that?

Page 279

A. Yeah.

Q. I'm going to hand you that article as well and mark it as Exhibit 15.

(Whereupon, Deposition Exhibit 15 was marked for identification.)

BY MS. RODGERS:

Q. This study involved, if you look at the methods section again, 34 adolescents.
Do you see that?

A. Yes.

Q. And participants in this study used a program that simulated Instagram, but it wasn't actually Instagram, right?

A. Yes.

Q. This paper doesn't purport to measure any persistent alteration of the teenage brain as a result of the use of Instagram, right?

A. Correct.

Q. It shows brain activation in response to this environment that the researchers created, right?

A. Yes.

Q. Activation of the brain's reward processing occurs in response to all kinds of everyday activities, right?

Page 280

A. All kinds of reinforcing activities, yes.

Q. Could be receiving a hug from a good friend, right?

A. Yes.

Q. Or smelling a donut?

A. Yes.

Q. Brain activity alone doesn't indicate addiction, right?

A. That is correct.

Q. And brain activity alone doesn't indicate harm, right?

A. That is correct.

Q. Nothing in this ▇▇▇ study demonstrates that the brain activity measured in response to this simulated environment was more or less than brain activities in response to any ordinary activity that we just talked about, right?

A. This paradigm specifically compared images that were liked with images that were less liked. It didn't make other comparisons.

Q. It didn't compare images that were liked to hugs from friends?

A. Correct.

Q. Okay. And there's no study that's quantified the amount of dopamine released by the

Page 281

use of social media, right?

A. That's right. At least not absolute values. This is a study showing relative dopamine release, which is informative, but you're right, there are no studies of absolute values of dopamine release, that I'm aware of.

Q. The amount of dopamine released from viewing these posts in this artificial environment would also vary based on the content that was being viewed in those posts, right?

MS. MCNABB: Objection.

THE WITNESS: I don't think so. I think that this study controlled for content.

BY MS. RODGERS:

Q. So is it your opinion that -- do you think the study controlled for content or are you certain?
It doesn't -- we can actually set the study aside, I can ask these questions in a broader way.

A. Okay.

Q. The amount of dopamine that is released when somebody views posts on any social media platform varies based on what that post is about, right?

MS. MCNABB: Objection.

71 (Pages 278 - 281)

HIGHLY CONFIDENTIAL

Page 282

THE WITNESS: Not necessarily. It's very possible, and even plausible, and this study is a good example of that, that an image that has more likes versus an image that has fewer likes would activate the brain's reward pathway independent of content.

BY MS. RODGERS:

Q. Well, this study doesn't purport to quantify the amount of dopamine released when viewing one post versus another, right?

A. Well, the whole point of the study is comparing the two, so --

Q. It's comparing likes to not likes, right?

A. It's comparing dopamine release in response to liked images versus not liked images. So it is comparing dopamine release, relative dopamine release.

Q. My question, though, is a little bit different. Maybe I'm not being clear. I apologize for that.

This study isn't comparing, if you take a post for carpet cleaners, for example, that has ten likes with a post for puppies that has ten likes, it's not comparing the amount of dopamine across those two posts, correct?

Page 283

A. The study is not doing that, that is correct.

Q. And do you have an opinion as to which would create more dopamine?

A. Yes.

Q. Which?

A. Well, in that comparison, probably an equal amount, if I had to guess.

Q. Okay.

A. 'Cause they had equal number of likes, right, in your hypothetical.

Q. So it's all about the likes from your perspective. Even if it's carpet cleaner or puppies, the same amount of dopamine would be released if they were the same amount of likes for each of the two posts?

A. I contend that it is the addictive design features that trump content in terms of reward activation and promoting addictive behaviors.

Q. But this study didn't test that hypothesis, right?

A. We could argue about that. I think the study does test that hypothesis by showing that images with more likes release more dopamine relative to images -- images with fewer likes.

Page 284

Q. But this study doesn't control for likes in the sense of it doesn't say how much dopamine is released or how much brain activation is there with a post for carpet cleaners with ten likes versus a post with puppies with ten likes?

A. Well, that's not exactly how this study was designed, but this study shows that images with more likes got more dopamine release, so ...

Q. This study shows that if there are two posts with carpet cleaners, and one has ten likes and one has zero likes, the one with ten likes gets more dopamine, that's what you're saying the study tested, correct?

A. I think so, yes.

Q. Yes.

But it did not test, and it therefore makes no conclusions about whether a post of carpet cleaners with ten likes gets the same amount of brain activation as a post of puppies with ten likes?

A. Sure. But you can't criticize a study for what it doesn't do.

Q. I agree, but you can't say it stands for something that it's not testing, right?

A. That's fine, but this study stands for

Page 285

something very powerful, which is showing that when you control for content, the number of likes affects the amount of dopamine released.

Q. When you meet with a patient and diagnose that patient with social media addiction, before you make that diagnosis, you have to interview the person, right?

A. Yes. I mean, that is how it's done in clinical care.

Q. Can you make an assessment without having met the person?

A. In clinical care, our standard is to meet patients and to do a clinical interview. Often that can be aided by a standard survey instruments or scales, like the Social Media Use Disorder Scale or Bergen Social Media Addiction Scale, and those can help inform clinical judgment.

But within that clinical setting, it is the individual interview that makes the -- the diagnosis.

Q. And what kind of information do you want from the person during that interview?

A. I mean, we have a biopsychosocial approach so we look at biological risk factors, psychological risk factors, social risk factors. We usually do a

72 (Pages 282 - 285)

HIGHLY CONFIDENTIAL

Page 286

lifetime chronological assessment of their behaviors, looking for the first signs and symptoms of psychiatric symptoms and how they progressed or changed over time in response to interventions or social stressors or what have you.

We will often also get collateral information from family members and such.

Q. People sometimes use the word "addicted" colloquially, right?

A. Yes.

Q. And every time a person uses the word "addicted," it doesn't reach the level of a clinical diagnosis for addiction, right?

A. That is true.

Q. Okay. Some of the documents that you cite in your report are summaries of user experience research conducted by Meta, right?

A. Yes.

Q. Do you know why Meta performs user experience research?

A. Well, I would hope that it would be to improve the safety of their products. But that's not really what -- what I've seen in reviewing the documents.

Q. Did you review -- let me start here.

Page 287

Are you familiar with someone named Dr. Kristin Hendrix?

A. No. It -- if you have evidence that I've met this person, then maybe I have. I've encountered a lot of names. I can't necessarily remember every person I've met.

Q. She's not on -- she's nowhere in your report so I don't have evidence that you're familiar with this person.

A. Okay.

Q. That's why I'm asking.

Do you understand -- I take it you may not, but she is the head of research at Instagram.

Does that ring a bell?

A. Again, names is usually not how I'm going to be able to recall that I, you know, came across her name. I could have came across her name. I just don't remember her name.

Q. So I wasn't giving you her name. She's the head of user research.

Does that help put context on her name?

A. I have reviewed so many documents with so many different people and different titles, that doesn't stand out to me.

Q. Okay. Her deposition is not identified in

Page 288

your materials considered list.

Does that mean that you did not review her deposition testimony?

A. That is what it means, yes.

Q. So you didn't consider her testimony as the head of research at Instagram when she testified that user experience research measures people -- people's utilization of technology, their preferences, their needs, and the usability of a platform?

MS. MCNABB: Objection. Foundation.

BY MS. RODGERS:

Q. You didn't review that testimony, correct?

A. If it's not in my materials considered, then I did not review it.

Q. Did you ask to review the deposition testimony of people who are conducting and responsible and -- for the user experience research at Instagram and Facebook?

A. If I felt it was important to forming a conclusion, then I did ask to review it, yes.

Q. Don't you think it is important to review their testimony before reaching conclusions about the research that is going on at Facebook and Instagram?

Page 289

A. I reviewed a lot of the testimony of people doing research in various forms. I don't think that a deposition is the only way to understand the work that somebody has done at Meta. Sometimes the research and the internal documents just speak for themselves.

Q. You talk in your report about Meta's tools and features.

We talked a little bit earlier about age verification, right?

A. Yes.

Q. And you've never designed an age verification process before?

A. I have not.

Q. Do you know what the time spent tool on Meta's apps does?

A. What do you mean by "the time spent tool"?

Q. Do you know what the time spent tool is?

A. I believe so.

Q. So do you have an understanding of -- of what it does?

A. My understanding of time spent tools are that they track the amount of time that individuals are spending on a particular platform and let them know what that time is.

73 (Pages 286 - 289)

HIGHLY CONFIDENTIAL

Page 290

Q. Do you think that's a good feature to have available?

A. I'm hopeful that that will be helpful to people. As I said before, I have, in my clinical and my own research experience, not seen people use it or find it helpful in the cases of social media addiction.

Q. Are you familiar with the activity dashboard tool?

A. I think so, yes.

Q. Do you have an understanding as to what it does?

A. I believe that it shows people where they have spent time or what they have been doing.

Q. Do you think that's a good feature to have available?

A. Again, I think that information might be helpful. But I'm not convinced that it's going to actually change behavior, especially in the more severe cases.

Q. Do you have an understanding as to what the daily limit tool is?

A. Yes.

Q. What is that?

A. I think that's where people can go in and

Page 291

set a limit of time spent on the platform such that when that time is over, they get some kind of alert that tells them they exceeded their time or at their time.

Q. Do you think that's a good feature to have available?

A. Again, I think those are all potentially useful, but they're very soft nudges, especially for kids. And in my clinical experience, for people who are addicted to social media platforms, they don't work.

Q. Do you have an understanding as to what the limit notifications tool is?

A. Yes.

Q. What is it?

A. It's a limit on the number of notifications or types of notifications received.

Q. I think you may have mentioned this earlier, but is this something that you tell your patients to implement from time to time?

A. Yes.

Q. It's a good feature to have available, right?

A. I think so.

Q. Do you have an understanding as to what

Page 292

the take a break tool is?

A. Yes.

Q. What is that?

A. That's where there's a sort of automatic screen that pops into the view that encourages the individual to step away from the app for a period of time.

Q. Do you ever tell your patients to -- to use that feature?

A. No.

Q. Do you think that the take a break tool is a good feature to have available?

A. I think it's good that we are experimenting with all kinds of tools to help people limit their use of an addictive platform. I think that's really good. And I think we need to continue to try to find out what works. In my clinical experience, as well as in my review of internal documents and data on the effectiveness of these wellbeing tools, that they don't -- they don't generally work very well. People don't -- first of all, they are usually -- you have to opt in, they are not a default setting. And that people don't really use them in a sustained way that changes behavior.

Page 293

Q. I just want to be clear, clarify your testimony there, you said, "I think it's good we are experimenting with all kinds of tools to help people limit their use of an addictive platform."
You think it's good that Meta is experimenting with all kinds of tools, right?

A. I think it's good that Meta is experimenting with tools, but I do think it's too little, too late, and I think that for kids, there's such overwhelming evidence of harm that these kinds of nudges are really not sufficient.

Q. Should Meta discontinue them?

A. No. Meta has the capability. Again, this is outside the scope of, you know, what I am supposed to opine on in this litigation, but Meta has so much data and really granular data. They could do much more to help us as a society, try to figure out this problem.

Q. You've never designed a social media platform, just to be clear, right?

A. I never have.

Q. Okay. Are you aware of the parental controls that are available to set limits on use for specific days and times?

A. I'm aware that parental controls exist,

Golkow Technologies,
A Veritext Division
877-370-3377                                            www.veritext.com

HIGHLY CONFIDENTIAL

Page 294

yes.

Q. That's a good thing that those parental controls exist, right?

A. If they were actually easy to use, that would be a good thing, but you almost need a Ph.D. in computer science to be able to implement them.

Q. You don't know sitting here today how to implement the parental control?

A. No. I can't figure it out.

Q. And have you asked Google how to figure it out?

A. No, I haven't, but my patients and their families also struggle with parental controls.

Q. Have you ever asked Facebook how to put into place, chatted with Facebook about how to put those controls into place?

A. I have not personally asked, but I know that people -- I know people who have asked and still found it very difficult.

Q. Have you ever tried to ask Gemini or ChatGPT how to set up a parental control?

A. I haven't. My kids are older now, so I'm sort of passed that age.

Q. And when you say you can't figure it out, I'm just trying to understand, have you -- have you

Page 295

tried to log on to Facebook to set up a parental control before?

A. I started to investigate at one point what that would require, and just sort of gave up. It seemed far too complicated. I didn't have the time.

Q. What steps did you take?

A. I can't even really remember. Maybe I talked to a friend. They said are you using the parental control, have you figured out. Is that worth trying to do it. I think I got some response, like, it's not worth it, the kids find all kinds of workarounds, it doesn't work.

Q. So the friend told you that kids can find a workaround, the friend didn't say it's too hard to figure out how to turn on?

A. I don't remember the exact incidents. Again, my kids are older now. Our situation was that we didn't have confidence in the parental controls, so we just didn't give our kids devices and they didn't have devices until they were in high school.

Q. That's a choice parents can make?

A. That's a choice, I think, that privileged parents can make. I don't think everybody has either the knowledge, you know, to inform a choice

Page 296

like that, or frankly, the bandwidth.

Q. Are you familiar with the quiet mode tool?

A. Yes.

Q. What is that?

A. I think it's where you can quiet, for a period of time, notifications.

Q. And that's a good feature to have available, right?

A. Yeah. These are all, you know, good things, but probably insufficient for people who are already addicted and insufficient for kids.

MS. RODGERS: Let me just take a five-minute break, and I might be done or else I might have just a couple more questions and then we'll pass.

MS. MCNABB: Okay.

THE VIDEOGRAPHER: Time is 3:36. We're off the record.

(Whereupon, a recess was taken from 3:36 p.m. to 3:50 p.m.)

THE VIDEOGRAPHER: Time is 3:50. We're back on the record.

BY MS. RODGERS:

Q. Dr. Lembke, before the break, do you recall that we were talking about some of the tools

Page 297

and features that Meta makes available?

A. Yes.

Q. And you testified that in your view, they are potentially useful, but you said for people who are addicted to social media platforms, they don't work.

Do you recall that?

A. Yes.

Q. You agree that more and more people are kind of coming of age and starting to use social media platforms for the first time, right?

A. Yes.

Q. And for those people, the tools are helpful, correct?

MS. MCNABB: Objection. Form. Speculation.

THE WITNESS: Again, I don't know. I think we need to analyze the data, and Meta has the data. It would be great if they used the data that they have access to to analyze whether or not it helps.

BY MS. RODGERS:

Q. Should Meta analyze the data before making these tools available to people?

A. I never said that.

75 (Pages 294 - 297)

HIGHLY CONFIDENTIAL

Page 298

Q.  So in your view, is it a good thing that Meta has made these tools available?

A.  I will just reiterate, it seems like too little, too late.

But I guess better late than never.

Q.  How is it too late for people who are only just becoming introduced to social media?

A.  Well, it's maybe not too late for those individuals, but it's not a very aggressive stance when you think about what they could be doing.  And it's certainly far too late for all the folks who got, you know, exposed to their platforms, to Meta's platforms going back a decade or more.

Q.  It's not your testimony that Meta should take away those tools and features, right?

A.  No.  That's not my testimony, but my testimony is that Meta could do much more, for example, by starting with making their data publicly available so that other people could research the impact of those features in a non-biased way.

Q.  Of course, you agree there are privacy implications to that, right?

A.  I mean, I -- I think that the data could be evaluated while preserving the privacy of the users.

Page 299

Q.  And that opinion is not in your report, is it?

A.  No.

Q.  You testified earlier about --

A.  Sorry, let me qualify that.  I do state in the rebuttal report that I believe that they could do more, including releasing data to researchers, so I do say that in the report.

Q.  And you say that in your rebuttal report for the first time?

A.  I say that in my rebuttal report.

Q.  And you haven't considered the implications of releasing data for people under the age of 18 to the public?

A.  Again, I think there are ways to release that data anonymized and in aggregate so that they could be studied.

Q.  You don't have a proposal for how Meta or any other company should do that in your report, do you?

A.  Not in my report, but Meta has access to the world's experts.  If they wanted to really do that, they could do that.

Q.  Do you recall testifying that you have been addicted to Erotica?

Page 300

A.  Yes.

Q.  Have you ever been addicted to home improvement books?

A.  No.

Q.  Have you ever been addicted to spy novels?

A.  No.

Q.  Have you ever been addicted to John Grisham novels?

A.  No.

Q.  Do you know who John Grisham is?

A.  Yes.

Q.  And you would agree that John Grisham's novels follow a pretty set formula, right?

A.  Yes.

Q.  Okay.

MS. RODGERS:  I have no further questions for you at this time.

THE VIDEOGRAPHER:  Time is 3:54.  We're off the record.

(Whereupon, a recess was taken from 3:54 p.m. to 4:04 p.m.)

(The following pages were deemed confidential by counsel and sealed under separate cover.)

Page 301

(The following pages were deemed confidential by counsel.)

THE VIDEOGRAPHER:  Time is 4:04.  Back on the record.

FURTHER EXAMINATION BY MS. VAKY

BY MS. VAKY:

Q.  Dr. Lembke, we're back from a break.

MS. VAKY:  For the record, counsel for any Attorneys General have stepped out of the room.  Anyone on the Zoom who is not counsel of record in the MDL 3047 with respect to all the defendants has left the Zoom because we're going to transition to a YouTube-specific module.  At this point, everything in the transcript will be confidential under the protective order in the MDL as that is spelled out in that protective order.

BY MS. VAKY:

Q.  So switching gears here, have you had any communications with Google or YouTube after you were retained for the social media litigation?

A.  Not that I'm recalling.

Q.  Have you taken any money from Google or YouTube after you were retained for the social media litigation?

A.  No.

76 (Pages 298 - 301)

HIGHLY CONFIDENTIAL

Page 302

Q. After this lawsuit was filed, did you tell Google or YouTube that you believed YouTube was harming adolescents?

A. Not directly, but I have given a lot of talks to that effect.

Q. You've given a lot of talks to that effect referring to podcasts that you've done?

A. Podcasts, talking to parents and schools and kids, community centers.

Q. Have you ever had a direct communication with someone at Google or YouTube to tell them you believed YouTube is harming adolescents?

A. No.

Q. We're going to go to your MDL report. Opening report, please. I think that's Exhibit 3. Your discussion of YouTube begins on page 55.

Actually, page 56, please, at the top.

IA, this year states that (as read):

    YouTube's explicit market
    includes both children and teens
    and specifically kids under 13.

    Do you see that?

A. Yes.

Q. And then there's the next sentence (as read):

Page 303

    YouTube internal documents
    reveal YTK growth strategy become
    the daily tool for all U13 kids
    globally.

    Do you see that?

A. Yes.

Q. Do you know what YTK stands for?

A. I did at one point. I'm not remembering right now.

Q. YouTube Kids, does that sound familiar?

A. Okay. Yes.

Q. YouTube Kids is a completely separate website and app from YouTube.com or YouTube main, right?

A. Yes. I believe so.

Q. Do you know why YTK was created?

A. I believe it was in recognition that YouTube's other products are not safe for kids.

Q. Are YouTube Shorts available on YouTube Kids?

A. I don't believe so, but I'm not 100 percent.

Q. YouTube Kids does not offer the comments feature, correct?

A. I think that's correct, yes.

Page 304

Q. Parents can set limits for their children on YouTube Kids, correct?

A. I believe so, yes.

Q. Parents can handpick content for their children on YouTube Kids, right?

A. I believe so, yes.

Q. Your YouTube analysis in your MDL reports did not distinguish between YouTube Kids and main YouTube, correct?

A. Yes. And that is because it is known that there are many U13 kids who are going on the main YouTube app and not on YouTube Kids.

Q. So then is it fair to say that your analysis of YouTube that begins on page 55 of your report was looking at YouTube main?

A. Primarily, yes.

Q. Where do you look at exclusively YouTube Kids in your report?

A. I didn't do an exclusive analysis of YouTube Kids except for the occasional reference here of which I cite. So when I specifically cite to YouTube Kids, that was from a YouTube Kids document, but I was looking at all of the platforms.

Q. You didn't do a separate causal analysis for whether YouTube Kids is addictive; is that fair?

Page 305

A. I did not specifically look at -- do a separate causal analysis of YouTube Kids, that's correct.

Q. And you did not do a causal analysis that only considered the features that are present on YouTube Kids, right?

A. That's right. I looked at the platforms and the design features in aggregate.

Q. You looked -- when you say you looked at the platforms in aggregate, you are saying that you looked at YouTube Kids and YouTube main together or you only looked at the features that were available on YouTube main?

A. I primarily looked at YouTube main, but I did look at some YouTube Kids relevant documents.

Q. Paragraph C on the same page, 56 of your report, you discuss YouTube's signed out or logged out state, right?

A. Yes.

Q. If you were in a logged out state on YouTube, you cannot comment on YouTube videos, correct?

A. I believe that's correct, yes.

Q. If you were in a logged out state on YouTube, you cannot upload YouTube videos, correct?

77 (Pages 302 - 305)

HIGHLY CONFIDENTIAL

Page 306

A. That's correct.

Q. If you are in a logged out state on YouTube, you cannot like YouTube videos, correct?

A. I believe that is correct, yes.

Q. If you are in a logged out state on YouTube, you cannot follow or subscribe to specific accounts, right?

A. Yes.

Q. If you are in a logged out state on YouTube, you won't get notifications about specific accounts that you previously watched, correct?

A. That is correct.

Q. If you are in a logged out state on YouTube, YouTube isn't linking your activity to an account, right?

A. I believe that is correct, yes.

Q. If you are in a logged out state on YouTube, you wouldn't be able to do anything that triggers a notification to you, correct?

A. I believe that is correct.

Q. Do you know how the algorithmic recommendations work on YouTube when someone is using it in a locked out state?

A. I mean, I don't know the specifics of how that algorithm is designed, but my experience, the

Page 307

experience of my patients, my research suggests that it is an algorithm that, again, is based on where that individual has spent time before. And then an endless feed or an infinite scroll of suggested videos that are similar to what has been viewed before or similar to where that individual has spent time on the platform before.

Q. And that knowledge that you -- that you just spoke about, that's coming from your individual experience, not any company documents that you're able to identify today?

A. Also from company documents -- I'm sorry, what was the specific question again?

Q. I had asked about how the algorithmic recommendations work on YouTube when someone is in a locked out state, and you spoke about your experience from personal use of YouTube and in the clinical setting.

Is there anything about the internal documents that you reviewed that helped you understand YouTube's algorithm in the logged out state specifically?

A. Yes.

Q. Okay. Would those be what is cited in the footnotes in paragraph C?

Page 308

A. I mean, no, that doesn't encompass the algorithmic features in the logged out state, because the -- even in the logged out state, the algorithmic features still promote addictive behavior.

Q. Okay. So let's start with recommendations. So I want to focus on recommendations when you're in the logged out state.

You had testified that what the individual -- individual has seen before or spent time with before on the algorithm would feed them more that similar content.

Is that about right?

A. Yes. And interspersing YouTube Shorts with the more traditional YouTube format is also very common in the logged out state, as well as being able to see what other people have liked and other people have commented even if the logged out user can't themselves comment or like.

Q. And in terms of sticking with recommendations, the algorithm would only know what else you had seen in that particular session, right?

A. I'm not sure if it's limited to just that session. I don't know the answer to that. It seems to me that the algorithm has a memory that extends

Page 309

beyond individual sessions, even in the logged out state.

Q. Is that something -- is that opinion based on any documents that you reviewed in your materials considered list?

A. No.

Q. Is that within the scope of your reports?

A. I mean, it's within the scope of my report in the sense that I am opining that the logged out state is an addictive product that has addictive design features that are also embedded in the algorithm and the format, the YouTube Shorts, the algorithmic recommendation, tailored for you, the ability to see the comments and the likes and the number of views, and that's all part of what makes the platform addictive, plus the infinite scroll.

Q. Okay. Let's clean that up a little bit.

When you were in a logged out YouTube state, can you just list the features that you consider to be addictive that are available in the logged out state?

A. The ability to see likes, see number of views, see number of comments, the forced feed based on the algorithm, the forced interspersing of the YouTube Shorts as a default, the endless scroll or

78 (Pages 306 - 309)

HIGHLY CONFIDENTIAL

Page 310

bottomless bowl.

Q. Anything else?

A. Not that I'm thinking as I sit here today. Oh, yes, the pull to refresh, mystery -- quote, unquote, "mystery of the algorithm."

Q. What is pull to refresh?

A. That speaks to the slot machine effect of -- and the unpredictable nature of the rewards. And I talk about that specifically in the YouTube section if you want me to find it.

Q. The phrase "full to refresh"?

A. YouTube documents attest -- sorry, page 59.

Q. Go slowly for our court reporter.

A. Sure.

So I say that (as read):

YouTube provides intermittent positive reinforcement, which promotes continued scrolling in a treasure hunting fashion.

Q. Can you tell me what paragraph number you're on?

A. Sure. This is paragraph A.

Q. Got it.

Go ahead, keep reading.

Page 311

A. (As read):

Looking to replicate the good feelings of a previous video with a promise of something similar and potentially more rewarding in the future.

Q. Are you on the opening report?

A. I am. Page 59.

Q. 59 and 4A?

A. We're at 5, under --

Q. That's what I was missing.

A. Yeah.

Q. Okay.

A. And then YouTube's own documents state (as read):

Unpredictable rewards are disproportionally delightful compared to predictable rewards because they are unexpected or exceed expectations, unquote.

And on from there in a similar vein, page 60, Romanette c, it talks about how important it is to provide those high risk unpredictable rewards to, quote, "keep people coming back."

Q. I just had never heard you phrase it as a

Page 312

pull to refresh terminology, so is that just another way to describe what you have already called the mystery algorithm?

A. Well, not quite. The pull to refresh is where you can refresh the YouTube button and have it regenerate a whole new array of videos in a slot machine-like fashion. And also on page 60, subparagraph D, in a YouTube document entitled "Digital Wellbeing Teen Insights," unquote, it states (as read):

The results of a study of teen users --

Actually, I state (as read):

The result of a study of teen users is that YouTube concluded that the combination of "variable recommendations" and lack of "stopping queues" created "an infinite slot machine" for teen users. The slide also noted it doesn't -- quote, it doesn't cost anything to keep coming back except your time.

Q. Okay. Does YouTube have a particular feature known as pull to refresh?

Page 313

A. No. But that's what it's commonly colloquially called.

Q. When you refresh the page to get --

Okay. The refresh that you're talking about, is that within the YouTube platform or is that the internet browser refresh?

A. I think that's the internet browser refresh. I'm not sure.

Q. So if I'm using Firefox, that would be a feature of Firefox, not a feature of YouTube?

A. Well, you could press on the YouTube -- again, I mean, it's you press on the YouTube app again and get a whole new series of recommendations.

Q. What do you mean, "press on the YouTube app again"?

A. So you could open another window of YouTube, and you could get a whole new series of recommendations.

Q. Okay. And that's a function of your internet browser, right?

A. Well, I mean, whether you want to call it a function of the browser or function of YouTube, you don't get the same thing you were looking at before.

Q. You don't discuss in your report that

79 (Pages 310 - 313)

Golkow Technologies,
877-370-3377                A Veritext Division                www.veritext.com

HIGHLY CONFIDENTIAL

Page 314

refreshing functionality; is that right?

A. I believe I do.

Q. Can you point me to that? Maybe that's what I'm missing.

A. I mean, I -- the slot machine language is used, not just by the Meta defendant, but also by other defendants. And the infinite slot machine, you know, on a slot machine, you pull a lever and you get a new series of items on the screen that's similar with YouTube, whether or not you're logged into the platform.

Q. So the phrase that you have quoted here, "infinite slot machine" that you're quoting to the document cited in footnote 272, it's your testimony that when that document was talking about an infinite slot machine, that document was referring to the concept of refreshing the YouTube website or app?

A. Not necessarily. That document is referring to the unpredictable rewards that the YouTube algorithm has created to keep people coming back. And it's explicitly stated here, so ...

Q. I got that.

I'm really trying to figure out, this is the first time I've heard you discuss a feature of

Page 315

refreshing the page or refreshing the app, and I'm wondering where in the report that feature is discussed.

A. I don't -- I mean, you could do a word search and see if I have "pull to refresh" in the report.

I don't remember if I used that specific language, but that's often what people with social media addiction will talk about doing.

Q. Is it your testimony today that your reports that were disclosed to the defendants included analysis of a feature of refreshing website pages and social media apps?

A. It is my testimony today that the unpredictable nature of the rewards and the way the algorithm is designed that way is part of the addictive feature of the apps. I don't think that including refreshing the page is necessary to, you know, my opinion here.

Q. Okay. I'm going to try my question again, because I just want to make sure we have -- I leave here today knowing a complete list of features that Dr. Lembke opines with respect to YouTube, and I don't see anywhere in your reports where you opine about a feature of refreshing the page as

Page 316

contributing to the addictive nature of YouTube.

So is it fair to say that your reports look at a number of factors, but the refresh functionality is not one of the features discussed in your reports?

A. It would be helpful if somebody other than me did a word search for "pull to refresh."

Q. Okay. If I do a word search for the word "refresh" in your reports, I get no hits, at least with respect to YouTube, I can rest assured that the scope of your reports does not include a feature of refreshing?

We can go off the record and you can look. I just want to make sure I know the -- I'm entitled to know the four corners of what features you --

A. If it's not -- if it's not in the report, and I don't discuss it in any form in the report, then you can conclude that I don't need to opine on it, and I won't opine on it unless directly asked, to make -- you know, to support my opinions.

Q. Thank you. I appreciate that.

Your YouTube causal analysis does not do a separate analysis for YouTube when logged in and YouTube when logged out, correct?

A. Correct.

Page 317

Q. We're going to do a document next. This will be tab 30 for our trial tech.

MS. VAKY: And then I believe we'll figure out what exhibit number we're on, because it will need a sticker.

They're in front of me. Great. 16.

BY MS. VAKY:

Q. Dr. Lembke, if I could request that you place this.

A. On one of them? Which one?

Q. Whichever you like.

MS. VAKY: For the record, the Bates number on this document is GOOG-3047MDL-00284728.

(Whereupon, Deposition Exhibit 16 was marked for identification.)

BY MS. VAKY:

Q. Dr. Lembke, you recognize this as one of the documents that you discuss in your report?

A. Yes.

Q. Okay. We see a VIN diagram on the second page, right?

A. Yes.

Q. Do you know what DAV stands for?

A. Daily active viewers or something like that, DAV.

80 (Pages 314 - 317)

HIGHLY CONFIDENTIAL

Page 318

Q. Do you know how YouTube is defining the term "leaned in" on this page?

A. No.

Q. What about "most passionate," do you know how that is defined?

A. No.

Q. Would watching a two-minute video about gaming one time in one year be enough for that to -- for that account to be counted in the blue circle?

A. The "Broad GenZ Gaming Viewers"?

Q. Yes.

A. I'm not sure.

Q. You can put that to the side.

Do another document.

(Whereupon, Deposition Exhibit 17 was marked for identification.)

MS. VAKY: This will be Exhibit 17.

For the record, GOOG-3047MDL-0087419.

BY MS. VAKY:

Q. Okay. This deck, if you look at the first page, lists an author, ███████████.

Do you see that?

A. Yes.

Q. Do you know who that is?

A. A Meta researcher.

Page 319

Q. You think that's a Meta person?

A. Sorry, YouTube, sorry, it's late in the day. This is a YouTube employee.

Q. And is that a deduction you've made by the four corners of the document?

A. If she's not a Meta employee, then she was contracted -- sorry, a YouTube employee, then she was contracted by YouTube to -- to look at the addictive nature of video watching for part of YouTube's broader research into this topic.

I'm not exactly remembering who employed her.

Q. Do you know what her instruction was?

A. I believe her instruction was to look at the impact of watching videos on teen mental health.

Q. Is that something that you discerned based on the four corners of the document?

A. What do you mean by "the four corners of the document"?

Q. Did you review any deposition testimony specifically about this document?

A. I -- I'm not remembering if I did or if I didn't. If it's in my materials considered, then I did. If not, I didn't.

Q. Sitting here today, can you recall any

Page 320

other documents that discussed this document that gave you context for what is in this document?

A. Not as I sit here today.

Q. Do you have any knowledge about Miss ███████ educational background?

A. No.

Q. Do you have any knowledge whether Miss ███████ has any training or expertise in mental health research?

A. No.

Q. Okay. So we're going to go to page 29. And unfortunately, there are no page numbers, so better off working from the back. But we're looking for this page, Gaming content on YouTube.

A. Okay. I'm there.

Q. The second bolded bullet, under that, there's a hollow bullet. It says (as read):

If DSM criteria were applied to watching gaming videos, one in five teens would be diagnosed with addiction.

Do you see that?

A. Yes.

Q. Do you know which DSM criteria they're referring to here?

Page 321

A. Not specifically, no.

Q. The slide does not tell you how the author applied the DSM criteria, right?

A. No, it doesn't.

Q. You don't know whether the author accurately applied the DSM criteria, right?

A. Well, it's not that hard.

Q. Give yourself more credit.

There is no mention of any YouTube feature on this slide, right?

A. Well, there is YouTube in the graphic.

Q. Is that a YouTube feature --

A. By "feature," you mean a design element.

I think the fact that it talks about viewers who are underage speaks to the access problem that I define as one of the features that drugifies the platform, making it more accessible.

Q. Where do you see "underage"?

A. In the first bullet point, it says (as read):

YouTube's wealthy gaming content is being watched by viewers who are underage to actually play the game.

Q. So that's reviewing -- referring to the

81 (Pages 318 - 321)

HIGHLY CONFIDENTIAL

Page 322

age of the viewer versus what the recommended age of the particular game they are watching is, right?

A. Yeah. I mean, it refers to the most important aspect, which is the age of the viewer.

Q. And then --

A. Sorry. Let me just finish.

The sub-bullet point says (as read):

These vicarious players are still exposed to the features in the game that are not age-appropriate.

Q. The features in the game being the content of the video, right?

A. That they accessed on YouTube.

Q. Okay. So the features of the game is referring to the content itself on YouTube, right?

A. I believe so, yes.

Q. And you understand that video games often come with a rating, right?

A. I'm not really that familiar with video game ratings. I mean, I know ratings for difficulty in video games, but --

Q. You never heard, like, the acronym MA, mature audience, as a rating for a video game?

A. Yes, I have now that I think about it.

Page 323

Q. Do you know what age is considered appropriate for a video game rated MA?

A. No, I don't.

Q. Do you know what age is considered appropriate for a video game rated mature?

A. No.

Q. Okay. So if the DSM criteria referenced here was for gaming addiction, one in five teens would be diagnosed with an addiction to gaming, not social media, right?

MS. MCNABB: Objection.

THE WITNESS: Well, YouTube is a social media platform that provides access to underage kids who get addicted to the platform.

BY MS. VAKY:

Q. So it's not asking about all of YouTube; it's focused on video gaming. So if the DSM criteria that's being used is for gaming addiction, then the diagnosis would be one in five teens with a gaming addiction?

A. No, that's not what it says. It specifically says (as read):

DSM criteria applied to watching gaming videos.

Q. Right.

Page 324

And I'm asking, we don't know what DSM criteria they're referring to?

A. It doesn't really matter. I mean, if there were sufficient DSM criteria to meet the threshold for a diagnosis, which is two of the 11 criteria, then one in five teens would be diagnosed with addiction to watching gaming videos on YouTube.

Q. If the addiction is solely to watching gaming videos, the content of the video matters, right?

A. In this particular analysis, they looked at gaming videos, but typically people who are addicted to gaming videos are also addicted to other videos on YouTube.

Q. The sentence doesn't say diagnosed with social media addiction, right?

A. It doesn't say that, but it's evaluating YouTube, a social media platform.

Q. And if you look at the bullet above, it actually is talking about gaming content, right?

A. It does say that, yes.

Q. So your view is, reading this document, you believe it's referring to social media addiction and not gaming addiction?

A. I believe that it's referring to YouTube

Page 325

addiction, and it's very clear that that is also what the author is saying here. She's talking about gaming content on YouTube is sought out by inappropriately aged children. That's her bolded heading.

Q. So the inappropriately aged children are seeking out a particular type of content on YouTube?

A. This analysis looked at games, but it's clear from the rest of the report that this researcher is looking at videos, and that's specifically the medium agnostic to content.

Q. So watching a video versus playing a video game, are those different things?

A. Well, they are different things, yes.

Q. Because one is passive, and one is active?

A. You could make that argument.

Q. Does the content matter if you're watching Grand Theft Auto versus playing Grand Theft Auto?

A. When it comes to defendant platforms, the content is not the primary drug. The drug is the medium itself. And this document is a great example of that because it really is looking agnostic to content at the addictive nature of videos themselves, and the rest of the document looks at everything from cat videos to sex videos to video

82 (Pages 322 - 325)

HIGHLY CONFIDENTIAL

Page 326

game videos.  This is not about video game addiction, it's about YouTube and the addictive nature of YouTube and underage children having access to YouTube.

Q.  I mean, this slide is not agnostic to content, it's specifically looking at those who are watching gaming videos, right?

MS. MCNABB:  Objection.  Asked and answered.

THE WITNESS:  This particular slide is looking specifically at gaming videos, but --

BY MS. VAKY:

Q.  And the --

A.  Sorry, let me finish.

Q.  Sure.

A.  Other slides look at videos entitled things like Our Maid, Our Sex Toy or Horrors, English Sex, Movie Sex, or Ten Movie Sex Scenes that Were Real or James Brown, Sex Machine.

Q.  Okay.

A.  As well as pet videos, as well as, you know, on and on.

MS. VAKY:  I'll move to strike all that as nonresponsive.

//

Page 327

BY MS. VAKY:

Q.  On this particular slide, this sentence, the one in five statistic here is only looking at those watching video -- watching gaming videos, right, that's where that statistic came from?

MS. MCNABB:  Objection.  Asked and answered.

THE WITNESS:  Yeah.

BY MS. VAKY:

Q.  Okay.  We kind of danced over each over so let me just get it clean in the record.

On this slide, the statistic, one in five teens, is specifically derived from those watching gaming videos, right?

MS. MCNABB:  Objection.  Asked and answered.

THE WITNESS:  Yes.

BY MS. VAKY:

Q.  Second-to-last slide, it lists references, correct?

A.  Yes.

Q.  You do not discuss any of these references in the body of your reports, correct?

A.  If I didn't list them in my materials considered or cite to them, then I don't discuss

Page 328

them in the body of my report, that's right.

Q.  Let's jump back to the report, page 65, subparagraph iv.

Numeral iv, the very, very bottom under wellbeing, you reference "digital wellbeing breaks and bedtime reminders," correct?

A.  Yeah.

Q.  We talked about this a little earlier today, but those are examples of discouraging access at certain times of the day, limiting the length and frequency of the sessions, right?

A.  Yes.

Q.  In preparing your report, did you ask to see Google or YouTube documents reflecting the company's efforts to invest in digital wellbeing?

A.  Yes.

Q.  Did you get all of the documents in response to that request?

A.  I got a representative number of documents that were sufficient for me to form my opinion.

Q.  How did you determine that the number of documents you received was sufficient?

A.  I didn't base it on number.  I just based it on a sense that I had saturated some of the themes that I was interested in.

Page 329

Q.  You saw what you needed to see and didn't need to see anymore; is that fair?

(Simultaneous speakers - inaudible.)

MS. MCNABB:  Objection.  Misstates testimony.

THE WITNESS:  Yeah.  I saw -- I saw a sufficient number to inform my opinion.  It was -- it was sufficient for me.

BY MS. VAKY:

Q.  And who selected those documents for you to see?

A.  The internal documents I obtained through counsel at my request.

Q.  Are you opining that YouTube should never be used in the classroom?

A.  I don't believe I've said that it should never be used in the classroom.

Q.  I don't know if you have or haven't.  Let me rephrase the question.

Do you believe YouTube should never be used in the classroom?

A.  It really depends on the age of the student and how it's curated.

I don't think that students, certainly younger kids, should go on the platform themselves

83 (Pages 326 - 329)

HIGHLY CONFIDENTIAL

Page 330

and be navigating the platform on their own.

Q. Do you think teachers should not use YouTube in the classroom in high school?

A. I think that there may be some educational benefit of some videos, some YouTube videos in the classroom in high school.

Q. Do you think teachers should not use YouTube in the classroom in middle school?

A. As I've said before, for me, under 13 is an age group that I really think should be insulated from addictive social media, especially having, you know, their own access and ability to navigate those platforms and have access to them on a regular basis. As far as older teens, I wouldn't say that I believe there's never an instance when that would be useful.

But in general, that would be -- would have to be use of educational content with the addictive design features removed.

Q. Okay. So my question is about the teacher using it themselves.

Do you think teachers should not use YouTube in the classroom for students that are 12 and under?

A. Again, I would say if the addictive design

Page 331

features are stripped of the platform and there's some kind of carefully curated content that a teacher finds a way to use, that might be okay. It would probably depend on a case-by-case basis.

Q. Is there a social media company out there that you believe is doing an adequate job of measuring the wellbeing of its users?

A. It's very hard to know because they don't share the data.

So, you know, it's almost impossible to know what they're actually measuring.

Q. Sitting here today, can you identify a social media company that you believe is doing an adequate job of measuring the wellbeing of its users?

A. No.

Q. Does YouTube have an autoplay function?

A. I believe that YouTube has a -- one video rolling into the next function.

Q. Okay. Explain that to me.

How does that work?

A. I'm not exactly sure, but I think there's a function -- no, maybe it doesn't. Maybe it doesn't. I can't quite remember.

Q. Okay. So YouTube does not have an

Page 332

autoplay function, correct?

MS. MCNABB: Objection.

THE WITNESS: I don't -- I don't think so. I'm not 100 percent sure.

BY MS. VAKY:

Q. Do you know whether YouTube offers filters?

A. I don't believe so, no.

Q. Can users post photos on YouTube?

A. Well, they can post videos.

Q. Can users who are not logged in post photos on YouTube?

A. I don't believe so, no.

Q. Can users who are logged in post photos on YouTube?

A. They might post photos as a part of a video montage.

Q. Can users make connections with other users on YouTube?

A. Yes.

Q. How does that work on YouTube?

A. Live stream, live chat, monetary donations, those sorts of interactions.

Q. Does YouTube offer private messaging on its platform?

Page 333

A. I don't know.

Q. Does YouTube have ephemeral features?

A. I don't believe so, unless you count -- well, actually, no, that's not true. The live -- the live streaming on YouTube has that same ephemeral quality.

Q. So if someone live streams on YouTube, it vanishes after the live stream is over?

A. The interactive portion certainly vanishes, and maybe the video itself.

Q. Do you know if someone live streams on YouTube whether it will automatically vanish after the live stream concludes?

A. I don't know.

Q. Do you know if someone live streams on YouTube whether the interaction feed vanishes once the live stream concludes?

A. I think in most instances, it does not.

Q. So do you know whether YouTube has any ephemeral features?

A. Well, it's ephemeral in the sense that unless you log on right when it's being live streamed, you can't engage in the interactive aspect of it. You miss out on the opportunity to do that.

Q. But YouTube does not have any vanishing

84 (Pages 330 - 333)

HIGHLY CONFIDENTIAL

Page 334

features, can we agree on that?

A. I don't think so.

Q. I forgot to ask you earlier, and we'll catch the AGs up, but are you currently working on any books?

A. Not anything related to this litigation.

Q. Are you working on any books in your professional capacity at the moment?

A. Not anything I'm really willing to talk about now.

Q. Do you currently have any publications that are slated to be published in the next two years?

A. Yes.

Q. Do any of them relate to social media?

A. Only tangentially.

Q. What do you mean by "tangentially," other than the interplay between opioid epidemic and social media?

A. Right. I mean, I am working on something related to more a philosophical look at technology, but not specifically social media.

Q. Do you have an estimate of when that publication might be publicly available?

A. Maybe two years, three years. I don't

Page 335

know for sure.

Q. It hasn't been submitted for publication yet?

A. Oh, no.

Q. Will it be peer reviewed?

A. Probably not.

MS. VAKY: Thank you, Dr. Lembke.

THE WITNESS: Thank you.

MS. VAKY: You might see me again.

THE VIDEOGRAPHER: Time is 4:48. We're off the record.

(Whereupon, a recess was taken from 4:48 p.m. to 4:55 p.m.)

THE VIDEOGRAPHER: Time is 4:55. We're back on the record.

EXAMINATION BY MS. FRANKLIN

BY MS. FRANKLIN:

Q. Good afternoon, Dr. Lembke, my name is Lyndsey Franklin. I'm an attorney at Munger Tolles & Olson. I'm here on behalf of Snap. Thank you for your time today.

A. You're welcome.

Q. I am going to ask you a couple of questions relating to your opinions about Snapchat.

Will you please let me know if anything I

Page 336

say is unclear?

A. Sure.

Q. Sitting here today, are you offering any expert opinions about Snapchat that are not disclosed in your MDL opening or MDL rebuttal reports?

A. No.

Q. Did you review any Snap internal documents that are not cited in your reports or listed in your materials considered list?

A. No.

Q. Did you review the testimony of any current or former Snap employees not cited in your reports or listed in your materials considered list?

A. No.

Q. Is it fair to say that you did not read the expert report of Dr. Stephen Buka?

A. If it's not listed, I did not read it.

Q. Is it fair to say, then, that you do not intend to offer any specific opinions in response to what Dr. Buka opined in his report?

A. Again, if I am specifically asked to opine on something in his report, I'm happy to offer my opinion, but outside of that context, I will not be offering an opinion.

Page 337

Q. You reviewed the expert report of Dr. Nicholas Allen, correct?

A. Yes.

Q. Is it fair to say that this scope of your rebuttal opinions as to his report are contained within your reports?

A. That's fair to say, yes.

Q. Sitting here today, you have no plans to offer any additional opinions in response to Dr. Allen that aren't contained in your reports?

A. Yes.

Q. I'd like to turn to your MDL rebuttal report, which I believe is Exhibit 4, and let's go to page 7, paragraph L.

In this paragraph, you are discussing design features, such as likes, streaks, followers and rankings, and you opine that there exists (as read):

Evidence that defendants used these design features to optimize for time spent on platform by encouraging users to chase these quantified social rewards and induce fear of missing out, FoMo, when they weren't optimizing for

85 (Pages 334 - 337)

HIGHLY CONFIDENTIAL

Page 338

these.

Did I read that correctly?

A. Yes.

Q. Based on that, is it fair to say your opinion is that these design features of the defendants' platforms, including Snapchat, can induce a fear of missing out, also known as FoMo?

A. Yes.

Q. You cite a few sources for that opinion, only one of which is a published academic article, right?

A. Yes. That's true at this particular mention of streaks, but I mention streaks elsewhere in my main report and rebuttal report.

Q. In this paragraph, you only reference this particular article, right?

A. Yes.

Q. I'd like to introduce that article as Exhibit 18. It's called "Combating Fear of Missing Out, FoMo on Social Media, the FoMo R method."

(Whereupon, Deposition Exhibit 18 was marked for identification.)

BY MS. FRANKLIN:

Q. This is an article that creates a plan for how individuals can manage the experience of the

Page 339

fear of missing out; fair?

A. Give me just one second to read the abstract again.

Okay. Thank you. Can you restate --

(Simultaneous speakers - inaudible.)

THE WITNESS: Yeah. Sorry.

BY MS. FRANKLIN:

Q. No worries.

This is an article that creates a plan for how individuals can manage the experience of the fear of missing out, right?

A. Yes.

Q. And the authors test that FoMo management plan on a set of 30 participants, right?

A. Yes.

Q. Are you aware that this paper does not create or describe any data about the prevalence of the experience of FoMo by users of Snapchat specifically?

A. I'd have to really refresh my memory on this particular paper to be able to state that.

Q. Let me ask this: Is it fair to say that in your report, you didn't cite any data from this paper about the prevalence of the experience of FoMo by users on Snapchat specifically, right?

Page 340

A. That's correct.

Q. And I'll represent to you that I read the article and I didn't see any data of that nature.

Do you have any reason to dispute that?

A. I do not.

Q. Are you aware that this paper did not collect any quantitative or qualitative data that isolates the effects of Snapchat features on the experience of FoMo for the participants they studied?

A. If you're representing to me that the paper doesn't specifically mention Snapchat, I believe you.

Q. So this article does not tell us whether and to what extent users are actually experiencing FoMo as a result of Snapchat features, right?

A. I will accept that, yes.

Q. But you cited this article for the proposition that we have evidence that the platform features you listed, like streaks, induce FoMo; true?

A. Can you give me a moment to look at the article again?

So without, you know, rereading the whole article, the article does state, quote (as read):

Page 341

Existing approaches overlook the role of social network design features in triggering the problem, and at the same time, there are potential to play a role in solving it.

So I do think that this article is relevant to Snapchat streaks even if it doesn't specifically call out Snapchat streaks because it really speaks to the ways in which the addictive design elements promote addictive use, including FoMo, and how changing those design elements might help mitigate the risk of FoMo.

Q. So I understand your testimony, you agree it doesn't specifically mention Snapchat features in that description?

A. That is true, but it does specifically mention addictive design features, which could include Snapchat streaks.

Q. But they do not say that it includes Snapchat streaks?

A. That is true, they do not call out Snapchat by name.

Q. And they don't otherwise collect data on the experience of FoMo as a result of Snapchat

86 (Pages 338 - 341)

HIGHLY CONFIDENTIAL

Page 342

features?

A. Because it's primarily focused on this mitigation effort, building on prior research, which they have done.

Q. Do you recall coming across any evidence that design features of Snapchat, like streaks, are not associated with the fear of missing out?

A. I'm not recalling any specific evidence to that effect.

Q. I'd like to introduce what will be Exhibit 19. This is an article called "Snapchat Streaks, How are These Forms of Gamified Interactions Associated with Problematic Smartphone Use and Fear of Missing Out Among Early Adolescents."

(Whereupon, Deposition Exhibit 19 was marked for identification.)

BY MS. FRANKLIN:

Q. Do you recognize this study?

A. I'm not recognizing it right now, but if it's in my materials considered, then I have read it.

Q. I'll represent to you that it's item 234 on your amended materials considered list.

A. Can you give me a second to reread the

Page 343

abstract?

Q. Absolutely.

A. Okay. Thank you.

Q. This is a study that attempts to measure the association between Snapchat streaks and the experience of FoMo, among other things; fair?

A. Yes.

Q. And the study does this by surveying nearly 2,500 early adolescents, correct?

A. Yes.

Q. And if we look at the results section, which is on page 4, let's go to the last sentence of that first section titled "Engagement in Snapchat Streaks."

(As read):
    The authors come to the
    conclusion that FoMo, that is fear
    of missing out, is not
    significantly related to whether an
    adolescent engages with streaks.
    Fair?

A. That's what it says here, yes.

Q. I'll start over to the discussion section, same page, and let's look at the last two paragraphs. In the middle of that second to last

Page 344

paragraph, it says that (as read):
    The authors also found that
    for adolescents that do have a
    streak, the number of people with
    whom the adolescent has a streak
    and the maximum number of days the
    streak has lasted are correlated
    with FoMo.
    Correct?

A. I'm sorry, can you tell me where you're looking?

Q. Absolutely.
    It says "However" -- it's in the middle of the second paragraph, starts with, "However."

A. Okay. I see that.

Q. So just to clarify, you understood the previous question and you agree that that is what the study says?

A. Can you restate the question?

Q. It says that (as read):
    The authors also found that
    for adolescents that do have a
    streak, the number of people with
    whom the adolescent has a streak
    and the number of days that the

Page 345

    streak has lasted are correlated
    with FoMo.
    Right?

A. Yes.

Q. If we jump to the next paragraph in that first sentence, the authors clarify that (as read):
    The effect size of all the
    variables, including FoMo, is
    relatively small.
    Fair?

A. Yes, that's what it says.

Q. From these results, looking at that last sentence on this page, the authors conclude that, quote (as read):
    The engagement in Snapchat
    streaks might, in fact, be part of
    a normative communication process
    of the adolescent population, not
    necessarily driven in strong
    degrees by FoMo, problematic
    smartphone use and self-control.
    Did I read that correctly?

A. That is what it says here, but that does contradict other statements, including the statement, in the abstract, where the authors state,

87 (Pages 342 - 345)

HIGHLY CONFIDENTIAL

Page 346

(as read):

Problematic smartphone use was associated with the engagement in Snapchat streaks, unquote.

Q. This is the conclusion that the authors drew, however, based at least in part on the fact presumably effect sizes are relatively small.

Is it fair to say?

A. Which conclusion are you talking about?

Q. The conclusion that I just read (as read):

The engagement in Snapchat streaks might be part of a normative communication process, not necessarily driven in strong degrees by FoMo, problematic smartphone use and self-control.

A. Again, I would say that the author's statement at that place in the article does contradict the summative conclusion in the abstract that says, quote (as read):

Problematic smartphone use was associated with engagement in Snapchat. Snapchat streaks and that FoMo problematic smartphone use and social media self-control

Page 347

were correlated with the number of people and the number of days adolescents maintain Snapchat streaks with, albeit being a weak relationship.

Q. How is that inconsistent, in your view?

A. Well, you're pointing me to a statement that emphasizes that Snapchat streak is just normal adolescent communication behavior, and I'm redirecting your attention to the summative conclusions that problematic smartphone use was found by these authors to be associated with engagement in Snapchat streaks and that FoMo, problematic smartphone use and social media self-control were correlated with the number of people and the number of days adolescents maintained Snapchat streaks.

Q. The association of these variables, as the authors say, was relatively small, correct?

A. But there was still an association.

Q. Answer is a yes-or-no question, the authors state that the association between the variables is relatively small, correct?

MS. MCNABB: Objection. Asked and answered.

Page 348

THE WITNESS: Their exact wording is that the effect size of all variables, though statistically significant, are relatively small. Once something is statistically significant, then it's a significant finding.

BY MS. FRANKLIN:

Q. Okay. Let's continue on to the next, page 5.

Authors go on to say (as read):

Our study does contribute to cumulative evidence that these novel forms of interpersonal communication do not necessarily have to be understood from a risk perspective and that the public concern about these gamified forms of interpersonal communication may be overstated.

Did I read that correctly?

A. Can you point me to the specific paragraph?

Q. Go to the very first paragraph on this page, the very first full sentence.

A. Are we talking about page 5?

Q. Yes. Page 5.

Page 349

A. Page 5 -- sorry, which paragraph on page 5?

Q. Very first paragraph, it starts with "Our study."

A. Page 5? I see a paragraph that starts with "Our exploratory study."

Is that the one?

Q. I believe the trial tech is highlighting it right now. So if you have access to that.

A. Okay.

Q. Would you like me to repeat the question?

A. Let me read it first, and then I may ask you to repeat the question, okay?

Q. My question was just reading the statement.

A. Oh, okay. What was -- what was your question?

Q. So the authors go on to say (as read):

Our study does contribute to cumulative evidence that these novel forms of interpersonal communication do not necessarily have to be understood from a risk perspective and at the public concern about these gamified forms

88 (Pages 346 - 349)

HIGHLY CONFIDENTIAL

Page 350

of interpersonal communication may be overstated.

Did I read that correctly?

A. You -- yes, you read that correctly, that's what it says here.

Q. And finally they say in the next paragraph (as read):

In practice, this might mean for parents and educators that they should not be too concerned about children's engagement with Snapchat streaks as it pertains to their children's FoMo, problematic smartphone use and social media self-control.

Did I read that correctly?

A. You read that correctly, but I would say that that's a conclusion of these authors that's not based on their actual evidence.

MS. FRANKLIN: I'll move to strike everything after "you read that correctly" as nonresponsive.

BY MS. FRANKLIN:

Q. Is it fair to say that these authors who surveyed nearly 2,500 adolescents came to the

Page 351

conclusion that using streaks may be part of a normative communication process between adolescents?

A. If you look at Snapchat's own analysis of using streaks, what you can see is that 55 percent of individuals, teens, I think, who use streaks say that they use streaks just to get their numbers up. They are not using streaks to actually interact with peers. Let me refer to my report on that.

MS. FRANKLIN: I'm going to move to strike that as nonresponsive.

BY MS. FRANKLIN:

Q. My question is about what these authors concluded. And these authors who surveyed nearly 2,500 adolescents came to the conclusion that using streaks may be part of a normative communication process between adolescents; is that right?

A. My response to that is that these authors' conclusions are a departure from their actual findings and also a departure from Snapchat's own data about the way that kids use streaks.

Q. That is your interpretation of these authors' findings based on what we've just read, correct?

A. Well, it's -- it's me expressing my opinion about the statements that you've isolated in

Page 352

this article drawing a distinction between the statements you've isolated and what the authors actually found, that is to say a statistically significant association between problematic use and streaks and FoMo and the number of streaks. And that's also consistent with Snapchat's own findings that a lot of what teens are doing when they're using streaks is not about -- is not about communicating with peers. It's really just about getting their numbers up.

Q. So just so I understand your testimony, your testimony is that you think that these statements are inconsistent with the author's actual findings?

A. Yes.

Q. But it is fair to say that what these authors found is that streaks may be part of a normative communication process between adolescents?

MS. MCNABB: Objection. Asked and answered.

THE WITNESS: And what I would say is that the Snapchat's own data shows that a substantial portion of teen users are not using streaks to communicate with peers, they are using them to get their numbers up.

Page 353

BY MS. FRANKLIN:

Q. But you don't dispute that that is what this paper says?

A. Well, that's what this paper says in this paragraph, but if you go to the abstract, which is where authors are really putting the most important findings in their papers, the authors here clearly don't include those kinds of qualifying statements, and instead make it very clear that, quote, problematic smartphone use was associated with the engagement in Snapchat streaks, and specifically FoMo was correlated with the number of people and the number of days adolescents maintained Snapchat streaks.

Q. They also clarified in the abstract the effect size was relatively small, right?

A. Yes. They said it was a weak relationship, but it was nonetheless a statistically significant relationship.

Q. You did not cite this finding when you discussed the evidence about defendants' platform features as inducers of FoMo, correct?

A. I'm sorry, was this in my materials considered, maybe --

Q. Using your materials considered, but I'm

89 (Pages 350 - 353)

HIGHLY CONFIDENTIAL

Page 354

asking about your MDL rebuttal report and the paragraph we looked at earlier.

A. I easily could have cited it. I didn't cite -- it's impossible to cite everything that I reviewed. There was lots of -- lots of materials that strengthened my opinion and my argument that I didn't cite simply because it's impossible to cite everything. But I could have easily used this article to support my opinion.

Q. So it is your opinion that this article is relevant to conclusions about whether streaks induce FoMo?

A. Absolutely, yes. They have -- they found a statistically significant relationship between FoMo and the number of people and the number of days adolescents maintained Snapchat streaks. It's a great example.

Q. I apologize for interrupting. Is a statistically significant, but relatively small association, correct?

A. Yes. But the point of statistical significance is that you set a threshold, and if you meet that threshold, then it's significant.

Q. What you did cite in your rebuttal report was the 2020 article that we just looked at in the

Page 355

previous exhibit, even though it discusses no data about the prevalence of FoMo as a result of any Snapchat features, correct?

A. Again, this earlier article is really talking about mitigation strategies, but highlighting that the design features are key to the addictive nature and the creation of FoMo. So these two articles together both support my opinion.

Q. Your plan in the paragraph was that these design features induce fear of missing out and that we have evidence of that, correct?

A. Which paragraph are we talking about now?

MS. MCNABB: Objection. You're misstating the sentence.

BY MS. FRANKLIN:

Q. This is your MDL rebuttal report, page 7, paragraph L.

A. Yeah. Yes.

Q. And the paper you cited does not have data about the prevalence of FoMo as a result of any Snapchat features, correct?

A. Again, I cite not just to that paper. That's what I cite here. But I -- the whole report, this whole Snapchat section discusses the data to support my opinions. It's not just a -- you know, a

Page 356

narrow look at this one paragraph.

Q. Let's look at another document that you cited there. I'll introduce as Exhibit 20 the document Bates stamped SNAP5486213.

(Whereupon, Deposition Exhibit 20 was marked for identification.)

BY MS. FRANKLIN:

Q. The first paragraph of this document bears the heading "Overview." Do you see that?

A. Yes.

Q. The first sentence of that paragraph reads (as read):

As Snap expands getting a wider audience set is important.

Did I read that correctly?

A. Yes.

Q. And the last sentence of that paragraph says (as read):

This doc stock has some musings from an audience of one, me, a 38-year-old mom who is on social media way too much to give thoughts for expansion.

Page 357

Did I read that correctly?

A. Yes.

Q. Fair to say that the text of this document indicates that it reflects the musings or thoughts of just one person?

A. Well, but this is not just any person, right, this is somebody who's deeply embedded and employed by Snapchat working on these issues on a regular basis, who also happens to be a parent, which is valuable background.

Q. Do you know who authored this document?

A. Can you tell me where in my report I cite to this?

Q. This -- you cite to this in the same paragraph that we were just looking at of your MDL rebuttal report, page 7, paragraph L.

A. I don't specifically know who this is.

Q. Do you know whether the author has any training or expertise in mental health or mental health research?

A. Can you give me a second to read through the document?

Q. In the interest of time, Dr. Lembke, I'll represent to you that the author of this document is not disclosed in the four corners of the document.

90 (Pages 354 - 357)

HIGHLY CONFIDENTIAL

Page 358

A. Okay.

Q. Do you have any reason to dispute that?

A. I'm also not finding a name on this document.

Q. Do you know whether the views expressed in this document were shared by employees at Snap, including those with decision-making authority?

A. I do not know.

Q. Do you know whether Snap took any action based on the recommendations expressed in this document?

A. Give me a second to read the recommendations.

Okay. I'm sorry, can you repeat your question?

Q. Do you know one way or another whether Snap took any action based on the recommendations in this document?

A. So this document recommends taking ephemeral content on Snap and making it enduring, and Snapchat has done that with Snapchat memories.

Q. Do you know when this document was published --

A. I don't know.

Q. -- created?

Page 359

So you couldn't say whether this document caused that adoption of that feature?

A. I can't say for sure, but you asked me if any of the recommendations have been implemented, and so I can --

Q. That's not what I asked.

A. Sorry.

I can infer from this document that there was nothing like memories when the document was written because, otherwise, there would not be this comment (as read):

Can you imagine telling a 70-year-old grandpa that he can't see that favorite pic of his grandkids again because it's femoral?

Q. Do you know the extent of the author's knowledge about Snapchat products' features at the time this document was created?

A. I do not.

Q. Can you point me to any data in this document demonstrating that Snapchat users, in fact, experience FoMo as a result of specific Snapchat design features?

A. What's your question again? Sorry.

Page 360

Q. My question was, can you point me to any data in this document demonstrating that Snapchat users, in fact, experience FoMo as a result of specific Snapchat design features?

A. Well, this document does mention FoMo in at least two places. It says that (as read):

Customer coming back to the app out of boredom or FoMo, fear of missing out.

It also says (as read):

If we can get things like actions, UI and rewards right, the internal triggers become things like FoMo, wanting to get the news and staying in touch with all friends.

So I don't see any specific data, but the document mentions those design features that create FoMo.

MS. FRANKLIN: I'll move to strike everything before "I don't see any specific data" as nonresponsive.

BY MS. FRANKLIN:

Q. In the interest of time, I'm just going to ask you a couple of questions about the document,

Page 361

and if we need to go to the document, we can do that.

Are you aware of whether Snapchat founder and CEO Evan Spiegel has any medical, psychological or behavioral science training?

A. I do not know.

Q. Are you aware of whether Snapchat founder and CEO Mr. Spiegel has any training in addiction medicine?

A. I do not know.

MS. FRANKLIN: I don't have any further questions. Thank you for your time, Dr. Lembke.

MS. RODGERS: Let's go off the record.

THE VIDEOGRAPHER: Time is 5:31. We're off the record.

(Whereupon, a recess was taken from 5:31 p.m. to 5:36 p.m.)

THE VIDEOGRAPHER: Time is 5:36, we're back on the record.

EXAMINATION BY MS. LEHMAN

BY MS. LEHMAN:

Q. Good afternoon, Dr. Lembke.

A. Good afternoon.

Q. We met -- we met several months ago. My name is Katy Lehman. You've been answering

91 (Pages 358 - 361)

HIGHLY CONFIDENTIAL

Page 362

questions for a number of hours today.

Before I start mine, I want to make sure that you are okay to continue giving full and complete answers.

A. Yes.

Q. All right. Have you spent any time using the TikTok platform since your deposition on June 18th, 2025?

A. No.

Q. Have you opened or created a TikTok account since your deposition on June 18th?

A. No.

Q. Have you developed any new opinions about the TikTok platform since your deposition on June 18th, 2025?

A. No.

Q. Do your MDL report and your MDL rebuttal report fully set out your opinions with respect to features on the TikTok platform?

A. Yes.

Q. Do your MDL and rebuttal reports fully set out your opinions rebutting or responding to the defense experts including, for example, Dr. Kishida, Dr. Galvan and others?

A. Yes.

Page 363

Q. Do your materials considered list that are appended to the MDL report and the MDL rebuttal report include all of the TikTok documents, depositions and other materials that you have reviewed?

A. Yes.

Q. What is the default setting for privacy for TikTok users who are under 18?

A. What do you mean by "for privacy"?

Q. Well, when I say "privacy," do you -- do you have an understanding that there are different settings that relate to privacy under TikTok?

A. For people who have platforms that are looking at videos?

Q. Correct.

A. No.

Q. Do you know what the default settings are for nighttime management features for TikTok users who are under 18?

A. I think that's changed over time. And I don't know when it changed, and I don't know specifically what the defaults are now, but I do know that for a long time, there were no such management settings in place.

Q. And do you know when the changes that

Page 364

you're referencing?

A. I don't know.

Q. What comes up on the screen if a TikTok user searches for types of images that have been identified as, for example, relating to eating disorders?

A. I'm not sure.

Q. What are the default settings for sleep reminders for TikTok users who are under 18?

A. I don't specifically know, but I do know that those are all recent changes.

Q. When you say "recent," what are you referring to?

A. Past three to five years.

Q. Okay. Do you know, for example, what the default users were with respect to sleep users for TikTok users under 18 in 2023?

A. I'm sorry, can you repeat the question?

Q. Yes.

Do you know what the default settings were with respect to sleep reminders for TikTok users under 18 in 2023?

A. No.

Q. Are you familiar with TikTok's mediation feature?

Page 365

A. What do you mean by "mediation feature"?

Q. Well, are you aware that TikTok has -- it's called a mediation feature -- I'm sorry, a meditation feature?

A. Oh.

Q. It's late for me too. I'm sorry. Let me reask the question.

Are you familiar with TikTok's meditation feature?

A. No.

Q. Have you reviewed any safety video published by TikTok?

A. Can you be more specific with regard to safety video?

Q. Sure.

Well, let me ask it -- ask it this way.

Have you reviewed any video that TikTok made and made available to the public in the last six years?

A. No.

Q. Are you familiar with the parental controls that are available on TikTok?

A. Let me look at my report.

Q. Please do.

A. Okay. Can you ask your question again?

92 (Pages 362 - 365)

HIGHLY CONFIDENTIAL

Page 366

Thank you for your patience.

Q. Yes.

Are you familiar with the parental controls that are available on TikTok?

A. I'm not that familiar with parental controls.

Q. All right. Are you familiar with the download restrictions on accounts for TikTok users who are under 18?

A. No.

Q. Did your analysis conclude that TikTok's algorithms promote addictive engagement and behavior?

A. Yes.

Q. And where do you rank the algorithm in causing that addiction, that addictive engagement and behavior, as compared to other features?

A. I didn't really rank the features. I looked at the features sort of individually without a view to ranking them one way or another.

Q. Do you claim that TikTok causes addiction because the TikTok platform failed to institute blocks to use during certain times of the day, such as during the school day?

A. I'm sorry, can you state the question

Page 367

again?

Q. Yes.

Do you claim that TikTok causes addiction because the TikTok platform failed to institute blocks to use during certain times of the day, such as during the school day?

A. I am saying that TikTok is addictive because it has design features that increase access, quantity, potency, novelty and uncertainty.

I'm not specifically saying that it is addictive because it failed to do something. I'm saying that it is addictive because it actively created an addictive platform. The fact that it then failed to curb access or create adequate guardrails perpetuates the problem.

Q. Is it your opinion that TikTok causes addiction because the videos on the platform are limited to short form videos?

A. I think short form videos make the videos more potent and contribute to their addictiveness, but that's not the only feature.

Q. Do you claim that TikTok causes addiction because the platform doesn't institute a beginning and an end to a user's feed?

A. I'm not quite sure what you mean by that

Page 368

except for the end part, so the sort of infinite scroll aspect, I do talk about as one of the addictive features.

Q. Okay. And so then when you were talking about the addictive features that are driving the opinions that you have outlined in your report, is one of the factors underlying that opinion for TikTok the fact that the scroll does not have an end?

A. That there's an infinite scroll bottomless bowl, yes.

Q. Do you recall -- excuse me.

Do you recall reviewing any study that found that TikTok is not addictive?

A. I have reviewed a variety of studies that have looked at both the benefits and the harms of platforms like TikTok. So I haven't just reviewed literature that showed the harms; I've looked at literature that showed both sides.

Q. Okay. And so in -- when you say that you have looked at literature that showed both sides, my question to you is more refined than that.

In reviewing literature, did you review scientific studies that found that TikTok is not addictive?

Page 369

A. A lot of the literature on the addictive nature of social media often looks at different platforms or sometimes the internet more broadly or smartphones more broadly.

So I'm not recalling, as I sit here now, any specific TikTok paper that says TikTok is not addictive.

Q. In reviewing literature, did you review scientific studies that found that social media platforms more broadly -- not confining the question to TikTok, but that social media more broadly is not addictive?

A. I have reviewed articles that have made that claim, yes.

Q. Can you name any?

A. Yes. Give me a moment here.

So on page 80 of my report, I review a Meta analysis by Ferguson, et al., that claims in reductions in social media have no impact on mental health, and then states Meta analytic evidence for causal effects were statistically no different than zero, the summative conclusion being that social media is not addictive. So that's one example.

Q. And you're referring to the Ferguson study that you cite at footnote 370?

93 (Pages 366 - 369)

HIGHLY CONFIDENTIAL

Page 370

A. Yes.

Q. Okay. Did you -- can you name any other such studies?

A. I have reviewed other studies that here in my materials considered, which I may not necessarily cite in the report, that look at both the benefits and the potential harms of social media or focus on another aspect of social media that's not necessarily related to its addictive potential. So that is in my materials considered. I could make you a list of that. I'm not going to be able to remember right now which those are.

Q. I want to hand you what I'm going to mark as Exhibit Number 21.

(Whereupon, Deposition Exhibit 21 was marked for identification.)

BY MS. LEHMAN:

Q. Can you confirm that I have handed you a copy of the study by Su entitled "Viewing personalized video clips recommended by TikTok activates default mode network and ventral tegmental area"?

A. Yes.

Q. The Su -- is it okay with you if we call this the Su study?

Page 371

A. Sure.

Q. The Su study is a study that uses functional MRI technology, correct?

A. Can you give me a second to reread the abstract?

Q. Please do.

A. Okay. Thank you.

Q. All right. And can you confirm that in this study, 30 students received an fMRI? And I'll just orient you, that's in paragraph 2.2.1.

A. I'm seeing 14 females. Where were you getting 30?

Q. So if you read the -- if we look under -- you see the header for 2.2.1 participants?

A. Yeah.

Q. Do you see it says 30 healthy students?

A. Oh, yeah, thanks.

Q. All right. So can we agree that 30 students received an fMRI in this study?

A. Yes, we can.

Q. All right. And all of the participants were college students at the Zhejiang University --

A. Mm-hmm.

Q. -- is that correct?

A. Yes.

Page 372

Q. Do you know how to say that word? Is it Zhejiang?
How do you say it?

A. Zhejiang.

Q. Do you know where that's located in China?

A. I don't.

Q. Okay. Do you know anything about that university?

A. I don't.

Q. All right. Now, if you turn to page 9 of the study, all right, we're going to look in the bottom paragraph in the left column.

A. Mm-hmm.

Q. And on the sixth line down, the authors write, quote (as read):

The second limitation is participants are mostly college students whose ages range from 19 to 30.

Did I read that correctly?

A. Yes.

Q. Okay. And then the authors go on to state, quote (as read):

The relatively narrow age range makes the finding hard to

Page 373

generalize to the less educated adults and younger students.

Did I read that correctly?

A. That's what it says, yes.

Q. And do you agree that the fact that this is a study of 30 participants in China who were aged 19 to 30 means that this study does not have broad generalized ability to American students who are ages 11 to 18?

A. No.

Q. What's your basis for disagreeing there?

A. I mean, the human reward pathway across millions of years of evolution, across individuals, highly conserved, highly similar, you know, the fact that this happens to be Chinese people matters not at all. Chinese brains have the same reward pathway as U.S. brains, and the fact that it's age range 19 to 30, I mean, I -- I have no reason to think that you wouldn't find similar findings in a younger brain.

Q. So then is it your opinion that across culture -- across cultures, across -- around the world, no matter the culture, people have the same dopaminic response to things that they see and experience?

94 (Pages 370 - 373)

HIGHLY CONFIDENTIAL

Page 374

A. So keep in mind what we're talking about here is the addictive response to these specific design features that are well established to make something more addictive or not. And that's true across time periods, across cultures, across populations. It's not about the content, you know, whether Chinese people prefer to look at, I don't know, panda videos and Americans prefer cat videos, like, that doesn't matter. It's the addictive design feature. These are ancient brain networks that are going to respond, not just across different humans, but across species.

Q. Okay. So my question is different. So I am not asking if all humans across cultures have dopaminic responses. I am asking if you can sit here and state to a reasonable degree of medical certainty that people across cultures have the same dopamine response to a certain type of content.

So no matter what culture, if they see the same video, cat video, panda video, whatever it is, they have the exact same response.

A. There is interindividual variability in response to a variety of intoxicants. But in general, intoxicants are intoxicating for most people. So most people who use an opioid or, you

Page 375

know, drink alcohol or watch a TikTok video will find that drug reinforcing. Of course, there are always going to be a small subset for whom it's not reinforcing, but those would be the small minority of people.

Q. All right. Now, in this study, the -- the participants were not actually using TikTok, were they?

A. Well, these were TikTok users, right. And they showed them personalized videos versus generalized videos to simulate the TikTok platform.

Q. All right. But just not to lose my question.

The participants in the study were not actually using TikTok, they were shown a prerecorded video of some content on TikTok, correct?

A. Give me a second.

It says here that all short videos used as stimuli were recorded from TikTok using a smartphone.

So that's about as close as you're going to get to using TikTok in an fMRI machine where you can't move.

MS. LEHMAN: I want to show you another document we're going to mark as Exhibit Number 22.

Page 376

(Whereupon, Deposition Exhibit 22 was marked for identification.)

BY MS. LEHMAN:

Q. Can you confirm that I am handing you a study by Seekis entitled "The impact of beauty and self-compassion TikTok videos on young women's appearance, shame and anxiety, self-compassion, mood and comparison processes."

A. Can you give me a moment to reread the abstract?

Q. Yes.

A. Thank you.

Q. Can you first confirm --

A. Yes.

Q. -- I've handed you the title that I've just read?

A. You have.

Q. Okay.

A. Okay. Thank you.

Q. All right. If you'll turn to page 119, you see there's a discussion of the method?

A. Yes.

Q. All right. And can you confirm that there were 115 study participants recruited from a public university in Australia?

Page 377

A. Yes.

Q. All right. If you'll turn to page 120.

Do you see on the right-hand side, 3.8, there's a discussion of procedure?

A. Yes.

Q. All right. And there was (as read):

Ethics approval was obtained from the university's human research committee prior to it starting the study.

A. Yes. I see that.

Q. Okay. And in the United States, would that be similar to what we might call an IRB?

A. Yes.

Q. Have you ever served on an IRB?

A. What do you mean, "served"?

Q. Have you ever been a member of an IRB?

A. Like an internal review board?

Q. Yes.

A. Where I evaluated studies?

Q. Yes.

A. Yes, I have.

Q. And what is the purpose of an internal review board, or IRB?

A. Well, there are different purposes, but

95 (Pages 374 - 377)

HIGHLY CONFIDENTIAL

Page 378

the primary purpose is to ensure the safety for participants.

Q. Okay. Would -- when you were serving on an IRB, would you have approved a study design that exposed participants to something that could harm their health?

A. I mean, no. That's something that we definitely try to prevent.

Q. Okay. If you'll turn back to the first page, the front page of the article, and I want to look -- you see on the right-hand side, there's 1.1 beauty on TikTok?

A. Yes.

Q. I want to look at the sentence immediately preceding that.

Do you see that it says (as read):

In the current study, we investigated the effect of brief exposure to TikTok videos featuring either beauty, self-compassion or travel content on young women's facial appearance concerns, self -- compassion, mood and comparison processes.

A. Yes, I see that.

Page 379

Q. Okay. And do you agree that a simplified summary of the study here is that they divided the participants into three groups and showed one group content related to beauty, a second group content related to self-compassion and a third group, content related to travel?

A. Let me just quickly look at the methods again.

Can you point me to where in this article it says that?

Q. Sure.

You know, we can actually go to the place you sort of pointed my colleague to. We can go to the abstract.

A. Mm-hmm.

Q. And if you look at the second sentence, it says, quote (as read):

Undergraduate women, N equals 115, were randomly assigned to view one of three compilation TikTok videos on either beauty tips, self-compassion strategies or travel destinations.

Do you see that?

A. Yes.

Page 380

Q. All right. And so then do you agree that the study design randomly assigned the 115 participants to view a compilation TikTok video either about, one, beauty tips, two, self-compassion strategies, or three, travel?

A. Yes.

Q. Have you looked at data that evaluates what type of content on TikTok is most often viewed?

A. I believe I have seen information to that effect. But I'm not now remembering specifically what that was.

Q. Do you agree that this study tested response to different types of content on TikTok?

A. Yes.

Q. Okay. Now, if you'll turn to page 123, and there we're going to look under the limitations discussion. All right. In the second sentence under the limitations discussion, the author writes (as read):

With regard to duration of video content, we only measured short-term effects of exposure to a seven-minute compilation of TikTok videos, thus it is not possible to know whether the effects were

Page 381

maintained for longer periods of time.

Did I read that correctly?

A. Yes, you did.

Q. And do you agree that based on the study design, it was not possible to draw conclusions from this study about whether the effects from the videos were maintained for longer periods of time?

A. Yes.

Q. Okay. I'd like to now, in that same paragraph, about three-quarters of the way down -- I'm sorry, the last sentence in that paragraph.

Do you see that it says (as read):

Additionally, with a larger sample size, moderation analysis using trait body image measures, e.g., appearance comparisons may provide deeper insights into how self-compassion by safeguard against appearance concerns.

Did I read that correctly?

A. Yes.

Q. Okay. And do you agree with that -- that statement, that (as read):

With a larger sample size,

96 (Pages 378 - 381)

HIGHLY CONFIDENTIAL

Page 382

moderation analyses using trait body images measures could provide deeper insights into how self-compassion could safeguard against appearance concerns?

A. I mean, more research is always better, as long as it's good research.

Q. All right. I'm going to hand you another document that I'm going to mark as Exhibit Number 23.

(Whereupon, Deposition Exhibit 23 was marked for identification.)

BY MS. LEHMAN:

Q. Can you confirm that I have handed you an article by Mink entitled "TikTok use and body dissatisfaction, examining direct, indirect and moderated relations"?

A. Yes.

Q. All right. And this is a study of 778 college women in the United States.

A. Can you give me a moment to reread the abstract?

Q. Please do.

A. Okay. Thanks. I read it.

Q. Can you confirm that this is a study of

Page 383

778 college women in the United States?

A. Yes.

Q. And the participants were recruited through the Department of Psychology at the University of Tennessee, Knoxville, correct?

A. Let me take a look at the methods.

Q. And I can actually direct you to where that is discussed. If you look at page 208 under 2.2.

A. Okay. Yes.

Q. All right. It's correct that participants were recruited from the Department of Psychology at the University of Tennessee, Knoxville?

A. Yes.

Q. Okay. And the participants in this particular study were age range 18 to 29, correct?

If you look at almost immediately above where you were just looking on page 208, it's about ten lines up.

A. I'm sorry, I'm not seeing it. If you could just direct me to where that is.

Q. Sure.

If you'll just look right about here.

A. Right.

Q. It says (as read):

Page 384

Participants ranged in age from 18 to 29 years old.

A. Yes. Got it.

Q. All right. Now, if you'll turn to page 214, I want to look under Section 4.1, limitations and directions for future research.

A. I'm there, yes.

Q. Okay. And do you see that the first limitation that the authors identify is that potential for self-selection bias, that they say, quote (as read):

May have impacted our results.

And then they point to the fact that the sample was not random, but instead were college women who had been recruited through the Department of Psychology at their university.

A. Yes, I see that.

Q. Okay. And then if you continue in the same paragraph, the authors also note that, quote (as read):

Our research design was also correlational, which means that we cannot claim causation or determined directionality.

Did I read that correctly?

Page 385

A. Yes.

Q. And do you agree that there -- the research design of this study was correlational?

A. Yes.

Q. Do you agree that because the research design on this study was correlational, this study does not allow you to reach conclusions as to either causation or to determine directionality?

A. Well, again, it's not in and of itself conclusive, but it is, as the authors say, suggestive. And taken as part of a larger body of evidence, I do think there's a causal direction between spending time on TikTok and negative upward comparisons.

Q. Okay. My question is different.

You agree that looking at this single study, the Mink study that we have marked as Exhibit Number 23, that given that this is a correlational study design, that you cannot use the study to determine causation or directionality?

A. In isolation, no. But, again, my opinions are not based on a single study in isolation.

Q. Okay. Now, if you'll turn to page 214.

A. Yes.

Q. Looking under "Ethics approval," can you

97 (Pages 382 - 385)

HIGHLY CONFIDENTIAL

Page 386

confirm that this study was approved by the University of Tennessee's institutional review board, or IRB?

A. Yes.

Q. Okay. In your MDL report or your MDL rebuttal report, putting aside the Su, the Seekis and the Mink studies, did you cite any study that specifically studied TikTok and not other platforms?

A. So TikTok's internal documents cite to their own studies, which I think are some of the most valuable pieces of evidence.

Q. Well, let me -- let me make sure that my -- my question is specific, okay?

In your MDL report or your MDL rebuttal report, did you cite to any peer-reviewed scientific study other than Su, Seekis and Mink that specifically studied TikTok?

A. I have reviewed other studies that, within the body of those studies, they mention TikTok. I can't specifically recall them now, but there are other studies in my materials considered that do evaluate TikTok.

Q. Okay. And do they control for all other platforms?

A. No. Those studies are looking at a

Page 387

variety of different platforms together.

Q. Okay. Do you have a treater patient relationship with any plaintiff in the MDL?

A. No.

Q. Have you made any treatment recommendations to any plaintiff in the MDL?

A. No.

Q. Have you made any treatment recommendations to the parent or guardian of any plaintiff in the MDL?

A. Not that I'm aware of.

Q. Okay. Have you ever referred an MDL plaintiff to any healthcare professional for treatment?

A. No.

Q. Have you ever provided a list of healthcare professionals who treat social media addiction or problematic social media use that can be distributed to the plaintiffs in the MDL?

A. No.

Q. Have you reviewed any of the data that TikTok produced showing how much time any specific plaintiff in the MDL spent on its platform?

A. No.

Q. Have you ever consulted with a school

Page 388

district about social media?

A. Yes.

Q. Which school district?

A. Palo Alto Unified School District, including private schools. I've also given talks to a number of other school districts in and around the Bay Area, and also in other states.

Q. Have you ever been hired as a consultant as opposed to a speaker about by school district with respect to social media?

A. No. But I generally, as I said before, don't do consultancy work outside of litigation.

Q. Did you review any of the documents produced by any school districts who are in the MDL?

A. No.

Q. Have you spoken to an employee of any school district that is a plaintiff in the MDL?

A. No.

Q. Have you evaluated the impact of social media on any of the plaintiff school districts in the MDL?

A. No.

Q. Have you ever written a policy for any school district related to social media?

A. I've been involved in designing online

Page 389

platforms for schools to help them with kids who are struggling with addiction, including addiction to social media.

Q. Other than that involvement in designing online platforms, have you written any written policies with respect to social media for any school districts?

A. No.

Q. Okay. What -- when you say that you were designing online platforms, can you tell me more about those platforms?

A. Yeah. So I wrote a workbook called The Official Dopamine Nation Workbook, which talks about the early intervention with people with mild to moderate, or even pre-addiction states, including addiction to social media. And that has been adapted by a company called BrainAbouts, which creates social emotional learning for schools and adopts the core principles from the workbook.

Q. You mentioned earlier today that you did some work with the company Yondr?

A. Yes.

Q. Okay. Is Yondr the company that manufactures the pouches sometimes referred to as Yondr pouches?

98 (Pages 386 - 389)

HIGHLY CONFIDENTIAL

Page 390

A. Yes.

Q. Okay. And so how would you describe a Yondr pouch?

A. It's a pouch that once you put the smartphone into the pouch, it can't connect to the internet, can't transmit or receive.

Q. When did you work with Yondr?

A. I don't know the exact dates. But, you know, it's been sometime in the last five to six years.

Q. How long did you work with Yondr?

A. Again, I offered my expertise for free on an -- on an ad hoc basis as they needed it, as they were trying to develop their product and implement it and such.

Q. Did you offer your services for free because you believed in the benefits of the Yondr product?

A. I believe that it's important to try to help kids in school when it comes to these addictive platforms, and so it seemed like a reasonable idea.

Q. Is it your opinion that it is helpful for schools or classes to implement Yondr pouches so that students do not have access to their cell phone devices during school?

Page 391

A. I'm not sure that the Yondr pouch is the specific answer for every school or necessarily even any school, but I certainly think that schools need a lot more support to be able to create a safe environment for their kids to learn.

Q. Okay. Do you believe that the Yondr pouches are one example of a way that that environment can be created so that students are not accessing digital media through their cell phones during the school time?

A. Potentially. Potentially. Again, I think, you know, it would be important to analyze the specific evidence of the impact of Yondr pouches, which I have not done.

Q. Does the DSM-5-TR include fear of missing out, or FoMo, as a diagnosis?

A. No.

Q. Is there an ICD-11 code for fear of missing out or FoMo?

A. No.

Q. Does the DSM-5-TR include fear of missing out or FoMo as a diagnostic criteria for any mental health diagnosis?

A. No.

Q. Do you agree that fear of missing out is a

Page 392

normal human emotion?

A. Yes.

Q. Do you agree that fear of missing out can be caused by experiences unrelated to social media?

A. Yes.

Q. Do you agree that social media users who experience withdrawal symptoms, that those withdrawal symptoms can vary in severity depending on the individual?

A. Yes.

Q. For some users, do you agree that the withdrawal symptoms can be mild?

A. Yes.

Q. Do you agree that some withdrawal -- excuse me. Got tongue tied.

Do you agree that some users may not experience withdrawal when they stop using social media?

A. Yes.

Q. And would that be true even for users who are addicted?

A. Yes.

Q. Do you have an opinion about how long after someone stops using social media that their withdrawal symptoms peak?

Page 393

A. It varies by individual, but on average, withdrawal symptoms are most severe in the first ten to 14 days and then start to get better.

Q. Okay. And --

A. Sorry, can I add something to that? There is something called the protracted withdrawal syndrome or protracted abstinence syndrome where people can continue to have withdrawal symptoms for months and even years.

Q. And what is the percentage of individuals who have social media addiction, if this is known, who will indeed experience protracted withdrawal syndrome?

A. I do not know.

Q. And do you agree that after withdrawal symptoms peak, whether that's at ten days or 14 days, depending on the user, that those symptoms will become less severe?

A. For most users, they should become less severe, but, again, there is this protracted abstinence syndrome where, for some people, those symptoms persist over very long periods of time.

Q. What advice do you give to individuals who may be experiencing withdrawal symptoms?

A. There are lots of different interventions

99 (Pages 390 - 393)

HIGHLY CONFIDENTIAL

Page 394

for withdrawal. We find that for people who are addicted to drugs and alcohol, some exercise can be helpful. Reaching out to other supportive humans can be helpful, going to mutual help group meetings are helpful, getting plenty of sleep, eating right, all those other standard and well-known wellbeing measures.

Q. If a patient were to complain to you or express concern that they could experience withdrawal, would you assure them that those feelings will pass?

A. In general, I let people know that the withdrawal symptoms are typically time-limited, and if they can just get through the acute withdrawal phase, it will get better.

Q. Do you agree that some people use -- strike that. Let me start again.

Do you agree that people use social media for a variety of reasons?

A. Yes.

Q. Do you agree that some people use social media for reasons other than addiction?

MS. MCNABB: Objection. Form.

THE WITNESS: Yeah. I'm not sure how to answer that question because most people who start

Page 395

out using social media are not addicted yet 'cause they haven't been exposed yet. So their initial entry into use is not caused by an addiction because they haven't developed the addiction yet.

BY MS. LEHMAN:

Q. And appreciating that, you would agree that there are people who continue to use social media for years who use it for reasons other than addiction?

MS. MCNABB: Objection. Form.

THE WITNESS: I clearly state in my report that not everybody who uses an addictive substance or behavior will get addicted to that substance or behavior. In fact, most people won't, but there is a subset of people who will get addicted, and that's true also for defendants' platforms.

BY MS. LEHMAN:

Q. Okay. Well -- and not to lose my question, but you would agree that that group of people who use social media and do not become addicted, that that includes millions of users who use social media for years, correct?

MS. MCNABB: Objection. Form.

THE WITNESS: I think it's important to separate out kids as an especially vulnerable group

Page 396

that we really have to look at distinct from adults because of their developing brains and their unique vulnerability to addictive use.

MS. LEHMAN: I respectfully move to strike as nonresponsive.

BY MS. LEHMAN:

Q. But let me ask you this: Do you believe that children and teenagers have a unique response to social media that is different from those adults who use social media?

A. I think that children's brains are more vulnerable to the addictive nature of social media, and that's also supported by defendants' own data wherein they show that problematic use, or in the case of TikTok, imbalanced use I think was their euphemism, is more likely to occur in young people.

MS. MCNABB: Katy, you're out of time.

MS. LEHMAN: All right. I respectfully move to strike as nonresponsive.

I think I had -- I had, like, five more seconds. Hold on. Hold on.

MS. MCNABB: Katy, you're out of time.

MS. LEHMAN: I think I had -- hold on. I think I have one more question. Hold on. I get to ask it. Okay? You can't use my time by telling me

Page 397

I'm out of time. Okay? So let's ask the videographer where we were when you stopped me, okay?

MS. MCNABB: Five seconds isn't even enough for you to get a question, if that even is correct. But you're out of time, so we can ask the videographer, but I'm not going to let you ask another question.

MS. LEHMAN: Okay. Well, we're -- I appreciate that you have made your record that you're not going to let me ask another question, but I'm still going to make the record because if I have -- and I want to ask -- I just want to make sure the record is clear for the court.

So, sir, can you tell me how much time we had on the record when counsel for the plaintiffs told me I had to stop?

THE VIDEOGRAPHER: Right under seven hours. Right there, couple seconds.

MS. LEHMAN: All right. I disagree. You won't let me -- unless you're going to let me ask one more question.

MS. MCNABB: No.

MS. LEHMAN: Okay.

MS. MCNABB: Okay. Will you -- we can go

100 (Pages 394 - 397)

HIGHLY CONFIDENTIAL

Page 398

off the record, and we'll be right back.

THE VIDEOGRAPHER:  Time is 6:29, we're off the record.

(Whereupon, a recess was taken from 6:29 p.m. to 6:40 p.m.)

THE VIDEOGRAPHER:  Time is 6:40, we're back on the record.

MS. MCNABB:  Katherine, did any of the defendants want to ask Dr. Lembke today about her Massachusetts or Arkansas reports?  It's my understanding the opinions are the same in those reports as the opinions she's discussed today.

MS. RODGERS:  Megan Rodgers for Meta.  I think we talked about this at the top of the deposition.  We don't agree that this deposition covers those expert reports.  We're willing to meet and confer on it later, but it's not part of the order issued by Judge Kang and it's not what this deposition was intended to cover.

MS. MCNABB:  Okay.  We are giving you the opportunity to ask questions now, to the extent that you want it.  My understanding is you do not.  We, plaintiffs, have no redirect for Dr. Lembke.

THE VIDEOGRAPHER:  The time is 6:41.  We're off the record.  Total time for defendants was

Page 399

eight hours and one minute.  We're off the record.

(Whereupon, the deposition adjourned at 6:41 p.m.)

--oOo--

Page 400

I declare under penalty of perjury the foregoing is true and correct.  Subscribed at

_____, _____,
        CITY                    STATE

this ___ day of _____, 2025.

_____
        WITNESS SIGNATURE

Page 401

CERTIFICATE OF REPORTER

I, Kathleen A. Maltbie, Certified Shorthand Reporter licensed in the State of California, License No. 10068, the State of Nevada, CCR 995, and the State of Texas, CSR 12212, hereby certify that deponent was by me first duly sworn, and the foregoing testimony was reported by me and was thereafter transcribed with computer-aided transcription; that the foregoing is a full, complete, and true record of proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificates null and void.

In witness whereof, I have hereunto set my hand this day:

_____  Reading and Signing was requested
_____  Reading and Signing was waived
___x_  Reading and Signing was not requested

*Kathleen Maltbie*

_____
KATHLEEN A. MALTBIE
RPR-RMR-CRR-CCRR-CLR-CRC-RDR
California CSR 10068, Nevada CCR 995
Texas CSR 12212

101 (Pages 398 - 401)