# Exhibit 19

# PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE GENERAL CAUSATION TESTIMONY OF PLAINTIFFS' EXPERTS

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 1

1             UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA

2

3    IN RE:  SOCIAL MEDIA              )Case No.
     ADOLESCENT                        )4:22-MD-03047-YGR

4    ADDICTION/PERSONAL                )MDL NO. 3047
     INJURY PRODUCTS                   )

5    LIABILITY LITIGATION,             )
                                       )

6    This Document Relates to          )
     All Actions                       )

7    _____

8      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

9              VIDEOTAPED DEPOSITION OF

10                 LAUREN HALE, Ph.D.

11

12   DATE:          September 17, 2025

13   TIME:          9:08 a.m.

14   HELD AT:       Four Points By Sheraton
                    333 S. Service Road

15                  Plainview, New York  11803

16

17      By:         Sarah J. Miner, RPR, LSR #238

18

19

20

21

22

23

24

25

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 2

```
 1   A P P E A R A N C E S :
 2   For Meta Platforms, Instagram and Siculus:
 3   Stephen Petkis, Esq.
     Marc P. Capuano, Esq.
 4   Alexander Kennedy, Esq. (Appearing via Zoom)
     Covington & Burling LLP
 5   One CityCenter
     850 Tenth Street, NW
 6   Washington, DC  20001-4956
     spetkis@cov.com
 7   mcapuano@cov.com
 8
     For the Texas ISDs:
 9
     Craig Eiland, Esq. (Appearing via Zoom)
10   David Bonnin, Esq. (Appearing via Zoom)
     Eiland & Bonnin Law Firm
11   2200 Market Street
     Suite 501
12   Galveston, Texas  77550
     ceiland@eilandlaw.com
13   dbonnin@eilandlaw.com
14
     For the Plaintiffs:
15
     Jason Slothouber, Esq.
16   State of Colorado
     Colorado Department of Law
17   Ralph L. Carr Colorado Judicial Center
     1300 Broadway, 9th Floor
18   Denver, Colorado  80203
     jason.slothouber@coag.gov
19
     Nayha Arora, CA AG
20   Young Jun Choi, MA AG
     Shaheen Sheikh, CO AG
21
     -and-
22
23
24
25
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 3

```
 1   For the Plaintiffs:
 2   (Appearing via Zoom)
 3   Peter Downing, MA AG
     Verna Pradaxy, NJ AG
 4   Zachary Richards, KY AG
     Megan O'Neill, CA AG
 5   Steve Kaufmann, CO AG
     Elizabeth Orem, NY AG
 6   Christina Chan, MA AG
 7
     Also Present:
 8
     Justin Bily, Trial Technician
 9   Robert Benimoff, Videographer
     Jacob Genualdi (Via Zoom)
10   Corin Stigall (Via Zoom)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 4

```
 1              I N D E X
 2   WITNESS:                            Page
 3   LAUREN HALE, Ph.D.
 4   Direct Examination by Mr. Petkis     10
     Cross-Examination by Ms. Arora      375
 5   Redirect Examination by Mr. Petkis  378
 6             E X H I B I T
     Deposition
 7   Exhibits     Description            Marked
     Exhibit 1    Rebuttal Trial Report of  24
 8                Dr. Lauren Hale, Ph.D.
                  7/30/25
 9   Exhibit 2    Supplemental Materials    69
                  Considered by Dr. Lauren Hale
10                9/12/25
     Exhibit 3    Expert Report of Dr. Sarah  72
11                Morabach Honaker, Ph.D.
                  HSPP, DBSM and Rebuttal
12                to all State Attorney
                  General' Experts
13   Exhibit 4    Hale Curriculum Vitae     81
     Exhibit 5    Invoice                  153
14   Exhibit 6    Invoice                  153
     Exhibit 7    Instagram posts          175
15                Haugen_00020135-196
     Exhibit 8    IG Mental Well-being     200
16                Behaviour Production Strategy
                  Late Night Use
17                META3047MDL-060-00000456-482
     Exhibit 9    Late Night Use           200
18                IG Mental Well-being,
                  Problematic Use Strategy
19                and Design META3047MDL-111-
                  0371250
20   Exhibit 10   Designing sleep disruption:  253
                  The digital persuasion
21                underlying screen use and sleep
     Exhibit 11   Handbook of Children and   261
22                Screens
     Exhibit 12   Childen and Scrrens National  266
23                Advisory Board
     Exhibit 13   Board of Advisors Spotlight:  275
24                Matthew Bergman, JD
25
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 5

```
 1   Deposition
     Exhibits     Description            Marked
 2   Exhibit 14   HHS Public Access        304
                  Interactive screen-based
 3                activities predict worse
                  actigraphic sleep health
 4                that night among adolescents
     Exhibit 15   Social Media and Sleep Health  310
 5   Exhibit 16   Taking a Break from Social  318
                  Media Improves Wellbeing
 6                Through Sleep Quality
     Exhibit 17   Facebook use and sleep quality:  318
 7                Light interacts with socially
                  induced altertness
 8   Exhibit 18   2023 Constant Companion:   358
                  A Week in the Life of a
 9                Young Person's Smartphone Use
     Exhibit 19   Adolescent Smartphone Use   372
10                During School Hours
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 6

1    THE VIDEOGRAPHER:  Good morning.  We
2  are now going on the record at
3  approximately 9:08 a.m. on September 17th,
4  2025.  Please note that this deposition is
5  being conducted partly virtually.  Quality
6  of recording depends on the quality of
7  camera and internet connection of
8  participants.  What is seen from the
9  witness and heard on screen is what will
10  be recorded.  Audio and video recording
11  will continue to take place until all
12  parties agree to go off the record.
13    This is Media Unit 1 of the
14  video-recorded deposition of Dr. Lauren
15  Hale in the matter of In Re: Social Media
16  Adolescent Addiction/Personal Injury
17  Products Liability Litigation, filed in
18  the United States District Court, Northern
19  District of California, Case Number
20  4:23-CV-05448.
21    The location of this deposition is
22  Four Points Sheraton, 333 South Service
23  Road, Plainville -- Plainview, New York.
24    My name is Robert Benimoff,
25  representing Golkow, and I'm the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 7

1  videographer.  The court reporter is Sarah
2  Miner.  I am not authorized to administer
3  an oath.  I am not related to any party in
4  this action, nor am I financially
5  interested in the outcome.
6    If there are any objections to
7  proceeding, please state them now.  All
8  appearances were previously made on the
9  stenographic record.
10    Will the court reporter please swear
11  in the witness, and then we can proceed.
12    LAUREN HALE, Ph.D.,
13  having first been duly sworn by Sarah J. Miner,
14  LSR, a Notary Public in and for the State of
15  Connecticut, was examined and testified as follows:
16    MR. CHOI:  The Commonwealth of
17  Massachusetts states for the record that
18  we have timely served prior to today's
19  deposition Dr. Hale's opening report and
20  rebuttal report in our litigation.
21  Commonwealth of Massachusetts versus Meta
22  Platforms and Instagram, LLC, Suffolk
23  Superior Court, Civil Action Number
24  2384CV02397, which contain opinions that
25  are the same as or similar to those in the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 8

1  reports served by the MDL plaintiffs.
2    Thus, for purposes of coordination
3  efficiency, we issued a cross-notice of
4  deposition.  As a result, the Commonwealth
5  opposes any efforts to further depose
6  Dr. Hale based on any --
7    THE COURT REPORTER:  I'm sorry?  The
8  Commonwealth?
9    MR. CHOI:  Opposes any efforts to
10  further depose Dr. Hale based on any of
11  the same or similar opinions contained in
12  both the MDL and Massachusetts reports
13  that Meta has an opportunity to ask
14  questions about today, but we are happy to
15  meet and confer on that issue at the
16  appropriate time if and/or when it becomes
17  ripe.
18    MR. PETKIS:  Just to respond briefly.
19  We obviously understand that an attorney
20  from the Massachusetts Attorney General's
21  Office is in attendance today.
22  Massachusetts is not part of the federal
23  MDL.
24    We received an email last Friday,
25  September 12, saying that the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 9

1  Massachusetts A.G. intended to attend and
2  cross-notice into this MDL deposition.  I
3  have not seen a formal cross-notice
4  pleading or anything else purporting to
5  operationalize that email.  I take
6  Counsel's representation for what it is,
7  but I have not seen it.
8    Just to be clear.  Meta believes this
9  is improper.  There is a federal court
10  order at ECF 2157 that explicitly says
11  Massachusetts depositions are to be taken
12  separately.  We are not, just as a matter
13  of courtesy, going to ask the attorney
14  from the Massachusetts A.G.'s Office to
15  leave the room, but we are not going to
16  permit the Massachusetts A.G. to
17  participate in this deposition in any way.
18    And to be clear, Meta will not be
19  asking any questions about Dr. Hale's
20  Massachusetts reports, one of which,
21  again, was served just five days ago on
22  September 12th.  You know, we obviously
23  disagree that Massachusetts' informal
24  attendance at this deposition to which
25  they are not a party and have no interest

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 10

1      limits Meta's ability to properly depose
2      Dr. Hale on the content of her separate
3      Massachusetts report at the appropriate
4      time, but we are obviously happy to meet
5      and confer later on that point.
6          And I think with that, we can begin.
7              DIRECT EXAMINATION
8  BY MR. PETKIS:
9      Q   Good morning, Dr. Hale.  My name is Steve
10 Petkis.  I represent the Meta defendants in this
11 lawsuit.
12         We have not met before today; is that
13 right?
14     A   That is correct.
15     Q   Can you start by just stating your full
16 name and business address for the record, please.
17     A   Sure.  My full name is Dr. Lauren Hale.  I
18 work at Stony Brook University.  My office address
19 is Program and Public Health, HSE Level 3071,
20 School of -- Renaissance School of Medicine, Stony
21 Brook, New York, 11794-8338.
22     Q   Thank you very much.
23         You understand that you are here today to
24 provide testimony in connection with an expert
25 report that you submitted on behalf of several

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 11

1  State Attorneys General in the social media MDL
2  litigation that is based in California?
3      A   Yes, I understand that I am here today to
4  speak about my rebuttal to the Dr. Honaker report
5  that I submitted on July 30th of this year.
6      Q   And again, that is in the -- you
7  understand that is in the social media MDL that is
8  in California?
9      A   Yes, I am aware of the case.
10     Q   Are you prepared to testify fully about
11 all of your opinions today?
12     A   Yes, I am.
13     Q   There are no documents you still need to
14 review?
15     A   I think I am well-prepared for today's
16 meeting.  There are always more documents I could
17 review, but I am prepared to speak about my
18 opinions in the report.
19     Q   Let me put it a little bit differently.
20 There are no additional documents you feel you need
21 to review to reach the opinions contained in your
22 report.  Is that right?
23     A   That is correct.
24     Q   The plaintiffs' lawyers have not asked you
25 to perform any further work before the MDL trial.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 12

1  Is that right?
2              MS. ARORA:  Objection, form.
3              THE WITNESS:  I don't fully
4          understand the question.  They have not
5          asked me to write any additional reports.
6  BY MR. PETKIS:
7      Q   Okay.  And they have not asked you to
8  consider or reach any further opinions besides
9  those contained in the rebuttal report that you
10 served on July 30th?
11     A   No.
12     Q   Are there any additional opinions that you
13 feel like you still need to form in this MDL case?
14     A   As of right now, I feel satisfied with my
15 opinions that I submitted on July 30th.
16     Q   Have you ever been deposed before,
17 Dr. Hale?
18     A   No.
19     Q   Have you ever provided sworn testimony at
20 trial or any other proceeding?
21     A   No, I have not.
22     Q   Have you ever been retained as an expert
23 in litigation either on the testifying basis or on
24 a consulting basis?
25     A   I have never testified before, but I did

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 13

1  write a declaration for another case in the spring.
2      Q   Can you tell me what that case was.
3      A   It was an injunction for the State of
4  Florida regarding Snapchat.
5      Q   Is the State of Florida the plaintiff in
6  that lawsuit?
7      A   The State of Florida -- it was the
8  Attorney General's Office of the State of Florida,
9  yeah.
10     Q   They were the plaintiff?
11     A   I don't know where it got to.  It never --
12 it was like an injunction.  It was a declaration
13 about a related topic on screens and sleep.
14     Q   Take a step back.  The State of Florida
15 was suing Snapchat.  Is that right?
16     A   That was my understanding, yes.
17     Q   Do you remember the nature of the
18 allegations?
19     A   It was concern about -- I don't really
20 know if I am allowed to talk about it in this
21 context, so I guess I don't really know.  But it
22 was about a piece of legislation, I can't remember
23 the number of it, that affected the age of users of
24 Snapchat.
25     Q   Did you offer any opinions in that

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 14

1  declaration that pertain to Facebook or Instagram
2  in any way?
3     Q   Can you please repeat the question.
4     Q   Did you offer any opinions in that State
5  of Florida declaration that you just described that
6  pertain to Facebook or Instagram in any way?
7     A   The opinions in that declaration were
8  relevant to all social media platforms.  So in that
9  way it was related to Facebook and Instagram, but
10 it was not specifically about Facebook or
11 Instagram.
12    Q   Did you offer any opinions in that
13 declaration that pertain to any specific features
14 of Facebook or Instagram?
15    A   I cannot recall.
16    Q   Besides signing a declaration, have you
17 had any other involvement in that case?
18    A   No.
19    Q   You haven't been asked to testify?
20    A   No.
21    Q   You don't know how that case resolved or
22 is progressing in any way?
23    A   I received an email about it in April --
24 or I submitted in April -- in July maybe, but I
25 don't know any more details.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 15

1     Q   You submitted this declaration in July?
2     A   I submitted it in April.  And then I don't
3  -- I really don't know what is the next step with
4  that.
5     Q   How did you come to be retained in that
6  litigation?
7     A   My understanding -- well, my colleague
8  Jean Twenge had recommended me to another Attorney
9  General's office as being a potential expert
10 witness on the topic of sleep.  And that was how I
11 got introduced to the contact for that case.
12    Q   You are aware that Dr. Twenge is also an
13 expert being paid by the plaintiffs' lawyers in
14 this litigation?
15    A   I am aware, and I actually have not spoken
16 to her at all, but I am aware.  I actually wasn't
17 100 percent aware she was on this case.  I was
18 aware she was involved in the case in Florida.
19    Q   You said she recommended you to another
20 Attorney General.  Do you remember which state she
21 recommended you to?
22    A   Nebraska.
23    Q   And what litigation were you recommended
24 for that Nebraska is involved in?
25    A   TikTok litigation.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 16

1     Q   So just to make sure I have it.
2  Dr. Twenge recommended you to the Nebraska Attorney
3  General's office to offer opinions against TikTok
4  in social media litigation?
5       MS. ARORA:  Objection to form.
6       THE WITNESS:  Dr. Twenge recommended
7      my name as somebody who could speak to the
8      science of social media and sleep, and
9      that is what I was asked to report on.
10 BY MR. PETKIS:
11    Q   Were you ultimately retained in the
12 Nebraska litigation?
13    A   I have been retained in the member
14 litigation.
15    Q   When did that occur?
16    A   Sometime in around April.  I can't
17 remember -- it was around the same time as the
18 Snapchat, but I have not filed anything with them
19 yet.
20    Q   Are you working on a report in that case?
21    A   I am working on the report.
22    Q   Do you know when it is due?
23    A   They said -- just recently I asked, and
24 they said it will be in early 2026.
25    Q   Same question with respect to the Nebraska

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 17

1  litigation.  Are you offering any opinions in that
2  case that are specific to Facebook and Instagram?
3     A   Well, I haven't completed that report yet,
4  but as I said for most of my opinions, they are
5  based broadly on screen use, smartphone use and
6  social media use.  And only when I have specific
7  evidence are they about an individual platform.  So
8  as far as I know, if it is not written -- I can't
9  say what it will say, but I don't see why right now
10 it would include specific opinions about Instagram
11 or Facebook.
12    Q   Do you have any specific evidence about
13 Instagram or Facebook?
14      MS. ARORA:  Object to form.
15      THE WITNESS:  Can you say more about
16     what you mean specific evidence about
17     Instagram and Facebook?
18 BY MR. PETKIS:
19    Q   Actually I'm just trying to follow up on
20 your answer.  I think you said that, quote, only
21 when I have specific evidence are my opinions about
22 an individual platform.
23      What did you mean by specific evidence?
24    A   Oh.  Well, there were several studies,
25 just a few, that really isolate specific platforms.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 18

1  There is one that looks at a Facebook experimental
2  study.  That is one.  And then there is another one
3  that limits social media, I think it is Instagram.
4  I would have to look at my report.  I don't want to
5  say.  And -- but out of the numerous -- really
6  hundreds of articles -- scientific articles written
7  on screen use and sleep, very few of them just
8  focus on just a single platform because that is not
9  the nature of how these platforms are used.
10         They are used of with a lot of toggling
11  back and forth.  So only in a case where I am
12  reviewing a study that specifically looks at one
13  platform.
14     Q    Sitting here today, you are aware of you
15  think two studies that specifically look at
16  evidence relating to Facebook or Instagram?
17     A    Off the top of my head, I can think of
18  two.  There may be others, but that is all I have
19  right now.
20     Q    Can you give me the names of those
21  studies, or at least the authors?
22     A    Is it possible for me to see my report so
23  I can confirm the studies?
24     Q    Let's circle back to it because I have a
25  few more introductory questions I want to ask.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 19

1         Besides the Nebraska litigation and the
2  Florida litigation, have you been retained by any
3  other plaintiffs' lawyers to offer social media
4  opinions?
5     A    Yes.  I was -- actually I don't think it
6  is complete, but I have been contacted by the State
7  of New York Attorney General Office.
8     Q    What is the nature of that engagement?
9     A    It is similar to the Nebraska case.
10    Q    It is against TikTok?
11    A    Yes.
12    Q    Anything else?
13    A    I have not seen the Complaint so I don't
14  know if it is exactly the same.  I don't know.
15  Those are the only states that I have had a direct
16  conversation about being retained.  Because of the
17  nature of the MDL, I have been on Zoom calls with
18  lawyers from other states, but the focus has not
19  been on them, it has been on me.  So I can't say
20  which states exactly.
21    Q    I don't mean to trip you up.  But you have
22  also been retained by the Massachusetts Attorney
23  General's office.  Is that right?
24    A    Yes.  I didn't mean to omit them.  I
25  presumed you knew that, yes.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 20

1     Q    I did know that.  I just want to make sure
2  I have a complete list.
3     A    Yes.
4     Q    So I have you have been retained in
5  Florida litigation against Snapchat.  Right?
6     A    Yes.
7     Q    You have been retained in Nebraska
8  litigation against TikTok?
9     A    Yes.
10    Q    You were discussing or maybe have
11  completed or attention in New York against TikTok?
12    A    Yes.
13    Q    You have been retained by the
14  Massachusetts Attorney General's Office to give
15  opinions against Meta?
16    A    That's correct.
17    Q    And you've also been retained by the MDL
18  coalition of states to offer opinions against Meta?
19    A    Yes.
20         MS. ARORA:  Objection to form.
21  BY MR. PETKIS:
22    Q    Can you think of any other retentions
23  besides those ones I just listed?
24    A    Those are all of the ones that I have --
25  that is enough.  That is a lot.  So those are the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 21

1  ones that I have -- that I am aware of, yes.
2     Q    Was Nebraska first in time?
3     A    Nebraska reached out to me first.  I
4  actually think the Snapchat one came up and they
5  had like a ten-day turnaround before they wanted an
6  opinion.  It was something short like that.  So
7  they might have retained me first, but Nebraska
8  contacted me first.
9     Q    Okay.  And I apologize if I have already
10  asked this, but when exactly did that outreach from
11  the Nebraska Attorney General's Office occur?
12    A    In the fall, I want to say October.
13    Q    Fall of 2024?
14    A    2024, right.
15    Q    Do you recall when you formally signed up
16  as an expert in that case?
17    A    I don't remember exactly, but it wasn't
18  until the spring that -- I don't remember.  Things
19  kept getting delayed, and it was around the time
20  they called me again so I would actually want you
21  to talk with somebody in Florida.
22    Q    So the first retention that you signed
23  with an Attorney General's office was you think in
24  the spring of 2025?
25    A    Yes.  Definitely.  I just don't remember.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 22

1  They were around the same time because it was the
2  call that we did simultaneously with them.
3      Q   Would you say that was roughly in April of
4  2025?
5      A   It was almost definitely in April.  The
6  report was submitted in April.  And I think I was
7  given ten days, so it was maybe late March or early
8  April.
9      Q   Besides these social media cases that we
10 have been talking about, have you been retained as
11 an expert in any other litigation?
12     A   No, this is my first time.
13     Q   Between all of your social media
14 engagements, how much have you been paid?
15     A   I don't really know.  This case we added
16 up, it was about 30 hours.  It was 30 hours to
17 write the report, something like that.  And then it
18 was about the same probably for the Snap case,
19 so --
20     Q   And this MDL litigation and the Florida
21 litigation against Snapchat, those are the only two
22 reports you have actually written and submitted?
23     A   The Massachusetts, the MDL, and then the
24 Florida, yeah.
25     Q   Do you think you spent roughly the same

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 23

1  amount of time on the MDL report, the Florida
2  report, and the Massachusetts report?
3      A   Yes.  The Massachusetts report was
4  actually two reports because it was an opening
5  report and a rebuttal.  But the opening report was
6  -- did not take a lot of hours.  So I would say it
7  was roughly about the same for each of those.  I
8  really can't remember how much I billed for the
9  Florida report, but it was very -- it was shorter.
10 So I don't know.  It was probably fewer hours,
11 but --
12     Q   Let me see if I can ballpark things a
13 little bit.  Do you think you've spent more or less
14 than 100 hours providing opinions against social
15 media companies as an expert?
16         MS. ARORA:  Objection, speculation.
17         THE WITNESS:  I think I've spent less
18     than 100 hours.
19 BY MR. PETKIS:
20     Q   Do you think you have been paid more or
21 less than $100,000 in all of those social media
22 litigations?
23     A   I know it's --
24         MS. ARORA:  Objection, speculation.
25         THE WITNESS:  I know it has been less

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 24

1      than $100,000.
2          THE COURT REPORTER:  Just try to
3      pause a minute after the question.  Thank
4      you.
5          THE WITNESS:  Sorry about that.
6  BY MR. PETKIS:
7      Q   Dr. Hale, because you haven't been deposed
8  before, let me just take a couple minutes to see if
9  we can agree to some ground rules.
10         You understand that you are under oath
11 today?
12     A   Yes.
13     Q   And you that it's just the same as if you
14 are in front of a court or jury?
15     A   Yes.
16     Q   And you understand that means you need
17 give honest and truthful answers to my questions to
18 the best of your ability?
19     A   Yes, I understand that, and I have been
20 doing so.
21     Q   Good.  I am not suggesting otherwise.  Is
22 there any reason you can't do that today?
23     A   There is no reason I can't do that today.
24     Q   If you don't understand my question for
25 any reason, will you let me know?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 25

1      A   Yes, I will let you know.
2      Q   And if you don't raise any concerns with
3  my question, I am going to understand and assume
4  that you understood the question.  Is that fair to
5  you?
6      A   That is fair.
7      Q   Let me know if at any point today you need
8  a break for any reason and we will take a break.  I
9  will try to structure them every hour if you don't
10 ask.
11     A   Every hour sounds excellent.
12         (Exhibit No. 1 marked for
13         identification.)
14 BY MR. PETKIS:
15     Q   Dr. Hale, you have just been handed
16 Exhibit 1, which is a copy of the rebuttal report
17 you submitted in MDL litigation on July 30, 2025.
18         Do you see that?
19     A   Yes.
20     Q   Does this appear to be a true and accurate
21 copy of your rebuttal report?
22     A   I am obviously not able to read the whole
23 thing through, but it looks like you submitted.
24     Q   You didn't alter it in any way.  Let me be
25 clear.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 26

1    We did take off -- I think your materials
2  considered in your CV were appended in the same
3  document.  We removed them from this.  This is just
4  the substance of your report, but we haven't
5  altered it in any way.
6    A   It looks like the CV is in here.
7    Q   It is.  Never mind.
8    Is there anything in this report that is
9  not accurate from your perspective?
10   A   I don't think so.
11   Q   Is there anything in this report that you
12 would like to correct?
13   A   I don't see the need to correct anything,
14 but I do feel like if I had more time to write this
15 rebuttal I would have added more about my concerns
16 about Dr. Honaker's errors in her report.  So there
17 is stuff I would like to add, but not things that I
18 would like to correct.
19   Q   Are there any opinions that you plan to
20 offer at an MDL trial that are not contained in
21 this report?
22     MS. ARORA:  Objection, form.
23     THE WITNESS:  I would say the gist of
24     the opinions are the same as what I would
25     offer in a trial.  Yes.  They are the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 27

1    same.  Can you please ask the question
2     again.
3  BY MR. PETKIS:
4    Q   Yes.  Are there any opinions that you plan
5  to offer at an MDL trial that are not contained in
6  this report?
7    A   I feel cautious about agreeing to that
8  because I -- as I said, I have more to say so I
9  might have stronger opinions, but the -- I support
10 and agree with the content of these opinions.
11   So does that answer your question?
12   Q   I don't think so actually.
13   A   Okay.
14   Q   You understand that today Meta has the
15 opportunity to ask you questions about your MDL
16 opinions?
17   A   Okay.
18   Q   Do you understand that?
19   A   I do.
20   Q   And that we need disclosure of opinions in
21 order to ask you questions about that.  Right?  Is
22 that fair?
23   A   Yes.
24   Q   My question is:  Are there any opinions
25 that you intend to offer in this case that are not

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 28

1  disclosed in this rebuttal report that you have
2  been handed?
3     MS. ARORA:  Objection, calls for
4     speculation, calls for legal conclusion.
5     THE WITNESS:  My hesitance, and maybe
6     I am hung up on it inappropriately, is
7     that if I say yes to that, that means I
8     cannot have an additional opinion later.
9     And I -- I can only stick to these
10    opinions?  Is that -- I guess I don't
11    fully understand.
12 BY MR. PETKIS:
13   Q   It is not my job to advise you, but we do
14 need to know all of your opinions now.  Are there
15 any opinions that you have sitting here right now
16 with respect to the Meta defendants that are not
17 contained in this rebuttal report?
18     MS. ARORA:  Objection, form.
19     THE WITNESS:  I will say the only
20     thing I would add and I think it is
21     important and I did add it to the
22     Massachusetts rebuttal, which is very
23     similar to this, is for Opinion 3,
24     Introduction 1A summary of opinions, that
25     Opinion 3, I said Dr. Honaker's opinion is

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 29

1     that there is no causal relationship
2     between social media use and sleep in
3     adolescents is inconsistent with academic
4     literature and expert consensus.
5     I would also add the word is
6     inaccurate and inconsistent with academic
7     literature and expert consensus.  I would
8     add that.  And I think that would cover
9     the change of my -- the addition of my
10    opinion.
11 BY MR. PETKIS:
12   Q   Okay.
13   A   It is just a stronger thing in just that
14 she is inconsistent.  She is wrong.
15   Q   Besides offering that minor modification
16 that you believe Dr. Honaker's opinion is wrong in
17 addition to being inconsistent with the literature,
18 do you have any other opinions that you intend to
19 offer in this case that aren't contained in this
20 report?
21     MS. ARORA:  Objection, form,
22     misstates her testimony.
23     THE WITNESS:  I think that is what I
24     wanted to point out.  So I think that is
25     fine.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 30

1   BY MR. PETKIS:
2       Q   And with that modification, this rebuttal
3   report constitutes the entirety of your opinions in
4   this MDL case?
5       A   Yes.
6       Q   Okay.  And just to be clear, this rebuttal
7   report only contains rebuttal to the report of
8   defendant's expert, Sarah Honaker.  Is that right?
9       A   Yes, that is correct.
10      Q   And you know Dr. Honaker both personally
11  and professionally?
12      A   I do know her professionally, and I have
13  seen her at several conferences, so I know her.
14      Q   I apologize.  I don't mean to interrupt.
15          Do you have a high regard for
16  Dr. Honaker's professional work?
17          MS. ARORA:  Objection, form.
18          THE WITNESS:  I -- as I wrote in this
19      report, I am commenting on the quality of
20      her -- I am critiquing her opinions and I
21      -- let me see what I wrote about the
22      situation.
23          I said I -- this is not a critique of
24      her professionally or personally.  I would
25      rather not comment on how I regard her

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 31

1       professionally.  But this opinion is not a
2       critique of her professionally.  It is a
3       critique of her opinions.
4   BY MR. PETKIS:
5       Q   I am going to ask my question again.
6   Outside the context of this litigation report, do
7   you have a high regard for Dr. Honaker's
8   professional work?
9           MS. ARORA:  Objection, asked and
10      answered.  Form.
11          THE WITNESS:  I do not.
12  BY MR. PETKIS:
13      Q   And why do you say that?
14      A   I can't speak to how she is a clinician,
15  and I know she is a clinician.  But I can say that
16  I have reviewed some of her work, and the papers
17  that I have reviewed, I am concerned about her
18  study design, the items that she included in a
19  survey where she didn't ask at all about screen
20  time except for the effects of light but nothing
21  about other aspects of screen time.  And then she
22  made -- she drew conclusions based on a study in
23  which she did not even allow for participants to
24  answer about screen time and she drew conclusions
25  that screen time was not important.  I think that

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 32

1   is a weird way to draw a conclusion.
2           One time she shared some data with me that
3   I asked her for to use in a presentation.  And
4   there were errors in how she created the figures.
5   So in that way I am concerned about the quality of
6   her work, the interpretation of her findings and I
7   am also concerned about sloppiness.
8       I, you know, confess I wasn't that
9   familiar with her written work before I was
10  retained for this.  She really does not have that
11  many highly cited articles.  She collaborates with
12  some people who do.  But she does not have a lot of
13  articles that I was familiar with and I became more
14  familiar with her work upon reading her statement
15  or her rebuttal, and I was not impressed.
16      Q   Okay.  Did you have the opinion that you
17  were not impressed with Dr. Honaker's professional
18  work before being retained by plaintiffs' lawyers
19  to offer opinions in this case?
20      A   I was interested in the work she was doing
21  based on a presentation I saw her give in 2022 and
22  that is why I reached out to her to ask her for
23  some data, which is -- which she did generously
24  share with me.  She was responsive.  She has always
25  been friendly with me.  That is part of why I am

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 33

1   hesitating.  This is not easy or comfortable to
2   say.
3           But I did have concerns about, one, the
4   data that she shared with me and, two, the fact the
5   data she shared with me has never been published or
6   peer reviewed.  When I asked her if she would get
7   it published, she said she didn't plan to.  And to
8   me, that is not the behavior of a -- either a
9   serious scholar or a -- somebody with interesting
10  and good findings.  It was a little confusing to
11  me.  It's different than most of the people I work
12  with.
13          I will also say I found my concern about
14  her as a professional colleague alarming because
15  the work that she did share with me was all about
16  problematic screen use as a measure of poor sleep
17  health, and it felt very inconsistent to see a
18  colleague testify with an opinion that is contrary
19  to work she has presented publicly.  So I do have
20  concerns about her professional work.
21      Q   What is the full set of concerns that you
22  had before being retained by the plaintiffs'
23  lawyers in this case with respect to Dr. Honaker's
24  work?  What is the full scope?
25          MS. ARORA:  Objection, form.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 34

1     THE WITNESS: As I said, I was not
2     that familiar with her work, but I was
3     concerned about some errors in the data,
4     how it was presented to me. And lack of
5     follow-through. It felt a little bit
6     incomplete, sloppy.
7 BY MR. PETKIS:
8    Q Besides the data errors and the lack of
9 follow-through, did you have any other concerns
10 with Dr. Honaker's professional work before being
11 retained by the plaintiffs in this case?
12    A No. I was really not paying that much
13 attention to Dr. Honaker's professional work.
14    Q Did you communicate these concerns to
15 Dr. Honaker at the time with respect to her data?
16    A I do think I told her that I fixed her
17 figure. This was two or three years ago. It was
18 spring of '23. But I did not say anything like I
19 thought it was sloppy, but I did.
20    Q Did you tell her that you had concerns
21 with her professional work?
22    A No.
23    Q You are pretty prolific in terms of the
24 articles you publish. Right?
25    A I publish -- I don't know if you need to

Page 35

1 use the word prolific, but yes, I have an active
2 publication record.
3    Q You have published hundreds of articles.
4 Right?
5    A Yes.
6    Q Have you ever in any of those hundreds of
7 articles offered any criticisms of Dr. Honaker's
8 work?
9    A In those articles? No.
10    Q Have you ever collected data that you
11 didn't then follow through and publish in your
12 career?
13     MS. ARORA: Objection, scope.
14     THE WITNESS: Have I ever collected?
15     Not off the top of my head, but I can
16     understand how that happens.
17 BY MR. PETKIS:
18    Q I just want to make sure I have your
19 testimony. Any data that you have ever collected
20 has been published?
21     MS. ARORA: Objection, form, asked
22     and answered.
23     THE WITNESS: Something from the
24     dataset has been published. Not every
25     single variable has been published, but

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 36

1     sometimes we collect hundreds of variables
2     and then we write a story just about
3     caffeine and sleep. But the information
4     something that's irrelevant to that didn't
5     make it into the manuscript, but yes.
6     Mostly we -- if we put the time and
7     energy into designing a study and
8     collecting data, we publish it. We
9     publish the results.
10 BY MR. PETKIS:
11    Q Have you ever had any articles that you
12 either drafted or coauthored that were rejected by
13 peer review journals?
14    A Yes, all the time.
15    Q And the fact that an article is rejected
16 by a peer review journal doesn't necessarily mean
17 that it is unreliable or a bad article. Right?
18     MS. ARORA: Objection, form,
19     speculation.
20     THE WITNESS: The scientific
21     publication process is iterative, so it
22     could get rejected by one usually with
23     feedback, and you make changes and you
24     revise and resubmit maybe to a different
25     journal, maybe to the same journal. But

Page 37

1     that is the process through which peer
2     review works to help improve the quality
3     of the science.
4 BY MR. PETKIS:
5    Q Have you ever had any articles that just
6 never made it through peer review and were never
7 published in a peer review journal?
8    A I think -- yes, I can think of one like in
9 2008 or something, but, yes, for some reason nobody
10 was interested in marriage and sleep. But that is
11 one that I can think of where I just said I am not
12 going to try this anymore. But for the most part,
13 once I work on a paper I continue working on the
14 paper and submitting it and revising it until it
15 gets published.
16     I am sure there are others with various
17 collaborators, but that is the one I remember being
18 the first author and finally saying it is time.
19    Q Did you edit a handbook on "Children and
20 Screens" with Dimitri Christakis?
21    A Yes.
22    Q Was that handbook submitted to any peer
23 review journals or publications?
24    A Yes, before it was a handbook, it was
25 submitted to the "Journal of Pediatrics".

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 38

1    Q   Was it accepted or rejected?
2    A   It was rejected.
3    Q   What did you do after that?
4    A   Actually -- I'm sorry.
5    Q   That's okay.  After it was rejected, did
6  you publish it open source online?
7    A   It was not rejected.  It was revised and
8  resubmit.  And they asked for substantial
9  revisions.  And including -- and we had -- I can't
10  remember if it was 87 or 89 chapters at that point.
11  They were separate articles.  And the request from
12  the editors of "Pediatrics" was to -- it involved a
13  lot of feedback.  It was a huge, huge, huge
14  submission.
15       The request involved -- I am not going to
16  remember the exact wording, but they wanted us to
17  prune and consolidate a lot of the articles into
18  fewer.  And after extended discussion, we -- and
19  inclusion of 390 co-authors, my number might not be
20  accurate, but something huge, we decided to publish
21  it as a handbook rather than as a set of articles
22  in a special issue of Pediatrics.
23       Then your follow-up question, can you
24  repeat that.
25    Q   Let me take a step back and make sure I

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 39

1  understand your answer.  The content of what
2  eventually became your handbook was submitted to
3  the "Journal of Pediatrics" for publication.
4    A   Yes.
5    Q   And the "Journal of Pediatrics" did not
6  accept it for publication in that form.  Right?
7         MS. ARORA:  Objection, misstates
8         testimony.
9         THE WITNESS:  Yes.
10  BY MR. PETKIS:
11    Q   And the "Journal of Pediatrics" actually
12  had what I think you called substantial revisions
13  to the content of the handbook?
14    A   They had of -- yes, recommendations to
15  substantially prune it because they found it
16  repetitive.  And as a team, we did not feel that
17  that would be the best response especially since
18  there had already been so many.  There was a lot of
19  work put into figuring out what the different
20  chapters would be, and we were okay with redundancy
21  so we chose this path instead.
22    Q   The team you are referring to is you and
23  Dr. Christakis?
24    A   And the people from the Children and
25  Screens, the staff.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 40

1    Q   Just to be clear, instead of making the
2  revisions requested by "Pediatrics" and
3  resubmitting it for publication, you and the team
4  you described decided to just publish it open
5  source online.  Is that right?
6    A   Right.  I think open source is not the
7  right word.  Let me get the word right.  Open
8  access.  Open source sounds like a different thing.
9  We published it as a book with Springer, which is a
10  well-known scientific publisher.  And to then I
11  believe there was an extra fee, please don't ask me
12  what the fee was, to make it open access so there
13  could not be restrictions on who could read the
14  chapters in the book.
15    Q   Are the articles contained in the handbook
16  after publishing peer reviewed?
17    A   Yes.
18    Q   By who?
19    A   Dr. Christakis and I split up the 80 some
20  chapters and then we sent them out to two to three
21  expert reviewers each, and then they went through a
22  second round or sometimes more round of reviews.
23    Q   It was not peer reviewed by any scientific
24  journals.  Right?
25         MS. ARORA:  Objection to form.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 41

1         THE WITNESS:  Let me back up for one
2         second.  Dr. Christakis is the editor of
3         the number one pediatrics journal in the
4         world, "Journal of Pediatrics".  He
5         effectively is the editor of a scientific
6         journal and I was for five and a half
7         years editor of Sleep Health.  And so we
8         both have extensive experience serving as
9         editors in chiefs of journals where we
10         know how to request peer review.  This was
11         an even more extensive peer review than we
12         get from these top journals because we
13         asked.
14         We actually paid each of the peer
15         reviewers, I can't remember if it $300 or
16         $500 to conduct the review.  My apologies
17         for not remembering the dollar value, but
18         we did actually pay people for the review
19         so they would take the review seriously.
20         They were peer reviewed in the form of --
21         as if it were an academic journal.
22  BY MR. PETKIS:
23    Q   Does the "Journal of Pediatrics" pay its
24  peer reviewers?
25    A   No, the "Journal of Pediatrics" does not.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 42

1      Q   Does JAMA pay its peer reviewers?

2      A   No, they do not.

3      Q   Just to be clear of my question.  I

4  understand your perspective that the handbook was

5  submitted to something equivalent to a peer review.

6  Is that your testimony?

7      A   That is my testimony.  That is what

8  happened.  Yes.

9      Q   The content of the handbook was not

10  accepted for publication by any scientific

11  journals.  Right?

12      A   The content of the handbook was sent back

13  for revisions from "Pediatrics" and we pivoted to

14  publishing it as a book.

15      Q   My question is:  The content of the

16  handbook was not accepted for publication by any

17  scientific journals.  Is that right?

18          MS. ARORA:  Objection, asked and

19          answered.

20          THE WITNESS:  As I said, we sent it

21          to Pediatrics.  It was not rejected.  It

22          was -- revisions were requested and we

23          chose not to revise and resubmit, and

24          instead chose to publish it as a handbook

25          instead.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 43

1  BY MR. PETKIS:

2      Q   Let me ask it this way.  Was the content

3  of the handbook accepted for publication by any

4  scientific journals?

5          MS. ARORA:  Objection, asked and

6          answered.

7          THE WITNESS:  It was not accepted by

8          any scientific journals because it was

9          published as a handbook before

10          resubmitting it.

11  BY MR. PETKIS:

12      Q   Did the content of the handbook go through

13  any formal peer-review process established by any

14  scientific journals?

15          MS. ARORA:  Objection, form, asked

16          and answered.

17          THE WITNESS:  The content -- the

18          chapters of the handbook went through a

19          peer review akin to the type of peer

20          review that occurs with scientific

21          journals.

22  BY MR. PETKIS:

23      Q   Did it go through the actual formal

24  peer-review process established by any scientific

25  journals, though?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 44

1          MS. ARORA:  Objection, form, asked

2          and answered.

3          THE WITNESS:  I am not understanding

4          what you mean by the actual formal

5          process.  The actual formal process is the

6          editor or an associate editor sends a

7          request.  The person -- the reviewer

8          agrees or disagrees.  They give a time

9          line.  They send the feedback through the

10          editor or the editorial staff.  They send

11          that to the reviewers -- I mean to the

12          authors themselves.  The authors take a

13          chance at revising, responding to the

14          reviewer feedback, making revisions.

15          Usually they submit -- I can't remember

16          how we did it, clean and altered copy.

17          And then it gets sent back for review by

18          the peer reviewers.

19          So that is the same process -- if you

20          call it the actual process, no, it wasn't

21          sent from a journal because it wasn't a

22          journal publishing it.  It was two people

23          with substantial editorial experience,

24          specifically Dr. Christakis and also

25          myself, overseeing the process.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 45

1  BY MR. PETKIS:

2      Q   I understand you want to make your points

3  today but this is going to go a lot quicker if you

4  focus on my questions.

5          My question is:  Did the content of the

6  handbook go through to completion any formal

7  peer-review process established by any scientific

8  journals?

9          MS. ARORA:  Objection, asked and

10          answered.  Objection to the preamble.

11          THE WITNESS:  I believe I answered

12          that question that the process is the

13          same, and I don't even know what you mean

14          by a formal process.  So it went through a

15          peer-review process executed by

16          Dr. Christakis and myself --

17  BY MR. PETKIS:

18      Q   Do you --

19      A   -- and the editorial staff.

20      Q   I'm sorry to interrupt.

21          Do you consider the team of yourself,

22  Dr. Christakis and the Children and Screens folks

23  to be a scientific journal?

24          MS. ARORA:  Objection, form.

25          THE WITNESS:  No.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 46

1        MS. ARORA:  Asked and answered.
2        THE WITNESS:  No, we are not a
3     scientific journal.
4 BY MR. PETKIS:
5    Q   So regardless of what you think about the
6 peer-review process that that team set up, the
7 content of the handbook did not go through a
8 peer-review process with an actual scientific
9 journal.  Is that right?
10       MS. ARORA:  Objection, asked and
11    answered.  Form.
12       THE WITNESS:  It did go through a
13    scientific process with a journal, namely
14    Pediatrics.  And then part of that process
15    sometimes involves not submitting it again
16    to the same journal and choosing to do
17    something else with it, and that is what
18    happened.  It went through the process and
19    we chose to publish it more quickly this
20    way.
21 BY MR. PETKIS:
22    Q   The only scientific journal that the
23 content was submitted to did not accept it for
24 publication.  Is that right?
25    A   Yes, that is correct.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 47

1    Q   Could you turn to page 44 of your report,
2 please.  On page 44, there is an attestation that
3 you signed and dated?
4    A   Yes.
5    Q   It states, in part, the undersigned hereby
6 certifies their understanding that they owe a
7 primary and overriding duty of candor and
8 professional integrity to help the Court on matters
9 within their expertise and in all submissions to or
10 testimony before the Court?
11    A   Yes.
12    Q   Why did you provide this attestation?
13    A   Why did I write this report or this
14 paragraph?
15    Q   Why did you provide this attestation?
16       MS. ARORA:  Objection, form.
17       THE WITNESS:  I am not understanding
18    the question.  Does attestation -- just
19    little final section or the whole report?
20 BY MR. PETKIS:
21    Q   I want to know why you included that
22 language that I just read to you here and why did
23 you sign it?
24       MS. ARORA:  Objection, form.
25       THE WITNESS:  This was just a way

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 48

1    that I certified the report.
2 BY MR. PETKIS:
3    Q   Did you believe you owe a duty of candor
4 to help the Court on matters within your expertise?
5    A   Yes.
6    Q   And what does that mean to you?
7    A   That I have -- that I am committed to my
8 scientific and professional integrity and I am not
9 being untruthful.  I don't -- I don't understand.
10    Q   Does the duty of candor and professional
11 integrity to help the Court that you talk about
12 here include being as balanced as you can in your
13 opinions?
14       MS. ARORA:  Objection, form.
15       THE WITNESS:  My interest is in
16    presenting the Court with my professional
17    opinion and experience based on 20 years
18    of working in the field of sleep health
19    research.
20 BY MR. PETKIS:
21    Q   Does that include presenting the research
22 and the evidence in a balanced manner that is
23 consistent with the findings?
24       MS. ARORA:  Objection, form, asked
25    and answered, calls for legal conclusion.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 49

1       THE WITNESS:  I am interested in
2    reporting an accurate representation.
3    Sometimes I worry that the word balanced
4    sounds like we want equivalence from both
5    sides and that we want to have both sides
6    represented, but I am actually interested
7    in identifying the truth.
8    As often in this field of social
9    media research, we find journalists talk
10    about balance.  And when they talk about
11    balance, they want to get -- one side
12    argues one thing another side argues
13    another thing.  But hundreds of social
14    media researchers and digital media
15    researchers believe one thing and three
16    people believe the other thing.
17    I am not interested in providing
18    balance.  I am interested in providing
19    what the science shows.
20 BY MR. PETKIS:
21    Q   Do you think it is your job to be an
22 advocate on behalf of the plaintiffs in this case?
23       MS. ARORA:  Objection, form, calls
24    for legal conclusion.
25       THE WITNESS:  I'm not -- I was asked

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 50

```
 1        to respond to research on screen use,
 2        smartphone use, social media use, and
 3        sleep, and that is what I am reporting on.
 4        I am not here as an advocate.  I am here
 5        as an expert witness.
 6   BY MR. PETKIS:
 7        Q   Does the duty of candor and professional
 8   integrity that you swore to in this report include
 9   presenting the weakness in the plaintiffs'
10   causation case as well as what you believe supports
11   the causation case?
12             MS. ARORA:  Objection, form, calls
13        for legal conclusion.
14             THE WITNESS:  I am happy to talk
15        about the weakness in any scientific
16        article and at the same time I am
17        interested in primarily focusing on a
18        summary of the totality of the evidence.
19   BY MR. PETKIS:
20        Q   Do you believe you have an obligation to
21   report and discuss the weaknesses in the opinions
22   that you have reached?
23             MS. ARORA:  Objection, form, calls
24        for legal conclusion.
25             THE WITNESS:  Can you please repeat
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 51

```
 1        the question.
 2   BY MR. PETKIS:
 3        Q   Do you believe you have an obligation to
 4   report and discuss any weaknesses in the opinions
 5   that you have offered in your report?
 6             MS. ARORA:  Same objections.
 7             THE WITNESS:  I -- do I have -- are
 8        you asking me if I have a duty to report
 9        the weaknesses in my report?
10   BY MR. PETKIS:
11        Q   I'm asking you if you -- do you think you
12   have an obligation pursuant to this attestation
13   that you signed on page 44 to honestly and
14   truthfully report weaknesses in the opinions you
15   have reached?
16             MS. ARORA:  Objection, form, calls
17        for legal conclusion.
18             THE WITNESS:  As I said, I'm here to
19        represent the scientific evidence
20        regarding screen use, smartphone use,
21        social media use and sleep, and that
22        includes strengths and weaknesses of the
23        data.
24   BY MR. PETKIS:
25        Q   And if you are relying on documents, you
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 52

```
 1   should fairly present documents.  Right?
 2             MS. ARORA:  Objection, form, calls
 3        for legal conclusion.
 4             THE WITNESS:  Yes.  I -- I, of course
 5        support, accurately presenting documents.
 6        I am not quite sure what you mean by
 7        fairly presenting documents, but, yes, I
 8        support accurately reporting documents.
 9   BY MR. PETKIS:
10        Q   One example is it would be improper for
11   you to take snippets of documents or studies that
12   you like and ignore other portions of those studies
13   because they're not consistent with your opinions?
14   That would be improper?
15             MS. ARORA:  Objection to form, calls
16        for a legal conclusion.
17             THE WITNESS:  I think context really
18        matters when talking about the propriety
19        of what to report.  A theme that kept
20        coming up in my rebuttal here is about
21        focusing on limitations.  And as I know
22        from experience as the editor of a journal
23        and an author, as you noted, hundreds of
24        articles limitations are common -- not
25        just common, expected in a scientific
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 53

```
 1        article.
 2             You can't write a scientific article
 3        without acknowledging limitations.  But
 4        when you talk about the totality of the
 5        evidence, that is not the time to focus on
 6        limitations.  You speak about where the
 7        evidence is.  You speak about what the
 8        main message is across all the studies.
 9        And those -- and so in that way, my report
10        is not to talk about the limitations of
11        the studies, even though at times I may
12        mention them, but to focus on, What is the
13        main thing we learn from these studies?
14        And that is -- if that is where you are
15        going, that is what I did.
16   BY MR. PETKIS:
17        Q   It is actually not where I was going, but
18   let me ask a couple questions about that.
19        A   Sure.
20        Q   Do you think it is important for the
21   authors of academic studies to report limitations
22   of their studies?
23        A   I definitely do.
24        Q   And is it your position that in evaluating
25   what you call the totality of the evidence it is
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 54

1 proper to ignore completely the limitations of any
2 individual study?
3           MS. ARORA:  Objection form.
4           THE WITNESS:  I would never recommend
5     ignoring limitations.
6 BY MR. PETKIS:
7     Q   My earlier question to you before you
8 answered about discussing limitations was, it would
9 be improper to take a snippet of a document that
10 you believe supports your opinion and then ignore
11 other portions of the same document that are
12 inconsistent with your opinion.  Right?  That would
13 be improper?
14           MS. ARORA:  Objection, form, calls
15     for legal conclusion, asked and answered.
16           THE WITNESS:  I think taking snippets
17     of documents is necessary because
18     otherwise this report would be thousands
19     of pages long.  So when summarizing a
20     field, which is in part what I have done
21     here, I must include snippets.  And to me
22     I selected -- you used the word snippet.
23     It sounds pejorative.
24           I selected what I believe to be best
25     summaries of -- without pointing to a

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 55

1     specific, quote unquote, snippet, it is
2     hard for me to say.  I provided what I
3     thought was the take-home message from
4     these articles that were relevant to my
5     opinion.  And therefore, I do not have a
6     problem with including some parts of an
7     article but not all parts of an article
8     that otherwise you would have to include
9     the entirety of every article in the
10     document.  I don't -- that is not
11     realistic or valuable to anybody.  You are
12     supposed to extract the most relevant
13     parts, and that is what I did.
14 BY MR. PETKIS:
15     Q   I think you are focused on a question I am
16 not asking.  I am actually not referring to any
17 specific portion of your report.  I am trying to
18 see if we can agree on some general principles.
19         Do you understand that?
20     A   Sure.  Try again.
21     Q   The general question I'm asking is it is
22 improper for anyone, including an expert in
23 litigation, to focus exclusively on one portion of
24 a document they like and ignore other portions of
25 that same document that might be inconsistent or

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 56

1 that they don't like.  Right?  Just in general.
2           MS. ARORA:  Objection, form, calls
3     for legal conclusion, asked and answered.
4           THE WITNESS:  I think it is important
5     to look at the entirety of the document
6     and make a conclusion based on the
7     entirety of the document.
8 BY MR. PETKIS:
9     Q   Okay.  Did you endeavor to make your
10 opinions in this case as free of lawyer influence
11 as possible?
12           MS. ARORA:  Objection form.
13           THE WITNESS:  Yes.  I wrote -- I
14     don't even know what this is this report,
15     this rebuttal report, on my own with the
16     assistance of people to help me with
17     formatting the document.  At first I
18     did -- this is not interesting.  But I did
19     everything in notes and then they helped
20     me shift it all to footnotes and sort of
21     introductory structuring.
22 BY MR. PETKIS:
23     Q   Do you understand that the duty of candor
24 and professional integrity that you swore to on
25 page 44 of your report extends to this deposition?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 57

1           MS. ARORA:  Objection, form.
2           THE WITNESS:  Yes.
3 BY MR. PETKIS:
4     Q   And that means in terms of giving candid
5 and truthful answers to my questions that are
6 consistent with professional integrity?
7     A   Yes, I do.
8           MS. ARORA:  Objection, form.
9 BY MR. PETKIS:
10     Q   And you understand I think as I have asked
11 previously, your role is not to be an advocate for
12 the lawyers or the states but to help the Court get
13 to the truth.  Right?
14           MS. ARORA:  Objection, form.
15           THE WITNESS:  Yes, I understand I am
16     here as an expert witness.
17 BY MR. PETKIS:
18     Q   Your rebuttal report doesn't contain
19 rebuttal opinions to any other defendant experts
20 besides Dr. Honaker.  Is that right?
21     A   That was the only defendant expert report
22 that I reviewed, so no, it does not.
23     Q   Do you have any opinions about any defense
24 experts that are not included in your report?
25     A   I do not.  I am not aware of any other

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 58

1  defense experts, so I do not have any additional
2  opinions.
3      Q   Have you read the Complaint in this case?
4      A   I have.  I have seen it, yes.
5      Q   In its entirety?
6      A   I have looked at it.  I cannot say that I
7  read it carefully in its entirety, but I have
8  looked at it.
9      Q   Have the allegations in the Complaint been
10  proven?
11          MS. ARORA:  Objection, form, calls
12      for legal conclusion.
13          THE WITNESS:  I believe that is out
14      of scope of what I was asked to do.  I was
15      asked to respond to the report from
16      Dr. Honaker, and so I was writing a
17      rebuttal to that.
18  BY MR. PETKIS:
19      Q   So you are not offering any opinions with
20  respect to whether or not the Complaint allegations
21  are true or false.  Is that right?
22      A   I don't think any of my opinions directly
23  address that, but certainly indirectly they inform
24  the Complaint.
25      Q   Just as a general matter as a person who

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 59

1  lives in the world, you understand that allegations
2  are different from verified facts.  Right?
3          MS. ARORA:  Objection, form, scope.
4          THE WITNESS:  Yes, I understand those
5      terms.  I understand that allegation and
6      fact is a different term -- have different
7      meanings.  I am not exactly sure what you
8      mean in the legal context, but as in usual
9      parlance, yes, I understand that.
10  BY MR. PETKIS:
11      Q   Do you understand that the statements in
12  the Complaint are allegations?
13          MS. ARORA:  Objection, form.
14          THE WITNESS:  I -- I understand that
15      is how Complaints are written, yes.
16  BY MR. PETKIS:
17      Q   How would you describe what this case is
18  about?
19      A   Let me look at what I wrote.  Here it is.
20  I would describe this as a broad case about concern
21  of Meta's actions and practices against health and
22  safety of youth, and in particular or -- not in
23  particular, including sleep.  And that is how my
24  role fits in because I am speaking to the research
25  on screen use, social media use, and sleep.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 60

1      Q   How did you gain that understanding of the
2  case, is that from the Complaint?
3      A   Yes, that is from the Complaint and also
4  from -- you know, it is written here in my report.
5      Q   Just to be clear, your report cites the
6  Complaint.  Right?
7      A   Yes.
8      Q   Do you have any understanding of what this
9  case is about separate from what is listed in the
10  Complaint?
11          MS. ARORA:  Objection, form, and
12      calls for privileged information.  I am
13      going to instruct the witness not to
14      disclose conversations with counsel.
15          THE WITNESS:  I am going to follow
16      the advice of counsel.  Do I call you
17      counsel?
18  BY MR. PETKIS:
19      Q   Let me make a record of that.  Have you
20  had -- yes or no -- discussions with counsel about
21  what the case is about?
22          MS. ARORA:  Objection, calls for
23      privileged information.
24          THE COURT REPORTER:  I'm sorry.
25      Speak up, please.  Objection what?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 61

1          MS. ARORA:  Calls for privileged
2      information.
3  BY MR. PETKIS:
4      Q   You can answer.
5      A   To a limited extent, I know about as much
6  of what I have written here.  I don't have extended
7  conversations as evidenced by the -- I mean, what
8  they asked me to do was respond to the Honaker
9  report.
10      Q   I understand that.  Do you have any
11  understanding of what this case is about besides
12  conversations that you have had with the attorneys
13  or the statements that are made in the Complaint?
14      A   Only at a very broad level.  So I think --
15  can you be specific about what you mean?  I don't
16  understand all of the legal issues, if that makes
17  sense.
18      Q   Well, I guess what I am getting at, have
19  you followed media coverage of the case at all?
20      A   No.
21      Q   And have you discussed the case or social
22  media litigation with any other academic
23  researchers?
24      A   Yes.
25      Q   Who?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 62

```
1        A   Dr. Christakis, for starters, and we were
2   at a conference this summer on Children and
3   Screens.  And Dr. -- not Dr. -- Matthew Bergman
4   gave a talk about his work for social media.  I
5   don't remember the exact name of his firm.
6            And so I am familiar with Section 230 and
7   I saw a presentation with the Secretary of Commerce
8   -- I can't remember who it was -- that same
9   conference talking about his interest in -- I can't
10  remember if it was Secretary of Commerce.  I can't
11  remember.  Can we scratch that?  I don't want to
12  lie under oath.
13           But it was an appointed guy from Virginia.
14  I can't remember his name.  But -- so I am familiar
15  with it, but I am following -- I am certainly not
16  closely following media coverage of this case.
17       Q   Besides Dr. Christakis, have you discussed
18  this case with any other academic researchers?
19           MS. ARORA:  Object to form.
20           THE WITNESS:  Only to the extent that
21       people know I am serving as an expert
22       witness, but no substantive conversation
23       about the case or my work in the case.
24  BY MR. PETKIS:
25       Q   You mentioned a conference that you
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 63

```
1   attended this summer.  Was that hosted by Children
2   and Screens?
3        A   Yes, it was.
4        Q   You said Mr. Bergman gave a talk at that
5   conference?
6        A   Yes, he was.
7        Q   Was Mr. Bergman a sponsor of that
8   conference?
9        A   Yes, he was.
10       Q   You understand that Mr. Bergman is a
11  plaintiff lawyer who is suing social media
12  companies, including Meta.  Right?
13       A   Yes, I am aware of that.
14       Q   You said that you had an understanding of
15  Section 230?
16       A   I am aware of Section 230.  To say that I
17  have an understanding of it is -- I don't want to
18  overstate my knowledge in a room of lawyers.  I am
19  aware of -- yes, I am aware of 230.
20       Q   And did your awareness of Section 230 come
21  from Mr. Bergman?
22           MS. ARORA:  Objection, scope.
23           THE WITNESS:  I actually first heard
24       about Section 230 on a radio episode.
25  BY MR. PETKIS:
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 64

```
1        Q   Why don't you tell me what your
2   understanding of Section 230 is?
3            MS. ARORA:  Objection, scope, calls
4        for speculation.
5            THE WITNESS:  So I respond to this?
6        You objected.
7   BY MR. PETKIS:
8        Q   You can answer.
9        A   As I said, I am a little uncomfortable
10  because I am not an expert on this.  I feel like
11  this is out of the scope of what my report is on.
12  But my understanding of Section 230 is that it was
13  a -- it was introduced I think in the late '90s to
14  protect companies from lawsuits, and they said that
15  any third-party content was not their
16  responsibility because it was -- they did not
17  create it.  That is my understanding of it.
18       Q   Did Mr. Bergman give a speech or discuss
19  Section 230 in any way at the Children and Screens
20  conference?
21           MS. ARORA:  Objection, form.
22           THE WITNESS:  I can't remember
23       exactly if he used the phrase Section 230,
24       but he was talking about the victims of
25       some of his plaintiffs and the effects of
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 65

```
1        social media on their -- on those
2        children's lives.
3   BY MR. PETKIS:
4        Q   Did Mr. Bergman say anything about content
5   -- third-party content being immunized from
6   liability?
7            MS. ARORA:  Objection, form, scope.
8            THE WITNESS:  I wish I could remember
9        exactly what he said.  I do -- and I also
10       saw a movie about Mr. Bergman's lawsuit.
11       So I -- while I said I don't follow media
12       coverage, I did watch that movie.  Can't
13       Look Away.  Are you familiar with that
14       movie?
15  BY MR. PETKIS:
16       Q   I am actually not.
17       A   There is a movie about this lawsuit, and
18  it involves some of the stories of the plaintiffs,
19  and also Bergman is in that movie.  So that is
20  maybe where I learned more about 230.
21           MS. ARORA:  If I may, Counsel.  We
22       have been going over an hour.  I want to
23       note if there is a good time.
24           MR. PETKIS:  I am just about to get
25       there.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 66

1  BY MR. PETKIS:
2      Q   Did your understanding of Section 230, as
3  you described it, affect your opinions that you
4  have offered in your report in any way?
5          MS. ARORA:  Objection, form, scope.
6          THE WITNESS:  I did not write this
7          report with Section 230 at the top of my
8          mind.  I was mostly writing this report in
9          response to Dr. Honaker's report, and that
10         is what I was responding to.
11 BY MR. PETKIS:
12     Q   Do you have any hesitation in just
13 confirming now that Section 230 didn't influence
14 your opinions in any way?
15         MS. ARORA:  Objection, form, scope,
16         calls for legal conclusion.
17         THE WITNESS:  It is hard to say that
18         something that is in your head doesn't
19         influence your opinions.  So I don't -- it
20         didn't overtly influence my opinions.  But
21         I can't -- I don't know.  I don't have an
22         answer to that question.
23 BY MR. PETKIS:
24     Q   I think I understand your testimony.  You
25 can't rule out that your understanding of Section

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 67

1  230 may have indirectly or subconsciously informed
2  your opinion in any way?
3          MS. ARORA:  Objection, form, calls
4          for speculation, calls for legal
5          conclusion.
6          THE WITNESS:  I think I wrote this
7          report in response to reading
8          Dr. Honaker's report, and accurately
9          presenting the overwhelming evidence about
10         the effects of screen use, social media
11         use on sleep.  And I wasn't actively
12         thinking about 230 when I wrote it.
13 BY MR. PETKIS:
14     Q   Can you rule out that your understanding
15 of Section 230 did not influence your opinions in
16 this case in any way?
17         MS. ARORA:  Objection, form, asked
18         and answered, speculation, legal
19         conclusion.
20         THE WITNESS:  I am not comfortable
21         ruling that out, so I don't know.
22         MR. PETKIS:  Take a break.
23         THE VIDEOGRAPHER:  This is the end of
24         Media 1.  We are off the record at
25         approximately 10:18 a.m.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 68

1          (Recess taken from 10:18 a.m. to
2          10:33 a.m.)
3          THE VIDEOGRAPHER:  This is Media 2.
4          We are back on the record at approximately
5          10:33 a.m.
6  BY MR. PETKIS:
7      Q   Welcome back, Dr. Hale.
8          You understand you are still under oath.
9  Right?
10     A   I do.
11     Q   And you understand that to be true through
12 all the breaks we take today so I don't always have
13 to confirm?
14     A   Yes.
15     Q   Okay.  We were discussing your work in
16 this MDL litigation.
17         Do you recall that?
18     A   Yes.
19     Q   Which social media platforms do you
20 understand to be at issue in the MDL that you have
21 been retained in?
22     A   My understanding is that I was retained to
23 -- for a complaint against Meta, social media
24 platforms are Instagram and Facebook.
25     Q   I think you previously said that you are

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 69

1  aware of two studies that contain sleep-related
2  findings specific to Instagram and Facebook.  Is
3  that right?
4      A   Yes.
5      Q   You now have your report in front of
6  you --
7      A   Okay.
8      Q   -- including your materials considered
9  list.  I just ask that you identify those two
10 studies, if you can.
11     A   I am not sure.  One minute, please.  I am
12 not sure I cited these in this rebuttal.  They
13 might have been in the -- is this on?  Is this on?
14 As I mentioned I -- well, I don't know if I
15 mentioned, but the rebuttal trial report or -- the
16 rebuttal report I wrote for Massachusetts goes into
17 more detail about some of the articles, so I don't
18 know -- I believe one of them was the Bowler, et
19 al., article, which I believe had an intervention
20 on Facebook.  I don't see that I cited it here.  So
21 my apologies.
22         And then the other one, maybe it was -- I
23 want to say Graham.  I don't see that I cited it
24 here either.  So in other words, they are not in my
25 list of materials considered, but they were cited

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 70

1  in Dr. Honaker's report if we have that.
2      Is there a copy I can review?  Before I
3  commit to saying that, that is my memory of what
4  those lead authors were.
5      Q   Can you spell that first author that you
6  provided?
7      A   Is it possible for me to look for a
8  description of the experimental studies and then --
9  B-O-W-L-E-R.  If I saw her list, I would be able to
10 identify it.
11     (Exhibit No. 2 marked for
12         identification.)
13 BY MR. PETKIS:
14     Q   Dr. Hale, I have just handed you what has
15 been marked as Exhibit 2 to your deposition.  And
16 this is Tab 19 in your folder.  This is a copy of
17 your supplemental materials list in the MDL
18 litigation dated September 12, 2025.
19     Do you see that?
20     A   Yes.
21     Q   This was provided to us last week.  Can
22 you describe for me what this is?
23     A   This is a list of supplemental materials
24 considered by Dr. Hale, by me.
25     Q   And these are articles that you didn't

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 71

1  consider at least initially in forming your
2  opinions contained in your rebuttal report?
3      MS. ARORA:  Objection, form.
4      THE WITNESS:  Yeah, these were from,
5      I guess, last week's thing.  I also just
6      -- I think noticed a typo.  The Bowler
7      report is the one that I mentioned on --
8      is it Facebook intervention?  And the
9      Harris report, I believe that is -- you
10     know, I use endnote -- I think that is the
11     wrong Harris study.  So I don't know if
12     there is a way I can make an amendment,
13     but -- the Harris study.
14     I was asking if I could see the
15     report by Dr. Honaker where she went
16     through experimental studies and that
17     Harris report, not this one.  This is the
18     wrong Harris report reference.  If that is
19     the study -- and I am sorry I don't have
20     all the things memorized.
21 BY MR. PETKIS:
22     Q   That is okay.  We are looking at your
23 supplemental materials considered list.  Number 2
24 under Books and Academic Papers is an article by
25 Bowler --

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 72

1      A   Yeah.
2      Q   -- and colleagues titled "Facebook use and
3  sleep quality:  Light interacts with
4  socially-induced alertness."  Is that right?
5      A   Yes.
6      Q   And is that one of the two studies that
7  you believe relates to Facebook and Instagram
8  specifically?
9      A   Yes.
10     Q   I think you testified you believe the
11 other article was written by Harris and colleagues?
12     A   I am uncomfortable saying I have testified
13 because I have uncertainty that that is exactly it,
14 and it would help me if I could see the Honaker
15 report and then answer that question.
16     Q   I will show you the Honaker report, but my
17 question is just is it your belief -- not this
18 specific article listed in Number 11 of your
19 supplemental materials considered, but is it your
20 belief the other article --
21     A   Is lead authored by Harris --
22     Q   Okay.
23     A   -- but I would like to confirm that
24 whatever is up on the screen is the wrong article.
25 I don't know.  Mistakes happen.  I have an endnote

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 73

1  full of last names and Harris is a common one.
2      (Exhibit No. 3 marked for
3          identification.)
4  BY MR. PETKIS:
5      Q   Just before we look at that, Dr. Hale.  As
6  a general matter, you understand mistakes sometimes
7  do happen either in academic articles or in written
8  reports.  Right?
9      MS. ARORA:  Objection, form, calls
10     for speculation.
11     THE WITNESS:  Yes, I understand that.
12     Unfortunately, I wasn't -- I was an editor
13     of a journal, so I am very aware mistakes
14     happen and hopefully we correct the
15     mistakes.
16 BY MR. PETKIS:
17     Q   That was going to be my question.  Just
18 because there is a mistake in an article that's
19 been submitted for publication or something like
20 this expert report doesn't mean you throw out all
21 of it.  Right?
22     A   I --
23     MS. ARORA:  Objection, incomplete
24     hypothetical and calls for speculation.
25     THE WITNESS:  Let me look at --

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 74

1  BY MR. PETKIS:
2      Q   Did you answer that question?  Is my
3  understanding correct?
4      A   My understanding is that mistakes happen
5  and we do the best we can to correct the mistakes.
6  It was not Harris.  I got that wrong.  But that
7  citation is the wrong one.
8      Q   Let me just make clear for the record.
9  You have been handed Exhibit 3 to your deposition,
10  which is the opening report by Dr. Honaker in the
11  MDL and that was Tab 24 in our folder.
12      Do you have that in front of you,
13  Dr. Hale?
14      A   Dr. Honaker's report?
15      Q   Yes.
16      A   Yes, I do.
17      Q   And are you able to identify by looking at
18  Dr. Honaker's report the other study that you
19  believe contains specific findings to Instagram and
20  Facebook?
21      A   Yes.  It is Graham 2021, and I believe
22  that is in my -- I just went through the wrong one.
23  It is so stupid.  I saw that it was Graham, but
24  then I noticed that the Harris one was wrong and
25  then I focused on that.  I need to slow down.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 75

1      Q   Yes.
2      A   So the Harris one might not even be wrong.
3  But the Graham one was the one that is accurately
4  cited in my supplemental materials.
5      Q   So you have Exhibit 2 in front of you,
6  which is your supplemental materials considered
7  list.  Right?
8      A   Uh-huh.  And so it --
9      Q   Hold on.  Let's just -- wait for my
10  questions.
11      Number 2 under Books and Academic Papers,
12  the article by Bowler and colleagues is one of the
13  two studies that you believe contains specific
14  findings for Facebook and Instagram.  Right?
15      A   Yes.
16      Q   The other of the two studies that you
17  believe contain specific findings for Facebook and
18  Instagram is Number 10, as paper by Graham and
19  colleagues entitled "Taking a Break from Social
20  Media Improves Well-being Through Sleep Quality"?
21      A   Yes.
22      Q   Are you aware of any other academic
23  articles that contain findings specific to Facebook
24  and Instagram related to sleep?
25      MS. ARORA:  Objection, form.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 76

1      THE WITNESS:  At this moment, I
2      cannot think of any other studies that
3      explicitly identify Facebook and Instagram
4      as targets, but there are multiple
5      articles that use the term "social media
6      apps" broadly.  And so, you know, those
7      are included, but not specific about
8      Facebook or Instagram.
9  BY MR. PETKIS:
10      Q   And just to be clear, Dr. Hale, these two
11  articles that you believe contain specific findings
12  for Facebook and Instagram are not cited in your
13  July 30th report.  Is that right?
14      A   That is correct.
15      Q   Let's get your report back out, which is
16  Exhibit 1.  And I am going to have you go to page 6
17  and take a look at paragraph 11.
18      Do you see there a list of states that you
19  say is a coalition of attorneys general who are
20  plaintiffs in this lawsuit?
21      A   Yes.
22      Q   To the best of your knowledge, have you
23  spoken to attorneys representing each of these 29
24  states?
25      A   To the best of my knowledge, I have not

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 77

1  spoken to that many attorneys.  I have spoken
2  primarily to the attorneys who are in this room or
3  on this Zoom call.  I believe they represent the
4  states of Colorado, California, Kentucky, and, of
5  course, now Massachusetts, who is also here, with
6  regard to this -- with regard to the case against
7  Meta.
8      Q   Thank you for that.  That was going to be
9  my next question.
10      Which states out of this group of 29 are
11  alleging that Meta interfered with the sleep of
12  adolescents?
13      MS. ARORA:  Objection, form, calls
14      for legal conclusion.
15      THE WITNESS:  I do not know which
16      states played -- I thought they were all
17      on the same complaint.  So I do not know.
18  BY MR. PETKIS:
19      Q   Just as a follow-up to my earlier
20  question, Dr. Hale.
21      Your report dated July 30th doesn't cite,
22  to the best of your knowledge, any academic studies
23  that have specific findings on Facebook or
24  Instagram?
25      MS. ARORA:  Objection, form, asked

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 78

1    and answered.
2         THE WITNESS:  To the best of my
3    knowledge, I did not focus on that because
4    I was primarily focusing on systematic
5    reviews and meta-analyses, and consensus
6    statements --
7         THE COURT REPORTER:  I'm sorry.
8    Focus on systematic reviews --
9         THE WITNESS:  Systematic reviews,
10   comma, meta-analyses and consensus
11   statements to write my rebuttal.
12   BY MR. PETKIS:
13        Q    Just so we have it clearly.  Your answer
14   is no, you didn't cite any studies in your July
15   30th report that have specific findings for
16   Facebook and Instagram?
17        MS. ARORA:  Objection, form, asked
18   and answered.
19        THE WITNESS:  I do not believe that I
20   did include any articles -- cite any
21   articles specifically about Facebook or
22   Instagram, but many address social media
23   broadly.
24   BY MR. PETKIS:
25        Q    Dr. Hale, there are a lot of different

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 79

1    social media platforms.  Right?
2         MS. ARORA:  Objection, form.
3         THE WITNESS:  I don't know what you
4    mean by a lot, but there are four or five
5    big ones.
6    BY MR. PETKIS:
7         Q    There are social media platforms other
8    than Facebook and Instagram?
9         A    Yes, there are other social media
10   platforms.
11        Q    TikTok is one?
12        A    Yes.
13        Q    Snapchat is another?
14        A    Yes.
15        Q    Do you consider YouTube to be a social
16   media platform?
17        MS. ARORA:  Objection, scope.
18        THE WITNESS:  That is open for
19   discussion and I don't know the answer to
20   that.  I don't know.  I am familiar with
21   some researchers who do consider it and
22   some people who do not consider it to be a
23   social media platform.  I think it may
24   have changed over the years, but that is
25   out of the scope of my expertise.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 80

1    BY MR. PETKIS:
2         Q    You are not an expert what is and is not a
3    social media platform.  Is that fair?
4         MS. ARORA:  Objection to form.
5         THE WITNESS:  I am not an expert in
6    the definition of social media.
7    BY MR. PETKIS:
8         Q    Can you think of any other social media
9    platforms besides the one that I just listed -- the
10   ones I just listed?
11        A    Yes.
12        Q    Could you go ahead and just list those for
13   me?
14        A    There are ones -- I don't know all the
15   names of.  X, formerly known as Twitter.  LinkedIn
16   is something of a social media platform.  There are
17   ones in other countries that I am not that familiar
18   with.  But those are the ones that are top ones
19   that come to mind.  So as I said, I am an expert in
20   what is and is not social media.
21        Q    We are going to be talking today about
22   social media platforms and studies that take a look
23   at social media as a concept.
24        Do you understand that?
25        A    Yes.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 81

1         Q    When we talk about social media, do you
2    have in mind all these that we discussed, not just
3    Facebook and Instagram, but also platforms like
4    TikTok, Snapchat, Twitter and others?
5         MS. ARORA:  Objection.  Objection,
6    form.
7         THE WITNESS:  I am aware of these
8    other platforms and they are included in
9    my definition of social media.  My working
10   definition.  But when I refer to articles
11   that are written by other people, I don't
12   have control over their definitions so I
13   don't have the ability to distinguish what
14   they are referring to.  But I am familiar
15   with features of -- many common features
16   of social media platforms, so I understand
17   why they are categorized together.
18   BY MR. PETKIS:
19        Q    Different researchers define social media
20   differently.  Is that fair to say?
21        MS. ARORA:  Objection to form.
22        THE WITNESS:  Different researchers
23   define everything differently.  Yes, it is
24   -- you know, there is a harmonization
25   process when you look across articles,

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 82

1    yes.
2  BY MR. PETKIS:
3    Q    Just in terms of our common understanding
4  for the deposition today, when you refer to social
5  media you are not referring exclusively to Facebook
6  and Instagram.  Right?
7    A    Most of the time I don't think I will be,
8  no.
9    Q    If at any point today you do have
10 statements or conclusions or opinions specific to
11 Facebook or Instagram, will you clarify that and
12 not just use the term social media?
13   A    Ye.
14   Q    Thank you.
15        (Exhibit No. 4 marked for
16        identification.)
17 BY MR. PETKIS:
18   Q    Dr. Hale, Exhibit 4, which you have just
19 been handed, is a copy of your CV that was sent to
20 us last week on September 12th.  And this is Tab 18
21 in our folder.
22        Do you recognize this as the current copy
23 of your CV?
24   A    Yes.
25        Like I mentioned, this was sent to us last

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 83

1  Friday and I think it differs from the copy of your
2  CV that was attached to your report on July 30th.
3  Is that right?
4    A    Only to the extent that it has been
5  updated with more recent publications.  The
6  fundamental aspects are the same.
7    Q    That was going to be my question.
8        Is the only change that you made between
9  the two CVs is to add publications that postdated
10 your report?
11   A    Let me just check for one minute.  There
12 is -- yes, that is true.  And I just spotted
13 another error that I -- as of this month, I am no
14 longer the director of the Ph.D. program so that
15 line should be deleted from my CV now -- my current
16 CV, but yes, it's otherwise -- all I did was add
17 new manuscripts.
18   Q    You are no longer the director of the
19 Ph.D. program in Population, Health and Clinical
20 Outcomes Research at Stony Brook University?
21   A    That is correct.
22   Q    Besides that change, are there any other
23 changes that you need to make to your CV for it to
24 be complete and accurate?
25   A    No.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 84

1    Q    There is nothing missing on here in terms
2  of your current positions, education, experience or
3  publications that you need to add?
4        MS. ARORA:  Objection, form.
5        THE WITNESS:  It is hard to identify
6        if something is missing from the first
7        line that is many pages long, but I would
8        say it is complete in what is included on
9        this CV.  I have never been an expert
10       witness until this year.  Maybe I need to
11       include that on a CV, so I have not
12       included that.  But for the most part,
13       this represents my academic contributions
14       and my work.
15 BY MR. PETKIS:
16   Q    Well, let me just ask you that question.
17 Do you believe you should list expert engagements
18 on your CV?
19       MS. ARORA:  Objection, form.
20       THE WITNESS:  I honestly never
21       thought about it until just now because
22       that is not the standard section of a CV.
23       I do disclose my role as expert witness on
24       manuscripts and presentations that I give,
25       so that is -- I think it is important to

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 85

1        disclose.  But a CV is generally used to
2        show an academic accomplishments, not to
3        show expert witness.  I don't show that I
4        worked at a summer camp on my CV because
5        it is not relevant.  So I don't know if
6        expert witness is relevant for a CV.  I
7        don't know.
8  BY MR. PETKIS:
9    Q    Do you believe it is important to disclose
10 your work as a paid expert in social media
11 litigation on academic papers or manuscripts you
12 submit for publication?
13       MS. ARORA:  Object to form.
14       THE WITNESS:  It is not only
15       important, it is expected and I have done
16       so ever since I started in this new role
17       as an expert witness.
18 BY MR. PETKIS:
19   Q    And it is your intention to doing so in
20 the future?
21   A    Yes, usually there is a timeline like
22 within the last three years you put up your
23 disclosures, but until it no longer becomes
24 relevant maybe three years from now, I will
25 continue to include that.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 86

```
 1        Q   If that disclosure is missing from any
 2   studies or manuscripts you submit after 2025, is it
 3   your understanding you need to correct that?
 4             MS. ARORA:  Object to form.
 5             THE WITNESS:  I would look into it
 6        and try to correct that, yes.  I take
 7        disclosure seriously and I expect others
 8        to do so as well so I would not want to
 9        overlook any disclosures.
10   BY MR. PETKIS:
11        Q   You have a Master's and a Ph.D. in public
12   affairs.  Is that right?
13        A   Yes.
14        Q   Do you have any other advanced degrees?
15        A   No.
16        Q   Do you have any licenses or
17   certifications?
18        A   No.
19        Q   You are not a lawyer.  Is that right?
20        A   I am definitely not a lawyer.
21        Q   You are also not a medical doctor?
22        A   I am not a medical doctor.
23        Q   Do you have any medical training?
24        A   No.
25        Q   And you are not a psychiatrist.  Right?
```

---

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 87

```
 1        A   No, I am not a psychiatrist.
 2        Q   Do you have any formal training in
 3   psychiatry?
 4        A   No, I do not have formal training in
 5   psychiatry.
 6        Q   You are not a psychologist.  Is that
 7   right?
 8        A   I am not a psychologist.
 9        Q   Do you have any formal training in
10   psychology?
11        A   No, I do not have formal training in
12   psychology.
13        Q   Do you have any education or training in
14   childhood development?
15        A   I do not have formal training in
16   childhood development.
17        Q   You are not an epidemiologist.  Is that
18   right?
19        A   I would say I am an epidemiologist
20   adjacent.  I'm -- I was trained as a demographer in
21   population studies, which some people think is a
22   more rigorous form of epidemiology.
23        Q   Do you consider yourself to be an
24   epidemiologist?
25        A   Sometimes.  Sometimes I refer to myself as
```

---

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 88

```
 1   a sleep epidemiologist.
 2        Q   Do you have a degree in epidemiology?
 3        A   No, I do not.
 4        Q   You received your degree in public
 5   affairs, not public health.  Right?
 6        A   That is correct.  Princeton does not have
 7   a school of public health.
 8             THE COURT REPORTER:  I'm sorry?
 9             THE WITNESS:  Princeton does not have
10        a school of public health.
11   BY MR. PETKIS:
12        Q   Princeton does have an office of
13   population research.  Right?
14        A   Yes.
15        Q   That office offers a Ph.D. in population
16   studies?
17        A   Yes.
18        Q   You don't have a degree from that program.
19   Right?
20        A   That is actually where my degree is from
21   within the school of public and international
22   affairs.  I was located in the office of population
23   research.  So my concentration is in population
24   research.
25        Q   Does Princeton offer a separate Ph.D. in
```

---

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 89

```
 1   population studies?
 2        A   They do.  It is very, very tiny.  And it
 3   is underfunded, so I was actually accepted to that
 4   program and they said, oh, wait, there is a broader
 5   opportunity, you can get a public affairs degree
 6   and our degree at the same time and we have full
 7   funding for you.  What do you choose?  So I chose
 8   the public affairs route, but it is very similar
 9   set of core courses.
10        Q   Do you hold yourself out to colleagues as
11   an expert in epidemiology?
12             MS. ARORA:  Objection, form.
13             THE WITNESS:  I hold myself out to
14        colleagues as a sleep researcher.
15   BY MR. PETKIS:
16        Q   You do not hold yourself out as an expert
17   in epidemiology?
18             MS. ARORA:  Objection, asked and
19        answered.
20             THE WITNESS:  I do not actively
21        present myself as an expert, but I am --
22        II would say yes, I do not hold myself to
23        be an expert in epidemiology or present
24        myself as an expert in epidemiology, but I
25        have taught in the public health program
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 90

```
1          for 20 years in epidemiology at the core
2          of public health.
3   BY MR. PETKIS:
4       Q   You don't have any degrees in public
5   health.  Right?
6       A   No, I do not have any degrees in public
7   health.  It is a very interdisciplinary field.
8       Q   You don't have any degrees in public
9   education?
10      A   No, I don't have any degrees in public
11  education.
12      Q   You can't prescribe medications to treat
13  any medical conditions like depression, anxiety or
14  bipolar disorder.  Right?
15          MS. ARORA:  Objection.
16          THE VIDEOGRAPHER:  Off the record at
17      10:57.
18          (Off-the-record discussion.)
19          THE VIDEOGRAPHER:  This is still
20      Media 1 [sic].  We are back on the record
21      at approximately 10:58 a.m.
22  BY MR. PETKIS:
23      Q   Dr. Hale, my question was, you don't have
24  any prescribing privileges?
25      A   That is correct.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 91

```
1       Q   You have never prescribed any medication?
2       A   No.
3       Q   Do you consider yourself to be a
4   clinician?
5       A   No.
6       Q   Do you see patients in your day-to-day
7   work?
8       A   No.
9       Q   Have you ever treated a patient?
10      A   No.
11      Q   That means you have never treated any
12  adolescents as part of your sleep research?
13      A   That is correct.
14      Q   Have you ever treated an adolescent for
15  sleep disorder?
16      A   No, I do not treat patients.
17      Q   And you also don't make diagnoses of
18  patients as part of your work.  Right?
19      A   That is correct.
20      Q   You have never diagnosed anyone with a
21  sleep disorder?
22      A   I have never -- I have never diagnosed an
23  individual with a sleep disorder.  In my data where
24  we collect symptoms of sleep complaints on
25  anonymized individuals for whom we have actigraphic
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 92

```
1   data and other things, I categorize people based on
2   their reported symptoms, but I am not seeing these
3   -- they are not getting feedback from me.  It is
4   how I categorize it in the data.  It is not the
5   same as a diagnosis.  I understand the definition
6   of insomnia, but I do not diagnose or, more
7   importantly, I do not treat insomnia.
8       Q   You have never made a diagnosis in your
9   life.  Right?
10      A   That is correct.
11      Q   What standards do you use to categorize
12  study participants as part of your research?
13          MS. ARORA:  Objection, form.
14          THE WITNESS:  I am not sure I
15      understand the question.
16  BY MR. PETKIS:
17      Q   Do you ever reference diagnostic manuals?
18          MS. ARORA:  Objection, form.
19          THE WITNESS:  Only to -- I might
20      reference them, but it has nothing to do
21      with participant study -- study
22      participant selection.
23  BY MR. PETKIS:
24      Q   I just want to understand what your
25  testimony is.  I think you previously said that you
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 93

```
1   categorize people based on their reported symptoms
2   as part of your sleep research?
3       A   When analyzing the data I am familiar with
4   the definitions of insomnia and we ask questions
5   about symptoms.  If you -- and you can either make
6   it into a scale or you can say based on their
7   symptoms they dichotomize it, they have or don't
8   have insomnia, but my data are population-based
9   data.  So a small percentage of people, teenagers
10  report insomnia that would arise to the level of a
11  diagnosis.
12          But I don't recruit only participants with
13  insomnia symptoms.  So it is the whole sample and
14  then a small fraction of those participants report
15  symptoms that would cause them to be rise to the
16  level of a diagnosis of insomnia, if that answers
17  your question.
18      Q   My question is:  What is the basis or your
19  understanding of the definition of insomnia?
20      A   Oh, I use the clinical definition of
21  either trouble falling asleep, staying asleep,
22  waking up too early along with daytime impairment
23  based on self-report.
24      Q   Is that clinical definition the same as
25  diagnostic criteria for insomnia?
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 94

1       MS. ARORA:  Objection, form.
2       THE WITNESS:  I believe they are -- I
3   believe I am reporting, you know, a
4   layperson's interpretation of the
5   diagnostic criteria for insomnia.
6   BY MR. PETKIS:
7       Q   Do you have any expert understanding of
8   diagnostic criteria for sleep disorders, including
9   insomnia?
10      MS. ARORA:  Objection to form.
11      THE WITNESS:  I don't diagnose
12  patients with sleep disorders, and
13  basically this report is not about sleep
14  disorders, it is about delayed sleep
15  onset, short sleep duration and impaired
16  sleep quality.  And those are distinct
17  from insomnia.
18  BY MR. PETKIS:
19      Q   Do you consider delayed sleep onset to be
20  a sleep disorder?
21      A   No.
22      Q   Do you consider short sleep duration to be
23  a sleep disorder?
24      A   No.
25      Q   Do you consider impaired sleep quality a

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 95

1   sleep disorder?
2       A   It is a symptom of insomnia, but it is on
3   its own not a -- not part of the definition.  It is
4   not a sleep disorder.
5       Q   And just to be clear on those three
6   points.  You have never diagnosed anyone with
7   delayed sleep onset, short sleep duration or
8   impaired sleep quality.  Right?
9       MS. ARORA:  Objection to form.
10      THE WITNESS:  Just to be perfectly
11  clear, I am not a clinician.  I do not
12  diagnose anyone with any sleep disorder,
13  but I am familiar with the definitions.
14  BY MR. PETKIS:
15      Q   And you have never diagnosed anyone.
16  Right?
17      A   That is accurate.
18      MS. ARORA:  Object to form.
19  BY MR. PETKIS:
20      Q   Do you consider yourself to be an expert
21  in medical or psychiatric conditions like
22  depression, anxiety or eating disorders?
23      MS. ARORA:  Objection to form.
24      THE WITNESS:  I am familiar with
25  those as outcomes.  I would not use the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 96

1   word expert to describe myself, but I have
2   used those outcomes in -- especially in
3   anxiety symptoms and depressive symptoms
4   in analyses of my population-based cohort.
5   BY MR. PETKIS:
6       Q   You are not qualified to diagnose any
7   medical or psychiatric conditions.  Right?
8       A   That is correct, I am not qualified.
9       Q   You are not qualified to opine on whether
10  social media is capable of causing any specific
11  medical or psychiatric conditions.  Right?
12      MS. ARORA:  Objection, form, calls
13  for legal conclusion.
14      THE WITNESS:  Can you please repeat
15  the question.
16  BY MR. PETKIS:
17      Q   You are not qualified to opine on whether
18  social media is capable of causing any specific
19  medical or psychiatric conditions?
20      MS. ARORA:  Same objections.
21      THE WITNESS:  I am qualified as a
22  researcher to look at relationships
23  between variables based on data and
24  existing studies.  I feel very experienced
25  and qualified in looking at data and

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 97

1   analyzing data.  I am not in the business
2   of analyzing individual patients.
3   BY MR. PETKIS:
4       Q   Have you ever in your 20 years of sleep
5   research diagnosed a cohort group of people with
6   any psychiatric or medical condition?
7       MS. ARORA:  Objection, form.
8       THE WITNESS:  As I said, I have not
9   -- I am not a clinician and I do not
10  diagnose individuals.
11  BY MR. PETKIS:
12      Q   Okay.  In your 20 years of sleep research,
13  you have not undertaken to investigate whether or
14  not social media is causing any specific
15  psychiatric or medical conditions in a group or
16  cohort of people that you have researched.  Is that
17  right?
18      MS. ARORA:  Objection, form, asked
19  and answered.
20      THE WITNESS:  Can you please repeat
21  the question.
22  BY MR. PETKIS:
23      Q   In your 20 years of sleep research, you
24  have not undertaken to investigate whether or not
25  social media is causing any specific psychiatric or

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 98

1  medical conditions in a group or cohort of people
2  that you have researched?
3          MS. ARORA:  Same objection.
4  BY MR. PETKIS:
5      Q  Is that right?
6          MS. ARORA:  Same objection.
7          THE WITNESS:  In my research, I have
8          investigated the associations between
9          various types of phone use -- screen use,
10         phone use and social media use on multiple
11         health outcomes, including both sleep and
12         depressive symptoms.
13 BY MR. PETKIS:
14     Q  Are you qualified to diagnose medical or
15 psychiatric conditions at the individual level?
16     A  As I have previously stated, I am not
17 qualified nor have I ever diagnosed an individual
18 with a medical or psychiatric condition at the
19 individual level.
20     Q  Are you qualified to diagnose medical or
21 psychiatric conditions at the population level?
22         MS. ARORA:  Objection to form.
23         THE WITNESS:  I don't even know what
24         that means.  I am not defining the
25         diagnosis, so I -- I use existing

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 99

1          definitions to inform my research on
2          outcomes related to sleep and mental
3          well-being.  Am I qualified to do so?
4          Anyone is qualified to use existing
5          definitions.  It has no impact on
6          individual patient care.
7  BY MR. PETKIS:
8      Q  Are you qualified to categorize groups or
9  cohorts of people included in a study population
10 into categories of diagnosable medical or
11 psychiatric outcomes?
12         MS. ARORA:  Objection, form, asked
13         and answered.
14         THE WITNESS:  I think -- as I noted,
15         I think anyone who is familiar with
16         statistical software and can read the
17         definition of a diagnosis, is able to
18         categorize by simple commands of the
19         software program, yes.
20 BY MR. PETKIS:
21     Q  Let me ask it this way.  Have you ever in
22 any of your research offered a statement that some
23 group of study participants have insomnia?
24     A  I have never in any of my research issued
25 such a statement because I don't see the purpose of

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 100

1  what that statement would be.  The type of work I
2  do not just on social media, but I use data from
3  the women's health initiative, we might look at the
4  insomnia severity index as an outcome.  We might
5  look at predictors of insomnia severity.  Am I
6  diagnosing those individuals?  No.
7          We are using participant answers and
8  definitions to calculate an index of insomnia and
9  then we use predictors to look at the associations
10 over time.  And if you are calling that a
11 diagnosis, that is fine.  But it is not really a
12 diagnosis because it is a data analytic technique.
13     Q  Have you ever in any of your research
14 offered a statement that some group of study
15 participants have sleep impairment caused by social
16 media?
17         MS. ARORA:  Objection, form.
18         THE WITNESS:  My research often
19         addresses the issue of the screen use,
20         smartphone use, social media associations
21         with sleep health.  And as I think you
22         probably read in my report, the consensus
23         panel that I chaired, the language of one
24         of the consensus statements that we
25         reached consensus on was, in fact, screen

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 101

1          use.  We did not use the term social media
2          impaired sleep health, so yes, I have
3          issued a statement on that.
4  BY MR. PETKIS:
5      Q  Have you ever issued a statement in any of
6  your published research that social media
7  specifically impairs sleep health?
8      A  The -- I have several papers that I can
9  think of where social media is separated out from
10 other variables, other types of screen use.  One is
11 in Reichenberger 2023, we found associations
12 between higher levels of social media use and
13 sleep outcomes.  I can't remember the exact
14 associations.  And I know they were adverse,
15 though, and using actigraphic well-measured
16 assessments of sleep.
17         And another paper by Stella Lee (phonetic)
18 in, I believe 2019, where we found that
19 self-reported sleep troubles were associated -- no,
20 that higher use of social messaging apps, it was a
21 question -- a self-reported question about social
22 messaging was associated with higher rates of
23 impaired sleep -- impaired sleep.
24         Those are at least two that directly
25 address social media in my own research.  But then

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 102

1  I have also conducted literature reviews, summary
2  articles and, as mentioned, the consensus
3  statement.
4      Q   Do you accept as true, Dr. Hale, there is
5  a difference between association and causation?
6      A   I certainly do.
7      Q   Have you ever published that social media
8  causes sleep impairment?
9          MS. ARORA:  Objection, form, asked
10         and answered.
11         THE WITNESS:  I am very careful about
12         using the word "causes," which is, in
13         part, why the National Sleep Foundation
14         decided to make a consensus panel on this
15         topic.  And we -- we use the word
16         "impairs," but I -- most of my research
17         cautiously uses the word is "associated
18         with," and I think you are probably
19         hearing me say that.
20         But based on the totality of the
21         evidence, I interpret the current data
22         from my own research as well as all of the
23         research in the field to show a causal
24         relationship such that we can use the word
25         "impairs."  So it is a causal effect.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 103

1  BY MR. PETKIS:
2      Q   Do you think it is important to be
3  cautious in using the word "causation"?
4          MS. ARORA:  Objection to the form.
5          THE WITNESS:  I think language is
6          incredibly important.
7  BY MR. PETKIS:
8      Q   Particularly for population health
9  researchers like yourself, it is important when you
10 are using the word "causation" in relation to two
11 variables.  Right?
12         MS. ARORA:  Objection to form.
13         THE WITNESS:  I think it is important
14         to be precise about what the study is
15         showing.
16 BY MR. PETKIS:
17     Q   Have you ever published in any of your
18 academic articles that social media causes sleep
19 impairment?
20         MS. ARORA:  Objection, asked and
21         answered.
22         THE WITNESS:  I am not familiar off
23         the top of my head with the language I
24         used in every article on this topic.  But
25         I think that the gist of the consensus

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 104

1          panel, which is not just representing my
2          opinion but the opinion of 16 members of
3          the panel, is that it causes -- I think we
4          used the word "impairs," but I think it
5          implies that it is causal.
6  BY MR. PETKIS:
7      Q   Sitting here right now, are you aware of
8  any published statement you have ever made that
9  uses the word "causation" to relate social media
10 and sleep impairment?
11     A   As I said, I think that the consensus
12 panel uses the word "causal direction" in the
13 manuscript.  I don't have the manuscript in front
14 of me so I don't want to commit.  But that was the
15 gist of the consensus.  I don't know about my other
16 articles if I used that word.
17     Q   Can you sitting here right now think of
18 any time that you published a statement that social
19 media causes sleep impairment?
20         MS. ARORA:  Objection, asked and
21         answered.
22         THE WITNESS:  Off the top of my head,
23         I cannot think of any articles in which
24         I used the "causal" language except for in
25         the consensus panel.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 105

1  BY MR. PETKIS:
2      Q   Are you referring to the National Sleep
3  Foundation consensus panel from 2023?
4      A   Yes, Hartstein, et al.
5          THE COURT REPORTER:  I'm sorry?
6          THE WITNESS:  Hartstein, et al.
7          H-A-R-T-S-T-E-I-N.  It's Item 22 on my CV.
8          The title of the article is "The impact of
9          screen use on screen health."  So "impact"
10         implies causal language -- or causal
11         relationship.
12 BY MR. PETKIS:
13     Q   Have you ever published that Facebook or
14 Instagram individually caused sleep impairment?
15     A   It has never -- I have -- until my
16 engagement with this expert witness experience, I
17 have never focused specifically on one platform of
18 social media over another.  The level of the
19 science -- the scientists are mostly interested in
20 understanding the mechanism and the broad types of
21 exposures that are harmful to sleep health so that
22 we can make recommendations to families to help
23 improve the sleep of their children.  And it has
24 never been a target to go after one or another
25 social media platform.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 106

1    As far as I know, I have never written the
2  name of any social media platform in any published
3  article because it was never relevant.  One
4  exception is the "JAMA Pediatrics" article we might
5  have identified which one -- that one, Item 8, I
6  think we did identify Instagram as commonly used
7  during the school day.  It was not an article about
8  sleep, but that was just a descriptive article, so
9  -- but I have not ever, to my knowledge, identified
10  one social media platform to be worse than another
11  platform.
12    And I believe it is out of the scope of my
13  assignment to focus on any one particular platform.
14  It was just to respond to the Honaker report.
15    Q   You believe it is outside the scope of
16  your assignment to focus on Instagram and Facebook
17  specifically?
18        MS. ARORA:  Objection, form.
19        THE WITNESS:  I don't believe that is
20      what I was asked to respond to.  It was to
21      respond to Dr. Honaker's claim that social
22      media is not linked to sleep.
23  BY MR. PETKIS:
24    Q   Yes or no, have you ever published that
25  Facebook or Instagram individually caused sleep

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 107

1  impairment?
2        MS. ARORA:  Objection, asked and
3      answered.
4        THE WITNESS:  As I noted, I have
5      never to this point in time focused on
6      specific platforms so I have not published
7      that Facebook or any other platform has
8      caused harm to sleep because when I have
9      studied or talked about social media, I
10      talk about it as a broad category it is
11      inclusive of many platforms and not picked
12      in on one.
13  BY MR. PETKIS:
14    Q   Do you have an opinion -- an expert
15  opinion that Instagram or Facebook individually
16  caused sleep impairment?
17        MS. ARORA:  Objection, form, scope.
18        THE WITNESS:  My expert opinion is
19      that social media causes sleep harm.  And
20      I am not differentiating between Facebook
21      and Instagram compared to other platforms.
22      And until I have more information, it is
23      -- I am not prepared to say one way or the
24      other.  I -- that is where I stand.
25  BY MR. PETKIS:

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 108

1    Q   Do you have any opinion as to whether or
2  not Facebook or Instagram are better or worse for
3  sleep health than any other social media platform?
4        MS. ARORA:  Object to form.
5        THE WITNESS:  I don't have any
6      opinion or evidence on the ranking of
7      social media platforms compared to each
8      other.  And I also believe it is out of
9      the scope of my report.
10  BY MR. PETKIS:
11    Q   Are you aware of any evidence that would
12  allow you to disaggregate the impact of Facebook
13  and Instagram on population sleep health from other
14  social media platforms?
15        MS. ARORA:  Objection, form.
16        THE WITNESS:  Can you please repeat
17      the question.
18  BY MR. PETKIS:
19    Q   Are you aware of any evidence that would
20  allow you to disaggregate the impact of Facebook
21  and Instagram on population sleep health from other
22  social media platforms?
23        MS. ARORA:  Same objection.
24        THE WITNESS:  As of right now, the
25      science is not at that level.  I hope

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 109

1      there will be more granular data in the
2      future.  But as of right now, I can't
3      speak to that and I don't have a
4      hypothesis -- I might have a hypothesis,
5      but I don't have an opinion on that so I
6      -- that is all I can offer.
7  BY MR. PETKIS:
8    Q   I asked you about your research.  Are you
9  aware of any academic research at all that makes a
10  finding that Instagram and Facebook specifically
11  cause sleep impairment at the population level?
12        MS. ARORA:  Objection, form.
13        THE WITNESS:  Off the top of my head,
14      I am not aware of the data being asked --
15      investigated in that way.  So no, I am
16      not.  As I said, the scientists right now
17      -- the level of granularity of social
18      media versus non social media, not at the
19      level of platform versus platform.
20  BY MR. PETKIS:
21    Q   Have you ever worked with any kind of teen
22  advisory board?
23        MS. ARORA:  Objection, form.
24        THE WITNESS:  There is a group of
25      youth, I believe they are called the Log

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 110

1  Off Movement and -- who I have talked with
2  on phone calls, but I have not worked
3  closely with a teen advisory board.
4  BY MR. PETKIS:
5  Q   Have you incorporated any discussions or
6  information you have learned from the Log Off
7  project in your academic research?
8  A   At this point, it has all been preliminary
9  conversations, not incorporated into my active
10  ongoing research.
11  Q   Do any of your academic articles include
12  perspectives from teen stakeholders?
13  MS. ARORA:  Objection, form.
14  THE WITNESS:  I don't typically work
15  in that format.  But let me think about if
16  there are any studies that have had some
17  teen stakeholders.  I don't think so.
18  BY MR. PETKIS:
19  Q   Do you know of any researchers that do
20  include teen stakeholders in their research design?
21  MS. ARORA:  Object to form.
22  THE WITNESS:  I am sure there are
23  many people who use teen stakeholder focus
24  groups, et cetera, in their research, but
25  I am not familiar with any off the top of

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 111

1  my head.
2  BY MR. PETKIS:
3  Q   Is involving teen stakeholders a standard
4  practice in the teen research field?
5  A   I would not say it is a standard practice
6  in the population based study I do.
7  Q   Have you ever designed or conducted a
8  randomized control trial or RCT?
9  A   No.
10  Q   Have you ever designed or conducted a
11  prospective cohort study?
12  A   Yes, I am the PI of two studies where we
13  collected our -- or three studies where we
14  collected our own prospective sample.  And I have
15  also utilized prospective cohort studies for
16  ongoing research, but -- so I don't know if that
17  answers your question.
18  Q   Do any of the three studies where you have
19  collected data from a prospective cohort include
20  data on social media use?
21  A   Yes.
22  Q   Can you name those for me?
23  A   Sure.  The future of families and child
24  well-being cohort has a young -- is the sleep
25  substudy versus a cohort.  It went from being the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 112

1  teen sleep study to the young adult sleep study.
2  That is the first one.
3  The second one is a study of screen -- or
4  it is a study of sleep and screens in grades two
5  semirural counties in -- outside of Atlanta, in
6  Georgia.  And the third is the SBU study.
7  THE COURT REPORTEr:  Is the what?
8  THE WITNESS:  Stony Brook University
9  media study.  And all three of those are
10  longitudinal studies.
11  BY MR. PETKIS:
12  Q   Does the future of families cohort study
13  conclude that social media causes sleep impairment?
14  MS. ARORA:  Objection, form.
15  THE WITNESS:  The future families
16  cohort study is -- has published on the
17  age 15 data showing that social media use
18  is associated with self-reported sleep and
19  actigraphic sleep.  So it does not show
20  causality, but it does not show that sleep
21  is on the mediating pathway --
22  THE COURT REPORTER:  I'm sorry.  It
23  does show --
24  THE WITNESS:  It does not show
25  causality, but it does show that sleep is

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 113

1  on the mediating pathway toward depressive
2  symptoms.
3  BY MR. PETKIS:
4  Q   The future of family cohorts study does
5  not show causality between social media use and
6  sleep impairment?
7  A   That is the nature of a cohort study is
8  you can't confirm causality.  That is part of my
9  hesitation about using that word, but we do have
10  longitudinal data showing that even after adjusting
11  for earlier wave depressive symptoms, higher social
12  media use is associated with worse sleep health,
13  and that explains a large portion -- and I can't
14  remember the exact numbers -- of higher depressive
15  symptoms in that longitudinal cohort.  So it does
16  not show causality, but it shows a causal pathway
17  between social media, social messaging is what we
18  called it -- social messaging, sleep and depressive
19  symptoms.
20  Q   I am not asking you about associations
21  now.  I am not asking you about causal findings.
22  Okay.
23  Does the future of families cohort study
24  make a causal finding with respect to social media
25  use and sleep impairment?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 114

```
 1            MS. ARORA:  Objection, asked and
 2       answered.  Form.
 3            THE WITNESS:  No, it does not.
 4   BY MR. PETKIS:
 5       Q    Does the cohort study involving sleep and
 6   screens in semirural communities in Atlanta make a
 7   causal finding social media and sleep impairment?
 8       A    It is a cohort study so it is not able to
 9   show a causal pathway, and --
10            THE COURT REPORTER:  Show what?
11            THE WITNESS:  Causal pathway -- or
12       show -- confirm causality, but, no, it
13       does not.
14   BY MR. PETKIS:
15       Q    Does the SBU --
16       A    Media study.
17       Q    -- media study make a causal finding
18   between social media and sleep impairment?
19       A    As I already mentioned, the nature of
20   these population-based studies is that they can
21   confirm causality.  So no.
22       Q    I apologize.  Are you familiar with
23   Bradford Hill analysis?
24       A    I am.
25       Q    Have you ever done a Bradford Hill
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 115

```
 1   analysis?
 2       A    No.
 3       Q    You didn't do a Bradford Hill analysis in
 4   this case.  Right?
 5       A    No, I did not.  I was simply responding to
 6   the complaint -- or the report by Dr. Honaker.
 7       Q    You never worked for a social media
 8   company.  Correct?
 9       A    No, I have not.
10       Q    You never worked for any tech company?
11       A    No.
12       Q    You don't have a degree in computer
13   science?
14       A    No, I do not.
15       Q    Or electrical engineering?
16       A    No, I do not.
17       Q    You don't have any technical expertise in
18   how social media services work?
19            MS. ARORA:  Objection, form.
20            THE WITNESS:  That is correct, I do
21       not have technical expertise in how social
22       media services work.
23   BY MR. PETKIS:
24       Q    And you don't have any technical expertise
25   in how any particular features of a social media
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 116

```
 1   platform work.  Right?
 2            MS. ARORA:  Objection, form.
 3            THE WITNESS:  That is correct.  I
 4       have never worked at a social media
 5       company and I have never -- I do not have
 6       technical expertise.
 7   BY MR. PETKIS:
 8       Q    There is a lot of discussion in public
 9   parlance about algorithms for social media
10   platforms.  Are you familiar with that?
11       A    I am familiar with the term "algorithm"
12   and -- yes.
13       Q    Do you know how social media algorithms
14   work?
15            MS. ARORA:  Object to form.
16            THE WITNESS:  I believe that is out
17       of the scope of my assignment.
18   BY MR. PETKIS:
19       Q    You have never written any software code.
20   Right?
21       A    Only data analysis code.
22       Q    What is the platform used for that?
23       A    Stata.
24       Q    Have you written any code outside of
25   Stata?
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 117

```
 1       A    A very long time ago.
 2       Q    Describe what that was.
 3       A    C plus plus or something, or like Pascal,
 4   I think in high school.  So no, not as an adult.
 5       Q    You are not qualified to look at Meta's
 6   source code and opine on how it works.  Right?
 7            MS. ARORA:  Objection, calls for a
 8       legal conclusion.
 9            THE WITNESS:  I have never thought to
10       do that.  I have written HTML, but that is
11       pretty easy.  But no, I have not looked at
12       Meta's source code.
13   BY MR. PETKIS:
14       Q    Okay.  You have never published on
15   infinite scroll.  Right?
16            MS. ARORA:  Objection, form.
17            THE WITNESS:  I have not published on
18       infinite scroll, as far as I know.  I have
19       coauthored an article where we talked
20       about design features, but I have not -- I
21       have never taken expertise on infinite
22       scroll.
23   BY MR. PETKIS:
24       Q    I am going to ask you about that article
25   where you discuss design measures, but you don't
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 118

```
1   know how any of Meta's design features work.
2   Right?
3            MS. ARORA:  Objection, form.
4            THE WITNESS:  That is correct.  And
5       also is correct that article is not
6       written specifically about any Meta
7       Platforms.
8   BY MR. PETKIS:
9       Q   You are not offering any expert opinions
10  in this case regarding the Meta Platform's design
11  features?
12      A   I think that is out of the scope of my
13  report.
14      Q   Do you know what safety tool Meta makes
15  available on Facebook and Instagram?
16           MS. ARORA:  Objection, scope.
17  BY MR. PETKIS:
18      Q   You can answer.
19      A   I am aware of several screen management
20  tools like quiet mode and awareness bumpers.  I am
21  not otherwise expert in safety features.
22      Q   Are those safety features that you think
23  Meta makes available on Facebook and Instagram?
24           MS. ARORA:  Objection, scope.
25           THE WITNESS:  I am not an expert in
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 119

```
1       who makes them available.  I am uncertain
2       about that.
3   BY MR. PETKIS:
4       Q   Have you ever visited Meta's website and
5   looked at their safety center?
6       A   I have visited Meta's website with the
7   list of -- a timeline of updates of safety measures
8   for parents and kids.  I don't know if that is
9   exactly what you are talking about, but I have seen
10  a single page that has a 20-year history or
11  something of edits.
12      Q   Is that something that you looked at in
13  connection with your expert reports in the social
14  media litigation?
15      A   Yes.
16      Q   Do you have any opinions with respect to
17  the safety features whether they are adequate or
18  inadequate?
19           MS. ARORA:  Objection, form.
20           THE WITNESS:  My opinion based on
21      having seen only these two internal
22      documents listed on -- for the September
23      12th submission, is that it looks like
24      these are not highly adopted safety
25      features, but I do not have full knowledge
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 120

```
1       of the extent to which they are in use.
2   BY MR. PETKIS:
3       Q   Would you say you don't have full
4   knowledge of all the safety features that Meta
5   makes available on Facebook and Instagram?
6            MS. ARORA:  Objection, scope.
7            THE WITNESS:  I would say I do not
8       have full knowledge.
9   BY MR. PETKIS:
10      Q   Are you offering an expert opinion in this
11  case that Meta's safety features on Facebook and
12  Instagram are inadequate?
13      A   I think that is out of the scope of my
14  report.
15      Q   You are not an expert in content
16  moderation on social media platforms.  Right?
17           MS. ARORA:  Objection, form.
18           THE WITNESS:  I am not an expert on
19      content moderation.
20  BY MR. PETKIS:
21      Q   You are not an expert on reasonable design
22  of a social media platform?
23           MS. ARORA:  Objection, form.
24           THE WITNESS:  I am not an expert in
25      reasonable design.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 121

```
1   BY MR. PETKIS:
2       Q   Are you offering any opinions that any
3   features of Meta's social media platforms should be
4   designed differently or implemented in a different
5   way?
6            MS. ARORA:  Objection, form.
7            THE WITNESS:  My opinions were
8       responsive to Dr. Honaker's report and not
9       about the specific features of Meta
10      Platforms.
11  BY MR. PETKIS:
12      Q   So just -- for instance, you don't have
13  any expert opinions that Meta should do
14  notifications differently?
15           MS. ARORA:  Objection, form.
16           THE WITNESS:  I have research support
17      that notifications are disrupting sleep in
18      the middle of the night, so I do have an
19      opinion that a notification is harmful to
20      adolescent youth.  I do not have an expert
21      opinion on what the solution should look
22      like, but I do have a concern about it.
23  BY MR. PETKIS:
24      Q   Meta allows adolescents or anyone to turn
25  off notifications on Facebook or Instagram.  Right?
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 122

1      MS. ARORA: Objection, scope, assumes
2   facts not in the record.
3      THE WITNESS: I -- yeah, I assume
4   that is an option. I am not clear whether
5   that many teens or adults actually
6   implement such quiet mode or notification
7   turn off. So, yes, I can't imagine they
8   restrict people from turning off
9   notifications, but I don't know.
10  BY MR. PETKIS:
11     Q   Let me ask it this way. What should Meta
12  do differently with respect to notifications on
13  Facebook and Instagram?
14     MS. ARORA: Objection, form, asked
15  and answered.
16     THE WITNESS: I think that is out of
17  the scope of my report. My report was to
18  respond to Dr. Honaker's opinion on the
19  harmful -- or on the effects of screen --
20  social media on sleep.
21  BY MR. PETKIS:
22     Q   What should Meta do differently with
23  respect to infinite scroll on Facebook and
24  Instagram?
25     MS. ARORA: Objection, form, asked

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 123

1   and answered.
2      THE WITNESS: I think that is outside
3   of the scope of my report. I was asked to
4   respond to Dr. Honaker's report on social
5   media use and sleep.
6   BY MR. PETKIS:
7      Q   What should Meta do differently with
8   respect as to photo filters on Instagram and
9   Facebook?
10     MS. ARORA: Objection, form, scope.
11     THE WITNESS: That is outside the
12  scope of my report.
13  BY MR. PETKIS:
14     Q   What should Meta do differently with
15  respect to its algorithms on Facebook and
16  Instagram?
17     MS. ARORA: Object to form.
18     THE WITNESS: That is outside the
19  scope of my report.
20  BY MR. PETKIS:
21     Q   What should Meta do differently with
22  respect to classifiers on Facebook and Instagram?
23     MS. ARORA: Objection, form, scope.
24     THE WITNESS: Can you tell me more
25  about classifiers?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 124

1   BY MR. PETKIS:
2      Q   Do you know what classifiers are?
3      A   No, I idea.
4      Q   What should Meta do differently with
5   respect to age verification systems on Facebook and
6   Instagram?
7      MS. ARORA: Objection to form, scope.
8      THE WITNESS: That is outside of the
9   scope of my report.
10  BY MR. PETKIS:
11     Q   What should Meta do differently with
12  respect to like accounts on Facebook and Instagram?
13     MS. ARORA: Objection to form.
14     THE WITNESS: That is outside of the
15  scope of my report.
16  BY MR. PETKIS:
17     Q   What should Meta do differently with
18  respect to autoplay on Facebook and Instagram?
19     MS. ARORA: Object to the form.
20     THE WITNESS: That is outside of the
21  scope of my report.
22  BY MR. PETKIS:
23     Q   What should Meta do differently with
24  respect to ephemeral content on Facebook and
25  Instagram?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 125

1      MS. ARORA: Object to form and scope.
2      THE WITNESS: Again, that is outside
3   of the scope of what I was asked to write
4   about.
5   BY MR. PETKIS:
6      Q   Do you have an opinion as to a single
7   thing that Meta should do differently on Facebook
8   and Instagram at all?
9      MS. ARORA: Object to form.
10     THE WITNESS: I have opinions, but I
11  don't know if they constitute expert
12  opinions, so I think it is outside of the
13  scope of my report.
14  BY MR. PETKIS:
15     Q   Do you have an Instagram report?
16     A   I do have an Instagram account.
17     Q   When did you open it?
18     A   I really don't know. I barely open it. I
19  barely use it. It doesn't even have a picture of
20  me on it, but I do have -- I have maybe opened it
21  in 2015 or something. I don't know. At least 10
22  years ago, but I don't know.
23     Q   Do you not use Instagram regularly?
24     A   That is correct.
25     Q   Fair to say that you are not familiar with

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 126

1  kind of the current state of how Instagram operates
2  or what is available on Instagram?
3          MS. ARORA:  Object to form.
4          THE WITNESS:  I am not overly
5          familiar with how Instagram works.
6  BY MR. PETKIS:
7      Q   Do you have a Facebook account?
8      A   Yes, I do.
9      Q   When did you open that one?
10     A   The very beginning, 2003.
11     Q   Do you use Facebook regularly?
12     A   I use Facebook constantly.  Constantly --
13  I am under oath.  I use Facebook every day and
14  multiple times a day.  I take back constantly.
15  That sounds like I have a real problem, but I do
16  use it a lot.
17     Q   Do you think that everybody uses Facebook
18  a lot has a problem use of Facebook?
19          MS. ARORA:  Objection, speculation,
20          form.
21          THE WITNESS:  I think that is outside
22          the scope of my report, but I will just
23          answer that I think, no, I do not think
24          every user has a problem -- has
25          problematic use.

Golkow Technologies,
A Veritext Division
877-370-3377                                www.veritext.com

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 127

1  BY MR. PETKIS:
2      Q   Including not every user who uses Facebook
3  a lot.  Right?
4          MS. ARORA:  Objection, form.
5          THE WITNESS:  Oh, I thought it was
6          about Instagram, both of those, yes, I
7          think every user does not necessarily have
8          a problem.
9  BY MR. PETKIS:
10     Q   Including if they use Facebook a lot.
11  Right?
12          MS. ARORA:  Same objection.
13          THE WITNESS:  Yes, including if you
14          use Facebook a lot, it does not mean --
15          well, can you please ask the question
16          again.
17  BY MR. PETKIS:
18     Q   Do you believe that every individual who
19  uses Facebook a lot has problem use of Facebook?
20          MS. ARORA:  Objection to form.
21          Speculation.
22          THE WITNESS:  I misunderstood.  First
23          I heard you say did every user has a
24          problem use.  But you said every user who
25          uses it a lot.  It really depends on what

Golkow Technologies,
A Veritext Division
877-370-3377                                www.veritext.com

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 128

1          the definition of a lot is.  I do think
2          time spent on an app is a good proxy for
3          problematic use if you don't have another
4          measure.
5          On the other hand, there are scales
6          of problematic use that incorporate things
7          like compulsion and craving and also
8          impact on daytime functioning and other
9          behaviors.  So I -- and nighttime
10         functioning.  So I -- it depends what the
11         definition is, but at some point if you
12         use Facebook too much, even if you might
13         not say you have problematic use, I might
14         say you have problematic use.
15  BY MR. PETKIS:
16     Q   Have you derived any benefit from using
17  Facebook over the last 20 years?
18          MS. ARORA:  Object to form.
19          THE WITNESS:  I have derived benefit
20          from using Facebook.
21  BY MR. PETKIS:
22     Q   Do you believe social media platforms
23  shouldn't exist?
24          MS. ARORA:  Objection, form, scope.
25          THE WITNESS:  I do not think that is

Golkow Technologies,
A Veritext Division
877-370-3377                                www.veritext.com

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 129

1          within the scope of my report so I won't
2          comment.
3  BY MR. PETKIS:
4      Q   I am now being clear.  I am asking for
5  your personal opinion, not as an expert.
6          Do you believe social media platforms
7  shouldn't exist?
8          MS. ARORA:  Object to form.
9          THE WITNESS:  Okay.  I have never
10         thought about it that way.  But I would
11         say I don't have -- I am not anti all
12         social media platforms.
13  BY MR. PETKIS:
14     Q   Do you believe that Facebook and Instagram
15  shouldn't exist just as a personal opinion?
16          MS. ARORA:  Objection to form and
17          scope.
18          THE WITNESS:  No, I don't believe
19          that.
20          MR. PETKIS:  Should we take a break.
21          THE VIDEOGRAPHER:  We are now off the
22          record at approximately 11:40 a.m.  This
23          is the end of Media 2.
24          (Recess taken from 11:40 a.m. to
25          11:55 a.m.)

Golkow Technologies,
A Veritext Division
877-370-3377                                www.veritext.com

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 130

1      THE VIDEOGRAPHER:  This is Media 3.
2      We are back on the record at approximately
3      11:55 a.m.
4    BY MR. PETKIS:
5      Q    Welcome back, Dr. Hale.
6      You mentioned in your July 30th report
7    that you were first retained by the MDL state
8    coalition on July 17.  Is that correct?
9      A    That is the day I had my first phone call
10   with -- or I think it was a Teams call with A.G.s'
11   Offices about this opportunity.  I don't remember
12   when I was sent the documents.
13     Q    It was certainly no earlier than July
14   17th?
15     A    It definitely was not.
16     Q    You submitted your report on July 30th?
17     A    Yes.
18     Q    That is 13 days in between?
19     A    Yes.
20     Q    And all of your work to form your opinions
21   in this MDL case happened in that 13-day time span?
22     MS. ARORA:  Objection to form.
23     THE WITNESS:  I drew upon other
24     things I've worked on in my career,
25     including the work, but, yes, I wrote this

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 131

1    report during those.  I didn't even know
2    about my involvement in it until the end
3    of July, and I spent basically an entire
4    week working on it.
5    BY MR. PETKIS:
6      Q    Are any portions of this report pulled
7    verbatim or in large part from the declaration that
8    you signed in the Florida litigation?
9      A    There are some sections that are very
10   similar.  Since this was written as a rebuttal, it
11   was restructured and any section in that other
12   report that was filed that had anything to do with
13   Snap, I removed so --
14     Q    Are there any particular sections of your
15   report that you have in mind as being very similar
16   to the Florida litigation?
17     A    Let me take a look.  The Section 2 on the
18   clinical -- or rather the significant of sleep loss
19   for optimal functioning during adolescence, a lot
20   of those sections were adapted from what I
21   submitted in Florida.  That one for sure.
22     Then also probably the section on the
23   mechanisms was very similar, too.  So the
24   mechanisms were over in paragraphs -- let me get to
25   it -- 45 -- basically paragraph 45, but then also

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 132

1    46, 47, 48, and probably 49 were also very similar,
2    and 50.
3      But then I think anything -- I also talked
4    about the consensus panels.  There were some
5    sections.  Obviously, anything specifically
6    mentioning Dr. Honaker had nothing to do with what
7    I -- or response to her report were not included in
8    the Snap declaration.
9      Is that a complete answer?
10     Q    Yes.  Thank you.
11     A    I am not sure if that was precisely
12   because it got all restructured, but I believe the
13   Florida report was about 20 pages.  So this
14   contains substantially more than the Snap report.
15     Q    Do you know if that Florida declaration is
16   under seal or confidential in any way?
17     A    I really do not know.  I don't have
18   regular communication with those people.
19     MR. PETKIS:  We will follow up on
20     that.
21     MS. ARORA:  Okay.
22   BY MR. PETKIS:
23     Q    You acknowledge in your report, Dr. Hale,
24   that you have known Dr. Honaker personally for at
25   least three years.  Right?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 133

1      A    That is correct.
2      Q    Do you know any other expert witnesses in
3    this case personally?
4      A    Well, you mentioned that -- Dr. Twenge is
5    an expert witness.  And I know Dr. Christakis.  But
6    I think he is on a different case, but it is
7    related to this.  And those are all that I know who
8    are on this MDL case.
9      Q    Do you know whether or not Dr. Twenge or
10   Dr. Christakis are offering any opinions in this
11   State A.G. litigation?
12     A    I actually do not know.  I thought you
13   just told me about Twenge, I don't know.
14     Q    Dr. Twenge is an expert on behalf of
15   social media plaintiffs against Meta.  Right?  You
16   are aware of that?
17     MS. ARORA:  Objection, asked and
18     answered.
19     THE WITNESS:  Say it again.  You said
20     it, but I thought -- I don't know.  I knew
21     that Twenge was involved in the Snap case,
22     but I didn't know about this particular.
23     I thought you said that today.
24   BY MR. PETKIS:
25     Q    I'm not trying to put words in your mouth.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 134

```
1   Let me ask you an open-ended question.
2       A   Okay.
3       Q   Do you know whether or not Dr. Twenge is
4   engaged as an expert witness providing any opinions
5   against Meta in any social media cases?
6       A   I have not communicated with Dr. Twenge so
7   I do not know that for a fact.  I thought that is
8   what you said.  So I don't know.
9       Q   Do you know whether or not Dr. Christakis
10  is engaged as an expert witness offering opinions
11  against Meta in any social media cases.
12          MS. ARORA:  Objection, form, scope.
13          THE WITNESS:  I do know that
14          Dr. Christakis, he is a co-author of mine
15          and we both listed in our disclosures that
16          we are involved in social media
17          litigation.  My understanding is that it
18          is not the State A.G. case, so that is all
19          I really know.  I mean I don't -- so I
20          think -- I don't know if that answers your
21          question.  He is involved as an expert
22          witness in social media litigation.  I do
23          not know exactly which case.
24  BY MR. PETKIS:
25      Q   You said it is your understanding that it
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 135

```
1   is not the State A.G. case.  I just want to know
2   what is the basis of that understanding?
3           MS. ARORA:  Objection to form and
4           scope.
5           THE WITNESS:  I thought you -- the
6           basis of that understanding is that I
7           thought you just said that is the State
8           A.G. cases.  My -- that he has been
9           involved in a case in different -- for
10          longer than I have been involved in the
11          case, so I thought it was a different
12          case.
13  BY MR. PETKIS:
14      Q   Okay.  Do you know one way or another
15  whether Dr. Christakis is in the State A.G. case?
16          MS. ARORA:  Objection, asked and
17          answered, scope.
18          THE WITNESS:  As I stated, I do not
19          know if it is the same case.  I don't
20          know.  I have not seen his report and I do
21          not know if it is the same exact thing, so
22          I don't know.
23  BY MR. PETKIS:
24      Q   You have never reviewed any of
25  Dr. Christakis expert reports in social media
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 136

```
1   litigation?
2       A   No, I have not.
3       Q   Have you ever discussed the substance of
4   any Dr. Christakis's in social media litigation?
5       A   Dr. Christakis and I collaborate together
6   on the topic of social media and well -- child
7   well-being, me specifically with sleep and him on
8   other issues.  So in that way we have discussed the
9   substance of the issues but not the substance of
10  these cases.
11      Q   You have never had a discussion with
12  Dr. Christakis about the subject of expert opinions
13  in these cases?
14      A   No.
15      Q   When did Dr. Christakis first tell you
16  that he was retained by social media plaintiffs to
17  offer expert opinions?
18          MS. ARORA:  Objection, scope and
19          form.
20          THE WITNESS:  I don't know when he
21          was retained, but I learned that he was
22          working on some case -- I am going to go
23          with -- I don't even know.  It was before
24          I was involved, so it was maybe 2023.  I
25          think it was -- we had a 2023 Children and
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 137

```
1           Screens meeting.  I think it was after
2           that, but I don't know exactly when he had
3           told me.  It was sometime between 2023 and
4           early 2024.
5   BY MR. PETKIS:
6       Q   Were you aware that Dr. Christakis has
7   been deposed at length by Meta's attorneys in
8   connection with these social media cases?
9       A   I am aware.
10          MS. ARORA:  Objection, form and
11          scope.
12  BY MR. PETKIS:
13      Q   Have you talked to him about his
14  deposition?
15      A   I have discussed that it was very
16  challenging for him.  He posted on Facebook that he
17  was going to deposition, so I don't think it is a
18  secret that he has been deposed.
19      Q   I agree with that.
20          Have you discussed the substance of his
21  deposition with him?
22          MS. ARORA:  Objection to form and
23          scope.
24          THE WITNESS:  No.  No, we have not
25          discussed the substance of the deposition.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 138

1  BY MR. PETKIS:
2      Q   And you have not read his deposition
3  transcript?
4      A   No, I have not had access to it.
5      Q   In fact, you have not reviewed any
6  deposition transcripts in any social media cases.
7  Right?
8          MS. ARORA:  Object to form.
9          THE WITNESS:  That is correct, I have
10         never read any depositions.  I think at
11         one point I asked if I could see
12         Dr. Honaker's deposition, but I don't
13         think anybody gave it to me.
14 BY MR. PETKIS:
15     Q   When did you ask for that?
16     A   I don't remember.  Sometime probably in
17 that crazy week at the end of July.
18     Q   Have you ever asked for any other
19 deposition transcripts?
20     A   No.
21     Q   You have never reviewed any transcripts
22 from Meta witnesses.  Right?
23         MS. ARORA:  Objection to form.
24         THE WITNESS:  I have never reviewed
25         any -- you mean the defense witnesses?  I

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 139

1          have never reviewed any defense witness --
2          well, I reviewed Sarah Honaker's report,
3          but not her deposition.
4  BY MR. PETKIS:
5      Q   I apologize.  I was unclear.
6      A   Okay.
7      Q   You have not reviewed any transcripts from
8  Meta employees, current or former employees.
9  Right?
10         MS. ARORA:  Objection to form.
11         THE WITNESS:  The only internal
12         documents that I have seen from Meta are
13         the ones that are listed here on Exhibit
14         2, the Haugen leak documents and the two
15         slide decks.  Those are the only internal
16         documents.  I have not seen any Meta
17         employee transcripts.  I don't even know
18         what they would be.  Depositions?  Okay.
19 BY MR. PETKIS:
20     Q   Did you know that Meta employees have
21 provided testimony in the State A.G. case
22 specifically regarding sleep research issues?
23         MS. ARORA:  Objection to form and
24         scope.
25         THE WITNESS:  No, I did not know

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 140

1          that.  And I think if I had known that, I
2          would have asked if I could see that, but
3          I did not know that.
4  BY MR. PETKIS:
5      Q   Do you think that testimony is relevant to
6  your opinions at all?
7          MS. ARORA:  Objection to form, calls
8          for speculation.
9          THE WITNESS:  I can't answer that
10         question without having seen what they
11         wrote, but I would be curious to see what
12         they wrote.  It was a deposition?  Is
13         there a way that I can see those?
14 BY MR. PETKIS:
15     Q   I am asking the questions here today.
16     A   Okay.  Sorry.
17     Q   How often do you speak with
18 Dr. Christakis?
19         MS. ARORA:  Objection, scope.
20         THE WITNESS:  Regularly.  Every day.
21 BY MR. PETKIS:
22     Q   Are you two currently collaborating on any
23 academic research studies?
24     A   Yes, we collaborate frequently.
25     Q   Any studies relating to Facebook or

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 141

1  Instagram specifically?
2      A   As I noted, at this -- at the current
3  level of science right now, the research mostly
4  groups social media as a single unit.  So I do not
5  think we have any studies that specifically pick at
6  one or the other or either -- any individual
7  platform.  That is not the nature of the research
8  questions we are interested in answering.
9      Q   In your -- in your academic research, you
10 are not interested right now in answering whether
11 or not any specific social media platforms impairs
12 sleep health?
13         MS. ARORA:  Object to form.
14         THE WITNESS:  In my academic
15         research, I am interested in that question
16         but the data I'm not at that level of
17         granularity that allows us to answer that.
18         So that is not something that has been
19         pursued to date, but that doesn't mean it
20         is not of interest.
21 BY MR. PETKIS:
22     Q   Do you have any plans to conduct any
23 experimental studies on the impact of Facebook or
24 Instagram specifically on sleep health?
25         MS. ARORA:  Objection to form, calls

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 142

```
 1        for speculation.
 2             THE WITNESS:  I have not -- I do not
 3        have any specific plans to look at
 4        specific platforms.  Although I do have --
 5        I have recently submitted a grant proposal
 6        to look at a study in which we withdraw
 7        access to social media platforms broadly.
 8        It is not a targeted attack on -- targeted
 9        -- "attack" is the wrong word.  Targeted
10        investigation on any specific platform.
11        It's a question about does limiting social
12        media impact sleep health, and social
13        media broadly, not any particular
14        platform.  That grant has not yet been
15        funded so I don't have any immediate plans
16        to do that study.
17   BY MR. PETKIS:
18        Q    When did you submit that grant proposal?
19        A    I think it was due in May.
20        Q    Who is the funding agency or entity?
21        A    The funding agency is the Huo Foundation,
22   H-U-O, Family Foundation.
23        Q    Can you describe just at a high level the
24   study design --
25             THE COURT REPORTER:  The study what?
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 143

```
 1             THE WITNESS:  The study design.
 2             The study proposed that we take the
 3        -- not we take -- we include the
 4        participants in our SBU media study around
 5        250 participants and have them install an
 6        app called the Freedom app on their phone
 7        to restrict access to certain types of
 8        apps at designated hours.  And naturally
 9        because I'm a sleep researcher, I was
10        interested in the effect of restricting
11        social media use during the evening hours,
12        evening and nighttime hours.  And also
13        monitor using actigraphy, sleep health --
14             THE COURT REPORTER:  Monitoring
15        using?
16             THE WITNESS:  Using wrist-worn
17        devices that collect data on movement,
18        also known as actigraphy, to measure
19        sleep.  And we would use that data to
20        investigate whether restricting social
21        media access changes sleep patterns.  That
22        is basically the study that we proposed.
23   BY MR. PETKIS:
24        Q    What are evening and nighttime hours, just
25   so we have a common understanding?
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 144

```
 1        A    Well, it is an interesting question.  From
 2   a research perspective, because some studies are,
 3   you know, set at 9 o'clock or 10 o'clock and then
 4   you find out that it doesn't match the timelines of
 5   the users.  So one way to characterize evening
 6   hours is the hour before their habitual bedtime.
 7   That is one measure of evening hour.  But typically
 8   for a group of teenagers, I would say between 8:00
 9   and 10:00 p.m. or 8:00 and 11 p.m. are evening
10   hours, and I would call nighttime hours between
11   11:00 and 6:00 a.m, hours in which the teenager
12   should probably be sleeping.
13        Q    In academic research regarding the impact
14   of social media on sleep health, is the primary
15   focus social media used during those evening and
16   nighttime hours?
17             MS. ARORA:  Objection, form.
18             THE WITNESS:  The science on screen
19        use and sleep has evolved over the last 15
20        years just as the platform and technology
21        has evolved.  I think early on the field
22        was constrained to global measures of
23        daily screen use.  So there was new
24        granularity whatsoever in what time the
25        device was used or the social media app
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 145

```
 1        was accessed.
 2             But -- and even then, you find
 3        relatively large inconsistent associations
 4        between more screen use and later bedtime,
 5        shorter sleep duration, impaired sleep
 6        quality.  But as the field has evolved and
 7        there have been better surveys developed
 8        and a better understanding of how and when
 9        screens might be most disruptive, the
10        research has shown that questions and
11        assessment of screen exposure at the
12        evening hours -- during the evening hours
13        or over the night are the periods with the
14        most disruption on sleep.  And that makes
15        intuitive and theoretical sense as well.
16             But it is too difficult to say what
17        the whole field does because it has
18        changed over time.  We started in -- with
19        the broadest possible question and now we
20        have honed in on evening and nighttime
21        hours.
22   BY MR. PETKIS:
23        Q    In terms of your study design you said
24   that the intent is to restrict certain applications
25   using the Freedom app.  Is that right?
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 146

1    A    Uh-huh.

2    Q    Which applications specifically are

3  restricted?

4    A    I don't remember exactly.  I think just to

5  cover our concerns we said we were going to

6  restrict the top ten social media apps, and of

7  course that would be time dependent if the top ten

8  changed.  I don't think we needed to list them, not

9  for the grant proposal, so we did not.  So you

10  know, I don't know.  I am -- I can assure you that

11  Instagram and Facebook would have been included in

12  the top ten, so --

13    Q    Do you know where Instagram and Facebook

14  fall in the top ten?

15    A    That is outside the scope of my knowledge.

16  I know that they are in the top five, but I don't

17  know if they are -- and I think of -- as I am sure

18  everyone knows, it varies by age.  So I don't know

19  overall or for whom you are asking about.

20    Q    Are there nonsocial media apps or screen

21  uses restricted in your grant proposal?

22        MS. ARORA:  Objection, asked and

23        answered.

24        THE WITNESS:  This particular grant

25        proposal, the research question was

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 147

1        focused on social media only.  But as I

2        said, we didn't specify which social media

3        apps we were interested in, nor are we

4        interested in identifying or ranking

5        individual social media apps.  We were

6        interested in simply describing the role

7        of social media on sleep.

8  BY MR. PETKIS:

9    Q    Does social media use during the daytime

10  impact adolescent sleep health?

11    A    That is a very good question.  There is an

12  association, especially among very high users.  But

13  it is less strong than the association between

14  social media use at night, in the evening or in the

15  nighttime hours, so --

16    Q    Does the academic research find a causal

17  relationship between daytime social media use and

18  adolescent sleep health?

19    A    The causal mechanism is at the heart of

20  the question today.  There are four causal -- at

21  least -- at least four causal mechanisms why we

22  might see this association.  The consensus panel

23  that I chaired did conclude that general and

24  overall screen use, which was not specifically

25  social media, but general screen use, does have a

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 148

1  causal effect on sleep health.  Screen use -- in

2  general, screen use impairs screen health.  And the

3  mechanism for that I would say is sleep

4  displacement.  The more time you're spending on the

5  device, the less time there is in the 24-hour day

6  to sleep.

7    Q    I am asking specifically, though, about

8  daytime social media use.  Is there any academic

9  research finding a causal connection between

10  daytime -- isolated daytime use and adolescent

11  sleep health?

12        MS. ARORA:  Objection, asked and

13        answered.

14        THE WITNESS:  As I just mentioned,

15        the consensus panel assessing the totality

16        of the data -- the totality of the studies

17        indicated that in general -- and by in

18        general meant over the course of the day,

19        not just evening screen use, does impair

20        sleep in adolescents.

21  BY MR. PETKIS:

22    Q    Are you aware of any research that

23  attempts to disaggregate daytime and nighttime use

24  and finds that daytime use has a casual

25  relationship with adolescent screen health?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 149

1        MS. ARORA:  Objection, form, asked

2        and answered.

3        THE WITNESS:  I am -- the studies are

4        not designed to answer the question in the

5        way that you asked it, but the totality of

6        the evidence is that with more screen use

7        over the day but especially in the evening

8        and at night, we find more sleep health in

9        adolescents.

10  BY MR. PETKIS:

11    Q    Screen use during the evening and night is

12  the primary concern with respect to adolescent

13  health?

14        MS. ARORA:  Object, misstates the

15        evidence, form.

16        THE WITNESS:  Screen use during the

17        evening and at night are markedly worse

18        for sleep help, but I would -- I would not

19        say it is the primary concern, but it is

20        maybe more of a concern.  They are all of

21        concern to me.

22  BY MR. PETKIS:

23    Q    You testified earlier that you were

24  familiar with the Bradford Hill framework?

25    A    I am.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 150

```
1        Q   Are you aware of any academic papers or
2   any other source that applies the Bradford Hill
3   framework to the relationship between social media
4   use and adolescent sleep health?
5        A   I may have seen one recently in the role
6   of a reviewer, but I cannot remember who wrote it
7   or if it has ever been published, so I am not
8   comfortable sharing information about that paper.
9        Q   I take it then you are not aware of any
10  academic papers that apply the Bradford Hill
11  framework to the relationship between Instagram and
12  Facebook specifically and adolescent sleep health?
13       A   That is correct.  I am not familiar with
14  any papers and also it is atypical for a scientific
15  or academic article to specifically focus on a
16  platform.  It's -- so no, I have not seen any
17  articles related to that.
18       Q   Is it atypical from your perspective for
19  academic research that is focused on the causal
20  question to apply a Bradford Hill framework?
21            MS. ARORA:  Objection to form.
22            THE WITNESS:  I don't know if it is
23       atypical, but it is -- most papers don't
24       mentioned Bradford Hill when -- when
25       writing a systematic review or
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 151

```
1       meta-analysis.  But I would not -- I don't
2       know.  Bradford Hill is an approach, but
3       it is not everybody's approach.
4   BY MR. PETKIS:
5        Q   Do you have any financial interest in
6   Dr. Christakis's earnings as an expert in this
7   case?
8            MS. ARORA:  Objection to form and
9       scope.
10           THE WITNESS:  I am not sure I
11      understand the question.
12  BY MR. PETKIS:
13       Q   What part did you not understand?
14       A   Do I have an interest in his earning
15  anything?  No.  I don't have a -- no.
16       Q   You don't have any agreement with
17  Dr. Christakis to receive a portion of his earnings
18  as an expert?
19       A   I definitely do not have an agreement with
20  Dr. Christakis to earn a portion of his earnings.
21       Q   Does Dr. Christakis self-fund any of his
22  research or academic work?
23           MS. ARORA:  Objection.
24           THE WITNESS:  I have no idea.  I
25      don't -- I do not think he self-funds his
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 152

```
1       work.
2   BY MR. PETKIS:
3        Q   Do you know whether or not Dr. Christakis
4   has ever contributed his own funding to any
5   research that you have collaborated with him on?
6            MS. ARORA:  Object to form.
7            THE WITNESS:  I am not aware of him
8       funding any of my work or his work.  He
9       has definitely not funded any of my work.
10  BY MR. PETKIS:
11       Q   How much do you charge per hour, Dr. Hale?
12       A   $600 an hour.
13       Q   And that is all money that you are
14  keeping?  Right?  It's not being submitted to Stony
15  Brook or anyone else?
16       A   That is correct.
17       Q   You create invoices and document the time
18  that you spend on your expert work in this case?
19       A   Yes, I do.
20       Q   That is how you get paid?
21       A   Yes, I submit invoices and then I get paid
22  by a law firm.
23       Q   How many invoices have you submitted to
24  the State A.G. lawyers in connection with your work
25  on this MDL case?
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 153

```
1        A   In connection with this MDL case, I
2   submitted one at the end of July, although I may
3   have submitted it in early August, and then one at
4   the beginning of September.  So two so far, plus I
5   will submit one at the end of this month.
6        Q   And those two invoices cover your July
7   work and your August work?
8        A   Yes.
9        Q   And then your -- I think you are intending
10  to submit a subsequent invoice for your September
11  work, including for this deposition?
12       A   Yes, I will.
13           (Exhibit Nos. 5 and 6 marked for
14      identification.)
15           (Off-the-record discussion.)
16  BY MR. PETKIS:
17       Q   Dr. Hill, I have handed you what has been
18  marked as Exhibit 5, which is your invoice for July
19  2025 work, and Exhibit 6, which is your invoice for
20  August 2025 work.
21           Do you see that?
22       A   Yes.
23       Q   And are these the only two invoices that
24  you have submitted for your work thus far?
25       A   Related to the MDL case, yes.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 154

1    Q   The invoices were submitted to a Brian
2  Barnes at Cooper Kirk.
3        Do you see that?
4    A   Yes.
5    Q   Who is Mr. Barnes?
6    A   Mr. Barnes is a lawyer who works at Cooper
7  Kirk and he is the lawyer that I worked for for the
8  Snap case.
9    Q   Is Mr. Barnes the lawyer that reached out
10  to you regarding providing opinions in the MDL?
11   A   He reached out to connect me to the
12  California A.G.'s office.  My primary point of
13  contact was Megan O'Neill, but some of the people
14  in this room I believe were on that call, but I
15  can't remember who.  Is that right?
16   Q   So just so we have it, you billed 32 hours
17  in July of 2025?
18   A   Yes.
19   Q   And you billed 6.25 hours in August of
20  2025?
21   A   Yes.
22   Q   And this is a full and complete list of
23  the time that you spent on your work in the State
24  A.G. case?
25        MS. ARORA:  Object to form.

Page 155

1  BY MR. PETKIS:
2    Q   Excluding work that has happened in
3  September?
4    A   Yes.  For the State A.G. case for the MDL.
5    Q   So that is a total of 38.25 total hours
6  between July and August?
7    A   Yes.
8    Q   And according to these invoices, you have
9  been paid just under $23,000 total for your work
10  during July and August?
11   A   That is what it looks like, yes.
12   Q   Do you have an estimate of time you have
13  spent in September thus far?
14   A   I don't, but I estimate it will be a total
15  of about 20 -- 20 to 25 hours.  I don't know.
16   Q   That would mean a total of somewhere
17  around 60 total hours between July, August and
18  September?
19   A   I think that is right.
20   Q   You worked with a consulting firm called
21  Bates White to prepare your report?
22   A   Yes, I did.
23   Q   What was Bates White's role?
24   A   Bates White's -- Bates White's --
25   Q   That is tough.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 156

1    A   Sorry.  I will just say it as a singular.
2  If you recall, I wrote this report in a very short
3  amount of time and so I had to read Dr. Honaker's
4  report and write the report and Bates White helped
5  me turn the -- restructure it into more of the form
6  of a rebuttal because I had never written a
7  rebuttal before, and also helped me with the
8  formatting of the front pages, the materials
9  considered pages.  And really I think the most
10  time-consuming part was the endnotes because if you
11  ever get a copy of my Snap document, I used a
12  different format for my references that I typically
13  use for academic articles, and it was getting very
14  confusing having footnotes and endnotes, which I
15  was using both.  So we put them all into footnotes,
16  and that was a big step that Bates White helped
17  with.
18   Q   Did Bates White find any articles to cite
19  in your report?
20        MS. ARORA:  Object to form.
21        THE WITNESS:  I don't think they
22        needed to.  I don't recall, but I already
23        had most of the articles already in my
24        computer.
25  BY MR. PETKIS:

Page 157

1    Q   Do you recall Bates Whites sending you any
2  academic articles on sleep health?
3    A   No, I do not recall that.
4    Q   Did Bates White draft any portions of the
5  report?
6    A   No.  It was -- they helped with editing
7  and formatting and reviewing, but they did not
8  draft any sections of the report.
9    Q   Have you ever worked with Bates White
10  previously in your academic work?
11   A   No, and, in fact, I thought they were a
12  law firm until after the file was submitted, so I
13  did not know who I was working with.
14   Q   It sounds like a law firm.  The first time
15  you worked with Bates White was in connection with
16  your expert reports in the social media litigation?
17   A   It was in late July.
18   Q   Were you connected with Bates White
19  through the State Attorney General lawyers?
20   A   Yes.
21   Q   Is Bates White's work accounted for in
22  your invoices?
23        MS. ARORA:  Objection to form.
24        THE WITNESS:  No.
25  BY MR. PETKIS:

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 158

1    Q   Your understanding is that they are
2  billing separately?
3    A   They didn't bill me.
4    Q   Have you seen any of Bates White's
5  invoices?
6    A   No, I have not.
7    Q   You have no idea how much they have been
8  paid?
9    A   I have no idea how much they have been
10  paid.
11    Q   Besides the folks at Bates White, have you
12  had any other staff or research assistants or
13  anybody at all supporting you doing your expert
14  work?
15    A   No.
16    Q   What did you do to prepare for this
17  deposition?
18    A   Starting from when?  What do you mean, for
19  today?
20    Q   I am asking for the total work that you
21  did preparing for today, yes, for this deposition.
22    A   I met with my team of counsel, lawyers
23  from this side of the table, and we practiced and
24  talked about what is within scope and what is out
25  of scope.  And --

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 159

1         MS. ARORA:  I just want to note that
2         -- I want to remind you not to disclose
3         the content of the conversations with
4         counsel.
5         THE WITNESS:  Okay.  And I reread my
6         report and I reviewed the Honaker report.
7         So that is what I did to prepare.
8  BY MR. PETKIS:
9    Q   How many times did you meet with the State
10  A.G. lawyers to prepare?
11    A   Two times in person.
12    Q   When did those meetings occur?
13    A   Prior two days.
14    Q   So Monday and Tuesday of this week?
15    A   Yes.
16    Q   How long was each meeting?
17    A   Six hours.
18    Q   So 12 hours total over the last two days
19  you have spent meeting with the attorneys?
20    A   Yes.
21    Q   Did you review any documents during those
22  sessions besides your report or Dr. Honaker's
23  report?
24    A   We only reviewed -- is this privileged
25  information?  Do I -- I only reviewed what was in

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 160

1  my report and the Massachusetts reports.
2    Q   Just the reports themselves or did you go
3  back and review any underlying research?
4    A   No, I didn't do that in those meetings,
5  no.
6    Q   You didn't review any materials that
7  aren't cited in your materials considered list?
8    A   It is hard to differentiate.  I review
9  articles all the time that aren't cited in my -- in
10  my cited materials because of my role as an
11  academic and reviewer.  I -- you know, even
12  yesterday, I saw an article that came up.  It was
13  just like as I was going to bed of a systematic
14  literature review on this topic that I did not
15  include.
16         I see articles that are relevant all the
17  time because every single day I get a Google
18  citations email saying here's people who have cited
19  your work.  And then I look at those articles and I
20  see them.  So it is hard for me to differentiate
21  which articles I looked at recently are in or
22  without what is listed here, but I am constantly
23  aware of articles on this topic.
24    Q   I am going to ask you a narrow question --
25    A   Okay.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 161

1    Q   -- which is:  Did you review any articles
2  Monday or Tuesday in your meetings with the lawyers
3  that are not cited in any of your materials
4  considered lists?
5    A   I don't think so.
6    Q   Okay.
7    A   Especially if we include the Massachusetts
8  report is in my materials considered.
9    Q   I'm no.  I am explicitly not including
10  them.
11    A   Okay.
12    Q   Did you review any articles that are cited
13  in the Massachusetts report that you think are not
14  cited in either of your materials considered list
15  in this MDL case during your preparation for this
16  deposition?
17    A   I am not 100 percent sure.
18    Q   Can you pull out Exhibit 1 and 2, which is
19  going to be your report and your supplemental
20  materials considered list.  For Exhibit 1, can you
21  flip to original materials considered list, which I
22  think is Appendix A.
23    A   Of my Exhibit 1?
24    Q   Yes.
25         Are you there?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 162

1    A    Yes.

2    Q    You have in front of you your original

3   materials considered list, Appendix A to your

4   report, Exhibit 1, and you also have in front of

5   you your supplemental materials considered list

6   dated September 12, 2025, which is Exhibit 2?

7    A    Yes.

8    Q    Do these two documents together include

9   everything that you reviewed and relied upon in

10   forming your opinions in this case?

11    A    In forming my opinions that are written

12   down, I would say they are complete, but my

13   opinions are always being informed by other sources

14   of information.

15    Q    Are there any materials you reviewed or

16   relied upon in forming your opinions that aren't

17   listed in these two documents?

18        MS. ARORA:  Objection, asked and

19        answered.

20        THE WITNESS:  I do not think so.  I

21        think that these are complete for the

22        reports I have provided.

23   BY MR. PETKIS:

24    Q    So if I wanted to know whether you

25   reviewed or relied upon a certain source in forming

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 163

1   your MDL opinions, I can just look at these two

2   documents.

3        MS. ARORA:  Objection, asked and

4        answered.

5        THE WITNESS:  I think that is

6        accurate.

7   BY MR. PETKIS:

8    Q    Did you review each and every document

9   listed on these two documents?

10    A    I am familiar with every document because

11   of my several -- two decades of time as a sleep

12   researcher and as the editor of a sleep journal.

13   So I am familiar with these articles --

14    Q    Fair to say --

15    A    -- and documents.

16    Q    Fair to say there weren't some you went

17   back and rereview in connection with your expert,

18   or just that you know the?

19    A    That is --

20        MS. ARORA:  Objection to form.

21        THE WITNESS:  It is true that I did

22        not pull up every single article for some

23        straightforward citations on sleep

24        recommendations.  For example, I don't

25        need to look those up.  I knew those

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 164

1        recommendations.

2   BY MR. PETKIS:

3    Q    Is there a difference between what you

4   chose to cite in the body of your report and what

5   you included in the materials considered list?

6        MS. ARORA:  Objection to form.

7        THE WITNESS:  There might be some

8        additional articles included in the

9        materials considered section, but I can't

10        remember off the top of my head.

11   BY MR. PETKIS:

12    Q    Are the primary materials that you relying

13   on for your opinions the ones that are cited in

14   your report?

15        MS. ARORA:  Objection to form.

16        THE WITNESS:  The primary -- yes, the

17        primary materials are cited in footnotes.

18        Thank you, Bates White.  And if there were

19        some that did not make it into the

20        footnotes, they were included in the other

21        materials considered, I guess, or maybe --

22        is there not a section on that?  They are

23        either footnotes or in the back here,

24        yeah.

25   BY MR. PETKIS:

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 165

1    Q    Let me have you take a look at -- let's

2   focus on your original materials considered list,

3   which is in Exhibit 1, Appendix A.  And let's just

4   walk through these different categories of

5   documents.

6        Do you see there is one legal document

7   listed here?

8    A    Yes.

9    Q    And that is the Amended Complaint that was

10   filed on June 9, 2025?

11    A    Yes, I see that.

12    Q    It says here specifically that you

13   reviewed the redacted version of the Complaint?

14    A    I suppose, yes.  That was because I got

15   the -- I was retained for the case and my report

16   was due before the disclosures were -- I don't know

17   disclosures -- before I was cleared to get any

18   internal documents.  I don't know the right

19   terminology.

20    Q    I think I understand.

21        Were you ever provided an unredacted

22   version of the Complaint?

23    A    Not to my knowledge.  If it was sent to

24   me, I don't think I looked at it.

25    Q    Are there any other legal documents, case

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 166

1  pleadings, motions, briefs, anything like that that
2  you have reviewed?
3          MS. ARORA:  Objection to form.
4          THE WITNESS:  The Massachusetts case.
5      I don't know if that is listed here.
6  BY MR. PETKIS:
7      Q    No, I am just asking you about the MDL
8  report in this particular materials considered
9  list.
10     A    Okay.  No, for this, I have not reviewed
11 any other Complaints.
12     Q    And no other case documents, to your
13 knowledge?
14         MS. ARORA:  Objection to form.
15         THE WITNESS:  To my knowledge, I have
16     not reviewed any other case documents.
17 BY MR. PETKIS:
18     Q    There are two expert reports listed here,
19 Right?  Dr. Honaker and Dr. Zicherman?
20     A    Yes.
21     Q    Are those the only two expert reports that
22 you reviewed in connection with your MDL report?
23     A    Yes.
24     Q    Why did you select -- let me take a step
25 back.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 167

1          I think it is obvious why you read
2  Dr. Honaker's report, right, because you are
3  providing rebuttal opinions?
4      A    Yes.
5      Q    Why did you look at Dr. Zicherman's
6  report?
7      A    Because Dr. Honaker wrote a critique of
8  Dr. Zicherman, so I needed to see what the critique
9  was about.
10     Q    Do you have any opinions on
11 Dr. Zicherman's report or any of the content in
12 that report?
13         MS. ARORA:  Objection to form.
14         THE WITNESS:  I -- only what I wrote
15     in the report.  May I review what I wrote
16     in the report?
17 BY MR. PETKIS:
18     Q    Sure.
19     A    Do you know what page that is?  Paragraph.
20 It looks like Dr. Prinstein --
21         THE COURT REPORTER:  I'm sorry?  The
22     name?
23         THE WITNESS:  Zicherman,
24     Z-I-C-H-E-R-M-A-N.  And Dr. Prinstein
25     should have also listed there have.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 168

1  BY MR. PETKIS:
2      Q    Did you review Dr. Prinstein's report?
3      A    I did.
4      Q    Any other reports that you reviewed
5  besides Dr. Honaker, Dr. Zicherman and
6  Dr. Prinstein?
7      A    No.
8      Q    Is everything you have to say about
9  Dr. Prinstein and Dr. Zicherman's report on pages
10 42 and 43 of your expert report?
11         MS. ARORA:  Objection to form, calls
12     for speculation.
13         THE WITNESS:  Let me look.  I believe
14     I only addressed it at the very end.  As
15     you can tell by the report, it was
16     primarily focused on responding to
17     Dr. Honaker, with just one or two
18     paragraphs on Dr. Prinstein and
19     Dr. Zicherman.  Right, it is a just
20     reiteration of the critique, so --
21 BY MR. PETKIS:
22     Q    And in fact, your only discussion of
23 Dr. Prinstein and Dr. Zicherman comes through the
24 lens of Dr. Honaker's critiques.  Right?
25     A    That's correct, but I did ask for the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 169

1  files to be sent to me.  And it is an oversight
2  that Prinstein was not included.
3      Q    That is okay.  I just want to understand
4  so that we understand the scope of what you are
5  saying in this case.
6          Do you have any opinions at all regarding
7  what will Dr. Prinstein and Dr. Zicherman are
8  saying in this case?
9          MS. ARORA:  Objection to form, calls
10     for speculation, calls for legal
11     conclusion.
12         THE WITNESS:  Can you please ask the
13     question again.
14 BY MR. PETKIS:
15     Q    What do you recall of Dr. Prinstein's
16 report?
17         MS. ARORA:  Objection to form.
18         THE WITNESS:  To be honest, I don't
19     recall very much of it.  I think I was
20     responding primarily of Dr. Honaker's
21     critique of it.  So I did request both the
22     Prinstein and the Zicherman report, but I
23     don't recall particular details, so I am
24     reluctant to say more.
25 BY MR. PETKIS:

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 170

1    Q    This is all I'm trying to establish.
2         Do you have any views or perspectives as
3    an expert on Dr. Prinstein's report?
4              MS. ARORA:  Objection to form and
5         speculation.
6              THE WITNESS:  I don't have any
7         additional comments on Dr. Prinstein's
8         report.
9    BY MR. PETKIS:
10   Q    Do you have any views or perspectives as
11   an expert on Dr. Zicherman's report?
12             MS. ARORA:  Object to form and calls
13        for speculation.
14             THE WITNESS:  I don't have any
15        additional comments on Dr. Zicherman's
16        report.
17   BY MR. PETKIS:
18   Q    Underneath "Expert Reports," you list what
19   you call discovery documents.  Right?
20   A    On page -- on the main report?
21   Q    Yes.
22   A    The July 30th report.  Yes.
23   Q    And you initially in your original
24   materials considered list included one discovery
25   document, which is a document titled

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 171

1    "Haugen_00020135"?
2    A    Yes.
3    Q    What is that document?
4    A    That -- do you happen to have that so I
5    can look at that document?
6    Q    I do, and I will show it to you.  But do
7    you recall anything about it before I do?
8    A    Sure.  It was a document of a survey that
9    Francis Haugen -- a survey internally done by, I
10   believe Facebook, that Francis Haugen leaked.  And
11   so at that point, it was not confidential or
12   privileged information.  And I reviewed it and I
13   actually didn't think it was necessary to include
14   in my report.  So I did review it, but I did not
15   include it in my report.
16   Q    My question was going to be:  Why did you
17   review it?
18   A    Because I asked for information from the
19   team, the A.G.s' offices.  I said, Do you have any
20   data on screen use or -- social media use, Facebook
21   use at night in teens?  And that was the only thing
22   they were allowed to give me.  I don't know if --
23   that is what they gave me.  And that didn't answer
24   -- sufficiently answer my questions so I did not
25   include it.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 172

1    Q    You asked the State A.G. lawyers for data
2    on use of Facebook and Instagram at night?
3    A    Yeah.  Evening and nighttime hours, right.
4    Q    Did you ever ask the State A.G. lawyers
5    for any other data or internal Meta research on any
6    topic?
7    A    At that point, I definitely did not
8    because it was a time crunch and I was specifically
9    responding to Dr. Honaker's report.  But I thought
10   that data, if it were available, would be helpful
11   or informative.  "Helpful" is the wrong word.  But
12   that is what they gave me.
13   Q    Did there ever come a time you asked the
14   state A.G. lawyers for any other data or internal
15   Meta research on any topic?
16             MS. ARORA:  Objection, asked and
17        answered.
18             THE WITNESS:  As I mentioned, I did
19        ask for data from Meta on nighttime
20        smartphone use in adolescents, and I was
21        not able to get it in time for the
22        deadline for the July 30th submission.
23        But the Massachusetts A.G. Office did
24        provide me with two internal slide decks.
25        So that is how I have some familiarity of

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 173

1         the limited percentage of teenagers who
2         are logging onto Meta's platforms in the
3         middle of the night.
4    BY MR. PETKIS:
5    Q    I am just trying to understand the scope
6    of what you asked to review.  And I understand you
7    had asked for data of nighttime use of Facebook and
8    Instagram.  Right?
9    A    That --
10             MS. ARORA:  Objection, asked and
11        answered.
12             THE WITNESS:  I requested data on
13        patterns of use, right, nighttime patterns
14        of use.
15   BY MR. PETKIS:
16   Q    Did you ever ask for any other data?
17   A    I don't --
18             MS. ARORA:  Objection, asked and
19        answered several times now.
20   BY MR. PETKIS:
21   Q    You can go ahead and answer.
22   A    As I just stated, I don't think I asked
23   for any other data at that point.  I was busy
24   responding to the Honaker report.
25   Q    And the reason I keep asking the question

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 174

1  is because you keep qualifying your answer by
2  saying "at that point."
3        Have you ever asked the State A.G. lawyers
4  from any other data from Facebook or Instagram?
5        MS. ARORA:  Objection, asked and
6        answered.
7        THE WITNESS:  When you say the "State
8        A.G. lawyers," do you mean the MDL case?
9  BY MR. PETKIS:
10       Q   Yes.
11       A   Okay.  I don't recall I have asked --
12  after that case was submitted, I didn't write
13  anything else.  So I don't think I asked them for
14  more.  But in the interest of full disclosure, I
15  did start working with the Massachusetts case and I
16  did ask them for data, which is now listed in my
17  supplemental material.  So that is how I gained
18  access to that.
19       Q   I am going to ask you in more detail about
20  those two documents, but those two internal Meta
21  documents in your supplemental materials considered
22  list, you did not consider those two documents in
23  forming your opinions in your July 30th report.
24  Right?
25       A   That is correct.  In my July 30th report,

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 175

1  I had not seen those documents.
2        Q   And you also -- let me just ask.  Did you
3  rely on the Haugen document in any way in forming
4  your opinions in the July 30th report?
5        MS. ARORA:  Objection, form.
6        THE WITNESS:  I don't exactly know
7        what you mean by "rely," but I did not
8        include it in anything I wrote about it,
9        so I would say I did not use it.
10  BY MR. PETKIS:
11       Q   Did you find it useful in understanding
12  any concepts related to your expert report?
13       MS. ARORA:  Objection to form.
14       THE WITNESS:  I can't recall if I
15       found it useful or not.  I did not -- I
16       did not feel it fit in well with what I
17       was writing, so I did not include it, but
18       it may have been interesting.
19       In my recollection -- actually, may I
20       look at the document to refresh my memory
21       on what it is?
22       (Exhibit No. 7 marked for
23       identification.)
24  BY MR. PETKIS:
25       Q   Dr. Hale, you have just been handed

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 176

1  Exhibit 8 [sic], which is a copy of -- I'm sorry.
2        You have just been handed Exhibit 7, which
3  is a copy of the Haugen document ending in 20135
4  that you cited in your initial materials considered
5  list.
6        Do you see that?
7        A   Yes.
8        Q   And is this the document that you
9  reviewed?
10       A   Yes.
11       Q   Did you review the entire document?
12       MS. ARORA:  Objection to form.
13       THE WITNESS:  I looked at the
14       document.  I was looking specifically for
15       information on nighttime usage.
16  BY MR. PETKIS:
17       Q   Did you find that information in the
18  document?
19       A   I must have not because I decided not to
20  use it.  So I don't think I found what I was hoping
21  to find.  It was more of a survey.
22       Q   Are you relying on this document in any
23  way to offer your opinions in the MDL case?
24       MS. ARORA:  Objection to form.
25       THE WITNESS:  I am not -- as far as I

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 177

1        am aware, I am not relying on this
2        document to inform my opinions.  My
3        opinions are based on the scientific
4        literature and my experience as a sleep
5        health researcher and my experience as the
6        editor of a sleep health journal, former
7        editor, founding editor.
8  BY MR. PETKIS:
9        Q   This document begins with an -- well, let
10  me take a step back.
11       This -- the document itself is a series of
12  photographs of what look to be someone's computer
13  screen.
14       Is that consistent with your
15  understanding?
16       A   Yes.  It is very weird.
17       Q   Okay.  And do you see that the very first
18  photograph is a post by someone named Shruti
19  Bhutada on some sort of messaging platform?
20       A   Yes, I see that.
21       Q   Do you know what messaging platform this
22  was posted on?
23       A   No, I do not.
24       Q   And just based on the face of the
25  document, does this appear to be some information

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 178

1  collected by Ms. Bhutada regarding well-being
2  insights for Instagram?
3        MS. ARORA:  Objection, calls for
4        speculation.
5        THE WITNESS:  The title of the
6        message is -- she has posted it to
7        something it looks like called Instagram
8        Well-Being Insights.
9  BY MR. PETKIS:
10     Q   And throughout this document there is a
11 variety of information of regarding, just broadly
12 speaking, well-being topics?
13       MS. ARORA:  Objection to form, calls
14       for speculation.
15       THE WITNESS:  Yes.
16 BY MR. PETKIS:
17     Q   Do you have any idea whether there is
18 other research on these topics internal to
19 Instagram and Facebook besides what is contained in
20 this document?
21       MS. ARORA:  Calls for speculation,
22       scope.
23       THE WITNESS:  Yeah, I have no way of
24       knowing what else -- what other data
25       Facebook has collected on these topics.

---

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 179

1        So I don't know.
2  BY MR. PETKIS:
3     Q   Do you know if anyone at Instagram or
4  Facebook proposed any product changes based on the
5  research contained in this document?
6        MS. ARORA:  Objection, speculation,
7        scope.
8        THE WITNESS:  I do not know about any
9        proposed product changes as a result of
10       this document.
11 BY MR. PETKIS:
12     Q   I take it then you don't know if Facebook
13 or Instagram implemented any product changes as a
14 result of this research?
15       MS. ARORA:  Same objections.
16       THE WITNESS:  I -- I do know that
17       there have been some safety features since
18       this document has been released, but I do
19       not know if there was a causal impact.
20 BY MR. PETKIS:
21     Q   Did you know that the authors of the
22 research contained in this document were deposed
23 in this case?
24       MS. ARORA:  Objection, scope.
25       THE WITNESS:  I definitely did not

---

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 180

1        know that the authors of this document
2        were detained in this case -- retained --
3        detained -- deposed.
4  BY MR. PETKIS:
5     Q   Slip of the tongue.
6     A   Deposed.  Deposed.  I did not know.  The
7  author was Francis Haugen, like she -- who got
8  deposed?
9     Q   The authors of the research -- underlying
10 research contained in the document.
11       Did you know that?
12       MS. ARORA:  Object to the scope.
13       THE WITNESS:  No, I did not know
14       that.
15 BY MR. PETKIS:
16     Q   You did not ask to review any of their
17 deposition testimony?
18     A   No.
19       MS. ARORA:  Objection.
20       THE WITNESS:  No.  As I stated
21       earlier, I have not reviewed any other
22       deposition -- or any deposition testimony.
23 BY MR. PETKIS:
24     Q   And your understanding is that this
25 information was stolen and leaked by Francis

---

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 181

1  Haugen?
2        MS. ARORA:  Objection, form, scope,
3        compound.
4        THE WITNESS:  My understanding is
5        that Francis Haugen made this publicly
6        available.  I do not know how she got it.
7  BY MR. PETKIS:
8     Q   I think you used the term "leaked" a
9  couple of times --
10    A   Yes.
11    Q   -- in your deposition.
12       You believe this was leaked?
13       MS. ARORA:  Objection to form.
14       THE WITNESS:  I think that's how it's
15       been framed.  But to be more specific, I
16       do not know what that even means.  But it
17       appears that she should not have.  It was
18       confidential information and she -- she
19       released it.
20 BY MR. PETKIS:
21    Q   What do you know about Francis Haugen?
22       MS. ARORA:  Objection, scope.
23       THE WITNESS:  I know -- I don't know
24       very much about Francis Haugen, but I know
25       that she used to work at Facebook, I

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 182

1    believe, or maybe at Instagram.  She
2    worked at Meta, and -- and that is about
3    the extent of what I feel comfortable
4    confidently saying about her.
5    BY MR. PETKIS:
6        Q   Do you know anything about her job
7    responsibilities at Meta?
8            MS. ARORA:  Objection, scope.
9            THE WITNESS:  No, I don't.
10   BY MR. PETKIS:
11       Q   Do you know whether she is knowledgeable
12   about Meta's internal research?
13           MS. ARORA:  Objection, form, scope.
14           THE WITNESS:  I have no idea what
15           Francis Haugen had at Facebook when she
16           worked there -- or Meta when she worked
17           there, so I do not know what her job
18           responsibilities were.
19   BY MR. PETKIS:
20       Q   You don't know whether or not she was
21   knowledgeable about the information she leaked.
22   Right?
23           MS. ARORA:  Objection to form.
24           THE WITNESS:  I do not know if
25           Francis Haugen is knowledgeable about the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 183

1    data on the screens that she leaked.
2    BY MR. PETKIS:
3        Q   Do you know whether Francis Haugen took
4    photographs of all of Meta's internal research?
5            MS. ARORA:  Objection to form and to
6            scope.
7            MR. PETKIS:  Just before we continue.
8            What is the basis of the scope objection?
9            This is a document cited in the expert
10           report.  I'm asking questions on the
11           document.
12           MS. ARORA:  She has explained the
13           extent to which she understands --
14           THE COURT REPORTER:  I can't hear
15           you.
16           MS. ARORA:  She's explained the
17           extent to what she understand and knows
18           about it, and it is not part of her
19           opinion.
20           MR. PETKIS:  Okay.  This is a
21           document -- just for the record.  I think
22           the scope objections are getting abusive
23           at this point.
24           This is a document that's cited by
25           the expert and I am asking questions about

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 184

1    the document.
2            THE WITNESS:  I don't believe I don't
3            actually cite it.  I just list it as
4            materials considered.  I didn't spend a
5            lot of time looking at this document.
6    BY MR. PETKIS:
7        Q   Okay.  And you don't know whether or not
8    Ms. Haugen took photos of all Meta's research.
9    Right?
10       A   I have no idea how many photos Ms. Haugen
11   took.  All sounds excessive, but I do not -- it
12   looks -- I don't know what she did or didn't
13   include.
14       Q   Could you go to page ending in -- do you
15   see the numbers at the bottom right-hand of these
16   documents?
17       A   Yeah.
18       Q   Can you go to the page ending in 20139.
19       A   20 -- yes.
20       Q   And this particular slide describes how
21   the study described in the remainder of these
22   photographs was conducted.  Right?
23           MS. ARORA:  Objection, speculation.
24           THE WITNESS:  This slide presents a
25           research strategy of surveying over 20,000

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 185

1    users from about six countries.
2    BY MR. PETKIS:
3        Q   At least according to this slide, more
4    than 22,000 users were surveyed?
5        A   Yes, that is what the slide says.
6        Q   And you see the general reach questions?
7        A   Yes.
8        Q   And you understand that the survey asked
9    users whether they had in the last 30 days
10   experienced a difficult life moment?
11       A   Which question?  I see have you -- oh,
12   then six randomly selected experiences.  I don't
13   see what the six randomly selected experiences are,
14   but -- okay.
15       Q   Let me take a step back.  Can you go to
16   the page ending in 21 -- 20137.
17       A   Sure.
18       Q   You see this describes hard life moments
19   on Instagram?
20       A   Oh, okay.
21       Q   Do you understand that this study relates
22   to what Meta called hard life moments?
23           MS. ARORA:  Objection, calls for
24           speculation.
25           THE WITNESS:  Yes.  I do see that the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 186

```
1         language of this slide says "hard life
2         moments."  I would more broadly say this
3         is a study of mental health.
4  BY MR. PETKIS:
5     Q   I agree with that.  Let's go back to the
6  page ending in 20139.
7     A   Okay.
8     Q   I want to focus on the research questions
9  that were asked here.
10        One of the questions was how bad did this
11 experience make you feel.  Right?
12    A   Yes, intensity.
13    Q   And then the next question is what impact
14 did using Instagram have on this experience?
15    A   Yes, impact.
16    Q   That is a self-report question.  Right?
17    A   Yes.
18    Q   It essentially asks users to self-report
19 the impact using Instagram had a particular hard
20 life experience covered in this survey?
21        MS. ARORA:  Objection, calls for
22        speculation.
23        THE WITNESS:  That is a reasonable
24        interpretation of that question, yes.
25 BY MR. PETKIS:
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 187

```
1     Q   Could you go to the question ending in
2  20158.
3     A   Yes.
4     Q   Do you see that this particular slide is
5  reporting results from that self-report question
6  that we just reviewed regarding whether -- how
7  Instagram impacted their experience?
8         MS. ARORA:  Objection, speculation.
9         THE WITNESS:  Yes, I see.
10 BY MR. PETKIS:
11    Q   Do you see where it says at the top,
12 Instagram is more likely to make things better than
13 worse?
14    A   I do see that title.
15    Q   Do you have any disagreement with that
16 finding?
17        MS. ARORA:  Objection, form,
18        speculation.
19        THE WITNESS:  It is very hard to read
20        the numbers.  The sleep issues, it looks
21        like they are comparable -- about 53
22        percent -- I can read the number in the
23        middle -- had no impact on sleep.  And
24        then to the blue and the purple to the
25        left and the right, it is hard to see the
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 188

```
1         numbers but they don't look that
2         different.  It could go in either
3         direction.  But yes, I see that.
4  BY MR. PETKIS:
5     Q   Let's focus on the sleep issues.  It says
6  here 53.2 percent of survey respondents said that
7  Instagram had no impact on sleep issues?
8     A   53.2, yes.
9     Q   And --
10    A   During a hard life moment?
11    Q   Correct.
12        And it looks like 17 -- I see 17.7 percent
13 of survey respondents said that Instagram made
14 sleep issues worse during hard life moments?
15    A   Okay.
16        MS. ARORA:  Objection, form.
17        THE WITNESS:  Did you ask me a
18        question?
19 BY MR. PETKIS:
20    Q   I'm just about to.
21        I also can't see the number on the "made
22 it better" column, but I did some quick math and
23 there is 29.5 percent remaining of 100 percent --
24    A   Okay.
25    Q   -- if you take those two into account.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 189

```
1         Does that sound right to you?
2     A   So around 18 percent and 29 percent,
3  something like that.  Is that what you said?
4     Q   Well, let's recap so we have it cleanly.
5  3.2 percent had said --
6     A   In the middle.
7     Q   -- no impact on sleep issues?
8     A   Yes.
9         MS. ARORA:  Objection, speculation.
10 BY MR. PETKIS:
11    Q   And 17.3 percent said made sleep issues
12 worse?
13    A   17 --
14        MS. ARORA:  Objection, speculation.
15        THE WITNESS:  17.3, is that what you
16        said?  Okay.
17 BY MR. PETKIS:
18    Q   And so that leaves 29.5 percent you said
19 that --
20    A   I --
21        THE COURT REPORTER:  Excuse me.  You
22        have to wait till -- I can't get you both.
23        Could you  repeat your question.
24 BY MR. PETKIS:
25    Q   Yeah, so just -- we're having fun now with
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 190

1  numbers.  Let's just wait until I finish my
2  question and then you can provide your answer.
3        So if we are tracking here, when you add
4  up 17.3 percent and 53.2 percent, that adds up to
5  70.5.  Right?
6    A   Yes.
7    Q   If we assume that this is out of 100, that
8  means that that 29.5 percent reported that
9  Instagram made sleep issues better during hard life
10 moments?
11           MS. ARORA:  Objection, speculation.
12           THE WITNESS:  That is what it looks
13        like they reported.
14 BY MR. PETKIS:
15    Q   Okay.  Do you have any reason to disagree
16 with Instagram's finding that nearly 30 percent of
17 survey respondents felt Instagram made their sleep
18 issues better?
19           MS. ARORA:  Objection, speculation.
20           THE WITNESS:  I don't have a reason
21        to doubt this survey.  I just think it is
22        actually out of scope of what my research
23        question was because this is in the
24        context of a hard life moment.  What is
25        the acute impact of sleep issues?  And I

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 191

1        am concerned about ongoing use of social
2        media on sleep patterns.
3           So I think while this survey may be
4        useful for a certain question, it was out
5        of scope of what I was looking for
6        information on.  And it is on an age range
7        of 13 to 65 plus, so I did not find it
8        worth including.
9  BY MR. PETKIS:
10    Q   Okay.  I think I understand your testimony
11 on that.
12           This survey that Facebook or Meta
13 conducted concluded that more users were reporting
14 Instagram made them feel better than worse with
15 respect to sleep issues during a hard life moment.
16 Right?
17           MS. ARORA:  Objection, speculation.
18           THE WITNESS:  That is the
19        interpretation, especially as you just
20        laid it out for me, of this study.  But I
21        think that is a different question than
22        the opinion that I was asked to write,
23        which is habitual use of smartphone use,
24        not during a hard life moment.  Not going
25        to be instrumental or helpful in

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 192

1        connecting people.
2           But on a regular basis does bringing
3        a stimulating, activating, engaging,
4        interactive social media platform into the
5        bed help or hinder sleep, and I think, as
6        I have shown in my report, the totality of
7        the evidence demonstrates a consistent and
8        strong adverse association between the use
9        of engaging interactive platforms on
10       adolescent sleep health.
11          And this is I think asking a
12       different question, so that is why I did
13       not include it, or that, among other
14       reasons, because it wasn't answering what
15       I was asking is why I did not include it
16       in the report.
17 BY MR. PETKIS:
18    Q   I want to be clear.  I am not asking you
19 any questions about why you did or did not include
20 it in your report at this moment.  Okay?
21    A   Okay.
22    Q   My question is:  Separate from the
23 opinions that you have reached, do you have any
24 reasons to disagree with Meta's conclusion based on
25 this survey that more users are finding a benefit

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 193

1  from Instagram during hard life moments in terms of
2  their sleep issues?
3           MS. ARORA:  Objection, form, asked
4        and answered, speculation.
5           THE WITNESS:  I -- my main concern
6        about that is that it is a self-report of
7        sleep issue.  It is a perception of sleep
8        issue.  And I would just be careful about
9        overinterpreting the meaning of their
10       perception of benefit.
11 BY MR. PETKIS:
12    Q   Are self-report studies capable of
13 establishing causation: --
14           MS. ARORA:  Objection, form --
15           THE WITNESS:  Self-report --
16           MS. ARORA:  -- and speculation.
17           THE COURT REPORTER:  Objection, form
18       what?
19           MS. ARORA:  And speculation.
20           THE WITNESS:  Self-reported data on
21       sleep is very important, especially when
22       looking at questions like insomnia where
23       you're -- the diagnosis relies on a
24       self-report.  But there are other measures
25       of sleep, such as timing and fragmentation

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 194

1    and duration and regularity that people
2    are pretty bad at reporting.  They just
3    don't know.  Why?  Because they are
4    asleep.  They don't know exactly what time
5    they fell asleep, how long they were
6    asleep.
7             And so this survey is only getting at
8    the question of perceived sleep issues,
9    not at objective sleep issues.  But your
10   question was about causation.  And I think
11   causation isn't -- is a separate question
12   than measurement.  So yes, self-reported
13   data can be helpful in identifying
14   causation, but this wasn't a study about
15   causation.
16   BY MR. PETKIS:
17       Q   Is self-reported data -- I am asking you
18   now a question about general survey design and
19   research.
20           Okay.  Is self-reported data sufficient
21   standing alone to draw a causal conclusion with
22   respect to those variables?
23             MS. ARORA:  Objection, form,
24       speculation, incomplete hypothetical.
25             THE WITNESS:  Self-reported data is

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 195

1        -- is useful and sufficient if the study
2        is designed well, yes.
3    BY MR. PETKIS:
4        Q   So your testimony is that you would be
5    able to, depending on the study design and whether
6    it is done properly, draw a causal conclusion just
7    based purely on self-report data?
8             MS. ARORA:  Objection, form,
9        misstates testimony.
10            THE WITNESS:  Yes, with -- I am
11       comfortable that self-reported data can be
12       useful in identifying a causal connection
13       between two variables.  Is it sufficient?
14       No.  It also -- causality is confirmed by
15       multiple studies and generalized ability
16       of sample size, as well as the rigor of
17       the study design.
18   BY MR. PETKIS:
19       Q   And that's my question.  Is self-report
20   had study sufficient on its own to get causation?
21            MS. ARORA:  Objection, asked and
22       answered, form.
23            THE WITNESS:  Self-reported data -- I
24       am not quite understanding the question
25       because I don't think a self-reported

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 196

1        one-time question is not enough to
2        identify causation, if that is the answer
3        -- if that is sufficient to answer your
4        question.
5    BY MR. PETKIS:
6        Q   Yeah.
7             MS. ARORA:  We have been going a
8        little over an hour.  I just wanted to
9        know if there is a breaking point.
10            MR. PETKIS:  I am going to wrap up
11       shortly.
12            MS. ARORA:  Okay.
13   BY MR. PETKIS:
14       Q   Dr. Hale, I want to be clear.  The reason
15   I am asking you questions about this research cited
16   in the Haugen document is because you listed the
17   Haugen document on your materials list.  Okay?
18       A   That is fine.
19       Q   My question is:  Do you have any reason to
20   disagree with any of the research data contained in
21   this document?
22            MS. ARORA:  Objection, form,
23       speculation, and objection to the
24       preamble.
25            THE WITNESS:  I listed this document

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 197

1        because I was advised to include any
2        document that I looked at even if I did
3        not cite it, and I was definitely provided
4        this document so I listed it.  I do not
5        have any reason to doubt the content of
6        the document.  But I also, as I noted, was
7        writing my report in a short amount of
8        time.
9             I was specifically looking for
10       information about use patterns, not about
11       perception of sleep issues.  And I did not
12       see that in the Haugen document.  Maybe I
13       missed it.  And that is why I didn't cite
14       it, but I listed it just for completeness.
15   BY MR. PETKIS:
16       Q   OLkay.  You are not going to show up at
17   trial and testify that there are a bunch of
18   problems with the way that Meta designed the
19   survey.  Right?
20            MS. ARORA:  Objection, form,
21       speculation.
22            THE WITNESS:  I have no idea what I
23       will say at trial, but that is not -- I
24       don't even know what trial looks like.
25       But I -- I don't have any intention of

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 198

1    relying on this Haugen document any
2    further than listing that I did consider
3    it and I reviewed it and did not include
4    it in my report except to say that I
5    considered it.
6        To me, it was answering a different
7    question than what -- than what was within
8    scope.
9        MR. PETKIS:  Why don't we break.
10       THE VIDEOGRAPHER:  This is the end of
11   Media 3.  We are off the record at
12   approximately 1:08 p.m.
13       (Recess taken from 1:08 p.m. to 1:50
14   p.m.)
15       THE VIDEOGRAPHER:  This is Media 4.
16   We are back on the record at approximately
17   1:50 p.m.
18   BY MR. PETKIS:
19   Q    Okay.  Welcome back, Dr. Hale.
20       We were taking a look of your supplemental
21   materials considered list, which I believe is
22   Exhibit 2.
23       Do you have that in front of you?
24   A    Yes, I do.
25   Q    In your supplement, you added two

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 199

1    additional Meta-produced documents.  Is that right?
2    A    Yes.
3    Q    To be clear, these are the only internal
4    Meta documents that you have ever viewed.  Right?
5    A    These two Meta documents are the only two
6    that I have ever seen in addition to the Haugen
7    ones, right.  I would say the Haugen ones also
8    include Meta documents.  But these three are the
9    ones -- only ones I have ever reviewed.
10   Q    And to be clear, these two additional
11   Meta-produced documents listed in your supplemental
12   materials considered list, you didn't consider them
13   in forming your opinions in the MDL case.  Right?
14       MS. ARORA:  Objection to form.
15       THE WITNESS:  As I mentioned earlier
16   today, I requested information about
17   nighttime Instagram and Meta Platform use
18   by teenagers originally for the MDL case
19   was -- I was not able to access anything
20   at that point.  So then I asked again when
21   I was writing my report for the
22   Massachusetts case.  So that is how I got
23   them.
24   BY MR. PETKIS:
25   Q    I understand that testimony, but just

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 200

1    temporally, you didn't rely on those two documents
2    in forming your July 30th opinions.  Right?
3    A    That is right, I had not seen these
4    documents when I submitted the July 30th report.
5    Q    In reviewing these two documents in
6    connection with your Massachusetts engagement, did
7    you see anything that you found relevant to your
8    July 30th opinions?
9        MS. ARORA:  Objection, form.
10       THE WITNESS:  Yes.
11   BY MR. PETKIS:
12   Q    What is that?
13   A    That -- may I look at the documents so I
14   can accurately reflect what they are because I
15   don't remember exactly?  The one titled Late Night
16   Use is the one.
17       (Exhibit Nos. 8 and 9 marked for
18   identification.)
19       THE WITNESS:  So --
20   BY MR. PETKIS:
21   Q    Hold on.  Dr. Hale, Exhibit 8 is a
22   document with the Bates stamp -- Exhibit 8 is a
23   document with the Bates stamp Meta
24   MAAG-020-00000830 and Exhibit 9 is a document with
25   the Bates stamp Meta MAAG-037-00373980.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 201

1        Do you see that, Dr. Hale?
2    A    Yes, I do.
3    Q    These are the two Meta-produced documents
4    that you included in your supplemental materials
5    considered list?
6    A    Yes.
7    Q    Okay.  Neither of these two documents are
8    cited in your July 30th report?
9    A    That is correct.  I had not seen these
10   documents before July 30th.
11   Q    And my understanding is that you received
12   these documents in connection with your
13   Massachusetts engagement because you had asked
14   counsel for data on use of Instagram and Facebook
15   at nighttime?
16   A    Yes, that is the way in which I was sent
17   these two slide decks.
18   Q    To be clear, you didn't identify these
19   documents on your own.  Right?
20       MS. ARORA:  Objection, form.
21       THE WITNESS:  Correct.  I have no
22   idea how many other documents are possible
23   to have sent me.  These were the ones that
24   were provided to me by the Massachusetts
25   A.G. Office.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 202

1  BY MR. PETKIS:
2      Q   Have you ever been given access to a
3  database for any other platform that would allow
4  you to personally search and review all of the
5  documents that Meta has produced in this
6  litigation?
7      A   I have never had such access, no.
8      Q   Are you aware that Meta has produced more
9  than 2.5 million documents to the State A.G.s in
10 this case?
11         MS. ARORA:  Objection, scope.
12         THE WITNESS:  I am not aware of that
13         and I have only seen these in front of me.
14 BY MR. PETKIS:
15     Q   And that's my next question.  You reviewed
16 two out of 2.5 million documents that Meta has
17 produced in this case.  Right?
18         MS. ARORA:  Objection, form.
19         THE WITNESS:  Yes, these are the
20         documents that I have received.  And I
21         have received none other than these ones
22         and the Haugen document.
23 BY MR. PETKIS:
24     Q   Do you know what methodology the plaintiff
25 lawyers employed to identify these two documents

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 203

1  and give them to you?
2          MS. ARORA:  Objection, form,
3          speculation.
4          THE WITNESS:  I do not recall even
5          who sent them to me, nor do I know what
6          methodology they used.  But I know that
7          they were responding to my question about
8          data on late night use of adolescents on
9          these platforms.
10         So I assume they had notes somewhere
11         on where that data exists.  I just don't
12         know how they keep those notes.
13 BY MR. PETKIS:
14     Q   Do you know one way or another whether or
15 not the plaintiff lawyers gave you all of the
16 internal data available regarding nighttime use of
17 Instagram and Facebook?
18         MS. ARORA:  Objection, form, calls
19         for speculation.
20         THE WITNESS:  I cannot answer whether
21         they gave me all of the data that they
22         have.
23 BY MR. PETKIS:
24     Q   Do you know whether or not the plaintiffs'
25 lawyers were balanced in what they gave you?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 204

1          MS. ARORA:  Objection, form, calls
2          for speculation and calls for legal
3          conclusion.
4          THE WITNESS:  I do not know if they
5          had other data they could have given me,
6          but they gave me what I asked for.
7  BY MR. PETKIS:
8      Q   Do you know one way or another whether or
9  not this is a representative set of data regarding
10 nighttime use on Instagram and Facebook?
11         MS. ARORA:  Objection, form,
12         speculation.
13         THE WITNESS:  I do not know a huge
14         amount about the data collection, but I
15         recall there was a mention of it being one
16         week and I don't even know what week it
17         was.  So but -- so I don't know.  It was
18         one week's worth of data is what I
19         believe.
20 BY MR. PETKIS:
21     Q   Do you know whether or not there is other
22 data out there on Facebook and Instagram that has
23 been collected?
24         MS. ARORA:  Objection, form, scope,
25         foundation.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 205

1          THE WITNESS:  I cannot speculate how
2          much data is out there, but I imagine --
3          well, it is speculation.  So this all --
4          this is the only information I have about
5          late night use from Meta internal
6          documents.
7  BY MR. PETKIS:
8      Q   And you don't know whether this data is
9  representative of the full set of data that Meta
10 has on these issues.  Right?
11         MS. ARORA:  Objection, asked and
12         answered, form, speculation.
13         THE WITNESS:  That is -- while it is
14         true that I do not know if this is
15         representative since this was a -- I
16         believe an internal document providing
17         information to other Meta employees, I
18         have no reason to believe they would
19         falsify their findings.  But I -- or
20         select an atypical week to investigate
21         usage patterns, but I do not know any
22         researchers at -- at Meta.  So I don't
23         know who is doing the research or how well
24         it is conducted.
25 BY MR. PETKIS:

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 206

1   Q   You don't know how many of these slide
2   decks exist.  Right?
3           MS. ARORA:  Objection, asked and
4       answered, speculation, form.
5           THE WITNESS:  I do not know how many
6       of these slide decks exist or how many
7       have been provided to the A.G.'s offices.
8       I have no idea.
9   BY MR. PETKIS:
10  Q   Do you have any reason to believe that
11  these two documents out of 2.5 million that have
12  been produced are representative in any way of the
13  internal research Meta has conducted on late night
14  use?
15          MS. ARORA:  Objection, form, asked
16      and answered, speculation.
17          THE WITNESS:  I have only this --
18      these two documents to provide me
19      information on late night use, and I am
20      unaware of other slide decks that might
21      provide similar information.  So -- but as
22      I stated, I have no reason to believe that
23      they would select an atypical week to
24      provide information to their team about
25      late night use.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 207

1           And if they would -- if the research
2       were conducted by a thoughtful scientist,
3       they would probably provide information
4       about the expectations of the week as
5       atypical.  So I -- I have no reason to
6       think that this is not atypical -- or
7       that this is an atypical week.
8   BY MR. PETKIS:
9   Q   You said a couple of times that these
10  slide decks provide information to their team.
11  What team are you referring to?
12  A   I -- my understanding is that this is a
13  document for a mental well-being team, but maybe I
14  don't know exactly who the intended audience is.
15  Q   Do you know what the purpose of these
16  slide decks were?
17          MS. ARORA:  Objection, speculation.
18          THE WITNESS:  I do not know the
19      precise purpose, but I can read the goals
20      page, the objectives page.
21  BY MR. PETKIS:
22  Q   That is the limit of your understanding of
23  these?
24          MS. ARORA:  Objection, form.
25          THE WITNESS:  That is not the limit

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 208

1       of my understanding, but that is the limit
2       of my understanding of the purpose.
3   BY MR. PETKIS:
4   Q   Okay.  What portions of these two
5   documents are you relying on for purposes of your
6   MDL opinions?
7           MS. ARORA:  Objection, form.
8           THE WITNESS:  So it is a little
9       confusing for me because I don't cite them
10      in my MDL report.  But they confirm
11      information about high levels of nighttime
12      use over the week.  So I don't rely on
13      them, but I think they support the MDL
14      report because, as you recall, I did not
15      have them when I wrote the report.  So I
16      am a little uncomfortable saying that I
17      relied on them when I received them
18      afterwards.
19  BY MR. PETKIS:
20  Q   You didn't rely on these documents?
21          MS. ARORA:  Objection to form.
22          THE WITNESS:  I reviewed these
23      documents.  In the interest of full
24      disclosure, I am sharing them with you to
25      inform my expert witness opinion.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 209

1   BY MR. PETKIS:
2   Q   I think you are looking at Exhibit 9 right
3   now?
4   A   I am.
5   Q   What portion of Exhibit 9 supports the
6   opinions in your MDL report?
7   A   Sure.
8           MS. ARORA:  Objection, form.
9           THE WITNESS:  Okay.  Well, on -- I am
10      going to go through this will slowly.  So
11      this is not my only answer to that
12      question.  But on -- it doesn't have a
13      page number, but on the page that says,
14      "What is problematic use and why should we
15      care," there is an estimate of Instagram
16      users -- Instagram weekly active users who
17      exhibit problematic use and is 18.3
18      percent.
19          And given some of the studies in my
20      rebuttal report that show that problematic social
21      media use is associated with sleep health
22      -- poor sleep health, I think this is
23      concerning that 18 percent of IG users
24      have problematic use.  So that is one
25      piece of evidence.

Page 210

1      Continuing to go through.  Also
2   speaking not about only the problematic
3   users on the page that says "Teens 13 to
4   17 late night use," we see a number that
5   43 percent of weekly active users are
6   actively using -- actively are -- at least
7   one night session between midnight and
8   4:00 a.m.  That is, to me, a period in
9   which, as a sleep researcher, when
10  teenagers should not be awake and they
11  should not be on their devices.  It is
12  natural to wake up and fall back asleep,
13  but that is not a time to open up your
14  phone and see what is happening with your
15  friends down the street.
16      So I am concerned about that high
17  level of middle-of-the-night use.  And
18  that is a narrower window than I would
19  usually use, but it is 12:00 a.m. to 4:00
20  a.m. is what's provided here.  So if we
21  were to use a wider range, 11:00 to 6:00
22  a.m., it is probably an even bigger
23  number.
24      And then there are other details
25  about definitions.  Those are internal

Page 211

1   definitions.  Those are two pieces of
2   information that I find supportive of the
3   evidence that social media problematic use
4   is high and late night use is commonplace.
5   So those 42 percent.
6      And then I saw one other number I
7   wanted to point out the role of
8   notifications in initiating late night
9   use.  I can't find that number right now.
10  So just give me one minute.  It might be
11  on the other.  I am sorry.  I can't find
12  it right now.  I am sorry.  I can't find
13  this.  I am going to check the other
14  document.
15  BY MR. PETKIS:
16     Q   Let's just pause now on Exhibit 9.
17     A   Okay.
18     Q   You have referenced two figures, the 18.3
19  percent figure of problematic use --
20     A   Yeah.
21     Q   And the 43.3 percent figure of individuals
22  who engaged in at least one night -- one late night
23  session.  Right?
24     A   Yes.
25     Q   And just based on going through that

Page 212

1   document just now, there is no other portions that
2   you highlighted as specifically relying on or
3   supporting your opinions.  Right?
4      MS. ARORA:  Object to form.
5      THE WITNESS:  I wouldn't confidently
6   say there is no other relevant
7   information, but those are two pieces of
8   information that I took as concerns.
9   BY MR. PETKIS:
10     Q   Do you know anything about how that data
11  was collected?
12     A   Unfortunately, I don't know that much
13  about it.  It said somewhere, I believe, that it
14  was based on one week.  I don't know how the data
15  were collected, what the inclusion criteria were.
16  It does focus -- it seems to be focusing on teens
17  in some of the sections.  But I -- there is not
18  complete information about where the data some from
19  or when it was collected.
20     Q   Do you know if the data is reliable or
21  complies with basic scientific principles?
22      MS. ARORA:  Objection, form.
23      THE WITNESS:  I would hope that Meta
24  would provide reliable data to its
25  employees, so I have no reason to believe

Page 213

1   it is not reliable.  I would also hope,
2   although this is speculation, that they
3   would use standard scientific principles
4   for collecting data, but I really don't
5   know how they collected the data.
6   BY MR. PETKIS:
7      Q   You believe Meta uses scientific
8   principles for its internal reference?
9      MS. ARORA:  Objection, misstates her
10  testimony.
11      THE WITNESS:  I have no reason to
12  believe that Meta is doing inaccurate
13  reporting of usage patterns because it is
14  probably in their interest to collect
15  high-quality data.
16  BY MR. PETKIS:
17     Q   You have no reason to believe Meta is not
18  collecting high-quality data.  Right?
19      MS. ARORA:  Objection, form.
20      THE WITNESS:  I have no reason to
21  believe that they are not collecting
22  high-quality data.
23  BY MR. PETKIS:
24     Q   You have no reason to believe that this or
25  any other internal research collected by Meta is

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 214

1  not reliable?
2          MS. ARORA:  Objection, form,
3      speculation.
4          THE WITNESS:  I can't speculate
5      broadly on all data, but if this is an
6      internal document designed to help inform
7      the usage patterns or inform employees
8      about the usage patterns, I would imagine
9      that this is providing data based on
10     objective assessment of usage patterns.
11  BY MR. PETKIS:
12     Q   You don't -- you don't know what this
13  document was designed to do.  Right?
14         MS. ARORA:  Objection, form.
15         THE WITNESS:  I do have questions
16     about what this document was designed to
17     do.  But I can see that it was designed to
18     focus on problematic use and potential
19     interventions or described two
20     interventions for late night use.  But I
21     don't know that much more about what it
22     was designed to do.
23  BY MR. PETKIS:
24     Q   Who collected the data?
25         MS. ARORA:  Objection, speculation.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 215

1          THE WITNESS:  I do not know exactly
2      who collected the data.
3  BY MR. PETKIS:
4      Q   Who was the data presented to?
5      A   I do not know who it was presented to.
6      Q   What was the purpose of collecting the
7  data?
8          MS. ARORA:  Objection, asked and
9      answered, speculation.
10         THE WITNESS:  I do not know the
11     purpose of collecting the data, but they
12     do write that they were interested in
13     investigating problematic use and
14     interventions.
15  BY MR. PETKIS:
16     Q   Does Meta have any other internal data on
17  problematic use?
18         MS. ARORA:  Objection, speculation.
19         THE WITNESS:  I believe -- I think
20     they have problematic use in the other
21     document that I was provided, but I don't
22     know the other documents -- I don't know
23     of the other 2.5 million documents.  So I
24     only have access to -- to two files.
25  BY MR. PETKIS:

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 216

1      Q   The same is true as to individuals engaged
2  in a late night session, you don't know whether
3  Meta has internal data on that.  Right?
4      A   I don't know if Meta has other internal
5  data.
6      Q   The slide deck at Exhibit 9 is dated July
7  2022.  Right?
8      A   Yes.
9      Q   And the slide deck describes a number of
10 safety features and other interventions that Meta
11 had designed in order to assist individuals with
12 problematic use and late night use?
13         MS. ARORA:  Objection, form,
14     speculation.
15         THE WITNESS:  They do list -- the
16     document does list several, I think,
17     proposed and ongoing interventions.
18  BY MR. PETKIS:
19     Q   Were those interventions implemented?
20         MS. ARORA:  Objection, speculation.
21         THE WITNESS:  I am not 100 percent
22     sure on timeline, but them of them are
23     already implemented, yes.
24  BY MR. PETKIS:
25     Q   Were any of these design changes effective

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 217

1  in changing the numbers of problematic use or
2  individuals with late night sessions?
3          MS. ARORA:  Objection, form, scope,
4      speculation.
5          THE WITNESS:  I am not aware of the
6      assessment of the benefits of those
7      interventions, just that the interventions
8      exist.
9  BY MR. PETKIS:
10     Q   Have the interventions been effective?
11         MS. ARORA:  Objection, form, scope,
12     speculation.
13         THE WITNESS:  My recollection is I
14     want -- let me look and see what it says.
15     I found the thing about notifications
16     driving late night use.  That is something
17     different.
18         My recollection is there is very
19     small adoption of these interventions,
20     very low levels of adoption by teenagers
21     of these interventions.
22  BY MR. PETKIS:
23     Q   What is that based on?
24     A   Let me look.  I can't remember.  It was
25  from these two documents.  These are the only two

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 218

1  documents I have.  Okay.  Document 8 -- Exhibit 8
2  on a page called "Summarizing success," the first
3  line, it is not about adoption.  It is about
4  success.  "Our success will be measured by whether
5  we reduce late nighttime in the top 10 percent of
6  teens by .35 percent."  And they are currently at a
7  tiny fraction of that, .018 percent.  So that is
8  some information that is not effective.
9      Q   You are referring Exhibit 8, which is
10 dated as of February 2023.  Right?
11     A   Yes.
12     Q   Do you know how the data has changed since
13 then?
14     A   No.
15         MS. ARORA:  Objection, form,
16     speculation.
17         THE WITNESS:  I do not.
18 BY MR. PETKIS:
19     Q   Do you know whether or not Meta has
20 reached its goal in terms of reducing nighttime
21 spent by adolescents?
22         MS. ARORA:  Objection, form,
23     speculation.
24         MR. PETKIS:  I am going to say on the
25     record these are blatantly invalid

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 219

1      objections.  And I am going to start
2      marking them at this point because they
3      are abusive and they are coaching the
4      witness.
5          MS. ARORA:  I will just say on the
6      record there is absolutely no intention or
7      effect (phonetic) of coaching of course.
8          THE WITNESS:  Please repeat the
9      question.
10 BY MR. PETKIS:
11     Q   Do you know whether or not Meta has
12 reached the goal that you just referenced in your
13 testimony in terms of reducing nighttime spent by
14 adolescents since this deck was published in
15 February of 2023?
16     A   I do not have any more recent data than
17 what I have in front of me.
18     Q   You don't have any external data either,
19 right, analyzing the impact of the interventions
20 that Meta has made on nighttime use in terms of how
21 that changes the data?
22     A   That is correct, I do not have any
23 external data.
24     Q   These two documents, just to clarify, they
25 are dated February 2023 and July of 2022.  Right?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 220

1      A   Yes.
2      Q   You have no idea how this data reflected
3  in these two documents has changed since those two
4  dates.  Right?
5          MS. ARORA:  Objection, speculation,
6      form.
7          THE WITNESS:  That is true.  These
8      are the only two points in time I have
9      data for, and I don't have any more recent
10     data.
11 BY MR. PETKIS:
12     Q   Do you know what product design changes
13 were recommended based on the data contained in
14 either of these slide decks?
15     A   I do not know the direct effect of these
16 two slide decks on anything.
17         I did find the answer to your prior
18 question about how do I know there are low rates of
19 adoption on page -- slide deck -- Exhibit 8.  In
20 the notes section of -- I don't know what page this
21 is.  The one that says "Our approach."  It says,
22 "There are 50 million teens in our target cohort.
23 Of these, less than 1 percent opted into quiet
24 mode."  That is, to me, a very small percentage.
25         "4 percent have opted into take a break

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 221

1  and with less than 1 percent adopting into both."
2          And I don't think anybody would quibble
3  with these being low levels of adoption by the
4  highest users.
5      Q   And you're referring to Exhibit 8, the
6  page ending in 464 -- sorry -- 838?
7      A   Yes, that is the same page.
8      Q   What can Meta do to force adolescents to
9  adopt safety features that it makes available?
10         MS. ARORA:  Objection, scope, form,
11     speculation.
12         THE WITNESS:  It is out of the scope
13     of my expert opinion to comment on the
14     solutions.  I was simply asked to respond
15     to Dr. Honaker's report on the effect of
16     social media on sleep.  And these data
17     here support that my opinion on that.  But
18     I don't have -- it is out of scope for me
19     to say more.
20 BY MR. PETKIS:
21     Q   Okay.  And you don't have any opinion on
22 whether or not any product design changes that have
23 been implemented as a result of these slide decks
24 prospectively have been effective or not.  Right?
25         MS. ARORA:  Objection, speculation.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 222

1      THE WITNESS:  I am unfamiliar with
2   any studies that have tested efficacy or
3   effectiveness, so, yes, I don't have any
4   data on that.
5   BY MR. PETKIS:
6      Q   You haven't reviewed any expert reports
7   discussing Meta's product design for either side,
8   plaintiff side or defense side?
9      A   I have not reviewed any -- can you ask the
10  question again.  I reviewed Honaker's report.  What
11  are you asking?  Please ask it again.
12     Q   You haven't reviewed any expert reports
13  discussing Meta's product design for either the
14  plaintiffs or defendants.  Right?
15     A   No.  That is out of the scope of my
16  assignment.
17     Q   Okay.  You can put these away.
18         Let's turn back to your supplemental
19  materials considered list and your original
20  materials considered list, which is Exhibit 1 and
21  Exhibit 2.
22         You consulted in forming your opinions a
23  number of books and academic papers.  Right?
24     A   Correct.
25     Q   How did you determine which books and

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 223

1   papers to review?
2      MS. ARORA:  Objection, form.
3      THE WITNESS:  I evaluate a lot of
4   literature in my professional life, and I
5   use standard search processes to identify
6   articles.  And also, I am very familiar
7   with articles because I cite them in my
8   own and prior studies and papers that I
9   have written.  And so I relied on my
10  existing knowledge and experience with the
11  broad literature, including, as I said, I
12  was the editor of a leading sleep health
13  journal for five and a half years.
14     But to have a broad knowledge of the
15  field and then I also supplement with
16  literature searches through PubMed or
17  Google Scholar.
18     THE COURT REPORTER:  Through what?
19     THE WITNESS:  PubMed.  It's a search
20  engine.
21     THE COURT REPORTER:  Maybe take your
22  hand away.
23     THE WITNESS:  Oh, I'm so sorry.
24  That's my second or third time I've done
25  that.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 224

1      THE COURT REPORTER:  That's all
2   right.
3   BY MR. PETKIS:
4      Q   So you performed a literature search for
5   purposes of identifying articles?
6      MS. ARORA:  Objection, form.
7      THE WITNESS:  I frequently search for
8   articles.  I did not do a systematic
9   search in this particular case because I
10  -- to do a systematic literature review, I
11  usually invoke the help of a librarian.
12  And I was doing this in very short order.
13  But I had recently conducted the consensus
14  panel, the National Safe Foundation
15  Consensus Panel.  When I say recently,
16  within the prior two years.  So I used the
17  literature from that systematic review
18  combined with responding to some of the
19  articles in the Honaker report.
20  BY MR. PETKIS:
21     Q   Do I understand correctly you did not
22  perform a systematic literature review for purposes
23  of this report?
24     MS. ARORA:  Objection to form.
25     THE WITNESS:  That is correct.  I was

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 225

1      -- in the limited amount of time that I
2   wrote a response to Dr. Honaker's
3   rebuttal, I only thought it was necessary
4   -- I had sufficient evidence to respond
5   with the existing articles that I was
6   familiar with, supplemented by several
7   additional ones that I might have not
8   looked at carefully before that might not
9   have been in the consensus panel report.
10  BY MR. PETKIS:
11     Q   Did you personally identify all the books
12  and academic papers listed on those two documents?
13     A   Did I personally identify?  Yes, I am
14  familiar with all of them through my own experience
15  in the past, yes.
16     Q   Were any of them provided to you or
17  suggested to you by the plaintiffs' lawyers?
18     A   No, they did not help me write this
19  document other than to give me suggestions on
20  formatting and, you know, shape, but not on the
21  content.
22     Q   And every study has limitations.  Right?
23     MS. ARORA:  Objection, form.
24     THE WITNESS:  That is a critique I
25  have of Dr. Honakar's report.  Yes, every

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 226

1      study has limitations.
2  BY MR. PETKIS:
3      Q   And for the studies that you didn't
4  personally conduct, you have to just accept those
5  limitations because you didn't do the research.
6  Right?
7          MS. ARORA:  Objection, form.
8          THE WITNESS:  For the studies -- even
9      for my own studies, I have to acknowledge
10     and accept the limitations and see the
11     results of the studies in light of the
12     limitations.
13 BY MR. PETKIS:
14     Q   All right.  On your primary materials
15 considered list, you list a number of website
16 articles and press releases.
17         Do you see that?
18     A   Yes.
19     Q   How did you identify these?
20     A   Google searches.
21     Q   Did you do anything besides Google
22 searching?
23     A   I don't think so.  I mean, maybe -- no.
24 Google is my primary research engine.
25     Q   Do you know what keywords you used?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 227

1      A   No.
2      Q   Similar question to your academic papers.
3  Did you identify all of these internet sources
4  yourself or were any of them provided by
5  plaintiffs' lawyers?
6      A   These were searches that I found to
7  provide support -- well, some of them are newspaper
8  articles, but they were mostly to support the case
9  that the major scientific organizations are in
10 agreement that social media use and screen use are
11 harmful to adolescent sleep health.
12     Q   Let's take a look at the portion of your
13 expert report which describes your assignment,
14 which I think begins on page 7 of Exhibit 1.  In
15 paragraph 16, I am looking at the second to last
16 sentence of that paragraph.
17         You state on July 17, 2025, "I was
18 retained by plaintiffs and asked to reply to
19 Dr. Honaker's report."
20     A   Yes.  So I must have been retained on that
21 particular day.  That was also the day of our first
22 phone call, so yes.
23     Q   Is that an accurate reflection of your
24 understanding of your assignment in this case?
25     A   That is an accurate reflection that I was

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 228

1  asked to respond to Dr. Honaker's report.
2      Q   Okay.  You were not retained as an expert
3  in addiction.  Right?
4      A   I do not consider myself an expert in
5  addiction.
6      Q   You are not retained as an expert in youth
7  mental health or well-being?
8      A   I consider myself very familiar with youth
9  well-being, but I was not retained as an expert in
10 that.
11     Q   You were not retained as an expert in
12 social media product design?
13     A   I was not retained as an expert in social
14 media product design.
15     Q   And you are not an expert in that field.
16 Right?
17     A   No, I am not an expert in that field.
18     Q   You are not retained as an expert on how
19 children can stay safe online?
20     A   I was not retained as an expert on how
21 children can stay safe online.
22     Q   You're not retained as an expert on any
23 legal concepts, like CAPA, negligence, product
24 liability or misrepresentation?
25         MS. ARORA:  Objection, form,

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 229

1      compound.
2          THE WITNESS:  I was not retained to
3      be expert on any legal concepts.
4  BY MR. PETKIS:
5      Q   You aren't opining in this case that Meta
6  engaged in any unfair or deceptive practices.  Is
7  that right?
8          MS. ARORA:  Objection, form.
9          THE WITNESS:  I am opining on the
10     effect of social media, which includes two
11     of Meta's platforms, being harmful to
12     youth sleep.  I do not think I was -- I do
13     not think it was in scope for me to ask
14     about -- to comment on legal -- on their
15     legal practice.  I was just interested in
16     whether there is an effect on sleep
17     health.
18 BY MR. PETKIS:
19     Q   Do you have, sitting here today, an expert
20 opinion as to whether or not Meta engaged in unfair
21 or deceptive practices?
22         MS. ARORA:  Objection, calls for
23     legal conclusion.
24         THE WITNESS:  I do not have an expert
25     opinion on -- can you please ask the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 230

1          question again.
2  BY MR. PETKIS:
3      Q   Do you have any expert opinion as to
4  whether or not Meta engaged in unfair or deceptive
5  practices?
6          MS. ARORA:  Objection, calls for
7          legal conclusion and form.
8          THE WITNESS:  I think that is out of
9          scope for me to comment on whether Meta
10         engaged in unfair practices.  My scope was
11         to address the effect of social media
12         platforms on adolescent sleep or youth
13         sleep.
14  BY MR. PETKIS:
15     Q   You aren't opining that Meta failed to
16  warn the public regarding potential dangers of
17  social media?
18         MS. ARORA:  Objection, form, calls
19         for legal conclusion.
20         THE WITNESS:  Again, I think it was
21         out of scope for me to opine on Meta's
22         behaviors.  I am simply interested in the
23         link between Meta's social media platforms
24         and youth sleep.
25  BY MR. PETKIS:

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 231

1      Q   Do you have any opinions -- any expert
2  opinions at all on Meta's behaviors?
3          MS. ARORA:  Objection, form.
4          THE WITNESS:  I think that is out of
5          scope of my opinion.
6  BY MR. PETKIS:
7      Q   Do you know what representations Meta made
8  to the public at any point in time?
9      A   I am --
10         MS. ARORA:  Objection, form.
11         THE WITNESS:  I am familiar with the
12         website that shows the list of changes to
13         improve safety of children and families.
14         I don't know what other representations
15         you are speaking about.
16  BY MR. PETKIS:
17     Q   You are not familiar and you have not
18  investigated any of Meta's representations besides
19  its description of safety tools?
20         MS. ARORA:  Objection to form.
21         THE WITNESS:  I think that is
22         accurate.
23  BY MR. PETKIS:
24     Q   You don't have any opinion that any of the
25  features of Facebook or Instagram caused harm to

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 232

1  adolescents.  Is that right?
2          MS. ARORA:  Objection, form.
3          THE WITNESS:  I have an opinion about
4          the interactive nature of social media use
5          interfering with youths' ability to fall
6          asleep and stay asleep because of the ways
7          in which these features are engaging and
8          hard to put down and how notifications can
9          disrupt through audio-visual cues in the
10         middle of the night wake up youth.  So I
11         do have an opinion about their -- the
12         features effect on sleep health.  I don't
13         know if that exactly answers your
14         question, but I do have an opinion.
15  BY MR. PETKIS:
16     Q   Your opinions regarding the interactive
17  features of social media are not specific to
18  Facebook or Instagram.  Right?
19     A   That is correct.  My opinions about the
20  interactive nature are based on research on more
21  interactive digital media use compared to less
22  interactive digital media use.  And more
23  interactive digital media use is consistently at
24  least as bad and usually worse than less
25  interactive media use.  And that is what raises my

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 233

1  concern about some of these features that are on --
2  on social media platforms.
3      Q   Do you consider the content that is
4  displayed on someone's Facebook or Instagram feed
5  to be a feature?
6      A   Can you explain what you mean by
7  "content"?
8      Q   The video that I might see when I log into
9  Instagram on the very first page, is that content
10  or is that a feature?
11         MS. ARORA:  Objection to scope.
12         THE WITNESS:  Can you please ask the
13         question again?  I am sorry.
14  BY MR. PETKIS:
15     Q   You testified previously that you use
16  Facebook.  Right?
17     A   I do use Facebook.
18     Q   When you log into Facebook, do you
19  typically do so on your phone?
20     A   Yes, I do.
21     Q   When you first log into Facebook typically
22  what you see is your home page, your main feed?
23     A   Yes.
24     Q   And very often it is a post by someone you
25  are friends with, including a video or a photo.  Is

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 234

1  that right?

2      A   Yes.

3      Q   Is -- that post that you see when you

4  first log into Facebook, is that content or is it a

5  feature of Facebook?

6          MS. ARORA:  Objection to form.

7          THE WITNESS:  It is very difficult

8      for me to differentiate between content

9      and features.  I don't know how to answer

10     that question in a yes or no dichotomous

11     manner.  Because a post, for example, on

12     Facebook when I log on as a user and a mom

13     that includes a picture of my two kids.  I

14     look at it and then I immediately also

15     look to see who has liked it, who has

16     hearted it, who has commented on it, what

17     they have said, if anybody shared it.  And

18     it is very engaging and interactive.

19         And if I were to pull up that same

20     picture of my exact same two kids on my

21     camera, I might look at it and say, Those

22     are my two boys, I love them, and then put

23     it down.  But because of the nature of it

24     being on a social media platform, I look

25     at the picture of my two boys and then I

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 235

1      engage emotionally, physically with my

2      finger, touching to see who liked it, who

3      didn't like it.  Why didn't somebody share

4      this?  Why didn't somebody give it a

5      heart?

6          All of those things are features of

7      that post.  And it is also related to the

8      content.  The content itself is

9      emotionally stimulating, but the way that

10     other people respond to it make it even

11     more engaging and more interactive.  So I

12     cannot -- I honestly don't have a way to

13     answer that question differentiating

14     between content and feature because the

15     features come with the content.

16  BY MR. PETKIS:

17     Q   So a few follow-up points on that.

18         When you discuss and have discussed today

19  the interactive nature of social media, are you

20  including as part of that the actual content posted

21  on social media?

22         MS. ARORA:  Objection, form.

23         THE WITNESS:  When I discuss the

24     interactive nature, I am actually

25     referring to studies that measure

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 236

1      interactivity.  So those studies don't

2      differentiate what it is they are looking

3      at.  It is either interactive type of use

4      or less interactive type of use.

5          And the less interactive type of use

6      includes things like passively watching a

7      Netflix video where I am not checking to

8      see if somebody has also liked it or

9      shared it or recommended it to me.  Less

10     interactive, of course, includes

11     television watching.  All I have to do is

12     turn the remote control on or off.  And

13     then those things are less interactive

14     because there is less visual and emotional

15     and actual physical engagement.  Whereas,

16     social media platforms offer a range of

17     options for interactivity and

18     bidirectional sharing with peers and the

19     outside world that make it more

20     interactive and more stimulating and

21     psychologically arousing in many ways.

22         And especially, as I mentioned, in

23     the hours before, during and after

24     bedtime, it can be very disruptive to

25     sleep health.  So that is the nature of my

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 237

1      concern.  And I can't -- and the evidence.

2      And I cannot differentiate whether it is

3      the feature or the content because, in the

4      case of social media, they go together.

5  BY MR. PETKIS:

6      Q   So in -- in discussing the interactivity

7  of social media, are you able to distinguish

8  between content and features?

9          MS. ARORA:  Objection to form.

10         THE WITNESS:  I don't think studies

11     are designed that way.  It is too hard to

12     differentiate.  So social media is

13     considered an interactive type of digital

14     media use.  And interactive digital media

15     uses are associated with bigger effects on

16     sleep health.

17  BY MR. PETKIS:

18     Q   And certain forms of content -- just

19  focusing on the content.  Certain forms of content

20  are more interactive than others.  Right?

21         MS. ARORA:  Objection to form.

22         THE WITNESS:  Can you explain what

23     you mean by "content" there?

24  BY MR. PETKIS:

25     Q   Just a video.  Right?  Different videos

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 238

1  can be arousing in different ways to different
2  people. Right?
3          MS. ARORA: Object to form.
4          THE WITNESS: That is one of the
5      challenges of media research of all types,
6      and not just social media research, is
7      that there is a heterogenous response
8      because people respond to different
9      things. So, yes. And short-form videos
10     tend to be more interactive because there
11     is more need for swiping or moving or
12     touching or switching, and so it is the
13     content and the form go together.
14 BY MR. PETKIS:
15     Q   And putting aside at least for the moment
16 everything you said about likes and sharing and
17 notifications, the content alone can have a
18 different level of interactivity depending on the
19 person. Right?
20         MS. ARORA: Objection, form.
21         THE WITNESS: I am not sure I agree
22     with your use of the word "interactivity"
23     there. I think it is the features that
24     enable the interactivity. And the content
25     I believe is mostly the images or the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 239

1          words, and they are less interactive. The
2      interactivity is brought on by the
3      features.
4  BY MR. PETKIS:
5      Q   Is a "Like" on Facebook or Instagram
6  content or feature?
7      A   A "Like" on both platforms are a feature,
8  in my conception.
9      Q   Is a notification on Facebook or Instagram
10 a feature or content?
11     A   A notification on Instagram and Facebook
12 are both features.
13     Q   What about a notification that somebody
14 has sent you a direct message, is that a feature or
15 is that content?
16     A   That is a feature of the platform.
17     Q   What about a notification that somebody
18 has "Liked" your photo, is that content or feature?
19     A   Anytime that the -- in my understanding,
20 anytime that the platform is sending a message to
21 me, that is a feature of the platform. And it is
22 not the content itself. It is -- the content are
23 the words and the images or maybe videos. But it
24 is the way the platform interacts with the user
25 counts as a feature.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 240

1      Q   Are photo filters content or features?
2      A   That is a way that the user can engage
3  with the platform, so that is a feature as well
4  rather than the other way around.
5      Q   What about an actual photo posted on
6  Instagram using a filter, is that content or
7  feature?
8      A   In my understanding, that would be a
9  feature of Instagram.
10     Q   When you log into Facebook on your phone
11 and you see the first three posts that appear
12 before you scroll down, are those three posts
13 content or a feature?
14         MS. ARORA: Objection, speculation.
15         THE WITNESS: When I log onto -- it
16     is not even I log on. When I open up my
17     Facebook app, which is always logged into
18     on my phone, I review the top posts in my
19     feed. And some of them are features that
20     I have nothing to do with, like reels or
21     ads, things that I did not ask for.
22         And some of them are comments or
23     pictures from friends or colleagues. And
24     while the comments or pictures may be the
25     content, the presence of them on my feed

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 241

1      make them a feature because I
2      automatically look to see this, Is
3      well-liked? Who is liking this? What --
4      what else is going on, do people have a
5      lot to say about this? So you can't
6      differentiate the picture or the words
7      from the feature.
8          There are some things that are
9      exclusively features, like, you know,
10     advertisements and reels that I didn't ask
11     for. But the ones that I have signed up
12     -- I don't know. I am a little out of
13     scope of my report. But I feel like it is
14     very difficult to answer your questions
15     about differentiating content and features
16     because once it is on the platform, it is
17     wrapped up in a bunch of features.
18 BY MR. PETKIS:
19     Q   Is it your perspective that content and
20 features on platforms like Instagram and Facebook
21 are kind of inextricably intertwined?
22         MS. ARORA: Objection, form.
23         THE WITNESS: I would agree with the
24     statement that content and features on
25     social media platforms like Instagram and

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 242

1    Facebook are inextricably intertwined and
2    it is too difficult to differentiate. And
3    it is the nature of the interactivity that
4    makes them particularly harmful for sleep
5    health.
6         THE COURT REPORTER: Could you repeat
7    that last sentence.
8         THE WITNESS: It is the nature of
9    interactivity of the features that make
10   them interactive that make them
11   particularly harmful to sleep health.
12   BY MR. PETKIS:
13   Q   You testified just a few questions ago
14   that there are some things that are exclusively
15   features.
16        Do you remember that?
17   A   I said that, yes.
18   Q   My question is: Is there anything from
19   your perspective that is exclusively content?
20   A   That is an interesting question. I would
21   have to think about that for a little bit. Maybe
22   the immutable parts of the page, like my "About me"
23   page might be content. That is a one-way thing.
24   Other people can't comment or "Like" on -- I list
25   my name, my hometown, those things. Maybe they can

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 243

1    comment, I don't know. But those are not
2    interactive.
3         But many of the other parts of the
4    platform that are posted all have an opportunity
5    for external engagement, whether it is just among
6    friends, friends or friends or a bigger circle,
7    that opens it up to having platform-related
8    features.
9    Q   Okay. In the research that you have
10   described that discusses the interactivity of
11   social media and the relationship of that
12   interactivity to potential harms on sleep health,
13   it discusses this mix of features and content.
14   Right?
15        MS. ARORA: Objection to form.
16        THE WITNESS: Not in the way that we
17   are discussing it today. It is generally
18   conceived of -- and you can find this in
19   the National Safe Foundation Consensus
20   Panel that I chaired as a question of is
21   it -- is the effect of digital media on
22   sleep due to light or is it due to what is
23   happening on the screen? And what is
24   happening on the screen is a combination
25   of the interactivity, the how you use it,

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 244

1    the how hard it is to put down, the public
2    nature of it, as well as the words and the
3    visuals.
4         So it is the -- and the way that my
5    colleagues and I have used the word
6    "content," content embraces the
7    interactivity as part of the content, not
8    -- the feature -- embraces the whole
9    picture of content, not just features
10   versus content. So there is a slight or
11   maybe a very important definitional
12   difference.
13   BY MR. PETKIS:
14   Q   I think I understand this, but I just want
15   to make sure we are on the same page.
16        The academic research on this point
17   regarding the impact of social media on sleep
18   health discusses two hypotheses, one being that it
19   is the light and one being that it is what's
20   actually happening on the screen, on the social
21   media screen. Is that right?
22   A   There are other hypotheses out there, but
23   those are -- it is an important distinction about
24   whether it is sort of how the screen is being used
25   or whether it is a physiological response to the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 245

1    light that is being emitted from the screen and
2    suppressing melatonin.
3    Q   And the light being emitted from the
4    screen is content agnostic? It has nothing to do
5    with social media?
6    A   Yes, that is a perfect way to describe it.
7    Q   But the -- what's happening on the screen
8    does depend in some part on the content that is
9    being shown on the social media screen. Right?
10   A   In part, yes. Yes.
11   Q   Could you pull out -- do you have your
12   expert report in front of you?
13   A   I sure do.
14   Q   Could you go to page 6, paragraph 13.
15   A   Okay. Paragraph 13.
16   Q   Just one moment. Beginning paragraph 13
17   and continuing to paragraph 15, there are a number
18   of statements under the title "Meta's alleged
19   unfair and deceptive practices."
20        Do you see that?
21   A   Yes.
22   Q   And you start -- you start each of these
23   paragraphs with some formatting saying you
24   understand that, and then you list something
25   relating to Meta's conduct or unfair or deceptive

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 246

1  practices.  Right?
2      A   Yes.
3      Q   And your understanding comes from the
4  Complaint.  Right?
5      A   Yes.
6      Q   And that was provided to you by the
7  plaintiffs' lawyers?
8      A   Yes.
9      Q   Do you have any separate understanding of
10  Meta's unfair and deceptive practices other than
11  what is included in the Complaint?
12          MS. ARORA:  Objection, form.
13          THE WITNESS:  I do not have any
14          outside information giving me an
15          explanation of these practices, no.
16  BY MR. PETKIS:
17      Q   And this section, beginning on page 6 and
18  continuing into page 7, is this just context for
19  your report?
20          MS. ARORA:  Objection, form.
21          THE WITNESS:  Yes.  These three short
22          paragraphs simply provide some context on
23          why I would be responding to Dr. Honaker's
24          report.
25  BY MR. PETKIS:

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 247

1      Q   Paragraphs 13, 14 and 15 are not expert
2  opinions that you are offering.  Is that right?
3          MS. ARORA:  Objection, form.
4          THE WITNESS:  That is correct.  That
5          paragraphs 13, 14 and 15 are just a -- I
6          would say a layperson's summary of my
7          understanding of the Complaint.
8  BY MR. PETKIS:
9      Q   So just as an example.  Paragraph 13
10  reads, quote, I understand that certain plaintiffs
11  allege that Meta has engaged in unfair and
12  unconscionable acts and practices related to the
13  health and safety of its young users on its social
14  media platforms, including as related to sleep.
15  And then you cite the Complaint?
16      A   Yes.
17      Q   You aren't offering an opinion -- an
18  expert opinion in this case that Meta has, in fact,
19  engaged in unfair and unconscionable acts and
20  practices relating to the health and safety of its
21  young users on its social media platforms,
22  including as related to sleep.  Right?
23      A   In this entire section I -- or 1D, I am
24  summarizing the Complaint in my understanding.
25      Q   Okay.  So you are not offering an expert

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 248

1  opinion in that regard?
2      A   This is not an expert opinion.  This is a
3  summary of the Complaint.
4      Q   Let me have you take a look at paragraph
5  34, which is on page 16.
6      A   Okay.
7      Q   I want you to focus on the sentence that
8  ends in Footnote 56.  If you can find that for me.
9      A   Yes.
10      Q   You state here in paragraph 34, quote,
11  Design features, e.g., notifications, infinite
12  scroll, autoplay, ephemeral content, and tailored
13  algorithms that social media platforms such as
14  Facebook and Instagram that facilitate this
15  prolonged interaction interfere with sleep.
16          Do you see that?
17      A   I do see that sentence.
18      Q   Are you offering that as an expert opinion
19  in this case?
20      A   I believe I am offering that in the fuller
21  context of support for the reasons why more
22  interactive forms of screen use have a stronger
23  adverse association with sleep health.  And the
24  sentence before that -- not the sentence before
25  that.  The sentence before the one you read goes on

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 249

1  to say that, The stronger link between social media
2  use and sleep than other forms of screen time may
3  be due to the physical interactivity with the
4  screen.  And then I have a parenthetical talking
5  about using the fingers and the continuous
6  scrolling.  The fact that it is done in bed, and
7  the interactive aspects of social media.
8          And then that next sentence is filling in
9  the gaps on what I meant by the interactive aspects
10  of social media just as I discussed with you a
11  short bit ago.
12      Q   I just want to understand.  So are you
13  actually offering an expert opinion that the design
14  features of Facebook and Instagram interfere with
15  sleep?
16          MS. ARORA:  Objection to form.
17          THE WITNESS:  I am offering opinion
18          that these are design features that make
19          social media more interactive.  And we
20          know that more interactive social media is
21          more disruptive to sleep than less
22          interactive media.
23  BY MR. PETKIS:
24      Q   So you are opining that Meta's design
25  features interfere with sleep?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 250

1      MS. ARORA:  Objection, asked and
2  answered.
3      THE WITNESS:  I am opining that these
4  are examples of design features.  I am not
5  ranking them or -- these are the types of
6  design features that are included when I
7  describe interactive aspects of social
8  media.
9  BY MR. PETKIS:
10     Q   You are talking about social media
11  generally, right, not specific to Facebook or
12  Instagram?
13     A   The research is done on social media
14  generally.  But because this is a rebuttal design
15  to respond to a Meta case, I refer to design
16  features that are included in Facebook and
17  Instagram.
18     Q   Okay.  So the only reason you called out
19  Facebook and Instagram here is because this is a
20  case involving Facebook and Instagram?
21     MS. ARORA:  Objection, misstates her
22  testimony and form.
23     THE WITNESS:  I would say it is not
24  the only reason I called it out.  Those
25  are actual reasons, design features of

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 251

1  Facebook and Instagram, and those are
2  examples of interactive aspects of social
3  media, and -- and the most relevant to
4  this case.  I selectively included
5  information that was relevant to this
6  case.
7  BY MR. PETKIS:
8      Q   Do notifications on Facebook and Instagram
9  impair adolescent sleep health?
10     MS. ARORA:  Objection to form.
11     THE WITNESS:  I do not have specific
12  data on notifications on Facebook and
13  Instagram, but I can say broadly that
14  research on notifications disrupting or
15  awakening youth and adults in the night,
16  it interferes with sleep health.
17  BY MR. PETKIS:
18     Q   Are you able to offer that opinion to a
19  reasonable degree of scientific certainty
20  specifically as to Facebook and Instagram
21  notifications?
22     MS. ARORA:  Objection, calls for a
23  legal conclusion.
24     THE WITNESS:  I am comfortable saying
25  it broadly, not specifically for Facebook

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 252

1      and Instagram, but I think notifications
2  work similarly across platforms.
3  BY MR. PETKIS:
4      Q   Have you done anything to investigate
5  whether notifications work similarly across
6  platforms?
7      A   No, I have not.
8      Q   Okay.  Does infinite scroll on Facebook
9  and Instagram significantly impair adolescent sleep
10  health?
11     A   Infinite scroll is another example of an
12  interactive aspect of social media and, therefore,
13  it falls in the category of ways in which more
14  interactive social media interferes with sleep
15  health.  I am not specifically identifying which
16  design features are better or worse, just that they
17  are part of a conglomerate of design features that
18  come together.  I can't tease apart whether or not
19  it is the "Likes" or the sharability on my Facebook
20  page that make me want to keep looking at it.
21     Q   This is all I am trying to understand.
22     Do you have a specific opinion that any --
23  what you consider to be design features of Facebook
24  and Instagram specifically impair adolescent sleep
25  health or are you focused on social media as a

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 253

1  whole?
2      MS. ARORA:  Objection to form.
3      THE WITNESS:  I am focused on the
4  research and data that I have available to
5  me, and I don't have specific information
6  just on Instagram or Facebook.  So I am
7  primarily focusing on social media as a
8  whole because that is where the state of
9  the science is.
10  BY MR. PETKIS:
11     Q   Okay.  You cite a single source here in
12  Footnote 56, which is an article by Reichenberger
13  and colleagues from February 2025 called "Designing
14  sleep disruption:  The digital persuasion
15  underlying screen use and sleep"?
16     A   Yes.
17     Q   That is the only source that you cite
18  here.  Right?
19     A   Yes, it is an example of design features
20  and interactivity affecting sleep.  And this is an
21  editorial I was a co-author.  I was a senior author
22  on this article.
23     Q   Let's take a look at that article.
24     A   Sure.  Do you have a copy that I can
25  review?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 254

1     (Exhibit No. 10 marked for
2     identification.)
3         MS. ARORA:  We have been going over
4     an hour.  Do we want to take a before we
5     get into this section?
6         MR. PETKIS:  I think this will be
7     relatively quick.  Five minutes.
8         MS. ARORA:  Okay.
9  BY MR. PETKIS:
10    Q   Dr. Hale, Exhibit 10 is a copy of the
11 study -- I am sorry -- the editorial that you cited
12 in Footnote 56 titled "Designing sleep disruption:
13 The digital persuasion underlying screen use and
14 sleep"?
15    A   That is correct.
16    Q   And you are a senior author on this
17 editorial?
18        MS. ARORA:  Objection.
19        THE WITNESS:  I am a senior author on
20    this editorial.
21 BY MR. PETKIS:
22    Q   Does it involve any original research?
23    A   No, it does not.
24    Q   Okay.  On page 2, in the second paragraph,
25 on the bottom, in the left-hand column, there is a

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 255

1  suggestion in this editorial to consider the role
2  of design in, quote, screen based media.  Right?
3     Q   Can you please tell me which paragraph?
4  The second from the bottom paragraph or the second
5  paragraph?
6     Q   I am looking at the paragraph that is one
7  -- how do I say this?  Third paragraph from the
8  top.  It starts with "To facilitate" -- "To
9  facilitate the inclusion."
10    A   Okay.  I see that paragraph.
11    Q   All right.  It reads, quote, To facilitate
12 the inclusion of both reflective and automatic
13 processes in future studies, we should consider
14 the role of persuasive systems design embedded
15 within modern screen-based media that encourages
16 the initiation of specific content, immersion, and
17 the subsequent formation of habits.
18        Do you see that?
19    A   Yes, I do.
20    Q   And so what you are doing in this
21 editorial is suggesting future consideration of
22 design features and the impact that they might
23 have.  Right?
24        MS. ARORA:  Objection, form.
25        THE WITNESS:  Sure.  This was a

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 256

1     response to somebody else's article in
2     response to something else we wrote, so it
3     is a little -- you know, a few layers
4     down.  But yes, that is what -- we are
5     responding to their concern about volition
6     versus kind of automatic behaviors, and
7     that is what we did here, yes.
8  BY MR. PETKIS:
9     Q   What you are doing is suggesting that
10 future studies should look at design features more
11 closely.  Right?
12    A   Yes.
13        MS. ARORA:  Object to form.
14 BY MR. PETKIS:
15    Q   This particular editorial doesn't reach
16 any findings or conclusions with respect to
17 features.  Correct?
18    A   This is not an empirical paper.  We are
19 identifying or listing -- I don't know even
20 identifying because we are not the first people.
21 We are listing ways in which designs may affect
22 usage patterns, yes.
23    Q   And there is no mention of Facebook or
24 Instagram anywhere in this editorial.  Right?
25    A   No.  This was written totally unrelated to

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 257

1  this -- this lawsuit.
2     Q   There is no discussion of any specific
3  design features or Facebook or Instagram or how
4  they work anywhere in this editorial?
5         MS. ARORA:  Objection to form.
6         THE WITNESS:  That is out of scope of
7     this editorial.
8  BY MR. PETKIS:
9     Q   There are no findings or conclusions
10 regarding the impact of any design features of
11 Facebook or Instagram on adolescent sleep health
12 anywhere in this -- in this editorial?
13        MS. ARORA:  Objection to form.
14        THE WITNESS:  Let me pause for one
15    second and review the rest of the article.
16    Can you please repeat the question.
17 BY MR. PETKIS:
18    Q   There are no findings or conclusions
19 regarding the impact of design features of
20 Instagram or Facebook on adolescent sleep health
21 anywhere in this editorial.  Is that right?
22        MS. ARORA:  Same objection.
23        THE WITNESS:  We did reference TikTok
24    down in the final paragraph because there
25    is a recent report on TikTok acknowledging

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 258

1      negative mental health effects, as well as
2      effects on sleep.  But we did not, as far
3      as I am aware, mention anything related to
4      Facebook or Instagram in this article.
5  BY MR. PETKIS:
6      Q   Okay.  And there is no mention of infinite
7  scroll anywhere in this editorial?  I am sorry.
8      A   Wait.
9      Q   Let me retract that question.
10         There is no mention at all of autoplay
11  anywhere in this editorial.  Right?
12     A   That is correct.  We do mention endless
13  scrolling, but not autoplay.
14     Q   You mentioned endless scrolling just in
15  the context of social media, not specific to
16  Facebook or Instagram.  Right?
17     A   In this article, correct.  It is just in
18  the same paragraph you mention -- you pointed out.
19     Q   And there is no mention of ephemeral
20  content in this editorial?
21     A   Not specifically that phrase, but variable
22  rewards and reinforcements might fit in under that
23  category.
24     Q   There is no mention at all of -- strike
25  that.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 259

1      If you go back to the first page in the
2  second paragraph, there is a sentence that reads,
3  quote, Indeed, screen-based content varies along
4  the continuum from passively viewed movies and
5  television shows to dynamic interactive video games
6  and algorithmically curated social media feeds.
7      Do you see that?
8      A   My brain must be getting tired because I
9  don't see it, but I do remember writing that
10  sentence.  So I don't -- so where is it?  On the
11  first page?
12     Q   First page, second paragraph.  It is a
13  sentence that runs from the end of the first -- the
14  column on the left into the column on the right.
15     A   I see.  The second paragraph to me was
16  after the start.  The first page was -- it is weird
17  with the disclosures.  Okay.  So indeed
18  screen-based content varies --
19         THE COURT REPORTER:  Just read a--
20         THE WITNESS:  Don't read it out loud?
21         THE COURT REPORTER:  Not unless you
22     read it loud enough for me to hear it.
23         THE WITNESS:  Okay.
24         Yes, I see that sentence.
25  BY MR. PETKIS:

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 260

1      Q   In this -- this article, you referred to
2  algorithmically curated social media feeds as,
3  quote, screen-based content.  Right?
4      A   That is a very good example of the
5  ambiguity of the word "content" and how this group
6  of researchers, who I know very well, use the word
7  "content" to mean not the light, but everything
8  else, including the features, the interactivity,
9  and the words and pictures, to include all of those
10  things.  And as we point out, it varies from movies
11  to interactive feeds, so --
12     Q   As you understand the terms and as you
13  understand the research surrounding these issues,
14  are algorithmically-curated social media feeds
15  screen-based content?
16     A   Algorithmically-curated social media feeds
17  are interactive contents, which includes the
18  features.  So yes, in my definition of the word
19  "content," which is the definition that the sleep
20  experts on the National Safe Foundation panel used,
21  it means not the light but the interactivity and
22  what is done on the screen.
23         MR. PETKIS:  Let's take a break.
24         THE VIDEOGRAPHER:  This is the end of
25     Media 4.  We are off the record at

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 261

1      approximately 3:05 p.m.
2         (Recess taken from 3:05 p.m. to 3:22
3     p.m.)
4         THE VIDEOGRAPHER:  This is Media 5.
5     Back on the record at approximately 3:22
6     p.m.
7  BY MR. PETKIS:
8      Q   Dr. Hale, you cite something called the
9  "Handbook of Children and Screens" in your report?
10     A   Yes, I do.
11     Q   And you are a co-editor of that handbook
12  with Dr. Christakis?
13     A   I am.
14         (Exhibit No. 11 marked for
15     identification.)
16  BY MR. PETKIS:
17     Q   I am going to hand you what has been
18  marked as Exhibit 11, which is the full handbook.
19     A   I have nine more of these at home.
20     Q   Do you recognize this as a complete copy
21  of the "Children and Screens" handbook?
22     A   It is at least as thick as the hard copy I
23  have.  It appears to be the complete handbook.
24     Q   Can you go to page Roman numeral 8 for me,
25  which I think is the Forward.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 262

1    A    Yes.

2    Q    This lists appreciation for folks who have

3  contributed to bringing the handbook to fruition?

4    A    Yes.

5    Q    You are listed here as one of the

6  individuals who provided leadership and direction

7  along with Dr. Christakis?

8    A    That is correct.

9    Q    Did you, in fact, direct the content and

10 creation of this handbook?

11         MS. ARORA:  Objection to form.

12         THE WITNESS:  I served as a co-editor

13         on the handbook.  I am not quite sure what

14         you meant by "direct."  So I was not

15         involved in the solicitation of chapters,

16         if that is what you meant.

17 BY MR. PETKIS:

18    Q    Were you involved in deciding which

19 chapters should be published in the handbook?

20    A    I was involved in some of the early

21 discussions about the handbook, because as we

22 discussed it was originally designed to be a

23 special issue of the "Pediatrics" -- the "Journal

24 of Pediatrics."  And I was involved in identifying

25 -- helping identify section leaders -- well,

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 263

1  actually, I have been involved with the

2  organization of Children and Screens for a long

3  time.  We did  earlier a supplemental issue of

4  Pediatrics.  I believe it was published in 2017 or

5  2018.  And this was intended to be a follow-up for

6  that.  So that was the -- a few years ago.

7         And then people were invited to submit

8  articles for the follow-up "Pediatrics" issue.  And

9  then I was invited to join as a co-editor with

10 Dr. Christakis.  I believe it was fall of 2023 when

11 I was invited to co-edit this with him.  And at

12 that point, most of the authors had already written

13 first drafts.

14    Q    Okay.

15    A    So that my role was a little bit delayed

16 compared to some of the other members of this

17 board, but then all of those articles went through

18 peer review.

19    Q    And we have already had a back and forth

20 what peer review means in this context.  Is that

21 what you are referring to?

22    A    Uh-huh.

23    Q    Do you see that the fifth bullet point on

24 this appreciation section thanks the National

25 Scientific Advisory Board for Children and Screens?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 264

1    A    Yes, that includes me.

2    Q    It's thanking them for their leadership

3  and support.  Right?

4    A    Yes.

5    Q    The sixth bullet thanks Children and

6  Screens' individual donors?

7    A    Yes.

8    Q    Can you name any of the individual donors?

9    A    Sure.  One of them is the Della Pietra

10 Family Foundation.  It's two brothers, Stephen and

11 Vincent Della Pietra, and their wives, Pamela and

12 Barbara.  And I believe another one of the donors

13 is a member of the board of directors, Nancy

14 Goroff.  I believe Marilyn Simons, the widow of Jim

15 Simons, is also a donor.  And Jim Simons was when

16 he was alive, which I believe was -- I don't know

17 the exact donors of this particular handbook, but

18 those are donors to Children and Screens Institute.

19    Q    Any others you can think of?

20    A    Those are the only ones that I am aware of

21 are big donors.  Or I actually don't even know the

22 magnitude of the donors, but those are people who I

23 know contribute.  And I do not know the other

24 donors.

25    Q    Children and Screens has a National

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 265

1  Scientific Advisory Board?

2    A    Yes, and I am on it.

3    Q    The board does things like provide advice

4  on evaluation the institute's work strategy,

5  structure and membership?

6         MS. ARORA:  Object to form.

7         THE WITNESS:  Sure.  It is not a

8         member organization.  What we -- the type

9         of things we address on the Scientific

10        Advisory Board are what sorts of research

11        and -- research, education -- public

12        education and also things related to the

13        conference.

14        So for example, one of my roles on

15        the Scientific Advisory Board is doing

16        grant review.  So we have a call -- a

17        letter of intent right now for grant

18        submission.  I am excluded from

19        submitting a proposal because I am on the

20        advisory board, and I will be reviewing

21        the applications that come in for

22        scientific merit and we will decide which

23        ones get funded.  And I have served on the

24        board in the past.

25        I also on that board have played a

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 266

1     role in various mentorship activities.  I
2     run -- I co-led a mentorship activity at
3     our national -- or international
4     congress's -- congress planning committee.
5     The Scientific Advisory Board help with
6     things related to research and science,
7     not about membership.
8  BY MR. PETKIS:
9     Q    Okay.
10         (Exhibit No. 12 marked for
11    identification.)
12  BY MR. PETKIS:
13    Q    Dr. Hale, Exhibit 12 is a printout from
14  the Children and Screens web page describing the
15  National Scientific Advisory Board.
16         Do you see that?
17    A    Yes.
18    Q    Do you recognize this as, in fact, a
19  printout of the web page describing the National
20  Scientific Advisory Board?
21    A    The logo looks accurate.  I don't think I
22  have ever been to this website, but the names of
23  all the people look accurate.
24    Q    Do you see the second full sentence on the
25  first page says, quote, Our advisors serve two-year

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 267

1  terms and work with Institute staff to advance the
2  organization's goals, provide advice on and
3  evaluation of the Institute's work, strategy,
4  structure and membership, peer-review grant
5  proposals to fund, help plan national conferences,
6  and oversee working group of experts and
7  researchers on specific areas of interest?
8     A    I do see this.  I have never read this
9  paragraph before or that sentence before, but I
10  will say other than the section -- the word
11  "membership," I think that is accurate.  I don't
12  think we are a member organization, as far as I
13  know.
14    Q    I am not focused on the membership point
15  at all.
16    A    Those are the types of things we do and
17  those are similar to what I said that my role is.
18  I review grant proposals.  I help plan national
19  conferences.  And I work -- do work with working
20  groups.  I have attended workshops in person and
21  virtual on specific areas of interest.
22    Q    Does the National Scientific Advisory
23  Board oversee working group of experts and
24  researchers on specific areas of interest?
25    A    "Oversee" might be the wrong word.  We

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 268

1  participate in working groups.  And frankly,
2  recently we have not had that many working groups.
3  It was a little bit of a thing that we did before
4  the pandemic when we would gather for workshops.
5         But yes, we are aware of various kind of
6  subgroups of researchers, and when possible we
7  convene.  The most important thing that this
8  Children and Screens organization does, in my mind,
9  is that we provide freely available webinars on
10  YouTube, but they are also live via Zoom where we
11  invite experts to talk about the latest research,
12  as well as respond to participants' questions.  And
13  to me, it is an enormous freely available resource
14  that I am very proud of.  So -- but that is not
15  listed here.  But that is one of the things that we
16  do.
17    Q    Dr. Hale, we're getting late in the day
18  and --
19    A    Okay.  I'm rambling.  Sorry.
20    Q    -- I understand the impulse to provide --
21  it's going to go faster if you focus on my
22  questions.
23    A    Sorry.
24    Q    The National Scientific Advisory Board
25  supported the creation of the "Children and Screens

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 269

1  Handbook."  Right?
2         MS. ARORA:  Objection to form.
3         THE WITNESS:  The financial support
4    for the handbook did come from the
5    Children and Screens.
6  BY MR. PETKIS:
7    Q    Okay.  And you are listed as a member of
8  the National Scientific Advisory Board.  Right?
9    A    Yes, I am.
10   Q    So is Matthew Bergman?
11   A    Yes.
12   Q    And as we discussed, Mr. Bergman is a
13  plaintiffs' lawyer in these cases who is suing the
14  social media companies, including Meta?
15   A    Yes, I am aware of his role in that way.
16  He recently joined the Scientific Advisory Board.
17   Q    He is a lawyer.  Right?  He is not a
18  doctor or a psychologist or anyone with mental
19  health training?
20   A    That is accurate.
21   Q    He is not a scientist?
22   A    He is not a scientist.
23   Q    Do you understand he has a very meaningful
24  financial interest in these social media lawsuits?
25        MS. ARORA:  Objection, form,

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 270

```
1        speculation.
2                THE WITNESS:  I understand that he is
3            a lawyer involved in these cases.  So yes,
4            I believe he is financially invested in
5            these cases.
6    BY MR. PETKIS:
7        Q    And do you know that he has such a
8    financial interest in these lawsuits that he named
9    his law firm after them?
10       A    I am -- I am --
11               MS. ARORA:  Objection to form,
12           speculation, and scope.
13               THE WITNESS:  I don't know the
14           sequence of events, but I know that his
15           law firm involves the term social media
16           victims, but I don't remember the exact
17           title of the law firm.
18   BY MR. PETKIS:
19       Q    Okay.  And did you know that he's been
20   taking these cases on a contingency fee, which
21   means he only gets paid if he wins?
22               MS. ARORA:  Objection to form, scope,
23           speculation, perhaps assumes facts not in
24           the record.
25               THE WITNESS:  I did not know that.  I
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 271

```
1            did -- I did not know that.
2    BY MR. PETKIS:
3        Q    Okay.  Just to be clear.  He is on the
4    National Scientific Advisory Board that the authors
5    of your "Children and Screens Handbook" thanks for
6    their leadership and support?
7        A    Yes, he was.  I am trying to think about
8    the timeline when he joined the board.  But he
9    clearly is on the board now, and the handbook only
10   came out in January or something.  So I would say
11   he might have already been on the board when we
12   thanked the other members of the Scientific
13   Advisory Board.
14       Q    And he is the only member of the
15   Scientific Advisory Board that doesn't have a
16   medical degree or Ph.D.?
17       A    That is not true.  I do not believe
18   Barnaby has a Ph.D.  Let me check before I respond
19   to that.  Oh, Barnaby does have a Ph.D.  Okay.
20   Well, Barnaby is -- as far as I know, is not a
21   scientist.  I don't think he does any research.  I
22   don't actually know.  I am surprised to see that
23   he's listed here at Princeton.  Let me check about
24   the others.
25       Q    Please review this website, but after you
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 272

```
1    do so, you can confirm that --
2        A    Based on --
3        Q    -- Mr. Bergman is the only member of this
4    advisory board without an M.D. or Ph.D.  Right?
5        A    If -- if this website that you provided me
6    is correct, then it does appear that -- that
7    Mr. Bergman is the only one that does not have a
8    Ph.D. or M.D.
9        Q    Is it appropriate from your perspective
10   for a financially interested lawyer to be in that
11   role that is intended to be filled by scientists
12   and healthcare professionals?
13               MS. ARORA:  Objection, form, scope,
14           speculation, compound and assumes facts
15           not in the record.
16               MR. PETKIS:  Let's mark that
17           objection.
18               THE WITNESS:  At the time that he was
19           nominated and suggested to be on the
20           board, nobody raised a question about his
21           expertise because he is obviously very
22           knowledgeable about the impact of digital
23           media on children and adolescents.  So we
24           did not raise that as a concern.
25   BY MR. PETKIS:
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 273

```
1        Q    He is also very financially interested in
2    the outcome of these lawsuits.  Right?
3                MS. ARORA:  Objection, asked and
4            answered, form, speculation.
5                THE WITNESS:  Mr. Bergman is
6            financially interested in the outcome of
7            this -- these cases.
8    BY MR. PETKIS:
9        Q    Do you have any concern sitting here right
10   now with Mr. Bergman's participation in Scientific
11   Advisory Board that is meant to be filled by
12   scientists and healthcare professionals?
13               MS. ARORA:  Objection, form, scope,
14           and assumes facts not in the record.
15               THE WITNESS:  There is really no
16           intention about the Scientific Advisory
17           Board only being about scientists.  I do
18           see that lawyers are not listed in the
19           opening sentence here.
20               And I would just say in the one or
21           two meetings that we both attended, I
22           really think he just joined in the last
23           eight months or so.  It does not appear
24           that he is using any -- he participates as
25           a normal adviser.  I don't have that many
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 274

```
 1        concerns of him being on the Scientific
 2    Advisory Board.
 3        It is about the direction of the
 4    Institute, not about actually conducting
 5    science.
 6  BY MR. PETKIS:
 7    Q   The very first sentence of this website
 8  page reads, "The National Scientific Advisory Board
 9  is comprised of experts in the field of
10  neuroscience, communication, child psychiatry,
11  child psychology, pediatrics, education,
12  information science and public health."
13        Do you see that?
14    A   I see that.  And I see that there is a gap
15  and it doesn't say and law.  And I believe that
16  when he was nominated to be on the board, he was
17  thought to bring in a perspective about the role of
18  legislation and litigation in addressing concerns
19  about harms to children.
20    Q   Did Mr. Bergman have an unbiased
21  prescription of law to these social media
22  questions?
23        MS. ARORA:  Objection, form,
24        speculation, calls for --
25        THE WITNESS:  I can't answer that
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 275

```
 1        question if he has got an unbiased
 2    opinion.
 3  BY MR. PETKIS:
 4    Q   Okay.  How much of Children and Screens'
 5  work has Mr. Bergman personally funded since he
 6  joined the board?
 7    A   I am only aware of one donation that he
 8  made to the Congress.
 9    Q   How much was it?
10    A   And I think it was a $25,000 donation.  I
11  don't know of any other donations.
12    Q   Do you know Mr. Bergman personally?
13    A   Yes, I do.
14    Q   Are you friends?
15        MS. ARORA:  Objection, scope.
16        THE WITNESS:  Friends would be a
17        reach, but I have spent time with him
18        outside of these meetings.
19  BY MR. PETKIS:
20    Q   Did you play any role in getting him onto
21  the Scientific Advisory Board?
22    A   When he was nominated, I had never met
23  him, so, no.  I was in the room when he was
24  nominated.
25    Q   You can put that away.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 276

```
 1        (Exhibit No. 13 marked for
 2        identification.)
 3  BY MR. PETKIS:
 4    Q   Exhibit 13 is a document published by
 5  Children and Screens titled "Board of adviser
 6  spotlight Matthew Bergman, J.D."
 7        Do you see that?
 8    A   Uh-huh.
 9    Q   Have you ever seen this document before?
10    A   No.
11    Q   Do you see that this announces
12  Mr. Bergman's appointment to the National
13  Scientific Advisory Board in November of 2024?
14    A   Okay.  So that is about ten months ago.
15    Q   And that predates publication of the
16  "Children and Screens Handbook."  Right?
17    A   That is accurate.  The timeline of
18  publication is very slow, though.  So the handbook
19  had been written and submitted before November
20  2024, but yes.  And I will just say this is about
21  right.  I was a little off on the month he joined
22  or the first meeting he joined, which might have
23  been January or February, but I guess he officially
24  joined November 2024.
25    Q   Do you see at the bottom of the first page
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 277

```
 1  the very last sentence on the first page reads,
 2  "His expertise is informed by his decades long
 3  experience as a lawyer, particularly his more
 4  recent work representing families affected by the
 5  youth mental health crisis tied to the harmful
 6  design and profit structure of social media
 7  platforms"?
 8    A   I see that sentence.
 9    Q   So Mr. Bergman is saying that he is
10  informed by his work suing social media platforms?
11        MS. ARORA:  Objection, form,
12        speculation, assumes facts not in the
13        record.
14        THE WITNESS:  Can you please repeat
15        the question.
16  BY MR. PETKIS:
17    Q   Mr. Bergman is saying he is informed
18  specifically by his work suing social media
19  platforms.  Right?
20        MS. ARORA:  Same objections.
21        THE WITNESS:  Yeah, I would say his
22        work is informed by his experience
23        representing families who have lost
24        children to the harmful effects of social
25        media.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 278

1  BY MR. PETKIS:
2      Q   Representing them and suing social media
3  platforms.  Right?
4      A   Those words are not written on this page.
5  In my experience, listening to him speak at the
6  meeting last summer, three months ago, he was very
7  compelling in talking about the impacts of social
8  media on harms of -- harms to children.
9      Q   Why don't you go to the third -- the back
10 of the third page, which is essentially page 6 of
11 this document.
12     A   Third page.  Picture of him.
13     Q   No.  One more.  Right there.  You see at
14 the top of the sixth page it reads, Mr. Bergman
15 encourages concerned parents to visit the Social
16 Media Victims Law Center website to access their
17 guides, social media platforms and mental health
18 resources for teens, as well as request a free case
19 evaluation for families with children harmed by
20 social media?
21     A   I see that.
22     Q   So Mr. Bergman is using the Children and
23 Screens' web page to advertise potential lawsuits
24 against social media companies?
25         MS. ARORA:  Objection, form, scope,

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 279

1      speculation.
2          THE WITNESS:  It does look like he
3      provides a link to his website, and you
4      could interpret that as advertising.
5  BY MR. PETKIS:
6      Q   Do you think that is appropriate?
7          MS. ARORA:  Objection, form,
8      speculation, scope.
9          THE WITNESS:  I had never thought
10     about that question before.  In fact, I
11     never even went to this website about the
12     Scientific Advisory Board.  So I don't
13     have an opinion on that.
14 BY MR. PETKIS:
15     Q   The more people that click on that link
16 and sue social media companies, the more money that
17 Mr. Bergman stands to make.  Right?
18         MS. ARORA:  Objection, speculation,
19     form.
20 BY MR. PETKIS:
21     Q   Did you know that?
22         MS. ARORA:  Objection, form, scope.
23         THE WITNESS:  I don't actually -- I
24     don't actually know how the payment
25     structure of these cases work, so I didn't

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 280

1      know if it was about number or -- I don't
2      know how it works.  So I agree it is
3      unusual to have an advertisement in a bio,
4      but it is also his website.  So it is a
5      little complicated to differentiate.
6  BY MR. PETKIS:
7      Q   Is the Children and Screens' website
8  Mr. Bergman's website now?
9      A   No.  Not that I'm -- I don't go to the
10 Children and Screens' website very often, but I
11 believe it is Children and Screens.org.  I don't
12 think it is his website.
13     Q   Do you think it is appropriate for a
14 member of the National Scientific Advisory Board to
15 advertise one of their profit initiatives on the
16 Children and Screens' website.  If you do, that's
17 okay, just say so.
18         MS. ARORA:  Objection, form, scope
19     and speculation.
20         THE WITNESS:  I had never thought
21     about that before.  I would say it is not
22     like he is selling Beanie Babies.  He is
23     offering a service to people who are
24     interested in the effects of harm of
25     screens on children.  So I think,

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 281

1      obviously, to you it looks like he is
2      advertising a product, but another way to
3      look at it is he is sharing information
4      about his service.  So --
5  BY MR. PETKIS:
6      Q   He is sharing information about his
7  service that he stands to recover financially from.
8  Right?
9          MS. ARORA:  Objection, asked and
10     answered, form, scope, speculation.
11         THE WITNESS:  I am frankly unfamiliar
12     with how the payment structure works of
13     these lawsuits, so I don't know the answer
14     to that question.
15 BY MR. PETKIS:
16     Q   Are you okay with this?
17         MS. ARORA:  Objection, asked and
18     answered a couple of times now.
19         THE WITNESS:  Am I okay with what?
20 BY MR. PETKIS:
21     Q   Are you okay with Mr. Bergman's
22 advertisement here?
23         MS. ARORA:  Objection, form, asked
24     and answered.
25         THE WITNESS:  It is not really up to

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 282

1    me.  It is up to the -- Kris Perry, the
2    executive director of the Children and
3    Screens to decide whether that is
4    appropriate or not.
5    BY MR. PETKIS:
6        Q   That wasn't my question.  I am asking
7    whether you are okay with it, whether you think it
8    is appropriate.
9             MS. ARORA:  Objection, asked and
10   answered.
11            THE WITNESS:  I think it is out of
12            the scope of my opinion.  I don't have a
13            strong feeling one way or the other
14            because it's -- to me, it is not like he
15            is directly selling a product.
16   BY MR. PETKIS:
17       Q   Okay.  Are you going to raise any concerns
18   about this particular advertisement when you leave
19   the deposition today?
20            MS. ARORA:  Objection, form, scope,
21            speculation.
22            THE WITNESS:  I don't think I am
23            going to discuss much about this
24            deposition with anyone, so I don't think I
25            will be specifically bringing this to the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 283

1        director, executive director of the
2        program --
3    BY MR. PETKIS:
4        Q   Okay.
5        A   -- of the Institute.
6        Q   You can put that away.
7        A   Okay.
8        Q   Do you stand behind the scientific rigor
9    of the handbook?
10       A   I stand behind the process of the
11   handbook.  There is a lot of heterogeneity of the
12   authors.  There are 390 authors from many different
13   fields.  390 might be a -- is an approximate.  At
14   one point, it was 390, then we had a couple
15   chapters drop off because they didn't make the cut.
16   But I stand behind the process and think it is a
17   valuable contribution to the field.
18       Q   Did you read all the articles that are
19   included?
20       A   I did not read all the articles that were
21   included.
22       Q   If something is included in the handbook,
23   can we assume that it is something that you believe
24   to be accurate?
25            MS. ARORA:  Objection to form.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 284

1            THE WITNESS:  The publication of an
2            article does not mean endorsement by the
3            editor of the handbook.  It means that I
4            -- it went through a peer-review process
5            and it passed peer review and it was
6            appropriate for contributing to the
7            conversation.  But this is the same type
8            of process for a scientific journal that I
9            cannot endorse every single publication
10           and every journal article that was
11           published in my journal.  But I can say
12           that it passed a sufficient peer review,
13           and I may have some disagreement with
14           different content in it.
15           As I mentioned earlier,
16           Dr. Christakis and I divided up sections
17           of the report so I handled the peer-review
18           process for approximately half of the
19           sections and he handled the peer-review
20           process for the other half.  I did not
21           read every single article.  It was a lot
22           of work.
23   BY MR. PETKIS:
24       Q   Okay.  I think that makes it important for
25   me to show you some statements and I am interested

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 285

1    and see whether you agree or disagree.  Is that
2    fair?
3        A   That sounds fine.
4        Q   Okay.  Why don't you go to page 275 for
5    me.
6        A   Okay.  As for my chapter, I support it.
7    But -- okay.  Let me read it before I say I support
8    it.
9            Okay.  275.  Okay.
10       Q   Let me know when you are ready.
11       A   I'm on 275.  I thought I made that clear.
12       Q   I just want to make sure.
13           Okay.  Do you see the four authors that
14   are listed for this particular which is called "Is
15   social media increasing risks for mental health
16   problems among youth?  It is complicated"?
17       A   Yes, I do.
18       Q   Do you know them?
19       A   I am not familiar with any of them in
20   person, but of course I am familiar with
21   Dr. Auerbach's name and report because he submitted
22   a report for -- that I reviewed for the rebuttal in
23   the Massachusetts case.
24       Q   Is Dr. Auerbach a good scientist?
25            MS. ARORA:  Objection, form.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 286

1       THE WITNESS:  I don't know enough
2       about his full research career.
3   BY MR. PETKIS:
4       Q    Okay.  Even given that you decided to
5   publish one of his articles in your handbook?
6       MS. ARORA:  Objection, form.
7       THE WITNESS:  Yeah, as I mentioned,
8       the invitations for people to write, first
9       articles, and then they became chapters,
10      in this handbook happened before I was a
11      co-editor.  And second, that is the
12      process of peer review, that you don't
13      always know all the details about the
14      authors.  It is not about the status of
15      the author, it is about the content of the
16      article and whether it passes peer review.
17  BY MR. PETKIS:
18      Q    Okay.  About halfway through the first
19  paragraph on the left-hand column, do you see there
20  is a pair of sentences that read, quote, Recent
21  reports imply a causal association between social
22  media use and the rise in mental health problems
23  among adolescents in the United States, yet causal
24  interpretations are premature at best and dangerous
25  at worst?

Page 287

1       Did I read that correctly?
2   A   Yes, you read those sentences correctly.
3   Q   Do you agree with that statement?
4       MS. ARORA:  Objection, foundation.
5       THE WITNESS:  I agree with the first
6       sentence.  And I do not agree with the
7       second part of the -- I don't agree with
8       the second sentence.  I do not believe.
9       This is about mental health, which is
10      outside the full scope of my report, but I
11      -- this is about -- do I think causal
12      interpretations are dangerous?  No.  Do I
13      causal interpretations are premature?  No,
14      I really don't.  But that is not what my
15      report was based on.  My report was based
16      of affects on sleep.
17  BY MR. PETKIS:
18      Q   Okay.  So you are not offering an expert
19  opinion in this case that there is a causal
20  association between social media use and the rise
21  in mental health problems among adolescents in the
22  United States?
23      A   That is not within the scope of my report.
24  But I do agree with the first sentence, which is
25  recent reports imply causal association.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 288

1       Q   Okay.  Did you raise any concerns with the
2   authors' statement that "causal interpretations are
3   premature at best and dangerous at worst" during
4   the editing process?
5       MS. ARORA:  Objection, form.
6       THE WITNESS:  No, I did not raise a
7       concern about that particular sentence,
8       and I -- I think it is an interesting
9       motivation for writing a chapter.  And
10      sometimes that is how conversation occurs
11      by having a proposition such as that.  I
12      don't necessarily agree with that
13      proposition, but that is okay for the
14      introduction or background of a chapter.
15  BY MR. PETKIS:
16      Q   Go to the next page, 276, under the header
17  "Current state social media and adolescent mental
18  health."  There is a sentence that reads, "Despite
19  widespread concerns about the potential harms of
20  social media, research is examining its impact on
21  mental health is inconclusive."
22      Did I read that correctly?
23      A   You did read that correctly.
24      Q   Is that part of your handbook wrong?
25      MS. ARORA:  Objection, form,

Page 289

1   foundation.
2       THE WITNESS:  This sentence of this
3       chapter, which is not to say part of the
4       handbook, but this sentence of this
5       chapter reflects a position taken using a
6       very strict scientific standard on
7       causality and -- for mental health.  And I
8       think at the time this was written, which
9       is actually probably two years ago or
10      more, because I said it is a long slow
11      process, the National Academy of Sciences
12      had conducted a several-day workshop to
13      which I was an invited participant.  And
14      their conclusion was about the need for
15      more rigorous studies on the association
16      between social media and mental health.
17      But I think it actually
18      misrepresented the totality of the
19      evidence from that workshop, and instead
20      fell in the category of where
21      Dr. Honaker's report falls of relying on
22      an extremely strict scientific standard
23      for evidence rather than looking at the
24      totality of the evidence, the
25      preponderance of evidence where study

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 290

1   after study consistently reports strongly
2   suggestive, convincing reasons to believe
3   that this is a concern.
4          So I think -- I understand why
5   somebody might have written that,
6   especially around that time.  And I think
7   the evidence is strengthening every day,
8   especially with new data of the ABCD
9   study, which I guess maybe it didn't cite
10  in here -- I think it did actually --
11  coming out.  But new data is coming out
12  every day from large national studies
13  showing longitudinal effects on mental
14  health, sleep and overall functioning of
15  kids.  And I think it is -- I think that
16  is my statement here.
17  BY MR. PETKIS:
18     Q   So you think the statement saying that
19  "research examining potential harms of social media
20  and its impact on mental health is inconclusive,"
21  you think that is wrong?
22          MS. ARORA:  Objection, asked and
23      answered and misstates her testimony.
24          THE WITNESS:  I -- as I noted, I
25      understand why this team of authors may

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 291

1   have argued that the association and
2   growing evidence is inconclusive based on
3   a very strict definition of scientific
4   evidence, but the overwhelming evidence
5   suggests that -- a pretty clear causal
6   relationship.  And that is -- so in some
7   ways, it has aspects of being true that we
8   could find stronger data, but I would not
9   go so far to say it was inconclusive.
10  BY MR. PETKIS:
11     Q   Did you apply a very strict definition of
12  scientific causation evidence in forming your
13  opinions in your July 30th report?
14          MS. ARORA:  Objection, form.
15          THE WITNESS:  I used a consensus
16      method as well as reviewing totality of
17      the academic literature, so --
18  BY MR. PETKIS:
19     Q   I guess I am trying to understand the
20  distinction you are drawing between a, quote, very
21  strict definition of scientific evidence and
22  whatever you did in your report.
23          What is the difference?
24          MS. ARORA:  Objection to form.
25          THE WITNESS:  The difference is about

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 292

1   the overreliance on -- let me think about
2   what the difference is, because it is also
3   two different research questions so I need
4   to think about how I described them
5   accurately.
6          Without having read this chapter
7   either recently or carefully right now,
8   although it is very short -- maybe I
9   should just take a look at it -- I think
10  that the focus here is requiring a higher
11  standard of methodological approaches,
12  including reliance on too much
13  self-reported data.
14          And it is requiring a reliance on, it
15  looks like, interventional -- I need to
16  look at what they did.  I don't know
17  exactly what he is proposing.  But I think
18  it is -- the difference is I think he is
19  taking a very narrow perspective of
20  expecting more -- let me just read what
21  this says.
22          I think his critique is there aren't
23  a lot of randomized control trials on the
24  effects of social media use on mental
25  health.  I think that is the nature of his

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 293

1   critique, even though I haven't seen that
2   in here.  My argument is that you don't
3   need an abundance of randomized control
4   trials to -- to show that there is an
5   association -- to show that there is a
6   causal link.
7   BY MR. PETKIS:
8      Q   You are more willing to consider
9   low-quality scientific evidence like self-reports.
10  Right?
11          MS. ARORA:  Objection, misstates her
12      testimony, form.
13          THE WITNESS:  I am definitely open to
14      accepting self-reported data because it is
15      a way to collect data on a large number of
16      people.  I prefer rigorous objective data,
17      but the problem with self-reported data is
18      that you are more likely to find no
19      relationship because of all the noise in
20      self-reported data.
21          And instead, what we have -- in my
22      research area, which is on sleep, we have
23      even in the presence of all the noise from
24      all the self-reported data where you would
25      expect mitigation or attenuation of the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 294

```
 1        association, you find very large signal.
 2        So even in the absence of high-quality
 3        data, you see a strong effect of screen
 4        use, social media use, smartphone use on
 5        sleep.
 6             So I don't have a problem with you
 7        using self-reported data in that context.
 8        And I think it is important to be able to
 9        get a generalizable data representing
10        large swaths of people and including
11        national representative data, boys and
12        girls, all age groups.  And that is harder
13        to get with these smaller-scale studies.
14   BY MR. PETKIS:
15        Q   Is self-reported data lower or
16   higher-quality scientific evidence than the results
17   of a randomized control trial?
18             MS. ARORA:  Objection to form.
19             THE WITNESS:  So those are two
20        different things.  Self-reported data
21        refers to the data collection.  You can
22        have a randomized control trial with
23        self-reported data.  I think you are
24        asking if cross-sectional or observational
25        studies are lower or higher than
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 295

```
 1        randomized controlled --
 2   BY MR. PETKIS:
 3        Q   Let me rephrase.
 4        Are cross-sectional studies lower or
 5   higher quality scientific evidence than RCT
 6   studies?
 7             MS. ARORA:  Object to form.
 8             THE WITNESS:  Cross-sectional studies
 9        are -- provide less information about
10        causality than RCT studies, but
11        cross-sectional studies do provide
12        important evidence about prevalence rates,
13        disparities or differences across
14        populations.  And then if you follow up on
15        cross-sectional studies, changes over
16        time.  So you can use cross-sectional
17        studies to inform the direction of trends,
18        whereas a randomized control trial is not
19        able to do that.
20             It is a short -- it's a small sample
21        size in a select, usually homogenous,
22        population, and it doesn't give you any
23        external generalizability about what is
24        happening at the population level.
25   BY MR. PETKIS:
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 296

```
 1        Q   Do you remember my question?
 2        A   Yes.  Your question is are cross-sectional
 3   lower than RCTs, and my answer is it is a different
 4   type of study.  They provide different types of
 5   evidence.
 6        Q   You are not willing to testify here today
 7   that cross-sectional studies are lower quality from
 8   a scientific perspective than RCT studies?
 9             MS. ARORA:  Objection, asked and
10        answered and argumentative.
11             THE WITNESS:  Quality is relevant to
12        the question.  If I wanted to ask a
13        question about the prevalence rates of
14        screen use -- let me not make it about
15        screen use.
16             The prevalence rates of chicken pox,
17        just to make it something fun.  We are all
18        a little tired.  A randomized control
19        trial about chicken pox might only have 50
20        participants and I know nothing about
21        prevalence of chicken pox from those 50
22        people who enrolled.  But I would, if I
23        had survey data on, Have you ever had
24        chicken pox and what age?  I could provide
25        evidence.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 297

```
 1             So the quality of answering the
 2        question about chicken pox is better than
 3        from a large cross-sectional study because
 4        the question is about prevalence.  If the
 5        question is about treatment of chicken
 6        pox, then I might want to use a randomized
 7        control trial.  So it really has to do
 8        with the question.
 9   BY MR. PETKIS:
10        Q   Okay.  It is possible for cross-sectional
11   studies to be done well and for RCT studies to be
12   done poorly.  Right.
13        A   Absolutely.
14        Q   Okay.  Are you familiar with just a
15   general concept of a hierarchy of scientific
16   evidence in the research field?
17        A   Yes, I am.
18        Q   Okay.  And I am asking you specifically
19   about that hierarchy.  Where does cross-sectional
20   studies stand in the hierarchy relative to RCT
21   studies?
22             MS. ARORA:  Objection, asked and
23        asked, twice.
24             THE WITNESS:  If you are asking the
25        hierarchy of causality, which is what I
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 298

```
 1        think you are asking about, not -- the
 2        example I gave is about prevalence.
 3             For identifying causality,
 4        cross-sectional studies are lower down
 5        than randomized control trials.
 6   BY MR. PETKIS:
 7        Q   Okay.  Can you go to page 25 for me,
 8   please.
 9        A   Of which document?
10        Q   I am looking at the handbook now.
11        A   Okay.  I am there.
12        Q   I am just going to ask you again a couple
13   questions about statements on this page and another
14   one.  If you disagree with them, that's okay, just
15   let me know that you disagree.  I don't need an
16   explanation as to why.
17        A   Okay.
18        Q   On page 25, on the right-hand column, the
19   second full sentence reads, "Limited validity of
20   self-report data of media use due to estimation,
21   recall and social desirability biases can be
22   overcome by integrating trace data and in situ
23   assessments of specific screen media use."
24             Do you see that?
25        A   Uh-huh.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 299

```
 1        Q   Do you agree that self-report data can be
 2   infected by estimation, recall and social
 3   desirability biases?
 4             MS. ARORA:  Objection, speculation.
 5             THE WITNESS:  Yes, I do have concerns
 6        about the measurement error in -- of
 7        self-reported data on media use, which is
 8        why I advocate for granular objectively
 9        assessed social media use -- not social
10        media -- screen use data.
11   BY MR. PETKIS:
12        Q   Okay.  And when self-report data is
13   affected by estimation, recall and social
14   desirability biases, do you agree that it has
15   limited viability -- I'm sorry -- validity?  Just
16   yes or no?
17             MS. ARORA:  Objection to form.
18             THE WITNESS:  I agree that it is less
19        good than passively sensed or objective
20        assessment of screen use.
21   BY MR. PETKIS:
22        Q   Could you go to page 34 for me.
23             In the right-hand column, the first full
24   sentence reads, "Moreover, without randomized
25   manipulation, this body of research cannot rule out
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 300

```
 1   confounding nor reverse causality."
 2             Do you see that?
 3             MS. ARORA:  Objection, form.  What is
 4        this sentence even referring to?  It is
 5        unclear.
 6   BY MR. PETKIS:
 7        Q   You can go ahead and answer.
 8        A   I answer.  Okay.  Yes, I see that
 9   sentence.
10        Q   Do you agree that studies that do not use
11   randomized manipulation cannot rule out
12   confounding?
13             MS. ARORA:  Objection, form,
14        speculation, incomplete hypothetical.
15             THE WITNESS:  I do not fully agree
16        with that sentence because some -- some
17        questions are not available to randomized
18        manipulation.  But I will say -- for
19        ethical reasons or other factors, but I
20        would say that, as scientists, we always
21        try to address both issues of confounding,
22        which we do through statistical
23        adjustment, as well as addressing reverse
24        causality.
25             And one very important way we address
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 301

```
 1        reverse causality is to collect
 2        longitudinal data, which is the type of
 3        data that I have collected in my work.
 4        And also we look at the timing of the
 5        exposure variable relative to the timing
 6        of the outcome variable.
 7             And in the case of sleep, it is very
 8        convenient because sleep is following the
 9        use of evening screen time use and sleep
10        is also following the use of -- or the
11        presence of screens in the bedroom.  It is
12        not the case that the screens snuck into
13        the bedroom after the person fell asleep.
14             So it is easier to rule out the
15        possibility that the sleep is causing the
16        prior screen use.
17             For topics like screen use and mental
18        health, it is much harder to rule out the
19        reverse causal hypothesis.  But with
20        sleep, I am more confident that reverse
21        causal pathways are less of an issue.
22   BY MR. PETKIS:
23        Q   Okay.  Just yes or no.  Do you believe
24   that studies without randomized control
25   manipulation can rule out reverse causality?
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 302

1          MS. ARORA:  Objection to form,
2     incomplete hypothetical, speculation.
3          THE WITNESS:  If the variables are
4     linked temporarily, I think, yes, you can
5     rule out reverse causality with some
6     studies.
7     BY MR. PETKIS:
8          Q   Would you go to page 101 for me.
9          A   I know this study.
10         Q   This is an article that you authored
11    titled "What do we know about the link between
12    screens and screen health?"
13         A   Yes, it is.  I see it.
14         Q   Go to page 104.
15         A   This is fun.
16         Q   Under Section 2.5, which is titled "What
17    are the limitations of the current research," there
18    is a sentence that reads, "Despite general
19    agreement on the association between screen time
20    and adverse sleep health outcomes using
21    cross-sectional studies, many of these studies lack
22    rigorous experimental design, making it difficult
23    to identify causality when there are likely
24    bidirectional relationships."
25              Did I read that correctly?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 303

1          A   Yes, you did.
2          Q   Do you agree with that statement?
3          A   I do.  I've -- given my more recent
4     research from when this was originally drafted, I
5     have more confidence in the temporality of
6     relationship but this -- the bidirectionality is
7     always a concern -- not always, but often a
8     concern, so -- but I still agree with this
9     statement.
10         Q   And it is specifically a concern in the
11    context of assessing the relationship between
12    screen time and adverse sleep health as a result of
13    the lack of rigorous experimental design for some
14    studies.  Right?
15         A   Yes, I would maybe adapt that to say fewer
16    rigorous experimental designs, but yes.  Lack is an
17    overstatement.
18         Q   There is a sentence here that reads,
19    "Beyond the issue of causality, the field struggles
20    with concerns about measurement error for both the
21    predictor" --
22         A   Yeah.
23         Q   -- "and the outcomes with the primary
24    reliance on self or apparent reported data for both
25    sets of measures."

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 304

1              Did I read that correctly?
2          A   Yes, I am outspoken about concern about
3     measurement error.
4          Q   You agree with that statement?
5          A   I do.  And as I noted, measurement error
6     makes the signal of the association smaller because
7     there is so much noise.  And even with all of the
8     noise from the poorly-reported data on both screen
9     use and sleep, we still find a strong and
10    consistent association between screen use, social
11    media and sleep.
12              So I think the fact that there is this
13    much measurement area and the effects are as large
14    as they are, are -- actually support that -- the
15    case that screen use is harmful for sleep.
16              MR. PETKIS:  Okay.  Move to strike
17         everything after "I do."
18    BY MR. PETKIS:
19         Q   I am going to hand you another document.
20         Q   What just happened?  Okay.
21         Q   Yeah, you can put away your handbook.
22         A   Thank God.
23              Another one of my own.  This is fun.
24              I'm going to open up my Diet Coke.
25              (Exhibit No. 14 marked for

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 305

1         identification.)
2     BY MR. PETKIS:
3          Q   All right.  Dr. Hale, Exhibit 14 is a
4     study that you coauthored titled "Interactive
5     screen-based activities predict worse actigraphic
6     sleep health at night among adolescents."
7          A   That is correct.
8          Q   This was published in April of 2024?
9          A   You know, I thought it was 2023.  I think
10    it came out in 2023, but it was in print in 2024.
11         Q   Under "Study design," it states that
12    "Daily survey and actigraphy data from the age of
13    15 wave of the future of families and child
14    well-being study were analyzed using multi-level
15    modeling, 475 adolescents provided three or more
16    days of valid daily survey and nighttime sleep
17    data."
18         A   That is accurate.
19         Q   You conducted this well-being study?
20         A   I am the PI on this study, correct.
21         Q   It involved 475 adolescents?
22         A   Correct.  It actually involved more than
23    that, but this 475 adolescents provided three or
24    more days of data actigraphy data as well as the
25    survey data.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 306

1  Q And looked at nighttime sleep data
2 specifically. Right?
3  A That is correct.
4  Q Could you go to page 8 for me.
5  A Sure.
6  Q The first sentence under "Limitations"
7 reads, quote, We did not find any associations
8 between screen-based activities in the hour before
9 bed and subsequent sleep within adolescents.
10  Did I read that correctly?
11  A Yes.
12  Q Is that an accurate statement of the
13 findings of this study, or at least one of the
14 findings of this study?
15  A I need to look at the data.  I thought --
16 let me look at the tables for one minute, please.
17  It is true that for the within-person
18 measures, we did not find it, but we did find it
19 for the between-person measures, especially for the
20 interactive.  I want to -- just let me look for one
21 second.  My apologies.
22  And what we did find between-persons --
23 adolescents who talked, texted or played games on a
24 device before -- an hour before bed had later sleep
25 onset by about 30 minutes or more, and later sleep

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 307

1 timing by about 25 minutes --that is the midpoint
2 of sleep -- than those who did not do that before
3 bed.  But the within-person findings, we did not
4 find it statistically significant.  And we found it
5 only for the interactive screen-based activities
6 and not for the passive screen-based activities.
7  Q This study you were the PI on did not find
8 any within-person associations between screen-based
9 activities in the hour before bed and subsequent
10 sleep within adolescents.  Right?
11   MS. ARORA:  Objection, asked and
12   answered.
13   THE WITNESS:  Yes, as I reported, we
14   did not find within-person associations
15   but we did find between-person
16   associations with the interactive
17   activities, including talking, texting,
18   playing video games.
19 BY MR. PETKIS:
20  Q And those between-person associations that
21 you found involved nonsocial media use of
22 smartphones or screens?
23  A They involved interactive media use.  I
24 don't think we specifically had it worded by
25 communicating and playing video games.  This was a

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 308

1 survey in which they were just asked a binary
2 question about in the hour before bed, did you
3 communicate with friends?  Yes/no.  Did you play
4 video games?  Did you browse the internet or did
5 you watch videos?
6  So it -- it's another case of
7 inappropriate measurement on the exposure.  We had
8 very good measurement on the outcome, which is
9 sleep, but the exposure was a pretty weak measure
10 because this study was not designed to be a study
11 of social media use and sleep.  It was -- or any
12 digital media use and sleep.  It was -- so what are
13 they doing on their devices before bed and which
14 types of things are -- are more harmful?
15  And we did find during the day some
16 interactive effects -- interactive activities were
17 associated with, I think, later sleep time.
18  Let me check.
19  Q I just really want you to focus on my
20 questions.
21  A Okay.
22  Q Are there any specific findings with
23 respect to the association  between social media
24 and sleep health in this study?
25  A This study was about interactive

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 309

1 screen-based media and not specifically about
2 social media.  So not one-to-one overlap.  We -- I
3 don't even think we used the word "social media"
4 here.
5  Q Did you recite this finding in your
6 report, do you recall?
7  A I think I used this as an example of
8 evidence that interactive media use is a type of --
9 more interactive media use is more harmful to sleep
10 of teens than less interactive, but it is not
11 evidence of social media per se.
12  Q Did you cite the finding that you were not
13 able to find any association for within-person
14 analysis?
15  A In this report?
16  Q In your report in this case.
17  A As I said, this was not specifically about
18 social media so I don't think that I did.  It was
19 about interactive associate -- interactive versus
20 passive, and we found interactive forms of media
21 were more harmful than less interactive.
22   MS. ARORA:  You know, we have been
23   going for an hour.  Do you want to take a
24   break before (inaudible) --
25   MR. PETKIS:  That is fine.  Let's

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 310

1      just pull that exhibit back if you are
2      going to ask for a break right now.
3          THE VIDEOGRAPHER:  This is the end of
4      Media 5.  We are off the record at
5      approximately 4:20 p.m.
6          (Exhibit No. 15 marked for
7      identification.)
8          THE VIDEOGRAPHER:  This is Media 6.
9      We are back on the record at approximately
10     4:37 p.m.
11 BY MR. PETKIS:
12     Q   Dr. Hale, we are handing you Exhibit 15,
13 which is an article that you coauthored entitled
14 "Social media and sleep health."
15     A   Yes.
16     Q   Do you recall when this article was
17 published?
18     A   It looks like it was published in 2024.  I
19 believe I wrote it beforehand, but 2024, Lauren
20 Hartstein was still in Colorado at that point --
21         THE COURT REPORTER:  I'm sorry --
22         say -- it again.
23         THE WITNESS:  Lauren Hartstein was
24         still at Colorado at that point.  So yes,
25         2024 it was published.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 311

1 BY MR. PETKIS:
2      Q   Can you take a look at page 166.
3      A   Yes.
4      Q   Do you see there is a section entitled
5 "Social media before bed and during the night
6 adversely affects sleep"?
7      A   Yes.
8      Q   I want to ask you about a sentence that
9 begins at the bottom of that paragraph and
10 continues onto the next page, and it reads, quote,
11 In contrast to presleep and nighttime screen use,
12 studies of screen use or social media specifically
13 during the day and/or further from bedtime have
14 more inconsistent effects.
15     A   Yes.
16     Q   Is that your statement?
17     A   That is consistent with what I wrote in my
18 report and all of the systematic reviews I cited.
19     Q   Is the association between social media
20 use and impact on sleep health less strong with
21 respect to daytime use?
22         MS. ARORA:  Objection to form.
23         THE WITNESS:  I said it is more
24         inconsistent and typically it is -- the
25         association -- the closer to bedtime the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 312

1      stronger the association, or especially --
2      the closer to bedtime or in the night, the
3      stronger the association with sleep.
4          There are still many studies showing
5      a positive association between five and
6      ten minutes of shorter sleep duration for
7      every hour that you are on your screen
8      over the course of the day, and that adds
9      up because many kids on their screens for
10     six, seven, eight hours a day.  But
11     daytime use typically has a smaller
12     association than just looking at nighttime
13     use.
14 BY MR. PETKIS:
15     Q   So is studies looking at daytime use a
16 little bit less informative in terms of
17 understanding the potential impact on sleep health?
18         MS. ARORA:  Objection to form,
19         misstates the testimony.
20         THE WITNESS:  I think studies looking
21         at daytime use are informative and that
22         they help us understand the mechanism.
23         And by comparing studies that look only at
24         daytime use and their effects or
25         associations with sleep health with

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 313

1      studies that look primarily at night or
2      before bedtime and seeing stronger
3      effects, then we say, all else equal,
4      nighttime screen use is generally worse
5      for sleep health than daytime screen use.
6          So if I were a parent or a
7      pediatrician or a sleep foundation giving
8      recommendation, I would say if you have to
9      reduce screen use, the first place to go
10     is where the effect is the strongest.  But
11     it doesn't mean that the daytime studies
12     are not informative.
13         Finding a different magnitude or
14     inconsistent magnitude is informative.
15 BY MR. PETKIS:
16     Q   And again, so understand -- if you were --
17 if you were going to try to understand the impact
18 of social media use on sleep health and you had
19 data showing daytime use and data showing nighttime
20 use, the first place you would go is the data
21 showing nighttime use?
22         MS. ARORA:  Objection to form,
23         misstates the testimony.
24         THE WITNESS:  Can you please repeat
25         what the question was?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 314

```
1   BY MR. PETKIS:
2      Q   If you are going to try to understand the
3   impact of social media use on sleep health and you
4   had data showing daytime use and data showing
5   nighttime use, is it right that the first place you
6   would go to look is the data showing nighttime use?
7          MS. ARORA:  Same objections.
8          THE WITNESS:  I did -- I asked for --
9          the question -- I think -- if I wanted to
10         investigate the research, I would be
11         interested in both daytime and nighttime
12         use.  But if I wanted to design an
13         intervention or recommendation that was
14         more effective, I would probably design it
15         to address nighttime exposure as opposed
16         to daytime exposure.
17  BY MR. PETKIS:
18     Q   Is nighttime exposure more acute than
19  daytime exposure?
20     A   For -- with regard to sleep health, I
21  can't say with regard to other outcomes.  That
22  is -- that is the state of the science.
23     Q   On page 168, there is a "Limitation"
24  section.  Right?
25     A   Yes.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 315

```
1      Q   The very first sentence reads, quote,
2   Although cross-sectional observational research
3   studies consistently demonstrate a strong
4   association between increased social media use and
5   poor sleep health, experimental studies
6   establishing a causal relationship are lacking.
7          Did I read that correctly?
8      A   You did read that correctly.  And I would
9   say --
10     Q   Well, hold on.  Let's proceed question and
11  answer.
12         Did you believe that statement was --
13         MS. ARORA:  Objection.  She wasn't
14         done speaking.
15         MR. PETKIS:  I believe she was about
16         to about to answer something I hadn't
17         asked.  My question was --
18         MS. ARORA:  You have to give her the
19         opportunity to answer so you can find that
20         out.
21         MR. PETKIS:  I have done that
22         throughout the day.  We are getting
23         three-page long answers and we are running
24         out of time, so --
25         MS. ARORA:  She's just trying to
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 316

```
1          answer your questions.
2   BY MR. PETKIS
3      Q   Dr. Hale, did you believe that statement
4   when you wrote it in this publication?
5      A   Yes, I do -- let me read -- the
6   experimental studies establishing a causal
7   relationship between social media use and poor
8   sleep health are lacking when you look at just
9   exclusive social media use.  Yet, clearly in --
10  earlier in the article -- next sentence after that
11  other page you had me read -- was about two studies
12  that I cite where they take phones away from
13  participants in the hour before their bedtime or
14  hour before bed, and they see improvements in sleep
15  health, including earlier bedtimes and longer sleep
16  duration.
17         So it is true that they were lacking
18  exclusively on social media, but there are studies
19  on smartphone use, experimental studies on
20  smartphone use.
21     Q   Experimental studies purporting to
22  establish a causal relationship between Facebook
23  and Instagram use specifically and sleep health are
24  nonexistent.  Right?
25         MS. ARORA:  Object to form.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 317

```
1          THE WITNESS:  As I have mentioned
2          throughout the day, experimental studies
3          or -- the state of the science is asking a
4          question about social media broadly or
5          smartphone use broadly because, often, it
6          is very difficult to disentangle use of
7          one app from a browser from a game from a
8          text message.  So it -- the researchers
9          are interested in the use of smartphones
10         or social media broadly, not on a specific
11         platform.
12         So it is correct that with the
13         exception of the one or two studies I
14         mentioned at the very beginning, Bowler
15         and Graham, most of these do not
16         specifically focus on Meta Platforms.
17  BY MR. PETKIS:
18     Q   Do the Bowler and Graham articles purport
19  to find a causal relationship between Facebook and
20  Instagram use specifically and an impact on sleep
21  health?
22         MS. ARORA:  Objection, speculation.
23         She doesn't have the documents in front of
24         her.
25         THE WITNESS:  Do you have the
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 318

1  documents so I can read them?
2       (Exhibit Nos. 16 and 17 marked for
3  identification.)
4       MR. PETKIS:  I will note for the
5  record we have limited copies.
6       (Off-the-record discussion.)
7       MR. PETKIS:  Yeah, I will just make a
8  note for the record --
9       THE WITNESS:  Okay.
10       MR. PETKIS:  -- we have limited
11  copies of these documents for opposing
12  counsel.  I do apologize for that.  We
13  printed these during lunch.
14       MS. ARORA:  Okay.
15  BY MR. PETKIS:
16       Q   Let me know once you have had a chance to
17  review those two documents, Dr. Hale.
18       A   Sure.  Which one would you like to discuss
19  first?
20       Q   I'm going to discuss them at the same
21  time.  And just for the record, I have handed you
22  what has been marked as Exhibits 16 and 17.  These
23  are copies of the Bowler and Graham studies that
24  you previously identified as the two that you
25  believe address Facebook and Instagram

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 319

1  specifically.  Is that right?
2       A   Those were the two articles that I knew
3  off the top of my head that specifically address
4  Facebook and Instagram.  There may be other
5  articles.  I just only had those two at top of
6  mind.
7       Q   And these are those two articles.  Right?
8       A   These are the two articles.  I have
9  confirmed that -- one is only on Facebook and the
10  other includes Facebook, InstaGram and SnapChat.
11       MS. ARORA:  Sorry to pause for a
12  second.  We only have Bowler on this --
13       MR. PETKIS:  Yeah, I just said on the
14  record that we didn't have a copy of the
15  other one.
16       MS. ARORA:  Oh, there's no more
17  copies for Graham for us at all?
18       MR. PETKIS:  No, there is not.  I
19  apologize for that.
20       MS. ARORA:  Well, it will be
21  difficult to follow.
22       MR. CAPUANO:  We are going to pull it
23  up on the screen.
24       MS. ARORA:  Okay.  I appreciate that.
25  BY MR. PETKIS:

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 320

1       Q   Have you had an opportunity to review
2  these two articles.
3       A   Yes.  I may need some more time when you
4  ask me specifics questions.  I am familiar with the
5  study design.
6       Q   Do you have Exhibit 16 in front of you
7  right now?
8       A   Yes.
9       Q   Is that Bowler or Graham?
10       A   That is Graham.
11       Q   Okay.  So Exhibit 16 is the Graham study
12  that you identified as relating potentially to
13  Facebook and Instagram specifically?
14       A   Yes.
15       Q   Which platform does it relate to?
16       A   This is a experimental study with 132
17  individuals, and half of them were advised,
18  instructed, to limit their use of three social
19  media apps, Facebook, Instagram and SnapChat, for
20  one week, by limiting each of those apps to, at
21  most, ten minutes per day.
22       Q   Okay.  So the Graham study does not limit
23  itself to just Facebook and Instagram.  Correct?
24  It also includes SnapChat?
25       A   That is correct.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 321

1       Q   Does the Graham study purport to find a
2  causal link between the use of Facebook and
3  Instagram specifically and sleep health?
4       A   They write their article about social
5  media broadly, but they show that restricting usage
6  of these three platforms to just ten minutes per
7  use per day are causally linked to improvements in
8  well-being due to changes in sleep quality.
9       So restricting access to these three
10  social media platforms improves both well-being and
11  sleep quality.
12       Q   Where -- I apologize.  I didn't mean to
13  interrupt.
14       A   That is all.  I repeated myself.
15       Q   Okay.  Where is the causal finding?  Tell
16  me specifically where you are looking.
17       A   Well, I am just reading the last sentence
18  of the abstract.  This improvement at least in part
19  appears to be changes due to changes in sleep
20  quality.
21       Q   So where did the authors conclude there
22  was a causal link between use of Facebook Instagram
23  and sleep health?
24       A   Well, let's take a look at the Table 1,
25  complete cases.  We will follow the first row

Page 322

1  across.  In the control condition where
2  participants did not restrict their access to those
3  three social media platforms, well-being was
4  consistent if not -- consistent across Time 1 and
5  Time 2.  There is the control condition.  And in
6  time -- in the intervention condition, well-being
7  increased.  And that is a statistically significant
8  increase from 3.31 to 3.51.  I know it is hard to
9  interpret what that means because it is a scale of
10 well-being.  It doesn't have any tangible meaning
11 to people sitting around the table.  But that is a
12 large improvement over one-week condition.
13         And then you can follow the same thing for
14 sleep quality did not change significantly, 2.88 to
15 2.92 in the control condition.  But it did increase
16 from 2.7 to 3.06 in the intervention condition.
17         And then mediation analysis shows that the
18 mechanism -- I have to find the sentence here.
19 Sleep quality contributed to well-being.  It is
20 because the effect of social networks site use and
21 well-being was not significant once you adjust for
22 the change in sleep quality.  So the change in
23 sleep quality explains the benefit to well-being.
24         So I am actually speaking about two
25 benefits, two causal effects.  One is the effect on

Page 323

1  sleep quality and then sleep quality contributing
2  to the benefit on well-being.  And it is a story
3  about social media.
4      Q   I appreciate your testimony, and I just
5  want to confirm the testimony because I think this
6  is actually helpful in understanding your report.
7          Is it your testimony that this study
8  standing alone makes a causal finding between the
9  use of the three social media platforms, Facebook,
10 Instagram and SnapChat, and sleep health?
11         MS. ARORA:  Object to form.
12         THE WITNESS:  It is -- it is my
13     testimony that this is one experimental
14     study that is part of a larger set of
15     studies, both observational, longitudinal,
16     cross-sectional, and intervention in
17     experimental studies, that make a
18     compelling case for the totality of the
19     evidence.
20         And this is an example of causality
21     where they experimentally manipulated
22     exposure to social media and saw
23     immediate, or near immediate, effects --
24     benefits on both well-being and on sleep
25     quality.

Page 324

1  BY MR. PETKIS:
2      Q   The reason I am showing you this article
3  is because you cited it as relating specifically to
4  Instagram and Facebook.
5          Do you recognize that?
6      A   That's -- yeah, I brought it up this
7  morning when you asked me if there were any studies
8  that looked at this particular -- at these --
9  Meta's platforms.  And many of the other studies
10 that I referred to just take away smartphones
11 altogether.  And this was a specific one about
12 social media platforms that are relevant to this
13 case.
14     Q   With that understanding, I am not asking
15 you any questions about a causal link between
16 social media and sleep health.  I'm asking you
17 specifically about a causal link between Facebook
18 and Instagram and sleep health.
19         Do you understand that framework for the
20 questions I am asking you?
21         MS. ARORA:  Objection to the form.
22         THE WITNESS:  I would like you to
23     please ask the question again so I can be
24     sure I understand it.
25 BY MR. PETKIS:

Page 325

1      Q   I am going to ask you a question in a
2  moment, and I want you to understand that I am not
3  asking you about a causal link between social media
4  generally and sleep health.  I am asking you about
5  Facebook and Instagram specifically and sleep
6  health.
7          Do you understand that limitation?
8      A   I understand, I think, and I hope I will
9  be able to answer the question.
10     Q   Does this study, the Graham study from
11 2021, establish a causal link between the use of
12 Facebook and Instagram specifically and sleep
13 health?
14     A   It contributes -- the totality of the
15 evidence of a causal link between Facebook and
16 Instagram.  It's -- if it were only Facebook and
17 Instagram, I could say yes.  But since SnapChat is
18 in there as well, it is hard to say it definitely
19 is all Facebook and Instagram.  But I would say it
20 contributes to the causal evidence for the effects
21 of Meta's platforms on sleep health.
22     Q   Okay.  This study doesn't disentangle the
23 Meta Platforms and SnapChat.  Right?
24         MS. ARORA:  Objection, form, asked and
25     answered.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 326

1          THE WITNESS:  No.
2    BY MR. PETKIS:
3          Q    And it doesn't report how much time the
4    study participants were spending on the Meta
5    Platforms relative to SnapChat?
6          A    No.
7          Q    It doesn't report on how much the study
8    participants restricted their use of the Meta
9    Platforms relative to SnapChat.  Right?
10         A    No, they were all restricted to, at most,
11   ten minutes per day.
12         Q    But it doesn't tell you how much of that
13   restriction relative to the starting point was the
14   Meta Platforms versus SnapChat.  Right?
15         A    I think that is correct.  It might be in
16   there.  I do not know.
17         Q    All right.  Can you take a look at the
18   page ending -- page 424.
19         A    Yes.
20         Q    In the right-hand column, the first
21   paragraph the authors list a number of limitations
22   of their study.  Right?
23         A    Yes.
24         Q    I just want to you confirm these
25   limitations as written.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 327

1          A    That is fine.
2          Q    Okay.  The first limitation that the
3    authors list is that social media usage on other
4    devices beyond smartphones, including computers,
5    tablets, was not monitored?
6          A    That is correct.
7          Q    The authors also state, second, due to the
8    recruitment process, participants were aware that
9    they might have to restrict their social media use
10   and as a result, people who are particularly
11   invested in social media or regularly use high
12   amounts of social media may have been reluctant to
13   participate?
14         MS. ARORA:  Objection to form.  Are
15         you asking her if that is what it says
16         or -- is that what you're asking?
17         MR. PETKIS:  That is right.
18         MS. ARORA:  Okay.
19         THE WITNESS:  That is what it says.
20   BY MR. PETKIS:
21         Q    The third limitation listed here by the
22   authors states, Finally, our measure of social
23   media use did not distinguish between overall use
24   and nighttime specific use?
25         A    That is what the third limitation says.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 328

1          Q    Okay.  Do you accept those limitations as
2    stated by the authors given that you didn't conduct
3    the research yourself?
4          MS. ARORA:  Objection to the form,
5          speculation.
6          THE WITNESS:  I not only agree with
7          these limitations and they are informative
8          because I didn't quite understand that
9          they could also be using Facebook or
10         Instagram on their computer during the day
11         or at work.  But I want to make a very
12         important point here, is that every single
13         one of these biases, the positive findings
14         -- there are positive findings of this
15         experimental intervention.  Biases -- the
16         positive findings towards the null.  The
17         -- which is to say that all of these
18         limitations indicate that the true effects
19         of social media on sleep are probably
20         larger than what is observed in this
21         study.
22              And I think that is a very important
23         limitation of many of these experimental
24         studies, is that the null findings likely
25         underestimate the effect sizes because of

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 329

1          many of these limitations.  And if you
2          want, I can walk through the rationale for
3          each of those.
4    BY MR. PETKIS:
5          Q    Well, it doesn't necessarily mean that the
6    impact of Facebook and Instagram is larger than
7    reflected in this study.  Right?  Because there
8    could be confounding use of SnapChat or other
9    social media platforms?
10         MS. ARORA:  Objection to form and
11         speculation.
12         THE WITNESS:  Let me explore.  There
13         could be confounding, but the concern here
14         is social media on other smartphones,
15         including the ones that they were
16         restricted on, was not monitored, not --
17         social media on other platforms,
18         computers, tablets was not monitored.  So
19         it means the experimental manipulation of
20         restricting -- let's just focus on one of
21         them -- Facebook found an effect even if
22         they were -- even if they were also using
23         Facebook at their desk, but just
24         restricted on my phone, found a benefit.
25         So it's not -- it's not a confound

Page 330

1    when it is within person effects --
2         THE COURT REPORTER:  It's not a what?
3         THE WITNESS:  Confound.  When it's a
4    within-person effect, there is not --
5    that's -- that's -- it's still an
6    underestimate.  If they -- if we are still
7    getting Facebook time but all we are doing
8    is limiting the amount of Facebook time I
9    have on my phone and we still see an
10   effect, then it says, wow, just -- just
11   reducing that small amount and you still
12   get a -- so that is the first.
13        The second is the recruitment
14   process.  This is a very important concern
15   about selection effect, is that there are
16   challenges.  This is a real problem for
17   media research.  Kids in particular do not
18   like to enroll in studies where they have
19   to put their phones away.  Why?  Because
20   they like their devices and they like
21   their devices at night.
22        So when they are told you can paid to
23   participate in the study, put your phone
24   away, they don't agree to.  So who are the
25   people who are going to be willing to do

Page 331

1    that?  The people who are less attached to
2    their phones.  And the direction of that
3    effect is that means the people who are
4    not the heavier users of their devices are
5    going to benefit less from the restriction
6    of their phones.
7         So again, biasing the finding towards
8    the null, which is to say this study,
9    based on these limitations, are likely an
10   underestimate of the true effect size of
11   social media on sleep.
12        And then the third, which is about
13   measurement, again measurement error
14   always biases towards the null because
15   measurement error implies that there is a
16   noise, people aren't always accurate,
17   there are biases in report.  And when you
18   have biases in report, you get more noisy
19   data and it is harder to read the signal.
20        So all of three of these bias towards
21   the null.
22        And I also want to say one more thing
23   about this article, which is that
24   Dr. Honaker misinterpreted and
25   misrepresented this study in her report.

Page 332

1         She said it found no effects.  And that is
2    not at all what this study found.  So that
3         is an added point.
4    BY MR. PETKIS:
5         Q   A random participant from this study could
6    have been using SnapChat for three hours and
7    Facebook or Instagram for ten minutes at the
8    starting point and then restrict it down to ten
9    minutes of Snapchat or zero minutes of Facebook or
10   Instagram.  Right?
11        MS. ARORA:  Objection, speculation,
12        form.
13        THE WITNESS:  A participant, as long
14        as they followed the protocol regarding
15        their smartphones, yes, they could have
16        had a pattern like that.
17   BY MR. PETKIS:
18        Q   You just don't know one way or another?
19        A   I don't -- don't know exactly, but I -- I
20   can say that the limitations stated by these
21   authors who I do not know -- usually I know the
22   authors of manuscripts.  I don't know these people
23   in New Zealand.
24        They point out these limitations.  And all
25   of them go in the direction against it being

Page 333

1    overstatement.  They go in the direction of saying
2    that the effects are underestimated, or --
3         Q   You understand you have been retained in
4    this case to provide opinions against the Meta
5    Platforms, Facebook and Instagram.  Right?
6         A   I believe I was retained to provide an
7    opinion about Dr. Honaker's study about social
8    media on sleep health, not specifically about only
9    the Meta Platforms.  So I provided a rebuttal
10   and -- but, yes, I do understand that this case is
11   about the Meta Platforms.
12        Q   Do you think it is important to try to
13   disentangle the impact of the Meta Platforms
14   specifically from social media generally?
15        MS. ARORA:  Objection, form, scope.
16        THE WITNESS:  I think as a public
17        health question we want to adopt -- which
18        I am a professor of public health.  We
19        want to adopt a broader approach.  But I
20        think from a perspective of somebody
21        working at one of these platforms, you
22        would -- might be interested in the
23        individual effects of your platform.
24        But I would like to see more granular
25        data in general.  But as I mentioned, the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 334

```
1         state of the science is to understand the
2         category of type of use rather than the
3         specific platform.  Because otherwise, it
4         would be -- there is barely enough
5         research on this to begin with, so it
6         would be hard.  I mean, there is a lot of
7         research on it, but the high-quality
8         research is hard to do.  So it's -- it's
9         hard to separate out each platform one at
10        a time.
11  BY MR. PETKIS:
12        Q   Okay.  You can put Graham away.
13        A   Great.  If you want to look at that, you
14  can look at it.
15        Q   Exhibit 17 is the Bowler article --
16        A   Yes.
17        Q   -- titled "Facebook use and sleep quality:
18  Light inter acts with socially-induced alertness"?
19        A   Yes.
20        Q   What type of study is this?
21        A   This is a highly-controlled experimental
22  study.
23        Q   Okay.  And does this -- does this study,
24  based on your read and your review, find a causal
25  link between the use of Facebook specifically and
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 335

```
1   impact on sleep health?
2         A   So this -- let me think about the answer
3   to your question.  This study does find a causal
4   link between a normal Facebook page with full light
5   exposure compared to a fake Facebook page which has
6   no personal content and various levels of light
7   exposure.
8         So it shows that both light and content
9   work together to affect sleep health, which is just
10  a little bit different than how I write about it in
11  the report, but that is what this finding is about.
12        Q   Okay.  And I just want to get your
13  testimony so that we have it, your perspective as
14  an academic researcher and an expert in this case,
15  is that this study by Bowler standing alone
16  establishes a causal link between the use of
17  Facebook and negative impact on sleep health in
18  adolescents?
19            MS. ARORA:  Object to form.
20            THE WITNESS:  This -- let me read the
21        intervention.  There were four conditions,
22        and I want to look at what the four
23        conditions were.
24            Okay.  So this was a study in which
25        there were four conditions, each -- so it
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 336

```
1         was experimental and manipulated.  Four
2         nights.  Each participant had one night in
3         each of the conditions looking at tablet
4         with either their real Facebook page and
5         highlight, high levels of blue light, a
6         fake Facebook page with high levels of
7         blue light, or the real Facebook page low
8         levels of blue light, filtered light and a
9         fake Facebook page, low levels of light.
10            And what they showed that
11        within-person in this experimental
12        condition, the best sleep, different than
13        all the other forms of sleep, occurred
14        when they were looking at a fake Facebook
15        page, not their own Facebook page, but a
16        fake Facebook page without stimulating --
17        I don't know what to say -- the features
18        and stimulation of their own website with
19        the blue-filtered light.  And everybody
20        else -- all the other nights within-person
21        found higher levels of -- had poor sleep.
22            So this suggests that it is a
23        combination of both light exposure and --
24        I will just say the personalized exposure
25        to the Facebook page, including features
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 337

```
1         in our activity and words and pictures of
2         their own page that affect sleep.
3             And that way I think it is causal.
4         It is a little complicated because it has
5         these four conditions with light as well,
6         but I think that shows causal
7         relationship.
8   BY MR. PETKIS:
9         Q   The study participants for this particular
10  analysis were between 18 and 23 years old.  Right?
11        A   I would have to check that.
12        Q   Take a look at page 521 under "Method."
13        A   Okay.  Yes.
14        Q   Okay.  And the results of this study are
15  intermingled between variations in the type of
16  Facebook page addressed, whether it was high
17  arousal or low arousal, and the type of light,
18  right, whether it was full light or blue filtered
19  light?
20            MS. ARORA:  Object to form.
21            THE WITNESS:  Yes.  The two-by-two
22        table are as you described.
23  BY MR. PETKIS:
24        Q   You can put that away.
25        A   Okay.
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 338

```
1      Q   Dr. Hale, if someone uses social media for
2   ten minutes per day, are they more likely than not
3   to experience a detrimental effect on sleep?
4            MS. ARORA:  Object to form and
5            incomplete hypothetical.
6            THE WITNESS:  If someone uses social
7            media for ten minutes a day compared to
8            zero minutes a day?
9   BY MR. PETKIS:
10     Q   Right.
11     A   I don't have the data to answer that
12   question.
13     Q   What about 20 minutes per day?
14     A   I don't have the data to answer that
15   question.
16     Q   What about one hour per day?
17           MS. ARORA:  Same objection, objection
18           to form, incomplete hypothetical.
19           THE WITNESS:  I think that is
20           accurate.  I do not have the data to
21           answer the question about what the minimum
22           amount of social media use is to have a
23           consequence on sleep at night.
24           What I do know is looking at patterns
25           within large samples within-person and
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 339

```
1            between-person and over time, you see that
2            longer duration spent on devices are
3            linked to later bedtimes, shorter sleep
4            durations and impaired sleep quality.
5   BY MR. PETKIS:
6      Q   What's the minimum time spent on Instagram
7   necessary to cause a detrimental effect on
8   adolescent sleep?
9            MS. ARORA:  Objection, form, asked
10           and answered.
11           THE WITNESS:  I don't have enough
12           data to answer that question.
13   BY MR. PETKIS:
14     Q   What is the minimal amount of time spent
15   on Facebook to cause a detrimental effect on
16   adolescent sleep?
17           MS. ARORA:  Objection to form and
18           asked and answered.
19           THE WITNESS:  Again --
20           THE COURT REPORTER:  And what?
21           MS. ARORA:  Asked and answered.
22           Sorry.
23           THE WITNESS:  -- I don't have enough
24           data to answer that question.
25           And I will point out that, as stated
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 340

```
1            in my report, even seemingly small amounts
2            of sleep loss could have consequential
3            effects, not just at the individual, but
4            at the population level.  When you look at
5            school start later movement and you look
6            at studies where they adjust school start
7            times, you see a 5 percent, sometimes
8            higher, drop in car crashes.
9            And so just small shifts in sleep at
10           the population can have massive
11           consequences for individuals and
12           populations.
13           So I am not even comfortable
14           answering the question about the minimum
15           not to have a detriment.  Because any
16           detriment to sleep could be impactful,
17           especially when we are talking about
18           teenagers who are walking around very
19           vulnerable to sleep deficiency.
20   BY MR. PETKIS:
21     Q   I think that answer looks at things from
22   the opposite direction from what I asked --
23           My question is:  How much Meta use,
24   whether it be Facebook or Instagram, is necessary
25   to cause any amount of sleep loss for an
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 341

```
1   adolescent?
2      A   Any amount --
3            MS. ARORA:  Objection, asked and
4            answered.
5            THE WITNESS:  I heard you say
6            detrimental amount.
7   BY MR. PETKIS:
8      Q   Let's start with any amount.  Do you have
9   an answer on that?
10     A   Well, I will take the number that I often
11   use for a linear association between hours of
12   screen use, and these are daytime hours.  Hours of
13   screen use and shorter sleep duration is around
14   seven minutes.  Earlier I said five to ten minutes.
15   I could do a (inaudible).
16           So one hour or more of social media or
17   screen use could reduce sleep by seven minutes.
18   That is, to me, a meaningful amount, and I write
19   about that in my report.  You know, ten or more
20   minutes is what you see when you look at the
21   benefits of other educational efforts to
22   nonpharmacological interventions to reduce -- to
23   improve sleep health.  And so a single hour of
24   smartphone use could reduce by sleep by seven
25   minutes.  Half an hour, four minutes.  Is that
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 342

1  clinically meaningful?  It could be.  I can't say.
2  On a habitual basis over the course of a week, I
3  think it's something we want to -- even small
4  changes in sleep duration, we want to take
5  seriously.
6    Q    Okay.  So is it your testimony that 30
7  minutes of use of either Facebook or Instagram
8  during the day can cause sleep loss in an
9  adolescent?
10        MS. ARORA:  Objection, misstates her
11    testimony.
12        MR. PETKIS:  I am just asking what
13    her testimony is.
14        THE WITNESS:  It is -- that is not
15    exactly my testimony.  My testimony is
16    that even small amounts of social media,
17    especially depending on when the exposure
18    occurs, I have already stated that
19    nighttime social media is -- has a higher
20    association with impact on sleep than
21    daytime social media use.  So I would say,
22    you know, even small amounts could impact
23    sleep adversely.
24        And I am not willing to put a -- I am
25    not comfortable -- not willing.  "Willing"

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 343

1        is the wrong word.  I am not comfortable
2        putting a time limit on what the right or
3        wrong amount is, but I am interested in
4        reducing harm to children's sleep.
5  BY MR. PETKIS:
6    Q    Okay.  I will just ask it one more time
7  just because I think we have gone around a bit.
8    A    Okay.
9    Q    What is the minimum amount of time using
10  either Facebook or Instagram that is necessary to
11  cause an adverse impact on adolescent sleep?
12        MS. ARORA:  Objection, asked and
13    answered.
14        THE WITNESS:  I am not comfortable
15    giving a minimum amount of time.  And I
16    also don't mean to imply that the impact
17    of social media affects all individuals
18    equivalently.  Some people are very
19    vulnerable to exposures and some people
20    less vulnerable.  So I'm not comfortable
21    giving a hard and fast number.  I don't
22    think the science is there yet.
23  BY MR. PETKIS:
24    Q    Okay.  Let me have you take out your
25  report, which is Tab 1.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 344

1    A    Back to the beginning.
2    Q    Let me have you take a look at page 14.
3  There is a section here titled, "Dr. Honaker
4  inappropriately dismisses studies of screen use."
5    A    Yes.
6    Q    And at a high level in this section, you
7  make the case that studies considering the impact
8  of screen use on adolescent sleep health can be
9  used to draw -- or at least part of evidence to
10  draw a causal connection between social media and
11  adolescent sleep health.
12    A    Yes, at a high level, that is accurate.
13    Q    There are a lot of different ways that
14  adolescents can use screens.  Right?  And we have
15  been discussing those today?
16    A    Yes.
17    Q    They can obviously use social media.
18  Right?
19    A    Yes.
20    Q    They can use streaming platforms like
21  Netflix or Hulu?
22    A    Yes.
23    Q    They can watch TV?
24    A    Yes.
25    Q    They can engage in video gaming either

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 345

1  platform gaming or cell phone games?
2    A    Yes.
3    Q    They can message with their friends
4  outside of social media, like on iMessage?
5    A    Yes.
6    Q    They can Facetime?
7    A    Yes.
8    Q    They can do homework on their laptops.
9  Right?
10    A    Yes, they can.
11    Q    That counts as screen time?
12    A    It depends on who is collecting the data,
13  but yes.
14    Q    They can also just browse the internet.
15  Right?
16    A    Yes.
17    Q    Social media is just a subset of total
18  screen time.  Right?
19        MS. ARORA:  Objection to form.
20        THE WITNESS:  As I note in my report,
21    social media is an important category of
22    apps because it is the largest category of
23    apps of how teenagers are using their --
24    their smartphones.  So it is just a -- in
25    some ways you are correct that it is just

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 346

1      a subtype, but it is an important subtype
2      of screen use.
3  BY MR. PETKIS:
4      Q   Okay.  I am going to ask you about your
5  statement that it is the largest portion, but it is
6  just a subset.  Social media is just a subset of
7  screen time.  Right?
8          MS. ARORA:  Objection, asked and
9      answered.
10         THE WITNESS:  Social media is a
11     subset of smartphone use, and I would say
12     that it is a more -- it falls in the
13     category of a more interactive subset than
14     some of the other uses that you had
15     mentioned, such as streaming Netflix or
16     Hulu or listening -- you didn't mention
17     listening to a podcast or music.  Those
18     are more passive uses.
19         So in the -- in the sense that it is
20     a more interactive subset and more
21     interactive behaviors on the smartphone
22     are -- have a stronger association with
23     sleep, it is an important -- it is an
24     important subset.  And it is also -- when
25     we -- in the absence of detailed granular

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 347

1      data on social media use, screen use is a
2      underestimate of the assessment of the
3      effect of social media on sleep.
4  BY MR. PETKIS:
5      Q   Okay.  Did you say everything you wanted
6  to on that?
7      A   I think so.
8      Q   Okay.  We are going to have to come back
9  for more time if you can't answer my questions
10 simply.
11         My question is:  Social media use is a
12 subset of screen use.  Is that right?
13         MS. ARORA:  Objection to the
14     preamble, asked and answered twice.
15         THE WITNESS:  Social media is a
16     subset of screen use.
17 BY MR. PETKIS:
18     Q   Okay.  And smartphone use itself is also
19 just a subset of screen use?
20     A   Smartphone use is a subset of screen use.
21     Q   And if an adolescent reports that they
22 spend one hour engaging in screen time, that screen
23 time could involve no social media use whatsoever.
24 Right?
25         MS. ARORA:  Objection, speculation.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 348

1          THE WITNESS:  In the -- yes, in the
2      hypothetical you provided, one hour of
3      screen time is not clear about whether it
4      is -- how it is spent.
5  BY MR. PETKIS:
6      Q   And similarly along those same lines, if
7  an adolescent reports that they spent one hour on
8  their smartphone, that could involve no social
9  media use whatsoever.  Right?
10         MS. ARORA:  Objection, speculation.
11         THE WITNESS:  Yes.
12 BY MR. PETKIS:
13     Q   You mentioned earlier that you have this
14 opinion that social media use is the largest
15 category of smartphone use.  Is that right?
16     A   Yes, I would direct you to Figure 1 on
17 page 15 of my report.
18     Q   Okay.  And I want to ask you about that
19 specifically.  Figure 1 is -- is the only evidence
20 you cite in support of that opinion.  Right?
21     A   I think I also refer to a paper that I
22 coauthored in "Journal of Pediatrics."
23     Q   Okay.  So you cite two sources in support
24 of your opinion that social media use is a majority
25 of smartphone use, one of which is your article

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 349

1  with Dr. Christakis in "JAMA Pediatrics" titled
2  "Adolescent smartphone use during school hours."
3  The other is a paper published by Common Sense
4  Media titled "Constant Companion:  A Week in the
5  Life of a Young Person's Smartphone Use"?
6      A   Yes.  And I would just say that not the
7  majority, but the largest  app category.
8      Q   Okay.  And so again, your opinion that
9  social media is the largest app category is based
10 on those two sources I just read?
11         MS. ARORA:  Objection to form.
12         THE WITNESS:  Yes, it is.
13 BY MR. PETKIS:
14     Q   And you specifically rely on Figure 1
15 which you say shows that 61 percent of time spent
16 on smartphones is attributable to social media?
17         MS. ARORA:  Objection to form.
18         THE WITNESS:  Let me check the
19     numbers.  Yes.  It is 61 percent of time
20     spent on smartphones in this -- what is
21     special about these data, and it is
22     important to make clear is that it is very
23     difficult to collect objective data on
24     smartphone use of participants.
25         So this Common Sense Media study that

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 350

1     this figure comes from and the other study
2     that I mentioned are two studies that were
3     able to get samples of participants to
4     install apps on their phones to track
5     daily use.
6   BY MR. PETKIS:
7     Q   And do you think that 61 percent figure
8   you that you cite from the Common Sense Media is
9   generalizable across all adolescents and all
10  populations?
11         MS. ARORA:  Objection to form.
12         THE WITNESS:  I am uncomfortable with
13     the use of the word "all," but I will say
14     in -- within the last two weeks, I am
15     familiar with -- well, I will say that the
16     data from the Common Sense Media study are
17     very similar to the data from the SB media
18     study, and they are also similar to the
19     study from the ABCD study, which recently
20     released their years' data.
21         THE COURT REPORTER:  Released their
22     what?
23         THE WITNESS:  Another measure of
24     objective sleep.  Sorry.  I am so sorry.
25         Of objective screen use, smartphone

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 351

1     use data.  So I have reason to believe
2     that they are accurate and representative.
3     And the ABCD study is the largest of those
4     samples, so nationally representative.
5   BY MR. PETKIS:
6     Q   The figure on social media use that you
7   cite from the Common Sense Media study includes not
8   only Facebook and Instagram but also TikTok,
9   SnapChat and YouTube.  Right?
10    A   Yes.
11    Q   Do you know how much of the 61 percent is
12  time spent on Facebook?
13    A   I do not know off the top of my head, and
14  I am not sure it is in that report.
15    Q   Do you know how much of the 61 percent is
16  time spent on Instagram?
17    A   I do not know.
18    Q   Okay.  On the basis of this 61 percent
19  finding that you cite from Common Sense Media, you
20  state, quote, it is reasonable to assume that even
21  studies that focus on overall screen time are
22  driven, in large part, by use of social media.
23  Right?
24    A   Yes.
25         MS. ARORA:  Object to form.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 352

1   BY MR. PETKIS:
2     Q   What methodology did you apply in
3   determining how much or what percentage of social
4   media use means that a study is driven, in large
5   part, by use of social media?
6     A   This was a statement to say that it is not
7   a small fraction.  I didn't use a methodology.  It
8   was just a -- a statement of reasoning.
9     Q   Okay.  If a study showed that only 50
10  percent of time spent on smartphones was social
11  media, would it still be reasonable to assume that
12  a study focusing on overall screen time is driven,
13  in large part, by the use of social media?
14         MS. ARORA:  Objection to form,
15     speculation.
16         THE WITNESS:  I want to be careful
17     about making a hard and fast rule about
18     what point is reasonable or not
19     reasonable, but I also want to graphically
20     look at the figure in Figure 1, which is
21     Figure 14 from the Common Sense Media
22     report, which demonstrates that compared
23     to the other individual types of
24     activities, email, education, shopping,
25     calls, reading, music, the predominant

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 353

1     amount of time that teens are spending are
2     on social media and YouTube.  And they
3     divided it up.  YouTube was treated
4     separately in this particular figure.
5         And I think that that is the basis
6     for my statement there is not a hard and
7     fast rule about what the -- what
8     constitutes driven, in large part, so --
9   BY MR. PETKIS:
10    Q   I just want to confirm.  You didn't apply
11  any methodology in making that statement that the
12  screen time studies are driven, in large part, by
13  social media.  Right?
14         MS. ARORA:  Objection, form, asked
15     and answered.
16         THE WITNESS:  I did not use a
17     specific methodology except to say in the
18     absence of more granular data, this is the
19     best available proxy that we have for
20     social media.
21  BY MR. PETKIS:
22    Q   Based on this same data reported in Figure
23  14, is it reasonable to assume that studies that
24  focus on overall screen time are driven, in large
25  part, by gaming?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 354

1  MS. ARORA:  Objection to form.
2  THE WITNESS:  I think we do see that
3  is the third highest category -- or the
4  second highest if you include social media
5  and YouTube together.  But I think the
6  largest category is social media,
7  including the apps named above, including
8  YouTube.
9  So I think gaming drives some of it
10 and it may drive some of it for certain
11 youth more than others, but I think it is
12 clear from looking at that figure that the
13 two largest app categories -- the two
14 largest ways in which adolescents are
15 using their phones are social media and
16 YouTube, which you can even combine into
17 one, well, if YouTube is considered a form
18 of social media.
19 BY MR. PETKIS:
20 Q   Based on this data reported in Figure 14,
21 is it reasonable to assume that studies focusing on
22 overall screen time are driven, in large part, by
23 gaming?
24 MS. ARORA:  Objection to form, asked
25 and answered.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 355

1  THE WITNESS:  I would -- in the
2  absence of individual gaming data, I would
3  be less comfortable saying it was driven
4  by gaming than I would be comfortable by
5  saying it's driven by social media because
6  social media and YouTube are the largest
7  app category.
8  BY MR. PETKIS:
9  Q   And are you relying on the fact simply
10 that it is the largest or is it a specific
11 percentage threshold that you are trying to hit?
12 A   As I mentioned, I do not have a specific
13 percentage threshold.
14 Q   Okay.  So you would be comfortable if
15 there were data showing that gaming was the largest
16 app category, then at that point it would be
17 reasonable to assume that gaming is driving, in
18 large part, the overall screen time studies?
19 MS. ARORA:  Objection, form, asked
20 and answered.
21 THE WITNESS:  In that hypothetical
22 situation, if gaming were the most common
23 app category, then I might write that
24 sentence.  But that is not what I wrote.
25 BY MR. PETKIS:

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 356

1  Q   Is it reasonable to assume that all of the
2  studies cited in your report and in your materials
3  considered list that are general screen time
4  studies are driven, in large part, by the use of
5  social media?
6  MS. ARORA:  Objection to form.
7  THE WITNESS:  I am not comfortable
8  that saying that all the study that I cite
9  were driven in large part because some
10 were studies specifically on other
11 questions, such as video gaming and other
12 things.  So I am not comfortable saying
13 all.
14 But I do find that in the absence of
15 more granular data, smartphone use and
16 overall screen use are reasonable proxies
17 for social media use.
18 BY MR. PETKIS:
19 Q   Does this data allow you to conclude that
20 general screen time studies are driven, in large
21 part, by the use of Facebook and Instagram
22 specifically?
23 MS. ARORA:  Objection to form.
24 THE WITNESS:  I think these data are
25 convincing that -- if you look at the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 357

1  footnote at the bottom -- Footnote 54,
2  When considered as a proportion of a
3  participant's overall smartphone usage,
4  social media 42 percent, YouTube is
5  counted separately 19 percent, and gaming
6  apps 11 percent, took up the largest
7  amount of time per day.
8  So -- and everything else was well
9  below that.  So I think it is reasonable
10 because there are a lot of other
11 categories.  There is a diversity of
12 categories as you mentioned of things that
13 people can do on -- but the category where
14 much of the time is spent is within the
15 category of social media.
16 BY MR. PETKIS:
17 Q   Okay.  I am asking about Facebook and
18 Instagram specifically, not social media.
19 A   Okay.
20 Q   Does this data allow you to conclude that
21 general screen time studies are driven, in large
22 part, by Facebook and Instagram specifically?
23 MS. ARORA:  Objection to form.
24 THE WITNESS:  No, that is not the --
25 either the intention of that statement nor

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 358

1    is it the scope of my report I was asked
2    to respond to Dr. Honaker's question about
3    social media on sleep -- social media
4    broadly on sleep.
5          You get the whole report.
6          (Exhibit No. 18 marked for
7          identification.)
8    BY MR. PETKIS:
9    Q   Dr. Hale, Exhibit 18 is the publication
10   that we have been discussing titled "Constant
11   Companion:  A Week in the Life of a Young Person's
12   Smartphone Use," published by Common Sense Media?
13   A   Yes.
14   Q   This is not a peer-reviewed study.  Right?
15   A   No.  This was a report published by a
16   nonprofit -- well, I don't know if it is nonprofit
17   -- an organization called Common Sense Media.
18   Q   Do you know if Common Sense Media has any
19   connections to any of the plaintiffs' lawyers in
20   this case?
21         MS. ARORA:  Objection to scope.
22         THE WITNESS:  The plaintiffs'
23         lawyers?  I do not think so.  I have never
24         asked them about their connection.  The
25         plaintiffs' lawyers meaning the A.G.s'

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 359

1    Offices?  I don't think so.
2    BY MR. PETKIS:
3    Q   What about other plaintiffs' lawyers, like
4    Mr. Bergman or lawyers that are pursuing personal
5    injury claims on behalf of individuals?
6    A   I have --
7          MS. ARORA:  Objection to form and --
8          THE WITNESS:  I do not know of any
9          relationship between Common Sense Media
10         and any lawsuits.
11         (Off-the-record discussion.)
12   BY MR. PETKIS:
13   Q   Okay.  Can you take a look at page 27 for
14   me.
15   A   Yes.  This here I just showed you.
16   Q   Page 27 is the source of the figure in
17   your report regarding use of different app
18   categories ranked from largest to shortest
19   duration?
20   A   Uh-huh.
21   Q   Again, having looked at the full context
22   in this page, this doesn't disaggregate the social
23   media category between different platforms.  Right?
24   A   Figure 14 does not, correct.
25   Q   And you can't tell based on this the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 360

1    duration that anybody was spending on Facebook or
2    Instagram compared to TikTok, SnapChat or any other
3    social media platform?
4          MS. ARORA:  Object to form.
5          THE WITNESS:  It is true that Figure
6          14 does not differentiate between which
7          social media platforms, with the exception
8          of YouTube.  And I showed this figure
9          because I was making a point about social
10         media broadly being the largest app
11         category, not about the Meta Platforms in
12         particular.
13   BY MR. PETKIS:
14   Q   I think I understand that.  I hope you
15   understand I am focused on the Meta Platforms for
16   obvious reasons.
17         Can you take a look at page 28 for me.
18   A   I can.  I see it right here.
19   Q   Page 28 does include a breakdown of that
20   same data for specific apps.  Right?
21   A   Yes, it does.
22   Q   Average daily duration for TikTok was one
23   hour and 52 minutes?
24   A   Yes, I see that.
25   Q   And that was 34.4 percent of the total

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 361

1    percentage of daily use?
2    A   Yes, I see that.
3    Q   And that was by far -- far and away the
4    largest category.  Right?
5          MS. ARORA:  Objection to form.
6          THE WITNESS:  It sort of depends on
7          how you count.  The largest number of
8          users is in YouTube and Chrome and Google
9          quick search.  But, yes, one hour 52 is
10         the largest average daily duration for
11         TikTok.
12   BY MR. PETKIS:
13   Q   The -- in terms of percentage of daily
14   use, 38.4 percent for TikTok is more than 20
15   percent more than the next closest, which is --
16   A   Oh, yes.
17   Q   -- YouTube.  Right?
18   A   Yes.
19   Q   Okay.  And Instagram and Facebook are
20   neither the largest apps in terms of average daily
21   duration or percentage of daily use.  Right?
22         MS. ARORA:  Objection to form,
23         compound.
24         THE WITNESS:  Instagram and Facebook
25         -- can you please repeat the question.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 362

1    I'm so sorry.  Instagram -- can you please
2    repeat the question.
3    BY MR. PETKIS:
4        Q   Yeah, let me break it down.
5        Instagram and Facebook are not the largest
6    app categories in terms of average daily duration?
7             MS. ARORA:  Objection, compound.
8             THE WITNESS:  That is correct.
9        Instagram and Facebook are not the largest
10       apps in terms of -- I'm losing --
11   BY MR. PETKIS:
12       Q   Let me ask my question again.
13       Instagram and Facebook are not the largest
14   app categories in terms of average daily duration
15   of use?
16       A   That is true.  Instagram and Facebook are
17   not the largest app categories in terms of average
18   percentage of daily use or average daily duration.
19       Q   Okay.  Average daily duration for using
20   Instagram was 16 minutes?
21       A   Yes.
22       Q   And that was 5.9 percent of percentage of
23   daily use for this study population?
24       A   Yes.
25       Q   Average daily duration of use for Facebook

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 363

1    was one minute?
2        A   Yes.
3        Q   And that was 0.1 of the percentage of
4    daily use for the study population?
5        A   That is true.
6        Q   Would you be comfortable, based on this
7    disaggregated data, saying that general screen time
8    studies are driven, in large part, by the use of
9    Facebook, which is just 0.1 percent of total use?
10            MS. ARORA:  Objection to form.
11            THE WITNESS:  I would not say that it
12            is driven by the Meta Platforms
13            specifically, but I would say it is driven
14            by social media platforms.  And that was
15            the nature of -- the scope of the report
16            that I wrote.
17   BY MR. PETKIS:
18       Q   Okay.  I am not asking you about your
19   report.  I am just asking you about -- a new
20   question now.
21       A   Okay.
22       Q   Would you feel comfortable saying that
23   general screen time studies are driven, in large
24   part, by Facebook based on this disaggregated data
25   that shows just 0.1 percent of total daily use?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 364

1        A   No.
2             MS. ARORA:  Objection to form.
3             THE WITNESS:  No, I would not feel
4             comfortable saying that.
5    BY MR. PETKIS:
6        Q   And would you feel comfortable saying that
7    general screen time studies are driven, in large
8    part, by Instagram based on the disaggregated data
9    showing just 5.9 percent of total daily use?
10            MS. ARORA:  Objection to form.
11            THE WITNESS:  No, I would not say
12            that.
13   BY MR. PETKIS:
14       Q   TikTok is actually higher than Facebook
15   and Instagram combined.  Right?
16       A   Than Facebook and Instagram, yes.
17       Q   By multiple, multiple times?
18       A   Yes.
19            MS. ARORA:  Objection to form.
20   BY MR. PETKIS:
21       Q   Do you have any other data showing that
22   adolescents are using Instagram or Facebook more
23   than TikTok?
24       A   I have not investigated that question so I
25   do not have data to turn to for that.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 365

1        Q   In your report, I think as you said
2    intentionally, based on your assignment and your
3    understanding of the -- of the assignment, did not
4    address Instagram and Facebook specifically?
5        A   My assignment was to respond to
6    Dr. Honaker's report on the impact of social media
7    on sleep health.
8        Q   All right.  On page 30, do you see Figure
9    15 lists average daily duration of select popular
10   apps?
11       A   Yes.
12       Q   For Instagram, the largest category,
13   representing 49 percent, were only using the app
14   somewhere between zero to 15 minutes per day?
15       A   Yes, I see that.
16       Q   Facebook isn't even listed here.  Right?
17       A   It does not look like it.  No.
18       Q   Okay.  And conversely, for TikTok, the
19   largest categories are a tie at 22 percent between
20   two to three hours per day and zero to 15 minutes
21   per day?
22       A   Yes.  And zero to 15 is also 22 percent.
23       Q   And just to be clear, Dr. Hale, you didn't
24   cite this data contained in Figure 15 or the data
25   contained in Table 2 that we just reviewed in your

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 366

1  report.  Right?
2      A    That is accurate.  I was focusing on the
3  question of whether social media -- whether screen
4  time is a good proxy for social media, not whether
5  screen time is a good proxy for Meta Platforms in
6  particular.
7      Q    Take a look at page 5 for me.
8           On page 5, do you see Figure 3 lists
9  median duration of use of different smartphone app
10 categories during school hours?
11     A    Yes, I do.
12     Q    And again, this is a different cut of the
13 data than what is included in your report.  Right?
14          MS. ARORA:  Object to form.
15          THE WITNESS:  Correct.  This is
16     related to the school day.
17 BY MR. PETKIS:
18     Q    Yep.  And do you see on the left-hand side
19 where it says that 32 percent of smartphone use
20 during the school day was social media?
21     A    I don't see that.  Hold on one second.
22          Yes, I do see that.
23     Q    Okay.  And that is just a little bit more
24 than half of the 61 percent figure you reported in
25 your report.  Right?

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 367

1           MS. ARORA:  Objection to form.
2           THE WITNESS:  That was overall over
3      the course of the 24 hour in my report I
4      reported on the 61 percent.  Yes.
5  BY MR. PETKIS:
6      Q    Okay.  Take a look at page 43 for me.
7           Figure 19 provides a cut of the same data
8  looking at median duration of use of different
9  smartphone apps during school nights.  Right?
10     A    Yes.
11     Q    And social media is no longer the largest
12 category in terms of time spent -- average time
13 spent.  Right?
14     A    I think it is important to look at the
15 sample size here.  Because in terms of -- the
16 reason they are ordered in such a way is the
17 largest number of users was on social media and
18 YouTube, with 60 and 54, while gaming has a little
19 bit longer duration for those 32 users.
20          The 60 users -- or 60 and 54 users of
21 social media and YouTube, when combined, still
22 would be a larger number of minutes and also a
23 larger number of individuals.  So I would still say
24 that social media measured here is the largest app
25 category used at night.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 368

1           In contrast, reading looks like it takes
2      up a lot of minutes, but it's only six
3      participants.  So I wouldn't go for the largest
4      minutes but rather the largest sample size.
5      Q    But putting sample size aside here, the
6  largest app category listed is reading.  Right?
7           MS. ARORA:  Objection to form and
8      mischaracterizing the diagram.
9           THE WITNESS:  I think that is an
10     oversight to put sample size aside.  I
11     think when you look at the population
12     effect, who are -- what are teens doing in
13     this sample at night to add up all the
14     number of person minutes of app use, it is
15     very clear that the largest app category
16     is social media and YouTube because you
17     multiply times the sample size.  Whereas,
18     the reading is -- it's six people doing
19     20 minutes -- 15 to 20 minutes of reading,
20     not 60 people doing ten minutes of social
21     media and eight minutes of YouTube.  It is
22     very different.
23 BY MR. PETKIS:
24     Q    Okay.  I want you to answer my question
25 now, which is putting sample size aside, reading

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 369

1  the largest app category in terms of median time
2  spent.  Right?
3           MS. ARORA:  Objection to form and
4      mischaracterizing the diagram.
5           THE WITNESS:  I am uncomfortable
6      putting sample size aside.  The correct
7      interpretation of this data is to see what
8      are teens doing at night, what other apps
9      they are using.  Not what are six teens
10     doing at night, but what are the majority
11     of behavior of teens doing at night.  And
12     you see that they are on social media and
13     YouTube at night, in far more prevalence
14     than both gaming and reading, by the way.
15 BY MR. PETKIS:
16     Q    Median time spent on social media is less
17 than ten minutes.  Right?
18     A    Median -- for 60 of the participants, it's
19 -- is it ten minutes?  I don't -- yes, it is about
20 ten minutes.
21     Q    Those are the only 60 participants, in
22 fact, that are using social media at night at all
23 at night.  Right?
24          MS. ARORA:  Objection to form.
25          THE WITNESS:  Right.  I want to see

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 370

1    what the -- let me take a minute to see
2    what the assessment of what the time range
3    was for night.  Midnight until 5:00 a.m.
4    This is between midnight and 5:00 a.m.
5        As a parent, I can tell you that I
6    think there should be zero teens on social
7    media between midnight and 5:00 a.m.
8    Midnight and 5:00 a.m. are times when
9    teens should be sleeping.  We should not
10   be having teens picking up their phone.
11       Common Sense Media in both their 2019
12   and their 2023 study have over a third of
13   teens -- I think it was up to 60 percent
14   of teens in the most recent study, showing
15   teens reporting that they check their
16   phone in the middle of the night.
17       And as a sleep health researcher, I
18   am very concerned about that regular
19   behavior among youth.  It is disruptive
20   and damaging to child sleep and child
21   health.  So this is between midnight and
22   5:00 a.m., there should be zero here.
23   Instead, we see 60 minutes [sic] of social
24   media -- or 60 people doing ten minutes of
25   social media and 54 kids doing eight or so

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 371

1    minutes of YouTube.  Those numbers are
2    alarming.
3        They shouldn't be reading either, but
4    it is only six students -- or
5    participants.
6    BY MR. PETKIS:
7        Q    Do you remember my question?
8            MS. ARORA:  Object to form.
9            THE WITNESS:  Is reading the largest
10           category?
11   BY MR. PETKIS:
12       Q    No.
13       A    What was your question?
14       Q    This data reflects that only 60
15   participants were using social media at night as
16   defined by the authors.  Right?
17       A    Yes.  The sample size was only around 200,
18   though.
19       Q    Okay.  And on the left-hand side in the
20   second paragraph, do you see where the authors
21   write in the second to last sentence, Specific apps
22   seemed particularly engaging overnight, including
23   mobile games like Nikke, Klondike, Random Dice!,
24   WWE SuperCard, or Cat Game.
25       A    Yes.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 372

1        Q    Facebook and Instagram aren't listed
2    there.  Right?
3        A    I see that.
4        Q    And it continues to state that the longest
5    running social media app overnight was TikTok.
6        A    I see that.
7        Q    It wasn't Facebook or Instagram.  Right?
8        A    I see --
9            MS. ARORA:  Object to form.
10           THE WITNESS:  I see that Facebook and
11           Instagram were not mentioned here.
12   BY MR. PETKIS:
13       Q    All right.  I'm going to hand you what
14   will be marked as Exhibit 19.  And for the record,
15   this is --
16           THE COURT REPORTER:  Wait one second.
17           (Exhibit No. 19 marked for
18           identification.)
19   BY MR. PETKIS:
20       Q    This is the other study that you cited as
21   supporting social media as the largest app
22   category.  This is an article that you co-authored
23   with Dr. Christakis in "JAMA Pediatrics" in April
24   2025 titled "Adolescent Smartphone" During --
25   "Smartphone Use During School Hours."

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 373

1        Do you see this?
2        A    Yes, I do.
3        Q    Is this a true and accurate copy of that
4    article?
5        A    Yes, it is.
6        Q    I am going to have you take a look at page
7    3 in Table 1.
8        A    Page 3.  It looks like it's 475, 476.
9        Q    I apologize.  It is 477.
10       A    Okay.
11       Q    You see Table 1 on page 477.
12       A    Yes, I do.
13       Q    This reflects that the median 24-hour
14   smartphone use for the study population was five
15   hours and 49 minutes?
16       A    That is correct.
17       Q    And median social media use was two hours?
18       A    That is correct.
19       Q    Do you dispute that your data shows social
20   media use is much less than half of total
21   smartphone use for your sample over a 24-hour
22   period?
23           MS. ARORA:  Objection to form.
24           THE WITNESS:  I do want to note that
25           we did not include YouTube as a social

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 374

1    media platform in this estimate.  I don't
2    know if I have YouTube separately here,
3    but that was -- that was treated as
4    something different.
5         So I think we included that as a
6    video streaming or something, so my
7    apologies.  But, yes, I agree that is less
8    than half.
9    BY MR. PETKIS:
10   Q   Okay.  In fact, it is less than 40
11   percent.  Right?
12   A   If you don't include YouTube in there,
13   then yes.
14   Q   And the total 24-hour social media use
15   that you report in Table 1 is not disaggregated
16   between different social media platforms.  Right?
17   A   In Table 1, the social media has -- we
18   have Instagram, TikTok and Facebook listed
19   separately here in terms -- in minutes.
20   Q   I am asking about your 24-hour social
21   media use data and disaggregated --
22   A   Oh, I'm sorry.  I'mn sorry.  You're right.
23   We didn't -- my apologies.  I was not
24   understanding.
25        For the 24-hour, because this was a study

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 375

1    of school day smartphone use, we did not
2    differentiate by platform use.
3         MR. PETKIS:  Why don't we take a
4    quick break.
5         THE VIDEOGRAPHER:  We are now off the
6    record at approximately 5:50 p.m.
7         (Recess taken from 5:50 p.m. to 6:08
8    p.m.)
9         THE VIDEOGRAPHER:  We are back on the
10   record at approximately 6:08 p.m.
11        MR. PETKIS:  Dr. Hale, I want to
12   thank you for your time and your
13   testimony.  I have no further questions at
14   this time, subject to any redirect by the
15   State counsel.
16        THE WITNESS:  Thank you.
17        THE VIDEOGRAPHER:  Please identify
18   yourself as the questioning attorney.
19        MS. ARORA:  Yes.  Nayha Arora for the
20   people of the State of California.
21             CROSS-EXAMINATION
22   BY MS. ARORA:
23   Q   Okay.  Hello, Dr. Hale.
24   A   Hello.
25   Q   Can you start off by going back to your

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 376

1    report and looking at paragraph 34, please.
2    A   Sure.
3    Q   Let me know when you are there.
4    A   I am there now.
5    Q   Okay.  Great.
6         So in this paragraph you list some design
7    features of social media platforms.
8         Do you see that?
9    A   Yes.
10   Q   Specifically here, you have listed
11   notifications, infinite scroll, autoplay, ephemeral
12   content and tailored algorithms.
13        Did I read that correctly?
14   A   Yes.
15        MR. PETKIS:  Objection to leading.
16   BY MS. ARORA:
17   Q   You were asked some questions about your
18   opinion on these features today.  Can you explain
19   for the record how these design features relate to
20   your opinion?
21   A   Sure.  My opinion is about the consistent
22   finding that more interactive digital media content
23   is more disruptive and harmful for sleep health.
24   And the examples of interactive aspects of social
25   media that I pointed out included those design

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 377

1    features, notifications, infinite scroll, autoplay,
2    ephemeral content, and tailored algorithms.
3         Although my research does not specifically
4    investigate those design features specifically,
5    they are part of a cluster of features that fall in
6    the category of more interactive screen use than
7    less interactive screen use.
8    Q   Okay.  Thank you.
9         And can we look at now Exhibit 19.  That
10   is the -- I think it is the final exhibit that you
11   were just looking to counsel about.
12   A   The JAMA article.
13   Q   Yeah.  This is called "Adolescent
14   Smartphone Use During School Hours"?
15   A   Yes.
16   Q   Could you -- yes.  So you were explaining
17   the time spent findings in Table 1 earlier.  Can
18   you explain the time spent findings for the
19   individual social media platforms on this table?
20   A   Sure.  So we only separated out by the --
21   it looks like three social media platforms
22   separately, Instagram, TikTok and Facebook.  And I
23   will start with reading the median values of
24   Instagram, TikTok and Facebook in that order.
25        It is 13 minutes of use during the school

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 378

1  day of Instagram.  Nine minutes of use during the
2  day of TikTok.  And 7.3 minutes of use for the
3  median of Facebook.
4        But then if you look at the mean values --
5  means can vary from the median, depending on the
6  distribution -- you see all three of those
7  categories have higher means.  And Instagram has a
8  mean use of in school or school day, school hour
9  smartphone use of 24.6 minutes.  TikTok has
10 smartphone use during the school day of 18.9
11 minutes.  And Facebook has 19.9 minutes.  So that
12 is what we see in that Table 1.
13        MS. ARORA:  Those are all our
14    questions for Dr. Hale.
15        REDIRECT EXAMINATION
16 BY MR. PETKIS:
17    Q   Just two short things.
18        Do you still have Exhibit 19 in front of
19 you?
20    A   Yes, I do.
21    Q   And Table 1 in particular?
22    A   Yes, I do.
23    Q   I just want to be clear that the figures
24 that you just read regarding use of specific social
25 media platforms during the school day, that is not

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 379

1  use during nighttime.  Right?
2     A   Correct.  These are -- this is a research
3  paper only focusing on smartphone use during the
4  school day, that is correct.
5     Q   And this data doesn't tell you anything
6  about when during the school day the participants
7  were using these platforms.  Right?  It could have
8  been during lunch.  It could have been during a
9  break?
10    A   That is correct.
11    Q   And you are not offering any opinions
12 regarding interruption of learning or impact on
13 youth in that way.  Right?
14        MS. ARORA:  Objection to form.
15        THE WITNESS:  Not for this report.  I
16    do have opinions on it, but I am -- not
17    for this report.
18 BY MR. PETKIS:
19    Q   No expert opinions in this case regarding
20 the use of Instagram or Facebook impacting learning
21 in any way?
22    A   Not for this --
23        MS. ARORA:  Object to the form.
24        THE WITNESS:  I do not have any -- I
25    am not comfortable offering opinion in --

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 380

1      because it is out of the scope of this
2      report.  But I have been on the record
3      saying I am concerned about high levels of
4      smartphone use in the school day.
5        MR. PETKIS:  Okay.  Nothing further.
6        THE VIDEOGRAPHER:  Do you want me to
7      announce the record times?
8        MR. BERGMAN:  Please.
9        THE VIDEOGRAPHER:  So we had 6:55 for
10     direct.  It then -- it took us to seven
11     hours for cross, so five minutes.  And
12     then it was one minute of redirect.
13        This concludes today's testimony.  We
14     are now off the record at approximately
15     6:14 p.m.  The total number of media units
16     was six.
17        (Whereupon, the deposition adjourned
18     at 6:14 p.m.)
19
20
21
22
23
24
25

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 381

1        J-U-R-A-T
2      I, LAUREN HALE, Ph.D., do hereby certify
3  that the foregoing testimony taken on September
4  17th, 2025, is true and accurate, including any
5  corrections noted on the corrections page, to the
6  best of my knowledge and belief.
7
8
9      _____
       LAUREN HALE, Ph.D.
       Date:
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 382

```
 1                    TRANSCRIPT CORRECTIONS
 2    REPORTER:  Sarah J. Miner
 3
 4
      CASE STYLE:  IN RE:  SOCIAL MEDIA ADOLESCENT
 5    ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY
      LITIGATION
 6
 7
 8    DEPONENT:  LAUREN HALE, Ph.D.
 9
10
11
12    PAGE   LINE   CORRECTION   REASON FOR CHANGE
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 383

```
 1              C E R T I F I C A T E
 2         I hereby certify that I am a Notary Public, in
 3    and for the State of Connecticut, duly commissioned
 4    and qualified to administer oaths.
 5         I further certify that the deponent named in
 6    the foregoing deposition was by me duly sworn and
 7    thereupon testified as appears in the foregoing
 8    deposition; that said deposition was taken by me
 9    stenographically in the presence of counsel and
10    reduced to typewriting under my direction, and the
11    foregoing is a true and accurate transcript of the
12    testimony.
13         I further certify that I am neither of counsel
14    nor related to either of the parties to said suit,
15    nor of either counsel in said suit, nor am I
16    interested in the outcome of said cause.
17         Witness my hand and seal as Notary Public the
18    19th of September, 2025.
19
20
21    _____
22    Notary Public
23    My Commission Expires:
24    November 30, 2027
25
```