# Exhibit 24

# PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE GENERAL CAUSATION TESTIMONY OF PLAINTIFFS' EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

-------------------------------------------

COORDINATION PROCEEDING SPECIAL

TITLE [RULE 3.400]          JCCP No. 5255

For Filing Purposes:

IN RE: SOCIAL MEDIA          22STCV2135

ADOLESCENT ADDICTION

(JCCP No. 5255)

THIS DOCUMENT RELATES TO:

Cristina Arlington Smith, et al. v. TikTok

Inc., et al., Case No. 22STCV2135,

Los Angeles Superior Court

-------------------------------------------

June 25, 2025

(caption continued)

CONFIDENTIAL

Page 2

VOLUME I

Videotaped deposition of DIMITRI A. CHRISTAKIS, M.D., M.P.H., held at 620 Eighth, New York, New York, commencing at 9:00 a.m. EDT, on the above date, before Marie Foley, a Registered Merit Reporter, Certified Realtime Reporter and Notary Public.

- - -

GOLKOW, a Veritext Division

877.370.3377 ph | 917.591.5672 fax

Page 3

A P P E A R A N C E S:

ON BEHALF OF PLAINTIFFS:

MOTLEY RICE, LLC
BY: SARA O. COUCH, ESQUIRE
   NELSON L. DRAKE, ESQUIRE
   28 Bridgeside Boulevard
   Mount Pleasant, South Carolina  29464
   PHONE: 843.216.9000
   EMAIL: scouch@motleyrice.com
      ndrake@motleyrice.com
   - and -

BEASLEY ALLEN LAW FIRM
BY: JENNIFER EMMEL, Ph.D., ESQUIRE
   218 Commerce Street
   P.O. Box 4160
   Montgomery, Alabama  36103-4160
   PHONE: 800.898.2034
   EMAIL: jennifer.emmel@beasleyallen.com

Page 4

A P P E A R A N C E S: (Continued)

ON BEHALF OF META:

COVINGTON & BURLING, LLP
BY: PAUL W. SCHMIDT, ESQUIRE
   DANIEL AUTEN, ESQUIRE
   The New York Times Building
   620 Eighth Avenue
   New York, New York  10018-1405
   PHONE: 212.841.1134
   EMAIL: pschmidt@cov.com
      dauten@cov.com

BY: PAUL BANKS, ESQUIRE
   One City Center
   850 Tenth Street, NW
   Washington, DC  20001-4956
   PHONE: 202.662.6000
   EMAIL: pbanks@cov.com

Page 5

A P P E A R A N C E S: (Continued)

ON BEHALF OF SNAPCHAT:

MUNGER, TOLLES & OLSON LLP
BY: JONATHAN H. BLAVIN, ESQUIRE
   560 Missions Street, 27th Floor
   San Francisco, California  94105-2907
   PHONE: 415.512.4027
   EMAIL:  Jonathan.Blavin@mto.com

BY: PRISCILA CORONADO, ESQUIRE (via Zoom)
   350 South Grand Avenue
   50th Floor
   Los Angeles, California  90071-3426
   PHONE: 213.683.9100
   EMAIL: priscila.coronado@mto.com

ON BEHALF OF TIKTOK and BYTEDANCE:
KING & SPALDING LLP
BY: TODD P. DAVIS, ESQUIRE
   1180 Peachtree Street, N.E.
   Atlanta, Georgia  30309-3521
   PHONE: 404.572.3589
   EMAIL: tdavis@kslaw.com

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

A P P E A R A N C E S: (Continued)

ON BEHALF OF GOOGLE LLC/YOUTUBE LLC:
WILLIAMS & CONNOLLY LLP
BY: ASHLEY W. HARDIN, ESQUIRE
    JOSEPH SANDOVAL-BUSHUR, ESQUIRE
    680 Maine Avenue SW
    Washington, DC  20005
    PHONE: 202.434.5000
    EMAIL: ahardin@wc.com
        jsandoval-bushur@wc.com

ALSO PRESENT VIA ZOOM:
    Kelly McNabb, Lief Cabraser
    Catherine McCormick

EXHIBIT TECHNICIAN:
    Derek Palisoul, Core Legal Concepts

VIDEOGRAPHER:
    Jonathan Juarez

Page 8

FEDERAL STIPULATIONS

    IT IS HEREBY STIPULATED AND
AGREED by and between the parties hereto,
through their respective counsel, that the
certification, sealing and filing of the
within examination will be and the same
are hereby waived;
    IT IS FURTHER STIPULATED AND
AGREED that all objections, except as to
the form of the question, will be reserved
to the time of the trial;
    IT IS FURTHER STIPULATED AND
AGREED that the within examination may be
signed before any Notary Public with the
same force and effect as if signed and
sworn to before this Court.

Page 7

- - -
TRANSCRIPT INDEX
PAGE

APPEARANCES........................ 3 - 6
INDEX OF EXHIBITS................. 9 - 16
EXAMINATION OF
DIMITRI A. CHRISTAKIS, M.D., M.P.H.:
BY:  MR. SCHMIDT................... 19
AFTERNOON SESSION................. 215
EVENING SESSION................... 452
SIGNATURE PAGE.................... 528
ERRATA........................... 529
REPORTER'S CERTIFICATE............ 530

EXHIBITS WITH ORIGINAL TRANSCRIPT

- - -

Page 9

- - -
E X H I B I T S
- - -

NO.       DESCRIPTION            PAGE
Christakis  Expert Report of Dimitri A.   23
Exhibit 1   Christakis, M.D., M.P.H.
        April 18, 2025

Christakis  Expert Report of Dimitri A.   26
Exhibit 3   Christakis, M.D., M.P.H.
        April 18, 2025 (witness
        copy)

Christakis  Handwritten notes of the      28
Exhibit 4   witness

Christakis  JAMA Pediatrics Review        28
Exhibit 5   April 2023

Christakis  Nagata study                  29
Exhibit 6

Golkow Technologies,
877-370-3377        A Veritext Division        www.veritext.com

CONFIDENTIAL

Page 10

E X H I B I T S

NO.        DESCRIPTION              PAGE

Christakis  Xiao study              29
Exhibit 7

Christakis  American Psychological       29
Exhibit 8   Association article Health
            Advisory on Social Media
            Use in Adolescence May 2023

Christakis  Expert Report of Dimitri A.   31
Exhibit 2   Christakis, M.D., M.P.H.
            May 16, 2025

Christakis  Dimitri Christakis          61
Exhibit 9   Biographical Sketch,
            Bates
            META3047MDL-177-00063201-204

Christakis  Email thread November 12,    111
Exhibit 10  2024,
            Bates CHRISTAKIS0445-446

Page 11

E X H I B I T S

NO.        DESCRIPTION              PAGE

Christakis  Common Sense presentation    132
Exhibit 11  2023 Constant Companion:  A
            Week in the Life of a Young
            Person's Smartphone Use

Christakis  JAMA Pediatrics April 2025   137
Exhibit 12  article

Christakis  NEDA article                156
Exhibit 13

Christakis  NEDA article Media and       158
Exhibit 14  Eating Disorders

Christakis  JAMA Viewpoint, Christakis   195
Exhibit 15  and Hale, April 28, 2025

Christakis  Dimitri Christakis          201
Exhibit 16  Materials Considered List,
            Bates Christakis0054-444

Page 12

E X H I B I T S

NO.        DESCRIPTION              PAGE

Christakis  American Psychological       235
Exhibit 17  Association What is DSM and
            why is it important?

Christakis  DSM-5 Unspecified Other (Or   238
Exhibit 18  Unknown) Substance-Related
            Disorder

Christakis  DSM-5 Conditions for         243
Exhibit 19  Further Study

Christakis  DSM-5 Substance-Related and   259
Exhibit 20  Addictive Disorders

Christakis  "The Leading Voices in       276
Exhibit 21  Food" podcast transcript

Christakis  U.S. Surgeon General's       286
Exhibit 22  Advisory Social Media and
            Youth Mental Health 2023

Page 13

E X H I B I T S

NO.        DESCRIPTION              PAGE

Christakis  American Academy of          288
Exhibit 23  Pediatrics Problematic
            Technology Use

Christakis  American Psychological       298
Exhibit 24  Association What is
            Technology Addiction?

Christakis  American Psychological       302
Exhibit 25  Association Health Advisory
            on Social Media Use in
            Adolescence

Christakis  Handbook of Children and     318
Exhibit 26  Screens

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

- - -

E X H I B I T S

- - -

NO.    DESCRIPTION            PAGE

Christakis  The Jed Foundation (JED)    323
Exhibit 27  Recommendations For
Safeguarding Youth
Well-Being on Social Media
Platforms February 6, 2024

Christakis  National Academies Sciences   324
Exhibit 28  Engineering Medicine Social
Media and Adolescent Health
(2024)

Christakis  Chelly Maes article       336
Exhibit 29

Christakis  HHS Public Access Author     338
Exhibit 30  manuscript 2022 November, 17

Christakis  List the Studies         340
Exhibit 31

Page 15

- - -

E X H I B I T S

- - -

NO.    DESCRIPTION            PAGE

Christakis  AJPH article,         386
Exhibit 32  Jon-Patrick Allem

Christakis  Facebook "Addiction", Basis   421
Exhibit 33  Well-Being Research June 2018
Bates
META3047MDL-014-00359270-336

Christakis  Video clip            435
Exhibit 34

Christakis  JAMA Viewpoint June 18, 2019  443
Exhibit 35

Christakis  Handbook Children and       483
Exhibit 36  Screens

Christakis  Sherman study         485
Exhibit 37

Page 16

- - -

E X H I B I T S

- - -

NO.    DESCRIPTION            PAGE
Christakis  Rod study          488
Exhibit 38

Christakis  Starcevic study       505
Exhibit 39

Christakis  Vanden Abeele study     518
Exhibit 40

(REPORTER'S NOTE:  All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily denote an exact quote from the document.)

Page 17

DEPOSITION SUPPORT INDEX

DIRECTION TO WITNESS NOT TO ANSWER

| Page | Line | Page | Line |
|------|------|------|------|
| 211  | 21   | 463  | 22   |

REQUEST FOR PRODUCTION OF DOCUMENTS

| Page | Line |
|------|------|
| 149  | 17   |

STIPULATIONS

| Page | Line |
|------|------|
| 8    | 4    |

QUESTIONS/ANSWERS MARKED

| Page | Line | Page | Line | Page | Line |
|------|------|------|------|------|------|
| 54   | 14   | 341  | 14   | 502  | 14   |
| 78   | 14   | 396  | 12   |      |      |
| 83   | 2    | 398  | 6    |      |      |
| 89   | 6    | 398  | 13   |      |      |
| 102  | 23   | 398  | 21   |      |      |
| 231  | 22   | 399  | 11   |      |      |
| 253  | 12   | 425  | 16   |      |      |
| 305  | 2    | 462  | 16   |      |      |

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

- - -

9:06 a.m. EDT

New York, New York

- - -

THE VIDEOGRAPHER: We are now on the record. My name is Jonathan Juarez. I am a legal videographer for Golkow.

Today's date is June 25th, 2025. And the time is 9:06 a.m.

This deposition is taking place at 620 Eighth Avenue, New York, New York, in the matter of In Re: Social Media Adolescent Addiction Personal Injury Products Liability Litigation.

The deponent is Dr. Dimitri Christakis.

All counsel will be noted on the stenographic record.

The court reporter is Marie Foley, and will now swear in the witness.

THE STENOGRAPHER: If I could ask you to raise your right hand,

Page 19

please.

Do you swear or affirm the testimony you give will be the truth, the whole truth, and nothing but the truth today?

THE WITNESS: I do.

THE STENOGRAPHER: Thank you.

- - -

DIMITRI A. CHRISTAKIS, M.D., M.P.H., the Witness herein, having been first duly sworn by a Notary Public in and of the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. SCHMIDT:

Q. Good morning, Dr. Christakis.

My name is Paul Schmidt. We met just before the deposition. I represent Meta.

Have you been deposed before?

A. No, not like this, no.

Q. Okay. Do you know the process? Do you need me to walk through the process

Page 20

for you?

A. I -- I -- sure, walk through it.

I mean, I've read so many depositions in this case that I, sort of, heard the process over and over, but let's be official and be on the record.

Q. You're probably an expert in it, but let me -- let me walk through it.

I'm going to ask you questions. I'm going to ask you to answer verbally. If you shake your head or say "uh-huh," they can't get it.

A. Yep.

Q. It's important that we don't talk at the same time. Your lawyer may have objections. Unless she tells you not to answer the question, you still have to answer the question.

I'm going to ask you to try and answer my questions, obviously, truthfully and, as best you can, succinctly if that's what the question calls for.

And if you need a break, let me know. Otherwise we'll take breaks about

Page 21

once every hour. The only exception is you can't take a break in the middle of a question, but if you don't mind, just give me a heads-up, I can wrap up what I'm asking, and then we can take a break.

A. Okay.

Q. It's not meant to be an endurance test.

It looks like you've got, I assume that's your report --

A. It is.

Q. -- in front of you?

Okay.

We're going to go ahead and mark your report as an exhibit, but you can feel free to consult your report if you need to throughout your testimony, but I'll -- whenever I put a document in front of you, I'll flag for you what I'm specifically asking about so you're not searching for things.

As I said before, the most important thing is giving truthful, accurate testimony, and I take it there's

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

no reason you can't give truthful, accurate testimony today.

A. No.

Q. Okay. Good.

Are you prepared to fully testify about all your opinions today?

A. I am.

Q. Have you done all the work you need to do in order to be able to testify before a jury in these cases?

A. I have.

Q. Are there any documents you know of that you still need to review that you have not reviewed?

A. For the purposes of today or that there are other documents?

No, I feel prepared to testify today.

Q. Okay.

And there's no further work you've been asked to perform before trial that you have not yet performed, is there?

A. No, but I imagine between now and then additional work might come up.

Page 23

Q. Okay.

There are no opinions, new opinions you know of, that you have now that aren't contained in your report?

A. No.

MR. SCHMIDT: Why don't we go ahead and mark your report as Exhibit 1 and 2.

I have two different versions of your report. So I'll pass you both of them, and then I'll ask you what you have in front of you.

THE WITNESS: I -- I have the one -- I don't remember which one. It's -- it's the first one 'cause I was told that was the one we were going to work off of.

MR. SCHMIDT: Okay.

THE WITNESS: Is that the JCC --

MR. SCHMIDT: I'll give you -- the JCCP, correct.

(Christakis Exhibit 1, Expert Report of Dimitri A. Christakis, M.D., M.P.H. April 18, 2025, was marked for

Page 24

identification, as of this date.)

BY MR. SCHMIDT:

Q. So, Exhibit 1, and I guess we're giving this to you in a binder just because it's voluminous, is a copy of your report.

A. The first one. Okay.

Q. From the JCP.

And is that the same --

A. That's the -- that's --

(Stenographer admonition on crosstalk.)

BY MR. SCHMIDT:

Q. Is that the same as what you have in front of you?

A. I believe it is the same. I mean, it is the JCCP.

Q. I note that you've got what looks like a forest of taped flags on your version of the report.

Is it annotated and highlighted, or is it just the tape flags?

A. There's tape and there is some highlights.

Page 25

Q. Okay.

A. But that's it. There's no notations of any kind.

MR. SCHMIDT: All right.

With your leave, I'm going to mark this as an exhibit because we need to be able to know what you've highlighted --

THE WITNESS: Sure.

MR. SCHMIDT: -- and whatnot.

So why don't we mark this as Exhibit 3.

THE WITNESS: Are you then going to take this?

MR. SCHMIDT: That will come with us after and we'll get you a copy. Or we'll copy it and we'll get it back to you --

THE WITNESS: It doesn't matter.

(Stenographer admonition on crosstalk.)

MR. SCHMIDT: So would you mind if I just put this on the cover?

And it looks like you've got

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

some materials in the sleeve.  May I look at the materials in the sleeve?

THE WITNESS:  Yeah.

(Christakis Exhibit 3, Expert Report of Dimitri A. Christakis, M.D., M.P.H. April 18, 2025 (witness copy), was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q.   Okay.

As I understand it, the materials in the sleeve are a deposition notice, several studies, and I don't know what the terminology is for the second to last one, an advisory?

A.   Yeah.

Q.   An advisory, and then some handwritten notes.

Are those your handwritten notes?

A.   These are my handwritten notes.

Q.   What's the purpose of the handwritten notes?

A.   These are some notes that I took

Page 27

with respect to the rebuttals that were filed -- or, the -- yeah, not the rebuttals.  The -- the defense reports.

Q.   Okay.

And what's the -- why -- why do you have specifically those studies and that advisory with you?

May I look at this?

A.   Yeah.

This -- this -- these two studies -- oh, I didn't even -- these two studies came out since -- since I filed my report, they came out in the last two weeks.  So they're not even reflected in it.

This is cited in my report.  I don't know why I had it.

And this is something I wanted to be able to -- to cite.

MR. SCHMIDT:  Okay.

So if I may take those and mark those as exhibits.

THE WITNESS:  Yeah.

MR. SCHMIDT:  I don't think I

Page 28

need to mark the notice.

I'll mark as Exhibit 4 that's the notes on the defense experts.

Is that correct?

THE WITNESS:  Correct.

(Christakis Exhibit 4, handwritten notes of the witness, was marked for identification, as of this date.)

MR. SCHMIDT:  I'll mark as Exhibit 5 the Schlossarek study.

Is that one of the --

THE WITNESS:  No.

MR. SCHMIDT:  That's a study you just wanted to be able to cite?

THE WITNESS:  Yes.

MR. SCHMIDT:  Okay.

(Christakis Exhibit 5, Nagata study, was marked for identification, as of this date.)

MR. SCHMIDT:  And then I'll mark as Exhibit 6, that's one of the new studies?

THE WITNESS:  Correct.

Page 29

(Christakis Exhibit 6, JAMA Network Open May 21, 2025, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q.   Have you --

MR. SCHMIDT:  Actually, let me strike that.

And I'll mark as Exhibit 7 Xiao.

Is that another new study?

THE WITNESS:  Yes.

(Christakis Exhibit 7, Xiao study, was marked for identification, as of this date.)

MR. SCHMIDT:  And I'll mark as Exhibit 8 the Health Advisory from the American Psychological Association.  That's something you said you wanted to be able to reference.

THE WITNESS:  (Nodding.)

Correct.  It's in my report, but I wanted to be able to reference.

(Christakis Exhibit 8, American Psychological Association article Health Advisory on Social Media Use in

8 (Pages 26 - 29)

Page 30

Adolescence May 2023, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. Have you written any -- any, kind of -- anything, I guess, on Exhibits 4, 6, or 7 beyond the handwritten notes that appear on Exhibit 4?

A. No.

Q. The two, 6 and 7, are the new studies?

A. When you say "written," what do you mean?

Q. Have you done any kind of write-up, like amendment to your report or supplement or anything like that?

A. No.

Q. Okay. All right. I'll come back to those.

In the interest of space, you can put all that to the side and probably -- whichever binder you want to work off for your report. I'm going to refer to your original report as Exhibit 1, but if you want to use the copy

Page 31

that you've highlighted --

A. Yep.

Q. -- which we've marked as Exhibit 3, that's fine too.

Exhibit 1 and Exhibit 3 are your report from April 18th of 2025; is that correct?

A. That's correct.

Q. And I take it you stand behind everything in that --

A. I do.

Q. -- report?

MR. SCHMIDT: We're going to mark as Exhibit 2 what we understand to be your MDL report.

(Christakis Exhibit 2, Expert Report of Dimitri A. Christakis, M.D., M.P.H. May 16, 2025, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. And this one is dated May 16th, 2025.

Do you see that?

A. I do.

Page 32

Q. Do you stand behind everything in that report?

A. I do.

Q. And I had understood, and I might be wrong, that you referred to something called the JCCP. You understand that there's some cases in state court in Los Angeles and some federal court cases in Oakland in an MDL.

Do you have that understanding?

A. I have a very rudimentary understanding that there are two separate cases that have -- but I don't want to -- yes, I understand there's -- I don't understand the details, frankly, of what the differences between them are.

Q. My question to you is we have your original JCCP report, Exhibit 1, for the cases in Los Angeles in state court, and then we received Exhibit 2, your MDL report for the federal cases in Oakland.

My understanding was you intended Exhibit 2 to apply also in the JCCP as a supplement. Is that correct?

Page 33

A. There's more in this than there is in this 'cause they were separated by, I don't remember, a month or six weeks or something.

So, yes, that's fine. I mean, I'm happy to defend anything that's in this, but I -- yes.

Q. All right. I'm going to work off of Exhibit 2 because that is the more complete version of your report --

A. Okay.

Q. -- when I ask you questions, unless you prefer I work off of Exhibit 1. But that means the numbers are going to be a little different, the page numbers are going to be different than what you have in front of you.

So this Exhibit 2 is going to be the most important document for you to have throughout the deposition 'cause that will be the -- the basis for me questioning you.

A. That's fine. I was just told that it would be this one, which is why I

CONFIDENTIAL

Page 34

read and annotated this one. So it's a little frustrating, but we can make it work. I mean, I'm fine with --

Q. All right. Well, I don't want to frustrate you. We might have had a different understanding from your counsel than you did, but I had understood that Exhibit 2 was intended to apply in the JCCP, and if it doesn't and there's anything new in Exhibit 2 is outside the JCCP, then I'll put it to the side.

MR. SCHMIDT: But I thought you guys intended to incorporate Exhibit 2.

MS. COUCH: I believe that was the position instructions by the court at the last CMC.

MR. SCHMIDT: Okay.

MS. COUCH: And I think for purposes of today that, you can feel free to, like, reference that one. They're close enough. You should be able to go back and forth without much issue.

Page 35

THE WITNESS: It's mostly a pagination issue, quite frankly.

MR. SCHMIDT: Yeah.

MS. COUCH: Right.

THE WITNESS: And figure -- in fact, you had asked for a figure -- or I think it was you. I don't know, someone asked for a figure and it was not the same number, so.

MR. SCHMIDT: Yeah. Yeah, 'Cause we were working off --

THE WITNESS: I understand.

MR. SCHMIDT: -- of Exhibit 2.

BY MR. SCHMIDT:

Q. Did you draft Exhibit 1 and 2 yourself?

A. Absolutely.

Q. Is there any opinion you plan to offer at trial that's not contained in Exhibit 1 or Exhibit 2 that you know about?

A. No, not at -- no, not at the moment, no.

Q. Did you form any new opinions

Page 36

not contained in your reports in response to seeing the defense expert reports?

A. Any new opinions?

Q. Yes.

A. No.

Q. Okay.
Let's look at page 1 of Exhibit 2, and I want to ask you about that -- it's actually not numbered page. It's the cover page of the report.
Do you see you have that certification at the bottom?

A. Yes.

Q. Why did you provide that certification?

MS. COUCH: Objection; calls for legal reasoning.

A. Why did I provide this?

Q. Mm-hm.

A. I was asked to sign this. I mean, I -- I assume it's standard legal procedure.

Q. Okay.
Do you intend to comply with

Page 37

that --

A. Yes, absolutely.
(Stenographer admonition on crosstalk.)

BY MR. SCHMIDT:

Q. And is that true as to any case you testify in, regardless of whether it's the federal court cases or the state court cases or some other case?

A. Are you asking me if I intend to --

Q. Follow that certification, comply with that certification, regardless of which case you're testifying in. And the reason I ask is that certification does not appear on Exhibit 1.

A. Yes, I intend to -- yes.

Q. Okay.
The first sentence talks about owing the court a duty of candor and professional integrity.
Do you see that?

A. I do.

Q. Does that extend to providing a

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

balanced presentation of the science and the documents to the court?

MS. COUCH: Objection; calls for legal reasoning.

A. Say that again?

Q. Does -- you have signed off on this --

A. Yes.

Q. -- certification, correct?

A. Yes.

Q. Does certifying that you owe a primary and overriding duty of candor and professional integrity to help the court, does that include providing a balanced presentation of the science and the documents to the court?

MS. COUCH: Objection; calls for legal reasoning.

A. Candor to me means honest.

Q. Okay.

A. And I absolutely intend to be honest.

Q. What about professional integrity, does that call for providing a

Page 39

balanced presentation to the court?

MS. COUCH: Same objection.

A. No. Actually, I don't -- I don't know what you mean -- I don't -- I mean, I think professional integrity, again to me, means professional and honest.

Q. Okay.

You looked at various documents and various studies, right?

A. I did, many.

Q. Is part of your certification to the court that you'll present those even-handedly without, kind of, pulling out just the positives or the negatives?

MS. COUCH: Objection; calls for legal reasoning.

A. My certification is that I will provide my expert opinion on having reviewed all of the data and -- that -- and all of the sources of information that I considered.

Q. I understand that.

What I'm asking is, in your

Page 40

view, does that include, when you talk about a study or when you talk about documents as you do, does that include providing balance in terms of how you present those documents, not just picking out selected parts, but giving context, giving strengths and limitations?

A. I --

MS. COUCH: Asked and answered.

A. I'm prepared to defend my opinions in this which are based on my read of all of the information that I reviewed.

Q. Well, I'm asking a different question, respectfully.

What I'm asking is in presenting your opinions, do you -- and giving the certification, are you undertaking any commitment to be balanced in the way in which you address the science?

MS. COUCH: Calls for legal reasoning; asked and answered.

BY MR. SCHMIDT:

Page 41

Q. And I'm trying to ask it just as a yes-or-no question.

A. Yeah, I see that, but I -- I -- you know, we -- I think we have a bit of a semantic disagreement here.

I am offering my expert opinion which takes into account the totality of the evidence and makes -- come -- comes to a conclusion, which is what I was asked to do.

Q. Well, let me try it a different way.

Are you an advocate in this case?

A. No.

Q. Is it important that you not be an advocate in this case in terms of following standards and professional --

A. Absolutely.

MS. COUCH: Let me get in my objection too, Dimitri.

THE WITNESS: Sorry.

BY MR. SCHMIDT:

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

Q. Is it important that when you address scientific studies, you take into account their strengths as well as their weaknesses?

A. Absolutely. That is something that I do as a scientist, as a journal editor, as a professional, yes.

Q. Is it important when you address company documents that you give a fair presentation of the company documents in their context?

MS. COUCH: Objection; vague.

A. I -- I guess I would ask you to clarify what you mean by that.

Q. I mean fully presenting the document, not just taking misleading quotes out of a document, but giving a fair presentation of what the document reflects and how it fits into the larger document set.

A. I don't believe I've taken any misleading quotes out of any document.

Q. Would it be inappropriate to do that in a scientific perspective and in

Page 43

terms of the certification, in your view?

MS. COUCH: Objection; calls for legal reasoning.

A. I have no intention of misleading anyone.

Q. Okay.
Would it be inappropriate to do so?

MS. COUCH: Same objection; asked and answered.

A. I have no intention of misleading anyone.

Q. Would it be inappropriate to do so, in your view?

A. To mislead someone?

Q. Yes.

A. Yes, I would think it's inappropriate to intentionally mislead someone.

Q. Is it important when you address things like scientific studies or company documents that you take into account the context of the study, the context of the documents?

Page 44

MS. COUCH: Asked and answered.

A. I -- I believe I've answered this many times now.

Q. What's the answer?

A. The answer is that I take into account everything and offer my opinion, and I'm not misleading anyone, nor do I have any intention of functioning as advocate. I'm here as an expert who's reviewed tens of thousands of pages and hundreds of studies and synthesized them into what I consider to be a mainstream and completely defensible position.

Q. Have you ever done work -- I'm going to focus on company documents.
You reviewed a lot of company documents in this case, right?

A. I did.

Q. Have you ever done that type of work before in your professional -- let me -- let me take a step back.
In this case, you reviewed company documents from how many companies?

A. All five of them, I believe.

Page 45

Q. Okay. And you're counting Instagram and --

A. I'm calling -- I'm sorry.

Q. -- companies?

A. We can count them as one.

Q. Yeah, I'm not going to fuss with you on semantics.

A. Okay.

Q. I just want to know I -- we have the same count.

A. Yes.

Q. Okay.

A. We have the same count.

Q. Have you ever undertaken work like that before that you could point us to where you've been given a set of documents from a company and asked to reach opinions based on those documents?

A. Yes, I have.

Q. When have you done that?

A. I've done it in the course of my professional life over the past 25 years. I am one of the leading epidemiologists at the Seattle Children's Hospital and

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

University of Washington Hospital. And many people don't think of hospitals as businesses, but in fact they are. We -- we serve patients, or clients. There are safety risks. There are data that are collected in the process of our work that need to be analyzed, and decisions have to be made about whether or not we would invest resources to make changes that would improve safety or reduce risk. And those data, quite frankly, are often messy and collected in the course of day-to-day work, and I'm often called on to review them and help the hospital make decisions.

Also, in the course of my work as an editor in chief of JAMA Pediatrics, which is the leading pediatric journal in the world, over the last eight years as editor-in-chief and previously for 17 years as associate editor, we frequently get industry studies for review and consideration.

And then finally, I suppose, I've been asked multiple times, including

Page 47

just three weeks ago, presumably because of my expertise, to serve on a data safety monitoring board for industry. I've never agreed to do it, but I was just asked two weeks ago to serve on a data safety monitoring board for a formula company.
Q. Okay.
What formula company is that?
A. I don't recall, but I can get that for you if it's important.
Q. What -- what is -- what is it you're being asked to review?
A. They are -- I -- honestly, I didn't get beyond the initial email that asked me to serve on it, and I would normally have not even paid any attention to it except for the fact that it was another opportunity to review industry documents.
But that's basically what it is. They are in the process of bringing a new formula to -- actually, this is inferential because I didn't get beyond the original email. But typically what it

Page 48

is is that they are bringing a new product to market and they want someone to independently review their data that they would trust.
Q. In this case, you reviewed various types of documents from the companies: emails, chats, survey research, other types of documents, correct?
A. That's correct.
Q. Have you ever had occasion to review those type of documents and reach opinions based on those type of documents other than for an institution that you were working for?
MS. COUCH: Objection; misstates prior testimony.
A. I don't understand the nature of your question.
You mean other than an institution, other -- like as a -- as a consultant as opposed to as a --
Q. As opposed to an institution you're working for, like your hospital that you mentioned.

Page 49

MS. COUCH: Same objection.
BY MR. SCHMIDT:
Q. Have you ever had occasion to go to a company that you don't work for --
A. Yeah.
Q. -- and review the range of documents and give opinions based on the range of documents as you've done here?
A. Yeah, I've -- okay.
I've been asked previously, as I mentioned, to do -- to serve in that capacity for industry, and I've always demurred.
I have, however, served as an independent scientist doing site visits for several other hospitals and academic institutions in the United States and, frankly, around the world where I would come in as an outside expert and offer my opinion on their processes.
Q. Have you ever reviewed the types of documents you have in this case regarding a tech company and given opinions based on those documents?

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

A.   I have never served in that capacity for a tech company even though I have been asked to, that's correct.

Q.   If you look across the medical community, do you believe that there's -- I'm trying to ask this as a yes-no question.

If you look across the medical community, do you believe that there is a consensus that social media is addictive?

A.   Yes, I believe that's true.

Q.   And you believe that consensus is held by the medical community at large?

A.   Yes, I believe that's true.

Q.   Okay.

Is Roblox addictive?

A.   Oh, the -- the -- the -- the app. Yeah, I think that -- I'm not -- the -- I think the -- any of these things can be. It's really an -- it's -- it's about the experience rather than the content.

Q.   Okay.

A.   And I didn't review individual

Page 51

apps or games.

Although I can tell you that I have encountered in my clinical and professional life parents who've told me that their child obsessively plays all kinds of games.

Q.   So I'm just going to ask you yes, no, or you don't have a view, do you believe Roblox can be addictive?

A.   I don't have an opinion on that.

Q.   Do you believe Discord can be addictive?

A.   I don't have an opinion on that.

Q.   Do you believe Twitter can be addictive?

A.   I don't have an opinion on that.

Q.   Do you believe dating apps can be addictive?

A.   I don't have an opinion on that.

Q.   Do you believe text messaging can be addictive?

A.   I don't have an opinion on that.

Q.   Do you believe video games can be addictive?

Page 52

A.   I do believe video games can be addictive.

Q.   And is that both off-line and online video games?

A.   Well --

Q.   Let me ask it more precisely.

Do you believe online video games are addictive?

A.   I do -- I -- I do believe that. I'm serving on a expert committee right now to have internet gaming disorder added to the DSM-5, and I do believe they're addictive, yes.

Q.   Do you believe off-line games can be addictive?

A.   I haven't considered that. It's not under review.

Q.   Okay.

Do you believe --

A.   But can I --

Q.   I'm -- I'm just trying to get through these quickly.

Do you believe television can be addictive?

Page 53

A.   No, I do not television can be addictive.

Q.   Do you believe Netflix can be addictive?

A.   I haven't considered that.

Q.   Do you believe -- when you say that there's -- is -- is --

MR. SCHMIDT:  Strike that.

Q.   Do you believe that there is medical consensus that social media can cause eating disorders?

A.   Yes, I believe that.

Q.   Suicide?

A.   Yes, I believe that.

Q.   Okay.

Do you believe that there is consensus that social media can cause eating disorders irrespective of the content that people see on social media; yes or no?

A.   Not only do I believe that, but the National Eating Disorder Association has issued that same opinion.

MR. SCHMIDT:  Okay.  And I'll

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

respectfully move to strike everything after "not only do I believe that."

BY MR. SCHMIDT:

Q.   I'm just asking about your views.  I'll come to some of the materials you cite.

Do you believe that social media can cause suicide independent of the content that people see; yes or no?

A.   Well --

MS. COUCH:  Object to the form.

Just so you know, Dimitri, you don't have to give a yes or no.

THE WITNESS:  Yeah, I'm not going to.

MS. COUCH:  You just answer.

MR. SCHMIDT:  Let's mark that portion of the transcript, please.

I think that's improper coaching, directing the witness to be evasive.

MS. COUCH:  I think in telling the witness they have to answer a question yes or no goes against the

Page 55

rules of procedure.

MR. SCHMIDT:  And just to be clear, I'm going to ask you -- I'll re-ask my question just so you have it cleanly.

BY MR. SCHMIDT:

Q.   I'm going to ask you a lot of yes-or-no questions because you've got a massive report.  We have limited time.  I'm trying to get through a lot of material with you without having to go to the court and ask for more time.  So I think I'm entitled to ask you a yes-or-no question.  If I ask you a yes-or-no question and either your answer is you don't know or you can't answer it "yes" or "no," that's a perfectly fine answer too.

A.   Okay.

Q.   So that's going to be baked into every yes-or-no question I ask you.

MS. COUCH:  And I will just put on the record we have twelve hours and we have an additional MDL deposition coming up in August.

Page 56

Otherwise I do agree with the reading of the rules of procedure that if you can't answer it "yes" or "no," then you are permitted to give your full answer.

With that.

MR. SCHMIDT:  Object to the coaching.

BY MR. SCHMIDT:

Q.   And what I'm going to ask you to do is -- I'm trying to avoid having long colloquies where we can.

A.   Yeah.

Q.   If you can't answer it "yes" or "no," just tell me and I'll move on or I'll try to rephrase if I can.

So, to go back to the question I asked you, the yes-or-no question, do you believe that there's medical consensus that social media features can cause suicide independent of the content that people see?

A.   I do believe that.

Q.   Okay.

Page 57

A.   And the reason I believe that is because the -- the -- the algorithms that feed content -- I'm sorry, the algorithms that drive experience are content agnostic, and when -- and in fact, the social media addiction scales that we use don't ask about what people view.  They ask about the experience of viewing.

MR. SCHMIDT:  Okay.  Move to strike everything after "I do believe that."

BY MR. SCHMIDT:

Q.   Do you believe that social media has any benefits?

A.   I think social media can have benefits for certain children if used properly, and I've -- I've said as much in my report and in public statements.

Q.   What benefits can social media have for under 18 users for teens?

A.   Again, if it's used safely and properly and under the right conditions, I think it can help youth connect.  I think it can expose -- it can expose them to

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

different perspectives. I think it can enhance a sense of belonging, but all of those things have their counter-availing examples.

Q. What's the benefit to helping youth connect?

MS. COUCH: Objection; vague.

A. I'll ask you just what you -- I mean --

Q. You said a moment ago, quote: I think it can help youth connect.

A. Yeah.

Q. My question is what's the benefit of that?

A. I think --

MS. COUCH: Same objection.

A. Human connection can be affirming. It can be fun.

Q. Can it be positive in terms of mental health?

A. It can be positive in terms of mental health.

Q. You said a moment ago: I think it can expose -- it can expose them to

Page 59

different perspectives.

What's the benefit of that?

A. It can expand people's thinking.

Q. Is that a positive thing?

A. It can be. It can be a negative or a positive.

Q. You said: I think it can enhance a sense of belonging.

What's the benefit of that?

A. I think that for certain marginalized youth, as I've said previously, it can give them the opportunity to find other people who are like them in situations where it could be challenging for them to otherwise do so.

Q. Can that have mental health benefits?

A. It can have mental health benefits. It can also lead to harms.

Q. Do some people only benefit from social media in the ways you've described it?

A. I haven't considered that. But I think given the risks posed, I would say

Page 60

on balance, most people have mixed experiences, and I think that the data not just that I've reviewed, but the internal data from the companies themselves show that everybody -- or virtually everybody, I shouldn't be so extreme, who's on them has had a -- a bad experience at some point.

MR. SCHMIDT: Okay. I'll move to strike everything after "I haven't considered that" as nonresponsive to the question I asked.

Let me try it this way.

BY MR. SCHMIDT:

Q. Do you know if there are teens in the world who have used social media and had positive mental health experiences from it with no negative mental health experiences from it?

MS. COUCH: Objection; vague.

A. I haven't considered that.

Q. Okay.

A. I don't even know how one could consider that.

Page 61

Q. Do you have any quantification --

MR. SCHMIDT: Well, strike that.

Let me give you a document that -- that you wrote. This is Exhibit 9.

(Christakis Exhibit 9, Dimitri Christakis Biographical Sketch, Bates META3047MDL-177-00063201-204, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. And you will see this is a biological -- biographical sketch. It has your name on the first page, and it has a personal statement and some of your credentials.

Do you see that?

A. Yep.

Q. Do you recognize this document?

A. I'm -- I -- I wish you provided more context because, yes, this is a biosketch of mine, but I've -- I have written so many of these for so many

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

grants, I'm now trying to figure out which -- when precisely this was -- it says 150 peer-reviewed publications, so it must have been from a while ago.

But, yes, I recognize it as a biosketch of mine.

Q. And these are your words?

A. Yes.

Q. Okay. Let's look at the second paragraph under "Personal Statement," please.

A. Yeah.

Q. If you look at the end of that paragraph, the final sentence, I'm going to read that and ask you if I've read it correctly: While my research shows potential problematic internet usage among U.S. youth, I have also found significant evidence of social networking qualities that may contribute to positive emotional development in tolerant communities.

Did I read that correctly?

A. You did read that correctly.

Q. Now, I take it you still stand

Page 63

behind the point that your research shows potential problematic Internet usage among U.S. youth?

MS. COUCH: Objection; broad.

BY MR. SCHMIDT:

Q. Is that correct?

MS. COUCH: Same objection.

A. I -- I -- I stand behind that, yes.

Q. Okay.

Do you also stand behind the statement that you have, quote: found significant evidence of social networking qualities that may contribute to positive emotional development in tolerant communities?

A. I do stand behind that. I think it's consistent with what I said a minute ago. And I would emphasize that "may contribute."

Q. Okay. But that is a true statement today?

MS. COUCH: Objection; misstates his testimony.

Page 64

A. I -- I believe I said that some youth may benefit from social media, and I believe I said that before, unless I'm not remembering what I said.

Q. Yeah. But it is a true statement today that you found significant evidence of social networking qualities that may contribute to positive emotional development in tolerant communities, that's a true statement today, correct?

A. Yeah --

MS. COUCH: Objection; asked and answered.

A. I think you're misreading the word "significant."

Q. I'm just asking you, using your words, if you think this is a true statement today.

A. I have found -- I -- I stand by my statement that some children may benefit from social networking sites.

Q. Do you stand behind your statement that you have found significant evidence of social networking qualities

Page 65

that may contribute to positive emotional development in tolerant communities?

A. I believe that some children may benefit from -- may derive -- some -- some social networking sites may contribute to positive emotional development in some children.

Q. You're changing the words that you put on the page. So I'm just asking if you stand behind these words on the page, yes or no?

MS. COUCH: Objection; asked and answered.

A. I -- I stand behind the statement I made before and the statement as I just made it, that -- which I believe are consistent by the way, that some children may benefit from social networking sites.

Q. Do you stand behind the statement that you have found significant evidence of social networking qualities that may contribute to positive emotional development in tolerant communities?

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

That's the statement you wrote --

A. Yeah.

Q. -- and I'm asking if you stand behind it.

A. I would --

MS. COUCH: Asked and answered.

Q. Yes or no?

A. I would now ask, because as I said initially I don't remember when this was from, can you tell me what the date of this biosketch was? 'Cause it's got to be at least --

Q. My understanding --

A. -- ten years old.

Q. My understanding is it's from 2012.

A. Yeah.

Q. So do you stand behind the statement you wrote in 2012 --

A. That is why --

(Stenographer admonition on crosstalk.)

BY MR. SCHMIDT:

Page 67

Q. Do you stand behind the statement you wrote in 2012 today?

A. I stand behind the statement I made now, which I think is somewhat different, that I think the internet and social media sites are very different 13 years later, and I think the risks posed today are considerably greater than they were in 2012 when I -- when I made this statement.

Q. So let's -- I'm going to ask one more time and see if I can get an answer to my question.

I want to know if you stand behind this statement that I've been reading you in Exhibit 9. Is the answer no, you no longer stand behind it, or yes, you do?

MS. COUCH: Asked and answered.

A. I believe the statement I made before, which is not radically different than this statement, I stand behind.

I don't stand behind this statement then as written if you really

Page 68

want to get so precise about it because, as I said, I think the risk today of social media sites are considerably different than they were 13 years.

Q. All right. Let's look at Exhibit 2, which is your report, and if you look at page 319, please.

Paragraph 531. In the first sentence after the comma you say -- you state: This report prioritizes systematic reviews and meta-analyses - then you have a citation - over individual studies and experimental or longitudinal studies over cross-sectional ones.

Is that an accurate statement of the approach you've taken in this case?

A. Yeah -- yes, that is an accurate statement as I -- as I believe I said earlier in that -- in the description of my methods. I also included other studies that have come out since the systematic reviews, the most recent systematic reviews and analysis, including the ones I brought today, for example, and there have

Page 69

been other ones that are in the report.

Q. Okay.

A. But, yes, as a foundational principle, I relied on systematic reviews and --

Q. As a --

A. -- meta-analysis.

Q. I'm sorry, I didn't mean to step on your answer.

As a foundational principle, you prioritize systematic reviews and meta-analyses over individual studies; is that correct?

A. Whenever that was possible, yes.

Q. Okay.

And you recognize that systematic reviews and meta-analysis, if well designed, are recognized as superior in terms of the evidence they give to individual studies?

A. That is --

MS. COUCH: Objection; vague.

A. That is one of the reasons I prioritize them because they are, as I see

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

that you have the pyramid that I use, yes, they are considered to be at the pinnacle of the pyramid, that's correct.

Q. And that's on page 8, your hierarchy of evidence, right?

A. Yes.

Q. Can you go to page 8?

A. It's on page 9 for me, but...

Q. All right, then page 9.

I'm sorry, may I just look at which copy you're looking at here?

Yeah, on page 9 you have something that's referred to, and I think you refer to, as the hierarchy of evidence, right?

A. I'm not -- full disclosure, this is not -- this -- this pyramid is widely accepted. I didn't invent this.

Q. I know that.

I'm asking is that a hierarchy of evidence you referred to on page 9?

A. Yes.

Q. And it's hierarchy that recognizes some types of evidence, if

Page 71

well-conducted, are better than other types of evidence in terms of addressing questions like causality. Is that correct?

MS. COUCH: Objection; vague.

A. It -- it's a hierarchy of the value in terms of scientific contribution of all studies, not specific to causality.

Q. Okay.

And it has systematic reviews at the top, then randomized trials, then down at the bottom editorial and expert opinion?

A. That's correct.

Q. And I think you told me this, but you -- you understand this hierarchy to be widely recognized in the scientific community?

A. I do.

Q. Okay.

Let's go to page 319 in Exhibit 2, please. And you have a section of your report where you offer critiques of five different studies and

Page 72

publications.

Is that correct?

A. That's correct.

Q. Why have you focused on those five studies and publications?

A. I provide the rationale here. Because these are some of the, sort of, more outspoken critics of the prevailing science, and their work I anticipated would be used by the defense.

Q. Okay.

A. Even though I consider these studies to be critiquable, as I've done.

Q. Are they the only studies in the report that you discuss that are critiquable?

A. Oh, no. I -- there are many others. I reviewed hundreds.

Q. So let's start with the Orben study, and if you can go to page 320. In paragraph 533 you state: There's several notable limitations of the analyses.

And then you've got some --

A. Yep.

Page 73

Q. -- numbered items below that.

Are each of those the notable limitations?

A. Some of them, yes.

Q. All right. Let's look at the first one first: The study is cross-sectional and accordingly can't draw causal inferences.

Did I read that correctly?

A. You read that correctly.

Q. So, a few questions about that.

Is it true that cross-sectional studies cannot be used to draw causal inferences, yes or no?

A. I think a single individual cross-sectional study by itself is not considered sufficient to draw causal inferences. That is part of a compendium of scientific query, yes. It provides corroboratory evidence.

In this case, the notable thing is that these two authors in particular are extremely critical of all other studies when they disagree with them

CONFIDENTIAL

Page 74

because they are cross-sectional, or when they are cross-sectional. And yet -- so it's -- it's a bit ironic that they themselves undertook a cross-sectional study.

MR. SCHMIDT: Move to strike everything as nonresponsive after the first sentence.

BY MR. SCHMIDT:

Q. Can you draw causal inferences only by looking at cross-sectional studies, yes or no?

MS. COUCH: Objection; asked and answered.

A. I consider cross-sectional studies as corroboratory in the context of the larger group -- larger scientific evidence in this case, and I think cross-sectional studies can corroborate other studies and lend credence to causality.

Q. Okay. I'm going to ask you to answer my question now.

MS. COUCH: He did answer your

Page 75

question. You just didn't like the answer.

MR. SCHMIDT: That's a speaking objection. Please don't do that.

BY MR. SCHMIDT:

Q. Can you answer my question? Do you need me to re-ask my question?

A. Ask your question again.

Q. My question is simply all you have is cross-sectional studies. I understand your point about them being corroborating.

Here's my question. If all you have is cross-sectional studies, can you conclude causation from those studies --

MS. COUCH: Asked and answered.

Q. -- in your view?

A. If -- if all one has is cross-sectional studies, there are certain constraints in drawing causal inferences. So, but it doesn't apply -- that's not always the case.

So, if I told you cross-sectionally that age was correlated

Page 76

with dementia, right, dementia doesn't cause age, so age would cause dementia.

So, yes, in some cases you can, in fact, draw causal inferences only from cross-sectional studies.

Q. If all you had were cross-sectional -- let -- let's look at --

A. You're asking me -- you're asking me --

Q. Let me ask my question. You're arguing with my question before I've asked it. Let's look at page 246 of your report.

If you look at paragraph 425, the third sentence starts with "The authors acknowledge." Tell me when you're there.

A. Yes.

Q. (Reading) The authors acknowledge that these associations are cross-sectional and therefore causality cannot be established.

Do you see that statement?

A. I do see that statement.

Page 77

Q. Do you agree with that statement?

A. I agree with the statement that the authors acknowledge that there is -- these associations were cross-sectional, yes.

Q. Do you agree with the point that the authors were making, these associations are cross-sectional and therefore causality cannot be established?

A. The authors are making that in -- in the context of their paper, they're limiting their conclusions to their individual data.

In my case, in the case of the report, I'm not making my -- I'm not basing my expert opinion solely on the existing cross-sectional studies. I'm basing them on the totality of the evidence, which in -- includes cross-sectional studies.

I might also add, since I tried to say this before and you struck it, and you might strike this too, but --

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

Q. I will.
A. You will?
Q. Yes.
A. Okay. But I'll say it --
MS. COUCH: I'll oppose.
THE WITNESS: What?
MS. COUCH: Continue. I'll oppose his motion.
THE WITNESS: Okay. Well, whatever. You guys can argue amongst yourselves.
A. But what -- what I say here is that, and I think is relevant, it could credibly be asserted that the causality is reversed because that persistent feelings of sadness beget social media usage, for example.
But I want to emphasize that the example I tried to use before, that if I find a cross-sectional association between age and dementia, dementia can't increase age, but -- so age must be increasing dementia.
So, you asked before can you

Page 79

ever make causal associations from cross-sectional data. In fact, there are situations where you can.
MR. SCHMIDT: Let's mark this answer, please.
BY MR. SCHMIDT:
Q. I'm not going to ask you about age and dementia. Let me ask you my question and see if I can get an answer.
MR. SCHMIDT: I move to strike that answer as entirely nonresponsive.
Q. When these authors say that their study, the associations they saw are cross-sectional and thereafter causality cannot be established, do you agree with that statement they're making to that study?
A. They're --
MS. COUCH: Asked and answered.
A. They're making that statement with respect to their individual study done in one population in one point of time that, yes, from a -- their single study alone, they deduce that they could

Page 80

not make causal associations. That's correct.
Q. So yes, you do agree with them?
A. I agree that they made that statement.
Q. I'm not asking if they made that statement. I'm not asking you -- I'm asking if you agree with that statement they made as to their study.
MS. COUCH: Asked and answered.
BY MR. SCHMIDT:
Q. Yes or no?
MR. SCHMIDT: Asked five times now, evaded every time.
A. Let me put it to you this way.
Q. Can you -- can you put it to me in terms of answering my question?
MS. COUCH: Objection; argumentative.
A. I'm trying to.
MS. COUCH: He is answering you.
(Stenographer admonition on crosstalk.)
BY MR. SCHMIDT:

Page 81

Q. Let me just for the record re-ask my question.
Do you agree with these authors when they state that their finding are cross-sectional and therefore causality cannot be established, yes or no?
MS. COUCH: Asked and answered.
A. So, as I mentioned before, I'm, among other things, an editor of a scientific journal, and as an editor of a scientific journal, we expect every paper to acknowledge its limitations, and these authors are doing what I expect any author to do when they do a cross-sectional study which is to say that on the basis of this single study, causality cannot be deduced.
Q. So is that a yes, you agree with them --
A. That's my answer.
Q. -- or a no, you don't?
(Stenographer admonition on crosstalk.)
THE WITNESS: I apologize. You can put that on the record. I

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

apologize.

I will be better.

THE STENOGRAPHER: It's the record.

BY MR. SCHMIDT:

Q. My question was was that a yes, you agree with the authors or a no, you don't or you don't have a view?

A. I --

MS. COUCH: Asked and answered.

A. I stand by my answer.

Q. Will you answer my question?

MS. COUCH: Argumentative.

A. I -- I believe I answered your question.

Q. Well, I'm asking it again 'cause you haven't.

Do you agree with these authors when they say their data are cross-sectional and thereafter causality cannot be established?

MS. COUCH: Argumentative; asked and answered.

A. I agree that these authors

Page 83

stated that they cannot deduce causality from their single study that deployed cross-sectional data to address associations.

MR. SCHMIDT: All right. Let's mark that answer, the witness refusing to answer my question.

MS. COUCH: That's incorrect. And we can call the judge if you --

MR. SCHMIDT: I think we might need call the judge, yeah.

MS. COUCH: Happy to.

MR. SCHMIDT: Okay.

BY MR. SCHMIDT:

Q. Do you see where the next sentence it says: It could credibly be asserted that the causality is reversed and that persistent feelings of sadness beget social media usage for example.

Are those your words or the authors' words?

A. Those are my words.

Q. Okay.

A. And I'd like to read the next

Page 84

sentence, if I might.

Q. No.

A. My -- what, I can't read my own report to you?

Q. No. You can do that when your lawyer asks you questions if she chooses to ask you questions.

A. But -- but I think it's important because I think it reflects what I believe to be the operative here and elsewhere.

Q. There's no question pending.

My question is do you agree with what you wrote that it could credibly be asserted that causality is reversed in this study and that persistent feelings of sadness beget -- let me take a step back.

In your next sentence you talk about an alternative explanation for the data, right?

A. Yeah.

Q. Okay. So let's focus on the first sentence.

Do you -- is it accurate when

Page 85

you say it could credibly be asserted that the causality is reversed and that persistent feelings of sadness beget social media usage for example?

MS. COUCH: Objection; vague; misleading.

BY MR. SCHMIDT:

Q. Is that an accurate statement by you?

MS. COUCH: Same objection.

A. It's an accurate statement, and then I would -- you know, it's interesting 'cause you started this deposition by stating that you didn't want me to cherry-pick and I feel like you're cherry-picking here. You're taking one sentence out of a paragraph that's building an argument, and the next sentence should also be put -- be part of the context.

But it is an accurate statement that I have that sentence there. I'm not going to dispute that. But the next sentence I think is also important.

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

MR. SCHMIDT: Move to strike "it's an accurate statement."

BY MR. SCHMIDT:

Q. I'm not trying to argue with you, and I'm going to ask you not to argue with me. I'm just trying to understand your opinions and if you're building an argument, as you say here, why you are making the argument you're making.

Do you understand my point?

MS. COUCH: Objection; argumentative.

He's answering your questions.

A. I -- I guess I -- in the course of my work as a scientist, and I imagine the course of your work as a lawyer, you consider potential counterfactuals and then you consider other alternative explanations, which is what I'm doing here.

But we are getting a bit into the weeds here. I -- like I said before, I -- there -- cross-sectional data, the possibility that the directionality is

Page 87

reversed is always the case, but it's also the -- possibly the case that there is a mutually reinforces dyadic relationship as I state in the third sentence.

Q. Okay. So let me just read a portion of what you just said to me and ask you if you stand behind that.

Is it always the case that there is a possibility when you have a cross-sectional study that directionality is reversed? Is that always the case?

MS. COUCH: Objection; misstates prior testimony.

BY MR. SCHMIDT:

Q. When we're talking about social media.

A. It's often the case.

Q. Okay.

And directionality being reversed means it's possible when you see social media usage and mental health symptoms that the social media is causing the mental health symptoms, right?

A. I --

Page 88

Q. I asked the question badly. Let me take it back.

When you see a cross-sectional study that shows a correlation between social media use and some kind of mental health outcome, one possibility is the social media is causing that outcome, right?

A. Yes, that's one possibility.

Q. One possibility is that mental health outcome is actually causing the social media use, right?

A. And there's a third --

Q. I'm going to get to the third. Can you answer my second question? Is that --

A. Only if you promise to go to the third.

Q. I'm not making promises.

Do you recognize that one possibility is that the mental health condition is causing the social media use, as you discuss in your report?

A. That is a possibility.

Page 89

Q. And is a third possibility that something else is causing both social media use and the mental health outcome?

A. Actually, I think the interesting thing about the third possibility is that it's almost certainly the most likely one, and here's why, if you'll allow me to explain.

I think the reality is that both of those pathways are present, and that's precisely the way the design features of social media work. So, I could be a depressed teen who gets on social media and looks for something and the content that I get, the experience I start to have is driven by that, and that puts me into, frankly, what the industry themselves calls negative affect rabbit holes, filter bubbles. I -- we can cite many examples the industry themselves have realized that this becomes a prod -- a problem.

So that's the dyadic relationship and that's what's actually operative, and that's precisely why I put

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

that third sentence in there.

MR. SCHMIDT: Move to strike as not responsive.

And let's mark that answer, please.

MS. COUCH: Oppose.

BY MR. SCHMIDT:

Q. Would you mind going to page 249, please? And if you wouldn't mind just reading, it starts on the prior page, paragraph 248 -- 428 to yourself.

A. (Witness reads document.)

Q. You state, starting on page 248 and going to page 249, that: The vast majority of the included studies are cross-sectional, and while the association is plausibly causal based on the theoretical mechanisms discussed before, reverse causality once again cannot be excluded when studies are merely correlational.

Is that an accurate statement?

MS. COUCH: Objection; vague.

A. If -- if those studies are

Page 91

considered acontextually, that's always a concern. In the course of this report, and in fact in the very next bullet that I hope we'll read next, I talk about longitudinal studies.

And if I might add, which is precisely the reason I brought this study, even since my report there has been what I consider to be one of the best studies to date looking at suicidal ideation associated with social media addictive behaviors. That study -- this study is longitudinal, it's within person, and it finds a very strong correlation.

So, I -- the -- the point is that I looked at the totality of the evidence in making my expert opinion.

MR. SCHMIDT: Move to strike as entirely nonresponsive.

MS. COUCH: Oppose.

BY MR. SCHMIDT:

Q. Is it true that when you're talking about cross-sectional studies, reverse causality cannot be excluded when

Page 92

studies are merely correlational? Is that true what you wrote in your report?

MS. COUCH: Asked and answered.

A. It's true in -- in many cases.

Q. Is it true in the case of social media and mental health studies?

MS. COUCH: Asked and answered.

A. I -- I --

Q. Which is all I'm going to ask you about. I'm not asking about anything, any other context.

A. I think it -- I -- I believe I've answered this question. I am trying to figure out what you're trying to get me to say differently.

Q. I'm asking you if a sentence you wrote in your report is true or not, and I'm getting a speech every time I ask you that question. So all I want to know is it is this true, and if it's not true tell me; if it is true, tell me and I can move on.

MS. COUCH: Argumentative; asked and answered.

Page 93

BY MR. SCHMIDT:

Q. Is the sentence true?

A. You asked me in the context of a single study if, as I recall --

Q. No, I'm asking if the sentence is true, the one that I read to you that includes the language "reverse causality once again cannot be excluded when studies are merely correlational."

A. Yes.

Q. True or false?

MS. COUCH: Argumentative; asked and answered.

A. In -- in -- in -- in this case, I would say that reverse causality is a possibility, but again, when it's taken into the larger context of all of the other studies, it has a different meaning.

Q. So is what you said true or false?

MS. COUCH: Objection; asked and answered.

BY MR. SCHMIDT:

CONFIDENTIAL

Page 94

Q. In your report.

MS. COUCH: Same objection.

A. Everything in my report is true to the best of my ability.

Q. Okay. Thank you.

If you only had cross-sectional studies here in this setting, could you conclude causation, yes or no?

A. I -- it's a --

MS. COUCH: Objection; hypothetical.

(Stenographer admonition on crosstalk.)

MS. COUCH: Yeah, let me get my objection in, Dimitri.

It was objection; incomplete hypothetical.

A. I was -- that's -- what -- what I was going to say is I can't answer that question because that's not what I was -- that's not the reality. I didn't only have correlational studies. I had many other types of studies.

Q. I'm trying to understand

Page 95

scientific principles you're applying, and I'm allowed to ask you hypotheticals.

So my hypothetical is, and it's not even a hypothetical. It's a scientific principle. As a scientific principle in this setting, if all you had were cross-sectional studies, could you draw a causal conclusion only from cross-sectional studies in this context?

MS. COUCH: Asked and answered.

BY MR. SCHMIDT:

Q. Do they alone let you conclude causation?

MS. COUCH: Same objection.

BY MR. SCHMIDT:

Q. Yes or no?

A. I think they raise concerns about causation, they always do, but then the question always becomes is the -- could the causality be reversed. And that's why you do additional studies, that's why you do longitudinal studies, that's why you do ob -- experimental studies to try to add additional credence

Page 96

to the associations that are seen cross-sectionally.

You can strike all of that, but that's what I'll say.

Q. No, I'll just ask again.

What -- what if you only had -- looked at the cross-sectional studies here, do the cross-sectional studies here alone establish causation, in your view?

A. That's -- that's --

MS. COUCH: Asked and answered.

BY MR. SCHMIDT:

Q. Yes or no?

A. That's not what I -- that's -- I -- it's -- it's -- you're asking me something that I -- I didn't consider.

Q. Okay. I'm asking you now would they?

MS. COUCH: Asked and answered.

A. There's no reason for me to consider that. That's not the reality.

Q. There is a reason. You're here under oath. You're testifying about your methods and your opinions, and I'm asking

Page 97

you that question.

Would the --

MS. COUCH: But if he says he can't answer that, that is his answer.

MR. SCHMIDT: I'm not done, please.

BY MR. SCHMIDT:

Q. Would the correlational cross-sectional studies establish causation by themselves, in your view? Do they?

MS. COUCH: Asked and answered; argumentative.

A. You're -- you're asking me to -- I'm -- I'm here to represent the opinions in this report, as I understand it.

Is that what I'm here to do?

Q. You're here to answer questions that we have an opportunity to ask you, where I think we're going to need to have more time to ask you those questions.

A. I am -- I am asserting that --

MS. COUCH: You're here to answer questions if you can answer

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

them. If you can't answer them, then you just tell him, and he should move on and not argue.

THE WITNESS: All right. I can't answer that question.

MR. SCHMIDT: Okay. Let me try it a little differently.

BY MR. SCHMIDT:

Q. If -- and I'm going to ask you as a matter of scientific principles. I've tried to focus on language you have here where you recognize that a problem with cross-sectional studies is it's difficult to determine the direction of causality. Is that right?

A. In isolation, that's correct.

Q. Okay.

A. But that's not the situation we're here and that's not the situation -- that's not the context of my report.

MR. SCHMIDT: Move to strike everything after "that's correct."

BY MR. SCHMIDT:

Page 99

Q. As a matter of scientific principle, would it be reliable for a scientist to look only at cross-sectional data in this setting and draw a causation conclusion from that? Would that be reliable science in your view, yes or no?

MS. COUCH: Objection; vague.

A. I think that if all I had, or all we had was cross-sectional data showing associations between social media and untoward outcomes, it would legitimately cause concern that there is a causal relationship.

I don't think based on correlational studies alone one could definitively conclude that there is a causal relationship. But that's not the situation we're in.

MR. SCHMIDT: Okay. Move to strike "but that's not the situation we're in."

BY MR. SCHMIDT:

Q. Could you look at page 320 of your report? Let's go back to those

Page 100

criticisms you make of those five sources.

Your third point in paragraph 536 is that, quote: All of these measures relied on self-reported media usage which correlates only weakly to moderately R equals .38 with actual usage.

Did I read that correctly?

A. You did.

Q. All right.

R is the correlation coefficient, right?

A. That's correct.

Q. And this is another notable limitation you flag with respect to the Orben paper. Is that correct?

A. That's correct.

Q. Do you agree with that, that relying on self-reports of media usage is a notable limitation of a paper that does that, yes or no?

MS. COUCH: Objection.

A. I have to answer that with more than a yes or no, if you'll allow me. Otherwise I can't answer it.

Page 101

Q. Okay. If you can't answer it, that's fine.

A. Well, I want to answer it.

Q. I'm not sure I agree with that, but that's fine.

A. So I will go ahead and answer it, and you'll strike it.

MS. COUCH: No, Dimitri, if you cannot answer it with a yes or no, just tell him --

THE WITNESS: Well, I think it's --

(Stenographer admonition on crosstalk.)

MS. COUCH: If you cannot answer it with a yes or no, then that's the answer.

And you can decide if you follow up and if you want to know the full basis of the opinions that we will be offering.

BY MR. SCHMIDT:

Q. Does self-report of media usage correlate only weakly to moderately with

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

actual usage, in your view, yes or no?

A. It does, yeah.

MS. COUCH: Same objection.

BY MR. SCHMIDT:

Q. And you give a specific static here, R equals .38.

Is that correct?

A. I do, and it's important to understand what the implications of that are in the context of every individual study.

Q. Okay.

A. So --

Q. R equals .38 is a measure of the correlation between media usage and actual -- self-reported media usage and actual usage, right?

A. That's correct.

Q. Is that the best estimate you have of that correlation, the .38?

A. It's -- it's the estimate that I use. It's comes from a meta-analysis. I'm not -- I don't remember where precisely it is.

Page 103

But what I'd like to say is that is the issue here is one of precision and -- and -- and that's material because if you measure something -- and it's elsewhere in my report, if you'll want me to turn to that. But if something is imprecise -- imprecisely measured, it tends to bias towards the null, and that's why this is important.

So, if you have a negative study with imprecise data, you can't actually determine it that it's negative. But if you have a positive study, it actually means that you're underestimating the true effect size. So, that's the important thing here.

MR. SCHMIDT: Move to strike everything starting with "what I'd like to say."

And let's mark that answer.

BY MR. SCHMIDT:

Q. Do -- do you understand, just as a general matter of how the deposition works that I have the opportunity to ask

Page 104

you questions on topics we on the defense side think are relevant?

A. Yes.

Q. And do you understand you have an obligation to answer those questions?

A. I do, yes.

Q. And do you understand your lawyers may take the opportunity now or at trial to ask you whatever questions they want and get you to explain?

A. Yes.

MS. COUCH: Objection.

BY MR. SCHMIDT:

Q. And do you understand I'm trying to ask simple questions and ask if you agree or disagree with them? Do you understand that's what I'm trying to do?

A. I understand that's what you're trying to do.

Q. Okay.

A. But you're asking me questions that don't have yes-or-no answers and you're insisting that I answer with a yes-or-no answer.

Page 105

Q. Do you consider this .38 correlation figure you give between self-reports of media usage and actual media usage to be accurate?

A. Yes.

Q. Including for social media?

A. Yes.

Q. Okay.

And are you familiar with the statistic called R-squared?

A. Yes.

Q. What does R-squared measure?

A. It measures the amount of variance that's explained.

Q. Are you able to calculate, and I can give you a calculator if you want help - I don't mean to make you do it on the fly - what the R-squared for .38 is?

A. I don't think that that's relevant in this case.

Q. Are you able to calculate it?

MS. COUCH: Objection.

A. I don't think it's relevant.

Q. Are you able to calculate it?

27 (Pages 102 - 105)

CONFIDENTIAL

Page 106

A.   Well, it's .38 squared, but, yeah, I --

Q.   Okay.  We get .1444 when we do that.

Does that sound right to you? And if you want to check on your phone or --

A.   No, that sounds about right.

Q.   -- give you a phone, we can give you a phone.

So, what would the -- do you know that that means if the R-squared is .1444, do you know that that means that this correlation you report tells us that self-reported media use predicts only 14.4 percent of actual media use, that it explains only that much of the variation between the two?

MS. COUCH:  Objection; vague; misleading.

A.   I -- that's not relevant in this case in this example.

Q.   Is what I said accurate?

A.   That you've accurately

Page 107

calculated the R-squared, yes.

Q.   And so does that mean if this data is reliable, as you tell us it is, that self-reported media usage explains only 14.4 percent of actual usage?

A.   Of the variants of actual usage, but that's not relevant.

MR. SCHMIDT:  Okay.  Move to strike "but that's not relevant."

BY MR. SCHMIDT:

Q.   Does that mean that over 85 percent of the actual time spent using social media is explained by something other than the self-reported time spent?

A.   It's not relevant.

MS. COUCH:  Objection; vague.

A.   I don't think you're applying the statistic correctly here.

Q.   Is what I said right, yes or no?

MS. COUCH:  Objection; vague.

A.   I don't understand what you're saying.

Q.   That the R-squared tells us that over 85 percent of actual time spent is

Page 108

accounted for by factors other than what people say they actually spent?

A.   It -- it's --

Q.   Is that accurate, yes or no?

A.   That's not accurate.

MS. COUCH:  Objection.

(Stenographer admonition on crosstalk.)

BY MR. SCHMIDT:

Q.   Let's go to page 322, your next -- some more critiques.

MS. COUCH:  For your planning purposes, Paul, I need a bathroom break within about five minutes.

MR. SCHMIDT:  Sure.

MS. COUCH:  I'm just -- I don't want if you want to do it now or if you want to do --

MR. SCHMIDT:  Why don't we do this one line of questions and then we can take a break.

MS. COUCH:  Okay.

BY MR. SCHMIDT:

Page 109

Q.   Do you see you discuss --

MR. SCHMIDT:  If that's okay. We can take it now.

MS. COUCH:  That's fine.  As long as it's like the lawyer finishing line of questions like five, but I am serious about.

MR. SCHMIDT:  Why don't we take a break?

MS. COUCH:  Okay.

THE VIDEOGRAPHER:  The time right now is 10:15 a.m.

We are off the record.

(Recess taken.)

THE VIDEOGRAPHER:  The time right now is 10:33 a.m., and we're back on the record.

BY MR. SCHMIDT:

Q.   Dr. Christakis, let's look at page 322 of your report, Exhibit 2, please.

A.   Okay.

Q.   Do you see where you discuss the Ferguson study, where you critique it?

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

A.  I do.

Q.  On the fourth line, your first critique of the Ferguson study is that, quote:  It had a single author.

Do you see that?

A.  I do see that.

Q.  And then you explain why that's a critique.  Do you see that?

A.  I do.

Q.  Is that grounds for critiquing an article, if it has a single author?

A.  That is grounds for critiquing a meta-analysis in particular, yes.

Q.  Okay.

What about any article that has a single author?

A.  No.

Q.  Let's look at page -- actually, before we leave this, do you see on -- on paragraph 541 on page 323 you paste part of an email exchange that you had with another author about re-analyzing some of Ferguson's data?  Do you see that?

A.  On number 541?

Page 111

Q.  Paragraph 541, yes.

I'm sorry, I'm reading --

A.  That's not the --

Q.  I'm reading the wrong paragraph.  Paragraph 543.

A.  Yes.

Q.  And just so I ask my question cleanly, in par -- am I correct that you reached out to another author, I believe it's Johannes Thrul, T-H-R-U-L-E [sic], about a re-analysis that he was doing of some of Ferguson's data.

Is that correct?

A.  That -- that's correct.  I -- I -- I came across this study and critiques of it online, and one of them was by this person, and I reached out to him because he had alluded to a re-analysis of the data that he was doing.

MR. SCHMIDT:  Let's look at that outreach.  We've marked that as Exhibit 10.

THE WITNESS:  Yes.

(Christakis Exhibit 10, email

Page 112

thread November 12, 2024, Bates CHRISTAKIS0445-446, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q.  Is this your correspondence, your email correspondence with I assume it's Dr. Thrul, which you then forwarded to Ms. Crouch?

MS. COUCH:  Couch.

MR. SCHMIDT:  Couch, I apologize.  I'm sorry.

MS. COUCH:  Believe it or not, Paul, you're not the first.

MR. SCHMIDT:  Okay.  I still apologize.  Thank you for being gracious.

A.  Yes, this is correct.

Q.  All right.

You reached out to Dr. Thrul in November of 2024; is that correct?

A.  That's correct.

Q.  Did you reach out for purposes of your expert work in this litigation?

A.  No.

Page 113

Q.  Were you working on your expert report at this time?

A.  I was.

Q.  Did you disclose to Dr. Thrul that you were an expert in litigation when you reached out to him?

A.  Not -- I don't believe I did in this -- certainly not in this email.

Q.  Did you in any other way that you're aware of?

A.  No, this is the -- I believe this is the sum total interaction I had with him.

Q.  Okay.

When you reach out to him, you say:  Have you submitted your re-analysis of Ferguson for publication?  If so, where?  If not, consider JAPA peds.

Do you see that?

A.  I do see that.

Q.  At this point in time, were you contemplating making use of his work in your report, as you ultimately did?

A.  It -- I was interested in using

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

his re-analysis for the report, and I thought it was an important re-analysis that I wanted to see published, yes.

Q. Have you disclosed to JAMA -- when -- when you said to him "please consider JAMA peds," you were an editor at JAMA Peds, correct?

A. That is correct.

Q. Have you disclosed to JAMA Peds that you are an expert in these cases?

A. Yes, I have.

Q. Did you disclose to them that you were soliciting work that you hoped to use in your expert report in these cases, you were submitting -- soliciting submissions?

A. I solicit manuscripts in the context of being an editor for JAMA Peds routinely, it's part of my job, and we publish a lot of studies on children and media.

Q. Did you disclose to JAMA Peds that you were soliciting a potential publication that you wanted to use in your

Page 115

expert report?

MS. COUCH: Objection.

A. This is the sum total of my exchange with -- with Johannes Thrul.

And no, I did not tell JAMA Peds that I sent this email to him.

Q. Okay.

A. But I would have sent it to him regardless of whether or not I was an expert witness in this case.

Q. Did he send you his re-analysis while it was in press, or did you find that online?

A. It was online.

Q. Okay.

Do you know if Dr. Thrul's work is specific to children or adolescents?

A. His other work?

Q. No, this re-analysis.

A. He re-analyzed the data in the Ferguson paper.

Q. Is that specific to children and teens?

A. I believe so.

Page 116

Q. Do you know if it has any age analysis in it?

A. I -- I don't recall offhand what you're --

Q. Okay.

Let's go to page 332 of your report, please. You talk about the Hancock study.

Do you see that?

A. I do.

Q. And one limitation you note of the Hancock study is in your third sentence: It has only, to my knowledge, been "published" on a pre-print server (SSRN) and not in the peer-reviewed literature.

Do you see that?

A. I do see that.

Q. Do you recognize that as a limitation of a study if it has not been published in the peer review literature?

A. Yes, I do see that.

Q. Do you recognize that as a limitation?

Page 117

A. It -- it -- it is not -- in my opinion, that is a -- a limitation, yes.

Q. Why is that?

A. Because I rely in my capacity as an editor on formal peer review. Pre-print servers rely on informal peer review and -- so, yes.

Q. What is the value, from a scientific perspective, of formal peer review as opposed to informal peer review?

A. There's the process is supervised by an editor, and we know, in my case, I know who the experts commenting are. Whereas the pre-print server is, sort of, crowd sourced, anybody can comment.

Q. Do you believe that formal peer review leads to a more reliable publication than informal peer review or no peer review?

A. In general I think that's true, yes. I -- but others disagree with that opinion. That is my opinion, yes.

Q. Okay. And I just want to know

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

your opinion.

If you look about halfway down that paragraph, do you see there's a sentence that begins "Their intended purpose and their biggest selling points"?

Do you see that?

A.  Yes.

Q.  And at the end of that sentence you make the statement:  Peer review which remains the gold standard of quality in biomedical journals.

Do you see that?

A.  Yes.

Q.  Do you believe that this kind of formal peer review that you're talking about here is the gold standard quality for scientific publications?

A.  I do believe that, yes.

Q.  Do you exercise greater caution with something that has not gone through that kind of peer review?

A.  I do as a matter of course.  If something has not been peer-reviewed, I -- I -- I -- I take that into consideration.

Page 119

But of course as a scientist and an editor, I'm able to provide my own peer review.  But yes.

Q.  Let's go to page 24 of your report.

Do you recall before the break talking about the language you had where I think you said there's only a weak correlation between reported time spent and actual time spent?

A.  Yes.

Q.  Let's look at page 24.  On page 24 you make reference to, in paragraph 55, to various, what you call, internal studies from defendants.  And at the end of that you say:  The investigators had the ability to link survey data to actual site usage.

Do you see that?

A.  I do.

Q.  Is that a benefit to be able to link survey data to actual site usage?

A.  Yes, it's a -- it's a real -- yes.

Page 120

Q.  And am I right that in several instances in your report you rely -- well, let me take a step back.

Do you think that the actual site usage data that the defendants have is valuable in analyzing some of the questions at issue in these cases?

A.  I think it -- it -- it's very valuable, and I've asked on several occasions for -- of -- of industry that they collaborate with independent scientists for exactly that reason.

Q.  As I understand it, there's several occasions in your report where you rely on reported company data as to how much time people spend using their services.  Is that correct?

MS. COUCH:  Objection; vague; ambiguous.

A.  There are -- I do cite documents that have precise measures of time that people spend on various platforms and that come from company data, that's correct.

Q.  Do you have any specific

Page 121

concerns about the reliability of the company data that you have been given regarding how much time spent -- people spend using their services?

A.  I have no reason to doubt that they measure that time very precisely.  It's one of their primary key metrics.

Q.  Okay.  Let's look at page 43, please, Figure 12.  And this is the one I think that we had -- or it leads into the one we had some confusion about in terms of which figure.

You recognize Figure 12 is data on usage of smartphones by under 18 year olds from a group called Common Sense?

A.  Yes.

Q.  Do you consider this data reliable?

A.  I do consider this data re -- I mean, yes.

Q.  Do you question its accuracy in any way?

A.  I mean, it has limitation as all data do, but I don't question its

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

accuracy, no.

Q.   Just to take a couple of examples, they are estimating, according to the title of this figure, popular apps, their average daily duration, and the percentage of total smartphone usage on a typical day.

Do you see that?

A.   Yes.

Q.   So for example, for Snapchat the average is ten minutes, correct?

A.   The average for Snapchat is ten minutes, yes.

Q.   For Instagram it's 16 minutes?

A.   That's correct.

Q.   For Facebook it's one minute?

A.   That's correct.

Q.   And you believe that Facebook is addictive or has the potential to be addictive?

A.   I do believe that Facebook has the potential to be addictive.

Q.   If we look at other services that have the same or higher daily usage

Page 123

rates, you don't have an opinion as to Roblox?

A.   I don't have an opinion as to respect to Roblox, no.

Q.   Is Chrome -- does Chrome have the potential to be addictive?

A.   I don't have an opinion about Chrome.

I don't even know what Chrome means in this context.

Q.   You don't have an opinion on Netflix; is that right?

A.   I do not have an opinion on Netflix.

Q.   Does Spotify have the potential to be addictive?

A.   I do -- don't have an opinion on Spotify, but I don't think so, no.

Q.   Do Amazon or Pinterest have the potential to be addictive?

A.   I don't have an opinion on those.

Q.   I'm just going to ask you about -- I'll give you the list again just

Page 124

so you have it.  I'm going to ask you, kind of, some global questions about these ones and it will apply to Discord, Roblox, Chrome, Netflix, Spotify, Amazon and Pinterest.  Does that make sense?

A.   Yep.

Q.   And if you want, I can write it on your sheet.

A.   I see them.

Q.   My question to you is do you know if any of those use algorithmic feeds?

A.   I -- I don't know.

Q.   Do you know if any of those have continuous scroll?

A.   I do not know.

Q.   Do you know if any of those have auto-play?

A.   I -- I don't know.  I haven't studied them.

Q.   Do you know if any of them have "likes" features?

MS. COUCH:  Objection; assumes facts not in evidence.

Page 125

A.   I -- I -- I don't -- I mean, I have a personal, not a professional opinion, in the context of using some of them, but no, I don't know.

Q.   Do you know if any of them allow comments?

A.   It -- you're asking me a complicated question, and I don't want to be evasive so --

MR. SCHMIDT:  Why don't I withdraw it then.  I'll withdraw it.

Q.   Let's go to page 44.

I'm sorry, actually, let's stay on page 43.  Do you see where you write in paragraph 86:  Over 60 percent of the median total daily -- I misread it.

(Reading) Over 60 percent of the median total daily media time is spent on TikTok, YouTube, Instagram, Snapchat and Facebook.

Did I read that correctly?

A.   You did.

Q.   And you then say:  Given that, it is not unreasonable to posit that even

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

studies that focus on the effects of overall screen time are driven in large part by usage of these apps.

Do you see that?

A.   I do.

Q.   So if I understand what you're saying there is you're saying we know more than 60 percent of the daily time is these five apps.  Therefore, one -- it would not be unreasonable to posit that even studies that focus on overall screen time are driven largely by these apps?

A.   It would depend on the context, but yes, it could -- one could legitimately deduce that, yes.

Q.   All right.

Now, is it -- is it your understanding of the Common Sense data that that --

MR. SCHMIDT:  Strike that.

Q.   How did you get that 60 percent figure?

A.   I added up the median time on those apps and put it over the total time

Page 127

that they estimated.

Q.   Are you aware that the median times only apply to people who use the apps, not all people surveyed in this study?

A.   Ask that question again.

Q.   Sure.

You understand that this study surveyed a larger number of people than use the individual apps.

A.   It was not a survey.

Q.   Whatever you want to call it.  This study looked at a larger number of people than used the individual apps.

A.   It -- is your point if some people didn't use these apps?

Q.   Yes.

A.   That's correct.

Q.   Okay.

So for example, if we take the average use for, say, TikTok, it's -- well, let's take -- let's take Instagram.  The average use for Instagram is 16 minutes, correct?

Page 128

A.   Correct.

Q.   And you added that up with the average use for TikTok, YouTube, Snapchat, and Facebook to get your 60 percent number, right?

A.   I -- I -- if you look at the third -- the final column, it has --

Q.   But --

A.   Yeah, correct.

Q.   Okay.

But in fact, only a third, a little more than a third of the people in this study used Instagram, correct?

A.   That's correct.

Q.   And even fewer used Facebook, correct?

A.   That's correct.

Q.   And only half of them used TikTok, correct?

A.   That's correct.

Q.   Okay.

So if we looked at all the people in this study, it actually is not the case that 60 percent of the total

Page 129

people in this study had --

MR. SCHMIDT:  I'm sorry, let me re-ask the question.

Q.   If you look at everyone in the study, it is not the case that over 60 percent of the total median daily time spent was on TikTok, YouTube, Instagram, Snapchat, and Facebook, is it?

A.   No --

MS. COUCH:  Objection; vague.

A.   No, it is correct.  What you're saying -- I'm using time, not people.  So the time -- the people who are not on TikTok or the people who are not on Facebook are on some other social media or some other site.  The unit of analysis I'm using is time, not people.

Q.   Right.

But do you understand that when we look at, say, Instagram and we see that 5.9 percent that you used as part of your 60 percent, do you see that number?

A.   I do.

Q.   That only applies to a third of

Golkow Technologies,
A Veritext Division
877-370-3377                                                    www.veritext.com

CONFIDENTIAL

Page 130

the people in this study, not a hundred percent of the people in this study, correct?

A.   Correct.

Q.   Okay.

And when we see the TikTok number of 38.4 percent, that only applies to 50 percent of the people in this study, right?

A.   That's correct.

MS. COUCH:  Objection.

BY MR. SCHMIDT:

Q.   And you don't know if the Instagram and TikTok people overlap a hundred percent, zero percent, or somewhere in between, correct?

MS. COUCH:  Objection; assumes facts not in evidence.

A.   I'm -- I don't know, correct.

Q.   So if we look at all people in this study, it would not be accurate to say that as to all people in the study who are using smartphones, 60 percent of them are spending their time on TikTok,

Page 131

YouTube, Instagram, Snapchat and Facebook, correct?

A.   It would be correct to say that 60 percent of the time spent in this study was spent on those sites.

Q.   Across all people in the study?

A.   Across all people in the study.

Q.   That's not accurate.

MS. COUCH:  Objection; argumentative.

A.   How is that not accurate?

Q.   Well, for example, you say -- you get the 60 percent by adding 5.9 percent for Instagram, right?

A.   Correct.

Q.   And you apply that across everyone in the study, right?

A.   No.

Okay, go ahead.

Q.   And the 5.9 percent of people actually does not apply across everyone in the study.  It only applies to the 34.5 percent who use Instagram, correct?

MS. COUCH:  Objection.

Page 132

A.   I -- I don't think we're going to -- this -- I don't agree with the way you're characterizing this.

Q.   Okay.

Is it your testimony that what this Common Sense data shows us is if -- well, let's take a look at the -- at the -- at the source.

MR. SCHMIDT:  We'll mark this as Exhibit 11.

(Christakis Exhibit 11, Common Sense presentation 2023 Constant Companion:  A Week in the Life of a Young Person's Smartphone Use, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q.   Do you recognize this as the Common Sense --

A.   I do.

Q.   -- data that you're relying on?

And let's go to page 28, please.

Do you see that this is the table that you reprint?

Page 133

A.   Yes.

Q.   If you go to page 27 right before that, do you see that in the second paragraph there are 203 participants in their sample?

A.   Yes.

Q.   And they used a total of 1644 unique apps over the week?

A.   Yes.

Q.   Individual participants used anywhere from five to 125 different apps over the course of a week, averaging about 40 apps overall.

Do you see that?

A.   Yes.

Q.   And they actually tell us that the average social media time, the median social media time for people who did use social media is less than a hundred minutes, right?

MS. COUCH:  Objection; misstates the document.

A.   Where are you getting that from?

Q.   Figure 14 on page 27.  It's a

CONFIDENTIAL

Page 134

little hard to read, but if you kind of draw a line down, you get less than a hundred minutes for social media.

A. They're not counting YouTube as social media, but I am. They're not counting streaming video which is a bit ambiguous, but YouTube I count as social media so --

Q. Let's just -- sorry.

A. Go ahead.

Q. Let's just look at YouTube. YouTube is less than 15 minutes, right?

A. YouTube is looks like 15 minutes across.

Q. Across, okay. Do you -- do you understand -- here's my question. Do you understand that the people they're surveying is actually 203 people, some of whom didn't use any social media or YouTube?

A. That's correct.

Q. And do you understand that -- that those people used a range of

Page 135

different apps with an average of 40 apps overall?

A. Let me -- let me refine my last answer because I said, and I don't know if it's in the report, but I said not all of them use social media.

MR. SCHMIDT: Why don't I withdraw that question and that answer.

THE WITNESS: Okay.

BY MR. SCHMIDT:

Q. Do you know the survey used -- they surveyed 203 people?

A. Correct.

Q. And those people averaged 40 different apps, correct?

A. Yes.

Q. Is it your testimony that if you look across those 203 people and those average of 40 different apps, 60 percent of that time across those 203 people is TikTok, YouTube, Instagram, Snapchat, or Facebook?

A. Yes.

Page 136

Q. Okay. Let's go to page 44 of your report. And this is your own data, correct?

A. Correct. Well, it's -- yes.

Q. And it -- you cite here a publication of yours in the footnote 41. Do you see that? It's on page 44.

A. Yeah, I see that. This -- these are -- yes, I see that.

Q. Okay. Figure 13, that data does not appear in the published version of the paper, correct?

A. That's correct. The -- these are -- this is daily use, and the published version of the paper was the subset of time during school hours, but it was drawn from the same dataset. That's correct.

Q. Okay. Let me actually go ahead and mark your published paper.

Page 137

While I'm doing that, just looking at the data that is not in the publication, your estimate was the median Facebook time was 1.92 minutes; is that correct?

A. That's correct.

Q. And the median Instagram time is 15.78 minutes; is that correct?

A. That's correct.

Q. And according to your data, if you add up the percentage of daily use attributable to these five different apps, you don't get to 40 percent; is that correct?

A. That's correct.

Q. Do you consider your data to be accurate and reliable?

A. I do. These are both -- if you add up mine, you get to 38, 23.5, 28. That's correct. I'm sorry, you said do I consider my data to be accurate, I -- I do, yes.

Q. Let's look at Exhibit 12. (Christakis Exhibit 12, JAMA

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

Pediatrics April 2025 article, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. Do you recognize Exhibit 12 as the publication that you cite in support of Figure 13 in your report?

A. Yes, this is the -- these are -- as I said before, that's a reference to the data source, but this table is not what's in this -- in this paper, but yes.

Q. Right.

In your published data if you go to page 477 of the report, Table 1, you estimated 20 -- you attempted to measure 24-hour smartphone use.

Do you see that?

MS. COUCH: I'm sorry, Paul, what page?

MR. SCHMIDT: It's the one that has 477 in the bottom corner and it's Table 1 and it's the second -- it's actually the first row with data.

THE WITNESS: Okay.

Page 139

BY MR. SCHMIDT:

Q. And so, your estimate of total daily 24-hour smartphone use in this study was 5.49 hours.

Do you see that?

A. Yes.

Q. And your estimate of 24-hour social media use was less than half of that, two hours. Correct?

A. Where are you getting that? I'm sorry.

Q. The next row down.

A. Yes. Two hours, yes.

Q. And that's less than 40 percent, right?

A. Yes.

Q. Do you consider that to be a reliable estimate that less than 40 percent of total daily smartphone use by under 18 users is social media?

A. I think it's important to -- I mean, it's -- it's -- I would consider that to be a reliable estimate, but it's a estimate. It's a small, non-generalizable

Page 140

sample, as I'm sure we said in our limitations section, but yes.

Q. Now, to the point we're talking about that Figure 13 does not appear in Exhibit 12, am I correct that you've got an underlying dataset that you pulled the data that appears in Exhibit 12 from and that you also pulled the data that appears in Figure 13 from?

A. That's correct.

Q. Can we have that dataset?

MS. COUCH: Objection.

You've already requested this through counsel. We have objections to that.

He is not in the place to make legal decisions in that regard. And I'm happy to meet-and-confer and follow the correct procedural processes outside of this deposition.

And I would put into context it was requested yesterday afternoon.

BY MR. SCHMIDT:

Page 141

Q. Do you mind answering my question?

Do you have an objection to us getting that dataset?

A. I -- I do have an objection because I'm not at liberty to release these data under the auspices of the institutional review board for which they were collect -- from which they were collected.

Q. What -- what data -- so let me see if I can understand the constraints.

Exhibit 12 reports some data from a -- a survey that you performed. Is that correct?

A. Exhibit 12?

Q. Yes.

A. Yes, correct.

Q. What data from that survey are you authorized to release?

A. I -- I --

MS. COUCH: Objection.

A. -- cannot.

MS. COUCH: Go ahead.

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

A.   I -- I'm not allowed to release any of the data to a party that was not part of the institutional review board that gave us permission to collect these data.

Q.   Okay.  Let me -- go ahead.

A.   You -- participants in the survey -- in the survey.

In the study were consented and told that their data would not be released to anybody but the people listed.

Q.   Well, you published some of this data, right?

A.   Yes.

Q.   Okay.

Were you authorized to publish this data?

A.   Yes.  That's --

Q.   Were you authorized to do anything else with -- with -- were you authorized to publish any other data that you didn't publish?

MS. COUCH:  Objection; misleading; vague.

Page 143

A.   The -- the data in this table are currently under review, and I anticipate they will be published in the next few months.

Publishing the data is different than releasing the raw data.

Q.   Okay.  I understand what you're saying there.

So, is there some kind of publication in the works relating to the data that appears in Figure 13 of Exhibit 2?

A.   It's currently undergoing peer review, and I anticipate it will be published in the near future.

Q.   Can you share that publication with us?

A.   Let -- let --

MS. COUCH:  Same objections.

A.   Is "I need to think about it" a reasonable response?

Q.   Yes, that is a reasonable response.

A.   Okay.

Page 144

Q.   Let me just say this.  Let me ask a couple of factual questions, and then I'll make a request, but that's a reasonable response.

Have you already had peer review communications about that publication, comments on the paper, things like --

A.   No, not yet.

Q.   Has it been submitted?

A.   Sorry, I'm trying to remember to pause and -- because I know I'm -- it has been submitted.

Q.   But you just haven't gotten peer review comments?

A.   That is correct.

Q.   Have you -- is it a solo publication or co-authored?

A.   It's co-authored.

Q.   Okay.

Have you had communications with your co-authors about the drafting?

MS. COUCH:  Objection; vague.

A.   We've drafted the paper together consistent with the way we always -- I

Page 145

always write papers with co-authors.

Q.   Is it the same co-authors as on Exhibit 12?

A.   I believe so, yes.

Q.   Do you know if any of these co-authors are also expert witnesses for plaintiffs in social media litigation?

MS. COUCH:  Objection; calls for speculation.

A.   I know that one of them is.

Q.   Dr. Hale?

A.   Dr. Hale.

Q.   And what -- what's your understanding of Dr. Hale's work as an expert witness in social media litigation?

A.   I know that she is a sleep expert that has been retained.

Q.   Do you know which side has retained her?

A.   In -- in -- which side?

Q.   Plaintiffs or defendants, the people suing or the people being sued.

A.   The people suing.

Q.   Okay.

37 (Pages 142 - 145)

CONFIDENTIAL

| Page 146 | Page 148 |
|---|---|
| So she's been retained by the plaintiffs as an expert in social media litigation?<br>A. That's correct.<br>Q. Do you know when she was retained?<br>MS. COUCH: Objection; calls for speculation.<br>A. I don't -- I do not know the answer to that.<br>Q. You -- if you look at that page you were just on, the last page of Exhibit 12, there's a conflict of interest disclosure.<br>A. Yes.<br>Q. You disclose receiving personal fees from Social Media Victims Law Center.<br>What's your understanding of what Social Media Victims Law Center is?<br>A. My understanding is is that it's one of the law firms in -- in this case.<br>Q. Do you know any of the lawyers from that firm?<br>A. Matthew Bergman I believe, yes. | Law Center that are distinct from payments you've received for serving as an expert witness?<br>A. No.<br>Q. Okay. So those refer to the same thing?<br>A. They do. And I -- I guess I separated out payment from serving as an expert witness, but when I said Social Media Victims Law Center, I -- I guess I should have said -- well, I don't know how -- I've -- I've been compensated for my work serving as an expert, is what I'm trying to disclose.<br>Q. You also say you're the chief science officer of Children and Screens.<br>Do you see that?<br>A. I do see that.<br>Q. Is that -- does that involve any payments?<br>A. I get an honorarium for that, yes.<br>Q. And I'm always mindful of asking people about money. |

| Page 147 | Page 149 |
|---|---|
| Q. And how do you know Mr. Bergman? Do you know him in any way other than through these cases?<br>A. I -- I met him through these cases.<br>Q. Are you --<br>A. I knew his father.<br>Q. Okay.<br>Are you friends with him?<br>A. I wouldn't say I was friends with him, no.<br>Q. Okay.<br>After disclosing personal fees from Social Media Victims Law Center, one clause over you say: Serving as an expert witness in ongoing litigation against social media companies.<br>Do you see that?<br>A. Yes.<br>Q. And that's obviously what we're here talking about today, right?<br>A. Correct.<br>Q. Are there personal fees that you have received from Social Media Victims | Do you mind telling us how much that honorarium is?<br>A. I get -- I get $14,000 a year.<br>Q. Okay.<br>Do you see any disclosures regarding expert witness work for plaintiffs from Dr. Hale?<br>A. Let's see.<br>Q. She's the last one mentioned.<br>A. No, I do not see that.<br>Q. Have you ever discussed the litigation with Dr. Hale?<br>A. I haven't discussed the litigation with anybody, under direction from my counsel.<br>Q. What I will ask for, and like this is to the point if you'll take the time to consider it, is any drafts or communications regarding the in-process work that contains the data in Figure 13. I'll put a request for that on the record.<br>I will request it by tomorrow so we could use it and not have to come back another time, but that can be something |

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

you can consider with your counsel.

A. I -- I'm not sure what you're asking.

MS. COUCH: Hold on one second. This is a legal thing. So, Paul, if you could send us a request in writing, that would be appreciated, following the proper procedure.

We will certainly consider it, but as you know, there's been multiple back-and-forth between both sides about underlying data, and so we would stand by all the objections as previously stated.

But other than that, I think it -- we can move on 'cause this will be --

MR. SCHMIDT: Yeah, we did put a request in writing. We'll make another request in writing.

BY MR. SCHMIDT:

Q. If I look at Figure 13, there's nowhere outside of this report that I could get access to that data, is there?

Page 151

Or to other related data that you might have as part of this dataset?

A. As I -- as I said before, I'm not at liberty to release the raw data to anybody because of the constraints of the institutional review board.

Q. What about other reports of the data like we see in Exhibit 13, there's no place I could get those other than in this report, right?

A. Currently that's correct, yes.

Q. Okay.

When you gave that 60 percent figure that we were looking at in your report from the Common Sense data.

A. Yeah.

Q. Is there a reason you gave the 60 percent data as opposed to the 40 percent figure from your -- less than 40 percent figure from your own data?

MS. COUCH: Objection; misstates the report.

MR. SCHMIDT: Let me ask it -- actually, let me withdraw it ask the

Page 152

question differently.

BY MR. SCHMIDT:

Q. Do you see where you say: It is not unreasonable to posit that even studies that focus on the effects of overall screen time are driven in large part by usage of these apps.

Would you still say that if you used your data instead of the Common Sense data and the percentage of median total daily time was less than 40 percent, would you still make that statement?

A. If these were the only data I had to go on, I -- what I suppose I would do would be, as a scientist, would be to take the two and, as they say, average them and come up with 50 percent. But the truth is I have much -- I've had access to much better data from the industry documents I reviewed themselves that show that there's a significant amount of time spent on social media sites.

Q. You've not seen any industry documents that tell you what proportion of

Page 153

total smartphone usage is on social media, have you?

A. That's a really good question.

There was -- I don't think this is in my report, but I have a recollection of seeing that Meta acquired a company early on that -- that acted as a conduit for people's smartphone use, precisely 'cause it allowed them to see how much time they were spending on other apps, but I don't think I put that in my report.

And aside from that, no, I have not seen any.

Q. Okay.

What was that company?

A. I don't recall it offhand, but I could find it.

Q. What data did it give access to?

A. As I recall, it was an app that -- that allowed people to save bandwidth on their phone and get more value for their subscriptions, and as a result of using that app, people shared their data with the company so that the

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

company knew how much time everyone was on their app and they were -- this isn't in my report, so I'm trying to recollect as to the best of my ability. But they then sold those data to apps. And this was early in Meta's, as I recall, and they acquired that company. And I don't know if that -- I don't know what happened to it after that.

Q. Okay.

Do you know what year that was?

A. It was early. I don't -- I mean, it was -- it was -- I don't re -- no. I would speculate if I did.

Q. Do you know if there's any data from that app after 2010?

A. It's funny you say that.

As -- as I think about it, I remember looking to see if there was subsequent data when I was looking at documents, and I didn't find any after a certain date. It looked like it went away. And I don't remember. I can't be precise about that, no.

Page 155

Q. Okay.

You just mentioned that you didn't cite that in your report. You gave us quite a lengthy report, 300-plus pages.

I trust that took a lot of work on your side.

A. A lot of work.

Q. You discuss various studies and various documents.

Did you put in your report what you considered important for your opinions?

MS. COUCH: I would just object and place that his report also includes the materials considered.

But with that.

MR. SCHMIDT: Object to the coaching.

Wow.

A. I -- I -- I put what I thought what was material and important and I -- I'm -- yes.

Q. Did you discuss the studies and documents you thought were material and

Page 156

important in your report?

MS. COUCH: Asked and answered.

A. I -- I did. I mean, I -- if -- I -- it could have been longer, but I didn't have time, actually.

Q. I think the expression goes the other direction.

(Christakis Exhibit 13, NEDA article, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. This is Exhibit 13.

Do you recognize this as a National Eating Disorders Association webpage that you cite in your report?

And if you'd like, I can show you where you cite it.

MS. COUCH: Is this the only copy?

MR. SCHMIDT: I'm sorry?

MS. COUCH: Because this didn't copy well. I just asked if it's the only one.

BY MR. SCHMIDT:

Page 157

Q. And my only question to you is do you recognize this as a -- a National Eating Disorders Association webpage you cite in your report?

A. Yes.

Q. And in fact, is this the National Eating Disorders webpage you referred us to earlier when you said that -- when I asked you that there was a consensus that social media can cause eating disorders irrespective of the content that people see on social media, and you said: Not only do I believe that, but the National Eating Disorders Association has issued that same opinion.

Is this what you were referencing?

A. Yes, that social media -- yes.

Q. Okay. Let's look at -- why -- why don't you tell me where in this report the National Eating Disorders Association has issued the opinion that social media can cause eating disorders irrespective of the content that people see on social

40 (Pages 154 - 157)

Page 158

media?

A.   (Witness reads document.)
Well, I guess I would -- I would say that there's several places where I think it's -- it's alluded to.

(Christakis Exhibit 14, NEDA article Media and Eating Disorders, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q.   I'm going to give you -- could I just give you a new exhibit. I'm going to give you Exhibit 14 which is a different version of the same printout that fixes some of the formatting issues.
So you can look at either version, whichever version is easier for you to read.

MS. COUCH:  Sorry.

BY MR. SCHMIDT:

Q.   You've got your poison. You can look at it small or you can look at it bigger, but you've just got to read past the imperfect print job when you download

Page 159

something from the internet.
So let me go back to my question because I think I cut in on you when you were answering it.
Where in this report does the National Eating Disorders say that social media can cause eating disorders irrespective of the content that people see on social media?

A.   Well, I guess I would say that reading my -- my takeaway from it is several place where it says, for example, social media differs from traditional media as allows users to post their own content and then receive feedback from others.
So the feedback has nothing to do with content.

Q.   You don't understand that feedback itself is content?

MS. COUCH:  Objection; misleading.

A.   Well, I think -- I don't consider a "like" to be a content, no.

Page 160

Q.   Okay.

A.   Or a "dislike."

Q.   Do you know if the judge in this case has determined that the "likes" are content or not content?

A.   I don't --

MS. COUCH:  Objection; calls for legal reasoning.

A.   I don't know what the judge's -- I -- okay, ruled. But I -- I would also say that this is part of the design features of the -- of the social media that it promotes and prompts these -- these kinds of messagings and that the, as I started to say before, that -- that posting images can lead to -- in fact -- am I allowed to refer to might have report?

Q.   If you want. But my question is if you could just show me the other instances you think that where they find eating disorders -- social media can cause eating disorders irrespective of the content that people see on social media.

Page 161

A.   I guess I would say that on number 3 where it says: Use media literacy strategies to think critically about messages you consume and content you create on social media. Ask the following key questions: Are the body depictions -- I think it says realistically or digitally altered.
And I think this is important because this is some of the design features of social media that you can alter your appearance through cosmetic surgery effects and other glamor filter, every -- every -- every site has them and I consider that to be a feature of social media distinct from content.

Q.   Anything else?

A.   No.

Q.   Okay. So let me just ask you a few follow-up questions.
You said every site has glamor filters.
Do you know if all five of the sites at issue here, Facebook, Instagram,

41 (Pages 158 - 161)

Page 162

TikTok, YouTube, and Snapchat, all have glamor filters?

MS. COUCH: Objection.

A. I used the phraseology "glamor filters," which I think is what one company calls them, but I don't --

Q. I'm sorry.

A. Well, I believe that if you look at table 35 of my report it states that: Appearance filters and negative social comparisons are present on TikTok, Instagram, Facebook, YouTube, and Snapchat.

Q. Okay.
So do you believe all five have glamor filters, as you just used that term?

A. I -- I -- it depends on what you mean by glamor filters.

Q. Well, what do you mean when you used it just a minute ago?

A. I -- I mean that appearance alteration, cosmetic surgical -- surgery effects, et cetera, yes.

Page 163

Q. You understand there's a range of appearance-altering filters that are available on social media services: ones that are whimsical, ones that can make you look like a puppy, ones that can make you look more physically beautiful?

A. I do.

Q. Okay.
Do you know which of the five services had cosmetic surgery filters available?

A. That phraseology was used by -- I -- I -- I cannot recall offhand which terminology applied to -- to which, but it's in my report.

Q. Okay.
Do you know what cosmetic surgery filters are?

A. Yes.

Q. They simulate the effects of having cosmetic surgery.

A. Correct.

Q. Okay.
Do you know which defendants had

Page 164

filters that did that?

A. It's in my report.

Q. Do you know if Snapchat had that?

MS. COUCH: Asked and answered.

A. It's in my report.
I think that -- I'd rather not answer these offhand. I'd rather look in my report, if that's okay. But it's in there.

Q. Here's something that I did not see in your report.
Do you know if any of the apps created cosmetic surgery filters themselves as opposed to having third-party users create those filters?

A. Yeah, I don't know -- I didn't -- I don't have an opinion on that. It wasn't clear from the documents I review -- reviewed whether or not it was created in-house or acquired.

Q. Well, you read the deposition of █████████ --

A. Yes.

Page 165

Q. -- who was the Meta employee.
Do you remember that?

A. I remember that.

Q. And her deposition was largely about this cosmetic surgery filters issue.
Do you remember that?

A. I don't think it was largely about that. It did have that in there.

Q. Okay.

A. But there was a lot of other stuff in there.

Q. Let's not quibble over wording. Then I'll take your framing.
She did talk about cosmetic surgery filters, right?

A. She did.

Q. Do you recall her saying that Meta never created cosmetic surgery filters, that they were third-party?

A. I -- I don't -- I don't recall whether -- it did -- it wasn't material to me whether they created it or not, frankly. That -- so I don't recall that.

Q. Do you recall talking about a

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

ban that Meta instituted on cosmetic surgery filters?

A. I do recall that that was considered and ultimately decided against at Meta, yes.

Q. And do you know what the policy was, and I'll represent I didn't see this in your report -- let me break it down.

You know that there was a temporary ban on cosmetic surgery filters? Yes?

A. Yes.

Q. Okay.

And that temporary ban was lifted, correct?

A. Yes.

Q. What was -- was anything banned after that lift date?

MS. COUCH: Objection; vague.

A. I don't know what -- was anything banned after that? I don't know what --

Q. Was any type of cosmetic surgery filter banned after that lift date?

Page 167

MS. COUCH: Objection; vague.

A. I don't recall offhand if -- if -- if -- if the -- I don't recall offhand.

Q. Do you know if Meta kept in place a ban on filters that actually simulated surgery effects, like scarring and things like that?

MS. COUCH: Objection; assumes facts not in evidence.

A. I don't recall offhand.

Q. Okay. Let's go back to the examples you gave us here.

Let's start with the first one. I'm -- I'm going to use Exhibit 13 on page 2, the bullet point at the bottom. You flag: Social media differs from traditional media as it allows users to post their own content and then receive feedback from others.

Do you see that?

A. I do.

Q. And obviously when people post their own content, that is content, right?

Page 168

A. It -- it's content, but the moment one posts it, it leads to them being directed to other content and content being directed to them.

Q. I'm just asking you about whether when people post that's content.

Do you agree?

A. When people post their own content, it is content.

Q. And if they receive feedback saying "that's an ugly picture" or "you look fantastic," is that content, in your view?

MS. COUCH: Objection; vague.

A. When people receive feedback, I -- I don't know that I consider that content, actually. I consider that a comment, but yeah.

Q. Okay.

So if someone says "I don't like your picture, you look awful, you're overweight," or "I do like your picture, you're in such good shape," you don't consider that to be content?

Page 169

MS. COUCH: Asked and answered.

A. I -- I -- I'm -- I -- I consider that to be text, but yes.

Q. Is that content?

MS. COUCH: Asked and answered.

A. I suppose one could construe it that way, yeah.

Q. Do you?

MS. COUCH: Same, asked and answered.

A. I -- I think of -- I suppose it could be considered content, yes.

Q. Okay.

Look further down. You -- they say: For example, studies have found that social media use particularly engaging with appearance-focused content that idealizes thin bodies, taking selfies, and viewing and/or comparing oneself to images of celebrities, et cetera can lead to disordered eating.

Do you see that?

A. I do.

Q. Are you aware of any studies

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

that show differences in any form of disordered eating or eating disorders or symptoms relating to eating disorders where they showed those differences based on features after they have controlled for content the people see? So people see the same content but they're exposed to different features, and that results in differences in eating disorder symptoms, body image symptoms, disordered eating symptoms.

MS. COUCH: Objection; vague.

A. Yeah, I think offhand I can recall I think it was the Tiggemann study that did manipulations of cos -- showing I believe it was teenagers cosmetically surgically altered. It's in my report. And then assessing their self -- assessing their self-esteem afterwards in an experimental study.

Q. Yeah, I think you're citing something different than what I'm asking. That one involved showing one type of content to one group and another type of

Page 171

content to another group, correct?

A. The -- the -- the same image in one case surgically altered, yes.

Q. Right.

So it was different content because they saw different images, right?

MS. COUCH: Objection; vague.

A. I thought you were -- let -- ask your question again.

Q. Sure.

A. 'Cause I must have misunderstood it.

Q. Yeah.

In -- in that study you cited, the Tiggemann study -- in that study you cite you recognize that the two groups saw different content because one was digitally altered and one was not.

A. Yeah.

Q. Okay.

A. Yes.

Q. My question is kind of the opposite.

Are you aware of any studies

Page 172

where they control for content, they make sure people see the same content and they're able to determine that the features without seeing different content contribute to eating disorders, disordered eating, or related symptoms?

A. I don't understand your question because I -- the way I understood it was you were trying to see whether or not it was the features that drive the eating disorder, which is my contention, and I believe that's what that study showed.

And I also recalled that Dr. ███████ I don't know if I'm pronouncing her name right, specifically proposed doing a study to test the effects of cosmetic surgery on body image.

Q. Look with me, if you would, at page 163 of your report, 278. You discuss a study called Kleemans.

Is that what you were referencing a moment ago?

A. This was one of them. There was another one too, but yes, this is one of

Page 173

them.

Q. Okay.

And in this study, people were shown content, right?

MS. COUCH: Objection; vague; misrepresents the study.

A. So, they were -- what -- what I interpret this study to be, from an experimental standpoint, this study is testing the effects of showing images. It's isolating the effects of cosmetic surgery enhancement.

Q. My question is simply were they being shown content in this study?

MS. COUCH: Objection; vague; misleading.

A. They're seeing an image.

Q. Okay. And are they -- is one group seeing one form of an image and a second group is seeing another form of an image?

MS. COUCH: Objection; vague; misleading.

A. One is seeing one version and

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

the other is seeing one that has been altered by a filter.

And the reason that's important is some of the filters create body types that are unachievable in real life. So it's -- it's -- it's not really an image that one could find outside of -- but for the filter.

Q. So they take content that does exist in the real world and one group sees that and then another group sees images that don't exist in the real world?

MS. COUCH: Objection; misleading.

A. That -- that might not be achievable, yes. That might not exist in the real world.

Q. And that study is looking at whether seeing the real world image versus the non-real world image has an impact, correct?

MS. COUCH: Objection; misstates.

A. In my mind, that study is

Page 175

testing whether or not the manipulation that a feature of social media enables has a negative impact on teens' self-esteem and body image.

Q. Is what I said correct?

MS. COUCH: Asked and answered.

A. Not the way I -- no, I would say it's not correct.

Q. Okay.

So your understanding is that the Kleemans study does not involve comparing the effect of seeing a real-world image to the effect of seeing a manipulated image?

A. It's seeing the effect of manipulation.

Q. Okay. Seeing --

A. Yes.

Q. Comparing one image to a manipulated image and what effect that has?

A. This study as constructed, the principal intention of it was to isolate the effect of manipulation.

Page 176

Q. Manipulation of what?

A. Of the image.

Q. Okay. The content?

MS. COUCH: Objection; misstating.

A. It's isolating the manipulation.

Q. Of the content?

MS. COUCH: Objection; misstating.

A. The manipulation.

Q. What's being manipulated?

MS. COUCH: Argumentative; asked and answered.

A. The images would be the same but for the manipulation.

Q. What's being manipulated?

A. What's being studied is the app's ability to manipulate an image.

MR. SCHMIDT: Move to strike as nonresponsive.

BY MR. SCHMIDT:

Q. Is the image being manipulated?

A. The image is being manipulated.

Q. Do you consider manipulated

Page 177

image to be content?

MS. COUCH: Objection; asked and answered; misleading.

A. I consider the fundamental test of this study to be the effect of manipulation.

Q. Do you consider a manipulated image to be content, yes or no?

MS. COUCH: Objection; argumentative.

A. I -- I feel like I've answered the question that this study is trying to address.

Q. You haven't answered my question which is what I'll ask it one more time.

Do you feel like a manipulated image is content?

A. I said --

MS. COUCH: Objection.

BY MR. SCHMIDT:

Q. Yes or no?

A. That's not a yes-or-no question.

Q. Okay.

Are you aware of studies that

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

CONFIDENTIAL

Page 178

show or purport to show an impact of social media on any kind of eating disorder-related symptom or body image-related symptom that don't involve viewing images?

MS. COUCH: Objection; vague and compound.

A. I would say that it's -- it's hard for me to answer that question, honestly.

Q. Okay. Well, let me -- let me ask it slightly differently and maybe your answer will be the same.

Can you point us to a study that purports to show an impact of social media on body image issues, eating issues that does not involve people viewing image?

A. Well, let me answer it this way and see if this satisfies you.

Studies that have reduced exposure to social media have resulted in re -- reduction in body image issues. Those studies are content agnostic. They're not saying watch less of this

Page 179

type. They're saying spend less time on social media.

So, the social comparison, the context that's created by the social media sites is what drives it. It's not -- it's not the content, it's the experience. It's the context.

MR. SCHMIDT: Move to strike as nonresponsive.

BY MR. SCHMIDT:

Q. Do -- do you know if studies that have looked at whether reduced social media use leads to -- first of all, what are the studies you're thinking of that say reduced social media use leads to reduced body image or eating disorder issues?

A. So, I want to call out the -- the -- I think it's the Davis study. Let's put a pin in that for a minute and then let me look here.

So, yeah.

So, if you look at the meta-analysis I cite here in my report.

Page 180

Q. Can you just tell us the page?

A. I'm on page 161, 162. I believe it's the McComb study, if I remember correctly. Yeah, McComb shows that combining all the data about social media use and body image problems shows that there is a net effect of exposure to social media and body image problems and -- and disordered eating behaviors, I should say.

Q. Do you know if these studies controlled for content between the two groups they were comparing to make sure they saw the same body content?

MS. COUCH: Objection; vague.

A. They -- in fact, they're content agnostic, which I think is the whole point. They're just exposure to social media whatever that is. And again, I think it's the ecosystem that social media creates more than the content itself.

And I --

(Pause.)

Can I -- can I say stuff that's

Page 181

unsolicited or I need to wait for you to ask me stuff?

Q. Yeah, let me ask stuff 'cause I don't think you answered my question.

Do you know if the people who were being compared in these studies saw the same types of content?

A. I don't know what they saw.

Q. Okay.

Are you aware of any study where people did see the same type of content but because of different features being studied had different experiences with social media?

A. I believe --

MS. COUCH: Asked and answered.

A. -- that's what we were discussing before, the Figure 30 in this is an example of that kind of a study.

Q. Okay.

Can you cite me any other study where you believe people saw the same content, other than one where they actually saw digitally-altered content and

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

nevertheless had different symptoms as a result of features of social media?

MS. COUCH: Objection; vague.

A. I'm not sure I understand the context. I don't -- I'm not sure I understand your question. But to me the salient point is that that feature of social media is what drives the negative -- negative body image. It is the manipulation.

Q. I agree. I agree. That's what you're saying, it's manipulation of the content, right?

A. It's the -- it's the feature.

Q. What is the feature manipulating?

MS. COUCH: Objection; asked and answered.

A. The -- the feature manipulates an image.

Q. Okay.

Are you aware of people seeing the same images where the image they see are controlled for and because of

Page 183

features, they nevertheless have different outcomes in terms of mental health measures?

MS. COUCH: Asked and answered; vague.

A. I feel like we're talking in -- in circles.

I -- I think that's what this is.

Q. Anything else other than one where they actually manipulated the images so people saw two different images?

A. I guess I don't -- is your question if two people see the same image?

Q. But they had different features, is there a study showing that that scenario leads to different outcomes?

MS. COUCH: Asked and answered.

A. I feel like I've answered that question. I'm sorry.

Q. Okay.

Which studies do that where they see the same images but are exposed to different features and have different

Page 184

outcomes as a result of that?

MS. COUCH: Asked and answered.

A. I feel like that's what this is.

Q. They see the same images in Kleemans?

MS. COUCH: Asked and answered; argumentative.

A. I don't -- I guess -- I guess we're talking past each other.

Q. Okay.

A. I don't --

Q. Any other studies -- the judge can sort out this question in terms of the legal impact of it, but are there any other studies you're aware of where people see the same content, the same images and the study instead manipulates the features that they're exposed to and they have different outcomes?

MS. COUCH: Asked and answered.

A. I -- I think I said Tiggemann, and I'm trying to find it in here 'cause I think they also did a similar study, but I think -- Tiggemann, here it is, 308.

Page 185

Q. What page are you on?

A. 178.

But that's -- and --

Q. Tiggemann they're seeing totally different content, right?

A. They are seeing different content.

Q. Okay.

A. That's correct.

Q. And so I'm looking for a study where they see the same content, the same images, but they have exposure to different features and they have different reported mental health outcomes.

A. I don't -- I feel like that's what this is. We're -- we're in a rabbit hole. I don't know what else to say.

Q. Okay.

Anything other than Tiggemann which doesn't involve that and Kleemans which you say does even though they saw different manipulated images?

A. There's a meta-analysis that I cite here, but I -- I don't -- I don't

47 (Pages 182 - 185)

CONFIDENTIAL

Page 186

know of one offhand. Let me just answer it that way.

Q. Okay.

Let's go back to the National Eating Disorders website.

A. Do you --

Q. Let me just ask you the question again.

When I asked you earlier "Do you believe there's a consensus that social media can cause eating disorders irrespective of the content that people see on social media, yes or no?" you said, "Not only do I believe that, but the National Eating Disorders Association has issued the same opinion."

Do you remember giving that testimony this morning?

A. I do.

Q. Do you believe that this document that you were referring to actually states what you say it states, that they concluded that social media can cause eating disorders irrespective of the

Page 187

content that people see on social media?

MS. COUCH: Objection; misleading; misstates testimony.

A. I believe what I said before was that I pointed to a place that showed that you could manipulate the image, and I believe that this is a feature of social media that is not -- that is part of social media.

Q. And that doesn't impact the content people see?

A. It's the feature of social media that creates an experience that is -- that is damaging.

MS. COUCH: Objection; vague.

BY MR. SCHMIDT:

Q. Does it result in people seeing different content, in your view?

MS. COUCH: Objection; vague; misleading.

A. I feel like I've answered the question.

Q. What's the answer?

MS. COUCH: Same objection.

Page 188

A. That it -- it's -- it's the feature that leads to body dissatisfaction.

Q. Look at the first bullet on page 1 of Exhibit 13. That's the webpage printout you cited?

A. Yes.

Q. It says over 80 percent of Americans watch television daily which accounts for 55 percent of the total time people spend on leisure activities in a day.

Do you see that?

A. I do.

Q. And on average these people watch over three hours of television a day.

Do you see that?

A. I do.

Q. Do you accept that data as reliable in this publication, or this webpage --

A. I don't see the reference for it. It says number 2, but I don't --

Page 189

probably on this one.

It looks -- if I can read this, it looks like the reference for that is from the U.S. Bureau of Labor Statistics from 2016.

MS. COUCH: '18.

A. Or '18.

So I would say that that data is probably not accurate today.

Q. Okay. Let's look at the next bullet. On a typical day, and then it says 13 to 18 year olds use some form -- some type of media for about 7.5 hours.

Do you see that?

MS. COUCH: Objection; misstates the document.

A. On a typical day, 8 to 12 year olds use some form of media for about five hours and --

(Stenographer admonition on crosstalk.)

A. I'm only reading what it says, but I can read it slower. I apologize.

(Reading) On a typical day 8 to

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

12 year olds use some form of media for about five hours and 13 to 18 year olds use some type of media for about 7.5 hours.

Q. So to go back to my question, I was reading the part about the 13 to 18 year olds.

A. Yeah.

Q. Is that consistent with your understanding that 13 to 18 year olds use some type of media for about 7.5 hours a day?

A. Yeah, that's -- again, that -- that's from the Common Sense media report of 2019 which has been updated since then, but it's still about right. I think it was up -- it's a little more than that today, but that's approximately correct, yes.

Q. Then it says: Most of this time is spent watching television or streaming videos, though children and teens play video games for approximately 1.5 hours and are on their computers for more than

Page 191

an hour a day.

Do you -- is that consistent with your understanding of how 13 to 18 year olds spend their time watching some type of media?

A. In 2019, six years ago, that is what the data showed, that's correct. Like I said, there has been a Common Sense update since then.

Q. And what does it show today?

A. I -- I think it shows more time and that it's shifted more towards smartphone use.

Q. Okay. Do you know today how much an average 13 to 18 year old watches television?

A. Honestly, watching television is sort of an archaic construct at this stage.

Q. Kids don't watch television anymore?

A. I don't know what's meant by television, and I don't think a lot of

Page 192

people that answered that question know what it means.

Q. Okay. What if it includes having a box on your wall that you can zoom Netflix in or sports into or Apple TV into and that people sit around and call it TV?

A. Or -- or stream TikTok videos on it.

Q. Do you know how common it is for teens to stream TikTok videos on TV?

A. I don't know the answer to that.

Q. Okay.

A. But I might point out that, again, when we -- the concept of television, which I've studied, I've studied television for 25, 30 years, is a dated construct because what most people have now is a smart TV which is effectively a computer on their wall, and they may call it a television, but it does a lot more than that.

Q. Okay. Have you made a determination of

Page 193

how much time people have to spend using social media to have an impact on mental health?

MS. COUCH: Objection; vague.

A. Have I spent any time on that? I don't think it's a relevant question.

Q. Okay. Do you know?

MS. COUCH: Objection; vague.

A. I don't think it's -- I don't think it's -- I don't think that's the right way of -- of -- of thinking about the problem.

Q. Okay. Do you know though? All right. Well, actually maybe let me move on. Let's look at page 44 of your report and paragraph 88. If you want to just read that paragraph to yourself, and then I'll ask you a question about the very end of it.

A. (Witness reads document.) Okay.

Q. Give me one second. I'm sorry.

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

(Pause.)

Q.   Do you see at the end of this paragraph you say:  All totalled, a sizable amount of time is spent by the average teenager on social media sites and more than enough to profoundly influence mental health and behavior.

Do you see that?

A.   Yes.

Q.   When you say "more than enough," how much is enough?

A.   I -- that's not a -- something I've considered.

Q.   Is ten minutes a day enough?

MS. COUCH:  Objection.

A.   It's not something I've considered.

Q.   Is five hours a day enough?

MS. COUCH:  Objection; vague.

A.   I would say that there isn't a threshold at which it becomes a problem, but there are extremes at which it obviously is.

Q.   Do you agree with me that time

Page 195

spent on digital devices alone isn't sufficient to determine whether the experience is harmful or harmless?

A.   No, I do not agree with that.

Q.   Okay.  Let me show you a document.

(Christakis Exhibit 15, JAMA Viewpoint, Christakis and Hale, April 28, 2025, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q.   Do you recognize what -- do you recognize what I've marked as Exhibit 15 as a Viewpoint piece written by you and fellow plaintiffs' expert Dr. Hale?

A.   Yes.

Q.   And I'm going to read you language from that in the first paragraph, please.

Do you see about halfway down that first paragraph, or third of the way down, I guess, you have a sentence that begins "Concurrently"?

A.   Yes.

Page 196

Q.   You write:  Concurrently, the media research landscape has evolved to recognize that time spent on digital devices alone is not sufficient to categorize the experience as salubrious, harmful, or harmless, suggesting instead that families create a family media plan.

Did I read that correctly?

A.   Yes.

Q.   Is that accurate?

A.   That's -- that's -- yes, that --

Q.   Okay.

A.   That -- it's correct that the media research landscape has evolved to that --

Q.   Correct.

A.   -- as stated.

Q.   Correct.

Do you believe that time spent on digital devices alone is not sufficient to categorize the experience as harmful or harmless, yes or no?

A.   That time alone is not in -- do I believe that time alone is not

Page 197

sufficient to categorize it as harm -- yes, I believe that time alone is not, that's correct.

Q.   And then you go on to say:  Although we agree that content matters as much, or perhaps more, than duration on devices, time spent using digital media is not without cost insofar as it displaces time spent in the real world.

Did I read that correctly?

A.   You read that correctly.

Q.   Now, I've seen you talk about those two concepts: one being the content that you see and one being displacing time in the real world.

A.   Yes.

Q.   Am I correct that you sometimes refer to, and help me with the terminology, the content that you see as the direct effect of social media and the displaced time as the indirect effect?

MS. COUCH:  Objection.

A.   That's correct.

Q.   Okay.

CONFIDENTIAL

Page 198

A. Those quotes were in the context of my work on young children, and that content and dis -- and that -- in a -- those constructs were applicable primarily to -- exclusively to analog video viewing, but yes.

Q. Well, this article here we're looking at is about adolescents.

A. That's correct.

Q. And in this article about adolescents you say: We agree that content matters as much, or perhaps more, than duration on devices.

Do you see that?

A. Yes.

Q. Do you agree with that statement?

A. Yes.

Q. And then you give estimates of how to categorize time spent on the -- on the right.

Do you see that in the table?

A. I -- I wouldn't say I give -- I -- the point of this viewpoint was to

Page 199

create a taxonomy that recognizes that certain usage pattern are problematic regardless of content. It's a separate conversation than what we were having before.

And in fact, the point of this viewpoint is to differentiate -- is to move the debate away from focusing exclusively on content in certain situations.

Q. Okay.

What you have done in Table 1, or table -- the table is to create different categories of media usage.

Do you see that?

A. Yes.

Q. And you categorize moderate media use as less than five hours per day, right?

A. I do.

I should point out that, as I state in this piece, that this was a provisional proposed taxonomy, and we defined "moderate use" somewhat

Page 200

arbitrarily as less than a 50th percentile based on what's actually currently happening. It doesn't mean that that's the right amount, but yes.

Q. Okay. But what you called "moderate media use" in this article is less than five hours per day?

A. That's correct.

Q. And that's based on 50 percent of people being below the five hours per day.

A. In the sample we use for the data, that's correct.

Q. And "heavy media use" you classify as nine hours or more on any day or 60 more -- hours or more per week.

A. That's correct.

Q. And that's based on those people being in the top 85th percentile.

A. That's correct.

Q. Let me mark -- did you prepare a list of the materials you considered in this case?

A. My reliance list?

Page 201

Q. Yes.

A. Yeah.

Q. Okay. It's not going to be in there.

MS. COUCH: And, Paul, just so you know, we're coming up on an hour and a half and the lunch hour. So I don't know how much longer, but I would request we start to sum.

MR. SCHMIDT: Okay. Do you want me to stop here? Do you want to quickly do a little more and see if we can get through this and break then?

MS. COUCH: So, that's I defer to you because I don't know how long, but I'd love to stop within five to ten minutes.

MR. SCHMIDT: All right. Let me see if I can get through this.

MS. COUCH: Okay.

MR. SCHMIDT: What exhibit number do you have on that?

THE WITNESS: 16.

(Christakis Exhibit 16, Dimitri

CONFIDENTIAL

Page 202

Christakis Materials Considered List, Bates Christakis0054-444, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. Do you recognize Exhibit 16?

A. I do.

Q. Did you prepare this?

A. Yes.

Q. Exhibit 16 includes company documents, scientific literature, deposition references, probably some other scattered material. Is that correct?

A. Yes.

Q. And what -- what is Exhibit 16?

A. It's -- it's all of the materials that I considered in the preparation of this report.

Q. If something does not appear on this list, can we understand that you did not consider it in the preparation of this report?

A. No, I don't think you can construe that because there is a lot of literature that I'm familiar with in this

Page 203

space that's just in my brain. I mean, I -- I didn't cite it if it's -- I shouldn't have cited it if it's not -- I be -- let me say it another way.

I believe that everything I've cited is listed here. Now, given that it's -- I mean, I can't attest that it's complete because it's so --

Q. Does ex -- does Exhibit 16 cover all the company documents and testimony you reviewed?

A. I believe so, yes.

Q. And how did you find the documents and the testimony that you reviewed?

A. It was -- it was an iterative -- iterative process. It began with me asking counsel for all documents that referenced internal studies done by the defendants, and then on reviewing those, I asked for additional ones because they -- the documents I reviewed alluded to other studies or other potential presentations.

And then in addition to that, I

Page 204

used the software program to do my own searches to see documents that might be relevant that I was searching for.

Q. Okay. And that's what I wanted to know.

Do you have access to full datasets of all the depositions and all the documents that each defendant produced in these cases?

A. I -- I do have access to it, yes.

Q. And you did your own searches?

A. I did some of my own searches, yes.

Q. What searches did you do on your own?

A. I -- I would search for keywords that I thought might shed more light on some of the documents I had reviewed.

Q. Do you remember what those keywords were?

A. Sometimes it was a specific person named in a deposition or alluded to in an email. Sometimes it was a

Page 205

particular study, like the Daisy study. Those -- those kinds of things.

Q. Did you -- did you review -- did you read all these documents that you cite here in their entirety?

A. I -- I -- yes, I read them all.

Q. In their entirety?

A. Well, it's an interesting question.

I read them all in their entirety, yes, but I can assure you that many of them could be skimmed in a way that I've learned to skim because, for example, depositions tend to be fairly laborious and don't require detailed reading.

Q. Well, that's why I asked you the question that I did. Some of the material you have listed here is quite voluminous, right?

A. Yes.

Q. Including the depositions.

A. Yes.

Q. Did you skim the depositions?

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

A.   I skimmed them, but I don't believe I missed any salient material. I'm a very experienced reader.

Q.   Did you --

A.   I've been reading for 50 years.

Q.   Did you skim the documents or some of the documents?

A.   I -- I read them, I would consider, consistent with how I read any scientific studies, literature, papers, with an eye to extracting what I consider to be important and meaningful information.

Q.   Okay.
Did that involve skimming or reading them in their entirety?

A.   No, I -- I -- I don't think it's a yes-or-no question.

Q.   Did you read them in their -- every document listed in its entirety?

A.   I would say that I read every document here suff -- with sufficient care to have extracted everything that I think was relevant.

Page 207

Q.   Did that mean you read every document in its entirety, or no?

MS. COUCH:  Asked and answered.

A.   As I -- as I said --

MR. SCHMIDT:  That's not answered.

A.   As I said --

MS. COUCH:  Argumentative.

A.   -- there were portions of some documents that were not relevant.  For example, the depositions tend to be very repetitive.  Many of the paper -- many of the documents, the email chains tended to repeat and then there was huge pages that just had, I don't remember what it was, the -- who else was on this.  So I don't know how you want me to represent that.  I didn't read all those pages because they didn't seem relevant.

Q.   Let me just ask you a couple questions about the deps, then we can break for lunch.
Let's go to the depositions, please.

Page 208

A.   In this document?

Q.   Yeah, and it's specifically --

A.   These pages aren't numbered?

Q.   You've got them numbered, yeah. Christak.

A.   Oh, there.

Q.   If you go to the one ending 2420.  This refers to the deposition and exhibits of someone named ███████.

A.   Yes.

Q.   Do you remember what ████ ███ role was at Meta?

A.   I don't remember offhand what his role was.  There -- honestly, I'm not very good with names, and I -- many of these names are very similar.

Q.   Okay.
Do you know that you didn't review all the depositions that were taken in these cases and made available to the lawyers in these cases?

A.   I -- I --

MS. COUCH:  Objection; misleading.

Page 209

A.   I did not review all of the depositions in -- in part because many of them arrived very late in the process and I didn't have sufficient time to review them.

Q.   Okay.  Let me ask you about one you didn't review.
Do you know who Antigone Davis is?

A.   I do.  She was at Meta and I believe she was on the well-being team. She had a -- I -- I quote her a lot from documents that I read in my report.

Q.   You don't -- you didn't read her testimony, did you?

A.   I think I did read her testimony.

Q.   You don't list it here.

A.   Maybe I did not read her testimony.
I know I quoted her.  It must have been from internal emails.

Q.   Do you know why you didn't read her testimony?

53 (Pages 206 - 209)

CONFIDENTIAL

Page 210

A.   I -- I -- it must not -- I don't know the answer to that.

Q.   You did not read the testimony of ▮▮▮▮▮ who -- I actually didn't see any quotes from Antigone in your report, but you do quote ▮▮▮▮▮. You didn't read his testimony.

Do you know why you didn't read his testimony?

A.   Like I said, I continued to review depositions as long I had time. I'm almost certain that Antigone because, frankly, it's a Greek name, but I'm almost certain that I do quote her in here and -- and I -- the only reason I didn't finish reading depositions is because I ran out of time and I had essentially, in any case, achieved saturation. I wasn't learning anything more from the ones I was reading.

Q.   Do you know ▮▮▮▮▮ -- I smiled what you said Antigone is a Greek name because my wife is Greek and I think of it as the same way with regard to that.

Page 211

But do you know ▮▮▮▮▮ was the first deposition taken in these cases?

A.   I -- I -- I don't know that, no.

Q.   Okay.

Any reason you didn't read ▮▮▮▮▮ deposition?

A.   Not that I recall.

MS. COUCH:  Objection.

BY MR. SCHMIDT:

Q.   Okay.

Do you know that you focus on the Vaishnavi Jayakumar repeatedly in your report?

A.   I do.  I was trying to quote her earlier, yes.

Q.   Do you know why -- were you pointed to her testimony by the lawyers?

MS. COUCH:  Objection.

Obviously communications with lawyers are privileged.  So you can't answer anything that would ask for communications with lawyers.

THE WITNESS:  So I should not

Page 212

answer that question?

MS. COUCH:  Correct.

BY MR. SCHMIDT:

Q.   Okay.  You're going to follow that instruction?

MS. COUCH:  I mean, you're welcome to rephrase that doesn't call for counsel communication, but drafts and counsel communications are privileged.  So here we are.

MR. SCHMIDT:  Understood.

BY MR. SCHMIDT:

Q.   You're going to follow that instruction?

I just need you to say yes so I can move on.

MS. COUCH:  Yeah.

A.   I -- I guess that's the right -- yes.

Q.   I'm not counseling you, but if you answer yes, I'll move on.

MS. COUCH:  Have we reached a lunch and bathroom break, Paul?

MR. SCHMIDT:  Yeah, let me just

Page 213

ask one or two more.

MS. COUCH:  Okay.

BY MR. SCHMIDT:

Q.   Do you know why Ms. Jayakumar left the company?

A.   I do not know why she left the company.

Q.   Do you know if she was terminated for performance issues?

A.   I do not know that.

Q.   Is that something you'd want to know when considering how you weigh her testimony given how frequently you cite it?

MS. COUCH:  Objection.

A.   No, I don't consider that to be relevant.

Q.   Okay.

Do you know if she has animus against the company in terms of the circumstances of her termination?

A.   No, I have no knowledge of that whatsoever.

Q.   Is that relevant to you in

54 (Pages 210 - 213)

CONFIDENTIAL

Page 214

considering her testimony and her claims?

A. No. I presume she was under oath and testified honestly, as I did everybody else.

Q. Okay.

Did you presume that everyone you read at Meta testified honestly?

A. In their depositions?

Q. Yes.

A. Yes. I had no reason to believe otherwise.

MR. SCHMIDT: Okay.

Why don't we break there.

MS. COUCH: Okay.

THE VIDEOGRAPHER: The time now is 12:09 p.m., and we're off the record.

(Luncheon recess taken.)

Page 215

- - -

AFTERNOON SESSION

- - -

THE VIDEOGRAPHER: The time right now is 12:53 p.m., and we're back on the record.

BY MR. SCHMIDT:

Q. Do you -- do you have any publication, Doctor, where you evaluate a scientific question by going through a company's documents and analyzing their documents in a publication?

MS. COUCH: Objection; vague.

A. Do I have any scientific publications?

Q. Where you do that.

MS. COUCH: Same objection.

A. I have scientific publications where I've used industry data, but I don't have scientific publications that I'm aware of that have -- that have used hospital data. There's a lot of reasons why that wouldn't be appropriate.

Q. What about publications where

Page 216

you go through company emails and company chats and materials like that and use them in a scientific publication, have you ever done that before?

MS. COUCH: Compound.

A. Could you clarify your question?

Q. Yeah. You looked at a lot of emails and chats here, right?

A. I do.

Q. Have you ever -- have you ever done that in any of your public work, gone through a company's emails and chats and written a scientific article about that?

A. Reviewing emails and internal data would not normally be suitable for scientific publication. There isn't a quantitative question there.

Q. Are you familiar with the Bradford Hill criteria?

A. Yes.

Q. Did you apply them in this case?

A. I -- I'm aware of them and they inform my decision-making. I use a different approach, but the criteria of

Page 217

Bradford Hill are, sort of, woven throughout all of this even if they're unnamed.

Q. You didn't do a formal Bradford Hill analysis in this case, did you?

A. I used a different standard. I used sort of a totality-of-evidence approach, which is kind of consistent with what I do in my clinical practice and my scientific practice.

Q. Okay.

A. But I'm familiar with the Bradford Hill criteria. And like I said, they're informing a lot of the decision-making.

Q. Did you perform a full Bradford Hill analysis here?

A. I did not do a formal Bradford Hill analysis in the report, no.

Q. What is a totality-of-the-evidence analysis?

A. It's basically, in my opinion, it's applying what I deduce from published literature, from my clinical experience,

55 (Pages 214 - 217)

CONFIDENTIAL

Page 218

from my education, from my own research, and in this particular case, from the data that was made available to me from industry's own studies and their own conclusions.

Q. Okay.

Does a totality of the evidence approach require you to review as much of the public literature as you can on the question you're analyzing?

A. Yes, enough of the public literature or -- and I deliberately used -- given how voluminous the literature is on this and how much has changed in it over the last 12, 15 years, I deliberately used a approach focusing primarily on systematic reviews and meta-analyses published in the last five years.

Q. You're familiar with what a systematic literature review is, right?

A. I'm very familiar with it, yes.

Q. One recognized way of performing a systematic literature review is using

Page 219

PRISMA criteria, which you cite in your report, right?

A. I -- correct, yes.

Q. Did you do a systematic literature review in your work in this case in that sense?

A. That's not the standard --

MS. COUCH: Objection.

A. -- I used.

Q. Okay.

A. I use -- I reviewed the systematic reviews to be, as I said in my report, to be sure that they used PRISMA.

I didn't do -- I didn't do a systematic review. I read systematic reviews and made sure that they met quality standards.

Q. Have you ever done a totality-of-the-evidence analysis that depends on documents, emails, chats from a company you don't work for before?

MS. COUCH: Objection; misstates his testimony.

A. I'm not sure how to answer that.

Page 220

I don't know that that's a yes-or-no question.

Have I ever done a report like this where I've -- ask it again.

Q. Sure, yeah.

Have you ever done a -- when I asked you about what a totality-of-the-evidence review was, you mentioned public literature.

A. Yeah.

Q. But you also mentioned company data and --

A. Yeah.

(Stenographer admonition on crosstalk.)

Q. I'm focused on company data and documents.

So, my question is have you ever done a totality-of-the-evidence review before this case focused on data and documents from individual companies where you don't work?

A. The closest thing that I've done to that is what I mentioned before, that

Page 221

I've done site visits as a visiting professor and reviewed an institution, reviewed their policies, reviewed their data and rendered a report, but it wasn't one submitted for publication. It was really for internal consumption.

Q. Okay.

You've never published a totality-of-the-evidence review of a company's data and documents before?

A. I've never published one. I could tell you as an editor, I don't -- I wouldn't publish one if someone else did this. This is not -- you know, it's not a scientific review in that sense.

Q. Okay.

Exhibit 6 is one of the studies you brought with you, the lead author is Nagata. It's dated May 21st, 2024.

Why did you bring this study with you?

A. I brought it with me because it has been published since my report was submitted, and it is a very well done,

56 (Pages 218 - 221)

CONFIDENTIAL

Page 222

large longitudinal study examining social media usage and depression, and -- and finds a significant association.

Q. Okay.

A. So it's one more piece of evidence that's pretty compelling because of its size and quality.

Q. This is a study that evaluated time spent, correct?

A. This is a study that evaluated time spent, that's correct.

Q. And when time spent on social media increases, that means people are exposed to more content, correct?

A. No, it means they're exposed to more social media which importantly means of the features of social media.

I mean, the really important thing here is it's time spent on social media. It's not time spent on any particular content. And in fact, the content is as varied as the individuals in the studies -- I'm sorry, the individuals in the study. They're all viewing

Page 223

different things, but their experience on social media is driven by the features that I enumerate in my report.

MR. SCHMIDT: I'll move to strike everything other than "no."

BY MR. SCHMIDT:

Q. Just as a matter of fact, are you denying that if someone spends more time on social media they see more content?

MS. COUCH: Objection; misleading.

A. I -- I am asserting that if they spend more time on social media, they are experiencing social media as it exists, and it is not merely content.

Q. Does it include seeing more content, which is my question I've now asked you three times?

A. It includes seeing more content and more features.

MR. SCHMIDT: Move to strike everything after "it includes seeing more content."

Page 224

BY MR. SCHMIDT:

Q. Can it include seeing more content of a certain type?

MS. COUCH: Objection; vague.

A. I don't -- it -- I didn't -- to be honest, that's a little bit of the black box that most of us are in, and when we study social media, all we know is that they are being exposed to the context and the experience that it creates for them.

Q. And that experience includes content, right?

A. It includes features. It includes aggregated and selected con -- yes, content. But the important thing is it's not just content. It's different from just any other experience of watching.

Q. In a time spent study like this one that we've marked as Exhibit 6, it just tracks time spent with mental health measurements, right?

A. Yeah, I mean, you -- you can -- you can view this as -- as time spent

Page 225

exposed to social media features and mental health outcomes.

Q. Can you answer my question without giving me a little speech? My question is just does this study look -- like this look at time spent and whether that's linked to mental health measurements?

A. That's what it does, yes, it looks at time spent on social media and subsequent mental health.

Q. And I take your point that that includes being exposed to features, that includes being exposed to content. Does a study like this attempt to determine how much of the psychological outcomes it sees are attributable to greater exposure to features versus greater exposure to content?

A. I don't think there is content devoid of features on social media.

Q. Are there features devoid of content?

A. Yes, I think there are features

57 (Pages 222 - 225)

CONFIDENTIAL

Page 226

devoid of content.

Q.   Does a study like this -- and what are those features that are devoid of content?

A.   It's the ability to manipulate images. It's endless scroll. It's suggested subsequent content. It's likes. I don't consider any of those things content, but I consider them features. It's cosmetic surgical effects.

Q.   When someone has endless scroll, what is it they're scrolling through?

A.   I honestly don't know. It's whatever the algorithm is suggesting comes next.

Q.   Is it content of some form?

A.   It's whatever the algorithm suggests, but it's not necessarily content that they would have suggested. It's what the algorithm is suggesting for them.

Q.   Does the algorithm suggest anything other than content?

MS. COUCH:  Objection; vague.

A.   Yes, the algorithm suggests

Page 227

people for them to like.

Q.   Okay.

A.   People for them to follow, et cetera.

Q.   And people they might like and follow, do those people post content?

A.   Sometimes they're predators.

Q.   Do they post content?

A.   Sometimes. I don't know what they do.

Q.   Okay.

A.   I have no way of knowing what they do.

Q.   Okay.

My question on a study like this, a time spent study like this, is do any of the time spent studies you're aware of make an effort to say here's how much of what we're measuring is due to people being exposed to features for longer versus here's how much is people being exposed to content for longer?

A.   I'll say it again, there is no content devoid of features on social media

Page 228

sites.

Q.   So what's the answer to my question?

A.   It's unanswerable.

Q.   Okay. Let's look at page 3 of this study.

Do you see that they rely on self-reported estimates of time spent?

A.   Yes.

Q.   Do you agree with me that that's using the verbiage you used earlier in your report, a meaningful limitation of this study?

A.   It's an imprecise measure. It's a limitation which biases their findings towards the null, which is to say it attenuates them.

Q.   Do you know that?

A.   Yes.

Q.   Okay.

They don't say that, do they?

A.   I don't know. Let me take a look at what they say.

Q.   What they say if you go to their

Page 229

limitations on page 7 of the article under "Strengths and Limitations" is they say: Limitations include the observational design of the study leading to susceptibility to residual and unmeasured confounders despite adjustment for potential confounders, as well as reporting, recall, and social desirability bias.

Do you see that?

A.   Mm-hm.

Q.   And reporting bias -- that was a "yes"?

A.   I see that they say that, yes.

Q.   Okay.

Reporting bias includes the unreliability of self-reported data, right?

A.   Yes.

Q.   And you agree that's a limitation of this study?

A.   I agree that it's --

MS. COUCH:  Asked and answered.

I was just putting an objection,

58 (Pages 226 - 229)

CONFIDENTIAL

Page 230

asked and answered.

A.   I agree that they state that that's a limitation, yes.

Q.   You're familiar with the DSM, of course?

A.   I am.

Q.   It's a diagnostic manual of recognized mental disorders published by the American Psychiatric Association?

A.   That's correct.

Q.   It provides a standardized means of classifying and diagnosing psychiatric disorders?

A.   It's one such means, that's correct.

Q.   Are you aware of any means of classifying and diagnosing psychiatric disorders that's more authoritative than the DSM?

A.   Not everybody relies on the DSM-5.

And they don't rely on it because it's historically very, very slow to change.  I can point out, for example,

Page 231

that Gamblers Anonymous was started in 1957, I believe, and the -- it wasn't recognized by the A -- by the DSM-5 as a formal addiction until 2013.  So it took them 57 years to recognize gambling addiction, and in the meantime, tens of thousands of people were successfully treated for it.

Q.   Are you finished?

A.   Yeah.

MR. SCHMIDT:  Move to strike as nonresponsive.

BY MR. SCHMIDT:

Q.   To go back to my question, are you aware of any other source that -- for assessing and diagnosing psychiatric disorders that is recognized as more authoritative than the DSM?

A.   I --

MS. COUCH:  Asked and answered.

A.   I don't know what authoritative means in this context.  There are many people that rely on -- on -- on -- on -- on -- on different sources and many -- and

Page 232

I would actually say that most -- majority of clinicians recognize this as -- as a disorder.  The American Psychiatric Association, the American Pediatric Association, the American Psychological Association all recognize social media addiction as an entity.

MR. SCHMIDT:  Let's mark that answer, if we could, please, as totally nonresponsive and giving advocacy speech in response to a question that had nothing to do with what was answered.

MS. COUCH:  Objection to the soliloquy by counsel.

BY MR. SCHMIDT:

Q.   Are you a psychiatrist?

A.   I'm not a psychiatrist.

Q.   Are you a psychologist?

A.   I'm not a psychologist.

Q.   Are you a member of the American Psychiatric Association?

A.   No, I'm not a member of the American Psychiatric Association, but I am

Page 233

on an expert committee reviewing the DSM-5-R to make an amendment to it for internet gambling disorder.

MR. SCHMIDT:  Move to strike everything beginning with "but."

BY MR. SCHMIDT:

Q.   Do you understand that psychiatrists recognize the DSM as an authoritative source for assessment and diagnosis of psychiatric disorders?

MS. COUCH:  Objection; vague.

A.   Say that again.

Q.   Do you recognize that psychiatrists use the DSM as an authoritative source for diagnosing and recognizing --

A.   No, I don't recognize that.  I know that --

Q.   -- disorders -- you got to let me finish.

MS. COUCH:  Let him finish and then I'll object and then you answer.

THE WITNESS:  Sorry.

MS. COUCH:  I know.

59 (Pages 230 - 233)

CONFIDENTIAL

Page 234

THE WITNESS: My bad.

BY MR. SCHMIDT:

Q. I'll re-ask it.

Do you understand that psychiatrists use the DSM as an authoritative source for diagnosing and classifying psychiatric disorders?

MS. COUCH: Objection; vague.

A. No, I don't acknowledge that.

Q. Okay.

Do you think your work on the DSM that you just told us about is important?

MS. COUCH: Objection; vague.

A. I do think it's important.

Q. Do you recognize that the DSM is the handbook used by healthcare professionals in the U.S. and much of the world as the authoritative guide to the diagnosis of mental disorders?

MS. COUCH: Asked and answered.

A. I recognize that it has significant limitations, that it's slow to make changes, that many diagnoses are not

Page 235

included in it.

MR. SCHMIDT: Move to strike as nonresponsive.

BY MR. SCHMIDT:

Q. Was that a "yes" or a "no"?

MS. COUCH: Objection; vague.

A. It's a "no."

Q. All right.

MS. COUCH: Let me get my objections in.

(Christakis Exhibit 17, American Psychological Association What is DSM and why is it important?, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. I'm going to show you Exhibit 13 which is a printout from the American Psychiatric Association.

I'm sorry, Exhibit 17.

Do you see where they talk about the DSM?

A. I do.

Q. And they say: The Diagnostic and Statistical Manual of Mental Disorders

Page 236

is the handbook used by healthcare professionals in the U.S. and much of the world as the authoritative guide to the diagnosis of mental disorders.

Do you see that language I just read to you that you disagreed with?

MS. COUCH: Objection; misstates his testimony.

A. So, I stated my opinion, and this is the opinion of the American Psychiatric Association whose handbook they're introducing.

Q. My question was did you see that language that I just read to you and that you disagreed with on this page?

MS. COUCH: Same objection.

A. I represented my opinion.

Q. Right.

A. And this is their opinion.

Q. Do you understand my question? I'm asking you do you see that language on the page?

A. If your question is do I see this language.

Page 237

Q. Yes.

A. I see this language, yes.

Q. Thank you.

And you disagree with that statement from the American Psychiatric Association, correct, about the DSM?

A. I would argue that it is not the authoritative guide, yes.

Q. Okay.

Look further down, at the bottom of the page it says in the second to last sentence on the first page it says: It was developed with the help of more than 200 subject matter experts and text updates are based on current scientific literature.

Do you see that?

A. I do.

Q. Do you agree or disagree with the American Psychiatric Association on that point?

MS. COUCH: Objection; lacks foundation.

A. I -- I have no reason to dispute

60 (Pages 234 - 237)

CONFIDENTIAL

Page 238

that it involves subject matter experts.
I am part -- I am one of those experts, and as I said, it's very, very slow to make changes.

Q. So do you agree or disagree with that complete sentence from the American Psychiatric -- well, let me actually pick up on the point where I think you were fussing a little bit.

Do you see where it says: Text updates are based on current scientific literature? Do you see that?

A. I do.

Q. Do you agree or disagree with that?

A. I disagree with it.

Q. Okay. Let's look at what you have done on the DSM.

Actually, before we do, I'm going to ask you about a few parts of it.

(Christakis Exhibit 18, DSM-5 Unspecified Other (Or Unknown) Substance-Related Disorder, was marked for identification, as of this date.)

Page 239

BY MR. SCHMIDT:

Q. Exhibit 18 is the section of the DSM-5-TR that talks about non-substance-related disorders, and the only recognized disorder in that group is gambling disorder.

Is that consistent with your knowledge?

A. That is consistent with my knowledge.

MS. COUCH: Are you representing this is the pages from the DSM?

MR. SCHMIDT: Yes.

BY MR. SCHMIDT:

Q. And if we go to -- the pages aren't perfect, but look with me at the one that has 663 at the bottom.

A. Yes.

Q. Actually, it's the prior page.

Do you see in the middle of the second page of the document it says 662?

A. Yes.

Q. Right below that it says: Although some behavioral conditions that

Page 240

do not involve ingestion of substance have similarities to substance-related disorders, only one disorder, gambling disorder, has sufficient data to be included in this section.

Do you see that?

A. I do see that.

Q. And do you think that is an accurate statement?

A. Do I think that's an accurate or inaccurate?

Q. Accurate, please.

A. I -- I believe that's an inaccurate statement.

Q. Okay. Let's look at another document.

You mentioned that you have done work on internet gaming disorder with the DSM; is that correct?

A. I mean, I am currently doing work with them around that, yes.

Q. How longstanding is that work?

A. I have been serving on that committee for almost three years, I

Page 241

believe.

Q. Have you been an advocate for adding internet gaming disorder to the DSM?

A. I don't know --

MS. COUCH: Objection; vague. Go ahead.

A. I don't know what you mean by "advocate."

Q. Have you advocated for adding internet gaming disorder to the DSM?

MS. COUCH: Same objection.

A. Advocate can mean different things in different context.

I believe it should be added.

Q. Okay.

Have you taken that view in your work on the DSM committee you mentioned?

A. Yes. I believe it's the consensus of all of us on that committee that it should be added.

Q. And you speak for the committee when you say it's the --

A. No.

Golkow Technologies,
877-370-3377    A Veritext Division    www.veritext.com

CONFIDENTIAL

Page 242

Q. -- consensus of all of you?

A. It -- I -- I do not speak for the committee, but I -- I have been in enough meetings of the committee that it's my understanding that we are going to move it forward.

Q. Okay.

In your work on the committee, do you know how many meetings you've had regarding that?

A. As an entire committee or as subcommittees? Or what is your question exactly?

Q. I'll take any of those. Just ones you've been involved in. If it's a lot, then you can just say it's dozens or whatever. I'm just trying to get an order of magnitude.

A. It's in excess of ten.

Q. Okay.

Are there -- are there minutes of those committee meetings?

A. No, I don't believe that there are.

Page 243

Q. Do you exchange written documents as part of that work?

A. Not in any formal way.

Q. Do you informally email about your work on the committee?

A. It's entirely possible that members of the committee have emailed each other over the last three years, but most of our work is done over Zoom.

Q. Let's look at Exhibit 19.

(Christakis Exhibit 19, DSM-5 Conditions for Further Study, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. Do you recognize this portion of the DSM-5-TR "Conditions For Further Study"?

And if you're looking for internet gaming, it appears on -- it's discussed on page 914.

A. That is what I was looking for and -- 'cause I knew that it was in there, and yes, there it is.

Page 244

Q. Okay.

You're familiar with this portion of the DSM, this "Conditions For Further Study," at least as it relates to internet gaming disorder?

A. I am.

Q. Okay. Let's look at that.

Halfway down the page there's a paragraph that begins: Gambling disorder is the only non-substance-related disorder included in the DSM-5 Section 2 Chapter Substance-Related and Addictive Disorders.

Do you see that?

A. I see that.

Q. And then below that, next paragraph it says: The DSM-5 workgroup reviewed more than 240 articles and found some behavioral similarities of internet gaming to gambling disorder and to substance use disorders.

Do you see that?

A. Yes.

Q. And do you understand that to be a reference to your work?

Page 245

MS. COUCH: Objection; lack of foundation.

A. My work on the committee?

Q. Yes.

Is that -- when it says "the DSM workgroup reviewed more than 240 articles," is that referring to work you did with the DSM or work someone else did?

A. No, that -- so, this is the Conditions For Further Study that was published in 2013, is my understanding. And our committee is in the process of submitting a revision. Our work started after that.

Q. Okay.

A. So 2013 was twelve years ago, which in this space represents an enormous amount of time.

Q. So, in terms of submitting a revision, is there any kind of written work product that's been created by your committee?

A. There will be, yes.

Q. Has there been to date?

62 (Pages 242 - 245)

CONFIDENTIAL

Page 246

A.   No.  I mean, nothing's been submitted yet, no.

Q.   Has anything been written?  Do you have a draft?

A.   No.

Q.   Is there any kind of -- like do you see the reference to them reviewing over 240 articles?

Is there any kind of literature review or anything like that that your committee has done?

A.   That's what we've been doing, yes.

Q.   So is there any kind of written material on that?

A.   Not in my possession, no, but there is an enormous compendium of articles exceeding 240 by quite a lot.

Q.   Has anyone written anything analyzing those articles, or is it just a database of articles?

A.   We are in -- that's what the committee's work is is going through those articles and coming up with a consensus.

Page 247

Q.   And is there some kind of document that's being generated?

A.   Not yet.

MS. COUCH:  Asked and answered.

BY MR. SCHMIDT:

Q.   Have you had any communications regarding those articles or this issue?

MS. COUCH:  Asked and answered.

BY MR. SCHMIDT:

Q.   As part of your work on the committee, any written communications?

MS. COUCH:  Asked and answered.

A.   I -- I think I've answered that.

Like I said, there is no -- I have not -- I may have exchanged e -- emails over the last three or four years with other people on the committee, but the vast majority of the work is done over Zoom.

Q.   Okay.  Let's go two pages ahead to page 916.

Have you -- have you -- before we do, have you -- I think you've answered this, so I apologize for re-asking, but I

Page 248

want to make sure I have it.

Have you taken the view that in your work on the DSM committee that internet gaming disorder should be added as a condition?

A.   Yes, that is my position and -- and that's the position of many other people on the committee as well.

Q.   Has anyone on the committee dissented from that view, or taken the view that it should not be added?

A.   Not to my knowledge, no.

Q.   Have you taken that view in writing?

MS. COUCH:  Objection; vague.

A.   Have -- have I committed that to writing?

Q.   In any way.

A.   I've publicly said it in speeches I've given.

Q.   I'm asking specifically in terms of your committee work.

A.   Have I stated that in the committee?

Page 249

Q.   Yeah, in writing.

MS. COUCH:  Objection; vague.

A.   I don't recall.

Q.   Okay.

Have you ever taken the view in your committee that there should be recognition of internet addiction?

A.   As opposed to internet gaming disorder?

Q.   Yes.

A.   There are people on the committee that believe that we need to broaden the definition of internet gaming disorder to be more inclusive.

Q.   Who -- who is that?

A.   I'm one of those people.

Q.   Okay.  Who else?

A.   I'm not at liberty to say.

Q.   Not at liberty to say you don't know, or you don't feel like you can?

A.   I don't want to represent other people's opinions on that matter.

Q.   Are there people on the committee who don't believe the definition

63 (Pages 246 - 249)

CONFIDENTIAL

Page 250

of internet gaming disorder should be broadened?

MS. COUCH: Asked and answered.

A. The consensus of the committee was that we -- that -- that we should first get internet gaming disorder through the process and then try to broaden it.

And again I want to emphasize that's emblematic of how glacial the pace is at trying to make changes in the DSM-5.

MR. SCHMIDT: Move to strike everything starting with "and again."

BY MR. SCHMIDT:

Q. Is there any work underway now to add internet addiction or something equivalent to the DSM?

MS. COUCH: Asked and answered.

A. Not that I'm aware of.

Q. Have you ever advocated specifically for adding social media addiction to the DSM in connection with your work on your DSM working group?

A. I have proposed it as others have at times in that committee, yes.

Page 251

Q. And has that gone anywhere?

A. That committee was empaneled with the specific task of adding internet gaming disorder, and so the consensus of the committee was that we need to do the work that we've been assigned and then we can proceed.

Q. Have you ever gone to anyone at the DSM and said we need a separate committee to look now at internet -- at whether we should add social media addiction to the DSM?

A. I have not done that, no.

Q. Do you believe social media addiction should be added to the DSM?

A. I do believe it should be added.

Q. Can you give me the name of anyone else who works on the DSM who you can give me a name holds the view that social media addiction should be added to the DSM?

A. So, just to clarify, people don't actually work for the DSM. I mean, there -- it's a group of professionals who

Page 252

basically volunteer their time to put these things together.

Q. Why don't I reframe my question? Can you point me to anyone who is doing work on updating --

MR. SCHMIDT: Strike that.

Q. Can you give me the name of anyone who is doing work on updating the DSM who you can say this person is an advocate for adding social media addiction to the DSM?

A. There --

MS. COUCH: Objection; vague.

A. There are many people that I know, many professional colleagues, many scholars, who clearly feel that it should be added. I don't know offhand if any of them are currently advocating, your word, to the DSM-5 to add it.

Q. Okay. And can you give me the name of anyone working in any capacity on updating the DSM who believes, who you can say this is a person that believes social media

Page 253

addiction should be added to the DSM?

MS. COUCH: Asked and answered.

A. There -- there are many people, as I said, who believe that. Many, many, many.

Q. All right. I want the names. I'd like to know who that is.

MS. COUCH: Asked and answered; harassment.

BY MR. SCHMIDT:

Q. I'm going on the "trust but verify" principle. So if we wanted to verify what you said, could you give us the name of anyone who does work on the DSM and who had taken the view that the DSM should be updated to add social media addiction?

A. I'm --

MS. COUCH: I would just state for the record that I don't know if this is confidential information, and I don't know if he knows it, but I do know that he's not relying on other people who may or may not have said

64 (Pages 250 - 253)

CONFIDENTIAL

Page 254

something as a basis for his opinions here.

And I know that you say that you have very limited time. So to the extent he can answer something that's not confidential or that he knows it, I will leave that to you. But I would mark this question if you ever come back and ask for more time.

BY MR. SCHMIDT:

Q. Could you answer my question?

A. I'm not at liberty to disclose that. I guess I -- but I -- I can say reliably that many other people feel this way, but it's not influencing my de -- my opinion. My opinion is my own.

Q. And I'm not asking you if it's influencing your opinion. I believe you're an outlier, and so what I'm trying to ask you is can you tell me the name of anyone else working on the DSM -- right now the --

MR. SCHMIDT: Strike that.

Q. Right now the DSM does not

Page 255

recognize social media addiction, correct? Correct?

A. Right now that is correct.

Q. It doesn't recognize any kind of problematic use disorder relating to social media, correct?

A. The DSM-5 does not recognize social media disorder as a -- as a behavioral addiction, that's correct, but many other professional organizations do.

MR. SCHMIDT: Move to strike everything starting with "many other professional organizations."

BY MR. SCHMIDT:

Q. I'm going to come back to what you say recognizes in a bit.

My question is -- actually, there's no work you're aware of that's underway at the DSM to add social media addiction or social media disorder as a behavioral addiction, is there?

MS. COUCH: Asked and answered.

A. Not that I'm aware of, but it -- I would -- but there very well could be.

Page 256

It's -- I don't work for the DSM, and I have no way of knowing what other committees are out there. For all I know, there are others.

Q. You're not aware of any?

A. I'm not aware of any.

Q. Okay.

Do you have a view as to when the science supported recognizing internet gaming disorder?

A. Internet gaming disorder?

Q. Mm-hm.

A. My personal opinion is that the science was adequate in -- in -- in 2013.

I'll point out that the WHO recognized it in 2023, I believe, or 2019. Now I don't remember off the top of my head. But that's my opinion, that there was adequate science back then.

Q. Does the WHO recognize any kind of behavioral disorder recognize -- related to social media?

A. The WHO -- I don't know the answer to that off the top of my head.

Page 257

Q. Okay.

If we look at page 914 of this document, the one we're still on, Exhibit I think it's 16.

A. 914?

Q. Yeah. What -- what number --

A. This is different.

Q. What exhibit is that, 18?

A. 19.

Q. If we look at page 914 of Exhibit 19, that language we were looking at about internet gaming disorder.

A. Yes.

Q. Where they say they reviewed more than 240 articles, that language.

A. Yes.

Q. And they ultimately conclude not to list internet gaming addiction, but -- internet gambling -- internet gaming disorder, but to conduct further review.

A. Yes.

Q. Do you believe they should have recognized internet gaming disorder as a condition at this time based on that

65 (Pages 254 - 257)

CONFIDENTIAL

Page 258

literature they cite?

A.    I -- I believe I already said that, and I --

Q.    Okay.

A.    But short -- certainly shortly thereafter, yes.

I was not charged with coming up with a recommendation at that time. I'm making that statement now based on having reviewed the literature today and reflecting back.

Q.    Let's look at page 916.

Do you see where it says "Differential Diagnosis"?

A.    Yes.

Q.    And do you see where it says: Excessive use of the internet not involving the playing of online games, e.g. excessive use of social media, such as Facebook, viewing pornography online, is not considered analogous to internet gaming disorder.

Do you see that?

A.    I do.

Page 259

Q.    Do you agree with that statement?

MS. COUCH:  Objection; vague.

A.    I don't think it's anala -- I don't -- I don't agree with that statement.

Q.    Okay. Let's look at another document on this.

A.    But I might point out that this again was from 20 -- this language is probably from 2011 or 2012.

MR. SCHMIDT:  I'll move to strike everything starting with "I might point out."

(Christakis Exhibit 20, DSM-5 Substance-Related and Addictive Disorders, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q.    Exhibit 20 is another DSM document, this time on substance-related and addictive disorders.

Are you familiar with this portion of the DSM?

Page 260

A.    Not as much, no.

Q.    All right. Let me show you some language and see if you agree with it.

Look with me on the first page, if you would, third paragraph.

A.    Can I ask when this document is from? I don't see a date on it.

Q.    I believe this is from the current DSM-5-TR.

A.    That's not -- that doesn't tell me the date.

Q.    I don't have any information beyond that.

MS. COUCH:  The DSM-5 was published in 2013.

MR. SCHMIDT:  Okay. I'm going to note that coaching objection.

A.    Well, I said that before, but I didn't know if this is more recent than that. That's why.

Q.    Do you know when the DSM-TR was updated?

A.    That's why I'm asking you.

Q.    No, I know. But do you know

Page 261

when that update occurred?

A.    No, I don't know the precise date.

Q.    Okay. And I don't have it. I'm not trying to hold back. I don't have the date.

A.    Okay.

Q.    I think it was after the date your counsel just coached you --

A.    2013 was the DSM-5 and it was -- it was updated and I don't know the precise date.

Q.    I thought the TR was, like, '19, but I don't want to commit to that.

I'm getting told it was 2022, so I understated, for the TR.

A.    I would want to see that this -- I apologize. Trust but verify, I want to see when --

Q.    Fine.

Look at the first page in the last full paragraph, the last sentence that begins "Thus."

A.    Yeah. Wait, I'm sorry, the last

66 (Pages 258 - 261)

Golkow Technologies,
A Veritext Division
877-370-3377                                    www.veritext.com

CONFIDENTIAL

Page 262

full paragraph.

Q. On the first page the last sentence. So this paragraph beginning "Thus."

A. Oh, yes.

Q. (Reading) Thus groups of repetitive behaviors sometimes termed behavioral addictions with subcategories such as sex addiction, exercise addiction, and shopping addiction, are not included because there is insufficient evidence to establish the diagnostic criteria and course descriptions needed to identify these behaviors and mental disorders.

Did I read that correctly?

A. You read that correctly.

Q. Do you agree with that statement?

A. No, I don't agree with that statement. I don't agree with it now, and I don't know if I didn't agree with it then 'cause I don't know what year this was.

Q. Okay.

Page 263

Do you agree that there is such a thing as sex addiction?

A. That's outside of the scope of my expertise.

Q. Do you agree that there's such a thing as exercise addiction?

A. Also outside of the scope of my expertise.

Q. Do you agree that there's such a thing as shopping addiction?

A. Also outside of the scope of my expertise.

Q. Have you diagnosed teens with social media addiction in your professional work?

A. I'm not a treating psychotherapist, so I tend to diagnose conditions that I treat. I have seen it and referred people to psychiatrists for treatment for it, yes, and I have seen -- I've had teens under my care that suffer from it on multiple occasions.

Q. Do you diagnose any -- any psychiatric conditions in your work, or

Page 264

have you?

A. In general if I suspect one, I defer it -- I have a psychiatrist confirm it because they're going to be the treating physician. So --

Q. Okay.

A. -- I have a provisional belief that someone suffers from depression or anxiety disorder, but it's not something in my scope of practice, and so I will have someone else confirm it.

I can tell you that I'm very reliably diagnosed it, and the people that I've referred for treatment for if have been diagnosed with it.

Q. But have you ever diagnosed -- like for example, do you know what major depressive disorder is?

A. I do.

Q. Have you ever diagnosed major depressive disorder in your career?

A. I've treated people with it. They've been under my care.

I'm not a psychiatrist, and

Page 265

that's not something in my scope of practice.

Q. There are various eating disorders you talk about in your report, correct?

A. Yes.

Q. Have you ever diagnosed an eating disorder in your career?

A. I've treated people with, and routinely they're on my service in the hospital, yes.

Q. Have you diagnosed an eating disorder?

A. I've referred people for a confirmatory diagnosis when I've seen them and was worried that they have them, yes.

Q. Have you yourself made the diagnosis?

A. Is that --

MS. COUCH: Asked and answered.

A. As a general principle, if I diagnose something, I want to treat it, and I -- I -- treating eating disorders and treating major depressive disorders is

Golkow Technologies,
877-370-3377    A Veritext Division    www.veritext.com

CONFIDENTIAL

Page 266

outside the scope of my practice, so I will make my provisional diagnosis and refer them to a specialist who can provide care.

Q.   Is major depressive disorder outside the scope of your practice?

A.   I don't -- again, I have had people with major depressive disorder and eating disorders under my care, but always in conjunction with a psychiatrist.

Q.   Is actually treating the major depressive disorder outside -- you said a moment ago that treating eating disorders is outside the scope of your practice.

Is treating major depressive disorder outside the scope of your practice?

A.   I take care of patients that have it, but I have their medications managed by psychiatrists.

Q.   Do you treat -- is treating suicidality outside the scope of your practice?

A.   I take care of people that have

Page 267

that when they're admitted to the hospital under my service, but I always consult a psychiatrist to make sure they're getting optimal care.

Q.   Why?

A.   Because I don't provide ongoing psychotherapy.  It's not part of my practice.  And those patients need that.

Q.   So in your career, have you ever -- for example, you give two scales in your report for evaluating problematic use; is that correct?

A.   I -- I -- I cite two that we identified in a systematic review that I was part of, but there are many other scales that people use.

Q.   Do you use those two scales in your practice to diagnose problematic use disorder, some kind of social media disorder?

A.   I use those in the context of my research routinely.  I don't remember if I've used them in my clinical practice.

Q.   Have you used any kind of scale

Page 268

or questionnaire or something of that nature to try to assess problematic social media use in your clinical practice that you're aware of?

MS. COUCH:  Asked and answered.

A.   Not that I am aware of.

Q.   Have you performed any studies evaluating social media use and mental health outcomes where you use any of those questionnaires or scales to evaluate individuals?

A.   Ask the question again.  I'm not sure.

Q.   Sure.  It was intended to be the same question, believe it or not, but focused on studies as opposed to clinical experience.

A.   Okay.

Q.   So the question was have you performed any studies where you used those scales to assess problematic social media use to evaluate mental health conditions in individuals?

A.   Yes, I believe that I have.

Page 269

Yes.

Q.   Which studies are those?

A.   That I've used the -- -- I'd have to -- they weren't studies that I was the first author on, but with collaborators we've used them, yes.

Q.   Were you the one who actually administered the studies?

A.   The surveys?

Q.   The surveys, yeah.

A.   No.  The scientist never is. It's always done by research assistants.

Q.   In your practice, have you treated patients who have been diagnosed by another clinician as having a actual diagnosis of social media addiction?

A.   Not that I recall.

Q.   You talk about various harms in your report like - I'm going to get the acronym wrong - BDD.

What does BDD stand for?  Body?

A.   Dysmorphic disorder.

Q.   I was getting one of the Ds wrong, okay.

68 (Pages 266 - 269)

CONFIDENTIAL

Page 270

You talk about various conditions, including BDD, eating disorders, depression, anxiety --

A. Yes.

Q. -- in your report.

All of those that I just listed, BDD, eating disorders, depression, anxiety, are all recognized conditions in the DSM, correct?

A. That's correct.

Q. And are you aware that when the DSM lists those conditions, it also lists specific risk factors for those conditions?

A. Yes, I'm aware that they list specific risk factors.

Q. Some of the risk factors are genetic, some of them are things in the environment, environmental risk factors?

A. That's correct.

Q. For example, do you know that one of the risk factors the DSM lists for body dysmorphia disorder, BDD, is high rates of childhood neglect, abuse, and

Page 271

trauma?

A. I'm aware of that, yes.

Q. Are you aware that one of the risk factors the DSM lists for eating disorders, or at least some eating disorders, is familial anxiety?

A. Yes, I'm aware of that.

Most psychiatric diagnoses have other psychiatric risk factors associated with them.

Q. Are you aware that one of the risk factor -- some of the risk factors listed for major depressive disorder are adverse childhood experience and genetics?

A. Yes, I'm aware of that.

Q. And are you aware that there are recognized risk factors in the DSM for generalized anxiety disorder?

A. Yes, I'm aware of that.

Q. Including childhood adversities?

A. Yes, I'm aware of that.

Q. Is there any condition, including these ones I've been talking about, where the DSM recognizes social

Page 272

media use as a risk factor for the condition, that you're aware of?

A. Not that I'm aware of.

Q. Are you aware of any work that anyone specifically has done at the DSM, and I'll read you -- let me actually read you a list first. I'm going to read you a list of recognized DSM conditions that I think are relevant to your opinions, but if they're not, tell me.

BDD, body dysmorphia disorder, avoidant restrictive food intake disorder, anorexia, bulimia, major depressive disorder, and generalized anxiety disorder. Are you generally familiar with all those conditions?

A. Yes.

Q. Have you ever by yourself, without consultation, diagnosed one of those conditions in your career?

A. Like I said, I have, but I refer them to someone else for confirmation and treatment.

Q. Okay.

Page 273

Did you actually make a diagnosis, or did you just refer them for diagnosis?

A. I think we're discussing semantics here.

I make a provisional diagnosis of those conditions, and I don't -- because I don't treat them, I refer them to somebody else who will then confirm that and initiate treatment.

Q. Has -- have people ever referred patients to you to confirm diagnoses on any of those conditions?

A. No, because I'm not a psychiatrist.

Q. And have you ever diagnosed any of those conditions without getting a confirmatory diagnosis?

A. If I diagnose those conditions, I refer them for confirmation and diagnosis.

Q. Meaning --

A. I mean and treatment.

Q. Meaning you've not diagnosed

69 (Pages 270 - 273)

CONFIDENTIAL

Page 274

them without getting a confirmatory diagnosis?

A.   What I said before, and I'll say it again, is that in the scope of my practice, if I have an adolescent who comes in with significant weight loss, food restriction, diminished heart rate, body image issues, I believe that she, in this case let's say, has anorexia and I will refer her for confirmation and treatment by a specials because I don't treat that.

Q.   Got it.  And that's what I'm trying to understand.

Are there instances where you have made a diagnosis and you say "I don't need to refer them for a confirming diagnosis"?

A.   Because I don't treat them, I refer them.

Q.   Right.

A.   And anyone who I refer them to won't treat them without independently confirming the diagnosis.

Page 276

believe there is such an entity, there are clearly some people who are -- believe it's in need of further study.  Much the same way as in 2013, people thought gaming disorder was in need of further study.  Much the same way that until 2013, people thought gambling disorder was in need of further study.

Q.   What do you mean when you talk about something being hotly debated?

MS. COUCH:  Objection; vague.

A.   I mean that there are often very, very strident opinions, and sometimes there can be more heat than light.

Q.   Let's -- I'm going to give you a transcript and show you a video clip of a statement you made.  The transcript is marked as Exhibit 21.

(Christakis Exhibit 21, "The Leading Voices in Food" podcast transcript, was marked for identification, as of this date.)

Page 275

Q.   The diagnosis.

A.   That's correct.

Q.   So there's no case where you have made the diagnosis without referring them for a confirming diagnosis?

A.   For treatment and confirmation, that's correct.

Q.   Okay.

Are you aware of any work being done by anyone affiliated with the DSM to add social media as a risk factor for any of those conditions I ran through?

A.   I am not aware of anyone doing that, but that doesn't mean no one's doing it.  I have no way of knowing what is going on in that space.

Q.   Okay.

Do you agree with me that the issue of whether there's such a phenomena as digital addiction is still being hotly debated?

A.   It depends on what you mean by "hot," but I think there are -- while the, in my opinion, the majority of experts

Page 277

BY MR. SCHMIDT:

Q.   This is an appearance you made on a podcast, and I'm going to read you a clip of this.

I actually don't know where this appears in the statement.

MR. SCHMIDT:  Do you know?

Q.   Let me show you the video.

MR. SCHMIDT:  Can we play tab 19, please?

Q.   Actually, while he's queuing that up, do you see this is a podcast hosted by Kelly Brownell at Duke?

A.   Yes.

Q.   On April 9, 2025?

A.   Yes.

Q.   And if we go several pages in, do you see that you presented, or you appeared on this podcast?

A.   I did appear on the podcast, that's correct.

Q.   And do you -- this was just a few months ago.

Do you recall appearing on this

70 (Pages 274 - 277)

CONFIDENTIAL

Page 278

podcast?

A. I re -- I recall being videotaped for it, yes.

Q. All right. Let's show you some of that videotape.

(Video played.)

BY MR. SCHMIDT:

Q. Do you agree with that statement still?

A. You're -- this is a very short clip from a one-hour interview I did. So I would like to see the broader context.

Q. That's right there.

A. This is the whole hour interview? I don't think so. But -- but --

MS. COUCH: Are you representing this is the whole interview?

MR. SCHMIDT: I'm representing that this is what we pulled down and pulled the clip from.

MS. COUCH: From? I'm sorry, I didn't hear you.

MR. SCHMIDT: I'm not making any

Page 279

representations.

Let's not go into silly territory. This is where we got the statement from.

BY MR. SCHMIDT:

Q. Do you stand behind that statement?

MS. COUCH: Lack of foundation. We have no idea where this is from or what it is.

A. I -- I can represent you what I believe 'cause it's unchanged from what's there, but I just want to state that this was a one-hour conversation and you're showing me a 30-second clip that actually skipped a bit, so I wasn't even sure if it's edited. But I'm -- but I'll represent what I'm saying there.

Q. And do you stand behind that statement, that the issue about whether or not there's such a phenomena as digital addiction is still being hotly debated?

A. At the --

MS. COUCH: Objection; lack of

Page 280

foundation; lacks authentication; and vague.

A. The specific context I'm referring to there, and the very specific one 'cause I think I go on to say that, is with respect to the DSM-5.

Q. Okay.

A. Which, as I said before, is not the be-all and end-all in my opinion, and where I say the one that's being seriously considered is gaming disorder and that's because the DSM-5.

Q. Do you stand behind that statement with that context, whether or not there's such a phenomena as digital addiction is still being hotly debated?

MS. COUCH: Objection; vague; lacks foundation.

A. I don't believe that it's being -- I believe that the majority of experts believe that there's such a entity.

MR. SCHMIDT: Okay. Move to strike as nonresponsive.

Page 281

BY MR. SCHMIDT:

Q. Do you stand behind that statement?

Was that you in the podcast that we just heard?

A. That was me, yes.

Q. Okay.

Do you stand behind that statement that you made on April 9th, 2025?

MS. COUCH: Objection; asked and answered --

A. Hotly debated is --

(Stenographer admonition on crosstalk.)

MS. COUCH: Objection; vague; asked and answered; lack of foundation.

Counsel has refused to identify where or the identity of the exhibit.

MR. SCHMIDT: That's not just true.

BY MR. SCHMIDT:

Q. But can you answer the question.

71 (Pages 278 - 281)

CONFIDENTIAL

Page 282

A.   Let me provide context for the adjective "hotly."

Q.   All I want to know is if you stand behind that statement, yes or no.

A.   I can't answer that yes or no.

Q.   Okay.

Let's look at your report Exhibit 2, please.

A.   What's that?

Q.   Exhibit 2, your report.  Go to page 52, if you would.  I think this is something you've been waiting to talk about, so I'm going to ask you about it.

Do you see where you say at the bottom of the -- right before -- I think you're in a different -- you got to look at Exhibit 3.

A.   Yes.

Q.   Page 52, please.

A.   Yes.

Q.   You refer to -- right before subparagraph A you refer to consensus statements.

Do you see that?

Page 283

A.   Yes.

Q.   And you say:  Leading professional, medical and psychological organizations recognize that social media and its problematic and addictive usage is harmful to children and teenagers today.

Do you see that?

A.   Yes.

Q.   And if you go back to page 49. Actually, page 50.

A.   Yes.

Q.   One of those sources you cite is a source from the American Psychiatric Association.

Do you see that?

A.   Yes.

Q.   And then on page 51 you cite a report by the U.S. Surgeon General.

Do you see that?  I'm looking in the middle of paragraph 100.

A.   Yes.

Q.   You cite your own handbook, right?

A.   Yes.

Page 284

Q.   You cite the National Academy of Sciences report in 2024, right?

A.   Yes.

Q.   You cite a health advisory from the American Psychological Association in 2023?

A.   Yes.

Q.   You cite the Jed Foundation in 2024?

A.   Yes.

Q.   And you cite an American Academy of Pediatrics document.

A.   Yes.

Q.   And then going to 52 you cite the National Eating Disorders Association webpage we talked about earlier.

A.   Yes.

Q.   Are these the consensus statements you're referring to when you say there's little doubt that leading professional, medical, and psychological organizations recognize that social media and its problematic and addictive uses is harming children?

Page 285

A.   Yes.

MS. COUCH:  Objection; vague.

BY MR. SCHMIDT:

Q.   All right.  I want to go through each one of them.  Let's start with the Surgeon General Advisory.

Does the Surgeon General Advisory constitute a complete review of the literature, to your knowledge?

MS. COUCH:  Objection; calls for speculation.

BY MR. SCHMIDT:

Q.   Do you know?

A.   It depends on what you mean by that.

Q.   Do you know if they reviewed all the literature on social media and mental health harms?

A.   I take the surgeon general as being an authoritative voice who convenes experts and comes to an consensus.

Q.   What experts did the surgeon general convene?

A.   It's listed in the report there,

CONFIDENTIAL

Page 286

and I don't remember them offhand, but I -- we can pull it up and look at it.

Q. There's no experts listed in the report.

MR. SCHMIDT: Can I get the report?

And it's not a report. It's an advisory.

(Christakis Exhibit 22, U.S. Surgeon General's Advisory Social Media and Youth Mental Health 2023, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. Do you see that Exhibit 22 is the Surgeon General Advisory?

A. Yes.

Q. Do you know of any specific experts they consulted with?

A. Well, I'm referring to the acknowledgments on page 20.

Q. Okay.

And do you know who they consulted with?

Page 287

A. I don't know.

Q. Okay.

A. But I recognize all of these as very respective, authoritative organizations with very credible scientists associated with them.

Q. And do you know if they reviewed the entire literature on social media and potential mental health impact?

A. I -- again, I don't know what do -- let me read you from the acknowledgments. It says here: We are grateful to all experts, academic researchers and associations and community based organizations across the country who shared their insights.

So, I'm guessing that somewhere, perhaps elsewhere, that is acknowledged more explicitly, but the point again is there was a process here where experts were consulted.

Q. Okay. That wasn't my question. And I don't want you to guess, especially about something that's not accurate.

Page 288

My question was simply do you know if they reviewed the entire literature on social media and potential mental health impact?

A. I don't know the process that they deployed.

Q. Let's look at the American Academy of Pediatrics.

(Christakis Exhibit 23, American Academy of Pediatrics Problematic Technology Use, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q.

Do you recognize what we're marking as Exhibit 23 the American Academy of Pediatrics source you site on page 101 of your opinion?

And my only question is -- it's on page 1 -- I'm sorry, I said page 101. It's on page 51, paragraph 101.

A. Okay.

Q. This is what you cite, right, Exhibit 23?

Page 289

A. I'm actually -- I -- this is presented in a different way. But there's multiple places on the American Academy of Pediatrics where they talk about this, but we can look at this page if you want.

Q. I will represent to you that if we go to the source, the URL cited in footnote 61, this is what --

A. This is what comes up.

Q. Yeah.

A. Okay.

Q. So let's look at the first page, second paragraph.

Do you see where it says: While addiction terminology may frequently be used to describe problematic technology use and often dominates the headlines around social media, recent studies have actually shown that it's not an accurate way to describe teens' experience with social media.

Do you see that statement?

A. I do.

Q. Do you agree with that

73 (Pages 286 - 289)

CONFIDENTIAL

Page 290

statement?

A. No, I don't agree with that statement.

Q. (Reading) Research finds instead that when young people experience problematic use of social media, it's more of a broad range of challenges. They experience addictive behaviors only at the extreme end of that spectrum.

Do you agree with that statement?

A. I believe if you look in my report, there's a continuum from what I would call healthy use to habitual use to problematic compulsive use to addictive use, and as I say in my report, anything beyond casual use represents increased risk, and the risks only go up as you move to the right of that continuum.

Q. Do you agree with that statement I just read to you?

A. It's a vague statement, but I would agree that addictive behaviors are at the extreme right of the continuum.

Page 291

Q. Okay.

Look with me, if you would, at page 2. And do you see the first full paragraph begins "Another myth"?

A. Yes.

Q. And then at the end of that paragraph there's a boldfaced sentence that begins: In general, the amount of screen time itself is not an adequate way to represent problematic technology use.

Do you agree with that?

A. No, I don't agree with that. And in fact, that was the -- well, let me phrase this another way.

I do agree with that, but I need to provide a broader context for it. So, the truth is that small amounts of screen use can be problematic for individual children, but at the extreme, it doesn't matter what the contents or context is. It represents a significant problem, which is really the primary impetus for the viewpoint we discussed earlier.

Q. Right before this they say: One

Page 292

teen may use technology one hour a day and it is clearly problematic and another child may use technology 2.5 hours a day and they are learning and thriving.

Did I read that correctly?

A. You did. But I would posit that a teen that's using technology nine or twelve hours a day is not thriving.

MR. SCHMIDT: Move to strike everything after "you did" as not responsive.

BY MR. SCHMIDT:

Q. Do you agree that a child may use technology 2.5 hours a day and be learning and thriving?

A. I believe that some children could use technology for two and a half hours a day and be learning and thriving, but that's a very vague phrase as it's put there, and it doesn't even specify what type of technology. For example, it doesn't say social media. It says technology.

Q. Let's look back at Exhibit 27.

Page 293

I'm sorry. Let's look back at --

MR. SCHMIDT: Do you have the exhibit number for the eating disorders website?

BY MR. SCHMIDT:

Q. I'm going to give you both these versions again. This is the one where we've got two different versions. I've got them for you here.

This is the National Eating Disorders website you cite, correct?

A. It is, yes.

Q. And let's look at -- first of all, do you understand this is about media generally, not about social media specifically?

MS. COUCH: Objection; misstates the document.

A. There are times where it talks about social media. There are times where it talks about media. And the truth is that the predominant media forum for most teenagers is social media. So in this

74 (Pages 290 - 293)

CONFIDENTIAL

Page 294

particular document, it talks about both.

Q.   Not according to this document it's not the predominant form.

A.   Where do you get that from?

Q.   The bullet we read at the bottom of page 1.

A.   Where is that?

Q.   That 13 to 18 year olds use some type of media for about 7.5 hours.  Most of this time is spent watching television or streaming videos.  The children and teens play video games for approximately 1.5 hours and are on their computers for more than --

A.   Yeah.

Q.   -- one hour a day.

A.   I -- I think we discussed this before, that -- that -- that the date of this and the fact that television for me is a very vague phrase in this context.

Other studies would clearly attest to the fact that 13 to 18 year olds' predominant recreational media time is social media.

Page 295

Q.   Well, even according to your data, even if we exclude TV and just look at smartphones, well under half of smartphone time is social media, right?

You remember looking at that --

A.   It was not under half, no.

Q.   All right.  Let's look at it.

A.   I believe it was between 40 and 60 percent on the two --

Q.   I'm talking about your data, not data that I'm -- I don't believe you read correctly.

Your data is Exhibit 12, correct?

A.   I -- I believe I read that data correctly, and I believe the report actually says what I said it does.  If you -- if you'd like to go back and look at that.

Q.   Okay.  I've looked at it several times.

Do you see Exhibit 12, your data?

A.   Yes.

Page 296

Q.   And according to your data, less than half, well under half of time spent on smartphones is used on social media, correct?

A.   That's correct.  From those data, that's correct.

Q.   And if we expand it to include TV, however you think of TV, smart TV or not smart TVs, that would be an even lower percentage of TV plus smartphone time being spent on social media, correct?

A.   That could be the case.

Q.   Okay.

Does -- let's go back to the National Eating Disorders exhibit, Exhibit 13.

Does that exhibit refer anywhere to addiction or problematic use?

A.   I don't remember seeing it there, no.

Q.   Let's go to the APA website.

A.   But if you're trying to represent what's stated in my report, what I'm saying there is that social media can

Page 297

lead to meet -- eating disorders, and that is represented in this document, as we discussed before.

Q.   Well, I disagree with how you characterize the document, but I'm asking about the consensus statements that you say leave little doubt that social media is problem -- that social media has problematic and addictive use in harming children --

A.   Yeah, that --

Q.   Let me just ask my question.

Does the National Eating Disorders document talk about problematic or addictive use in any way?

MS. COUCH:  Objection; misstates --

BY MR. SCHMIDT:

Q.   Yes or no?

MS. COUCH:  Objection; misstates his report.

A.   My report, we're getting into semantics here, but --

MR. SCHMIDT:  I'll withdraw the

75 (Pages 294 - 297)

CONFIDENTIAL

Page 298

question to your report. I'll withdraw that reference.

THE WITNESS: I'd like to answer.

MS. COUCH: If he withdraws it, we'll move on.

THE WITNESS: Okay.

BY MR. SCHMIDT:

Q. Does the National Eating Disorders Website refer to problematic use or addictive use in any way?

A. It does not.

Q. Okay.

A. But it refers to social media use.

MR. SCHMIDT: Let's look at Exhibit 24, please.

(Christakis Exhibit 24, American Psychological Association What is Technology Addiction?, was marked for identification, as of this date.)

MR. SCHMIDT: Did I give you guys a copy of it?

MR. DRAKE: Yes, I think so.

Page 299

It's the "What is Technology?"

MR. SCHMIDT: Yes.

BY MR. SCHMIDT:

Q. This is the A -- the American Psychiatric Association website that you cite, correct?

A. Correct.

Q. And it's talking generally about technology -- technology addiction, not limited to social media addiction, right?

A. In the title, but in the first bullet it says: Social media addiction involves problematic and compulsive use of social media.

Q. And then it refers to other forms of technology addiction, correct?

A. It refers to other forms afterwards, that's correct.

Q. And we've talked about internet gaming disorder, so I'll skip over that.

Do you see where it says: Online gambling, online shopping, or auction addiction, problematic use of online pornography?

Page 300

A. I see those.

Q. Do you know if those are, in fact, addictive conditions?

A. Those are outside of the scope of my expertise, and I don't have an opinion on that.

Q. Let's go to page 6 of this document.

Do you see that this is written by someone named James Sherer in February 2024?

A. Yes.

Q. Do you know if he was authorized to speak for the entire American Psychiatric Association as opposed to just posting something on their website?

MS. COUCH: Objection; vague; lacks foundation.

A. I have no idea.

Q. Do you know anything about his credentials?

A. I believe he's a psychiatrist, if I'm remembering correctly.

Q. Do you know if he's done work,

Page 301

research on social media?

A. I don't know the full extent of his -- of his research portfolio.

Q. Do you know if he's done any research?

A. Off the top of my head, no.

Q. Okay.

If you look right above his name he cites three sources: The Surgeon General Advisory report.

Do you see that?

A. Yes.

Q. An American Psychological Association report that we'll come to in a minute that you also cite? I'm sorry --

A. You mean the National Academy of Sciences Engineering? You said --

Q. I skipped over one. If you skip past that one there's one from the American Psychological Association, the health advisory that you cite?

A. Yes.

Q. And a Jed Foundation --

A. Yes.

76 (Pages 298 - 301)

Page 302

Q. -- report that you site. And then also, as you point out, the NAS report, right, that you also cite?

A. Yes.

Q. Okay. Let's look at some of those sources.

MR. SCHMIDT: Can I get the American Psychological Association report?

(Christakis Exhibit 25, American Psychological Association Health Advisory on Social Media Use in Adolescence, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. We've marked as Exhibit 25 the health advisory from the American Psychological Association that both you and Dr. Sherer cite.

Do you recognize that?

A. Yes.

Q. Let's look at page 3 --

A. It's a forum.

Q. -- please.

Page 303

Yeah, I think some of these are available on the Web, so they get printed out kind of funky.

Look with me if you would at page 3, please. There's a heading that says "A."

A. Yes.

Q. (Reading) Using social media is not inherently beneficial or harmful to young people.

Do you see that statement?

A. Yes.

Q. Do you agree with it?

A. I think using social media is inherently risky.

Q. So do you disagree with that statement?

A. I think it's inherently risky.

Q. Well, this says it's not inherently beneficial or harmful to young people.

Do you agree with that?

MS. COUCH: Asked and answered.

A. I think it's inherently risky.

Page 304

Q. So you disagree with this?

A. I'm saying something different. I wouldn't characterize it that way. I think it has risks associated with it.

Q. Okay.

Is this an accurate way to characterize the science: Using social media is not inherently beneficial or harmful to young people?

A. I think using -- the science would suggest that using social media is risky.

Q. So is that accurate?

A. Is what accurate?

Q. That statement that they have in this publication you cite, or this webpage you cite.

A. It reflects what -- it reflects the opinion of -- of whoever wrote that, but the more important thing from my perspective is what I said, that I think it's an inherently risky activity.

Q. Do you agree with that opinion of the American Psychological Association?

Page 305

A. I believe it's -- my opinion is that it's inherently risky activity.

MR. SCHMIDT: Let's mark that portion, please.

BY MR. SCHMIDT:

Q. If you go down a line, it says: In most cases, the effects of social media are dependent on adolescents' own personal and psychological characteristics and social circumstances intersecting with the specific content, features, or function that are afforded with many social media platforms.

Do you see that statement?

A. Yes, I see that statement.

Q. Do you agree with that statement?

A. I think that statement to me captures what I've been trying to say, which is that it's not the -- it's not the -- the content, it's the -- the -- the features and functions that drive how that content is experienced by children, adolescents that makes the experience

77 (Pages 302 - 305)

CONFIDENTIAL

Page 306

risky.

Q.   You don't see that language saying the specific content?

A.   I see it lists content, but it also lists features and functions, and those to me, as I said, are what's salient about -- and what, frankly, distinguishes social media from other forms of media.

Q.   Let's look at the next sentence: In other words, the effects of social media likely depend on what teens can do and see online, teens' pre-existing strengths or vulnerabilities, and the contexts in which they grow.

Do you agree with that statement?

MS. COUCH:  Objection; vague.

A.   I believe that teens' own individual vulnerabilities, such as they are, accentuate the effects of social media.

Q.   Was that a "yes" or a "no"?

A.   It's my answer.

Q.   Do you agree with that statement

Page 307

in this webpage that you cited?

A.   I don't think it's a yes-or-no question.

Q.   Okay.

Let's look at page 5 of the document.  And these are not numbered, so let me just show it to you.  It looks like that (indicating).

A.   Is it E?

Q.   No.  It's under F.

A.   Okay.  So the next page up.

Q.   Yeah, and it's the first full sentence there.  And -- and let me give you a second just to read E by yourself, if you want to.

A.   E or F?

Q.   F, I'm sorry.  Thank you.

Actually, you know what, I'll move on in the interest of time.

Let's go to -- let's go to page 15 of this study.

MS. COUCH:  What does it look like?

A.   What letter is that?

Page 308

Q.   I'm going to try to help you.  I don't actually know.

MR. SCHMIDT:  Where does this appear?

Q.   I found it.  If you look partway through under item 9, this one that has a picture of a girl on a bed.

A.   Yes.

Q.   And if you look at the first bullet on this page, it refers to signs of problematic social media use.

Do you see that reference?

A.   I see that bullet.

Q.   Yeah.

A.   Yes.

Q.   Do you agree that problematic use is an appropriate way to talk about people who struggle with their social media use?

A.   I think it's --

MS. COUCH:  Objection; vague.

A.   I think the -- it's -- it's -- ask the question again.

Q.   Is problematic use acceptable

Page 309

terminology to use to talk about people who struggle with how they use social media --

MS. COUCH:  Objection; vague.

Q.   -- as an appropriate term?

MS. COUCH:  Same objection.

A.   I think the terminology in this area is a little bit muddled, but I use problematic social media use, habitual problem -- social media use, compulsive social media use, and addictive social media use as being -- I see them as being on a continuum, and all of them moving from left to right, if you will, pose increased risks of untoward effects.

Q.   The reason I ask you that is because, I can point it to you if you need it, but in your report, you talk about someone named Arturo Bejar.

Do you remember reading his testimony?

A.   I remember reading his deposition, yes.

Q.   Do you know if he has any mental

CONFIDENTIAL

Page 310

health training, psychiatric training?

A. I don't know. I don't recall.

Q. Do you know that he lets his kids use Instagram?

MS. COUCH: Objection.

BY MR. SCHMIDT:

Q. Did you see that in his testimony?

MS. COUCH: Assumes facts not in evidence.

A. I don't remember that.

Q. Do you recall that in his deposition, you say -- I'm sorry.

In your report, you cite Mr. Bejar talking about how people were told to talk about problematic use at Meta rather than using the term "addiction"?

A. I remember that and it's in my report, yes.

Q. Okay.

And do you understand from reading Mr. Bejar's testimony that what he was actually -- that was not something he was told. He was relaying something he --

Page 311

someone else was told that they then passed along to him?

MS. COUCH: Objection; vague.

BY MR. SCHMIDT:

Q. In the words of the law, double hearsay.

A. I don't --

MS. COUCH: Objection.

A. I -- sorry, I don't recall the precise circumstances of that exact statement, but I do recall his deposition more broadly and his concerns.

Q. You use problem -- the term "problematic use" throughout your report, right?

A. I use it as people within the industry use it as well.

Q. And people you respect say that "problematic use" is actually preferred to "addiction" because "addiction" is imprecise?

MS. COUCH: Objection; vague; assumes facts not in evidence.

A. No, that's not actually why I --

Page 312

I say that. I don't recall saying that. If I did I don't recall that.

I -- I use that terminology, as I said, because I think one doesn't have to cross a threshold of addiction for social media to pose increased risks, even problematic -- even problematic use. Anything to the right, as I said, of -- of casual or healthy use increases the risks associated with social media.

Q. Well, do you agree with me that the term "problematic media use" is preferred by experts given the imprecision of the term "addictive"?

MS. COUCH: Objection; vague; lacks foundation.

A. I don't agree with that. I don't think the term "addiction" is -- is -- I mean --

Q. I used "addictive."

MS. COUCH: Same objections.

A. I don't -- I don't agree with that.

Q. Okay.

Page 313

A. I don't -- I don't think I said that.

Q. I'm not representing that you've said that.

A. Okay.

Q. Do you distinguish in your mind between "problematic media use" and "addiction" as different points, as you said earlier, on a continuum?

A. I think --

MS. COUCH: Objection; vague.

Go ahead.

A. I think conceptually they are different, but as I say, they all pose increased risks.

Q. And do you know what percentage of users you believe of any one of the social media apps at issue in this case have become addicted, that far end of the spectrum that you were talking about?

A. Yeah, I would say, honestly, one of the best studies of that was done by --

Q. █████████?

A. █████████ at Facebook and Meta

79 (Pages 310 - 313)

CONFIDENTIAL

Page 314

and she --

MS. COUCH: Let the record reflect counsel's smiling, very happy with himself.

A. But -- but I say that because they, as I recall, interviewed 20,000 teens and linked it to their social media usage. That same report also showed that 55 percent had -- I believe it was 50 percent or 50 -- had -- so I think three percent was extreme and 50 percent was moderate. But there are other studies that have come up with different prevalences.

That's not inconsistent with what others have, but I find that one interesting because it had data that very few other people have.

Q. Okay.

The three percent, was that problematic use, or was that addiction on your spectrum, or do you know?

A. It's not my data. It was theirs. And I'm trying to remember the

Page 315

precise terminology that they used. And they -- I don't remember -- can I look at my report to tell you?

Q. Yeah.

A. But I know that they -- they actually tried to have a declaration that in their survey that included elements of problematic gambling and it's right here.

Q. I think you misspoke. You meant problematic use, not problematic gambling, right?

A. They made it -- they analogized it to problematic gambling when they came up with questions. So it's -- it's -- shoot, I'm using the wrong -- it's page 71 of -- I don't know what page it is on yours.

79 on the other one?

Q. Yes.

A. So they define "problematic use" based on their review of literature, yes.

Q. So, she used the term "problematic use," right?

A. She did, correct.

Page 316

Q. Do you know if that's what you would call "addiction" or just "problematic use"?

MS. COUCH: Objection; vague.

A. Yeah, I would -- I mean, it -- it's hard to say, I would say, based on what information is provided from the documents I saw.

Q. And do you know, you mentioned a 55 percent figure for "moderate problematic use."

Do you recall mentioning that just a minute ago?

A. Yeah, I said "moderate" and it looks like it's -- they separate it here as "severe" or -- honestly, when I reviewed these documents, as I recall, it was a little bit -- and I think I say this in my report, I didn't understand, and this is one of the things I asked for more clarification of 'cause I couldn't -- I couldn't harmonize the different numbers. But if you look at in one place they say -- she says 3.1 percent severe and

Page 317

then 55 percent "mild" for problematic use. And then in the next table, which is from ███████ deposition, there are other prevalences where it's, like, "extreme" is estimated 12 percent. So I -- I don't really know where these numbers came from.

Q. Okay.

A. But I attest that they believe them to be true and that they collected them.

Q. Okay.

Do you know if that 55 percent figure was validated in any way?

A. I -- I don't know. And I -- as I said, this is one of those situations where I -- I tried to get more information and there may be more information. I have no way of knowing.

Q. Do you know if the 55 percent was simply anyone had some unintentional use?

A. I -- I have no way of knowing. I -- everything I could discern is there.

80 (Pages 314 - 317)

CONFIDENTIAL

Page 318

Q.   Okay.
     Let's look at your handbook on problematic use.
     You're an editor on that book, right?
A.   Yes.
Q.   Okay.
     MS. COUCH:  Paul, if we're switching topics, can we take a quick bathroom break?  We've been going about --
     MR. SCHMIDT:  Can you give me two minutes on this?
     MS. COUCH:  If it's two minutes.
     (Christakis Exhibit 26, Handbook of Children and Screens, was marked for identification, as of this date.)
BY MR. SCHMIDT:
Q.   This is an excerpt from this. Do you recognize this -- I misstated your handbook.  It's handbook on Children and Screens.
A.   That I was the editor of.
Q.   Yes.

Page 319

A.   Yes.
Q.   Do you recognize Exhibit, what number is that?
A.   26.
Q.   26 is an excerpt from your handbook on Children and Screens?
A.   I would have to -- I -- I will -- I will attest that this is from the handbook.  The handbook has 80 chapters.  It's been a while since I've read these papers, and I haven't re-reviewed them in preparation for this deposition, but yes, this is from the handbook.
Q.   Did you read every one of the chapters --
A.   I --
Q.   -- including this one at the time, at some point?
A.   I -- and it could have been as long as two years ago, but yes.
Q.   Okay.
     Look on the first page, the very last full sentence says -- begins with

Page 320

"However."
A.   Yes.
Q.   And it has that language I read to you.
A.   Yes.
Q.   (Reading) However, the term the "problematic media use" --
A.   Yes.
     (Stenographer admonition on crosstalk.)
     MS. COUCH:  Let him finish.
Q.   -- is preferred by experts given the imprecision of the term "addictive."
     Did I read that correctly?
A.   Yes, you read it correctly.
Q.   And this is from one, two, three, four, five, six experts publishing in your handbook, correct?
A.   Yes.
Q.   Do you agree with that statement from these six experts published in your handbook, yes or no?
A.   I -- I -- I --
     MS. COUCH:  Objection; misstates

Page 321

     the document.
A.   I'm a limit -- I mean, honestly I'm just looking up earlier where it says: Due to pervasiveness, there's concern about habitual engagement with smartphones and other digital devices --
     (Stenographer instruction.)
A.   -- affirmed by prevalence data indicating that at least one out of four adolescents report symptoms of problematic (addictive) digital media --
Q.   I think you missed the air quotes around "addictive."
     Air quotes "addictive" do you see that?
A.   I don't -- why are those air quotes?
Q.   'Cause I think that's the English language.
     Do you see quotation marks around "addictive"?
A.   Yes.
Q.   Okay.
     My --

81 (Pages 318 - 321)

CONFIDENTIAL

Page 322

A. That doesn't make them air quotes.

Q. Okay.

My question is do you see where they say: The term "problematic media use" is preferred by experts given the imprecision of the term "addictive"?

A. I see that statement and I don't --

Q. Do you agree?

A. I don't agree with it.

MR. SCHMIDT: Okay. We can stop.

Actually, one more question before we break.

Q. This handbook is available online, right?

A. It's available online.

Q. Do you have the ability to suggest to authors of the handbook that they make changes to it if they have things that you think are wrong in it?

MS. COUCH: Objection; calls for speculation.

Page 323

A. No, I don't believe I have the ability to do that. It's -- it's considered published online.

Q. Okay.

A. It's not --

Q. Got it.

MR. SCHMIDT: Let's break.

THE VIDEOGRAPHER: The time right now is 2:24 p.m., and we are off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time right now is 2:43 p.m., and we're back on the record.

(Christakis Exhibit 27, The Jed Foundation (JED) Recommendations For Safeguarding Youth Well-Being on Social Media Platforms February 6, 2024, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. Do you see in front of you Exhibit 27 is the Jed Foundation --

A. Yes.

Page 324

Q. -- paper that you cite.

And do you see looking at this they don't cite any literature in this study?

A. It's not a study. It's recommendations, but yes, I --

Q. Yeah, let me ask the question better.

In this Jed Foundation webpage report that you include in your report, they don't cite any literature, correct?

A. In what you've shared with me, I don't see any citations to literature, yes.

Q. Do you know what, if any, literature the Jed Foundation reviewed before coming out with these recommendations that you cite?

A. I have no way of knowing.

MR. SCHMIDT: Let's look at the National Academy of Sciences publication, which I will mark as Exhibit 28.

(Christakis Exhibit 28, National

Page 325

Academies Sciences Engineering Medicine Social Media and Adolescent Health (2024), was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. You've obviously seen this before.

A. Yes.

Q. Do you recognize the National Academy of Sciences as an authoritative body when it comes to scientific questions?

A. I do. I've served on -- on committees and consensus panels for them.

Q. If we -- if we look at the second page, they -- unnumbered. The -- yeah, at the bottom of the second page just right here (indicating).

A. Yes.

Q. They call this a consensus study report.

Do you see that?

A. Yes.

Q. Are you aware that that's a term

82 (Pages 322 - 325)

CONFIDENTIAL

Page 326

of art that the National Academy of Sciences uses?

A. Yes.

Q. And what does it mean for something to be a consensus study report?

A. I'm going to represent my recollection of what their process entails, but it -- having served on one, it basically en -- entails empaneling a group of experts having a specific scope of work doing a literature review and then discussing the question and trying to come up with a consensus.

Q. Do you understand that the National Academy of Medicine is part of the National Academy of Sciences?

A. I do.

Q. And you agree with me that the National Academy of Medicine is a highly-respected independent body of scientists?

A. I do.

Q. And in general, you have tremendous respect for the institution and

Page 327

the work that they do?

A. I do. In general I do, yes.

Q. This consensus report was peer-reviewed, correct?

A. Yes, it's reviewed by peers, yes.

Q. Was the Jed Foundation report that we -- well, actually, before I get there, if you look at the little romanette 4 in the report.

MS. COUCH: Which report?

MR. SCHMIDT: In the National Academy of Sciences report, Exhibit 28.

MS. COUCH: Thank you.

A. Yes.

Q. You see where it says that it is a peer-reviewed document?

A. Yes.

Q. The report has been subject to a rigorous and independent peer review process?

A. Yes, I see that. I mean, I -- I -- I'm not sure where you're pointing

Page 328

to, but I know that to be true.

Q. Okay. Is Exhibit 27, the Jed Foundation report you referenced, peer-reviewed?

A. I have no way of knowing if it is or is not.

Q. Is Exhibit 25, the American Psychological Association Health Advisory, a peer-reviewed document?

A. I don't have any way of knowing if it was peer-reviewed or not.

Q. Is the -- is Exhibit 24, the American Psychiatric Association webpage written by James Sherer, was that peer-reviewed?

A. I don't know if it was or was not.

Q. Was the National Eating Disorders Association webpage that we marked as Exhibit 13 and 14 peer-reviewed?

A. I don't know if it was or it was not.

Q. Was the American Academy of

Page 329

Pediatrics webpage that we marked as Exhibit 23 peer-reviewed?

A. I know that they have an internal review process. I don't know what was done in this case.

Q. Was the Surgeon General Advisory report peer-reviewed in the sense you use --

MS. COUCH: Objection.

Q. -- the term "peer"?

A. I don't -- it's hard for me to say in that case because as I mentioned before, they acknowledge the contributions of many individuals, and I'm not sure what they did.

Q. Okay. Let's look at the consensus review -- the consensus report, I'm sorry, from the National Academy of Sciences, and let's go to romanette page 7, please, where they list the reviewers. Actually, before we get there, if you look at page 5, they list the committee itself and that's ten people, right?

83 (Pages 326 - 329)

Page 330

A. Yeah -- yes.

Q. And I'll come back to those ten people 'cause I think you had something to say about them that I want to talk about.

If you go to page 7, in addition to those ten people, they have one, two, three, four, five, six, seven, eight, nine, ten reviewers.

A. Yes.

Q. Do you see that?

And are you aware that those reviewers are people who have extensive social media research experience?

A. I -- actually, I -- I don't recognize some of them. So no, I don't know that all of them have extensive social media experience.

Q. And I'll be more precise in my question.

Do you know that some of them have extensive social media research experience?

A. I know that -- that -- that, yes, that some of them do.

Page 331

Q. For example, Matthew Gentzkow is someone you actually cite his work, correct?

A. Yes.

Q. And do you know that both Sunny Liu and Daragh Murphy have -- are social media researchers?

A. I know Sunny -- Sunny Liu is, yes.

Q. But not Daragh Murphy?

A. I -- I don't recognize the name, but that doesn't mean that -- that he or she is not.

Q. And are you aware that Sunny Patel is -- has a public health background?

A. No.

Q. Are you aware that they had open meetings, the National Academy of Sciences, where people could present their views?

A. They invite people to present their views. It's not anybody can present their views.

Page 332

Q. Did you -- were you invited to present your views on social media?

A. I was not invited.

Q. Let's go to page 5, please. Numbered page 5. Tell me when you're there.

A. You mean not Roman numeral 5?

Q. I think Arabic numeral 5.

A. Yes, okay.

Q. Look at the bottom. Do you see at the bottom it says in the carryover paragraph: The committee's review of the literature did not support the conclusion that social media causes changes in adolescent health at the population level.

Do you see that?

A. I see that sentence.

Q. Do you think that that is an accurate statement of the science?

A. I do not think that that is an accurate statement of the science, and I would correct to the preface Roman numeral 16, I guess where the first full paragraph says, this is -- this is authored by the

Page 333

chair of the committee: The science suggests that some features of social media function can harm some young people's mental health. These include, but are not limited to, algorithmically-driven distortions of reality exacerbating harmful content and disinformation, the distraction away from time that could otherwise be used in more healthy ways, and the creation of opportunities where youth can be abused or exploited.

MR. SCHMIDT: I'll move to strike everything after "I do not think that it is an accurate statement of the science."

MS. COUCH: Oppose.

BY MR. SCHMIDT:

Q. Let's look at 16. You just read a statement from 16 that I moved to strike. The first portion of the statement refers to: Algorithmically-driven distortions of reality, exacerbating harmful content, and

84 (Pages 330 - 333)

CONFIDENTIAL

Page 334

disinformation.

Did I read that correctly?

A. Yes.

Q. That refers to content, right?

A. It refers to algorithmically-distorted content, but yes.

Q. Then it says: Distraction away from time that can otherwise be used in healthy ways.

Do you see that?

A. Yes, and I think that refers to problematic use.

Q. And then it says: The creation of opportunity where youth can be abused or exploited.

That's referring to people interacting with youth on social media, correct?

A. Correct.

Q. Okay. Let's go back to the language we were looking at that you disagreed with.

Do you know what -- did you look

Page 335

to see whether you reviewed any -- well, let's -- let's look at the specific language.

When they say their review of the literature, do you see that statement that you disagreed with on page 5?

A. Yes.

Q. Do you know of any literature you reviewed that they did not review?

A. I'm -- I'm certain that there was literature that I reviewed that they did not review.

Q. Did you check to see that?

A. I didn't check to see it in preparation for this deposition, but I -- I'm familiar with the -- I've read the review -- I've read -- when this report came out because I was -- I believe that to be the case.

Q. Okay.

Did they review literature that you did not review?

A. I can't answer that offhand.

Q. I'm going to show you a couple

Page 336

studies. I'll just ask you if you've seen these before.

(Christakis Exhibit 29, Chelly Maes article, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. Exhibit 29 is a study by Chelly Maes. And I'm not representing that these are things the National Academy reviewed 'cause, frankly, I haven't looked at them. So I just want to be clear on that.

Do you follow me?

A. Yes.

Q. Okay. But I am representing that this is something that you had not reviewed. It does not appear in your report or on your materials considered list. It is a study saying -- that begins: Adolescent girls' Instagram and TikTok use.

Do you see that?

A. Yes.

Q. Do you know if you've seen this before, notwithstanding the fact that it

Page 337

doesn't appear on your materials considered list?

A. I don't believe I've seen this before.

Q. Okay.

If you look at the abstract, do you see that if you look about -- do you see five lines down there's a sentence that begins "Controlling for age and body mass index"?

A. Yes.

Q. And it says: The RI-CLPMs revealed that neither TikTok nor Instagram were predictive of subsequent increases or decreases in internalization of beauty ideals and body image self-discrepancy.

Do you see that statement?

A. I see that statement.

Q. You don't know if you've ever reviewed -- you -- you've never seen that before, right?

MS. COUCH: Objection; misstates testimony.

A. I -- I don't recall having read

85 (Pages 334 - 337)

CONFIDENTIAL

Page 338

this study constitutes.

Q.   Let me give you another study that does not appear on your materials considered list.  This is Exhibit 30.

(Christakis Exhibit 30, HHS Public Access Author manuscript 2022 November, 17, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q.   Have you seen this study which does not appear on your materials considered list?

A.   I don't recall having seen this one, but there are -- in large part because of the methodology I deployed.  As I mentioned earlier, that I did not search for every individual study that had ever been done.  There are tens of thousands of them, and I'm not sure how you identified this one.

I -- I -- I don't recall having seen either of these before though.

Q.   Do you see the title of Exhibit 30 is:  Does objectively measured social

Page 339

media or smartphone use predict depression, anxiety, or social isolation among young adults?

A.   I do see that title.

Q.   And if you look at the abstract, do you see the second to last sentence in the abstract says:  Across 81 different model specifications, we found that most with in person prospective effects between digital, technology use, and psychological distress were statistically nonsignificant and were all very small.  Even the largest effects were unlikely to register a meaningful impact on a person's psychological distress.

Have you seen that statement before from the study?

A.   I haven't seen the study before, but I'll just tell you that as an editor of a journal, and frankly as an independent scientist, I don't read just the abstract and make decisions about what the article concludes.

I haven't seen these.  I would

Page 340

have to review the -- the methods, the sampling.  I mean, I -- it's -- I -- I'm prepared to stipulate that any of these findings are accurate.

Q.   Okay.  I'm just asking if you'd seen that finding before.

A.   I -- and I have not seen either of these studies, no.

(Christakis Exhibit 31, List the Studies, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q.   I'll give you as Exhibit 31 a list of studies we have put together that do not appear on your materials considered list.  And instead of giving you them one by one, I'm going to ask you just to look through this list and tell me if there are any you recognize having seen before.

I count one, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve, thirteen, fourteen studies on this list in addition to the ones we just looked at.  Have you seen any of

Page 341

these studies before, that you know of?

MS. COUCH:  When you make your representation, are you saying this is not included in any of the underlying meta-analysis or handbooks, these are completely 100 percent not on that list, or are you just saying this text does not appear on that list?

MR. SCHMIDT:  I'm saying these studies do not appear on the list.  Just what I said.

A.   That's, I mean, a good -- I don't know that these are not reflected in my report.  I didn't see these individual studies, but as I said, my methodology wasn't to pull individual studies.  I don't know if these were not included in the meta-analyses.  I imagine some of them were or all of them if they were of sufficient quality to go through -- to survive the PRISMA assessment.

MR. SCHMIDT:  Let's mark that portion of the transcript.

86 (Pages 338 - 341)

CONFIDENTIAL

Page 342

BY MR. SCHMIDT:

Q.   Do you know if you reviewed --

A.   Some of these -- I'm sorry. Some of these are sufficiently old that I wouldn't have included them anyway and I --

Q.   What was your date cutoff for studies?

A.   I went back five years for meta-analyses and systematic reviews.

Q.   And why not look before five -- at studies older than five years?

A.   Because it's a fast-changing field and a fast-changing product, and Facebook or Meta or TikTok or any of them are very different today than they were ten years ago.

But let me also add that by definition, systematic reviews and meta-analyses always have a look-back period. So a systematic review done in 2023 would have included studies that went back before 2020.

Q.   So to get a clean answer, do you

Page 343

know if you've read any of these studies on Exhibit 14 in that individual form?

A.   I -- I think I have actually read some of them in their individual form. It's hard for me to tell only from the authors and titles because some of the authors' names I recognize. But again, some of these studies may very well be included, I would expect that some of them were in the meta-analyses and systematic reviews.

Q.   Do you know if any individual ones were?

A.   There would be no way for me to know without going through each of the systematic reviews.

And again, I don't know how you identified these, but there are easily tens of thousands of studies, and -- and individual studies, particularly small ones, individually don't tell much. That's the precise reason to use systematic reviews and meta-analyses.

Q.   Okay.

Page 344

Do you agree with me that small studies individually don't tell us much?

MS. COUCH:  Objection; vague.

A.   Do I agree that small studies individually by themselves can have limitations?  Yes.

Q.   And I just literally read back what you just said to me.

A.   Yeah.  Small studies by themselves in isolation can suffer from limitations, primarily power.

Q.   Do you know how many times you rely on small studies by themselves in your report for distinct propositions you make?

MS. COUCH:  Objection; misstates his report.

A.   I don't -- I don't know.  It's not the way my report is formatted, but --

Q.   Okay.

A.   So no.

Q.   Do you know -- do you recognize, like look, for example, at the name of the first study and the last study.  This

Page 345

includes longitudinal studies, this list of studies that are not on your materials considered list.

MS. COUCH:  Objection; misstates his report.

A.   It may be in my materials considered list if they were in the systematic reviews, and I do see that it says longitudinal change, yes.

Q.   And you recognize longitudinal studies are superior to other types of studies like cross-sectional studies?

A.   I think all of them add something to the picture and they should be examined together.  Yes, longitudinal studies in principal are a stronger individual design than cross-sectional studies.

Q.   Let's go back to the National Academy of Sciences report and let's look at page 11 to 12, please, under the heading "Research Agenda."

A.   Yes.

Q.   They say in the second sentence

87 (Pages 342 - 345)

CONFIDENTIAL

Page 346

of the second paragraph on -- on page 11, quote: Most of the research on this topic has established only an association between social media use and different mental and physical health outcomes.

Did I read that correctly?

A. You read that correctly.

Q. Do you agree with that statement?

A. I think that the phraseology there is vague. I think there are cross-sectional studies, but there are also many longitudinal and experimental studies.

Q. Do you agree with what that they say when they say most of the research on this has established an association?

A. It's -- it's -- to be honest with you, it's vaguely phrased. I don't know what the denominator is.

Q. Okay.

A. Is it the proportion of studies, is it the number of subjects. But the point is -- my point is that my report

Page 347

doesn't rely only on associative studies.

Q. They then say: Evidence of such associations is useful and can drive hypothesis formation and further inquiry, but it is not sufficient on balance to leave this committee to recommend additional restrictions on young people's access to social media.

Do you see that?

A. I see that statement.

Q. Do you agree with that characterization of the science?

A. No, I do not.

Q. Let's go to page 93. And they have a heading called "Inferring Causation."

Let me know when you're there?

A. Yep.

Q. They say: Most research on the relation between social media and health is cross-sectional, and the preponderance of cross-sectional studies research has in turn informed a number of systematic reviews and meta-analyses.

Page 348

Do you see that?

A. I do.

Q. Do you agree with that?

A. I do not agree with that because the systematic reviews and meta-analyses that I cite in my report, I differentiate between ones that are only cross-sectional and ones that are systematic reviews of experimental or longitudinal studies throughout my report when they're available.

Q. (Reading) It is difficult to establish a cause and effect relationship on the basis of such evidence.

Do you agree with that?

MS. COUCH: Objection; vague.

A. I -- I don't agree with that. As I say, I believe there is a causal relationship between the existing science of -- between social media and adverse outcomes in children as -- as outlined in my report.

Q. Do you consider the National Academy of Sciences to be part of some

Page 349

kind of consensus that there is such a thing as social media addiction?

A. I don't understand the question.

Q. You've talked about whether there is a consensus view within the medical community about whether social media is addictive.

Do you recall that?

A. Yeah.

Q. Is the National Academy of Science report consistent with that consensus, in your view?

MS. COUCH: Objection; vague.

A. I don't understand what you mean by that.

Q. Well, is there a consensus, in your view, that social media is addictive?

A. I -- I said there was a consensus among scientists in that field that that is the case, yes.

Q. Is the National Academy of Science report part of that consensus?

Do you understand -- let me try it differently.

88 (Pages 346 - 349)

CONFIDENTIAL

Page 350

Do you understand the National Academy of Science to be concluding that social media is addictive?

A.   I don't -- be more specific.

Q.   Did they conclude that social media is addictive?

A.   I don't recall offhand if they concluded that or not. But what I said before was -- I stand by what I said, before that the vast majority of scientists in this field believe that to be the case.

Q.   Do you think the National Academy of Sciences believes that to be the case?

MS. COUCH:  Asked and answered.

A.   I'm -- I'm still struggling to see where they comment on -- can you direct me to what part of the report you're referring to?

Q.   I think we've covered it.

Let me ask you about another quote. Let's look -- can you go back to 93 where we were.

Page 351

Do you see where it says the committee -- I'm looking at the very bottom paragraph: The committee recognizes that studies showing that a social media exposure preceded changes in mental health or well-being are not necessarily evidence that social media caused the changes.

Do you see that language?

A.   Yes, I see that language.

Q.   Do you agree with that statement?

A.   No, I don't agree with that statement.

Q.   (Reading) Especially in mental health epidemiology, the true onset of psychological problems can be difficult to ascertain even in clinical settings.

Is that true?

A.   Well, I think -- I -- I think it lacks context, and I don't believe that this general statement here is true because I think that there are studies that show that there is a linkage.

Page 352

Q.   You're aware that many of the studies look at symptoms of psychological distress, including self-reported symptoms. Is that correct?

MS. COUCH:  Objection; vague.

A.   Yes, I am aware that many studies look at symptoms of psychological distress.

Q.   Are you aware of any study that looks at whether social media increases the rate of actually diagnosed psychological conditions, medically diagnosed?

A.   The study that comes to mind would be the Braghieri study of the quasi-experimental study of the roll-out of Facebook, and I -- I think in that study, they asked people if they had been diagnosed with mental illness in the past year and saw differences, at least in anxiety, as I recall. But most studies don't rely on clinical -- diagnoses for a variety of reasons, and they're not -- it's not necessary, in my opinion, to have

Page 353

an affirmed clinical diagnosis.

Q.   Are you aware of any study other than Braghieri that actually shows a difference between -- based on social media use and diagnosed psychological or psychiatric conditions other than Braghieri?

A.   I'm not aware offhand. But as I say, that's not the way studies of mental health conditions are done. They rely on validated measures of psychological distress that are correlated with and predict clinical diagnoses.

MR. SCHMIDT: Okay. Move to strike everything after "I'm not aware offhand."

BY MR. SCHMIDT:

Q.   Do you know when the Facebook usage in the Braghieri study occurred?

A.   It was right after the roll -- it would have been in the early two thousand -- it would have been 2006 or something. It was right after the roll-out of Facebook. I could look it up.

89 (Pages 350 - 353)

CONFIDENTIAL

Page 354

It's in my report.

Q. Earlier when we were talking, we talked about you gave me a list of features that you thought were problematic, and I'm just going to run through those features with you.

Did the ability to manipulate images exist on Facebook at that time?

A. No --

MS. COUCH: Objection; vague.

A. I don't believe it did, no.

Q. Did images even exist on Facebook at that time?

MS. COUCH: Objection; vague.

A. I don't know, actually.

Q. Did endless scroll exist on Facebook at that time?

MS. COUCH: Objection; vague.

A. I don't recall.

Q. Did suggesting subsequent content exist on Facebook at that time?

MS. COUCH: Objection; vague.

A. I -- I don't recall precisely when those were introduced in terms of

Page 355

when the study was done 'cause it was a roll-out of Facebook and I -- I -- the chronology is complicated.

Q. Was there an algorithm at that time?

MS. COUCH: Objection; vague.

A. I'm not in a position to comment. I suspect there probably was.

Q. There was not -- if I tell you there was not, do you know that to be wrong?

MS. COUCH: Objection; vague.

A. I'm not -- I don't know.

Q. Do you know when the algorithm was -- when a Facebook algorithm was first put in place, algorithmic feed?

A. I guess it would depend on what you mean by that. I mean, reviewing the documents, I mean, I -- I know that -- I know that, for example, infinite scroll was introduced in a certain -- I don't know the precise chronology of when, and I don't really know -- there wouldn't be any way for me to know precisely when

Page 356

algorithms were introduced. So I don't have a comment on that.

Q. Did "likes" and "comments" exist at the time of the Braghieri study?

A. I don't know when they precisely existed in terms of the study 'cause, as I said, the study looked at the roll-out over a few years.

Q. Cosmetic surgery filters, did they exist at the time of the Braghieri study?

A. I don't believe so, but I don't know for fact.

Q. And those are the features you mentioned to me earlier.

Are there any other features you believe that are problematic that you know existed at the time of the Braghieri study?

A. I -- I think the -- the point is that the -- the effect size that was seen in the Bulgari -- Braghieri study, given the paucity of these additional features, that effect size is only -- would be a

Page 357

conservative estimate of what it would be given how those features drive the experience.

Q. My question is are there any other features you believe that are capable of causing harm that you know existed on Facebook at the time of the Braghieri study?

A. I don't know what features existed on Facebook at the time. I wasn't -- I wasn't using it at the time.

Q. Are you aware that Facebook had content at the time of the Braghieri study?

A. I -- I honestly don't know what Facebook looked like at that point. I wasn't on it and there would be no way for me to find out now.

Q. You don't know if it had content?

A. I don't know what it had. I -- I -- I really don't know what it had in 2004.

Q. It was social media with no

90 (Pages 354 - 357)

CONFIDENTIAL

Page 358

media?

MS. COUCH: Objection; argumentative.

A. It -- it was -- I don't know what it looked like.

Q. Okay.

Can you tell me anything about Facebook as it existed at the time of the Braghieri study?

A. What little I know about Facebook at its inception, honestly, is from The Social Network, the documentary.

Q. Well, that's not a documentary. That's a movie.

A. Well, the movie.

Q. Okay.

You didn't think Social Network was a documentary, did you?

A. A movie.

Q. You didn't think it was a documentary, did you?

MS. COUCH: Objection; argumentative.

A. It's a movie.

Page 359

Q. It's not a documentary, right? Can we agree on that?

MS. COUCH: Asked and answered. He just said it's a movie.

A. I -- I don't know what its base -- its factual -- it -- its basis was.

Q. Okay.

Do you know whether creators of the movie had acknowledged that they took artistic license on different points?

A. It's really outside of the scope of my expertise.

Q. You don't rely --

A. No, nowhere do I rely on that movie for my testimony.

Q. Okay.

So other than what you saw in a movie, do you know anything about how Facebook existed at the time that it was launched?

A. No.

Q. And at the time of the Braghieri study?

Page 360

A. No, I do not.

Q. Let's look at page 336, please.

In your report, you talk about the National Academy of Sciences report. You make criticisms of the report.

Is that correct?

A. That's correct.

Q. One of the criticisms you say is the, quote: Lack of relevant expertise on the committee.

Do you see that?

A. I do.

Q. And if we go to page 221 of the NAS report, Exhibit 28, you'll see they write about their qualifications.

A. 221.

Q. 221, yes, please.

And you might want to just have your report and the NAS report next to each other. We're going to toggle back and forth between them.

So, looking at your report, when you talk about lack of relevant expertise, you recognize that two people on the

Page 361

committee have, quote, in your words, actively researched social media and adolescent health, correct?

A. Correct.

Q. And you recognize that a -- and -- and who are those two? Is that Dr. Galea -- I'm sorry. Who are those two who have actively researched social media and adolescent mental health?

A. I would -- I -- I -- I would say Doug Gentile and -- and Jeff Hancock.

Q. Okay.

A. As I recall.

Q. And then you recognize that one of those ten members of the committee is part of a School of Public Health, right?

A. Yes.

Q. And that is Dr. Galea, right?

A. Correct.

Q. And under Dr. Galea's qualifications, it says he is one of the most widely-cited scholars in the social scientist -- in the social sciences having published more than a thousand scientific

91 (Pages 358 - 361)

CONFIDENTIAL

Page 362

journal articles, as well as book chapters and chapters, correct?

A.   That's correct.

Q.   Do you recognize Dr. Galea as one of the most widely-cited scholars in the social sciences?

A.   I -- I know Dr. Galea very well, and I have a lot of respect for him, but this is not his area of expertise.

Q.   Is he one of the most widely-cited scholars in the social sciences?

A.   That I don't know for a fact.

Q.   Okay.

If you look at page 226, please.

A.   Of this report?

Q.   Yeah, of the NAS report, Exhibit 28.  Page 226.

A.   Yes.

Q.   Do you see there's one of the members of the committee was someone named Leslie Walker-Harding?

A.   Yes.

Q.   Do you know Dr. Walker-Harding?

Page 363

A.   I know her very well.

Q.   Do you know her personally?

A.   I do.

Q.   Do you know her as a professional?

A.   I do.

Q.   Do you have a very good regard for her professional standing?

A.   As a -- as a -- as a pediatrician professional, yes.  As a scientist, she's -- she's -- this again is not her area of expertise.

Q.   Do you have a very good regard for her scientific integrity?

MS. COUCH:  Objection; vague.

A.   I -- I have no reason to doubt her integrity whatsoever, no.

Q.   In fact, you worked with her, right?

A.   She's the chair of my department, yeah.

Q.   She's the chair of your department, which means you report to her, right?

Page 364

A.   Correct, yeah.

Q.   And she was also -- I mean, I don't think she is anymore, but tell me if I'm wrong, she was also the chief academic officer at Seattle Children's Hospital where you are.

A.   That's correct, yes.

Q.   Did you report to her in that capacity too?

A.   I did.  And previously she -- she was a -- before she took that role, she was a scientist in my center, and she reported to me.

MR. SCHMIDT:  Okay.

I'm not trying to ruffle your feathers and not pointing that out, but I am going to move to strike that because I don't think that's responsive.

BY MR. SCHMIDT:

Q.   Have you reported to Dr. Walker-Harding in two different capacities?

A.   Yes.

Page 365

Q.   She's still your boss?

A.   Yes, she's still the department chair.

Q.   Okay.

Like for example, does she have a role in setting your compensation?

A.   Yes.  Nominally actually, but yes.

Q.   If you look at her description, it says she has been dedicated to the health and well-being of children and adolescents for more than 25 years, particularly in the area of prevention of adolescent substance use and promotion of healthy adolescent development.

Do you see that?

A.   I do.

Q.   From your understanding of her expertise, is that an accurate statement of her background?

A.   I think it's a -- you're putting me in a bit of an awkward position because I do report to her.

But I will say that she is a

92 (Pages 362 - 365)

CONFIDENTIAL

Page 366

well-respected clinician, but -- and -- and she has been a very powerful advocate for the well-being of children and adolescents. But you'll notice that she doesn't really even attest to being a researcher in this space.

Q. Okay.
You do consider her a well-respected clinician?

A. I do, yes.

Q. You do consider her a powerful advocate for the well-being of children and adolescents?

A. I consider her to be an advocate for -- yes.

Q. Okay.
Did you -- have you talked to her about your criticisms of her committee's work on this report?

A. I have not.

Q. Have you shared these criticisms anywhere outside of this report in this litigation?

A. No, I have not.

Page 367

Q. You haven't published an editorial or an opinion piece or anything like that?

A. No, I have not.

Q. We talked earlier about that Surgeon General Advisory.

A. Yes.

Q. Do you remember that?

A. Yes.

Q. Do you know what surgeon general that was?

A. Vivek Murthy.

Q. Do you know if Vivek Murthy has any clinical experience in pediatric health?

A. I don't know that, no.

Q. Do you know if he has conducted any research in the area of social media?

A. Independently, I don't -- I don't know that, no.

Q. Do you know if he's conducted any research in any form of adolescent health?

A. I don't know.

Page 368

Q. Does that cause you to discredit his views in any way, yes or no?

MS. COUCH: Objection; calls for speculation.
You can give a full response.

A. I -- as I said before, my assumption in that his -- is that in his role as surgeon general, and I consider him to be a -- a -- I -- I don't actually know what his research background is, but I consider him to be a very smart and thoughtful person, and my assumption is in that role, having read who -- what -- what agencies were involved, was that he was leading this effort and that this was a summation of a lot of experts' opinions.

Q. And you used the word "assumption" twice.
Do you know that to be true outside of assuming it?

A. No, I don't know what -- I -- I don't know how -- I said before, I don't know the process by which surgeon general's recommendations are made.

Page 369

Q. You talk -- you quote throughout your report various people who worked at the defendant companies in this case and things they said in chats and emails and what have you, right?

A. I do, as corroboratory evidence. That my -- the basis of my report is primarily and largely based on the scientific evidence I reviewed, my own research experience, my clinical experience, and the final pillar is the -- is the internal documentation and studies that I had access to.

Q. Did you undertake any effort with the people you quoted, whether it's from YouTube or Snap or TikTok or Meta, to see whether they had relevant experience as you used that term here in talking about the National Academy of Sciences report?

A. I looked at, as part of my due diligence, I did do Google searches on some of the individuals to see what their back -- found their LinkedIns and saw what

CONFIDENTIAL

Page 370

their training and background was.

Q.   Okay.

A.   But beyond that, I -- I didn't do much more.

Q.   Did it cause you to weigh less or note limitations in any of the sources you cited because you discovered that they didn't actually have background in research on mental health effects?

A.   No.

Q.   Okay.

A.   I mean, I believe that they were well-positioned to do the research that they did.  They had adequate training, in my opinion.

Q.   Let me give you an example.  You quote a document from someone named ▓▓▓ at Meta --

A.   Yes.

Q.   -- talking about addiction.
     Do you recall that?

A.   I quote him several times.

Q.   Yes.

A.   Which one are you referring to?

Page 371

Q.   Where he has a reference to addiction in a document.

A.   Can you point it to me -- me to it in a report?

Q.   Yeah, I can.  Page 78 and it's the text accompanying footnote 91 where you quote someone, who I'll represent to you is ▓▓▓, talking about creating a world of addicted monsters, making people's mental health deteriorate slowly over time.

A.   Yes.

Q.   What -- what did you find out about ▓▓▓ -- and -- and --

MR. SCHMIDT:  First of all, strike that.

Q.   This is a chat between coworkers, correct?

A.   I -- I -- I don't recall precisely what this was from, but it -- I think it was, yes, an internal chat, yes.

Q.   And you understand that at least at Meta, probably at all of the defendants, people have workplace systems

Page 372

where they can just share thoughts as they have them back and forth?

A.   Yes.  I saw that -- that, yes.

Q.   And you saw, I'm sure, a lot of the time they use loose language.  A lot of the times they're kind of talking things through, and they change their views as they talk.

MS. COUCH:  Objection.

BY MR. SCHMIDT:

Q.   Did you see that?

MS. COUCH:  Objection; vague.

A.   I saw -- I saw a lot of banter, but I saw a lot of substantive discussion that was serious and sustained.

Q.   Did you see people in their sworn testimony saying, I hadn't thought about it that much, or, I thought about it more and came to a different view on some of the points you cite in your report?

MS. COUCH:  Objection; vague.

A.   I don't recall.

Q.   Okay.  Well, let's take this as an example.  This quote from ▓▓▓

Page 373

▓▓▓
     Does ▓▓▓ have any experience with addiction?

A.   I don't --

MS. COUCH:  Objection; vague; lacks foundation.

A.   I don't recall offhand what his background is, but I -- I will point out that -- and I think it was ▓▓▓ who generated in short order at one point a distribution of time spent on Meta, if I'm recalling it correctly, and showed -- or maybe -- that there was a sizable number of people that spent more than four hours a day on it.

MR. SCHMIDT:  Move to strike as nonresponsive.

BY MR. SCHMIDT:

Q.   Do you know if ▓▓▓ --

MR. SCHMIDT:  Everything after "I don't recall what his background is."

Q.   Do you know if ▓▓▓

94 (Pages 370 - 373)

CONFIDENTIAL

Page 374

had any mental health training or experience?

MS. COUCH: Objection; vague; lacks foundation.

A. I don't know.

Q. Do you know if he's capable of diagnosing addiction in any setting?

MS. COUCH: Same objections.

A. I don't know.

Q. Let's look at that page 77.

Do you see there's a chart on page 77 that shows different usage for different groups of people on a weekly basis?

A. Yes.

Q. And it's got numbers that spend 14 to 21 hours, a smaller number that spends 21 to 28 hours, and an even smaller number that spent 28 plus hours.

Do you see that?

A. I do.

Q. And do you know who prepared this chart?

A. I -- I -- I -- as I -- I think

Page 375

it was -- I think it was ███████, but I could be wrong. I don't know. It was in the -- it's -- it's cited here, so I don't recall offhand.

Q. Did you -- and I might have misspoke. I said this was weekly. This was just in one week he picked.

Do you see where it says "in a week"?

A. Yes.

Q. Do you know whether this data held true over time?

MS. COUCH: Objection; vague.

BY MR. SCHMIDT:

Q. Or whether it fluctuated over time?

MS. COUCH: Same objection.

A. I -- from -- this is a single week, but there are other data that -- that -- from internal documents that are corroboratory of this in terms of the frequent -- the -- the amount of time that some people spend. I can point you to it if you want.

Page 376

Q. So, like, let's take the 28-plus hours group.

A. Yeah.

Q. Do you see that?

A. I do.

Q. Do you know if those numbers were equivalent in 2021, 2022, 2023, 2024?

A. I -- I don't recall offhand.

Q. Meta had -- do you know whether Meta has tracked time spent over -- at every point in time, whether it's generated data on that?

A. I -- I know that -- I know that they are tracking time spent on the platform very robustly. I have -- I did not come across, as I recall, a single graph that showed use over many years.

Q. But did you attempt to chart out how time spent varied over time according to Meta's data or any other company's data?

A. No, I didn't attempt to do it, but -- no.

Q. And would you say that if

Page 377

someone uses social media for 28-plus hours in one week that that means they are addicted to social media, knowing nothing else?

MS. COUCH: Objection; hypothetical.

A. I would attest that using social media for 28-plus hours a week is --

Q. One week, which is what I'm asking about.

A. Which would be a -- a week, right? What did I say?

Q. You said per week. I'm saying in one --

MR. SCHMIDT: Let me withdraw my question. And I'm sorry for jumping on your answer.

Q. Do you see the heading of this is "Using Instagram "in a week"?

A. Right.

Q. Do you know if for any of these people, let's focus on the 28-plus hours group, when you started charting across weeks, their numbers go up and down? Do

95 (Pages 374 - 377)

CONFIDENTIAL

Page 378

you know whether that's the case?

MS. COUCH: Objection; vague.

A. I -- I can't tell that from this graph.

Q. Okay.

A. I have no reason to believe that this week was not representative, but I don't know.

Q. But do you know that it varies for some people over time?

MS. COUCH: Objection; vague.

A. I don't know that it does, but it very well might, yes.

Q. For example, if we did average weekly use for a full year, do you know if it would be the same numbers as we see on this document?

A. I have no way of knowing that.

Q. Okay.

MS. COUCH: One second, Dimitri. Let me get my objections in.

BY MR. SCHMIDT:

Q. Would you say that the simple fact that someone uses 28-plus hours of

Page 379

social media in one given week means they are addicted without more information?

MS. COUCH: Objection; incomplete hypothetical.

A. I would need to know more information, but I think four hours a day or more of usage of one social media site would certainly be a cause for concern.

Q. Let's go to page 336, please, of your report, Exhibit 2. Back to your criticisms of the NAS.

The second one is: Conflict of interest. Do you see that?

A. I do.

Q. And your conflict of interest criticism is that two of the panelists have had their research supported by digital media companies: one received an unrestricted gift from Google and the other from Instagram.

Do you see that?

A. I do.

Q. And do you know the size of either of those unrestricted gifts?

Page 380

A. No, I do not know the size.

Q. Do you know how far in advance they preceded the work on the committee?

A. I don't recall it. I looked at it. I don't recall it -- how -- how far in advance it was.

Q. You say: The National Academy of Medicine policy is that even research support from a relevant industry would be disqualifying.

Do you see that?

A. I do.

Q. Is that true only as to current research support as opposed to former research support?

A. My understanding of it is that it's in the past.

Q. So any research support is disqualified, in your understanding?

A. My recollection is it was in the -- it may be in the last five or seven years. I don't recall precisely, but yes, it doesn't have to be active research.

Q. Okay.

Page 381

Do you know if these researchers were outside that time period?

A. I don't recall.

Q. How did you learn that they had received these gifts? From their disclosures?

A. From their disclosures, that's correct.

Q. Do you have any reason to believe they weren't transparent in their disclosures?

A. No, I don't have any reason to believe they weren't transparent.

Q. And do you know if the unrestricted gift from Google and the one from Instagram covered a topic at all relating to this report as opposed to something else?

A. No, I have no way of knowing what the unrestricted gift was for.

Q. I'm going to come back to this, but -- but what is the amount you've been paid by plaintiff lawyers in this litigation?

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

CONFIDENTIAL

Page 382

A. I don't know offhand. We've submitted all the invoices to you.

Q. Okay.

Are you aware that it's several hundred thousand dollars?

A. Yeah, I believe it is, yes.

Q. Do you know if that con -- is that a conflict of interest you need to disclose when you are publishing papers relating to social media?

A. It -- I -- I -- I believe from the time that I've been retained, research that I do since then that relates to social media I should declare that as a conflict of interest, yes.

Q. Okay.

Do you know whether --

A. Potential conflict of interest, I should say, because I don't view it as one, but it's a potential one.

Q. Is theirs a conflict of interest or a potential interest, these two authors you call out? I want to know if you give them that same grace you're giving

Page 383

yourself. Is it a potential conflict or an actual conflict?

MS. COUCH: Objection; vague.

A. I think that an unrestricted gift is a conflict.

Q. Okay. But not being paid a hundred thousand dollars from lawyers seeking money from companies?

MS. COUCH: Objection; argumentative.

BY MR. SCHMIDT:

Q. In a court case.

MS. COUCH: Same objection.

A. The conflict of interest has to do in the research arena with being -- receiving unrestricted gifts that might color the research that you do or the find -- or the interpretation of the research that you do.

As a journal editor, we require that people declare that for exactly that reason and studies have shown, for example, that studies funded by pharmaceutical industry tend to find

Page 384

favorable results for pharma compared to ones that are not.

Q. Those are not unrestricted grants in those studies, are they?

A. In some cases they are; in some cases they weren't.

Q. There's never been a study that looked at only unrestricted grants and found what you just said, correct?

MS. COUCH: Objection; vague.

A. I don't know the answer to that.

Q. Okay.

Do you know whether your conflict of interest, being paid hundreds of thousands of dollars by plaintiff lawyers, is a larger financial conflict of interest than the unrestricted grants these authors received at some unknown time in the past?

MS. COUCH: Objection; vague; argumentative.

A. I -- I don't have any conflict of interest. I was asked to render my expert opinion and I have rendered it.

Page 385

Q. Do you know whether you've been paid more by plaintiff lawyers to give your opinions than these two committee members received in unrestricted grants?

A. I have no way of knowing that.

Q. Did you -- if you look under conflicts of -- actually, if you look at the end of lack of relevant expertise -- actually, you know, I'm going to move on.

Are you aware of anyone other than you who has made these criticisms of the NAS report?

A. Yes, many people have, and one person in particular has actually published on this.

Q. Who is that? Is it the person you cite in footnote 591?

A. Yes. Here, Allem, JP, yes.

Q. Are you aware of any other publications making these criticisms other than Allem that you cite that you could point us to?

A. I don't know of any other peer-reviewed publications on that topic.

97 (Pages 382 - 385)

CONFIDENTIAL

Page 386

There are many people that have criticized these reports as footnotes in their -- in their papers that I've seen.

Q. Are you aware of anyone who has made these specific criticisms other than Allem: a lack of claimed relevant expertise or conflict of interest?

MS. COUCH: Asked and answered.

A. The lack of relevant expertise, yes. Other people --

Q. Who has said that, that you can point me to, other than Allem?

A. As I said, not in a published peer-reviewed report, but --

Q. That's what I'm interested in.

Let's look at Allem. That's Exhibit 32.

(Christakis Exhibit 32, AJPH article, Jon-Patrick Allem, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. Do you recognize that as the Allem paper you cite?

A. Yes, I do.

Page 387

Q. And this is not a peer-reviewed publication, is it?

A. No, I believe it's peer-reviewed publication. My -- I mean, I don't know the procedure at AJPH for -- for opinions, but usually they're peer-reviewed. We peer review them at my journal, and AJPH is a very respected journal in public health.

Q. Do you know anything about Jon-Patrick Allem's qualifications other than what it says here, Ph.D. MA?

A. No, I don't.

Q. But you do see he -- he makes this conflict of interest critique and the experience critique, the same ones you make, correct?

A. Yes.

Q. And did you get those critiques from him, or did you just happen to independently raise the exact same two critiques?

A. Raise -- no, it was independent of him.

Page 388

Q. Okay.

A. I came up with my own and came across his.

Q. Okay. Let's go to the last page of his article.

Do you see he discloses conflicts of interest?

A. Yes.

Q. And he doesn't say potential. He says conflicts of interest, right?

A. Yes.

Q. And his conflicts of interest, did you read this when you looked at this article at the outset?

A. I don't recall.

Q. Okay.

You see he discloses that he's been paid by plaintiff lawyers, right?

MS. COUCH: Objection; misstates this document.

MR. SCHMIDT: Well, I'll tell you we haven't been paid -- we haven't paid him.

MS. COUCH: I can tell you I

Page 389

haven't paid him either, so.

MR. SCHMIDT: Well, if you can represent that for all the plaintiffs' lawyers.

MS. COUCH: No, I can represent it for myself, but I also don't take your representation for every defense lawyer either.

MR. SCHMIDT: Anyone can make representations they want.

I'll represent we have not paid him.

MS. COUCH: And I'll represent that document does not say what you have just said.

BY MR. SCHMIDT:

Q. Do you see where it says he has received fees for consulting services in court cases pertaining to the content on social media platforms?

A. I see that it says that. I don't know what it means in his case. I don't know him personally.

Q. If I say to you he's been paid

98 (Pages 386 - 389)

CONFIDENTIAL

Page 390

by plaintiff lawyers, do you know that that's not true?

MS. COUCH: Objection; lacks foundation; states facts not in evidence.

A. I -- I -- I don't know how to answer that. He declared his conflict of interest. This went through peer review at a very respected journal. The editor, whoever he, she, they were, decided to publish it and in -- in spite of that declared conflict and that's --

Q. Do you know how much plaintiff lawyers have paid him --

A. I have no way of --

MS. COUCH: Objection; lacks foundation.

Q. -- for his work?

MS. COUCH: States facts not in evidence; misleading.

A. I have no way of knowing that.

Q. Did you know when you cited this paper that you were using someone who has been paid, who has a acknowledged conflict

Page 391

of interest because he has been paid for lawsuits to criticize someone else for a conflict of interest?

MS. COUCH: Objection; misstates the document.

BY MR. SCHMIDT:

Q. Do you know that when you cited his work?

MS. COUCH: Objection; misstates the document.

BY MR. SCHMIDT:

Q. I think I gave you the wrong copy. You can use that one.

A. To be totally honest, I don't recall when I read this having seen this, and so I don't know that it affected my decision one way or the other.

Q. Your last criticism, if you go back to the -- your report starting on page 337, is you take issue with how they discuss -- how the NAS discusses the positive effects of social media; is that correct?

A. That's correct.

Page 392

Q. And let's look at one of those points that you make in that regard. Could you go to page 339?

A. Oh, of mine.

Q. Yes, I'm sorry.

A. Yes.

Q. Do you see where you point out that a study that the NAS relies on found benefits, but they were benefits on Reddit?

A. I -- I -- I see that, yes.

Q. And do you -- I probably asked you this, so I'll ask you again just to make sure I have it.

Do you know whether Reddit is addictive and capable of causing harm in the way you say that the defendants' apps in this case are?

MS. COUCH: Compound.

A. I didn't -- I didn't study Reddit. I'm not on Reddit. I have a passing understanding of how Reddit works, but I think it doesn't have many of the same features, but -- but I don't know

Page 393

'cause I didn't study it. It's outside the scope of this report.

Q. Okay.

A. But it's -- go ahead.

Q. But your point here is they shouldn't be -- it doesn't tell us anything about the defendants' apps to rely on a Reddit study; is that correct?

MS. COUCH: Objection; vague; lacks foundation.

A. That's correct.

Q. Do you know that a large number of the studies you rely on include data from Reddit users?

MS. COUCH: Objection; vague; lacks foundation.

A. I -- I don't know that, and I don't believe that to be true.

Q. Okay.

Do you know that -- do you consider Reddit to be social media?

MS. COUCH: Objection; vague; asked and answered.

A. I don't have an opinion on it.

Golkow Technologies,
A Veritext Division
877-370-3377                                    www.veritext.com

CONFIDENTIAL

Page 394

I've never used it, and I wasn't asked to -- to -- to study it, so I don't actually know, frankly, how Reddit works except from what I've discerned in passing.

Q. Okay.

And just to be sure I'm clear on my question, which I think you have, but I want to make sure you do. I'm asking the question about whether it counts as social media.

Would you count Reddit as social media?

A. For the --

MS. COUCH: Asked and answered.

A. For the purposes of this report, I did not count it as social media.

Q. Do you know whether it is social media?

A. I don't have an opinion on that.

Q. Okay.

A. I -- as I said, I haven't used it and I --

MS. COUCH: Dimitri, let me get

Page 395

my objections in.

BY MR. SCHMIDT:

Q. Is Twitter or X social media?

MS. COUCH: Asked and answered.

MR. SCHMIDT: I haven't answered -- asked that.

MS. COUCH: You asked about Twitter.

MR. SCHMIDT: I asked if it's addictive. I'm asking now about social media.

BY MR. SCHMIDT:

Q. Is Twitter or X social media?

A. I don't have an opinion on that. It's not something I studied and I don't use it.

Q. Are dating apps social media?

MS. COUCH: Asked and answered.

A. I don't have an opinion on that. It's outside of the scope of this report.

Q. Do you know that -- I'll ask a silly question, but do you know that the purpose of dating apps is for people to engage in social interaction?

Page 396

MS. COUCH: Objection; outside the scope.

A. I -- I -- I'm -- I'm embarrassed to say or just honestly I've never been on a dating app, so I don't know how they work.

Q. Do you know from your professional work?

MS. COUCH: Same objection.

BY MR. SCHMIDT:

Q. You can rest assured I'm not going to ask anything about your personal life. But from your professional work, do you know if dating apps involve social interaction?

MS. COUCH: Same objection. Marking this question.

MR. SCHMIDT: Please do.

A. I don't know how dating apps work. I didn't study them for this. I'm not on them.

Q. Do -- do you know anything about the facts of any of the individual plaintiffs in these cases?

Page 397

A. I don't know any of the individual plaintiffs or any of the facts related to them, but I have my own experience as a clinician with people that have been affected in all of the ways documented in my report.

Q. You've never seen people who have addiction to Twitter or Reddit?

A. No, I have not.

Q. You've never seen people who have addiction to dating apps?

A. No, I have not, but the -- but I -- the scope of my practice is -- is teenagers. I -- I -- I've not seen that, no.

Q. Did you look at any of the medical records of individual plaintiffs in these cases?

MS. COUCH: Asked and answered; lacks foundation.

A. I have not seen the medical records. I don't know the plaintiffs at all.

Q. Did you look into details

100 (Pages 394 - 397)

CONFIDENTIAL

Page 398

regarding any of the school districts in any of these cases?

A. No. I don't even know what school districts are involved.

Q. Do you know the names of any individual plaintiffs?

MS. COUCH: Objection; asked and answered.

Mark the question.

A. I do not know the names of any individual plaintiffs.

Q. Let me give you one name.

Have you heard the name Heaven Moore before?

MS. COUCH: Objection; asked and answered.

A. I'm sorry, what was the name?

MS. COUCH: Mark the question.

BY MR. SCHMIDT:

Q. Heaven Moore, like up in the sky, Moore, M-O-O-R-E.

MS. COUCH: Objection; asked and answered.

Mark the question.

Page 399

A. I have never heard that name before.

MR. SCHMIDT: Can I tell him the name of KGM?

MS. COUCH: No.

MR. SCHMIDT: No?

MS. COUCH: No.

MR. SCHMIDT: Okay.

BY MR. SCHMIDT:

Q. Do you know if Heaven Moore struggled more with dating apps than she did with Instagram or TikTok or Snapchat?

MS. COUCH: Objection; asked and answered; outside the scope.

Mark the question.

A. I don't know anything about Heaven Moore.

Q. Okay.

Or any other plaintiff?

A. Or any other plaintiff.

MS. COUCH: Same objections.

BY MR. SCHMIDT:

Q. You talk about dopamine in your report.

Page 400

Do you agree with me that dopamine is a naturally-occurring substance in the body that can be triggered by a broad range of activities?

MS. COUCH: Objection; vague.

A. Dopamine is a neurotransmitter. It serves many functions in the brain, and it can be triggered by a variety of activities, yes.

Q. I think you say in your report that being told "thank you" can trigger a dopamine release. Is that accurate?

MS. COUCH: Objection; misstates the report slightly.

A. I -- I -- in the context of my report, I talk about the dopamine reward pathway and that it is triggered by things that one experiences as pleasurable and that that can include a number of things, yes.

Q. Can dopamine release be triggered by someone saying "thank you"?

A. Yes, it can.

Q. Thank you. You're welcome.

Page 401

Can it be triggered by dancing?

A. It -- it -- it can be triggered by anything that one experiences as pleasurable.

Q. Can that include dancing?

A. Not for me, but for some people.

Q. Okay. Fair enough.

Could it be triggered by cooking?

A. I suppose, yes.

Q. Could it be triggered by stress that is experienced in a positive way?

A. I don't think of it that way, no.

Q. Okay.

Could it be triggered by something like smelling cookies?

A. Yes.

Q. Could it be triggered by reading a book or watching a TV show?

A. I've stipulated that it could be triggered by anything that someone experiences pleasurable, yes.

Q. Including those things?

101 (Pages 398 - 401)

CONFIDENTIAL

Page 402

A.   Including those things, yes.

Q.   Can it be triggered by watching a good sports play?

A.   I suppose, yes.

Q.   You would agree with me that just because something can trigger dopamine release does not mean that the activity by itself is harmful or causes addiction, right?

MS. COUCH:  Objection; vague.

A.   I agree that not everything that is experienced as pleasurable leads to addiction automatically, yes.

Q.   And you talk about, in your report, the brain's reward system is -- is -- there are lots of activities, including the ones we mentioned, that can trigger the brain's reward system that are not harmful or addictive, right?

A.   We -- we listed many, yes.  But the -- but I also talked in my report about how that pathway can become -- can lead to it -- to -- to addiction.

Q.   Are you aware of any studies

Page 403

that measure the amount of dopamine that gets released from a specific -- from seeing -- from using a specific social media service?

A.   I'm not aware of any that measure dopamine.  You can't really measure dopamine exogenously, but that's really outside the area of my expertise.

Q.   Okay.

Let me ask you do -- do you know if there's any -- been any effort to quantify whether the amount of dopamine, if any, that gets released when someone is using social media is more or less than the amount of dopamine that gets released when someone is, say, cooking, assuming they enjoy cooking?

MS. COUCH:  Objection; vague.

A.   I -- I don't know of studies that have looked -- I don't know that -- again, this is outside of my area of expertise.  But the -- the point isn't the release of dopamine.  It's the context it's -- in which it's released.  And as I

Page 404

mention in my report, the intermittent reward nature, the -- the features of social media distinct from the other activities you mentioned can lead to an addictive habit.

Q.   Okay.  My question is simply do you know if you could quantify at all whether someone uses social media for an hour, someone cooks for an hour, assuming they like cooking, whether they get more dopamine one way or the other?

MS. COUCH:  Objection; incomplete hypothetical.

A.   I don't have a way of answering that.

Q.   Okay.

In terms of dopamine release, if someone watches -- looks at a post on Instagram and they enjoy looking at that post, can that trigger a dopamine release in the same way it might if they read a book or someone said thank you to them?

MS. COUCH:  Objection; vague; compound.

Page 405

A.   It -- it can, but the -- the point is that the experience of social media isn't limited to the simple viewing of something.  It's the context that -- that -- and -- and the features that -- that drive the experience, and that's fundamentally different than just viewing something or, I might add, cooking something.

Q.   Are you aware of any data -- let's take one example you gave us earlier, "likes" and "comments."

Are you aware of any data saying that if you see a "like" or comment and you have no interest in the content that's being liked or commented on, that that can trigger dopamine?

A.   I don't have any comment on that.  I don't know.

Q.   Is that true for all your features?

MS. COUCH:  Objection; vague; compound.

MR. SCHMIDT:  Let me -- I'll

102 (Pages 402 - 405)

CONFIDENTIAL

Page 406

withdraw it.

Why don't we take our next break. We've been going for more than an hour.

THE VIDEOGRAPHER: The time right now is 3:56 p.m., and we're off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time right now is 4:20 p.m., and we're back on the record.

BY MR. SCHMIDT:

Q. Dr. Christakis, do you hold yourself out as an expert on social media?

A. Yes, I do.

Q. Do you hold yourself out as an expert on what is and what is not social media?

A. Yes, I do.

Q. Do you use Instagram?

A. I have an account, but I don't use it.

Q. When is the last time you posted it -- on it?

Page 407

A. It -- it's been a while. I don't know offhand.

Q. Do you know when the last time you used Instagram was?

A. The last time I checked it or the last time I posted?

Q. Checked it.

A. It's been a while. I don't know what my -- I -- my -- both my kids are on it and that's the only reason I ever go to it, frankly, but I don't recall when the last time I checked was.

Q. And I don't like asking people about their family. You just mentioned your kids. I'm going to ask you how old they are. If you're not comfortable answering, then I'll move on.

A. They are 27 and 24.

Q. Did they use it as teens?

A. They were on -- they were initially on Facebook, which is why I got on Facebook, and then they moved to Instagram, but neither of them are very active anymore.

Page 408

Q. Do you recall any social media limits you put on your kids?

MS. COUCH: Objection; vague.

A. Am I obligated to answer my personal --

Q. No. I'm going to say you're not. If you're not comfortable talking about it, I'm going to move on.

A. I'm --

Q. I only ask --

THE WITNESS: I'll ask should I answer that?

MS. COUCH: Dr. Christakis, you seem uncomfortable. I'll let the record reflect that.

BY MR. SCHMIDT:

Q. If you tell me you're uncomfortable, I'll move on. There's questions that I can --

A. I will say that I had limits and I monitored their usage.

Q. I'll move on.

A. I had stipulations.

Q. I'll move on.

Page 409

I am going to ask you about you those.

A. That's fine.

Q. Have you used YouTube?

A. I -- I -- I use YouTube, yes.

Q. Do you post on YouTube?

A. No.

Q. When is the last time you used YouTube?

A. Let me clarify that.

I posted on YouTube -- I -- I -- just so I'm completely transparent. I -- it was only in the context of this case that I recall that I do have a YouTube account that I created when my son was four or five or six and made videos of -- made "stop Lego animations" that I posted to YouTube. So I have an account, but I have not posted since then.

Q. Do you have a Snapchat account?

A. I had one. I deleted it.

Q. How long ago did you delete it?

A. Two years ago, but I wasn't active on it for a while.

103 (Pages 406 - 409)

CONFIDENTIAL

Page 410

Q.   Okay.
Have you used it in the past two years outside of deleting that account?
A.   I -- in the context of this trial, I -- I looked at it to see what it was like, how it had changed since I last used it, which had been a long time ago.
Q.   Had it changed in that time?
A.   I believe it has changed, yes. I mean, that was my instant recollection, but I can tell it's changed from reading the documents I've read.
Q.   Do you have a TikTok account?
A.   I do not have a TikTok account.
Q.   Have you ever used TikTok?
A.   I have -- I have -- no.  I mean, I don't know how to answer that.  I somehow see TikTok videos.  Sometimes they get -- I've seen TikTok videos because they -- people send them to me or they come across my Facebook feed, but I have not gotten on the app and used it myself. I don't have an account.
Q.   Okay.

Page 411

If you had a social media service that only had blank screens, but it let people do likes on those screens and it had endless scroll of those screens and it let people -- and let's leave it there.
Would that be addictive, in your view?
MS. COUCH:  Objection; hypothetical.
A.   I don't know how to answer that. That's such a strange hypothetical. There's no -- there's no -- it's never been studied, to my knowledge.
Q.   If you had a service that only supplied content to someone that they had no interest in, like someone who hates baseball, has no interest in baseball, and all it supplied was baseball content and it had "likes" for the baseball content, it had an algorithm to try to feature baseball content, it had endless scroll about base call content, it had the ability to manipulate images in the

Page 412

baseball content, would that be addictive to that person?
MS. COUCH:  Objection; hypothetical.
A.   I --
Q.   If they just had no interest in the content.
A.   I don't have --
MS. COUCH:  Same objection.
A.   -- a answer to that.  I haven't studied it.  I don't know that anyone has studied that.
My opinion here is based on the literature as it exists, which studies the social media platforms as they exist and have evolved.
Q.   Let me flip it around.
Do you understand the purpose of -- well, do you consider yourself an expert on how social media algorithms work?
A.   I would say I don't consider myself an expert on how they work.  I have a passing understanding of it just from my

Page 413

own -- my own experience as a user and from what little I've gleaned from these documents, but there are people that know a lot more about it than I do.
Q.   Do you have the understanding that all of the defendants in this -- all of the apps in these cases, Facebook, Instagram, YouTube, TikTok, Snapchat, use different algorithms to recommend feed to people who use their services?
A.   I don't know that they use different ones.  I think they're all, from what I've discerned from reading the documents and my own understanding about how the platforms are monetized, they're all trying to maximize engagement and emulating each other, but I don't know beyond that how the algorithms do that.
Q.   Okay.
Like let me take an example.  Do you know that Twitter and Reddit have algorithms that try to maximize engagements?
A.   No, I don't know that.

104 (Pages 410 - 413)

CONFIDENTIAL

Page 414

Q. Do you know whether that's wrong, or do you just not know?

A. I don't have an opinion. I -- I don't use either of those, and I don't know how they work.

Q. If I list those two services, Twitter, Reddit, and then the ones in this case, Facebook, Instagram, TikTok, YouTube, Snapchat, are you able to pick any of those two out and say here's how they're different from each other, their algorithms, their feed algorithms?

MS. COUCH: Objection; vague; compound.

A. Of the -- I -- as I said, I -- I don't know virtually anything from a scientific standpoint about Twitter and Reddit.

I can tell you the similarities between the -- the other five in terms of their features and their -- I have a whole table on the -- the similarity of their features and they -- they share a lot in common.

Page 415

Q. Well, you're talking about just whether they have the same features. I'm decking down into one of those features, the algorithm that you list in that table.

Do you know how, if at all, the algorithm varies between Facebook, Instagram, TikTok, YouTube, Snapchat?

A. No, I don't know how it --

MS. COUCH: Objection; vague; compound.

A. I -- I -- I don't know how the algorithms vary.

Q. Do you know whether the Instagram algorithm, for example, is closer to the TikTok algorithm, the Twitter algorithm, the Reddit algorithm, or something else in terms of how it operates?

MS. COUCH: Same objection.

A. I -- I -- I don't. I deduced from reading the documents that I read that there are differences between, or some differences at least be -- between Insta and Facebook in terms of how people

Page 416

can get access to -- how privacy settings vary with respect to individuals.

Q. Okay. I'm not asking about privacy.

A. Yeah.

Q. I'm asking about the algorithms.

A. The algorithms, yeah, okay. No, I don't know.

Q. Okay. Let's talk about habits. You talk about habits in your report, correct?

MS. COUCH: Objection; vague.

BY MR. SCHMIDT:

Q. And habit-forming activity?

MS. COUCH: Same objection.

A. I talk about habit in the context of a continuum between casual use, habitual use, problematic use, compulsive use, and addictive use, yes.

Q. And you actually distinguish addiction from habit in your report; is that right?

A. I put them on a continuum, yes.

Q. But they're different?

Page 417

MS. COUCH: Objection; vague; misstates.

A. Habit can lead to compulsive use. Compulsive use can lead to addiction. But yes, habitual use and addictive use I believe are, in principle, can be distinguished.

Q. Okay. There can be lots of habits you can have that are not addictive, right?

MS. COUCH: Objection; vague.

A. Yes, but habitual use can be problematic.

Q. You can have habits that are actually beneficial, right?

MS. COUCH: Objection; vague.

A. In general or with respect to social media?

Q. In general.

A. Yes, there are healthful habits.

Q. You can have a habit of checking -- of brushing your teeth every day, that can be a positive thing?

A. Yes, brushing your teeth every

105 (Pages 414 - 417)

CONFIDENTIAL

Page 418

day as a habit would be a good thing.

Q. You can have a habit of drinking a certain amount of water every day and that cannot be detrimental, right?

A. Yes.

Q. And would you agree with me that you could have a habit of checking social media at certain intervals and that could not be detrimental?

A. Well, I think the difference there is that there is no inherent risk associated with brushing your teeth and there's no inherent risk with drinking water, but there is inherent risk with social media. So it's a habit that is a risky habit as opposed to a habit that is safe and healthful.

Q. You can have a habit of checking social media every day without ever becoming addicted, right?

MS. COUCH: Objection; vague; hypothetical.

A. Some people have habitual use without becoming addicted, I suspect.

Page 419

I -- but again, habitual use is a risky behavior in and of itself.

MR. SCHMIDT: Move to strike everything starting with "but again."

BY MR. SCHMIDT:

Q. Would you mind looking at page 75 of your report, Exhibit 2. This is a section: Internal documents from defendant platform recognizing problematic and addictive --

A. I'm sorry, page 7 -- which number?

Q. Sorry, fair question. I'm looking at the heading G.

A. Internal documents, yes.

Q. This is a section where you purport to summarize internal documents from defendant platforms recognizing problematic and addictive usage among users.

A. Yes.

Q. Do you see that?

A. Yes, I do.

Q. One of the documents, and I'll

Page 420

just take one as an example.

Actually, let me go back in your report. Can we go back to page 54. At the bottom of the page you say: Meta documents acknowledge that Facebook does activate the brain's reward system.

And then you cite a single document.

Do you see that?

A. Yes.

Q. And if you just kind of put your finger there and go to page 114, here again, carrying over to 115, you cite that same document.

Do you see that?

A. Is that the same document as --

Q. Yes.

A. Okay.

Q. And the second citation appears in a section: Internal documents connecting features to harms.

Do you see that? It's on page 112 is the heading for this section.

A. Yes.

Page 421

Q. Okay.

Is it important to you when you present a document like this to -- to give full context to the document?

MS. COUCH: Objection; vague.

A. I'm not sure what you mean by "full context."

Q. Well, is it important to you that you don't present it in a misleading way?

MS. COUCH: Objection; vague.

A. I don't believe I've presented anything in a misleading way.

MR. SCHMIDT: I'm going to give you -- do we have a exhibit number?

Yeah, Exhibit 33 which is that document you cite.

(Christakis Exhibit 33, Facebook "Addiction", Basis Well-Being Research June 2018, Bates META3047MDL-014-00359270-336, was marked for identification, as of this date.)

106 (Pages 418 - 421)

CONFIDENTIAL

Page 422

BY MR. SCHMIDT:

Q. Have you seen this document before?

A. Yes, I believe that I have.

Q. This is the document cited on page 115 and that we saw cited earlier, right?

A. Yes.

Q. Do you know who ███████ is?

A. Yes, I believe she's from the well-being team at Meta.

Q. Do you know what her qualifications are?

A. I don't recall offhand, but I remember reviewing them as part of her deposition.

Q. Okay. She has a degree in neurobiology from Harvard.

That's not training you have, correct?

A. A degree in neurobiology from Harvard, no, I do not have that.

Q. And she is a Ph.D. in clinical psychology.

Page 423

You're not a clinical psychologist, right?

A. I'm not a clinical psychologist.

Q. I want to show you a few things from this slide presentation that you did not present in your discussion of Meta documents. Let's go to page 4 of the document, its TL,DR. She starts: There is no evidence that Facebook use meets the clinical definition of addiction.

Do you see that?

A. I do -- can you -- yes, I see that.

Q. Do you agree with that?

MS. COUCH: Objection; vague.

A. No, I don't agree with that. And I -- I think other people within Meta don't agree with that even -- maybe not in -- this was in 2018, so that was seven years ago. But no, I do not agree with that.

MR. SCHMIDT: Okay. And I'll move to strike the reference to "other people at Meta."

Page 424

BY MR. SCHMIDT:

Q. Do -- do you know if there's anyone at Meta who you would say has concluded that Facebook or Instagram is addictive?

A. There -- there were -- I mean, starting with ███████ who reported that 3 percent addiction which, as I said, was a very well-done study, better than most of us could do because of her access to the internal data.

Q. She didn't use the word "addiction" though. I'm focused on addiction.

Do you know anyone who concluded that Facebook or Instagram is addictive --

MS. COUCH: Objection misstate --

Q. -- at Meta?

MS. COUCH: Objection; misstates the internal documents.

A. I -- I think the terminology here is used internally, and for that matter externally, somewhat

Page 425

interchangeably, but if you let me look at my report, I believe that there were people who referred to it as addictive, yes.

Q. And I know those words appear in documents.

A. Yes.

Q. You've heard people call all kinds of things addictive in lay terms, right?

A. Well, I don't know --

MS. COUCH: Objection; vague; hypothetical.

BY MR. SCHMIDT:

Q. Like have you heard people say Diet Coke is addictive?

MS. COUCH: Objection; vague.

BY MR. SCHMIDT:

Q. In lay terms?

A. Many of the people that were using those term -- that terminology in internal document were not lay people, and I have no way of knowing if they were using the professionally or pejoratively.

107 (Pages 422 - 425)

CONFIDENTIAL

Page 426

Q.   Okay.

A.   But I might also add that many of the design elements of many of the platforms specifically specify that they wanted to make an addictive product.

MR. SCHMIDT:  I'd like to know where you see that, but let me move to strike that.

THE WITNESS:  Can I -- can I find that in my report?  I'd like to show it to you.

MR. SCHMIDT:  No, let me move to strike that as nonresponsive.

Let me ask a different question.

MS. COUCH:  Can we mark this question, please?

Thank you.

BY MR. SCHMIDT:

Q.   Are you aware of anyone at Meta who has training in addiction or mental health who conducted research or surveyed the literature and came to a medical or psychiatric conclusion that Facebook or Instagram are addictive?

Page 427

MS. COUCH:  Objection; vague; compound.

A.   I believe there is such evidence.  I would need time to go through my report, if you'll allow me to do it.

Just in these two seconds I found a quote here that says --

Q.   Where are you looking, please?

A.   Unfortunately, I'm on my version 'cause that's the one I have highlighted.

Q.   Why don't you tell me your page in that version?  I'll try --

A.   Page 70 in this version.

MS. COUCH:  And just for the record, I think he's referring to Exhibit 3.

MR. SCHMIDT:  I didn't hear what you said.

MS. COUCH:  I was just saying I think for the record he was referring to Exhibit 3 that the witness was referring to.

BY MR. SCHMIDT:

Q.   You're referring to, look with

Page 428

me, if you would, at Exhibit 12 -- I'm sorry, look with me at Exhibit 2, page 78.

A.   Of the other -- of the one that you prefer -- that you prefer?

Q.   Yeah.

And I think you're referring to language we already talked about from ▮▮▮▮▮▮.  Is that correct?

A.   Well, it's just after that.  And I'm not sure who this is attributed to offhand, but it says:  While other Meta internal documents argue that addiction to Facebook has not been established.

I think I'm referring to this one.

(Reading) They could see that they, quote, there are parts of the addictive process that may be at play and contributing to common issues for people.

That's cited there as that Meta --

Q.   That's the one we were just looking at, the slide deck that says "There is no evidence that Facebook use

Page 429

meets the clinical definition of addiction."

A.   But -- but in that same document, she says:  There are parts of the addictive process that may be at play in attributing to common issues for people.

And then right after it says: Relevant here, an internal Meta document concluded that a large fraction of users struggle with their Facebook use.  A significant minority report serious difficulties.

And I want to add that my opinion is not based on these internal documents.  I just find it interesting that they corroborate my opinion both because they presumably read the same literature I read and because they have access to data that I didn't have access to.

Q.   The second sentence you cited me, the one that accompanies footnote 94, do you know who wrote that?

108 (Pages 426 - 429)

CONFIDENTIAL

Page 430

A.   Offhand I don't know who wrote it.  The reference is to -- to have been, but I don't think she -- I don't know who wrote it.

Q.   Do you know if that person had any mental health or addiction experience?

MS. COUCH:  Objection; vague; calls for speculation.

A.   I -- I don't know who wrote it. We -- offhand, I don't know what expertise they have, but I don't know also -- I -- I don't know more than that offhand.

Q.   Let's go back to Exhibit 33, please, the ▮▮▮▮▮▮ slide deck where she says "There is no evidence that Facebook meets the clinical definition of addiction."

A couple lines below that she says:  We should reduce cases where rewards are unpredictable or lacking in value and reduce unintentional behavior.

Do you see that?

A.   I do.

Q.   Is that a good thing for Meta to

Page 431

be trying to do that?

MS. COUCH:  Objection; vague.

A.   I think that unpredictable rewards are one of the addictive features that I call out, and reducing them would make the platform less addictive.

I didn't see any evidence that -- that that was done from 2018 when this was, whatever, shared to today.

Q.   Let's look at page 281, page 12 of the slide deck.  She says:  Facebook itself seems unlikely to be capable of producing a true addiction.

Do you see that?

A.   Yes, I do see that she says that.

Q.   And then she says:  Facebook is not a substance that acts directly on the brain.  It does not create brain changes at the level of intoxication or impairment.  The rewards that Facebook produces are naturalistic, i.e. social, not chemical.

Do you see that?

Page 432

A.   I do and I -- I don't agree with it as stated.

Q.   Then she says:  There is no evidence of dopamine system abnormalities related to Facebook use.

Do you agree with that statement, or do you know whether that's true?

MS. COUCH:  Objection; vague.

A.   I -- I don't know if that's true, but I -- I -- I don't think what -- there's -- there's an adage in science that says absence of evidence is not evidence of absence.  And I don't know that, as I mentioned before, that people have actually studied the amount of dopamine that is released.  But it's interesting that she says that Facebook does likely activate dopamine.

Q.   And then she -- I just want know if you agree that there's no evidence of dopamine system abnormalities related to Facebook use.

Are you aware of any evidence of

Page 433

dopamine system abnormalities related to any social media use?

MS. COUCH:  Asked and answered.

A.   I'm not aware of studies that looked at dopamine release.  As I said, I don't know how those could be done in humans exogenously.

Q.   At the end of that after that sentence you read she says:  The degree of dopamine released from behaviors is not as extreme as from substances.

Do you know whether that's true or not?

A.   To be honest with you, the same reason I said I don't know the first means I don't know how she got that 'cause I don't know if studies that have looked at the amount of dopamine -- that have quantified dopamine release.  So for the same reason I don't know that the first is true, I don't know that her -- her second assertion is true, and I -- I don't know how she said that.

Q.   Let me ask you a question.

109 (Pages 430 - 433)

CONFIDENTIAL

Page 434

If we were going to be concerned about technology versus content, what would you say we should fear more, technology or content?

MS. COUCH: Objection; vague; incomplete.

A. I think that the -- the two are in -- in the case of social media, the two are completely correlated. There is no content devoid of the algorithms and the features of social media. The -- it -- it's not content, it's an experience, and that's a fundamentally different relationship.

Q. Is content involved in that experience?

MS. COUCH: Objection; vague.

A. The -- the -- the -- the -- the physical act of reading a magazine which is -- is fundamentally and structurally different from being on social media in very profound ways.

Q. I don't think you answered my question.

Page 435

You said in your last answer when you were talking about social media that it's experience, and all I asked was is content involved in that experience.

A. Yes, content is involved, but it doesn't exist without the features.

Q. Do you agree with me that content is the most important thing; it's really what drives most of the effects?

A. I absolutely --

MS. COUCH: Objection; misstates his testimony; vague.

A. I absolutely do not agree with that. I think that's the opposite of what I was saying.

MR. SCHMIDT: Okay. Let's play the clip that we've got marked as tab 34.

And if we could pull up the image without pressing play just for a sec?

(Christakis Exhibit 34, video clip, was marked for identification, as of this date.)

Page 436

MS. COUCH: Do you have a copy of this?

MR. SCHMIDT: I don't have a copy.

Do we have a copy?

MR. BANKS: Of the transcript?

MR. SCHMIDT: Yeah.

MR. BANKS: There is not one for this.

MR. SCHMIDT: There's not a transcript for this.

MS. COUCH: Okay.

Do you have a link that you could send us to this clip if you're marking it as an exhibit?

MR. SCHMIDT: Sure. Yeah, we can do that.

MS. COUCH: Could you -- do you mind sending it to Nelson now?

BY MR. SCHMIDT:

Q. All right.

Do you see this image of yourself that we pulled down from the website?

Page 437

A. I do. And I'm wondering -- I'm trying to date myself from that. I -- I think that was -- I haven't worn that jacket for twelve years. I don't know when that's from.

Yes, I recognize myself, but it's been a while.

Q. Okay. My understanding is this is from April 2016, if that helps you.

MS. COUCH: Objection; lacks foundation.

MR. SCHMIDT: Okay. I'll withdraw it.

A. I don't know if that's --

MR. SCHMIDT: Could we play the first portion of the clip?

(Video played.)

MS. COUCH: Objection; lacks foundation and incomplete.

MR. SCHMIDT: Do you have the preceding question where he states the question? I thought we had the question.

THE WITNESS: Can I ask the

110 (Pages 434 - 437)

CONFIDENTIAL

Page 438

context of this? 'Cause I've given so many talks.

If I'm not mistaken, this was a talk on early childhood media use. Can you -- can you put that -- can you tell me when this is from or what --

MR. SCHMIDT: I told you when it was from and your lawyer objected.

MS. COUCH: No, he wasn't asked.

THE WITNESS: I want to know what the subject is.

MR. SCHMIDT: Okay. If we go back a little bit in the -- let's go to the start of the clip. Is this the earliest point we have?

EXHIBIT TECHNICIAN: Yeah.

MR. SCHMIDT: And is this straight from the internet, or is this what we pulled?

EXHIBIT TECHNICIAN: This is what you asked me.

MR. SCHMIDT: We'll send you the thing from the internet.

MS. COUCH: Please.

Page 439

BY MR. SCHMIDT:

Q. Do you see where --

MR. SCHMIDT: Can you pull up the question?

Q. Do you see where it says this is a talk at a hospital, Our Lady of the Lake Hospital?

A. Yeah.

Q. And the question is: Should we fear technology?

(Video played.)

MR. SCHMIDT: Can you stop that? Can you go back to that question on the screen?

BY MR. SCHMIDT:

Q. Yeah. Do you see where the question is posed: Should we fear technology or content?

A. I do see that.

Q. Okay.

A. And I would like to say, again, I -- two things.

First, this was nine years ago.

Second, if I'm not mistaken,

Page 440

this was a talk about preschool children or infants, young children, very young children, and media usage, which is a totally different question than what we're addressing here.

Q. Do you see where you say should we -- where the question asks: Should we fear technology or content?

MS. COUCH: And I'm just going to place an objection to lack of foundation, incomplete, and we have not been provided a copy of this, per procedure. I haven't --

MR. SCHMIDT: Per procedure? There's no procedure.

MS. COUCH: There is a procedure that if you put something into evidence, you provide a copy.

MR. SCHMIDT: That's not how your side has been operating, but we're going to get you a copy of the link.

BY MR. SCHMIDT:

Q. Do you see where it says:

Page 441

Should we fear technology or content?

A. I see that question, but it lacks context here.

Q. Okay.

A. I don't know in what context it was being asked.

My recollection is it was being asked in the -- nine years ago with respect to preschool children.

MR. SCHMIDT: Okay. Let's play the clip one more time.

Why don't you just play from here.

(Video played.)

BY MR. SCHMIDT:

Q. Now, you said you thought that was in the context of kids and what -- what context did you think that was in?

A. I think it's in --

MS. COUCH: Same objections that I've been making.

A. If my recollection serves, and it was nine years ago, I think this was a talk on preschool children and media

111 (Pages 438 - 441)

CONFIDENTIAL

Page 442

usage.

Q.    In that context, do you stand behind that statement today, that the content is the most important thing, it's really what drives most of the effects and unfortunately most parents and most pediatricians recommend a limiting amount of time and they don't talk about the content and what children watch?

A.    The preschool --

MS. COUCH:  Objection; vague; lacks foundation; incomplete; and relevance.

A.    So it -- in the context of preschool children, they're not using social media sites, thankfully, and their experience is one of watching programming that parents put on.  And I still believe, yes, that content matters, but amount also matters, and I think I've been consistent in my writing on that point from then to now.  The only thing that has changed in my research around that is the advent and use of touch screens in very young

Page 443

children.

Q.    Do you stand behind that statement today?

MS. COUCH:  Same objections.

BY MR. SCHMIDT:

Q.    With the context that you gave us?

MS. COUCH:  Same objections; vague.

A.    I -- I'm not going to speak more about this until I know precisely what it is.  But if it's in the context of preschool children, which is what I believe it to be, no, because as I mentioned, when I did this, it was pre my research on interactive media and apps, yes.

MR. SCHMIDT:  I'm going to give you a document marked Exhibit 35, please.

(Christakis Exhibit 35, JAMA Viewpoint June 18, 2019, was marked for identification, as of this date.)

Page 444

BY MR. SCHMIDT:

Q.    Do you recognize this as a publication of yours from 2019 in JAMA?

A.    I do.

Q.    And this is a publication regarding digital addiction in children?

A.    Yes.

Q.    And this is -- you're the sole author of this publication, right?

A.    That's correct.

Q.    Let's look on the right-hand side.  You -- and -- and I'm looking at the end of the paragraph that begins "Except."

Do you see that paragraph?

A.    Yes.

Q.    You say:  Media usage as a predictor variable belies the reality that content drives any observed effects.

Do you see that statement you make in the context of this Viewpoint paper on digital addiction?

MS. COUCH:  Objection; vague and misstates the title.

Page 445

A.    Yes, I see that statement.

Q.    Do you agree with that statement, that the reality is that content drives any observed --

A.    No, I don't agree with that statement anymore, but even in that context, again, it's -- it's -- it's the -- it's the experience and the content is important, but it's the content as part of the total experience and how it's delivered.

MS. COUCH:  And I would just note I have the same objections.

And, Dimitri, just give me a second to get them in the record.

THE WITNESS:  Okay.

BY MR. SCHMIDT:

Q.    You go on to describe:  It is not as simple as time spent on a device or activity, but rather how that time is spent that matters.

Do you still stand behind that statement?

MS. COUCH:  Objection; vague.

112 (Pages 442 - 445)

CONFIDENTIAL

Page 446

A. Yes, I think that's still relevant today. I don't think that's exclusively -- I still think that's a very operative important principle, yes.

Q. You then a few sentences down have a sentence that begins "Even." Tell me when you're there, "Even drawing distinctions."

A. Yes.

Q. You say: Even drawing distinctions between social media versus passive viewing or gaming is inadequate. For example, one hour of social media usage could be spent in an online support group.

Do you see that?

A. I do.

Q. Do you stand behind that statement?

MS. COUCH: Objection; vague; incomplete.

A. Yes, I stand behind that. I view that as evidence that there are situations and structures where social

Page 447

media could be positive, but an online support group for LGBTQ youth is very different than most of the experiences that people have on social media today.

MR. SCHMIDT: Move to strike everything after "yes, I stand behind that."

MS. COUCH: Oppose.

A. May I add that the point of this viewpoint was to try to get social media companies to cooperate with independent researchers so that we could do the kinds of studies that social media companies were able to do for themselves?

MR. SCHMIDT: Move to strike as nonresponsive.

No question pending.

BY MR. SCHMIDT:

Q. Are you familiar with a statute referred to as Section 230 which protects social media companies against certain types of lawsuits?

MS. COUCH: Objection; calls for legal reasoning.

Page 448

A. I -- I know of it, but I'm not a lawyer. I don't know entirely how it applies or how it's interpreted. But, yes, I'm familiar with it from -- I have a lay -- I guess more than a layperson's understanding of it because I read about it a lot, but yes.

Q. You've read about Section 230 a lot?

A. Well, I have read about it a lot because it's -- it's relevant to my work, yes.

Q. Okay.

A. But I wouldn't consider myself an expert on it.

Q. But you do consider Section 230 relevant to your work?

MS. COUCH: Objection; vague; misstates his testimony.

A. I know what Section 230 says and I know that it's been used to -- to try and insulate social media companies from harm, but it's really outside of my -- from harm that they cause, but it's

Page 449

outside of my expertise.

Q. I'm just picking up what you said a moment ago.

You said, "It's relevant to my work."

Is Section 230 relevant to your work?

MS. COUCH: Objection; misstates his testimony.

A. It's relevant to my research, is what I should have said.

Q. Okay.

A. Yes.

Q. And you've actually talked publicly about Section 230, correct?

A. I probably have, yes.

Q. All right. I want to play you a clip of that. And this I do have a transcript of.

MR. BANKS: It's tab 18.

MR. SCHMIDT: It's actually the one I already gave you. It's -- do you know what the exhibit number that is?

CONFIDENTIAL

Page 450

MR. BANKS:  Exhibit 21.

MR. SCHMIDT:  Exhibit 21 in your stack, if you want.

But let's play the clip.

(Video played.)

MR. SCHMIDT:  No, that's not correct.

Can you play the clip before this?

MR. BANKS:  This is the clip.

MR. SCHMIDT:  All right.  Let's play this clip then.

EXHIBIT TECHNICIAN:  This is a very short one.

(Video played.)

MR. SCHMIDT:  Play this from the start.

Here's what I'm looking for, these two clips here.

(Pause.)

(Video played.)

MR. SCHMIDT:  No.

(Pause.)

MR. SCHMIDT:  What do you --

Page 451

while we're looking for that, do you have Exhibit 18 in front of you?

Let me see if I can find it for you.  That's not the right number.

What was tab 18 marked?

MR. BANKS:  Exhibit 21?

MR. SCHMIDT:  Exhibit 21.

Do you know where it is in the exhibit?

Let me give you that and I'll just show it to you on the page as soon as I find it.

Could we go off the record for just one second?

THE VIDEOGRAPHER:  The time right now is 5:01 p.m., and we're off the record.

(Recess taken.)

Page 452

- - -

E V E N I N G   S E S S I O N

- - -

THE VIDEOGRAPHER:  The time right now is 5:14 p.m., and we're back on the record.

BY MR. SCHMIDT:

Q.   All right.  Do you have Exhibit 21 in front of you, this transcript of a podcast you gave just a few months ago?

A.   I do.

Q.   And go to the end of it, if you would.

A.   The very end?

Q.   Yes, please.  The last text, yeah.

I think there's a page before that.

A.   Okay.

Q.   And skip ahead a few pages from that to one that begins with the question that includes "The areas of public health."

Page 453

A.   Okay.

Q.   All right.

And if you look down at your answer, and you can read the whole answer if you want, I'm going to ask you about some language that you use in the middle of that answer where one, two, three, four, five, six, seven, eight, nine lines down you refer to Section 230, what we were talking about right before the break.

Do you see that?

A.   Yes, I do.

Q.   You say:  There's the Section 230 that's given them kind of blanket immunity to date.

Do you see that?

A.   I do.

Q.   Do you recall making the statement on this podcast?

A.   I do.

This is a podcast run by an ad -- someone who's done advocacy in the space of food, and the other person on there is the executive director of

114 (Pages 450 - 453)

CONFIDENTIAL

Page 454

Children and Screens, who's also an advocate.

And, yes, I recall making this statement.

Q.   But are you an advocate?

A.   No.

Q.   Okay.

When it says -- when you say -- when you said on this podcast there's this Section 230 that's given them kind of blanket immunity, what's your understanding of the immunity that Section 230 gives?

MS. COUCH:  Objection; calls for legal reasoning.

BY MR. SCHMIDT:

Q.   As you discussed it on this podcast just a few months ago.

A.   I --

MS. COUCH:  Same objection.

A.   I am not an expert at all on 230.  It's not represented in my report in any place.  It's really outside of the scope of my testimony here as an expert.

Page 455

So I -- I have nothing really to say about it except what I, as I said before, as a layperson, I read in The Times that cases have been -- the Supreme Court, for example, I know ruled on a case about it. I don't really have any professional or expert opinion on it whatsoever.

Q.   Okay.

When you spoke about it, what was your understanding of the blanket immunity it gave?

A.   Honestly, I shouldn't be using that terminology, certainly not in this context, because I don't really know what blanket immunity means.

Q.   Okay.  Let's go a couple pages ahead and there's one where there's a question that says:  All right.  So again for our listeners.

I think it's before that.  One that looks like that (indicating).  It's a couple before that.

A.   You're going backwards, not forward.

Page 456

Q.   Yes, earlier in the document.

A.   Earlier in the document, yes.

Q.   Okay.

And the answer below that you again reference Section 230 which was added to the Communications Decency Act in 1996.

Do you see that?

A.   I see that.  It's in response to the question of -- as again both the people on the podcast are legislative advocates and they were asking about what role the courts play, what --

Q.   Right.

A.   Yes.

Q.   And you answered that question, right?

A.   I answered it not as an expert. I answered it as a layperson who was -- yes.

Q.   And you said Section 230 was, quote, carrying over to the next page: Put in place essentially to provide protections for internet companies and it

Page 457

basically said they should be treated like bookstores and not publishers, that they weren't responsible for the content, they were just conveying it.

Is that your understanding of Section 230?

MS. COUCH:  Objection; misleading; incomplete.

BY MR. SCHMIDT:

Q.   Were you stating what you believed to be true when you said that understanding of Section 230?

MS. COUCH:  Same objections and calls for legal reasoning.

A.   I was not -- I was not testifying.  I was not speaking as an expert.  That is my perfunctory understanding of, yes, I suppose that's correct.

I don't really understand how 230 works, certainly not in any detail in a court case.

Q.   All right.

So, you referred in the earlier

115 (Pages 454 - 457)

CONFIDENTIAL

Page 458

answer we looked at to Section 230 giving some kind of blanket immunity, correct?

A. And as I said, I don't really know what that means. But, yes, I did say that.

Q. Well, what did you mean when you said it?

MS. COUCH: Objection; asked and answered.

A. There are contexts in which I speak as an expert and I know what I mean and what I'm saying, and there are contexts when I speak as a guest on a podcast and, you know, I -- I -- I -- I don't know precisely what I meant when I said blanket immunity.

Q. Then on this page we're looking at you talk about Section 230 being put in place to provide protections for internet companies, right?

A. That's my understanding from what I've read in the newspaper reports of it, yes.

Q. I mean, you actually cite court

Page 459

cases, don't you?

MS. COUCH: Objection; misstates the document.

A. Where do I cite court cases?

Q. In the next page. In the next paragraph, sorry.

MS. COUCH: Same objection.

BY MR. SCHMIDT:

Q. That's a court case you're citing, the Backpage case.

Did you know you were citing a specific court case, or did you just make that up?

A. I didn't make it up, but I don't know which specific court -- again, this is what I read in the newspaper.

Q. Okay.

A. I didn't know it was a specific court case. Actually, I thought that was --

Q. And you're --

A. I don't know that was a court case. I thought that was an amend -- I don't -- I didn't know that.

Page 460

Q. It was an amendment based on that court case which you did know about, right?

A. I didn't know it was a court case.

Q. You knew about the amendment to the statute?

A. I believe -- I don't remember. I think -- I thought it was an amendment to the statute, correct, but I didn't know it was a court case.

Q. Yeah, it was in response to a court case.

A. Okay.

Q. If you look at the top of the page where you say: Section 230 was essentially put in place to provide protections for Internet companies.

You understand those -- as you understand those protections is that they aren't responsible for content, correct?

MS. COUCH: Objection; misstates the document; calls for legal reasoning; outside the scope.

Page 461

A. I -- I don't -- I don't, sort of, feel like this is relevant to my testimony here what I said about 230 'cause it's not my area of expertise and it's not what I'm testifying about. I'm not an expert on it. So, whatever I say or whatever my understanding is doesn't seem to be relevant to my testimony.

Q. Okay. We have a judge who decides that. You don't decide that. I don't decide that.

So I think it's relevant. You don't. Let me ask you to answer my question, please.

A. But I believe I'm here to testify as an expert, and I'm not an expert on this. So I don't feel like there's any reason for me to give my opinion on it.

MS. COUCH: Objection.

BY MR. SCHMIDT:

Q. Are you refusing to answer my question?

MS. COUCH: I would say this is

116 (Pages 458 - 461)

CONFIDENTIAL

Page 462

getting to be harassing. It is outside the scope.

If you feel you need to ask Dimitri Christakis, based on the disclosed report, questions about what he knows about 230, we can call Judge Kuhl and see if she agrees.

MR. SCHMIDT: Well, you're welcome to call Judge Kuhl any time you like, but I'll ask the question.

MS. COUCH: Then I will say this is leading to harassment. The witness has already said that.

BY MR. SCHMIDT:

Q.   Do you have an understanding that Section 230 was put in place to provide protections for internet companies?

A.   I -- I don't feel like this is relevant to my testimony or my expertise. It's -- I'm -- I'm -- I'm not -- I'm not an expert on it. I mean, I don't know what to say. Like, I don't see the -- I mean, what can I say?

Page 463

MS. COUCH: I'm going to mark this --

BY MR. SCHMIDT:

Q.   You can answer my question.

MS. COUCH: Let me finish.

I'm going to mark that question, and if you ask another question about 230, we will call Judge Kuhl.

MR. SCHMIDT: I'm going to ask the same question.

MS. COUCH: Then we are going to call Judge Kuhl.

BY MR. SCHMIDT:

Q.   Do you have an understanding that Section 230 was put in place essentially to provide protections for Internet companies?

MS. COUCH: Do not --

BY MR. SCHMIDT:

Q.   Do you have an understanding?

MS. COUCH: Do not answer that. We are going to call Judge Kuhl on this question.

MR. SCHMIDT: Okay. Why don't

Page 464

we ask the witness to leave the room while we do that.

MS. COUCH: You may leave the room, Dimitri.

(Witness exits the deposition room.)

(Pause.)

MR. SCHMIDT: Let's go off the record.

THE VIDEOGRAPHER: The time right now is 5:23 p.m., and we are off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time right now is 5:33 p.m., and we're back on the record.

MR. SCHMIDT: I will note we went off the record on a dispute over whether we should call the judge over this line of questioning regarding this podcast statement and the comments about Section 230. I think we have resolved it, but, Ms. Couch, please tell me if I get this wrong,

Page 465

where I'm going to ask the witness if he made certain statements and then move on. We will reserve all arguments as to why this is relevant. You will reserve all your arguments as to why it's not proper or admissible or whatever framing is appropriate, and that's it.

MS. COUCH: Yes, I believe that is our agreement. You will ask questions. He will confirm.

And to your point, just so that it's clear on record, we reserve all arguments available to us.

MR. SCHMIDT: And would you like a running objection on that basis?

MS. COUCH: I -- I would. I presume it's not going to be multiple questions, or maybe. But yes.

MR. SCHMIDT: It is going to be multiple questions, but they're going to be short and then I'll move on. It's just the reading the material.

CONFIDENTIAL

Page 466

BY MR. SCHMIDT:

Q. All right.

So, do you have in front of you Exhibit 21?

A. Yes.

Q. All right. And I have put it to a page where I've marked text that carries over to the next page.

Do you see that?

A. I do.

Q. Do you mind just reading that quote to me, subject to counsel's objections?

MS. COUCH: Really quick, can you just tell me where it is?

MR. SCHMIDT: I'm sorry. Why don't I give this to you? You should have -- absolutely be able to look at that. I marked his exhibit if you want to just track it to yours.

Why don't we go off the record quickly while you do that?

THE VIDEOGRAPHER: The time right now -- the time right now is

Page 467

5:34 p.m., and we're off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time right now is 5:36 p.m., and we're back on the record.

BY MR. SCHMIDT:

Q. Do you mind reading the first bit of language I've marked out in Exhibit 21?

A. There's been an enormous loophole, unfortunately, created by Congress when they added the Section 230 to the Communications Decency Act in 1996, and that was put in place essentially to provide protections for Internet companies, and it basically said that they should be treated like bookstores and not publishers, that they weren't responsible for content, that they were just conveying it.

Q. Did you say those words on April 9th, 2025?

A. Yes.

Q. Look further down the page, and

Page 468

would you mind reading me that quote?

A. (Reading) The only exception that's been made of it to date was around sex trafficking on Backpage, if anyone remembers that. But other than that, the social media sites and internet sites in general have been able to say that they're not liable for anything that's done, and I think that was a huge mistake that was made. It needs to be rectified. It's being challenged in the courts presently. My only belief is that and I'm not speaking --

Q. Thank you.

A. -- as a lawyer.

Q. I think you passed the language I asked you to read.

Were those your words on -- were those your views on April 9th, 2025?

A. Yes. Those are my words.

Q. Okay.

Let's go two pages ahead. Can you read the quote there?

A. (Reading) I mean, I think the

Page 469

failure of our legislative branch to enact policy leaves us with very few options at this point anyway except to try to pursue it through the judiciary.

Q. Were those your words on April 9th, 2025?

A. Those were my words.

Q. And do you mind reading the last quote?

A. (Reading) But there are many, many very large pending cases in several jurisdictions brought by individuals, brought by school districts, brought by states, and those at least provisionally have gotten further than prior cases have which have been thrown out because of Section 230. So we'll see what happens with that litigation, but right now my guess is that the best chance we have -- it's the best chance we have to set some guardrails.

Q. Were those your words on April 9th, 2025?

A. Those were my words.

118 (Pages 466 - 469)

CONFIDENTIAL

Page 470

Q.   Okay.
When you speak -- you can put that to the side.
When you speak publicly, do you do your best to be truthful?
MS. COUCH:  Objection; vague.
A.   I have nothing -- I don't know what I was saying then.  I don't recall --
Q.   I'm asking generally.
MS. COUCH:  Objection; vague; broad.
BY MR. SCHMIDT:
Q.   Generally when you speak publicly, do you do your best to be truthful?
MS. COUCH:  Same objection.
BY MR. SCHMIDT:
Q.   And the reason I'm asking about this is we agreed I wasn't going to get into more detail on it to avoid a dispute.
Generally when you speak publicly, do you do your best to be truthful?
MS. COUCH:  Same objections.

Page 471

A.   But -- I try to be truthful, but I often misstate things.
Q.   Okay.  Let's look at --
(Audio interruption.)
MR. SCHMIDT:  I don't know who's on audio talking.
BY MR. SCHMIDT:
Q.   Let's look at your report at Exhibit 2.
I'm sorry.
Yeah, 2, the marked report, and let us look at page 103, please.
Do you see this is a section of your report that you have entitled:  Design features of social media that drive usage and addictive behavior.
Do you see that?
A.   I do.
Q.   Am I correct that you have no training in software engineering or coding?
A.   I have no training in software engineering or coding.
Q.   You've never worked at a social

Page 472

media company?
A.   I have never worked at a social media company.
Q.   You've never worked at a tech company of any sort?
A.   I have never worked at a tech company.
Q.   You've never designed a feature for a social media platform?
A.   I have never designed a -- a -- a -- yes, a feature for a social media platform.
Q.   Would you be able to do that?
A.   The engineering part of it?
Q.   Yeah.
A.   No.  The -- the -- the conceptually outlining what a feature might look like, yes.
Q.   Do you have the expertise to be able to tell whether given features are feasible technologically or logistically?
MS. COUCH:  Objection; compound.
A.   I don't have that technical expertise, but I don't believe that

Page 473

anything I would conceptualize would be impossible to engineer.
Q.   All right.  Let's look at exhibit -- let's stay with your report, if you would, and let's look at page 109 where you reference auto-play.
A.   Yes.
Q.   Do you know that in a app like Instagram there are different service -- surfaces?
A.   I don't know what you mean by "surfaces."
Q.   Well, did you see reference to "surfaces" in the testimony that you reviewed.
A.   You mean like different versions of it, yes.
Q.   No, I mean different areas in the app that you can look at.
A.   Yes.  Yes.
Q.   Do you recognize one of them as called Reels?
A.   Yes, I do.
Q.   Do you know if one of them is

119 (Pages 470 - 473)

CONFIDENTIAL

Page 474

called My Story?

A. Yes.

Q. Do you know if one of them is just someone's personalized feed?

A. Yes.

Q. Are those all different surfaces within Instagram?

A. They function -- I -- I -- I don't -- I mean, they're -- they're different -- I suppose they're -- they are different from each other, yes.

Q. Okay.

Do you know if there is a Message feature in all four of -- all five, I'm sorry, of the social media apps at issue here?

A. If there's Message feature in all of the social media -- all of the platforms that we're discussing here is there a messaging app?

Q. Yes.

A. A messaging feature, I believe there is, yes.

Q. Does YouTube have one?

Page 475

A. I believe that you can post messages on people's channels, yes.

Q. Does Snapchat, TikTok, Instagram, and Facebook have messaging features?

A. As I understand messaging, I believe they do, yes.

Q. Is the Instagram messaging feature addictive, in your view?

MS. COUCH: Objection; vague; incomplete.

A. I -- I don't have an opinion on that.

Q. Okay.

If I look at auto-play as an example of a feature that you have flagged here, do you know if there is auto-play on Instagram Reels?

A. I -- I -- I believe there is, yes.

Q. Do you know if it's the same as auto-play on -- is there auto-play on TikTok and Snapchat?

A. I don't know if there's

Page 476

auto-play on Snapchat. I believe there's auto-play on -- on TikTok.

Q. Is there auto-play on Netflix?

A. I don't know. I don't have a -- I don't have an opinion on that.

Q. Do you know if the auto-play on Instagram works the same way as the auto-play on Netflix or on TikTok?

A. It's outside of the area of my expertise.

Q. For example, do you know if to see additional content on -- well, let me ask you this.

Do you know if when you watch Netflix at the end of a show, it will automatically queue up another show that will play without you doing anything?

A. No, I don't know if it does that or not.

Q. If it does that, is that auto-play?

MS. COUCH: Hypothetical.

A. I don't have an opinion on that.

Q. Okay.

Page 477

A. It's not auto-play the way I view these.

Q. Well, how due use auto-play?

A. I don't use auto-play.

Q. Well, you've got it in your report.

What do you understand it to mean? How does it -- how does the auto-play you're talking about in your report work?

A. The auto-play in my report worked by automatically playing additional content, and as is detailed in my report, it is one of the primary drivers of usage.

Q. Does -- is auto-play one of the primary drivers in addiction, in your view?

A. It's an important feature of addiction. In fact, it's one of the addictive features I call out, but it's one of several.

Q. Do you know whether there is auto-play on Instagram in the way you just described it, or whether you only see

120 (Pages 474 - 477)

CONFIDENTIAL

Page 478

additional content if a user takes an action?

A. I -- I -- I -- I don't know the answer to that.

Q. Okay.

Do you see that in talking about these features you cite various documents? And I'm talking about the section in your report that begins on page 103 talking about design features of social media that you believe drive usage and addictive behavior.

Yeah, if you flip through that report, you see that as you talk about the individual features, you cite various documents and studies.

A. Yes.

Q. And the one document that you cite more than anything is the handbook, correct?

A. Well, the handbook is a compendium of many different papers. It has, I think, 80 different papers in it, but, yes, so.

Page 479

Q. Are you aware that when you cited the handbook and then you cite studies, like let's look at 160.

MS. COUCH: Page 160?

MR. SCHMIDT: Footnote 160 on page 105.

BY MR. SCHMIDT:

Q. Do you see you've got a citation in the handbook and then two citations to the same Sherman study?

A. Yes, I see that.

Q. All right.

Are you aware that when you cite the handbook, all the handbook cites is the Sherman study?

A. You're saying every citation to the handbook is the Sherman study?

Q. No, I'm not.

Are you aware that in 160 --

A. Yes.

Q. -- you cite the handbook and the Sherman study?

Do you see that?

A. Yes.

Page 480

Q. Are you aware that the only citation in the handbook on this point is to the Sherman study?

A. I -- I'm -- I'm missing what you -- are you saying that these are the same citation?

Q. No. I'm saying that the handbook does nothing other than cite to Sherman itself. It cites no other authority for this proposition other than Sherman.

MS. COUCH: Objection; misleading.

A. I'm not -- I don't --

Q. Let's take a look.

I'm sorry, I stepped on your answer. I didn't mean to do that.

Do you not know whether what I'm saying is true or do you not --

A. I don't know whether what you're saying is true. I just --

MR. SCHMIDT: Can I get a sticker?

MR. BANKS: It's on there.

Page 481

MR. SCHMIDT: May I have my copy and copies for them?

MR. BANKS: We didn't do full copies. We did excerpts.

MR. SCHMIDT: Let's just mark excerpts.

MR. BANKS: We don't have excerpts for this one.

MR. SCHMIDT: Okay.

BY MR. SCHMIDT:

Q. Let's look at the Sherman study itself.

And before we do, do you see the text that supports the Sherman study is stating: Scientists have found that receiving likes on social media platforms are very similar to the re -- I'm sorry, I'm reading the wrong language.

No, I am reading the right language.

Do you see whether the -- where the text that says: Scientists have found that receiving likes on social media platforms are very similar to the rewards

CONFIDENTIAL

Page 482

that researchers have associated with addiction research for decades.

Do you see that language?

A. I do.

Q. And that's what cites the handbook. That's what cites Sherman.

Do you see that?

A. I do.

MR. SCHMIDT: And I will go ahead and mark the handbook as Exhibit 36.

I don't have a copy. If you want I'll get you a copy.

So if you want your lawyer to see it first, please pass it to her.

Or if you want to look over his shoulder, I'm going to be pretty quick with it.

MS. COUCH: Just one second. Can you -- you don't have to wait to give me a copy, but could you get me a copy that can arrive?

MR. SCHMIDT: Yeah. Thank you.

MR. BANKS: Do you want it

Page 483

printed?

MS. COUCH: A printed would be lovely. Thank you.

(Christakis Exhibit 36, Handbook of Children and Screens, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. Do you see you cite in the handbook, you cite pdf page 59 and 123, that corresponds to page 23 of that document?

(Pause.)

A. At pdf page 59, 153.

Q. It's because we've given you a printed copy of this different than the pdf.

A. Okay.

Q. Look with me, if you would, at page 23 of the handbook.

A. Okay.

Q. Do you see where the footnote marker is for footnote 17?

A. Yes.

Q. And do you see it says: For

Page 484

example, one study showed that receiving likes on Instagram activates the gratification system to the same extent as receiving money?

A. Yes.

Q. And then the source for that on page 28 is the Sherman study?

A. Is the Sherman study, yes.

Q. And that's the same proposition you're making in your report, right?

A. Yes.

Q. Okay.

And then if you look at page 123 of the handbook.

MS. COUCH: On hard copy 123.

BY MR. SCHMIDT:

Q. And see if you can find the footnote marker for footnote 23 on page 123.

A. Yes. Yes, I see, yes.

Q. And that text says: Functional MRI research suggests heightened neural activity and reward processing regions when viewing one's own post with a higher

Page 485

number of likes.

Do you see that language?

A. I do.

Q. And that's consistent with what you're talking about in your report?

A. It is. And it cites the -- the Sherman study as well.

Q. Okay. Thank you.

I'll come back to that concept. Let's take a look at the Sherman study, please.

(Christakis Exhibit 37, Sherman study, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. This is Exhibit 37.

This study says nothing about addiction, correct?

MS. COUCH: Objection; vague; misleading.

A. This study is about the -- I mean, for me -- do you want me to read the whole thing before I tell you if it never says anything about addiction? I mean,

122 (Pages 482 - 485)

CONFIDENTIAL

Page 486

I've read this, but it's been a while and it's ten pages.

Q. Are you aware of this study talking about addiction?

A. It --

MS. COUCH: Objection; vague; misleading; lacks foundation.

A. It's talking specifically about the dopamine reward pathway, which is -- and that's why I'm curious if they never mention addiction because it's the -- it's the nucleus accumbens and the dopamine reward pathway activity that they're measuring, which is the underlying pathway that creates addiction, so.

Q. All right.

My question is do you believe this study comes to a conclusion that that dopamine pathway means addiction can occur with social media?

MS. COUCH: Same objections; asked and answered.

A. I think the point is that it's activating the dopamine reward pathway

Page 487

which is part of the addiction pathway, yes.

But I -- again, I have to read the whole study again to see if you want me to say whether or not they definitively comment on addiction or not.

Q. Okay. I don't want to waste our time doing that. So let me go to the next document.

Look with me at page 105 to 106 in your report, which is also in the "Like" section. And do you see that you've got some text associated with footnote 161 where you talk about -- where you say: While seemingly innocuous, users' quests for these publicly visible rewards has been linked to a number of secondary harms, such as reduced sleep deficiency and duration due to routine checking in the night.

Do you see that?

A. I do.

Q. And you cite your handbook and you cite Rod for that proposition.

Page 488

Do you see that?

A. I do.

Q. And I'll represent to you that your handbook itself just cites Rod.

So let me give you the Rod study as Exhibit 38.

(Christakis Exhibit 38, Rod study, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. Do you recognize this as the Rod study that you and your handbook cite to support this claim that users' quest for publicly visible rewards has been linked to a number of secondary harms, such as reduced sleep efficiency and duration due to routine checking behaviors during the night?

A. Yes.

Q. Let's take a look at what this study looked at.

Do you consider this study to be reliable?

A. Yes.

Page 489

Q. Do you consider the data in it to be reliable?

A. Yes, I do.

Q. All right.

If we look at page 3 of this study, the heading: Smartphone activity during the sleep period.

Do you see that heading?

A. I do.

Q. Are you aware that this study looked at all smartphone use, not just social media use?

A. Yes, I believe that's the case.

Q. Let's go to page 5 of the study.

If you look under the figure there, there's a sentence halfway down that carryover paragraph that begins with the word "Interestingly."

Tell me if you see that.

A. Yes.

Q. Halfway down the paragraph below the figure. It says: Interestingly, the majority of these activities.

And these are activities during

123 (Pages 486 - 489)

CONFIDENTIAL

Page 490

the sleep period, right?

A.    Yes.

Q.    (Reading) The majority of activities during the sleep period were due to outgoing text messages (76.5 percent), while calls (21.7 percent) and "likes" or status updates on Facebook (1.8 percent) were much less prevalent.

Do you see that?

A.    (Witness reads document.)

Yes.

Q.    Okay.

So, according to this -- you cite this study in your report for the proposition that social media users' use of likes has been linked to secondary harms such as reduced sleep efficiency and duration, correct?

A.    It's not the only citation that supports the fact that social media interrupts sleep. It's -- it's one such study.

Q.    Okay.

And this study actually involves

Page 491

less than 2 percent social media use, 1.8 percent, correct, among the different nighttime activities measured with a smartphone?

A.    It -- it's -- it's not the -- the -- the -- the unit of analysis of activities isn't necessarily the one that is most dominant. It could very well -- I mean, if you want my opinion, it could very well be that the social media sites are what get people awake, get them agitated, and then they text and call.

Q.    Okay.

A.    Can't discern that from this.

MR. SCHMIDT:  I'll move to strike that as nonresponsive.

Actually, I won't.

BY MR. SCHMIDT:

Q.    If you go back to my question, am I right that this study involves less than 2 percent social media use among the nighttime activities with a smartphone?

MS. COUCH:  Objection; misstates the study.

Page 492

A.    Two percent of the activities. That's not two -- I'm not sure you're interpreting -- in fact, I would say you're not interpreting it correctly.

Q.    Well, what -- what do they mean when they say 1.8 percent of the prevalence was "likes" or status updates?

A.    It misinterprets -- it misrepresents the effect that each of those activities might have. It's purely a count. It's not reflection of -- of -- of the effects it has on a individual's arousal.

Q.    When these authors say that 1.8 percent of the nighttime activity was checking "likes" or status updates on Facebook as opposed to 76.5 percent being outgoing text messages and 21.7 percent being calls, you question that data?

A.    No. I'm saying that the level of arousal that's adduced by getting a "like" on Facebook is -- can't be compared to the level of arousal someone experiences from sending a text message.

Page 493

It's apples to oranges.

MR. SCHMIDT:  Okay. And I'll move to strike that as nonresponsive, everything after the "no."

BY MR. SCHMIDT:

Q.    Do you think they're misrepresenting their data by presenting it in this way?

A.    I think --

MS. COUCH:  Objection.

A.    -- you're misrepresenting their data.

Q.    I think you're misrepresenting data, but the deposition's not going to be productive if we kind of make accusations like that. So let me ask to you keep it to, kind of, my questions.

My question is do you think they're misrepresenting data when they report that only 1.8 percent of the nighttime activity was "likes" or status updates on Facebook?

MS. COUCH:  Objection; argumentative.

CONFIDENTIAL

Page 494

And you can give your answer, Dimitri.

A.   I think that the -- it -- that looking at the -- let me take another second.

(Witness reads document.)

I -- I guess I -- you know, in reading this now, I am struck by the fact that this is not representative of most people's social media use, and I'm seeing that the authors acknowledge that it's not a very representative sample.

Q.   Well, this is what you cited for this claim in your report.

Do you withdraw your reliance on this study?

A.   I --

MS. COUCH:  Objection; misstates his report.

A.   This reliance -- this -- this citation is one of many citations that support the idea that -- that social media sites interrupt sleep.

Q.   According to this study -- do --

Page 495

do you know whether the 1.8 percent refers to time or actual occasions of checking?

A.   That's the point I was trying to make before.  It's not easy to compare those two.  I'm not really exactly sure why they use that unit of analysis.

But, so, no, I don't know.

Q.   Okay.

In your report, if you look at page 105 of your report, you make this statement:  Users' quests for these publicly visible rewards has been linked to a number of secondary harms.

Do you see that language where you refer to a number of secondary harms?

A.   I do.

Q.   And you say:  Such as sleep -- reduced sleep efficiency and duration due to routine checking behaviors during the night.

Do you see that?

A.   I do.

Q.   And that's where you cite the Rod study that we've been discussing that

Page 496

we've marked as Exhibit 38, right?

A.   Mm-hm.

Q.   And that's where you cite your handbook which in turn also just cites the Rod study.

Do you see that?

A.   Mm-hm.

Q.   And then you go on your text to say that:  They have also been associated with reenforcing addictive behaviors in order to encourage users to spend more time on these platforms.  They have even been linked to increased feeling of depression, anxiety, and negative social comparison since receiving fewer "likes" is viewed as a form of negative peer feedback.

Do you see that?

A.   I do.

Q.   And did you know this study that you cited talking about sleep disruption showed no link between what they found as sleep reduction and any kind of mental health symptoms or depressive symptoms?

Page 497

MS. COUCH:  Objection; vague; misleading.

A.   Which study are you referring to now?

Q.   The same one we've been looking at, the Rod study that you cited in your report and in --

A.   I -- I didn't cite -

Q.   -- your handbook?

(Stenographer admonition on crosstalk.)

A.   I didn't cite this study saying that there were differences in mental health.

I'll point out, as I'm reading this now, that there are many other citations in my report, in -- including an experimental study that showed that reducing social media improves sleep.

Q.   Okay.

My question --

MR. SCHMIDT:  I'll move to strike that as nonresponsive.

Q.   -- is did you cite the Rod study

125 (Pages 494 - 497)

CONFIDENTIAL

Page 498

in your report and in your handbook?

A. I cite it in the report.

The handbook it was cited by the author of the chapter, not by me. But yes.

Q. Do you know that whether the Rod study you cited in your report and that is cited in your handbook found any relation between sleep disturbance and any other psychological harms?

A. I don't believe that they looked at that, but there are many other studies that have found that.

Q. Let's look at page 9, and I'm going to read the first full sentence on that page: We found no clear relation between objectively measured smartphone interrupted sleep and self-reported mental health symptoms or depressive symptoms.

Did I read that correctly?

A. You did read that correctly, but it goes on to say: This lack of association is surprising given the close

Page 499

interrelation between impaired sleep and depression observed in other studies.

Q. Okay.

And then they say: A hypothetical explanation may be that the opportunities for social interaction and support provided by the mobile phone may counteract some of the negative influences of frequent use during nighttime.

Correct?

A. Right.

Q. Okay.

Did you know before I just read that to you that the study you cite found no clear relation between objectively measured smartphone interrupted sleep and self-reported mental health symptoms or depressive symptoms? Did you know that before I read that to you?

A. I -- I have read this study, and that to me was not a salient finding for the reasons that I mention because there are many other studies that found other things, including the authors -- one the

Page 500

authors cite themselves.

Q. Okay.

And when you cited other studies to claim that there was a relationship between interrupted sleep and self-reported mental health symptoms, you did not cite this among them, correct?

A. Not that I recall, yeah.

Q. Look at the conclusions, if you would, on page 11.

Do you see where they say: We document substantial overnight smartphone activity in young adults, but it is unclear whether the smartphone is causing sleep interruption or if it is used as an entertainment device among those with sleep impairment due to other causes?

A. Yes, I think they're saying that because there was a cross-sectional study and so they can't determine which way the -- whether people were kept awake by smartphone use or they were awake and therefore using their smartphone, which is a common problem with cross-sectional

Page 501

studies looking at sleep.

Q. Okay.

Is that a common problem with cross-sectional studies looking at social media and reported psychiatric effects?

MS. COUCH: Objection; vague.

A. Again, it's about, as I've said before, cross-sectional studies in isolation. I don't view the cross-sectional studies in isolation. I view them as corroboratory and confirmatory and consistent with the totality of the evidence, and in the case of social media and sleep, there is -- there are multiple studies cited in my report, including one experimental study that -- no, two experimental studies that showed benefits to using social media in terms of sleep, at least two, two that I can think of off the top of my head.

Q. Do you recall my question, sir?

A. I recall your question, yes, but I'm trying to give a complete answer to it.

126 (Pages 498 - 501)

CONFIDENTIAL

Page 502

MR. SCHMIDT: Okay. My -- I'm going to move to strike because it wasn't responsive at all.

BY MR. SCHMIDT:

Q. My question is is it a common problem with cross-sectional studies looking at social media and reported psychiatric effects that you can't tell which direction the causality is going?

A. If you --

MS. COUCH: Objection. Oppose the motion. Asked and answered.

A. If you were -- I -- as I've said repeatedly before, cross-sectional studies play a role in establishing causality in the context of the totality of the evidence, as I've done in this report.

MR. SCHMIDT: Okay. Move to strike as totally nonresponsive.

Let's mark that answer, please.

MS. COUCH: Oppose.

BY MR. SCHMIDT:

Q. If you look -- stick with me on page 106. You -- in footnote 162 you cite

Page 503

two sources beyond the handbook, Brand and Starcevic.

Do you see that?

A. Yes.

Q. Are you aware that those are editorials?

A. I -- I -- I need to confirm that.

Q. Okay.

Do you agree that editorials are the bottom of the hierarchy of evidence?

A. Editorials are the -- yes, they are, that's correct, but they can represent the opinions of leading experts in some cases.

Q. Before we leave your handbook, you mentioned someone named Chris Perry.

Did Chris Perry have a role in your handbook?

A. No.

Q. Is Chris Perry part of the Children and Screens?

A. She's the executive director, but she's a -- not a scientist.

Page 504

Q. She's an advocate, you said?

A. She leads the advocacy part of -- of -- of Children and Screens. I don't even know if that's her official title, but she is active in that space.

Q. Would you mean just passing me your copy of Children and Screens? It's in your binder.

Am I correct that she actually wrote the foreword to your handbook?

A. Yes, she wrote the foreword to the handbook.

Q. Okay.

A. She was instrumental in getting the funding to support its creation.

Q. Do you know where that funding came from?

A. I do not. You'd have to -- I mean, I -- I could -- I do not know where the funding came from, and it came from the Children and Screens budget which is a -- it's a independent 5013(c) [sic].

(Pause.)

Q. If you look at that footnote we

Page 505

were looking at, 162, you cite a source called Starcevic.

A. I'm sorry, what page is this in the --

Q. It's in your report if you go back to Exhibit 2.

A. Yes.

Q. You cite a source called Starcevic?

A. Yes.

(Christakis Exhibit 39, Starcevic study, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. Pass you as Exhibit 39 a copy of Starcevic, and I want you to look at the conclusion with me, if you wouldn't mind, on page 11.

Do you recognize this as the Starcevic opinion he -- that you cite in your report?

A. (Witness reads document.)

Yes.

Q. Okay. Look with me, if you

127 (Pages 502 - 505)

CONFIDENTIAL

Page 506

would --

MR. SCHMIDT: Strike that.

Q. Do you know anything about Starcevic's or Aboujaoude's experience with social media research?

A. No, I don't.

Q. Do you know if this is the first time they've ever written about social media?

A. No, I don't.

Q. Okay. Let's look at page 11.

A. Yes.

Q. Do you see there's a conclusion?

A. Yes.

Q. I'm going to read to you from the conclusion if I could.

(Reading) The term internet addiction and the corresponding concepts are not adequate for several reasons. First, addiction may be a correct designation only for those individuals who meet the general criteria for addiction. The majority of people considered to be internet addicts may not have an addiction

Page 507

disorder.

Do you agree with that?

MS. COUCH: Objection; vague.

A. I -- I -- I mean, I would point out that this is talking about internet addiction and it was written in 2015, which is quite a long time ago.

Q. Do you agree with that statement?

MS. COUCH: Same objection.

A. I -- I -- the terminology for addiction I'm not sure precisely how they were referring to it in this context, again whether they were using it as a clinical diagnosis or -- which I suspect they were, but I don't know.

Q. Look with me at the second. They say: Second, there is no evidence that addiction to the internet is such, i.e. as a medium exists, although the internet as a medium may play an important role in making some behaviors addictive.

Do you agree with that statement in this opinion piece that you cited?

Page 508

MS. COUCH: Same objection.

A. I'm not -- my report is not about the internet. It's about social media and they're referring to the internet as its own entity.

Q. Well, this is a study you cited, so I just want to know -- or opinion piece that you cited. So I just want to know if you agree or disagree with that statement I just read.

MS. COUCH: Objection; vague.

A. I mean, the reason I cited this is because it talks about internet addiction being too heterogenous and that there should be greater specificity, which in my case would -- to me would include social media usage as a specific activity on the internet.

Q. Actually, that's not at all why you cite it. You cite it to say that "likes" have also been associated with reinforcing addictive behavior in order to encourage users to spend more time on those platforms.

Page 509

That's why you cite it, correct?

MS. COUCH: Objection.

A. Where is that?

Q. It's the text accompanying footnote 162 on page 106.

A. I -- I'm not sure that's the right footnote for this, honestly. And I need -- I -- I don't know what to say. That's not -- I think it's the wrong footnote.

Q. Okay.

If you find errors in your report, will you correct them?

MS. COUCH: Objection; overbroad; calls for legal reasoning.

He will do what his counsel asks or what is required by the court.

BY MR. SCHMIDT:

Q. Dr. Christakis?

A. I'll do what my counsel asks.

Q. Okay.

Do you want to correct errors in your report if you find them?

MS. COUCH: Same objection.

128 (Pages 506 - 509)

CONFIDENTIAL

Page 510

A.   I -- I don't believe that any of these small potential footnote errors that you might find include duplicative citations or new -- misnumbers in any way undermine the -- the central premise and findings of my report in any way, shape, or form. It's a 470-page document, and there may very well be some errata, but I stand by -- but I stand by my conclusions as being soundly based on my clinical experience, my own research, the existing scientific evidence, and the internal documents I reviewed, which is to say that I can't attest that the 300 or the 400 references in here in the 470 pages don't have any small mistakes in them, but I will attest that the substance of this is valid and I stand behind it.

MR. SCHMIDT:  Move to strike most of that as completely nonresponsive.

BY MR. SCHMIDT:

Q.   Are you withdrawing your reliance on the Starcevic opinion piece?

Page 511

MS. COUCH:  Objection; misstates his report.

BY MR. SCHMIDT:

Q.   That we've marked as Exhibit 39?

MS. COUCH:  And calls for legal reasoning.

BY MR. SCHMIDT:

Q.   And it's just a yes-or-no question.

MS. COUCH:  And you can give a full response if you're able to.

MR. SCHMIDT:  Object to the coaching.

A.   As I'm reading it now, I believe that -- I -- I don't withdraw the relevance of this paper, but I think that the reference is potentially misplaced, yes.

Q.   Okay.

Do you agree with the statement in this paper that you're not withdrawing the relevance of that there is no evidence that addiction to the internet is such, i.e. as a medium, exists?  Do you agree

Page 512

with that statement in this paper that you cited?

MS. COUCH:  Objection; vague.

A.   That's -- the reason I'm citing this paper is because -- the reason I'm citing this paper is because it comments on the fact that the internet is a heterogenous series of activities and that they're not all equally addictive.

Q.   So do you agree or disagree with that statement that I read you?

MS. COUCH:  Same objection.

A.   I maintain that there are certain activities on the internet are more addictive than others.

Q.   Can you answer my question now?

MS. COUCH:  Argumentative.  He did.

BY MR. SCHMIDT:

Q.   Do you agree with the statement that there is no evidence that addiction to the internet is such, i.e. as a medium, exists?

A.   No, I don't agree with that

Page 513

statement.

Q.   Okay.

A.   I published a paper myself in 2010 that -- that talked about internet addiction.

Q.   Let's go to page 107 of your report, please, where you talk about algorithmic recommendations.

You can put this opinion piece to the side.

Do you see that you write: These algorithms - in the second sentence - are optimized to maximize time on the platform rather than healthy interactions with the person's social network.

Do you see that?

A.   I do.

Q.   And you cite testimony from, for that proposition, from someone named Tom Cunningham and ▓▓▓▓▓▓.

Do you see that?

A.   I do.

Q.   And you similarly cite them for

129 (Pages 510 - 513)

CONFIDENTIAL

Page 514

the next claim you make, that the algorithms accomplish this in a variety of ways. One way is by inferring the interest of the user, I'm paraphrasing a little bit, and feeding them an aggregation of posts that, while most likely to keep them engaged, may lead the user down problematic rabbit holes.

Do you also cite Cunningham and Simmons for that --

A.   I do, but I could have cited many other people as well. If you'd like me to point to some of those in my report I can.

Q.   No. Let's focus on who you actually cited.

MS. COUCH: Objection to the --

Q.   Do you know what Mr. Cunningham --

(Stenographer admonition on crosstalk.)

MS. COUCH: Objection to the soliloquy; misstates the report.

Page 515

BY MR. SCHMIDT:

Q.   Do you know what Mr. Cunningham's background is?

A.   I don't recall offhand all the people I've -- reports I read. I don't remember now.

Q.   Do you know if his background is in economics?

MS. COUCH: Objection; asked and answered.

A.   I -- I said I didn't know his background. So I -- I wouldn't know, no.

Q.   Do you know that Mr. ███████ was never a full-time employee at Meta?

MS. COUCH: Objection; misstates facts not in evidence.

A.   I -- I did not know that. I -- but it wouldn't change my opinion.

Q.   Did you think that he was a part-time visiting research scientist on an AI team?

MS. COUCH: Objection; misstates facts not in evidence.

A.   I -- I -- I don't recall that.

Page 516

Q.   Do you know that neither of these people ever worked with the Snap, TikTok, or YouTube algorithm, assuming they have algorithms?

MS. COUCH: Objection; lacks foundation.

A.   I have no way of knowing if that were true or not.

Q.   Do you know if Mr. ███████ has any expertise you're aware in data science, neuroscience, psychology, or anything related to teen mental health?

MS. COUCH: Objection; compound.

A.   I don't recall offhand precisely what expertise he has.

Q.   Well, did you assess his expertise before quoting him multiple times in your report?

A.   I assessed his role and, yes, and his expertise, yes.

Q.   What was his role and expertise?

A.   I just said I don't recall it offhand, but I -- I did read the depositions and I -- I -- I've read -- I

Page 517

don't remember even how many I've read. I've read tens of depositions, and it's hard for me now to recall everyone's precise role and training.

Q.   Are you aware from your reading of Mr. ███████ deposition, your skimming of his deposition, that he admitted his only claim in terms of knowledge about how the algorithms work was something someone told him?

A.   I don't recall that.

Q.   Do you know how he got any information he had that you cite here about how the algorithms work?

MS. COUCH: Objection; lacks foundation.

A.   I don't recall that.

Q.   Do you know if he even has a basis to say anything about how the algorithms work?

MS. COUCH: Objection; calls for speculation.

A.   All I can say is I read the deposition and -- and took from it what he

130 (Pages 514 - 517)

CONFIDENTIAL

Page 518

testified to under oath and what he was asked and responded to.

Q. Yeah, my question is do you know if he has a basis to say anything about how the algorithms work in terms of expertise and knowledge?

MS. COUCH: Objection; assumes facts not in evidence.

A. I have no way of knowing that, but I would have assumed that would have come up.

MR. SCHMIDT: Let's look at Exhibit 40.

(Christakis Exhibit 40, Vanden Abeele study, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. Do you recognize that article by Vanden Abeele?

A. I believe so, yes.

Q. And in fact, if you look at page 109 of your report under "Auto-Play," do you see your discussion of auto-play?

A. Yes.

Page 519

Q. And if you look at the footnotes that accompany that discussion, his is the only published work other than the handbook that you cite in the "Auto-Play" section.

Is that correct?

MS. COUCH: Objection; misstates the document.

MR. SCHMIDT: Actually, you're right. It does.

BY MR. SCHMIDT:

Q. You cite --

A. I cite many things.

MR. SCHMIDT: Let me re-ask my question.

Q. In your section on "Auto-Play," the published works you cite are the handbook, Munzer, and Vanden Abeele, correct?

A. That -- that's correct, but the handbook would be a -- an article in the handbook which would have -- yes.

Q. And are you aware that all the handbook cites is the Munzer and Abeele

Page 520

articles or publications?

MS. COUCH: Objection; misleading.

A. I don't recall.

Q. Let's look at the Vanden Abeele article that you cite in discussing auto-play in your report.

Do you recognize Exhibit 40 as that article?

A. Yes.

Q. You cite it in the text for the claim that auto-play has been linked to difficulties controlling device use more broadly.

Do you see that?

A. Yes.

Q. The Vanden Abeele argument is not a research paper, is it?

Let me ask it more precisely.

The Vanden Abeele paper does not report original research, does it?

A. No, it does not. I don't believe, no.

Q. Let's look at 935 in this paper.

Page 521

Do you see there's a heading on 935 "Consideration 1."

And actually, am I right that this type of paper would be at the bottom of the hierarchy of evidence?

A. No, you're not because this cites a lot of original research and is a person's considered opinion trying to tie it together. It's --

Q. Let's look at page 8 of your report, Exhibit 2.

I'm sorry, page 9. Do you see the hierarchy?

A. Yes.

Q. Is there any place in the hierarchy for someone who gives an opinion citing research?

A. No, there is nothing on there like that, correct.

Q. Not expert opinion at the bottom of the hierarchy of evidence?

A. This is an expert's opinion, but it's well-substantiated.

Q. But it would be at the bottom of

131 (Pages 518 - 521)

CONFIDENTIAL

Page 522

the hierarchy of evidence because it's --

A.   It would be at the bottom, yes.

Q.   Thank you.

Look with me at 935.

Do you see under "Consideration 1" in the second paragraph there's a sentence that begins "Of late"?

A.   Yes.

Q.   It says:  Of late, steadily more scholars argue against the medicalization implied by the level of media addiction because it easily misclassifies users who occasionally experience some problems with digital media as individuals suffering from a disorder.

Do you see that statement?

A.   I do.

Q.   Do you agree with that statement from this well-substantiated expert that you have cited?

MS. COUCH:  Objection; vague.

BY MR. SCHMIDT:

Q.   You shook your head but you didn't give an oral answer.

Page 523

MS. COUCH:  Let the record reflect the witness is reading.

A.   I -- I -- I think that the point here again is that anything to the right of habitual use can represent a problem, and it doesn't have to rep -- it doesn't have to be -- reach the level of addiction before it creates substantive problems for individuals.

Q.   Okay.

Do you agree with that statement I read you from this well-substantiated expert opinion?

A.   I don't actually understand what they're implying in that statement, to be honest with you.

Q.   He goes on to the next page to say:  Such misclassification leads to overpathologization of everyday behaviors and experiences.

Do you see that?

A.   Yes.

Q.   (Reading) Rather than medicalizing the condition of these false

Page 524

positives as a clinical disorder, it might therefore be more valid to consider the experience as sometimes having some struggles as one of a lack of digital well-being rather than as a pathological condition that is so severe that it needs clinical help.

Do you agree with that statement?

A.   I think it's --

MS. COUCH:  Objection.

Just let me get my objection in.

A.   I think -- I -- I would characterize it differently.

Q.   So do you agree with it or disagree with it?

MS. COUCH:  Same objection.

A.   I don't view it as a yes-or-no question.

Q.   Okay.

Let's look at the section of your report starting at page 110 "Beauty Filters."

Do you see that?

Page 525

A.   I do.

Q.   And if you look at the sources -- let's go to page 111.  One of the sources is Holland G. Tiggemann, correct?

A.   Yes.

Q.   One of the sources is Kleemans, which we discussed earlier, correct?  In footnote 185?

A.   Yes.

Q.   And one of the sources in footnote 185 is Spitzer, Crosby, and Witte.

A.   Yes.

Q.   Are you aware that all of those sources look at the impact of seeing certain types of content on social media?

MS. COUCH:  Objection; vague.

A.   No, I don't agree with that.  I think we discussed this before.  They're looking at a feature of social media.

Q.   Does that feature lead to seeing specific types of content on social media?

MS. COUCH:  Objection; vague.

132 (Pages 522 - 525)

CONFIDENTIAL

Page 526

BY MR. SCHMIDT:

Q. In your view.

A. Those studies are specifically designed to study the feature, not the content.

Q. What does the feature do?

A. The feature is the manipulation of the image.

MR. SCHMIDT: Okay. Can we go off the record for -- actually, why don't we do five more minutes, or do you want to go off?

MS. COUCH: If it's a real five minutes. Otherwise I want to step to the ladies' room.

MR. SCHMIDT: Why don't we go off the record now?

THE VIDEOGRAPHER: The time right now is 6:34 p.m., and we're off the record.

(Recess taken.)

MR. SCHMIDT: We're breaking for the day.

(Time noted: 6:41 p.m. EDT)

Page 527

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it. It will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 528

A C K N O W L E D G M E N T

STATE OF            )
                    :ss
COUNTY OF           )

I, DIMITRI A. CHRISTAKIS, M.D., M.P.H., hereby certify that I have read the transcript of my testimony taken under oath in my deposition of June 25, 2025; that the transcript is a true and complete record of my testimony, and that the answers on the record as given by me are true and correct.

_____
DIMITRI A. CHRISTAKIS, M.D., M.P.H.

Signed and subscribed to before me this
_____ day of _____, 20__.

_____
Notary Public, State of

Page 529

E R R A T A

PAGE/LINE/   CHANGE   /   REASON

____/____/_____/_____
____/____/_____/_____
____/____/_____/_____
____/____/_____/_____
____/____/_____/_____
____/____/_____/_____
____/____/_____/_____
____/____/_____/_____
____/____/_____/_____
____/____/_____/_____
____/____/_____/_____
____/____/_____/_____
____/____/_____/_____
____/____/_____/_____
____/____/_____/_____
____/____/_____/_____
____/____/_____/_____
____/____/_____/_____
____/____/_____/_____
____/____/_____/_____
____/____/_____/_____
____/____/_____/_____

133 (Pages 526 - 529)

CONFIDENTIAL

Page 530

CERTIFICATE

I, MARIE FOLEY, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public for the State of New York, do hereby certify that prior to the commencement of the examination, DIMITRI A. CHRISTAKIS, M.D., M.P.H., was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

_Marie Foley, RMR CRR_

_____

COURT REPORTER
Registered Merit Reporter
Certified Realtime Reporter
Notary Public
Dated: June 28, 2025

Page 531

LAWYER'S NOTES

PAGE / LINE

____/____/_____
____/____/_____
____/____/_____
____/____/_____
____/____/_____
____/____/_____
____/____/_____
____/____/_____
____/____/_____
____/____/_____
____/____/_____
____/____/_____
____/____/_____
____/____/_____
____/____/_____
____/____/_____
____/____/_____
____/____/_____
____/____/_____
____/____/_____
____/____/_____
____/____/_____

134 (Pages 530 - 531)

CONFIDENTIAL

Page 532

SUPERIOR COURT OF THE STATE OF CALIFORNIA

    FOR THE COUNTY OF LOS ANGELES


----------------------------------------

COORDINATION PROCEEDING SPECIAL

TITLE [RULE 3.400]          JCCP No. 5255

                    For Filing Purposes:

IN RE: SOCIAL MEDIA          22STCV2135

ADOLESCENT ADDICTION

(JCCP No. 5255)


THIS DOCUMENT RELATES TO:

Cristina Arlington Smith, et al. v. TikTok

Inc., et al., Case No. 22STCV2135,

Los Angeles Superior Court

----------------------------------------




           June 26, 2025


                 (caption continued)

CONFIDENTIAL

Page 533

VOLUME II

Videotaped deposition of DIMITRI A. CHRISTAKIS, M.D., M.P.H., held at 620 Eighth, New York, New York, commencing at 9:00 a.m. EDT, on the above date, before Marie Foley, a Registered Merit Reporter, Certified Realtime Reporter and Notary Public.

- - -

GOLKOW, a Veritext Division
877.370.3377 ph | 917.591.5672 fax

Page 535

A P P E A R A N C E S: (Continued)

ON BEHALF OF META:
COVINGTON & BURLING, LLP
BY: PAUL W. SCHMIDT, ESQUIRE
    DANIEL AUTEN, ESQUIRE
    The New York Times Building
    620 Eighth Avenue
    New York, New York  10018-1405
    PHONE: 212.841.1134
    EMAIL: pschmidt@cov.com
        dauten@cov.com

BY: PAUL BANKS, ESQUIRE
    One City Center
    850 Tenth Street, NW
    Washington, DC  20001-4956
    PHONE: 202.662.6000
    EMAIL: pbanks@cov.com

Page 534

A P P E A R A N C E S:

ON BEHALF OF PLAINTIFFS:
MOTLEY RICE, LLC
BY: SARA O. COUCH, ESQUIRE
    NELSON L. DRAKE, ESQUIRE
    28 Bridgeside Boulevard
    Mount Pleasant, South Carolina  29464
    PHONE: 843.216.9000
    EMAIL: scouch@motleyrice.com
        ndrake@motleyrice.com
    - and -

BEASLEY ALLEN LAW FIRM
BY: JENNIFER EMMEL, Ph.D., ESQUIRE
    218 Commerce Street
    P.O. Box 4160
    Montgomery, Alabama  36103-4160
    PHONE: 800.898.2034
    EMAIL: jennifer.emmel@beasleyallen.com

Page 536

A P P E A R A N C E S: (Continued)

ON BEHALF OF SNAPCHAT:
MUNGER, TOLLES & OLSON LLP
BY: JONATHAN H. BLAVIN, ESQUIRE
    560 Missions Street, 27th Floor
    San Francisco, California  94105-2907
    PHONE: 415.512.4027
    EMAIL:  Jonathan.Blavin@mto.com

BY: PRISCILA CORONADO, ESQUIRE (via Zoom)
    350 South Grand Avenue
    50th Floor
    Los Angeles, California  90071-3426
    PHONE: 213.683.9100
    EMAIL: priscila.coronado@mto.com

ON BEHALF OF TIKTOK and BYTE DANCE:
KING & SPALDING LLP
BY: TODD P. DAVIS, ESQUIRE
    1180 Peachtree Street, N.E.
    Atlanta, Georgia  30309-3521
    PHONE: 404.572.3589
    EMAIL: tdavis@kslaw.com

2 (Pages 533 - 536)

CONFIDENTIAL

Page 537

APPEARANCES: (Continued)

ON BEHALF OF GOOGLE LLC/YOUTUBE LLC:
WILLIAMS & CONNOLLY LLP
BY: ASHLEY W. HARDIN, ESQUIRE
    JOSEPH SANDOVAL-BUSHUR, ESQUIRE
    680 Maine Avenue SW
    Washington, DC  20005
    PHONE: 202.434.5000
    EMAIL: ahardin@wc.com
        jsandoval-bushur@wc.com

ALSO PRESENT VIA ZOOM:
    Tricia Campbell, Wagstaff & Cartmell
    Kelly McNabb, Lief Cabraser
    Lexi Hazam, Lief Cabraser
    Clinton Richardson, Beasley Allen

EXHIBIT TECHNICIAN:
    Derek Palisoul, Core Legal Concepts

VIDEOGRAPHER:
    Jonathan Juarez

Page 539

FEDERAL STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the parties hereto, through their respective counsel, that the certification, sealing and filing of the within examination will be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, will be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed before any Notary Public with the same force and effect as if signed and sworn to before this Court.

Page 538

- - -
TRANSCRIPT INDEX
PAGE

APPEARANCES........................ 534-537
INDEX OF EXHIBITS................. 540-544
EXAMINATION OF DIMITRI A. CHRISTAKIS, M.D., M.P.H.:
BY:  MR. SCHMIDT................... 547
BY:  MS. HARDIN................... 714
BY:  MR. BLAVIN................... 761
BY:  MR. DAVIS.................... 806
BY:  MS. COUCH.................... 839
BY:  MR. SCHMIDT.................. 846
AFTERNOON SESSION................. 714
SIGNATURE PAGE.................... 328
ERRATA........................... 329
REPORTER'S CERTIFICATE............ 330

EXHIBITS WITH ORIGINAL TRANSCRIPT

- - -

Page 540

- - -
E X H I B I T S
- - -

NO.      DESCRIPTION              PAGE
Christakis  Zhang study          564
Exhibit 41

Christakis  Brown study          598
Exhibit 42

Christakis  Tang study           601
Exhibit 43

Christakis  Bill For Consulting  653
Exhibit 44  Services Dimitri
        Christakis MD MPH July 2024,
        Bates CHRISTAKIS0043-053

Christakis  Application of Matthew P.   654
Exhibit 45  Bergman For Appointment to
        Plaintiffs' Steering
        Committee

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

CONFIDENTIAL

Page 541

- - -

E X H I B I T S

- - -

NO.     DESCRIPTION          PAGE

Christakis  Prior Testimony list     665
Exhibit 46

Christakis  Children and Screens     668
Exhibit 47  Introduction

Christakis  Children and Screens     674
Exhibit 48  Foreword

Christakis  Children and Screens Board   677
Exhibit 49  of Advisors Spotlight:
        Matthew Bergman, JD

Christakis  Children and Screens     684
Exhibit 51  Sponsorship Opportunities

Christakis  Children and Screens     689
Exhibit 50  Invited Program

Page 543

- - -

E X H I B I T S

- - -

NO.     DESCRIPTION          PAGE

Christakis  Greenberg study,        797
Exhibit 58  Bates SNAP0029949-960

Christakis  Slide deck "Power       799
Exhibit 59  Friendships & Streaks:
        Problem Statements"
        Bates SNAP2183204-275

Christakis  Cheng study             841
Exhibit 60

Christakis  Slide deck "Of Mice and     842
Exhibit 61  Children: How early
        experiences affect cognition"

Christakis  Transcript of Presentation   842
Exhibit 62  "Can media effects in kids
        be reversed?"

Page 542

- - -

E X H I B I T S

- - -

NO.     DESCRIPTION          PAGE

Christakis  Children and Screens     695
Exhibit 52  excerpt by Barzilay

Christakis  Children and Screens     702
Exhibit 53  excerpt by Baumgartner

Christakis  Supplemental Online Content   724
Exhibit 54

Christakis  Deng study              777
Exhibit 55

Christakis  Vaterlaus study         784
Exhibit 56

Christakis  Clearworks Final Report     792
Exhibit 57  Healthy Interactions
        Research Prepared February
        2023 for Snapchat,
        Bates SNAP0404262-318

Page 544

- - -

E X H I B I T S

- - -

NO.     DESCRIPTION          PAGE

Christakis  Curriculum Vitae of        844
Exhibit 63  Dimitri A. Christakis,
        MD, MPH,
        Bates CHRISTAKIS0001-041

(REPORTER'S NOTE:  All quotations from
exhibits are reflected in the manner
in which they were read into the
record and do not necessarily denote
an exact quote from the document.)

4 (Pages 541 - 544)

CONFIDENTIAL

Page 545

DEPOSITION SUPPORT INDEX

DIRECTION TO WITNESS NOT TO ANSWER
  Page   Line
   - -none- -

REQUEST FOR PRODUCTION OF DOCUMENTS
  Page   Line
   - -none- -

STIPULATIONS
  Page   Line
    539    4

QUESTIONS/ANSWERS MARKED
  Page   Line
   584    10
   596    23
   606    17
   613    13
   634    11

Page 546

- - -

9:08 a.m. EDT

New York, New York

- - -

THE VIDEOGRAPHER: We are now on the record. My name is Jonathan Juarez. I am a legal videographer for Golkow.

Today's date is June 26, 2025, and the time is 9:08 a.m.

This deposition is taking place at 620 Eighth Avenue, New York, New York, in the matter of In Re: Social Media Adolescent Addiction Personal Injury Products Liability Litigation.

The deponent is Dr. Dimitri Christakis.

All counsel will be noted on the stenographic record.

The court reporter is Marie Foley, and will now swear in the witness.

THE STENOGRAPHER: If I could ask you to raise your right hand,

Page 547

please.

Do you swear or affirm the testimony you give will be the truth, the whole truth, and nothing but the truth today?

THE WITNESS: I do.

THE STENOGRAPHER: Thank you.

- - -

DIMITRI A. CHRISTAKIS, M.D., M.P.H., the Witness herein, having been first duly sworn by a Notary Public in and of the State of New York, was examined and testified as follows:

CONTINUED EXAMINATION BY MR. SCHMIDT:

Q. Good morning, Dr. Christakis. I hope you had a nice evening.

Let's pick back up with where we were in your report. If you wouldn't mind going to page 150, I'm going to ask you about some of the harm areas in your report. Let me know when you're there.

MS. COUCH: 158 or 150?

Page 548

MR. SCHMIDT: I'm sorry?

MS. COUCH: 158 or 150.

MR. SCHMIDT: 158.

BY MR. SCHMIDT:

Q. Let me know when you're there.

A. Yes.

Q. This is a section of your report talking about BDD, a subject we briefly touched on yesterday, body dysmorphic disorder; is that correct?

A. Yes.

Q. And in paragraph 271 you cite the DSM on BDD; is that correct?

A. That's correct.

Q. Why do you cite the DSM?

A. I cite the DSM because that's the -- I cite the DSM because it's the official clinical diagnosis as recognized by the APA DSM-5.

Q. Do you recognize the DSM as authoritative when it comes to assessing body dysmorphic disorder?

A. As the clinical diagnosis, it's one of many ways that can be diagnosed.

5 (Pages 545 - 548)

CONFIDENTIAL

Page 549

It's one that's widely recognized.

Q.   Is it recognized as authoritative by you?

A.   Yes, it's recognized as one of the authoritative sources of -- of diagnosis, yes.

Q.   At page 182 of your report you give your conclusion and you state in paragraph 317 that, quote, and I'm going to start partway through the sentence, that, quote: The overwhelming evidence supports a causal relationship between social media use and body dysmorphia.

Did I read that correctly?

A.   You did.

Q.   Is that your opinion?

A.   It is my opinion.

Q.   And when you refer to body dysmorphia there, you're referring to BDD?

A.   No, I'm referring to body dysmorphia, and body dysmorphia can lead to BDD.

Q.   Okay.

What is body dysmorphia as

Page 550

distinct from BDD?

A.   Body dysmorphia has the symptoms of feeling unhappy with your body wanting to change it in some way, being distressed about it.

Q.   Have you ever diagnosed BDD --

A.   I have.

Q.   -- in your career?

Without referring out a case for a confirming diagnosis?

A.   Yes.

I need to clarify that my clinical practice is in the context of a hospital system, a teaching hospital system where I have ready access to specialists, and the way our care is organized is that as a general pediatrician on a hospital service or an outpatient service, I make diagnoses and I refer them to specialists for their care. It's a luxury I have being in a hospital system that has ready access to these specialists, and so I don't take it upon myself to treat conditions even when I

Page 551

recognize and diagnose them since there's people that are specialized and readily available to do so.

In fact, I was thinking about this in the context of what drew me into this case, and five years ago when I was on hospital service, we had a teenage girl who I admitted from the emergency department because she had attempted to commit suicide because her parents had taken away her phone. I diagnosed her with social media disorder when I saw her in the morning, and she was followed up on my service by psychiatric services who confirmed that diagnosis as well as other psychiatric conditions.

Q.   Are you finished?

A.   I am.

MR. SCHMIDT:  I'll move to strike everything after "yes" on the clearly preplanned speech.

BY MR. SCHMIDT:

Q.   Do you treat people with BDD?

A.   I diagnose them and I refer them

Page 552

to people who specialize in their treatment.  It requires ongoing specialized treatment, and as I said, I have ready access to those experts.

Q.   Was that "yes" or "no"?

A.   That's a "yes."

Q.   You do treat people with BDD?

A.   I do.

Q.   Okay.  By referring them to someone else who treats them?

A.   No, because they remain on my --

Q.   Can you let me finish my question, please?  Otherwise we're going to have an issue with the reporter.

My question is simply do you treat people with BDD independent of referring them out to people?

A.   Are you done?

Q.   Yes, I am.

A.   Yes.  They're on my clinical service.  They've been admitted for eating disorders.  I am the attending of record, and I am responsible for their care.

Q.   Do you treat patients today?

6 (Pages 549 - 552)

CONFIDENTIAL

Page 553

A.   No.  As of a year and a half ago, I stopped treating patients.

Q.   So when you just referred to the present tense a few minutes ago to treating patients, that's not something you've done in a year and a half?

A.   That is correct, I have not treated patients for a year and a half.

Q.   Okay.
So when you say "I make diagnoses and I refer them to specialists for care," that's not true as of a year and a half ago?

A.   That's technically not true as of a year and a half -- as of a year -- I'm still able to do that, but I choose not to.

Q.   Okay.  Let's go back to your report, please.
We were looking at 317.  Do you have that -- paragraph 317.  Do you have that in front of you?

A.   Mm-hm.

Q.   Look with me, if you would, at

Page 554

page 184.  At page 183, I'm sorry, paragraph 318.  And tell me when you're there.

A.   Yes.

Q.   So we just looked at your language about BDD, and you said there's overwhelming evidence that supports a causal relationship.
In the "Eating Disorder" section you say:  There are reasons to plausibly believe that social media usage can cause eating disorders.
Do you see that language?

A.   Mm-hm.

Q.   That language reads differently to me.  Are you drawing a distinction between the weight of the evidence supporting eating disorders and the weight of the evidence supporting body dysmorphia?

A.   No, I'm not.

Q.   Okay.
Does everything that can cause body dysmorphia symptoms lead to BDD, in

Page 555

your view?

MS. COUCH:  Objection; vague.

A.   Yeah, I don't really understand the context of your question, but there's -- there are elements of body dysmorphia that -- that are consistent with eating disorders and lead to eating disorders, but not everything.  For example, body dysmorphia can include feeling like your nose is too large.

Q.   And that's where I was going.  I was asking something a little different.
When I asked you about paragraph 317 and your language about body dysmorphia, if that was the same as body dysmorphia disorder, I understood you to say that's the symptoms which can lead to body dysmorphia disorder.
So my question is do you know how often the symptoms of body dysmorphia that you're referring to here lead to body dysmorphia disorder?

A.   When you mean -- what do you mean by "how often"?

Page 556

Q.   Is it a hundred percent of the time?  Is it one percent of the time?  Do you know?

A.   It's not a hundred percent of the time, and it's way more than one percent of the time.

Q.   Is it the case that you can have symptoms of what you think of in your view is body dysmorphia that doesn't actually lead to body dysmorphia disorder?

A.   Yes, but in my opinion, the literature as it's been -- as I've reviewed it clearly supports that -- that the exposure to social media increases the risk of body dysmorphia and body dysmorphia disorder.

Q.   My question is just general.
Is it the case that you can have symptoms of what, in your view, is body dysmorphia but it doesn't actually lead to body dysmorphia disorder?

A.   My answer --

MS. COUCH:  Objection; vague.

7 (Pages 553 - 556)

CONFIDENTIAL

Page 557

BY MR. SCHMIDT:

Q.   Is that possible?

MS. COUCH:  Same objection.

A.   It's my belief that based on the preponderance of the literature, my clinical experience, my education, and I might add documents from the industry itself, that exposure to social media sites increases the likelihood of body -- body dysmorphia and body dysmorphia disorder.

Q.   By how much?

A.   Significantly and clinically -- clinically significantly and statistically significantly.

Q.   By how much?

A.   It's impossible to quantify that.

Q.   Okay.

Well, when you say "clinically significantly," what constitutes clinically significantly to you?

A.   At a level that poses significant risk that I would, as an

Page 558

expert and a clinician, advise people not to expose their teenagers to it.

Q.   What level is that?

MS. COUCH:  Objection; asked and answered.

A.   An unacceptably high risk.  It's a subjective opinion, but -- on my part, but it's based on scientific evidence. It's my expert opinion, and it's the advice I give to patients.

Q.   Okay.

When you were treating patients. You don't give that advice to patients today?

A.   I give it to parents.

Q.   Do you give it to patients today, as you just said?

MS. COUCH:  Objection; vague.

A.   I refer to patients because I'm a doctor, and I tend to refer to everyone I speak to as patients.

Q.   Okay.

A.   But in spite of the fact that I don't treat patients for the last year and

Page 559

a half, I still routinely talk to parents around the world about the effects of social media, and when asked to speak on this topic, I recommend that they keep their teenagers off of it.

Q.   Can we go -- I'm going to come back to that.  Can we go back to my question, which respectfully I don't think you answered, which is is it your view that every case that involves symptoms of body dysmorphia ultimately results in body dysmorphia disorder?

A.   It's my opinion that --

Q.   Can you answer my question "yes" or "no"?

A.   No, I can't answer that "yes" or "no."

Q.   Okay.  I'll move on then.

Let's look at one of the studies you cite.

Which eating disorders do you believe that social media causes?

A.   I be -- it increases the risks of all of -- -- of all of them.

Page 560

Q.   Okay.  I didn't ask about increases the risk.  I asked about cause.

I believe you're looking at Figure 32 on page 14 -- 184 of Exhibit 2; is that right?

A.   That's correct.

Q.   Does social media cause all of those eating disorders?

A.   It -- it causes -- it increases the risk and causes them, yes, all of them.

Q.   Including Pica, which is eating dirt?

A.   Pica is actually eating non-nutritive, non-food substances, not dirt specifically.  Pica --

Q.   Do you know if -- sorry.

A.   Go ahead.

Q.   No, go ahead.  I don't want to argue about Pica.

Just does social media cause Pica?

A.   Social media causes eating disorders.  Eating disorders take many

8 (Pages 557 - 560)

CONFIDENTIAL

Page 561

forms. The point of eating disorders is to reduce one's weight. There are many ways in which one can do that, including eating non-nutritive substances. That's an uncommon one, but it occurs.

Q. Has there ever been a study that links Pica to social media?

A. Not to my knowledge, but as I said, the studies link it to eating disorders at large in general and that would include Pica. It's sufficiently rare that I can't imagine someone doing a study that would specifically look at Pica.

Q. Do you know that body dysmorphia is not even categorized as an eating disorder by the DSM?

MS. COUCH: Objection; misleading.

MR. SCHMIDT: Let me ask the question differently.

BY MR. SCHMIDT:

Q. Do you know whether body dysmorphia disorder is categorized as an

Page 562

eating disorder by the DSM?

A. It's categorized separately, but it has overlap in terms of the feelings of despair, the feelings of body dissatisfaction, and some people that have body dysmorphia go on to develop eating disorders, but not all of them.

Q. How frequent is that the case, is when it's body dysmorphia disorder and goes on to develop an eating disorder?

A. I don't recall off the top of my head. There are studies that have looked at that and I believe I've referenced in my report. If I have not, I can find them for you. It's -- it's a significant percentage.

Q. Did you -- by the way, I asked for some documents yesterday.

Did you bring any additional documents with you today?

A. I don't recall what you asked for, but I didn't bring any additional documents with me.

Q. It was, I think, the data on the

Page 563

I believe it was Figure 12 that you put in your report where we don't have the data, or I think you said there was an in-press document or early in-press document that we don't have.

MS. COUCH: I would object to this as already covered yesterday.

I never got an additional request in writing what the basis for your request, as I put on the record. Please send that and we'll consider.

MR. SCHMIDT: We'll send it. We sent it before the deposition, but we'll send it again.

BY MR. SCHMIDT:

Q. Let me look at the first -- I believe it's the first, if you go back to page 163 in your report, your BDD section. The first data you report in that section appears on 161, 162, with a discussion of it on 163.

That comes from the Zhang study, correct?

A. Yes.

Page 564

Q. By the way, do you know what section of the DSM, what group of disorders BDD appears in, body dysmorphia disorder?

A. What do you mean by "what section"?

Q. Well, we talked about it not being in the eating disorder section.

Do you know what -- what conditions it's grouped with?

A. I don't recall off the top of my head what section it's in, but it's -- doesn't -- in my opinion, it -- it's not important.

Q. Do you know if it's with anxiety disorders, depression, obsessive compulsive disorders?

MS. COUCH: Objection; calls for speculation.

A. I would be -- I have -- I don't know off the top of my head.

(Christakis Exhibit 41, Zhang study, was marked for identification, as of this date.)

9 (Pages 561 - 564)

CONFIDENTIAL

Page 565

Q.   Okay.  And I'm going to pass you documents through the day.  I'm going to apologize in advance, we're at a big table, so I'm going to be throwing stuff. I don't mean to be rude in doing that.

MR. SCHMIDT:  And same goes for counsel.

MS. COUCH:  What exhibit is this?

BY MR. SCHMIDT:

Q.   Could you read the number of that exhibit, Doctor?

A.   41.

Q.   I marked as 41 the Zhang study.

Do you recognize this as the Zhang study where you report from on pages 161 and 162 of your report?

A.   I do.

Q.   And I want to look at what you conclude from this study.  If you look at page 163, paragraph 276.

Do you see you reference a figure from the Zhang study?

A.   Yes.

Page 566

Q.   And if you want to just orient yourself, that figure appears on page 7 of the Zhang study; is that correct?  Page 7 of Exhibit 41.

A.   Yes.

Q.   And you say about the figure it's from a meta-analysis limited to the studies that allowed for pooling and combining data relating social media usage and body image problems.

Do you see that?

A.   Yes.

Q.   Then you say:  Although the figure is presented in a way that makes it too small to see the individual studies, all bars to the right of the central bar show a positive correlation between social media usage and BDD.

Is that correct?

A.   That's correct.

Q.   Okay.

And, so, if we look at your -- and so, if we look at your page 161, if you look at the first study listed --

Page 567

actually, let's look at page 162.  The way we can read this is if you look at the first two studies listed, those show a statistically significant increased rate.

Is that correct?

A.   That's correct.

Q.   If we look at the third study listed, that shows an increased rate, but it's not statistically significant, correct?

A.   That's correct.

Q.   And if we look at the fourth, that shows a statistically significant reduction in body dysmorphia with social media at a statistically significant level; is that correct?

A.   That's correct.

Q.   If you look down at the very bottom, what this tells us is that there's a -- a -- one of these lines that says, I think it says RE mode.

Do you see that?  Or model.  RE model, random effect model.

A.   Yes.

Page 568

Q.   And that shows that it is on the positive side, but it -- when you meta-analyze this data, it is not statistically significant.

Is that correct?

A.   That -- that's correct.

Q.   When you look at the top study, which I think is Santrosa, the one that is statistically significant, your understanding is that shows a statistically significant increase in body dysmorphia disorder in this study with social media, correct?

A.   That's correct.

Q.   Okay.

And everyone you believe that is on the -- where the entire bar, the entire -- well, to be technical, the circle in the middle of that bar is the point estimate.  The lines on either side are the confidence interval.

Correct?

A.   The lines on either side are the 95 percent confidence interval, that's

Golkow Technologies,

877-370-3377                    A Veritext Division                    www.veritext.com

CONFIDENTIAL

Page 569

correct.

Q. So the way we read this is every -- every study where the full confidence interval is to the right of the vertical dotted line is a statistically significant finding of increased body dysmorphia disorder with social media, correct?

A. That's correct. The -- that's correct.

Q. Okay. Let's look at Zhang, please.

Actually, before we do, if we -- if we stick with your report. You don't -- I'm on page 163.

You don't make notes of the fact that the finding in Zhang was not statistically significant in your report, do you?

A. That it was not statistically significant?

Q. Correct.

A. No. The -- the point of the point estimate is to show if you summed

Page 570

all these studies where they would end up, and what it shows is that there is a overall effect size of .11 and --

MR. SCHMIDT: Could we go back one page just for the doctor?

Q. We'll put it back up on the screen if you want to look at it on the screen.

A. Yeah, go down to the bottom. Looks like you can actually see it better here than I can.

So, yes.

Q. Right. You give the point estimate of .11 in your report. You don't note that that point estimate is not statistically significant, correct?

A. That's correct. I -- it is not statistically significant, but you can see it's the confidence interval is -- goes from to minus .06.

Q. Right.

A. So it's close to statistically significant, but not. That's correct.

Q. And what that means is within

Page 571

that 95 percent confidence interval there's a 95 percent confidence that it is somewhere between social media reducing slightly the risk of body dysmorphia disorder to increasing slightly the risk of body dysmorphia disorder, correct?

MS. COUCH: Objection; vague.

A. The best way of interpreting is is that the best estimate of the effect size is what the point estimate represents.

Q. Did I describe the confidence interval correctly?

MS. COUCH: Same objection.

A. Describe it for me the way you described it again.

Q. Why don't I just move on.

You agree that the .11, the point estimate is a small effect size?

A. It -- it is a small effect size, but it's important to contextualize it. This is looking at all social -- the net effect of social media use on children to body dysmorphia disorder, and the reality

Page 572

is that for some children, it has no effect at all; some children find social media body affirming; and a segment of children, a sizable segment of children, it increases the risk significantly.

So when you take all-comers, as these studies do, the net effect -- the net population effect doesn't represent the actual risk it poses to certain vulnerable populations. I think that's a really important point to consider.

MR. SCHMIDT: Move to strike everything after "small effect size."

BY MR. SCHMIDT:

Q. This study doesn't deal with body dysmorphia at all, does it?

MS. COUCH: Objection; misleading.

A. This study is -- is about disordered eating behaviors, that's correct.

Q. Right.

Disordered eating is different than body dysmorphia disorder, correct?

11 (Pages 569 - 572)

CONFIDENTIAL

Page 573

MS. COUCH: Objection; vague.

A.  Disordered eating is -- disordered eating is -- is -- is -- has overlap with, but is different than body dysmorphia disorder, that's correct.

Q.  Look with me, if you would, at page 158 of your report, paragraph 171 where you quote the DSM.

The first criteria you quote is: Preoccupation with one or more defects or flaws in physical appearance that are not observable or appear slight to others.

Do you see that?

A.  I do.

Q.  And that can mean thinking your nose is too large, your ears are too big, something like that, right?

A.  That's correct.

Q.  Okay.

Do you know how many cases of body dysmorphia involve concerns about eating as opposed to some other physical feature?

MS. COUCH: Objection; vague.

Page 574

A.  I'm trying to recall if -- off the top of my head, and I thought I had it in the report.

I can get that for you if you want.

Q.  Please do.

Do you know sitting here today?

A.  Ask me your question again.

Q.  Yeah.

Do you know how many cases of body dysmorphia disorder involve concerns regarding weight as opposed to concerns involving body features that have nothing to do with weight?

MS. COUCH: Objection; vague; misleading.

A.  I don't know that off the top of my head, and I don't know if it's known.

Q.  Do you know if it's more than 50 percent of the cases?

MS. COUCH: Objection; calls for speculation.

A.  I don't know that off the top of my head.

Page 575

Q.  If you look at your diagnostic -- or the DSM's diagnostic criteria that you quote in your report that you quote on page 158, do you see that the fourth diagnostic criteria is: Appearance preoccupation is not better explained by concerns with body fat or weight in an individual whose symptoms meet diagnostic criteria for an eating disorder.

Do you see that?

A.  I do.

Q.  Is someone with disordered eating more likely to have an eating disorder or body dysmorphic disorder; do you know?

A.  What I'm --

MS. COUCH: Objection; vague.

A.  The reason for this criteria is that -- is that you can be concerned about your body weight and have body dysmorphia, and as I said before, that can lead you to develop an eating disorder.  In which case, the DSM-5 would prefer you to be

Page 576

classified as an eating disorder rather than body dysmorphia, and that is precisely the mechanism by one -- which one can spill or lead to the other.

Q.  Do you know if it's even possible to diagnose someone who has disordered eating with body dysmorphia, body dysmorphic disorder given these criteria for body dysmorphic disorder?

MS. COUCH: Objection; vague.

A.  Body dysmorphia disorder can lead somebody to develop an eating disorder.  At which point, they have an eating disorder and they're treated as an eating disorder and not body dysmorphia, and that's why, as I say in here, body dysmorphia can lead to eating disorder in many cases, but not all cases.

Q.  Right.

Do you see that -- what I'm focusing on this criteria says, the first three criteria tell us what body dysmorphic disorder is, right?

MS. COUCH: Objection;

12 (Pages 573 - 576)

CONFIDENTIAL

Page 577

misleading.

BY MR. SCHMIDT:

Q. You understand that, right? They give us criteria for determining if someone has body dysmorphic disorder?

MS. COUCH: Same objection.

A. Yes, I understand that.

Q. And then the fourth criteria says if they have this, then they go in the eating disorder category, not the body dysmorphic category, right?

MS. COUCH: Objection; vague misleading.

A. No, it doesn't say that. Actually it says if they meet the criteria for eating disorder.

Q. Right. Yeah, then they're in that category, not body dysmorphic disorder, right?

MS. COUCH: Same objections.

A. As I said before, one can feel that they are overweight, that their stomach is too large, that they look fat, they can even take some steps to reduce

Page 578

their weight. Once they've -- and even though they're not overweight, they can feel like they're overweight. That can be body dysmorphia disorder.

When they meet the clinical criteria for eating disorder, then they have that disorder.

Q. According to the DSM, can someone have both the diagnosis of body dysmorphic disorder and a diagnosed eating disorder at the same time?

A. According to D, no, they cannot.

Q. Let's go back to Zhang. If we look at page 4.

Let's look at page 5, please. Do you see where they talk about their overall analysis on page 5?

A. Yes.

Q. And do you see where they say that: From the 22 studies that examine the correlation between SNS.

You understand that's social media, right?

A. I'm sorry, which paragraph are

Page 579

you on?

Q. The one under "Overall Analysis" in the right column.

A. Yes. Okay.

Q. Do you see where they say: From the 22 studies that examined the correlation between SNS and disordered eating behaviors.

Do you see that?

A. Yes.

Q. And SNS is social media, right?

A. Social networking sites. But yes, social media, yes.

Q. (Reading)...and disordered eating behaviors.

Do you agree that eating behaviors can include a lot of conditions that by definition cannot be body dysmorphic disorder?

MS. COUCH: Objection; vague; compound.

A. No, I don't. This is not make -- this is not talking about a disordered eating diagnosis. It's talking

Page 580

about disordered eating behaviors, and that's a distinction.

Q. Do you know if there was a single case in any one of these 22 studies of body dysmorphic disorder?

MS. COUCH: Objection; broad.

A. There would be no way for me to know that off the top of my head.

Q. Did you read the studies?

A. There would be no way to know that from even reading the studies. That's not something that would be reported in them.

Q. Did you read the studies?

A. Did I read every individual study that was in the -- no, I -- that's the reason for doing -- for reviewing a meta-analysis and reviewing the qualitative analysis.

I surely read some of them, but I did not read all of them.

Q. In 276, let's go back to your report, Exhibit 2 where you say that language I asked you about earlier: All

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

CONFIDENTIAL

Page 581

bars -- I'm looking at the third line, at the end of the third line on the top in paragraph 276:  All bars to the right of --

A.   I'm sorry, that -- page 276?

Q.   I'm sorry.  I keep saying paragraph and pages.
    Page is 163.

A.   276, yes.

Q.   Paragraph 276, third line:  All bars to the right of the central bar show a positive correlation between social media and BDD.
    Do you see that language of yours?

A.   Yes.

Q.   Is that accurate in terms of you saying that these studies show a positive correlation between social media usage and body dysmorphic disorder, yes or no?

MS. COUCH:  Objection; vague.
BY MR. SCHMIDT:

Q.   Or should that be corrected to say "disordered eating"?

Page 582

MS. COUCH:  Objection; vague; misleading; argumentative.

A.   That should say "disordered eating" as the figure itself says.  That's a typographical error.
    And this is in the section of my report on disordered eating.

Q.   It's actually in the section of your report on body dysmorphia disorder.  Do you know that?
    I'll help you out.  If you look at page 158 you'll see the section "Body Dysmorphic Disorder" that this erroneous statement appears in.

MS. COUCH:  Objection to the soliloquy and mischaracterization.

A.   Yeah, I -- I want to emphasize that there's a subsequent systematic review that I cite in paragraph 277 of -- that looked specifically at body dysmorphia disorder and social media use that actually, as it -- as I note here, found a significant effect size of .24.

Q.   Okay.

Page 583

    Do you want to correct the error regarding Zhang?

MS. COUCH:  Objection; argumentative; misleading.

A.   Yes, but I stand by my assertion.  As I said, there's other -- there's a systematic review cited in 277 and there's experimental manipulations.  This doesn't substantively change my opinion in any way.

Q.   Are you familiar with something called Weibo, W-E-I-B-O?  Do you know what that is?

A.   No, I do not what Weibo is.

Q.   Do you know if it's an app or a social media service or something else?

MS. COUCH:  Objection; calls for speculation.

A.   I have no idea what it is.

Q.   Have you studied any data regarding Weibo and whether it has addictive or other harmful propensities?

A.   I -- I -- I don't know what it is.

Page 584

Q.   And do you know if -- have you studied Twitter to evaluate whether it has addictive or other harmful propensities?

MS. COUCH:  Asked and answered.

A.   We talked about this yesterday.
    Twitter was not something I studied.  It's outside the scope of this report.

Q.   Do you know if Twitter is worse or better on the criteria you're talking about in terms of ability to cause harm than any of the social media services at issue here?  Have you done that analysis?

MS. COUCH:  Asked and answered --

A.   I have no opinion on --

MS. COUCH:  Wait.  Wait.
    Asked and answered.  Calls for speculation.
    Mark the question.

A.   I have no opinion on that as outside of the scope of this report.

Q.   Understood.  The reason I ask about that is if you look at page 4 of the

14 (Pages 581 - 584)

CONFIDENTIAL

Page 585

Zhang study, Exhibit 41, and if you look on the right, upper right column.

A. Yes.

Q. Do you see that they --

MR. SCHMIDT: It's Exhibit 41, upper right column. I think we've lost our feed on the screen.

Q. Do you see that it -- this study included studies that looked at Twitter and that source I asked you about called Weibo?

A. Yes, I see that.

Q. Do you know how this data would change if Twitter and Weibo data were excluded?

MS. COUCH: Objection; calls for speculation.

A. My expert opinion is it would not change substantively at all. In fact, if anything, my expectation is that it would make the findings more significant, and I say that because the literature on the association between the social media sites in question and eating disorder is

Page 586

robust, and I have not seen any studies that have looked at Twitter, and I wonder how many, if any, are even in it.

Q. Well, you haven't attempted to review the Twitter literature, have you?

A. No, I have not. And I'm looking to see if -- how many studies in this article would have been with Twitter.

Q. Let me ask you this question. Various articles that you cite draw on data involving social media services or apps not at issue in this litigation.

For any studies that you relied on, did you make any effort to determine whether and how the results of the study might change if the non-defendant services were excluded: Twitter, Reddit, Pinterest, Weibo? Did you -- did you do any analysis of that in your work?

MS. COUCH: Objection; vague; compound.

A. It's my expert opinion that they wouldn't change at all.

Page 587

I'm looking right now to see, if you'll give me a minute I can look.

Q. I'm actually not asking you to do work for the first time in the deposition.

What I'm asking you is prior to today, did you do any analysis of the studies you looked at to see, insofar as they included data on services not at issue, would there be an impact to the results of the study if you removed that data? Did you do that analysis?

MS. COUCH: Objection; vague.

BY MR. SCHMIDT:

Q. Before today?

MS. COUCH: Same objection.

A. My belief is that the studies that I included are overwhelmingly driven by the effects of the -- of the social media sites that we are discussing here today and the effects of these other ones, if they were even included, and I believe they were not included in most of them, would be small to negligible.

Page 588

Q. My question is did you do an analysis to support that belief?

MS. COUCH: Asked and answered.

A. My answer is the same. It would not substantively -- substantively affect the findings in any way.

Q. I understand that. Can you answer my question?

Did you actually conduct an analysis of any study to say if you take out Twitter data, Reddit data, Weibo data, Pinterest data, what have you, would the results change? Did you do that analysis before today?

A. I don't see a --

MS. COUCH: Same objection.

A. I don't believe there's a need to do that analysis. The amount of time that teenagers spend on those sites is -- is trivial and unlikely to drive the results in any way.

Q. And you did not do that analysis?

A. There was no need to.

15 (Pages 585 - 588)

CONFIDENTIAL

Page 589

MS. COUCH: Same objection.

BY MR. SCHMIDT:

Q. Okay.

MS. COUCH: Let me get my objection in.

THE WITNESS: Sorry.

BY MR. SCHMIDT:

Q. Let's look at page -- let's look at the eating disorder section of your report which begins on page 184, I believe.

Actually, 183. Tell me when you're there.

A. Yes.

Q. In your report on page 186, paragraph 324, you make reference to several longitudinal studies, and you say they confirm that there is a temporal association between exposure to social media images of ideal bodies and subsequent eating disorder symptoms.

Do you see that?

A. In number 324, yes.

Q. Yes.

Page 590

Do you know if there's a -- a link between viewing, as you described it, images of ideal bodies in magazines and eating disorders?

A. Yes, there is. That is established science prior to the advent of social media sites that showed that idealized images that -- that particularly teenage girls exposed to idealized images of bodies increases the risk of body dysmorphic disorder and eating disorders. And that's the same mechanism, except it's exacerbated by the algorithms and the features of social media that make social media sites much more risky than magazines and other idealized imagery.

Q. Are you aware of any study that has compared idealized messages in magazines and social media to see there's a difference?

A. What do you mean by that?

Q. Just what I said.

Are you aware of a -- you said that social media's worse than magazines,

Page 591

so I'm trying to ask if there's data on that point.

Are you aware of a study that has looked at the impact of seeing idealized images in magazines and compared it to the impact of seeing idealized images in social media and compared those two to see if one is, in fact, greater?

A. I believe that what I said was that the mechanism by which magazines drive disordered eating and eat -- and -- and eating disorders and body dysmorphia in magazines is the same mechanism except it's amplified by social media.

Q. Right. And I'm asking if there's data on that point.

Are you aware of data that compares people seeing idealized images in magazines to people seeing idealized images on social media?

A. Yeah.

Q. Is there a study you've seen on that point?

A. I think the best data in support

Page 592

of that is that we've seen a significant increase in eating disorders with the rise of social media use, and that the use of social media is associated in -- in a causal way with the increased risk of eating disorders. And presumably -- not presumably. The exposure to magazines is kept constant in both groups.

So yes, I believe there is data to support that.

Q. Is there direct data comparing the impact of viewing idealized images in magazines to viewing it on social media, that you're aware of?

MS. COUCH: Vague.

A. There would be no way to do that study, in my opinion.

Q. Okay.

Let's look at that language we were looking at on 186. Do you see where you reference several longitudinal studies?

A. Yes.

Q. What are those several

16 (Pages 589 - 592)

CONFIDENTIAL

Page 593

longitudinal studies that you reference?

A. Ironically, this is the Zhang reference is here as well, and that has many of them, but this is in the disordered eating section, and there are other ones referenced in the -- there's -- there's one here, the Tiggemann study. There -- there are many idealized ones. I've given some exemplars here, but there are many, many others.

Q. Okay.

Do you know if Zhang involved longitudinal studies?

And I'm focused, just to orient us why don't we highlight it on the screen, the language at the beginning of paragraph 324 where you refer to "several longitudinal studies confirm that there's a temporal association between exposure to social media images of ideal bodies and subsequent eating disorder symptoms."

Do you see that?

A. I do.

Q. Okay. Let me just ask you a

Page 594

couple questions about that before I ask you about those studies.

A longitudinal study is different than a cross-sectional study, right?

A. That's correct, yes.

Q. Which is higher on the hierarchy of evidence? Which is better?

A. The point --

MS. COUCH: Objection; vague.

A. They are both important. It's not an either/or.

Q. Is one higher on the hierarchy of evidence that you set on page 8 of your report?

A. One is higher, but in my report, I use both because they provide corroboratory evidence, one for the other.

And I note that there are several longitudinal studies cited. They went on to the next page in support of the -- of the temporal association between social media exposure and --

Q. Which one is higher on the

Page 595

hierarchy of evidence, longitudinal studies or cross-sectional studies?

A. In the hierarchy --

MS. COUCH: Objection; asked and answered.

A. I -- I do believe I answered that question.

Q. You didn't answer it. And we'll take it to the judge if -- let me ask you. You didn't answer it.

Which one is higher on the hierarchy of evidence: longitudinal studies or cross-sectional studies?

MS. COUCH: Same objection.

A. In the hierarchy of evidence, longitudinal studies are higher.

Q. Thank you.

A. But in --

Q. Are experimental studies --

MS. COUCH: Excuse me.

Were you done with your answer, Dimitri?

THE WITNESS: No, but my --

MS. COUCH: You need to --

Page 596

A. But my report relies on both and the point is that one corroborates the other.

Q. Okay. We've talked about cross-sectional and longitudinal.

Are experimental studies different from longitudinal and cross-sectional?

A. They are different.

I think the important point here is that every study design has its strengths and limitations, and in the hierarchy of evidence, one has to take that into account.

MR. SCHMIDT: Move to strike everything after "they are different."

MS. COUCH: Oppose.

BY MR. SCHMIDT:

Q. Are experimental studies higher or lower than longitudinal studies in the hierarchy of evidence?

A. The hierarchy of evidence as presented is presented in abstraction and the reality is that when one evaluates the

17 (Pages 593 - 596)

CONFIDENTIAL

Page 597

scientific literature, one has to take into account the conditions and the populations under which a particular study is being conducted.

MR. SCHMIDT: Move to strike as nonresponsive.

Let's mark that answer, please.

BY MR. SCHMIDT:

Q. Let's go back to page 186. Do you see where you say: Several longitudinal studies? And at the end of that sentence you've got footnote 325 which cites the Brown study?

A. Well, it cites more studies on the next page too.

Q. You're right. It cites Kim and Puccio.

MS. COUCH: Objection; misstates the document.

A. There are more studies than those.

Q. I think there are more than in the footnote, but that's fine.

MS. COUCH: Misstates the

Page 598

document.

MR. SCHMIDT: It doesn't. And that's an improper objection when you're saying something that's wrong.

MS. COUCH: I'm not, but you've done that throughout this deposition.

MR. SCHMIDT: That's not appropriate either.

BY MR. SCHMIDT:

Q. Do you see that in footnote 125 you cite -- 325, I'm sorry, you cite three studies, first one Brown?

A. Yes, I cite three studies.

MR. SCHMIDT: Can I get Brown? This is Exhibit 42.

(Christakis Exhibit 42, Brown study, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. Do you recognize this - I'm sorry for throwing - as the Brown study that you cite in footnote 235, the Brown longitudinal study?

A. Yes.

Page 599

Q. If you look at page -- well, we can just look at the -- let's look at the abstract: A large body of research --

MR. SCHMIDT: Well, let's strike that.

Q. Let's go to page 40, please. Do you see the "Procedure" heading?

A. Yes.

Q. Do you see the second sentence says: Participants were randomly assigned to one of three experimental conditions?

A. Yes.

Q. Is this an experimental study or a longitudinal study?

A. This is an experimental study.

Q. Not a longitudinal study, correct?

A. Well, experimental studies are longitudinal. It's a specific type of longitudinal study.

Q. If you go to page 39, please. Stimulus Materials. Do you see that this study

Page 600

involves showing the people participating in this study different types of images, celebrity images, other images?

A. Yes.

Q. Do you agree with me that the study was -- involved showing people content and testing their reaction to it?

A. Yes, I agree with that.

Q. Let's look at the Tang study that you cite.

(Christakis Exhibit 43, Tang study, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. Actually, I'm sorry, let's go ahead to the section of your report dealing with depression and anxiety. And tell me when you're there.

A. What -- what page are you on?

Q. It begins on page 206.

A. I -- I want to add that, because I thought you were going to talk about this study more, that it -- it is a study of content to isolate the effects that

18 (Pages 597 - 600)

CONFIDENTIAL

Page 601

seeing these things has, and the point -- the reason that's relevant is because those images are presented to people by the design features of the sites, so.

MR. SCHMIDT: Move to strike. No question pending.

BY MR. SCHMIDT:

Q. Do you -- do you see in your "Anxiety and Depression" section, if you go to page 215, you have a reference to a Tang study? Do you see that reference in your report to the Tang study?

A. I do.

Q. Is that Exhibit 43 that we have marked?

A. Yes.

Q. Let's go to page 8 of the study where it says "Social Media." Tell me when you're there.

A. I'm there.

Q. Do you see that they talk about: Four studies examined the association between social media use and subsequent depressive symptoms.

Page 602

Do you see that?

A. I do.

Q. And they say: In three out of four of those studies they reported no association between social media use and subsequent depressive symptoms.

Do you see that?

A. I do see that.

Q. They say: However, for one of the studies in fairness, follow-up analyses revealed a positive and nonnegligible association between social media use and subsequent depressive symptoms among males, but not females.

Do you see that?

A. I see that.

I want to emphasize that there -- the point of this study was to look at the -- the -- it's a systematic review and look at the totality of the effects, and it's not the sole basis for my opinion. There are other studies included in number 374, which I hope we will get to, that are not included in the

Page 603

systematic review, in fact, and are extremely robust.

MR. SCHMIDT: Move to strike everything after "I see that."

BY MR. SCHMIDT:

Q. Do you then see they say a fourth study -- this is one sentence down: A fourth study found a small, positive association between the frequency of Instagram browsing and subsequent depressive symptoms.

Do you see that?

A. I see that.

I want to re-emphasize, I'm not sure where you're going with this, but the -- my point remains that their overall effect of this was they found a negative significant association between screen time and depressive symptoms.

MR. SCHMIDT: Move to strike everything after "I see that" as nonresponsive.

MS. COUCH: Oppose.

Page 604

BY MR. SCHMIDT:

Q. Do you see they say: Associations between the frequency of both Instagram posting and liking and subsequent depressive symptoms were not significant.

Do you see that?

A. I see that.

But again I want to emphasize that this report -- this study found overall a significant negative association between screen time and depressive symptoms.

MR. SCHMIDT: Move to strike the speech after "I see that."

MS. COUCH: I oppose.

BY MR. SCHMIDT:

Q. Do you note that negative --

MS. COUCH: That was his answer.

BY MR. SCHMIDT:

Q. Do you note that negative -- that lack of a finding of any link between posting and liking on Instagram and subsequent depressive symptoms anywhere in

CONFIDENTIAL

Page 605

your report?

A.   My report focuses on the overall findings of the systematic review as part of the larger body of evidence that bears on the effects of social media and depression, and it's -- this -- this is part of it.

Q.   So is that a "no"?

MS. COUCH:  Objection.

A.   That's my answer.

Q.   Does your report anywhere note --

(Stenographer admonition on crosstalk.)

BY MR. SCHMIDT:

Q.   Does your report anywhere note the finding in this study that there is no association between Instagram posting and liking and subsequent depressive symptoms?

MS. COUCH:  Asked and answered; misstates the document.

A.   My report shows that this systematic review concluded that there was a small significant association between

Page 606

screen time and depressive symptoms in adolescents.

Q.   Now that you've said that, do you mind answering my question, please?

A.   That's my answer to your question.

Q.   It's not a responsive answer. My question is does your report make note of this specific finding that there is no association between posting and liking on Instagram and subsequent depressive symptoms?  Is that finding noted in your report anywhere, yes or no?

MS. COUCH:  Asked and answered; misstates the paper.

A.   I don't view that as a yes-or-no question.

MR. SCHMIDT:  Okay.  Let's mark that answer.

BY MR. SCHMIDT:

Q.   Look with me, if you would, at the abstract, please.  And do you see in the second to last -- actually, let -- let's move on.

Page 607

Do you recognize that some teenagers struggling with suicidality or self-harm thoughts find support on social media?

A.   I think that for children with suicidal thoughts, social media sites are especially dangerous.  And I base that on the scientific literature that I reviewed.

And I will base it on Meta's own documents.  If you look at in your document page 213, this is from Meta itself which shows that teens who are unsatisfied with their lives are more likely to seek content related to mental health on Instagram, and the result of that is that their mental health is actually negatively affected.  In fact, they talk about it creating a spiral.

MR. SCHMIDT:  I'm going to note that's a page-long nonanswer on the live notes.

MS. COUCH:  I'll note it was four sentences.

Page 608

BY MR. SCHMIDT:

Q.   Do some teenagers who struggle with suicide or self-harm get help on social media, yes or no?

A.   I don't view that as a yes-or-no answer.

Q.   Okay. Do you know that some social media companies try to provide suicide resources to people who show signs of suicidality and are using social media? Do you know whether that's the case or not?

MS. COUCH:  Objection; vague.

A.   I know that in response to -- from -- I know in response -- in -- from reading industry documents that in response to public outcries about the link between social media and suicide, some safeguards were put in place, but they have not proven to be adequate.

MR. SCHMIDT:  Move to strike as a speech.

Page 609

BY MR. SCHMIDT:
Q.   Do you know whether Instagram gives referrals to mental health resources to people who are showing signs of suicide, yes or no?
MS. COUCH:  Objection; vague.
A.   I don't think it's a yes-or-no question.
Q.   Do you know whether Facebook provides mental health resources to people showing signs of suicide, yes or no?
MS. COUCH:  Same.
A.   I don't think it's a yes-or-no question.
Q.   Do you know whether TikTok, Snap, and YouTube provide mental health resources to people showing signs of suicidality, yes or no?
A.   I don't think it's a yes-or-no question.
Q.   Do you know whether any of the defendants actually reach out to first responders when they learn that people are showing signs of self-harm or suicidality

Page 610

or violence, yes or no?
MS. COUCH:  Lacks foundation; assumes facts not in evidence.
MR. SCHMIDT:  There are facts in evidence, just not known by your expert.
BY MR. SCHMIDT:
Q.   Do you know?
MS. COUCH:  Object to the soliloquy.  Misstates the record.
MR. SCHMIDT:  Let me ask the question again just so we have a clean question subject to counsel's objections.
BY MR. SCHMIDT:
Q.   Do you know whether any of the defendants actually reach out to first responders when they learn that people using social media are showing signs of self-harm or suicidality or violence, yes or no?
A.   I know that the safeguards they put in place have been reactive and ineffective.

Page 611

MR. SCHMIDT:  Move to strike as nonresponsive.
BY MR. SCHMIDT:
Q.   Do you know whether any of the defendants reach out to first responders when they learn that people are showing signs of self-harm or suicidality or violence, yes or no?  Do you know?
A.   There are some safeguards in place.  They are inadequate, in my opinion.
Q.   I didn't ask you if they were accurate.  I asked you -- what are those safeguards for Instagram?
A.   They -- on -- they make -- they -- it -- make people aware of help lines.
Q.   What else do they do?
A.   The safeguards that they have in place are not adequate.
MR. SCHMIDT:  Move to strike as nonresponsive.
BY MR. SCHMIDT:
Q.   What else does Instagram do?

Page 612

A.   As a matter of course, they do very little.
Q.   Do they ever reach out to first responders?
A.   I didn't see evidence that they do that with any regularity, no.
Q.   Do they do that at all, ever?
A.   I would never say that they never do that.
Q.   How often do they do that?
MS. COUCH:  Objection; calls for speculation.
A.   I have no way of knowing that, and I don't -- I didn't see any evidence that they provided that they did it with any frequency.
Q.   What do you mean "with any frequency"?
Did you see any evidence that they did it ever when you were skimming through the deposition transcripts?
A.   I did see evidence that it happened on occasion, but I think it was very rare.  I didn't see evidence about

CONFIDENTIAL

Page 613

how frequently it happened, which is what you asked me.

Q. Well, if you're saying it's rare, you must have some number in mind of how much it happened.

How frequently did it happen? How many times a year does Instagram do that?

MS. COUCH: Objection; argumentative; asked and answered.

A. I didn't see any evidence of it.

Q. You didn't see if it was once a year, once every ten years, 500 times a year, 10,000 times a year?

MS. COUCH: Same objection.

Mark the question.

A. Given the frequency with which suicidal ideation and suicidal content appears on these sites, if it was done with any regularity, I would expect that there would be multiple, multiple examples of it, and I didn't see it.

Q. How many did you see?

MS. COUCH: Same objection.

Page 614

A. In the documents that I reviewed?

Q. Yeah, and the testimony that you skimmed.

A. I -- I -- I didn't --

MS. COUCH: Mischaracterizes his testimony.

You can answer.

A. In the documents I reviewed, I didn't see any evidence of the frequency with which it was done.

Q. Okay. Let's look at page 249, please.

MS. COUCH: Paul, we've been going about an hour, and I need to take a bathroom break.

MR. SCHMIDT: Sure. Why don't we take a break.

THE VIDEOGRAPHER: The time right now is 10:10 a.m., and we're off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time right now is 10:27 a.m., and we're

Page 615

back on the record.

BY MR. SCHMIDT:

Q. Doctor, when you were treating patients a year and a half ago and before that, you were also undertaking research, correct?

A. That's correct.

Q. You were also publishing; is that correct?

A. That's correct.

Q. Do you teach?

A. I teach medical students, residents, and graduate students, yes.

Q. How much of your time, and if we go back a year and a half ago when you were treating patients, were you dedicating to patient care as opposed to these other activities?

A. About 25 percent of my time.

Q. Okay.

Did you have, kind of, days set aside for patient care? Or was it just interspersed with your day?

A. No, it -- it varied over the

Page 616

course of my career. There were times where I had an outpatient clinic, that was regular. Then there were times where I did in-patient pediatric care, and there were times when I did both, but it was always about 25 to 30 percent of my time.

Q. What about if you go back two years ago, did you have, kind of, a set schedule then?

A. I did four weeks a year -- yeah, four -- four to six weeks a year.

Q. And for how long did you spend four to six weeks a year with patient care?

MS. COUCH: Objection; vague.

A. I don't -- for how long? You mean --

Q. Yeah, like how long a period was that spread out where your interval was four to six weeks a year?

A. It was -- like I said, my -- my patient care has gone up and down. It would be difficult for me to tell you how many weeks it was for how long.

22 (Pages 613 - 616)

CONFIDENTIAL

Page 617

Q.   And was your patient care, kind of, the range of conditions that pediatric patients might present with at a hospital?

MS. COUCH:  Objection; vague.

A.   It was the -- the children's hospital when I worked there is a referral hospital.  It sees the full range of pediatric conditions.  It also is -- tends to see more severe cases of -- it sees the full range of pediatric conditions, yes, is the short answer.

Q.   Do you know how much --

MR. SCHMIDT:  All right.  Let's strike that.

Q.   Have you ever designed a study evaluating risk factors for suicide?

A.   I've never designed such a study.

I have evaluated many such studies in my -- my role as a -- as an editor and a peer reviewer and a mentor.

MR. SCHMIDT:  Move to strike everything starting with "I have evaluated."

Page 618

BY MR. SCHMIDT:

Q.   Have you ever performed a study evaluating risk factors for self-injury?

MS. COUCH:  Objection; vague.

A.   Not that I recall.

Q.   Have you ever published academic research focused primarily on suicide or self-harm?

MS. COUCH:  Objection; vague.

A.   I believe I have published a paper at least that looked at risky behaviors, including self-harm, yes.

Q.   Did it focus on suicide?

A.   It focused on risky behaviors including self-harm, as I recall, yes.

Q.   Did it focus on suicide?

A.   It focused on risky behaviors including self-harm, and self-harm is a risk factor for suicide.

Q.   Did it actually look at suicide, yes or no?

A.   Very few studies look at suicide.  It's a, thankfully, a very, very rare event, and it's very difficult to do

Page 619

research studies that focus specifically on suicide.

Q.   Do you hold yourself out to your colleagues as an expert on suicidology?

MS. COUCH:  Objection; vague.

A.   I consider myself an expert on suicide, yes.

Q.   Do you consider yourself an expert on self-injury?

A.   I do consider myself an expert on self-injury.

Q.   Have you ever published a paper on age verification?

A.   Say more what you mean by that.

Q.   You talk in your report about -- if you look at section -- at the section on page 353 you have a title that says "Inadequate Age Verification."

My question is have you ever published a paper on age verification?

A.   I've not published a paper on age verification, but I understand why it's important and I -- and I -- yeah.

MR. SCHMIDT:  Move to strike

Page 620

everything starting with "but."

BY MR. SCHMIDT:

Q.   Have you ever conducted research outside of litigation on age verification that you can point us to?

A.   Not that I recall.

Q.   Have you ever designed an age verification system yourself?

A.   No, I have not designed.

Q.   Have you ever advised on designing an age verification system?

MS. COUCH:  Objection; vague.

A.   What -- what -- what do you mean by that?

Q.   Have you ever advised someone or some company that's trying to come up with an age verification system on how they might do that?

A.   I've never advised on how to do it to someone, but I've advised on why it's important.

Q.   Have you advised anyone other than lawyers on why age verification is important?

23 (Pages 617 - 620)

CONFIDENTIAL

Page 621

A.   Yes, I've advised other people besides lawyers on why age verification is important.

Q.   Who have you advised?

A.   I have advised parents, pediatricians, software start-up people who've asked me.

Q.   What software start-up people have asked you about age verification?

A.   I've been approached many times over the years by companies that are interested in making the digital world safer for children. I've never worked for any of them. They've asked me what I consider to be the problems that need to be addressed, and -- and that's one of the ones that I've recommended.

Q.   Okay. What companies?

A.   I honestly don't recall off the top of my head now. There have been many companies that have consulted -- or, asked me to work for them over the course of the last 15, 20 years.

Q.   Can you name one that has asked

Page 622

you to help them with age verification?

MS. COUCH:  Objection; asked and answered.

A.   I -- I -- I never said that they asked me to help them with age verification. I said that I said that, to them, that age verification would be an important problem for them to solve.

Q.   Could you name one company that has reached out to you in any capacity, any software start-up company?

MS. COUCH:  Same objection.

A.   A company called -- I believe they're now called Circle. When they reached out to me before, I think they were still called Circle. I don't remember. This was a while ago.

Q.   Do you know technically how to design an age verification system? Is that something you could do as a technical matter? Do you have the expertise to do that?

A.   I don't have the technical expertise to do that. I have -- no.

Page 623

Q.   Can you point me to any Internet app that you would -- that you know of that is intended for use by teens, maybe among other people, and, in your view, conducts appropriate age verification?

MS. COUCH:  Objection; vague.

A.   Age verification is not an area of -- that I have technical expertise in.

It's my understanding that certain platforms, certain websites have found ways to do it.

Q.   Who?

MS. COUCH:  Objection; vague.

A.   It -- as I recall, the -- the Microsoft gaming platform, I'm trying to remember what it's called. I can't remember off the top of my head.

Q.   But you believe the Microsoft gaming platform has appropriate age verification?

A.   Yes.

As I sit here, I'm struggling to remember precisely which ones, but I -- I -- I -- I do believe that there are ones

Page 624

that have done so, and I -- I -- I -- yes.

Q.   And how does the Microsoft gaming platform that you're thinking of conduct age verification?

A.   I think one of the effective mechanisms is that an adult has to verify their age and then attest to the age of a child.

I think more recently, their AI mechanisms that are also deployed to assess age by image.

Q.   Do you know who creates those AI programs?

A.   I don't. This is not an area that I have technical expertise in. I have a passing awareness of it, but it's not my area of expertise and it's --

Q.   Do you know if any of the defendants use those kind of photo age check processes that you just referenced?

A.   I think more recently, some of them can -- have started to look at ways that they might deploy them.

Q.   Who has?

24 (Pages 621 - 624)

CONFIDENTIAL

Page 625

A.   I -- I -- I'm honestly now trying to remember because I know that as recently as a couple of years ago, they were not being deployed, as I mention in my report, and I don't recall now precisely who was using them and in what capacity.

Q.   Have you ever designed or built an age prediction model?

A.   Explain what you mean by that.

Q.   Well, do you know if any of the defendants in these cases have age prediction models or have attempted to develop age prediction models?

MS. COUCH:  Compound.

A.   There was reference to them trying to estimate age.

In fact, in some respects, I remember them using that to show that they had an un -- that they had an inordinate number of underage people on their websites.

MR. SCHMIDT:  Move to strike everything starting with "in fact."

Page 626

BY MR. SCHMIDT:

Q.   Do you know who has attempted to build an age development -- an age prediction model among the defendants?

MS. COUCH:  Objection; asked and answered.

A.   I seem to recall that YouTube had -- was developing or trying to develop a age classifier, but it -- it only scanned, as I say here, a small portion of their accounts and still identified that there were many -- 300,000 accounts per week that were suspicious for being underage.

Q.   Have you ever developed an age classification, an age classifier, or an age prediction model along the lines of what we're talking about?

A.   For social media sites, no.

Q.   Or for any website.

A.   Not for any website.

Q.   Do you know how to do one?  Do you have the technical knowledge to be able to create one?

Page 627

A.   I --

MS. COUCH:  Objection; vague.

A.   In -- in the context of my work doing research, I've used statistical tools to impute age, but not for social media sites.

Q.   So would you be able to develop an age classifier for a social media website?

A.   I have a understanding of how one would building a statistical prediction model given inputs that might predict age, but I've never done it for a social media site.

Q.   Have you ever signed a safety feature for a social media app?

MS. COUCH:  Objection; vague; compound.

A.   I have never signed a safety feature for a social media.

Q.   Have you ever designed a safety feature for any Internet service?

A.   I have never designed one, but that's another example of a consulting

Page 628

role that I have been approached for by companies in the past that I have passed on.

Q.   Did you actually do any work in that regard?

A.   No.  I have always opted not to work for industry.

Q.   Can you name me any social media service that has safety features that you believe are appropriate?

MS. COUCH:  Objection; vague.

A.   Of the five social media sites that are listed in my report, I don't believe any of them have adequate safety features.

Q.   Yeah, that's not the question I asked.

The question I asked is can you name me any social media site that you think does have adequate safety features?  If I wanted to compare your opinions to the real world, can you point me to one where I could say "This is what Dr. Christakis thinks you should have"?

25 (Pages 625 - 628)

CONFIDENTIAL

Page 629

A.    As a social media site --
        MS. COUCH:  Objection; vague --
        (Stenographer admonition on crosstalk.)
        MS. COUCH:  Just let me get my objection in.
        THE WITNESS:  I'm sorry.
        MS. COUCH:  Vague and argumentative.
A.    Your question was can I name a safety -- a social media site that, in my opinion, has adequate safety features.
Q.    Yes, please.
A.    The only social media sites that I reviewed with that in mind were the five listed in my report, and I don't consider any of them to have adequate safety features.
Q.    Can you name me any Internet service or app that you believe has appropriate safety features?
        MS. COUCH:  Compound.
A.    The only social media sites that I reviewed were in the context of this

Page 630

report, their safety features, and I don't consider any of them to be adequate.
Q.    I've tried to ask the question a little broader.
        Can you name me any Internet service or app, whether it's social media or otherwise, that you believe has adequate safety features?
A.    My area --
        MS. COUCH:  Objection; vague.
A.    I reviewed the safety features of these five websites, and I didn't consider any of them to be adequate.
Q.    Can you answer my question now, please?
A.    The only social media sites' safety features that I reviewed are these five, and I don't consider any of them to be adequate.
Q.    I'm not asking -- my question wasn't about social media sites.  It was about any Internet site, any app.
        Can you name me any one that you believe has appropriate safety features?

Page 631

A.    The only ones that I've looked at have been these five, and I don't consider any of them to be adequate.
Q.    Okay.
        Is there any kind of government standard --
        MR. SCHMIDT:  Well, strike that.
Q.    You talk about parent controls.
        Have you ever designed parental controls for a social media platform?
A.    I have never designed parental controls, but it's an area that I've been asked about, again, by companies looking to make the Internet social media sites safer for children.
Q.    Did you actually do that work?
A.    I opted not to do that work. Although I, again, told them what I thought the problems were.
Q.    Have you ever published any papers on parental controls or safety features?
        MS. COUCH:  Objection; vague; compound.

Page 632

A.    Have I published papers specifically looking at the role that parental safety features play?
Q.    No.  Parental controls parental controls or safety features.
A.    Parent --
        MS. COUCH:  Compound.
A.    Parental controls or safety features play?
Q.    Yes.
        MS. COUCH:  Same objection.
A.    I would say that I would answer that affirmatively with "yes."
Q.    What papers?
A.    About -- I'll have to look at my CV.  It may have been 20 years ago.
        I published a study on MySpace where we did an experiment to show that if we let teenagers know that we were looking at what they were posting, they reduced their risky behaviors online.
Q.    Outside of the MySpace publication, have you ever published on parental controls or safety features

26 (Pages 629 - 632)

CONFIDENTIAL

Page 633

regarding any form of app?

MS. COUCH: Objection; vague; compound.

A. Would -- ask that question again, I'm sorry.

Q. Sure.

A. I want to make sure I understand it.

Q. Outside of that publication you referenced on MySpace, have you published any paper evaluating either parental controls or safety features on any app?

MS. COUCH: Objection; vague; compound.

A. I've published papers on risky behaviors shown on -- on Facebook that followed up that MySpace one, but they were not focused on parental controls as I expect you're referring to them.

Q. Okay. Let me ask the question just for parental controls.

Have you ever published a paper on evaluating parental controls on any kind of app?

Page 634

A. No, I don't believe so.

Q. Can you name any app that serves teens that you believe has fully appropriate parental controls?

MS. COUCH: Objection; vague.

A. The only apps that I evaluated with respect to parental controls were the five in this report in this case, and I consider all of them to be inadequate.

Q. Is there any one you can point me to that is inadequate -- that is adequate, any app at all?

MS. COUCH: Asked and answered.

A. The only ones that I evaluated and that I can comment on are the five in this report, and I consider them all to be inadequate.

MR. SCHMIDT: I'm going to note that we've gotten frequent "asked and answered" objections, and every time the witness gives the same speech in response to the "asked and answered" objection. I think it's improper.

MS. COUCH: I'm going to note

Page 635

that there's nothing nefarious going on.

You're asking questions repeatedly despite getting answers. It's wasting your time. You can do what you please with your time.

We can mark the question for the record. The transcript speaks for itself.

BY MR. SCHMIDT:

Q. Do you know of an app, if we wanted to benchmark your opinions of inadequate parental controls, that you would tell us here's what an adequate parental control system looks like in terms of a real-world app?

MS. COUCH: Objection; vague.

A. The apps that I studied with enough depth to render an opinion on are the five that I was tasked with doing that for and it's these five, and I consider all of them to be inadequate.

Q. So is it correct that you cannot point us to an app that you would say this

Page 636

is one that has adequate parental controls? Is that correct, yes or no?

A. I don't have an opinion on that.

Q. Okay.

A. Because the only five that I evaluated are here, and I don't consider any of them to be adequate.

Q. Did you reach any opinions based solely on reviewing company documents?

A. No. I -- the company documents were used as confirmatory evidence of the literature that I reviewed, my own research, my clinical experience, and my education.

Q. Is there any methodology you would point us to that you applied in reviewing the company documents beyond reading them and talking about what you think they say?

MS. COUCH: Objection; misstates his testimony; argumentative; improper characterization.

A. Well, in many cases, the company documents referred to specific research

27 (Pages 633 - 636)

CONFIDENTIAL

Page 637

studies and provided research findings that I evaluated the same way I evaluate all research, either external or consistent with the way I evaluate hospital-level data.

Q. That's a fair point. Let's put the research to the side.

When you evaluated company documents other than research, is there specific methodology you would point us to that you employed beyond reading the documents and talking about what you think they say?

MS. COUCH: Objection; mischaracterizes his testimony and the record.

MR. SCHMIDT: Object to the coaching.

A. Explain what you mean by "methodology."

Q. Yeah. We talked yesterday about Bradford-Hill. We talked about the PRISMA systematic literature review methodology. We talked about I think you called it

Page 638

"totality of the evidence" review. That's what I'm talking about about methodology. And I think you alluded to it just now when you say "I reviewed the studies the same way I review the studies -- the research findings, I'm sorry, the same way I review research in the real world."

A. Yeah.

Q. I'm asking about the other company documents reviewed, things like the emails, things like the chat.

Is there some type of methodology you can identify for us that you apply to your review of those documents beyond simply reading them and talking about what you think they say?

MS. COUCH: Objection to the characterization; argumentative.

A. I applied what we call in the hospital world, and I think it came from the business world, the quality improvement approach, which is to say when you see a problem, when you see a sentinel event, you try to evaluate the root cause

Page 639

and decide how to rectify it.

Q. Have you ever written a warning for a product of any kind?

A. I have never written a warning, but warnings have been written based on research that I have done.

Q. Have you ever helped advise a company on specific warning language that should be given about a product or a service?

A. I consider that outside of the area of my expertise, but there are people that have expertise in that area.

Q. Have you ever worked with any government agency on developing a warning for a product or a service?

A. I served on expert consensus panels that have made recommendations to parents and to providers of care around medical services and testing.

Q. What about for a product or an app, have you ever actually advised a government agency on how a product should have a warning or an app should have a

Page 640

warning?

A. I've provided written testimony about products, but I've never functioned in an official advisory capacity about how an app should be developed.

Q. Are you giving an opinion in this case about whether social media should have specific warnings accompanying it?

A. I -- I believe that there should be parental warnings, yes.

Q. What should the parental warnings say? Have you written out what they should say?

A. What the text of those should be?

Q. Yes.

A. I've not written the text of what they should say, but I think that parents should be informed of the risks that are posed by their children being on social media sites and the type of content they might be exposed to if they use them.

Q. Okay.

28 (Pages 637 - 640)

CONFIDENTIAL

Page 641

And what should those warnings say?

MS. COUCH: Objection; outside the scope.

A. I -- I'm -- I have not devised what the text of those warnings should say, but I know what the substance of them should be.

Q. What risks and type of content should they warn about, in your view?

MS. COUCH: Objection; misleading; outside the scope.

A. There's -- -- frankly, there's many things that parents need to be alerted to, and I -- the truth is that I don't think the alerts themselves would be adequate to make the -- the sites safe. But as they exist now, there -- parents should be alerted that there's inappropriate content that's not suitable for children under the age of 18. There's content that increases the risks of all of the stuff that we've miss -- mentioned here. There are specific design features

Page 642

that their children will be exposed to that could increase the risk of eating disorders, depression, all of the -- all of the -- everything in this report.

Q. What design features should be warned about?

MS. COUCH: Objection; outside the scope.

BY MR. SCHMIDT:

Q. Or should any be warned about specifically?

A. I think --

MS. COUCH: Same objection.

A. I think that all of the design -- I -- okay.

I think that parents should be warned about infinite scroll, about streaks, about notifications, about the risk of reels, about variable intermittent rewards, about auto-play, about appearance filters. And that's why I said that there are so many design features that pose risks that the -- that the platforms are unsafe and those design features should be

Page 643

rectified rather than warning parents.

Q. What page are you reading from in your report?

A. It's -- it's my Table 5. It's on page 139 of my thing.

On yours --

EXHIBIT TECHNICIAN: 157.

MR. SCHMIDT: What?

EXHIBIT TECHNICIAN: 157.

MR. SCHMIDT: Thank you.

A. 157.

Q. Are there any features that you think should be warned about beyond what appears on 157?

MS. COUCH: Objection; outside the scope.

MR. SCHMIDT: If you're not putting him up as a warning expert, I'll withdraw the question.

MS. COUCH: We're putting him up for his specific warnings in his report, but we're not putting him up for the questions that you're asking.

Page 644

BY MR. SCHMIDT:

Q. What features should be warned about beyond those on 157, if any?

MS. COUCH: I do want to correct the transcript did not come through the way I wanted it to.

We are not putting him up for the types of questions that you are asking. We are only putting him up as stated in the very beginning of his report, that warnings are needed, period.

Thank you. Sorry.

A. Your question was what did -- what -- what warnings should there be besides these?

Q. Yeah. Should there be any warnings about features besides these features on 157?

A. No, I --

MS. COUCH: Objection; outside the scope.

A. I think that the warnings should alert parents that -- that use of the

29 (Pages 641 - 644)

CONFIDENTIAL

Page 645

product, use of the platforms increases the risks of all of the things that we've discussed here, eating disorders, body dysmorph -- all of them.

Q. Okay.

Where should those warnings be given?

MS. COUCH: Objection; outside the scope; lacks expertise.

A. I don't -- I -- it's -- I don't have the expertise to comment on that. I know that there are people that know how to draft and position warnings to maximize their effectiveness.

Q. But that's not your expertise?

A. That's not my expertise, no.

Q. Okay.

Do you know if every service has terms of service that they require people to agree to before signing up?

A. You -- you mean every one of these services has a terms of service that you click to?

Q. Yes.

Page 646

A. I believe that they do, yes.

Q. Have you read those terms of services for each defendant and how they've changed over time?

MS. COUCH: Objection; relevance.

A. How the terms of service have changed over the last however many years?

Q. And what they are for any defendant.

Let me -- let me take it -- make it simpler.

Have you reviewed any of the terms of service for any defendant?

A. I have not reviewed the terms of service of any defendant, but I -- I don't think that that matters. I don't think anybody reads the terms of service on anything that they sign up for, whether they're a child or an adult.

Q. Do you know if the terms of service address any of these warnings that you're proposing?

MS. COUCH: Objection; calls for

Page 647

speculation.

A. I -- I don't know if they do, but if they do, it's not an adequate way of doing it.

Q. Do you know if any --

MR. SCHMIDT: Move to strike "if they do," starting with that.

BY MR. SCHMIDT:

Q. Do you know if any service will actually give in-app warnings when certain types of content is presented?

MS. COUCH: Objection; vague.

A. I have a recollection that some content does sometimes have warnings, but it's not adequate.

Q. Which services provide such warnings, in-app warnings regarding specific content?

MS. COUCH: Objection; vague; calls for speculation.

A. I don't have an opinion on it. I -- I -- it's -- I can't recall now precisely which ones and what circumstances trigger it, but I do recall

Page 648

that there are occasions where some are triggered.

Q. Do you know if any of the apps work to restrict certain types of content that might be available for adults for teens?

MS. COUCH: Objection; vague.

A. I know that that restriction is not effective.

MR. SCHMIDT: Move to strike as nonresponsive.

BY MR. SCHMIDT:

Q. Let me ask you more broadly.

Do you know if any of the services in this case, any of the defendants in this case just don't allow certain types of content?

MS. COUCH: Objection; vague.

BY MR. SCHMIDT:

Q. Have rules against certain types of content?

MS. COUCH: Same objection.

A. Yes, they do have rules about content. And when -- and in reviewing the

Golkow Technologies,

877-370-3377        A Veritext Division        www.veritext.com

CONFIDENTIAL

Page 649

document and -- and -- and this -- this did rely on -- this did include reviewing internal documents, they make a point of noting repeatedly that their methods are ineffective.

Q.   Did you see one company document that said "Our methods for content moderation are ineffective," as you just claimed under oath?  A single document that said that?

MS. COUCH:  Objection; argumentative.

A.   I saw depositions that -- where people attested to the effectiveness of their controls, yes.

Q.   You just said "documents."

You said reviewing internal documents that make a point of noting repeatedly that their methods are ineffective.  I'd like to know if there's a single document that you reviewed that supports that claim you made under oath that you reviewed internal documents and, quote, they make a point of noting

Page 650

repeatedly that their methods are ineffective.  I'd like to know any documents that support that under-oath claim that you made.

MS. COUCH:  Objection; argumentative.

A.   So, among others --

Q.   Would you mind telling me what page you're on?

A.   This is on -- this is 259 in mine.

Q.   Why don't you give me the footnote number?  Maybe I can track it that way.

A.   It's documents 146.

Q.   I don't think so.

Why don't you read the text and we'll find it?

A.   It says -- well, it's an internal communication between Michael Rothschild and Yoav Shapiro.  He said -- he says:  By the way, according to Manoli, we don't have CEI/IIC classifiers integrating to filtering and recommending

Page 651

the only prediction we have is tiering.

And Yoav Shapiro says:  Yup. Those classifiers are somewhat between nonexistent and shitty.

Michael Rothschild replies:  I see.  Bummer.

Q.   Can you read -- I think you're reading a screen image, right?

A.   Yes.

Q.   Can you read text below it that you've written?

A.   Below it it says:  ▮ goes on to say:  Most of our policies I don't believe will have really good classifier -- classifiers for years, if ever.

Q.   Okay.  That's a chat you're referring to.

Thank you.

Correct?

A.   That is a -- yeah, I believe I said -- yes, that's a document, yes.  It's an internal document, yes.

Q.   And do you know if this refers

Page 652

to content or refers to putting people in touch with people?

MS. COUCH:  Objection; vague.

BY MR. SCHMIDT:

Q.   Because I was asking you about content.

MS. COUCH:  Same objection.

A.   I don't understand the nature of the distinction you're trying to make.  I apologize.

Q.   Okay.

Did you read Mr. ▮ testimony?  It doesn't appear on your list of testimony.

Did you read his testimony to see what he said about this?

A.   I don't recall if I read it or not.  I -- I -- I have the ones that I -- I -- I -- I don't recall if I read it or not.  I -- I read many, many depositions.

Q.   If it doesn't appear on your list, did you read it?

A.   I don't recall if I read it.  I read so many, but...

31 (Pages 649 - 652)

CONFIDENTIAL

Page 653

(Christakis Exhibit 44, Bill For Consulting Services Dimitri Christakis MD MPH July 2024, Bates CHRISTAKIS0043-053, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q.   Okay.
Do you recognize Exhibit 44?

A.   Yes.

Q.   These are your invoices in this -- for these lawsuits, right?

A.   Yes.

Q.   And few questions about them.
The very first invoice you have is dated July 18th, 2024, correct?

A.   Yes.

Q.   It says:  Talk with Matt.
Who's Matt?

A.   Matthew Bergman.

Q.   And is he the one that hired you in this case?

A.   He was the one that first contacted me.

Q.   And when did he first contact

Page 654

you?

A.   I think it was in October of 2023.  I -- I don't recall off the top of my head.

(Christakis Exhibit 45, Application of Matthew P. Bergman For Appointment to Plaintiffs' Steering Committee, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q.   I'm going to show you a document you've probably never seen before, Exhibit 45.  This is a court filing.

MS. COUCH:  Objection to the characterization.

BY MR. SCHMIDT:

Q.   And have you seen this before?

A.   I don't -- I -- I don't remember seeing this.

Q.   Okay.  If you look at the first page of the document.

A.   Yes.

Q.   Do you see that it is dated the 20th of October, 2022?

Page 655

A.   I do.

Q.   And this is the same Matt Bergman we've been talking about, right?

A.   It is, yes.

Q.   You said you knew his father.
How do you know his father?

A.   His father was a very preom -- a -- a -- a preeminent pediatrician and one of my mentors at University of Washington.

Q.   Okay.
So, Mr. Bergman the lawyer, his father was your mentor?

A.   One of them, yes.

Q.   Okay.
Were you friends with his father?

A.   I wouldn't say we were friends.

Q.   Okay.  Fair enough.  I understand that type of mentor relationship.
Let's look at page 3, please, of this document.
And if you look one, two -- if

Page 656

you look halfway down there's a paragraph that begins "Since late 2021."
Do you see that?

A.   I do.

Q.   (Reading) Since late 2021, SMVLC.
That's his law firm, right?

A.   Yes.

Q.   (Reading)...has engaged a roster of nationally renowned experts.
Do you see that?

A.   I do.

Q.   And then one of the experts that he talks about, in fact the first expert, is you.

A.   Yes.

Q.   And then if you look at -- well, let me just ask you was Mr. Bergman being accurate when he said that since late 2021 he had hired you?

MS. COUCH:  Objection; lacks foundation; calls for speculation; and mischaracterizes the document.

A.   Reading this reminds me that I

32 (Pages 653 - 656)

CONFIDENTIAL

Page 657

had a conversation -- I guess I said 2023 and I -- now I'm -- I mean, I had a conversation with Matt about this, but I didn't have any more contact with him until 2024.

Q.   Okay.  That's -- and that's fine.

When you had that -- do you see where he says "SMVLC has engaged"?  Do you see that word "engaged"?

A.   Yes.

Q.   Were you hired at that point in time to be an expert for Mr. Bergman in these cases in late 2021?

A.   I don't know what the word "engaged" means in this context.  He asked me if I was willing to work with him if I -- and I -- I said yes.

Q.   Okay.

Did you know which side he was representing in the lawsuits?

A.   Who -- who he was -- I -- I -- I know he was representing children and their parents.

Page 658

Q.   Okay. Plaintiffs.

A.   Plaintiffs, yes.

Q.   And at that point, had you reviewed any company documents?

A.   No.

Q.   At that point, had you conducted the literature review that's reflected in your report?

A.   No.

Q.   Okay.

Let's look back at Exhibit 44, please.  Your next item is:  Talk with Team.

Who is the team?

A.   The team, as I recall, was -- you mean for this particular phone call or the -- what I consider to be the team that I've engaged on and off?

Q.   Well, is -- let me just ask you this.

Is there -- do -- do you have people helping you other than lawyers in this work?

A.   Oh, no.

Page 659

Q.   Okay.

Did you have to seek approval from the University of Washington before you could be an expert?

A.   No.

Q.   Did you have to give a disclosure?

A.   No.

Q.   Have you given any disclosure to the University of Washington that you're doing expert work for plaintiffs in this case?

A.   No, I have not.

Q.   Do you agree that it's important to disclose your expert work in your publications that deal with social media pursuant to conflict of interest policies?

MS. COUCH:  Objection; vague; asked and answered.

A.   Do I believe that it is important for me to disclose the work I'm doing on my publications when I -- yes, I do believe that's important.

Q.   Let's -- if we total up these

Page 660

invoices, we get a little over $400,000.

Is that consistent with your understanding?

A.   I haven't totalled them, but this is the total of the work I've done, so if that's what it amounts to, then yes.

Q.   Okay.  And it specifically amounts to 411,280 between July 2024 and May of 2025, less than a one-year period.

Do you see that?

A.   Yes.

Q.   What is your annual compensation outside of litigation?

MS. COUCH:  Objection.

A.   My -- my annual compensation is -- varies year to year, but it is my -- my -- a combination of my salary, my compensation for my role as an editor, and various speaking fees I get for giving talks to various groups.

Q.   How much do you get in speaking fees for giving talks?

MS. COUCH:  Objection; vague.

A.   It -- it varies.

33 (Pages 657 - 660)

CONFIDENTIAL

Page 661

Q.   What's the max?

MS. COUCH:  Same objection.

A.   The maximum I've ever gotten for a single speech?

MS. COUCH:  Objection.

A.   Am I obligated to answer that?

Q.   Unless your attorney tells you not to, yes.

MS. COUCH:  Technically if you think something is harassment or voids privacy, you can decline, and then they could decide if they want to know that enough to go to the court and move to compel.

MR. SCHMIDT:  And I will tell you this is -- like, there's a confidentiality order in place for this deposition, and if your attorneys want to mark this confidential, we won't object to it.

MS. COUCH:  If you tell us that you're not going to use it and make it public at trial.

MR. SCHMIDT:  I'm not going to

Page 662

say that, no.  Of course not.

MS. COUCH:  I didn't think so.

MR. SCHMIDT:  That's ludicrous.

MS. COUCH:  So that's back to the original, but...

BY MR. SCHMIDT:

Q.   How much -- what's your highest speaking fee?

A.   $100,000.

MS. COUCH:  Preserving the objections.

BY MR. SCHMIDT:

Q.   And what's your salary last year?

A.   My University of Washington salary is -- it's a matter of public record, but I think it's about $360,000.

Q.   So last year you made more from this lawsuit than your salary?

A.   No, 'cause I have --

MS. COUCH:  No, misstates his testimony.

Let me get my objections in, Dimitri.

Page 663

THE WITNESS:  Sorry.

A.   No.

Q.   Well, then I'm confused.  I thought you said your salary was 360,000 last year.

A.   I -- I said that my -- my annual income is a mixture of my salary, my editorial responsibilities, and my speaking fees.

Q.   No, I get that.  I was asking just about your salary.

Was your payments from the litigation, am I correct that they were higher than your salary last year?

MS. COUCH:  Objection; misleading and mischaracterizes the invoices.

MR. SCHMIDT:  That's more speaking.  Please don't do speaking objections.

MS. COUCH:  Please don't mischaracterize facts and evidence.

MR. SCHMIDT:  There's no reading of that.

Page 664

BY MR. SCHMIDT:

Q.   What was your salary last year again?

MS. COUCH:  Objection; vague.

A.   My University of Washington salary, which represents one source of income, was about $360,000.

Q.   Is that more or less than the 411,000 you were paid to be an expert in this case by plaintiff lawyers?

MS. COUCH:  Objection; vague.

A.   My -- my total compensation last year was my University of Washington sal -- my total compensation last year was approximately $500,000.

Q.   Not my question.  My question was -- but I'll take that.

Who paid you the hundred thousand for a speaking fee?

A.   I was a -- a guest of the Crown Prince in Abu Dhabi.

Q.   How many times have you given speeches to -- in Abu Dhabi, paid speeches?

34 (Pages 661 - 664)

CONFIDENTIAL

Page 665

A.   In the -- in -- in the UAE I've given speeches several times.

Q.   Have you given prior expert testimony before?

A.   I've given -- it's disclosed what I've done.  I don't know if it constitutes ex -- I've never been deposed. I've given a report one prior time which is -- which is somewhere in here.  Besides that, I've never given expert testimony.

(Christakis Exhibit 46, Prior Testimony list, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q.   And are you referring to what I've marked as Exhibit 46, please?

A.   Yes, I believe this is it.

Q.   Okay.

Are these the only -- and this is deposition and trial testimony in the last five years.  Do you see that?

A.   Yes.

Q.   But neither of these actually involve deposition or trial testimony, did

Page 666

they?

A.   No.  All I did was file a -- a -- a report.

Q.   Okay.

A.   That's correct.

Q.   And other than these three reports, this says the last fives years, have you done any expert work before those five years?

A.   No.

Q.   Do you recall that in these cases, you worked with the Lieff Cabraser law firm?

A.   I don't --

MS. COUCH:  Objection; lacks foundation.

A.   I -- I -- I know the name of the lawyer.  I don't recall what law firm it was.

Q.   What's the name of the lawyer?

A.   The -- the one I -- I principally had contact with, I believe his name was Doug Cuthberton [sic] or something.

Page 667

Q.   Okay.

Let's look at page 106, please, of your report, Exhibit 2.

Do you see at page 136 you --

A.   Wait.  106 or 136?

Q.   You're right, 106.

A.   I went to the wrong one.

Q.   You see that you have various citations here to your Handbook of Children and Screens?

A.   I do.

Q.   And if you keep flipping through you'll see it runs throughout your report citing the Handbook of Children and Screens?

A.   I do.

Q.   That was published in 2025, correct?

A.   Yeah, January of -- well, actually, yes, January of 2025.  That's correct.

Q.   There's no other source you cite more in your report than your handbook, is there, that you know of?

Page 668

MS. COUCH:  Objection; vague.

A.   As a -- as a -- as a single source?

Q.   Yes.

A.   Well, that's -- misrepresents. I mean, the handbook itself is -- is 80 -- about 80 chapters, so.

Q.   Suffice it to say you cite it pretty extensively, right?

A.   I cite the handbook frequently because it was a recent publication by seminal experts and -- but it has 80 chapters covering pretty much everything.

Q.   Let's look at Exhibit 47, which is an excerpt from the handbook.

(Christakis Exhibit 47, Children and Screens Introduction, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q.   You see that this is your introduction, along with fellow expert Lauren Hale?

A.   Yes.

Q.   And do you see that on page 3,

35 (Pages 665 - 668)

CONFIDENTIAL

Page 669

by this point -- let's go back to page 1.

By this point, you had been working on this litigation for over half a year, correct?

A. By which point?

MS. COUCH: Objection.

BY MR. SCHMIDT:

Q. By the January 2025 publication date of this book, you had been working on -- as a paid expert for plaintiffs in social media litigation, for over a half year, correct?

A. The -- the publication date of this is long after the book itself was completed and submitted for publication.

Q. By January of 2025, had you been a plaintiffs' expert for more than a half year?

A. By January 2025 I had been a plaintiffs' expert for, yes, for six months.

Q. And that's actually getting paid, you had agreed with Mr. Bergman to be an expert a couple of years ahead of

Page 670

that, right?

MS. COUCH: Objection; vague.

A. I had not done any work for Mr. Bergman before.

Q. But you had agreed to work with him, correct?

A. You mean by --

MS. COUCH: Objection.

A. -- the thing you --

Q. Yeah.

A. Yes, I had agreed to work with him, but I hadn't done any work.

Q. There's no disclosure of your expert work on page 3 in your "Conflict of Interest" section, correct?

A. That's correct, because at the time that this book was completed, I had not been working as -- as a -- as a paid consultant for anyone.

Q. It's never been amended on the Internet.

This book is available on the Internet, right?

A. This book is available on the

Page 671

Internet.

Q. And it's -- you've never amended to disclose the conflict on the Internet, have you?

MS. COUCH: Objection; asked and answered.

A. The conflict of interest that one declares is based on one's role when the work was being done, and the work of editing this book was done actually over a year before this when it was in editorial process after that.

Q. Have you ever amended the conflict disclosure on the Internet?

A. This conflict?

Q. Yes.

MS. COUCH: Objection; asked and answered.

A. I have not. I didn't see a need to. I'm willing to -- I mean, I don't -- I'm -- I'm willing to discuss with the publishers if they think it's relevant.

I -- my belief as a -- as an editor myself is that it isn't relevant

Page 672

because it -- the work predated my work.

I have in subsequent publications noted the conflict when I saw appropriate, and I believe you have those publications that came out in 2025.

Q. The handbook is a publication of a group called Screens and Children, right?

MS. COUCH: Objection; misstates the document.

A. The handbook isn't -- the handbook is a publication of Springer.

Q. Who is -- what is the relationship between the handbook and Screens and Children?

A. It's Children and Screens.

Q. I'm sorry, Children and Screens.

A. Children and Screens provided the funding to enable us to put the handbook together.

Q. Okay.

Children and Screens has a scientific advisory board, right?

A. Yes, it does.

36 (Pages 669 - 672)

CONFIDENTIAL

Page 673

Q.   What's the purpose of the scientific advisory board for Children and Screens?

A.   The scientific advisory board advises Children and Screens on the current state of the science related to children and screens.

Q.   And specifically the scientific advisory board gave leadership and support for the handbook, correct?

MS. COUCH:  Objection; misstates testimony.

A.   I -- I'm wondering what you mean by that and where you got that from.

Q.   Did they -- did the scientific advisory board for Children and Screens give leadership and support for the handbook?

MS. COUCH:  Objection; vague.

A.   I'm not sure what you mean by "support" in that context.

Q.   In any context.

MS. COUCH:  Same objection.

A.   They were aware that the

Page 674

handbook was being drafted.  Many of them are authors on some of the chapters.  You know, we discussed it with them.

Q.   What -- what did you discuss with them?

MS. COUCH:  Objection; vague.

A.   The original plan for this handbook was -- in fact, it was originally submitted as a supplement to pediatrics.  This is why I'm saying that the -- the work was completed long before 2025.  We submitted the same work as a supplement to the pediatric -- to the Journal of Pediatrics two years prior and afterwards had a conversation with the scientific advisory board about what we should do next.

(Christakis Exhibit 48, Children and Screens Foreword, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q.   Okay.

Do you see Exhibit 48, the foreword to the handbook that I passed

Page 675

you?

A.   Yeah.

Q.   If you look on the second page, do you see that there are appreciations?

A.   Yes.

Q.   And one of the "thanks" is to the, I'm looking at the one, two, three, four --

A.   Yeah.

Q.   -- fifth bullet, to the Children and Screens --

A.   Yes.

Q.   -- National Scientific Advisory Board --

A.   Yeah.

(Stenographer admonition on crosstalk.)

Q.   -- and Board of Directors for their stalwart leadership and support.

Do you see that?

A.   Yes.

Q.   Is that an accurate statement?

MS. COUCH:  Objection; vague.

A.   It's an accurate statement.

Page 676

Q.   Are you aware that Matt Bergman is part of the advisory board for Children and Screens, the scientific advisory board?

MS. COUCH:  Objection; lacks foundation.

A.   I'm aware that he joined, I believe, I don't know, three months ago or something, yes.

Q.   Does he have any scientific -- as a lawyer who sues social media companies, do you believe he is a scientist?

MS. COUCH:  Objection; argumentative; lacks foundation.

A.   The advisory board includes people who -- if you bring up the whole list of it, I could talk about who's on it individually, but not everybody on it is a -- not everybody who's on it is a scientist.

Q.   Well, do you know everyone who's on it has a M.D. or Ph.D. other than plaintiff lawyer Matthew Bergman?

37 (Pages 673 - 676)

CONFIDENTIAL

Page 677

MS. COUCH: Objection; lacks foundation.

A. Actually, I don't think everybody on it has a Ph.D. or an M.D.

(Christakis Exhibit 49, Children and Screens Board of Advisors Spotlight: Matthew Bergman, JD, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. Okay. Let me show you what I've marked as Exhibit 49 which is from the Children and Screens website announcing that Matthew Bergman was being appointed to the National Scientific Advisory Board for Children and Screens. And that was November 2024. So more than a few months ago.

Do you see that?

A. Yes, I see it.

Q. And you were the -- what is your title with Children and Screens?

A. I'm the chief science officer.

Q. As the chief science officer,

Page 678

does it bother you at all that one of the members of your national science board is one who not only is a lawyer, but is a lawyer who has a financial interest in suing social media companies?

MS. COUCH: Objection; vague; argumentative.

BY MR. SCHMIDT:

Q. Does that bother you?

A. No, it does not bother me.

Q. Does it bother you at all that he used your Children and Screens website to try to recruit plaintiffs to further his financial interest?

MS. COUCH: Objection; lacks foundation; assumes facts not in evidence.

And I would remind counsel of the LA Court Code of Civility Number 3.

And certainly would call for speculation.

A. I -- I -- I don't know -- I don't know what you're talking about,

Page 679

frankly.

Q. I'm going to show you what I'm talking about.

Look with me at the last substantive page right here. It's page one, two, three, four, five, six.

You have it there? It's also up on the screen.

Do you see where he encourages concerned parents to visit his law firm's website where they can, quote, request a free case evaluation for families with children harmed by social media? Do you see that?

A. I do see that.

Q. Okay.

MS. COUCH: Objection.

BY MR. SCHMIDT:

Q. And, so --

MS. COUCH: Let me get my objections in, Dimitri.

BY MR. SCHMIDT:

Q. Does that bother you that he is recruiting lawsuits through your website?

Page 680

MS. COUCH: Objection; mischaracterizes the website; mischaracterizes the testimony; lacks foundation; and calls for speculation.

A. No, it does not bother me.

Q. Do you know if Mr. Bergman financially supports Children and Screens?

MS. COUCH: Same objections.

A. I don't know if he financially supports them.

Q. Do you know if he pays money that goes to fund your honorarium?

MS. COUCH: Same objection.

A. I -- I -- I -- I don't know that.

Q. Do you know that even as we speak, he is financially supporting Children and Screens and work you're doing at Children and Screens?

MS. COUCH: Objection; lacks foundation; assumes facts not in evidence.

I'll remind of the LA Code of Civility Number 3.

38 (Pages 677 - 680)

CONFIDENTIAL

Page 681

And argumentative.

MR. SCHMIDT: It's an inappropriate objection, and I hope you withdraw it when I lay -- when I prove exactly what I'm saying.

MS. COUCH: Right now you have no evidence of it. My objection is perfectly appropriate that it assumes facts not in evidence.

MR. SCHMIDT: If you had done that diligence or your own expert, that's up to you. But let me ask my question.

BY MR. SCHMIDT:

Q. Do you know that even as we speak, Matt Bergman is financially supporting both Children and Screens and work you're doing with Children and Screens?

A. I have no --

MS. COUCH: Same objection.

A. I have no reason to believe that's the case. I've worked for Children and Screens in this capacity for three

Page 682

years, and I don't know -- I -- I -- I don't know who the donors are and I don't know where -- so, I -- I -- I -- what do they say? I don't -- I don't have an opinion on it. I don't know anything about it.

Q. What are you doing -- are you going to Washington in two weeks, Washington, D.C.?

MS. COUCH: Objection; scope; relevance; harassment.

A. For the Children and Screens meeting, yes, I am going to it.

Q. Okay.

And that is a Children and Screens meeting you're going to in Washington, D.C., correct?

A. Yes, it is.

Q. And you're actually going to be presenting at that meeting in Washington, D.C. in two weeks, correct?

A. I am moderating, but yes.

Q. Okay.

And who -- who is supporting

Page 683

that meeting? Who's funding it?

MS. COUCH: Objection; assumes facts not in evidence; calls for speculation.

A. Who's supporting the conference?

Q. Mm-hm.

A. It -- I -- I'm not involved in the financials of the foundation. There's a -- it's like any conference, there's a cost for attending it. It -- and there's presenters, I mean, business presenters and sponsors and -- and, as I said, people -- there's a, I think, like a $600 attendance fee for going to it.

Q. Could anyone attend?

A. Anyone could attend, yes.

Q. Do you get paid for speaking there?

A. No.

Q. You don't get a speaker's fees for that?

A. No.

Q. Okay.

Do you know that one of the

Page 684

sponsors of the conference is Matt Bergman's law firm?

MS. COUCH: Objection; calls for speculation; lacks foundation.

A. No, I don't know that.

Q. Okay. Well, let me help your lawyer out.

(Christakis Exhibit 51, Children and Screens Sponsorship Opportunities, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q. Exhibit 51 is --

MR. SCHMIDT: I'll withdraw it.

Q. Exhibit 51 is a website from Children and Screens and it says "Sponsorship opportunities" and then it references your conference below.

Do you see that, the one we've been talking about?

A. Yes.

Q. And if you go to the third page --

MS. COUCH: Just objection to

39 (Pages 681 - 684)

CONFIDENTIAL

Page 685

the characterization.

Let me get my objections in, Dimitri.

BY MR. SCHMIDT:

Q.   If you go to the bottom of the second page do you say it says:  Thank you - in bold font - to the 2025 Congress sponsors - exclamation mark.

Do you see that?

A.   I see that.  I'm just waiting for -- yes.

Q.   Who is the first listed sponsor?

A.   Social Media Victims Law Center.

Q.   Now, at this conference -- and that's Matt Bergman's firm, the firm he founded and advertises for on Children and Screens.

MS. COUCH:  Objection; mischaracterizes the document; assumes facts not in evidence.

BY MR. SCHMIDT:

Q.   Correct?

MS. COUCH:  Same objections.

A.   As far as I know, yes.

Page 686

Q.   All right.

Do you know that at that conference you will have people present on topics relevant to this litigation, like research designs, addressing causal mechanisms in a sea of correlational studies?

MS. COUCH:  Objection; lacks foundation; calls for speculation.

A.   I am aware of the scientific program, yes.

Q.   And is one of the presentations on Research Designs Addressing Causal Mechanisms in a Sea of Correlational Studies?

MS. COUCH:  Objection; lacks foundation.

A.   Yes, I believe that's one of the -- one of the -- one of the talks, yes.

Q.   Who decides who presents on which topics at this conference?

MS. COUCH:  Objection; calls for speculation.

Page 687

A.   There's a program committee that's -- I -- I assume is listed on the website, but there is a program committee that put it -- put together the whole conference.

Q.   Are you part of the program committee?

A.   I am part of the program committee.

Q.   Do you head the program committee?

A.   I don't know if I head -- it doesn't feel that way, but I'm on the program committee.

Q.   Is there, like, a chair, or is it just --

A.   It's -- no.

Q.   Okay.  Got it.

Do you recall who is moderating the panel on Research Designs Addressing Causal Mechanisms in a Sea of Correlational Studies?

MS. COUCH:  Lacks foundation.

A.   I don't recall who's moderating,

Page 688

but I -- I remember discussing it.  If you want to remind me of who it is.

Q.   And you said you were moderating a -- a panel, right?

A.   I'm moderating a session, yes.

Q.   What is the session you're moderating addressing?

A.   It's -- it's updates on legislation and litigation related to social media, or something like that.

Q.   And you're moderating that panel?

A.   I am asking the questions of -- I'm -- I'm asking the questions of the three panelists, yes.

Q.   And are you competent to moderate a panel on updates on legislation and litigation related to social media?

MS. COUCH:  Objection; argumentative.

A.   I actually --

MS. COUCH:  Vague.

A.   I actually think I'm an excellent moderator.  Like I said, my role

40 (Pages 685 - 688)

CONFIDENTIAL

Page 689

is going to be to ask them questions and -- and -- and have them -- and moderate the discussion amongst them. It's a role I played on many occasions.

Q.   I'm asking specifically about that topic.  Are you competent to moderate a panel on updates on legislation and litigation related to social media?

MS. COUCH:  Objection; asked and answered; argumentative.

A.   My role as moderator will be to ask questions.

Q.   Are you competent to do that --

MS. COUCH:  Same objections.

Q.   -- on this topic?

A.   I believe I'm competent to function as a moderator, yes.

(Christakis Exhibit 50, Children and Screens Invited Program, was marked for identification, as of this date.)

BY MR. SCHMIDT:

Q.   I'm giving you Exhibit 50, please.  This is the invited program for

Page 690

this talk.

Do you recognize this as the invited program?

MS. COUCH:  Let me see that front page real quick.

MR. SCHMIDT:  I took one out of order.

MS. COUCH:  Yeah, I know.  That's why you're asking questions without showing the document.

MR. SCHMIDT:  I hope he knows what he's doing in two weeks.

BY MR. SCHMIDT:

Q.   Do you recognize this as the program for your program in two weeks?

MS. COUCH:  Objection; mischaracterizes what the program is and who is doing it.

A.   Are you -- I mean, are you asking me is this what the program is on the Web?

This looks like it's print from the website.

Q.   Yes.

Page 691

A.   Yes.

Q.   And do you see that panel I was asking about -- it's on page 6 "Research Designs Addressing Causal Mechanisms in a Sea of Correlational Studies," the moderator is someone named Sunny Xun Liu at the Stanford Social Media Lab?

A.   Yes.

Q.   Do you have any questions about her qualification to say talk about correlational studies or causal mechanisms in relation to digital media and developing minds?

MS. COUCH:  Objection; relevance; calls for speculation.

A.   So, I'm -- I don't really understand your question.

Q.   Do you --

A.   Do I have concerns about her functioning as a moderator on this panel?

Q.   Yeah.

A.   I don't have concerns about her being a moderator.

The moderator's role is to

Page 692

basically make sure that the speakers get their chance to -- that they stay on time, that they address the topic, that they discuss amongst themselves, that they moderate questions.

I don't really understand the nature of your question, quite frankly.

Q.   Okay.

Let's look at your panel.  Your panel at the bottom of page 1 is "Legislation and Litigation: Approaches to Accountability for Social Media."

Do you see that?

A.   I do.

Q.   And you are the moderator.  Matt Bergman is one of the presenters, correct?

A.   That's correct.

Q.   There are no other lawyers who are presenters, correct?

MS. COUCH:  Objection; assumes facts not in evidence.

A.   I don't know the qualifications of Alix Fraser or Imran Ahmed.

41 (Pages 689 - 692)

CONFIDENTIAL

Page 693

Q. Well, do you see where you have "JD" after Matthew Bergman but no one else?

MS. COUCH: Objection; misstates the author of the document.

Let the record reflect the deponent has not authored this document, so he has not stated anything.

MR. SCHMIDT: That's a heck of a speaking objection.

MS. COUCH: Well, that's a heck of a violation of Rule 3 which says that the witness -- excuse me, examiner speak truthfully.

MR. SCHMIDT: That's frivolous and inappropriate and itself a violation of Rule 3. And if you want, we can take it up with the judge.

MS. COUCH: Happy to.

BY MR. SCHMIDT:

Q. Do you see --

MR. SCHMIDT: You should not be, but that's fine.

Page 694

BY MR. SCHMIDT:

Q. Do you see where it says "Matthew Bergman, JD" and no one else on this panel has a JD listed?

A. I see that. I don't know -- some people put their credentials after them and some people don't. I'm not trying to be evasive here. I'm merely saying that I don't know the credentials.

If you want me to say -- state that they don't have a "JD" after the name, I don't see a "JD" after their name.

MR. SCHMIDT: All right. Let's break there.

THE VIDEOGRAPHER: The time right now is 11:42 a.m., and we are off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time right now is 12:02 p.m., and we're back on the record.

BY MR. SCHMIDT:

Q. Have you previously spoken on panels with Mr. Bergman?

Page 695

A. No, I have not.

Q. The hundred thousand dollars that the Crown Prince of Abu Dhabi paid you, what was that for?

A. It was to give a -- a speech in his majlis.

Q. In his what?

A. His majlis. It's his living room.

Q. How long was the speech?

A. Thirty minutes.

Q. Did you do anything else for the hundred thousand dollars?

MS. COUCH: Objection; vague.

A. I -- I met with various people while I was there.

Q. What was the speech on?

A. Early childhood development.

Q. How many people attended?

A. Several hundred.

Q. Okay.

(Christakis Exhibit 52, Children and Screens excerpt by Barzilay, was marked for identification, as of this

Page 696

date.)

BY MR. SCHMIDT:

Q. I want to show you another chapter of your handbook of screens. This is marked as Exhibit 52.

Do you recognize Exhibit 52 as a chapter from your handbook of screens?

MS. COUCH: Objection; misstates the title.

A. I recognize this as a chapter from the book, yes. From the handbook.

Q. This is one called: Is social media increasing risk for mental health problems among youth? It's complicated.

Do you see that?

A. I do.

Q. Did you have a role --

MR. SCHMIDT: Strike that.

Q. You would have reviewed this chapter before it got published in your book, right?

MS. COUCH: Objection; assumes facts not in evidence.

A. As an editor, yes, I -- I read

42 (Pages 693 - 696)

CONFIDENTIAL

Page 697

all of the chapters.

Q. Did you pick the authors for the chapters?

A. Not by myself, no. There was a complicated procedure for picking the authors.

Q. Did you have a role in picking the authors for the chapter?

A. Yes, I played some role, yes.

Q. And these authors are Ran Barzilay, David Pagliaccio, Carter Funkhouser, and Randy Auerbach.

Do you see that?

A. I do.

Q. Do you recognize those all as qualified experts on the subject of social media and mental health problems?

MS. COUCH: Objection; compound.

A. Yes, I recognize them.

Q. All right. Let's look at what they write in your book.

Under "Background" on the left column, do you see there's a footnote marker for number 3?

Page 698

A. Yes.

Q. They -- actually look at the one for number 2, please.

Do you see where it begins "Recent reports"?

A. Yes.

Q. They write: Recent reports imply a causal association between social media use and the rise in mental health problems among adolescents in the United States. Yet, causal interpretations are premature at best and dangerous at worst.

Do you agree with that statement?

MS. COUCH: Objection; vague.

A. I don't agree with that statement.

Q. Go to page 2.

Do you see that they give a current state on social media and adolescent health in Section 2.1?

A. Yes.

Q. And they write: Despite widespread concerns about the potential

Page 699

harms of social media, research examining its impact on mental health is inconclusive.

Do you see that language?

A. I see that language.

Q. Do you agree with that description of the science by these authors in your book?

A. I do not.

Q. If you go down about eight or nine lines there's a sentence that begins "Longitudinal." Tell me if you see that.

A. Yes.

Q. It says: Longitudinal studies examining the directionality of this effect have provided mixed findings.

Let me actually read the full quote. Let me start again.

Let's start on the second sentence, please. Do you see where it says "meta-analyses"?

A. Yes.

Q. (Reading) Meta-analyses in large-scale studies suggest social media

Page 700

use and screen time are cross-sectionally associated with worse mental health problems (e.g. depressive symptoms). These associations are generally weak but are stronger for those who make more social response and/or use social media excessively.

And then they state: Longitudinal studies examining the directionality of this effect have provided mixed findings.

Do you see agree with that description of the science?

MS. COUCH: Objection; vague.

A. I do not agree with that finding because although the findings are mixed, I relied on systematic reviews and meta-analyses for my report.

Q. If we look further down the page in the second paragraph on this page halfway through it there's a sentence that begins "Particularly for marginalized youth." Tell me when you're -- when you're there.

43 (Pages 697 - 700)

CONFIDENTIAL

Page 701

A. I'm sorry, the next paragraph down?

Q. Yeah. And it's also highlighted on the screen, if that helps.

A. Yes.

Q. They write: Particularly for marginalized youth, social media offers opportunities for emotional support, community building and self-expression beyond their in-person communities.

Do you agree with that language?

MS. COUCH: Objection; vague.

A. I think that there are certain youth who have the potential to benefit from social media, but as a whole -- taken on a whole, I believe that the risks outweigh the benefits.

Q. Do you recall during the editing process having any reaction to any of the language I just read you?

MS. COUCH: Objection; vague; calls for speculation.

A. So, the role of an editor in a peer-reviewed publication such as this is

Page 702

to send the chapters out for peer review and read the reviews and make a decision about whether or not to publish the paper. That doesn't mean that the -- that I agree with everything that's in the --

Q. If you thought there was something scientifically inaccurate in one of the chapters you read, would you ask that it be changed as an editor, if it was inaccurate?

A. I don't have an opinion on that. "Inaccurate" is a vague term.

Q. Okay.

Am I correct that you just told me you send these chapters out for independent peer review?

A. Yes, every chapter was peer-reviewed.

MR. SCHMIDT: Let me show you another chapter from the book.

(Christakis Exhibit 53, Children and Screens excerpt by Baumgartner, was marked for identification, as of this date.)

Page 703

BY MR. SCHMIDT:

Q. This is Exhibit 53, please.

Do you recognize this as a chapter, this time written by one, two, three, four, five, six, seven authors in your book on -- this chapter is on the "Short and Long-Term Effects of Digital Media Use on Attention"?

A. Yes.

Q. Let's look at page 34, please. This states under "Future Research": Extant cross-sectional work has provided initial foundational knowledge about the short and long-term effects of digital media on attention. However, the vast majority of existing studies are cross-sectional and therefore the causal direction of the relationship remains unknown.

Do you agree with that statement?

A. No, I don't agree with that statement. I mean, I agree with the part that there's cross-sectional studies, but

Page 704

I believe that there are also longitudinal stubbed and that together they support that there are effects on attentional capacity as detailed in my report.

Q. Okay.

Do you agree with their statement that the vast majority of existing studies are cross-sectional and therefore the causal direction of the relationships cited remains unknown?

A. I do not agree with that.

Q. They then say: Moreover, without randomized manipulation, this body of research cannot rule out confounding nor reverse causality.

Do you agree with that?

A. I do not agree with that. And randomization is very difficult, if not possible, in this capacity.

Q. Did you use ChatGPT at all to help you write your report?

A. No.

Q. Would you mind looking at Exhibit 2, please?

44 (Pages 701 - 704)

CONFIDENTIAL

Page 705

Are there rules that apply at the University of Washington when you use ChatGPT in your work?

MS. COUCH: Calls for speculation.

BY MR. SCHMIDT:

Q. That you're aware of?

A. I -- I don't know. I -- I'm sure there are, but I'm not familiar with them.

Q. Do you know that if you use GenAI in your work at University of Washington you have to -- you have a mandatory disclosure obligation and you have to maintain detailed records of GenAI use?

MS. COUCH: Objection; lacks foundation.

A. I -- I don't know.

Q. Okay. Look with me, if you would, at page 342 of your report, please.

Actually, let's look at the -- let's look at 341. Can you go to 341, page -- paragraph 561.

Page 706

A. Yes.

Q. You state: To put the vulnerabilities of younger children into perspective, consider that according to a survey of over 4500 U.S. parents who chose to delude their children about the existence of Santa Claus.

Did I read that?

A. Yes.

Q. That sounds pejorative or judgmental.

Do you take issue with parents letting their kids believe in Santa Claus?

MS. COUCH: Objection; argumentative; mischaracterizes the document.

BY MR. SCHMIDT:

Q. And I'm reacting to the word "delude." No one wants to be deluded.

MS. COUCH: Objection; lacks foundation.

A. I didn't mean to be pejorative. I used the term because the point I was trying to make is that you can -- that

Page 707

Santa Claus is not, in fact, real.

Q. He's not?

MS. COUCH: Objection; relevance.

BY MR. SCHMIDT:

Q. Look with me at 600. It's in the report. Look with me at footnote 600, please.

A. Footnote 600, yes.

Q. Do you see at the end of that footnote you have a URL and the source is ChatGPT.com?

MS. COUCH: I'm just going to object to incompleteness.

A. I -- I don't -- I -- I see that. I don't -- that's not the source that I -- I -- the source is the website.

Q. Do you know why you have a ChatGPT source in there?

MS. COUCH: Objection; mischaracterizes the document and the citation.

A. I found this -- I did not use ChatGPT to come up with this.

Page 708

Q. Do you know if anyone used ChatGPT on your behalf?

A. No one used ChatGPT on my behalf.

Q. Have you ever been involved in budgeting or allocating resources within a social media or tech company?

A. No, I have never been involved with allocating resources within a social media.

Q. Did you review budgets for any groups within the social media companies in these cases?

A. I did not review budgets, no, for social media companies.

Q. If you look at page 83 of your report, paragraph 147.

You see that you make a claim about Meta failing to adequately resource teams to address problematic usage and related wellness concerns?

A. I'm sorry, where -- where are you?

Q. Page 83, paragraph 147.

45 (Pages 705 - 708)

CONFIDENTIAL

Page 709

A. Yes.

Q. And the first sentence there.

A. Yes.

Q. Did you -- do you know what teams at Meta were responsible for addressing problematic use and related wellness concerns?

A. That statement was supported by multiple documents that I reviewed from people on the wellness team stating that they were being underresourced.

Q. Is there a single wellness team at Meta, or are there multiple wellness teams at Meta?

A. There are at least two that I know of because there are separate ones on Insta and on -- on Facebook, and then I -- I don't know the precise how those org charts work.

Q. Do you know if there's a wellness team and an integrity team, or if those are the same thing or different?

A. I don't know the relationship between the two of those.

Page 710

Q. Do you know if the PAC team is related to wellness or integrity or something else?

A. I don't know the org chart specifically and how the teams' organized, no.

Q. Do you have any idea if I were to give you a given year how many people across Meta are primarily dedicated to what you describe as problematic usage and related -- related wellness concerns?

A. Do I have an idea of how many people?

Q. Yeah, in any given year.

A. No.

What I put in my report was quotes that I found from people on the PAC team and other teams claiming that they were underresourced and that they had requested more FTE and were not getting them and this was a recurrent theme over many years.

Q. Do you know how common it is in a company like Meta for different teams to

Page 711

put in requests for different funding initiatives?

MS. COUCH: Objection.

BY MR. SCHMIDT:

Q. Does it happen weekly, monthly, yearly?

A. I don't have an --

MS. COUCH: Objection; vague.

BY MR. SCHMIDT:

Q. And do you know if there were more requests for additional funding from people focused on well-being than, say, people focused on growth?

A. I know that people within Meta repeatedly reported that they were requesting additional FTE and not getting it and that -- that growth was being prioritized over safety.

Q. Do you know if there were more requests from growth for additional FTE than there were from well-being that were not funded?

MS. COUCH: Objection; vague.

A. I'm not even sure how to answer

Page 712

that question because it's not a raw number. It's the -- it should be proportionate to the need and the size of the work. So it's not a -- it's not a headcount issue, per se. It's having adequate person power for the work.

So I can't answer that question.

Q. Did -- did you try to find documents where Meta took resources and headcount away from growth and gave it to well-being?

MS. COUCH: Objection; vague.

BY MR. SCHMIDT:

Q. Did you look for that?

A. I read many documents where -- many, many documents where there was repeated statements to the effect that engineering headcounts for well-being, problematic usage were not going to be funded. In fact, I quote many of that -- those -- I -- I cite many of those communications in my report.

MR. SCHMIDT: Move to strike as nonresponsive.

46 (Pages 709 - 712)

CONFIDENTIAL

Page 713

BY MR. SCHMIDT:

Q.   Did you try to find if there were documents where headcount was moved from growth to well-being areas?

A.   I wouldn't know how to find those.  I reviewed the documents that I had with respect to wellness and well-being and problematic usage and reported what I found in them.

Q.   Did you attempt to calculate the amount Meta spent in any given year for well-being, problematic usage, and related wellness concerns?

A.   That would be outside of the scope of my expertise, but I was -- what's inside of the scope of my expertise is to -- to see that there were safety concerns that weren't being addressed, and that's something that I am expert at because it relates to my work at the hospital where we also have safety concerns and make decision about allocations.

MR. SCHMIDT:  Move to strike

Page 714

everything after the "outside the scope of my expertise."

MS. COUCH:  Oppose.

BY MR. SCHMIDT:

Q.   Do you know, given Meta's size, how the resources as dedicated to well-being compared to any other social media company or any other tech company?

MS. COUCH:  Object --

Q.   If they're proportionately larger, smaller, average?

MS. COUCH:  Objection; vague; compound.

A.   I don't have a way of answering that, and it would be a complicated question to answer robustly.

Q.   Did you look at any public -- publicly available data on budget dedicated to safety and well-being and integrity topics at Meta?

MS. COUCH:  Objection; vague; assumes facts not in evidence.

A.   Did -- can you ask that question again?

Page 715

Q.   Yeah.

Did you look at Meta's budgets to see how much, to try to calculate across the company how much the company dedicates to safety, well-being, and integrity topics?

MS. COUCH:  Same objections.

A.   I didn't see a way to do that.  I did not do it, no.

Q.   Do you know who Susan Lee is?

A.   The name Lee rings a bell.  I mean, I -- I don't know if it was a different Lee.

Q.   Okay.

MR. SCHMIDT:  That's all I have.  Thank you, Dr. Christakis.

MS. COUCH:  Who's next?

THE VIDEOGRAPHER:  Can we go off the record?

The time right now is 12:24 p.m., and we are off the record.

(Luncheon recess taken.)

Page 716

- - -

A F T E R N O O N   S E S S I O N

- - -

THE VIDEOGRAPHER:  The time right now is 1:08 p.m., and we're back on the record.

EXAMINATION BY

MS. HARDIN:

Q.   Good afternoon, Dr. Christakis.  I'm Ashley Hardin.  I represent Google and YouTube.

How are you?

A.   Good.

Q.   I'm going to ask you some questions that are going to be focused on YouTube.

I understood from your testimony yesterday that it is your opinion that television watching by adolescents is not addictive.

Is that right?

A.   Yes, that's correct.  There have been studies around the use of television and its addiction, and those did not find

47 (Pages 713 - 716)

CONFIDENTIAL

Page 717

it to be addictive, which is part of the evidence that the features of social media sites are what make the product addictive because it's more than just the viewing, it's more than the content.

Q. And you have not offered in your report, either of your reports, the opinion that video streaming platforms are addictive, correct?

MS. COUCH: Objection; vague.

A. I -- I -- I didn't comment specifically on video streaming platforms because I don't see anything as being simply a video streaming platform. All of the platforms that I discussed had features in common that I outline, including I might add YouTube, that drive addictive use.

Q. And you have not offered the opinion in your report, either of your reports, that TV, movie, or video streaming platforms cause adolescents' mental health harms; is that right?

MS. COUCH: Objection; compound.

Page 718

A. Actually, I don't think that's true because I believe in the suicide chapter I talked about a program that -- that was associated with an increased risk of suicide. A show, I should say, that was on television.

Q. Is that your opinion regarding the Faces of Death movie?

A. No. The Faces of Death movie I think is something that's very disturbing to look at that has been deemed inappropriate for children and is banned in several countries, including Canada.

I was referring to the 13 Reasons Why program, or movie, or show, or whatever that was.

Q. And that show is available on Netflix; is that correct?

A. I don't know where it's available or where it was streamed, but it was -- the -- that was the evidence that the -- of the contagion effect of -- of -- of suicide.

Q. And when you mentioned a suicide

Page 719

chapter, what did you mean by that?

A. I'm sorry, the section in my report that dealt with suicide and self-injury.

Q. Are you aware that the most common usage of YouTube is to watch YouTube on a television screen rather than a mobile device?

A. I don't distinguish between how -- what platform people watch things on. I -- a television screen to me is, technically when it's a smart TV, is functionally not different than a -- than a phone. It's just a -- it's just a -- a large phone.

MS. HARDIN: Motion to strike as nonresponsive.

BY MS. HARDIN:

Q. My question was are you aware that the most common usage of YouTube is to watch YouTube on a television screen rather than a mobile device?

A. I'm -- I'm not aware of that. That -- no, I didn't -- I didn't see

Page 720

quantification of that.

Q. And outside of this litigation, you have characterized YouTube as being a TV, movie, video-streaming app rather than a social media app.

Is that right?

MS. COUCH: Objection; lacks foundation.

A. I'm not sure what you're referring to.

I think, you know, all of these apps have evolved over time, and the features, they all emulated features that the other ones were doing effectively to drive engagement. And so, in fact what is evident is that by 2019, they were remarkably similar in terms of the design features they deployed to promote engagement.

And in -- for YouTube in particular, the auto-play feature was a key one. And in fact, when I reviewed YouTube documents, it was clear that auto-play was a major contributor to view

48 (Pages 717 - 720)

CONFIDENTIAL

Page 721

time and that the vision, if you look at document 57, the vision at YouTube's creation, number one, two, three, four, five, was that it be addictive and it says: Our app experience should compel users to come back more and more --

Q. Dr. Christakis, I'm going to interrupt because I actually have quite limited time today.

A. I apologize.

MS. HARDIN: So I'm going to move to strike everything you said after "I'm not sure what you're referring to."

THE WITNESS: Okay.

BY MS. HARDIN:

Q. But I'm going to show you what I'm referring to.

I think yesterday Exhibit 12 was marked. So if you still have that in your stack, can you get that out, please.

A. Thankfully they're in order.

Q. It's your --

A. Yes.

Page 722

Q. -- 2025 letter --

A. Yes.

Q. -- in the JAMA Pediatrics.

Do you have that?

A. I do.

Q. Great.

And this is a letter that you authored; is that right?

A. That's correct.

Q. And it was published by the journal of JAMA Pediatrics in April of 2025.

A. That's correct.

Q. That's the same month that you issued your report in the JCCP litigation, right?

A. That's correct.

Q. And that's Exhibit 1 to this deposition?

A. That's correct.

Q. And it's just a few weeks before you issued -- issued your report in the MDL in this litigation, which is Exhibit 2, right?

Page 723

A. That's correct.

Q. Okay.

And the point of this paper was to characterize the duration and content of smartphone use during school. Is that right?

A. That's correct.

Q. And in this paper, you provided some statistics regarding the amount of time during the school day that the sampled students spent on social media apps, right?

A. That's correct.

Q. And in Table 1 you report on some of those statistics.

Do you see that?

A. Yes.

Q. And there was a sample of 117 students who spent time on different categories of apps, right?

A. Yes.

Q. And in this paper, you did not include YouTube in the category of social media.

Page 724

Is that right?

A. I'm -- I'm wondering where do you -- where do you see that precisely?

MS. HARDIN: Well, let's look at something that was not part of Exhibit 12, but we will mark it as Exhibit 54 to the deposition.

(Christakis Exhibit 54, supplemental Online Content, was marked for identification, as of this date.)

BY MS. HARDIN:

Q. Which is, I believe, a supplemental paper that you put out that further explains the 2025 JAMA paper, right?

A. Yes.

Q. And it says so on the first page. It says: This supplemental material has been provided by the authors to give readers additional information about their work.

A. Yes.

Q. Do you see that?

49 (Pages 721 - 724)

CONFIDENTIAL

Page 725

A.  I do.

Q.  Okay.  And then if you turn over to what is page 3 of that document, you see where it says:  Categorization of smartphone applications?

A.  Yes.

Q.  It says:  Our RealityMeter data collection identified 632 unique applications that were used by other participants on school days over the course of the study.

Do you see that?

A.  I do.

Q.  It said:  In order to better characterize these data, we characterized similar applications together in known categories (for example, email, internet browser.)  And then:  TV/movie/video streaming.

Do you see that?

A.  I do.

Q.  It says:  There were some high-frequency social media applications that were not characterized and retained

Page 726

their singular status as the name of the application.

Do you see that?

A.  I do.

Q.  (Reading) And those standalone applications including Instagram, Facebook, Snap chat, TikTok, X (formerly known as Twitter), and Reddit.

Do you see that?

A.  I do.

Q.  And YouTube is not in that list; is that right?

A.  That's correct.

Q.  And then if you turn over to page 4 and 5 of that supplement, you see a -- a table.

Are you with me?

A.  I'm sorry.  Yes.

Q.  "Categorization of Smartphone Applications."

Do you see that?

A.  Yes.

Q.  And the third one down is YouTube.

Page 727

Do you see that?

A.  Yes.

Q.  And the category that is ascribed to YouTube is "TV/movie/video streaming."

A.  Yes.

Q.  And of the two pages of apps that are listed on pages 4 and 5, the only other application that has that same categorization of TV/movie/video streaming is Netflix.

Is that right?

A.  That's correct.

Q.  And if you'll notice also on -- on this table you'll see that some applications have what looks to me like a small section symbol after their name.

Do you see that?

A.  Yes.

Q.  YouTube does not have a section symbol after its name.

Is that right?

A.  That's correct.

Q.  And if you look down at the very

Page 728

bottom of page 5 right underneath the table, the section symbol is meant to indicate top social media applications.

Do you see that?

A.  I do.

Q.  And so, just two months ago, during the same time period in which you were issuing your reports in this case, you believed that the appropriate classification for YouTube was as a TV/movie/streaming application.

Is that right?

A.  No, it's not and I can explain --

MS. COUCH:  Let me get my objection in real quick.

Objection; misstates the document.

BY MS. HARDIN:

Q.  It's a yes-or-no question.

A.  It's not a yes-or-no question.

Q.  Can you answer it yes or no?

A.  I cannot answer it yes or no.

Q.  And I understood your testimony

50 (Pages 725 - 728)

CONFIDENTIAL

Page 729

from yesterday is that you have no opinion as to whether Netflix is -- usage by Netflix by adolescents --

MS. HARDIN: Strike that.

Q. As I understood your testimony yesterday, you have no opinion as to whether watching Netflix is addictive.

Is that right?

A. That's correct. I didn't study Netflix.

Q. Do you watch Netflix?

A. Yes, I have watched Netflix.

Q. And so you understand that YouTube is similar to Netflix; is that right?

A. They share some similarities, but they have significant differences.

Q. Netflix makes recommendations for other shows and movies based on what a user has watched in the past, right?

A. I believe it does, but that's not the -- the -- the sole salient feature that drives the addictive properties.

MS. HARDIN: Move to strike

Page 730

everything after the word "does."

BY MS. HARDIN:

Q. Netflix auto-plays the next episode when you're watching a television -- or, a show for example. Is that right?

A. I don't know if it does that.

Q. Have you ever heard the term "binge watching" on Netflix?

A. On -- from -- I've heard of binge watching, yes.

Q. Do you have an understanding that that's something that teenagers, for example, do with regard to watching shows on Netflix?

A. Yes.

Q. And in this article published in April of 2025 --

MS. HARDIN: Strike that.

Q. You can put that aside, Dr. Christakis.

YouTube does not have the feature "infinite scroll," correct?

A. You -- YouTube, I believe, does

Page 731

have infinite scroll.

Q. What portion of YouTube contains the feature infinite scroll?

A. I'm not sure what you mean by one -- what portion.

Q. Well, I believe you just testified that you believe that YouTube does have infinite scroll. So I'm asking you where on this -- on the platform would that feature appear.

A. If you have a YouTube channel, you -- there's -- it will continuously scroll if people are posting on it.

Q. And what's your basis for that statement?

A. That's my understanding.

Q. You reviewed the testimony of YouTube employee Cristos Goodrow; is that right?

A. I did review his deposition, yes.

Q. You know -- I'm sorry.

A. I'm sorry.

Q. You did review it, that's

Page 732

correct.

Do you know who Mr. Goodrow is? Do you know what his title is at YouTube?

A. I reviewed it when I read the -- his deposition and I -- I'm sure it's in my report, but I don't recall it offhand of all the people who I all -- the depositions I read, but...

Q. Does it sound familiar to you that he is a vice president of engineering at YouTube?

A. Yes.

Q. Do you know how long he's worked at YouTube?

A. I do not recall how long he's worked at YouTube.

Q. Did you review the portion of his testimony where he testified that the YouTube home feed in particular is designed to ensure that videos that he said we, meaning YouTube, think you'll like most are at the top so that it's designed to reduce scrolling?

MS. COUCH: Objection;

51 (Pages 729 - 732)

CONFIDENTIAL

Page 733

incomplete.

A.   I don't recall reviewing that specifically.

Q.   And you did not cite that testimony in your report; is that right?

A.   I don't remember reciting it, no.

Q.   Okay.

YouTube does not have the feature "beauty filters"; isn't that correct?

A.   I don't believe they have beauty filters, but they have an opportunity for -- well, I don't know that the filter is built in, but there's the opportunity to use them, put them on your channel and -- and -- and gender negative social comparisons through it.  But yes, I don't believe they have their own appearance filter.

Q.   And YouTube has never had filters that simulate cosmetic surgery effects, correct?

A.   I -- I don't believe so.

Page 734

Q.   Are you aware that YouTube users can turn off notifications such that they don't receive any at all?

MS. COUCH:  Objection; vague.

A.   I'm aware that that's an option, but it's opt in instead of opt out and it's not deployed with -- it's deployed very, very rarely as a result.

Q.   What's your basis for suggesting that it's rare to opt out of receiving notifications?

A.   There's a -- in general, a very high level of discordance between people who feel that the platforms compel them to view and their -- to -- to remain engaged and their activation of the features that might diminish that.

Q.   What is your factual basis for any of the things you just said?

A.   Well, it's -- it's -- throughout my report I -- I document that both scientific literature, expert testimony, and internal documents that show that opting -- making things opt in instead of

Page 735

opt out reduces the uptake.

Q.   Dr. Christakis, I asked you about your basis for suggesting that it is rare for people to opt out of receiving notifications and what your factual basis for that was.

What scientific study, expert testimony, or internal document supports that statement?

A.   Well, with -- with respect to parental controls, YouTube didn't allow --

Q.   Mr. -- Dr. Christakis, I didn't ask you about parental controls.  I asked you about your factual basis for a -- a factual claim that you made about something being rare.

A.   Yes.

Q.   And the topic is notifications.

A.   Yes.

Q.   Do you have an answer to that question?

MS. COUCH:  Objection; argumentative.

A.   Are you -- you're asking me

Page 736

specifically about YouTube, or you're asking me in general?

Q.   I'm asking you only about YouTube.

A.   Yeah, it's -- I'm -- I'm -- and that's why I'm trying to find within YouTube specific documents.

But I can tell you that the research that's been done, both in general about peep -- whether or not people opt -- choose to opt in versus opt out shows that most teenagers in particular don't do that, and then the other social media platforms which internally studied this more consistently and had similar features show that it was very rarely opted for.

MS. HARDIN:  Motion to strike as nonresponsive.

BY MS. HARDIN:

Q.   Is it your testimony that on YouTube, you will receive note -- a user will receive notifications unless he or she opts out of them?  That's your testimony?

52 (Pages 733 - 736)

CONFIDENTIAL

Page 737

MS. COUCH: Objection; confusing.

A. That's my understanding, yes, that they'll receive notifications unless they opt out.

Q. Okay.

There is no direct messaging function on YouTube, correct?

A. In the sense that you can text somebody specifically privately, is that what you mean?

Q. What is your understanding of direct messaging?

A. You said no messaging. I just want to make sure you mean direct messaging.

Yes, I'm not aware that there is.

Q. And just so it's clear, my question was: You're not aware that there is a direct messaging function on YouTube.

Your answer is?

A. I'm not aware of that, no.

Q. Now, do you agree with me, Dr.

Page 738

Christakis, that the potential effects on adolescents from the use of online platforms are not the same across all platforms?

MS. COUCH: Objection; vague.

A. No, I don't agree that the potential effects are not the same. I -- I think the potential effects are the same, and in fact, that's why I believe it's reasonable to extrapolate findings from one to another because the features are shared by all of them.

Q. Yesterday, and in your report, I believe you testified that a study about the platform Reddit would not be applicable to the defendant platforms because it's a different platform.

Isn't that right?

MS. COUCH: Objection; misstates testimony.

A. My recollection was that I didn't look at Reddit because it was not something that I was tasked to look at.

Q. Well, let's look at page 339 of

Page 739

your MDL report which is Exhibit 2 and it's paragraph 558.

A. Yes.

Q. And you're talking about a -- a study?

A. Mm-hm.

Q. And -- and about four lines up from the bottom of 558 you say: The study authored by a member of the committee did indeed find benefits...on Reddit.

And then you say: There are multiple salient differences between Reddit and social media sites, including the demography of users, the site's features.

And it goes on.

A. Yes.

Q. So your opinion, at least as regard to Reddit, that you can't apply the conclusions of one study to other platforms because you'd have to know what the particular features of that platform are.

Is that right?

Page 740

MS. COUCH: Objection; vague.

A. As I -- as I state, the features that the -- the salient features of Reddit, in particular the ones that I view as being problematic in terms of harmful design, are very different, and that's why I didn't think that the study that said that Reddit offered benefits could be applied to these other sites.

Q. I think your testimony over the past two days has been that you don't really know how Reddit operates.

Is that right?

A. I said I didn't --

MS. COUCH: Objection.

A. I said I didn't do a deep dive on the -- on the studies of Reddit 'cause I wasn't asked to do it, but the salient features of it that I'm aware of are different.

Q. And it's your understanding that Reddit does not have, for example, an algorithmic recommendation system?

A. I -- I -- what I say is there's

53 (Pages 737 - 740)

CONFIDENTIAL

Page 741

no algorithmic display of content or pictures, yes, that's my understanding.

Q. Okay.

In forming your opinions in this case, Dr. Christakis, you have not relied upon any study that concluded that use by adolescents of YouTube alone is capable of causing or has caused the mental health harms of which you describe in your reports.

Is that right?

MS. COUCH: Objection; vague; compound.

A. There are some studies that include YouTube. The vast majority of the studies look at social media sites combined, and the most important thing is that the -- the -- the design features that drive usage are shared by all of the sites since 2019.

MS. HARDIN: Motion to strike as nonresponsive.

BY MS. HARDIN:

Q. My question again is that in

Page 742

forming your opinions in this case, you have not relied upon any study that concluded that the use by adolescents of YouTube alone is capable of causing or has caused anti -- any of the mental health harms that you discuss in your report?

MS. COUCH: Objection; vague; compound.

A. I -- I believe that the feature -- I believe that the literature that looks at the features is applicable to YouTube because it has commonality -- YouTube has commonality with the other platforms with respect to how it curates and presents content to children and adolescents.

Q. Dr. Christakis, no study considers adolescent use of YouTube alone separate and apart from generalized screen time or separate and apart from usage of other platforms; isn't that right?

A. No, I don't agree with that.

Q. What study considers adolescent use of YouTube alone that is separate and

Page 743

distinct from general screen time or use of other platforms and concludes that there is a causal relationship between use of YouTube and any of the harms mentioned in your report?

A. We -- you're --

MS. COUCH: Objection; compound.

A. You're -- you're asking for a study that I don't even know would be possible to do.

Q. So there is none?

MS. COUCH: Objection; compound; vague; argumentative.

A. As I understand, you're asking me is there a study that looks specifically at YouTube irr -- controlling for all other exposures and found that YouTube viewing itself was associated with mental health harms?

I don't know of such a study.

Q. You don't cite any in your report?

A. I don't, but I stand by my -- my assessment that the commonality of the

Page 744

features that YouTube deploys makes it very similar to the other sites, and therefore, as risky.

MS. HARDIN: Motion to strike everything after "I don't."

BY MS. HARDIN:

Q. And in fact, most of the studies that you cite in your report, Dr. Christakis, do not mention YouTube use at all; isn't that right?

MS. COUCH: Objection; facts not in evidence.

A. I don't -- I don't believe that's true.

Q. Your testimony is that the majority of the studies that you have cited specifically call out and mention the use of YouTube? That's your testimony?

MS. COUCH: Objection; argumentative.

A. My testimony is that they include YouTube. I -- I have not quantified what percent single out YouTube

54 (Pages 741 - 744)

CONFIDENTIAL

Page 745

or mention YouTube specifically. That wasn't something I thought was important to do.

Q. And you have not determined whether, how, or if your opinions would change as to YouTube if you relied only on studies that specifically evaluate usage of YouTube. Is that right?

MS. COUCH: Objection; compound; calls for speculation.

A. I guess I would say by analogy if we were talking about tobacco and -- and the risk of lung cancer and somebody asked me if I studied every brand of cigarette, I -- I would say there wasn't a need to. They're very similar.

MS. HARDIN: Motion to strike as nonresponsive and completely off-topic.

BY MS. HARDIN:

Q. I asked you a yes-or-no question, Dr. Christakis.

Do you need it read back?

A. Read it back to me.

Page 746

MS. HARDIN: Madam Court Reporter, could you read the question back, please?

(The requested portion of the record was read back by the court reporter.)

A. I don't think that's a yes-or-no question, I -- but I'm happy to answer it, but it's not a yes-or-no.

Q. We'll move on.

You mentioned earlier a -- a section of your report regarding suicide, suicidal ideation and self-harm.

Do you recall that?

A. Yes.

Q. And your report does not identify a single study that finds that YouTube use specifically causes suicide, suicidal ideation, or self-harm. Is that right?

MS. COUCH: Objection; vague.

A. I -- I didn't find a -- I don't cite a specific study, but I do state -- I do show an example of YouTube videos that

Page 747

would be the kind of content that would be -- that would be very high risk for increasing suicidal ideation that are recommended by YouTube algorithms.

Q. Well, let's talk about that.

The only specific discussion in that section of your report about suicide and self-harm is a discussion of a horror movie called Faces of Death.

Is that right?

A. I'm trying -- can you point me to where you are in the -- so that we can be on the same page, so to speak?

Q. I will certainly try to.

Page 264, paragraph 451.

A. Yes.

Q. Now, Faces of Death is a movie that came out in 1978. Is that right?

A. I don't remember the precise date, but I -- yes, that --

Q. Sounds about right?

A. Sound about right.

Q. And that was about 30 years before the advent of YouTube?

Page 748

A. That's correct.

Q. Now, you said in your report that you opened an incognito Chrome page and you specifically searched on YouTube for Faces of Death, right?

A. That's correct.

Q. It wasn't recommended to you by -- by YouTube; you searched for it?

A. It -- it was not recommended to me because I don't have recommendations on YouTube.

But the reason I looked for that video in particular was because YouTube's own document showed that there were parents that were concerned that their children were viewing that on the platform and it had been recommended for them.

MS. HARDIN: Motion to strike everything after "it was not recommended to me."

BY MS. HARDIN:

Q. When you did search for Faces of Death on YouTube, you found two links; is that right?

55 (Pages 745 - 748)

CONFIDENTIAL

Page 749

A. I found two links and recommendations for other content as well.

Q. The first link you found required a subscription, right, in order to watch the movie?

A. That's correct.

Q. And the other link was age-gated, correct?

A. It -- well, it asked for age verification. I -- yes, that's correct.

Q. And in the -- in the signed-out state that you were using YouTube, you were not able to watch an age-gated move, correct?

A. What happened when I did this was, as I put in -- in paragraph 452, the link below popped up and just played Faces of Death for me, or a clip from it.

Q. Well, I think what you actually say in 452 is that the Shutter video link required a subscription.

A. Right.

Q. You talked about that.

And then you say: The second

Page 750

link is the Heros link and that asked for age verification.

A. Correct, but then I say the link --

Q. I'm not asking you about that. I'm asking you about the two links that popped up, Shutter and Heros.

Heros was age-gated, right?

A. That's correct.

Q. And you're aware that when you are -- when a user is using YouTube in a signed-out state, that user may not watch videos that are age-gated; is that right?

A. Say that again. When someone is watching in a -- a video in a signed-out state?

That -- that may be true now, but I don't -- that was -- that's not always been true.

MS. HARDIN: Motion to strike after "that may be true now."

MS. COUCH: Opposed.

BY MS. HARDIN:

Q. And then you say that there were

Page 751

some links provided to you for several other videos, including the example that you give in Figure 51.

Do you see that?

A. I do, but as -- you -- but as I've pointed out here, a -- a -- a scene from Faces of Death automatically played, but, and then simultaneously I saw this other link, that's correct.

Q. Are you aware that the Faces of Death movie is available to watch on Prime Video?

A. I'm -- I'm -- I'm not aware of that. I -- no, I -- I've never seen it personally.

Q. Are you aware that it is available to watch for free on Roku?

A. I'm not aware of its availability, but I can only comment that it's not appropriate for children to watch on any platform.

MS. HARDIN: Motion to strike after the word "availability."

Page 752

BY MS. HARDIN:

Q. So, back to 45 -- 453, this Figure 51 you said you got recommend -- that another video popped up and it was titled "Girls Bungee Jumping First Time Fell to Death."

Do you see that?

A. Do I.

Q. Did you watch that video?

A. No, I did not. I did not want to see it.

Q. So, are you aware that the video simply shows a girl bungee jumping from a building?

A. I didn't see it. I don't know what it shows.

Q. So you're not aware that no one dies in that -- in that video?

A. I don't know if someone dies or not. I didn't see it. I just see what the title says.

Q. Well, if that's -- if that's true, and I'll represent to you that it is, then that video would not be a video

56 (Pages 749 - 752)

CONFIDENTIAL

Page 753

that would be appropriately classified as a suicide or self-harm video, correct?

MS. COUCH: Objection; lacks foundation; speculative.

A. I don't know what the video showed 'cause I didn't click on it, but I think the title itself suggests that the algorithms are promoting content that is dangerous, triggering, and likely to advance feelings of self-harm or glorify suicidal ideation.

MS. HARDIN: Motion to strike after "I didn't click on it."

BY MS. HARDIN:

Q. And then in paragraph 454 you say: I am imaging that my feed would soon be populated with multiple such videos defaulted to auto-play.

Do you see that?

A. I do see that.

And I see that I go on to point out that --

Q. It's a yes-or-no question do you see it.

Page 754

A. Well, it's -- I don't think it's a yes-or-no.

Q. Do you see it?

MS. COUCH: Objection; argumentative.

BY MS. HARDIN:

Q. It's a yes-or-no question, and I think you answered.

A. I -- I don't believe it's a yes-or-no question. I would like to answer, but it's not a yes-or-no question.

MS. HARDIN: Motion to strike everything after "I do see that."

BY MS. HARDIN:

Q. That is pure conjecture on your part, isn't it, Dr. Christakis?

MS. COUCH: Objection; argumentative.

A. It's not entirely conjecture because I reviewed documents that follow that confirm that YouTube is aware that self-harm content often appears as part of their algorithms.

And in fact, if you look at

Page 755

document 152 on the next page.

Q. I haven't asked you about that, Dr. Christakis. And you've answered my question. So we will -- we will move on.

I believe your testimony over the -- over the past couple of days has been that your opinions regarding the defendants are based on the, quote/unquote, experience of using those platforms as opposed to the content that is available.

Is that right?

A. That's correct.

Q. I want to ask you a little more about that in the context of YouTube. So let's take an example.

Let's say that a teenager watches the -- the 2025 Super Bowl on network television and then watches the 2025 Super Bowl on YouTube.

There would be nothing different about that experience of watching, isn't that right, The Super Bowl?

MS. COUCH: Objection;

Page 756

hypothetical.

A. That's -- that's not the nature of what my report focuses on. It's not about watching a single piece of content. That's not the way any of the studies have looked at this.

The studies are content agnostic and don't focus on specific programming, but the experience.

Q. But you agree with me that there would be nothing different about the experience of watching The Super Bowl on network television versus watching it on YouTube, right?

MS. COUCH: Objection; hypothetical.

A. I -- I mean, that's a hypothetical that I didn't consider in looking at my -- in -- in my report. I looked at the experience of watching YouTube, not the experience of watching a -- of an individual watching one show on one platform versus another.

Q. Well, I'm asking you to consider

57 (Pages 753 - 756)

CONFIDENTIAL

Page 757

that hypothetical now.

So are you able to answer my question, which is there would be nothing different about the experience of watching The Super Bowl on network television versus watching it on YouTube?

MS. COUCH: Objection.

A. That -- that doesn't reflect the nature of my report or the nature of the risk posed to have the hypothetical of a single program watched on one platform or another.

Q. Well, you understand that that's something a person can -- a teenager, let's say, can do on YouTube. They -- a teenager can go to YouTube and watch a single piece of content?

A. They can, but it's -- the experience of doing it on YouTube is fundamentally different than the experience of doing it on network television, is my point.

Q. What is the basis for your statement that watching a single piece of

Page 758

content is fundamentally different on network television than on YouTube?

A. Because based on the information that YouTube will know about the individual and their past experience, it will make recommendations for other programming that's readily available and can be clicked on and -- and -- and -- and started.

So watching The Super Bowl on YouTube would offer additional content, taking into account everything it knows about the individual, which is different than watching YouTube on network television which would not do that.

Q. Network television auto-plays; isn't that right?

A. I don't --

MS. COUCH: Objection.

A. That's not my understanding, no.

Q. When you watch television, it shuts off after a certain amount of watching?

MS. COUCH: Argumentative.

Page 759

A. I don't think of that as auto-play.

Q. Does one show on network television play one right after the other?

A. There's no -- there are no algorithmic suggestions to network television, and that's one of the things that distinguishes it from watching on YouTube and -- and any other social media platform. It's one of the reasons why those are addictive as opposed in a way that traditional television is not.

MS. HARDIN: Motion to strike. I didn't ask you anything about algorithms.

BY MS. HARDIN:

Q. Dr. Christakis, you are a user of YouTube, right?

A. I have used YouTube, yes.

Q. You're aware it's the world's second largest search engine?

A. I -- I -- I -- I'm not aware of that, but I don't dispute it, no.

Q. Do you use YouTube personally?

Page 760

A. Yes, I have used YouTube personally.

Q. For what reasons?

A. I've used it for searching for relevant videos to assemble a piece of furniture.

Q. And you use it in your academic work?

A. Not -- not often. I mean, I'm on it, but I don't use it often in my academic work, no.

Q. And I think we've established that you're the chief science officer of an organization called Children and Screens, right?

A. That's correct.

Q. And that organization has a YouTube channel?

A. Yes, I believe they do.

Q. And Children and Screen has posted more than 100 videos to YouTube; is that right?

MS. COUCH: Assumes facts not in evidence.

58 (Pages 757 - 760)

CONFIDENTIAL

Page 761

A.   I -- I don't know how many they've posted, but I do know that they've posted videos.  There are parent educational videos, yes.

Q.   Have you ever told anyone at Children and Screens that the organization should not have a YouTube channel?

A.   No, I have not ever told them that.

Q.   And you don't believe that an adolescent who watched -- who used YouTube to watch videos posted by Children and Screens would suffer harm to his or her mental health, correct?

MS. COUCH:  Objection.

A.   That's recapitulating the conversation we had before about whether or not a particular program watched on YouTube one time would cause damage, and that's not what my report looked at.

Q.   Well, you don't believe that if a teenager watched all 100 videos posted by Children and Screens that that teenager would suffer mental health harms, correct?

Page 762

MS. COUCH:  Same objection; hypothetical.

A.   It's -- I -- I -- it's a -- sit -- it's a -- it's a hypothetical that's impossible to imagine happening.  I can't comment on it.

Q.   And you don't believe that a teenager would suffer mental health harms if they watched all 100 of those videos because they auto-played one right after another, right?

A.   I think if they watched a hundred of those videos continuously, they would be on YouTube for probably close to a hundred hours continuously, and I think they would suffer consequences as a result.

Q.   Are you going to ask anyone at Children and Screen to remove those 100 videos or any portion thereof from YouTube after today?

MS. COUCH:  Objection.

A.   I -- I -- no, I'm not going to do that.  I don't think that there's a

Page 763

reason to do that.

MS. HARDIN:  I have no further questions at this time, Dr. Christakis.

MS. COUCH:  Go off the record.

THE VIDEOGRAPHER:  The time right now is 1:54 p.m., and we're off the record.

(Recess taken.)

THE VIDEOGRAPHER:  The time right now is 2:04 p.m., and we're back on the record.

EXAMINATION BY
MR. BLAVIN:

Q.   Good afternoon, Dr. Christakis.  My name is Jonathan Blavin.  I represent Snap, and I'm going to ask you some questions regarding your opinions relating to Snapchat.

Sitting here today, are you offering any opinions regarding Snapchat that are not disclosed in your report?

A.   No.

Q.   So if your report is silent on a

Page 764

particular feature or attribute of Snapchat, you do not intend to offer any opinions about that feature at trial, correct?

MS. COUCH:  Objection; calls for legal reasoning.

A.   I'm not prepared to concede that, I guess.  I don't really -- I -- I -- no.

Q.   Okay.

I believe you testified yesterday, Dr. Christakis, that previously you had a Snapchat account.  Is that right?

A.   I did briefly, shortly after -- well, I don't know -- I did briefly.

Q.   Okay.

And when, approximately, did you have that Snapchat account?

A.   Probably about 10 or 12 years ago.

Q.   Okay.

Why did you have a Snapchat account?

59 (Pages 761 - 764)

CONFIDENTIAL

Page 765

A.   I got a Snapchat account because my -- my then son had one and I made a point of being on the -- using the apps that my children used.

Q.   Okay.
Did you communicate back and forth with your son on Snapchat?

A.   I did not.  I mean, briefly once or twice, but no, not regularly, no.

Q.   Okay.
What did you do while you were on Snapchat?

A.   I had very few snaps with my son and with one professional colleague whose got on it at the same time because she had a daughter that was that age and that was it.  I didn't use any of the other features at all.  It was -- the only feature I used at the time was the ethereal nature of it.

Q.   Right.
So you used Snap as a means of communicating with other people?  Snapchat, that is.

Page 766

MS. COUCH:  Objection; broad.

A.   That's the only way I've ever used it, yes.

Q.   And I think you testified as well that you deleted your account two years ago?

A.   I deleted it, yes.

Q.   Why did you delete it?

A.   I -- I hadn't used it in years and I was just deleting apps on my phone that I wasn't using.

Q.   Now, Dr. Christakis, when a user opens Snapchat on their phone, what part of the app do they initially see?

A.   So, I don't have an account, but I looked at it.  The first thing you see as I recall, is an image of your -- of yourself.

Q.   A camera?

A.   A camera.

Q.   There's a camera?

A.   Facing you, yes.

Q.   Right.
And that's so you can take a

Page 767

picture of yourself and then you can send that picture to your connections on Snapchat.  Is that correct?

A.   I don't know what the purpose of it is.  That's something one could do.  But it starts with a picture of yourself, or -- or camera faced on your -- facing you, yes.

Q.   Could you explain to me the different sections or tabs within the Snapchat app?

A.   Sitting here right now today I can't go through all of them.  I -- 'cause I don't -- I haven't spent time on the -- a lot of time on the recent app.  But I -- I know some of the features from reviewing the -- the literature and the -- the Snap documentation I reviewed.

Q.   Okay.
But sitting here today, you can't state exactly what those features are?

A.   Well, there are --
MS. COUCH:  Objection;

Page 768

mischaracterizes.

A.   I can -- I can state the features.  I haven't used all of them.
I know, for example, that there are -- the design features that I've summarized on the Table 5 for Snap.  I know that Snap has beauty filters in particular.  I know it has engagement algorithms, likes, intermittent rewards, reels, et cetera.  It -- it's similar to all of the other platforms.  And it has the distinguishing feature that -- of streaks which are its own problematic entity.

Q.   Okay.
Do you understand that a user must choose to initiate a streak with another user?
MS. COUCH:  Vague.

A.   I -- you mean that someone must start a streak -- actively start a streak?

Q.   Correct.

A.   I -- yes, I believe that's true.

Q.   Okay.

60 (Pages 765 - 768)

CONFIDENTIAL

Page 769

And to maintain a streak, you would agree that it would only take a few seconds or a minute per day to continue that streak correct?

MS. COUCH: Objection; speculative.

A. It would only take a minute -- well, the minimum it would take would be a minute or so per day per person that you're streaking.

Q. Right.

A. But the -- but that doesn't -- it's not purely about the time. It's about the addictiveness of it.

Q. Are you aware that other apps use streaks such as the Duolingo language app?

A. I didn't study or use Duolingo, so I don't know whether they use streaks.

Q. Have you used any fitness apps that have streaks?

A. I have not used any fitness apps that have streaks.

Q. You mentioned before that you

Page 770

believe that Snapchat has "likes."

Are "likes" publicly available on Snapchat?

MS. COUCH: Objection; vague.

BY MR. BLAVIN:

Q. Publicly visible, I should say. Are "likes" publicly visible on Snapchat?

A. So that anybody can see them?

Q. Correct.

A. I -- I -- I -- I don't know the answer to whether they're publicly visible or not.

Q. Isn't one of the points that you make, though, regarding "likes" is they have an impact on users because everyone who's using a platform can see how many "likes" that a particular piece of content received?

A. What do you mean by "anyone"? It doesn't have to be -- "likes" themselves are important whether they come from strangers or friends or family.

Q. But the fact that those "likes"

Page 771

are publicly visible to the entire user base as opposed to being private.

A. No, I -- I don't think that that makes a significant difference. If you -- if you look at the -- at the -- there's plenty of studies that show that the simple act of seeing a "like" regard -- an individual seeing a "like" regardless of whether or not other people see it is -- activates the reward pathway.

Q. Okay.

Do you know how much time Snapchat users on average spend using different features of the Snapchat app?

A. As opposed to Snapchat all together?

Q. Well, for example, I think you testified earlier that when you used Snapchat, you used it for messaging purposes.

Do you know, for example, on average for adolescents how much time they use Snapchat for messaging purposes versus other aspects of the app or other features

Page 772

on the app?

A. I -- I -- sitting here today, I do not know how much time they spend on each aspect of the app. And I didn't see Snap documentation that, to my recollection. But there may be. There probably is, yes.

Q. So for example, you don't know if users spend the vast majority of their time messaging on Snapchat as opposed to viewing content on Snapchat?

MS. COUCH: Vague; misleading.

A. I don't know. And it's not really material to my report that snap leads to untoward outcomes in children and adolescents.

Q. Did you ask anyone for that data?

A. I did not ask for that data 'cause I -- I didn't consider it to be relevant.

Q. Are you aware, Dr. Christakis, that Snapchat is used primarily for direct communications between users?

61 (Pages 769 - 772)

CONFIDENTIAL

Page 773

MS. COUCH: Objection; lacks foundation.

A. I -- I'm not aware of that, and I don't believe that is true.

Q. You don't believe that's true? What's the basis for that?

A. Well, because I -- well, I should say I -- I -- I'm not certain that that's true or what you mean by that because communication with you, if I'm altering my appearance, is more than just communication, and communication with you if I'm trying to keep a streak alive is more than just communication.

So I -- if you're counting that as just communication, then you're discounting the role that the features play in that communication. So that -- that's why I'm saying that.

Q. Okay.

Well, do you know for example -- well, you didn't request any data on use of particular Snapchat features, correct? You said that before.

Page 774

MS. COUCH: Objection; vague; misleading.

A. You mean I didn't request any data from -- from the Snap documents or from Snap?

Q. Right, from anyone, about which features of the Snapchat app are used for how much time and how extensively they're used.

A. I didn't because I didn't think it would inform my opinion.

Q. Now, when you were using Snap to send messages back and forth with your son and with your colleague, was that functionally equivalent, from your perspective, as to sending text messages back and forth with the friend or connection?

MS. COUCH: Objection.

A. The way --

MS. COUCH: Vague.

A. The way I used Snap that many years ago was similar to sending a picture but for the fact that it disappeared

Page 775

after, I think you could set the time, I don't remember what I set it to or we set it to.

Q. Right, but the fact that it was ephemeral was a difference?

A. The way I used it twelve years ago, that's all I used it for.

Q. Okay.

And I believe you testified yesterday that, in your opinion, texting is not an addictive behavior, correct?

A. Texting using a pure text app, I -- I say I didn't study it, but I -- in this report, but I don't believe it's addictive, no.

Q. And you also testified yesterday that you had no opinion on whether any messaging feature on any of the platforms was addictive. That's not an opinion that you had.

A. I --

MS. COUCH: Objection; misstates.

A. I didn't -- I didn't -- I -- I

Page 776

did not study the specific messaging feature independent of the entirety of any of the apps.

Q. Right.

You didn't come to any conclusions isolating the messaging features on the app as to whether or not they were addictive?

A. I did not come to -- that's correct.

Q. Now, in your report, Dr. Christakis, you cite numerous peer-reviewed studies about social media and mental health, correct?

A. That's correct.

Q. Isn't it true, Dr. Christakis, that none of those studies analyzed Snapchat specifically in a way that isolates its effects from other platforms?

MS. COUCH: Objection; vague.

A. Sitting here today, I don't recall a specific study that focused on Snap independent of all other apps, but the commonality of the features, as I

62 (Pages 773 - 776)

CONFIDENTIAL

Page 777

said, between Snap and the others are -- make the -- the studies apply to all of them.

The -- the one thing I will say that does distinguish Snap that I didn't see -- I did not see external studies of but I did see internal ones is the effects of Snapstreaks.

Q.    Are you aware of any other app, any of the other defendants' apps that opened to a camera as opposed to a feed of content?

MS. COUCH:  Objection; vague.

A.    Sitting here today, no, I'm not aware of other ones that do.

MR. BLAVIN:  I don't think this has been introduced as an exhibit yet. It's a study that you cited in your report at page 26 -- 276 and paragraph 468.  It's tab 1.

(Christakis Exhibit 55, Deng study, was marked for identification, as of this date.)

THE WITNESS:  Sorry, what page?

Page 778

'Cause I was getting.

MR. BLAVIN:  Sorry.  It's page 276 of your report.  You cited in paragraph 468 and footnote 461.

MS. COUCH:  Did you mark this as an exhibit?

MR. BLAVIN:  Yes, we should mark -- I'm sorry, what exhibit number are we on?

THE STENOGRAPHER:  It will be 55.

BY MR. BLAVIN:

Q.    All right.

Dr. Christakis, from my review of your report and the materials cited in it, this is the only peer-reviewed study that you cite that even mentions Snapchat by name.

MS. COUCH:  Objection; mischaracterizes.

BY MR. BLAVIN:

Q.    Do you have any reason to disagree with that?

MS. COUCH:  Same objection.

Page 779

A.    I can't comment on that.  I don't know whether that's true.  But as I said, there's -- the point of my report is the commonality across all of these sites, and there isn't a reason to look at each individual one.

Q.    Okay.

Is it fair to say that this study is what has been described as a pooled analysis in that it looks at various platforms collectively?  And in particular I'm looking on -- at page 2 of this -- sorry.

A.    The second page?

Q.    The second page and the fourth page and it describes, you know, studying over a period of time usage of TikTok, YouTube, followed by Instagram and Snapchat.

Is that right?

A.    Is your question they -- they pooled those four websites together, is that your point?

Q.    Correct.

Page 780

A.    Is that your question?

Q.    Yes.

A.    Yes.  And I think the reason they did that is because they, like me, believe that they function very similarly because of the salient features they share.

Q.    When you do these type of pooled analyses such as in this study, how do they isolate, if at all, whether one platform in particular causes the symptoms that are identified, in this one I believe dealt with ADHD, as opposed to a different platform?

MS. COUCH:  Objection.

A.    When you do a pooled analysis like this, you are, by definition, not looking at --

Q.    Right.

A.    -- the individual sites -- or platforms, but you've made a decision a priori that they belong together because they have similar features that are driving the effect that you're trying to

63 (Pages 777 - 780)

CONFIDENTIAL

Page 781

look at.

Q.   So it's fair to say that this one study, based on the methodological design of the study, by its nature can't reach a conclusion that Snapchat, for example, itself caused the ADHD symptoms that were identified in the study?

MS. COUCH:  Objection; misstates.

BY MR. BLAVIN:

Q.   Is that right?

MS. COUCH:  Same objection.

A.   I'm sorry, I'm reading this report now, 'cause it's been a while since I've read it, to see if -- yeah, I mean, it's -- it's evident that they made a decision to loop -- lump them together because they had similar features, and so they belong together.

MR. BLAVIN:  Dr. Christakis, I'll move to strike that answer.

BY MR. BLAVIN:

Q.   My question again, and I think you previously testified to this effect,

Page 782

that by the very nature or design of the study, it cannot isolate whether Snapchat or any other platform itself caused the ADHD symptoms that were identified in the study.

Is that correct?

MS. COUCH:  Objection; vague; misstates.

A.   This particular study as done could -- did not identify -- did not focus on Snap in particular.

Q.   And this, again, is the only peer-reviewed study that you cited that even mentioned Snapchat by name.

If we --

A.   I'm not -- I'm not certain that that's the case.  I'm not attesting to that.

Q.   Do you have any reason to disagree with that sitting here now?

A.   I --

MS. COUCH:  Objection.

A.   I -- I don't -- I'm not disagreeing or agreeing.  I don't know

Page 783

whether it's true.

But the point is that the features are similar across all of them. So whether it's Snap or any of the others, they share the common features that I think drive addiction.

Q.   If we could go to, I believe, Exhibit 16.  It's your materials considered list.

A.   Did you want it -- this is not marked.

MR. BLAVIN:  That exhibit should be marked.  I apologize.

Is it Exhibit 55?

EXHIBIT TECHNICIAN:  56.

MR. BLAVIN:  I apologize.

THE COURT:  55.  55.

MR. BLAVIN:  Yeah, apologies.

BY MR. BLAVIN:

Q.   If you could go to Exhibit 16, your materials considered list.  I believe it's at the Bates stamp ending '151 is the page I want to go to.

A.   Okay.

Page 784

Q.   Okay.

And on that page, you identify as one of the studies that you considered a report by Vaterlaus et al. from 2016.

Do you see that?

A.   I do.

Q.   And it's entitled "Snapchat is more personal": An exploratory study on Snapchat behaviors and young adult interpersonal relationships."

A.   You're referring to the study from 2016; is that correct?

Q.   Correct:

A.   Yes.

Q.   Yes.

MR. BLAVIN:  I'll introduce as Exhibit 56 a copy of that study.

(Christakis Exhibit 56, Vaterlaus study, was marked for identification, as of this date.)

BY MR. BLAVIN:

Q.   And this study looked at how young adults use Snapchat for interpersonal communication; is that

64 (Pages 781 - 784)

CONFIDENTIAL

Page 785

correct?

A. Yes.

Q. Okay.

And if you look at page 599 of the study under the subheading entitled "7.3 Enhanced connection in existing interpersonal relationships."

Do you see that?

And I apologize. This is tab --

A. This is what?

MR. BLAVIN: I'm just talking to the technician there.

This is tab 3.

Great.

A. Page 599?

Q. Yeah.

A. Yes.

Q. And it says on the bottom, near the bottom under Section 7.3: Young adults perceived that Snapchat could enhance connection within the relationship with family, friends and romantic partners. Some young adults even suggested Snapchat could strengthen their

Page 786

interpersonal relationships.

Do you see that?

A. I do.

Q. And it goes on: In fact, again suggesting the rules of youth culture, Snapchat was viewed as a personal form of communication reserved for young adults' closest interpersonal relationships, not random people.

Do you see that?

A. I do see that.

Q. And you chose -- you reviewed this document, but you chose to not cite, quote, or discuss the study at all in your report; is that right?

A. Yeah, I reviewed it and I didn't cite it. I -- yes.

Q. Okay.

A. Do you want to know why?

Q. No, that was my -- my question and you've answered it.

Other than the Deng study that we discussed, this study, the Vaterlaus study that you did not choose to cite in

Page 787

your report, your analysis of Snapchat primarily relies upon Snap's internal documents; is that correct?

MS. COUCH: Objection; misstates his report.

A. No, my analysis of the risk posed by Snap relies on the totality of the evidence, including the peer-reviewed literature, my own personal experience, my -- my own research, my education, and the internal documents.

Q. Okay.

And the peer-reviewed literature, again, is one study, a pooled analysis that looked at Snapchat and four other platforms, right?

MS. COUCH: Objection; misstates his report.

A. No, my -- the pool -- the existing literature is -- supports that the -- the features drive the untoward effects, and -- and Snap is similar to the others in that respect and --

Q. But you didn't analyze any, as

Page 788

we discussed before, any data which showed you how Snapchat is actually used and whether those features that you've identified are used greater or less than others.

So how can you extrapolate from features that may exist on other platforms to determine that those would support your conclusions as to Snapchat?

MS. COUCH: Objection; vague; calls for conjecture; argumentative.

A. My -- my considered opinion is that -- that the experience on Snapchat is very similar to the experience people have on other social media sites precisely because every site emulated every other and added the features that the other ones had so that by 2019 they were -- they all had features in common, most of them.

Q. But you have no basis to determine whether or not -- for example, you discuss the Spotlight feature on Snapchat --

A. Yes.

65 (Pages 785 - 788)

CONFIDENTIAL

Page 789

Q. -- as comparable to TikTok, Instagram, et cetera, as an algorithm.

A. Right.

Q. You have admitted that you don't know if Snapchat users use that feed for five percent of the time versus 95 percent of the time messaging on the app, correct? You just don't know the answer to that question?

MS. COUCH: Objection; vague.

A. I -- I -- I don't know the answer to it and I don't -- it -- I don't consider it to have implications in terms of my --

Q. How is that possible if -- if an app feature is used not at all by users, how can you draw conclusions from other studies that have analyzed that peach and say that those conclusions should apply to that feature which has minimal to no use?

MS. COUCH: Objection; hypothetical.

And let him finish his answer.

Page 790

BY MR. BLAVIN:

Q. Would that be sound methodologically?

MS. COUCH: Objection.

A. The point I draw is that the -- the -- well, let's talk about how -- it -- you -- you're positing that people use Snap just for messaging. If they were only messaging, if that was their only intention, they would just message. I mean, they're -- they're on Snap because of the features. The same reason they're on other sites, there's features that make the sites compelling.

Q. Okay.

But again, you do not know if users primarily or overwhelmingly use Snapchat just for messaging versus use of other features?

MS. COUCH: Objection; misstates.

A. I -- I don't know the predominant usage of Snap.

Q. Okay. Thank you.

Page 791

Now, when I think you testified yesterday with respect to the company's internal documents that you would not, for example, publish a study in a peer-reviewed journal that's alone analyzed a company's internal documents to reach any conclusions regarding causation, for example.

A. Well, I -- I -- I --

MS. COUCH: Objection; misstates.

A. What I said was that the -- the email exchanges and -- and attestations themselves don't rise to the level of peer review, but some of the studies that were conducted not only could rise to the level of peer review, but some of them were peer-reviewed. The ████ study I mentioned yesterday was peer-reviewed and published, and there have been other studies. The Kramer study was peer-reviewed and published.

Q. But did any of those studies involve Snapchat? Were they Snapchat

Page 792

studies?

A. No, I don't recall seeing Snapchat studies that would have been sufficiently robust to be peer-reviewed -- I mean to be published in the peer-reviewed literature.

Q. Okay.

Dr. Christakis, if you go to your report at page 98, you cite in the document 31 and 32 figures a Snap internal document Bates number ending '262.

Do you see that?

A. I do.

Q. Okay.

(Christakis Exhibit 57, Clearworks Final Report Healthy Interactions Research Prepared February 2023 for Snapchat, Bates SNAP0404262-318, was marked for identification, as of this date.)

BY MR. BLAVIN:

Q. Do you recall, Dr. Christakis, seeing this document introduced as Exhibit 57, I believe?

66 (Pages 789 - 792)

CONFIDENTIAL

Page 793

A.  I do.  I recall seeing several iterations of it, yes.

Q.  Okay.

And this was research conducted for Snap by the company Clearworks.  Is that right?

A.  That's correct.

Q.  Okay.

And you understand, and this is clear under the "Objectives" heading on page 4265 of the document, the primary objective was to understand what healthy social media generally looks like to users, parents, and SMEs.

I think that's subject matter experts.  Is that correct?

A.  That's correct.

Q.  Okay.

And it says below in one of the bullet points that it was to understand the impact social media has on teens, positive and negative.

Correct?

A.  That's correct.

Page 794

Q.  And if you look through the study, it has various pages starting at Bates stamp, Bates number 4271 on Positive Themes.

Do you see that?

A.  Yeah.

Q.  One's connection?

A.  Yes.

Q.  One's community, one's education, correct?

And for example, the Connection page, 4272 says that social media is a great way to stay connected and communicate with friends, family, and people who live far away.

Do you see that?

A.  Yes.

Q.  Okay.

And if you go to page 4280 of the document "Positive Theme Opportunities" under the "Takeaway" column, if you look at the last one it says:  Teen and YAs - young adults - typically use Snapchat with close friends,

Page 795

but finding people with similar interests or experiences online can help them feel less alone.

Do you see that?

A.  Yes, I see that.

Q.  Okay.

Now, you didn't discuss in your report any of the positive themes that were identified in this document at all, did you?

MS. COUCH:  Objection; misstates the report.

A.  I believe there are many times in the report -- in my report that I talk about the fact that some children derive benefit from some parts of social media apps, but if you're ask -- yeah, I'm done.

Q.  Okay.

And these types of findings in the study would be consistent with that conclusion, correct?

A.  This would be consistent with the fact that some teens derive some benefits from some aspects of social media

Page 796

apps, yes.  But my report emphasizes that on balance, the risks pose -- posed outweigh the benefits.

Q.  Okay.  But this -- in this study when it's talking about the positive attributes at Snapchat, it's not say some -- some minors as to Snapchat.  It says teen and young adults typically use Snapchat with close friends, but finding people with similar interests or experiences online can them.

Correct?

MS. COUCH:  Objection; compound.

A.  That's what it says.  I mean, this is a small focus group that they conducted.  I'm not sure -- it's not really in a position to -- this is not the kind of study for which you can estimate a prevalence.  It's a theme.  It doesn't tell me how frequent that is or how often or how important.

Q.  Okay.

If you go to your report, your MDL report at page 147, you cite, and this

67 (Pages 793 - 796)

CONFIDENTIAL

Page 797

is in footnote 251, a document ending in Bates number '949.

Do you see that?

A. Number 251?

Q. Footnote 251.

A. Yes, ending 9959, yes.

Q. And it's referenced at 253 a 2017 study of Snap Power Users, correct?

A. Yes.

(Christakis Exhibit 58, Greenberg study, Bates SNAP0029949-960, was marked for identification, as of this date.)

THE WITNESS: Are we done with this one?

MR. BLAVIN: Yes, we're done.

BY MR. BLAVIN:

Q. And this was it's called "Snap Power User, UX evaluation," and it was prepared by the Greenberg Group, correct?

A. That's correct.

Q. And if you go to page 2 of the report under "Who we talked to" it says: All participants qualify as Power Users

Page 798

with Snapchat score between 20,000 and 200,000.

Correct?

A. Yes, it says that.

Q. If you go to the Bates number 9952 on page 4 of the report it says under "Snapchat Stories."

Do you see that? The last line?

A. Yep.

Q. (Reading) Snapchat Stories help users maintain a sense of connection.

Do you see that?

A. Yes.

Q. Okay.

And if you go to the next page, 9953 under the column "Lenses" there's quote from a user describing Lenses. It says, quote: It's fun to look through the Face filters, and when they add new ones, it's funny to send them to your friends.

Correct?

A. Where -- is that --

Q. In the box.

A. The quote, yes.

Page 799

Q. Now, you cited this study in your report, but you didn't cite any of these particular findings regarding Snapchat, correct?

A. I didn't cite these -- these -- the findings you just highlighted right now?

Q. Yeah.

A. That's correct, I did not cite those.

Q. Okay. You can put that document away.

Now, you also cite in your report at pages 148 to 50, and I'm looking at footnote 252 in particular, a survey of Snap users, and I think this is regarding streaks, correct?

A. Yes.

Q. Okay.

(Christakis Exhibit 59, slide deck "Power Friendships & Streaks: Problem Statements", Bates SNAP2183204-275, was marked for identification, as of this date.)

Page 800

BY MR. BLAVIN:

Q. And this document is entitled "Power Friendships & Streaks: Problem Statements."

Correct.

A. Yes.

Q. And this is the study that you -- you reviewed and cite in your report?

A. Yes, I believe so.

Q. Okay.

MR. BLAVIN: This is at tab 11.

Q. Now, if you go, Dr. Christakis, to pages 8237 to 8238 of this report, the Bates number that is. There's various --

A. Which numbers are you referring to the --

Q. Sorry, the last four --

A. The last four digits.

Q. Yes, the last four digits. I apologize.

A. Okay.

Q. '8237 and '8238.

A. That numbering is -- do you mean

CONFIDENTIAL

Page 801

'3237?

Q. Sorry, '83237.

A. Okay.

Q. Okay. I apologize. I may have misstated the number.

So, these are two pages from the study highlighting various user feedback regarding streaks on 82 -- I'm sorry, '83237.

It says, for example "Streaks give me a reason to talk to people just because."

"I feel like it keeps a little insights connection with whoever it is and the people that I do it with. It's a little something more with them."

"Streaks are kind a important. They don't mean anything but it keeps you connected."

Do you see that?

A. I do.

Q. And on the next page it says "Streaks are not stressful. It's not going to kill me if I lose my Streak but

Page 802

it's just more sentimental value."

"Streaks are definitely fun. They are not stressful for me."

"I don't think that there are any downsides to Streaks."

And that page in particular is entitled "Most users see Streaks as more fun than stressful."

Correct?

A. That -- that's what that page says. That's a single person's report on their assessment of it.

Q. Okay.

But you did not include any of this discussion from input like this regarding streaks in your report?

A. Well, what I --

MS. COUCH: Vague.

A. Well, what I did include, and I believe it's in this report, is what I would consider a more robust representation of how stressful streaks are because a single person's comment means less than the quantitative data

Page 803

across all of them.

And what you see, I think -- is it -- I think it's in this presentation, but it's certainly in my report, was that a sizable percentage of participants in this study found streaks to be very stressful.

Q. Very stressful, that was 6 percent, correct?

A. Well, 6 percent is the way Snap presented it. If you -- if you combine intolerable and large. I'm not sure why moderately stressful was not included in that, but --

Q. Well, I'm just saying you said very stressful, and that was 6 percent as you identified in your report at pages 149 to 150.

A. Very stress -- I -- that is quoting the way Snap entitled that slide, but what I think I said in my report is that I would -- I'm not sure why moderate was not included in that.

Q. Can I ask you a question?

Page 804

Moderately stressful, lots of things in life are moderately stressful, correct?

MS. COUCH: Objection; vague.

BY MR. BLAVIN:

Q. Texting can be moderately stressful if you're texting with a friend?

MS. COUCH: Objection; vague.

BY MR. BLAVIN:

Q. Would you consider something moderately stressful to rise to the clinically diagnosable condition of having a mental health condition?

Someone came to you and said, "Homework is moderately stressful for me," would you say that's a negative mental health outcome?

MS. COUCH: Objection; vague.

A. I don't know how to --

MS. COUCH: Argumentative.

(Stenographer clarification.)

MS. COUCH: I would just note he asked three questions without waiting for an answer.

A. I don't know how to answer that

69 (Pages 801 - 804)

CONFIDENTIAL

Page 805

hypothetical. It's not --

Q. Have you ever -- okay. Let me ask it this way.

Have you ever diagnosed someone in your practice as having a clinically diagnosable mental health condition based solely upon something being moderately stressful?

MS. COUCH: Objection; vague.

A. I -- I have not -- I don't even know what that means.

But I guess what I would say is that if an app is inducing moderate or more stress every single day, which is what streaks are -- I mean, streaks need to be used every day, I wouldn't consider that to be something that I would encourage people to seek out.

Q. Okay.

I think you referenced earlier, and this is in your MDL report at page 18, your generalizability conclusions, correct?

A. Page 18.

Page 806

Yes.

Q. Okay.

And if you look on that page around four or five lines down there's the sentence, quote: In much the same way, given the similarities between the salient features of social media platforms and the mechanisms by which they lead to harms discussed below, it is reasonable and appropriate to extrapolate findings from one site to another.

Correct?

A. That is correct.

Q. Okay.

Now, did you at all consider different platform architectures in reaching this determination that the similarities between the salient features of social media platforms and the mechanisms by which they lead to the harms discussed below allows this extrapolation?

MS. COUCH: Vague.

A. Could you explain what you mean by "architecture"?

Page 807

Q. Well, for example, I think you agreed with me that Snapchat is the only app that opens up to a camera as opposed to, for example, a feed of content.

Did you consider that different architecture in reaching your conclusions on extrapolation?

MS. COUCH: Same objection.

A. I -- I did not consider the first thing one sees when they go to the websites or the apps, but I don't think that that -- or, I believe that that would not, in any way, materially make them different from each other.

Q. Okay.

And you've testified previously that you didn't consider, you didn't ask for, you didn't consider data use -- data reflecting usage of particular features on the apps in reaching your conclusions regarding extrapolation, correct?

A. Right --

MS. COUCH: Asked and answered and misstates.

Page 808

A. I did testify to that earlier, yes, I believe so.

MR. BLAVIN: Thank you, Dr. Christakis. No further questions.

THE VIDEOGRAPHER: The time right now is 2:51 p.m., and we're off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time right now is 3:06 p.m., and we're back on the record.

EXAMINATION BY
MR. DAVIS:

Q. Dr. Christakis, my name is Todd Davis. I represent the TikTok and the ByteDance defendants.

Do you understand that?

A. Yes, I do.

Q. Alrighty. And we met briefly before the start of the deposition, right, yesterday?

A. Yes, I think so. Yes.

Q. Okay. I'm going to use a couple definitions throughout our discussion, and

70 (Pages 805 - 808)

CONFIDENTIAL

Page 809

so I'm going to run those through with you, okay.

When I'm referring to "social media app" or "platform," I'm using those interchangeably, okay? Is that acceptable to you?

A.   Yes.

Q.   And if I'm using the term "psychiatric disorder," I also mean any mental health disorder.

Is that acceptable to you?

A.   Yes.

Q.   And if I use the term "BDD" to mean body dysmorphic disorder, you're all right with that as well?

A.   I am.

Q.   And -- and when I use the term "psychiatric disorder," I'm including any psychiatric disorder.

Is that acceptable to you?

A.   Explain to me what you mean by that, "any psychiatric disorder."

The ones in here or any psychiatric disorder?

Page 810

MR. DAVIS:  I'll rephrase it.

BY MR. DAVIS:

Q.   If I use the term "psychiatric disorder," I'm using that to mean any diagnosis that's in the DSM-5.

Is that acceptable to you?

A.   That's vague, but if that's what you want to do, yes, I can understand it that way.

Q.   Great.

And if I use the term "RCT," I'm using that to mean randomized control trial.

Is that acceptable to you?

A.   Yes.

Q.   And I'm going to use the term "RCT" and "experimental studies" interchangeably.

Is that acceptable to you?

A.   If that's the way you want to use it, that's not perfect, but I can accept it, yes.

Q.   Okay.  Great.

Now, I want to talk to you about

Page 811

your methodology.

What role did replication or consistency play in your methodology to -- to -- to the -- make causal assessments in this case?

MS. COUCH:  Compound.

A.   Those are two different things. Can you -- which of those do you want -- what are those -- what do you mean by those, and what do you want me to address specifically?

Q.   Do you understand what "replication" means in terms of study results where you want to see a specific study result replicated in more than one study?

A.   Yes.

Q.   Okay.

Did that play a role at all in your causation opinions in the case?

A.   It -- it -- yes, it informed my -- my -- my determination, yes.

Q.   And in terms of the consistency of the results, did that also play a role

Page 812

in your causation opinions in the case?

A.   Yes.

Q.   Were both replication and consistency something that you -- you made sure you determined before you reached your opinions on causation in the case?

A.   Yes.  One of the ways to assess consistency is by looking at systematic reviews and meta-analyses and seeing whether or not there's a consistent signal or pattern amongst all the studies, yes.

Q.   You anticipated my next question.

With respect to the meta-analyses that you rely upon in this case, did you actually look at the individual studies that were -- that were referenced in each of the meta-analyses that you rely upon?

A.   Did I look at the individual methods of each study?

Q.   No.

Did you look -- did you -- if there's meta-analysis and it identified

71 (Pages 809 - 812)

CONFIDENTIAL

Page 813

eight or ten or twelve studies that were included in that meta-analysis, did you actual pull those specific studies and look at them?

A.   No, but I looked at the meta-analysis of methodology to see how they assessed the methods, which is one of the cardinal features of well-done meta-analysis.

Q.   So for any individual study in a meta-analysis that you relied upon, you didn't look at the individual study itself to study -- to assess what it measured or how it measured it, right?

MS. COUCH:  Objection.

A.   The meta-analyses themselves do that.  They assess the consistency of the outcomes and the consistency of the exposure before they put the results together.

Q.   I think you missed my question.  So I'd ask you because I've got limited time to really focus on my question.

For any of the individual

Page 814

studies identified in the meta-analyses that you relied upon, you did not pull those individual studies and actually look at them to see what specific measures or outcomes that they assess.

Fair?

MS. COUCH:  Objection.

A.   The authors of the meta-analysis did that and reported those results.

Q.   But you didn't do that, right?

MS. COUCH:  Same objection.

A.   The authors did it, and I looked at what they did, yes.

Q.   When you say "the authors," you're referring to the meta-analysis authors, right?

A.   Correct.  And I assessed to see that they had followed PRISMA guidelines.

Q.   You -- you didn't pull any of the individual studies identified in the meta-analyses that you rely upon to look at the strengths, limitations, or any specific confounders or covariants that were assessed in any of the individual

Page 815

studies.

Fair?

MS. COUCH:  Objection; compound.

A.   As part of the meta-analysis of -- a systematic review, first and foremost, they do a quality review of each of the articles and they use PRISMA guidelines to report whether or not the article -- whether or not the experiment or the study followed.

Q.   I think you missed my question.

You yourself did not pull the individual studies identified in the meta-analyses to look at what the individual study authors said about strengths, limitations, or confounders or covariants that are assessed.

Fair?

MS. COUCH:  Same objection.

A.   I did not personally pull and review the -- every single individual study because there is no need to do that.

Q.   In fact, you didn't pull any of the individual studies it -- identified in

Page 816

any of the meta-analyses.

Fair?

A.   No, that's not correct.

MS. COUCH:  Objection.

BY MR. DAVIS:

Q.   Can you identify any individual studies that you identified in a meta-analysis that you actually pulled and assessed individually?

A.   Many of the studies included in meta-analyses are ones that I was already familiar with because they are -- I'm sorry, did you --

Q.   Are you finished?

A.   I wasn't.

Many of the studies included in the meta-analyses were studies that I was familiar with already because they are high-profile studies in the field.

Q.   Can you name any of them today?

A.   Oh, they're -- there are tens of them.  I mean, I -- I can't name them off the top of my head, but I'm someone who's read this literature over many years and

72 (Pages 813 - 816)

CONFIDENTIAL

Page 817

then when a meta-analysis is done, it summarizes those studies. So yes, I was familiar with many of the individual studies, but would -- yes.

Q. Okay.

Any that -- any -- can you name five here today?

MS. COUCH: Objection; asked and answered.

A. I'm -- sitting here today right now off the top of my head, for all of the meta-analyses, all of the studies, to be honest with you, some of them are mine. I mean, there are many studies in there that I'm familiar with.

Q. Can you name five?

MS. COUCH: Same objection and argumentative.

A. I can -- I can reliably report that I have -- I am intimately familiar with many of the studies that were included in the meta-analysis.

Q. Is that the best answer you can give me today?

Page 818

MS. COUCH: Objection; argumentative.

A. That's the answer I'm giving you today.

MR. DAVIS: Okay.

I don't have time to argue with you today, Dr. Christakis. I'll just reserve on that as nonresponsive.

BY MR. DAVIS:

Q. Dr. Christakis, you included studies in your causation assessment that actually did -- that were not limited to the four -- the defendants' platforms in this case, right?

MS. COUCH: Objection; vague.

A. Say -- say what you mean by that.

Q. There were individual studies -- some of the -- some of the -- the studies that you relied upon were not limited to the defendants' platforms, correct?

MS. COUCH: Objection; vague.

A. Some of the studies may have included other platforms, but most of them

Page 819

did not, and the predominant platforms represented in all of them are these five that are in the report.

Q. Dr. Christakis, just a couple basic questions.

You agree that correlation or association may or may not be causation, right?

A. Correlation may or may not be causation, but as -- it -- it adds corroboratory evidence as part of the entirety of the -- of -- of -- of the scientific literature.

Q. That's --

MR. DAVIS: Object to the responsiveness.

BY MR. DAVIS:

Q. Dr. Christakis, a statistically significant association may or may not be causal, right?

A. A statistical significant relationship may or may not be causal, that's correct.

Q. Thank you.

Page 820

Body dys -- body dysmorphia alone is not sufficient to make a diagnosis of an eating disorder or body dysmorphic disorder.

Fair?

MS. COUCH: Asked and answered.

A. Body dysmorphia alone is a significant risk factor and its own untoward event for body dysmorphic disorder and for eating disorders, yes.

MR. DAVIS: Okay. But I move to strike nonresponsive.

BY MR. DAVIS:

Q. I'm just simply asking body dysmorphic disorder alone, standing alone all by itself with nothing else, that's not --

MR. DAVIS: Excuse me, strike that.

Q. All I'm asking is that body dysmorphia standing alone all by itself is not sufficient to make a diagnosis of BDD or any eating disorder, is it?

A. It's necessary --

73 (Pages 817 - 820)

CONFIDENTIAL

Page 821

MS. COUCH: Compound.

A. -- but not sufficient, that's correct.

Q. And disordered eating alone standing all by itself is not sufficient to make a diagnosis of BDD or any eating disorder.

Is that fair?

A. It -- it by itself it does not rise to make -- to reaching the DSM-5 criteria, but it -- it is necessary, but not sufficient, and is a risk factor for it.

Q. Thank you.

Now, Dr. Christakis, there's no study that you analyzed or assessed that actually used a diagnosed psychiatric disorder as an outcome or an endpoint when assessing social media use.

Fair?

A. There -- the -- there was a study that -- the Braghieri study looked at clinically diag -- reported clinical diagnosis of anxiety or depression in the

Page 822

past year. But there isn't a need to focus on clinical diagnoses and it's impractical, frankly, and unethical to do in research hospitals.

MR. DAVIS: I'll move to strike after "Braghieri."

BY MR. DAVIS:

Q. Other than Braghieri, can you identify any other study that you claim assessed psychiatric disorders as an outcome or an endpoint in any social media study?

A. That's not a yes-or-no question.

Q. Can you identify one for us, Dr. Christakis?

A. Can I identify one that -- that -- I -- that -- that made clinical diagnoses? Aside from Braghieri, I can't identify one sitting here right now, but that's not the way this research is done.

Q. Okay.

The experimental or RCT studies that you rely upon, those were all -- lasted -- some of them lasted days, some

Page 823

of them lasted hours or minutes, some of them lasted up to a month, right?

MS. COUCH: Compound; misstates.

A. Some of them lasted actually several months, but there was a whole range of how long they lasted, that's correct.

Q. Okay.

For any of those that -- well, which one do you think lasted several months?

A. The -- the -- the -- the Davis study.

Sitting here right now, it's difficult for me to recall precisely how long -- which ones lasted that long, but several -- several of them lasted for at least two months and maybe longer.

Q. Can you identify any study on social media use of any kind that's either an experimental or a longitudinal study that looked at diagnosed disorders where the use of social media actually made social media --

Page 824

MR. DAVIS: Excuse me, let me strike that.

Q. Can you identify any longitudinal or experimental study or RCT that studied diagnosed disorders and that social media use or a feature of social media use made the diagnosed disorder worse?

MS. COUCH: Compound; vague.

A. I -- I don't understand the -- can you rephrase that in a way that I can understand?

Q. Sure.

I'm asking about studies that assessed as an outcome -- I'm asking about studies that actually looked at patients with diagnosed psychiatric disorders, and of those studies, did any study looking at social media use determine that a social media use or a feature of social media use made the diagnosed disorder actually worse?

MS. COUCH: Objection.

A. So, the study that comes readily

74 (Pages 821 - 824)

CONFIDENTIAL

Page 825

to mind that addressed that is the Davis study, which looked at college students who had a history of depression, anxiety, and asked them to undergo abstinence from social media and their symptoms improved.

Q. The Davis study was a self-report assessment, not a clinical diagnosis for the patients that got enrolled in the study, correct?

A. It was not a clinical diagnosis. It's not practical or possible to do clinical diagnosis. But their symptoms improved and symptomology is what's measured for people with anxiety and depression to assess how well a therapy is working for them.

Q. Can you identify any other study that you claim was either experimental or longitudinal where you claim that the study assessed diagnosed psychiatric disorders and the use of social media or a feature of social media made the diagnosis worse?

A. So, the recently published

Page 826

Nagata study and the Xiao study both looked at social media use, and one looked at -- one looked at social media use and depression and anxiety; the other looked at social media addiction and suicidal ideation and -- and behaviors.

Q. Okay. I think you missed my question.

I'm not asking about -- Nagata, that just was published, that looked at depressive symptoms, not a clinical diagnosis, right?

A. Again, depressive symptoms are what we follow when we're looking at people developing depression.

Q. Straightforward question, Dr. Christakis, 'cause I don't have a lot of time.

A. Yeah.

Q. The Nagata study that was just published looked at symptoms of depression, not a clinical diagnosis, right?

A. Yeah, studies of clinical

Page 827

diagnosis are simply not done in -- for reasons of feasibility, ethics, practicality, nor are they necessary.

MR. DAVIS: I didn't ask that question. I simply asked that the Nagata study.

I move to strike your answer as nonresponsive.

BY MR. DAVIS:

Q. The Nagata study looked at symptoms of depression, not a clinical diagnosis, right?

A. The Nagata study looked at symptoms of depression, which I consider to be a reasonable and practical approach.

Q. But not a diagnosis of depression. Fair?

A. That's correct.

Q. Okay. Thanks.

The Xiao study looked at suicidal thoughts or behavior. It didn't look at a depression or anxiety or any other psychiatric disorder being diagnosed, right?

Page 828

A. I think suicidal ideation or intent to commit suicide is a pretty serious psychotic diagnosis.

MR. DAVIS: Move to strike as nonresponsive.

BY MR. DAVIS:

Q. The Xiao study that you mentioned which was just published did not look at clinically diagnosed psychiatric disorders.

Fair?

A. Well, suicidal ideation behavior are -- are serious psychiatric outcomes. It's not -- there isn't no -- there is no diagnosis for suicide, but yes.

MR. DAVIS: I move to strike as nonresponsive.

I reserve on that. I just don't have time to get -- get an answer with the time limits that have been imposed.

BY MR. DAVIS:

Q. Dr. Christakis, have you done any analysis of any kind in your reports

75 (Pages 825 - 828)

CONFIDENTIAL

Page 829

where you assess how a screening instrument used in any of the studies can determine what percentage of patients actually have a diagnosed disorder versus those that don't have a diagnosed disorder?

MS. COUCH: Objection; vague.

A. I don't understand the question.

Q. You understand that studies that were -- that were analyzed in your report, they used different types of screening tools to assess psychiatric symptoms, right?

A. That's correct.

Q. Okay.

And have you done any analysis of any kind in either of your reports where you determined what the rate of error is for those screening tools versus the -- the scales and the scores used versus an actual diagnosis of a psychiatric disorder?

A. Yeah, I --

MS. COUCH: Objection;

Page 830

misstates.

A. All of the -- all of the validated screening tools that were used for depression, anxiety are used precisely because they have a high predictive validity for -- for having those underlying diagnoses. That's why they're used.

MR. DAVIS: Move to strike; nonresponsive.

BY MR. DAVIS:

Q. Dr. Christakis, you don't know what the specific predictive value is of any of the screening tools that were used in the studies that you rely upon to determine how many of the patient who scored on those screening tools actually had a diagnosed disorder, do you?

MS. COUCH: Objection; vague; lacks foundation.

A. There -- there are a couple of questions embedded in that.

One is do I know how scores on various screening tools correlate with

Page 831

subsequent diagnosis of anxiety and depression. Yes, that is known. It varies by screening tool.

The second one was do I know how many patients in these studies went on to develop clinically diagnosed anxiety or depression or other psychiatric -- and the answer to that is I do not know when these studies were presented.

Q. If you look at -- let's go back a little bit to meta-analysis.

Meta-analysis is a method by which researchers can combine individual studies to provide -- to provide a summary effect size for the -- the data that's collected.

Is that fair?

A. Yes, that's an accurate, simple representation of what --

Q. And meta-analyses are, again, they're -- they're analysis -- they're analyzing many -- or, several different studies and combining them, right?

MS. COUCH: Objection; vague.

Page 832

A. The -- that's the final step in a meta-analysis, but there are many steps leading up to it that are essential to making sure that the results are robust.

Q. Now, you've stated that a summary of cross-sectional data cannot prove causality, haven't you?

MS. COUCH: Objection; lacks foundation.

A. I -- I -- I -- I have not stated that. I've stated that a summary of cross-sectional data can corroborate as part of the totality of the evidence that -- to build a causal argument. There -- there -- there are strengths and limitations to all approaches and the best -- the best summary incorporates all of them.

Q. Let's turn to page 251 of your expert report in the JCCP.

You see on 250 -- page 251 you are putting in the result of a meta -- a forest plot for a meta-analysis that's identifying different individual studies

76 (Pages 829 - 832)

CONFIDENTIAL

Page 833

that were included in the meta-analysis, right?

A.   Yes.

Q.   And there -- on that forest plot there's about 20-some studies, 20-plus studies, right?

A.   Yes.

Q.   Turn to page 252, top of the page.  You say, in discussing this summary of 20-plus studies, quote:  This meta-analytic summary is not without limitations.  Most notably that the studies were all cross-section -- cross-sectional, so causality cannot be proven.

Do you see that?

A.   I see that.

Q.   Those were your words, right?

A.   That's correct, but it must be interpreted in the context of the entirety of everything, and if you keep reading the report, it includes longitudinal studies as well.

Q.   Now, Dr. Christakis, you are a

Page 834

pediatrician, right?

A.   I am.

Q.   You don't hold any board certification in psychiatric or addiction medicine, do you?

A.   No, I do not.

Q.   You haven't done a residency or a fellowship in psychiatry or addiction medicine, have you?

A.   I have not done a residency, but I've taken care of patients with psychiatric disorders and diagnosed them with psychiatric disorders in the scope of my practice.

MR. DAVIS:  Move to strike; nonresponsive.

BY MR. DAVIS:

Q.   I was just simply asking you have not done a residency or a fellowship in addiction medicine or psychiatry, have you?

A.   I have not done a fellowship in either of those, that's correct.

Q.   Or a residency, right?

Page 835

A.   Or a residency.

Q.   And you've never worked in an addiction clinic, have you?

A.   I've done rotations in addiction clinic during my residency and during my medical school.

Q.   Okay.

And so that was how many years ago when you did that?  Couple decades?

A.   It was a couple -- couple of decades ago, yes.

Q.   Right.

And you have not had any research grants or projects where you have studied addiction, have you?

MS. COUCH:  Objection.

A.   Actually, I have had research funded to study alcohol and tobacco addiction.

Q.   I think you have less than three publications combined on those two topics, don't you?

MS. COUCH:  Objection.

A.   I -- I -- actually, I'm almost

Page 836

certain it's more than that, but we can look at my CV, if you want to.

Q.   Okay.

There are physicians who specialize in treating patients with addictive disorders, right?

A.   There are.  There are not enough of them to treat everyone with addiction, but there are some, yes.

Q.   Do you hold yourself out to your peers and your colleagues as someone who is a specialist in addiction medicine?

MS. COUCH:  Objection.

A.   I consider myself expert in making the diagnosis of social media addiction, alcohol addiction, drug addiction, and I've made those diagnoses.

MR. DAVIS:  Okay.  I move to strike as nonresponsive.

I don't have the time to come back to that, Dr. Christakis.

BY MR. DAVIS:

Q.   How much total time have you ever spent on TikTok?

77 (Pages 833 - 836)

CONFIDENTIAL

Page 837

A. Personally on the -- how many -- how much time have I watched TikTok videos or spent on the platform itself? 'Cause those are, in my mind, separate because I don't -- I have not spent a lot of time on the platform, but I come across many TikTok videos because they are put in front of me.

Q. Put in front of you by who?

MS. COUCH: Objection.

A. Variety of sources. By social media accounts. They're sometimes texted to me by friends, family, et cetera.

Q. Okay.

So, how much time have you personally spent on the TikTok app or the platform?

A. I can't estimate it precisely, but not a very -- not a lot of time.

Q. Would you say it's less than a couple of hours?

A. Yes, I would say it's less than a couple of hours on the actual app, yes.

Q. And is that true for all the

Page 838

other defendants as well in the case, that you've spent probably less than a few hours on each of their platforms?

A. No, it's definitely not true for the -- all of the defendants.

Q. Okay.

And in terms of people send you TikTok videos that you watch?

A. I have seen some, yes.

Q. Do your friends and family send those to you?

A. Some come from friends and family. Some come on my -- on Facebook feed.

Q. Some of them --

MS. COUCH: We're out of time.

Q. Some of them would send you videos on your TikTok video on your Facebook feed?

MS. COUCH: Todd, we're done with time.

MR. DAVIS: I'm sorry, that's not true. I have eight -- how much time is there?

Page 839

MS. COUCH: I'm happy to go off the record while we work this out.

THE VIDEOGRAPHER: The time right now is 3:34 p.m., and we are off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time right now is 3:36 p.m., and we're back on the record.

MS. COUCH: Yeah. By party agreement, we are at 12 hours 51 seconds, and so this portion of the deposition will conclude.

We'll be back for redirect, and of course defendants will have reciprocal time in that regard.

MR. DAVIS: Yeah, defendants' position is that we reserve on additional time because the agreement was that the witnesses would come and answer questions asked. That's not happened over the course of the two days. That's impeded the time limits that -- that were in place, and

Page 840

because of that, our examinations were impeded, and we reserve the right for additional time.

MS. COUCH: And just in response to that, so that it's on the record, we obviously oppose. We would -- I think the transcript speaks for itself, and without getting into anything, I think there was significant time spent wasted on topics well outside the scope and asked and answered, but if it ever comes to that, we can look at the transcript.

Thank you so much.

THE VIDEOGRAPHER: The time right now is 3:37 p.m., and we are off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time right now is 4:07 p.m., and we're back on the record.

78 (Pages 837 - 840)

CONFIDENTIAL

Page 841

EXAMINATION BY

MS. COUCH:

Q. Dr. Christakis, I'm going to hand you a copy of what I've marked as Exhibit 60.

(Christakis Exhibit 60, Cheng study, was marked for identification, as of this date.)

BY MS. COUCH:

Q. Is this a copy of the peer-reviewed publication you referenced in your deposition conducted by adversary Meta Sciences?

A. Yes.

MR. SCHMIDT: I object. I don't have a copy of the document.

BY MS. COUCH:

Q. And does it reference within that study --

A. Yes.

Q. And within that study, does it reference problematic use and addiction and including addiction use scales?

MR. SCHMIDT: Objection;

Page 842

leading.

A. Yes, it does.

MS. COUCH: And I'm going to now hand you what I am marking as Exhibit 61.

(Christakis Exhibit 61, slide deck "Of Mice and Children: How early experiences affect cognition", was marked for identification, as of this date.)

(Christakis Exhibit 62, transcript of Presentation "Can media effects in kids be reversed?", was marked for identification, as of this date.)

MR. DAVIS: Excuse me. I assume one objection by a defendant is good for all defendants.

MS. COUCH: It is.

MR. DAVIS: Thank you.

BY MS. COUCH:

Q. I'm now handing you what I marked as Exhibit 61 and 62.

A. Yes.

Page 843

Q. Are these true and accurate copies --

MR. SCHMIDT: I only have 61.

Q. -- of the full slide deck?

MR. SCHMIDT: Objection to asking questions of the witness when I don't have a copy of the document.

Thank you.

BY MS. COUCH:

Q. Are these true and accurate copies of the full slide deck and partial transcripts of the talk you gave on toddlers that was referenced earlier in your deposition?

A. Yes.

Q. And is this transcript and deck to the short clip that was shown earlier by defendants as part of Exhibit 34 on your talk regarding toddlers?

MR. SCHMIDT: Objection; leading.

A. This clip is from the question-and-answer period following the talk I gave in -- that's Exhibit 61.

Page 844

Q. And when was -- what year was that talk?

A. It was December of 2015.

Q. And anywhere within that talk that you gave in 2015, did you discuss adolescents or teenagers?

A. I did not discuss adolescents, teenagers, or social media.

Q. Okay. Great.

MS. COUCH: And now I'm handing you a copy of Exhibit 63.

(Christakis Exhibit 63, Curriculum Vitae of Dimitri A. Christakis, MD, MPH, Bates CHRISTAKIS0001-041, was marked for identification, as of this date.)

MR. SCHMIDT: Thank you.

BY MS. COUCH:

Q. And is that a copy of your current CV?

A. Yes, it's from -- yes.

Q. Okay. You can set that aside. In this case, are you offering any opinions on the content or structure

79 (Pages 841 - 844)

CONFIDENTIAL

Page 845

of warnings?

A.  No, I'm not.

Q.  And in this case, do you have any opinions in regards to the terms of services of any company?

A.  No.

Q.  Okay.

Earlier you were discussing the Children and Screens and your handbook that was earlier marked as an exhibit.

Do you recall that testimony?

A.  I do.

Q.  And you said that the handbook had been funded by Children and Screens.

Do you recall that?

MR. SCHMIDT:  Objection; leading.

A.  I do recall saying that.

Q.  And when was that funding received?

A.  The contract for the handbook was signed in December of '23.

Q.  And what was the amount of that funding that Springer received?

Page 846

A.  My recollection is that was $35,000.

Q.  And was the funding received prior to Mr. Bergman's association with that nonprofit?

A.  Yes.

Q.  And did you -- in your work on this case, did you review the individual social media platforms?

A.  Yes, I did.

Q.  And what did you review in that regard?

A.  I reviewed the scientific literature.  I reviewed the deposition of the deposed defendants.

Q.  And --

A.  I reviewed internal documents. I relied on my own clinical experience and my own research.

Q.  And how were you able to assess each individual platform increases the risk or causes harm to adolescents?

MR. DAVIS:  Object to form.

MR. SCHMIDT:  Objection;

Page 847

leading.

MR. DAVIS:  Leading.

A.  Many, if not most, of the studies I cite included all of the social media platforms, and when they did not include all of them, the features they share in common as I outlined in Table 5 of my report make extrapolating across all of them scientifically defensible.

MS. COUCH:  Okay.

Can we go off the record, please?

THE VIDEOGRAPHER:  The time right now is 4:12 p.m., and we're off the record.

(Recess taken.)

THE VIDEOGRAPHER:  The time right now is 4:28 p.m., and we're back on the record.

FURTHER EXAMINATION BY MR. SCHMIDT:

Q.  Dr. Christakis, do you have Exhibit 60, the study by _____ from Facebook and other people from Facebook --

Page 848

on Facebook that your counsel marked, in front of you?

A.  I do.

Q.  Do you consider this a well-designed study?

A.  I do.

Q.  Is it good that Facebook is publishing data like this for scientists, yes or no?

MS. COUCH:  Vague.

A.  I -- I -- I think it's -- I don't know what you mean if it's good for scientists.

I think it was -- I think this was an important study.

Q.  Okay.  Look on the first page of this important study that you cite in your report under "Introduction" in the second paragraph.

Do you see where there's the footnote marker for footnote 8?

A.  The present study --

Q.  No.

A.  Footnote 8.

CONFIDENTIAL

Page 849

Q.   Yeah, in that paragraph halfway down there's a sentence that begins "We don not" --

A.   Yeah, "We do not use the term." Yes.

Q.   Right.

They say:  We do not use the term "addiction" because there's no agreed upon criteria for diagnosis and because diagnoses of clinical level concerns would require more formal assessment, i.e. by a mental health professional.

Do you see that?

A.   I do.

Q.   Do you agree with this article that you cited that there is no agreed-upon criteria for diagnosing addiction?

MS. COUCH:  Objection.

BY MR. SCHMIDT:

Q.   Yes or no?

MS. COUCH:  Same objection.

A.   No, I don't.

This was from 2019, and

Page 850

actually, the data are collected in 2018. But I -- I -- I think there is a -- there is a belief that there is addiction -- there's such a thing as social media addiction.

Q.   Do you --

A.   People use different terms, but, yes.

Q.   Do you agree that there was no agreed-upon criteria at the time of this article, yes or no?

MS. COUCH:  Objection.

A.   This was in 2018.

I actually think they use the Bergen --

MR. SCHMIDT:  I'll withdraw the question.

BY MR. SCHMIDT:

Q.   Do you have Exhibit 61 in front of you?  This is the slide deck with the transcript that I'll give you in a moment that your lawyer gave you from your presentation.

Do you remember testifying about

Page 851

that a few minutes ago?

A.   This is the PowerPoint presentation --

Q.   Yes.

A.   -- I gave.

Q.   Do you remember testifying about that a few minutes ago?

A.   Yes, I do.

Q.   And you said:  I did not discuss adolescents, teenagers, or social media in this talk.

Is that correct?

A.   In the prepared talk on the PowerPoint, that's correct.

Q.   Or in the talk itself, correct?

A.   In the question-and-answer period, I took all questions.

Q.   Okay.

A.   But what I said was that this talk does not contain data on -- on adolescents, that's correct.

Q.   Do you see on page 2 you list your lab's mission?  Do you see that?

A.   Yes.

Page 852

Q.   Do you see there's no reference to teens or social media in your lab's mission?

A.   In -- this was in 20 --

Q.   Sir, I have very few minutes. Can you answer my question?

Do you see that there is no reference to teens or social media in your lab's mission at the time of this document?

A.   At the time of this document, this was the principal focus of my laboratory.

Q.   Do you see this slide on "Children's Daily Media Usage" partway through the deck?

A.   Yes.

Q.   Do you see that you report data for teens?

A.   These aren't data I collected, but yes.

Q.   Okay.

Let's look at the transcript that your counsel marked of this talk, and

81 (Pages 849 - 852)

CONFIDENTIAL

Page 853

you'll -- if -- it's Exhibit 62 which is right there.

On this point of whether this talk involved teens, adolescents, or social media, can you go to the third page of that?

You see right at -- no, you were there. You see right at the top it says "teens"? Do you see the word "teens"?

Sir, you took 40 minutes or 30 minutes on the break to look at this. All I'm asking you is do you see the word "teens" at the top of the third page of this document?

A.   I do, but it's a little bit hard to understand.

Q.   Okay.

A.   Yes, I do.

Q.   If you go to page 2 of that document, you'll see it's got numbering at the bottom. There's time stamps on this.

At 1:02 do you see it talks about teens again in this document that your lawyer marked --

Page 854

A.   Yes.

Q.   And if you go to page 3, 1:16 do you see it says: Lots of shows that teenagers watch?

A.   Yes.

Q.   If you go to page 5, time stamp 2:26 you state: Your job as parents, particular -- particularly around teens is to remediate the effects of media.

Do you see that?

A.   Yes, I see that.

Q.   And if you look there's another document clipped at the end of this set, and if you go to page 1 of that document, this is the one that has a title "Why is digital media so addictive?"

And you say: They're incredibly addictive.

Do you see that?

A.   What time stamp are you referring to?

Q.   08 up at the top.

A.   On page 1 of this?

Q.   Mm-hm.

Page 855

If you pass it to me I'll make sure you have the right one.

MS. COUCH:  We're out of time, but I'll let him answer this question.

A.   The next page.

Q.   You see where you talk about they're incredibly addictive, what are you referencing there in this talk that frequently references Facebook, Instagram?

MS. COUCH:  Objection.

A.   I don't see references to Facebook and Instagram. And I don't know there -- this only says they're incredibly addictive.

Q.   You don't see references to Facebook on page 2, Instagram on page 3?

A.   I don't have the reference.

MS. COUCH:  Paul, we're done. You're out of time. You went over a minute.

MR. SCHMIDT:  What's the time? Let's go off the record.

THE VIDEOGRAPHER:  The time right now is 4:34 p.m., and we're off

Page 856

the record.

(Recess taken.)

THE VIDEOGRAPHER:  The time right now is 4:35 p.m., and we're back on the record.

MR. SCHMIDT:  Do you want to go first?

MS. COUCH:  If you have no statement to make, then I would say the deposition is concluded per agreement of the parties, but I will assume that you'll say something and I'll have something to say in response.

MR. SCHMIDT:  Okay.

Yeah, my understanding is counsel's cutting off the deposition. I did not have the chance to ask about Exhibit 62 in full, which was a new document. I understand it's a transcript, you're representing, of a talk I asked the witness about.

But I will note that in the third -- it's a compilation document

82 (Pages 853 - 856)

CONFIDENTIAL

Page 857

and the third exhibit which begins: Why is digital media so addictive? On page 2 there is a reference to posting on Facebook at 1:12.

On page 3 Dr. Christakis talks about: My daughter when she was on 15 on her Instagram, the moment she posts. That's at 1:17.

There's a reference to Facebook on page 5 at 2:37.

MS. COUCH: Okay.

I would just state in response to that that the parties have met and conferred on the timing and length of depositions and the procedure extensively. Per agreement of the parties, this deposition was limited to 12 hours and redirect would be limited -- cross of the redirect would be limited to however much time redirect took. That is the agreement that we have and what we have adhered to today.

In response to that, I would

Page 858

only clarify that I did not represent that was the full transcript. That is clips of the transcript. It was as much as we could -- we -- we had available to us.

MR. SCHMIDT: Yeah, and I didn't mean to say anything to the contrary. I understand what you're saying about that. We have disagreement that it's partial clips.

MS. COUCH: I think with that, we'd be situated to go off the record.

MR. SCHMIDT: With our objection.

THE VIDEOGRAPHER: The time right now is is 4:37 p.m., and we are off the record.

(Deposition adjourned at approximately 4:37 p.m. EDT)

Page 859

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it. It will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 860

A C K N O W L E D G M E N T

STATE OF          )
                  :ss
COUNTY OF         )

I, DIMITRI A. CHRISTAKIS, M.D., M.P.H., hereby certify that I have read the transcript of my testimony taken under oath in my deposition of June 26, 2025; that the transcript is a true and complete record of my testimony, and that the answers on the record as given by me are true and correct.

_____
DIMITRI A. CHRISTAKIS, M.D., M.P.H.

Signed and subscribed to before me this
_____ day of _____, 20__.

_____
Notary Public, State of

83 (Pages 857 - 860)

CONFIDENTIAL

Page 861

ERRATA

PAGE/LINE/ CHANGE / REASON

___/___/_____/_____
___/___/_____/_____
___/___/_____/_____
___/___/_____/_____
___/___/_____/_____
___/___/_____/_____
___/___/_____/_____
___/___/_____/_____
___/___/_____/_____
___/___/_____/_____
___/___/_____/_____
___/___/_____/_____
___/___/_____/_____
___/___/_____/_____
___/___/_____/_____
___/___/_____/_____
___/___/_____/_____
___/___/_____/_____
___/___/_____/_____
___/___/_____/_____
___/___/_____/_____

Page 863

LAWYER'S NOTES

PAGE / LINE

___/___/_____
___/___/_____
___/___/_____
___/___/_____
___/___/_____
___/___/_____
___/___/_____
___/___/_____
___/___/_____
___/___/_____
___/___/_____
___/___/_____
___/___/_____
___/___/_____
___/___/_____
___/___/_____
___/___/_____
___/___/_____
___/___/_____
___/___/_____
___/___/_____
___/___/_____

Page 862

CERTIFICATE

I, MARIE FOLEY, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public for the State of New York, do hereby certify that prior to the commencement of the examination, DIMITRI A. CHRISTAKIS, M.D., M.P.H., was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

_____
COURT REPORTER
Registered Merit Reporter
Certified Realtime Reporter
Notary Public
Dated: June 29, 2025

84 (Pages 861 - 863)