# Exhibit 28

# PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE GENERAL CAUSATION TESTIMONY OF PLAINTIFFS' EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

_____

                           : MDL No. 3047

IN RE: SOCIAL MEDIA     : Case No.

ADOLESCENT ADDICTION/   : 4:22-MD-03047-YGR

PERSONAL INJURY PRODUCTS  :

LIABILITY LITIGATION,    :

_____:

                           :

This Document Relates to: :

                           :

ALL ACTIONS              :

                           :

                           :

_____:

Friday, September 12, 2025

Video deposition of STEPHEN L. BUKA, ScD., taken at the Law Offices of Munger Tolles & Olson, LLP, 601 Massachusetts Ave NW, Suite 500, Washington, DC, beginning at 8:31 a.m., EST, before Ryan K. Black, Registered Professional Reporter, Certified Livenote Reporter and Notary Public in and for the District of Columbia.

CONFIDENTIAL

Page 114

A. I'm sorry. There's no "struggled" in that sentence.

Q. "Media outlets and researchers have suggested" -- I'm sorry. Did I say "struggle"?

MS. EHLER: Yeah. It's okay.

MS. MCNABB: Fine. All right.

MS. EHLER: Sorry.

BY MS. MCNABB:

Q. "Media outlets and researchers have suggested that experiences on FB may increase the risk of depression, referred to as 'Facebook depression,' which some believe to be triggered by spending a great deal of time using SM. In particular, there is concern that addictive SM use, cyberbullying, and the evocation of jealousy due to the constant exposure to others' personal information may lead to depression."

Do you see that?

A. I do.

Q. So this article used the term "addictive SM use." Do you see that?

A. Yes.

Q. Okay. And this -- this sentence is -- is this what prompted you to conduct this research?

Page 115

A. I --

MS. EHLER: Object to form.

THE WITNESS: -- want to be respectful to the process here, because you've handed me this article and you withdrew a question about this article. But there was a prior question that I can now answer, which I don't believe has been withdrawn. And I just want to point out this is a strong peer-reviewed article. And that's all.

My -- my -- the scientist relies on the peer-reviewed literature. And that's what we cite in our article, this peer-reviewed literature.

The -- this paper was led by the first author, Samantha Rosenthal. And what her primary motivation was 12 years ago leading her to design and conduct this study, I cannot say. I cannot answer whether this sentence that you read was the primary motivation.

BY MS. MCNABB:

Q. Okay.

A. It certainly figured into her reasoning, because that's what's written here.

Q. Okay. If you jump down to Measures.

Page 116

It's at the bottom of the same page.

A. Yes.

Q. Under Primary Outcome, it says, "Depressive symptoms, as measured by the Center for Epidemiological Studies Short Depression Scale (CES-D 10) were the primary outcome. The CES-D is a screening tool commonly used to identify depressive symptoms among the general population. The scale's validity and reliability to detect clinical and nonclinical depressive symptoms have been previously established."

Do you see that?

A. I do.

Q. Okay. And the CES-D is a self-reported screening tool, correct?

A. It is.

Q. Okay. So in the study you relied on self-reported data for depressive symptoms, correct?

A. Yes.

Q. And what does it mean that "The scale's validity and reliability to detect clinical and nonclinical depressive symptoms have been previously established"?

A. It's one sentence, in shorthand, for a

Page 117

lot. And it generally means that the scale does a reasonable job of identifying people -- and it goes on to state in the next sentence with, "who have a score of 10 or more, who are considered to have depressive symptoms," and that those with moderate to high number of depressive symptoms are more likely to have clinical -- it's all a little bit circular.

It's basically saying that those with a high level of symptoms have a high level of symptoms.

Q. Is there a distinction between clinical and nonclinical depressive symptoms?

MS. EHLER: Object to form.

THE WITNESS: It's a little bit imprecise, that language.

There's a distinction between clinical and nonclinical depression, and there's a distinction be -- yeah, so it's -- it's a bit imprecise.

BY MS. MCNABB:

Q. Does the SE -- or CES-D screening tool measure clinical and nonclinical symptoms?

A. I'm -- the term clinical and nonclinical depressive symptoms is a bit imprecise.

30 (Pages 114 - 117)

CONFIDENTIAL

Page 146

General's Office. The -- the Surgeon General's report of 1964 was commented on at some length in some of the plaintiffs' reports. That's a summary of 30 articles not conducted by the Surgeon General's report.

So if -- I'm not -- maybe the Surgeon General's Office conducts primary research. In my experience, they're primarily reviewing, synthesizing and making advise -- giving advice based on their understanding of research conducted by others, which is why I made the distinction to say that, in my primary research, I really don't have that much interaction with the Surgeon General's Office, or documents of the Surgeon General's Office. In my synthesis, summarizing, disseminating, explaining the results of my research, that's where work from the Surgeon General's Office, as in this paper, comes into play.

I hope that helps explain the distinction.

BY MS. MCNABB:

Q. Yeah. It -- it will help me clarify my question. So do you disagree that the Surgeon General's advisories are rigorous reviews of the

Page 147

available literature?

A. I think the devil's in the detail there. I would imagine that some advisories are more thorough, more rigorous and more convincing to the scientific community than others.

Q. So you agree that the 1964 advisory was such a review. It was rigorous and -- and more convincing to the scientific community?

A. I don't believe the 1964 report was an advisory. It was a panel -- a blue panel report on the causal association between whether cigarette smoking is a cause of lung cancer.

And -- and let me spend some time on that since you asked about the 1964 report. I do not know if the word "advisory" appears in it. But that report sought to do what I did in my report, which was to assemble and synthesize all available primary published articles on a purported causal association.

The topic then is like the topic now. Then, in 1964, there was evidence that there was an association between cigarette smoking and lung cancer, and the purpose of that report was to evaluate that literature to determine whether a causal conclusion was warranted, and they

Page 148

concluded that it was warranted. And the way they reached that conclusion was -- I was pleased to see -- entirely consistent with how I approached my report, even though I did not model my report after the Surgeon General's. It's just that I used good scientific logic as the members of that report did.

They go into detail on the longitudinal studies showing a link between smoking and subsequent lung cancer. They then review approximately 25 case control studies around the link between lung cancer and cigarette smoking. They conclude that heavy smokers are 20 times more likely to develop a lung cancer than nonsmokers.

And the last point I'll make about that is there's not a cross-sectional study in that report. They rely on longitudinal studies and case control studies. So I go into that in some detail, because many of the criticisms that I have of the plaintiffs' experts' reports is the mischaracterization of what was done in that 1964 report.

So I have a lot of respect for Surgeon General outputs, and it depends report by report,

Page 149

advisory by advisory.

Q. And you would differ that the Surgeon General's Advisory on Social Media and Adolescent Mental Health was not as rigorous as the 1964 report that you were just discussing?

A. I wouldn't use, and I don't use -- and you've seen it now in having some back and forth with me -- my words imprecisely. Whether it was more rigorous or not rigorous, it was less detailed.

The recent Surgeon General advisory on social media use is -- has nowhere near the level of detail and specifics as does the 1964 report of the Surgeon General on tobacco use and lung cancer.

It's less detailed -- that's for sure -- the -- the more recent advisory.

Q. Okay. If you -- since we have this paper in front of us, this paper -- turning back to Exhibit 13 -- used the Metro West Adolescent Health Survey, correct?

A. Where are you seeing that?

Q. Just under Methods, under the abstract.

A. Yes.

Q. And that's a survey based on

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

self-reported data, correct?

A. Yes.

Q. Okay. You can put that away.

We can go off the record for a second.

THE VIDEOGRAPHER: Stand by.

MS. EHLER: Sure.

THE VIDEOGRAPHER: We are off the record at 12:03.

(Recess taken.)

THE VIDEOGRAPHER: We are on the record at 12:04.

BY MS. MCNABB:

Q. Okay. Dr. Buka, we've been looking at your July 17th report, correct?

A. Yes.

Q. Okay. And you also provided a report on July 9th. Are you aware of that?

A. I can -- I -- if you have the report, then I'll be fully certain.

Q. Yeah. We can -- we can introduce it.

So Tab 14, which will be Exhibit 14.

(Buka Exhibit No. 14, a document titled Expert Report of Stephen L. Buka, ScD, dated July 9, 2025, was introduced.)

MS. MCNABB: Okay. So here's a prior

Page 151

report with the date July 9th.

MS. EHLER: Thank you.

BY MS. MCNABB:

Q. So we were produced that. And then as you see, shortly thereafter on July 17th, we were provided an amended report.

And the only thing that we were able to glean that was different is that there's a Footnote 139 on the July 17th report.

A. It's on Page 139?

Q. It's Footnote 139 on -- I'll flip to the page -- on Page 1 -- or, I'm sorry, maybe it is Page 139.

A. Page 112, yeah, is where I see Footnote 139.

Q. Sorry. I think I missed where this --

A. Okay. I'll let you ask --

Q. Well, there's a footnote where we put the -- well, either way, we didn't see any substantive changes in the two reports. Do you know if there are any substantive edits that were made between July 9th and July 17th?

A. I, again, want to be accurate, thorough, complete and correct. And I do not know with certainty what the changes were between the

Page 152

9th and the 17th.

Q. Okay. I --

A. I don't recall anything major and substantive. There may have been -- there were -- there were details that I wanted to correct. And exactly what those details were, I can't recall right now.

Q. Okay. I will tell you it's a -- it's on 118 of July 17th report, Page 118, Footnote 141.

A. 118, Footnote 131.

Q. And it -- it just reads, "The descriptions of studies and Appendices A, B and C may incorporate language closely tracking the original sources to help ensure accurate and faithful representation of the underlying literature."

Do you see that?

A. I do.

Q. That was the only edit we saw. Is -- do you know why this was added?

A. I do.

Q. And why was it added?

A. The lion's share of my time on this project was identifying and summarizing four dozen articles, approximately. They're in

Page 153

Appendixes A, B and C. And in providing the summaries in the appendix, I did my best to succinctly and accurately summarize the main features of those studies.

In so doing, I would have used and paraphrased language from the studies themselves. If I were submitting it for a peer-reviewed or a scientific audience, I may have been more detailed in when I quoted exactly the language from the underlying papers. And in this instance when my intent was merely to summarize for this audience -- not for publication and dissemination -- my quoting and my paraphrasing of their language, I -- I did that. And I wanted to acknowledge that my summaries drew heavily on oring -- original language from those authors.

Q. Okay. Fair enough.

And other than the research scientists we already discussed, did you write your July 17th report in its entirety?

A. I would largely remove the, "Other than the" -- the first portion of that. I wrote this report in its entirety.

Q. Okay. And did you --

A. And I largely rewrote and revised any

39 (Pages 150 - 153)

CONFIDENTIAL

Page 254

A. Yes.

Q. Okay. So the search terms you used for social media were Social Media or Social Network or Snapchat, Facebook, Twitter, Instagram, YouTube, TikTok, Tumblr, LinkedIn, WhatsApp, Telegram or Viper, correct?

A. Yes.

Q. Okay. So when you are thinking of how you define social media, are -- do the -- are those terms what you use to define social media?

A. I --

MS. EHLER: Object to form.

THE WITNESS: Not -- well, I'm mainly relying on the approach to measure social media that were used by the studies that I identified. I'm -- I'm sort of working backwards into my definition.

I'm -- I'm using the definitions that result from all available studies that I could find. So it's -- my definition is -- as is consistent with the studies identified.

BY MS. MCNABB:

Q. Okay. So the -- the definition of social media could depend on what the study itself was measuring, correct?

Page 255

A. Yes. That's --

Q. Okay.

A. That's central to the whole field, that there's different definitions from one study to the next.

Q. Okay. Great.

And then in your search terms you used certain platforms that are not involved in this litigation. Was there a reason you did so?

A. I wanted to -- I was really -- I was trying to cast as wide a net as possible. I really -- so that's -- that's why I wanted to. I wanted to leave no relevant stones unturned, and I wanted to cast a wide net.

I realize that there was a potential downside of that. If, for instance, I found a report that had to do with Telegram only and had no relevance for the other platforms, that might have been something to then consider. I didn't find any of that sort. So that was the rationale for this wider net.

I didn't want to -- I wanted to, if anything, be overinclusive in my search and certainly not underinclusive.

Q. Okay. And then the five terms that

Page 256

you used to hit on depressive disorders were Depressed, Major Depression, Dysth --

A. Dysthymia is what it's short for.

Q. Okay. Persistent Depressive Disorder or MDD. Do you see that?

A. Yes.

Q. Okay. So does that help -- we talked earlier about what you were looking at as far as depressive disorders and if you were limiting your report to Major Depressive Disorder. Does this help clarify?

A. Yeah.

Q. Okay.

A. I think it's fair -- and the definitive answer would be in the DSM-5s which are in front of us -- that to say in the general category of depressive disorder would, most likely, sit Major Depressive Disorder, Persistent Depressive Disorder or Dysthymia. The most notable one there is the Dysthymia, which is another clinical diagnosis that is similar to but has somewhat different features than Major Depressive Disorders.

Q. Okay. And then this resulted in many records.

Page 257

A. Yes.

Q. Over 21,000.

A. Yeah.

Q. So to narrow the -- the field, the universe, you note that you conducted an automated title and abstract screening. What does that mean?

A. That I can't recall as I sit here now. I mean, the -- this part of the work would have been done, and as we already said, with a fair amount of input from our -- my research assistant back in August and September. And how we went from 21,000 to exactly 462, I cannot reconstruct at this time.

Q. Okay.

A. Go on -- hopefully we'll keep working on this, because then the fact that we did a lot of intensive review of 462 was part of my desire to cast as wide a net and identify all potentially relevant studies.

Q. Okay. And you excluded -- there were some exclusion criteria. So, for example, you excluded reviews, meta-analyses, systematic reviews, correct?

A. In this search for -- you know,

65 (Pages 254 - 257)

CONFIDENTIAL

Page 270

captured ones that used high CES-D.

But we also have a umbrella search term which says "depress," which could be depressive symptoms and all of that. So I'd have to go back and -- and confirm this. Certainly, in my use of categorical, I was -- where my focus is and where I feel is -- what is most informative is a clinical diagnosis, or a -- I'm sorry, not clinical diagnosis, a diagnosis that meets clinical criteria.

There are other chara -- categorical groupings that is, like, high on a CES-D that warrant consideration. I mean, this is sounding a little bit overly-vague than I would want it to be. My goal was --

Q. It's okay. I think it actually has helped me understand.

A. Yeah. My goal was to lay out all of the most -- all of the relevant data. My position is that the longitudinal data is more informative than the case control -- than the cross-sectionals. The longitudinal was more informative than the cross-sectionals.

I sought to identify, at the end of the day, every darn longitudinal study that I could

Page 271

find on both categories and symptom -- mean symptom levels. And I hope I got them correct in -- I certainly feel like I have every. And I hope that in the 16 -- I'd have to check it again -- there are none that belong in the four. That's a little bit vague and, hopefully, clear enough for you.

Q. Yeah. It -- yeah. It -- it -- it just -- it helps me understand the process.

Looking at the Frøyland -- it's on Page 134, the Frøyland study -- it looks like it examined the association between sexting and depressive symptoms.

A. Yeah.

Q. And I'm just wondering why that article was included?

A. Well, it is included to the extent that we're looking at it here. And I describe it, and it states that they found no association -- well, I say, you know, "within-person association," which is the most relevant analyses.

Q. Do you know if the sexting was -- was being carried out on a social media platform?

A. I would need to look, again, at this study to answer that.

Page 272

Q. Okay. We can turn to it later if we've got time.

But jumping now -- we understand the universe of the studies you looked at. Jumping now to your Bradford Hill analysis on social media use and depressive disorders. So the Bradford Hill analysis -- if you'd jump back to Page 79.

So in your analysis, did you rely on the 20 longitudinal studies that were included in Appendix A, meaning was it isolated to those 20 studies, or did you do the Bradford Hill analysis based on everything you reviewed?

A. It varies somewhat. And there's a logic that I would need to reconstruct for when I rely more on -- or incorporate the longitudinal of symptoms and when I focused less on them.

When I'm talking about temporality, I include all longitudinal studies. When I'm describing particularly strength of association with a disorder, I emphasize the studies of disorder.

Q. Okay. But whether you're looking at the depressive disorder studies or the depressive symptoms disorder -- or depressive symptom

Page 273

studies, is it -- is the Bradford Hill analysis just confined to those 20 studies that were in Appendix A?

A. Yes. Well, --

Q. Okay.

A. -- I mean, yes and no. I mean, there's part of the Bradford Hill which has to do with coherence and plausibility and analogy, which draws on the entire field and not just those 20 studies.

Q. Fair enough.

And in conducting your analysis, did you weigh any of the Bradford Hill factors more than others?

A. Yes.

Q. Okay. And which factors did you put more weight or emphasis on?

A. Consistency, strength of association and temporality received the -- are what I would have --

Q. Okay.

A. Biological gradient or dose response would have been closer in those top four.

Q. Okay. And did you conduct your Bradford Hill analysis specifically for Snapchat, or is

69 (Pages 270 - 273)

Page 274

this for all social media?

A. I conducted the Bradford Hill analysis -- and this is going to sound indirect, but it's important -- as I felt was most consistent and most relevant for the question that I sought to answer for the hypothesis that I was testing, which is social media use is a cause of depressive disorder.

So that based on that, that's why I focused primarily on the studies of depressive disorder and I considered social media use broadly. And, therefore, the conclusion of the Bradford Hill analysis speaks to social media use broadly, and not specifically to Snapchat.

Q. Okay. And just flipping back to Page 26 of your report, this is the section of your report where you just lay out what the Bradford Hill analysis is.

A. Mm-hmm. Mm-hmm.

Q. And you state that, you know, Bradford Hill consideration applies once an association has first been firmly established.

A. Mm-hmm.

Q. Do you -- do you think that an association between social media use and

Page 275

depressive disorders have been -- has been firmly established?

A. No, I do not.

Q. Okay. So, in other words, your opinion that there's this threshold requirement for performing a Bradford Hill analysis hadn't been met, correct?

A. I'm saying that by the language of Hill when he wrote the paper in 1965, it may not -- that the threshold criteria had not been met.

I still feel it's useful and instructive, given the deliberations of all of this process, to proceed with the Bradford Hill analysis, which is why I did it.

Q. Okay. So that's why you still did that?

A. Yeah. In fact, we did a lot of work to summarize the scientific literature.

And I have to just keep going on this point, which is that, you know, you've asked about the process by which I identified these studies. You know, the main rationale behind it was consistency and replicability. And my desire was that the work that I did was systematic and could be replicated. And that's how -- what permits -- what permits me to come to an accurate

Page 276

and scientifically sound Bradford Hill analysis.

In my critiques of the other reports, it's that lack of a systematic and replicable identification of the relevant studies that is part of my concern with those reports.

Q. Okay. And -- and just outside the context of litigation, if -- in your academic research, if you had not established a -- a clear-cut association, would you have conducted a Bradford Hill analysis?

MS. EHLER: Object to form.

THE WITNESS: It's a useful exercise as a academician and as a scholar. I mean, if you have some -- I don't know what to say. You know, if you're training for a marathon, you certainly should run certain distances every day, and it will help you if you're training for a marathon. If you're not training for a marathon, it's still probably is useful to -- to go through the exercises to stay in shape.

So, yes, I -- I well may have. It -- you can't establish -- it's -- it's -- would be -- I can't even do the thought exercise as to what happens if you -- you could -- I don't think one would establish -- I -- I don't know. I'll

Page 277

leave it at that.

Yes, I think it's reasonable to go through the exercise of a Bradford Hill when trying to give a thoughtful synthesis and evaluation of a body of epidemiologic literature.

BY MS. MCNABB:

Q. Okay. And that's not even if there's a clear-cut association that's been established?

MS. EHLER: Object to form.

THE WITNESS: I'm sorry. Hill would say it's done once an estab -- association has been established. I personally feel that's a somewhat, you know, I wouldn't say, artificial -- an unnecessary bar that has to be met, and that it's not unreasonable to do it even in the absence of a clear-cut association.

BY MS. MCNABB:

Q. Okay. And you stand by your Bradford Hill analysis --

A. Yes.

Q. -- today, correct?

A. I do.

Q. Okay.

A. I guess in wording it the way I have is I'm making two conclusions from the scientific

70 (Pages 274 - 277)