**Exhibit 29**

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE GENERAL CAUSATION TESTIMONY OF PLAINTIFFS' EXPERTS**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF CALIFORNIA
2
   IN RE: SOCIAL MEDIA ADOLESCENT ) MDL No. 3047
3  ADDICTION/PERSONAL INJURY      )
   PRODUCTS LIABILITY LITIGATION  )
4  _____ ) Case No.
                                   ) 4:22-md-3047-YGR
5  THIS DOCUMENT RELATES TO:       )
                                   )
6  ALL CASES                       )
                                   )
7  _____ )
8
9
10
11
12            Tuesday, August 12, 2025
13    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
14
15
16       Video-Recorded Oral Deposition of RAMIN
   MOJTABAI, MD, PhD, MPH, held at the offices
17 of Irwin Fritchie Urquhart Moore &
   Daniels LLC, 400 Poydras Street, Suite 2700,
18 New Orleans, Louisiana, commencing at
   9:03 a.m. CDT on the above date, before
19 Michael E. Miller, Fellow of the Academy of
   Professional Reporters, Certified Court
20 Reporter, Registered Diplomate Reporter, and
   Louisiana Certified Court Reporter #27009.
21
22
23              __ __ __
24          GOLKOW - VERITEXT
       877.370.DEPS | fax 917.591.5672
25          deps@golkow.com

Page 2

1 A P P E A R A N C E S :
2 LIEFF CABRASER HEIMANN & BERNSTEIN LLP
  BY:  KELLY K. MCNABB, ESQUIRE
3     kmcnabb@lchb.com
  250 Hudson Street
4 8th Floor
  New York, New York 10013
5 (212)355-9500
6 -and-
7 BEASLEY ALLEN LAW FIRM
  BY: JENNIFER EMMEL, ESQUIRE
8    jennifer.emmel@beasleyallen.com
     DAVIS S. VAUGHN, ESQUIRE (via Zoom)
9    davis.vaughn@beasleyallen.com
     JAMES LAMPKIN, ESQUIRE (via Zoom)
10   james.lampkin@beasleyallen.com
  218 Commerce Street
11 Montgomery, Alabama 36104
  (334)269-2343
12
  -and-
13
  GOZA HONNOLD LLC
14 BY:  GRACE QUINLAN, ESQUIRE (via Zoom)
     gquinlan@gohonlaw.com
15 9500 Nall Avenue
  Suite 400
16 Overland Park, Kansas 66207
  (913)451-3433
17 Counsel for Plaintiffs
18
19 KING & SPALDING LLP
  BY:  TODD P. DAVIS, ESQUIRE
20    tdavis@kslaw.com
  1180 Peachtree Street NE
21 Suite 1600
  Atlanta, Georgia 30309
22 (404)572-4600
  Counsel for Defendants TikTok Inc. and
23 ByteDance Inc.
24
25

Page 3

1 A P P E A R A N C E S :
2 MUNGER TOLLES & OLSON LLP
  BY:  CORDELL A. BROWN, ESQUIRE (via Zoom)
3     cordell.brown@mto.com
  350 South Grand Avenue
4 50th Floor
  Los Angeles, California 90071
5 (213)683-9100
  Counsel for Defendant Snap Inc.
6
7 MORGAN LEWIS & BOCKIUS LLP
  BY: MELISSA M. COATES, ESQUIRE
8    melissa.coates@morganlewis.com
  600 Brickell Avenue
9 Suite 1600
  Miami, Florida 33131
10 (305)415-3000
  Counsel for Defendants YouTube LLC and
11 Google, LLC
12
  COVINGTON & BURLING LLP
13 BY:  PAUL BANKS, ESQUIRE
     pbanks@cov.com
14   AMBER CHARLES, ESQUIRE (via Zoom)
     acharles@cov.com
15 One City Center
  850 Tenth Street NW
16 Washington, DC 20001
  (202)662-6000
17 Counsel for Defendants Meta Platforms, Inc.
  f/k/a Facebook, Inc.; Facebook Holdings, LLC;
18 Facebook Operations, LLC; Facebook Payments, Inc.;
  Facebook Technologies, LLC; Instagram, LLC;
19 Siculus, Inc.; and Mark Elliot Zuckerberg
20
21 TRIAL TECHNICIAN:
  JEFFREY FLEMING (via Zoom)
22
23 VIDEOGRAPHER:
24 JULIE ROBINSON
  GOLKOW - VERITEXT
25

Page 4

1           INDEX

2    RAMIN MOJTABAI, MD, PhD, MPH

3       August 12, 2025

4

5 APPEARANCES                        2

6 PROCEEDINGS                       10

7

8 EXAMINATION OF RAMIN MOJTABAI, MD, PhD, MPH:

9   BY MR. DAVIS          11

10  BY MS. COATES         203

11  BY MR. BANKS          213

12  BY MR. BROWN          225

13  BY MR. DAVIS          239

14

15 CERTIFICATE             244

16 ERRATA                  246

17 ACKNOWLEDGMENT OF DEPONENT         247

18 LAWYER'S NOTES              248

19

20

21

22   LITIGATION SUPPORT INDEX       PAGE

23 Instruction Not To Answer       193

24 Request for Production          195

25

Page 5

1       DEPOSITION EXHIBITS

2   NUMBER                      MARKED

3 Mojtabai-MDL-1  Defendants' Notice of       15

4      Videotaped Deposition of

5      Ramin Mojtabai and

6      Incorporated Requests to

7      Produce Documents

8 Mojtabai-MDL-2  5/16/25 Mojtabai Expert     16

9      Report

10 Mojtabai-MDL-3  7/30/25 Mojtabai Rebuttal   17

11     Expert Report

12 Mojtabai-MDL-4  Materials Considered List,  17

13     MOJTABAI0188 - MOJTABAI0275

14 Mojtabai-MDL-5  Mojtabai Invoices,          17

15     MOJTABAI0177 - MOJTABAI0179

16 Mojtabai-MDL-6  E-mail(s) re: Missing COI   18

17     statement,

18     MOJTABAI0180 - MOJTABAI0187

19 Mojtabai-MDL-6A  Supplemental E-mail(s) re: 190

20     Missing COI statement,

21     MOJTABAI0276 - MOJTABAI0288

22 Mojtabai-MDL-7  Excerpt From DSM-5-TR re:   40

23     Definition of a Mental

24     Disorder

25

2 (Pages 2 - 5)

Page 6

DEPOSITION EXHIBITS

1
2  Mojtabai-MDL-8  An integrative literature    46
3       review of birth cohort and
4       time period trends in
5       adolescent depression in
6       the United States, by
7       Askari et al.
8  Mojtabai-MDL-9  Associations Between Time    52
9       Spent Using Social Media
10      and Internalizing and
11      Externalizing Problems
12      Among US Youth, by Riehm
13      et al.
14  Mojtabai-MDL-10  Limitations of the    59
15      symptom-oriented approach
16      to psychiatric research, by
17      Mojtabai et al.
18  Mojtabai-MDL-11  Trends in Mental Disorders    63
19      in Children and Adolescents
20      Receiving Treatment in the
21      State Mental Health System,
22      by Mojtabai et al.
23  Mojtabai-MDL-12  Webpage, The World Mental    68
24      Health Survey Initiative
25

Page 8

DEPOSITION EXHIBITS

1
2  Mojtabai-MDL-19  Association between    158
3       engagement with appearance
4       and eating-related TikTok
5       content and eating disorder
6       symptoms via recommended
7       content and appearance
8       comparisons, by Dondzilo
9       et al.
10  Mojtabai-MDL-20  The association between    160
11      social comparison in social
12      media, body image concerns
13      and eating disorder
14      symptoms, by Bonfanti
15      et al.
16  Mojtabai-MDL-21  Addictive Screen Use    162
17      Trajectories and Suicidal
18      Behaviors, Suicidal
19      Ideation, and Mental Health
20      in US Youths, by Xiao
21      et al.
22  Mojtabai-MDL-22  Excerpt From Reference    173
23      Manual on Scientific
24      Evidence, Third Edition
25

Page 7

DEPOSITION EXHIBITS

1
2  Mojtabai-MDL-13  Excerpt From DSM-5-TR    89
3  Mojtabai-MDL-14  Excerpt From DSM-5-TR re:    93
4       Major Depressive Disorder
5  Mojtabai-MDL-15  Excerpt From DSM-5-TR re:    97
6       Generalized Anxiety
7       Disorder
8  Mojtabai-MDL-16  Use of multiple social    148
9       media platforms and
10      symptoms of depression and
11      anxiety: A nationally
12      representative study among
13      US young adults, by Primack
14      et al.
15  Mojtabai-MDL-17  How TikTok's Algorithm    154
16      Beats Facebook & Co. For
17      Attention Under The Theory
18      of Escapism, by Rach et al.
19  Mojtabai-MDL-18  Instagram and TikTok Flow    155
20      States and Their
21      Association with
22      Psychological Well-Being,
23      by Roberts et al.
24
25

Page 9

DEPOSITION EXHIBITS

1
2  Mojtabai-MDL-23  Excerpt From Cochrane    178
3       Chapter 10: Analyzing data
4       and undertaking
5       meta-analyses
6  Mojtabai-MDL-24  Excerpt From Cochrane    178
7       Chapter 9.5.2: Identifying
8       and measuring heterogeneity
9  Mojtabai-MDL-25  6/27/25 Expert Report of    233
10      Krista Hayakawa
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

Page 10

1          ------------
2          P R O C E E D I N G S
3          August 12, 2025, 9:03 a.m. CDT
4          ------------
5          THE VIDEOGRAPHER:  We are now
6    on the record.  My name is Julie
7    Robinson.  I'm a videographer for
8    Golkow, a Veritext division.
9          Today's date is August 12th,
10   2025, and the time is 9:03 a.m.
11   Central Time.
12         This video deposition is being
13   held in New Orleans, Louisiana in the
14   matter of Social Media Adolescent
15   Addiction/Personal Injury.
16         The deponent is Dr. Ramin
17   Mojtabai.
18         Counsel be will noted on the
19   stenographic record.
20         The court reporter, Mike
21   Miller, will now swear in the witness.
22   ///
23   ///
24   ///
25   ///

Page 11

1          ------------
2      RAMIN MOJTABAI, MD, PhD, MPH,
3          having been duly sworn,
4          testified as follows:
5          ------------
6          EXAMINATION
7          ------------
8    BY MR. DAVIS:
9       Q.   Dr. Mojtabai, good morning.
10   I'm Todd Davis.  We have met before?
11      A.   Yes, we have.
12      Q.   It's nice to see you again.
13      A.   Good morning.
14      Q.   You understand the ground rules
15   for the deposition based upon your deposition
16   in the JCCP litigation, right?
17      A.   I do.
18      Q.   All right.  If you don't
19   understand one of my questions, will you let
20   me know?
21      A.   Yes, I would surely make you.
22      Q.   And if you answer my question,
23   I will assume that you heard it, you
24   understood it and you answered the question
25   that I asked.

Page 12

1          Is that acceptable to you?
2       A.   It's acceptable.
3       Q.   Is there -- are you on any
4    medication or have any medical conditions
5    that would prevent you from giving your best
6    testimony today?
7       A.   No.
8       Q.   You understand that you are
9    here because you've been identified as an
10   expert witness on behalf of the plaintiffs'
11   lawyers in the social media MDL litigation,
12   right?
13      A.   I do.
14      Q.   You prepared a report in
15   connection with that litigation that's
16   dated -- the report is dated May 16, 2025,
17   right?
18      A.   That's correct.
19      Q.   You also prepared a rebuttal
20   report?
21      A.   (Nods head.)
22      Q.   Yes?
23      A.   That's correct.
24      Q.   And outside of those two
25   reports -- strike that.

Page 13

1          Those two reports contain the
2    opinions that you would offer at -- in this
3    litigation; is that fair?
4       A.   That is fair.
5       Q.   All right.  And those reports
6    also identify the scientific literature or
7    other bases that you are using to form your
8    opinions, right?
9       A.   That's correct.
10      Q.   And you're prepared, at least
11   as of today, based upon what you know and the
12   materials you reviewed, to give your final
13   opinions in the case, right?
14      A.   I have.
15      Q.   You are?
16      A.   Yeah.  What was the question?
17      Q.   Just that you're -- based upon
18   your two reports --
19      A.   Uh-huh.
20      Q.   -- in the federal litigation,
21   and also the materials that you've
22   reviewed --
23      A.   Yes.
24      Q.   -- you're prepared to give
25   final opinions in the case, right?

CONFIDENTIAL

Page 14

1    A.    Final to this point, to this
2 day, yes.
3    Q.    Okay.  Last time we went over
4 some definitions --
5    A.    Uh-huh.
6    Q.    -- about certain types -- you
7 know, in terms of what I was -- let me back
8 up.
9        When I use the term "mental
10 health disorder," I'm also going to use it to
11 mean any psychiatric disorder.
12       Is that acceptable to you?
13   A.    Yes, it is.
14       MS. MCNABB:  Objection, I may
15   have -- just reserving objections I
16   may have to that broad term with the
17   specific questions later.
18 BY MR. DAVIS:
19   Q.    Is that acceptable to you?
20   A.    Generally, mental disorders and
21 behavioral disorders, that's what you call
22 them, are synonymous, especially in children.
23   Q.    And I also am going to use
24 "randomized controlled trials" and
25 "experimental studies" interchangeably.

Page 15

1        Is that acceptable to you?
2    A.    That is acceptable.
3    Q.    Okay.  And if I'm referring to
4 social media, I'm referring to not only the
5 app that is downloaded but also what's
6 available, for example, through a computer;
7 is that fine?
8    A.    That is fine.
9    Q.    Okay.  Now, what I've marked in
10 front of you, Dr. Mojtabai -- just some
11 housekeeping issues.
12       (Whereupon, Mojtabai-MDL-1,
13   Defendants' Notice of Videotaped
14   Deposition of Ramin Mojtabai and
15   Incorporated Requests to Produce
16   Documents, was marked for
17   identification.)
18 BY MR. DAVIS:
19   Q.    Exhibit 1 is the notice of your
20 deposition, right?
21   A.    Correct.
22   Q.    It had some document requests
23 attached to it, right?
24   A.    I'm looking to find the place
25 with -- yeah.

Page 16

1    Q.    And did you search for the
2 documents that were requested?
3        (Sotto voce document review.)
4    A.    I believe I have.  Some of them
5 may be for the previous deposition and they
6 haven't changed.
7 BY MR. DAVIS:
8    Q.    Okay.  There's also -- I
9 understand from an off-the-record
10 conversation we had that there's additional
11 correspondence that you had with the
12 scientific journal about your potential
13 conflict of interest statement, right?
14       MS. MCNABB:  Objection, form.
15   A.    That is correct.
16 BY MR. DAVIS:
17   Q.    Okay.  So we'll get that marked
18 as well, okay, later.
19       (Whereupon, Mojtabai-MDL-2,
20   5/16/25 Mojtabai Expert Report, was
21   marked for identification.)
22 BY MR. DAVIS:
23   Q.    Exhibit 2 is a copy of your
24 May 16, 2025 report in the MDL litigation,
25 right?

Page 17

1    A.    That is correct.
2    Q.    Okay.
3        (Whereupon, Mojtabai-MDL-3,
4   7/30/25 Mojtabai Rebuttal Expert
5   Report, was marked for
6   identification.)
7 BY MR. DAVIS:
8    Q.    Exhibit 3 is a copy of your
9 rebuttal report in the MDL litigation, right?
10   A.    That is correct.
11       (Whereupon, Mojtabai-MDL-4,
12   Materials Considered List,
13   MOJTABAI0188 - MOJTABAI0275, was
14   marked for identification.)
15 BY MR. DAVIS:
16   Q.    Exhibit 4 is a list of updated
17 materials that we -- that you considered that
18 we received from plaintiffs' counsel last
19 night, all right?
20   A.    Yeah.  That's correct.
21   Q.    Okay.
22       (Whereupon, Mojtabai-MDL-5,
23   Mojtabai Invoices, MOJTABAI0177 -
24   MOJTABAI0179, was marked for
25   identification.)

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

1 BY MR. DAVIS:
2      Q.    And then Exhibit 5 are invoices
3 that we received that are related -- that are
4 in addition to invoices that were produced at
5 your last deposition; is that right?
6      A.    That is right.
7          (Whereupon, Mojtabai-MDL-6,
8      E-mail(s) re: Missing COI statement,
9      MOJTABAI0180 - MOJTABAI0187, was
10     marked for identification.)
11 BY MR. DAVIS:
12     Q.    Okay.  And then Exhibit 6 is
13 the correspondence that we've received in
14 response to the request that you provide the
15 communication that you've had with the
16 journal about amending your conflict of
17 interest statement in one of your articles,
18 right?
19     A.    That is correct.  Except there
20 is one more that would be shared with you
21 guys, a more recent after this one, I guess,
22 August 6th.
23     Q.    Yes.  And I think what we'll do
24 is we'll add that to the stack in some way.
25 We'll add what was going to be produced to

Page 19

1 Exhibit 6 in some way, okay?
2      A.    Okay.
3      Q.    All right.  Dr. Mojtabai, in
4 terms of your retention by the plaintiffs'
5 counsel in either the JCCP or the MDL
6 litigation, have you signed a retention
7 letter?
8      A.    In addition to -- can you
9 repeat the question?
10     Q.    Sure.
11         When you got retained by
12 plaintiffs' lawyers --
13     A.    Yes.
14     Q.    -- for purposes of the social
15 media litigation, did you sign a retention
16 letter?
17     A.    I did.
18     Q.    Okay.  And that's not something
19 that you've brought here today, is it?
20     A.    No.  I don't know if I have a
21 copy.  Probably I have a copy, but I didn't
22 bring it.
23     Q.    Okay.  And that retention
24 letter outlined what you were to do --
25     A.    Uh-huh.

Page 20

1      Q.    -- and how you were to go about
2 your task in the litigation?
3          MS. MCNABB:  Objection, form,
4      foundation.
5      A.    That is what I recall.
6 BY MR. DAVIS:
7      Q.    Okay.  Now, in terms of the
8 preparation for today's deposition, what did
9 you do?
10     A.    I reviewed the report that I
11 had produced in May and also the rebuttal
12 report, and a couple of more recent articles,
13 like Nagata, Xiao, and some of the articles
14 that were in the original were in the
15 rebuttal.
16     Q.    Okay.  So let me see if I can
17 break that down.  And I would -- let me
18 just -- if I ask you to keep your voice up a
19 little bit, it will help me understand and
20 also for the court reporter.
21     A.    I'll try and do that, yes.
22     Q.    You looked at your original MDL
23 report and your rebuttal report to prepare
24 for today's deposition?
25     A.    Yes, I did.

Page 21

1      Q.    You also looked at some
2 articles that you had cited in those reports?
3      A.    I did.
4      Q.    You also mentioned that you
5 looked at the Nagata article that came out
6 this year?
7      A.    Yes.
8      Q.    And then you also mentioned
9 that you looked at the Xiao, X-I-A-O, study
10 that came out this year?
11     A.    That's correct.
12     Q.    That's the study from the ABCD
13 research database?
14     A.    That is correct.
15     Q.    Okay.  And Nagata is from the
16 same database too, right?
17     A.    That is correct.
18     Q.    Any other additional work that
19 you did to prepare for today's deposition?
20     A.    Besides reviewing the sources,
21 I had a conversation with the counsel.
22     Q.    To prepare for today's
23 deposition, how many meetings or remote calls
24 did you have with plaintiffs' counsel?
25     A.    I believe they are in the -- in

6 (Pages 18 - 21)

Page 22

1  the invoices that I have submitted, but that
2  may be one or two -- two, probably one
3  yesterday in person and then one by Zoom.
4      Q.    Okay.  How long did the
5  in-person meeting last that took place
6  yesterday?
7      A.    Two and a half hours or so.
8      Q.    How long did the Zoom remote
9  call last?
10     A.    Maybe half an hour or an hour.
11     Q.    In terms of your work in this
12 case in the litigation -- in the MDL
13 litigation, did you review any of the
14 plaintiffs' experts' reports?
15     A.    To prepare the rebuttal,
16 actually, I did review some of the -- the
17 plaintiffs' reports or --
18     Q.    Yes.
19     A.    -- the defense?  Okay.  I was
20 wrong.
21        I had, for the original report,
22 reviewed some of the plaintiff reports as
23 well.
24     Q.    Which ones did you review?
25     A.    I believe I reviewed Dr. -- is

Page 23

1  it Christakis?
2      Q.    Christakis?
3      A.    Christakis.  And because -- and
4  Dr. Twenge, and I might have actually --
5  Dr. Bagot's, also, report, I may have looked
6  at that too.
7      Q.    Any others?
8      A.    I don't recall any others.  I
9  looked at the defense reports as well.
10     Q.    I'll get to those in a minute.
11     A.    Sure.
12     Q.    Let me ask you about the
13 plaintiffs' expert reports.
14        In terms of the plaintiffs'
15 expert reports that you reviewed, are you
16 relying on any of those reports in any way to
17 form your own opinions?
18        MS. MCNABB:  Objection, form.
19     A.    No, actually, I'm not.
20 BY MR. DAVIS:
21     Q.    Okay.  On the defense expert
22 reports, you identified in your rebuttal
23 report the reports -- the defense reports
24 that you actually reviewed?
25     A.    I did.

Page 24

1      Q.    Okay.  And in your rebuttal
2  report, you identified what disagreements
3  that you had with the defense expert reports,
4  right?
5      A.    That's correct.
6      Q.    Okay.  And you gave a full and
7  complete list of what you disagreed with in
8  the rebuttal report?
9        MS. MCNABB:  Objection,
10 foundation.
11     A.    I'm not sure it's full.  I was
12 instructed to actually do a -- you know, as
13 brief a rebuttal as possible, not very long.
14 I didn't want to write a long-winded review
15 of them.
16        But certain points that I made
17 where I disagreed with them, the major
18 points, I referred to some of the references
19 where they talked about those issues.
20 BY MR. DAVIS:
21     Q.    But in terms of the specific
22 points or the rebuttal points that you made
23 in your rebuttal report --
24     A.    Uh-huh.
25     Q.    -- you set out in your rebuttal

Page 25

1  report the specific disagreements that you
2  had with specific defense experts, right?
3      A.    With some of them, yeah.  Yeah.
4      Q.    You didn't do all the defense
5  expert -- you didn't address all of the
6  defense expert reports in your rebuttal
7  reports, just several which you identified in
8  your report?
9      A.    And at places I put e.g., which
10 means for example, so there were some
11 commonalities across some of the different
12 points, and I used some examples of their
13 work.
14     Q.    For the MDL litigation, you are
15 not offering any opinions about any
16 individual plaintiff, are you?
17     A.    No.
18     Q.    You haven't reviewed any
19 medical records or other information that is
20 specific to an individual plaintiff in the
21 MDL litigation, have you?
22     A.    No, I haven't.
23     Q.    And you've not reviewed any
24 information that's specific to a school
25 district or an attorney general action in any

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

1  of the -- brought against any of the
2  defendants, have you?
3      A.   I have not.
4      Q.   Okay.  And you don't have any
5  opinions about any school district that's
6  making a claim against any of the defendants
7  in this litigation; is that fair?
8          MS. MCNABB:  Objection,
9      foundation, form.
10     A.   That's correct.
11 BY MR. DAVIS:
12     Q.   Okay.  And in this -- on your
13 invoices, you do note that you are splitting
14 time -- your time between the JCCP litigation
15 and the MDL litigation, right?
16     A.   That's correct.
17     Q.   You split it 50/50, correct?
18     A.   That's correct.
19     Q.   Okay.  Last time I asked you in
20 the -- in your JCCP deposition about certain
21 areas that you weren't going to offer
22 opinions on, such as the defendants' conduct
23 or a safer design for the platforms, and I
24 take it that those opinions -- you're not
25 offering opinions on those issues in the MDL

Page 27

1  either, are you?
2          MS. MCNABB:  Objection,
3      foundation.
4      A.   Can you clarify "conduct"?  You
5  mentioned defendants' conduct --
6  BY MR. DAVIS:
7      Q.   Sure.  Sure.  Let me see if I
8  can ask it this way.
9          In the MDL litigation, you're
10 not offering any opinions on the actual
11 design of the defendants' social media
12 platforms or apps, are you?
13     A.   Well, I have comments about the
14 features, the algorithms, in the -- in the
15 apps, but they are general.  And some of them
16 are specific, as I have specified in my
17 report.
18     Q.   Let me see if I can ask a
19 clearer question.
20         You're not offering opinions
21 about how any of the defendants' social media
22 platforms or apps are actually designed, are
23 you?
24     A.   Not about the design as you
25 say, the engineering part of it.  I have no

Page 28

1  opinion about the engineering part of the --
2      Q.   You're not offering any
3  opinions in the MDL litigation about any
4  warnings that should or should not accompany
5  the use of social media platforms or apps,
6  are you?
7      A.   That's correct, I'm not
8  offering any.
9      Q.   You're not offering any
10 opinions about any of the defendants'
11 business practices or conduct, are you?
12     A.   I'm not.
13     Q.   You're not offering any
14 opinions in the MDL litigation about whether
15 there is a safer alternative design to any of
16 the social media platforms from the
17 defendants, fair?
18     A.   That is a fair statement, yeah.
19     Q.   You're not offering any
20 opinions in the MDL litigation whether any of
21 the defendants' social media platforms or
22 apps should be banned or restricted in some
23 way, are you?
24     A.   I'm not.
25     Q.   Dr. Mojtabai, a couple big

Page 29

1  picture questions for you, okay?
2          Is it fair to say that a person
3  can be sad or down and not have a psychiatric
4  disorder?
5      A.   That's possible, yes.
6      Q.   And is it fair to say that
7  being sad or down is part -- falls within the
8  range of normal human emotions?
9          MS. MCNABB:  Objection, form.
10     A.   Most cases, I would say yes,
11 but people with psychiatric problems also
12 feel sad and down, especially depression.
13 BY MR. DAVIS:
14     Q.   So a person can be sad or down
15 and may or may not have a psychiatric
16 disorder?
17     A.   That's correct.
18     Q.   A person could be anxious or
19 have anxiety and not have a psychiatric
20 disorder?
21         MS. MCNABB:  Objection, form,
22     foundation.
23     A.   That is correct also.
24 BY MR. DAVIS:
25     Q.   A person can be lonely and not

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 30

1  have a psychiatric disorder?
2      A.    That is possible, yes.
3      Q.    Yes.
4          And a person can have a loss of
5  interest in activities and not have a
6  psychiatric disorder, right?
7      A.    That is also possible, although
8  loss of interest is one of the signs of major
9  depressive disorder, so we don't look at one
10  symptom.
11      Q.    So a person can be lonely or
12  have a loss of interest in activities and may
13  or may not have a psychiatric disorder?
14          MS. MCNABB:  Objection, form.
15      A.    It's correct, it may or may
16  not.  The person may or may not.
17  BY MR. DAVIS:
18      Q.    Right.  And being lonely at
19  times and having a loss of interest in
20  activities also falls within the range of
21  normal human emotions, right?
22          MS. MCNABB:  Objection, form.
23      A.    Again, it could be.  It could
24  be a normal reaction or it could be part of a
25  mental health problem.

Page 31

1  BY MR. DAVIS:
2      Q.    Yes.
3          And so normal range of emotions
4  includes happiness, right?
5      A.    Uh-huh.
6      Q.    Yes?
7      A.    Yes.
8      Q.    Sadness?
9      A.    Yes.
10      Q.    Saying -- even sometimes saying
11  I feel down or depressed?
12          MS. MCNABB:  Objection, form.
13      A.    It depends on how long and
14  for -- when they feel depressed, for how many
15  days, and whether it impacts their
16  functioning, yeah.  And then you can actually
17  think of a mental health problem.
18  BY MR. DAVIS:
19      Q.    Yes.
20          So part of the normal range of
21  emotions can be someone saying I feel down or
22  I feel sad or I feel depressed?
23          MS. MCNABB:  Objection, form.
24      A.    If it's a transient experience,
25  it could be part of the normal experience,

Page 32

1  yes.
2  BY MR. DAVIS:
3      Q.    And feeling anxious or stress
4  can be part of the normal range of human
5  emotions?
6          MS. MCNABB:  Objection, form.
7      A.    Again, if it is a transient
8  experience, yes.
9  BY MR. DAVIS:
10      Q.    Yes.
11          And feeling left out or not
12  part of a group or feeling lonely can also be
13  part of a normal human experience, right?
14          MS. MCNABB:  Objection, form.
15      A.    Again, we have to look at the
16  context and consider the person's
17  surroundings and their relationships and
18  other symptoms, and on that basis, can decide
19  whether it's normal or not.
20  BY MR. DAVIS:
21      Q.    What differentiates an
22  individual with the normal range of emotions
23  from the emotions or feelings that rise to
24  the level of a depressive disorder or an
25  anxiety disorder?

Page 33

1          MS. MCNABB:  Objection, form.
2      A.    So as I mentioned, occurrence
3  of these symptoms, the symptoms you
4  mentioned, feeling sad, feeling anxious,
5  feeling left out, loss of interest, and if
6  they are happening for a number of days,
7  then -- for a significant part of the time,
8  then that is -- those are characteristics of
9  a major depressive episode, could be.  So
10  yeah.
11  BY MR. DAVIS:
12      Q.    So you have a length of --
13  there has to be a certain length of time,
14  right?
15      A.    It has to be a certain length
16  of time, it has to be associated with
17  functioning decline or distress.  Then it
18  falls within the major depressive disorder
19  category.
20      Q.    Okay.  So is one of the -- one
21  of the things that differentiates a
22  psychiatric disorder -- let me strike that.
23          Is one of the things that
24  differentiates someone having a normal range
25  of emotions compared to a psychiatric

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

1  disorder of depression or anxiety is there
2  has to be chronicity, right?  It has to last
3  for a period of time?
4           MS. MCNABB:  Objection, form.
5      A.    "Chronicity" is a broad term.
6  It is a good amount of time, like in the DSM,
7  for example, it says most of the day and for
8  a period of two weeks for major depressive
9  disorder.
10          Now, if it is less than that,
11 it could be minor depression, and so you have
12 minor depression also.
13 BY MR. DAVIS:
14     Q.    Doesn't the DSM have a longer
15 period than two weeks?  Isn't it months?
16     A.    For major depressive disorder?
17     Q.    Yes.
18     A.    It's two weeks having symptoms,
19 yeah.  That's -- for major depressive
20 disorder.
21     Q.    The other thing you mentioned,
22 it has to impact functionality, right?
23     A.    Yeah.
24     Q.    And by functionality, you mean
25 that it has to have some significant impact

Page 35

1  on day-to-day living and activities?
2           MS. MCNABB:  Objection, form.
3      A.    For the period of time the
4  person is having symptoms, yes.
5  BY MR. DAVIS:
6      Q.    Okay.
7      A.    So, for example, the person
8  says I can't take care of the household, I
9  wasn't able to take care of the household
10 chores or my schoolwork for two weeks.
11 During that two weeks, I was feeling down and
12 sad and all that.
13     Q.    Right.
14          And you also said that it has
15 to -- there has to be a decline or distress.
16          Did I understand you correctly?
17     A.    No, I said it should impact the
18 functioning, which we talked about, or
19 distress.
20     Q.    Right.
21     A.    Experience of distress.
22     Q.    For each of those -- is there
23 anything else that needs to be added to the
24 list of how you differentiate between a
25 normal range of emotions versus a psychiatric

Page 36

1  disorder?
2      A.    Well, there are symptoms of
3  major depressive disorder.  There is a list
4  of nine symptoms in the DSM.  You ask about
5  those.  Similarly for generalized anxiety
6  disorder, you can ask about those symptoms.
7  So those are all considered in the clinical
8  interview with the patient.
9      Q.    I was going to ask you:  How is
10 it, then, that you make the determination of
11 assessing whether the person is experiencing
12 a normal range of emotions or actually a
13 psychiatric disorder, such as depression or
14 anxiety or something else?  How do you make
15 that assessment?
16     A.    By asking about symptoms, by
17 looking at the person, talking to the person,
18 some of the symptoms you observe.  But mostly
19 it's based on the report that they provide.
20     Q.    It's -- when you say it's based
21 on -- when you say you -- is what you were
22 describing, the assessment you were
23 describing as part of your diagnostic
24 assessment and interview?
25     A.    If I'm doing a clinical

Page 37

1  interview with the patient, yes.
2      Q.    Okay.  And is it -- and the
3  diagnostic interview that takes place, that
4  allows a clinician such as yourself to put
5  into context the symptoms and how they're
6  impacting the individual on a day-to-day
7  basis?
8           MS. MCNABB:  Objection,
9      foundation.
10     A.    It includes all of that as a
11 comprehensive look at the person, the
12 circumstances, what's happening in their
13 life.  Sometimes things that are happening in
14 a person's life may explain their symptoms.
15 So you have to consider all of that for
16 clinical interview making a clinical
17 diagnosis.
18 BY MR. DAVIS:
19     Q.    And why is it important to pull
20 all that information together in a diagnostic
21 interview of a patient?
22     A.    Because to make the
23 determination we talked about, the
24 determination of whether the person is
25 experiencing a major depressive episode or

10 (Pages 34 - 37)

Page 38

1  generalized anxiety disorder or not.
2      Q.    Okay.  Is it fair to say that a
3  person can have body satisfaction and not
4  have a psychiatric disorder or an eating
5  disorder?
6      A.    Again, it depends on the
7  severity.  If you're making a diagnosis of a
8  body dysmorphic disorder, definitely the
9  person has body dissatisfaction, but the
10  severity of it might be, you know, to an
11  extent that causes a problem in functioning.
12      Q.    Yeah.  This is slightly --
13  little slightly different question for you,
14  Dr. Mojtabai.
15          Body dissatisfaction may or may
16  not be body dysmorphic disorder, an eating
17  disorder or a psychiatric disorder; is that
18  fair?
19      A.    May or may not, as you said.
20  That's a fair statement, yeah.
21      Q.    And do you know what the
22  prevalence rate is for body dissatisfaction
23  for pediatric and adult patients in the US or
24  any other place?
25      A.    Just body dissatisfaction?

Page 39

1      Q.    (Nods head.)
2      A.    I think I -- I might have some
3  data in my report.  I'm not on top of that.
4  I can't recall the numbers.  But there are
5  some estimates.
6      Q.    Are the estimates in the range
7  of over 50%?
8      A.    I wouldn't say so, no, it's
9  definitely not.
10      Q.    What's the range in your mind
11  for body dissatisfaction for pediatric and
12  adult patients?
13      A.    Do you want me to look at
14  the -- my report?  I can actually --
15      Q.    Yeah, if you can tell me what
16  the range is, just, you know, that would be
17  great.
18      A.    I can look at it and see if I
19  have report -- I may or may not have talked
20  about it.
21          (Sotto voce document review.)
22  BY MR. DAVIS:
23      Q.    Were you able to find it,
24  Dr. Mojtabai?
25      A.    I was not able to find those

Page 40

1  estimates, but some of those papers that I
2  referred to I'm sure have talked about the
3  prevalence.
4      Q.    Right.  And I'm talking about
5  the prevalence in terms of, like, a
6  background rate in the US or some other area.
7          Do you know what the prevalence
8  is for either pediatric or adult patients for
9  body dissatisfaction?
10      A.    I'm not sure that I can give an
11  estimate.  I don't recall that.
12      Q.    Okay.  Let me hand you what's
13  been marked as Exhibit 7.
14          (Whereupon, Mojtabai-MDL-7,
15          Excerpt From DSM-5-TR re: Definition
16          of a Mental Disorder, was marked for
17          identification.)
18  BY MR. DAVIS:
19      Q.    This is an excerpt from the
20  DSM-5-TR.
21          Do you see that?
22      A.    Uh-huh.
23      Q.    And it says there that -- it
24  describes a mental disorder as a syndrome
25  characterized by disturbance in the

Page 41

1  individual's cognition, emotion regulation or
2  behavior that reflects a dysfunction in the
3  psychological, biological or developmental
4  processes underlying mental functioning.
5          Did I read that correctly?
6          MS. MCNABB:  Todd, can I have a
7          copy?
8          MR. DAVIS:  I only have one.
9  BY MR. DAVIS:
10      Q.    Is that -- did I read that
11  correctly?  You may share with your counsel,
12  of course.
13      A.    Yeah, sure.
14          Yeah.
15      Q.    Okay.  And does that generally
16  describe -- strike that.
17          Does that generally describe
18  what a mental disorder is?
19      A.    I would say it's a, yeah, fair
20  description of a mental disorder, yeah.
21      Q.    And one of the things that's
22  interesting -- well, why does it describe a
23  mental disorder as a syndrome?
24      A.    Because it's a number of
25  symptoms.  It's not just one symptom.  It's a

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

1  number of symptoms that happen together.
2      Q.    Okay.  All right.  You can set
3  that aside.
4          Now, the Diagnostic and
5  Statistical Manual and the ICD, do you use
6  both of those in your diagnosis of patients?
7      A.    I do because there are some --
8  there's some overlap, but there are some
9  discrepancies.  There are some disorders that
10 are described differently in the ICD.
11     Q.    And each of those diagnostic
12 classifications has separate diagnostic
13 criteria for depressive disorders and anxiety
14 disorders and eating disorders, right?
15     A.    Separate, but overlapping.
16     Q.    There are some overlapping
17 features, for example, between depression and
18 anxiety, right?
19     A.    That is correct.
20     Q.    But when you diagnose a patient
21 with depression or -- major depressive
22 disorder or some other depressive disorder,
23 you're using the criteria specific to that
24 disorder as opposed to the anxiety disorders;
25 is that fair?

Page 43

1          MS. MCNABB:  Objection,
2      foundation.
3      A.    I should say that there is a
4  significant overlap between generalized
5  anxiety disorder and major depressive
6  disorder.  So majority of patients that I
7  have diagnosed with major depressive
8  disorder, for example, also fit the criteria
9  for generalized anxiety disorder.
10 BY MR. DAVIS:
11     Q.    But if you're just looking at a
12 patient who has a depressive disorder such as
13 major depressive disorder --
14     A.    Uh-huh.
15     Q.    -- you don't use the criteria
16 for an anxiety disorder to make that
17 diagnosis, do you?
18         MS. MCNABB:  Objection, form.
19     A.    I ask about anxiety disorder
20 because of the overlap.  I think most
21 clinicians would do that.  They would ask
22 about anxiety disorder; they also would ask
23 about symptoms of psychosis, again, because
24 there is overlap between those -- ask about
25 substance use problem, which is common in

Page 44

1  mental disorders.
2          So generally you ask -- you
3  don't ask just a set of questions that are
4  limited to a disorder.  You ask a number of
5  questions and screen for other disorders that
6  may exist there too.
7  BY MR. DAVIS:
8      Q.    Sure.
9          You screen for other disorders,
10 but when you're -- if you have a patient in
11 front of you that you believe only meets the
12 criteria for major depressive disorder, you
13 don't use the criteria for general anxiety
14 disorder or some other anxiety disorder to
15 make the diagnosis, do you?
16         MS. MCNABB:  Objection, form.
17     A.    Again, I would ask about --
18 questions about anxiety disorders,
19 definitely, when I see a patient with major
20 depressive disorder.
21 BY MR. DAVIS:
22     Q.    But in that patient, you
23 wouldn't -- who has just major depressive
24 disorder, you wouldn't use general anxiety
25 disorder or some other anxiety disorder to

Page 45

1  actually make the diagnosis, would you?
2          MS. MCNABB:  Objection, form,
3      asked and answered.
4      A.    Yeah, I think I did answer.  I
5  can repeat.
6          Because there are overlaps
7  between generalized anxiety disorder and
8  major depressive disorder, I wouldn't limit
9  myself to just criteria for major depressive
10 disorder.
11 BY MR. DAVIS:
12     Q.    Can you turn to your MDL
13 report, paragraph 76, page 19.
14     A.    Page 19.  76, you said?
15     Q.    Yes, paragraph 76.
16     A.    Yeah.
17     Q.    Okay.  You say in there that:
18 One potential criticism of past studies that
19 have shown increasing trends of child and
20 adolescent depression and anxiety is that
21 these studies are based on self-reports.
22         Did I say that correctly?
23     A.    That's correct.
24     Q.    Okay.  And your own
25 publications discuss that self-reported

12 (Pages 42 - 45)

CONFIDENTIAL

1  symptoms as opposed to a diagnosis is a
2  measurement error that reflects information
3  and bias in a study, right?
4       MS. MCNABB:  Objection,
5  foundation.
6       A.   I mean, you're -- you're
7  referring to a specific paper?
8       (Whereupon, Mojtabai-MDL-8, An
9       integrative literature review of birth
10      cohort and time period trends in
11      adolescent depression in the United
12      States, by Askari et al., was marked
13      for identification.)
14  BY MR. DAVIS:
15      Q.   Let me hand you what's been
16  marked as Exhibit 8.  Go to Table 2, Doctor.
17  Let me back up.
18       This an article entitled An
19  Integrative Literature Review of Birth Cohort
20  and Time Period Trends in Adolescent
21  Depression in the United States.
22       Right?
23      A.   Yes.
24      Q.   You're a coauthor on this
25  article, right?

1       A.   I am.
2       Q.   It was published in 2024,
3  right?
4       A.   I'm looking at the year.  Yes.
5       Q.   Okay.  Go to Table 2.
6       A.   Table 2.
7       Q.   It's on page 902.
8       A.   Yes.  Yeah.
9       Q.   Table 2 is a summary of
10  included articles, right?
11      A.   Uh-huh.
12      Q.   And you have a -- you have a
13  critique of the Twenge 2015 article.
14       Do you see that?
15      A.   Uh-huh.
16      Q.   Yes?
17      A.   Yes.
18      Q.   And on the Limitations and
19  Biases, you say that the Twenge article --
20  Twenge article has measurement error, slash,
21  information bias, focuses on psychosomatic
22  symptoms of depression that are very
23  nonspecific.
24       Did I read that correctly?
25      A.   You read it correctly.

1       Q.   Okay.  And the next one, the
2  Mojtabai 2016.
3       A.   Uh-huh.
4       Q.   You also describe the
5  limitations and biases as measurement error,
6  slash, information bias, depressive episodes
7  based on self-report by adolescents and does
8  not include clinical assessment or assessment
9  from parents or teachers.
10       Did I read that correctly?
11      A.   You read it correctly, yes.
12      Q.   Right.
13       And so in both of those -- in
14  both of those summaries, you're describing
15  the limitations of self-reported symptoms,
16  right?
17      A.   Well, that is -- I have to
18  back -- back up.
19       This is Melanie Askari's
20  dissertation, and so this -- and these are
21  the summaries that she made of these studies
22  based on her opinion.  And so with that
23  caveat -- and if you notice, for every one of
24  those studies, she's mentioning measurement
25  error.

1       That doesn't mean that the
2  measurement is erroneous.  It is that
3  measurement is prone to error.  All
4  measurement is prone to error.
5       Q.   Dr. Mojtabai, the statements I
6  read to you came from an article that you
7  coauthored, right?
8       A.   Correct.
9       Q.   Yes?
10      A.   Yes.  I --
11      Q.   And you're not saying that
12  they're wrong, are you?
13      A.   I say that it is out of context
14  to read that and say that this is a
15  measurement error.  That means that the study
16  is erroneous.
17      Q.   But you -- but in the article
18  that you coauthored, you list on virtually
19  every one of the studies that have looked at
20  social media use and self-report symptoms --
21      A.   Right.
22      Q.   -- it's described as a
23  measurement error, slash, information bias,
24  right?
25       MS. MCNABB:  Objection,

CONFIDENTIAL

Page 50

1    foundation, form.
2    A.    Again, it has to be read in the
3    context.
4    BY MR. DAVIS:
5    Q.    I'm just asking you:  In every
6    one of the -- on virtually every one of the
7    studies that looked at social media use and
8    self-reported symptoms that are described in
9    this article you coauthored, the use of
10   self-reported symptoms is described as a
11   measurement error, slash, information bias,
12   right?
13        MS. MCNABB:  Objection, form,
14        foundation, asked and answered.
15   A.    As I said, error is -- happens
16   in measurement.  All measurement has error.
17   So that is a description of measurement.
18   BY MR. DAVIS:
19   Q.    And you -- and in this article
20   you coauthored, you describe self-reported
21   symptoms as a measurement error, right?
22        MS. MCNABB:  Objection, asked
23        and answered.
24   A.    No, I didn't say that.
25        ///

Page 51

1    BY MR. DAVIS:
2    Q.    Okay.  And you agree that you
3    have stated that self-report of symptoms may
4    or may not correspond to a clinical
5    assessment as to whether or not a person has
6    a psychiatric disorder, right?
7        MS. MCNABB:  Objection,
8        foundation.
9    A.    Can you repeat the question?
10   BY MR. DAVIS:
11   Q.    Sure.
12        You've written that
13   self-reports of symptoms may or may not
14   correspond with a clinical assessment as to
15   whether a person has a psychiatric disorder?
16        MS. MCNABB:  Objection,
17        foundation.
18   A.    As a general statement, that is
19   correct.
20   BY MR. DAVIS:
21   Q.    Now, screening scales that are
22   used in the social media studies, they are
23   not a diagnostic interview, fair?
24        MS. MCNABB:  Objection,
25        foundation.

Page 52

1    A.    That is, by definition, a
2    screening instrument or a questionnaire is
3    not diagnostic, correct.
4    BY MR. DAVIS:
5    Q.    Typically, the screening scales
6    that are referenced or used, they're used in
7    conjunction with an actual diagnostic
8    interview, right?
9    A.    Not in research studies, but in
10   clinic -- so screening instruments like PHQ-9
11   have different uses.  They can be used in
12   research by themselves or they can be used in
13   a clinic as a screening measure.
14   Q.    And when they're used in a
15   clinic as a screening measure, they are used
16   in connection with an actual diagnostic
17   interview and assessment, right?
18        MS. MCNABB:  Objection, form,
19        foundation.
20   A.    Typically, that is correct,
21   yes.
22        (Whereupon, Mojtabai-MDL-9,
23        Associations Between Time Spent Using
24        Social Media and Internalizing and
25        Externalizing Problems Among US Youth,

Page 53

1    by Riehm et al., was marked for
2    identification.)
3    BY MR. DAVIS:
4    Q.    Let me hand you what's been
5    marked as Exhibit 9.
6        That's a copy of your -- the
7    study entitled Associations Between Time
8    Spent Using Social Media and Internalizing
9    and Externalizing Problems Among US Youth; is
10   that right?
11   A.    Correct.
12   Q.    This is the Riehm, R-I-E-H-M,
13   2019 study that you coauthored, correct?
14   A.    That is correct.
15   Q.    And in this article, you made a
16   point of distinguishing between self-reported
17   symptoms that were assessed in the study and
18   the fact that it was not a diagnostic
19   interview, right?
20   A.    Can you point me to the place
21   where you're talking about?
22   Q.    Sure.  If you go to page 1272.
23   A.    1272.  Okay.
24   Q.    Under Limitations on the
25   right-hand side.

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

1    Do you see that?
2    A.    Yes.
3    Q.    It says, as the second
4 limitation:  Second, comma, we measured
5 mental health problems with a self-report
6 questionnaire rather than a diagnostic
7 interview.
8    Did I read that correctly?
9    A.    Yep.
10    Q.    Okay.  One of the other things
11 you said is a limitation in the study is
12 that:  Adolescents self-reported the exposure
13 and outcome, which may inflate the observed
14 observations.
15    Did I read that correctly?
16    A.    Again, can you point me to
17 where you're reading it from?
18    Q.    Sure.  It's the sentence above
19 where we just read.
20    (Sotto voce document review.)
21    A.    Yeah, I read that.
22 BY MR. DAVIS:
23    Q.    Okay.  And you made a point in
24 this article to point out to other scientists
25 who would be reading this article and

Page 55

1 assessing the study that the self-reported
2 exposure and outcomes may have inflated the
3 actual observations, correct?
4    A.    That is what we have said, yes.
5    Q.    Right.
6    And you wanted readers to know
7 that information, right?
8    A.    That is correct.
9    Q.    Okay.  And by inflate, what
10 that means is it may increase the
11 observations or associations seen, right?
12    A.    It may, and on reflection now,
13 I think it could work both ways, if they are
14 underestimating, like, for example, the time
15 they spent on the social media.  So it could
16 work both ways.
17    Q.    Did you mention the both ways
18 in the article?
19    A.    No.  Perhaps we should have,
20 but now I see that it could have gone either
21 way.  And that's what is meant by measurement
22 error.
23    Q.    You've not -- you've not done
24 any assessment of the data in the Riehm study
25 to determine whether, in fact, the

Page 56

1 self-reported exposure and outcome that was
2 reported by the participants actually went
3 both ways?
4    MS. MCNABB:  Objection, form.
5    A.    That was a general comment I
6 made.
7 BY MR. DAVIS:
8    Q.    It wasn't based upon an
9 analysis that you've done for the Riehm
10 study, correct?
11    A.    Again, that was based on the
12 GAIN-SS; that's the instrument that's used in
13 this study, and the general knowledge that
14 measurement error could go either way.
15    Q.    Yeah.  And I'm not asking you
16 about general.  I'm asking you specific to
17 the Riehm study.
18    You have not done an assessment
19 of the data that is analyzed in the Riehm
20 study to determine that the self-reported
21 exposure and outcome data actually went both
22 ways or was decreased or -- in terms of
23 decreasing the reported association, right?
24    MS. MCNABB:  Objection, form,
25    foundation, asked and answered.

Page 57

1    A.    Yeah.  As I answered before, I
2 have not done that -- that analysis.
3 BY MR. DAVIS:
4    Q.    Okay.  You also say in the
5 Riehm article that it remains possible -- if
6 you look at 1272, right column.
7    A.    Uh-huh.  It's -- I'm reading --
8 can you point me again to it?
9    Q.    Sure.  First full paragraph,
10 it's the third-to-last sentence.  It's right
11 here, Doctor, (indicating), under the
12 Limitations.
13    A.    Yes, sixth?
14    Q.    Yeah, the sixth.
15    It remains possible that mental
16 health problems are prospectively associated
17 with social media use, but we could not
18 examine this in the present study because of
19 data limitations.
20    Did I read that correctly?
21    A.    You read it correctly.
22    Q.    So what you're saying in that
23 limitation is that you were not able to rule
24 out that it was actually mental health
25 problems that are prospectively associated

Golkow Technologies,
A Veritext Division

877-370-3377                                                              www.veritext.com

CONFIDENTIAL

Page 58

1  with social media use?
2          MS. MCNABB:  Objection, form.
3      A.   Yeah.  And as we say that it
4  remains possible that there are problems of
5  prospectively associated with social media
6  use, but we could not examine this in the
7  present study.
8  BY MR. DAVIS:
9      Q.   Yes.  That's something you just
10  couldn't rule out from the study?
11     A.   That is correct.
12     Q.   Okay.  And you also state in
13  the article itself that the validity of
14  self-reported time spent on social media and
15  the database that you pulled from the PATH
16  study was unknown, right?
17     A.   Again, can you point me to
18  that?
19     Q.   Sure.  271.
20     A.   Uh-huh.
21     Q.   Right column.
22     A.   Yes.
23     Q.   First full paragraph, fourth
24  sentence.
25     A.   Yeah, I see that.

Page 59

1      Q.   Dr. Mojtabai, you've actually
2  published on how symptom-oriented -- you've
3  actually published an article on
4  symptom-oriented approach in psychiatric
5  research and what the problems with that are,
6  right?
7      A.   Yeah.
8          (Whereupon, Mojtabai-MDL-10,
9          Limitations of the symptom-oriented
10         approach to psychiatric research, by
11         Mojtabai et al., was marked for
12         identification.)
13  BY MR. DAVIS:
14     Q.   Let me hand you what's been
15  marked as Exhibit 10.
16         This is an article that you
17  coauthored that's entitled Limitations of the
18  symptom-oriented approach to psychiatric
19  research.
20         Do you see that?
21     A.   I see that.
22     Q.   And in this article, you
23  critically reviewed and analyzed the
24  arguments of researchers who proposed to
25  replace syndromes and diagnostic criteria

Page 60

1  with symptoms as the measure of analysis,
2  right?
3      A.   It's not exactly accurate, what
4  you said.  There was a movement in
5  psychiatric research to look at individual
6  symptoms and look at their biological
7  correlates.
8          What you advocated was that
9  people should look at syndromes rather than
10  individual symptoms.
11     Q.   Let's look at what you said in
12  the top -- very first paragraph in the
13  abstract under Background.  It says, quote --
14  you said:  We critically reviewed the
15  arguments of the symptom-oriented researchers
16  who proposed to replace syndromes and
17  diagnostic categories with symptoms as units
18  of analysis in psychiatric research.
19         Did I read that correctly?
20     A.   That is correct.
21     Q.   And one of the three arguments
22  that you assessed was that the
23  symptom-oriented theories are clearer, easier
24  to test and more likely to lead to an
25  explanation of psychopathology.

Page 61

1      A.   Can you point me to that part?
2      Q.   Yeah.
3          Let's look under Method.
4      A.   Method, okay.
5      Q.   Second paragraph of the article
6  you coauthored.  It says:  These arguments
7  are based on three assumptions respectively.
8          Do you see that?
9      A.   Can you send me to the right
10  page?
11     Q.   Look in the abstract under
12  Method.
13     A.   Under Method.  Okay.
14     Q.   It says:  These arguments are
15  based on three assumptions respectively:  (a)
16  symptoms have higher reliability and
17  validity; (b) underlying pathological
18  processes are symptom specific; and (c)
19  elucidation of the process of symptom
20  development will lead to (and must precede)
21  the discovery of the causes of syndromes.
22     A.   Correct.
23     Q.   Did I read that correctly?
24     A.   Correct.
25     Q.   Okay.  And you stated that

16 (Pages 58 - 61)

Page 62

1 you -- in this article, that you found little
2 evidence supporting these assumptions and the
3 arguments based on them, right?
4      A.    For individual symptoms, that
5 is correct.  Individual symptoms are not as
6 reliable as syndromes.
7      Q.    Okay.
8      A.    And that's what we said in this
9 article.
10     Q.    And you said also that if --
11 quote:  If an investigator focuses only on
12 one or two symptoms, it does not allow for
13 tighter and more elaborate theories to be
14 positive if by tighter one means more
15 directly and immediately connected with the
16 symptoms.
17           That's what you wrote in this
18 article, right?
19     A.    Yeah, one symptom, that is
20 correct.
21     Q.    Actually, you say one or two
22 symptoms, right?
23     A.    Well, it's -- yeah, but it's
24 not syndrome.
25     Q.    Okay.

Page 63

1      A.    The thrust of this paper was
2 comparing the method of relying on individual
3 symptoms --
4      Q.    Okay.
5      A.    -- versus syndromes.
6      Q.    You also said:  Where the
7 question is the etiology of mental disorders,
8 syndromes appear to be the most suitable
9 units of analysis.
10          Right?
11     A.    That is correct.
12     Q.    Okay.  And you've also assessed
13 diagnostic conditions -- excuse me.
14          You've also assessed diagnosed
15 conditions in your own published articles,
16 right?
17     A.    I have, as well as
18 questionnaires.
19     Q.    Okay.  You've assessed...
20          (Whereupon, Mojtabai-MDL-11,
21          Trends in Mental Disorders in Children
22          and Adolescents Receiving Treatment in
23          the State Mental Health System, by
24          Mojtabai et al., was marked for
25          identification.)

Page 64

1 BY MR. DAVIS:
2      Q.    Exhibit 11 is an article that
3 you authored called Trends in Mental
4 Disorders in Children and Adolescents
5 Receiving Treatment in the State Mental
6 Health System.
7           Right?
8      A.    Correct.
9      Q.    This was published in 2024,
10 right?
11     A.    Correct.
12     Q.    And if you go to page 12 -- I'm
13 sorry.  If you go to 2, sorry, page 2.
14     A.    Page 2.
15     Q.    Yes, sir.
16           On the right-hand side there's
17 a section called Diagnosis, right?
18     A.    Correct.
19     Q.    And you lay out in this paper
20 your methodology for how you collected the
21 data, correct?
22     A.    I didn't collect the data.  I
23 used the data that was collected by the
24 states.
25     Q.    Yes.  You lay out your

Page 65

1 methodology about how you assess the data,
2 correct?
3      A.    That's correct.
4      Q.    And you assess the data using
5 diagnoses, right -- diagnoses, right?
6      A.    Yeah, that's the only thing
7 that was available in the data.
8      Q.    Okay.  So there are databases
9 out there from which psychiatric researchers
10 and epidemiologists can pull diagnoses from,
11 right?
12     A.    There are some administrative
13 datasets which are based on clinician
14 diagnosis, yes.
15     Q.    And, in fact, you used
16 diagnoses not just in one publication, but
17 you've used the diagnoses as the outcome
18 measure in multiple publications, right?
19     A.    Both diagnostic measures as
20 well as questionnaires, scales, rating
21 scales, PHQ, for example.
22     Q.    Sure.  Let's not lose the
23 point.
24           You have published multiple
25 papers where you used as an outcome measure

17 (Pages 62 - 65)

Page 66

1 diagnoses, right?
2     A.    That is correct.
3     Q.    Okay.  Are you familiar with
4 Harvard's World Mental Health Survey
5 Initiative?
6     A.    I am, yes.
7     Q.    It's an epidemiological survey
8 conducted by psychiatric epidemiologists,
9 right?
10     A.    Correct.
11     Q.    It involves psychiatric
12 epidemiologists from a host of different
13 countries, including France, Germany, Italy,
14 the United States, Spain and others, right?
15     A.    That is correct.
16     Q.    And it's -- the World Mental
17 Health Survey Initiative is one of the
18 largest epidemiological surveys, right?
19     A.    It is one of the larger ones,
20 yes.
21     Q.    Do you know of a larger one?
22     A.    Well, there's the burden of
23 disease that is also collecting this type of
24 data, and then there are -- like there is the
25 British Biobank that also collects data.

Page 67

1 There is -- right now, there is, all of us,
2 initiative in the United States that's
3 collecting clinical data and is used for
4 epidemiological studies.
5     Q.    Do you participate in the World
6 Mental Health Survey Initiative?
7     A.    I -- I have somewhat.
8     Q.    And you understand from your
9 participation that it actually uses diagnosed
10 disorders as the outcome measure, right?
11     A.    It uses structured interviews,
12 specifically something called CIDI, to derive
13 psychiatric diagnoses, but it is based on
14 self-report of patients -- persons, not
15 really patients, because it's a community
16 survey.
17     Q.    The World Mental Health Survey
18 Initiative uses structured clinical
19 interviews to -- using the DSM, right?
20     A.    Well, it's not clinical; it's
21 structured.  It is administered by lay
22 interviewers who have received a few days of
23 training in using that measure, which is
24 called CIDI.
25         (Whereupon, Mojtabai-MDL-12,

Page 68

1     Webpage, The World Mental Health
2     Survey Initiative, was marked for
3     identification.)
4 BY MR. DAVIS:
5     Q.    Let me hand you what's been
6 marked as Exhibit 12.
7     A.    Sure.
8     Q.    This is a -- you see this is a
9 printout from the World Mental Health Survey
10 Initiative website?
11     A.    Yeah.
12     Q.    And if you go down --
13     A.    Uh-huh.
14     Q.    -- under the Measures --
15     A.    Uh-huh.
16     Q.    -- category, it says:  All
17 surveys use the WHM-CIDI [sic] (Composite
18 International Diagnostic Interview), a fully
19 structured diagnostic interview, to assess
20 disorders and treatment.
21         Did I read that correctly?
22     A.    That's correct.
23     Q.    So what this explains is that
24 there is a trained -- someone who is trained
25 to actually conduct the diagnostic interviews

Page 69

1 for purposes of this survey, right?
2     A.    They are lay interviewers that
3 are trained for a few days, a couple of days,
4 really, to administer these instruments.
5     Q.    They are trained to conduct the
6 structured clinical interview, right?
7         MS. MCNABB:  Objection, asked
8     and answered.
9     A.    As I said, they're lay
10 interviewers.  They're not clinical.
11 BY MR. DAVIS:
12     Q.    And what they use is the
13 disorders -- it says later in the Measures:
14 The disorders are assessed using the
15 definitions and criteria of the Diagnostic
16 and Statistical Manual of Mental Disorders
17 and the ICD-10 Classification of Mental and
18 Behavioral Disorders.
19         Right?
20     A.    That's correct.
21     Q.    Okay.  So you've used
22 diagnostic -- excuse me.
23         You used diagnostic -- excuse
24 me.
25         You've used diagnosed

18 (Pages 66 - 69)

Page 70

1  psychiatric disorders as an outcome and a
2  host of other psychiatric epidemiologists
3  have used diagnosed disorders as on outcome
4  to assess risk factors and prevalence in
5  psychiatric research, right?
6        A.    A "host" is a vague term.
7        Q.    Many?
8        A.    Yeah, many have used it, yes.
9        Q.    Okay.  And you have as well?
10       A.    I have used it in my
11  publications analysis, yes.
12             MR. DAVIS:  We've been going
13  about an hour.  Do you want to take a
14  break or do you want to --
15             THE WITNESS:  Sure, I can use
16  the restroom.
17             MR. DAVIS:  Okay.  Let's do
18  that.
19             THE VIDEOGRAPHER:  Off the
20  record.  The time is 10:01 a.m.
21             (Recess taken, 10:01 a.m. to
22  10:10 a.m. CDT)
23             THE VIDEOGRAPHER:  We're back
24  on the record.  The time is 10:10 a.m.
25             ///

Page 71

1  BY MR. DAVIS:
2        Q.    Okay.  Dr. Mojtabai, are you
3  ready to continue?
4        A.    Yes.
5        Q.    Okay.  A couple general
6  questions about the studies on social media
7  use that you reviewed and rely upon.
8        A.    Sure.
9        Q.    Those -- those studies -- let
10  me back up.
11             The studies on social media use
12  were drawn from the general population,
13  right?
14       A.    Most of them were general
15  population studies, that's correct.
16       Q.    Can you identify any study that
17  was not drawn from the general population?
18       A.    There were a few studies that
19  were drawn from clinics, and I talk about
20  them where I talk about youth with
21  preexisting mental health problems, page 59
22  of my report.
23       Q.    I see.  Okay.
24             And so what we're -- let me see
25  if I make sure I understand.

Page 72

1        So there's a -- how many of
2  those studies do you think there are that
3  drew from clinics?
4        A.    Well, I don't have the count on
5  them, but a handful, I would say, maybe
6  between five or ten.
7        Q.    Okay.  And I think we talked
8  about those --
9        A.    Before.
10       Q.    -- at your JCCP deposition.
11       A.    I think so, yeah.
12       Q.    Okay.  So did any of the
13  studies on social media use draw from an
14  eating disorder clinic?
15       A.    Oh.  Again, I think some of
16  them did, and that might be actually in that
17  section, that same section I mentioned, 59.
18             And there are other studies
19  also that ask, for example, or compare the
20  posts that -- that people with social -- with
21  eating disorders receive -- or body
22  dysmorphic disorder receive compared to the
23  posts that other people receive.
24             Yes, so there are a few, and I
25  can -- if you want, I can go through those.

Page 73

1        Q.    Okay.  Okay.  No, I think
2  that's fine.  I think you answered my
3  question generally about this --
4        A.    Right.
5        Q.    -- in response to my previous
6  question about the number of them.
7        Let me ask you this,
8  Dr. Mojtabai:  I want to talk to you about
9  sensitivity and specificity, all right?
10       A.    Sure.
11       Q.    Sensitivity describes how well
12  a test can detect a specific disease or
13  condition in people who actually have the
14  disease or condition, right?
15       A.    That is correct.
16       Q.    Okay.  And is it fair to say
17  that sensitivity does not assess the number
18  of people without the disorder?
19       A.    That is correct.
20       Q.    Okay.  And specificity is --
21  refers to the percentage of people who test
22  negative for a specific disease or condition
23  among a group of people who do not have the
24  disease or condition, right?
25       A.    That is correct.

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

1    Q.   The positive predictive value
2  is the proportion of people who screen
3  positive for a disease or disorder who
4  actually have the disease or disorder, right?
5    A.   That is correct.
6    Q.   Okay.  A positive predictive
7  value is the likelihood that a person who has
8  a positive test result actually has the
9  disease or condition, right?
10   A.   That is correct.
11   Q.   Okay.  And the positive
12  predictive value is a calculation that uses
13  sensitivity, specificity, and the prevalence
14  of the specific disorder in the population,
15  right?
16   A.   That is correct.
17   Q.   For -- in neither of your
18  reports do you calculate a positive
19  predictive value for any of the screening
20  scales that are used in any of the studies on
21  social media, fair?
22   A.   I did not compute those, but
23  those scales often have psychometric
24  properties published, and they include
25  sensitivity, specificity.  And positive

Page 75

1  predictive value is a -- something that is
2  very context dependent because, as you said,
3  it depends on prevalence.
4        So usually they only publish
5  sensitivity and specificity of a scale
6  because it depends on whether you're using it
7  in a clinic or in a population, the positive
8  predictive value would change.
9    Q.   Yeah.  And just so I'm clear,
10  for your MDL report and your rebuttal report,
11  you don't actually calculate the positive
12  predictive value for any of the scales used
13  in the studies on social media use, do you?
14   A.   I did not conduct
15  individual-level analysis for -- for this
16  report.  As such, I could not have computed
17  those measures.
18   Q.   Okay.  And in terms of the --
19  are you aware of any literature that you cite
20  in either of your reports or any of your
21  reports that actually calculated the positive
22  predictive tools or scales used in the studies on social
23  media use that you rely upon?
24  media use that you rely upon?
25        MS. MCNABB:  Objection, form.

Page 76

1    A.   Can you repeat this question,
2  please?
3  BY MR. DAVIS:
4    Q.   Sure.
5        Are you aware of any literature
6  that you cite in any of your reports that
7  actually calculated the positive predictive
8  value for any of the screening tools or
9  scales used in the studies on social media
10  use that you rely upon?
11       MS. MCNABB:  Objection, form.
12   A.   Many of them are using
13  established measures like CDI or PHQ-9 that
14  are well-published and -- psychometric
15  properties, including sensitivity and
16  specificity.  Both of them have been
17  published.
18  BY MR. DAVIS:
19   Q.   Yeah.  And I'm not asking about
20  psychometric properties.  I'm specifically
21  asking about positive predictive value.
22       For any of the literature that
23  you cite in your reports, did any of that
24  literature actually calculate the positive
25  predictive value for any of the screening

Page 77

1  scales or tools that are used in the social
2  media studies that you rely upon?
3    A.   You said that you don't care
4  about psychometric properties, but positive
5  predictive value is a psychometric -- one of
6  the psychometric properties, along with
7  sensitivity and specificity.
8        So those measures, like, for
9  example, for PHQ-9, I know that Kroenke has
10  published extensively on the positive
11  predictive value as well in clinical setting.
12   Q.   So you mentioned the Kroenke
13  study on PHQ-9, right?
14   A.   Correct.
15   Q.   Other than the Kroenke study
16  that assessed the PHQ-9, are you aware of any
17  other literature in your reports that
18  actually calculated the positive predictive
19  value for any of the screening scales in the
20  social media studies?
21       MS. MCNABB:  Objection, form,
22   asked and answered.
23   A.   I believe that in my rebuttal
24  report I actually have a list of the
25  instruments that are used in one of those

20 (Pages 74 - 77)

Page 78

1  meta-analysis by Cunningham that actually
2  lists all those measures, including CDI,
3  PHQ-9, et cetera, that have well-established
4  psychometric properties.
5  BY MR. DAVIS:
6      Q.   Can you turn to your rebuttal
7  report.
8      A.   Sure.
9      Q.   You're referring to the
10 appendix that's attached to your rebuttal
11 report --
12     A.   Yes.
13     Q.   -- that discusses --
14     A.   Correct.
15     Q.   -- the screening scales
16 referenced in the Cunningham meta-analysis?
17     A.   That's correct.
18     Q.   And in the appendix, you don't
19 identify anywhere what the positive
20 predictive value is for any of those scales,
21 do you?
22     A.   I don't.
23     Q.   Okay.  And none of the studies
24 that are identified in the appendix attached
25 to your rebuttal report actually discuss the

Page 79

1  positive predictive value for the screening
2  scales that they used, fair?
3          MS. MCNABB:  Objection,
4  foundation.
5      A.   I wouldn't say none.  I haven't
6  looked at each one of them to see if they
7  have described the psychometric properties
8  for the study.  They may have done it in the
9  context of their own study.
10 BY MR. DAVIS:
11     Q.   Do you know of any study on
12 social media use where the study actually
13 sets out the positive predictive value for
14 the screening scale that they used in the
15 study?
16     A.   As I mentioned, these are
17 well-established screening studies, screening
18 measures, like BDI-II, CSD, these are -- so
19 there's a lot of literature on their
20 psychometric properties.  They wouldn't
21 necessarily redo what is done before.  They
22 use a measure that is -- has established
23 sensitivity and specificity, positive
24 predictive value.
25     Q.   I'm simply asking,

Page 80

1  Dr. Mojtabai:  Do you know of any study on
2  social media use where the study actually
3  sets out the positive predictive value for
4  the screening scale that they used in the
5  study?
6      A.   Off the top of my head, I can't
7  direct you to some, but some of them I'm sure
8  have done it because that is customary.
9      Q.   You don't know of one today, do
10 you?
11     A.   Not today.
12     Q.   Okay.
13     A.   I can look at them, if you
14 want.
15     Q.   And do you agree that when
16 the -- when the prevalence of a disorder or
17 condition is low, the positive predictive
18 value will also be low?
19     A.   That is generally the case.
20     Q.   Yeah.
21          And other than the Kroenke
22 study and the PHQ-9, are you -- do you know
23 today the positive predictive value for any
24 of the screening scales that were used in any
25 of the social media studies?

Page 81

1          MS. MCNABB:  Objection, form.
2      A.   I haven't looked at them
3  recently, but I have in the past, and I
4  recall that they were for community settings.
5  Positive predictive value is generally not
6  very high because of the prevalence issue,
7  but the sensitivity and specificity were
8  good.
9  BY MR. DAVIS:
10     Q.   Okay.  So in a community
11 sample, I think you said the positive
12 predictive value is generally not very high?
13     A.   Unless the condition is very
14 common.
15     Q.   Okay.  And for psychiatric
16 disorders, they don't fall into the common
17 category, do they?
18     A.   Psychiatric disorders, when you
19 say, is a category -- as a category, they
20 may.  Some of them are more prevalent, some
21 of them are less prevalent.
22          But if you're looking at the
23 measures that use questionnaires like PHQ or
24 BDI, and you administer it to your general
25 population, and you use their cutoffs,

Page 82

1  they're generally higher than you would get
2  from like a clinical interview.
3      Q.    Okay.  Cite me the literature
4  and the authority that supports that
5  statement.
6      A.    That what statement that I
7  make?
8      Q.    That if you're using
9  questionnaires like the PHQ or the BDI in the
10  general population and you've used their
11  cutoff, they're generally higher than what
12  you would get like in a clinical interview?
13      A.    I'm talking about it's a
14  psychometric property, so like calculations,
15  math.  If something is more prevalent, then
16  you would have higher positive predictive
17  value.
18      Q.    I'm simply asking you:  Cite me
19  the scientific literature or authority for
20  your statement that if you use a
21  questionnaire like the PHQ or the BDI in the
22  general population, and you use their cutoff,
23  that you generally get a higher than what you
24  would get from a clinical interview.
25      A.    Again, it's based on math, the

Page 83

1  mathematics of the --
2      Q.    And I'm asking you to cite me
3  the literature that supports that.
4      A.    The mathematical calculation,
5  I -- I don't have it on top of my head, but
6  possible that Kroenke has.
7      Q.    Okay.  You haven't calculated
8  your -- I think you've already told me you
9  haven't calculated in your expert reports --
10      A.    I haven't.
11      Q.    -- the positive predictive
12  value for any screening scale, including
13  PHQ-9 or BDI, have you?
14      A.    I have not.
15      Q.    Okay.  Do you know what the
16  prevalence is for adolescent depression
17  between the years 2011 and 2020?
18      A.    In 2011, based on a study we
19  did, it was around 8, 9%.  It went up in the
20  later years to 16, 17% based on -- again,
21  when you say prevalence, you have to also say
22  based on what.  It's based on the structured
23  interview that was used in the NSDUH,
24  National Survey of Drug Use and Health.
25      Q.    Okay.  So the prevalence rates

Page 84

1  that you're quoting me from 8 to 9% in 2011
2  or 16 to 17% later --
3      A.    Yeah.
4      Q.    -- those are based upon
5  structured --
6      A.    Interviews.
7      Q.    -- diagnostic interviews?
8      A.    Structured diagnostic
9  interviews, yes, correct.
10      Q.    And when you say that it was
11  later, adolescent depression was 16 to 17% ,
12  by later, what year are you referring to?
13      A.    Well, the last year that I
14  believe the NSDUH was done before the
15  COVID-19 was 2019.
16      Q.    Okay.  Do you know what the
17  prevalence rate is in adolescents for
18  generalized anxiety disorders?
19      A.    I don't think that we have very
20  good estimates like depressive episodes.
21      Q.    Do you know what the
22  prevalence -- let me back up.
23          Do you know what the prevalence
24  is for general anxiety disorder for young
25  adults 18 to 24?

Page 85

1      A.    I'm thinking if there is any
2  recent data that I have seen.  It's
3  definitely lower than the major depressive
4  episode, but I can't put an exact number on
5  that.
6      Q.    Do you know the prevalence rate
7  for any anxiety disorder for pediatric
8  patients or young adults up to age 24?
9      A.    That is high.  When you say any
10  anxiety disorder --
11      Q.    I mean individually, like any
12  individual.  Let me ask a better question.
13      A.    Yeah.
14      Q.    For any individual anxiety
15  disorder --
16      A.    Right.
17      Q.    -- do you know what the
18  prevalence rate is in pediatric patients or
19  patients 18 to 24?
20      A.    So you want me to -- just
21  clarification.
22          You want specific disorders --
23      Q.    Yeah, let me see if I can help
24  you out.
25      A.    Yeah.

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

1    Q.    Do you know what the prevalence
2    rate is for pediatric social anxiety
3    disorders?
4        A.    Well, there haven't been
5    surveys, recent surveys of them.  This was
6    the NCSA that was done in 1990, so it's old.
7    So now I don't know.  I don't know if anybody
8    has actually an accurate estimate of that.
9        Q.    Do you know what the social
10   anxiety prevalence rate is for 18- to
11   24-year-olds?
12       A.    No, I don't.
13       Q.    Do you know what the prevalence
14   rate is for post-traumatic stress disorder
15   is -- for either pediatric patients or
16   patients 18 to 24?
17       A.    Not off the top of my head.
18   It's less common than generalized anxiety
19   disorder or social anxiety disorder.
20       Q.    Okay.  For any other anxiety
21   disorder, do you know what the prevalence
22   rate is for a pediatric population or for
23   patients 18 to 24?
24       A.    Well, overall, when you put
25   them all together -- because anxiety

Page 87

1    disorders, again, overlap quite a bit,
2    generalized anxiety and panic disorder
3    especially.  It's somewhat -- I would say
4    around 20% or in that vicinity.
5            Now, things have changed.
6    Internalizing disorder have increased
7    recently, in recent years, so it might be
8    different now if somebody does a survey.
9            MR. DAVIS:  Okay.  Move to
10   strike as nonresponsive.
11   BY MR. DAVIS:
12       Q.    For panic disorder,
13   Dr. Mojtabai, do you know what the prevalence
14   is for pediatric population or for population
15   18 to 24?
16       A.    I don't.
17       Q.    Okay.  For eating disorders, do
18   you know what the prevalence rate is for --
19   in the pediatric -- let me strike that.
20           For anorexia, do you know what
21   the prevalence rate is in the pediatric
22   population or population 18 to 24?
23       A.    Again, I don't have those exact
24   numbers, but there are surveys that are old
25   now, but there are survey data that should,

Page 88

1    like -- as I mentioned, NCS.
2        Q.    Do you know what the prevalence
3    rate is for any eating disorder in the
4    pediatric population or in patients 18 to 24?
5        A.    Not off the top of my head.
6        Q.    And eating disorders -- well,
7    let me back up.
8            Anorexia, bulimia and binge
9    eating disorders are three eating disorders,
10   right?
11       A.    Correct.
12       Q.    Each of them has a very, very
13   low prevalence rate, right?
14           MS. MCNABB:  Objection,
15   foundation.
16       A.    Yeah, I don't know what you
17   based on.  We have published from the NCS on
18   eating disorders, and so that paper, if --
19   you might have it -- has some estimates.  I'm
20   not exactly sure.
21   BY MR. DAVIS:
22       Q.    Well, the DSM sets out
23   information about prevalence rates, right?
24       A.    That's true.  They usually get
25   it from NCS or NCSA.

Page 89

1        Q.    Right.
2            And that's a source that you
3    look to for prevalence rates?
4        A.    So again, NCS was done in early
5    2000s, and so we don't have better estimates,
6    unfortunately, in this country.
7        Q.    Okay.
8        A.    We don't have ongoing surveys
9    of these disorders.
10           (Whereupon, Mojtabai-MDL-13,
11   Excerpt From DSM-5-TR, was marked for
12   identification.)
13   BY MR. DAVIS:
14       Q.    Let me hand you what's been
15   marked as Exhibit 13.
16       A.    Uh-huh.
17       Q.    If you turn to page 384, what I
18   have handed you is excerpts from the
19   DSM-5-TR, right, Doctor?
20       A.    I understand.
21       Q.    And this excerpt has to do with
22   eating disorders, okay?
23       A.    Uh-huh.
24       Q.    Yes?
25       A.    Yes.

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

1    Q.    And if you turn to page 384,
2    there's a discussion about prevalence rates
3    for anorexia, right?
4    A.    Uh-huh.
5    Q.    Yes?
6    A.    Yep.
7    Q.    And the discussion in the
8    DSM-5-TR discusses how prevalence rates for
9    anorexia in the US are less than 2%, correct?
10    A.    Can you, again, point to the --
11    where you are reading from?
12    Q.    It's under the section called
13    Prevalence.
14    A.    Yeah. Well -- so can you read
15    the section you're -- you're referring to the
16    less than 2%?
17    Q.    Sure.
18        It says: According to two US
19    epidemiological studies conducted in
20    community samples, the 12-month prevalence of
21    anorexia nervosa ranges from 0.0% to 0.05%,
22    with much higher rates in women than in men.
23    And it cites that data.
24    A.    Yeah.
25    Q.    And the lifetime prevalence

Page 91

1    range is from 0.60% to 0.80%.
2    A.    Right.
3    Q.    Right? Is that right?
4    A.    Uh-huh.
5    Q.    So that's discussing how rare
6    anorexia nervosa is in terms of prevalence,
7    right?
8        MS. MCNABB:    Objection, form.
9    A.    Based on those two
10    epidemiological studies, which I know what
11    they are -- they are NCS and NCS-R, which
12    were done in 1990 and 2000.
13    BY MR. DAVIS:
14    Q.    And that's the last data that
15    you know about that collects that
16    information?
17    A.    Yeah.
18    Q.    And if you look -- if you turn,
19    then, to page 389, there's a section on the
20    prevalence for bulimia nervosa, correct?
21    A.    Uh-huh. Yeah.
22    Q.    Do you see that section?
23    A.    Yes.
24    Q.    And the prevalence in the US
25    for bulimia nervosa, again, it's less than

Page 92

1    2%, correct?
2    A.    That is correct.
3    Q.    Okay. And some of the data
4    even goes much lower in terms of prevalence
5    rates than 2%. It gets below 1%, right?
6    A.    Uh-huh.
7    Q.    Yes?
8    A.    Yes.
9    Q.    Okay. And then if you go to
10    binge eating disorders, page 394 --
11    A.    394, yes.
12    Q.    There's a discussion about the
13    prevalence rates in the US for binge eating
14    disorders, correct?
15    A.    Correct.
16    Q.    And again, the prevalence rates
17    for binge eating disorder is less than 1%,
18    right?
19    A.    Yep.
20    Q.    Okay.
21    A.    Yeah.
22    Q.    And then if we look at --
23    A.    Although I should say that
24    lifetime prevalence ranges from 0.85 to 2.8,
25    so a little bit higher for binge eating.

Page 93

1        (Whereupon, Mojtabai-MDL-14,
2        Excerpt From DSM-5-TR re: Major
3        Depressive Disorder, was marked for
4        identification.)
5    BY MR. DAVIS:
6    Q.    Okay. I'm going to hand you
7    what's been marked as Exhibit 14.
8        This is an excerpt from the
9    DSM-5-TR --
10    A.    Yes.
11    Q.    -- that deals with major
12    depressive disorder, right?
13    A.    Uh-huh.
14    Q.    Yes?
15    A.    Yes.
16    Q.    And if you look at the
17    prevalence rate there, it says that:
18    12-month prevalence of major depressive
19    disorder in the United States is
20    approximately 7%, with marked differences by
21    age group such that the prevalence in 18- to
22    29-year-old individuals is threefold higher
23    than the prevalence in individuals age 60 or
24    older.
25        Did I read that correctly?

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

1    A.    That's correct.
2    Q.    And the approximately 7%
3  prevalence rate that's discussed in the
4  DSM-5, is that a fair assessment of what the
5  prevalence rate of MDD is?
6    A.    Across the ages, it might be,
7  but as they say here, it varies quite a bit
8  across the age range.
9    Q.    Can you cite to any publication
10  that has a higher prevalence rate for
11  pediatric patients or -- for major depressive
12  disorder for patients 18 to 24?
13    A.    For major depressive episodes?
14  Yeah, there are publications from the --
15  based on the NSDUH, National Survey of Drug
16  Use and Health, that specifically look at
17  adolescents and young adults.
18         And there was -- as I
19  mentioned, in 2019, the rates were quite
20  high.  Of course they are higher in the girls
21  than boys, so there are these gender
22  differences, but you may look at -- I think
23  Renee Goodwin published one study based on
24  the 2019 NSDUH.
25         ///

Page 95

1  BY MR. DAVIS:
2    Q.    Can you quote me any range
3  today that you would say this is a reliable
4  range -- this is a reliable -- let me strike
5  that.
6         Can you quote me any number
7  today, any specific number today that you say
8  is a reliable number for the prevalence of
9  major depressive disorder in patients under
10  18 between the years 2011 and 2020?
11    A.    Again, that range of years that
12  you mentioned saw an increase, almost a
13  doubling of the -- of the prevalence of major
14  depressive episodes in adolescents
15  specifically.
16         So at the end, in 2019, it was
17  getting around, I would say, 17, 18%.
18    Q.    And my question is:  Can you
19  cite me any authority, any scientific
20  authority or article for that?
21    A.    Well, as I mentioned, Renee
22  Goodwin has published on this.  We published
23  up to 2016, me and Mark Olfson, and then
24  other studies have published after that,
25  going up to 2019.  And it's gone up.

Page 96

1    Q.    You mentioned Mark Olfson.
2  Have you published with Mark Olfson?
3    A.    Oh, yeah.
4    Q.    What's your assessment of him
5  as a researcher?
6         (Interruption off the record.)
7         MR. DAVIS:  Let's go off the
8  record.
9         THE VIDEOGRAPHER:  Off the
10  record.  The time is 10:39 a.m.
11         (Discussion off the record.)
12         THE VIDEOGRAPHER:  We're back
13  on the record.  The time is 10:39 a.m.
14  BY MR. DAVIS:
15    Q.    You mentioned Mark Olfson.
16  You've published with -- have you published
17  with Mark Olfson?
18    A.    Yes.
19    Q.    What's your assessment of him
20  as a researcher?
21    A.    He's a good researcher, I would
22  say.
23    Q.    Careful?  Is he a careful
24  researcher?
25    A.    Well, I don't -- I can't

Page 97

1  really -- what I have worked with him on, he
2  has been careful.
3         (Whereupon, Mojtabai-MDL-15,
4    Excerpt From DSM-5-TR re: Generalized
5    Anxiety Disorder, was marked for
6    identification.)
7  BY MR. DAVIS:
8    Q.    Okay.  Let me hand you what's
9  been marked as Exhibit 15.
10    A.    Right.
11    Q.    This is an excerpt from the
12  DSM-5-TR, right, Doctor?
13    A.    Correct.
14    Q.    And it's about -- it discusses
15  general anxiety disorder, right?
16    A.    Uh-huh.
17    Q.    You have to answer out loud.
18    A.    Yes.
19    Q.    And if you look under the
20  prevalence rate for generalized anxiety
21  disorder, it talks about how the prevalence
22  is 0.9% among adolescents?
23    A.    Uh-huh.  Yes.
24    Q.    And 2.9% among adults in the
25  general community of the United States.

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

1          Did I read that correctly?
2     A.    That is correct.  That's based
3 on the -- probably, as I mentioned, NCS.
4     Q.    Okay.  And do you know of any
5 better data than this about generalized
6 anxiety disorder prevalence?
7     A.    I think that's the most recent
8 data that unfortunately we have.  We don't
9 have more recent data.
10    Q.    Okay.  Thank you.  You can put
11 that over there.
12          Doctor, in your reports that
13 you've done for this litigation, you haven't
14 done an analysis of the positive predictive
15 value for any of the screening scales that
16 are used in the various studies on social
17 media use, have you?
18          MS. MCNABB:  Objection, asked
19 and answered, form.
20    A.    Again, as I answered, I didn't
21 use the individual-level data for any
22 analysis for preparing this report.
23 BY MR. DAVIS:
24    Q.    Yeah.  And I'm simply asking
25 you that for your reports in this case, you

Page 99

1 did not determine the positive predictive
2 value for any of the scales that are used in
3 any of the studies on social media use; is
4 that fair?
5          MS. MCNABB:  Objection, asked
6     and answered.
7     A.    Yeah.  If by determine you mean
8 did I compute it?  I did not.
9 BY MR. DAVIS:
10    Q.    The PHQ-9 and the GAD-7,
11 they're both screening tools, right?
12    A.    That is correct.
13    Q.    Alone, those -- those screening
14 tools are not diagnostic, are they?
15    A.    In a clinical setting, they are
16 not.  They are used as screening measures.
17    Q.    Okay.  And can you -- and in
18 the context of a nonclinical setting, such as
19 an observational study or an experimental
20 study, the PHQ-9 and the GAD-7 still serve as
21 screening tools as opposed to diagnostic
22 instruments, fair?
23    A.    So screening has a specific
24 meaning.  It means that you screen somebody
25 for a disorder so that a clinician can

Page 100

1 conduct further evaluation.
2          These measures are also used as
3 research measures in a lot of surveys, like
4 and Hanes uses PHQ-9, and National Health
5 Interview Survey uses both surveys -- both
6 instruments, PHQ-9 and GAD-7, as research
7 questionnaires.  So they have different uses.
8          I don't know if I answered your
9 question or not.
10    Q.    Yeah.
11          And the research uses that
12 you -- for the PHQ-9 or the GAD-7, the
13 research users recognize that they -- that
14 those instruments are screening tools that
15 are not diagnostic of the condition that
16 they're assessing, fair?
17          MS. MCNABB:  Objection, form.
18    A.    They use again, cutoffs on
19 these measures as probable disorder, so even
20 in my research, I might have used that term
21 as probable MDE or probable GAD.
22          So because of the positive
23 predictive value that we were talking about
24 with these instruments, that is -- suggests
25 when you do the analysis, suggests higher

Page 101

1 cutoffs on these are highly correlated with
2 clinician-diagnosed conditions.
3 BY MR. DAVIS:
4     Q.    But even in the research
5 setting, PHQ-9 or GAD-7, those alone -- you
6 said those screening scales -- let me back
7 up.
8          Even in the research setting
9 that you described --
10    A.    Uh-huh.
11    Q.    -- for PHQ-9 and the GAD-7
12 alone are not diagnostic of whether someone
13 actually has the disorders that those
14 screening scales can assess, right?
15          MS. MCNABB:  Objection, form.
16    A.    So I think the term
17 "diagnostic," in a lot of epidemiological
18 surveys, we don't use that term.  So these
19 are not used for diagnosis in those contexts.
20 BY MR. DAVIS:
21    Q.    So let me ask you this.  Okay.
22          You've got -- let me switch
23 gears on you, Dr. Mojtabai.
24          In your expert reports, you
25 don't discuss anywhere potential confounders

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

1  for any of the observational studies that you
2  rely upon, do you?
3      A.   Can you repeat your question?
4      Q.   Sure.
5          Can you point to me anywhere in
6  your original report or your rebuttal report
7  where you actually specifically assess the
8  potential confounders in the individual
9  studies that you rely upon?
10     A.   I have to think about that, but
11  I -- if it is a -- there is a glaring issue,
12  a glaring confounder -- sometimes I have said
13  a study adjusted for this and that, like, for
14  example, for preexisting conditions, which is
15  a confounder.
16         So I have talked about
17  individual studies where they have -- where
18  it has been an important issue.
19     Q.   Okay.  Can you point to me
20  anywhere in your reports where you actually
21  discuss the potential confounders assessed in
22  each of the studies?
23     A.   Well, when I talk about
24  longitudinal studies, I often talk about,
25  like, preexisting conditions.  But I can look

Page 103

1  for those...
2          (Sotto voce document review.)
3      A.   So here, for example, I'm
4  talking about the Mundy and colleagues.
5  BY MR. DAVIS:
6      Q.   What page are you on, sir?
7      A.   Page 37.
8          So I say:  The models adjusted
9  for anxiety and depressive symptoms at wave 1
10  and 3.
11     Q.   What paragraph are you on,
12  Doctor?
13     A.   I am in the first paragraph of
14  page 7.
15     Q.   37?
16     A.   37.  37, first paragraph, four
17  lines up.
18     Q.   Okay.
19     A.   So again, in paragraph 150, I
20  say that -- at the end of the paragraph:  The
21  study in effect adjusted for preexisting
22  levels of depressive symptoms.  Because it
23  was a cross-lagged study.
24     Q.   Other than that reference on
25  page 37, is there any other reference to

Page 104

1  assessing potential confounders in any of the
2  observational studies that you assessed?
3      A.   I'm looking.  So...
4          (Sotto voce document review.)
5      A.   Yeah, I talk also about the
6  issue of preexisting conditions where I talk
7  about our study, pages 38-39, and the Kreski
8  and Keyes criticism of that.
9  BY MR. DAVIS:
10     Q.   So far I think you've
11  identified two studies that you identified
12  that assessed confounders.  Can you identify
13  any others in your report?
14     A.   So where I talk about, like,
15  the Braghieri study, I say that it was
16  ecological.  It's not based on individual
17  participants, but rather, based on exposure
18  and outcomes both measured at the aggregate
19  level.
20         And aggregate level could
21  actually be a confounder of the -- you could
22  consider it as a confounder because it's not
23  at individual level.
24         So yeah, I can go through those
25  and identify others, if I have talked about

Page 105

1  specifically the confounders.
2      Q.   Other than the three that
3  you've -- studies you've identified, are
4  there any others?
5          (Sotto voce document review.)
6      A.   So I talk about, like, at 45,
7  where I talk about the ABCD study, Chu study,
8  where I say:  Further, depression at baseline
9  might have been a mediator of the association
10  of social media, in which case...
11         So there are -- there are
12  places where I talk about them, where I
13  thought that they were relevant.
14  BY MR. DAVIS:
15     Q.   Can you identify -- any others
16  that you want to identify?
17     A.   Well, I mean, I can -- I have
18  to go through the whole thing.  I -- you
19  know, I don't have -- I don't remember each
20  one of them.
21     Q.   Okay.  Sitting here today, can
22  you identify one longitudinal study or
23  experimental study that you rely upon that
24  assessed a family history of psychiatric
25  disorders as a confounder?

27 (Pages 102 - 105)

CONFIDENTIAL

Page 106

1    A.    I'm thinking if there are some
2    studies that looked at that.
3            I can't off the top of my head.
4    There might have been.  The ABCD studies, for
5    example, consider a lot of different
6    background factors.
7    Q.    Any others?
8    A.    No, I can't think of any right
9    now.
10    Q.    Can you name one longitudinal
11    study or experimental study that you rely
12    upon that assessed a past history of
13    psychiatric disorders as a confounder?
14            MS. MCNABB:  Objection.
15    A.    Well, we talked about these.
16    Again, I think I mentioned a number of the
17    studies, all of them, yeah.
18    BY MR. DAVIS:
19    Q.    The three that you mentioned?
20    A.    Yeah.
21    Q.    Any others?
22            MS. MCNABB:  Objection, asked
23    and answered.
24    A.    Yeah, I can't -- I can go
25    through the report, and a number of those

Page 107

1    studies have looked or adjusted for past
2    history of psychiatric problems.
3    Cross-lagged studies like Nagata is also --
4    is looking at the past history.  That is the
5    nature of the cross-lagged studies.
6    BY MR. DAVIS:
7    Q.    Can you --
8    A.    Actually, most cross-lagged
9    studies, all of them are doing that exactly.
10    Q.    Can you name one longitudinal
11    study or -- well, can you name an
12    experimental study that -- that you rely upon
13    that assessed a past history of psychiatric
14    disorders as a confounder?
15    A.    First of all, I have to think
16    about if that could be even a confounder.
17    What's confounding of what and what?
18    Experimental studies, by definition, are
19    randomized.  When you randomize, you're
20    breaking the link between any confounding,
21    potential confounding factor and -- and the
22    exposure.
23    Q.    Can you identify any
24    experimental study that actually took into
25    consideration in the randomization past

Page 108

1    medical history of the participants in the
2    study or of family history of psychiatric
3    disorders in the participants?
4    A.    I can't recall right now that
5    I'm talking to you.
6    Q.    Can you name one longitudinal
7    study or experimental study that you rely
8    upon that assessed a history of adverse
9    childhood experiences as a confounder or as a
10    means to conduct randomization in an
11    experimental study?
12    A.    Actually, the Nagata study did
13    consider ACEs, which is adverse childhood
14    experiences.  Also, a report based on the
15    ABCD study by Raney, 2024, I believe --
16    R-A-N-E-Y -- looked at the association of
17    adverse childhood experiences with social
18    media use or other device uses or other
19    technology uses, and the association with
20    social media use was not significant.
21            So there are studies that have
22    considered it and looked at it.
23    Q.    Okay.  Can you -- other than
24    Nagata and Raney from the ABCD database --
25    A.    Yeah.

Page 109

1    Q.    -- can you name any other
2    longitudinal study or any experimental study
3    that you rely upon that assessed a history of
4    adverse childhood experiences as a confounder
5    or in terms of -- or randomization?
6    A.    I mean, off the top of my head,
7    I cannot.
8    Q.    Can you name any longitudinal
9    study on social media use that accounted for
10    life stressors as a potential confounder?
11    A.    When you say life stressors,
12    can you be more specific?
13    Q.    You understand from psychiatric
14    research that people have life stressors from
15    family, right?  Families can be a life
16    stressor; life events like work or school can
17    be life stressors, right?
18    A.    Well --
19    Q.    And my question, simply just to
20    help you orient.
21    A.    Yeah.
22    Q.    Can you name one longitudinal
23    study that accounted for life stressors as a
24    potential confounder?
25    A.    Again, I think ABCD studies, it

28 (Pages 106 - 109)

Page 110

1 might be Nagata or Xiao, looked at stress,
2 baseline stress. I'm thinking whether they
3 looked at -- or asked about school stress
4 also or not.
5         But ACEs in general, we
6 consider them as stressors, childhood --
7     Q.   Can you --
8     A.   -- experiences.
9     Q.   Can you identify any
10 longitudinal study, other than from the Xiao
11 or a study from the ABCD database, that
12 assessed the confounder of life stressors
13 when assessing the study on social media use?
14     A.   So I have to -- it's not a
15 yes/no answer.
16         When you say -- when you say
17 confounding, it assumes that there is a
18 relationship between social media use and
19 stressor -- life stressors.
20         If there is no evidence of
21 that, then adjusting for that will -- calling
22 it a confounder might not be justified.
23     Q.   I'm just asking you: Can you
24 identify any longitudinal study, other than
25 Xiao or a study from the ABCD database, that

Page 111

1 assessed the confounder of life stressors
2 when assessing social media use?
3     A.   Again, I repeat my answer and
4 explain, if you want.
5     Q.   No, no. I just want to know if
6 you can identify a study.
7     A.   The premises of these questions
8 are not correct.
9     Q.   That's okay. I can -- I just
10 want to know if you can identify a study or
11 not.
12     A.   If I -- if the question is --
13 is not correct, how can I answer it?
14     Q.   Are you aware of any study,
15 outside of the ABCD study, such as Xiao, that
16 assessed the confounders of life stressors
17 when looking at and analyzing the impact or
18 effect of social media use?
19         MS. MCNABB: Objection, asked
20     and answered.
21     A.   I cannot answer that question,
22 and I can tell you why I can't, if you want.
23 BY MR. DAVIS:
24     Q.   Do you know of a study?
25     A.   As I said, I cannot answer this

Page 112

1 question the way you asked it, and I can tell
2 you why.
3     Q.   Dr. Mojtabai, what is your
4 definition of a social media platform?
5     A.   They are apps that are, as you
6 were mentioning earlier, you can access
7 through your tablet or phone or computer, on
8 which people can communicate, network with
9 peers, relatives, friends; and post
10 recordings or usually video clips or pictures
11 or stories and receive reactions or change --
12 exchange these material with their peers, and
13 as I mentioned, can receive reactions.
14         And these apps can propose or
15 offer notifications or posts by other people
16 who might be in the person's network or not,
17 and some of them allow for actually
18 communication, direct communication among
19 people more readily than others.
20         So that's my understanding of
21 it.
22     Q.   Does your -- does your
23 definition of a social media app, does it
24 have to have any of those specific features
25 or is it enough to have one?

Page 113

1     A.   Well, communication, people can
2 do through texting or e-mails, and that
3 doesn't count as a social media app.
4     Q.   Okay. If we take out texting
5 and e-mails --
6     A.   Uh-huh.
7     Q.   -- is there -- all the other
8 features that you described would qualify an
9 app as a social media app?
10         MS. MCNABB: Objection, form,
11     foundation.
12     A.   So I guess my -- my definition
13 is by -- however you call it, intentional.
14 I'm just saying that this is usually the
15 typical, the prototypical app, social media
16 app, does have those features.
17         Now, there might be -- there
18 are multitudes of social media apps, and I'm
19 not familiar with all of them, and some of
20 them might actually not have those.
21 BY MR. DAVIS:
22     Q.   Besides the defendants'
23 platforms --
24     A.   Right.
25     Q.   -- what other social media apps

CONFIDENTIAL

Page 114

1  are out there that you're aware of?
2      A.    I think there's Pinterest or
3  Pinterest was one of those.  What other
4  media?
5          WhatsApp is not exactly a
6  social media app, but some people -- it has
7  some of those features.  I'm thinking of
8  others.
9          You should get a young person,
10 an adolescent to tell you all about different
11 social media apps.  I only use YouTube myself
12 and get notifications from Facebook.
13     Q.    What about Reddit?  Is Reddit a
14 social media app?
15     A.    It has some of those features.
16 People can post and get reactions on their
17 posts.  But it's not a -- like, a visual app,
18 I would say, so it doesn't have a lot of
19 those posting short videos, infinite scroll.
20 So it has some of those features, I would
21 say.
22     Q.    If I were to ask you, okay,
23 Dr. Mojtabai, I want you to identify for me
24 the apps that you consider to be social media
25 apps, could you list those out for me?

Page 115

1      A.    The major ones are -- I would
2  say are Facebook, Instagram, nowadays,
3  TikTok, YouTube.  I think I counted most of
4  the apps that are commonly used besides
5  Facebook, Instagram, TikTok and -- and
6  YouTube, YouTube being the most commonly
7  used, of course.
8      Q.    And in terms of -- is there
9  certain features that a social media app has
10 to have in order to qualify it in your mind
11 as a social media app?
12     A.    Well, there's certain features
13 that these major ones that I mentioned share,
14 and so -- and there's a lot of commonality
15 among those.
16     Q.    And I'm just looking for the
17 list of in order for something to be a social
18 media app, what does -- what does the app
19 have to have?
20         MS. MCNABB:  Objection, form.
21     A.    So I -- yeah, I don't think
22 it's like not a diagnostic interview say
23 that, okay, these symptoms exist.  It is a
24 prototype.  What's the prototypical social
25 app.  And prototypical social app, as I

Page 116

1  mentioned, has those things; notifications,
2  sharing of posts, getting feedbacks, scrolls,
3  visual posting of videos, short videos.
4  BY MR. DAVIS:
5      Q.    So for your definition of
6  social media app, does it have to have all of
7  those, or is there a specific combination of
8  those features that it has to have to qualify
9  as a social media app?
10         MS. MCNABB:  Objection, form.
11     A.    I think in my report I have
12 focused on the major ones, the major, most
13 common.  And those have -- share those common
14 features.  Those media apps share those
15 common features.
16 BY MR. DAVIS:
17     Q.    Yeah.  And I think we're
18 miscommunicating.
19         I just want to know, for your
20 definition of a social media app, what does
21 the app have to have in order to qualify it
22 as a social media app?
23         MS. MCNABB:  Objection, asked
24     and answered.
25     A.    So I don't have a necessary and

Page 117

1  sufficient indicator that I say this is
2  necessary for a social media app and this is
3  sufficient.  So -- but I look at them as a
4  group and common features.
5  BY MR. DAVIS:
6      Q.    Okay.  A number of the studies
7  that you rely upon --
8      A.    Right.
9      Q.    -- assess social media
10 platforms or apps that are not made by any of
11 the defendants in this case, right?
12     A.    Yeah, they are -- they have --
13 they usually look at social media apps in
14 general.  Most studies look at that.  They
15 don't distinguish or identify specific ones.
16     Q.    Right.  So I think what you're
17 saying is that there's some studies that
18 don't distinguish between which specific --
19     A.    Yeah.
20     Q.    -- social media apps they're
21 looking at?
22     A.    That's correct.  And as such,
23 they may include some social media apps that
24 are not in that list.
25     Q.    Do you know what the percentage

30 (Pages 114 - 117)

Page 118

1 of those studies are in terms of the ones
2 that you reviewed and assessed?
3     A.    I have to look at them to see
4 if they have mentioned what social media apps
5 they were actually counting as social media
6 apps.
7     Q.    Can you give me a ballpark
8 percentage of how many of those studies fall
9 under that category?
10     A.    In that category of?
11     Q.    They didn't describe what the
12 social media apps were that were involved in
13 the study.
14     A.    I can't give you an accurate
15 estimate.
16     Q.    Can you give me a range?
17     A.    I'm thinking back to the
18 studies, individual studies, whether they
19 mentioned the specific apps.
20         And I didn't pay attention to
21 that because the most common apps are
22 YouTube, Facebook, Instagram, TikTok. So I
23 can't give you a range. I'm sorry.
24     Q.    Okay. But there are studies,
25 social media studies that you relied upon,

Page 119

1 that included data from social media apps
2 that are unconnected with any of the
3 defendants, right?
4         MS. MCNABB:  Objection, form.
5     A.    It's very -- it's possible. I
6 wasn't looking at specifically the defendant
7 apps.
8 BY MR. DAVIS:
9     Q.    So when you did your analysis,
10 you weren't trying to look specifically at
11 the defendants' apps and pull out the data
12 specific to the individual defendants' apps
13 and make an assessment of the data based on
14 that?
15         MS. MCNABB:  Objection, form,
16     misstates report.
17     A.    Most studies do not distinguish
18 between different apps, and the reason is
19 that people use multiple apps. Kids use
20 multiple apps.
21 BY MR. DAVIS:
22     Q.    And in any of your analysis for
23 your opinions, did you go and look at the
24 individual studies and try to pull out the
25 data specific to the defendants' social media

Page 120

1 apps --
2         MS. MCNABB:  Objection, form.
3 BY MR. DAVIS:
4     Q.    -- and do an analysis specific
5 to those apps or -- yeah, specific to those
6 apps?
7         MS. MCNABB:  Objection, form.
8     A.    Well, in my report there is a
9 section that I look at studies that
10 specifically look at one app or a specific
11 app, and -- like, there is a section on
12 Snapchat, I think. Snapchat is another one
13 that I missed to mention. There is one on, I
14 believe, YouTube, one on Instagram.
15         So there were other studies
16 that specifically look at the apps. I also
17 included some of those. I'm not saying that
18 it is comprehensive, but some of those in my
19 report.
20 BY MR. DAVIS:
21     Q.    Yeah. When you were doing your
22 causation analysis, did you go to the studies
23 that specifically identified one or more of
24 the defendants' apps, and pull out that data
25 just specific to those defendants?

Page 121

1         MS. MCNABB:  Objection, asked
2     and answered.
3         Also, this was covered in the
4     prior deposition. We're rehashing old
5     ground.
6     A.    Yeah. As I mentioned before,
7 people are using nowadays multiple apps, have
8 been using for many years. So it's not
9 really -- you can't really do a fair causal
10 analysis if you just focus on one app --
11 BY MR. DAVIS:
12     Q.    Okay.
13     A.    -- if a person is using
14 multiple apps.
15     Q.    Sure.
16         But when you were doing your
17 causation analysis, you weren't specifically
18 pulling out data specific to Meta's platforms
19 or TikTok's platform or Snap's platform or
20 YouTube's platform and only looking at that
21 data?
22         MS. MCNABB:  Objection, form --
23 BY MR. DAVIS:
24     Q.    Did you --
25         MS. MCNABB:  -- and asked and

31 (Pages 118 - 121)

CONFIDENTIAL

1    answered.
2        A.    For my causal analysis, that's
3    correct, I wasn't pulling specifically for
4    each one of those platforms.
5    BY MR. DAVIS:
6        Q.    Or just looking at the data in
7    individual studies that were specific to each
8    of those platforms?
9            MS. MCNABB:  Same objection.
10       A.    Yeah.  As I said, I did not
11   look at individuals for causal analysis, for
12   Bradford Hill analysis.
13   BY MR. DAVIS:
14       Q.    Okay.  In your -- in your
15   expert reports, you didn't compare any of the
16   platforms to each other, did you?
17       A.    I did not, but there might have
18   been studies that have reported, you know --
19   made a distinction, and I might have here and
20   there, like one -- so, like, some of the
21   studies specifically looked at the visual,
22   more visual platforms, like Instagram or
23   TikTok.  So to that extent, I might have done
24   that.
25           I've done it, I think, in my

1    report, where I talk about more visual --
2        Q.    Yeah.  But in terms of an
3    actual comparison of specific features that
4    each of the different apps provides, that's
5    not something that you delved into for
6    purposes of your causation analysis, is it?
7        A.    Not for the purpose of my
8    causation analysis, but I have reported on,
9    like, Snapchat's -- the maps, Snap Maps and
10   the Snap Streaks and so on.
11       Q.    There's not a section in any of
12   your reports where you go and look at the
13   different defendants' platforms and say
14   here's the features that are similar, here's
15   the features that are dissimilar, is there?
16           MS. MCNABB:  Objection,
17       foundation.
18       A.    There are many similarities
19   among them, and the research that talks about
20   the features, those features are common
21   across platforms.
22   BY MR. DAVIS:
23       Q.    Yeah.  And I'm simply asking
24   you, for your expert report, you didn't pick
25   out specific features of the defendants'

1    platforms and discuss how they're similar or
2    dissimilar, did you?
3            MS. MCNABB:  Objection,
4        misstates reports.
5        A.    Can you repeat your question?
6    I'm sorry.  I just --
7    BY MR. DAVIS:
8        Q.    Sure.
9            For your causation analysis and
10   in your expert reports, you didn't pick out
11   specific features of the defendants'
12   platforms and discuss how those features are
13   similar or dissimilar to each other, did you?
14           MS. MCNABB:  Same objection.
15       A.    Well, for example, where I talk
16   about Snap Maps, I'm talking about Snap Maps,
17   it's not something that is common.  None of
18   the other apps have a map that allows people
19   to track their peers.
20           Other ones don't have those
21   Snap Streaks where if you don't keep it
22   alive, it dies, the connection dies.
23           So there are certain features
24   that are unique that -- to certain apps, and
25   I talk about them.  Again, the visual ones

1    being the ones that come to mind.
2    BY MR. DAVIS:
3        Q.    Okay.  But in terms of your
4    causation analysis, you didn't specify these
5    are the features specific to this specific
6    platform, these are the specific features
7    specific to this platform or some other?
8            MS. MCNABB:  Objection,
9        misstates report.
10   BY MR. DAVIS:
11       Q.    Did you?
12       A.    So if I understand, when you
13   say causation, you're talking about my
14   Bradford Hill?
15       Q.    Yeah.  Let me ask a clearer
16   question.
17       A.    Yeah.
18       Q.    There's not a place in your
19   reports where we can go and look at and say
20   here's all the similar features of the
21   defendants' apps, here's the dissimilar
22   features, is there?
23           MS. MCNABB:  Objection,
24       misstates report.
25       A.    There is no place in my report

CONFIDENTIAL

Page 126

1  that specifically has a table or a figure
2  that shows different features of different
3  apps.
4  BY MR. DAVIS:
5      Q.   Okay.  And if I were to ask
6  you, like, today I want you to set out in
7  detail what's similar for any specific app
8  and what's dissimilar, could you give me a
9  complete list?
10     A.   I have to rely upon documents
11 to do that, and what I have learned from
12 watching YouTube.  I don't use -- for
13 example, I don't have a Snapchat account.  I
14 don't have a TikTok account.
15          So I've learned about those
16 through looking at YouTube videos, reading
17 about them.  And so based on that, I can, you
18 know, probably compile a list.
19     Q.   Have you done -- have you
20 compiled a list as of today?
21     A.   For this report, I haven't.
22 But before writing the report in the context
23 of the report, I was making a list of
24 features that are common across these.
25     Q.   Okay.  And that list of

Page 127

1  features isn't reflected in your report, is
2  it?
3          MS. MCNABB:  Objection,
4      misstates report.
5  BY MR. DAVIS:
6      Q.   Or your reports.  Excuse me.
7      A.   As mentioned, I focus on
8  features that are common across, so no, I
9  didn't make a specific table there to list
10 these features.
11     Q.   Okay.  If I were to ask you,
12 okay, what are the -- like for a specific
13 platform, such as TikTok --
14     A.   Uh-huh.
15     Q.   -- and I were to ask you list
16 all the specific features of that platform,
17 could you give me that list?
18          MS. MCNABB:  Objection.
19     A.   I'm not sure it's going to be
20 detailed, but I can give you some of the
21 features that are common in the TikTok.
22 BY MR. DAVIS:
23     Q.   Okay.
24     A.   Or prominent, maybe, in the
25 TikTok.

Page 128

1      Q.   Yeah.
2          MS. MCNABB:  We've been going
3      for an hour.
4          MR. DAVIS:  Sure.  If he can
5      answer this series of questions, we
6      can take a break.
7  BY MR. DAVIS:
8      Q.   So what are -- what are the
9  features that are specific to TikTok?
10     A.   Well, I'm not sure it's
11 specific.  I didn't say specific, but they
12 are features of TikTok, and some of the other
13 apps also share that.
14          One of them is the infinite
15 scroll.
16     Q.   Uh-huh.
17     A.   One of them is My Page.  The
18 other is, of course, notifications.  These
19 are all shared with others.  Maybe called
20 different things in the other apps, but they
21 are shared across these apps.
22          Notifications, ability to post
23 short videos, ability to actually do
24 doctoring of the short videos, changing,
25 like, the features of the face or body shape.

Page 129

1  As I mentioned, notifications that are common
2  across all these apps.
3          What are the other TikTok
4  features that are -- that are -- that My Page
5  also links you to other related posts that
6  might not be specifically in your net -- in
7  your network of people you know.
8          Those are the major features in
9  TikTok that come to mind, yeah.
10     Q.   And make sure I -- that I'm
11 understanding the distinction you're making
12 here, okay?
13     A.   Yeah.
14     Q.   The list that you gave me,
15 infinite scroll, My Page, notifications,
16 posting, shared videos, ability to doctor or
17 filter.
18     A.   Yeah, filter, beautification
19 filters.
20     Q.   Is it your view that those are
21 specific to TikTok, or is it your testimony
22 that those are specific to each of the
23 defendants' platforms?
24     A.   So then specific doesn't make
25 sense when you say -- it's common to --

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

1    Q.    Let me rephrase it.
2    A.    Yeah.
3    Q.    Because I'm trying to
4  understand what you're telling me.
5    A.    Yeah.
6    Q.    And I just want clarity on it.
7         The infinite scroll, My Page,
8  notifications, posting shared videos, ability
9  to doctor or use filters, is it your
10  testimony that each of those is a shared
11  feature of these platforms?
12    A.    Different names, they may use
13  different names, different titles, but they
14  do essentially the same.
15         And another thing that is -- we
16  don't see it, is the algorithm; that if you
17  look, linger on one post, one video, it will
18  send you other videos that are related, posts
19  that are related.  And it's also part of the
20  algorithm.  You don't see it in your
21  features, but it's happening behind the
22  scene.
23  BY MR. DAVIS:
24    Q.    But any other feature that you
25  claim are shared by each of the defendants'

Page 131

1  platforms, other than what you've listed for
2  me?
3    A.    They are, as I mentioned,
4  shared across the platforms, different names.
5    Q.    Sure.
6    A.    Yeah.
7    Q.    Any other thing I need to add
8  to the list of shared features other than
9  what you've identified?
10    A.    Well, one of the features that
11  is -- happens with some of them -- I'm not
12  sure exactly if TikTok does it -- is hiding
13  the clock and not sending notifications about
14  how long you have been on the app.  It might
15  have changed in more recent years.  I don't
16  know.  They may have done something about
17  that.
18         That's -- those are the major
19  ones that come to my mind.
20    Q.    Any others I need to add to the
21  list of shared features of the defendants'
22  platforms?
23    A.    I can't think of any right now.
24    Q.    Okay.  Do you know what -- the
25  percentage of time that users spend with any

Page 132

1  specific feature of any social media
2  platform?
3    A.    When you say specific feature,
4  I mean, people don't spend time with a
5  specific feature.  They spend time with the
6  app.
7    Q.    Yeah.  And I'm asking you:  Do
8  you know of any percentage of time of how
9  users for any of the defendants' platforms
10  spend with any specific feature of that
11  platform?
12    A.    I think that's industry's data
13  I don't have.  I'm not privy to that.  I
14  don't know.
15    Q.    So, for example, you're not
16  aware of data that allows you to say this is
17  the percentage of time for any of the
18  defendants' platforms that's spent on
19  notifications or posting or sharing videos or
20  ability to doctor or use filters or any of
21  the other features that you've identified?
22    A.    I haven't looked at that, so as
23  such, I'm not aware of any data.  There might
24  be data, especially from industry.
25    Q.    And do you know of how much

Page 133

1  time average users on any of the defendants'
2  platforms spend posting photographs?
3    A.    I'm -- I'm aware of some data
4  on length of time people are on the apps, and
5  that comes from -- from the Pew Research
6  Foundation.  But not specifically on
7  activities that they engage in through the --
8    Q.    So in terms of how much time
9  average users of any of the defendants'
10  platforms spend posting photographs, you're
11  not aware of any data?
12    A.    If there is data, I haven't
13  looked at it and I'm not --
14    Q.    Are you aware of any data that
15  discusses the percentage of time that users
16  spend with any of the social media platforms
17  that deals -- that accounts for time spent on
18  posting videos?
19         MS. MCNABB:  Todd, just an
20         objection.  He wasn't finished with
21         his prior answer, but if you have
22         anything to add to the prior answer,
23         you can finish that.
24    A.    As I was saying, that I wasn't
25  looking at individual activities.  I was

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

1  looking at data on time on each one of those
2  apps, and overall time that people spend on
3  it, not individual activities.
4  BY MR. DAVIS:
5       Q.    Okay.  So in terms of what you
6  looked at, you looked at total time spent on
7  the apps in your causation analysis as
8  opposed to specific time devoted using any
9  specific feature?
10      A.    I'm thinking now that there
11  might be studies that have looked at, like,
12  for example, passive use or active use,
13  because that also relates to use of features.
14  There are some data.  And I might -- I'm sure
15  I talked about in my report at places.
16           But not specific, like,
17  feature, like postings.  There might have
18  been some where I talk about the body
19  dysmorphia, so there might be research on
20  that that I have referred to.  But right now,
21  I can't think of it.
22      Q.    Other than some studies that
23  looked at passive use or active use of social
24  media apps, in your causation analysis, did
25  you determine the average time that anyone

Page 135

1  using social media actually used any specific
2  feature of a specific app or the apps as a
3  whole?
4           MS. MCNABB:  Objection, asked
5      and answered.
6      A.    As I mentioned, I was looking
7  at the -- mainly looking at the overall time
8  as one of the exposures; it's not the only.
9  It's also problematic use and engagement with
10  the app, which may be related to the specific
11  features.  For example, engagement might be
12  related to whether the person is posting or
13  doctoring pictures.
14           I talk about the impact of
15  specifically doctoring pictures on the body
16  dysmorphophobia, so that might be the only
17  place where I talk about it, and I can go to
18  that if you want.
19  BY MR. DAVIS:
20      Q.    Do you know the percentage of
21  time users spend with posting photographs on
22  any social media app?
23      A.    Off the top of my head, no, I
24  don't.
25      Q.    Do you know the percentage of

Page 136

1  time that users spend with any feature of the
2  defendants' apps that deal with posting
3  videos?
4      A.    Can you repeat the question?
5      Q.    Do you know the percentage of
6  time that the average user spends with a
7  feature of the defendants' apps that deals
8  with posting videos or photographs?
9           MS. MCNABB:  Objection, vague.
10      A.    Again, off the top of my head,
11  I can't -- yeah.
12  BY MR. DAVIS:
13      Q.    Do you know the percentage of
14  time that users spend with any of the
15  defendants' social media platforms that deals
16  with texting or communicating with friends,
17  family or others?
18      A.    I'm thinking to see if there
19  was any data that I recalled from my report.
20  I don't recall anything.
21      Q.    Do you know the percentage of
22  time that users spend with any of the
23  defendants' social media platforms that deals
24  with watching videos or looking at
25  photographs?

Page 137

1           MS. MCNABB:  Objection, form.
2      A.    Again, that falls into the
3  passive/active use of the media, because
4  posting is an active use of the medium.
5  BY MR. DAVIS:
6      Q.    But do you know what the
7  average amount of time that social media --
8  that people who use that feature of social
9  media -- strike that.
10           Do you know the average amount
11  of time that people who use social media
12  actually spend devoting their time to either
13  posting -- excuse me, watching either videos
14  or photographs?
15           MS. MCNABB:  Objection, form,
16      asked and answered.
17      A.    Off the top of my head, I can't
18  tell you that, yeah.
19  BY MR. DAVIS:
20      Q.    Do you know the percentage of
21  time that the average user on a social media
22  platform uses for looking at the news or
23  searching for information related to work or
24  school?
25           MS. MCNABB:  Objection, form.

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

1    A.    A lot of these apps are not
2 types of apps where schools or work would
3 actually have a -- you know, a page.  Usually
4 they are on LinkedIn or, you know, at best,
5 Facebook.  They usually don't have a --
6 university schools works don't have an app --
7 or a page on TikTok or Instagram.
8 BY MR. DAVIS:
9    Q.    Do you know the average
10 percentage of time -- strike that.
11        Do you know the percentage of
12 time that the average user uses any of the
13 defendants' social media platforms to use
14 appearance-related filters or change their
15 appearance or other appearances on images?
16        MS. MCNABB:  Objection, form,
17    foundation.
18    A.    Those data that you're asking
19 for might be actually on some of the papers
20 that talk about, like, doctoring photos.
21 But, again, off the top of my head, I cannot
22 answer your question.
23 BY MR. DAVIS:
24    Q.    You don't know here today?
25    A.    No.

Page 139

1    Q.    Now, the studies that you rely
2 upon to form your opinion, they do include
3 social media platforms that are not owned or
4 operated or connected in any way with the
5 defendants' platforms, right?
6        MS. MCNABB:  Objection, asked
7    and answered.
8    A.    As I mentioned, there --
9 nowadays there might be hundreds of social
10 media apps, and many of those studies --
11 again, I don't know exact percentage -- just
12 mention looking at use of social media and do
13 not make a distinction.
14        So I assume some of them would
15 be included in those general category of
16 social media.
17        MS. MCNABB:  Todd, we've been
18    going now for like an hour 20.
19        MR. DAVIS:  Okay.  That's fine.
20    That's fine.
21        THE VIDEOGRAPHER:  Off the
22    record.  The time is 11:30 a.m.
23        (Recess taken, 11:30 a.m. to
24    11:43 a.m. CDT)
25        THE VIDEOGRAPHER:  We're back

Page 140

1 on the record.  The time is 11:43 a.m.
2 BY MR. DAVIS:
3    Q.    Are you ready to continue,
4 Dr. Mojtabai?
5    A.    Sure.
6    Q.    All right.  In terms of the
7 studies on social media use, none of them
8 assess what percentage of content was brought
9 to the study participants through searches by
10 the study participants versus content brought
11 to the study participants by the platform's
12 algorithm, fair?
13        MS. MCNABB:  Objection, form.
14    A.    Again, those studies that look
15 at passive and active use reflects that --
16 exactly what you said, what was brought to
17 them and what they were actually posting or
18 doing to the app.
19 BY MR. DAVIS:
20    Q.    Okay.  So you're saying that
21 the passive versus active studies assessed
22 that, right?
23    A.    Yeah.
24    Q.    There are, what, a handful of
25 those?

Page 141

1    A.    I haven't counted them, but we
2 can go through the report and see what they
3 look at.
4    Q.    Other than passive versus
5 active use analyses, in the studies you
6 relied -- or social media use, none of the
7 other studies assessed what percentage of
8 content was brought to the study participants
9 through searches that the study participants
10 performed versus content brought to them by
11 the algorithm, fair?
12        MS. MCNABB:  Objection, form.
13    A.    I'm thinking if there are
14 studies that look specifically at push
15 notification.  I assume that the industry has
16 this type of data, but they haven't made it
17 public as to what percentage of the use is
18 through what they initiate -- the person
19 initiates or what is given them by the app.
20 BY MR. DAVIS:
21    Q.    Sure.  If I could just circle
22 back to my question.
23        Other than the studies that
24 looked at passive versus active use, none of
25 the other studies assessed what percentage of

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

1  content was brought to the study participants
2  through searches that the study participants
3  performed versus content brought to them by
4  the algorithm, true?
5        MS. MCNABB:  Objection, form,
6     and asked and answered.
7     A.    You know, I have to think about
8  it, if there are studies.
9        Those percentages as I
10  mentioned as I responded to you, I think it
11  is hard to compute because the app has to
12  actually compute it and say what percentage
13  of use time is on this activity or the other
14  activity.
15        And I think if there are these
16  data, the industry -- the -- Meta should have
17  it or, for example, for their apps or --
18  BY MR. DAVIS:
19     Q.    I'm not asking you what the
20  companies have.  I'm asking what you did for
21  your analysis and the studies that you looked
22  at for your analysis.
23        None of the studies on social
24  media use assessed what percentage of content
25  was brought to the study participants through

Page 143

1  searches that the study participants
2  performed versus content brought to them by
3  the algorithm, except maybe the passive
4  versus active use analysis in some of the
5  studies, right?
6        MS. MCNABB:  Objection, form,
7     asked and answered, foundation.
8     A.    And also the studies that look
9  at doctoring of pictures.  That's also an
10  active activity that the person would engage
11  in, to change their features.
12  BY MR. DAVIS:
13     Q.    The studies dealing with
14  doc- -- what you say, changing appearance --
15     A.    Yeah.
16     Q.    -- those studies did not
17  specifically look at how much of the
18  percentage of the content was brought to the
19  study participants versus searches as opposed
20  to images or videos brought to the study
21  participants by the algorithm, right?
22        MS. MCNABB:  Objection, form,
23     asked and answered, foundation.
24     A.    I'm not aware of any such data
25  as you mentioned.

Page 144

1  BY MR. DAVIS:
2     Q.    Okay.  Even on the studies that
3  assessed passive versus active use of social
4  media, none of those had data that say here's
5  the number of searches that the study
6  participants performed to bring content to
7  them, right?
8        MS. MCNABB:  Objection, form,
9     foundation.
10     A.    Now that I think about it,
11  there are studies that look at the
12  association between notifications and mental
13  health outcomes.  I think at least one study
14  that I have in the report, I don't exactly
15  remember the name, but they have looked at
16  that, the association.
17        But it is -- as I mentioned
18  again, the type of data you're talking about
19  is the type of data that the companies would
20  have because it's not easy for researchers to
21  access those data.
22        MR. DAVIS:  I move to strike as
23     nonresponsive.
24  BY MR. DAVIS:
25     Q.    Dr. Mojtabai, I was simply

Page 145

1  asking you:  None of the studies, even those
2  on passive versus active use of social media,
3  assess specific searches that the study
4  participants performed to bring content to
5  them versus content brought to them by way of
6  the algorithm, right?
7        MS. MCNABB:  Objection, form,
8     asked and answered, foundation.
9     A.    I think I responded the
10  definition of passive and active use is that
11  passive is the person is sitting and the
12  material is coming to them.  Active is they
13  post something on the app.
14  BY MR. DAVIS:
15     Q.    On none of the passive versus
16  active use studies, there isn't a place in
17  those studies where it says this is the
18  number of searches that the study
19  participants performed to bring content to
20  them, right?
21        MS. MCNABB:  Objection, form,
22     asked and answered, foundation.
23     A.    I can't answer that off the top
24  of my head because there are a number of
25  studies that look at active/passive.  We

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

1 could go through those studies individually
2 and look to see if there are places where
3 they give those percentages.
4 BY MR. DAVIS:
5      Q.    Do you know of any study that
6 gives those percentages as you sit here
7 today?
8           MS. MCNABB:  Same objection.
9      A.    It is in my report, but I can't
10 recall the percentage or the number of
11 notifications or the number -- percentage of
12 time that was one versus the other.
13 BY MR. DAVIS:
14      Q.    Do you know of any study
15 sitting here today?
16           MS. MCNABB:  Same objection.
17      A.    I can look in my report if you
18 want me to do that.
19 BY MR. DAVIS:
20      Q.    I'm just asking:  Do you know
21 of one as you sit here today?
22      A.    Without --
23           MS. MCNABB:  Same objection.
24      A.    Without looking in the report,
25 I can't recall.

Page 147

1 BY MR. DAVIS:
2      Q.    If you go to page 10 of your
3 rebuttal report, paragraph G(3).
4      A.    Rebuttal.  Rebuttal.  G(3).
5 Okay.  I have --
6      Q.    It's on page 10.
7      A.    -- misplaced my rebuttal
8 report.  Did anybody -- oh, here it is.
9 Page 10, yes.  Yes.
10      Q.    Paragraph G(3) of your rebuttal
11 report says:  Additionally, there is evidence
12 that depressive and anxiety feelings are
13 related to the number of apps that the person
14 uses.
15           Right?  You see that?
16      A.    Yeah.
17      Q.    The only study that you cite to
18 support that is the Primack 2017 study,
19 correct?
20      A.    Correct.
21      Q.    Primack 2017 was a
22 longitudinal -- excuse me, strike that.
23           Primack 2017 is a
24 cross-sectional study, correct?
25      A.    Right.  Correct.

Page 148

1      Q.    And the -- the Primack study
2 doesn't know what direction the association
3 was going in, correct?
4      A.    Do you happen to have the
5 Primack study with you?
6           (Whereupon, Mojtabai-MDL-16,
7      Use of multiple social media platforms
8      and symptoms of depression and
9      anxiety: A nationally representative
10      study among US young adults, by
11      Primack et al., was marked for
12      identification.)
13 BY MR. DAVIS:
14      Q.    I'm going to hand you
15 Exhibit 16, which is the Primack 2017 study.
16      A.    Thank you.
17      Q.    If you'll turn to page 4 and
18 look at the right column.
19      A.    Yeah.
20      Q.    Last sentence on the page,
21 these researchers said:  Because our data
22 were cross-sectional, the directionality of
23 this association is unclear.  It may be that
24 individuals from depressive -- excuse me.
25 Let me reread it.

Page 149

1           Because our data were
2 cross-sectional, the directionality of this
3 association is unclear.  It may be that
4 individuals who suffer from depressive
5 symptoms and/or anxiety symptoms tend to
6 subsequently use a broader range of social
7 media outlets.  This may be because these
8 individuals tend to search multiple avenues
9 for a setting that feels most comfortable and
10 in which they feel most accepted.
11           Do you see that?
12      A.    Yes, you read it correctly.
13      Q.    So this study, because it's a
14 cross-sectional study, doesn't know the
15 direction of the association that is
16 reported, right?
17      A.    Yeah, that's correct.  That's
18 general, something that applies to many
19 cross-sectional studies, not all of them, but
20 many.
21      Q.    So the Primack study that you
22 cite in paragraph G(3) can't determine the
23 causal relationship between the number of
24 apps used and depressive or anxiety symptoms,
25 can it?

38 (Pages 146 - 149)

Page 150

1    A.    In general, cross-sectional
2  studies have this limitation.
3    Q.    And that's -- and one of the
4  ones -- excuse me.
5        One of the limitations is that
6  they cannot determine a causal relationship?
7    A.    Many of them can't.  Not all of
8  them, again.
9    Q.    The Primack 27 [sic] study
10  cannot determine a causal relationship
11  between the number of apps used in either
12  depressive or anxiety symptoms, fair?
13    A.    By itself, it cannot.
14    Q.    Right.
15        Primack -- the Primack 27
16  study -- 2017 study cannot establish the
17  direction of the association of causality,
18  correct?
19    A.    Cross-sectional studies, many
20  of them have difficulty identifying direction
21  of causation.
22    Q.    And Primack 2017 is one of
23  those?
24    A.    Yeah, it's a cross-sectional
25  study.

Page 151

1    Q.    Okay.  Let me ask you a few
2  follow-up questions about the GAD and the
3  PHQ-9.
4        The PH -- let me back up.
5        I think you mentioned earlier
6  that both the PHQ-9 and the GAD-7 assess
7  symptoms only going back two weeks; is that
8  right?
9    A.    For PHQ-9, it is two weeks.
10  For GAD, I'm not sure exactly what the time
11  frame is.  Might be one week.
12    Q.    Okay.  So it's either one or
13  two weeks for GAD-7?
14    A.    Yeah.  Correct.
15    Q.    Okay.  So those screening
16  tools, you don't give them out to try to
17  assess symptoms of depression or anxiety that
18  happen three months in the past or six months
19  in the past or a year in the past, do you?
20    A.    If the symptoms have resolved,
21  no.  As a screening measures, if you're using
22  them, if the symptoms have resolved, you
23  don't see the effect.  Maybe there would be
24  some residual symptoms that would be
25  reflected.

Page 152

1    Q.    Do you know whether you've ever
2  done that in the past, where you've handed
3  out the PHQ-9 or the -- strike that.
4        Have you ever used the PHQ-9 or
5  the GAD-7 in a clinical setting where
6  you've -- you're using it to ask the patient
7  what happened six months to a year ago?
8    A.    About their symptoms then?  No,
9  but if I see some evidence that the patient
10  has minor symptoms, some symptoms on those
11  screening measures, I may ask about their
12  past.
13    Q.    Okay.  Not -- yes.
14        And so the PHQ-9 and the GAD-7,
15  the psychometric validation studies that had
16  been done on those screening tools haven't
17  been done to collect information or validate
18  information that's a month old or six months
19  old or a year old, right?
20    A.    So this has to be qualified.
21  Answer is not a yes/no.
22        Many of those disorders, if
23  you're using -- because you mentioned the
24  clinical setting.  If you're using a clinical
25  setting, symptoms linger or persist.  And so

Page 153

1  you expect that some symptoms would be
2  present even if the person experienced an
3  episode six months ago or two months ago.
4    Q.    Okay.  But just not to lose the
5  question, the GAD-7 and the PHQ-9 haven't
6  been psychometrically validated to collect
7  symptoms that happened six months or a year
8  ago, have they?
9        MS. MCNABB:  Objection, asked
10    and answered.
11    A.    They're not psychometrically
12  designed to do that.
13  BY MR. DAVIS:
14    Q.    Are they psychometrically
15  designed to collect symptoms three months
16  out?
17    A.    Three months before?
18    Q.    Yes.
19    A.    I'm thinking to see if there
20  have been modifications of them to assess
21  longer symptoms.  I can't recall any.
22    Q.    You don't know of them being
23  validated in that manner as you sit here
24  today, do you?
25    A.    So as I mentioned, these

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

1  disorders are not episodic disorders.
2  They're not states of mind that change
3  quickly.  If the person experiences
4  depressive episodes, they continue to have
5  depressive symptoms for a while.
6          And if they use as screening
7  measures -- that's why we use them as
8  screening measures, because the current state
9  is reflective of past state.  Say they have a
10  trend-like quality, these conditions,
11  depression, anxiety.
12      Q.    Has the PHQ-9 and GAD-7 been
13  psychometrically validated to assess symptoms
14  that are three months before the screening
15  tool is used?
16          MS. MCNABB:  Objection, asked
17  and answered.
18      A.    I'm not aware if they have been
19  designed for that or tested for that.
20  BY MR. DAVIS:
21      Q.    Okay.
22          (Whereupon, Mojtabai-MDL-17,
23      How TikTok's Algorithm Beats
24      Facebook & Co. For Attention Under The
25      Theory of Escapism, by Rach et al.,

Page 155

1      was marked for identification.)
2          (Whereupon, Mojtabai-MDL-18,
3      Instagram and TikTok Flow States and
4      Their Association with Psychological
5      Well-Being, by Roberts et al., was
6      marked for identification.)
7  BY MR. DAVIS:
8      Q.    Doctor, I'm going to hand you
9  what's been marked as Exhibit 17 and
10  Exhibit 18.
11          Exhibit 17 is the Rach and --
12  R-A-C-H -- and Peter article entitled How
13  TikTok's Algorithm Beats Facebook & Co. for
14  Attention Under the Theory of Escapism: A
15  Network Sample Analysis of Australian [sic],
16  German and Swiss Users.
17          Correct?
18      A.    Yeah.
19      Q.    And then Exhibit 18 is the
20  Roberts and David article entitled Instagram
21  and TikTok Flow States and Their Association
22  with Psychological Well-Being.
23          Right?
24      A.    Correct.
25      Q.    You cite both of these studies

Page 156

1  in your rebuttal report, right?
2      A.    Uh-huh.
3      Q.    Yes?
4      A.    Yes, I think so.
5      Q.    Okay.
6      A.    Let me just see the Rach -- the
7  other one is very familiar, Roberts, but
8  Rach, I want to just make sure that's the --
9  How TikTok -- yeah.  Yes.
10      Q.    You know what, I think I
11  misspoke.  You cite Rach and Peter 2021 and
12  Roberts and David 2023 in your MDL report at
13  page 65, paragraph 267.  Okay.  All right.
14          Now, just so I -- the Rach and
15  Peter 2021 study, that involved a survey of
16  217 Austrian, German and Swiss Facebook or
17  TikTok users.
18      A.    Okay.
19      Q.    Right?
20      A.    It looks like that.  Both of
21  them are there based on the same sample, if
22  I'm --
23      Q.    This was a survey that
24  collected usage and experiences concurrently,
25  right?

Page 157

1      A.    Correct.
2      Q.    It's cross-sectional data,
3  right?
4      A.    I'm reading it to see if it
5  is -- if both of them are cross-sectional.
6  Activity based on surveys, so I assume they
7  are, yes.
8      Q.    Okay.  So just so -- both the
9  Rach and Peter 2021 article and the Roberts
10  and David 2023 article, they're both
11  cross-sectional studies?
12          (Sotto voce document review.)
13      A.    I'm reading to see also if the
14  Rach study is a cross-sectional, just to make
15  sure.
16          It also mentions the survey, so
17  I assume they are.
18  BY MR. DAVIS:
19      Q.    Okay.  So both articles are
20  cross-sectional studies?
21      A.    Okay.  Yeah.
22      Q.    Okay.  So neither of these
23  articles or studies can determine the
24  directionality of the association that's
25  discussed, right?

40 (Pages 154 - 157)

Page 158

1    A.    As such, cross-sectional
2  studies -- not all of them, again, but most
3  of them have difficulty identifying
4  directional --
5    Q.    I'm just asking about these
6  two.
7          These two articles or studies
8  can't establish the direction of the
9  association, correct?
10    A.    Okay.
11    Q.    Yes?
12    A.    Yes.
13    Q.    Okay.
14          (Whereupon, Mojtabai-MDL-19,
15    Association between engagement with
16    appearance and eating-related TikTok
17    content and eating disorder symptoms
18    via recommended content and appearance
19    comparisons, by Dondzilo et al., was
20    marked for identification.)
21  BY MR. DAVIS:
22    Q.    Let me hand you what's been
23  marked as Exhibit 19 to your study [sic].
24    A.    Okay.
25    Q.    This is the Dond --

Page 159

1  D-O-N-D-Z-I-L-O, article, right?
2    A.    Uh-huh.
3    Q.    You have to answer out loud.
4    A.    Yes.
5    Q.    It's entitled Association
6  between engagement with appearance and
7  eating-related TikTok content and eating
8  disorder symptoms via recommended content and
9  appearance comparison.
10          Did I read that correctly?
11    A.    That's correct.
12    Q.    Okay.  And if you go to
13  page 461.
14    A.    460, 61, yes.
15    Q.    And if you look at the
16  right-hand column, second full paragraph.
17    A.    Yes.
18    Q.    Fourth sentence, it says that
19  it was -- this study was cross-sectional and
20  therefore precluded from any exploration of
21  the direction of the associations.
22          Right?
23    A.    I'm looking to see.  Can you
24  point me to the direct -- to the place where
25  you're reading from?

Page 160

1    Q.    Here, I put a little red
2  highlight on the exhibit so you'll see it.
3    A.    Okay.
4          (Sotto voce document review.)
5  BY MR. DAVIS:
6    Q.    So again, this study was a
7  cross-sectional study, right?
8    A.    Correct.
9    Q.    Let me put that back, because I
10  think I dismantled it.
11          The Bonfanti, B-O-N-F-A-N-T-I,
12  study is marked as Exhibit 20.
13          (Whereupon, Mojtabai-MDL-20,
14    The association between social
15    comparison in social media, body image
16    concerns and eating disorder symptoms,
17    by Bonfanti et al., was marked for
18    identification.)
19  BY MR. DAVIS:
20    Q.    Do you see that, Doctor?
21    A.    Yes, it's a meta-analysis.
22    Q.    This is a meta-analysis,
23  correct?
24    A.    Uh-huh, yes.
25    Q.    And if you go to page 8.

Page 161

1    A.    Yes.
2    Q.    Left-hand column, last
3  paragraph, about six, seven lines down says:
4  Firstly, the analysis only included
5  cross-sectional and correlational studies,
6  thus limiting the possibility of inferring
7  causality.
8          Do you see that?
9    A.    Yep.
10    Q.    This study also was comprised
11  of cross-sectional studies, correct?
12    A.    It appears so, yes.
13    Q.    Okay.  So neither of these
14  studies can determine the association --
15  excuse me.  Strike that.
16          Neither of these studies can
17  determine the direction of the association or
18  infer a causal inference, correct?
19    A.    As a general rule,
20  cross-sectional studies have limited ability
21  unless there are specific provisions in them.
22    Q.    Neither of these studies can
23  determine the direction of the association or
24  be used to infer causality, right?
25    A.    That's what the authors say,

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1  yeah.
2      Q.    And you don't disagree with
3  that, do you?
4      A.    I don't disagree with that as a
5  general limitation of cross-sectional
6  studies.
7      Q.    Okay.
8          (Whereupon, Mojtabai-MDL-21,
9          Addictive Screen Use Trajectories and
10         Suicidal Behaviors, Suicidal Ideation,
11         and Mental Health in US Youths, by
12         Xiao et al., was marked for
13         identification.)
14 BY MR. DAVIS:
15     Q.    Doctor, let me hand you what's
16 been marked as Exhibit 21.
17     A.    Okay.  This is the Xiao study,
18 yeah.
19     Q.    This is the Xiao, X-I-A-O, 2025
20 study, right?
21     A.    Correct.
22     Q.    Okay.  Look at page E3,
23 Figure 1.
24     A.    Yes.  Yes.
25     Q.    Figure 1 is describing how the

Page 163

1  study was conducted, correct?
2      A.    Correct.
3      Q.    And if you look at that
4  diagram, that figure, suicidality or suicidal
5  thoughts or behavior was not assessed at
6  baseline, was it?
7      A.    I -- I don't see any mention
8  about anything that was assessed in the
9  baseline, so can I look at the rest of the
10 paper where they talk about --
11     Q.    Sure.  E2 on the right --
12 right-hand column.
13     A.    Yeah.
14         (Sotto voce document review.)
15     A.    It's an addictive use scale,
16 that's different.  Covariates.
17 BY MR. DAVIS:
18     Q.    No.  If you look at the
19 right-hand column, Suicidal Behaviors and
20 Suicidal Ideation (Year 4 Follow-Up) --
21     A.    Yeah.
22     Q.    -- on E2.
23     A.    Yes.  Yes.  I'm looking at the
24 covariates, baseline covariates.
25         Well, they say:  Models were

Page 164

1  also adjusted for baseline clinical
2  characteristics, that means suicidal
3  behavior, suicidal ideations and
4  internalizing and externalizing symptoms,
5  under the covariates.
6      Q.    I'm sorry, where are you
7  pointing to?
8      A.    The covariates paragraph.
9      Q.    Okay.  This particular -- this
10 particular study --
11     A.    Uh-huh.
12     Q.    -- for the suicidal behaviors
13 and ideation doesn't have -- well, the
14 suicidal behaviors and ideation was only
15 reported out in one wave, and that was wave
16 4, correct?
17     A.    Well, apparently they had data
18 in the baseline also.
19     Q.    I'm just asking you:  It was
20 only reported out for one wave, correct?
21     A.    As an outcome, correct.
22     Q.    Correct.
23         And so this analysis, if you,
24 again, look back at Figure 1, didn't assess
25 suicidal thoughts or behavior either at the

Page 165

1  second-year follow-up or the third-year
2  follow-up, correct?
3      A.    That's my understanding.
4      Q.    Right.
5          And the study doesn't present
6  data about how suicidal thoughts or behavior
7  changed from baseline to wave 2 or to wave 3,
8  right?
9      A.    If they didn't measure in wave
10 2 and wave 3, they cannot do that.  They
11 cannot look at that change in suicidal
12 behaviors or ideations.
13     Q.    Right.
14         And this study didn't measure
15 suicidal thoughts or behavior at wave 2 or at
16 wave 3, did it?
17     A.    They don't report it as an
18 outcome.
19     Q.    Okay.  And then they don't
20 report data also about the suicidality or
21 suicidal behavior in terms of comparing
22 wave 1 to wave 4, do they?
23     A.    They adjust for wave 1 suicidal
24 ideations and behaviors as far as
25 internalizing and externalizing symptoms.

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

1  But they don't mention that they look at
2  changes in those ideations.  I can't see it.
3      Q.    Right.
4           So this study doesn't assess
5  the change from -- for suicidal thoughts or
6  behavior from wave 1 to wave 4, does it?
7      A.    Can you repeat your question,
8  I'm sorry.  I was looking to see if they had
9  that or not.
10     Q.    Yeah.
11          This study does not assess a
12 change for suicidal thoughts or behavior from
13 wave 1 to wave 4, does it?
14     A.    I don't think that that was the
15 study's aim.  They were looking at the
16 outcome that was suicidal ideation at wave 4.
17     Q.    Okay.  And so the assessment of
18 suicidal thoughts and behavior at wave 4 was
19 a -- was a concurrent assessment in terms of
20 when they were also assessing the
21 trajectories that they were analyzing, right?
22     A.    No, it's not concurrent.
23 Trajectories by definition are longitudinal.
24 They looked at the trajectories of use of
25 social media and addictive use of social

Page 167

1  media, actually, across time.  So it's not
2  concurrent, it's --
3      Q.    Okay.  Let me see if I can
4  change my question.
5           This study didn't assess how
6  suicidal thoughts or behavior changed over
7  the different waves of the study, fair?
8      A.    They don't report that, if they
9  have looked at that.
10     Q.    So in terms of the assessment
11 of suicidal thoughts or behavior, they report
12 that for one time point, which was wave 4,
13 right?
14     A.    Two time points, baseline and
15 wave 4.
16     Q.    Okay.  And they don't assess
17 the change from base -- they don't report out
18 on the change from baseline to wave 4, do
19 they?
20     A.    That's my understanding, they
21 didn't look at that.
22     Q.    So in that sense, the wave 4
23 assessment is a cross-sectional analysis,
24 right?
25     A.    No.  I wouldn't call it

Page 168

1  cross-sectional analysis.  Cross-sectional
2  analysis is when you look both at the
3  exposure and the outcome at the same time
4  point.  They're looking at the trajectories
5  that start from baseline, continue to year 2,
6  year 3, year 4.  So it's a longitudinal
7  thing.
8           And then they're adjusting for
9  the baseline suicidality.  So it's a
10 longitudinal study.  It's not
11 cross-sectional.
12     Q.    Okay.  Just not to lose the
13 point, but along the way for this study, they
14 don't assess the change for suicidal thoughts
15 or behavior from wave 1 to wave 2, wave 2 to
16 wave 3, wave 3 to wave 4 or from wave 1 to
17 wave 4, right?
18     A.    That's not required for a
19 longitudinal study, to be that, you know --
20     Q.    I'm just asking you if what I
21 said is correct.
22     A.    That is what the design is.
23     Q.    Okay.  Were the people who
24 were -- who were part of the trajectories,
25 when they did these trajectories that they --

Page 169

1  different trajectories that they assessed --
2      A.    Uh-huh.
3      Q.    -- were those people matched up
4  with the wave 4 assessment of suicidal
5  thoughts or behavior?
6      A.    Those were exposures.  They
7  actually created the trajectories.  Then they
8  identified the trajectories with dummy-coded
9  variables.  They put it in the models, caused
10 some models to predict who would have the
11 outcome, adjusting for the baseline
12 assessments.
13     Q.    And they made clear in the
14 study that the observational nature of this
15 study precludes establishing that addictive
16 use trajectories caused the outcomes studied,
17 correct?
18     A.    Well, that's the -- any
19 observational study would have that
20 limitation, as you said.  Observational
21 studies in general are limited by that fact.
22          Cross-sectional studies you
23 were talking about, they cannot establish
24 direction, but a longitudinal -- since it is
25 a longitudinal study, it can establish the

Page 170

1  temporal order of the events.
2        MR. DAVIS:  Yeah, I move to
3  strike as nonresponsive.
4  BY MR. DAVIS:
5        Q.    I'm simply asking you,
6  Dr. Mojtabai, that these study authors said
7  that the observational nature of the study
8  precludes establishing that addictive use
9  trajectories cause the outcome studied.
10        That's what they said, right?
11        MS. MCNABB:  Objection, form.
12        A.    That's their state- -- yeah,
13  that's their statement.
14  BY MR. DAVIS:
15        Q.    Okay.  They also said that one
16  of the things this study did not do was
17  include psychosocial and behavioral factors
18  which were potential confounders, right?
19        A.    Well, again, let's look at the
20  confounders, if you want to answer that.
21  Yeah.
22        Q.    Let's go to page E8.  Are you
23  at E8?
24        A.    Well, I'm looking at E3.
25        Q.    Can you go to page E8, please?

Page 171

1        A.    That's where they talk about
2  the covariates.
3        Q.    Can you please go to E8.
4        MS. MCNABB:  Todd, if he wants
5  to point out something in the study,
6  he can do that.
7        MR. DAVIS:  There's no question
8  pending in front of him, other than:
9  Can you please go to page 8.
10        A.    Correct.  Yes.  Thank you.
11  BY MR. DAVIS:
12        Q.    Okay.  It says the very last --
13  second-to-last sentence on the -- above
14  Conclusions it says:  Finally, these analyses
15  did not include psychosocial --
16        A.    I'm sorry, can you point to me?
17        Q.    Of course.  Here.  It's right
18  here (indicating).
19        A.    Okay.
20        Q.    Finally, these analyses did not
21  include psychosocial and behavioral factors
22  such as bullying, adverse childhood
23  experiences, parental monitoring, sleep
24  disturbances, stress, social isolation and
25  social determinants of health, example,

Page 172

1  neighborhood and school contexts.
2        Did I read that correctly?
3        A.    You read it correctly.
4        Q.    And it says:  Future studies
5  should examine potential interactions and
6  mediating relationships among these factors,
7  addictive use trajectories and mental health
8  outcomes.
9        Did I read that correctly?
10        A.    You read it correctly.
11        Q.    Okay.  All right.  You can put
12  that aside.
13        Can you --
14        MR. DAVIS:  Jennifer and Kelly,
15  what time do you want to take a break?
16        Can we go off the record for a
17  sec?
18        THE VIDEOGRAPHER:  Off the
19  record.  The time is 12:19 p.m.
20        (Recess taken, 12:19 p.m. to
21  12:55 p.m. CDT)
22        THE VIDEOGRAPHER:  We're back
23  on the record.  The time is 12:55 p.m.
24  BY MR. DAVIS:
25        Q.    Dr. Mojtabai, we're back from

Page 173

1  lunch.  Are you ready to continue?
2        A.    Sure.
3        (Whereupon, Mojtabai-MDL-22,
4  Excerpt From Reference Manual on
5  Scientific Evidence, Third Edition,
6  was marked for identification.)
7  BY MR. DAVIS:
8        Q.    Let me hand you what's been
9  marked as Exhibit 22.
10        So Exhibit 22 is a copy of the
11  Reference Manual on Scientific Evidence that
12  we discussed last time.  It's excerpts from
13  that, right, okay?
14        A.    Correct.
15        Q.    So if you go to the very last
16  page, page -- and it says -- the very first
17  full paragraph says:  Meta-analysis is most
18  appropriate when used in pooling randomized
19  experimental trials, because the studies
20  included in the meta-analysis share the most
21  significant methodological characteristics,
22  in particular, use of randomized assignment
23  of subjects to different exposure groups.
24        Did I read that correctly?
25        A.    Correct.

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

1    MS. MCNABB:  Todd, I'll just
2    put an objection on the record that
3    this is a partial document and not the
4    entire thing, and even -- not even --
5    just pages, not even a complete
6    section or chapter.
7         But go ahead.
8 BY MR. DAVIS:
9    Q.    Did I read that correctly,
10 Dr. Mojtabai?
11    A.    You did.
12    Q.    Do you agree with that
13 statement?
14    A.    No, I don't.  And other people
15 would disagree with this also.  It's most
16 appropriate is -- I think meta-analysis
17 nowadays is used for observational studies.
18 As you see, I have a lot of meta-analyses in
19 my report that are based on observational
20 studies, and also experimental studies as
21 well as longitudinal studies.
22         So different study designs you
23 could do meta-analysis with.
24    Q.    It says:  However -- the next
25 sentence says:  However, often one is

Page 175

1 confronted with nonrandomized observational
2 studies of the effects of possible toxic
3 substances or agents.  A method for
4 summarizing such studies is greatly needed,
5 but when meta-analysis is applied to
6 observational studies, either case-control or
7 cohort, it becomes more controversial.
8         Did I read that correctly?
9    A.    You read it correctly.
10    Q.    Do you agree with that?
11    A.    I don't -- no, I don't.  I
12 don't.  I guess I'm part of that controversy,
13 but the 174 study that you notice is a
14 meta-analysis of observational studies in
15 epidemiology, and so there are a number of
16 papers that are linked -- are cited to,
17 papers are cited, and they have different
18 views.
19         And I tend to be on the side
20 that thinks that meta-analysis is a good way
21 of summarizing, pooling different types of
22 studies.  It's not limited to randomized
23 controlled trials.
24    Q.    There are some epidemiologists
25 who believe that meta-analyses of

Page 176

1 observational studies is controversial and
2 also provides -- let me strike that.
3         There are some epidemiologists
4 who believe that the use of meta-analysis for
5 observational studies is controversial and
6 should not be done, right?
7         MS. MCNABB:  Objection, form,
8    foundation.
9    A.    There might be a few.  I mean,
10 they're referring to those.  But I would say
11 that the majority of -- the majority -- I
12 don't know what percent, don't ask me the
13 percent.  The majority would think that
14 meta-analysis is an appropriate way of
15 summarizing, reviewing and pooling data from
16 cross-sectional, observational studies as
17 well.
18 BY MR. DAVIS:
19    Q.    When you say don't ask me the
20 percent, do you know the percentage of
21 epidemiologists --
22    A.    No.
23    Q.    -- who believe that it's
24 appropriate to pool observational studies to
25 get a reliable effect size?

Page 177

1         MS. MCNABB:  Objection, form,
2    foundation.
3    A.    Based on my just personal
4 observation and contact with the field, I
5 would say the majority would agree that
6 meta-analysis is -- is a better way of
7 summarizing data than just doing a narrative
8 review of those studies.
9 BY MR. DAVIS:
10    Q.    You yourself haven't done a
11 survey of the -- of the epidemiologists,
12 including psychiatric epidemiologists, to
13 determine whether or not the majority of
14 that -- of those scientists would agree with
15 you, fair?
16    A.    It's based on my experience and
17 observation that the majority would consider
18 meta-analysis appropriate for cross-sectional
19 and observational studies in general.
20    Q.    For whatever anecdotal
21 references you're making there, do you know
22 the percentage of people who would agree with
23 you on that?
24    A.    As I said --
25         MS. MCNABB:  Objection,

45 (Pages 174 - 177)

CONFIDENTIAL

1    argumentative.
2        Sorry.
3    A.    I cannot come up with a
4  percentage.  I can say it's a majority.
5  BY MR. DAVIS:
6    Q.    Okay.  One of the reasons that
7  they say is that -- that there's also --
8  often, methodological differences among
9  studies are much more pronounced than they
10  are in randomized trials.
11        Do you agree with that?
12    A.    Again, no, I don't.
13    Q.    Okay.
14    A.    Because there are so many
15  randomized controlled trials and there are in
16  my report that are so different from each
17  other, and so I don't think that they -- that
18  argument is accurate.
19        (Whereupon, Mojtabai-MDL-23,
20    Excerpt From Cochrane Chapter 10:
21    Analyzing data and undertaking
22    meta-analyses, was marked for
23    identification.)
24        (Whereupon, Mojtabai-MDL-24,
25    Excerpt From Cochrane Chapter 9.5.2:

1    Identifying and measuring
2    heterogeneity, was marked for
3    identification.)
4  BY MR. DAVIS:
5    Q.    Okay.  I'm going to hand you
6  what's been marked as Exhibit 23 and
7  Exhibit 24.
8        Exhibit 23 is a chapter from --
9  that's the Cochrane handbook.  Are you
10  familiar with the Cochrane handbook?
11    A.    Yeah, I am familiar with the
12  initiative.  There are a number of
13  meta-analyses under Cochrane.
14    Q.    Yes.
15        And if you turn -- one of
16  the -- and if you turn to Exhibit 24 --
17    A.    Exhibit 24.  I'm sorry,
18  which -- can you point me to it?
19    Q.    Yeah.  I'm sorry.  Let's go
20  back to Exhibit 23, and if you turn to
21  page -- the 10.10.1, if you hand that to me,
22  I'll show you where it is.
23    A.    Ten point?
24    Q.    Yeah, it's on page 16.
25    A.    Okay.

1        MS. MCNABB:  Todd, I just have
2  an objection to Exhibit 23 to the
3  extent that it's only a chapter of
4  this, I assume book, that doesn't
5  include the entirety of what's in
6  there.
7        And also, Exhibit 24 appears to
8  be a small excerpt of something
9  similar.
10  BY MR. DAVIS:
11    Q.    Dr. Mojtabai, are you with me
12  on page 16?
13    A.    Yes, I am.
14    Q.    And the Cochrane handbook --
15  that's something that you're familiar with,
16  and have you consulted it in the past?
17    A.    Not the handbook, no, but I
18  have read studies that were conducted by the
19  Cochrane group.
20    Q.    Okay.  And any -- any reason to
21  doubt that this is a useful, reliable source
22  of information?
23    A.    It's a useful source of
24  information, like any other, yeah.  It is
25  used by people who do those analyses, that

1  make the analysis on the Cochrane.
2    Q.    And if you look under
3  Section 10.10.1 there is a section called
4  What is Heterogeneity?
5        Do you see that?
6    A.    Yes.
7    Q.    It says:  Inevitably, studies
8  brought together in a systemic -- a
9  systematic review will differ.  Any kind of
10  variability among study in a systematic
11  review may be termed heterogeneity.
12        Did I read that correctly?
13    A.    Correctly, yes.
14    Q.    You don't disagree with that,
15  do you?
16    A.    No.
17    Q.    Okay.  And then it says:  It
18  can be helpful to distinguish between
19  different types of heterogeneity.
20  Variability in the participants,
21  interventions and outcomes studied may be
22  described as clinical diversity, sometimes
23  called clinical heterogeneity.
24        Do you see that?
25    A.    Uh-huh.

46 (Pages 178 - 181)

CONFIDENTIAL

1    Q.    Yes?
2    A.    Yes.
3    Q.    You don't disagree with that,
4  do you?
5    A.    No, that's a term that's -- I
6  don't have any disagreement with that.
7    Q.    Okay.  And if you turn to
8  page 18 of this chapter, this discusses -- if
9  you go down to the third paragraph --
10    A.    Uh-huh.
11    Q.    -- this discusses what's called
12  the I-squared statistic, right?
13    A.    Correct.
14    Q.    An I-squared statistic is a
15  measure that can be used to guide the
16  interpretation of the -- in the context of
17  meta-analyses, correct?
18    A.    It is -- with a caveat that as
19  they say, thresholds can be misleading.
20    Q.    Yes.  But it is a calculation
21  that you can do upon performing a
22  meta-analysis to assess heterogeneity,
23  correct?
24    A.    Different types of
25  heterogeneity.  Could be clinical, as you

1  said, you read it, methodological.  They can,
2  you know, contribute to this heterogeneity.
3    Q.    Yeah, and it says here there's
4  a rough guide to interpretation in the
5  context of meta-analyses of randomized
6  controlled trials, right?
7        Do you see that?
8    A.    Yes.
9    Q.    And it says that if you get an
10  I-squared result between 50 to 90%, that may
11  represent substantial heterogeneity, right?
12    A.    That is what it states here.
13    Q.    Right.
14        And if you get a result of 75
15  to 100%, that's considered considerable
16  heterogeneity, right?
17    A.    According to these, with the
18  caveat that it could be.  They say the
19  thresholds could be misleading.
20    Q.    Yeah.
21    A.    So it has to be interpreted in
22  the context.
23    Q.    And you know from looking
24  at the -- that the meta-analyses that you
25  rely upon --

1    A.    Uh-huh.
2    Q.    -- that the researchers
3  typically calculated this I-squared test to
4  determine the level of heterogeneity in the
5  meta-analyses, right?
6    A.    They typically do that,
7  correct.
8    Q.    And, in fact, they did it for a
9  host of the meta-analyses that you rely upon,
10  right?
11    A.    They did, yes.
12    Q.    And can you identify, sitting
13  here today, a single meta-analysis that you
14  rely upon that did not have substantial
15  heterogeneity or considerable heterogeneity?
16    A.    So I have to answer this -- I
17  can't say yes or no or just a word.  If I can
18  explain?  Do you want me to --
19    Q.    I'm just asking can you
20  identify for me here today a single
21  meta-analysis that you rely upon that did not
22  have either substantial heterogeneity or
23  considerable heterogeneity?
24        MS. MCNABB:  Objection, asked
25    and answered.

1    A.    The answer is not yes or no,
2  but -- and I can explain if you want.
3  BY MR. DAVIS:
4    Q.    I'm just asking you, can you
5  identify one?
6        MS. MCNABB:  Same objection,
7    asked and answered.
8    A.    I cannot answer yes or no, yes,
9  I can or I cannot.  I can explain if you
10  want.
11  BY MR. DAVIS:
12    Q.    No, I just want to know, can
13  you -- for any of the -- any of the
14  studies -- meta-analyses that you rely upon,
15  can you identify a single one that did not
16  have either a substantial heterogeneity or
17  considerable heterogeneity?
18        MS. MCNABB:  Objection, asked
19    and answered.
20    A.    I think I did answer that
21  question, and I can explain if you are
22  interested to --
23  BY MR. DAVIS:
24    Q.    Either you can or you can't
25  identify.  Just let me know what it is.

CONFIDENTIAL

1        MS. MCNABB:  Objection, asked
2    and answered.
3        He's already told you he can't
4    answer yes or no.
5    A.    I cannot answer that question
6 like that.
7 BY MR. DAVIS:
8    Q.    Why can't you answer that,
9 Doctor?
10    A.    Because heterogeneity, when you
11 identify it, you go into the study, into the
12 sample, and you -- as you mentioned, there's
13 clinical, there's methodological, there's
14 longitudinal, cross-sectional.  Is it the
15 girls, boys?  Is it age?  You can then
16 subcategorize these studies and look at the
17 heterogeneity that way.
18        So coming up with one measure
19 of originating for a meta-analysis is
20 misleading.
21    Q.    Take all that into
22 consideration.
23        Name for me one meta-analysis
24 that you rely upon to form your opinions in
25 this litigation where the heterogeneity

1 calculated by the researchers who did the
2 meta-analysis was not either substantial or
3 considerable.
4        MS. MCNABB:  Objection, asked
5    and answered.
6    A.    Yes, I think I did -- I can
7 look at individual studies if you want, and I
8 don't recall all the I-squared measures, but
9 I can do that.  I can look at the individual
10 studies.
11        There might be one and --
12 BY MR. DAVIS:
13    Q.    Do you know of one?
14    A.    Right now, I haven't -- without
15 having the studies in front of me, I cannot
16 answer that question.
17    Q.    Okay.  Now, is it fair to say
18 that virtually all of the meta-analyses that
19 you rely upon, with the exception of -- let
20 me strike that.
21        With the exception of the Shin
22 meta-analysis that we talked about in your
23 JCCP deposition, all of the other
24 meta-analyses of observational studies that
25 you rely upon include cross-sectional data,

1 right?
2        MS. MCNABB:  Objection,
3    foundation.
4    A.    As well as some of the
5 longitudinal studies, cross-sectional and
6 longitudinal studies, some of them do both --
7 have both.
8 BY MR. DAVIS:
9    Q.    Yeah.  I'm just -- with the
10 exception of the Shin meta-analysis, all of
11 the other meta-analyses of observational
12 studies that you rely upon use
13 cross-sectional data in their analysis of an
14 effect size, right?
15        MS. MCNABB:  Objection,
16    foundation.
17    A.    I have to look to see if they
18 have included longitudinal in those studies,
19 because they're like -- I don't know, more
20 than 20 meta-analyses that I have in this
21 report, and so I don't recall if they all
22 were cross-sectional or had included
23 cross-sectional and experimental or
24 longitudinal.
25        So I can't answer that

1 question.
2 BY MR. DAVIS:
3    Q.    Well, you -- can you identify
4 any study other than the Shin meta-analysis
5 that only used longitudinal studies in its
6 meta-analysis?
7    A.    I can look at the meta-analysis
8 for -- of longitudinal -- to just be --
9 answer your question carefully.
10        I can't find my report now.  Is
11 it here?  Oh, yeah.
12        (Document review.)
13    A.    Yeah.  So here I talk, for
14 example, about the Huang study, and I say
15 this is a limitation that it makes
16 longitudinal and cross-sectional studies.
17 BY MR. DAVIS:
18    Q.    Yeah.  I think you missed my
19 question --
20    A.    Yeah.
21    Q.    -- which was:  Can you identify
22 any meta-analysis, other than the Shin
23 meta-analysis, that only used longitudinal
24 studies in its analysis?
25    A.    Well, there is that

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

1  longitudinal analysis. I'm thinking if there
2  was one...
3        (Sotto voce document review.)
4     A.  I can't think of one that was
5  purely longitudinal studies.
6  BY MR. DAVIS:
7     Q.  I'm sorry, I couldn't hear you,
8  Doctor.
9     A.  I can't think of one that was
10  purely longitudinal studies, if that's your
11  question.
12    Q.  Okay.
13        (Whereupon, Mojtabai-MDL-6A,
14        Supplemental E-mail(s) re: Missing COI
15        statement, MOJTABAI0276 -
16        MOJTABAI0288, was marked for
17        identification.)
18  BY MR. DAVIS:
19    Q.  I put in front of you
20  Exhibit 6A.
21    A.  Okay. Yeah.
22    Q.  That's additional
23  correspondence that you've had with the
24  scientific journal about your potential
25  conflict of interest, right?

Page 191

1     A.  That is correct.
2     Q.  Okay. So let me ask you a
3  couple of questions about that.
4     A.  Uh-huh.
5     Q.  The correspond- -- the e-mail
6  asking for a correction about your potential
7  conflict of interest, you sent that e-mail
8  the day before your JCCP deposition in June
9  of 2025, correct?
10    A.  I don't know the exact sequence
11  of events, but I trust you -- I don't recall
12  what day we met. It's possible.
13    Q.  Well, if you look at Exhibit
14  6A.
15    A.  6A, yes.
16    Q.  It says -- there's an e-mail
17  from you dated June 3, 2025, correct?
18    A.  June...
19    Q.  You were just on it. It's
20  where your thumb is. There you go.
21    A.  Oh, yeah.
22    Q.  Right?
23    A.  Okay. Yes.
24    Q.  Right?
25        And it says: Dear Dr. Morgan,

Page 192

1  I hope this message finds you well. It was
2  brought to my attention that the section on
3  conflict of interest in my 2024 paper in SPPE
4  titled "Problematic social media use and
5  psychological symptoms in adolescents" does
6  not reflect my potential conflict of interest
7  at the time of publication.
8        Did I read that correctly?
9     A.  You did.
10    Q.  So who was it that brought this
11  to your attention?
12    A.  It might have been my
13  conversation with counsel it came up or I
14  don't recall.
15    Q.  Your conversation with who?
16    A.  With the counsel.
17    Q.  The plaintiffs' lawyers?
18    A.  Yes.
19    Q.  Okay. And when did this first
20  come up?
21        MS. MCNABB: Objection to the
22    extent this is calling for privileged
23    information.
24    A.  I cannot disclose that.
25        MS. MCNABB: You can say when.

Page 193

1     You don't have to -- just don't get
2     into the details of our conversation.
3     THE WITNESS: Oh.
4  BY MR. DAVIS:
5     Q.  When did this first come up?
6     A.  This is the -- I don't know
7  exactly the timing. But it is before
8  June 3rd that I sent this.
9     Q.  Okay. And what was discussed
10  about it?
11    A.  What?
12    Q.  What was discussed about it?
13        MS. MCNABB: Again, privilege.
14        Are you asking discussed with
15    counsel?
16        MR. DAVIS: Yes.
17        MS. MCNABB: I'm going to
18    object and tell him not to answer.
19    That's privileged expert-attorney
20    communication.
21        MR. DAVIS: What's the basis of
22    the privilege?
23        MS. MCNABB: That we were
24    preparing for his deposition.
25        MR. DAVIS: Okay. That's it?

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

1    MS. MCNABB: That's my
2 objection.
3 BY MR. DAVIS:
4    Q.   Dr. Mojtabai, are you going to
5 answer my question or are you going to follow
6 counsel's advice and not answer my question?
7    A.   Well, I don't want to disclose
8 anything that is privileged, so I have to
9 follow my counsel -- the counsel's advice.
10    Q.   Okay. Other than what's marked
11 as Exhibit 6 and 6A, are there any other
12 documents that reflect communications that
13 you've had with this journal about correcting
14 your conflict of interest statement?
15    A.   I don't -- it's possible that I
16 have sent -- I don't recall, but it is --
17 Dr. Morgan is the editor, so I might have
18 actually sent something to the office, to the
19 journal office. And not having heard
20 anything from them, might have sent something
21 to Dr. Morgan.
22    Q.   Something besides an e-mail?
23    A.   Yeah, an e-mail to them.
24    Q.   Okay. So there might be an
25 additional e-mail that you have?

Page 195

1    A.   Yeah, to the -- or to --
2 directly in their -- they have a website
3 and -- where you can actually write to them.
4    Q.   Do you have copy -- do you have
5 on your computer those e-mails?
6    A.   I can check to see if there was
7 an e-mail or was something that I sent
8 directly to the website.
9    MR. DAVIS: Okay. We would ask
10 that those be preserved and produced.
11 BY MR. DAVIS:
12    Q.   Did you have any communications
13 at all with anybody at the journal over the
14 phone or on a remote video call?
15    A.   No.
16    Q.   In this letter to Dr. Morgan,
17 you proposed a change?
18    A.   Yes.
19    Q.   Or a correction, I should say,
20 correct?
21    A.   Yes.
22    Q.   And you said you drafted a
23 potential erratum text.
24    Do you see that?
25    A.   Of this message -- okay. Yes.

Page 196

1    Q.   It says, quote: My 2024 paper
2 did not reflect my potential conflict of
3 interest. At the time of that publication, I
4 had received royalties and consulting fees
5 from UpToDate, Medscape and MindMed, and
6 provided consultation regarding social media
7 litigation on behalf of the plaintiffs.
8    Did I read that correctly?
9    A.   Correct.
10    Q.   And you describe that as an
11 omission, correct?
12    A.   Correct.
13    Q.   Now, what's the conflict of
14 interest that would require you to disclose
15 the royalty and consulting fees from
16 UpToDate, Medscape and MindMed?
17    A.   Well, I write a chapter for
18 UpToDate. I receive a royalty --
19    You're asking what is the
20 content of those conflicts or what --
21    Q.   Yes. What is the basis for
22 saying that there's a potential conflict of
23 interest that wasn't disclosed for your
24 consulting and royalty fees from UpToDate,
25 Medscape and MindMed?

Page 197

1    A.   First of all, it's my standard
2 practice to send this -- whatever sources I'm
3 getting, either consulting fees or royalties
4 in -- in the papers that I publish. So
5 especially some journals have a three-year
6 window, some of them have longer.
7    Some of them don't consider
8 some of these items as not -- as conflicts,
9 and so there have been occasions when they
10 have scratched out, for example, the
11 consultation on behalf of the plaintiffs
12 because they don't consider it a conflict.
13    So the basis is having received
14 some sort of money for -- or support,
15 financial support or some -- some other
16 in-kind support from -- mainly pharmaceutical
17 companies they're concerned about or device
18 companies, and so you're supposed to disclose
19 those.
20    Q.   Okay. And for the -- you
21 specifically mention as to UpToDate, Medscape
22 and MyMed that you're receiving money from
23 them, correct?
24    A.   I have received between the
25 three, past three years.

50 (Pages 194 - 197)

CONFIDENTIAL

1    Q.    Yes.
2         And you specifically mentioned
3    for those three entities that you're
4    receiving money, correct?
5    A.    Well, royalties and consulting
6    fees, different -- under different mechanisms
7    you may say.
8    Q.    Okay.  So for those three
9    entities, you specifically mentioned you're
10   getting royalties, fees and consulting money,
11   right?
12   A.    Yeah.
13   Q.    And for -- when you say that
14   you've -- you've provided consulting --
15   consultation regarding social media
16   litigation on behalf of the plaintiffs, you
17   don't reference receiving any money there, do
18   you?
19        MS. MCNABB:  Objection, form.
20   A.    I say I've provided
21   consultation regarding.  It is -- it is
22   implied.  I mean, when you consult on behalf
23   of plaintiffs, you don't do it pro bono
24   usually.
25        ///

1    BY MR. DAVIS:
2    Q.    Did any of the plaintiffs'
3    lawyers help you draft any part of that
4    statement?
5    A.    No.  I might have actually
6    asked how usually it's worded, this sort of
7    conflict of interest.
8    Q.    And did you get feedback from
9    the plaintiffs' lawyers about that?
10   A.    I don't recall.  It might have
11   been asked, like, in person.  This is years
12   ago when I started, so like 1923 [sic] I
13   think.  If go back to my publications, there
14   are places where they allowed me to add that.
15   Q.    I'm simply asking you:  When
16   you crafted this potential erratum text, did
17   you get input from plaintiffs' counsel or
18   feedback from them about the language?
19   A.    I did not for this erratum, no.
20   Q.    Okay.  So you alone, with no
21   help from anybody, came up with this
22   language?
23   A.    This language in this erratum,
24   yes, is mine.
25   Q.    Did you give this language to

1    the plaintiffs' lawyers before you sent it
2    in?
3    A.    I don't recall having given
4    them that.  As I mentioned, I asked what is
5    the typical -- years ago I might have asked
6    what's the typical conflict of interest
7    statement for -- for consultation on behalf
8    of plaintiffs or social media litigation.
9    Q.    Okay.  You sent a copy of your
10   correspondence to the plaintiffs' lawyers,
11   right?
12        MS. MCNABB:  Objection,
13        foundation.
14   A.    For this -- yeah, they wanted
15   me to -- for this deposition, they wanted me
16   to send the material.
17   BY MR. DAVIS:
18   Q.    No, no.
19        When you were communicating
20   with the journal --
21   A.    No.
22   Q.    -- you were sending --
23   A.    No.
24   Q.    -- to the plaintiffs' lawyers
25   your -- you were keeping them up to date on

1    the correspondence with the journal?
2        MS. MCNABB:  Objection,
3        foundation, misstates prior testimony.
4    A.    I think I sent them whatever is
5    here, and the last one even I printed out a
6    minute ago.
7    BY MR. DAVIS:
8    Q.    So let me try to understand
9    your testimony.
10        At no time did you describe --
11   did you send the correspondence from the
12   journal to the plaintiffs' lawyers?
13        MS. MCNABB:  Objection,
14        misstates testimony.
15   A.    So for preparing for the
16   deposition, I sent whatever I had at the time
17   to the counsel.
18   BY MR. DAVIS:
19   Q.    Okay.
20   A.    But I didn't get any feedback
21   on, you know, the content of the erratum.
22   Q.    Did you keep the plaintiffs'
23   lawyers apprised of your communications with
24   the journal?
25   A.    For -- for the deposition, as I

51 (Pages 198 - 201)

CONFIDENTIAL

Page 202

1  mentioned, I told them this is what I've been
2  doing with the journal.
3           Because it came up in the last
4  deposition also, and so I thought it would be
5  important for them to be informed.
6      Q.    So after you sent this
7  e-mail --
8      A.    Uh-huh.
9      Q.    -- on June 3rd --
10     A.    Yeah.
11     Q.    -- to the journal --
12     A.    Yeah.
13     Q.    -- your testimony is at no time
14  in June and no time in July did you send any
15  communications with the journal to the
16  plaintiffs' counsel?
17     A.    Might have.  I mean, I -- it's
18  possible.  I didn't keep track of, you know,
19  whom I'm sending this to or not.
20          It's possible because it came
21  up during the testimony last deposition I was
22  giving that this should have been done.  So I
23  might have sent them something.  I don't
24  recall.
25          But the -- this one that I sent

Page 203

1  them -- the last one that I sent them was
2  before the deposition, and then today, the
3  last communication from them.
4      MR. DAVIS:  Okay.  All right.
5  I'm going to reserve on remainder of
6  time.
7          Yeah, I'm going to reserve on
8  remainder of time, and I'm going to
9  turn --
10         Let me go off the record so we
11  can switch spots for defense counsel.
12         THE VIDEOGRAPHER:  Off the
13  record.  The time is 1:24 p.m.
14         (Recess taken, 1:24 p.m. to
15  1:26 p.m. CDT)
16         THE VIDEOGRAPHER:  We're back
17  on the record.  The time is 1:26 p.m.
18         ------------
19            EXAMINATION
20         ------------
21  BY MS. COATES:
22     Q.    Good afternoon, Dr. Mojtabai.
23  It's nice to see you again.  In case you
24  don't remember, I'm Melissa Coates and I
25  represent YouTube and Google, and so I'm

Page 204

1  going to just ask you a few questions
2  specific to YouTube.
3          And you mentioned that you used
4  YouTube in the past.  Do you know how users
5  find videos to watch on YouTube?
6      A.    They search.
7      Q.    And are you familiar with the
8  Watch Next feature of YouTube?
9      A.    Yeah, it's on the right-hand
10  side there is a list of -- or actually, it's
11  snippets or pictures of the other stuff to
12  watch, yes.
13     Q.    And must users watch
14  recommended videos?
15     A.    There is no "must," but they
16  can choose to because it's in front of their
17  face and it's related to what they watched
18  before.
19     Q.    And do recommended videos play
20  without input from the user?
21     A.    I haven't seen them play by
22  themselves.  You have to usually click on
23  them.
24          I have to add something to
25  that.  I have noticed when one video

Page 205

1  finishes, the other video starts -- the other
2  related videos start.  So it's not only
3  pushing on the button on the video that you
4  want to watch next.  The next video comes
5  after sometimes advertisements, automatically
6  starts.
7      Q.    Okay.  So are you familiar with
8  the autoplay feature of YouTube then?
9      A.    Yeah, that's what probably has
10  been going on.
11     Q.    Okay.  And I think I understand
12  from your last answer that Watch Next is
13  different from autoplay; is that correct?
14     A.    That's correct.
15     Q.    And do you know if users can
16  turn off autoplay?
17     A.    I wasn't aware of that.
18     Q.    Okay.  Do you know if autoplay
19  is on by default?
20     A.    For me it has been for -- by
21  default.  I just use YouTube, and it's
22  usually coming after whatever I watched.
23     Q.    Okay.  And other than for you,
24  do you know if it is on by default for all
25  users?

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

1    A.    That's my understanding, that
2  you have to opt out of it.  But I haven't
3  looked how to do it on my page.
4    Q.    And what is that understanding
5  based on?
6    A.    Well, partly my own experience,
7  also reading about it.
8    Q.    Okay.  And if autoplay is
9  turned off, then your opinions about the
10 effects of flow states would not apply to
11 YouTube, correct?
12    MS. MCNABB:  Objection, form,
13    foundation.
14    A.    Well, there's other content
15 that is displayed.  As you say, Watch Next
16 is -- the app is somehow -- the algorithm is
17 conscious of what I watched before, and it's
18 choosing those videos related to what I
19 watched before.
20 BY MS. COATES:
21    Q.    But without the auto feature --
22 autoplay feature turned on, you would
23 actually have to select to watch one of those
24 Watch Next videos, correct?
25    A.    The recommended --

Page 207

1    MS. MCNABB:  Objection,
2    foundation.
3    A.    The recommended Watch Next
4  that's in front of you, yeah.
5  BY MS. COATES:
6    Q.    Are you familiar with YouTube
7  Shorts?
8    A.    YouTube Shorts?  I'm not
9  exactly -- they are videos, short videos that
10 are played?  I'm not sure what I know about
11 those.
12    Q.    And you didn't analyze this
13 feature on YouTube in reaching your opinions
14 in this case, then, correct?
15    MS. MCNABB:  Objection,
16    foundation, form.
17    A.    I based it on YouTube videos.
18 I don't know if that's what you called
19 YouTube Shorts or it's different.
20 BY MS. COATES:
21    Q.    Okay.  And so if you don't know
22 that distinction, that didn't go into your
23 analysis in this case, correct?
24    MS. MCNABB:  Objection,
25    misstates report.

Page 208

1    A.    So some of the videos might
2  have been YouTube Shorts, as you call them.
3  So I can't say if it went into the analysis
4  or not.
5  BY MS. COATES:
6    Q.    Do you know whether YouTube has
7  filters?
8    A.    Beautification filters, you
9  mean or -- what do you mean by filters?
10    Q.    Do you know if YouTube has --
11 sure, beautification filters?
12    A.    I know that people can doctor
13 what they put on YouTube, but -- and there
14 are filters that they can do for videos that
15 they put on, if that's what you mean.
16    Q.    What do those filters do?
17    A.    Well, they change the context,
18 the background.  They may actually do changes
19 of the appearance.
20    Q.    Of the appearance of the
21 individuals in the videos?
22    A.    Yeah, that's my understanding.
23 I haven't used them, but that's my
24 understanding.
25    Q.    And what is that understanding

Page 209

1  based on?
2    A.    Reading.
3    Q.    Can you cite to something
4  specific that gave you that understanding?
5    A.    I can't off the top of my head.
6  No, off the top of my head.  But in reading
7  and watching also YouTube -- about YouTube,
8  YouTube videos about YouTube, I've come
9  across that.
10    Q.    And does YouTube have other
11 appearance-altering -- strike that.
12    Do you know whether YouTube has
13 appearance-altering filters such as cosmetic
14 surgery-like filters?
15    MS. MCNABB:  Objection, asked
16    and answered.
17    A.    I think that beautification is
18 sort of like cosmetic surgery.  That was my
19 understanding when I --
20 BY MS. COATES:
21    Q.    Okay.  And if your
22 understanding is wrong and YouTube does not
23 have appearance-altering filters, would that
24 change your opinion as to YouTube?
25    A.    There are other features, as I

53 (Pages 206 - 209)

Page 210

1  mentioned, infinite scroll, the algorithm
2  that is aware of what the person watched
3  before. Those are still features that keep
4  young people engaged with the -- with the
5  app.
6      Q.   But as to your opinions on
7  appearance-altering filters and their
8  specific relationship with eating disorders,
9  those would not apply, correct?
10     A.   Again, they could use
11 third-party filters to alter their appearance
12 and post them on YouTube, so still could --
13 YouTube could be a source of these types of
14 materials.
15     Q.   Okay. And I think you
16 testified earlier that you used screening
17 tools in your clinical practice.
18     A.   I do.
19     Q.   And --
20         MS. MCNABB: Just, sorry,
21     objection to misstating prior
22     testimony.
23 BY MS. COATES:
24     Q.   And have you ever given a
25 patient a screening tool and asked them to

Page 211

1  fill it out in the mindset that they were
2  filling it out one year prior?
3      A.   One year prior?
4      Q.   Uh-huh.
5      A.   I haven't done that.
6      Q.   And have you ever asked a
7  patient to fill out a screening tool as if
8  they were taking it two years prior?
9          MS. MCNABB: Objection, form,
10     speculation.
11     A.   So I should say that screening
12 tools are used sometimes to capture symptoms.
13 They are used as a checkmark, you may call
14 it, for symptoms, and so you may -- you know,
15 I have asked patients those questions that
16 are, for example, on a PHQ-9 about depressive
17 symptoms, about major depression that a year
18 ago you had these symptoms, sleep problems,
19 loss of interest in activities, depressed
20 mood, eating problems, energy level problems.
21         So in that regard, you could
22 extrapolate, you may say, or use the measure
23 to screen for something that happened before,
24 a year before. But -- so that's the only use
25 I can think of after the screening measure as

Page 212

1  a checklist.
2  BY MS. COATES:
3      Q.   Okay. But the screening
4  measure would not be psychometrically
5  validated to be used in that way; is that
6  correct?
7          MS. MCNABB: Objection, form,
8      foundation.
9      A.   Well, I'm not aware if there
10 are psychometrics for -- using screening
11 measures for a period before what the window
12 of assessment is for those measures.
13 BY MS. COATES:
14     Q.   You can't identify any study
15 that does that today?
16     A.   I cannot. I haven't looked for
17 it, so there might be.
18         MS. COATES: Thank you. Those
19     are all of my questions.
20         THE WITNESS: Sure, thank you.
21         MS. COATES: Probably go off
22     the record.
23         THE VIDEOGRAPHER: Off the
24     record. The time is 1:35 p.m.
25         (Recess taken, 1:35 p.m. to

Page 213

1  1:36 p.m. CDT)
2          THE VIDEOGRAPHER: We're back
3      on the record. The time is 1:36 p.m.
4          ------------
5          EXAMINATION
6          ------------
7  BY MR. BANKS:
8      Q.   Good afternoon, Dr. Mojtabai.
9      A.   Good afternoon.
10     Q.   My name is Paul Banks. I'm a
11 lawyer representing Meta in this case.
12         So earlier today you testified
13 that you learned about how social media
14 platforms work by watching YouTube videos
15 about them, correct?
16     A.   Correct.
17     Q.   Did you look at any Meta
18 resources explaining how the Instagram or
19 Facebook platforms work?
20     A.   I'm not sure. Some of those
21 videos might have been part of the resources
22 that you say. I watched a number of YouTube
23 videos about different apps.
24         I have an account, a Facebook
25 account, so I'm somewhat familiar with

54 (Pages 210 - 213)

Page 214

1  Facebook.
2      Q.    Understand.
3          Did you look at, for example,
4  the Meta Safety Center or the Meta Family
5  Center resources?
6      A.    I don't recall having looked at
7  those.
8      Q.    When your counsel provided you
9  with Meta internal documents, did they
10 provide you with any documents describing how
11 the features of Instagram work?
12     A.    What I learned from -- about
13 these apps was through actually, as I
14 mentioned, videos and reading about them.
15 But any --
16          Can you ask the question again?
17 I'm sorry.
18     Q.    When your counsel provided you
19 with Meta internal documents, so not
20 materials that you might have seen on
21 YouTube --
22     A.    Uh-huh.
23     Q.    -- did they provide you with
24 any documents describing how Instagram or the
25 features of Instagram work?

Page 215

1      A.    No, but some of the documents,
2  internal documents, describe these features.
3      Q.    Okay.  So today you've
4  explained that you analyzed a number of
5  features on social media apps.
6          How did you select the features
7  that you chose to analyze in your report?
8      A.    Those were features that were
9  mostly discussed in the literature, and they
10 were more concerned by people about them as
11 contributing to problematic use of social
12 media, factors that contribute to problematic
13 use of social media.
14          So that was
15 the basis of -- of my choice of the features.
16     Q.    Okay.  So you looked
17 specifically at the features about which
18 there was more concern.
19          Did you look at any of the Meta
20 safety or well-being features?
21     A.    Again, when I was looking at
22 the literature from internal documents from
23 Meta, I read about some of the initiatives
24 within the Meta regarding safety, well-being
25 initiatives that they discussed.

Page 216

1      Q.    For example, are you aware of a
2  Meta feature called Take a Break?
3          MS. MCNABB:  Objection,
4  foundation.
5      A.    I have read about it, again, in
6  those documents and -- but I don't know how
7  recent it is.  I think it is more recent
8  than -- than a lot of those literature that I
9  talked about were published.
10 BY MR. BANKS:
11     Q.    Is the Take a Break feature in
12 your view a good thing?
13     A.    I think if it is activated and
14 if kids really follow that, it might be.  I
15 haven't seen any evidence about it, that it
16 has impacted, either positively or
17 negatively, any outcomes, mental health
18 outcomes.
19     Q.    Same question for a Meta
20 feature called Alternative Topic Nudges, have
21 you heard of that feature?
22     A.    I haven't heard of that
23 feature.
24     Q.    Okay.  So as part of developing
25 your opinion on the features of social media

Page 217

1  platforms, the defendants in this case, did
2  you do anything to educate yourself on how
3  social media platforms other than the
4  defendant platforms work?
5      A.    Most kids in the country, in
6  the US at least, are using one of these
7  platforms that are actually discussed, the
8  YouTube, Facebook, Instagram, TikTok and
9  Snapchat.  So the large majority, the bulk of
10 kids are using these.
11          So I familiarized myself as
12 much as I could with these apps, and
13 especially -- not so much on the recent
14 initiatives, because the data that I was
15 looking at was based on people who had used
16 them years before.
17     Q.    So is -- understanding that,
18 did you look at materials about other social
19 media platforms?
20     A.    Like what?
21          MS. MCNABB:  Objection, asked
22 and answered.
23     A.    Yeah, what platforms are we
24 talking about?
25          ///

55 (Pages 214 - 217)

CONFIDENTIAL

1  BY MR. BANKS:
2      Q.    Any other social media
3  platforms aside from the defendant platforms.
4      A.    As I said, it's -- as I said
5  before, the majority -- the large majority of
6  kids only use these apps, and so I focused on
7  those.
8      Q.    Okay.  So turn with me, if you
9  will, to page 62 of your MDL report.
10     A.    Page 62, you said, right?
11 Page 62.
12         MS. MCNABB:  In the May
13     version?
14         MR. BANKS:  That's right.
15     Yeah.
16     A.    Is this May?  Yes.  Yes.
17 BY MR. BANKS:
18     Q.    I'd like to look just at
19 paragraph 257.
20     A.    57, yes.
21     Q.    Yeah.
22         Do you see here that you say in
23 paragraph 257:  In addition to the rapid
24 growth and spread of these media among teens,
25 algorithmic features, including

1  personalization of feeds based on how likely
2  the recipient is to interact with the feeds,
3  as well as the highly immersive nature of the
4  apps, distinguish them from other social
5  media apps.
6          What apps were you talking
7  about?
8      A.    So I was thinking -- I was
9  talking about the new image-based platforms.
10 This section is about new image-based
11 platforms, specifically Instagram and TikTok.
12     Q.    And so I understand what you
13 were talking about when you referenced those,
14 however, what were you talking about when you
15 referenced other social media apps in
16 paragraph 257?  Which apps?
17     A.    Yeah, Facebook is the major one
18 that was -- was before, but the older ones,
19 Facebook, YouTube.
20     Q.    Okay.  So Facebook and YouTube
21 are not image-focused apps in your view; is
22 that right?
23     A.    Not to that extent.  They all
24 have images.  Right now we were talking about
25 YouTube.  It has videos and short videos,

1  so -- but TikTok and Instagram are mainly
2  focused on the -- the visual, the apps -- the
3  videos that people post and interact through
4  videos more than the older ones.
5      Q.    So in forming your opinions
6  about the design features of the defendant
7  apps, did you look into the design features
8  of other apps, such as, for example, dating
9  apps?
10         MS. MCNABB:  Objection, asked
11     and answered.
12     A.    I did not look at the dating
13 apps, no.
14 BY MR. BANKS:
15     Q.    Are you aware that those apps
16 use an algorithm?
17     A.    Oh, yeah.
18     Q.    And you're aware that they have
19 likes and they have feedback?
20         MS. MCNABB:  Objection,
21     foundation.
22     A.    Yeah, they -- not many of them
23 do have videos.  I think they are mainly
24 photo based, not videos.
25         ///

1  BY MR. BANKS:
2      Q.    What about other online video
3  platforms, such as Netflix or Twitch?  Did
4  you look into the features of those
5  applications?
6      A.    Netflix, I don't know if you
7  can count it as a social media app.
8      Q.    Regardless of whether it's a
9  social media app, did you look into those
10 features of Netflix or the other apps I
11 mentioned?
12     A.    Netflix and what was the other
13 one?
14     Q.    Other -- so other apps, such
15 as, for example, Twitch.
16     A.    Well, Netflix specifically,
17 because I use it, I don't consider it -- so I
18 didn't see them on the same level to compare
19 them with the social media apps.  It doesn't
20 have any of those features.
21         It doesn't have personal
22 videos, doesn't have infinite scroll.  It
23 doesn't have -- you don't get feedback on --
24 you can't post anything to get feedback.  You
25 don't get -- well, you get notifications

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 222

1  about the movies, but not about somebody else
2  in your network who is doing something great.
3        So I didn't see it as -- on the
4  same level.
5     Q.   Okay.  So you've offered
6  opinions on something that you've called
7  content personalization.
8        What is that?
9     A.   That is when the algorithm
10 offers you content based on what you have
11 looked at before.
12    Q.   Do you have an opinion on
13 whether it would be better for social media
14 apps to have nonpersonalized content, where
15 everyone sees the same thing?
16    A.   So for those kids who are
17 vulnerable, I think not being exposed to --
18 not -- the algorithm not automatically
19 exposing them to features that -- or to
20 content that might be harmful, I think it is
21 just -- as a public health person -- is
22 beneficial.
23    Q.   Do you have an opinion on
24 whether nonpersonalized or a purely
25 chronological feed would or would not expose

Page 223

1  users to more harmful content?
2     A.   Well, the experimental studies
3  that have -- have used features like the
4  personalized videos or personalized content
5  or content that is, for example, highlighting
6  the good life that others have and creates
7  social comparison, we know are harmful based
8  on experimental studies.
9        So to that extent, I think it
10 would be beneficial if it is not
11 personalized, and for some kids who
12 especially are more prone to -- to have
13 adverse mental health outcomes.
14    Q.   Do you know whether Facebook
15 and Instagram have an option for those users
16 to just view posts in chronological order, if
17 they want to?
18       MS. MCNABB:  Objection,
19 foundation.
20    A.   I think that's an opt-out at
21 least for -- I'm thinking which one of those
22 apps has opt outs for, as you said,
23 personalized or recommended content.
24 BY MR. BANKS:
25    Q.   Would it be meaningful to you

Page 224

1  if users could reset their content
2  recommendation algorithms to depersonalize
3  them in some way?
4     A.   So I don't know if
5  depersonalization alone is sufficient.  I
6  think it is -- there are a number of other
7  features like push notifications, infinite
8  scrolls that are based on, to some extent,
9  what people watched before that need also to
10 be addressed for these apps to be less
11 harmful for those people who are vulnerable.
12       I'm not saying that all kids
13 are vulnerable.  I'm saying that some kids
14 are vulnerable, and for those kids, this
15 should be done.
16       MR. BANKS:  Okay.  I'll stop
17 there.
18       THE VIDEOGRAPHER:  Want to go
19 off?
20       MR. BANKS:  Yes.
21       THE VIDEOGRAPHER:  Off the
22 record.  The time is 1:48 p.m.
23       (Recess taken, 1:48 p.m. to
24 1:50 p.m. CDT)
25       THE VIDEOGRAPHER:  We're back

Page 225

1  on the record.  The time is 1:50 p.m.
2         ------------
3         EXAMINATION
4         ------------
5  BY MR. BROWN:
6     Q.   Good afternoon, Dr. Mojtabai.
7  My name is Cordell Brown.  I'm an attorney at
8  Munger Tolles & Olson LLP.  I'm here on
9  behalf of Snap Inc., the maker of Snapchat.
10 Thanks for your time.
11       Can you hear me?
12    A.   Yeah, I'm going to move one of
13 these loud speakers closer, if possible.
14 Thank you.
15    Q.   Okay.  My first question is
16 going to be:  Could you explain to me your
17 understanding of the Snapchat feature
18 Streaks?
19    A.   My understanding is that when
20 two people start a Snapchat Streak, they're
21 supposed to continue sending each other
22 messages every 24 hours; otherwise, the
23 streak would disappear.
24       And to continue that, they have
25 to have constant contact or constant

CONFIDENTIAL

Page 226

1  back-and-forth messaging or posting videos so
2  that the relationship continues.
3      Q.    And you're aware that it only
4  takes one message a day to maintain a streak,
5  correct?
6      A.    That's my understanding, that
7  there has to be a message a day.
8      Q.    Okay.  And how much time do you
9  estimate that it takes for a user to send a
10  message to maintain a streak?
11      A.    I'm not Gen Z, so I can't
12  really answer that question.  I don't know
13  how long they take these days to -- to --
14  probably you got -- well, you have access to
15  industry data.  You can tell.  You have
16  better access to that information.
17      Q.    Got it.
18          Would you agree that it
19  wouldn't take longer than minute to do so?
20      A.    I can't tell.  Especially
21  streaks.  I mean, these are people who are --
22  they are having a relationship, so they may
23  write longer about their day, what they did,
24  their friends, et cetera.  I can't tell.
25      Q.    Got it.

Page 227

1          But only a single particular
2  Snap is needed to send to maintain the
3  streak, correct?
4      A.    That's my understanding.
5      Q.    Are you aware of other apps
6  that use streaks or streak-like functions?
7      A.    I think it is -- it's -- I'm
8  only aware of Snapchat that has this feature.
9  Others might have it, but I'm not aware of
10  it.
11      Q.    Have you heard of the language
12  learning platform Duolingo?
13      A.    Duolingo?  I've heard of it.  I
14  don't know if it is used as a social media
15  app.  I didn't know that.
16      Q.    Do you think that other apps
17  that use streaks or record the amount of
18  times you do something on a daily basis are
19  necessarily harmful in the way that you claim
20  Snapchat is harmful?
21      A.    Can you repeat your question?
22  I'm sorry.  It was...
23      Q.    Do you think that other apps
24  that use streaks to measure the days that an
25  individual does something on the app are

Page 228

1  necessarily harmful in the same way you think
2  Snapchat is harmful?
3      A.    I don't think it's recording
4  the time on the app that is harmful.  I think
5  what happens is that if these streaks are
6  interrupted or -- first of all, the kids may
7  feel pressure to actually keep the streaks
8  going, and also, if it is interrupted, there
9  might be -- that might be a cause for
10  feelings of missing out, FOMO, or feelings of
11  jealousy.
12          So those were -- from my read
13  of the literature, those are the concerns
14  that -- in the literature that are discussed.
15      Q.    Right.
16          Are you aware of the
17  application Duolingo gives you a streak and
18  tracks how many times you revisit the app to
19  take a language lesson?
20          MS. MCNABB:  Objection.
21  BY MR. BROWN:
22      Q.    So every day that you take a
23  lesson, you get another day added to your
24  streak.
25          Are you aware of that?

Page 229

1          MS. MCNABB:  Objection, form.
2      A.    Yeah, I didn't know that they
3  had that feature, but I didn't realize that
4  Duolingo is a social media app and allows
5  people to communicate with each other.
6  BY MR. BROWN:
7      Q.    It's not for communication;
8  it's for language learning.
9          Are you aware of that?
10          MS. MCNABB:  Objection,
11  foundation.
12      A.    I wasn't aware of it, but I
13  don't see the -- the point of the comparison.
14  BY MR. BROWN:
15      Q.    Well, would you consider the
16  streak function on that platform as harmful?
17          MS. MCNABB:  Objection,
18  foundation, form, scope.
19      A.    Based on the research that's
20  available, some -- some children who have
21  been affected describe it as harmful because
22  it created the sense of feeling of missing
23  out, or as I mentioned, jealousy or pressure,
24  pressure to keep the streak.
25          It's different than a

58 (Pages 226 - 229)

Page 230

1 relationship with a -- with an app. It's a
2 personal relationship between two people or
3 more than two. It might be multiple people
4 who have ongoing streaks, and that is
5 different than losing connection to Duolingo,
6 I think.
7 BY MR. BROWN:
8    Q.   All right. Dr. Mojtabai, is it
9 fair to say that social media platforms are
10 not all identical in how they function?
11    A.   They're not identical, but they
12 share a lot of features, and what these
13 features and algorithms do is to keep people
14 engaged by giving them, as I mentioned, push
15 notifications, infinite scroll and
16 personalized content.
17        And so they -- they all somehow
18 share this feature, and for that reason, kids
19 actually are reporting that they are spending
20 so much time on these five major apps that we
21 discussed today.
22        MR. BROWN:  Got it. I'll move
23    to strike everything after "They're
24    not identical" as unresponsive.
25        ///

Page 231

1 BY MR. BROWN:
2    Q.   Dr. Mojtabai, would you agree
3 that when assessing the mental health effects
4 of a platform, it was important to give
5 consideration to how the platform is used?
6        MS. MCNABB:  Objection, form.
7    A.   It's how it's used and also how
8 long it is used. It's not just the quality
9 of the interaction.
10        If the kid is spending seven,
11 eight hours on the app, no matter what they
12 do, that means that that are losing an
13 important personal relationship, they're
14 losing on sleep, they are losing on
15 schoolwork, possibly on relationships within
16 the home.
17        So it is both the time, the
18 amount of time that they spend on these apps
19 and I think -- I believe, based on my reading
20 of the literature, that one factor is these
21 features in these apps and also the -- as you
22 said, quality of interactions with the apps,
23 like having problematic use of these social
24 media, so having withdrawal symptoms and
25 distress that kids experience when they stop

Page 232

1 using the app.
2 BY MR. BROWN:
3    Q.   Got it.
4        Do you know how much time
5 Snapchat users, on average, spend messaging
6 with their friends on the app versus
7 consuming content?
8        MS. MCNABB:  Objection,
9    foundation, and this was covered in
10    the prior deposition, rehashing old
11    ground.
12    A.   I don't have that data, but I
13 believe the industry has it. They collect
14 this type of data.
15 BY MR. BROWN:
16    Q.   Did you ask for that data?
17        MS. MCNABB:  Same objection.
18    A.   I was provided some data from
19 Snapchat, but it didn't include this
20 information about, like, hours and
21 distribution of time that they spend on the
22 apps.
23 BY MR. BROWN:
24    Q.   All right. Let's look at some
25 data.

Page 233

1        MR. BROWN:  I would like to
2 introduce Krista Hayakawa's JCCP
3 expert report as Exhibit 25.
4        (Whereupon, Mojtabai-MDL-25,
5    6/27/25 Expert Report of Krista
6    Hayakawa, was marked for
7    identification.)
8        THE WITNESS:  Okay.
9 BY MR. BROWN:
10    Q.   Can you see the screen?  Are
11 you able to see that?
12        (Technical comments off the
13    stenographic record.)
14        THE WITNESS:  Better. I can...
15 BY MR. BROWN:
16    Q.   If we go to the second page of
17 the document at the top, you'll see it says
18 Expert Report -- Rebuttal Report of Krista
19 Hayakawa; is that correct?
20    A.   Yes.
21    Q.   And if we go to paragraph 3,
22 Ms. Hayakawa states that she's currently
23 employed as a data engineer at Snap Inc.; is
24 that correct?
25    A.   Correct.

59 (Pages 230 - 233)

CONFIDENTIAL

Page 234

1    Q.    Now, if we go to the next page,
2  paragraph 10, she says:  According to our
3  usage statistics for Q1 2025, 13- to
4  17-year-old users in the United States spent
5  about 78% of their time using the messaging
6  and camera portions of the Snapchat app
7  during that period.
8        Is that correct?
9    A.    I can read that, yes.
10    Q.    Do you have any reason to doubt
11  this data?
12    A.    No, this is industry data.  I
13  think it's internal data.  I don't have any
14  reason to doubt it.
15    Q.    So from a user behavior
16  perspective, Snapchat is used in a manner
17  closer to a messaging app, like iMessage or
18  WhatsApp.
19        Would you agree?
20        MS. MCNABB:  Objection,
21    foundation, form.
22    A.    Well, if they are using the
23  camera portion, the camera portion could be
24  for short videos, producing short videos, and
25  it doesn't say anything about streaks or

Page 235

1  maps.  I'm not sure what the messaging part
2  is.  Does it include the streaks?
3  BY MR. BROWN:
4    Q.    The messaging and camera on
5  Snapchat are used to communicate with others,
6  correct?
7        MS. MCNABB:  Objection,
8    foundation.
9    A.    Yeah, so I -- it's still not
10  very informative to me so that I don't know,
11  like, how much of that time is spent on the
12  streaks.
13  BY MR. BROWN:
14    Q.    Got it.
15        But streaks are sent to other
16  users to communicate with them?
17    A.    They're not sent to others, but
18  when you say messaging, it's ambiguous.
19    Q.    Yeah.  A streak message is sent
20  to another user, correct?
21    A.    Yeah, so that could fall under
22  the messaging, I think.  I'm not sure.  I
23  mean, I shouldn't assume.  I don't know.
24    Q.    In your expert opinion, do you
25  believe that Apple should offer that iMessage

Page 236

1  could be addictive?
2        MS. MCNABB:  Objection,
3    foundation, form, scope.
4    A.    iMessage is only a messaging,
5  from what I understand, app.  It's not a
6  social media app.
7        Yeah, so I don't know if there
8  is -- if the comparison is -- let's put it
9  this way -- if the comparison is on the same
10  level.
11  BY MR. BROWN:
12    Q.    Got it.
13        But if users spend 78% of their
14  time using Snapchat in a manner similar to
15  iMessage, would you agree that it has similar
16  effects on users?
17        MS. MCNABB:  Objection, form,
18    foundation, scope.
19    A.    First of all, it's using
20  messaging and camera; it's not just
21  messaging.  Second, it's not clear to me that
22  that messaging doesn't include the streaks.
23  BY MR. BROWN:
24    Q.    Okay.  Do you agree that
25  messaging with others can be beneficial for

Page 237

1  your mental health?
2    A.    For some people, I'm sure it is
3  beneficial, but -- yeah, for some people it
4  possibly is.
5    Q.    Got it.
6        If we can go to -- do you have
7  your rebuttal report?  I think that's
8  Exhibit 3.
9        Go to page 16 of your rebuttal
10  report.
11    A.    Page 16.
12    Q.    Right at the top there, that
13  paragraph actually starts at the end of
14  page 15.  It details a sentence from Riehm
15  2019 which you say you agree with, that says
16  one of the benefits -- or some of the
17  benefits of social media include exposure to
18  current events, communication over geographic
19  barriers, and social inclusion for those who
20  may be otherwise excluded in their day-to-day
21  lives.
22        Is that correct?
23    A.    That is correct.  That is --
24  that is -- yeah, it is in another -- yeah.
25    Q.    You yourself agree that

60 (Pages 234 - 237)

CONFIDENTIAL

Page 238

1 communicating with others is a benefit that
2 comes from social media?
3     A.    It's -- yeah, for some -- for
4 some people it is beneficial, as it's -- you
5 know, for some other people it's harmful
6 because of their vulnerabilities, so yeah.
7     Q.    Okay.  And you do not anywhere
8 in your report account for the fact that
9 Snapchat is used predominantly as a messaging
10 platform, correct?
11         MS. MCNABB:  Objection,
12     foundation.
13     A.    I didn't see it even in your
14 data that you presented that it is
15 predominantly used for messaging.  It said
16 messaging or camera so -- and then messaging
17 could be Snap Streaks or other forms of
18 messaging.
19         So I'm not sure when you say
20 predominantly used for that, if it is.  I
21 haven't seen the data, let's put it this way.
22 BY MR. BROWN:
23     Q.    Got it.
24         MR. BROWN:  I have no further
25     questions, Dr. Mojtabai.  Thank you.

Page 239

1         THE WITNESS:  Thank you.
2         THE VIDEOGRAPHER:  We're going
3     off the record.  The time is 2:04 p.m.
4         (Recess taken, 2:04 p.m. to
5     2:13 p.m. CDT)
6         THE VIDEOGRAPHER:  We're back
7     on the record.  The time is 2:13 p.m.
8         ------------
9         EXAMINATION
10        ------------
11 BY MR. DAVIS:
12     Q.    Dr. Mojtabai, can I have your
13 MDL report, it's Exhibit 2, yeah.  I've
14 opened it up to paragraph 146 on page 36.
15         Are you there?
16     A.    Yes.
17     Q.    In this paragraph, you talk
18 about some studies that did not find an
19 association between use of social media and
20 depressive symptoms, right?
21     A.    Correct.
22     Q.    And you say -- I'm sorry --
23         MR. DAVIS:  Can we go off the
24     record a second?  I lost my place.
25     Can we go off the record?

Page 240

1         THE VIDEOGRAPHER:  We're off
2     the record.  The time is 2:14 p.m.
3         (Discussion off the record.)
4         THE VIDEOGRAPHER:  We're back
5     on the record.  The time is 2:14 p.m.
6 BY MR. DAVIS:
7     Q.    All right.  Dr. Mojtabai, I
8 directed you to the wrong paragraph.  If you
9 look at paragraph 147.
10    A.    Okay.
11    Q.    You talk about studies -- four
12 studies that found no significant effect
13 between use of social media and depressive
14 symptoms.
15        Do you see that?
16    A.    Yes.
17    Q.    Okay.  Other than those four
18 studies, there are no other studies in your
19 MDL report where you discuss that the study
20 found no association between social media use
21 and any other mental health outcome, do you?
22        MS. MCNABB:  Objection, form.
23    A.    Can you repeat?  I'm sorry.
24 BY MR. DAVIS:
25    Q.    Sure.

Page 241

1         Other than the four studies
2 that you identify in paragraph 147, you don't
3 identify any other studies of social media
4 use and -- that found no association between
5 social media use and adverse mental health
6 outcomes, correct?
7         MS. MCNABB:  Objection, form.
8     A.    These are longitudinal studies,
9 so are you talking about longitudinal
10 studies, correct?
11 BY MR. DAVIS:
12    Q.    Yes.
13    A.    These were the ones that I had
14 found by that time, yeah.
15    Q.    And you understand from looking
16 at Dr. Gibbons' expert report, Dr. Patten's
17 expert report and other defense expert
18 reports, that there are more than these
19 longitudinal studies that found no
20 association, correct?
21    A.    And there are more that found
22 an association.
23    Q.    Not my question.
24        My question is:  You know that
25 there are more longitudinal studies than

CONFIDENTIAL

Page 242

1  these four that found no association between
2  use of social media and adverse mental health
3  outcomes, correct?
4      A.   Reading those, I saw some other
5  studies that they had identified that both
6  found an association and did not find an
7  association. So both ways.
8      Q.   Okay. There are more studies
9  that are -- that were not cited in your
10  report that did not find an association,
11  fair?
12      A.   I don't know if. I didn't
13  count them. I didn't get a count of the
14  studies.
15      Q.   There are more -- there are
16  also --
17      MS. MCNABB: We're out of time.
18  Todd, we're out of time.
19      MR. DAVIS: Well, I just have
20  to ask him one more.
21  BY MR. DAVIS:
22      Q.   There are other experimental
23  studies -- there are other experimental
24  studies that found no association between use
25  of social media and mental health disorders

Page 243

1  or outcomes that you did not cite in your
2  report, right?
3      A.   Again, I saw those longitudinal
4  studies, but I'm not aware of any
5  experimental ones that you're mentioning.
6  There might be. There might very well be.
7      MR. DAVIS: Thank you,
8  Dr. Mojtabai. We will reserve on our
9  time as well as the questions about
10  the correspondence with the journal
11  that we don't have yet.
12      MS. MCNABB: Plaintiffs have no
13  questions at this time.
14      THE VIDEOGRAPHER: Total time
15  on the record for counsel for Meta, 12
16  minutes; total time for TikTok,
17  3 hours, 25 minutes; total time for
18  Snapchat, 14 minutes; total time for
19  YouTube, 9 minutes.
20      That concludes the deposition.
21  The time is 2:17 p.m.
22      (Time noted: 2:17 p.m. CDT)
23          --o0o--
24
25

Page 244

1          CERTIFICATE
2      I, MICHAEL E. MILLER, Fellow of
  the Academy of Professional Reporters,
3  Registered Diplomate Reporter, Certified
  Realtime Reporter, Certified Court Reporter
4  and Notary Public, do hereby certify that
  prior to the commencement of the examination,
5  RAMIN MOJTABAI, MD, PhD, MPH was duly sworn
  by me to testify to the truth, the whole
6  truth and nothing but the truth.
7      I DO FURTHER CERTIFY that the
  foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
  before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
  ability.
10
      I DO FURTHER CERTIFY that pursuant
11  to FRCP Rule 30, signature of the witness was
  not requested by the witness or other party
12  before the conclusion of the deposition.
13      I DO FURTHER CERTIFY that I am
  neither a relative nor employee nor attorney
14  nor counsel of any of the parties to this
  action, and that I am neither a relative nor
15  employee of such attorney or counsel, and
  that I am not financially interested in the
16
17
18
  MICHAEL E. MILLER, FAPR, RDR, CRR
19  Fellow of the Academy of Professional Reporters
  NCRA Registered Diplomate Reporter
20  NCRA Certified Realtime Reporter
  LA Certified Court Reporter #27009
21
  Dated: August 14, 2025
22
23
24
25

Page 245

1      INSTRUCTIONS TO WITNESS
2
3      Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8      After doing so, please sign the
9  errata sheet and date it.
10      You are signing same subject to
11  the changes you have noted on the errata
12  sheet, which will be attached to your
13  deposition.
14      It is imperative that you return
15  the original errata sheet to the deposing
16  attorney within thirty (30) days of receipt
17  of the deposition transcript by you. If you
18  fail to do so, the deposition transcript may
19  be deemed to be accurate and may be used in
20  court.
21
22
23
24
25

62 (Pages 242 - 245)

CONFIDENTIAL

```
1            ERRATA
2  PAGE LINE CHANGE
3  ____ ____ _____
4      REASON: _____
5  ____ ____ _____
6      REASON: _____
7  ____ ____ _____
8      REASON: _____
9  ____ ____ _____
10     REASON: _____
11 ____ ____ _____
12     REASON: _____
13 ____ ____ _____
14     REASON: _____
15 ____ ____ _____
16     REASON: _____
17 ____ ____ _____
18     REASON: _____
19 ____ ____ _____
20     REASON: _____
21 ____ ____ _____
22     REASON: _____
23 ____ ____ _____
24     REASON: _____
25
```

```
1            LAWYER'S NOTES
2
3  PAGE   LINE
4  ____ ____ _____
5  ____ ____ _____
6  ____ ____ _____
7  ____ ____ _____
8  ____ ____ _____
9  ____ ____ _____
10 ____ ____ _____
11 ____ ____ _____
12 ____ ____ _____
13 ____ ____ _____
14 ____ ____ _____
15 ____ ____ _____
16 ____ ____ _____
17 ____ ____ _____
18 ____ ____ _____
19 ____ ____ _____
20 ____ ____ _____
21 ____ ____ _____
22 ____ ____ _____
23 ____ ____ _____
24 ____ ____ _____
25
```

```
1        ACKNOWLEDGMENT OF DEPONENT
2
3
4        I, RAMIN MOJTABAI, MD, PhD, MPH,
   do hereby certify that I have read the
5  foregoing pages and that the same is a
   correct transcription of the answers given by
6  me to the questions therein propounded,
   except for the corrections or changes in form
7  or substance, if any, noted in the attached
   Errata Sheet.
8
9
10
11
12 _____
   RAMIN MOJTABAI, MD, PhD, MPH     DATE
13
14
15 Subscribed and sworn to before me this
16 _____ day of _____, 20 _____.
17 My commission expires: _____
18
19 _____
20 Notary Public
21
22
23
24
25
```