# Exhibit 30

# PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE GENERAL CAUSATION TESTIMONY OF PLAINTIFFS' EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

| COORDINATION PROCEEDING | ) | JUDICIAL COUNCIL |
| SPECIAL | ) | COORDINATION |
| TITLE [RULE 3.400] | ) | PROCEEDING NO. 5255 |
| SOCIAL MEDIA CASES | ) | |
| _____ | ) | For Filing |
| | ) | Purposes: |
| THIS DOCUMENT RELATES | ) | 22STCV21355 |
| TO: | ) | |
| | ) | Judge: Hon. |
| Cristina Arlington | ) | Carolyn B. Kuhl |
| Smith, et al., v. TikTok | ) | SSC-12 |
| Inc., et al., | ) | |
| Case No. 22STCV21355 | ) | |
| _____ | ) | |

Thursday, June 19, 2025
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Video-Recorded Oral Deposition of
STUART MURRAY, MSc, DClinPsych, PhD held at
the offices of King & Spalding LLP, 633 West
Fifth Street, Suite 1600, Los Angeles,
California commencing at 9:02 a.m. on the
above date, before Michael E. Miller, Fellow
of the Academy of Professional Reporters,
Certified Court Reporter, Registered
Diplomate Reporter, and California
CSR #13649.

— — —
GOLKOW - VERITEXT
877.370.DEPS | fax 917.591.5672
deps@golkow.com

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

CONFIDENTIAL

Page 2

APPEARANCES:

BEASLEY ALLEN LAW FIRM
BY: JOSEPH VANZANDT, ESQUIRE
joseph.vanzandt@beasleyallen.com
JENNIFER EMMEL, ESQUIRE
jennifer.emmel@beasleyallen.com
218 Commerce Street
Montgomery, Alabama 36104
(334)269-2343

-and-

MOTLEY RICE LLC
BY: SARA O. COUCH, ESQUIRE
scouch@motleyrice.com
ANNIE E. KOUBA, ESQUIRE (via Zoom)
akouba@motleyrice.com
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina 29464
x(843)216-9000

-and-

MOTLEY RICE LLC
BY: NELSON L. DRAKE, ESQUIRE
ndrake@motleyrice.com
401 9th Street NW, Suite 630
Washington, DC 20004
(202)232-5504

-and-

MOTLEY RICE LLC
BY: JESSICA C. COLOMBO, ESQUIRE (via Zoom)
jcolombo@motleyrice.com
One Corporate Center
Hartford, Connecticut 06103
(860)882-1681

-and-

LIEFF CABRASER HEIMANN & BERNSTEIN LLP
BY: KELLY K. MCNABB, ESQUIRE (via Zoom)
kmcnabb@lchb.com
250 Hudson Street, 8th Floor
New York, New York 10013
(212)355-9500

Page 3

APPEARANCES:

-and-

WAGSTAFF & CARTMELL LLP
BY: THOMAS P. CARTMELL, ESQUIRE (via Zoom)
tcartmell@wcllp.com
LUCY R. MALONE, ESQUIRE (via Zoom)
lmalone@wcllp.com
JONATHAN P. KIEFFER, ESQUIRE (via Zoom)
jkieffer@wcllp.com
TRICIA L. CAMPBELL, ESQUIRE (via Zoom)
tcampbell@wcllp.com
LINDSEY SCARCELLO, ESQUIRE (via Zoom)
lscarcello@wcllp.com
4740 Grand Avenue
Suite 300
Kansas City, Missouri 64112
(816)701-1100

-and-

GOZA HONNOLD LLC
BY: KIRK J. GOZA, ESQUIRE (via Zoom)
kgoza@gohonlaw.com
9500 Nall Avenue
Suite 400
Overland Park, Kansas 66207
(913)451-3433

-and-

BARON & BUDD PC
BY: LINDSAY STEVENS, ESQUIRE (via Zoom)
lstevens@baronbudd.com
11440 West Bernardo Court, Suite 265
San Diego, California 92127
(858)225-7200

-and-

MORGAN & MORGAN PA
BY: NARMEEN NKEITI, ESQUIRE (via Zoom)
nnkeiti@forthepeople.com
20 North Orange Avenue, Suite 1600
Orlando, Florida 32801
(407)420-1414

-and-

Page 4

APPEARANCES:

PANISH | SHEA | RAVIPUDI LLP
BY: RAHUL RAVIPUDI, ESQUIRE (via Zoom)
ravipudi@panish.law
11111 Santa Monica Boulevard
Suite 700
Los Angeles, California 90025
(310)928-6200
Counsel for Plaintiffs

KING & SPALDING LLP
BY: TODD P. DAVIS, ESQUIRE
tdavis@kslaw.com
1180 Peachtree Street NE
Suite 1600
Atlanta, Georgia 30309
(404)572-4600
Counsel for Defendants TikTok Inc. and
ByteDance Inc.

MUNGER TOLLES & OLSON LLP
BY: JOHN B. MAJOR, ESQUIRE
john.major@mto.com
350 South Grand Avenue
50th Floor
Los Angeles, California 90071
(213)683-9100
Counsel for Defendant Snap Inc.

MORGAN LEWIS & BOCKIUS LLP
BY: EVAN K. JACOBS, ESQUIRE
evan.jacobs@morganlewis.com
2222 Market Street
Philadelphia, Pennsylvania 19103
(215)963-5000
Counsel for Defendants YouTube LLC and
Google, LLC

Page 5

APPEARANCES:

COVINGTON & BURLING LLP
BY: MICHAEL N. KENNEDY, ESQUIRE
mkennedy@cov.com
One City Center
850 Tenth Street NW
Washington, DC 20001
(202)662-6000

-and-

COVINGTON & BURLING LLP
BY: MICHAEL JEUNG, ESQUIRE
mjeung@cov.com
1999 Avenue of the Stars
Los Angeles, California 90067
(424)332-4800
Counsel for Defendants Meta Platforms, Inc.
f/k/a Facebook, Inc.; Facebook Holdings, LLC;
Facebook Operations, LLC; Facebook Payments, Inc.;
Facebook Technologies, LLC; Instagram, LLC;
Siculus, Inc.; and Mark Elliot Zuckerberg

ALSO PRESENT:
KATY LAWRIMORE, PARALEGAL (via Zoom)
Motley Rice LLP

VIDEOGRAPHER:
DAVID KIM
GOLKOW - VERITEXT

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

INDEX

STUART MURRAY, MSc, DClinPsych, PhD

June 19, 2025

APPEARANCES                2

PROCEEDINGS                15

EXAMINATION OF STUART MURRAY, MSc, DClinPsych, PhD:

BY MR. DAVIS               16

BY MR. JACOBS              461

BY MR. MAJOR               486

BY MR. KENNEDY             512

BY MR. DAVIS               539

BY MR. VANZANDT            558

BY MR. DAVIS               561

CERTIFICATE                565

ERRATA                     567

ACKNOWLEDGMENT OF DEPONENT           568

LAWYER'S NOTES             569

LITIGATION SUPPORT INDEX        PAGE

Instruction Not To Answer        56

Request for Production           515

Page 7

DEPOSITION EXHIBITS

NUMBER                              MARKED

Murray-1    Defendants' Joint Notice of        28
      Deposition of Plaintiffs'
      Retained Expert Dr. Stuart Murray
      and Request For Production of
      Documents

Murray-2    List of Materials Reviewed,        30
      MURRAY0001 - MURRAY0343

Murray-3    Presentation, Severe Eating        32
      Disorders in the Outpatient
      Setting: Navigating Treatment and
      Ethical Challenges

Murray-4    Invoices,                          35
      MURRAY0344 - MURRAY0356

Murray-5    4/18/25 Murray Expert Report       38

Murray-6    5/16/25 Murray Expert Report       38

Murray-7    Excerpt From Clinical Handbook of   99
      Complex and Atypical Eating
      Disorders, by Anderson et al

Murray-8    Body dissatisfaction, narcissism   102
      and self-esteem in young men and
      women:
      A moderated mediation analysis,
      by Purton et al

Page 8

DEPOSITION EXHIBITS

Murray-9    The Impact of Teasing and          106
      Bullying Victimization on
      Disordered Eating and Body Image
      Disturbance Among Adolescents: A
      Systematic Review, by Day et al

Murray-10   Appearance-related cyberbullying:  110
      A qualitative investigation of
      characteristics, content,
      reasons, and effects, by Berne
      et al

Murray-11   Disentangling Body Image: The      143
      Relative Associations of
      Overvaluation, Dissatisfaction,
      and Preoccupation with
      Psychological Distress and Eating
      Disorder Behaviors in Male and
      Female Adolescents, by Mitchison
      et al

Murray-12   Excerpt From DSM-5-TR              156

Murray-13   June 2020 Deloitte Report, Social  162
      and economic cost of eating
      disorders in the United States of
      America

Page 9

DEPOSITION EXHIBITS

Murray-14   The association between            179
      personality and eating
      psychopathology in inpatients
      with anorexia nervosa, by Marzola
      et al

Murray-15   Screen Capture of YouTube Video    211

Murray-16   Media File, YouTube Video of       223
      Interview

Murray-17   University of Southern California   223
      Social Media Posts

Murray-18   New York Times Article, A          225
      Gymnast's Death Was Supposed to
      Be a Wake-Up Call, What Took So
      Long

Murray-19   Social Media Use and Depressive    264
      Symptoms During Early
      Adolescence, by Nagata et al

Murray-20   Binder Containing Dr. Murray's     274
      Copy of Expert Reports

Murray-21   Handwritten Rebuttal Points        276
      Contained in Exhibit 20 Binder

Golkow Technologies,
A Veritext Division

877-370-3377                                     www.veritext.com

CONFIDENTIAL

Page 10

DEPOSITION EXHIBITS

Murray-22    Contemporary screen time    278
modalities among children 9-10
years old and binge-eating
disorder at one-year follow-up: A
prospective cohort study, by
Nagata et al

Murray-23    Concurrent and prospective    287
associations of social media
usage with binge eating symptoms
in early adolescence, by Shi
et al

Murray-24    Me, my selfie, and I: The    317
relationship between editing and
posting selfies and body
dissatisfaction in men and women,
by Lonergan et al

Murray-25    Screen time, problematic screen    282
use, and eating disorder symptoms
among early adolescents: Findings
from the Adolescent Brain
Cognitive Development (ABCD)
Study

Page 11

DEPOSITION EXHIBITS

Murray-26    Sociodemographic Correlates of    319
Contemporary Screen Time Use
among 9- and 10-Year-0ld
Children, by Nagata et al

Murray-27    Distinct functional connectivity    320
phenotypes in preadolescent
children with binge eating
disorder by BMI status, by
Steward et al

Murray-28    Seeing yourself clearly:    341
Self-identification of a body
image problem in adolescents with
an eating disorder, by Fatt et al

Murray-29    Contemporary screen time    343
modalities and disruptive
behavior disorders in children: A
prospective cohort study, by
Nagata et al

Murray-30    Screen time and suicidal    380
behaviors among US children 9-11
years old: A prospective cohort
study, by Chu et al

Page 12

DEPOSITION EXHIBITS

Murray-31    Effects of exposure to self-harm    390
on social media: Evidence from a
two-wave panel study among young
adults, by Arendt et al

Murray-32    Social anxiety and internet use -    400
What are we missing, by
Prizant-Passal et al

Murray-33    Contemporary Screen Time    477
Modalities among Children 9-10
years old and Binge-Eating
Disorder at One-Year Follow-Up: A
Prospective Cohort Study, by
Nagata et al

Murray-34    Instagrowth: A Longitudinal    418
Growth Mixture Model of Social
Media Time Use Across
Adolescence, by Coyne et al

Murray-35    Screen Time and    479
Obsessive-Compulsive Disorder
Among Children 9-10 Years Old: A
Prospective Cohort Study, by
Nagata et al

Page 13

DEPOSITION EXHIBITS

Murray-36    E-mail(s) re: Chubby Face Lens    501
Stakeholder Notification,
SNAP0009825 - SNAP0009843

Murray-37    Presentation, Connecting with    507
Young People on Mental Health &
Wellbeing,
SNAP0933703 - SNAP0933735

Murray-38    E-mail(s) re: Collaboration    524
Review Submission Confirmation,
META3047MDL-040-00593105

Murray-39    November 2018 Consequences and    527
Implications of Selfie
Manipulation: Literature Review,
META3047MDL-014-00376279 -
META3047MDL-014-00376305

Murray-40    E-mail(s) re: Message Summary,    533
META3047MDL-014-00360058

Murray-41    Further evidence of the    540
association between social media
use, eating disorder pathology
and appearance ideals and
pressure: A cross-sectional study
in Norwegian adolescents, by
Dahlgren et al

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

DEPOSITION EXHIBITS

Murray-42    The relationship between social    541
media use and disordered eating
in young adolescents, by Wilksch
et al

Murray-43    Association Between Social Media    544
Use
and Depression Among US Young
Adults, by Lin et al

Murray-44    Use of multiple social media    545
platforms and symptoms of
depression and anxiety: A
nationally-representative study
among US young adults, by Primack
et al

Murray-45    Addictive Screen Use Trajectories    560
and Suicidal Behaviors, Suicidal
Ideation, and Mental Health in US
Youths, by Xiao et al

Page 15

------------

P R O C E E D I N G S

June 19, 2025, 9:02 a.m. PDT

------------

THE VIDEOGRAPHER:  We are now on the record.  My name is David Kim. I'm a videographer for Golkow, a Veritext division.

Today's date is June 19th, 2025, and the time is 9:02 a.m.

This video deposition is being held in Los Angeles in the matter of Social Media Litigation, JCCP 5255 in the Superior Court of the State of California for the County of Los Angeles.

The deponent is Stuart Murray.

Counsel will be noted on the stenographic record.

The court reporter is Mike Miller, and he will now swear in the witness.

///
///
///

Page 16

------------

STUART MURRAY, MSc, DClinPsych, PhD,
having been duly sworn,
testified as follows:

------------

EXAMINATION

------------

BY MR. DAVIS:

Q.    Good morning.

A.    Good morning.

Q.    You are Dr. Stuart Murray?

A.    Yes.

Q.    My name is Todd Davis.  I represent ByteDance and TikTok in the litigation.

And on behalf of the defendants, I'm here to ask you questions about the opinions that you will offer at the trial of this case as a presented expert on behalf of plaintiffs.

Do you understand that?

A.    Yes.

Q.    All right.  Now, have you ever had your deposition taken before, Dr. Murray?

A.    I have never been deposed as an

Page 17

expert witness.

Q.    Have you been deposed in some other way?

A.    I was deposed as a treater. I've done that once before.

Q.    Okay.  Where was that?

A.    Did you say when or where?

Q.    Where?  When and where?

A.    When and where.  That was in San Francisco, probably eight or nine years ago, I'm recalling.

Q.    Do you remember the name of the patient?

A.    No.

Q.    Was it in state or federal court?

A.    I don't recall.

Q.    All right.  Well, let me just go over some ground rules with you.

A.    Okay.

Q.    All right.  First of all, you understand that you're under oath, right?

A.    Yes, sir.

Q.    Sure.

And if you don't understand one

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

of my questions, will you let me know?

A. Yes.

Q. And if you answer my question or the questions by the other defense counsel, I will assume that you understood it, you heard it and you answered the question that was asked.

Is that acceptable to you?

A. Okay.

Q. You're doing a great job of it right now, but I would ask just to be mindful that you have to answer out loud so the court reporter can take down your testimony, all right?

A. Yes, sir.

Q. And also, I'm not as far down south from where you are, but I still -- nonetheless, I'm from the south, I talk a little slow. So there will be times where you think I'm done, and I may not be done.

So just give a pause, and I will do my best to get the question out, and I'll also do the same for you. If you haven't quite finished yet, I'll wait to make sure that you've finished before I begin my

Page 19

next question, or otherwise, the court reporter is going to talk to both of us and get us in trouble, okay?

A. Okay.

Q. All right. If you need a break of any kind, let us know. It's not a marathon. All I ask is that if there's a pending question, you answer the pending question, and then we can take a break.

Is that acceptable to you?

A. Yes.

Q. Now, I'm going to be using some terms throughout the deposition, and so are the other defense counsel. I just want to make sure that we're on the same page about those terms. I'm going to run through those with you, okay?

A. Okay.

Q. When I'm referring to social media platforms, I'm including the app that is downloaded onto users' phones and vice versa.

Is that acceptable to you?

A. Can you explain what you mean by vice versa?

Page 20

Q. Sure. When I'm talking about a social media platform or social media, I'm talking not only about the platform that exists, but also the app that is downloaded onto people's phones.

Do you understand that?

A. I understand.

Q. Okay. So I'm going to use those terms interchangeable, okay?

A. Okay.

Q. When I talk about psychiatric disorders, I'm going to use that to be interchangeable with mental health disorders.

Is that fine with you?

MR. VANZANDT: Objection, vague and ambiguous.

Go ahead.

A. I don't generally understand that to be conflated, but I understand your point.

BY MR. DAVIS:

Q. Maybe I can -- so do you understand that there's a difference between a psychiatric disorder and some other mental health issue?

Page 21

A. Can you give me an example?

Q. I don't know. I was trying -- can you give me an example where there's a difference between a psychiatric disorder and some mental health disorder?

A. I'm referring to psychiatric disorders in my report.

Q. Okay. And so can we use the term "psychiatric disorder" and "mental health disorder" to be the same?

A. I understand if you want to use them that way. I'll try my best to recall this conversation and remember that's what you're alluding to.

Q. All right. And if you have a problem with how I'm using it, you let me know, all right?

A. Sure, thank you.

Q. And then when I'm referencing psychiatric disorders, I mean any psychiatric disorder, including a depression-related disorder, an anxiety-related disorder, an eating disorder, and body dysmorphic disorder.

Is that acceptable to you?

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

A.    Yes.
MR. VANZANDT:  Objection, vague.
BY MR. DAVIS:
Q.    And when I say BDD, I'm going to use that to mean body dysmorphic disorder.
Do you -- is that acceptable to you?
A.    Yes.
Q.    And when I use RCT, I mean that to be randomized controlled trial.
Is that acceptable to you?
A.    Yes.
Q.    And I'm going to use the term "RCT" or "randomized controlled trial" and "experimental studies" to mean the same thing.
Is that acceptable to you?
A.    They're not the same.
Q.    What's the difference between an RCT and an experimental study?
A.    One is randomized and one is not.
Q.    Okay.  So would you -- in terms of the studies that you looked at for your

Page 23

purposes of your report, were they all randomized or were some not with respect to the -- let me back up.
Were there some experimental studies that you looked at in your -- and analyzed in your report that were not randomized?
A.    I would be happy to go through each study.  I'm trying to point out that an experimental study does not necessarily mean it's an RCT.
Q.    Well, and my question is:  For purposes of what work you did in this case, were there any studies that you looked on about social media use that were not randomized but you would describe them as experimental studies?
MR. VANZANDT:  Objection, vague.
A.    Can you repeat your question?  Sorry.
BY MR. DAVIS:
Q.    Sure.
A.    Thanks.
Q.    For purposes of your opinions

Page 24

and the materials you reviewed to form your opinions, were there studies that you believe were randomized -- let me back up.
For the purposes of your opinions in the case, were there any studies that you looked at -- that you saw and looked at experimental studies that you didn't believe were randomized?
MR. VANZANDT:  Objection, vague.  Compound.
A.    I'm having a hard time understanding your question.  I'm sorry.
BY MR. DAVIS:
Q.    Okay.  Well, I think you told me there are experimental studies, right?
A.    Uh-huh.
Q.    And there's a difference between those and randomized studies, right?
A.    Yeah.
Q.    Of the materials you looked at for your opinions in the case, were there any that were experimental but not randomized?
A.    Again, I'm happy to review all of the -- I reviewed an array of different methodologies.

Page 25

Q.    I'm just asking you if you know of any.
A.    I reviewed an array of methodological designs.
Q.    Do you know of any?
MR. VANZANDT:  Objection, asked and answered.
A.    Again, I reviewed --
BY MR. DAVIS:
Q.    It's okay.  If you tell me "I don't know of any," that's fine too.
MR. VANZANDT:  Don't talk over him.  Don't talk over him.  Let him answer the question.
A.    I reviewed an array of methodological designs, and I'd be happy to talk about the methodology of studies.
BY MR. DAVIS:
Q.    Do you know of any, Dr. Murray?
MR. VANZANDT:  Objection, asked and answered.
A.    Again, as I reviewed lots of different designs.
BY MR. DAVIS:
Q.    Sure.  I understand.  But I'm

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

just asking if you know of any.

A.    I'd be happy to go through them and --

Q.    I'm not asking you to go through them. I'm just asking if you know of any.

A.    Yeah, and I -- I can tell you that I have reviewed lots of different methodological designs in my report.

Q.    Can you identify -- well, are there any experimental studies that you reviewed in your report which are not randomized?

MR. VANZANDT:  Objection, asked and answered.

A.    Again, I can review them now. I know that I reviewed so many different types of methodology.

BY MR. DAVIS:

Q.    Did you understand that one of the things that you would be asked about today would be about the bases of your opinions?

A.    Yes.

Q.    And you worked to make sure you

Page 27

would be prepared to answer questions about the bases of your opinions, right?

A.    Yes.

Q.    Okay. So with that in mind, can you identify any studies that you say are experimental but not randomized that are reflected in your report?

MR. VANZANDT:  Objection, vague, ambiguous, compound, asked and answered.

A.    Again, I'd be happy to review them.

BY MR. DAVIS:

Q.    Is that the best answer you can give me today?

A.    The answer I can give you is that I reviewed lots of different types of methodology, and there were lots of studies that I reviewed, and I'd review any methodology with you if you would like.

Q.    All right. Given the fact that my time is limited today, I've asked that question as many times as I can to try to get an answer.

(Whereupon, Murray-1,

Page 28

Defendants' Joint Notice of Deposition of Plaintiffs' Retained Expert Dr. Stuart Murray and Request For Production of Documents, was marked for identification.)

BY MR. DAVIS:

Q.    Let me show you what's been marked as Exhibit 1, which is your deposition notice.

Did you see this before your deposition today, Dr. Murray?

A.    Yes.

Q.    You've got to wait until I finish, all right?

A.    Sorry.

Q.    It's all right.

Do you see that there were a number of document requests that were asked of you on page 3 and 4?

A.    Yes.

Q.    Did you look for those documents?

A.    Yes.

Q.    Okay. And you have -- you have a current CV? Did you --

Page 29

A.    I've made that available to counsel.

Q.    All right. And you've not listed -- you've not been -- you've not testified as an expert in any case before today, right?

A.    Correct.

Q.    And in terms of the literature that you relied upon or looked at for purposes of your opinions, that's all identified in the -- either -- one of the two reports that you issued, correct?

A.    The literature that I relied on to form my opinions --

Q.    Yes.

A.    -- are peer-reviewed data that are in the report. There are defense documents that I considered. I also reflected on my clinical practice, my clinical experience.

Q.    Let me see if I can ask it. We got this document which has been marked as Exhibit 2 on June 17, which identified the list of materials that you reviewed, relied upon or considered in the case.

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

(Whereupon, Murray-2, List of Materials Reviewed, MURRAY0001 - MURRAY0343, was marked for identification.)

BY MR. DAVIS:

Q. Other than what's been marked as Exhibit 2, do you know of anything else in terms of written materials or documents that you reviewed or considered or relied upon?

MR. VANZANDT: Objection, vague, compound.

A. Can you rephrase your question, Todd?

BY MR. DAVIS:

Q. Yes.

A. Thanks.

Q. Is Exhibit 2 a complete list of the materials that you've reviewed, relied upon or considered to form your opinions in the case?

A. As I sit here today, I mean, I'm a scientist. I continue to review science as it's released. There was a paper that came out yesterday that is relevant here. I also have an opinion on some of the

Page 31

experts retained by you folks and their reports that also informs my opinion today.

Q. Okay. Other than the study that came out yesterday and the defense expert reports that you reviewed and what's listed in Exhibit 2, is there any other written material that you've reviewed or considered?

A. I've seen studies that have been published since this date. I've seen other studies as well.

Q. Can you identify any of them?

A. One that came out yesterday.

Q. Other than the one yesterday.

A. I don't recall --

Q. Okay.

A. -- now.

Q. Look at -- number 5 in the document request asks for any or all documents related to presentations made by you in which risk factors or causes of any eating disorder or body dysmorphic disorder is discussed, including, but not limited to, handouts, slides or videos used.

Do you see that?

Page 32

A. Yes.

Q. And did you search for that information?

A. I did.

Q. And I will represent to you, the only thing that we received is marked as Exhibit 3.

Is that the sum total of documents responsive to that request?

(Whereupon, Murray-3, Presentation, Severe Eating Disorders in the Outpatient Setting: Navigating Treatment and Ethical Challenges, was marked for identification.)

A. Would you give me a second to look through this?

BY MR. DAVIS:

Q. Sure.

A. Thanks.

Q. I'll represent to you that that came straight from the lawyers who are sitting right next to you.

MR. VANZANDT: Objection to the extent that calls for a legal conclusion.

Page 33

You got an extra copy of that?

Thanks.

(Document review.)

THE WITNESS: Sorry, I'm trying to navigate to the title of each of these.

BY MR. DAVIS:

Q. I'll represent to you, Dr. Murray, we got that from the lawyers that are sitting next to you, okay?

Let me ask it this way.

You gave the lawyers all the documents that were responsive to Request No. 5, right?

MR. VANZANDT: Objection to the extent it calls for a legal conclusion.

A. I gave counsel these documents.

BY MR. DAVIS:

Q. Okay. Is there anything that you gave the lawyers that's not included in Exhibit 3 that was -- that you pulled together to respond to the document request?

A. Is your question is there anything I gave to the lawyers which is not

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

in this pile?

Q. Yes.

A. Okay. Let me look through.
Doesn't appear so.

Q. All right. We're good?

A. Yeah.

Q. Okay. Now, look at Request No. 6: Any and all documents published or presented by you to the public that discuss social media, Internet use or video games as a cause or risk factor for any eating disorder or body dysmorphic disorder.
All right. Did you look for those documents?

A. Yes.

Q. Other than what's been marked as Exhibit 3, is there anything else that's responsive to that request?

A. These are the documents that I could locate that included presentations around the sort of phenomenology of risk factors of eating disorders.

Q. And you said by this, you're referring to Exhibit 3?

A. Yes.

Page 35

Q. And next is that we asked for billing statements, records, employee records, timesheets and other invoices that reflect the amount of time that you spent --

A. Uh-huh.

Q. -- on the case.
And you provided that to the lawyers?

A. Yes.

Q. Okay.
(Whereupon, Murray-4, Invoices, MURRAY0344 - MURRAY0356, was marked for identification.)

BY MR. DAVIS:

Q. I'm going to mark as Exhibit 4 the invoices we received. All right.
Dr. Murray, Request No. 8 asks for any and all documents reflecting any funding, payment or compensation received by you from plaintiffs' counsel or other lawyers representing claimants against any social media platform that relate to any research publication or article that you have authored or coauthored.

A. Uh-huh.

Page 36

Q. Do you see that?

A. Yeah.

Q. Did you look for those documents?
(Sotto voce document review.)

A. Yes.

BY MR. DAVIS:

Q. Do you have any?

A. Any -- this is the payments I've received.

Q. Well, you're referring to Exhibit 4, which are the invoices?

A. Yes.

Q. Outside of Exhibit 4, have you received any kind of payment, compensation of any kind from plaintiffs' lawyers or lawyers representing claimants against social media companies that relate to any research or publication or articles that you've authored or done?

A. No.

Q. Okay. You can put that aside.

A. Thank you.

Q. Now, Dr. Murray, you understand that we're -- the defendants are here today

Page 37

to understand what opinions you're going to offer at the trial of this case, right?

A. Yes.

Q. And you're prepared to give those opinions today, correct?

A. Yes.

Q. And other -- other than today's deposition, do you anticipate any further work in the -- the JCCP, which is the state court litigation, or the MDL federal litigation, outside of your deposition?

MR. VANZANDT: Just a second.
Objection, vague and compound.
And then I'll remind you, you can answer the question, but do not repeat any conversations that you've had with attorneys for plaintiffs or any written communications or oral communications.
You can answer the question.

A. Could you repeat your question? Sorry.

BY MR. DAVIS:

Q. Sure.
Do you anticipate doing any

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

further work in the litigation, other than perhaps reviewing literature or perhaps evaluating some plaintiffs in individual cases? Do you anticipate any further work other than that?

A.   I'm not -- I'm not sure.

Q.   Okay.  You don't know of any?

A.   No.

Q.   Okay.

A.   I'm not sure.  I'm aware that I have assessed some plaintiffs in this case. I am aware that I may be asked to testify in this case.

Q.   Okay.

(Whereupon, Murray-5, 4/18/25 Murray Expert Report, was marked for identification.)

BY MR. DAVIS:

Q.   Dr. Murray, I'm going to hand you what's been marked as Exhibit 5, which is your April 18, 2025 report; is that correct?

A.   Yes.

Q.   And I'm going to hand you what's been marked as Exhibit 6.

(Whereupon, Murray-6, 5/16/25

Page 39

Murray Expert Report, was marked for identification.)

BY MR. DAVIS:

Q.   That is your May 16, 2025 report, correct?

A.   Yes.

Q.   All right.  You understood, for purposes of the opinions that you would offer in either of the two litigations, that you had to do a written report?

A.   Yes.

Q.   And you understand that you were to set out the opinions that you would offer in the case in those reports?

A.   Yes.

Q.   And you did that, right?

A.   I did.

Q.   Okay.  Is there anything in the reports that you want to change or correct in any way?

A.   In what capacity?

Q.   In any way.

A.   I think it's relevant to mention that I -- I have an opinion that -- to some of the reports that your experts have

Page 40

published or shared.

As I mentioned, I consume science, so any new science that comes out -- I always consume science, so that informs my opinion as well on an ongoing basis.

Q.   Yeah, my question was a little bit different than that.  My question was: For those two reports, is there anything you want to change in those reports?

A.   I stand by my opinions in both reports.

Q.   You stand by the statements in those reports too, right?

A.   Yes.

Q.   Now, which defense expert reports did you review?

A.   Primarily, the two eating disorder experts, I believe Dr. Schwartz and Dr. Shear.

Q.   Okay.  Those are the only two that you reviewed?

A.   Those are the two that I had the most opinions on.  I reviewed some others as well.

Q.   Which other ones did you

Page 41

review?

A.   I'm blanking on their names, unfortunately.  Yeah.  Those names are salient because I'm aware of who those folks are; they're in my field.

Q.   Is it fair to say that other -- like, did you read Dr. Schwartz' and Dr. Shear's entire reports?

A.   Uh-huh.

Q.   You have to answer out loud.

A.   Yes.  I'm sorry, yes.

Q.   It's okay.

And other than Dr. Shear and Dr. Schwartz's reports, did you read all of any of the other defense expert reports?

A.   I -- I read parts of all the other experts' reports.

Q.   You skimmed those other expert reports?

A.   I wouldn't necessarily say skimmed.  I read parts of them.

Q.   Is there any specific expert -- set aside Dr. Shear and Dr. Schwartz for a second.  I'll get to them in a minute.

A.   Uh-huh.

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

Q. For the other defense expert reports, was there any specific thing that was said in any of those reports that you take issue with?

A. Outside of the -- outside of the content of the Schwartz and the Shear reports?

Q. No, no. I'll ask you about the Dr. Schwartz and Dr. Shear reports later.

A. Okay.

Q. I'm asking about all the other defense expert reports.

A. Yeah.

Q. For those reports, is there any specific statement that you take issue with in those reports?

MR. VANZANDT: Objection, vague, ambiguous.

A. I can't recall specific statements. I recall a general sentiment of not having the same opinion.

BY MR. DAVIS:

Q. Okay. Well, is there anything that you're going to come to trial at, in this -- in the case and say: For these other

Page 43

defense expert reports that are not Dr. Schwartz and Dr. Shear, I take issue with X, Y and Z?

MR. VANZANDT: Objection, vague.

A. Again, I -- I can recall a general sentiment of not having the same opinion.

BY MR. DAVIS:

Q. Other than that, can you give me any more specifics?

A. That I -- you said I didn't share the same opinion in its entirety as some of those other expert reports.

Q. Can you point to any study in those other defense expert reports, any statement or analysis in those other defense expert reports and say I disagree with this and here is why?

A. Not as I recall right now.

Q. Okay. All right. Let me ask you about the Schwartz and Shear reports.

A. Sure.

Q. What -- did you disagree with anything about those reports?

Page 44

A. Quite a bit.

Q. Okay. What are -- what are the differences? What are the places that you -- let me back up.

What are -- what did you see in Dr. Schwartz and Dr. Shear's reports that you take issue with?

A. Should I enumerate them --

Q. You should.

A. -- to the best of my recollection?

Q. You should. I'm here to find those out today.

A. Okay. Great.

One was an inconsistent use of a methodological criticism. And I can expound on any of these. I'm going to give you the broad issues. If you'd like me to expound on them, I can.

Q. No, give me the list and we'll come back. So thank you.

A. Okay. Great. There is -- let's see.

Both Dr. Schwartz and Shear make reference to the body of evidence that

Page 45

there are no studies assessing diagnosed eating disorders. I don't agree with that in the context of social media use.

I don't agree with the criticisms rendered around the construct of self-report.

And their criticisms of validated psychometric instruments to measure psychopathology is not shared by me and many in my field.

Let's see. The methodology of their review was fairly unclear to me as well.

And I, in particular, don't share Dr. Shear's opinion that body dissatisfaction is not part of an eating disorder. And to that particular point, Dr. Shear cites a study from the 1940s, '40s or '50s, I believe.

There are -- I'm sure I have others. I can't recall them right now off the top of my head. But those are some broad stroke concerns.

Q. Well, I'm here to find out all the opinions you have in response to those

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

two reports. So can you think of anything else sitting here today?

A.   I'm sure it will come up in the nature of the questions that you ask. As I'm on the spot sitting here now, those are the -- those are the criticisms that I can recall.

Q.   Okay.

A.   Or the points of disagreement that I would have with their conclusions, rather.

Q.   Those are the ones you know right now?

A.   Those are the ones that I can recall off the top of my head.

Q.   Okay.

A.   And I'm fairly certain that there would be others too that I just can't recall.

Q.   All right.

A.   Yeah.

Q.   If you think of another during the course of the day, you let me know, all right?

A.   Thank you. I will. Yeah.

Page 47

Q.   All right. Now, there's also -- in terms of the inconsistent -- the first one you listed was inconsistent use of methodology.

What did you mean by that?

A.   I mentioned inconsistent critique of a methodological design. So part of both reports -- if you're asking me to elaborate on this, I would like to.

Q.   I'm absolutely asking you to elaborate, yes.

A.   Thank you. I just want to understand the parameters.

Both Dr. Shear and Schwartz critiqued cross-sectional studies heavily in their reports, and what is stated abundantly throughout their report is one cannot reach causal conclusions based on cross-sectional studies.

Yet, at the same time, both Dr. Shear and Schwartz refer to genetics as being a known risk factor in the development of eating disorders and the neurobiology broadly as a risk factor, and particularly with -- they're both evidence bases that rest

Page 48

almost entirely on cross-sectional data.

So it strikes me that they -- both experts are saying, on the basis of almost entirely cross-sectional data, genetics, brain structure is a risk factor, without critiquing -- without offering any pause for concern in rendering a causal conclusion. Yet at the same time, they render an opinion that cross-sectional data, when applied to social media as a possible causal factor, has different criticisms that don't apply to the cross-sectional data supporting genetics or brain-based research.

Q.   Okay. Anything else about their -- where you describe -- anything else about that criticism that you can tell me today?

A.   I think that captures the essence of it. I can go into it further if you like.

Q.   That gives a good summary of it, right?

A.   Uh-huh. Uh-huh.

Q.   Yes?

A.   Yes.

Page 49

Q.   All right. How did you go about finding the literature that is identified in Exhibit 3, which is your list of materials considered?

A.   Exhibit 3 is my presentation.

Q.   Excuse me. I apologize.

A.   I may need a bigger table.

Q.   You may need a bigger table.

A.   So there are several forms of data. I want to just glance at this to make sure this is my materials considered list.

(Document review.)

A.   So I performed a systematic search. Additionally, I asked counsel for defense documents. And then I performed a search -- a search of defense documents too.

BY MR. DAVIS:

Q.   Did you do -- did you ask counsel for any literature searches as well that they had performed?

MR. VANZANDT: Objection.
Don't repeat any conversations or communications that you've had with plaintiffs' counsel.

A.   I undertook the literature

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

review myself.
BY MR. DAVIS:
Q. Did you receive any literature from plaintiffs' counsel that you included in your review and assessment of your opinions?
A. Not that I can recall. I can recall being -- very early on in the course of our correspondence, being sent some small volume of papers to orient myself to the broader issue, but once I had commenced the systematic review, no, that was my search.
Q. Can you identify that small set of material?
A. Not as I -- not as I recall today, I'm sorry.
Q. I've counted up the scientific articles in Exhibit 2, and it's over -- it's about 600-plus articles, okay?
A. Uh-huh.
Q. Did you review every single one of those articles?
A. I screened every article.
Q. Did you read them from front to back?
A. Generally, in a systematic

Page 51

review, you screen for relevance, salience. That's when most systematic reviews have exclusion and inclusion criteria. So I can tell you that I did not read every article in this front to back.
Q. Okay. With respect to the articles that are actually discussed in your two reports, did you read them all the way through?
A. Yes.
Q. Okay. In terms of the amount of time -- I've added up the -- well, let me back up.
There's 1500-plus internal company documents that are on Exhibit 3, okay -- excuse me, 2.
A. 2, actually.
Q. Did you read every single one of those front to back?
MR. VANZANDT: Objection, assumes facts not in evidence.
A. Again, I performed a screening -- screening search. If it seemed relevant, I read it. If it didn't, I didn't.
///

Page 52

BY MR. DAVIS:
Q. There are millions and millions of pages that have been produced in this litigation.
A. Yeah.
Q. You didn't review those millions and millions of pages, did you?
A. I did not review millions and millions of pages.
Q. Now, in terms of the selection of the internal company documents that you reviewed, is that -- were they all selected by plaintiffs' counsel and given to you?
A. No.
MR. VANZANDT: I'm sorry. Objection, misstates prior testimony, and, again, don't repeat any communications with plaintiffs' counsel.
A. As I mentioned, I was given some -- I asked for some documents, and then I performed an additional search.
BY MR. DAVIS:
Q. Were you given access to a database to search?

Page 53

A. Yes.
Q. You were?
A. Yes.
Q. And so what search terms did you use?
A. Pretty similar terms to the ones outlined in my systematic report.
Q. Okay.
A. They're listed.
Q. So was it the access to the entire document production in the litigation or was it a subset of the document production?
A. It's my understanding --
MR. VANZANDT: Sorry, hold on a second. Objection, vague, ambiguous, compound.
A. It's my understanding that it was access to the defense documents. That's what I asked for, and that's what I understood to receive.
BY MR. DAVIS:
Q. What search terms did you plug in?
MR. VANZANDT: Objection, asked

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

and answered.

A.    Yeah, the same search terms as my systematic review.

BY MR. DAVIS:

Q.    Were those identified in your report?

A.    They are.

Q.    Okay.

A.    Yeah.

Q.    That's identified in -- if you look at your May 16 report.

A.    Okay.

(Interruption by the videographer.)

MR. VANZANDT:  Todd, can we pause a second so he can slide over for the camera.

MR. DAVIS:  I'm sorry.

(Technical comments off the stenographic record.)

BY MR. DAVIS:

Q.    So paragraph 36 identifies the key search terms?

A.    You said to look at the May, not the April?

Page 55

Q.    Yes.  They're identical, but go ahead.  I just want to let you know they're identical.

A.    Yeah, those are the search terms.

Q.    Okay.  Those are the search terms that you used and plugged into the database of company documents?

A.    Yeah, these are some of the search terms I used.

Q.    Were they some or are they all of them?

A.    No, they were the search terms that I used.

Q.    So every -- so there weren't any additional search terms that you used other than what's identified in paragraph 36?

A.    There were no additional search terms that I used that are not identified here, correct.

Q.    Were there any documents that counsel asked you to focus in on?

MR. VANZANDT:  Objection. Again, don't repeat any conversations that you've had with

Page 56

plaintiffs' counsel.

A.    Would you repeat your question.

BY MR. DAVIS:

Q.    Were there any documents that plaintiffs' counsel asked you to focus in on?

MR. VANZANDT:  Same objection, and instruct him not to answer about anything plaintiffs' counsel has asked him to do.

A.    Yeah, not that I can recall.

BY MR. DAVIS:

Q.    So they didn't -- there wasn't a discussion where plaintiffs' counsel said you need to pay attention to X, Y or Z document?

MR. VANZANDT:  Okay. Objection, stop.  Don't answer the question, okay.  That violates the stipulation we have in this case. Communications between the witness and counsel are protected.

MR. DAVIS:  I think it goes to the issue of what facts he was asked to assume.

MR. VANZANDT:  I don't care

Page 57

what issue you think it goes to.  It violates the stipulation and he's not going to answer the question.

MR. DAVIS:  Are you going to follow that instruction, Dr. Murray?

THE WITNESS:  I've been instructed to not answer the question. I would like to follow that instruction.

MR. DAVIS:  Okay.

BY MR. DAVIS:

Q.    Now, were you given any set of facts or assumptions in terms of your assignment in this case?

A.    What do you mean?

Q.    Any -- well, did plaintiffs' counsel say we want you to assume these facts, or we are giving you these facts, now go do your assignment?

A.    I don't think any -- can you repeat your question, Todd?  I'm sorry.

BY MR. DAVIS:

Q.    Sure.

Did plaintiffs' counsel give you any assumptions to do your assignment or

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

did they give you any facts and say I want you to assume these facts and then go do your assignment?

MR. VANZANDT: Objection, compound and vague.

A.   No, I can't recall ever receiving an opinion or an instruction to form an opinion.

BY MR. DAVIS:

Q.   Okay.

A.   I can't recall that.

Q.   You -- your MDL report says that you reviewed and relied upon Dr. Lembke's expert report, right?

A.   I included that as one of the things I read.

Q.   Okay.  Did you read it or just skim it?

A.   I skimmed it, I would say.  I didn't read every page.

Q.   Okay.  And why is it that you are relying on Dr. Lembke's opinions in her report?

MR. VANZANDT: Objection, vague and misstates testimony.

Page 59

You can answer.

A.   I asked for it, and I don't -- wouldn't say -- I'd say that I considered it.

(Clarification requested by the stenographer.)

A.   I would not say that I relied on it.  I would say that I considered it.

BY MR. DAVIS:

Q.   Look at paragraph 43 of your May 2025 report.

A.   Which is -- paragraph 43.

(Document review.)

BY MR. DAVIS:

Q.   It says -- paragraph 43 says: For purposes of opinions regarding social media addiction, I have reviewed, rely upon and concur with the opinions in Anna Lembke MD's April 18, 2025 JCCP report.

Did I read that correctly?

A.   Yes, you did.

Q.   So you are relying on Dr. Lembke for the purposes of social media addiction opinions?

A.   What I wanted to clarify was that this was many -- this was one of many

Page 60

things that I considered and relied upon. Your question made it sound like that was the only thing I relied upon, so I didn't want to give a false impression.

Q.   I think we're miscommunicating. My question simply was:  You are relying upon Dr. Lembke's opinions about social media addiction for purposes of your opinions in this case?

MR. VANZANDT: Objection, asked and answered.

A.   I mean, I skimmed that report.

BY MR. DAVIS:

Q.   You relied upon it according to this -- this expert report, correct?

A.   Uh-huh.

Q.   Yes?

MR. VANZANDT: Objection, asked and answered.

A.   Like I mentioned, I skimmed that report, and I assume -- assimilated that evidence with other forms of evidence.

BY MR. DAVIS:

Q.   But you are relying upon Dr. Lembke's report regarding social media

Page 61

addiction, correct?

MR. VANZANDT: Objection, asked and answered.

A.   Again, I will say to you, Todd, that I read parts of that report, and that --

BY MR. DAVIS:

Q.   You tell me, Dr. Murphy [sic]. Are you --

MR. VANZANDT: I'm sorry.  I'm sorry.

MR. DAVIS: No.  No.

MR. VANZANDT: You can't cut him off.

BY MR. DAVIS:

Q.   Are you finished, Dr. Murphy?

MR. VANZANDT: Were you done with your answer?

A.   Can I correct my name, though? My name is not Dr. Murphy.

BY MR. DAVIS:

Q.   Murray, excuse me.

A.   That's okay.

Q.   Dr. Murray, did you finish?

A.   I lost my train of thought with your --

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

Q.   Let me just reask the question, okay?

A.   Yeah.

Q.   My only -- it's like tell me yes or no: Did you rely upon Dr. Lembke's opinions about social media addiction for purposes of your opinions in the case?

MR. VANZANDT: Objection to the commentary. You can ask questions but you can't tell the witness how to answer.

A.   I mean, I read parts of this report. They -- it was largely concordant with my research.

BY MR. DAVIS:

Q.   Is there any part of Dr. -- so do you have your own opinion about whether or not social media use is addictive?

A.   Yes.

Q.   Okay. And is that reflected in your report?

A.   I believe so.

Q.   Okay. So are you in any way relying upon Dr. Lembke's report for purposes of your opinions in the case?

Page 63

MR. VANZANDT: Objection, asked and answered.

A.   Like I say, I read parts of it. It concords with a lot of my own research, and certainly with my clinical experience in this domain.

BY MR. DAVIS:

Q.   Have you had any conversations with any of the other lawyers -- of plaintiffs' experts, Dr. Murray?

A.   No.

Q.   Okay. Now, if you can look at the invoice for -- that's been marked as --

MR. VANZANDT: You did mark it.

(Interruption by the stenographer.)

THE WITNESS: I may need a bigger table. Sorry.

BY MR. DAVIS:

Q.   Let me ask you before I get to that.

A.   Yeah.

Q.   Dr. Murray, when were you first contacted by plaintiffs' counsel?

A.   Hmm. In 2023, as I recall.

Page 64

Q.   Do you know when?

A.   I don't recall when.

Q.   The first -- your first invoice is dated June 26th, 2023, right?

A.   Correct. I see that here.

Q.   Okay. And who contacted you?

A.   Hmm. I --

MR. VANZANDT: Let me just interject here real quick. You can answer who contacted you and the timing of that, but just a reminder not to repeat any conversations you had with plaintiffs' counsel.

But you can answer the question.

THE WITNESS: Okay. Thank you.

A.   I don't recall. I think it was either Jennifer or Sara.

BY MR. DAVIS:

Q.   Jennifer, Emma or Sara?

A.   Sara Couch.

Q.   Okay.

A.   That's as I recall, I think.

Q.   A lawyer from the Beasley Allen firm, right?

Page 65

MR. VANZANDT: Objection, assumes facts.

A.   Yeah, I -- I was contacted, I think, by Jennifer or Sara first. I'm not sure who they were representing at that time. I don't know.

BY MR. DAVIS:

Q.   Do you know how they got your name?

A.   No.

Q.   And in relationship to your invoice being dated June 26th, 2023 --

A.   Uh-huh.

Q.   -- where in relationship to that date did this first contact happen?

MR. VANZANDT: Objection, vague.

A.   Yeah, I don't know.

BY MR. DAVIS:

Q.   All right.

A.   I just don't know. I'm sorry.

Q.   And at that time, did you agree to serve as an expert for the plaintiffs' lawyers?

MR. VANZANDT: Objection,

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

characterization.

A.   I don't recall when that conversation happened and when I agreed to do that.

BY MR. DAVIS:

Q.   Okay.

A.   Yeah, I'm sorry.

Q.   After the first contact, when did you -- what time period elapsed, if any, for -- before you agreed to serve as an expert on behalf of plaintiffs' counsel?

MR. VANZANDT:  Objection, vague, asked and answered.

A.   Yeah, I don't know.  I'm sorry.

BY MR. DAVIS:

Q.   Well, if you look at your invoices.

A.   Yeah.

Q.   You've got an invoice -- the next invoice -- you've got an invoice dated June 26th, 2023, okay?

A.   Yeah.

Q.   Right.

And then you have a number of other time that's listed on these invoices,

Page 67

correct?

A.   Correct.

Q.   Other than the time that's listed -- the last invoice, if you go to look at that, that's at -- it's dated May 2, 2025, right?

A.   Yes.

Q.   Okay.  Since this last invoice in May, May 2025, have you done additional work on the case?

A.   Yes.

Q.   How many hours since that -- the last time you billed on May 2, 2025?

A.   I don't know.  I haven't formulated the invoice.  I don't know. Probably similar to the -- probably similar to the prior three, I would say.

Q.   Okay.

A.   But I'm not sure.  I genuinely don't know.

Q.   By the prior three, you mean the one that's --

A.   Or the prior four, I'm sorry, looking at this too.  I don't know.  I can find out for you though.

Page 68

Q.   Yes, I'd like the additional invoices for the time that you've spent up to the deposition, all right?

A.   Sure, yeah.

Q.   You charge $1,000 an hour, right?

A.   Yes.

Q.   And that's for anything you do on the case, right?

A.   Uh-huh.

Q.   Yes?

A.   Yes, I'm sorry.

Q.   So for today, sitting here today, if we go eight and a half hours, you'll make $8500, right?

A.   I charge in hourly increments, so like nine.

Q.   Oh, I see, excuse me.  So if we go eight and a half hours, you round up and you're going to charge $9,000 for the day?

A.   I charge in hourly increments, yes.

Q.   Okay.  So, for example, if you do 31 minutes, you charge a thousand dollars, correct?

Page 69

A.   Yes.

Q.   Okay.  And you also even charge for things such as updating your CV, right?

A.   Uh-huh.

Q.   Yes?

A.   Yes.

Q.   Okay.  And do you charge for your travel time as well?

A.   Yes.

Q.   So, for example, if you drive somewhere for purposes of the case, like coming here to the deposition, you charge for that, right?

A.   No.  I wouldn't charge for that travel.

Q.   What if you're traveling to go examine one of the plaintiffs in the case; do you charge for that?

A.   Depending where, if it's not in Los Angeles, I would probably charge for that travel time.

Q.   And have you, in fact, charged for that travel time in the case?

A.   I think so.

Q.   Okay.  So, for example, you're

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

driving down the freeway, you're going from LA to San Diego, you're charging for that time?

A.    Correct.

Q.    Okay.

A.    I haven't been to San Diego.

Q.    How does the amount -- the hourly -- well, the $1,000 per hour compare to your annual salary?

MR. VANZANDT:  Objection, vague and ambiguous.

A.    Yeah, what do you mean?  In terms of the hourly amount or the --

BY MR. DAVIS:

Q.    I added up your hours, and I -- that you had spent and the amount of money you have made from May -- up to the May 2, 2025 invoice, and it's over a half a million dollars.

Does that sound about right to you?

A.    That's surprising.

Q.    I'll just represent to you that it was $547,786.14, okay?

Accepting that as true, how

Page 71

does that compare to your annual salary over the last two years?

MR. VANZANDT:  Objection, assumes facts.

A.    Yeah, I don't -- I don't exactly know what my salary is because I have different sources of funding, different sources of support from my university.

BY MR. DAVIS:

Q.    You have a -- but you have a salary from USC, right?

A.    I had a -- do you mean currently or historically?

Q.    Currently.

A.    I don't work at USC currently.

Q.    Okay.  When did you end your work at USC?

A.    My work at USC ended, I believe, in September of last year.

Q.    Okay.

A.    Yeah.

Q.    So back to my question:  How does the almost $550,000 over the last two years compare to your annual income?

MR. VANZANDT:  Objection,

Page 72

vague, calls for speculation, asked and answered.

A.    Yeah, I'm not sure what my income -- my salary was.

In academic medical centers, generally there's multiple streams of income, so I don't know what it is, and that's also true at UCLA where generally you have various streams to support your salary.

I will say that my UCLA salary is publicly available.

BY MR. DAVIS:

Q.    Is it fair to say that the work that you're doing in this litigation testifying on behalf of plaintiffs' counsel is more -- you make more per hour doing that work than what you do in your day-to-day job?

MR. VANZANDT:  Objection, mischaracterizes evidence.

A.    On an hourly basis?

BY MR. DAVIS:

Q.    Yes.

A.    Generally, academic salaries are not discussed on an hourly basis.  So it's difficult for me to conceptualize my

Page 73

academic salary on an hourly basis.  I'm sorry.

Q.    Your academic salary, you're not getting $1,000 an hour, are you?

A.    Again, my salary is not parsed out into hours so --

Q.    What is your -- since your academic salary is public, what is it?

A.    I don't know.  It's publicly available.  But I know that if I get more grants, my salary will go up, and if I lose grants, it may change.  If I see more patients or do more patient care, it may change as well.  So it's pretty fluid.

Q.    Can you say it's more or less than what you're making over the last two years as an expert for plaintiffs' lawyers?

MR. VANZANDT:  Objection, calls for speculation, asked and answered.

A.    I don't know, to be honest with you.

BY MR. DAVIS:

Q.    Okay.  Now, you're not a medical doctor, right?

A.    I am a PhD and a DClinPsych.

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

Q.   And can you prescribe medication?

A.   I do not prescribe medication.

Q.   You don't -- do you hold any board certifications?

A.   I'm registered with my licensing board.

Q.   Okay.

A.   Yeah.

Q.   That's different than an MD who has to have a board -- can have a board certification, right?

A.   Well, both are licenses to practice, and I have a license with my organization.

Q.   But a board certification by an MD is different than a license to practice, right?

A.   A board certification for an MD is different from a clinical psychology license to practice, yeah.

Q.   Okay.  You don't hold any degrees in epidemiology or statistics, do you?

A.   I -- I recently completed a

Page 75

master's of neural imaging and informatics, which was -- informatics.

Q.   You may have missed my question.

My question simply was:  You don't have a degree in epidemiology or statistics, do you?

A.   I have a lot of training in those areas, and I don't have a formal degree in epidemiology.  But I study epidemiology often, and I've published close to 250 papers now, and serve on the NIMH study section of expert reviewers to review epidemiological studies.  So I consume epidemiological studies.

Q.   Have you done a statistical analysis yourself for an epidemiological study of any kind?

A.   Yes, I've done plenty of statistical analyses myself.

Q.   For an epidemiological study, where you constructed the statistical analyses and then performed the statistical analyses?

A.   As I recall, yes.

Page 76

Q.   Okay.

A.   I've been involved in many analyses.

Q.   All right.  Have you ever published anything that states that social media use is addictive?

A.   I mean, I generally focus on neurobiology in my research, but I'm recalling now a book which I coedited in 2019.  There's a -- there's a lot of reference to social media as a risk factor.

There's a chapter on social media use in that book as it relates to eating disorders in boys and men, and I can't quite recall if that sentence was there.  It's certainly something I've talked about with colleagues.

Q.   Okay.  What's the name of the book?

A.   Eating Disorders in Men and Boys, I think.  It's by Springer.

Q.   All right.  Back to my question:  In any publication, have you ever stated that social media use is addictive?

MR. VANZANDT:  Objection, asked

Page 77

and answered.

A.   I can't recall if I've ever said that sentence in a publication.  I can recall having conversations to that effect with trainees, with colleagues.  I can recall publishing on social media.

BY MR. DAVIS:

Q.   Yeah.  I can --

MR. VANZANDT:  Don't interrupt his answer.  Finish answering, please.

MR. DAVIS:  Are you finished?

A.   So I can't quite recall if I've ever said that sentence in a publication.

BY MR. DAVIS:

Q.   I would just ask, Dr. Murray, if you could really focus on my question.

The lawyers sitting to your right have given me time limits today.

A.   Okay.

Q.   And so I'm asking you to answer my question because that will make the process run smoother and that will also avoid me having to ask for you to come back on another day.

So let me ask the question

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

again.

MR. VANZANDT: And pause, please. Objection to the speech and this admonition of the witness. Please, just ask questions.

MR. DAVIS: Yeah, I'm just letting him know and I'm letting you too know, Mr. Van Zandt, that that's my advice, that I really need responsive answers and not answers that don't answer my question. That's a problem. So I'm just letting everybody know.

MR. VANZANDT: His answers are answering your questions. You may not be getting the answers you want, but he's answering your questions. So please just continue to ask questions.

BY MR. DAVIS:

Q. Dr. Murray, it's fair to say that you've never published that social media use is addictive, have you?

A. Again, I can't recall if I've ever published that sentence, but like I mentioned, I've published a book where social

Page 79

media is discussed as a risk factor for psychiatric disorders.

Q. You don't specifically mention addiction in that book, do you?

MR. VANZANDT: Objection, asked and answered.

A. Yeah, I can't recall. I'd happily read it.

BY MR. DAVIS:

Q. You've never said in any book or any other publication that social media use causes any depressive disorder, any anxiety disorder, or any eating disorder or eating disorder symptoms, have you?

MR. VANZANDT: Objection, compound.

A. I've -- I can recall many instances. And I do this all the time with my patients and with my trainees, where we formulate the causal factors implicated in -- as you alluded to, eating disorders, and very frequently, what comes up is social media.

And to answer the first part of your question, I can't recall if I've ever published that.

Page 80

BY MR. DAVIS:

Q. Okay.

A. Because a lot of my research focuses on neurobiology, which I'm obligated to do to finish out the grants that I hold.

Q. Okay. Now, you've never published any article or other publication of any kind that says that social media use causes BDD, suicidal thoughts or behavior or sleep disorders, fair?

MR. VANZANDT: Objection, compound.

A. I can recall a study that I have published where I think we do a pretty good job of illustrating a prospective link between social media use at time one and the onset of psychiatric disorders at time two.

Whether or not that targeted BDD, I don't think it did. It targeted other psychiatric disorders.

BY MR. DAVIS:

Q. I think you missed my question again, so I'm going to ask you again. Please, listen to my question, focus in on my question.

Page 81

A. Got it.

Q. My question simply was: You've never published anything where you said that social media use causes suicidal thoughts or behavior, BDD, or sleep disorders of any kind, right?

MR. VANZANDT: Objection, compound, asked and answered.

A. That requires some context. Can I share?

BY MR. DAVIS:

Q. No, I just want to know whether you've published anything that says that.

A. What my publications have said is that social media -- the one I'm thinking of in particular that's in my report illustrates that social media use at time one predicts prospectively the onset of an eating disorder at time two.

And we know that those eating disorders are linked with the subsequent onset of other comorbidities. So it's a little bit of a nuanced answer.

BY MR. DAVIS:

Q. Dr. Murray, I've not asked you

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

anything about eating disorders. I've asked you about any publication you've made where you've said that social media use causes suicidal thoughts or behavior, BDD, or sleep disorders of any kind.

Have you published anything?

MR. VANZANDT: Objection, asked and answered.

A. Again, if we know that there's certain comorbidities that cluster with other psychiatric disorders, and I have published a paper that illustrates that social media prospectively predicts the onset of one disorder that is statistically linked to the onset of other disorders, I would say as a scientist that those -- those are relevant to your question, which is why I bring them up.

BY MR. DAVIS:

Q. I haven't asked you that. I've simply asked you whether you've put pen to paper in a published article or any publication of any kind where you said social media use causes suicidal thoughts or behavior, BDD, or sleep disorders of any kind.

Page 83

Have you -- have you made that statement in any publication?

MR. VANZANDT: Objection, asked and answered, compound.

A. Yeah, I don't recall if I've said verbatim that sentence that you highlighted.

BY MR. DAVIS:

Q. Okay.

A. But I do recall having published on the impact of social media on eating disorders, and I also have reviewed the comorbidities that develop after an eating disorder develops. And so they're related to depression, body dysmorphic disorder and sleep perturbations, as you've said.

Q. In any of the publications that you've just identified, in none of them do you say that any of those comorbidities of social media use cause any mental health disorder or outcome, do you?

A. Can you -- sorry. I lost my train of thought for a second. Would you repeat that question?

Page 84

MR. DAVIS: Court reporter, can you repeat the question, please.

------------

(The following portion of the record was read.)

QUESTION: In any of the publications that you've just identified, in none of them do you say that any of those comorbidities of social media use cause any mental health disorder or outcome, do you?

(End of readback.)

------------

A. So in the paper --

THE WITNESS: Thank you, by the way.

A. In the papers that I publish, we demonstrate the link between social media use and the onset of a series of psychiatric disorders which are known to co-relate and coalesce with other psychiatric disorders. And I don't recall whether I said the sentence that you said, though.

BY MR. DAVIS:

Q. You don't recall saying in any

Page 85

of your publications that social media use causes any type of comorbidity that then leads to some mental health harm or injury, do you?

MR. VANZANDT: Objection, asked and answered.

A. Yeah, I don't recall if I've said that sentence.

BY MR. DAVIS:

Q. Okay.

A. But I do recall demonstrating evidence of a prospective link between social media and psychiatric disorders --

Q. Name those --

MR. VANZANDT: Don't interrupt.

BY MR. DAVIS:

Q. Name the studies that you keep referring to. What are they?

A. Can I finish my sentence first?

Q. Sure.

A. Gosh, what was I going to say. I can name a study that I'm referring to. It's a study that I published. It's a study showing social media --

Q. I just need the name of it.

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

That's all.

A. Oh.

MR. VANZANDT: Stop interrupting him, okay. That's the second time in a row. You're not letting him finish his answer. Stop interrupting.

BY MR. DAVIS:

Q. I just need the name of the study.

A. Sure. Give me one sec. I'm going to pull it up.

The study's name -- thank you for your patience, Todd -- is "Contemporary screen time modalities among children 9-10 years old and binge-eating disorder at one-year followup: A prospective cohort study," which illustrated that greater screen time, including social media use, in 9- to 10-year-old children, was prospectively associated with greater odds of being diagnosed with binge-eating disorder at --

Q. I got you, Dr. Murray?

A. My bad.

Q. That's the Nagata 2021 paper?

Page 87

A. That is -- that's the 2021 paper. I know that --

Q. The lead author is Nagata, right?

MR. VANZANDT: Hey, stop interrupting him. This is the fifth time in a row. We're going to stop the deposition if you keep going. He was in the middle of a sentence.

BY MR. DAVIS:

Q. Is it Nagata 2021, Dr. Murray?

A. I don't remember who the first author was. It was a collaboration that was with Jason Nagata, yes.

Q. Okay. But it was about binge-eating disorder symptoms and contemporary screen usage in 9- or 10-year-olds in the ABCD dataset, right?

A. That sounds familiar, yes.

Q. Okay, thanks.

A. Thanks.

Q. Now, have you ever diagnosed any patient with social media addiction?

A. We conceptualize it often in the clinical treatment programs and treatment

Page 88

planning. Where -- we're limited by billing codes ultimately. There's no billing code at this time that relates to that.

And so what we do is we talk about it. We conceptualize it, we formulate it into a treatment plan. We understand it often as a maintaining variable, as a risk factor, as a predictor of poor outcome, which we see clinically often.

But we're limited by billing codes, so I can't recall a billing code right now that relates to that.

Q. So you've never -- you're not able to put social media addiction down because it's not recognized in the DSM-5, right?

MR. VANZANDT: Objection, misstates testimony.

A. We're not able to bill for social media addiction because there's no billing code for that at this time.

BY MR. DAVIS:

Q. Have you ever written in any patient's chart "this patient has social media addiction," or words to that effect?

Page 89

MR. VANZANDT: Objection, vague and ambiguous.

A. I recall oftentimes documenting in patient -- patient correspondence, correspondence with the treatment providers in my team, social media addiction, often.

BY MR. DAVIS:

Q. So you're telling us under oath that you have determined and written down somewhere in a patient's chart that that patient has social media addiction.

Is that what you're telling us?

MR. VANZANDT: Objection, asked and answered and argumentative.

A. Yeah, I'm telling you that what I said -- and let me clarify -- is that we discuss this as treatment providers often where we talk about risk factors, maintaining variables, things that would portend a poor outcome, and oftentimes, in those clinical discussions and supervision meetings and treatment planning meetings, we talk about social media addiction.

I'm also saying that because we can't bill for that, it's not a diagnostic

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

code and therefore it's not a diagnosis that I've rendered in a chart because I can't bill for it.

BY MR. DAVIS:

Q. I'm not asking you that, Dr. Murray. I really need you to focus on my question.

Have you ever written in a patient's chart anywhere at any time, the patient had social media addiction, or words to that effect?

MR. VANZANDT: Objection, vague, asked and answered.

A. Yeah, I can't recall if that sentence has been in a chart. I can tell you that treatment planning, case conceptualizations, case formulations oftentimes include discussions of social media addiction with my patients.

BY MR. DAVIS:

Q. Okay. And how many patients have you told: You have a social media addiction?

MR. VANZANDT: Objection, misstates testimony.

Page 91

MR. DAVIS: Let me back up.

BY MR. DAVIS:

Q. Have you ever told a patient "you have a social media addiction"?

A. Patients have told me that.

Q. Have you ever told a patient that "you have a social media addiction"?

A. Sure.

Q. How many?

A. Oh, gosh. I don't remember. It's many --

Q. Okay.

A. -- in the course of my career. This is increasingly common. And again, we talk about this often with colleagues and with my treatment team.

Q. So can you put a number on it?

A. A number on what?

Q. How many patients you've told have a social media addiction.

MR. VANZANDT: Objection, asked and answered.

A. I don't -- no idea.

BY MR. DAVIS:

Q. Is it five? Is it 10? Is it

Page 92

20?

MR. VANZANDT: Objection, asked and answered and argumentative.

A. Yeah, I don't know the number, Todd. It's several.

BY MR. DAVIS:

Q. Okay.

MR. VANZANDT: We've been going about an hour. We can take our first break.

MR. DAVIS: Yeah. Yeah, why don't we -- if we can excuse Dr. Murray, there's a couple of things I want to talk with you about.

Thank you, Doctor.

THE VIDEOGRAPHER: We're now going off the record, and the time is 10:04 a.m.

(Whereupon, the following proceedings were conducted off the video recording outside the presence of the witness.)

MR. DAVIS: Joseph, I'm just letting you know, I'm not getting responsive answers. I think they're

Page 93

pretty straightforward answers about what he's said, what he's done, and for whatever reason, he's not answering.

And so I just want to give you a heads-up early on that if that continues, you know, we're going to bring him back for another day.

The discussion was, you know, we would have answers to questions that we put -- that there would be responsive answers. That just hasn't taken place, and so I'm just -- I'm just letting you know at the front end.

MR. VANZANDT: And he is being responsive and answering your questions. Again, it's not the answer you already wrote down in your notes there that you wanted, but he's answering your questions.

And I will put you on notice that you're going to stop interrupting the witness when he's trying to answer. And we're not going to have

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

that kind of conduct.  If you ask him questions, he gets to answer.

MR. DAVIS:  Look, you're free to do whatever you'd like in that respect.  But when, Dr. Murray, I ask him what time it is, and he starts to build me a clock that has nothing to do with the time, it's not a productive use of our -- any of our time.

And so I would really appreciate it if you would have a conversation with him to try to get him back on track.  There were times that that happened with Dr. Mojtabai where it was helpful.

So I'm just asking you if you could have that conversation with him.

MR. VANZANDT:  I understand.  I don't think there's been anything inappropriate so far.

THE STENOGRAPHER:  Off the record?

MR. VANZANDT:  Good.

THE STENOGRAPHER:  Todd?

Page 95

MR. DAVIS:  Yes.

(Recess taken, 10:06 a.m. to 10:18 a.m. PDT)

THE VIDEOGRAPHER:  We are now going backing on the record, and the time is 10:18 a.m.

BY MR. DAVIS:

Q.    Dr. Murray, are you ready to continue?

A.    Yes.

Q.    Have you ever published anything on addiction?

MR. VANZANDT:  Objection, vague.

A.    Yes.

BY MR. DAVIS:

Q.    What publication?

A.    I published -- as I recall now, and there may be more than what I can recall off the top of my head.  I published a paper about eating disorders and comorbid methamphetamine use disorder.  I published a series of papers assessing anabolic steroid use.

Q.    Okay.

Page 96

A.    Go ahead.

Q.    Are you finished?

A.    I was just going to say I can't recall if there were more off the top of my head.

Q.    Have you ever published anything on risk factors or causes of addiction?

MR. VANZANDT:  Objection, vague.

A.    Again, I would have to go back and review my -- I've published many studies about steroid use in particular.  I can't quite recall if they discussed the epidemiology or the risk architecture.  I can't recall that.

BY MR. DAVIS:

Q.    Have you ever published any clinical research that you've done about risk factors for addiction or causes of addiction?

MR. VANZANDT:  Objection, vague and compound.

A.    Again, I can't recall.  There have been many studies that I've done looking at things like steroid use, and I can't quite

Page 97

recall if they discussed risk architecture. And I've also studied other -- go ahead. Looks like you want to...

BY MR. DAVIS:

Q.    Are you finished?

MR. VANZANDT:  He's not finished.  He's in the middle of a word.

MR. DAVIS:  I've asked him if he's finished.

MR. VANZANDT:  And he very clearly wasn't.

MR. DAVIS:  That's why I've asked him, are you finished.

MR. VANZANDT:  Well, if he's in the middle of a word, you don't need to ask him if he's finished.

MR. DAVIS:  Joe, he asked me if I wanted to say something.

MR. VANZANDT:  Because you start pointing at him in the middle of him talking.

MR. DAVIS:  Okay.  This is how it's going to go.  I see.

Do you want to finish

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

something, Dr. Murray? Are you finished with your answer?

THE WITNESS: I don't remember where I was, but I finished.

MR. DAVIS: Okay.

BY MR. DAVIS:

Q. Have you ever done any clinical research on substance use disorders or behavioral addictions?

A. Your question is have I ever done research?

Q. Clinical research.

A. Clinical research.

Yes.

Q. On substance use disorders?

A. I have a grant right now from the NIH which is assessing alcohol use and comorbid disordered eating. We have another grant that's about to be reviewed, hopefully favorably, looking at other substance use disorders and comorbid eating disorders, and in clinical populations and those -- sorry, clinical and community populations.

Q. So the research that you've done with respect to substance use disorders

Page 99

is related to whether or not they are a comorbid risk -- or a risk factor for an eating disorder; is that fair?

A. No. I think these particular studies are trying to limit the extent to which one exacerbates the other or causes the other. So in both of those grants I'm alluding to, they're sort of oriented to the prevention of symptoms causing symptoms in another different domain.

Q. Okay. Other than those two research projects, have you done any other clinical research on substance abuse disorders or behavioral addictions?

A. Again, outside of those -- outside of those two NIH grants, I can't recall exactly other -- other studies.

Q. None come to mind?

A. I mean, I've -- none come to mind, but I would be happy to review the 250 that I've published and go through it.

(Whereupon, Murray-7, Excerpt From Clinical Handbook of Complex and Atypical Eating Disorders, by Anderson et al, was marked for identification.)

Page 100

BY MR. DAVIS:

Q. Let me ask you this before I -- I've handed you Exhibit 7.

A. Yeah.

Q. Which is -- which I'll get to in a second.

A. Okay.

Q. It's your Clinical Handbook of Complex and Atypical Eating Disorders, right?

A. That's what this exhibit is, yes.

Q. There's some pages I've pulled out of that book that I'm going to ask you some questions about.

A. Okay.

MR. VANZANDT: Can I have a copy, please?

MR. DAVIS: It's right there.

MR. VANZANDT: Thanks.

BY MR. DAVIS:

Q. Dr. Murray, body dissatisfaction alone is not sufficient to make a diagnosis of any eating disorder or body dysmorphic disorder, true?

A. Body dissatisfaction is

Page 101

embedded, in many instances, within an eating disorder. I'm thinking of anorexia nervosa, for instance, the criteria related to a fear of weight gain, disturbance in how one's body is perceived and an overvaluation of one's body. So I would say that it's very central to disorders.

Q. I think you missed my question. My question was --

A. Sure.

Q. -- body dissatisfaction alone, that's all you have, body dissatisfaction, that is not sufficient to diagnose an eating disorder or body dysmorphic disorder, right?

MR. VANZANDT: Objection, vague, ambiguous, calls for speculation.

A. Body dissatisfaction is part of an eating disorder and almost always part of a body dysmorphic disorder, and when accompanied with other symptoms, would go towards supporting a diagnosis when accompanying other symptoms of an eating disorder.

MR. DAVIS: I'll move to strike

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

as nonresponsive.

MR. VANZANDT:  Look, I'll object to your motion.  The question was answered appropriately and was responsive.

MR. DAVIS:  Joseph, it wasn't.

MR. VANZANDT:  Todd, I just want to note that the copy you gave me, there's a lot of highlighting and stuff marked out.  I want to make sure I don't have the wrong version.

MR. DAVIS:  No, it's okay.

MR. VANZANDT:  Okay.

BY MR. DAVIS:

Q.    Doctor, you agree that body -- excuse me.

You agree that body dissatisfaction is common in the adult and pediatric population, right?

A.    That's a relative question.  It depends on how you define common, I suppose.

(Whereupon, Murray-8, Body dissatisfaction, narcissism and self-esteem in young men and women: A moderated mediation analysis, by

Page 103

Purton et al, was marked for identification.)

BY MR. DAVIS:

Q.    I'll hand you what's been marked as Exhibit 8.  This is an article that you wrote, right?

A.    Yes, I'm one of the authors on this article.

Q.    Okay.  Turn to page 99.

A.    Okay.

MR. VANZANDT:  And, Dr. Murray, you can take a moment and review and get familiar with the article if you need to.

THE WITNESS:  Okay.

BY MR. DAVIS:

Q.    If you look at the paragraph on the right column, the third sentence --

MR. VANZANDT:  Dr. Murray, are you ready to answer questions on the document yet?

MR. DAVIS:  Excuse me.  Excuse me.

MR. VANZANDT:  No, he can have a moment to review the document.

Page 104

MR. DAVIS:  If he's going to do that, we're going off the record.

MR. VANZANDT:  Going off the record?

MR. DAVIS:  Yeah, we're going to go off the record.

MR. VANZANDT:  No, we're not going off the record.  I didn't say we'd go off the record.

BY MR. DAVIS:

Q.    Dr. Murray, can you look at page 99, the right-hand column.

A.    Yes.

Q.    Okay.

A.    Uh-huh.

Q.    And if you look at the third sentence, okay --

A.    What does the sentence start with?

Q.    BD.

A.    Okay.

Q.    And BD is body dissatisfaction, correct?

A.    In this paper, that's abbreviated to BD, correct.

Page 105

Q.    It says:  Body dissatisfaction has been common in young women for decades, is increasingly common in men and is associated with a range of adverse outcomes, including low self-esteem, eating disorder behavior and poor mental health more generally.

That's what you wrote, correct?

A.    That's what that sentence says, yes.

Q.    You don't disagree that body dissatisfaction is common in both pediatric and adult patients, right?

MR. VANZANDT:  Objection, misstates evidence.

A.    What I'm saying here in this line is that it is increasingly common, and I don't -- my question was merely depends how you define common.

I think to your question, though, and as indicated in this sentence, it's common.

BY MR. DAVIS:

Q.    Body dissatisfaction has been around for decades and decades before social

27 (Pages 102 - 105)

CONFIDENTIAL

Page 106

media use ever existed, right?

A.   Correct.

Q.   And you agree that adolescence is a developmental period in which disordered eating and negative body image are highly prevalent, right?

A.   I would agree that adolescence is a period in which some evidence documents the onset of eating disorders is more likely.

MR. DAVIS:  Objection, nonresponsive.

(Whereupon, Murray-9, The Impact of Teasing and Bullying Victimization on Disordered Eating and Body Image Disturbance Among Adolescents: A Systematic Review, by Day et al, was marked for identification.)

BY MR. DAVIS:

Q.   Let me hand you what's been marked as Exhibit 9.

MR. VANZANDT:  Again, I'll note your objection as being nonresponsive, but it was answered appropriately.

///

Page 107

BY MR. DAVIS:

Q.   This is another article that you actually cite in your expert report, okay?

A.   Uh-huh.

Q.   Look familiar to you?

A.   Uh-huh.

Q.   Yes?

A.   Yes.

Q.   All right.  And it's an article called "The impact of teasing and bullying victimization on disordered eating and body image disturbance among adolescents:  a systemic review."

Correct?

A.   A systematic review.

Q.   Right?

A.   Yes, that's the article I have.

Q.   And if you look at the first sentence in the abstract it says:  Adolescence is a developmental period in which disordered eating and negative body image are mightily prevalent, yet their risk factors are insufficiently understood and targeted.

Page 108

Do you see that?

A.   I see that.

Q.   You don't disagree with that sentence, do you?

A.   It begs a question.  If you're asking me to agree with it or not, I would need to define prevalent here, but I certainly agree with the notion that adolescence is a developmental period where disordered eating and negative body image often manifest.

Q.   They're often occurring at that time, right?  Right?  That's -- they're highly prevalent, right?

A.   They often occur at that time.

Q.   And there's a high prevalence rate for disordered eating and negative body image during adolescence, correct?

A.   You would need to assess the prevalence rates, but as my clinician -- with my clinical hat on, I can tell you that body -- negative body image and disordered eating often manifest in adolescence.

Q.   Right.  And there's a high prevalence rate for that, right?

Page 109

MR. VANZANDT:  Objection, asked and answered, foundation.

A.   Again, I can tell you that there -- they often manifest in adolescence.  I don't know the prevalence rate that they're citing.

BY MR. DAVIS:

Q.   I'm just asking you for your view.

MR. VANZANDT:  Again, I'll note for the record, again, interrupting the witness' answer.

A.   Here my view is that -- excuse me -- disordered eating and negative body image often manifest in adolescence and in young people.

BY MR. DAVIS:

Q.   Yeah.  They often manifest because they're seen in a fair number of kids and adolescence, both disordered eating and negative body image, right?

MR. VANZANDT:  Objection, vague, ambiguous, compound, asked and answered.

A.   Would you ask me that again?

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

BY MR. DAVIS:

Q.  Yeah.

A.  I got lost a little bit in your question.

Q.  Negative body image and disordered eating are seen in a fair number of kids during adolescence.

MR. VANZANDT:  Objection, vague.

A.  Yeah, I don't know what you mean by fair number.  I can tell you with -- with -- I can tell you my opinion is that eating disorders, disordered eating and negative body image often manifest in young people.

BY MR. DAVIS:

Q.  Let's look at Exhibit 10.

(Whereupon, Murray-10, Appearance-related cyberbullying: A qualitative investigation of characteristics, content, reasons, and effects, by Berne et al, was marked for identification.)

A.  Thank you.

///

Page 111

BY MR. DAVIS:

Q.  This is another article that you cite in your report, right?

A.  I'm aware of this article, yeah.

Q.  Yeah.

And if you turn to page -- it's 1, left-hand column, first paragraph, second sentence.

It says:  Moreover, concerns over how one's body is perceived by peers preoccupy the minds of a majority of adolescents.

Do you see that?

A.  I see that sentence.

Q.  You don't disagree with that, do you?

MR. VANZANDT:  Objection, vague and foundation.

A.  Yeah, I agree with the notion that concerns over how one's body is perceived by peers are often a significant concern for adolescents.

I don't know if I agree with it being the majority, but I agree with the

Page 112

sentiment.

BY MR. DAVIS:

Q.  And if you look at left-hand column, first paragraph, the next sentence it says, quote:  Peers thus have a major impact in shaping adolescents' thoughts about their bodies.

Do you see that?

A.  Peers thus have a major impact in shaping adolescents' thoughts about their bodies.

Yeah, I see that.

Q.  You don't disagree with that either, do you?

MR. VANZANDT:  Objection, vague, foundation.

A.  I -- my opinion is that peers and other forms of social interactions, forms of social feedback, forms of comparison, which is -- I agree that that can shape an adolescent's thoughts about their bodies.

BY MR. DAVIS:

Q.  Right, and peer interactions can be classmates or friends, family members, all can shape a person's perception of their

Page 113

body image or their body satisfaction, right?

A.  This doesn't say that, but, I mean, as I mentioned, I think that peer -- peer interactions, social feedback, garnering feedback on how one is sort of socially received and their social context, that would include peer feedback.  That would also include online forms of peer feedback.  That would include social media.

And I do think that that is implicated in shaping how adolescents view and think about their bodies.

MR. DAVIS:  Sorry, but I didn't ask you that, Dr. Murray.  Please listen to my question.

BY MR. DAVIS:

Q.  The peer interactions that can shape negative body image or positive body image or negative thoughts about appearance, those can be -- they can come from family, they can come from friends, they can come from classmates, right?

MR. VANZANDT:  Objection, vague, ambiguous, compound and asked and answered.

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

A. So I think the social feedback that can shape an adolescent's thoughts and feelings about their body can come from classmates, they can come from peers, and they can be also derived from online platforms where people garner feedback as well.

MR. DAVIS: I move to strike after peers and classmates, nonresponsive.

MR. VANZANDT: His answer was appropriate and responsive.

BY MR. DAVIS:

Q. Is it fair to say that a person could have body dissatisfaction or negative thoughts about their body image and never develop an eating disorder or BDD?

MR. VANZANDT: Objection, vague.

A. I mean, I -- body dissatisfaction is part of an eating disorder and BDD, and to your question, it's one of many symptoms, or one of several symptoms of both of those disease states.

MR. DAVIS: I'll object as

Page 115

nonresponsive.

I didn't ask you that, Dr. Murray. Please focus on my question.

BY MR. DAVIS:

Q. A child, a teen or adult can have body dissatisfaction or negative imaging about their body and never develop an eating disorder or BDD, right?

MR. VANZANDT: Objection, vague.

A. A child can have body dissatisfaction and that serves as a risk factor for the development of an eating disorder and a body dysmorphic disorder, and it's also possible that a child with body dissatisfaction might not develop those symptoms.

BY MR. DAVIS:

Q. Well, Dr. Murray, please focus on my question.

A patient can have -- let me strike that.

A child, a teen or adult who has body dissatisfaction does not mean that

Page 116

they will more likely than not develop an eating disorder or BDD, fair?

A. I -- in all of my clinical experience, Todd, and the data as I understand it would suggest that if you have body dissatisfaction, you're more likely to develop other body image-related sequelae, which can include eating disorders and body dysmorphic disorder, and there are also cases where a body dissatisfaction may not go on to develop those sequelae.

Q. So body dissatisfaction or body imaging problems alone are not enough to diagnose a person with either an eating disorder or BDD, right?

MR. VANZANDT: Objection, vague, asked and answered.

A. Body dissatisfaction is part of a constellation of symptoms that would support the diagnosis, the two of which you mentioned.

It's also more likely to portend the development of other symptoms that would support a full diagnosis. And I accept that there are people that have body

Page 117

dissatisfaction that may never go on to reach full clinical threshold for those disorders.

BY MR. DAVIS:

Q. There are a number of people -- a significant number of people who will have body dissatisfaction or negative body imaging, and they will never develop an eating disorder or BDD, right?

MR. VANZANDT: Objection, vague, foundation.

A. I mean, I can tell you that there -- there are people that have body dissatisfaction and do not go on to develop an eating disorder, and there are people that have body dissatisfaction and are exposed to more risk by virtue of being dissatisfied with their body for the development of body image disorders, including BDD and eating disorders.

BY MR. DAVIS:

Q. Being at risk for BDD or an eating disorder does not mean you will, in fact, develop an eating disorder or BDD, right?

A. Being at risk for -- having

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

body dissatisfaction -- again, I'm just going to answer your question in the way that I understand it.

And the way that I understand it based on my patients and the literature, body dissatisfaction is a really robust -- not only is it a core symptom of many of the disorders we're discussing. It's a really robust predictor of the onset of other symptoms and other diagnoses.

And there are cases where a child may be body dissatisfied and may not ever go on to develop an eating disorder. I've seen both.

MR. DAVIS: Move to strike as nonresponsive. I asked you a very straightforward question, Dr. Murray.

MR. VANZANDT: The answer was responsive. Just ask your next question.

BY MR. DAVIS:

Q.   Being at risk for BDD or an eating disorder does not mean that the person will, in fact, develop an eating disorder or BDD, right?

Page 119

MR. VANZANDT: Objection, asked and answered.

A.   Being at risk inherently makes it more probable to develop the disorder that you're exposed to risk for.

BY MR. DAVIS:

Q.   It doesn't mean you actually will develop the eating disorder or the BDD, right?

A.   As I mentioned, there's -- there's -- there are children that are body dissatisfied and they do okay, and there are children that are body dissatisfied and that serves in the pathogenesis of the development of a much more deleterious array of sequelae which includes eating disorders.

Q.   Over 50% of the people who have body dissatisfaction or disordered eating will not develop anorexia, true?

MR. VANZANDT: Objection, foundation, calls for speculation.

A.   I would want to see your source for that.

BY MR. DAVIS:

Q.   I'm asking you, the expert.

Page 120

A.   I mean, the data, I wouldn't say -- I mean, my understanding of the data would say that if you have body dissatisfaction, you are linearly more likely to develop an eating disorder and a body dysmorphic disorder, and I'm aware there are instances where one doesn't.

Q.   That's not my question.

Over 50% of the people who have body dissatisfaction or disordered eating will not develop anorexia, true?

MR. VANZANDT: Objection, asked and answered.

A.   I would want to review that paper.

BY MR. DAVIS:

Q.   You don't know the answer to that?

MR. VANZANDT: Objection, argumentative.

A.   Like I said, I would want to review the paper.

BY MR. DAVIS:

Q.   You don't know today?

A.   I'm saying that I would want to

Page 121

review the paper --

Q.   I'm not asking you to review a paper. I'm asking you for your opinions.

MR. VANZANDT: Objection, asked and answered.

BY MR. DAVIS:

Q.   Do you know today --

MR. VANZANDT: Argumentative.

BY MR. DAVIS:

Q.   Do you know today the percentage of people who have body dissatisfaction or disordered eating that actually go on to develop anorexia?

A.   In my clinical experience, almost every single patient I recall developed body dissatisfaction before their eating disorder, and my understanding of the evidence is that body dissatisfaction is quite a potent risk factor.

And I'm aware that some kids, to your point, may not develop an eating disorder.

Q.   I didn't ask you that, Dr. Murray.

MR. VANZANDT: Don't interrupt

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

his answers.
BY MR. DAVIS:
Q.   Do you know today the percentage of people who have body dissatisfaction or disordered eating that actually go on to develop anorexia?
MR. VANZANDT:  Objection, asked and answered.
A.   Yeah, the majority of my patients over the last many, many years develop body dissatisfaction prior to their development of an eating disorder.
I would need to look at the literature to answer your question.  I'm -- yeah.
BY MR. DAVIS:
Q.   Doctor, just to be clear, you're treating a patient population of people who have an eating disorder, right? That's who you treat?
A.   Correct.
Q.   Right.
A.   Yeah.
Q.   Right.
You're -- I'm asking a

Page 123

different question, which is:  At the population overall --
A.   Yeah.
Q.   -- how many people who have body dissatisfaction or disordered eating actually go on to develop anorexia?
MR. VANZANDT:  Objection, vague, calls for speculation.
A.   Yeah, the -- to my understanding, the data aren't curated in that way.  You can't look at a person with body dissatisfaction and say you're not going to develop an eating disorder and you are.
The data really support it as a risk factor, and those are data derived from population levels.  So I'm not able today to give you a percentage.
MR. DAVIS:  Move to strike as nonresponsive.
BY MR. DAVIS:
Q.   Doctor, is the same -- would you give me the same answer for disordered eating and body dissatisfaction and any other eating disorder?
MR. VANZANDT:  Objection, vague

Page 124

and compound.
A.   What do you mean?
BY MR. DAVIS:
Q.   Well, would you give me the same answer?  You said -- you're not prepared to give me an answer today.
So my question is can you give me a percentage of patients who have either body -- binge-eating disorder or bulimia -- strike that.
Can you give me a percentage of patients who have disordered eating or body dissatisfaction that then go on to develop either binge-eating disorder or bulimia?
MR. VANZANDT:  Objection, vague and compound.
A.   Yeah.  May I look at my report? It seems like you're asking me for a percentage.
BY MR. DAVIS:
Q.   I'm asking you a very specific question.
A.   Yeah.
Q.   For the percentage of people who have either body dissatisfaction or

Page 125

disordered eating, how many of those people go on to develop binge-eating disorder or bulimia?
MR. VANZANDT:  Objection, vague, calls for speculation, foundation.
A.   I mean, I'll just say, Todd, that the link between body dissatisfaction and the onset of these disorders is robust. It's reproducible.  It's been replicated.
I think study to study, there may be some shift in the percentage.  I don't dispute the notion that there exist children who have body dissatisfaction who may not ever be diagnosed with an eating disorder, and there are children who experience body dissatisfaction and go on to become very sick.
MR. DAVIS:  Sorry, but that's not what I asked you.  I move to strike as nonresponsive.
BY MR. DAVIS:
Q.   Do you know the percentage?
MR. VANZANDT:  Objection, asked and answered.

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

A.    Again, I would want to review the data.  I think the data shows this to be quite a robust predictor.

BY MR. DAVIS:

Q.    You're saying it's a predictor in people -- strike that.

So you can't give me an answer about the percentage today?

A.    I'm saying I would want to review the data.  I'm aware of mixed data, and I would want to review it.

Q.    Disordered eating is not an actual diagnosis, right?

A.    Disordered eating is a symptom of an eating disorder.

Q.    Okay.  And disordered eating also includes a wide range of behavior that doesn't meet diagnostic criteria for having an eating disorder, right?

A.    Well, disordered eating is one symptom of an eating disorder, and if people have other symptoms, they would likely meet diagnostic criteria.  It's a part of the clinical constellation.

Q.    Disordered eating is a part of

Page 127

diagnostic criteria, but it's not dispositive for a diagnosis, right?

A.    What do you mean by that, Todd?

Q.    Well, you could have disordered eating and not have any eating disorder or BDD, right?

A.    I mean, it is a symptom of an eating disorder, and a diagnosis of an eating disorder requires the presence of multiple symptoms.

Q.    It requires -- yeah, the presence of an eating disorder or BDD requires more than just disordered eating, right?

A.    The diagnosis of an eating disorder is predicated on the diagnostic criteria, I think several of which allude to disordered eating, and they manifest differently across different types of eating disorder.

I can tell you that disordered eating and anorexia nervosa looks different from binge-eating disorder, and that looks different than it does in ARFID.

Q.    Are you finished?

Page 128

A.    Yes.

MR. DAVIS:  I move to strike as nonresponsive.  And again, this is not a productive use of time for this -- for the fact that we've come, we've prepared to ask very straightforward questions, and we have nonresponsive answers.  So I'm reserving on this.

MR. VANZANDT:  Okay.

MR. DAVIS:  Next, I'm --

MR. VANZANDT:  I'm going to respond to that if you're going to make those speeches on the record.

His answers are appropriate and responsive the best they can be to those questions.

MR. DAVIS:  If that's the case, then he's not prepared today for this deposition.  And the rules require him to be prepared today for this deposition.

MR. VANZANDT:  There's no indication that he's not prepared.  He's trying to answer your questions fully and truthfully.

Page 129

MR. DAVIS:  I think we've set out our positions.

BY MR. DAVIS:

Q.    Fair to say that weight concerns alone are insufficient to make a diagnosis of either BDD or eating disorders?

A.    Again, this is one symptom of an eating disorder.  It's associated with the onset of other symptoms of an eating disorder.  It seldom is the case that that manifests by itself, but it requires the presence of other symptoms to make the diagnosis.

Q.    Right.  If you have weight concerns alone, that's not enough to make the diagnosis, right?

A.    If you have weight concerns alone in a patient who comes into my office, I would want to screen for the other potential symptoms of an eating disorder, and if -- you know, it's probable, given my read on the data, that other symptoms may manifest.  It's a robust predictor.

Q.    I'm not asking you that.  Weight concerns alone are not enough to make

Golkow Technologies,
A Veritext Division
877-370-3377                                           www.veritext.com

CONFIDENTIAL

Page 130

a diagnosis of either BDD or any eating disorder, right?

MR. VANZANDT: Objection, asked and answered.

A. Well, the diagnosis is predicated on the presence of several symptoms in every psychiatric -- in almost every --

BY MR. DAVIS:

Q. Right. And the symptoms are more than just weight concerns alone, correct?

The diagnostic criteria are more than just weight concerns alone, correct?

MR. VANZANDT: Objection, asked and answered.

A. So when someone has weight concern, it's highly likely that they'll make efforts to modify their weight because they're concerned with their weight.

But to your point, the diagnosis is predicated on the full presence of the symptom criteria.

///

Page 131

BY MR. DAVIS:

Q. The diagnostic criteria require more than disordered eating to make a diagnosis of an eating disorder or BDD, right?

MR. VANZANDT: Objection, asked and answered.

A. I can read you the diagnostic criteria.

BY MR. DAVIS:

Q. I'm not asking you to read me. I'm asking you whether the diagnostic criteria require more than just disordered eating to make a diagnosis of BDD or eating disorder?

A. Yeah. And in my clinical experience, it's not often that I would treat -- that I would encounter somebody just with shape concern or weight concern. They very often co-occur, and they very often drive a series of behaviors that would be designed to remediate their concern with their shape and weight.

And if they are present, that's an eating disorder, and if the symptoms are

Page 132

not all present, that's not a diagnosis.

MR. DAVIS: Move to strike as nonresponsive.

BY MR. DAVIS:

Q. Dr. Murray, body dissatisfaction -- excuse me.

The diagnostic criteria require more than body dissatisfaction to make a diagnosis of any eating disorder or BDD, right?

MR. VANZANDT: Objection, asked and answered about eight times now.

A. I'm trying to answer -- I'm trying to answer your question with context, and I'm trying to convey to you that a diagnosis is predicated on the presence of several symptoms.

One of the symptoms that you're alluding to is embedded in the diagnostic criteria. It is one symptom. Usually it co-occurs with other symptoms, and if the other symptoms are present, it would be diagnosed, and if they're not, it would not be.

MR. DAVIS: Move to strike as

Page 133

nonresponsive.

BY MR. DAVIS:

Q. Dr. Murray, is it true that any form of media, whether it's TV, movies, newspapers or magazines, can result in body dissatisfaction, weight concerns or disordered eating?

MR. VANZANDT: Object to vague and compound.

A. Yeah. Could you specify what you mean by other forms of media? I'm not quite sure what you mean. Tell me a little bit more.

BY MR. DAVIS:

Q. I just described them for you.

A. Could you repeat it, please.

Q. Yes. I would just ask that you please listen to my question.

A. I'm trying.

Q. Any form of media, whether it's TV, movies, newspapers or magazines can result in body dissatisfaction or weight concerns or disordered eating behaviors, right?

A. I think there's data to support

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

the notion that media that's disseminating thin ideals or ideals can cause body dissatisfaction, and when that exposure is enhanced or amplified or in some way changed, there's data to suggest that that's also arguably more damaging.

Q.    Yeah.  I think you missed my question.

My question simply was:  Any form of media, whether it's TV or magazines, newspapers, that's nondigital, right?  Any of that can result in body dissatisfaction, weight concerns or disordered eating behaviors, right?

MR. VANZANDT:  Objection, vague, compound, asked and answered.

A.    So we've studied the effects of media for some time, and we know that media content that espouses an unrealistic thin ideal can have resulting effects on body image, and we also know that when that is disseminated on a platform where it's modified or enhanced in some way, the effects are greater.

MR. DAVIS:  Move to strike,

Page 135

nonresponsive.

BY MR. DAVIS:

Q.    Females with more body dissatisfaction are more likely to consume media and engage in upward comparisons, true?

MR. VANZANDT:  Objection, foundation.

A.    More likely than who?

BY MR. DAVIS:

Q.    Let's look at your report.  Go to page 68 of your --

A.    Which one are you referring to?

Q.    The JCCP report.

A.    Which time?

MR. VANZANDT:  The April.

THE WITNESS:  April.  Gotcha. Thank you.

BY MR. DAVIS:

Q.    Page 68.

A.    Thank you.

Q.    Do you see the graphic that you put in your report?

A.    I do.

Q.    Right?  And it says:  Females with more body dissatisfaction are more

Page 136

likely to:  consume media, especially fashion magazines; engage in upward social comparisons; and activate self-ideal discrepancies.

Did I read that correctly?

A.    You read that right.  You're referring to Figure 33?

Q.    Yeah.  That's correct, right? That's your view, right?

A.    You read that sentence perfectly.

Q.    Yeah.  That's your view, right?

A.    That is -- that's part of a recursive diagram that I think requires full context.  So what this is saying is if you follow directionality of the arrows, that mass media or transmission of the thin beauty ideal results in processes whereby social comparisons are optimized.  That drives body dissatisfaction, and that then, in turn, may portend greater consumption of media because they're drawn towards social comparison.

And what I'm also saying is that that effect seems to be amplified more when the images are modified and arguably

Page 137

more unrealistic.

But -- but -- so it's just important to give that snippet context.

Q.    You wrote in your report the words I read out to you, right?

A.    You -- I -- the words that you read are part of my report, and they're part of a flow, a diagram.  And that is a recur -- it's a mutually reinforcing loop that I think this is talking about, and so that sentence taken out of context requires context. That's what I'm trying to provide.

Q.    You agree that BDD is not an eating disorder, right?

A.    One of the diagnostic criteria rule-outs is that these concerns are not better accounted for by another disorder, for example, an eating disorder.

Q.    Right.  So BDD is not an eating disorder, right?

A.    BDD is not an eating disorder.

Q.    Right.

Body dysmorphia is not the same as body dysmorphic disorder, correct?

A.    It's used somewhat

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

interchangeably.

Q. But the clear -- just to be clear --

MR. VANZANDT: He's not done answering.

THE WITNESS: Thank you.

A. In the literature, it's used interchangeably. I think some of that use reflects a colloquial referral to BDD.

BY MR. DAVIS:

Q. When you use body dysmorphic disorder, you're talking about the diagnosis that's in the DSM-5, right?

A. In my report?

Q. No, just in your general practice in what you do. You -- you use the diagnostic criteria in the DSM-5 to make psychiatric diagnoses, right?

A. Yes.

Q. Right.

And you -- and you do that because it's a reliable source of information for what the diagnostic criteria are, right?

A. I mean, that guides our diagnostic practice, right.

Page 139

Q. And a lot of psychiatrists and psychologists view the DSM-5 as an authoritative source for diagnostic information, correct?

MR. VANZANDT: Objection, vague.

A. I think a lot of psychiatrists and psychologists rely on the DSM-5 criteria to make their diagnoses and to render billing codes associated with their diagnoses.

BY MR. DAVIS:

Q. And it's not just billing codes, but it's actually help with treatment and diagnosis of patients, correct?

A. I mean, the DSM does not provide sort of treatment plans for any individual patient. It provides a frame to diagnose a patient, and what that would allow one to do, Todd, is extrapolate and go and seek out data relating to the diagnosis.

Q. But when you are diagnosing somebody with body dysmorphic disorder, you're using criteria that are set out in the DSM-5, right?

A. That's what I do, yes.

Page 140

Q. Okay. And there's some times the term "body dysmorphia" can be used by others, but it's not to be confused with "body dysmorphic disorder" that's in the DSM-5, right?

MR. VANZANDT: Objection, vague and compound.

A. You know, I think people use that term interchangeably. I can recall times where I may have used that term interchangeably. In consuming research and writing research and talking with trainees, I think I use terms interchangeably as well. But -- yeah, go ahead.

BY MR. DAVIS:

Q. But when making diagnoses, you're very clear to use the DSM-5 for BDD?

A. When I make the diagnosis, I use DSM-5.

Q. Okay. And the diagnostic criteria for body dysmorphic disorder requires preoccupation with one or more perceived defects or flaws in physical appearances that are not observable or appear slight to others, correct?

Page 141

A. I'm going to look this up as well.

Q. It's on page 91, if you want help.

A. Thank you, that's very helpful.

(Document review.)

A. I don't see it on 91.

BY MR. DAVIS:

Q. 91 of your -- I'm sorry, your MDL report. I apologize.

A. That's okay.

Q. Page 91, paragraph 188.

A. Thank you. Paragraph 98 did you say?

Q. 91. Excuse me, 188 at page 91.

A. Got it. Okay. Sure, I'm with you.

Q. Yeah.

You set out there the diagnostic criteria for the DSM-5 for BDD, right?

A. That's what I've attempted to do here, yes, is outline the DSM-5 BDD diagnostic criteria.

Q. Right.

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

One of the criteria is preoccupation with one or more perceived defects or flaws in physical experience that are not observable and appear slight to others.

Correct?

A.    That's what criterion A is, yes.

Q.    Yes.  And then there's another criteria that is:  At some point during the behavior [sic], the individual has performed repetitive behaviors, and it gives examples, right, in response to the appearance concerns.

Correct?

A.    Yeah.  And I think the appearance concerns are alluding to dissatisfaction with one's appearance.  That's how I would understand an appearance concern.

But yes, point 2 is -- requires an individual to perform repetitive behaviors, reassurance seeking around their perceived dissatisfaction and preoccupation with their experience.

Page 143

Q.    The preoccupation causes clinically significant -- strike that.

The preoccupation has to cause clinically significant distress or impairment in social, occupational or other important areas of functioning.

Right?

A.    Yes, I agree with that.

Q.    Okay.

THE WITNESS:  Would you like me to keep this page open?

MR. DAVIS:  Huh-uh.

THE WITNESS:  Okay.

MR. DAVIS:  Let's go off the record so I can get some exhibits.

THE VIDEOGRAPHER:  We're going off the record.  The time is 11:01 a.m.

(Recess taken, 11:01 a.m. to 11:08 a.m. PDT)

THE VIDEOGRAPHER:  We are now going back on the record, and the time is 11:08 a.m.

(Whereupon, Murray-11, Disentangling Body Image: The Relative

Page 144

Associations of Overvaluation, Dissatisfaction, and Preoccupation with Psychological Distress and Eating Disorder Behaviors in Male and Female Adolescents, by Mitchison et al, was marked for identification.)

BY MR. DAVIS:

Q.    I'm going to hand you, Dr. Murray, a copy of Exhibit 11.  Do you see this is an article that you are a coauthor on?

A.    Yes.

Q.    And if you turn to page 125, if you go to the left-hand column, the first paragraph, first -- four lines down, you wrote, quote:  More generally, research seeking to disentangle key components of body image disturbance is hampered by a lack of reliable and valid measures that adequately isolate these constructs.

Did I read that correctly?

A.    You did.

Q.    And that was a true statement when you put that in your article, right?

A.    Yes.

Page 145

Q.    Right?

And you agree that there's -- and you also say in the next sentence that:  An important direction of -- for future research will be the development of standardized measures of both preoccupation and overevaluation of weight and shape given their theoretical prominence and clinical significance as supported by the current studies' findings.

Do you see that?

A.    I do.

Q.    And so as of today, there are not standardized measures that assess those issues with respect to body imaging, correct?

MR. VANZANDT:  Objection, vague.

A.    There are many measures that assess those constructs.

BY MR. DAVIS:

Q.    Are there --

A.    Go ahead.

Q.    Go ahead.

A.    You go.

Q.    Are there any that are

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

standardized?

A.    Standardized used universally across the field, I think every researcher wants to study different dimensions of body disturbance.

And I note, too, this is a -- this is a limitation of a study, and everybody is required to list limitations.

Q.    I'm simply asking you:  As of today, there aren't any standardized measurements for body imaging disturbances?

A.    Standardized -- as I mentioned, I think what this sentence is alluding to is sort of used universally across the field.

I'll say there are validated measures of body dissatisfaction, and I would suggest to you that they -- the use of different measures of body dissatisfaction or body image precludes the comparison across studies if they use different measures.

I think that's what we're alluding to here is having a standardized measure across the field would optimize more comparisons.

Q.    Can you identify any

Page 147

standardized measure that is able to assess if you look at body image in a population of people who are not diagnosed with an eating disorder or BDD that then can predict, out of that population, who will then develop an eating disorder or BDD?

A.    That's a good question.

I'm recalling now the SCOFF -- the SCOFF is a five-item questionnaire that I think has about a 92% sensitivity and specificity in determining true eating disorder cases.  That's frequently administered in community settings, and it's used as a proxy to indicate clinical eating disorder psychopathology.  That's one I can think of.

Q.    Any others?

A.    The EDE-Q is a measure which has a -- which has four subscales; shape concerns, which would relate to body image; weight concerns; eating concerns and dietary restraint.  That is probably the most widely used measure in our field.  It's empirically derived.

But that's also been validated

Page 148

in both clinical populations and nonclinical populations.

So what researchers generally do is score the questionnaire or average out -- take a mean of a community.  And you can, sort of with reliability, situate someone's score within your clinical disorder context or a nonclinical community context.

Q.    Okay.  Let's go back to my question.

Can you identify any standardized measure that is able to assess, if you look at body image in a population of people who are not diagnosed with an eating disorder or BDD, that then can predict out of that population who will then develop an eating disorder or BDD?

A.    I --

MR. VANZANDT:  Objection, asked and answered.

A.    Yeah, I thought I answered that.  The SCOFF has high specificity and sensitivity in determining who has an eating disorder, who does not have an eating disorder, with about 92 to 93% certainty.

Page 149

And the EDE-Q does a similar thing.

BY MR. DAVIS:

Q.    But the specificity and the sensitivity are not predicting -- there's a thing called a positive predictive value, correct?

A.    Uh-huh.

Q.    Yes?

A.    Yes.

Q.    And that's the score that you determine, out of using rating scales or screening scales, how many patients will actually have the disorder, correct?  That's what a positive predictive value does?

A.    Sure.  I would call it predictive validity, yeah.

Q.    And the SCOFF and the EDE-Q do not have a positive predictive value of 90%, do they?

A.    So I -- I'm referring to sensitivity and specificity in both.

Q.    Correct, and I'm asking about positive predictive value.

MR. VANZANDT:  No interrupting him.  He's in the middle of an answer.

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

A.    I'll get there.

In determining true eating disorder cases and in accurately ruling out true non-eating-disorder cases, I think there are also data to support the predictive validity of the SCOFF.  I'd have to review the data, but I'm fairly sure that there's some predictive validity.

BY MR. DAVIS:

Q.    Can you tell me today what the positive predictive value is of the SCOFF?

A.    Not as I sit here today.  I would need to review the psychometric data.  I'm aware that the SCOFF is incredibly psychometrically robust.  There are a lot of papers, and I would want to review them.

Q.    Psychometrically robust does not mean that it is -- that's a different issue than positive predictive value, true?

A.    Part of -- part of psychometric validity is whether it has predictability, whether it has concurrent validity, faith validity, sensitivity and specificity.  These all matter.

Q.    But can you tell me the

Page 151

positive predictive value for the EDE-Q?

A.    Again, I would have to look at the data.  As I sit here today, I can't recall the data.

Q.    Isn't it true that the positive predictive value for both SCOFF and EDE-Q is somewhere in the range of 40 to 60% or higher being not diagnostic?

A.    I mean, my data don't suggest that.

Q.    Do you have any data to -- do you have any data in your mind where you can say I know that the positive predictive value for either SCOFF or EDE-Q is over 50% for any eating disorder?

A.    May I refer to this presentation?

Q.    Sure.

A.    Thank you.  I might have it here.

(Document review.)

A.    So if I can refer you to -- I don't know how to label this, but this is one page of a document that I produced.  This actually illustrates SCOFF score and clinical

Page 152

diagnosis post -- post-training.

And there's another study which illustrates that --

BY MR. DAVIS:

Q.    Can I see that, please?

A.    Sure.  I can talk you through that.

Q.    Okay.  Just for the -- we're looking at a slide that was -- that's part of Exhibit 3.

A.    Yes.

Q.    And it's MURRAY0549 for the record.

These graphics are not showing positive predictive value for a population of people who have not been diagnosed with an eating disorder that then go on to develop an eating disorder, fair?

A.    This graph is showing the rates of concordance between a score on a screener and subsequent diagnostic diagnoses.

Once you've trained a psychiatrist how to ascertain an eating disorder diagnosis, they're almost -- they're almost identical values.

Page 153

Q.    But the population of people that's being screened in the study -- or in this graphic, they're people who are actually in an eating disorder and being assessed for an eating disorder, correct?

A.    Those data derive from an outpatient psychiatric clinic, but your point is well taken.  They're clinically afflicted individuals, yes.

Q.    They're not the broad -- they're not everybody in the population who has not been diagnosed with an eating disorder, correct?

A.    Correct.  They derive from clinical population.

Q.    Right.  So my question is different.

A.    Okay.

Q.    My question is:  In a population of people who have not been diagnosed with an eating disorder or have been -- you know, gone in for treatment, and if those people were administered the SCOFF or the EDE-Q, do you know what the positive predictive value for that population to

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

predict an actual eating disorder?

MR. VANZANDT: Objection, calls for speculation and compound.

A. I don't have the data in front of me, but I would say it would be a wonderful thing in our field if we had something that could predict who would develop an eating disorder and who wouldn't. That would be fabulous.

BY MR. DAVIS:

Q. You don't know of anything today?

A. We know risk factors.

Q. I'm asking for a study. That's all.

A. There's not a single test you can give somebody in the community and say you're going to develop an eating disorder and you are not. We don't have that yet in the field.

Q. Okay. Can you identify any study for the materials you looked at in this case that use the SCOFF?

A. I'm certain some did. The one that I'm thinking of right now is Jamie --

Page 155

I'm blanking on her name, her last name, I'm sorry.

I guess the answer to your question is I can't recall sitting here right now.

Q. Don't know of one?

MR. VANZANDT: Objection, misstates testimony.

A. I can't recall one right now. I'm really trying to remember the person's last name. But I would be happy to review --

BY MR. DAVIS:

Q. If you think of it today, let me know, okay?

A. You bet.

Q. Okay. Now, the EDE-Q and the SCOFF, neither of them are diagnostic tools, right?

A. Well, the EDE-Q is derived from the EDE, which is a diagnostic tool. It's -- and it has published and empirically validated clinical norms. So many people in research and in clinical practice use it as a diagnostic tool.

MR. DAVIS: Move to strike as

Page 156

nonresponsive.

BY MR. DAVIS:

Q. The EDE-Q -- let me start with the SCOFF. The SCOFF is not a diagnostic tool, correct?

A. Again, people, when you have high rates of specificity and sensitivity, people use it all the time in my field in research and in clinical practice to indicate diagnostic status.

MR. DAVIS: Okay. Move to strike as nonresponsive.

MR. VANZANDT: Again, I oppose the motion. He's completely responsive.

(Whereupon, Murray-12, Excerpt From DSM-5-TR, was marked for identification.)

BY MR. DAVIS:

Q. Let me show you what's been marked as Exhibit 12.

A. Sure.

Q. Do you see this is a copy of the DSM-5?

A. I see this as -- it doesn't

Page 157

look like a full copy of the DSM-5.

Q. Yes, it's excerpts. Fair point.

A. Yeah.

Q. If you turn to page 384.

A. 384.

Q. Under Prevalence, the first sentence, it says: According to two US epidemiological studies conducted in community samples over a 12-month prevalence of anorexia nervosa ranges from 0.0% to 0.05%, with much higher rates in women than in men.

Did I read that correctly?

A. You read that correctly.

Q. Right.

And so -- and you don't disagree with that data, do you?

A. I don't -- I mean, I've certainly seen prevalence data higher than that.

Q. But you haven't seen prevalence data for anorexia that puts it at over -- that consistently puts it over 4%, have you?

A. Over 4%?

CONFIDENTIAL

Page 158

Q.    Yeah.

A.    I'd have to review the data. I've certainly seen it presented higher than 0.05%.

Q.    Right.

But even if it's -- the point is that anorexia nervosa, the prevalence rate for anorexia nervosa in the US is rare?

MR. VANZANDT:  Objection, vague, foundation.

A.    I -- the prevalence of anorexia, there are more people walking the streets of the United States that do not have anorexia than there are people who do have anorexia, sure.

BY MR. DAVIS:

Q.    Yeah.  I'm not asking that. I'm just saying that percentage-wise, that the percentage of people who actually develop anorexia nervosa in the US is relatively small and rare, right?

MR. VANZANDT:  Objection, vague, compound, foundation.

A.    It's higher than -- the data

Page 159

that I reviewed would support a higher prevalence rate in a multitude of different populations.  I've not seen data purporting it to be the statistical majority of the population studied.

BY MR. DAVIS:

Q.    But anorexia -- the prevalence rate in the US for anorexia is -- most studies put that prevalence rate at 2% or less, right?

A.    I've seen a range higher than that, but I --

Q.    I said most.

A.    Well, it depends on the study. And it just depends on the population.  But generally, the prevalence rate of anorexia nervosa in most studies is in single digits.

Q.    Well, it's typically less than a single digit.  It's like a point -- there's a point 0 and then another digit, right?

A.    Not always.  It depends on the study.  There's usually a range presented in prevalence studies, and that's what certainly is provided in the studies that I've seen.

Q.    But a range of about 1% is --

Page 160

for anorexia nervosa in the US is consistent with the studies that you've seen, correct?

A.    I think the studies I've seen would have that as the bottom bar.  It would range between 1 and I think probably 5%.  I'm guesstimating here.  I don't have the data in front of me.  But that's -- that's what I'm recalling right now.

Q.    Look at page 380 -- well, look at -- where it says the lifetime prevalence rate, page 384, the lifetime prevalence ranges from .60% to .08% [sic], correct?

A.    The prevalence rate ranges -- You said page 384, Todd?

Q.    Yeah.  It's the same sentence we were reading.

A.    Sure.

Q.    It says:  The lifetime prevalence for anorexia nervosa ranges from .06% to .08% [sic], correct?

MR. VANZANDT:  Objection, misstates the document. Todd, you read that just flat-out wrong.

///

Page 161

BY MR. DAVIS:

Q.    The lifetime prevalence rate ranges from 0.6% to 0.8%, correct?

A.    You read that correctly, and it's followed by .9% to 1.42% in women.

Q.    Right. These figures don't -- these figures don't show something as high as 5%, do they?

A.    Those figures don't show something as high as 5.

Q.    Okay.  And then if you go to 389 -- 90, this is talking about bulimia nervosa, right?

A.    Yeah.

Q.    And if you go to -- under Prevalence, it discusses:  Prevalence rates in US epidemiological studies conducted in adult community samples, that the 12-month prevalence rate of bulimia nervosa ranges from 0.14% to 0.3%, with much higher rates in women than in men.

And then it continues on to state those figures.  Correct?

A.    I see those figures being cited

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

from two epidemiological studies. They're the figures that you read.

Q. Right.

And the lifetime prevalence ranges for bulimia nervosa range from 0.28% to 1%, correct?

A. That's what is stated in this document I have in front of me.

Q. Okay.

A. And I'm aware of other prevalence data as well that are arguably more recent and probably more targeted for purposes of ascertaining eating disorder prevalence.

Q. Are you referring to the Deloitte report that you put in your report?

A. That's one of them. That's a study conducted by Harvard and Deloitte.

Q. And you view them to be very good researchers?

A. Sure. I have a ton of respect for the people on this.

(Whereupon, Murray-13, June 2020 Deloitte Report, Social and economic cost of eating disorders in

Page 163

the United States of America, was marked for identification.)

BY MR. DAVIS:

Q. Here is Exhibit 13. This is the copy of the Deloitte report that we just finished talking about, right?

A. Yep.

Q. Why don't you turn to the top -- there's a Table 2.1 at the top of page 15.

Do you see that?

A. Yes.

Q. And this is -- this table is summarizing the prevalence estimates for eating disorders, correct?

A. This table is a summary of prevalence estimates for eating disorders.

Q. Correct. Every single one of the ones for anorexia nervosa found in all eight of the studies for anorexia and bulimia, the lifetime prevalence is under 1.5%, correct?

A. Those studies conducted in the 2000s and 2000-and-teens suggest a prevalence -- a lifetime prevalence rate

Page 164

of -- for anorexia nervosa, between or ranging up to .8, it looks like, and for bulimia, 1 -- bulimia nervosa, 1.2 -- 1.26, it looks like.

Q. And the highest prevalence rate for binge-eating disorder, according to this table, across all eight studies that are being analyzed is at 2.8%, correct?

A. Where are you seeing those data, Todd?

Q. I'm just asking you if that's -- well, if you look at the -- if you look at the lifetime prevalence rates for binge-eating disorder, right?

A. Uh-huh.

Q. They are all less than 2%, correct?

A. These prevalence are less than 2%. No, the top one is 2.3, it looks like; binge-eating disorder is 2.3. That's the Duncan et al study.

Q. So let me rephrase. All of the lifetime prevalence rates for binge-eating disorder in this report are 2.3 or under, correct?

Page 165

A. All of the prevalence rates listed in this report are 2.3 and under for binge-eating disorder.

Q. And then for the one-year prevalence rate, all the -- for binge-eating disorder, all of them are 1.1% or less, correct?

A. Correct.

Q. Most of them all begin with a zero and then a .1 followed by a number, correct?

MR. VANZANDT: Objection, vague.

BY MR. DAVIS:

Q. Yes?

A. Can you repeat your question? I'm sorry, Todd.

Q. Sure.

The one-year prevalence rates for binge-eating disorder, almost all of them start with a zero point, then a zero and another number, correct?

A. Well, they range from zero point another number to 2.3. There's a range.

CONFIDENTIAL

Page 166

Q. For binge-eating disorder?

A. Binge-eating disorder, the Duncan study -- oh, you're talking about the one-year prevalence, not lifetime.

Q. Yeah.

A. I'm sorry.

Q. Yeah, the one-year prevalence rates for binge-eating disorder, most of them all start with a zero followed by a point something, right? So almost all the studies for the prevalence rates for one-year prevalence is less than 1%?

A. I mean, there's a range of zero point something to 1.1 is the top end of the range, yeah --

Q. All right.

A. -- in the study.

Q. Let's go back to your publication, your book.

A. The publication in my book?

Q. Yes. I need to find it.

Go to page 23.

Just so we're clear, this is a book that -- this is --

A. Can I have a copy?

Page 167

Q. I think you have it.

MR. VANZANDT: It's in that stack right there. Is it 7?

BY MR. DAVIS:

Q. Yeah, Exhibit 7. This a book entitled Clinical Handbook of Complex and Atypical Eating Disorders, correct?

A. Yes.

Q. You edited this book, correct?

A. I did.

Q. You even wrote some chapters in it, correct?

A. I did.

Q. You reviewed all the chapters yourself before it was public, right?

A. I edited the book, yeah.

Q. And so if there is something mistaken or incorrect in there, you would have fixed it, right?

A. You generally work with authors. If there's something I would disagree with in a chapter, I would work with authors.

Q. There's nothing that's in this book that you think is misleading or

Page 168

inaccurate in any way, is there?

A. It's possible that new data has emerged since the publication of this book, of course. But at the time, I don't recall feeling really moved by anything in this book.

Q. When the book got published, there was nothing that you knew of that was false or misleading in any way, right?

A. Again, when the book was put out, I wasn't -- I don't recall feeling as though there was something false or misleading in this book. And again, I think this was published some time ago.

Q. Okay. Let's look at page 23, first paragraph.

Fair to say that a substantial portion of individuals with eating disorders report the onset of an anxiety disorder occurring in childhood, correct?

A. The -- can I read the sentence you're alluding to?

Q. Sure.

A. Starting -- sentence starting "Nevertheless"?

Page 169

Q. No, it's four lines down from the top.

A. Okay.

Q. Do you see there's: A substantial portion of individuals with eating disorders report an onset of an anxiety disorder occurring in childhood, indicating that etiological factors influencing the development of these disorders are likely trait based and appear in the early course of life.

Is that a correct statement?

A. That's what this sentence says.

Q. You agree with that, right?

A. I mean, I certainly have seen cases where an anxiety disorder has manifest prior to an eating disorder.

Q. Yeah. I'm just asking you whether you agree with the statement in the book that you edited.

A. I agree with the statement that trait markers of anxiety often precede the development of an eating disorder. I think there are other risk factors, of course, but that -- the fundamental crux of this sentence

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

which is trying to articulate that because anxiety has been observed to manifest before eating disorders, these particular authors cited made the assertion that some of the trait markers of anxiety may be implicated as one risk factor.

Q.    Right.  One of the etiological factors or causal factors for the development of an eating disorder or anxiety disorder are likely trait-based personality characteristics, right?

A.    It's difficult to know. There's a conundrum in our field versus the -- the state versus trait conundrum.  But certainly, these data would suggest that anxiety manifesting before the onset of an eating disorder can both serve as a risk factor -- and I'm also aware of data showing anxiety exacerbates eating disorders.

Q.    And you agree that -- if you look at page 23?

A.    Same page?

Q.    Yep.  First paragraph, the eighth line.

A.    Uh-huh.

Page 171

Q.    That among -- you say:  Anxiety disorders among family members of those with eating disorders are also significantly more common, suggesting that anxiety disorders and eating disorders may share traits belonging to a common phenotype.

Correct?

A.    That's what that sentence says.

Q.    And by phenotype, what do you mean?

A.    I mean, a -- let's see.  Can I read the sentence again?

Q.    Yeah.

(Document review.)

A.    Yeah, I think this sentence is referring to possible overlap in their etiological risk factors.

BY MR. DAVIS:

Q.    By etiological risk factors on phenotype, do you mean genetic makeup?

A.    That's not what I think this is alluding to.  I think they're talking about traits.

Q.    Personality traits?

A.    Traits, yes.  Personality

Page 172

traits.

Q.    Okay.  And the personality traits that are described in this article include anxiety, perfectionism, harm avoidance and obsessionality, right?

MR. VANZANDT:  Objection, foundation.

BY MR. DAVIS:

Q.    Would you look at page 34.

A.    The part you highlighted?

Q.    Yes.  In this book that you edited, it says:  Shared temperament and personality traits can also be targeted as a way to improve both eating disorders and anxiety disorder-related behavior, given the shared commonalities.

Temperament and personality traits associated with both illnesses include trait anxiety, perfectionism, harm avoidance and obsessionality.

That's what's in the book you edited, correct?

A.    That's in the book I edited, correct.

Q.    You don't disagree with that,

Page 173

do you?

A.    I think that there's a -- there's a commonality in some of the risk factors that extend to temperament traits that characterize anxiety and eating disorders.

Q.    Including the ones that I read out to you?

(Sotto voce document review.)

A.    I've certainly seen data supporting the implication of harm avoidance, perfectionism, and obsessionality in both eating disorders and anxiety disorders, and I see them overlap in my patients often as well.

BY MR. DAVIS:

Q.    And on page 24 and 25 -- go back.  At the bottom of the page, you say what's in the book is --

A.    Hang on one second, I'm sorry. You said page 24.  I'm going the wrong way. Gotcha.

Q.    That the over -- you say at the bottom paragraph, second paragraph in the book that you edited says:  The overarching

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

commonality between anxiety disorders and eating disorders is a critical consideration because it suggests that the relationship between these illnesses is best understood and explained as underlying traits that predispose an individual to the development of both diagnostic subsets.

Correct?

A.   That's what that sentence says.

Q.   Do you agree with that?

A.   I -- my opinion on this is that there are traits that make children more susceptible to the onset of anxiety disorders and eating disorders, if exposed to risk, if exposed to other factors.

But the mere presence of these traits alone does not render an eating disorder.  They're part of a sort of -- a larger body of risk factors.  And what this study is trying to convey is that some of those personality traits overlap -- or this chapter, I'm sorry.

Q.   Then down at page 27, the bottom paragraph, fourth line -- I don't know if I got page 27.  Okay.

Page 175

A.   I don't have 27.

Q.   Apparently I don't.  We'll skip that one.

A.   Okay.

Q.   If you go to page 51 and 52 -- I don't have that one either.  Okay.

Is it fair to say that --

A.   Sorry.  The pages --

Q.   Is it important -- is it important in your mind to assess personality traits when assessing the cause of an eating disorder or other psychiatric disorder?

A.   Just -- I'm sorry.  I don't have page 51 and 52.

Q.   Yeah, I've moved on.  I don't know if you heard me.  I said I don't have it.

MR. VANZANDT:  You told him to go to those pages and started asking the questions.

MR. DAVIS:  I'm sorry if you missed that, but I did say that. Sorry.

THE WITNESS:  Thank you. That's okay.

Page 176

BY MR. DAVIS:

Q.   Is it important in your mind to assess personality traits when assessing the cause of an eating disorder or another psychiatric disorder?

A.   Yes, it's important to assess all risk factors, of course.

Q.   And is it also important to basically account for -- for any potential risk factor when making a causal assessment?

A.   You know, when a patient presents to me, I assess all their risk factors and all the sort of self-reported accounts of driving pathogenesis.

Q.   Well, it's -- even outside the clinical setting, like in the research setting --

A.   Got it.

Q.   -- when you're trying to make an assessment of a causal effect of a potential risk factor for an eating disorder or BDD, do you try to include in the studies the potential risk factors that you know of to make an assessment of how they may be impacting?

Page 177

A.   It depends on the --

MR. VANZANDT:  Sorry.
Objection, vague, ambiguous.
Go ahead.

A.   Yeah, I think it depends on the topic of the study.

BY MR. DAVIS:

Q.   Yeah.  If you're looking at a risk factor -- you're examining a potential risk factor for an eating disorder, if you're researching that, is it important to assess and take into consideration other potential exposures or risk factors that also could impact the analysis to determine whether or not the exposure being targeted is causal?

MR. VANZANDT:  Objection, vague, compound.

A.   I mean, if you're attempting to study a risk factor, it usually means you would study that risk factor.  It really depends on the nature of the study, what you're trying to accomplish, what the hypotheses are.  It depends.  That's a good question, but a broad one.

///

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

BY MR. DAVIS:

Q.    Yeah, let's say you're trying to study a risk factor for binge-eating disorder, okay?

A.    Uh-huh.

Q.    And you also know that there are other experiences in life that are known are potential risk factors for binge-eating disorder.

A.    Uh-huh.

Q.    And do you -- how do you account for those in the study to make sure that they aren't impacting the study results?

A.    So firstly you would generate a hypothesis, first of all.  You would consider the statistical design.

It's not common practice to throw every risk factor into an analysis because you run into the issue of statistical reductions in power, and so people don't generally do that.

What they often do is control for other variables in analyses, but again, it's not always comprehensive.

And that's gated by feasibility

Page 179

of the research design, funding, you know. Every study would love to ask every question that we can, but we can't.

(Whereupon, Murray-14, The association between personality and eating psychopathology in inpatients with anorexia nervosa, by Marzola et al, was marked for identification.)

BY MR. DAVIS:

Q.    Let me hand you what's been marked as Exhibit 14.

MR. VANZANDT:  Thanks.

BY MR. DAVIS:

Q.    This is an article that you wrote called "The association between personality and eating psychopathology in inpatients with anorexia nervosa."

Correct?

A.    That's an article that I coauthored, yes.

Q.    Yes.

And if you go to page 125, you go to -- under Introduction, the first sentence -- excuse me -- yeah, first sentence under the introduction it says:  Anorexia

Page 180

nervosa is a severe psychiatric disorder for which the precise etiology remains elusive.

Did I read that correctly?

A.    You read that correctly.

Q.    That's a true statement, correct?

A.    The statement, I think, is that there's no singular etiological cause. That's a true statement.  I think the field generally accepts that the pathogenesis is elusive.  It's multifactorial.

Q.    So when you say the pathogenesis, you're talking about the cause, correct?

A.    Yes, etiology, yes.

Q.    Right.

And in terms of the situation where you have multiple risk factors in a patient with -- who has an eating disorder, is there any way to determine which one of those eating disorders actually is the risk factor that caused the eating disorder?

MR. VANZANDT:  Objection, vague, ambiguous, incomplete hypothetical.

Page 181

A.    But did you say have I considered which eating disorder causes a risk factor?

BY MR. DAVIS:

Q.    No, let me ask it in a different way.

A.    Okay.

Q.    Let's say you have a patient.

A.    Uh-huh.

Q.    Multiple risk factors for an eating disorder, right?

A.    Yeah.

Q.    And yet -- I think you explained it, eating disorders are multifactorial, right?

A.    Yes.

Q.    And by that you mean they have -- there's multiple different risk factors that can cause an eating disorder, correct?

A.    My opinion is yes, that there are a multitude of risk factors that are salient and -- in cases.

Q.    And in terms of that situation where you have a patient who has multiple

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

risk factors for an eating disorder, is there any way to determine, out of that group of risk factors, which one is the most significant risk factor?

A. I mean, I would just do an assessment of that patient.

Q. So what you're talking about is, you would do -- when you say an assessment, you'd do -- you would do -- you would -- well, how do you quantify? That's my question.

When you have a patient who has multiple risk factors for an eating disorder, how do you go about quantifying which risk factor contributed to the eating disorder?

A. I have a conversation with my patient, and I talk with them about usually them, and if children, their people close to them. But that requires an assessment.

And what matters -- what matters more is that you target the risk factors, and it's very seldom the case where I've allocated a greater proportionality to one risk factor over another. I try to target every risk factor to try to help these

Page 183

kids get well.

Q. So is what you're saying that when you're treating a patient that has multiple risk factors, you're more focused on the treatment and getting them better as opposed to determining which one of the risk factors may have actually been the significant contributor?

MR. VANZANDT: Objection, misstates testimony.

A. That's not what I said.

BY MR. DAVIS:

Q. Okay. Well, when you're treating a patient with multiple risk factors, is there any way to determine in that patient what percentage of contribution each of the different risk factors is making in that patient?

A. You would just do an assessment. You would do an interview with the patient. You would probably ascertain their history. You would ascertain family history. You would ascertain developmental history. You would talk with people and canvass and surveil the known risk factors.

Page 184

Then I would usually elicit from the patient their perspective on why they got sick and what their understanding is. And then I would use that assessment to form a treatment plan and treat them.

Q. Right.

But I'm saying after all that process is done --

A. Yeah.

Q. -- and you have multiple risk factors that are at issue, how do you go about determining which percentage each of the risk factors actually contributed to a patient's eating disorder?

MR. VANZANDT: Objection, foundation.

You can answer.

A. In an individual patient?

BY MR. DAVIS:

Q. Yeah.

A. Just -- just with conversation with them, with data points, with talking with their family members, with ascertaining their history. Just with assessing them.

Q. Right.

Page 185

But is there ever any point in your career when you treated a patient who has multiple risk factors for an eating disorder where you've been able to say, you know what, I think this risk factor contributed 20%, this risk factor contributed 8%, this risk factor contributed 40%?

Are you able -- have you ever been able to do that?

A. I can't recall that ever -- I can't recall a time where I've allocated a percentage.

What I can recall more commonly is assessing the patient to get a full understanding of risk factors and treating this patient, and that's an assessment.

Q. Yeah, but -- and then after -- but I'm just trying to walk through your process, right?

And then after you are able to have the conversation with the patient, get all the information you need to treat the patient, are you able to say -- and do some objective measurement and assessment to say, okay, now I know everything about this

47 (Pages 182 - 185)

CONFIDENTIAL

Page 186

patient. I can assign this risk factor this percentage, that risk factor that percentage, and this risk factor this other percentage?

Can you do that?

MR. VANZANDT: Objection, asked and answered.

A.   Again, I would -- I would assess the patient. I don't recall a time where I've attempted to do anything other than understand all of the risk factors and understand how they maintain the illness.

BY MR. DAVIS:

Q.   Right.

A.   And that's what I would generally do.

Q.   But then my question is a step further.

After you've done all that, can you then make a determination of what percentage each individual risk factor is making in an individual patient?

MR. VANZANDT: Objection, foundation.

A.   Again, I seek to assess the patient. I can't recall attempting to

Page 187

allocate percentages. I just try to understand the full pathology.

BY MR. DAVIS:

Q.   So -- go ahead, you finish.

A.   No. So, for instance, if I have a patient who has a family member who has had an eating disorder who comes to me and reports a history, and then they say I've -- you know, I've been on social media for -- all day for the last two years, and my body esteem has gone down the gurgler, I can't go out without seeing -- without trying to closely approximate a filter.

I don't know that I would try to allocate a percentage. I would try to treat every risk factor.

Q.   Okay. Let's say you have a patient where you have -- adverse childhood experiences are a risk factor for an eating disorder, right?

A.   Yes.

Q.   Right.

And there's a significant body of literature that shows that childhood -- adverse childhood experiences play a causal

Page 188

role in eating disorders and body dysmorphic disorder, right?

MR. VANZANDT: Objection, foundation.

A.   I mean, there's data that I'm aware of that show that there's an increased risk of developing an eating disorder if you have had a series or one, even, adverse childhood event.

BY MR. DAVIS:

Q.   And that's also true for BDD, right?

A.   I would need to review the literature, but that sounds very on brand with what I understand to be from the data.

Q.   So let's say you have a patient who has a -- a family history of eating disorders is a risk factor for a child or an adolescent to develop an eating disorder or BDD, right?

A.   You said family history?

Q.   Yes.

A.   Uh-huh.

Q.   Yes.

A.   I mean, there's greater --

Page 189

greater weights of prevalence in families and nonfamily members, so yeah, I think that's an accepted risk factor, sure.

Q.   And then you also have psychiatric history of either the patient themselves or family members. Both of those are risk factors for developing an eating disorder and body dysmorphic disorder, right?

A.   Both the patients' history and the history of the family members is very salient to assess when you have a patient who presents to you.

Q.   Let's say you've got that patient sitting in your office. They have an adverse childhood experience. They have a family history of psychiatric disorder. They also have a psychiatric disorder themselves. They have a family history of an eating disorder.

A.   Uh-huh.

Q.   When you have that collection of risk factors and you've evaluated the patient, you've assessed them, is there any way for you to say, okay, in my mind, I can place this percentage on each of these risk

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

factors to say how much they contributed to that person's eating disorder?

MR. VANZANDT: Objection, compound, incomplete hypothetical, and getting to be beyond the scope.

Go ahead.

A.  I mean, I would just -- I would assess the patient and I would try to target all the risk factors.

BY MR. DAVIS:

Q.  But I'm asking a little different.

It's like can you take any -- can you take any of the risk factors and assign them a percentage of what they're contributing to or -- in terms of a causal role for the person having an eating disorder?

MR. VANZANDT: Objection, incomplete hypothetical, asked and answered and objection to the extent it seeks a legal conclusion.

A.  Again, I would -- my role as a clinician is to understand the pathway into a disease, assess that, formulate a treatment

Page 191

plan and treat them.  And that includes all the risk factors that they report, that their loved ones report.

BY MR. DAVIS:

Q.  Would you tell that patient, look, I looked at your family history, I looked at your adverse childhood experiences, I looked at your -- your own psychiatric history, and of those, I think this risk factor is contributing this percentage and this one is contributing that percentage?

Have you ever said that to a patient?

MR. VANZANDT: Objection, asked and answered, calls for speculation and is an incomplete hypothetical.

A.  Again, I frequently assess patients.  I identify the causal driving factors via interview, and I treat that.

BY MR. DAVIS:

Q.  Sure.  But my question was a little different.

Do you ever say -- tell the patient, hey, I can tell you -- I can tell you, based upon your different risk factors

Page 192

that you have, this one is contributing this percentage, this one is contributing this percentage, and this other one is this percentage?

Have you ever done that?

MR. VANZANDT: Same objections, asked and answered.

A.  Again, my -- my assessment includes a full surveillance of risk factors, a full surveillance of maintaining factors that inform the treatment plan, and I focus more on the -- at that point, with the treatment.

BY MR. DAVIS:

Q.  Right.  But I'm just asking a little different question.

Have you ever assigned -- told a patient, I can assign a percentage to you of which risk factor is causing or contributing to your eating disorder?

MR. VANZANDT: Same objections.

A.  And I can tell you that I assess a patient -- I talk with them.

BY MR. DAVIS:

Q.  I get it.

Page 193

A.  I treat them.

That is my role, to have the treatment based off the assessment.

Q.  Have you ever told them that?

MR. VANZANDT: Objection, asked and answered.

A.  As I mentioned, I -- I assess them.

BY MR. DAVIS:

Q.  All right.

A.  I formulate a treatment plan in concert with conversations with afflicted individuals and their loved ones, and I develop a treatment plan.

Q.  Is it fair to say that you can't recall any occasion throughout your clinical practice where you've assigned a percentage of contribution when you have a patient that has multiple risk factors for eating disorder?

MR. VANZANDT: Objection, asked and answered.

A.  Can you repeat your question?

BY MR. DAVIS:

Q.  Yeah.  Is it fair to say you

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

can't recall any occasion throughout your clinical practice where you've assigned a percentage of contribution for a risk factor when there are multiple risk factors for an eating disorder in a patient?

MR. VANZANDT: Same objection.

A.   What I -- what I convey to patients is the treatment plan once I've done an assessment.

BY MR. DAVIS:

Q.   You don't convey to them a percentage of what -- what percentage each risk factor is contributing to the eating disorder, do you?

A.   Again, I make sure that my treatment plan incorporates all of the driving factors, and then I communicate with my patient and usually their family what the treatment plan is, and that's how I treat patients.

Q.   You don't tell them the information about what contribution each risk factor is having on their condition, do you?

MR. VANZANDT: Asked and answered.

Page 195

A.   Again, I'm sorry if I'm sounding repetitive. But I want to give you the context of how I assess a patient.

BY MR. DAVIS:

Q.   You've done that. I promise, you've done that. And I totally get that.

I'm just asking you: Can you recall any situation anytime in your clinical practice where you've assigned a percentage of contribution to a risk factor when a patient you were seeing has multiple risk factors for an eating disorder? Can you recall ever doing that?

A.   My job at that point, Todd, is to assess the patient and develop a treatment plan. That's my job at that point.

Q.   So you're not doing -- you're not doing where -- you're not doing something where you're assessing a contribution because that's not your focus at the time, right?

MR. VANZANDT: Objection, misstates testimony.

A.   Yeah, that's not what I said.

BY MR. DAVIS:

Q.   Just tell me. Have you ever,

Page 196

anytime throughout your entire career, ever assigned a contribution of what -- for a specific risk factor?

Let me strike that.

At any time in your clinical practice, have you ever assigned a percentage of contribution to a risk factor when a patient you were seeing has multiple risk factors for an eating disorder?

A.   Again, my assessment informs a treatment plan, and the treatment plan follows the assessment of all of the risk factors, and that's what the conversation with the patient usually is.

Q.   Right. It wouldn't be about percentages of risk for each risk factor, correct?

A.   The conversation with the patient usually focus on my understanding of the -- of the onset and the maintenance, and they usually develop into a treatment plan. That is -- that is my common practice.

Q.   Okay. Let's look at your slides. If you could turn to slide 568.

A.   On these here?

Page 197

Q.   Yes.

A.   I'm a little bit out of order. I'm sorry.

Q.   That's Exhibit --

A.   Exhibit 7?

Q.   No, it's not 7. 7 is the book you edited. It's Exhibit 3.

MR. DAVIS: It's 3, yeah.

THE WITNESS: Gosh, I'm out of whack.

MR. DAVIS: If you hand it to me, I'll find it.

THE WITNESS: Thank you. I appreciate that.

(Document review.)

THE WITNESS: My apologies.

MR. DAVIS: All right.

BY MR. DAVIS:

Q.   We've opened up to a slide, correct?

A.   The -- thank you, again.

Q.   It's a slide about anorexia nervosa, correct?

A.   This slide is titled Anorexia Nervosa, What about the brain? That is what

50 (Pages 194 - 197)

CONFIDENTIAL

Page 198

you just showed to me.

Q.    Yeah.  And you say here that the pathophysiology of anorexia nervosa is unknown, correct?

A.    That's what I say on this slide.

Q.    And pathophysiology, part of it includes etiology or cause, correct?

A.    Pathophysiology -- this sentence refers again to the earlier sentence, which is the pathophysiology or the etiology is elusive.

Q.    Okay.  And the -- and by elusive meaning -- and as you put in your slide, it's unknown, right?

A.    That a singular cause has evaded the field at this point in time because we understand these disorders to be biopsychosocial.

Q.    Do you see anywhere where you're talking about there's -- where you say there's some kind of multiple causes on the slide?

MR. VANZANDT:  Objection, argumentative.

Page 199

A.    I mean, my -- my slides, as you can see probably throughout all of my slides, are very image focused and they're very conversational in nature.  I've always found that teaching that way promotes more learning and more engagement, so I typically give bullet points and images.

So what I can tell you is when I present this slide, I say that the pathophysiology has remained elusive and there's no singular stand-alone cause.

BY MR. DAVIS:

Q.    You don't put anywhere in any of these slides, you don't identify social media use as a risk factor for an eating disorder or for BDD, do you?

A.    Can I check?

Q.    Sure.

(Document review.)

THE WITNESS:  It may be in this batch.  I'm sorry.

A.    I don't know how these slides got this out of order.  If I'm recalling this correctly, I think there's a slide that alludes to "what I eat in a day" videos on

Page 200

social media.

And again, I will say, though, that these -- my teaching style is very photo-based because I teach very, very tired and exhausted residents and child psychiatry fellows, for the most part.

BY MR. DAVIS:

Q.    Yeah.  I'm simply asking you:  Can you point to any place in the slides where you identify, where you say on the slide that social media use is a risk factor for an eating disorder or body dysmorphic disorder?

A.    So on page -- it's Anorexia Nervosa, A Clinical Overview, there's a sentence here that says -- this is --

Would you like me to read the Bates number?

Q.    Sure.

A.    MURRAY0565.

The snapshot here says:  Tumblr Eating Disorder Culture Has Made It to TikTok, From body checking to "what I eat in a day" videos.

And that generally is a --

Page 201

that's part of a discussion around the clinical phenomenology of anorexia nervosa, and it's usually part of a discussion around risk factors for anorexia nervosa.

Q.    On that slide that you just read from, is there anywhere you said that social media use is a risk factor or that social media use causes an eating disorder or body dysmorphic disorder?

MR. VANZANDT:  Objection, vague.

A.    What I said three slides prior was the eating disorder -- the etiology has remained elusive, and then I go on to discuss factors.

And I also want to point out that the center I operate in right now, Todd, is probably treating some of the sickest children in the nation who -- and so the fellows and the residents that work with me in this capacity require a lot of sort of education and treatment.  And that is why this is part of that broader -- broader presentation.

MR. DAVIS:  I move to strike as

51 (Pages 198 - 201)

CONFIDENTIAL

Page 202

nonresponsive. I'm sorry, I didn't ask you that.

BY MR. DAVIS:

Q. I'm just simply asking, on the slide that you read from, is there any place where you identify, on the face of the slide --

A. Uh-huh.

Q. -- that social media use is a risk factor or causes eating disorders or body dysmorphic disorder?

MR. VANZANDT: Objection, asked and answered.

A. Yeah, I -- I mention it.

BY MR. DAVIS:

Q. You mention it on the slide?

A. I refer to social media in a discussion around the -- I mention TikTok in a discussion around the clinical phenomenology, and the treatment of eating disorders, which I just alluded to, requires a thorough assessment of the risk factor for an individual patient.

Q. Dr. Murray, I don't think this has to be difficult.

Page 203

I'm simply asking: On the face of the slide, it doesn't say that TikTok or any other social media platform is a risk factor for an eating disorder or BDD, and it doesn't say that it causes -- that those platforms cause eating disorders or BDD, right?

MR. VANZANDT: Objection, compound, asked and answered.

A. Gosh. I lost access to the slide.

I mean, I can tell you what the title of the slide is, and I can also tell you how it is delivered. And it's usually delivered with a view to helping trainee psychiatrists and psychologists understand the treatment/assessment of eating disorders, thereby inherently involving risk factors.

MR. DAVIS: I'm sorry, I move to strike as nonresponsive. I'm afraid that's just not the answer to the question I asked.

MR. VANZANDT: And objection. Just please let the record note Mr. Davis continues raising his hands

Page 204

at the witness while he's trying to answer his questions.

MR. DAVIS: Oh, Joe, come on. The fact that I -- I've not been in any way directing that -- you're talking about me moving and opening my hand up and back? I mean, come on.

MR. VANZANDT: When you want him to stop, you do this or you point at him.

MR. DAVIS: I have not pointed at him one bit. That is a total fabrication.

MR. VANZANDT: It's not, but go ahead.

BY MR. DAVIS:

Q. Okay. You say on -- look at slide 682.

Just let me back up.

A number of these slides, Dr. Murray, you're talking about the genetic impact of eating disorders, correct?

A. Let me go to the slide, if that's okay. You said slide number?

Q. Well, I'm asking you in

Page 205

general.

Like, where you are right now, all those slides that you're thumbing through right now --

A. Yeah.

Q. -- are talking about the search for the genetic impact on eating disorders, correct?

A. These slides I'm looking at right now are assessing the neurobiology of eating disorders.

Q. And in the slide deck --

A. Yeah.

Q. -- right, for a presentation that you've given multiple times, you talk about the genetic influences for eating disorders, correct?

A. I talk about the genetics of eating disorders, yes.

Q. And you talk about how there's a search for genetic mutations that can actually cause eating disorders, right?

A. Can you point me to where you got that?

Q. I'm just asking you if that's

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

what your talk's about.

A.    I'm -- my talks usually refer to one genome-wide association study which illustrated nine genome-wide hits in the study of anorexia nervosa.  That is a study that's well accepted in our field as illustrating some of the genetic risk architecture for anorexia nervosa.

Q.    Right.  There's genetic mutations that predict that some people will actually develop anorexia nervosa?

MR. VANZANDT:  Objection, calls for speculation, mischaracterizes evidence.

A.    This is one study.  And I can tell you what is not on these slides is the series of earlier GWAS, or genome-wide association studies, which either find no significant findings or purported other genes as nearing or trending toward significance.

(Clarification requested by the stenographer.)

A.    Either insignificant hits or trending -- or hits trending towards significance.

Page 207

BY MR. DAVIS:

Q.    Please turn to page 682 of your slides.

A.    I'm really out of whack.  I'm sorry here.  What does it look like?

Q.    682.  It's talking about binge-eating disorder.

A.    Okay.  Good.  I know where to navigate to.

MR. VANZANDT:  Todd, may I show him?

MR. DAVIS:  Of course.

MR. VANZANDT:  Here you go.  These.

THE WITNESS:  Okay.  I'm sorry.  I -- that should be helpful.  Thank you.

A.    Yes.

BY MR. DAVIS:

Q.    You have a slide there that -- and the slide says:  Even at -- it's talking about binge-eating disorders, correct?

A.    Yes.

Q.    And it says:  Even at age nine, girls and boys with binge-eating disorder

Page 208

demonstrate strikingly different brain structure and function.

Correct?

A.    That's what that sentence says.

Q.    That's right.

And so the brains of children as young as nine showed that they looked and functioned differently.

A.    The brains in children -- the brains of children with binge-eating disorder, at nine, that's what this study is illustrating.  Yes, they look different.

Q.    Right.  And they function different, right?

A.    There's one -- this is a -- yes, this is a functional connectivity analysis and the other is a voxel-based morphometry analysis.  Those report brain structure and brain function at rest.

Q.    And you also -- you talk about how there's altered synaptic pruning and impaired functional connectivity, right?

A.    That was one of our interpretations of those data.  We talk about how, in the context of children with

Page 209

diagnosed binge-eating disorder, how their brains look different from children without binge-eating disorder.

Q.    How early do you think that those changes started?

A.    That's a great question.  We don't know is the short answer.  As a field, we don't know.  I wish we did.  We don't know.

Q.    But obviously, the changes -- it's likely the changes didn't happen overnight, right?  There was sometime before where they started?

MR. VANZANDT:  Objection, calls for speculation.

A.    Yeah, I don't want to go beyond where the data are.  There's a -- there are very few studies ascertaining -- in fact, there are no studies that I know of ascertaining a pro brain-based onset.  I don't know that.

BY MR. DAVIS:

Q.    Why is it important not to go beyond what the data says?

A.    Because it's important to

53 (Pages 206 - 209)

CONFIDENTIAL

Page 210

accurately represent what this slide says to you.

Q.    But not only that, but, I mean, is it -- it's important not to go beyond what the data shows just generally as a matter of scientific principles, right?

MR. VANZANDT:  Objection, vague, misstates testimony.

A.    As a matter of scientific principle in any stand-alone paper, it is usually feedback from the journal editor or editors that you're encouraged to not go beyond the data in any stand-alone paper.

So that's the job of a review, for instance, is to surmise data and summarize data.

BY MR. DAVIS:

Q.    Setting aside what journals do, do you believe it's good scientific practice not to go beyond what the scientific data shows?

A.    I think --

MR. VANZANDT:  Sorry. Objection, vague.

A.    I think it's good scientific

Page 211

practice to report the data, interpret the data, and acknowledge where the data ends in any stand-alone paper.

BY MR. DAVIS:

Q.    Dr. Murray, let me show you what's marked as Exhibit 61.

(Interruption by the stenographer.)

MR. DAVIS:  Excuse me, not 61. Exhibit 15.

(Whereupon, Murray-15, Screen Capture of YouTube Video, was marked for identification.)

BY MR. DAVIS:

Q.    You gave an interview, right?

A.    Yeah.

Q.    About male -- males and eating disorders, correct?

A.    Yes.  I look very young here.

Q.    Right.

In that -- in that interview, you said that the genetics and the neurobiology of eating disorders and the emerging data and the emerging genetic data should suggest that the 50 to 80% of the risk

Page 212

of developing eating disorders is conferred by genetics.

That's what you said, right?

A.    I don't know what I said. Here, this probably -- this looks like it was from 2015, more than ten years ago or about ten years ago.

I don't know -- I don't recall the content of what I said in this talk.  I can read the slide and read the transcript.

Q.    Do you deny that you said in this interview that the data suggests that 50 to 80% of the risk of developing eating disorder is conferred by genetics?

A.    I'm saying I can't recall what I said in this particular talk, which was ten years ago.

MR. DAVIS:  Okay.  Let's take a break for lunch.

THE VIDEOGRAPHER:  We are now going off the record, and the time is 12:15.

(Recess taken, 12:15 p.m. to 12:50 p.m. PDT)

THE VIDEOGRAPHER:  We are now

Page 213

going back on the record, and the time is 12:50 p.m.

BY MR. DAVIS:

Q.    Dr. Murray, are you ready to continue?

A.    Yes.

Q.    All right.  We were talking about, when we broke, about an interview that you gave where you talked about the genetic risk that -- for eating disorders.

Do you remember that discussion?

A.    I remember that discussion.

Q.    Let me show you on my phone. I've pulled up the clip and the interview. Let's play it, and then I'm going to ask you some questions.

First off, just to make sure we're clear, what I'm showing you on this video, that's you talking in an interview, right?

A.    Yes.

Q.    Okay.

    ----------

(Whereupon, Exhibit 16 was

54 (Pages 210 - 213)

CONFIDENTIAL

Page 214

played in the deposition room, transcribed as follows.)

DR. MURRAY: -- which begs the question, what's happening in adolescence? Is there something happening to insulate guys from eating disorder concerns in adolescence and given the comparability pre-adolescence?

And the other thing that I think is worth considering here is the genetics and the neurobiology of eating disorders and the emerging imaging data and the emerging genetic data should suggest that the 50 to 80% of the risk of developing an eating disorder is conferred by genetics, and there is no evidence at all that this genetic risk skips males.

(Transcription ends.)

----------

BY MR. DAVIS:

Q. Those were your words in the interview that you gave, right, Dr. Murray?

A. Those were my words.

Page 215

Q. Okay. Do you stand by those words today?

A. I think my opinion has evolved since then.

Q. Let's see if I can understand this.

In your opinion -- is your opinion different today?

A. My opinion has evolved since that interview ten years ago.

Q. Do you still believe that the 50 to 80% of the risk of developing an eating disorder is from genetics?

A. I still think that genetics impart a risk for the development of eating disorders. I've seen data showing variable data since that time.

Q. Do you agree that whatever data you've seen since you gave this interview, that the percentage of people who have an eating disorder that -- up to 80% of those people have the eating disorder because of the -- the genetics?

MR. VANZANDT: Objection, vague.

Page 216

A. I think some of those studies refer to looking at rates of heritability between twins, and you get shared processes in there, too.

It's really hard to parse out the stand-alone risk, but I definitely think that genetics confers some risk.

MR. DAVIS: That's not -- I think you missed my question, so I object to the responsiveness. Move to strike it.

BY MR. DAVIS:

Q. I'm simply asking you: Do you agree that for whatever data you've seen since this interview, that the percentage of people who have an eating disorder from genetics is as high as 80%?

MR. VANZANDT: Objection, vague, foundation.

A. I mean, that interview was ten years ago, and I don't -- I can't recall all the data I've seen since then off the top of my head now.

BY MR. DAVIS:

Q. Can you --

Page 217

MR. DAVIS: I object, nonresponsive.

BY MR. DAVIS:

Q. Can you identify here today any study that you can say with certainty that the genetic risk for eating disorders is not somewhere in the range between 50 and 80%?

MR. VANZANDT: Objection, asked and answered.

A. Again, as I -- as I sit here today, I know that I've seen other sources of data since those studies, and I can't recall them exactly precisely right now, but I'd be happy to look at them.

BY MR. DAVIS:

Q. Can you identify such a study sitting here today?

MR. VANZANDT: Objection, asked and answered.

A. Again, in the last ten years I've seen other data, and I can't recall the specific numbers today.

BY MR. DAVIS:

Q. And you can't recall the name of the study today, can you?

55 (Pages 214 - 217)

CONFIDENTIAL

Page 218

A.    Again, I can't recall the studies that I've reviewed over a ten-year period today.

Q.    Okay.

A.    I apologize.

Q.    Look at page 65 where I've got -- to your MDL report.  I've got page --

A.    Page 65 of 184?

Q.    Yeah.  Let me see if I've got it.

Where you've picked up your MDL -- excuse me.  Let's do this one.  It's easier.

A.    Thank you for your help.

Q.    Sure.

MR. VANZANDT:  We're in the JCCP report?

MR. DAVIS:  JCCP report, April.

BY MR. DAVIS:

Q.    You identify causal factors in your report for eating disorders, correct?

A.    I identify factors contributing to the risk of developing an eating disorder.

Q.    You believe that those risk factors are causal, right?

Page 219

A.    I believe that these factors can confer risk for the development of an eating disorder.

Q.    Well, you understand that conferring risk and causing are two different things, right?

A.    In a clinical sense, they would be fairly interchangeably used.

Q.    Do you equate increased risk or risk factor with causation?

A.    Let me restate this.  I think all of the factors I've listed here can be implicated in the cause and the development of an eating disorder.

Q.    By implicated, you mean a causal risk factor?

A.    Yes.

Q.    Okay.  And so you've got genetics listed, correct?

A.    That's the first one listed, yes.

Q.    That's the very first one you list.  And you've got gut microbiota, correct?

A.    Yeah.

Page 220

Q.    And what is it about gut microbiota that you say is a causal risk factor for eating disorders?

A.    The emerging data relating to microbiome.  We're learning a lot more now about the microbiome as related to anorexia nervosa in particular.  I don't think it's as well developed in evidence based for other types of eating disorder.

In fact, some of the genetics, some of the genes identified relate to gastrointestinal functioning.  So I think there's an evidence base there to suggest.

Q.    When you say suggest, are you saying that you have enough information to say that it's causal?

A.    I'm saying the field accepts that gut microbiota and autoimmune functioning can confer risk for causing an eating disorder.

Q.    When you say -- okay.

You agree that autoimmune functioning is a causal risk factor for eating disorders?

A.    That's one of the things I've

Page 221

listed here.

Q.    Okay.  And you've also got -- of course, childhood and early adolescent experiences, which include adverse childhood experiences, right?

A.    Childhood and early adolescent experiences would definitely include early adverse events, yes.

Q.    And that's a risk factor for an eating disorder?

A.    Yes.

Q.    Okay.  And then you also have personality traits and comorbid psychiatric conditions, correct?

A.    That is what I list here, correct.

Q.    And also socioeconomic, gender and ethnicity status, correct?

A.    That's what I list here, that's correct.

Q.    So, for example, is it lower socioeconomic or higher socioeconomic that is a risk factor?

A.    We -- well, food insecurity and low socioeconomic functioning is considered a

Golkow Technologies,
A Veritext Division
877-370-3377                                    www.veritext.com

CONFIDENTIAL

Page 222

risk factor.

Q. And also gender, that relates to females more than males --

A. Correct.

Q. -- are at risk for an eating disorder, right?

A. Yes.

Q. And then ethnicity status. Is it more likely that it's Caucasians that have eating disorders than other races?

A. That's what the data would illustrate, yes.

Q. Okay. And -- okay.

And you also talk in the next sentence that: Anorexia nervosa shows some evidence of being a heritable phenotype with a genetic underpinning.

Right?

A. Yes.

Q. And that's one of the things you talked about in your slides we went over earlier, right?

A. That's one of the things that was mentioned in the slides, yes.

Q. Okay. You have even said as to

Page 223

genetics that it is a biologically based disorder, wired in the brain, and it's not a fad you grow in or out of.

True?

A. Again, I think my understanding is a biopsychosocial model of etiology.

Q. Let me hand you what's been marked as Exhibit 16.

(Interruption by the stenographer.)

MR. DAVIS: Yeah, let's do the video for Exhibit 16. Thank you. Good catch, Mike.

(Whereupon, Murray-16, Media File, YouTube Video of Interview, was marked for identification.)

MR. DAVIS: And then we'll do -- we'll do Exhibit 17 for this next exhibit.

(Whereupon, Murray-17, University of Southern California Social Media Posts, was marked for identification.)

BY MR. DAVIS:

Q. Dr. Murray, I've handed you an

Page 224

Exhibit 17.

This is an Instagram posting that you made, correct?

MR. VANZANDT: Objection, mischaracterizes evidence.

A. This is a post from USC --

BY MR. DAVIS:

Q. Right. So USC --

A. -- School of -- USC -- USC.

Q. Right.

So USC, the place where you at one time were employed --

A. Correct.

Q. -- used social media to put this posting out where you're talking about eating disorders, correct?

MR. VANZANDT: Objection, foundation.

A. They released a video for National Eating Disorder Awareness Week. That is what I see in front of me.

BY MR. DAVIS:

Q. Right.

And this was posted on February 22, 2022, correct?

Page 225

MR. VANZANDT: Objection, foundation.

A. I mean, that's the time stamp I see on this, yes.

BY MR. DAVIS:

Q. And you're -- you say in this discussion that: Eating disorders are biologically based disorders that are really wired in the brain, and it's not a fad or a phase of folks who grow out.

Right?

A. That's what this transcription says.

Q. And it says that because you said it, right?

A. I don't recall what I said. I don't disbelieve that I said that.

Q. Okay.

(Whereupon, Murray-18, New York Times Article, A Gymnast's Death Was Supposed to Be a Wake-Up Call, What Took So Long, was marked for identification.)

BY MR. DAVIS:

Q. I'm going to show you what's

57 (Pages 222 - 225)

CONFIDENTIAL

Page 226

been marked as Exhibit 18.

A.    Thank you.

Q.    You also gave an interview to The New York Times on April -- sometime before April 26th, 2022, correct?

A.    This was -- looks like it was published on April 28th, 2022.

Q.    Right.

And if you turn to page 4, you're quoted in the article, correct?

A.    I'm quoted in the article.

Q.    And your quote is:  It has been misportrayed consistency -- let me back up.

What you're talking about is you're talking about anorexia, correct?

A.    Let me --

Q.    Strike that.

You're talking about eating disorders, correct?

A.    It looks like I'm talking about eating disorders, yes.

Q.    And it says, quote -- your quote is:  It's been misportrayed consistently as a disease of choice, and it's really not at all a disease of choice.

Page 227

Did I read that correctly?

A.    You read that correctly.

Q.    That was your -- you don't deny you made this quote, do you?

A.    You -- I don't remember the specific wording of the interview, but that's the quote that's in there.

Q.    You don't dispute that that's the quote you gave?

A.    No.

Q.    Okay.  And it also says, it's a -- your quote is:  It's a biologically based illness that people can't opt into, and they can't opt out of it oftentimes.

Correct?

A.    That's what this quote says.

Q.    And you -- and you don't dispute that you made that quote, do you?

A.    No.

Q.    Okay.  Other risk factors for eating disorder are early menstruation?

A.    That's been shown to be a risk factor, early age of menarche, yes.

Q.    Elite sports and sporting activities are also a risk factor for eating

Page 228

disorders?

A.    Where are you pulling this data from?  May I ask?

Q.    I'm just asking you.

A.    I think there's data to suggest there's an elevated risk in elite athletes.

Q.    Right.

A.    Usually, it's sort of -- we know the risk is greater in some weight-category-based sports, for example.

Q.    Are you finished?

A.    I'm done, thank you.

Q.    Okay.

A.    Thanks.

Q.    And you agree that it's not just elite sports, but it's also sporting activities that also presents as a risk factor for eating disorders, right?

MR. VANZANDT:  Objection, foundation.

A.    That's not what I said.  I think I said that elite sport participation with all the pressures therein and usually either weight-category-based sports or -- geez, we see an increased risk in elite

Page 229

sports where, yeah, I think generally pressure based and weight-category based.

BY MR. DAVIS:

Q.    Well, do you agree that outside of elite sports, that sporting activities, particularly those in women, can be -- and teenage girls, can also be a risk factor for an eating disorder?

MR. VANZANDT:  Objection, vague and foundation.

A.    I mean, I -- I'm aware of data demonstrating an elevated risk in athletes.

BY MR. DAVIS:

Q.    Okay.

A.    I don't know that those data quantify the level of performance or not.

Q.    Well, certainly there's also a risk factor for men who work out a lot and who are concerned about their body image; that type of physical activity is also a risk factor for both eating disorders and BDD, right?

A.    If a man is working out because he's concerned about his body image, yes, I would contest that that is a risk factor.

58 (Pages 226 - 229)

CONFIDENTIAL

Page 230

Q. Okay. That would also hold true for females, too, right?

A. Body image dissatisfaction is a risk factor.

Q. And if someone is working out a lot as a female, that is also a risk factor for developing an eating disorder and BDD, right?

MR. VANZANDT: Objection, vague and calls for speculation.

A. I mean, there's data linking compulsive exercise in the context of body dissatisfaction that portends an elevated risk, sure.

BY MR. DAVIS:

Q. If you can go back to --

A. In which one, Todd, the --

Q. Yeah, I'll give you --

A. Just which version of the report?

Q. I'll give you in a second.

A. Thanks.

Q. Now, it's pages 14 and 16 of your April report.

A. Great. Yeah.

Page 231

Q. Okay. You outline on pages 14 and 15 the search strategy that you use to help form your causation opinions in the case, right?

A. Those are the search terms, yes.

Q. Okay. And so what you specifically -- one of -- the search terms that you focused in on were "social media," and then specific social media platforms, including Instagram, Facebook, TikTok, Snapchat and YouTube, right?

A. Yes.

Q. Okay. And you didn't do a comprehensive -- you didn't include in that just screen time generally, did you?

A. Those are the search terms that I used.

Q. So in terms of forming your opinions in this case, you aren't relying upon assessments of screen time generally, are you?

A. I know that there are studies that reported screen time, and there are studies that disambiguated screen time from

Page 232

social media use. I think all are helpful in forming an opinion of an evidence base.

Q. But in terms of forming your opinions about a causal relationship, if any, between social media use and any psychiatric disorder or symptom, you agree that you look at studies that specifically assess social media use and not another form of screen usage such as television, smartphones or Internet use, right?

MR. VANZANDT: Objection, vague and compound.

A. I assessed a broad body of evidence, and I'm aware that some of these -- some of the literature that is out there assess screen time, which includes social media use, and other studies have disaggregated screen time from social media use from other -- other forms of screen time.

BY MR. DAVIS:

Q. But to form your opinions in this case, you're focusing on the studies that disaggregated the social media use and not screen time generally, correct?

MR. VANZANDT: Sorry.

Page 233

Objection, foundation, mischaracterizes testimony.

A. No, I'm forming -- my opinion considers the data. Some of those data have assessed screen time, which has included social media, and some of those studies I believe have disaggregated social media.

BY MR. DAVIS:

Q. Are you using screen time generally that's not specific to social media use to form your opinions about causation as to social media platforms?

A. Again, I'm -- I'm relying on an entire body of evidence.

Q. I understand what you looked at, but my question is: Are you using the data for screen time generally or smartphones generally or TVs or some other form of nonsocial media screen time to form your opinions of the case?

A. Again, I reviewed studies which assess social media. Sometimes that was -- sometimes that was measured independently, and in other studies, screen time, which has included social media use, has been studied.

59 (Pages 230 - 233)

CONFIDENTIAL

Page 234

Q.   So you used both to form your opinions?

A.   I've relied on the existing -- existing data.

Q.   Which is both?

A.   Which is to say that some studies have measured screen time which includes social media, and other studies have included only social media or they've disambiguated social media.

Q.   And you didn't make a distinction between the two to form your causation opinions, did you?

MR. VANZANDT:  Objection, misstates testimony.

A.   I considered the data to form my opinion.

BY MR. DAVIS:

Q.   So you didn't take, for example, general screen time usage or smartphone usage or TV usage and take it out of the causation assessment, did you?

A.   Let me give you an example, if I may.

Q.   I really would like you to

Page 235

focus on my question.  Please focus on my question.  Can you answer my question?

A.   Can you restate your question?

Q.   Yeah.

You didn't take general screen time usage or smartphone usage or TV usage and take it out of your causation assessment, did you?

A.   I'm aware that some of these studies assess social media in the context of screen use, and I'm aware that other studies have assessed social media separately, and I think they're all relevant to consider when forming an opinion.

Q.   So you didn't take out -- you included the studies on general screen time, TV usage or smartphone usage to form your opinions --

MR. VANZANDT:  Objection, asked and answered.

BY MR. DAVIS:

Q.   -- on causation as to smartphones -- excuse me, as to social media, right?

MR. VANZANDT:  Objection, asked

Page 236

and answered.

A.   I reviewed studies assessing social media, and some papers, they assessed it as a part of screen time, and in other studies they assessed it independently, or where possible, did separate analyses and disaggregated.

MR. DAVIS:  I move to strike as nonresponsive.

Because of time constraints, I just have to move on and reserve on that question.

MR. VANZANDT:  And I disagree. It was completely responsive.

BY MR. DAVIS:

Q.   Dr. Murray, the DSM criteria has specific criteria for each eating disorder, correct?

A.   That's correct.

Q.   The DSM doesn't lump the different types of eating disorders all together under one bucket of a single diagnosis, does it?

A.   That is technically not correct.  In any diagnostic category, there's

Page 237

an "other" specified, which is designed to be a catchall category to sort of accommodate disordered eating, but one that doesn't neatly fit in a box.

MR. DAVIS:  I think we're miscommunicating again, so object, nonresponsive.

BY MR. DAVIS:

Q.   For example, you don't use anorexia criteria to diagnose someone with ARFID, do you?

A.   I use ARFID criteria to diagnose someone with ARFID.

Q.   You don't use ARFID criteria to diagnose binge-eating disorder, do you?

A.   Say that again.

Q.   You don't use ARFID criteria to diagnose binge-eating disorder, do you?

A.   No.  Where available, I rely on the diagnostic criteria.

Q.   Right.

Now, the diagnostic criteria actually for each of the eating disorders actually makes it plain that you're supposed to be focused on trying to differentiate one

60 (Pages 234 - 237)

CONFIDENTIAL

Page 238

eating disorder from another, right?

A.    The diagnostic criteria for the -- for eating disorders are designed to encapsulate the full spectrum of disordered eating, and some of those have specific diagnostic criteria, and others have sort of residual catchall criteria, which are important to use also.

Q.    If you had a study that showed an increased risk for anorexia following an exposure, would you conclude from that study that bulimia is also -- that exposure also increases the risk of bulimia?

MR. VANZANDT:  Objection, incomplete hypothetical.

A.    I would rely on the criteria where -- where available.

MR. DAVIS:  Okay. Nonresponsive.  Object.  That's not responsive to my question.

BY MR. DAVIS:

Q.    I simply asked if you had a study that showed an increased risk for anorexia following an exposure, would you conclude from that study that that exposure

Page 239

also increases the risk for bulimia?

A.    To the extent that bulimia and anorexia nervosa are comorbid and oftentimes can visit higher prevalence of transdiagnostic migration, but if the diagnostic criteria were met currently, I would say anorexia nervosa.  But it's also not lost on me that there's a high degree of transdiagnostic migration from AN, anorexia nervosa, to bulimia nervosa.

So I guess your question speaks to sort of primary versus secondary risk.

MR. DAVIS:  Sorry, move to strike as nonresponsive.

BY MR. DAVIS:

Q.    I'm simply asking:  The study that you have in front of you looks at an exposure and finds an increased risk of anorexia.  That's all it finds.  It doesn't say anything about another eating disorder.

Would you then conclude from that that the exposure also increased the risk of bulimia?

MR. VANZANDT:  Objection, vague, asked and answered.

Page 240

A.    You know, if something increases the risk of anorexia nervosa and we know that anorexia nervosa is -- or rather, that bulimia nervosa is linked to anorexia nervosa, that's important to know.

MR. DAVIS:  Move to strike as nonresponsive.

I have to move on.  I have to reserve.  I just don't have time to deal with two -- with the responsiveness of the answers.

MR. VANZANDT:  Slide down just a tad.

THE WITNESS:  I'm sorry, of course.

BY MR. DAVIS:

Q.    Look at page 5 of your JCCP report, please.

A.    Uh-huh.

Q.    Okay.  You list out here the medical conditions that you say social media use increases the risk of?

A.    Correct.

Q.    And are you -- in your mind, is there a difference between increased risk and

Page 241

causal?

A.    No.

Q.    Let me ask -- that's a bad question.

In your mind, there's no difference for you between increased risk and causation?

A.    When I say increased risk I mean a factor embedded in the etiology.

Q.    Okay.  And in terms of the factor -- and can you quantify that factor in any way?

A.    What do you mean?

Q.    Well, you know, you said it's a factor, and my question to you is:  Do you know for any of the risk factors that you believe result in an eating disorder or BDD what quantification of risk that that factor conveys?

A.    To my understanding, the data aren't really curated in that way, and certainly in clinical practice you ascertain risk factors, you index the severity of a risk factor, and you design a treatment plan.

Q.    Okay.  Thank you.

61 (Pages 238 - 241)

CONFIDENTIAL

Page 242

So the list of conditions that you identify on page 5 of your April 2025 report are anxiety, depression, eating disorders, body dysmorphia, suicidality, self-harm and insomnia, right?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. That's the list that you believe that social media use results in, correct?

A. That's a list of disorders that is linked to the exacerbation of eating disorders and linked, I believe, to social media.

Q. Okay. Help me out with that, because I'm not following.

A. Okay.

Q. I'm asking for your help here.

A. Okay.

Q. So is it your view that independent of whether -- independent, a patient doesn't have an eating disorder at all, doesn't have BDD.

A. Okay.

Page 243

Q. Are you offering any opinions in the case that social media use results in either anxiety or depression or suicidality or self-harm or insomnia or symptoms of those conditions?

A. Yes.

Q. You are. Okay. So your view is that -- your opinions in the case is that social media use, independent of an eating disorder, causes anxiety or depression, right?

A. Yes.

Q. Okay. Same with suicidality, self-harm and insomnia, right?

A. Yes.

Q. Now, when you are talking about insomnia, you're talking about the actual diagnosis, right?

A. Yes.

Q. Okay. Anything else that we need to add to -- this is a complete list for you in this case, right? There's nothing that needs to be added to it, is there?

MR. VANZANDT: Objection, vague.

Page 244

A. Yeah --

BY MR. DAVIS:

Q. Let me ask it again.

A. Yeah.

Q. You specifically set out on page 5 of your April 2025 report those conditions that you believe social media results -- use causes, which is anxiety, depression, eating disorders, body dysmorphia, suicidality, self-harm and insomnia, right?

A. Yes.

Q. That's a complete list, right?

A. That is the list that I reviewed. That's...

Q. And you're not adding anything to that list today, are you?

A. I mean, I -- as I mentioned, I consume data often, but today, I'm not adding anything to this list today.

Q. Okay. And you didn't add anything to that list in your MDL May 2025 report, did you?

A. May I check? I don't think so.

Q. Okay.

Page 245

A. Can I check?

Q. Sure.

MR. VANZANDT: It's up there.

THE WITNESS: I'm all over the place.

MR. DAVIS: I believe it's right in the front there, Dr. Murray.

THE WITNESS: Okay. Thank you.

(Document review.)

BY MR. DAVIS:

Q. It's the same list, right?

A. It looks like it, yes.

Q. Okay. All right. So -- and I just want to make sure I'm clear that you're not saying it's just symptoms of anxiety or symptoms of depression. You say it's actually the disorder of anxiety and the disorder of depression, right?

MR. VANZANDT: Objection, vague and compound.

A. I'm saying that the disorder are all predicated on symptoms, and if something exacerbates symptom severity, that is part of -- part of a disorder, right.

///

62 (Pages 242 - 245)

Page 246

BY MR. DAVIS:

Q. Okay. I don't -- I'm not sure I'm following that.

Is it your opinion to a reasonable degree of medical and scientific certainty that social media use causes the DSM-5-diagnosed anxiety disorders?

A. It is my opinion that social media use is causally connected to the onset of anxiety disorders.

Q. Okay. So you think it's actual -- it's -- social media use is actually causing each and every anxiety disorder?

MR. VANZANDT: Objection, misstates testimony.

A. That's not what I said.

BY MR. DAVIS:

Q. Okay. Tell me specifically which anxiety disorders you claim that social media causes.

A. Can I review my report?

Q. Sure.

A. Thanks.

(Document review.)

Page 247

BY MR. DAVIS:

Q. Are you ready, Dr. Murray?

A. Yes, I am. Thanks for your patience.

Q. Yeah.

A. Social anxiety disorder.

Q. Okay.

A. There's also evidence supporting some generalized anxiety disorder.

Q. Okay.

A. And that comports my clinical practice as well.

Q. Okay. So you've identified social anxiety disorder and generalized anxiety disorder and that's it, right?

A. I am saying that those are the -- I think those are the anxiety disorders I think with the strongest evidence base.

Q. I'm sorry, I'm not asking that, Dr. Murray. And I really do need you to answer this, because I have to know which anxiety disorders you're going to claim at trial social media causes. You've listed social anxiety disorder and generalized

Page 248

anxiety disorder.

Anything else that you -- anxiety disorder related that you believe social media causes?

A. Uh-huh.

Certainly, I think that social anxiety and generalized anxiety disorders, and again, in my -- in my clinical practice, I see a lot of patients attribute panic disorder and panic-like symptoms.

MR. DAVIS: I'm sorry. Again, that's not an answer to my question. I move to strike as nonresponsive.

BY MR. DAVIS:

Q. What other anxiety disorders do you claim that social media causes other than social anxiety disorder and generalized anxiety disorder?

MR. VANZANDT: Objection, asked and answered.

A. As I mentioned, many patients that I can recall sitting here right now, in the case conceptualizations we discussed earlier in my assessment, have attributed panic disorder, and that's been the

Page 249

assessment of me and others.

BY MR. DAVIS:

Q. So you -- any others you want to add to the list?

A. Not as I sit here right now.

Q. Okay. So for panic disorder, you're basing that upon reports that you have received from patients, right?

A. I'm simply saying that my -- a lot of my patients will report that their panic is emanating from their social media use.

MR. DAVIS: Okay. But that's not -- again, not an answer to my question. Move to strike as nonresponsive.

BY MR. DAVIS:

Q. I'm asking you: Are you basing your opinion on -- panic disorder is caused by social media by anything other than your clinical experience?

A. No. There's data here that support -- that assess anxiety disorders across the spectrum.

Q. Okay. All right. So is there

63 (Pages 246 - 249)

CONFIDENTIAL

Page 250

any study that you reviewed or are aware of that had an endpoint of obsessive -- excuse me, strike that.

Any study that you reviewed or are aware of that analyzed social media use and had an endpoint of social anxiety disorder or generalized anxiety disorder or panic disorder?

A.   I'd have to review the literature.  I reviewed a lot of studies.

Q.   Do you know of --

A.   I'm aware of studies measuring symptom escalation, and I would need to review the studies.

Q.   Okay.  Can you identify any study here today that used social anxiety disorder, generalized anxiety disorder or panic disorder as an endpoint in studying social media use?

MR. VANZANDT:  Objection, asked and answered.

A.   Yeah, I don't recall sitting here today.  I'd have to review these data.  There are a lot of data.

///

Page 251

BY MR. DAVIS:

Q.   Okay.  The depressive disorders -- which depressive disorders do you claim that social media use causes?

A.   Bear with me.

Thank you for your patience.

(Document review.)

A.   I think I would say major depressive disorder.

BY MR. DAVIS:

Q.   Any others?

A.   That can migrate into persistent depressive disorder, but same symptomology, different length of symptoms.

Q.   Okay.  So are you saying -- I'm unclear and that's why I'm asking the follow-up.

Are you claiming in this case that persistent depressive disorder is caused by social media use?

A.   What I'm saying is that major depressive disorder, if persisting over time without abating, is persistent depressive disorder.

Q.   So my question to you is:  Are

Page 252

you claiming that persistent depressive disorder is caused by social media?  That's all I'm asking.

MR. VANZANDT:  Objection, asked and answered.

A.   Yeah.  I'm saying that if major depressive disorder does not remit, it becomes persistent depressive disorder.

BY MR. DAVIS:

Q.   So in that circumstance, you believe that it can be caused by social media use?

A.   In the instance in which major depressive disorder becomes -- sorry, persistent depressive disorder, the same causal factors would apply.

Q.   Okay.  Other than major depressive disorder or persistent depressive disorder, is there any other depressive disorder identified in the DSM-5 that you claim social media use causes?

A.   Not that I can -- no.

Q.   Okay.  And I take it -- okay.

And then eating disorders.  Which eating disorders are you claiming that

Page 253

social media causes?

Let me back up for a second.

A.   Yeah.

Q.   Are you aware of any study that used major depressive disorder -- strike that.

Are you aware of any social media use study that analyzed major depressive disorder or persistent depressive disorder as an endpoint or an outcome measure?

A.   Yes.

Q.   Major -- major depressive disorder and persistent depressive disorder diagnosis as a endpoint?

A.   I would need to review the data, but I can recall a study that as an endpoint had a diagnosis of a depressive disorder.  I think it was major depressive disorder.  I would need to review the data.

Q.   What's the name of the study?

A.   It's in Nagata.  This study found -- it was published very recently -- found that prospectively, social media use at time point one prospectively predicts the

64 (Pages 250 - 253)

CONFIDENTIAL

Page 254

onset of a depression diagnosis at time point two, I believe two years later; and conversely, depression at time point one did not affect the use of social media at time point two.

Q.   This is a study that came out in 2025?

A.   This came out quite recently, yes.

Q.   Okay.  All right.

Other than that study, are you aware of any study on social media use that used major depressive disorder as an income -- or an outcome measure, an endpoint or an outcome measure?

A.   Yeah.  I -- again, the one that stands out to my mind the most is the Nagata study, but I would definitely review the data and share with you.

Q.   Are you aware of one as you sit here today?

A.   As I sit here today, I can't recall, and I would like to review the data. I reviewed a lot of studies.

Q.   Are you aware of any study that

Page 255

has replicated the findings of the Nagata 2025 study, which you claim looked at major depressive disorder as an endpoint?

A.   Again, I would probably want to review the data.  I don't recall sitting here today.  I'm aware that studies have measured depressive symptoms which -- many studies have used validated measures of depression psychopathology, and I would want to review the data before, you know -- before fully answering that question.

MR. DAVIS:  I move to strike as nonresponsive.

BY MR. DAVIS:

Q.   I'm simply asking you:  Do you have a study that you can identify here today which replicated the findings of Nagata 2025 which you claim looked at major depressive disorder as an endpoint?

MR. VANZANDT:  Objection, asked and answered.

A.   I would ask to review the data because the one that stands out to my mind the most right now is the Nagata study, and I would willingly review the data and get back

Page 256

to you.

BY MR. DAVIS:

Q.   You can't answer that question today?

MR. VANZANDT:  Objection.  It's asked and answered.

A.   The data that I recall the most right now sitting here is the prospective data indicating an increased odds ratio of the onset of depression post social media use, but I can't recall others as I sit here today, and I would definitely review the data.

MR. DAVIS:  I reserve on the responsiveness.

BY MR. DAVIS:

Q.   Okay.  So let's move to eating disorders.

Let me back up.  Can you identify any study sitting here today that used persistent depressive disorder as an endpoint or an outcome measure when analyzing social media use?

A.   Again, I would want to review the data before -- because the sort of -- the

Page 257

depressive disorder study that I have top of mind right now is the Nagata study.  Excuse me.  I would like to review the data.  Excuse me.

Q.   Are you able to answer me today?

A.   Again, I would -- top of mind, I don't recall sitting here today.  I would like to review the data.

MR. DAVIS:  I'll reserve on the responsiveness.

BY MR. DAVIS:

Q.   The body -- eating disorders -- which eating disorders do you claim social media causes?

A.   Binge-eating disorder, anorexia nervosa and bulimia nervosa.

Q.   Other than those three, are you claiming to a reasonable degree of medical or scientific certainty that social media use causes any other eating disorder?

A.   No.

Q.   Do you agree that the scientific data doesn't establish that social media use causes ARFID or OSFED?

65 (Pages 254 - 257)

CONFIDENTIAL

Page 258

A.    I haven't seen data supporting that, so I would not conclude that social media use causes OSFED or ARFID.

Q.    Okay.  Suicidality, self-harm. Okay.

Now, what social media use study analyzed binge-eating disorder diagnosis as an endpoint or an outcome measure?

A.    That's a good question.  I can think of several.  There's a study that I was part of that assessed social media use and other screen time use in nine- to ten-year-old children, and prospectively predicted the development of binge-eating disorder one year later.

There's another study that I'm thinking about with -- done by Jason Nagata, not myself, which disaggregated social media and screen time and found the prospective two-year outcome that screen -- social media use at time one predicts the onset of binge-eating disorder at time two.  And that incrementally -- the risk incrementally increased with each hour of exposure to

Page 259

social media.

And probably the other one I have top of mind now is the study, again by Jason Nagata's group, illustrating that social media use at time one -- this is in 12,000 nine- to ten-year-old children using the ABCD study set.  That's the adolescent brain and cognitive development study set -- independently predicted the onset of a cluster of eating disorder symptoms, which included dietary --

Let me review the data, actually, before I -- but essentially, those data illustrated an array of eating disorder symptoms, core eating disorder symptoms, including loss of control, eating, fear of overeating, compulsive exercise and things of that nature.

Q.    Okay.  I'm going to need you to specifically identify the studies.  I can't -- I don't know which ones you're specifically talking about for that description.

So what I'd like to do is go off the record, allow you to figure out where

Page 260

that is in your report, and we'll come back and we'll talk about them, okay?

A.    Okay.

MR. VANZANDT:  Why are we going off the record to do that?

MR. DAVIS:  Because I have to take a break.

THE VIDEOGRAPHER:  Should we go off?

MR. DAVIS:  Yes.

THE STENOGRAPHER:  Joe, off?

MR. VANZANDT:  Yeah.

THE VIDEOGRAPHER:  We are now going off the record, and the time is 1:38.

(Recess taken, 1:38 p.m. to 1:49 p.m. PDT)

THE VIDEOGRAPHER:  We are now going back on the record, and the time is 1:49 p.m.

BY MR. DAVIS:

Q.    All right.  Dr. Murray, have you been able to identify the three studies about binge-eating disorder that we were talking about before the break?

Page 261

A.    One of the -- one of the studies is Nagata, Iyer, Chu, Baker --

Q.    Wait a minute.  You're reading from something.  Would you mind directing me to what you're reading and where it is?

A.    Sure.  This is on -- I don't know how to correctly identify this page, but it's -- it's not numbered.

Q.    Is it part of Exhibit --

A.    It's Exhibit B.

Q.    Exhibit B to your -- which report?

A.    Gosh, the April report.

Q.    Okay.  Why don't we do this. Why don't you star what -- just star the three articles.

A.    Well, I -- I looked up one, and I can tell you about the other two.

Q.    Well, can you star the one, please?

A.    Sure.

Q.    Thank you.

And then dog-ear the page?

A.    (Witness complies.)

Q.    Thank you.

66 (Pages 258 - 261)

CONFIDENTIAL

Page 262

A.   Yes, sir.

Q.   Okay.  Now, may I see that one?

A.   Yeah.

Q.   Okay.  So this is -- just for the record, the one that is starred is Nagata 2021, Contemporary screen time modalities among children 9-10 years old and binge-eating disorder at one-year follow-up.

Okay?

A.   Thank you.

Q.   What are the other two?

A.   The other two, again, are Jason Nagata studies.  One, lead author is Chu, if I remember.  And the other lead author has a name that I can't quite recall.  Yeah.

Q.   Okay.  Chu, was that -- what year was that published?  Because he's got several publications.

A.   I don't recall.

Q.   And then what's the third one?

A.   The other one I don't recall the name of the first author.  I know that Nagata is an author.

Q.   Okay.  I want you to look in your expert report, either one, both of them,

Page 263

I don't care, and tell me where in the discussion, when you talk about social media causing eating disorders, that you discuss any of these three studies.

MR. VANZANDT:  Objection, argumentative.

A.   I can tell you on the first study that I mentioned, I mention it on -- and I'm looking at my April report.

BY MR. DAVIS:

Q.   Where?

A.   I'm just going to find it.  Bear with me one second.

On page 11.

Q.   Okay.  Page 11, footnote 4?

A.   Correct.

Q.   Okay.  So that's -- that's Nagata 2021, right?

A.   Yeah, that's what that author list is, yes.

Q.   Okay.  Show me in your report where you talk about -- about social media causes binge-eating disorder or other eating disorders.  In that section of the report, do you discuss any of these studies?

Page 264

A.   I discuss it in this report.  It's mentioned in the page I just mentioned.

Q.   You don't mention it in the analysis where you're actually talking about specific studies that supposedly where social media causes any eating disorder, do you?

MR. VANZANDT:  Objection, mischaracterizes evidence, argumentative.

A.   Can I -- it's in my report.

BY MR. DAVIS:

Q.   Okay.  Let's go back.  So let me make sure.

And you've got a Chu, but you don't know the year or any -- or the title?

A.   Not as I recall it right now, Todd.

Q.   Okay.

(Whereupon, Murray-19, Social Media Use and Depressive Symptoms During Early Adolescence, by Nagata et al, was marked for identification.)

BY MR. DAVIS:

Q.   Let me hand you what's been marked as Exhibit 19.  This is the study by

Page 265

Nagata that you referenced for analyzing social media use and major depressive disorder, right?

A.   Let me familiarize myself with what you just gave me, please.

(Document review.)

A.   I think this pertains to depressive symptoms and not binge-eating disorder.

BY MR. DAVIS:

Q.   Yes.  I've gone back because you mentioned --

A.   I understand.

Q.   You mentioned this study, right?  This was the one study that you identified that you said used an endpoint or an outcome measure of major depressive disorder, right?

A.   I think I was -- I think I was alluding to depressive disorders, yes.

Q.   Okay.  Let's be clear about what the study says.  This is the study that you were mentioning, though, about major depressive disorder and social media use, right?

67 (Pages 262 - 265)

CONFIDENTIAL

Page 266

A.    I believe so.
Q.    Right.
And this -- look at the Main Outcome and Measures on page 1.
Do you see that?
A.    Uh-huh.
Q.    The main outcome was depressive symptoms, not a diagnosed disorder of depression, true?
A.    These studies -- this particular study measures the core symptoms of depression, and so that goes towards supporting a diagnosis.
MR. DAVIS:  Dr. Murray, I move to strike as nonresponsive.  This doesn't have to be this difficult, okay.  Please, please focus on my question.
BY MR. DAVIS:
Q.    The main outcome measure was depressive symptoms, not diagnosed major depressive disorder or some other depressive disorder, right?
MR. VANZANDT:  Objection to counsel's comments, asked and

Page 267

answered.
A.    These -- this study measures depressive symptoms which form the core constellation of a depressive disorder as an outpoint measure.
BY MR. DAVIS:
Q.    I'm sorry, we're just miscommunicating, and I think it's because -- well, I'm not going to comment why.  But will you please focus on my question.
The outcome measure was not a diagnosis of depression, right?
A.    The outcome measures were measures of depressive symptomatology, which is emblematic of a depressive disorder.
MR. DAVIS:  Objection, nonresponsive.
BY MR. DAVIS:
Q.    What they used was a screening tool or a screening scale called the Child Behavior Checklist, correct?
A.    Let me catch up to you.
Q.    It's on page 1.  We were just there, Dr. Murray.
A.    I want to just look at the list

Page 268

of the measures.  I don't want to miss anything.
(Document review.)
MR. DAVIS:  Note for the record that page 1, the section that I had Dr. Murray on, specifically said what the outcome measure is.
MR. VANZANDT:  Counsel, if you're going to give him a study that's 20-something pages, he has every right to familiarize himself with it before he answers your question.
MR. DAVIS:  I'm sorry, Counsel, but that's just not -- it's not right.
MR. VANZANDT:  It is right.  It's what happened at every single deposition in this litigation.
MR. DAVIS:  Can you please not cut me off.
He is required to come prepared to the deposition about specific studies that he's going to claim support his opinions.  And he couldn't remember them, didn't know the name of

Page 269

them.
I've now provided him with them, and we're asking the -- at least one of them.  I still don't know the others.  So anyway.
MR. VANZANDT:  Right.  And you've turned this into a memory test.  He has a 160-something page report, and you're just asking him to say stuff off the top of his head, memory specifics, about.
So, I mean, I don't understand what the purpose of the report was.
MR. DAVIS:  Well, obviously, there's the witness that apparently didn't either, so anyway...
BY MR. DAVIS:
Q.    Dr. Murray, can you, please, look at the page -- page 1 identifies that they use a Child Behavior Checklist, correct?
A.    That's what they used.
Q.    That's not a diagnostic tool, correct?
A.    This is a core validated measure of depressive symptomatology that's

CONFIDENTIAL

Page 270

emblematic of a depressive disorder.

Q. Please, please, please focus on my question, okay?

A. Uh-huh.

Q. The Child Behavior Checklist is not a diagnostic tool, fair?

A. The -- the Child Behavior Checklist is a measure of depressive symptomatology and psychopathology.

MR. DAVIS: Move to strike, nonresponsive.

Reserve on it.

BY MR. DAVIS:

Q. For the patients that are in the study, Nagata 2025, who had depressive symptoms, do you know how many of them actually had a diagnosis of depression?

A. It looks like the design of the study was to index the severity of depression psychopathology in a very large sample, after controlling for variance, it looks like, to social media. And that is what this study was designed to do. It looks like...

MR. DAVIS: I'm sorry, that's just simply not an answer to my

Page 271

question. I move to strike as nonresponsive.

BY MR. DAVIS:

Q. Doctor, my question was: Do you know how many of the patients, the children that were enrolled in the study, actually had a diagnosis of depression?

A. But the study was intended and designed to measure depressive symptom severity and the severity of psychopathology using a validated measure that's been normed and validated in persons with clinical diagnoses of depression, and that was -- that was the aim of this study.

MR. DAVIS: I'm sorry, that's just simply not responsive to my question. Move to strike.

BY MR. DAVIS:

Q. Dr. Murray, these children who were involved in the study did not undergo a clinical interview or evaluation by a professional to determine whether or not they actually had a diagnosis, true?

MR. VANZANDT: Objection, calls for speculation, foundation.

Page 272

A. I didn't write this study. I'm reading it, and how I'm reading this study is that it was designed to measure an index of depressive symptomatology, which is done all the time in our field to measure factors that exacerbate and cause increased risk.

MR. DAVIS: Okay. I move to strike as nonresponsive.

Would you mind exiting the conference room for a short period of time?

THE WITNESS: Sure.

MR. DAVIS: I'd appreciate it.

THE VIDEOGRAPHER: Stay on the video or go off the video?

(Whereupon, the witness exits the deposition room.)

MR. DAVIS: Joseph, I'm going to be honest. This is just really unacceptable. I don't understand why he doesn't want to answer my questions. I think they're very straightforward. The study itself provides the information. He knows that there were no clinical interviews

Page 273

or evaluations done by professionals in the study. The study doesn't say that that happened. It's very easy for him to answer that question, and for whatever reason, he doesn't want to answer that question, and a ton of others.

And so I'm just left with having a witness sit in a chair for hours on time and not answer questions, and it's not a productive use of anybody's time. And so I'm reserving.

You know, this has just gotten to be out of hand. I would really appreciate it if you would take a few minutes, talk to him, ask him to be responsive to the questions. I don't want to bring him back, but I can promise you, we're going to be back.

So I would ask that you do that at a break.

MR. VANZANDT: Sure. And before we go off the record, I do feel like that the witness is trying his

69 (Pages 270 - 273)

CONFIDENTIAL

Page 274

best to answer, you know, in an appropriate, fulsome way to where the answer is not misleading based upon some very compound and vague questions that we think he's trying to answer, but we will take a break.

THE VIDEOGRAPHER: Okay. We are now going off the record, and the time is 2:04 p.m.

(Recess taken, 2:04 p.m. to 2:21 p.m. PDT)

(Whereupon, Murray-20, Binder Containing Dr. Murray's Copy of Expert Reports, was marked for identification.)

THE VIDEOGRAPHER: We are now going back on the record, and the time is 2:21 p.m.

BY MR. DAVIS:

Q.    Okay. Dr. Murray, are you ready to continue?

A.    Yes.

Q.    Just a matter of logistics, I've marked as Exhibit 20 the black notebook that you brought to the deposition, right?

Page 275

A.    Okay.

Q.    Is that -- you brought this binder?

A.    Yes, I did.

Q.    And it's got your -- it's got your reports in it, right?

A.    Yes.

Q.    And reliance list and, it looks like, your testimony, correct?

A.    Yes.

Q.    And it's got the April 18th, 2025 report in it, right?

A.    Yes.

Q.    Okay. And also there's some handwritten notes over here as well?

A.    There's one looseleaf note, yes.

Q.    This is your handwriting?

A.    Yes.

Q.    And is it a list of rebuttal points, right?

A.    Those are the list of my thoughts after reviewing the expert reports.

Q.    Of the defendants?

A.    Of two, the ones we discussed

Page 276

earlier.

Q.    Okay. I'm going to mark that as Exhibit 21.

(Whereupon, Murray-21, Handwritten Rebuttal Points Contained in Exhibit 20 Binder, was marked for identification.)

A.    Sure.

BY MR. DAVIS:

Q.    Okay. Nice doctor handwriting.

A.    Sorry. I try my best to be --

Q.    That's the pot calling the kettle black, trust me.

All right. So where we left off is we were talking about the Exhibit 19, which is the Nagata 2025 study about social media use and depressive symptoms during early adolescence, right?

A.    Yes, that's where we left off.

Q.    Yeah. And my question to you --

I'll circle back to it.

A.    Yeah.

Q.    -- is: This study did not do a clinical evaluation or a clinical interview

Page 277

of any of the study participants, did it?

A.    I think this study was designed to index the symptom severity and it did not include diagnosis as an outcome.

Q.    Okay. Thank you.

And in terms of any of the number of study participants, in terms of how they scored on the screening tool that was used, do you know how many of them actually even had a diagnosis of depression?

A.    Again, it's a really -- it's a good question, and it's really important in our field to be able to index symptom severity, which I think was the goal of this particular study. And as a result, they did not report how many had a diagnosis.

Q.    Okay. Now, is that -- okay.

Now, you mentioned three other studies that you were talking about that you believe had an endpoint of binge-eating disorder, right?

A.    I talked about several, yes.

Q.    Okay. I have Nagata 2021 that you read. I have a paper that you couldn't remember, and then one other. Okay.

70 (Pages 274 - 277)

CONFIDENTIAL

Page 278

So here's -- I think here, marked as Exhibit 22 --

(Whereupon, Murray-22, Contemporary screen time modalities among children 9-10 years old and binge-eating disorder at one-year follow-up: A prospective cohort study, by Nagata et al, was marked for identification.)

BY MR. DAVIS:

Q.   -- I believe this is the study that's in your --

MR. DAVIS:  Do you want to look at it?

MR. VANZANDT:  Sure.

BY MR. DAVIS:

Q.   I think that's the study that's actually referenced in your report, right?

A.   It looks like one, yes.

Q.   Okay.  And this is from the ABCD --

A.   This particular study --

Q.   -- cohort study, right?

A.   -- Exhibit 22?

(Clarification requested by the

Page 279

stenographer.)

A.   I'm just asking Todd if this study -- this Exhibit 22 is a study from the ABCD cohort study.

BY MR. DAVIS:

Q.   Yes.

A.   Yes.

Q.   Okay.  And what they did in this in study, if you can look at the measure, right, on page 889, it says:  Outcome:  Binge-eating disorder.  Right?

Do you see that?

A.   Yes.

Q.   What they did is they applied a screening tool known as the KSADS -- that's K-S-A-D-S, dash, 5, right?

A.   They utilized the KSADS.

Q.   Right.

And they -- again, this one didn't do a clinical evaluation of the study participants to determine whether or not they had a diagnosis of a binge-eating disorder, correct?

A.   I think this is a -- a clinical interview that was completed with a trained

Page 280

assessor on the phone.  As I understand the parent ABCD dataset --

Q.   It -- go ahead, I'm sorry.

A.   It's not a screen is my point.

Q.   Look at what it says in 2.2.

A.   Uh-huh.

Q.   2.2.2.  It says:  The ABCD study utilized the Kiddie Schedule for Affective Disorders and Schizophrenia, a computerized tool for categorizing child and adolescent mental health concerns based on the DSM-5, for assessment of current binge-eating disorder at baseline and one-year follow-up.  Parents/caregivers completed the binge-eating disorder modules of the KSADS-5.

Do you see that?

A.   I do.

Q.   And it doesn't describe anywhere in -- and then it says down at the bottom, it says:  The KSADS-5 computerized scoring system, responses to the interview questions from parents were extrapolated into the diagnosis of current binge-eating disorder from reported symptoms.

Page 281

Do you see that?

A.   I do.

Q.   So that clarifies that there was no clinical interview or evaluation by a professional to determine whether or not they actually had binge-eating disorder, right?

MR. VANZANDT:  Objection, foundation.

A.   This is -- this is a measure anchored into DSM-5 criteria for binge-eating disorder.

MR. DAVIS:  I'm sorry, but that's not my question.  Move to strike as nonresponsive.

BY MR. DAVIS:

Q.   This description reflects that they did not do a clinical evaluation of the -- of the kids in this study to determine how many, if any of them, actually had a binge-eating disorder, right?

A.   This study does report on how many of these children, I believe -- let me refresh, but they do report as an outcome point the diagnosis of binge-eating disorder according to DSM-5 criteria, but not -- I

71 (Pages 278 - 281)

CONFIDENTIAL

Page 282

don't recall if they reported the exact percentage, but binge-eating disorder diagnosis per DSM-5 criteria is an outcome that was measured.

Q.    That's your testimony even though it doesn't say in the measures that they actually did a clinical interview or evaluation, right?

MR. VANZANDT:  Objection, argumentative.

A.    My -- what I'm telling you is that this measure is based on DSM-5 criteria, and allows reliably in my field the determination of a diagnosis.

MR. DAVIS:  I'm sorry.  Object, nonresponsive, move to strike.

Reserve on it.  I've got to move on because of the time that I'm being limited to.

(Whereupon, Murray-25, Screen time, problematic screen use, and eating disorder symptoms among early adolescents: Findings from the Adolescent Brain Cognitive Development (ABCD) Study,

Page 283

was marked for identification.)

BY MR. DAVIS:

Q.    Exhibit 25, is this --

A.    Thank you.

Q.    -- the other study that you think deals with binge-eating disorder diagnosis?

A.    Bear with me one second.

Q.    Sure.

A.    Okay.

MR. VANZANDT:  Do you have another copy, Todd?

MR. DAVIS:  I do.

MR. VANZANDT:  Thank you.

(Document review.)

BY MR. DAVIS:

Q.    Are you done, Dr. Murray?

A.    Yes, thank you, Todd.

BY MR. DAVIS:

Q.    Okay.  Is this the -- one of the other studies that you mentioned that you think evaluate a diagnosis versus a symptom?

A.    What I think I mentioned earlier was how other studies assess an array of eating disorder symptoms, and that is what

Page 284

this is.  I did -- this was the one that I referred to as the diagnosis, the one we just talked about.

This, as I mentioned earlier, assesses fear of weight gain, self-worth tied to weight, compensatory behaviors, binge eating.  I tried to enumerate some of those features earlier.

Q.    Let me see if I can clear the record up.

Exhibit 22 is the study that you maintain assessed actual binge-eating disorder diagnosis, right?

A.    Study -- Exhibit 22 assessed DSM-5 criteria for binge-eating disorder and reported on the diagnosis of BED as an outcome.

Q.    Okay.  Putting 22 aside.

Let me fix this right now before -- I'm going to change Exhibit 25 because it's out of line.

(Interruption by the stenographer.)

BY MR. DAVIS:

Q.    Exhibit 25 is "Screen time

Page 285

problematic screen and eating disorder symptoms among early adolescent findings" -- right?

And this is a Chu 2023 article, right?

A.    Yes.

Q.    That article assessed binge-eating disorder symptoms and not a diagnosis of binge-eating disorder, correct?

A.    This -- this article assesses an array of eating disorder behaviors, including binge-eating disorder symptoms, but also symptoms of other eating disorders, like a fear of weight gain.

Q.    Okay.  This study did not use binge-eating disorder diagnosis as an outcome or an endpoint, correct?

A.    Look, I apologize.  This study was designed to measure eating disorder symptom severity and was designed to reflect that, and did not report diagnoses/outcomes, which is very common in my field.

Q.    Okay.  Now, the other study -- there's three that you mentioned --

A.    Uh-huh.

72 (Pages 282 - 285)

CONFIDENTIAL

Page 286

Q. -- right?

A. Uh-huh.

Q. And you mentioned there was another Nagata?

A. I did.

Q. Okay. That study that you mentioned, the other Nagata that you mentioned, that assessed symptoms of binge-eating disorder, and not a diagnosis, right?

A. I don't recall -- I mean, I would like to review it, but my recollection of this study was that it assessed binge-eating disorder symptom severity, which again, is very common in my field, and that...

Q. Now, that study that you're thinking of, that happened in -- the second Nagata study, that's a publication from 2021?

A. I don't recall when it was from. I recall that it was Jason Nagata because I know his work and I've collaborated with him often. Unfortunately, I don't recall sitting here today.

Q. Let me mark for you Exhibit 23,

Page 287

which is an article by Shi, S-H-I; it's published in 2024.

(Whereupon, Murray-23,
Concurrent and prospective
associations of social media usage
with binge eating symptoms in early
adolescence, by Shi et al, was marked
for identification.)

A. Okay. Thank you.

BY MR. DAVIS:

Q. Do you see that?
Before today, had you ever seen that study before?

A. I review a lot of studies, Todd, and I -- let me see. May I familiarize myself with that to more comprehensively answer your question?

Q. Sure.

A. Great.

(Document review.)

A. So this is not a Nagata study.

BY MR. DAVIS:

Q. I know it's not.

A. Okay.

Q. I'm just asking if you have

Page 288

ever seen this study before.

A. This looks like a really good study. I can't recall if I have reviewed it before.

Q. If you look at the results --

A. Yeah.

Q. -- on page 8 -- here, I'll find it for you.

A. I got it.

Q. It's page 8.

A. Yeah.

Q. First paragraph on the left, where it says: Contrary to a previous study.
Do you see that?

A. Yes.

Q. It says: Contrary to a previous study of the ABCD cohort that found a prospective association between social media time and binge-eating disorder, our study did not find a link between social media time and binge-eating symptoms.
Correct?

A. That's what that sentence says.

Q. Right. And you agree that this study did not find a statistically

Page 289

significant association between social media time and binge-eating symptoms, right?

MR. VANZANDT: Objection, foundation.

A. It looks like this study finds a prospective link between social media addiction and prospective binge-eating symptoms, but not social media time.

MR. DAVIS: Move to strike as nonresponsive.

BY MR. DAVIS:

Q. My question was: This study did not find a statistically significant association between social media time and binge-eating symptoms, right?

MR. VANZANDT: Objection, asked and answered.

A. This study delineated, it looked like, social media addiction from social media time, and they found an effective social media addiction, and did not find a statistically significant effect of social media time, it looks like.

BY MR. DAVIS:

Q. And binge-eating symptoms,

73 (Pages 286 - 289)

CONFIDENTIAL

Page 290

correct?

A. And binge-eating symptoms.

Q. Okay. Look at the next sentence. It says -- well, the prior study that they're referencing, they cited it. That's reference 10, right?

You go back to 10, and it's the study we just went over, right, the Nagata 2021 study, correct?

A. That's what's listed there.

Q. Right?

A. Yeah.

Q. And it says: The prior study relied on eating disorder diagnoses, which were subsequently identified as inaccurate in the ABCD Study 5.1 release notes.

Do you see that?

A. I see that.

Q. So what this study is saying is that the ABCD data -- excuse me.

The researchers who maintained the ABCD data revealed that the diagnoses were inaccurate in the study that we -- that you rely upon as Exhibit 22, correct?

A. That is what that sentence

Page 291

says.

Q. You have no reason -- you have no evidence to dispute that, do you?

A. I -- this study -- again, this study found a significant effect of social media addiction on binge-eating symptoms.

In particular, with regard to your question, they are saying that previous studies leveraging the ABCD cohort identified an anomaly which has rendered BED diagnoses less accurate.

Q. Not less accurate. It says specifically that: The prior study relied on eating disorder diagnoses, which were subsequently identified as inaccurate in the ABCD 5.1 release notes.

Correct?

A. Yeah.

Q. So it doesn't say it's an anomaly. It doesn't say it's somewhat inaccurate.

It says they were inaccurate, correct?

A. That's what that says.

Q. You have no evidence to dispute

Page 292

that, do you?

A. I -- I'm not questioning that sentence.

Q. You're not -- you're not questioning that sentence. You're not questioning -- you don't have any evidence to dispute that the diagnoses that you say were used in the Nagata 2021 study were inaccurate, right?

MR. VANZANDT: Objection, asked and answered.

A. These -- these measures still -- they measured the same symptoms. I don't know the specific nature of the atypicality, but I -- I would still suggest that the previous study measured binge-eating disorder psychopathology, as we previously discussed.

MR. DAVIS: Move to strike as nonresponsive.

I simply just don't have the time to get straight answers to straightforward questions. I'm reserving on that one.

///

Page 293

BY MR. DAVIS:

Q. Other than -- can you identify --

MR. VANZANDT: I'm sorry. You specifically asked him if he had any evidence, and he's trying to explain his reasoning to you on that, so it wasn't really a straightforward question. It was pretty open-ended, do you have any evidence, and he was providing his answer.

MR. DAVIS: Yes, but he didn't answer my question that he had any evidence to support the statement that the -- that was in the 5.1 release notes for ABCD data, that the study he was relying upon, the diagnoses were inaccurate. He has no evidence to support that, and he didn't answer the question at all about that.

MR. VANZANDT: Okay.

MR. DAVIS: He answered a different question. All right.

BY MR. DAVIS:

Q. Dr. Murray, for the last -- I

74 (Pages 290 - 293)

CONFIDENTIAL

Page 294

guess with respect to the -- do you have any evidence that -- well, strike that.

Is there any study that you're aware of that assessed social media use and had an outcome measure or an endpoint of diagnosed anorexia or diagnosed bulimia nervosa?

A.    The studies that I'm aware of assessed the core psychopathology of those disorders, and I can't recall -- which is absolutely common practice in my field, by the way.  I can't recall if any have assessed a diagnosis as an outpoint adjacent to assessing the symptom severity.

MR. DAVIS:  I will move to strike as nonresponsive.

BY MR. DAVIS:

Q.    I'm not asking you if you -- about something about a core symptom.

I'm asking you:  Are you aware of any study on social media use where the outcome or endpoint was anorexia nervosa or bulimia nervosa?

A.    I can't recall sitting here right now studies that assessed diagnoses of

Page 295

anorexia or bulimia as an endpoint, but I can recall many studies assessing the core symptom severity by virtue of the research design.

Q.    Can you identify any such study?

A.    Again, I would like to review -- sorry, go ahead, Todd.

Q.    Can you identify any study that used an endpoint of diagnosed bulimia or anorexia that assessed social media use?

MR. VANZANDT:  Objection, asked and answered.

A.    It's very important to understand that common practice in my field is studies designed to assess the symptom severity if they're a core symptom of a disorder, and that is what these -- this particular study has tried to do.

And I don't recall whether any studies, certainly off the top of my head now, assessed AN or BN as an outcome point.

BY MR. DAVIS:

Q.    Dr. Murray, I want to switch gears with you.

Page 296

A.    Uh-huh.

Q.    And let me ask you this.

Are you aware of any study on social media use that used insomnia as an outcome measure or endpoint?

MR. VANZANDT:  Objection, vague.

Go ahead.

A.    I'm aware of studies measuring symptoms, the core symptomology, psychopathology.  I can't recall right now studies where I'm doing a diagnosis of insomnia.

BY MR. DAVIS:

Q.    You don't know of one as you sit here today, do you?

MR. VANZANDT:  Objection, asked and answered.

A.    Again, it's really rich information in my field to garner dimensional measures of symptom severity, and that is what a lot of studies have done, and I don't recall off the top of my head, Todd, studies directly rendering diagnoses.

MR. DAVIS:  I'll move to strike

Page 297

everything before "I don't recall off the top of my head studies directly rendering diagnoses."  All right.

BY MR. DAVIS:

Q.    Dr. Murray, let me switch gears with you.

Observational studies include cross-sectional studies and longitudinal studies, right?

A.    Observational studies include cross-sectional and longitudinal studies, yes.

Q.    Okay.  And longitudinal studies include cohort and case-controlled studies, right?

A.    Longitudinal studies include case-controlled studies, yes.

Q.    And cohort studies?

A.    Uh-huh.

Q.    Yes?

A.    Yes.

Q.    Okay.  And RCTs are a different design than observational studies, right?

A.    Yes.

Q.    Okay.  When you performed your

75 (Pages 294 - 297)

CONFIDENTIAL

Page 298

causal assessment, did you limit your causal analysis to any type of study design?

A.    I think it's in my report that I included other types of design that I included prospectively.  It's in my report.

Q.    Okay.  But I'm asking you.  I'm here to find out your bases for your opinions and how you got there.

A.    Sure.  Yeah.

Q.    When you performed your causal assessment, did you limit your causal analysis to any type of study design?

MR. VANZANDT:  Objection, argumentative and asked and answered.

A.    No limitations on the study methodology were imposed.

BY MR. DAVIS:

Q.    And by methodology, you mean design?

A.    Methodological design.

Q.    So, for example, cross-sectional studies, longitudinal studies, any type of study went into the causation analysis?

MR. VANZANDT:  Objection,

Page 299

vague.

A.    Can you say that a little more, what --

BY MR. DAVIS:

Q.    Yeah.  You didn't limit your causation analysis to any particular type of studies, did you?

A.    No, I included the studies of -- a broad swath of methodology.

Q.    Okay.  And that broad swath for your methodology included cross-sectional studies and also meta-analyses that included cross-sectional data, right?

A.    Yes.

Q.    And you didn't say to -- you didn't say I'm going to take those studies out which are cross-sectional or have cross-sectional data in them, and I'm going to exclude them from my causation analysis?

A.    No.

Q.    You didn't do that, right?

A.    I didn't exclude cross-sectional studies.

Q.    Okay.

A.    On what basis?

Page 300

Q.    Did you do any causation analysis of any kind where you took out the cross-sectional data and you said I'm going to park that over to the side and look at the other types of studies?

A.    As I mentioned, I included broad methodological -- designed and surveilled the entire evidence base.  I didn't exclude based on methodological design.

Q.    Yeah.  I -- right.

So just to make sure we're clear, you didn't take the cross-sectional data -- you didn't do any causational analysis that excluded cross-sectional data, did you?

MR. VANZANDT:  Objection, asked and answered.

A.    When I performed my review, I included all types of methodological design, and I didn't exclude cross-sectional data.

BY MR. DAVIS:

Q.    When you did your causation analysis, did you include studies that only assess symptoms of actual diagnosed

Page 301

disorders?

A.    Can you repeat that question?

Q.    Sure.

Did you -- when you did your causation analysis, did you do -- did you include studies that only assessed symptoms of psychiatric disorders as opposed to a diagnosed disorder?

A.    Let me refer back to my methodology.  My recollection now is I included studies which included measures of psychopathology, measures of symptomatology and diagnoses.

Q.    Okay.  So -- right.

So you didn't -- for example, you didn't say I'm going to just look at diagnosed disorders and do my causal assessment, did you?

A.    I included the whole body of evidence base because it's really important to surveil the full body of evidence.  That's why I didn't exclude cross-sectional data.  It's very important in my field.

Q.    Now, did you include studies regardless of whether the symptoms reported

76 (Pages 298 - 301)

CONFIDENTIAL

Page 302

were clinically significant or not?

A. As I -- I don't recall, sitting here right now, nonsignificant findings or significant findings. I just remember the broad outcomes of the study.

I'm sure, as you just pointed out, each study may have had some significant findings, some insignificant findings as you just pointed out in the previous study.

Q. Yeah. I think we're miscommunicating, so -- I'm talking about -- you understand that there are symptoms that someone can have --

A. Uh-huh.

Q. -- that -- like sadness or stress or anxiety, but those symptoms don't rise to the level of a clinically significant finding that require treatment, right?

You understand that distinction, right?

MR. VANZANDT: Objection to form.

A. That's -- that's an important question, and I would have reviewed things of that nature.

Page 303

BY MR. DAVIS:

Q. Yeah. So there are studies that are included in your analysis where there's no -- let me strike that.

There are studies included in your analysis that did not rise to the threshold of clinical significance, right?

A. What I tried to do in my analysis was review the psychopathology and the symptom severity, symptomatology, and I included those if they did not include a diagnosis.

Q. Yeah. But there's also -- there's also -- there were also some rating scales where --

For example, there were studies that assessed symptoms of how people felt, like do you feel like you're -- you know, what -- they rated how your symptoms were on a scale of like one to five, right?

A. Uh-huh.

Q. Yes?

A. Can you say more? Like they rated how what symptoms were?

Q. Depressive symptoms.

Page 304

A. Okay.

Q. There was a rating of -- you could mark where you fall on the scale of depressive symptoms, right?

A. Yeah, uh-huh.

Q. And of those, did you go through and say, okay, I'm going to pick out those that are only clinically significant that would require treatment, or did you include everything?

A. Again, I didn't exclude studies based on the design. If I selected to include a study, I would have reviewed its findings.

Q. Right. But, I mean, like for the actual symptoms that are reported, you weren't going through and making an assessment of whether something was clinically significant or not.

You were including all of the information so that you could analyze it, right?

A. I can re-review my -- I don't recall, Todd, sitting here right now. I can review my report.

Page 305

I generally tried to review the findings in a way that I would do with any body of evidence, which generally relates to the findings of interest in the study, and generally, people don't report nonsignificant outcomes or they report a null hypothesis confirmation.

Q. You're talking about an effect size. I'm talking about a report of symptoms.

When you went through and looked at the studies, did you make any type of recording or documentation of these are clinically significant symptoms being reported, these aren't?

A. I don't recall right now.

Q. Okay. Nothing that comes to mind?

A. As I mentioned, I tried to review the studies in totality. I don't recall excluding some symptoms and including other symptoms. I don't recall.

Q. Okay. With respect to the different types of study designs -- well, strike that.

77 (Pages 302 - 305)

CONFIDENTIAL

Page 306

You're familiar with what's called a case report and what's called a case series, right?

A.    Yes.

Q.    Okay.  Case reports and case series are not controlled studies, are they?

A.    Bear with me one second.

(Document review.)

A.    Sorry, what was your question, Todd?  I'm sorry.

BY MR. DAVIS:

Q.    Case reports and case series are not controlled studies, are they?

A.    Right.

Q.    Okay.  And, generally, they are -- they are used to note possible adverse events, and then they're like signal generators for possible associations, right?

A.    Case studies and case series are more sort of, I would say, naturalistic observations in a small sample size.

Q.    When you say natural, you're basic -- you're saying that someone reports an adverse event, someone reports a medical condition, but in terms of analyzing that in

Page 307

a controlled fashion, that's just not what case reports or case series do, do they?

A.    Case reports just naturalistically observe a person or group of persons and document.

Q.    They're generally described as anecdotal information, right?

A.    I -- I wouldn't say a case study or a case series was an anecdotal piece of data.

Q.    Do you agree that case series or case reports are essentially signals of adverse events, but you need controlled data to determine whether there's actual -- actually a causal effect going on?

MR. VANZANDT:  Objection, compound.

A.    Can you ask that question again?

BY MR. DAVIS:

Q.    Sure.

Do you agree that case series or case reports are essentially signals of adverse events, but you need controlled data to determine whether there's actually a

Page 308

causal effect going on?

MR. VANZANDT:  Same objection.

Go ahead, you can answer.

A.    I mean, I think the case studies give rich information, case series give rich information.  They're part of an evidence base that would be accompanied by other forms of methodological interrogation, sure.

BY MR. DAVIS:

Q.    But in terms of establishing a cause and effect, case reports or case series can raise questions, but they can't answer those questions, correct?

A.    Case studies and case series are an important part of an evidence base because it's a trade-off.  You can get more rich information than you could in other study designs, but the sample size is smaller.

So I think that they're important sources of data that ought to be considered in concert with other forms of data.

MR. DAVIS:  I object,

Page 309

nonresponsive.

I don't have time to -- with my time limits to get an answer to that.

BY MR. DAVIS:

Q.    You're familiar with the term "temporality"?

A.    Yes.

Q.    What does it mean?

A.    Temporality is assessing the relationship over time.

Q.    Temporality means that one event precedes the other, correct?

A.    Which is temporality.

Q.    Did I describe temporality correctly?

A.    You -- I want you to give it context, and I can probably give you a more nuanced definition.

Q.    I'm just simply asking:  Did I describe temporality correctly?  If you want to say yes or no, that's fine, and I'll ask my next question.

A.    Let me clarify, though.  If you're establishing a temporal relationship between a set of variables, you would do that

78 (Pages 306 - 309)

CONFIDENTIAL

Page 310

over two or more time points. You would look at one time point and another time point to establish a temporality of the nature of the relationship.

Q. Temporality means that one event, such as an exposure, happens before a second event, which is an outcome, correct?

A. That's -- that's -- sure.

Q. Okay. And you agree that in order to establish the causal relationship, you have to establish that the exposure happens first and then the outcome happens next, right?

A. To establish a causal relationship, I think one ought to consider multiple types of methodology, and temporality would be a consideration, of course.

Q. Okay. One of the things necessary to establish a causal relationship is that the exposure must come before the outcome or the psychiatric disorder symptom, correct?

A. The -- repeat your question, I'm sorry, Todd.

Page 311

Q. Yeah.
To establish a causal relationship, one of the things that has to be established is that the exposure happens before the outcome, correct?

A. One of the -- causality means one thing causes the other, impacts the development of another. So I would agree with your statement.

Q. You agree with how I described the temporal sequencing of events that you have to have to establish a cause-and-effect relationship, right?

A. I agree with your characterization of a temporal relationship. I offer to you that I consider other forms of methodology as well.

Q. There's -- in other words, you have to have temporality, but you also have a number of other things to establish cause and effect, right?

MR. VANZANDT: Objection, vague.
Go ahead.

A. Yeah, I was going to ask you to

Page 312

rephrase that, if that's okay.
BY MR. DAVIS:

Q. You have to have temporality to have a cause and effect, but you also have to have a number of other -- let me back up.
In order -- in order to have a causal relationship, you have to have temporality, but you also have to consider a number of other important scientific principles to establish causation, right?

MR. VANZANDT: Objection, vague.

A. What are you -- what are the principles that you're referring to?
BY MR. DAVIS:

Q. I'm just asking if you agree with that?

A. I think you should consider a multitude of scientific factors.

Q. Let's see if we can go through that list for you, okay?
We both agree you have to have temporality, right?

A. We -- I agree that you need to ascertain the relationship between one

Page 313

variable and another.

Q. By that you mean you have to establish that the exposure happens before the disorder, the disease or the outcome, correct?

A. I'm simply saying that you -- with an array of methodologies, you -- you ought to ascertain the relationship between two variables.

MR. DAVIS: I move to strike, nonresponsive.
BY MR. DAVIS:

Q. I think this a very basic question, which is one of the things you have to establish for a causal relationship, is you have to establish that the exposure happened before the disease, the disorder, the symptom, or the outcome, correct?

A. If you're establishing that at the time of onset, it's possible that people can retrospectively support data, but I -- I agree with your importance -- your notion that temporality is salient.

Q. Salient, you mean it's important to have?

Golkow Technologies,
A Veritext Division
877-370-3377                    www.veritext.com

CONFIDENTIAL

Page 314

A.    It's important to have.

Q.    Right.

Can you envision a causal relationship that doesn't establish temporality?

A.    I can -- gosh, that's hypothetical.

Q.    Do you know of a causal relationship where the exposure did not happen before the outcome?

A.    I'm simply saying that as I tried to convey causal relationship is predicated on one thing causing the other. I'm simply saying that there are a multitude of ways to ascertain that.

MR. DAVIS:  I move to strike as nonresponsive.

I just can't seem to move this process along.  Reserve on that.

BY MR. DAVIS:

Q.    Do you agree that cross -- you have stated -- let me just show you -- cross-sectional studies do not determine if the exposure actually led to the outcome or the outcome led to -- or the outcome led to

Page 315

the exposure, correct?

A.    Cross-sectional studies determine the association between two variables, yeah.

MR. DAVIS:  Move to strike as nonresponsive.

BY MR. DAVIS:

Q.    Cross-sectional studies cannot determine whether or not the exposure led to the outcome or the outcome led to the exposure, right?

A.    That is a common conundrum for scientists.  It's very important to establish the nature of a relationship between two variables, and I accept your point that establishing a directionality is important also.

Q.    And cross-sectional studies don't establish the directionality of the association, do they?

A.    That's why you would need to look at other studies as well.

Q.    Okay.

A.    May I add to my last comment?

Q.    Sure.

Page 316

A.    There's also statistical methods that you can apply with cross-sectional data to establish a better -- a better picture of the nature of the relationship between two variables.

Q.    Applying those statistical methods, cross-sectional studies still don't establish the directionality of the association, do they?

A.    You can use advanced statistical methods to really parse out whether the variance in one variable predicts an outcome.  Even with cross-sectional data, you can establish predictive conclusions.

Q.    We're talking -- you're talking about predictive conclusions and I'm not asking about predictive conclusions.

A.    Okay.

Q.    I'm asking whether those -- that applying even those statistical methods that you say you can apply, cross-sectional studies still don't establish the directionality of the association, do they?

A.    Again, I think that you can establish the nature of the directional --

Page 317

the nature of the relationship, but there's one -- there are enough of the studies and there are an array of statistical methods, you can certainly use cross-sectional data to inform meaningful opinions.  And I do that in my clinical practice all the time.

(Whereupon, Murray-24, Me, my selfie, and I: The relationship between editing and posting selfies and body dissatisfaction in men and women, by Lonergan et al, was marked for identification.)

MR. DAVIS:  Move to strike as nonresponsive.

BY MR. DAVIS:

Q.    Dr. Murray, this is an article you wrote, correct?

A.    I was an author on this it looks like, yes.

Q.    Right.

You helped write this?

A.    Yes.

Q.    And this is an article about -- it's called "Me, my selfie, and I:  The relationship between editing and posting

80 (Pages 314 - 317)

CONFIDENTIAL

Page 318

selfies and body satisfaction [sic] in men and women," correct?

A. That's the title.

Q. Yep.

And let's turn to page 43, top left paragraph, fifth line down.

A. 43, I'm sorry.

Q. Are you ready?

A. Yes.

Q. What you said in this article was: Given the cross-directional study design, further research is needed to determine the direction of the relationship between photo-based social media behaviors and body dissatisfaction.

Did I read that correctly?

A. You read that correctly.

Q. That's not a false statement, is it?

A. That's the statement that --

Q. It's not a false statement, is it? It's a true statement?

A. That is a statement that applies to this one study. And as I mentioned earlier, when there's a confluence

Page 319

of many, many, many existing cross-sectional studies that have applied different statistical methods, I believe you can form meaningful conclusions.

MR. DAVIS: Objection, move to strike, nonresponsive after -- for the entire answer.

(Whereupon, Murray-26, Sociodemographic Correlates of Contemporary Screen Time Use among 9- and 10-Year-0ld Children, by Nagata et al, was marked for identification.)

BY MR. DAVIS:

Q. Exhibit 26, this is another article that you coauthored, correct?

A. Correct.

Q. Look at page 218, right column, second full paragraph, second sentence. You stated in this article that cross-sectional analyses are unable to make causal claims, true?

MR. VANZANDT: Objection, foundation.

A. That is -- that's a sentence in this article.

Page 320

BY MR. DAVIS:

Q. Those are your words?

A. And I -- look, the --

Q. Are those your words, Dr. Murray?

A. Those are -- I mean, this is in a paper that I wrote.

Q. Okay. Thank you.

A. And I think it's important to qualify that every study design has limitations and strengths, and as researchers, we weigh that out and try to -- we try to develop a study design that's going to address our question.

(Whereupon, Murray-27, Distinct functional connectivity phenotypes in preadolescent children with binge eating disorder by BMI status, by Steward et al, was marked for identification.)

BY MR. DAVIS:

Q. I'm going to hand you what's been marked as Exhibit 27. It's another article you coauthored, right?

A. Yes.

Page 321

Q. This was in 2024, right?

A. Yes.

Q. This was after you were retained by plaintiffs' lawyers, right?

A. The publication of it was, I suspect.

Q. Yes?

A. Yes.

Q. Okay. And then look at right column, first full paragraph of page 2085. You see the fifth line, sixth line down it says -- when you're talking about the limitations of the study, correct?

A. Can you point me to where you see that? I'm sorry.

Q. Sure.

A. Thanks.

Q. Right here.

A. Thank you.

Q. Okay. You say -- one of the limitations of this study is: the cross-sectional nature of our analysis did not allow for inferences on causality.

Correct?

A. That is a standard limitation

81 (Pages 318 - 321)

CONFIDENTIAL

Page 322

of any single stand-alone study which, when you start to compile a body of evidence, becomes important to consider.

MR. VANZANDT: Make sure you answer his question.

MR. DAVIS: Objection, move to strike --

THE WITNESS: I'm sorry.

MR. DAVIS: -- nonresponsive.

BY MR. DAVIS:

Q. You said in this article, one of the -- that one of the limitations for using cross-sectional data is that it does not allow for inferences on causality, correct?

A. I --

Q. That's the words you used?

A. I say that in this article, and I said that in many single individual studies.

Q. Okay.

THE WITNESS: Before you ask your next question, is it okay if I go to the restroom?

MR. DAVIS: Sure.

Page 323

THE WITNESS: Thanks.

THE VIDEOGRAPHER: We're now going off the record, and the time is 3:08.

(Recess taken, 3:08 p.m. to 3:19 p.m. PDT)

THE VIDEOGRAPHER: We are now going back on the record, and the time is 3:19 p.m.

BY MR. DAVIS:

Q. Dr. Murray, are you able to remember the name of that third binge-eating disorder study?

A. No, I don't. I don't recall it.

Q. Okay. And you -- and you're not able to point it out anywhere in your reports, are you?

A. I know that it was a study that included Jason Nagata. I don't recall.

Q. Okay. Because I've looked for it. I don't -- I can't find it. I'll be honest with you. So I wanted to know if you could identify it for me here today because I want to ask you questions about it.

Page 324

A. Okay. I can describe it or I can --

Q. I need the name and I need the year so I can locate it.

A. Yeah. My memory is that it's Jason Nagata as the -- as, I think, the senior author. I think he was the senior author.

Q. You think, but you don't know. Is it fair to say he's somewhere in the authorship, but you're not sure where?

A. He's an author. I think he's a senior author, I think.

Q. Senior authors typically aren't listed first, are they?

A. They're listed last, Todd, yeah.

Q. Right. Okay. Let's -- quickly on a couple of issues.

You agree that even a statistically significant association may or may not be causal?

A. That depends on the nature of the question.

Page 325

Q. Okay. So you think you can have a statistically significant association and that alone tells you that it's causal?

MR. VANZANDT: Objection, misstates evidence.

A. That's not what I said.

BY MR. DAVIS:

Q. Okay. Do you agree that even a statistically significant association may or may not be causal?

MR. VANZANDT: Objection, vague.

A. It depends on the nature of the study. I think some studies not purporting to assess -- or some studies purporting to assess different constructs will be able to conclude differently, and the statistical significance would allow them to confirm or refute the hypotheses.

So it depends on what the hypothesis is in the study.

BY MR. DAVIS:

Q. Well, if you have a statistically significant association in the study, that alone doesn't tell you whether or

82 (Pages 322 - 325)

CONFIDENTIAL

Page 326

not it's causal, does it?

MR. VANZANDT: Objection, asked and answered.

A. It depends on the type of study and what --

BY MR. DAVIS:

Q. Okay. Do you agree that an association that is found in a study may or may not be causal?

A. I --

MR. VANZANDT: Objection, vague.

Go ahead and answer.

A. There are statistically significant findings which don't independently of themselves prove causality.

BY MR. DAVIS:

Q. Okay. Other than temporality, in the mind of Dr. Stuart Murray, what else do you need to establish causation?

MR. VANZANDT: Objection, vague, and to the extent it calls for a legal conclusion.

Go ahead.

A. Sorry, would you rephrase your

Page 327

question, Todd. Sorry.

BY MR. DAVIS:

Q. Yeah.

For Dr. Stuart Murray --

A. Yeah.

Q. -- what is it, besides temporality, that you need in order to establish cause and effect?

A. I think you would want to, in my mind -- an understanding of how much exposure is associated with how much harm or a dose-response.

I think prospective studies, longitudinal studies, these are -- these are salient.

And I think meta-analyses or sort of grouping together studies of discrepant study sizes can give meaningful summary statistics, but overall, I think one has to consider the entirety of the evidence base because the reality is, is that every study has strengths and every study has limitations.

Q. Okay. So you said you would want to see a dose-response, right?

Page 328

A. That's -- yes, I would --

Q. Okay. And why are longitudinal studies salient to the question of causation?

A. Longitudinal studies are salient to the question of causation because you can index over time the -- the relationship between variables.

Q. So in other words, you can index -- longitudinal studies can establish temporality, right?

A. Yeah. You can index the nature of the relationship over time.

Q. Okay.

A. That's one of the -- one of the features.

Q. Okay. Anything else besides those two issues that you would want to have in your -- before you reach a causation opinion?

MR. VANZANDT: Objection, misstates prior testimony.

A. Can you rephrase your question, Todd?

BY MR. DAVIS:

Q. Sure.

Page 329

Besides dose-response and longitudinal studies, anything else that you would want as -- to have -- to be established before you can reach an opinion about causation?

MR. VANZANDT: Objection, asked and answered.

A. I would -- I think I would look for a multitude of studies of different designs.

BY MR. DAVIS:

Q. So you're looking for consistency?

MR. VANZANDT: Objection, misstates testimony.

A. I'm looking for a body of evidence. That is how I would review data as a scientist and as a clinician.

BY MR. DAVIS:

Q. But a body of evidence doesn't tell you whether or not there's causation or not. There has to be something in the body of evidence that says I can reach a causation opinion.

And my question to you is:

CONFIDENTIAL

Page 330

What is it in the body of scientific evidence that would allow you to get to a causation opinion, other than what you've already said?

MR. VANZANDT: Objection, argumentative.

A.   I would look -- I think it is important to include in your surveillance, in your research, a large body of evidence that includes different methodological designs, and you would weight each study on its strengths and its limitations because every study has them.

BY MR. DAVIS:

Q.   Are you finished?

A.   I would just add meta-analyses as well, I think that's...

Q.   A meta-analysis of what?

A.   Of studies.

Q.   What kind?

A.   They're all -- they're all really meaningful.

Q.   Okay.  So you would say a meta-analysis, including even with -- if it had cross-sectional data in it?

A.   I think a meta-analysis with

Page 331

cross-sectional data could provide meaningful data.

Q.   On the question of causation?

A.   Yes.

Q.   Okay.  Now, are you looking for anything in terms of the studies that are done in terms of consistency or inconsistency?

MR. VANZANDT: Objection, vague.

A.   I think it would be important to consider that the -- the findings of each individual study.

BY MR. DAVIS:

Q.   So are you looking for consistency or not?  I'm unclear.  Can you tell me?

A.   I mean, you would hope for consistency across similar methodological designs with similar populations.

Q.   If there was inconsistency, could you reach a causal opinion?

A.   I think --

MR. VANZANDT: Objection, vague, incomplete hypothetical.

Page 332

Go ahead.

A.   I think one has to consider all findings in the broad body of evidence, so if there's one inconsistency in an otherwise consistent body of evidence, that should be considered.

And if there's -- if the data is kind of all over the map, that should be considered too.

BY MR. DAVIS:

Q.   What if it's mixed?  Can you reach a causal opinion if it's mixed, if the study shows mixed results?

A.   Again, I think you would weight the studies, their strengths, their limitations.  I think we do that as scientists all the time in the clinical practice to --

Q.   If the studies were mixed, would that count against a causal effect?

A.   You -- if the studies were mixed or the -- what do you mean, the methodology or the findings?

Q.   No, the findings.

A.   If the findings were mixed.

Page 333

Q.   If the findings were mixed, would that count against the causal effect?

A.   It would be considered in how you reach your summary.

Q.   Considered how?  Would it count against or would it count for?

A.   You would calibrate these findings into your overall opinion.  I don't know that I review data with having a tally of what's for, what's against.  I'm trying to sort of assimilate a broad body of evidence, and I'm incorporating different designs, oftentimes different measures.

Q.   But I'm asking you what pushes you one way or the other about causation or not?  That's why I'm asking about consistency.

If you've got mixed results, does that push you more towards causation or more away from causation?

MR. VANZANDT: Objection, vague, compound.

A.   I mean, mixed results should be weighed in the context of the evidence base, but if there's more mixed results than

84 (Pages 330 - 333)

CONFIDENTIAL

Page 334

nonmixed results, I would lean away from causation.

BY MR. DAVIS:

Q.   But that doesn't answer my question.

If you've got mixed results, you've got studies going one way and studies going the other way, does that push you toward or away from causation?

MR. VANZANDT:  Objection, asked and answered.

A.   I think it depends on the study, the methods, the measures, the population.

But to your point, though, if the study's findings are all over the map, if there's no line of best fit, if there's no way to make sense of the data, that would make me question a summary of causality, and if there's generally data trending towards one conclusion, I expect there to be mixed findings because no two studies are the exact same.

BY MR. DAVIS:

Q.   Okay.  Anything else you want

Page 335

to put on your list of things that you need in order to make a causal -- or to reach a causal opinion?

MR. VANZANDT:  Objection, asked and answered, and vague.

Sorry, go ahead.

A.   As a scientist, I would look at RCTs as well.

BY MR. DAVIS:

Q.   Okay.  I'm not sure that's -- okay.

You're looking at -- that's a type of study design, but I'm talking about kind of what the data tells you, not what's in -- what kind of studies are in the data.

I'm looking for something like anything else that you would add to the list of things that you would assess in order to reach a causation opinion?

A.   Not that I can think of right now.

Q.   All right.  Is it fair to say that you -- to determine whether or not an association is valid or true, you have to rule out bias and confounding?

Page 336

A.   I think you should factor that into your study design and you should factor it into your conclusion.

Q.   Okay.  Well, I'm not sure that that answers my question, Dr. Murray.

I'm asking specifically:  In order to establish that an association is valid, you have to rule out bias and confounding, right?

A.   You have to consider bias.

Q.   So you can have bias and you can have confounding, and you would include that in your causation analysis?

MR. VANZANDT:  Objection, misstates testimony.

A.   When I say consider bias, it depends on the nature of the bias that one is concerned about, but there are ways to control for that or there are ways to design study methodologies to kind of limit bias.

BY MR. DAVIS:

Q.   I'm not asking that question.

I'm asking you:  In order to determine whether an association is valid, do you -- do you first have to determine that

Page 337

there's -- that you can rule out bias or confounding as an explanation for the association?

MR. VANZANDT:  Objection, vague.

A.   I mean, bias is obviously a consideration when you evaluate individual studies.

BY MR. DAVIS:

Q.   But if you have a study that you can see is biased or you can see a study that is confounded, do you include that into the causation analysis to determine whether there's a valid association?

A.   If a study has confounds and really demonstrable bias, I would weight that.  I would sort of consider that in arriving at my opinion.

Q.   Well, what's the objective test for that?  Is it just what Stuart Murray decides or is there something else that is factored in?

A.   I mean, I'm -- I'm trained to ascertain and assess study designs.  I do that for the NIMH.  I can understand and

85 (Pages 334 - 337)

CONFIDENTIAL

Page 338

review potential source of biases.

I think it's just a review, Todd. I think you review the methodological designs and you base your opinion on both the findings, the strength of the findings to your point, whether they're mixed, and also, bias is a consideration for scientists.

Q. You agree that if a person is isolated or has depressive or anxiety symptoms, that can lead to more screen time, right?

A. If a person has depressive symptoms?

Q. Yes. Or anxiety symptoms.

A. Well, that would not comport with these findings from Jason's study, Jason Nagata's study, which just demonstrated that depression prospectively predicts -- let me -- sorry, I'm going down a different track here, I'm sorry.

Q. I'm saying that just generally --

A. Yeah.

Q. -- you agree that if someone is depressed or has --

Page 339

A. Yeah.

Q. -- anxiety, that that can lead to greater screen time use?

MR. VANZANDT: Objection, vague and incomplete hypothetical.

Go ahead.

A. In some instances, I could see that. And I can see data that show that -- would suggest different findings.

BY MR. DAVIS:

Q. Right.

But just as a practical matter, somebody who is depressed or stressed or anxious, or things aren't going well in their life, they can isolate, right? That can happen, right?

A. Yes.

Q. And as part of that isolation or an effort to get away from whatever the problems are, they can spend more time on -- more screen time, right?

MR. VANZANDT: Objection, vague compound, assumes facts not in evidence.

Go ahead.

Page 340

A. I can see the -- the nature of the relationship between depression and screen time, and I think that the data support that both depression prospectively predicts -- sorry, my bad -- social media prospectively predicts depression but not the other way around.

BY MR. DAVIS:

Q. That's not true.

MR. VANZANDT: He wasn't done. He wasn't done talking.

A. That is what depressive symptoms -- I'm sorry, that's what one of the Nagata studies just illustrated.

But I can accept the point that when you're depressed, you isolate more. Of course.

BY MR. DAVIS:

Q. And isolation can lead to more screen time, right?

MR. VANZANDT: Objection, calls for speculation.

BY MR. DAVIS:

Q. You've had people tell you that, right?

Page 341

MR. VANZANDT: Objection, argumentative.

A. I mean, I've had lots of people tell me how screen time, and in particular, social media, impact their depression.

MR. DAVIS: I move to strike as nonresponsive. It's just -- it's just the routine today, so let's see...

(Whereupon, Murray-28, Seeing yourself clearly: Self-identification of a body image problem in adolescents with an eating disorder, by Fatt et al, was marked for identification.)

BY MR. DAVIS:

Q. I'll hand you what's been marked Exhibit 28.

A. Thank you.

Q. This is another -- this is another article that you coauthored, correct?

A. Yes.

Q. Go to 578, please.

Just so we're clear, this is an article entitled "Seeing yourself clearly: Self-identification of a body image problem in adolescents with an eating disorder."

86 (Pages 338 - 341)

CONFIDENTIAL

Page 342

Correct?

A.   That's the title.

Q.   Right.

And if you turn to page 578, right-hand column, third paragraph, it says there were correlates that were assessed for which there's evidence of relationship with help seeking for an eating disorder.

Correct?

A.   That's what that says.

Q.   And so the covariates that were examined were psychological distress and impairment, right?

A.   Uh-huh.

Q.   And also, weight and shape concerns?

A.   That's one of them too.

Q.   Right.

And are those -- that psychological distress, is that something that can lead to -- of course can lead to a binge-eating disorder or other eating disorder, correct?

MR. VANZANDT:  Objection, vague, calls for speculation.

Page 343

(Document review.)

A.   You listed quality of life and weight and shape concerns?

BY MR. DAVIS:

Q.   And psychological distress, yes.  Right?  Each of those can lead to a binge-eating disorder, correct?

MR. VANZANDT:  Same objection.

A.   I -- I certainly have seen patients where they are more prone -- they report greater proneness to binge episodes when they're distressed.

BY MR. DAVIS:

Q.   With respect to longitudinal studies, you yourself have said that causality can't be inferred from those studies, true?

A.   I said that longitudinal studies are salient, and I think that they should be considered in any summary around causality.

MR. DAVIS:  Objection, move to strike as nonresponsive.

(Whereupon, Murray-29, Contemporary screen time modalities

Page 344

and disruptive behavior disorders in children: A prospective cohort study, by Nagata et al, was marked for identification.)

BY MR. DAVIS:

Q.   Exhibit 29.

MR. VANZANDT:  That last question was clearly responsive.

MR. DAVIS:  I'm sorry, Joe, it just was not, and we're going to find out right now why.

BY MR. DAVIS:

Q.   If you look at page 131 -- well, first of all, this is, again, an author that -- you're a coauthor on this study, correct?  Yes?

A.   I'm an author on this study, yes.

Q.   And it's called "Contemporary screen time modalities and disruptive behavior disorders in children: A prospective cohort study."

Right?

A.   That's the title of this study.

Q.   And if you turn to page 131.

Page 345

This is a longitudinal study, right?  It's a longitudinal cohort, right?

A.   May I review it?

Q.   Of course.

A.   Thanks.

(Document review.)

BY MR. DAVIS:

Q.   The title says it's a prospective cohort study, right, Dr. Murray?

A.   That's what the title says.

Q.   Right.  That's a type of longitudinal study, right?

A.   Yes.

Q.   And if you look at page 131, right column, second paragraph, you talk about the limitations of this type of study, correct?

A.   Can you point me to where that is, Todd?  Sorry.

Q.   Yeah.  Page 131, right-hand column, first full paragraph.  You talk about the limitations of this type of study, correct?

A.   Yeah, I talk about the limitations of the study as is common

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

CONFIDENTIAL

Page 346

practice with every study. And it's true, this study has limitations like every study does.

Q. And one of the limitations that you say for this type of study is that causal associations cannot be inferred, correct?

MR. VANZANDT: Objection, misstates evidence.

A. I say -- that's a line in this study, yes.

BY MR. DAVIS:

Q. Right. And that's a truthful statement by you, right?

MR. VANZANDT: Objection, vague.

A. That is a limitation of this study because it is just one study.

BY MR. DAVIS:

Q. It's a truthful statement by you, right?

MR. VANZANDT: Objection, asked and answered, vague.

A. Again, it's an honest limitation of one study.

MR. DAVIS: Objection,

Page 347

responsiveness. I'll move on because I simply just don't have time to...

BY MR. DAVIS:

Q. For any of the experimental studies or RCTs that you looked at to form your opinions, did any of them make a diagnosis of any type of psychiatric disorder, including eating disorders or BDD?

A. Any of the RCTs writ large or any RCTs relating to --

Q. Any RCTs that you reviewed to form your opinions about social media use, did any of --

A. Okay.

Q. -- those RCTs or experimental studies use a diagnosed disorder as an outcome measure or an endpoint?

A. There -- the major limitation with that which is noteworthy is if you have a hypothesis around something being potentially harmful, you can't randomly allocate people to receive harms or not.

And so I don't recall whether I've seen any social media-driven RCTs where they randomized people to receive something

Page 348

potentially harmful.

MR. DAVIS: I'm sorry, I didn't ask about randomization, Doctor.

A. You asked about an RCT.

BY MR. DAVIS:

Q. Do you remember my question?

A. Uh-huh.

Q. What was it?

A. Your question was whether there are any RCTs relating to social media that used depression as an outpoint --

Q. Yes.

A. -- or an endpoint.

Q. And are there any?

A. That is what I'm saying. I can't recall sitting here today, but I should share with you the very real --

Q. Okay. Thank you.

A. -- ethical limitations around --

Q. Okay.

A. -- prospectively allocating --

Q. Okay.

A. -- people to receive something potentially harmful.

Page 349

Q. All the RCTs or the experimental studies measure people for very shorts periods of time, correct?

A. That's a broad statement. I would have to sort of look at the --

Q. Do you know today?

A. I -- can you repeat your question?

Q. All of the experimental studies or the RCTs followed the study participants for either -- for about a month or less, correct?

MR. VANZANDT: Objection, vague and foundation.

A. Again, I would have to review them. I know that they were -- they were followed. I would want to review the data to give you the exact duration of follow-up, experimental follow-up period.

BY MR. DAVIS:

Q. Can you identify any study here today that's an RCT or an experimental study on social media use that followed study participants longer than one month?

A. As I sit here today, I can't

88 (Pages 346 - 349)

CONFIDENTIAL

Page 350

recall.

Q. Okay. Can you identify any study participant in an RCT or experimental study on social media use that ever was treated for any psychiatric disorder, any sleep disorder or -- including insomnia or suicidal thoughts or behavior?

MR. VANZANDT: Objection, vague and compound.

A. You're asking about a treatment RCT? I'm not sure what you're asking.

BY MR. DAVIS:

Q. Are you aware of any of the study participants in the experimental or RCTs on social media use that was actually treated for symptoms of an eating disorder, another psychiatric disorder of any kind, suicidal thoughts or behavior, or insomnia?

A. Generally, if one were to do an RCT on social media use, the outcome of interest would be symptom severity not -- that's different from a treatment RCT.

So as I sit here right now, I don't recall treatment RCTs.

Q. Do you recall any -- any study

Page 351

participants at all being evaluated to determine whether or not they had clinically significant symptoms or not?

A. What is coming to my mind is the use of validated symptom measures allows you to contextualize people's severity of psychopathology. So a lot of researchers choose to use methods that have been validated in clinical populations.

Q. Can you name one experimental study or RCT where the study participants were actually evaluated for clinically significant symptoms as a result of social media use?

MR. VANZANDT: Objection, asked and answered.

A. Again, generally, researchers use validated measures that have been normed and validated in clinical populations so that they can understand the symptom severity in the context of a clinical or nonclinical population.

And if that wasn't the -- the nature of their research, they would have designed their research accordingly.

Page 352

MR. DAVIS: Okay. Move to strike as nonresponsive.

BY MR. DAVIS:

Q. I'm just asking for the name of a study that met that criteria. Can you name any? One?

A. Again, for the reasons I stated around the use of validated instruments being widely used in my field, I can't recall off the top of my head an RCT that you're alluding to.

Q. Or an experimental one?

A. Sorry, an experimental one.

Q. Okay. If you can turn to page 142 and 153 of your MDL report. You state -- in pages 142 through 153, you discuss a number of different scales that are used in structural clinical interviews of patients, correct?

Strike that. That's not correct. Strike that.

On pages 142 to 153 of your MDL report, you discuss a number of different scales, correct?

A. I discuss a series of scales,

Page 353

yes.

Q. Okay. And you discuss screening tools within that -- with those pages that are completed by patients that are then used to help guide the mental health professional assessment of the patient, correct?

Look at paragraph 296.

A. Yep.

Q. Okay. The scales, the self-report measures, are those that kind of help with -- help the clinician, right, make an assessment of whether or not there's a diagnosis, correct?

A. Let me read the point, please.

(Document review.)

THE WITNESS: Thank you, Todd. Would you mind restating your question, please.

BY MR. DAVIS:

Q. Sure.

A. Thanks.

Q. The scales, the self-report measures that you discuss, those are there to help the clinician make an assessment of

89 (Pages 350 - 353)

CONFIDENTIAL

Page 354

whether or not there's a diagnosis in the patient, correct?

A.    Those are -- those are scales to ascertain symptom severity when you have a patient in front of you.

Q.    Right.  They help the clinician make a determination of whether or not that patient has a psychiatric disorder, correct?

A.    They help the clinician ascertain the severity of symptoms, and many of these are validated in clinical populations so you can understand very quickly whether this person is in -- within a clinical -- within the norm of a clinical population or a nonclinical population.

MR. DAVIS:  Object, nonresponsive.

BY MR. DAVIS:

Q.    I'm not asking you that.  I'm not asking you about community scales.  I'm not asking you about anything other than the symptom scales, the self-report measures that patients report --

A.    Uh-huh.

Q.    -- that helps the clinician

Page 355

determine whether or not the patient actually has a diagnosis, right?

MR. VANZANDT:  Objection to the argumentative preamble.

You can answer.

A.    These -- these reports help the clinician assess the patient broadly.

BY MR. DAVIS:

Q.    Right.  To see whether or not the patient actually meets diagnostic criteria or not, right?

A.    These -- these scales can definitely be used to infer whether a patient meets diagnostic criteria or not, I would agree.

Q.    No, no.  Not the scales, Doctor.  I'm saying that the scales help the doctor make the assessment of whether or not the diagnostic criteria are met for psychiatric disorder.

MR. VANZANDT:  Objection, asked and answered.

Go ahead.

A.    Yeah, the scales help the doctor understand the level of symptom

Page 356

severity within the patient in front of them.  And because these scales are widely validated, you can infer in a snapshot, when a patient is in front of you, is this a severely debilitated patient?  Is this not a person who is debilitated?  You can assume that.

BY MR. DAVIS:

Q.    You're telling me that you make diagnoses in a snapshot of time?

MR. VANZANDT:  Objection, misstates testimony.

A.    That's not what I said.  I said --

BY MR. DAVIS:

Q.    Okay.  Let's focus in on my next question, then.

MR. VANZANDT:  Don't interrupt.  Finish your answer.

MR. DAVIS:  I think he did.  He said --

MR. VANZANDT:  No, he didn't.  You interrupted him.  I stopped calling you out on it but, I mean, it's just getting out of hand again.

Page 357

Were you finished answering?

A.    I was going to say, when you have a person in front of you, these self-report measures can give you a snapshot insight into the level of functioning and the level of symptom severity.  And I'll clarify that, of course, I don't assess patients in a snapshot.

BY MR. DAVIS:

Q.    Okay.  Thank you.

And what you do as your standard practice is you assess historical psychopathology, which includes a clinical interview, a review of historical medical records, an interview with family members.

That's what you typically do, right?

A.    When working with minors, especially when a person lives at home --

Q.    That's how you go about assessing making a diagnosis.  That's your standard practice?

A.    Can you repeat your question?

Q.    Yeah.

It's your standard practice

90 (Pages 354 - 357)

CONFIDENTIAL

Page 358

when you -- when you do an assessment of historical psychopathology is to conduct a clinical interview, review historical medical records, and interview family members, right?

A.    And I would use measures, self-report measures that have been validated.

Q.    You do all of that in order to make the diagnosis, right?

A.    I use all of that to assess the patient and to these -- these measures of symptom severity are very salient.

Q.    And to make -- you do all of that information to make a diagnosis, right?

A.    So, I mean, ultimately, my goal is to make a diagnosis and --

Q.    You use the information --

MR. VANZANDT:  No, no --

BY MR. DAVIS:

Q.    -- to make the diagnosis --

MR. VANZANDT:  He was talking still.  Finish your answer.

MR. DAVIS:  All right.  I need a break.  I'm going off the record.

THE STENOGRAPHER:  Off, Joe?

Page 359

MR. VANZANDT:  Yeah.

THE VIDEOGRAPHER:  We are now going off the record, and the time is 3:52 p.m.

(Recess taken, 3:52 p.m. to 4:02 p.m. PDT)

THE VIDEOGRAPHER:  We are now going back on the record, and the time is 4:02 p.m.

BY MR. DAVIS:

Q.    Dr. Murray, look at paragraph 299 on page 143 of your MDL report.

Do you see that?

A.    Yes.

Q.    And in there you say that: retrospective measure administration may be vulnerable to recall bias and therefore cannot be used to determine retrospective diagnostic status.

Do you see that?

A.    I see that.

Q.    Why do you believe that?

A.    Because distal recall of symptoms years ago is subject to recall bias.

Q.    And recall bias is what?

Page 360

A.    Recall bias is the imperfect recollection of events of several years ago.

Q.    Can recall bias also be the imperfect recollection of events that happened months or something less than a year?

A.    I can tell you in my clinical practice that I am less concerned about recall of several months as I would be over several years.

And in fact, the majority of symptom measures that have been validated ask you to recall symptoms over a previous X number of days or months, usually.

Q.    Okay.  Look at paragraph 300.

A.    Yeah.

Q.    You say that:  it is important that the assessment of historical psychiatric symptomatology not rely solely on retrospective measure administration, but include clinical assessment, a review of historical health records, and interview with family members and witnesses to inform a comprehensive assessment of historical symptomatology.

Page 361

Right?

A.    That's what that sentence says, yes.

Q.    Correct.

Why do you think that's important?

A.    Because that's part of -- that's all part of the clinical assessment. Especially when you are assessing historical psychopathology, you're sure the measures are great and they're validated.  But it's important to include a review of health records to get a complete picture, as you would do with an assessment.

Q.    And you also included --

MR. VANZANDT:  Hold on.

MR. DAVIS:  Were you finished?

THE WITNESS:  Yes.

MR. VANZANDT:  Thanks.

BY MR. DAVIS:

Q.    You also include that it's important to do a clinical assessment and interview the patient and family members, right?

A.    I say that.

91 (Pages 358 - 361)

CONFIDENTIAL

Page 362

Q. Yeah. Let's run through this a couple -- I think this should be quick.

The study -- for the studies on social media use, can you identify any study participant that had symptoms of body dysmorphic disorder and then developed diagnosed body dysmorphic disorder?

A. I'm going to refer to this report.

(Document review.)

A. It looks like the studies that I'm alluding to here generally refer to symptom severity and have not assessed body dysmorphic disorder. They've attempted to index the severity of symptoms.

BY MR. DAVIS:

Q. Okay. So none of the studies that you rely upon to form your opinions about body dysmorphic disorder had study participants that were actually diagnosed with body dysmorphic disorder, right?

A. Again, I think that when you have measures to assess core constructs, it allows you as researchers to develop methods to garner greater sample size, and that is

Page 363

what the majority of these studies have done, and they've not assessed DSM-5 diagnoses, it looks like.

Q. Okay. And none of the studies that you rely upon that say that social media use causes insomnia actually looked at the endpoint of insomnia, fair?

A. Let me -- I'm going to refer to this.

(Document review.)

A. It looks like the majority of the studies here are measuring dimensions of symptom severity, degree of perturbation. I'm not recalling any of it garnered a DSM-5 diagnosis.

BY MR. DAVIS:

Q. Of insomnia?

A. Yes.

Q. In fact, none of them used any other diagnosis -- diagnostic criteria outside of DSM-IV for a diagnosis of insomnia in any of the studies you looked at, right?

MR. VANZANDT: Objection, vague.

A. I would have to review the

Page 364

document.

BY MR. DAVIS:

Q. Do you know what --

A. Could you rephrase your question?

Q. Sure.

Any of the studies that you looked at on social media and sleep, did any of them use any diagnostic criteria as an endpoint or an outcome measure?

A. I think the studies predominantly used dimensional measures of symptom severity which could support a diagnosis. They've been validated in disorder populations.

So as a researcher, it allows you to understand fluidly shifting symptom severity.

MR. DAVIS: Object, nonresponsive.

BY MR. DAVIS:

Q. Did any of the studies that you rely upon for your opinions about social media and sleep -- did any of them use a diagnostic criteria for insomnia as an

Page 365

endpoint or an outcome measure?

A. The studies embedded in my report have used dimensional symptom measures, which is common in my practice, in psychiatry, and they've not used a DSM-5 diagnosis. They've used sort of dimensional measures of psychopathology, which are very meaningful.

MR. DAVIS: Move to strike, nonresponsive, other than "they've not used the DSM-5 diagnosis."

BY MR. DAVIS:

Q. Dr. Murray, name one -- name one psychometric scale that you say has been validated and can predict insomnia over 50%.

A. Gosh.

MR. VANZANDT: I'm sorry, objection, argumentative.

Go ahead.

A. I don't know that off the top of my head, Todd.

BY MR. DAVIS:

Q. You don't identify any such data in your report, do you?

A. Again, I can't recall off the

92 (Pages 362 - 365)

CONFIDENTIAL

Page 366

top of my head.

Q.    Well, you can look.  Take a look.  Do you see anything in there?

MR. VANZANDT:  Objection, argumentative.

A.    I see these -- a multitude of designs looking at various dimensions of sleep disturbance that are salient in the psychopathology of sleep disorders.

BY MR. DAVIS:

Q.    Sorry, that's not my question. My question was:  Can you name any psychometric scale that was used in any of theses studies that you rely upon that has been validated and determined to predict insomnia based on psychometric scales so that they can -- they're predicting at least 50% of patients who complete the scale actually have insomnia?

A.    I'm not able to recall right now studies used -- studies using a measure that you describe.  I'm aware of studies relying on dimensional measures of sleep disturbance, including -- well, a very dimensionality of sleep disturbance.

Page 367

MR. DAVIS:  Move to strike after "I'm not recalling anything right now."

BY MR. DAVIS:

Q.    Dr. Murray, can you identify any study that shows that social media use by individuals with a psychiatric disorder or condition were actually made worse by social media use?

A.    Can you rephrase that question?

Q.    Yeah.

Can you identify any longitudinal or experimental study that shows social media use by individuals who have a diagnosed psychiatric disorder where the social media use made that diagnosis worse?

A.    I can -- I can recall many studies -- well, I can recall studies reporting an increased odds of developing a psychiatric diagnosis as a result of social media.  And the majority of those studies, I would assume controlled for baseline symptom severity.

MR. DAVIS:  Move to strike, nonresponsive.

Page 368

BY MR. DAVIS:

Q.    Dr. Murray, please listen to my question.  Can you identify any longitudinal experimental study that says that social media use in individuals who have a diagnosed psychiatric condition was made worse by social media use?

A.    I'm not recalling a study off the top of my head now.  I would like to review my report.

And I can recall studies documenting an increased symptom severity within a community level.  I mean, I can also share, too, that my -- many patients oftentimes tell me that they've been very deeply debilitated and impacted by their social media use following the first onset of their psychiatric diagnosis.

MR. DAVIS:  I move to strike as nonresponsive.

I just don't have the time to get the right -- to get the answer to my question.  I'm moving on. Reserving.

MR. VANZANDT:  Okay.  He's

Page 369

being responsive.  This line of questions, he's being responsive.  He might not be saying what you want, but he is answering your question.

MR. DAVIS:  Joseph, nobody can read that answer that's in front of that screen on you and reach that determination.  Nobody objectively.

When I ask about a study that -- in diagnosed patients with a psychiatric disorder with social media use, making that diagnostic -- diagnosed disorder worse, that's not the answer I got.  I didn't get anywhere close to that.

MR. VANZANDT:  He said I'm not recalling a study off the top of my head, and then he provided further context, so as his answer would not be misleading.

BY MR. DAVIS:

Q.    Okay.  Doctor, can you identify the name of any study where social media use was assessed in diagnosed patients with a psychiatric disorder, and that the diagnosed

93 (Pages 366 - 369)

CONFIDENTIAL

Page 370

psychiatric disorder was made worse by social media use?

A. I mean, what comes to my mind immediately is my own clinical practice. But to answer your question, I'm not recalling a study off the top of my head that assesses within DSM-5-diagnosed patients how social media has deleteriously impacted their diagnosis.

I'm recalling studies assessing the effect of social media on symptom severity for DSM-5 diagnoses.

MR. DAVIS: Object to responsiveness.

BY MR. DAVIS:

Q. On the -- you go through a number of different screening scales in your report, right?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. The EDE-Q is not diagnostic of an eating disorder, correct?

MR. VANZANDT: Objection, asked and answered.

Page 371

A. The EDE-Q is based on the EDE, which is a diagnostic instrument, and it's been validated within clinical populations and nonclinical populations, so it's used as a proxy often by researchers to confer diagnostic status.

MR. DAVIS: Move to strike, nonresponsive.

BY MR. DAVIS:

Q. Dr. Murray, look at paragraph 148 of your report. You say that the binge-eating scale is not a diagnostic -- is not diagnostic of an eating disorder. Correct?

A. Bear with me one second.

(Document review.)

A. Which report are you in, I'm sorry?

BY MR. DAVIS:

Q. Your MDL report.

A. Point 144?

Q. 148.

The binge-eating scale is not a diagnostic tool. That is what you say, right?

Page 372

A. I'm on a different -- different line. I have -- this is my point 148. I'm sorry.

Q. Yeah, you're -- you're on page 75, that's why you're not on page 148.

MR. VANZANDT: Oh, you said point 148.

THE WITNESS: I thought you said point 148.

BY MR. DAVIS:

Q. No. I said --

Here. Let me help you.

MR. VANZANDT: Yeah, I'm sorry. You did say paragraph 148.

THE WITNESS: I'm sorry, Todd, my apologies.

MR. DAVIS: I misspoke. I apologize. I put you on the wrong page. There you go.

THE WITNESS: Thank you.

BY MR. DAVIS:

Q. The binge-eating scale is not a diagnostic tool, true?

A. The binge-eating scale in itself is not a diagnostic tool, but is a

Page 373

consistent reliable indicator of binge-eating symptomatology.

MR. DAVIS: Move to strike, nonresponsive.

BY MR. DAVIS:

Q. Dr. Murray, the DAS, Depression, Anxiety and Stress Scale, is not a diagnostic instrument, true?

A. Bear with me. As stated in my report, the DAS is not a diagnostic instrument, but is able to measure symptom severity in three core domains, including depression, stress and anxiety.

MR. DAVIS: Move to strike, nonresponsive.

BY MR. DAVIS:

Q. The PHQ is not -- excuse me, the Patient Health Questionnaire 9 is not a diagnostic instrument, true?

A. Again, I think the PHQ-9 is not a diagnostic instrument, but does serve in most settings as a reliable screening instrument for depression with strong psychometric properties.

MR. DAVIS: Object to

94 (Pages 370 - 373)

CONFIDENTIAL

Page 374

everything after it's not a diagnostic instrument.

BY MR. DAVIS:

Q.    The Screen for Child Anxiety Related to Emotional Disorders, the Social Media Disorder Scale, the EAT-26 scale, all three of those are not diagnostic instruments, true?

A.    Those are what I would refer to as empirically validated scales of symptom severity but are not diagnostic instruments.

MR. DAVIS:  Okay.  Move to strike everything before they're not diagnostic instruments.

MR. VANZANDT:  Again, I'm not going to say this every time, but I disagree and would oppose your motion to strike the answer.

BY MR. DAVIS:

Q.    Dr. Murray, I want you to -- okay.  I want you to go to page -- the page in your report that discusses -- you can use your May 16, 2025 report, okay?

A.    Okay.

Q.    If you go to pages 55 through

Page 375

68, you see a number of brain imaging studies, right?

A.    Yes.  Yes.

Q.    Okay.  And those brain imaging studies that you're discussing there, they're not measuring the brains of individuals that use social media, right?

A.    These images are measuring the brains of persons with eating disorders.

Q.    They're not measuring individuals who have used social media, correct?

A.    I mean, given what I know in my clinical practice, it's highly possible that some of the persons in these studies were using social media, but these subjects were selected by virtue of having an eating disorder diagnosis.

Q.    Do you have any evidence that you can say affirmatively that I know that -- that you know that one of the patients in those brain scan studies used social media?

A.    As I mentioned, these are the brains of people with -- eating disorder patients, and while I don't know the social

Page 376

media status of any one of these studies, I know that in my own clinical practice, lots of patients with eating disorders use social media problematically.

Q.    You're not putting those brain imaging studies in your report to say that this is what happens as a result -- that these studies document social media use and this is what happens if you use social media?

A.    These studies are illustrating the neurobiological structure and function of persons with eating disorders.

Q.    You're missing my question.
You're not going to come into trial and say "Look at all these brain imaging studies in my report.  These were done in patients who had social media use, and this is what happens when you -- what happens to your brain when you use social media"?

A.    These are labeled as the brains of people with anorexia nervosa, and I can't tell you that I know their social media status.

Q.    Look at page -- look at your

Page 377

section on eating disorders.

A.    Which page, please?

Q.    Begins on page 79, and page 79 through 90, you discuss social media and eating disorders, right?

A.    I discuss within these pages social media use and eating disorders and field recommendations around the harms of social media related to eating disorders.

Q.    Can you identify any longitudinal study in that section where you're discussing eating disorders and social media use?

A.    I mean, one of the -- one of the studies that come to mind is the study we discussed earlier, prospectively illustrating a greater --

Q.    Dr. Murray, you're missing my question.
I'm talking about this section of your report --

A.    Yes.

Q.    -- where you're analyzing eating disorders and social media use.

A.    Uh-huh.

95 (Pages 374 - 377)

CONFIDENTIAL

Page 378

Q.  In that section of your report, do you identify any longitudinal studies and discuss them?

A.  I would probably need to review the methodology of each of these studies because I'm primarily reporting the summary findings here.

But I will add, too, that the data that prospectively link baseline social media use with subsequent eating disorder symptoms is being referenced earlier in my report.

MR. DAVIS:  I'm sorry, that's nonresponsive; move to strike.

Please focus on my question.

BY MR. DAVIS:

Q.  Can you identify any longitudinal study in that section of your report that is focused on social media use and eating disorders?

A.  And I hope I'm answering this, but I would need to review the methodology, because these are reporting the simple -- the findings, and so I can't do that as I sit here right now.

Page 379

Q.  Okay.  Can you identify -- in your section on -- let me back up.

A.  Yeah.

Q.  I've looked at every one of those studies.  They are either cross-sectional studies, they're qualitative studies, or they're review articles, okay?

Do you have any evidence to dispute that sitting here today?

MR. VANZANDT:  Objection to counsel's characterization of the evidence.

A.  I would need to review the methodology again, and then I can have that...

BY MR. DAVIS:

Q.  The review articles that you identified don't present original data, correct?

A.  Review articles present an overview of data.  They don't present new data, to your point.

Q.  Okay.  And qualitative studies don't quantify risk, right?

A.  Qualitative studies don't

Page 380

quantify risk necessarily, but qualitatively characterize the nature of risk, if --

Q.  Can you --

I'm sorry, go ahead.

A.  No, no, no.  Depending on the study design and the methodology.

Q.  Can you identify any qualitative study in your report on any mental health harm that you identify where you can say that the qualitative study identified and quantified the risk?

A.  I would need to review each of these studies and their methodology.  As I sit here now, I cannot point you to a study that used a qualitative framework and quantitatively defined risk.

Q.  I think we already marked -- I'm not sure we did.

MR. DAVIS:  Mike, help me out here.  I think I need another exhibit number.

MR. VANZANDT:  There.

MR. DAVIS:  Thank you, Joe.

(Whereupon, Murray-30, Screen time and suicidal behaviors among US

Page 381

children 9-11 years old: A prospective cohort study, by Chu et al, was marked for identification.)

BY MR. DAVIS:

Q.  This is Exhibit 30.  This is an article that you're a coauthor on, correct?

A.  Correct.

Q.  It's dated -- it's published in 2023, correct?

A.  Correct.

Q.  And if you look at the right -- the first page, right-hand column -- I'm sorry.  Wrong page.

Page 3, you discuss the studies that looked at screen time and mental health in this, right?  You summarized the data, right?

A.  Let me -- let me familiarize myself with this.

Are you looking at the table or the text?

Q.  I'm looking at the text.

(Document review.)

A.  Can you point -- it might be faster if you point me to where you're

96 (Pages 378 - 381)

CONFIDENTIAL

Page 382

looking at.

Q. Sure.

First -- right-hand column, first full paragraph.

A. Yeah.

Q. And you're summarizing the scientific literature in the paragraph, correct?

A. Let me -- let me read, and I will definitely answer that.

(Document review.)

A. I can see that.

BY MR. DAVIS:

Q. Yeah. And you say -- in summarizing that literature, you say: existing research has produced mixed findings regarding the relationship between screen time and mental health.

Do you see that?

(Document review.)

A. I see that sentence.

BY MR. DAVIS:

Q. That's a true statement, correct?

A. I see that sentence, that's in

Page 383

there. I'm sure that it was true at the time we wrote this.

Q. Turn to the section of your report dealing with social media use and suicidality. It's on pages 118 and 119.

Are you there?

A. I'm just reading the snapshot of that.

I'm sorry, could you remind me of the page?

Q. Sure. Your MDL report, pages 118 to 119; you have a section in your report, right?

A. Yes, 118, I'm here.

Q. Okay. 118 and 119, you discuss your opinions about social media use and suicidal thoughts or behavior, right?

A. I discuss the data and then -- I can read it and tell you if it offers my opinion in this particular page, but --

Q. I'm just asking you if those pages outline the data --

A. Okay.

Q. -- that you say supports a relationship between social media use and

Page 384

suicidal thoughts or behavior.

A. There are other pages that would support that as well, but these two in particular, I can read it.

Q. Well, I'm asking specifically about the studies that you've identified in your report about suicidal thoughts and behavior and social media use. Are we on the same page?

A. Page 118 to 119?

Q. Yes. Does that not -- is that not in there?

A. It is in there.

Q. Okay. I want to focus on -- let me ask you a question.

A. Okay.

Q. Throughout your entire report --

A. Yeah.

Q. -- you don't identify any RCTs or experimental studies on suicidal thoughts and behavior and social media use because there just isn't any, right?

MR. VANZANDT: Objection, mischaracterizes evidence.

Page 385

I'm sorry. I'm confused. You asked him to look at 118 and 119. Now you're asking his entire report.

MR. DAVIS: Yeah, because he seems to be quibbling with me about what's in the report in that section. So I'm broadening the question.

MR. VANZANDT: Okay. I just wanted to make sure he understood the question. Thank you.

MR. DAVIS: Yeah.

BY MR. DAVIS:

Q. Dr. Murray, throughout your entire report, you don't identify any experimental studies or RCTs that looked at suicidal thoughts or behavior in social media use because there's simply not any, right?

A. I would have a hard time imagining that you could, as a researcher, randomize someone to potentially expose them to something that would be causal to suicidal thoughts. And in that context, I can't point you to any on the pages that you've mentioned.

Q. I'm not asking about the pages.

97 (Pages 382 - 385)

CONFIDENTIAL

Page 386

I'm talking about your entire report. There's not such a study because one just hasn't been done, right?

MR. VANZANDT: Objection, argumentative, asked and answered.

A. I mean, I can review my report, but I can tell you, that would be an ethically very hard study to do.

BY MR. DAVIS:

Q. Do you know of one?

A. I can't recall one right now that I can tell you about.

Q. Okay. You identify only two longitudinal studies in your report that discuss social media use and suicidality, true?

A. I can review it. But there -- I know there are longitudinal studies in here, so...

Q. There are two studies, right? There's the Arendt study from 2019 and there's the Chu study from 2023, right?

(Document review.)

MR. VANZANDT: You can answer.

A. Yeah, there's a study that

Page 387

is -- there's another -- I can see here what looks like a longitudinal study following suicide -- rates of suicidality over time.

BY MR. DAVIS:

Q. Which study are you referring to?

A. This figure. I can review it.

Q. What study?

A. This looks like a longitudinal figure. I can review the methodology and tell you if it's a longitudinal study.

Q. I'm just asking for the name of the study, Doctor. Please help me out here.

MR. VANZANDT: He's trying to look.

THE WITNESS: Yeah.

A. It's one of the Won studies that looks like what this figure belongs to.

BY MR. DAVIS:

Q. Please identify it for me.

A. Identify the study?

Q. Yes.

A. So I think it's the one -- the one that belongs to this figure, which looks like a longitudinal predictive model is the

Page 388

Won study listed as 273 or '4. There were two Won studies.

Q. Are you talking about the Zein study, the quantitative analysis?

A. Am I talking about which one?

Q. Let me just rephrase the question because --

A. Okay.

Q. Other than the Arendt study and the Chu 2023, are you aware of any other longitudinal studies about suicidal thoughts or behavior and social media use that's identified in your report?

MR. VANZANDT: Objection, asked and answered.

A. Yeah, I can review -- I'd have to review the methodology, and I could share that with you.

There's --

BY MR. DAVIS:

Q. Do you know of one?

A. I know of one that came out yesterday which showed that a third of children in this country have increasingly addictive trajectories of social media use,

Page 389

and that that is related to suicidality.

Q. I'm sorry, Doctor. My question simply is: Do you know of one in your report other than Arendt and Chu 2023?

A. I can't -- I could review the methodology. It's hard to discern the individual methodology of every study because I'm presenting short summaries of their findings.

Q. We've already marked the Chu 2023 study as an exhibit. Can you find that, please?

A. Can you tell me what number?

MR. VANZANDT: Is it 30?

MR. DAVIS: I think it's one of the last ones we just went over.

THE WITNESS: Thank you.

BY MR. DAVIS:

Q. If you go to page 3, right column, paragraph 2, line 7 from the bottom.

A. Page 2, right paragraph.

Q. Right.

This is a study that you were involved in, and it reported that there was no -- that: It's important to highlight that

98 (Pages 386 - 389)

CONFIDENTIAL

Page 390

in fully adjusted models, social media was not associated with suicidal behaviors at two-year follow-up.

True?

A. Can you point me to where you see that?

Q. That's on page 3, right column, paragraph 2, seven lines from the bottom.

A. Yes, I see that.

Q. That's what the study found, correct?

A. The study found broadly that -- this was a -- looks like a screen time -- a screen time study, it looks like, in -- to your point, fully adjusted models don't support the same relationship in this one study.

Q. Okay. So the other study that we talked -- the other longitudinal study is Arendt. Let me mark that as Exhibit 32 [sic].

(Whereupon, Murray-31, Effects of exposure to self-harm on social media: Evidence from a two-wave panel study among young adults, by Arendt

Page 391

et al, was marked for identification.)

BY MR. DAVIS:

Q. Okay.

MR. VANZANDT: Can I get a copy? I'm sorry.

BY MR. DAVIS:

Q. Turn to page 2436, first paragraph, second line.

A. Which page again, I'm sorry?

Q. 2436.

A. Thank you.

Q. This study states: At a most basic level, the present study thus shows that young people who get exposed to self-harm on social media (either intentionally or by accident) are at higher risk of self-harm or suicide, either because of the exposure itself or because they are at higher risk to begin with, and thus, more likely to run into this problematic content.

Did I read that correctly?

A. You read that well.

Q. Okay. That's the findings of that study, correct?

A. That is an important thing to

Page 392

consider in this study when showing the association between social media use and suicidality. In this particular study design, that's one limitation.

Q. So for the two studies that we looked at --

A. Yeah.

Q. -- neither of them were able to determine that there was an actual association between social media use and suicidal thoughts or behavior, right?

A. I -- I mean, this establishes a relationship.

Q. The one -- when you say this, you're saying Arendt?

A. You're saying that this does not establish a relationship?

Q. Are you saying that Arendt establishes a relationship? That's my question to you.

A. Let me reread the study, please.

(Document review.)

A. I mean, it does -- it does indicate, even in the abstract that: As

Page 393

hypothesized, exposure to self-harm on Instagram at the first wave prospectively predicted self-harm and suicidality-related outcomes at the second wave one month later.

That, to me, is a relationship.

BY MR. DAVIS:

Q. That's different than what you found in your study in 2023, correct?

A. That's --

MR. VANZANDT: Sorry.

Objection, vague.

BY MR. DAVIS:

Q. This study -- you say this study, Arendt, reported an association. Your study, Chu in 2023, did not report an association, correct?

A. That is correct.

Q. Those two are not consistent with each other, right?

A. The Chu one is looking like it's primarily focused on screen time in fully adjusted models with a multitude of covariates supported different findings than the one reported in the Arendt study.

Q. Right.

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

CONFIDENTIAL

Page 394

The Arendt study is not consistent with your finding in the Chu study, correct?

A. They -- they -- as I mentioned, they -- they -- the Chu study looks at screen time, and when you adjust fully for different covariates, the findings don't align with the findings in the Arendt study.

Q. Do you know whether the Arendt study actually adjusted for the same covariates that you adjusted for in your study?

A. I haven't -- I can read it now thoroughly and --

Q. Do you know one way or the other?

A. I can't recall, sitting here today.

Q. Okay. So are you aware of any longitudinal study replicating the findings in Arendt with respect to social media use and suicidal thoughts or behavior?

A. There's a paper that came out two days ago in JAMA, the Journal of the American Medical Association, that looks at

Page 395

incremental increasing trajectories of social media addiction, and I think as I remember it today, that is related to suicidality.

Q. Well, I can't ask you about a study that's not in your report, so let me rephrase the question.

MR. VANZANDT: No. Object. You can ask him about the study that's not in his report. That's not true.

MR. DAVIS: Where is it on the reliance list?

MR. VANZANDT: It came out two days ago.

MR. DAVIS: Thank you. That's my point.

MR. VANZANDT: So you can ask him questions about it.

MR. DAVIS: I'm not asking him questions about it.

BY MR. DAVIS:

Q. Doctor, is there any study in your expert reports that looked at -- that replicates the finding of the Arendt study as to suicidal thoughts or behavior and social media use?

Page 396

A. While -- I mean, I think the figure on the one study is compelling to me. If you can predict variance in suicidality rates based on social media data over time, that's also, I think, important data to consider.

And the other data, again, I think just illustrate the same -- illustrate a similar -- that illustrates a similar finding to me. And the other studies in here look like they're meta-analyses and cross-sectional studies.

And again, the one I alluded to yesterday is a prospective follow-up analysis which articulates three discrepant trajectories of increasing social media addiction amongst children in this country.

And I believe, and I'm happy to review this, articulates how that relates to an increased suicide risk.

MR. DAVIS: I'm sorry, that's nonresponsive. I didn't ask you that question at all, Dr. Murray.

BY MR. DAVIS:

Q. I said, very specifically, can

Page 397

you identify any study in your report that's a longitudinal study that replicates the findings in the Arendt with respect to self-harm or suicidal thoughts and behavior and use of social media?

A. Again, I can't recall sitting here today without reviewing all the methodology, but I'm aware of other studies which are in my report which demonstrate temporal predictive models and a study that came out just two days ago.

Q. Just to be clear, Dr. Murray, the other studies that you are referring to are not longitudinal studies, fair?

A. This is -- I established this is temporal secular trends.

Q. Doctor, I'm not asking you about temporal or secular trends.

A. Okay.

Q. I'm asking you about whether there's a -- the studies that you're referencing, other studies in your report, they are not longitudinal studies that assessed social media use and suicidal thoughts or behavior or self-harm, did they?

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

CONFIDENTIAL

Page 398

MR. VANZANDT: Objection, asked and answered.

A. Again, I would have to review the methodology, Todd. I don't recall the methodology employed in every single study in my report.

What I'm looking at here is a predictive model looking at -- looks like secular trends and suicidality rates based off of social media data.

MR. DAVIS: Yeah, I'm sorry, but that's just simply not a response to my question. I'm specifically asking about longitudinal studies. I don't have time.

I reserve on it. It's nonresponsive. I'm going to the next one.

BY MR. DAVIS:

Q. If you can look at the section in your report, Section XV, that deals with The Role of Social Media in Anxiety at subsection D.

A. Do you have the page number, by any chance?

Page 399

Q. 127.

A. I see that.

Q. Okay. You identify seven cross-sectional studies in that -- well, excuse me.

You cite seven studies that are either cross-sectional or have -- or meta-analyses that use cross-sectional data. That's Vannucci, Wu, Du, Ahmed, Nan, N-A-N, Hancock, and Ma.

All right? Are you with me?

A. I'm with you.

Q. And you agree that those were either cross-sectional or use cross-sectional data as part of a meta-analysis?

A. Again, I would have to review the methodology. I can't recall what methodology they used right now.

Q. Do you -- is there -- do you have any evidence to dispute my description of those seven studies?

A. I'm simply saying that I can't recall the methodology of every single study in my report when I'm providing summary findings.

Page 400

Q. Okay. You cite an eighth study. That's the Prizant-Passal study, right?

A. Where is this?

Q. You don't know where that study is?

A. I'm looking at the footnotes and I don't see a Prizant on the pages you asked me to look at.

Q. Yeah. It's footnote 292. It's about three -- halfway down in that footnote.

Do you see that, you identify the Prizant-Passal?

A. Oh, I'm sorry, it's buried in there. Yes, I see it.

Q. Okay.

(Whereupon, Murray-32, Social anxiety and internet use - What are we missing, by Prizant-Passal et al, was marked for identification.)

BY MR. DAVIS:

Q. And let me hand you Exhibit 34 [sic].

A. Thank you.

Q. Excuse me. Hand me that back.

Page 401

That's the wrong number.

Let me hand you what's been marked as Exhibit 32, which is the Prizant-Passal study, right?

MR. VANZANDT: Can I get a copy?

MR. DAVIS: Sure.

BY MR. DAVIS:

Q. If you look at page 228, right-hand column, first paragraph -- excuse me, fourth paragraph -- no, sorry. 228, right-hand column, and four lines down.

It says, quote: Second, we could not address the important issue of the relationship between social anxiety and communication in online social networks, again, because of a lack of relevant research.

Did I read that correctly?

A. You read that line correctly.

Q. So this study didn't even look at social networks like the defendants' platforms in this case, correct?

A. Let me read the...

(Document review.)

101 (Pages 398 - 401)

CONFIDENTIAL

Page 402

BY MR. DAVIS:

Q. Is that right?

A. This study look -- this study looks at Internet use.

Q. This study did not look at social media platforms, did it?

A. This states this study is reporting findings of studies, it looks like, assessing Internet use, which, to your point earlier, did not rule out social media, but they did not specifically label which platforms are included or excluded.

Q. Dr. Murray, it's a very simple question.

This study says it did not analyze social media platforms, right?

MR. VANZANDT: Argumentative.

(Document review.)

A. The line in this study says we could not assess the important issue of the relationship between social anxiety and communication in online social networks, again, because of a lack of relevant research.

///

Page 403

BY MR. DAVIS:

Q. Correct. So you're not aware of any data specific to social media platforms in this study, are you?

A. In this study, this is generally looking at Internet use, and they didn't exclude social media, so I wouldn't necessarily -- the way this particular study --

Q. You're missing my question.

There's no data in this study specific to social media use, true?

A. It looks like this is a study of Internet use and not specifically social media.

Q. There's no specific data in this study about social media use, is there?

A. I can read it, but I don't see it now.

Q. Okay. And do you speak Indonesian?

A. Do I speak Indonesian?

Q. Yeah. Can you read or write Indonesian?

A. No.

Page 404

Q. Okay. Let's look at the next study that's down in footnote 292. You've got a study that's in Indonesian, right?

It's the Budury. Do you see that, the Budury study?

A. I see that.

Q. Did you ever read this study in English before you signed your report?

MR. VANZANDT: Objection, argumentative.

A. I don't -- I can't recall that study, to be completely honest with you.

BY MR. DAVIS:

Q. Okay. But do you remember laying eyes on the Budury study in English before signing your report?

A. I can't -- I can't recall.

Q. And you haven't identified any RCT or experimental study in this section dealing with anxiety and social media use, have you?

A. Again, RCTs are extremely difficult to do if you're potentially going to randomize participants to potential harm. There's not an IRB study in the land that

Page 405

would support that.

So I can't identify RCTs. I identified other study methodologies.

Q. Okay. Let's move to the next section that deals with social media use and depressive symptomatology, okay? That's in your report.

You don't identify any randomized controlled trial or experimental study in this section either, for the same reason you just said, right?

A. There -- I'm going to navigate to the section on depression, if that's okay.

I mean, stopping short of reviewing that section, Todd, I'd have to tell you that it would be difficult to conduct an RCT prospectively randomizing to someone to receive harms that may result in depression. You're obligated by an IRB to not put patients or research subjects in harm's way.

Q. It's a different issue. I'm simply asking you whether or not you can identify any randomized controlled trial experimental study in your discussion about

102 (Pages 402 - 405)

CONFIDENTIAL

Page 406

depressive symptoms and depression and social media use. Can you identify one?

A.    As I sit here, no, I can't identify RCTs randomizing people to potentially receive harm, and ascertaining the effects on subsequent depression.

MR. DAVIS:  Move to strike, nonresponsive other than "I can't identify."

THE WITNESS:  Before your question, may I run to the restroom?

MR. DAVIS:  Of course.

THE VIDEOGRAPHER:  We're now going off the record, and the time is 4:54 p.m.

(Recess taken, 4:54 p.m. to 5:04 p.m. PDT)

THE VIDEOGRAPHER:  We are now going back on the record, and the time is 5:04 p.m.

BY MR. DAVIS:

Q.    Dr. Murray, let me ask you one follow-up question, or a couple of follow-up questions about your analysis of social media use and anxiety symptoms or anxiety

Page 407

disorders, okay?

A.    Okay.

Q.    You skimmed through or looked through Dr. Patten's report for the defendants, correct?

A.    Let me consult my materials considered list.

Q.    Is that back at the end?

A.    Gosh, there's so many of these.

Q.    Do you remember reviewing a report by Dr. Patten, P-A-T-T-E-N, who is an epidemiologist?

A.    I remember -- I reviewed so many studies. Let me look, or you can point me to where I reference it if that would be easier.

Q.    Let me just ask you this. In the anxiety disorder discussion, you only -- you didn't identify any longitudinal studies and discuss them, did you?

(Document review.)

MR. VANZANDT:  I'm sorry, which report is this?

MR. DAVIS:  This is his MDL

Page 408

report.

MR. VANZANDT:  Okay.  Does that have his materials considered list attached?

MR. DAVIS:  I'm just simply asking him in his -- either of his expert reports, he's happy to look at the other one too.  Please feel free to look at the other one.

But in neither report did he discuss any longitudinal studies in his discussion about social media use and anxiety or anxiety-related symptoms.

BY MR. DAVIS:

Q.    Is that right?

A.    It looks like I've referenced meta-analyses, some reviews with over a million participants.  I can review the methodology of the studies in the report.

Q.    I just want you to -- can you identify any longitudinal studies that you reviewed and discussed in the section of your reports that deal with social media use and anxiety or anxiety- related symptoms?

Page 409

A.    I can't recall right now.  I'd have to review the studies.

Q.    I'll tell you, there aren't any, okay?  I looked at every one of your studies.  There aren't any, okay?

You also understand that there are a number of studies that looked at anxiety symptoms and social media use that are discussed in Dr. Patten's report, right?

MR. VANZANDT:  Objection to counsel's comments and testimony, argumentative.

A.    I'd have to -- I'd have to look at it, Todd.

BY MR. DAVIS:

Q.    How many studies on anxiety -- and longitudinal -- strike that. How many longitudinal studies on social media use and anxiety or anxiety-related symptoms did you look at before forming your opinions?

A.    Again, I would have to look at the methodology of the studies.  I'm simply providing summary -- summary findings here in this report.  A robust review of every

103 (Pages 406 - 409)

CONFIDENTIAL

Page 410

methodology would be long.

Q. You understand that there are studies that looked at anxiety symptoms and social media use that were longitudinal studies and found no association, right?

MR. VANZANDT: Objection, foundation.

BY MR. DAVIS:

Q. Do you know that?

A. If you show me them, I'll be happy to review them.

Q. Do you know that?

A. I can look at the methodologies for the studies I've presented and reported.

Q. Do you -- no, my question is broader than that, Doctor. Not what's in your report.

A. Okay.

Q. I'm saying: You know -- are you aware that there are a number of epidemiological studies that have been done on social media use and anxiety symptoms that have shown no association? Do you know that?

MR. VANZANDT: Objection, foundation.

Page 411

A. Again, I'll happily review them. I've --

BY MR. DAVIS:

Q. I'm not asking if you can review.

I'm asking: Do you know whether or not those studies exist?

A. It's -- again, I don't recall every study and their methodology. You're asking specific study-level questions. I can --

Q. Did you put a single longitudinal study on social media use and anxiety that found no association? Did you find a single -- put a single study of that nature in your report?

MR. VANZANDT: Objection, vague, compound.

A. Again, I need to review the methodology to ascertain which ones are longitudinal studies.

BY MR. DAVIS:

Q. Do you -- okay. Go ahead, finish.

A. No, I'm done. You can.

Page 412

Q. Do you know that there are studies on depression symptoms and social media use that found no association?

MR. VANZANDT: Objection, foundation.

BY MR. DAVIS:

Q. Do you know that?

A. I'd happily review those data.

Q. Do you know that?

A. Do I know there are studies out there?

Q. That found no association between social media use and depressive symptoms. Do you know that?

A. I would have to look at the data.

Q. Do you know of one today?

A. I can't recall off the top of my head.

Q. You don't discuss a single one in your report, do you?

MR. VANZANDT: Objection, argumentative.

A. Yeah, I don't -- I don't recall.

Page 413

BY MR. DAVIS:

Q. Okay. Have you ever done a causation analysis on -- in any context where you didn't include studies that found no association between the exposure and the outcome?

A. Can you repeat your question? I'm sorry.

Q. Have you ever done a causation analysis where you have not reviewed, considered and discussed the studies that found no association?

MR. VANZANDT: Objection, vague.

A. I've reviewed the most pertinent data that I was able to find, and if I am presented with new data, I will opine on it right now.

BY MR. DAVIS:

Q. Okay. But that's a different question, a different answer to the question.

I asked have you ever done a causation analysis where you have not discussed studies that reported no association?

104 (Pages 410 - 413)

Page 414

MR. VANZANDT: Again, objection, vague, asked and answered.

A. Yeah, I...

BY MR. DAVIS:

Q. Have you ever done a causation analysis like that?

A. Have I ever done a causation --

Q. Have you ever done a causation analysis where you've not discussed studies that found no association?

MR. VANZANDT: Again, I'm sorry. Objection, vague, foundation.

A. I have done analyses where I've tried to include all of the relevant data, and if there's any new data, I would incorporate that into my opinion or if there's things that maybe were missed, I would also look at that.

BY MR. DAVIS:

Q. Okay. I want you to assume for me that there are studies finding no association between use of social media and depression symptoms and anxiety symptoms, okay?

A. Okay.

Page 415

Q. Assume with me that, all right? If you didn't include that in your report, do you still stand by your report, that you did a thorough analysis of the causation issues?

MR. VANZANDT: Objection, argumentative, foundation.

A. I definitely think I did a thorough assessment, and if I -- if asked to opine on a study that's not included in here, I would definitely do that.

BY MR. DAVIS:

Q. Okay. Let's go quickly to your section on depression -- depression symptoms and social media use, okay?

You have -- you have 12 articles that you say support the proposition that increasing social media use exacerbates depressive symptomatology, okay? I counted up 12, okay?

MR. VANZANDT: Objection, foundation, misstates evidence.

Go ahead.

BY MR. DAVIS:

Q. Are you with me, Doctor?

Page 416

A. I'm following your sentence, yes, Todd.

Q. Okay. And so eight of the 12 articles are either cross-sectional studies or meta-analyses that include cross-sectional data, right?

A. I can review the methodology and share with you my understanding.

Q. Well, I'll tell you, I've got Kelly, Cunningham, Shin, Marengo, Li, Lin, Primack and Nesi. They were either cross-sectional data -- well, they were all cross-sectional data, okay?

Are you with me?

MR. VANZANDT: Objection, foundation.

A. I'm following your sentence, yes.

BY MR. DAVIS:

Q. Do you have any evidence sitting here today that any of these studies are not cross-sectional?

A. I'd have to review the data that -- the study that comes to the top of my mind is the Nagata study which illustrated

Page 417

prospectively increased depressive symptoms several years later.

Q. You don't -- you don't cite the -- you don't discuss the Nagata study in your report, do you?

A. It just came out.

Q. Right. You don't discuss it, correct?

A. Because it just came out, I don't discuss it.

Q. That's right. So I'm talking about what's in your report.

And do you have -- for the -- for the other studies, the two of the other 12, they're review studies. That's the Vidal -- strike that.

The Vidal and the Seabrook articles are review articles, right?

MR. VANZANDT: Objection, foundation.

A. The Vidal study you mentioned is called a scoping review of 42 studies.

BY MR. DAVIS:

Q. Right. And the Seabrook is also a

105 (Pages 414 - 417)

CONFIDENTIAL

Page 418

review article, right?

A.    Seabrook.  Let me navigate to that.

Do you have a -- can you point me to that?

Q.    Do you have any evidence sitting here today that the Seabrook article is not a review article?

A.    I'm trying to locate it in my footnotes.  I can't see it for some reason.

Q.    All right.  Look at Exhibit 34.

(Whereupon, Murray-34, Instagrowth: A Longitudinal Growth Mixture Model of Social Media Time Use Across Adolescence, by Coyne et al, was marked for identification.)

BY MR. DAVIS:

Q.    I will represent to you that you have two longitudinal studies identified in this section.  That's Coyne and Nesi, okay?

Do you have any evidence to dispute that?

A.    Did I have these in my report?

Q.    And they're longitudinal

Page 419

studies.

A.    I can see the Coyne -- the Coyne paper.

Q.    All right.  Your view is that it's a longitudinal study?

A.    Yes.

Q.    Okay.  And the Nesi article is -- is it your view that that's a longitudinal study?

A.    I can't discern that from my summary of that here.

Q.    Okay.  Let's look at the Coyne.

A.    Okay.

Q.    Page 4.

In the Coyne study, it talks about -- on page 4, it talks about the measures that were used, both for assessing social media time use and also depression, aggression and delinquency, right?

A.    Okay.

Q.    Yes?

A.    I can see that section, yes.

Q.    Okay.  And then you look at social media use time, it says they measured -- all six waves had one single

Page 420

question about how many hours people spent using social media networks, correct?

A.    That's what this says, yes.

Q.    So this was assessing time spent on social media, right?

A.    It looks like that.

Q.    Okay.  And then if you look at the depression, aggression and delinquency outcomes, they only assessed those in a single point in time, which was time 6, correct, which was the sixth wave of the study, right?

A.    That is what's indicated here.  That looks like the study design.

Q.    Right.

So, for example, at time 1, time 2, time 3, time 4 and time 5, there was no assessment of symptoms of depression or any of the other outcomes, correct?

A.    Let me review this briefly.

(Document review.)

A.    Looks like this is reported here as time 6.

BY MR. DAVIS:

Q.    That's the only time that

Page 421

symptoms of depression were assessed, right?

A.    That's what it looks like.

Q.    Okay.  So, for example, at time 1, the study -- this study didn't collect information on depression symptoms, correct?

A.    Let me check if that's not a confound.  It looks like it's an outcome.  The depression reported at time 6 is the outcome.

(Document review.)

A.    I'm with you there.

BY MR. DAVIS:

Q.    Okay.  At time 1, they did not assess symptoms of depression, correct?

A.    That's what this looks like, yes.

Q.    Okay.  So this study did not determine what were the baseline level of symptoms of depression at time 1, right?

A.    Correct.  Depression is assessed at time 6.

Q.    Correct.

So, for example, they didn't look at symptoms of depression at time 1 and see how that changed to time 6, did they?

106 (Pages 418 - 421)

CONFIDENTIAL

Page 422

A. Not if they were looking just at time 6.

Q. Okay. So in that respect, what they're doing -- when they're drawing information out at time 6 along with -- on social media use and also on symptoms of depression, they're drawing that information out at the same time, correct?

A. Can you say that again? You lost me a bit.

Q. Sure.

When they are looking at time 6 and they're drawing that information on social media use and on depressive symptoms, they're drawing that information out at the same time, correct?

A. It looks like social media is measured at six waves in this study. I'm reading from the Measures section.

Adolescents responded to all six waves to one item regarding how many hours they spend in a typical day using social networking sites, for example, Facebook and Instagram.

MR. DAVIS: Move to strike as

Page 423

nonresponsive. I have to move on.

BY MR. DAVIS:

Q. Is it fair to say that all the -- almost all the studies that you looked at assessed and focused on the amount of screen time with respect to social media use, right?

MR. VANZANDT: Objection, vague, compound.

A. Can you rephrase that?

BY MR. DAVIS:

Q. Sure.

A. I'm not following your question.

Q. Almost all the studies that you looked at assessed social media use by amount of screen time, right?

A. I'd have to review the data.

Q. You don't know?

A. I --

MR. VANZANDT: Objection, argumentative.

He was in the middle of his answer.

A. I'm aware of, certainly,

Page 424

studies reporting time used.

BY MR. DAVIS:

Q. Okay. There's a lot of studies that you've looked at on social media use that the focus was -- and the only focus -- was amount of screen time, right?

A. There were studies that included amount of time on social media, and I think there's other studies as well. I can't recall right now other method -- other measures.

MR. DAVIS: Okay. Move to strike as nonresponsive.

BY MR. DAVIS:

Q. If you could look at your table of contents in your April 2025 --

A. Okay.

Q. -- JCCP report, okay?

And if you look at Roman numeral number X.B. Are you there?

Dr. Murray?

A. Yes, I'm there. I'm just navigating to it. Yes.

Q. Okay. It says -- this is what you say: Social media platforms

Page 425

disproportionately expose eating disorder patients to harmful eating disorder content.

Correct?

A. That's what that says.

Q. Right?

A. Yes.

Q. And you say it's the fact that the eating disorder content that is, in fact -- look at report at 3 -- look at your report at page -- at X, number C, right underneath there, X, Roman numeral X.C., you say: The promotion of eating disorder content and the recurrent exposure on social media platforms confers significant risk for the development of eating disorder psychopathology.

Correct?

A. Yeah, that's what that says.

Q. Correct?

A. Yes.

Q. And those are two of your opinions in the case, correct?

A. Yes.

Q. And so is it fair to say that without content, there's no increased risk?

CONFIDENTIAL

Page 426

MR. VANZANDT: Objection, misstates testimony.

A.    What do you mean by that?

BY MR. DAVIS:

Q.    Well, if you didn't have -- if social media didn't have any content, in your view, would there be any increased risk of using social media for any adverse mental health outcome?

MR. VANZANDT: Again, objection, misstates testimony and incomplete hypothetical.

A.    It's -- it's hard to imagine what that would -- how that would be, what that would be.

BY MR. DAVIS:

Q.    Well, I'm asking you: If there was no content on social media, would there be in your view, any increased risk between social media use and any adverse mental health outcome?

MR. VANZANDT: Same objections.

A.    If there's no content, it's hard for me to even conceptually disaggregate the features of social media with what's on

Page 427

there.

BY MR. DAVIS:

Q.    So what you're saying is it's hard for you to disaggregate the impact of content on what's causing harm?

MR. VANZANDT: Objection, misstates testimony.

A.    Could you help me understand what social media would look like without content?

BY MR. DAVIS:

Q.    I'm asking you.

If you don't have any content on social media, do you have any increased risk of harm for any users in your mind?

MR. VANZANDT: Objection, calls for speculation.

A.    Yeah, I don't want to speculate.

BY MR. DAVIS:

Q.    Do you know -- let's say there's no content whatsoever on social media. It's a blank screen.

Is it your view that there's any increased risk of harm by looking at that

Page 428

blank screen?

MR. VANZANDT: Same objection.

A.    I don't want to speculate.

BY MR. DAVIS:

Q.    Do you know whether or not there would be any harm or no harm?

MR. VANZANDT: Same objection.

A.    I don't want to speculate on that.

BY MR. DAVIS:

Q.    You're an expert. Experts get to get asked hypotheticals all the time. I'm asking you a hypothetical.

I want you to assume there's a blank screen on social media, for social media use. In your view, is that harmful?

A.    Can you repeat your question?

Q.    Sure.

A.    Thanks.

Q.    There's a blank screen on social media use. Every platform just has a blank screen, no third-party content.

In your view, is that harmful?

MR. VANZANDT: Objection, calls --

Page 429

BY MR. DAVIS:

Q.    Or is it harmful or you don't know?

MR. VANZANDT: Calls for speculation, incomplete hypothetical.

A.    I don't want to speculate, and that's really -- it's just speculative.

BY MR. DAVIS:

Q.    Do you have an opinion to a reasonable degree of medical or scientific certainty that if there was -- well, let's put it this way.

Let's say that there's -- what the content that's being shown on social media is a roaring fire. That's all users see. Or it's a field of wildflowers.

A.    Uh-huh.

Q.    In your view, is that harmful to people to look at? Does that cause each and every one of the adverse mental health outcomes that you put in your report?

MR. VANZANDT: Objection, calls for speculation and incomplete hypothetical.

A.    That's -- that's -- I can't

108 (Pages 426 - 429)

CONFIDENTIAL

Page 430

speculate on that.

BY MR. DAVIS:

Q.    So tell me -- so is it your view that social media content is harmful?

MR. VANZANDT:  Objection, vague.

A.    It's my view that content, when amplified and targeted to people on social media, can -- can result in harms.

BY MR. DAVIS:

Q.    Let's say -- you say amplified. You mean by an algorithm?

A.    I mean many -- I mean, that's one of the things that amplifies the harm, I think.

Q.    Let's say there's no algorithm.

A.    Uh-huh.

Q.    There's none of the other features that you take issue with.  They don't exist on social media.  And the people are still doing searches, they're calling up the images.

Do you believe that that's harmful --

MR. VANZANDT:  Objection --

Page 431

BY MR. DAVIS:

Q.    -- or can lead to mental health harms such as what you put in your report?

MR. VANZANDT:  Objection, calls for speculation, incomplete hypothetical.

A.    That's hard to speculate on, Todd.

BY MR. DAVIS:

Q.    You don't know?

MR. VANZANDT:  Argumentative.

A.    It's a speculative question that is not the way that social media operates.

BY MR. DAVIS:

Q.    Okay.  I want you to tell me --

A.    Uh-huh.

Q.    -- versus third-party content that's put on social media and algorithm, what's -- what percentage does each cause the harms that you say happen from social media?

A.    Your question is what percentage of third-party content causes the harms that I see stemming from social media?

Q.    Versus an algorithm.

Page 432

MR. VANZANDT:  Objection, vague, ambiguous.

A.    It's hard to -- it's hard to say.

BY MR. DAVIS:

Q.    Can you give any percentage to a reasonable degree of medical or scientific certainty?

MR. VANZANDT:  Objection, vague.

A.    It's -- the ways that studies have assessed social media -- assess social media, which includes the content and it includes all the design features, all the features of social media, thereby --

BY MR. DAVIS:

Q.    I'm --

A.    Go ahead.

Q.    I'm asking you:  Between -- so third-party content on social media and an algorithm that's used on social media, can you put a percentage of how much those two are each contributing to any harm that you say exists with social media use?

MR. VANZANDT:  Objection, asked

Page 433

and answered.

A.    Again, I think the studies that I cite documenting harm assess social media in the context of both the content and all the design features, and most studies are content agnostic.  They code and measure social media use.  That is how they do it, and that is what's depicting the harm.  So to sort of now hypothetically, potentially, to disaggregate these two key inextricable features to me is hard.

BY MR. DAVIS:

Q.    So, for example, the content in your mind, there's no way to be able to say this amount of harm is caused by the content, this amount of harm is caused by algorithm or some other feature?

MR. VANZANDT:  Objection, mischaracterizes testimony.

A.    Again, I think that's speculative and hard to -- hard to answer because the studies assess social media platforms, which includes their features and what's on them.

///

109 (Pages 430 - 433)

Page 434

BY MR. DAVIS:

Q. Okay. So can you say to any reasonable degree of scientific or medical certainty -- I'm going to strike that.

Look at -- let's look at your report.

A. Okay.

Q. Look at page 72.

MR. VANZANDT: April report?

MR. DAVIS: April report.

A. Okay.

BY MR. DAVIS:

Q. You say: Empirical analyses of university students in the United States illustrate that engagement with appearance and eating-related content on TikTok is associated with higher eating disorder symptoms.

Correct?

A. That's what that sentence says.

Q. Right? That's what you believe, right?

A. That's what that sentence says.

Q. Yeah.

And you also say that -- if you

Page 435

go down to the people who are looking at social media, using social media, whether it's kids, adults, they're responding to what they see and what they hear on social media, right?

MR. VANZANDT: Objection, calls for speculation.

A. Can you repeat that?

BY MR. DAVIS:

Q. Sure.

Any user of social media, they're responding to what they see or hear on social media, right?

A. In what capacity?

Q. In any capacity, in every capacity when they're using it.

A. I think the question is more how are they pulled in, what is their capacity to abstain, how are the features affecting them psychologically, psychiatrically, in addition to what they see, which I'm sure is part of what they respond to as well.

Q. Well, when somebody is responding to a like, somebody is responding

Page 436

to an appearance filter, they're responding to what they see, right?

MR. VANZANDT: Objection, vague.

BY MR. DAVIS:

Q. Right?

A. Can you rephrase that, Todd?

Q. Yeah. I think it's pretty straightforward.

When somebody responds to an emoji, like a like or a heart shape, or they're responding to an appearance filter, the people who are looking at social media are responding to what they actually see or what they actually hear, right?

A. And do you mean are they behaviorally responding? Are they psychologically responding?

Q. Just as users of the platform, they're responding to what they see and hear, right?

A. I think they're responding to how -- how information is portrayed to them, whether they want information, whether they want certain elements that are portrayed to

Page 437

them.

I also think that they -- well, let me stop there.

Q. Okay. Let's look at page 76, first bullet, first sentence.

You talk about in this sentence -- you talk about dieting and toxic eating disorder videos in your view are driven by users liking such videos or whether those videos appear independently of liking.

Correct?

A. They're the primary findings of this study were that those with eating disorders were more -- far more likely -- the algorithm of those with eating disorders --

(Clarification requested by the stenographer.)

A. The algorithms of those with eating disorders are far more likely to deliver problematic videos.

BY MR. DAVIS:

Q. Go to page --

MR. DAVIS: I'll move to strike as nonresponsive.

///

CONFIDENTIAL

Page 438

BY MR. DAVIS:

Q. Go to page 77, Doctor.

A. Okay.

Q. First bullet, first sentence, you state that there's a study assessing a sample of -- let me back up. Sorry.

It's the actual -- you state that there is -- it's the -- it's TikTok video content was deemed to be pro-eating disorder content, which encouraged the development or sustaining of eating disorders.

Correct?

MR. VANZANDT: Objection, misstates the document.

A. Can you read that again, please.

BY MR. DAVIS:

Q. Yeah. You say in this paragraph that it's -- TikTok video content was deemed to be pro-eating-disorder-related content, which encouraged the development or sustaining of eating disorders.

Correct?

MR. VANZANDT: Again, misstates

Page 439

the document.

You can answer.

A. I just want to read what this says. It's: In a study assessing a sample of 200 TikTok videos linked to eating disorder-related hashtags, up to 30% of TikTok video content was deemed to be pro-eating-disorder-related content, which encouraged the development or sustaining of eating disorders, whereas 60% was deemed recovery oriented.

BY MR. DAVIS:

Q. Right. Your belief -- you say it's the pro-eating -- it's the third bullet. The pro-eating disorder content was markedly less accurate than recovery-related content.

That's what you write about this study, correct?

A. Let me see. This does state that pro-eating disorder content was less accurate than recovery-oriented content.

Q. So it's the pro-eating disorder content, right, that you're discussing in this paragraph, right?

A. This sentence states that this

Page 440

particular study demonstrated that pro-recovery content on social media was less accurate than recovery-oriented content on social media, less factually accurate.

Q. If you go to page 78, second bullet from the bottom, you say: Pro-eating disorder content is associated with worsening body image and eating disorder symptom severity.

Correct?

A. That's what I say.

Q. Okay. And you also discuss that it's the engagement with pro-eating disorder content that's associated with elevated drive for thinness and greater body dissatisfaction, correct?

(Sotto voce document review.)

A. That's what that sentence says.

BY MR. DAVIS:

Q. Okay. You say on -- go to page 80, top sentence. You say: Among those with eating disorder, greater use of image-centric social media platforms results in greater exposure to thinspiration content, which in turn is related to greater physical

Page 441

appearance comparison, which in turn directly relate to greater severity of eating disorder symptomatology.

Right?

A. One second.

(Document review.)

A. That's what that sentence says, yeah.

BY MR. DAVIS:

Q. Go to page 85. Page 85, you set out Appendix 2, which is from an advocacy group, the Butterfly Foundation, right? That summarizes eating disorder-related harms, correct? In your view, right?

A. This is a -- bear with me one second. This looks like a -- right. This is documents from the Butterfly Foundation in Australia stemming from a roundtable on social media use and the risk of eating disorders.

Q. And you put this in here because you thought it was helpful to explain your opinions, right?

A. I put this in here as one example of several where my fields'

111 (Pages 438 - 441)

CONFIDENTIAL

Page 442

organizational bodies are warning about harmful elements on social media.

Q. And this Appendix 2 talks specifically about -- in this organization's view, known harmful content and types of that content, correct?

MR. VANZANDT: I'm sorry. Objection, misstates the document.

Go ahead.

A. Could you repeat your statement, Todd?

BY MR. DAVIS:

Q. Sure.

Appendix 2 from this advocacy group sets out what it believes to be the known harmful content of social media, correct?

A. This particular appendix lays out some of the ways in which harmful social media elements impact those with eating disorders, and I think it's important, and I want to acknowledge that there exists content that is demonstrably unhelpful for those with eating disorders.

Page 443

And the way in which this content is delivered is equally as damaging, in my opinion, for those with an eating disorder. That is to say that both the content and the features are what combine to make social media so potently powerful for those with eating disorders.

MR. DAVIS: Okay. I move to strike as nonresponsive after the answer of it sets out the known harmful contents. Okay.

BY MR. DAVIS:

Q. Go to page 113. This is in your section talking about suicidality -- your views about suicidal thoughts or behavior and social media use, right?

A. On page 113?

Q. Yes. It's included within that section, correct?

A. Yes, it's in that section, yes.

Q. And you say in here: In a separate study assessing the effects of exposure to self-harm content on a social media platform, it was noted that exposure to self-harm-related content was related to

Page 444

increased suicidal ideation, self-harm and emotional disturbances.

Right?

A. That's what that says. And I think it's important to consider --

MR. DAVIS: Yeah. Don't interrupt him.

A. -- that -- let's imagine self-harm content, and let's imagine a young girl who is doing her homework. She gets notified that something pops up on her social media. She checks it. She sees that it gets lots of likes. She puts it away. And then she'll see another notification indicating to her that someone else may be actively self-harming on social media.

And this is an increasing trend portraying this type of content to this young person. That is oftentimes how this is experienced by patients that I treat that are very sick. It is the content and it is important to consider that the way that these elements are delivered to kids in particular is really engaging and hard to pull away from.

Page 445

BY MR. DAVIS:

Q. Let me ask you this: If the algorithm doesn't exist, the content on social media is the same, do you still believe that the images and the content that would be available to people could still result in an eating disorder?

MR. VANZANDT: Objection, vague and calls for speculation.

A. Could you run that back for me, Todd.

BY MR. DAVIS:

Q. Sure.

A. Thanks.

Q. If the algorithms on social media platforms didn't exist and the content was the same, do you believe that the images and the content on social media used in that way would -- could still lead to an eating disorder?

MR. VANZANDT: Same objection. You can answer.

A. Supposing all -- hypothetically, all the other features were the exact same as they are today, I think

112 (Pages 442 - 445)

CONFIDENTIAL

Page 446

that would be damaging to those with eating disorders still. Even if you took away one element, the rest of the elements remain.

BY MR. DAVIS:

Q. Well, let's change the question then.

A. Okay.

Q. If you have -- if you took away the algorithm and every other feature of social media that you take issue with, it's gone, but the images and the content are still the same, do you believe that someone could still develop an eating disorder from looking at that content?

MR. VANZANDT: Objection, calls for speculation, incomplete hypothetical.

A. It's really speculative. It's hard to answer.

BY MR. DAVIS:

Q. Do you believe that someone can be at risk for an eating disorder by looking at images that are not on social media platforms?

A. Do I believe somebody with an

Page 447

eating disorder is at risk for an eating disorder?

Q. No.

A. I'm sorry.

Q. No. Someone -- you know, nondigital -- strike that.

Images that are on social media, let's take all those out of this question, okay, and instead, we're focused on images that other people encounter in their everyday lives through TV, Internet --

A. Uh-huh.

Q. -- magazines, movies.

Do you agree that each of those, or in combination, can put someone at risk for developing an eating disorder?

A. I -- we've known about the drive for thinness for a long time. We've known about unrealistic standards of beauty for a long time.

And I believe what is more damaging and certainly what I see a lot of in my clinical practice now, which I didn't always see, is people saying how the way in which they're exposed to increasingly

Page 448

unrealistic images in a way that interrupts them, in a way that makes it hard for them to come away from and in a way that encourages them to use filters to look like somebody else, is really harmful, and arguably, more harmful than viewing content without those same features.

MR. DAVIS: Object, nonresponsive.

Again, I just don't have time to pursue the line of questioning because of my time limits, so I reserve on it.

BY MR. DAVIS:

Q. Dr. Murray, if you remove social media, and -- you just took it out of the equation -- fair to say that people are still going to develop eating disorders?

MR. VANZANDT: Objection, vague, calls for speculation.

You can answer.

A. People -- people developed eating disorders before social media.

BY MR. DAVIS:

Q. Right.

Page 449

And if you took out social media, it didn't exist, the images that people would see in other contexts would still place them at risk for body dissatisfaction and disordered eating, right?

A. While -- while it's true that we've known about eating disorders before social media, what is now true is that the way that social media is impacting eating disorder pathology is different than what we've encountered in the field, and that is why so many organizations are putting out warning recommendations, and it's harmful.

MR. DAVIS: I move to strike as nonresponsive. I --

BY MR. DAVIS:

Q. My question to you was --

A. Okay.

Q. -- very different than what you answered.

Social media doesn't exist. It's gone. It doesn't -- it's not even in the equation, right? In that scenario, people are still going to -- teens, adults are still going to have body dissatisfaction

113 (Pages 446 - 449)

CONFIDENTIAL

Page 450

and disordered eating from other images that they experience in their life, right?

MR. VANZANDT: Calls for speculation.

A. I'll say that before social media, we knew that body dissatisfaction and eating disorder existed -- sorry, before social media existed, but now we see, and I certainly see often in my clinical practice, how social media and the features therein make eating disorders very challenging for young people and can render them very sick.

MR. DAVIS: I'm sorry, that's not a question that I asked you. I reserve on it.

I object to responsiveness.

MR. VANZANDT: I disagree. I object to the questions, and they're highly speculative. I think he's doing the best he can to answer them.

MR. DAVIS: What's my time?

THE STENOGRAPHER: Six hours, 53.

MR. DAVIS: Okay. Let's take a break.

Page 451

THE VIDEOGRAPHER: We're now going off the record, and the time is 5:47 p.m.

(Recess taken, 5:47 p.m. to 6:02 p.m. PDT)

THE VIDEOGRAPHER: We are now going back on the record, and the time is 6:02 p.m.

BY MR. DAVIS:

Q. Dr. Murray, are you aware that there are longitudinal studies that found no association between use of social media and body dissatisfaction or symptoms of eating disorders?

MR. VANZANDT: Objection, foundation.

A. I would -- in my report, I reviewed all the most pertinent data I could find. If there are studies that have come out since then or there are more there, I'd happily review them.

BY MR. DAVIS:

Q. That's a different question -- or a different answer to my question.

I'm simply asking you: Are you

Page 452

aware that there are studies assessing body dissatisfaction or disordered eating or symptoms of an eating disorder that found no association?

A. Again, I am aware of studies assessing body -- sorry, body dissatisfaction and eating disorders. I'm aware of varying effect sizes, but I don't think I -- I think I included all the most relevant data.

Q. Did you include in your report a single study that found no association -- excuse me, strike that.

Did you discuss anywhere in either of your reports a single study that found no association between body dissatisfaction, disordered eating or symptoms of an eating disorder --

A. I don't recall.

Q. -- and social media use?

A. I'm sorry if I interrupted.

I don't recall. I can review.

Q. Do you know of one that you discussed?

MR. VANZANDT: Objection, asked and answered.

Page 453

A. I don't recall.

BY MR. DAVIS:

Q. If there are those studies, you didn't put them in your causal assessment or analysis, did you?

MR. VANZANDT: Objection, vague.

A. If -- if there -- so I tried to review the most pertinent data, as I mentioned, and if there are -- if there's anything that came out recently or was missed, I'd be happy to review it now, you know, and I will let you know if that impacts my opinion.

BY MR. DAVIS:

Q. I'm sorry, that's a different answer to the question I asked you.

I asked you: If there are studies that found no association between body dissatisfaction or disordered eating or symptoms of an eating disorder, and those studies exist, you did not put them into your causal assessment, did you?

MR. VANZANDT: Sorry.

Objection, misstates testimony.

114 (Pages 450 - 453)

Page 454

A.    I considered the evidence base, and I developed an opinion based on my understanding of the evidence base and the sort of totality of it.

I'm sure there are findings which differ from one another, and my opinion is really based on the totality of the evidence base.

BY MR. DAVIS:

Q.    Did you discuss any study in your expert report that found no association -- strike that.

In either of your expert reports, did you discuss any study that found no association between body dissatisfaction, disordered eating or symptoms of an eating disorder and social media use?

MR. VANZANDT:  Objection, asked and answered.

A.    I can't recall.

BY MR. DAVIS:

Q.    You don't know of one today, do you?

MR. VANZANDT:  Objection, asked and answered.

Page 455

A.    As I mentioned, I don't recall.

BY MR. DAVIS:

Q.    Okay.  Your report doesn't do a causation analysis for each specific eating disorder, does it?

A.    My report focuses on eating disorders.

Q.    As a group?

A.    As a group.

Q.    Right.  You didn't do a specific causation analysis where you said I'm going to look at data specific to what I think is anorexia or bulimia or binge-eating disorder, did you?

A.    So I didn't do a separate analysis for each disorder, but I included studies which included measures of the psychopathology of each of those three disorders.

Q.    And you didn't do -- in your report, you didn't do a specific analysis as to each defendant's platforms, did you, and any -- any psychiatric or mental health outcome that you claim social media use causes?

Page 456

MR. VANZANDT:  Sorry.
Objection, compound.
Go ahead.

A.    I reviewed the data relating to social media, which includes the defendants' platforms.

BY MR. DAVIS:

Q.    So you lumped all the defendants' platforms together to do a causal assessment?

MR. VANZANDT:  Objection, mischaracterizes testimony.

A.    Where studies delineated platforms, I reported that.  And where studies reported social media use broadly, I included that too.

BY MR. DAVIS:

Q.    So when you did your causation assessment, you didn't pick out the studies specific to TikTok or Instagram or Snap or YouTube or any other platform and do a separate causation analysis as to each of those based upon what the scientific data showed, right?

A.    Many of the studies include

Page 457

multiple platforms, and I'm aware that many of the features are the same, and so where reviewing the data, I reviewed the data relating to social media, which included sometimes several platforms.

Q.    But what you did for your causation analysis is you put all the defendants together and all social media use together in a single analysis, and then did your causation assessment, right?

A.    I mean, I could go through each study and let you know which one have delineated which platform, but for my causation report, I am referring to the defendants when I refer to social media.

Q.    No, no, it's a different question.  You're answering something different than I asked.

A.    I'm sorry.  I'm meaning --

Q.    When you did your causation assessment, you didn't pick out data specific to any individual platform and do a causation analysis specific to that platform, did you?

MR. VANZANDT:  Objection, asked and answered.

CONFIDENTIAL

Page 458

A.    In the peer-reviewed data, I reviewed peer-reviewed studies assessing social media.  I also requested platform-specific defense documents, which I reviewed, or internal documents, rather, which I reviewed, and those became part of my opinion.

MR. DAVIS:  I'm sorry, that's not responsive, move to strike.

Reserve on it.

BY MR. DAVIS:

Q.    You didn't take, for example, in your causation analysis and look specifically at the data on TikTok to do your causation analysis, did you?

A.    The data that I used related to social media, and I don't know how to better answer this, Todd, than just to say that the studies that I used, some of them grouped social media platforms together on the basis of their commonalities, and others disaggregated specific platforms, like the TikTok study we just mentioned, and I additionally reviewed platform-specific documents that were made available to me.

Page 459

Q.    Could you -- like, based upon the data available, could you take each individual defendant's platform and look at data specific to its platform and do a causation analysis?

MR. VANZANDT:  Objection, vague and ambiguous.

BY MR. DAVIS:

Q.    Could do you that?

MR. VANZANDT:  Vague and ambiguous, calls for speculation.

A.    That's speculative.  I don't know what data you would be alluding to.

BY MR. DAVIS:

Q.    That data is not available to you?

A.    Are you talking about -- which data are you talking about?

Q.    I'm talking about looking at the individual studies and assessing specific platform data in each of those studies, and then doing a causation analysis specific to each platform.  Is that data available or not?

A.    The way that the data are

Page 460

published refer oftentimes to social media, and that includes several platforms.  And as I mentioned, when studies have reported findings relating to one or several platforms, I would report that.  I would include that.

But I feel like the features are similar, and certainly, my patients tell me about all of the same features as they apply to their own disease state, the exacerbation of their disease state, and that extends across platforms.

MR. DAVIS:  I move to strike as nonresponsive.  All right.

I'm going to turn the floor over to my colleagues who have some questions.  I'm going to reserve on my questions for two reasons.

One, the responsiveness issue that has happened throughout the day, and also, if there's time left in the defendants' time, then I may ask questions then.

MR. VANZANDT:  So I agree you can reserve your time.  I don't think

Page 461

there's any grounds to reserve based on the responsiveness of the questions.

THE STENOGRAPHER:  Go off?

THE VIDEOGRAPHER:  Go off? Okay.  We're now going off the record, and the time is 6:11 p.m.

(Recess taken, 6:11 p.m. to 6:14 p.m. PDT)

THE VIDEOGRAPHER:  We are now going back on the record, and the time is 6:14 p.m.

------------

EXAMINATION

------------

BY MR. JACOBS:

Q.    Dr. Murray, very nice to meet you.  My name is Evan Jacobs, and I represent YouTube.  So I'm going to -- I know it's been a long day.  We're getting towards the end. My questions are primarily going to focus on YouTube, but I'm going to try not to rehash anything that we've gone over before.

But we have very limited time, so I would just ask you to listen to my

116 (Pages 458 - 461)

CONFIDENTIAL

Page 462

questions carefully and try and answer them as directly as you can, okay?

A.    Sure.  And nice to meet you too.

Q.    Nice to meet you.

So it's been a long day.  We'll start with a softball.  Do you know what YouTube is?

A.    Yes.

Q.    Okay.  What is it?

A.    It is a social media platform where people interact with elements, content, videos, where specific features accompany those elements.  Sure.

Q.    It's a video-based platform, correct?

A.    Yes.

Q.    Okay.  It's not a photo-based platform, correct?

A.    That's correct, Evan, yes.

Q.    Are you familiar with the design features of YouTube?

MR. VANZANDT:  Objection, vague.

Go ahead.

Page 463

A.    What are you referring to?

BY MR. JACOBS:

Q.    Well, so, for example, at page 86 of your report, your April report?

A.    My April report, yes.

Q.    The last sentence before Section XI, you say:  In particular, specific design features of social media apps.

Do you see that?

A.    Yes, I see that.

Q.    Okay.  So under the definition of specific design features that you're using, are you familiar with the specific design features of YouTube?

A.    Yes.

Q.    Okay.  Which design features?

A.    Notifications, targeted algorithmic processing, likes.  Let's see.  What I would call rabbit-holing.  Did I mention notifications?

(Clarification requested by the stenographer.)

THE WITNESS:  I asked did I mention notifications.

If you bear with me, I will

Page 464

just refresh my -- I want to be comprehensive.

MR. JACOBS:  Sure.

(Document review.)

A.    There are more, Evan.  I think those are the top-of-mind ones right now.

BY MR. JACOBS:

Q.    I want to know all of them.

A.    Okay.

MR. VANZANDT:  He has an extensive report.

MR. JACOBS:  He should be prepared to talk about the design features that are central to his opinions.

MR. VANZANDT:  I understand.  You want to know his opinions.  But we have reports that you normally don't have in California state law.  I'm just letting you know that he has the report.

BY MR. JACOBS:

Q.    I'm asking you:  Which design features did you specifically look at YouTube in forming your opinions?

Page 465

A.    I think those are the -- those are the ones I would say, Evan.  Social comparison metrics, likes, targeted algorithms, the rabbit holes.  I think those are the ones I'm alluding to.

Q.    Okay.  So you gave four: notifications, algorithmic processing, likes and rabbit-holing.

No others that you can think of right now?

A.    I -- I can't think of -- those are the ones that come to top of mind right now.

Q.    So for those features, as far as your literature review, did you find any studies that specifically assessed a link between those four YouTube features and any mental health disorder?

A.    The data that I reviewed assessed all the features.

Q.    I'm looking at did any of them specifically isolate YouTube notifications to find -- to assess a link between YouTube notifications and any mental health disorder?

A.    I'm not aware of any study

117 (Pages 462 - 465)

CONFIDENTIAL

Page 466

parsing out notifications on YouTube. What I have seen is studies assessing the global features of YouTube and other social media platforms.

But, I mean, I can tell you -- as a clinical provider, I can tell you how YouTube notifications have detrimentally impacted my patients with regard to eating disorders.

MR. JACOBS: Move to strike everything after the first sentence that ends with "YouTube" as nonresponsive.

BY MR. JACOBS:

Q. Same question for algorithmic processing. Have you found any -- in your literature review, did you find any studies that specifically assessed YouTube's algorithmic processing and any mental health disorders?

A. I reviewed the peer-reviewed literature, and I reviewed some documents produced by YouTube. Which one are you -- are you referring to both bodies of evidence? I would --

Page 467

Q. I'm referring to scientific studies.

A. You're referring to scientific studies.

My understanding is that the studies did not parse out the --

Which feature did you say?

Q. Algorithmic processing.

A. -- the algorithmic specifically on YouTube that I can recall right now.

Again, what is more common in the scientific literature is that some of these platforms are grouped together, yeah. And again, I think my patients talk a lot about how they're sort of stuck in receiving this content that they don't search for.

MR. JACOBS: Move to strike everything starting with "again" as nonresponsive.

BY MR. JACOBS:

Q. Would your answer be the same for likes and rabbit-holing with respect to YouTube?

A. As I recall today, and I would want to be able to review my entire report, I

Page 468

think that the data assesses broadly either social media platforms or YouTube, and I'm not aware of studies that have parsed out any individual components of the features of YouTube that I can recall.

Q. I'm going to jump around a little so I want to talk a little bit more about your expertise.

A. Okay.

Q. You're not an expert in user interface design, correct?

A. No, I'm not an expert in user interface design, that's correct.

Q. And you're not an expert in user experience design?

A. I would agree, I'm not an expert in user experience design.

Q. You're not an expert in product development?

A. I would not state that I'm an expert in product development.

Q. You're not an expert in product testing?

A. I am not an expert in product testing.

Page 469

Q. You're not an expert on how product features are tested?

A. I'm not an expert in how these companies, social media platforms, test their features, no.

Q. You're not an expert in technical product development?

A. I would not say I'm an expert in technical product development.

Q. And you don't have training, experience or education as an engineer, correct?

A. That is correct.

Q. Okay. And you don't have training, experience or education as a software developer?

A. I do not have training as a software developer, or expertise.

Q. And you have no training, experience or education on how web features should be tested for efficacy, correct?

A. Can you repeat that? I'm sorry.

Q. Sure. You have no training, experience or education on how web features

118 (Pages 466 - 469)

CONFIDENTIAL

Page 470

should be tested for efficacy?

A. Efficacy in what respect?

Q. Whether the feature is working the way it's supposed to work.

A. Okay. I do not have expertise in that domain.

Q. Okay. So in -- on pages 159 to 165 of your April report -- can you turn there?

A. Sure. 1 --

Q. 159.

This is in the YouTube section of your report where you're talking about internal YouTube documents, correct?

A. Sure.

Q. Is that correct?

A. Yes. Yes.

Q. And here, at the bottom of page 159, you talk about a project at YouTube called Project VIBE, correct?

A. Uh-huh, yes.

Q. Okay. You're not offering any opinions about the design of VIBE?

A. I'm offering opinions based on the correspondence I saw that relate to the

Page 471

effects of matter related to social comparison in particular, and that was subsumed under Project VIBE, but I -- again, I'm not a software engineer. I...

Q. You're not opining on whether VIBE was effective or not?

A. It -- I have a -- I mean, that's evident in my report.

Q. You don't have an expertise to opine on whether VIBE is effective or not, correct?

A. I can read the data that I saw.

Q. You read internal documents and you repeated them in your report, correct?

A. I read internal documents. I considered them and they went to -- they supported the basis of my report.

Q. Okay. But you don't -- outside of what you read from the company, you have no expertise to tell whether what the company was doing was standard in developing a product or developing a new -- a new feature for its platform, correct?

MR. VANZANDT: Objection, vague.

Page 472

Go ahead.

A. Could you repeat that, Evan.

BY MR. JACOBS:

Q. So you don't have any expertise in the area to assess the development of Project VIBE and whether it would be effective or not, correct?

MR. VANZANDT: Objection, vague.

A. Again, I'm not quite sure what you're asking.

BY MR. JACOBS:

Q. Did you look -- when you were assessing Project VIBE, were you looking -- did you look at the amount of resources that were dedicated to it?

A. I reviewed a lot of documents. And I don't recall exactly every document. What I recall most about Project VIBE is this notion that there was some conversation around potentially impacting vulnerable use. That's what really stands out in my mind.

But I don't know those fully. I don't the extent to which that was acted on.

Page 473

Q. And in terms of how you went about finding the documents related to Project VIBE, did anybody ask you to look specifically and assess Project VIBE?

A. No.

MR. VANZANDT: Objection on that.

Just again, don't repeat any conversations you've had with counsel for plaintiffs.

THE WITNESS: Okay.

BY MR. JACOBS:

Q. So all the documents you found on Project VIBE were subject to the search that you ran and that you described earlier today with Mr. Davis, correct?

MR. VANZANDT: Objection, misstates testimony.

A. That's not --

BY MR. JACOBS:

Q. Well, strike that.

Earlier today you testified that the way you've collected -- you found internal documents was by running the same search terms that you did for your literature

119 (Pages 470 - 473)

CONFIDENTIAL

Page 474

review, right?

A. I testified earlier today that I asked for documents pertinent to my report, and I additionally performed a keyword search myself.

Q. Okay. So some documents were provided to you and some documents were based on a keyword search?

A. That -- that is my understanding, yes.

Q. Okay.

A. That's my recollection.

Q. For Project VIBE, were those documents provided to you or was that based on your keyword search?

A. I don't recall, but every document I got is what I asked for.

Q. Did you ask for documents that specifically talked about the resources that went into Project VIBE?

A. I asked for documents pertinent to the keywords in my report, and I got them, and I additionally performed searches myself.

Q. That wasn't my question.

Did you ask for documents that

Page 475

specifically talked about the resources that went into Project VIBE?

A. Again, I asked for documents relevant to my report, and then I wanted to take a peek myself and did a search myself.

The topics pertinent to my report were the psychiatric harms that I -- yeah.

Q. Did you ask to be provided with any documents that discussed the benefits of YouTube or any other social media platform?

A. Again, I did a keyword search myself. I asked for documents pertinent to my report. I can't recall, Evan, the specific documents that -- that came up.

Q. Okay. So you don't specifically recall requesting documents that discussed the benefits of social media platforms, correct?

A. I requested documents pertinent to my report, which included any impacts on psychiatric wellness, and I got a small spattering, and then I got a -- I did a keyword search myself.

MR. JACOBS: Okay. I'm going

Page 476

to object as nonresponsive and reserve. And I'm going to move on.

BY MR. JACOBS:

Q. So earlier today, do you remember discussions with Mr. Davis about a series of studies that were authored by Nagata and you that analyzed screen time modalities and their association with certain health conditions?

A. We discussed quite a few different studies by myself, and Jason is very prolific.

Q. Sure. Do you generally recall those discussions?

A. I recall some discussions around some of the papers, yes.

Q. Okay. And they were talking -- and the titles of those studies were screen time modalities and then a specific -- and then some type of health condition, correct?

A. We can -- can you point me to them?

Q. Sure. Let me give you one as an example.

A. Okay.

Page 477

(Whereupon, Murray-33, Contemporary Screen Time Modalities among Children 9-10 years old and Binge-Eating Disorder at One-Year Follow-Up: A Prospective Cohort Study, by Nagata et al, was marked for identification.)

BY MR. JACOBS:

Q. I'll mark this as Exhibit 33, and this is Contemporary Screen Time Modalities among Children 9-10 years old and Binge-Eating Disorder at One-Year Follow-Up.

A. Thank you.

Q. So all I'm asking now is the title of this article is Contemporary Screen Time Modalities, right? That's the title?

A. That's the title.

Q. Okay. What is a modality?

A. Gosh. Contemporary screen time modalities. I think that means the different methods of screen time or ways of accessing screen time.

Q. A modality is a different method of screen time?

A. That's how I understand it, the

120 (Pages 474 - 477)

CONFIDENTIAL

Page 478

different forms of screen time.

Q. Okay. And why in this study did you look at different forms of screen time as opposed to aggregating all the screen time together?

A. Let me read this study for a second, please, and I can tell you.

(Document review.)

A. Could you repeat your question, Evan. I'm sorry.

BY MR. JACOBS:

Q. Sure.

And why in this study did you look at different forms of screen time as opposed to aggregating all screen time together?

A. We -- I'm looking at the methodology here. This is the ABCD study, which is publicly available data that Jason and I collected ourselves. And we did collate some forms of social media platforms, and others were -- YouTube in particular is a social media platform that was disaggregated, it looks like.

Q. Well, you don't call YouTube a

Page 479

social media platform in this study, do you?

A. We -- in this study in 2021, it looks like here, Jason -- Jason and our group referred to YouTube as a streaming video service.

Q. Jason and you, right? You referred to it?

A. Yeah, I said Jason and our group, sorry. That was -- this was referred to in 2021.

Q. And you disaggregated YouTube from social networking sites, correct?

A. That's what is stated in this method section, yes.

Q. And you published a series of studies related to this data, correct?

A. We -- certainly we published several studies stemming from these data. I'm not confident that the way the data was sliced was equal in all the studies. I'd have to review them.

Q. Okay. So let's -- let's mark this as Exhibit 35.

(Whereupon, Murray-35, Screen Time and Obsessive-Compulsive Disorder

Page 480

Among Children 9-10 Years Old: A Prospective Cohort Study, by Nagata et al, was marked for identification.)

BY MR. JACOBS:

Q. This is titled Screen Time and Obsessive-Compulsive Disorder Among Children. And this is dated March 2023, correct?

A. That is dated March 2023, and that is called Screen Time and OCD Among Children 9-10 Years Old: A Prospective Cohort Study.

Q. So as late as March 2023, you were disaggregating the data the same way, correct?

You can look at page 4, Exposures: Screen Time.

A. Thank you.

(Document review.)

A. That's -- so this study measures YouTube, which is coded in this study as watching videos, and coded under social media is Facebook, Instagram, and Twitter.

BY MR. JACOBS:

Q. Would you agree that there are

Page 481

benefits to using YouTube?

MR. VANZANDT: Objection, vague.

You can answer.

A. I'm aware that many people use YouTube, and some, I'm sure, report benefits in some ways. I'm sure that other people report harmful effects.

BY MR. JACOBS:

Q. YouTube has educational content on it?

A. I'm aware of that.

Q. Adolescents can use YouTube, for example, to learn how to cook?

A. I would imagine that to be true.

Q. They can learn how to draw?

A. I imagine that to be true.

Q. They can use it to help with their homework?

A. Right.

Q. And teachers use -- utilize YouTube in school to help with assignments?

A. Right. Right.

Q. Did you consider any of the

Golkow Technologies,
877-370-3377        A Veritext Division        www.veritext.com

CONFIDENTIAL

Page 482

benefits of YouTube in reaching your opinions in this case?

A.    Again, I considered the data relating to social media platforms and that that, in my report, includes YouTube.

And I'm not saying that YouTube doesn't have potentially beneficial elements. What I'm saying is that it can also be very harmful.

Q.    Okay.

A.    And that's based on the data and my clinical experience and other forms.

MR. JACOBS:  Move to strike every -- starts -- move to strike everything after "beneficial elements" as nonresponsive.

BY MR. JACOBS:

Q.    So I want to just quickly go back to the Nagata studies that you were an author on.

A.    Okay.

Q.    So in those studies, you disaggregated YouTube from other social networking sites, correct?

A.    Say that again.  I lost you.

Page 483

Q.    In those studies, you disaggregated YouTube from other social networking sites.

A.    I mean, the broad --

Let me look at the analyses.  I think that they were coded differently.

The general study is looking at screen time, so I can -- I need to look at their results.  And, I -- I mean, they're clearly labeled differently in these studies. I don't know if they were analyzed separately or not.

I can review that, though, and let you know.

Q.    But in your analysis, in forming your opinions and what's in your report, you didn't disaggregate YouTube from any other social networking site, correct?

A.    I did not disaggregate YouTube from other social media platforms for several reasons.  One is because a lot of the studies -- there are many studies that assess YouTube as part of social media, and it's also my opinion that many of the features that I know to be harmful in my clinical

Page 484

experience extend to YouTube as well.

Q.    Okay.  Did you actually assess how many of the studies you cited included YouTube as part of their analysis?

A.    I don't -- I don't recall.

Q.    Is it more than half?

A.    Again, I don't --

MR. VANZANDT:  Objection, asked and answered.

BY MR. JACOBS:

Q.    You can't say?

A.    I can't say sitting here today.

Q.    And you didn't -- in your report, you didn't specifically call out every time a study was related to one social media platform specifically, that it was only related to that one social media platform, did you?

A.    Can you say that again?  I'm not sure that I agree.

Q.    In your report, you cited many studies and referred to social -- social media generally even when those studies only studied one platform.

A.    Again, there's a series of

Page 485

studies that combined different types of social media platforms, and it's my opinion that because the features are largely similar and because my patients describe the harms of these platforms in very similar ways, I group them together --

Q.    Okay.

A.    -- in my report.

Q.    Would you agree that the content presented on one platform is not necessarily representative -- representative of all social networking or web platforms?

A.    Would I agree that the content presented on one platform is?

Q.    Is not necessarily representative of the content available on other social networking or web platforms?

A.    That would depend.

Q.    I'll represent that's a statement you've made previously.

Does that sound right?

A.    I mean, I think it would depend.

Q.    But it -- do you recall making a statement that says that content presented

CONFIDENTIAL

Page 486

on one platform is not necessarily representative of all social networking web platforms?

A.    I don't recall making that statement. I'd like to look at it.

MR. JACOBS: Let's go off the record.

THE VIDEOGRAPHER: We're now going off the record, and the time is 6:39.

(Recess taken, 6:39 p.m. to 6:50 p.m. PDT)

THE VIDEOGRAPHER: We are now going back on the record, and the time is 6:50 p.m.

------------
EXAMINATION
------------

BY MR. MAJOR:

Q.    Good evening, Dr. Murray. My name is John Major. I'm a lawyer from the law firm of Munger Tolles & Olson. I represent Snap Inc. in this case.

Thank you for your time tonight.

Page 487

A.    Thank you.

Q.    You're not offering any opinions specific to Snapchat that aren't disclosed in your report; is that fair?

A.    Could you say that again? I'm sorry.

Q.    You're not offering any opinions specific to Snapchat that aren't disclosed in your report; is that fair?

A.    I'm offering opinions relating to social media platforms and their harms. I have other opinions that are not in my report because I consume science. I'm sure I can give you an opinion on any new science.

But in addition, and as I mentioned earlier, I have an opinion on some of the expert opinions that you folks have retained.

Q.    Did you review Nick Allen's report?

A.    I reviewed -- I don't recall the names, John, I'm sorry.

Q.    Sitting here today, you don't know of any specific rebuttal opinions you'd have to Dr. Nick Allen's report; is that

Page 488

fair?

A.    I think a lot of the -- my response to their reports are pretty similar. The two that I can recall, I mentioned by name. I know that my opinions extend to others. I just can't recall.

Q.    So you have no specific rebuttal opinions as to his report, beyond what we talked about earlier?

A.    Again, I have opinions we didn't talk about earlier. I mentioned, I think, at one point I maybe enumerated like several responses to the reports, but I can't recall right now. It's been a long day.

Q.    Fair enough.

I want to be sure that I understand all of your opinions that are specific just to Snapchat.

A.    Yeah.

Q.    Can you think of any opinions that you have that are specific to Snapchat sitting here today that wouldn't be covered in either your April 18 report or your May 16 report?

A.    Do you mind if I consult my

Page 489

report, John?

Q.    No problem.

A.    My opinion is based on evidence. It's based on some documents produced by Snapchat. The majority of my opinions are enumerated in my report.

Q.    And you can't think of any specific opinions that are particular to Snapchat that aren't in your report as you sit here right now today?

A.    Only the opinions relating to the expert reports.

Q.    Understood.

A.    Yeah.

Q.    So if your report is silent on a particular feature of Snapchat, you don't intend to offer any opinions about that particular feature at trial; is that fair?

A.    If my report is silent on one particular feature, again, I think that my -- my report pertains to sort of the platforms, which include all the features.

Q.    Okay.

A.    So if I've not mentioned one specific feature by name, a lot of the

123 (Pages 486 - 489)

CONFIDENTIAL

Page 490

studies just address the platform, they assess the platform, and that includes all the features.

MR. VANZANDT: Sorry, I didn't want to interrupt, but objection, vague, to the prior question.

Thank you.

BY MR. MAJOR:

Q. Let me get a little more specific.

Your report doesn't talk at all about Streaks. Are you offering any opinions about the Streaks feature on Snapchat?

A. I -- I mean, in my -- I can offer an opinion right now. I can tell you that many of my patients in the hospital where I work report feeling compelled to keep their streak alive. I've known people to be really, really dysregulated when they've lost their streak.

So yeah, that's my -- that's what I can share right now related to Snap Streaks.

Q. Is that anywhere in your report?

Page 491

A. I don't recall if it's in my report. I'm happy to share my opinion. I felt like you were asking me my opinion. I don't know if I should give this right now, but I can review my report.

Q. Do you personally have a Snapchat account?

A. I don't have a Snapchat account.

Q. Have you ever used the Snapchat app?

A. I don't ever recall using Snap.

Q. So as you sit here today, you don't believe you've ever used the Snapchat app?

A. I have reviewed it. I've used it for purposes of research, but I don't recall being an active Snapchat user.

Q. What do you mean by used it for purposes of research?

A. I sort of am obligated to understand more about what my patients tell me, and understand some of the features that they talk about, so I've sort of looked at it. I don't use an account that's just for

Page 492

me. That's kind of what I mean.

Q. Have you ever used a Snapchat lens or a filter?

A. I've never -- I can't recall using Snapchat.

Q. You talk in your report about lenses and filters that provide beautification-type features.

Do you recall that?

A. Yes.

Q. When did Snapchat start offering those types of features?

MR. VANZANDT: Objection, foundation.

A. John, I don't recall, sitting here today. I can obviously review that and share that. I don't recall when the features -- I don't exactly recall when the features across platforms coalesced and when they started to add in new features.

But if you want, I can review my document.

BY MR. MAJOR:

Q. Do you know how many Snapchat lenses or filters offer beautification-type

Page 493

technology?

A. How many Snapchat features -- can you say that again? I'm sorry.

Q. Sure.

Do you know how many Snapchat lenses and filters offer beautification-type functionality?

A. I'm not sure that I could tell you the precise number.

Q. Do you know the percentage?

A. Again, I'm not sure I could tell you the precise percentage today.

Q. Do you know a nonprecise percentage?

A. I can talk about the -- the way that my patients talk about them, they seem to be many-fold. I can't give you an exact percentage, though, John.

Q. And you've never -- you did not ask in connection with preparing your report for information about the percentage of Snapchat lenses and filters that offer beautification-type functionality; is that fair?

A. I'm saying I just can't recall

CONFIDENTIAL

Page 494

those data right now.

Q. Did you review that data in preparing your report?

A. I reviewed -- I mean, I reviewed a lot of data. I don't recall the precise data that I reviewed, and I certainly wouldn't feel confident in my memory to recount all of the data that I reviewed as part of this report.

Q. Let's look at Exhibit 6. Do you have that handy? It's your May 16th report. So it may be the one that's open in front of you actually. And I'm going to direct you to paragraph 158.

A. 158.

Q. Do you have it in front of you?

A. The one starting "Repeated exposure"?

Q. Yeah. It should say: Importantly, the design features of social media apps disproportionately expose those with eating disorders to harmful eating disorder content.

Do you see that?

A. I see that.

Page 495

Q. Are you aware that Snapchat moderates all content that appears on its algorithmic feed-type surfaces?

MR. VANZANDT: Objection, foundation.

A. Can you say a little more?

BY MR. MAJOR:

Q. Well, I'm asking you: Are you aware that Snapchat moderates all content that appears on its algorithmic feed content surfaces in its app?

MR. VANZANDT: Sorry.

Objection, vague and foundation.

You can answer.

A. I'm aware that people are exposed to features they find harmful. I'm not precisely able to recount the moderation features right now. I can just tell you that a lot of my patients still really suffer because of the content and because of the design features that give them stuff.

BY MR. MAJOR:

Q. Sure. And I'm asking you a very specific question.

Page 496

MR. MAJOR: I'll move to strike that as nonresponsive.

BY MR. MAJOR:

Q. Did you know that Snapchat bans content that promotes eating disorders?

MR. VANZANDT: Objection, foundation.

A. I think the -- I'm going to read my report, John, if that's okay.

BY MR. MAJOR:

Q. That's fine.

(Document review.)

BY MR. MAJOR:

Q. I'll represent to you there's nothing in those pages that says that. The question is just: Did you know that Snapchat bans content that promotes eating disorders?

MR. VANZANDT: Same objection.

You can answer the question.

A. Yeah, I'm not aware of how Snapchat filters its -- its content, other than to say that I'm aware that it's still rendering lots of my patients very impacted.

BY MR. MAJOR:

Q. Sure.

Page 497

What was your total income in 2024 just from all sources? Total income. I know it's hard. An estimate is fine.

MR. VANZANDT: Objection. That does get into some privacy issues in terms of his whole income, unless there's some overriding reason why you need to know that.

MR. MAJOR: It's the percentage of his income that comes from expert work, and you can't know that without knowing his income from all sources.

MR. VANZANDT: He can give a percentage, if he knows.

A. Sorry, I -- the short answer is I don't know.

BY MR. MAJOR:

Q. Can you give a rough estimate of your total income from 2024?

A. I -- yeah, I can't recall. I know that I transitioned from -- into several grants then, other projects. I don't recall.

Q. Can you estimate it within a couple hundred thousand dollars?

A. Sure. Probably, let's say --

125 (Pages 494 - 497)

CONFIDENTIAL

Page 498

gosh. I'm trying to tally it, but I don't want to misrepresent. Thank you for your patience.

It's hard to say. I'd say, you know, within a standard deviation of a couple hundred thousand, either way, I'd probably say, like, 350.

Q. So somewhere between 150 and 550, fair?

A. Right.

Q. Okay. Then your best estimate, you think, would probably be somewhere around 350, but between the --

A. That's a complete ballpark figure. That's an estimate on the spot.

Q. Sure.

A. And again, I'm not confident in that.

Q. Your opinion in this case -- and I'm just quoting from your report -- is that there's a clear causal connection between certain design characteristics of social media and an increased risk of eating disorders and body dysmorphia.

Is that a fair summary of your

Page 499

opinion?

Actually, I don't know where I'm quoting from, but I'm hoping it sounds accurate of your opinion.

A. Let me check. Could you restate your sentence and I will tell you --

Q. Yeah. Your opinion in this case, one of them, is that there's a clear causal connection between certain design characteristics of social media and an increased risk of eating disorders and body dysmorphia; is that fair?

A. That sounds accurate.

Q. Okay. Had you publicly expressed that view before you were hired as an expert in this case?

A. I had certainly talked about it with patients publicly. I had certainly talked about it with colleagues publicly.

I can recall sort of -- you know, lots of collegial conversations, conversations with trainees, conversations with parents.

I mean, I've published on this prior to being involved in this case as well.

Page 500

I've published some data in 2021 illustrating a prospective risk of eating disorder symptoms.

Q. Over the course of your career, you've done some news interviews; is that true?

A. Yes.

Q. Have you ever done a news interview where you told people that social media use causes eating disorders at any point?

A. I don't recall. I've done many news interviews. I don't recall.

Q. You don't recall doing that sort of news interview?

A. No, I don't recall the content of what every interview was.

Q. Can you, sitting here today, recall a specific news interview where you got on the news to warn people that social media use causes eating disorders, sitting here today?

A. I cannot recall that sitting here today. I've done a lot of different interviews.

Page 501

Q. Do you believe social media should be banned entirely?

MR. VANZANDT: Objection, calls for speculation.

You can answer.

A. It is my opinion that social media harms many children, many patients that I see on a day-to-day basis. I am not -- I'm not offering an opinion that it should be banned entirely.

BY MR. MAJOR:

Q. Thank you.

A. Yeah.

Q. I want to mark as Exhibit 36 a document -- a document with the Bates stamp SNAP0009825.

(Whereupon, Murray-36, E-mail(s) re: Chubby Face Lens Stakeholder Notification, SNAP0009825 - SNAP0009843, was marked for identification.)

BY MR. MAJOR:

Q. This is an internal Snap e-mail that you cite in your report.

A. Thank you.

126 (Pages 498 - 501)

CONFIDENTIAL

Page 502

Q.    You cite this on page 169 of the May 16 report.

Just looking at the subject line of the e-mail, this is an e-mail talking about the Chubby Face lens.

Do you see that, looking at the top of the first page?

A.    Yes, Chubby Face lens stakeholder notification.

Q.    You'd agree with me, this isn't publishable scientific evidence, right?

MR. VANZANDT:  Objection, foundation.

A.    Can I -- let me refresh my --

BY MR. MAJOR:

Q.    Take a look.

(Document review.)

BY MR. MAJOR:

Q.    Actually, why don't we do it this way.  Why don't you take a look at page 169 of Exhibit 6 -- that's your report -- paragraph 345.

A.    Yes.

Q.    And there you cite this document in support of the proposition that:

Page 503

Snap documents indicate the team tasked with creating lenses had a single-minded focus on growing Snap's metrics, even when lenses were harmful to users.

Do you see that in your report?

A.    Yes.

Q.    Let's walk through the document.  Let's look at -- and I'll point you to the most relevant portions here.

The beginning of the document talks about some complaints that were received about this lens before it was launched, I'll represent to you.

And then on the page ending with 9837, there's an e-mail towards the middle of the page that says:  Hi there, the user reports seem pretty concerning.  Several about triggering dysmorphia and fat shaming.  Seems to really go against the -- go against of values of supporting our community's well-being.

Do you see that?

A.    I see that.

Q.    And then if you turn back in the document to page 827, there's an e-mail

Page 504

from someone named ███████, who writes, among other things:  From the IDEA team perspective, I want to share that we're strongly opposed to this lens launching.

You see that?

A.    I see that.

Q.    If you turn back to page 826, an employee named ██████ writes:  Hi team, I wish was there was a world where this lens would not be considered fat shaming.  The fact is it will be.  It's a good, albeit painful, example of where we have to set our values against the uplift in DAUs.

Do you see that?

Towards the middle of the page there?  Have you got it?

A.    I see that, yes.

Q.    Do you understand DAU means daily active users?

A.    Thank you.

Q.    And then let's look a little bit further up the chain.  On December 20th, 2021, someone named, Nona Yadegar writes --

A.    It's on the same page?

Q.    On the page towards the top of

Page 505

the page.

A.    I see.

Q.    She says:  Victor shared the lens with some members of exec prior to the memo's completion, so we are going to pause on circulating written feedback until we have a newer version of the lens that may be suitable for distribution.  The lens will not be distributed as is.

Do you see that?

A.    I see that.

Q.    So at least based on what's written here, Snap decided not to launch this lens, right?

A.    I would need to read the entire -- reread the entire document.  I know you pulled out excerpts.  It appears to me that there's some concern about this lens being fat shaming.  There's debate about this, it looks like, from the snippets you read.

Q.    This is the sort of debate you would hope to see inside of a company, isn't it?

MR. VANZANDT:  Objection to

127 (Pages 502 - 505)

CONFIDENTIAL

Page 506

form.

A.   I mean, personally, I would like to see people unambiguously prioritizing the wellness of their users in a way that doesn't require this level of discourse and calibration against DAUs.  I think we ought to -- that's my sense.

BY MR. MAJOR:

Q.   You wrote in your report that this document was an example of the lenses team having a single-minded focus on metrics.

That's what you wrote in your report, right?

(Document review.)

A.   This is one of -- one or several sources cited in that point, but I see that in my report.

BY MR. MAJOR:

Q.   And what the document actually shows is that after discussion back and forth, that lens was not, in fact, launched; isn't that what the document shows?

MR. VANZANDT:  Objection, misstates evidence, misstates testimony.

Page 507

A.   To me what this shows is a clear understanding that this lens would be considered fat shaming, and there's a calibration against the potential impact on DAUs, at least from the excerpts you read.

BY MR. MAJOR:

Q.   I'll mark one more document here.

A.   Thanks.

Q.   I'll mark it as Exhibit 37.  It's a document Bates-stamped SNAP933703.

(Whereupon, Murray-37, Presentation, Connecting with Young People on Mental Health & Wellbeing, SNAP0933703 - SNAP0933735, was marked for identification.)

A.   Can I set that one aside?

BY MR. MAJOR:

Q.   Yeah you can set that one aside.

So you cite this study -- let me do it a different way -- well, I'm going to do it this way.

Looking at page 167 of your report, you cite this study as support for

Page 508

the proposition that Snap's internal studies confirm that negative body image was a top concern for its young female users, and depression and anxiety were top concerns for all users.

Q.   Do you see that in your report?

A.   Bear with me one second.

Q.   Last two lines, paragraph 341.

A.   Got it.

(Document review.)

A.   I see that.

BY MR. MAJOR:

Q.   And then if you turn to the page ending in 705, it's the third page of the slide deck here.  It says Research Objectives.

Do you see that?

A.   Uh-huh.

Q.   And the research objectives here were to understand how young adults think, talk about and approach mental health and well-being.

Do you see that?

A.   I see that sentence.

Q.   Then looking at the fourth

Page 509

bullet, another objective was to gauge young people's reaction to Snapchat engaging on mental health and well-being and identify ways for Snapchat to participate in the conversation in a way that feels appropriate and authentic to Snapchat.

Do you see that?

A.   I see that, too.

Q.   There's no mention here of this study gauging whether Snapchat caused anxiety or depression or any other mental health disorder, is there?

A.   There -- I would have to reread the entire document, John.  I can share with you that the excerpts you read are just small excerpts from a larger document.  I could refresh my memory.

Q.   And unfortunately, I have such limited time that I'll just ask you:  Sitting here right now, you don't know one way or another whether this study speaks to whether Snapchat causes mental disorders, or instead, whether Snap is thinking about how it might approach mental health and well-being.

You just don't know one way or

Golkow Technologies,
A Veritext Division

877-370-3377                                         www.veritext.com

CONFIDENTIAL

Page 510

another?

MR. VANZANDT: Objection, vague, foundation.

You can answer.

A.   I'm aware, based on a pretty exhaustive review of the literature and many documents more than this just one, that there are very harmful elements.

BY MR. MAJOR:

Q.   Are you done?

A.   Yes, sorry.

Q.   Sure.

And I'm asking just about this one specific internal document.

A.   Uh-huh.

Q.   This specific document does not speak in any way to whether Snapchat causes mental disorders; is that fair?

A.   Yeah, I would want to read -- I would want to read the whole document.

Q.   Take a look. I have one more minute, so I'll give it to you. Just take a look.

(Document review.)

///

Page 511

BY MR. MAJOR:

Q.   Dr. Murray, my minute is up. Based on what you've had a chance to review, you haven't seen anything indicating that this study speaks to whether Snapchat causes mental disorders, fair?

MR. VANZANDT: Objection, foundation.

You can answer.

A.   I haven't read the entire document. I'm just getting into some data -- getting to the data --

I saw the objectives, and oftentimes, the objectives are aspirational and not executed. I want to kind of get to the data and the action taken. I'd like to do that very much.

MR. MAJOR: Thank you, Dr. Murray. Let's go off. Take a break.

THE WITNESS: Okay.

THE VIDEOGRAPHER: We're now going off the record, and the time is 7:14 p.m.

(Recess taken, 7:14 p.m. to

Page 512

7:20 p.m. PDT.)

THE VIDEOGRAPHER: We are now going back on the record, and the time is 7:20 p.m.

------------

EXAMINATION

------------

BY MR. KENNEDY:

Q.   Good evening, Dr. Murray. Just to introduce myself, my name is Mike Kennedy. I'm with the firm of Covington & Burling, and I represent the Meta defendants.

A.   Okay.

Q.   Again, thank you for your time today.

Could you please turn to your April 18 report, page 137?

Are you there?

A.   I am.

Q.   This is the beginning of the section where you talk about certain Meta internal documents.

Do you see that?

By the way, how did you select the Meta internal documents you discussed in

Page 513

your April 18 report?

A.   I keyword searched.

Q.   You word searched Meta's production, document production in this case?

A.   I -- yeah, the documents that I got were either documents that I asked for pertinent to this -- to the domain of my report or documents that I had searched for.

Q.   Okay. So you did a search of Meta's document production in this case using keywords? I'm not talking about the literature. I'm talking about Meta's internal documents.

A.   Yeah. Yeah.

Q.   Did you disclose the keywords you used in your report? I don't recall seeing those.

A.   No. No.

Q.   Okay. Do you have --

A.   Sorry, go ahead.

Q.   Do you happen to remember any of those keywords?

A.   Not as I sit here right now. Unfortunately, I don't. I can...

Q.   But your testimony is that you

CONFIDENTIAL

Page 514

decided which of the many, many documents Meta has produced in this litigation that were worth discussing in your report?

A. Yes.

Q. Were there any documents you reviewed from Meta's document -- internal documents that you decided were not worth discussing in your report?

A. There were documents that I sort of screened. If they were relevant, I read more. If they didn't seem relevant, I would exclude them and not include them.

And then additionally, I sort of stopped -- when I got to a saturation point, I stopped searching.

Q. How do you define relevance in this context?

A. If it was related to the -- if it was related to what I was writing about, then trying to understand.

Q. What were you writing about?

A. I was writing about how social media platforms can harm young people with eating disorders and related disorders.

Q. Did your review of Meta

Page 515

internal documents involve searching for documents about how social media platforms could benefit their users?

MR. VANZANDT: Objection, foundation.

You can answer.

A. My review of the internal documents included terms that I believe would have been subsumed under, that would have included documents irrespective of their effect, I believe.

BY MR. KENNEDY:

Q. Effect on what?

A. Effect on constructs related to my report. I didn't search for negative effect on body image. I would just search body image, for instance. So there's a lot of documents and there were a lot of search hits and...

MR. KENNEDY: Okay. I ask that the searches he performed on Meta's internal documents and keywords and so forth be produced.

I don't think they're in the report.

Page 516

MR. VANZANDT: Okay. We'll take that under consideration.

BY MR. KENNEDY:

Q. So if you look at the bottom of page 137, you're talking about the different Meta platforms. And I'm looking at the last paragraph, it says, quote: These platforms consist of a number of features.

Let me stop there.

So in context, "these platforms" refers collectively to Instagram and Facebook; is that right?

A. That is -- that's my understanding, yes. That's how I would have used that term, yes. This is about Meta. This would have included Facebook and Instagram, yes.

Q. Now, this paragraph goes on to page 138, and you refer to a number of features that Meta either pioneered or adopted from other platforms, and I counted eight features that you identify in this paragraph, which are: Like, Stories, Reels, Augmented Reality filters, endless scroll, auto-play, algorithmic aggregation and

Page 517

notifications.

You're welcome to read the paragraph to yourself, but can you confirm that those are the eight Facebook or Instagram features that you identify in your report?

(Document review.)

A. Those are the features identified here.

BY MR. KENNEDY:

Q. And those are the only eight features of Facebook or Instagram about which you formed any opinions for purposes of this litigation, correct?

A. Those were -- those were some features. I --

Q. Well, what are the others?

A. Let me see.

(Document review.)

BY MR. KENNEDY:

Q. Let me do it this way.

Sitting here today, you can't think of any other Instagram or Facebook features, other than the eight enumerated in this paragraph, that -- about which you

130 (Pages 514 - 517)

CONFIDENTIAL

Page 518

formed opinions for purposes of this litigation, correct?

A. Those are -- those are -- yeah, those are the features that I would have considered amongst the data.

Q. Okay.

A. The peer-reviewed data, that is.

Q. Now, you testified a few minutes ago that you did an exhaustive review of the literature concerning social media and its effect on mental health.

Is that a fair statement?

A. Uh-huh.

Q. And in that exhaustive review, you didn't identify any literature that isolated the effect of any one of these eight features on negative mental health impacts, correct?

A. The way that the data -- the peer-reviewed data are shared and curated and analyzed and published assess the effects of social media sort of taken together. I'm not aware of any study that has sort of isolated out one feature and reported on that.

Page 519

Q. So you're not aware of any data that isolates the effect on negative mental health impacts in children attributable to any particular Instagram or Facebook feature, correct?

A. Are you talking about in the peer-reviewed data?

Q. I'm talking about anything you reviewed for purposes of forming your opinions in this case.

A. Yeah, I am aware how some of the conversations within Meta expressed concerns about some features, and there appeared to be some data substantiating the concern that folks shared. I recall that.

Q. So let's -- let's exclude internal documents.

Are there -- is there any literature from your systematic review of the literature that isolated the effect of any particular Instagram or Facebook feature on any particular negative mental health impact?

A. I -- let me -- would you allow me to glance at this to --

Q. I have very limited time, but

Page 520

sitting here today, you can't remember any literature that isolates the effect of any particular Instagram or Facebook feature and connects it to a negative mental health impact?

A. I am recalling a study about likes. And I would like to try to look it up -- pardon the pun -- but that's what I'm recalling.

I'm not quite sure if it's on Meta. I think it is, but that's one that comes to the top of my mind as I sit here now.

Q. Can you remember any other study that isolates the effect of a particular Instagram or Facebook feature and connects it to any negative mental health impact?

A. Again, given that the vast -- given that the majority of studies assess the effects of social media broadly, I can't remember other studies that -- in addition to that one study, which has isolated independent components of Instagram or Facebook.

Page 521

Q. So the literature you reviewed, it just evaluates the effect of social media generally, not a particular feature or features versus content, correct?

MR. VANZANDT: Objection, compound.

A. The -- just, could you restate your question?

BY MR. KENNEDY:

Q. So the literature you reviewed is part of your exhaustive systematic review, it just -- that literature just evaluates the effect of a social media platform generally, not isolating a particular feature and that feature's effect or -- feature's effect versus content's effect on mental health, right?

A. That's a long question. Can I take that into -- I may need more caffeine, I'm sorry.

Q. Okay. There -- you can't think of any literature --

A. Uh-huh.

Q. -- that isolates negative mental health impacts from a particular

131 (Pages 518 - 521)

CONFIDENTIAL

Page 522

feature of Instagram or Facebook?

A. Thank you for rephrasing that question.

I can recall broad studies that assess broad social media features, and I can recall many conversations with my patients talking about individual features and how they harm my patients.

But I don't recall independent studies now segregating out features of the social media apps other than the one that's on the tip of my tongue relating to likes.

Q. Conversations with your patients, none of those are disclosed in your report, correct?

A. They -- conversations with my patients are not disclosed in my report, that is correct.

Q. Yeah, your opinions in this case are based on your literature review, not conversations with your patients, right?

MR. VANZANDT: Objection, misstates testimony and misstates evidence.

A. I mean, my opinions in this

Page 523

case are based on a multitude of factors, including my literature review, my review of documents, my training as a scientist and my role as someone who treats these disorders.

BY MR. KENNEDY:

Q. But you haven't disclosed those conversations with your patients in your April 18 report, correct?

A. I haven't disclosed conversations with my patients.

Q. So I have no way of testing, you know, the probative value of those conversations, correct?

A. And I am bound by HIPAA laws to also not disclose protected health information of the patient. But I accept that there's no conversations with my patients that are depicted in this report. It is --

MR. VANZANDT: That doesn't stop you from asking him generally what conversations he's had without violating HIPAA.

BY MR. KENNEDY:

Q. I'd like to mark as Exhibit 38

Page 524

a document with the Bates numbers META3047MDL-040-00593105. And I'll hand it to the witness.

(Whereupon, Murray-38, E-mail(s) re: Collaboration Review Submission Confirmation, META3047MDL-040-00593105, was marked for identification.)

A. Thank you.

BY MR. KENNEDY:

Q. And you recognize this document, right?

A. I have reviewed a lot of e-mails.

Q. All right. So it's cited on page 138 of your expert report, and it's cited in connection with the following, where you write, quote: As early as 2018, Meta commissioned a literature review to study the effects of selfie manipulations on adolescents, unquote.

Did I read that correctly?

A. Yes, you did. As early as -- yes, you did.

Q. And if you look at

Page 525

footnote 330, it's the same document I just handed you.

A. Yes.

Q. Now, if you look at Exhibit 38, this study wasn't commissioned to study the effects of selfie manipulations on adolescents, correct?

A. Let me reread this.

(Document review.)

BY MR. KENNEDY:

Q. Rather, it was -- well, I'll let you read it. Let me know when you're finished.

A. Thank you.

(Document review.)

A. Okay. I've seen this.

BY MR. KENNEDY:

Q. Now, this study was not limited to studying the effects of selfie manipulations on adolescents, correct?

MR. VANZANDT: Objection, foundation.

You can answer.

BY MR. KENNEDY:

Q. In fact, if you look about

132 (Pages 522 - 525)

Page 526

halfway down the statement of scope it says, quote: Understand who is most likely to engage in body-altering photo techniques, unquote.

Do you see that?

Then it goes on to state: Also understand who is most likely to be negatively impacted by using body-altering photo techniques and viewing body-altered photos, unquote.

A.    Uh-huh.

Q.    So this study was not intended to focus just on adolescents. It was focused on the general population, right?

A.    It doesn't specify.

It does specify that one of the stated points in the scope of research is to understand who is most likely to engage in body-altering photo techniques, which I would understand to be adolescents rather than -- I think that would be my understanding, but it doesn't say either way.

Q.    But Meta's understanding did not refer to adolescents. It just referred they want to investigate who might be most

Page 527

affected, right?

A.    That's correct. That's what it says.

Q.    I'd like to mark as Exhibit 39 a document with Bates number ending in 376297.

(Whereupon, Murray-39, November 2018 Consequences and Implications of Selfie Manipulation: Literature Review, META3047MDL-014-00376279 - META3047MDL-014-00376305, was marked for identification.)

BY MR. KENNEDY:

Q.    And, Dr. Murray, do you recognize this as the literature review from 2008 [sic] that resulted from the e-mail we just looked at?

A.    I'd like to pull up the file from this e-mail.

Q.    You can also refer to page 137 of your -- I'm sorry, 138 of your report --

A.    Okay.

Q.    -- where you cite to the document I just handed you.

Page 528

A.    Okay.

Q.    Now, you cite this literature review for the proposition that, quote: This literature review concluded that "findings to date suggest selfie manipulation exacerbates risk and maintenance of several mental health concerns, including body dissatisfaction, eating disorders and body dysmorphic disorder cross culturally," unquote.

And I'm reading from page 138 of your report.

I'd like to direct you to the first page of this literature review, second paragraph, where it says, quote: Although research examining selfie manipulation is in its infancy, unquote.

Do you see that?

A.    I see that paragraph, yes.

Q.    And this is -- that phrase appears right before the portion of the literature review you quoted in your report.

Do you see that?

A.    I see that.

Q.    Now, do you agree -- do you agree with the proposition that as of

Page 529

November 2018, research examining selfie manipulation is in its infancy?

MR. VANZANDT: Objection, foundation.

A.    I -- I would like to review the data, review the studies, and in particular, look at the time of publication. I can't give you a snapshot answer of a timeline off the top of my head after so many hours of being here today.

BY MR. KENNEDY:

Q.    No, I understand. But you're relying on this literature review as demonstrating something about Meta's social media platforms, right?

A.    I'm considering these documents.

Q.    So if you're considering that the conclusions of this literature review are valid but you may be disagreeing with the proposition that the selfie manipulation research was in its infancy; is that right?

A.    What I'm saying is to be able to support or refute that particular sentence

CONFIDENTIAL

Page 530

whether selfie manipulation was in its infancy, I would just want to refer myself back to the data that I used, and I could give you an opinion on that.

Q. Well, if the research was in its infancy, doesn't that suggest an inherent limitation on the probative value of this literature review?

MR. VANZANDT: Objection, foundation, calls for speculation.

You can answer.

A. I'm just simply saying I would like to review the timeline of this particular feature.

BY MR. KENNEDY:

Q. Now, the literature review could not determine causality of photo investment in selfie manipulation leading to body dissatisfaction and eating disorder symptoms, right?

A. My literature review, you mean?

Q. No, the 2018 literature review that Meta did that you're relying on.

A. Could you restate your sentence, please?

Page 531

Q. So this study didn't demonstrate causality between selfie manipulation on the one hand and body dissatisfaction and eating disorder symptoms on the other hand, correct?

A. I would like to read the document again, but I'll point you to the statement that findings to date suggest it exacerbates risk and maintenance of several mental health concerns, including body dissatisfaction, eating disorders and BDD.

Q. Well, could you go to page --

MR. VANZANDT: Stop. Don't interrupt.

Were you finished answering?

THE WITNESS: Sure.

BY MR. KENNEDY:

Q. So if you could go to the page ending in 6300, which I think is page 4 of the literature review.

A. Got it.

Q. Okay. And if you look about halfway down the page, the first full paragraph, maybe six lines from the bottom, the literature review says, quote: Although

Page 532

the study cannot determine causality, findings indicate that photo investment and selfie manipulation may, at the very least, perpetuate body dissatisfaction and eating disorder symptoms among those already struggling.

Do you see that?

A. I see that.

Q. So in forming your opinions concerning this document, Exhibit 39, did you consider the fact that the literature review itself disclaimed any finding of causality?

A. I mean, I considered the review and I considered peer-reviewed data as well. I weighted the -- I weighted the evidence and I considered this.

Q. You considered the fact that this literature review didn't find causality?

MR. VANZANDT: Objection, foundation.

A. I considered this document, and I considered the peer-reviewed data and other documents --

BY MR. KENNEDY:

Q. But you --

Page 533

A. -- in forming my opinion.

Q. You didn't discuss this aspect of the literature review in your report, correct?

A. I didn't repeat the entire literature review back in my document. I tried to summarize.

Q. All right. One more document. Exhibit 40 is a one-page document with identification numbers ending in 360058.

(Whereupon, Murray-40, E-mail(s) re: Message Summary, META3047MDL-014-00360058, was marked for identification.)

A. Thank you.

BY MR. KENNEDY:

Q. Do you recognize this document?

A. I reviewed a lot of e-mails.

Q. If you go to page 138 of your report, you cite it for the proposition that, quote: Internally, Meta's Vice President of Product Safety and Responsible Innovation stated that, quote, "it seems patently obvious that phone usage, selfie culture and photo editing are contributing to anxiety,

134 (Pages 530 - 533)

CONFIDENTIAL

Page 534

depression and body dysmorphia," unquote.

I was reading from halfway down page 138 of your report.

A. Yeah.

Q. I'd like to ask about another part of this document that you didn't quote in your report, where the same person, ███████████ [sic] says, quote: Even though no causal effect is evident from existing research between screen-based activities or the amount of the time spent using screens and any particular negative effect, it does not mean that there's no effect. It is still wise to take a precautionary approach. This needs to be balanced, however, against the potential benefits that CYP can derive from their screen-based activities.

Do you see that?

A. I see that.

Q. Now, you didn't cite that passage from this document in your report, correct?

A. No.

Q. In forming your opinions in

Page 535

this case, you didn't weigh any potential benefits of Meta's platforms against any potential drawbacks of Meta's platforms, correct?

MR. VANZANDT: Objection, misstates testimony.

A. I'm not sure that's true.

BY MR. KENNEDY:

Q. So you -- nowhere in your report do you discuss the benefits that can be provided by Instagram or Facebook; is that right?

A. I mean, just going back to this document, this person is saying in the two separate incidents you mentioned that this does not mean that there's no effect, and then goes on to share some other concerns in addition to the concern quoted here.

Q. Yeah, and one more thing. She also refers to no causal effect is evident from existing research between screen-based activities or the amount of time spent using screens and any particular negative effect.

Do you see that?

Now, of course, screen-based

Page 536

activities is a much broader universe of activities than just using Instagram or Facebook, right?

MR. VANZANDT: You have to answer out loud.

A. Sorry. That's how I would understand it.

BY MR. KENNEDY:

Q. And, you know, you can do a lot of other things with a screen other than use social media, correct?

A. That's correct.

Q. So even research concerning screen-based activities would capture a lot of activity that is not relevant to your opinions in this case concerning the potential harms of social media, right?

MR. VANZANDT: Objection, vague.

You can answer.

A. Studies of screen time, if they include social media, would be relevant, and I agree that some facets of screen time do not relate to social media.

///

Page 537

BY MR. KENNEDY:

Q. And your reports do not suggest any methodology for excluding screen time not involving social media from screen time that does involve social media, correct?

A. You lost me a little bit.

Q. So you're -- in your -- in forming your opinions in this case, you had no way to isolate screen time that related to using social media from screen time that didn't relate to using social media, correct?

A. Some of the studies, as I mentioned earlier, did separately study screen time versus social media.

Q. But some of them didn't, correct?

A. Some of them didn't. And I would still hold the opinion that if a study of screen time includes social media, that's relevant information to consider.

MR. KENNEDY: I move to strike everything after the words "Some of them didn't."

I'll -- that's all the questions I have for you today. I

135 (Pages 534 - 537)

CONFIDENTIAL

Page 538

associate myself with the concerns Mr. Davis raised about the responsiveness of your answers and how it ate into our time today, but with that, I'll pass it back to Mr. Davis.

THE WITNESS: Okay.

MR. DAVIS: How much time is left?

THE STENOGRAPHER: We're at 8 hours, 18.

MR. DAVIS: I've got 12 minutes.

THE WITNESS: Can we take a break?

MR. DAVIS: Yeah.

THE VIDEOGRAPHER: We're going off the record, and the time is 7:46 p.m.

(Recess taken, 7:46 p.m. to 7:53 p.m. PDT)

THE VIDEOGRAPHER: We are now going back on the record, and the time is 7:53 p.m.

///

///

Page 539

------------

EXAMINATION

------------

BY MR. DAVIS:

Q.    All right, Dr. Murray. I only have a handful of questions left in the time that the defendants are allotted. So if you could turn to Exhibit 5, which is your April 2025 report, and the first tab, that blue tab that I have there for you on page 70. Right?

On page 70, you specifically identify which studies you're claiming support a dose-response relationship between eating disorders and social media use, correct?

A.    I -- I identify a finding that states that more social media accounts amongst adolescents and the relationship between more time spent on social media and this sort of concomitant endorsement of eating cognitions and disordered eating.

MR. DAVIS: I'm sorry, that's not responsive to my question. Move to strike.

Page 540

BY MR. DAVIS:

Q.    Page 70 you say: Moreover, a dose-response is evident.

Right? Do you see that?

This paragraph is talking about your claim that there's a dose-response effect between social media use and eating disorders, right?

A.    Yes, I see a dose-response is evident.

Q.    Right.

And then you cite two studies for that support, down in foot -- footnote 141. One is Dahlgren, and the other is Wilksch, right?

A.    Those are two studies mentioned here, yes.

Q.    And those are the two that you identify, right?

A.    Those are two that I identify here.

Q.    Okay. Let's go -- let's go to Exhibit 41.

(Whereupon, Murray-41, Further evidence of the association between

Page 541

social media use, eating disorder pathology and appearance ideals and pressure: A cross-sectional study in Norwegian adolescents, by Dahlgren et al, was marked for identification.)

BY MR. DAVIS:

Q.    Right? That's the -- that's the Dahlgren 2024 study that you cite, correct?

A.    I believe so.

Q.    Yeah. It says in the title it's a cross-sectional study, right?

A.    It says a cross-sectional study in Norwegian adolescents.

Q.    Correct.

If you go to the Wilksch 2022 study that's marked as Exhibit 42.

(Whereupon, Murray-42, The relationship between social media use and disordered eating in young adolescents, by Wilksch et al, was marked for identification.)

BY MR. DAVIS:

Q.    Are you there?

Wilksch is the other study that

136 (Pages 538 - 541)

CONFIDENTIAL

Page 542

you cite for the claim of a dose-response effect with eating disorders and social media use, right?

A. That's one other study that I cite.

Q. Right? If you turn to page -- I've got it dog-eared for you. I dog-eared a page in the Wilksch study, okay?

If you go to page 104.

A. There's no dog ears here.

Q. Page 104, right?

You've got a highlighted sentence there that reads: The current study was cross-sectional and exploratory in nature, thus preventing conclusions about causation.

Did I read that correctly?

A. You read that correctly. And I think what I'm alluding to here in terms of a dose-response is that a greater number of social media accounts is associated with higher disordered eating.

MR. DAVIS: Move to strike, nonresponsive.

BY MR. DAVIS:

Page 543

Q. I'm simply asking you: This is a cross-sectional study where they say that causality can't be inferred, correct?

A. They say here that this is a cross-sectional study and exploratory in nature, and that causation -- thus preventing conclusions about causation.

Q. Okay. So let's go to page 107 in your report here.

A. Gotcha.

Q. Page 107, top bullet, you there talk about a study that has illustrated a dose-response effect with respect to social media and depressive symptoms, correct?

A. Yes.

Q. And in support of that, you cite two studies in the footnote, correct?

A. I cite two studies here.

Q. And those two studies are the Lin 2016 and the Primack 27 [sic] study, correct?

A. In addition to the Nagata study that I already mentioned today.

MR. DAVIS: Move to strike, nonresponsive.

Page 544

BY MR. DAVIS:

Q. Dr. Murphy -- excuse me, Dr. Murray.

A. That's okay.

Q. Please, my question was simply: In your report, you cite two studies to support your claim about a dose-response effect with depressive symptoms. They are Lin and Primack, correct?

That's all I'm asking about, what's in your report.

A. Can I -- I want to answer it.

Q. Please answer my question, not some other question.

A. I -- in making the conclusions here, I rely on the studies included in my report. These are two studies that I cited here, and I mentioned another one that we've already discussed today.

But those are the two studies, it looks like, that I cited here.

(Whereupon, Murray-43, Association Between Social Media Use and Depression Among US Young Adults, by Lin et al, was marked for

Page 545

identification.)

(Whereupon, Murray-44, Use of multiple social media platforms and symptoms of depression and anxiety: A nationally representative study among US young adults, by Primack et al, was marked for identification.)

BY MR. DAVIS:

Q. Okay. Over here, for Exhibits 43 and 44, are in fact the Lin and Primack studies you cite, correct?

A. Correct.

Q. Yes?

A. Correct.

Q. Go to page 328 of the Lin study.

You see I've got a highlighted sentence there, right?

A. Yes.

Q. It says: Because our data was cross-sectional, the directionality of association is not clear.

Did I read that correctly?

A. You read that correctly.

Q. This -- the Lin study is a

137 (Pages 542 - 545)

CONFIDENTIAL

Page 546

cross-sectional study, right?

A. You read that correctly, it is a cross-sectional study.

Q. Okay. And then if you go to Exhibit 44, which is the Primack study, and turn to page 7.

I've got a highlighted sentence there for you. It says, under Limitations: As discussed above, our data was cross-sectional.

Did I read that correctly?

A. You read that correctly. And it's standard language to list limitations of a study when one publishes it.

MR. DAVIS: I literally have not asked you that question.

BY MR. DAVIS:

Q. Dr. Murray, no doubt that the Primack study is a cross-sectional study as well, right?

Primack. Not Lin, Primack.

A. I'm sorry.

This appears to be a nationally representative cross-sectional study.

Q. Okay. Can you identify --

Page 547

other -- I know you mentioned -- let me back up.

All the studies that you cite for the claim of a dose-response effect with respect to depressive symptoms or eating disorders that are -- that's identified in your report are cross-sectional studies, right?

A. Again, some of the studies I've spoken about today are not cross-sectional studies. They are longitudinal studies. And some of the studies I report are cross-sectional.

MR. DAVIS: Objection, move to strike, nonresponsive.

BY MR. DAVIS:

Q. You're not -- you only identify in your report a dose-response effect for eating disorders and for depression symptoms, right?

A. I indicate a dose-response effect where I think it's appropriate to conclude that.

Q. So say, for example, you're not claiming that there's a dose-response effect

Page 548

between social media use and anxiety symptoms or anxiety-related disorders, are you?

A. I'd have to review my report to refresh my memory of the data, but as regards to this particular question around depression, I'm indicating a dose-response relationship.

Q. Can you identify any study sitting here today that establishes a dose-response effect between social media use and anxiety or anxiety-related symptoms?

A. I can't recall off the top of my head as I sit here.

Q. Can you identify any study on social media use that you claim establishes a dose-response effect between social media use and suicidal thoughts or behavior?

A. I'm recall -- I'm remembering the study that came out just a couple of days ago, which I think shows, again, a third of adolescents in this country, a third of 12-year-olds, have addictive social media behavior, and that is prospectively linked with depression. And I need to revisit that to ascertain if it's a dose-response or not.

Page 549

I think it is.

Q. Okay. Sitting here today, you don't know whether that study that you just mentioned is, in fact, a dose-response?

A. I would need to refresh my memory. Sitting here today, I can't remember right now.

Q. And there's certainly no study in your report where you discuss a dose-response effect between suicidal thoughts and behavior and -- and suicidal thoughts or behavior, right?

Excuse me. There's no study in your report that you discuss a dose-response effect between suicidal thoughts and behavior and social media use, right?

A. Again, I want to make sure that I'm accurate here.

I can't recall right now, Todd, in the interest of --

Q. You don't know of one today, do you?

MR. VANZANDT: Objection, asked and answered.

A. I can't recall.

138 (Pages 546 - 549)

Page 550

BY MR. DAVIS:

Q. Okay. The other thing is can you identify any scientific authority, publication, treatise, whatever you want to identify, that's scientific in nature that says that you can use cross-sectional data to establish a dose-response effect?

A. I mean, for that, I'm relying on my training, my understanding of, again, NIH-level expertise. You can -- cross-sectional data with correct analyses can be used to support a dose-response relationship.

MR. DAVIS: Objection, move to strike, nonresponsive.

BY MR. DAVIS:

Q. This is a very straightforward question, Dr. Murray. Can you identify any scientific authority, whether it's a publication, a treatise, or anything else that says that you can use cross-sectional data to establish a dose-response effect?

MR. VANZANDT: Objection, asked and answered.

A. Again, I -- when you're talking

Page 551

about an authority, I would hold the NIH to be an authority, and I sit on study sections with other experts and review studies that purport to have a cross-sectional aim for analyses -- sorry, a dose-response analyses and cross-sectional data with proper analyses.

BY MR. DAVIS:

Q. I'm not asking for conversations that you've had with people. I'm asking for someplace that you can point to in the scientific literature in the whole worldwide, that exists, right?

Anything that exists, it's written down, where it says that you can use cross-sectional data to support a dose-response effect?

A. I can't recall right now.

Q. Okay.

A. I can't recall.

Q. You don't know of one today?

MR. VANZANDT: Objection, asked and answered.

A. I don't recall.

///

Page 552

BY MR. DAVIS:

Q. Is that your best answer?

A. That's the answer I can offer. I am sure if I were afforded more time, I could look at where these conversations at NIH emanate from and who supports them. But as of right now, I don't recall.

Q. Dr. Murray, any opinions that you will offer at trial that are not discussed in your reports or that we haven't covered here today in deposition?

MR. VANZANDT: Objection to the extent that he laid out opinions earlier related to the defendants' reports that you never revisited.

MR. DAVIS: Joe, my question specifically included the deposition today.

BY MR. DAVIS:

Q. Do you remember my question?

A. Could you rephrase it?

Q. Any opinions that you will offer at trial that are not in your expert reports or that we haven't covered here in your deposition today?

Page 553

A. Yes, probably.

Q. You're going to have opinions -- you're going to have different opinions or new opinions at trial?

MR. VANZANDT: Objection, misstates testimony.

A. I would consider -- I consider science as it comes out. I would also like to review again any expert documents that your team produces.

But outside of just continually assaying the database and the science --

BY MR. DAVIS:

Q. I'm not asking about that. I think you're mis- -- sitting here today, do you know of any opinions that you will offer at trial that are not in your two reports or that we haven't covered in your deposition today?

A. I -- I mentioned I will probably have an opinion on some of the expert reports that your experts have rendered, the defendants' experts have rendered.

It's possible that new science

CONFIDENTIAL

Page 554

comes out pertinent to this that would be relevant.

Q. Okay. Sitting here today, you haven't read those expert reports to tell us what those opinions are, right?

A. I tried to articulate earlier what some of my thoughts were, and I did state that if any questions you have come up, I'm sure I'll be able to articulate further thoughts.

Q. So there may be some opinions about expert reports -- of the defendants' expert reports that you may offer at trial that we haven't discussed here today?

A. I -- I'm not sure that I've recalled all of my thoughts about the expert reports today.

Q. This was my opportunity to ask you the questions. Do you know of any other opinions about the defendants' expert reports that you plan on offering today as you sit here right now?

MR. VANZANDT: Todd, to be fair, number 1, I've let you go over a little bit.

Page 555

Number 2, he gave you a whole bullet point list earlier to which you said you would go back and explore further, which you never did. So...

MR. DAVIS: Well, that's not right, Joe.

MR. VANZANDT: You didn't.

MR. DAVIS: I did.

MR. VANZANDT: You asked him details on one.

MR. DAVIS: Joe, that is so not right. He listed out several things on his opinions. I asked him in every topic I went through about those rebuttal opinions. Every single one was touched on. I got them all. Okay?

MR. VANZANDT: I disagree.

MR. DAVIS: He expressed them.

BY MR. DAVIS:

Q. So my opinion [sic] to you is: Dr. Murray, sitting here today, do you know of any opinions about the defendants' expert reports that you have that you haven't told us about?

Page 556

A. I have mentioned some of the opinions I have. It's unclear if I recalled all of the opinions I had. It's a pressurized situation. I'm trying to remember the criticisms I had.

Q. I'm just asking if you know of any other opinions about the defense expert reports sitting here today that you haven't told us about. That's all I'm asking.

MR. VANZANDT: You can answer the question, and then we're done.

A. I don't know.

MR. DAVIS: Okay. No, just a second.

Defendants are reserving their right because of the consistent pattern of behavior today with the witness just not answering the question. We were patient throughout the whole day trying to get answers, had questions and insistence about having breaks so that this could be resolved.

We're reserving our right to bring Dr. Murray back, and that -- and

Page 557

to ask him -- to have additional time with him in order to be able to answer the questions that were put to him.

MR. VANZANDT: We disagree with your assessment of the deposition and would oppose that, and we've allowed you to go over time already as it is.

Let's go off the record, and we'll take a quick break.

THE VIDEOGRAPHER: We're now going off the record, and the time is 8:08 p.m.

(Recess taken, 8:08 p.m. to 8:13 p.m. PDT)

THE VIDEOGRAPHER: We are now going back on the record, and the time is 8:13 p.m.

MR. DAVIS: Joe, I assume that one objection for all -- one objection for one defendant is good for all defendants?

MR. VANZANDT: Absolutely.

MR. DAVIS: Thank you.

///

///

140 (Pages 554 - 557)

CONFIDENTIAL

Page 558

------------
EXAMINATION
------------
BY MR. VANZANDT:

Q.    Dr. Murray, Joseph VanZandt.  I have just a few questions for you.

Do you consider your report to include not just your written materials but also your materials considered?

MR. DAVIS:  Object to form, leading.

A.    Yes.

BY MR. VANZANDT:

Q.    And in forming your opinions in this case, did you rely on your clinical experience?

A.    Yes.

Q.    And does your clinical experience on which you based your opinions include training, patient assessments and interactions and collaboration with colleagues?

A.    Yes.

Q.    When you treat and diagnose patients with eating disorders, you do not

Page 559

assume social media has caused or contributed to their diagnosis, do you?

MR. DAVIS:  Object to form.

A.    Correct.

BY MR. VANZANDT:

Q.    Do you assume that social media has caused or contributed to the diagnosis of your patients when you're treating them?

MR. DAVIS:  Object to form.

A.    I do not assume that.

BY MR. VANZANDT:

Q.    Okay.  In fact, some of your patients have eating disorders in which social media is related to their eating disorders and some have eating disorders to where social media is not related; is that correct?

A.    Correct.

Q.    And similarly here, in reaching your opinions, you considered all of the literature, including the literature that found no or limited associations to harm in reaching your opinions; is that correct?

MR. DAVIS:  Object to form, leading and mischaracterizes the

Page 560

witness' testimony.

A.    Yes.

BY MR. VANZANDT:

Q.    Throughout your testimony today, you referenced a study or an article that came out, I think you said just a couple of days ago, and that was a study in JAMA.

Do you recall that study?

A.    Yes.

Q.    Okay.  I'm going to mark that study as Exhibit 45.

(Whereupon, Murray-45, Addictive Screen Use Trajectories and Suicidal Behaviors, Suicidal Ideation, and Mental Health in US Youths, by Xiao et al, was marked for identification.)

BY MR. VANZANDT:

Q.    Is that the study that you referred to throughout your deposition today?

A.    Yes.

Q.    Okay.

MR. VANZANDT:  That's all the questions I have.  Thank you.

///

Page 561

------------
EXAMINATION
------------
BY MR. DAVIS:

Q.    Dr. Murray, the article that just got marked as Exhibit 45 is not in your report, it's not on your reliance materials, is it?

A.    As I mentioned, I will continue to assess emerging science as it comes out, but I'm aware, because this came out very recently, that that could only be analyzed, interpreted and synthesized into my opinion recently.  So it is not in my materials list.

Q.    Okay.  Thank you.

Now, the other thing is, you got asked some questions about studies that showed no association between social media use and various mental health outcomes.

Do you remember that question?

A.    Yes.

Q.    Name all of them.

MR. VANZANDT:  Objection, vague, calls for speculation.

A.    I can't recall, Todd.

141 (Pages 558 - 561)

CONFIDENTIAL

Page 562

BY MR. DAVIS:

Q.   Name one of them, Dr. Murray.

A.   I can't recall as I sit here, Todd.  I can review my materials and talk with you at length, but I can't recall off the top of my head any study that's --

Q.   So when you answered plaintiffs' counsel's question about there being studies that showed no association and you considered them, you didn't have any particular study in mind when you gave that answer, did you?

A.   I considered the studies.  I just can't recall the names of studies.  I can't name them.

Q.   You can't name them, you can't tell us what the -- what the findings were, what the study population was, what years they covered, what journals they were in.  You can't tell us any of that information today, can you?

A.   I've tried to the best of my ability today to talk with you about authors, journal, titles, publication, years.  I just simply can't recall all these studies on

Page 563

demand.

Q.   And, of course, when the plaintiffs' counsel asked you questions about studies that showed no association between social media use and any mental health outcome, he didn't show you something that you had actually put in your report and wrote about, did he?

A.   He did not show me any particular study.

MR. VANZANDT:  Objection, argumentative.

MR. DAVIS:  That's right.

MR. VANZANDT:  That is time.

MR. DAVIS:  I thought you'd like that one.

We reserve.  Obviously, we're not done for all the reasons we've talked about before.

MR. VANZANDT:  Okay.  We disagree and believe the transcript will speak for itself.

THE VIDEOGRAPHER:  This concludes this video deposition of Stuart Murray.  We are now going off

Page 564

the record.

The times used are:

Mr. Jacobs, 26 minutes; Mr. Majors, 25 minutes; Mr. Kennedy, 25 minutes; Mr. Davis, 7 hours and 20 minutes; and Mr. VanZandt, 2 minutes.

We are now off the record, and the time is 8:18 p.m.

(Time noted: 8:18 p.m. PDT)

--o0o--

Page 565

CERTIFICATE

I, MICHAEL E. MILLER, Fellow of the Academy of Professional Reporters, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Court Reporter and Notary Public, do hereby certify that prior to the commencement of the examination, STUART MURRAY, MSc, DClinPsych, PhD was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

_____
MICHAEL E. MILLER, FAPR, RDR, CRR
Fellow of the Academy of Professional Reporters
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
California CSR #13649

Dated: June 23, 2025

142 (Pages 562 - 565)

CONFIDENTIAL

Page 566

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 568

ACKNOWLEDGMENT OF DEPONENT

I, STUART MURRAY, MSc, DClinPsych, PhD, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
STUART MURRAY, MSc, DClinPsych, PhD  DATE

Subscribed and sworn to before me this _____ day of _____, 20 _____.
My commission expires: _____

_____
Notary Public

Page 567

ERRATA

PAGE  LINE  CHANGE
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____

Page 569

LAWYER'S NOTES

PAGE   LINE
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____

143 (Pages 566 - 569)