**Exhibit 41**


**PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION TO EXCLUDE GENERAL CAUSATION
TESTIMONY OF PLAINTIFFS' EXPERTS**


Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

```
                                              Page 1

 1   UNITED STATES DISTRICT COURT

 2   FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                    - - -

 4   IN RE:  SOCIAL MEDIA ADOLESCENT        MDL NO.

     ADDICTION/PERSONAL INJURY PRODUCTS     3047

 5   LIABILITY LITIGATION                   CASE NO.

 6   THIS DOCUMENT RELATES TO:              4:22-MD-03047-YGR

 7   ALL ACTIONS

 8

 9       SUPERIOR COURT OF THE STATE OF CALIFORNIA

              FOR THE COUNTY OF LOS ANGELES

10              UNLIMITED JURISDICTION

11   COORDINATION PROCEEDING

     SPECIAL TITLE (RULE 3.550)

12                                          JCCP

13   SOCIAL MEDIA CASES                     JUDICIAL COUNCIL

     _____  PROCEEDING NO. 5255

14

15   THIS DOCUMENT RELATES TO:

16   ALL ACTIONS                     JUDGE CAROLYN B. KUHL

17                    - - -

18            ** VIDEOTAPED DEPOSITION**

19              DIMITRI CHRISTAKIS

20          Thursday, September 11, 2025

21

22

23   Reported by:

24   Angela M. Shaw-Crockett, CCR, CRR, RMR, CSR

25   Job 7514201
```

Page 2

1
2
3          Thursday, September 11, 2025
4          9:06 a.m.
5
6          VIDEOTAPED deposition OF Dimitri Christakis, held
7          held at Covington & Burling LLP, 620 Eighth
8          Avenue, New York, New York, before Angela (Angie)
9          M. Shaw-Crockett, a Certified Court Reporter,
10         Certified Realtime Reporter, Registered Merit
11         Reporter and Notary Public of the States of New
12         York, New Jersey, and Connecticut.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1 A P P E A R A N C E S:  (CONT'D)
2
    ATTORNEY FOR THE DEFENDANTS:
3 META PLATFORMS, INSTAGRAM, SICULUS
4 COVINGTON & BURLING, LLP
    620 Eighth Avenue
5   New York, New York  10018
6 BY:  PAUL SCHMIDT, ESQ.
    pschmidt@cov.com
7
8 ATTORNEY FOR THE DEFENDANTS:
    META PLATFORMS, INSTAGRAM, SICULUS
9
10 COVINGTON & BURLING, LLP
    850 10th Street NW
11   Washington, District of Columbia  20001
12 BY:  DANIEL AUTEN, ESQ.
    PAUL BANKS, ESQ.
13   dauten@cov.com
    pbanks@cov.com
14
15 ATTORNEY FOR THE DEFENDANT SNAP INC.,
    the maker of Snapchat:
16
    MUNGER, TOLLES & OLSON LLP
17   350 South Grand Avenue
    50th Floor
18   Los Angeles, California  90071-3426
19 BY:  ALBERTO J. DeDIEGO-HABEL, ESQ.
    alberto.dediego@mto.com
20   (Appearing Remotely)
21
22
23
24
25

Page 3

1     A P P E A R A N C E S:
2 ATTORNEY FOR THE PLAINTIFFS:
3 BEASLEY ALLEN LAW FIRM
    218 Commerce Street
4   P.O. Box 4160
    Montgomery, Alabama  36103-4160
5
    BY:  JENNIFER EMMEL, PH.D., J.D., ESQ.
6   jennifer.emmel@beasleyallen.com
7   -and-
8 ATTORNEY FOR THE PLAINTIFFS META:
9 MOTLEY RICE LLC
    401 9th Street NW
10   Suite 630
    Washington, District of Columbia 20004
11
    BY:  NELSON L. DRAKE, ESQ.
12   ndrake@motleyrice.com
13   -and-
14 MOTLEY RICE LLC
    28 Bridgeside Boulevard
15   Mount Pleasant, South Carolina  29464
16 BY:  SARA COUCH, ESQ.
    JODI WESTBROOK FLOWERS, ESQ.  (Appearing Remotely)
17   scouch@motleyrice.com
18
19 ATTORNEY FOR THE DEFENDERS:
    GOOGLE LLC and YouTube LLC
20
    WILLIAMS & CONNOLLY LLP
21   680 Maine Avenue SW
    Washington, District of Columbia  20024
22
    BY:  ASHLEY W. HARDIN , ESQ.
23   JOSEPH SANDOVAL-BUSHUR, ESQ.
    ahardin@wc.com
24   jsandoval-bushur@wc.com
    (Appearing Remotely)
25

Page 5

1 A P P E A R A N C E S: (CONT'D)
2 ATTORNEY FOR THE DEFENDANT TikTOK:
3 KING & SPALDING LLP
    1180 Peachtree Street, NE
4   Suite 1600
    Atlanta, Georgia  30309
5
    BY:  GREGORY A. RUEHLMANN, ESQ.
6   gruehlmann@kslaw.com
7
8
9 ALSO PRESENT:     Ryan Knecht, Exhibit Tech
10             Ingrid Rodriguez, The Videographer
11 REMOTE APPEARANCES
12 David Bonnin
13 Tricia Campbell
14 Grace Quinlan - Gaza Honnold LLC
15
16
17     **          **          **
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

1     I N D E X
2 Examination of:     Page
3 Dimitri Christakis
    C O N T E N T S
4
  MR. SCHMIDT     9
5
  MS. HARDIN     173
6
  MR. RUEHLMANN     185
7
  MR. DE DIEGO-HABEL     202
8
  MS. COUCH     222
9
  MR. SCHMIDT     225
10     E X H I B I T S
11   (Retained by the court reporter)
12 DEPOSITION     EXHIBIT     PAGE
13 Exhibit 1  Christakis expert report     11
14 Exhibit 2  Christakis rebuttal report     11
15 Exhibit 3  Christakis reports with tape flags   13
16 Exhibit 4  Studies used in Christakis reports   14
17 Exhibit 5  Xiao study     15
18 Exhibit 6  Thottan study     26
19 Exhibit 7  Christakis presentation     35
20 Exhibit 8  ScienceDirect Sleep Medicine Guide   63
    for Authors
21
  Exhibit 9  Printout of a statement     65
22
23
24
25

Page 7

1     E X H I B I T S (CONT'D)
2   (Retained by the court reporter)
3 Exhibit 10  Printout of a statement     66
4 Exhibit 11  Printout of a statement     67
5 Exhibit 12  Video     71
6 Exhibit 13  Video clip     96
7 Exhibit 14  Questionnaire for PHQ-9     103
8 Exhibit 15  GAD-7     104
9 Exhibit 16  Book chapter     108
10 Exhibit 17  Chapter from the book, The Elephant  127
    in the Living Room
11
  Exhibit 18  APA statement     130
12
  Exhibit 19  Email chain     132
13
  Exhibit 20  Presentation by Elena Davis     137
14
  Exhibit 21  Instagram well-being strategy doc   144
15
  Exhibit 22  Dr. Christakis invoices to     152
16     plaintiff's lawyers
17 Exhibit 23  Dr. Christakis prior deposition   154
18 Exhibit 24  UW Policy Outside professional work  160
19 Exhibit 26  Marlow study     193
20 Exhibit 27  Fonseca study     200
21 Exhibit 28  Expert Rebuttal Report of Krista   203
    Hayakawa
22
  Exhibit 29  van Essen and Van Ouytsel study   207
23
  Exhibit 30  Schroeder and Behm-Morawitz study  212
24
25

Page 8

1     E X H I B I T S (CONT'D)
2   (Retained by the court reporter)
3 Exhibit 31  Report of Dr. Allen     217
4 Exhibit 32  Woodward study     218
5
6     E X H I B I T
7     (PREVIOUSLY MARKED)
8   (Retained by the court reporter)
9 DEPOSITION     EXHIBIT     PAGE
10 Exhibit 32  Document with Footnote 80     223
11
12 REQUESTS
13   36 - 14  Alternate copies of presentation, "Digital
    Addiction"
14
15
16     RULINGS
17 37-10     37-19     38-9
18 41-4     43-24     44-12
19 113-14     121-16     121-24
20 125-2     140-1     146-17
21 171-22
22
23
24
25

Page 9

1     THE VIDEOGRAPHER: We are now on the
2 record. My name is Ingrid Rodriguez. I'm a
3 videographer for Golkow Litigation Services.
4 Today's date is September 11, 2025. The time
5 is 9:06 a.m.
6     This video deposition is being held at
7 Covington & Burling LLP, New York, New York, in
8 the matter of In Re: Social Media Adolescence
9 Addiction/Personal Injury product liability
10 litigation in the United States District Court
11 for the Northern District of California.
12     The deponent is Dr. Dimitri Christakis.
13 All counsel present will be noted on the
14 stenographic record. The court reporter is
15 Angie Shaw-Crockett and will now swear in the
16 witness.
17 Dimitri Christakis, having been first duly sworn by a
18 Notary Public of the State of New York, was examined and
19 testified as follows:
20 EXAMINATION
21 BY MR. SCHMIDT:
22   Q. Good morning, Dr. Christakis.
23     Are you prepared to testify fully about
24 all of your opinions today?
25   A. I am.

3 (Pages 6 - 9)

CONFIDENTIAL

Page 10

1    Q.   Have you done all of the work you need to
2 do in order to be able to testify in front of a
3 jury?
4         MS. COUCH:  Objection to the form.
5    A.   Yes, I have.
6 BY MR. SCHMIDT:
7    Q.   Is there any further work that you need to
8 do in order to testify, in terms of reviewing
9 documents or anything else?
10         MS. COUCH:  Same objection.
11    A.   Between now and when the jury trial
12 happens, whenever that is, additional information
13 might be made available, new studies might come out.
14 But as of today, my opinion is based entirely on
15 what is here, and I don't expect it to change
16 between now and then, but I'm a scientist and I'm
17 always open to new information.
18 BY MR. SCHMIDT:
19    Q.   Is there any further work you know that
20 you need to do before you can testify?
21    A.   As of today, no.
22         MR. SCHMIDT:  I've marked as Exhibit 1 a
23 copy of your original report.
24         (Exhibit 1 was received and marked for
25 identification, as of this date.)

Page 11

1 BY MR. SCHMIDT:
2    Q.   And do you recognize that?
3    A.   I do.
4    Q.   And do you stand by everything in there?
5    A.   I do.
6    Q.   Do you have any errors to correct in your
7 original report?
8    A.   Not to my knowledge, no.
9    Q.   I've marked as Exhibit 2, your rebuttal
10 report.
11         (Exhibit 2 was received and marked for
12 identification, as of this date.)
13 BY MR. SCHMIDT:
14    Q.   Do you stand by everything in your
15 rebuttal report?
16    A.   I do, yes.
17    Q.   Is there any opinion you intend to offer
18 that is not addressed in your initial report,
19 Exhibit 1, or your rebuttal report, Exhibit 2?
20         MS. COUCH:  Object to the form.
21    A.   These represent all of my expert opinions.
22 I don't know what you mean by -- I mean, if you ask
23 me -- these are my opinions, my official opinions.
24 BY MR. SCHMIDT:
25    Q.   Are they your complete opinions?

Page 12

1    A.   I'm only hesitating because you're going
2 to ask me to render opinions, I suspect.  But yes,
3 these are my opinions, yes.
4    Q.   I will not be asking you to render
5 opinions.  I just want to know if there's any
6 opinions that you plan to offer that are not
7 contained in Exhibits 1 and 2?
8    A.   No.
9    Q.   You have in front of you two binders.
10 What are those?
11    A.   This one I believe is -- completely
12 recapitulates this.  In other words, it's my initial
13 report and the rebuttal.  And then, in anticipation
14 that you will be -- someone will be asking me to
15 represent certain studies, I brought along some
16 exemplary ones that are all from my reliance list.
17 Actually, they're all referenced in either my report
18 or my rebuttal.  I have one internal document which
19 is also on the reliance list.
20    Q.   Okay.
21    A.   And this is -- and then I have one more
22 study that I had added at the last second that's not
23 in here, but it's also referenced.
24    Q.   May I look at the version of your report
25 that you have with you?

Page 13

1    A.   Of course.  Oh --
2    Q.   Do you mind if I mark that as an exhibit?
3    A.   No, you can take it.
4         The only thing that's in there is some
5 highlights and some sticky things.
6    Q.   Okay.  Why don't I let you keep that one.
7    A.   Well --
8    Q.   I'm going to give it back to you.
9    A.   Oh, okay.
10    Q.   I'll mark this --
11    A.   I like the sticky things.
12         MR. SCHMIDT:  I'll mark as Exhibit 3, what
13 you have identified to us as your report and
14 your rebuttal report with some tape flags on
15 them.
16         (Exhibit 3 was received and marked for
17 identification, as of this date.)
18 BY MR. SCHMIDT:
19    Q.   Is that a correct description of what
20 Exhibit 3 is?
21    A.   Yes.
22         MR. SCHMIDT:  May I have the other binder?
23 I'm going mark that as Exhibit 4.
24 (Exhibit 4 was received and marked for identification, as of
25 this date.)

4 (Pages 10 - 13)

CONFIDENTIAL

1    A.  Yes.
2  BY MR. SCHMIDT:
3    Q.  I've marked as Exhibit 4, the binder you
4  described that has different studies in it.  And
5  also has a Meta document in it.  Did I correctly
6  describe what Exhibit 4 is?
7    A.  Yes.  That last thing is just a table of
8  contents for each tab.
9    Q.  Do you mind if I just take a picture of
10  this table of contents?
11    A.  Not at all.
12    Q.  And as I understand it, what is contained
13  in Exhibit 4, as reflected in your table of
14  contents, is a study corresponding to various
15  features at issue in this case; is that correct?
16    MS. COUCH:  Object to form.
17  BY MR. SCHMIDT:
18    Q.  I guess it's more than that.  Various
19  features and other -- let me take that back.
20    In Exhibit 4, you've prepared a table of
21  contents that corresponds in part to various
22  features at issue in this case, correct?
23    A.  In part, yes.
24    Q.  All right.  I'll come back to that.
25    I'd like to start by asking about a study.

1  Could I get tab 218, please?
2    Do you recall in your rebuttal report,
3  that you discussed a study called the Xiao study,
4  X-I-A-O?
5    A.  I do.
6    MR. SCHMIDT:  We'll mark that as
7    Exhibit 5.
8    (Exhibit 5 was received and marked for
9  identification, as of this date.)
10  BY MR. SCHMIDT:
11    Q.  Do you agree with me that the Xiao study
12  has limitations?
13    MS. COUCH:  Objection to the form.
14    A.  Every study has limitations and the Xiao
15  study is no exception in that regard.
16  BY MR. SCHMIDT:
17    Q.  Is one of the limitations -- do you
18  recall, the Xiao study is a study that looked at
19  suicidal behaviors?
20    MS. COUCH:  Object to the form.
21    A.  It looked at suicidal thoughts and
22  behaviors, yes.
23  BY MR. SCHMIDT:
24    Q.  Do you agree that one limitation of the
25  study is that it cannot establish that the addictive

1  use they looked at was causing the suicidal thoughts
2  and behaviors?
3    MS. COUCH:  Object to form.
4  BY MR. SCHMIDT:
5    Q.  Do you agree that that is a limitation in
6  the study?
7    MS. COUCH:  Same objection.
8    A.  No I don't agree with that as a limitation
9  of the study.
10  BY MR. SCHMIDT:
11    Q.  I'm giving a copy of the study, which I've
12  marked as Exhibit 5.  I'm going to toss things
13  across the table, and I'll apologize again and not
14  intending to be rude in doing that.  I don't know if
15  you want extra copy of exhibits.
16    Do you recognize Exhibit 5 as the Xiao
17  study we've been discussing from 2025?
18    A.  I do.
19    Q.  Let's look at exhibit -- and you cite the
20  study and discuss it in your report, correct?
21    A.  I do.
22    Q.  Is this an important study from your
23  perspective?
24    MS. COUCH:  Objection to the form.
25    A.  Yes, it's an important study.

1  BY MR. SCHMIDT:
2    Q.  Let's look at page 8 of the study, please.
3    Do you see that there's a section of this
4  study called "limitations"?
5    A.  E8?
6    Q.  E8, yes, please.  Thank you.
7    A.  Yes.
8    Q.  And do you have a screen in front of you
9  where you can see the document?
10    A.  Oh.
11    Q.  Just -- you don't need to look at that if
12  you don't want to, but it's just there if it helps
13  you find stuff on the page.  You can look at the
14  hard copy or the screen.  But just to help you out
15  if that helps in locating things.
16    Do you see where, under limitations, it
17  states "There are limitations."  And the first
18  limitation is what we were just talking about:
19    "First, the observational nature of this
20  study precludes establishing that addictive use
21  trajectories cause the outcomes studied."
22    Do you see that?
23    A.  I see that.
24    MS. COUCH:  And real quick, we can see
25    people chatting on this screen.  So people

Golkow Technologies,
A Veritext Division
877-370-3377                                          www.veritext.com

CONFIDENTIAL

Page 18

1  don't need to put anything in the chat unless
2  you want --
3      MR. SCHMIDT: That's a good flag.
4      We are showing, just for everyone on the
5  Zoom and in the room, we're showing the witness
6  the Zoom feed, I think. And so anytime someone
7  puts a chat in the Zoom it becomes apparent to
8  the witness. Thank you, for flagging that. So
9  no one should be chatting on the Zoom, please.
10 BY MR. SCHMIDT:
11     Q. Do you agree with these authors that a
12 limitation of their study is that it cannot
13 establish that addictive use trajectories caused the
14 outcomes studied?
15     A. I understand why they said that. As a --
16 as a general editor myself, the general standard is
17 that the only time that you can deploy causal
18 language in the manuscript is when you conducted a
19 randomized control trial. But I feel like this is
20 an incredibly strong design, and I believe that it
21 provides very compelling evidence for causal
22 relationship, as do they.
23     Q. My question is simply, do you agree that a
24 limitation of the study is that it cannot establish
25 that the addictive use they were measuring caused

Page 19

1  the outcomes they were looking at in terms of
2  suicidal thoughts and behaviors.
3      Do you agree with them on that?
4      MS. COUCH: Object to the form.
5      A. I'll restate that this single study, as
6  strong as it is, and no single study for that
7  matter, is enough to establish a causal
8  relationship. My opinion in this matter is based on
9  this very strong study and the totality of the
10 evidence that I reviewed.
11     MR. SCHMIDT: Okay. I move to strike
12 everything after, "no single study is enough to
13 establish a causal relationship."
14 BY MR. SCHMIDT:
15     Q. Let's look at the next sentence. Well,
16 before I do, do you see them focus on the fact that
17 this is an observational study?
18     MS. COUCH: Object to form.
19     A. I don't know what you mean by "focus."
20 They say -- they cite that it's an observational
21 study.
22 BY MR. SCHMIDT:
23     Q. That's what I mean, yeah. Do you see that
24 they reference this as being an observational study?
25     A. Yes, because it was an observational

Page 20

1  study.
2      Q. And do you agree with me that as a general
3  proposition, that an observational study prevents
4  causal inference?
5      MS. COUCH: Object to the form.
6      A. I don't agree with that. There are many
7  things that we accept. For example, there have
8  never been randomized control trials linking tobacco
9  leads to cancer. It's only been observational
10 studies, and yet we clearly are convinced that
11 there's a causal relationship there.
12     MR. SCHMIDT: Move to strike everything
13 after, "I don't agree with that."
14 BY MR. SCHMIDT:
15     Q. Is there a difference between an
16 observational and a cross-sectional study?
17     A. The phraseology you use is difficult for
18 me to respond to.
19     Q. Okay. That's fair.
20     Do you agree with me that because -- when
21 a study is cross sectional, that that precludes --
22 that prevents causal inference?
23     MS. COUCH: Object to the form.
24     A. I don't agree with that either. I think
25 that a cross-sectional study provides contributory

Page 21

1  evidence for causal relationship. And in some
2  cases, the directionality can only be one way, in
3  which case, it can provide evidence of a causal
4  relationship.
5  BY MR. SCHMIDT:
6      Q. And I didn't ask if it can provide
7  evidence. My question was, do you agree with me
8  that a cross-sectional study -- that when a study is
9  cross sectional, that prevents causal inference?
10     MS. COUCH: Object to the form, asked and
11 answered.
12 BY MR. SCHMIDT:
13     Q. And I'm just trying to ask you as a yes or
14 no matter.
15     A. Yeah, I don't think it's a yes-or-no
16 question because, like I said, there are situations
17 where cross-sectional studies can provide causal
18 relationships, and there are many situations in
19 which it's corroboratory of a causal relationship.
20     Q. Let's look at the next sentence in this
21 Xiao study. It's:
22     "Second, reliance on self-reported data
23 may introduce recall and social desirability
24 biases."
25     Do you see that language?

CONFIDENTIAL

Page 22

1    A.  I do see that.
2    Q.  Do you agree that's a limitation of the
3 study, yes or no?
4        MS. COUCH:  Object to the form.
5    A.  I agree that that's a limitation of the
6 study.  I don't think it changes the conclusions in
7 any meaningful way at all.
8 BY MR. SCHMIDT:
9    Q.  What is "recall bias"?
10    A.  Recall bias is when you are recalling
11 things that happened in the past in the present, and
12 the present situation may inform how you report
13 things that happened in the past.
14    Q.  And why is that a limitation, recall bias?
15        MS. COUCH:  Object to the form.
16    A.  Let me start by saying, I don't believe
17 these are significant biases in this case.  I'm
18 trying to think now about --
19 BY MR. SCHMIDT:
20    Q.  And I'll withdraw my question and reask.
21 And I'm not asking about in this case.  I'm asking
22 you, recall bias generally, why is that a limitation
23 of a study?
24        MS. COUCH:  Object to form.
25    A.  I'm sorry.  That's different question than

Page 23

1 you asked before.
2 BY MR. SCHMIDT:
3    Q.  Okay.
4    A.  Is it or not?  Because I thought you said
5 it was in this case.
6    Q.  Let me ask generally.
7        Why is recall bias a limitation?
8        MS. COUCH:  Object to the form.
9    A.  Recall bias -- I think I answered this.
10 Recall bias can be a limitation if current
11 circumstances systematically bias the way that you
12 report current data.
13 BY MR. SCHMIDT:
14    Q.  Past data, you mean?
15    A.  I'm sorry.  Past data, yes.
16    Q.  Okay.
17        What is social desirability bias?
18        MS. COUCH:  Object to the form.
19    A.  Social desirability bias is when by dint
20 of not wanting to reveal something that could be
21 embarrassing, you give answers that you anticipate
22 are more acceptable.
23 BY MR. SCHMIDT:
24    Q.  Why is social desirability bias a concern
25 in a study?

Page 24

1    A.  It can bias reporting if you're trying to
2 get people to faithfully disclose, or accurately
3 disclose, things that they're reluctant to disclose
4 because of -- for fear of being embarrassed or
5 admitting something that they don't want to
6 disclose.
7    Q.  If you look -- if you continue on in this
8 paragraph on limitations, they note, ultimately,
9 seven different limitations.  And I want to go to
10 the seventh one that begins, "finally," on the next
11 column.
12        Do you see towards the end of that column,
13 it says "finally"?
14    A.  Yes.
15    Q.  "Finally, these analyses did not include
16 psychosocial and behavioral factors such as
17 bullying, adverse childhood experiences, parental
18 monitoring, sleep disturbances, stress, social
19 isolation, and social determinants of health, e.g.,
20 neighborhood and school contexts."
21        Do you see that?
22    A.  I do.
23    Q.  Do you agree that these factors they list,
24 bullying, adverse childhood experiences, parental
25 monitoring, sleep disturbances, stress, social

Page 25

1 isolation, and social determinants of health like
2 neighborhood and school contexts, are all things
3 that can influence an adolescent's mental
4 well-being?
5        MS. COUCH:  Object to the form.
6    A.  I agree that those can all influence
7 adolescent's well-being, but they are not
8 confounders in this study.
9        MR. SCHMIDT:  Move to strike everything
10 starting with, "but," and I'm just going to put
11 on the record, I don't want to have to ask for
12 more time for your deposition.  I'm going to
13 ask if you can try to answer my questions as
14 directly as you can without adding to them.
15        MS. COUCH:  And we would oppose and point
16 out the record reflects nearly all answers have
17 been a single sentence or less.
18 BY MR. SCHMIDT:
19    Q.  Do you agree with these authors that it is
20 a limitation of their study that their analyses did
21 not include various psychosocial and behavioral
22 factors?
23        MS. COUCH:  Objection.
24 BY MR. SCHMIDT:
25    Q.  Yes or no?

7 (Pages 22 - 25)

CONFIDENTIAL

---

Page 26

1         MS. COUCH:  Same objection.
2     A.  I actually don't think it's a limitation
3 of their findings at all.
4 BY MR. SCHMIDT:
5     Q.  Okay.
6     A.  I think -- Did you want me to say more or
7 do you want me to stop there?
8     Q.  No, I think you've answered my question.
9         MR. SCHMIDT:  Let's look at the next
10 document, tab 205, please.
11        (Exhibit 6 was received and marked for
12 identification, as of this date.)
13 BY MR. SCHMIDT:
14    Q.  Are you familiar -- you should be, it's
15 your study -- are you familiar with the study
16 called -- I might get the name wrong -- the Thottan
17 study from this year, T-H-O-T-T-A-N, which I've
18 marked as Exhibit 6.
19    A.  Oh -- oh, yes.  I haven't seen it in
20 print, but yes, this is my study, yes.
21    Q.  All right.  This is a study on internet
22 addiction and sleep outcomes, correct?
23    A.  It is.
24    Q.  And as you noted, you're an author on this
25 study?

---

Page 27

1     A.  That's correct.
2     Q.  And if we look down at the bottom of the
3 page, you can see that this study was first
4 submitted on May 6, 2025, and it was accepted on
5 June 29, 2025.
6         Do you see that?
7     A.  I do see that.
8     Q.  Let's look at the second page, please.
9         In your introduction on the top left
10 corner, first full paragraph -- and let me just
11 pause for a second.  In this study, you use the
12 acronym "IA" to refer to internet addiction, right?
13    A.  Yeah, I should point out that I'm not the
14 lead author on this, I'm not the senior author.  I'm
15 a participating author.  I'm familiar with the work,
16 and I take responsibility for it, but it was driven
17 by the principal investigator, Mark Tremblay, and
18 his postdoc.  But yes, go ahead.
19    Q.  Well, in fact, you had a role in reviewing
20 this document, right?
21    A.  That's correct.
22    Q.  Okay.
23        IA in this document refers to internet
24 addiction?
25    A.  That's correct.

---

Page 28

1     Q.  You write:
2         "Currently, internet addiction is not
3 classified as a diagnoseable disorder by the DSM-5
4 or the ICD-11, though internet gaming disorder has
5 been included in the DSM under conditions for
6 further study."
7         Do you see that?
8     A.  I do see that.
9     Q.  And that's a true statement, right?
10    A.  That is a true statement.
11    Q.  Is that a meaningful fact for you, that
12 internet addiction is not classified as a
13 diagnosable disorder by the DSM-5 or the ICD-11?
14        MS. COUCH:  Object to the form.
15    A.  What do you mean by "meaningful"?
16 BY MR. SCHMIDT:
17    Q.  Well, why is that noted in this article of
18 yours?
19    A.  It's a statement of fact.  It doesn't have
20 for me a lot of relevant meaning.
21    Q.  Okay.  Let's look at the next sentence, it
22 states:
23        "There is a high level of comorbidity
24 between internet addiction and other conditions such
25 as depression, anxiety, and stress."

---

Page 29

1         Do you see that?
2         MS. COUCH:  Object to the form.
3     A.  I see that.
4 BY MR. SCHMIDT:
5     Q.  And it continues:
6         "So whether it can be classified as a
7 behavioral addiction remains a debate in the
8 literature despite the many features that behavioral
9 and substance addictions share with IA."
10        Do you see that language?
11    A.  I see that.
12    Q.  Is it a true statement that, whether
13 internet addiction can be classified as a behavioral
14 addiction remains a debate in the literature.
15        Is that a true statement?
16        MS. COUCH:  Object to the form.
17    A.  If by "debate" you mean that there are
18 people publishing on both sides, then that is true,
19 because in fact, you've cited papers that disagree
20 with it.  But I think the predominant opinion of the
21 vast majority of scientists and clinicians, more
22 importantly, is that it's such a thing, but most
23 people don't talk about internet addiction anymore.
24 It's sort of a somewhat dated terminology.
25

---

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 30

1 BY MR. SCHMIDT:
2    Q.  So when you published this article just a
3 few months ago, on internet addiction, that was
4 dated in your view?
5    A.  I didn't choose the exposure variable of
6 internet addiction, it was chosen by the principal
7 investigator and his -- and his junior faculty
8 member.  I don't have a problem with it
9 scientifically.
10   Q.  Do you agree with this statement as
11 written, that whether internet addiction can be
12 classified as a behavioral addiction remains a
13 debate in the literature.
14      MS. COUCH:  Object to the form.
15 BY MR. SCHMIDT:
16   Q.  Do you agree that that's an accurate
17 statement of the science?
18      MS. COUCH:  Same objection.
19   A.  If -- as I said before, if -- for
20 something to be debated in the literature only needs
21 to mean that people are -- they're publishing on
22 both sides of the issue, but the vast majority of
23 publications in this space believe -- the vast
24 majority of scientists in this space believe it is a
25 real entity.  And while there are a few scientists

Page 31

1 that publish on the other side, as I said, who
2 you've cited, I think the vast majority of
3 scientists believe it's real entity.  And certain,
4 all clinicians believe it's a real entity.  I'm
5 sorry, not all, the vast majority.
6 BY MR. SCHMIDT:
7    Q.  There's no reference to what the vast
8 majority of clinicians or scientists believe in this
9 article; is there?
10      MS. COUCH:  Objection to the form.
11   A.  No there's not.  And I would point out
12 that these authors are not clinicians to my
13 knowledge.  They're actually, as I recall -- I think
14 they mostly study physical activity.
15 BY MR. SCHMIDT:
16   Q.  Even though you haven't treated patients
17 in a year and half, do you consider yourself a
18 clinician?
19   A.  Yes, I absolutely consider myself a
20 clinician.
21   Q.  You're an author on this article, correct?
22   A.  Yes, I am.
23   Q.  So what I would like to know is whatever
24 meaning you give to this phrase in your publication,
25 is it true or not, whether internet addiction can be

Page 32

1 classified as a behavioral addiction remains a
2 debate in the literature.
3      Is that true or not in your view?
4      MS. COUCH:  Objection, form, asked and
5 answered.
6    A.  Insofar as there are publications that
7 allege that it is not, I would argue that yes, it
8 could be considered to be debated.  But that doesn't
9 mean that it's contentious, it just means there are
10 people publishing on both sides.
11 BY MR. SCHMIDT:
12   Q.  Okay.  Is internet addiction in your view
13 the same as social media addiction?
14      MS. COUCH:  Object to the form.
15   A.  No.  I would suggest that they're very
16 highly correlated with each other, but they are not
17 the same thing.
18 BY MR. SCHMIDT:
19   Q.  What is the difference between them?
20   A.  I think I first published on the concept
21 of internet addiction myself on -- I may get the
22 date wrong -- I think was 2010.  And at the time, it
23 was just time that people were spending on the
24 internet.  But over time, it's become clear that the
25 vast majority of time that certain people spend,

Page 33

1 certainly, most adolescents spend, is on social
2 media.  And so the field has sort of moved to
3 looking at that as a construct rather than general
4 internet addiction.
5    Q.  I'm just trying to understand, is there a
6 difference between internet addiction in your view,
7 and social media addiction?
8      MS. COUCH:  Object to the form.
9    A.  They are highly correlated, but yes, I
10 think they are distinct entities.
11 BY MR. SCHMIDT:
12   Q.  Look with me if you would at Exhibit 2,
13 your rebuttal report, page 26, paragraph 59.  And
14 you'll want to keep --
15   A.  Hold on.  Where?
16   Q.  Page 26, paragraph 59.
17      Do you see that you refer to:
18      "Numerous academic centers across the U.S.
19 include problematic social media in their grand
20 rounds educational presentations.  I have given
21 several such lectures around the world."
22      Do you see that?
23   A.  Yes, I see that.
24   Q.  And is it your testimony that you have --
25 the lectures you reference here in Seattle,

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

1 Rochester, Doha, and Lisbon, have focused on social
2 media addiction?
3        MS. COUCH:  Object to the form.
4     A.  Yes, I think they may have been -- I think
5 I used the phrase "digital addiction," in some of
6 them anyway, but it's -- what I'm talking about in
7 the case of adolescents is social media addiction.
8 BY MR. SCHMIDT:
9     Q.  Have you been paid for any of those
10 lectures?
11    A.  For some of them I received an honorarium,
12 yes.
13    Q.  Which ones were you paid for?
14    A.  Of these, for Rochester -- of these the
15 only one I have been paid for is Rochester.
16    Q.  Will you be paid for Doha and Lisbon?
17    A.  No, gave the one in Doha.  I did not get
18 paid for that.  I was doing that as part of a
19 charity.  And for the one in Lisbon, I'm not getting
20 paid, they're just paying my travel.
21    Q.  Okay.  Did they pay your travel for Doha?
22    A.  They did pay my travel for Doha.
23    Q.  Is that first class travel?
24        MS. COUCH:  Object to the form.
25    A.  It was not first class travel.

Page 35

1 BY MR. SCHMIDT:
2     Q.  It was business class?
3     A.  It was business class travel.
4        MR. SCHMIDT:  Okay.  Let's look at one of
5     those presentations.  I'm going to the pass you
6     what we've marked as Exhibit 7.
7        (Exhibit 7 was received and marked for
8     identification, as of this date.)
9 BY MR. SCHMIDT:
10    Q.  This is something that we were given
11 yesterday.  It's entitled "Digital Addiction," and
12 it has your name on it.
13        Is this the presentation that you
14 referenced here?
15    A.  Well, it's not all the -- I mean, this
16 is -- this is substantively, yes.  I don't remember
17 which one this is, but it's substantively very
18 similar to some of them, yes.
19    Q.  Do you have other versions of this
20 presentation?
21        MS. COUCH:  Object to the form.
22    A.  I mean, each -- I don't know the -- I
23 mean, these were all -- I don't know how to answer
24 that.  I mean, I don't know where this one comes
25 from.  They're all -- they're very similar, but...

Page 36

1 BY MR. SCHMIDT:
2     Q.  Are there any differences?
3        MS. COUCH:  Object to the form.
4     A.  I honestly can't answer that.  I mean,
5 some of these were like three years ago, four years
6 ago.  I don't know if there are any difference.
7 BY MR. SCHMIDT:
8     Q.  Do you keep earlier copies?
9     A.  Sometimes, yeah.  I mean, sometimes I just
10 update it.  And sometimes I -- yeah, I don't know
11 offhand.  I give lots of talks.
12        MR. SCHMIDT:  We will put a request in for
13     the alternate copies.
14 BY MR. SCHMIDT:
15    Q.  Do you see where you cite yourself as the
16 "George Adkins Professor of Pediatrics, University
17 of Washington"?
18    A.  Yes.
19    Q.  Are you full-time faculty at the
20 University of Washington?
21    A.  My situation is a little bit unusual.  I
22 am a professor of pediatrics at the University of
23 Washington.  I work at Seattle Children's Research
24 Institute.  I'm not sure where you're going with
25 that.

Page 37

1     Q.  I thought it was a simple question.
2        Are you full-time faculty at U-Dub?
3        MS. COUCH:  Objection to form.
4     A.  Yes, I'm a full-time faculty member at the
5 University of Washington.  But my employment is what
6 I'm saying is complicated.
7 BY MR. SCHMIDT:
8     Q.  So this is a talk, not about social media
9 addiction but about digital addiction, correct?
10        MS. COUCH:  + Object to the form,
11     misstates.
12        MR. SCHMIDT:  Let's mark that objection
13     and the language on the screen that says,
14     "digital addiction."
15 BY MR. SCHMIDT:
16    Q.  Do you see that this is a talk about
17 digital addiction, not social media addiction?
18        MS. COUCH:  Objection to form.
19    A.  + The title of this talk is digital
20 addiction, and the reason is that is because if
21 you -- I mean, would you like me to give you the
22 talk because it's very good talk.
23 BY MR. SCHMIDT:
24    Q.  No, I would not.
25    A.  Okay.  But --

CONFIDENTIAL

1    MR. SCHMIDT: Let's note that for the
2    record. If we could mark that answer, please.
3    A. The reason I'm saying that, sir, is
4    because if you look at the very end, what you're
5    seeing here is a toddler. And so toddlers don't use
6    social media.
7    BY MR. SCHMIDT:
8    Q. Okay.
9    A. + And I -- the talk covers the whole age
10   spectrum from late childhood, early adulthood to
11   infancy.
12       MR. SCHMIDT: May we mark that answer,
13   please?
14   BY MR. SCHMIDT:
15   Q. If you see that if you go, one, two,
16   three, four, five slides in, there's a timeline that
17   you have been building in this presentation of, I
18   take it, notable events.
19       Do you see that?
20   A. Yes.
21   Q. And on this timeline is an iPad.
22       Do you see that?
23   A. Yes.
24   Q. And before and after the timeline with the
25   slide on the iPad, you have an image of Steve Jobs

1    with an iPad and a quote about -- from Steve Jobs
2    about the iPad, correct? As well as a quote from
3    Tony Fadell, the "Father" of the iPad.
4        Do you see that?
5        MS. COUCH: Object to the form.
6    A. I do.
7    BY MR. SCHMIDT:
8    Q. There's no timeline in here that has
9    social media on it as a distinct entity, correct?
10       MS. COUCH: Object to the form.
11   A. As a matter of fact, that's correct,
12   social media is not listed as -- in this timeline
13   because the talk was not about social medias only.
14   BY MR. SCHMIDT:
15   Q. If you go to the end of the presentation,
16   you have "Top 10 practical tips."
17       Do you see that?
18   A. Yes.
19   Q. And if you look at those top 10 practical
20   tips, they include things like start early, low risk
21   games.
22       Do you see that?
23   A. Yes.
24   Q. And "games" are a reference to video
25   games?

1    A. Not exclusively, but digital games, yes.
2    Q. Digital games. Okay.
3        And then, there's references to various
4    other aspects of use of a phone, or iPad, like
5    self-monitoring, digital curfew, smartphone
6    contract, daily screen-free time.
7        Do you see that?
8        MS. COUCH: Object to the form.
9    A. I don't agree with the way you
10   characterize it. It's not all about the platform,
11   it's about the time.
12   BY MR. SCHMIDT:
13   Q. Okay. There are references to aspects of
14   using a phone, or an iPad, like a smartphone
15   contract, correct?
16       MS. COUCH: Object to the form.
17   A. That's correct.
18   BY MR. SCHMIDT:
19   Q. None of the practical tips here are
20   specific to social media as opposed to broader
21   iPhone, iPad use, correct?
22       MS. COUCH: Object to the form.
23   A. No, that's not correct.
24   BY MR. SCHMIDT:
25   Q. Which one of these top 10 practical tips

1    applies only to social media and not more broadly to
2    iPhone or iPad use?
3        MS. COUCH: Object to the form.
4    A. + This talk covered the entire age
5    spectrum and so each of these had to be interpreted
6    in the context of the child for whom the
7    recommendations were to be made. So this talk was
8    intended for pediatricians and these are practical
9    tips for pediatricians to address to their patients.
10       And if you look at the rest of the talk,
11   there are sections where I talk about specific
12   features of social media, et cetera. And the idea
13   would be that you would make recommendations
14   accordingly. So self-monitoring would include being
15   mindful of how you're using social media. The
16   smartphone contract would include whatever parents
17   decide about social media usage for their children.
18   That's part of a smartphone contract.
19       MR. SCHMIDT: Let's mark that answer,
20   please. I'll move to strike it as entirely
21   nonresponsive.
22       MS. COUCH: Opposed.
23   BY MR. SCHMIDT:
24   Q. My question to you, sir, is, is there any
25   practical tip in these 10 practical tips you give

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

1 your presentation, that applies only to social media
2 and not to broader smartphone or iPad use?
3        MS. COUCH:  Object to the form.
4        A.  If you heard the talk instead of looking
5 at the things you would see that, in fact, I do
6 mention social media with respect to these tips if
7 you're talking to an adolescent or as opposed to the
8 parent of a young child.
9 BY MR. SCHMIDT:
10        Q.  I'm going to ask you to listen to my
11 question carefully, please.  I think you're
12 answering a question I'm not asking.  I didn't ask
13 if some of this might apply to social media or if
14 you, in fact, reference social media in talking
15 about this.  What I'm asking about is something
16 different.
17        What I'm asking about is are there any of
18 these ten-top practical tips you offer that apply
19 only to social media and not also to smartphones and
20 iPads.  That's my question that I'm trying to get an
21 answer to, sir.
22        MS. COUCH:  Same objection.
23        A.  I can't answer it the way you're asking me
24 to do it.
25

Page 43

1 BY MR. SCHMIDT:
2        Q.  Is it your testimony that if someone is
3 looking at slides for a talk or a presentation, they
4 need to actually know what was said, know the
5 context in order to understand what's written on the
6 page?
7        MS. COUCH:  Object to the form.
8        A.  I don't understand what you mean by that.
9 BY MR. SCHMIDT:
10        Q.  Well, in an answer a moment ago, I pointed
11 out the fact that there's no reference at all here
12 to social media.  And you said:
13        "If you heard the talk instead of looking
14 at the things, you would see, in fact, I do mention
15 social media."
16        Do you remember saying that a minute ago?
17        A.  Yeah.
18        Q.  Do you agree with me in order to
19 understand slides like these or like other slides,
20 you need to have the context, including, if there
21 was a talk about it, what was said at the talk.
22        Do you agree with that?
23        MS. COUCH:  Same objection.
24        A.  + I don't agree with that, no.
25

Page 44

1 BY MR. SCHMIDT:
2        Q.  Okay.  All right.  I will rest on the
3 language on your page, which makes no reference to
4 social media.
5        Is there any reference you can point me to
6 in this document to Instagram?
7        MS. COUCH:  Objection to the colloquy.
8        MR. SCHMIDT:  And I'll also mark the
9 answer because it highlights the
10 nonresponsiveness.
11        MS. COUCH:  Oppose.
12        A.  + The point of this talk was not
13 specifically to talk about each of the platforms but
14 to talk about the features that are shared in common
15 with all of them.  So if you look, for example,
16 where I talk about digital addiction, these would
17 apply to all of the platforms.
18        MR. SCHMIDT:  Move to strike as
19 nonresponsive.  And let's mark that answer,
20 please.
21 BY MR. SCHMIDT:
22        Q.  Is there any reference you can point me in
23 this document to Instagram; yes or no?
24        MS. COUCH:  Objection to form.
25

Page 45

1 BY MR. SCHMIDT:
2        Q.  I'm going to ask you the same question
3 about Facebook in the event you're looking through
4 it.
5        MS. COUCH:  Same objection.
6        A.  So just to try to answer your question
7 directly, I do not see a slide here that has
8 Instagram or Facebook mentioned, but I mention them
9 in my talk.
10 BY MR. SCHMIDT:
11        Q.  Look with me, if you would, at the slide
12 ending -- do you see there are numbers in the bottom
13 corner of the slide?
14        A.  No.
15        Q.  If you look past the first page, you'll
16 see them -- look past the first few pages.  It's not
17 on every page.
18        I'm looking at one that says "916," and it
19 says "Infants may be at great risk."
20        A.  Yes, okay.
21        Q.  You told me a moment ago that infants
22 don't use social media.
23        What is it infants are at great risk for,
24 as you discuss it in this talk?
25        A.  They're at risk of what I call "digital

CONFIDENTIAL

Page 46

1 addiction."
2    Q.   What is that risk?
3    A.   They can exhibit some of the four Cs that
4 are cardinal features of addictions, particularly,
5 compulsive use, consequence.  Yeah, they will become
6 very fixated on it.  But the underlying reasons are
7 very similar to what older people and adults -- what
8 drives their compulsive use.
9    Q.   What presents a great risk of digital
10 addiction to infants -- what media?
11       MS. COUCH:  Objection to form.
12    A.   It's not the media.  It's the intermittent
13 variable reward and the predictable outcomes in the
14 case of infants.
15 BY MR. SCHMIDT:
16    Q.   What -- how are they getting exposed to
17 that is my question?
18       MS. COUCH:  Object to the form.
19 BY MR. SCHMIDT:
20    Q.   Are they reading The New York Times
21 online?
22       What's the exposure vehicle you're talking
23 about for infants?
24       MS. COUCH:  Object to the form.
25    A.   It's various digital platforms.

Page 47

1 BY MR. SCHMIDT:
2    Q.   Like what?
3    A.   Touch screens of various kinds.
4    Q.   Like iPads?
5       MS. COUCH:  Objection to form.
6    A.   IPad, iPhone, Androids -- whatever the
7 touch is or whatever the Microsoft product is.
8 BY MR. SCHMIDT:
9    Q.   TV?
10    A.   No.  It's not the same on television at
11 all.  I've studied television in infants for a long
12 time.
13    Q.   Not a smart TV?
14    A.   What do you mean by "smart TV"?
15    Q.   Let me try a specific example.
16       Does Netflix place infants at great risk
17 of digital addiction?
18    A.   I haven't studied that.  But that's not
19 the basis of this report.  The basis of this report
20 is based on -- or the study that I report on here,
21 is not based on Netflix or on television.
22    Q.   Does having access to their parents' iPad
23 place infants at great risk of digital addiction?
24       MS. COUCH:  Object to the form.
25    A.   Having access definitely increases the

Page 48

1 risk, and then depending on what kind of access and
2 what they do increases the risk more, yes.
3 BY MR. SCHMIDT:
4    Q.   You have, if you look a little further
5 back on slide 924, 925, 927.
6    A.   Hold on.  I can't see the numbers.
7    Q.   Start with me, if you would, at 924.
8 You'll see it's an image of the a Sesame Street
9 guitar and then two online images it looks like.
10       Do you see that?
11    A.   Yes.
12    Q.   Do you know what Peg's Parade is?
13    A.   I do.
14    Q.   What is Peg's Parade?
15    A.   Well, two slides later you'll see a
16 demonstration of it.  But it's a highly engaging app
17 that has predictable and unpredictable features
18 built in it so that when a toddler experiences it,
19 they develop compulsive use of it.
20    Q.   Does Peg's Parade put toddlers at risk of
21 digital addiction?
22       MS. COUCH:  Object to the form.
23    A.   I think the features of Peg's Parade,
24 which is sort of the point of this talk, are what
25 create compulsive use in a way that's different than

Page 49

1 traditional programs, even that infants might watch,
2 traditional -- you said television.  This is
3 different from television because of the features it
4 has.
5 BY MR. SCHMIDT:
6    Q.   Let me try it in your terms.
7       Do the features of the Peg's Parade put
8 infants at risk of digital addiction?
9    A.   Yes.  I think the features of games like
10 Peg's Parade put infants at risk for digital
11 addiction.
12    Q.   You know -- I guess it tells us here.  It
13 says "Elmo" and then it says "Sesame Street."
14       You know Elmo is a Sesame Street
15 character, right?
16    A.   I'm aware, yes.
17    Q.   I'm not gonna do an Elmo
18 cross-examination, in the event it puts you at ease.
19       Does seeing online content regarding --
20 well, let me put it in your terms.
21       Why do you reference Elmo and Sesame
22 Street on this slide?
23    A.   So, again, if I can show you the document,
24 this was a study where we bring in toddlers, and we
25 had them cross over from playing with a traditional

13 (Pages 46 - 49)

Page 50

1 electronic toy, like Elmo's guitar.  The Music
2 Sparkles is just a simple app that simulates Elmo's
3 guitar.  And the Peg's Parade has these other
4 additional features that build in salients,
5 intermittent variable reward, et cetera.
6         And the idea was to test how
7 compulsively -- or how reluctant the child was, the
8 latency with which they would return the toy.  And
9 so that was the point of this particular study.
10    Q.  Okay.  Let me go back to -- that helps to
11 understand.  Let me go back to the Peg's Parade
12 example.
13        Are there a range of other -- strike that.
14        Is Peg's Parade an app?
15    A.  Yes, it's something you'd have on a
16 touchscreen, yes.  You can download it.
17    Q.  Are there a range of apps available on
18 iPads, Galaxy, iPhones that put -- that have
19 features that put toddlers at risk of digital
20 addiction?
21        MS. COUCH:  Object to the form.
22    A.  There are.  And we -- this is an exemplar.
23 We had at least two or three in this study that we
24 varied.  So yes, there are other ones too, and we
25 deliberately chose it because of those features,

Page 51

1 just differentiating it from the Music Sparkles app
2 which is there.
3 BY MR. SCHMIDT:
4    Q.  Do you know how many, ballpark -- I know
5 you probably haven't counted one by one -- but is it
6 common or uncommon for there to be apps on iPads,
7 iPhones, Galaxies that have features that create a
8 risk of digital addiction in toddlers?
9        MS. COUCH:  Objection to form.
10    A.  There are hundreds of thousands of apps.
11 I'm not in position to say how common it is.  I
12 haven't studied them.
13 BY MR. SCHMIDT:
14    Q.  Does digital addiction -- strike that.
15        If a toddler has digital addiction, are
16 they at risk for further addiction down the road in
17 your view?
18        MS. COUCH:  Objection to form.
19    A.  It's funny you should ask that.  We have a
20 research study under review now.  It's an NIH study.
21 No one knows the answer to that as far as I know.
22 It's -- you know...
23 BY MR. SCHMIDT:
24    Q.  What if -- let me be more specific in my
25 question.

Page 52

1         If a toddler develops digital addiction,
2 is there a greater likelihood that they will still
3 have digital addiction as a teen?
4        MS. COUCH:  Objection to form.
5    A.  I can't answer that.  No one knows the
6 answer to that.
7 BY MR. SCHMIDT:
8    Q.  If a toddler has digital addiction, is
9 there a greater likelihood that that they will have
10 social media addiction as a teen?
11        MS. COUCH:  Objection to form.
12    A.  I can't answer that.  No one can answer
13 that.
14 BY MR. SCHMIDT:
15    Q.  Go back, if you would, to that slide that
16 said "Infants may be at great risk."
17        Do you see that?
18    A.  I know it.  I don't see it.
19        Okay.
20    Q.  What do you mean when you say "great
21 risk"?
22        What is the great risk that infants are at
23 risk of from being exposed to apps with features
24 that can create digital addiction?
25    A.  These two bullets here speak to them, that

Page 53

1 they -- to try and understand causality.  And the
2 so-called "violation of expectations paradigm."
3    Q.  What I'm wondering is, "risk" seems like
4 a risk of harm; is that right?
5    A.  Risk of developing digital addiction, yes.
6    Q.  Do you know how easy it is, once you have
7 digital addiction, as you understand it, to overcome
8 it, to no longer have digital addiction?
9        MS. COUCH:  Object to the form.
10    A.  Are we still talking about toddlers?
11 BY MR. SCHMIDT:
12    Q.  Sure.
13    A.  I can't -- honestly, I don't know that
14 there are many people studying this besides me.  And
15 I don't know the answer to that, so I can't answer
16 that.
17    Q.  Look with me, if you would, at the next
18 slide, please.  It says "cause and effect."
19        What is it that you're illustrating here?
20    A.  That young infants, when they're born,
21 don't understand the rules that govern universe, and
22 they spend an enormous amount of mental energy
23 trying to understand cause and effect.  So when you
24 look at a baby who is looking intently at you,
25 they're trying to make sense of what makes something

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

1 happen.
2    Q.  Is social media addiction, in your view, a
3 form of digital addiction?
4        MS. COUCH:  Object to the form.
5    A.  Yes, I would say it's a form of digital
6 addiction.
7 BY MR. SCHMIDT:
8    Q.  Let's go back to your Thottan paper,
9 Exhibit 6.
10    A.  Which paper?  The sleep paper we're
11 talking about?
12    Q.  Yes.  The one from this year.  Let's go
13 back to page 2.  Let's look at the third paragraph.
14        Do you see it discusses sleep being a
15 vital part of lifestyle of young people in the
16 consequences of -- actually, let's strike that.
17        Let's go to page 5 of the publication,
18 please.
19    A.  (Witness complies.)
20    Q.  Do you see that this is a discussion of
21 the findings of this publication of yours?
22    A.  Yes.  Where are you referring to
23 specifically?  The whole page 5.
24    Q.  Mostly of page 5.  Let's go to
25 section 4.1, where it says "Potential mechanisms."

Page 55

1        Do you see that?
2    A.  Uh-huh.
3    Q.  If we look towards the end of that
4 paragraph, after the marker for footnote 30 and 31,
5 it says:
6        "These findings suggest that the addictive
7 properties of screen time could be compelling young
8 people to prolong screen time at the expense of
9 sleep."
10        Do you see that?
11    A.  I do.
12    Q.  Do you agree with that statement; yes or
13 no?
14        MS. COUCH:  Object to the form.
15    A.  I agree with that statement.  And the
16 question is, what constitutes that screen time?  But
17 yes, I agree with that statement.
18 BY MR. SCHMIDT:
19    Q.  It then says:
20        "However, it is also possible that chronic
21 lack of sleep impairs self-regulation, leading to
22 increased screen time, highlighting a potential
23 bidirectional and self-perpetuating relationship
24 where screen time continues to increase, and sleep
25 quality and quantity continue to decrease."

Page 56

1        Did I read that correctly?
2    A.  You did.  This is all in my sleep section
3 of my report.  There's nothing here that -- yes,
4 this is correct.
5    Q.  And do you agree with that statement?
6    A.  I agree with that statement, and it's in
7 my report.
8    Q.  Next, it says:
9        "Alternatively, children and adolescents
10 who naturally have sleep difficulties could be using
11 electronic devices as a sleeping aid" -- and then
12 there's a citation to a study on that point -- "or
13 as entertainment after trying to fall asleep and
14 failing," and then there's a citation to another
15 study.
16        Do you agree with that statement?
17    A.  I agree with that statement, and this is
18 all in my sleep section, yes.
19    Q.  Next paragraph says:
20        "In a 2024 systematic review by the
21 National Sleep Foundation expert consensus panel on
22 screen use and sleep health, a consensus was reached
23 that screen use was generally detrimental to sleep
24 health in children and adolescents and that the
25 content of presleep screen use was an important

Page 57

1 factor."
2        Do you agree with that statement?
3        MS. COUCH:  Objection to form.
4    A.  I'm actually an author on that consensus,
5 statement.  So yes.
6 BY MR. SCHMIDT:
7    Q.  And then if you look down under "Strengths
8 and limitations,"
9        Do you see that?
10    A.  Yes.
11    Q.  Do you agree with that last statement in
12 that paragraph:
13        "Lastly, this study" -- and you'll recall
14 I read this language -- I referenced this language
15 earlier today.  It says:
16        "Lastly, this study was cross-sectional,
17 which prevents causal inference, so future
18 longitudinal or experimental studies are needed to
19 confirm our findings in a large and representative
20 U.S. sample."
21        Did I read that correctly?
22    A.  You read that sentence correctly, yes.
23    Q.  Do you agree that because this study was
24 cross-sectional, it prevents causal inference; yes
25 or no?

15 (Pages 54 - 57)

CONFIDENTIAL

1    MS. COUCH:  Object to the form.
2    A.  I believe that this study in isolation as
3 a cross-sectional study prevents causal inference in
4 this case, yes.
5 BY MR. SCHMIDT:
6    Q.  Look with me at the next page.  You see
7 where it says the funding source is a grant from
8 Children and Screens: Institute of Digital Media and
9 Child Development.
10    Do you see that?
11    A.  I do.
12    Q.  What is your role in Children and Screens
13 again?
14    A.  I'm the chief science officer.
15    Q.  How long have you had that role?
16    A.  I believe, two years.  As a matter of
17 fact, we can find it out, but I think it's about two
18 years.  Maybe it's longer.
19    Q.  Did you have a role with them before that?
20    A.  I was a member of their advisory board
21 since its inception.
22    Q.  Do you know where the funding that allowed
23 this grant came from, where Children and Screens
24 received that funding?
25    A.  For this particular study?

1    Q.  Yes.
2    A.  As a general principle, the biggest donor
3 for this is the founder.  I think she collects --
4 she has fundraising.  I don't know -- I can't answer
5 specifically where it came from, but it's knowable
6 from their --
7    Q.  Who is the founder?
8    A.  Her name is Pamela Hurst-Della Pietra.
9    Q.  Do you remember me asking you when we had
10 a chance to talk before about one of the lawyers in
11 this case, Matt Bergman?
12    A.  Yes, I do.
13    Q.  Do you know if Mr. Bergman provided
14 funding that allowed this grant for this study?
15    A.  The reason I hesitated before was because
16 I was wondering if that's what you were thinking.
17 And I know for a fact that he did not because he was
18 unknown to Children and Screens at the time that
19 this study was funded.
20    Q.  When did he become known to
21 Children and Screens?
22    A.  I don't know precisely when, but this was
23 well before that.  This was funded three or four
24 years ago.  We can find that out.  I don't remember
25 the precise date.

1    Q.  How would we find that out?
2    A.  I can find it out for you if you really
3 want to know the date.  I can tell you that the
4 point -- I mean, this -- the intent of this study
5 was, if you want to know --
6    Q.  No.  I'm just interested in the funding
7 point.  And if you don't know right now, that's
8 fine.
9    A.  We can find it out, but it was many years
10 ago.  It was before the Utah law was supposed to go
11 in effect.  This was supposed to be pre-Utah law
12 data.
13    Q.  Look with me, if you would, a little
14 further down.  It says "Declaration of competing
15 interest."
16    Do you see that?
17    A.  Yes.
18    Q.  It says "The authors have nothing to
19 declare."
20    Do you see that?
21    A.  I do see that.
22    Q.  Did you fill out a form with any competing
23 interests you would have when this was submitted for
24 publication?
25    A.  I must have, yes.

1    Q.  Did you identify the fact that you were a
2 paid plaintiff's expert in that form?
3    A.  I don't recall, but I don't think I was.
4 This paper has been submitted -- before it was
5 published, was submitted to multiple, multiple
6 journals.  So -- but I'm happy to contact the
7 journal.  I'm happy to declare it.  But at the time
8 this paper was written, which was a long time ago, I
9 don't believe I was actually retained.
10    Q.  Well, when you submitted this to the
11 journal, if we look at page 1, it was just a few
12 months ago, on May 6, 2025, correct?
13    MS. COUCH:  Object to the form.
14 BY MR. SCHMIDT:
15    Q.  That's when they first received it from
16 you?
17    MS. COUCH:  Same objection.
18 BY MR. SCHMIDT:
19    Q.  Correct?
20    A.  That's what it says, yes.
21    Q.  And then they received it again from you
22 on June 19, 2025, just a few days before you and I
23 met for your prior deposition, correct?
24    A.  Yeah, that's correct.  That's what it
25 says.

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

1    Q.  At both those points in time, you were a
2  paid expert for plaintiff lawyers in this lawsuit,
3  right?
4    A.  You are correct.  This paper was written
5  long before that, but you are right that when it was
6  submitted, according to this, I was; that's correct.
7    Q.  And so do you know if you disclosed to
8  this journal that you were a paid expert for
9  plaintiffs in this lawsuit?
10        MS. COUCH:  Object to form.
11    A.  I honestly don't recall.  Like I said, the
12  original version of this was submitted many years
13  ago, and it's been submitted to many journals.  I
14  don't recall.  I should have.  And I can rectify
15  that if that's important to you.
16  BY MR. SCHMIDT:
17    Q.  Do you know -- well, do you think it's
18  important for the scientific community to know, to
19  have a full disclosure of competing interests?
20        MS. COUCH:  Object to the form.
21    A.  As a journal editor, the question of bias
22  is when the study is done and written.  And as I
23  said, this was -- yes, I think it should be
24  disclosed, and I'm happy to disclose it to the
25  journal now.

Page 63

1  BY MR. SCHMIDT:
2    Q.  Do you know if the sleep medicine
3  disclosure specifically asks about expert witness
4  work as part of their competing interests
5  disclosure?
6        MS. COUCH:  Object to the form.
7    A.  I don't recall offhand.  We can find that
8  out.  And like I said, I'm -- I will -- I'm happy to
9  note that I should have reported that.  I don't
10  recall filling it out -- oh, you have it for me.
11        MR. SCHMIDT:  Passing you a copy which I'm
12    marking as Exhibit 8.
13        (Exhibit 8 was received and marked for
14    identification, as of this date.)
15  BY MR. SCHMIDT:
16    Q.  Do you recognize this as the website for
17  Sleep Medicine including information about
18  disclosures?
19    A.  I do not, actually, but...
20    Q.  Let's take a look.  Do you see it says
21  "Sleep Medicine"?
22    A.  I do.  I do.
23    Q.  If you go to the second page, do you see
24  it says "About this Journal"?
25    A.  Yes.

Page 64

1    Q.  If we go to page 6, please.
2    A.  (Witness complies.)
3    Q.  Do you see it has "Declaration of
4  competing interests"?
5    A.  Yes.
6    Q.  It says:
7        "All authors must disclose any financial
8  and personal relationships with other people or
9  organizations that could inappropriately influence
10  or bias their work.  Examples of potential competing
11  interests include," and then if you look down at the
12  bottom, it says "paid expert testimony."
13        Do you see that?
14    A.  I see that.
15    Q.  Will you now disclose your paid expert
16  testimony based on this disclosure statement?
17        MS. COUCH:  Object to the form.
18    A.  I will notify them, yes.
19  BY MR. SCHMIDT:
20    Q.  Okay.  And do you agree with me your paid
21  expert work does require disclosure under the
22  agreement that we're looking at?
23        MS. COUCH:  Same objection.
24    A.  I do.  And I have disclosed it to the best
25  of my knowledge since I've been retained.  This was

Page 65

1  an oversight.
2  BY MR. SCHMIDT:
3    Q.  I asked if you agree to some of the
4  statements in your article and some of the
5  statements in the Xiao article.
6        Do you remember that?
7        MS. COUCH:  Object to the form.
8    A.  I don't know what you're referring to.
9        MR. SCHMIDT:  That's fine.  I'll show you
10  another statement.  And I want to see if you
11  agree with me on this statement, marked as
12  Exhibit 9.
13        (Exhibit 9 was received and marked for
14  identification, as of this date.)
15  BY MR. SCHMIDT:
16    Q.  A statement that I'll read into the
17  record.  And I want you to tell me if you agree with
18  this as a description of the science.
19        "The available evidence is insufficient to
20  support or challenge the claim that imposing and
21  enforcing a legal minimal age of 16 for opening
22  social media accounts would benefit the mental
23  health of adolescents overall."
24        Do you see that statement?
25        MS. COUCH:  Object to form.

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

1      A.  I see the same.
2  BY MR. SCHMIDT:
3      Q.  Do you agree with it?
4          MS. COUCH:  Same objection.
5      A.  I don't agree with.
6          MR. SCHMIDT:  Show you another one.  This
7  will be Exhibit 10.
8          (Exhibit 10 was received and marked for
9  identification, as of this date.)
10         MS. COUCH:  When it's a good time, I need
11  to take a bathroom break.
12         MR. SCHMIDT:  If I could finish this,
13  would be a perfect time.
14  BY MR. SCHMIDT:
15     Q.  Exhibit 10 states:
16         "While there is some preliminary
17  correlational evidence supporting the claim that
18  heavy daily use of smartphones and social media can
19  cause behavioral addiction, the experimental
20  evidence is virtually absent and the underlying
21  mechanisms are at times controversial."
22         Do you agree with that statement?
23         MS. COUCH:  Object to form.
24     A.  It's provided without any context.  I
25  don't know where this comes from, when it was said.

Page 67

1  But I don't agree with it.
2  BY MR. SCHMIDT:
3      Q.  Okay.  Let me show you another one.  Back
4  to the point we were talking about, about sleep a
5  moment ago.
6          MS. COUCH:  You've got a big stack of
7  folders.
8          MR. SCHMIDT:  Three more.
9          (Exhibit 11 was received and marked for
10  identification, as of this date.)
11  BY MR. SCHMIDT:
12     Q.  Exhibit 11 states:
13         "While there is evidence that heavy daily
14  use of smartphones and social media can cause some
15  sleep problems, the extent to which it causes sleep
16  deprivation specifically remains unclear."
17         Do you agree with that statement?
18         MS. COUCH:  Objection to form.
19     A.  These statements are all being taken, in
20  my opinion, out of context.  It's hard to know what
21  they're referencing to.  They're very abstract and
22  very general.  But -- so -- well, that's what I'll
23  say about all of these statements, frankly.  But
24  yeah.
25

Page 68

1  BY MR. SCHMIDT:
2      Q.  Do you agree with this statement about
3  heavy daily use of smartphones and social media
4  causing -- let me read it again.
5          Do you agree with this statement that:
6          "While there is evidence that heavy daily
7  use of smartphones and social media can cause some
8  sleep problems, the extent to which it causes sleep
9  deprivation specifically remains unclear"?
10         Do you understand that to be an accurate
11  statement of the science?
12         MS. COUCH:  Objection to the form.
13     A.  Again, without context, I don't know -- I
14  honestly don't know what is meant in this.  I do
15  believe the first part, that smartphone and social
16  media particularly can cause sleep problems.  I
17  believe that, and it's in my report.
18  BY MR. SCHMIDT:
19     Q.  Do you believe that the extent to which
20  heavy daily use of smartphones and social media
21  causes sleep deprivation specifically remains
22  unclear?
23         MS. COUCH:  Object to the form.
24     A.  I don't know the context that this
25  statement is coming from.  You're making me answer

Page 69

1  it without any context.  It's a hard thing for me to
2  do.
3  BY MR. SCHMIDT:
4      Q.  Okay.  Do you know if it's true or not?
5          MS. COUCH:  Same objection.
6  BY MR. SCHMIDT:
7      Q.  Let me just ask you independent.
8          Do you know if it's true or not that the
9  extent to which heavy daily use of smartphones and
10  social media causes sleep deprivation remains
11  unclear?
12         MS. COUCH:  Object to the form.
13     A.  I believe that it's in my report.  I
14  believe that social media causes sleep problems,
15  yes.
16  BY MR. SCHMIDT:
17     Q.  That's not my question.
18         My question is, do you agree with me that
19  it is unclear the extent to which heavy daily use of
20  smartphones and social media causes sleep
21  deprivation?  That's unclear?
22         MS. COUCH:  Same objection.
23     A.  I think these are out of context, and I
24  have a feeling I -- it's hard for me to answer.
25         MR. SCHMIDT:  Okay.  Why don't we take our

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

1    break.
2        MS. COUCH: Thank you.
3        THE VIDEOGRAPHER: The time right now is
4    10:15 a.m. We're off the record.
5        (Recess.)
6        THE VIDEOGRAPHER: The time right now is
7    10:33 a.m. We're back on the record.
8 BY MR. SCHMIDT:
9    Q. Dr. Christakis, I want to return to this
10 topic of digital addiction and early exposure to
11 digital addiction.
12       You've given various talks on that topic,
13 right?
14    A. On the topic of digital addiction, have I
15 given various talks?
16    Q. I'm thinking specifically of talks on
17 digital addiction at a very early age.
18       You've given talks on that, right?
19    A. I have given talks on digital addiction at
20 an early age.
21    Q. Do you believe that digital addiction at
22 an early age is a public health concern?
23    A. I can't comment on that. There's not
24 enough data, but -- I can't comment on that.
25    Q. Well, you have expressed concern about the

Page 71

1 risk of digital addiction in toddlers.
2        We saw that in your slide deck, right?
3    A. Right. But for it to be a public health
4 concern, I'd have to have a better sense of the
5 prevalence, and I have no idea of the prevalence.
6        MR. SCHMIDT: I'm going to show you a clip
7    from a talk you've given on digital addiction
8    in very young children, and I want to ask you a
9    question about it. And we'll mark the URL as
10   Exhibit 12.
11       (Exhibit 12 was received and marked for
12 identification, as of this date.)
13       MR. SCHMIDT: Are we able to play that?
14   It's 220A.
15       (Video played.)
16       MR. SCHMIDT: A few questions.
17 BY MR. SCHMIDT:
18    Q. Do you recognize yourself giving that
19 talk?
20    A. I do. I'm curious when that was. I'm
21 trying to place it. But yes, that's me in the talk.
22    Q. And do you recall giving that talk?
23    A. I don't know when this talk was, but
24 that's me in the video, yes.
25    Q. I'm going to ask you about a specific

Page 72

1 statement you made. And if you want -- I've got it
2 written down on my page, but we don't have a
3 transcript of it, so if you want, we can replay the
4 video.
5        But in that talk you say:
6        "The truth is that I think, and I hope I
7 can convince you, that the digital addiction really
8 begins in early childhood."
9        Do you remember saying that or do you want
10 to see the clip again?
11       MS. COUCH: Object to the form.
12    A. No. I heard myself say that.
13 BY MR. SCHMIDT:
14    Q. Okay. And do you believe that the digital
15 addiction really begins in early childhood?
16       MS. COUCH: Object to the form.
17    A. No, I don't believe that. I think what I
18 was trying to say there is that the problem of
19 compulsive use can occur in young children. That's
20 really all I could say, because that's all I know.
21 BY MR. SCHMIDT:
22    Q. Do you know -- do you recall in the clip
23 just now saying media habits you develop with your
24 young children are really essential to the long-term
25 development?

Page 73

1        MS. COUCH: Object to the form.
2    A. I did say that. It's out of the broader
3 context of the talk because I was talking about
4 child development.
5 BY MR. SCHMIDT:
6    Q. Do you believe that media habits developed
7 with young children are essential to their long-term
8 development?
9        MS. COUCH: Object to the form.
10    A. I believe that early media use can
11 adversely affect some young children's development.
12 Yes, I believe that.
13 BY MR. SCHMIDT:
14    Q. Let's look at something else.
15       Do you have your rebuttal report in front
16 of you, Exhibit 2?
17    A. I do.
18    Q. Would you mind going to page 14, Figure 6.
19    A. Yes.
20    Q. Actually, go back with me two pages.
21       Do you see you have an image there from an
22 APA PowerPoint presentation?
23       MS. COUCH: Object to the form.
24    A. Figure 5?
25       MR. SCHMIDT: Yes.

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

1    A.  Yes.
2  BY MR. SCHMIDT:
3    Q.  And do you see it says:  "Social media
4  companies use strategies like 'closed portals' and
5  'infinity scrolls'"?
6        Do you see that?
7    A.  Yes.
8    Q.  What is a closed portal?
9    A.  I'm not sure what they meant by that.  I
10  know what an infinity scroll is, but I don't know
11  what a closed portal is in this context.
12    Q.  Does Instagram have closed portals?
13        MS. COUCH:  Object to the form.
14    A.  I'm not sure what they mean by "closed
15  portals," so I can't comment on who has it.
16  BY MR. SCHMIDT:
17    Q.  Does YouTube, Snapchat, TikTok, or
18  Facebook have closed portals?
19        MS. COUCH:  Object to the form.
20    A.  I don't know what they mean by "closed
21  portals."  I know what they mean by "infinity
22  scrolls."  I don't know what they mean by "closed
23  portals."
24  BY MR. SCHMIDT:
25    Q.  Let's go to page 14, please.

Page 75

1    A.  (Witness complies.)
2    Q.  Do you see that you have in Figure 6 a
3  list of what you -- well, I'll use your wording.
4        Figure 6 is a "Summary of Harmful Design
5  Features by Platform," according to you.
6        Do you see that?
7    A.  Yes, I see that.
8    Q.  The first one is "infinite scroll."
9        Do you see that?
10    A.  I do see that.
11    Q.  Do you know if other apps, especially
12  media apps, have infinite scroll?
13    A.  I don't know if other apps have it.  I
14  only know the ones that I looked at for this case.
15    Q.  I'm just going to give you some names and
16  ask you if they have infinite scrolls.
17        Does Netflix?
18    A.  I don't know.
19    Q.  Does Amazon Prime?
20    A.  I don't know.
21    Q.  Do dating sites?
22    A.  I don't know.
23    Q.  Does X or Twitter?
24    A.  I don't know.
25    Q.  Do you know of any media app that does not

Page 76

1  have infinite scroll?
2        MS. COUCH:  Object to the form.
3    A.  Can you repeat the question?
4        MR. SCHMIDT:  Of course.
5  BY MR. SCHMIDT:
6    Q.  Do you know of any media app that does not
7  use infinite scroll?
8    A.  What do you mean?
9        MS. COUCH:  Object to the form.
10    A.  What do you mean by "media app"?
11  BY MR. SCHMIDT:
12    Q.  Well, you know what media is, right?  You
13  know different media sources have apps?
14    A.  Yeah.
15    Q.  There's social media apps.  There's media
16  apps like Netflix, like Amazon, like New York Times,
17  various forms of media apps, right?
18    A.  Yeah.
19    Q.  Are you able to identify any media app
20  that does not employ infinite scroll?
21        MS. COUCH:  Object to the form.
22    A.  I'm sure there are.  I'm just thinking, I
23  mean, of the ones that I use.  I don't know.  I
24  can't answer that, but I'm sure there are.
25

Page 77

1  BY MR. SCHMIDT:
2    Q.  Look with me a few lines down.  You
3  identify "notifications."
4        Do you see that?
5    A.  Yes.
6    Q.  Are you aware that notifications can be
7  blocked through the iPhone, that there's a feature
8  on the iPhone that lets you block notifications from
9  every service or from specific services?
10        MS. COUCH:  Object to the form.
11    A.  I know there's a notification switch on
12  the iPhone and that it has apps.  I don't know how
13  it works and how complete it is.
14  BY MR. SCHMIDT:
15    Q.  Have you had the experience where you
16  download a new app, and the first time you open it,
17  it asks if you want to receive notifications?
18        MS. COUCH:  Object to the form.
19    A.  Yes.  I recall getting that sometimes, but
20  I also feel like I get notifications when I don't
21  want them from -- you know...
22    Q.  Do you know of any app that does not try
23  to send notifications?  Can you name me any app that
24  does not try to send notifications?
25        MS. COUCH:  Object to the form.

Golkow Technologies,
A Veritext Division

877-370-3377                                          www.veritext.com

Page 78

1    A.  I'm honestly not an expert on all of the
2  existing apps.  There are -- I can't comment on if
3  there's any app anywhere that doesn't use
4  notifications.
5  BY MR. SCHMIDT:
6    Q.  Let's look at newsfeed prioritization.
7       Do you see that?
8    A.  I see that.
9    Q.  Let me take a step back.  These different
10 design features you have listed here, do you see
11 this list?
12   A.  I do.
13   Q.  Is there any design feature on this list
14 that you would say is unique to the social media
15 companies involved in this case: Instagram,
16 Facebook, TikTok, Snapchat, and YouTube?
17      MS. COUCH:  Object to the form.
18   A.  Is any of these unique to a single one?
19 BY MR. SCHMIDT:
20   Q.  No.  Unique to some combination of those
21 companies as opposed to other apps not using them?
22      MS. COUCH:  Object to the form.
23   A.  Oh, I'm sure there are.  I mean, there
24 must be, but I don't -- I can't -- I'm not in a
25 position to answer that.  I didn't study that

Page 79

1  specifically.  That's a totally different question.
2  BY MR. SCHMIDT:
3    Q.  Okay.  Could you point to any of these
4  features that are only present on some combination
5  of TikTok, Instagram, Facebook, YouTube, and Snap
6  and no other app outside of those apps?
7       MS. COUCH:  Object to the form.
8    A.  I wasn't asked to render an opinion on
9  that.  I don't have an opinion on that.  I don't --
10 no.
11   Q.  Do you know which of these features are
12 present on Peg's Parade?
13   A.  On what?
14   Q.  Peg's Parade, the kids one we were talking
15 about earlier.
16   A.  I didn't look at that.  I can -- I don't
17 have an opinion on that.
18   Q.  Do you know if -- do you know what
19 Cocomelon is?
20   A.  No, I don't know what Cocomelon -- no, I
21 don't know what Cocomelon is.
22   Q.  Okay.  We were talking about newsfeed, do
23 you see your identification of newsfeed?
24   A.  Newsfeed prioritization?
25   Q.  Yeah.

Page 80

1    A.  Yes.
2    Q.  Does X, formerly known as Twitter, have
3  newsfeed?
4       MS. COUCH:  Object to the form.
5    A.  I don't know, I'm not on it anymore.  I
6  haven't been it on it for quite a while.
7  BY MR. SCHMIDT:
8    Q.  Does LinkedIn have newsfeed?
9       MS. COUCH:  Object to the form.
10   A.  I don't know.  I'm on LinkedIn, but I
11 don't know.  I almost never go there.
12 BY MR. SCHMIDT:
13   Q.  Do apps like ESPN and Bleacher Report have
14 newsfeed?
15      MS. COUCH:  Same objection.
16   A.  I don't know the answer to that.
17 BY MR. SCHMIDT:
18   Q.  Let's look at short form videos.
19      Do you see that?
20   A.  I see that.
21   Q.  Are you aware of --
22      MS. COUCH:  Object to form.
23 BY MR. SCHMIDT:
24   Q.  -- any media app that does not offer short
25 form videos, whether it's Netflix, whether it's

Page 81

1  something like ESPN, whether it's something like
2  Twitter, whether it's a dating site, are you aware
3  of any app that focuses on media and does not have
4  short form videos?
5       MS. COUCH:  Object to the form.
6    A.  I'm sure there are, again, but I don't
7  know -- I'm not -- there's hundreds of thousands of
8  apps so...
9  BY MR. SCHMIDT:
10   Q.  Can you name me one that doesn't have
11 short form videos?
12      MS. COUCH:  Object to the form.
13   A.  It's not something I was asked to look at.
14 So I don't have an answer for that.
15 BY MR. SCHMIDT:
16   Q.  You then list variable intermittent
17 rewards.
18      Do you see that?
19   A.  Yes.
20   Q.  Are you aware of any media apps or gaming
21 apps that don't have variable intermittent rewards?
22      MS. COUCH:  Object to the form.
23   A.  I do the Bee every day, it doesn't have
24 intermittent variable rewards.
25

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

1  BY MR. SCHMIDT:
2      Q.  The Spelling Bee on the New York Times?
3      A.  Yeah.
4      Q.  That does have streaks, right?
5          MS. COUCH:  Object to the form.
6      A.  It might, yeah.
7  BY MR. SCHMIDT:
8      Q.  You didn't notice every time you open it,
9  it tells you how long your streak has been going?
10         MS. COUCH:  Object to the form.
11 BY MR. SCHMIDT:
12     Q.  Let me -- actually --
13     A.  I don't know.
14     Q.  Let me actually withdraw that.
15         Do you know that you can go into the app
16 and it -- yeah -- do you know every time you open
17 it, it tells you your performance stats?
18         MS. COUCH:  Object to the form.
19     A.  I'm not disputing that.  I haven't noticed
20 it.  Maybe I don't use it enough.
21 BY MR. SCHMIDT:
22     Q.  Do you use Wordle on the New York Times?
23     A.  I do not.
24     Q.  Okay.  That's what I was thinking of in
25 terms of the streaks.

Page 83

1          Do you know of any other app other than
2  Spelling Bee on The New York Times that does not
3  use -- that is a media app that does not use
4  intermittent variable rewards?
5          MS. COUCH:  Object to the form.
6      A.  Sitting here right now, no, I don't, but
7  I'm sure there are others.
8  BY MR. SCHMIDT:
9      Q.  Are there other apps that have likes?
10     A.  Other apps besides these that use likes in
11 some?
12     Q.  Yes, sir.
13     A.  I don't know -- I wasn't asked to look at
14 that.  I suspect there probably are.
15     Q.  Do you know how common it is for apps to
16 use likes?
17         MS. COUCH:  Object to the form.
18     A.  I have no way of answering that.  The
19 denominator is in the hundred of thousands.
20 BY MR. SCHMIDT:
21     Q.  Do you know if there are other apps that
22 use engagement algorithms?
23         MS. COUCH:  Object to the form.
24     A.  I don't know how to answer that.  I'm sure
25 there are but I don't know.  I didn't look at it.

Page 84

1  BY MR. SCHMIDT:
2      Q.  Can you name me a single media app that
3  does not use engagement algorithms?
4          MS. COUCH:  Object to the form.
5      A.  I'm sure there are.  I wasn't asked to
6  look at that.
7  BY MR. SCHMIDT:
8      Q.  Can you name me one?
9          MS. COUCH:  Same objection.
10     A.  It's not something that I was asked to
11 render an opinion on.
12 BY MR. SCHMIDT:
13     Q.  Can you name me one, notwithstanding the
14 fact you weren't asked by your lawyers to render an
15 opinion on that?
16         MS. COUCH:  Same objection.
17     A.  I honestly don't use very many apps so I'm
18 not in a position to comment.  I'm sort of
19 reflecting on a few that I use.  I don't know.  I
20 don't have an opinion on that.
21 BY MR. SCHMIDT:
22     Q.  What about video autoplay, do you know if
23 there are apps other than TikTok, Instagram,
24 Facebook, YouTube, and Snap that use video autoplay?
25         MS. COUCH:  Object to the form.

Page 85

1      A.  I don't know the answer to that.
2  BY MR. SCHMIDT:
3      Q.  Do you know if most media apps use video
4  autoplay?
5          MS. COUCH:  Same objection.
6      A.  I don't even know what constitutes a media
7  app so I don't have an answer to that.
8  BY MR. SCHMIDT:
9      Q.  Do you know if all these apps you list
10 here use video autoplay:  TikTok, Instagram,
11 Facebook, YouTube, and Snap?
12         MS. COUCH:  Same objection.
13     A.  At the time I authored this report, yes, I
14 believe that they did.
15 BY MR. SCHMIDT:
16     Q.  What is video autoplay?
17     A.  It's a setting whereby when one video
18 finishes, another one automatically cues up and
19 starts if you don't take an action.
20     Q.  Do you know Instagram does not have that
21 feature as you just described it?
22         MS. COUCH:  Object to the form.
23     A.  I believe that they did when I wrote this.
24 BY MR. SCHMIDT:
25     Q.  Do you know whether Instagram has never

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

1 had that feature as you describe it?
2      MS. COUCH: Object to the form.
3      A. I don't agree with that.
4 BY MR. SCHMIDT:
5      Q. Do you know that Facebook does not have
6 that feature as you just described it?
7      MS. COUCH: Objection.
8      A. I don't agree with that. I'm not sure
9 what you're referring to.
10 BY MR. SCHMIDT:
11      Q. Do you know how common that feature is
12 among media apps other than the ones being sued in
13 this case?
14      MS. COUCH: Object to the form.
15 BY MR. SCHMIDT:
16      Q. Media autoplay.
17      A. I don't know how common that is, no.
18      Q. Focusing on this list, do you have the
19 opinion that one of these features is -- strike
20 that.
21      Could you rank these features in terms of
22 the impact you believe they have, the negative
23 impact you believe they have?
24      MS. COUCH: Object to the form.
25      A. I can't rank them, no. They're all part

Page 87

1 of the experience when they're together and I can't
2 rank them, no.
3 BY MR. SCHMIDT:
4      Q. Do you know if any one of these is
5 independently sufficient to cause harm by itself?
6      MS. COUCH: Object to the form.
7      A. What do you mean by that?
8 BY MR. SCHMIDT:
9      Q. I mean, if you had infinite scroll, but no
10 other feature, is that independently sufficient to
11 cause harm?
12      MS. COUCH: Object to the form.
13      A. If by "harm" you mean increase engagement
14 with the platform, I believe that yes, infinite
15 scroll increases engagement by itself, but it's
16 rarely present by itself. These are present, as you
17 can see, in combinations on all of the sites.
18 BY MR. SCHMIDT:
19      Q. So let me ask you a few questions about
20 that. Did you try to tease out the impact of one of
21 these features versus the others to give some kind
22 of weighting to the impact individual features have
23 as opposed to their combined effect?
24      MS. COUCH: Object to the form.
25      A. I did not, and I don't think it's

Page 88

1 important because the studies I looked at looked at
2 the experience of the platforms as they exist. And
3 as they exist, multiple features are present.
4 BY MR. SCHMIDT:
5      Q. I asked you about harm and you said if by
6 harm you mean increased engagement with the
7 platform. Are you -- do you remember giving that
8 answer just a moment ago?
9      A. Yes, I did give that answer.
10      Q. Engagement means using the platform,
11 right?
12      MS. COUCH: Object to the form.
13      A. No. No, I think engagement is more than
14 using the platform.
15 BY MR. SCHMIDT:
16      Q. Okay. Are you aware of any media app that
17 doesn't try to increase engagement with the app?
18      MS. COUCH: Object to the form.
19      A. I can't answer that. I don't know.
20 BY MR. SCHMIDT:
21      Q. Okay. You are aware that, like, let's go
22 back to TV. TV measures how long people spend
23 watching TV shows and what shows they watch, right?
24 You're familiar with Nielsen ratings and set-top box
25 data that tracks how long people watch TV, right?

Page 89

1      MS. COUCH: Object to the form.
2      A. Nielsen ratings didn't track how long
3 people watched, it tracked how many people watched a
4 particular show. That's different.
5 BY MR. SCHMIDT:
6      Q. Okay. That's a measure of engagement,
7 though, right?
8      A. It's a measure of viewing, it's not a
9 measure of engagement.
10      Q. You don't think a Nielsen rating is a
11 measure of engagement?
12      MS. COUCH: Object to the form.
13      A. I studied television years ago, and some
14 of the problem with the Nielsen data is that
15 25 percent of households have their televisions on
16 all the time, even when no one is watching. And if
17 that's a Nielsen household, they're collecting data
18 on it.
19 BY MR. SCHMIDT:
20      Q. My only question is -- I understand
21 there's limitations to Nielsen data that probably
22 are surprising to people who don't know those
23 limitations, given how much it gets talked about.
24 My question is simply: Does Nielsen data measure
25 engagement?

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

1  A.  No.
2  Q.  Okay.  Do you believe -- just looking at
3 your features list, you believe one of the features
4 that causes harm is the use of algorithms to promote
5 addictive engagement; is that right?
6  A.  That's correct.
7  Q.  I don't see this on your list so I'm going
8 to ask you about it.  Do you believe that a feature
9 that causes harm is failing to put default
10 protective limits on the length and frequency of
11 sessions?
12      MS. COUCH:  Object to the form.
13 BY MR. SCHMIDT:
14  Q.  Do you believe that causes harm?
15      MS. COUCH:  Same objection.
16  A.  Can you repeat the question?  I'm sorry.
17 BY MR. SCHMIDT:
18  Q.  Yeah.  Does failing to put default
19 protective limits on the length and frequency of
20 sessions cause harm in your view?
21      MS. COUCH:  Object to the form.
22  A.  I would say that that's one of the -- I
23 would say that that's -- I wouldn't call that a
24 design feature of the platform, I would call it a
25 sort of failure to provide countervailing measure

Page 91

1 but yes.
2 BY MR. SCHMIDT:
3  Q.  Does failing to institute blocks on use
4 during certain times of day, such as during school
5 hours or late at night, cause harm in your view?
6      MS. COUCH:  Object to the form.
7  A.  I don't think it's the designed feature
8 that creates the problems of -- that I'm talking
9 about here, but I think it's a mitigation step that
10 could be taken, yes.
11 BY MR. SCHMIDT:
12  Q.  Not providing a beginning and end to a
13 user's feed, is that infinite scroll?
14  A.  It's a component of infinite scroll, yes,
15 but it's not the totality of infinite scroll.
16  Q.  Do you believe publishing geo locating
17 information for minors causes harm?
18  A.  I believe it has certainly caused harm,
19 yes.
20  Q.  Do you believe that recommending minor
21 accounts to adult strangers causes harm?
22  A.  I believe it is caused harm, yes.
23  Q.  Do you believe that limiting content to
24 short form in ephemeral content causes harm?
25  A.  You mean on social media platforms or just

Page 92

1 in general?  What are you asking about?
2  Q.  On social media platforms.
3  A.  Yeah, I believe that short-form videos, or
4 reels or whatever they're called, are especially
5 engaging and pose greater risks for addiction, yes.
6  Q.  Do you believe that allowing private
7 content causes harm?
8      MS. COUCH:  Object to the form.
9  A.  I don't know what you mean by "private
10 content."
11 BY MR. SCHMIDT:
12  Q.  Whereas people can post content only
13 available to some people on social media?
14      MS. COUCH:  Object to the form.
15  A.  I don't know what you mean by "some
16 people."
17 BY MR. SCHMIDT:
18  Q.  Okay.  Do you believe that the manner in
19 which notifications are given, in terms of their
20 timing and clustering, causes harm?
21  A.  I mean, I believe that the variable
22 intermittent reward of notifications is one of the
23 strategies that's deployed to make platforms -- to
24 promote problematic usage, if that's what you mean.
25  Q.  Okay.  So if I go through these features

Page 93

1 on page 14, and some of these additional points
2 we've talked about, failures to put in place blocks
3 as you described it, geolocation, recommending minor
4 accounts, short form content, are you able to tell
5 me which of those by itself causes specific types of
6 harm?
7      MS. COUCH:  Object to the form.
8 BY MR. SCHMIDT:
9  Q.  In isolation from the other features?
10      MS. COUCH:  Same objection.
11  A.  I can't answer that.  In some respects,
12 it's not an important question because they all are
13 present and the research, the studies I looked at
14 explored the platforms as they existed at the time.
15 And at the time, they had multiple or all of those
16 features.
17 BY MR. SCHMIDT:
18  Q.  Are you aware of any study that -- well,
19 strike that.
20      Are you aware of any of these features
21 that -- you said the studies you looked at evaluated
22 the full experience of the platform; is that right?
23  A.  Of the social media platforms, yeah.
24  Q.  For the features we just went through
25 where you agreed that they caused harm, are you able

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

1 to separate out any way what the impact of one
2 individual feature is versus other features that you
3 believe also cause harm?
4        MS. COUCH: Object to the form.
5     A. Is that a different question than what you
6 just asked me? Am I just misunderstanding it? I
7 mean, I feel --
8 BY MR. SCHMIDT:
9     Q. It might be the same. But your answer
10 might be the same.
11     A. Okay.
12     Q. I'm just trying to make sure I have your
13 answer.
14        MS. COUCH: Object to the form.
15     A. The vast majority of the studies that I
16 looked at looked at the platforms in their entirety
17 as they existed and not the individual features in
18 them. But that's not a relevant question because
19 people experience the platforms with all of the
20 features in my opinion.
21 BY MR. SCHMIDT:
22     Q. Let me shift gears.
23        Am I correct that you believe that school
24 closures during the pandemic caused mental health
25 challenges for adolescents and younger children?

Page 95

1     A. Among other things, yes. I believe it
2 caused mental health problems, and also led to
3 learning loss, yes.
4     Q. What mental health problems did school
5 closures from the pandemic cause?
6        MS. COUCH: Object to the form.
7     A. Ask the question again. What mental
8 health problems did school closures cause?
9 BY MR. SCHMIDT:
10     Q. Yes.
11        MS. COUCH: Same objection.
12     A. Well, it's a difficult question to answer
13 because it will require commenting on the broader
14 context of school closures and what the effects of
15 that were, so I'm not...
16 BY MR. SCHMIDT:
17     Q. Did school closures lead to a rise in
18 anxiety and depression and increases in suicidal
19 ideation and suicide attempts?
20        MS. COUCH: Object to the form.
21     A. I stated publicly at the time on -- and in
22 many places that one of the things that happened
23 when we closed schools is that we diminished
24 opportunities for children to be present --
25 authentically present with other children, and they

Page 96

1 spent more time on social media, and that we did see
2 a rise in anxiety and depression, yes.
3 BY MR. SCHMIDT:
4     Q. I'm not sure I've ever seen you say that
5 publicly at the time.
6     A. I would --
7     Q. I'll show you what I have seen you say.
8        MR. SCHMIDT: Can we play clip 223-B?
9        MS. COUCH: Is this an exhibit?
10        MR. SCHMIDT: Let's stop, please. Could
11 we stop please? Let's go back to the start of
12 the clip. I'll mark this as Exhibit 13.
13        (Exhibit 13 was received and marked for
14 identification, as of this date.)
15        MR. SCHMIDT: This is the URL also.
16 We don't have a transcript of it.
17        Let's go ahead and play that.
18        (Video played.)
19        MR. SCHMIDT: I'm just going to pause
20 that.
21 BY MR. SCHMIDT:
22     Q. Do you recognize that as a talk you gave
23 during the pandemic?
24     A. That was hour and a half interview with
25 Phil what's his name? Dr. Phil, and this is

Page 97

1 twenty-second clip of out. So I don't remember the
2 full hour and a half, what I said.
3     Q. I didn't ask you if you remember the full
4 hour and half. I think you've already answered my
5 question by saying you remember who you were talking
6 with.
7        Do you recognize this as a talk you gave
8 during the pandemic?
9        MS. COUCH: Object to the form.
10     A. It was an interview.
11 BY MR. SCHMIDT:
12     Q. Okay. An interview. And this is you in
13 the interview talking?
14     A. Yes. It's me.
15     Q. Okay. Let's keep playing, and I want --
16 sorry, before we do. I want you to listen, if you
17 could, for what you say about a rise in anxiety and
18 depression.
19        MR. SCHMIDT: If we could play.
20        (Video played.)
21 BY MR. SCHMIDT:
22     Q. Do you believe that school closures
23 associated with the pandemic contributed to a rise
24 of anxiety and depression and an increase in
25 suicidal ideation and suicide attempts in kids?

25 (Pages 94 - 97)

Page 98

1      MS. COUCH:  Object to the form.
2      A.   You're asking me to make a -- that's not a
3  yes-or-no question.
4  BY MR. SCHMIDT:
5      Q.   Okay.  Are you aware that school districts
6  are plaintiffs in these lawsuits?
7      A.   I am aware that school districts are the
8  plaintiffs.
9      Q.   I asked you this last time, I'll ask you
10  again.  Do you know of any school districts who are
11  plaintiffs in this lawsuit?  Do you know the names
12  of any of them?
13      A.   I -- I do not.  I mean, I'm just thinking
14  I've read some stuff in the news but I don't -- I
15  can't recall now which ones I've read about.
16      Q.   Have you met with anyone from a school
17  district in connection with your work in this case?
18      A.   In connection with my work in this case?
19      Q.   Yes?
20      A.   No, I have not.
21      Q.   Have you read any testimony from anyone
22  from a school district in connection with your work
23  in this case?
24      A.   The only thing I read was -- I mean, in my
25  rebuttal report, I read -- I don't know if that was

Page 99

1  related to a school district.  I mean, everything
2  I've read by experts you're talking about?
3      Q.   No, by people who work at school
4  districts.  Have you read anything --
5      A.   No, I haven't read anything from people
6  who worked at school districts.
7      Q.   Do you know where Breathitt County School
8  District is?
9      A.   Breathitt?
10      Q.   Breathitt, B-R-E-A-T-H-I-T-T?
11      A.   No.
12      Q.   Do you know where Irvington School
13  District is?
14      A.   No.
15      Q.   Do you know where Harford School District
16  is?
17      A.   Harford?
18      Q.   Harford, H-A-R-F-O-R-D.  No T.
19      A.   I mean, is this a geography quiz, I mean,
20  I can -- no, I don't know where Har-- -- first I
21  thought you said Hartford and then I was going to
22  say Connecticut, but I don't know where Harford is,
23  no.
24      Q.   Okay.  Have you -- do you know where
25  Charleston School District is?

Page 100

1      A.   I would guess South Carolina because I
2  know where Charleston is but I don't -- yeah.
3      Q.   Do you know if there's a Charleston School
4  District that has brought a lawsuit in this case and
5  whether that's in Charleston, West Virginia or
6  Charleston, South Carolina?
7      A.   No, I don't.
8      Q.   Do you know whether DeKalb County has
9  brought a lawsuit in this case?  D-E-K-A-L-B?
10      A.   I do not.  I do not know if they brought a
11  lawsuit.
12      Q.   Do you know if Tucson has brought a
13  lawsuit in this case?
14      A.   I don't.  You didn't ask me where Tucson
15  is, and I do know where Tucson is.
16      Q.   I'm glad you do.  I'm not trying to do
17  geography.  I'm trying to understand if you know
18  these school districts or not.
19      A.   No.
20      Q.   Do you know if Breathitt County,
21  Irvington, Harford have brought lawsuits, the school
22  districts in those locations have brought lawsuits
23  in these cases?
24      A.   I do not know.
25      Q.   Have you studied the policies that the

Page 101

1  suing school district has regarding school closures
2  during the pandemic?
3      MS. COUCH:  Object to the form.
4      A.   I'm sorry.  Did I study the policies of
5  those school districts during the pandemic?  No, I
6  did not.
7  BY MR. SCHMIDT:
8      Q.   Have you studied their policies on phone
9  use?
10      MS. COUCH:  Same objection.
11      A.   Those specific counties that you -- no, I
12  have not.
13  BY MR. SCHMIDT:
14      Q.   Have you talked to any administrator or
15  teacher or staff member from those school districts?
16      MS. COUCH:  Same objection.
17      A.   No, I have not.
18  BY MR. SCHMIDT:
19      Q.   Do you know if there's specific students
20  in those school districts who meet your definition
21  of being addicted to one of the services in this
22  case?
23      MS. COUCH:  Object to the form.
24      A.   Do I know for a fact that there's -- of a
25  child -- no, I haven't looked at any of that, no.

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

1 BY MR. SCHMIDT:
2    Q.  Do you know whether a student in any of
3 those districts has suffered a mental health harm
4 specifically as a result of using Instagram,
5 YouTube, TikTok, Facebook, Snapchat?
6        MS. COUCH:  Object to the form.
7    A.  I have no opinion on that.  I have not
8 studied any of the children in that -- in those
9 school districts.
10 BY MR. SCHMIDT:
11    Q.  Let's go back to Exhibit 2, your rebuttal
12 report.  And let's look at page 24, please.
13    A.  (Witness complies.)
14    Q.  Do you see in paragraph 54, you have a
15 reference to validated instruments such as the PHQ-9
16 and GAD-7 have been studied.
17        Do you see that?
18    A.  I do.
19    Q.  And those are inventories that can be
20 given to people where they answer questions, and you
21 can get diagnostic information from the way they
22 answer their questions; is that right?
23    A.  That's correct.
24    Q.  Have you ever administered those exams?
25    A.  Multiple times.

Page 103

1    Q.  And you say they're validated.  What does
2 that mean?
3    A.  That means that they've been assessed for
4 their ability to reliably predict, meeting
5 diagnostic criteria for a clinical diagnosis.
6    Q.  You said you had administered these
7 several times; is that right?
8    A.  In the context of my clinical work and my
9 research, multiple times, yes.
10        MR. SCHMIDT:  Look, if you would, at what
11 we've marked as Exhibit 14.
12        (Exhibit 14 was received and marked for
13 identification, as of this date.)
14 BY MR. SCHMIDT:
15    Q.  Do you recognize that as the questionnaire
16 for the PHQ-9?
17    A.  I do.
18    Q.  And do you see where it asks about
19 experiencing certain problems, quote -- I'm looking
20 at the upper left -- over the last two weeks.
21        Do you see that?
22    A.  Yes.
23    Q.  Is that your understanding of how the
24 PHQ-9 works, it inquires about the last two weeks?
25        MS. COUCH:  Object to the form.

Page 104

1    A.  That's correct.
2        MR. SCHMIDT:  Let's mark as Exhibit 15,
3 the GAD-7.
4        (Exhibit 15 was received and marked for
5 identification, as of this date.)
6        THE WITNESS:  Yeah.
7 BY MR. SCHMIDT:
8    Q.  Do you recognize this as the GAD-7 exam or
9 inventory?
10    A.  I do.
11    Q.  And like the PHQ-9, the GAD-7 asks about
12 problems over the last two weeks.
13        Do you see that?
14    A.  I see that, yes.
15    Q.  And do you know why these two inventories
16 focused on problems over the last two weeks instead
17 of problems a year ago or two years ago or six
18 months ago?
19        MS. COUCH:  Object to the form.
20    A.  I mean, they're intended -- that's a
21 difficult question to answer shortly, briefly, but
22 they're intended to assess present symptoms, not
23 past symptoms.
24 BY MR. SCHMIDT:
25    Q.  Are you aware of the PHQ-9 or the GAD-7

Page 105

1 being validated to assess past symptoms as opposed
2 to present symptoms?
3        MS. COUCH:  Object to the form.
4    A.  I don't understand the question.
5 BY MR. SCHMIDT:
6    Q.  Well, you said these are valid
7 inventories?
8    A.  Yes.
9    Q.  Okay.  And the inventories, as written, as
10 you just told us, inquire about present symptoms,
11 not past symptoms, correct?
12    A.  Yes.
13    Q.  Are you aware of whether the inventories
14 have, in fact, being validated to ask about past
15 symptoms as opposed to being validated to ask about
16 present symptoms?
17        MS. COUCH:  Object to the form.
18    A.  I don't understand.  I need you -- can you
19 rephrase that?
20 BY MR. SCHMIDT:
21    Q.  Sure.  Have you ever used the PHQ-9 or the
22 GAD-7 to inquire about past symptoms as opposed to
23 present symptoms?
24    A.  You mean asking someone like, a year ago
25 did you have these symptoms?

27 (Pages 102 - 105)

CONFIDENTIAL

Page 106

1    Q.  Yeah.
2    A.  To my knowledge, they haven't been
3  validated that way.  You could use them that way,
4  but they would be subject to significant recall
5  bias.
6    Q.  What would the significant recall bias be?
7       MS. COUCH:  Object to the form.
8    A.  The risk would be that you're not
9  recalling accurately how you felt a year ago.
10 BY MR. SCHMIDT:
11   Q.  Are you aware of any peer reviewed --
12 strike that.
13      You're aware of peer-reviewed studies that
14 employ the PHQ-9 or the GAD-7 as they're validated
15 to inquire about certain symptoms, correct?
16      MS. COUCH:  Object to the form.
17   A.  Am I aware of peer-reviewed studies that
18 use them as they're written?
19 BY MR. SCHMIDT:
20   Q.  Yes.
21   A.  Yes, many.
22   Q.  Are you aware of any peer-reviewed studies
23 that used the GAD-7 or PHQ-9 to try to evaluate past
24 symptoms?
25      MS. COUCH:  Object to the form.

Page 107

1    A.  Explain again what you mean.  What I --
2  saying did you feel this way a year ago?
3  BY MR. SCHMIDT:
4    Q.  Uh-huh.  Or six months ago or two years
5  ago?
6       MS. COUCH:  Same objection.
7    A.  Sitting here right now, I don't recall
8  studies offhand that have done that, I'm sure people
9  have done that, though.  I don't know.  There's a
10 lot of studies out there.
11 BY MR. SCHMIDT:
12   Q.  Is that something you've ever done in your
13 clinical practice when you had a clinical practice?
14   A.  No, I don't -- when I administer these, I
15 don't ask people how they felt a year ago.  No, I
16 administer them as written.
17   Q.  Why not?
18      MS. COUCH:  Object to the form.
19   A.  In my clinical practice, I'm trying to
20 make a decision about what to do with someone today
21 not what to do about how they felt a year ago.
22      MR. SCHMIDT:  Okay.  We have been going
23 over an hour, why don't we take a break?
24      THE VIDEOGRAPHER:  The time right now is
25 11:16 a.m.  We're off the record.

Page 108

1       (Recess.)
2       THE VIDEOGRAPHER:  The time right now is
3  11:41 a.m.  We're back on the record.
4  BY MR. SCHMIDT:
5    Q.  Do you remember during our last meeting, I
6  asked you various questions about the handbook that
7  you serve as an editor for?
8       MS. COUCH:  Object to the form.
9    A.  I remember we talked about the handbook.
10 I don't remember the questions you asked, no.
11      MR. SCHMIDT:  I'm going to show you
12 another portion of the handbook, which I've
13 marked as Exhibit 16.
14      (Exhibit 16 was received and marked for
15 identification, as of this date.)
16 BY MR. SCHMIDT:
17   Q.  This is a chapter entitled "Social Media
18 Use in Childhood and Adolescence:  Minimizing Its
19 Adverse Effects Through Corporate Responsibility and
20 European Union Regulations."
21      Do you see that?
22   A.  I do.
23   Q.  And the authors of this include various
24 psychiatrists and psychologists?
25   A.  Yes.

Page 109

1    Q.  Look with me if you would at page 481 of
2  this chapter.  In the right column, there are
3  various "recommendations."
4       Do you see that?
5    A.  Yes.
6    Q.  Let's look at the recommendation in the
7  upper right column.
8    A.  Yes.
9    Q.  "Besides reopening APIs to really
10 understand the behavior of younger users, research
11 needs to be supplemented by neuroscientific studies
12 as this area is surprisingly sparse."
13      Do you see that?
14      MS. COUCH:  Object to the form.
15   A.  I see that statement.
16 BY MR. SCHMIDT:
17   Q.  It then says:
18      "This is especially noteworthy because
19 mass media, laypersons, and the industry use a
20 highly neuro-scientifically slanted language to
21 describe the effects of social media engineering
22 such as dopamine triggers, brain hacks, and of
23 course, the term 'addiction'."
24      Do you see that?
25   A.  I see that.

28 (Pages 106 - 109)

CONFIDENTIAL

1    Q.   It then says:
2        "We explicitly note that the addiction
3   term is currently not officially recognized in the
4   context of excessive social media use by either the
5   World Health Organization or American Psychiatric
6   Association."
7        Do you see that?
8    A.  I see that they say that, yes.
9    Q.  Do you recognize that as a true statement?
10       MS. COUCH:  Objection to form.
11   A.  No, I don't recognize that as true
12   statement.
13 BY MR. SCHMIDT:
14   Q.  Is it a false statement?
15   A.  It's neither true nor false.  I would say
16  that the World Health Organization and American
17  Psychiatric Association do recognize social media
18  addiction based on statements that I can point to in
19  my report.
20   Q.  So do you disagree with that statement in
21  your handbook.
22       MS. COUCH:  Object to the form.
23 BY MR. SCHMIDT:
24   Q.  That, "The addiction term is currently not
25  officially recognized the context of excessive

1   social media use by either the World Health
2   Organization or American Psychiatric Association."
3    A.  I think --
4        MS. COUCH:  Object to form.
5    A.  I think both the World Health Organization
6   and the American Psychiatric Association have
7   statements that are consistent with them believing
8   that there's such a thing as problematic social
9   media use or social media addiction, and I can point
10  to them.
11 BY MR. SCHMIDT:
12   Q.  So my question to you is, do you agree
13  with this statement in your handbook that:
14       "The addiction term is currently not
15  officially recognized in the context of excessive
16  social media use by either the World Health
17  Organization or American Psychiatric Association."
18       Do you agree with that statement?
19       MS. COUCH:  Object to the form.
20 BY MR. SCHMIDT:
21   Q.  Yes or no?
22       MS. COUCH:  Same objection.
23   A.  I believe that the World Health
24  Organization and the American Psychiatric
25  Association have statements that point to the

1   addiction -- point to the existence of social media
2   addiction.
3  BY MR. SCHMIDT:
4    Q.  So I'm going to ask you to answer my
5   question now.
6        Do you agree with the statement written
7   here that we've been looking at?
8        MS. COUCH:  Object to the form, asked and
9        answered.
10   A.  I'm not exactly sure what -- I mean, I'm
11  telling you, I'm not sure precisely what they mean
12  when they say "not officially recognized" because I
13  can point to statements that show that the World
14  Health Organization and the American Psychiatric
15  Association acknowledge social media addiction.  We
16  looked at one from the American Psychiatric
17  Association, you brought it to my attention earlier
18  in this deposition.
19 BY MR. SCHMIDT:
20   Q.  So do you agree with that statement or
21  not?
22       MS. COUCH:  Object to the form, asked and
23       answered.
24 BY MR. SCHMIDT:
25   Q.  Yes or no?

1        MS. COUCH:  Object to the form.
2    A.  I don't think it's a yes-or-no question.
3  I'll say it again that --
4  BY MR. SCHMIDT:
5    Q.  Okay.
6        They then say, "The discussion around
7  social media addiction" --
8        MS. COUCH:  Pardon me.  He gets to finish
9        his answer.
10       MR. SCHMIDT:  Go ahead.
11       I think the witness is being instructed to
12       burn time on the clock, but go ahead.
13       MS. COUCH:  No, you interrupted him.
14   A.   + I was stating that -- to answer your
15  question, and not appear that I didn't answer it,
16  that both the American Psychiatric Association and
17  the World Health organization have recognized social
18  media addiction, and I can point to them.  They're
19  in my report, but I can point to them if you'd like.
20       MR. SCHMIDT:  Okay.  Could we mark that
21       answer, please?
22 BY MR. SCHMIDT:
23   Q.  Your textbook then says, or your handbook
24  then says:
25       "The discussion around social media

CONFIDENTIAL

Page 114

1 addiction remains controversial and it is critical
2 to provide clarity to parents and other
3 stakeholders, grounded in solid scientific
4 evidence."
5        Do you see that language?
6    A.  I see that language.
7    Q.  Do you agree with your handbook that the
8 discussion around social media addiction remains
9 controversial, yes or no?
10       MS. COUCH:  Object to form.  He does not
11 have to answer yes or no.
12    A.  I don't think it's a yes-or-no question.
13 BY MR. SCHMIDT:
14    Q.  Okay.
15    A.  And I also want to add that I'm the editor
16 of the handbook.  I didn't write everything in the
17 handbook.
18    Q.  Okay.
19       Is it true, when the handbook that you're
20 the editor for states that the discussion around
21 social media addiction remains controversial.  Is
22 that a true statement in your handbook?
23       MS. COUCH:  Object to the form, asked and
24 answered.
25    A.  No.  I believe that the preponderance of

Page 115

1 scientists and clinicians believe that there's such
2 a thing as social media addiction.
3 BY MR. SCHMIDT:
4    Q.  Okay.  Let's look at something else.
5 Let's go to your rebuttal report, Exhibit 2,
6 page 12, paragraph 21.
7    A.  Paragraph 20.
8    Q.  Twenty-one.
9    A.  (Witness complies.)
10    Q.  Do you see you discuss research regarding
11 television addiction, TV addiction?
12    A.  Yes.
13    Q.  And you discuss that in the late '90s TV
14 addiction was widely discussed as cultural phenomena
15 in the lay press.
16       Do you see that?
17    A.  Yes, I see that statement.
18    Q.  Were there scientists who believed that TV
19 addiction might ultimately be a recognized condition
20 at that time?
21       MS. COUCH:  Object to the form.
22    A.  There very well might have been, yes.
23 BY MR. SCHMIDT:
24    Q.  You say:
25       "Yet scientific studies failed to

Page 116

1 establish it as a clinical entity."
2        Do you see that?
3    A.  Uh-huh.
4    Q.  Then you say:
5        "It was never even seriously considered
6 for inclusion in the DSM or the ICD system."
7        Do you see that?
8    A.  Yes, I see that.
9    Q.  Why is that meaningful?
10    A.  Why is that meaningful?
11    Q.  Uh-huh.
12    A.  Well, I'm -- because there was never
13 consideration of it being an addiction, unlike for
14 social media where there's been discussion about it
15 being an addictive platform almost since its
16 inception, but certainly shortly thereafter.
17       MR. SCHMIDT:  Move to strike as
18 nonresponsive.
19 BY MR. SCHMIDT:
20    Q.  I'm not asking about social media.  I'm
21 asking about TV addiction in this paragraph where
22 you say, "It was never even seriously considered for
23 inclusion in the DSM or the ICD system."
24       What I'm asking you is, why is that
25 meaningful to you that TV addiction was never even

Page 117

1 seriously considered for inclusion in the DSM or the
2 ICD system?
3        MS. COUCH:  Object to the form.
4    A.  I don't really understand the nature of
5 your question.  It's -- the point I'm making is that
6 television addiction was not something that was --
7 that had traction amongst clinicians or scientists.
8 BY MR. SCHMIDT:
9    Q.  Okay.  Were there scientists who proposed
10 including TV addiction in the DSM or ICD system?
11       MS. COUCH:  Object to the form.
12    A.  Not to my knowledge.
13 BY MR. SCHMIDT:
14    Q.  Has TV addiction -- I'm sorry -- strike
15 that.
16       Has social media addiction been seriously
17 considered for inclusion in the DSM?
18    A.  I'm on a committee now that's revising the
19 DSM-5, and amongst that committee there's a -- I
20 would say a -- the vast majority of people believe
21 that it should be, and most of us believe that it
22 will be in the near future.
23    Q.  Well, that committee is not focused on
24 social media addiction, it's focused on internet
25 gaming, correct?

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

1        MS. COUCH:  Object to the form.
2     A.  That is correct.
3  BY MR. SCHMIDT:
4     Q.  And that committee's work is not
5  determining whether or not social media addiction
6  should be added to the DSM; is that correct?
7        MS. COUCH:  Object to the form.
8        MR. SCHMIDT:  Let me ask the question
9     differently.
10 BY MR. SCHMIDT:
11    Q.  Is it within the scope of your work
12 regarding the DSM, to conduct an evaluation as to
13 whether social media addiction should be added to
14 the DSM?
15    A.  I think that the plan of that committee is
16 to, once we have finished with gaming disorder, to
17 move on to social media addiction.
18    Q.  Have you evaluated social media addiction
19 as part of your internet gaming disorder committee?
20       MS. COUCH:  Object to the form.
21    A.  That's not the task of the committee, so
22 not in a formal way.  But most of us on there are
23 experts about this and we have conversations about
24 it.
25

Page 119

1  BY MR. SCHMIDT:
2     Q.  Okay.  So who believes, on the committee,
3  that social media addiction should be added to the
4  DSM?
5        MS. COUCH:  Object to the form.
6     A.  We haven't taken a formal poll of it.  I
7  can't answer that question.
8  BY MR. SCHMIDT:
9     Q.  Okay.  Well, you just told us under oath
10 that the majority of the committee supports having
11 it.
12    A.  Yeah.
13    Q.  And the plan is to move on to an
14 evaluation of it.  And so I'd like to know who on
15 the committee supports having social media addiction
16 in the DSM?
17       MS. COUCH:  Object to the form.
18    A.  I'm not in a position to answer that now.
19 It's conversations that we've had over meetings that
20 have occurred over the last three years.
21 BY MR. SCHMIDT:
22    Q.  Okay.  Who -- name me anyone, other than
23 you, who is on your committee for gaming addiction
24 who believes social media addiction should be added
25 to the DSM.

Page 120

1        MS. COUCH:  Object to the form, asked and
2     answered.
3  BY MR. SCHMIDT:
4     Q.  Anyone.
5        MS. COUCH:  Same objection.
6     A.  I could name names, but I'm not really
7  sure what the point of this is.
8  BY MR. SCHMIDT:
9     Q.  Because you just made a claim that I don't
10 believe and that I'm entitled to test, so I'm
11 testing it.
12       Tell me who, other than you, believes, not
13 only that social media addiction should be added to
14 the DSM, but that that's going to be the next work
15 of your internet gaming committee?
16       MS. COUCH:  And to be clear, he's entitled
17 to ask you questions.  I don't know what
18 confidentiality, if any, applies to these
19 meetings.  You should answer it to the extent
20 possible without violating any agreements you
21 have.
22       MR. SCHMIDT:  He's already waived any
23 confidentiality that applies.  He doesn't get
24 to --
25       MS. COUCH:  He did not -- don't interrupt

Page 121

1  me.
2        MR. SCHMIDT:  I didn't interrupt you.  Let
3  me finish.  He doesn't get to make claims that
4  I think are not accurate to help this
5  litigation position and then say, oh, no, I
6  can't tell you any facts.  I can just make my
7  claim.  That's not how confidentiality works.
8        MS. COUCH:  I will obviously object to the
9  quote/unquote interjection of what's happened.
10       MR. SCHMIDT:  It's absolutely what's
11 happened.  But let me ask my question again.
12 BY MR. SCHMIDT:
13    Q.  Tell me anyone on your internet gaming
14 committee who agrees with you that social media
15 addiction should be added to the DSM?
16    A.  + There are people on it, there are many
17 people on it, but the larger point here is that the
18 consensus of scientists and clinicians are that
19 there's such an entity.  So I'm not sure why this
20 committee is so important to you with respect to
21 this.  But...
22       MR. SCHMIDT:  Please mark that answer as
23 wholly nonresponse.
24       + I'll try again, and then we'll take this
25 to the court.

31 (Pages 118 - 121)

CONFIDENTIAL

1 BY MR. SCHMIDT:
2      Q.  Can you tell me anyone on your committee,
3 your DSM committee on internet gaming, who believes
4 social media addiction should be added to the DSM?
5          MS. COUCH:  And I would just mark for the
6    record because I think it's threatening and
7    it's not accurate that you cannot just go
8    directly to the court.  We have to meet and
9    confer, the court -- we have to
10    meet-and-confer.  There's a process, and I
11    don't want the witness to be intimidated.
12 BY MR. SCHMIDT:
13      Q.  I'm not trying to scare you, Doctor.
14      A.  I'm not scared, I just don't --
15      Q.  Let me ask my question again.
16          Can you name me anyone on the committee
17 who holds the view that social media addiction
18 should be added to the DSM, yes or no?
19          MS. COUCH:  Object to the form.
20          You obviously don't so have to answer yes
21 or no.
22          MR. SCHMIDT:  Wait, wait, wait.  Can I
23 just -- I couldn't hear what you said.
24          "You obviously don't have to answer."
25          Okay.  That's an improper speaking

1    objection, but go ahead.
2      A.  I'm going to not answer that question.
3 BY MR. SCHMIDT:
4      Q.  You you're refusing to answer that
5 question?
6      A.  I can name people, but I'm not certain
7 that I'm -- that I should be naming people, so I'm
8 not going to name.  I don't want to speak for other
9 scientists.  But I can tell you these were
10 conversations that I had.  And I'm not -- yeah.
11      Q.  Are you refusing to answer the question?
12          MS. COUCH:  Object to the form.
13      A.  I'm not sure I am -- I'm not sure if the
14 conversations we had were privileged or not, if I
15 should share them.  So I'm -- and I don't -- I don't
16 see the relevance of it to this case, if that
17 matters.
18 BY MR. SCHMIDT:
19      Q.  Well, you don't get to decide what's
20 relevant, Doctor.
21          Are you refusing to answer my question?
22          MS. COUCH:  He has answered your question
23 multiple times.
24          MR. SCHMIDT:  No, he's refused to answer
25 it.

1          MS. COUCH:  Objection to advising the
2    witness on anything relating to any legal
3    matter, even in development.
4          MR. SCHMIDT:  He's refused to answer and
5    I'm just confirming that so I can move on.
6 BY MR. SCHMIDT:
7      Q.  Are you refusing to answer my question?
8      A.  I'm not going to answer that question.
9      Q.  Okay.
10          MS. COUCH:  And I would just like the
11    record to reflect his full answer was that he
12    wasn't even sure if he's entitled to.
13          MR. SCHMIDT:  We are now deep into
14    speaking objections and actually testifying for
15    the witness.
16          MS. COUCH:  I'm just making sure that the
17    record is clear because I happen to know that
18    sometimes it's --
19 BY MR. SCHMIDT:
20      Q.  Doctor --
21          (Cross-talking)
22          MS. COUCH:  -- and selectively.
23 BY MR. SCHMIDT:
24      Q.  Dr. Christakis, is there any committee now
25 evaluating whether social media addiction should be

1 added to the DSM that you're aware of?
2      A.  + I'm not aware of one, but I don't think
3 it's relevant to this case or to the clinical
4 diagnosis of social media addiction whether or not
5 there's a DSM diagnosis of it.
6          THE WITNESS:  Move to strike everything
7    beginning with "but," and please mark that
8    answer.
9 BY MR. SCHMIDT:
10      Q.  Is there any serious consideration you're
11 aware of, of adding social media addiction to the
12 ICD system?
13      A.  I know it's talked about.  I don't know --
14 I'm not an expert in that.  I'm not in a position to
15 talk about -- to definitively say whether or not
16 what the ICD intends for 11 or 12 is planning.
17      Q.  You can't point me to any effort under way
18 to add social media addiction to the ICD system; can
19 you?
20      A.  I'm not aware of any, but that doesn't
21 mean there isn't.
22      Q.  Are you aware that when TV addiction was
23 being discussed in the '90s, that there were
24 scientists who actually created TV addiction
25 inventories to try to measure TV addiction?

32 (Pages 122 - 125)

Golkow Technologies,
A Veritext Division

Page 126

1    MS. COUCH: Object to the form.
2    A. I am aware and they weren't validated.
3 BY MR. SCHMIDT:
4    Q. Does watching TV lead to aggressive
5 behavior?
6    MS. COUCH: Object to the form.
7    A. Watching violent programs has been shown
8 to lead to increased aggressive thoughts and
9 actions, yes.
10 BY MR. SCHMIDT:
11    Q. Do you believe there's a causal link
12 between violent video games and violent behavior?
13    A. I believe that there's a causal link
14 between violent video games and increased aggressive
15 thoughts and actions, not violent behavior.
16    Q. Are you aware that the APA has disclaimed
17 a causal link between violent video games and
18 violent behavior?
19    A. I don't believe that that's accurate.
20    (Reporter clarification request.)
21    MR. SCHMIDT: Can I get tab 231?
22 BY MR. SCHMIDT:
23    Q. Do you recall writing a book on TV called
24 "The Elephant in the Living Room: Make Television
25 Work for Your Kids."

Page 127

1    A. I recall that it was 22 year ago or
2 something, yes.
3    MR. SCHMIDT: I've given you a chapter
4    from that book, which I've marked as exhibit --
5    is that 17, Doctor, on the front of that
6    exhibit?
7    A. It is.
8    (Exhibit 17 was received and marked for
9 identification, as of this date.)
10 BY MR. SCHMIDT:
11    Q. Do you recognize this as a chapter from
12 your book?
13    A. Yes, I do.
14    Q. And if you look at page 66 and 67, this is
15 a chapter on "Television and Violence: What's the
16 Connection?"
17    Do you see that?
18    A. I do.
19    Q. And you discussed at the bottom of page 66
20 a meta-analysis of data on violent programming and
21 aggressive behavior.
22    Do you see that?
23    A. Yes.
24    Q. Then you've got a chart on page 67, where
25 I believe you are talking about effect size, but

Page 128

1 tell me if that's wrong, of the data on media
2 violence and aggression compared to other effect
3 size data?
4    A. It's not effect size, it's likelihood of
5 representing the truth. But relatively speaking one
6 to the other, you can consider them to be effect
7 size if that's what you're trying to say.
8    Q. I guess what I'm trying to understand is,
9 like you've got the question, "Does smoking cause
10 lung cancer?"
11    A. Right.
12    Q. And that's the one where you've got the
13 highest bar graph in terms of whether it's more
14 likely to be true, right?
15    A. Yes.
16    Q. And at the lower end, you've got this
17 "Does homework improve academic achievement?"
18    Do you see that?
19    A. I do.
20    Q. What do -- what are these measuring? What
21 is the measurement you're using to assess whether
22 something is more likely to be true in this table?
23 I thought it was effect size. Maybe it's something
24 else?
25    A. This book was written 25 years ago. I

Page 129

1 think we used the -- I don't remember what we used,
2 to be honest with you. I mean, I stand by the
3 relative effects. I don't remember how I
4 constructed it.
5    Q. The second most likely to be true thing
6 is, "Does media violence cause aggression," in your
7 tables, right?
8    A. That's correct.
9    Q. And you say:
10    "In scientific circles, these data have
11 largely ended the debate about the connection
12 between media violence and aggression, but it
13 remains alive in the American public's mind."
14    Do you see that?
15    A. I do.
16    Q. And what were you saying when you say,
17 "These data have largely ended the debate about the
18 connection between media violence and aggression"?
19    A. What was I saying?
20    Q. Yeah. How have they ended the debate?
21 What is the answer to the debate that you are
22 offering here?
23    A. I think that -- first of all, this is a --
24 written for lay audience on which we are reading
25 this some years later.

33 (Pages 126 - 129)

Page 130

1    That at the time this was written, and
2  still today, the vast majority of scientists in this
3  space believe that there's a connection.  But then
4  and now, there are a few contrarian positions,
5  including...
6        MR. SCHMIDT:  Let's look at Exhibit 18.
7        (Exhibit 18 was received and marked for
8  identification, as of this date.)
9  BY MR. SCHMIDT:
10    Q.   Do you see that this is an APA statement
11  on violent video games and violent behavior?
12        MS. COUCH:  Object to the form.
13    A.   Yes.
14  BY MR. SCHMIDT:
15    Q.   This is from 2020.
16        Do you see that?
17    A.   I see that.
18    Q.   The first sentence says:
19        "There's insufficient scientific evidence
20  to support a causal link between violent video games
21  and violent behavior."
22        Do you see that?
23    A.   I do.
24    Q.   Do you agree with that?
25    A.   I agree with that statement.  As you may

Page 131

1  recall, a minute ago you asked me that, and I said,
2  "aggressive thoughts and actions," and there's a
3  difference.
4        MR. SCHMIDT:  Move to strike everything
5  after, "I agree with that."
6        MS. COUCH:  Oppose.  It's fine.  You get
7  to say your full answer.
8        MR. SCHMIDT:  Note the coaching again of
9  the witness to give flatly nonresponse answers.
10        MS. COUCH:  You disagree that he gets to
11  give a full answer, Paul?
12  BY MR. SCHMIDT:
13    Q.   Let's look back at your rebuttal report,
14  please, Exhibit 2.  And let's go to page 65, please.
15    A.   (Witness complies.)
16    Q.   Do you see you are discussing Meta
17  documents in this section?
18    A.   Yes.
19    Q.   And you quote a document, in the fourth
20  line from the bottom, saying that the "problematic
21  use prevalence was 55 percent mild and 3.1 percent
22  severe."
23    A.   Yes.
24        MR. SCHMIDT:  I'll give you a document
25  I've marked as Exhibit 19.

Page 132

1        (Exhibit 19 was received and marked for
2  identification, as of this date.)
3  BY MR. SCHMIDT:
4    Q.   Do you recognize this document?  It's not
5  the same Bates number, but I believe it's a
6  different -- it's been produced a few times with
7  different Bates numbers.  And let me see if I can
8  help you specifically.
9        If we go to the second page of the
10  document down at the bottom, you see that there's
11  some numbered items, this is tab 89.  And page 2 at
12  the bottom says, "problematic use," and it has the
13  same statistics you cite in your report.
14    A.   Okay.
15    Q.   "55 percent mild, 3.1 percent severe."
16        Do you see that?
17    A.   I do.
18    Q.   And this is the email you're referencing
19  in your report, right?
20        MS. COUCH:  Object to the form.
21    A.   It's the same number, but it's a
22  different -- I mean, that percent is the same, but
23  the number I think is different.  So I'm not sure if
24  it's the exact same email.  I don't know how to
25  answer that question I guess.

Page 133

1  BY MR. SCHMIDT:
2    Q.   Do you see where you say in your text,
3  shared directly with Mark Zuckerberg?
4    A.   Yeah, yes.
5    Q.   You see that this was in fact shared
6  directly with Mark Zuckerberg?
7        MS. COUCH:  Object to the form.
8    A.   Yes, I see that, okay.
9  BY MR. SCHMIDT:
10    Q.   Whether looking at Exhibit 19, this
11  55 percent prevalence mild problematic use or
12  3.1 percent severe problematic use, or looking at
13  the quote you have in your rebuttal report with
14  those same statistics --
15    A.   Yeah.
16    Q.   -- do you know what constituted mild
17  problematic use?
18        MS. COUCH:  Object to the form.
19  BY MR. SCHMIDT:
20    Q.   What the criteria for determining whether
21  there was mild problematic use was?
22    A.   There was another -- so I'm looking at --
23  I see -- sorry -- If you looked at numbers -- I'm
24  trying to remember.  I seem to recall having seen --
25  so if you look at number 140 in my report.

CONFIDENTIAL

Page 134

1    Q.    Exhibit 1.
2    A.    Exhibit 1.  If the data were collected by
3  Moira Burke and Chen, and they did 20,000 users and
4  then they -- I've seen the data.  That's why I'm
5  trying to figure out the data here.
6    Q.    Let me see if I can help you -- sure, go
7  ahead.
8    A.    Okay.  So on page [sic] 143, yes, I say
9  this:
10         "It's not clear from what I've seen how
11  these prevalences were estimated and why they are
12  divergent.  It seems Document 15 is general
13  prevalence, whereas Document 16 includes Facebook
14  prevalence.  In her deposition" --
15         (Reporter clarification request.)
16    A.    I'm not sure.  I recall having seen the
17  data, but now I can't find precisely where it was.
18  But the -- she defined it somewhere as mild.  And
19  I'm not -- if you're asking me how she distinguished
20  between mild and severe.
21  BY MR. SCHMIDT:
22    Q.    Yes, that's what I'm asking you.
23    A.    I'm not sure how I laid it out how she did
24  it specifically, but I remember seeing her having
25  the data about mild and severe.  And I don't know if

Page 135

1  I can find the criteria that she used to
2  differentiate them.  But she had some.
3    Q.    Look with me if you would at paragraph 57
4  of your report, your opinion report, Exhibit 1,
5  Page 25.
6    A.    (Witness complies.)
7    Q.    And do you see here you cite the same data
8  in your second sentence, 3.1 percent severe and the
9  55 percent mild?
10    A.    Yes.
11    Q.    And if you look here in footnote 12, you
12  cite an exhibit from Mr. Zuckerberg's deposition,
13  and the exhibit ends in the number 761?
14    A.    Yes.
15    Q.    And do you see that Exhibit 19, which
16  we've marked, the page we are on is that page ending
17  761?
18    A.    Yes.
19    Q.    Okay.  So let's go back to Exhibit 19,
20  this document with the 55 percent mild, 3.1 percent
21  severe.
22    A.    Yes.
23    Q.    Do you see that the email to
24  Mr. Zuckerberg comes from someone named
25  David Ginsberg?

Page 136

1    A.    I see that, yes.
2    Q.    Do you know what Mr. Ginsberg's role was
3  at this time at Facebook?
4    A.    I believe he was an engineer in the user
5  experience or something, or maybe well-being.  I
6  don't remember precisely what his role was.
7    Q.    Did you have any --
8    A.    I did read his -- what?
9    Q.    I'm sorry.  I didn't mean to cut you off.
10    A.    Go ahead.
11    Q.    Did he have any training or expertise in
12  psychology or teen mental health?
13    A.    I don't know if he did or did not.
14    Q.    Was he the one who conducted this research
15  or did he have any role in this research?
16    A.    I don't know.  My recollection of it was
17  that it was conducted by Dr. Burke.
18         MR. SCHMIDT:  I'm going to show you a
19    document that does not appear on your materials
20    considered list and ask you if you've seen it
21    before.  This is a slide presentation from
22    Elena Davis, dated April 2019, that we've
23    marked as Exhibit 20.
24         (Exhibit 20 was received and marked for
25  identification, as of this date.)

Page 137

1  BY MR. SCHMIDT:
2    Q.    Have you seen this document before that
3  you're aware of?
4         MS. COUCH:  Objection to the form.
5    A.    I've seen so many documents.  This --
6  parts of this are definitely familiar.  I don't know
7  if I've seen this exact one or I've seen other
8  examples of this similar presentation.  But I don't
9  remember, maybe I've seen it.  Yeah, maybe.  I don't
10  know.  I don't recall.
11  BY MR. SCHMIDT:
12    Q.    Let's go to page 3.
13         Do you see there's a slide that says:
14         "We have defined problematic use as the
15  combination of lack of control and negative life
16  impact from Facebook use."
17    A.    I think I have that exact same -- that's
18  why I'm saying, I think I have that same thing in
19  mine.
20    Q.    Okay.
21    A.    But yes, but from a different source.
22    Q.    By the way, this data that we're talking
23  about with the 55 percent mild and 3.1 percent
24  severe, are you aware that that data was focused
25  specifically on Facebook as opposed to Instagram or

35 (Pages 134 - 137)

Page 138

1 any other app?
2    A.  I know it was Meta. I don't know if it
3 was only Facebook or Instagram, but it was 20,000
4 users, it was a Meta study. I don't know offhand if
5 it was only Facebook or Facebook and Instagram. I
6 could look if you want me to figure that out.
7    Q.  Well, let's look back at Exhibit 19, the
8 email from Mr. Ginsberg that you cite.
9      MS. COUCH: Objection, misstates.
10     MR. SCHMIDT: It doesn't misstate.
11     MS. COUCH: He does not cite that.
12     MR. SCHMIDT: And that's a false statement
13 on the record. He does cite it in his report.
14 I just put that in the record.
15     MS. COUCH: The document he cites in his
16 report is not this document.
17     MR. SCHMIDT: It is this document.
18     MS. COUCH: It's not.
19     MR. SCHMIDT: I just put it in the record.
20     MS. COUCH: You can say it, but it's not
21 true, and I'm going to come back on redirect
22 and put the record he cites to.
23     MR. SCHMIDT: That's fine. You can do
24 that.
25     Did you see where he cited it in his main

Page 139

1 report?
2     MS. COUCH: When you said that he cited it
3 in rebuttal, it's not this one.
4     MR. SCHMIDT: I didn't say he cited it in
5 rebuttal just now.
6     Let's continue on.
7 BY MR. SCHMIDT:
8    Q.  Do you see Exhibit 19, which you cite in
9 your main report by Bates number, at the bottom of
10 page 2, the email from Mr. Ginsberg, where he has
11 the data that you cite in your main report by Bates
12 number, before he gave gives that data he says -- he
13 refers to, "negative drivers that occur frequently
14 on Facebook."
15     Do you see that?
16     MS. COUCH: Object to the form.
17    A.  I'm sorry. I'm trying to figure out --
18 because when you asked me about this document, I
19 said it had a different Bates number. And you said,
20 "It's the same email." And I want to make sure I
21 didn't say that it was the same because I thought
22 the Bates numbers were unique, and there's a
23 different Bates number.
24 BY MR. SCHMIDT:
25    Q.  Okay. Let's --

Page 140

1    A.  + I thought we were going to talk about
2 what this email says. We can talk about this email.
3     MR. SCHMIDT: Can we mark that answer? I
4 think this is a function of the witness being
5 coached improperly, and --
6     MS. COUCH: I'm placing an objection --
7     MR. SCHMIDT: -- it's delaying the
8 deposition.
9     (Cross-talking)
10     MS. COUCH: Counsel is misrepresenting.
11     MR. SCHMIDT: Let's just --
12     (Reporter clarification request.)
13     MR. SCHMIDT: Could we go off the record?
14     MS. COUCH: Yeah, we can go off the
15 record.
16     (A discussion was held off the record.)
17     THE VIDEOGRAPHER: The time right now is
18 12:15 p.m. We're off the record.
19     (Recess.)
20     THE VIDEOGRAPHER: The time right now is
21 12:17 p.m. We're back on the record.
22 BY MR. SCHMIDT:
23    Q.  Doctor, if you look at Exhibit 19, page 2,
24 where Mr. Ginsberg reports this data, "55 percent
25 mild, 3.1 percent severe," do you see when he

Page 141

1 presents this data in the sentence above he
2 references Facebook?
3    A.  Yes, I see that.
4    Q.  There's no reference to Instagram there.
5     Do you see that?
6    A.  There's no reference to Instagram.
7    Q.  And if you look -- okay.
8     Okay. Let's look at Exhibit 20, page 3,
9 the one we were looking at next.
10    A.  (Witness complies.)
11    Q.  And if we look at that bullet in the
12 bottom right corner, we see that same 55 percent
13 statistic.
14     Do you see that number, "55 percent"?
15    A.  Yes, I see that.
16    Q.  And it says, 50 percent of -- I'm sorry --
17 it says, "55 percent of people feel they spend," and
18 then there are quotes. Let me start again.
19     This says:
20     "55 percent of people feel they 'spend too
21 much time on social media.'"
22     Do you see that?
23    A.  Yes.
24    Q.  Okay. My question to you is, do you know
25 one way or another whether that was the criteria

CONFIDENTIAL

Page 142

1 used to come up with this 55 percent measurement of
2 mild problematic use. Someone saying they, "spend
3 too much time on social media"?
4      A.  I have no way of knowing how they came up
5 with that, no.
6      Q.  Do you know how -- what proportion of
7 people feel they spend too much time watching TV?
8          MS. COUCH:  Object to the form.
9      A.  I don't know that offhand, no.
10 BY MR. SCHMIDT:
11     Q.  Do you know if it's higher or lower than
12 55 percent?
13     A.  I have no idea.
14         MS. COUCH:  Objection to the form. Let me
15     give my objection.
16 BY MR. SCHMIDT:
17     Q.  Look with me if you would, at your
18 original report, Exhibit 1, page 251.
19     A.  (Witness complies.)
20     Q.  Paragraph 432.
21     A.  (Witness complies.)
22       432?
23     Q.  Yes, sir.
24     A.  Yes.
25     Q.  Do you see where you write:

Page 143

1         "Meta has internally acknowledged that
2 addictive use of Instagram plays a role in suicide
3 and self-injury as is shown in an internal memo."
4         Do you see that?
5      A.  Yes.
6      Q.  And is that your belief, that Meta
7 acknowledged that addictive use plays a role in
8 suicide and self-injury?
9          MS. COUCH:  Object --
10 BY MR. SCHMIDT:
11     Q.  Is that your understanding of what that
12 document says?
13         MS. COUCH:  Object to the form.
14     A.  That single -- that -- my opinion is not
15 based entirely on this figure, but the existence of
16 this figure shows that they were mindful of the
17 possible link between social media addiction and
18 suicide and self-harm, yes.
19 BY MR. SCHMIDT:
20     Q.  Did you read the whole document?
21     A.  I read -- I read hundreds if not thousands
22 of documents.
23     Q.  I'm talking about this one that you have a
24 picture of in your report.  Did you read that whole
25 document?

Page 144

1          MS. COUCH:  Object to the form.
2      A.  I'm sure that I did if I pulled this out
3 of it, yes.
4          MR. SCHMIDT:  I've marked as Exhibit 21.
5          (Exhibit 21 was received and marked for
6 identification, as of this date.)
7 BY MR. SCHMIDT:
8      Q.  Do you recognize this as the document you
9 cite in paragraph 432 of your original report, this
10 slide deck?
11     A.  (Witness reviews document.)
12     Q.  If it helps, the slide you cite is
13 slide 30.  Why don't we go to that.
14     A.  I mean, this doesn't have the Bates number
15 on it, which would be the easiest way for me to
16 assert that it's the same.  So I'm sorry, I don't
17 want to just say it's the same and I wouldn't -- I
18 looked at it a long time ago.  And I mean, so...
19     Q.  Okay.  I don't need you to say it's the
20 same.
21         Do you see this -- the chart that you
22 excerpted on page 30, in your report?
23         MS. COUCH:  Object to the form.
24     A.  Yes, I see the chart.
25

Page 145

1 BY MR. SCHMIDT:
2      Q.  Do you know if there was a presentation
3 given in connection with this slide deck?
4          MS. COUCH:  Object to the form.
5      A.  Do I know if this slide deck was given as
6 a presentation?
7 BY MR. SCHMIDT:
8      Q.  Uh-huh.
9          MS. COUCH:  Same objection.
10     A.  I don't know.  I mean, I assume it was.
11 BY MR. SCHMIDT:
12     Q.  In much the same way when I showed you
13 your slide deck, you said you need to listen to what
14 I have to say, would you want to know what these
15 people had to say when they gave this presentation?
16         MS. COUCH:  Objection to form.
17     A.  I think you would add context and nuance,
18 yes.
19 BY MR. SCHMIDT:
20     Q.  Let's look at -- do you know why this
21 presentation was given?
22         MS. COUCH:  Object to the form.
23     A.  I don't know why it was given.
24 BY MR. SCHMIDT:
25     Q.  Look with me if you would at -- do you

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

1 know the context in which it was given? Strike
2 that.
3        Do you know the context in which this
4 presentation was given or the slide deck was
5 prepared?
6        MS. COUCH: Object to the form.
7     A. I don't know the context of which it was
8 prepared or given, and I don't even know if it's the
9 same slide deck. But I don't know the context in
10 which this was prepared or given.
11 BY MR. SCHMIDT:
12     Q. Let's look at the slide that you cite,
13 number 30, that's up on the screen. This says:
14        "Model for how social media usage may be
15 linked to suicide/self-harm."
16        Do you see that?
17        MS. COUCH: + Object to the form,
18 misstates.
19        MR. SCHMIDT: Can we mark that objection,
20 please.
21     A. Yes, I do see that it says that.
22 BY MR. SCHMIDT:
23     Q. And do you recognize the difference
24 between "maybe" and "is"?
25        MS. COUCH: Object to the form.

Page 147

1 BY MR. SCHMIDT:
2     Q. And I guess what I'm getting at, just to
3 make it simpler, you recognize "maybe" as a
4 conditional statement. It has some uncertainty
5 involved, right?
6     A. I do.
7     Q. And then, when they talk about social
8 media addiction, on item 1, do you see that the only
9 place quotes appear on this slide is around the word
10 "addiction"?
11     A. Yes, I see that.
12     Q. Do you know why that's quoted as opposed
13 to being unquoted?
14     A. I have no way of knowing why they put
15 quotes around the word "addiction" in that context.
16     Q. Do you know if it's an indication that we
17 don't know if that's actually a thing?
18     A. I have no way of knowing.
19        MS. COUCH: Objection to the form.
20        THE WITNESS: Sorry.
21     A. I have no way of knowing why they put it
22 in quotes.
23 BY MR. SCHMIDT:
24     Q. Let's look at page 40, please.
25     A. (Witness complies.)

Page 148

1     Q. Do you know if you've ever seen this slide
2 before?
3     A. It looks familiar. I don't know if I saw
4 this precise slide, but I may very well have.
5     Q. Do you see it identifies "key questions,"
6 And one of the key questions is:
7        "Do we see a correlation between time
8 spent on Instagram and loneliness, depression, and
9 negative well-being."
10        Do you see that?
11     A. I see that.
12     Q. And do you understand the authors of this
13 slide viewed that as an open question to answer?
14        MS. COUCH: Object to the form.
15     A. The fact that they were trying to answer
16 it doesn't mean that they didn't already have data
17 about it, but that was the study that they -- that
18 was the question that they were posing, yes.
19 BY MR. SCHMIDT:
20     Q. Do you see that they identify it not as a
21 question with an answer, but as a question to
22 answer? And then they lay out how they will answer
23 it.
24        MS. COUCH: Object to the form.
25

Page 149

1 BY MR. SCHMIDT:
2     Q. Do you see that?
3        MS. COUCH: Same objection.
4     A. As a scientist, I would answer -- I would
5 interpret this question as being the question that
6 this study is trying to answer. Not a question that
7 doesn't have an answer.
8 BY MR. SCHMIDT:
9     Q. Okay.
10        What was the answer the study generated to
11 this question?
12     A. For this particular one, I mean, there
13 were -- I mean, I present data in my report. I
14 don't know if it was from this particular -- I'm
15 looking to see if they have it in this actual
16 report. But I do -- I did see data on the
17 correlation of this.
18     Q. I'm not asking for other data. I'm asking
19 you -- you told me that you would interpret this
20 question as being the question that the study is
21 trying to answer.
22     A. Yeah.
23     Q. My question is, what data did this study
24 show?
25        MS. COUCH: Object to the form.

38 (Pages 146 - 149)

Page 150

1    A.  When I answered -- what I was saying is
2 that that's what this -- this was the key question
3 that this study was trying to answer.
4 BY MR. SCHMIDT:
5    Q.  Right.  So what did this study show?
6    A.  I don't know.  I'm not sure I have the --
7 I certainly don't have the data in this presentation
8 of what this study showed, but there were many
9 studies that I reviewed from Facebook.
10    Q.  Do you know if this presentation even
11 related to a study?
12        MS. COUCH:  Objection to the form.
13    A.  I don't know.
14 BY MR. SCHMIDT:
15    Q.  Let's go to slide 41, please.
16    A.  (Witness complies.)
17    Q.  Do you see where they say, "What can we do
18 if addiction/sleep deprivation are real issues," at
19 the top of that slide?
20    A.  Forty-one is not marked, yes.
21    Q.  Do you understand from that that they
22 don't know if addiction/sleep deprivation are real
23 issues?
24        MS. COUCH:  Object to the form.
25    A.  I don't interpret it that way; and this

Page 151

1 study was from 2018, or this presentation, I'm
2 sorry, was given in 2018.
3 BY MR. SCHMIDT:
4    Q.  Do you see they have, "Starter ideas for
5 how to solve," and it's a combination of education
6 and product changes.
7        Do you see that?
8    A.  Yes, I see that.
9    Q.  If I tell you every single one of these
10 ideas was adopted, do you know if that's true or
11 not?
12        MS. COUCH:  Object to the form.
13    A.  I don't know if that's true or not.
14 BY MR. SCHMIDT:
15    Q.  Do you know of any that were not adopted?
16        MS. COUCH:  Same objection.
17    A.  I don't know offhand, as I sit here,
18 but -- and I know that they've adopted additional
19 things over time, but I don't know when they were
20 adopted, and if they were adopted.
21        MR. SCHMIDT:  We received yesterday a copy
22 of your invoices to date.  I'm going to go
23 ahead and mark those as an exhibit, it's going
24 to be tab 311 please.
25        (Exhibit 22 was received and marked for

Page 152

1 identification, as of this date.)
2 BY MR. SCHMIDT:
3    Q.  Do you recognize what we've marked as
4 Exhibit 22 as a copy of your invoices in your
5 paperwork for plaintiff's lawyers?
6    A.  Yes.
7    Q.  When we add these up, we get a total since
8 July of 2024, of $513,880.
9        Any reason to question that?
10        MS. COUCH:  Object to the form.
11    A.  No, I trust you added them up accurately.
12 BY MR. SCHMIDT:
13    Q.  I asked you when we talked previously if
14 you had disclosed your plaintiff expert work to the
15 University of Washington and you said you have not.
16 Have you done so since then?
17        MS. COUCH:  Object to the form.
18    A.  Yes, I have done so.
19 BY MR. SCHMIDT:
20    Q.  Okay.  When did you do so?
21    A.  I did so -- I did so a while ago, and it
22 turns out that I used a -- they switched to an
23 electronic form, and I have to resubmit.
24    Q.  Okay.  When did you first submit
25 erroneously?

Page 153

1        MS. COUCH:  Object to the form.
2    A.  I don't remember the precise date.
3 BY MR. SCHMIDT:
4    Q.  Was it after our deposition and you said
5 you had not told them?
6        MS. COUCH:  Object to the form.
7    A.  Yeah, that -- so I work at Seattle
8 Children's Research Institute and they don't have --
9 they the only disclosures that they require is for
10 industry, not for this.  And so when I -- it's not
11 clear I have to submit to University of Washington,
12 but I did and I used the wrong form because I hadn't
13 done it in a while.
14 BY MR. SCHMIDT:
15    Q.  Have you properly submitted -- have you
16 properly informed the University of Washington that
17 you were a paid plaintiff's expert in these cases?
18        MS. COUCH:  Object to the form.
19    A.  I have to do it electronically.
20 BY MR. SCHMIDT:
21    Q.  Have you done that?
22        MS. COUCH:  Same objection.
23 BY MR. SCHMIDT:
24    Q.  As we sit here today?
25        MS. COUCH:  Same objection.

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

1    A.  I have not done it yet, but I need to do
2  it.
3  BY MR. SCHMIDT:
4    Q.  I'm going to give you your prior
5  testimony, Exhibit 23.
6        (Exhibit 23 was received and marked for
7  identification, as of this date.)
8  BY MR. SCHMIDT:
9    Q.  And we'll also put it up on the screen.
10  Let's go to page -- let's go to page 659, and we've
11  also got it on the screen.  If we look at line 3.
12  Let's go up to line 3, please?
13        EXHIBIT TECHNICIAN:  (Complies.)
14  BY MR. SCHMIDT:
15    Q.  Do you see where I ask you:
16        "Do you have to seek approval from the
17  University of Washington before you could be an
18  expert," and you said "No."
19        Do you see that?
20        MS. COUCH:  Object to the form.
21    A.  Yes.
22  BY MR. SCHMIDT:
23    Q.  Do you still understand that to be
24  accurate testimony?
25    A.  I mean, yes, I believe it's accurate, but

Page 155

1  I'm going to report it.
2    Q.  Then, I ask you, "Did you have to give a
3  disclosure," and you say "No."
4        Do you see that?
5    A.  Yes.
6    Q.  Do you understand that to still be
7  accurate testimony?
8    A.  I believe that is accurate, but I intend
9  to disclose it, and I did disclose it.  But as I
10  said, I used -- I used a paper version of it, and it
11  came back to me as saying you have to do it
12  electronically.
13    Q.  Then you say -- then I ask you:
14        "Have you given any disclosure to the
15  University of Washington that you're doing expert
16  work for plaintiffs in this case?"  And you say "No,
17  I have not."
18        Do you see that?
19    A.  I do.
20    Q.  Was that accurate at the time when you
21  made that statement under oath on June 26, 2025?
22    A.  Yes.
23    Q.  When did you first give any disclosure to
24  the University of Washington that you're doing
25  expert work for plaintiffs in this case?

Page 156

1        MS. COUCH:  Object to the form.
2    A.  I don't remember the precise date, but it
3  was a while ago.
4  BY MR. SCHMIDT:
5    Q.  Some time between June 25, 2026, and today
6  in -- I'm sorry -- I misread the dates.
7        Was it sometime between June 26, 2025, and
8  September 2025, that you gave that disclosure for
9  the first time?
10    A.  Yes.
11    Q.  Let's keep that up there if we could.
12        Have you read the disclosure policy at the
13  University of Washington?
14    A.  Not for a long time.
15    Q.  And when you say "a long time," do you
16  mean last month or two, or years ago?
17    A.  I moved my research lab from the
18  University of Washington to Seattle Children's in
19  2010.  And I am a faculty member of the University
20  of Washington, but my research and my grants go
21  through Seattle Children's Research Institute and
22  Seattle Children's is its own separate entity.  So
23  I'm in a weird position.
24    Q.  Have you given disclosure to Seattle
25  Children's about the fact that you were a retained

Page 157

1  plaintiff's expert in these cases?
2    A.  To my knowledge, Seattle Children's
3  requires -- has a different standard.  It's not a
4  state institution, it's a private entity.  And their
5  requirement is that you do it if you're -- if you
6  have an equity stake in a private company.  And when
7  I have -- the only time I've ever had that, I've
8  disclosed it.
9    Q.  Was that a yes or no?
10        Have you disclosed to Seattle Children's
11  that you are a paid plaintiff's expert in this
12  litigation?
13        MS. COUCH:  Object to the form.
14    A.  I have not disclosed to Seattle Children's
15  that I'm an expert witness in this litigation.
16  BY MR. SCHMIDT:
17    Q.  Look with me, if you would, at your
18  report, your original report, Exhibit 1, page 44,
19  Figure 13.
20    A.  (Witness complies.)
21    Q.  And while you're finding that, my question
22  will be, do you recognize this as study data you
23  generated regarding usage of different apps by
24  teens?
25    A.  Yes.

40 (Pages 154 - 157)

CONFIDENTIAL

Page 158

1    Q.  Who is responsible for that data?  Is it
2 you, is it Seattle Children's, is it
3 University of Washington?
4         MS. COUCH:  Object to the form.
5    A.  These data actually are at Stony Brook
6 University.
7 BY MR. SCHMIDT:
8    Q.  Stony Brook is responsible for these data?
9    A.  That's where the data are, yes.
10    Q.  Have you disclosed to Stony Brook
11 University that you're a paid plaintiff's expert in
12 this litigation?
13         MS. COUCH:  Object to the form.
14    A.  I'm not -- I have no role that at Stony
15 Brook University.  My collaborator on this is at
16 Stony Brook.
17 BY MR. SCHMIDT:
18    Q.  Who is that?
19    A.  My collaborators, the authors on the
20 paper.
21    Q.  Okay.
22         Do you know -- did you make any disclosure
23 to Stony Brook that you would be using unpublished
24 data from this study as a paid plaintiff's expert?
25         MS. COUCH:  Object to the form.

Page 159

1    A.  No, I did not.
2 BY MR. SCHMIDT:
3    Q.  Let's go back to the
4 University of Washington.
5         Do you know if the University -- as we sit
6 here today, if the University of Washington policy
7 on outside professional work requires disclosure of
8 the fact that you're a paid plaintiff's expert?
9         MS. COUCH:  Object to the form.
10    A.  My recollection of the University of
11 Washington's outside work, from when I last read it,
12 was it was based on percent effort, because they --
13 it's a state institution and they don't want you to
14 be -- have a conflict of commitment.  If you're
15 doing more than 20 percent of your time spent in
16 outside work is my recollection of it.
17 BY MR. SCHMIDT:
18    Q.  My question is a little different.  My
19 question is, do you understand the
20 University of Washington policy on outside
21 professional work to require advance approval for
22 paid plaintiff expert work?
23    A.  I don't recall that, no.  I told you I
24 haven't read it in a while.
25         MR. SCHMIDT:  Mark this as Exhibit 24, a

Page 160

1 copy of that policy.
2         (Exhibit 24 was received and marked for
3 identification, as of this date.)
4 BY MR. SCHMIDT:
5    Q.  Do you recognize this as the
6 University of Washington policy EO 57, tab 300, on
7 outside professional policy work?
8         MS. COUCH:  Object to the form.
9 BY MR. SCHMIDT:
10    Q.  In the University of Washington purple, go
11 huskies.
12    A.  You're asking me if I recognize this?
13 Like I told you, I haven't seen it for a while, so I
14 can't say that I recognize it, but it looks like it
15 came from the University of Washington, yes.
16    Q.  Let's go to page 3, "Procedures."
17         Do you see a heading that says, "Approval
18 in advance"?
19         Do you see that?
20    A.  Yes, I see that.
21    Q.  And then it says:
22         "Outside consulting work for compensation
23 must be approved in advance."
24         Do you see that?
25    A.  Yes, I see that.

Page 161

1    Q.  And then it gives a helpful explanation of
2 how you get approval, including a hyperlink to a
3 form that, "must be filed with the immediate
4 supervisor and must be approved as required in
5 advance of accepting any outside consulting
6 activity."
7         Do you see that?
8         MS. COUCH:  Object to the form.
9    A.  Yes, I see that.
10 BY MR. SCHMIDT:
11    Q.  Did you know about this requirement for
12 advance approval for any outside consulting work for
13 compensation before, I just showed it to you now?
14         MS. COUCH:  Object to the form.
15    A.  As I said, I'm at Seattle Children's and I
16 was not aware of this, no.
17 BY MR. SCHMIDT:
18    Q.  Who is your immediate supervisor at the
19 University of Washington?  Was it Leslie Walker at
20 the time you first started doing work on these
21 cases?
22         MS. COUCH:  Object to the form.
23    A.  She's my department chair, yeah.
24 BY MR. SCHMIDT:
25    Q.  Is she your immediate supervisor?  And

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1  what I'm reacting to is, do you see where it says,
2  you have to complete this form, and then at the end
3  of the second line it says, it must be filed with
4  the immediate supervisor.
5      Do you see that?
6  A. I do.
7      MS. COUCH: Object to the form.
8  BY MR. SCHMIDT:
9  Q. Who is your immediate supervisor?
10     MS. COUCH: Same objection.
11  A. At the University of Washington, it would
12  be Leslie Walker. At Seattle Children's -- well, at
13  the time -- I don't know. Seattle Children's it
14  would be someone else.
15  BY MR. SCHMIDT:
16  Q. Yeah, I'm just asking about U-Dub.
17     Do you see that there is this hyperlink to
18  a form, "Request for approval of outside
19  professional work for compensation form."
20     Do you see that?
21  A. Yes. And I believe I clicked on this
22  link, and as I mentioned before, it was returned to
23  me because it was not -- I filed it in the wrong
24  form.
25  Q. As we sit here today, have you, more than

Page 163

1  a year into your -- strike that.
2      Do you recognize that the paid litigation
3  work you were doing in the case is, quote, "outside
4  consulting work for compensation"?
5      MS. COUCH: Object to the form.
6  A. Yes. I recognize that.
7  BY MR. SCHMIDT:
8  Q. As we sit here today, have you received
9  any approval for that work from the
10  University of Washington?
11     MS. COUCH: Objection to form.
12  A. I have not received approval from the
13  University of Washington.
14  BY MR. SCHMIDT:
15  Q. Will you get that approval
16  retrospectively?
17     MS. COUCH: Object to the form.
18  A. Yes. I believe I will get that approval.
19  BY MR. SCHMIDT:
20  Q. Okay. And I'm going to ask you again, if
21  we have the opportunity for me to ask you questions,
22  if you've received that approval and if you have a
23  document with that approval. So I'm just putting a
24  request, if you do get approval, we're going to ask
25  to see it.

Page 164

1      And you can talk with your lawyers --
2      MS. COUCH: Discovery request --
3      MR. SCHMIDT: Please let me finish.
4  BY MR. SCHMIDT:
5  Q. You can talk with your lawyers about
6  whether you're going to give that. I just want you
7  to understand I'm going to ask for that.
8      Do you understand that?
9      MS. COUCH: I'm going to object that
10  discovery requests be made to the attorney.
11     MR. SCHMIDT: I'm not making a discovery
12  request.
13  BY MR. SCHMIDT:
14  Q. I'm telling you I will make a discovery
15  request, and I'm asking if you understand that.
16  What I want to avoid is I don't want to ask you in
17  two months, a year, and have you say, "Oh, I didn't
18  know you were going to ask me for this."
19     So do you understand I'm going to ask you
20  for that? And if you get approval, I'd like to see
21  the form.
22     Do you understand?
23     MS. COUCH: I'm going to object to the
24  extent that this calls to legal discovery.
25  He's not a lawyer, and I can't imagine you want

Page 165

1  to be his lawyer --
2  BY MR. SCHMIDT:
3  Q. Do you understand that I'm going to ask
4  for that?
5      MS. COUCH: Object to the form for all the
6  reasons stated above.
7  A. I'm not going to answer it.
8  BY MR. SCHMIDT:
9  Q. You're refusing to answer it?
10  A. I'm refusing to answer.
11     MS. COUCH: Object to the form.
12  BY MR. SCHMIDT:
13  Q. Let's look at something I believe you
14  referenced.
15     If you look on page 2, there's a reference
16  to time limitations.
17     Do you see that?
18  A. Page 2 of this?
19  Q. Of the University of Washington policy on
20  outside professional work.
21     Do you see the time limitations portion of
22  the policy?
23  A. Yes.
24  Q. And, again, it references "subject to
25  approval in advance."

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

1    Do you see that?
2    A.   Yes.
3    Q.   And then, it allows outside consulting
4 work, if you read through it.  I'm now on the second
5 line:
6    "For remuneration to the maximum extent of
7 13 calendar days of each academic quarter."
8    Do you see that language?
9    MS. COUCH:  Object to the form.
10    A.   Yes, I see that language.
11 BY MR. SCHMIDT:
12    Q.   Do you have the understanding that there
13 is a policy that applies to you that limits the
14 amount of outside work you can do to 13 calendar
15 days per academic quarter?
16    MS. COUCH:  Object to the form.
17    A.   I'm not sure what you're asking.  Are you
18 asking is that what that says?
19 BY MR. SCHMIDT:
20    Q.   I'm asking if you understand that that
21 policy applies to you, that you were limited in your
22 outside consulting work for compensation to a
23 maximum of 13 calendar days each academic quarter?
24    MS. COUCH:  Object to the form.
25

Page 167

1 BY MR. SCHMIDT:
2    Q.   Do you understand that that limit applies
3 to you?
4    MS. COUCH:  Object to form.
5    A.   I don't believe it applies to me.
6 BY MR. SCHMIDT:
7    Q.   Why is that?
8    A.   Well, so before, I said the interpretation
9 of this has been 20 percent, which is -- of effort.
10 But effort for people in the medical school is kind
11 of unlimited.  So on the upper campus, it's assumed
12 to be a 40-hour workweek; in the medical school,
13 it's an 80-hour workweek.  There's no -- so it's
14 interpreted historically as effort, which is to say
15 it's a lot of hours.
16    Q.   Well, I'm not sure I understood that
17 answer.
18    Let me ask this:  Is there any limit you
19 believe applies to the volume of outside work you
20 can do under University of Washington policies?
21    MS. COUCH:  Object to the form.
22    A.   I don't know how to answer your question.
23 I mean --
24 BY MR. SCHMIDT:
25    Q.   Do you see where this says, in this

Page 168

1 language in the first line, that it applies to,
2 "full-time members of the faculty"?
3    Do you see that language in the first
4 line?
5    MS. COUCH:  Objection to form.
6    A.   I see that language.
7 BY MR. SCHMIDT:
8    Q.   I asked you earlier if you're a full-time
9 professor at the University of Washington.  You said
10 yes.
11    Are you a full-time member of the faculty
12 at the University of Washington?
13    MS. COUCH:  Objection to the form.
14    A.   I am a -- as I said, I'm in a somewhat
15 unusual situation, in that I -- my salary comes from
16 grants that are at Seattle Children's Research
17 Institute, but I am a member of the faculty of the
18 University of Washington.
19 BY MR. SCHMIDT:
20    Q.   Are you full-time member of the faculty at
21 the University of Washington, as you old us earlier
22 today under oath?
23    MS. COUCH:  Objection to form.
24    A.   Yes.  I'm a full-time member of the
25 faculty.

Page 169

1 BY MR. SCHMIDT:
2    Q.   Are you aware that if this policy does
3 apply to you as a full-time member of the faculty,
4 you are in excess of the maximum of 13 calendar days
5 each academic quarter in your paid work for
6 plaintiff lawyers?
7    MS. COUCH:  Object to form.
8    A.   I don't believe I have exceeded the
9 University of Washington policy.
10 BY MR. SCHMIDT:
11    Q.   That's not my question.
12    My question is -- and maybe you're trying
13 to answer my question, but let me focus in on what
14 I'm focused on.
15    Do you see this reference to "13 calendar
16 days each academic quarter"?
17    A.   Yes, I see that phrase.
18    Q.   Are you aware that your outside consulting
19 work for compensation exceeds that level?
20    MS. COUCH:  Object to the form.
21    A.   I'm not aware it exceeds that level.
22 BY MR. SCHMIDT:
23    Q.   Will you get guidance when you submit your
24 form as to whether you are exceeding the level of
25 outside consulting work for compensation that the

43 (Pages 166 - 169)

Page 170

1  University of Washington allows?
2      MS. COUCH:  Object to the form.
3      A.  I will submit my form, and consistent with
4  whatever -- I mean, I already submitted it.  I know
5  what it entails, but I need to do it electronically.
6  BY MR. SCHMIDT:
7      Q.  The form doesn't ask, "Are you following
8  the rules on amount of time?"  It doesn't ask you
9  for how much time you've spent already before you
10  got advanced permission; does it?
11      MS. COUCH:  Object to the form.
12      A.  Yeah, I don't remember that it asks.
13  That's what I'm saying.  It's weird.
14  BY MR. SCHMIDT:
15      Q.  Yeah.  So that's my question.
16      Will you get guidance as to whether you're
17  exceeding the limits that the
18  University of Washington sets?
19      MS. COUCH:  Object to the form.
20      A.  I'll submit the form.
21  BY MR. SCHMIDT:
22      Q.  Will you ask for guidance on whether
23  you're over the limit?
24      MS. COUCH:  Let me get my objection in.
25      Object to the form.

Page 171

1      A.  I'll submit the form.
2      MR. SCHMIDT:  Move to strike as
3  nonresponsive.
4  BY MR. SCHMIDT:
5      Q.  My question is -- you just told me the
6  form doesn't ask about time limits, so I'm asking
7  you something different now.
8      I was asking if you'll submit the form
9  that was supposed to be submitted before you did
10  work.  What I'm asking you now is, will you ask for
11  guidance on whether you've exceeded the time limits?
12      MS. COUCH:  Object to the form.
13  BY MR. SCHMIDT:
14      Q.  Do you have any intentions on doing that?
15      MS. COUCH:  Asked and answered.
16      A.  I will comply with the policies as stated
17  here and submit the form.
18  BY MR. SCHMIDT:
19      Q.  You will you ask for guidance on the time
20  limits; yes or no?
21      MS. COUCH:  Object to form.
22      A.  + I will submit the form as directed by
23  the policy that's here.
24      MR. SCHMIDT:  Let's mark the witness'
25  refusal to answer that line of questions.

Page 172

1      MS. COUCH:  I think it's time for a break,
2  Paul.
3      MR. SCHMIDT:  Okay.  Let's take a break.
4      THE VIDEOGRAPHER:  The time right now is
5  12:51 p.m.  We're off the record.
6      (At 12:51 p.m. a luncheon recess was
7  taken.)
8      (At 1:42 p.m. the deposition resumes.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 173

1  ********************************************
2      A F T E R N O O N   S E S S I O N
3  ********************************************
4      THE VIDEOGRAPHER:  The time right now is
5  1:52 p.m.  We're back on the record.
6  EXAMINATION
7  BY MS. HARDIN:
8      Q.  Dr. Christakis, we met before.  I'm Ashley
9  Hardin, and I represent the YouTube Defendants.
10      Nice to see you again.
11      A.  Nice to see you.
12      Q.  You agree that many adolescents do not
13  suffer adverse mental health effects from social
14  media; is that right?
15      MS. COUCH:  Object to the form.
16      A.  I don't know that I'd go so far as to say
17  "many," but I would say certainly some don't.
18  BY MS. HARDIN:
19      Q.  Let's take a look, if you would, at your
20  rebuttal report, which I think was marked as
21  Exhibit 2.
22      A.  Yeah.
23      Q.  I'll direct you to paragraph 10.
24      A.  Yes.
25      Q.  Sort of halfway through, you say that --

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

1 paragraph 10 you say:
2        "Many adolescents do not suffer adverse
3 mental health effects from social media."
4        Do you see that?
5    A.  Yes.
6    Q.  And you agree with that?
7    A.  Yes.
8    Q.  And then you go on to say:
9        "And as a result, the overall net effect
10 at a population level is small."
11       And you agree with that, correct?
12   A.  Yes.  I agree with that.
13   Q.  And you agree that most adolescents do not
14 suffer adverse mental health effects from social
15 media, correct?
16   A.  No.  That's where we differ.  I wouldn't
17 say "most."  I mean, we're getting into semantics
18 here, but I don't know that I would say "most."  I
19 would say "many," but not "most."
20   Q.  Well, continuing on in paragraph 10, you
21 say:
22       "But for a sizable fraction of children
23 and teenagers, the effects are large and
24 significant."
25       Do you see that?

Page 175

1    A.  I do see that.
2    Q.  So is it your testimony that a "sizable
3 fraction" refers to more than 50 percent?
4    A.  Is it your question that "most"
5 constitutes 51 percent?
6    Q.  I'm asking you about language that you put
7 in your rebuttal report.
8    A.  Yeah.
9    Q.  So I'm asking you, is your reference to a
10 "sizable fraction" -- well, let me start this:  What
11 do you mean when you refer to a "sizable fraction"
12 in paragraph 10?
13   A.  It's a really fair question.  And I can't
14 put a number on it precisely.  If I used the data
15 from Meta's study, it would be somewhere between 3.1
16 and 58 percent, as we discussed before.  That's some
17 of the best data we have.
18   Q.  And when you referenced a Meta study, you
19 meant the Defendant Meta as opposed to a
20 meta-analysis?
21   A.  I meant the Defendant Meta.  I can point
22 to the reference we discussed before if you want me
23 to find the precise --
24   Q.  That's okay.
25       Besides that one study that you're calling

Page 176

1 a "Meta study," what data are you relying on for
2 your references in paragraph 10 to a "sizable
3 fraction"?
4    A.  Well, if I look at number 169 of my -- I'm
5 sorry -- of my report, of the original report -- not
6 the rebuttal, the -- do you not have it?  You want
7 me to read it to you?
8    Q.  Sure.
9    A.  This is from YouTube's data of their
10 users.  They report that:
11       "60 percent of survey respondents 'go down
12 the rabbit hole' unintentionally on YouTube, using
13 it longer than desired."  And then it says "The same
14 report noted that 20 percent of teens and 30 percent
15 of young adolescents who watch weekday evenings
16 don't leave YouTube until after midnight."
17   Q.  You would agree that "unintentional use"
18 is not the same thing as having a "mental health
19 effect," as a result of usage, correct?
20   A.  Well, I would report that that's a risk
21 factor for it.  And I would add, when I said that 20
22 to 30 percent are watching on YouTube after midnight
23 on weekdays, I would say that's a problem for mental
24 health and for school performance.
25       MS. HARDIN:  Motion to strike as

Page 177

1     nonresponsive.
2 BY MS. HARDIN:
3    Q.  Since you have your main report out, let's
4 look at paragraph 68 of that, if you would, which is
5 on page 31.
6    A.  Yeah.
7    Q.  You state there that:
8        "The effect of social media is not uniform
9 across all children."
10       You agree with that?
11   A.  I agree with that.
12   Q.  And you agree that:
13       "a subset of them are especially
14 vulnerable to social media, while other children may
15 derive benefit"?
16       You agree with that?
17   A.  Yes, I agree with that.
18   Q.  And then you say that:
19       "The net effect on a population may be
20 attenuated, whereas, at an individual level, there
21 may be significant harms."
22       And you agree with that, correct?
23   A.  Yes, I agree with that.  And I think
24 that's why when you look at the entire population,
25 if every -- yes.  Every child who derives benefit

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

1 diminishes the population effects of children who
2 are harmed by it, depending on what outcome you're
3 looking at.
4    Q.  Now, in your rebuttal report,
5 Dr. Christakis, you mention social media effect on
6 the school environment.
7        Do you recall that?
8    A.  Yes.  And in my main report, I mention it
9 too, but in my rebuttal, yes.
10    Q.  You talk specifically about distraction
11 and behavioral issues in school.
12        Do you recall that?
13    A.  In my main report or in my rebuttal are
14 you referring?
15    Q.  I'm sorry.  In your rebuttal report,
16 paragraph 13.
17    A.  I'm sorry.
18    Q.  I'm sorry.  I have the wrong --
19    A.  It's not.
20    Q.  I'm sorry.  I think it was on the main
21 report.  I'm sorry.  My apologies.
22    A.  Yeah, okay.  Which?
23    Q.  Paragraph 13.
24    A.  Oh, in the main report.  You mean my very
25 first.  Okay.

Page 179

1    Q.  I misspoke.  Apologies.
2    A.  No worries.
3        (Witness reviews document.)
4        Okay.  Go ahead.  Yes.
5    Q.  You speak in that paragraph about the
6 quote/unquote negative effects of social media in
7 school is distraction and behavioral issues.
8        Do you see that?
9    A.  Well, I say -- tell me exactly what
10 you're -- what you're referring to.
11        "The school environment has been
12 negatively affected by social" --
13        (Reporter admonition.)
14        THE WITNESS:  I apologize.
15 BY MS. HARDIN:
16    Q.  That is what I'm referring to, if that
17 helps you.
18    A.  Yes.  So what I'm saying, as I say in the
19 body of my report, is that in addition to the
20 disruptive effects and intentional effects that
21 social media has during the school day, all of the
22 mental health effects that are detailed in the
23 report come to school and impact the learning
24 environment.  So diminished sleep, as we just
25 discussed, eating disorders, depression, anxiety,

Page 180

1 suicidal ideation, kids bring those to school with
2 them.
3        MS. HARDIN:  Move to strike everything
4        after the word "yes."
5 BY MS. HARDIN:
6    Q.  Dr. Christakis, a student in a school
7 environment can be distracted, even if that
8 distraction has nothing to do with the use of social
9 media, correct?
10        MS. COUCH:  Objection to the form.
11    A.  Yeah.  There's certainly other things that
12 can distract them, but it's clear that social media
13 is a major distraction for them.
14        MS. HARDIN:  Move to strike everything
15        under "certainly" -- well, move to strike the
16        answer after "There are certainly other things
17        that can impact."
18 BY MS. HARDIN:
19    Q.  And a student can be distracted even by
20 his or her cell phone but not be quote/unquote
21 addicted to social media, correct?
22    A.  The primary activity that children do on
23 their cell phones is social media.  And the pull
24 that that device has is to get on to one of the
25 social media sites predominantly that are listed in

Page 181

1 this report.
2        MS. HARDIN:  Motion to strike as
3        nonresponsive.
4 BY MS. HARDIN:
5    Q.  My question, Dr. Christakis, is a student
6 can be using his or her cell phone and not be
7 quote/unquote addicted to social media, correct?
8    A.  Oh, I'm sorry.  I misheard -- is that
9 your -- yes.  A person can use their cell phone and
10 not be addicted, yes.  Not everyone that uses their
11 cell phone is addicted, yes.
12    Q.  And a person -- a student can be
13 distracted by his or her cell phone in a classroom
14 and not have a mental health harm as a result of
15 social media use, correct?
16    A.  Well, I think that's not a yes-or-no
17 question.
18    Q.  Do you agree that a student could be
19 distracted by his or her cell phone in class and not
20 have a mental health harm as a result of social
21 media usage?
22        MS. COUCH:  Object to the form.
23    A.  I don't really -- I guess I don't
24 understand -- can you break it down a little bit?
25 Because I guess what I'm -- ask it again.

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

1  BY MS. HARDIN:
2      Q.  Let's try it this way:  Not every student
3  who is using his or her cell phone in class has a
4  mental health harm that could be attributed to
5  social media use, correct?
6      A.  Yes.  Not every student that is using
7  their cell phone in class has a social media
8  addiction problem, yes.
9      Q.  And a student could be sleep deprived for
10  all sorts of reasons that have nothing to do with
11  usage of these four defendants' platforms; isn't
12  that right?
13         MS. COUCH:  Object to the form.
14      A.  There are other reasons students can be
15  sleep deprived, but as I outline in my report, these
16  platforms are one such causal factor.
17  BY MS. HARDIN:
18      Q.  Dr. Christakis, are you aware that
19  94 percent of teachers globally use YouTube in the
20  classroom?
21      A.  I haven't heard that statistic, no.
22      Q.  Do you have any reason to dispute it?
23         MS. COUCH:  Object to form.
24      A.  I'd like to see the citation for it.  It
25  seems high to me, but -- so I'd like to see how that

Page 183

1  data was collected.
2  BY MS. HARDIN:
3      Q.  In your opinion, Dr. Christakis, can
4  students be harmed in connection with using YouTube
5  on a school-issued device?
6      A.  It's hard to answer that question because
7  school-issued devices vary with respect to the
8  controls they have on them.  And from what I've seen
9  clinically -- and I haven't seen research on this --
10  many students are able to subvert whatever controls
11  schools try to put on their devices.
12      Q.  In that circumstance, is it your opinion
13  that a student can be harmed in connection with
14  using YouTube on a school-issued device?
15         MS. COUCH:  Object to the form.
16      A.  Yes.  Insofar as they would be able to use
17  the YouTube platform, I think they would be
18  subjected to the risks, as I outline in my report,
19  that YouTube and another social media apps can pose.
20  BY MS. HARDIN:
21      Q.  Is it your opinion that school districts
22  should ban students from using YouTube on a
23  school-issued device?
24         MS. COUCH:  Object to the form.
25      A.  I don't have an opinion what school

Page 184

1  districts should do with respect to YouTube on
2  school-issued devices.
3  BY MS. HARDIN:
4      Q.  Can students be harmed, in your opinion,
5  in connection with accessing YouTube on a school
6  internet network?
7      A.  Again, I don't have an opinion because I
8  don't know about how those school internet sites or
9  platforms lock YouTube down or lock access down.  I
10  don't know -- I'm not -- I don't know how school
11  districts do that or how well they do it.
12      Q.  In your opinion, can students be harmed in
13  connection with using YouTube as part of
14  teacher-assigned YouTube schoolwork or homework?
15         MS. COUCH:  Objection to form.
16      A.  I don't have an opinion on that.
17  BY MS. HARDIN:
18      Q.  And do you have an opinion on whether
19  school districts should allow teachers to use
20  YouTube as part of the curricula in the classroom?
21         MS. COUCH:  Object to form.
22      A.  I don't have an opinion on that.
23         MS. HARDIN:  One moment.
24         Those are all of the questions I have
25  today, Dr. Christakis.  Thank you very much.

Page 185

1         THE WITNESS:  You're welcome.
2         MS. HARDIN:  I will pass the witness.
3         THE WITNESS:  Who's next?
4         MS. COUCH:  Do we want to go off the
5  record for a second?
6         THE VIDEOGRAPHER:  The time right now is
7  2:07 p.m.  We're off the record.
8         (Recess.)
9         THE VIDEOGRAPHER:  The time right now is
10  2:09 p.m.  We're back on the record.
11  EXAMINATION
12  BY MR. RUEHLMANN:
13      Q.  Good afternoon, Dr. Christakis.  As I just
14  mentioned, my name is Greg Ruehlmann.  I'm one of
15  the attorneys for the defendant -- the TikTok
16  Defendants, okay?
17         I have some questions for you here.
18  Hopefully, it won't take too long to go through
19  this.
20         In your report you talk about certain
21  screening scales for mental health and other related
22  conditions that you've opined on in this litigation,
23  correct?
24      A.  That's correct.
25      Q.  And I want to ask if you are familiar with

47 (Pages 182 - 185)

CONFIDENTIAL

Page 186

1 some concepts related to screening scales.
2        You've noted the concept of sensitivity.
3    A.  Yes.
4    Q.  Specificity?
5    A.  Yes.
6    Q.  Prevalence?
7    A.  Yes.
8    Q.  Positive predictive value?
9    A.  Yes.
10    Q.  Do you agree with me that sensitivity
11 describes how well a test or scale can detect a
12 specific disease or condition in people who actually
13 have it?
14    A.  Yes, that's correct -- well, yes, in a
15 manner of speaking, that's fine.
16    Q.  Would you agree with me that sensitivity
17 does not assess the number of people in a cohort of
18 population who do not have a condition or disease?
19        MS. COUCH:  Objection to form.
20    A.  So sensitivity -- that's why I'm trying to
21 understand where you're going with this question --
22 the more sensitive a test is, the more useful a
23 negative result is.  Sensitive tests are better for
24 ruling out conditions; specific tests are more
25 useful for ruling in conditions.  And I don't know

Page 187

1 if that's where you're going with this.
2 BY MR. RUEHLMANN:
3    Q.  And I'll ask you about specificity in a
4 moment.
5    A.  Okay.
6    Q.  But just, you agree that sensitivity does
7 not assess the number of people in a cohort who
8 don't have a disease or condition at issue, correct?
9    A.  It -- that's not the way I think of
10 sensitivity.  So like I said, the more sensitive a
11 test is, the more valuable the negative result of
12 the sensitive test is.
13    Q.  Would you agree that specificity, so the
14 next concept, refers to the percentage of people in
15 a group cohort who test negative for a specific
16 disease or condition --
17    A.  Yes.
18    Q.  -- within that group?
19    A.  Correct.  And I would use "specificity"
20 for the exact opposite.  So the more specific a test
21 is, the more a positive result tells you that the
22 person is likely to have the condition.
23    Q.  Do you agree that the positive predictive
24 value for a screening scale is the proportion of
25 people who screen positive for a disease or disorder

Page 188

1 who actually have that disease or disorder?
2    A.  So tests don't have positive predictive
3 values.  They have sensitivities and specificities.
4 The positive and negative predictive value vary
5 depending on the prevalence of the condition in the
6 population you're testing.
7    Q.  But you understand that within studies
8 relating to these conditions and screening scales,
9 there are efforts to assess the positive predictive
10 value of that screening scale, correct?
11    A.  It always depends on the population you're
12 studying.  So the test doesn't have a positive
13 predictive value that -- in every setting.  It has a
14 different positive predictive value depending on the
15 population you're applying it to.  And the same for
16 negative predictive value.
17    Q.  So my question was just a little
18 different, which is, would you agree that a positive
19 predictive value is the proportion of people who
20 screen positive for a disease or disorder who
21 actually have that disease or disorder?
22    A.  That is what the positive predictive value
23 means.
24    Q.  Okay.
25    A.  But the same test will have a different

Page 189

1 positive predictive value in population A, B, C, and
2 D.
3    Q.  Do you agree that positive predictive
4 value is a calculation that uses sensitivity,
5 specificity, and prevalence of the specific disorder
6 in a population?
7    A.  That's exactly right.  I would agree with
8 that completely.
9    Q.  Would you agree with me, Dr. Christakis,
10 that you yourself have not attempted to calculate a
11 positive predictive value for any of the screening
12 scales discussed in your report?
13        MS. COUCH:  Object to the form.
14    A.  I did not calculate a positive or negative
15 predictive value.  There's no reason to.  Others
16 have in various different settings, but there was no
17 need for me to do that in the context of this
18 report.
19        MR. RUEHLMANN:  I'm going to move to
20    strike everything after, "I did not calculate a
21    positive or negative predictive value."
22 BY MR. RUEHLMANN:
23    Q.  Would you agree that you yourself have not
24 assessed the positive predictive value of any of the
25 screening scales discussed in any of the studies on

48 (Pages 186 - 189)

CONFIDENTIAL

1 social media usage cited in your reports?
2    A.  Can you state that again?
3    Q.  Do you agree that you have not attempted
4 to calculate the positive predictive value for any
5 screening scales discussed in the studies cited in
6 your reports?
7        MS. COUCH:  Object to the form.
8    A.  That seems like the same question, but I
9 did not calculate the positive predictive value of
10 any of the screening tests used in the study cited
11 in my report.  I didn't think -- I don't believe it
12 is necessary to do that.
13        MR. RUEHLMANN:  I'm going to move to
14     strike the portions starting with "I didn't
15     think -- I don't believe it's necessary to do
16     that."
17 BY MR. RUEHLMANN:
18    Q.  I'd like you to take a look at your
19 rebuttal report, which, I believe, was marked
20 previously as Exhibit 2.
21    A.  Yes.
22    Q.  Do you have that handy?
23    A.  Yes, I do.
24    Q.  Do you see that at paragraphs 54 to 56 --
25    A.  Yes.

1    Q.  -- you have a discussion of a positive
2 predictive value of two screening scales, the PHQ-9
3 and the GAD-7, correct?
4    A.  That's correct.
5    Q.  And you were asked previously some
6 questions about those two screening scales in
7 particular, right?
8    A.  I was.  That's right.
9    Q.  Do you agree those are the two screening
10 scales that you discuss as to predictive value
11 across your two reports?
12        MS. COUCH:  Object to the form.
13    A.  Those were two of -- I mean, there were
14 others, you know.  Those are two of the more common
15 ones that are deployed in many of the studies that I
16 cite, but they're not the only ones.
17 BY MR. RUEHLMANN:
18    Q.  Which other screening scales do you talk
19 about the positive predictive value for in your
20 reports besides the PHQ-9 and the GAD-7?
21        MS. COUCH:  Object to the form.
22    A.  Okay.  Let me -- let me reflect back.
23 So I believe, earlier, you asked me did I
24 calculate it, and I said I did not.  I didn't
25 calculate this.  This was someone else's cited

1 study.
2        MR. RUEHLMANN:  Understood.
3    A.  Which is why -- okay.
4        And then -- and then I don't know if I
5 report other positive predictive values of the
6 measures in my report -- I mean, it's 500 pages --
7 but there are others in my reliance report.
8        There are other -- the sensitivity and
9 specificity of all of the measures I use are
10 available because they've been validated.  I don't
11 know that the positive and negative predictive
12 values are reported for all of them.
13 BY MR. RUEHLMANN:
14    Q.  But sitting here right now, you don't
15 recall any other screening scale referenced in your
16 reports for which you discuss the positive
17 predictive value, correct?
18    A.  I see.
19        I don't recall discussing the positive
20 predictive value of other measures in my report, but
21 the measures that were used were all validated.
22    Q.  Okay.  And for these two screening scales
23 on which you do mention positive predictive value,
24 you cite two studies in the footnotes of those
25 paragraphs 54 to 56 --

1    A.  Yes.
2    Q.  -- correct?
3    A.  Yes.
4    Q.  And one of those is the Marlow study,
5 right?
6    A.  Yes.
7    Q.  The other is Fonseca, footnote 69 to 70?
8    A.  Oh, it's on the other page.  Yes.
9        MR. RUEHLMANN:  I'm going to mark as
10 Exhibit 26, the Marlow study.
11        (Exhibit 26 was received and marked for
12 identification, as of this date.)
13 BY MR. RUEHLMANN:
14    Q.  And, Dr. Christakis, do you recognize this
15 as the Marlow study that is cited at footnote 69 and
16 71 of your rebuttal report?
17    A.  I do.
18    Q.  Looking at the description of page 2 and
19 page 4, would you agree that this study involves
20 structured clinical interviews of the participants?
21    A.  Yes.  So they were -- yes.  It included
22 that and included the PHQ-9 and the GAD-7, yes.
23    Q.  I'd like you to turn to page 5 of this
24 study.
25    A.  (Witness complies.)

Page 194

1    Q.   I'll strike that.
2        Page 6.
3        Up at the top, you see --
4    A.   Study -- 556, you mean?
5    Q.   Well, the sixth page of the document.  It
6  ends in S57 if you're using the pagination up at the
7  top.
8    A.   Okay.  Got it.  I'll try and use those
9  pages to avoid confusion.
10   Q.   You see at the top of this page a Table 2?
11   A.   Yes.
12   Q.   And do you see in this table, they set
13 forth a PHQ -- total PHQ-9 scores for the sample
14 population and different subgroups within that
15 population?
16   A.   I see that.
17   Q.   And then the same for the GAD-7 score
18 underneath that?
19   A.   Yes, I see that.
20   Q.   And then you see -- looking over the
21 fourth column to the right of that, do you see a
22 column for PPV?
23   A.   Uh-huh.
24   Q.   And that is "positive predictive value,"
25 correct?

Page 195

1    A.   Correct.
2    Q.   And then a number is set forth under that
3  PPV for each of these populations or subpopulations,
4  correct?
5    A.   Yes.
6    Q.   And it's zero-point, and then two digits,
7  right?
8    A.   Yes.
9    Q.   All right.  And you agree with me, looking
10 up and down, that every single one of these is less
11 than 0.5?
12   A.   You mean all of the positive predictive
13 values are less than 0.5?
14   Q.   Correct.  You agree with that?
15       That's what it says, right?
16   A.   Can I -- that's not a yes-or-no question.
17   Q.   You are reading the same column as me
18 here, correct?
19   A.   I am.
20   Q.   It says "PPV."
21       Would you agree that every number listed
22 below "PPV" here --
23   A.   Yes.  This is in a general population
24 of -- again, that's what I want to emphasize.  The
25 positive predictive value is driven by the

Page 196

1  population studied.  And so this population, yes,
2  the positive predictive value for all of them, I
3  guess, the maximum one is .49; that's correct.
4    Q.   And we'll get to the specific population
5  here in a moment, sir.
6    A.   Yeah.
7    Q.   But, in fact, would you agree that most of
8  these are below .4, up and down?
9        MS. COUCH:  Object to the form.
10   A.   Most of the numbers in that column are
11 below .4; that's correct.
12 BY MR. RUEHLMANN:
13   Q.   Would you agree that this table is showing
14 that for that population that's studied here, less
15 than half are going to actually have the disorder
16 identified, be that anxiety or depression?
17       MS. COUCH:  Object to the form.
18   A.   Less than half of all of the kids in this
19 sample are going to have anxiety or depression?
20       MR. RUEHLMANN:  Yes.
21   A.   Yes.  Fewer -- will have a clinical
22 diagnosis of anxiety or depression yes.  Fewer than
23 50 percent will, yes.
24 BY MR. RUEHLMANN:
25   Q.   And this study that you cite shows that

Page 197

1  there is a greater than 50 percent chance, in other
2  words, more likely than not, that the screening
3  scale is not going to be diagnostic, correct?
4        MS. COUCH:  Object to form.
5    A.   No.  That's not the way to -- that's
6  not -- I'm not -- that's a different -- that's
7  different than what you said before.  Before, you
8  said that 50 percent of these students will not have
9  depression, and that's correct.
10       That's different than "The test is not
11 diagnostic."  They're not -- they don't have
12 depression, so the test isn't failing to diagnose
13 it.
14 BY MR. RUEHLMANN:
15   Q.   Isn't one of the purposes of a positive
16 predictive value to determine what percentage of
17 participants actually have a condition, right?
18       MS. COUCH:  Object to the form.
19   A.   So let me answer it this way:  This is
20 measuring whether they meet a clinical diagnosis of
21 depression.  And a clinical diagnosis of depression,
22 for example -- I'm worried I'm going to give too
23 long an answer, so I'm trying to be very short, and
24 it's hard for me to be short in this because it's a
25 complicated question.

Page 198

1    When you speak about psychiatric problems,
2 it operates on a continuum.  And I can assure you
3 that even if you don't -- if you have four out of
4 the five criteria for meeting a clinical diagnosis
5 of depression, you have significant psychological
6 distress and are at very high increase of developing
7 depression in the future.
8        MR. RUEHLMANN:  I'm going to move to
9    strike that.  I don't think you answered my
10   question, respectfully.
11       Let me see if I can pose a different one.
12 BY MR. RUEHLMANN:
13   Q.  Paragraph 54 of your rebuttal report, you
14 say that:
15       "The PHQ-9 and the GAD-7 screening scales
16 have been studied for the predictive value in" --
17   A.  Yes.
18   Q.  -- "large samples" --
19       MS. COUCH:  Let him finish.
20 BY MR. RUEHLMANN:
21   Q.  -- "and have been consistently shown to
22 discriminate between individuals at high and low
23 risk for having or developing clinical diagnoses,"
24 right?
25   A.  Yes.

Page 199

1    Q.  And then in that citation, you cite this
2 Marlow report, right?
3    A.  Uh-huh.
4    Q.  You've already agreed with me that in the
5 PPV column, every single one of these numbers is
6 less than .5, right?
7    A.  I have agreed with you with that, yes.
8    Q.  And you mentioned earlier that the
9 population matters, correct?
10   A.  Yes, it matters.
11   Q.  Okay.  So I'd like you to look at page 2
12 of the Marlow study.  This is S53.
13   A.  Yes.
14   Q.  Look at the right column.  You see a
15 section for participants?
16   A.  Yes.
17   Q.  Going down a few lines, you see a sentence
18 that says:
19       "We aimed to obtain an enriched sample or
20 a specific proportion of participants likely to have
21 anxiety and depression at a 2:1 ratio to
22 participants without these conditions"?
23   A.  Yes.
24   Q.  You understand the concept of an enriched
25 population; do you not?

Page 200

1    A.  Yes.
2    Q.  Enriched sample?
3    A.  Yes.
4    Q.  And in seeking an enriched sample, you
5 were trying to get a higher proportion of people who
6 actually have the condition at issue, not a lower
7 percentage, correct?
8    A.  Well, in this context, that's correct,
9 yes.
10   Q.  Do you have any reason to dispute that the
11 majority of the participants in this study were
12 sought out specifically in order to obtain a higher
13 rate of people with and without the condition?
14   A.  No, I don't.  I don't have reason to
15 dispute that's what they did, no.
16   Q.  And this enriched population is the one
17 that reported the PPV numbers that are all less than
18 .5 in Table 2?
19   A.  That's correct.
20       MR. RUEHLMANN:  I'd like to show you
21   briefly the Fonseca study that I've marked as
22   Exhibit 27.
23       (Exhibit 27 was received and marked for
24 identification, as of this date.)
25

Page 201

1 BY MR. RUEHLMANN:
2    Q.  And you recognize this as the Fonseca --
3 I'll say Fonseca-Pedero study --
4    A.  Yes.
5    Q.  -- cited as the only other study in your
6 report in these paragraphs about positive predictive
7 value, correct?
8    A.  It's the only other one I cite in my
9 rebuttal report, yes.
10   Q.  Sitting here, can you identify any other
11 study that you cite in your primary report for this
12 concept of positive predictive value as to any
13 screening scale?
14   A.  I don't recall having done so, no.
15   Q.  Looking at the Fonseca-Pedero study,
16 would you agree with me that there is no place in
17 here that discusses its positive predictive value?
18   A.  Not as specifically -- I don't see it as
19 positive predictive value, but there are for
20 correlation coefficients with the gold standard,
21 yes.
22       MR. RUEHLMANN:  I'm going the move to
23   strike everything after "predictive value."
24 BY MR. RUEHLMANN:
25   Q.  And would you agree with me that this

51 (Pages 198 - 201)

Page 202

1 study, unlike the Marlow study, did not involve any
2 structured clinical interview?
3       In fact, if you look on the second page,
4 there's a section called "Method."
5       Would you agree with me that there's no
6 description of a structured clinical interview?
7    A.  Yes.  This used -- yes, this looked at
8 other validated instruments, yes.
9    Q.  Okay.
10      MR. RUEHLMANN:  Those are all of the
11 questions I have for you, Dr. Christakis.
12 Thank you for your time.
13      THE WITNESS:  Thank you, and you're
14 welcome.
15      THE VIDEOGRAPHER:  The time right now is
16 2:30 p.m.  We're off the record.
17      (Recess.)
18      THE VIDEOGRAPHER:  The time right now is
19 2:33 p.m.  We're back on the record.
20 EXAMINATION
21 BY MR. DE DIEGO-HABEL:
22    Q.  Good afternoon Dr. Christakis, my name is
23 Alberto De Diego-Habel, and I'm here on behalf of
24 Snap, Inc., the maker of Snapchat.  I'm going to ask
25 you some questions today about your opinions related

Page 203

1 to Snapchat specifically.  And if anything is
2 unclear, please let me know.
3       Dr. Christakis, during your June 25th and
4 26th deposition, you testified that you had not
5 reviewed or requested data on how much time users
6 spend using the different features of Snapchat.
7       Do you recall that?
8       MS. COUCH:  Object to the form.
9    A.  I recall seeing that, and I also recall
10 saying that I didn't think it was relevant.
11      MR. DE DIEGO-HABEL:  Let's take a look at
12 some data.
13      I'm going to produce as Exhibit 28, the
14 expert rebuttal report of Snap data scientist
15 Krista Hayakawa, which is tab 2 in the Snap
16 exhibit folder.
17      (Exhibit 28 was received and marked for
18 identification, as of this date.)
19 BY MR. DE DIEGO-HABEL:
20    Q.  Dr. Christakis, can you see at the top of
21 page -- well, this is an expert rebuttal report of
22 Krista Hayakawa.
23      Do you see that on the first page?
24    A.  I see that.  I'm not sure I've seen this
25 before, but that's not relevant, I guess.

Page 204

1       Okay.  Go ahead.
2       MS. COUCH:  Well, I would lodge an
3 objection because you haven't seen it before.
4       THE WITNESS:  Okay.
5    A.  I don't recall having seen this.
6 BY MR. DE DIEGO-HABEL:
7    Q.  Okay.  If you turn, please, to page -- to
8 paragraph 3.
9    A.  (Witness complies.)
10   Q.  Can you see that Ms. Hayakwa is a data
11 engineer at Snap?
12      MS. COUCH:  Objection to form.
13   A.  Yes.  I see that it says that at number 3.
14 BY MR. DE DIEGO-HABEL:
15   Q.  And at paragraph 10, do you see where it
16 says:
17      "According to our usage statistics for
18 Q1 2025, 13-17 year-old-users in the United States
19 spent about 78 percent of their time using the
20 messaging and camera portions of the Snapchat app
21 during that period"?
22      MS. COUCH:  Objection.
23   A.  I see that it says that.
24 BY MR. DE DIEGO-HABEL:
25   Q.  You don't have any reason to doubt this

Page 205

1 data; do you?
2       MS. COUCH:  Objection.
3    A.  It's the first I'm seeing it.  And I mean,
4 I don't know how it was -- there's no methods about
5 how it was collected or defined.  But I mean -- so I
6 can't really answer that.
7 BY MR. DE DIEGO-HABEL:
8    Q.  You don't address this data in your MDL
9 rebuttal report; do you?
10      MS. COUCH:  Objection.
11   A.  I don't address this data in my rebuttal
12 report?  I don't -- I do not.  This is the first
13 I've seen it.
14 BY MR. DE DIEGO-HABEL:
15   Q.  Okay.  And I understand that you're not
16 familiar with how the data was arrived at, but
17 sitting here today, you don't have any reason to
18 doubt the data one way or the other, correct?
19      MS. COUCH:  Objection, asked and answered.
20      I'd also point out it's from the JCCP
21 proceeding, and we're in the MDL one.
22   A.  To be honest, I'm looking at -- I'm trying
23 to look at -- there's Appendix B data there, and I'm
24 trying to look at it.
25

52 (Pages 202 - 205)

CONFIDENTIAL

1  BY MR. DE DIEGO-HABEL:
2     Q.  Dr. Christakis, in the interest of time, I
3  can just move on.
4     A.  Okay.
5     Q.  Dr. Christakis, you do not anywhere in
6  your reports cite any studies that evaluate the
7  impacts of messaging applications on mental health,
8  correct?
9        MS. COUCH:  Object to the form.
10     A.  I didn't specifically in my report focus
11  on the messaging portion because the report was
12  focused on the way the platforms are used, which
13  includes all of the features, including messaging.
14  BY MR. DE DIEGO-HABEL:
15     Q.  So just to make sure I understand your
16  answer, the answer to my question is, no, you did
17  not cite anywhere in your reports any studies about
18  any of the impacts of messaging applications
19  specifically on mental health, correct?
20        MS. COUCH:  Objection.
21     A.  Because I looked at the use of the app in
22  toto, which includes all of the features including
23  messaging, yes, I did not specifically call out
24  messaging.  I didn't see a reason to do that.
25

1  BY MR. DE DIEGO-HABEL:
2     Q.  Let's take a look at some of the studies
3  that you do cite.
4        If you will please turn to paragraph 36 of
5  your rebuttal report.
6     A.  Okay.
7     Q.  You cite a study by Van Essen and Van
8  Ouytsel in connection with your opinion on Snapchat
9  streaks, correct?
10     A.  Yes.
11        MR. DE DIEGO-HABEL:  Let's take a look at
12     that study, which I want to introduce as
13     Exhibit 29.  Tab 7 in the Snap folder.
14        (Exhibit 29 was received and marked for
15  identification, as of this date.)
16  BY MR. DE DIEGO-HABEL:
17     Q.  Turning to page 5, do you see the header
18  that reads "Limitations and suggestions for future
19  research"?
20     A.  Page 5?
21     Q.  Correct.
22     A.  Limitations, yes.
23     Q.  The first sentence under that header
24  reads:
25        "Some limitations in this research need to

1  be kept in mind when interpreting the results of our
2  study.  First, the cross-sectional data were
3  self-reported by a convenience sample of
4  adolescents.  To collect the data for our study, we
5  relied on a convenience sample of adolescents who
6  self-reported their information."
7        Did I read that correctly?
8     A.  You read that correctly, yes.
9     Q.  And the author is writing in the next
10  sentence:
11        "It is worth noting that this type of
12  cross-sectional data collection approach may have
13  limitations in terms of its generalizability to
14  larger populations."
15        Do you see that?
16     A.  I see that.
17     Q.  About halfway down the paragraph, the
18  authors add:
19        "Longitudinal designs are needed to track
20  behaviors over time."
21        Do you see that?
22     A.  Yes, I see that they say that.
23     Q.  So this is a cross-sectional study, not a
24  longitudinal study, correct?
25     A.  This study was cross-sectional; that's

1  correct.
2     Q.  You don't cite in your report any of
3  this -- any of the limitations language that we just
4  read; do you?
5        MS. COUCH:  Object to the form.
6     A.  I did not cite their limitations in my
7  report, no, but this report was evaluated in the
8  context of all of the data, including, I might add,
9  my clinical experience, my training, the other
10  medical literature I viewed, and Snapchat's own
11  data.
12        MR. DE DIEGO-HABEL:  Move to strike
13     everything after the word "but."
14  BY MR. DE DIEGO-HABEL:
15     Q.  Let's take a look at the author's
16  discussion of their findings.
17        If you go back to the previous page, on
18  page 4, do you see the header that says
19  "Discussion"?
20     A.  Yes.
21     Q.  And the third paragraph begins:
22        "The effect size of all variables, though
23  statistically significant, are relatively small.  It
24  can therefore be said that, unless engaging in
25  Snapchat streaks may be risky in other contexts,

53 (Pages 206 - 209)

Page 210

1 e.g., adolescents engaging in password sharing or
2 other forms of social media addiction."
3      Do you see that?
4    A.   At a population level, that's correct in
5 the context of this study, yes.
6    Q.   Could you please read for the jury the
7 rest of this paragraph, which begins with "The
8 engagement in Snapchat streaks"?
9      MS. COUCH:  Object to the form.
10    A.   "The engagement in Snapchat streaks might,
11 in fact, be part of a normative communication
12 process of the adolescent population, not
13 necessarily driven, in strong degrees, by FOMO,
14 problematic smartphone use, and social media
15 self-control.  Our study does contribute to
16 cumulative evidence that these novel forms of
17 interpersonal communication do not necessarily have
18 to be understood from a risk perspective, and that
19 the public concern about these gamified forms of
20 interpersonal communication may be overstated."
21 BY MR. DE DIEGO-HABEL:
22    Q.   Could you please read the first sentence
23 of the next paragraph as well?
24    A.   "In practice, this might mean for parents
25 and educators that they should not be too concerned

Page 211

1 about children's engagement with Snapchat streaks as
2 it pertains to their children's FOMO, problematic
3 smartphone use, and social media self-control."
4    Q.   Finally, could you please read the last
5 sentence of this paragraph, which begins with
6 "Unless adolescents are engaging"?
7      MS. COUCH:  Object to the form.
8    A.   "Unless adolescents are engaging in
9 potentially harmful interactions on Snapchat, e.g.,
10 interactions with strangers, interactions with
11 adults, adult sexual solicitation, bullying,
12 adolescents' use of Snapchat with other peers may
13 not necessarily be related to negative digital media
14 use."
15 BY MR. DE DIEGO-HABEL:
16    Q.   You don't cite any of this language that
17 we just looked at in your rebuttal report; do you?
18      MS. COUCH:  Object to the form.
19    A.   My report was based not just on this
20 study, as I said, but on hundreds of studies, my
21 clinical experience, my training as an
22 epidemiologist, and Snap's internal documents.  So
23 yes, the limitations cited for this particular study
24 were not cited in my report.
25      MR. DE DIEGO-HABEL:  Move to strike as

Page 212

1 nonresponsive, everything before, "Yes, the
2 limitations cited for this particular study."
3 BY MR. DE DIEGO-HABEL:
4    Q.   Okay.  Let's turn back to your rebuttal
5 report and look at paragraph 42, please.
6    A.   (Witness complies.)
7    Q.   You cite a study by Schroeder and
8 Behm-Morawitz in connection with your opinion on
9 filters, correct?
10    A.   Yes, I do.
11      MR. DE DIEGO-HABEL:  I'll introduce that
12 study as Exhibit 30, which is tab 8 in the Snap
13 folder.
14      (Exhibit 30 was received and marked for
15 identification, as of this date.)
16 BY MR. DE DIEGO-HABEL:
17    Q.   And let's please take a look at page 3.
18      MS. COUCH:  He doesn't have it yet.
19      Okay.  He's got it now.
20    A.   Page 3, yes.
21 BY MR. DE DIEGO-HABEL:
22    Q.   Page 3 on the bottom right-hand corner,
23 you see where it says, Section 2, "Method"?
24    A.   Yes.
25    Q.   And under it says Section 2.1, "Procedure

Page 213

1 and participants," correct?
2    A.   Yes.
3    Q.   Turning to the next page, page 4, where
4 the section continues.  In the first partial
5 paragraph at the top left-hand corner, do you see
6 where it says:
7      "Upon recruitment and consent to
8 participate in the study, participants were asked to
9 answer questions regarding their social media
10 consumption and their perceived body size.
11 Afterward, they were given detailed instructions to
12 download the free app, Snow, where they were then
13 tasked with using specific filter, depending on
14 their condition."
15      Do you see that?
16    A.   I do.
17    Q.   So participants weren't studied based on
18 their use of Snapchat or any filters or lenses that
19 actually exist on Snapchat, correct?
20      MS. COUCH:  Object to the form.
21    A.   I'm not -- I mean, I don't.  What they say
22 is that we believe that their offerings were
23 representative of filters across social media
24 platforms.  So I'm not sure where they got this
25 filter or what they were mimicking, but the

54 (Pages 210 - 213)

Page 214

1 intention was to make it similar to the beauty
2 filters, the slimming beauty filters on Snapchat and
3 others.
4          MR. DE DIEGO-HABEL:  Move to strike as
5     nonresponsive.
6 BY MR. DE DIEGO-HABEL:
7     Q.  I didn't ask what their intention was.  I
8 simply asked what app the participants were studied
9 on the basis of.  It says right here that they were
10 studied on the basis of a free app called Snow,
11 correct?
12          MS. COUCH:  Object to the form.
13     A.  Yes, they used Snow, not Snap, if that's
14 your question, yes.
15 BY MR. DE DIEGO-HABEL:
16     Q.  That was my question.  Thank you,
17 Dr. Christakis.
18          Okay.  Let's turn, please, to page 7.
19     A.  (Witness complies.)
20     Q.  Do you see section 4.3, titled
21 "Limitations and Future Directions"?
22          Could you please read for the jury the
23 first two sentences of the second paragraph in this
24 section?
25     A.  "Limitations of this research include the

Page 215

1 generalization of our findings" --
2     Q.  Excuse me, Dr. Christakis.  The first two
3 sentences of the second paragraph, that begins with
4 "additionally" --
5     A.  Additionally, okay.
6          "Additionally, the average age of our
7 participants was 36, which does not represent
8 Generation Z social media users.  Rather, the
9 majority of our participants were Millennials who
10 are engaging with filters alongside younger
11 generations but potentially from different life
12 experiences and with different effects."
13     Q.  So the average age of participants in this
14 study was 36, correct?
15     A.  That's correct.  I would expect the
16 effects to be larger in younger children, but in
17 this study it was 36, that's correct.
18          MR. DE DIEGO-HABEL:  Move to strike
19     everything after, "that's correct."
20 BY MR. DE DIEGO-HABEL:
21     Q.  So this study was not focused on
22 adolescents, correct?
23     A.  This study was not primarily focused on
24 adolescents, that's correct, but there are other
25 studies cited in the report that did look at younger

Page 216

1 children, adolescents, and there's Snap studies as
2 well that looked at it.
3     Q.  Dr. Christakis, I have limited time so I'm
4 going to ask you to answer my questions as directly
5 as possible.
6          MR. DE DIEGO-HABEL:  I'll ask to move to
7     strike everything after "that's correct."
8 BY MR. DE DIEGO-HABEL:
9     Q.  You don't mention in your report the
10 average age of participants in this study; do you?
11          MS. COUCH:  Object to the form.
12     A.  I do not mention the average age of the
13 participants in the -- in my rebuttal, that's
14 correct.
15 BY MR. DE DIEGO-HABEL:
16     Q.  And you don't mention in your report the
17 fact that participants used an app called Snow
18 instead of Snapchat or the other defendant
19 applications in connection with this study, correct?
20          MS. COUCH:  Object to the form.
21     A.  Well, what I say in my report is that the
22 adverse effects of cosmetic surgery mimicking
23 filters on body image have been studied.  I didn't
24 mention a particular platform because you can
25 generalize from one to others.

Page 217

1 BY MR. DE DIEGO-HABEL:
2     Q.  Okay.  Let's take a look in your rebuttal
3 report in paragraph 80.
4          Let me know when you're there.
5     A.  Yes.
6     Q.  Do you see where you write:
7          "Dr. Allen further claims that I ignore
8 the positive impacts of Snapchat.  I did not see any
9 studies demonstrating such benefits for Snap
10 specifically nor does he cite any."
11     A.  Yes.
12          MR. DE DIEGO-HABEL:  I believe this is
13     Exhibit 30.  Okay.  Pardon.  I have to
14     introduce this.
15          Let's introduce as Exhibit 30 [sic],
16     Dr. Allen's report, which is tab 4 in the Snap
17     folder.
18          (Exhibit 31 was received and marked for
19     identification, as of this date.)
20          (A discussion was held off the record.)
21          MR. DE DIEGO-HABEL:  Is it 31?
22     A.  Yes.
23 BY MR. DE DIEGO-HABEL:
24     Q.  And if you'll turn, please -- thank you.
25          If you'll turn, please, to paragraph 102,

55 (Pages 214 - 217)

CONFIDENTIAL

1 which is on page 39.
2     A.  (Witness complies.)
3        Yes.
4     Q.  You see where he writes, "Some studies
5 report Snapchat has positive effects."
6        Do you see that language?
7     A.  Yes, I see that he says that, yes.
8     Q.  Okay.
9        About halfway down the paragraph, do you
10 see that he mentions a study called Bayer, et al.,
11 2016?
12     A.  Yes.
13     Q.  And then, on the next page, do you see
14 that he mentions a study by Woodward in 2025, at the
15 top of the page?
16        Do you see that?
17     A.  Yes, I see that.
18        MR. DE DIEGO-HABEL:  Let's take a look at
19 Woodward, which is tab 6 in the Snap folder, at
20 Exhibit 32.
21        (Exhibit 32 was received and marked for
22 identification, as of this date.)
23 BY MR. DE DIEGO-HABEL:
24     Q.  Do you recognize this study,
25 Dr. Christakis?  And I'll represent to you that I

1 did not see it listed in your reliance list?
2        MS. COUCH:  Object to the form.
3     A.  I did not see this study.  It was
4 published after I had completed my review.  It looks
5 like it was published in 2025.
6 BY MR. DE DIEGO-HABEL:
7     Q.  But you addressed Dr. Allen's report in
8 your rebuttal report, correct?
9     A.  I addressed Dr. Allen's report in my
10 rebuttal report, but I just realized, this report,
11 his rebuttal, was updated.
12     Q.  I'll withdraw.
13     A.  Go ahead.  I do address his, yes.
14     Q.  Can you please turn to page 7 to the
15 discussion section?
16     A.  (Witness complies.)
17     Q.  At the start of the second paragraph, the
18 authors write:
19        "It is important to highlight that more
20 time spent on social media was not universally
21 associated with worse mental health," correct?
22     A.  Yes.
23     Q.  And in the next sentence they write:
24        "Greater use of Snapchat was associated
25 with fewer mental health-related difficulties, i.e.,

1 less anxiety and loneliness, more friend support,
2 and self-esteem," correct?
3     A.  Yeah.  If you want me to comment on this
4 study that I'm seeing for the first time, I'm sorry,
5 I can read what they're saying but I haven't had
6 time to review it.  I don't know -- I don't even
7 know how it was done.  But you're reading me what
8 they say, and that's what they say.
9     Q.  I understand.  I'm just asking if that's
10 what they say, thank you.
11        And then, if you turn to the next page on
12 page 8?
13     A.  But can I just -- I mean, they go on to
14 say that:
15        "These findings are partially at odds with
16 Perlis and colleagues who found that they were
17 associated -- that Snapchat was associated with
18 increases in depression."
19        So, but go ahead.
20     Q.  I didn't have a question pending,
21 Dr. Christakis.
22        MR. DE DIEGO-HABEL:  So I'll move to
23 strike that answer.  And again, we'll ask you
24 to please focus on my questions.
25

1 BY MR. DE DIEGO-HABEL:
2     Q.  If you turn please to the next page,
3 page 8, in the partial paragraph that's on the
4 right-hand corner.
5        Do you see where it says:
6        "It should be noted that the platform that
7 was used the most in the current study, i.e.,
8 Snapchat, was frequently linked with fewer mental
9 health issues, indicating that it is likely not
10 merely a function of spending greater time on a
11 platform itself that is harmful."
12     A.  I see that it says that, yes.
13     Q.  Okay.  Now, you didn't cite any of this
14 language that we just looked at in your reports
15 because you didn't review this study, correct?
16     A.  That's correct, I did not review this
17 study.
18     Q.  And yet as we saw a moment ago in
19 paragraph 80 of your rebuttal report, you wrote
20 that:
21        "I did not see any studies demonstrating
22 benefits for Snap specifically, nor does he," he
23 being Dr. Allen, "cite any," correct?
24     A.  That's correct.  But I go on to say:
25        "This assertion is beside the point.

CONFIDENTIAL

Page 222

1  Something could be good or harmless for some people
2  and harmful for other or benign in small amounts but
3  lethal in large ones, or inherently dangerous but
4  safe under supervision."
5       And I stand by that now.  This does not
6  change it at all.
7       MS. COUCH:  And we're out of time.
8       MR. DE DIEGO-HABEL:  Move to strike
9  everything after the word "but," as
10 nonresponsive.
11      No further questions.  Thank you,
12 Dr. Christakis.
13      MS. COUCH:  We can go off the record.
14      THE VIDEOGRAPHER:  The time right now is
15 2:56 p.m.  We're off the record.
16      (Recess.)
17      THE VIDEOGRAPHER:  The time right now is
18 3:13 p.m.  We're back on the record.
19 EXAMINATION
20 BY MS. COUCH:
21      Q.  Dr. Christakis, I'm going to ask just a
22 few questions.  I want you to turn, if you will, to
23 page 28 of your rebuttal report.
24      A.  Yes.
25      Q.  And then in paragraph 65, do you recall

Page 223

1  that you were questioned about this paragraph
2  earlier by defense counsel?
3       A.  About the Cheng and Burke study, yes.
4       (Exhibit 32 was PREVIOUSLY received and marked for
5  identification, as of this date.)
6  BY MS. COUCH:
7       Q.  And if we look at footnote 80, I want to
8  hand you what we premarked as Exhibit 32, and I just
9  want you to confirm that that document that I've
10 handed you and those Bates numbers match the
11 document that you've cited here, footnote 80 for
12 paragraph 65.
13      A.  Yes, this is the same Bates number.  This
14 is the document I was referencing.
15      Q.  You can set that aside.
16      Do you recall testifying multiple times
17 today that your opinions are based upon the totality
18 of the evidence combined with your clinical
19 experience?
20      MR. SCHMIDT:  Objection, leading,
21 characterization.
22      A.  I recall many times saying my opinions are
23 based on the totality of the evidence, my clinical
24 experience, my review of the literature, and the
25 internal documents and data that I reviewed.

Page 224

1  BY MS. COUCH:
2       Q.  In reviewing the literature, did you
3  consider the limitations of each of the studies that
4  you reviewed?
5       A.  Of course.  I consider the strengths and
6  limitations of every study that I review, always.
7       Q.  And did you take those limitations or
8  strengths into account when you were rendering your
9  opinions in your reports?
10      A.  Consistent with best science practices,
11 Yes, I did.
12      MS. COUCH:  That's all my questions.
13 Thank you, Dr. Christakis.
14      We can go off the record.
15      MR. SCHMIDT:  Could you put Exhibit 20 in
16 front of you, and Exhibit 32?  And if you want,
17 you can go ahead and put Exhibit 19.
18      THE WITNESS:  Okay.  19?
19      MR. SCHMIDT:  32 --
20      THE WITNESS:  Yes.
21      MR. SCHMIDT:  32, the one you were just
22 asked about, 19, page 2, and 20, page 3.
23      THE WITNESS:  Okay.
24      MR. SCHMIDT:  Do you have all three of
25 those?

Page 225

1       THE WITNESS:  19, 20, and 32.  I have them
2  all, yes.
3       MR. SCHMIDT:  Okay.  Let's go back on the
4  record.
5  EXAMINATION
6  BY MR. SCHMIDT:
7       Q.  Do you have Exhibit 32 in front of you,
8  Dr. Christakis, that your counsel just showed you?
9       A.  Yes.
10      Q.  Do you see the reference to a mild
11 problematic use figure of 55 percent and a severe of
12 3.1 percent?
13      A.  You mean number 2(a)?
14      Q.  Yes.
15      A.  Yes.
16      Q.  Do you see that this is referencing
17 Facebook data not Instagram data?
18      A.  Yes, this is referencing Facebook data.
19      Q.  Do you have Exhibit 19, which I showed
20 you, in front of you, page 2?
21      A.  Yes.
22      Q.  Do you see down at the bottom those same
23 statistics, prevalence:  55 percent mild,
24 problematic use 3.1 percent severe?
25      A.  Yes.

Golkow Technologies,
A Veritext Division
877-370-3377                                                    www.veritext.com

CONFIDENTIAL

Page 226

1    Q.  Do you know if there's any difference in
2  the datasets between Exhibit 32 and Exhibit 19?
3    A.  I have no way of knowing if there's a
4  difference in the datasets.
5       MS. COUCH:  You're out of time.
6  BY MR. SCHMIDT:
7    Q.  Do you have page 3 in front of you?
8       MR. SCHMIDT:  I'm going to ask to finish
9  this because I was trying to orient the
10  witness.  I thought we were off the record, and
11  I have just a couple of more questions.
12      MS. COUCH:  I didn't include that time in
13  it.  You're out of time.
14      MR. SCHMIDT:  Okay.  Well, if you're going
15  to enforce, then we'll move to strike reliance
16  on this testimony.
17      MS. COUCH:  I will follow the Judge's
18  order that's been fully briefed.  You can do
19  what you would like to do after that.
20      MR. SCHMIDT:  Okay.  Well, I'd like to ask
21  more questions.  Are you enforcing?
22      MS. COUCH:  I am going to follow the
23  Court's order on this issue that has been fully
24  briefed.  We are at over 15 hours with this
25  witness.

Page 227

1       MR. SCHMIDT:  Are you shutting it down?
2  That's my question.
3       MS. COUCH:  Yes, yes.  I'm going to follow
4  the court order.  The court order says you get
5  half the time that I spent.  I spent
6  one minute, 48 seconds, and I gave you
7  60 seconds.  I was generous.
8       MR. SCHMIDT:  And I'll note that you spent
9  15 minutes or 20 minutes preparing your witness
10  on this testimony, and the witness suddenly
11  couldn't find things in documents when I was
12  asking him questions.  But we can take that up
13  at a future date.
14      Thank you, Dr. Christakis.
15      MS. COUCH:  I will say the record reflects
16  itself, and you have no idea what I did.
17      THE VIDEOGRAPHER:  The time right now is
18  3:18 p.m.  We're off the record.
19
20
21
22      (Time noted:  3:18 p.m.)
23
24
25       _____

Page 228

1         DIMITRI CHRISTAKIS
2
3  Subscribed and sworn to
4  before me this    day
5  of        2025.
6  _____
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 229

1         CERTIFICATE
2
3  STATE OF NEW YORK  )
4             :  ss
5       I, Angela M. Shaw-Crockett, a Certified Court
6  Reporter, Registered Merit Reporter and Notary Public within
7  and for the States of New York, New Jersey and Connecticut,
8  do hereby certify:
9       That DIMITRI CHRISTAKIS, the witness whose
10  deposition is herein before set forth, was duly sworn by me
11  and that such deposition is a true record of the testimony
12  given by such witness.
13       I further certify that I am not related to any of
14  the parties to this action by blood or marriage and that I
15  am in no way interested in the outcome of this matter.
16       In witness whereof, I have hereunto set my hand
17  this                    5
18
19
20  _____
   ANGELA M. SHAW-CROCKETT, CCR, CRR, RMR, CSR
21  LICENSE NO. XI00218400
22
23
24
25

58 (Pages 226 - 229)

CONFIDENTIAL

Page 230

1  NAME OF CASE:  Social Media Adolescence Addition/Personal
   Injury Products Liability Litigation
2
3  DATE OF DEPOSITION:  September 11, 2025
4  NAME OF WITNESS:  Dimitri Christakis
5  Reason Codes:
6    1.  To clarify the record.
     2.  To conform to the facts.
7    3.  To correct transcription errors.
8  Page _____ Line _____ Reason _____
   From _____ to _____
9
10 Page _____ Line _____ Reason _____
   From _____ to _____
11
12 Page _____ Line _____ Reason _____
   From _____ to _____
13
14 Page _____ Line _____ Reason _____
   From _____ to _____
15
16 Page _____ Line _____ Reason _____
   From _____ to _____
17
18 Page _____ Line _____ Reason _____
   From _____ to _____
19
20 Page _____ Line _____ Reason _____
   From _____ to _____
21
22 Page _____ Line _____ Reason _____
   From _____ to _____
23
24      _____
            DIMITRI CHRISTAKIS
25