**Exhibit 52**

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION TO EXCLUDE GENERAL CAUSATION
TESTIMONY OF PLAINTIFFS' EXPERTS**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES, CENTRAL DISTRICT


| | | |
|---|---|---|
| COORDINATION PROCEEDING SPECIAL TITLE [RULE 3.400], SOCIAL MEDIA CASES _____ | ) ) ) ) ) ) | JUDICIAL COUNCIL COORDINATION PROCEEDING NO. 5255 |
| THIS DOCUMENT RELATES TO: | ) ) | For Filing Purposes: 22STCV21355 |
| CHRISTINA ARLINGTON SMITH, ET AL. Plaintiffs v. | ) ) ) ) ) | Judge: Hon. Carolyn B. Kuhl |
| TIKTOK INC., ET AL. Defendants _____ | ) ) ) | SSC-12 |


CONTINUED DEPOSITION OF GARY GOLDFIELD
held at the offices of
Dow's Lake Court Conference Centre,
865 Carling Avenue, Ottawa, Ontario
on Wednesday, September 10, 2025, at 9:08 a.m.


CONDENSED TRANSCRIPT WITH INDEX


Arbitration Place © 2025
900-333 Bay Street      Toronto, Ontario M5H 2R2

Page 614

APPEARANCES:


ON BEHALF OF THE PLAINTIFFS:

Austin Brane
WAGSTAFF & CARTMELL
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
abrane@wcllp.com
816-701-1114

ON BEHALF OF THE DEFENDANTS, META PLATFORMS, INC.,
FACEBOOK HOLDINGS, LLC, FACEBOOK OPERATIONS, LLC,
FACEBOOK PAYMENTS, INC., FACEBOOK TECHNOLOGIES,
LLC, INSTAGRAM, LLC, AND SICULUS, INC.:

Andrew Stanner
Paul Banks
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
202-662-5007
astanner@cov.com
pbanks@cov.com

ON BEHALF OF THE DEFENDANT, SNAP INC.:

Rose L. Ehler
Cordell A. Brown
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
213-683-9100
Rose.Ehler@mto.com
Cordell.Brown@mto.com

Page 615

APPEARANCES (CONT'D):


ON BEHALF OF THE DEFENDANTS, TIKTOK INC. AND
BYTEDANCE INC.:

Lisa Horvath
KING & SPALDING LLP
500 West 2nd Street
Suite 1800
Austin, TX 78701
512-457-2000


ON BEHALF OF THE DEFENDANTS, YOUTUBE, LLC, GOOGLE
LLC, ALPHABET INC.:

Rachel Raphael
MORGAN LEWIS
Pennsylvania Avenue, NW
Washington, DC 20004-2541
202-739-5589
rachel.raphael@morganlewis.com

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                          September 10, 2025

INDEX

|                                              | PAGE |
|----------------------------------------------|------|
| RE-AFFIRMED:  GARY GOLDFIELD                  | 620  |
| DIRECT EXAMINATION BY R. EHLER (CONT'D)       | 620  |
| CROSS-EXAMINATION BY R. RAPHAEL (CONT'D)      | 709  |
| CROSS-EXAMINATION BY L. HORVATH (CONT'D)      | 785  |
| CROSS-EXAMINATION BY A. BRANE                 | 843  |

LIST OF OBJECTIONS

Answers given under objection (OBJ) found at
pages:
623, 624, 625, 626, 637, 638, 639, 640, 641, 642,
646, 647, 648, 650, 651, 652, 653, 655, 657, 658,
660, 661, 662, 663, 664, 665, 666, 667, 668, 669,
674, 677, 678, 679, 681, 683, 686, 687, 688, 690,
692, 694, 711, 713, 714, 715, 716, 717, 719, 720,
726, 729, 730, 733, 736, 743, 747, 748, 753, 754,
756, 757, 761, 765, 768, 770, 771, 772, 774, 775,
776, 778, 787, 788, 789, 790, 791, 793, 795, 796,
797, 798, 801, 803, 804, 805, 806, 808, 809, 811,
812, 814, 815, 818, 821, 822, 823, 825, 826, 827,
832, 834, 835, 837, 839

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 617

LIST OF EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 39 | Deposition transcript of Gary Goldfield dated July 10, 2025 | 620 |
| 40 | Deposition transcript of Gary Goldfield dated July 11, 2025 | 621 |
| 41 | Errata Sheet for the deposition of Gary Goldfield dated July 10, 2025 | 621 |
| 42 | Errata Sheet for the deposition of Gary Goldfield dated July 11, 2025 | 622 |
| 43 | Amended and Supplemental Expert Report of Gary Goldfield, Ph.D. C. Psych. dated July 30, 2025 | 627 |
| 44 | Rebuttal Report of Gary Goldfield, Ph.D. C. Psych. dated July 30, 2025 | 629 |
| 45 | Materials Considered list marked with "Exhibit C" on the first page | 632 |
| 46 | Invoice from Thrive Professional Services dated July 31, 2025 | 697 |
| 47 | Invoice from Thrive Professional Services dated August 31, 2025 | 697 |
| 48 | Printout of an article from the website of the Centre for Healthy Screen Use titled "Are there benefits of screen use for children and youth?" | 702 |
| 49 | Printout from the website of Psychology Today of an article titled "Is Social Media Making Teens Depressed?" | 705 |
| 50 | Article titled "The effects of social media restriction: Meta-analytic evidence from randomized controlled trials" authored by Burnell et al. | 766 |

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                          September 10, 2025

Page 618

LIST OF EXHIBITS (CONT'D)

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 51 | Article titled "Digital Media Use and Adolescents' Mental Health During the Covid-19 Pandemic: A Systematic Review and Meta-Analysis" authored by Marciano et al. | 812 |
| 52 | Article titled "A meta-analysis of the association between adolescent social media use and depressive symptoms" authored by Ivie et al. | 812 |
| 53 | Article titled "Fear of missing out and social networking sites use and abuse: A meta-analysis" authored by Fioravanti et al. | 813 |
| 54 | Article titled "Are active and passive social media use related to mental health, wellbeing, and social support outcomes?  A meta-analysis of 141 studies" authored by Rebecca Godard and Susan Holtzman | 838 |

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 619

1    Ottawa, Ontario
2    --- Upon commencing on Wednesday, September 10,
3    2025, at 9:08 a.m.
4         THE VIDEOGRAPHER:  Good
5    morning.  We are going on the record at 9:08 a.m.
6    on September 10th, 2025.
7         This is Media Unit 1 of the
8    video-recorded deposition of Dr. Gary Goldfield,
9    taken by counsel for Defendant in the matter of:
10    Social Media Cases, Judicial Council Coordination
11    Proceeding No. 5255, filed in the Superior Court
12    of the State of California, County of Los Angeles,
13    Central District.
14         This deposition is being held
15    at Arbitration Place Ottawa, located at 865
16    Carling Avenue, Ottawa, Ontario, K1S 5S8.  My name
17    is Christophe Davidson from the firm Arbitration
18    Place and I am the videographer.  The court
19    reporter is Mariann Vianello from the firm
20    Arbitration Place.
21         Will the counsel please
22    introduce yourselves, followed by the court
23    reporter swearing in the witness.  Thank you.  We
24    may proceed.
25         R. EHLER:  This is Rose Ehler

Page 620

1    from Munger, Tolles & Olson, and I represent Snap
2    Inc.
3         L. HORVATH:  Lisa Horvath from
4    King & Spalding representing TikTok.
5         A. BRANE:  Austin Brane from
6    Wagstaff & Cartmell on behalf of the witness and
7    Plaintiffs.
8         R. EHLER:  And we have other
9    colleagues on Zoom who will identify themselves
10    when they ask questions later, but Andrew Stanner
11    from Covington representing Meta, and Rachel
12    Raphael from Morgan Lewis representing YouTube.
13         A. BRANE:  And I believe also
14    on the Zoom is Tricia Campbell from Wagstaff &
15    Cartmell.
16    RE-AFFIRMED:  GARY GOLDFIELD
17    DIRECT EXAMINATION BY R. EHLER (CONT'D):
18         Q.  Good morning,
19    Dr. Goldfield, with all of that introduction.  We
20    met for your prior deposition in July, and I've
21    brought with me your transcript from that
22    deposition which is in the binder in front of you.
23    We've marked as Exhibit 39, day one.
24         EXHIBIT NO. 39:
25         Deposition transcript of

Page 621

1         Gary Goldfield dated July
2         10, 2025
3    BY R. EHLER:
4         Q.  And as Exhibit 40, day
5    two of that transcript.
6         EXHIBIT NO. 40:
7         Deposition transcript of
8         Gary Goldfield dated July
9         11, 2025
10    BY R. EHLER:
11         Q.  Do you still stand behind
12    the testimony that you previously provided in this
13    case?
14         A.  I do.  I believe I
15    submitted some errata, so just clarifying some
16    answers.
17         R. EHLER:  And I have as
18    Exhibits 41 and 42.
19         A. BRANE:  Take one and pass
20    it along.
21         R. EHLER:  Well, those ones
22    are for you.
23         A. BRANE:  Thank you.
24         EXHIBIT NO. 41:  Errata
25         Sheet for the deposition

Page 622

1         of Gary Goldfield dated
2         July 10, 2025
3         EXHIBIT NO. 42:  Errata
4         Sheet for the deposition
5         of Gary Goldfield dated
6         July 11, 2025
7    BY R. EHLER:
8         Q.  Exhibit 41 is your errata
9    for day one and Exhibit 42 is your errata for day
10    two.
11         A.  Um-hum, that's right.
12         Q.  This is what you were
13    referencing.  Other than what's set forth
14    expressly in your errata, do you stand by all of
15    the testimony that you previously provided?
16         A. BRANE:  Counsel, the
17    exhibits I have are just July 10th.  Did I get two
18    copies of the same?  Do you have a July 10th and
19    July 11th?
20         THE DEPONENT:  No, you're
21    right.  They both say the 10th.
22         R. EHLER:  The documents are
23    different.  I mean, this is how they were served
24    to us.
25         A. BRANE:  They are.  You're

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                                September 10, 2025

Page 623

1  right.  So that could be a typo on --
2           R. EHLER:  My understanding
3  from the page number, page/line numbers --
4           A. BRANE:  I'm with you.
5           R. EHLER:  If you want to
6  errata your errata, that's fine.
7           A. BRANE:  Okay.  Appreciate
8  it.  So Exhibit 41 will be the one that starts
9  with page 36, it looks like, as the first entry.
10  BY R. EHLER:
11           Q.  Great.  And I don't know
12  if I got an answer, Dr. Goldfield, but my question
13  was whether other than what's expressly set forth
14  in the errata, do you stand by the testimony you
15  previously provided?
16           A.  I do.
17           Q.  And so is the testimony
18  that you provided on July 10th and 11th still
19  accurate today?
20  OBJ       A. BRANE:  Object to form.
21           THE DEPONENT:  It was two days
22  of testimony.  Is there anything in particular
23  that you want to ask me about?
24  BY R. EHLER:
25           Q.  Well, I ask you if you

Page 624

1  stood by it and I'm --
2           A.  And I said yes.
3           Q.  Yes.  And do you believe
4  that the testimony you provided as of July 10th
5  and 11th is still accurate today?
6  OBJ       A. BRANE:  Object to form.
7           THE DEPONENT:  Yes.
8  BY R. EHLER:
9           Q.  Other than what's set
10  forth in your errata and the July 30th, 2025,
11  reports, have you changed or amended any of your
12  opinions in this case since your last deposition?
13           A.  My opinions changed based
14  on new literature.  I have not made any edits to
15  any reports or anything.  I've discovered some new
16  literature and some domains, so I think -- I stand
17  by the testimony, but -- you know, my opinions
18  will always change based on the evolution of the
19  literature.
20           Q.  Understood.  And our goal
21  with your reports in this deposition is to
22  understand what those opinions are.  So how have
23  your opinions changed beyond what's set forth in
24  your errata and the reports that you've served in
25  this case?

Page 625

1  OBJ       A. BRANE:  Object to form,
2  misstates testimony.
3           THE DEPONENT:  I think I
4  answered.  I stand by my opinions that I've
5  testified.  I'm just saying that if I come across
6  new literature, those opinions could change.
7  BY R. EHLER:
8           Q.  That's going forward.
9  And I thought you had said you had read some new
10  literature since submitting your further reports.
11  Did that change your opinions in any way?
12           A.  No.
13           Q.  You understand that your
14  testimony today is under oath just as it was last
15  time?
16           A.  I do.
17           Q.  And you're still offering
18  general causation opinions in this case; is that
19  right?
20           A.  That's right.
21           Q.  Are your general
22  causation opinions the same for the MDL case as
23  the JCCP cases?
24           A.  Yes.
25           Q.  And there's no reason for

Page 626

1  those to be different depending upon the case or
2  the forum; is that right?
3           A.  Correct.
4           Q.  The science that you're
5  interpreting is the same regardless of the
6  proceedings; right?
7           A.  Right.
8           Q.  And you understand that
9  your deposition testimony from July can be used in
10  the MDL proceedings and the testimony you give
11  today can be used in the JCCP proceedings?
12  OBJ       A. BRANE:  Object to form.
13  That's a lawyer question.
14           You can answer.
15           THE DEPONENT:  Yeah.  Yes, I
16  understand that.
17  BY R. EHLER:
18           Q.  Is there any further
19  analysis you need to do as it relates to your
20  general causation opinions for either case?
21           A.  I don't believe so.
22           Q.  Are there any documents
23  you still need to review?
24           A.  I don't believe so.
25           Q.  Have the Plaintiffs'

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                                    September 10, 2025

---

Page 627

1  lawyers asked you to perform any further analysis
2  as it relates to your general causation opinions
3  before trial?
4          A.  No.
5          Q.  Okay.  You have submitted
6  in the MDL proceedings an amended report dated
7  July 30th, which I've premarked Exhibit 43.
8              EXHIBIT NO. 43:  Amended
9              and Supplemental Expert
10             Report of Gary Goldfield,
11             Ph.D. C. Psych. dated
12             July 30, 2025
13         BY R. EHLER:
14         Q.  This is your most recent
15 expert report setting forth your opinions in this
16 case; correct?
17         A.  Correct.
18         Q.  And this is the fourth
19 report you've submitted in these cases; right?
20         A.  Correct.
21         Q.  Is the only change
22 between this report and your July 8th report to
23 remove that incorrect citation to the Ferguson
24 article?
25         A.  Well, I think we gave you

---

Page 628

1  last time the track changes, the red line version.
2          Q.  Yes.
3          A.  So you're talking about
4  the amended from the MDL?
5          Q.  Yes.
6          A.  Yeah, I was just
7  basically correcting some typos.
8          Q.  And did you draft this
9  report yourself?
10         A.  I did.
11         Q.  Every word?
12         A.  Every word.
13         Q.  Is there anything in this
14 report that you would like to change or correct
15 today?
16         A.  Beyond the errata, it's a
17 long report.  I can't really think offhand.  I
18 haven't memorized the report.
19         Q.  Well, the errata was
20 related to your July 10th and 11th deposition;
21 right?
22         A.  Right.
23         Q.  And I'm just trying to
24 understand if in preparing for this depo, reading
25 back through your reports, there is anything about

---

Page 629

1  the report sitting in front of you, which is your
2  most recent in the MDL, that you want to change or
3  correct today.
4          A.  Nothing comes to mind at
5  the moment.
6          Q.  And is there any opinion
7  that you plan to offer at trial that's not
8  contained in that report?
9          A.  Nothing that I could
10 think of right now.
11         Q.  I also have your MDL
12 rebuttal report premarked as Exhibit 44.
13             EXHIBIT NO. 44:  Rebuttal
14             Report of Gary Goldfield,
15             Ph.D. C. Psych. dated
16             July 30, 2025
17         BY R. EHLER:
18         Q.  This is the rebuttal
19 report, very short, that you submitted on July
20 30th; correct?
21         A.  Correct.
22         Q.  Is there anything in your
23 rebuttal opinions that you would like to change or
24 correct today?
25         A.  No, no.

---

Page 630

1          Q.  Is there anything you
2  would like to add in rebuttal other than what's
3  set forth in your report?
4          A.  No, not anything that
5  comes to mind.
6          Q.  I did not see an updated
7  CV since the April 2025 CV attached to your
8  original report in these July reports.  Is that
9  April 2025 CV still up-to-date?
10         A.  More or less.  I have a
11 few publications not in social media and I got an
12 obesity grant.
13         Q.  Congratulations.  So what
14 are those, if you could briefly just describe for
15 me the new additions to your CV?
16         A.  So my post doc and I just
17 got a book chapter published on time-use
18 reallocation using an epidemiology framework.  So
19 it's not specific to social media, but it's
20 basically the mental health benefits derived from
21 reallocating time from screens to either sleep or
22 physical activity.
23         Q.  Does that -- are you
24 relying on that publication or that work for your
25 opinions in this case?

---

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 631

1      A.  No.
2      Q.  What else?
3      A.  I think I'm a co-author
4   on some papers that may or may not be published.
5   I think they're in press.  I have not done a
6   PubMed search of myself so -- and then the obesity
7   grant was eating related, just on set point of
8   eating and -- it had -- it's all psychology and
9   physiology, but not related to screens or social
10  media at all.
11     Q.  The other papers you
12  mentioned that may or may not be published, what
13  do those relate to?
14     A.  Some are just general
15  screen time and health.  I think there's screen
16  and obesity one.  I think one that you may have
17  brought up last time, it might be -- it might be
18  out now.  It was probably out then but now
19  officially out, because sometimes they put it up
20  ahead of publication, ahead of print.  But no,
21  it's been -- I'm launching clinical trials so I
22  haven't really been focusing on papers and
23  focusing on launching studies.  So pretty minor
24  changes to the CV.
25     Q.  Okay.  The other screen

Page 632

1   time and health articles that have been published
2   more recently, are you relying on any of those
3   publications or that work for your opinions in
4   this case?
5      A.  No.
6      Q.  I've marked as Exhibit 45
7   the most recent version of your materials
8   considered list that we've received.
9          EXHIBIT NO. 45:
10         Materials Considered list
11         marked with "Exhibit C"
12         on the first page
13  BY R. EHLER:
14     Q.  Is this, in fact, the
15  most up-to-date copy of your materials considered
16  list?
17     A.  It looks like it.
18     Q.  How do we know?  How do
19  you know?
20     A.  Because I'm looking for a
21  few references that I put on here.
22     Q.  Which ones?
23     A.  So there should be three
24  that I wrote on there relating to education.  It
25  would be the Gordon one -- actually, I don't see

Page 633

1   that on here.  Literature -- oh, wait a minute.
2   This is a weird order.  Let's see if the Walsh one
3   is on here.  This may not be the most up-to-date
4   one, because I put a few papers on and I don't see
5   them here, unless they're in some other order.
6      Q.  Did you draft this
7   document?
8      A.  I got a bit of help.
9   Everything on here I've looked at.
10     Q.  Who helped you with this
11  document?
12     A.  Some -- I got a bit of
13  help with -- from one of the attorneys.
14     Q.  This document was
15  produced to us this week.  When did you review it?
16     A.  Oh, here it is.  Here is
17  the Walsh one.  Okay.  Yeah, this is --
18     Q.  You're saying "here," are
19  you referring to page 165?
20     A.  I just closed it.  Yes.
21  That's about right.  Yeah.
22     Q.  Okay.
23     A.  Yeah, this is the updated
24  one.
25     Q.  Okay.  And we know that

Page 634

1   because it includes the Walsh article on page 165,
2   which you added to this list?
3      A.  Yes.
4      Q.  Okay.  But you did not
5   draft this list.  You had help from the attorneys?
6      A.  I -- I got -- I had some
7   help, but I -- drafted a lot of it.
8      Q.  I did not see on this
9   list any documents or information relating to the
10  specific individual Plaintiffs in these cases.
11  Does it remain true that you have not reviewed
12  documents or information regarding the individual
13  Plaintiffs?
14     A.  That remains true.
15     Q.  And so you don't know who
16  Ms. Heaven Moore is?
17     A.  No idea.
18     Q.  Same for minors with the
19  initials KGM?
20     A.  No idea.
21     Q.  Or a minor RKC?
22     A.  No idea.
23     Q.  Ms. Smith?
24     A.  No.
25     Q.  Ms. Clevenger?

Arbitration Place
(613) 564-2727                                        (416) 861-8720

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                                    September 10, 2025

Page 635

1          A.  No.
2          Q.  Mr. Craig, you don't know
3    who he is?
4          A.  No.
5          Q.  Ms. Davidson, you don't
6    know who she is?
7          A.  No.
8          Q.  Ms. D'Orazio, you don't
9    know who she is?
10         A.  No.
11         Q.  Ms. Carmen Guzman, you
12   don't know who she is?
13         A.  No.
14         Q.  Mr. Melton?
15         A.  No.
16         Q.  Or Ms. Mullen?
17         A.  No.
18         Q.  And you're not offering
19   opinions that the Defendants' platforms caused the
20   specific injuries that those individuals are
21   alleging in these cases; right?
22         A.  I've never heard of these
23   individuals.
24         Q.  Same question for school
25   districts who are specifically identified in the

Page 636

1    trial pool.  You have not reviewed or analyzed any
2    documents regarding the Tucson school district?
3          A.  Correct.
4          Q.  Or Irvington?
5          A.  Correct.
6          Q.  De Kalb?
7          A.  Correct.
8          Q.  Breathitt?
9          A.  Correct.
10         Q.  Hartford?
11         A.  Correct.
12         Q.  And Charleston?
13         A.  Correct.
14         Q.  Okay.  So you're not
15   offering any opinions that Defendants' platforms
16   caused damages specifically to any of those school
17   districts; right?
18         A.  I'm offering an opinion
19   on causation of mental health harms and academic
20   performance that would certainly impact schools,
21   but if you're asking me for an analysis of those
22   districts in particular, then no.
23         Q.  Right.  I'm not trying to
24   take away your general cause opinions.  I'm just
25   trying to get confirmation that you are not

Page 637

1    opining specifically that the general cause
2    opinions you have based on the literature are
3    applicable to the damages claimed specifically by
4    each of those districts; right?
5    OBJ          A. BRANE:  Object to form,
6    asked and answered, misstates the report.
7              THE DEPONENT:  They may be.  I
8    mean --
9              BY R. EHLER:
10         Q.  Right.  You don't know
11   one way or another?
12   OBJ          A. BRANE:  Object to form,
13   misstates the report, asked and answered.
14             THE DEPONENT:  I mean, I have
15   no reason to believe that my causation and belief
16   about how social media and the platform and
17   features relate to harm or drive harm would not
18   apply to those school districts.
19             BY R. EHLER:
20         Q.  Okay.  But is it -- it's
21   also true that you don't have a reason to believe
22   that your general opinions specifically do apply
23   to those school districts because you've not
24   reviewed any of their data; right?
25   OBJ          A. BRANE:  Object to form,

Page 638

1    misstates testimony in his report.
2              THE DEPONENT:  I have a hard
3    time believing that my opinions would not apply to
4    those school districts.
5              BY R. EHLER:
6          Q.  Do you know what damages
7    any of those school districts are claiming in
8    these cases?
9    OBJ          A. BRANE:  Object to form.
10             THE DEPONENT:  Just a little
11   bit of -- partly what's in the news.  So here in
12   Ontario where we sit, there is also a school
13   board -- school boards are launching lawsuits or
14   they're in the middle of litigation against --
15   with social media companies for the same reason,
16   causing disruption to school environments, to the
17   learning process, to disrupted attention in class
18   on behalf of the students, teachers have to manage
19   that.  It's just straining the schools.
20             BY R. EHLER:
21         Q.  Okay.  And is it your
22   belief that that's true for every school in Canada
23   and the United States?
24   OBJ          A. BRANE:  Object to form.
25             THE DEPONENT:  I -- yes, I

Page 639

1  believe this problem is endemic to all schools.
2           BY R. EHLER:
3           Q.  Okay.  But you have not
4  looked at any school district specific data to
5  know whether for any specific school district it's
6  more or less of a problem; right?
7  OBJ        A. BRANE:  Object to form.
8           THE DEPONENT:  As I said, no, I
9  have not inspected school-level data, but I've got
10  no reason to believe, and the literature would
11  suggest, that it would be unlikely that some
12  schools are exempt from the potential harms.
13          BY R. EHLER:
14          Q.  I understand that's your
15 belief and that you formed that belief without
16 reviewing any school-level data; correct?
17 OBJ        A. BRANE:  Object to form.
18          THE DEPONENT:  I formed that
19 belief based on hundreds of studies in the
20 literature.
21          BY R. EHLER:
22          Q.  I understand.  And I'm
23 not sure you understand the distinction I'm trying
24 to draw.
25          A.  Okay.

Page 640

1           Q.  There are specific school
2  districts that are individual Plaintiffs in these
3  cases that are claiming specific damages that they
4  have calculated.  And I understand your view on
5  harm generally, but what I'm trying to figure out
6  is whether you have any -- you have done any work
7  or you have any basis to tell us one way or
8  another whether those damages calculations are
9  accurate, inaccurate, high, low, valid, or not
10 valid, if you've done any work to assess that
11 question.
12 OBJ        A. BRANE:  Object to form,
13 asked and answered.
14          THE DEPONENT:  I -- I think
15 I've answered that question, with all due respect.
16          BY R. EHLER:
17          Q.  Can you answer it again.
18 OBJ        A. BRANE:  Object to form.
19          BY R. EHLER:
20          Q.  I mean the question that
21 I asked.
22 OBJ        A. BRANE:  Object to form,
23 asked and answered.
24          BY R. EHLER:
25          Q.  Dr. Goldfield, you

Page 641

1  answered the general question that your general
2  cause opinions are applicable to school districts.
3  That's how I understood your answer.
4           A.  Um-hum.
5           Q.  I'm asking for the answer
6  to the specific question whether you are offering
7  opinions specific to any of the school districts
8  that I listed that you did not know are Plaintiffs
9  in these cases and that you've told us that you
10 did not look at any of their documents, whether
11 you are sitting here today saying that you can
12 opine as to the degree of damages to any of those
13 cases?
14 OBJ        A. BRANE:  Object to form.
15          THE DEPONENT:  I've said I've
16 not inspected those particular schools --
17          BY R. EHLER:
18          Q.  So that's a no?
19          A.  School data.
20 OBJ        A. BRANE:  Object to form.
21          BY R. EHLER:
22          Q.  Is that a no to my
23 question?
24          A.  That's a no.
25          Q.  Okay.  On Exhibit 45,

Page 642

1  which is your most recent materials considered
2  list, last time we spoke you said that this was a
3  list of everything you had, but you had not
4  necessarily reviewed all of the documents listed
5  therein thoroughly.  Do you recall that generally?
6  Is that still true?
7  OBJ        A. BRANE:  Object to form,
8  misstates prior testimony.
9           THE DEPONENT:  There are a lot
10 of documents.  I've looked at them, some in more
11 detail than others.
12          BY R. EHLER:
13          Q.  Yeah, I get that.  There
14 are thousands of pages.  That's all I was trying
15 to remind you of.  How do we know which documents
16 on that list were important to your analysis
17 versus ones that you put eyes on but were just
18 available to you?
19 OBJ        A. BRANE:  Object to form.
20          THE DEPONENT:  I would say the
21 important ones were listed in my report.
22 Obviously felt it was important enough to support
23 the points that I was making to reference them.
24 The other ones might have filled in some gaps here
25 and there or may have peripherally related, just

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 643

1  informed -- a lot of it was, you know, just
2  background and context. I didn't think that was
3  all that important to reference so --
4        BY R. EHLER:
5        Q.  Okay. But as a general
6  matter, if it was referenced in your report, it's
7  likely to be more important than what's not?
8        A.  Generally, yes.
9        Q.  Last time we spoke, you
10 also said that you had added, as of July 2025,
11 materials that had come out more recently than
12 when your reports were drafted. Is that the same
13 approach you took for this updated materials
14 considered list?
15       A.  Yes.
16       Q.  Let's look at page 165
17 and 166 of your materials considered list. You
18 mentioned an article by Walsh which is on page
19 165. And below that one by Gordon. The Walsh
20 paper is from 2013; do you see that?
21       A.  Um-hum.
22       Q.  And the Gordon paper is
23 from 2023; right?
24       A.  That's right.
25       Q.  And then if we skip ahead

Page 644

1  a little bit, I see a Liu paper which doesn't
2  actually have a year. Do you know when that was
3  published?
4        A. BRANE:  What page is that
5  on, counsel, sorry?
6        THE DEPONENT:  165. I'm sorry,
7  I forgot to put the year.
8        BY R. EHLER:
9        Q.  That's okay. I just
10 asked if you knew. If you don't, that's okay.
11       A.  It's probably 20 -- it
12 could be 2022.
13       Q.  Okay. And there is a
14 Mabe article?
15       A.  Yeah. Yeah, that was
16 added, I believe.
17       Q.  From 2014. And then on
18 the last page of the materials considered list,
19 166, there is a Nagata 2021?
20       A.  Um-hum.
21       Q.  Arora 2018?
22       A.  Yeah.
23       Q.  So these are articles
24 that were at least published and available prior
25 to your first report being drafted in these cases;

Page 645

1  right?
2        A.  That's true.
3        Q.  And they did not hit on
4  your search criteria or search terms that you used
5  for your original analysis; correct?
6        A.  Well, not really. So I
7  focused on meta-analyses. And most of what I
8  added with -- the Nagata one is the exception.
9  Most were -- so what came out of the last
10 deposition -- so I focused on meta-analyses.
11 Meta-analyses pools studies, as you know. So with
12 regards to academic performance, there were only
13 two meta-analyses. And when I started digging
14 deeper, I started finding studies that were not in
15 those meta-analyses, and I don't know why they
16 were missed in those metas, but maybe their search
17 terms were not broad enough. So I found a few
18 studies, they were longitudinal, which I thought
19 added to the literature, considering a lot of it
20 was cross-sectional which was brought to my
21 attention. So I felt it was important to add to
22 the materials list, relied on list.
23       Q.  Thank you for that
24 explanation. And so it sounds like the answer to
25 my question is yes, which is that these studies

Page 646

1  were not captured by your original search or the
2  meta-analyses you reviewed as a result of that
3  search; correct?
4        A.  Correct. My search was
5  focused on meta-analyses. These are not
6  meta-analyses, they are single studies.
7        Q.  Right. And each of these
8  studies from the Walsh down relate to your school
9  district opinions; correct?
10 OBJ      A. BRANE:  Object to form.
11       THE DEPONENT:  Well, I think
12 they're interwoven. I think mental health impacts
13 academics, ability to attend/learn, executive
14 function. The Soares paper found a pretty tight
15 coupling between mental health and cognition and
16 executive functioning.
17       BY R. EHLER:
18       Q.  Okay. And my question is
19 a little bit different which is whether -- I mean,
20 I read some of these, for example, Gordon is
21 "Social Media Use and Early Adolescents' Academic
22 Achievements." Let's see. Arora is "The
23 Prospective Association Between Electronic Device
24 Use Before Bedtime and Academic Attainment in
25 Adolescents." These were sources that you sought

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                September 10, 2025

Page 647

1 out --
2         A. Um-hum.
3         Q. -- as relevant to your
4 school district opinions; right?
5 OBJ       A. BRANE: Object to form,
6 asked and answered.
7         THE DEPONENT: Yeah, I think
8 they do inform my school district opinions. They
9 inform my, you know, overall opinions, but again
10 they're -- you know, most of my opinion is based
11 on the totality of evidence. Did they perhaps
12 bolster my opinion? Yeah, I think so.
13 BY R. EHLER:
14         Q. Right. And some of these
15 sources were actually identified by Dr. Buka in
16 his report. Does that sound right to you?
17         A. That name is familiar,
18 but I don't recall him identifying some of these
19 sources.
20         Q. Okay. That's not where
21 you got them?
22         A. No.
23         Q. How did you get them?
24         A. PubMed.
25         Q. And so you ran a new

Page 648

1 search to identify more sources relevant to your
2 school district opinions after your July 30th
3 amended and supplemental report?
4         A. I found it odd that in
5 the meta-analyses there was only one longitudinal
6 study, and I just found that odd. And maybe that
7 it's a new area, social media in academics, and I
8 just found it odd that there were not more
9 longitudinal studies. So I had my team do a
10 search and they found these studies.
11         Q. Motion to strike. You
12 had your team -- my question was about timing.
13 You had your team do a search to identify new
14 studies relevant to your school district opinions
15 after your July 30th amended and supplemental
16 report; right?
17 OBJ       A. BRANE: Object to form,
18 assumes facts.
19         THE DEPONENT: I had actually
20 started some of that search before. I just ran
21 out of time because I had these deadlines on the
22 reports. So I just basically finished my search.
23 BY R. EHLER:
24         Q. After the July 30th
25 report deadline?

Page 649

1         A. Yes. I finished the
2 search after.
3         Q. Okay. So these were not
4 sources that you relied on for your July 30th
5 report?
6         A. No.
7         Q. Did you feel the need to
8 bolster your opinions regarding academic
9 achievement and harms to school districts?
10         A. Did I feel -- I found it
11 odd that there would be this much literature on
12 social media and there weren't more longitudinal
13 studies. So I wanted to know -- I just wanted to
14 know what was out there and are there any
15 longitudinal studies. Are there any experimental
16 studies, you know, out there? Sometimes our --
17 you know, as scientists we consult with librarians
18 and we do searches on the best keywords we can,
19 but sometimes that doesn't yield every paper in
20 the area. And I was curious to see if there were
21 any higher-quality, methodologically more rigorous
22 studies out there, and, lo and behold, they are
23 out there.
24         Q. Do you intend to come to
25 trial and talk about any of these studies that

Page 650

1 you've just added to your materials considered
2 list this week?
3         A. They are part of the
4 literature.
5         Q. I understand that. My
6 question was different. My question was, sitting
7 here today, do you intend to come to trial -- do
8 you think any of these studies are important to
9 your opinions regarding school districts in this
10 case?
11 OBJ       A. BRANE: Object to form.
12         THE DEPONENT: I think my
13 opinions were pretty solid before. These studies
14 seem to bolster what support my arguments.
15 BY R. EHLER:
16         Q. Is that a yes or a no?
17 OBJ       A. BRANE: Object to form.
18         THE DEPONENT: I may not even
19 be asked to testify.
20 BY R. EHLER:
21         Q. I understand that. My
22 question is: Based on your intent regarding your
23 opinions in this case, to support your school
24 district opinions, do you intend to cite or draw
25 from these studies that you just added this week

Page 651

1    to your materials considered list?
2    OBJ          A. BRANE:  Object to form.
3             THE DEPONENT:  Maybe.
4             BY R. EHLER:
5        Q.  What does that depend on?
6        A.  There could be new
7    studies that are better or worse.  As I said, you
8    know, at the outset, that, you know, my opinions
9    may change based on the evolution of the
10   literature, and I think as a scientist it's
11   important to be nimble that way.
12            Q.  Right.  But as lawyers,
13   we need to know what your opinions are for trial.
14            A.  Yeah.
15            Q.  And so what I'm trying to
16   understand is sitting here today with the
17   literature that you have already listed, whether
18   you think any of this literature is necessary to
19   explain to the jury in order to support your
20   school district opinions?
21   OBJ          A. BRANE:  Object to form,
22   asked and answered many times.  It's in his
23   report.  It's in his materials considered list.
24            THE DEPONENT:  I think if it's
25   in my materials considered list, it allows to me

Page 652

1    to talk about them; correct?
2             BY R. EHLER:
3        Q.  That is a legal
4    conclusion, Dr. Goldfield.
5             A. BRANE:  That is a legal
6    question.
7             BY R. EHLER:
8        Q.  And we may have a dispute
9    about that.  But my question is not a legal
10   question.  My question is a scientific question
11   which is whether you think these studies are
12   necessary to support your school district
13   opinions?
14   OBJ          A. BRANE:  Object to the
15   preamble.  Object to the question.  Asked and
16   answered.
17            THE DEPONENT:  I believe I've
18   answered that, Rose.
19            BY R. EHLER:
20       Q.  Please answer my
21   question.
22            A. BRANE:  He said maybe.
23   He's answered the question directly.
24            THE DEPONENT:  I mean, I think
25   it would depend on the context.  It would depend

Page 653

1    on the type of question that I'm asked.  It would
2    depend on which studies I can think of on the
3    spot.  I mean, it would depend on a lot of things.
4             BY R. EHLER:
5        Q.  Okay.  Let me try to ask
6    it a slightly different way.  Are any of these
7    studies important or crucial to your school
8    district opinions?
9    OBJ          A. BRANE:  Object to form.
10            THE DEPONENT:  I think they are
11   consistent with my opinions.
12            BY R. EHLER:
13       Q.  Not my question.  You
14   said "consistent."  Does "consistent" mean
15   important or crucial?  Do you think any of these
16   studies are important or crucial to your school
17   district opinions?
18   OBJ          A. BRANE:  Object to form.
19            THE DEPONENT:  Define
20   "crucial."  I mean, tip the balance?
21            BY R. EHLER:
22       Q.  Sure.
23            A.  They're supportive.
24   They're supportive of my opinions.  They're higher
25   methodological quality.  So I think I've already

Page 654

1    stated that they bolster my opinion -- or they
2    bolster my conviction in the opinion.
3             BY R. EHLER:
4        Q.  Okay.  Dr. Goldfield, is
5    one of the platforms' features that you believe
6    causes the harm that you see the algorithms that
7    curate, recommend, provide content or materials to
8    users, is that one of the features that you
9    believe is responsible for the harm?
10       A.  Yes.
11            Q.  And from my read of your
12   reports, that is a central cause or feature that
13   causes the -- what you claim is the addictive
14   nature of the platforms.  And I think in your
15   report you used language like "sustaining
16   prolonged engagement."  Is that a fair
17   characterization of your opinions?
18            A.  I think a lot of the
19   features promote excessive engagement, and I --
20   you know, I talked about that a lot in my report
21   and I'm happy to reiterate that today.  But yes, I
22   do believe the algorithms are a feature of social
23   media that drive excessive engagement and
24   addiction.
25            Q.  And where do you rank

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 655

1    algorithms as compared to other features in terms
2    of causing that harm?
3    OBJ          A. BRANE: Object to form.
4          THE DEPONENT: I think a lot of
5    the features are toxic. Evan Spiegel himself
6    calls Snap Streaks toxic in the documents. You
7    know, there are some really nice, elegant studies
8    that highlighted different features and the harms
9    they cause, including deleterious changes to brain
10   function and even structure.
11         But, Rose, in reality, people
12   are using these features almost simultaneously.
13   It's a dynamic process, and I think for some
14   people some of these features may cause more harm
15   than other features. So sort of ranking which one
16   is the least offensive or least harmful or, you
17   know, most harmful, I don't know, is somewhat
18   artificial.
19         BY R. EHLER:
20         Q. I'll move to strike the
21   preamble regarding toxic everything -- everything
22   before "but Rose." Are you telling me you cannot
23   rank the features, then, in terms of which are
24   more or less harmful?
25         A. I don't think I've ever

Page 656

1    seen data ranking features of harm. I think they
2    all, you know -- it's a whole experience. They
3    all interact. They're designed -- the features
4    are designed -- these are products that are, you
5    know, well designed to promote excessive
6    engagement and time spent, and that's a
7    reoccurring theme and goal in all of the internal
8    documents from all the Defendants' platforms. So
9    they do that through a bunch of different ways.
10         The personalized algorithm is
11   one. There is "likes," the constant notifications
12   drawing you back to the app. The gamification,
13   the company you represent, the ephemeral nature
14   draws people back to the app, triggers FoMO. The
15   "likes" are related to social comparison,
16   van Essen talked about that. So it is hard for me
17   to know which one is the worst, but I would say,
18   you know, algorithms are certainly part of the
19   equation of harm.
20         BY R. EHLER:
21         Q. Okay. I'm going to move
22   to strike everything in the middle between "I
23   don't think I've seen data ranking features of
24   harm" and your last sentence, "it's hard to know
25   which one is the worst, but I would say algorithms

Page 657

1    are certainly part of the equation." We will talk
2    about the other features. I'm going to ask you
3    some questions that go feature by feature.
4          A. Okay.
5          Q. And do I take it from not
6    having seen studies or data regarding the amount
7    of harm different features cause, you can't
8    assess -- you can't assign a percentage of harm to
9    algorithms or any particular feature; is that
10   fair?
11   OBJ          A. BRANE: Object to form,
12   misstates his report.
13         THE DEPONENT: My -- I think my
14   report discusses how the features -- there are
15   studies that assess the independent harms of
16   features, but no studies compare the harm of
17   features. So they all focus on one feature,
18   probably because it's just too hard to manipulate
19   too many features at once experimentally.
20         BY R. EHLER:
21         Q. And so there is no
22   studies that isolate the harm caused by algorithms
23   or one feature as distinct from other features?
24   OBJ          A. BRANE: Object to form,
25   asked and answered, misstates testimony.

Page 658

1          THE DEPONENT: The -- yeah --
2    I'm not sure that that's important because the
3    harm -- first of all, they're all -- you would
4    have to -- you could do that -- I mean, you could
5    do a meta-analysis of that, I suppose, and
6    standardize the effects. No one has done that,
7    but I suppose -- hmm, maybe that's my next review.
8    I suppose it's possible, but I haven't seen any
9    data. And I'm not sure that data is really
10   valuable, Rose. They're -- a lot of the features,
11   they all -- they all cause harm. I'm not sure
12   the -- there is value in ranking them.
13         BY R. EHLER:
14         Q. Dr. Goldfield, we've got
15   limited time here today. I get your opinions, but
16   I'm -- the specific question that I asked, which
17   you answered but just in the middle of a very long
18   answer, was whether there are any studies that
19   isolate the harm caused by algorithms or one
20   feature as distinct from other features. The
21   answer to that is no; right?
22   OBJ          A. BRANE: Object to form,
23   asked and answered.
24         THE DEPONENT: No, if I
25   understand you correctly, there are many studies

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 659

1  that isolate the harm of features.
2        BY R. EHLER:
3        Q.  I'm sorry, comparing
4  them.
5        A.  I'm not aware of any
6  studies that compare the harms of features.
7        Q.  Okay.
8        A.  Directly in one study.
9        Q.  Okay.  And so if you
10  wanted to quantify the harm caused by algorithms
11  or one feature as compared to other features, we
12  couldn't do that based on the literature that's
13  currently available; right?
14        A.  No, that's wrong.  So
15  meta-analyses, they're all different studies using
16  different measures, and we can compare the -- we
17  can compare the effects on mental health through a
18  process called standardization.  So you
19  standardize the facts and once everything is
20  standardized on a curve, then you can compare what
21  the effect size, which is another indicator of
22  harm, is.
23        Q.  Right.  But you -- and so
24  do you believe that you could compare the effect
25  size of harm caused by algorithms as compared to

Page 660

1  the effect size of harm by notifications or
2  something else?
3        A.  There -- yeah, there's
4  literature looking at the relationship between
5  notifications and depression.  There is literature
6  looking at the difference between notifications
7  and anxiety or FoMO.  And so, yeah, you could do
8  it that way if there -- I mean, it would be a
9  pretty labor-intensive review, but it's possible.
10        Q.  Okay.  You have not done
11  that yet.  You have not done that work to
12  standardize these measures and compare the effect
13  size of different features on harm; right?
14  OBJ        A.  BRANE:  Object to form.
15        THE DEPONENT:  If you could
16  show me a study that clearly indicates some kids
17  don't use a lot of these features and they only
18  use one or two, then I think there's value in that
19  line of research.  But I don't think that's true.
20  I think kids use the wide array of features, often
21  within seconds or minutes.
22        BY R. EHLER:
23        Q.  I'll move to strike as
24  non-responsive.  Dr. Goldfield, my question was
25  about what you have done.  You have not done the

Page 661

1  work to standardize measures of harm as it relates
2  to specific features and compare the effect sizes;
3  correct?
4  OBJ        A.  BRANE:  Object to form.
5        THE DEPONENT:  Rose, I was
6  tasked with a determination to review the
7  literature and come up with an opinion on whether
8  social media causes addiction -- the platforms and
9  the features cause addiction and harm.  I believe
10  I've done that.  Disentangling -- and I've even
11  presented feature-specific harms.  Ranking them, I
12  just see no value in that.
13        BY R. EHLER:
14        Q.  Okay.  And therefore you
15  didn't do it?
16        A.  Not quantitatively, no.
17        Q.  Okay.  Dr. Goldfield, if
18  you can turn to Exhibit 43, which is your MDL
19  report, page 192.  There is a certification at the
20  end.  We looked at this last time.  Do you recall
21  this certification?
22        A.  Um-hum.
23        Q.  Okay.  One of the aspects
24  of this certification is that your opinions are
25  not being presented, and one of the statements is,

Page 662

1  to cause unnecessary delay.  Do you see that?
2        A.  Yes.
3        Q.  Do you understand that
4  applies to this deposition?
5  OBJ        A.  BRANE:  Object to form,
6  argumentative, intended to harass and intimidate,
7  inappropriate.
8        THE DEPONENT:  I did not know
9  what applies to this deposition but --
10        BY R. EHLER:
11        Q.  Okay.  I'm just trying to
12  get through my questions.
13        A.  Okay.
14        Q.  If you could please
15  answer my questions directly, I'd appreciate that.
16  OBJ        A.  BRANE:  Yeah, object to
17  form.  The witness is allowed to answer the
18  questions.  He's done that.  And you might look at
19  the questions rather than the answers.
20        BY R. EHLER:
21        Q.  All right.
22  Dr. Goldfield, as it relates to your overall harm
23  opinions, if you took algorithms out of the
24  equation completely, would you be able to know
25  whether or not you'd still see harm?

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                                September 10, 2025

Page 663

1   OBJ          A. BRANE:  Object to form.
2            THE DEPONENT:  I believe there
3   is enough evidence without algorithms, all those
4   other features that drive compulsive use,
5   addictive use and harms -- yes, I believe there is
6   enough evidence that if you took algorithms out --
7   and in a perfect world, I would disable
8   algorithms.  I think they do far more harm than
9   good.
10           BY R. EHLER:
11           Q.  Okay.  The other features
12  you mentioned regarding promoting excessive
13  engagement, I just want to make sure I've got the
14  full list, "likes," notifications, ephemeral
15  nature, gamification.  Are there others?
16  OBJ          A. BRANE:  Object to form.
17  You're just asking for the list he gave previously
18  or the list in his report?
19           THE DEPONENT:  I may talk about
20  others, but off the top of my head -- well, the
21  algorithm -- beauty filters, definitely a feature
22  that causes harm.
23           BY R. EHLER:
24           Q.  I'm just asking for
25  promoting excessive engagements.

Page 664

1            A.  Oh.
2   OBJ          A. BRANE:  Object to form.
3   Let the witness finish, please.
4            THE DEPONENT:  I can't think of
5   anything else off the top of my head.
6            BY R. EHLER:
7            Q.  Okay.  I'll help you.
8   What about autoplay and infinite scroll?
9            A.  Ah, yes.  Thank you.
10           Q.  Does that fall under the
11  same category as algorithms?
12  OBJ          A. BRANE:  Object to form.
13           THE DEPONENT:  Well -- no.  I
14  would --
15           BY R. EHLER:
16           Q.  I'll withdraw the
17  question.  Let me ask a better question.  Are
18  infinite scroll and autoplay one of the features
19  that you believe causes harm through promoting
20  excessive engagement?
21           A.  Yes.
22           Q.  And is that relevant to
23  your displacement theory that it -- the mechanisms
24  through which it causes harm is by displacing
25  other healthy behaviors?

Page 665

1            A.  It's pretty consistent
2   with displacement, yes.
3            Q.  If there were a stop to
4   that autoplay or infinite scroll, is it your view
5   that adolescents would do -- would engage in
6   different behaviors?
7   OBJ          A. BRANE:  Object to form.
8            THE DEPONENT:  Well, there is
9   some evidence that when you restrict social media
10  use, people reallocate their time to more
11  health-promoting behaviors.
12           BY R. EHLER:
13           Q.  I'm just trying to figure
14  out if those are two sides of the same coin, that
15  you believe that autoplay and infinite scroll is
16  problematic and the solution would be a stop.
17           A.  I think it would -- I
18  think it would be helpful.  I think it would -- it
19  would -- and I think there was this debate in the
20  internal documents that I cited in my report about
21  some of the pros and cons of these features,
22  balancing user well-being with goals of user
23  growth and time spent on the app, which are often
24  accompanying goals.
25           Q.  And where does that

Page 666

1   feature of autoplay, infinite scroll rank in
2   causing the harms you see through prolonged or
3   excessive engagement?
4   OBJ          A. BRANE:  Object to form,
5   compound, two different features in the question.
6            THE DEPONENT:  Again, I think
7   trying to rank these features of harm is somewhat
8   artificial.  They all cause or contribute to
9   cause -- they are all key drivers of engagement
10  and addiction.  I think the peer review supports
11  that and the internal documents corroborate that.
12           BY R. EHLER:
13           Q.  And so you can't isolate
14  the harm caused by infinite scroll and autoplay as
15  compared to other features; right?
16           A.  You know, these features
17  work together.  They interact with child
18  development and these developmental
19  vulnerabilities that Zuckerberg and Sean Parker,
20  the former president of Facebook, describe as
21  exploiting human weaknesses in psychology.
22           Q.  I'll move to strike as
23  non-responsive.  My question is about whether or
24  not, as a scientific matter, you can isolate the
25  harm caused by infinite scroll and autoplay.

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                                     September 10, 2025

Page 667

```
 1    OBJ          A. BRANE:  Object to form.
 2              THE DEPONENT:  You can.  I
 3    mean, you could design a study around it.
 4              BY R. EHLER:
 5              Q.  Does the current
 6    literature isolate the harm caused by infinite
 7    scroll and autoplay?
 8    OBJ          A. BRANE:  Object to form.
 9              THE DEPONENT:  There is a lot
10    of literature on these features.  A lot of it has
11    been written.  Montag has a nice review about
12    auto-scroll and she cites -- she or he, I'm not
13    100% sure, cite some really nice literature to
14    support how auto-scroll, as well as TikTok's own
15    internal documents, how it gets you into this
16    state of flow where you lose all sense of time and
17    place and spend way more time than you otherwise
18    would have.
19              BY R. EHLER:
20              Q.  Dr. Goldfield, I'm not
21    trying to get at the fact of harm, I'm trying to
22    get at the isolating it from other features.  And
23    so maybe I'll ask the question a different way.
24    If you wanted to quantify the harm for infinite
25    scroll and autoplay as compared to all other
```

Page 668

```
 1    features, is there any literature that enables you
 2    to do that?
 3    OBJ          A. BRANE:  Object to form.
 4              THE DEPONENT:  Well, again, I
 5    think trying to disassemble all the features and
 6    ranking which one is the most or least harmful is
 7    artificial because kids -- the children use all
 8    the features.  It's a whole experience.
 9              BY R. EHLER:
10              Q.  Okay.  So is that a no?
11              A.  It's not a no or a yes.
12    I mean, I -- it's a hypothetical question that I
13    can't answer.
14              Q.  Okay.  If you took
15    infinite scroll and autoplay out of the equation,
16    do you think you would see -- you would still see
17    harm?
18    OBJ          A. BRANE:  Object to form.
19              THE DEPONENT:  Again, I think
20    all of these features contribute to harm.  The
21    magnitude may vary between individuals, but I
22    think there is enough evidence from the internal
23    research and the peer-review research that if you
24    knock out that -- if you knock out some of these
25    features, then you're probably getting some mental
```

Page 669

```
 1    health benefit.
 2              BY R. EHLER:
 3              Q.  Yeah, that was my
 4    question.  And so if you -- you would see the harm
 5    go down at a minimum, right?  If you took out
 6    algorithms, if you took out infinite scroll and
 7    autoplay, the harm that you're seeing more
 8    holistically -- and I realize this is a
 9    hypothetical -- it would go down based on what you
10    know?
11    OBJ          A. BRANE:  Object to form,
12    incomplete hypothetical.
13              THE DEPONENT:  Yeah, I mean,
14    it's a hypothetical.  My -- my hunch, based on
15    reading the literature is, yeah, it should go
16    down.
17              BY R. EHLER:
18              Q.  It certainly wouldn't go
19    up?
20              A.  It certainly wouldn't go
21    up.
22              Q.  Another feature you
23    mentioned was notifications.  Do you believe that
24    notifications are a feature of Defendants'
25    platforms that is causing harm?
```

Page 670

```
 1              A.  Yes.
 2              Q.  And is it the timing of
 3    the notifications or the content of the
 4    notifications or both that's causing harm?
 5              A.  I don't think it's a -- a
 6    content because, I mean, it's just a notification.
 7    So it's just a cue to return back to the app.  And
 8    there is literature to show that it doesn't matter
 9    what the content of the notification is.  The
10    notification itself and the repeated -- that Maza
11    describes, as Eva Telzer's work describes, is the
12    repeated checking and the repeated notifications
13    releases a dopamine release just in anticipation
14    of a possible social reward.
15              BY R. EHLER:
16              Q.  And would that be higher
17    if the notification said somebody liked your
18    photo?
19              A.  Yes, that produces a
20    bigger dopamine spike.
21              Q.  But in your view, it's
22    more about the timing and the clustering and that
23    aspect of notifications?
24              A.  Well, I think that a lot
25    of the notifications are on an intermittent
```

Page 671

1    schedule, a reinforcement schedule, which for sure
2    we know drives behavior and is inherent in
3    addictive processes.
4                Q.   Okay.  And I assume from
5    our prior conversation that you're not able to
6    rank notifications as it relates to other features
7    in terms of which are causing greater or lesser
8    harm; is that right?
9                A.   It's hard to rank, but
10   notifications are integral to promoting time
11   spent.  The internal research shows that, that it
12   draws the user back from whatever they were doing
13   back on the app.  And because of their cognitive
14   control and self-regulation deficits, once they're
15   on the app, all those other features take over.
16   So they all work in tandem.  Then auto-scroll
17   kicks in, or auto play and infinite scroll, to
18   promote excessive use.  So that's why they -- they
19   work together.  There is a synergistic effect of
20   harm.
21               BY R. EHLER:
22               Q.   Respectfully, I'll move
23   to strike everything after "it's hard to rank."
24   You said it's hard to rank; right?
25               A.   Yes, hard to rank.

Page 672

1                Q.   And none of the
2    meta-analyses that you've reviewed are attempting
3    to do that disentangling that you're talking about
4    between how much of the harm is caused by
5    notifications versus what happens on the app;
6    right?
7                A.   There -- that's not quite
8    true.  There are meta-analyses that look at
9    people's response in terms of body image to photos
10   that have been digitally altered and whether
11   they're liked or not liked.  So sort of
12   disentangling the social feedback of photos.
13   That's the McComb meta-analysis.
14               Q.   And so my question was
15   focused on notification.
16               A.   Okay.
17               Q.   Are you saying that that
18   analysis would let you know -- you could use that
19   analysis to know --
20               A.   Okay, sorry.
21               Q.   -- the harm on
22   notifications or --
23               A.   No, it's more "likes."
24               A. BRANE:  Let her finish the
25   questions.

Page 673

1                BY R. EHLER:
2                Q.   Sorry.  As Dr. Goldfield
3    knows, I'm somewhat conversational.
4                A. BRANE:  It's natural.
5    Everybody does it.  Try to let her finish.
6                BY R. EHLER:
7                Q.   My question which is
8    whether there are meta-analyses that disentangle
9    the effects of notifications such that you can
10   quantify the harm from notifications as compared
11   to other features you engage with on the app.
12               A.   To my knowledge, no
13   meta-analyses, but there are single studies.
14               Q.   Do those single studies
15   enable you to quantify the amount of harm from
16   notifications?
17               A.   There are some studies
18   that show relationships to psychological
19   constructs, like depression, anxiety.  They -- the
20   data tend to be supportive of all the other
21   literature that I've presented in here.  So
22   greater notifications associated with greater time
23   spent, greater problematic use.
24               Q.   Dr. Goldfield, I'll move
25   to strike as non-responsive.  Do those studies

Page 674

1    enable you to quantify the amount of harm from
2    notifications?
3                A.   Yes, they do.
4                Q.   What is the amount of
5    harm from notifications?
6    OBJ         A. BRANE:  Object to form.
7                THE DEPONENT:  They seem to be
8    the -- the effects with anxiety -- I'm thinking of
9    anxiety and depression and problematic use, in the
10   0.2 to 0.3 correlation range.  So still relatively
11   small, but at the population level, certainly add
12   up when you're talking about hundreds of millions
13   of children and youth using these platforms.
14               BY R. EHLER:
15               Q.   So if you removed
16   notifications, that would take out that 0.2 to 0.3
17   correlation of harm; is that your opinion?
18   OBJ         A. BRANE:  Object to form,
19   incomplete hypothetical.
20               THE DEPONENT:  Well, it depends
21   on the timing.  So, you know, Rose, once a habit
22   is developed because notifications have trained
23   the person to look at their phone up to 180 times,
24   if now the company has -- decides, you know what,
25   we think notifications are actually driving harm,

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                           September 10, 2025

Page 675

1    we're going to centralize into one a day or -- or
2    we're just going to do away with them.  For all
3    those people for, what, a dozen years in some of
4    these platforms who have been getting bombed with
5    notifications, it's too late for them, that
6    habit's already developed.
7               BY R. EHLER:
8               Q.  Okay.  But you would have
9    an actual experiment and you'd be able to see some
10   next generation?
11              A.  Yes.
12              Q.  And so do you have a
13   view, could you quantify the harm between what you
14   see and some group of people who did not
15   experience notifications?
16              A.  If -- if that were to
17   happen and it was well controlled that people
18   actually didn't get notifications, there was no
19   way -- like, the way to verify it, that would be
20   an interesting natural experiment.
21              Q.  We talked about this last
22   time, but you can turn off notifications on the
23   device level or the app level; right?
24              A.  Well, I think you would
25   have to opt out of them, find them, but yeah.

Page 676

1               Q.  Right.  And have you seen
2    any studies that look at individuals who have
3    notifications turned on versus off?
4               A.  I haven't seen many.  The
5    whole point of these platforms, social media
6    platforms, is to socially connect.  So I -- I
7    don't imagine many kids are turning off their
8    notifications.
9               Q.  You have not seen any
10   such studies then?
11              A.  I'm -- I -- you know, I
12   may have.  Again, I was focusing on meta-analyses.
13              Q.  Do you hold the opinion
14   that Defendants are causing harm by not disabling
15   notifications during certain times of day, like
16   before bed or during school?
17              A.  My opinion is
18   historically they've been extraordinarily late in
19   tending to these matters.  So it seems like a lot
20   of -- some of these that take a break or reduced
21   notifications during the night came years, if not,
22   in some cases, a decade, late.  So a lot of harm
23   has been caused by acting late on it.
24              Q.  Okay.  I'll move to
25   strike as non-responsive.  For whatever period of

Page 677

1    time that -- scratch that.
2               Do you hold the opinion that
3    Defendants caused harm by not disabling
4    notifications during certain times of day, like
5    before bed or during school?
6    OBJ         A.  BRANE:  Object to form.
7               THE DEPONENT:  The internal
8    documents support that.
9               BY R. EHLER:
10              Q.  So is that a yes, that is
11   part of your opinion?
12              A.  Yes.  Yes, that is part
13   of my opinion.
14              Q.  Okay.  That it is the
15   timing of the notifications, and had they been
16   disabled before bed or during school, you would
17   see less harm; is that your view?
18   OBJ         A.  BRANE:  Object to form.
19              THE DEPONENT:  That would be my
20   hypothesis.
21              BY R. EHLER:
22              Q.  Is that part of your
23   opinion?
24              A.  Again, I don't think it's
25   that simple, Rose, because if you block it for

Page 678

1    certain hours a day, there's probably going to be
2    a compensatory effect after that block.  So you
3    block it at night, okay, that's great.  Then you
4    wake up with 40 texts to start your day with.  So,
5    I don't know, is that more or less harmful?  Not
6    the best way to start your day, in my opinion.
7               BY R. EHLER:
8               Q.  So you don't know?
9               A.  I see no advantage of
10   certainly getting texts in the middle of the
11   night -- getting messages or Snaps.  But like I
12   said, that's not a -- that's not a great solution
13   because they -- you just turn on your phone and
14   your phone is blowing up and you're getting all
15   these messages first thing in the morning.  So --
16              Q.  So you wouldn't recommend
17   to people that they disable notifications?
18   OBJ         A.  BRANE:  Object to form.
19              THE DEPONENT:  You know, I
20   think it's not -- again, it's -- I think it would
21   be helpful, but I think having it disabled or the
22   amount of notifications at least to new users
23   would be critical.  Like I said, experienced
24   users, it's too -- it's basically too late.  The
25   habit is formed.  The dependency on the apps are

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 679

1  there.
2            BY R. EHLER:
3            Q.  Dr. Goldfield, are -- is
4  the sharing of geolocation information like Snap
5  Map, is that a feature that is part of your
6  general cause opinions that you believe is causing
7  harm?
8  OBJ            A. BRANE:  Object to form.
9            Feel free to refer to your
10  report, Mr. Goldfield.
11            THE DEPONENT:  Yeah, I talk
12  about Snap Map in my report, page, I don't know,
13  170s.  I know there are some safety risks with
14  Snap Map, security risks because it identifies
15  your location, and these kids are young.  Many of
16  them, a good proportion are minors.  And I know
17  from my clinical experience that it can cause
18  harm.  People feel excluded if they're at a party
19  and they haven't been invited.
20            BY R. EHLER:
21            Q.  Okay.  And so your view
22  is that the sharing of location information causes
23  harm because it -- the people feel excluded, the
24  sort of FoMO harms, and, as you said, safety or
25  security risks because it identifies location on

Page 680

1  the map; is that right?
2            A.  I mean, it -- there -- I
3  lay out -- in figure 3 I lay out all kinds of
4  pathways of harms from these features.  Most of
5  them, those pathways will apply to all of this.
6  So this is a form of gamification that can lead to
7  harms in a multitude of ways.  It could -- you
8  know, people can start getting obsessed with who's
9  where and -- you know, through Snap Map and all
10  these different features.  It promotes excessive
11  engagement.  It displaces other health-promoting
12  behaviors.  It -- you know, you could get exposed,
13  you're vulnerable.  You're a 13-year-old girl and,
14  you know, you reveal your location and, who knows,
15  there are predators out there.  There is that
16  risk.  There are all kinds of risks.  I -- I
17  don't -- trying to disentangle or rank these
18  risks, I think it again is artificial.
19            BY R. EHLER:
20            Q.  That was actually going
21  to be my next question.  So I assume you cannot
22  rank geolocation -- sharing of geolocation
23  information as compared to the other features that
24  you believe causes harm?
25            A.  Correct.

Page 681

1            Q.  And can you quantify the
2  amount of harm you believe is caused by sharing of
3  geolocation information?
4  OBJ            A. BRANE:  Object to form.
5            THE DEPONENT:  I think that
6  will partly depend on the outcome, partly depend
7  on how much time people spend on this feature.
8  Some may like it more than others and that would
9  cause more displacement.
10            BY R. EHLER:
11            Q.  Right.  But from the
12  analysis you've done and the literature you've
13  reviewed, you can't quantify the amount of harm
14  attributable to sharing of geolocation information
15  as compared to the other features; right?
16            A.  Again, I haven't seen
17  evidence of comparative harms of different
18  features, mostly because that doesn't represent
19  children and youth's reality.  They use these
20  features interchangeably.
21            Q.  You also mentioned
22  ephemeral content.  What do you believe about
23  ephemeral content is causing harm?
24            A.  So I talk about that in
25  my report.  So Snap uses a lot of ephemeral

Page 682

1  content and I think Instagram did for a bit too.
2  So not only do the -- generally the Snaps and
3  messages go away within either seconds or within
4  24 hours, depending on what tab you're on -- so it
5  basically forces the person to -- it triggers
6  FoMO, so I think that's a psychological process,
7  and it cues the person to want to go back in the
8  app.  And then of course once you're in the app,
9  you auto-scroll, infinite scroll, all of these
10  features take hold to promote excessive
11  engagement.
12            BY R. EHLER:
13            Q.  Okay.
14            A.  And addiction.
15            Q.  And I assume from our
16  prior conversation, you cannot rank ephemeral
17  content as compared to the other features for
18  which one causes the most to the least harm; is
19  that right?
20            A.  Based on my internal --
21  my review externally and the internal documents,
22  it seemed like a lot of the Snap employees really
23  felt the ephemeral nature of Snap was a key driver
24  and it differentiated them from other platforms.
25  So they certainly -- it seems like they would rank

Arbitration Place

(613) 564-2727                                                    (416) 861-8720

Page 683

1    that pretty high as a way to draw users back onto
2    the map -- back onto the app, and then of course
3    Snap Streaks kind of do the same thing.
4          Q.  Okay.  I will move to
5    strike that entire answer as non-responsive.  Do
6    you have a view and can you rank ephemeral content
7    as compared to the other features for which ones
8    cause more or less harm?
9    OBJ      A. BRANE:  Object to form.
10          THE DEPONENT:  I'm going to
11    give you the same answer I've been giving to all
12    the other features.
13    BY R. EHLER:
14          Q.  You can't rank them
15    because they're intertwined and there have not
16    been studies that compare the harm between the
17    two; is that fair?
18    OBJ      A. BRANE:  Object to form.
19          THE DEPONENT:  Yes, fair.
20    BY R. EHLER:
21          Q.  Short-form content, like
22    the length of content, so TikTok videos, the fact
23    that it's short as compared to a movie or a book,
24    is the length of content related to your general
25    cause opinions?

Page 684

1          THE DEPONENT:  Not huge, but
2    there are a few studies that show shorter content
3    will be more likely to be consumed.  Kids don't
4    want to look at 10-, 15-minute videos.  They like
5    the short nature of it, it holds their attention,
6    and then, boom, they're on to something else.
7    That's also been shown to be related to attention
8    fragmentation.  Just kind of promoting that
9    instant gratification and novel stimuli.  And
10    then, of course, when kids are forced to attend to
11    something for any length of time, I believe those
12    short videos undermine that process of sustained
13    attention.
14          Q.  Right.  That goes to your
15    distraction -- digital stress theory; is that
16    right?
17          A.  Yeah, more executive
18    functioning cognition.  The bubble above that on
19    --
20          Q.  Got it.
21          A.  -- page 95, figure 3.
22          Q.  Got it.  Okay.  And where
23    do you rank short-form nature or the length of
24    content in the causes of harm?  Is that the same
25    answer of:  We can't do it because we can't

Page 685

1    separate it from the others?
2          A.  Well, again, it's got to
3    be important.  YouTube has YouTube Shorts.  The
4    TikToks are, you know -- I think there is research
5    that the shorter videos are, you know, consumed
6    far more than -- I think it's up to three minutes,
7    but that's rare.  So it's on the, you know,
8    Defendants' radar as important.  But again, I've
9    seen no studies to rank order how the degree of
10    harm that is generated by those -- probably for
11    the exact same reason, they all work in tandem --
12          Q.  And just so we're clear,
13    we're not talking about --
14          A.  -- all those features.
15          A. BRANE:  Dr. Goldfield, were
16    you done with your answer?
17          THE DEPONENT:  Yeah.
18          A. BRANE:  Okay.
19    BY R. EHLER:
20          Q.  Just so we're clear,
21    we're not talking about Defendants' radar as
22    important.  I'm talking about your radar as
23    important for the harm that you are opining is
24    caused by these platforms and trying to understand
25    how these pieces fit together.  And so far we've

Page 686

1    gotten, you know, a half-dozen very important
2    features, and are those all very relevant and
3    important to the harm?  Is any one of them more or
4    less so than the others, or you just can't tell
5    us?
6    OBJ      A. BRANE:  Object to form.
7          THE DEPONENT:  I think without
8    looking at data, you know, my -- I could give an
9    educated -- I could give an educated opinion, but
10    it's artificial, Rose.  They use all of these
11    features often and they're intertwined.
12    BY R. EHLER:
13          Q.  Can you give us your
14    educated opinion?
15    OBJ      A. BRANE:  Object to form.
16    Aside from his report?
17          THE DEPONENT:  I think I
18    document harm from all of these features.
19    BY R. EHLER:
20          Q.  But we're not able to
21    quantify or -- we're able -- sorry, strike that.
22    Let me ask a better question.
23          We're able to say there is
24    harm, and from a magnitude you would say it's
25    meaningful, but we're not able to quantify that

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 687

1    amount or compare harm between features; is that
2    fair?
3             A.  It can be done.  I --
4    like, through the standardization process that I
5    mentioned.  But again, it's an artificial -- it's
6    an artificial -- it's a whole experience.  It's an
7    artificial -- you know, exercise.
8             Q.  Right.  And the
9    literature -- I'm sorry for interrupting you.  And
10   the literature has not done that, that you
11   reviewed; correct?
12   OBJ          A. BRANE:  Object to form,
13   misstates the testimony.
14            THE DEPONENT:  The literature
15   has documented the harms of each feature and the
16   impact on neurobiology.  I think those are real,
17   those are true.  They've been peer reviewed,
18   they're strong studies, most of them using an
19   experimental design.  And I think from that, you
20   could look at the effect sizes and see which one
21   is causing more harm.  I didn't do that because
22   most people use -- first of all, I focused on
23   meta-analyses.  Second of all because it's high on
24   the evidentiary pyramid.  Second of all, people --
25   it's rare to find someone who only uses one

Page 688

1    feature of social media.  It's a whole experience.
2             BY R. EHLER:
3             Q.  Fair enough.  Is another
4    feature that you believe is part of the harm
5    private messaging or private content?
6    OBJ          A. BRANE:  Object to form.
7             THE DEPONENT:  Are you talking
8    about like closed chats?
9             BY R. EHLER:
10            Q.  Yeah.  Yeah, private
11   messaging between people or the ability to save
12   content in a private space, like "my eyes only"
13   for Snap.
14            A.  Well, it can be.
15            Q.  You believe that causes
16   harm -- it can cause harm?
17            A.  It can, for sure.
18            Q.  Where do you rank the
19   harm -- well, let me ask a different question.
20            Is it part of your general
21   cause opinion that the platforms are causing harm
22   the existence of CSAM or adult content on the
23   platforms?
24   OBJ          A. BRANE:  Object to form.
25            THE DEPONENT:  Adult content

Page 689

1    for underage --
2             BY R. EHLER:
3             Q.  Let me ask them
4    separately.
5             A.  Yeah.
6             Q.  Is part of your general
7    cause opinion that the platforms are not able to
8    remove CSAM fast enough?
9             A.  I believe, based on the
10   internal documents and some peer review, the age
11   verification is extraordinarily weak in these
12   platforms.  And through their A.I. and machine
13   learning, they've -- all platforms identified
14   underaged users.  And yes, I agree that they
15   have -- Meta talked about a $700,000 backlog --
16   not dollar, user backlog and identified underaged
17   users.  Yeah, I believe they've been slow to act
18   and the age verification is weak.
19            So to answer your question,
20   that completely alters the content that people are
21   going to receive.  If they're 14 and say they're
22   18 --
23            BY R. EHLER:
24            Q.  Yeah.  Not my question.
25            A.  Okay.  Sorry, sorry.

Page 690

1             Q.  We're talking about very
2    different things.
3             A.  Okay.
4             Q.  I'll move to strike as
5    non-responsive.  Do you know what CSAM is?
6             A.  No.
7             Q.  You may not because it
8    may be an American term.
9             A.  Yeah, yeah.
10            Q.  I forget what it stands
11   for but it is sexually explicit content involving
12   minors.  It is illegal.  It is the stuff that you
13   are supposed to identify, report, and get off the
14   platform.  That is what CSAM is.
15            A.  Okay.
16            Q.  Okay.  And is it part of
17   -- this may not be part of your opinion, but is it
18   part of your opinion that the existence of CSAM on
19   these platforms and the inability to get it off
20   fast enough is causing harm to minors?
21   OBJ          A. BRANE:  Object to form.
22            THE DEPONENT:  Yeah, I have no
23   opinion on that.  I have not examined the
24   literature on that.
25            BY R. EHLER:

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                                    September 10, 2025

Page 691

1          Q.  Fair enough.  Okay.  We
2   talked about a bunch of --
3          A. BRANE:  Are we getting to a
4   stopping point?
5          R. EHLER:  We're close, but
6   I'm not switching quite yet.
7          BY R. EHLER:
8          Q.  We talked about a bunch
9   of features that you thought were all meaningful
10  to the harm opinions you express, algorithms,
11  autoplay, infinite scroll, notifications,
12  geolocation sharing, ephemeral content, short-form
13  content --
14         A.  "Likes."
15         Q.  "Likes."  If you took --
16         A.  Beauty filters.
17         Q.  I'll leave beauty filters
18  over here for a second.  If you took all of the
19  features that I mentioned and set those all to one
20  side, do you believe you would still see
21  statistically significant mental health harms for
22  adolescents?
23         A.  I would expect that they
24  would go down, the harms would go down.  But in
25  adolescents, the drive to connect is strong so

Page 692

1   I -- I suspect people will still use these
2   platforms.  I think it will help them regulate
3   their use, use more moderately, which should, in
4   theory, translate -- and I believe it would
5   translate -- to less harms.
6          Q.  So you would still have
7   things like the social comparison elements and
8   those social drivers to engage, but it would
9   reduce a lot of what we've talked about as the
10  excessive engagement; is that your view?
11  OBJ         A. BRANE:  Object to form.
12         THE DEPONENT:  I think
13  adolescence is a time where, you know, cognitive
14  control and self-regulation is really difficult,
15  the brain is still developing.  So I think having
16  those features promote excessive engagement -- so
17  having -- you know, if they were disabled, I think
18  it would make it incredibly -- a lot easier to
19  regulate use.
20         BY R. EHLER:
21         Q.  Would you still believe
22  that the platforms are addictive or designed to be
23  addictive if they did not have any of those
24  features?
25  OBJ         A. BRANE:  Object to form.

Page 693

1          THE DEPONENT:  I think those
2   are -- you know, together, working
3   synergistically, are important drivers.  I'm
4   trying to think of would there be any other
5   features that we haven't discussed that could also
6   be contributing to excessive use.  I'm not sure
7   because, I mean, I really haven't studied those.
8   There are other platforms that don't have those
9   features, they're not involved in this litigation,
10  but I haven't really studied the impact of those.
11  I wasn't tasked to examine that, so I don't know.
12         BY R. EHLER:
13         Q.  So sitting here today,
14  you don't know whether if you took all of those
15  features out, the platforms would still be
16  addictive in your view?
17         A.  I think they would be a
18  lot safer and I think they would be a lot less
19  addictive.  And I think it would be easier for
20  children and adolescents to regulate their use.
21  Therefore, there would be less displacement, there
22  would be better sleep, better executive control,
23  less anxiety, less depression.
24         Q.  Is it possible that the
25  levels of harm you see in the literature would

Page 694

1   become null or nonsignificant in that case?
2   OBJ         A. BRANE:  Object to form.
3          THE DEPONENT:  I mean, the
4   magnitude of reduction -- it's a hypothetical.
5          BY R. EHLER:
6          Q.  It's fine if we don't
7   know.  I'm just asking if that's --
8          A.  I hope it would.  I mean,
9   I -- that would be my -- my hope as an optimistic
10  scientist and psychologist.  But I would have to
11  look at the data.
12         Q.  Okay.
13         R. EHLER:  We're at a good
14  stopping point for a break.
15         THE VIDEOGRAPHER:  Okay.  We
16  are going off the record.  The time is 10:39 a.m.
17  --- Upon recessing at 10:39 a.m.
18  --- Upon resuming at 10:54 a.m.
19         THE VIDEOGRAPHER:  We are back
20  on the record and it is 10:54 a.m.
21         BY R. EHLER:
22         Q.  Great.  Dr. Goldfield, I
23  didn't ask you this last time we met.  How many
24  years have you been a practising clinical
25  psychologist?

Arbitration Place

(613) 564-2727                                                              (416) 861-8720

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                                September 10, 2025

Page 695

1          A.  23.
2          Q.  How many patients have
3    you treated in that time?
4          A.  I have no idea.  I don't
5    track that.
6          Q.  Can you estimate it?  Is
7    it more or less than a thousand?
8          A.  I don't -- honestly, I
9    couldn't tell you because I do a lot of
10   assessment, so that -- those are patients.  So I
11   do -- probably half my practice is assessment and
12   half is therapy.
13         Q.  And so assessment would
14   be you assess them but then refer them for
15   other --
16         A.  Or they could roll into
17   therapy.  I do a lot of learning disability
18   assessments or ADHD, in which case they may not
19   need, you know, follow up.  So it all depends.
20   But in all honesty, Rose, I have no idea.
21         Q.  If you included
22   assessment, do you think it would be well north of
23   a thousand?
24         A.  I mean, some years I saw
25   a ton and then other years less so, depending on

Page 696

1    how busy my research was.
2          Q.  Totally understood.  I'm
3    just trying to understand what a ton means.  Does
4    "a ton" mean 100 or does "a ton" mean 500?
5          A.  I think a thousand might
6    be -- I don't know.  I'd have to do the math.  23
7    years is a long time.
8          Q.  Absolutely.
9          A.  I -- I think that sounds
10   like a -- I mean, I don't know, a fair estimate, I
11   guess.
12         Q.  About a thousand?
13         A.  I really don't track
14   this.
15         Q.  As best of an estimate as
16   you can give me sitting here today, more or less
17   than a thousand?
18         A. BRANE:  Don't guess.
19         THE DEPONENT:  I really
20   honestly -- I -- I don't know.  I mean, it -- I
21   could be way off.  So I prefer not to answer that
22   with a specific answer because, again, I would
23   have to do the math on it.
24         BY R. EHLER:
25         Q.  Okay.  You can't tell me

Page 697

1    sitting here today whether it's more or less than
2    a thousand with any accuracy?
3          A.  Some patients come back
4    in to, you know, therapy with different problems
5    five years later, 10 years later.  I couldn't tell
6    you.  I don't track that.
7          Q.  Okay.  Your work does not
8    specialize in mapping and analyzing raw FMRI data;
9    correct?
10         A.  Correct.
11         Q.  And you are also not an
12   expert in warnings; is that right?
13         A.  That is correct.
14         Q.  I've premarked Exhibits
15   46 and 47 which are sitting to your left.
16             EXHIBIT NO. 46:  Invoice
17             from Thrive Professional
18             Services dated July 31,
19             2025
20             EXHIBIT NO. 47:  Invoice
21             from Thrive Professional
22             Services dated August 31,
23             2025
24   BY R. EHLER:
25         Q.  These are your most

Page 698

1    recent invoices in this case; is that right?
2          A.  Yes.
3          Q.  And when we met before,
4    we talked about at that point in time you had
5    billed 441.25 hours, totalling up to nearly
6    $400,000; does that sound right?
7          A.  Um-hum.
8          Q.  At that point you had not
9    been paid for the work you had done.  Have you
10   since been paid?
11         A.  I've been paid for a
12   portion of it.
13         Q.  How much?
14         A.  About 150.
15         Q.  Okay.  So you're still
16   due a few hundred thousand dollars more?
17         A.  Correct.
18         Q.  In July, Exhibit 46 says
19   you worked an additional 67.5 hours; is that
20   right?
21         A.  Yes.
22         Q.  And 12.5 more in August;
23   is that right?
24         A.  That is correct.
25         Q.  Do you know how many

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                                September 10, 2025

Page 699

1   hours you've billed in September so far?
2                A.   No idea.
3                Q.   Okay.  In total, you've
4   worked over 500 hours on these cases so far;
5   right?
6                A.   I haven't done the math,
7   but I trust you.
8                Q.   And that sounds right,
9   441.25 plus 67.5 plus 12.5 plus whatever unknown
10  amount you billed in September?
11               A.   That is correct.
12               Q.   And by our math, you
13  probably will have to trust me on this, we've
14  added up your invoices to $430,031.25 so far.
15  Does that sound right?
16               A.   I trust you.
17               Q.   That is the amount the
18  Plaintiffs' lawyers agreed to play you so far for
19  your work in this case.  Yes?
20               A.   Yes.
21               Q.   Do you recall our
22  discussion during your last deposition regarding
23  your service on the advisory committee for the
24  Canadian Centre for Healthy Screen Use?
25               A.   Yes.

Page 700

1                Q.   And we looked at a
2   printout from the website that we marked as
3   Exhibit 25.  And as of that date, you had not seen
4   that before.  Do you recall that testimony?
5                A.   I do.
6                Q.   And we were particularly
7   focused on the section towards the bottom of the
8   page that says "Moderate screen" -- excuse me one
9   second.
10                    "Moderate screen use (2
11                   to 4 hours a day) is
12                   linked with positive
13                   effects on well-being,
14                   including positive
15                   emotions, psychosocial
16                   functioning, and a sense
17                   of life satisfaction."
18  Right.
19               A.   Yes.
20               Q.   And you told me you
21  disagreed with that statement; correct?
22               A.   Correct.
23               Q.   What was it you disagreed
24  with?
25               A.   I think the bulk of the

Page 701

1   evidence is not consistent with that.
2                Q.   And you told me that you
3   were going to voice your concerns to the
4   organization, show them literature about the
5   potential harm of this, as you described it,
6   misinformation; is that right?
7                A.   Yes.
8                Q.   Did you, in fact, show
9   them literature?
10               A.   Yes.
11               Q.   What literature did you
12  show them?
13               A.   I showed them our work,
14  my colleague's work.  I showed them systematic
15  reviews that show greater than two hours of media
16  use is associated with depression, anxiety, and
17  reduce some quality of life.
18               Q.   Okay.  Did they make
19  changes to this website?
20               A.   I haven't checked, but
21  they assured me they have.  Something tells me
22  that I'm about to find out, perhaps otherwise.  I
23  met with the director personally --
24               Q.   Okay.
25               A.   -- to voice my concerns.

Page 702

1                A.   BRANE:  Dr. Goldfield, wait
2   for a question just so it's all clear.
3                    EXHIBIT NO. 48:  Printout
4                   of an article from the
5                   website of the Centre for
6                   Healthy Screen Use titled
7                   "Are there benefits of
8                   screen use for children
9                   and youth?"
10               BY R. EHLER:
11               Q.   Dr. Goldfield, I have
12  marked as Exhibit 48 a printout we took earlier
13  this week from the websites.  It's the second
14  page.
15               A.   BRANE:  Counsel, on page 2
16  it looks like the text is cut off, but perhaps
17  we're not missing any text at the top of the page?
18               R. EHLER:  Correct.
19               A.   BRANE:  Okay.  Thanks.
20               BY R. EHLER:
21               Q.   And since you haven't
22  seen this before today, maybe just confirm by
23  looking at Exhibit 25 well, but, by my assessment,
24  the only change that the Centre for Healthy Screen
25  Use made was to delete the parenthetical of two to

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

---

Page 703

1    four hours.  Is that what you see as well?
2                A.  Yeah.
3                A.  BRANE:  Specific to that
4    bullet.
5                THE DEPONENT:  Yeah, that
6    bullet.
7                BY R. EHLER:
8                Q.  Was that all you asked
9    them to do, was just to delete the two to four
10   hours?
11               A.  I didn't ask them to do
12   that.
13               Q.  Okay.
14               A.  I asked them to change
15   the bullet altogether, to flip it and say more
16   than two hours causes harm --
17               Q.  Okay.
18               A.  -- but they seemed
19   unlikely to do that, and I didn't win the
20   argument.
21               Q.  So it is still the
22   opinion of the Centre for Healthy Screen Use that
23   the:
24               "Moderate screen use is
25               linked with positive

---

Page 704

1                effects on well-being,
2                including positive
3                emotions, psychosocial
4                functioning, and a sense
5                of life satisfaction."
6    That's at least what it says on this website;
7    right?
8                A.  Yes.
9                Q.  And you're still on the
10   advisory board of that organization; correct?
11               A.  I am.
12               Q.  Okay.  You also told me
13   when we last met that you would be -- and I'm
14   paraphrasing -- but you would intend to, going
15   forward, disclose you participated in this
16   litigation in publications and manuscripts you
17   submit.  Do you recall that?
18               A.  Yes.
19               Q.  Have you made any such
20   conflicts of interest disclosures since the last
21   deposition?
22               A.  I have not published
23   anything on social media going -- since the
24   deposition.
25               Q.  And you have not made

---

Page 705

1    those disclosures in the publications that you --
2    have been published regarding screen time use;
3    correct?
4                A.  Correct.
5                Q.  Have you made any other
6    public statements regarding social media use since
7    your last deposition?
8                A.  I don't believe so.  I
9    have a blog on Psychology Today.  I can't recall
10   the last time I blogged.
11               Q.  Let's take a look.
12               EXHIBIT NO. 49:  Printout
13               from the website of
14               Psychology Today of an
15               article titled "Is Social
16               Media Making Teens
17               Depressed?"
18               BY R. EHLER:
19               Q.  Dr. Goldfield, I've
20   handed you what's been marked Exhibit 49.  This is
21   your blog on Psychology Today; correct?
22               A.  Um-hum.
23               Q.  And there is a post dated
24   July 25th, 2025; do you see that?
25               A.  I see.

---

Page 706

1                Q.  That was after our
2    deposition in -- last deposition in this case;
3    right?
4                A.  Um-hum.
5                Q.  And the topic of the
6    article is:  "Is Social Media Making Teens
7    Depressed?"  Right?
8                A.  Yes.
9                Q.  That's related to your
10   testimony in this case from a topic perspective;
11   correct?
12               A.  Yes, different forum but
13   related.
14               Q.  Right.  And different
15   forum because this blog aimed at providing more
16   general information to the public, to
17   professionals?
18               A.  Yeah, mostly the general
19   public.
20               Q.  Yeah.  And you try to be
21   honest in what you tell the public; right?
22               A.  Yeah.
23               Q.  And you want them to
24   believe what you say; correct?
25               A.  That would be nice.

---

Page 707

1          Q.  And you -- part of that
2   is them believing that you're approaching this
3   from an unbiased perspective; fair?
4          A.  I -- I think in -- I
5   mean, ideally, but I mean, I -- really, what my
6   blogs are about is just reviewing the literature
7   and just getting findings out to the general
8   public.
9          Q.  Understood.  But for the
10  general public to assess whether or not they
11  should believe what you say, don't you think that
12  they're entitled to know whether your approach is
13  biased or unbiased in any way?
14         A.  Well, I actually raised
15  this with the editor of this blog and I said that
16  I'm participating as an expert witness, should I
17  disclose this?  Are there any, you know, potential
18  conflicts of interest or forms that I have to fill
19  out, or does this have to be adjudicated?  And she
20  said:  No, it's whatever you want.  She said:
21  Many of our bloggers have participated in
22  litigation and didn't disclose it.
23         Q.  Totally understood.  And
24  you also chose not to disclose in this blog post
25  that you were retained by the Plaintiffs in this

Page 708

1   litigation; correct?
2          A.  I believe all the experts
3   who have disclosed that they're involved in
4   litigation have not declared a side.  They just
5   say they're involved in the litigation.  So in
6   other words, if I do disclose that I'm involved, I
7   think I'll -- that's -- it's my understanding that
8   I don't have to say what side.
9          Q.  I'll move to strike as
10  non-responsive.  You made a choice not to disclose
11  in this publication anything about the litigation;
12  right?
13         A.  Yes.
14         Q.  And that included a
15  decision not to disclose one way or the other
16  whether you were engaged by the Plaintiffs or the
17  Defendants; correct?
18         A.  Correct.
19         Q.  Okay.
20         R. EHLER:  Can we go off the
21  record for a second.
22         THE VIDEOGRAPHER:  We are
23  going off the record.  It's 11:09 a.m.
24  --- Upon recessing at 11:09 a.m.
25  --- Upon resuming at 11:13 a.m.

Page 709

1          THE VIDEOGRAPHER:  We are back
2   on the record.  It is 11:13 a.m.
3   CROSS-EXAMINATION BY R. RAPHAEL (CONT'D):
4          Q.  Hi, Dr. Goldfield.  It's
5   nice to see you again.  Again, my name is Rachel
6   Raphael and I represent Google YouTube.
7          A.  Nice to see you too.
8          Q.  So during your earlier
9   deposition in July, I asked you a few questions
10  about the 44 meta-analyses in your initial report
11  and, more specifically, the studies underlying
12  those meta-analyses.  Does that sound familiar?
13         A.  It does.
14         Q.  Okay.  And earlier today
15  you were asked about some literature that had been
16  added to your materials considered list since your
17  deposition in July, and you noted some individual
18  studies.  Do you recall those questions earlier
19  today?
20         A.  Yes, I do.
21         Q.  And looking just at those
22  studies added to your materials considered list
23  since your deposition in July, do you know sitting
24  here today if any included YouTube in the
25  definition of social media?

Page 710

1          A.  Well, YouTube is one of
2   the most popular platforms.  I assume -- you're
3   talking about the newly added ones?
4          Q.  I am.
5          A.  Or the metas?
6          Q.  I'm asking about the
7   newly added studies.
8          A.  In some of them, they
9   are.
10         Q.  Okay.  And which ones are
11  those?
12         A.  I'm pretty sure the
13  Van den Eijnden one, 2018, looked at YouTube.  I
14  believe Walsh did.  And what was the other one?
15  Dubuc I'm not sure.  And Gordon I think did as
16  well.
17         Q.  And for either of these
18  three studies, do you know whether those studies
19  controlled for -- whether those studies were
20  specific to YouTube only or whether there were
21  other social media platforms at issue in those
22  studies?
23         A.  I think like most of the
24  literature, they pooled -- they pooled the overall
25  time spent on social media.  Some studies

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 711

1  disentangled the platforms, but I -- I can't
2  recall offhand.  I would have to look at those
3  studies.  They might have, but I don't recall
4  offhand.
5          Q.   And when you say they
6  disentangled those studies, do you know whether
7  any of these studies controlled for the effects of
8  the study participants using other social media
9  platforms?
10 OBJ        A. BRANE:  Object to form.
11         THE DEPONENT:  In these newly
12 added studies?
13         BY R. RAPHAEL:
14         Q.   Yes.
15         A.   Well, yeah, it's the same
16 sort of question.  When I mean disentangled, they
17 mean present the data by how much time spent on
18 each platform in relation to whatever the harm the
19 paper is investigating, so the outcome.  In this
20 case, most of what I added was academic outcomes,
21 papers on academic outcomes.
22         Q.   And I apologize if my
23 question was unclear.  When I say "control," what
24 I'm asking for is whether these papers or these
25 studies did anything to isolate the harm

Page 712

1  associated with any given social media platform to
2  the best of your knowledge sitting here today.
3          A.   Well, in the literature
4  many of them do.  So there are different ways to
5  control, as you say.  So, I mean, one way is to
6  just look at the actual time spent in each
7  platform and see how that maps on to different
8  outcomes and different harms.  Another way is
9  throw them all in a regression equation and let
10 them compete for variance, and that's also looking
11 at the independent impact of social media
12 platforms or time spent on these platforms and
13 harms.
14         Q.   And of the three studies
15 you mentioned to me earlier today, I believe it
16 was -- and I may mispronounce, Van den Eijnden,
17 Walsh and Gordon, which of those studies did as
18 you say?
19         A.   I -- I was not looking at
20 such sort of granular detail.  I was looking more
21 at the gestalt and the overall pattern
22 commonalities, and all three of them showed
23 greater social media use was longitudinally
24 associated with worse academic performance.
25         Q.   And -- but you also do

Page 713

1  not know how any of the individual participants in
2  any of those studies were actually using any of
3  the social media platforms at issue in these
4  studies; correct?
5          A.   In the literature, some
6  ask -- you mean you're talking about their
7  motivation for using?  When you say how they're
8  using it, I'm not sure what you mean by that.
9          Q.   So at your deposition in
10 July, we talked about the ways in which -- the
11 differences that, for example, users might use
12 YouTube, educational purposes, for example,
13 listening to music, for example.  And I'm asking
14 you whether you recall sitting here today, with
15 respect to the three studies that you noted as
16 being newly added to your materials considered
17 list, whether there was any way to determine how
18 any individual participant was using any of the
19 social media platforms, specifically YouTube, in
20 the course of these studies?
21 OBJ        A. BRANE:  Object to form.
22         THE DEPONENT:  I don't think
23 these studies broke it down like by purpose.
24         BY R. RAPHAEL:
25         Q.   Okay.  And as far as you

Page 714

1  know, none of these studies made any effort to
2  disentangle the features that -- the features that
3  these individuals were using on these social media
4  platforms, as opposed to what they were exposed to
5  in terms of content on these platforms; correct?
6  OBJ        A. BRANE:  Object to form,
7  foundation, calls for speculation.
8          THE DEPONENT:  You know, I've
9  read research, internal research, that something
10 like two-thirds of the content consumed on YouTube
11 for eating disorder content and suicide content is
12 generated by the algorithms.  So that tells me
13 that the algorithms and recommender autoplay are
14 driving a lot of -- a lot of the content.  And
15 I -- there is no literature to suggest that most
16 of these children and youth are watching YouTube
17 for educational purposes.  I think the vast --
18 vast majority of time --
19         BY R. RAPHAEL:
20         Q.   I'm going to move to --
21         A.   Yeah, the vast majority
22 of time is, I think, recreational use.
23         Q.   And I'm going to move to
24 strike as non-responsive.  I asked you specific to
25 these three studies, the literature that you would

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                                                September 10, 2025

Page 715

1    identify, whether any of those studies did
2    anything to attempt to disentangle the features
3    that you've identified in your report as opposed
4    to the content that the individuals --
5    participants in the study were viewing on these
6    platforms.
7    OBJ          A. BRANE:  Object to form,
8    foundation, calls for speculation.  The reports
9    speak for themselves.  It might also be helpful to
10   put the report in front of the witness.
11          R. RAPHAEL:  I'm asking if he
12   recalls sitting here today.
13          BY R. RAPHAEL:
14          Q.  Do you have any
15   recollection, Dr. Goldfield, one way or the other?
16          A.  Well, I certainly review
17   a lot of the impacts of the -- based on the
18   internal documents from different features, which
19   seem consistent with the peer review.  I might
20   have this in my report.
21          Q.  Well, these three studies
22   that I'm asking you about specifically, those were
23   added after you prepared your report; correct?
24          A.  That's true.  That is
25   true.

Page 716

1          Q.  Okay.
2          A.  Yeah.
3          Q.  And so I'm asking with
4    respect to these three specific studies whether
5    you recall sitting there today any effort to
6    disentangle the harm associated with features as
7    opposed to content?
8    OBJ          A. BRANE:  Object to form,
9    foundation, calls for speculation.
10          THE DEPONENT:  I think features
11   and content on YouTube are inextricably linked.
12   So the features such as the algorithm generates
13   content.  So how do you -- I don't even know how
14   one would exist without the other.  They're
15   inextricable.
16          BY R. RAPHAEL:
17          Q.  No, understood.  So I
18   assume no, you don't recall whether the authors of
19   those studies attempted to do that one way or
20   another sitting here today?
21   OBJ          A. BRANE:  Object to form.
22          THE DEPONENT:  They've done
23   that with TikTok.  I'm aware of some TikTok
24   studies.
25          BY R. RAPHAEL:

Page 717

1          Q.  I'm asking about these
2    three specific studies, Dr. Goldfield, do you
3    recall one way or the other, yes or no?
4          A.  I think they were just
5    looking at overall time spent and the impact on
6    academics.
7          Q.  All right.  So no.
8          All right.  So back in July,
9    at the end of the day you were asked various
10   questions about your opinion that Defendants'
11   social media platforms cause mental health harms
12   to children and youth, and you may recall that at
13   that deposition you acknowledged that individuals
14   are able to use YouTube to listen to music.  Do
15   you recall that testimony?
16   OBJ          A. BRANE:  Object to form to
17   the extent it misstates prior testimony.
18          THE DEPONENT:  I think
19   people -- I don't recall saying that.  It was 11
20   hours of testimony, but I have -- that's -- I
21   accept that, that people could listen -- people
22   can listen to music on YouTube as one of the
23   features that YouTube offers.
24          BY R. RAPHAEL:
25          Q.  Sure.  And is it your

Page 718

1    opinion that YouTube will cause mental health
2    harms in children and youth who only use YouTube
3    to listen to hours of background music while doing
4    other things, for example, like studying for a
5    test?
6          A.  I think it depends on the
7    context, if the background music is interfering
8    with their concentration, then that's a harm.  If
9    they need music to regulate their mood and it's
10   coming at the cost of other things, that's another
11   harm.  So I think it would depend, depend on the
12   individual and depend on the context.  But it's
13   conceivable.
14          Q.  Okay.  And I believe --
15   and again at your deposition you also acknowledge
16   individuals are able to use YouTube to listen to
17   white noise or other sounds to help them sleep.
18   Does that sound familiar to you?
19          A.  Yes.
20          Q.  And is it your opinion
21   that YouTube will cause mental health harms in
22   children or youth who only use YouTube to listen
23   to hours of white noise at night to help them
24   sleep, for example?
25          A.  I'm not sure what you

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 719

1    mean. Who only listen to YouTube -- so they use
2    no other social media and they use YouTube for no
3    other purpose?
4              Q. I'm asking whether -- I
5    am asking you whether it's your opinion that
6    YouTube specifically will cause mental health
7    harms in a child who only uses YouTube to listen
8    to hours of white noise at night to help them
9    sleep?
10   OBJ         A. BRANE: Object to form.
11             THE DEPONENT: I don't know. I
12   have not looked at the literature on white noise
13   and sleep quality or sleep onset.
14             BY R. RAPHAEL:
15             Q. Okay. Are you aware that
16   individuals can use YouTube to learn another
17   language?
18             A. Yes.
19             Q. Okay. Is it your opinion
20   that YouTube will cause mental health harms in a
21   child who uses YouTube only in order to watch
22   hours of educational videos to learn a new
23   language?
24   OBJ         A. BRANE: Object to form.
25             THE DEPONENT: I think it's not

Page 720

1    that simple, Rachel. I think people have
2    sometimes good intentions, so they are drawn to
3    this. If there are -- half their viewing or a
4    minority of their viewing, I would say, is
5    educational, learning a new language, they'll be
6    fed some of those streams from the recommended
7    algorithm. But if two-thirds or three-quarters is
8    watching, I don't know, whatever they're
9    interested in, anime or, I don't know, martial
10   arts or whatever they're interested in, they're
11   going to be fed those. And kids being kids with
12   poor cognitive control, they're going to go for
13   the entertaining videos more.
14             BY R. RAPHAEL:
15             Q. I'm going to move to
16   strike as non-responsive. I asked you if a child
17   only used YouTube in order to watch videos to
18   learn a new language, whether it's your opinion
19   that YouTube in that case would cause that child
20   mental health harm?
21   OBJ         A. BRANE: Object to form.
22             BY R. RAPHAEL:
23             Q. Is that your opinion?
24   OBJ         A. BRANE: Incomplete
25   hypothetical.

Page 721

1              THE DEPONENT: It's -- yeah, I
2    was just about to say, that is so hypothetical, I
3    have no opinion on that. It's too hypothetical.
4    I don't think anybody uses these apps, A, as
5    intended. They don't spend the time amount --
6    they spend way more time than they intended and
7    it's because of the features and auto-scroll and
8    algorithms that, you know, I've talked about. So
9    again, the intention could be good. Once you're
10   on the app, you get sucked into that vortex. So I
11   don't believe these cases are very real world.
12             BY R. RAPHAEL:
13             Q. Again, I'm going to move
14   to strike as non-responsive.
15             And I think I'm going to go
16   off the record.
17             THE VIDEOGRAPHER: We are
18   going off the record. The time is 11:28 a.m.
19   --- Upon recessing at 11:28 a.m.
20   --- Upon resuming at 11:36 a.m.
21             THE VIDEOGRAPHER: We are
22   going back on the record. It's 11:36 a.m.
23             BY A. STANNER:
24             Q. Good morning,
25   Dr. Goldfield.

Page 722

1              A. Good morning.
2              Q. I'm sorry that I'm not
3    there in person because I love Ottawa. Hopefully
4    you can hear me okay. It's harder over Zoom. If
5    we have any issue, please let me know. Okay?
6              A. Sounds good.
7              Q. It is a little harder to
8    hear you, so if you could try to speak up, I would
9    be very grateful.
10             A. Okay.
11             Q. I -- last time you and I
12   spoke, we left off talking about the Nesi study
13   that you rely on for your opinions about suicide
14   and self-harm; is that right?
15             A. It's one of the studies.
16             Q. Right. It's one of the
17   studies that you rely on for the conclusions about
18   the effects of social media use on suicide, on
19   thoughts of suicide and self-injury; right?
20             A. It's one of the metas,
21   yeah.
22             Q. Okay. In your report,
23   which I know you have in front of you, on page 63
24   you say there is a clinical --
25             "-- a -- clinically

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                September 10, 2025

Page 723

1                   significant association
2                   between [social media
3                   use] and increased risk
4                   of suicide and
5                   self-harm."
6     Is that right?
7             A. BRANE:  Page 63.  What's
8     the paragraph, counsel?
9             A. STANNER:  139.
10            A. BRANE:  Okay.
11            THE DEPONENT:  So in the
12    "conclusions" section?
13            BY A. STANNER:
14            Q.  Yeah, it should be
15    paragraph 139 you write -- which you call
16    "Conclusions," right.  You said:
17                  "The evidence from recent
18                  meta-analyses powerfully
19                  underscores a strong and
20                  clinically significant
21                  association between
22                  [social media use] --
23                  particularly [problematic
24                  social media use] -- and
25                  increased risk of suicide

Page 724

1                   and self-harm."
2     Right?
3             A.  That is correct.
4             Q.  Okay.  In layman's terms
5     then, is it your opinion in this case that social
6     media use causes suicidal behaviors?
7             A.  Yes, that is my opinion.
8             Q.  Okay.  What -- and you
9     testified at length about the different features.
10    Is it your testimony that all of those features in
11    combination cause suicidal behaviors or can you be
12    more specific than that about particular features?
13            A.  I think in my report I
14    talk about multiple pathways of harm, how suicide
15    can happen.  So I mean the features prolong --
16    promote engagement and excessive use and
17    problematic use.  I think the table, table 5,
18    clearly shows stronger effects with problematic
19    social media use in suicide.  So that's showing
20    that, you know, compulsive, addictive use is more
21    harmful, and it could do so through multiple
22    pathways.  It could be through displacement of
23    health-promoting behaviors.  It could be through
24    sleep.  It could be through anxiety, it could be
25    through depression.  It could be through, you

Page 725

1     know, reduced cognitive control and increased
2     impulsivity that is related to suicide.  So there
3     are multitude of reasons how social media use and
4     problematic social media could use -- could
5     influence suicide, including harmful content which
6     is often generated by these algorithms as I've
7     stated previously and elsewhere in my report.
8             Q.  Okay.  So let me clarify
9     my question.  You just talked about content.  You
10    understand the distinction between content and the
11    features of the platforms; right?
12            A.  Yes.
13            Q.  All right.  So I take you
14    to be saying, you know, the content, the harmful
15    content can contribute to an increased risk of
16    suicide and self-harm on the one hand; right?
17            A.  I -- I -- you know, in
18    page 95, figure 3, I outline multiple pathways of
19    harm, and suicide is one of those harms.  So there
20    are multiple pathways that are content agnostic.
21    But you're asking me -- you were asking me how
22    social media can influence suicide.
23            Q.  So my -- I actually think
24    I was asking a different question.  My question
25    was about which features of social media and

Page 726

1     that's why I'm trying to get more specific.  So I
2     understand your testimony about the pathways.  I'm
3     trying to ask you specifically about content
4     versus features, okay?  Do you understand that?
5             A.  Yeah.
6             Q.  So I took you to be
7     saying in your last answer that one of the
8     pathways you've described, one thing that can lead
9     to an increased risk of suicide and self-harm is
10    content; right?
11            A.  I think there are
12    multiple pathways.  I think harmful content is --
13    there is evidence that I presented that it's, you
14    know, especially generated by the algorithms.  So
15    again, like I was talking with Rose, it's not so
16    easy to disentangle content from the features
17    because a lot of the features generate the
18    content.
19            Q.  Well, the features don't
20    generate the content; right?  They might generate
21    which content someone sees; right?
22    OBJ         A. BRANE:  Object to form.
23            THE DEPONENT:  Well, I mean, I
24    don't think the issue is how the content got
25    uploaded.  Yes, a user uploads content.  The

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 727

1    algorithms start feeding that person the same
2    content, which if you're looking at, I don't know,
3    creative problem solving, that's amazing.  If
4    you're looking at suicide or eating disorders, not
5    so amazing.  You can't disable the algorithm like
6    turning a notification off.
7              BY A. STANNER:
8         Q.  Right.  So -- and I
9    understood your testimony and I'm not trying to
10   recover ground.  I understood you to say today and
11   in your last deposition that the content and the
12   features are inextricable.
13        A.  Well, generally, yes, but
14   actually, there are some studies that really do
15   isolate the impact -- the harms of features.
16        Q.  Okay.  So that brings us
17   to where I want to start, the features.  My more
18   specific question is when you say, as an expert,
19   it's your opinion that social media use leads to
20   an increased risk of suicide and self-harm, are
21   you able to say what features -- what specific
22   features you believe cause an increase in -- an
23   increased risk of suicide and self-harm or is it
24   just a general combination of the features that
25   you've talked about?

Page 728

1         A.  I believe these features
2    work in tandem, they're synergistic.  The
3    notifications bring you into the app.  Once you're
4    into the app, you've got auto-scroll -- infinite
5    scroll and autoplay and all kinds of engagement,
6    so they work together.  I can't -- I can't rank
7    which features are causing more of the harm.  They
8    drive excessive engagement and problematic use,
9    which leads to harm.
10        Q.  Okay.  We -- do you have
11   in front of you Exhibit 38, the Nesi article?
12        A.  I do.
13        Q.  Okay.  So I want to talk
14   about that.  Can you look with me at page 2 of the
15   article, there is a sentence that starts:
16             "Social media can be
17             broadly defined --"
18   Take a look.  Let me know when you're there.
19        A.  Yeah, I'm here.
20        Q.  There on page 2 it says:
21             "Social media can be
22             broadly defined as any
23             digital tool that allows
24             for social interaction.
25             This includes social

Page 729

1             networking sites or
2             applications ("apps";
3             e.g., Snapchat, Facebook,
4             Instagram, Twitter), text
5             messaging and messaging
6             apps (e.g., WhatsApp),
7             online forums and
8             communities (e.g.,
9             Reddit, forums
10            specifically devoted to
11            suicide-related topics),
12            and video sharing sites
13            (e.g., YouTube, TikTok)."
14   Do you see that?
15        A.  Yes.
16        Q.  And you remember being
17   asked some questions about Reddit and WhatsApp
18   during your previous deposition?
19        A.  Yes.
20        Q.  And your testimony was
21   that those platforms -- Reddit specifically is
22   strictly a communication platform and not what you
23   would consider social media; right?
24   OBJ          A. BRANE:  Object to form.
25             THE DEPONENT:  You know, I

Page 730

1    haven't done an in-depth analysis on Reddit or,
2    you know, WhatsApp.  And, you know, at first
3    glance, it appears to not have some of these, you
4    know, harmful features that Defendants' platforms
5    have.  But, you know, I was not tasked to examine
6    those, so I really don't have a strong opinion on
7    those right now.
8              BY A. STANNER:
9         Q.  Okay.  Well -- and I
10   guess I want to understand though that -- well,
11   let me stipulate it that you were not asked to
12   look at Reddit specifically.  I understood your
13   testimony in the earlier deposition to be that you
14   don't consider that to be social media in the way
15   the Defendants' platforms are.  Is that right?
16   OBJ          A. BRANE:  Object to form.
17             THE DEPONENT:  I think Reddit
18   is often not included in the literature as social
19   media.  But again, I -- they're not involved in
20   this case and so I haven't done an in-depth
21   analysis on Reddit.
22             BY A. STANNER:
23        Q.  All right.  And looking
24   at what we've just looked at from Nesi, is it --
25   well, let's look at page 8 where he says it more

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 731

1  precisely.  On page 8 you see the paragraph that
2  starts:  "Note that social media"?  Do you see
3  that?
4              A.  Yeah.
5         Q.  Nesi writes:
6              "Note that social media
7              was broadly defined to
8              include digital tools
9              designed for social
10             interactions, including
11             social networking
12             sites/apps (e.g.,
13             Snapchat, Facebook,
14             Instagram), text
15             messaging and messaging
16             apps (e.g., WhatsApp),
17             online forums and
18             communities (e.g. Reddit,
19             forum specifically
20             devoted to suicide), and
21             video sharing sites
22             (e.g., YouTube)."
23  Do you see that?
24             A.  I do.
25        Q.  All right.  So for

Page 732

1  purposes of Nesi's study, Nesi included not only
2  Reddit but also forums specifically devoted to
3  suicide; right?
4              A.  Well, I mean, I think
5  there could be forums devoted to suicide on all
6  the platforms.
7              Q.  Well, but isn't Nesi
8  talking about something separate from the
9  Defendants' platforms, that is, you can see that
10 they are listed separately; right?
11             A.  Yeah, but they're just
12 examples.
13             Q.  Right.  And my question
14 is, based on this, Nesi, which you rely on, it
15 seems Nesi was considering platforms separate from
16 the Defendants' platforms; right?
17             A.  I'd have to look at the
18 analysis to see if they included that or they
19 present the findings by platform.  I haven't read
20 this paper in a while.
21             Q.  Okay.  Did you look at
22 the underlying -- I mean, Nesi is a meta-analysis;
23 right?
24             A.  Yes.
25             Q.  Did you look at the

Page 733

1  underlying studies that were included in that
2  meta-analysis?
3              A.  Not all of them.  There
4  were, I don't know, quite a few.
5              Q.  Okay.  So -- and then I
6  think to answer this question you probably
7  wouldn't -- it wouldn't be enough to look at Nesi,
8  you would have to look at the underlying studies
9  to see if they consider Reddit or specific suicide
10 forums; right?
11             A.  I think it would be
12 helpful.
13             Q.  Okay.  Obviously forums
14 devoted specifically to suicide might be a
15 different sample set than what you would see on
16 YouTube or Snapchat or Instagram; right?
17 OBJ          A.  BRANE:  Object to form.
18             THE DEPONENT:  Like I said, I
19 think you could have those forums and discussions
20 on all the platforms.  So I think she just meant
21 that just separating sort of classic paradigmatic
22 social media from, you know, more text-based
23 messaging apps.
24             BY A. STANNER:
25        Q.  Okay.  But in either --

Page 734

1  if that is -- whether that's what she meant or
2  not, it's clear that her meta-analysis included
3  types of platforms different from the ones you've
4  considered as part of your work as an expert in
5  the case; right?
6              A.  It appears that way.
7              Q.  Including fora
8  specifically devoted to suicide?
9              A.  I -- yeah.  I have a hard
10 time believing that, you know -- text messaging
11 has been around forever and most of the literature
12 shows that that's not, you know, where the harm
13 lay -- lies.
14             Q.  Okay.  But -- I guess
15 maybe I'll ask it more precisely.  When Nesi
16 writes that one fora they considered was forums
17 specifically devoted to suicide, you don't know
18 what that's referring to?
19             A.  It could be on all the
20 platforms.
21             Q.  Right.  It could be or it
22 could be some specific forum dedicated to suicide,
23 you don't know?
24             A.  Right.
25             Q.  Okay.  On page 7 there is

Arbitration Place

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                                    September 10, 2025

Page 735

1    a section titled "Search Strategy and eligibility
2    criteria."  Let me know when you're there.
3              A.  Okay.
4              Q.  There Nesi lays out the
5    search criteria used for the study; right?
6              A.  Um-hum, yes.
7              Q.  You have to say yes or no
8    for --
9              A.  Yes.
10             Q.  And you can see that some
11   of the terms -- I'm just going to try and show you
12   specifically a few.  In the middle of this
13   paragraph you see in all caps "AND"?
14             A.  Yes.
15             Q.  And then there you see:
16   "'Online forum' or twitch --"
17   You see that?
18             A.  Um-hum, yes.
19             Q.  Okay.  Twitch is -- you
20   know what Twitch is; right?
21             A.  Yeah.
22             Q.  Twitch is a video game
23   platform?
24             A.  Yes.
25             Q.  Then there is -- a couple

Page 736

1    of lines down you see there is an inclusion of
2    Tumblr or Reddit?
3              A.  Yes.
4              Q.  And Tumblr you know was a
5    blog; right?
6              A.  Yes.
7              Q.  Then below that, there
8    is -- it says "wechat or QQ or QZone."  Do you see
9    that?
10             A.  Yes.
11             Q.  Do you know what those
12   are?
13             A.  I've heard of WeChat.  I
14   don't know what QQ and Qzone are.
15             Q.  Okay.  But -- and these
16   search -- this is one way for us to know what was
17   it that Nesi et al. were looking at when they were
18   trying to identify different social media
19   platforms, this is -- these are all things they
20   were looking for?
21   OBJ          A.  BRANE:  Object to form.
22             THE DEPONENT:  I can't speak to
23   their motivation, what they were looking for.  It
24   appears they're having -- taking a very broad
25   definition of social media, a broad view of it.

Page 737

1              BY A. STANNER:
2              Q.  And right in the line we
3    looked at earlier, they say "social media was
4    broadly defined"; right?
5              A.  Right.
6              Q.  I'm asking a more
7    methodological question that hopefully you can
8    help me with.  When they say "Search Strategy and
9    eligibility criteria" and we look at these search
10   strings, that means part of what they were doing
11   was surveying these different platforms that are
12   listed here; right?
13             A.  Yeah.  They were
14   searching to see if there are any studies relating
15   to the topic on these platforms, yes.
16             Q.  Okay.  And you don't know
17   sitting here which platforms ultimately were
18   included or excluded?
19             A.  They don't report that, I
20   don't believe.
21             Q.  Okay.  In other words, if
22   I said, well, of the studies that made their way
23   into the meta-analysis, which ones specifically
24   address Instagram versus Tumblr versus Reddit, we
25   wouldn't know that answer?

Page 738

1              A.  I -- sometimes they
2    report that data in supplementary files that are
3    only available online.  So they might have a table
4    on that, on the inclusion of studies and what
5    proportion are from different platforms.
6              Q.  But as part of forming
7    your opinion in the case, you didn't go figure out
8    which studies related specifically to Instagram or
9    the platforms in this case versus the other
10   platforms that Nesi looked for?
11             A.  My opinion was based on
12   the totality of evidence.  This study is one of 44
13   meta-analyses I reviewed and a whole bunch of
14   high-quality single studies, so that's what I
15   relied on.
16             Q.  I understand.  I think my
17   question is much more specific than that.  I'll
18   ask it again.  As part of forming your opinion in
19   the case, you didn't figure out which studies from
20   among Nesi's different studies, you didn't go to
21   look to see which ones include the Defendants in
22   this case versus other platforms?
23             A.  I didn't look at every --
24   there are 44 meta-analyses, probably including
25   several million kids in hundreds of studies, so I

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 739

1    did not review every underlying study.  I was
2    looking at this more globally, and the pattern of
3    findings seemed to be pretty consistent in my
4    report.
5              Q.  Okay.  But Nesi et al.,
6    this meta-analysis, ultimately looks at something
7    like 60 different individual studies; right?
8              A.  Yes -- ah, no.  The
9    number of studies in the table show single digits,
10   so I don't know what eventually -- what they made
11   their -- I don't know what the final number was
12   and the inclusion of studies.
13             Q.  Okay.  And so the record
14   is clear, when you say "the table," you mean your
15   table 5?
16             A.  Yeah.
17             Q.  And in your table 5, you
18   break down the studies into smaller buckets;
19   right?
20             A.  Yes.
21             Q.  And some of those are
22   single digits; that is, for one of these
23   conclusions, there might be two studies, for
24   another there might be seven studies?
25             A.  Yes.  Yeah, depending on

Page 740

1    the outcomes, yes.
2              Q.  And my question is, let's
3    say for the one that's got seven studies, you do
4    not know if those seven studies looked at these
5    Defendants' platforms or something like Tumblr or
6    all of them at the same time?
7              A.  No, I would have to go to
8    those specific studies to see.
9              Q.  Right.  And just -- just
10   focusing on Nesi, you didn't -- as part of your
11   work in this case, you didn't do that, you didn't
12   go to the individual studies and say, does this
13   look at Snapchat or Instagram or does it look
14   instead at Twitch; right?
15             A.  In some cases, I did.  In
16   some cases, I didn't.  I was just looking at what
17   is the overall pooled or average effect of social
18   media on -- on -- in this case we're talking about
19   suicide.
20             Q.  Okay.  When you say in
21   some cases you did and some cases you didn't, are
22   you referring to the studies in Nesi --
23             A.  No.
24             Q.  -- or just generally --
25             A.  Generally, yes.  Just

Page 741

1    generally.
2              Q.  And if I said -- if I
3    asked you to tell me any individual study from
4    within the Nesi meta-analysis that you looked at,
5    could you tell me one?
6              A.  Not offhand.  It might be
7    in my report.  It's probably in my report, though.
8              Q.  Well, part of the reason
9    I'm asking you this, I don't mean this to be a
10   trick question, we looked for the underlying
11   studies in your materials considered and we did
12   not see them there.  So I was wondering if you
13   looked at them as part of your work in this case.
14             A.  I'm just looking to
15   see -- because sometimes in my summary of the
16   findings I talk about the individual studies, in
17   which case I would have to look at.  I mention the
18   Xiao one which is supportive and provides a
19   longitudinal effect of what Nesi found.  It
20   appears I don't reference any which is probably
21   why they are not in the materials considered list.
22             Q.  Okay.  If you had
23   specifically considered them, they were the basis
24   of your opinion, they would be identified in that
25   materials considered list; right?

Page 742

1              A.  Yes.
2              Q.  All right.  Staying in
3    Nesi for a bit, page 3, if you can look at page 3
4    with me, this is I think exactly where we left off
5    last time, that Nesi does call out certain
6    benefits of social media use for people struggling
7    with suicidal thoughts and behaviors; right?
8              A.  Is that the first
9    paragraph -- like the second paragraph from the
10   top?
11             Q.  That's right.  The
12   paragraph that starts "importantly."  Do you see
13   that?
14             A.  Yeah.
15             Q.  Okay.  So we'll look at
16   it, but do you remember -- let me just orient us.
17   Do you remember that I was asking you towards the
18   end of your deposition about this -- Nesi's
19   statement that --
20             A.  Well, they first document
21   --
22             A. BRANE:  Hold on.
23             THE DEPONENT:  -- all the
24   potential harms of social media in relation to
25   suicidal intentions and thoughts and behaviors.

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

---

Page 743

1          BY A. STANNER:
2          Q.  Okay.  So we'll go
3     through them.  But do you disagree with me that
4     they call out specific benefits?
5          A.  No, they -- they -- they
6     provide some references for some social support in
7     an online -- online and offline friendships.
8          Q.  Okay.  So to -- let's go
9     through it.  It starts by saying:
10              "-- social media use is
11              complex, and there are a
12              number of potential
13              components of social
14              media use that may
15              influence SITBs."
16    You agree with that, right, this is a complex
17    issue?
18          A.  Yes.
19          Q.  In other words, it's
20    not -- you wouldn't -- you couldn't say, well,
21    social media use is -- it's just bad for SITB
22    specifically.  It's more complex than that.
23    OBJ        A. BRANE:  Object to form.
24              THE DEPONENT:  Yeah, I mean,
25    social -- it is.  Suicide is complicated and

---

Page 744

1     social media is complex.  The whole area is
2     complicated.
3              BY A. STANNER:
4          Q.  So then she goes on to
5     write:
6              "Studies suggest that
7              risk for negative mental
8              health outcomes may be
9              heightened as the result
10             of negative social media
11             behaviors, such as
12             viewing SITB-related
13             content, engaging in
14             social comparison, and
15             excessive use, as well as
16             negative social media
17             experiences, such as
18             cyberbullying or social
19             exclusion --"
20    Do you see that?
21         A.  I do.
22         Q.  Okay.  And those are the
23    negative effects you were talking about earlier;
24    right?
25         A.  Yes.

---

Page 745

1          Q.  Then she goes on to say:
2              "Notwithstanding these
3              possible negative effects
4              of social media use,
5              there are also several
6              potential benefits of
7              use.  For example, social
8              media is a tool through
9              which individuals can
10             invite immediate social
11             support from online and
12             offline friends -- which
13             plays a protective role
14             for SITBs --"
15    Do you agree with that?
16         A.  I -- I read this and I
17    see she's making -- I haven't seen these
18    references, but again, any decision -- do I agree
19    with it?  No, I don't agree with it because --
20    sure, in certain circumscribed situations, can it
21    be helpful -- do single studies show that?  Maybe,
22    but the meta-analyses certainly show the harms
23    outweigh any potential benefits.
24         Q.  Well -- so I want to make
25    sure I understand this.  Nesi -- if you look at

---

Page 746

1     your table 5, you see that Nesi is very much -- is
2     your leading source for your opinions as it
3     relates to social media and SITB; right?
4          A.  Well, yeah, I would say
5     that the Xiao study is really, really important as
6     well just because it's so methodologically
7     rigorous and it's longitudinal.  But yeah, I --
8     yeah, Nesi is -- you know, there's not a lot of
9     metas in this table, right, so Nesi is certainly a
10    consideration.
11         Q.  Well, the table, I see
12    Chen which you call out for two studies and Huang
13    which you call out for PSMU and suicidal
14    ideation --
15         A.  Um-hum.
16         Q.  -- right?  Is that a yes?
17         A.  Yes, sorry, yes.
18         Q.  Then you said Xiao which
19    does not appear in this table; right?
20         A.  Correct.
21         Q.  But every other data
22    point in this table comes from Nesi, one, two,
23    three, four, five, six, seven, eight, nine, 10,
24    11, 12?
25         A.  Yes.

---

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 747

1        Q.  Twelve data points in
2  this table all taken from Nesi; right?
3        A.  Yes.
4        Q.  So you've relied in large
5  part on Nesi specifically for your opinions and
6  conclusions about the effects of social media on
7  suicide and self-injury?
8  OBJ        A. BRANE:  Object to form.
9        THE DEPONENT:  Well, I also
10  review literature in my report about how different
11  pathways -- how social media can contribute to
12  suicide through different pathways.  But I do
13  summarize the results on Nesi.  I take that into
14  consideration, for sure.
15        BY A. STANNER:
16        Q.  You relied in large part
17  on Nesi specifically for your opinions and
18  conclusions about the effects of social media on
19  suicide, true or false?
20  OBJ        A. BRANE:  Object to form,
21  asked and answered.
22        THE DEPONENT:  You're asking me
23  to essentially rank which studies I weighed the
24  most.  So I looked at this pretty thoroughly and
25  suicide is one outcome of about 15 that I

Page 748

1  examined.  And --
2        BY A. STANNER:
3        Q.  Right --
4        A. BRANE:  Hold on.  You can
5  finish your answer, unless you were done.
6        THE DEPONENT:  So part of my
7  thinking, you know, with Nesi is -- sure, I
8  interpret Nesi and there are a lot of data points,
9  as you said.  But it hangs together pretty
10  consistently with the anxiety and the depression
11  literature and the problematic, you know,
12  literature and all the mechanistic and the
13  neuroscience literature.  So when I look at the
14  totality of evidence, it supports -- it influences
15  my interpretation.  So you're asking me to rank
16  where Nesi falls in all of this and, again, that's
17  artificial.
18        BY A. STANNER:
19        Q.  I don't think I'm asking
20  for a ranking.  I'm just asking, you relied
21  largely on Nesi; right?  I'm not saying to the
22  exclusion of anything else.  I'm saying when you
23  reached your conclusions about suicide, you relied
24  largely on Nesi?
25  OBJ        A. BRANE:  Object to form,

Page 749

1  asked and answered.
2        THE DEPONENT:  I looked at all
3  the literature.  I mean, Nesi just happens to
4  contribute a lot of the data points.  But, you
5  know, Chen has fewer studies, but they're
6  longitudinal, and the Xiao study is longitudinal.
7  So again, I don't know how much I -- it's a meta,
8  it's a -- contributes a lot of data points, but I
9  can't assign a weighting of how much it influenced
10  my decision or opinion.
11        BY A. STANNER:
12        Q.  Okay.  And I'll use your
13  language.  When using -- when reaching your
14  conclusions about the relationship between social
15  media use and SITB, the Nesi study contributed a
16  lot of data points to your conclusion?
17        A.  Yes.
18        Q.  Okay.  And -- but when we
19  look at Nesi and she writes that:
20             "Notwithstanding these
21             possible negative effects
22             of social media use,
23             there are also several
24             potential benefits of the
25             use."

Page 750

1  There you disagree with Nesi?
2        A.  First of all, that's in
3  the introduction, not in the -- right?  So she's
4  just setting the stage about why there could be
5  potential benefits or why there may not be a
6  relationship between social media use.  I
7  certainly don't think she emphasizes any benefits
8  in the discussion given the results.
9        Q.  Are you disagreeing with
10  Nesi when she writes that there are several
11  potential benefits of use?
12        A.  There are studies that
13  show people can get a feeling of support and that
14  they don't feel alone in their, you know, deepest,
15  darkest moments of despair and when their mind
16  goes to extreme matters like suicide.  But there
17  is also literature to show that that -- for a lot
18  of people, that that togetherness and that sharing
19  of those suicidal thoughts without any context of
20  -- or messaging of hope and inspiration can
21  actually be counterproductive and can increase
22  SITBs.  So I don't think it's that simple.
23        Q.  Okay.  You disagree with
24  her framing of it here in the introduction to her
25  own article?

Arbitration Place

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                                    September 10, 2025

Page 751

1          A.  I think when you weigh
2  the benefit -- when you weigh the benefits and the
3  potential harms, I think there is a lot more
4  research to show social media is more harmful for
5  SITBs than beneficial.
6          Q.  So she goes on to
7  identify and call out specific benefits.  She
8  says:
9              "The function of social
10             media to strengthen
11             existing relationships
12             and connect individuals
13             to new social networks
14             may be particularly
15             relevant for individuals
16             in marginalized groups
17             --"
18  Do you agree or disagree with that or have no
19  opinion?
20         A.  I mean, I -- in theory --
21  but again, social -- social media doesn't occur in
22  a vacuum.  People go on with an intent, maybe in
23  this case to get support.  And that's a lovely
24  intent.  They're feeling horrible, they reach out.
25  What if they don't get the support they're looking

Page 752

1  for?  There's research to show that it's harmful.
2  Now nobody cares, right?  So it's complicated.
3  But any decision about social media or any other
4  environmental exposure, you know, the benefits
5  have to be weighed against the risks.  And I think
6  I've shown through 44 meta-analyses that the risks
7  and the potential harms clearly outweigh the
8  benefits.
9          Q.  Okay.  Your example --
10  you just gave an example if someone goes online
11  seeking help, that is a lovely thing, but if they
12  don't find it, then it could be harmful.  That's
13  what you said.
14         A.  Or they find it, but
15  it -- there is no -- there is no message of -- I
16  also cite a systematic review in the mechanisms
17  page of my -- section of my report that show the
18  type of support really matters.  So if the support
19  is around hope or coping strategies to help you
20  get through really tough moments, that's helpful.
21  If it's just reinforcing hopelessness, then
22  hopelessness -- then, no, actually makes -- it
23  makes SITB worse.
24         Q.  Okay.  And that would be
25  true -- that would be true even offline, right?

Page 753

1  If someone reaches out to their family members
2  seeking support and their family members reject
3  them, that's going to be harmful notwithstanding
4  the good intent.  If their family members embrace
5  them, it can be really helpful; right?
6  OBJ          A. BRANE:  Object to form.
7          THE DEPONENT:  Well, in theory
8  perhaps, but I think it's tougher to meet
9  someone's emotional needs in those precarious,
10  very vulnerable situations digitally than it is in
11  person because you just don't have the same
12  cues -- the emotional cues, the facial expression.
13  You know, a lot of warmth can be communicated
14  through someone's voice and tone.  That is a big
15  aspect of communication.  I think digital
16  communication is devoid of that.
17          BY A. STANNER:
18         Q.  Okay.  But if -- let's
19  say someone might also have a much harder time
20  reaching out to their parents, feeling that way,
21  and maybe they would be better off reaching out to
22  someone who is not a family member; right?
23         A.  Maybe.  Maybe.
24         Q.  When we say it's
25  complex -- you said a couple of times it's

Page 754

1  complex, that's because this is -- these are some
2  of the many things that can affect whether someone
3  has a positive or a negative experience as it
4  relates to suicidal thoughts.
5  OBJ          A. BRANE:  Object to form.
6          THE DEPONENT:  It's -- I think
7  there is -- I'm not downplaying the complexity.
8  There is definitely complexity.  What this -- what
9  these studies all show is greater time spent on
10  social media is associated with up to three and
11  four times the risk of suicide.  I think, Andrew,
12  you're losing sight of that.
13          BY A. STANNER:
14         Q.  All right.  I thought you
15  were done.  I'm not trying to cut you off.  Your
16  testimony just now is the studies show that
17  greater time spent is associated with up to three
18  and four times the risk of suicide; right?
19         A.  Yes.
20         Q.  Turn with me to the
21  conclusions on page 19.
22         A.  Of Nesi?
23         Q.  Yes.
24         A.  Okay.
25         Q.  Are you there?

Page 755

1        A.  Yeah.
2        Q.  Okay.  Under
3   "Conclusions" there is a sentence -- the
4   second-to-the-last sentence starts "notably."
5                "Notably, no evidence
6                emerged for associations
7                between frequency of
8                social media use and
9                SITBs."
10  Do you see that?
11       A.  Yeah, I see that.
12       Q.  Do you disagree that
13  Nesi's conclusion is that there is no evidence for
14  associations between frequency of social media use
15  and SITB?
16       A.  In -- well, apparently --
17  I don't know, I would have to look at the
18  individual studies and see how she synthesized
19  that -- those findings.
20       Q.  All right.  And you've
21  already told us you didn't look at the individual
22  studies; right?
23       A.  I did not, but part of
24  the reason why I disagree with it is because the
25  other studies do show a relationship.

Page 756

1        Q.  Okay.  And you told us
2   earlier --
3        A.  There are newer
4   meta-analyses, so that means they're including
5   different literature -- like, newer and different
6   literature than she reviewed and more current
7   literature.
8        Q.  Okay.  So your testimony
9   is that the newer, more recent meta-analyses are
10  better and more reliable than the Nesi study that
11  you rely on?
12  OBJ        A. BRANE:  Object to form.
13             THE DEPONENT:  I'm saying
14  they're not consistent with what Nesi found.
15  They're --
16  BY A. STANNER:
17       Q.  Okay.
18       A.  They're supporting what
19  all the other findings found, and greater time
20  spent is associated with greater risk of harm.
21  And the Xiao study, which is the best of all of
22  them, found the same thing.
23       Q.  You told us earlier when
24  we were talking about the introduction and you
25  suggested that the language in the introduction

Page 757

1   isn't as important as the language in the rest of
2   the article; right?
3        A.  I said she was setting
4   the stage, yes.
5        Q.  Okay.  Well, the
6   conclusion is pretty important; right?
7        A.  The conclusion's
8   important.
9        Q.  And her conclusion is
10  there is no evidence for associations between
11  frequency of social media use and SITBs.
12  OBJ        A. BRANE:  Object to form.
13             THE DEPONENT:  Ah, she
14  didn't -- she just looked at frequency.  She
15  didn't look at duration.  So those are different
16  measures, Andrew.  Duration has a more robust
17  relationship with psychological harm than
18  frequency.  Frequency is checking, how often do
19  you check your -- or go on social media?  You
20  could check it three times but stay on for two
21  hours each.  So they're very different.  They're
22  related, but they're different.
23             BY A. STANNER:
24       Q.  All right.  So help me
25  understand.  Do you agree or disagree then when

Page 758

1   she writes:
2                "-- no evidence emerged
3                for associations between
4                frequency of social media
5                use and SITBs."
6   Do you agree or disagree with that?
7        A.  In her studies -- first
8   of all, take a look at the number of studies
9   included, two -- three.  And for problematic
10  social media use and suicidal ideation, almost
11  three times the risk.  Right?
12       Q.  Okay.  So that sounds to
13  me like an answer to the next question,
14  Dr. Goldfield.  You can tell me why you agree or
15  disagree.
16       A.  Okay.
17       Q.  But, you know, my
18  question was do you agree or disagree with that?
19       A.  Yeah, I mean, I agree.
20  They weren't -- well, one of the odds ratios is
21  double the risk, but it wasn't quite significant.
22       Q.  Okay.
23       A.  Probably because a large
24  error, probably because it was only a couple of
25  studies.

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 759

1          Q.   Okay.  And the "only a
2   couple of studies" point is another one -- if
3   there's only two studies, then it would not be --
4   in your view, it would not be as valid of a
5   conclusion because it's only based on two studies
6   as opposed to 40, 50, 60; right?
7          A.   I think obviously the
8   greater the number of studies, you know, probably
9   the more robust findings.  But I think fewer
10  studies that are well controlled longitudinally,
11  like the Chen ones are longitudinal, I would put
12  more weight in that because it certainly
13  establishes a direction.  I would put more weight
14  on the Xiao study again because it establishes
15  temporality.  So, yes, number of studies is part
16  of the equation when I'm weighing this, but the
17  quality of studies is equally important and the
18  design of the studies.
19         Q.   Earlier you told me you
20  didn't want to rank the studies.  So when you say
21  now you put more weight on Xiao or more weight on
22  Chen, are you ranking them as compared to Nesi
23  because -- or are you just saying that the better
24  the study, the more credit it should get?
25         A.   Yeah, I think in general

Page 760

1   I think all scientists put more weight on
2   higher-quality studies, but it's one metric in
3   looking at the totality of evidence.
4          Q.   Right.  And I'm asking,
5   are you ranking them just on the -- of these
6   studies you rely on or your conclusions about
7   suicide, are you testifying now that now you would
8   rank Nesi lower than these others?
9          A.   Well, it's kind of
10  comparing apples and oranges, because Nesi is the
11  only one that really focuses on content.  The
12  other ones focus more on time spent.  So they're
13  kind of -- they're looking at different things.
14  So that's why you can't rank them.  They're
15  looking at different things.
16         Q.   Okay.  So --
17         A.   One's focused on --
18  sorry.
19         Q.   Sorry, that's Zoom.  I
20  promise I'm not trying to cut you off.  I thought
21  you were done.
22              Okay.  Well, we've looked at
23  the conclusions and you -- I guess I just want to
24  make sure that we understand before we find
25  ourselves together at trial.  You don't disagree

Page 761

1   with Nesi's conclusions; right?
2   OBJ          A. BRANE:  Object to form.
3              THE DEPONENT:  Her conclusions
4   are specific to frequency, not duration.  So I do
5   not -- based on the few studies she included, no,
6   I don't disagree with that.  But keep in mind,
7   there are newer studies that show the opposite
8   with time spent, that it increases risk of
9   suicide.  So I have to take that into
10  consideration too.
11             BY A. STANNER:
12         Q.   And when -- you've told
13  us about Xiao.  Is that -- when you say "newer
14  studies," is that one you're referring to?
15         A.   Yeah, and the other newer
16  meta-analyses that came out after hers.
17         Q.   Is one of those Burnell?
18         A.   I don't believe Burnell
19  looked at suicide.  I could be wrong.  Burnell's
20  an experiment -- a meta on experiments.
21         Q.   Let's look then --
22  let's -- we're going to talk about Burnell next,
23  but let's look at page 16 of Nesi where she talks
24  about frequency of social media use.  Okay?
25         A.   Although Burnell might

Page 762

1   have multiple publications.  I think she publishes
2   a lot in social media.  So we could be talking
3   about a different study.  16, okay, frequency.
4          Q.   There is a sentence at
5   the second half of that first paragraph where it
6   says "furthermore."
7          A.   Um-hum, yes.
8          Q.   Yeah:
9              "Furthermore, it should
10             be noted that these
11             studies examined a range
12             of frequency measures,
13             including continuous
14             measures of average hours
15             spent per day -- and
16             categorical measures with
17             different 'cut-points,'
18             including 2 hours of
19             social media use per
20             day -- and 30 minutes of
21             'online chatting' per
22             day --"
23  Do you see that?
24         A.   I do.
25         Q.   Okay.  So when she was

Page 763

1  talking about frequency, it does include time
2  spent.
3              A.  Yeah, but she doesn't
4  separate it.
5              Q.  I'm not sure I know what
6  you mean by that.  What do you mean?  What should
7  she have done in your view?
8              A.  She said "including," so
9  she probably has both frequency and duration
10 summed into one independent variable.
11             Q.  Okay.  So -- and I
12 understood your testimony earlier to be that
13 essentially you think duration is more important
14 than how -- than frequency as such; is that right?
15             A.  Well, it's just more
16 widely used in the literature, so, you know,
17 there's just more data.  So it seems like it's
18 more reliable, but it's just more widely used.
19             Q.  Okay.  So you don't have
20 an opinion about whether it's better or worse to
21 talk to -- to speak in terms of frequency versus
22 duration?
23             A.  Well, I think duration is
24 more, you know, widely studied.  And I would tend
25 to think -- I would tend to think duration would

Page 764

1  probably have a stronger relationship with mental
2  health than frequency.
3              Q.  Okay.  So when -- and in
4  any case what we know is Nesi considered both
5  frequency and duration.
6              A.  Well, she considered
7  both, but she lumped them together.
8              Q.  Okay.  And reached the
9  conclusion, lumping them together, that no
10 evidence emerged for association between frequency
11 and social media use -- frequency of social media
12 use and SITBs; right?
13             A.  Well, it appears of the
14 61 studies, it appears she cited three that looked
15 at duration, unless these are just examples, but I
16 don't know why she would cite three and not the
17 other ones that looked at duration.  That doesn't
18 make a lot of sense to me.
19             Q.  Okay.
20             A.  So in other words, the
21 measure is more frequency than duration.  It
22 appears if she's looking at 61 studies and only
23 three of them were duration, then 58 of them would
24 be frequency, no?
25             Q.  I don't know, doctor.

Page 765

1  You're the one who cited the report, so you tell
2  me.  But you -- I take it this is not something
3  you looked at all in forming your opinions and
4  reviewing and analyzing the Nesi article; right?
5  OBJ         A. BRANE:  Object to form.
6              THE DEPONENT:  In my report, it
7  clearly says "frequency," and that's what she
8  refers to.  In the literature, there is a duration
9  between frequency and time spent.  I'm telling you
10 that I believe, based on what she's written here,
11 that the table is accurate, that the metric more
12 accurately reflects frequency than time spent,
13 than duration.
14             BY A. STANNER:
15             Q.  Okay.  But earlier your
16 testimony was that she wasn't looking at duration
17 at all --
18             A.  Yes.
19             Q.  -- and that obviously --
20             A.  Yeah, I was mistaken,
21 sorry.
22             Q.  Okay.  So let's talk
23 about Burnell.  I think you can put Nesi down.
24             A.  I don't have Burnell in
25 front of me, do I?

Page 766

1              Q.  No, we can give it to
2  you, though.  Burnell we have as Meta 5 today.  I
3  apologize, I don't remember if it was an exhibit
4  or what the exhibit number was in July.
5              R. EHLER:  Exhibit 50.
6                  EXHIBIT NO. 50:  Article
7                  titled "The effects of
8                  social media restriction:
9                  Meta-analytic evidence
10                 from randomized
11                 controlled trials"
12                 authored by Burnell et
13                 al.
14             THE DEPONENT:  Thank you.
15             A. STANNER:  Thank you, Rose.
16             R. EHLER:  You're welcome.
17             A. STANNER:  So we've just
18 marked this as Exhibit 50 for identification.
19             Q.  Take a look, doctor.  But
20 can you just confirm that this is the Burnell
21 analysis?
22             A.  Yes.  Yes.
23             Q.  During your deposition in
24 July, you said Burnell is the best experimental
25 meta-analysis.  Do you remember saying that?

Page 767

1          A.  Yeah, I do.  There are
2     some issues with her meta, but better than the
3     other ones, yes.
4          Q.  In other words -- just so
5     that we're on the same page.  Today, in September,
6     it is still your testimony that the Burnell
7     meta-analysis in front of you is the best
8     experimental meta-analysis that there is.
9          A.  Yes, I agree.  Yes,
10    that's my testimony.
11         Q.  I want to look at some of
12    what Burnell says.  Under her section, should be
13    page 8, section 4.2.1.
14         A.  Okay.
15         Q.  Are you there?
16         A.  Yes.
17         Q.  This section is called
18    "Methodological advancements"; right?
19         A.  Yeah -- yes.
20         Q.  She says -- we'll look at
21    it together.  She says:
22              "Although positive
23              improvements in
24              subjective well-being
25              were observed,

Page 768

1              associations were small
2              and inconsistent across
3              individual outcomes.  We
4              implore caution before
5              interpreting our pooled
6              estimates as definitive
7              evidence that social
8              media use, broadly
9              defined, is harming
10             individuals."
11    Do you see that?
12         A.  I do.
13         Q.  Okay.  Is it -- am I
14    right then to say the conclusion of the best
15    experimental analysis is that associations were
16    small and inconsistent across individual outcomes
17    and you should take caution before interpreting
18    the results to say that social media use is
19    harmful?
20    OBJ         A. BRANE:  Object to form,
21    misstates the study and prior testimony.
22              THE DEPONENT:  No.  I
23    understand she's involved in the litigation here.
24    But no, I think she's selling her data short.  I
25    think her data pretty robustly shows that harm is

Page 769

1     reduced when social media is reduced.
2              BY A. STANNER:
3         Q.  Okay.  So you're -- you
4     disagree with Professor Burnell because you think
5     the data shows more than she says that it shows?
6         A.  You have to understand
7     the context of these comments.  So academia, we're
8     trained to be uber-cautious and to qualify
9     everything so that's the context in which she's
10    coming from.  The legal forum is different.  So we
11    have to make conclusions based on a reasonable
12    degree of scientific certainty.  So I outlined in
13    my report -- you know, she shows pretty consistent
14    harm reduction when social media is restricted or
15    reduced.  I outline those small effects that she's
16    qualifying as tentative or preliminary or to be
17    cautious when the primary limitation of these
18    studies of a floor effect -- these are primarily
19    healthy individuals.  When you start to examine
20    what the effect of social media reduction are in
21    those with actual symptoms -- higher symptoms and
22    there is no floor effect, right, so there is
23    actual room for improvement in symptom reduction,
24    I clearly outline from my studies, secondary
25    analysis, and the Hunt studies, that those effects

Page 770

1     become quite large and meaningful, that I don't
2     think anybody can debate.
3         Q.  Okay.  So your testimony
4     just now was in academia you're trained to be
5     uber-cautious and to qualify everything; right?
6         A.  Yeah.
7         Q.  You said a legal forum is
8     different?
9         A.  Yeah.
10        Q.  As offering opinions
11    here, you can be less cautious than in an academic
12    environment?
13    OBJ         A. BRANE:  Object to form.
14              THE DEPONENT:  No.  As a
15    scientist you have to speak, you know, based on
16    the data.  You have to make conclusions based on
17    data.  However, as I've written about in my
18    report, effect sizes can be interpreted different
19    ways by different scientists.  We all have
20    different ways of interpreting the exact same
21    data, so it's going to differ.  So I believe she's
22    selling her data short.  I think -- you know, I
23    think she reports certainly more benefits than
24    null findings, you know, on these psychological
25    outcomes and experiments are our highest quality

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 771

1  of evidence. But she wants to be really cautious,
2  put it out there, and, you know, more future -- or
3  future research and, you know, advancements, you
4  know, are needed to be more conclusive.
5  Personally, I think 30 experiments is -- that fits
6  with all the other designs, observational,
7  cross-sectional, neuroscience, it's all pointing
8  to the same signal of harm. It all fits together
9  nicely. I believe she's overly cautious here in
10  her conclusions.
11              BY A. STANNER:
12         Q.   And more specifically,
13  what you said is she's overly cautious because in
14  academia you are trained to be more cautious than
15  in a lawsuit.
16         A.   I think if you're going
17  to err, we're trained to err on the side of
18  caution.
19         Q.   Okay. But a legal forum
20  is different?
21  OBJ          A. BRANE: Object to form.
22              THE DEPONENT: Well, correct me
23  if I'm wrong, but I -- you know, I thought -- you
24  know, I'm new to this process, but I thought, you
25  know, in part, I make my opinions based on the

Page 772

1  science, which I believe I have. 44 meta-analyses
2  is -- and a lot of single high-quality studies is
3  quite a bit of science. And that's what's formed
4  the vast majority of my opinions, supplemented by
5  the internal research that corroborates the peer
6  review. But, you know, at the end of the day when
7  we're trying to attribute cause, I understand that
8  this forum is also about a reasonable degree of
9  scientific certainty. Right? And so that's not
10  applicable in academia. We're just kind of
11  trained to be cautious.
12              BY A. STANNER:
13         Q.   Okay. And that's all I'm
14  trying to get at. If you were -- you're offering
15  your opinions as an expert in this case to a
16  reasonable doubt of scientific certainty. That's
17  your testimony; right?
18         A.   In my opinions as stated
19  in the report, yes.
20         Q.   But if you were in --
21  acting in your capacity as an academic, putting
22  out a study or a meta-analysis, you would be more
23  cautious by training?
24  OBJ          A. BRANE: Object to form.
25              THE DEPONENT: You know,

Page 773

1  sometimes the final product is a little different
2  than how the authors write it. So I might use
3  causal links or causal associations, and an editor
4  of the journal may soften that, right, or may
5  require some of these limitations or caveats,
6  whatever, to get it published -- sometimes we
7  push back, but sometimes we say, you know what,
8  this is a really good journal, I could live with
9  that qualification or soften the causal conclusion
10  a bit.
11              BY A. STANNER:
12         Q.   And do you think that is
13  a good practice, that is, that a really good
14  journal tells, hey, don't jump to conclusions,
15  let's include some of these caveats?
16         A.   Again, we're all trained
17  from the same uber-conservative, cautious, you
18  know, paradigm. So do I think it's a good
19  practice? Well, it depends. I think by being
20  sometimes like -- let's just change the forum for
21  a second from social media and talk about cancer.
22  If people are too cautious when there is evidence
23  to support a new chemotherapy, that chemotherapy
24  will not be recommended and people will die. So
25  there is a harm for being too cautious. There is

Page 774

1  a harm for being not cautious enough and there is
2  a harm for being too cautious, so there is a
3  balancing act here.
4         Q.   Sure. But if you --
5  let's say you took your expert report in this case
6  and you submitted it to a journal, I understand
7  your testimony to be that an editor there might
8  well say, hey, Professor Goldfield, you need to
9  include several caveats?
10  OBJ          A. BRANE: Object to form,
11  calls for speculation, incomplete hypothetical.
12              THE DEPONENT: I've never seen
13  a study that has no limitations section. So even
14  if we tried to publish it without limitations,
15  most editors will say, look, there is no perfect
16  study. It is one study -- even a good meta, you
17  know, may not have captured all the experiments or
18  -- you know, who knows. Yes, academia is
19  uber-conservative and cautious.
20              BY A. STANNER:
21         Q.   But that hasn't been the
22  case in your work as an expert in this litigation?
23  OBJ          A. BRANE: Object to form.
24              THE DEPONENT: I don't think
25  I've been cavalier or -- you know, I believe there

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 775

1  is very solid evidence for all my opinions.  I
2  believe they're evidence based.
3              BY A. STANNER:
4         Q.  Did you include a
5  limitations section in your expert report the way
6  you would have in an academic article?
7  OBJ        A. BRANE:  Object to form.
8              THE DEPONENT:  It wasn't peer
9  reviewed.
10             BY A. STANNER:
11        Q.  So you didn't include it;
12  right?
13  OBJ        A. BRANE:  Object to form.
14             THE DEPONENT:  I did -- no, I
15  did a systematic review of meta-analyses of all
16  kinds of different designs.  Are there
17  limitations?  Did I look at every single possible
18  study on social media?  Most would be captured in
19  those metas, right?  I used pretty broad search
20  terms.  There were thousands of papers.  I think
21  relative -- I did look at some of the Defendants'
22  experts.  I think relative to their reports, it's
23  more comprehensive.  I can say that.
24             BY A. STANNER:
25        Q.  I think -- again, I think

Page 776

1  you might be answering the next question.  If you
2  had to write an academic article, you just told us
3  you would have to include a limitations section,
4  but as an expert in this case you didn't have to
5  do that; right?
6  OBJ        A. BRANE:  Object to form.
7              THE DEPONENT:  Right.
8              BY A. STANNER:
9         Q.  And I understand you have
10  your reasons for why you chose not to do that;
11  right?
12        A.  Right.
13        Q.  But if you were to take
14  the same expert report and submit it to a journal,
15  your testimony is they would of course force you
16  to include a limitations section acknowledging the
17  limitations of the research?
18  OBJ        A. BRANE:  Object to form,
19  asked and answered.
20             THE DEPONENT:  That's usually
21  the standard practice.
22             BY A. STANNER:
23        Q.  Okay.  Let's look more at
24  Burnell, page 9.  There is -- just the very top
25  left, Burnell says:

Page 777

1              "The focus on age is
2              perhaps especially
3              important.  Meta-analytic
4              evidence suggests limited
5              support for the
6              correlation between
7              social media use and
8              mental health varying by
9              age -- therefore, it is
10             plausible that our
11             findings may generalize
12             to adolescents."
13  Do you see that?
14        A.  Yes.
15        Q.  Then she goes on to say:
16             "However, without any
17             representation of
18             adolescents in the
19             current research, it is
20             difficult to conclude
21             that the observed effects
22             would generalize to this
23             population."
24  Do you see that?
25        A.  Yeah, I see that.

Page 778

1         Q.  So this is Burnell saying
2  that her meta-analysis actually didn't include any
3  studies of adolescents.
4         A.  Well, my review focused
5  on children and youth as defined by the CDC, and
6  that's 10 to 24 -- age 24 years.  So with that
7  broad definition, her meta would be considered,
8  which is why I included it, youth.  The brain is
9  still developing up until age 25 and I presume
10  that's why CDC calls it -- considers up to that
11  age youth, because you're still developing.
12        Q.  Okay.  I think I'm asking
13  an even more basic question than that.  Burnell --
14  do you read this to say that Burnell's
15  meta-analysis doesn't include any adolescents in
16  the underlying study?
17  OBJ        A. BRANE:  Object to form.
18             THE DEPONENT:  I think what --
19  no -- yes, I disagree.  I think what she means is
20  perhaps pure adolescents defined as age 13 to 17.
21  Because my study has adolescents and I believe my
22  study -- is my study included in here?  I have
23  three RCTs, three experiments.  I think they're
24  included.  And I know Hunt had adolescents.  I
25  mean, most university students -- some are 16,

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                          September 10, 2025

Page 779

1    some are 17.  In my study, the median was 17 to
2    19, so that's adolescents.
3              BY A. STANNER:
4              Q.  I see and I really just
5    trying to understand.  You think that she's
6    using -- in this section she's using a definition
7    of adolescents that's 13 to 17?
8              A.  Yes, it seems like that
9    way.  Because if she were to use the CDC
10   definition, she wouldn't have said that.  I mean,
11   unless it was a mistake.
12             Q.  And the CDC definition
13   that you're referring to, just so that we have it
14   clearly, goes up to age 24; right?
15             A.  Yes, they define youth as
16   up to 24, yes.
17             Q.  And youth is different
18   than adolescence.  So let me just -- help me
19   understand.  I know when you use the term "youth,"
20   you use the CDC definition that goes up to 24;
21   right?
22             A.  In my report, yes.
23             Q.  But is adolescent --
24   where does the definition, that 13 to 17
25   definition of adolescence come from that you think

Page 780

1    she is using?
2              A.  I mean, I think it's just
3    more of a -- I don't know.  I think World Health
4    Organization defines adolescence as 10 to 19.  I
5    mean, almost every organization defines it
6    differently.  I chose a broader age range because
7    early adolescence -- the research shows early
8    adolescence and emerging adulthood are two of the
9    biggest periods of development for high risk for
10   mental health -- mental health and suicide.  So I
11   thought -- and CDC is one of the most reputable
12   health organizations in the world, so I went with
13   that definition.
14             Q.  I'm not taking issue with
15   which definition you chose.  I'm just trying to
16   understand.  When you say you think she's using 13
17   to 17, what's your basis for saying that that's
18   what she's using?
19             A.  It's just a belief.
20   That's how a lot of adult -- a lot of people may
21   define adolescence is the teen years.
22             Q.  Okay.  So just the kind
23   of common sense, once you hit 18 you're an adult,
24   but you're a teenager prior to that, you're 13 to
25   17?

Page 781

1              A.  Yeah, some studies define
2    it that way, but it seems like the health
3    organizations don't.
4              Q.  So Burnell goes on to
5    talk on page 9, she talks about self-reported
6    data.  I'm going to ask you a little bit about
7    this.  You testified previously about self-report
8    data versus observed data.  Do you remember that?
9              A.  Um-hum, yeah, I remember
10   that.  Yes.
11             Q.  All right.  And obviously
12   in -- there are limitations to self-report data;
13   right?
14             A.  Well, self-report is
15   shown to be reliable and valid, but, yeah, there
16   are limitations to basically all measures in
17   science, but they are typically -- at the
18   population level, there is no other way to measure
19   it; right?
20             Q.  I understand.  I think in
21   any one study -- let me see if I can simplify it.
22   In any one study if the data was self-reported,
23   you would say, well, that is an obvious limitation
24   of the study.  It doesn't mean it's nonsense, but
25   it is a limitation that the data comes from --

Page 782

1    that the data is self-reported; right?
2              A.  It's a common limitation
3    that we put in, but like you said, it doesn't mean
4    the finding is undermined or doesn't mean the
5    finding is not reliable.  And in fact, most of the
6    literature are self-report and is extraordinarily
7    consistent and reliable findings, pre-pandemic,
8    post-pandemic, all kind of populations around the
9    world, different age groups.  So that certainly
10   shows the robustness of the measure.  It's
11   continuing to document a relationship time and
12   time again.
13             Q.  Okay.  I'm a little short
14   on time so I'm going to just skip here to 4, still
15   staying in Burnell on section -- further down that
16   column, 4.2.2.
17             A.  Yeah.
18             Q.  She writes:
19             "The small effects
20             observed in this study
21             could suggest that merely
22             restricting social media
23             use may not be the most
24             effective strategy for
25             improving subjective

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                                           September 10, 2025

Page 783

1          well-being."
2    Do you see that?
3               A.  Yes.
4               Q.  Okay.  Do you agree or
5    disagree with that conclusion?
6               A.  I'm just reading a little
7    bit more for context, sorry.  Yeah, so she's just
8    basically saying you need more theory-driven and
9    mechanistic work, which I don't disagree with.
10   But no, I think her data pretty clearly show that
11   restricting social media use leads to improvement
12   in mental health.
13              Q.  Okay.  So again, you
14   think she's underselling her results.
15              A.  I -- I do.  She's -- I
16   don't -- I disagree with that, actually.  So she's
17   attributing the small effects may not be due to
18   the restriction, but she looked at experiments, so
19   I don't know why she would really conclude that.
20   My guess is she might be thinking of how it's
21   used, how people use it might be important as
22   well, that that may have enhanced the effects.  To
23   be honest, it's all speculative.  I don't really
24   know what she means here, but my -- sorry.
25              Q.  Sorry.  Are you done?

Page 784

1    Okay.  In the next paragraph where she says:
2               "Based on our findings,
3          we argue that, although
4          well-intended, calls for
5          blind reduction of social
6          media use may distract
7          from more fruitful action
8          that targets more
9          specific sources of
10         mental health strife.
11         Recent data indicate that
12         social media plays a
13         minimal role in
14         predicting adolescent
15         mental health -- we worry
16         that such blanket calls
17         may be potentially
18         dangerous for some
19         individuals, particularly
20         young people."
21   Do you see that?
22              A.  Yes, I see that.
23              Q.  You told us that Burnell
24   is the best experimental meta-analysis there is.
25   Do you disagree with her conclusions here?

Page 785

1               A.  Absolutely.
2               Q.  Can we go off the record?
3               THE VIDEOGRAPHER:  Going off
4    the record.  The time is 12:47 p.m.
5    --- Upon recessing at 12:47 p.m.
6    --- Upon resuming at 1:22 p.m.
7               THE VIDEOGRAPHER:  Going back
8    on the record.  It is 1:22 p.m.
9    CROSS-EXAMINATION BY L. HORVATH (CONT'D):
10              Q.  Dr. Goldfield, pleasure
11   to meet you in person.
12              A.  Likewise.
13              Q.  I want to go back over
14   just one or -- I want to close the loop on the
15   Burnell study.  So do you still have Exhibit 50 in
16   front of you?
17              A.  I do.
18              Q.  Could you please turn to
19   page 10.  I'd like you to look at the second
20   column.
21              A.  Um-hum.
22              Q.  And five lines from the
23   top, do you see a sentence there beginning with
24   "moreover"?  I'm sorry, five lines from the
25   bottom.

Page 786

1               A.  Yes.
2               Q.  Sentence beginning with
3    "moreover."  Let me read that to you.  It says:
4               "Moreover, relative to
5          other factors, social
6          media use plays only a
7          small role in predicting
8          subjective well-being --
9          suggesting that other
10         factors must be
11         considered in
12         understanding detriments
13         (and benefits) to
14         well-being."
15   Did I read that correctly?
16              A.  Yes.
17              Q.  Do you agree with that
18   statement?
19              A.  I think mental health is
20   multi-factorial, and many diseases can have
21   multiple causes.
22              Q.  Right.  Do you agree with
23   the author's conclusion that social media use
24   plays only a small role in predicting subjective
25   well-being?

Arbitration Place
(613) 564-2727                                                                    (416) 861-8720

Page 787

1          A.  So this is under the
2     limitations section.  I presume she's referring to
3     maybe the magnitude of effects here?
4          Q.  Okay.  And do you agree
5     with that statement?
6     OBJ          A. BRANE:  Object to form.
7          THE DEPONENT:  So when I
8     read -- you know, the luxury of having reviewed
9     the literature in the way that I have, with 44
10    meta-analyses is -- it provides an awful lot of
11    context.  And based on what I have reviewed and
12    documented in my report, yeah, I would disagree.
13    I think it plays a pretty strong role in mental
14    health harms.
15         BY L. HORVATH:
16         Q.  Okay.  And you don't know
17    whether the authors have reviewed the
18    meta-analysis that you have also reviewed;
19    correct?
20         A.  I have no idea what they
21    have reviewed.
22         Q.  All right.  You talked
23    earlier in your deposition today about
24    reallocating time for -- from screens to sleep and
25    physical activity; right?

Page 788

1          A.  Um-hum.
2          Q.  Is that a yes?
3          A.  Yes.
4          Q.  That would be -- the
5     benefits of reallocating time from screens to
6     sleep or physical activity you agree would be true
7     as a replacement for any sedentary activity?
8     OBJ          A. BRANE:  Object to form.
9          THE DEPONENT:  Well, that's
10    part of -- yeah, I mean, in general, yes, yeah.
11         BY L. HORVATH:
12         Q.  So that would include
13    time spent reading books; right?
14         A.  There is literature to
15    support that reading books is good for you.
16         Q.  Right.  But it's also a
17    sedentary activity; right?
18         A.  Right.
19         Q.  And so the benefits that
20    might come from replacing a sedentary activity
21    with physical activity would be the same; right?
22    OBJ          A. BRANE:  Object to form,
23    incomplete hypothetical.
24         THE DEPONENT:  The paradigm we
25    laid out was statistical but also mostly

Page 789

1     conceptual.  So we didn't consider every possible
2     trade off.  We were just looking, reviewing
3     literature, taking time generally, and we did have
4     caveats like reading or music which -- you know,
5     even creative arts, creative hobbies could still
6     provide mental health benefits and you may not
7     want to take that time away.
8          BY L. HORVATH:
9          Q.  And watching TV, for
10    instance, is also a sedentary activity, which if
11    you reallocated time from watching TV to sleep or
12    physical activities, you would agree that would be
13    a positive thing for youth?
14    OBJ          A. BRANE:  Object to form.
15         THE DEPONENT:  Yes, our data
16    show that, yes.
17         BY L. HORVATH:
18         Q.  Have you looked at any
19    data that indicates how much time youth have spent
20    watching TV before social media?
21         A.  Yes, I've -- I've
22    published on TV time, TV viewing --
23         Q.  In your own literature?
24         A.  Yeah -- before social
25    media, so before, like, 2004, is that what you

Page 790

1     mean?
2          Q.  Um-hum, yes, sir.
3          A.  Like prevalent studies or
4     --
5          Q.  I'm just wondering if you
6     have any assessment of the amount of time
7     adolescents would spend watching TV before social
8     media --
9     OBJ          A. BRANE:  Object to form.
10         BY L. HORVATH:
11         Q.  -- existed.
12         A.  So we're going back 20
13    years ago almost.  I think it was probably two
14    hours to -- two to three hours a day maybe.
15         Q.  Do you know?  You said "I
16    think."  It sounds like you're not quite sure?
17    OBJ          A. BRANE:  Object to form,
18    argumentative.
19         THE DEPONENT:  The prevalence
20    from 20 years ago, I don't know it offhand.
21         BY L. HORVATH:
22         Q.  Okay.  That's fair
23    enough.  I want to ask you about a depression
24    diagnosis generally.  Even before social media
25    existed, adolescents were diagnosed from time to

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                                September 10, 2025

Page 791

1   time with depression; true?
2          A.   Yes.
3          Q.   And even before social
4   media, adolescents were diagnosed from time to
5   time with anxiety; right?  Correct?
6          A.   Correct.
7          Q.   And anorexia nervosa;
8   correct?
9          A.   Correct.
10         Q.   And sleep disorders;
11  correct?
12         A.   Correct.
13         Q.   And suicide; correct?
14         A.   Correct.
15         Q.   As adolescents age, you
16  would agree that the number of people diagnosed
17  will increase over time; correct?
18  OBJ        A.   BRANE:  Object to form.
19         THE DEPONENT:  Well, it depends
20  on the diagnosis.  But generally as time goes by,
21  sure, there is more time statistically for
22  something to develop.
23         BY L. HORVATH:
24         Q.   Right.  And for
25  depression, is adolescence a time when that

Page 792

1   depression may first become recognized as
2   problematic?
3          A.   Yes, it often starts in
4   adolescence.
5          Q.   Okay.  And same for
6   anxiety?
7          A.   Yes.
8          Q.   How about eating
9   disorders?
10         A.   Adolescence and emerging
11  adulthood, the youth definition of 10 to 24 is a
12  common period for that.
13         Q.   And self-harm?
14         A.   I -- I think adolescence
15  is, as I've described here, a vulnerable period
16  for the development of all kinds of mental health
17  problems.
18         Q.   Right.  And it's been --
19  adolescence has been that vulnerable time even
20  before social media existed; right?
21         A.   These disorders have
22  pre-existed, yeah, before social media.
23         Q.   Right.  But my point is
24  that adolescence has always been a vulnerable time
25  for the recognition of these types of disorders.

Page 793

1          A.   Yeah, that's what makes
2   them a high-risk population, developmental
3   vulnerabilities that I discuss in my report.
4          Q.   Okay.  As I understand
5   your opinion, what you focused on was the
6   meta-analyses, you've mentioned that several
7   times; right?
8          A.   Yes.
9          Q.   And you've mentioned
10  several times that you've looked at 44
11  meta-analyses; correct?
12         A.   Yes.
13         Q.   How many of those 44
14  meta-analyses contain overlapping data?
15  OBJ        A.   BRANE:  Object to form.
16         THE DEPONENT:  I haven't
17  quantified that, but there will be some
18  overlapping data.
19         BY L. HORVATH:
20         Q.   There will be significant
21  overlapping data, won't there?
22  OBJ        A.   BRANE:  Object to form.
23         THE DEPONENT:  Well, I
24  restricted the search to the last five years to
25  try to -- in attempt partly to get the most

Page 794

1   current review of the literature, but also so it's
2   just not so overlapping.
3          BY L. HORVATH:
4          Q.   Okay.  And when you
5   restricted to the last five years, did you -- you
6   acknowledge that at least some of that data is
7   also overlapping; correct?
8          A.   Yeah, there are some that
9   will overlap.
10         Q.   Okay.  I think we've
11  previously marked your report in this case as
12  Exhibit 43.  Do you have that in front of you?
13         A.   Yes.
14         Q.   I want to start with your
15  paragraph 10 -- I'm sorry, paragraph 12, beginning
16  at line 5.  And I'm going to start with the
17  sentence, you state:
18              "I elected to focus my
19              review only on
20              meta-analyses of
21              observational
22              (cross-sectional and
23              longitudinal) and
24              experimental studies
25              because this is a more

Page 795

1    robust quantitative and
2    objective approach to
3    estimating true effects
4    compared to reviews that
5    rely on narrative
6    synthesis, which are more
7    subjective in nature,
8    thus more prone to bias."
9  Did I read that correctly?
10       A.   You did.
11       Q.   And as you sit here
12 today, that's still the basis for your opinions;
13 correct?
14 OBJ       A. BRANE:  Object to form.
15       THE DEPONENT:  Correct, part of
16 them.
17       BY L. HORVATH:
18       Q.   Well, do you have any
19 opinions that aren't based on the meta-analyses?
20       A.   Well, yeah, I review all
21 kinds of other studies, mechanistic studies,
22 neuroscience studies, other longitudinal studies,
23 combined with my 23 years of clinical experience.
24       BY L. HORVATH:
25       Q.   But what moved the needle

Page 796

1  for you --
2       A. BRANE:  Counsel, please
3  don't interrupt him.  You've done that several
4  times.
5       L. HORVATH:  I'm sorry.
6       A. BRANE:  You may have been
7  done but --
8       L. HORVATH:  I thought he was
9  done.  I'm sorry.
10       THE DEPONENT:  Yeah.
11       BY L. HORVATH:
12       Q.   But what moved the needle
13 for you was the meta-analyses; correct?
14 OBJ       A. BRANE:  Object to form.
15 Vague as to "moved the needle."
16       THE DEPONENT:  Yeah.  I mean,
17 again, I can't wait -- I looked at the totality of
18 the evidence and I also considered my training,
19 experience, and education, and, you know, tried
20 not to be myopic about this.  You know, I also
21 applied the Bradford Hill based on my synthesis of
22 the meta-analytic research and the high-quality
23 single studies.
24       BY L. HORVATH:
25       Q.   Well, we can at least

Page 797

1  agree that reviews that rely on narrative
2  synthesis are more prone to bias and you would not
3  rely on a review alone to form a causation
4  opinion.  Fair?
5  OBJ       A. BRANE:  Object to form.
6       THE DEPONENT:  I think it's
7  fair to say that -- meta-analyses are more
8  quantitative and less prone to bias than a
9  subjective narrative review, all things being
10 equal.
11       BY L. HORVATH:
12       Q.   Okay.  And so you would
13 not rely on a review all by itself?
14 OBJ       A. BRANE:  Object to form.
15       THE DEPONENT:  A narrative
16 review?
17       BY L. HORVATH:
18       Q.   Correct.
19       A.   In some cases it's the
20 only thing -- it's the only review out there.
21       Q.   Okay.  But you would
22 agree that even if it is the only review out
23 there, it can be prone to bias which may affect
24 the reliability of that review in determining
25 causation; is that fair?

Page 798

1       A.   No, I think you're taking
2  my -- my intent out of context, with all due
3  respect.  What I'm saying is if there are
4  meta-analyses out there and there are reviews and
5  umbrella reviews and narrative reviews, I will
6  favor the meta-analyses because there is less bias
7  in that.
8       Q.   Right.  And I'm asking
9  you about if there are no meta-analyses and there
10 are not a lot of reviews, there is one review, in
11 that situation, would you rely on that review for
12 establishing causation without recognition that
13 that review was subject to bias?
14 OBJ       A. BRANE:  Object to form,
15 asked and answered, incomplete hypothetical.
16       THE DEPONENT:  It would have to
17 be on a case by -- it would have to be how good
18 the review is.
19       BY L. HORVATH:
20       Q.   Right.  You would have to
21 look at the quality?
22       A.   Yeah.  I would have to
23 look at the quality of the review, the quality of
24 the studies in the review.  Was it a systematic
25 review, how were the studies selected, is it

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                                    September 10, 2025

Page 799

1   representative.  All kinds of things to consider.
2          Q.   Right.  So you would
3   agree that a quality assessment is important;
4   true?
5          A.   Yeah, in general, yes.
6          Q.   If we can look at
7   paragraph 31 of your report.  Fourth line down,
8   you state that:
9               "Out of the included
10              meta-analyses,
11              approximately 50%
12              conducted a
13              methodological quality or
14              risk of bias assessment."
15  Do you see that?
16         A.   I see it.
17         Q.   So of those 44
18  meta-analyses we've been hearing about,
19  approximately 22 have had any kind of quality
20  assessment; correct?
21         A.   Correct.
22         Q.   And I think you indicated
23  that at some point you looked at only those from
24  2020 to the present; right?
25         A.   Um-hum.

Page 800

1          Q.   And I think you
2   identified 17.  If you look at paragraph 86 of
3   your report, you note a total of 17 meta-analyses
4   published in the last five years examined studies
5   published between 2010 and 2024, which evaluated
6   the association between social media use and
7   mental health outcomes.  Is that correct?
8          A.   That's what I have here.
9          Q.   And when you said you did
10  a more condensed analysis to try and avoid
11  duplication, were you referring to these 17?  That
12  was a bad question.  Let me start over.
13              You mentioned earlier that to
14  eliminate the concern that the studies were all
15  looking at the same underlying data, you tried to
16  do a condensed analysis looking at only more
17  recent data; correct?
18         A.   I said that could be one
19  of the benefits.  I never said it eliminated the
20  problem.  I said, A, to make it the most current
21  literature.
22         Q.   Right.
23         A.   And B, it could have the
24  secondary benefit of minimizing overlap.
25         Q.   Okay.  But you would

Page 801

1   agree there is still overlap even in those studies
2   since -- in your more condensed review of more
3   recent studies?
4          A.   You know, it's
5   speculative.  I would have to try to -- I would
6   have to look at every single study that -- made up
7   of every single meta that really evaluate that.
8          Q.   And you haven't done
9   that; is that fair?
10         A.   Not every single study of
11  every meta, no, that's --
12         Q.   Okay.  And would it be
13  fair to say you haven't done an analysis from
14  meta-analysis to meta-analysis to figure out which
15  contain unique studies; true?
16  OBJ        A.  BRANE:  Object to form.
17         THE DEPONENT:  You know, the
18  power of meta-analyses is that it combines
19  studies, different designs, sometimes if it's a
20  well-done meta, they will separate effects by
21  study design, by study population, they're called
22  sensitivity analyses.  But it provides -- at the
23  population level -- you know, in this case I think
24  there were 1.3 million kids.  So it's providing an
25  average effect of social media on all these

Page 802

1   different outcomes.  That's -- that's not without
2   limitations, but that's the beauty of a
3   meta-analysis.
4          BY L. HORVATH:
5          Q.   Objection,
6   non-responsive.  Do you recall my question?
7          A.   Can you repeat the
8   question, please?
9          L. HORVATH:  Could you please
10  read back the question.
11  --- (READBACK)
12              THE DEPONENT:  No, I haven't
13  done that.
14          BY L. HORVATH:
15          Q.   You would agree that the
16  quality of a study is important in assessing the
17  study's conclusions?
18         A.   Yeah, I mean, I -- the --
19  yes.  I mean, in general, quality is helpful for
20  sure.  But I think I go into quite a bit of detail
21  to separate cross-sectional from longitudinal to
22  experimental with ascending order of quality.
23         Q.   Have you looked at any
24  analyses of the studies contained in the
25  meta-analyses that you've reviewed that excluded

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 803

1  cross-sectional studies?
2  OBJ        A. BRANE:  Object to form.
3         THE DEPONENT:  Yeah, the --
4  well, many of the metas -- so that's what I was
5  mentioning before, the sensitivity analyses, they
6  separated the effects out by research design.  So
7  they estimate the effect on cross-sectional
8  studies and longitudinal studies.  And of course
9  by nature, experimental studies don't include --
10  metas don't include cross-sectional studies.  So
11  yeah, there's quite a bit of attention to those
12  details in my report.
13         BY L. HORVATH:
14         Q.  All right.  Well,
15  let's --
16         A.  Where possible.
17         Q.  Okay.  One of the things
18  that's important in determining causation is also
19  the strength of association; correct?
20         A.  Correct.
21         Q.  And if we turn to your
22  amended report at paragraph 90, you note that:
23             "Results indicate that
24             the effects of [social
25             media use] on mental

Page 804

1             health are generally
2             small --"
3  Do you see that?
4         A.  Yeah.
5         Q.  Did I read that
6  correctly?
7         A.  Yes.
8         Q.  Is that still your
9  opinion today?
10  OBJ        A. BRANE:  Object to form.
11         THE DEPONENT:  So the summaries
12  are in -- I summarize each table, right.  So the
13  effects for social media and mental health are --
14         A. BRANE:  Don't cut him off.
15         Yeah, keep going,
16  Dr. Goldfield.
17         THE DEPONENT:  They're small,
18  but I contextualize in that -- and I describe
19  reasons why they might be underestimated, some
20  methodological reasons.  And I also cite Funder
21  and Ozer, and, you know, there are others, it's
22  not like they invented the idea, that small
23  effects can be meaningful at the population level.
24         BY L. HORVATH:
25         Q.  My question was:  Do you

Page 805

1  stand by the statement that the results indicate
2  that the effects of social media use on mental
3  health are generally small?
4  OBJ        A. BRANE:  Object to the form
5  of the question.
6         BY L. HORVATH:
7         Q.  That's true still,
8  correct?
9  OBJ        A. BRANE:  Asked and answered.
10  Half the sentence.  Not an opinion.
11         THE DEPONENT:  You're asking --
12  yeah, exactly.  You're asking --
13         BY L. HORVATH:
14         Q.  To deal with counsel's
15  objection, let me read the rest.
16             "Results indicate that
17             the effects of [social
18             media use]on mental
19             health are generally
20             small, but the majority
21             -- are statistically
22             significant --"
23  That's correct; right?
24  OBJ        A. BRANE:  Object to form.
25         THE DEPONENT:  So this is just

Page 806

1  one table.
2         BY L. HORVATH:
3         Q.  My question is:  Is that
4  what your report says?
5  OBJ        A. BRANE:  Different question.
6  Object to form.
7         THE DEPONENT:  Yeah, that's a
8  different question than what you asked me.  You
9  asked me if that was my opinion, my overall
10  opinion.  So the answer is, in those small groups
11  of studies, I think it was 17, that's my opinion
12  for that.
13         BY L. HORVATH:
14         Q.  Okay.
15         A.  But my opinion is
16  bolstered by the experimental findings and the
17  longitudinal findings.
18         Q.  So as to the 17 studies
19  that you narrowed down to the more current
20  research, this sentence at the beginning of
21  paragraph 90 applies to those.  Is that what I
22  heard you just say?
23         A.  Yeah, I would say the
24  effects are generally small, but still meaningful
25  at the population level.

Arbitration Place
(613) 564-2727                                                        (416) 861-8720

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 807

1        Q.   All right.  I want to go
2   to paragraph 92.  You note that:
3                "Many methodological
4                limitations actually
5                undermine the validity of
6                some of the meta-analyses
7                and contribute to the
8                heterogeneity of
9                findings."
10  Right?
11       A.   Um-hum.
12       Q.   Is that a yes?
13       A.   Yes.
14       Q.   And you note that:
15                "-- inappropriate pooling
16                of outcome variables --
17                likely underestimates the
18                effect sizes reported in
19                the meta-analyses."
20  Do you see that statement in your report?
21       A.   Yes.
22       Q.   I noticed you did not
23  provide a citation for that concept.  Do you have
24  one?
25       A.   I actually do in other

Page 808

1   places.  Yeah, Vetter and -- like, if you go to
2   the statistical section of where I reference --
3   here, I could probably get it for you.  Vetter is
4   one.
5        Q.   Could you spell Vetter,
6   please?
7        A.   V-e-t-t-e-r.
8        Q.   I'm sorry, are you saying
9   "T "or "D"?
10       A.   T, T.  Where I first
11  introduce meta-analyses, so Vetter is one and
12  there's another one I'm almost positive I
13  reference here.  Meta-analyses -- I can't -- I
14  can't think of the other one, but I know it's
15  there.  It's just in another place.
16       Q.   So we just have to figure
17  that out.
18       A.   Yes.
19  OBJ       A. BRANE:  Object to form.
20  BY L. HORVATH:
21       Q.   Would you agree there are
22  some epidemiological papers that also note
23  inappropriate pooling of outcomes can overestimate
24  effect sizes?
25       A.   So the context in which

Page 809

1   all of these criticisms occurs is -- because
2   everything's context dependent, is that they're
3   clear -- and I've demonstrated this in my report.
4   The associations are stronger for negative mental
5   health outcomes.  When you pull positive -- like
6   life satisfaction and well-being into that, you're
7   underestimating the harm, meaning anxiety,
8   depression, eating disorder.  You're pooling
9   everything together.
10  BY L. HORVATH:
11       Q.   Objection,
12  non-responsive.  Do you recall my question?
13       A.   I do recall it, but your
14  question's not --
15       L. HORVATH:  Could you please
16  read -- please repeat my question.
17  --- (READBACK)
18  BY L. HORVATH:
19       Q.   I'm just asking if it
20  can.
21  OBJ       A. BRANE:  Objection, asked
22  and answered, partially probably.
23            THE DEPONENT:  I think you're
24  applying that -- the context differs --
25       A. BRANE:  Stop.  Don't

Page 810

1   interrupt, counsel.
2   BY L. HORVATH:
3        Q.   I would like for him to
4   answer the question.
5        A.   Is it possible?  Yes,
6   it's possible.
7        Q.   Okay.  Thank you.  I want
8   to look at your report, paragraph 103.  103 is
9   your section on quality assessment; correct?
10       A.   Sorry, page or paragraph?
11       Q.   I'm sorry, paragraph 103.
12       A.   Oh.  Quality assessment,
13  okay.
14       Q.   Okay.  And if I can refer
15  you to page 45 at the top there, second line you
16  say "however."
17       A.   Um-hum.
18       Q.
19                "It is important to note
20                that in the only 3
21                meta-analyses rated as
22                high quality, all three
23                reported that [social
24                media use] was
25                significantly correlated

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                September 10, 2025

Page 811

1          with higher symptoms of
2    anxiety, depression, and
3          FoMO, with effects rating
4          from small to large --"
5    Did I read that correctly?
6          A.  Yes.
7          Q.  And is that still your
8    opinion today?
9    OBJ          A. BRANE:  Object to form.
10          THE DEPONENT:  Yes.
11          BY L. HORVATH:
12          Q.  You cite the three
13    meta-analyses that you rated -- that were rated as
14    high quality as Marciano 2021, Ivie 2020, and
15    Fioravanti et al. 2021.  Do you see that?
16          A.  I do.
17          Q.  Is it still your opinion
18    that those are the only three meta-analyses rated
19    as high quality?
20          A.  Well, no.  I mean,
21    that's -- those were entirely high quality.  The
22    other reviews were moderate to high, which I think
23    would be important to include.
24          Q.  I want you to listen to
25    my question.  Are these three the only three, as

Page 812

1    you sit here today, that you have determined fit
2    the definition of high quality?
3    OBJ          A. BRANE:  Object to form,
4    asked and answered, argumentative.
5          THE DEPONENT:  That's what my
6    paper -- that's what the report says.
7          BY L. HORVATH:
8          Q.  And is that your -- and
9    you don't have any words to change there, do you,
10    as you sit here today?
11          A.  No.
12          Q.  I'm going to hand you
13    what we've marked as Exhibits 51, 52, and 53,
14    those three studies.
15          EXHIBIT NO. 51:  Article
16          titled "Digital Media Use
17          and Adolescents' Mental
18          Health During the
19          Covid-19 Pandemic: A
20          Systematic Review and
21          Meta-Analysis" authored
22          by Marciano et al.
23          L. HORVATH:  Fifty-one is
24    Marciano.
25          EXHIBIT NO. 52:  Article

Page 813

1          titled "A meta-analysis
2          of the association
3          between adolescent social
4          media use and depressive
5          symptoms" authored by
6          Ivie et al.
7          L. HORVATH:  Fifty-two is
8    Ivie.
9          EXHIBIT NO. 53:  Article
10          titled "Fear of missing
11          out and social networking
12          sites use and abuse: A
13          meta-analysis" authored
14          by Fioravanti et al.
15          L. HORVATH:  And 53 is
16    Fioravanti, if I'm pronouncing that correctly.
17          A. BRANE:  I'm sorry, counsel,
18    can you give me the numbers one more time.
19          L. HORVATH:  Marciano is 51,
20    Ivie is 52, and Fioravanti is 53.
21          A. BRANE:  Thank you.
22          BY L. HORVATH:
23          Q.  Let's look at Marciano
24    2021, which is Exhibit 51, please.  First of all,
25    the Marciano study, is this the one you referenced

Page 814

1    in your report?
2          A.  Yes, I believe so.
3          Q.  Okay.  And this study
4    focuses on a specific historical time period, the
5    pandemic; correct?
6          A.  Yes.
7          Q.  And if we look at the
8    second page, first column, second full paragraph,
9    first sentence, it states:
10          "Adolescents around the
11          world alleviated the
12          negative experiences of
13          social distancing by
14          spending more time
15          online."
16    Did I read that correctly?
17          A.  Yes.
18          Q.  The adolescents were not
19    only using the social media platforms of interest
20    in this case, though; correct?
21    OBJ          A. BRANE:  Object to form.
22          THE DEPONENT:  Not only, but
23    they were using all that's involved in this case.
24          BY L. HORVATH:
25          Q.  Right.  The authors also

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                                    September 10, 2025

Page 815

1  noted use of Pinterest, Reddit, LinkedIn and
2  Twitter; correct?
3           A.  Correct.
4           Q.  And this study is not
5  only limited to social media use, it includes all
6  digital media use; true?
7  OBJ         A. BRANE:  Object to form.
8           THE DEPONENT:  In inclusion,
9  yes, but they separate the analysis by social
10  media effects in other media.
11           BY L. HORVATH:
12           Q.  They looked at all
13  digital media; fair?
14           A.  Yeah.
15           Q.  The authors did this
16  meta-analysis because there was no other study
17  looking at the link between digital media and
18  mental health during the pandemic; right?
19  OBJ         A. BRANE:  Object to form,
20  speculation.
21           BY L. HORVATH:
22           Q.  That's what they state.
23           A.  Presumably.
24           A. BRANE:  Do you want to
25  point him to that sentence?

Page 816

1           BY L. HORVATH:
2           Q.  I want to talk about how
3  the quality of this study was deemed to be high,
4  okay?
5           A.  Um-hum.
6           Q.  On page -- well, the
7  quality assessment is identified on page 3, second
8  column, it says:  "Quality Assessment of the
9  Included Studies."  Do you see that?
10           A.  I do.
11           Q.  And it says:
12           "The quality assessment
13           of the included studies
14           was carried out using the
15           Strobe-checklist."
16  Correct?
17           A.  Correct.
18           Q.  And is that the
19  assessment tool that they used to determine that
20  these -- this was a high-quality study?
21           A.  Yes.
22           Q.  All right.  And table 2
23  at the top has what they are calling an adapted
24  STROBE checklist; is that correct?  It's up at the
25  top of the same page.

Page 817

1           A.  Yes.
2           Q.  There are 11 items in
3  table 2 that describes the STROBE checklist; is
4  that right?
5           A.  Yes.
6           Q.  The checklist asks
7  whether the categories of items listed is present
8  in the study; correct?
9           A.  Um-hum, yes.
10           Q.  It's asking does the
11  study have an introduction; right?
12           A.  Yes.
13           Q.  It's asking does the
14  study state a hypothesis; correct?
15           A.  Correct.
16           Q.  The checklist is asking
17  whether descriptions are present, not whether or
18  not the analysis within the study is correct; is
19  that fair?
20           A.  Yeah.  It's often
21  reflecting the quality of reporting of
22  methodology.
23           Q.  The checklist is
24  reporting whether or not these items are actually
25  contained within the study; right?

Page 818

1           A.  Whether they're reported
2  in the study, so they could be -- you know, a
3  study could be really solid methodologically, but
4  if some of the details are not reported, then they
5  could lose points, they could lose marks.
6           Q.  Right.  My point is the
7  STROBE checklist seeks to assess whether or not
8  each of these categories in table 2 is contained
9  within the study; correct?
10  OBJ         A. BRANE:  Object to form.
11           THE DEPONENT:  I -- well,
12  there's a rating of how -- of the degree in which
13  they handled the methodological issues and the way
14  they present their data.
15           BY L. HORVATH:
16           Q.  Where is that in the
17  checklist, that was the adapted STROBE checklist
18  in table 2 in Exhibit 51?
19           A.  So they have to describe
20  the statistical method, explain how the data were
21  addressed, how it was managed.  So it's -- yeah,
22  it's basically how clearly you've communicated the
23  methodology.
24           Q.  Okay.  It's not an
25  assessment of whether the author's analysis is

Arbitration Place

(613) 564-2727                                                    (416) 861-8720

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 819

1  correct; true?
2          A.  No.
3          Q.  Let's look at table 4 of
4  Exhibit 51.  Table 4 is the summary of the
5  included studies.  Do you see that?
6          A.  I see.
7          Q.  The studies in table 4
8  are studies from around the world; right?  Are you
9  with me on table 4, Arend is from Germany and
10 Austria --
11         A.  Oh, yeah, yeah.  Sorry.
12         Q.  -- Ellis is from Canada,
13 Li is from Australia, Liu is from United Kingdom.
14 Are you with me?
15         A.  Yes.
16         Q.  Only -- how many of the
17 studies in 51 are from the United States?
18         A.  It appears one.
19         Q.  Okay.  Only six of these
20 studies are longitudinal studies; correct?
21         A.  I'd have to count them,
22 but that seems about --
23         Q.  Marciano examined 30
24 different pieces of literature; correct?
25         A.  Yeah.

Page 820

1          Q.  Is that yes?
2          A.  Yes.
3          Q.  There -- by my count,
4  there were six longitudinal studies and the rest
5  are cross-sectional; right?
6          A.  Right.
7          Q.  If the cross-sectional
8  studies were excluded, do you know what the data
9  would show?
10         A.  Well, the sensitivity
11 analysis would reveal that, if they did one, on
12 cross-sectional versus longitudinal.
13         Q.  And did they do that?
14         A.  Well, if you give me a
15 minute, I'll see.  Longitudinal studies, so it
16 looks like they separated it.  So they list the
17 longitudinal ones.  I'm not sure they quantify.
18         Q.  Okay.  Ten of the studies
19 analyzed in the Marciano material -- or the
20 Marciano study are studies about screen time only;
21 correct?
22         A.  Yes, some are just
23 general screen time.
24         Q.  So we do not even know
25 that they are evaluating use of the social media

Page 821

1  platforms at issue in this case; correct?
2  OBJ        A.  BRANE:  Object to form.
3          THE DEPONENT:  No, it says in
4  the abstract --
5          BY L. HORVATH:
6          Q.  Let me rephrase the
7  question.  That was a bad question.  In the 10
8  studies that are about screen time only --
9          A.  Oh.
10         Q.  -- you don't know that
11 those 10 studies only focus on screen time during
12 use of the four platforms at issue in this case.
13 OBJ        A.  BRANE:  Object to form.
14         BY L. HORVATH:
15         Q.  Fair?
16         A.  It appears they separated
17 that out, the analysis.
18         Q.  Where are you referring?
19         A.  I'm referring to the
20 abstract.
21             "Results show that,
22             although most studies
23             reported a positive
24             association between
25             ill-being and social

Page 822

1             media use -- and
2             ill-being and media
3             addiction -- not all
4             types of digital media
5             use had adverse
6             consequences --"
7          Q.  Okay.
8          A.  So there -- there --
9          Q.  But we've talked about
10 that there is a larger body of social media
11 applications out there; correct?
12         A.  Yeah.
13         Q.  And we don't know that
14 the screen time used analyzing in these studies
15 was only for these four platforms?  That's my
16 question.
17         A.  Well, the results are
18 pretty consistent with all the other metas.
19         Q.  My question is:  As to
20 screen time in this analysis, we don't know that
21 the screen time was limited to these four
22 platforms; true?
23 OBJ        A.  BRANE:  Object to form.
24         THE DEPONENT:  I haven't seen
25 any data to suggest that effects would be

Page 823

1  different with Reddit included in -- what was it
2  LinkedIn?  What was the other one?  If anything,
3  because those platforms don't have a lot of the
4  features that I've shown to describe harm probably
5  underestimates the effects.
6          BY L. HORVATH:
7          Q.  You're speculating?
8          A.  Based on my knowledge of
9  the literature --
10         Q.  Yes, you're speculating?
11 OBJ        A. BRANE:  Object to form,
12 argumentative.
13         THE DEPONENT:  I'm here to
14 state my opinion.
15         BY L. HORVATH:
16         Q.  Um-hum, right.  You
17 haven't done an analysis -- there is no analysis
18 that you can look at that looks at the data on
19 screen time to determine if it's only analyzing
20 these four platforms?
21 OBJ        A. BRANE:  Object to form,
22 misstates prior testimony and his report.
23         THE DEPONENT:  You know, I've
24 done a pretty thorough analysis in --
25         BY L. HORVATH:

Page 824

1          Q.  Did you listen to my
2  question?
3          A. BRANE:  Did you just laugh
4  at his answer?
5          L. HORVATH:  No, I did not.
6  I'm asking if he listened to my question.  If he
7  would answer my question --
8          A. BRANE:  Maybe think about
9  the questions, not the answers.
10         L. HORVATH:  My questions are
11 pretty precise.
12         A. BRANE:  That question was
13 horrible, if you want my opinion.
14         L. HORVATH:  Well, that's
15 fine.
16         THE DEPONENT:  I'm trying
17 to context --
18         A. BRANE:  Are we still
19 talking about this report or --
20         BY L. HORVATH:
21         Q.  I know you're trying to
22 contextualize.  I'm asking for an answer to my
23 question.
24         A. BRANE:  If you don't recall
25 the question, Dr. Goldfield, please ask for it to

Page 825

1  be repeated.
2          THE DEPONENT:  Sure.  Can you
3  please repeat the question.
4          BY L. HORVATH:
5          Q.  In the 10 studies that
6  are about screen time only that are reported in
7  Marciano, you are unable to state whether those
8  studies looked at only the four platforms at issue
9  in this case in evaluating screen time?
10 OBJ        A. BRANE:  Object to form.
11         THE DEPONENT:  Quantitatively,
12 I have a hard time believing that Reddit is
13 driving harm here.  There is no evidence to
14 support that.
15         BY L. HORVATH:
16         Q.  Have you read Reddit?
17         A.  I've seen Reddit.
18         A. BRANE:  Like, all of it?
19         BY L. HORVATH:
20         Q.  Well, not all of it.
21 You've looked at Reddit?
22         A.  I've looked at Reddit.
23 Not in-depth analysis.
24         Q.  Okay.  And did you do an
25 in-depth analysis of any other social media

Page 826

1  platform that's not at issue in this case?
2          A.  I was not tasked to look
3  at in-depth analysis at other social media
4  platforms.
5          Q.  All right.  Let's go to
6  the second study or meta-analysis that you
7  identified as being rated as high quality; that's
8  Ivie 2020 which is Exhibit 52.  Are you with me?
9  The title of Exhibit 52 is:  "A meta analysis of
10 the association between adolescent social media
11 use and depressive symptoms."  Correct?
12         A.  Correct.
13         Q.  It did not look at
14 studies examining anxiety or fear of missing out;
15 correct?
16 OBJ        A. BRANE:  Object to form.
17         THE DEPONENT:  I would have to
18 refamiliarize myself with this.
19         BY L. HORVATH:
20         Q.  Okay.  Well, I wanted
21 to -- you would have to look at the study itself
22 to see if it includes that?
23         A.  Yeah, and I just want to
24 see what I reported in my report on it.
25         Q.  Well, I'm looking at the

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                September 10, 2025

Page 827

1  last sentence on paragraph 103 where you noticed
2  that this was one of the three meta-analyses that
3  reported more social media use was significantly
4  correlated with higher symptoms of anxiety,
5  depression, and fear of missing out.
6         The title of this Exhibit 52
7  is not about anxiety or fear of missing out;
8  correct?
9         A.  Can you direct me to
10  where I -- are we going back to that sentence --
11        Q.  Yes, that last sentence
12  in your paragraph 103.
13        A.  Yeah, so those are -- I'm
14  using them to -- these references are across all
15  three meta-analyses.
16        Q.  So you're not meaning to
17  suggest that all three meta-analyses correlated
18  social media use with all three --
19        A.  No.
20        Q.  -- categories; correct?
21        A.  Correct.
22        Q.  Because it would be
23  misleading to suggest that they do; correct?
24  OBJ        A. BRANE:  Object to form,
25  argumentative.

Page 828

1         THE DEPONENT:  Nobody is -- my
2  intention would not be to mislead.  It would
3  probably be not as precise as I could have been
4  with reference to it.
5  BY L. HORVATH:
6         Q.  Under "Coding procedures"
7  in Ivie, which is on page 167, first column, the
8  third sentence notes that:
9              "The quality of studies
10             was assessed with
11             questions from the NHLBI:
12             Quality Assessment Tool
13             for Observational Cohort
14             and Cross-Sectional
15             Studies that apply to
16             correlational study
17             design -- for a list of
18             quality assessment
19             questions --"
20  Do you see that?
21        A.  I do.
22        Q.  Table 1 right underneath
23  that are the questions that were asked in that
24  quality assessment; correct?
25        A.  Correct.

Page 829

1         Q.  Are you aware that the
2  NHLBI has actually 14 items in the quality
3  assessment tool for observational cohort and
4  cross-sectional studies?
5         A.  Um-hum, yes.
6         Q.  And the questions in
7  table 1 -- they only ask nine.  Is that -- do you
8  see that?
9         A.  Well, they only portrayed
10  nine.
11        Q.  Those were the questions
12  that were set forth that they used for the quality
13  assessment of this -- the studies in this
14  meta-analysis; is that right?
15        A.  So you're suggesting they
16  modified the criteria?
17        Q.  I'm asking you.
18        A.  They might have adapted
19  it, but they should have said they adapted it.
20        Q.  Okay.  They didn't say
21  that, but we know that there's nine questions when
22  there's 14 in the scale; correct?
23        A.  Where does it show 14?
24        Q.  Well, do you know how
25  many are in the scale?

Page 830

1         A.  Zero to 18 is the
2  scoring, and it appears there's nine because the
3  top score is rated as 2 and the total score is 18.
4         Q.  Have you looked at what
5  the actual questions are in the NHLBI?
6         A.  Do they append it here?
7         Q.  Well, they refer to it as
8  what they used for their quality assessment.
9         A.  Yeah, yeah, no, I know.
10        Q.  Did you look at that?
11        A.  I have not analyzed the
12  exact items on the NIH.
13        Q.  And so as you sit here,
14  you don't know if there were any questions
15  excluded from the analysis in the quality
16  assessment tool for observational cohort and
17  cross-sectional studies done by the authors in
18  Ivie?
19        A.  I cannot verify that
20  offhand.
21        Q.  If we look at table 2 in
22  Ivie, table 2 contains the summary of the studies
23  included in this Ivie meta-analysis; correct?
24        A.  Um-hum, yes.
25        Q.  This meta-analysis

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 831

1  included a total of 11 studies; correct?
2          A.  Yes.
3          Q.  Out of the 11 studies, 10
4  are cross-sectional; is that true?
5          A.  The results are
6  consistent with all the other longitudinal
7  studies.
8          Q.  Out of the 11 studies, 10
9  are cross-sectional; true?
10         A. BRANE:  There's 12 studies
11 in table 2.
12         THE DEPONENT:  I think 11.
13         L. HORVATH:  I'm sorry, there
14 is one on the next page.
15         THE DEPONENT:  Eleven.
16         BY L. HORVATH:
17         Q.  Out of the 12 studies, 11
18 are cross-sectional; is that correct?
19         A.  In this one report --
20         Q.  I'm just asking about
21 Ivie.
22         A.  Yes.
23         Q.  So in Ivie you agree that
24 of the 11 -- I'm sorry, of the 12 studies
25 analyzed, 11 cross-sectional; correct?

Page 832

1          A.  In this one particular
2  meta-analysis --
3          Q.  Only a single
4  longitudinal study is included; correct?
5          A.  Correct.
6          Q.  All right.  Let's look at
7  Fioravanti, 2021.  Fioravanti is a study examining
8  fear of missing out; correct?
9          A.  Correct.
10 OBJ     A. BRANE:  Object to form.
11         BY L. HORVATH:
12         Q.  And this meta-analysis is
13 one that you noted in -- hang on -- paragraph 87
14 of your report -- strike that.
15         If we look at Fioravanti under
16 the "Methods" section, it indicates that they
17 collected all cross-sectional studies assessing
18 both of fear of missing out and social network sites;
19 correct?
20         A.  Correct.
21         A. BRANE:  Ma'am, are we at
22 time?
23         BY L. HORVATH:
24         Q.  So this is a
25 meta-analysis that is all cross-sectional studies;

Page 833

1  correct?
2          A.  Where do you see the
3  design on these?
4          Q.  Do you know if all of
5  these were cross-sectional?
6          A.  It usually should be
7  reported.  I'm looking for it.
8          Q.  Is that not something you
9  analyzed?
10         A.  Well, the best way to
11 analyze this is if they do a sensitivity analysis.
12         Q.  Can I refer you to page
13 3, "Methods" section.
14         A.  Page 3?
15         Q.  Um-hum, first column.
16         A.  Methods, yeah.
17         Q.  And section 2.2 has
18 inclusion criteria and study selection; correct?
19         A.  Um-hum.
20         Q.  Is that a yes?
21         A.  Yes.
22         Q.  It states:
23             "All cross-sectional
24             studies assessing both
25             the fear of missing

Page 834

1              out -- and social network
2              site -- use or
3              problematic social
4              network site use -- were
5              included."
6  Do you see that?
7          A.  I do.
8          Q.  So it's only assessing
9  cross-sectional studies; correct?
10         A.  This one particular
11 meta-analysis?
12         Q.  Right.  This was one that
13 was noted by you to be one of the three
14 high-quality studies; correct?
15         A.  That wasn't my opinion,
16 that was their score based on established criteria
17 of quality of studies.
18         Q.  Do you have a different
19 opinion of what are the highest-quality
20 meta-analyses?
21 OBJ     A. BRANE:  Object to form.
22         THE DEPONENT:  My opinion would
23 be subjective.  So there are criteria in
24 frameworks to evaluate quality that all scientists
25 have to work from with parameters.  And based on

Arbitration Place
(613) 564-2727                                                                (416) 861-8720

Page 835

1  all the criteria from various frameworks, these
2  were rated as high, and that's partly a limitation
3  in the existing frameworks of evaluating the
4  stuff, but that's all we have to go on.
5  Otherwise, it's completely subjective.
6            BY L. HORVATH:
7            Q.  Right.  And you did not
8  identify the meta-analyses that you thought were
9  highest quality in your report based on your own
10 subjective interpretation; fair?
11           A.  No, I totally disagree.
12 I put a lot of weight on experiments because
13 that's the highest quality of evidence.
14           Q.  Okay.  So what are the
15 meta-analyses that you determined are the highest
16 quality?
17           A.  It's not what I
18 determined, it's a fact that experiments provide
19 the strongest causal inferences of, in this case,
20 if social media is driving mental health.
21           Q.  Let me rephrase the
22 question.  What are the three meta-analyses that
23 you determined have the highest quality based on
24 your subjective interpretation?
25 OBJ       A. BRANE:  Object to form.

Page 836

1            THE DEPONENT:  Out of the 44?
2  Again, you're asking me to rank?  I would say
3  Burnell would be up there.  Not perfect, but
4  certainly better than the other ones.
5            BY L. HORVATH:
6            Q.  And that's the study
7  whose author's conclusion you disagree with?
8            A.  Yes, I think she's
9  underselling her data.  Again, you're asking for
10 my subjective response -- first of all, that
11 requires me to remember all -- you know, the
12 methodology of 44 reviews that contain hundreds of
13 studies.
14           Q.  Well, we know out of the
15 44, only 50% had a quality rating; right?  That's
16 only 22.
17           A.  Keep in mind this is one
18 table out of a whole bunch of -- you know, a
19 200-page report.
20           Q.  I understand.
21           A.  It's a pretty narrow --
22           Q.  I understand.
23           A.  -- slice of the pie.
24           Q.  I understand.  But we're
25 looking at quality assessment; correct?

Page 837

1            A.  Um-hum.
2            Q.  Yes?
3            A.  Yes.
4            Q.  And only three out of the
5  whole slice of the pie were rated as high quality;
6  correct?
7            A.  The -- almost all of them
8  are moderate to high.  I mean --
9            Q.  Objection,
10 non-responsive.  My question is only three of them
11 were identified as high quality; true?
12 OBJ       A. BRANE:  Object to form.
13           THE DEPONENT:  I think
14 moderate-quality studies are fine.
15           BY L. HORVATH:
16           Q.  That's not my question.
17 Can you listen to my question?
18           A.  I heard your question.
19           Q.  And you just don't want
20 to answer it?
21 OBJ       A. BRANE:  Object to form,
22 argumentative.
23           THE DEPONENT:  I believe I
24 already answered it.
25           BY L. HORVATH:

Page 838

1            Q.  I don't believe you have.
2            A. BRANE:  Three times.
3            L. HORVATH:  Can you repeat my
4  question, please?
5            THE DEPONENT:  We read the
6  statement together.  That's how this whole thing
7  started.  Those were the three that scored, based
8  on validated frameworks, as high quality.  The
9  others were moderate or high -- moderate to high.
10 So in my mind, those have to be weighed too.
11           L. HORVATH:  How are we doing
12 on time?
13           R. EHLER:  I haven't been
14 tracking.
15           THE VIDEOGRAPHER:  It's
16 4:08:30, so four hours, 8 minutes, and 30 seconds.
17           L. HORVATH:  I'm going to go
18 ahead and mark as Exhibit 54 a study by Godard and
19 Holtzman.
20           EXHIBIT NO. 54:  Article
21           titled "Are active and
22           passive social media use
23           related to mental health,
24           wellbeing, and social
25           support outcomes?  A

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 839

1          meta-analysis of 141
2          studies" authored by
3          Rebecca Godard and Susan
4          Holtzman
5          L. HORVATH:  I don't have a
6    lot of copies of this one.
7          THE DEPONENT:  Sorry.  Here, I
8    will pass it on.
9          L. HORVATH:  Thank you.
10         BY L. HORVATH:
11         Q.  First of all, do you
12   accept this study as reliable?
13   OBJ      A. BRANE:  Object to form.
14         BY L. HORVATH:
15         Q.  You cite it in your
16   report.
17         A.  Yeah.  It's, from what I
18   recall, mostly cross-sectional, but it's published
19   in a pretty good journal, been peer reviewed.
20         Q.  And why did you mention
21   that most of the studies are cross-sectional?
22         A.  Well, it's just -- you
23   know, I reviewed lots of meta-analyses, some had
24   longitudinal designs, some had experimental
25   designs, some have cross-sectional designs.

Page 840

1          Q.  And cross-sectional
2    designs -- well, strike that.
3          In your report on page 44, you
4    say:
5          "-- Godard and Holtzman
6          -- found that active
7          [social media use] was
8          with greater benefits and
9          passive [social media
10         use] with more harm."
11   Do you stand by that characterization?
12         A.  I'd have to read -- I
13   mean, I haven't memorized the results of every
14   meta.
15         Q.  I understand.
16         A.  Can you give me a minute
17   to take a look at this?
18         Q.  Well, we're almost out of
19   time, so let me just skip ahead.  You see that in
20   the summary of the paper Godard and Holtzman
21   say -- that's at the abstract, a lay summary on
22   the first page.
23         A.  Yes.
24         Q.  Do you see where it says:
25         "-- results have been

Page 841

1          mixed.  This review and
2          summary examined" --
3    I'm sorry, strike that.  Third line down:
4          "We found that the extent
5          to which people use
6          [social media] actively
7          or passively was not
8          strongly related to most
9          aspects of wellbeing."
10   Did I read that correctly?
11         A.  Correct.
12         Q.  And then it states:
13         "However, using [social
14         media] actively or
15         passively was linked with
16         greater perceptions of
17         social support online."
18   Do you see that?
19         A.  Yes.
20         Q.  Did I read that
21   correctly?
22         A.  Yes.
23         Q.  Finally it says:
24         "Findings have
25         implications for the

Page 842

1          advancement of [social
2          media] research and
3          theory and warn against
4          overly simplistic claims
5          about the benefits of
6          active [social media use]
7          or harms of passive
8          [social media use]."
9    Do you see that?
10         A.  I do.
11         Q.  Do you agree with that
12   statement?
13         A. BRANE:  I imagine we're out
14   of time, counsel.
15         BY L. HORVATH:
16         Q.  This is my last question.
17   Do you agree with that statement?
18         A.  I believe in this article
19   they also make an argument about moving away from
20   passive versus active use, something that's been
21   echoed by Valkenberg and others, but given the
22   cross-sectional nature -- here's my take on active
23   use.
24         Q.  I'm not asking about your
25   take.  I'm asking if you agree with this warning.

(613) 564-2727                                              (416) 861-8720

22STCV21355
CONTINUED DEPOSITION OF GARY GOLDFIELD                    September 10, 2025

Page 843

1    A.  I believe a lot of what's
2  driving the positive associations with active use
3  is that people who are in good mental health, have
4  a good well-being, have more reason, they're
5  achieving their goals, they have more reason to
6  post.  I think it's reverse causation.  And I
7  mention that in my report.
8    Q.  Do you have -- you don't
9  have a longitudinal study to support that?
10    A. BRANE:  We're at time,
11  counsel.  Let's take five.  Let's go off the
12  record.
13    L. HORVATH:  All right.
14    THE VIDEOGRAPHER:  We are
15  going off the record at 2:22 p.m., and this
16  concludes today's testimony given by Dr. Gary
17  Goldfield.
18  --- Upon recessing at 2:23 p.m.
19  --- Upon resuming at 2:39 p.m.
20    THE VIDEOGRAPHER:  This does
21  not conclude today's testimony given by Dr. Gary
22  Goldfield.  We are back on the record, and it is
23  2:39 p.m.
24  CROSS-EXAMINATION BY A. BRANE:
25    Q.  Dr. Goldfield, we're back

Page 844

1  from break.  You're ready to continue?
2    A.  I am.
3    Q.  As you know, my name is
4  Austin Brane and I represent the Plaintiffs in
5  this matter.  I just have a few questions for you.
6    In forming your opinions that
7  you've offered in this case, did you take the same
8  approach and exercise the same level of rigor that
9  you would in your research work?
10    A.  Absolutely.
11    A. BRANE:  I have no further
12  questions.
13    THE VIDEOGRAPHER:  We are
14  going off the record.  It is 2:40 p.m., and this
15  concludes today's testimony given by Dr. Gary
16  Goldfield.
17  --- Whereupon the proceeding concluded at 2:40
18    p.m.
19
20
21
22
23
24
25

Arbitration Place

(613) 564-2727                                                        (416) 861-8720