**Exhibit 53**

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION TO EXCLUDE GENERAL CAUSATION
TESTIMONY OF PLAINTIFFS' EXPERTS**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES, CENTRAL DISTRICT


| | | |
|---|---|---|
| COORDINATION PROCEEDING SPECIAL TITLE [RULE 3.400], SOCIAL MEDIA CASES | ) ) ) ) | JUDICIAL COUNCIL COORDINATION PROCEEDING NO. 5255 |
| _____ | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) ) | For Filing Purposes: 22STCV21355 |
| CHRISTINA ARLINGTON SMITH, ET AL. | ) ) | |
| Plaintiffs | ) | Judge: |
| v. | ) | Hon. Carolyn B. Kuhl |
| | ) | |
| TIKTOK INC., ET AL. | ) | SSC-12 |
| Defendants | ) | |
| _____ | ) | |


DEPOSITION OF GARY GOLDFIELD
held at the offices of
Dow's Lake Court Conference Centre,
865 Carling Avenue, Ottawa, Ontario
on Thursday, July 10, 2025, at 11:38 a.m.


CONDENSED TRANSCRIPT WITH INDEX


Arbitration Place © 2025
900-333 Bay Street        Toronto, Ontario M5H 2R2

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 2

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

Lindsey Scarcello
Tricia L. Campbell
WAGSTAFF & CARTMELL
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
lscarcello@wcllop.com
tcampbell@wcllp.com
816-701-1100

Kirk Goza
GOZA & HONNOLD, LLC
9500 Nall Avenue, Suite 400
Overland Park, KS 66207
913-386-3547
kgoza@gohonlaw.com

ON BEHALF OF THE DEFENDANTS, META PLATFORMS, INC.,
FACEBOOK HOLDINGS, LLC, FACEBOOK OPERATIONS, LLC,
FACEBOOK PAYMENTS, INC., FACEBOOK TECHNOLOGIES, LLC,
INSTAGRAM, LLC, AND SICULUS, INC.:

Paul Banks
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
202-662-5007
pbanks@cov.com

ON BEHALF OF THE DEFENDANT, SNAP INC.:

Rose L. Ehler
Garrett Solberg
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
213-683-9100
Rose.Ehler@mto.com
Garrett.Solberg@mto.com

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 3

APPEARANCES (CONT'D):


ON BEHALF OF THE DEFENDANTS, TIKTOK INC. AND
BYTEDANCE INC.:

Lisa Horvath
KING & SPALDING LLP
500 West 2nd Street
Suite 1800
Austin, TX 78701
512-457-2000

ON BEHALF OF THE DEFENDANTS, YOUTUBE, LLC, GOOGLE
LLC, ALPHABET INC.:

Rachel Raphael
MORGAN LEWIS
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
202-739-5589
rachel.raphael@morganlewis.com

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 4

INDEX

                                                          PAGE

AFFIRMED:  GARY GOLDFIELD                                   8

DIRECT EXAMINATION BY R. EHLER                             8

LIST OF EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | EXPERT REPORT OF DR. GARY GOLDFIELD DATED APRIL 18, 2025 | 12 |
| 2 | CURRICULUM VITAE OF DR. GARY GOLDFIELD DATED APRIL 2025 | 12 |
| 3 | EXPERT REPORT OF DR. GARY GOLDFIELD DATED MAY 16, 2025 | 16 |
| 4 | SINGLE SHEET STATING HOURLY RATE OF $825 | 18 |
| 5 | INVOICE FROM THRIVE PROFESSIONAL SERVICES | 23 |
| 6 | MATERIALS CONSIDERED LIST | 71 |
| 7 | PAPER TITLED "ASSOCIATIONS BETWEEN SOCIAL MEDIA USE AND POSITIVE MENTAL HEALTH AMONG ADOLESCENTS: FINDINGS FROM THE CANADIAN HEALTH BEHAVIOUR IN SCHOOL-AGED CHILDREN STUDY" | 107 |
| 8 | AMENDED AND EXPANDED EXPERT REPORT OF DR. GARY GOLDFIELD DATED MAY 16, 2025 | 124 |
| 9 | PAPER TITLED "HEAVY SOCIAL MEDIA USE AND PSYCHOLOGICAL DISTRESS AMONG ADOLESCENTS: THE MODERATING ROLE OF SEX, AGE, AND PARENTAL SUPPORT" | 177 |
| 10 | PAPER TITLED "LIMITING SOCIAL MEDIA USE DECREASES DEPRESSION, ANXIETY, AND FEAR OF MISSING OUT IN YOUTH WITH EMOTIONAL DISTRESS: A RANDOMIZED CONTROLLED TRIAL" | 195 |
| 11 | PAPER TITLED "EXPERIMENT FINDS LIMITING SOCIAL MEDIA USE CAN REDUCE MENTAL HEALTH ISSUES IN DISTRESSED YOUTH" DATED MAY 28, 2024 | 211 |
| 12 | VIDEO OF DR. GARY GOLDFIELD'S APRIL 2024 GRAND ROUNDS | 245 |

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

_____

LIST OF EXHIBITS (CONT'D)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 13 | SLIDE TITLED "MAIN THEORIES OF SM IMPACT ON MENTAL HEALTH" | 245 |
| 14 | PAPER TITLED "THE EFFECTS OF REDUCING SOCIAL MEDIA USE ON BODY ESTEEM AMONG TRANSITIONAL-AGED YOUTH" | 253 |
| 15 | PAPER TITLED "SOCIAL MEDIA AND ADOLESCENT HEALTH (2024)" | 257 |
| 16 | ARTICLE TITLED "CORRIGENDUM: EVALUATING EFFECT SIZE IN PSYCHOLOGICAL RESEARCH: SENSE AND NONSENSE" AUTHORED BY FUNDER AND OZER | 299 |
| 17 | PAPER TITLED "THE ASSOCIATION BETWEEN SOCIAL MEDIA USE AND PHYSICAL ACTIVITY AMONG CANADIAN ADOLESCENTS: A HEALTH BEHAVIOUR IN SCHOOL-AGED CHILDREN (HBSC) STUDY" | 317 |
| 18 | PAPER TITLED "A SYSTEMATIC REVIEW AND META-ANALYSIS OF DISCREPANCIES BETWEEN LOGGED AND SELF-REPORTED DIGITAL MEDIA USE" | 329 |
| 19 | PAPER TITLED "A META-ANALYSIS OF THE IMPACT OF TECHNOLOGY RELATED FACTORS ON STUDENTS' ACADEMIC PERFORMANCE" | 350 |
| 20 | PAPER TITLED "LIFESTYLE HABITS PREDICT ACADEMIC PERFORMANCE IN HIGH SCHOOL STUDENTS: THE ADOLESCENT STUDENT ACADEMIC PERFORMANCE LONGITUDINAL STUDY (ASAP)" | 351 |
| 21 | PAPER TITLED "THE IMPACT OF SOCIAL | 355 |

_____

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 7

1        Ottawa, Ontario
2  --- Upon commencing on Wednesday, July 10, 2025,
3    at 11:38 a.m.
4          THE VIDEOGRAPHER:  Good
5  morning.  We are going on the record at 11:38 a.m.
6  on July 10, 2015.  This is Media Unit 1 of the
7  video-recorded deposition of Dr. Gary Goldfield,
8  taken by counsel for Defendants in the matter of
9  Social Media Cases, Judicial Council Coordination
10  Proceeding No. 5255, filed in the Superior Court
11  of the State of California County of Los Angeles,
12  Central District.
13          This deposition is being held
14  at Arbitration Place Ottawa, located at 150 Elgin
15  Street, Ottawa, Ontario, Canada, K2P 1L4.  My name
16  is Bruno Silva CLVS from the firm Arbitration
17  Place and I am the videographer.  The court
18  reporter is Mariann Vianello, RPR, from the firm
19  Arbitration Place.
20          Will counsel please introduce
21  yourselves, including all parties on Zoom.
22          R. EHLER:  Bruno, this is Rose
23  Ehler from Munger, Tolles & Olson.  I represent
24  Defendant Snap Inc.  And joined with me is my
25  colleague Garrett Solberg.  We're going to skip

Page 8

1  the Zoom defense appearances.  I'm briefly just
2  going to introduce other folks for the other
3  Defendants.  We have Paul Banks from Covington for
4  the Meta Defendants.  And on Zoom, individuals who
5  will ask questions at some point include Andrew
6  Stanner from Covington for Meta Defendants, Rachel
7  Raphael from Morgan Lewis for the YouTube, Google
8  Defendants, and Lisa Horvath from King and
9  Spalding for the TikTok Defendants.
10          L. SCARCELLO:  And I'm Lindsey
11  Scarcello with my colleagues Tricia Campbell and
12  Kirk Goza for the Plaintiffs.
13          THE VIDEOGRAPHER:  The court
14  reporter will now swear in the witness.
15  AFFIRMED:  GARY GOLDFIELD
16          THE VIDEOGRAPHER:  You may
17  proceed.
18  DIRECT EXAMINATION BY R. EHLER:
19          Q.  Good morning,
20  Dr. Goldfield.  I am Rose Ehler.  We just met.
21  I'm going to ask questions on behalf of all of the
22  Defendants for the large portion of today.  Does
23  that sound okay?
24          A.  Sure.
25          Q.  I have your CV, but can

Page 9

1  you just tell me as a general matter how you
2  describe your field of expertise.
3          A.  I'm a clinical
4  psychologist and I'm a professor in four
5  departments at the University of Ottawa.  So my
6  primary appointment is pediatrics in the Faculty
7  of Medicine.  I'm cross-appointed at the professor
8  level at population health, human kinetics and
9  psychology.  And I'm an adjunct research professor
10  in an experimental psychology program at another
11  university here called Carleton University here in
12  Ottawa.
13          Q.  So psychology would be a
14  general description of that field, clinical
15  psychology?
16          A.  Yeah, but I do a lot of
17  epi work, population-based work, clinical trials,
18  drug trials, which are not typical of
19  psychological science.
20          Q.  Have you been deposed
21  before?
22          A.  No.
23          Q.  Just for the record, I
24  think your counsel told you to --
25          L. SCARCELLO:  To stop

Page 10

1  twisting in his chair is what I said.  Yeah.
2          BY R. EHLER:
3          Q.  You have or have not been
4  deposed?
5          A.  I have not been deposed.
6          Q.  Fair enough, which
7  explains why looking forward and facing the video
8  or speaking to me is not normal.  That's totally
9  fine.  Another big rule of being deposed is you
10  have to answer verbally yes or no.  The non-verbal
11  gestures or really quiet "uh-huhs" don't reflect
12  well on the record for the testimony we're trying
13  to take today.
14          A.  Okay.
15          Q.  Great.  Is there any
16  reason you cannot testify truthfully and
17  accurately today?
18          A.  No.
19          Q.  We just received a
20  revised report from your attorneys the day before
21  yesterday.  So I know that you've done some
22  additional work on your opening -- since your
23  opening report.  Is the work that you've done
24  since the April 18th report -- could you have done
25  that work prior to April 18th?

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                        July 10, 2025

Page 11

1         L. SCARCELLO:  So I'll object
2    to the question.  The supplemental and amended
3    report was served two days ago.  Subject to that,
4    you can answer.
5         THE WITNESS:  Okay.  No, I
6    couldn't because the studies that I included were
7    -- had just been released.  So they weren't
8    available when I was writing my initial report.
9         BY R. EHLER:
10        Q.  All of the studies that
11   you added to your report are new?
12        A.  Yes.
13        Q.  Are you now done, there
14   is nothing left to do in the work to form your
15   opinions in this case?
16        A.  I try to stay current
17   with the literature, and if they're really, really
18   well done, methodologically rigorous studies that
19   I feel may shed light on causality, then, you
20   know, I -- it's possible I may add them in the
21   future.  I'd have to evaluate on a case-by-case
22   basis.
23        Q.  Anything you're aware of
24   sitting here today?
25        A.  No.

Page 12

1         Q.  I'm going to hand you
2    what's been premarked as Exhibit 1.
3         EXHIBIT NO. 1:  EXPERT
4         REPORT OF DR. GARY
5         GOLDFIELD DATED APRIL 18,
6         2025
7         BY R. EHLER:
8         Q.  Dr. Goldfield, this is
9    your April 18th report.  Can you just confirm that
10   for me?
11        A.  I'm just looking for one
12   quick --
13        Q.  I think the date is on
14   the last page.
15        A.  Got it.  Yes.
16        Q.  And I'll hand you what
17   has been marked as Exhibit 2.
18        EXHIBIT NO. 2:
19        CURRICULUM VITAE OF DR.
20        GARY GOLDFIELD DATED
21        APRIL 2025
22        BY R. EHLER:
23        Q.  Looking at Exhibit 2 for
24   me.  This is the April 2025 CV that was produced
25   with your April 18th report.  And I don't believe

Page 13

1    we received an updated CV; is that correct?
2         A.  That is correct.
3         Q.  So this CV is still
4    current from April 2025?
5         A.  Yes.
6         Q.  Have you published
7    anything new since then?
8         A.  No.
9         Q.  Were you too busy working
10   on this case?
11        A.  Yes.
12        Q.  And are there
13   publications forthcoming?
14        A.  I am working on some,
15   but, you know, with reviewers, I never know when
16   they're going to get published.
17        Q.  Anything particularly
18   relevant to this case?
19        A.  Not that I remember --
20        L. SCARCELLO:  Objection to
21   the form of the question.
22        Dr. Goldfield, if you can just
23   wait for just a second after the question to allow
24   me the opportunity to object.  Thank you.
25        L. HORVATH:  And for the

Page 14

1    record, can we just confirm that an objection by
2    one Defendant is good for all?
3         L. SCARCELLO:  Yes.
4         T. CAMPBELL:  Sure.  Yes.
5         BY R. EHLER:
6         Q.  Can you tell me did you
7    meet with attorneys to prepare for your deposition
8    in this case?
9         A.  I did.
10        Q.  How many times?
11        A.  Twice.
12        Q.  Just twice?
13        A.  Yes.
14        Q.  So the deposition
15   preparation you were doing back in May and June,
16   none of that involved --
17        A.  I thought you meant in
18   person.  Sorry.
19        Q.  In total, how many times
20   did you meet with attorneys to prepare?
21        A.  I didn't track.  I
22   honestly don't know.  I can't recall.
23        Q.  More than 10?
24        A.  I honestly can't recall.
25        Q.  Do you know about how

Arbitration Place

(613) 564-2727                                                      (416) 861-8720

Page 15

1  many hours you spent meeting with attorneys to
2  prepare for this deposition?
3          A.  Most meetings were an
4  hour.  And we met yesterday for, you know, a good
5  chunk of the day.
6          Q.  Did the attorneys show
7  you documents?
8          L. SCARCELLO:  Object to the
9  question.  Yeah, calls for work product.
10         BY R. EHLER:
11         Q.  Just yes or no.
12         A.  They showed me some.
13         Q.  Did you read or watch any
14 other expert witnesses' deposition testimony?
15         L. SCARCELLO:  Same objection.
16         So, Dr. Goldfield, I will
17 instruct you not to tell Ms. Ehler anything that
18 you have -- anything that you have discussed with
19 us.  You can answer these questions yes and no,
20 but please don't go into in any kind of detail
21 about what we have talked about in our meetings.
22 Okay?
23         THE WITNESS:  Okay.
24         BY R. EHLER:
25         Q.  Did you read or watch any

Page 16

1  other experts' deposition testimony in preparation
2  for today?
3          L. SCARCELLO:  Same objection.
4          THE WITNESS:  I have not
5  watched anything.  I have read some depositions.
6          BY R. EHLER:
7          Q.  Did you read other
8  experts' depositions?
9          L. SCARCELLO:  Same objection.
10         THE WITNESS:  I looked at
11 some.
12         BY R. EHLER:
13         Q.  Whose?
14         A.  Mostly the Defendants.  I
15 really haven't looked at the Plaintiffs' experts'
16 depositions.
17         Q.  Do you know if those are
18 listed on your updated materials considered list?
19         A.  I believe they are.
20         Q.  I'm handing you what has
21 been premarked as Exhibit 3.
22                 EXHIBIT NO. 3:  EXPERT
23                 REPORT OF DR. GARY
24                 GOLDFIELD DATED MAY 16,
25                 2025

Page 17

1          BY R. EHLER:
2          Q.  Do you recognize this as
3  your report from May 16th in the MDL litigation?
4          A.  I do.
5          Q.  Can you turn to the very
6  last page.  Do you see right above -- this is page
7  191 of Exhibit 3.  Do you see right above your
8  signature there is a certification?
9          A.  Um-hum, yes.
10         Q.  And do you see where you
11 certified that you owe a primary and overriding
12 duty of candor and professional integrity to help
13 the court on all -- on matters, excuse me, within
14 your expertise?
15         L. SCARCELLO:  Object to the
16 form.
17         THE WITNESS:  Yes, I see that.
18         BY R. EHLER:
19         Q.  Do you understand what it
20 means that you are required to testify candidly?
21         A.  I do.
22         Q.  Candid meaning
23 straightforward?
24         A.  Yes.
25         Q.  No spin?

Page 18

1          A.  Yes.
2          L. SCARCELLO:  Object to the
3  form.
4          Dr. Goldfield, please give me
5  a moment to object after the question is asked.
6  Thank you.
7          BY R. EHLER:
8          Q.  And so testifying
9  candidly means that you're not downplaying views
10 or evidence that would contradict your opinions;
11 is that correct?
12         A.  Correct.
13         Q.  I'm handing you what has
14 been premarked as Exhibit 4.
15                 EXHIBIT NO. 4:  SINGLE
16                 SHEET STATING HOURLY RATE
17                 OF $825
18         BY R. EHLER:
19         Q.  I believe you confirmed
20 this, but it represents here that you have not
21 given any expert testimony for the previous four
22 years --
23         A.  That's correct.
24         Q.  Have you given expert
25 testimony ever in your career?

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 19

1          A.  No.
2          Q.  No depositions, no
3   consulting -- I'll ask those separately.  No
4   depositions or testimony before a court?
5          A.  No.
6          Q.  Have you consulted on
7   litigation before?
8          A.  No.
9          Q.  And your hourly rate as
10  listed on Exhibit 4 is $825 an hour; is that
11  correct?
12          A.  Correct.
13          Q.  And you're being paid
14  that by the Plaintiffs in this case to provide
15  opinions that support their case; correct?
16          L. SCARCELLO:  Object to the
17  form of the question.
18          A.  No.  I'm being paid for
19  my time to evaluate the literature on whether
20  social media plays a causal role in mental health
21  in children.
22          BY R. EHLER:
23          Q.  But you're being paid by
24  the Plaintiffs; is that right?
25          L. SCARCELLO:  Object to the

Page 20

1   form.  Calls for speculation.
2          BY R. EHLER:
3          Q.  Who's signing your
4   checks, Dr. Goldfield?
5          L. SCARCELLO:  Object to the
6   form.
7          THE WITNESS:  I don't know.  I
8   haven't been paid yet.
9          BY R. EHLER:
10          Q.  You haven't been paid at
11  all for your time yet?
12          A.  No.
13          Q.  How did you decide on the
14  rate $825 an hour?
15          A.  I have a mentor who is
16  experienced in giving expert testimony in
17  litigation, and she made some calls and did some
18  due diligence and we arrived at this rate based on
19  my training, education, and experience.
20          Q.  Is that a rate you charge
21  to any other business or individual related to
22  your professional work?
23          L. SCARCELLO:  Object to the
24  form.
25          THE WITNESS:  No, it is not.

Page 21

1          BY R. EHLER:
2          Q.  How does it compare to
3   your hourly rate to treat patients?
4          A.  It's higher.
5          Q.  What's your hourly rate
6   to treat patients?
7          A.  $260.
8          Q.  When were you first
9   retained by the Plaintiff's counsel in this case?
10          A.  December of 2024.
11          Q.  Who reached out to you?
12          A.  Mr. Goza.
13          Q.  Do you know how he found
14  you?
15          A.  I do not.
16          Q.  And although you have not
17  yet been paid, you do or do not understand that
18  the Plaintiffs are contractually obligated to pay
19  you for your time in this case?
20          L. SCARCELLO:  Object to the
21  form.
22          A.  Yes.
23          BY R. EHLER:
24          Q.  Yes, you understand that
25  they will pay you?

Page 22

1          A.  Yes.
2          Q.  And do you understand
3   that the Plaintiffs' lawyers get paid if their
4   clients win these cases?
5          L. SCARCELLO:  Object to the
6   form.  Calls for speculation.
7          A.  I don't know anything
8   about that.
9          BY R. EHLER:
10          Q.  You get paid either way;
11  correct?
12          A.  Correct.
13          Q.  Would it be fair to say
14  that the money that they've agreed to pay you for
15  your testimony is an investment for the
16  Plaintiffs' lawyers?
17          L. SCARCELLO:  Object to the
18  form of the question.  Mischaracterization.
19          A.  I have no idea if that
20  can be considered an investment.  That would be
21  their perception and I can't presume to know their
22  perception.
23          BY R. EHLER:
24          Q.  No view on that one way
25  or another?

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                July 10, 2025

---

Page 23

1           A.  No.
2           Q.  I'm handing you what has
3    been premarked Exhibit 5.
4           EXHIBIT NO. 5:  INVOICE
5               FROM THRIVE PROFESSIONAL
6               SERVICES
7           BY R. EHLER:
8           Q.  Dr. Goldfield, are these
9    the invoices that you submitted in this litigation
10   to Plaintiffs' counsel?
11          A.  They are.
12          Q.  Were there drafts before
13   these?
14          L. SCARCELLO:  Objection.
15          A.  I'm not sure.  What do
16   you mean?
17          BY R. EHLER:
18          Q.  How did you know how to
19   invoice the Plaintiffs' lawyers for your time if
20   you've never done this before?
21          A.  We just had a discussion
22   about it.
23          Q.  Did you submit any draft
24   that looked different than this?
25          L. SCARCELLO:  Objection.

---

Page 24

1           A.  I don't recall.
2           BY R. EHLER:
3           Q.  You don't recall if these
4    are the only ones you've ever sent to them?
5           L. SCARCELLO:  Objection,
6    asked and answered.
7           BY R. EHLER:
8           Q.  There is a question
9    pending.  You don't recall?
10          A.  I don't recall.
11          Q.  Okay.  So you don't
12   recall if you ever sent them draft invoices that
13   were maybe edited or revised to reflect these?
14          L. SCARCELLO:  Objection,
15   asked and answered.
16          A.  Correct.
17          BY R. EHLER:
18          Q.  On the first and second
19   page this reflects your time -- let me ask a
20   different question.
21          When were these prepared?
22          A.  Well, they're dated.
23          Q.  So you sent them each on
24   the last day of the month?
25          A.  Not necessarily.

---

Page 25

1    Sometimes I sent them a week or two later
2    depending on my workload.
3           Q.  And they were all
4    prepared within a week or so of the month
5    completion?
6           L. SCARCELLO:  Objection.
7           A.  I'm not sure.  I was told
8    to bill monthly, so I've organized the invoices by
9    month.
10          BY R. EHLER:
11          Q.  Right.  And my question
12   is a little bit different which is just when did
13   you send this document to Plaintiffs' counsel?
14          L. SCARCELLO:  Objection,
15   asked and answered.
16          A.  Again, I -- there was a
17   bit of a delay at the beginning, so I think that's
18   why you will see two months of billing in the
19   first one, and then after that I tried to keep on
20   top of it.
21          Q.  Looking at February and
22   March, the total which is on page 2 of Exhibit 5
23   is 186.25 hours.  Do you see that?
24          A.  I do.
25          Q.  And by my calculation,

---

Page 26

1    the vast majority of that is in March, at least
2    182 of those hours?
3           A.  Yes.
4           Q.  Yes?
5           A.  Yes.
6           Q.  That's more than 40 hours
7    a week in March on the case; is that right?
8           A.  Yes.
9           Q.  That had to have impacted
10   your other work; correct?
11          L. SCARCELLO:  Objection.
12          A.  I worked incredibly hard
13   those four weeks.  Didn't get a lot of sleep.
14          BY R. EHLER:
15          Q.  And did you see patients
16   during those four weeks?
17          A.  I saw some, but at a
18   reduced load.
19          Q.  Were you doing additional
20   research for -- doing additional research outside
21   of this case in that period of time?
22          A.  Yes.
23          Q.  And were you teaching
24   during that period of time?
25          A.  I have -- I did teach,

---

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 27

1   yes.
2           Q.  And so do you have a
3   sense of what proportion outside of these 182
4   hours or so you were spending on other
5   professional obligations in March?
6           A.  I tried to minimize that
7   as much as possible.
8           Q.  So your focus was really
9   on this report and this work?
10          A.  Yes.
11          Q.  Do you think it
12  negatively impacted your ability to see patients
13  or do other research work during that period?
14          L. SCARCELLO:  Objection.
15  Object to the form.
16          A.  I'm not sure I understand
17  the question.
18          BY R. EHLER:
19          Q.  You were really busy
20  focused on this.  Do you think you were less
21  focused on your other work during that period of
22  time, less focused on your patients?
23          A.  I don't think I was less
24  focused on my patients.  I was less focused on my
25  research program.

Page 28

1           Q.  In April, you worked 161
2   hours, that's page 3 of Exhibit 5.
3           L. SCARCELLO:  Objection.  Is
4   that a question?
5           BY R. EHLER:
6           Q.  Is that correct?
7           A.  Yes.
8           Q.  And that also is about 40
9   hours a week in April; is that right?
10          A.  Correct.
11          Q.  I've done the totalling.
12  By my calculations, you billed for and not been
13  paid for 441.25 hours.  Does that sound right?
14          A.  It does.
15          Q.  And that's just through
16  June.  Do you know how about many hours you've
17  worked in July?
18          A.  Not many.  I've been on
19  vacation, really, just in the last few days,
20  really.
21          Q.  When did you write your
22  amended report?
23          A.  Very recently, just --
24  when did we submit it?  The 8th?  The 8th?  So I
25  believe I wrote it -- it was really just an

Page 29

1   addition of a little bit.  I started -- I came
2   back -- it was -- it was early July.  I came back
3   July 2nd.  So that week between July 2nd and July
4   8th.
5           Q.  Do you know about how
6   many hours you worked on this case in that period?
7           A.  I didn't track it.
8           Q.  Was it a 40-hour week
9   full time like you were doing in March and April?
10          A.  No.
11          Q.  Something about half
12  that, less?
13          A.  No, probably pretty close
14  to that.
15          Q.  Okay.  Maybe 20 hours?
16          A.  That seems about fair.
17          Q.  Okay.  Including that
18  time, by my estimation, the fees that you are due
19  from Plaintiffs' counsel for your time so far is
20  approaching $400,000.  Does that sound right to
21  you?
22          A.  Again, I really haven't
23  been tracking this.  Yeah, I guess it sounds about
24  right.
25          Q.  Right.  You're owed

Page 30

1   $400,000 but you're not worried about getting that
2   money?
3           L. SCARCELLO:  Object to the
4   form.
5           THE WITNESS:  I trust the
6   people I'm working with.
7           BY R. EHLER:
8           Q.  You agree it is a large
9   amount of money; right?
10          A.  Yes.
11          Q.  And you're going to
12  continue billing through additional depositions,
13  trial prep and testimony if you're asked in this
14  case; is that right?
15          A.  That's correct.
16          Q.  And so if you work as
17  hard as you've been working thus far, the total
18  amount could end up over $700,000 by the end of
19  the year.  Does that sound like I got my math
20  right?
21          L. SCARCELLO:  Object to the
22  form.  Calls for speculation.
23          A.  I have no idea what the
24  future -- how many hours will be involved.
25          BY R. EHLER:

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 31

1      Q.  These amounts of money
2  don't mean anything to you?
3      L. SCARCELLO:  Object to the
4  form.
5      A.  It is what it is.  I
6  didn't say it didn't mean anything.
7  BY R. EHLER:
8      Q.  Okay.  You're just not
9  focused on it?
10     A.  No.
11     Q.  I saw 32 hours in your
12  invoices that were identified as deposition
13  preparation; does that sound right?
14     A.  It does.
15     Q.  Do you feel well
16  prepared?
17     A.  I think so.
18     Q.  Well practiced?
19     L. SCARCELLO:  Objection.
20  BY R. EHLER:
21     Q.  Well practiced?
22     L. SCARCELLO:  Objection.  I
23  think we're getting into the area of our
24  confidential conversations, so I -- you can answer
25  that question yes or no and then I'd like to move

Page 32

1  on.
2      THE WITNESS:  I've prepared.
3      BY R. EHLER:
4      Q.  How much money do you
5  typically make in a year from sources other than
6  this case?
7      A.  It depends.  It depends
8  how many patients I see.  That will change year to
9  year, month to month.
10     Q.  What's an average?
11     A.  Roughly $200,000.
12     Q.  So you've been paid more
13  by the -- you've agreed to be paid more by the
14  Plaintiffs' counsel in this case in the last few
15  months than you make in an average year; is that
16  right?
17     L. SCARCELLO:  Objection,
18  object to form.
19     BY R. EHLER:
20     Q.  Twice as much?
21     L. SCARCELLO:  Harassing,
22  aggressive, asked and answered.  You can answer.
23     THE WITNESS:  Yes.
24     BY R. EHLER:
25     Q.  Is the amount of money

Page 33

1  that Plaintiffs have agreed to pay you more than
2  you've ever made in a year before in your career?
3      A.  Yes.
4      Q.  You've never worked for a
5  technology company before; right?
6      A.  True.
7      Q.  And you haven't done any
8  work designing technology platforms or anything
9  like that; correct?
10     A.  Correct.
11     Q.  Did you need to seek
12  approval from the University of Ottawa or Carleton
13  or any of your university affiliations to accept
14  this paid expert work?
15     A.  I don't know if I needed
16  to, but I did and it was approved.
17     Q.  You're not aware of
18  whether there is a process or not?
19     L. SCARCELLO:  Objection --
20     THE WITNESS:  There is a
21  process.
22     L. SCARCELLO:  -- misstates
23  testimony.
24     BY R. EHLER:
25     Q.  Are there rules that

Page 34

1  govern what sort of outside work you can and can't
2  do?
3      A.  There are.
4      Q.  What are those rules?
5      A.  Usually it involves
6  working with industry.  So the conflict of
7  interest in academia revolve around that, drug
8  companies, technology companies, those kinds of
9  things.  There is no conflict with consulting.
10     Q.  And there's no conflict
11  with being a paid expert witness?
12     A.  No.
13     Q.  Is the approval you
14  received documented in any way via e-mail or
15  written authority?
16     A.  It was a phone
17  conversation.
18     Q.  With who?
19     A.  A couple people at
20  University of Ottawa as well as my hospital that I
21  work at.  So I -- to clarify, I'm not paid by the
22  university, I'm paid by the hospital.
23     Q.  Did you tell them how
24  much money you expected to make total?
25     A.  I didn't know at the

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 35

1  time.
2              Q.   Did you tell them how
3  many hours you were going to devote to this work?
4              A.   I did say it was a big
5  commitment.
6              Q.   Did you tell them it was
7  going to be more than 40 hours a week for March
8  and April?
9              A.   Consulting is -- many,
10  many professors consult, so I think they have
11  confidence that it will -- we have to use our own
12  judgment so it doesn't interfere with our
13  performance.
14              Q.   That wasn't my question.
15  My question was whether you told them in seeking
16  approval that it would be more than 40 hours a
17  week for two months of the year.
18              L. SCARCELLO:  Objection.
19  Asked and answered.
20              THE WITNESS:  You know, I -- I
21  said it was going to be a big commitment.  I don't
22  recall if I specified the exact amount of hours
23  because I didn't know the exact amount of hours.
24              BY R. EHLER:
25              Q.   So you don't know if they

Page 36

1  might have raised concerns if you had told them
2  that it was going to be more than 40 hours a week
3  for two full months?
4              L. SCARCELLO:  Objection,
5  calls for speculation or conjecture.
6              THE WITNESS:  One of the
7  advantages of being a professor is the flexibility
8  it affords, flexibility in lifestyle, flexibility
9  in taking off -- taking outside work and
10  consulting.  And I think the understanding is
11  professors work really, really hard.  And I've
12  routinely worked 70 hours a week my whole career.
13  So the fact that I worked 40 hours on this case,
14  if it wasn't that, I probably would have just
15  spent another 40 hours on grants or seeing
16  patients.
17              R. EHLER:  I'll move to strike
18  that last answer.
19              BY R. EHLER:
20              Q.   Who wrote the first draft
21  of your report?  And I'm going to focus on the
22  April 18th, Exhibit 1, report?
23              A.   I did.
24              Q.   Were you provided any
25  written material from Plaintiffs' counsel to

Page 37

1  incorporate into the draft?
2              A.   I was given access to
3  internal documents.
4              Q.   Were you provided any
5  written material by Plaintiffs' counsel to
6  incorporate into the draft?
7              L. SCARCELLO:  Objection.
8  It's my understanding that we're not getting into
9  the drafting process by agreement, so I'm going to
10  instruct him not to answer.
11              R. EHLER:  You're instructing
12  him not to answer yes or no?
13              L. SCARCELLO:  Yes.
14              R. EHLER:  We can take that
15  offline.  Hold on, let's go off the record for a
16  second.
17              THE VIDEOGRAPHER:  Current
18  time is 12:08 p.m. and we are off the record.
19  --- Off-record discussion
20              THE VIDEOGRAPHER:  The current
21  time is 12:09 p.m., and we are back on the record.
22              BY R. EHLER:
23              Q.   Dr. Goldfield, if you had
24  to estimate, what percentage of the report are
25  your words as compared to counsel's words?

Page 38

1              L. SCARCELLO:  Objection.  I
2  am instructing the witness not to answer pursuant
3  to the agreement not to get into details of the
4  drafting process.
5              BY R. EHLER:
6              Q.   And I'm not asking about
7  specifics, just the general percentage.
8              L. SCARCELLO:  Again,
9  objection -- same objection and further
10  instruction not to answer.
11              BY R. EHLER:
12              Q.   Can you turn to page 145
13  of what is Exhibit 1, your April 18th report.
14  There is a section titled "Defendants' internal
15  knowledge."  Do you see that?
16              A.   Um-hum, I do.
17              Q.   And if you could please
18  now turn to page 182.  Okay.  And paragraph 439.
19              A.   Um-hum, yes.
20              Q.   Great.  The first
21  sentence but about halfway through it says:
22              "It is my opinion that
23              Defendants knew or should
24              have known --"
25  And then it goes on from there.  That "knew or

22STCV21355
DEPOSITION OF GARY GOLDFIELD

July 10, 2025

Page 39

1　should have known," that's lawyer language, right?
2　　　　L. SCARCELLO:  Objection.
3　Again, I'm going to instruct him not to answer
4　based on our agreement not to get into the details
5　of the drafting process.
6　　　　BY R. EHLER:
7　　　　Q.  And you don't have an
8　answer based on your counsel's instruction?
9　　　　A.  Correct.
10　　　　Q.  Separate and apart from
11　your report, as an academic, are the words "knew
12　or should have known" ones that you include in
13　your written publications?
14　　　　A.  It depends.  Depends on
15　the context.
16　　　　Q.  Can you think of an
17　academic publication you've written where "knew or
18　should have known" is a phrase that you've used?
19　　　　A.  I typically don't write
20　about -- this is a new process for me, so the
21　whole context is completely different from
22　academic publications.
23　　　　Q.  Right.  And so this
24　isn't -- that's not the sort of language you would
25　use in your academic work; correct?

Page 40

1　　　　A.  I've actually seen it
2　written in academic language.  I don't think it's
3　unique to the legal forum.  You know, if it's
4　NASEM -- NASEM guidelines, National Academy of
5　Sciences, call for algorithm reform.  So I think
6　in the -- just generally there is an understanding
7　that a lot of internal research has been done by
8　the social media companies and that they recognize
9　there are harms.
10　　　　Q.  Dr. Goldfield, my
11　question is a little bit different than that
12　question.  My question is about the language "knew
13　or should have known," and the reason I'm asking
14　is it sounds like very lawyerly language to me.  I
15　think you said a minute ago this process is very
16　different than academic work.  And I think what
17　I'm asking you is just confirming that, that sort
18　of "knew or should have known" language is lawyer
19　language, not academic language; right?
20　　　　L. SCARCELLO:  Objection.
21　Vague, ambiguous --
22　　　　THE WITNESS:  Yeah, I don't
23　really have an opinion on --
24　　　　L. SCARCELLO:  -- calls for
25　speculation, misstates evidence -- please let me

Page 41

1　finish my objection.
2　　　　THE WITNESS:  Sorry.
3　　　　L. SCARCELLO:  It's okay.
4　Yeah, I think I'm finished now.  Oh, and asked and
5　answered.  Subject to that, you can answer.
6　　　　BY R. EHLER:
7　　　　Q.  Okay.  Do you know the
8　name of any specific Plaintiff in this litigation?
9　　　　A.  I do not.
10　　　　Q.  And you've never met them
11　personally?
12　　　　A.  No.
13　　　　Q.  You haven't reviewed any
14　of their medical records?
15　　　　A.  I have not.
16　　　　Q.  And so you're not
17　specifically aware of the individual Plaintiffs in
18　these cases and how much they use social media;
19　correct?
20　　　　A.  Correct.  I have not
21　assessed any individual Plaintiffs.
22　　　　Q.  And you're not aware of
23　their backgrounds, life experiences, any of those
24　details of the Plaintiffs in this case; correct?
25　　　　A.  Correct.

Page 42

1　　　　Q.  And you're not offering a
2　specific cause opinion in this case; correct?
3　　　　L. SCARCELLO:  Objection, not
4　offering a specific cause opinion today.
5　　　　BY R. EHLER:
6　　　　Q.  Okay.  Do you intend to
7　offer a specific cause opinion, Dr. Goldfield?
8　　　　L. SCARCELLO:  Objection,
9　calls for speculation.
10　　　　THE WITNESS:  I don't know.  I
11　truly don't.  This has been a lot of work.
12　　　　BY R. EHLER:
13　　　　Q.  You haven't been asked to
14　offer a specific cause opinion; correct?
15　　　　A.  On individuals?
16　　　　Q.  On individuals.
17　　　　L. SCARCELLO:  Objection.
18　　　　BY R. EHLER:
19　　　　Q.  I don't think you're
20　going to.  I'm just trying to understand because
21　your counsel said not today, and I don't know what
22　report you can produce tomorrow.
23　　　　L. SCARCELLO:  Okay.  So I
24　will object to that.  To the extent that he is not
25　been disclosed as a case-specific expert, he would

22STCV21355
DEPOSITION OF GARY GOLDFIELD

July 10, 2025

Page 43

1  be considered a consultant and his work would be
2  work product unless and until it is disclosed.  So
3  subject to that, I guess you can answer the
4  question if you know whether you will be a
5  case-specific expert in the future.
6           THE WITNESS:  Yeah, I honestly
7  don't know.  It would depend on my workload and
8  other demands.
9           BY R. EHLER:
10          Q.  Okay.  You haven't been
11  asked to do that work; correct?
12          L. SCARCELLO:  Objection, same
13  objection.
14          BY R. EHLER:
15          Q.  Is that a yes, you have
16  been asked to do the work and you just haven't
17  disclosed it, or no, you have not been asked to do
18  that work?
19          L. SCARCELLO:  Same objection.
20  And, Dr. Goldfield, to the
21  extent that you have been -- strike that.  To the
22  extent that you have spoken with us about
23  potentially being a case-specific expert in the
24  future, again, you would be considered a
25  consultant in that context, and so I would object

Page 44

1  and instruct you not to answer because that is
2  work product.
3           THE WITNESS:  Therefore, I
4  choose not to answer.
5           BY R. EHLER:
6           Q.  Okay.  I'm just going to
7  put an objection on the record.  Given that the
8  deadlines have passed for you all to disclose
9  experts on this, I'm hoping that you will tell me
10  right now if Dr. Goldfield is going to show up or
11  else we're going have to keep this open --
12          K. GOZA:  Look, here is a fair
13  part of this.  I mean, there are waves of --
14          L. SCARCELLO:  Waves
15  of bellweathers --
16          K. GOZA:  Obviously, in the
17  future, who knows what's going to happen.
18          R. EHLER:  Fair enough.
19          K. GOZA:  I mean, we're
20  talking about this first wave.
21          L. SCARCELLO:  Yeah, that's
22  all I'm talking about.
23          K. GOZA:  We have identified
24  all of our case-specific experts.  We're not -- I
25  mean, nobody knows; right?

Page 45

1           R. EHLER:  Fair enough.
2           L. SCARCELLO:  That's all --
3           R. EHLER:  Fair enough.  That
4  was not how I understood the objection.
5           L. SCARCELLO:  Okay.
6           R. EHLER:  Gotcha.
7           K. GOZA:  No, that's -- I
8  understand.  That was all getting off track and
9  I'm like, this is really simple.  We don't need to
10  get all -- spend an hour on this.
11          R. EHLER:  Okay.
12  Straightforward is good.  We're going for candid
13  and straightforward today.
14          BY R. EHLER:
15          Q.  Dr. Goldfield, you have a
16  master's degree and a Ph.D. in psychology;
17  correct?
18          A.  Correct.
19          Q.  And we talked about this
20  before, you're a licensed clinical psychologist?
21          A.  Yes.
22          Q.  You don't have a degree
23  in computer science or engineering or product
24  design; right?
25          L. SCARCELLO:  Object to the

Page 46

1  form of the question.
2           THE WITNESS:  Correct.
3           BY R. EHLER:
4           Q.  And you have never worked
5  as a product designer; correct?
6           A.  Correct.
7           Q.  And we covered this
8  before, but you haven't been employed by a
9  technology company at all, let alone to work on
10  user interface or product architecture; correct?
11          A.  Correct --
12          L. SCARCELLO:  Object to the
13  form.
14          BY R. EHLER:
15          Q.  You're also not a medical
16  doctor; right?
17          A.  Correct.
18          Q.  Not a psychiatrist;
19  correct?
20          A.  Correct.
21          Q.  And you do not prescribe
22  and cannot prescribe medications to treat
23  psychological -- psychiatric conditions like
24  depression and anxiety; right?
25          A.  Correct.

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                July 10, 2025

Page 47

1          Q.   You don't have a degree
2    in epidemiology; correct?
3          A.   I'm a professor of
4    population health which encompasses epidemiology.
5          Q.   Do you have a degree --
6    are any of your degrees in epidemiology?
7          A.   No.
8          Q.   So it is a part of your
9    overall population health work?
10         A.   Yes.
11         Q.   You don't describe
12   yourself as an epidemiologist on your CV or in
13   your report; is that right?
14         L. SCARCELLO:  Object to the
15   form of the question.
16         THE WITNESS:  I typically
17   describe myself based on the context of where I am
18   and who I'm speaking with and what data I am
19   presenting or discussing.
20         BY R. EHLER:
21         Q.   In your published
22   academic work, have you ever described yourself as
23   an epidemiologist?
24         A.   When I'm presenting
25   epidemiological data or population-based data from

Page 48

1    some of our studies or publicly available data,
2    then I introduce myself as a professor of
3    population health.
4          Q.   Of population health, not
5    epidemiology; correct?
6          A.   Population health
7    encompasses epidemiology.
8          Q.   Before the report you did
9    in this case, had you conducted a Bradford Hill
10   analysis?
11         A.   In graduate school.
12         Q.   Never published a
13   Bradford Hill analysis; correct?
14         A.   No, but interestingly,
15   I've been thinking about doing one.  Just it was a
16   coincidence that -- well, not really a
17   coincidence.  I had actually been thinking about
18   doing one on this very subject, so I volunteered
19   to -- in addition to my exhaustive review, it gave
20   me a nice opportunity to do the Bradford Hill as
21   well.
22         Q.   Have you submitted the
23   Bradford Hill analysis that you've done in
24   connection with your litigation work for
25   publication?

Page 49

1          A.   I have not.
2          Q.   And so other than your
3    graduate work and thinking about doing a Bradford
4    Hill analysis, there is not another Bradford Hill
5    analysis in your professional career thus far?
6          L. SCARCELLO:  Objection,
7    misstates testimony.
8          BY R. EHLER:
9          Q.   Is that right?
10         A.   That is correct.
11         Q.   You're not a
12   neuroscientist; correct?
13         A.   Correct.
14         Q.   And you're not -- you
15   don't have a degree in public education; is that
16   fair?
17         L. SCARCELLO:  Objection.
18         THE WITNESS:  I'm not sure how
19   you define "public education."
20         BY R. EHLER:
21         Q.   I don't know.  Professor
22   of public education?
23         A.   I don't think I've ever
24   heard of that.
25         Q.   Master's of education?

Page 50

1          A.   It's -- yeah, it's not
2    typically called public education but -- no, I do
3    not have a degree in education.
4          Q.   Within your field of
5    psychology, do you hold yourself out to your
6    colleagues as someone who specializes in ADHD?
7          A.   I'm known clinically for
8    psychodiagnostic assessments in ADHD.
9          Q.   Is that part of your
10   patient practice?
11         A.   Yes.
12         Q.   But not your research
13   work?
14         A.   I don't typically do a
15   lot of research with ADHD.
16         Q.   Autism?
17         A.   Again, more clinically
18   than research.
19         Q.   Bipolar disorder?
20         A.   Again, more clinical than
21   research.
22         Q.   Have you ever done
23   research on bipolar disorder?
24         A.   No.
25         Q.   What about autism?

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                          July 10, 2025

Page 51

1          A.  No.
2          Q.  Schizophrenia?
3          A.  No.
4          Q.  Would you consider
5   yourself an expert in screening tools to assess
6   whether someone has a psychiatric disorder?
7          A.  Yes.
8          Q.  Do you specialize in
9   addiction medicine?
10         A.  What do you mean by
11  "specialize"?
12         Q.  In your research practice
13  or your clinical practice, since we've been
14  answering both.
15         A.  I've seen many, many
16  patients with all sorts of addictions.
17         Q.  And you treat patients
18  for addictions?
19         A.  I do.
20         Q.  Including substance
21  addictions?
22         A.  True.
23         Q.  But not with medication?
24         A.  No.
25         Q.  How frequently do you --

Page 52

1   let me ask this differently.  How many patients do
2   you have right now in your practice, in your
3   private clinical practice?
4          A.  Well, it fluctuates.
5   People come in and out of therapy, so it's really
6   hard to estimate.
7          Q.  Right now.
8          A.  Roughly, I would say
9   about seven a week.
10         Q.  And that would have gone
11  down during that March and April period when you
12  were working on the Plaintiffs' expert report?
13         A.  (No verbal response.)
14         Q.  Is that a yes?
15         A.  Yes.
16         Q.  During that time frame,
17  did your patients go see someone else?
18         A.  No, there's -- there's
19  ebb and flow with clinical work, and so I
20  basically used a triage system.  So people who
21  were -- needed to be seen were seen, and those who
22  were doing pretty well were not seen as
23  frequently.
24         Q.  What percentage of your
25  seven or so a week patients are under 18?

Page 53

1          A.  About two-thirds.
2          Q.  In Canada, do you all use
3   like a diagnostic form for insurance or is there
4   some other --
5          A.  No, we don't.  Patients
6   don't need a diagnosis to get reimbursed from
7   insurance.
8          Q.  Okay.  Do you have a
9   patient intake survey or somewhere where you
10  record the -- your diagnosis or other facts about
11  that patient?
12         A.  No, I just do a clinical
13  interview and make notes at that time.
14         Q.  You don't give them a
15  formal survey or questionnaire?
16         A.  Based on the interview, I
17  often follow it up with surveys to gather more
18  information.  I also get -- usually with
19  psychodiagnostic assessments, then I would need
20  information often from parents as well as
21  teachers, so they may fill out questionnaires as
22  well.  And I often chat with the parents as well.
23         Q.  Do you provide the
24  parents or the --
25         L. HORVATH:  We appear to have

Page 54

1   lost audio.
2          L. SCARCELLO:  Should we go
3   off the record?
4          R. EHLER:  Let's go off the
5   record for a second.
6          THE VIDEOGRAPHER:  Current
7   time is 12:24 p.m., and we are off the record.
8   --- Off-record discussion
9          THE VIDEOGRAPHER:  The current
10  time is 12:29 p.m., and we are back on record.
11      BY R. EHLER:
12         Q.  Doctor, we were just
13  speaking about your clinical work, and you were
14  saying you collected information from parents and
15  teachers about your patients.  Do you ever provide
16  them with information?
17         L. SCARCELLO:  Objection.
18  Misstates testimony.
19         THE WITNESS:  I can only
20  release confidential information with a patient's
21  consent.
22      BY R. EHLER:
23         Q.  That's not what I meant.
24  Sorry, I'll be more clear.  Like pamphlets or
25  websites or anything written -- any written

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                                July 10, 2025

---

Page 55

1  information as it relates to the
2  psychiatric condition -- or psychological
3  conditions that you're treating them for?
4          A.   I don't have any
5  pamphlets or -- I'm still not understanding.  Are
6  you talking about in the assessment process?
7          Q.   I'm talking about in the
8  treatment or kind of therapy process whether you
9  give any handouts or resources.
10         A.   I recommend some
11 self-help reading, some books that are -- that I
12 think would be helpful.  And, again, that's on a
13 case-by-case basis.
14         Q.   There is nothing standard
15 that you provide?
16         A.   No, no.
17         Q.   Nothing standard on, for
18 example, screen time limits or anything like that?
19         L. SCARCELLO:  Objection.
20 Asked and answered.
21         THE WITNESS:  No.
22         BY R. EHLER:
23         Q.   Do you refer patients to
24 other medical practitioners such as psychiatrists
25 if they reach the level of a clinical disorder?

---

Page 56

1          A.   I -- I -- when I believe
2  that biology is driving the problem, then yes, I
3  try to refer for a psychiatric consult.
4          Q.   How often does that
5  happen?
6          A.   I don't track that data.
7  It's really hard to tell.
8          Q.   Is it rare?  Is it
9  common?
10         A.   I would say it occurs
11 sometimes.
12         Q.   Once a week?
13         A.   It also depends on the
14 patient's age and the nature of the problem.
15 So -- no, I would not say it's once a week.
16         Q.   Have you ever diagnosed a
17 patient with clinical depression?
18         A.   Yes.
19         Q.   And this would be in your
20 notes that you keep for yourself; correct?
21         A.   Correct.
22         Q.   Have you diagnosed a
23 patient with video game addiction?
24         A.   I have.
25         Q.   What diagnostic criteria

---

Page 57

1  did you use?
2          A.   I don't need -- I don't
3  need to recite or document a code for DSM or ICD,
4  internet gaming disorder.  I typically describe
5  the problem, how it's causing impairment, and lay
6  out a treatment plan.
7          Q.   How many times or about
8  how many times have you diagnosed patients with
9  video game addiction?
10         A.   Again, I don't -- I don't
11 know.  I don't track that data.
12         Q.   Is it common?
13         A.   It's common among teenage
14 boys.  Maybe --
15         Q.   Is it common in your
16 clinical practice?
17         A.   I'm trying to think of
18 over the years.  My best guess is probably a
19 dozen.
20         Q.   In your clinical career?
21         A.   Yes.
22         Q.   And you said you provide
23 a treatment plan.  What's the treatment plan?
24         A.   Usually cognitive
25 behavioral therapy.

---

Page 58

1          Q.   Do you ever suggest that
2  they be medicated or refer them to somebody who
3  can prescribe them medication?
4          A.   Rarely, but there were a
5  couple instances.
6          Q.   For those dozen or so
7  individuals that you diagnosed with video game
8  addiction, was their treatment successful?
9          A.   Most of them.
10         Q.   Have you ever diagnosed a
11 patient with social media addiction?
12         A.   I have.
13         Q.   About how many patients
14 have you diagnosed with social media addiction?
15         A.   More because teenage
16 girls are more likely to come to therapy than
17 teenage boys, and boys are more likely to be --
18 have internet gaming disorder.  A few dozen
19 probably.
20         Q.   A few dozen over the
21 course of your clinical career?
22         A.   Yes.
23         Q.   And what diagnostic
24 criteria do you use to diagnose those individuals
25 with social media addiction?

---

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                July 10, 2025

Page 59

1          A.   Again, I use standardized
2     questionnaires that quantify addiction and -- a
3     problem is not a problem until it's interfering
4     with functioning and impairment.  So I routinely
5     screen for that, especially in teenage girls, who
6     are at highest risk, and, again, explain how their
7     relationship with social media may be harming
8     them, and mutually craft a program to help them
9     with their mental health and address the social
10    media addiction.  I typically call it
11    "problematic," by the way.  It's just softer for
12    patients, less stigmatizing.
13          Q.   Fair enough.  And you
14    said you use a standard criteria; right?
15          A.   Yes.
16          Q.   What do you use?
17          A.   I usually use the Bergen
18    Social Media Addiction Scale or the Van Eijnden
19    one, Social Media Disorder Scale.  Both have
20    strong psychometric properties, both have been
21    validated, and they're widely used in both
22    research and, I imagine, clinicians as well.
23          R. EHLER:  I'll move to strike
24    everything after you're identifying the ones that
25    you used, respectfully.

Page 60

1          BY R. EHLER:
2          Q.   And you said you do that
3     as a screen for most of your teenage girl
4     patients; is that right?
5          A.   Again, I certainly probe
6     for it on the clinical intake, the interview, like
7     I said before, and depending what information
8     comes out, I will administer questionnaires to get
9     more information.  So if they're telling me
10    they're using social media regularly a few hours a
11    day, then I'll often follow up with that
12    questionnaire.
13          Q.   And of those few dozen
14    patients that you've diagnosed with problematic
15    social media use or social media addiction, what
16    was their treatment plan?
17          A.   Again, mostly cognitive
18    behavioral therapy and finding alternatives to
19    social media that are also reinforcing and have
20    greater mental health benefits.
21          Q.   Do you ever -- have you
22    referred any of those individuals to a
23    psychiatrist for medication?
24          A.   Rarely, but sometimes.
25          Q.   How many?

Page 61

1          A.   Maybe 20%.
2          Q.   And of those few dozen
3     patients that you diagnosed with problematic
4     social media use or social media addiction, was
5     their treatment successful?
6          A.   Success at therapy is
7     often -- it's much like anything else in life.
8     It's sort of, you know, what you get out of --
9     what you put into it is often what you get out of
10    it.  I would say the social media addiction has
11    been difficult to treat, but with patients who are
12    motivated, yes, most of them their condition
13    improves quite a bit.
14          Q.   What percentage is that?
15    Like, can you give me a ballpark of -- and how you
16    feel, more than half of them you feel they did --
17    you're happy with their progress or more than half
18    of them you feel like, you know, you wish you
19    could have --
20          L. SCARCELLO:  Object to the
21    form of the question.
22          BY R. EHLER:
23          Q.   They could have invested
24    more?
25          L. SCARCELLO:  Same objection.

Page 62

1          BY R. EHLER:
2          Q.   You can answer it.
3          A.   My best estimate about --
4     again, about two-thirds to three-quarters do quite
5     well.  And the remaining ones that don't do well
6     are just really not that invested.  They're often
7     there because their parents want them there.
8          Q.   Shifting gears a little
9     bit.  You don't have training in corporate
10    governance, business operations or internal risk
11    assessment for companies; right?
12          L. SCARCELLO:  Object to the
13    form.  Compound.
14          THE WITNESS:  No.
15          BY R. EHLER:
16          Q.   And I know that you've
17    reviewed documents in connection with this case
18    and those are listed on your reliance list, but
19    apart from those, do you have knowledge of any of
20    the internal product development processes that
21    are typically used by technology companies?
22          L. SCARCELLO:  Object.
23    Mischaracterizes the documents.  Subject to that,
24    you can answer.
25          THE WITNESS:  Just what's in

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                July 10, 2025

Page 63

1  the public domain.  What's been written.
2              BY R. EHLER:
3         Q.   Right.  No specialized
4  expertise?
5         A.   I'm not sure I understand
6  the question.
7         Q.   I asked whether you
8  have -- fair enough.  My question was if you have
9  knowledge.  Sure.
10            Aside from what you can read
11  on the internet and, you know, news publications
12  and that sort of thing, you don't have any
13  proprietary knowledge of technology companies and
14  how their internal product development processes
15  work; correct?
16            L. SCARCELLO:  Object to the
17  form.
18            THE WITNESS:  That's correct.
19            BY R. EHLER:
20        Q.   Would you agree that
21  inferring corporate knowledge or motive is outside
22  your area of expertise as a clinical psychologist?
23            L. SCARCELLO:  Object to the
24  form.
25            THE WITNESS:  Clinical

Page 64

1  psychologists are essentially experts in human
2  behavior, and we get paid to try to identify
3  motivation, whether that be an individual or a
4  business.  Based on my readings of the internal
5  documents, it seems obvious they were aware --
6  that these features were specifically designed to
7  promote engagement, excessive use, and I think
8  they were aware of harm.  Whether that was
9  their -- the Defendants' -- these companies,
10  whether that was their initial intention, I would
11  like to believe it was not, but they were
12  certainly aware of it.
13            L. HORVATH:  Objection,
14  non-responsive.
15            R. EHLER:  I'll move to strike
16  that answer and re-ask my question.
17            L. SCARCELLO:  Okay.  We
18  oppose the motion to strike.
19            BY R. EHLER:
20        Q.   The -- inferring
21  corporate knowledge or motive, is that something
22  that clinical psychologists regularly do?
23            L. SCARCELLO:  Objection to
24  form, compound.
25            THE WITNESS:  Industrial

Page 65

1  organizational psychologists do.
2              BY R. EHLER:
3         Q.   Okay.  You don't though;
4  right?
5              L. SCARCELLO:  Object to the
6  form.
7              THE WITNESS:  The internal
8  documents were consistent with the peer-reviewed
9  literature --
10            BY R. EHLER:
11        Q.   Dr. Goldfield, I'm going
12  to interrupt you because my question is about your
13  expertise and I'm trying --
14            L. HORVATH:  Objection.
15            BY R. EHLER:
16        Q.   -- to understand your
17  expertise as compared to other people who might do
18  this for a living.
19        A.   Right.
20        Q.   And in your field, your
21  published literature, your clinical expertise with
22  individual patients, inferring corporate
23  knowledge, corporate motive, that's not something
24  you've done before; right?
25            L. SCARCELLO:  So, Ms. Ehler,

Page 66

1  I would object to the form of the question and
2  object to the narrative before the end and the
3  characterization.
4              R. EHLER:  Counsel, you can
5  object and that preserves it for the record.
6              L. SCARCELLO:  Yeah, that's
7  what I did.
8              R. EHLER:  Okay.  The speaking
9  objections are interrupting the flow of the
10  deposition.
11            L. SCARCELLO:  I understand
12  that, but your question is inappropriate and you
13  have this long narrative before you finally get to
14  your question and it's inappropriate.  You
15  can't -- that's not an appropriate question.
16            BY R. EHLER:
17        Q.   Dr. Goldfield, my
18  question was:  In your field and in your published
19  literature and in your clinical expertise with
20  individual patients, inferring corporate
21  knowledge, corporate motive, that's not something
22  that you've done before; right?
23            L. SCARCELLO:  Objection,
24  compound.
25            THE WITNESS:  It would be hard

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 67

1  to imagine that these features have been designed
2  unintentionally.
3          R. EHLER: I'll move to strike
4  as non-responsive.
5          L. HORVATH:  Objection,
6  non-responsive.
7          L. SCARCELLO:  So we have an
8  agreement that an objection by one defense counsel
9  is an objection for all.  So I don't think that we
10  need to have the attorneys from Zoom interrupting
11  the flow of the deposition.
12          BY R. EHLER:
13      Q.  Can you hold in your mind
14  my question, Dr. Goldfield, which is:  In your
15  field of expertise, the published literature that
16  you've written, your clinical expertise with
17  patients, inferring corporate knowledge, corporate
18  motive, that's not something that you've done
19  before this case; right?
20          L. SCARCELLO:  Same objection.
21          THE WITNESS:  I -- I don't
22  think you need a track record in that to interpret
23  the internal documents, but yes, I have not done
24  that before.
25          BY R. EHLER:

Page 68

1          Q.  Is your view that anyone
2  could do it?
3          A.  I'm not saying that.
4          Q.  Do you understand that
5  platform design decisions require evaluating
6  multiple factors like, for example, the
7  technological feasibility of the design?
8          A.  I do.
9          Q.  And if you're evaluating
10  those reasonable alternative designs, you would
11  probably need some technological expertise, like
12  software engineering or product design; right?
13          L. SCARCELLO:  Objection,
14  compound, calls for speculation.
15          THE WITNESS:  My evaluation of
16  the technology is its impact on mental health.  I
17  don't get bogged down in the program -- underlying
18  computer programs driving algorithms.
19          R. EHLER: I'll move to strike
20  as non-responsive because that's a different
21  question than the one that I asked, which I think
22  the answer is -- well, I ask the question again.
23          L. SCARCELLO:  So we disagree
24  with the objection.
25          BY R. EHLER:

Page 69

1          Q.  If someone is evaluating
2  reasonable alternative designs, you'd need a
3  technological expertise like software engineering
4  or product design to do that; right?
5          L. SCARCELLO:  Same objection,
6  compound, calls for speculation.
7          THE WITNESS:  Can you ask the
8  question one at a time, please.
9          BY R. EHLER:
10      Q.  I -- can you answer my
11  question as I stated it?
12          L. SCARCELLO:  He's asked for
13  clarification or for you to at least restate it.
14  It sounds like he doesn't remember what the
15  question was.
16          BY R. EHLER:
17      Q.  How do you understand my
18  question?
19          A.  I'd appreciate it if you
20  rephrased -- if you ask it again.  Just ask it one
21  more time.
22          Q.  Sure.  If someone is
23  evaluating reasonable design alternatives for a
24  product, they need to have some technological
25  expertise, like software engineering or product

Page 70

1  design, to know, for example, the technological
2  feasibility of those reasonable designs; correct?
3          L. SCARCELLO:  Objection,
4  calls for speculation, compound, incomplete,
5  hypothetical.
6          THE WITNESS:  I would say it
7  would certainly be helpful.
8          BY R. EHLER:
9      Q.  And you're not offering
10  an opinion that evaluates the engineering
11  feasibility or tradeoffs of different design
12  decisions; correct?
13      A.  I'm -- I was tasked with
14  evaluating the impact of social media on mental
15  health, so correct.
16      Q.  So no?
17      A.  Right.
18      Q.  And you're not offering a
19  cost-benefit analysis of specific design
20  alternatives; correct?
21      A.  You're talking about
22  financial cost benefits or emotional?  I don't
23  understand the question.
24      Q.  From a design perspective
25  cost-benefit analysis.

Arbitration Place
(613) 564-2727                                                (416) 861-8720

Page 71

1          A.  No, that's not part of my
2    analysis in the report.
3          Q.  And so you can't actually
4    assert that any particular design alternative
5    would be technologically or commercially viable
6    compared to the current design of Defendants'
7    platforms; correct?
8          L. SCARCELLO:  Objection to
9    the form.
10         THE WITNESS:  I don't know.
11   I'm not a programmer, so I can't speak to how
12   feasible an alternative design might be.
13   BY R. EHLER:
14         Q.  I'm going to hand you
15   Exhibit 6.
16         EXHIBIT NO. 6:  MATERIALS
17              CONSIDERED LIST
18   BY R. EHLER:
19         Q.  Dr. Goldfield, this is
20   the materials considered list that accompanied
21   your first April 18th report.  Do you recognize
22   it?
23         A.  I do.
24         Q.  How did you choose what
25   documents you put on this list?

Page 72

1          A.  I was given access to a
2    system called Disco and most of the -- most of
3    what's in here, I basically just used boolean
4    searches and brought up documents as relevant to
5    wherever I was in drafting the report.
6          Q.  That covers the internal
7    company documents.  What about the literature?
8          A.  I was provided access to
9    a lot of this information on an as-needed basis.
10   I would request it.
11         Q.  Did counsel provide you
12   anything to take a look at that you didn't
13   request?
14         A.  Yeah, they showed me some
15   documents early on in the process, I think, to
16   give me some context about the evolution of a lot
17   of these social media companies, when apps and
18   things came around, and some of the design feature
19   changes, and bans, and bans were lifted.
20         Q.  So they gave you the
21   context for the Defendants' platforms and then you
22   did further searches on your own; is that right?
23         L. SCARCELLO:  I'm going to
24   object to the question.  This violates the
25   agreement not to get into conversations between

Page 73

1    attorneys and experts.  So I would ask that we
2    move on from this.  We have not been going into
3    this in other depositions.
4    BY R. EHLER:
5          Q.  You'll take your
6    counsel's instruction not to answer?
7          A.  I will.
8          Q.  What percentage of the
9    documents on your materials considered list did
10   you identify versus what counsel provided to you?
11         L. SCARCELLO:  Same objection.
12   This gets into communications between attorneys
13   and experts, and we have not been getting into
14   that, subject to our agreement.  If we need to go
15   back off the record --
16         R. EHLER:  I'm just asking for
17   the percentage.
18         L. SCARCELLO:  I understand
19   what you're asking.  That question violates the
20   agreement not to get into attorney-expert
21   communications, and so I would like -- I think we
22   need to move on from this line of questioning
23   because that is the --
24         R. EHLER:  Counsel, you can
25   instruct your witness not to answer.

Page 74

1          L. SCARCELLO:  That's the crux
2    of the agreement is that we're not getting into
3    attorney-expert --
4          R. EHLER:  I don't think that
5    is, but I don't want to fight about it on the
6    record.  You can either instruct your witness not
7    to answer or say you object and move on.
8          L. SCARCELLO:  Yeah, I object.
9    We can move on.
10         BY R. EHLER:
11         Q.  You can answer if she's
12   not directing you not to answer --
13         K. GOZA:  I think you're
14   saying -- you're instructing him not to answer.
15   He's going to say, I'll follow the instruction.
16         L. SCARCELLO:  Okay.  Yes.  I
17   will instruct you not to answer.
18         BY R. EHLER:
19         Q.  You included, by my
20   count, about 2,700 internal company documents on
21   this reference list; does that sound right?
22         A.  Yeah, that sounds about
23   right.  There were a lot of productions.
24         Q.  Did you read every single
25   one of those documents?

Page 75

1        A.  I looked at a lot of
2    documents.  I can't tell you how many -- I didn't
3    track how many I looked at and how many I didn't.
4        Q.  Okay.  So it's possible
5    that there are documents on this list that you
6    haven't looked at?
7        A.  I think I looked at --
8        L. SCARCELLO:  Object to --
9    mischaracterizes his testimony.
10        Slow down.  Please to give me
11    an opportunity to object before you answer.
12    That's okay.  Just a reminder.
13        BY R. EHLER:
14        Q.  Can you answer my
15    question?
16        A.  Again, I can't recall the
17    percentage, but I looked at a lot of documents
18    over a five-month period.
19        Q.  Okay.  But not all of the
20    documents on this list?
21        L. SCARCELLO:  Objection,
22    misstates testimony.
23        THE WITNESS:  I believe I
24    looked at all of them.
25        BY R. EHLER:

Page 76

1        Q.  Do you understand the --
2    do you understand that Meta produced millions of
3    documents in this case?
4        A.  I have no idea what Meta
5    has produced.
6        Q.  Do you understand that
7    TikTok produced millions of documents in this
8    case?
9        A.  I am sure there is a lot
10    of documentation.
11        Q.  Do you understand that
12    Snap has produced millions of documents in this
13    case?
14        A.  Yes.
15        Q.  And the same for YouTube?
16        A.  I am sure it applies to
17    YouTube as well.
18        Q.  How do you know that
19    there aren't highly relevant documents that you
20    did not review?
21        A.  That would be impossible
22    to know, but there were recurring themes and the
23    internal research was consistent with the
24    peer-review literature.
25        R. EHLER:  I'll move to strike

Page 77

1    everything after "that would be impossible to
2    know."
3        L. SCARCELLO:  We disagree
4    with that motion.  We would object to that motion.
5        BY R. EHLER:
6        Q.  You said you had a
7    database, Disco.  Do you know if that included all
8    of the documents that the Defendants had produced
9    in this case?
10        A.  I -- I can't speak to
11    that.
12        Q.  What search terms did you
13    run?
14        A.  It would depend on
15    whatever is relevant to the section.  If I was
16    looking at algorithms, then I would put
17    "algorithm" in.  If I was looking at depression,
18    then sometimes I would use that key word.  If I
19    was looking at other terms, I would use other
20    search terms.
21        Q.  So just looking for what
22    might support the argument you're making in the
23    report?
24        L. SCARCELLO:  Objection,
25    mischaracterizes testimony.

Page 78

1        THE WITNESS:  I was looking
2    for consistent themes.  My opinion relies very
3    little on the internal documents and almost
4    exclusively on the peer-reviewed literature.  I
5    reviewed 44 meta-analyses, that's what I based my
6    opinion on.
7        BY R. EHLER:
8        Q.  Did you record the
9    searches you ran through the database?
10        A.  I did not.
11        Q.  In your own academic
12    research work and publications, you typically cite
13    that peer-reviewed literature; right?
14        A.  I do, yes, that's
15    correct.
16        Q.  And that -- tell me why.
17        A.  Why I cite peer-reviewed
18    literature?
19        Q.  Yeah.
20        A.  In academic?  Because
21    that's just part of the academic standard.
22        Q.  Why is it part of the
23    academic standard?
24        A.  Because it's been
25    reviewed by experts in a team to pass a certain

Page 79

1  amount of methodological rigor and validity.
2       Q.  And you wouldn't cite
3  written work product that doesn't meet those
4  academic rigorous standards; correct?
5       L. SCARCELLO:  Objection,
6  calls for speculation.
7       THE WITNESS:  Well, it depends
8  on the type of publication.  Some people write
9  opinion papers -- but no, that's not typically
10  part -- a standard part of academia.
11      BY R. EHLER:
12      Q.  In your work product, in
13  your research work that you seek to be published
14  and contribute to the scientific body of
15  literature, you wouldn't cite academic work or
16  written work that hasn't been peer-reviewed;
17  correct?
18      L. SCARCELLO:  Objection,
19  misstates testimony.
20      THE WITNESS:  I wouldn't say
21  never.  There -- I've seen papers and may have
22  referenced my own papers on a talk I've given or
23  other people who have presented data at a
24  conference and used that citation.  It's not
25  common, but it happens.

Page 80

1       R. EHLER:  I'll move to
2  strike.
3       BY R. EHLER:
4       Q.  Have you cited -- can you
5  think of right now a citation in one of your
6  publications, your academic publications, that is
7  not a peer-reviewed piece of work?
8       L. SCARCELLO:  We would object
9  to the motion to strike.
10      THE WITNESS:  I don't recall
11  that I have -- that I -- I mean, maybe, it's
12  possible.  But again, it's not typically part of
13  how I reference, nor is it common among most
14  scientists.
15      BY R. EHLER:
16      Q.  Of the thousands of
17  internal company documents that you include on
18  your materials considered list, none of those are
19  peer-reviewed scientific literature; right?
20      L. SCARCELLO:  Object to the
21  form, vague.
22      THE WITNESS:  I know a lot of
23  the internal research were conducted by very
24  well-qualified scientists.  Whether they had to go
25  through a research ethics board council or not, I

Page 81

1  don't know.
2       R. EHLER:  I'll move to strike
3  your answer.
4       BY R. EHLER:
5       Q.  I think it's a yes-or-no
6  question.  Of the thousands of internal company
7  documents that you included on your materials
8  considered list, none of those are peer-reviewed
9  scientific literature; right?
10      L. SCARCELLO:  We would object
11  to the motion to strike.  He can answer questions
12  in whatever way he believes is responsive.  So a
13  yes/no question doesn't necessarily get a yes or a
14  no one-word answer.
15      THE WITNESS:  I mean, I really
16  don't -- I'm naive to the process of internal
17  publications.
18      BY R. EHLER:
19      Q.  So you have no idea?
20      L. SCARCELLO:  Objection,
21  misstates testimony.
22      THE WITNESS:  It's kind of a
23  hypothetical.  I've already established I don't
24  consult internally to technology companies.
25      BY R. EHLER:

Page 82

1       Q.  Right.  So you don't
2  know?
3       L. SCARCELLO:  Objection,
4  misstates testimony.
5       THE WITNESS:  I don't know.  I
6  don't know what the process is.  I don't know if
7  they send it to their colleagues, which would be a
8  form of peer review, who are other scientists.
9  I've seen in the academic literature publications
10  from different -- from Defendants' scientists that
11  are also collaborative with professors in
12  traditional academia.  So there are many ways to
13  get a peer review without it being formal.
14      R. EHLER:  I'll move to strike
15  the last answer.
16      L. SCARCELLO:  We would object
17  to the motion to strike.
18      BY R. EHLER:
19      Q.  You're just speculating
20  with all of that, right, because you've never
21  worked at a technology company, you haven't seen
22  any peer-reviewed literature in what you reviewed?
23  That's just speculation?
24      L. SCARCELLO:  Object to form.
25      THE WITNESS:  Yeah, my guess

Page 83

1  is most of it is not peer-reviewed.
2          BY R. EHLER:
3          Q.  Is any of it?  Did you
4  see any peer-reviewed -- any of the internal
5  company documents that were peer-reviewed?  And
6  I'm struggling with the sort of candid -- and why
7  you can't just say no to this.
8          A.  Yeah.
9          L. SCARCELLO:  Objection.  If
10 you have a question, you can ask a question, but
11 you're not going to instruct the witness how to
12 answer.  So please ask questions and he will
13 answer them how he sees fit.
14         THE WITNESS:  I'm just -- the
15 reason I'm hesitating is I'm trying to think if
16 the Kramer and some of these other publications
17 peer-reviewed appeared internally or not.  Is that
18 what you're asking me?
19         BY R. EHLER:
20         Q.  No.
21         A.  Okay.
22         Q.  That's not what I asked
23 you.  But for the sake of time, I think we'll move
24 on.
25         A.  Okay.

Page 84

1          Q.  Dr. Goldfield, your
2  clinical license is for Canada; right?  You're not
3  a licensed psychologist in the United States;
4  correct?
5          A.  Correct.
6          Q.  And you didn't earn your
7  bachelor's degree in the United States; correct?
8          A.  Correct.
9          Q.  You didn't earn your
10 Ph.D. in the United States; correct?
11         A.  Correct.
12         Q.  And is it fair to
13 describe your psychology, your academic research
14 and the other work you've done, the vast majority
15 of that has been done on individuals and
16 adolescents outside of the United States; correct?
17         A.  Most of it.  But I've
18 published with American datasets and I did train
19 in the U.S., so obviously when I was in the U.S. I
20 did research on American children.
21         Q.  Yeah, fair enough.  But
22 the majority of your publications and your studies
23 are about Canadians; right?
24         A.  Yes.
25         Q.  You would agree with me

Page 85

1  that there are differences or at least
2  hypothetical differences between Canadian
3  adolescents and U.S. adolescents; right?
4          L. SCARCELLO:  Objection,
5  incomplete hypothetical.
6          THE WITNESS:  There might be
7  demographic differences, but I don't think there
8  are huge cultural differences.
9          BY R. EHLER:
10         Q.  Can you just assume that
11 without having tested that hypothesis?
12         A.  I would have to look at
13 the data more carefully.  I can't speculate on
14 that.  When -- you know, this context is social
15 media and mental health, and I'm not convinced
16 there are any differences between Canadians and
17 American children in that regard.
18         Q.  Are there differences
19 between Canadian and American children with
20 respect to physical health?
21         L. SCARCELLO:  Objection,
22 calls for speculation.
23         THE WITNESS:  There might be.
24 It depends.  Physical health is -- I don't know
25 what you're -- physical health can mean a lot of

Page 86

1  things.  Physical fitness, it could be body
2  weight, it could be diabetes, it could be all
3  kinds of parameters.
4          BY R. EHLER:
5          Q.  Sure.  And you said there
6  might be.  I'm just trying to get to the fact that
7  you would have to test that hypotheses to know;
8  right?
9          A.  Yes.
10         Q.  And same for other
11 nationalities, cultures as well, you would have to
12 test the hypothesis before you assumed that
13 research done on adolescents in China, for
14 example, is useful for making conclusions about
15 adolescents in the United States; right?
16         L. SCARCELLO:  Object to the
17 form, vague, calls for speculation.
18         THE WITNESS:  I think science
19 is driven by hypotheses, and so it's always a good
20 practice to verify findings in different cohorts
21 of children around the world.
22         BY R. EHLER:
23         Q.  Dr. Goldfield, your
24 opinion in your report -- and this is your
25 overarching opinion -- is that:

Page 87

1                    "Defendants' social media
2              platforms cause
3              problematic social media
4              use and cause or
5              contribute to cause other
6              mental health harms among
7              children and youth."
8    And if you're looking at it, that would be Exhibit
9    1, paragraph 39(A).
10            L. SCARCELLO:  And I would
11   just object that we are working from kind of a
12   superseded version of the report.
13            K. GOZA:  And, Rose, I hate to
14   interject, but I think you might have misspoke.
15   You said "cause or continue to cause" and I'm not
16   sure that's what it says.
17            R. EHLER:  Thank you.  I
18   appreciate that.  "Contribute to cause," if I
19   misspoke.
20            BY R. EHLER:
21       Q.  So let me read that
22   again.  Dr. Goldfield, your opinion expressed in
23   paragraph 39(A) is that:
24              "Defendants' social media
25        platforms cause

Page 88

1              problematic social media
2              use and cause or
3              contribute to cause other
4              mental health harms among
5              children and youth."
6    That's your opinion, right?
7       A.  That is my opinion, yes.
8       Q.  That opinion is new for
9    this case; right?
10            L. SCARCELLO:  Objection,
11   vague.
12            THE WITNESS:  I was asked to
13   formulate an opinion based on my scientific review
14   of the evidence.
15            BY R. EHLER:
16       Q.  Right.  But it's new for
17   this case, the concept that Defendants' social
18   media platforms cause problematic use and cause or
19   contribute to causing -- it's Defendants'
20   platforms that are causing those harms among
21   children and youth?
22            L. SCARCELLO:  Same objection.
23            THE WITNESS:  I'm not sure I
24   understand what you're trying to get at by "new."
25            BY R. EHLER:

Page 89

1       Q.  You haven't expressed
2    that opinion in your written work before the
3    expert reports that are sitting in front of you;
4    correct?
5       A.  I have never done an
6    exhaustive review so this process has allowed me
7    to review 44 meta-analyses, which is not typical
8    of any single paper that I publish nor any
9    academic.  And so it's given me a depth and
10   breadth of knowledge that I think positions me
11   well to make a conclusion about the causal nature
12   of social media and mental health harms.
13            R. EHLER:  I'll respectfully
14   move to strike that.
15            BY R. EHLER:
16       Q.  My question is more
17   simple, which is that --
18            L. SCARCELLO:  We would object
19   to the motion to strike.
20            R. EHLER:  I don't think you
21   need to do that for the record, just for time.
22            L. SCARCELLO:  Well, I'm going
23   to do it because I want to preserve the record
24   correctly, accurately.
25            BY R. EHLER:

Page 90

1       Q.  My question is that you
2    haven't expressed that opinion in your written
3    work before the expert reports that are sitting in
4    front of you; correct?
5            L. SCARCELLO:  Objection,
6    asked and answered.
7            THE WITNESS:  In my '23 and
8    '24 publication, I refer to causal relationships
9    and many other experiments use similar language.
10       Q.  Did you -- have you ever
11   used the words that say that it's Defendants'
12   social media platforms that are causing that?
13   Have you ever used those words in your 2023 or
14   2024 publications?
15       A.  No, that's not typical.
16   The term "defendant" would be for a litigation
17   case.  So I'm evaluating the peer-reviewed
18   literature in academia.
19       Q.  And is what you're trying
20   to tell me now that in your 2023 and 2024
21   publications, you expressed the opinion that --
22   taking aside Defendants -- social media platforms
23   cause problematic social media use?
24            L. SCARCELLO:  Objection,
25   mischaracterizes testimony.

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 91

1          THE WITNESS:  Again, my
2  arrival at that conclusion is not based on any one
3  study, whether I've done it or another study.
4  It's based on 44 meta-analyses which includes 6 to
5  800 studies.
6          BY R. EHLER:
7          Q.  Dr. Goldfield, we might
8  be talking past each other.  I'm trying to get a
9  sense of timing.
10          A.  Okay.
11          Q.  And the timing of this
12  opinion that you're expressing in these cases that
13  social media platforms cause problematic social
14  media use and cause or contribute to cause other
15  mental health harms among children and youth, that
16  opinion is new to the work you've been doing for
17  Plaintiffs in this case; right?
18          L. SCARCELLO:  Objection,
19  asked and answered.
20          THE WITNESS:  The opinion is
21  based on the new endeavor I've taken on to do such
22  an exhaustive comprehensive review.
23          BY R. EHLER:
24          Q.  Okay.  Since forming that
25  opinion, have you contacted any U.S. public health

Page 92

1  authority to tell them about this conclusion
2  you've reached?
3          A.  No, I have not.
4          Q.  We talked about your
5  clinical practice earlier.  For the individuals
6  that you've diagnosed with problematic social
7  media use, have you ever recommended to any of
8  them that they bring a lawsuit against one of the
9  social media platforms?
10          L. SCARCELLO:  Object to form.
11          THE WITNESS:  That is
12  certainly not a typical clinical recommendation,
13  no.
14          BY R. EHLER:
15          Q.  Is it your opinion that
16  social media platforms should be banned?
17          A.  I think it depends.
18  Banned for who?
19          Q.  For everyone.
20          A.  Well, I think I've
21  outlined the potential -- the actual harms in
22  children and adolescents, so I believe there
23  should be at least some safeguards.  And I believe
24  during adolescence, an incredibly vulnerable
25  period of time for all the reasons I outline in my

Page 93

1  report for mental health difficulties, I believe
2  that there should be at least parental consent.
3          R. EHLER:  Dr. Goldfield, I'm
4  going to move to strike because my question is
5  different.
6          L. SCARCELLO:  We will object
7  to the motion to strike.
8          BY R. EHLER:
9          Q.  It is whether you think
10  that social media platforms should be banned for
11  everyone.  Do you hold that belief?
12          A.  I believe they're
13  harmful, but I believe adults can make their own
14  decisions about social media.
15          Q.  Do you think they're
16  harmful for adults?
17          A.  I do.
18          Q.  Do you think they should
19  be banned for under -- well, for adolescents?
20          A.  I believe there should be
21  proper age verification and some safeguards put in
22  place to make the product healthier and to cause
23  less harm.
24          Q.  So is that a no, you
25  don't think they should be banned?

Page 94

1          L. SCARCELLO:  Objection,
2  asked and answered.
3          THE WITNESS:  I think that is
4  for the policy-makers.  I don't really have much
5  of an opinion about -- it would also depend -- the
6  harm of any environmental exposure is based on
7  individual susceptibility.  So I would -- you
8  know, I would argue that it's not safe at all
9  for -- as it is now, with no reform to the
10  features, I would -- I -- if it was a perfect
11  world, in my world, I would say it should be
12  banned at least 16 and under and maybe even 18 and
13  under.
14          Q.  That's not an opinion you
15  express in your report; correct?
16          A.  I do express that
17  13-year-old kids are incredibly vulnerable and
18  without proper age verification.
19          Q.  Dr. Goldfield, I'm going
20  to interrupt you.
21          L. SCARCELLO:  Excuse me.
22  Please let Dr. Goldfield finish his answer.
23          Go ahead.
24          THE WITNESS:  So that's the
25  demographic that's most vulnerable and one of the

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 95

1  highest users.  So no, I have not stated
2  necessarily about 16 or 18.  I've felt that --
3  like I said before, in the first part of my
4  answer, my personal opinion is not going to change
5  public policy.  That's for the policy-makers.
6          BY R. EHLER:
7          Q.  Have you told any
8  policy-makers of your view based on the scientific
9  evidence?
10         A.  I'm on a -- part of a
11  committee here in Canada and, yes, we have met
12  with politicians.
13         Q.  But not U.S.
14  policy-makers; correct?
15         A.  Correct.
16         Q.  So not the Surgeon
17  General?
18         A.  No.  But the Surgeon
19  General cited some of my work in their report,
20  identifying its harms.
21         Q.  Who is the U.S. Surgeon
22  General?
23         A.  Murthy.
24         Q.  Is he still the Surgeon
25  General?

Page 96

1          A.  He was when he wrote it.
2          Q.  Do you think that's still
3  the view of the U.S.?
4          L. SCARCELLO:  Objection,
5  relevance.
6          THE WITNESS:  How would I know
7  that?
8          BY R. EHLER:
9          Q.  Have you -- strike that.
10         If one of the Defendants'
11  experts in this case said that, to date, the
12  evidence of harmful effects from social media use
13  hasn't been compelling, would you disagree with
14  them?
15         L. SCARCELLO:  Objection,
16  incomplete hypothetical, calls for speculation.
17         THE WITNESS:  If someone said
18  that today?  Was that the question?  If someone
19  said that today?
20         BY R. EHLER:
21         Q.  If one of the defense
22  experts said that statement, to date, the evidence
23  of harmful effects from social media use has not
24  been compelling, would you disagree with that?
25         A.  After doing this

Page 97

1  exhaustive review, yes, I would disagree with
2  that.
3          Q.  Okay.  If that expert
4  expressed that opinion earlier in 2025, would you
5  still say they were wrong?
6          L. SCARCELLO:  Same objection.
7          THE WITNESS:  Again, this
8  process has allowed me to get far deeper and more
9  expansive knowledge of the literature and I feel
10  I'm best positioned right now to render an opinion
11  on causality than at any time in my career.
12         R. EHLER:  I'm going to move
13  to strike that as not answering my question.
14         L. SCARCELLO:  We would object
15  to the motion to strike.
16         BY R. EHLER:
17         Q.  If an expert expressed
18  the opinion earlier in 2025 before you did all
19  this work that, to date, the effects of harmful
20  effects from social media use has not been
21  compelling, would you agree with them?
22         L. SCARCELLO:  Objection,
23  asked and answered.
24         BY R. EHLER:
25         Q.  Or disagree with them?

Page 98

1          L. SCARCELLO:  Same objection.
2          THE WITNESS:  It would
3  depend -- there has been so much really
4  high-quality experimental research done in the
5  last 12 months, so I would have to really look at
6  the timelines, when publications became released.
7  You know, 12 months in the social media literature
8  can produce thousands of papers.  So that would
9  obviously change my mind about things.
10         BY R. EHLER:
11         Q.  So is your view that this
12  has only become clear in the last 12 months?
13         L. SCARCELLO:  Objection,
14  misstates testimony.
15         BY R. EHLER:
16         Q.  And by this, I mean your
17  opinion that social media platforms cause
18  problematic social media use and cause or
19  contribute to the cause of other mental health
20  harms among children and youth?
21         L. SCARCELLO:  Same objection.
22         THE WITNESS:  It is my opinion
23  because, like I said, I've never done such an
24  exhaustive review before and been so familiar with
25  the literature.

Page 99

1      R. EHLER:  Move to strike.
2  That wasn't my question.
3      L. SCARCELLO:  We object to
4  the motion to strike.
5  BY R. EHLER:
6      Q.  Is your view that your
7  opinion regarding Defendants causing problematic
8  social media use has only become clear in the past
9  12 months?
10      L. SCARCELLO:  Objection,
11  misstates testimony.
12      THE WITNESS:  I would say it
13  has become more clear since this process.  So I
14  would say in the last three months, or two months
15  even -- three months.
16  BY R. EHLER:
17      Q.  And do you mean clear to
18  you or more clear in general?
19      A.  Clear to me.
20      Q.  What about clear in
21  general?
22      A.  I -- that would depend on
23  if other people did the same exhaustive review or
24  not.
25      Q.  So somebody would have to

Page 100

1  do the review that you did to have the same level
2  of clarity that you currently have; right?
3      L. SCARCELLO:  Objection,
4  misstates testimony.
5      THE WITNESS:  I can't
6  speculate on how people, you know, make
7  interpretations of the science.
8  BY R. EHLER:
9      Q.  Why -- how many academic
10  publications do you have?
11      A.  200 and a few -- 200 --
12  200-plus.
13      Q.  What's the point of all
14  that time?  Why do you publish and spend all of
15  that effort and time to publish in your field?
16      A.  Because it's --
17  disseminating knowledge is a primary goal of
18  academia.
19      Q.  And is one audience for
20  that knowledge the public?
21      A.  Typically it's students
22  and other academics, but sometimes -- you know,
23  sometimes there's -- learnings from data and
24  information get translated to the public.  That's
25  becoming a more increasing trend.

Page 101

1      Q.  Do you endeavor to be
2  honest in those written publications with the idea
3  that students and other academics and maybe the
4  public would be relying on them?
5      A.  Yeah, I don't think I
6  would intentionally mislead anybody.
7      Q.  Well, my question is
8  different.  Do you intend to tell the truth?
9      A.  Yes.
10      Q.  And do you still agree
11  that social media use at moderate levels is not
12  inherently harmful?
13      A.  Again, after this
14  review -- again, it would depend on other risk
15  factors.  And it would depend on how you quantify
16  "moderate use."  I think for some, I think they
17  could use an hour or two a day and the data --
18  there is very little harm.  For other people who
19  have other risk factors and other developmental
20  vulnerabilities, psychosocial vulnerabilities,
21  then that can be more harmful.
22      Q.  Right.  I'll move to
23  strike that.
24      L. SCARCELLO:  We object to
25  the move to strike.

Page 102

1  BY R. EHLER:
2      Q.  You know that you've
3  previously written that at moderate levels social
4  media use is not inherently harmful; right?
5      L. SCARCELLO:  Objection.
6      THE WITNESS:  On average, yes,
7  I'm aware I've said that.
8  BY R. EHLER:
9      Q.  And that statement was
10  true when you made it; right?
11      A.  I make statements based
12  on my knowledge at that time.  So I believed that
13  at that time.  Also, you're probably referring to
14  a single publication, so scientists are tied to
15  conclusions based on that one study.  This
16  exercise is completely different.
17      R. EHLER:  And I'll move to
18  strike everything after "I made that statement
19  based on my knowledge at that time."
20      L. SCARCELLO:  We would object
21  to the motion to strike.  His answer is
22  responsive.  I understand you're asking yes/no
23  questions and those don't always elicit yes/no
24  answers.  He is allowed to give context.
25  BY R. EHLER:

Page 103

1      Q.   You've also stated that
2  it may be advantageous for teens to use social
3  media; right?
4      A.   On average, the
5  meta-analyses show far more harm than benefit. A
6  few -- some single studies show some benefit, but
7  in my opinion those are outweighed by harm.
8      Q.   Okay.  Well, your studies
9  have shown benefits; right?
10     A.   I don't recall many
11 benefits, certainly not from an experimental
12 design.
13     Q.   Do you still believe that
14 non-problematic social media use can promote
15 connectedness among peers?
16     A.   I think it depends on the
17 population studied.  I think for folks on the
18 spectrum, autism spectrum, I think it can.  I
19 think kids with social anxiety, perhaps it can be
20 helpful, although avoidance actually generally
21 reinforces social anxiety, so not a good long-term
22 strategy.  Again, there are individual
23 differences.  I've never said that there are
24 segments of the population that can't benefit, but
25 when it's used in high levels or excessively, I

Page 104

1  think my report demonstrates that's when harm gets
2  amplified.
3          R. EHLER:  I'll move to strike
4  where you start --
5          L. SCARCELLO:  We would object
6  to the motion to strike.
7          R. EHLER:  -- "when it's used
8  in high levels or excessively."
9          L. SCARCELLO:  We object to
10 the motion.
11         BY R. EHLER:
12     Q.   Can social media use
13 assist in identity formation?
14     A.   Social media is a social
15 tool and so people can explore their identities
16 and solicit feedback, try on different hats, so to
17 speak.
18     Q.   And can it provide
19 entertainment?
20     A.   I think people do find it
21 entertaining.
22     Q.   Are those advantages we
23 just spoke about, promoting connectiveness among
24 peers, assisting in identity formation and
25 providing entertainment, do you view those as good

Page 105

1  things?
2          L. SCARCELLO:  Objection,
3  misstates testimony.
4          THE WITNESS:  I think when
5  you're weighing the pros and cons of any
6  environmental exposure, I think you need to look
7  at both sides of it.  So what's the cost that
8  those benefits may come at or what are the harms?
9  Right?  What are the tradeoffs essentially?  And
10 so when I look at the tradeoff and the potential
11 risk of harm -- people felt socially connected way
12 before social media.  And if social media was such
13 an effective tool, loneliness would not be
14 increasing.  And most of the meta-analyses show
15 reduction of social media produces reduced
16 loneliness so --
17         R. EHLER:  And I'll move to
18 strike, respectfully, because I'm not asking for a
19 cost-benefit analysis or a pros and cons.  I'm
20 just asking for whether what I described are good
21 in your view.
22         L. SCARCELLO:  We would object
23 to the motion to strike.  The witness can answer
24 your question in the way that he sees fit.  It
25 doesn't -- the idea that his response was

Page 106

1  unresponsive is incorrect.
2          So subject to that, you can
3  answer.
4          THE WITNESS:  I'm just trying
5  to contextualize the answer.
6          BY R. EHLER:
7      Q.   I understand.
8      A.   It's not always that
9  simple.
10     Q.   I understand.  And your
11 counsel can ask you questions that go to the other
12 side of the issue, but I'm just trying to
13 understand whether, sitting here today, you're
14 willing to agree that promoting connectedness in
15 peers, assisting in identity formation and
16 providing entertainment are positives?
17         L. SCARCELLO:  Objection,
18 asked and answered.
19         THE WITNESS:  I -- I don't
20 know how best I can answer this question other
21 than what I've said.  I think when you look at any
22 positives of any decision, they have to be weighed
23 against potential harm.
24         BY R. EHLER:
25     Q.   But those are positives

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                                July 10, 2025

Page 107

1    that you would weigh into the calculus, yes?
2         A.  I think the meta-analyses
3    don't show many positives.  Do some select
4    individuals benefit?  Maybe.
5         Q.  I will hand you what I've
6    marked as Exhibit 7.
7              EXHIBIT NO. 7:  PAPER
8              TITLED "ASSOCIATIONS
9              BETWEEN SOCIAL MEDIA USE
10             AND POSITIVE MENTAL
11             HEALTH AMONG ADOLESCENTS:
12             FINDINGS FROM THE
13             CANADIAN HEALTH BEHAVIOUR
14             IN SCHOOL-AGED CHILDREN
15             STUDY"
16   BY R. EHLER:
17        Q.  Doctor, I've handed you
18   an article where you're an author.  The first
19   author is Clayborne, published in 2015, title:
20   "Associations between social media use and
21   positive mental health among adolescents:
22   Findings from the Canadian Health Behavior in
23   School-aged Children Study."
24        A.  Um-hum.
25        Q.  This is a study that you

Page 108

1    authored?
2         A.  Correct.
3         Q.  And this study came out
4    while you were working on this report; right?
5         A.  No -- oh, yeah, it came
6    out.  It was submitted well before I started the
7    report.
8         Q.  And on page 337, so
9    several pages in, the paragraph on the left side
10   under the table --
11        A.  Um-hum.
12        Q.  -- says:
13             "-- our findings
14             generally suggest that
15             non-problematic, active
16             use of social media is
17             not negatively associated
18             with PMH --"
19   Which means positive mental health.  Right?
20        A.  Yes, that's right.
21        Q.  And what that means is
22   that moderate social media use, active social
23   media use, doesn't decrease positive mental health
24   for the children you were looking at; right?
25        A.  I don't agree with that.

Page 109

1    It's an association study, it's a cross-sectional
2    study.  So you can't infer causality from a single
3    cross-sectional study.
4         Q.  Fair enough.  It's not
5    associated -- let me rephrase it so I make sure
6    I'm precise with my language.  You found that
7    non-problematic active use of social media wasn't
8    negatively associated, and by that you mean it
9    didn't suggest that it was associated with
10   decreases in positive mental health; right?
11        A.  Yes.
12        Q.  And you note in the next
13   sentence that this is:
14             "-- supportive of the
15             Goldilocks hypothesis,
16             which suggests that
17             technology use at
18             moderate levels is not
19             inherently harmful, and
20             may even be advantageous
21             in a growingly connected
22             world where most
23             communications are
24             technology-dependent."
25   Those were words that you wrote in this article;

Page 110

1    correct?
2         A.  I personally didn't write
3    them, but I am an author on the paper.
4         Q.  So you agree with them;
5    right?
6         A.  You know, we make
7    statements at the time based on our knowledge of
8    the literature.  Again, since this paper has been
9    submitted, my opinions have changed based on my
10   exhaustive review.
11        Q.  And at the time you
12   agreed with that statement; right?
13        L. SCARCELLO:  Objection,
14   asked and answered.
15        THE WITNESS:  I think that's
16   what the data showed in this study.
17        BY R. EHLER:
18        Q.  Do you generally agree or
19   think there is merit to the Goldilocks hypothesis?
20        A.  I think everything, you
21   know, in mild to moderate levels are generally
22   okay, depending on people's individual risks for
23   addictive behavior.  Other studies have found the
24   Goldilocks hypothesis, so -- but keep in mind, the
25   national average is above moderate levels.  So

22STCV21355
DEPOSITION OF GARY GOLDFIELD

July 10, 2025

Page 111

1  that means most people are not using moderately,
2  most children and youth.
3          BY R. EHLER:
4          Q.   Okay.  But you do think
5  that, you know, for those Goldilockses, the
6  moderate levels, that's not a problem?
7          L. SCARCELLO:  Objection,
8  misstates testimony.
9          BY R. EHLER:
10         Q.   I'm trying to make sure I
11  understand your testimony.
12         A.   I would say they're at
13  lower risk.
14         Q.   Well, that's not what you
15  said in this study, is it?  You think they're
16  still at risk, it's just lower, or do you think
17  that for them it's not a problem?
18         A.   It's an association
19  study.  So we didn't even really quantify -- we
20  didn't do any dose response kind of relationship
21  with this study.  So we simply just looked at the
22  relationship between different forms of social
23  media, active and passive, and mental health.
24         BY R. EHLER:
25         Q.   And you can't rely on the

Page 112

1  association or cross-sectional studies to suggest
2  causation; right?
3          L. SCARCELLO:  Objection,
4  misstates testimony.
5          THE WITNESS:  In a single -- I
6  mean, it depends.  In this context, no.  In a
7  single study, it does not -- even well-controlled
8  studies, single studies.
9          BY R. EHLER:
10         Q.   On page 338 you note
11  that -- and this is the paragraph under 4.1,
12  "Strengths and limitations," the second sentence.
13              "Social networks can
14              represent valuable
15              resources for sexual and
16              gender minority
17              adolescents through
18              provision of emotional
19              support and information."
20  Do you agree with that?
21         A.   I think there are -- like
22  I said before, there are benefits for small
23  sections of the population.  So gender
24  minorities -- yeah, there is -- there are some
25  studies that support that, Coyne's work, this

Page 113

1  study here.
2          Q.   You didn't cite this
3  Clayborne 2025 study in your expert report, did
4  you?
5          A.   I can't recall.  There
6  are a lot of references in that report.
7          L. SCARCELLO:  If you need to
8  look through your report, you can.
9          R. EHLER:  Well --
10         L. SCARCELLO:  If you're going
11  to ask what was said in the report --
12         BY R. EHLER:
13         Q.   You don't remember citing
14  it?
15         A.   I actually thought I
16  might have.  If I could look at the reference
17  list.
18         Q.   I'm asking if you cited
19  it in the text of your report.
20         A.   There are hundreds.  I --
21  I would have to double-check.  If you can give me
22  a moment, that would be great.  It appears I did
23  not.
24         Q.   Why not?
25         A.   Let me check -- when did

Page 114

1  this come out?  Well, again, my report focuses on
2  meta-analyses and so I didn't report all that many
3  single studies.
4          Q.   And this is one that you
5  chose not to include; correct?
6          A.   I think when you're
7  reporting 44 meta-analyses, a couple more
8  cross-sectional studies doesn't add any clarity.
9          Q.   And the cross-sectional
10  study that you did involving the social media use
11  in positive mental health, you didn't think that
12  added anything to the context of your report;
13  right?
14         L. SCARCELLO:  Object, form.
15  Misstates testimony.
16         THE WITNESS:  I think I noted
17  some studies, as you mentioned before, that there
18  are some segments of the population that may
19  benefit from mild or moderate use.
20         R. EHLER:  I'll move to
21  strike.
22         BY R. EHLER:
23         Q.   My question was this
24  particular cross-sectional study that you
25  did that --

33

Arbitration Place

Page 115

1      L. SCARCELLO:  We object to
2  the motion to strike.
3           R. EHLER:  Can you let me
4  finish my --
5           L. SCARCELLO:  Well, yeah, but
6  you were moving on to the next question.  You say
7  "motion to strike" and then you start talking
8  really fast.  So yeah --
9           R. EHLER:  I'll pause to give
10  you that opportunity.
11           L. SCARCELLO:  Okay.
12  Fantastic.  I will not interrupt you.
13  BY R. EHLER:
14      Q.   This study that you did
15  that analyzed associations between social media
16  use and positive mental health, this is not one
17  that you thought needed to be included in your
18  expert report?
19           L. SCARCELLO:  Objection --
20  BY R. EHLER:
21      Q.   -- fair?
22           L. SCARCELLO:  Objection,
23  misstates testimony.
24           THE WITNESS:  Again, I focused
25  on meta-analyses.  Maybe -- perhaps it was an -- I

Page 116

1  don't know.  I just didn't feel that many single
2  studies really adds much to the meta-analytic
3  literature, unless it's really high quality.
4  BY R. EHLER:
5      Q.   Page 334 of Clayborne,
6  which is Exhibit 7.  You note a gap in the
7  evidence base and you say that:
8           "-- many studies don't
9           distinguish
10           intensity/frequency of
11           [social media use] from
12           problematic [social media
13           use], which are distinct
14           concepts."
15           L. SCARCELLO:  Can you point
16  us to where you're talking about, sorry.
17  BY R. EHLER:
18      Q.   Sure.  It's the second
19  paragraph on the left side that starts:
20           "An additional gap in the
21           evidence base is that
22           many studies do not
23           distinguish
24           intensity/frequency of
25           [social media use] from

Page 117

1           problematic [social media
2           use], which are distinct
3           concepts."
4      A.   There are some studies
5  that don't.
6      Q.   That was a gap that you
7  noted in the literature at the time; correct?
8      A.   I would say I disagree
9  with that statement based on my thorough review of
10  the literature for this litigation.
11      Q.   Well, at the time when
12  you wrote this, did you mean to draw a distinction
13  between how much people use social media and
14  whether or not that use is problematic and to
15  articulate that those are two different things?
16  WAS that what you were trying to articulate?
17      A.   Yes, I believe they are
18  different.
19      Q.   And if somebody is simply
20  using social media at a high level, intense level,
21  that doesn't mean that they're suffering from
22  problematic social media use; correct?
23           L. SCARCELLO:  Objection,
24  vague.
25           THE WITNESS:  Problematic

Page 118

1  social media use is measured distinctly.  I would
2  certainly say they're at risk if they're using --
3  if they're using really high -- you know, spending
4  four, six hours a day.  And I would be concerned
5  about the displacement of other health-promoting
6  behaviors, sleep, time with friends.
7  BY R. EHLER:
8      Q.   Exercise?
9      A.   Exercise.
10      Q.   You just said that
11  they're at risk, if they're using they're at
12  risk.  But I'm trying to understand analytically
13  that they're distinct concepts.  Just because
14  somebody is using a lot of social media doesn't
15  mean that you as a clinical psychologist would
16  diagnose them with problematic social media use;
17  correct?
18      A.   I would say there is
19  often overlap, but if you're forcing me into a
20  yes/no answer, they're measured separately.
21      Q.   And in this 2025
22  publication, you actually note that there is a big
23  difference in terms of the numbers.  So I'm in
24  that same paragraph and you say that:
25           "Among Canadian

22STCV21355
DEPOSITION OF GARY GOLDFIELD

July 10, 2025

Page 119

1    adolescents in 2018, 38%
2    of girls and 30% of boys
3    reported intense
4    SMU," social media use,
5    "(almost all the time
6    throughout the day),
7    whereas 7.7% of girls and
8    5.2% of boys reported
9    problematic use."
10   Do you see that?
11           A.   Yes, I see that.
12           Q.   So that was what you
13   wrote in this research publication; correct?
14           A.   Yeah, that's based on one
15   report.
16           Q.   Okay.
17           A.   Yeah.
18           Q.   And just to kind of flesh
19   out the numbers, there are 38% of girls that
20   report intense social media use, but 92.3% of all
21   girls don't report problematic usage, according to
22   this Public Health Agency of Canada that you
23   quoted in your research paper.  Yes?
24           A.   Well, according to that
25   paper, I guess those were the statistics.  But I

Page 120

1    have since come upon a meta-analysis from Cheng
2    that documents much higher rates of problematic
3    social media use, including in the U.S., among
4    children and adolescents.
5            R. EHLER:  I'll move to strike
6    your last answer --
7            L. SCARCELLO:  Object to the
8    motion to strike.
9            BY R. EHLER:
10           Q.   And I'm not talking about
11   Cheng.  I'm talking about your research where you
12   reported a big distinction between the rate of
13   intense social media use and problematic social
14   media use.  That's what you wrote in this paper
15   when you were trying to be honest; correct?
16           L. SCARCELLO:  Object to the
17   form of the question.
18           THE WITNESS:  Yes, there is a
19   difference in prevalence between problematic
20   social media use and intensity.
21           BY R. EHLER:
22           Q.   And the numbers are quite
23   stark, they're very different; right?  Those are
24   big differences in the numbers?
25           A.   There -- there are

Page 121

1    differences, but frequency and intensity are
2    associated with harm too.  It doesn't mean they're
3    exempt.
4            Q.   And if my math is
5    correct, there are 30% of boys that report intense
6    social media use in the numbers you reported in
7    your 2025 article, but there is 94.8% of boys that
8    don't report problematic usage.  That's what you
9    wrote in 2025 --
10           L. SCARCELLO:  So I will
11   object to the form of the question.  This study is
12   not from 2025.  It was submitted in 2023.  It was
13   accepted in November of 2024.  This is not a 2025
14   publication.
15           R. EHLER:  It is published in
16   2025.  It's at the top.  But can you let me finish
17   my questions and just object?
18           L. SCARCELLO:  Oh, sure, I
19   thought you were finished.  I'm so sorry.
20           THE WITNESS:  Sorry, can you
21   ask the question again?
22           BY R. EHLER:
23           Q.   Dr. Goldfield, when we
24   are talking about problematic social media use, as
25   you reported it in this Clayborne study that was

Page 122

1    published in 2025, the numbers you reported were
2    7.7% of girls and 5.2% of boys; right?
3            A.   That's what I reported.
4            Q.   And you mentioned a Cheng
5    article, and that's the one you reference in your
6    report, with much higher numbers; right?
7            A.   It's in -- it's not based
8    on a single study.  It's based on a meta-analysis
9    of a whole bunch of studies globally.
10           Q.   Right.  And all I want to
11   know is why you didn't think it was relevant to
12   put in your report that you had just published an
13   article with much lower numbers for problematic
14   social media use amongst Canadian adolescents?
15           L. SCARCELLO:  Objection,
16   asked and answered, mischaracterizes the testimony
17   and the documents.
18           THE WITNESS:  I think
19   statements are made based on knowledge at the
20   time, and clearly I know -- I can't speak for the
21   other people on the team, the other authors.  I
22   certainly was not aware of the Cheng paper.  Had I
23   been aware of it, we would have documented a
24   higher rate.
25           BY R. EHLER:

Arbitration Place

(613) 564-2727                                                                          (416) 861-8720

Page 123

1          Q.  Can you look at
2    paragraph -- page 21 of your April 18th report,
3    paragraph 48.  Maybe it's not on page 21.  Page 23
4    of Exhibit 1.
5          L. SCARCELLO:  And again, I
6    would just object to the use of the non-operative
7    report.
8          THE WITNESS:  This is Exhibit
9    1?  Sorry?  Yeah, 23.
10         BY R. EHLER:
11         Q.  Page 23, paragraph 48,
12   and this is where you talk about the Cheng 2021
13   study.
14         A.  Um-hum.
15         Q.  And so you reference 15%
16   as a conservative number for the percentage of
17   North American or U.S. teens that you estimate
18   have problematic social media use, yeah?
19         A.  Yes.
20         Q.  And from that, you
21   calculate that 11 million American adolescents
22   would meet the criteria for problematic social
23   media use?
24         A.  That's an approximation.
25         Q.  Sure.

Page 124

1          A.  Yes.
2          Q.  But if you had used the
3    2022 numbers that were estimates from the Public
4    Health Agency of Canada, that number would be half
5    or less of that 11 million; correct?
6          A.  Correct.
7          R. EHLER:  I'm at a decent
8    stopping place if you guys want to take a break
9    now, but I'm also happy to keep going.
10         L. SCARCELLO:  I've been
11   drinking a lot of water.  Let's take a bio break.
12         THE VIDEOGRAPHER:  The current
13   time is 1:44 p.m., and we are off the record.
14   --- Upon recessing at 1:44 p.m.
15   --- Upon resuming at 2:24 p.m.
16         THE VIDEOGRAPHER:  Current
17   time is 2:24 p.m., and we are back on record.
18         BY R. EHLER:
19         Q.  Good afternoon,
20   Dr. Goldfield.
21         A.  Good afternoon.
22         Q.  I'm going to give you
23   your amended report, which I'll mark as Exhibit 8.
24         EXHIBIT NO. 8:  AMENDED
25         AND EXPANDED EXPERT

Page 125

1          REPORT OF DR. GARY
2          GOLDFIELD DATED MAY 16,
3          2025
4          L. SCARCELLO:  Do you need
5    help organizing these things?  You might try to
6    stack these up.  This is for you.  This is your
7    copy.
8          BY R. EHLER:
9          Q.  And I didn't ask before,
10   but you brought two documents with you to the
11   deposition.  Are those just your two reports?
12         A.  Yes.
13         Q.  No notes on them --
14         A.  No.
15         Q.  -- or they have notes?
16         A.  No, no notes.
17         Q.  Why don't you go ahead
18   and turn to page 71 -- nope.  78.  I want to ask
19   some questions about the methodological
20   limitations that you identify in your report
21   leading to underestimation, as you describe it, of
22   effects.  But these are limitations on the
23   meta-analyses that you reviewed for your analysis;
24   correct?
25         L. SCARCELLO:  Just quickly, I

Page 126

1    just want to object.  So I think that you
2    described this exhibit as his amended and
3    supplemental report.  This is a redline showing
4    the changes against the JCCP report.  So this
5    isn't actually the amended and supplemental
6    report.  Subject to that, we can go ahead.
7          R. EHLER:  Thanks.
8          L. SCARCELLO:  I just wanted
9    to make that clear.
10         BY R. EHLER:
11         Q.  Sorry, Dr. Goldfield, you
12   probably have lost track of where we are.
13         A.  Yeah.  No, I remember the
14   question.
15         Q.  The methodological
16   limitations you identify in this paragraph, 157,
17   of this redline of your amended report, those are
18   limitations on the meta-analyses that you reviewed
19   and relied on for your literature review and
20   Bradford Hill analysis; correct?
21         A.  Many of them, yes.  Keep
22   in mind, meta-analyses are based on studies, a
23   whole bunch of studies, so I just tried to
24   highlight some of the main ones.
25         Q.  Right.  And that's what I

Page 127

1   wanted to talk about a little bit.  And the
2   meta-analyses are only as good as the studies that
3   underlie them.  Fair enough?
4              A.   Fair enough.
5              Q.   And so you've -- these
6   are limitations that you identified.  I just want
7   to make sure that we're clear on what they are and
8   that I understand them.  So first you identify the
9   reliance on cross-sectional or short-term study
10  design.  Is that a limitation of the meta-analyses
11  that you reviewed is they're relying on -- their
12  underlying studies are cross-sectional or
13  short-term study design?
14             L. SCARCELLO:  I'll object to
15  the form of the question.
16             THE WITNESS:  A lot of the
17  meta-analyses included longitudinal studies as
18  well.
19             BY R. EHLER:
20             Q.   Fair.  But the limitation
21  of the meta-analyses is if they included many or
22  there were sort of an overreliance, but in general
23  the reliance on cross-sectional and short-term
24  studies?
25             A.   Yes.

Page 128

1              Q.   And that's because the
2   cross-sectional studies, they only analyze data
3   from a single point in time or over a relatively
4   short period; yes?
5              A.   Correct.
6              L. SCARCELLO:  Can we take a
7   quick break?  I'm sorry.  The realtime isn't
8   working.  Can we take a quick break to address
9   that?
10             R. EHLER:  Sure.
11             L. SCARCELLO:  So sorry.
12             R. EHLER:  Off the record for
13  a second.
14             THE VIDEOGRAPHER:  Current
15  time is 2:29 p.m., and we are off the record.
16  --- Off-record discussion
17             THE VIDEOGRAPHER:  The current
18  time is 2:30 p.m., and we are back on the record.
19             BY R. EHLER:
20             Q.   Okay.  Technical glitch.
21  Dr. Goldfield, we were just talking about
22  cross-sectional studies.  They're distinguishable
23  from longitudinal studies which look at data over
24  a much longer period of time; correct?
25             A.   Correct.

Page 129

1              Q.   And you write in your
2   report that reliance on cross-sectional studies
3   can actually obscure delayed or cumulative harms;
4   is that right?
5              A.   Yes.
6              Q.   And it could also
7   potentially inaccurately highlight short-term or
8   ephemeral harms; right?
9              L. SCARCELLO:  Object to form.
10             THE WITNESS:  It depends on
11  the measure.  Some of the measures for mental
12  health, they're all validated, reliable
13  instruments.  Some ask about the last week, some
14  ask about the last two weeks, some even ask about
15  the last month.  So I would say most likely or at
16  least in some cases, it's not ephemeral at all.
17             Q.   Okay.  But if it's not a
18  month long that it's asking about, then we're
19  dealing with other issues like recall bias, right,
20  which we'll get to in a minute.  But I'm just
21  trying to get kind of the two sides of the coin.
22  One side, you say that cross-sectional studies,
23  they could obscure delayed or cumulative harms,
24  but because they have that short-term, narrow
25  focus, they are also potentially going to

Page 130

1   highlight what is happening in that moment for
2   that individual in a way that might actually
3   over-index towards short-term or ephemeral harms;
4   fair?
5              L. SCARCELLO:  Object to the
6   form.
7              THE WITNESS:  It's possible.
8              BY R. EHLER:
9              Q.   And that could lead to
10  false positives or a larger effect size than what
11  you might otherwise see if -- in a longitudinal
12  study, for example?
13             L. SCARCELLO:  Object to form,
14  compound.
15             THE WITNESS:  Yes,
16  cross-sectional studies are one snapshot in time
17  that have to be considered in a larger -- with
18  other -- a pattern of other stronger research
19  designs.
20             BY R. EHLER:
21             Q.   With all respect, I'll
22  move to strike your answer.  Can you answer my
23  question which was whether or not those -- what
24  you identified as limitations and what we just
25  spoke about regarding cross-sectional studies

22STCV21355
DEPOSITION OF GARY GOLDFIELD

July 10, 2025

Page 131

1  being at a point in time might lead to false
2  positives or larger effect sizes than what you
3  might otherwise get with a better design study.
4        A.  I'm not aware of any
5  research to highlight that or show that.  It's --
6  might be possible.  It's possible.
7        Q.  Probable?
8        A.  I wouldn't say probable.
9  It's possible.
10        Q.  So you won't concede that
11  a limitation on these sort of short-term studies
12  is that they could lead to false positives?
13        L. SCARCELLO:  Object to form.
14        THE WITNESS:  I think when you
15  look at medicine and psychology in general and you
16  look at the measures used in this literature,
17  generally, the weaker phenotyping, that's poor
18  measurement, less-precise measurement, typically
19  leads to an underestimation of associations and
20  effect sizes.  So I don't believe -- is it
21  possible they could be overestimated?  Possible,
22  but I wouldn't say likely.
23        BY R. EHLER:
24        Q.  And just to make sure I
25  understand what you just said.  So you're saying

Page 132

1  that reliance on cross-sectional studies,
2  associational studies, are more likely to
3  underestimate.  And so your view is that the
4  wealth of literature involving cross-sectional
5  studies is only flawed in that it underestimates
6  the effect size; is that your testimony?
7        L. SCARCELLO:  Object to the
8  form, misstates testimony.
9        THE WITNESS:  No, we're
10  talking about different things.  So in
11  cross-sectional, as I mentioned before, there --
12  you can't infer causality from a single
13  cross-sectional study.
14        BY R. EHLER:
15        Q.  And you can't actually
16  infer causality from any cross-sectional study
17  because they lack temporality?
18        A.  Exactly.
19        Q.  Okay.  Then I think we do
20  understand each other.  On variability and outcome
21  definitions, which is another limitation that you
22  cite, by that you mean that different studies are
23  actually defining outcomes in different ways.  We
24  all might mean something slightly different by
25  what is a generalized term like well-being, for

Page 133

1  example?
2        L. SCARCELLO:  Object to form.
3        THE WITNESS:  Yes, there is
4  variability in how mental health is measured.
5        BY R. EHLER:
6        Q.  And that's a limitation
7  you identified; right?
8        A.  Yes.
9        Q.  And so if one study is
10  testing stress and another study is testing a
11  clinical condition like major depressive disorder,
12  they're really kind of getting at different
13  things, and that variability in what is defined as
14  the outcome is going to be a limitation in pooling
15  those studies' for meta-analyses; right?
16        L. SCARCELLO:  Object to the
17  form.
18        THE WITNESS:  That's not what
19  I was referring to.  What I was referring to is
20  that lumping in measures that are completely
21  different constructs and have different factorial
22  structures into one is not appropriate.
23        BY R. EHLER:
24        Q.  Explain that to me like
25  I'm a smart person but not a scientist.

Page 134

1        A.  So the meta-analyses
2  control for different types of measures of the
3  same construct.  So in other words, there are
4  many, many numerous depression questionnaires, for
5  example.  So it controls quite well by just
6  standardizing the score.  So that means you can
7  compare studies and pool them based on different
8  measures of depression.
9        But, as you alluded to before,
10  when you start lumping in well-being with
11  depression, they're very different and that
12  muddies the water.
13        Q.  Got it.  So if all of
14  this -- these use the same depression
15  questionnaire, standardized, then great, because
16  you can compare the outcomes.  But if the studies
17  are measuring depression but using different
18  questionnaires, maybe okay because at least it's
19  the same construct as you described it?
20        L. SCARCELLO:  Object to the
21  form.
22        THE WITNESS:  Yeah, when
23  you're talking about clinical depression, some
24  instruments will have clinical cutoffs.  Others
25  don't, they just measure symptoms.

Page 135

1          BY R. EHLER:
2          Q.  Right.  So that's a
3    weakness because they're not measuring exactly the
4    same thing, or a limitation because they're not
5    measuring exactly the same thing?
6          L. SCARCELLO:  Object to the
7    form.
8          THE WITNESS:  I don't view it
9    as a limitation as I outlined in my updated report
10   because psychopathology exists on a continuum and
11   harm occurs with subclinical symptom levels.
12         BY R. EHLER:
13         Q.  But it's a limitation in
14   the statistical analysis because you're comparing
15   slightly different things; right?
16         A.  Again, it depends on your
17   research question.  So if the research question
18   is:  Is there a dose-response relationship,
19   meaning is there -- when people use social media
20   more, does harm go up?  And I think those
21   dimensional symptom scales answer that question.
22         Q.  But that's -- you
23   answered a different question than the one that I
24   asked.  I'm just talking about methodologically
25   when you're trying to answer -- because I think

Page 136

1    you told me before that you can't really lump in
2    two things that are completely different.  You
3    can't lump in the analyses you have on eating
4    disorders and lump them in with a, you know,
5    well-being metric over here.  They're just
6    different things.  You're measuring different
7    things.
8          And then what I was trying to
9    articulate -- and I understand that you -- the
10   continuum point.  But what I was trying to
11   articulate was you also can't really lump together
12   different outcome measures and assume that from a
13   statistical perspective you're going to get as
14   strong -- it's a limitation if people are asking
15   different questions and getting different answers?
16         L. SCARCELLO:  Objection to
17   the form.
18         BY R. EHLER:
19         Q.  And then you're pooling
20   those studies together, as opposed to if they're
21   all using the same questionnaire?
22         L. SCARCELLO:  Object to the
23   form.
24         THE WITNESS:  No, I think you
25   misunderstood the standardization component.  So

Page 137

1    when you standardize a scale, each participant,
2    their score is relative to the mean.  It doesn't
3    matter what the -- the measure used as long as the
4    constructs are the same.  So looking at where
5    someone falls on the depression score, you know,
6    whether they're in the clinical range or they're
7    not, or between studies, variability and the types
8    of the way they measure depression, statistics
9    handle that pretty well.
10         But as you said before, when
11   you're pooling depression with eating disorders or
12   resilience, well, now you're comparing apples and
13   oranges and you're pooling that.  And so --
14         BY R. EHLER:
15         Q.  Okay.  Fair enough.
16         What's sampling bias?
17         A.  So that means that people
18   who participate in the study may -- may or may not
19   necessarily represent the general population.
20         Q.  And so if you're
21   oversampling one group and undersampling another
22   group, the observed association will be less
23   reliable as applied to the entire population that
24   you're speaking about; right?
25         L. SCARCELLO:  Object to the

Page 138

1    form.
2          THE WITNESS:  I don't know if
3    there's -- I mean, by definition, if people are
4    not in the study, I don't know how you could
5    quantify whether the relationship is different
6    than the rest of the population.  So it's possible
7    but certainly not likely because they're not
8    included in the study.
9          BY R. EHLER:
10         Q.  I can't tell if we agree
11   or not.  Are you telling me that if you're -- if
12   you have a sampling bias so that the sampling
13   doesn't reflect the population, are you telling me
14   that that is or is not a limitation on the study?
15         A.  Sampling bias -- well, it
16   depends on the size of the -- I mean, there are
17   population-based studies.  Many in the
18   meta-analyses were huge studies that are quite
19   representative of the population.  But in a single
20   study, if they mention in the limitation there is
21   a potential sampling bias, it means not everybody
22   in that demographic participated in the study and
23   these results may or may not generalize to the
24   rest of the population.
25         Q.  Got it.  So if you've got

Page 139

1    a study and they tell you, we sought out to get
2    roughly equal numbers men/women, but we way
3    oversubscribed on women and not men, they're
4    reflecting that limitation may mean the pool
5    doesn't apply, the results are not necessarily
6    generalizable to the population; fair?
7           L. SCARCELLO:  Object to form.
8           THE WITNESS:  Generally, yes.
9    Yes.
10          BY R. EHLER:
11          Q.   Right.  What makes you
12   think that low-risk, healthy adolescents are
13   oversampled in the studies that you cited in your
14   literature review?
15          A.   Because -- well,
16   clinically their depression and anxiety disorders
17   are not all that prevalent.  And when you look at
18   the mean depression scores, almost all of them are
19   in the normal range.  Like, when you look at the
20   studies -- and some of the meta-analyses report
21   this, others don't -- most of them, with rare
22   exception, are healthy.  They're not exhibiting
23   many symptoms.
24          Q.   And is your view that
25   that differs from the population?

Page 140

1           A.   No.  Many of these were
2    population-based studies.  And in the population,
3    75, 80% of kids will not have a disorder.  So you
4    have -- and same with these studies.  So most kids
5    on average are healthy.
6           Q.   And so your point about
7    oversampling is that it oversamples because you're
8    not -- these studies are not actually targeting
9    the population that suffers from these disorders
10   in the first place or that has these disorders?
11          A.   Yeah, they're on average
12   healthy populations, that's right.
13          Q.   And that biases the
14   results to be -- to show less of an effect size?
15          A.   I think there is less
16   vulnerability and there is less -- I mean, it --
17   if -- you know, how statistics work, base rates
18   are important.  And if you have a sample that's
19   not exhibiting many symptoms, that's going to
20   truncate the variability which underestimates the
21   actual association.  If more unhealthy people were
22   in the sample, you would have greater variability
23   and greater probably -- yes, so I agree.  I think
24   it underestimates.
25          THE VIDEOGRAPHER:  Sir, I

Page 141

1    think your microphone fell.
2           BY R. EHLER:
3           Q.   What's your basis for
4    believing that the true effect of social media use
5    on mental health harms in groups other than these
6    low-risk adolescents would be stronger than what
7    you're observing?
8           L. SCARCELLO:  Object to form.
9           THE WITNESS:  Well, there was
10   a couple studies by Fassi, Amy Orben's group.
11   This is not well studied at all, but we knew
12   there -- that mental health is -- kids who were
13   suffering mental health challenges are more
14   vulnerable to what we call the dark side of social
15   media and some of the social media harms.  So I
16   think kids with good resilience, who come from
17   good families, who have generally low risk factors
18   for mental health, I think will probably be less
19   affected than kids who are more vulnerable.
20          BY R. EHLER:
21          Q.   And you're basing that on
22   that Fassi 2024 study?
23          L. SCARCELLO:  Objection,
24   misstates testimony.
25          BY R. EHLER:

Page 142

1           Q.   I was just asking which
2    study.  You mentioned that one.  I was making sure
3    we were thinking of the same one.
4           A.   No, they conducted a
5    follow up, because again, that study -- they admit
6    their own limitation there.  They looked at the
7    correlation in a clinical sample and then looked
8    at it in the community and it was roughly
9    comparable.  But they themselves acknowledge again
10   the problem of limited variability.  The clinical
11   sample, now you just have the exact opposite
12   problem, they're all symptomatic, so there's not
13   much variability in symptoms there.  And they also
14   acknowledge that everybody is using social media
15   and there's not a ton of variability there.  So
16   they followed it up with another study and they
17   compared social media -- the inverse of that.  So
18   do people who are -- have clinical levels of
19   psychopathology differ in social media duration
20   compared to healthy kids?  And the answer was yes.
21   So it's a cleaner way of arriving at the same
22   answer.
23          Q.   And the answer, just so
24   that we're clear, is that your view is the general
25   literature -- because I'm trying to get a sense

Page 143

1   too.  The general literature includes too many
2   healthy kids, or oversamples healthy kids, and so
3   that's why the effect sizes are not -- you think
4   they're underestimating the effect sizes?
5           L. SCARCELLO:  Object to form,
6   misstates testimony.
7           THE WITNESS:  I think I've
8   stated that's one potential reason, yes.
9           BY R. EHLER:
10          Q.   But that's only true if
11  you are trying to figure out what is happening
12  with the more vulnerable kids; right?  It's not
13  true if what you're trying to do is figure out the
14  general effect on kids or on adolescents writ
15  large?
16          L. SCARCELLO:  Object to form.
17          THE WITNESS:  No, I actually
18  think it's -- I actually think it's because most
19  of the population are not ill, that most kids are
20  pretty healthy, that it is representative of most
21  kids.  And I stand by my opinion that even with
22  these limitations that likely underestimate the
23  effect sizes, they still show harm.
24          BY R. EHLER:
25          Q.   What does "blinding"

Page 144

1   refer to in the context of the studies you've
2   looked at in this area of academic research?
3           A.   It means when
4   participants don't know that -- are either unaware
5   of the purpose of the study or they don't know in
6   which the treatment arm they've been allocated.
7           Q.   And why would you want
8   that?  What value does it serve to the research
9   hypothesis and the information-gathering process?
10          A.   They're -- first of all,
11  it's very difficult for behavioral interventions
12  to be blinded.  Some people -- some scientists
13  think it's virtually impossible.  But it's
14  believed to reduce some bias.
15          Q.   What bias?
16          A.   Demand bias.
17          Q.   What does that mean?
18          A.   Reduce the risk of social
19  desirability responding.  In other words,
20  answering in a way that participants believe the
21  researchers want.
22          Q.   And so if I follow the
23  concept correctly, the participants in the
24  research have a sense of what the researchers
25  are -- what their hypothesis or what they're

Page 145

1   testing and try to answer in a way that they think
2   is geared more towards what the researcher wants
3   than the actual true answer to the question?
4           L. SCARCELLO:  Object to form.
5           BY R. EHLER:
6           Q.   Is that a
7   characterization that's fair?
8           A.   Well, it depends, but
9   yes, that's the concept of demand bias.
10          Q.   And do you think that
11  impacts the experimental work on social media and
12  its effects on mental health?
13          A.   It's hard to say because
14  most of the psychological science, the randomized
15  control trials don't really use blinding a lot,
16  yet the studies are still considered valid.
17          Q.   Right.  The randomized
18  control trials, the trials in this space of social
19  media and its effects on mental health don't use
20  blinding because, as you said, they can't.  It's
21  pretty much impossible?
22          A.   It's hard --
23          L. SCARCELLO:  Object to --
24  object to form.
25          THE WITNESS:  Yes.

Page 146

1           BY R. EHLER:
2           Q.   And so that means -- I
3   hear you saying they're still valid, but that
4   wasn't my question.  My question was whether it
5   affects them.
6           A.   Affects them how?
7           Q.   Affects the -- whether a
8   bias is the outcome.
9           A.   I think all studies have
10  limitations and it's really hard to quantify a
11  potential bias.  That's why it's listed as a
12  limitation.
13          Q.   So you don't -- you can't
14  quantify it.  You don't know if it's a big impact
15  or a small impact?
16          A.   It depends also on the
17  pattern of data.  That would help you determine
18  the magnitude of it, but there's no number to
19  quantify bias.
20          Q.   And nobody's done that
21  research to attempt to determine the pattern of
22  data to quantify that bias; right?
23          L. SCARCELLO:  Object to form.
24          THE WITNESS:  I reviewed
25  meta-analyses and there have been no meta-analyses

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 147

1  that have tried to arrive at that bias.
2          BY R. EHLER:
3          Q.   And so we don't know the
4  degree to which these demand effects and the bias
5  may be impacting how participants respond and data
6  is gathered on these studies involving social
7  media use and mental health?
8          L. SCARCELLO:  Object to form.
9          BY R. EHLER:
10         Q.   Right?
11         L. SCARCELLO:  Object to form.
12         THE WITNESS:  I would say in
13  my opinion, after reviewing the literature
14  exhaustively and based on my studies, I would say
15  there is very little demand bias and I will tell
16  you why.  Firstly, if people are going to give
17  socially desirable answers, then they would
18  improve on all outcomes.  And that's clearly --
19  Burnell is the best experimental meta-analysis.
20  Clearly there are differences in outcome.
21         Number two, it's really
22  difficult to remember how you responded to a
23  baseline questionnaire four weeks prior, as you
24  mentioned a few minutes ago.  So if you're going
25  to try to fake your answers, you have to remember

Page 148

1  on an hour battery of questionnaires, hundreds of
2  questions, how you answered a month ago, that's --
3  that's difficult.
4          And number three, it's a
5  limitation in almost all the psychotherapy
6  treatment research.  Almost all of it is controls,
7  and that's the best -- that's the best we can do.
8  We certainly are not going to say psychotherapy is
9  -- there is no validity to it or it's biased,
10  otherwise we would have nothing to recommend.
11         Q.   Well, you -- okay.  So I
12  understand that that's your opinion, but just to
13  be clear, that's not based on a meta-analysis
14  because you said nobody has studied this
15  expressly; right?
16         L. SCARCELLO:  Object to form.
17         THE WITNESS:  But I also
18  prefaced it by saying that you can arrive at the
19  magnitude of bias based on the pattern of
20  responding, pattern of results.  And so when some
21  outcomes are improving and other outcomes are not,
22  there is no research to support that the bias
23  would be selective.
24         Not to mention that bias can
25  also be overrepresented.  These are children and

Page 149

1  youth.  When they're reporting problematic social
2  media use or mental health, they could be
3  overestimating or, you know, underestimating their
4  use or, you know, the extent of their symptoms out
5  of fear that maybe if this gets out in the public,
6  the parents might take it away from them, the
7  phone.  So --
8          BY R. EHLER:
9          Q.   So you're saying it could
10  go in either direction?
11         A.   I'm saying it's unlikely
12  that the effects are influenced by demand bias.
13  Based on the pattern of responding, you would
14  see -- you would see not all outcomes improve.
15  It's really difficult to remember from a week or a
16  month earlier how you responded.  It just seems
17  unlikely.  And I think in the psychological
18  science literature in general, people that do
19  treatment studies, yes, we acknowledge the
20  possibility as a limitation, but we don't throw
21  out the results.  They're still valid.
22         Q.   I'm not asking you to
23  throw out the results.  I'm just trying to get to
24  the limitation, and I think we agree it's a
25  limitation.

Page 150

1          A.   Yes.
2          Q.   But what I'm also trying
3  to understand is your view on it, which is you
4  would agree with me that at a general level, at
5  the societal level, there is a narrative about
6  social media being bad, bad for health; right?
7  That's kind of out there in the public?
8          L. SCARCELLO:  Object to form,
9  calls for speculation.
10         THE WITNESS:  Yeah.  I mean, I
11  don't really know what kids believe.  I think a
12  lot of kids think it's good for them, that they
13  like it, they enjoy it.
14         BY R. EHLER:
15         Q.   Okay.  And do you think
16  if they enrolled in a study where they knew the
17  hypothesis involved reducing social media use or
18  otherwise measuring their social media use as it
19  related to health, do you think that those kids
20  would not -- is it your view that those
21  participants in that study would not have a sense
22  that the study is trying to test whether reducing
23  social media use improves their health?
24         L. SCARCELLO:  Object to form.
25         THE WITNESS:  Well, it depends

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                                    July 10, 2025

Page 151

1  how -- what participants are told and how -- I
2  think most experimenters try to obscure the
3  purpose of the study. I know we did. I imagine
4  other people followed similar procedures.
5              BY R. EHLER:
6         Q. And did you --
7         A. So we --
8         Q. Did you --
9              L. SCARCELLO: Sorry, can you
10 let him finish his answer.
11             Please go ahead,
12 Dr. Goldfield.
13             THE WITNESS: Yeah. So one
14 way of doing that is by including other
15 questionnaires that are not necessarily related to
16 mental health so it's just not as obvious.
17             BY R. EHLER:
18        Q. Okay. Did you look at
19 the studies in the meta-analyses you reviewed to
20 see whether they had involved additional
21 questionnaires, for example, to obscure the
22 hypothesis or other steps to control and obscure
23 the hypothesis?
24             L. SCARCELLO: Object to form.
25             THE WITNESS: So some did, but

Page 152

1  often -- I mean, the key thing is also what's
2  communicated to participants, and that level of
3  detail is often not in publications, but sometimes
4  it is.
5              BY R. EHLER:
6         Q. So you specifically
7  looked at that for each of the analyses underlying
8  the meta-analyses that you reviewed?
9         A. For experiments?
10             L. SCARCELLO: Object to form.
11             BY R. EHLER:
12        Q. Yes.
13        A. We're talking about for
14 experiments?
15             L. SCARCELLO: Wait, wait.
16 Please give me the opportunity to object. Object
17 to form, misstates testimony.
18             BY R. EHLER:
19        Q. You can answer.
20        A. I looked at a lot, a lot
21 of the studies.
22        Q. Let me ask you a
23 different question.
24        A. Okay.
25        Q. I know you looked at a

Page 153

1  lot of studies. How did you track what you were
2  finding? Did you keep notes? Was there a
3  document or did you mark up the studies or did you
4  keep a spreadsheet where you analyzed these
5  things? What did you do to actually do the
6  math -- the work of analyzing them?
7              L. SCARCELLO: Object to the
8  form.
9              THE WITNESS: I made the
10 tables in Excel and then just pasted them into the
11 document.
12             BY R. EHLER:
13        Q. Okay. So there's nowhere
14 that I could look to find your notes of where in
15 the meta-analyses or the studies underlying the
16 meta-analyses you looked for things like demand
17 bias or how surveys were attempting to control for
18 demand bias?
19             L. SCARCELLO: Object to form.
20             THE WITNESS: Like I said, I
21 read a lot of the individual studies that made up
22 the meta-analyses, so I was looking for that
23 there. Did I document it? No.
24        Q. That was my question was
25 whether there was some table that I was missing

Page 154

1  where you actually counted these things and
2  documented it.
3         A. Oh, oh.
4         Q. You did not create such a
5  table. You did not do this in a sort of
6  systematical, here are 25, these 25 do this, these
7  25 -- or these other ones do this. You didn't
8  document it in that way?
9              L. SCARCELLO: Object to the
10 form.
11             THE WITNESS: That is correct.
12             BY R. EHLER:
13        Q. I apologize if we've
14 covered this already, but you would acknowledge
15 that correlational studies don't prove causation,
16 right, because there is no temporality? We've
17 talked about that?
18             L. SCARCELLO: Object to form.
19 Misstates testimony.
20             THE WITNESS: A single
21 correlational study cannot -- you cannot infer
22 causality. When the pattern for meta-analyses of
23 cross-sectional studies lines up with longitudinal
24 and experimental, now that -- now you're looking
25 more at causality because they're what we call

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 155

1 convergent validity.
2          R. EHLER:  I'll move to strike
3 that as noon-responsive to my question which was
4 specifically focused on correlational
5 cross-sectional studies.
6          Q.  So you understand where
7 I'm looking, not longitudinal.  Correlational
8 cross-sectional studies as a group cannot
9 establish causation?
10         L. SCARCELLO:  Object to form.
11         BY R. EHLER:
12         Q.  Right?
13         L. SCARCELLO:  Object to form.
14 And I would be willing to stipulate that I'll have
15 a standing opposition to your motions to strike.
16 Is that okay?  Instead of saying it every time?
17         R. EHLER:  That's fine.
18         L. SCARCELLO:  Okay.  Let's do
19 that.
20         THE WITNESS:  Single-study
21 correlational studies, cross-sectional studies
22 cannot infer causality.
23         BY R. EHLER:
24         Q.  But you think if you add
25 up a bunch of correlational and cross-sectional

Page 156

1 studies, set aside everything else, I'm just
2 talking about correlational and cross-sectional
3 studies, if you've got a bunch of studies, once
4 you've got 10, 20, then you can prove causality?
5          L. SCARCELLO:  Object to form.
6          THE WITNESS:  It depends on
7 how well the studies are controlled, you know, and
8 it -- I -- no, I would still like to see the
9 longitudinal and experimental trials to arrive at
10 a determination of causality as I've done in my
11 report.
12         BY R. EHLER:
13         Q.  Right.  If you were only
14 looking at correlational and cross-sectional
15 studies, you could not make a conclusion about
16 causality.  That's what you would tell the judge
17 if you were being candid; right?
18         L. SCARCELLO:  Object to form.
19 That's argumentative and inappropriate.
20         THE WITNESS:  I would have to
21 look at each study and how well -- the statistical
22 controls for potential confounders.  But as a
23 general rule, yes.
24         BY R. EHLER:
25         Q.  Yes, I'm right?

Page 157

1          L. SCARCELLO:  Object to the
2 form, asked and answered.
3          BY R. EHLER:
4          Q.  That was a yes?
5          A.  Again, research doesn't
6 occur in isolation.
7          Q.  I understand that.  I'm
8 just trying to understand the categories of
9 studies so I'm asking you a specific question.  I
10 know your broader view, but I'm allowed to ask a
11 specific question and get a specific answer and
12 the -- okay.  You mentioned confounders.
13 Associations -- so correlational studies,
14 cross-sectional studies, they establish
15 associations; right?
16         A.  Yes.
17         Q.  And associations can't
18 rule out confounding factors; right?
19         A.  Well, they can control
20 for them statistically.
21         Q.  But you have to control
22 for them in order to rule them out, and even then,
23 because you don't have temporality, you still
24 can't get to causation.  You can just get to a
25 strength of association; right?

Page 158

1          L. SCARCELLO:  Object to form.
2          THE WITNESS:  Well, not
3 necessarily.  It depends on the confounder.  So if
4 you were looking at does gender influence the
5 relationship between social media and mental
6 health and you statistically control in the -- in
7 your study for gender, that's removing that
8 influence of gender on that relationship.
9          R. EHLER:  I'll move to strike
10 as non-responsive.
11         BY R. EHLER:
12         Q.  What's a common
13 confounder, sort of a common cause, what does that
14 mean in the context of associational studies?
15         A.  It could be other factors
16 that influence either social media or mental
17 health.
18         Q.  At the same time; right?
19         A.  At the same time.
20         Q.  What are some examples?
21         A.  Could be peer-support
22 network, could be family factors, socio-economic
23 status, things like that.
24         Q.  What about adverse
25 childhood events?

Arbitration Place

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 159

1          A.   That's possible, yes.
2          Q.   You said socio-economic
3    status, but poverty versus affluence, so if -- in
4    general, poverty might be more associated with
5    mental health, we know that from other studies --
6          A.   Yes.
7          Q.   -- with negative mental
8    health, excuse me, I misspoke.
9          A.   Yes, yes.
10         Q.   Gender as well.  What
11   about genetics?
12         A.   As I outlined in my
13   report, they're -- like most conditions, mental
14   health is no different.  There is genetic -- some
15   genetic susceptibility.  Not many studies control
16   for genetics.
17         Q.   And in your report, you
18   note that -- you note a particular study,
19   Fergusson et al. 2022, that attempted to compare a
20   meta-analysis, that attempted to compare studies
21   that controlled for confounding variables with
22   those that did not or had weaker controls.  And
23   Fergusson reported that -- or your
24   characterization was that the:
25              "-- findings suggest that

Page 160

1              studies that did not
2              adjust for confounding
3              variables tend to report
4              stronger effect size than
5              those that did."
6    Correct?
7              L. SCARCELLO:  Counsel, can
8    you point us to where you're talking to?
9              THE WITNESS:  Could I -- yes.
10             R. EHLER:  Sure.
11             L. SCARCELLO:  Thank you.
12             R. EHLER:  I'm in the -- go to
13   the original.
14             L. SCARCELLO:  So Exhibit 1.
15             R. EHLER:  Exhibit 1,
16   paragraph 86.
17             L. SCARCELLO:  Okay.  Thank
18   you.
19             THE WITNESS:  Sorry, paragraph
20   86?
21             BY R. EHLER:
22         Q.   Yes, it's on page 37.  Do
23   you remember my question?
24         A.   I do.  I'm just reading.
25         Q.   Okay.  And the sentence

Page 161

1    that I quoted is actually on the next page, same
2    paragraph.
3              So am I correct,
4    Dr. Goldfield, you said in this paragraph:
5              "-- that studies that did
6              not adjust for
7              confounding variables
8              tend to report stronger
9              effect size than those
10             that do."
11             Right?  That's the point
12             you're trying to make
13             here?
14             L. SCARCELLO:  Object to form.
15             THE WITNESS:  Yes.
16             BY R. EHLER:
17         Q.   Okay.  So if I've got --
18   if I'm interpreting your words correctly, whether
19   or not a study controls for or is able to control
20   for some of these common causes and confounders,
21   that's relevant to how strong of an effect size
22   you're going to get; right?
23             L. SCARCELLO:  Objection,
24   misstates testimony.
25             THE WITNESS:  Well, that's

Page 162

1    making a lot of assumptions, but yes.  Statistical
2    controls can strengthen the effect or weaken the
3    effect.  It depends on what the controls are and
4    how well they're measured.
5              BY R. EHLER:
6          Q.   Doctor, with all due
7    respect, you didn't say that.  You said that they
8    tend to report stronger effect size.  You did not
9    write in your report that they could weaken the
10   effect size.
11         A.   I've seen --
12             L. SCARCELLO:  Objection.  Is
13   that a question, counsel?
14             BY R. EHLER:
15         Q.   Well, I'm trying to
16   figure out if you're telling me that your report
17   is wrong.  Is that what you're saying sitting here
18   now, that this -- this sentence you wrote?
19         A.   So you're asking me --
20   you're not asking me how I wrote.  How I
21   interpreted the question was is it possible that
22   -- or is it always that statistical controls
23   weaken relationships.  And I'm telling you that
24   in -- I've seen studies that sometimes happens,
25   but not all the time.

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 163

1          Q.  Okay.  Well, I'm speaking
2    specifically about the studies that you reviewed
3    in your report where you said that in your report:
4               "The findings suggested
5                that the studies that did
6                not adjust for
7                confounding variables
8                tend to report stronger
9                effect sizes than those
10               that did."
11              (As read)
12   Is that true?
13          L. SCARCELLO:  Object to the
14   form.
15          THE WITNESS:  In this
16   particular meta, yes.  But I reviewed 44
17   meta-analyses.
18          BY R. EHLER:
19          Q.  And is there somewhere
20   else in your report that you say that failure to
21   control for confounding variables led to weaker
22   effect sizes?
23          A.  I don't recall.
24          Q.  So if, as we discussed
25   earlier, a number of these studies did not control

Page 164

1    for genetics, for example, or poverty, or family
2    status and parental relationships, according to
3    this sentence that you wrote, the effect sizes
4    might actually be overstated; right?
5          L. SCARCELLO:  Object to form.
6          THE WITNESS:  No.  This is --
7    this is one meta out of 44 and so that's a really
8    broad, sweeping statement that I -- I don't know
9    if other meta-analyses did the same -- same
10   analysis of controlled versus uncontrols or levels
11   of controls.  I can't predict what the answer will
12   be.
13          And by the way, these are not
14   terribly big differences between the beta weights
15   of .06 and .03.  So it's not like they're
16   night-and-day differences here.
17          BY R. EHLER:
18          Q.  Okay.  So sitting here
19   today, you have no idea if other meta-analyses
20   looked at the difference between controlling for
21   confounding variables or not controlling for
22   confounding variables and reached a different
23   conclusion; correct?
24          L. SCARCELLO:  Object to form.
25          THE WITNESS:  To my knowledge,

Page 165

1    I -- it's possible, but nothing's coming to mind
2    at the moment.
3          BY R. EHLER:
4          Q.  So is it possible then,
5    since the literature more generally isn't
6    confounding for genetics, which makes sense
7    because you can't necessarily take someone's DNA
8    or get their genetic information for a study
9    you're conducting, is it possible that that
10   confounding relationship may be biasing the effect
11   sizes to be bigger than they would be if these
12   studies controlled for genetics as it relates to
13   mental health outcomes?
14          L. SCARCELLO:  Object to form.
15          THE WITNESS:  I based a lot of
16   my opinion not only on the totality of evidence,
17   but really on the high-quality studies and the
18   hierarchical pyramid of evidence.  So we're
19   talking a lot about cross-sectional studies and
20   metas, that's a small piece of the overall pie
21   here.  So when you look at experiments, that gets
22   at the -- and meta-analyses of randomized
23   controlled trials, that's the top of the
24   hierarchical pyramid of evidence.  And those
25   studies, in particular the Burnell study, that is

Page 166

1    the most methodologically rigorous, that didn't
2    pool positive outcomes with negative outcomes show
3    widespread harm.  And that's our greatest cause --
4    those research designs yield the strongest causal
5    conclusions.
6          R. EHLER:  Move to strike,
7    respectfully.
8          Q.  Dr. Goldfield, my
9    questions are trying to understand the effects of
10   confounders on the research that you reviewed.
11   And we've talked about lots of confounders.  I
12   would include other ones like pre-existing
13   psychiatric disorders.  That could be a
14   confounder, right, on a mental health outcome that
15   may not be captured by the study design; is that
16   fair?
17          L. SCARCELLO:  Object to the
18   form.  Object to the preamble.  You can answer.
19          THE WITNESS:  In a
20   cross-sectional study, I don't know why they
21   would -- I mean, you're trying to look at the
22   relationship between social media and psychiatric
23   outcomes.  You wouldn't control for other
24   psychiatric outcomes.  That's the whole point of
25   the study is to see if there is a relationship

22STCV21355
DEPOSITION OF GARY GOLDFIELD

July 10, 2025

Page 167

1  there.
2          Q.  Well, what about
3  longitudinal studies you would control?
4          A.  Then it's more
5  appropriate.
6          Q.  Okay.  And I'm just
7  talking about controlling for confounders in
8  general --
9          A.  Um-hum.
10         Q.  -- and the way that they
11  impact the effect sizes that you found and
12  reported.
13         Let's talk about the Burnell
14  study then.  Did the Burnell study control -- did
15  the Burnell meta-analysis evaluate whether the
16  studies that it looked at controlled for genetics?
17         A.  There was -- so the --
18  no, because the assumption of randomized control
19  trials, you can't measure everything.  I mean,
20  researchers would be there all day and
21  participants wouldn't -- no research ethics board
22  would approve such onerous measurement and
23  phenotyping.  Plus, genetics is super expensive.
24         Q.  So that's a no?
25         A.  When you

Page 168

1  randomize people -- again, it depends.  So when
2  you randomize people to arms, you're making
3  certain assumptions that -- and many of this can
4  be tested, is that basically the demographics, the
5  psychosocial profile, the medical file, all those
6  characteristics become comparable between groups.
7  So they're both starting from the same place.  So
8  genetics should get randomized out too.
9          Q.  Now you're talking about
10  experiments?
11         A.  Burnell is an
12  experiment -- meta-analysis of an experiment.
13         Q.  Okay.  And so in
14  experiments genetics don't matter?
15         L. SCARCELLO:  Object to form.
16         THE WITNESS:  No.  It should
17  be randomized out.
18         BY R. EHLER:
19         Q.  Genetics would only
20  matter to a longitudinal study?
21         L. SCARCELLO:  Object to form.
22         THE WITNESS:  There -- I cited
23  a few papers looking at the potential genetic
24  possibility of a moderating factor.  So are some
25  people genetically predisposed to being more

Page 169

1  harmed by social media?  Yes.  In experiments,
2  that gets randomized out.  In longitudinal
3  studies, sure.  Is it possible that it could
4  influence the association one way or the other?
5  Possible.
6          Q.  Knowing what we know
7  about the impact of genetics on psychiatric
8  disorders, is it more than possible?  Is it
9  probable?
10         A.  Again, you're looking
11  at -- so just because there are some genetics
12  involved in mental health disorders or psychiatric
13  disorders -- my task here and the meta-analysis
14  are looking at the relationship between two
15  variables.  So --
16         Q.  Right.  And if you're
17  looking at the relationship between social media
18  use and mental health and you don't control for
19  genetics, is it probable that you might be missing
20  something?
21         A.  I would say it's unlikely
22  because if genetics really drive psychiatric
23  conditions, it will show up on the validated
24  questionnaires.  It would be --
25         Q.  How would genetics show

Page 170

1  up on the validated questionnaires?
2          A.  Well, if the
3  assumption -- if you're asking me if there is a
4  genetics susceptibility to social media and some
5  kids are more genetically prone to be harmed, that
6  harm is measurable.  Psychological harm would --
7  that would show up on the questionnaires.
8          Q.  Right.
9          A.  Right.
10         Q.  But if you haven't tested
11  the genetics, you wouldn't know whether some kids
12  are genetically predisposed to be more harmed?
13         A.  Correct.
14         Q.  In the context of social
15  media and mental health, does reverse causation
16  mean that symptoms like depression or anxiety
17  could potentially cause a teenager to spend more
18  time on social media?
19         L. SCARCELLO:  Object to form.
20         THE WITNESS:  There is some
21  research to suggest a bidirectionality, so yes.
22         BY R. EHLER:
23         Q.  Is stress on parental
24  relationships or parental-child relationships
25  another potential hypothesis for reverse causation

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 171

1  with respect to social media use and mental health
2  harms?
3              L. SCARCELLO:  Object to form.
4              THE WITNESS:  Some studies
5  have examined this, but I don't -- usually more as
6  an effect or a moderator.  But some studies have
7  examined this.  It's possible.
8        BY R. EHLER:
9        Q.  You actually did a study
10 in 2023, right, a cross-sectional study, that
11 looked at this and -- titled "Social media use and
12 parent-child relationships: A cross-sectional
13 study of adolescents," and you stated:
14              "We cannot establish
15              whether heavy social
16              media use impinges upon
17              parent-child relationship
18              quality or whether
19              negative parent-child
20              relationships predispose
21              adolescents towards
22              heavier social media
23              use."
24              (As read)
25 That was your prior statement; right?

Page 172

1              L. SCARCELLO:  Counsel, I
2  would ask if you're going to ask him about prior
3  statements and earlier studies, that you would put
4  those in front of him before you ask him about
5  them.
6              THE WITNESS:  I would have to
7  look at the study to refresh my memory.
8        BY R. EHLER:
9        Q.  You don't remember if you
10 said that in a published article from 2023?
11             L. SCARCELLO:  Object to form.
12             THE WITNESS:  I would have to
13 look at the context in which I said it, what kind
14 of study it is.  I've published a lot of papers,
15 so I can't quite recall.
16       BY R. EHLER:
17       Q.  Is that true that we
18 cannot establish whether heavy social media use
19 impinges upon parent-child relationship quality or
20 whether negative parent-child relationships
21 predispose adolescents towards heavier social
22 media use?
23             L. SCARCELLO:  Object to form,
24 compound.
25             THE WITNESS:  Statements made

Page 173

1  in that paper are based on a single study.  I
2  cited quite a bit of other evidence that social
3  media leads to reduced social time with friends
4  and family.  In fact, I cited meta-analyses
5  showing that as well, weakened attachments with
6  family.
7              BY R. EHLER:
8        Q.  Okay.  So sitting here
9  today, you're saying that you now know that
10 negative parent-child relationships do not
11 predispose adolescents towards heavier social
12 media use?
13             L. SCARCELLO:  Object to form.
14             THE WITNESS:  I'm saying --
15 I'm acknowledging there may be a bidirectional
16 relationship there.  Most things in psychology are
17 bidirectional.
18             BY R. EHLER:
19       Q.  And so that means we
20 don't know which way it goes; right?
21       A.  No.  What it means is it
22 goes both ways.
23       Q.  And you can't know which
24 comes first?
25       A.  Again, when you're

Page 174

1  looking at a single study, a single
2  cross-sectional study, no, but longitudinal
3  studies tease that out.  They establish
4  temporality.
5        Q.  And are you aware of
6  longitudinal studies that look at the parent-child
7  relationship as it relates to social media use?
8        A.  There are a few.  Most of
9  it is cross-sectional.
10       Q.  No longitudinal studies
11 come to mind; right?
12             L. SCARCELLO:  Object to form.
13             THE WITNESS:  I referenced a
14 lot of papers in here.  I would have to look at
15 some of the -- some of it.  But nothing is coming
16 to mind.
17             BY R. EHLER:
18       Q.  And I think you would
19 agree with me that parents do play a significant
20 role in adolescents' social media use and their
21 behavior towards it; right?
22             L. SCARCELLO:  Object to form,
23 vague.
24             THE WITNESS:  Parents have an
25 influence on their child's behavior broadly, but

Page 175

1  kids are using social media probably way more than
2  their parents know because they're adolescents.
3  They're not at home all the time.  They're at
4  school and going to places after school.
5  Adolescence is a time where peer connection is
6  super important, and feedback and sensitivity to
7  criticism.
8         So I think parents have no
9  idea the extent of the problem and use.
10        BY R. EHLER:
11        Q.  So you think that the
12  adolescents' use is completely outside of the
13  parents' control?
14        L. SCARCELLO:  Object to form,
15  misstates testimony.
16        THE WITNESS:  Are you -- I'm
17  not sure what you're asking.  Are you asking me
18  about co-viewing?
19        BY R. EHLER:
20        Q.  No, the first question I
21  asked you that I thought you would agree with was
22  that parents play a significant role in
23  adolescents' social media use and their behavior
24  towards it.  And then I thought your answer --
25        A.  Yeah.

Page 176

1         Q.  -- was no, so I was
2  trying to confirm that the answer was no.
3         A.  Oh.  Okay.  So --
4         L. SCARCELLO:  Okay.  Counsel,
5  do you have a question?
6         R. EHLER:  Trying to
7  communicate.
8         L. SCARCELLO:  I understand.
9  Is there a question?
10        THE WITNESS:  You know, it
11  would be really nice to have context here to look
12  at the study.
13        BY R. EHLER:
14        Q.  I don't have a study.
15  I'm just asking a question.  What role -- do you
16  think that parents have a role to play in their
17  adolescents' social media use?  Do they play a
18  significant role in determining kids',
19  adolescents' social media use?
20        L. SCARCELLO:  Objection,
21  asked and answered, calls for speculation, vague.
22        THE WITNESS:  I think they
23  have more control at younger ages, like 10, 11,
24  12.  I think they have less control during the
25  more traditional adolescent years.  And I think

Page 177

1  the research shows a lot of these kids have
2  accounts that parents are not aware of.
3         R. EHLER:  I'll move to strike
4  everything after "and I think the research shows."
5         BY R. EHLER:
6         Q.  Dr. Goldfield, you
7  wrote -- I'll mark this as Exhibit 9.
8             EXHIBIT NO. 9:  PAPER
9             TITLED "HEAVY SOCIAL
10            MEDIA USE AND
11            PSYCHOLOGICAL DISTRESS
12            AMONG ADOLESCENTS: THE
13            MODERATING ROLE OF SEX,
14            AGE, AND PARENTAL
15            SUPPORT"
16        BY R. EHLER:
17        Q.  Do you recognize this
18  article, first author, I'm going to mispronounce
19  Fatima's last name, Mougharbel --
20        A.  Yeah, Mougharbel.
21        Q.  -- from 2023?  You were
22  an author on this article?
23        A.  I am.
24        Q.  If you could please turn
25  to page 7 towards the end.  The last paragraph

Page 178

1  starting with "on the other hand."
2             Are you with me?
3         L. SCARCELLO:  Counsel, can he
4  have an opportunity to look through this,
5  familiarize himself?
6         BY R. EHLER:
7         Q.  Dr. Goldfield, do you
8  need more time to review the article?
9         A.  Can you give me one more
10  minute, please?
11        Q.  Yeah.
12        A.  Thank you.  Okay.
13        Q.  And so I'm on the last
14  paragraph where you write:
15             "-- our results showed
16             that those with rare
17             parental support used
18             social media more
19             frequently and had higher
20             odds for psychological
21             distress, consistent with
22             previous work."
23        And then you wrote:
24             "It has been known that
25             parents play a

Page 179

1      significant role in their
2      adolescents' social media
3      use and behavior, which
4      can impact mental
5      well-being."
6  And then you go on to say:
7      "Adolescents who reported
8      having unsupportive
9      parents felt
10     disconnected, and used
11     social media more
12     frequently to find
13     meaningful social
14     interaction."
15  Those were your words in this 2023 article?  Did
16  you answer?
17      A.  Well, I would like to
18  contextualize it.
19      Q.  I asked if those were
20  your words in this 2023 article.
21      A.  The measure -- so I
22  didn't collect this data.  This was a
23  population-based database, cross-sectional, which
24  we've already established cannot infer
25  causality --

Page 180

1      Q.  Dr. Goldfield, your
2  counsel --
3      L. SCARCELLO:  I'm sorry, were
4  you finished Dr. Goldfield?
5      BY R. EHLER:
6      Q.  -- can ask you
7  questions --
8      THE WITNESS:  No.
9      L. SCARCELLO:  Okay.  He
10  wasn't finished with his response.  Can he finish
11  with his answer, please?
12      R. EHLER:  Right.  But this is
13  becoming a little bit of a pattern.  And my
14  question was whether or not those were your words
15  in this 2023 article.  And so if he does want to
16  provide more context, you can ask him to provide
17  more context on whatever you would like.
18      L. SCARCELLO:  I understand
19  you want a yes/no answer to your yes/no questions,
20  but that is -- that can't be done.  And if it
21  can't be done, he's going to have to provide
22  context.  I understand it's frustrating.  I've
23  been on the other side of it.  That's just how it
24  goes, you know, so I'm -- but you have to let him
25  finish.  That we can all agree on.  So please let

Page 181

1  him finish.
2      BY R. EHLER:
3      Q.  I'll withdraw the
4  question.  Dr. Goldfield, on the first page --
5      L. SCARCELLO:  Well, he still
6  gets to finish his answer.  He still gets to
7  finish his answer.  So, Dr. Goldfield, if there is
8  anything you have to add, if you remember the
9  question or what you were saying anymore, please
10  do so.
11      BY R. EHLER:
12      Q.  Dr. Goldfield, on the
13  first page of this study --
14      L. SCARCELLO:  I'm sorry.
15  Dr. Goldfield, please finish your answer if you
16  have more to say.
17      R. EHLER:  I withdrew the
18  question.  Counsel, I withdrew the question.
19      L. SCARCELLO:  I understand
20  that --
21      R. EHLER:  I withdrew the
22  question.
23      L. SCARCELLO:  -- but you
24  withdrew the question after he had already started
25  his answer, so --

Page 182

1      R. EHLER:  I withdrew the
2  question.
3      L. SCARCELLO:  It doesn't
4  matter.  He gets to finish his answer.
5      Please go ahead and say what
6  you were trying to say.
7      THE WITNESS:  Thank you.  So I
8  was going to say two main things.  Number one, we
9  didn't collect this data and we were reliant on
10  what measures were used.  There were two questions
11  used to measure parental support --
12      R. EHLER:  This is not
13  responsive, I'm sorry.  But if you want to spend
14  your time on redirect asking him to put more
15  context on the article, that's great.  But my
16  question did not have anything to do with how the
17  data was collected.  If you want to raise it with
18  the judge, also great.
19      L. SCARCELLO:  He can answer
20  the question how he sees fit.
21      THE WITNESS:  But -- yeah.
22      L. SCARCELLO:  I mean, you're
23  -- I understand that you're asking a specific
24  question and looking for a specific answer.
25      R. EHLER:  The question is

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                         July 10, 2025

---

Page 183

1  withdrawn.  I'm going to ask a different question.
2           L. SCARCELLO:  Okay.  Let's
3  move on.
4           BY R. EHLER:
5           Q.  Dr. Goldfield, the first
6  page of this study, underneath the title "Heavy
7  social media use and psychological distress among
8  adolescents: the moderating role of sex, age, and
9  parental support," you see that title?  Underneath
10 that title are listed the authors; right?
11          A.  Yes.
12          Q.  And the last author is
13 Gary S. Goldfield.  That's you, right?
14          A.  Yes.
15          Q.  And that position in the
16 authorship, that's the senior author on the paper;
17 correct?
18          A.  Correct.
19          Q.  And the words that I
20 previously read, those appear in the paper in
21 which you're the senior author; correct?  And I'll
22 read them again --
23          A.  I understand the words.
24 But in the same paper, I also acknowledge the
25 limitations of the cross-sectional design and the

---

Page 184

1  potential for bidirectionality.  I also
2  acknowledge how parental support was measured
3  pretty weakly, with only two items, which is by
4  anybody's scientific standards a weak measure.
5           R. EHLER:  Move to strike that
6  answer.
7           BY R. EHLER:
8           Q.  Could you please answer
9  my question which is whether these words appear in
10 the paper where you are the senior author.
11          "-- our results showed
12             that those with rare
13             parental support used
14             social media more
15             frequently and had higher
16             odds for psychological
17             distress, consistent with
18             previous work.  It has
19             been known that parents
20             play a significant role
21             in their adolescents'
22             social media use and
23             behavior, which can
24             impact mental well-being.
25             Adolescents who reported

---

Page 185

1             having unsupportive
2             parents felt
3             disconnected, and used
4             social media more
5             frequently to find
6             meaningful social
7             interaction."
8  Those words appear in the paper where you're the
9  senior author; correct?
10          L. SCARCELLO:  Object to form,
11 asked and answered.
12          THE WITNESS:  Those words
13 appear in the context of a single cross-sectional
14 study.
15          BY R. EHLER:
16          Q.  That you were the senior
17 author on; right?
18          A.  Yes.
19          Q.  And that was published
20 before you were hired by the Plaintiffs in this
21 case; right?
22          A.  That was published before
23 I had the knowledge I have now of the literature
24 that this exercise has allowed me to gain.
25          Q.  Right.  This exercise

---

Page 186

1  that you're going to be paid $400,000 to do;
2  right?
3           L. SCARCELLO:  Object to form,
4  argumentative, inappropriate.
5           BY R. EHLER:
6           Q.  Dr. Goldfield, I'd like
7  to discuss self-report questionnaires and data
8  collection.  What limitations are there if you're
9  relying on self-report questionnaires and data
10 collection?
11          A.  Well, there might be some
12 inaccuracies.
13          Q.  And that could be
14 response bias, recall bias, social bias, those are
15 the sorts of inaccuracies?
16          A.  Yes.
17          Q.  And in the context of the
18 literature review that you did for this case, did
19 some of the studies within the meta-analyses rely
20 on self-report data?
21          A.  Yes.
22          Q.  Do you know how many?
23          A.  I did not count.
24          Q.  More common than not,
25 more than 50%?

---

Arbitration Place

(613) 564-2727                                                         (416) 861-8720

Page 187

1      A.   You know, self-report,
2   there -- to my knowledge, there is no better
3   index, no more valid or reliable way to measure
4   mental health than social -- than self-report.
5   There is no MRI that will show a psychiatric
6   profile yet.
7          Q.   Fair enough, but what
8   about self-report as it relates to social media
9   usage too?
10         L. SCARCELLO:  Object to form,
11  vague.
12         THE WITNESS:  The biases you
13  mentioned can come into play with self-reported
14  behavior.  A lot of the research shows it's
15  underestimated.
16         BY R. EHLER:
17         Q.   Does the research show
18  that it's overestimated or exaggerated?
19         L. SCARCELLO:  Object to form.
20         THE WITNESS:  The problem in
21  evaluating -- both methods are reliable and valid,
22  and both have limitations.  So objective measures
23  are not necessarily truly objective, they're just
24  electronic measures.  So in other words, if people
25  use their app and they don't close their phone,

Page 188

1   it's going to continue to record.  So there is no
2   real truth here.  There is no "true" objective
3   like body weight on a scale.
4          BY R. EHLER:
5          Q.   Understood, and we can
6   agree on that.  But what I want to know is whether
7   the research shows that self-report data of social
8   media use tends to overestimate or exaggerate that
9   usage.
10         A.   Again, yeah, there is
11  some study, the review by Parry.  But, you know,
12  compared to what?  The objective measures are not
13  so "objective" and they're inaccurate too, and
14  Falkenberg has mentioned that and other people
15  have mentioned that.
16         Q.   Do you think that the
17  objective measures are less reliable than the
18  subjective self-report measures of social media
19  use; that if something is recorded on your phone,
20  it's less reliable than if you're trying to
21  remember how much time you spend on social media?
22         L. SCARCELLO:  Object to form.
23         THE WITNESS:  I think at the
24  population level, using electronic objective
25  measures is just not feasible.  This -- the

Page 189

1   review -- to get at causality, I have to look at
2   not only a totality of evidence, but
3   population-based studies.  And that is how they
4   measure social media is by self-report.
5          Q.   That's fine.  I won't
6   even move to strike.  I don't -- I get it.  I'm
7   just trying to get a sense of what's more or less
8   reliable, and I'm asking if you think that
9   objective measures are less reliable than
10  self-report measures of social media use.
11         L. SCARCELLO:  Object to the
12  preamble.
13         THE WITNESS:  I would say both
14  have their strengths and both have their
15  limitations.  I would have to look at -- it would
16  be hard to quantify the reliability of electronic
17  recording because, again, what would it be
18  compared to?  It can't be compared against
19  self-report.  So do you know what I mean?  Like,
20  where is the truth?  Where is the gold standard?
21  We make assumptions it might be more reliable.  We
22  don't know.
23         BY R. EHLER:
24         Q.   So you don't think it
25  necessarily is?

Page 190

1          A.   I think it -- it --
2   again, it would depend --
3          THE VIDEOGRAPHER:  Sorry.  Can
4   we stop?  I lost -- it wasn't your audio.
5          R. EHLER:  It's okay.  We can
6   go off.  We can go off record.
7          THE VIDEOGRAPHER:  Current
8   time is 3:38 p.m., and we are off the record.
9   --- Upon recessing at 3:38 p.m.
10  --- Upon resuming at 3:52 p.m.
11         THE VIDEOGRAPHER:  The current
12  time is 3:52 p.m., and we are back on the record.
13         BY R. EHLER:
14         Q.   Welcome back,
15  Dr. Goldfield.  Did you speak with your attorneys
16  during the break?
17         A.   Briefly.
18         L. HORVATH:  Excuse me, I'm
19  not sure we're getting sound for the video.  It
20  looks like he's on mute.
21         N. MEHRA:  Yes, he was on
22  mute.  Now he's unmuted.  Mr. Goldfield, could you
23  please try speaking.  We can check if the audio is
24  working.
25         THE WITNESS:  Testing.  Can

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

---

Page 191

1  you hear me? Yeah?
2      N. MEHRA:  Yes, I can hear
3  you.  I hope everybody else can also hear him?
4      L. HORVATH:  Yes, thank you.
5      N. MEHRA:  Perfect.
6      BY R. EHLER:
7      Q.  Dr. Goldfield, I don't
8  want to know the substance of your conversations,
9  but did you talk with your attorneys about your
10 testimony in this deposition?
11     L. SCARCELLO:  Objection.
12 We're not talking about attorney-expert
13 communications.  He's told you that we talked
14 about the deposition during the break, that's as
15 far as it's going to go.
16     BY R. EHLER:
17     Q.  You can still answer my
18 question.  Unless you're instructing him not to
19 answer?
20     L. SCARCELLO:  Yeah, I am
21 instructing him not to answer this.
22     R. EHLER:  Okay, counsel,
23 there is no stipulation.  The stipulation, as I
24 understand it, is the federal rules.  I didn't ask
25 for the contents of communications.  So you can go

---

Page 192

1  ahead and leave your instruction as you want to,
2  but we might need to reopen the deposition on the
3  basis of all of the instructions.
4      L. SCARCELLO:  The question
5  was did you speak with us during the break -- can
6  you please -- what was the question?
7      BY R. EHLER:
8      Q.  Did you speak -- you
9  don't need to tell me the substance of your
10 communications.  Did you speak with your attorneys
11 about the substance of your testimony at this
12 deposition?  It's a yes or no.
13     A.  Briefly.
14     Q.  Dr. Goldfield, who is
15 Chris Davis?
16     A.  He is a colleague of mine
17 at Carleton University, a professor.
18     Q.  Have you known him for a
19 long time?
20     A.  I have known him for
21 several years.
22     Q.  Is he a reliable
23 researcher?
24     L. SCARCELLO:  Object to the
25 form.

---

Page 193

1      THE WITNESS:  He's -- I would
2  say he's a solid researcher.
3      BY R. EHLER:
4      Q.  Not willing to say
5  "reliable"?
6      L. SCARCELLO:  Object to form.
7      THE WITNESS:  To be honest, I
8  know him -- I don't -- I haven't really read his
9  work, so I can't really comment on the quality of
10 his research.
11     BY R. EHLER:
12     Q.  Okay.  Do you take him to
13 be an academic who has integrity and is honest?
14     L. SCARCELLO:  Object to the
15 form.
16     THE WITNESS:  I -- I don't
17 know him well enough to evaluate his integrity,
18 but I guess I have no reason to believe he doesn't
19 have integrity.
20     BY R. EHLER:
21     Q.  Okay.  You actually did
22 an experimental study with Chris Davis that was
23 recently published; correct?
24     A.  Correct.
25     Q.  And it's titled "Limiting

---

Page 194

1  social media use decreases depression, anxiety,
2  and fear of missing out in youth with emotional
3  distress:  A randomized controlled trial."  Right?
4      A.  Yes.  If you're going to
5  ask me a question about the study, I would
6  appreciate having it put in front of me, please.
7      Q.  Let me first ask whether
8  you're relying on this study for the conclusions
9  that you reach in your report and for your opinion
10 that social media is bad for youth mental health.
11     L. SCARCELLO:  Object to form.
12     THE WITNESS:  Again, did I --
13 did I take it into consideration?  Of course.  But
14 my opinion was based on the totality of evidence,
15 and my statements in that paper were based on my
16 knowledge at that time.
17     BY R. EHLER:
18     Q.  Okay.  And this was one
19 of the pieces of evidence that you took into
20 consideration in the research and report you did
21 for this case; right?
22     A.  I looked at hundreds of
23 studies, but that was one of them, yes.
24     Q.  Right.  And you probably
25 know this one better than you know the other ones

---

Page 195

1  because you did this one and wrote this paper;
2  right?
3          L. SCARCELLO:  Object to form.
4          THE WITNESS:  I'm familiar
5  with the study, yes, the paper.
6          BY R. EHLER:
7          Q.  I'll hand you Exhibit 10.
8              EXHIBIT NO. 10:  PAPER
9              TITLED "LIMITING SOCIAL
10             MEDIA USE DECREASES
11             DEPRESSION, ANXIETY, AND
12             FEAR OF MISSING OUT IN
13             YOUTH WITH EMOTIONAL
14             DISTRESS: A RANDOMIZED
15             CONTROLLED TRIAL"
16         BY R. EHLER:
17         Q.  I'd like to ask some
18  questions about how this study was designed.  You
19  selected participants from an undergraduate
20  introduction to psychology class at one of the
21  universities where you teach; correct?
22         A.  Correct.
23         Q.  And there were 260 of
24  them once you excluded ineligible folks for not
25  meeting inclusion criteria or those that withdrew

Page 196

1  prior to randomization; is that right?
2          L. SCARCELLO:  Object to form,
3  misstates the document.
4          THE WITNESS:  Are you
5  referring to the figure 1, the consort diagram?
6          BY R. EHLER:
7          Q.  Yeah, and asking whether
8  that's correct, that there were 260 students
9  available for randomization.
10         A.  That's correct.
11         Q.  As studies go, is that a
12  large sample or a small sample?
13         A.  For randomized control
14  trials of this nature, I would say it's a pretty
15  good sample.
16         Q.  But it's not
17  representative; right?
18         A.  No randomized control
19  trial is representative.
20         Q.  Great.  And this one is
21  not representative either?
22         A.  Representative of who?
23         Q.  Of the broader
24  population.
25         A.  Again, no randomized

Page 197

1  control trial is representative.  Randomized
2  trials are not designed to be representative.
3  Population-based surveys are designed to be
4  representative.  Randomized control trials are
5  designed to be proof of concept and to arrive at a
6  determination of causality.
7          Q.  Okay.  And -- but you're
8  limited to -- your determination of causality is
9  limited to the sample that you've pooled; correct?
10         A.  Correct.
11         Q.  And so the causality in
12  this study is limited to this set of
13  undergraduates who take introduction to psychology
14  at the Canadian university where you teach; right?
15         L. SCARCELLO:  Object to form.
16         THE WITNESS:  It's a proof of
17  concept study that is using youth who attend a
18  high -- yes, who attend university.
19         BY R. EHLER:
20         Q.  And on page 3, the top --
21  the paragraph in the top right column about
22  halfway down, there is a sentence that says:
23             "The social media
24             platforms that were
25             targeted in this study

Page 198

1             include Facebook,
2             Instagram, TikTok,
3             Snapchat, Twitter,
4             Pinterest, and Tumblr."
5  Those are the platforms that were targeted in your
6  experiment; correct?
7          A.  Correct.
8          Q.  And then it goes on to
9  say:
10             "Messaging apps (e.g.
11             Facebook Messenger,
12             WhatsApp, Reddit, and
13             texts) were not targeted
14             for reduction as research
15             has shown these to be
16             separate domains of
17             social media."
18  Can you explain why you made that choice or what
19  you intended by that?
20         A.  Well, our intent and I
21  think our thinking at that time was if we're going
22  to reduce traditional forms of social media -- we
23  didn't think messaging is where the harm lay.  We
24  thought -- we thought harm lay through the
25  algorithms, the push notifications, the

Page 199

1   displacement of sleep and health behavior, social
2   comparison. So we weren't trying to socially
3   isolate them. So we wanted them to continue
4   messaging each other, just not be drawn in and to
5   do that on social media because of all the
6   algorithms that would promote excessive use.
7           Q.  Okay. And I think I
8   understood that correctly -- well -- okay, so you
9   thought what you were isolating with this study
10  was algorithms, push notifications, those aspects
11  of social media, and not the messaging; is that
12  right?
13          L. SCARCELLO:  Object to form.
14          THE WITNESS:  We're -- social
15  media is a whole experience. It's more than push
16  notifications. It's a whole experience. We're
17  trying to target what happens when you reduce
18  that. We didn't want to say, don't message your
19  friends. So apps that focus mostly on messaging
20  -- at that time that was also our understanding --
21  my understanding at that time. So that was the
22  reason these apps were excluded.
23          BY R. EHLER:
24          Q.  You're saying "at that
25  time that was my understanding." Has your

Page 200

1   perception of messaging changed since you wrote
2   this paper?
3           A.  I have a better
4   understanding of what social media constitutes.
5   And if I had to do this study again, I would
6   definitely include YouTube and possibly even
7   WhatsApp. Maybe even Facebook Messenger.
8           Q.  But not Reddit or text
9   messaging?
10          A.  No.
11          Q.  Why?
12          A.  Because those are just
13  strictly communication platforms. There is no
14  posting, there are no likes, there is no social
15  feedback, there is no public display of pictures.
16  It's just text.
17          Q.  Okay. Did you --
18          A.  Much like e-mail.
19          Q.  Did you do anything in
20  this experiment to control for what people -- what
21  features people were using or what they were
22  engaging with on the platforms you did test?
23          A.  We targeted reduction on
24  the apps, time spent on the apps.
25          Q.  Okay. So you don't know

Page 201

1   if they were -- what features they were using or
2   if they were messaging through the social media
3   apps or using other aspects of those apps, that
4   was just an uncontrolled-for variable?
5           L. SCARCELLO:  Object to form.
6           THE WITNESS:  Well, again,
7   randomized control trials operate under the
8   assumption that those factors that are unmeasured
9   are going to be randomized out and equalized
10  between groups.
11          BY R. EHLER:
12          Q.  Okay. But that's an
13  assumption?
14          A.  It's an assumption not
15  all scientists make using those randomized control
16  trial study designs.
17          Q.  Right. But you weren't
18  testing it because it's not -- it wasn't part of
19  what you were testing. You were testing reduction
20  in time spent, so you weren't testing what people
21  were doing on the apps?
22          A.  That's right.
23          Q.  Okay. The individuals in
24  the intervention group, they knew that they were
25  in the intervention group; correct?

Page 202

1           A.  We didn't assess the
2   degree of blinding, but they knew they were being
3   asked to reduce social media.
4           Q.  Okay. And you actually
5   used -- I think I read an acronym SMART,
6   S-M-A-R-T, to help reinforce the behavior so that
7   they could kind of keep track of their goal to
8   reduce their social media to one hour a day. That
9   was part of the study design?
10          A.  True.
11          Q.  And so the individuals in
12  the -- did they know the hypothesis? They did?
13          A.  Again, we --
14          Q.  You don't know.
15          A.  We tried to obscure the
16  hypothesis.
17          Q.  How did you try to
18  obscure the hypothesis?
19          A.  We just said the purpose
20  of the study was to look at lifestyle, the study
21  was called Lifestyle Habits and Health. So we
22  just try to be as vague as possible.
23          Q.  Okay. But the only thing
24  they were asked to do was to reduce social media
25  use. There weren't other things they were asked

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 203

1   to do, like eat healthy or anything like that?
2           A.   That's correct.
3           Q.   So the individuals in the
4   intervention group were -- everybody was sent a
5   daily message to indicate their -- to respond to
6   the survey and indicate their social media use;
7   right?
8           A.   Both groups, participants
9   in both groups, yes.
10          Q.   And then the intervention
11  group was additionally sent this sort of SMART
12  intervention.  What did that look like?  What is
13  that?
14          A.   No, we just --
15          L. SCARCELLO:  Object to form.
16          THE WITNESS:  It was just a
17  very brief session up front about some tips on how
18  to -- for them to be able to reduce their social
19  media effectively.  It was, I think, a 30-minute
20  presentation.
21          BY R. EHLER:
22          Q.   Oh, it wasn't -- it
23  wasn't a daily effort to keep them on track?
24          A.   No, no.  No.  It was
25  handout of just some tips to help them reduce.

Page 204

1           Q.   On page -- this is not a
2   memory test -- but on page 3, that same first
3   paragraph on the right, but at the end of the
4   paragraph it says:
5               "Participants were also
6               positively reinforced via
7               e-mail for achieving
8               their smart goals every
9               time that goal was
10              achieved."
11  So they received an e-mail when they were able to
12  hit their goal of one hour or less a day?
13          A.   Yes.  But they were
14  also --
15          Q.   So there was a daily --
16          A.   But they were also -- no,
17  no, there was no provision of behavioral
18  modification daily.  Both groups were sent e-mails
19  whether -- the intervention group, if they met
20  their goal, we basically sent them a good job, you
21  met your goal.  If both groups exceeded their
22  goal, we sent them -- well, sorry, the
23  intervention group, if they exceeded their
24  one-hour limit, we sent them just a canned
25  reminder of the limit and the same tips that we

Page 205

1   told them up front.
2           Q.   Right.  And that was only
3   the intervention group that got those e-mails
4   because you had to keep them at that hour level to
5   test the hypothesis; right?
6           A.   Yes.
7           Q.   Okay.  And so then what
8   you found was this intervention group that knew
9   that they were reducing social media and received
10  positive feedback when they hit their goals, that
11  they then reported reduced symptoms of anxiety,
12  depression, and FoMO; correct?
13          A.   Relative to the control
14  group, yes.
15          Q.   And how do you know it
16  wasn't the positive feedback or the fact that they
17  had sort of set a goal to reduce their social
18  media by an hour or those aspects of the study
19  design that were contributing to the effects you
20  observed?
21          A.   Control groups were also
22  sent messages, reminders to -- the contact between
23  participants were -- was virtually similar.
24          Q.   But it wasn't, because
25  this sort of SMART goal setting, cueing, immediate

Page 206

1   positive reinforcement that you mention on page 3
2   was only for the intervention group.
3           A.   No, I know, but that was
4   not done interpersonally.  That was a handout.
5           Q.   But they were e-mailed
6   separate SMART goal e-mails every time the goal
7   was achieved.  That's just the intervention group.
8   There wasn't a goal set for the control group;
9   right?
10          A.   No, there was no -- there
11  was no limit on the control group.
12          Q.   So you can't be sure that
13  what was reflected in the results you saw might
14  not have been the positive impact on their overall
15  symptoms as a result of setting and achieving a
16  goal to reduce their social media use and feeling
17  accomplished for doing that?
18          L. SCARCELLO:  Object to form.
19          THE WITNESS:  I would say it
20  is unlikely simply because the same pattern of
21  results that emerged here are presented in 30
22  experiments by Burnell and the Hunt studies as
23  well.  We modeled our study after Hunt who did not
24  use SMART goals.  Therefore, that leads me to
25  believe it was the social media reduction.

Page 207

1    BY R. EHLER:
2        Q.   Okay.  So just based on
3    the similarity with the other study?
4        A.   Yes.
5        L. SCARCELLO:  Object to form.
6    BY R. EHLER:
7        Q.   Do you think it could
8    have changed the effect size you observed?
9        A.   I would say unlikely.
10       Q.   And that's just based on
11   the comparison to the other study?
12       A.   Yes.  Well, it's based on
13   that, but also on the Burnell meta-analysis that
14   yielded very similar results over 30 studies.
15       Q.   And those were all
16   similarly designed experiments?
17       A.   They were all randomized
18   control trials which yields the highest quality of
19   causal evidence.
20       Q.   And they all involved
21   reduction of social media use?
22       A.   Yes.
23       Q.   And the same fact that
24   the participants that were reducing their social
25   media use would have known that they were reducing

Page 208

1    it?
2        A.   I think this goes back to
3    what I was saying before.  I think some studies
4    used -- obscured the hypothesis.  But for the
5    reasons I mentioned before, I don't think demand
6    bias is coming into play here because it wouldn't
7    be selective.  It wouldn't occur for anxiety and
8    depression but not for well-being.  That makes no
9    scientific sense.
10       Q.   Well, you got the same
11   effect for -- same directional effect for
12   depression, anxiety, FoMO in your study; right?
13       A.   Yes, but they were -- a
14   lot of the outcomes were not significant.  Like
15   the positive psychology outcomes.
16       Q.   In your study?
17       A.   In my study.
18       Q.   Right, but that's
19   coherent in my mind.  In my mind, it's coherent
20   that college students in an introduction to
21   psychology class that know they're part of an
22   experiment that's reducing social media, and if
23   what they think is supposed to feel
24   better, they're going to answer that they feel
25   better as it relates to their depression and

Page 209

1    anxiety symptoms.  And that's kind of part of what
2    they think you're testing and what they -- you
3    know, that's sort of part of what they think is
4    going on, what the hypothesis is.  And then
5    they're also going to be like -- think that
6    they're -- you know, positive well-being, doing
7    fine.  That's not coherent in your view?
8        A.   No.
9        L. SCARCELLO:  Objection.
10   Object to form of the question, preamble, et
11   cetera.
12       THE WITNESS:  Not at all.
13       BY R. EHLER:
14       Q.   Great.  That's fine.
15   Before this study, before you did this study, did
16   you all -- and by "you all," I mean you and Chris
17   Davis -- acknowledge that the literature to date
18   before this study doesn't tell us anything about
19   what is causing what between social media use and
20   mental health harms?
21       L. SCARCELLO:  Object to form.
22       THE WITNESS:  At the time when
23   this paper was written, my knowledge of the
24   literature was far more limited than it is now.
25   And so the statements I made in this paper were

Page 210

1    based on my knowledge at the time, not based on
2    reviewing 44 meta-analyses and six on experimental
3    studies, not to mention which more than two-thirds
4    of the studies, experimental studies, have been
5    published in the last 15 months, 18 months.  There
6    were no meta-analyses published at the time that
7    we submitted this, let alone ran the study and
8    conceived of the study, which took a couple of
9    years.
10       BY R. EHLER:
11       Q.   Okay.  And your
12   co-author, Chris Davis, he was in the same boat,
13   right?  He had the same knowledge that you did at
14   the time?
15       A.   That's correct.
16       Q.   To your knowledge, is he
17   also engaged as an expert for the Plaintiffs in
18   this case?
19       L. SCARCELLO:  Object to form.
20   Calls for speculation.
21       THE WITNESS:  I don't know.  I
22   haven't talked to him about it.
23       BY R. EHLER:
24       Q.   Okay.  As a co-author on
25   this study, is he just as much entitled to his own

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                      July 10, 2025

Page 211

1  interpretations of it as you are?
2           L. SCARCELLO:  Object to form.
3           THE WITNESS:  People interpret
4  data differently.  He's entitled to his
5  interpretation.
6           BY R. EHLER:
7           Q.  Do you think that it
8  would be fair for -- scratch that.
9           I'm going to hand you what's
10 been marked as Exhibit 11.
11               EXHIBIT NO. 11:  PAPER
12               TITLED "EXPERIMENT FINDS
13               LIMITING SOCIAL MEDIA USE
14               CAN REDUCE MENTAL HEALTH
15               ISSUES IN DISTRESSED
16               YOUTH" DATED MAY 28, 2024
17          BY R. EHLER:
18          Q.  Do you recognize this
19 article?
20          L. SCARCELLO:  Can he have a
21 moment to look through it, please.
22          THE WITNESS:  I've actually
23 never seen it before.
24          BY R. EHLER:
25          Q.  Okay.  If you turn to

Page 212

1  page 2, about halfway down the page -- this is
2  quoting Chris Davis -- it starts:
3               "'Many people interpreted
4               this correlation --'"
5  Do you see that?
6          A.  Yes.
7          Q.  Let me start a paragraph
8  above to give enough context.  He says:
9               "'My colleague Gary
10              Goldfield --'"
11 That's you, right?
12         A.  Yes.
13         Q.  "'-- of the Children's
14             Hospital of Eastern
15             Ontario Research
16             Institute had been
17             following research
18             showing that as teens and
19             young adults have become
20             more connected to their
21             smartphones and social
22             media in particular,
23             rates of anxiety and
24             depression in this age
25             group had been rising,'

Page 213

1               explained study author
2               Chris Davis, a professor
3               of psychology at Carleton
4               University and head of
5               the Stress and Coping
6               Lab."
7  And then it goes on to say:
8               "'Many people interpreted
9               this correlation as
10              evidence that excessive
11              social media use was
12              harmful to the mental
13              health of teens and young
14              adults. But recognizing
15              that this correlation
16              between time spent on
17              social media and mental
18              health issues does not
19              tell us anything about
20              what is causing what,
21              he'" --
22 And that's a reference to you.
23              -- "determined that a
24              better test of whether
25              excessive use of social

Page 214

1               media was harmful was to
2               conduct an experiment."
3  Is that consistent with what you remember
4  happening when you decided to do this experiment?
5          A.  I was aware of some
6  experiments, as I have documented and made some
7  references here.  And we -- also in this document
8  that there is cross-sectional research.  And as I
9  said before, I agree that cross-sectional research
10 is not a great design to arrive at causality and
11 was trying to justify the need for an experiment.
12         Q.  Did your experiment
13 change your view that the research up until this
14 point was not able to tell us anything about what
15 is causing what?
16         A.  What's changed my review
17 is looking at 44 meta-analyses that include
18 children and youth around the world, looking at
19 the neuroscience, looking at mediators,
20 moderators, experiments.  The totality of that
21 evidence which I was not aware of at that time has
22 changed my view.
23         Q.  Okay.  So at this time,
24 when you were embarking on this experiment you
25 were doing and following the research in this

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                July 10, 2025

Page 215

1    space, you just weren't aware of all those other
2    meta-analyses -- I understand some were published
3    later -- but the ones that did exist at the time,
4    you weren't aware of all of that information?
5              A.   None of the meta-analyses
6    and experiments were published, and even a lot of
7    the cross-sectional longitudinal ones were not.
8    This study was conceived almost five years ago.
9              Q.   Okay.  And this -- the
10   study that you ended up doing, the experiment
11   study with Chris Davis, that in and of itself
12   didn't change your view?
13             A.   It certainly bolstered
14   it.
15             Q.   Sorry.  I thought you
16   didn't have a view about what causes what at this
17   point in time, and I'm trying to figure out if the
18   experiment gave you a view of what caused what.
19             A.   Again, yes, it was one
20   piece of information in the context of hundreds of
21   studies, but because it has a causal design, a
22   randomized, controlled trial, yes, that influenced
23   the way I think about it.
24             Q.   So did it make you think
25   that social media was harmful for adolescents?

Page 216

1              A.   Yes.
2              Q.   Can you turn to page 4 of
3    this.  At the very top.  And again this is quoting
4    your co-author Chris Davis, not you.  But the
5    first full paragraph says:
6                   "I should add that we
7                   are not saying that
8                   social media is bad for
9                   mental health,' Davis
10                  explained."
11             L. SCARCELLO:  Object to form.
12   Is that a question?
13             R. EHLER:  I haven't finished
14   yet.
15             L. SCARCELLO:  Oh.
16             R. EHLER:  You objected before
17   I finished my question.
18             L. SCARCELLO:  Oh, sorry,
19   there was a pause.
20             BY R. EHLER:
21             Q.   Dr. Goldfield, your
22   co-author, Chris Davis, who also wrote this
23   article with you and is not an expert in this
24   litigation, he described this study at the time
25   when it came out as saying:

Page 217

1                   "-- we are not saying
2                   that social media is bad
3                   for mental health --"
4    Did you agree with him at the time when he
5    expressed this view?
6              L. SCARCELLO:  Object to form.
7              THE WITNESS:  This is the
8    first time I've seen this.
9              BY R. EHLER:
10             Q.   You never talked to him
11   about the results of this study and whether they
12   led to the conclusion that social media is bad for
13   mental health at the time that you were writing an
14   article about it?
15             L. SCARCELLO:  Object to form,
16   vague, compound.
17             THE WITNESS:  I can't -- I
18   can't imagine -- I can't control what Chris
19   thinks.  I think if he did the exhaustive review I
20   did, I don't even think he would stand by that
21   statement.
22             BY R. EHLER:
23             Q.   Have you --
24             A.   Chris is also mostly
25   doing lab studies, so he's new to clinical trials.

Page 218

1    So who knows, maybe that was part of his thinking.
2    He is also extraordinarily conservative in his
3    views.  And this is the only paper on social media
4    he has published.  He was a complete rookie in all
5    of this.  I'm not -- I -- I like Dr. Davis, I
6    think he's a really bright guy, but he has no
7    experience in social media.
8              BY R. EHLER:
9              Q.   Okay.  And so when he
10   says "we," that "we" is you and him, you're the
11   only two authors on the paper; right?
12             A.   Um-hum.
13             Q.   And when he says "we are
14   not saying that social media is bad for mental
15   health," he never talked to you about that or
16   consulted you about that before he went and put
17   that in a published article that would be
18   available to the public, that would link to your
19   profile, and have the name of the experiment you
20   had published on it in May 2024; right?
21             A.   We --
22             L. SCARCELLO:  Object to form.
23             THE WITNESS:  We both did
24   media separately.  And again, I've never seen
25   this -- not that I recall anyway.  We did a lot of

Page 219

1    media.
2            BY R. EHLER:
3            Q.   Okay.  You can put that
4    down.
5            Dr. Goldfield, one of the
6    theories in your report for why you argue social
7    media causes harm to young people is the social
8    comparison theory; is that right?
9            A.   Correct.
10           Q.   And social comparison
11   theory includes upwards social comparison; right?
12           A.   (No verbal response).
13           THE COURT REPORTER:  Is that a
14   yes?
15           THE WITNESS:  Yes.
16           BY R. EHLER:
17           Q.   And in the context of
18   social media, that means that somebody is seeing
19   images, videos, texts, posted by or about somebody
20   that they might perceive as superior to
21   themselves.  Is that a fair way of describing
22   that?
23           L. SCARCELLO:  Object to form.
24           THE WITNESS:  That's generally
25   what it refers to, yes.

Page 220

1            BY R. EHLER:
2            Q.   And then the second type
3    of social comparison would be downward social
4    comparison; right?  And in the context of social
5    media, that would be if people are seeing images,
6    videos, texts, posted by or about someone they
7    perceive as inferior; right?
8            L. SCARCELLO:  Object to form.
9            THE WITNESS:  Yes.
10           BY R. EHLER:
11           Q.   And in your report, you
12   contend that social media contributes to social
13   comparison because users are essentially accessing
14   idealized images, like ideal standards of beauty,
15   that sort of content; right?
16           L. SCARCELLO:  Object to form.
17           THE WITNESS:  Are we talking
18   about the same report as the --
19           BY R. EHLER:
20           Q.   I'm in -- I'm still
21   working off the page numbers in your original
22   one --
23           A.   Okay.
24           Q.   -- but I've read your
25   amended one, so I'm not trying to limit your views

Page 221

1    or anything like that.
2            A.   Okay.  Okay, okay.
3            Q.   I want your full opinion.
4            A.   Okay.
5            Q.   Do you remember my
6    question?
7            A.   Whether I believe social
8    comparison's playing in a role in --
9            Q.   Whether the reason that
10   social comparison -- the connection between social
11   media -- sorry, scratch that.  Let me ask a better
12   question.
13           I'm characterizing your report
14   and whether your report says that social media is
15   contributing to social comparison as a mechanism
16   because it gives access to these idealized, you
17   know, standards of beauty, images, that sort of
18   thing.
19           L. SCARCELLO:  Object to form.
20           THE WITNESS:  I think there
21   are multiple pathways in how social media can
22   cause psychological harm.
23           BY R. EHLER:
24           Q.   Totally.  Just talking
25   about social comparison.  I'm not trying to limit

Page 222

1    --
2            A.   Okay.
3            Q.   I'm not saying that's
4    your only theory.  Just trying to talk about
5    social comparison theory for now.  I can stipulate
6    that you have others.  Just trying to get a sense
7    if I have accurately characterized social
8    comparison theory.  Yes?
9            A.   Yes.
10           Q.   And part of what social
11   media, in your view, does in contributing to the
12   social comparison theory is allowing users to --
13   oh, sorry, that social media can contribute to
14   ultimately dissatisfaction with a user's own body
15   or shape because they are potentially looking at
16   images of beauty ideals that are reinforced by
17   celebrities or social media influencers; is that
18   right?
19           L. SCARCELLO:  Object to form.
20           THE WITNESS:  I think that's
21   part of it, but the social comparisons are not
22   necessarily based on celebrities or influencers.
23   They are based on photo -- all kinds of feature
24   and beautification features of these apps that
25   project an idealized version of these teens.

Page 223

1    People take hundreds of selfies a day and will
2    post the best one, with the best lighting, that
3    have been photo edited.  So yes, do I believe
4    that's in the pathway of -- causal pathway of
5    harm?  Yes.  I think there are data to show that.
6            BY R. EHLER:
7            Q.  Okay.  And just so we're
8    clear, I said celebrities and social media
9    influencers, and you're correcting me because
10   you're saying it's not just celebrities and
11   influencers.  It's peers, and it's the fact that
12   the images suggest they appear more attractive or
13   they lead an exciting life or they're doing
14   something interesting.  Those are -- that's sort
15   of the -- that's what's happening on social media
16   that is causing the harm to the adolescents;
17   right?
18           L. SCARCELLO:  Object to form.
19           THE WITNESS:  The features
20   that allow one to alter their image to beautify
21   themselves project an unrealistic standard that
22   teens are -- in this developmental period,
23   especially young girls, are extraordinarily
24   sensitive to.  And that creates harm and the
25   McComb meta-analysis of experimental studies

Page 224

1    showed that.
2            BY R. EHLER:
3            Q.  Okay.  I think that we're
4    saying the same thing, but I just want to make
5    sure that your view hasn't changed about what you
6    think the social comparison is.  Do you think that
7    the social comparison is being exposed to images
8    of celebrities or peers on social media who appear
9    more attractive, seem to live more exciting and
10   interesting lives, and may lead adolescents,
11   essentially vulnerable adolescents, to see their
12   own appearance in life as worse by social
13   comparison processes?  That's what you view as the
14   social comparison problem; right?
15           L. SCARCELLO:  Object to the
16   form of the question.  If you're asking him
17   something specific in his report, if you could
18   point him to it, I appreciate that.
19           THE WITNESS:  Yes, sorry, what
20   page are we on?
21           BY R. EHLER:
22           Q.  I'm not on your report.
23   Is that what you mean by social comparison?
24           A.  That is.
25           Q.  And so if adolescents are

Page 225

1    on -- I represent Snap.  If adolescents are on
2    Snapchat, they could be doing different things.
3    They could be engaging with classmates on a group
4    project or they could be looking at these sort of
5    idealized images and engaging in social
6    comparison.  Is it your view that those impact the
7    adolescent equally if they're both on Snapchat,
8    same amount of time, same platform?
9            L. SCARCELLO:  Object to form.
10           BY R. EHLER:
11           Q.  Or are they different?
12           L. SCARCELLO:  Object to form.
13           THE WITNESS:  I think it would
14   depend.  Most people who use social media, they
15   scroll.  So in one sitting, they're exposed to all
16   kinds of things.
17           R. EHLER:  I'll move to strike
18   as non-responsive.
19           BY R. EHLER:
20           Q.  I'm trying to ask you a
21   hypothetical.  So, like, let's take a
22   hypothetical.  Same individual, platform Snapchat,
23   same amount of time they're spending on it.  In
24   one session they're spending that amount of time,
25   half-hour, engaging with classmates related to a

Page 226

1    group project they're working on for school.  In a
2    different setting, they're looking at images or
3    chats, messages from friends that involve, you
4    know, what their friends are doing, social
5    comparison in your view.  Are those two things the
6    same or are they different?
7            L. SCARCELLO:  Object to form,
8    incomplete hypothetical, calls for speculation.
9            THE WITNESS:  So if you're
10   asking me how you interact with the app or what
11   you're doing on it, does that matter?  Is that
12   what you're asking me?
13           BY R. EHLER:
14           Q.  Yeah, and I guess I
15   should have completed my -- I'm asking if it
16   matters for purposes of harm.  Like, are you
17   willing to agree with me that you don't think it's
18   harmful for people -- for adolescents to be on
19   Snapchat talking to classmates about a school
20   project?
21           L. SCARCELLO:  Object to form.
22           THE WITNESS:  Again, I guess
23   it would depend.  If they're spending hours and
24   hours a day on it, that will displace other
25   health-promoting behaviors.

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 227

1          BY R. EHLER:
2          Q.  Do you remember the
3  hypothetical that I gave you?
4          A.  Yes.
5          Q.  Can you answer the
6  question with respect to my hypothetical, if
7  you've got the same kid, same amount of time, some
8  amount of time that they're spending engaging with
9  classmates on a group project, and some amount of
10  time where they're looking at or engaging with
11  images, chatting with friends about, you know,
12  something that touches on idealized beauty
13  comparisons.  In that hypothetical, are there
14  different impacts of harm in your view --
15          L. SCARCELLO:  Object to
16  form --
17          BY R. EHLER:
18          Q.  -- based on all of the
19  research and the meta-analyses and everything
20  you've learned in the last few months?
21          L. SCARCELLO:  Object to form,
22  calls for speculation, incomplete hypothetical,
23  asked and answered.
24          THE WITNESS:  Most of -- I
25  base my opinions on the literature, and it's

Page 228

1  really hard to measure accurately what people are
2  doing when they're on the app.  So I can't -- I
3  don't know.  There is really no evidence to tease
4  that out, or limited evidence anyway.
5          BY R. EHLER:
6          Q.  I'll get there in a
7  second.  Just stick with my hypothetical for a
8  second.  You can't answer my hypothetical because
9  it's not in the research; is that your answer?
10          L. SCARCELLO:  Objection,
11  form, misstates testimony.
12          THE WITNESS:  I think the
13  impacts of media depend on all kinds of
14  vulnerability factors that I outlined in my
15  report.
16          BY R. EHLER:
17          Q.  Yeah, Dr. Goldfield, all
18  due respect, I asked you what I think is a clear
19  and straightforward hypothetical and you're
20  fighting my hypothetical.  Same individual, same
21  vulnerabilities, we've controlled for that.  I
22  learned that from you.  Same individual, 30
23  minutes engaged -- same time of day, 30 minutes
24  engaging with classmates on a school project, 30
25  minutes looking at images of friends in, you know,

Page 229

1  summer wear, you know, getting ready for a party.
2  Same individual.  Do you have a view based on all
3  the research that you've done of whether those
4  impact an individual in ways that are -- promote
5  harm or no harm perspective -- different or the
6  same or no view or you can't say because the
7  literature isn't there?  What's --
8          L. SCARCELLO:  Object to form,
9  calls for speculation, incomplete hypothetical,
10  asked and answered.
11          THE WITNESS:  I base my
12  opinions on the literature and I -- I don't -- I
13  just don't know the answer to that hypothetical.
14          BY R. EHLER:
15          Q.  That's fine.  You don't
16  have an answer from all the research and
17  literature you do, you can't answer?
18          L. SCARCELLO:  Object to form,
19  argumentative, and misstates his testimony.
20          BY R. EHLER:
21          Q.  That's fine.  You said
22  that there's no -- I want to talk about the
23  literature now.  You said that there is no or very
24  little literature that is able to assess what
25  adolescents are doing on the platforms; is that

Page 230

1  right?
2          L. SCARCELLO:  Object to form,
3  misstates testimony.
4          THE WITNESS:  There are some.
5  There are some.
6          BY R. EHLER:
7          Q.  But it doesn't tell
8  you -- none of that literature tells you, for
9  example, whether they're talking about a class
10  project or talking about, you know, excluding a
11  friend or being excluded by a group of friends.
12  Nothing's going to give you that information;
13  correct?
14          L. SCARCELLO:  Object to form.
15          THE WITNESS:  You could get
16  that -- there are some survey studies that try to
17  get at what kind of activities are being done.
18  There is some electronic-monitoring studies that
19  track that, but there are issues with privacy.
20  But the vast majority of research is not looking
21  at that.  And my professional opinion is if
22  these -- the kids are not -- it's an experience,
23  social media.  They're not using it the bulk of
24  their time for educational purposes.
25          BY R. EHLER:

22STCV21355
DEPOSITION OF GARY GOLDFIELD

July 10, 2025

Page 231

1     Q.  I'm actually not even --
2  I hear you on educational.  I will spot you that,
3  that they're doing all sorts of stuff.  Some of it
4  might be educational, not the majority.  That's
5  fine.  I'm more getting at whether or not we can
6  disentangle -- whether there's anything you're
7  seeing in the literature whether we can
8  disentangle the effects you're seeing from
9  precisely what it is they're doing, whether it's
10 educational for 10 minutes or an hour, whether
11 it's social support with a friend for 10 minutes
12 or an hour, whether they're looking at cat videos
13 for 10 minutes or an hour, or whether they're
14 looking at political violence in the Middle East
15 for 10 minutes or an hour.  I'm trying to
16 understand -- you said the literature is limited.
17 It doesn't let you disentangle that; right?
18        L. SCARCELLO:  Object to form.
19        THE WITNESS:  I would have to
20 look at studies that try to disentangle it and
21 evaluate the quality of the methods.
22        BY R. EHLER:
23     Q.  And you --
24     A.  It's challenging.
25     Q.  But you haven't done that

Page 232

1  in the course of writing your report; right?
2        L. SCARCELLO:  Object to form.
3        THE WITNESS:  There have been
4  -- I cite some meta-analyses by Godard and
5  Holtzman of 144 studies that look at the most
6  popular form of qualitative analysis, and that's
7  active use versus passive use.  Not huge
8  differences there.  I mean, I think active is a
9  bit more -- it's a bit less harmful.  Passive is
10 probably -- called doom scrolling is probably more
11 harmful.  I think that's what the data support.
12 But there are, to my knowledge, no meta-analyses
13 on disentangling or looking at content and the
14 effect on mental health.
15        BY R. EHLER:
16     Q.  Got it.  And you can't
17 disentangle -- or sorry.  Within the -- take them
18 one at a time, active versus passive.  Within
19 passive, you don't actually know whether the
20 effects that you're seeing, the negative effects
21 on mental health that you're seeing, are because
22 the individuals are looking at, to use my example,
23 reporting or images or videos of violence in the
24 Middle East as opposed to cats riding on Roombas.
25 That -- those distinctions -- I don't mean to make

Page 233

1  light of it, but I'm just saying it doesn't come
2  out in the research of what exactly they're
3  viewing and whether it's idealized beauty or
4  violence or something else.  You can't get that
5  from the literature; right?
6        L. SCARCELLO:  Object to form.
7        THE WITNESS:  As I laid out in
8  figure 3, there are multiple pathways of harm.
9  Social comparison or harmful content is one
10 pathway.  Displacement is another pathway that has
11 nothing to do with content, nothing to do with
12 social comparison --
13        BY R. EHLER:
14     Q.  I'm not talking about
15 displacement.  We can talk about displacement
16 later.  Just within the concepts of -- or within
17 the world of the research we were just talking
18 about, what I'm trying to figure out is in all of
19 the work that you've done whether at this point in
20 time with the literature it is able to disentangle
21 the effect you're seeing between content and other
22 aspects of the usage.
23        L. SCARCELLO:  Object to form,
24 asked and answered.
25        THE WITNESS:  I think it's

Page 234

1  really -- it's a whole experience.  I think it's
2  really difficult to disentangle content from the
3  features.  The features activate the dopamine
4  reward system which compel prolonged engagement or
5  excessive engagement.  And then the exposure I
6  think -- so I've talked about the pathways, how
7  that leads to harm, through displacement, through
8  effects on the brain, through reduced impulsivity,
9  cognitive control, executive functioning, is
10 outlined in figure 3.  But I also think prolonged
11 engagement exposes people to harmful content and
12 there is relationships with unfavorable social
13 comparisons that amplify the harm.
14        BY R. EHLER:
15     Q.  I understand that's your
16 view.  My question is a little bit different.  My
17 question is about whether the research -- can the
18 research tell you what percentage is due to
19 content versus amplification, or no?
20        L. SCARCELLO:  Object to form.
21        BY R. EHLER:
22     Q.  I get that it's a whole
23 experience and that makes sense to me, but I think
24 if it's the whole experience, then likely the
25 research can't attribute what percentage is

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 235

1  attributable to the content or other features.
2         L. SCARCELLO:  Object to form.
3         BY R. EHLER:
4         Q.  Fair?
5         L. SCARCELLO:  Asked and
6  answered.
7         THE WITNESS:  I think the
8  brain doesn't lie.
9         R. EHLER:  Okay.  I'm going to
10 move to strike that as non-responsive.
11        BY R. EHLER:
12        Q.  I get the whole
13 experience.  My question is about the 44
14 meta-analyses and all of the research that you
15 looked at.  Is there any study that is able to
16 disaggregate and control for either features or
17 content in a way that can tell you some assessment
18 of what proportion of the harm you think you're
19 seeing is attributable to the content?
20        A.  I don't know what social
21 media would look like without content.  Would it
22 be a blank screen?  Like, I'm not sure I
23 understand the question.
24        Q.  Okay.  I'll try to ask
25 the question again.  Is -- none of the research

Page 236

1  that you looked at for your work in this case was
2  able to control for content; correct?
3         L. SCARCELLO:  Object to form.
4         THE WITNESS:  I think it's
5  really difficult to disentangle content from
6  features, but I think they have independent
7  pathways to harm.
8         R. EHLER:  I'll move to strike
9  as non-responsive.
10        BY R. EHLER:
11        Q.  My question is about what
12 you looked at.  I know what you think, which is a
13 hypothesis, right?  But I'm asking about the
14 research that you looked at that you based your
15 opinion on.  None of that research controls for
16 content in a way that could allow someone to
17 control out the variable content and tell you that
18 it's the features of the platform and not the
19 violent videos from the Middle East that are
20 causing the harm?
21        L. SCARCELLO:  Object to form,
22 asked and answered.
23        BY R. EHLER:
24        Q.  The research you looked
25 at, is the answer to that question no?

Page 237

1         L. SCARCELLO:  Same objection.
2         THE WITNESS:  You know, when
3  you look at animal research and there's -- there
4  are the media effects that look at animal
5  research.  I don't think animals or rats and mice
6  can really decipher content and you see the same
7  decrements in executive functioning in the
8  pre-frontal cortex, cognitive control, as you do
9  with high social media use.  Very similar brain
10 reactions.  That leads me to believe that at least
11 part of the harm is independent of content.  But I
12 think the content is a -- driven by the
13 algorithms, personalized algorithms, are a fire
14 hose that amplifies harm.
15        BY R. EHLER:
16        Q.  Okay.  So the research
17 that you are basing this view on is the animal
18 research on intermittent variable rewards?
19        L. SCARCELLO:  Object to form,
20 misstates testimony.
21        THE WITNESS:  No, that's not
22 what I'm saying.  I'm saying I've read animal
23 studies that try to simulate overstimulation of
24 the brain in animals that leads to deficits in
25 executive functioning.  It happens in a very

Page 238

1  similar way as the functional and the -- all the
2  brain imaging studies show the same pattern,
3  because animals can't process content.  That leads
4  me to believe -- that's my digital stress
5  hypothesis -- that part of the harm at least which
6  is amplified by content can still exist
7  independent of content.  Basically it
8  overstimulates the brain.
9         BY R. EHLER:
10        Q.  Okay.  And so there is no
11 human research that you're basing that opinion on;
12 correct?
13        L. SCARCELLO:  I object to
14 form, misstates the testimony.
15        THE WITNESS:  Again, I think
16 it's really, really difficult to try to -- it's
17 such a hypothetical to parse out how much of it is
18 content, how much of it is features.  They're
19 inextricable.
20        BY R. EHLER:
21        Q.  Okay.  Is it fair to say
22 that the theory of social comparison is a
23 content-driven theory?
24        A.  People compare in person
25 all the time, at a party, wherever.  There's

Page 239

1  context, but I don't think it's -- it doesn't
2  always have to be content, no.
3          Q.  But you're -- okay.  Have
4  you ever said that social comparison theory is
5  more of a content-driven theory?
6          A.  In the context of social
7  media, yes, I said that.  But social comparison
8  theory has been around from the '50s --
9          Q.  That's very fair.
10         A.  -- way before computers
11  were --
12         Q.  In the context of social
13  media, which was relevant context that was not in
14  my question, do you believe that social comparison
15  theory is more of a content-driven theory?
16         A.  In the context of social
17  media, a lot of the content is driven -- is --
18  social comparison is based on a lot of content.
19         Q.  Do you remember a -- you
20  can go ahead and load it.  Do you remember an
21  April 2024 Grand Rounds, they're called Grand
22  Rounds, that you did for the hospital's pediatrics
23  group?
24         A.  Yes.
25         Q.  Where you presented on

Page 240

1  some of the -- on the experimental research and
2  some of the other research you had been doing in
3  this space?
4          A.  Yes.
5          Q.  I'm going to show you a
6  clip from that, if we can make the technology
7  work, from that Zoom call, it looked like.
8          (Video played)
9          L. SCARCELLO:  Counsel, can
10  you tell us where this video is from, when it's
11  from?
12         R. EHLER:  Yeah, I just did in
13  my questions a few minutes ago.
14         L. SCARCELLO:  You said the
15  Grand Rounds, '24?
16         R. EHLER:  Uh-huh.
17         L. SCARCELLO:  Okay.
18         BY R. EHLER:
19         Q.  Dr. Goldfield, was it
20  accurate at the time when you said that social
21  comparison theory, that's more of a content-driven
22  theory?
23         A.  Again, that was in the
24  context of social media --
25         Q.  Yeah.

Page 241

1          A.  -- and my knowledge at
2  the time.
3          Q.  Right.  And I think
4  you'll correct me if I am wrong, but I believe in
5  your amended report you've got a statement that
6  I'm not able to find right now where you say it's
7  not the content.  Does that sound familiar?
8          A.  I would have to look at
9  the report.
10         Q.  Okay.  It doesn't sound
11  familiar?
12         L. SCARCELLO:  Objection,
13  misstates testimony.  He would like to see the
14  report to get context for the question.
15         R. EHLER:  Oh, sure.  Exhibit
16  8.
17         BY R. EHLER:
18         Q.  Okay.  So paragraph 48.
19  Drivers of social media use.  Exhibit 8.  I know,
20  there's a lot of paper.  I'm sorry.
21         A.  I don't seem to have 8
22  handy.
23         Q.  It was the red-line
24  document.
25         A.  Okay.  This one?

Page 242

1          L. SCARCELLO:  Well, that is
2  your version of it.  You probably want to use the
3  version she has given you.
4          THE WITNESS:  Maybe that was
5  it.  Yeah.  Okay.
6          BY R. EHLER:
7          Q.  Page 29, paragraph 48 --
8          A.  I don't know where the
9  other part of the document is.  I think I mixed it
10  in.
11         Q.  That's okay.  Why don't
12  we -- we can -- if you want, we can take a break
13  and look for it, or we can come back to it.  Do
14  you have it or not?
15         A.  I might have mixed it in.
16         Q.  Okay.  It's okay, it's
17  okay.  We can come back to it.  It's okay.  Just
18  to wrap up this piece on social comparison theory.
19  So for that aspect of your report, you think
20  that's largely driven by the content; right?
21         L. SCARCELLO:  Object to form.
22         THE WITNESS:  Are you asking
23  me about what I said on the video or --
24         BY R. EHLER:
25         Q.  I'm asking about your

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                July 10, 2025

Page 243

1    opinions, in your opinions about social comparison
2    theory. Setting aside displacement and your other
3    theories, the social comparison theory is largely
4    driven by the content; fair?
5         L. SCARCELLO: Object to form.
6         THE WITNESS: I think there
7    are multiple pathways of harm, and I think content
8    is part of that cause.
9         BY R. EHLER:
10        Q.  Okay. You also talk
11   about cyberbullying as being a source of strain
12   and being part of the harm for adolescents, right?
13        A.  I talk about many
14   pathways of harm and cyberbullying is one of them.
15        Q.  And cyberbullying, that's
16   bullying but it happens online; right?
17        A.  Yes.
18        Q.  And cyberbullying is when
19   somebody sends harmful messages either to or about
20   the victim of that bullying; is that a definition
21   of cyberbullying that we can agree on?
22        L. SCARCELLO: Object to form.
23        THE WITNESS: It often occurs
24   publicly, so it's generally -- often not private,
25   so that adds to the shame and stigma and the harm.

Page 244

1         BY R. EHLER:
2         Q.  Okay. And so an example
3    could be if somebody were to post a mean or
4    hurtful message or video of -- about somebody
5    else; right?
6         A.  Right.
7         Q.  And it could be that the
8    bully is doing that intentionally to make the
9    other person feel bad; right?
10        L. SCARCELLO: Object to form,
11   incomplete, hypothetical.
12        THE WITNESS: There are many
13   reasons why someone might bully another person,
14   but that's one of them.
15        BY R. EHLER:
16        Q.  Okay. Cyberbullying,
17   that's also a content-driven theory; right?
18        A.  Again, it's really hard
19   to disentangle, you know, the features, the public
20   nature of it, the -- of the display of it, but --
21   well, there's -- there are actually multiple
22   theories of this, but generally it's -- generally
23   it's content.
24        Q.  Right. And we -- I think
25   the slide was on the screen that we just looked at

Page 245

1    in the video. I'm going to pause for a
2    housekeeping. I'll make Exhibit 12 the video and
3    we'll get you the full one and the clip, and so
4    I'm going to take this exhibit and give it to you.
5         EXHIBIT NO. 12:  VIDEO OF
6         DR. GARY GOLDFIELD'S
7         APRIL 2024 GRAND ROUNDS
8    BY R. EHLER:
9         Q.  And then I'm going to
10   move on to Exhibit 13, so we don't have a
11   missing --
12        EXHIBIT NO. 13:  SLIDE
13        TITLED "MAIN THEORIES OF
14        SM IMPACT ON MENTAL
15        HEALTH"
16   BY R. EHLER:
17        Q.  Dr. Goldfield, this was
18   the slide that you were presenting during that
19   Grand Rounds talk to -- at the hospital?
20        A.  Yes, that's correct.
21        Q.  And after the second
22   bullet where it says, "Cyberbullying, negative
23   online experiences," it says, "Content."
24        A.  That's correct.
25        Q.  Did you mean to convey to

Page 246

1    the -- is it medical students you're talking about
2    at the hospital during Grand Rounds?
3         A.  Lots of different people
4    attend Grand Rounds. It could be doctors, nurses,
5    students.
6         Q.  Okay. So for that
7    audience that you were speaking to, do you know
8    how many people there were?
9         A.  It was a virtual talk so
10   I don't recall.
11        Q.  Okay. You were trying to
12   convey to them that cyberbullying and negative
13   online experiences, those are about the content as
14   well; right?
15        L. SCARCELLO: Object to form.
16        THE WITNESS: Negative online
17   experiences are not necessarily -- are not
18   necessarily content but -- so cyberbullying is
19   typically content. People have negative
20   experiences online for all kinds of reasons.
21        BY R. EHLER:
22        Q.  In your report you talk
23   about other forms of cyber victimization and the
24   relationship with suicidal ideation, including
25   sextortion, for example. What is sextortion?

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 247

1          L. SCARCELLO:  Can you point
2   him to where you're talking about in his report?
3          R. EHLER:  Just talking.
4          L. SCARCELLO:  If you're going
5   to ask him questions about what he says in his
6   report, I would like for him to be able to see it.
7          BY R. EHLER:
8      Q.   Do you need your report
9   to answer the question what is sextortion?
10         L. SCARCELLO:  Well, I think
11  we're headed somewhere here, so it's not just to
12  answer that question.
13         THE WITNESS:  Yeah.  What
14  page?
15         BY R. EHLER:
16     Q.   I have no question about
17  your report.  Just asking you what sextortion is.
18         L. SCARCELLO:  The question
19  was: "In your report you talk about other forms
20  of cyber victimization and the relationship with
21  suicidal ideation, including sextortion, for
22  example.  What is sextortion?"  Where are you
23  talking about in his report?
24         BY R. EHLER:
25     Q.   Can you define sextortion

Page 248

1   for me, Dr. Goldfield?
2      A.   It would be great to see
3   where -- the context in which I said it.
4      Q.   I'm just asking for a
5   definition.
6      A.   I would really like to
7   see where I said it.
8      Q.   Well, your counsel can
9   ask you about that when she has time with you on
10  direct.  But I'm not asking you about the report.
11  Do you have an opinion about sextortion in this
12  case, Dr. Goldfield?
13     A.   Sextortion typically
14  means an exchange between people who have been
15  intimate with each other and may have revealing
16  photos, and those photos are being threatened to
17  be uploaded publicly or spread to peer groups, you
18  know, unless certain conditions are met.
19     Q.   And the subject matter of
20  that sextortion are the messages conveying the
21  threat or the photos or videos that may or may not
22  ultimately be disseminated; right?
23         L. SCARCELLO:  Object to form.
24         THE WITNESS:  Again, figure 3
25  does highlight that, yeah, this is one of many

Page 249

1   pathways to harm, but . . .
2          R. EHLER:  I'll move to strike
3   that.
4          BY R. EHLER:
5      Q.   My question was
6   different.  The subject matter of the sextortion
7   is the messages that are conveying the threat or
8   the photos or videos that may or may not be
9   disseminated; right?
10         L. SCARCELLO:  Object to form.
11         THE WITNESS:  I think it's the
12  whole experience, the -- I think people feel
13  anxiety when those photos get passed on, whether
14  they're being sextorted or not.  I had a
15  16-year-old male who was flirting with a girl and
16  sent some photos impulsively and had tremendous
17  amount of anxiety about where those photos would
18  end up.  I don't think she was sextorting him, but
19  he was anxious about the sextortion.
20         BY R. EHLER:
21     Q.   Yeah, that's fair.  And I
22  am trying to get at the ultimate anxiety, but the
23  subject matter of that is the photos; right?  The
24  concern is about the photos?
25         L. SCARCELLO:  Object to form.

Page 250

1          THE WITNESS:  I -- I think it
2   depends on what's exchanged between two people.
3   But in this particular example, he was anxious
4   about the photos being released.
5          BY R. EHLER:
6      Q.   And you would agree with
7   me that sextortion, that is also going to be a
8   content-based theory like cyberbullying and social
9   comparison theory; correct?
10         L. SCARCELLO:  Object to form
11  and misstates his testimony and --
12         THE WITNESS:  Sextortion
13  doesn't have to occur online.  I mean, blackmail
14  doesn't always occur online.
15         BY R. EHLER:
16     Q.   Right.  And it's harmful
17  when it's not online too; right?
18     A.   Yes, it's part of the
19  harms.
20     Q.   Well, when it's not
21  online, that is the harm; right?
22         L. SCARCELLO:  Object to form.
23         THE WITNESS:  It probably --
24  in this current context, it occurs more on social
25  media than not -- than probably in person because

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 251

1  that's where kids spend their time is in social
2  media.
3            BY R. EHLER:
4        Q.  Do you have studies or
5  data to support that statement you just made or is
6  that just an assumption?
7        A.  Well, when you look --
8            L. SCARCELLO:  Object to form.
9            THE WITNESS:  You look at
10  national averages, the averages are pretty high on
11  social media.
12            BY R. EHLER:
13        Q.  The averages of what?
14        A.  Of the amount of time
15  spent on social media.
16        Q.  And so you're drawing
17  from the time spent on social media the conclusion
18  that there is -- that's where the majority of
19  sextortion is happening?
20            L. SCARCELLO:  Objection,
21  misstates testimony.
22            THE WITNESS:  I've based my
23  opinions on the literature, which most of it
24  measures time on the app.  I don't know what that
25  would look like if there was no content to view.

Page 252

1  So it's impossible -- the questions you're asking
2  me are essentially can you disentangle content
3  from the whole experience.  It's kind of like
4  saying would you enjoy watching TV if there was no
5  screen, like a blank screen, no programming.
6            BY R. EHLER:
7        Q.  Do you agree that
8  identifying the platform, content and/or the
9  sources of what social media users are following
10  may be as important as the algorithms that social
11  medias use to display the content?
12            L. SCARCELLO:  Object to form.
13            THE WITNESS:  Again, you're
14  trying to get me to guesstimate the proportion of
15  harm caused by content versus the features, which
16  is really -- I mean, I don't know.  I've never
17  seen a study that looked at that, so I have no
18  basis of the opinion.
19            BY R. EHLER:
20        Q.  Do you think -- do you
21  think that it may be just as important to identify
22  the platform, content, or sources, like models,
23  peers, businesses, memes, that social media users
24  are following as it is to determine the algorithms
25  or other aspects of a social media platform?

Page 253

1            L. SCARCELLO:  Object to form.
2            THE WITNESS:  The algorithms
3  generate the content.  So what you're asking me to
4  do is almost like is the gunshot wound due to the
5  bullet or the gun?  One doesn't exist without the
6  other.
7            R. EHLER:  I'll move to strike
8  everything after "so what you're asking me to do."
9            L. SCARCELLO:  It was
10  responsive.  We would oppose that.  Should we take
11  a quick break, maybe he can collect and organize
12  his exhibits here.
13            R. EHLER:  I think I'm almost
14  done with this line of questioning if you'll give
15  me a little bit more.
16            L. SCARCELLO:  Okay.
17            EXHIBIT NO. 14:  PAPER
18                TITLED "THE EFFECTS OF
19                REDUCING SOCIAL MEDIA USE
20                ON BODY ESTEEM AMONG
21                TRANSITIONAL-AGED YOUTH"
22            BY R. EHLER:
23        Q.  Dr. Goldfield, I've
24  handed you what's been marked Exhibit 14.  This is
25  an article titled "The Effects of Reducing Social

Page 254

1  Media Use on Body Esteem Among Transitional-Aged
2  Youth," and you're one of the authors; is that
3  right?
4        A.  Yes.
5        Q.  And if you could please
6  turn to page 499 of the document.  And it's kind
7  of in the middle -- no, one, two, three, four,
8  five lines down --
9            L. SCARCELLO:  Dr. Goldfield,
10  are you ready to answer questions about this
11  document?
12            THE WITNESS:  I would
13  appreciate a minute just to read the context in
14  which the limitations are presented.
15            BY R. EHLER:
16        Q.  Can you tell me when
17  you're ready, please.
18        A.  Okay.
19        Q.  Okay.  Do you see the
20  sentence that starts:
21            "Finally, to our
22            knowledge, there has been
23            limited research
24            exploring the impact of
25            quality or content of

Page 255

1    social media use on body
2    esteem."
3    (As read)
4    And then right after that, because I actually
5    meant the sentence after that:
6    "Identifying the
7    platform, content, and/or
8    sources (e.g., models,
9    peers, businesses, memes)
10    that social media users
11    follow may be important
12    as" --
13    I think there is a missing "as" but:
14    "-- may be important as
15    the algorithms that
16    generates one's
17    day-to-day feed greatly
18    depend on who / what one
19    follows and whether these
20    accounts influence facets
21    of body image
22    differently."
23    So in this sentence were you trying to identify or
24    at least posit that needing to identify the
25    content and who social media users follow is an

Page 256

1    important aspect of understanding, in this
2    article, the effects on body esteem?
3    L. SCARCELLO:  Object to form.
4    THE WITNESS:  I think trying
5    to clarify the pathways of a harm are important
6    for any problem, whether it be mental health or
7    medicine or obesity.  And so I think having a
8    better understanding of the mechanistic pathways
9    would be helpful.
10    BY R. EHLER:
11    Q.   And in the context of
12    social media, that includes the specific content
13    that adolescents are viewing; right?
14    A.   Yeah, as I laid out in
15    figure 3, I think content is exacerbating harm.
16    It's not the -- there are other pathways I note,
17    but content is one.
18    Q.   As it relates to sleep,
19    do you agree that adolescents may have more
20    trouble falling to sleep if the content that
21    they're viewing online is particularly salient,
22    exciting or -- whether positive or negative, but
23    arousing for them?
24    L. SCARCELLO:  Object to form.
25    THE WITNESS:  I think anything

Page 257

1    that's upsetting before bed, whether it be
2    watching something on TV or social media, getting
3    messages, or having a bad day, or being anxious
4    about a test, can interfere with sleep.
5    R. EHLER:  Okay.  I'm at the
6    end of that line of questioning if you guys want a
7    break.  Thank you for letting me finish.
8    L. SCARCELLO:  Sure.  We can
9    go off the record.
10    THE VIDEOGRAPHER:  Current
11    time is 5:11 p.m., and we are off the record.
12    --- Upon recessing at 5:11 p.m.
13    --- Upon resuming at 5:28 p.m.
14    THE VIDEOGRAPHER:  The current
15    time is 5:28 p.m., and we are back on the record.
16    BY R. EHLER:
17    Q.   Dr. Goldfield, I'm going
18    to hand you Exhibit 15.
19    EXHIBIT NO. 15:  PAPER
20    TITLED "SOCIAL MEDIA AND
21    ADOLESCENT HEALTH (2024)"
22    BY R. EHLER:
23    Q.   Do you recognize this
24    document?
25    A.   I do.

Page 258

1    Q.   What is it?
2    A.   The National Academies
3    Press.  Is this the consensus statement, social
4    media and adolescent health?
5    Q.   Yes, I believe so if
6    we're referring to the same thing.  It's the
7    report that was put out in -- it says 2024 on here
8    by the National Academy of Sciences, Engineering,
9    and Medicine.
10    A.   Yes.
11    Q.   You reviewed it in
12    connection with your report in this case?
13    A.   Yes.
14    Q.   But you didn't cite it at
15    all in the text of your report and I'm wondering
16    why.
17    A.   Because I disagreed with
18    the conclusions.
19    Q.   You disagree with the
20    National Academy of Sciences' conclusions
21    regarding social media and adolescent health?
22    A.   That's right.
23    Q.   Is your disagreement
24    based on the fact that, as we've been talking
25    about, you've reviewed these 44 additional

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                        July 10, 2025

Page 259

1  meta-analyses, and based on this newer data, you
2  think there is evidence that they may not have had
3  available or didn't consider?
4       A.   Well, first of all, their
5  review was not systematic.  Mine was.  Second of
6  all, they cited very limited amount of research.
7  No experiments at all, none.  So they've
8  completely disregarded the study design that
9  yields the strongest causality, causal inferences.
10  I have a problem with that.
11            Number two, and they only
12  mention maybe a few longitudinal studies.  So, of
13  course, if they're only reviewing cross-sectional
14  research, they're going to have some conclusions
15  that I believe are wrong because they've just --
16  they've not included or selectively included
17  studies that they were aware of.  Their search
18  wasn't systematic.
19            So I completely disagree with
20  the conclusions.  I don't think it was a very good
21  literature review.  I don't think it was thorough.
22  And I believe if they reviewed the literature that
23  I did in my report, their conclusions would be
24  different, more aligned with mine.
25       Q.   Have you spoken to

Page 260

1  anybody on this committee/subcommittee of the
2  National Academy of Sciences, Engineering and
3  Medicine to tell them you disagree with their
4  views?
5       A.   I have not.  I don't know
6  these people.
7       Q.   Is there anything in this
8  report you do agree with?
9            L. SCARCELLO:  Object to form.
10            THE WITNESS:  This is a
11  really, really long report and I haven't committed
12  it to memory.  But what I do recall is they
13  certainly lay out a lot of recommendations for
14  algorithm reform, for transparency of internal
15  research by social media companies, you know, to
16  the -- they identify social comparison as part of
17  the potential cause of harm.  So again, what
18  struck me was this, for a conclusion that doesn't
19  reach on causality, they certainly lay out a lot
20  of cautions here.  So I don't -- I just don't
21  really think much of this document.  Their review
22  is not systematic and excludes 30 experiments.  So
23  I would -- just don't think much of it.
24       Q.   Okay.  And despite this
25  being a national committee of -- scratch that.

Page 261

1            Can you turn to page 11?
2       A.   Yes.
3       Q.   Underneath the research
4  agenda, second paragraph down, it says:
5            "The standard of evidence
6            needed to establish a
7            causal relation between
8            the outcome and exposure
9            is high."
10  Do you agree with that statement?
11       A.   It depends what kind of
12  designs you're looking at and the number of
13  studies.  But generally, yeah, you need
14  high-quality studies to arrive at a determination
15  of causality.  Keep in mind they say "causal
16  relation." So, in other words, experiments.
17       Q.   What does that mean?
18            L. SCARCELLO:  Object to form.
19            BY R. EHLER:
20       Q.   Is that different than
21  your opinion?
22       A.   My opinion's stated
23  slightly differently, but they're -- what they're
24  basically saying is there is a -- you need to
25  consider certain types of study designs to

Page 262

1  establish causal relationships.  In other words,
2  experiments or really well done, well-controlled
3  longitudinal studies.  This report doesn't review
4  really any of that.
5       Q.   Are you -- I'm just
6  trying to -- I was struck by what you said that
7  causal relation is different than the conclusion
8  you reached in this case.  Is your conclusion
9  different than causal relation?
10            L. SCARCELLO:  Objection,
11  misstates testimony.
12            THE WITNESS:  Causal relation
13  is languages -- language used for single-study
14  experiments.
15       Q.   I see.
16       A.   So in my opinion, it's
17  based on the totality of evidence.  So I believe
18  when you look at the neuroscience, you look at
19  cross-sectional, longitudinal, experimental
20  studies, you use the Bradford Hill analysis what
21  helps you arrive at causation.  But fundamentally,
22  they're not huge differences.  Those are just
23  minor languages.  Causal is causal.
24       Q.   Okay.  Can you go back to
25  page 5 and at the bottom of that page, the last

Page 263

1  paragraph, it says:
2      "The committee's review
3      of the literature did not
4      support the conclusion
5      that social media causes
6      changes in adolescent
7      health at the population
8      level."
9  Do you agree, let's start with at this point in
10  time, that the literature did not support the
11  conclusion that social media causes changes in the
12  adolescent health of the population level?
13      A.  I believe based on the
14  literature that they reviewed in this report that,
15  yes, that's led them to that conclusion.
16      Q.  I see.  So the difference
17  between what you did and this report is the corpus
18  of literature that you reviewed compared to the
19  corpus of literature they reviewed; correct?
20      L. SCARCELLO:  Objection,
21  form, misstates testimony.
22      THE WITNESS:  The literature I
23  reviewed was far more expansive than the
24  literature reviewed here, not only in number of
25  studies but quality of studies.

Page 264

1      BY R. EHLER:
2      Q.  And so it's not a timing
3  issue -- or is it a timing issue about newer
4  studies coming out?
5      A.  I think part of it is the
6  timing issue.  Their search was, I think, '22 or
7  '23.  There were no meta-analyses of randomized
8  controlled trials or experiments then.
9      Q.  I see.  So at this point
10  in time, even if they had done your research, the
11  National Academies Press may have reached the same
12  result if they didn't have the updated research.
13      L. SCARCELLO:  Object to form,
14  misstates testimony.
15      THE WITNESS:  I don't know
16  what they would reach, but there were experiments
17  done, many of them before '23, that were not even
18  mentioned at all here.  I think they cited two or
19  three meta-analyses.  There were a lot more than
20  two or three.  The review wasn't systematic.  So
21  scientists' conclusions are based on the data, the
22  extent of the data that they're given for the
23  review.  So my guess is the committee fed them a
24  bunch of papers and they arrived at a
25  determination, which I believe is wrong.

Page 265

1      BY R. EHLER:
2      Q.  Okay.  You can put that
3  down.  One more question just on that last point.
4  You said the committee gave them papers.  Do you
5  know how they did their review?  Did you look into
6  what they did to collect research and how they
7  conducted their analysis?
8      L. SCARCELLO:  Object to form.
9      THE WITNESS:  They describe
10  how they got -- they openly say the review was not
11  systematic.  It sounds like it was just more about
12  the experts doing some -- their own gathering.
13  Typically how these committees work are the
14  support staff doing a lot of the lit reviews,
15  people, students, but it wasn't systematic.
16      Q.  Okay.  But do you know
17  the full corpus of research that they looked at?
18      A.  They have a table that
19  they outlined, so I'm aware of at least some of
20  the studies that they looked at.  But, no, I
21  didn't see their search or -- but they do say it's
22  not a systematic review.
23      Q.  And they also interviewed
24  experts in the field, right, over the course of
25  several months?

Page 266

1      A.  I believe they did.
2      Q.  Okay.  You don't have a
3  more detailed set of information about what
4  exactly they did to reach that conclusion?
5      L. SCARCELLO:  Object to form.
6      THE WITNESS:  Based on reading
7  this, it was almost all based on cross-sectional
8  studies, which is the lowest quality of evidence.
9  So in that context, it doesn't surprise me that
10  they reached that conclusion.
11      BY R. EHLER:
12      Q.  Okay.  In the context of
13  experiments, we've talked a lot about
14  well-designed and limitations -- well-designed
15  experiments, limitations on experiments.  All else
16  being equal, if you were designing an experiment
17  in this space on social media, you would try not
18  to use a convenience sample; right?
19      L. SCARCELLO:  Object to form.
20      THE WITNESS:  Again,
21  experiments are about internal validity, so does
22  the change in the exposure independent variable,
23  which in this case is social media, lead to a
24  change in the outcomes you want to study?
25  Randomized controlled trials don't arrive at

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                             July 10, 2025

Page 267

1  generalizability.  No trial, even with 3,000
2  patients, is representative of the population.
3  It's based on people willing to volunteer for the
4  study.  They're not -- they're not designed to be
5  representative.  They're designed to be causal.
6        BY R. EHLER:
7        Q.  Okay.  So it doesn't
8  matter what sample you use.  Is that your
9  testimony?
10       L. SCARCELLO:  Object to form.
11  Misstates testimony.
12       THE WITNESS:  No, that's not
13  what I'm saying.
14       BY R. EHLER:
15       Q.  Right.  And my question
16  was a little bit different too.  It was, all else
17  being equal, whether would you not use a
18  convenience sample for a randomized controlled
19  trial?
20       A.  I think it depends on
21  your research question.  I mean, you know, in our
22  study, one of the primary limitations, as I've
23  noted in the report, is that all the experiments
24  trying to reduce distress through reduced social
25  media looked at healthy kids who are not

Page 268

1  symptomatic.  Well, even the most powerful
2  anti-depressant's not going to reduce depression
3  if you're not really showing any symptoms.  So
4  what our study tried to do, with Dr. Davis, as you
5  mentioned, was address that limitation, as did
6  Hunt's, and we showed really large and clinically
7  meaningful effects.
8        BY R. EHLER:
9        Q.  I understand that, but my
10  question is about convenience samples.  And your
11  study did use a convenience sample because it was
12  the university students in the intro to psych
13  class; right?
14       A.  Correct.
15       Q.  Would your study have
16  been better if you had been able to continue to
17  isolate and kind of identify folks who already
18  were suffering from anxiety and depression
19  symptoms but have a broader, more representative
20  sample, that would be a better study; right?
21       L. SCARCELLO:  Object to form.
22       THE WITNESS:  There is no
23  reason to believe that when you look at 30 studies
24  of experiments all showing the same thing, that
25  the effects would be so markedly different if the

Page 269

1  sample was a bit more representative.  Again,
2  randomization takes care of any between group
3  differences and characteristics.  Would it be
4  better to have more participants, a little more
5  representative of the population?  Sure, of
6  course.  Then your generalizability is better.
7  But generalizability has nothing to do with the
8  validity of the manipulation, of the internal
9  validity of the proof of concept of causality.
10       BY R. EHLER:
11       Q.  Right.  Internal, but
12  what you just said was it takes care of in between
13  group characteristics, but it can't do anything
14  to tell you -- if those people are not in your
15  sample, it can't tell you anything about those
16  people.  So if you test, for example, college
17  students, it doesn't necessarily tell you anything
18  about 10-year-olds; right?
19       A.  Well, it's coherent with
20  the research -- the research on 10-year-olds when
21  you reduce screen time, health and mental health
22  improves.  As I outlined in the Bradford Hill
23  analysis, it's perfectly coherent in other
24  populations around the world, different age
25  groups, there is no reason to believe it would be

Page 270

1  specific to college students.
2        Q.  What I'm actually trying
3  to get at is some best practices of randomized
4  controlled trials.  Let me ask the question in a
5  different way.  If you could design a perfect
6  randomized controlled trial, what are the best
7  practices if you were trying to explain to
8  somebody, the best practices you would implement,
9  what would they be?
10       L. SCARCELLO:  Object to form.
11       THE WITNESS:  It depends on
12  what your goals are.  Probably a multi-site trial
13  with more subjects.  It depends.  Are you
14  targeting healthy kids?  Then you're going to want
15  a good cross-section of healthy kids from
16  different demographics and different ages.  You
17  probably need a large sample, good measurement,
18  good manipulation, good adherence to the
19  restriction.
20       BY R. EHLER:
21       Q.  A lower rate of
22  attrition?
23       A.  That's always a good
24  thing.
25       Q.  Preregistration?

Page 271

1    A.  That's become a lot more
2  popular in recent years, yes.
3         Q.  The adjustments we talked
4  about before in attempting to blind as much as
5  possible the hypothesis?
6         A.  Yeah, it's difficult when
7  you're taking something away from somebody, but
8  that's helpful for sure.
9         Q.  And in the -- so that's
10 an ideal study, and I get that that's hard to
11 achieve.  Going to the other extreme, is there a
12 version of an experiment that you would not rely
13 on because some of, you know, these issues so
14 infect the study design that it's not reliable?
15        L. SCARCELLO:  Object to form.
16        THE WITNESS:  All studies have
17 limitations, but by and large, randomized
18 controlled trials are in the -- in the
19 hierarchy of evidence, it ranks way higher than
20 any other research design.  So even though it may
21 have limitations, it still gets at causality far
22 more than cross-sectional studies and maybe even
23 well-controlled and likely well-controlled
24 longitudinal studies.
25        BY R. EHLER:

Page 272

1         Q.  My question was a little
2  bit different which is whether there would ever be
3  a study -- an experimental randomized controlled
4  study that had so many flaws that you would not
5  rely on it.
6         L. SCARCELLO:  Object to form
7  incomplete hypothetical.
8         THE WITNESS:  I would have to
9  look at the study and see where the flaws lay.
10        BY R. EHLER:
11        Q.  Were there any
12 experimental studies in the course of your
13 literature review that you reviewed and thought
14 had -- were sufficiently biased in their study
15 design or had flaws or limitations in their study
16 design that they were not reliable?
17        A.  I think some of the
18 studies didn't verify the -- so some of the
19 manipulations didn't work.  So I think when you
20 don't successfully reduce social media, then it's
21 hard to make a determination of whether there was
22 no effect, you can't help but wonder is if they
23 did successfully reduce social media, would there
24 have been an effect on mental.  But the beauty
25 about meta-analyses is it pools all of that.  So

Page 273

1  it's taking an average effect of the studies that
2  were successful, the studies that were not
3  successful, some of the stronger studies, some of
4  the weaker studies.  And the overall conclusion
5  when you're looking at the pattern of findings of
6  the well-done ones in Burnell, which is why I
7  added it, it is by far the best one because they
8  don't pool all the outcomes, they list them
9  separately.  The actual average effect of social
10 media reduction is comparable to anti-depressant
11 medication for adolescent depression based on a
12 recent -- some recent meta-analyses published in
13 World Psychiatry and The Lancet Psychiatry.
14        Q.  Dr. Goldfield, do you
15 remember my question?
16        A.  Yeah.  Your question is
17 what would my worst study design be -- or, no, it
18 was more are there features -- are there design
19 limitations that would warrant me to discard the
20 findings.
21        Q.  Right.
22        A.  Again, every study has
23 strengths and limitations.  When you're trying to
24 arrive at causality, you look at -- you don't look
25 at one study in isolation.  You consider all of

Page 274

1  the studies.
2         Q.  Right.  And so did you
3  make any effort in your literature review to -- in
4  looking at all of the studies, to try to identify
5  and exclude ones that were not reliable?
6         A.  I relied on systematic
7  review and meta-analytic evidence.  So I wasn't
8  analyzing individual studies.  I was analyzing
9  pooled studies.  Which by the way, meta-analyses
10 or randomized controlled trial is the top of the
11 hierarchy of evidence, the pyramid.  You can't get
12 better evidence than that if it's done properly.
13        Q.  Right.  I was going to
14 say there is a limitation that again if you have
15 garbage experiments in that meta-analysis, it
16 doesn't tell you much; right?  Is that correct?
17        L. SCARCELLO:  Object to form,
18 incomplete hypothetical.
19        THE WITNESS:  Again, I would
20 still take a poorly designed RCT if the
21 manipulation worked and they could actually verify
22 -- or even through self report which is valid, a
23 reduction in social media, but, yes, there are
24 certain caveats for that.  There are all kinds of
25 other ways, you know -- trials could fill.  But I

Page 275

1  would still emphasize those studies and weigh them
2  more heavily than a large cross-sectional study.
3          BY R. EHLER:
4          Q.   What about a longitudinal
5  study?
6          A.   Depends on the
7  longitudinal studies. The two new ones I added
8  were really, really methodologically elegant and
9  rigorous.
10         Q.   Did you see any
11 randomized controlled trials involving social
12 media that met that kind of gold standard we
13 talked about early, multi-site, low attrition,
14 representative sample, controlled for bias? Were
15 any experiments like that in the ones you
16 reviewed?
17         L. SCARCELLO:  Object to form.
18         THE WITNESS:  The studies I
19 reviewed were very similar to -- when you look at
20 meta-analyses that I cited of psychotherapy
21 research, for example, they had the same
22 limitations, yet the findings are not discarded
23 because they weren't the Cadillac of designs.
24         R. EHLER:  I'll move to
25 strike, respectfully.

Page 276

1          BY R. EHLER:
2          Q.   I understand that. But
3  you did not see any experimental studies that were
4  the Cadillac of designs; right?
5          L. SCARCELLO:  Object to form.
6          THE WITNESS:  Generally, we're
7  in the first wave here of experiments, evidenced
8  by very reputable organizations putting position
9  statements on that don't even mention experiments.
10 That's how new this is.  So when there is -- when
11 you're first doing -- and the reason you only see
12 these in weeks, they're proof-of-concept studies.
13 The first wave of any trial designs are
14 generally -- you know, there are strengths to them
15 and there are weaknesses to them. But again, I go
16 back to, I rather base my opinion on an
17 experimental design than a cross-sectional design.
18         R. EHLER:  Respectfully, I'll
19 move to strike that.
20         BY R. EHLER:
21         Q.   The more simple question
22 that I asked:  Did you see any Cadillac-level
23 designed experiment studies in those you reviewed
24 or not?
25         L. SCARCELLO:  Object to form.

Page 277

1          THE WITNESS:  I saw many that
2  were really good, that really got at causality.
3  They manipulated the variables well of social
4  media, they used accurate phenotyping, and there
5  were some really tight studies.
6          BY R. EHLER:
7          Q.   Multi-site, controlled
8  for biases, blinded, low attrition?
9          A.   Well, we already talked
10 about --
11         L. SCARCELLO:  Object to form.
12         THE WITNESS:  -- blinding is
13 really difficult. Especially when you're trying
14 to remove something from someone, it's pretty hard
15 to blind that.
16         BY R. EHLER:
17         Q.   What are the
18 individual -- not the meta-analyses, the
19 individual experiments that you think meet the
20 Cadillac standard?
21         A.   Again, I think they're --
22 all studies have limitations and they are noted,
23 every study. Even you'll see studies published in
24 JAMA or the Lancet, they'll cite limitations. No
25 study is perfect. So I didn't cite individual

Page 278

1  studies all that much. I relied on meta-analyses.
2          Q.   So sitting here today,
3  you're not able to identify any specific one that
4  met that Cadillac standard; right?
5          L. SCARCELLO:  Object to form.
6          THE WITNESS:  I think a lot
7  were well done, but the meta-analyses don't -- the
8  beauty about meta-analyses is they don't
9  cherry-pick, they pool, right. So, you know,
10 stronger designs will be mixed in with weaker
11 designs and that's all -- it all kind of comes
12 out. So there's no bias in interpretation of, you
13 know, I think this study design is better than the
14 other one so I'm going to write up my narrative
15 review based on that, no.  It's combined.
16         BY R. EHLER:
17         Q.   Right.  I'm trying to get
18 at a slightly different issue which is whether you
19 are able to identify any of the underlying
20 experiments that -- by name or author, that you
21 think meet that incredibly high standard that
22 we're talking about.
23         A.   I think they're -- I
24 think the primary limitation in the research that
25 I identified in the report when you're trying to

22STCV21355
DEPOSITION OF GARY GOLDFIELD

July 10, 2025

Page 279

1  arrive at a determination of causality is a floor
2  effect.  That means if you're going to try to
3  improve mental health or reduce anxiety or
4  depression or body dissatisfaction in people who
5  don't show symptoms, really you're guaranteed to
6  have the effect being small, but it's by the
7  nature of the population that you're studying.
8  Like I said before, the most powerful
9  anti-depressant is not going to reduce anxiety or
10 depression if you're showing no symptoms.  The few
11 studies that address that limitation, mine with
12 Davis as we reviewed, and Hunt's, showed really
13 clinically meaningful effects.
14            Q.  Did your study with Davis
15 control for potential selective dropout?
16            A.  No study can control for
17 it.  People drop out.
18            Q.  Right.  But I think
19 sometimes studies analyze who dropped out and
20 whether or not there are aspects about the effect
21 of the dropout that might change the analysis.
22            A.  So --
23            L. SCARCELLO:  If you're
24 looking for that --
25            THE WITNESS:  Yes.

Page 280

1            L. SCARCELLO:  -- it's in the
2  stack.
3            THE WITNESS:  So you're
4  talking about the last one we reviewed?
5            BY R. EHLER:
6            Q.  Your Davis study.  Number
7  10, Exhibit 10.  If you did, it would be in the
8  article; is that fair?
9            A.  I'm just looking at the
10 figure.  Let me just look in the -- can you tell
11 me where that is?
12            Q.  I don't know because I
13 don't -- I -- I'm -- I'm asking you.
14            A.  Well, I could just tell
15 by the numbers it is very unlikely to be
16 significant, and if anything, the intervention
17 group had better retention than the control group.
18 So that wouldn't bias results in favor of the
19 intervention group.
20            Q.  What if the people who
21 dropped out of the intervention group were the
22 people for whom social media was actually helpful
23 to their symptoms?
24            L. SCARCELLO:  Object to form.
25            THE WITNESS:  There is no way

Page 281

1  to know that, really.
2            BY R. EHLER:
3            Q.  That's my point.  You
4  didn't test for that, you don't know?
5            A.  Well, they -- if they
6  drop out of the study, we don't know where they
7  would have ended up.
8            Q.  What is self-fulfilling
9  prophecy bias in this area of research?
10            A.  Again, these types of
11 biases generally get randomized out.
12            Q.  My question was what is
13 it?
14            A.  Self-fulfilling?
15            Q.  Yeah, self-fulfilling
16 prophecy bias.
17            A.  That's when you think
18 about things in a certain way and then you behave
19 that way.
20            Q.  Does it apply to the
21 participants in the research or the researchers?
22            A.  It could -- I mean, it's
23 typically applied to the participants.  A lot of
24 researchers, myself included, analyze the study
25 somewhat blindly, so group A, group B, to remove

Page 282

1  bias.  And we don't analyze our own data.  We paid
2  a statistician to analyze the data, also to remove
3  bias.  And the data are publicly available, by the
4  way.
5            Q.  If you only had
6  experimental studies and meta-analyses that only
7  included experimental studies for the basis for
8  your expert opinions in this case, would you reach
9  the same conclusion that social media causes or
10 contributes to mental health?
11            L. SCARCELLO:  Object to form,
12 incomplete hypotheticals.
13            BY R. EHLER:
14            Q.  Harms.
15            A.  I reached my conclusion
16 based on an exhaustive review of 44 meta-analyses.
17 When you get -- I'm looking for patterns of
18 results.  When you get the same pattern of
19 cross-sectional, longitudinal, and experimental,
20 it actually bolsters your confidence in the
21 conclusion that social media is being harmful.
22 When you reduce -- when you -- there have been
23 some experiments -- one experiment looking at the
24 brain effects by Hu, '22, I don't know how this
25 passed ethics approval, but they actually

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                July 10, 2025

Page 283

1  increased social media use from two to four hours
2  and compared to people who were randomized to
3  begin at four hours.  People at four hours
4  compared to baseline had more deficits in all
5  kinds of brain health outcomes.  And at the end of
6  a couple of weeks of the increased social media
7  use from two hours to four hours a day, all those
8  differences went away.  That's the strongest
9  causal evidence that we have.  The brain doesn't
10 lie.  There is no bias, there is no social
11 desirability, there is none of that.
12          Q.  So just to get back to my
13 question, because I'll move to strike that because
14 you didn't answer it, if you only had the Hu
15 study, if you only had experimental studies and
16 you didn't have all the cross-sectional and
17 longitudinal studies, would you reach the same
18 conclusions?
19          L. SCARCELLO:  Again,
20 incomplete hypothetical, calls for speculation.
21          THE WITNESS:  Again, it is a
22 hypothetical.  I already -- I can't answer that
23 because I've already seen all the literature.  How
24 do you erase that from your mind?
25          BY R. EHLER:

Page 284

1          Q.  So you can't answer that
2  question because you can't unknow what you know?
3          A.  I think I've already said
4  that I rather -- looking at the hierarchy of
5  evidence, looking at the pyramid, and how we are
6  trained based on my experience, in general, I put
7  more weight on experiments than I do
8  cross-sectional studies, than I do on trends and
9  whatnot.
10          Q.  Okay.  And so you can't
11 answer if you only looked at the experiments, Hu,
12 yours and Davis, and Hunt were the three that
13 you've mentioned since we've been talking about
14 these so far as the best ones, if you only looked
15 at those and any other experiment you want, would
16 you reach the same conclusions?
17          L. SCARCELLO:  Objection,
18 asked and answered.
19          THE WITNESS:  I don't know how
20 better I can say this.  I reach my conclusion
21 based on looking at the totality of evidence.  If
22 you're asking a hypothetical, I don't know.  I
23 can't unknow what I know.
24          BY R. EHLER:
25          Q.  Did the degree of

Page 285

1  conviction in your opinion -- is that -- the
2  degree of that conviction is because you have all
3  three and you sort of need all three to have that
4  degree of conviction?
5          L. SCARCELLO:  Object to form.
6          THE WITNESS:  It provides a
7  lot more converging validity than any group that
8  does, like, just cross-sectional.  Like, each one
9  independently.  And when you add the neuroscience,
10 there is even more corroborating evidence.  If you
11 add the internal research, there is even more
12 corroborating.  To me, it perfectly aligns.
13          BY R. EHLER:
14          Q.  In your design of your
15 own literature review, the ages you were focused
16 on were studies or meta-analyses that include
17 studies with a mean age of up to 25 years; is that
18 right?
19          A.  Up to.  That was not the
20 norm.
21          Q.  Fair enough.  So some of
22 the studies had 25 as the mean?
23          A.  Yes.
24          Q.  Which means that those
25 might include 20-year-olds, they might include

Page 286

1  30-year-olds.
2          A.  It was rare, I think, to
3  have adults in these studies, especially the
4  experiments.
5          Q.  The experiments are
6  mostly college kids; right?
7          A.  A lot of them are.
8          Q.  And the -- there is a
9  pretty big difference between a 13-year-old and a
10 21-year-old; right?
11          L. SCARCELLO:  Object to form.
12          THE WITNESS:  It depends on
13 the context.
14          BY R. EHLER:
15          Q.  Do you think they're at
16 different stages of neurological development?
17          A.  I think younger
18 adolescents, as I put in my report, are certainly
19 more vulnerable.  I think the research bears that
20 out with social media.  More vulnerable to harm.
21          Q.  Does that mean they're at
22 different stages of neurological development?
23          A.  Yes, they're at different
24 stages, but the brain is still maturing until age
25 25.  So they're still developing, but just not at

Page 287

1  as rapid pace.
2          Q.   Do they have different
3  challenges and day-to-day experiences?
4          L. SCARCELLO:  Objection to
5  form.
6          THE WITNESS:  It's a
7  different -- they're both high-risk periods of
8  development, you know, the early/late teen,
9  transition-aged youth, early adolescence.  As I
10  said, I believe early adolescence there is
11  probably more change, greater risk, greater
12  vulnerability.
13          Q.   To the extent that this
14  case is more focused on middle school and high
15  school students -- first of all, let me ask -- do
16  you understand that to be true?
17          A.   What to be true?
18          Q.   That this case is more
19  focused on middle school and high school students
20  than college?
21          A.   Yes.
22          Q.   Okay.  Did you make any
23  effort to isolate and give less weight to the
24  studies that involved college age and above in
25  that age range?

Page 288

1          A.   A lot of studies --
2  again, I'm looking at meta-analyses.  I had no
3  control over disentangling age groups.  However,
4  many of the meta-analyses did what we call
5  sensitivity analyses.  Is the relationship between
6  social media and mental health different by age?
7  And many of them found, through state-of-the-art
8  statistics, yes, the relationship is stronger for
9  harm in younger ages, which makes sense.
10  Developmentally, Amy Orben's written widely on
11  these developmental susceptibilities.  Accentuated
12  likely -- she talks a lot about the social media
13  features and algorithms and concordances colliding
14  at a very sensitive period in development.
15          R. EHLER:  And I'll move to
16  strike everything after "is the relationship
17  between" as commentary.
18          BY R. EHLER:
19          Q.   I'm just trying to figure
20  out how you were looking at the meta-analyses,
21  whether you made any effort to weigh differently
22  ones that were primarily comprised of college-age
23  youth versus younger adolescents.
24          A.   Most looked at age as a
25  moderator.  So again, that's does younger ages or

Page 289

1  older ages, do they amplify harm, do they increase
2  risk or do they protect against risk?  So when
3  you're looking at meta-analyses, I have no way to
4  manipulate age.  I can just review what they --
5  how they've analyzed the data.
6          Q.   You curated the set of
7  meta-analyses that you chose through search terms;
8  correct?
9          A.   Correct.
10          Q.   And there is a table of
11  those search terms.  I think it is on pages 12 and
12  13 of Exhibit 1.
13          A.   Yes.
14          Q.   These searches defined
15  the universe of what you would ultimately look at;
16  correct?
17          A.   Yes, this is what I was
18  focused on.
19          Q.   And do you think that
20  these search terms are inclusive of everything
21  that would be relevant to this topic of social
22  media's impact on adolescent mental health?
23          A.   Well, we consulted
24  multiple librarians, combined with our own
25  research looking at the other meta-analyses, what

Page 290

1  terms that they used, and so I certainly think it
2  was comprehensive and systematic.
3          Q.   But you didn't include
4  outcomes that would go to positive effect of
5  social media on mental health; right?
6          A.   No, that's not true.  We
7  used the term "well-being," which is often an
8  umbrella term used for positive outcomes.  And I
9  talk a lot about separating out positive outcomes
10  from negative outcomes in the tables and in the
11  text.
12          Q.   But you didn't include
13  like social connectedness or --
14          A.   There are metas on
15  connectedness.
16          Q.   But you didn't include
17  that as a search term?
18          A.   Those would usually be
19  embedded in "well-being."
20          Q.   So you used "well-being,"
21  that word, as a proxy for all of the positive
22  mental health studies?
23          L. SCARCELLO:  Object to form.
24          THE WITNESS:  "Loneliness" is
25  in here, that would relate to connectedness.  If

Page 291

1   you're feeling socially connected to someone,
2   you're not going to feel lonely.
3                BY R. EHLER:
4        Q.   Right.  But I'm talking
5   about whether your search terms were designed to
6   capture studies that might be specifically looking
7   to measure positive effects on mental health?
8        L. SCARCELLO:  Object to form,
9   asked and answered.
10       THE WITNESS:  I don't know how
11  best I can answer that question.  This is a really
12  comprehensive literature search.  We did capture
13  many what we call positive psychology outcomes,
14  from happiness to self esteem to well-being to
15  mental well-being, subjective well-being,
16  loneliness. It's kind of, you know, getting at
17  social connectedness.
18       Q.   Yeah, but "happiness"
19  isn't a search term either.  So I'm not saying you
20  ignored them when you found them, but what I'm
21  trying to figure out is whether you were looking
22  for them in the first place.
23       L. SCARCELLO:  Object to form.
24       THE WITNESS:  When you're
25  looking at -- I was -- I was tasked -- this

Page 292

1   litigation, from my understanding, is about harm.
2   And so I was focused more on -- so I was tasked to
3   come up with a determination on whether social
4   media plays a causal role in causing harm,
5   psychological harm.  My focus was more on
6   indicators of harm, but they did include many
7   positive psychology outcomes too.
8        Q.   But not search terms like
9   "maintaining friendships" or "finding community,"
10  "building connections," "entertaining," "fun,"
11  "joy," those weren't relevant to the question you
12  were analyzing; correct?
13       L. SCARCELLO:  Object to form,
14  misstates testimony.
15       THE WITNESS:  I have never
16  seen the meta-analyses on joy or building
17  connections.  I have seen individual studies.
18                BY R. EHLER:
19       Q.   And -- but you didn't
20  search for them here?
21       L. SCARCELLO:  Object to form.
22       THE WITNESS:  No.
23                BY R. EHLER:
24       Q.   Okay.  You identified --
25  I'm on page 14.  You identified 2,174 records

Page 293

1   through your search.
2        A.   Sorry, what page?
3        Q.   14, paragraph 28.
4        A.   Yes.
5        Q.   And then you ultimately
6   reviewed 143 studies?
7        A.   Yes.
8        Q.   Do you have a list of the
9   studies you excluded?
10       A.   I may have it somewhere.
11       Q.   But you're not sure?
12       A.   I -- I might be able to
13  dig it up.
14       Q.   Did you update this
15  search with your new report, with your amended
16  report?
17       A.   I did not.
18       Q.   Who did the culling and
19  the title and abstract screening of these
20  analyses?
21       A.   I got some help from my
22  post-doctoral fellows, someone who has a Ph.D.
23  who's still training to become an independent
24  scientist and another doctoral student of mine.
25       Q.   And did you give them

Page 294

1   any, like, protocol for how to review them?
2        A.   Yes, they were -- they
3   were trained.
4        Q.   Who paid them?
5        A.   I'm paying them.
6        Q.   Out of the money that the
7   Plaintiffs are paying you?
8        A.   Correct.
9        Q.   What are their names?
10       A.   Um -- well, Marcus Lopes,
11  Karina Branje.
12       Q.   Did you communicate with
13  them by e-mail?
14       A.   About --
15       Q.   This work?
16       A.   -- the search?  Yes, I
17  communicated with them by e-mail.
18       Q.   And so they were the ones
19  that ultimately made the decision of what -- what
20  143 you looked at; right?
21       L. SCARCELLO:  Objection,
22  misstates testimony.
23       THE WITNESS:  No.  So there is
24  a standard, systematic review protocol that we
25  followed, and everybody involved in this process

Page 295

1  was familiar with this process, but I oversaw all
2  of it.
3           BY R. EHLER:
4           Q.  Okay.  That -- I haven't
5  seen that protocol so that's why I'm asking the
6  questions.  But they followed the protocol which
7  selected the 143 studies that you reviewed; right?
8           A.  That's right.
9           Q.  Okay.  And that protocol
10 is available in document form?
11          A.  No.  This was -- I can't
12 publish any of this, so it's not written up in a
13 document form.
14          Q.  Oh, it's not a written
15 protocol?
16          L. SCARCELLO:  Object to form,
17 misstates testimony.
18          THE WITNESS:  We followed the
19 guidelines outlined by PRISMA in standard
20 reporting.  I mean, we have something, we have
21 stuff written, but it's certainly not in
22 publication form or --
23          BY R. EHLER:
24          Q.  Well, what I'm trying to
25 figure out -- this is not a trick question -- is

Page 296

1  there -- you did a title and abstract screening
2  that excluded 1,767 studies, and then there was a
3  further assessment of 187 full text articles, and
4  then 143 review studies were -- ultimately made it
5  into the conclusions.  What -- how did they know
6  what to exclude and what to include?
7           A.  We had inclusion
8  criteria.  So if they weren't studying or
9  measuring social media use or they weren't
10 studying the relationship between social media use
11 and mental health, those studies would be
12 excluded.
13          Q.  Okay.  And so -- and that
14 decision was made by your research colleagues?
15          L. SCARCELLO:  Object to form,
16 asked and answered, misstates testimony.
17          THE WITNESS:  We made the
18 decision based on the established guidelines for
19 systematic review, so there needs to be consensus.
20 So you have two independent reviewers.  They both
21 review -- they have a set of inclusion criteria.
22 They both review each paper based on the title and
23 abstract.  That's level one screening.  If it
24 makes it through level one screening, then level
25 two screening is you actually get the paper, look

Page 297

1  at it more carefully as the abstract
2  representative of what's described in the paper.
3  And both of them make these decisions
4  independently, and then there is a review meeting
5  after to go through to see if there is any --
6  because sometimes there is not perfect consensus,
7  there is general consensus, but some people may
8  disagree whether studies should be included or
9  excluded.  And I was usually involved in those
10 decisions --
11          Q.  Got it.
12          A.  -- when there was
13 disagreement.
14          Q.  And what I'm trying to
15 figure out is was there like a -- there wasn't a
16 written protocol that they used for that inclusion
17 criteria, then?
18          L. SCARCELLO:  Object to form.
19          THE WITNESS:  We're all
20 familiar with the process.  We've done several of
21 these.
22          BY R. EHLER:
23          Q.  I understand the process,
24 but there is a judgment -- you have to judge the
25 papers by what you're seeking to include and

Page 298

1  exclude, and I want to know what those words said
2  to -- was there an e-mail?  How did they know what
3  exactly to look for and what not, if the paper was
4  about social media and friendship?
5           A.  We had a whole table.
6  And so we had a table of inclusion criteria and if
7  they met the inclusion criteria, they were in.  If
8  they didn't, they were out.
9           Q.  Okay.  I want to talk
10 briefly about your reliance on the Funder and Ozer
11 benchmark to determine how you should think about
12 effect sizes.  Are you aware that those criteria
13 have been criticized in another paper by Sauer and
14 Drummond for risking fishing for small effect
15 sizes and -- well, for fishing for small effect
16 sizes.  Are you aware of that Sauer and Drummond
17 article?
18          L. SCARCELLO:  Object to form.
19          THE WITNESS:  I'm aware the
20 paper has been cited 3,000 times and is -- uses
21 established, reliable, and valid points to clearly
22 illustrate how repeated occurrences of a behavior
23 accumulate over time to have large impacts.
24          R. EHLER:  I'll move to strike
25 that.

Page 299

1          BY R. EHLER:
2          Q.  Is that a no to my
3    question of whether you're familiar with the
4    criticisms by Sauer and Drummond?
5          L. SCARCELLO:  Objection.
6    That answer was responsive.
7          Go ahead.
8          THE WITNESS:  All papers
9    receive criticism.  That's part of academia.
10         BY R. EHLER:
11         Q.  Totally.  And I'm just
12   asking --
13         A.  Healthy debate and
14   healthy disagreement.
15         Q.  Yes, like we're all
16   having too.  I'm just trying to understand if
17   you're aware of the Sauer and Drummond criticisms
18   in 2020.
19         A.  I have not seen the Sauer
20   and Drummond paper.
21         BY R. EHLER:
22         Q.  In the -- I'm going to
23   hand you Funder and Ozer, Exhibit 16.
24         EXHIBIT NO. 16:  ARTICLE
25         TITLED "CORRIGENDUM:

Page 300

1          EVALUATING EFFECT SIZE IN
2          PSYCHOLOGICAL RESEARCH:
3          SENSE AND NONSENSE"
4          AUTHORED BY FUNDER AND
5          OZER
6          BY R. EHLER:
7          Q.  And I'm on page 163, the
8    bottom left.
9          L. SCARCELLO:  Do you need a
10   minute to look over this before you answer
11   questions about it?
12         THE WITNESS:  Please.
13         BY R. EHLER:
14         Q.  Are you ready?
15         A.  Yes.
16         Q.  So at the bottom left on
17   163, under the heading "Reliable Estimation of
18   Effect Sizes," the first sentence says that:
19         "Our analysis is based on
20         a presumption that the
21         effect size in question
22         is, in fact, reliably
23         estimated."
24   And then the next sentence goes on to say:
25         "This is a big

Page 301

1          presumption, and a
2          critical concern when the
3          effect size is in the
4          range traditionally
5          regarded as small."
6    Do you see that?
7          A.  Um-hum.
8          Q.  Okay.  And so your
9    reliance on Funder and Ozer and using the same
10   benchmarks for effect sizes, is that also making
11   the presumption that these effect sizes are
12   reliably estimated?  I know you do.  I'm just
13   wondering if you agree with me that, as Funder and
14   Ozer said, you have to be assuming that these
15   effect sizes are reliable in order to extrapolate
16   in the way that you do to the population level?
17         L. SCARCELLO:  Object to form.
18         THE WITNESS:  I think -- I
19   think the presumption is, when you're analyzing
20   effect sizes, that it's reliable.  If
21   questionnaires were validated and proven to be
22   reliable to measure the behavior you're
23   measuring --
24         BY R. EHLER:
25         Q.  Right.  And there's not

Page 302

1    self-report biases and the sample is targeting the
2    right population and all of the other things, you
3    have to have reliable studies to get reliable
4    results, that control for confounding to get
5    reliable results, and then you can rely on the
6    effect sizes; is that fair?
7          L. SCARCELLO:  Object to form.
8          THE WITNESS:  No, it's not
9    that simple.  At the population level, they're
10   not -- in this context, they're not really talking
11   about experiments.  They're talking about at the
12   population level.  At the population level, almost
13   all national surveys throughout the world are
14   going to use self-report.  Most if not all
15   national surveys -- not all, many use validated
16   instruments.  So I think it stands to reason it's
17   a reliable measure if the psychometrics properties
18   support that measure.
19         BY R. EHLER:
20         Q.  But it does depend -- I
21   understand that, that it's similar to other
22   national surveys.  But we're operating under the
23   assumption that the effects are reliable, right,
24   that that self-report data is, in fact, closer to
25   truth than further away?

Arbitration Place

(613) 564-2727                                          (416) 861-8720

22STCV21355
DEPOSITION OF GARY GOLDFIELD

July 10, 2025

Page 303

1  A.  It's a -- it says
2  reliable estimate, so it's an approximation.
3  Q.  Right.  But it has to be
4  reliable?
5  A.  True.
6  Q.  So then if you -- if the
7  studies themselves have fundamental flaws, then
8  you can't really take the small effect sizes and
9  give them much weight; right?
10  L. SCARCELLO:  Object to form.
11  THE WITNESS:  No.  Again,
12  my -- no, I actually disagree with that because
13  if -- all studies have limitations.  The best
14  studies will cite a whole bunch of limitations.
15  Again, that doesn't invalidate the finding and it
16  doesn't invalidate the effect.  It just means
17  there are limitations to the study that need to be
18  considered.
19  So to throw away 44
20  meta-analyses because of concerns of whatever
21  these limitations might be, I think we would be
22  throwing the baby out with the bath water.
23  Q.  I said "fundamental
24  flaws" and you changed it to "limitations."  What
25  about fundamental flaws?  What if those aren't

Page 304

1  just limitations and there are real concerns as to
2  the validity of the results?
3  L. SCARCELLO:  Object to form,
4  incomplete hypothetical, calls for speculation,
5  vague.
6  THE WITNESS:  Fundamental flaw
7  is a subjective -- there is no criteria to define
8  or operationally define a fundamental flaw.  That
9  is a subjective judgment, and I don't believe
10  there is any fundamental flaws.
11  BY R. EHLER:
12  Q.  In any of the studies
13  that you looked at?
14  A.  I believe there are
15  limitations which I've acknowledged, but I don't
16  believe they are fundamentally flawed.
17  Q.  And the same paragraph
18  but at the top of 63 -- sorry, 163, the paper goes
19  on to say:
20  "In any event" --
21  This is the last sentence of that paragraph:
22  -- "it is clear that the
23  precision of the estimate
24  of the effect size
25  becomes more important

Page 305

1  the smaller the effect
2  size is."
3  Right?
4  A.  Yeah, I see that.
5  Q.  And you didn't include
6  that caveat or the caveat about presuming the
7  effects are reliably estimated in the text of your
8  report; correct?
9  L. SCARCELLO:  Object to form.
10  THE WITNESS:  Sorry, I'm just
11  reviewing this.  So how I interpret this is when
12  you're looking at meta-analyses, the direction of
13  the effect, even small, is still meaningful.  If
14  the precision of error estimate of the effect size
15  becomes -- so the -- so you have to consider both
16  is what it's saying.
17  BY R. EHLER:
18  Q.  Right.  You have to
19  consider --
20  A.  You have to consider the
21  effect size and the level of precision or error.
22  Q.  Yeah.  And an error or --
23  well, scratch that.
24  Effect sizes, as we talked
25  about earlier, can be impacted around the margins

Page 306

1  by confounding variables; right?
2  A.  Again, I can't -- it's
3  possible, but I -- I would have to look at --
4  again, I reviewed meta-analyses.  The statistics
5  used in meta-analyses random effects models
6  control really well for heterogeneity or
7  differences -- differences in measures, difference
8  in variability.  They're state-of-the-art
9  statistics.
10  Q.  I'm sorry, I interrupted
11  you.  I try not to do that.  That is fine.  My
12  question is different, which is controlling or
13  failing to control for confounding variables can
14  change the effect size.  So if you control for
15  it -- and you can run this, right.  When you do
16  control for a variable --
17  A.  Yes.
18  Q.  -- you can run it without
19  the control and then you can run it with the
20  control and the effect size changes?
21  A.  Yes.
22  Q.  And so if there are
23  confounding variables that are not captured and
24  controlled for, logic stands that those may
25  actually influence the effect size even if you

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                July 10, 2025

Page 307

1    can't show it or control for it?
2            L. SCARCELLO:  Object to form.
3            BY R. EHLER:
4        Q.  Right?
5            L. SCARCELLO:  Object to form.
6            THE WITNESS:  Most of the
7    literature actually controlled for a lot of
8    obvious confounders, but --
9            BY R. EHLER:
10       Q.  But not genetics, not
11   parental relationships --
12       A.  Well, the two studies I
13   added, the one by Niigata actually did control for
14   a lot of -- they control for childhood trauma,
15   adversity and parental dysfunction.
16           BY R. EHLER:
17       Q.  Right.  And I haven't
18   seen any other study that's controlled for adverse
19   childhood events, right?
20           L. SCARCELLO:  Object to form,
21   calls for speculation.
22           THE WITNESS:  Again, I focused
23   more on reviewing meta-analyses, which pools a
24   whole bunch of individual studies, hundreds of
25   them.

Page 308

1            BY R. EHLER:
2        Q.  Right.  And have you seen
3    others that controlled for adverse childhood
4    events, genetics, parental relationships?
5            L. SCARCELLO:  Object to form.
6            THE WITNESS:  That is not the
7    scientific standard.
8            BY R. EHLER:
9        Q.  I didn't ask that.  I'm
10   just asking if you saw them.
11           THE WITNESS:  There is a
12   reason I haven't seen them, they're not the
13   scientific standard.
14           BY R. EHLER:
15       Q.  Okay.  But I'm trying to
16   understand if they could affect the effect sizes
17   around the margins because they are confounding
18   variables; right?
19           L. SCARCELLO:  Object to form.
20           THE WITNESS:  So I'm not sure
21   if you understand how statistics work, but more --
22   the more things you control for, sometimes just by
23   simply having more variables in the equation will
24   reduce the effect size, but even if it's not
25   related to the outcome that you're studying.  It's

Page 309

1    just because it reduces statistical power, the
2    ratio between number of participants per variable.
3    So the more you control for, you're reducing the
4    effect size, but somewhat of that can be
5    artificial.  It doesn't always necessarily mean,
6    oh, that's the -- when you put that variable into
7    the equation, then, you know, that's -- that's the
8    obvious confounder because the effect is reduced.
9    Part of that will just be a statistical artifact.
10       Q.  Right.  And that's --
11   that's possible in both directions; right?
12       A.  I've seen studies where
13   adding controls can strengthen the effect, yes.
14       Q.  And for smaller effect
15   sizes, they're actually going to be more at risk
16   of that artifact effect or potential effects of
17   unmeasured confounding variables; right?
18       A.  I think it would depend
19   more on sample size than whether the effect is
20   small or not.  But again, when I look at this --
21   in epidemiology, it's widely considered that small
22   effects that occur repeatedly over time are
23   considered reliable and valid.  And they don't
24   need to be large to be clinically meaningful.
25       Q.  Have you used this Funder

Page 310

1    and Ozer benchmarking method in any other
2    published research that you've done?
3        A.  All my research and
4    dissemination, at least in written form, for
5    publication, I'm talking about just pure
6    publication here, have been for scientific
7    audiences.  Scientific audiences, when I publish
8    epidemiological data, they understand that small
9    effects at the population level can be really
10   meaningful.  The odds ratio of air pollution
11   mortality is 1.07.  That falls below traditional
12   academic benchmarks, yet scientists take it really
13   seriously and so do governments because half the
14   world has poor-quality air and exposed to air
15   pollution.  It causes a lot of deaths.
16           Social media is used by
17   billions of people around the world.  So Funder
18   and Ozer is a nice application because it's
19   repeated behavior over and over by huge numbers of
20   children and youth globally.
21           R. EHLER:  I'll move to strike
22   and ask my question again.
23           BY R. EHLER:
24       Q.  Have you used it in any
25   other published research that you've done or any

Page 311

1  published research that you've done?
2        A.   I didn't feel it was
3  necessary for an academic audience.  This audience
4  is a bit different.  It's a little bit more --
5  less scientific and a bit more lay.  And I was
6  just really trying to provide context.
7        L. SCARCELLO:  Counsel, it's
8  been a little bit over an hour.  I'm hungry.  I
9  don't know if you are.
10       R. EHLER:  I'm fine.  That's
11  fine, that's fine.  We can stop.
12       L. SCARCELLO:  We don't have
13  to.  I just wanted to suggest that maybe we could
14  or wrap up sometime soon.  I'm not trying to
15  derail anything.
16       R. EHLER:  I was going to move
17  on to something else so --
18       L. SCARCELLO:  If it's a good
19  stopping point, that would be great.
20       R. EHLER:  Yeah.
21       L. SCARCELLO:  Okay.
22       THE VIDEOGRAPHER:  The current
23  time is 6:38 p.m., and we are off the record.
24  --- Upon recessing at 6:39 p.m.
25  --- Upon resuming at 7:25 p.m.

Page 312

1        THE VIDEOGRAPHER:  Current
2  time is 7:25 p.m., and we are back on the record.
3        BY R. EHLER:
4        Q.   Dr. Goldfield, we -- you
5  mentioned before your analysis included an
6  analysis of the displacement theory.  Can you
7  explain to me what that is?
8        A.   Displacement simply means
9  when you're spending a lot of time on social media
10  or any other behavior, that it takes time away for
11  other behaviors that might be more
12  health-promoting.
13       Q.   Like what?
14       A.   Sleep, time with friends,
15  family, physical activity.
16       Q.   All right.  And is that
17  true of -- in your view and in your opinion, true
18  of screens broadly or is that a narrow opinion to
19  social media?
20       A.   I think there is research
21  to support both that time spent on social media
22  displaces other health-promoting behaviors.  Time
23  spent -- excessive amounts of time on watching TV
24  can also displace other health behaviors.
25       Q.   And so same would be true

Page 313

1  for other applications on adolescents'
2  smartphones, if they had smartphones, not just the
3  social media Defendants in this case; right?
4        A.   Most of the time spent on
5  smartphones is social media use.  That's what the
6  time-use studies indicate.
7        Q.   Okay.
8        A.   But yes, the more time
9  you're on any screen, the higher the risk of
10  displacing other behaviors.
11       Q.   And for younger
12  adolescents, it's probably less the smartphones
13  and social media and more television or other
14  screens?
15       L. SCARCELLO:  Object to form.
16       THE WITNESS:  Yeah, I'm not
17  sure.  I think there are pretty good data that 12,
18  13, 14-year-olds are using social media quite a
19  bit.
20       BY R. EHLER:
21       Q.   Um --
22       A.   I think that's true of,
23  say, the early years, kids who are 5, 6, 7.
24       Q.   What about video games?
25       A.   You're asking me if they

Page 314

1  could displace?
2        Q.   Yes.
3        A.   Excessive amounts, for
4  sure.
5        Q.   What about text messaging
6  on your phones through, like, iMessage or texting?
7        A.   It seems like most of the
8  teens text through apps these days.  But if
9  someone was -- I mean, texting is not all that
10  engaging.  It's a completely different animal than
11  social media.  It's just you get -- you might have
12  the intention of texting someone or wishing them
13  happy birthday, and then you just get drawn in to
14  the features and the auto scroll, and, you know,
15  an hour and a half later, time goes by.
16       Q.   So it's not your opinion
17  that text messaging or iMessaging fits into the
18  same category of things that may displace other
19  healthy activities like sleep, time in person with
20  friends, physical activity?
21       L. SCARCELLO:  Object to form.
22       THE WITNESS:  I'm not aware of
23  any studies that show people texting, spending
24  copious amounts of hours texting displaces health
25  behaviors.

Page 315

1       BY R. EHLER:
2          Q.   But studies that go to
3   general screen time would include texting, video
4   games, watching TV as well; right?
5          A.   It depends on the study.
6   Sometimes it is an aggregate measure.  Often they
7   parse it out and try to measure each type of
8   screen to look at differential associations.  In
9   my review with Fatima Mougharbel, we actually
10  looked at that, all different forms of screen time
11  in relation to mental health.
12         Q.   Right.  I remember that.
13  I don't have it in front of me.  What exhibit is
14  it?
15         A.   It hasn't -- you probably
16  haven't passed it to me yet.  I'm just citing it
17  because we published a few papers together.
18         Q.   And I don't have it in
19  front of me now, but my memory of that paper was
20  it showed relationships between even, like, video
21  calls and phone calls with friends.  Maybe I'm
22  thinking of the wrong paper.
23         A.   Yeah, this was a review
24  paper, not an individual study.  So the main
25  result of that paper was a lot of forms of media

Page 316

1   are related to poor mental health, but social
2   media showed the strongest relationship to anxiety
3   and depression, especially in girls.
4          Q.   Tell me the name of it
5   again.  I want to make sure we're thinking of the
6   same thing.
7          A.   I'll look at my CV.  If
8   you just give me a minute.
9          Q.   We did use it already,
10  right?  Exhibit 9?
11         A.   No, we didn't.
12         Q.   No, it's a different one.
13         A.   I published multiple
14  papers with her.  This one -- sorry, this is all
15  out of order so it's a little harder to find.
16         Q.   It's okay.  It's a
17  digression.  I'm sure we can find it.
18         A.   It's published in current
19  opinion report, current obesity reports.
20         Q.   Okay.  Don't worry about
21  it.  We'll get there.  I think what you were
22  saying, though, is it showed connections between
23  lots of different kinds of screen use and
24  potential symptoms like depression, anxiety, okay.
25         You've also done research that

Page 317

1   actually suggests the opposite association; right?
2          L. SCARCELLO:  Object to form.
3          THE WITNESS:  Can you explain
4   a little bit more what you mean?
5          BY R. EHLER:
6          Q.   Yeah.  You've done
7   research -- and this is with Brandon Morningstar
8   and this is a 2023 paper titled "The association
9   between social media use and physical activity
10  among Canadian adolescents: a Health Behavior in
11  School-aged Children (HBSC) study."
12         Does that ring a bell?
13         A.   It does.
14         Q.   And in that study, you --
15  which I'll mark as Exhibit 17.
16         EXHIBIT NO. 17:  PAPER
17             TITLED "THE ASSOCIATION
18             BETWEEN SOCIAL MEDIA USE
19             AND PHYSICAL ACTIVITY
20             AMONG CANADIAN
21             ADOLESCENTS: A HEALTH
22             BEHAVIOUR IN SCHOOL-AGED
23             CHILDREN (HBSC) STUDY"
24         BY R. EHLER:
25         Q.   You actually found that

Page 318

1   the adolescents who were nonactive social media
2   users, they were the ones who had the lowest odds
3   of meeting their daily physical activity
4   recommendations.  And the adolescents who were
5   intense social media users, they were associated
6   with a higher odd of meeting the daily physical
7   activity recommendations.  And those individuals
8   you categorize as problematic social media use, I
9   believe, there was no relationship with physical
10  activity.  Is that --
11         L. SCARCELLO:  Object to --
12  I'm sorry.
13         R. EHLER:  Sorry.
14         BY R. EHLER:
15         Q.   Is that the --
16         A.   Not quite.
17         Q.   Those were the findings
18  of your -- no, those are not the findings of your
19  paper?
20         A.   No, because the
21  problematic social media use was associated with
22  lower odds of high physical activity engagement.
23         Q.   In one domain, just
24  exercise?
25         A.   In one domain.

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                                    July 10, 2025

Page 319

1          Q.   Just exercise?
2          A.   Yeah.
3          Q.   Right.  Not the other
4    physical domains.  There were, I believe, six
5    tested.
6          A.   So this paper came out in
7    2023, which was submitted in 2022.  And -- again,
8    single study.  And I believe this one was actually
9    referenced in my report.
10         Q.   Was it?
11         A.   I believe it was.
12         Q.   And on page 646 in the
13   "Results" section, second column, I think this is
14   where you were and I were just talking about
15   different things, the first full sentence in the
16   second column says:
17              "There was no significant
18              association in the odds
19              of meeting physical
20              activity recommendations
21              for problematic social
22              media use -- when
23              compared to active social
24              media use."
25   And then you go on to say that there were some

Page 320

1    lower odds just related to exercise domain.
2    And in the "Discussion" section on page 647, you
3    express surprise because it sounds like this
4    didn't conform -- your findings didn't conform
5    with your displacement theory hypothesis; right?
6              L. SCARCELLO:  Object to form
7    and also "express surprise."  Can you point him to
8    where he talked about on 647, please.
9              BY R. EHLER:
10         Q.   You can answer my
11   question.
12         A.   I'm just reading it,
13   sorry.  "In contrast to our expectations"?
14         Q.   Sure.  "Problematic
15   social" -- just to read this into the sentence:
16              "In contrast to our
17              expectations, problematic
18              social media use was only
19              associated with lower
20              odds of high physical
21              activity engagement in
22              the exercise domain.  We
23              also found that intense
24              social media use was
25              associated with a greater

Page 321

1              odds of meeting physical
2              activity
3              recommendations."
4    And you go on to say in the next paragraph:
5              "The theory that
6              heightened social media
7              use would displace time
8              away from physical
9              activity (i.e., the
10             displacement theory) was
11             not fully supported by
12             our results."
13   And that's because the intense social media users,
14   they actually had a higher association with
15   meeting physical activity than even just the
16   active ones; right?
17         A.   I was surprised because
18   this finding doesn't fit with the body of my other
19   studies on the same topic and not very consistent
20   with the literature.  So yes, I was surprised.
21         Q.   Okay.  And you go on to
22   hypothesize that maybe it's driven by a
23   relationship to personality and social
24   connectedness, things like extraversion; right?
25         A.   We speculate on a few --

Page 322

1    you know, a few reasons why this finding was
2    found.  It's a cross-sectional study, though, so
3    again you can't get a causality.
4          Q.   Sure.  I'm just
5    interested in -- this seems to me to be not
6    consistent, as you said, with the displacement
7    theory.  And maybe you did mention it in your
8    report.  I didn't see it.  And then you
9    hypothesize that it's related to extraversion or
10   personality or social connectedness.  So would
11   that be one of those unexplained, confounding
12   variables that you can't really test for because
13   you didn't collect it in this study, but that
14   explains the association?
15         A.   We had to come up with an
16   explanation for the findings, and at that time,
17   based on our knowledge of the literature, which is
18   a lot more limited than it is now, at least from
19   my perspective -- and I think I speak on behalf of
20   the team -- we found that there may be personality
21   factors that may explain why social -- intense
22   social media may not be -- may not be harmful, at
23   least toward physical activity.
24         Q.   So you were just coming
25   up with ideas?

Arbitration Place
(613) 564-2727                                                              (416) 861-8720

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                                    July 10, 2025

Page 323

1          L. SCARCELLO:  Object to form,
2    misstates the testimony.
3          BY R. EHLER:
4          Q.  Or coming up with an
5    explanation?
6          A.  Yeah, we had to --
7          L. SCARCELLO:  Same objection.
8          THE WITNESS:  Yeah.
9          BY R. EHLER:
10         Q.  On the next page, 648,
11   you say -- there is a paragraph that is at the end
12   of the first paragraph, it's not a full paragraph,
13   just the second-to-last sentence:
14              "Thus, our results
15              coincide with the idea
16              that social media may
17              serve as a tool that
18              reinforces physical
19              activity habits through
20              social connectedness."
21   Is that true?
22         A.  I think it's possible in
23   some circumstances.  But, again, my opinion now is
24   very different than it was three years ago.  And
25   this is a single cross-sectional study.

Page 324

1          Q.  That's fine.  And then
2    you go on to say:
3              "Similar to intense
4              social media use, the
5              findings of the study
6              indicate that problematic
7              social media use does not
8              displace physical
9              activity, nor is it
10             associated with reducing
11             the odds of meeting
12             physical activity
13             recommendations."
14   Those were your findings in 2023?
15         A.  Based on a single study
16   that is cross-sectional in design, yes, these were
17   our findings.  And I was surprised because they
18   are not typical of the research.
19         Q.  And you didn't say that
20   in this paper, that it was not typical of the
21   research, did you?
22         A.  I said "contrary to our
23   expectations."  So our hypothesis was not that it
24   would show beneficial associations with physical
25   activity.  We were surprised at that.

Page 325

1          Q.  Right.  But I didn't see
2    other research cited that suggested that someone
3    else had studied this and found different
4    conclusions?
5          A.  I'd have to look at the
6    article in more detail.
7          Q.  Me too.  I'm not sure.
8    You said --
9          A.  I cite a lot of evidence
10   in the report that --
11         Q.  Right.  And you said
12   you've changed your view now since doing the
13   research for the report.  Have you gone back to
14   issue a correction or an addendum or something so
15   that people who are finding this article or this
16   research know that you don't stand by these
17   results anymore?
18         A.  Again, I don't think
19   that's necessary because my conclusion in this
20   forum is based on an exhaustive review of the
21   literature.  The conclusions based on any one
22   study have to be based on that study, not my
23   knowledge of all of the literature.  It's what did
24   you find.  Those are -- forms the basis of any
25   scientist's conclusions.

Page 326

1          Q.  The last -- the column on
2    the right side of 648 under "Strengths and
3    limitations of the study," you note some
4    limitations.  And one of the limitations you --
5    you note the:
6              "-- cross-sectional
7              design which precludes
8              the ability to identify
9              causal relationships."
10   And then second -- we've talked about that at
11   length.  Second, you note that:
12             "-- there was the
13             possibility of inherent
14             biases in the
15             self-reported
16             questionnaires, including
17             self-report bias,
18             response bias, and the
19             propensity for
20             adolescents to exaggerate
21             physical activity and
22             social media use in
23             self-report
24             questionnaires."
25   And you cite Parry 2021.  Do you see that?

Page 327

1        A.  I do.
2        Q.  Okay.  You can put that
3   down.  And I'm going to your report, Exhibit 1,
4   page 130, paragraph 296.  And we talked about this
5   earlier.  In 296 you describe some methodological
6   limitations and you say that they are likely --
7   sorry, I'll read the sentence.  I don't want to
8   get it wrong:
9                "-- many methodological
10                limitations in the
11                research likely attenuate
12                effect sizes and bias
13                results towards the null.
14                This includes the
15                preponderance of
16                self-reported social
17                media use that is known
18                to be unreliable."
19                (As read)
20   And you again cite Parry 2021.
21   We've talked about self-report before today, and
22   you told me your view that you think it leads to
23   lower effect sizes.  Is that still your view?
24        L. SCARCELLO:  Objection to
25   form.

Page 328

1        THE WITNESS:  Yes.
2   Generally -- generally, screen time, there are
3   systematic reviews that show screen time is
4   typically underreported.
5        BY R. EHLER:
6        Q.  Right.  But in your
7   paper -- your Morningstar 2023 paper, you said
8   that you thought the adolescents were exaggerating
9   their social media use, that they were
10   overreporting it.
11        A.  No, I said that we
12   thought they could be exaggerating physical
13   activity over -- there is a lot of --
14   meta-analyses have shown screen time is generally
15   underreported, physical activity is generally
16   overreported.
17        Q.  Right.  But that's not
18   what you said in this paper.  You said:
19                "The propensity for
20                adolescents to exaggerate
21                physical activity and
22                social media use in
23                self-reported
24                questionnaires."
25   You didn't say they would underreport social media

Page 329

1   use, you said they would exaggerate it, which
2   makes sense because in this study the results were
3   high social media use, intense social media users,
4   and high physical activity.
5        A.  That could have been a
6   typo.  It could have been.  Again, in my report I
7   provide other studies that we've done that showed
8   the exact opposite finding.
9        Q.  I'm handing you what I've
10   marked as Exhibit 18.
11                EXHIBIT NO. 18:  PAPER
12                TITLED "A SYSTEMATIC
13                REVIEW AND META-ANALYSIS
14                OF DISCREPANCIES BETWEEN
15                LOGGED AND SELF-REPORTED
16                DIGITAL MEDIA USE"
17        BY R. EHLER:
18        Q.  This is the Parry article
19   that you cite in both your report and in the
20   study -- the Morningstar 2023 study we were
21   looking at.
22        A.  Um-hum.
23        Q.  And what Parry actually
24   concluded was that self-report data raised overall
25   concerns about the validity of findings from

Page 330

1   studies that relied only on self-report measures
2   of social media use.  Is that your understanding
3   of what Parry concluded?
4        L. SCARCELLO:  Sorry,
5   Dr. Goldfield, if you need to take a moment to
6   familiarize yourself with this, you're welcome to.
7        THE WITNESS:  Yes, I would
8   like to take a minute.
9        BY R. EHLER:
10        Q.  And if it helps, I'm on
11   page 1541.  Tell me when you're ready.
12        A.  Yeah.
13        Q.  1541, the column on the
14   left side.  And Parry concludes that paragraph by
15   saying:
16                "-- our findings raise
17                important concerns about
18                the validity of findings
19                and conclusions across
20                many areas of the social
21                sciences in which
22                self-reported media use
23                is a central outcome or
24                explanatory variable."
25   Do you see that?

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 331

1          A.  Yes, I see that, but I
2   don't agree with it.
3          Q.  Okay.  But you cited
4   Parry for the proposition in your report; right?
5          A.  I did cite this paper.
6          Q.  And in the next column,
7   Parry finds that this is an even more problematic
8   issue with respect to problematic use scale.  So
9   he -- at the beginning -- in the middle of that
10  paragraph:
11              "Our observation of an
12              even smaller association
13              between problematic use
14              scales and device logs
15              suggests even more
16              caution when adopting
17              measures of problematic
18              use to make claims about
19              media usage itself."
20          A.  That doesn't surprise me
21  because problematic use is your relationship with
22  technology, not time spent.  A log measure cannot
23  ascertain symptoms of addiction like salience and
24  mood modification and motivation.  It simply
25  measures time spent.  So that makes perfect sense

Page 332

1   to me why there would be more error when you're
2   looking at problematic use.
3          Q.  Totally agree.  And so if
4   a study is measuring problematic use by time spent
5   and articulating that high time spent of
6   problematic social media use are using that as the
7   log, that would make those results even less
8   reliable right?  Scratch that.  Let me ask a clear
9   question.
10             If a study is using time as a
11  proxy for problematic social media use, then those
12  results would be even less reliable; do we agree
13  on that?
14          A.  No.  No studies measure
15  problematic use by using the addiction criteria
16  set forth in the DSM.  So they're looking at your
17  relationship with technology and what happens when
18  there is some constraints put on it.  Is there
19  tolerance, is there withdrawal, do you use it to
20  modify your mood, is there persistence, is it
21  causing an impairment in functioning, conflict
22  with family or friends, is it displacing sleep and
23  other health-promoting behaviors.  In some of
24  these questionnaires that are well validated and
25  reliable, they don't even measure time spent.

Page 333

1   They are completely different constructs.
2          Q.  Okay.  And just so we're
3   clear, the DSM does not have criteria specific to
4   problematic social media use or social media
5   addiction; right?  You're talking about substance
6   addiction?
7          A.  Or gambling addiction.
8          Q.  That then are used to --
9          A.  Yes, they've been
10  modified based on the DSM criteria.
11          Q.  If you go to the next
12  page, 1542, the first full paragraph that starts
13  with "given."  And I think you actually quoted
14  some of this in your report.  It says that:
15              "For instance," I'm about
16              halfway through,
17              "multiple studies found
18              the accuracy of
19              self-reported media use
20              depends, in part, on how
21              much the respondent uses
22              media.  And furthermore,
23              a recent study found that
24              the degree of inaccuracy
25              was directly related to

Page 334

1               the respondent's level of
2               well-being."
3          (As read)
4   Now, I understand that to mean that Parry is
5   reporting that individuals who are having --
6   suffering from mental health issues are going to
7   be -- are going to have a harder time reporting
8   their social media use.  Is that how you
9   understand that?
10          L. SCARCELLO:  Object to form.
11          THE WITNESS:  That is how I
12  understand it.  But when you look at the totality
13  of the evidence, in almost every study, the
14  majority of people with mental health issues was 5
15  to 10%.  So that means 90% of the samples were
16  healthy, therefore their reporting should be more
17  accurate and the data more reliable.
18          Q.  But you're relying on
19  that 5 to 10% to draw your conclusions as it
20  relates to social media use?
21          A.  I was actually talking
22  about mental health.
23          Q.  Oh, sorry.  The same
24  issue applies when you're trying to study
25  individuals who you've identified as having

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 335

1  problematic social media use, those individuals
2  are going to be even more likely to incorrectly
3  estimate their time on social media.  That's what
4  this Parry point underscores; right?
5              A.  No.  Again, I disagree
6  with it because -- for the exact same reason as I
7  said before.  Problematic social media use is more
8  than just time spent.  In fact, many of the
9  validated questionnaires don't even assess time
10  spent.  They assess addiction criteria.  A log
11  measure has no way of getting at a person's
12  relationship with technology and the level of
13  impairment it causes.  It's just a tracking, a
14  time tracker.
15              Q.  If you can go down to the
16  next paragraph that starts "while," and I'm
17  halfway through that paragraph.  Parry concludes:
18              "Because findings
19              regarding media use and
20              well-being have the
21              potential to foment
22              societal or policy
23              changes, concerns about
24              the quality of evidence
25              extend to any claims or

Page 336

1              recommendations made on
2              their basis.  The results
3              presented herein suggest
4              pause in drawing
5              wide-reaching conclusions
6              - whether these relate to
7              knowledge claims or
8              policy recommendations -
9              from studies relying
10              solely on self-report
11              measures of media use."
12  Do you agree with that?
13              A.  What I find interesting
14  is the broader context of -- is not taken into
15  account in this -- in this study.  So if a study
16  is unreliable or its measures are unreliable,
17  typically that bias is toward null.  It's called a
18  Type II error.  Imprecise phenotyping is more
19  likely than not to miss a relationship that
20  actually exists.  So when you -- when you -- in
21  over 44 meta-analyses, when you get 80 to 90% of
22  the same findings repeated over and over in
23  populations with now cumulatively millions of
24  people all over the world, you can't get a more
25  reliable finding than that.  The measures can't be

Page 337

1  that bad if it's detecting an association time and
2  time and time again.
3              Q.  Unless it's
4  systematically biasing those numbers in a
5  particular direction; right?
6              A.  The -- again, the -- the
7  bias that they found is in the vast majority of
8  people with mental health issues.  They're not
9  representative of the population.
10              Q.  Okay.  Got it.  In your
11  report, you focus on this point about some studies
12  supporting the argument that self-reports have
13  attenuated effect sizes and increased false
14  negatives.  That's your point about biasing the
15  null?
16              A.  Yes.
17              L. SCARCELLO:  Can you point
18  him to the same part.
19              R. EHLER:  It's 1542, the part
20  that starts "given," but right in the middle of
21  that paragraph.
22              Q.  But Parry disagrees with
23  you and obviously scientists can disagree.  Parry
24  says in the next sentence:
25              "-- a larger number of

Page 338

1              studies suggest that the
2              (in)accuracy of
3              self-reported media use
4              measures may indeed be
5              systematic."
6              A.  May be.
7              Q.  May indeed be.  I mean,
8  I'm just reflecting his view.  And so you're
9  entitled to your opinion, but Parry at least, who
10  you rely on for this point, seems to think this is
11  a systematic issue.  Is that a fair representation
12  of the article?
13              A.  I think Parry thinks it's
14  an issue and cites a couple of studies, but that
15  doesn't make it true.
16              Q.  But you rely on his paper
17  for a point that is inconsistent with what he is
18  arguing in this paper.
19              L. SCARCELLO:  Object to form.
20  Is there a question?
21              BY R. EHLER:
22              Q.  Don't you?
23              A.  When you say I'm relying
24  on, I told you, my -- I'm relying on the totality
25  of the evidence.

Arbitration Place

(613) 564-2727                                                          (416) 861-8720

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                          July 10, 2025

Page 339

1    Q.  You --
2    A.  In any one study, is
3  there a potential to have error?  Of course, in
4  self-report.  But if self-report is so weak, why
5  would the same finding occur repeatedly in
6  hundreds of studies?  That makes no sense to me.
7    Q.  Because, according to
8  Parry, it systematically biases it in one
9  direction.
10    A.  The -- and he cites a
11  couple of studies out of hundreds.  That's a huge
12  leap that I just don't buy.
13    Q.  Okay.  Changing topics.
14  You conducted a Bradford Hill analysis.  Can you
15  describe to me precisely the hypothesis you were
16  analyzing using the Bradford Hill criteria?
17  What's the causal hypothesis you were analyzing?
18    A.  Bradford Hill is an
19  epidemiological model to try to arrive at a
20  determination of causation through those nine
21  factors -- through applying those nine factors to
22  the literature.
23    Q.  I understand that.  What
24  was the causal hypothesis you were using Bradford
25  Hill to assess?

Page 340

1    A.  The hypothesis was to see
2  whether social media plays a causal role in mental
3  health in children and youth.
4    Q.  And you didn't
5  specifically conduct a Bradford Hill causation
6  analysis as to eating disorders; right?
7    A.  I looked at the
8  literature more holistically.
9    Q.  Right.  But -- so you
10  didn't do -- you didn't test that specific
11  hypothesis, whether social media use causes eating
12  disorders through the Bradford Hill lens; correct?
13    A.  I -- I think eating
14  disorders are influenced by anxiety and
15  depression.  So they're a likely potential
16  consequence of that.
17    Q.  You also did not do a
18  specific Bradford Hill causation analysis
19  assessing social media use role in causing
20  depression; correct?
21    A.  Correct.
22    L. SCARCELLO:  Object.
23    BY R. EHLER:
24    Q.  And you didn't do a
25  Bradford Hill analysis that specifically analyzed

Page 341

1  social media's relationship in causing anxiety;
2  correct?
3    L. SCARCELLO:  Object to form,
4  misstates the report.
5    THE WITNESS:  My analysis of
6  Bradford Hill was more holistically looking at --
7  basically using all the 44 meta-analyses as data,
8  otherwise the report would have been, I don't
9  know, 600 pages if I applied it to each outcome.
10    BY R. EHLER:
11    Q.  But -- understood.  You
12  had to make decisions and your decision was to
13  treat them holistically, but that meant that you
14  didn't do a specific Bradford Hill for the various
15  disorders alleged in these cases like suicidal
16  thoughts and behaviors or sleep disorders or --
17  I'm trying to think of what else we haven't talked
18  about yet, more general well-being?
19    L. SCARCELLO:  Object to form,
20  misstates his report.
21    THE WITNESS:  I don't know how
22  much more clear I can answer that question.  I was
23  applying the analysis holistically based on all
24  the tables of all the meta-analyses in the report.
25    BY R. EHLER:

Page 342

1    Q.  Right.  I am also just
2  trying to get clarity.  You used your literature
3  review and then you applied the Bradford Hill
4  factors holistically.  I'm just trying to get
5  clarity that you weren't analyzing the specific
6  hypotheses as it related to specific disorders;
7  right?
8    L. SCARCELLO:  Object to form,
9  asked and answered.
10    THE WITNESS:  I was asked to
11  try to arrive at a determination of whether social
12  media is causing psychological harm to these
13  children and youth.  Harm, as I defined it, was
14  defined broadly.  I think if you have harm on one
15  outcome, you don't need harm on all outcomes.
16  Harm on one outcome is harm.
17    BY R. EHLER:
18    Q.  I understand that, and
19  mine's just a more methodological, technical
20  question of whether it sought to do a
21  disorder-specific analysis.  And I think you've
22  answered that, so I won't belabor the point.  But
23  I do want to confirm, you also treated the
24  platforms holistically.  You didn't do a specific
25  Bradford Hill analysis that looked at causation

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                         July 10, 2025

Page 343

1  between Instagram and the various mental health
2  harms; correct?
3          A.  Most of the literature
4  pools the social media platforms together, but the
5  features are common to all of them, and there is
6  actually no research to show that any one is far
7  more harmful than the other.
8          Q.  Right.  But there is also
9  not research to disaggregate them; correct?
10         A.  Actually, there are some
11 studies that disaggregated them, and some of them
12 meta-analyses looked at Instagram versus other
13 ones.  Most of the literature shows, probably
14 because of the commonality or the features that
15 generate the excessive engagement and capitalizing
16 on vulnerabilities, developmental vulnerabilities,
17 they actually show very comparable relations to
18 mental health outcomes.
19         R. EHLER:  I'll move to strike
20 that as non-responsive.
21         BY R. EHLER:
22         Q.  The -- your Bradford Hill
23 analysis, you did not conduct a Bradford Hill
24 analysis that specifically showed causation as to
25 the Defendant platforms individually; correct?

Page 344

1  You treated them holistically like the literature
2  does?
3          A.  They share common
4  features.  And so I didn't see -- first of all, I
5  don't even know how I would do that because there
6  is not enough literature to even support that.
7          Q.  And your report didn't
8  conduct a Bradford Hill causation analysis that
9  would have looked feature by feature and assessed
10 do notifications cause these specific harms, do
11 auto play features cause these specific harms.
12 You didn't do a feature-by-feature analysis;
13 right?
14         L. SCARCELLO:  Object to form.
15         THE WITNESS:  Meta-analyses --
16 as I said before, social media is a whole
17 experience.  The features are the driving force of
18 the content, which amplifies harm through social
19 comparison, as I said in my talk.  No
20 meta-analysis has been done on is one feature more
21 harmful than others, but I think collectively
22 they've all been identified to play a mediological
23 role in addictive processes, the gamification, the
24 likes, the auto scroll.  When you combine all of
25 it, they're using behavioral principles of

Page 345

1  motivation learning that activate brain reward,
2  that drive excessive use and problematic use.
3          R. EHLER:  I'll move to strike
4  that as non-responsive.
5          BY R. EHLER:
6          Q.  My questions are more
7  specific to what you did not why you didn't do it.
8  But you didn't do a Bradford Hill analysis that
9  was specific to each feature and an outcome of
10 harm; correct?
11         L. SCARCELLO:  Objection,
12 preamble.
13         THE WITNESS:  The features and
14 content are inextricable and there is no research
15 on a single feature, at least not on a
16 meta-analysis.  If I was looking at individual
17 studies, there are studies on certain features.
18 That wasn't -- I took a different approach.
19         BY R. EHLER:
20         Q.  And so the more specific
21 work you did was in the literature section of your
22 report, where you did analyze it by groups of
23 disorders.  We talked about those earlier.  I
24 think you called them functions categories, I
25 can't remember, but --

Page 346

1          A.  Outcomes.
2          Q.  It was something a little
3  bit different, but how you couldn't compare
4  anxiety and sleep, for example, because they were
5  different things.  You grouped anxiety disorders
6  together, eating disorders together.
7          A.  Um-hum, um-hum.
8          Q.  Okay.  Just trying to get
9  us on the same page.  It's late.
10         And did you use the same
11 methodology for each of those meta-analysis
12 literature reviews, where you gathered your
13 meta-analyses, you surveyed them, you have your
14 table of your effect sizes, and then you reach
15 your conclusions based on what you found?  That
16 was the process for the literature review section?
17         A.  Are you talking about the
18 Bradford Hill or are you talking about the metas?
19         Q.  I moved to the
20 meta-analyses.
21         A.  The metas, okay.
22         Q.  Your literature review of
23 the meta-analyses where you broke things down more
24 specifically.
25         A.  Yes, I described the

Page 347

1    process that we discussed earlier about how the
2    studies were selected and tables constructed and
3    then the analysis that follows.
4                Q.   Okay.  And I think what
5    you said as part of that process was that you
6    looked at the meta-analyses and you analyzed them
7    in a couple of different ways, and then you also
8    looked at -- maybe not all but at least a number
9    of the underlying studies as well; right?
10               A.   Yes.
11               Q.   Okay.  And that was the
12   process you used for each of the areas of outcomes
13   you analyzed; correct?
14               A.   There -- yes.  And
15   there -- in a couple of circumstances, I looked at
16   other studies that went beyond the
17   meta-analysis one.
18               Q.   Thank you.  I appreciate
19   that completeness.
20               Okay, I want to talk about one
21   as an example so I can understand your process.
22   On page 66 of your Exhibit 1, one of the outcomes
23   you looked at was academic performance; is that
24   right?
25               A.   Yes, that's right.

Page 348

1                Q.   And it looked like -- I'm
2    just looking at the redline, too, to make sure
3    nothing changed.  Oh, a few things did change.
4    Would you prefer to look at your updated report?
5                L. SCARCELLO:  Did you answer,
6    Dr. Goldfield?
7                THE WITNESS:  Yes, I've got
8    it, the amended one.
9                BY R. EHLER:
10               Q.   Okay, great.  Are you at
11   the same place?  This is the academic performance
12   section.  I think one of the changes was a change
13   from "neurocognitive outcomes" to "academic
14   performance."  Do those mean the same thing or was
15   it a typo?
16               A.   I think I'm -- I'm not
17   sure I'm looking at the right document.
18               Q.   Are you in Exhibit 1?
19               L. SCARCELLO:  No, he switched
20   to Exhibit 8.
21               BY R. EHLER:
22               Q.   That's where I am too.
23   I'm on page 79 of the red-line amended report,
24   Exhibit 8.
25               A.   Exhibit 8 -- oh, 79.  I

Page 349

1    thought you said 61.  Okay.  I might have been on
2    the other one.
3                Q.   Yeah, we're all -- it's
4    late.
5                A.   Okay.  Yeah.
6                Q.   Okay.  So I'm looking at
7    the table and you cite only two meta-analyses to
8    support this outcome.  Is that a sufficient number
9    for you to reach your conclusions regarding
10   academic performance?
11               A.   That's what's in the
12   literature that was captured by our search, so I
13   didn't really have a lot of choice.
14               Q.   So that's available.  Is
15   it from a methodological perspective sufficient?
16               A.   Well, again, it's not two
17   studies, it's two meta-analyses.
18               Q.   Right.
19               A.   So meta-analyses include
20   many studies.
21               Q.   Got it.  18 for Kus and
22   16 for Salari; right?
23               A.   That's right.
24               Q.   And did you look at the
25   studies underlying these?

Page 350

1                A.   Some of them.
2                Q.   So let's start with Kus.
3    I don't know how to say his name.  Just hang on.
4    This is Exhibit 19.
5                EXHIBIT NO. 19:  PAPER
6                TITLED "A META-ANALYSIS
7                OF THE IMPACT OF
8                TECHNOLOGY RELATED
9                FACTORS ON STUDENTS'
10               ACADEMIC PERFORMANCE"
11               BY R. EHLER:
12               Q.   And I'm on page 10 of
13   Kus.  Are you with me?
14               L. SCARCELLO:  He might be
15   taking a minute to get familiar, re-familiar.
16               THE WITNESS:  Okay.
17               BY R. EHLER:
18               Q.   And only one of these
19   articles is longitudinal; correct?  And you can
20   tell because in the table we're looking at on page
21   10 of Exhibit 19, there is a research design
22   column, which categorizes the research design.
23               A.   Um-hum.
24               Q.   Do you see how Dubuc, the
25   third one down, 2020, is a longitudinal design,

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                            July 10, 2025

Page 351

1  with L?
2            A.  Yeah.  I'm not sure -- I
3  just want to look up what "OS" is.  Okay.
4            Q.  Did you read Dubuc?
5            A.  I took -- I read a lot of
6  studies.  I don't recall.  If you have it handy, I
7  would like to take a look at it.
8            Q.  Sure.  I've marked this
9  as Exhibit 20.
10           EXHIBIT NO. 20:  PAPER
11           TITLED "LIFESTYLE HABITS
12           PREDICT ACADEMIC
13           PERFORMANCE IN HIGH
14           SCHOOL STUDENTS: THE
15           ADOLESCENT STUDENT
16           ACADEMIC PERFORMANCE
17           LONGITUDINAL STUDY
18           (ASAP)"
19           BY R. EHLER:
20           Q.  And if you turn to page
21  12 of Dubuc with me --
22           A.  Okay, just --
23           Q.  That's okay.  Take your
24  time.
25           A.  Okay.

Page 352

1            Q.  And this is the only
2  longitudinal study; correct?  We established that.
3            A.  In this meta-analysis, it
4  seems to be.
5            Q.  Yeah.  And the -- in this
6  Dubuc study, if we go to page 12, there's -- the
7  third paragraph down lists some limitations.  And
8  at the bottom of that paragraph, the author's
9  note:
10           "Due to a logistic
11           reality, another
12           limitation was the
13           self-reported measure of
14           lifestyle habits."
15  Do you see that?
16           A.  Yes.
17           Q.  And then the sample in
18  this longitudinal study was from a French-Canadian
19  public school in Montreal?  That's at the
20  beginning of that paragraph.
21           A.  Um-hum.
22           Q.  And they actually had
23  higher-than-average academic performing students?
24  Do you think that a high-performing public school
25  in Montreal is representative of academic

Page 353

1  performance in U.S. schools?
2            L. SCARCELLO:  Object to form.
3            THE WITNESS:  Again, I base my
4  conclusions on the meta-analyses of -- it shows
5  here 63 studies.
6            BY R. EHLER:
7            Q.  Right.  So let's look
8  back at Kus, the meta-analysis.
9            A.  Um-hum.
10           Q.  Table -- sorry, not
11  table.  Page 16.  The second paragraph down says:
12           "Second, the effect of
13           social media use on AP,"
14           that's academic
15           performance, "was found
16           to be weakly positive,
17           though not statistically
18           significant."
19  And then it -- there's some numbers.  It rejected
20  the hypothesis as not statistically significant.
21  And then it says:
22           "This suggests while
23           social media use may not
24           substantially enhance
25           academic performance, it

Page 354

1            does not appear to exert
2            a strong detrimental
3            effect either.  This
4            aligns with other studies
5            that highlight the
6            potential of social media
7            as a resource for
8            academic collaboration,
9            information sharing, and
10           peer learning."
11  Do you see that?
12           A.  I do.
13           Q.  So the conclusion of Kus,
14  this 2025, very recent meta-analysis on academic
15  performance, was no statistical significance and,
16  if anything, a weakly positive result; correct?
17           L. SCARCELLO:  Object to form.
18           THE WITNESS:  The result was
19  not significant, so I noted this in my report.
20           BY R. EHLER:
21           Q.  Yeah.  Going back to your
22  report, page -- we're on 79 of Exhibit 8.  So you
23  looked at one other study, right, Salari?
24           A.  One other meta, yes.
25           Q.  One other

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 355

1  meta-analysis --
2           A.  Yeah.
3           Q.  -- Salari.  And so if Kus
4  was not statistically significant, it must have
5  been Salari, right, that drove your conclusions?
6           A.  Correct.
7           L. SCARCELLO:  Object to form.
8           BY R. EHLER:
9           Q.  Doctor, I've handed you
10 Exhibit 21.
11          EXHIBIT NO. 21:  PAPER
12               TITLED "THE IMPACT OF
13               SOCIAL NETWORKING
14               ADDICTION ON THE ACADEMIC
15               ACHIEVEMENT OF UNIVERSITY
16               STUDENTS GLOBALLY: A
17               META-ANALYSIS"
18          BY R. EHLER:
19          Q.  This is the Salari study
20 and it's titled "The impact of social networking
21 addiction on the academic achievement of
22 university students globally: A meta-analysis."
23          Do you see that?
24          A.  Yes.
25          Q.  And the authors are based

Page 356

1  in Iran?
2           A.  That's right.
3           Q.  And this study actually
4  involves no longitudinal studies; right?
5           L. SCARCELLO:  If you need to
6  take a minute to reacquaint yourself, you're
7  welcome to, doctor.
8           THE WITNESS:  I'm not sure I
9  mentioned study design.
10          BY R. EHLER:
11          Q.  So if you look at section
12 2.1, "Inclusion and exclusion criteria," on page
13 2, it includes:
14               "Descriptive analytical
15               studies (correlation)
16               that reported the effect
17               of a social network
18               addiction on students'
19               academic performance."
20          A.  Um-hum.
21          Q.  But then if you go to the
22 next paragraph:
23               "On the contrary, the
24               following criteria was
25               used to exclude some of

Page 357

1                  the identified articles:
2                  1. Case controls and
3                  cohort studies."
4  I understand cohort studies to be longitudinal
5  studies; is that true?
6           A.  They could be that or a
7  repeated cross-sectional studies, also referred to
8  cohort.
9           Q.  Okay.
10          A.  Waves.
11          Q.  But either way this was
12 only looking at correlational studies; right?
13          A.  Yes, it appears that way.
14          Q.  And then if you go to the
15 table on page 3, table 1, there is the "Summary of
16 the selected studies' characteristics."
17          A.  Um-hum.
18          Q.  And these studies that
19 involve college students and are correlational are
20 from Kuwait, Qatar, India, China, Malaysia, Iran,
21 Türkiye, Bangladesh, I do see that there is one
22 from the United States, I'm not going to exclude
23 that, Nigeria, and Pakistan, and then one from the
24 United States.  Is that right?
25          A.  That is correct.

Page 358

1           Q.  So there was only one
2  North American correlational study in the entire
3  meta-analysis from the United States and that was
4  from the year 2015?
5           A.  The finding is remarkably
6  similar to all the other meta-analyses on
7  problematic social media use and mental health
8  harms.  Even the magnitude of the relationship is
9  almost identical.  So while this meta-analysis was
10 cross-sectional, I reviewed lots of other
11 longitudinal ones that showed the same
12 relationship.
13          Q.  Not with respect to
14 academic performance.
15          A.  No --
16          L. SCARCELLO:  Objection,
17 form.
18          THE WITNESS:  No, that is
19 true, but the pattern of findings are almost
20 identical.
21          BY R. EHLER:
22          Q.  Dr. Goldfield, will you
23 agree with me that your causation finding doesn't
24 hold with respect to academic performance?
25          L. SCARCELLO:  Object to form.

Page 359

1          THE WITNESS:  I would say with
2  problematic social media use, there is a
3  relationship here of greater symptoms, lower
4  academic performance.
5          BY R. EHLER:
6          Q.   And you're basing that on
7  Kus and Salari where there is one longitudinal
8  study involving a high-performance school in
9  Quebec, the rest are cross-sectional, and only one
10  involves college kids in the United States, the
11  rest are from Iran, Kuwait, Malaysia, Türkiye,
12  Bangladesh, and you're drawing conclusions about
13  academic performance in the United States; that's
14  your testimony?  Just making sure.
15          L. SCARCELLO:  Objection,
16  form.
17          THE WITNESS:  Social media is
18  a global phenomenon.  I haven't seen a whole lot
19  of data to show it has significantly stronger
20  effects on kids from Europe or other parts of the
21  country as it does in North America.
22          BY R. EHLER:
23          Q.   That's not true.  You
24  said in your report that different cultures, like
25  collective, individualistic, actually show

Page 360

1  different results; right?
2          A.   Those are very --
3          L. SCARCELLO:  Object to form
4  and misstates the report.
5          THE WITNESS:  Those are very
6  crude measures in meta-analyses.
7          BY R. EHLER:
8          Q.   But you don't have any
9  basis to conclude that college students in Iran
10  are -- conclusions as to college students in Iran
11  in cross-sectional studies tell you about whether
12  social media is causing lower academic performance
13  in middle and high school in the United States;
14  right?
15          L. SCARCELLO:  Object to form.
16          BY R. EHLER:
17          Q.   As a scientist, if you're
18  being candid?
19          L. SCARCELLO:  Object to form,
20  argumentative.
21          THE WITNESS:  So what I talk
22  about in my report is that the pattern that you
23  see, despite the cross-sectional findings, when
24  they occur over and over and over again, raise the
25  concern that problematic social media use is

Page 361

1  having a negative effect on academic performance.
2          BY R. EHLER:
3          Q.   You have no studies, no
4  longitudinal, no experimental studies that support
5  what you just said; right?
6          L. SCARCELLO:  Object to form.
7          THE WITNESS:  So in my report,
8  I contextualize this on the bottom of page 81 and
9  recognize that schools, teachers, clinicians --
10  and there are meta-analyses showing that even
11  having the presence of your phone is a distraction
12  in class and is associated with poor attention.
13          So again, broader context, I'm
14  looking holistically at the evidence and the
15  totality of the evidence when I'm forming my
16  opinions.
17          R. EHLER:  Respectfully, I'll
18  move to strike.
19          BY R. EHLER:
20          Q.   Because we just looked at
21  your literature review of the meta-analyses that
22  you've relied on so heavily today and you cannot
23  identify for me one longitudinal study that
24  relates to U.S. kids that supports your hypothesis
25  that there is a negative impact between social

Page 362

1  media use and academic performance; correct?
2          L. SCARCELLO:  Object to form.
3          THE WITNESS:  I can't think of
4  a biological or psychological reason why
5  problematic social media use would harm kids from
6  Iran less than kids from Canada or the U.S. or
7  Australia.  That doesn't make any biological sense
8  to me.
9          BY R. EHLER:
10          Q.   I -- well, with all due
11  respect, I will move to strike that last response
12  and I'm just asking you about the evidence you
13  reviewed.  That could be a hypothesis, but the
14  evidence you reviewed did not reach that
15  conclusion; correct?
16          L. SCARCELLO:  Object to form.
17          THE WITNESS:  My conclusions
18  are as stated here in the report.
19          BY R. EHLER:
20          Q.   Right.  And we just
21  looked through the meta-analyses that underlie
22  those conclusions for academic performance;
23  correct?
24          A.   I think I've
25  contextualized the findings and I think the

Page 363

1    concern -- I -- so, first of all, these are --
2    these are based on only two meta-analyses, as you
3    said, as opposed to all the -- like the 42 other
4    ones, yet they establish that people who have
5    problematic social media use don't do as well in
6    school.  There is interference.
7             Q.   You didn't look at any of
8    these underlying studies that involves college
9    students in Kuwait, Qatar, India, China, Malaysia.
10   Did you analyze these specific studies?
11            L. SCARCELLO:  Object to form,
12   argumentative.
13            THE WITNESS:  Again, I'm
14   looking at the evidence based on meta-analyses
15   holistically.  And not even each meta-analysis
16   conclusion is how does this fit in the larger
17   piece of findings?  And the magnitude of the
18   association is almost identical to that reported
19   for anxiety and depression and body
20   dissatisfaction.
21            BY R. EHLER:
22            Q.   I'd like to turn to --
23   you can stay in your amended report -- paragraph
24   308.  Maybe -- yes.  In this paragraph you cite a
25   study involving the NIH-funded ABC study by

Page 364

1    Pagliaccio et al. (2024); is that right?
2             A.   Um-hum.
3             Q.   What's your understanding
4    of that study?
5             A.   That they were trying to
6    get at this measure of cumulative risk by looking
7    at a digital exposome of a whole bunch of facets
8    of social media use, including your relationship
9    with it, how you use it, as well as some other --
10   you know, your peer connection, a whole bunch of
11   variables.  And they formed this exposome or I
12   think of it conceptually as cumulative risk.
13            Q.   And at that -- good
14   memory for late in the evening.  At the end of
15   that paragraph, you note the last sentence:
16            "This independent
17            contribution is reflected
18            by the digital exposome
19            variable accounting for
20            15.61% of the unique
21            variance in the
22            psychopathology
23            composite --"
24   That was your summary of that study?
25            A.   Yes.

Page 365

1             Q.   If you were wrong about
2    how to interpret that study, would it change your
3    opinion?
4             A.   Again, single study,
5    cross-sectional, probably not, no.
6             Q.   And are you aware that a
7    co-author on that study was Randy Auerbach?
8             A.   I'm aware.
9             Q.   And are you aware of his
10   response to your reference of the study?  Did you
11   read that in his report?
12            A.   I looked at it.
13            Q.   And so you know then that
14   he corrected that two-thirds of the 15.61% is
15   actually offline factors?
16            A.   That was taken -- that
17   was taken into account -- I mean, they presented
18   the same analysis multiple ways.  So I would
19   actually love to take a look at that paper again
20   to refresh my memory.
21            Q.   Okay.  You can do that
22   overnight if you want to.  I don't have it.
23            A.   Oh, okay.
24            Q.   Did you have any response
25   to Dr. Auerbach when you read that?

Page 366

1             L. SCARCELLO:  So, counsel, if
2    we could we wait until tomorrow so that he has the
3    opportunity to look at it or -- you know.
4             R. EHLER:  I have like two or
5    three minutes to get through this last section,
6    because I think we're almost at time, and he can
7    look at it tomorrow if he wants.
8             L. SCARCELLO:  I just want to
9    know if you --
10            R. EHLER:  Let me keep going.
11   I think I'm asking the question that you were also
12   asking.
13            BY R. EHLER:
14            Q.   Sitting here today right
15   now, do you have a response to Dr. Auerbach?
16            L. SCARCELLO:  Object to the
17   form.
18            THE WITNESS:  No.  To get back
19   to your earlier question, my opinion doesn't
20   change, it's a cross-sectional study in a
21   vulnerability section.  It is the only study that
22   touches on the concept of cumulative risk and I
23   think is important.  If you have multiple factors,
24   time spent, poor peer connections, overuse of
25   technology, problematic use, all these other

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                      July 10, 2025

Page 367

1  factors, it shows a stronger relationship with
2  mental health, which is intuitive.  That's all my
3  point was.
4           L. SCARCELLO:  Counsel, I
5  would just object to asking him questions about
6  Dr. Auerbach's rebuttal and this particular study
7  without putting it in front of him.  So I would
8  just object to this line of questioning.
9           BY R. EHLER:
10          Q.  I don't disagree with
11  your assessment of whether cumulative risk is
12  relevant, but what Dr. Auerbach said was that the
13  15.61% is actually -- two-thirds of that is
14  offline factors, not the digital exposome
15  variables.
16          L. SCARCELLO:  And, again, I
17  would object to asking him about these things --
18          THE WITNESS:  Again, yeah, I
19  --
20          L. SCARCELLO:  -- without
21  having the -- Dr. Auerbach's report in front of
22  him or the study in front of him.
23          R. EHLER:  Your objection is
24  standing.  Noted.
25          L. SCARCELLO:  You can answer.

Page 368

1           BY R. EHLER:
2           Q.  So if the percentage of
3  digital exposome variables was only 5% or 6%, that
4  wouldn't change your view?
5           L. SCARCELLO:  Object to form.
6           THE WITNESS:  First of all, 5%
7  is clinically meaningful.  Second of all, the
8  study wasn't even included in the meta-analysis.
9  It was just to highlight a peripheral point that
10  if people have multiple factors, multiple
11  vulnerabilities, then the relationship is probably
12  going to get stronger.
13          BY R. EHLER:
14          Q.  You included on your
15  amended materials considered list the expert
16  reports for Defendants' experts; correct?
17          A.  Yes.
18          Q.  And you've reviewed those
19  before coming here today; right?
20          A.  Yes.
21          L. SCARCELLO:  I'm also going
22  to object to any questions about the details of
23  that without having that in front of him.
24          BY R. EHLER:
25          Q.  When did you review those

Page 369

1  reports?
2           A.  In the last -- we're
3  talking about the rebuttal reports?
4           Q.  The April 18th reports or
5  the May 16th rebuttal reports, either.
6           A.  I guess in the last
7  couple months.
8           Q.  So before you submitted
9  your amended and supplemental report in this case;
10  right?
11          A.  Some -- mostly, yes, but
12  not always.  But mostly, yes.  Mostly, yes.
13          Q.  Which of the reports did
14  you not read until after you submitted your
15  amended and supplemental report two days ago in
16  this case?
17          L. SCARCELLO:  Object to form.
18          THE WITNESS:  I don't recall
19  the exact person's name.
20          BY R. EHLER:
21          Q.  Okay.  But some of them?
22          A.  I think one.
23          Q.  One.  Did you include in
24  your amended and supplemental report that you
25  produced to us two days ago, after you read all

Page 370

1  but one of the defense side experts, your
2  responses to their reports?
3           A.  I did not.
4           Q.  Why?
5           A.  I disagreed with most of
6  what they said and I didn't feel the need to rebut
7  those criticisms.
8           Q.  Did -- you understand
9  that part of your report's function is a notice
10  document of what your opinions are going to be
11  when you testify at trial?  Do you as a general
12  matter understand that?
13          L. SCARCELLO:  Object to the
14  form.
15          THE WITNESS:  Yes, I'm aware.
16          BY R. EHLER:
17          Q.  So sitting here today,
18  are there more things you have to say about
19  Defendants' expert reports that are not covered by
20  what's in your amended and supplemental report?
21          A.  I would say I disagreed
22  with a lot of their comments.  I think some of
23  them are completely off base, and I'd be willing
24  to discuss that if it goes to a trial and I
25  testify.

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                July 10, 2025

Page 371

1          Q.   Okay.  There was nothing
2   that you had a concrete enough view on to put in
3   writing and put in your report when you
4   supplemented it with new studies and other new
5   information, including studies you hadn't seen
6   before and you -- let me ask a clearer question.
7          I understand you disagree, and
8   I understand that you want to respond to
9   Defendants at trial, but we have a short amount of
10  time for your deposition.  And what I'm trying to
11  understand is whether there is anything that you
12  thought mattered enough to your opinion or to
13  their opinions that it should have been disclosed
14  as one of -- as relevant to your overall
15  conclusion in your report?
16         L. SCARCELLO:  Object to the
17  form of the question.
18         THE WITNESS:  Like I said, I
19  don't know how to better answer that question.  I
20  disagreed on almost all grounds with them.  So in
21  the -- in my MDL report, I addressed some concerns
22  and elaborated on dimensionality and how important
23  that is for conceptualizing psychopathology and
24  not just looking at disorders.  And symptoms
25  count, they matter, they cause impairment and

Page 372

1   harm.  But I disagree with a lot of what they
2   said.  All the research is cross-sectional, that's
3   not true.  It's discounting 30 experiments.
4          BY R. EHLER:
5          Q.   And what I'm trying to
6   figure out is whether there are things like that
7   or other things that we don't know sitting here
8   today because they're not written in your report
9   that you have in your mind and would like to offer
10  as concrete rebuttals to Defendants' experts?
11         L. SCARCELLO:  Object to the
12  form.
13         THE WITNESS:  I think I've
14  addressed some of those comments through our
15  natural discussion today.  I think symptoms
16  matter.  I think I laid out a really comprehensive
17  report that clearly shows very similar
18  relationships, cross-sectionally, longitudinally,
19  experimentally.  Problematic social media use is
20  even more strongly related to mental health harms.
21  The measures of social media, while not perfect,
22  have been shown to be reliable and valid, repeated
23  countless times in countless children around the
24  world.  To me, that indicates these findings are
25  robust, reliable and valid.

Page 373

1          BY R. EHLER:
2          Q.   Anything else you want to
3   offer in rebuttal to the Defendants' experts?
4          L. SCARCELLO:  Object to the
5   form and characterization.
6          THE WITNESS:  I want to
7   reiterate that they're dismissing the experiments
8   because of the possibility of a demand bias.  As I
9   said before, that seems unlikely.  Number one,
10  demand bias doesn't work selectively on outcome.
11  If it's there, it's going to be there on all
12  outcomes, not some versus the other.  So -- two,
13  there's no evidence that it actually exists.  It's
14  possible.  Number three, the methodology used in
15  these experiments is no different than the
16  methodology used in almost all clinical trials in
17  psychology and behavioral interventions, for the
18  reasons we talked about.  It's really difficult to
19  blind and even more difficult to blind when you're
20  taking some -- something away from someone like
21  social media.  That doesn't invalidate the
22  findings.  And I think to dismiss that body of
23  literature based on those limitations is not good
24  science, and I just disagree fundamentally with
25  those opinions.  I think they're valid and I think

Page 374

1   they're the highest quality of evidence out there.
2          BY R. EHLER:
3          Q.   Is that it?
4          A.   I mentioned the
5   cross-sectional findings being consistent with
6   longitudinal and experimental.  I would have to
7   have a list of all their -- I can't recall all
8   their criticisms, but I had a general feeling that
9   I really didn't agree with many of them.
10         Q.   Well, let me list them
11  just so you can tell me if you remember who you
12  only read until more recently.  We talked about
13  Dr. Auerbach, Alan Berman, Ian Gotlib, Sarah
14  Honaker, Robert Platt, Matthew Shear, Craig Bryan,
15  Adriana Galvan, Robert Gibbons, Keith Hampton,
16  Daniel Keating, Ken Kishida, Scott Patten, Terry
17  Schwartz, Jeff Hall, Jennifer Pfeifer and Doug
18  Tucker.  Do you remember which of those you only
19  read yesterday?
20         L. SCARCELLO:  Object to form.
21  Misstates the testimony.
22         THE WITNESS:  I read Alan
23  yesterday.
24         BY R. EHLER:
25         Q.   Okay.  Anything different

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 10, 2025

Page 375

1   as it realities to Alan?
2            A.   No.
3            Q.   We have those reports, if
4   you would like to take them home.  If you think
5   that's necessary to more specifically provide your
6   rebuttal reports, you're welcome to do that.
7   Otherwise, we're probably at seven hours and we
8   can call it a night.  Do you want to take the
9   reports home?
10           A.   Sure.
11           Q.   Okay.
12           THE VIDEOGRAPHER:  This
13  concludes today's testimony given by Dr. Gary
14  Goldfield.  Current time is 8:46 p.m., and we are
15  off the record.
16  --- Whereupon the proceeding concluded at 8:46
17      p.m.
18
19
20
21
22
23
24
25

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | | |
|---|---|---|
| COORDINATION PROCEEDING SPECIAL TITLE [RULE 3.400], SOCIAL MEDIA CASES | ) ) ) ) | JUDICIAL COUNCIL COORDINATION PROCEEDING NO. 5255 |
| ——————————————— | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) ) | For Filing Purposes: 22STCV21355 |
| CHRISTINA ARLINGTON SMITH, ET AL. | ) ) | |
| Plaintiffs | ) | Judge: |
| v. | ) | Hon. Carolyn B. Kuhl |
| | ) | |
| TIKTOK INC., ET AL. | ) | SSC-12 |
| Defendants | ) | |
| ——————————————— | ) | |

DEPOSITION OF GARY GOLDFIELD
held at the offices of
Dow's Lake Court Conference Centre,
865 Carling Avenue, Ottawa, Ontario
on Friday, July 11, 2025, at 8:35 a.m.


CONDENSED TRANSCRIPT WITH INDEX


Arbitration Place © 2025
900-333 Bay Street        Toronto, Ontario M5H 2R2

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 11, 2025

Page 380

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

Lindsey Scarcello
Tricia L. Campbell
WAGSTAFF & CARTMELL
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
lscarcello@wcllop.com
tcampbell@wcllp.com
816-701-1100

ON BEHALF OF THE DEFENDANTS, META PLATFORMS, INC.,
FACEBOOK HOLDINGS, LLC, FACEBOOK OPERATIONS, LLC,
FACEBOOK PAYMENTS, INC., FACEBOOK TECHNOLOGIES,
LLC, INSTAGRAM, LLC, AND SICULUS, INC.:

Andrew Stanner
Paul Banks
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
202-662-5007
astanner@cov.com
pbanks@cov.com

ON BEHALF OF THE DEFENDANT, SNAP INC.:

Rose L. Ehler
Garrett Solberg
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
213-683-9100
Rose.Ehler@mto.com
Garrett.Solberg@mto.com

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                          July 11, 2025

APPEARANCES (CONT'D):


ON BEHALF OF THE DEFENDANTS, TIKTOK INC. AND
BYTEDANCE INC.:

Lisa Horvath
KING & SPALDING LLP
500 West 2nd Street
Suite 1800
Austin, TX 78701
512-457-2000
(Via videoconference)


ON BEHALF OF THE DEFENDANTS, YOUTUBE, LLC, GOOGLE
LLC, ALPHABET INC.:

Rachel Raphael
MORGAN LEWIS
Pennsylvania Avenue, NW
Washington, DC 20004-2541
202-739-5589
rachel.raphael@morganlewis.com
(Via videoconference)

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 11, 2025

Page 382

INDEX

                                                              PAGE

PREVIOUSLY AFFIRMED:  GARY GOLDFIELD                           386

DIRECT EXAMINATION BY R. EHLER (CONT'D)                        386

CROSS-EXAMINATION BY L. HORVATH                                472

CROSS-EXAMINATION BY R. RAPHAEL                                493

CROSS-EXAMINATION BY A. STANNER                                545

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                                July 11, 2025

Page 383

LIST OF EXHIBITS

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 22 | ARTICLE TITLED "LONGITUDINAL ASSOCIATIONS BETWEEN DIFFERENT TYPES OF SCREEN USE AND DEPRESSION AND ANXIETY SYMPTOMS IN ADOLESCENTS" | 386 |
| 23 | PRINTOUT OF THE ADVISORY BOARD ABOUT US WEB PAGE OF THE CENTRE FOR HEALTHY SCREEN USE | 392 |
| 24 | PRINTOUT OF THE Q&A BANK WEB PAGE OF THE CENTRE FOR HEALTHY SCREEN USE | 393 |
| 25 | PRINTOUT OF WEB PAGE TITLED "ARE THERE BENEFITS OF SCREEN USE FOR CHILDREN AND YOUTH?" | 394 |
| 26 | PRINTOUT FROM THE JOURNAL OF PSYCHIATRIC RESEARCH | 401 |
| 27 | ARTICLE TITLED "SOCIAL MEDIA USE AND PARENT-CHILD RELATIONSHIP: A CROSS-SECTIONAL STUDY OF ADOLESCENTS" | 411 |
| 28 | ARTICLE BY XIAO PUBLISHED IN 2025 TITLED "ADDICTIVE SCREEN USE TRAJECTORIES AND SUICIDAL BEHAVIORS, SUICIDAL IDEATION, AND MENTAL HEALTH IN US YOUTH" | 421 |
| 29 | "THE NEW YORK TIMES" ARTICLE TITLED "REAL RISK TO YOUTH MENTAL HEALTH IS 'ADDICTIVE USE,' NOT SCREEN TIME ALONE, STUDY FINDS" | 427 |
| 30 | VIDEO CLIP OF GRAND ROUNDS DATED 2024 | 470 |
| 31 | VIDEO CLIP OF GRAND ROUNDS DATED 2024 | 470 |
| 32 | PAPER TITLED "CONNECTING WITH YOUNG PEOPLE ON MENTAL HEALTH & WELLBEING" | 471 |
| 33 | ARTICLE TITLED "HELPFUL OR HARMFUL? AN EXAMINATION OF VIEWERS' RESPONSES TO NONSUICIDAL SELF-INJURY VIDEOS ON YOUTUBE" | 514 |

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 11, 2025

                                                                    Page 384

                        LIST OF EXHIBITS (CONT'D)

NO.                    DESCRIPTION                      PAGE

34      MATERIALS CONSIDERED DOCUMENT, 159           563
        PAGES, FIRST PAGE TITLED "EXHIBIT C"

35      PRINTOUT OF DANISH-LANGUAGE SLIDE DECK       580
        TITLED "SELVSKADE INDSATSER I BUC
        SELVSKADE, SELVMORD & SOME."

36      AMENDED AND SUPPLEMENTAL EXPERT REPORT       596
        OF GARY GOLDFIELD DATED JULY 8, 2025

37      PAPER TITLED "THE SOCIAL MEDIA               597
        INDUSTRY AS A COMMERCIAL DETERMINANT
        OF HEALTH"

38      PAPER TITLED "SOCIAL MEDIA USE AND           607
        SELF-INJURIOUS THOUGHTS AND BEHAVIORS:
        A SYSTEMATIC REVIEW AND META-ANALYSIS"

22STCV21355
DEPOSITION OF GARY GOLDFIELD

July 11, 2025

Page 385

1      Ottawa, Ontario
2  --- Upon commencing on Friday, July 11, 2025, at
3      8:35 a.m.
4      THE VIDEOGRAPHER:  Good
5  morning.  We are going on the record at 8:35 a.m.
6  on July 11th, 2025.  This is day two of the
7  video-recorded deposition of Dr. Gary Goldfield,
8  taken by counsel for the Defendant in the matter
9  of Social Media Cases, Judicial Council
10  Coordination Proceeding No. 5255, filed in the
11  Superior Court of the State of California, County
12  of Los Angeles, Central District.  This deposition
13  is being held at Arbitration Place Ottawa, located
14  at 865 Carling Avenue, Ottawa, Ontario, Canada,
15  K1S 5S8.  My name is Bruno Silva CLVS, and I'm the
16  videographer from the firm Arbitration Place.  The
17  court reporter is Mariann Vianello, RPR, from the
18  firm Arbitration Place.
19      Will counsel please introduce
20  yourselves, followed by the court reporter
21  swearing in the witness.
22      R. EHLER:  Same counsel are
23  here today as yesterday.  This is Rose Ehler from
24  Munger, Tolles & Olson on behalf of Defendant
25  Snap, joined at counsel table by Garrett Solberg

Page 386

1  from Munger, Tolles & Olson for Snap,
2  Andrew Stanner and Paul Banks from Covington &
3  Burling for Meta.  And virtually, we are joined by
4  Lisa Horvath from King & Spalding for TikTok, and
5  Rachel Raphael from Morgan Lewis for YouTube
6  Defendants.
7      L. SCARCELLO:  And this is
8  Lindsey Scarcello with my colleague Tricia
9  Campbell for the Plaintiffs.
10      THE VIDEOGRAPHER:  Will the
11  court reporter swear in the witness or he will
12  reaffirm.
13  PREVIOUSLY AFFIRMED:  GARY GOLDFIELD
14  DIRECT EXAMINATION BY R. EHLER (CONT'D):
15      Q.  Dr. Goldfield, you
16  understand you are still under oath today?
17      A.  I do.
18      Q.  We spoke towards the end
19  of yesterday about an article that you co-authored
20  with Mougharbel.  It had not been an exhibit.  I'm
21  going to hand it to you.
22      EXHIBIT NO. 22:  ARTICLE
23      TITLED "LONGITUDINAL
24      ASSOCIATIONS BETWEEN
25      DIFFERENT TYPES OF SCREEN

Page 387

1      USE AND DEPRESSION AND
2      ANXIETY SYMPTOMS IN
3      ADOLESCENTS"
4  BY R. EHLER:
5      Q.  Dr. Goldfield, Exhibit
6  22, this is a 2023 article you co-authored with
7  Mougharbel titled:  "Longitudinal associations
8  between different types of screen use and
9  depression and anxiety symptoms in adolescents."
10      Do you recall referencing this
11  yesterday?
12      A.  This was not the paper I
13  referenced, no.
14      Q.  Okay.  This paper -- in
15  this study, you looked at a longitudinal design
16  study of Canadian high school students.  Do you
17  recall that?
18      A.  Yes.
19      Q.  And you measured five
20  different types of screen use; is that correct?
21      L. SCARCELLO:  Counsel, can
22  the witness.
23      THE WITNESS:  Can I --
24      L SCARCELLO:  Have a minute to
25  look through the document, please.  Thanks.

Page 388

1      THE WITNESS:  Yeah, can I
2  please just have a minute?
3  BY R. EHLER:
4      Q.  Sure.
5      A.  Thanks.  Okay.
6      Q.  And you measured
7  television; right?
8      A.  Um-hum.
9      Q.  Video games; is that
10  right?
11      A.  That's right.
12      Q.  Talking on the phone?
13      A.  Um-hum, yes.
14      Q.  Surfing the internet?
15      A.  Yes.
16      Q.  And then texting,
17  messaging, and e-mailing; correct?
18      A.  Correct.
19      Q.  And your conclusion was
20  that all of these types of screen use were
21  associated with depression/anxiety in this
22  longitudinal study; correct?
23      A.  Correct.
24      Q.  And you actually found
25  that phone calls, talking on the phone, had a

7

Page 389

1  dose-response relationship with anxiety; is that
2  correct?
3          A.  That is correct.
4          Q.  Do you believe, based on
5  this article, that talking on the phone is harmful
6  for adolescents?
7          A.  Again, this is a single
8  study that was done almost five years ago.  So,
9  for context, you have to consider -- and I think I
10  talk about this in the discussion -- the finding
11  relative to the literature.  Does it cohere?  Does
12  it hang together with the rest of the literature?
13  So no, I don't believe talking on the phone is
14  inherently harmful, yet that's what this study
15  found, which I don't believe has been confirmed in
16  many other studies.
17          Q.  And text messaging,
18  e-mail, do you believe that text messaging and
19  e-mail are inherently harmful for adolescents?
20          A.  Not inherently.  I --
21  again, it is one finding of a group of probably
22  hundreds of studies, maybe thousands, that have
23  looked at different forms of screen time.
24          Q.  Okay.  And -- but sitting
25  here today, it's not your view that those are

Page 390

1  harmful; right?
2          A.  It depends on what's
3  being communicated.
4          Q.  Fair enough.
5          A.  Content matters, as we
6  established yesterday.
7          Q.  Great.  Dr. Goldfield, do
8  you have kids?
9          A.  I do.
10          Q.  How old are they?
11          A.  24 and 22.
12          Q.  When -- well, I'll ask
13  now.  Do they have smartphones?
14          A.  They did.
15          Q.  Do they now?
16          A.  I believe so, yes, they
17  do, yeah.
18          Q.  And they did when they
19  were teenagers too?
20          A.  Yes.
21          Q.  What age did they get
22  smartphones?
23          A.  13.
24          Q.  Did they have social
25  media when they were in high school?

Page 391

1          A.  With all due respect, I'm
2  not sure -- I'm here to talk about the literature.
3  How are my kids' social media usage, how is that
4  relevant?
5          Q.  Dr. Goldfield, your
6  counsel can object, but if you could please answer
7  my question.  With all due respect, I'm just
8  asking.
9          A.  Okay.
10          Q.  Did they have social
11  media in high school?
12          A.  Yes.
13          Q.  Did they have Snapchat?
14          A.  Yes.
15          Q.  Instagram?
16          A.  Yes.
17          Q.  TikTok?
18          A.  Yes.
19          Q.  And did they use YouTube?
20          A.  I think so.
21          Q.  You -- different
22  question.  What is the Canadian Centre for Healthy
23  Screen Use?
24          A.  It's a new center that's
25  developed that's supposed to be a very similar --

Page 392

1  has a very similar mandate to the sort of Children
2  and Screens organization, which you may be
3  familiar with in the United States.  So basically
4  just trying to educate the public on, you know,
5  the potential harms of screen use, perhaps how to
6  use it more adaptively in less harmful ways,
7  research dissemination.  We're actually just
8  started and still fleshing out the mandate.
9  There's been one meeting, that was three weeks
10  ago, so it's an evolving organization.
11          Q.  And you're on the
12  advisory board; is that right?
13          A.  That is right.
14          Q.  And so -- and you said
15  it's brand new.  How long have you been on the
16  advisory board?
17          A.  We've only had one
18  meeting, so maybe a month.
19          Q.  Have you been involved in
20  their publications to date?
21          A.  No.
22          EXHIBIT NO. 23:  PRINTOUT
23          OF THE ADVISORY BOARD
24          ABOUT US WEB PAGE OF THE
25          CENTRE FOR HEALTHY SCREEN

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                          July 11, 2025

---

Page 393

1          USE
2    BY R. EHLER:
3          Q.  I've handed you what's
4    been marked as Exhibit 23.  This is a list of
5    advisory board members.  Your photo's on the
6    second page.  Do you see that?
7          A.  I do.
8          EXHIBIT NO. 24:  PRINTOUT
9          OF THE Q&A BANK WEB PAGE
10         OF THE CENTRE FOR HEALTHY
11         SCREEN USE
12   BY R. EHLER:
13         Q.  And I've handed you
14   Exhibit 24.  And I took this from the website for
15   the Canadian Centre for Healthy Screen Use.  And
16   do you see where it says under "Common questions
17   about screen use":
18         "Browse through our list
19         of questions and answers
20         to find the information
21         you are looking for.
22         Answers are
23         evidence-based and
24         developed in
25         collaboration with the

---

Page 394

1         child and youth health
2         professionals on our
3         Advisory Board and
4         Digital Health Task
5         Force."
6    Do you see that?
7         A.  Yes.
8         Q.  So even though this
9    website says that the publications are developed
10   with the advisory board, you haven't had any role
11   in that?
12         A.  No, I got asked really --
13   really, really late.  So I'm the newest member of
14   the advisory board.  So I wasn't on the Digital
15   Health Task Force, so I can't even speak to the
16   degree of rigor in their review, and, you know --
17   so again, I'm new to the organization.
18         Q.  Did you review their
19   website before agreeing to join?
20         A.  I actually did not.  I
21   know the person who invited me, and so I have not
22   read all their disseminations.
23         EXHIBIT NO. 25:  PRINTOUT
24         OF WEB PAGE TITLED "ARE
25         THERE BENEFITS OF SCREEN

---

Page 395

1         USE FOR CHILDREN AND
2         YOUTH?"
3    BY R. EHLER:
4         Q.  I handed you what's been
5    marked Exhibit 25.  This is a question and answer
6    that's on their website and the title is "Are
7    there benefits of screen use for children and
8    youth?"  Do you see that?
9         A.  I do.
10        Q.  If you go about halfway
11   down the page it says:
12        "For school-aged children
13        and youth:
14        A small amount of
15        recreational screen use
16        (1 hour a day) is linked
17        with lower depression
18        risk."
19   That's the first bullet.  Do you see that?
20        A.  I do.
21        Q.  Do you agree with that?
22        A.  Well -- yeah, those are
23   largely based on cross-sectional findings, so it
24   could easily be that moderate people who have
25   moderate -- who use social media moderately are

---

Page 396

1    well-balanced and have good mental health.  But
2    yes, I see it.
3         Q.  Do you agree with it?
4         A.  I think I put in the
5    report that small amounts of screen use and social
6    media use are probably not harmful.  Yes, I agree
7    with the first bullet.
8         Q.  And the second bullet:
9         "Moderate screen use (2
10        to 4 hours a day) is
11        linked with positive
12        effects on well-being,
13        including positive
14        emotions, psychosocial
15        functioning, and a sense
16        of life satisfaction."
17   Do you see that second bullet?
18        A.  I do.
19        Q.  Do you agree with that?
20        A.  No, I don't.  I don't
21   think there is a whole bunch of research to
22   support that.
23        Q.  But you're on the board
24   of this organization, and have you taken any steps
25   to identify what their recommendations are?

---

Arbitration Place

(613) 564-2727                                                      (416) 861-8720

Page 397

1    L. SCARCELLO:  Object to form.
2    THE WITNESS:  This is the
3  first I have seen this, but I will definitely
4  address that with them.
5    BY R. EHLER:
6    Q.  And ask them to take it
7  down?
8    A.  I'm going to show them
9  evidence that this is not true.  I'm not the
10  decision maker of this organization.  Thank you
11  for pointing this out to me.  This is concerning.
12  I'm not on the Digital Task Force.  I did not
13  participate in any of those actions, and I can't
14  control what they put on their website.
15    Q.  You are on the advisory
16  board, though; correct?
17    A.  I am.
18    Q.  And so if we look at this
19  website at the time of trial, that bullet won't be
20  there anymore?
21    L. SCARCELLO:  Objection,
22  counsel.
23    THE WITNESS:  Again, I'm not
24  the decision maker, I don't run this organization.
25  All I can do is voice my concerns, show them

Page 398

1  literature that is inconsistent with that and the
2  potential harm of misinformation.
3    BY R. EHLER:
4    Q.  I didn't see anything on
5  the website for the Centre for Healthy Screen Use
6  that articulates your view that social media
7  platforms are causing harm to children.  That's
8  not -- I suppose you have no idea because you
9  haven't looked at the website; right?
10    L. SCARCELLO:  Object to form.
11    THE WITNESS:  So how -- so I
12  got asked to participate in this organization as
13  an advisory board member.  I participated in a
14  meeting.  I believe it was June 18th.  I was asked
15  sometime in late May.  I read a couple pages of
16  what they gave me, just like basically what the
17  meeting would entail, and then I went on vacation
18  with my kids.
19    So I am brand new to this
20  organization and I am not responsible for anything
21  that they've disseminated.
22    BY R. EHLER:
23    Q.  You can go ahead and set
24  those aside.  Yesterday we briefly spoke about
25  conflicts of interest as it related to your

Page 399

1  academic appointments, and you mentioned that was
2  about industry.  Am I getting the gist of that
3  discussion correct?  What about conflict of
4  interest statements as they relate to publications
5  of scientific studies, is that also about industry
6  involvement, or what's your understanding of
7  conflicts of interest as they relate to
8  disclosures in academic papers?
9    L. SCARCELLO:  Object to form,
10  vague.
11    THE WITNESS:  Well, different
12  journals have different requirements for conflict
13  of interest, but yeah, usually you're -- there is
14  an option or a requirement to declare any
15  potential conflict of interest.
16    BY R. EHLER:
17    Q.  And why do they have
18  those?
19    A.  Just for transparency.
20  So context, I suppose.
21    Q.  And that context is so
22  that the people reading the article have
23  transparency, they know what affiliations you or
24  other authors may have as relevant to the research
25  you're doing and what you're reporting; correct?

Page 400

1    A.  Correct.
2    Q.  So if somebody is being
3  paid by one side of a litigation, that might be
4  the sort of conflict of interest the public would
5  want to know as well; right?
6    L. SCARCELLO:  Object to form.
7    THE WITNESS:  I certainly
8  intend going forward to disclose that I've
9  participated in this litigation.
10    BY R. EHLER:
11    Q.  Is that a yes to my
12  question?
13    L. SCARCELLO:  Object to form.
14    THE WITNESS:  Yes, I plan to
15  do that.
16    BY R. EHLER:
17    Q.  Right, and that's because
18  the public would want to know you're being paid by
19  the Plaintiffs in this litigation; correct?
20    A.  I think they're --
21    L. SCARCELLO:  Objection,
22  form.
23    THE WITNESS:  I think it's
24  part of disclosures of conflicts of interest.
25    BY R. EHLER:

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 11, 2025

Page 401

1          Q.  If you could grab Exhibit
2  7, which should be -- I tried to organize your
3  exhibits this morning.  Are you looking at the
4  Clayborne study, Exhibit 7, Dr. Goldfield?
5          A.  Yes, I am.
6          Q.  This study was published
7  in 2025; correct?
8          A.  Correct.
9          Q.  And that's after you were
10  hired by Plaintiffs in December of 2024; correct?
11          A.  No.  The paper was
12  written and submitted in 2023.
13          Q.  I understand that, but it
14  was published after you were engaged by
15  Plaintiffs; correct?
16          A.  It was in press before I
17  was engaged, which means the proofs already were
18  signed off before I was engaged.
19          Q.  You understand that
20  publications frequently submit corrections and
21  updates and notices of errata; right?
22          L. SCARCELLO:  Object to form.
23          THE WITNESS:  Yes, I'm aware
24  of that.
25          EXHIBIT NO. 26:  PRINTOUT

Page 402

1          FROM THE JOURNAL OF
2          PSYCHIATRIC RESEARCH
3          BY R. EHLER:
4          Q.  I've handed you Exhibit
5  26 which is a printout from the Journal of
6  Psychiatric Research.  That's the journal in which
7  Exhibit 7, the Clayborne study, was published;
8  correct?
9          A.  Correct.
10          Q.  And if you could please
11  turn to page 5, underneath the heading
12  "Declaration of competing interests" --
13          L. SCARCELLO:  Counsel, can he
14  have a second to go through the whole document,
15  please.  I would object to this document to the
16  extent that it appears not all of the content --
17  it appears that some of the content is cut off in
18  the header on each page of this.
19          BY R. EHLER:
20          Q.  Are you with me on page
21  5, Dr. Goldfield?
22          A.  I am.
23          Q.  Under the heading
24  "Declaration of competing interests," do you see
25  that it says:

Page 403

1          "All authors must
2          disclose any financial
3          and personal
4          relationships with other
5          people or organizations
6          that could
7          inappropriately influence
8          or bias their work.
9          Examples of potential
10          competing interests
11          include --"
12  And then the fifth bullet down is:
13          "Paid expert testimony."
14  Do you see that?
15          L. SCARCELLO:  Counsel, I
16  would just object to this line of questioning
17  about this considering that this study was
18  performed and written up and submitted and
19  published online before he was engaged by counsel.
20          R. EHLER:  Counsel, you're
21  testifying.
22          L. SCARCELLO:  Subject to
23  that, he can answer.
24          R. EHLER:  You're coaching
25  your witness and you're testifying.

Page 404

1          BY R. EHLER:
2          Q.  Do you see where it says
3  "Paid expert testimony"?
4          A.  She's not coaching me.  I
5  said the exact same thing.
6          Q.  Right.
7          A.  This was written and
8  submitted before I was engaged.
9          Q.  Great.  Not my question.
10  Do you see the bullet that says "Paid expert
11  testimony"?
12          A.  Yes.
13          Q.  Do you understand the
14  Journal of Psychiatric Research cares about
15  whether the authors have received paid expert
16  testimony in connection with publications in their
17  journal?
18          L. SCARCELLO:  Object to form.
19          THE WITNESS:  Again, yes, I
20  understand that, but I was not engaged during
21  this -- when this paper was written.
22          BY R. EHLER:
23          Q.  Right, but you read these
24  requirements and made a declaration of your
25  interest at the time; correct?

Page 405

1        A.  Yes, but at the time I
2   wasn't engaged.
3        Q.  And you take those
4   obligations seriously; correct?
5        A.  Correct.
6        Q.  And you have not taken
7   any steps since this article came out to let the
8   Journal of Psychiatric Research know about your
9   current engagement for expert testimony; right?
10       L. SCARCELLO:  Object to form,
11  argumentative.
12       THE WITNESS:  I plan to.
13       BY R. EHLER:
14       Q.  And so they'll issue an
15  errata or a correction?
16       L. SCARCELLO:  Object to form,
17  calls for speculation.
18       THE WITNESS:  I'm not sure how
19  they'll handle it.
20       BY R. EHLER:
21       Q.  Do you plan to do the
22  same for the 2015 Davis and Goldfield article
23  "Limiting media social use decreases depression,
24  anxiety and fear of missing out in youth with
25  emotional distress: A randomized controlled

Page 406

1   trial"?
2        L. SCARCELLO:  Object to form.
3        THE WITNESS:  So I'm a little
4   unsure where you're going.  So these studies were
5   done and written before my engagement.  So this
6   process -- so how -- I'm unclear of how far back
7   you would like me to go and add all my --
8        BY R. EHLER:
9        Q.  I just asked you about
10  one other one, the 2025 Davis and Goldfield one.
11  Do you plan to notify the journal -- American
12  Psychological Association Psychology of Popular
13  Media journal?
14       L. SCARCELLO:  Object to form,
15  misstates the evidence.  This article was
16  published --
17       THE WITNESS:  It was published
18  before.
19       L. SCARCELLO:  Excuse me,
20  Davis and Goldfield was published in 2024.  That
21  misstates the evidence.
22       BY R. EHLER:
23       Q.  Is that a no or a yes?
24       A.  No.  It was published
25  before my engagement here.

Page 407

1        Q.  Yesterday you mentioned
2   the Burnell 2025 meta-analysis of experiments as a
3   new study that you thought was very important to
4   this area?
5        A.  True.
6        Q.  Do you know if
7   Dr. Burnell is engaged by Plaintiffs in this
8   litigation?
9        A.  No idea.
10       Q.  Did you look at the
11  conflict of interest for that study?
12       A.  No.
13       Q.  So would it make any bit
14  of difference to your claims if she was?
15       L. SCARCELLO:  Object to form.
16       THE WITNESS:  The review, in
17  my opinion, is by far the most rigorous in -- it
18  was published in a reputable journal, and I think
19  it's widely considered to be the best one out
20  there.  So no, it passed peer-review standards.
21       BY R. EHLER:
22       Q.  Okay.  So you don't care
23  whether or not she was engaged by one side of this
24  litigation when she authored that study?
25       L. SCARCELLO:  Object to form,

Page 408

1   argumentative.
2        THE WITNESS:  I try to base my
3   opinions on the data.
4        BY R. EHLER:
5        Q.  So that's a no?
6        A.  I found it interesting --
7   my sense is she might be for -- expert for the
8   Defendants?
9        Q.  I ask questions, you
10  answer them, Dr. Goldfield.
11       A.  What I found interesting
12  in that paper was even though she shows widespread
13  benefits -- psychological benefits of reducing
14  social media, that she qualifies it to some
15  degree.  So I did have to wonder about potential
16  personal biases, but yet her data are -- speak for
17  themselves, so I still stand by it as a really
18  solid meta-analysis.
19       Q.  So she might be spinning
20  her characterization of her results because of her
21  paid expert work; that's what your hypothesizing?
22       L. SCARCELLO:  Object to form.
23       THE WITNESS:  I'm saying the
24  thought crossed my mind, but --
25       BY R. EHLER:

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 11, 2025

Page 409

1          Q.   Would it change your view
2    if you knew she was an expert for the Plaintiffs?
3          L. SCARCELLO:  Object to form.
4          THE WITNESS:  I think her data
5    speak for itself.
6          BY R. EHLER:
7          Q.   Dr. Goldfield, in your
8    report, you discuss particular opinions as they
9    relate to vulnerable youth who may have
10   biological, predisposed, or genetic traits that
11   make them more at risk for the harms that you
12   identify here; correct?
13         L. SCARCELLO:  Object to form.
14         BY R. EHLER:
15         Q.   Those biological, genetic
16   factors, those are going to predate any exposure
17   to social media; right?
18         A.   Not necessarily.
19   Genetics, of course, you're born with your
20   genetics, although environment can, through a
21   process called epigenetics, alter genes.  They can
22   be turned on.  So when I talk about genetics, I'm
23   talking about susceptibility.  So there are
24   genetic susceptibility for all kinds of addictive
25   behaviors and psychiatric disorders.

Page 410

1          Q.   And so it's a risk
2    factor; right?
3          A.   Yes.
4          Q.   And is it your view that
5    those factors, genetic and biological, make more
6    vulnerable youth more predisposed to problematic
7    social media use or that the problematic social
8    media use may actually, as you said, contribute
9    to -- what's your opinion on directionality?
10         L. SCARCELLO:  Object to form.
11         THE WITNESS:  So I cite
12   evidence for both, that there is a strong genetic
13   basis for addictive behavior, addiction.  There
14   are also personality factors that predispose you
15   to addiction and even suicide.  And that's
16   impulsivity, poor emotion regulation.  There is
17   temperamental factors.
18         The point of this whole
19   chapter was to highlight that people are just
20   studying these relationships between social media
21   and mental health and harm on average, right,
22   pooling everything together.  Nobody has really
23   studied what happens if you have multiple risk
24   factors to this exposure of social media?  That's
25   my point is I believe the risk goes up

Page 411

1    exponentially if you add in genetic
2    susceptibility, you add in you come from a lower
3    socio-economic status family, you're kind of
4    temperamentally disposed to, you know,
5    impulsivity, beyond what's obviously part of child
6    development, they don't have cognitive control and
7    the brain is still developing and I talk about
8    those neurobiological vulnerabilities.  So it
9    takes the cumulative risk --
10         BY R. EHLER:
11         Q.   Okay.  Understood.
12         A.   -- which I believe
13   when -- when you look at the broad literature of
14   psychology and addiction and psychiatric
15   illnesses, you see that in almost all instances
16   with multiple risk factors, there's greater harm.
17         Q.   You would agree with me
18   that directionality as between problematic social
19   media use and these genetic and biological factors
20   is difficult to establish; right?
21         L. SCARCELLO:  Object to form.
22         THE WITNESS:  It depends on
23   the research design.  If it's a longitudinal
24   study, that certainly would establish temporality.
25         EXHIBIT NO. 27:  ARTICLE

Page 412

1                TITLED "SOCIAL MEDIA USE
2                AND PARENT-CHILD
3                RELATIONSHIP: A
4                CROSS-SECTIONAL STUDY OF
5                ADOLESCENTS"
6          BY R. EHLER:
7          Q.   You have Exhibit 27,
8    which is a 2019 article you co-authored with
9    Sampasa-Kanyinga --
10         A.   Um-hum.
11         Q.   -- titled "Social media
12   use and parent-child relationship: A
13   cross-sectional study of adolescents"?
14         A.   Correct.
15         Q.   And in this paper you say
16   that:
17              " Directionality is
18              difficult to establish as
19              it may be that already
20              vulnerable youth are more
21              prone to problematic
22              social media use."
23              (As read)
24         L. SCARCELLO:  Object to form.
25   Counsel, can you give him a second to please look

Page 413

1    through the document, and if you're going to ask
2    him about specific statements in it, can you point
3    him to them.
4              THE WITNESS:  Okay.
5    BY R. EHLER:
6         Q.   And I'm on page 800 for
7    the statement that I just quoted.  Is that true,
8    that directionality is difficult to establish as
9    it may be that already more vulnerable youth --
10   excuse me, I misspoke.
11             "Directionality is
12             difficult to establish as
13             it may be that already
14             vulnerable youth are more
15             prone to problematic
16             media use."
17   Is that true?
18             L. SCARCELLO:  Object to form.
19             THE WITNESS:  This is a
20   cross-sectional study, so the statements are made
21   in the context of the research design.
22   Cross-sectional studies -- single studies don't
23   get at causality.  So that statement in this
24   context is accurate.
25             BY R. EHLER:

Page 414

1         Q.   Is it accurate beyond
2    this context?
3         A.   In cross-sectional
4    designs, in single studies, it's difficult to
5    establish temporality.  When cross-sectional
6    designs show the same pattern of findings as
7    longitudinal ones, then it bolsters the
8    interpretation of temporality even in those
9    cross-sectional studies.
10        Q.   And so your view is that
11   this statement is purely about methodology and is
12   not a broader statement about the difficulty of
13   drawing that conclusion?
14             L. SCARCELLO:  Object to form.
15             THE WITNESS:  I'm not sure I
16   understand your question.  I've -- I've documented
17   in my report that there are individual differences
18   in susceptibility which would mean individual
19   levels of risk in susceptibility developing
20   problematic social media use.  Not everybody
21   develops it.
22             BY R. EHLER:
23        Q.   And those same levels of
24   risk and susceptibility are also risk factors for
25   the mental health harms that you've articulated;

Page 415

1    right?
2              L. SCARCELLO:  Object to form.
3              THE WITNESS:  Those factors
4    should be taken into account and likely play a
5    role, but un -- in the totality of evidence -- and
6    I'm drawing mostly on the Ahmed review that looked
7    at 10 longitudinal studies -- clearly rule out
8    baseline mental health as a confounding variable.
9    So, in other words, they rule out the reverse
10   causation hypothesis or mental health
11   vulnerabilities, if you want.
12             BY R. EHLER:
13        Q.   So your view is that
14   Ahmed rules out that pre-existing biological and
15   genetic vulnerabilities are what are causing the
16   later development of mental health disorders?
17        A.   No.  What they do rule
18   out is that mental health issues at baseline do
19   not lead to increased social media use, but social
20   media use, high social media use, leads to
21   increased depression.  So that rules out reverse
22   causation.  Those studies generally don't take
23   into account genetic vulnerabilities.
24        Q.   I think I understand.  So
25   the genetic vulnerabilities in other pre-existing

Page 416

1    factors could be a variable that's relevant to the
2    ultimate mental health outcomes; is that right?
3              L. SCARCELLO:  Object to form.
4              THE WITNESS:  I think if -- I
5    think if you have certain genetics that are
6    associated with addiction and risk, yes, there
7    is -- they're -- extrapolating from the larger
8    body of addiction research, you'll be at higher
9    risk.
10             BY R. EHLER:
11        Q.   And so the research can't
12   say for certain that the groups of individuals in
13   the studies underlying Ahmed's meta-analysis would
14   not have still developed those mental health
15   outcomes were it not for the social media use;
16   right?
17             L. SCARCELLO:  Object to form.
18             THE WITNESS:  These studies
19   are thousands of people, so the chance that a
20   genetic factor would consistently bias one way or
21   the other seems remote, extraordinarily unlikely I
22   would even say.
23             BY R. EHLER:
24        Q.   Okay.  So possible but in
25   your view remote and unlikely?

Page 417

1      A.  Yes.
2      Q.  Okay.
3      A.  And when I -- when I say
4  that, I'm talking about -- it sounds like what
5  you're saying, if I understand you correctly, that
6  genetic factors may play a role in increasing
7  susceptibility or decreasing susceptibility.
8      Q.  I was -- no.  I was
9  actually trying to articulate that genetic and
10  other factors may increase risk for the mental
11  health outcomes, irrespective of their social
12  media use.  Do you agree with that statement?
13      L. SCARCELLO:  Object to form.
14      THE WITNESS:  Again, I think
15  that would probably get all averaged out, study
16  after study, with thousands of kids.  People
17  don't -- there can't be a response bias based on
18  genetics.  People don't know the genes that they
19  carry.
20      BY R. EHLER:
21      Q.  Exactly.  And my question
22  is not about response bias.  It is about
23  pre-existing genetic and biological factors that
24  could actually be a third confounding variable
25  that leads to the mental health outcomes like

Page 418

1  anxiety, depression, eating disorders.
2      A.  Again, that seems highly
3  unlikely because the same pattern of findings keep
4  occurring over and over and over.
5      Q.  But, just engage with me
6  for a minute, if those same risk factors are in
7  your view making them more susceptible to
8  problematic social media use, and we know from all
9  of the decades of literature they make them more
10  susceptible for negative mental health outcomes
11  like anxiety and depression and addiction in
12  general, isn't it possible that the pre-existing
13  genetic and other risk factors are what are
14  driving the outcome?
15      L. SCARCELLO:  Object to form.
16      THE WITNESS:  We're trying to
17  establish causality here, and you're talking about
18  a very specific piece of my report.  Experiments
19  don't manipulate genetics.  They manipulate the
20  exposure variable, which is social media use.  So
21  whether genetics are playing a role, those
22  experiments establish that when you reduce social
23  media use, mental health improves, regardless of
24  genetics.
25      BY R. EHLER:

Page 419

1      Q.  I wasn't talking about
2  experiments.  I was talking about the longitudinal
3  studies.  And as the longitudinal studies, it's
4  possible that genetics are a third confounding
5  factor that's impacting their susceptibility to
6  problematic social media use and the outcomes;
7  right?
8      L. SCARCELLO:  Object to form.
9      THE WITNESS:  I have never
10  actually seen that written, that genetics could
11  be -- I mean, it -- I'm not disputing it, but I've
12  never seen a study, unless it's a behavioral
13  genetic study, the few that I've shown, I've never
14  seen a study say:  This study has a limitation
15  because we didn't account for genetic
16  susceptibility.  That is way above and beyond the
17  scientific standard in longitudinal studies.
18      BY R. EHLER:
19      Q.  I -- that's fine.  I'm
20  just trying to understand that it -- because it is
21  a factor.  We know genetics are a factor for
22  mental health outcomes and you're articulating
23  they're a factor for problematic social media use.
24  It could be the third variable that's explaining
25  both; right?  That's feasible?

Page 420

1      L. SCARCELLO:  Object to form,
2  asked and answered.
3      THE WITNESS:  I don't know how
4  best to answer that question.  I would say highly
5  unlikely.
6      BY R. EHLER:
7      Q.  And that's based on the
8  experimental studies; right?
9      A.  It's based on the
10  totality of the evidence.
11      Q.  You mentioned yesterday
12  an article recently published by Xiao in 2025;
13  right?
14      A.  Yes.  Can I please have a
15  minute to refamiliarize myself with it?  Okay.
16      Q.  And what's your view of
17  what this article establishes?
18      A.  So a study is examining
19  addictive screen use trajectories in association
20  predicting suicidal ideation and behaviors and
21  other mental health outcomes.
22      Q.  And what's your view of
23  what it establishes in your view?
24      L. SCARCELLO:  Object to form.
25      THE WITNESS:  I believe it

22STCV21355
DEPOSITION OF GARY GOLDFIELD                       July 11, 2025

Page 421

1  establishes temporality.
2          L. SCARCELLO:  Counsel, you
3  haven't identified the exhibit, just so you're
4  aware.
5          R. EHLER:  Thank you.  This is
6  Exhibit 28, an article by Xiao published in 2025
7  titled "Addictive Screen Use Trajectories and
8  Suicidal Behaviors, Suicidal Ideation, and Mental
9  Health in US Youth."
10         EXHIBIT NO. 28:  ARTICLE
11         BY XIAO PUBLISHED IN 2025
12         TITLED "ADDICTIVE SCREEN
13         USE TRAJECTORIES AND
14         SUICIDAL BEHAVIORS,
15         SUICIDAL IDEATION, AND
16         MENTAL HEALTH IN US
17         YOUTH"
18  BY R. EHLER:
19         Q.  Do you think it
20  establishes causation?
21         A.  I think research designs,
22  experimental studies get more at causation.  But,
23  again, when the same patterns findings show up
24  across a bunch of research designs, it bolsters
25  the confidence in causality.

Page 422

1         Q.  But you agree with me
2  that this article itself does not establish
3  causality; right?
4         L. SCARCELLO:  Object to form.
5         THE WITNESS:  It establishes
6  temporality.
7  BY R. EHLER:
8         Q.  Right.  And when the
9  authors of this article say that the observational
10  nature of this study precludes establishing that
11  addictive use trajectories cause the outcome
12  studied, you agree with that; right?
13         A.  In the context of a
14  single study that is based on the data from one
15  study and this research design, I think that's a
16  reasonable conclusion.
17         Q.  And this study was not
18  also based on self-report data; right?
19         A.  Yes, it was.
20         Q.  That's another limitation
21  of the study?
22         A.  Self-report is -- so many
23  publications have come out of this study.  And
24  again, at the population level, and there are
25  thousands of kids here, self-report is a validated

Page 423

1  measure of social media.  And there is no
2  objective measure of suicide.  That's self-report
3  too, unless it's completed.
4         Q.  So do you believe --
5  sorry.  Do you disagree with the authors of this
6  study that its reliance on self-report data is a
7  limitation and may introduce recall and social
8  desirability biases?
9         L. SCARCELLO:  Object to form.
10         THE WITNESS:  I agree that all
11  studies have limitations and it behooves authors
12  to cite these limitations.  Journal reviewers want
13  it.  I don't think it invalidates the temporality,
14  directionality of the findings.
15         BY R. EHLER:
16         Q.  It doesn't concern you?
17         L. SCARCELLO:  Object to form,
18  misstates the testimony.
19         THE WITNESS:  It doesn't --
20  it's a standard limitation of survey research that
21  is in virtually every publication, but that
22  doesn't invalidate the finding.  It simply means
23  that there are limitations to the study, which all
24  studies have.
25         BY R. EHLER:

Page 424

1         Q.  So if the authors of this
2  study believed that objective measures of social
3  media use, like digital monitoring, would be more
4  reliable, would you disagree with them?
5         L. SCARCELLO:  Object to form,
6  asked and answered.
7         THE WITNESS:  You know, I read
8  a study last night -- I actually read a few
9  studies that found the relationship between
10  objective monitoring and self-report and mental
11  health are pretty comparable.
12         BY R. EHLER:
13         Q.  So that's a yes, you
14  agree with the authors of this article?
15         L. SCARCELLO:  Object to form.
16         BY R. EHLER:
17         Q.  Sorry, you disagree with
18  the authors in this article?  I misspoke.
19         A.  No, I --
20         L. SCARCELLO:  Object to form.
21         THE WITNESS:  In the context
22  of a single study, I think noting the study
23  limitations is reasonable.  But again, it doesn't
24  invalidate the study.  It doesn't mean -- the
25  study is published in one of the best medical

22STCV21355
DEPOSITION OF GARY GOLDFIELD

July 11, 2025

Page 425

1  journals in the world. A journal -- so the
2  statistics are state-of-the-art, a cluster
3  analysis. So -- and it establishes -- clearly
4  establishes temporality. I think it's a great
5  study.
6          BY R. EHLER:
7          Q.  And if the article's
8  authors believed another limitation is that it
9  does not account for psychosocial and behavioral
10  factors such as bullying, adverse childhood
11  experiences, parental monitoring, sleep
12  disturbances, stress, social isolation, social
13  detriments of health like neighborhood and school
14  contexts, do you think those are not limitations
15  that have any chance of altering the outcomes of
16  this study? Have they been accounted for?
17          L. SCARCELLO:  Object to form.
18          THE WITNESS:  The Niigata
19  paper accounts for those and found the exact same
20  thing with depression. So again, when you look at
21  the pattern of findings -- and I'm talking about
22  this study but I'm trying to contextualize it.
23  The Ahmed 10 longitudinal studies that ruled out
24  reverse causation. When you see the same pattern
25  with really, really well-controlled studies that

Page 426

1  account for parental factors and child adversity
2  and you get the same effect size and the same
3  directionality and the same outcome as
4  less-well-controlled studies, to me that
5  highlights those potential confounders are not
6  influencing mental health. They could in theory,
7  but they don't appear to be because the pattern of
8  findings wouldn't be the same, they would be
9  different.
10          BY R. EHLER:
11          Q.  And so your view is the
12  Niigata study controls for each of these factors?
13          L. SCARCELLO:  Object to form.
14          THE WITNESS:  Based on my
15  recollection, the Niigata does control for a lot
16  of family factors and child adversity.
17          BY R. EHLER:
18          Q.  Did it control for
19  bullying?
20          L. SCARCELLO:  Object to form.
21  Counsel, if you want to ask him specifics about a
22  study, I would like you to put it in front of him,
23  please.
24          THE WITNESS:  I don't
25  understand why they would want to control for

Page 427

1  bullying. Cyberbullying, as we established
2  yesterday, is in the causal pathway of harm of
3  social media use.
4          BY R. EHLER:
5          Q.  And you think that social
6  media causes bullying?
7          L. SCARCELLO:  Object to form,
8  misstates the testimony.
9          THE WITNESS:  I never said it
10  causes. I said it's -- it's a contributing factor
11  and one of the mechanisms in how social media can
12  lead to harm, one of many outlined in figure 3 of
13  my report.
14          BY R. EHLER:
15          Q.  If the authors of this
16  article, like Dr. Xiao, told "The New York Times"
17  that the study did not establish that addictive
18  use caused suicide behaviors at age 14, would you
19  disagree with that statement?
20          L. SCARCELLO:  Object to form.
21          THE WITNESS:  I would have to
22  look at the context of this media interview.
23          EXHIBIT NO. 29:  "THE NEW
24          YORK TIMES" ARTICLE
25          TITLED "REAL RISK TO

Page 428

1          YOUTH MENTAL HEALTH IS
2          'ADDICTIVE USE,' NOT
3          SCREEN TIME ALONE, STUDY
4          FINDS"
5          BY R. EHLER:
6          Q.  Dr. Goldfield, I'm
7  handing you Exhibit 29. This is an article in
8  "The New York Times" regarding the Xiao study. Do
9  you see that?
10          A.  Yes.
11          Q.  And on the second page at
12  the bottom, Dr. Xiao tells "The New York Times"
13  that:
14          "Because of its design,
15          the study did not
16          establish that addictive
17          use caused suicidal
18          behaviors at age 14 --"
19          A.  The second part of the
20  sentence shows it establishes directionality.
21          Q.  That's the temporality
22  point; right?
23          A.  Yes.
24          Q.  Okay. But you don't
25  disagree with the first half of the sentence;

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                July 11, 2025

Page 429

1  right?
2           L. SCARCELLO:  Object to form.
3           THE WITNESS:  No, I don't
4  disagree with the first part.  So I would --
5  again, I would like to add and contextualize my
6  comment, and I've made this comment several times.
7  No one study, even the best randomized controlled
8  trial in a media publication will use the word
9  "definitively caused."  Academics are trained to
10 be uber-conservative in their language.  So that
11 doesn't mean it's not causing it.  It just means
12 we have to temper our conclusions.
13          When you look at hundreds of
14 papers or 30 experiments that all show the same
15 thing -- and again, I go back to the hierarchy of
16 evidence, randomized controlled trials,
17 meta-analyses of those, that's the highest quality
18 of evidence, then you can be more confident in
19 using the word "cause" or "contributing cause" or
20 beyond -- certainly causal beyond a medical degree
21 of reasonable certainty.  So the fact that they
22 didn't based on this single study doesn't mean
23 it's not causal.  It just means they're being very
24 conservative in their interpretation.
25          R. EHLER:  I'll move to strike

Page 430

1  everything after "so I would."
2           L. SCARCELLO:  We oppose that.
3  It was responsive.
4           BY R. EHLER:
5      Q.  Dr. Goldfield, of the 44
6  meta-analyses that you reviewed, did any of those
7  studies reach the conclusion that social media
8  platforms cause negative mental health outcomes?
9      A.  Many of the experiments
10 use the word "causal relationships," "causal
11 associations," so they mention the word "cause,"
12 so yes, I would say they do.  But again, those are
13 taken in context of whatever the studies were
14 reviewed.  I've reviewed neuroscience -- I've
15 reviewed hundreds of papers.  In that context,
16 when you're getting the same signal from a bunch
17 of research designs and millions of kids, I think
18 it bolsters the causal interpretations and
19 inferences that can be drawn.
20     Q.  You mentioned
21 experimental studies so -- and the hierarchy of
22 evidence.  So just so we're clear, none of the
23 observational studies, longitudinal or
24 cross-sectional, in your recollection, reach the
25 conclusion that social media platforms causes

Page 431

1  negative mental health outcomes; correct?
2      A.  They likely -- again, in
3  each publication, they likely do not use that
4  language.
5      Q.  And as we discussed
6  yesterday, in experimental studies, those are
7  limited to the -- those studies are not
8  generalizable to the rest of the population
9  because they're experiments that are -- can only
10 discuss the control in that context of the sample
11 of the experiment; right?
12          L. SCARCELLO:  Object to form,
13 misstates testimony.
14          THE WITNESS:  Experimental
15 studies are proof of concept to arrive at
16 causality.  They're not designed to be
17 representative of the population.  They're
18 designed to answer the question what happens when
19 we reduce social media use?
20          BY R. EHLER:
21     Q.  Dr. Goldfield, do you
22 have a Snapchat account?
23     A.  I don't believe so.
24     Q.  So you've never used
25 Snapchat?

Page 432

1      A.  No.
2      Q.  So then you've never --
3  your familiarity with Snapchat's features is based
4  on the academic literature and -- is that right?
5           L. SCARCELLO:  Object to form.
6           THE WITNESS:  Partly the
7  academic literature and the internal documents
8  that I've been exposed to.
9           BY R. EHLER:
10     Q.  Got it.  You reviewed
11 documents.  You didn't speak to anybody who worked
12 at Snapchat; correct?
13     A.  Correct.
14     Q.  And you didn't speak to
15 any software engineers or app designers in the
16 course of your work on this case; right?
17     A.  My work was not about the
18 mechanics or programming of the features, it was
19 more about the impact of the features, how it
20 generates harmful content, all the mechanisms
21 involved, neuro, biological, and behavioral, how
22 it could lead -- influence mental health.
23     Q.  So that's a no?
24     A.  That's a no.
25     Q.  And how much time did you

Page 433

1  spend specifically learning about Snapchat
2  features and how Snapchat works in order to
3  provide your opinions in this case?
4           L. SCARCELLO:  Object to form.
5           THE WITNESS:  Again, most of
6  it was based on my reading and talking with
7  people, talking with teens, talking with study
8  participants, talking with people I work with who
9  use it.
10          R. EHLER:  I'll move to strike
11  as non-responsive.
12          BY R. EHLER:
13          Q.  My question was how much
14  time did you spend specifically learning about
15  Snapchat features and how Snapchat works in order
16  to provide your opinions for this case?
17          L. SCARCELLO:  Object to form.
18          THE WITNESS:  I have not
19  tracked how much time I spent reading Snap-related
20  materials.  That's a pretty granular type of
21  process that I did not engage in.
22          BY R. EHLER:
23          Q.  So you don't have
24  personal familiarity with what the Snapchat app
25  looks like when you open it; right?

Page 434

1           L. SCARCELLO:  Object to form,
2  misstates testimony.
3           THE WITNESS:  My kids have
4  shown it to me.
5           BY R. EHLER:
6           Q.  Do you know -- have a
7  sense of what the tabs are, what the functions
8  are?
9           L. SCARCELLO:  Object to form.
10          THE WITNESS:  A few -- some.
11          BY R. EHLER:
12          Q.  Like, what are you
13  familiar with?
14          A.  Like the face page, my
15  chat, there was -- you can save things privately
16  to an account, share stuff.  I'm familiar with the
17  ephemerality nature of them and just stuff that
18  I've been exposed to through my kids.
19          Q.  And you're aware that it
20  opens to a camera; correct?
21          L. SCARCELLO:  Object to form.
22          THE WITNESS:  I think so, but
23  I'm not sure.
24          BY R. EHLER:
25          Q.  So do you have any

Page 435

1  reason -- do you know why it opens to a camera?
2           A.  It's a photo-based type
3  of social media.  It's more visual than messaging,
4  although you can message as well.
5           Q.  But the photos are to
6  send messages; right?  Snaps?
7           A.  Yeah.
8           Q.  Do you know how "Streaks"
9  works?
10          A.  I do.
11          Q.  What's your understanding
12  of "Streaks"?
13          A.  So "Streaks" are a form
14  of gamification that compel children to send each
15  other messages every day to maintain a streak.
16          Q.  And do you understand
17  that users choose to initiate and pursue
18  "Streaks"?
19          A.  I understand that those
20  gamification features promote more regular use to
21  capitalize on not wanting to lose the streak, to
22  increase motivation to use the app and maintain
23  the streak.
24          R. EHLER:  I'll move to strike
25  that as non-responsive.

Page 436

1           BY R. EHLER:
2           Q.  I'm talking about the
3  initiation of a streak, that's a choice the user
4  makes.  Do you understand that or no?
5           A.  Yes, I understand that.
6           Q.  Are you aware of other
7  applications that use the same concept of
8  "Streaks"?
9           L. SCARCELLO:  Object to form.
10          THE WITNESS:  What do you mean
11  by "concepts"?
12          BY R. EHLER:
13          Q.  I'll give you some
14  examples.  Do you know the app Duolingo for
15  language learning?
16          A.  Um-hum.
17          Q.  Are you aware that
18  Duolingo uses "Streaks"?
19          A.  I've heard of it.
20          Q.  Is that a yes?  You have
21  never experienced it, you've just heard of it?
22          A.  Yes.
23          Q.  There is a meditation app
24  called Headspace, are you aware of that?
25          A.  Yes, I know Headspace.

22STCV21355
DEPOSITION OF GARY GOLDFIELD

July 11, 2025

Page 437

1    Q.  Do you know that
2  Headspace uses "Streaks"?
3    A.  Um-hum.
4    Q.  Yes?
5    A.  Yes.
6    Q.  Are you aware of other
7  sorts of fitness apps that may use the concept of
8  "Streaks" to keep people engaged in the fitness
9  program?
10    A.  Yes.
11    Q.  In your understanding of
12  Duolingo, Headspace, similar fitness apps that all
13  use the same concept of "Streaks," are the
14  "Streaks" in those contexts -- do you view them as
15  harmful?
16    A.  I view them as positively
17  reinforcing, which I believe is the intent.  So
18  positively reinforcing is getting feedback that is
19  going to increase the likelihood of a behavior.
20  So in other words, it's going to increase
21  motivation to keep doing it.  That's the intent.
22    R. EHLER:  I'll move to strike
23  as non-responsive.
24  BY R. EHLER:
25    Q.  My question is whether

Page 438

1  you view "Streaks" in the context of different
2  applications, Duolingo, Headspace, fitness apps,
3  as harmful to the people who use those?
4    L. SCARCELLO:  Object to form.
5    THE WITNESS:  I guess it -- it
6  depends on what you mean by "harmful."  There's --
7  short term, probably not.  It depends what
8  direction they're headed.  If it's positively
9  reinforcing healthy behaviors like physical
10  activity, no, of course not, it's not harmful.  If
11  it is reinforcing behaviors that are not healthy,
12  then it is harmful.
13  BY R. EHLER:
14    Q.  And so just to make sure
15  I understand, the "Streaks" themselves and that
16  positive reinforcement, there is nothing
17  inherently harmful about that; right?
18    L. SCARCELLO:  Object to form.
19    THE WITNESS:  Again, it would
20  depend on the context.
21  BY R. EHLER:
22    Q.  Right.  So what I'm
23  trying to distinguish is "Streaks" as they relate
24  to Snapchat and "Streaks" as they relate to
25  Duolingo, Headspace, fitness apps, and is your

Page 439

1  opinion that the "Streaks," the positive
2  reinforcement is inherently harmful or not?
3    L. SCARCELLO:  Object to form,
4  asked and answered.
5    THE WITNESS:  Again, it
6  depends on the context.  If you're reinforcing
7  learning and education, that can't be harmful,
8  unless you're spending copious amounts on Duolingo
9  and it's displacing other things that need to get
10  done.  Sending each other hundreds of Snapchats a
11  day to -- or feeling compelled to do that just to
12  keep your streak alive -- some of these kids send
13  blank screens just to keep the streak alive.  How
14  is that constructive?
15    R. EHLER:  I'll move to strike
16  and ask my question again.
17  BY R. EHLER:
18    Q.  Is the streak itself
19  inherently harmful or is it really just about the
20  behavior on the end?
21    L. SCARCELLO:  Object to form,
22  asked and answered.
23    THE WITNESS:  Again, you're
24  asking me about a process.  The process is
25  capitalizing on developmental vulnerabilities

Page 440

1  using social-reinforcement principles, positive
2  reinforcement, it depends on the context.  Let's
3  change the context to addictive behavior.  Let's
4  say there were "Streaks" about how many times you
5  can drink every day.  That would be harmful to try
6  to maintain that streak.  So my answer is it
7  depends.
8  BY R. EHLER:
9    Q.  Got it.  And I actually
10  think that we agree on this.  I'm just trying to
11  make sure.  The positive reinforcement is not what
12  is harmful, the streak is not what's harmful, it
13  is what is happening on the other side of it.  So
14  if it's learning, it's good, subject to your
15  caveats; and if it's something that like alcohol
16  or addictive substances, it's bad.  Right?  But
17  the streak itself is not inherently harmful;
18  right?
19    L. SCARCELLO:  Object to form,
20  asked and answered.
21    THE WITNESS:  Again, you have
22  to contextualize it.  I don't know how better to
23  answer than the answers I've given now.  I think
24  it depends.
25  BY R. EHLER:

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                                July 11, 2025

Page 441

1      Q.   Okay.  But you're not
2  willing to admit that the positive reinforcement
3  of the streak itself is not inherently harmful,
4  without the context?
5          L. SCARCELLO:  Object to form.
6  Sorry, object to form.
7          THE WITNESS:  I'd have to look
8  at context.  The context of Snapchats are
9  fundamentally different than the context of
10  Duolingo and other educational apps.
11          BY R. EHLER:
12      Q.   So that's a no to my
13  question?
14          L. SCARCELLO:  Object to form,
15  asked and answered.
16          BY R. EHLER:
17      Q.   Is that a no?
18          L. SCARCELLO:  Object to form.
19          THE WITNESS:  I'd have to look
20  at the context again.
21          BY R. EHLER:
22      Q.   Okay.  So just to be
23  clear to my question that you cannot admit that
24  positive reinforcement of "Streaks" in of itself
25  is not inherently harmful without the context?

Page 442

1          L. SCARCELLO:  Objection,
2  argumentative.
3          THE WITNESS:  I think
4  reinforcement depends on the behavior and the
5  context in which it occurs.
6          BY R. EHLER:
7      Q.   Do you know what
8  "Spotlight" is?
9      A.   I think it's highlighting
10  personal experiences, events, pictures.
11      Q.   In the context of
12  Snapchat, that's your understanding?
13      A.   Yeah.
14      Q.   Do you know if Snapchat
15  uses "likes"?
16      A.   I think there is a form
17  of feedback.
18      Q.   Do you know whether
19  they're publicly available -- or publicly visible,
20  excuse me?
21          L. SCARCELLO:  Object to form.
22          THE WITNESS:  They're within
23  the people you're communicating with, but, you
24  mean like to the -- to everybody?  My
25  understanding is they're not publicly available.

Page 443

1          BY R. EHLER:
2      Q.   Or visible to anybody
3  other than the person whose Snapchat account it
4  is; right?
5          L. SCARCELLO:  Object to form.
6          THE WITNESS:  Well, there
7  could be groups.  I mean, sometimes you have --
8  you can have groups, it's not just individuals;
9  right?
10          BY R. EHLER:
11      Q.   Sure.  Like on a Teams
12  message for work --
13      A.   Right.
14      Q.   -- you can have a
15  thumbs-up emoji; right?
16          L. SCARCELLO:  Object to form.
17          THE WITNESS:  I'm not sure
18  what you're asking.
19          BY R. EHLER:
20      Q.   I'm just trying to get a
21  sense of whether your -- of your understanding
22  which is -- my understanding is that Snapchat does
23  not have a "likes" feature that interacts with
24  "Spotlight" or the other kind of feed aspects of
25  it, and I want to make sure that you understand

Page 444

1  that or know if you don't know or have a different
2  view.
3          L. SCARCELLO:  Object to form.
4          THE WITNESS:  I'm unsure.
5          BY R. EHLER:
6      Q.   When users post a public
7  story on Snapchat, do you know if the number of
8  times the story has been viewed is publicly
9  visible?
10      A.   I understand that a lot
11  of changes have happened with all of these apps.
12  Some features that used to be available, like
13  public displays of "likes," I'm talking more
14  broadly, have now been removed.  Some new features
15  have been added.  The apps are constantly
16  changing.  It's hard to keep track.
17          BY R. EHLER:
18      Q.   Okay.  So you don't know?
19          L. SCARCELLO:  Object to form.
20          BY R. EHLER:
21      Q.   Is that a no, I don't
22  know?
23          L. SCARCELLO:  Object to form.
24          BY R. EHLER:
25      Q.   You gave a non-verbal and

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                              July 11, 2025

Page 445

1   so I'm trying to confirm your answer.
2              A.  Yeah.  You're asking me
3   about the highlights --
4              Q.  No, I'm sorry.  I --
5              A.  Sorry, can you ask the
6   question again?
7              Q.  I asked whether you know
8   whether the number of times someone views a story
9   is visible publicly on Snapchat, sitting here
10  today?
11             L. SCARCELLO:  Object to form,
12  asked and answered.
13             THE WITNESS:  I thought it
14  was.
15             BY R. EHLER:
16             Q.  Do you know the average
17  age of a Snapchat user?
18             A.  Young.
19             Q.  Like 13?  9?  What do you
20  think?
21             A.  Well, it's --
22             L. SCARCELLO:  Object to form.
23             THE WITNESS:  It's hard to get
24  that data accurately because a lot of the kids are
25  not truthful about their age on Snapchat.  But I

Page 446

1   think I've read documents that something like,
2   yeah, 13, 12, 13.
3              BY R. EHLER:
4              Q.  And that's based on what
5   information?
6              A.  It's based on some
7   internal documents I read.  It's also based on
8   some peer-review studies.
9              Q.  And so if there were
10  other documents that said the average age of a
11  Snapchat user was actually 18, you would think
12  those are inaccurate; right?
13             L. SCARCELLO:  Object to form.
14             THE WITNESS:  Average age of
15  18?  I would have to seriously look at that study
16  and the quality of it.
17             BY R. EHLER:
18             Q.  Do you know how much time
19  Snapchat users on average are spending on the
20  different features?  And I'll just give you an
21  example.  Like Snapping or messaging with their
22  friends versus the "Spotlight" feature we
23  discussed earlier?
24             A.  I'm not sure of the -- I
25  haven't looked at the data that granularly.

Page 447

1              Q.  Did you ask for that data
2   in the context of your work in this case?
3              A.  I believe -- I looked at
4   a lot of documents.  I believe I may have seen
5   some graphs on that, but with thousands of
6   productions I can't recall.  I would have to take
7   a look at the internal document again.
8              Q.  Does it matter to your
9   opinions what percentage of time Snapchat users
10  are spending on messaging and Snapping versus
11  engaged with "Spotlight"?
12             L. SCARCELLO:  Object to form.
13             THE WITNESS:  Social media is
14  a whole experience.  It -- first of all, that's
15  difficult to quantify.  People are on and off the
16  apps in seconds.  I was tasked to look at this
17  holistically and not break it down by which
18  feature causes -- is associated with more harm.
19  Collectively, the features make up the app.  They
20  drive the content, they maintain use, extended
21  use, prolonged use.  And I think the important
22  thing is what's the overall impact that these
23  features which generate the content have on
24  children's mental health?
25             L. SCARCELLO:  Counsel, we've

Page 448

1   been going for about an hour and 10 minutes, could
2   we take a break?
3              R. EHLER:  Yeah.  I'm going to
4   move to strike that last answer and just get an
5   answer to this question and then we can break.
6              L. SCARCELLO:  Okay.
7              R. EHLER:  So I'll move to
8   strike that answer.
9              BY R. EHLER:
10             Q.  My question is whether it
11  matters to your opinions -- and maybe the answer
12  is no -- what percentage of time Snapchat users
13  are spending on messaging and Snapping versus
14  "Spotlight."
15             L. SCARCELLO:  Object to form,
16  asked and answered.
17             THE WITNESS:  I'm not sure it
18  really matters all that much.
19             R. EHLER:  Okay.  We can take
20  a break.
21             THE VIDEOGRAPHER:  Current
22  time is 9:45 a.m., and we are off the record.
23  --- Upon recessing at 9:45 a.m.
24  --- Upon resuming at 9:55 a.m.
25             THE VIDEOGRAPHER:  The current

Page 449

1 time is 9:55 a.m., and we are back on the record.
2        BY R. EHLER:
3        Q.  Dr. Goldfield, if you
4 could pull out Exhibit 1, which is your report,
5 and I'm at paragraph 367 on page 160.
6        L. SCARCELLO:  I would just
7 object to the characterization of this as his
8 report.  We've served the supplemental and amended
9 report.
10        BY R. EHLER:
11        Q.  The last sentence of
12 paragraph 367 says:
13        "The product went from a
14        simple messaging and
15        photo-sharing application
16        to a paradigmatic social
17        media platform."
18 And I want to get a sense of what you mean by that
19 in terms of timing.  Is it your understanding that
20 Snap started with Snaps, the visual messages and
21 messaging, and then at some point it added an
22 additional set of features that made it a
23 paradigmatic social media platform?
24        L. SCARCELLO:  Object to form.
25        THE WITNESS:  Yes, that's what

Page 450

1 I've documented.
2        BY R. EHLER:
3        Q.  Do you know what that
4 time was in your view?
5        L. SCARCELLO:  Object to form.
6        THE WITNESS:  Based on what
7 I've written here, it appears -- I mean, again the
8 features are constantly changing and I haven't
9 committed to memory --
10        BY R. EHLER:
11        Q.  That's fine.
12        A.  -- the road map of which
13 features were added when and which were taken away
14 when.
15        Q.  Totally fine.  I was just
16 asking you if you did have a sense of timing.  But
17 at some point it was a simple messaging,
18 photo-sharing application.  And am I right that
19 you don't believe that that was harmful in the way
20 that you're expressing in your opinions in your
21 report prior to adding these additional features;
22 correct?
23        L. SCARCELLO:  Object to form.
24        THE WITNESS:  Again, it would
25 depend.  I mean, if you're spending three hours a

Page 451

1 day sending pictures, the potential to displace
2 other health-promoting behaviors is high.
3        BY R. EHLER:
4        Q.  That's on the individual
5 level.  I'm asking about the platform of Snapchat.
6 Do you have a view of Snapchat as a messaging and
7 photo-sharing application with ephemerality, you
8 know, as you described sort of when it started, do
9 you have a view that that is or is not harmful?
10        L. SCARCELLO:  Object to form.
11        THE WITNESS:  I believe adding
12 gamification, personalized algorithms and the
13 other features that were eventually added -- and I
14 don't have the exact dates -- certainly makes it
15 more harmful.
16        BY R. EHLER:
17        Q.  Do you believe it started
18 as harmful or was there a point in time when it
19 was not harmful?
20        L. SCARCELLO:  Object to form.
21        THE WITNESS:  I don't think
22 there are a lot of data on the early days of when
23 it was just simply a photo-sharing application,
24 compared to the amount of data that are on with
25 all the features now.

Page 452

1        BY R. EHLER:
2        Q.  So you have no view about
3 that point in time?
4        L. SCARCELLO:  Object to form,
5 misstates testimony.
6        THE WITNESS:  I think in the
7 world of social media, when you're looking
8 literature from 2013/2014 and trying to apply that
9 now is a big stretch and I would say it's pretty
10 outdated.
11        R. EHLER:  I'll move to
12 strike.  That wasn't my question.
13        BY R. EHLER:
14        Q.  My question was about
15 your view, and whether you have one, it's fine if
16 you don't, that Snapchat as a messaging and
17 photo-sharing application with ephemerality,
18 whether that was inherently harmful?
19        L. SCARCELLO:  Object to form,
20 asked and answered.
21        THE WITNESS:  I guess my
22 answer is exactly what I said before.  It depends.
23 If it's 15 minutes a day or 10 minutes a day, no,
24 it's not inherently harmful.  If it's hours a day,
25 I'd be concerned about the impact.

23

22STCV21355
DEPOSITION OF GARY GOLDFIELD

July 11, 2025

Page 453

1    BY R. EHLER:
2        Q.    Paragraph 386, a couple
3    pages forward in your report.  Page 165.  You
4    describe Snap's "North Star Metric" as a "daily
5    bidirectional communication."  Do you see that?
6        A.    Um-hum.
7        Q.    What do you mean by that?
8    L. SCARCELLO:  Object to form.
9        THE WITNESS:  It just means
10   communication both ways.
11       BY R. EHLER:
12       Q.    And by "North Star
13   Metric," do you understand that to mean their goal
14   is daily bidirectional, two-way communication?
15       A.    Yes.
16       Q.    And that would be one
17   person to one person; correct?  Bidirectional?
18   L. SCARCELLO:  Object to form.
19       THE WITNESS:  Again, I think
20   there could be other people involved in the chat,
21   but typically small groups, yes, or individuals.
22       BY R. EHLER:
23       Q.    Is that similar to text
24   messaging?
25   L. SCARCELLO:  Object to form,

Page 454

1    vague.
2        THE WITNESS:  I guess it
3    depends on what the content is.
4        BY R. EHLER:
5        Q.    Fair enough.  Without
6    getting into the content, just the sort of
7    functionality, is it similar to iMessage, Apple's
8    messaging platform, for example?
9        A.    Sending Snaps?
10       Q.    This bidirectional
11   communication that you reference in your report.
12   L. SCARCELLO:  Object to form.
13       THE WITNESS:  Again, to
14   contextualize the answer, I think texting is not
15   inherently harmful, but when features drive
16   excessive texting, that's harmful because it comes
17   at an opportunity cost.
18       BY R. EHLER:
19       Q.    My question was a little
20   bit different which was whether the functional of
21   bidirectional communication, this "North Star" on
22   Snap's platform, that functionality is the same as
23   iMessage.  Do you have a view on that question?
24   L. SCARCELLO:  Object to form,
25   asked and answered.

Page 455

1        THE WITNESS:  I think -- I
2    think people spend far more time because the app
3    Snap is -- with all the lenses and filters is far
4    more engaging and the risks are much higher than
5    simply sending a text, which is -- sure, could
6    accompany a picture, a photo, but generally
7    doesn't.  So I don't really view them as all that
8    comparable.
9        BY R. EHLER:
10       Q.    Okay.  And one of the
11   reasons you don't think that they're comparable is
12   Snapchat has -- uses bitmojis.  Do you know what a
13   bitmoji is?
14       A.    Um-hum, yes.
15       Q.    And -- what's your
16   understanding of Snapchat's use of bitmojis?
17       A.    Well, they can just, you
18   know, add emojis to pictures.  There is filters to
19   alter the photo, beautify themselves or others.
20   There's kind of classic paradigmatic social media
21   features.
22       Q.    Do you know what bitmojis
23   are?
24       A.    Yeah, I've sent a couple
25   bitmojis.

Page 456

1        Q.    Okay.  They're not
2    filters or photos, though?
3        A.    No, no.
4        Q.    Okay.  Paragraph 369 of
5    your report.  You describe bitmojis and you
6    describe them as "cartoon avatars"?
7        A.    Yes.
8        Q.    And are bitmojis one of
9    the features, as you described it, that makes
10   Snapchat different from the iMessage platform
11   because it's driving -- it's more engaging, if I
12   accurately summarized your testimony?
13   L. SCARCELLO:  Object to form,
14   misstates testimony.
15       THE WITNESS:  Again, the
16   bitmoji is a very small aspect of the overall
17   experience of Snap.  So when you're trying to
18   parse out a single feature in a group of features
19   that are designed to promote, successfully I might
20   add, prolonged engagement, I don't think that's
21   fair.  It's a whole experience.
22       BY R. EHLER:
23       Q.    So going back to my
24   question, are you not able to identify whether
25   bitmojis specifically are causing harm because in

24

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                   July 11, 2025

Page 457

1  your view it's only the totality and you can't
2  drill down more specifically?
3              L. SCARCELLO:  Object to form,
4  argumentative, misstates testimony.
5              THE WITNESS:  I'm saying the
6  overall experience is not -- is more than just the
7  sum of each little feature.  And to my knowledge,
8  nobody's studied the impact of just bit emojis in
9  the larger context.  So your question is pretty
10 hypothetical.
11             BY R. EHLER:
12       Q.  That's fine.  And I'll
13 ask you hypothetically.  Do you think,
14 hypothetically, bitmojis alone are sufficient to
15 drive engagement and harm?
16             L. SCARCELLO:  Object to form,
17 incomplete hypothetical.
18             THE WITNESS:  I think bit
19 emojis enhance the experience and may promote
20 engagement in isolation, which these things never
21 occur in isolation.
22             BY R. EHLER:
23       Q.  You understand that bit
24 emojis are used on Apple iMessage as well; right?
25       A.  Yes, I understand.

Page 458

1        Q.  Do you view them as
2  harmful in the context of Apple iMessage?
3        A.  Seeing someone's little
4  emoji when they text you?  Again, I think that's
5  fundamentally different.  But no, I don't view
6  that as harmful.
7        Q.  One of the other features
8  that you include as a causal -- one of the
9  features you highlight with respect to Snapchat is
10 notifications; is that right?
11       A.  Correct.
12       Q.  And why are
13 notifications -- what's your opinion with respect
14 to notifications?
15       A.  So notifications are
16 designed to draw users' attention back to the app.
17 So they could be doing homework, they could be
18 engaged with their family or friends, they get a
19 notification that someone posted.  Given the --
20 what I talked about, the neurobiological
21 vulnerabilities in childhood, weakened cognitive
22 control, greater problems regulating behavior and
23 impulsivity, it is extraordinarily unlikely that
24 most children and youth would be able to have the
25 control to not check it immediately.  Not to

Page 459

1  mention the whole culture of social media, and my
2  kids have pointed this out to me, that if you
3  respond to a message hours later, it's considered
4  rude and disrespectful.
5        Q.  Is that the same with
6  respect to text messages as notifications for
7  Snapchat or the other social media platforms?
8              L. SCARCELLO:  Object to form.
9              THE WITNESS:  I'm not sure I
10 understand.
11             BY R. EHLER:
12       Q.  The opinion you just
13 expressed if someone gets a text message from
14 their friend, they get a notification; right?
15       A.  Yes.
16       Q.  So what you just
17 identified as the inability to, you know, not
18 check it, that's the same for text messages;
19 right?
20       A.  Not necessarily, because
21 you can actually see a lot of the content in a
22 text, but you don't even really -- you just have
23 to look at your phone.  But again, I think the
24 content -- I think the question is it depends.
25 The problem is -- the problem is the larger

Page 460

1  context.  Many people have the experience of, oh,
2  I'm just going to check what this person says, and
3  then all of a sudden the autoscroll kicks in and
4  they're on the app for way longer than they want
5  to be.  So that doesn't happen with texts.  You
6  read your text, it's a three-line text, it's
7  factual or whatever, you could respond or you
8  could not respond.  So the text does not occur in
9  the context of all those other features that
10 promote engagement.  So to me they're apples and
11 oranges.
12       Q.  So it's not the text and
13 the notification and the fact of checking it, it's
14 that you're then spending longer on the app?
15             L. SCARCELLO:  Object to form.
16             THE WITNESS:  I think that the
17 flurry that happens in social media is going to be
18 way more notifications than by text.  Typically,
19 by text you're communicating with, I don't know, a
20 dozen or half a dozen people maybe every other
21 day.  The online networks are sometimes 100 times
22 in-person networks.  So the notifications and the
23 interruption is going to be way more frequent with
24 online notifications than by text.
25             BY R. EHLER:

25

Page 461

1     Q.  Have you reviewed any
2  literature that looks at the volume of
3  notifications from social media platforms as
4  compared to text messages or other in-app
5  messaging?
6     A.  I've looked at some
7  time-use studies and found a lot -- something like
8  two-thirds of the amount of smartphone use is
9  spent on social media.
10     Q.  Not time use, number of
11  notifications.
12     L. SCARCELLO:  Object to form.
13     THE WITNESS:  Notifications by
14  text versus by social media or Snap in particular?
15  I'm not sure what you're asking.
16     BY R. EHLER:
17     Q.  That's what I'm asking
18  you, if you looked at studies that compared the
19  difference between notifications on social media
20  apps and notifications on messaging.
21     A.  So how -- the reason
22  notifications are positively reinforcing is they
23  don't generally notify you every single solitary
24  message.  They do it in an intermittent schedule
25  which is the exact reinforcement schedule that

Page 462

1  prolongs --
2     Q.  Dr. Goldfield, that is
3  not answering my question.
4     L. SCARCELLO:  No, I'm sorry,
5  please let him finish his answer.
6     R. EHLER:  It is completely
7  non-responsive and we're short on time.  My
8  question is --
9     L. SCARCELLO:  No, it is not
10  non-responsive.  It's responsive.  Please let him
11  finish.
12     Go ahead.
13     THE WITNESS:  So the number of
14  notifications -- the notifications are intended to
15  be delivered on a variable or intermittent
16  reinforcement schedule.  If they did it every
17  single solitary time somebody posted and you have
18  thousands of followers, people will turn their
19  notifications off.  So the sheer number of
20  notifications is a factor, not necessarily the
21  factor.
22     BY R. EHLER:
23     Q.  Dr. Goldfield, you just
24  mentioned this, but you do understand that users
25  can turn notifications off; right?

Page 463

1     A.  Yes, I understand that.
2     Q.  And you also understand
3  that users actually opt in to being notified by
4  the particular app when they sign up for it;
5  right?
6     L. SCARCELLO:  Object to form.
7     THE WITNESS:  I think there
8  are a lot of the -- the preamble, that most people
9  just say "I accept the terms" instead of reading
10  all the fine print.
11     BY R. EHLER:
12     Q.  But when you download an
13  application or you sign up for an application on
14  Android or iPhone, it asks specifically whether
15  you want push notifications, right, and you have
16  to hit "yes"?
17     L. SCARCELLO:  Object to form.
18  When are you talking about, counsel?  At what
19  point did this happen?  Be specific.
20     THE WITNESS:  So, again, I've
21  spoken to there has been an evolution with default
22  setting in the app.  Some features have come and
23  have gone.  I'm not sure what time point you're
24  talking about now, but there -- I believe most of
25  the apps, a lot of these were push notifications,

Page 464

1  you had to opt out.  They were default settings.
2  And given the point of this is to communicate, I
3  can't imagine that many teenagers are going to opt
4  out of push notifications, because they want to
5  be -- they want -- I think they -- they don't
6  understand the potential harm of the
7  notifications.
8     BY R. EHLER:
9     Q.  But you do understand
10  that it's a choice somebody's making; right?
11     L. SCARCELLO:  Object to form,
12  misstates the evidence.
13     THE WITNESS:  I believe that
14  the fear of missing out and the culture that's
15  emanated around social media, the broader context
16  will make it extraordinarily difficult for people
17  to completely turn off all notifications.
18     BY R. EHLER:
19     Q.  I'm not asking about
20  whether or not it's difficult, I'm asking about
21  whether or not they choose to opt in or choose to
22  opt out, they have to push a button; correct?
23     L. SCARCELLO:  Object to form.
24  Again misstates the evidence.
25     THE WITNESS:  I'm not

Page 465

1  convinced it was always that way.  Are you saying
2  it is this way now?
3         BY R. EHLER:
4         Q.  Can you answer the
5  question as I asked it?
6         L. SCARCELLO:  He's seeking
7  clarification.
8         THE WITNESS:  Yeah, I would
9  like some clarification.  Are you talking about
10  historically or are you talking about now?
11         BY R. EHLER:
12         Q.  I'm talking about in the
13  studies that you reviewed, do you know one way or
14  the other?
15         A.  I don't think the studies
16  go into detail about whether people have opted in
17  or opted out.  They just look at the relationship
18  of apps and time spent on apps and psychological
19  harms.
20         Q.  You understand that iOS
21  and Android allow Silence mode or other Do Not
22  Disturb modes that individuals can choose to turn
23  on while they sleep or do homework?
24         A.  I'm aware of that, yes.
25         Q.  Do any of the studies you

Page 466

1  looked at evaluate whether those features were in
2  use?
3         A.  Again, I think most
4  studies operate under the assumption that people
5  don't turn their notifications off or they only do
6  it in very circumscribed situations, like right
7  before a test or during an exam or --
8         Q.  You have identified a
9  difference between active and passive social media
10  use; correct?
11         A.  Correct.
12         Q.  And is your general view
13  that active use is less problematic than passive
14  use; is that your view?
15         A.  My view is the
16  relationship between -- the meta-analysis by -- I
17  think I cited on 144 studies, Holtzman -- Godard
18  and Holtzman found some slight differences between
19  passive and active use in relation to mental
20  health harms.  Active use was -- showed some more
21  positive associations.  But, again, all of it is
22  cross-sectional.  So my view on that is children
23  and youth who are meeting their goals, they're
24  feeling good, they're going to cool parties,
25  they're traveling with their parents, they're

Page 467

1  getting good grades, can be more likely to post
2  about their accomplishments.  And epidemiological
3  surveys actually show the number one reason for
4  active-use posting is to share their
5  accomplishments.
6         So I'm not convinced -- and
7  actually there is experimental evidence by Hunt --
8  I'm not convinced active use leads to better
9  mental health, and that was actually shown by Hunt
10  who did an experiment.  One group were actually
11  told to increase their active use in the context
12  of a restriction versus another group that was
13  just restricted but didn't alter the type of use,
14  and they actually found there was no benefit when
15  increasing active use and, in fact, it might have
16  been counter productive.
17         Q.  Great.  Do you remember
18  the Grand Rounds video we looked at yesterday?
19         A.  I do.
20         Q.  And that was a talk you
21  gave to individuals who worked at the hospital in
22  April of 2024; correct?
23         A.  Correct.
24         Q.  And you told -- and in --
25  and we'll show you the clip.  But you told the

Page 468

1  individuals at the hospital that active or
2  purposeful use of social media is only weakly
3  associated with emotional distress, and some
4  studies even found it is associated with
5  psychological benefits; correct?
6         L. SCARCELLO:  Objection,
7  counsel.  If you're going to ask him whether he
8  said that, he needs to see it.
9         BY R. EHLER:
10         Q.  Do you recall saying
11  that?
12         A.  What I recall saying is
13  giving the exact explanation of that relationship
14  later in the presentation, that I believe --
15  because the number one reason to share
16  accomplishments -- I mean, to post actively is to
17  share accomplishments, that the relationship is
18  driven by reverse causation.  People with better
19  mental health are in a better place, they're out,
20  they're more engaged, they're doing fun things,
21  they're playing sports, they're going to parties,
22  they're more likely to post.  People feeling kind
23  of depressed, they're inside more, they're not
24  feeling well, their not engaged with life, maybe
25  they come from poor families, they don't have a

Page 469

1  whole lot to post about.
2            R. EHLER:  Can you play the
3  clip.
4            (Video played - Exhibit 30)
5            BY R. EHLER:
6            Q.  That was what you said in
7  2024 at your hospital Grand Rounds; right?
8            L. SCARCELLO:  I'm sorry, I
9  think the video got cut off, like, in the middle
10  of a word that he was saying, so I guess I would
11  object to it on those grounds.
12            THE WITNESS:  I've given that
13  talk multiple times.  For one thing, that talk was
14  way before I engaged in this process, and I don't
15  even think the meta-analysis -- at least I wasn't
16  even aware of it at that time.
17            Secondly, I'm pretty sure it
18  was that talk, it may have been another one, where
19  I explain the relationship, as I just did now.  So
20  while I do believe passive use may increase the
21  risk, I think the explanation with active use is
22  not -- if there are any benefits associated with
23  it, I'm not convinced it's due to the active use.
24  I think it's just what I said before, people who
25  are feeling good mentally and doing well in life

Page 470

1  and achieving their goals are more likely to post
2  and engage in active use.
3            BY R. EHLER:
4            Q.  That's your reverse
5  causation view based on the cross-sectional data?
6            L. SCARCELLO:  Object to form,
7  misstates testimony.
8            THE WITNESS:  I believe that
9  that could be coming into play, yes.
10            R. EHLER:  The clip we just
11  watched, I'm going to mark as Exhibit 30.
12            EXHIBIT NO. 30:  VIDEO
13            CLIP OF GRAND ROUNDS
14            DATED 2024
15            R. EHLER:  And we'll show you
16  another clip that we'll mark as Exhibit 31.
17            EXHIBIT NO. 31:  VIDEO
18            CLIP OF GRAND ROUNDS
19            DATED 2024
20            L. SCARCELLO:  Is this from
21  the same presentation?
22            R. EHLER:  Yes.
23            (Video played - Exhibit 31)
24            L. SCARCELLO:  Object to the
25  video.  It sounds like that got cut off in the

Page 471

1  middle of a word too.
2            BY R. EHLER:
3            Q.  Dr. Goldfield, was the
4  statement that we just heard that you gave in 2024
5  to the hospital true?
6            A.  I gave many statements.
7            Q.  Were those statements
8  true?
9            A.  At that time, the Coyne
10  study is not fabricated, it's true.  But the
11  context of high use was in a closed group chat
12  setting.  So they're actively engaging with a
13  small number of people who are also either
14  transgendered or considered gender minorities.  So
15  even in my report, I have not denied there can be
16  select benefits for some populations, and we
17  discussed this yesterday.  But the vast majority
18  of people don't fall into gender minorities here
19  or transgendered youth or -- ASD is not all that
20  common.  Even social anxiety disorder is not super
21  common.  So there are some benefits in these
22  subgroups, but they're not representative of all
23  children and youth, or even most.
24            EXHIBIT NO. 32:  PAPER
25            TITLED "CONNECTING WITH

Page 472

1            YOUNG PEOPLE ON MENTAL
2            HEALTH & WELLBEING"
3            BY R. EHLER:
4            Q.  Dr. Goldfield, you've got
5  Exhibit 31.  Do you recall this -- sorry, 32.  Do
6  you recall this as one of the documents that you
7  relied on and you reviewed in connection with your
8  opinions regarding Snapchat?
9            A.  I relied mostly on my
10  peer-review literature.  When I looked at a lot of
11  the internal documents, they seemed pretty
12  consistent with the peer review.
13            Q.  And is your view that
14  this was a study that --
15            R. EHLER:  I'm going to yield
16  my time to my colleagues on their questions.  So
17  we can go off the record for a minute.
18            THE VIDEOGRAPHER:  The current
19  time is 10:26 a.m., and we are off the record.
20  --- Off-record discussion
21            THE VIDEOGRAPHER:  The current
22  time is 10:27 a.m., and we are back on the record.
23  CROSS-EXAMINATION BY L. HORVATH:
24            Q.  Good morning,
25  Dr. Goldfield.  I want to represent to you from

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 11, 2025

---

Page 473

1  the outset that I won't take as much time as
2  Ms. Ehler did, so my questioning will be
3  significantly shorter.
4            Do you have a TikTok account?
5       A.   I do not.
6       Q.   Have you ever?
7       A.   No.
8       Q.   Have you ever had any
9  conversations with anyone at TikTok?
10      A.   I have not.
11      Q.   Have you ever used the
12 TikTok app?
13      A.   Again, just in the
14 context of, you know, my kids.
15      Q.   And by that, you mean you
16 have looked at something your kids have shown you;
17 is that fair?
18      A.   Yes.
19      Q.   We've talked a lot about
20 the data that you've reviewed and we've talked
21 about the amount of data that's out there.  You
22 understand that some of the data does not show an
23 association between social media and the mental
24 health harms; true?
25           L. SCARCELLO:  Object to form.

---

Page 474

1            THE WITNESS:  I think I've
2  outlined in my report that there are some studies
3  that show no harm, but the majority point toward
4  harm.
5            BY L. HORVATH:
6       Q.   Right.  But you
7  acknowledge some studies show no harm; that's
8  fair?  Correct?
9            L. SCARCELLO:  Object to form.
10           THE WITNESS:  Again, when you
11 look at the totality of the evidence, no -- I
12 mean, if you look at the literature on Tylenol or
13 Aspirin, some people don't benefit from it, but on
14 average it helps with headaches, so people take it
15 and use it.
16           BY L. HORVATH:
17      Q.   Would you agree --
18      A.   There will never be 100%
19 certainty in any research finding.
20      Q.   Okay.  And you would
21 agree that some scientists disagree that social
22 media causes harm, wouldn't you?
23      A.   I'm aware of that, yes.
24      Q.   And even today, there are
25 peer-reviewed journals that are publishing

---

Page 475

1  literature that says causation of mental health
2  harms from social media has not been established;
3  right?
4            L. SCARCELLO:  Object to form.
5            THE WITNESS:  Again, what you
6  see in the peer-review literature will likely be
7  based on a single study.  Academics are trained to
8  be extraordinarily conservative in that one study
9  needs replication over and over and over to form a
10 pattern.  So my opinions are based on the totality
11 of evidence, not a single study.
12           L. HORVATH:  Objection,
13 non-responsive.  That's not my question, and I'm
14 going to move to strike.
15           BY L. HORVATH:
16      Q.   Dr. Goldfield, my
17 question is that there are peer-reviewed journals
18 that say causation of mental health harms from
19 social media has not been established; true?
20      A.   I don't think journals
21 say that.  I think there are papers that might,
22 individual papers that may say that.
23      Q.   Right.  And those papers,
24 those individual papers, are published in
25 peer-reviewed journals; true?

---

Page 476

1       A.   True.
2       Q.   You've mentioned several
3  times that some studies that do not show an
4  association between mental health harms and social
5  media are cross-sectional studies; right?
6            L. SCARCELLO:  Object to form.
7            THE WITNESS:  Some, yes.
8            BY L. HORVATH:
9       Q.   And have you reviewed any
10 longitudinal studies that also do not find an
11 association between social media and mental health
12 harms?
13      A.   So my review focused on
14 meta-analyses that was generated from a systematic
15 review.  The meta-analyses by Ahmed included 10
16 longitudinal studies and clearly established
17 temporality.  So they tested both pathways, social
18 media leading to depression or depression leading
19 to social media.  They found social media
20 predicted depression but not the other way around.
21 So that establishes temporality.
22           L. HORVATH:  Objection,
23 non-responsive.  I move to strike.  That wasn't my
24 question.  Please listen carefully to my question.
25           BY L. HORVATH:

---

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                      July 11, 2025

Page 477

1          Q.  Have you reviewed any
2   longitudinal studies that do not find an
3   association between social media and mental health
4   harms?
5          L. SCARCELLO:  Object to form.
6          THE WITNESS:  I have seen
7   some, yes.
8          BY L. HORVATH:
9          Q.  You believe that study
10  quality is important; true?
11         A.  True.
12         Q.  You note in your report
13  that TikTok has literature regarding analyses of
14  whether social media may or may not cause harm in
15  its possession; right?
16         A.  They've done internal
17  research on this, yes.
18         Q.  And you agree that it's a
19  good thing for a company to monitor literature
20  about its product?
21         A.  I believe so.
22         Q.  You've also cited in your
23  report some discussion of company documents where
24  individuals within the company have made certain
25  statements; right?

Page 478

1          L. SCARCELLO:  Object to form.
2          THE WITNESS:  Can you direct
3   me to where I've -- where I'm outlining this in my
4   report, please?
5          BY L. HORVATH:
6          Q.  Well, you have a whole --
7   I'm not going to ask you about any particular
8   document.  You've got a whole section on TikTok.
9   I think if you look at your table of contents in
10  Exhibit 1, it will take you right there.
11         A.  Yeah.
12         Q.  Are you with me?
13         A.  Yeah.
14         Q.  And you recall citing
15  some TikTok company documents in your report;
16  right?
17         A.  Yes.
18         Q.  The only information you
19  have about those documents is what the documents
20  say; right?
21         L. SCARCELLO:  Object to form.
22         THE WITNESS:  Internally?
23  You're talking about the internal --
24         BY L. HORVATH:
25         Q.  Yes, sir.

Page 479

1          A.  Yes.
2          Q.  Okay.  You don't know
3   what conversations occurred before that document
4   was prepared; right?
5          A.  Correct.
6          Q.  You don't know what
7   conversations might have occurred at the company
8   after a document was prepared; true?
9          A.  True.
10         Q.  You know -- you reference
11  certain teams at TikTok.  For instance, I think
12  you mentioned an algorithm team; do you recall
13  that?
14         A.  Um-hum, yes.
15         Q.  Do you know how many
16  teams there are at TikTok?
17         A.  I may have this in my
18  report.
19         Q.  Sitting here right now,
20  do you know how many teams there are at TikTok?
21         A.  Teams?
22         Q.  Yes, sir.
23         A.  I don't recall offhand.
24         Q.  You understand that
25  different teams at TikTok have different goals;

Page 480

1   true?
2          A.  Yes, true.
3          Q.  And so the views of one
4   team don't necessarily reflect the entire position
5   of the company; fair?
6          L. SCARCELLO:  Object to form.
7          THE WITNESS:  I -- I can't
8   speculate on that.
9          BY L. HORVATH:
10         Q.  In fact, if you were to
11  try and take a company document and take
12  statements within that, you would be, in fact,
13  speculating about the position of the company; is
14  that fair?
15         L. SCARCELLO:  Object to form.
16         THE WITNESS:  I think it's
17  relevant for -- if teams discover information -- I
18  mean, it's -- that could be potentially harmful.
19  Whether people -- whether it's the official byline
20  of the CEO or the executives, I don't think is
21  really the heart of the issue here.  I think -- I
22  think it's the finding that is the issue, not
23  whether people agree with the finding or it's
24  disseminated.
25         L. HORVATH:  Objection,

22STCV21355
DEPOSITION OF GARY GOLDFIELD

July 11, 2025

Page 481

1  non-responsive. Move to strike.
2       BY L. HORVATH:
3       Q.  Dr. Goldfield, that
4  wasn't the question I asked. I want you to listen
5  to my specific question. Okay?
6            If you were to take a company
7  document and determine that, you would be
8  speculating whether the contents of that company
9  document are, in fact, the position of the
10  company; fair?
11       L. SCARCELLO: Object to form,
12  vague, calls for speculation.
13       THE WITNESS: It would -- I
14  think it would depend on what the document is,
15  when it was released, and in the context of what
16  it's discussing.
17       BY L. HORVATH:
18       Q.  Totally agree, right. So
19  you would need all of those facts to have a
20  complete picture of what the position of the
21  company actually is; true?
22       L. SCARCELLO: Object to form.
23       THE WITNESS: That would be
24  helpful.
25       BY L. HORVATH:

Page 482

1       Q.  What actions has TikTok
2  taken to limit when notifications are sent, do you
3  know?
4       A.  Again, there's been so
5  many changes with all of these apps. Features
6  have come and gone. In my opinion, there are not
7  a lot of safeguards, so I don't know the exact
8  date.
9       L. HORVATH: Objection,
10  non-responsive. Move to strike.
11       BY L. HORVATH:
12       Q.  Do you know what TikTok
13  has done to limit when notifications are sent?
14       L. SCARCELLO: Object to form,
15  asked and answered.
16       BY L. HORVATH:
17       Q.  Is the answer no?
18       L. SCARCELLO: Object to form.
19       THE WITNESS: Well, it appears
20  it's probably pretty recently.
21       L. HORVATH: Objection,
22  non-responsive.
23       BY L. HORVATH:
24       Q.  My question is: Do you
25  know what has been done? It's okay if you don't

Page 483

1  know.
2       A.  Recent -- if it's a
3  recent thing, I don't know.
4       Q.  Do you know at any time?
5  Are you aware of -- well, strike that. Let me
6  start over.
7            Sitting here today, are you
8  aware of when TikTok sends notifications to users?
9       L. SCARCELLO: Objection,
10  vague.
11       THE WITNESS: I think I've
12  referred that most of the notifications are
13  designed to be intermittent.
14       BY L. HORVATH:
15       Q.  But do you know what time
16  of day those are sent?
17       L. SCARCELLO: Same objection,
18  asked and answered.
19       BY L. HORVATH:
20       Q.  Do you know?
21       A.  I think they're delivered
22  intermittently. I don't think they're at a
23  fixed -- necessarily fixed time of day.
24       Q.  Okay. Do you know if
25  there are times -- well, strike that.

Page 484

1            What actions has TikTok taken
2  to ban underaged users, if you know?
3       L. SCARCELLO: Object to form,
4  vague.
5       THE WITNESS: What kind of
6  time frame are you talking about?
7       BY L. HORVATH:
8       Q.  Any time frame. Do you
9  know what actions TikTok has taken to ban underage
10  users?
11       L. SCARCELLO: Same objection.
12       THE WITNESS: I know there is
13  no objective age verification.
14       L. HORVATH: Objection,
15  non-responsive. That wasn't my question.
16       BY L. HORVATH:
17       Q.  Do you know what action
18  TikTok has taken to ban underage users and when
19  that action was taken?
20       L. SCARCELLO: The answer was
21  responsive. Objection, asked and answered.
22       THE WITNESS: I think the
23  research shows that they're not -- TikTok is not
24  being very effective at discerning people's real
25  age.

Page 485

1    L. HORVATH:  Objection,
2  non-responsive.  That wasn't my question.
3          BY L. HORVATH:
4    Q.   What actions has TikTok
5  taken, if you know, to identify underage users?
6          L. SCARCELLO:  Objection,
7  vague.
8          THE WITNESS:  They sometimes
9  can decipher people's age based on content and
10  other metrics that they use to guesstimate or
11  estimate people's age.
12          BY L. HORVATH:
13    Q.   And if TikTok metrics
14  identify an underage user, you're aware that that
15  user is banned; true?
16          L. SCARCELLO:  Objection,
17  form.
18          THE WITNESS:  I'm aware in
19  theory.  I'm not aware if that actually happens.
20          BY L. HORVATH:
21    Q.   You just don't know one
22  way or the other whether it would happen; is that
23  fair?
24          L. SCARCELLO:  Objection,
25  misstates testimony.

Page 486

1          THE WITNESS:  I have no real
2  opinion on that.
3          BY L. HORVATH:
4    Q.   Well, do you have -- have
5  you looked at any study that examines mental
6  health effects from TikTok specifically?
7    A.   Most of the studies
8  aggregate social media use.  There have been a few
9  studies that looked at different platforms.  They
10  seem to show similar impacts on, you know --
11  adverse impacts on mental health, the correlations
12  seemed pretty similar, likely for the same
13  mechanisms.  Most of the apps share common
14  features.
15          L. SCARCELLO:  Objection,
16  non-responsive.  Move to strike.
17          BY L. HORVATH:
18    Q.   Please listen to my
19  question.  Can you identify any study that
20  specifically looks at TikTok and mental health
21  harms only?
22          L. SCARCELLO:  Objection,
23  asked and answered.
24          THE WITNESS:  Like I said,
25  I've documented a few of those studies in my

Page 487

1  report.  But I --
2          BY L. HORVATH:
3    Q.   Can you identify --
4          L. SCARCELLO:  Sorry, counsel,
5  he wasn't finished.
6          THE WITNESS:  Yeah.  Again, I
7  looked at meta-analyses, right, so --
8          BY L. HORVATH:
9    Q.   Okay.  You would agree
10  that a meta-analysis is only as good as the
11  studies that are in them?
12          L. SCARCELLO:  Object to form,
13  vague.
14          THE WITNESS:  At an individual
15  level, I believe quality is important.
16          BY L. HORVATH:
17    Q.   Are you familiar with the
18  concept that ignorance is bliss?
19    A.   Yes, I'm familiar with
20  that.
21    Q.   And that concept is based
22  on the fact that if you read or see distressing
23  information, that might make you distressed; fair?
24          L. SCARCELLO:  Object to form.
25          THE WITNESS:  That's not

Page 488

1  usually in the context of how it's applied, but if
2  you're talking about contagion -- I'm not sure
3  what context you're talking about the ignorance is
4  bliss comment, but there are lots --
5          BY L. HORVATH:
6    Q.   Well, what does
7  ignorance -- I'm sorry.  I didn't mean -- are you
8  finished?
9    A.   Yeah.  Yeah.
10    Q.   I didn't mean to
11  interrupt you.
12    A.   I was wondering if you
13  could rephrase the question.  I'm not exactly sure
14  what you're asking me.
15    Q.   What does ignorance is
16  bliss mean to you?
17    A.   It means sometimes less
18  information is better.
19    Q.   Less information
20  sometimes might make you feel better than if you
21  had full information; true?
22    A.   That's usually what it
23  refers to.
24    Q.   Did you evaluate any
25  experiments to evaluate mental health if you took

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                      July 11, 2025

Page 489

1  away news programming?
2          A.  No, I don't -- I don't
3  think that's been studied.
4          Q.  Have you evaluated any
5  experiments to evaluate mental health if you took
6  away radio?
7          A.  No.
8          Q.  Did you evaluate any
9  experiments to evaluate mental health if you took
10 away homework?
11         A.  I imagine that might
12 improve mood.
13         Q.  Right.  Did you evaluate
14 any experiments to evaluate mental health if you
15 took away academic pressure?
16         A.  I evaluated literature
17 trying to arrive at the causal impacts of mental
18 health.  The experiments allowed designs to yield
19 those causal inferences.  So I did not --
20         L. HORVATH:  Objection, non --
21         THE WITNESS:  Yes -- no, I --
22 so I'm just contextualizing my answer.  So no, I
23 did not study those other impacts of when they are
24 manipulated.
25         L. HORVATH:  Objection to the

Page 490

1  non-responsive portion of your answer and move to
2  strike.
3          L. SCARCELLO:  We would
4  oppose.
5          BY L. HORVATH:
6          Q.  Did you evaluate any
7  experiments to evaluate mental health if you took
8  away video games?
9          A.  The focus of my report
10 was not on video games, so no.
11         Q.  Okay.  Did you evaluate
12 mental health effects if you took away online
13 gambling?
14         A.  The focus of my report
15 was on social media.  I did not study gambling.
16         Q.  And did you evaluate any
17 experiments to evaluate mental health if you took
18 away pornography online?
19         A.  Again, I focused on
20 social media, not on pornography.
21         Q.  Are you aware -- well,
22 strike that.  You weren't asked to look at the
23 impact of any specific feature of any platform; is
24 that what I heard you say?
25         L. SCARCELLO:  Object to form.

Page 491

1          THE WITNESS:  Because I
2  reviewed meta-analyses, they don't disentangle
3  single features, but discuss them in -- in --
4  discuss them more in the -- that they promote --
5  they drive high use, and then the exposure was
6  basically high use or problematic use.
7          L. HORVATH:  Objection,
8  non-responsive.  Move to strike.
9          BY L. HORVATH:
10         Q.  My question is:  Did you
11 look at the impact of any specific feature of any
12 platform, yes or no?
13         L. SCARCELLO:  Object to form,
14 asked and answered.
15         THE WITNESS:  I think I've
16 answered that.  I -- the literature does not
17 break them -- it's a whole experience.  The
18 literature does not disentangle the independent
19 impacts of each feature.
20         BY L. HORVATH:
21         Q.  Okay.  So the answer is
22 no; fair?
23         L. SCARCELLO:  Object to form,
24 misstates testimony.
25         THE WITNESS:  Features do not

Page 492

1  exist in isolation.
2          BY L. HORVATH:
3          Q.  How many cross-sectional
4  studies do you need before you believe causation
5  is established?
6          L. SCARCELLO:  Object to form.
7          THE WITNESS:  Again, as I've
8  said many times before, if it's a few
9  cross-sectional studies, then that doesn't
10 establish causality.  But if the same finding is
11 repeated cross-sectionally and longitudinally,
12 experimentally and there is biological
13 plausibility, supported by the neuroscience, as
14 outlined in my Bradford Hill and all the other
15 dose-response relationships, now that bolsters the
16 interpretations of cross-sectional studies.
17         L. HORVATH:  Objection,
18 non-responsive.  Move to strike.  That doesn't
19 answer my question.
20         BY L. HORVATH:
21         Q.  You've mentioned several
22 times about a single cross-sectional study or
23 something's only a single cross-sectional study.
24 My question to you, focusing only on
25 cross-sectional studies, is how many

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                July 11, 2025

---

Page 493

1  cross-sectional studies does it take in your mind
2  to establish causation, assuming there are no
3  experimental or longitudinal studies?
4      L. SCARCELLO:  Objection,
5  asked and answered, incomplete hypothetical, calls
6  for speculation.
7      THE WITNESS:  There is no
8  magic number.
9      BY L. HORVATH:
10     Q.  Because cross-sectional
11  studies do not establish causation on their own;
12  true?
13     A.  True.
14     L. HORVATH:  All right.  I'm
15  going to pass the witness.
16     R. EHLER:  Could we go off the
17  record for a second.
18     THE VIDEOGRAPHER:  Current
19  time is 10:50 a.m., and we are off the record.
20  --- Upon recessing at 10:50 a.m.
21  --- Upon resuming at 11:03 a.m.
22     THE VIDEOGRAPHER:  Current
23  time is 11:03 a.m., and we are back on the record.
24  CROSS-EXAMINATION BY R. RAPHAEL:
25     Q.  Hi, Dr. Goldfield.  My

---

Page 494

1  name is Rachel Raphael and I represent the YouTube
2  Defendants, and I'll have just a few questions for
3  you today.  Have you ever used YouTube?
4      A.  I have.
5      Q.  And for what purpose?
6      A.  Partly educational,
7  partly -- partly entertainment.  I don't use it
8  very often.
9      Q.  About how often do you
10  use YouTube?
11     A.  A couple times a year.
12     Q.  Okay.  You mentioned
13  using it for entertainment.  Does that mean you've
14  watched videos on YouTube?
15     A.  I have.
16     Q.  What kinds of videos?
17     A.  Usually sports.  If I
18  missed a sporting event, there will be a clip, so
19  I'll try to catch whatever the highlights would
20  be.  Sometimes they're on YouTube, you know --
21     Q.  Sure.
22     A.  -- in the days or weeks
23  following.
24     Q.  Sure.  Have you ever
25  posted videos on YouTube?

---

Page 495

1      A.  Me personally?
2      Q.  Yes.
3      A.  I have not posted videos.
4  I think it's possible the hospital that I work at
5  may have.
6      Q.  Are you aware one way or
7  the other whether others have posted videos on
8  your behalf?
9      L. SCARCELLO:  Object to form,
10  vague.
11     THE WITNESS:  I would have to
12  check the -- I would have to check YouTube.  I
13  generally don't Google myself.
14  BY R. RAPHAEL:
15     Q.  Sure.  Are you aware that
16  YouTube is the second-largest search engine in the
17  world?
18     A.  I'm aware it's big, yeah.
19     Q.  Do you ever search for
20  information on YouTube?
21     L. SCARCELLO:  Object to form.
22     THE WITNESS:  A few times,
23  yes, for -- to help fix things or help around the
24  house.
25  BY R. RAPHAEL:

---

Page 496

1      Q.  Are you aware that if you
2  run a search for Dr. Gary Goldfield on YouTube,
3  there are several videos featuring you and
4  discussing your research and work?
5      A.  I think I'm aware of one.
6  Again, I have not watched these videos.  I believe
7  one may have just been the Grand Rounds
8  presentation from the hospital, I'm aware of that
9  one.  I don't know about the other ones.
10     Q.  Sure.  Do you believe
11  that children and adolescents watching any YouTube
12  videos that feature you will suffer harm?
13     L. SCARCELLO:  Object to form.
14     THE WITNESS:  I believe -- I
15  believe that content matters.  But I also believe
16  that the intention -- the YouTube shares common
17  features that -- you know, someone's intention
18  might be to Google something educationally, but
19  then the personalized algorithms shows all these
20  personalized videos on the sides, and it takes an
21  adolescent an extreme exert -- cognitive control
22  not to click on those, not to mention they often
23  just, you know, start playing.
24     R. RAPHAEL:  I'm going to
25  object as non-responsive and move to strike that

---

Page 497

1   response.
2           BY R. RAPHAEL:
3           Q.   What I asked was whether
4   you believed that individuals or children or
5   adolescents specifically watching your YouTube
6   videos would suffer harm?
7           L. SCARCELLO:  Object to form.
8           THE WITNESS:  I don't believe
9   so.
10          BY R. RAPHAEL:
11          Q.   What if they watched
12  three or more of your videos in a row on autoplay,
13  would they suffer harm?
14          L. SCARCELLO:  Object to form,
15  incomplete hypothetical, calls for speculation.
16          THE WITNESS:  Well, if you
17  define boredom as harm, then possibly.
18          BY R. RAPHAEL:
19          Q.   Sure.  Do you believe
20  children or adolescents watching three or more of
21  your YouTube videos in a row on autoplay would
22  develop an addiction to YouTube?
23          L. SCARCELLO:  Same
24  objections.
25          THE WITNESS:  I doubt my

Page 498

1   videos would activate the dopamine-reward system.
2   I think it might put them to sleep.
3           BY R. RAPHAEL:
4           Q.   So you don't think that
5   your YouTube videos are necessarily addictive;
6   true?
7           L. SCARCELLO:  Same
8   objections.
9           THE WITNESS:  I don't believe
10  the content of my videos is what children and
11  youth are watching on YouTube.
12          BY R. RAPHAEL:
13          Q.   And content matters, as
14  you mentioned; right?
15          L. SCARCELLO:  Object to form,
16  misstates testimony.
17          THE WITNESS:  I -- yes.  As we
18  established yesterday, content associated with
19  adverse social comparisons -- and the content is
20  generated by the algorithms and they're
21  personalized.  So yes, content matters.
22          BY R. RAPHAEL:
23          Q.   Thank you.  So yesterday
24  you were asked some questions about how you
25  identified the documents found in your materials

Page 499

1   considered list.  Do you recall this question?
2           A.   I do.
3           Q.   Your report itself only
4   cites to 43 internal YouTube documents.  Does that
5   sound right to you?
6           A.   Yes.
7           Q.   How did you determine
8   which of the internal YouTube documents cited in
9   your materials considered list to discuss in the
10  body of your report?
11          L. SCARCELLO:  Object to form.
12  It's my understanding that we have an agreement
13  not to discuss attorney-expert communications, and
14  there is also an agreement in this case to follow
15  the federal rules, so anything about the drafting
16  process would be protected.
17          Subject to that, you can
18  answer.
19          R. RAPHAEL:  Thank you.
20          THE WITNESS:  So as I said
21  yesterday, I was shown some documents, but most
22  were self-directed through a system called Disco,
23  where I used boolean searches.  Again, my opinions
24  in this case were far more weighted on the
25  peer-review evidence, but I found the internal

Page 500

1   documents pretty consistent with that -- with
2   those findings.
3           BY R. RAPHAEL:
4           Q.   Okay, I'm going to -- oh,
5   sorry, I didn't mean to interrupt, Dr. Goldfield.
6           A.   It's okay.
7           Q.   Are you done?
8           A.   I'm done.
9           R. RAPHAEL:  I'm going to
10  object and move to strike as non-responsive.
11          BY R. RAPHAEL:
12          Q.   What I asked is how you
13  chose between the YouTube documents on your
14  materials considered list to cite the 43 documents
15  in the text, how you chose to highlight those
16  documents, that's what I asked.
17          L. SCARCELLO:  Same objection,
18  and asked and answered.
19          THE WITNESS:  I -- if you're
20  asking me if the review of documents were random
21  or systematic -- no, I was picking out documents
22  that I thought sort of highlighted some harms,
23  highlighted some awareness that the features --
24  the commonality of features, you know, can be in
25  the causal pathway.  And so -- yeah.

Page 501

1         BY R. RAPHAEL:
2         Q.  All right.  That wasn't
3    what I'm asking, but I'll move on.
4              For the documents you cite in
5    your report, you don't know when each of these
6    documents was first created; correct?
7         L. SCARCELLO:  Object to form.
8         THE WITNESS:  Some documents
9    had dates, but not -- it seemed like maybe not all
10   of them.
11        BY R. RAPHAEL:
12        Q.  Did you evaluate whether
13   each of those documents was a draft?
14        L. SCARCELLO:  Object to form.
15        THE WITNESS:  I can't -- I
16   can't recall where they were in the drafting
17   process or if they were final products or not.  I
18   think -- I think there was both.
19        BY R. RAPHAEL:
20        Q.  Okay.  Did you personally
21   speak with anyone at YouTube about any of the
22   documents cited in your report?
23        A.  I have not.
24        Q.  Have you ever spoken with
25   anyone at YouTube?

Page 502

1         A.  No.
2         Q.  For the YouTube documents
3    that you cite in your report, did you do any kind
4    of investigation to determine the purpose of the
5    document?
6         L. SCARCELLO:  Object to form.
7         THE WITNESS:  Often the
8    purpose was stated in the documents.
9         BY R. RAPHAEL:
10        Q.  And where it wasn't, did
11   you do anything to investigate?
12        A.  Excuse me -- I'm sorry,
13   did I investigate?
14        Q.  Do anything to
15   investigate the purpose where you did not find it
16   was otherwise stated in the document itself?
17        L. SCARCELLO:  Object to form,
18   vague.
19        THE WITNESS:  I can't recall
20   many documents that had no purpose.  I mean, there
21   were some e-mails that I came across, but a lot of
22   the documents that I've cited, I think the purpose
23   was pretty evident about the data they were
24   collecting.
25        BY R. RAPHAEL:

Page 503

1         Q.  But you haven't spoken to
2    the authors about their intent or the purpose of
3    the document; true?
4         A.  True.  Just whatever's
5    stated in the document itself.
6         Q.  And you don't know
7    whether there were any conversations at the
8    company prior to preparation of the document?
9         L. SCARCELLO:  Object to form.
10        THE WITNESS:  Do you mean
11   whether the company approved -- officially
12   approves the document?
13        BY R. RAPHAEL:
14        Q.  I mean whether there was
15   any kind of discussion contextualizing the
16   document.  You just see it at face value; true?
17        L. SCARCELLO:  Object to form.
18        THE WITNESS:  Yeah, as a
19   scientist, there is a lot of value in the findings
20   of whether it be peer-review literature or
21   internal.  And I think while I'm not discounting
22   context or other people's opinions, I think the
23   findings speak for themselves.
24        R. RAPHAEL:  I'm going to
25   object and move to strike as non-responsive.

Page 504

1         BY R. RAPHAEL:
2         Q.  What I asked you was
3    whether you knew of any context, not whether or
4    not you think it is important.
5         L. SCARCELLO:  Object to form.
6         THE WITNESS:  Sometimes yes,
7    but often no.
8         BY R. RAPHAEL:
9         Q.  And you don't know how
10   each of these documents was ultimately used;
11   correct?
12        L. SCARCELLO:  Object to form,
13   vague.
14        THE WITNESS:  Is it -- in
15   terms of internal decision making about app
16   features and tweaks to the app and evolution?
17        BY R. RAPHAEL:
18        Q.  Correct.
19        A.  I was not privy to those
20   decisions, no.
21        Q.  Okay.  Thank you.  So
22   yesterday and again today you referenced the 44
23   meta-analyses that you reviewed to form your
24   opinions in this case; right?
25        A.  Correct.

Page 505

1    Q.   And as part of your
2  review of these 44 meta-analyses, did you look to
3  see how many of the studies underlying those
4  analyses included YouTube in their definition of
5  social media?
6             A.   That would have required
7  me to read every individual study which would have
8  been hundreds and hundreds and hundreds.  Some did
9  and some didn't include YouTube.
10            Q.   In your report, you don't
11 know which if any of these 44 meta-analyses are
12 based on studies that include YouTube in their
13 definition of social media; true?
14            L. SCARCELLO:  Object to form,
15 argumentative.
16            THE WITNESS:  I think, given
17 there were so many meta-analyses, I believe
18 YouTube was represented.  But again, YouTube uses
19 often the same common features as the other apps.
20 So I think it's prone to displacement, displacing
21 other health-promoting behaviors.  So I've got no
22 reason to believe why the impact of YouTube would
23 be significantly different on mental health than
24 the other apps.
25            R. RAPHAEL:  I'm going to

Page 506

1  object and move to strike as non-responsive.
2             BY R. RAPHAEL:
3             Q.   What I asked you was
4  whether you looked to see if any of the studies
5  underlying these 44 meta-analyses included YouTube
6  in their definition of social media; is that
7  something you looked at?
8             A.   Yes, and I said some
9  studies did include it.
10            Q.   Sitting here today, can
11 you identify any such studies that included
12 YouTube in their definition of social media?
13            A.   I -- I can't recall
14 specific individual studies.  I focused more on
15 the bigger picture of the meta-analyses and the
16 pattern of how it all fits together holistically.
17            Q.   Okay.  So, no, you can't
18 recall today; true?
19            L. SCARCELLO:  Object to form,
20 asked and answered.
21            THE WITNESS:  True.
22            BY R. RAPHAEL:
23            Q.   And of the studies that
24 you -- I realize we're not talking about specific
25 ones because you can't recall.  But in those that

Page 507

1  you saw that did include YouTube, do you know one
2  way or the other whether the underlying study
3  controlled for the effects of participants using
4  other social media platforms?
5             A.   Usually when the studies
6  analyze the impacts of each platform, they often
7  controlled for overall screen use.  But the best
8  way to analyze that is having multiple platforms,
9  if it's broken down that way, in the regression
10 equation.  And so that way you're looking at the
11 unique correlation between each platform and
12 mental health.  So I know a lot of single studies
13 did that, as we did, I think it was one of the
14 exhibits with my student Mougharbel, whether the
15 meta-analyses accounted for that.  I don't think
16 there are any metas breaking down platforms that
17 granularly.  There are certainly meta-analyses
18 showing effects on Instagram versus, say,
19 Facebook, or all the other ones pooled.  But
20 again, I was focused more holistically about how
21 the features promote excessive use and what is the
22 relationship between excessive and problematic use
23 in mental health.
24            R. RAPHAEL:  Objection, move
25 to strike as non-responsive.

Page 508

1             BY R. RAPHAEL:
2             Q.   You mentioned that there
3  were some underlying studies that included YouTube
4  in the definition of social media, and I asked you
5  if, sitting here today, you know whether any of
6  those studies that you referenced controls for the
7  effects of participants using other social media
8  platforms.
9             L. SCARCELLO:  Is there a
10 question?
11            BY R. RAPHAEL:
12            Q.   That's the question I'm
13 repeating because he didn't answer it.
14            L. SCARCELLO:  He did answer
15 it.
16            THE WITNESS:  I did answer it.
17 I answered that my analysis focused on
18 meta-analyses.  There are -- there have been --
19            BY R. RAPHAEL:
20            Q.   So no?
21            A.   There have been single
22 studies that have looked at the individual
23 platforms and found pretty comparable associations
24 with mental health harms.
25            Q.   And do you know if any of

22STCV21355
DEPOSITION OF GARY GOLDFIELD

July 11, 2025

Page 509

1  those individual studies controlled for the
2  effects of participants using other social media
3  platforms aside from YouTube, sitting here today?
4          L. SCARCELLO:  Objection.
5  Objection, asked and answered.
6          THE WITNESS:  I don't recall
7  the statistical controls of those studies.  I
8  cited hundreds of studies.  I would have to look
9  at the citation in the paper.
10         BY R. RAPHAEL:
11         Q.  Okay.  And sitting here
12  today, are you aware of whether any of the
13  underlying studies isolated the effect of
14  third-party content from the effect of
15  YouTube-specific features?
16         A.  I think it's really
17  difficult to disentangle content from the
18  features.  The features generate the content.
19  They're inextricable.
20         Q.  I appreciate the
21  difficulty, but did you see any study that
22  attempted to isolate the effect of third-party
23  content from specific features?
24         L. SCARCELLO:  Object to form.
25         THE WITNESS:  Again, I think

Page 510

1  that's really difficult to disentangle.  It's a
2  whole experience.
3          BY R. RAPHAEL:
4          Q.  Have you seen a study
5  attempt to do so, yes or no?
6          L. SCARCELLO:  Objection,
7  asked and answered.
8          THE WITNESS:  I can't recall.
9          BY R. RAPHAEL:
10         Q.  That's not something you
11  looked at specifically; right?
12         L. SCARCELLO:  Objection,
13  misstates testimony.
14         THE WITNESS:  My focus again
15  was on meta-analyses and looking at social media,
16  the underlying drivers.  How the features, the
17  notifications, the gamification, reinforcement,
18  personalized algorithm affects the brain and
19  behavior.  So because I'm focusing on
20  meta-analyses, usually the analysis of each
21  platform was not so granular.
22         BY R. RAPHAEL:
23         Q.  So in your report,
24  you also referred to something called suicide
25  contagion; right?

Page 511

1          A.  Yes.
2          Q.  And you described that as
3  an:
4              "-- increased likelihood
5              of suicide or suicidal
6              behavior following
7              exposure to another
8              person's suicide or
9              suicidal acts --"
10  Right?
11         L. SCARCELLO:  Objection,
12  counsel.  If you're going to quote things to him,
13  can you please point him to where you are reading
14  from in his report.
15         R. RAPHAEL:  Sure.
16         Q.  You can take a look at
17  paragraph 135 of the amended report, which I
18  believe is Exhibit 8.
19         L. SCARCELLO:  To clarify,
20  Exhibit 8 is actually the redline of the JCCP
21  report served on April 18th, versus the amended
22  and supplemental report served earlier this week.
23         R. RAPHAEL:  Sure.
24         THE WITNESS:  Page 135?
25         BY R. RAPHAEL:

Page 512

1          Q.  Yes -- no, paragraph 135.
2  It should be at the bottom of page 67 of the
3  document.
4          A.  Okay.  I see it.
5          Q.  And in this paragraph,
6  you referred to an article by Lewis et al. 2012.
7  You see that?  The third line down on the top of
8  page 68.
9          A.  Yes, I see it.
10         Q.  And you're aware that
11  this article discusses the review and sampling of
12  comments from certain videos depicting
13  non-suicidal self-injury, or NSSI; right?
14         A.  Yes.
15         Q.  Okay.  And those videos,
16  those are posted by third parties; true?
17         L. SCARCELLO:  Objection,
18  form.
19         THE WITNESS:  I'm not sure
20  what you mean by "third parties."
21         BY R. RAPHAEL:
22         Q.  The videos are posted --
23  the videos that are under discussion in this
24  article are not posted by YouTube itself; correct?
25         A.  Yes, correct.

Page 513

1          Q.   So by third-party users.
2          A.   Okay.
3          Q.   And the comments to those
4    videos by others, those are also posted by third
5    parties; true?
6          A.   That is true.
7          Q.   And as I mentioned, this
8    study didn't look at suicide videos; right?  This
9    is non-suicidal self-injury content; true?
10         A.   True.
11         Q.   Now, you would agree with
12   me that not all individuals who view a video on
13   YouTube necessarily comment on that video; right?
14         A.   That's reasonable, I
15   would say.
16         Q.   And conversely, you don't
17   need to necessarily have to watch a full video in
18   order to comment on it; true?
19         A.   I -- I suppose in theory,
20   no.  I --
21         Q.   And we also know nothing
22   about the individuals who posted the comments that
23   were looked at by the authors to this article, do
24   we?
25         L. SCARCELLO:  Objection.

Page 514

1    Counsel, if you're going to ask him about that
2    study, I would like it to be in front of him.
3    You're asking him sort of granular details about
4    it, so does -- is there someone here who has that
5    that can put that in front of him?
6          R. RAPHAEL:  Sure, we can
7    introduce an exhibit.  I believe we would be --
8    this would be Exhibit 30.
9          R. EHLER:  We're on 33.
10         L. SCARCELLO:  I think we're
11   on 33, counsel.
12         R. RAPHAEL:  I'm sorry, 33.  I
13   apologize.
14         L. SCARCELLO:  That's okay.
15         R. RAPHAEL:  I've lost track.
16         EXHIBIT NO. 33:  ARTICLE
17         TITLED "HELPFUL OR
18         HARMFUL?  AN EXAMINATION
19         OF VIEWERS' RESPONSES TO
20         NONSUICIDAL SELF-INJURY
21         VIDEOS ON YOUTUBE"
22         R. RAPHAEL:  We should have
23   this up on Exhibit Share.
24         L. SCARCELLO:  Is someone
25   going to put it on the screen?  Oh, okay.

Page 515

1          Dr. Goldfield, it's right
2    here.  You'll probably have to tell someone how to
3    move it and stuff to see it.
4          THE WITNESS:  Yeah, there's no
5    way I can read that.
6          BY R. RAPHAEL:
7          Q.   And I just want to refer
8    you to --
9          L. SCARCELLO:  Counsel, I
10   think he would like to take a second to look at
11   it, get familiar -- or re-familiar with it.
12         T. CAMPBELL:  Can you see it?
13         THE WITNESS:  I can't see it.
14   I'm sorry, but I can't see --
15         L. SCARCELLO:  He can't --
16   counsel, he can't see it.
17         THE WITNESS:  I can't see
18   that.
19         L. SCARCELLO:  I mean, it's on
20   the screen, but it's far away and the text is
21   tiny, so -- anyway, he's just having a hard time
22   looking at it.  Is that better?  We've zoomed in.
23         THE WITNESS:  Is there any way
24   we can move this in a bit?
25         R. EHLER:  Do you want to go

Page 516

1    off the record for a second?
2          R. RAPHAEL:  Yes, please,
3    let's go off the record to resolve these technical
4    issues.
5          THE VIDEOGRAPHER:  The current
6    time is 11:26 a.m., and we are off the record.
7    --- Off-record discussion
8          THE VIDEOGRAPHER:  The current
9    time is 11:27 a.m., and we are back on the record.
10         BY R. RAPHAEL:
11         Q.   All right.  And the
12   question I asked, and if you're familiar enough
13   with the article to answer, Dr. Goldfield, I hope
14   you will, but I asked -- or my question was:  We
15   also don't know anything about the individuals who
16   posted comments that were looked at by the authors
17   to this article, do we?
18         L. SCARCELLO:  Object to form.
19         THE WITNESS:  We just know the
20   impact of those comments.  That it seems to
21   normalize and encourage non-suicidal self injury.
22         BY R. RAPHAEL:
23         Q.   But the authors of the
24   article -- sorry.
25         A.   Sorry, go ahead.

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 11, 2025

---

Page 517

1          Q.   But to your point, there
2    is no conclusion that there is a causal
3    relationship between the rates of self-harm or
4    suicide and watching NSSI videos; true?
5          L. SCARCELLO:  Object to form.
6          THE WITNESS:  Again, the study
7    was an association study, but it -- the study was
8    included to highlight that comments and feedback
9    can reinforce a harmful behavior and lead to even
10   more harm.
11         BY R. RAPHAEL:
12         Q.   But the study itself that
13   you cite didn't reach that conclusion; correct?  I
14   understand why you may have included it, but
15   that's not what this study says; true?
16         L. SCARCELLO:  Object to form,
17   asked and answered.
18         THE WITNESS:  Again, at an
19   individual-level study, a single study that's
20   cross-sectional, they are -- they are going to be
21   conservative about their causal inferences.  But
22   taken together in a larger pattern of what we
23   know, in the larger literature of feedback and
24   social feedback, I think it points toward a pretty
25   consistent pattern that people's responses online

---

Page 518

1    can amplify harm.
2          R. RAPHAEL:  Okay.  I'm going
3    to object and move to strike as non-responsive.
4          BY R. RAPHAEL:
5          Q.   I asked you whether the
6    authors to this article reached the conclusion
7    that there was a causal relationship between rates
8    of self-harm and suicide and watching NSSI videos.
9          L. SCARCELLO:  Objection.
10   Counsel, he really wasn't able to look at the
11   study and see the conclusions and things like
12   that.  So anyway --
13         R. RAPHAEL:  If he cannot
14   answer, then I will move on.
15         THE WITNESS:  Yeah, I'm a bit
16   uncertain of their exact on that paper.  I kind of
17   skimmed the abstract and that's all I got to, so I
18   don't know what their conclusions were relative to
19   limitations or strengths.
20         BY R. RAPHAEL:
21         Q.   How familiar are you with
22   YouTube's sensitive content warnings?
23         A.   I'm aware they exist.
24         Q.   Aware that YouTube
25   provides these warnings on videos that involve

---

Page 519

1    sensitive content such as suicide and self-harm?
2          A.   I'm aware of the
3    literature showing that warning labels are not
4    very effective.
5          R. RAPHAEL:  Okay, I'm going
6    to object and move to strike as non-responsive.
7          BY R. RAPHAEL:
8          Q.   I asked whether you were
9    aware that these warnings were provided on videos
10   that involve sensitive content.
11         L. SCARCELLO:  Object to form.
12         THE WITNESS:  I'm aware that
13   YouTube uses some warnings.
14         BY R. RAPHAEL:
15         Q.   And that these have been
16   in place on videos since 2015?  Are you aware of
17   that?
18         A.   I'm aware that YouTube
19   uses some warnings.
20         Q.   Okay.  How familiar are
21   you with YouTube's crisis resource panel?
22         A.   Not very familiar.
23         Q.   Are you aware that these
24   are informational boxes that appear on YouTube to
25   connect users with support services when they

---

Page 520

1    search for sensitive topics like suicide and
2    self-harm?
3          L. SCARCELLO:  Object to form.
4          THE WITNESS:  I actually have
5    heard that you can connect with like-minded
6    individuals on serious matters like suicide
7    through YouTube.
8          BY R. RAPHAEL:
9          Q.   But here I'm asking
10   about -- these are informational boxes that
11   provide links to mental health resources, are you
12   aware of that?  Like the suicide hotline, for
13   example.
14         A.   Right.  Right, right.
15   Right.  Not in the particular instance of YouTube,
16   but I --
17         Q.   Okay.  Now, you would
18   agree with me, right, that the platforms in this
19   case are different from each other; true?
20         L. SCARCELLO:  Object to form,
21   vague.
22         THE WITNESS:  Well, they share
23   a lot of common features that generate
24   personalized content that activate brain reward
25   systems, compel prolonged use.  Are they

---

22STCV21355
DEPOSITION OF GARY GOLDFIELD

July 11, 2025

Page 521

1  different?  They're different in the design
2  feature, the content differs.  But they share a
3  lot of commonality, a lot of the features designed
4  for use.
5          BY R. RAPHAEL:
6          Q.  Understood.  They're
7  designed differently, though, as you said; right?
8          A.  Yes, they -- well, there
9  are a lot of similarities, but there are
10  differences.
11          Q.  And they also -- there
12  are differences that exist in their features;
13  true?
14          A.  There are commonalities
15  and there are some differences.
16          Q.  Okay.  You're aware that
17  YouTube doesn't offer a private messaging feature?
18          A.  I'm aware that people can
19  comment on YouTube and send comments to people who
20  post it, but it may not be to the same level as,
21  say, Instagram or others.
22          R. RAPHAEL:  Okay.  I'm going
23  to object as non-responsive and move to strike.
24          BY R. RAPHAEL:
25          Q.  What I asked was whether

Page 522

1  you were aware that YouTube doesn't have a private
2  messaging feature?
3          L. SCARCELLO:  Objection,
4  asked and answered.
5          THE WITNESS:  I mean, there
6  are avenues to reach individual users, so I'm not
7  sure if an absence of that is achieving what it's
8  perhaps designed to do.
9          BY R. RAPHAEL:
10          Q.  I asked whether you were
11  aware of the absence of this feature on YouTube.
12          L. SCARCELLO:  Is there a
13  question, counsel?
14          BY R. RAPHAEL:
15          Q.  Yes or no?
16          L. SCARCELLO:  Objection,
17  asked and answered.
18          THE WITNESS:  I think I've
19  contextualized my answer.
20          BY R. RAPHAEL:
21          Q.  Are you aware that
22  YouTube doesn't offer short-term content that then
23  disappears, so ephemeral content?  Are you aware
24  of that?
25          A.  Yes.

Page 523

1          Q.  Would you agree with me
2  that the platforms in this case can also have
3  different uses?
4          L. SCARCELLO:  Objection,
5  vague.  Object to the form.
6          THE WITNESS:  I think people
7  have different motivations for using them.
8          BY R. RAPHAEL:
9          Q.  Okay.  You're aware
10  YouTube has been used by teachers to help them
11  teach, for example?
12          A.  I'm -- yes, I'm aware.
13          Q.  You agree with me that
14  there are ways that YouTube can be used
15  effectively in the classroom?
16          L. SCARCELLO:  Object to form.
17          THE WITNESS:  In the
18  classroom, I haven't seen any studies about that,
19  whether it promotes learning or not.
20          BY R. RAPHAEL:
21          Q.  Are you aware that
22  schools use YouTube for education purposes?
23          L. SCARCELLO:  Object to form.
24          THE WITNESS:  I am aware, but
25  again I haven't looked at the research to see if

Page 524

1  it's effective or not.
2          BY R. RAPHAEL:
3          Q.  Are you aware that
4  schools and teachers even instruct kids to use
5  YouTube for purposes like homework or schoolwork
6  help?
7          L. SCARCELLO:  Object to the
8  form.
9          THE WITNESS:  Again, I --
10  schools, agencies often make recommendations in
11  the absence of evidence, so I don't know if it's
12  helping or hurting or having no effect.
13          R. RAPHAEL:  Okay.  Objection.
14  Motion to strike.  It's non-responsive.
15          BY R. RAPHAEL:
16          Q.  I didn't ask whether it
17  was helpful.  I asked whether you knew if it was
18  used that way.
19          L. SCARCELLO:  Counsel, do you
20  have a question?
21          BY R. RAPHAEL:  Yes.
22          Q.  Are you aware that
23  schools use -- that schools and teachers instruct
24  kids to use YouTube for homework?
25          L. SCARCELLO:  Object to the

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                           July 11, 2025

Page 525

1  form.
2              BY R. RAPHAEL:
3         Q.  Are you aware?
4         L. SCARCELLO:  Object to the
5  form, and asked and answered.
6              BY R. RAPHAEL:
7         Q.  You can still answer
8  again, Dr. Goldfield.
9         A.  I think a lot of teachers
10 in schools may refer students to YouTube for
11 homework.  Whether that's -- whether the kids are
12 actually going to that site to learn or for
13 entertainment purposes or the effects of that, I
14 don't know.
15        Q.  Are you aware that
16 YouTube has been used by therapists to share
17 techniques with their patients?
18        L. SCARCELLO:  Object to form,
19 vague.
20             THE WITNESS:  I was not aware
21 of that.
22             BY R. RAPHAEL:
23        Q.  And are you aware that
24 users can also access YouTube to listen to white
25 noise and other sounds to help with sleep?

Page 526

1         A.  Yes, that I'm aware of.
2         Q.  The platforms in this
3  case, I believe you mentioned this but I may be
4  misremembering, provide different content;
5  correct?
6         L. SCARCELLO:  Object to form.
7         THE WITNESS:  Generally, yes.
8              BY R. RAPHAEL:
9         Q.  YouTube has educational
10 content; true?
11        A.  True.
12        Q.  Users can view tutorials
13 in various subjects, for example?
14        A.  That is true.
15        Q.  In your report, you
16 mentioned YouTube's algorithm for recommending
17 content.  Do you recall?
18        A.  I would have to refresh
19 my memory, but I remember discussing algorithms.
20        Q.  Okay.  Are you aware that
21 in the case of YouTube, content recommendations
22 are impacted by parental controls in place on the
23 user's account?
24        L. SCARCELLO:  Object to form.
25        THE WITNESS:  I'm aware most

Page 527

1  of the platforms have parental controls, but they
2  seem to be not very widely used.
3              BY R. RAPHAEL:
4         Q.  Are you aware that the
5  parental controls can impact the content
6  recommendations on YouTube?
7         L. SCARCELLO:  Object to form,
8  vague.
9              THE WITNESS:  I haven't seen
10 any studies looking at the degree in which it
11 alters content.
12             BY R. RAPHAEL:
13        Q.  So you're not aware then?
14        A.  I'm not aware of studies
15 showing that parental controls effectively
16 modulate content to mitigate harm.
17        Q.  Okay.  So you're not
18 aware one way or the other whether this is
19 something that the parental controls have the
20 capability to do?
21        A.  Well, I believe they have
22 the capability.  I just haven't seen any studies
23 showing that they're widely used, implemented and
24 having a positive effect in protecting their
25 children and youth from watching harmful content.

Page 528

1         Q.  Okay.  Do you consider
2  Netflix to be social media?
3         A.  I do not.
4         Q.  What about Hulu or Apple
5  TV?
6         A.  No.
7         Q.  Are you aware that these
8  platforms also use algorithms to suggest
9  categories of movies and shows that the user might
10 like?
11        A.  Yes, I'm aware of that.
12        Q.  And in this litigation,
13 you're not offering the opinion that platforms
14 like Netflix, Apple TV or Hulu cause the harms you
15 allege social media causes; correct?
16        A.  Correct.
17        Q.  How familiar are you with
18 the autoplay feature on YouTube?
19        A.  I'm familiar --
20        L. SCARCELLO:  Object to form,
21 vague.
22             THE WITNESS:  I'm familiar
23 with it.
24             BY R. RAPHAEL:
25        Q.  And are you aware whether

Page 529

1   autoplay can be turned off?
2           L. SCARCELLO:  Object to form,
3   vague.
4           THE WITNESS:  I imagine it can
5   be, but it may not -- it may not be simple or easy
6   to find.
7           BY R. RAPHAEL:
8           Q.  Okay.  And I had just
9   asked you about Netflix, Hulu and Apple TV.  Are
10  you aware that these platforms also have autoplay?
11          A.  I'm aware of -- I've read
12  some papers on the relation between autoplay and
13  binge-watching.
14          Q.  In connection with
15  Netflix, Hulu and Apple TV?
16          A.  Yes.
17          Q.  Okay.  With respect to
18  YouTube notifications, do you know if
19  notifications can be disabled?
20          A.  I think it would be a
21  serious problem if they couldn't be disabled.
22          Q.  Okay.  Are you aware that
23  the sounds and vibrations on notifications can be
24  turned off?
25          L. SCARCELLO:  Object to form,

Page 530

1   vague.
2           THE WITNESS:  As I said
3   before, I think it's really difficult for children
4   and youth to turn off such an engaging,
5   interactive app.  So is it possible?  Yes.  I'm
6   aware it's possible.  That doesn't happen much in
7   the real world.
8           BY R. RAPHAEL:
9           Q.  Are you aware that quiet
10  hours can be set on notifications on YouTube?
11          A.  Yes.
12          Q.  Okay.  And that
13  notifications are actually silent by default
14  between the hours of 10:00 p.m. and 8:00 a.m. on
15  YouTube?
16          L. SCARCELLO:  Object to form.
17          THE WITNESS:  Now I do.
18          BY R. RAPHAEL:
19          Q.  Okay.  And are you aware
20  that YouTube notifications can be combined into a
21  single notification?
22          A.  Can you give me an
23  example, please?
24          Q.  So you can elect to have
25  all notifications contact you at one single time

Page 531

1   during the day, for example.
2           A.  So to limit it to one per
3   day?
4           Q.  Correct, correct.
5           A.  I did not know that.
6           Q.  Okay.  Are you aware that
7   a user can disable comments on their YouTube
8   videos?
9           L. SCARCELLO:  Object to form,
10  vague.
11          THE WITNESS:  It would make
12  sense that one can do that.  But, again, how many
13  people disable notifications in the comments?
14          BY R. RAPHAEL:
15          Q.  Were you aware of this
16  possibility before today?
17          L. SCARCELLO:  Same objection.
18          THE WITNESS:  It makes sense
19  that that exists.  Is that the default option?
20          BY R. RAPHAEL:
21          Q.  Are you aware that you've
22  been able to disable comments since 2005?
23          A.  I was not aware of the
24  timeline.
25          Q.  Are you aware that users

Page 532

1   can hide comments from specific commentators
2   across all their channels?
3           L. SCARCELLO:  Object to form.
4           THE WITNESS:  No.
5           BY R. RAPHAEL:
6           Q.  Okay.  So in your report,
7   you refer to YouTube, and I want to make sure that
8   -- whether you understand that YouTube Kids and
9   YouTube main are separate and distinct platforms;
10  right?
11          A.  Yes.
12          Q.  And you're aware, aren't
13  you, that YouTube Kids doesn't have the comments
14  feature?
15          A.  I would like to take a
16  moment to take a look at -- at my report, if you
17  don't mind.
18          Q.  I'm asking you sitting
19  here, not whether or not it was in your report.
20  I'm asking, sitting here, whether you're aware of
21  whether YouTube Kids offers a comments feature.
22  There is no need to reference the report.  I'm not
23  asking about an opinion in your report.
24          L. SCARCELLO:  But you are
25  welcome to look at your report if you would like

22STCV21355
DEPOSITION OF GARY GOLDFIELD

July 11, 2025

Page 533

1  to do so.
2            THE WITNESS:  It appears
3  YouTube shares an awful lot of features as the
4  other apps as I've documented in my report.
5  Sorry, can you remind me of the question?
6            R. RAPHAEL:  Yeah, I'm going
7  to move to strike that as non-responsive.
8            BY R. RAPHAEL:
9       Q.   I asked whether you were
10  aware that YouTube Kids doesn't offer a comments
11  feature.
12       A.   I'm aware that these --
13  they share an awful lot of features with the other
14  apps, and that that drives high use and displaces
15  health-promoting behaviors.  So I'm not sure
16  whether being able to disable a content, and
17  whether a 13 or an 11-year-old or a 9-year-old
18  would, you know, have the digital media literacy
19  to do that, is really going to have an impact.
20            R. RAPHAEL:  I'm going to move
21  to strike that entire response as non-responsive
22  and object.
23            BY R. RAPHAEL:
24       Q.   Dr. Goldfield, I asked
25  you did you know that YouTube Kids doesn't have a

Page 534

1  comments feature at all.  Is that something you
2  are aware of, not whether users can disable it.  I
3  asked whether YouTube Kids has a comment feature.
4  Were you aware that that platform does not?
5            L. SCARCELLO:  Object to form.
6  Asked and answered.
7            THE WITNESS:  I think when
8  you're trying to disentangle these individual
9  features, there's no -- it's a whole experience.
10  So whether YouTube Kids has a comment feature or
11  not, I don't think is -- the fact that it has no
12  comment feature, I don't necessarily think it
13  mitigates harm.  For all the other features it
14  does that.
15            R. RAPHAEL:  Okay.  I'm going
16  to object again and move to strike as
17  non-responsive.
18            BY R. RAPHAEL:
19       Q.   I didn't ask your on
20  opinion whether or not it could still cause harm.
21  I just asked whether you were aware that there was
22  no comments feature on YouTube Kids?
23            L. SCARCELLO:  Object to form.
24  Asked and answered.
25            BY R. RAPHAEL:

Page 535

1            Q.   With that, I will move
2  on.  Are you aware that parents can set screen
3  time limits for their kids on YouTube Kids?
4            L. SCARCELLO:  Object to form,
5  vague.
6            THE WITNESS:  I'm aware that
7  that function exists.  I believe it's not widely
8  used.
9            BY R. RAPHAEL:
10       Q.   And what's your basis for
11  that belief?
12       A.   I've done my own research
13  on electronic controls of digital media, and I
14  think parents get worn down, that the -- you know,
15  the content and the algorithms of it, it's so
16  addictive and engaging that a lot of the parents
17  just -- they are sick of fighting and they -- you
18  know, my experience clinically and in some of the
19  research that I've looked at shows they're not
20  widely used.  And I believe the reason they're not
21  widely used is because parents just get sick of
22  the backlash and the friction that they cause.
23            R. RAPHAEL:  Objection, move
24  to strike as non-responsive.
25            BY R. RAPHAEL:

Page 536

1            Q.   I asked you specifically
2  about the parents' ability on YouTube Kids to set
3  screen time limits.  Were you aware of that?
4            A.   I'm aware these functions
5  exist, but they're --
6            Q.   Okay, thank you.
7            A.   -- not widely used.
8            Q.   Okay.  Are you aware that
9  YouTube Kids allows parents to hand-pick content
10  for users?
11            L. SCARCELLO:  Object to form.
12            THE WITNESS:  I'm aware
13  they -- they have an influence over the content.
14  But I'm also aware that kids set up accounts that
15  parents are not aware of.
16            BY R. RAPHAEL:
17       Q.   On YouTube Kids?  That
18  was the question.
19       A.   On other social media
20  platforms.
21       Q.   And I'm specifically
22  right now asking about YouTube Kids.  Do you know
23  how many Plaintiffs, if any, are bringing claims
24  against YouTube and Google for their use of
25  YouTube Kids?

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 11, 2025

Page 537

1          A.  I have not been privy to
2    the number of Plaintiffs in -- in this case.
3          Q.  In your report, you
4    are -- there is a brief reference to something
5    called the Supervised Experience.  You don't
6    discuss it in your report, but are you aware that
7    the Supervised Experience also allows parents to
8    set time limits on YouTube use?
9          A.  Yes, I'm aware of that.
10         Q.  And are you aware that
11   these time limits actually override the autoplay
12   function?
13         A.  I'm not aware of any data
14   showing that these are widely used or effective.
15         R. RAPHAEL:  Okay.  Objection,
16   move to strike as non-responsive.
17         BY R. RAPHAEL:
18         Q.  I asked whether you were
19   aware that time limits restriction override an
20   autoplay function --
21         L. SCARCELLO:  Objection,
22   asked and --
23         BY R. RAPHAEL:
24         Q.  -- as a matter of design?
25         L. SCARCELLO:  Objection,

Page 538

1    asked and answered.  Further object to the form
2    otherwise.
3          THE WITNESS:  Again, having
4    features that are not widely used, it serves
5    really no purpose.
6          R. RAPHAEL:  Okay.  Objection,
7    non-responsive, move to strike.
8          BY R. RAPHAEL:
9          Q.  Turning to the age
10   verification process on YouTube, how familiar with
11   you with the differences in accessing YouTube in a
12   logged-in versus a logged-out state?
13         A.  I'm aware you can -- you
14   don't need to be logged in to view YouTube.
15         Q.  Sure.  Are you aware that
16   when you're logged out on YouTube, though, you
17   can't comment on YouTube videos?  Are you aware of
18   that?
19         A.  Yes.
20         Q.  And you can't upload
21   YouTube videos either; right?
22         A.  To your account, yes, I'm
23   aware of that.
24         Q.  You can't like or dislike
25   YouTube videos; true?

Page 539

1          A.  True.
2          Q.  You can't follow or
3    subscribe to specific accounts; right?
4          A.  Again, I -- it's a whole
5    experience.  You could get lost in YouTube whether
6    you're logged in or logged out.
7          Q.  Okay.  But these features
8    I just mentioned and you acknowledged don't exist,
9    they aren't present when you're in a logged-out
10   state; correct?
11         A.  I'm not aware of the
12   percentage of time people watch YouTube in their
13   account versus a logged-out state.  So --
14         Q.  Okay.
15         A.  -- to contextualize that
16   question, I would need that larger picture.
17         Q.  Sure.
18         A.  Is it possible that
19   people view videos in the logged-out state?  Sure.
20   If they want to know how to screw in a light bulb,
21   they probably don't need to log into their
22   account.  But it's certainly -- we know it's a
23   certainly more rewarding experience logging into
24   your account and being able to interact and get
25   personalized videos than it would be just a

Page 540

1    one-off, with a very intentional purpose of -- in
2    a logged-out state.  So I think the motivation is
3    different.  I think the impact is different.
4          R. RAPHAEL:  Objection, move
5    to strike as non-responsive.
6          BY R. RAPHAEL:
7          Q.  Are you familiar with
8    something called YouTube Restricted Mode?
9          A.  I've heard of it.
10         Q.  Okay.  Are you aware that
11   Restricted Mode intentionally limits content that
12   users can access on YouTube?  Is that something
13   you're aware of?
14         A.  Yes.
15         Q.  And you're aware that the
16   Restricted Mode applied to logged-out users
17   whether or not it's turned on while users are
18   logged in?
19         A.  Sorry, can you repeat
20   that question?
21         Q.  Are you aware that
22   Restricted Mode applies to logged-out users
23   whether or not that mode has been turned on when a
24   user's logged in?
25         A.  And when would that

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 11, 2025

Page 541

1  restriction kick in?
2          Q.  Pardon me?  If someone is
3  trying to use YouTube in a logged-out state.  It
4  applies no matter what.  It's the default.  Do you
5  understand that?
6          A.  I understand that.
7          Q.  How familiar are you with
8  the Google parent control service Family Link?
9          L. SCARCELLO:  Object to form.
10         THE WITNESS:  Again, looking
11 at the literature, parental controls are not very
12 widely used.
13         BY R. RAPHAEL:
14         Q.  I asked how familiar you
15 were or whether you were familiar with Family
16 Link?
17         A.  I've heard of it, yes.
18         Q.  And are you aware that
19 Family Link can be used to prevent a child from
20 accessing YouTube even in a logged-out state?  Is
21 that something you're aware of?
22         A.  Yes, that's my
23 understanding of that feature.
24         Q.  Are you familiar with
25 something called the birthday correction flow?

Page 542

1          A.  I am not.
2          Q.  Okay.  YouTube's birthday
3  correction flow is the process of requiring users
4  who are suspected of being under 13 years old to
5  provide a government I.D. or credit card verifying
6  their birth date.  Does that sound at all familiar
7  to you?
8          L. SCARCELLO:  Object to form.
9          THE WITNESS:  No.  I have not
10 heard of that.
11         BY R. RAPHAEL:
12         Q.  Are you familiar with any
13 of YouTube's other controls for identifying
14 accounts of users suspected to be under 13 and
15 directing those accounts to birthday correction
16 flow process?
17         L. SCARCELLO:  Object to form.
18 Counsel, he said he's not familiar with the
19 birthday flow process.
20         THE WITNESS:  I'm not
21 familiar --
22         BY R. RAPHAEL:
23         Q.  And I asked -- sorry.
24 Pardon me.
25         A.  Yeah.  I'm not familiar.

Page 543

1  I don't know how someone submitting a fake I.D.
2  can be verified or not.  Could you tell me a bit
3  more about the process?
4          Q.  I'm asking you what
5  you're familiar with in forming the opinions that
6  went into your report that you submitted in April
7  and then again recently again this month, whether
8  when you prepared that report you were aware of
9  YouTube's various other controls for identifying
10 accounts of users suspected to be under the age of
11 13.
12         A.  I'm aware of some
13 controls, but I'm also aware they're generally not
14 widely used.
15         Q.  And what controls are you
16 aware of sitting here today --
17         A.  Well, I said I was --
18         Q.  -- specifically with
19 respect to YouTube?
20         A.  Some of the parent
21 controls.  I knew that some of the features and
22 comments were negated in a logged-out state.  And
23 I think I've -- you've asked me about more than a
24 dozen questions, I've answered yes to some of
25 them.  So I was aware of some of the features and

Page 544

1  controls.
2          Q.  Were you aware of what
3  steps YouTube takes internally in order to attempt
4  to detect accounts suspected to belong to underage
5  users?
6          A.  That question relates to
7  my previous question about age verification and
8  the process involved in that.  So I know --
9          Q.  Okay.
10         A.  I know other platforms
11 try to arrive at that through different metrics,
12 content viewed, comments, communication, different
13 metrics to provide an index or an estimate of age,
14 but --
15         Q.  But -- and I've asked
16 whether you know of anything specifically with
17 respect to YouTube?
18         L. SCARCELLO:  Objection,
19 asked and answered.
20         THE WITNESS:  I think I just
21 answered that question.
22         R. RAPHAEL:  With that, I'll
23 pass the witness to my co-Defendant.
24         A. STANNER:  Are you ready to
25 keep going, doctor?

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                  July 11, 2025

Page 545

1    L. SCARCELLO:  I would like to
2  take a bathroom break if that --
3    A. STANNER:  Sure.
4    L. SCARCELLO:  Thank you so
5  much.
6    THE VIDEOGRAPHER:  Current
7  time is 11:57 a.m., and we are off the record.
8  --- Upon recessing at 11:57 a.m.
9  --- Upon resuming at 12:13 p.m.
10    THE VIDEOGRAPHER:  The current
11  time is 12:13 p.m., and we are back on the record.
12  CROSS-EXAMINATION BY A. STANNER:
13    Q.  Good afternoon,
14  Dr. Goldfield.
15    A.  Good afternoon.
16    Q.  My name is Andrew
17  Stanner --
18    A. KOVAL:  Apologies.  This is
19  Anastasiia speaking from Arbitration Place.  Your
20  camera is muted.  Thank you so much.
21    A. STANNER:  Are we good?
22  Okay.
23    BY A. STANNER:
24    Q.  My name is Andrew
25  Stanner, I represent Meta, and I'm last to ask you

Page 546

1  some questions today.  Okay?  One thing you said
2  earlier today is that notifications on certain
3  social media apps are sent at intermittent times
4  to prolong use.  Do you remember saying that?
5    A.  I do.
6    Q.  Okay.  What's the basis
7  for that claim?
8    A.  I've read some internal
9  documents to indicate that, as well as read some
10  peer-reviewed literature to indicate that as well.
11  And I actually have a Facebook account and can
12  vouch that it's not delivered every single
13  solitary time someone posts, but it's
14  intermittent.
15    Q.  Okay.  So I just want to
16  make sure I understand.  When you say you read
17  some internal documents, you're referring to
18  internal Meta documents?
19    A.  Yes.
20    Q.  Do you know which ones?
21    A.  I read a lot of
22  documents.  I think I cited quite a few in my
23  report.
24    Q.  And I just mean just for
25  this particular claim that notifications are sent

Page 547

1  at intermittent times, do you remember what
2  documents support that claim?
3    A.  Again, not offhand.  I
4  looked at hundreds if not thousands of documents.
5    Q.  Okay.  And I know you
6  said the main source for your opinions is not
7  internal company documents, but a lot of the
8  literature you've reviewed; right?
9    A.  Yes.
10    Q.  So also on your list as
11  to this intermittent time -- that notifications
12  are sent at intermittent times, you said
13  peer-reviewed literature?
14    A.  Peer-review literature to
15  discuss that concept in relation to Meta's
16  platforms and other platforms, yes.
17    Q.  Okay.  And again, I know
18  you've cited a number of different studies in the
19  course of putting together your full report.  Just
20  on this question, notifications are sent at
21  intermittent times, can you tell me what
22  peer-review literature you're referring to?
23    A.  Yeah, a study by Zarate
24  discusses that.  Many of the single studies cited
25  I think the neuroscience research.  I think Meshi

Page 548

1  talks about it.  The Maza study with Eva Telzer as
2  the senior author on that paper.  They talk about
3  the impact of "likes," the impact of reinforcement
4  schedules and notifications.
5    Q.  Okay.  And another thing
6  that you'd said earlier was that -- you said a
7  couple of times today that parental controls are
8  not widely used; do you remember saying that?
9    A.  I do, yes.
10    Q.  And when you were pressed
11  on that, I think you said some of that is based on
12  your conversations during clinical sessions; is
13  that right?
14    L. SCARCELLO:  Object to form.
15    THE WITNESS:  Some of that was
16  actually based on internal documents showing
17  that -- the internal research showing they're not
18  widely used.
19    BY A. STANNER:
20    Q.  And maybe the answer is
21  the same as for notifications.  I'd just like to
22  understand.  When you offer that opinion that
23  parental controls seem to be not widely used, what
24  is the basis for that claim?
25    A.  I've -- I mean, there

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 11, 2025

Page 549

1  have been survey studies in the peer-review
2  literature that seem to be consistent with Meta's
3  internal research.
4         Q.   Okay.  So again, it's --
5  you think there's support for that claim in Meta's
6  own documents?
7         A.   Yes.
8         Q.   And you think there's
9  support for that claim in peer-reviewed
10 literature?
11        A.   That parent controls are
12 not widely used?
13        Q.   Yes.
14        A.   Yes.
15        Q.   And again, recognizing
16 that you've cited lots of different sources, do
17 you know which sources, which peer-reviewed
18 sources support the notion that parental controls
19 are not widely used?
20        A.   I just recall -- I think
21 they're in my report.  I think they're just -- you
22 know, it's -- I don't recall the authors' names in
23 particular.
24        Q.   Okay.  You've said during
25 the course of the deposition that when you were

Page 550

1  looking -- as part of your work in this case, when
2  you were looking at harm, you took a broad
3  definition of "harm"; is that right?
4         L. SCARCELLO:  Object to the
5  form.
6         THE WITNESS:  Yes, I did.  I
7  looked at many outcomes, many indicators of harm
8  and mechanisms and vulnerabilities to harm.
9         BY A. STANNER:
10        Q.   And as I understand your
11 testimony, there are ways in which, you know, an
12 input, any input could be affirmatively harmful,
13 it could cause an adverse mental health impact; is
14 that right?
15        L. SCARCELLO:  Object to form,
16 vague.
17        THE WITNESS:  I outline in
18 figure 3 multiple pathways of harm that work
19 independently and interactively.
20        BY A. STANNER:
21        Q.   And I guess I want to
22 make sure I understand that one harm that you
23 would include would be displacing healthy
24 behavior; is that right?
25        L. SCARCELLO:  Object to form.

Page 551

1         THE WITNESS:  That is -- yes,
2  that is correct.
3         BY A. STANNER:
4         Q.   And so that would be not
5  necessarily creating an affirmative eating
6  disorder or other mental health issue, but it
7  would be harm in your definition because it's
8  preventing a person from engaging in healthier
9  behaviors?
10        L. SCARCELLO:  Object to form.
11        THE WITNESS:  Well, I think
12 that would increase the vulnerability to harm if
13 it displaces protective behaviors.
14        BY A. STANNER:
15        Q.   Understood.  But
16 displacing protective behaviors is not the same
17 as, say, creating an eating disorder; right?
18        L. SCARCELLO:  Object to form.
19        THE WITNESS:  Again, it's -- I
20 also note that the displacement theory doesn't
21 exist in isolation.  It's one theory.  But how
22 displacement works is the algorithms through
23 gamification and notifications and autoscroll
24 generate prolonged use.  The prolonged use -- or
25 problematic use.  But displacement is more about

Page 552

1  time spent.  So problem -- more time spent can
2  displace sleep, for example.
3         BY A. STANNER:
4         Q.   Okay.  And just focusing
5  on displacement, though.  Some of the healthy
6  behaviors -- you just gave us one example.  Sleep
7  is a healthy behavior; right?
8         A.   Right.
9         Q.   And I take your argument
10 to be if kids are spending too much time on social
11 media, they might not be getting as much sleep;
12 right?
13        A.   Right.
14        Q.   But a lot of other things
15 separate and apart from social media could lead to
16 displacement; right?
17        A.   I believe most of the
18 kids are spending their discretionary time on
19 social media, but I acknowledge that other things
20 can displace healthy behaviors.
21        Q.   And I just want to drill
22 down on that.  I mean, if a teenager is spending
23 seven hours at night watching TV, that, similarly,
24 would displace sleep; right?
25        A.   Yes, but TV doesn't have

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 11, 2025

Page 553

1  the fire hose of negative social comparisons and,
2  you know, all the other harms I list in figure 3,
3  but yes.  TV -- excessive amounts of TV could also
4  displace sleep or contact with friends and family
5  and other activities that are protective of mental
6  wellness.
7            Q.  Right.  And I understand
8  your testimony to be that you think social media
9  has other features that make it more harmful than
10  television; right?
11           A.  Yes.
12           Q.  But again, just focusing
13  on displacement, there are a number of different
14  things that kids can do that will prevent them or
15  take up time such that they are prevented from
16  doing healthier things; right?
17           L. SCARCELLO:  Objection,
18  vague, incomplete hypothetical, calls for
19  speculation.
20           THE WITNESS:  Yeah, I think in
21  theory, yes, that is true.  In practice, the
22  features make social media so engaging that the
23  risk of displacing other behaviors is much higher
24  than activities that don't activate the brain
25  reward system quite in the same way.

Page 554

1            BY A. STANNER:
2            Q.  Okay.  So that's what I
3  want to focus on.  I mean, I don't know how old
4  you are.  I'm 48, okay.  So 30 years ago, kids
5  played Nintendo; right?
6            A.  Yeah.
7            Q.  And that too could
8  displace time spent taking a walk in the park;
9  right?
10           A.  Right.
11           Q.  And I would take your
12  testimony today to be, yes, but social media has
13  these features and algorithms and you think it's
14  just worse than Nintendo; right?
15           A.  I remember Nintendo, it
16  wasn't all that engaging.  It was better than
17  Pong.
18           Q.  Okay.  You played
19  Nintendo?
20           A.  I've played Nintendo.
21           Q.  Sure.  Or video games --
22           A.  As a kid.
23           Q.  -- at an arcade?
24           A.  Yes.
25           Q.  And in some circumstances

Page 555

1  those things can have benefits.  If you go to the
2  arcade with your friends, maybe there are some
3  social benefits; right?
4            A.  I think my report is
5  focusing on social media.  But there is a whole
6  literature on video game and interactive video
7  gaming disorder and effects on the brain and
8  problematic video gaming, so -- but that's not
9  what I focused on.
10           Q.  No, I know, but I want to
11  make sure that I understand the limits of your
12  opinion about displacement, right?  You've
13  testified that one harm that you include in your
14  list of harms from social media is displacement,
15  it prevents kids from doing other things that can
16  be healthy?
17           A.  That is one harm that
18  generally is, again, not always occurring and I
19  might even argue rarely occurring in isolation,
20  but that's part of the harm.  Yes, I've outlined
21  that in my report.
22           Q.  Okay.  And that's what
23  I'm trying to understand.  I mean, it's --
24  certainly in advance of trial, if your testimony
25  is displacement is in and of itself the harm, we

Page 556

1  need to know that.  If the testimony instead is,
2  look, displacement is one or it could exacerbate
3  other harms, I'd like to know that.  So can you
4  explain that?
5            A.  Yeah, I think it also
6  depends.  For some people, the high use can
7  displace health-promoting behaviors and if it's --
8  you know, it increases susceptibility to mental
9  health harms.  It would depend on how high -- the
10  national average is about three hours, but for
11  five or six hours a day, I mean, that's 40 hours a
12  week of social media use.  It would be hard to
13  believe that doesn't displace some
14  health-promoting behaviors.
15           Q.  Okay.  So --
16           A.  But that exposure to
17  social media use -- that's what I mean by the
18  interactive comment.  So it's not just the time
19  spent, it's your relationship with it.  And we
20  know problematic social media use, the magnitude
21  of relation to harm is higher, but it's also the
22  fire hose of, you know, all the negative social
23  comparisons and all the cyberbullying and the
24  content stuff amplifies the harm of displacement,
25  so they interact to amplify harm.

Arbitration Place

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                      July 11, 2025

Page 557

1        Q.  But you are able to and
2   you try at different points to disentangle, just
3   speak to displacement as opposed to the other
4   harms.
5        A.  Yes, I do, but I also
6   note that it doesn't exist in isolation.
7        Q.  Understood.  Just to make
8   sure I understand, let's take Disney+.  You're
9   familiar with Disney+; right?
10       A.  I am.
11       Q.  It's an app where it's
12  got all the Star Wars movies and all the Disney
13  shows on it; right?
14       A.  Yeah.
15       Q.  Okay.  If an 8-year-old
16  gets on Disney+, that might show them all kinds of
17  movies start to finish.  They could watch the
18  entire Marvel Universe; right?
19       L. SCARCELLO:  Object to form.
20       THE WITNESS:  Right.
21       BY A. STANNER:
22       Q.  You would say if they
23  spend hours and hours watching the Marvel
24  Universe, that's going to have the same
25  displacement effect; right?

Page 558

1        L. SCARCELLO:  Object to form.
2        THE WITNESS:  Again, I would
3   say that that is one potential pathway to harm,
4   but I think social media lights up the brain
5   reward system a lot more than watching a movie
6   does.
7        BY A. STANNER:
8        Q.  But just to take Disney+.
9   Right?  I have an 8-year-old.  She doesn't have
10  social media.  But if she sits in front of Disney+
11  for a day, I would say to her, go outside.
12       A.  Yeah.
13       Q.  Right.
14       A.  Yeah.
15       Q.  And you would too if you
16  saw your child --
17       A.  Yes.
18       Q.  -- or grandchild sit for
19  nine hours in front of Disney+, you would say,
20  this is just playing you more videos, go outside;
21  right?
22       A.  Right.
23       Q.  And that is displacement;
24  right?
25       A.  Yes.

Page 559

1        Q.  And that can happen --
2   that particular harm, understanding that it
3   doesn't exist in isolation, that particular harm
4   can happen with all manner of things that engage
5   kids and distract them from healthier behaviors;
6   right?
7        L. SCARCELLO:  Object to form.
8        THE WITNESS:  Again, it rarely
9   occurs in isolation, but it can happen with other
10  screen media or other activities not related to
11  screen.
12       BY A. STANNER:
13       Q.  And specifically, you
14  mentioned the term "screen media," that's any time
15  anybody's got a phone or an iPad and they're
16  looking at something on it; right?
17       A.  Yes.
18       Q.  So there's a whole bunch
19  of things on phones and iPads that adolescents or
20  adults can get engaged in that might cause them to
21  spend more time on those devices than we would say
22  is healthy?
23       L. SCARCELLO:  Object to the
24  form.
25       THE WITNESS:  Again, when you

Page 560

1   parse out the different screen components, two
2   things come to mind.  One, that the majority of
3   time spent on smartphones is driven by social
4   media.  And number two, when you parse out -- I
5   did a review with Mougharbel published in 2023,
6   looking at the independent associations with each
7   screen, social media comes out as the most
8   harmful.
9        BY A. STANNER:
10       Q.  Understood.  I think I've
11  stipulated you think social media is worse than
12  other things.  But my question is just there's a
13  lot of things on a phone or an iPad that are
14  designed to or that can keep kids or adults using
15  their phones; right?
16       A.  I think texting is -- I
17  don't think has those features, I don't think
18  e-mail.  I use my phone for e-mail.  I don't think
19  it has any of those social media features except a
20  notification.
21       Q.  Right.  But let's say --
22  I mean, it might not have some of the features.  I
23  understand you're talking about features.  But,
24  you know, video games on your phone, people play
25  Candy Crush and games like that; right?

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                                July 11, 2025

Page 561

1          A.   Yeah, but I don't think
2    they're terribly -- I mean, for young children
3    like 5-year-olds, yeah.  Yes.
4          Q.   But we could go through a
5    list --
6          A.   Yes.
7          Q.   -- Disney+ and video
8    games --
9          A.   Right.
10          Q.   -- of things that exist
11    on screens that are not social media?
12          A.   Right.
13          Q.   And similarly, if you saw
14    adolescents or adults doing those things for long
15    periods of time you would say this is
16    displacement?
17          A.   Yes, I would be concerned
18    about displacement.
19          Q.   Okay.  How much time
20    would you say you spent reviewing Meta's documents
21    specifically?
22          A.   I spent most of my time
23    reviewing the peer-review literature.  Meta had a
24    lot of documents.  I think I tried to capture
25    quite a bit in my report.  I don't know.  I didn't

Page 562

1    quantify my hour spent, as I said before, on a
2    particular feature or a particular even platform.
3          Q.   Okay.  But I just want
4    to -- it's totally fair if you don't know, but if
5    I said, did you spend five hours looking at Meta
6    documents, 10 hours, 50, you wouldn't know?
7          L. SCARCELLO:  Object to the
8    form, misstates testimony.
9          THE WITNESS:  I -- you know, I
10    worked on this report for three months on and off,
11    and again, I -- I didn't say, okay, today I'm
12    going to look at the Meta documents, tomorrow is
13    TikTok, or whatever.  It would just be where I was
14    in the report.  And sometimes I would be curious,
15    mm, I wonder if the internal research supports
16    this and if there is anything on it.  And maybe I
17    should have been more systematic in either
18    tracking or approaching it, but that's not really
19    the way I approach it.
20          BY A. STANNER:
21          Q.   So in other words,
22    understanding that, you couldn't put a number on
23    it?
24          A.   It would be hard for that
25    number to be accurate because I didn't track it.

Page 563

1          Q.   You did say there were a
2    number of Meta documents you looked at.  Those are
3    included in your materials considered; right?
4          A.   Yes.
5          Q.   I'm going to show it to
6    you.
7          EXHIBIT NO. 34:
8          MATERIALS CONSIDERED
9          DOCUMENT, 159 PAGES,
10          FIRST PAGE TITLED
11          "EXHIBIT C"
12          BY A. STANNER:
13          Q.   We'll give you
14    Exhibit 34.  Just flip through that.  It should be
15    yours so it should be familiar to you.  Do you
16    recognize that?
17          L. SCARCELLO:  Can we wait
18    until I get a copy?
19          A. STANNER:  Oh, yes.
20          L. SCARCELLO:  Which version
21    of it is this?  Is this from the April 18 report?
22          A. STANNER:  It should be the
23    most recent.
24          L. SCARCELLO:  Okay.
25          A. STANNER:  But I can ask you

Page 564

1    so that we know what we're looking at.
2          L. SCARCELLO:  Well, I don't
3    think that he's memorized thousands and thousands
4    of Bates numbers.
5          THE WITNESS:  This makes
6    sense.  I looked at a lot of documents.
7          BY A. STANNER:
8          Q.   Okay.  So let's just
9    start simple.  Exhibit C is your Exhibit C from
10    your report; right?
11          A.   Yes.
12          Q.   And it is the list of
13    materials you considered in forming your opinions
14    in this case?
15          A.   Yes.
16          Q.   Okay.  We counted them,
17    I'm not going to ask you to count them, but it's
18    1,137 Meta documents.  Does that seem like it's
19    about right?
20          A.   Yeah, I said there were a
21    lot of documents that Meta had.
22          Q.   So when we look --
23    obviously not all 1,137 are cited in the report
24    itself; right?
25          A.   Right.

Page 565

1          Q.  But I take your testimony
2  to be that anything that is listed in there you
3  have personally read?
4          L. SCARCELLO:  Object to form,
5  misstates testimony.
6          THE WITNESS:  Yes, I've looked
7  at them, yes.
8      BY A. STANNER:
9          Q.  And then I think you said
10  this earlier, but you've read every one of the
11  documents that's in Exhibit C, but didn't
12  necessarily need to cite them for the propositions
13  in your report; right?
14          L. SCARCELLO:  Same objection.
15          THE WITNESS:  I felt I used
16  the documents that were relevant to the points I
17  was trying to make.
18      BY A. STANNER:
19          Q.  Okay.  And just focusing
20  on the review of the company documents specific to
21  Meta, I understand you're a psychologist by
22  training; right?
23          A.  Right.
24          Q.  And so you have some
25  expertise in kind of how humans operate; right?

Page 566

1          A.  Right.
2          Q.  But you do not in your
3  day job review company documents; right?
4          A.  No.
5          Q.  This is the first time
6  you've done that?
7          A.  Yes.
8          Q.  When I say "this time," I
9  mean as an expert in this litigation, it's the
10  first time you've made it part of your job to
11  review internal documents from companies?
12          L. SCARCELLO:  Object to form.
13          THE WITNESS:  I think my
14  scientific training enables me to have a pretty
15  good interpretation of the purpose and the data
16  that's generated from the internal research and
17  documents.
18      BY A. STANNER:
19          Q.  Sure.  But I mean, as a
20  psychologist you could apply that to anything;
21  right?  If you have a pretty good sense for human
22  behavior, that wouldn't make you an expert in how
23  and why humans do anything and everything; right?
24          A.  It would certainly give
25  me more knowledge than the average person.

Page 567

1          Q.  Okay.  But let's say --
2  but if you've never looked at company documents
3  before, this is the first time you've ever done
4  that, by the second time or the tenth time or the
5  fiftieth time you might get better at it; right?
6          L. SCARCELLO:  Object to form.
7          THE WITNESS:  I'm not sure
8  what you mean, "better at."  Do you mean more
9  efficient?
10      BY A. STANNER:
11          Q.  No, I mean if you're
12  drawing -- well, let me back up.  In your time as
13  a psychologist, you've treated patients; right?
14          A.  Right.
15          Q.  And that means they
16  answer your questions, they tell you about their
17  life experience, and then you help them on an
18  individual level; right?
19          A.  Right.
20          Q.  And you've been a
21  teacher; right?
22          A.  Um-hum.
23          Q.  Sorry, you have to say
24  yes or no for the record.
25          A.  Yes.

Page 568

1          Q.  And in the course of
2  that, you research, you read, you review studies,
3  you write your own things, you conduct your own
4  experiments; right?
5          A.  Right.
6          Q.  And you've done that for
7  30 years?
8          A.  Not quite but close, 25.
9          Q.  Okay.  I wasn't trying to
10  age you.  But in those 25 years until you worked
11  on this case, it was never as part of any of that
12  work part of your job to review internal company
13  documents; right?
14          L. SCARCELLO:  Object to the
15  form.
16          THE WITNESS:  Correct.
17      BY A. STANNER:
18          Q.  I mean, Meta produced 2.5
19  million document in this case and you looked at
20  1,137 of them; right?
21          A.  Correct.
22          Q.  Obviously -- well, do you
23  think that before you draw conclusions about Meta
24  internally and what Meta was thinking you should
25  look at the rest or no?

Page 569

1          L. SCARCELLO:  Object to form.
2          THE WITNESS:  I base my
3   opinions on 44 meta-analyses.  I looked at
4   internal research.  I've acknowledged the internal
5   research was not a systematic review like I did in
6   the peer-review literature.  I acknowledge I did
7   not look at 2 million documents.  What I've read
8   is consistent with the findings from the
9   meta-analyses --
10         BY A. STANNER:
11         Q.  And so I'm glad you're
12   bring --
13         A.  -- about the harm.
14         Q.  I'm sorry, I thought you
15   were done.
16         A.  Yes.
17         Q.  I'm glad you bring that
18   up.  I do understand.  I want to put over here,
19   when you draw conclusions about causation between
20   social media and harm, the basis for that you've
21   said several times is 44 meta-analyses; right?
22         A.  Yes, and the neuroscience
23   research, which -- well, one was a meta-analysis,
24   but I also inter -- looked at single studies, yes.
25         Q.  Right.  And you in your

Page 570

1   own career have done some experiments; right?
2          A.  Yes, yes.
3          Q.  And so that's really the
4   basis for the opinions that you give as to
5   causation; am I right?
6          A.  That -- the vast majority
7   of the weight I place is on the peer-review
8   literature.  The internal documents were
9   supplemental, but it corroborated the peer-review
10  literature, in my opinion.
11         Q.  And I'm just trying to
12  make sure that we disentangle it.  If I were to
13  say tell me what your opinions are about Meta as a
14  company, that wouldn't be based on any of the
15  stuff we've just talked about; right?
16         L. SCARCELLO:  Object to form.
17         THE WITNESS:  You mean the
18  peer-review literature?
19         BY A. STANNER:
20         Q.  Right.  In other words,
21  if --
22         A.  So if I had no exposure
23  to internal documents; is that what you're asking
24  me?
25         Q.  No, I think I'm trying to

Page 571

1   ask if separate from your opinions about
2   causation, right, that you think social media
3   causes the harms as you've described them, do you
4   intend to offer opinions about how Meta or other
5   Defendants operate as companies?
6          L. SCARCELLO:  Object to form.
7          THE WITNESS:  I'm not sure of
8   the context of what you're getting at.  So how
9   they operate, meaning do I feel they put in
10  sufficient safeguards?
11         BY A. STANNER:
12         Q.  Right.  Do you think that
13  they've invest --
14         A.  No.
15         Q.  Well, let me be more
16  precise about the question.  No, you -- I take you
17  to be saying, certainly in your personal capacity,
18  that you, Dr. Goldfield, don't think that these
19  companies have put in enough safeguards; right?
20         A.  Right.
21         L. SCARCELLO:  Object to form.
22         BY A. STANNER:
23         Q.  You, at least in your
24  personal capacity, in your day-to-day opinion,
25  don't think that social media companies have done

Page 572

1   enough to be good corporate citizens?
2          L. SCARCELLO:  Object to the
3   form.
4          THE WITNESS:  I believe
5   they -- Meta was aware from their internal
6   research that many kids are getting harmed, and
7   they put in a ban and they lifted the ban on
8   things and features evolved.  I feel they could
9   have done a lot more to prevent harm, yes.
10         BY A. STANNER:
11         Q.  And obviously you're
12  certainly entitled to an opinion as a citizen as
13  is anybody else here.  My question to you is do
14  you intend to come to court and tell the judge:
15  I'm an expert enough in Meta to tell you whether
16  they were good or bad corporate citizens?
17         L. SCARCELLO:  Object to the
18  form, calls for speculation.
19         THE WITNESS:  So what I've
20  tried to do in my report was not only just
21  document the back and forth, but Meta did a lot of
22  their own research.  They even did experiments,
23  Kramer's study, you know, on half a million people
24  on contagion.  They did experiments.  There is no
25  reason to believe that Meta internal research,

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                July 11, 2025

Page 573

1  designed by neuroscientists, psychologists, other
2  scientists, no reason to -- I read some of the
3  defense experts' rebuttals, oh, it's just flawed
4  research and you can't rely on the internal
5  documents. Well, these are designed by scientists
6  with Ph.D.s, so I can't just dismiss it as
7  unimportant or flawed simply because it's not peer
8  reviewed. So when those findings line up well
9  with the peer-review literature, I take that
10 really seriously.
11            BY A. STANNER:
12      Q. Okay. Do you remember my
13 question?
14      A. Can you please remind me?
15      Q. Sure. Do you intend to
16 come to court and tell the judge -- well, let me
17 put it this way. You certainly are come going to
18 come to court and say, I'm an expert in causation
19 and here is my opinion about whether social media
20 causes these harms; right?
21      A. Yes.
22      Q. Do you intend to say:
23 And here are my opinions about whether this
24 company did the good -- did the right thing, did
25 the wrong thing, did enough, should have done

Page 574

1  more?
2            L. SCARCELLO: Object to form.
3            THE WITNESS: I'm not sure I
4  control the process of how my testimony is going
5  to unfold.
6            BY A. STANNER:
7      Q. Okay. Do you hold
8  yourself out to be an expert in that or are you
9  just here to say: This is what my review as to
10 causation tells me about the question of
11 causation?
12            L. SCARCELLO: Object to form,
13 vague.
14            THE WITNESS: I think it
15 depends. It depends on how things will unfold.
16 I'm not -- I'm holding myself out as a -- as an
17 independent expert who's commented on causation,
18 as someone who has a very similar background as
19 the scientists internally to Meta and other social
20 media companies, I believe that qualified me to
21 comment on, you know, whether the evolution of the
22 apps, whether safeguards -- if it comes up, I
23 think I'm allowed to comment on it. But that's
24 not -- that's not why I -- that's not my task
25 here. My task is not to judge whether social

Page 575

1  media companies and Meta, you know, in
2  particular -- it's my opinion, as you've noted,
3  that I don't think they're doing enough and I
4  think they're -- they've been slow to respond,
5  especially based on the internal research.
6            I was tasked to arrive at a
7  determination of causation.
8            BY A. STANNER:
9      Q. Okay. And that -- I'm
10 sorry, I thought you were done.
11      A. Yeah.
12      Q. You are done?
13      A. Yeah.
14      Q. And that's -- that's sort
15 of -- maybe that answers it then. You view your
16 role as offering, as you do in your written
17 report, opinions about causation between social
18 media and the harms that you've identified; right?
19            L. SCARCELLO: Object to the
20 form, misstates testimony.
21            THE WITNESS: No. I talked a
22 lot about developmental vulnerabilities. And so
23 that's where features come in and protection comes
24 in. I think when you've got algorithms and
25 "likes" and autoscroll and all these features that

Page 576

1  compel use at a really sensitive period in
2  development, where it's well-known the risk for
3  addiction is high, it's well-known that people's
4  self-regulation and self-control, they're at such
5  an impressionable age, those two are -- they
6  interact. It's not like, you know, a 35- or
7  40-year-old or 45-year-old using these apps. It's
8  very different neurobiologically to -- you know,
9  the sensitivity to reward social -- so I believe
10 as a psychologist and an expert in human child
11 development, I believe I can speak to whether the
12 safeguards are effective and some of the potential
13 risks of why they may not be effective and how the
14 features maybe exploit developmental
15 vulnerabilities. I think that would fall under my
16 expertise.
17            BY A. STANNER:
18      Q. Okay. And just to make
19 sure that I understand what you're saying, you
20 think you can testify as an expert about how
21 features would affect adolescents?
22            L. SCARCELLO: Object to form,
23 vague.
24            THE WITNESS: When I -- the
25 impact of features, not the mechanics, not the

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                July 11, 2025

Page 577

1  computer programs that generate it. I'm not a
2  technical person, and I think I've tried to make
3  that really clear.
4          BY A. STANNER:
5          Q. Okay. The impact of
6  features on adolescent brains?
7          L. SCARCELLO: Object to form.
8          THE WITNESS: Collectively,
9  they're not -- as I said before, each feature
10 alone does not exist in isolation. It's all of
11 the features, it's a whole experience. Yes, I can
12 speak to -- about how developmental
13 vulnerabilities, neurobiological vulnerabilities,
14 psychosocial vulnerabilities make it difficult --
15 with these features, they exploit those
16 vulnerabilities, making it really difficult to
17 regulate and use moderately for most kids, not all
18 kids.
19         BY A. STANNER:
20         Q. Okay. But -- all right,
21 well, I think we understand each other.
22         So looking at Exhibit 34 --
23 it's 34, right? -- did you put that together
24 yourself?
25         L. SCARCELLO: Object to the

Page 578

1  form. And also, again, this is -- involved
2  report-drafting stuff that we have agreement not
3  to discuss attorney-expert communications and then
4  the process of drafting is protected so. Subject
5  to that you can answer.
6          THE WITNESS: Most of it.
7          BY A. STANNER:
8          Q. Okay. The -- can you
9  look with me at page 85 of that document. Let me
10 know when you're there.
11         A. Yeah, got it.
12         Q. At the very top it says:
13             "How Accurate is Mental
14             Health Advice --"
15 Do you see that?
16         A. Um-hum.
17         Q. Go down four, you see the
18 one that says:
19             "National Population
20             Characteristics."
21         A. Um-hum.
22         Q. It looks like this file
23 here, this link says user is S. Kelley,
24 K-e-l-l-e-y. Do you see that?
25         A. Yes.

Page 579

1          Q. Who is that?
2          A. I don't recall.
3          Q. Okay. Are you -- did you
4  meet at any point a woman named Sarah Kelley from
5  Wagstaff & Cartmell?
6          A. There were meetings with
7  lots of people on the calls.
8          Q. Okay. This looks like
9  it's a link from her computer. Do you know how
10 this could wind up here?
11         L. SCARCELLO: Okay. I'm
12 going to stop this line of questioning.
13 Sarah Kelley works at Wagstaff & Cartmell. She is
14 an assistant. She has not met with him. And,
15 again, this is something -- this is not an
16 appropriate line of questioning under the
17 agreements and the rules. So we're done answering
18 questions about how this list was put together.
19         A. STANNER: Okay. You're
20 instructing him not to answer?
21         L. SCARCELLO: If you're going
22 to keep asking detailed questions about how this
23 list was created, this list that is a part of his
24 expert report, yeah, I am instructing him not to
25 answer.

Page 580

1          BY A. STANNER:
2          Q. Okay. Are you going to
3  follow the instruction not to answer --
4          A. I am.
5          Q. -- questions about how
6  you made the list?
7          A. Yes. Yes.
8          Q. Okay. There is another
9  exhibit I want to ask you about. We'll mark this
10 as Exhibit 35.
11             EXHIBIT NO. 35: PRINTOUT
12             OF DANISH-LANGUAGE SLIDE
13             DECK TITLED "SELVSKADE
14             INDSATSER I BUC
15             SELVSKADE, SELVMORD &
16             SOME."
17         BY A. STANNER:
18         Q. Do you read Danish?
19         A. No.
20         Q. No. I don't either. I'm
21 going to hand you what we just marked as
22 Exhibit 35. This is -- make sure you got a second
23 to flip through it. I won't ask you to read it.
24         Do you recognize this,
25 Exhibit 35?

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                                July 11, 2025

Page 581

1              A.  It's possible I may have
2    read the English translation, but I don't read
3    Danish.
4              Q.  Okay.  It's cited in your
5    appendix C on page 84 and that was going to be my
6    question.  Did you review this as part of your
7    work in this case?
8              L. SCARCELLO:  Are you talking
9    about Exhibit 34?
10             A. STANNER:  Yeah, on page 84
11   of Exhibit 34, which is your materials considered.
12             L. SCARCELLO:  I think we've
13   talked about this.  I've said we're not answering
14   questions about this.  You, counsel, know that
15   these documents are either documents that he
16   independently sought out or that were made
17   available to him.  And so we aren't answering any
18   questions about how the materials considered or
19   the report itself was put together.  That's the
20   agreement.  We're going to stick to it.  I'd like
21   for you to as well.
22             A. STANNER:  It's been
23   referred to a few times as an agreement.  The
24   federal rules that you guys presented -- I'm not
25   going to fight you on it.  If you don't want him

Page 582

1    to talk about it, that's okay.  I'm not trying to
2    break an agreement.  I just don't see why it's
3    encompassed by the federal rules that he can't say
4    whether --
5              L. SCARCELLO:  It's not just
6    the federal rules, there is also the agreement
7    that attorney-expert communications are not going
8    to be discussed or disclosed.
9              A. STANNER:  Okay.  I think my
10   question is a little different.  You can tell him
11   not to answer, but just so that the record is
12   clear.
13             BY A. STANNER:
14             Q.  Did you use this in
15   forming your opinions in this case?
16             L. SCARCELLO:  Again, counsel,
17   you understand that the materials considered is
18   not the materials relied on.  It's a list of
19   documents that he either sought out or that were
20   made available to him.  So what you're talking
21   about is your -- what you're asking is a question
22   that both violates the agreement, it's contrary to
23   the federal rules that we've agreed to follow in
24   this case, and it's misleading.  Yeah, sure, you
25   can ask him about it.

Page 583

1              Go ahead, you can answer that
2    question.
3              BY A. STANNER:
4              Q.  Did you use this in
5    forming your opinions in this case?
6              A.  Again, I base my opinions
7    on the totality of evidence, not on any single one
8    document or single one study.
9              Q.  Okay.  But, like, this
10   one in particular you didn't use; right?
11             L. SCARCELLO:  Object to the
12   form of the question.
13             THE WITNESS:  No.
14             BY A. STANNER:
15             Q.  Okay.  I want to talk
16   about age verification.  You have a section in
17   your report about Meta regarding age verification;
18   right?
19             A.  Yes.
20             Q.  And you say -- well, are
21   you offering the opinion as an expert in this case
22   that age -- that Meta's age verification measures
23   were ineffective?
24             A.  What -- can you direct me
25   to the page in the report?

Page 584

1              Q.  Oh, no, I actually don't
2    have a page in the report.  I'm just wondering if
3    you intend to offer the opinion that Meta's age
4    verification measures are ineffective?
5              A.  I think the internal
6    research shows that, that they're not terribly
7    effective.  I believe through -- that they
8    actually -- I have reason to believe that they can
9    do more to verify age more objectively.
10             Q.  Okay.  So -- sorry again.
11   I thought you were done.  You told me earlier
12   you're not a tech person.  When it comes to the
13   features, you don't know, like, operationally how
14   features are designed or how they operate; right?
15             A.  I'm not a programmer.
16             Q.  And so similarly for age
17   verification, it would be -- one way to say it is
18   ineffective would be to say has any child ever
19   gotten on a platform when they're under the age of
20   13; right?
21             L. SCARCELLO:  Object to the
22   form.
23             THE WITNESS:  It's -- again,
24   Meta's platforms have been around for a long time.
25   Until fairly recently in the evolution, all you

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                    July 11, 2025

Page 585

1  had to do was enter your birthday which could be
2  adjusted to any number to suit the age
3  requirement.
4          BY A. STANNER:
5          Q.  Okay.  Well, that's sort
6  of where I'm going is if you intend to offer the
7  opinion that Meta's age verification measures are
8  ineffective, my question to you is:  What's the
9  standard for effectiveness?
10         A.  I think one metric -- I
11  mean, there are probably multiple metrics, but I
12  think certainly the number of underage users would
13  certainly show whether it's effective or not.
14         Q.  Okay.  So one way to do
15  it --
16         A.  One way.
17         Q.  -- would be to look at
18  how many underage users there are; right?
19         A.  Yes.
20         Q.  And then you could either
21  say, well, one is too many, or you could try and
22  measure it against some other standard; right?
23         L. SCARCELLO:  Object to the
24  form.
25         THE WITNESS:  Yes, that's one

Page 586

1  approach.
2          BY A. STANNER:
3          Q.  Okay.  Have you taken
4  that approach?
5          A.  Approach in arriving at
6  that determination?
7          Q.  Yeah.  When you say it's
8  ineffective, what's your basis for that?
9          A.  Basically, looking at
10  numbers of kids that -- that they deemed, as well
11  as some peer-reviewed literature that I also cite
12  who show -- who have accounts who were deemed,
13  through metrics, through content, through use,
14  through all kinds of -- whatever company metrics
15  to arrive at a rough age point toward there is a
16  substantial number that are underage users.
17         Q.  Okay.  So you just used
18  the phrase, for example, "substantial number";
19  right?
20         A.  Yeah.
21         Q.  That's a subjective
22  claim; right?
23         L. SCARCELLO:  Object to the
24  form.
25         THE WITNESS:  There is -- even

Page 587

1  small percentages at the population level, again,
2  would add up.  So let's say it's a small number
3  like 10%.  With millions if not billions of users,
4  that's a lot of kids.
5          BY A. STANNER:
6          Q.  Okay.  But here is what
7  I'm trying to understand because you're -- as an
8  expert witness, if your testimony is I've read
9  documents where Meta says it's ineffective, that
10  would be a basis to make that claim.  That's as
11  one example; right?
12         L. SCARCELLO:  Object to the
13  form of the question.
14         THE WITNESS:  Here I cite some
15  internal research showing that Meta has been aware
16  of this.  In 2020, they did not remove underage
17  participants, which would show a lack of safeguard
18  and deprioritizing enforcing against under 13s.
19  700,000 under-13 users.  I would say that's a
20  substantial number.
21         BY A. STANNER:
22         Q.  Okay.  So that's helpful.
23  So when you make the claim that Meta's age
24  verification measures are ineffective, is it based
25  on what you've just read from?

Page 588

1          L. SCARCELLO:  Object to the
2  form of the question.
3          THE WITNESS:  Again, I don't
4  base my opinions on a single document, but when
5  they all -- when you read a little bit more, there
6  is another document I cite, a backlog of under-13
7  users is up to 2 million, which suggests they are
8  very slow in acting.
9          BY A. STANNER:
10         Q.  Tell me what page you're
11  on?
12         A.  182.
13         Q.  So I'm just trying to
14  understand, like -- "very slow" or "substantial,"
15  those are not in and of themselves, you know,
16  peer-reviewed methodologies, those are just
17  adjectives; right?
18         L. SCARCELLO:  Object to the
19  form.
20         THE WITNESS:  I suppose
21  numbers are subjective, but when you're talking
22  about billions of people, I think that has cause
23  for concern.
24         BY A. STANNER:
25         Q.  Okay.  But if I were to

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                        July 11, 2025

Page 589

1  say there's millions of accidents on Canada's
2  highways every year, that means Canada's highways
3  are ineffective. You would say, well, what is
4  your basis for deciding what is effective and not;
5  right?
6              A. No, I would say the
7  purpose of a highway is to go from A to B, not to
8  prevent accidents.
9              Q. Sure. But I think you
10  take my point. If we're going to say --
11              A. Yeah.
12              Q. -- that something is
13  effective or ineffective, we should have a method;
14  right?
15              A. A method I think would be
16  helpful.
17              Q. Okay. What's your method
18  for determining that age verification tools,
19  measures on these platforms are ineffective?
20              A. I think the typical
21  methods are: Do the features exist, are they
22  using them and how effective are they? Those are
23  generally the three primary metrics.
24              Q. Okay. But that third one
25  isn't my question. What's the method for

Page 590

1  determining how effective it is?
2              A. Well, by the number of
3  underage users is probably the primary metric.
4              Q. Okay. So your
5  methodology for determining that they were
6  ineffective was, again, reading documents like
7  those you've just cited and saying these numbers
8  are too high?
9              L. SCARCELLO: Objection,
10  misstates testimony.
11              THE WITNESS: No, I -- again,
12  I would want to look at all three together. Now,
13  I know it's not that simple because protections
14  and safeguards and features change, and the number
15  of people on the apps are changing every day,
16  usually increasing. Not many people are
17  discontinuing their accounts. So that's a moving
18  target. That makes it more challenging.
19  BY A. STANNER:
20              Q. Okay. You've never --
21  let me ask it a more familiar way. You've never
22  published any papers in your career about age
23  verification; right?
24              A. No, I'm not -- I don't
25  hold myself out as an expert on age verification.

Page 591

1              Q. Okay. The -- I'm going
2  to ask you this because everybody else did and I
3  feel like now I have to. Do you use Instagram?
4              A. My kids -- I have an
5  Instagram account with about, I don't know, 10
6  followers.
7              Q. Don't take it personally.
8  So how often do you use Instagram?
9              A. I don't use Instagram.
10              Q. Okay. I take it you've
11  had the account for some amount of time but look
12  at photos of family or something like?
13              A. I use Facebook for that.
14              Q. Okay. So you do have a
15  Facebook account?
16              A. I do.
17              Q. All right. And how often
18  do you use that?
19              A. Usually once a year,
20  thank everybody for their birthday wishes and see
21  you next year.
22              Q. So you're not a big user
23  of Facebook or Instagram?
24              A. No.
25              Q. All right. In your

Page 592

1  report you talk about features of Facebook and
2  Instagram, so obviously that's not born of your
3  personal experience with Facebook and Instagram?
4              L. SCARCELLO: Object to form.
5              THE WITNESS: Not a whole lot.
6  It's based on what I've read.
7              BY A. STANNER:
8              Q. And, again, just so I'm
9  clear, when you say what you've read, you mean the
10  company documents, the 1,100-some Meta documents
11  that are cited in your report?
12              L. SCARCELLO: Object to form.
13              THE WITNESS: And the
14  neuroscience about features, "likes," person --
15  there are neuroscience research on personalized
16  algorithms with TikTok and how they activate the
17  brain reward system more than non-personalized
18  content.
19              BY A. STANNER:
20              Q. Okay. So in your report,
21  just to get more specific, you say that Meta
22  incorporates infinite scrolling and autoplay
23  features?
24              A. Yeah.
25              Q. Can you tell me what is

Page 593

1  autoplay?
2          A.  You open up the app and
3  it just -- you don't have to navigate it.  Things
4  just start playing.  It's just right there.
5  Infinite scrolls, it just keeps going on forever.
6          Q.  Okay.  And I know we're
7  short on time, so I'm trying to be quick.  But
8  you've said earlier that you know Instagram and
9  Facebook, they have lots of different ways that
10 people can interact with the apps; right?
11         L. SCARCELLO:  Object to the
12 form.
13         BY A. STANNER:
14         Q.  I'll give you a better
15 example.  So on Instagram, you can look at photos,
16 you can send direct messages --
17         A.  Yes.
18         Q.  -- there's other things
19 you can do --
20         A.  Yes.
21         Q.  -- besides that; right?
22         A.  Yes.
23         Q.  Where -- how -- when you
24 say that Facebook and Instagram have autoplay,
25 tell me where it exists?

Page 594

1          A.  Well --
2          L. SCARCELLO:  Object to the
3  form of the question.
4          THE WITNESS:  When you open it
5  up, you can scroll infinitely.  It's just all
6  there.  It's just endless content.
7          BY A. STANNER:
8          Q.  That's infinite scroll;
9  right?
10         A.  That's infinite scroll.
11         Q.  Meaning that you don't
12 get to the bottom of the page?
13         A.  There is no stop --
14 exactly.  There's no stopping point.
15         Q.  But autoplay
16 specifically, where does that exist on Instagram
17 or Facebook?
18         L. SCARCELLO:  Object to the
19 form of the question.
20         THE WITNESS:  I guess autoplay
21 was more probably in the context of TikTok and
22 perhaps other platforms.
23         BY A. STANNER:
24         Q.  Okay.  So not on
25 Instagram and Facebook.

Page 595

1          L. SCARCELLO:  Object to the
2  form of the question.  Misstates testimony.
3          THE WITNESS:  I think the
4  impact of infinite scroll would be very similar to
5  autoplay.  The apps are designed to hold your
6  attention, draw you in, spend a lot of time on the
7  app.
8          BY A. STANNER:
9          Q.  Do we -- we haven't given
10 you a copy of the report yet, right?  This is the
11 -- you've got a couple different versions of your
12 expert report; right?
13         A.  Yeah.
14         Q.  And just so that the
15 record is clear, you first wrote a report in
16 April?
17         A.  Yes.
18         Q.  You then wrote another
19 report for the MDL in May?
20         A.  Yes.
21         Q.  And then just this week
22 you issued an updated version of your report for
23 this case that we're here about today; right?
24         A.  Yeah.
25         Q.  So that's what this

Page 596

1  should be.  I'm going to hand you what I just
2  marked as Exhibit 36.  It's in a binder.
3          EXHIBIT NO. 36:  AMENDED
4          AND SUPPLEMENTAL EXPERT
5          REPORT OF GARY GOLDFIELD
6          DATED JULY 8, 2025
7          BY A. STANNER:
8          Q.  Is Exhibit 36 a copy of
9  your updated report for this case?
10         A.  Yes.  Yes.
11         Q.  All right.  Can you turn
12 with me to paragraph 358?
13         A.  Yes.
14         Q.  You see there where it
15 says:
16             "Meta in both Facebook
17             and Instagram
18             incorporates infinite
19             scrolling and autoplay
20             features --"
21         A.  I see that.
22         Q.  Okay.  The citation for
23 this is this article by Zenone; is that right?
24         A.  Um-hum.
25         Q.  You have to say yes or

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                July 11, 2025

Page 597

1    no.  Sorry.
2                    A.  Yes.
3                    Q.  Do you know if I'm saying
4    that name right, Zenone?
5                    A.  I'm not sure.  I've never
6    heard it pronounced.
7                    Q.  Me neither.  But if you
8    look, I think it's at 269 in the actual citation.
9    I'm going to show you that.  I'm going to hand you
10   what I just marked as Exhibit 37.
11                   EXHIBIT NO. 37:  PAPER
12                   TITLED "THE SOCIAL MEDIA
13                   INDUSTRY AS A COMMERCIAL
14                   DETERMINANT OF HEALTH"
15   BY A. STANNER:
16                   Q.  Do you recognize
17   Exhibit 37 as the article you cite and rely on for
18   that claim?
19                   A.  The year doesn't seem to
20   line up with the citation.
21                   Q.  The citation has -- fair
22   enough.  It says:
23                   "Zenone, M., Kenworthy,
24                   N. & Maani, N. (2022).
25                   The Social Media Industry

Page 598

1                   as a Commercial
2                   Determinant of Health."
3    You see that?
4                    A.  Yes.
5                    Q.  And then the document I
6    just handed you, Exhibit 37, does have those same
7    authors and the same title --
8                    A.  Yeah.
9                    Q.  -- but you point out that
10   at least on the top the Internal (sic) Journal of
11   Health Policy Management is dated 2023; is that
12   right?
13                   A.  Yes, that's right.
14                   Q.  Okay.  If you look below,
15   though -- see the gray box on the first page?
16                   A.  Of this paper?
17                   Q.  Yeah.
18                   A.  Yeah.
19                   Q.  It says published 27
20   April 2022, very last line of that?
21                   A.  Yes.
22                   Q.  Okay.  So my question to
23   you is:  Is this -- and if you don't know, you
24   don't know.  But is this the article that you cite
25   to -- that you rely on for the claim about

Page 599

1    infinite scroll and autoplay?
2                    L. SCARCELLO:  Objection --
3    object to the form.
4                    THE WITNESS:  I believe it is.
5                    BY A. STANNER:
6                    Q.  Okay.  This says at the
7    top "viewpoint"; right?
8                    A.  Um-hum.
9                    Q.  What -- sorry, you have
10   to say yes or no.  It says "viewpoint" at the top;
11   right?
12                   A.  Yeah.
13                   Q.  Sorry, you see the top,
14   it's called a viewpoint?
15                   A.  Yeah.
16                   Q.  What -- in your line of
17   work, what's the difference between a viewpoint
18   and, say, a peer-reviewed study?
19                   A.  It's often just more a
20   comment, opinion, but it's still gets reviewed.
21   It's in a journal.  People can't just say whatever
22   they want.
23                   Q.  Sure, right.  But it's --
24   it's like a comment or an opinion where they say,
25   here, this is our review of the literature that

Page 600

1    exists or some studies and this is our take on it;
2    right?
3                    A.  Yes.
4                    Q.  Okay.  And I know you
5    have a lot of things that you've reviewed and
6    relied on, but are you -- we went through this
7    article and didn't see any discussion of autoplay.
8    Are you able to help me understand where it is
9    that you come up with that conclusion from this
10   article?
11                   A.  Well, if you're referring
12   to the figure here, the figure is taken from
13   Meta's own documents.
14                   Q.  I'm referring to the
15   statement that we looked at in paragraph -- just
16   now in your report when we were looking together
17   in paragraph 358, you say:
18                   "Meta in both Facebook
19                   and Instagram
20                   incorporates infinite
21                   scrolling and autoplay
22                   features --"
23   Right.
24                   A.  Yes.
25                   L. SCARCELLO:  Objection, that

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                          July 11, 2025

Page 601

1    misstates the report.
2              BY A. STANNER:
3              Q.   And then it goes on and
4    it says that those things:
5                   "-- create seamless
6                    consumption experiences,
7                    take advantage of
8                    dopamine reward
9                    pathways --"
10   Right?
11             A.   Right.
12             Q.   And that's what I'm
13   trying -- the citation for those claims in the
14   rest of that sentence is this is a known article;
15   right?
16             L. SCARCELLO:  Object to the
17   form of the question.  Again, that misstates the
18   report.
19             THE WITNESS:  So the first
20   line about dopamine rewards, seamless consumption
21   experiences, I mean, yeah, that's touched on in
22   this report.  But the --
23             BY A. STANNER:
24             Q.   Okay.  Can you show me
25   where?

Page 602

1              A.   The figure is actually
2    taken from Meta's documents.
3              Q.   The figure below it?
4              A.   Yes.
5              Q.   Right.  But I'm just
6    trying to understand how this article supports the
7    claim for which you cite this article.
8              A.   It's been a while since I
9    looked at this paper.  I'd have to look at it more
10   carefully.
11             Q.   Okay.  Well, we'll have
12   to do that another time, unfortunately.  I would
13   be happy to come back to Ottawa.  Let me move on.
14   I want to ask you a little bit about suicide and
15   self-injury with the time that we have left.
16             A.   Okay.
17             Q.   Have you ever designed a
18   study on suicide or self-injury?
19             A.   I have published on it
20   but not extensively.
21             Q.   Okay.  Can you give me a
22   sense -- when you say you published on it, like,
23   to the best of your memory --
24             A.   Yeah, I think there was a
25   paper --

Page 603

1              Q.   -- what have you done?
2              A.   -- on social media and
3    suicide that is either come out or about to
4    potentially come out.  It's not in a great
5    journal, but it's in a population -- my student
6    thought -- you know, these journals have grandiose
7    names so he thought it was good.  In retrospect,
8    it turns out not very good.
9              Q.   We looked at your CV and
10   obviously you've got a lot of publications to your
11   name.
12             A.   Yeah.
13             Q.   We did not see any about
14   suicide, self-harm, self-injury.  I understand you
15   to be saying there is one that might be coming out
16   now.
17             A.   Yeah.
18             Q.   Okay.  Prior to that, had
19   you published anything about suicide and
20   self-injury?
21             A.   I haven't memorized my --
22   nothing comes to mind -- not extensively anyway.
23             Q.   Okay.  On -- in paragraph
24   131 of your report, which you have in front of you
25   in that binder, you say:

Page 604

1                   "Algorithms have been
2                    linked to suicide as
3                    well."
4    I'm referring, by the way, to the one we gave you
5    in the binder.  There's various iterations of this
6    report, but paragraph 131 in there.
7              A.   Paragraph 131?
8              Q.   Yeah.
9              A.   Okay.
10             Q.   And we're going to look
11   at is that and the table that follows.  But in
12   paragraph 131 you see where you say:
13                  "Algorithms have been
14                   linked to suicide as
15                   well"?
16             A.   Yes.
17             Q.   Okay.  There's been some
18   testimony over the last couple of days about
19   content versus algorithms; right?
20             A.   That's right --
21             L. SCARCELLO:  I object to the
22   form of the question.
23             BY A. STANNER:
24             Q.   Or content versus
25   features; right?

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                          July 11, 2025

Page 605

1          A.  Yes, the algorithms
2   typically generate the content.
3          Q.  Well, to be precise about
4   that, a person has to generate the content; right?
5          L. SCARCELLO:  Object to the
6   form.
7          THE WITNESS:  No, I'm not sure
8   about that.  I think based on your clicks and
9   based on your usage, I think it generates
10  recommendations for content.
11         BY A. STANNER:
12         Q.  Right.  The algorithm
13  might affect what -- which content someone sees
14  and when they see it.  But the content, it's a
15  video on, say, Instagram has to be posted by
16  another user; right?
17         L. SCARCELLO:  Object to the
18  form of the question.
19         THE WITNESS:  Yes.
20         BY A. STANNER:
21         Q.  So what is the basis for
22  the claim that algorithms, not the content, are
23  linked to suicide?
24         A.  Because -- I think I cite
25  a couple of studies a little bit later.  If

Page 606

1   someone is, say, vulnerable and some tragic events
2   have happened and it's thrown them into crisis and
3   they want to see do other people feel like this,
4   they can go on -- they can -- you know, they can
5   search anything about self-injury or suicide and
6   they're going to get exposed to all kinds of
7   video, some of them normalizing this behavior.
8   And there is research to show that is associated
9   with increased risk of harm.  So I believe that
10  is -- the algorithms are one mechanism of harm.
11         BY A. STANNER:
12         Q.  So you bring up the
13  studies that you cite and you're looking
14  specifically at table 5; right?
15         A.  Yes.
16         Q.  Okay.  And the one where
17  we look at you could see that you cite Chen and
18  Wong; right?
19         A.  Yeah.
20         Q.  And then after that you
21  cite Nesi?
22         A.  Um-hum.
23         Q.  And Nesi is
24  overwhelmingly -- I mean, there are two data
25  points from Chen and one from Wong and then the

Page 607

1   vast majority come from this Nesi article; right?
2          A.  Yeah, because Nesi was
3   getting at more suicide-related content generated
4   by the features.
5          Q.  I'm going to show it to
6   you.  This is Exhibit 38.
7          EXHIBIT NO. 38:  PAPER
8          TITLED "SOCIAL MEDIA USE
9          AND SELF-INJURIOUS
10         THOUGHTS AND BEHAVIORS: A
11         SYSTEMATIC REVIEW AND
12         META-ANALYSIS"
13         BY A. STANNER:
14         Q.  I know it's long, but
15  you've reviewed this.  This is the Nesi study
16  we're talking about?
17         A.  Yes.
18         Q.  And in Nesi, if we look
19  at page 4, there's -- on page 4 there is a heading
20  down near the bottom of that page that says
21  "SITB-related social media use."  Do you see that?
22         A.  I do.
23         Q.  And this is where Nesi, I
24  think, talks about what you were just talking
25  about.  In the second sentence it says:

Page 608

1                "Posting or sharing
2           SITB-related content,
3           particularly
4           self-generated content,
5           may serve as a strategy
6           to regulate self-harm
7           urges or feelings of
8           distress or as a way to
9           find community with
10          shared experiences."
11  Right?
12         A.  Yeah, but I believe they
13  also share the opposite opinion as well.
14         L. SCARCELLO:  So, counsel, I
15  think we're at time.
16         A. STANNER:  How much time do
17  we have?
18         THE VIDEOGRAPHER:  11.
19         A. STANNER:  Well, I don't
20  know what to do about that.  I guess we're out of
21  time unless we can find a way to get more time
22  with you, doctor.  Thanks for your time.
23         THE WITNESS:  Thank you.
24         L. SCARCELLO:  I don't have
25  any questions.

Arbitration Place

22STCV21355
DEPOSITION OF GARY GOLDFIELD                                          July 11, 2025

Page 609

```
 1              THE VIDEOGRAPHER:  Okay.  Just
 2    give me a second.  All right.  So this concludes
 3    today's testimony given by Dr. Gary Goldfield.
 4    Current time on the tape is 1:13 p.m., and we are
 5    off the record.
 6    --- Whereupon the proceeding concluded at 1:14
 7       p.m.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Arbitration Place

(613) 564-2727                                                     (416) 861-8720