# Exhibit 58

# PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE GENERAL CAUSATION TESTIMONY OF PLAINTIFFS' EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA              )
ADOLESCENT                       )    Case No.
ADDICTION/PERSONAL               )    4:22-md-03047-YGR
INJURY PRODUCTS                  )
LIABILITY LITIGATION             )    MDL No. 3047
_____  )
                                 )
THIS DOCUMENT RELATES            )    Judge: Hon. Yvonne
TO:                              )    Gonzalez Rogers
                                 )
ALL ACTIONS                      )    Magistrate Judge: Hon.
_____  )    Peter H. Kang

Monday, August 25, 2025

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Video-Recorded Oral Deposition of
STUART B. MURRAY, MSc, DClinPsych, PhD held
at the offices of King & Spalding, 633 West
Fifth Street, Suite 600, Los Angeles,
California, commencing at 9:00 a.m. PST on
the above date, before Debra A. Dibble,
Fellow of the Academy of Professional
Reporters, Certified Court Reporter,
Registered Diplomate Reporter, Certified
Realtime Reporter and California CSR #14345.

GOLKOW - VERITEXT
877.370.DEPS | fax 917.591.5672
deps@golkow.com

CONFIDENTIAL

Page 2

APPEARANCES:

MOTLEY RICE LLC
BY: SARA COUCH, ESQUIRE
scouch@motleyrice.com
NELSON L. DRAKE, ESQUIRE
ndrake@motleyrice.com
401 9th Street NW
Suite 1001
Washington, D.C. 20004
(202)232-5504
-and-
MOTLEY RICE LLC
BY: ANNIE E. KOUBA, ESQUIRE (via Zoom)
akouba@motleyrice.com
JESSICA C. COLOMBO, ESQUIRE (via Zoom)
jcolombo@motleyrice.com
28 Bridgeside Blvd.
Mount Pleasant, South Carolina 29464
(843) 216-9000

-and-

BEASLEY ALLEN LAW FIRM
BY: JOSEPH VANZANDT, ESQUIRE
joseph.vanzandt@beasleyallen.com
JENNIFER EMMEL, ESQUIRE
jennifer.emmel@beasleyallen.com
218 Commerce Street
P.O. Box 4160
Montgomery, Alabama 36103-4160
(509) 944-6414

-and-

MORGAN & MORGAN PA
BY: NARMEEN NKEITI, ESQUIRE (via Zoom)
nnkeiti@forthepeople.com
20 North Orange Avenue
Suite 1600
Orlando, Florida 32801
(407)420-1414

-and-

Page 3

APPEARANCES:

MORGAN & MORGAN PA
BY: BETH BILSBORROW, ESQUIRE (via Zoom)
bbilsborrow@forthepeople.com
350 5th Avenue
Suite 6705
New York, New York 10118
(212)738-6299
-and-
PANISH | SHEA | RAVIPUDI LLP
BY: RAHUL RAVIPUDI, ESQUIRE (via Zoom)
ravipudi@panish.law
11111 Santa Monica Boulevard
Suite 700
Los Angeles, California 90025
(310)477-1700
-and-
WAGSTAFF & CARTMELL LLP
BY: JACK T. HYDE, ESQUIRE (via Zoom)
jhyde@wcllp.com
4740 Grand Avenue
Suite 300
Kansas City, Missouri 64112
(816)701-1100
-and-
EILAND & BONNIN, PC
BY: CRAIG EILAND, ESQUIRE (via Zoom)
ceiland@eilandlaw.com
2200 Market Street
Suite 501
Galveston, Texas 77550
(409) 359-8969
Counsel for Plaintiffs

Page 4

APPEARANCES:

OFFICE OF THE TENNESSEE ATTORNEY GENERAL
BY: CHRIS DUNBAR, ESQUIRE
chris.dunbar@ag.tn.gov
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615)741-3491
Counsel for State of Tennessee, Office of
the Attorney General and Reporter

COVINGTON & BURLING LLP
BY: PAUL W. SCHMIDT, ESQUIRE
pschmidt@cov.com
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212)841-1000
-and-
COVINGTON & BURLING LLP
BY: NICOLE ANTOINE, ESQUIRE
nantoine@cov.com
MARCELA INTERIANO, ESQUIRE
einteriano@cov.com
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-5203
Counsel for Defendants Meta Platforms, Inc.
f/k/a Facebook, Inc.; Facebook Holdings,
LLC; Facebook Operations, LLC; Facebook
Payments, Inc.; Facebook Technologies, LLC; Instagram,
LLC; Siculus, Inc.; and Mark Elliot
Zuckerberg

MORGAN, LEWIS & BOCKIUS LLP
BY: JESSE S. KROMPIER, ESQUIRE
jesse.krompier@morganlewis.com
300 South Grand Avenue
22nd Floor
Los Angeles, California 90071-3132
(213) 612.7372
Counsel for Defendants YouTube LLC and
Google LLC

Page 5

APPEARANCES:

KING & SPALDING LLP
BY: TODD P. DAVIS, ESQUIRE
tdavis@kslaw.com
KATHRYN S. LEHMAN, ESQUIRE
klehman@kslaw.com
1180 Peachtree Street, NE
Suite 1600
Atlanta, Georgia 30309
(404) 572-3589
Counsel for Defendants TikTok Inc. and
ByteDance Inc.

MUNGER TOLLES & OLSON LLP
BY: ARIELLA PARK, ESQUIRE
ariella.park@mto.com
350 South Grand Avenue
50th Floor
Los Angeles, California 90071
(213)683-9100
-and-
KIRKLAND & ELLIS LLP
BY: CATHERINE I. MULLALEY, ESQUIRE (via Zoom)
catherine.mullaley@kirkland.com
200 Clarendon Street
Boston, Massachusetts 02116
(617) 385-7504
Counsel for Defendant Snap, Inc.

ALSO PRESENT:
KATY LAWRIMORE, PARALEGAL (via Zoom)
Motley Rice LLP

KAYLIE MORGAN, ESQUIRE (via Zoom)
O'Hanlon, Demerath & Castillo

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

A P P E A R A N C E S:

TRIAL TECHNICIAN:

CHRIS REYNOLDS (via Zoom)
CORE LEGAL CONCEPTS

VIDEOGRAPHER:

TORR PIZZILLO
GOLKOW - VERITEXT

Page 7

INDEX

APPEARANCES                        2
PROCEEDINGS                       12

EXAMINATION OF STUART B. MURRAY, MSC,
DCLINPSYCH, PHD:
    BY MR. DAVIS              13
    BY MR. SCHMIDT           276
    BY MS. PARK              298
    BY MR. KROMPIER          309
    BY MS. COUCH             318
    BY MR. DAVIS             322

CERTIFICATE                      330

        LITIGATION SUPPORT INDEX        PAGE
REQUEST FOR PRODUCTION               164

Page 8

DEPOSITION EXHIBITS

NUMBER            DESCRIPTION        PAGE
Murray-1    Defendants' Joint Notice of     19
            Videotaped Deposition of
            Dr. Stuart Murray and
            Incorporated Requests to
            Produce Documents
Murray-2    5-16-2025 Expert Report of      22
            Dr. Stuart Murray, MSc.,
            DClinPsych, Ph.D.
Murray-3    7-30-2025 Rebuttal Expert       22
            Report of Dr. Stuart
            Murray, MSc.,
            DClinPsych.Ph.D.
Murray-4    Dr. Stuart Murray invoices      23
Murray-5    Dr. Stuart Murray notebook      64
            of articles
Murray-6    Screening for Eating            88
            Disorders in Adolescents
            and Adults (Feltner)
Murray-7    Prevention and Early           100
            Identification of Eating
            Disorders (Attia)

Page 9

Murray-8    The SCOFF questionnaire: A      102
            new screening tool for
            eating disorders (Morgan),
Murray-9    Addictive Screen Use           149
            Trajectories and Suicidal
            Behaviors, Suicidal
            Ideation, and Mental Health
            in US Youths (Xiao)
Murray-10   Social Media Use and           162
            Depressive Symptoms During
            Early Adolescence (Nagata)
Murray-11   Curriculum Vitae of Stuart     163
            B. Murray, DClinPsych,
            Ph.D.
Murray-12   Does TikTok contribute to      193
            eating disorders?  A
            comparison of the TikTok
            algorithms belonging to
            individuals with eating
            disorders versus healthy
            controls (Griffiths)
Murray-13   Our tools, features and        292
            resources to help support
            teens and parents

CONFIDENTIAL

Page 10

Murray-14    Contemporary Screen Time    314
Modalities among Children
9-10 years old and
Binge-Eating Disorder at
One-Year Follow-Up: A
Prospective Cohort Study
(Nagata)
Murray-15    Psychology of Popular Media    319
(Ferguson)
Murray-16    Like This Meta-Analysis:    320
Screen Media and Mental
Health (Ferguson)
Murray-17    A meta-analysis of the    320
association between
adolescent social media use
and depressive symptoms
(Ivie)
Murray-18    Teenagers, screens and    320
social media: A narrative
review of reviews and key
studies (Orben)

Page 11

CERTIFIED QUESTIONS
PAGE
Certified Question    51
Certified Question    59
Certified Question    69
Certified Question    70
Certified Question    102
Certified Question    119
Certified Question    131
Certified Question    136
Certified Question    136
Certified Question    138
Certified Question    144
Certified Question    158
Certified Question    160
Certified Question    162
Certified Question    218
Certified Question    223
Certified Question    224
Certified Question    243

Page 12

----------
P R O C E E D I N G S
August 25, 2025, 9:00 a.m. PDT
----------
THE VIDEOGRAPHER:  We are now on the record.  My name is Torr Pizzillo.  I am a videographer for Golkow, a Veritext division.

Today's date is August 25th, the year is 2025, and the time is 9:06 a.m.

This video deposition is being held at 633 West Fifth Street, Los Angeles, California, In Re: Social Media, Adolescent Addiction Personal Injury Products Liability Litigation for the United States District Court, Northern District of California.

The deponent is Stuart Murray.

Counsel will be noted on the stenographic record.

Will the court reporter please introduce herself and swear in the witness.

THE COURT REPORTER:  My name is

Page 13

Debbie Dibble.  My California CSR number is 14354.
----------
STUART B. MURRAY, MSc, DClinPsych, PhD, having been first duly sworn, testified as follows:
----------
EXAMINATION
----------
BY MR. DAVIS:

Q.    Thank you.

You are Stuart Murray, right?

A.    Yes.

Q.    Dr. Murray, you and I have met before.  I represent the TikTok and ByteDance defendants.

Do you understand that?

A.    Yes, sir.

Q.    And you understand that I'm going to be asking you some questions on behalf of the other defendants in the case, and the other lawyers representing the different defendants will have some follow-up questions for you.

Do you understand that?

CONFIDENTIAL

Page 14

A.   Yes.  Mm-hmm.

Q.   Yes?

A.   Yes.

Q.   All right.  And we went through the ground rules when we were at your June 2025 depositions.  All those ground rules apply to this deposition.

Do you understand that?

A.   Yes.

Q.   If you don't understand one of my questions, will you let me know?

A.   Sure.

Q.   If you answer my question, I will assume that you heard it, you understand it, and you answered the question that I asked.

Is that acceptable to you?

A.   Yes.

Q.   Now, you understand that you've been identified as an expert witness on behalf of the plaintiffs in the federal multidistrict litigation proceedings, right?

A.   Yes.

Q.   And you issued a report for the case, correct?

Page 15

A.   Yes.

Q.   You also issued a rebuttal report for the case, right?

A.   (Witness nods.)

Q.   Yes?

A.   Yes, I did.

Q.   Now -- and those two reports contain all of the opinions that you will offer in these -- in the MDL proceedings, correct?

A.   Those reports contained my opinions that I rendered as a result of my review.

Q.   Let me see if I can ask a better -- a little bit of a clearer question.

The rebuttal -- the MDL report that's dated May 16, 2025, and your rebuttal report, set out all of the opinions that you'll offer in the MDL proceedings on the issue of general causation.  Fair?

MS. COUCH:  Object to the form.

THE WITNESS:  Could you repeat that, sir?  I'm sorry.

BY MR. DAVIS:

Q.   Sure.

Page 16

Your May 2025 report and your July 2025 rebuttal report set out all the opinions that you'll offer on the issue of general causation in the MDL proceedings.  Fair?

MS. COUCH:  Same objection.

THE WITNESS:  Sorry?

MS. COUCH:  You can answer.  I'm objecting to the form.

A.   I'm sorry.  They set out all my opinions at that time.  I think I made clear last time we talked, though, that as a scientist, I continue to be close to the science.  They did reflect my opinions at the time.

BY MR. DAVIS:

Q.   Yes.  And at -- and you have -- other than the opinions in your May 2025 report and your July rebuttal report, you haven't issued any additional reports to provide additional opinions in the proceeding, have you?

A.   In this proceeding?

Q.   Yes.

A.   In the general -- no, I don't

Page 17

believe so.

Q.   And in your view, the opinions, as of today, are final, absent some additional scientific literature that may get published, correct?

A.   Yes.

Q.   Okay.  And just so we're clear from the very beginning of this deposition, you've worked to prepare for this deposition, right?

A.   Yes.

Q.   You've worked by reviewing your report, your opinions --

A.   Yes.

Q.   -- and the scientific literature that you rely upon, correct?

A.   Yes.

MS. COUCH:  Objection to the form.

Dr. Murray, let him finish his question and then answer it, because it's getting very messed up on the transcript.

THE WITNESS:  I am sorry.

BY MR. DAVIS:

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

Q. You're prepared today to answer questions about your opinions in the litigation, correct?

A. Correct.

Q. Okay. Just so we're -- just a couple of definitions I'll go over.

If I'm talking about BDD, that's body dysmorphic disorder. Okay with you?

A. Mm-hmm. Yes.

Q. All right. And if I refer to social media, I'm including both the social media apps as well as the platform.

Is that acceptable to you?

A. Yes.

Q. Okay. And if I'm referring to psychiatric disorders or mental health disorders, I mean the one -- the same thing.

Is that acceptable to you?

A. Yes. I'll clarify, too, that those are interchangeable use in my report of body dysmorphic disorder and body dysmorphia, which I'm happy to talk about, but I understand you'll be using both as BDD?

Q. Yeah. And if you want to --

Page 19

you want to put some clarity on my questions, when I'm asking about specifically the disorder, when I'm talking about BDD, I'm talking about the psychiatric disorder that's in DSM-5.

A. Understood.

Q. Is that acceptable to you?

A. Yes.

Q. Okay. And if you need a clarification because of something to do with body dysmorphia, will you please just let me know?

A. Mm-hmm. I will.

Q. Thank you.

A. Mm-hmm.

Q. Now, there's a deposition notice that's marked as Exhibit 1. Let me hand that to you, sir.

A. Thank you.

(Whereupon, Murray-1, Defendants' Joint Notice of Videotaped Deposition of Dr. Stuart Murray and Incorporated Requests to Produce Documents, was marked for identification.)

Page 20

BY MS. HOWELL:

Q. Did you look through that deposition notice?

A. Yes.

Q. And did you bring any materials with you in today's deposition in response to that deposition notice?

A. I did.

Q. You have three notebooks in front of you?

A. I do.

Q. Is that all the material that you brought in response to the deposition notice?

A. Yes.

Q. Okay. So can you just briefly describe for us, what are in the three black notebooks that you have in front of you?

A. Sure, I will.

I have a copy of my May 16th report. I have a copy of my materials considered list, and my rebuttal.

And then, I also took the liberty to print out some papers as well, which are on my materials considered list,

Page 21

because I thought we might want to talk about some.

Q. Okay. And in terms of --

MS. COUCH: And I would just put on the record, we also provided some additional materials to -- through counsel.

BY MR. DAVIS:

Q. Dr. Murray, in terms of the literature that was in the third black notebook --

A. Mm-hmm.

Q. -- what -- how did you decide -- what's -- how do you decide what went in that-- the article that you pulled and that you put in the notebook?

A. Same methodology, systematic review. I wanted to expand on some of the questions from last time and thought it might be helpful to have papers to talk about. I figured you might want to talk about them today, so I brought a few.

Q. All right. So let's do this. I've marked as Exhibit 2 a copy of your May 16, 2025, report.

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

(Whereupon, Murray-2, 5-16-2025 Expert Report of Dr. Stuart Murray, MSc., DClinPsych, Ph.D., was marked for identification.)

BY MR. DAVIS:

Q. Correct?

A. Correct.

Q. I've marked as Exhibit 3 your July 30, 2025, rebuttal report.

Do you see that?

(Whereupon, Murray-3, 7-30-2025 Rebuttal Expert Report of Dr. Stuart Murray, MSc., DClinPsych.Ph.D., was marked for identification.)

A. Correct.

BY MR. DAVIS:

Q. And I've also marked as Exhibit 4 invoices that were produced to us concerning your work in the case.

Do you see that?

A. Mm-hmm. (Witness nods.)

Q. Yes?

A. Yes.

Q. Okay. And just a reminder, you have to answer out loud for the court

Page 23

reporter.

A. I'm sorry. I will.

Q. And you've got to wait until I finish so that we're not talking over each other and Ms. Couch doesn't switch both of our legs, okay?

A. Okay.

(Clarification by reporter.)

BY MR. DAVIS:

Q. Now, the last time at your June 2025 deposition, the invoices that had been produced to us totaled $547,000 -- excuse me, $547,786.14.

Does that sound right to you?

A. I don't know. I don't recall what -- I'm not keeping a tally, I suppose.

Q. Let's assume that that's correct, all right? Because that's what they do total up to, all right?

A. Okay.

Q. And you also have some -- you brought some additional invoices that were marked as Exhibit 4, correct?

(Whereupon, Murray-4, Dr. Stuart Murray invoices, was marked

Page 24

for identification.)

A. I didn't bring these, but --

BY MR. DAVIS:

Q. You provided them to be produced.

A. Okay. Okay. Yes.

Q. Okay. And the -- there are how many invoices that are attached as a -- I think there are three invoices that are attached as Exhibit 4, correct?

A. Correct.

Q. And those invoices are for your May through the end of July 2025 time in the litigation, right?

A. That's correct. That's what this looks like.

Q. All right. And your invoices for the May to July 2025 time period total $703,200 -- well, excuse me. $703,270.79.

Does that sound right to you?

A. I have no idea.

Q. You're not disputing that that's the amount, are you?

A. I don't know the amount, but -- yeah, I don't know the amount.

Page 25

Q. Okay. I'll represent to you that I added up those myself. That's the amount.

A. Okay.

Q. All right with you?

A. If you -- yeah.

Q. Okay. With that number in mind, plus the prior invoices, you've billed, in the litigation, over $1.2 million to plaintiffs' counsel so far.

MS. COUCH: Object to the form.

BY MR. DAVIS:

Q. Do you know that?

A. I know that I've billed for my time. I don't know how much it is, like I mentioned.

Q. Do you dispute at all that it's over $1.2 million?

MS. COUCH: Object to form.

A. I don't -- I haven't added it up, so I don't know.

BY MR. DAVIS:

Q. If I represent to you that that's the total, do you have any evidence to dispute it?

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

A.    Again, I don't know what the total is.

Q.    Now, have you been paid for all of that work?

A.    Yes.

Q.    And the money goes to you personally, right?

A.    Yes.

Q.    Does it go to anybody else?

A.    No.

Q.    Okay.  Now, are there any policies at -- you're an employee at UCLA, right?

A.    Correct.

Q.    Are there any policies at UCLA about expert consulting work?

A.    Yes.

Q.    What are they?

A.    That you disclose it in your yearly financial report.

Q.    So, for example, if you do expert consulting work, you have to fill out a form that then is submitted into UCLA?

        MS. COUCH:  Object to the form.

A.    It is -- so I sought guidance

Page 27

on this, and so I can tell you what I was told.

        That there is an annual financial disclosure report where you're obligated to share what outside activities were and what they were amounted to.

BY MR. DAVIS:

Q.    Mm-hmm.

A.    That's what I was told, and that's what I --

Q.    Did you submit that report for last year?

A.    I haven't yet.

Q.    So for 2024, you have not submitted that report?

A.    I haven't been at UCLA a full year yet.

Q.    Okay.  Did you submit a report at USC?

A.    I -- again, I can't recall the policy there.  It's a little bit different.  UCLA is a state school, USC is a private school.  I can't quite recall what the policy was, but I'm certain I followed them.

Q.    Okay.  So did you -- did you

Page 28

submit any paperwork at USC for purposes of your litigation consulting on behalf of plaintiffs' lawyers in the social media litigation?

        MS. COUCH:  Object to the form.

A.    I can't recall, Todd.  I was -- I can't recall.  I know that I followed their policy.  I can't recall what that was.

BY MR. DAVIS:

Q.    Are there any -- were there any limitations at USC in terms of the amount of money or the time that you could devote to consulting on litigation?

A.    Again, I don't recall.

        MS. COUCH:  Object to the form.

BY MR. DAVIS:

Q.    At UCLA, are there any limitations on time that you can spend on litigation or the amount of money that you can earn as a result of being an expert in litigation?

A.    Not that I am aware of.  Not that I've been informed, as I mentioned.

Q.    Okay.  And who did you speak with at UCLA about the policy?

Page 29

A.    Leadership.

Q.    Who's leadership?

A.    Leadership in the division.

Q.    Can you provide me a name, please?

A.    I spoke with the -- one of the medical directors about this.  I mentioned -- in my hire as well, I mentioned this to the chair of psychiatry.

Q.    So who is the medical director and who is the chair --

A.    The chair --

Q.    -- that you spoke with?

A.    The chair is Dr. Hansen.  I believe that I informed her that I was involved in this.  And the medical director at the hospital I'm in is Dr. Gillis.

Q.    Did you have any e-mail correspondence or other correspondence with either of them or anyone else about your role as a litigation consultant or expert?

A.    No e-mail correspondence.

Q.    What about other correspondence?

A.    These were both conversations.

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

Q.    If you can look at your invoices, on the June 30th invoice. Do you see that there is a reference on the June 3rd -- the June 30th reference -- June 30 invoice. There's a number of different references to either correspondence with team or call with team.
Who is the team?
A.    The team -- counsel.
Q.    Lawyers?
A.    Right.
Q.    Okay. Have you ever had anyone working with you in any way with respect to your expert consultant work on behalf of plaintiffs' lawyers who's not a lawyer?
A.    No.
Q.    For example, you haven't used anybody like an intern or an employee or somebody else to help you review literature or prepare your report or discuss with them issues involved in the litigation?
A.    No.
Q.    Outside of -- and this is your only litigation consulting or work as an expert is involved in this litigation, right?

Page 31

MS. COUCH: Object to the form.
I would just clarify, it's JCCP and MDL.
BY MR. DAVIS:
Q.    Well, I'm lumping in litigation to mean social media litigation, regardless of where it's pending.
Do you understand that?
A.    Yes. Could you repeat the original question?
Q.    Of course.
A.    Thank you.
Q.    Outside of work as an expert or litigation consultant in the social media litigation, have you done any other type of expert work or consultancy in litigation?
A.    No.
Q.    So outside of litigation, do you do any consultant work for any companies?
A.    What type of --
Q.    Any type of consulting work.
A.    Not currently. I have consulted with companies in the past.
Q.    Okay. What -- what companies have you consulted with in the past?

Page 32

A.    The ones that I can recall right now, I consulted with a company called Cubo.
I consulted with -- let's see. Hmm. I'm trying to delineate what you might mean by consultancy, so I'm just going to ask you to clarify it.
Q.    Sure. I think you mentioned that you did work as a consultant for Cubo; is that right?
A.    Mm-hmm. Yes, I did.
Q.    Tell me -- what kind of company is Cubo?
A.    Cubo is a beverage company. It's a functional beverage company.
Q.    And what type of consultancy work did you do for Cubo?
A.    I did some consultancy around neuroscience and the construction of their beverages as a means to augmenting health.
Q.    So what type of beverages do they have that you did the consultancy work for?
A.    They have really great beverages, by the way.

Page 33

They have -- essentially it is a company that provides beverages comprised of fruit and natural ingredients. It's frozen into a cube so there's no artificial preservatives, hence, the cube. That's the type of beverages that they provide, sort of natural ingredient-based.
Q.    Were you ever employed by Cubo?
A.    No.
Q.    What was your title, if any, that you had while you were with -- doing consulting work with Cubo.
A.    I don't recall.
Q.    What period of time did you do consultancy work with Cubo?
A.    I don't recall either -- I don't recall the dates.
Q.    Just give me a rough estimate.
A.    It's hard. I haven't done anything with them for a while. I can't recall the exact dates.
Q.    What's the last time you remember doing consultancy work with Cubo?
A.    I don't -- I don't recall, Todd.

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

Q.   Okay.  Do you have any ownership stake in Cubo?

A.   They -- let's see.  This is why I was trying to delineate what you meant by consultancy.  They provided some equity.

Q.   When you say they provided equity --

A.   Yeah.

Q.   -- are you saying that they gave you shares?

A.   Yes.  Yes.

Q.   So you have shares.

Do you still have shares of stock in Cubo?

A.   Yes, I haven't touched them.

Q.   Okay.  How many shares of stock in Cubo do you have?

A.   I have no idea.

Q.   Give me a rough estimate.

A.   I have no idea.  I know it's not worth -- it's not a significant sum of money.  I don't know.

Q.   Okay.  When you were doing your consultancy work for Cubo, did they pay you anything else outside of giving you an equity

Page 35

stake?

A.   No.

Q.   So in return for your consultancy work with Cubo, you received an equity stake in the company, right?

A.   It was something like a certain number of shares, and the valuation at that time was sort of like -- a very low amount.

Q.   But you received -- your compensation for doing consultancy work with Cubo was an -- was the share in the ownership or the equity of the company?

A.   That's correct.

MS. COUCH:  Object to the form.

BY MR. DAVIS:

Q.   Okay.  And what -- do you still have those shares?

A.   I haven't touched them.

Q.   And have the shares gone up or down?

A.   I don't know.

Q.   Who would know that?

A.   Probably the CEO of the company.

Q.   Outside of Cubo --

Page 36

A.   Yeah.

Q.   -- any other consultancy work that you've done outside of litigation?

A.   That was the one that came to my mind.

I can't recall as I sit here today.

Q.   You haven't done any consultancy work for any social media company or platform, have you?

A.   No.

Q.   What was the reason why you ended the consultancy with Cubo?

A.   The term expired.  I didn't renew it.  It was a very time-limited consultancy, and I think that's what I understood.

Q.   I take it you still believe in the products that Cubo markets?

A.   What do you mean believe in them?

Q.   Well, you still think that they market good products?

A.   I -- personally, I like them.

Q.   Is there anything about Cubo's

Page 37

products in any way that gives you any pause or concern about any health effects?

MS. COUCH:  Object to the form.

A.   Anything about their products that gives me pause for concern --

BY MR. DAVIS:

Q.   Yeah.

A.   -- about their health effects.

Not that I know of.

Q.   Just a couple questions on issues I don't think you're covering, but I just want to make sure, all right?

A.   Sure.

Q.   Your expert report doesn't analyze any data specific to any school districts and alleged harms that any school districts have incurred as a result of social media use, does it?

MS. COUCH:  Object to the form.

A.   Can I refer back to my report?

BY MR. DAVIS:

Q.   Sure.

A.   Thanks.

I think a lot of what is contained in my report applies to children in

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

a multitude of school districts.

Q. My question is simply: In your report, do you analyze any school district data that discusses any harms from social media?

A. Again, the data that I can recall analyzing pertained to children within school districts.

Q. That's not my question. My question is: Is there anywhere in your expert reports that analyzes data specific to school districts and any alleged harm from social media use?

A. Do you mean specific school districts?

Q. Yes.

A. I'm going to have to take a peek, if that's okay.

Q. Sure.

[Document review.]

A. I mean, I can recall seeing some studies that recruited, maybe advertised through school districts. I can't pull them up today, but I think that -- I know that my report included children school-aged.

Page 39

BY MR. DAVIS:

Q. And I'm not interested in that. I'm interested in a different question. So just try to follow me, okay? I'll ask it again.

Is there anywhere in your report that you analyzed data specific to school districts and any alleged harm from social media occurring to school districts?

MS. COUCH: Object to form.

A. Can I ask a clarifying question?

BY MR. DAVIS:

Q. Can you answer my question first?

A. Yeah, I want to clarify, though, first.

Q. Sure.

A. Are you referring to data provided to me by a particular school district?

Q. Let's answer that one first, sure.

A. No.

Q. Okay. Is there anywhere in

Page 40

your report where you look at any systematic school district data that analyzes harm, alleged harms from using social media while kids are in school?

MS. COUCH: Object to the form.

BY MR. DAVIS:

Q. Or some impact to schools generally for social media use?

MS. COUCH: Same objection.

A. Again, I recall studies, Todd, that were included that stem from children -- the data were direct from children in school districts. I can't recall delineating by school district, but I know that the data included kids within school districts.

BY MR. DAVIS:

Q. Yeah, my question is broader.

Is there anywhere in your report where you looked at any systematic school district data that analyzes alleged harms from using social media while kids are either in school or outside of school but then somehow impacts schools?

MS. COUCH: Object to the form, asked and answered.

Page 41

A. Again, I can't recall specifically, but I can tell you that the data included children within school districts. I know they're in there, but I don't know if I delineated by school districts.

BY MR. DAVIS:

Q. Is there any place in your reports that you can point me to that says this is a discussion about school district data and these are the alleged harms that result to school districts, either individually or systematically, as a result of social media use?

MS. COUCH: Object to the form.

A. I mean, my opinion is that young people of a certain age are harmed. That's the main body of my report, that children in school -- school-aged children are -- that's the bulk of my report.

BY MR. DAVIS:

Q. Go back to my question.

Is there any place in your report where you analyze the issue I asked you about?

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

MS. COUCH: Same objection.

A.    Again, Todd, it's going to take a minute to look through the report to give you -- it looks like you want a definitive "yes" or "no" answer, and I don't think I can give you that. But I can look through my report and do that.

BY MR. DAVIS:

Q.    Well, look through the report. See if there's anything --

Let me back up.

I think I've asked you this three times. Have you given me the best answer you can?

A.    I don't want to misrepresent what I did. And so I know that there are children here from school districts. I don't recall delineating by school district. And then you're asking a different question that's probably going to require me to look through my report to give you a very specific answer. So I can do that.

Q.    I have very limited time with you today. I've got five hours, Dr. Murray. I've asked you now three times to point to me

Page 43

any place in your report or to give me your opinion about whether or not you have that opinion, and I think -- I can't waste anymore time, so I'm reserving on that question and moving on.

MS. COUCH: And we would oppose. I think he's fully answered your question that his opinions relate to school-aged children.

BY MR. DAVIS:

Q.    Dr. Murray, you're not offering any opinions on the actual design of any of the defendants' social media apps, are you?

MS. COUCH: Object to the form.

A.    A lot of my report relates to the features of these apps.

BY MR. DAVIS:

Q.    Sure. But you're not offering opinions about how the designs actually came about, are you?

MS. COUCH: Object to the form.

A.    I'm offering an opinion on how the harms -- how the features harm children.

BY MR. DAVIS:

Q.    Yeah, that's not my question.

Page 44

Please listen to my question.

A.    Okay.

Q.    You're not offering any opinions about how any of the designs actually came about at any of the -- of the defendants, are you?

MS. COUCH: Object to the form.

A.    I can reread you my key opinions in my report.

BY MR. DAVIS:

Q.    Can you answer my question?

A.    Again, I'm -- my report is how the design features impacts children deleteriously and causes severe medical sequelae. That is almost the entirety of my report, how these features end up with harm.

Q.    Dr. Murray, you haven't put anywhere in your report any discussion about what you believe is to be a safer, feasible, alternative design for any social media platform, have you?

A.    My -- in my report -- and I'm happy to talk about this today. My report is around documenting the effects of these features and these apps and these platforms

Page 45

in young people with severe illnesses.

Q.    That's not my question, okay? Please answer my question.

A.    Mm-hmm.

Q.    Okay. Dr. Murray, is there anywhere -- did you put anywhere in your reports any discussion about what you believe to be a safer, feasible, alternative design for any social media platform?

A.    I'm going to look to my report. While I'm looking, I can tell you that still on an ongoing basis, the children I see are very harmed by social media.

I know that other people opined on that as well. I can't recall if I have a specific opinion on that in this report, Todd.

Q.    You don't know of one as you sit here today, do you?

A.    I'm sorry?

Q.    You don't know of one as you sit here today, do you?

A.    Know of one what?

Q.    Opinion that I've asked you about.

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

A.    I'm trying my best to answer your questions.

Q.    Do you know of an opinion in your reports where you discuss a feasible, safer, alternative design to any of the defendants' social media platforms?

A.    Again, I think that my -- I have an opinion on it. I think my report mainly documents the harms of these features.

Q.    Can you point to me any place in your report where you discuss a safer, feasible, alternative design to any of the defendants' social media platforms?

A.    That's not the nature of my report. My nature wasn't to propose alternative designs.

Q.    Thank you.

Dr. Murray, nowhere in any of your reports have you discussed what you believe to be a warning that should accompany any of the defendants' social media platforms, fair?

A.    I haven't discussed the warning that should come --

Q.    Yes.

Page 47

A.    -- in my opinion.

Again, I think the nature of my report was to document the harms. I can't recall if I did that. I mean, I can read through it, and I'm happy to do that. I think I shared the opinion last time that my general overarching opinion is that I've never -- I've never advised a patient -- I never advised a patient to go out and use social media.

Q.    Dr. Murray, I will just please ask you to focus on my question because I have limited time here today, and I don't want to call you back because you're not being responsive, all right?

Is there any place in your reports that you discuss what you believe to be a warning that should accompany any of the defendants' social media platforms?

A.    I think I discussed, somewhere, the efficacy of some warnings. I don't recall proposing alternative warnings that should come, to the best of my recollection as I sit here today.

Q.    You yourself haven't put down

Page 48

in writing any proposed warning that you believe any of the defendants should have with respect to any part of their social media platforms, or have you?

A.    I can't recall.

Q.    You don't know of one, do you?

A.    I don't know of one in the abstract or I don't know of one --

Q.    You don't know of a writing -- you don't know of any situation where you've actually written out a proposed warning for any of the defendants' social media platforms?

A.    I can't recall doing that, no.

Q.    You haven't tested in any way any proposed warning that you believe should or should not accompany any of the defendants' social media platforms, right?

A.    Would you bear with me for one second, Todd. I'm going to glance at my report for a second.

Thank you.

[Document review.]

A.    Thank you for your patience. What was that? Could you repeat your

Page 49

question, Todd? I want to answer that for you.

Q.    Sure.

You have not tested in any way any proposed warning that you believe should or should not accompany any of the defendants' social media platforms. True?

A.    I have tested this clinically. I have an opinion that's clinical. I don't recall having a study that I've done -- tested empirically, but I clinically discuss with patients a lot.

Q.    When you say you've tested it clinically, are you talking about conversations that you've had with patients?

A.    Yes.

Q.    Okay.

A.    Yeah. I'm talking about conversations in a clinical context and in the context of individual patient's treatment plans.

Q.    And that data that you're talking about, that's not published, is it?

A.    No, that's correct. This is part of the treatment plan for a patient.

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

Q. Right. And I'm asking about any testing, clinical -- let me back up.

Have you taken any proposed warning that you believe should or -- should be accompanied -- strike that.

Have you taken any proposed warning that you believe should accompany any of the defendants' social media platforms and tested it in a clinical sampling or in some other way to determine if it has any effect in making a difference?

MS. COUCH: Object to the form.

A. And so in the hospital that I work, it's inherently baked in. Children don't bring their phones. They're not allowed access to social media. So that is, in a way, testing this, right? That would be my conceptualization of it.

I work with parents to sort of set up a plan that almost -- very often includes a social media plan as part of the ongoing treatment plan.

To your question, I don't recall publishing data on a particular feature of a proposed plan, but I do this

Page 51

often in clinical practice.

MR. DAVIS: Okay. I object to the responsiveness.

Dr. Murray, I have limited time. I reserve on that.

BY MR. DAVIS:

Q. Dr. Murray, if you can turn -- let me go back.

In your expert report, the May 2025 report, you outline your methodology, right?

A. Mm-hmm. (Witness nods.)

Sorry, I was drinking water. Yes, I do.

Q. And you describe what types of studies that were included in your causation analysis, right?

A. Yes.

Q. And you describe the main outcomes that you assessed, correct?

A. I'm just going to refer to my report again.

[Document review.]

BY MR. DAVIS:

Q. Paragraph 41 in your report has

Page 52

what you describe as the main outcomes that you assessed in your causation analysis, right?

A. There's also page 38 -- paragraph 38, mental health-related outcomes were considered.

That was part of the search as well. But I'm going to go to 41.

Q. Let me read to you what paragraph 41 is. Paragraph 41 says: Main outcomes include any objective metric of the type, duration, frequency and intensity of social media use, and any validated measure of body image, disordered eating, and general psychiatric wellbeing.

Did I describe that correctly?

A. You read that sentence correctly.

Q. All right. Those were the main outcomes that you assessed in your causation analysis.

A. Those were the main outcomes I assessed.

Q. Okay. Now, in your May 16, 2025, report, you also discuss eating

Page 53

disorders, right?

A. In my May 16th -- yes, I discuss eating disorders.

Q. On the next page, paragraph 47, you say: The current DSM-5 conceptualization of the eating disorder spectrum delineates between several distinct subtypes of eating disorders, all characterized by central disturbances in feeding behavior.

Did I describe that correctly?

A. I see where you read that. You read that correctly.

Q. So when you make a diagnosis of an eating disorder or body dysmorphic disorder, you use the DSM-5, right?

MS. COUCH: Object to the form.

A. So there's a bit of a delineation here that I think is noteworthy. On paragraph 41, I mentioned disordered meeting, body image, and general psychiatric well-being. Those are outcome measures.

Your question about the DSM-5 diagnoses. In general practice, I see children with a range of diagnoses and a range of ailments. Some of those neatly fit

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

into diagnostic boxes and others don't, and I treat them.

BY MR. DAVIS:

Q. I'm sorry, Dr. Murray, that's not an answer to my question. Please focus on my question.

When you make a diagnosis of an eating disorder or body dysmorphic disorder, you use the DSM-5, right?

MS. COUCH: Object to the form.

A. I use my clinical experience.

So I'll give you an example. We diagnose people with -- or I diagnose people with muscularity-oriented disordered eating, right? That's my clinical conceptualization. That's not in the DSM-5. It, I think, will be in DSM-6.

A lot of my work has been around trying to garner enough evidence to sort of shape the field here, but I recognize the symptoms that are presented in front of me and I conceptualize it. And as I mentioned, sometimes it fits into a diagnostic box neatly.

Sometimes what our patients are

Page 55

going through is ahead of where the DSM is at.

Q. Dr. Murray, when you diagnose anorexia nervosa, you use the DSM-5 criteria, right?

A. When I diagnose anorexia nervosa, I predominantly use either DSM-5 or ICD-11.

Q. That's same true for body -- excuse me. That's also true for body dysmorphic disorder, binge eating disorder, and bulimia nervosa, correct?

A. Yeah. When I diagnose those conditions, I use either DSM or ICD criteria.

Q. Right.

And that's also true with respect to ARFID or OSFED, correct?

MS. COUCH: Object to the form.

A. OSFED is sort of a residual catchall category for an eating disorder. But ARFID has -- yeah, I think when I diagnose ARFID in clinical practice, I would use either DSM or ICD.

And I want to point out that there are a lot of patients that present to

Page 56

me with eating disorders that don't fit into these diagnostic categories, and that's important to not neglect.

Q. Do you use OSFED? Excuse me. Do you use DSM-5 or ICD-10 to diagnose OSFED?

MS. COUCH: Object to the form.

A. I primarily use DSM, and then oftentimes billing codes are -- just general practice, billing codes are done according to ICD categories.

BY MR. DAVIS:

Q. I'm going to switch gears on you for a couple of questions.

A. Okay.

Q. Is it fair to say that an increased risk, even a statistically significant one, may or may not be causal?

MR. DAVIS: Object to the form.

A. Can you repeat that, sorry. He was telling me to move over.

BY MR. DAVIS:

Q. An increased risk --

A. Yeah.

Q. -- even a statistically significant one, may or may not be causal?

Page 57

MS. COUCH: Same objection.

A. I think an increased statistically significant risk is something I would pay attention to.

BY MR. DAVIS:

Q. Please focus on my question.

A. I am.

Q. I have a limited amount of time with you today.

A. Uh-huh.

Q. A statistically -- excuse me. An increased risk, even a statistically significant one, may or may not be causal.

A. I can't --

MS. COUCH: Object to the form.

A. I can't agree with that in the abstract. That requires context and nuance.

BY MR. DAVIS:

Q. Okay. Is every increased risk that you see causal, regardless of whether it's statistically significant or not?

MS. COUCH: Same objection.

A. Again, every statistically significant finding you take on a case by

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

case, you sort of -- you interpret it, right? And you usually interpret it in the body of a broader body of evidence. That's what I would do.

BY MR. DAVIS:

Q. If you had an individual study and you see a statistically significant increased risk, that alone doesn't tell you that it's causal. Fair?

MS. COUCH: Same objection.

A. If you had a statistically significant finding in a study, it should be interpreted in the broader body of an evidence base and collectively interpreted. You would either refute a hypothesis, it would support a hypothesis, it would support the generation of new hypotheses.

But I'll say that every statistically significant finding is meaningful to a scientist and a clinician.

MR. DAVIS: Move to strike as nonresponsive.

BY MR. DAVIS:

Q. If you had a statistically significant increased risk in a study, that

Page 59

finding alone does not establish causation. Fair?

MS. COUCH: Object to the form.

A. My approach to interpreting any individual study, Todd, is to sort of synthesize it in a broader body of evidence. That's responsible practice as a scientist.

MR. DAVIS: Move to strike, nonresponsive. I'm going to move on and reserve because I have limited time today, Mr. Murphy.

MS. COUCH: We would oppose.

BY MR. DAVIS:

Q. Do you -- Dr. Murray, the participants in the studies that you rely upon were drawn from the general population, correct?

A. Some of them.

Q. Most of them, right?

A. I can't tell you a proportion. I know some of them were, some of them were not.

Q. Okay. Are you aware -- are you aware of any study on social media use that you rely upon that drew study participants

Page 60

from a clinical setting?

A. I can recall seeing that. I can point you to it, give me one second. I brought one. I thought this may come in handy.

[Document review.]

A. Yeah, there's a -- Todd, there's a 2024 study by Praet, P-R-A-E-T, which is -- I'll just read the Methodology section: This is a qualitative study --

(Clarification requested by the court reporter.)

A. Essentially these were adolescents diagnosed with eating disorders, so they -- and this was assessing the effects of social media.

BY MR. DAVIS:

Q. You've identified Praet, which is a qualitative study?

A. Yeah. I answered your question about a study being direct from a clinically diagnosed population. That's just one. I know there are others, but that's --

Q. Let me ask a different question.

Page 61

A. Sure.

Q. Can you identify any longitudinal or experimental study that drew study participants from a clinical study? Clinical setting, excuse me.

A. From a clinical setting.

MS. COUCH: Object to the form.

A. I mean, this one I just mentioned is from a clinical setting.

BY MR. DAVIS:

Q. Focus on my question.

MS. COUCH: Yeah, let him finish.

BY MR. DAVIS:

Q. You have got to focus on my question. My question is: Can you identify an experimental or a longitudinal study that drew study participants from a clinical setting and assessed social media use?

MS. COUCH: Object to the form.

[Document review.]

A. Can I recall seeing others? The one I brought today, just as an exemplar, is from a clinical setting. You're asking about a different type of methodological

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

design.

I can recall methodological designs that varied. I recall seeing them, Todd. The one I brought to show you today is a qualitative study.

BY MR. DAVIS:

Q. Can you identify, today, an experimental or longitudinal study that drew study participants from a clinical setting?

MS. COUCH: Object to the form.

BY MR. DAVIS:

Q. And just so it's clear, as opposed to a clinical study, I mean clinical setting.

Do you understand that?

A. Mm-hmm.

Q. Yes?

MS. COUCH: Object to the form.

A. Yes, I understand what you mean by clinical setting.

Yeah, Todd, as I sit here, the one study I brought, just as an exemplar, I didn't employ that particular type of methodology. I don't recall any others. I do recall --

Page 63

BY MR. DAVIS:

Q. Okay.

A. -- the Nagata studies looking at rendering the DSM-5 diagnoses. They were derived from community populations, though, as you know, and I just want to add as well that -- well, maybe I'll stop there.

Q. Okay. Thank you.

I notice that you've been looking through the black notebook that you brought that have the articles that you -- that you wanted to have referenced for today, correct?

A. Correct.

Q. And those articles have highlights and they also have Post-its on them, right?

A. They don't have Post-its on them.

Oh, I've organized them by theme.

Q. Okay.

A. So the front paper has a theme on it, so it has a Post-it; and there's just a section highlighted as well. You are

Page 64

correct.

Q. All right. I'm going to mark your notebook as Exhibit 5.

A. Put this on the front?

Q. Yes.

A. Thank you.

Right here?

Q. Yes.

(Whereupon, Murray-5, Dr. Stuart Murray notebook of articles, was marked for identification.)

MR. DAVIS: We've been going about an hour. Do you want to take a break?

MS. COUCH: Sure.

MR. DAVIS: Okay.

THE VIDEOGRAPHER: We are now going off the record. This is the end of Media Unit No. 1, and the time is 9:53 a.m.

(Recess taken, 9:53 a.m. to 10:04 a.m. PDT)

THE VIDEOGRAPHER: We are now back on the record. This is the

Page 65

beginning of Media Unit No. 2, and the time is 10:04 a.m.

BY MR. DAVIS:

Q. Dr. Murray, a couple of follow-up questions, on the school district questions.

Putting aside any harms to children or teens or students --

(Interruption.)

BY MR. DAVIS:

Q. Are you ready, Dr. Murray?

A. I'm ready.

Q. I'm ready now.

Putting aside any harms to students, have you analyzed any harms that -- to any school districts specifically?

MS. COUCH: Object to the form.

A. I thought that was the question you asked earlier.

Again, I assessed harms in children of school age that were in schools that were located in school districts. My understanding was that the harms weren't confined to one particular school district, but I -- I can't recall delineating by school

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

district, Todd.

BY MS. HOWELL:

Q. Yeah. And I'm asking you: Putting aside whatever harm you believe happened to children or teens generally, have you analyzed any harms specific to any school district?

A. I don't think I understand your question, because you're asking me to put aside the harms and then asking me if I've analyzed harms.

Q. No, I'm asking you specifically whether you've analyzed any harms to students to a specific school district or group of school districts.

MS. COUCH: Object to the form.

A. Right. And I assessed children in school districts all over the nation in all of these studies. The studies I considered included children from school districts that were from schools located in school districts, and I can't recall delineating by specific school district, because my understanding based on the data was that the harms would be not confined to

Page 67

one particular school district.

BY MS. HOWELL:

Q. My question is --

MR. DAVIS: Move to strike, nonresponsive. My question wasn't that.

BY MR. DAVIS:

Q. My question was: Have you analyzed any harm to children or teens that is specific to a school district or a group of school districts? So the harm is to the school districts themselves.

A. And I think -- I'm really --

MS. COUCH: Object to the form.

A. I'm really trying to answer your question, and the best way I can do that is with nuance to say that the participants, the patients, the studies that I've relied on have included children of school age in schools inside school districts, and I didn't get any data to support that it would be confined to one particular school district.

I think it's diffuse. And so I don't recall delineating by a particular school or school district, because it was

Page 68

kids within school districts.

BY MR. DAVIS:

Q. Was there any harm to a school district, separate and apart from any harm to the students, in any of the studies that you analyzed?

MS. COUCH: Object to the form.

A. Well, I mean, my intuitive response to that, if there's harm to children within a school district, by virtue of that, it's harm to the school district.

BY MR. DAVIS:

Q. Dr. Murray, name any study that you've reviewed and analyzed that looked specifically at a school district to assess harms to the school district.

A. And that's what I'm trying to articulate, that because the children I assessed were of school age, lots of -- almost all of these studies include children that are in schools, in school districts. I didn't delineate by particular school district, because I think the harms are diffuse.

And so I didn't delineate by

Page 69

particular school district. And it's also my opinion that if the children within a school district are harmed, that's kind of inherently going to impact the school district.

MR. DAVIS: Object, non --

A. This is my opinion.

MR. DAVIS: I'm sorry, that's not an answer to my question. I move to strike, nonresponsive, reserve on that one.

BY MR. DAVIS:

Q. Dr. Murray, with respect to any discussions that you've had with patients about social media use, have you ever handed out any written warning to any patient?

MS. COUCH: Object to the form.

A. Oftentimes we would develop -- when I say we, I mean the family, the patient, and the team, develop a sort of contract as part of their treatment plan. These are many patients I'm talking about, with severe eating disorders that are addicted to social media.

And so as part of that

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

treatment plan, they would oftentimes develop a contract. That's often verbal in nature with parents. And the reason is, it's because when you're working with children, you're inherently aiming to empower the parents to take a leadership role in their own child's recovery. So we do do that often.

I can't recall sitting here right now if I could place one global warning that I've put out. It comes up often with clinical patient care.

MR. DAVIS: I move to strike as nonresponsive. I'll reserve on that. I don't have the time to joust with you today, Dr. Murray. I'm moving on to the next question.

MS. COUCH: We would oppose.

MR. DAVIS: And I will say, Counsel, the question that I asked was very specific. It was very direct. And I didn't get anywhere close to the question. He didn't get anywhere close. And so we're reserving on that, as well as others.

Page 71

MS. COUCH: And just for the record, I think there is a possibility you guys are talking past each other, but I do think Dr. Murray is trying to answer your question to the best of his ability.

MR. DAVIS: I agree that someone is talking past the other person. I agree with that.

BY MR. DAVIS:

Q. Dr. Murray, the positive --
You're familiar with positive predictive value, correct?

A. Yes. We --

Q. Yes?
Yes?

A. Yes.

Q. Yeah. And positive predictive value is a way to measure how accurate a screening test is, right?

A. It's one way to measure the accuracy of a screening tool.

Q. And a positive predictive value is a calculation using the sensitivity, the specificity, and the prevalence of the

Page 72

disorder or disease in the population, right?

A. In some instances, those are used to calculate the predictability of a screen.

Q. And you agree that if the prevalence is low in a population, that the positive predictive value will also be low, right?

A. In the abstract, I don't agree with that. And I can expand on that if you'd like.

Q. In any of the reports that you have done for the litigation, you have not identified or assessed the positive predictive value for any of the screening scales that were used in the studies assessing social media use. True?

MS. COUCH: Object to the form.

A. I thought we talked about that in our last conversation, you and I, where I spoke about the sort of specificity and the sensitivity of the SCOFF, being one example. I remember I showed you the data that I pulled from one of my own studies and how that changed diagnostic accuracy in general

Page 73

psychiatric outpatient settings.

I can't recall if it's in my report. I did bring some other papers to sort of talk about the validity of symptom measures as related to diagnoses.

MR. DAVIS: I move to strike as nonresponsive. Dr. Murray, please listen to my question.

BY MR. DAVIS:

Q. In your reports, you do not identify any studies that assess the positive predictive value for any of the screening scales used in the studies on social media. True?

MS. COUCH: Object to the form, misstates.

A. Let me please refer to my rebuttal report, if that's all right with you.

[Document review.]

A. So I actually brought some additional papers.

BY MR. DAVIS:

Q. Can you come back to my question?

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

A. Sure.

Q. My question is very specific.

A. Sure.

Q. In your reports, that's plural, you do not identify any studies that assessed the positive predictive value for any of the screening scales used in the studies on social media. True?

MS. COUCH: Objection, misstates.

A. So in my report, I've referred to measures that have known metrics of sensitivity and specificity, which are in the peer-reviewed literature. And I considered that. I considered the predictive validity of the studies and the measures therein.

I didn't provide a known -- an independent sensitivity analysis. That's a very different type of methodology.

MR. DAVIS: I move to strike as nonresponsive.

BY MR. DAVIS:

Q. Dr. Murray, in neither of your reports did you calculate the positive predictive value for any of the screening

Page 75

scales or tools used in the studies on social media use. True?

A. It's not common in a systematic review to independently perform separate empirical analyses. It's more common, Todd, to use judgment when you're appraising and surveilling studies, and I made sure to sort of ascertain the sensitivity and the validity of the measures used in the studies.

We talked about that. I don't think I included a separate sensitivity analysis in my report because there's an abundance of peer-reviewed data supporting the validity of the scales that were in the studies I included.

MR. DAVIS: I move to strike as nonresponsive. That wasn't anywhere close to what I asked you. You really need to focus on my question, please. I'll ask you one more time.

BY MR. DAVIS:

Q. In neither of your reports did you calculate the positive predictive value for any of the screening scales or tools that were used in the studies on social media use,

Page 76

right?

MS. COUCH: Object to the form.

A. So I'm just going to have to try to explain this in a slightly more nuanced way.

BY MR. DAVIS:

Q. Did you calculate the positive predicative value? I think that's a "yes" or a "no."

MS. COUCH: And real quick, you can finish your answer. You don't have to give a "yes" or "no" if it's not on a yes-or-no question. But, of course, do listen to the specific thing that he's asking.

THE WITNESS: Right. Right. Right. Thank you.

A. In a systematic review, you appraise the methodology in every study, and I did not see the need to perform an independent sensitivity analysis because the metrics are known.

So I did not perform a separate sensitivity analysis of measures with known metrics.

Page 77

BY MR. DAVIS:

Q. You did not set out in your reports and you have not done any analysis calculating the positive predictive value for any of the screening scales used in the studies on social media use, fair?

MS. COUCH: Object to the form.

A. Again, because I know the data supporting these measures, and it's also not a feature of a systematic review to independently perform additional analyses, so I did not perform a predictive validity assessment because the predictive validity of the measures are in the peer-reviewed literature and they've been reliably reproduced.

BY MR. DAVIS:

Q. None of the articles that you identified in any of your reports actually calculate or set out the positive predictive value for any of the screening scales for the scales -- screening scales you used in the social media studies, true?

MS. COUCH: Object to the form.

A. Again, because the data is

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

empirically known, it's out there, the job of a systematic review is to sort of surveil the evidence and give that weight when you make your opinions.

So I didn't perform an independent predictive validity assessment. That's a different methodology. I relied on the literature that's out there that does support the utility and the validity and the criteria and the construct validity of the tools used.

And in our last disc- -- in our last talk, we -- I think I produced data to support that.

BY MR. DAVIS:

Q.   You missed my question again. None of the articles that you identified in your report actually calculate or set out the positive predictive value for any of the screening scales used in the social media studies.  True?

MS. COUCH:  Object to the form.

A.   Todd, in a systematic review, it's not common scientific practice to perform separate empirical data-derived

Page 79

analyses.  I did a systematic review, and so I weighted the opinion based on what was known about the methods included in the studies.  That is very in lockstep with a systematic review.

BY MR. DAVIS:

Q.   I'm asking you if any of the articles -- you're not following my question. You're giving me an answer to a different question than I asked.  I'm asking you if any of the articles that you rely upon in your reports actually calculated the positive predictive value for any of the screening scales used in the studies on social media use?

A.   I mean, I can refer you to my reliance list.

Q.   I'm asking you if any of the articles actually calculated the positive predictive value.

A.   Bear with me one second.

[Document review.]

A.   Maybe I'll try to -- I'll try to answer this in a different way.

Page 80

BY MR. DAVIS:

Q.   I would like for you to answer my question, please.

A.   I'm trying to answer your question, Todd, and it requires nuance.  And I'm really doing my best here.  It's not a yes-or-no question.  And, in fact, I've answered that.

But there's a study I have here showing the ability of the EDE-Q in being able to discriminate between ED cases and non-ED cases.

I have another study --

Q.   Excuse me.  What study are you referring to?

A.   This is a study by Black and Wilson.

Q.   Okay.  Black and Wilson involved a population of individuals who were not adolescents, true?

A.   Bear with me one second.  This is one exemplar study.

[Document review.]

BY MR. DAVIS:

Q.   True, Doctor?

Page 81

A.   This looks like it's a broad age range.  But I'm aware --

Q.   This study, Black, did not include adolescents, did it?

A.   Yeah, it's unclear whether this exemplar -- for some reason, I don't see the age range in this study.  But I know there are many others.

John Mund has published a lot on this, and there's actually clinical cutoffs, Todd, to enable you to ascertain whether one person's score is situated in either a clinical range score or a nonclinical range score.  And all of those studies are predicated on discriminative validity.

MR. DAVIS:  I move to strike as nonresponsive after everything -- it's unclear whether this study -- "I don't see the age range in the study."

BY MR. DAVIS:

Q.   Black actually assessed a population of adult patients who had substance use disorder, true?

A.   This particular study -- and

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

keep in mind, there are others like this. This particular study assessed a diverse group of women seeking help for substance use.

Q. Okay.

A. Correct.

Q. Again, come back to my question which started this discussion.

A. Yeah.

Q. None of the articles that you rely upon actually calculated the positive predictive value for any of the screening scales used in the studies on social media use, fair?

MS. COUCH: Object to the form.

A. The studies that I relied upon used methods with known predictive validity specificity, and I did not, on the basis of that, see the need to perform an independent analysis, so I did not include that in my study.

BY MR. DAVIS:

Q. Okay. So you don't have any articles that actually identify the positive predictive value for any of the screening

Page 83

scales used in the social media studies. Fair?

A. Bear with me one second. They may be somewhere in here as well. I'm just recalling a separate section in the main report.

[Document review.]

BY MR. DAVIS:

Q. Do you have an article, Doctor?

A. I have a few, yeah. There's a section in my report on page 147.305, where it's called the Eating Disorder Examination-Questionnaire. That's a measure that appears fairly frequently during my report.

There are several exemplar references here which support the validity of that, that particular method.

MR. DAVIS: I move to strike as nonresponsive. I didn't ask you that question. Please listen to my question.

BY MR. DAVIS:

Q. Can you identify any article in your reports that actually calculated the

Page 84

positive predictive value for any of the screening scales used in the social media studies?

MS. COUCH: Object to the form.

A. Keep in mind, the positive predictive value, as I mentioned earlier, is one way of assessing the utility of a measure. The other would be sensitivity, specificity, crossover rates, and so the EDE-Q, which is referenced here, has powerful predictive ability in being able to discriminate between ED and non-ED cases.

So I reference the studies that support the psychometric utility of the EDE-Q. And these studies have performed psychometric validation of the measure therein.

MR. DAVIS: I move to strike as nonresponsive.

BY MR. DAVIS:

Q. Dr. Murray, please, I'm really asking you to listen to my question and not go off on something else. So please focus.

Can you identify a single article in your reports that you rely upon

Page 85

that actually calculated the positive predictive value for any of the screening scales that you rely upon?

MS. COUCH: Object to the form.

BY MR. DAVIS:

Q. Excuse me, let me rephrase the question.

Can you identify any articles that actually calculated the positive predictive value for any of the screening scales used in the studies on social media use?

MS. COUCH: Object to the form.

A. So I've just identified studies that, while they may not have reported the positive predictive value, they do report the sensitivity and specificity.

BY MR. DAVIS:

Q. I'm not asking that. I'm specific on positive predictive value.

Can you identify one study that actually calculated the positive predictive value for the screening scales used in the studies on social media use? That's all I'm asking.

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

MS. COUCH: And, Dr. Murray, you can finish your answer.

A. Again, I mentioned that's one way. I can't --

Thank you.

I can't recall one study that used that particular method.

BY MR. DAVIS:

Q. Okay.

A. I pointed out to you studies that use other psychometric validation, and they've reported their sensitivity and specificity in detecting true eating disorder cases. Those data are out there, and that's on my reliance list.

Q. For any of the studies that you're relying on for this, what you say is the alternative methodology, did any of those actually calculate the prevalence rate in the communities that they assess to determine how that impacted the reliability of the screening scales?

A. I did a very similar study myself, which we talked about last time.

Q. I'm asking you: Did any of the

Page 87

studies that -- any of the -- the alternative methods that you've identified, using specificity and sensitivity --

A. Yeah. Yeah. Yeah.

Q. -- did those articles actually calculate --

MS. COUCH: Let him finish.

BY MR. DAVIS:

Q. -- actually use the prevalence rate to determine how reliable the screening scale was in determining that it -- that the study participant would actually meet a diagnosis?

MS. COUCH: Object to the form.

A. To the best of my recollection, as I sit here today, these studies have reported that concordance between clinician-rendered diagnoses and their scores in the EDE-Q. So inherently within that, you would look at specificity and sensitivity.

BY MR. DAVIS:

Q. But those articles that you're relying upon also didn't factor in prevalence, did they?

MS. COUCH: Object to the form.

Page 88

A. Well, I can't recall the specific methodology of these individual studies, but what I can tell you is they're very widely used and very empirically robust, and were just noted by a global think tank to be the gold standard in measuring, at least in this case, eating disorder psychopathology.

MR. DAVIS: I move to strike after "I can't recall a specific methodologies of these individual studies."

(Whereupon, Murray-6, Screening for Eating Disorders in Adolescents and Adults (Feltner), was marked for identification.)

BY MR. DAVIS:

Q. I'm going to hand you what's been marked as Exhibit 6. This is an article that you specifically rely upon in your rebuttal report, correct?

A. Let me just check.

Q. Go to page 13, Doctor, of your rebuttal report.

A. Okay. I'm getting there.

Page 89

Q. Do you see the Feltner article on page 13?

A. Feltner, Peat and Reddy?

Q. Yes.

A. Yep.

Q. That's the article that I've handed you marked as Exhibit 6, right?

A. This looks like the article, yes.

Q. Okay. Turn to page 1069. Top left-hand corner, first paragraph.

Do you see where it says that: Estimated lifetime prevalences for anorexia nervosa, bulimia nervosa and binge eating disorder in adult women are 1.42%, 0.46% and 1.25% respectively?

Do you see that?

A. I see that.

Q. Yep. And those are fair estimates of the lifetime prevalence for those disorders in adult women, right?

A. I mean, I've seen higher estimates than that, for sure.

Q. These estimates are within the -- are reasonable estimates. They're

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

within the range of what is known, correct?

A.    It's difficult to say because eating disorder -- a lot of times, eating disorder patients try to evade detection and treatment because there's a fear of weight gain as a cardinal symptom, and so folks know if they seek treatment, the proximal goal would be to gain weight.

And so what's very, very well known in the eating disorder field is that the prevalence rate oftentimes are artificially low, because a lot of people don't seek treatment when they should.

Q.    You're not suggesting that these authors put in false information in the article, are you?

MS. COUCH:  Object to the form.

A.    I'm simply trying to point out that there's a range of prevalence estimates that I've seen, and, in fact, a recent one by the Deluxe Economic Foundation was clear in that as high as 10% of the population of this country get an eating disorder at some point in their lifetime.

Page 91

BY MR. DAVIS:

Q.    My question was:  You're not suggesting that the authors are putting false information in this article about the prevalence rates, are you?

MS. COUCH:  Object to the form.

A.    I'm simply pointing out that alongside these prevalence estimates, there are other prevalence estimates, and I'm not suggesting that this is an inaccurate author disclosure.

BY MR. DAVIS:

Q.    And then if you see, it says: In adolescents aged 12 to 17 years, estimated lifetime prevalence for anorexia nervosa, bulimia nervosa and binge eating disorder are 0.3%. 1.3%, and 2.3% respectively, for females.

Do you see that?

A.    I see that.

Q.    And 0.3%, 0.5%, and 1.3% for males.

Do you see that?

A.    I see that too.

Q.    And you're not suggesting that

Page 92

those prevalence rates are false or misleading, are you?

MS. COUCH:  Object to the form.

A.    I'd have to review the study for this citation that it came from.  It looks like it's from a study --

BY MR. DAVIS:

Q.    I'm just asking you --

A.    -- a comorbidity study.

Q.    You're not suggesting here today that those prevalence rates used by these authors are somehow false or misleading?

MS. COUCH:  Object to the form.

A.    I'm trying to give you the context that there are broader evidence of different prevalence rates.  I've seen prevalence rates much higher, and I'm not suggesting that these ones are unfair to report either.

BY MR. DAVIS:

Q.    Okay.  Look at page 13 of your rebuttal report.

Paragraph 33.

A.    Yep.

Page 93

Q.    You say that -- you quote Dr. Schwartz's report, Dr. Terry Schwartz --

A.    Yep.

Q.    -- that, quote:  self-report symptoms and screening tools did not substitute for a clinician-administered diagnostic tool or assessment, closed quote, in part because, quote, self-report data has many potential flaws, biases, and inaccuracies, closed quote.

Right?  Do you see that?

A.    Yeah.  In her opinion--

Q.    I'm just asking if you see it. Right?

A.    Mm-hmm.

Q.    Yes?

A.    Yes, I see that.

Q.    And it says:  Likewise -- you say -- Dr. Shear writes that eating disorder data has "limited utility" because they rely on "self-reported data by study participants (which is often unreliable)."

Right?

A.    I see that too.  I see that sentence.

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

Q.   And your comment about those two statements is that Dr. Schwartz and Dr. Shear have identified a common general criticism of self-reported symptom measures. True?

MS. COUCH:  Object to the form.

A.   I see that sentence, yes.

BY MR. DAVIS:

Q.   Okay.

And let's look at the Feltner article, page 13 -- turn to table e3.

Table e3, from the Feltner article that you rely upon --

A.   Can you give me one -- I want to familiarize myself with the content of this study, so I just need a second.

Q.   Doctor, my question isn't about the study; it's about something different. Please turn to Table e3 in the back.

MS. COUCH:  If you need to take a second to answer a question about a study, you can take a second to look at it.

THE WITNESS:  Okay.

MR. DAVIS:  I'd like to go off

Page 95

the record if he's going to use time.

MS. COUCH:  We're not going off the record.  He's only -- he has not been using time.  He's literally taking 30 seconds.

He's done now, it looks like.

A.   All right.

BY MR. DAVIS:

Q.   Table e3, Dr. Murray.

A.   That's in the supplement?

Q.   Table e3.  It's in the back.

A.   Okay.

MS. COUCH:  Does it have a page number?

MR. DAVIS:  Very last page.

A.   Okay.

BY MR. DAVIS:

Q.   Do you see that there -- Table e3 is Detailed Summary of Recommendations From Organizations?

Do you see that?

A.   Yes.

Q.   And this is a listing in the Feltner article about the position about different professional organizations about

Page 96

use of screening scales.  True?

MS. COUCH:  Object to the form.

A.   It looks like some of these don't recommend specific scales, some of these organizations.  I see some scales in some organizations.

BY MR. DAVIS:

Q.   But these are current recommendations from other organizations, from organizations about screening scales, correct?

MS. COUCH:  Object to the form.

A.   I think this is recommendations about screening.  Some of them don't propose particular scales.  I think the broad conceptual point here is the importance of screening, as I understand it.

BY MR. DAVIS:

Q.   The very first professional organization is the American Academy of Pediatrics, correct?

A.   Yep.

Q.   And what they say about screening is that if -- a pediatrician should monitor and identify changes of height,

Page 97

weight, BMI, and vital signs longitudinally.

Do you see that?

A.   I see that.

Q.   It says:  If findings indicate that an eating disorder may be present, the pediatrician should conduct thorough medical and psychological assessments to identify if an eating disorder diagnosis is appropriate.

Did I read that correctly?

A.   You read that correctly.

Q.   That's what the American Academy of Pediatricians is recommending, correct?

A.   Correct.

Q.   Go to the -- there's a next one.

If you go down to the NICE 2017.  You know what NICE is, right?

A.   Mm-hmm.

Q.   It's the National Institute For Health and Care Excellence, correct?

A.   Mm-hmm.

Q.   Yes?

A.   Yes.  From England, yes.

Q.   Yes.  And you're -- it's a

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

respected organization, correct?

A. Yes.

Q. And that organization says: Patients who present symptoms of eating disorders should be assessed and treated as soon as possible. Guidelines highlight that reliance on screening tools alone, such as SCOFF, is not sufficient for diagnosis.

Did I read that correctly?

A. You read that correctly.

Q. That's the recommendation by this well-respected organization, correct?

A. Correct.

Can I add, though, that --

Q. There's no question pending, Doctor.

Let's go to --

MS. COUCH: Objection. If that's part of your original answer, you can complete it.

BY MR. DAVIS:

Q. Let's go to --

THE WITNESS: Yeah. Can I finish my thought, Todd?

MR. DAVIS: I'm sure Ms. Couch

Page 99

will ask you questions.

MS. COUCH: He can finish his answer if it is part of his original answer.

A. Yeah, it looks like that's part of their recommendation. I see where it says that. And it is use of a measure with great construct validity and remembering that not a lot of people -- these are broad guidelines, right?

And so they're recommending a specialized assessment after this, it looks like. They should be assessed. The SCOFF does give a very, very good idea, which is probably why they reference it, because it has a 92% specificity and sensitivity.

So I see that sentence, but in clinical practice, this is used all the time.

MR. DAVIS: Objection, move to strike, nonresponsive.

BY MR. DAVIS:

Q. Doctor, I'm going to hand you what's been marked as Exhibit 7 to your deposition.

(Whereupon, Murray-7,

Page 100

Prevention and Early Identification of Eating Disorders (Attia), was marked for identification.)

BY MR. DAVIS:

Q. Do you see this is an article in 2022 by Dr. Evelyn Attia and Dr. Angela Guarda?

A. Mm-hmm.

Q. Yes?

A. Yes. I see Evelyn's paper, yes.

Q. Do you see this is published in the Journal of American Medical Association, correct?

A. I see it's an editorial in JAMA, yes.

Q. Right.

And do you know Dr. Attia and Dr. Guarda?

A. I don't know them personally.

Q. Do you know their reputation?

A. I have interacted with them. I don't know them personally.

Q. Do you believe that they're conscientious physicians?

Page 101

MS. COUCH: Object to the form.

A. I don't know enough to suggest otherwise.

BY MR. DAVIS:

Q. Okay. Turn to page 1030. The right column, second paragraph.

The last sentence: Concern -- it says, quote: Concerns about the possible harms of screening, including false-positive screen tests --

A. You're on page 1030?

Q. Yes, sir.

Here.

A. Can I -- thank you.

Q. Do you see where I've high- -- I put a little mark there for you?

A. Yeah, yeah. I thought you said the bottom paragraph.

Q. It says -- this editorial says, quote: Concerns about the possible harms of screening, including false-positive screen results and overlabeling, could be addressed by procedures that pair initial screening with clinical interview for individuals who screen positive to confirm diagnosis.

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

Correct?

A.    That's what it says.

Q.    That's what this editorial is discussing about it must -- that you have to pair up a clinical interview for individuals suspected -- who may have an eating disorder because of false positives, correct?

A.    See, this -- this paper suggests pairing up a clinical interview with a screening confirmation. And I'll say that the vast body of evidence supporting these clinical screens are supportive of diagnostic accuracy and sensitivity.

MR. DAVIS:  Move to strike as nonresponsive.

I'm sorry, Dr. Murray, I reserve on that. I don't have time to go back and ask you another question today to have a responsive answer.

I'll hand you what's been marked as Exhibit 8.

(Whereupon, Murray-8, The SCOFF questionnaire: A new screening tool for eating disorders (Morgan), was marked for identification.)

Page 103

BY MR. DAVIS:

Q.    Do you see this is a document that's called the SCOFF questionnaire:  a new screening tool for eating disorders?

Do you see that?

A.    I see that study from 2000.

Q.    Yep.  And if you go back -- if you go down to page 165, the right column.

Second paragraph, first sentence.

It says, quote:  One issue that is likely to be raised with respect to the SCOFF questionnaire that is -- but that is by no means specific to the instrument -- is the relatively low base rate of eating disorders (anorexia nervosa, 0.5%, and bulimia nervosa, 1% to 2% in the age groups at risk) in the general population.

Did I read that correctly?

A.    You did read that correctly.

Q.    And it goes on to say:  As a result, the SCOFF questionnaire is likely to produce a relatively large number of false-positive cases, paren, respondents who test positively on the instrument but do not

Page 104

have a diagnosis of an eating disorder.

Did I read that correctly?

A.    You read that correctly, but --

Q.    Let me ask my next question.

A.    Can I finish my sentence?

But that assertion has been tested.

Q.    Let me ask my next question.

A.    The sensitivity has been tested.

Q.    Let me ask the next question.

That's what this article said, correct?

A.    That's what that sentence said.

Q.    Okay.

A.    I haven't read the whole article.  I'd have to re-review it.

Q.    Dr. Murray, at your June 19, 2025, deposition, I asked you whether you could identify a single study that found no association between social media use and any of the symptoms or psychiatric disorders that you claim social media use causes.

Do you remember that discussion?

Page 105

MS. COUCH:  Object to the form.

A.    Can I refer back to the last exhibit you gave me?

BY MR. DAVIS:

Q.    No, I've moved on to another question.  Do you remember that discussion that we had at your June 2025 deposition?

A.    Could you repeat your question? Sorry.

Q.    Sure.

At your June 19, 2025 deposition, I asked you if you could identify a single study that showed no association between use of social media and the psychiatric disorders or symptoms that you claim social media use causes.

Do you remember that discussion?

MS. COUCH:  Object to the form.

A.    I remember we had a long discussion about that construct.

BY MR. DAVIS:

Q.    And in your reports, you don't identify and discuss a single -- strike that. In your reports, you do not discuss a single

27 (Pages 102 - 105)

CONFIDENTIAL

Page 106

study that found no association between social media use and the psychiatric disorders or symptoms that you claim social media use causes, true?

MS. COUCH: Object to the form.

A. I don't recall. I'd have to reread my entire report. I can't recall sitting here today.

What I do report -- what I do recall is a conversation about this.

Q. Can you identify here today for us -- because I asked you -- let me back up. I asked you back in June if you could identify a single study. I'm following back up with you today.

Can you identify a single study that looked at social media use and the psychiatric disorders or symptoms that you claim social media use causes, and found no association?

MS. COUCH: Object to the form.

A. So my entire report was based on giving an opinion on the totality of the evidence base. And the evidence was, and is, fairly compelling, that the majority of the

Page 107

data or the sort of totality of the evidence support that there are harms.

I did report in my report as well that there was some data around connectivity. That seems to be more transient and more of a signal in adults and less so in adolescents. I recall that discussion too.

BY MR. DAVIS:

Q. I think you missed my question. My question today is: Having been asked back in June of 2025, and now me asking you again, can you identify a single study that found no association between social media use and the symptoms or psychiatric disorders that you claim social media use causes?

MS. COUCH: Object to the form.

A. I'm going to just go through my report.

BY MR. DAVIS:

Q. Can you identify one?

A. I'll let you know.

Q. Okay. Go ahead.

A. Rather than going through my entire report, which will take some time,

Page 108

I'll just state that my opinions reflect the overall evidence base, as I mentioned when we last talked.

Q. I didn't ask you that, Dr. Murray. I'm simply asking you if you can identify one study that found no association.

MS. COUCH: Object to the form.

A. And I would have to read through my whole report, sir.

BY MR. DAVIS:

Q. There are studies that found no association between social media use and the psychiatric symptoms or mental health outcomes that you claim social media use causes, correct?

A. If you can give me studies I'm happy to review them.

BY MR. DAVIS:

Q. I'm asking you if they do exist. They do exist, don't they?

A. The -- I mean, my report contains an opinion based on the totality of an evidence-based, and it's well sort of known in psychiatry that the data require interpretation synthesis to arrive at an

Page 109

opinion, and the best way to do that is a rigorous review.

Q. A rigorous review.

A. Mm-hmm.

Q. Of the data, correct?

A. (Witness nods.)

Q. Yes?

A. Yes.

Q. Now, in your rigorous review of the data, show me where you identify, discuss, and analyze any of the multiple studies that found no association between social media use and the mental health outcomes that you claim social media use causes.

MS. COUCH: Object to the form.

[Document review.]

A. So here's an example of, I think, how the data relate to the question you asked.

Q. What page are you on, please?

A. It's 116.242.

So this says: On the one hand, this study noted that social media provide -- may provide a sense of community for those

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

engaging in self-harm - providing users with a sense of being understood and acceptance. While on the other hand, several other studies have illustrated the potential harms of social media, and one study included in this review assessed almost 10,000 users of social media and found that the likelihood of suicidality and suicidal ideation increased linearly alongside the number of suicidal ideation communities to which users belonged.

So, in that, there's data reflecting the connectivity that I alluded to.

Q. Doctor -- Doctor, paragraph 242 does not analyze and discuss any of the studies finding no association between social media use and the mental health outcomes or harms that you claim social media use causes, does it?

A. I referenced it.

Q. What study do you specifically discuss?

A. Todd, the job of a systematic review is to ascertain an opinion based on an overall evidence base, and that's what I did.

Page 111

And to your original question, I've noted here that this particular study found, alongside a serious suite of harms, that there were some benefits in terms of connectivity and social support. But that, in my opinion, was less significant than the magnitude of the harms prevented.

MR. DAVIS: Doctor, move to strike as nonresponsive.

BY MR. DAVIS:

Q. The meta-analysis that you're discussing talks about benefit -- some studies finding a benefit of social media use, correct?

A. I --

Q. Correct?

A. I mean, I'll review the study again. I haven't -- it's been a while since I read it. And I read a lot of studies for this. If you -- I can reread it right now, if you'd like.

Q. No. I think you've missed my question again. I'll ask it again.

A. Okay.

Q. Where in your report do you do

Page 112

a rigorous analysis and assessment of any of the studies on social media use that found no association between the symptoms or mental health outcomes that you claim social media use causes?

MS. COUCH: Object to the form.

A. I just pointed you to one.

BY MR. DAVIS:

Q. Paragraph 242?

A. I just pointed you to a statement in my report where it says: This particular study noted on the one hand that, while social media can provide a sense of community for those engaging in self-harm, on the other hand, several other studies illustrated the potential harms of social media use, in particular, among 10,000 members of social media and how the likelihood of suicidal ideation increases.

Q. What you just read doesn't discuss the study that found no association between use of social media use and the mental health outcomes that you claim it causes, true?

A. If you provide any additional

Page 113

studies, I'll happily review them and give an opinion.

But what I'll say is that the job of a systematic review is to provide an overall synthesis of a body of evidence, and that is what I did.

MR. DAVIS: Move to strike, nonresponsive.

BY MR. DAVIS:

Q. Other than paragraph 242, show me one place, anywhere in your reports, that you did a rigorous analysis and assessment of the studies on social media use that found no association for the mental health outcomes that you say social media use caused.

MS. COUCH: Object to the form.

A. Yeah. Other than the exemplar that I just shared with you in response to your original question, I don't want to look through this entire report. There are papers that I reviewed.

The job that I was asked to do was a systematic review and give an opinion based on an evidence base. And the evidence is overwhelmingly compelling, and that, I

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

think, is reflected in my report.

MR. DAVIS: Move to strike, nonresponsive.

BY MR. DAVIS:

Q.  Doctor, you -- did you read Dr. Gibbons' and Dr. Patten's MDL reports?

A.  I read some reports. I don't remember the names. I read a lot of reports by your experts.

Q.  Do those names sound familiar to you?

A.  They sound familiar. They sound familiar.

Q.  And you read those and looked through them, didn't you?

A.  I can't recall if --

MS. COUCH: Object to the form.

THE WITNESS: I'm sorry.

A.  I can't recall if I read those specific reports. I -- I read a lot for this --

BY MR. DAVIS:

Q.  Those reports identify all of the studies that found no association between social media use and the mental health

Page 115

outcomes that you claim social media use causes.

Were you aware of that?

MS. COUCH: Object to the form.

A.  Again, I can't recall every specific piece of literature that I've read. I'm happy to review them now and give you my opinion on the spot.

BY MR. DAVIS:

Q.  Well, I'll ask you a question, since you're the expert.

A.  Uh-huh.

Q.  Name one study -- name one study that found no association between social media use and the mental health outcomes that you claim social media use causes that you actually reviewed, considered, and evaluated to form your opinions.

A.  Mm-hmm.

MS. COUCH: Object to the form, argumentative.

A.  So the study that I cite to here is the Masuda study in PLOS ONE. And this does note that on the one hand, social

Page 116

media may provide a sense of community for those engaging in self-harm, while on the other hand, illustrating a suite of harms.

That's one exemplar.

BY MR. DAVIS:

Q.  Can you give me any other study besides the Masuda study?

A.  As I mentioned, I can't recall, because my job was to really give an opinion on the overall evidence base, which is what I did. And that's with --

Look, my opinions are reflected by -- or mirrored, even, or are corroborated by large respected organizations, NEDA, AED, Surgeon General. So my -- my -- I believe my opinion accurately reflects the review that I did of the data.

BY MR. DAVIS:

Q.  Other than Masuda, can you name a single study?

MS. COUCH: Asked and answered.

A.  Yeah, again, that's the one example I can think of right here. I don't want to take all this time to read through my entire report and my reliance list. I --

Page 117

BY MR. DAVIS:

Q.  I'm giving you the opportunity to say -- to tell me a single study.

A.  Again --

MS. COUCH: Asked and answered.

A.  -- the Masuda study here reports the effects that I just mentioned in terms of connectivity and support, while at the same time, illustrating in 10,000 users of social media -- or 9,990 -- sorry, I'm not going to misrepresent myself, it's almost 10,000 users -- found that social media suicidal ideation communities increased the likelihood of suicidal ideation linearly alongside the number of communities to which somebody belongs.

So that's -- that's the Masuda study. That's one example.

And again, I'll reiterate, though, that my job was to really give an overall opinion based on the data, the evidence base.

MR. DAVIS: Move to strike, nonresponsive.

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

BY MR. DAVIS:

Q. Dr. Murray, you agree that social media does benefit youth and teens, correct?

MS. COUCH: Object to the form.

A. In the abstract, I can't agree to that.

BY MR. DAVIS:

Q. Do you agree that social media use by youth and teens provides opportunities for teens to create friendships and social connections?

A. Does social media provide opportunities for teens to create friendships and connections? That's what the Masuda study said, that I also want to point out that there's a suite of harms as well --

Q. I want to focus on benefits.

A. -- associated with social media use.

Q. You've made your opinions clear on harms. I want to focus on the benefits.

A. Mm-hmm.

Q. You agree that social media use can be beneficial to youth or teens by

Page 119

allowing them to keep and maintain friendships, right?

A. I want to just cite this Masuda study again, that this does support a sense of community and a sense of belonging. And at the same time, it illustrates that there's a suite of risks associated with social media use.

MR. DAVIS: Okay. Move to strike, nonresponsive.

Dr. Murray, I've marked that, reserve on it, because I don't have time to joust with you today on very straightforward questions.

We've been going about an hour. Why don't we take another break.

MS. COUCH: Okay.

THE VIDEOGRAPHER: We are now going off the record. This is the end of Media Unit No. 2, and the time is 10:58 a.m.

(Recess taken, 10:58 a.m. to 11:14 a.m. PDT)

THE VIDEOGRAPHER: We are now back on the record. This is the

Page 120

beginning of Media Unit No. 3, and the time is 11:14 a.m.

BY MR. DAVIS:

Q. Dr. Murray, are you ready to continue?

A. Yes. Thanks, Todd.

Q. Do you claim that social media use causes addiction?

A. Let me refer to my report before I answer.

[Document review.]

A. Yes.

BY MR. DAVIS:

Q. Okay. And are you using "problematic social media use" and "addiction" -- and "social media use addiction" interchangeably?

A. I saw some studies that seemed to do that. My understanding of the discrepancy is that problematic social media use may not -- while problematic and symptomatic and distressing, may not rise to the level of addiction, but is addictive and is problematic.

I think some studies use them

Page 121

interchangeably and some studies, I think, make a slight delineation.

Q. I'm asking you, Stuart Murray, do you equate social media addiction -- let me back up.

Some of the studies on problematic social media use do not equate social media use with an actual addiction. Is that fair?

A. Can you rephrase that? Sorry, that was a complex --

Q. Sure.

Some of the studies that use a term of "problematic social media use," do not equate that term with an actual addiction, correct?

A. I think some studies tend to use them interchangeably, and I think other studies make a delineation where problematic social media use is on the pathway to social media addiction. That's my understanding. I think I've seen two types of studies.

Q. So for the latter category of problematic social media use is not, in and of itself, in some of the studies, reflective

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

of addiction?

A.    I think it's a symptom of addiction, much in the same way as disordered eating is a symptom of an eating disorder.

If someone has problematic social media use, it's part of a broader social media addiction. It's -- that would be my sense.

Q.    Do you, Stuart Murray, equate problematic social media use with what you call social media addiction?

A.    I would equate problematic social media use -- let me rephrase this. I mean, they're inherently interconnected in my opinion, as I use it. I am aware of studies using these -- conflating these, but I think my understanding with my patients is that problematic social media use is part of an addiction.

Q.    I don't quite track that. So let me make sure I understand what your claim is.

A.    Uh-huh.

Q.    Are you saying, in your view, that problematic social media use is the

Page 123

equivalent of what you believe to be a social media addiction?

A.    I'm saying that my opinion is that problematic social media use is part of an addiction. It's a symptom of an addiction.

Q.    Okay. So your claim is that problematic social media use may or may not be an addiction?

A.    I don't think I said that.

Q.    I'm just asking you.

A.    Okay.

Q.    Is problematic social media use, in the mind of Dr. Stuart Murray, reflective of addiction?

A.    So in my mind, as I use this clinically, and again, I'm aware of studies that have conflated those two and I'm aware of studies that have delineated the two, I think that problematic social media use is part of a social media addiction. That's my sense.

Q.    I think we're going round and round on this unnecessarily. If you only had problematic social media use, that's all you

Page 124

had, Dr. Murray, can you say that that person has a social media addiction?

A.    If I had an individual person in front of me, I would ask them what they mean by that term. And I think -- my understanding is that that problematic social media use is part of an addiction and usually co-occurs with other symptoms.

Q.    For the studies that evaluated problematic social media use that you rely upon, do you say that that is the equivalent of social media addiction, or are they separate in your mind?

A.    I think that they -- social media -- problematic social media use is part of an addiction.

Q.    So you have to have problematic social media use to have an addiction?

A.    I suppose it depends how the individual studies define these constructs, but in my mind, social media addiction is characterized by problematic social media use and other closely related constructs.

Q.    Can you have problematic social media use and not have social media

Page 125

addiction, in your view?

A.    Can you have problematic -- I mean, I would have to assess the individual patient. I think it's part of an addiction that -- you know, in my conceptual opinion, the addiction is comprised of a series of symptoms, problematic social media being one of them. And that's a very central and cardinal one.

Q.    Neither the DSM -- well, you're familiar with the Diagnostic and Statistical Manual or the DSM, right?

A.    Yes.

Q.    Neither the DSM or the International Classification of Disease has a diagnosis of either problematic social media use or what you call social media addiction. Fair?

A.    So at this time, there's no diagnostic category for -- called social media addiction at this time.

Q.    Or problematic social media use, right?

A.    There's no diagnostic category at this time. While the field is rapidly

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

producing data, there's no diagnostic category called problematic social media use at this time.

Q.   Yeah.  And neither the DSM nor the ICD identify diagnostic criteria for either problematic social media use or what you call social media addiction.  Fair?

A.   Well, if they're not in the DSM, as you mentioned, then they're not at this time.

There are no diagnostic criteria reflected in the DSM, but I'll add that the APA are sharing a lot of public-facing information about social media addiction and they're really articulating what the phenotype is.

Q.   They may be articulating a phenotype, but to date, that problematic social media use and social media addiction, as you describe it, neither have been accepted by the DSM or the ICD.  Fair?

MS. COUCH:  Asked and answered.

A.   In this instance, Todd -- and I'll try to answer this in a different way -- what we know as scientists always comes

Page 127

before reflection in the DSM, right?  That is the order of discovery.  Patients experience it, we learn it as clinicians and scientists, and then it finds its way into DSM.

And at this time, there is not a diagnostic entity in the DSM or the ICD called social media addiction, but there's an abundance of data, part of which is being put out by the APA, and part -- a lot of which has been put out by scientists, which support it.

MR. DAVIS:  Move to strike as nonresponsive other than "at this time there is not a diagnostic entity in the DSM or the ICD called social media addiction."

BY MR. DAVIS:

Q.   You haven't published any diagnostic criteria for any social media addiction or problematic social media use, have you?

A.   I haven't published any diagnostic criteria for social media addiction, correct.

Q.   Or problematic social media

Page 128

use?

A.   I have not published diagnostic criteria for problematic social media use, correct.

Q.   Do you agree that engagement with social media use alone is not sufficient for either problematic social media use or what you call social media addiction?

MS. COUCH:  Objection.

A.   Depends.  It depends on how you define engagement.

BY MR. DAVIS:

Q.   Well, time.  Time on the platforms alone is not sufficient to determine what you call problematic social media use or social media addiction.  Fair?

A.   Well, there's a multitude of ways to determine problematic use.  Time is one of them.  The psychological relationship is another, and the level of distress and impairment are others.

MR. DAVIS:  Move to strike as nonresponsive.

BY MR. DAVIS:

Q.   I didn't ask you about the

Page 129

others.  I'm focused on time.  Time on social media apps or platforms alone, that's all you have, is not enough to determine, in your mind, that they have problematic social media use or what you call social media addiction.  Fair?

A.   I can't agree with -- that's an abstract question, and I think it requires nuance.  And so when I would assess, personally, problematic social media use, I would assess time alongside distress, psychological relationship with it.  I would do all of that.

Q.   You would do more than just -- when you're trying to make an assessment of whether someone has what you called problematic social media use or social media addiction, you would assess more than just the time that they spent on a platform or platforms, fair?

A.   I think time is part of it, as I'm trying to articulate.  Time is part of it and there are other harms, there are other pathways in as well.

I'm trying to make that clear.

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

Q.    I don't think you're answering my question. I'll try one more time.

Dr. Murray, if all you knew is time on a platform or a collection of platforms, that would not be enough for you to make a determination whether or not someone had problematic social media use or social media addiction in your view. Fair?

A.    In my clinical opinion?

Q.    You agree?

A.    I'm asking if you want my clinical opinion.

Q.    I'm asking you, Dr. Stuart Murray, as the expert.

A.    Uh-huh.

Q.    Time alone, that's all you had, would not be sufficient to determine whether you thought someone had problematic social media use or what you call social media addiction. Fair?

A.    Again, it's sometimes yes, sometimes no. Sometimes you can -- I think there are other metrics other than time. I think, like, distress, and that's supported by the APA.

Page 131

Time is a part of usage, and usage -- you know.

Q.    Please focus on my question. If all you had was time spent on a social media platform or group of platforms, you could not say whether or not the person had what you call problematic social media use or social media addiction. Fair?

MS. COUCH:  Asked and answered.

A.    Yeah. That's one part of it. I would assess it and I would ascertain if the persons had in front of me the other features, if there were any, including distress, impairment in functioning, those types of things as well. But obviously, time spent is an important part of problematic use.

MR. DAVIS:  I'm sorry, that's not the question I asked you. Move to strike. Reserve on it.

BY MR. DAVIS:

Q.    Dr. Murray, what is the amount of time, in your view, that you can say to a reasonable degree of medical or scientific certainty that someone has what you call

Page 132

problematic social media use or social media addiction?

A.    It's hard to say because of the other features I just mentioned. If someone -- I mean, someone could use social media and experience a whole slew of distress, difficulty withdrawing from it, continued use despite negative consequences, all these behavioral features of addiction that we know about.

And somebody else may be able to use it for the same period of time and not develop those suite of symptoms.

Q.    Is there any time that you could say, looking at that time, to a reasonable degree of medical certainty that a person using a social media platform will have what you call problematic social media use or social media addiction?

A.    I don't -- I can't sit here today and report that a time cutoff is being reported by any governing bodies, right? I don't think there's a time cutoff. There's not a safe zone, there's not a danger zone, I guess. There's more -- it's more an

Page 133

assessment of the psychological features of the relationship.

Q.    Can you identify to a reasonable degree of medical or scientific certainty any amount of time from social media use that you say is necessary in order to have any of the adverse mental health outcomes that you claim social media use causes?

A.    That's --

MS. COUCH:  Object to the form.

A.    That's not how the field works.

BY MR. DAVIS:

Q.    I'm asking you, can you identify that amount of time?

A.    And I'm trying to explain. That is not how the field works, because what we would -- what matters also is the nature of the psychological relationship with social media. So -- and that differs individual by individual, right.

Q.    So in your mind, someone could spend two minutes on social media and could spend 200 minutes on social media, and that person could experience some mental health

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

outcome that you claim social media causes?

MS. COUCH: Object to the form.

A.    I mean, I would want to assess it. I would put forth, though, that I've seen patients that have used social media for longer periods of time and not -- and I've seen patients who have used it for less time and been really harmed by it. So time alone is not the only metric.

BY MR. DAVIS:

Q.    Okay. Can you identify to a reasonable degree of medical or scientific certainty any amount of time of social media use that you say is necessary in order to have any of the adverse mental health outcomes that you claim social media use causes?

A.    I can't identify a time cutoff, because what equally matters is the nature of the relationship during the time being used, right? And also, lots of kids can be affected by social media without being on it.

Q.    So time alone is not enough for you to say to a reasonable degree of medical or scientific certainty that a person using

Page 135

social media will have any of the adverse mental health outcomes that you claim social media causes?

MS. COUCH: Asked and answered.

A.    Yeah, I thought I answered that already, Todd. Can you maybe ask it in a different way?

BY MR. DAVIS:

Q.    No, I want to ask it just like I asked it, which is: Can you identify to a reasonable degree of medical or scientific certainty that a person using social media will have any of the adverse mental health outcomes that you claim social media causes if you -- if -- based on time alone?

MS. COUCH: Asked and answered.

A.    I will say again, that that's one factor. It's a part of -- it's a part of it, but there are other parts too, like distress, impairment and functioning.

BY MR. DAVIS:

Q.    So there is not a time in your mind that you can say to a reasonable degree of medical or scientific certainty, that social media use will cause any of the

Page 136

adverse mental health outcomes that you claim result from social media use?

MS. COUCH: Asked and answered.

A.    Keep in mind, kids are harmed by social media. They don't have to be on it to be harmed by it.

MR. DAVIS: Move to strike, nonresponsive. Reserve on that. I think I've asked it as many times as I can.

MS. COUCH: If you scroll up to 122.22 --

MR. DAVIS: I'm not done.

MS. COUCH: -- he said: I can't identify a time cutoff.

MR. DAVIS: That's not to -- the answer to my question.

Reserve on that.

MS. COUCH: Oppose for -- the record speaks for itself.

BY MR. DAVIS:

Q.    You're not aware of any professional organization or scientific body that has identified a time cutoff that says this is -- this amount is needed in order to

Page 137

have some mental health adverse outcome from social media use?

A.    I can't recall seeing a time cutoff put forth by a reputable organization. And what is common practice is to assess the nature of the relationship on a person-by-person level, if you're asking me as a clinician.

Q.    What amount of time on social media use where there are specific features that are actually used by a user is necessary in order to have any of the mental health outcomes that you say social media use causes?

MS. COUCH: Object to the form.

A.    Can you repeat -- so your question was around what time using specific features?

BY MR. DAVIS:

Q.    What amount of time on social media, where a specific feature is used, is actually necessary in order for a user to experience any of the adverse mental health outcomes that you say social media causes?

MS. COUCH: Object to the form.

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

A. Again, the effect can surpass the number of minutes or hours on these platforms, but I think what is important here is that we asses how the features themselves relate to the harms and not -- you know, take that data in concert with the time using those features, or exposed to the features.

MR. DAVIS: I'm sorry. Are you finished?

THE WITNESS: Yes.

MR. DAVIS: I move to strike, nonresponsive. I'll reserve on that.

BY MR. DAVIS:

Q. Can you name any individual who -- including any youth or teen -- who has been admitted to an addiction clinic because of time spent on social media or some other use of social media, including a use of a feature?

A. So, as you know, I direct an eating disorder clinic for severely unwell eating disorders.

We often talk with referring parties about their use, their social media use. That is part of our conversations. I

Page 139

don't work in an addiction facility. I'm aware of the -- I'm aware of this pathway. I can't tell you a time cutoff, though.

MR. DAVIS: Move to strike as nonresponsive.

Please, Dr. Murray, please listen to the question that I'm asking and is not some other.

BY MR. DAVIS:

Q. Can you name one person, teen or child or adolescent, who's ever been admitted to an addiction clinic because of what you call problematic social media use or social media addiction?

A. Can I name any by name?

Q. Yes.

A. I'm not going to name a patient's information here.

Q. Can you -- do you know of a single person?

A. That's been harmed by social media in a --

Q. No.

A. -- facility or that's been addicted to social media?

Page 140

Q. Please listen to my question, Dr. Murray. You're not listening to my question.

Can you name one person, teen, or child or adolescent, who has ever been admitted to an addiction clinic because of what you call problematic social media use or social media addiction?

A. Without revealing any PHI or protected health information, I can tell you that I've seen plenty.

Q. Who have been admitted to an addiction clinic because of social media use or problematic social media -- what you call problematic social media use?

A. That have been admitted to the psychiatric hospital in which I work?

Q. That's not my question. Please listen to my question.

A. Okay.

Q. Can you name any individual, child, teen, or youth, who has ever been admitted to an addiction clinic because of what you call problematic social media use or social media addiction?

Page 141

A. So while my practice primarily resides in an eating disorder center, I am not aware of any patients in clinics outside of my own, right? But I can tell you that the patients in my practice do have social media addiction, some of them.

MR. DAVIS: I'm sorry, I move to strike as nonresponsive. I -- again, I just don't have the time to ask you these multiple questions and get multiple nonresponsive answers.

BY MR. DAVIS:

Q. Can you name -- strike that.

Are you aware of any individual, adult, child, or adolescent, who has been admitted to inpatient therapy for what you call addiction to a social media platform or what you call problematic social media use?

A. Yes.

Q. How many?

A. I can't -- I'm going to just float a number.

Q. How many?

A. Plenty.

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

Q. How many?

MS. COUCH: Object to the form.

You can finish your answer.

A. I can't give you a number, Todd. I didn't prepare that data for today, but I can tell you that in my clinic, which is an inpatient psychiatric hospital for severely unwell children, I see and treat a lot of people that are referred for disordered eating in the context of problematic social media use or social media addiction.

BY MR. DAVIS:

Q. I think you missed my question. My question was not whether they had eating disorders or whether they came into your clinic for eating disorders.

My question was: Can you name a single person, whether it's an adult, youth, or teen, that has been admitted to inpatient therapy for what you call problematic social media use or social media addiction? That's what you see on the intake form, that's what the diagnosis is.

A. But I think you missed the last

Page 143

part of my answer. It was eating disorders in the context of problematic social media use or social media addiction. So the answer would be yes.

Q. So for all the people that you're thinking of, they are individuals who have come to you individually for treatment for an eating disorder, correct?

A. They --

MS. COUCH: Object to the form.

THE WITNESS: Thank you.

A. The individuals that are referred to my program, not me by name, but my program, are predominantly children with eating disorders. Also, part of the program in which I work has two adjacent units, which is not an eating disorder program on which I consult, which are generally behavioral units. They are general psychiatry units, delineated by age, one for young children and one for adolescents.

BY MR. DAVIS:

Q. Okay. And the individuals who come for treatment of an eating disorder are admitted to the inpatient clinic for eating

Page 144

disorder issues, correct?

A. Yes.

Q. Okay. So has anyone, to your knowledge, ever been admitted to your inpatient therapy or any of the inpatient therapies that you do consulting work for, where it has been because they have problematic social media use or social media addiction, and that's it?

A. Well, keep in mind where I operate, Todd. I operate as a director of an eating disorders program. So oftentimes when I talk with referring parties, I'll get a -- sometimes a snapshot, and their problematic social media use or their social media addiction is conveyed to me right from the word go, while they're being referred for an eating disorder and the formulation that coexists with their eating disorder.

MR. DAVIS: I'm sorry, that's not an answer to my question. I move to strike. Reserve on it.

BY MR. DAVIS:

Q. Dr. Murray, do you agree that there are tens of millions of individuals,

Page 145

including children and adolescents, who use social media daily without experiencing any type of adverse mental health harm?

A. I am aware that people can use social media without experiencing the severe psychiatric disorders that I see. And also, I can tell you that when social media interacts with these harms, it's really bad.

MR. DAVIS: I'm sorry, I move to strike as nonresponsive.

BY MR. DAVIS:

Q. Please focus on my question, which is: Do you agree that there are tens of millions of individuals, including teens and children, who use social media daily without experiencing any adverse mental health outcome?

MS. COUCH: Object to the form.

A. And I'll say again, that I'm aware of children, or hypothetically, that children can use social media and maybe not get severely, severely debilitating psychiatric disorders.

And I also work in the context of severely unwell children. And when this

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

is underpinned by social media, it's awful for these children.

MR. DAVIS: I move to strike as nonresponsive.

BY MR. DAVIS:

Q. Do you agree that there are tens of millions of individuals who use social media daily, including youth and adolescents, who don't develop what you call problematic social media use or social media addiction?

A. I agree that children -- a portion of children using social media don't get psychiatrically unwell, and a portion of children using social media can be really harmed by it.

MR. DAVIS: I move to strike as nonresponsive.

BY MR. DAVIS:

Q. Are you aware of any of the scales used to assess problematic social media use or what you call -- let me strike that.

Are you aware of any scales that have used -- used in the studies on

Page 147

social media use that assess what you call problematic social media use or social media addiction, which have actually been used in clinical trials to assess how accurate they are in determining whether or not the disorder of social media use addiction exists?

A. Can you rephrase that, Todd.

Q. Sure.

Are you aware of any clinical trials where any scale used to assess problematic social media use -- let me strike that.

Are you aware of any randomized, controlled, double-blind studies, where the screening scales of social media use addiction or problematic social media use have been used?

A. That's -- in the abstract, that's a really hard study to do, because no IRB in the land will let you prospectively allocate people to receive something potentially harmful and linked to deleterious psychiatric sequelae.

So I'm not aware of an IRB

Page 148

saying, yes, you guys can expose these children to potential harm. That's not a study that would be supported.

Q. Doctor, I'm not asking you whether it would be supported by an IRB. I'm simply asking, are you aware of the study that I described? "Yes" or "no"?

A. I'm not aware of any study randomly allocating people to receive harms. And that is why the IRB is there.

Q. Can you identify any time someone has approached an IRB to conduct a clinical study or trial about social media use where the IRB has said, we can't do this, this is going to subject someone to an unreasonable risk of harm?

A. Of course I can't. I don't -- I don't -- I'm not in an IRB committee at this moment in time, but there are several standards of universal ethical principles that guide research that would mean that you can't expose people to harm. All scientists know that.

MR. DAVIS: Move to strike as nonresponsive after "Of course I

Page 149

can't."

BY MR. DAVIS:

Q. Dr. Murray, last time we talked, you mentioned a study by the name of Xiao 2025.

Do you remember that?

A. Yeah.

Q. Let me hand you a copy of that article.

MS. COUCH: Which exhibit is this?

MR. DAVIS: This is Exhibit 9.

(Whereupon, Murray-9, Addictive Screen Use Trajectories and Suicidal Behaviors, Suicidal Ideation, and Mental Health in US Youths (Xiao), was marked for identification.)

BY MR. DAVIS:

Q. Dr. Murray, if you can look at the Methods section on page E2.

A. E2. Uh-huh.

Q. What they did, under the section called Suicidal Behaviors and Suicidal Ideation, there was one point in time where that was assessed in this study,

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

correct?

A. Let me read it.

[Document review.]

BY MR. DAVIS:

Q. Do you see that on page E2, the study methodology is saying that suicidal behavior and suicidal ideation was assessed at the year 4 follow-up, correct?

A. Suicidal ideation was assessed at year 4 follow-up. I see that sentence.

Q. Yeah. And it was not assessed at the year 2 or the year 3 follow-up, right?

A. Let me double-check.

[Document review.]

A. Yeah, it says on Figure 1 that it looks like they did not complete analyses of the 2-, 3-, or 4-year follow-up surveys.

BY MR. DAVIS:

Q. Okay. So just so we're clear, suicidal ideation -- this study had a baseline and then four waves, correct?

A. This is from the ABCD data, the Adolescent Brain Cognitive Development study, it looks like.

So that has -- that has a

Page 151

number of waves. It looks like this one is confined to the waves you mentioned. It looks like the baseline, 2-, 3-, and 4-year follow-up.

Q. Correct.

So for years 1, years 2, and years 3, they didn't make any assessment of suicidal thoughts or behavior in the study participants, right?

A. It looks like their particular -- actually, let me reread this. It looks like there's a sentence that might not align with your statement in the abstract.

[Document review.]

A. Is the supplement in here as well, Todd?

BY MR. DAVIS:

Q. I've given you -- I don't have the supplement.

A. So --

Q. I think the methodology answers the question. If you look at the methodology, they didn't do a -- they didn't do a suicidal ideation or behavior assessment

Page 152

either at year one follow-up, year two follow-up, or year three follow-up. Fair?

A. I mean, there's three separate references, five separate references to a supplemental in the methods. So I'd like to see that before giving you a strong opinion on what the method was.

Q. Can we agree that in the methods --

Look -- the supplemental -- the supplemental indexes or the supplemental authority is not going to tell us the methodology. The Method section tells us that, right?

A. That's not true.

Q. Okay. Let's look at the Methods section.

A. So can I clarify?

Q. No, I'm asking you my next question. If you can look at --

MS. COUCH: If you need to finish your answer, you can finish it, if it's about this question pending.

BY MR. DAVIS:

Q. Is there anywhere in the

Page 153

Methods section where they say that they did a follow-up on suicidal behavior or ideation at the 1-, 2-, or 3-year follow-up?

MS. COUCH: You can go back and finish your answer as well.

A. Right. I don't see the entire Methods section because the supplement is not here. And with journals like JAMA, this is a very high-impact journal. Page space is considered to be at a premium, so it's really commonplace for authors to put the comprehensive methodology in a supplement.

MR. DAVIS: I'm sorry, Sara. This is not controversial. I had this discussion with Dr. Mojtabai, who is your expert epidemiologist. He confirmed exactly what I'm asking Dr. Murray from the exact same Methodology section that I am asking Dr. Murray about.

This is not controversial at all. And yet he's suggesting that there's some missing data, which there isn't. That's not what the supplemental data has. Everybody knows that.

So I'm asking, please, have a

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

conversation with Dr. Murray to get him to answer these questions, because it's not controversial.

MS. COUCH: For the record, obviously Dr. Mojtabai is not testifying today. I don't know what he said about this. I think that Dr. Murray is simply trying to tell you that he would want to confirm with the supplement before agreeing to your question.

BY MR. DAVIS:

Q. Can you turn to -- is that the best -- can you look at the methodology section and confirm for me that at least in that section it doesn't say that there was any follow-up at years 1, 2, or 3 with respect to suicidal thoughts or behavior, reserving whatever the supplemental information might say?

A. Uh-huh. Sorry. Not withstanding, not having seen the supplement, it looks like here that the 2-, 3-, 4-year follow-up surveys were not -- were not included.

Page 155

Q. Okay. If you look at the Limitations sections on E8, it says -- left-hand column under Limitations it says: The observational nature of the study precludes establishing that addictive use trajectories cause the outcomes studied.

Did I read that correctly?

A. You read that correctly.

Q. Okay. And you agree that that's a limitation of this particular study, right?

A. I mean, I agree that every study has a limitation, and every study has strength, and this is what these authors list as a limitation in the context of discussing the findings and implications.

Q. Yeah. And I don't think it has to be complicated, Dr. Murray. I'm simply asking if you accept that limitation for this study.

A. I mean, I accept that every study has limitations. I think this is what the authors say is a limitation.

Q. Do you accept it is?

MR. DAVIS: Object to form.

Page 156

BY MR. DAVIS:

Q. If you don't, that's fine. If you do, that's fine too. I just want to know what your view is.

A. Mm-hmm.

I mean, I'd have to review the whole paper, but I accept that's what they listed as a limitation.

Q. Do you accept that limitation when you assess this study?

A. I appraise --

MS. COUCH: I was just going to object to the form. You can answer that.

A. I mean, I appraise the strengths and limitations of every study, and I -- that's what I -- that's what I'm trained to do as a scientist.

BY MR. DAVIS:

Q. I'm not asking you in the abstract. I'm asking you specifically with respect to the limitations described in this study --

A. Yeah.

Q. -- that I read to you.

Page 157

Do you accept it?

A. And I --

Q. And if you don't, that's fine. I'll move on.

A. I'm trying to convey, Todd, that I appraise the strengths and limitations of every methodological design --

Q. Do you accept this study -- statement that this study precludes establishing that addictive use trajectories cause the outcomes studied? Do you accept that as a limitation of the study?

MS. COUCH: Object to the form.

A. Again, I would accept that every study has limitations. That's what they list here as the authors. I would appraise that and I would appraise it alongside the strengths and the implications and the methodological rigor. I can see this is a -- you know, a large sample as well, and --

BY MR. DAVIS:

Q. Are you finished?

A. Yes.

Q. Okay.

40 (Pages 154 - 157)

CONFIDENTIAL

Page 158

MR. DAVIS: I move to strike as nonresponsive, reserve on it.

BY MR. DAVIS:

Q.    Look -- right-hand column. It says: Sixth -- oh, excuse me. Finally. There's another limitation.

These analyses did not include psychosocial and behavioral factors such as bullying, adverse childhood experiences, parental monitoring, sleep disturbances, stress, social isolation and social determinants of health, example, neighborhood and school contexts.

Do you see that?

A.    I see that.

Q.    So what they're listing here is a number of potential confounders that were not assessed in the study.

A.    They're -- yeah, their analysis didn't include psychosocial and other behavioral factors, as -- in keeping with the ones you listed.

Q.    Right. And they're listing those out because they're potential confounders, right?

Page 159

A.    They're listing them to be comprehensive, and, yes, that is something that other studies have considered. That is something this particular study didn't consider.

And that should be a factor in how you appraise a study like this. That's why the editors ask for limitations of every single study.

Q.    I'm sorry, you didn't answer my question. Please focus on my question.

Dr. Murray, they're listing out those things because they are potential confounders that were not evaluated in the study. Fair?

MS. COUCH: Object to the form.

A.    They're listed in these because they -- their analyses didn't control for these, and I think in appraising the data, it behooves one to consider that when interpreting the data, which I did.

BY MR. DAVIS:

Q.    Yes, but the reason they listed them out is because these psychosocial behavior factors that they -- that they

Page 160

identify are potential confounders, right?

A.    They are listing them because there's data showing that they are constructs in and of themselves worthy of investigation. And again, when appraising a study like this, it's complex, you would weigh that in as you interpret the findings.

MR. DAVIS: Move to strike. Nonresponsive. Reserve on it, because...

BY MR. DAVIS:

Q.    Dr. Murray, you know what a confounder is, don't you?

A.    I do.

Q.    Right. And you understood -- when I asked you whether or not those were potential confounders, you understood that question, didn't you?

A.    I'm trying to answer your question.

Q.    I'm just asking if you understood the question.

MS. COUCH: Let him finish.

A.    I'm trying to explain that these are factors worthy of investigation,

Page 161

like I said, which other studies have sought to investigate, and that is a limitation, which is what they've listed, and as such, when you appraise a study, you have to consider both the strengths and limitations.

BY MR. DAVIS:

Q.    Yes.

They listed out those factors because they're potential confounders, right?

A.    As I just said to you, I don't know if you're asking me the same question because I'm -- I'm really trying hard to answer your question.

These are listed because these are constructs worthy of investigation in themselves, which may impact results. And you would appraise that when --

Q.    Okay.

A.    -- you synthesize the data from this one individual study, and it's important to note that my opinion is not based on just one study.

MR. DAVIS: I'm sorry, but that's -- move to strike, nonresponsive.

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

Reserve on it.

BY MR. DAVIS:

Q.   I'm going to hand you what's been marked as Exhibit 10.

(Whereupon, Murray-10, Social Media Use and Depressive Symptoms During Early Adolescence (Nagata), was marked for identification.)

BY MR. DAVIS:

Q.   Last time at your June 2025 deposition, you mentioned the Nagata 2025 study, correct?

A.   I mentioned a few studies by Nagata, and I know I mentioned the one you just handed me as Exhibit 10.  I mentioned this.

Q.   Okay.  This specific study, as it states in its title, is Social Media Use and Depressive Symptoms During Early Adolescence.

Correct?

A.   That's the title of the study.

Q.   Okay.  And the outcome that was measured was depressive symptoms.  Fair?

A.   Yeah, the outcomes that were

Page 163

measured were the core symptoms of depression, depressive symptoms.

Q.   Let's be clear.  The outcome measure was depressive symptoms and not a diagnosis of depression.  Fair?

A.   Again, I want to characterize the study properly.  The outcome measured here were the core symptoms of depression, not DSM-5 diagnoses of depression, but rather, depressive symptoms.

Q.   Okay.  Thank you.

(Whereupon, Murray-11, Curriculum Vitae of Stuart B. Murray, DClinPsych, Ph.D., was marked for identification.)

BY MR. DAVIS:

Q.   Dr. Murray, I'm handing you what's been marked as Exhibit 11.

It's a copy of your CV.  Do you see that?

A.   I do.

Q.   If you can turn to page 9.

Dr. Murray, you look down at -- you identify your consultantships and advisory boards.

Page 164

Do you see that?

Do you see that?

A.   Mm-hmm.

Q.   You have to answer out loud.

A.   Yes.

Q.   Okay.  And I don't see on here the Sebo -- or Cubo, excuse me.  I don't see Cubo listed here.  Why is that?

A.   It looks like this is actually a little bit of an outdated CV that you guys have, because also on the front it has my employment as the University of Southern California, which is also a little dated.

Earlier down in '23 it lists my position at -- I believe -- yeah, this is a -- this is not the most recent CV.  I don't know --

Q.   We'd asked for your most recent CV.  Will you agree to provide it?

A.   I would agree -- absolutely agree to provide it.  I don't know why this was -- yeah, I don't work at USC.  I haven't worked at USC for 11 months.

Q.   Let me look at -- go back to page 9.

Page 165

A.   Sure.

Q.   You have identified that from 2023 to the present of when this CV was put together --

A.   Yeah.

Q.   -- that you were on the scientific advisory board for Currax, Q-U-R-R-A-X [sic], Pharmaceuticals.

Do you see that?

[Document review.]

A.   Currax Pharmaceuticals.  Yes.

BY MR. DAVIS:

Q.   What did you do for Currax Pharmaceuticals?

A.   I went to one advisory board meeting.

Q.   Did you receive any type of compensation from Currax Pharmaceuticals?

A.   Expenses for the trip, and a -- from what I can recall, a conversation around potential studies, potentially studies I might be interested in.

Q.   So your sole contact as on -- being on the scientific advisory board for Currax was one meeting on a scientific

Golkow Technologies,
A Veritext Division
877-370-3377                                                      www.veritext.com

CONFIDENTIAL

Page 166

advisory board? That's it?

A. I haven't done any studies with them or for them. I haven't -- I can't recall. I know that I went to a meeting. I know there's been some -- there was some conversations subsequent to the meeting about doing a study. It hasn't come to fruition. I didn't propose a study for them.

Q. So other than attending a scientific advisory board on one occasion and some conversations about a -- doing a study, that's your sum total work that you did with Currax?

A. I can't recall anything else I've done for them.

I -- I can't recall anything else that I did. I went to the board meeting. It was a one-day meeting. And as I mentioned, there's been some conversation of a paper coming out. I think I gave some thought to a review they wanted. Again, with no -- nothing other than just an intellectual contribution.

Q. Okay. Did you -- did you receive any type of money from Currax other

Page 167

than travel expenses?

A. I can't -- I can't recall.

I might have. I might have. I don't know sitting here today.

Q. Okay.

A. I know that my trip was covered, though.

Q. Okay.

MR. DAVIS: It's noon, so let's take a break for lunch. I need to get that notebook copied, too.

THE WITNESS: Sure.

THE VIDEOGRAPHER: We are now going off the record. This is the end of Media Unit No. 3, and the time is 12:02 p.m.

(Recess taken, 12:02 p.m. to 1:39 p.m. PDT)

THE VIDEOGRAPHER: We are now back on the record. This is the beginning of Media Unit No. 4, and the time is 1:39 p.m.

MR. DAVIS: We've returned from our break, during which we had to copy the notebook that Dr. Murray brought

Page 168

with him that's now marked as Exhibit 5. So that's the reason for the delay in the lunch break.

BY MR. DAVIS:

Q. Dr. Murray, are you ready to continue?

A. Yes, I am. Thanks, Todd.

Q. Great. I'll ask you a couple of questions about dopamine, all right? The release of dopamine is how we perceive pleasure, that something is pleasurable, right?

A. The release of dopamine is how we perceive pleasure.

Q. Yeah. Dopamine is released when something is enjoyable. Fair?

A. It can be.

Q. Dopamine can be released when someone has had a nice meal or there is -- there is even the anticipation of a nice meal, right?

A. Dopamine can be sort of released and received when something pleasant happens like a nice meal.

Q. Dopamine can occur from

Page 169

chatting with friends or classmates, right?

MS. COUCH: Object to the form.

MR. DAVIS: Excuse me, let me rephrase.

BY MR. DAVIS:

Q. Dopamine can be released when someone is talking with friends or classmates, right?

A. Again, I think dopamine is released when something pleasant is perceived at the level of the brain. It is released in the midbrain, and then there's a series of dopamine projection sites, and where it's received in the brain, rather that released, is important to consider as well.

Q. Yeah. Dopamine can be released when someone is having a good conversation with friends or classmates, right?

A. Dopamine can be released when someone is having a good conversation with a friend or a classmate. It can be.

Q. And dopamine can be released, and uptake, when you're having a conversation or a communication with somebody about family or something about what's going on in your

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

life.  Right?

A.    I guess it would depend on the nature of the communication with family --

Q.    If it's pleasurable, it can be released and taken up, correct?

A.    If something pleasurable happens, usually the level -- the responsive level of the transmitter is the uptake of dopamine.

Q.    Watching a TV show or a movie can result in the release and uptake of dopamine, right?

A.    Again, I guess it depends on the TV show, but if it's an enjoyed TV show, if it's viewed subjectively to be pleasant, it could coincide with the release and the uptake of dopamine.

Q.    Is it fair to say that even the anticipation of something pleasurable can result in the release and uptake of dopamine?

A.    There's a good body of data showing the anticipatory prediction resulting in an uptake of dopamine in the context of things expected to be pleasurable.

Q.    Okay.  Are you aware of any

Page 171

scientific study that has determined that the release of dopamine in humans is more from using social media or an app or feature of social media than any other form of communication?

MS. COUCH:  Object to the form.

A.    That was a long question, Todd. I'm sorry, maybe I --

BY MR. DAVIS:

Q.    Reask it for you?

A.    Yes, please.

Q.    Are you aware of any scientific study that has determined that the release and uptake of dopamine is more from using -- more as a result of using social media than some other form of communication or entertainment?

MS. COUCH:  Object to the form.

A.    I suppose it depends on how you measure dopamine.  And so what some studies have done is look at BOLD response in the reward regions, so the parts of the brain that we know receive dopamine, part of the dopaminergic projection sites.

What fMRI studies have done is

Page 172

look up BOLD activity in sort of dopamine-rich regions like the nucleus accumbens, for instance, and other forms of sort of assessing dopamine uptake would be a PET study where you would use a ligand to sort of mimic dopamine.

I think the larger body of evidence is looking at activity, sort of BOLD activity, that's blood-oxygenated-level dependent response.  That is what I'm aware more of than dopamine release per se.  But they're used synonymously because they both reflect increased activity in the reward regions, which is assumed to mean uptake of dopamine.

BY MR. DAVIS:

Q.    Okay.  In any brain imaging study or other study that you are aware of, has any of them determined that the release and uptake of dopamine in humans is -- results more from social media use than some other form of entertainment or communication?

MS. COUCH:  Object to the form.

A.    I can recall studies right now looking at activity in -- at the tail end of

Page 173

the dopaminergic projection site.

It's -- it's thought that that reflects dopamine, but I can't recall right now PET studies looking at the uptake of dopaminergic ligands in the context of what you're talking about.  I can't recall sitting here.

BY MR. DAVIS:

Q.    You're not aware of any comparative studies where someone's used brain imaging or some other type of test to determine that the uptake and release of dopamine is more from social media use than other forms of communication and entertainment, are you?

A.    I can't --

MS. COUCH:  Object to form.

A.    I can't recall right now. Where my thought is going, Todd, is fMRI studies which are used in the field are a proxy for the sort of activity in the circuit where dopamine is projected, but that's not technically a study of dopamine.  That's a study of what they call dopamine-mediated brain activity.

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

But you're asking a technical question about dopamine release and uptake, so I can't recall one of those right now.

BY MR. DAVIS:

Q. You're not aware of any comparative study that I've asked about, are you?

A. Again, I think what you're referring to, if I'm not mistaken, would be a positron emission tomography study. I'm aware of fMRI studies, but I can't recall PET studies right now.

Q. Yeah, I'm not limiting my question like you're suggesting.

A. Okay.

Q. I'm simply asking you, are you aware of any brain imaging studies --

A. Got it.

Q. -- or any other test of any kind where the test or the study compared social media to some other form of communication or entertainment and measured dopamine release and uptake among each of the different forms of communication or entertainment?

Page 175

A. But there's a contradiction in your question. Allow me to explain.

If you're talking about the uptake and the release of dopamine, you are inherently talking about a PET study. That is separate from an fMRI study, which is a functional MRI study. I'm aware of the latter. In terms of the former, I can't recall.

Q. That's a comparative study? A comparative -- I'm asking about a comparative study. Are you following me?

A. Yeah.

Q. Are you aware of a comparative study that's looked at social media compared to some other form of communication or entertainment and measured either the release or uptake of dopamine?

A. So I think the reason that we're in different plains here is because by you saying the release and uptake of dopamine, you are inherently referring to a PET study. Right?

And then you're asking me at the same time if I'm aware of any imaging

Page 176

studies, and I'm saying that I'm aware of other methods of brain imaging studies, but they can't technically measure the release and uptake of dopamine.

As I mentioned, that's really done as a function of fMRI activity, especially in dopamine-mediated brain circuits.

I think that's why we're on different plains.

Q. Are you aware of any fMRI study that has compared the release or uptake of dopamine in social media to some other form of communication or entertainment?

A. I want to be clear here. An fMRI study does not measure the release and the uptake of dopamine.

Q. Are you aware of any study of any kind that measures the release or uptake of dopamine in social media and compares it to some other form of communication or entertainment?

A. What I'm aware of are studies illustrating increased activity in dopamine-mediated reward brain pathways,

Page 177

which is an fMRI study. In terms of dopamine release and uptake, they're generally less prevalent in the field because they're very expensive.

Q. Okay.

A. And so I'm not aware of dopamine uptake release studies, but I'm aware of activity in dopaminergic brain regions.

Q. With respect to the release of dopamine in binge eating disorders, you've discussed that in publications or in media presentations, correct?

A. If you can show me what you are alluding to, I'd love to comment on that.

Q. I'm just asking if you've done it.

A. If I've discussed dopamine release and binge eating disorder?

Q. Mm-hmm.

A. Yeah. It's thought that food consumption, as you mentioned earlier, can elicit a dopamine release and uptake.

Q. And is it -- for those who have binge eating disorder, when they are craving

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

food, does that result in the release and uptake of dopamine?

A. When you --

MS. COUCH: Object to the form.

A. When you're hungry?

BY MR. DAVIS:

Q. No. Someone who has binge eating disorder, and they have a craving for food, does that result in the release and uptake of dopamine?

MS. COUCH: Object to the form.

A. That would depend. I think there's mixed data around that particular question. It's a very nuanced question. And I think there's mixed data.

BY MR. DAVIS:

Q. Do you know whether or not there's any causal connection that's been established between the release -- excuse me, the release of dopamine in patients with binge eating disorder and then the resulting craving that happens with binge eating disorders?

A. Well, dopamine, in addition to sort of signal and reward, it's also involved

Page 179

in behavioral shaping.

So when dopamine is released, when something pleasant happens, you're more likely to do it again --

Q. Is that true for --

A. -- is my understanding.

Q. -- patients who have binge eating disorder?

A. Binge eating disorder is a little bit more complicated because of the shame and guilt involved in that. There's a reward and a shame component, I believe. But certainly there are mixed data, some of which shows predilections in dopamine pathways in mainly adults with binge eating disorder. I'm not aware of any PET studies in children with BED off the top of my head.

Q. You've talked with your -- let me back up. You use social media, don't you, Dr. Murray?

A. I use social media.

Q. You have social media accounts, don't you?

A. Mm-hmm. (Witness nods.)

Q. Yes?

Page 180

A. Yes.

Q. What -- when was -- what social media accounts do you have?

A. I have an Instagram, and as I mentioned in my last talk with you, I had a TikTok as well.

Q. Do you have a Facebook account?

A. I don't know if I do. I haven't used it in years. Years and years and years. Yeah.

Q. Do you have a Twitter account?

A. I have a Twitter account, yes.

Q. Do you have a YouTube account?

A. I use YouTube also, yes.

(Clarification by reporter.)

BY MR. DAVIS:

Q. You've had each of the social media accounts that we've talked about for several years, correct?

A. I've had each of those accounts -- again, I haven't used a Facebook account in a long time. But I've had them, for sure.

Q. You've posted this year on Instagram, right?

Page 181

A. Yeah, I would imagine so.

Q. You've posted this year on TikTok, right?

A. I would imagine so.

Q. You've posted this year on Twitter, right?

A. I would imagine so.

Q. You've posted this year on YouTube, right?

A. I'm not sure.

Q. You've used Instagram, TikTok, Twitter and YouTube quite frequently. Fair?

A. I'm not sure.

Q. You're not sure how -- that you've used it frequently?

A. Mm-hmm. (Witness nods.)

Q. You've put on a number of posts on each of those accounts, correct?

A. I can't recall.

Q. I'm just asking if you've posted frequently.

A. I wouldn't say I'm frequent.

Q. You've made posts, correct?

A. Yeah, I've made posts on the accounts you mentioned, but I don't think

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

they're frequent.

Q. You've used it for personal use? Strike that.

You've used each of those social media accounts for personal use, right?

A. Yes.

Q. You've used each of those social media accounts for professional use, right?

A. Yes.

Yes, I think so.

Q. You've used filters and emojis and likes on each of those accounts, right?

A. On each of those accounts? I'm not sure.

Q. A number of the accounts you've used -- a number of the -- strike that.

A number of the social media accounts, you've used emojis, such as likes and other -- and other types of emojis, right?

A. I would imagine on some of them. I'm not sure if on all of them.

Q. Okay. What's your TikTok

Page 183

handle?

A. I actually don't know.

Q. You have no idea what it is?

A. (Witness shakes his head.)

Q. No?

A. No, I can't recall that.

Q. Okay. Is @Dr-Stu it?

A. I don't know.

Q. You don't know? You have no idea?

A. No idea.

Q. You have followers on your TikTok account, don't you?

A. Again, I don't know. I don't use that often. I don't know.

Q. You have followers on each of the different social media accounts that you've identified, correct?

A. I'm not sure if on all of them. I would accept that -- I know on Instagram I have followers. I'm not sure if I'm --

Q. What's your Instagram account handle?

A. Again, I think it's some variation of my name, with my title in it, I

Page 184

believe.

Q. How long have you been using Instagram?

A. I have no idea.

Q. Over a decade?

A. Yeah, I don't know.

Q. Sound about right?

A. Maybe.

Q. Yeah.

A. Maybe.

Q. And your TikTok you've used since TikTok came online, right?

A. That, I don't know.

Q. You've used TikTok for several years, right?

A. Again, that, I don't know.

Q. You used TikTok before you became an expert for plaintiffs and you've used TikTok after you've been an expert for plaintiffs, right?

A. I don't know.

Q. You have no idea?

A. No. No. No idea.

Q. You have different accounts for Instagram and different accounts for TikTok,

Page 185

right?

A. Again, I don't know. I have no idea.

Q. Have you ever deleted any of your social media accounts?

A. I don't know.

Q. You don't know whether you've deleted it or not?

A. No, I don't know if I've deleted one. I --

Q. Can you say under oath that you actually have deleted a social media account?

A. I don't recall deleting a social media account. I know one was hacked, but I don't -- I don't recall deleting one.

Q. Which one was hacked?

A. The Facebook I had when I last used Facebook, that was hacked, and I didn't -- didn't get it again.

Q. You use LinkedIn too, don't you?

A. I do.

Q. And do you consider that a social media account?

A. It doesn't have all of the

47 (Pages 182 - 185)

CONFIDENTIAL

Page 186

common features of the other platforms you've described.

Q. It uses --

A. So --

Q. Go ahead. I'm sorry.

A. No. I would delineate a little bit.

Q. Does it use algorithms?

A. I don't know enough about LinkedIn. I didn't study LinkedIn as part of this preparation.

Q. Any immediate members of your family that have social media accounts?

A. Yeah, I don't -- my fiancée has an account.

Q. What social media accounts does she have?

A. I mean, I can't speak on her behalf. I don't want to misrepresent that, but I know she has some.

Q. Which ones?

A. I know she has an Instagram. And I think she has a TikTok. And outside of that, I don't know.

Q. Any other immediate member of

Page 187

your family that has a social media account?

A. Not that I can recall right now.

Q. Any sibling have a social media account?

MS. COUCH: Object to the form. I think that we're starting to get -- when we're talking about his siblings having social media, something that's invasive in privacy.

First of all, I don't actually know if Dr. Murray has siblings, but I would object to that.

BY MR. DAVIS:

Q. Doctor, any siblings of yours have social media accounts?

MS. COUCH: If you're not comfortable answering, you do not have to answer that.

A. Yeah, I don't want -- I'm not here to talk about my family, Todd. That's not what I want to do.

MR. DAVIS: We just had a witness asked over a full day, where you were sitting right there and

Page 188

listened to it, Dr. Becker was asked about her family's use of social media.

MS. COUCH: All --

MR. DAVIS: I'm asking no different question of Dr. Murray than that.

MS. COUCH: Dr. Becker was not asked about her sibling use. Mr. Drake asked if any of her children -- this is a lawsuit about children -- if any children used it, period.

BY MR. DAVIS:

Q. Dr. Murray, are you going to not answer the question about your -- about any of your siblings using social media?

A. Yeah, I don't want to talk about my family.

Q. Any immediate -- does your -- what's your fiancée's name?

A. Again, my -- her name is Falon.

Q. I'm sorry?

MS. COUCH: I would also put an objection to that we're now asking

Page 189

Dr. Murray about his fiancée's name. I do not think that is within the scope of the opinions that he is offering today. I did not ask Ms. Becker any of those private questions -- excuse me, Dr. Becker.

MR. DAVIS: You weren't asking the questions of Dr. Becker.

MS. COUCH: Fair. Mr. Drake did not.

BY MR. DAVIS:

Q. Dr. Murray, do any -- any -- do you have children?

A. Mm-hmm. Yes.

Q. Any of your children have social media accounts?

A. I don't let them use social media.

Q. Okay. So they don't have an account?

A. They -- as far -- I don't let them use social media.

Q. Yeah. And that's not my question.

Do any of your children have a

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

social media account?

A.   I'm not aware of any.  The reason I'm sort of -- my daughters live with me half the time.  I'm divorced.  They live with their mother half the time.  When they're with me, they don't use social media.

Q.   Okay.  Do you know, when they're living with your ex-wife, whether they use social media?

MS. COUCH:  Object to the form.

A.   This is feeling a little invasive, Todd.

BY MR. DAVIS:

Q.   I'm just asking, do you know?

A.   Like I said, I don't know.

Q.   Okay.

A.   I know when they're with me.

Q.   Have you ever told any member of your immediate family that they need to delete their social media account or not use social media?

MS. COUCH:  Objection.

A.   I can't -- I don't recall.

BY MR. DAVIS:

Q.   Okay.  Have you ever used any

Page 191

appearance filters on any social media platform?

A.   You asked that earlier.  I'm sure I have at some point.

Q.   What type of appearance filters have you used?

A.   Gosh, I don't know.

Q.   Can you give me some examples?

A.   I mean, I wouldn't know what they're called, I suppose, different filters.

Q.   So how do they -- for the filters you've used, how have they changed the appearance of the images that you're posting?

A.   I don't know.  I couldn't really tell you.

Q.   Okay.  Have you ever, on any post that you've ever made on social media over your entire life, ever put out a disclaimer or warning of any kind about social media's harm in any way?

A.   That, I don't recall.

Q.   You don't know of one, do you?

A.   That's what I'm saying, I can't recall if I have or haven't.  You're talking

Page 192

about a period of my entire life.

Q.   Mm-hmm.

A.   I can't recall.

Q.   On any post or use of likes or any other emoji, have you ever put out a warning to those who may be viewing your social media posts that social media is addictive, dangerous, unsafe, or causes mental health problems?

MS. COUCH:  Asked and answered.

A.   I can't recall.

BY MR. DAVIS:

Q.   You don't know of one sitting here today, do you?

A.   I can't recall.

Q.   You don't know of one, do you?

A.   I can't recall one sitting here today.

Q.   Thank you.

If you had made such a post, you would remember it because it was important, right?

MS. COUCH:  Object to the form.

A.   I don't know.  That's hypothetical.  I'm saying I can't recall -- I

Page 193

can't recall.

BY MR. DAVIS:

Q.   Are you going to leave here today and go make a post of any kind that a like or an emoji or some other feature of social media use is dangerous, unsafe, or causes harm to anybody?

MS. COUCH:  Object to the form.

A.   I think I'm going to leave here today and take any shoes off and probably sit down for a second.

I don't know if I'm going to -- right?  I don't know.

BY MR. DAVIS:

Q.   Right now, you don't have a plan to do that, do you?

MS. COUCH:  Same objection.

A.   No.  There's no plan I have right now.  I'm really trying to not think past the end of our day.  It's going to be a long day.

(Whereupon, Murray-12, Does TikTok contribute to eating disorders?  A comparison of the TikTok algorithms belonging to individuals with eating

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

disorders versus healthy controls (Griffiths), was marked for identification.)

BY MR. DAVIS:

Q.  Let me hand you what's been marked as Exhibit 12.

Doctor, do you see this is a copy of the Griffiths article from 2024?

Do you see that?

A.  Yes.  This is the Griffiths TikTok study.

Q.  Yes.

A.  Mm-hmm.

Q.  And I want you to turn to the -- page 10.

A.  Mm-hmm.

Q.  And the Study Limitations.

And before we get into that, this is a -- this is an article that you discuss in your report, right?

A.  This is on my reliance list, yes.

Q.  And you understand that this is a cross-sectional study, correct?

A.  I reviewed the methodology at

Page 195

the time.  I can briefly review it again, if you like.

Q.  Do you know whether or not it's a cross-sectional study?

A.  I will know in just a minute or so.

Q.  Okay.  Look at the third limitation.

A.  Can I read the Method before you move on to another question?

Q.  My time is limited, and Ms. Couch can ask you questions about follow-up of the methodology.

If you can look at Study -- 4.6 under Study Limitations.

MS. COUCH:  If you need to take a second when you actually have a question to answer it, you can.

BY MR. DAVIS:

Q.  If you look at the fourth sentence under Section 4.6.

It says, quote:  Third, our study is cross-sectional and nonexperimental and therefore does not permit causal claims.

Did I read that correctly?

Page 196

A.  You read that correctly.  I see that.

Q.  So this Griffiths is a cross-sectional study, right?

A.  I mean, I haven't reviewed the methodology, but I'm inclined to agree with that statement you just read from the limitations.

Q.  Yeah.  And Griffiths, as the authors say, does not permit causal claims based upon the data in it.  True?

MS. COUCH:  Object to the form.

A.  I mean, I think that's a caveat of this study.  And I think that making any type of causal inference really would require a synthesis of the broader evidence base.

But I accept Scott's limitation of this particular one study.

BY MR. DAVIS:

Q.  And you know from the study that, because it's cross-sectional, it doesn't know the direction of the association -- of any association between the algorithms's use and any eating disorder or eating disorder symptoms that are discussed,

Page 197

correct?

MS. COUCH:  Object to form.

A.  Is that a limitation that's in here?

BY MR. DAVIS:

Q.  It's a cross-sectional study, right?  Am I right?

A.  It looks like a cross-sectional study.

Q.  Right.  And when you have a cross-sectional study, one of the aspects of that type of study design is it cannot establish the direction of the association between the exposure and the outcome.  Correct?

MS. COUCH:  Object to the form.

A.  In the abstract, I don't agree with that.  I think there are cross-sectional studies that can provide inferences around the things you are talking about.

BY MR. DAVIS:

Q.  This study says it cannot determine causal relationships, correct?

A.  You asked me -- that's what this study says, and I was answering your

50 (Pages 194 - 197)

CONFIDENTIAL

Page 198

earlier question about, broadly, cross-sectional designs.

Q.    This study here doesn't -- can you identify any cross-sectional study that you rely upon on social media use that actually is able to establish the direction of the association?

A.    I recall -- I mean, I'm happy to look at my reliance list, and I list them on there. There are some that used linear regression models where you can develop a prediction, that is to say, does the variance in one variable explain the variance in the other variable. That is a unidirectional approach.

But I agree with you that you would take any single study in the context of the broader evidence base, which is what I've tried to do in my report.

Q.    Can you identify any cross-sectional study that you rely upon where you can say you can establish the direction of the association or correlation that's discussed?

A.    I would probably need to review

Page 199

my materials list. I think -- I'm sure there are some on there, Todd, and I want to underscore, though, that my opinion is not underpinned by one type of methodology because I use lots of different types of methodology in my report.

Q.    You just can't identify one sitting here today?

A.    Like I mentioned, I can have a brief look on the sort of handful of studies that I brought in. But I know there's a larger battery of papers in my materials considered list. I'm sure I reviewed some.

Q.    I'm just asking you to identify, here today, a cross-sectional study where you can say you can identify the -- and determine the direction of the association discussed in that cross-sectional study.

MS. COUCH:  Object to the form.

A.    Yeah. I would probably need to review my materials considered list for that. I'm sure somewhere on there. I just printed just a handful, maybe ten or so, papers to go through.

Page 200

BY MR. DAVIS:

Q.    Do you know of one, sitting here today?

A.    I am confident there's some in my materials list. I can't recall any right now, Todd.

Q.    Okay. Now, when we're talking about the direction of the association, we're talking about whether or not the exposure precedes the outcome or the outcome precedes the exposure, correct? That's what directionality is about.

A.    Right.

Q.    Okay. If you can look at -- back to the Limitations section.

A.    Of the Griffiths study?

Q.    Yes, please.

A.    Okay.

Q.    It says: Most participants -- on the seventh, on the seventh limitation it says: Most participants in our eating disorder groups were diagnosed with anorexia nervosa, and our findings may not generalize to other eating disorders, particularly those that do not involve body image concerns.

Page 201

And it identifies ARFID as an example, correct?

A.    I see that sentence in the Limitations, yes.

Q.    That's one of the limitations of the Griffiths study, correct?

A.    That's one of the limitations they list in the study, which requires interpretation when you read the study.

Q.    Yeah. This study did not determine the searches that were used by study participants that may have had an impact on the content that they actually reviewed, correct?

A.    Let me review the Limitations. This is a long paragraph.

Q.    Mm-hmm.

[Document review.]

A.    Todd, just as I'm going through this, would you mind just -- would you just orient me to your question again, please.

BY MR. DAVIS:

Q.    Sure.

If you look at the eighth limitation, it says: Our study did not

51 (Pages 198 - 201)

CONFIDENTIAL

Page 202

include other types of user-generated and systems-level data that were inaccessible or unretrievable using our methods, example, video comments, search bar inputs, system preferences, saves, and initial "interest" selections.

Did I read that correctly?

A. You read that correctly. It looked like the study used the liking -- the liking metric but not the ones you suggested.

Q. Right.

And so in terms of the study participants in the study, they didn't have data about the searches or preferences as to specific content that the users had input into the platform. Fair?

A. Could you repeat that? That was --

Q. Sure.

A. Thanks.

Q. The study didn't have information on the study participants where they had data about the searches or preferences as to specific contents that the users had input into the platform. Right?

Page 203

A. And that's limitation number eight. That's what I said. As I mentioned, it looked like they were just using data around likes.

Q. Okay.

A. And I think there's an -- I recall seeing something called a nonvolitional user action in this study as well.

Q. So in terms of the data that was coming back and that was being analyzed in the Griffiths study, one thing it didn't account for is searches by the study participants or preferences by the study participants to determine what content they were getting as a result of using TikTok. Right?

A. I mean, I would think that likes is related to preferences. Right? This study is indexing likes.

Q. Setting aside the use of likes, this study did not have data that allowed it to assess searches that the users input into the content that they wanted to see. Right?

A. Yeah. It said under the

Page 204

Limitations, they did not access video comments, search bar inputs, and they did access likes data.

Q. Okay. Let me ask you some questions about your black notebook that's marked as Exhibit 5.

A. Sure.

Q. Just so I understand it.

A. Okay.

Q. When did you put together this notebook?

A. Just over the -- in preparation for today, in the last few days.

Q. Okay. Did you have any help putting it together?

A. No.

Q. You did it all yourself?

A. I did.

Q. Okay. Now, there's a couple -- it's a tabbed notebook, and you have Post-its --

A. Yep.

Q. -- preceding -- like on the first -- let me back up. It's a tabbed notebook, and behind each tab are different

Page 205

sets of articles, correct?

A. Yes.

Q. And then on the first page behind each tab, there's a Post-it where you have your handwritten -- handwriting on it, right?

A. Yes.

Q. All right. Behind the first tab you have Prospective ED, which means eating disorder studies, right?

A. Yes.

Q. Right? And there, you have the Chu study, the Nagata study, and that's it, correct?

A. I have the Chu Study, I have the Nagata study, correct.

Q. Okay. So are there -- let me go -- what was it -- what was your decision-making or your process by whether something went into this notebook behind each of the tabs and as described by the Post-its?

A. I just wanted to organize my thoughts a little bit. I thought we might ask about studies -- you might ask about studies, so I just grabbed one or two

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

exemplar studies that I thought might...

Q. Okay. Now, the second tab behind it has a Post-it called Features.

Do you see that?

A. Yes.

Q. So those are articles that you identified from your expert reports that specifically looked at features of one or more of the defendants' platforms?

A. That's the idea behind this, yes. These are things that relate to -- I think there's things in here that relate to social media. I wanted to sort of conflate features plus social media use.

Q. Other than the studies behind tab 2 that are -- with a Post-it that says Features on it, are there any other studies about features that you're relying upon to form your opinions in the case?

MS. COUCH: Object to form.

A. Like I mentioned, this just represents a small spattering of studies that I relied upon. I brought them because I thought they might be helpful. They represent a body of evidence. I just grabbed

Page 207

a few. This is what I grabbed today. I didn't want to bring you a big thick binder. It would have been as tall as me.

BY MR. DAVIS:

Q. Can you identify for us any other studies on social media use that are experimental or longitudinal that you claim assessed features of social media --

MS. COUCH: Object to form.

BY MR. DAVIS:

Q. -- other than what's behind -- the articles behind Tab 2?

MS. COUCH: Object to the form.

A. Again, I -- this just represents a sample of papers. And so the reason I wanted to bring them was because I can't recall under -- you know, at any given moment, I can't recall all of the studies I reviewed, so I thought this might be helpful. That's why I brought them.

I know there were others on there, on my materials considered list, but the entire reason I brought them was to be able to talk about some of these because I thought you might ask about them.

Page 208

BY MR. DAVIS:

Q. Yeah. And you understand this is my opportunity to ask you your opinions, and it's the Defendants' opportunity to ask you opinions about your expert reports and the opinions you offer at trial? You understand that this is what today is about, right?

A. Yes, I understand that.

Q. And that's why I'm asking you, other than the articles behind Tab 2 that are identified as studies dealing with features, are there any other studies on features that you can point us to that say this is a study about social media features?

MS. COUCH: Asked and answered.

A. Let me read through it. Maybe it will jog my recollection.

But I'll say that the purpose of me bringing this was so I didn't have to do a memory test. But maybe something will trigger my memory.

[Document review.]

A. I mean, the aforementioned study, Griffiths, would include likes.

Page 209

That's another study that's not under this tab. But that's one example of just -- one off the top of my head. I can think of others, but -- sorry, I know there are others, but this is what I'm trying to bring here just today.

BY MR. DAVIS:

Q. Are you finished with your answer?

A. Yes. Thank you.

Q. Okay. Can you identify any longitudinal or experimental study on features of social media use that's not behind Tab 2 in the notebook marked as Exhibit 5?

MS. COUCH: Asked and answered.

A. Bear with me one second.

[Document review.]

A. I mean, I would argue that the depravation study by Seekis is an experimental design. I would argue that. And that is a study called "To detox or not to detox?"

BY MR. DAVIS:

Q. What tab is that behind,

53 (Pages 206 - 209)

CONFIDENTIAL

Page 210

Dr. Murray?

A.    That is behind Tab No. 4.

Q.    Okay.

A.    And I know -- as I mentioned, I know there are others that I considered. I just -- I just can't recall every single study that I've reviewed.

Q.    I'm here today to find out the full extent of your opinions.

Other than Seekis, is there any other longitudinal or experimental study that you want to say supports your opinions about features of social media use?

MS. COUCH: Object to the form, asked and answered. Let the record reflect he's relying on his entire list of his opinions and will do so at trial.

MR. DAVIS: Sara, I think you get to say "object to form" under the local rules, and not anything else. So I'd ask you to comply with that.

BY MR. DAVIS:

Q.    Anything else -- any other study you want to add that's either

Page 211

longitudinal or experimental? Because I want to know the full list leaving here today.

MS. COUCH: Same objection.

A.    I mean, I relied on more than the ten studies I have in this printed binder, and the reason I brought them was so that I didn't have to recall them.

If you want to know the full extent of my opinion, I can absolutely talk about my opinion. If you want me to recite a list of many, many, many, many studies, I can't do that. And that's why I brought these example studies in, Todd.

BY MR. DAVIS:

Q.    Can you -- I'm just going to give you -- I'll give you one more chance, Dr. Murray, because I need to leave here with a complete list.

Other than Seekis, is there any other experimental or longitudinal study that you rely upon to support your opinions about features of social media use, that is not included behind Tab 2 in Exhibit 5?

MS. COUCH: Same objection. And he will rely upon his full MC

Page 212

list.

A.    I mean, there's another one here by Thai.

BY MR. DAVIS:

Q.    What tab behind is that?

A.    T-H-I [sic]. That's another deprivation study where folks had limited social media access, and that's, I would argue, an experimental study as well because you're manipulating a variable. Again, these are examples.

Q.    Keep going. I want the full list.

MS. COUCH: Same objection. He'll rely upon his full list.

A.    I can't recall every single study, Todd. And that is why I brought this very, very abbreviated version of a list in.

BY MR. DAVIS:

Q.    Can you identify any other study that needs to be included, other than Seekis or Thai to the list of experimental or longitudinal studies that assessed feature?

MS. COUCH: Same objection.

A.    I know that there are other

Page 213

studies. I can't recall the name of every single author and every single paper, but I considered them in my report.

BY MR. DAVIS:

Q.    Okay. But you've given me today the list of studies that you can identify here, right?

A.    I've given you a list of example studies, from which there were more, which I can identify right now, while acknowledging that there are other studies that I considered that I can't recall off the top of my head.

Q.    Just to make sure the record is clear. There are certain studies that you've identified, which include what's behind Tab 2 --

A.    Right.

Q.    -- in your -- in Exhibit 5, plus Seekis and Thai, which are behind Tab 4, but those are the only studies that you can identify here today. Right?

MS. COUCH: Object to the form.

A.    What I'm saying is those are the studies that I can recall right now. I

54 (Pages 210 - 213)

CONFIDENTIAL

Page 214

know there were other studies, Todd. I can't recall them off the top of my head.

BY MR. DAVIS:

Q. Okay. Let's look at the studies that are behind Tab 2.

A. Okay.

Q. The first one is a study by Sherman that was published in --

A. 2016.

Q. -- 2016, right? Yes?

A. Yes. Sorry, I was helping you find it.

Q. This is a brain imaging study, right?

A. I think.

I think there's a behavioral component and there's a brain imaging component.

Q. What they did is they had study participants, there were 34 study participants, and what they did is those participants did neuroimaging studies, correct?

A. Part of what they underwent was fMRI, which is a neuroimaging metric, yes.

Page 215

Q. Okay. And they were -- they were shown images that had likes, correct?

A. That's part of what the study did, yes.

Q. Right? And as a result of seeing those images, the study participants reacted and responded to what they were seeing in the images, right?

A. I think they engaged with that. They were -- the metric of that particular aspect of the study is whether they liked the photo or not.

Q. Yeah, they saw something that had a like or -- in a photo, and they responded about how they reacted to it?

A. They were asked -- I think they were asked -- I'm not entirely -- maybe I should read the methodology again. But they -- their liking responses was recorded, yes.

Q. Yeah. And liking responses in terms of what -- I guess in terms of what they were seeing.

A. They were shown images that -- where the number of likes were manipulated.

Page 216

And in turn, it was me- -- how much they liked the images was measured as a function of how many likes the original image had, if that makes sense.

Q. Yeah. This study didn't determine that any of the study participants had any psychiatric disorder or any sleep disorder. Fair?

A. I think this is a study of general brain functioning in response to manipulating the likes on social media. And they were interested in looking at the -- that BOLD response I told you about and the reward pathway, I think that was their other sort of outcome of interest.

Q. Come back to my question. This study didn't determine that any of the study participants had any psychiatric disorder or any sleep disorder. True?

A. This study didn't include, as I see it, psychiatric patients, but it tells us a great deal about how manipulating the likes interacts with the reward pathway in the brain.

Q. Dr. Murray, this doesn't have

Page 217

to be this difficult. Please listen to my question.

The study didn't determine whether any of the study participants had any psychiatric disorder or any sleep disorder. Fair?

MS. COUCH: Object to the form.

A. The study, as far as I can tell, was intending to look at the response -- to the level of the human brain in response to manipulating likes, and I don't think they ascertained that in psychiatric populations. It was the general human brain functioning.

BY MR. DAVIS:

Q. Dr. Murray, I haven't asked about the general population, I haven't asked about manipulation. I'm simply asking whether the study made any determination that any of the study participants had a psychiatric disorder or sleep disorder. That's all.

A. Okay. I'll try to answer this in a different way. This study, while incredibly informative in teaching us about

55 (Pages 214 - 217)

CONFIDENTIAL

Page 218

the brain response to manipulating likes, didn't include -- didn't identify psychiatric patients.

Q.    Didn't identify psychiatric disorders or sleep disorders in any of the study participants.  Fair?

A.    Again, I think this study tells us a great deal about the neurobiological response to differential levels of likes in people whose psychiatric status was unclear. I don't think it was determined.  It's possible --

Q.    It's a very simple question and a very simple answer.

This study didn't determine whether any of the study participants had a psychiatric disorder or a sleep disorder. That just wasn't part of what the study did. Fair?

A.    The study was interested in assessing the brain-based response to differential levels of likes that were manipulated in people whose diagnostic status was unclear.

MR. DAVIS:  Reserve, move to

Page 219

strike, nonresponsive.

I just don't understand why that question can't be readily answered as a yes or a no as opposed to something else.

BY MR. DAVIS:

Q.    Dr. Murray, let's go to the next article, which is Kleemans, right?

A.    Yes.

Q.    This study had to do with exposure to retouched images on photo-based social media platforms, right?

A.    Yes.  This was 144 girls, adolescents, randomly exposed to either manipulated or non-manipulated Instagram photos, it looks like.

Q.    Right.  So the study participants either looked at manipulated images or unmanipulated images, and then reacted to what they saw, right?

That's what they did, right?

A.    I'm just trying to refresh because this is a long Methods section.  I know that they -- essentially, they did expose people to either manipulated or

Page 220

unmanipulated images, but there's also a metric of social comparison as well in this study.

Q.    Right.  They showed them -- as it -- look in the Methods section on page 96. They said that they had two -- the participants were randomly exposed to either ten original Instagram photos or ten manipulated photos, correct?

[Document review.]

BY MR. DAVIS:

Q.    That's what it says, right?

A.    I'm not seeing where you say 96 on page 2.

Q.    Yeah, look at page 96, under Methods.

A.    Got it.

Q.    Participants were randomly exposed to either ten original Instagram photos or to ten manipulated photos.

That's what it says, correct?

A.    That's what that says, yes.

Q.    Right.

And then that exposure happened in what?  Minutes?  Seconds?

Page 221

A.    Let's see.

[Document review.]

A.    There's usually a schematic of a paradigm, a study paradigm, usually.

[Document review.]

BY MR. DAVIS:

Q.    The showing of the manipulated and unmanipulated photographs took seconds, right?

A.    It doesn't say that.  I can't see that.  If you see that --

Q.    Do you know if it look longer than a minute or two?

A.    I don't know how long it took. I don't think that's in here.

Q.    Okay.  And then, none of the study participants were assessed for any diagnosed psychiatric disorder.  Fair?

[Document review.]

A.    I think this study showed that the essential exposure to manipulated images lowers body image, which is linked to psychiatric disorder.  It's part of a psychiatric disorder.

But to your question, I don't

56 (Pages 218 - 221)

CONFIDENTIAL

Page 222

think any of these were diagnosed with psychiatric disorders. It was a measuring construct that were part of psychiatric disorders.

Q. None -- these study participants were not clinically assessed to determine whether or not the exposure to the manipulated or unmanipulated photos actually resulted in any psychiatric disorder or any sleep disorder. Fair?

MS. COUCH: Object to the form.

A. Well, we do this all the time in science, where we're -- I think these authors are trying to measure constructs that are part of psychiatric disorders. In this instance, they're looking at whether exposure to manipulated Instagram photos rendered an effect on body image, and it seemed that the manipulated photos lowered body image, which we know is part of psychiatric disorders and the processes therein.

MR. DAVIS: Move to strike, nonresponsive.

BY MR. DAVIS:

Q. Show me where in paper these

Page 223

study participants were actually clinically assessed for a psychiatric disorder or a sleep disorder.

A. Again, as I just mentioned to you, this study is interested in indexing mechanisms known to be applicable in psychiatric disorders, and it seems that this particular sample were not either diagnosed or undiagnosed, but we know the mechanisms are relevant to psychiatric disorders.

MR. DAVIS: Move to strike, nonresponsive.

BY MR. DAVIS:

Q. I'll give you one more chance, Dr. Murray, and then I'm going to reserve on it.

Neither -- strike that.

None of the study participants were either diagnosed with any form of psychiatric or sleep disorder, right?

A. So context is important. This study is looking at whether manipulated photos can render an effect on body image, which it did. They found that it did.

And that construct is relevant

Page 224

to an array of psychiatric disorders, yet the subjects in this particular study, it's unclear whether they had diagnoses or not.

Q. Okay.

A. So I think it can tell us a greet deal about psychiatric disorders.

Q. So the study assessed body dissatisfaction, but then -- in the study participants, but then did not go on to determine whether or not that body dissatisfaction led to any psychiatric disorder, any eating disorder or any sleep disorder. Fair?

A. Again, I want to just reiterate the context, which is they are looking at how photo manipulation impacts constructs known to underpin and undergird psychiatric disorders, and it looks like they didn't diagnose anybody in this study, but we know that this stuff matters in psychiatry, because we treat people with these same constructs all the time.

MR. DAVIS: Move to strike, nonresponsive. Reserve.

Page 225

BY MR. DAVIS:

Q. Let's go to the next study.

The next one you identify is Bozzola, B-O-Z-Z-O-L-A, right?

A. That's the next one in this list of studies, which is just an example batch, yes.

Q. This is a review article, correct?

[Document review.]

A. Yes, it looks like a review or study, correct.

BY MR. DAVIS:

Q. There's no original data in the Bozzola article that you include on features, correct?

MS. COUCH: Object to the form.

A. This is a review article so it reviews original data, it doesn't include de nova original data. It reviews data. That's the nature of a review study. And they did find some pretty interesting findings on how --

BY MR. DAVIS:

Q. Dr. Murray, I haven't asked you

57 (Pages 222 - 225)

Page 226

what it found. I simply asked you whether it's a review article, and I think you answered that. So thank you.

A.   Understood.

Q.   Dr. Murray, let's look at the Mabe article that you list next, okay, behind Tab 2.

A.   Mm-hmm.

Q.   That is -- if you look in the abstract, under Results, it identifies Mabe as a cross-sectional survey, correct?

A.   The sentence in entirety is: More frequent Facebook use was associated with greater disordered eating in a cross-sectional survey.

Q.   Right. So you agree it's a cross-sectional study, correct?

A.   I mean, I agree this finding showing increased Facebook usage associated with more eating disorder pathology is cross-sectional in this particular study.

Q.   Just to be clear about what we're talking about. This study is a cross-sectional study, fair?

A.   This study -- this

Page 227

cross-sectional study found that greater Facebook use was associated with greater ED symptomatology. Yes, a cross-sectional study.

MR. DAVIS: I'll move to strike everything except "yes, it's a cross-sectional study."

BY MR. DAVIS:

Q.   Let's look at the next one, the Schroeder 2025. This is an experimental study, right?

A.   Bear with me one second. I just want to refresh my recollection.

[Document review.]

BY MR. DAVIS:

Q.   It's an experimental study, right?

A.   I mean, in the -- I'm trying to read through the entirety of the methodology, but it does say it's an online experiment of social media users to investigate the effects of a slimming and beauty filter on body image and weight-related outcomes.

Q.   So it's looking at body dissatisfaction, right?

Page 228

A.   Let's see the outcome measures.

[Document review.]

A.   I mean, the list of measures is long here. It's looking seemingly at quite a slew of body image-related constructs, including self-objectification, which we know is linked, theoretically and essentially, to the development of eating disorders.

BY MR. DAVIS:

Q.   Okay. This study did not make any clinical assessment of any of the study participants to determine whether or not they had any psychiatric disorder, including any eating disorder or any BDD, correct?

A.   I mean, this study was designed, I think, to assess the effects of beauty filter use on a range of constructs we know are implicated in psychiatric diagnoses, and I don't think they diagnose any themselves, but we know these constructs manifest in psychiatric diagnoses. So it's a useful study.

Q.   I understand you think it's a useful study, but let's be clear. There was no clinical assessment of the study

Page 229

participants to determine that they actually had diagnosed eating disorders or BDD or any other psychiatric disorder. Fair?

A.   This study assessed a range of constructs that are manifest and important in the disorders you mentioned. And I agree that this study didn't include diagnoses, but the constructs that it assessed are very well known.

Q.   If you look at the 4.3 under Limitations in future direct --

Let me back up.

MR. DAVIS: I move to strike everything except this study -- "I agree that this study didn't include a diagnostic description."

BY MR. DAVIS:

Q.   If you look at the Section 4.3, halfway down, it says --

A.   Which paragraph?

Q.   The first paragraph.

It says: We -- additionally, we employed an experimental design that lacks ecological validity; in this way, participants did not choose what filter they

58 (Pages 226 - 229)

CONFIDENTIAL

Page 230

used. In turn, the study's external validity may not harness the impact of real-world implications.

Did I read that correctly?

A. Will you show me that paragraph? I can't see it. I'm sorry.

We also?

Q. Mm-hmm.

Do you want me to read it again for you?

A. Yes, please.

Q. The study author said: We also rely on self-report data, which may not fully capture the extent of filter usage. Additionally, we employed an experimental design that lacks ecological validity; in this way, participants did not get to choose what filter they used. In turn, the study's external validity may not harness the impact of real-world implications.

Did I read that correctly?

A. You read that sentence correct.

Q. And you agree that that's a limitation of this study?

A. I agree. I would appraise that

Page 231

in the context of them sort of, by wanting to control variables tightly, as in any experimental study, you compromise a little bit of ecological validity because life doesn't happen in a lab. And I think this tells us a great deal about how photo manipulation affects very relevant constructs to psychiatry. This is what we do in science.

MR. DAVIS: Move to strike after -- everything after "I agree" as nonresponsive.

BY MR. DAVIS:

Q. And for the exposure of the actual -- the beauty filters that were used in this study, those were all exposures that happened over a very limited, transient amount of time, correct?

A. I'll need to refresh my understanding of the study. If you can point out where you see that, that would be great.

[Document review.]

BY MR. DAVIS:

Q. Do you know whether or not they used them -- they only looked at the filters

Page 232

for a transient or short amount of time?

A. It doesn't seem to say, unless I haven't seen -- I haven't finished reading. But if you see it, please point it out and I'll give you my thoughts.

Q. Let's look at the Burnell article, which is the next article behind Tab 2.

A. Got it.

Q. This article assessed body satisfaction or body imaging?

A. It looks like this investigated the use of Snapchat lenses and body image concerns.

And in particular, taking selfies with lenses, it looks like.

Q. Okay. And this study did not make any clinical assessment of whether any of the study participants had an eating disorder, BDD, or any other psychiatric disorder, right?

A. This study found that taking more photos with Snapchat lenses was associated with greater body image concerns, which we know is incredibly relevant to

Page 233

eating disorders, yet it doesn't look like this study included diagnoses.

Q. This particular study didn't determine whether any of the study participants went on to later develop an eating disorder or BBD or any other psychiatric disorder, right?

A. It looks like they found that Snapchat lens use in general was associated with greater body image concerns, which we know is very relevant to eating disorders and BDD, yet they didn't include diagnoses for people.

Q. You missed my question. Let me give it to you again.

This study did not make -- strike that.

This study did not determine whether any of the study participants who had body dissatisfaction or body imaging concerns went on to later develop an eating disorder, BDD, or any other psychiatric disorder. Right?

A. I think what this study was trying to do was --

59 (Pages 230 - 233)

CONFIDENTIAL

Page 234

Q. Okay.

A. -- index the effects of Snapchat lens use on body image concerns, which they did. And I -- it doesn't seem that they followed them longitudinally to determine their well-being. It just showed that greater Snapchat lens use was associated with greater body image concerns.

Q. Right. And that's where the assessment stopped, and it did not assess whether they went on to later develop any psychiatric disorder, including BDD or eating disorder, correct?

A. I'm going to repeat, because I think I'm answering your question. If I'm not, let me know.

Q. You're not.

MS. COUCH: Objection.

A. I'm trying to articulate what the study found. And --

BY MR. DAVIS:

Q. You're asking me what -- you keep telling me what it found.

A. Right.

Q. I'm trying to focus on what the

Page 235

limitations and what it didn't do, right? So that's what I'm focusing on.

A. Uh-huh.

Q. Okay? So let's focus on that.

A. Okay.

Q. This study did not determine that any of the study participants who had any body dissatisfaction or body imaging concerns then went on to later develop an eating disorder, BDD, or any other psychiatric disorder, right?

MS. COUCH: Object to the form.

A. One-sentence answer. This study found that greater Snapchat use in general was associated with greater body image concerns, which we know is incredibly relevant to psychiatric diagnoses, and at the same time, they didn't follow their subjects longitudinally to determine their long-term well-being.

BY MR. DAVIS:

Q. Which includes whether or not they ever developed a psychiatric disorder, right?

You can say it. It's okay.

Page 236

MS. COUCH: Object to the form. Object to counsel's soliloquy.

A. Again, they illustrated that Snapchat use -- lens use was associated with greater body image concerns in people whose diagnostic status was unclear. And why this is really useful, Todd, is because we know that these constructs manifest in psychiatry.

And I don't think that they followed them longitudinally over time, to your question.

BY MR. DAVIS:

Q. To determine whether they developed any type of psychiatric disorder of any kind. Fair?

A. This study illustrated Snapchat use in real time was associated with greater body image concerns, which we know is impacted in psychiatry -- in eating disorders and other body image disorders, and their diagnostic status was unclear, and their long-term diagnostic status was unclear, but it does tell us a great deal about how Snapchat lens use relates to what we see in psychiatry and psychiatric patients.

Page 237

MR. DAVIS: Okay. "Their diagnostic status was unclear and their long-term diagnostic status was unclear." Everything else, I move to strike as nonresponsive.

BY MR. DAVIS:

Q. Let's go to the next one. This is the S-F-E-I-R article.

MR. DAVIS: Did I miss one, Sara? I hit Burnell.

MS. COUCH: Yeah. I just don't have one after that one.

MR. DAVIS: What's that?

MS. COUCH: Do you have it after that?

No, I just -- I'm -- this folder is missing one.

MR. DAVIS: I'm sorry.

MS. COUCH: It's okay.

BY MR. DAVIS:

Q. You have the next one as Sfeir, S-F-E-I-R?

A. Sfeir, yes, I do.

Q. Okay. This was -- this one is -- this is a cross-sectional study. If

60 (Pages 234 - 237)

CONFIDENTIAL

Page 238

you look under the Methods, do you see that it says: This cross-sectional study was carried out between July and September 2021?

A.   I see that sentence, yes.

Q.   So you agree that this is a cross-sectional study?

A.   I mean, I certainly see that sentence where the authors describe it as a cross-sectional study.

Q.   And you agree that's the study design used in this study, right?

A.   I wouldn't doubt it if they say it.

Q.   All right.  The next one I think you have is the Kumar study from 2025, right?

Is that the next one?

A.   That's the next one I have, yes.

Q.   Okay.  This is a study from India, right?

A.   Yes.  It looks like both authors have an affiliation with an Indian institute.

Q.   And it's -- the sample size is

Page 239

18 people, right?

A.   Yeah.  This is a qualitative study of 18 people --

Q.   Right.

A.   -- which allows sort of -- you sacrifice a little bit of sample size for a lot more richness of data in these qualitative studies.

Q.   This is a qualitative study, and it does not quantify risk in it.  Fair?

MS. COUCH:  Object to the form.

A.   Let me skim through it, please.

[Document review.]

A.   When you say quantify risk, can you elaborate a little bit?

BY MR. DAVIS:

Q.   Do you see any date in the Kumar 2025 study where they actually run statistical analyses to determine whether use of social media or some feature of social media actually increased the risk of any type of psychiatric disorder or sleep disorder?  Or symptoms of -- thereof?

A.   Mm-hmm.

I mean, this is a qualitative

Page 240

study.  So by inherently, it's not a data-driven design.  It's a sort of qualitative study designed to provide rich subjective information.  And I do see here how someone says here the AR filters make you think so much about your appearance.  Unfortunately, they create so many drawbacks in your appearance and you get dissatisfied with your body.  That's one of the -- that's one of the results they posed.

Q.   There's no empirical data in the study that analyzes statistically -- let me back up.  There's no empirical data tables in this article that set forth that use of social media increases the risk of a psychiatric disorder, an eating disorder, or a sleep disorder or symptoms thereof, right?

A.   I mean, this is a qualitative study.  So the data that this study presents is subjective and qualitative based on interviews.  And they do say how some features of social media use make it more likely to experience body dissatisfaction.

And it's unclear if any of these subjects had an eating disorder, but

Page 241

they're certainly talking about concepts that are very relevant to eating disorders.

MR. DAVIS:  Move to strike, nonresponsive.

BY MR. DAVIS:

Q.   I'm simply asking, Dr. Murray, is there any data tables in the Kumar article where they analyze and present data showing that there's an increased risk of using social media and any psychiatric disorder, eating disorder, or sleep disorder or symptoms thereof?

A.   I think what this study is trying to do, Todd, so Table 2 is data.  Table 2 represents grounded theory analyses, analyses of data.

It is qualitative data, as you articulated in terms of the design of the study.  And what one of the examples would say is that AR filters make you think so much about your appearance and create drawbacks in your appearance, and you get dissatisfied.

That is a construct that's relevant to the onset and maintenance of psychiatric disorders, and it's unclear if

61 (Pages 238 - 241)

CONFIDENTIAL

Page 242

any of these folks did or did not have a psychiatric disorder, but it's definitely a valuable study.

MR. DAVIS: Objection, move to strike.

BY MR. DAVIS:

Q.    I'm simply asking you, the study -- please follow my question, because you haven't answered it, and I've given you two opportunities. I'll give you one more and then I'm moving on.

Can you tell me, anywhere in this -- in the Kumar article, whether or not they run any statistical analyses showing that there's an increased risk of any psychiatric disorder or any sleep disorder from the use of social media?

A.    Todd, this is a qualitative study, and the analyses are entirely different in a qualitative study. And they've presented their data in a qualitative way.

Q.    Is that a way of saying it doesn't have the statistical analysis I've asked about?

Page 243

A.    It's a way of saying that the qualitative study you asked me about has qualitative data and qualitative analyses.

Q.    Does it have quantitative data where they quantify the risk of using social media in any way, shape or form?

A.    It is a qualitative study. So qualitative studies don't include quantitative data. The data that this study provides, Todd, is sort of subjective experiential qualitative data that's grounded in a grounded theory analysis, which is very robust, and it does articulate that these filters are harming people, at least per the experience of these folks in this study.

MR. DAVIS: Move to strike. I'll reserve.

BY MR. DAVIS:

Q.    Okay. Dr. Murray, we've been through -- have we gone through every single one of the studies behind Tab 2?

A.    I think we've been through the studies behind Tab 2, and to your earlier question, I think I mentioned a couple of other studies that --

Page 244

Q.    I'm going to get to those, I promise. I'm just asking about Tab 2 right now.

A.    Okay.

Q.    Have we been through all of the articles behind Tab 2 in your notebook?

A.    It looks that way, yes.

Q.    Okay. Let's go to the two other articles that you identified, Seekis and Thai, which are behind Tab 4.

A.    Uh-huh.

Q.    Okay?

A.    Yeah.

Q.    Thai, T-H-A-I, that is a -- an experimental study, correct?

A.    Yes. It experimentally examines the affects of reducing smartphone social media use on appearance and self-esteem in youth. And clearly this is youth with emotional distress here.

Q.    Okay. And so for this particular -- the outcome -- let me back up.

This study did not do any clinical assessment of study participants to determine whether or not they had a

Page 245

psychiatric disorder of any kind or a sleep disorder of any kind. Fair?

A.    Let me review.

[Document review.]

A.    I mean, this is a study which is explicitly designed to be in emotionally distressed youth. And so it does indicate that reducing your social media use improves appearance and weight esteem and appearance esteem, it looks like. It's unclear what diagnoses they had, but they do say that it's a distressed sample.

BY MR. DAVIS:

Q.    Okay. The participants, the study participants in the study were not assessed to determine at the time they entered the study whether or not they had a psychiatric disorder or a sleep disorder. Fair?

A.    I mean, it looks like they were intentionally trying to find children with emotional distress. And it did illustrate that reducing social media use improves appearance in body -- appearance and weight esteem.

62 (Pages 242 - 245)

CONFIDENTIAL

Page 246

Q. The study participants were not clinically assessed to determine whether or not they had any psychiatric disorder or sleep disorder before they went into the study, correct?

MS. COUCH: Object to the form.

A. They -- these were emotionally distressed youth. We know that that's relevant to lots of different psychiatric disorders, and we know that in this sample of emotionally distressed youth, it does illustrate that reducing your social media use improves your body and your weight esteem.

But it's unclear what diagnoses these distressed youth had.

MR. DAVIS: Move to strike everything except "it's unclear what diagnoses these distressed youth had."

BY MR. DAVIS:

Q. There's no diagnoses discussed for any of the study participants when they enter the study, correct?

A. It looks like they were screened in on the basis of their emotional

Page 247

distress, which we know is very relevant, Todd, to an array of psychiatric diagnoses. That would be a transdiagnostic marker, and it does illustrate that reducing your social media use improves body image and weight-related outcomes.

And that's important, Todd. This really matters in psychiatry, to look at these things that we know is manifest in psychiatric disorders, really matters.

Q. I'm sorry. That is not even remotely close to what I asked you, Dr. Murray.

The study participants, when they enrolled in the study, it was uncertain whether any of them had an actual diagnosis of a psychiatric disorder of any kind or a sleep disorder of any kind. Fair?

A. Am I not answering your question?

Q. You're not answering my question.

A. I feel like I'm answering your question.

Q. No, you're really not.

Page 248

MS. COUCH: Object to the form. We will say --

(Crosstalk.)

BY MR. DAVIS:

Q. Focus -- let me ask the question so you can have it fresh in your mind.

A. I'm sorry?

Q. I want to ask it again so you have it fresh in your mind.

A. Okay.

Q. The study participants, when they enrolled in the study, they were not clinically assessed to determine what, if any, psychiatric disorder or sleep disorder they actually had, right?

A. And I need to give that answer context and say that these were intentionally studying -- these authors were intentionally studying emotional and distressed youth, which is very relevant to an array of psychiatric diagnoses.

And in this sample, they found that reducing social media use improved their body and weight esteem, and it wasn't clear

Page 249

what diagnoses they have.

But to my mind, this is a really important study because we know that intentionally selecting a sample of emotionally distressed youth relates intricately and intimately to psychiatric problems in youth.

MR. DAVIS: I move to strike as nonresponsive other than "it is unclear what diagnoses they had."

BY MR. DAVIS:

Q. Just to be clear, these study participants were administered a screening scale in advance of enrolling in the study, correct?

A. I haven't read the whole -- I just read the first part. It looks like by virtue of them saying they intended to study social media use on appearance and weight in youth with emotional distress, I would imagine they screened in for that.

Q. Look at the Methods section. It's pretty straightforward.

A. Okay.

Q. It says that they were assessed

63 (Pages 246 - 249)

CONFIDENTIAL

Page 250

for symptoms of depression or anxiety as assessment -- two items from the Center for Epidemiological Studies Depression Scale and two items from the General Anxiety Disorder Scale.

Do you see that?

A.    I see that.

Q.    So what they did is they used parts of, but not the full screening scale to determine whether they may have possible symptoms of depression or anxiety, right?

A.    I mean, that's a great study. If you find people with elevated depression and anxiety symptoms and you know that reducing social media use improves that, that's a great study, and it's super relevant to kids with depression and anxiety.

MR. DAVIS:  I move to strike as nonresponsive.  I think that answer is a classic reflection of the inability of this witness to listen and answer the question that is asked.

BY MR. DAVIS:

Q.    Okay.  Let's go to the next study that you identified, which is Seekis.

Page 251

This assessed social media and body image and well-being, right?

[Document review.]

A.    I'm just going to review the methodology very briefly.

[Document review.]

MS. COUCH:  Todd, did you say Seekis?

MR. DAVIS:  I sure did.

[Document review.]

A.    So this assessed the effects of a detox condition upon an array of relevant metrics, including self-objectification, appearance satisfaction, body appreciation, at 3 and 7 days following onset of study.

BY MR. DAVIS:

Q.    Right.  There -- this is a study that's assessing body satisfaction or imaging and well-being, right?

A.    This -- yeah, this study assesses the effects of sort of a detox from social media on body dissatisfaction, self-objectification, body appreciation, and a range of constructs that are pretty centrally embedded theoretically in eating

Page 252

disorders.

Q.    None of the study participants in this study were clinically assessed to determine whether or not they had any psychiatric disorder, any eating disorder, or any body dysmorphic disorder, following the reduction, or as you put it, detox of social media.

A.    Well, that's what they termed it, a detox.

[Document review.]

A.    Yeah, it looks like this study that found the detox improves an array of body image constructs was in people whose diagnostic status was unclear in this instance.

BY MR. DAVIS:

Q.    Okay.  So none of the study participants were assessed for any type of psychiatric disorder following the reduction of -- or cease of usage of social media, right?

[Document review.]

A.    It looks like these were undergraduate community participants in whom

Page 253

we know eating disorder risk in particular was elevated, but their diagnostic status was unclear.  And I think the findings in Thai are really relevant, that cutting back on social media impacts and improves self-objectification.

There's an entire theory of body dissatisfaction called self-objectification theory.  It underpins eating disorder psychopathology.  This is really relevant to psychiatric disorders, because it occurs in the -- in a very common age of onset.

And it is directly assessing theoretical constructs known to underpin psychiatric disorders, and in this particular instance, it -- the diagnostic status of the particular participants is unclear.

BY MR. DAVIS:

Q.    Were any of the study -- I'll give you one more chance to answer clearly and directly respond to my question.

Were any of the study participants found to have any psychiatric disorder, including any eating disorder or

64 (Pages 250 - 253)

CONFIDENTIAL

Page 254

BDD?

A.    This study assesses constructs that are very relevant to eating disorders and BDD, such as self-objectification, body appearance -- appreciation, appearance satisfaction.  This particular study is unclear whether they assessed folks with diagnoses, but the study of those constructs that underpin the diagnoses, which we know, is relevant.  And I think it's a good study.

Q.    Did a single -- can you say a single participant in this study actually had a psychiatric disorder, including any eating disorder or any BDD?

A.    Yeah.  As I just mentioned, this particular study, while showing that reducing social media use improves an array of body image constructs that we know manifest in eating disorders, it's unclear whether this particular study was undertaken in clinical samples, but we know that these mechanisms manifest and impact kids with these disorders, with these diagnoses.

Q.    Did any study participant in this study have an eating disorder, BDD, or

Page 255

any other psychiatric disorder?

A.    This finding showing reducing social media use improves body appearance satisfaction, body appreciation, and overall well-being is documented in this instance in people whose diagnostic status is unclear --

Q.    So you --

A.    -- in this particular paper.

Q.    So you don't know of any study participant in this study that actually had an eating disorder, BDD, or a psychiatric disorder.  Fair?

MS. COUCH:  Object to the form.

A.    It looks like the study was trying to assess the constructs that underpin eating disorder psychopathology, and they found that reducing social media use improves those constructs, and it's unclear whether these folks had diagnoses or not.

MR. DAVIS:  Move to strike, nonresponsive.

Let's take a break, because we've been going a little over an hour and a half, I think.

THE VIDEOGRAPHER:  We are now

Page 256

going off the record.  This is the end of Media Unit No. 4, and the time is 3:08 p.m.

(Recess taken, 3:08 p.m. to 3:37 p.m. PDT)

THE VIDEOGRAPHER:  We are now back on the record.  This is the beginning of Media Unit No. 5, and the time is 3:37 p.m.

BY MR. DAVIS:

Q.    All right, Dr. Murray, are you ready to continue?

A.    Yes.

Q.    We were talking about features of social media use before the break.  You recall that discussion?

A.    Yes.

Q.    Yes?

A.    Yes.

Q.    One of the things that you mentioned during that discussion, I believe, had to do with the Griffiths article and use of algorithms.

Do you remember that discussion?

Page 257

A.    Can I pull it back up, the study?  Do you have it?

Q.    It's over there.  It's sitting next to you.  I'm not going to ask you about the Griffiths study.  I was just orienting us about the conversation we had.

A.    Gotcha.

Q.    Right.

So one of the things that you talked about for features of social media use in your prior testimony is about the algorithms of social media, right?

A.    I think in this particular study, it's both the likes and the algorithm, as I understand it.

Q.    Yeah, I think we're miscommunicating.  I'm not talking about Griffiths.

A.    Got it.

Q.    I'm talking about your opinions overall.  I'm just trying to reorient us about a discussion point, okay?

A.    Understood.

Q.    One of your opinions in the case has to do with algorithms being a

65 (Pages 254 - 257)

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

CONFIDENTIAL

Page 258

feature of social media use that you claim causes and promotes addictive behavior and also results in mental health harm. Fair?

A.    That's one of the features I've discussed in my report, yes.

Q.    Right. And part of your analysis in the case, you actually discuss at length the substantial harm that you think algorithms do to promote addictive behavior and mental health harms, right?

A.    I can refer to my report. I know that I discussed the algorithm, and alongside some of the other features, I'm aware that there's definitely data related to the algorithm in my report.

Q.    Right.

And looking at usage of social media, where do you put the algorithms of the defendants' social media platforms in causing what you claim to be addictive behavior or mental health harms?

MS. COUCH: Object to the form.

A.    What do you mean where do I put it?

Page 259

BY MR. DAVIS:

Q.    Sure. Like in the overall usage of social media, and what you say causes addictive behavior or harms from social media use, mental health harms from social media use, where do you slot in the algorithm in your causation analysis?

MS. COUCH: Object to the form.

A.    I mean, it's part of the features that I believe drive harms. It's part of the features alongside some of the other features. I don't know if you're asking me to like -- whether I put it -- I put it on a -- I put it in an opinion that, in concert with the other features, can be harmful.

BY MR. DAVIS:

Q.    Okay. So in terms of the features that you claim to be harmful, whether it's addiction or some other mental health disorder, is there a way for you to pull out algorithms and other features from your causation analysis and say, if I took these out, this is what we would have?

MS. COUCH: Object to the form.

Page 260

A.    Hypothetically, do you mean?

BY MR. DAVIS:

Q.    No, just in terms of -- let me see if I can ask a clearer question.

A.    Yeah.

Q.    In terms of your opinions about features such as algorithms and the other features that you take issue with.

A.    Yeah.

Q.    Those are kind of part and parcel to your causation analysis in the case, right?

A.    Yes. The algorithm and the other features are centrally embedded in my report, yes.

Q.    Your report where you outlined your opinions about the harms of social media?

A.    Yes.

Q.    Okay. And do you claim that the defendants' social media platforms cause the mental health disorders or outcomes because they fail to provide default protections to limit the frequency or length of sessions?

Page 261

MS. COUCH: Object to the form.

A.    I don't know that I've offered that opinion. I'd have to reread my report. It's my opinion, it's my firm one, that the features of these platforms cause harm to children. I think that includes the algorithm, but I think it includes other features too.

BY MR. DAVIS:

Q.    Okay. And so are you offering an opinion in the case that the defendants' social media platforms cause mental health disorders or any other adverse mental health outcome because they don't have default protections to limit the length or frequency of sessions?

MS. COUCH: Object to the form.

A.    My opinion is that the defendant platforms cause harm because there are many features which are harmful.

BY MR. DAVIS:

Q.    Is that one of them?

A.    Is the algorithm one of them?

Q.    No. Is the failure to set default protective limits on the length and

66 (Pages 258 - 261)

CONFIDENTIAL

Page 262

frequency of sessions.

A.   I don't know that I've offered that opinion in my report.  I can talk with you about it, but -- I mean, my central opinion is that there are a series of features which drive harm, and that's what I see in my clinic all the time.

Q.   Okay.  Is it your opinion that the failure to block uses during certain times of day, such as during school hours or late at night, is a feature of social media use that causes the mental health harms outlined in your report?

A.   The failure --

MS. COUCH:  Object to the form.

A.   The failure to block use at night?

BY MR. DAVIS:

Q.   Or at certain times during the day.

A.   Or at certain times during the day.

In a way, I think that features are harmful whenever -- you know, I think whenever children, in particular, are exposed

Page 263

to them, I think they can be harmful.  I don't recall an opinion that, you know, certain times of day would make it okay.

Q.   Yeah.  And I'm really focused on is it, like, for the feature of social media use where a feature doesn't -- that the apps don't block usage during certain times of day, such as school hours or at night, is it your opinion that that's a feature that causes the harms that you've outlined in your report?

A.   Based on my report?  I can't recall if I --

Q.   I'm just asking if that's your opinion.

MS. COUCH:  Object to the form.

A.   Let me read -- just glance at this for a second.

And your question is around whether the failure to disable access to all features or some features during parts of the day is embedded in the harm?

BY MR. DAVIS:

Q.   Yeah.  Whether the -- whether the failure to block use of social media

Page 264

during parts of the day or at night is embedded in the harms that you outline in your report.

[Document review.]

A.   I mean, a lot of the studies that I can recall right now off the top of my head, they didn't, as I recall it, delineate times of use in terms of time of day.

I can tell you, clinically, I've worked with patients that have been differentially impacted by features at different times of the day.  I don't think that's -- I can't recall that opinion in this particular report.

BY MR. DAVIS:

Q.   Do you have an opinion that Defendants' platforms' failure to provide a beginning and an end to users' feed or scrolls causes the mental health disorders that you outline in your report?

MS. COUCH:  Object to the form.

A.   I mean, there's a -- there's data supporting the infinite scroll, if that's what you're alluding to, or is embedded in the harms that's caused -- in

Page 265

concert with the algorithm that you alluded to, I think it gives rise to a sort of infinite variable reward, continues to, which we know is sort of an incubator for addictive behaviors.

BY MR. DAVIS:

Q.   And that's -- that opinion is baked into your causation analysis in the case?

A.   Well, you're asking me for my opinion right now.  As I recall -- as I just mentioned, I can't recall -- I can read my report right now, if you'd like me to.  I can certainly -- but generally, I think that the infinite scroll is embedded in the harms that people have experienced, yes.

Q.   And that would include such things as the defendants' platforms don't limit the images or the videos or the postings or the notifications, that that's kind of constant?

A.   Well, it's infinite, right?  That's the name of it.  It's the infinite scroll and I think that is implicated in both what my patients tell me is harmful and what

67 (Pages 262 - 265)

CONFIDENTIAL

Page 266

the data would suggest as well.

Q. Are you offering the opinion that the defendants' platforms cause the mental health disorders or outcomes that you outline in your report because they allow private content or private messaging to occur?

MS. COUCH: Object to the form.

A. I think -- in my report, I'm trying to outline the main -- the data supporting mechanisms. And I think they're more feature oriented than content oriented. Because a lot of the studies done to study harms are content agnostic.

For instance, the ABCD study of 12,000 kids, there's no way that all 12,000 kids are exposed to the same thing. They're all looking at different stuff. But what they are exposed to is the same features, and so...

BY MR. DAVIS:

Q. Is it your opinion that it's the -- one of the issues that you have with the defendants' social media platforms that you say cause the mental health outcomes in

Page 267

your report is that those platforms use means to time and cluster notifications in a -- of messages in a way that promotes addiction and other mental health outcomes?

A. I think broadly, Todd, I think all of these features coalesce together to drive the harms. It's kind of challenging to hypothetically disambiguate or disaggregate one feature from another, because they do manifest together, and a lot of studies haven't -- a lot of studies have assessed them together.

Q. Is there any place in your report that you identify an opinion that the defendants' platforms increase the risk of third-party harms such as predation, sextortion, or bullying?

A. I can check, briefly. Where I identify the risk of third-party sextortion, bullying --

Q. And predation.

A. I think there's some things in here about bullying. If you're going to ask me to point to a study, I -- I'll read through it, but I think the data about

Page 268

bullying in particular.

Q. What about for predation or sextortion? Do you have anything about that in your expert report or opinions?

A. I can't recall a study off the top of my head right now about third-party predation in my report. I think that -- I think the third-party content, it coexists with the features of the platforms, right? And so I think that's how a lot of studies have addressed this.

Q. Can you identify any longitudinal or experimental study that analyzed how social media increased the risk of bullying that's in your reports?

A. Bear with me a second, please.

Q. Mm-hmm.

[Document review.]

BY MR. DAVIS:

Q. Any such study, Dr. Murray?

A. I'm just trying to reflect here. I'm still going, but I can say I'm not recalling a study right now.

Q. Okay.

A. Outside the link, I think of

Page 269

the data around bullying I just mentioned, but there's nothing on sextortion here.

Q. Or predation?

A. I can't recall off the top of my head.

Q. Okay. Is there any longitudinal or experimental study that you discuss or identify in your reports that assesses child sexual abuse material that's on the defendants' platforms?

A. I can't recall off the top of my head.

Q. Is there anything in your -- any longitudinal or experimental study in your report where you discuss the defendants' platforms as providing ineffective parental controls?

[Document review.]

A. Are you talking about peer-reviewed studies, Todd, or are you talking about some of the internal documents I reviewed or just anywhere in my report?

BY MR. DAVIS:

Q. I'm talking about peer-reviewed studies of any kind.

68 (Pages 266 - 269)

CONFIDENTIAL

Page 270

A. Okay. Yeah, I'd probably have to consult my entire reliance list, but I can't recall.

Q. You don't know of one?

A. I can't recall one right now, but I'd probably want to consult my reliance list.

Q. Did anyone provide you with a list or a summary of any kind of the defendants' platform features that are immunized or not subject to liability?

MS. COUCH: Object to the form.

A. No.

BY MR. DAVIS:

Q. Did anyone provide you with a list or summary of the defendants' platform features that are not immunized or not barred from liability under the Court's rulings?

A. No.

Q. Okay. Have you ever been provided with a list of features for any of the defendants' platforms?

MS. COUCH: Object to the form.

A. I'm sorry. Somebody's coming in and distracted me.

Page 271

Have I ever been provided with a list of the features?

BY MR. DAVIS:

Q. Yes.

A. No.

Q. And in terms of the features that you take issue with, what are they?

A. I think the features that are embedded in the harms that I've discussed in my report would include the endless scroll, as they relate to this sort of intermittent sort of reward schedule.

I think the algorithm combines with that to give rise to this sort of reward-driven addictive-like behavior, this addiction.

I think also the filters can serve to enhance a discrepancy between one's current appearance and one's ideal appearance, and I think that can enhance not only an objectification of oneself but internalization oftentimes of a completely unrealistic standard.

I think the comments and likes can augment social comparison processes

Page 272

immensely because you can see explicitly the positive connotations that people are ascribing to various images.

We know that likes change the way that kids interact with content.

Let's see.

I also think that notifications tends to drive FOMO, which, again, can sort of garner and portend disruptive behavior, and in particular, anxiety and addictive behavior.

Those are the ones that are coming to me off the top of my head, Todd. I think those are the ones that are primarily addressed in my report.

Q. Okay.

A. And by filters, I mean photo manipulation as well.

Q. Any other ones -- any other features of the defendants' platforms that you take issue with, other than what you've identified for me now?

A. Could you read back my list to me?

Q. Sure. You had endless scroll,

Page 273

which you included algorithms in that, right?

A. No, I sort of separated them both. But I did say that in combination with an algorithm plus an endless scroll, that can give rise to a sort of repetitive pattern of seeking reward or addictive behavior.

Q. Okay. So there's endless scroll, algorithms, filters, comments and likes, and notifications.

Anything that needs to be added to that list?

A. Can I look at my report for a second?

Q. Sure.

A. Thank you.

[Document review.]

I appreciate your patience, Todd.

[Document review.]

A. Todd, those are the ones I can think of off the top of my head right now.

BY MR. DAVIS:

Q. And just so the record is clear, what you were doing during that time period is exactly what you describe, is that

69 (Pages 270 - 273)

CONFIDENTIAL

Page 274

you went back and you were looking through your expert report, right?

A. Yeah. I haven't finished looking through all of it, just in the interest of time. I can, though. I skimmed through some of it. I can look through all of it, but in the interest of time, those are the features that I can sort of convey now.

But if given the opportunity, I would like to just finish looking through my report.

Q. I want to leave here with a complete list. Is there another -- any other thing you want to add?

A. Okay. Can you bear with me a few?

Q. Sure. But did you come prepared to talk about your opinions today?

A. I did.

MS. COUCH: Objection, argumentative.

A. I did. I've given you a good list off the top of my head. I just -- I don't want to misrepresent my opinion. And if there's one I missed, I'd rather find it

Page 275

now. I just can't recall it. I know I spoke about them in my report. That's why I want to look at my report.

BY MR. DAVIS:

Q. Okay.

[Document review.]

MR. SCHMIDT: I'll lodge an objection to further time spent reviewing the report while running the clock, because we're not going to have time to ask our questions. So I'd like to get more time from the Court.

MS. COUCH: I think everyone in here knows what page he lists them on. And if anyone wants to direct him to it, they are welcome to. It's not a secret. And he is going to rely on all the features in both the report and the rebuttal report, of which they're all listed out, and we all know which page it is.

So we can play a game of hide and seek, and I'll let you guys decide how you divide your time.

MR. DAVIS: Well, you're

Page 276

burning my time right now, so I'm going to stop and say --

MR. SCHMIDT: I'll object to that.

MR. DAVIS: I'm going to stop and say I'm going to turn the table over to my colleagues. So let's go off the record.

THE VIDEOGRAPHER: We are now going off the record. The time is 4:02 p.m.

(Recess taken, 4:02 p.m. to 4:10 p.m. PDT)

THE VIDEOGRAPHER: We are now back on the record. This is the beginning of Media Unit No. 6, and the time is 4:10 p.m.

------------

EXAMINATION

------------

BY MR. SCHMIDT:

Q. Dr. Murray, good afternoon. I'm Paul Schmidt. I represent Meta. I'm going to be really targeted given that I have limited time, and I'll ask you to be very

Page 277

targeted in your answers, if you can.

A. Okay. Hi, Paul.

Q. Thank you. Good to meet you. Are we first name? Should I call you Stuart?

A. As you wish. Stu, Stuart. However you wish.

Q. All right. Let's question and answer like we're on a first-name basis too, is that okay?

A. Sure.

Q. All right. I put on the screen Exhibit 2, your report. Do you see that and recognize that?

And it's also in front of you on your right.

A. Oh, I'm sorry.

Q. Whichever you prefer.

Do you see that?

A. Oh, this was --

Yes, I see that.

Q. Let's go to page 160.

Do you see that on page 160 of your report, and we'll put it up on the screen as well. You have a quote from someone named Vaishnavi Jayakumar.

70 (Pages 274 - 277)

CONFIDENTIAL

Page 278

Do you see that?

[Document review.]

BY MR. SCHMIDT:

Q. My question is simply: Do you see the quote from her?

A. Yes, I see that quote from her.

Q. You also quote her on page 162?

[Document review.]

A. Mm-hmm. (Witness nods.)

BY MR. SCHMIDT:

Q. And do you see you cite her in a number of the footnotes?

A. Yes.

Q. We counted it up. There is no one you cite more in terms of a person or a document than Ms. Jayakumar in your section on Meta, correct?

A. I don't know that to be true or not.

Q. Any reason to question it? I'll make that representation. Do you have a reason to question it?

A. I don't have a reason to question it. I don't know it to be true, though.

Page 279

Q. Did you read her full testimony?

A. I read a lot of testimony. I can say I read her testimony.

Q. Did you read her full testimony?

A. A lot of testimony I read, I -- you know, I read and focused on the parts that were super relevant, and I read the other parts. I read her testimony, yes.

Q. Did you read it all? That's all I'm asking. Do you know?

A. I know -- I want to say that I sort of probably skimmed it, like a lot of testimony.

Q. Do you know how long she worked at Meta for?

A. I can't recall right now, Paul.

Q. Do you know if she was on the research team at Meta?

A. There's some feedback on the mic.

No, I know she was in -- that other person was in leadership.

Q. Do you think she was in

Page 280

leadership?

I know you say that. Do you think she was?

A. An executive.

Q. Do you know if she was an executive?

A. I'm reading from my report here. This is a -- I mean, I would -- yeah.

Q. Okay.

A. I believe that to be the case.

Q. Do you know if she was in research?

A. I can't recall.

Q. Do you know if she was in integrity or well-being?

A. I don't recall.

Q. Do you know what the difference at Meta is between integrity and well-being, if anything?

A. Sure, I know the difference between integrity and well-being. And I know a lot of names that I read, that I don't remember the names because they're not -- you know, I remember researchers' names because they're known to me or they're people I know,

Page 281

and I don't remember other folks' names because they're not known to me. I just --

Q. What is the difference between integrity at Meta and well-being at Meta?

A. I would offer generally the difference between that is one is oriented towards well-being and the other is to adherence to standards --

Q. What standards?

A. -- broadly.

Standards, adherence to that would, to me, represent integrity.

Q. What are the standards?

A. The company standards. The sort of standards around wellness, well-being, protections. That's what I would understand to be integrity. Again, some of these folks are blending together in my mind, but that's how I would sort of understand the difference between those two terms.

Q. Do you know if Ms. Jayakumar had any role in developing safety tools at Meta?

A. Let me just read a little bit, if that's okay.

71 (Pages 278 - 281)

CONFIDENTIAL

Page 282

[Document review.]

BY MR. SCHMIDT:

Q.    I'll withdraw the question.
Do you agree with me that it's important for you to be fair and unbiased in your work?

A.    Yes, I would agree with that, Paul.

Q.    Did you do anything to investigate whether Ms. Jayakumar might have a bias against Meta?

A.    I understand she's a former Meta executive. I appraised that. But yes, I think it's important to be fair and assess bias in all of the sources of data.

Q.    Why did she leave the company?

A.    I can't recall sitting here today. I read a lot of testimony by former employees, including Béjar, Arturo Béjar and others.
They're kind of blending together in my mind, because I don't recall names.

Q.    Why did Mr. Béjar leave the company?

Page 283

A.    Well, I remember he worked there twice. He was there for two periods, I believe. And I can't recall why Mr. Béjar left.

Q.    Was he full time the second time he was there or part-time?

A.    That, I can't recall either. But I know he was there twice for lengthy periods. And I know he gave some testimony again, which I read and which was pretty compelling -- compelling in regards to eating disorder harms.

MR. SCHMIDT: Move to strike everything after "That, I can't recall either."

BY MR. SCHMIDT:

Q.    Do you know if Ms. Jayakumar left voluntarily or if she was let go?

A.    It was -- I wasn't -- I was trying to appraise the -- sort of the reports. I don't recall why she left. I don't recall why Arturo Béjar left. I...

Q.    Do you know if she filed a lawsuit against the company unrelated to anything regarding teen mental health after

Page 284

she left the company, after she was let go?

A.    I don't -- I don't recall, Paul. I don't recall appraising the -- I don't recall appraising that.

Q.    Does it matter to your reliance on her opinions if she was terminated from the company for cause and then sued the company for reasons unrelated to teen mental health?
Is that a relevant fact to you in assessing your testimony? I'm just asking that "yes" or "no."

A.    Well, I think that every testimony and every source of data should be appraised.

Q.    Okay.

A.    And if there's -- and no singular piece of data here informs my opinion. It's a confluence of a lot of data.

Q.    Did you do anything to verify the accuracy of Ms. Jayakumar's testimony?

A.    I -- I mean, I looked at other internal documents. I looked -- you know, I appraised this in the context of the body of evidence and the peer-reviewed data.

Page 285

Q.    Okay.

A.    That's what I would normally do in my practice as a scientist.

Q.    Let's look at page 160 of your report, where you discuss -- where you have a long block quote from her.
And do you see that you quote this language from her where she, quote -- right before the block quote, where she, quote, explained how leadership required proof beyond a shadow of a doubt to justify safety changes.
Do you see that?

A.    Yes, I see that sentence.

Q.    Is that true, that Meta leadership required proof beyond a shadow of a doubt to justify safety changes? Do you know?

A.    I recall developing the opinion that there were harms reported, and it sounded like the engagement was prioritized. And that was not just from one source of data.
There seemed to be a confluence of sources saying that the engagement

72 (Pages 282 - 285)

CONFIDENTIAL

Page 286

mattered more than the potential harms, and I think Béjar said that too. So you look for a confluence of data sources.

Q. Yeah. I didn't, respectfully, ask about a confluence.

I'm just asking if this statement that you attribute to Ms. Jayakumar, do you have a view as to whether it's a true statement or an untrue statement, that leadership required proof beyond a shadow of a doubt?

Do you think that's true?

A. Well, the reason I'm putting that in quotation marks, that's a direct quote from Jayakumar.

Q. I get it.

Do you think it's true?

A. I think it comports with the other reports that I saw.

Q. Okay. Do you know what Project Daisy is?

A. Can you refresh my memory?

Q. It's something you cite in a footnote of your report. It might be on that page.

Page 287

A. Okay.

Q. Do you know when -- but let me ask differently.

Do you know if Meta gave consideration to giving people the option to limit like counts on Instagram?

A. Do I recall whether Meta gave people the option to --

Q. Yeah.

A. -- limit like accounts [sic]?

But I --

Q. Did that happen?

A. I don't -- I don't recall if that happened, but I know that the --

Q. Okay.

A. -- kids wanted their likes.

Q. Do you know whether the research supported limiting like counts on Instagram as a -- in terms of providing well-being benefit?

A. Let me review my report. I know there are some studies about this.

I know that, for instance, when you get more likes, it's likely to change the way the brain perceives the data; that's the

Page 288

Sherman study. We know that kids are more likely to like photos with more likes, and that drives upward negative social comparison.

MR. SCHMIDT: Move to strike as nonresponsive.

BY MR. SCHMIDT:

Q. I'm asking you about what the company did.

Did the company, to your knowledge, study whether limiting like counts would have a well-being effect, and do you know what that research showed?

A. I reviewed a lot of internal documents, Paul. I can't recall right now.

Q. Okay.

A. I'm happy to review it right now. I didn't bring that with me.

Q. Okay.

A. I brought some peer-reviewed studies with me.

Q. You talked about teen struggle with body image and eating disorders in your Meta section, correct?

A. Yes.

Page 289

Q. You talked about rabbit-holing and social comparison in your Meta section, correct?

A. Yes.

Q. Did Meta take any steps to address eating disorders, body image issues, rabbit-holing, social comparison, that you saw?

A. Well, I know they did internal surveys. There were several internal surveys. I'm --

Q. Have they changed the features to try to address those challenges?

A. But I know that what was undertaken wasn't successful that --

Q. What was undertaken?

A. That, I can't recall, Paul. I know -- I want to review this. I've had a long day here. I can review it and tell you.

But I can tell you that children -- you know, data coming out now supports the notion that children are still harmed.

MR. SCHMIDT: Move to strike everything after "I can't recall,

73 (Pages 286 - 289)

CONFIDENTIAL

Page 290

Paul."

BY MR. SCHMIDT:

Q.    Do you know if Meta restricts certain types of eating disorder content that people can see?

A.    Mm-hmm.

Q.    Yes, they do?

A.    Yes, I'm aware that some of the hashtags have been -- you know, some of the hashtags are disabled.

Q.    Where does Meta draw that line in terms of what kind of eating disorder content people can or cannot see?

A.    So I'm aware that pro-ana content -- pro-ana being anorexia -- pro-mia, pro-bulimia.  And I think that the content that is on there propagates harm.

Q.    You think the content on Meta services propagates harm?

A.    I think --

Q.    Is that what you just said under oath?

A.    I think even though those particular types of videos, those hashtags are disabled, I think it's the way that the

Page 291

features interact with the content that --

MR. SCHMIDT:  I'm going move to strike that answer as nonresponsive.

BY MR. SCHMIDT:

Q.    Do you know where Meta draws the line in terms of what -- well, strike that.

Do you know if Meta provides warnings for people who search for eating disorder-related content?

A.    There's a link to NEDA, if people search for that sort of content.  I'm aware that there's a recommendation to contact the National Eating Disorder Association, and that, I'm aware of.

Q.    Do you know what Meta's Pressure to Be Perfect campaign is?

A.    Could you remind me?

Q.    Do you know what it is?

A.    I can't recall the details of all the internal documents I read through.  Many of them -- I can read my report, Paul, but I'm feeling a little bit pressured by your -- by the time you have left, and I --

Q.    I am too.  We share that.  We

Page 292

share that, Stu.

You talked about the algorithm before.  Do you know that the algorithm varies from -- let me strike that.

You mentioned the algorithm when Mr. Davis was questioning you.  Do you recall that?

A.    I do.

Q.    Do you know that different services' algorithms are different, how they work?

A.    I think that I'm aware that each -- you know, the algorithm is proprietary.  Everyone has their own.

Q.    Do you know, for instance, if Instagram's algorithm is closer to how Twitter's works or Snapchat's works or TikTok's works in terms of its operation?

A.    I don't.

Q.    Okay.  Let me mark what --

A.    Not off the top of my head.

Q.    -- we've got flagged as 243, and this will be Exhibit 13.

(Whereupon, Murray-13, Our tools, features and resources to help

Page 293

support teens and parents, was marked for identification.)

BY MR. SCHMIDT:

Q.    I'll just ask you if you've seen this before.  I'll tell you it's a web page that lists safety features that Meta has adopted over time.

Is this something you reviewed in your work?

A.    Yes, I've seen this before.

Q.    Let's go to the second page. And do you see it says under February 2021: We launched expert-backed resources when someone searches for eating disorders or body image-related content, and in May we launched a dedicated reporting option for eating disorder content.

Do you see that?

A.    I see that.

Q.    Do you know how that dedicated reporting option works?

A.    I can't recall right now.

Q.    Do you know what expert-backed resources were launched in February of 2021?

A.    I can't recall how that --

74 (Pages 290 - 293)

CONFIDENTIAL

Page 294

yeah, that coalesces with the other documents I have in my mind right now.

Q. Let's look at April 2021.

Do you see where it says: We launched our hidden words tool to give people the option to filter DM requests containing certain offensive words, phrases and emojis?

Do you see that?

A. I see that.

Q. Beyond what you see here, do you know how that tool works?

A. I can't recall.

Q. July 2021, we launched sensitive content control which allows people to decide how much sensitive content shows up in Explore.

Do you see that?

(Interruption off the record.)

MR. SCHMIDT: I think that means I'm almost done. So let me see if I can get one or two more quickly.

BY MR. SCHMIDT:

Q. Do you see that?

A. July 21?

Q. Yeah. And, I'm sorry, I should

Page 295

have flagged this. It's the third one under July 2021.

A. Okay.

Q. I didn't realize there were multiple.

Do you see that sensitive content control?

A. Mm-hmm.

Q. Do you know the limits to how sensitive content control works?

A. I can't recall right now, Paul.

Q. Okay. Do you know that some of these features were intended to address rabbit-holing?

A. I would imagine that -- I mean, let me take that back.

I'm not -- I can't recall these -- I recall reviewing this. There's a lot of different documents I reviewed, and --

Q. Let me take one example. Let's go to page 3.

A. Okay.

Q. And there's a reference. There's a bunch in June 2022. It's the fourth one; it says: New nudges.

Page 296

Do you see that?

A. June '23?

Q. No, I might have misspoke. June '22.

It's the fourth one down: We launched new nudges for teens on Instagram.

Do you see that?

A. Okay.

Q. Do you know if that's intended to address eating disorders, social comparison and rabbit-holing?

[Document review.]

A. I mean, I'm aware that the social comparison processes are still rife on the platforms. I'm aware that the measures taken were not probably as effective as they could have been.

MR. SCHMIDT: Move to strike as nonresponsive.

BY MR. SCHMIDT:

Q. Do you know if the nudges features that we're looking at from June 2022 is intended to help address social comparison, eating disorders, and rabbit-holing?

Page 297

Do you know if that was the intent of it?

A. I can't recall.

Q. Do you know anything about how it works beyond what you see on that page?

A. Just -- yeah, I can't -- these are -- there's a lot on here. I can't recall.

I know that I reviewed this a while ago, and I can't recall. If you can provide the documents, I'd love to see it and review it right now.

MR. SCHMIDT: That's all I have. Thank you for now.

Let's go off the record.

THE VIDEOGRAPHER: We are now going off the record. The time is 4:28 p.m.

(Recess taken, 4:28 p.m. to 4:35 p.m. PDT)

THE VIDEOGRAPHER: We are now back on the record. The time is 4:35 p.m.

75 (Pages 294 - 297)

CONFIDENTIAL

Page 298

------------

EXAMINATION

------------

BY MS. PARK:

Q. Hi, Dr. Murray, my name is Ariella Park, and I'm here on behalf of Snap, the maker of Snapchat.

As you've heard, we have limited amount of time today, so I'm going to be really targeted. I would appreciate if you could do the same with your answers.

A. Okay.

Q. I think you previously stated in your June deposition that you'd never used Snapchat before.

Is that still true?

A. I stated I can't recall, I think. I said that I don't have an account that I know of or use.

I did say that I was aware of it and have been on it to sort of ascertain how the features interacted and just to corroborate what my patients tell me.

Q. But your usage of Snapchat hasn't changed since that testimony; is that

Page 299

right?

A. Correct.

Q. Do you know how much time Snapchat users spend messaging their friends on the app versus on content surfaces, like Spotlight and Discover?

A. Gosh. Off the top of my head, I don't -- I don't know that, Ariella.

Q. You don't know?

Did you ask for that data?

MS. COUCH: Object to the form.

A. I -- I don't recall.

BY MS. PARK:

Q. You don't recall.

So fair to say that you're offering your opinions in this case without actually knowing how much time users spend on different features of the app. Is that fair?

A. I'm offering my opinions in this case based on a wealth of data. And what's demonstrated in the peer-reviewed literature is that the sort of psychological nature of the relationship is very important alongside time on the app.

And so I -- I reviewed all of

Page 300

those data. I think they're both valuable metrics.

Q. Sure.

But you didn't look -- in that data, you didn't look at the amount of time that users actually spend on different features of the Snapchat app; is that correct?

A. Again, I think just sitting here today, I can't recall. I know I reviewed a lot of data, and I sort of considered all of it.

Q. Okay. But you can't recall today one way or another whether you actually looked at time spent by users on different Snapchat features.

MS. COUCH: Object to the form.

A. I can't, sitting here today, recall all of the documents that I saw. There were many of them.

BY MS. PARK:

Q. Dr. Murray, I'm asking you a very specific question.

Can you recall looking at any time spent data by users on different

Page 301

Snapchat features?

A. I mean, I want to point out that my opinion is based on that everything I reviewed. And as I'm sitting here now, now I'm just telling you that I can't recall. I can't recall that.

Q. Okay. Thank you.

Would you agree that understanding how a user actually uses an app could affect how that app impacts their mental health?

A. I think how a user experiences rather than uses -- I think that's more of a subjective sort of experiential account of the app.

I think both are salient, but what we know is that in terms of the harms rendered, the psychological relationship with the app is important, and that stems from -- you know, from features.

Q. And so the last thing you just said was the psychological relationship stems from the features.

So you would agree that the way that the users actually use the features

76 (Pages 298 - 301)

CONFIDENTIAL

Page 302

affects the psychological experience; is that right?

A. Again, I --
Could you rephrase your question or ask it again? I'm sorry.

Q. Sure. I'll ask you again.

A. Yeah.

Q. So would you agree that the way that users actually interact with features on the app affects the psychological experience of the app for the user?

MS. COUCH: Object to the form.

A. Like, if -- if they're experiencing the high degree of distress stemming from certain features, that's important to know.

BY MS. PARK:

Q. Right. And the more that a user spends time with a feature that might cause distress, that might change the way a user experiences distress, right?

A. Again, I think that in some cases the time versus the distress are consistent and they marry up with one another, and I think in others cases there's

Page 303

a discrepancy.
And I've seen a great deal of distress being caused by less time than other people who use certain features for more time. But I think all of this is what I would want to sort of -- would want to consider.

Q. Is it your testimony that you don't think that how a user actually uses the app affects the experience of the app?

MS. COUCH: Object to the form.

A. That's not what I stated, I don't think. Can you say that again.

BY MS. PARK:

Q. So is it your testimony that you don't think how a user actually uses their app affects the user's experience of the app?

MS. COUCH: Object to the form.

A. Your question is a double-negative. It's tripping me up a little bit.
Your question essentially is does how a user interact with the app shape their experience on the app?

Page 304

BY MS. PARK:

Q. Yes.

A. I think that that's part of what shapes their experience on the app and part of the reason that they're oftentimes pulled into the app more. Sure.

Q. And you're not aware that the majority of time that users spend on Snapchat is actually spent on the messaging and camera features; is that right?

MS. COUCH: Object to the form.

A. I can't recall those data, but I can recall people saying that the camera app is incredibly debilitating for them.
Most of my patients say when they open it, it's selfie straightaway and they get very, you know, distressed by that. I don't know the data of particular usage off the top of my head.

MS. PARK: And I'm going to move to strike everything after "I can't recall those data" as nonresponsive.

BY MS. PARK:

Q. In your literature review, did

Page 305

you find any studies that examined the impact of the Snapchat messaging feature specifically?

A. Let me refer back to my report.

Q. In the interest of time I'm going to represent to you that when I reviewed your report, I didn't see any studies that looked at the Snapchat messaging feature specifically.
Does that sound right?

A. I can't agree with that without reviewing my report. I would have to review it. I know that I reviewed studies of Snap, and I can't agree or disagree with that. I'd have to review my reliance list.

Q. But can you recall any study off the top of your list -- off the top of your head right now that looked at Snapchat messaging features?

A. Again, with the important notion that my opinions are based on everything I reviewed and there was a lot off it. I tried to bring what I thought would be helpful studies today.
I can't recall off the top of

77 (Pages 302 - 305)

CONFIDENTIAL

Page 306

my head right now, but, I mean, I will review anything you show me, and I will -- I'm certain there are Snap studies in there.

Q. You're certain there are Snap studies generally, but you can't recall if there's any specific study about the Snapchat messaging feature specifically, right?

MS. COUCH: Object to the form.

A. What I'm saying is that I'm aware that I reviewed several studies that include Snap, and when you study Snap, you're inherently studying all of the features of Snap.

You don't really as a scientist disambiguate feature by feature. You tend to look at the overall usage, which is all the features combined.

So I'm sure that a little bit took place if there was one particular study that disaggregated that feature.

BY MS. PARK:

Q. Okay. I'm going to switch tracks now and just briefly ask you if you could look at your May report. I think that's Exhibit 2. Or, actually, maybe -- I

Page 307

won't --

Do you recall using the term "Snapchat dysmorphia" in your report? It's on page 95 at paragraph 198.

A. Thank you.

Q. Do you see there's a reference to "Snapchat dysmorphia," the term?

A. Yes, I see that.

Q. Would you agree that Snapchat dysmorphia is not a clinically -- does not have a clinically validated or standardized definition?

A. I think what that is alluding to is dysmorphic-like dissatisfaction with one's appearance based on the discrepancy between one's filtered self and one's actual self. That's how I understand that term to be used.

MS. PARK: All right. Respectfully, I will strike that answer as nonresponsive.

BY MS. PARK:

Q. My question is: Are you aware -- or you agree that Snapchat dysmorphia does not have a clinically

Page 308

validated or standardized definition. Right?

A. I would suspect that is a broader feature of a broader body dysmorphic presentation.

There is no diagnostic category called Snapchat dysmorphia, but it's trying to illustrate that this can promote a discrepancy between one's current and actual image and preoccupation with the deficit that they perceive.

MS. PARK: I'm going to move to strike everything after "There is no diagnostic category called Snapchat dysmorphia."

BY MS. PARK:

Q. Have you ever diagnosed any patient with Snapchat dysmorphia?

A. Again, how I come to understand it is it's a feature of body dysmorphic disorder.

I have never diagnosed anybody with Snapchat dysmorphia, but I think what this is trying to get at is the preoccupation with one's perceived defect in appearance.

MS. PARK: Again, I'll move to

Page 309

strike everything after "I've never diagnosed anybody with Snapchat dysmorphia" as nonresponsive.

Thank you for your time.

THE WITNESS: Thank you.

MS. PARK: And go off the record.

THE VIDEOGRAPHER: We are now going off the record. The time is 4:46 p.m.

(Recess taken, 4:46 p.m. to 4:50 p.m. PDT)

THE VIDEOGRAPHER: We are now back on the record. The time is 4:50 p.m.

------------

EXAMINATION

------------

BY MR. KROMPIER:

Q. Dr. Murray, my name is Jesse Krompier. I represent the YouTube defendants.

A. Hey, Jesse.

Q. Nice to meet you.

A. You too.

Golkow Technologies,
A Veritext Division
877-370-3377                                                  www.veritext.com

CONFIDENTIAL

Page 310

Q.    In rendering your opinions, did you make any effort to separate out claims based on YouTube's product features as opposed to claims based on the content itself on YouTube?

MS. COUCH:  Object to the form.

A.    Did I separate out the --

Can you repeat that?  Sorry, Jesse.

BY MR. KROMPIER:

Q.    Did you make any effort to separate out the claims in that case based on YouTube's product features versus the content on YouTube?

A.    You mean the claims --

MS. COUCH:  Object to the form.

A.    -- rendered in this case?

BY MR. KROMPIER:

Q.    Yes.

A.    Did I separate those out by defendants?  I'm not quite clear what --

Q.    By YouTube's product features, such as autoplay, recommendations, algorithm, versus the content of YouTube videos?

A.    It's hard to do that.  We know

Page 311

that lots of the studies that have assessed these things are content agnostic, so they're -- my opinion is that they're -- the unified theme is these features.  We know that the data would support a centrality of the features in driving the harms.

Q.    What do you mean by content agnostic?

A.    Well, a lot of these studies study very different children, and they don't code for what type of content they're viewing.  And the times that they've documented in some of the studies I have referenced don't all emanate from the same content at all, so it seems that they're content agnostic.

They're not looking a children with a specific type of content.  That's what I mean by content agnostic.

Q.    So when you're saying they don't code for content, does that mean that they're not looking at content at all?

A.    That means they're not selecting people for inclusion in their studies based on a specific type of content,

Page 312

and it certainly is not my understanding that every single person in a study has viewed the exact same durations and contents in all these things.  It seems more like it's the features to me.

Q.    You would agree that the people in those studies are viewing content, right?

A.    Yes, I would agree that the people in the studies that were harmed had been documented viewing content on platforms which also include features.

Q.    Features and content, correct?

A.    Features and contest, yes, I would agree with that.

Q.    And in the studies that you're referring to, they did not consider the content, correct?

A.    A lot of the studies I reviewed are what I would call content agnostic.

Q.    Are you offering any opinion that any specific YouTube feature was defectively designed or that there existed a safer alternative design?

MS. COUCH:  Object to the form.

A.    I -- I'm essentially offering

Page 313

the opinion that these features rendered harm as a result of the studies I've reviewed. That's my opinion.

BY MR. KROMPIER:

Q.    Have you offered any alternative design to any specific YouTube feature in your report?

A.    I don't recall offering specific alternative design suggestions in my report.

Q.    Your report does not evaluate what warnings or disclosures YouTube communicates to its users, right?

A.    My report primarily documented and investigated the impacts of YouTube writ large on young people alongside other -- other social media platforms.

Q.    But you're not offering any opinions regarding warnings that YouTube offers, correct?

A.    I mean, I'm aware that, you know, the platform as it exists today, is very harmful.

I know our time is limited, but we can -- you know, we get referrals all the

CONFIDENTIAL

Page 314

time about children that are addicted to YouTube.

Q. Okay. Anywhere in your report do you offer an opinion about the warnings that YouTube offers to its users?

A. In my report, my opinion essentially is related to the harms caused by social media platforms. I don't recall offering opinions on the efficacy of one or that they're not as effective as they currently exist today. That's my broad...

Q. Okay. I'm marking as the next exhibit, Exhibit 14.

(Whereupon, Murray-14, Contemporary Screen Time Modalities among Children 9-10 years old and Binge-Eating Disorder at One-Year Follow-Up: A Prospective Cohort Study (Nagata), was marked for identification.)

BY MR. KROMPIER:

Q. This is a study from 2021 called Contemporary Screen Time Modalities Among Children 9 to 10 Years Old and Binge Eating Disorder at One-Year Follow-Up: A

Page 315

Prospective Cohort Study.

Do you recognize this study, Dr. Murray?

A. Yes, I do. Yes, I do.

Q. You were one of the authors of this study, correct?

A. I was.

Q. When were you engaged by plaintiffs' counsel in this case?

A. Oh, gosh. I don't -- I don't recall. I don't --

Q. What year?

A. Probably -- probably, like, maybe like a year and a half ago.

Q. About 2024?

A. Possibly. Yeah.

Q. And what year was this study?

A. This was 2021.

Q. This was before you were engaged for this litigation, correct?

A. I would say this is before I was engaged in this litigation, yes.

Q. Okay. If you'd please turn to page 10. Table 1.

And under Screen Time

Page 316

Variables, do you see Videos (e.g. YouTube)?

A. Mm-hmm.

Q. And then below that you see social networking, right?

A. Yes, I see that.

Q. Why did you split out YouTube from social networking?

A. I think that was the way that the parent ABCD study did this, so I didn't collect these data. Just these were data derived from this ABCD study, which is an NIH-funded nationwide publicly available cohort. I think we borrowed their categorization at that time.

You know, I can tell you that the more subsequent studies have sort of categorized YouTube differently, as a social media platform, given their common features. But at this time I think that was based on the ABCD conceptualization.

Q. Okay. But there was before you were engaged by plaintiffs' lawyers, correct?

A. This was in 2021, correct.

Q. And go to page 6 of that study, please.

Page 317

Is it correct that you did not find any causal relationship between YouTube use and mental health harm in 2021?

A. You said page 6?

Q. Yep.

[Document review.]

A. I mean, this particular study supports all forms of screen time were associated with prospective harms.

MS. COUCH: And we're at time, Jesse.

MR. KROMPIER: Okay. We're out of time, based on the record, but we reserve rights to ask further questions about this as appropriate.

So we'll go off the record for now.

THE VIDEOGRAPHER: We are now going off the record. The time is 4:59 p.m.

(Recess taken, 4:59 p.m. to 5:10 p.m. PDT)

THE VIDEOGRAPHER: We are now back on the record. The time is 5:10 p.m.

80 (Pages 314 - 317)

CONFIDENTIAL

Page 318

MR. DAVIS: Sara, before you begin your questioning, is it fair to say that one objection for a defendant counts for all defendants?

MS. COUCH: Yes.

MR. DAVIS: Thank you.

------------

EXAMINATION

------------

BY MS. COUCH:

Q. Dr. Murray, I have just a couple of questions for you.

First of all, did you consider defendant documents as one of many inputs for your opinions?

A. Yes.

Q. Has anything changed about your opinions as expressed in your reports based upon questioning by the various defense counsel today?

MR. KROMPIER: Objection, form, leading.

A. No.

BY MS. COUCH

Q. Did your materials considered

Page 319

list that you've attached to your reports contain studies that did not find an association between social media and various mental health harms?

A. Yes.

MR. KROMPIER: Objection, form, leading.

BY MS. COUCH:

Q. I'm going --

MR. KROMPIER: Please give me a second to lodge an objection.

A. Yes.

BY MS. COUCH:

Q. I'm going to hand you some that we have premarked as Exhibits 15, 16, 17, and 18.

Will you take a look at those and confirm that those are negative studies that you have considered in your analysis?

MR. KROMPIER: Sorry, Counsel, which exhibits are which here?

(Interruption by the court reporter.)

(Whereupon, Murray-15, Psychology of Popular Media

Page 320

(Ferguson), was marked for identification.)

MS. COUCH: For the record, Exhibit 15 is Psychology of Popular Media.

(Whereupon, Murray-16, Like This Meta-Analysis: Screen Media and Mental Health (Ferguson), was marked for identification.)

MS. COUCH: Exhibit 16 is Like This Meta-Analysis: Screen Media and Mental Health.

(Whereupon, Murray-17, A meta-analysis of the association between adolescent social media use and depressive symptoms (Ivie), was marked for identification.)

MS. COUCH: Exhibit 17 is A meta-analysis of the association between adolescent social media use and depressive symptoms.

(Whereupon, Murray-18, Teenagers, screens and social media: A narrative review of reviews and key studies (Orben), was marked for

Page 321

identification.)

MS. COUCH: And Exhibit 18 is Teenagers, screens and social media: A narrative review of reviews and key studies.

BY MS. COUCH:

Q. Do you see those in front of you?

A. Yes.

Q. And you considered those in your -- reaching your opinions today?

MR. KROMPIER: Objection, form, leading.

A. Yes.

MS. COUCH: That is all my questions that I have for you, Dr. Murray.

MR. DAVIS: I just have a handful, if that's all right?

THE VIDEOGRAPHER: We are now going off the record. The time is 5:12 p.m.

(Recess taken, 5:12 p.m. to 5:13 p.m. PDT)

THE VIDEOGRAPHER: We are now back on the record. The time is

81 (Pages 318 - 321)

CONFIDENTIAL

Page 322

5:13 p.m.

------------

EXAMINATION

------------

BY MR. DAVIS:

Q.    Dr. Murray, you were asked questions about four articles that showed -- or studies that showed no association between social media use and the mental health outcomes that you claim social media use causes, correct?

A.    Correct.

Q.    One of those studies is an experimental study by Chris Ferguson, correct?

A.    Let me pull that up.  That is correct.

Q.    And, in fact, the other study is another experimental study by Chris Ferguson and others, correct?

A.    Let me verify this is an experimental study.  I just have the first author.

Which one were you referring to?  On the first Ferguson study?

Page 323

Q.    Both the Ferguson studies are experimental studies, correct?

A.    One is a meta-analysis.

Q.    Of experimental studies, right?

A.    But that's an experimental study, but this one is a meta-analysis, and --

Q.    Doctor, let me see if I can shorten this -- short-change this.

Dr. Murray, neither -- none of the articles that you've identified that were handed to you by plaintiffs' counsel were actually longitudinal studies that assess whether or not social media use causes some mental health outcome or symptom.  True?

A.    I'd have to look at them.

Q.    Well, Ivie is a cross-sectional study, true?

MS. COUCH:  We're at time.

BY MR. DAVIS:

Q.    Ivie is a cross-sectional study, true?

A.    I-V?

Q.    Ivie, I-V-I-E, one of the studies that you --

Page 324

A.    Oh, I'm sorry.  I thought you meant independent variable.

MS. COUCH:  Todd, we are at time under the Judge's order.  We're actually over time, but I let him finish the question that was pending.

THE WITNESS:  You said IV was an experimental study?

MS. COUCH:  Dr. Murray, we're out of time.

THE WITNESS:  I'm sorry.

BY MR. DAVIS:

Q.    Dr. Murray, I want you to identify for us here today any longitudinal study that you looked at that found no association between social media use and mental health outcomes that you claim are caused by social media use?

MS. COUCH:  The general deposition is at time, per the Judge's order.  In fact, it went over time, and so we are concluding the questioning.

MR. DAVIS:  You're telling me that he can't answer a single question

Page 325

that will take five seconds?

MS. COUCH:  No, I am telling you that because I've already given you an additional 35 seconds and two questions.

MR. DAVIS:  Let me -- let the record reflect that Dr. Murray has failed to identify a single longitudinal study or -- and he has failed to identify the host of studies that found no association between social media use and mental health outcomes, and none of the change -- none of those studies changed that.

MS. COUCH:  Let the record reflect that the counsel's soliloquy is not evidence.

MR. DAVIS:  Well, it would have been evidence if you would have let me ask the witness one question and get one answer.

For the record, the defendants reserve on our time as reflected in the discussion and of the nonresponsiveness of the witness.

82 (Pages 322 - 325)

CONFIDENTIAL

Page 326

MS. COUCH: And for the record -- really quick, Chris -- the MDL plaintiffs' counsel would oppose. The record speaks for itself, and we think we were -- we fulfilled all our obligations under the rules. All right. Continue.

MR. DUNBAR: Chris Dunbar for the State of Tennessee. Just one quick soliloquy.

Dr. Murray has submitted an expert report in the Tennessee litigation which is substantially identical to portions of his MDL report.

On July 29, 2025, the Davidson County Chancery Court ordered Meta and the State of Tennessee to make concerted good-faith and reasonable efforts to coordinate depositions of expert witnesses in this litigation, with the depositions of the same experts disclosed in related litigations.

To the extent coordination

Page 327

enables the parties to take fewer depositions of shared experts, the parties shall pursue those opportunities.

Consequently, the State notified Meta of its intention to attend this deposition, and the State did so, so that Meta may examine Dr. Murray about his opinions in the Tennessee litigation.

Between Dr. Murray's prior deposition and his deposition today, he's now been examined for more than 13 hours about the same opinions offered in the Tennessee litigation.

For the foregoing reasons, the State of Tennessee takes the position that it would be unreasonable and unduly burdensome for Dr. Murray to sit for additional Tennessee-specific deposition time, although we remain willing to meet and confer with Meta's counsel to see whether a dispute exists.

MR. SCHMIDT: We will, of

Page 328

course, meet --

Actually, do I need a mic?

We will, of course, meet and confer.

Our position is what we said before the deposition, that we're entitled to more time, at least two hours.

So I state clearly we believe that's justified by the answering to date, also by the separate disclosure in Tennessee, and by the fact that of that time you mentioned, I think Meta has had less than 20 minutes of that time to ask questions in a suit that the Tennessee Attorney General's prosecuting only against Meta.

So we are open to meeting and conferring, but our position, as communicated before this deposition and by me now, is we are entitled to more time, at least two hours, potentially more. But we'll meet and confer about that.

MS. COUCH: I think we can go

Page 329

off the record for this deposition, and then we would then pick back up with the next one.

THE VIDEOGRAPHER: We are now going off the record. The time is 5:18 p.m., and this is the end of Media Unit No. 6.

THE COURT REPORTER: Time on the record for Plaintiffs is 2 minutes.

Time on the record for Meta is 18 minutes.

Time on the record for Snap is 11 minutes.

Time on the record for TikTok is 4 hour 27 minutes.

Time on the record for YouTube is 8 minutes.

(Time noted: 5:18 p.m. PDT)

--o0o--

83 (Pages 326 - 329)

CONFIDENTIAL

Page 330

C E R T I F I C A T E

I, DEBRA A. DIBBLE, RDR, CRR, CRC, Notary Public, do hereby certify:

That STUART B. MURRAY, MSc, DClinPsych, PhD, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness;

That pursuant to FRCP Rule 30, signature of the witness was not requested by the witness or other party before the conclusion of the deposition;

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto ...ay of August, 2025.

_____
Debra A. Dibble
Fellow of the Academy of Professional Reporters
Registered Diplomate Reporter
Certified Realtime Reporter
California CSR #14345

Page 331

I HEREBY CERTIFY that I have read this transcript of my deposition, and that this transcript accurately states the testimony given by me, with the changes or corrections, if any, as noted.

X _____
STUART B. MURRAY, MSc, DClinPsych, PhD

Page 332

ERRATA SHEET FOR THE TRANSCRIPT OF:

CASE NAME: In Re: Social Media

DEP DATE:  August 25, 2025

DEPONENT:  STUART B. MURRAY, MSc, DClinPsych, PhD

Pg. Ln.  Now Reads   Should Read   Reason

X _____
STUART B. MURRAY, MSc, DClinPsych, PhD

84 (Pages 330 - 332)