**Exhibit 68**

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE GENERAL CAUSATION TESTIMONY OF PLAINTIFFS' EXPERTS**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

HIGHLY CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE: SOCIAL MEDIA ADOLESCENT  ) Case No.

     ADDICTION/PERSONAL INJURY      ) 4:22-MD-03047-YGR

5    PRODUCTS LIABILITY LITIGATION   )

                                     ) MDL No. 3047

6                                    )

     THIS DOCUMENT RELATES TO:       )

7                                    )

     ALL ACTIONS                     )

8

9

10       HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDERS

11

12

13

14

15     VIDEOTAPED DEPOSITION OF EVA H. TELZER, Ph.D.

16

17                    JB Duke Hotel

18

19                  230 Science Drive

20

21               Durham, North Carolina

22

23

24

25        Friday, August 8, 2025, 9:06 a.m.

HIGHLY CONFIDENTIAL

Page 2

1 APPEARANCES:
2 For MDL Plaintiffs:
3    BY: LANCE OLIVER, ESQ.
        KATY LAWRIMORE, Paralegal (Remotely)
4    Motley Rice LLC
     28 Bridgeside Boulevard
5    Mount Pleasant, South Carolina 29464
     843.216.9670
6    loliver@motleyrice.com
7
   For the Defendants Meta Platforms, Inc., and
8  Instagram, LLC:
9    BY: PHYLLIS A. JONES, ESQ.
        NICOLE ANTOINE, ESQ.
10       BRIAN T. REISER, ESQ.
        ALEXANDER KENNEDY, ESQ. (Remotely)
11   Covington & Burling LLP
     One CityCenter
12   850 Tenth Street, NW
     Washington, DC 20001-4956
13   202.662.6000
     pajones@cov.com
14   nantoine@cov.com
     breiser@cov.com
15   akennedy@cov.com
16
   For the Defendant Snap:
17
     BY: ARIELLA PARK, ESQ. (Remotely)
18   Munger Tolles & Olson LLP
     350 South Grand Avenue
19   50th Floor
     Los Angeles, California 90071-3426
20   213.683.9240
     ariella.park@mto.com
21
22
     (Appearances continued on next page.)
23
24
25

Page 3

1       APPEARANCES CONTINUED:
2
   For the Defendants Alphabet Inc., Google LLC, and
3  YouTube LLC:
4    BY: J. ANDREW KEYES, ESQ.
        LYDIA WEIANT, ESQ. (Remotely)
5    Williams & Connolly LLP
     680 Maine Street SW
6    Washington, DC 20024
     202.434.5584
7    akeyes@wc.com
     lweiant@wc.com
8
9  For the Defendants TikTok, Ltd.; TikTok, LLC;
   TikTok, Inc.; ByteDance Ltd.; and ByteDance, Inc.:
10
     BY: GREGORY S. CHERNACK, ESQ.
11   King & Spalding LLP
     1700 Pennsylvania Avenue, NW
12   Suite 900
     Washington, DC 20006
13   202.626.9227
     gchernack@kslaw.com
14
15     APPEARING REMOTELY:
16 Emily Jeffcott, Esq., Morgan & Morgan
   David Bonnin, Esq., Eiland & Bonnin
17 Kaylie Morgan, Esq.
18 Also Present: Matt Walters, Videographer
                 Derek Palisoul, Exhibit Technician
19
20
21
22
23
24
25

Page 4

1         I N D E X
2                        PAGE
3 EXAMINATION BY MS. JONES          6
4 EXAMINATION BY MS. PARK         168
5 EXAMINATION BY MR. KEYES        191
6 EXAMINATION BY MR. CHERNACK     221
7 EXAMINATION BY MR. OLIVER       224
8 EXAMINATION BY MS. JONES        228
9
10        E X H I B I T S
11
   TELZER
12 NUMBER      DESCRIPTION        PAGE
13 EXHIBIT 1   Expert Report of Eva Telzer,   7
       Ph.D., May 16, 2025
14
   EXHIBIT 2   Expert Rebuttal Report of Eva   8
15       H. Telzer, Ph.D., July 30,
         2025
16
   EXHIBIT 3   Invoices, Bates TELZER0001-018   8
17
   EXHIBIT 4   Common Sense Media Report      49
18       titled 2023 Constant
         Companion: A Week in the Life
19       of a Young Person's Smartphone
         Use
20
   EXHIBIT 5   Dataset titled Primary Study   63
21
   EXHIBIT 6   Burnell, et al., Paper titled  66
22       U.S. adolescents' daily social
         media use and well-being:
23       Exploring the role of
         addiction-like social media
24       use
25

Page 5

1 EXHIBIT 7   Christakis, et al., letter     70
       titled Adolescent Smartphone
2      Use During School Hours,
       Christakis, et al.
3
   EXHIBIT 8   Letter to editor titled       90
4      Filling Jobs, and Bridging the
       Blue-Collar Gap, July 4, 2025
5
   EXHIBIT 9   Vidal, et al., paper titled  127
6      Problematic Social Media Use
       or Social Media Addiction in
7      Pediatric Populations
8 EXHIBIT 11  Materials Considered List    138
9 EXHIBIT 12  Vaterlaus, et al., study    174
       titled "Snapchat is more
10     personal": An exploratory
       study on Snapchat behaviors
11     and young adult interpersonal
       relationships
12
   EXHIBIT 13  Dunn, et al., study titled "Oh  181
13     Snap!": A Mixed-Methods
       Approach to Analyzing the Dark
14     Side of Snapchat
15 EXHIBIT 14  van Essen, et al., article    187
       titled Snapchat streaks-How
16     are these forms of gamified
       interactions associated with
17     problematic smartphone use and
       fear of missing out among
18     early adolescents?
19 EXHIBIT 15  Summary of Studies on Social  224
       Media and the Brain
20
21
22     (Exhibit 10 was skipped.)
23
24
25

HIGHLY CONFIDENTIAL

Page 6

1        P R O C E E D I N G S
2              * * *
3        THE VIDEOGRAPHER:  We are now on
4 record.  Today's date is August 8th, 2025.  The
5 time is 9:06 a.m.  This is the video deposition of
6 Dr. Eva Telzer -- Telzler [sic].
7        THE WITNESS:  Telzer.
8        THE VIDEOGRAPHER:  Telzer.  Thank you.
9        Will counsel please -- we'll have
10 counsel noted on the stenographic record.
11        Can our court reporter please swear in
12 our witness.
13              * * *
14        EVA H. TELZER, Ph.D.,
15   having been first duly sworn, was examined and
16        testified as follows:
17              * * *
18        EXAMINATION
19 BY MS. JONES:
20    Q.  Dr. Telzer, good morning.
21    A.  Good morning.
22    Q.  We met, I think, almost two months ago
23 at your first deposition.  It's nice to see you
24 again.  I'm Phyllis Jones.  I'm a lawyer for the
25 Meta Platforms defendants.

Page 7

1        You are now here to testify in the --
2 the federal multidistrict litigation.  Do you
3 understand that?
4    A.  Yes.
5    Q.  And am I safe in understanding that you
6 stand behind all the testimony that you provided at
7 your deposition a couple of months ago?
8    A.  Yes.
9    Q.  Have any of your opinions changed since
10 your deposition in June of this year?
11    A.  No.
12    Q.  I'm going to hand you what we are going
13 to mark as Exhibit Number 1.
14        MS. JONES:  Here's a copy for you,
15 Counsel.  My arms are short.
16        MR. OLIVER:  I was going to say --
17 that's okay.
18        MS. JONES:  And, actually, let me go
19 ahead and mark a couple of other things, just so we
20 have it all in one place.
21        (TELZER EXHIBIT 1, Expert Report of
22 Eva Telzer, Ph.D., May 16, 2025, was marked for
23 identification.)
24 BY MS. JONES:
25    Q.  I'm also handing you what we are

Page 8

1 marking as Exhibit Number 2 to your deposition,
2 which is your MDL rebuttal report.
3        MS. JONES:  Do you need to do something
4 with this?  I was not keeping you from doing it.  I
5 just --
6        (TELZER EXHIBIT 2, Expert Rebuttal
7 Report of Eva H. Telzer, Ph.D., July 30, 2025, was
8 marked for identification.)
9 BY MS. JONES:
10    Q.  And then I am going to hand you what we
11 are marking as Exhibit Number 3 to your deposition.
12        (TELZER EXHIBIT 3, Invoices, Bates
13 TELZER0001-018, was marked for identification.)
14 BY MS. JONES:
15    Q.  So, Dr. Telzer, just to orient
16 ourselves, what you have in front of you as
17 Exhibit Number 1 should be a copy of your May 16th,
18 2025, expert report in the federal MDL litigation;
19 is that correct?
20    A.  Yes.
21    Q.  And what you have in front of you as
22 Deposition Exhibit Number 2 should be a copy of
23 your July 30th, 2025, expert rebuttal report, also
24 in the federal MDL litigation, correct?
25    A.  Yes.

Page 9

1    Q.  And then what you have in front of you
2 marked as Exhibit Number 3 should be a copy of what
3 we understand to be an updated set of your invoices
4 for the time that you have billed in connection
5 with your work in this matter; is that right?
6    A.  Yes.
7    Q.  And -- just to be clear, as to
8 Exhibit Number 3, just as we were looking at it, it
9 seemed like the additions from your first
10 deposition are reflected at Pages 17 and 18; is
11 that right?
12    A.  Yes.
13    Q.  Okay.  Let me ask you to go to
14 Exhibit Number 1, if you wouldn't mind.  And
15 Exhibit Number 1 is your principal MDL expert
16 report.
17        On the very first page of Exhibit
18 Number 1, there is a certification and what appears
19 to be your signature right underneath it; is that
20 right?
21    A.  Yes.
22    Q.  And the certification reads:  The
23 undersigned hereby certifies their understanding
24 that they owe a primary and overriding duty of
25 candor and professional integrity to help the Court

HIGHLY CONFIDENTIAL

Page 10

1 on matters within their expertise in all
2 submissions to, or testimony before, the Court.
3        Do you see that?
4    A.  Yes.
5    Q.  And it goes on to say:  The undersigned
6 further certifies that their report and opinions
7 are not being presented for any improper purpose,
8 such as to harass, cause unnecessary delay, or
9 needlessly increase the cost of litigation.
10        Do you see that?
11    A.  Yes.
12    Q.  And then the signature that appears
13 there is your signature; is that right?
14    A.  Yes.
15    Q.  Do you have an understanding, first of
16 all, Dr. Telzer, as to why you had to make that
17 certification?
18        MR. OLIVER:  Object to the form.  It
19 calls for a legal conclusion.
20        THE WITNESS:  I understand broadly but
21 not the specifics of the legal parts of that.
22 BY MS. JONES:
23    Q.  Well, tell me what you understand
24 broadly.
25    A.  I mean, I --

Page 11

1        MR. OLIVER:  Object.  Same objection.
2 She lets her lawyer speak for her on legal matters.
3        You can answer the question if you know
4 the answer.
5        MS. JONES:  Let me -- let me just --
6 Counsel, simply because I'm limited on time today,
7 your objection is noted.  I'm going to ask if we
8 minimize the speaking objections.
9 BY MS. JONES:
10    Q.  Do you have an understanding --
11        MR. OLIVER:  I'm going to protect the
12 record and my witness.
13        MS. JONES:  Okay.
14        MR. OLIVER:  Move on.
15 BY MS. JONES:
16    Q.  Dr. Telzer, did you hear my earlier
17 question?
18    A.  I think the question --
19    Q.  Do you need me to state it again?
20    A.  -- is, do I understand what is written
21 here?
22    Q.  Yes.  Well, no.  My question was not
23 "Do you understand what's written here?"
24    A.  Okay.
25    Q.  My question is:  Do you have an

Page 12

1 understanding of why you had to make that
2 certification in connection with your expert report
3 in the MDL?
4        MR. OLIVER:  Same objection.
5        THE WITNESS:  I don't know if I can
6 answer that.  I -- sorry.
7 BY MS. JONES:
8    Q.  Well, let me -- let me ask you this:
9 You signed off on that certification, correct?
10    A.  Yeah.
11    Q.  You signed off on that certification
12 with respect to both Exhibit 1, your primary expert
13 report in the MDL, and also Exhibit Number 2, your
14 rebuttal report in the MDL, correct?
15    A.  Correct.
16    Q.  Do you have an understanding of what
17 you were signing off on when you signed it?
18    A.  Yes.
19    Q.  What is that understanding?
20    A.  My understanding is what is written
21 here as it's written.
22    Q.  And you -- is your testimony that you
23 didn't have any understanding of why you needed to
24 make that certification?
25        MR. OLIVER:  I have the same objection.

Page 13

1 BY MS. JONES:
2    Q.  You can answer.
3    A.  I guess I don't understand the -- the
4 sort of law or legality behind it.  I understand
5 that I am signing what is written here.
6    Q.  To the extent that you signed off on
7 this certification, would your agreement to that
8 certification equally apply to your report and
9 opinions in the California JCCP?
10        MR. OLIVER:  Same objection.  This
11 calls for some kind of legal conclusion about
12 whether this certification has meaning in the JCCP.
13 I don't even know the answer to that right now.
14        MS. JONES:  Well, I'm not asking you
15 questions.
16 BY MS. JONES:
17    Q.  Do you -- does this -- if you -- does
18 what you signed off on here equally apply with
19 respect to the opinions and your -- that you
20 offered in the California JCCP?
21        MR. OLIVER:  I've got the same
22 objection.  She -- that is a legal question.  She
23 cannot answer that, unless you ask the question a
24 different way.
25        THE WITNESS:  I don't quite understand

HIGHLY CONFIDENTIAL

Page 14

1 what you're asking. If this specific cover was on
2 that report and I signed these sentences, then it
3 applies.
4 BY MS. JONES:
5    Q. One of the things that the
6 certification says is that you owe a primary and
7 overriding duty of candor and professional
8 integrity to help the Court on matters within your
9 expertise and in all submissions to, or testimony
10 before, the Court.
11        Do you see that?
12    A. Yes.
13    Q. Do you believe yourself to have that
14 primary and overriding duty of candor?
15    A. I believe -- I believe that I am -- can
16 I read that sentence real quick?
17    Q. Of course.
18    A. (Reading to self.)
19        Okay. And what's your question? Do I
20 believe that?
21 BY MS. JONES:
22    Q. Yes.
23    A. Yes.
24    Q. Do you similarly believe that you have
25 an obligation to the -- to the court that your

Page 15

1 report and opinions are not being presented for any
2 improper purpose?
3    A. Yes.
4    Q. Do you understand the certification
5 that you signed in connection with your MDL expert
6 report and your MDL rebuttal report to include
7 presenting to the court a balanced presentation of
8 the science and the literature that is at issue in
9 your opinions?
10        MR. OLIVER: I'm sorry. Can you let me
11 read that question?
12        Are you referring to something on the
13 certification, or are you just asking a
14 free-flowing question?
15        MS. JONES: I'm asking the witness
16 questions.
17 BY MS. JONES:
18    Q. Did you understand my question,
19 Dr. Telzer, or do you need me to repeat it?
20    A. I do need you to repeat it.
21    Q. Okay. Let me repeat my question for
22 you.
23        Do you understand the certification
24 that you provided with respect to your MDL primary
25 and rebuttal report to include an obligation to

Page 16

1 provide a balanced presentation of the science and
2 the literature that is referred to in your opinions
3 in your report?
4        MR. OLIVER: Give me a minute to
5 object. I understand this is hard, but I have a
6 lot of objections to this question.
7        The same objection. That calls for a
8 legal conclusion. That is not written in the
9 certification, so I don't know what you're asking
10 her with regard to the certification. That is
11 simply not what that certification says --
12        MS. JONES: I --
13        MR. OLIVER: -- and I object.
14        MS. JONES: Counsel --
15        MR. OLIVER: If you want to call the
16 judge, we can call the judge. This is entirely
17 improper. This is an improper line of questioning
18 for an expert.
19        MS. JONES: Well, I don't need to call
20 the judge.
21        MR. OLIVER: Okay.
22 BY MS. JONES:
23    Q. Dr. Telzer, let me ask my question one
24 more time.
25        Do you understand -- and when you --

Page 17

1 when you signed the certification that's associated
2 with your MDL report, did you understand the
3 contents of the certification?
4    A. I understand what's written here.
5    Q. Okay. Do you understand that
6 certification and your duty of candor and
7 professional integrity to include the
8 responsibility to provide a balanced presentation
9 of the science and the literature that's at issue
10 in your opinions in your report?
11        MR. OLIVER: Same objection.
12        THE WITNESS: I believe that throughout
13 my research I've done, I have done a balanced
14 review of all the literature. I don't know if that
15 is written right here as part of the obligation. I
16 don't see that sentence there.
17 BY MS. JONES:
18    Q. Okay. Do you understand the
19 certification that you've provided to the court to
20 include a responsibility that to the extent that
21 you are discussing the research on the topics that
22 are at issue in your report, that you will talk
23 about both the strengths of that research and the
24 limitations of the research?
25        MR. OLIVER: I object to the form to

HIGHLY CONFIDENTIAL

Page 18

1 the extent that calls for any legal conclusion or
2 interpretation of this certification.
3          And I also object to the extent that
4 you are mischaracterizing -- putting things in that
5 certification that are not there.
6 BY MS. JONES:
7     Q.  You can answer.
8     A.  Yeah, I just don't understand how
9 the -- I'm -- I'm -- it goes beyond what is written
10 in these sentences.  I signed these sentences,
11 which is my understanding of -- of what is here.
12          I have done a thorough review of the
13 literature.  I have looked at the benefits, and
14 I've looked at the risks.
15     Q.  And I just want to make sure I
16 understand.  So you're -- and I'm not trying to
17 fuss with you.  I'm just trying to make sure I
18 understand kind of what your understanding of this
19 certification is.
20          Am I correctly hearing you to say that
21 you didn't necessarily understand this
22 certification to require, for example, that when
23 you talk about the literature, that you talk about
24 both what the literature reflects in terms of its
25 findings, but also the limitations of the

Page 19

1 literature?
2          MR. OLIVER:  So I object to the form.
3 This has become argumentative and misleading
4 because you're putting things into the
5 court-ordered certification that aren't there.
6 BY MS. JONES:
7     Q.  You can answer.
8     A.  Yeah, I think it's the same answer as
9 before.  I -- my -- my signature here is in
10 reference to these sentences and not necessarily
11 beyond those things that you're talking about.
12     Q.  Okay.  Let me ask you to turn to --
13 we're actually going to stick with your first MDL
14 report, which includes some opinions with respect
15 to the use of social media in schools; is that
16 right?  You have to say "yes" or "no."
17     A.  Yes.  I wanted to make sure that I am
18 responding thoroughly to your question.  I mean, I
19 do include information and opinions about social
20 media in schools, yes.
21     Q.  I wanted to ask you specifically --
22 I'm actually going to ask you to turn to
23 Exhibit Number 2, which is your rebuttal report,
24 and look at Page 42 for me, if you would.
25          There's a section about midway down the

Page 20

1 page -- I guess it's Section XII -- that's entitled
2 "Social Media Creates Harms in School."  Do you see
3 that?
4     A.  I do.
5     Q.  And at Para 131, it reads:  Defendants'
6 experts claim evidence does not support that social
7 media use is occurring in schools and impairing
8 learning and attention.
9          Do you see that?
10     A.  I do.
11     Q.  And then there's a reference to a
12 couple of names, which are the names of certain
13 defense experts, correct?
14     A.  Correct.
15     Q.  And then it goes on to say:  This is
16 simply not true.  Across all available data and
17 published studies -- and then there are a number of
18 footnotes there -- combined with my own fieldwork
19 in schools, conversations with teen advisors,
20 parent groups, and direct consultation with
21 educators, I am confident in my professional
22 opinion that social media is impairing students'
23 ability to learn in schools.
24          Do you see that?
25     A.  I do.

Page 21

1     Q.  I want to ask you, first of all, about
2 this reference to conversations with teen advisors.
3 Do you see that?
4     A.  Uh-huh.
5     Q.  You have to say "yes" or "no."
6     A.  I'm sorry.  Yes.
7     Q.  That's okay.
8          What specific conversations are you
9 referring to there?
10     A.  We have multiple teen advisory boards
11 as part of our research.  We have monthly
12 conversations with them.  We are going into the
13 schools and doing focus groups with teens.  So it's
14 across multiple contexts.
15     Q.  Are the substance of those
16 conversations with those teen advisory boards
17 documented anywhere?
18     A.  No.  Well, what do you mean by
19 "documented"?
20     Q.  Written down.
21     A.  Are the conversations written down?
22     Q.  Yes.
23     A.  For the most part, not.
24     Q.  Are there -- are there any notes
25 related to the discussions that occur in the

HIGHLY CONFIDENTIAL

Page 22

1 context of these teen advisory boards?
2      A.  None that -- for which I've been
3 present for.  And I don't --
4      Q.  Are there any --
5      A.  Sorry.
6      Q.  I'm sorry to interrupt you.  Go ahead.
7      A.  Yeah, none that I've been present for.
8 And I don't know about some of our broader meetings
9 when I'm not there.
10     Q.  Are there any --
11     A.  Sorry.
12     Q.  Are -- excuse me.
13          Are there any other documents related
14 to those conversations with teen advisory boards?
15     A.  I don't think so.
16     Q.  Okay.  How many conversations are you
17 referring to in your report there?
18     A.  Specifically, in terms of conversations
19 with teen advisors?
20     Q.  Yes.
21     A.  Dozens.  We've been conducting these
22 conversations with teen advisors -- I mean, more
23 than dozens -- over many years now.  Over the past
24 two years, they've become sort of more regular and
25 intensive with regular meetings.

Page 23

1      Q.  And how many -- is it teenagers
2 themselves who are participating in the
3 discussions?
4      A.  Yes.
5      Q.  How many teenagers?
6      A.  It varies from a couple in a meeting to
7 a group of teenagers, dozens in a group.
8      Q.  And the teenagers are from where,
9 geographically?
10     A.  We have a teen advisory board from
11 New York.  We have several from across
12 North Carolina and then some specifically in the
13 schools of Chapel Hill.
14     Q.  And what -- what -- maybe let's start
15 at the most general level.  What is being discussed
16 specifically in these sessions?
17     A.  It varies.  Right now -- or in the past
18 year, the Chapel Hill school districts, for
19 example, asked us to work with them about social
20 media in school and have conversations specifically
21 about device use and social media in school.  So
22 there's been a lot of very specific conversations
23 about social media and device use during school
24 hours.
25          We also talked to adolescents in these

Page 24

1 conversations about social media more broadly.  So
2 it's not necessarily always specifically about
3 school.  But for the most part, our more recent
4 targeted conversations are about that.
5      Q.  Do you have documented anywhere the
6 names of the teenagers who participated in these
7 teen advisory boards?
8      A.  I mean, that's confidential
9 information.
10     Q.  Well, my question was not whether it
11 was confidential.  My question was:  Do you have
12 documented anywhere the names of the teenagers --
13     A.  No.
14     Q.  -- who are participating in -- you have
15 to let me finish my question.
16     A.  Sorry.
17     Q.  That's okay.
18          Do you have documented anywhere the
19 names of the teenagers who have participated in
20 these teen advisory boards?
21     A.  No.
22     Q.  If I asked you today what are their
23 names, you could not tell me?
24     A.  I couldn't tell you a single name.
25     Q.  Okay.

Page 25

1      A.  Sorry.
2      Q.  And it sounds like if I asked you,
3 like, show me notes or other documentation from
4 these sessions that you've had, there -- there are
5 no notes or documents; is that right?
6      A.  I don't have notes or -- notes from the
7 conversations I've had with our teen advisors, no.
8      Q.  Does anyone else participate in the
9 conversations besides you?
10     A.  We have -- so this is part of some of
11 our work with the Winston Center.  So we have other
12 people in those conversations as well.
13     Q.  Who are the other people?
14     A.  Many people on my team.
15     Q.  Who?
16     A.  A couple of other professors in the
17 Winston Center.
18     Q.  Who?  What are their names?
19     A.  Annie Maheux and then several of our
20 project coordinators who are involved in this as
21 well.
22     Q.  Are you relying or purporting to rely
23 on the conversations from these teen advisory
24 boards in connection with your opinions in this
25 case?

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

1     A.  Sorry.  Can you say that again?
2     Q.  Are you relying, for your opinions in
3  this case, on conversations that you've had with
4  these teen advisory boards?
5     A.  I'm not relying on those conversations
6  for my opinions, no.
7     Q.  Do you know if there's anyone else who
8  participates in these sessions, either from the
9  Winston Center or elsewhere, that preserves notes
10  of the discussions?
11     A.  I don't know.
12     Q.  Okay.  Let me ask you about the next
13  item on this list, which is parent groups.
14     A.  Uh-huh.
15     Q.  Do you see that?
16     A.  I do.
17     Q.  What specific parent groups are you
18  referring to there?
19     A.  We've done a few focus groups with
20  parents where we meet with a group of parents and
21  talk to them.
22     Q.  When you say a "few," what is a "few"?
23  What number?
24     A.  The most recent one was maybe five or
25  six parents.

Page 27

1     Q.  And I apologize because I may not have
2  been clear.  When I say -- how many of these focus
3  groups have you had?
4     A.  Oh, sorry.  Over the years, several
5  dozen.  Maybe in the past six months, two or three.
6     Q.  And I think you were saying that, at
7  least in the most recent of those focus groups,
8  there were five or six parents involved; is that
9  right?
10     A.  Uh-huh.
11     Q.  You have to say "yes" or "no."
12     A.  Yes.
13     Q.  Generally speaking, how many -- just
14  kind of on average, how many parents participate in
15  those focus groups?
16     A.  Well, usually when we do focus groups,
17  fewer is better so we can get very sort of in the
18  weeds and detailed with them.  So we try to average
19  around six to eight.
20     Q.  Is there written documentation of any
21  of the parent focus groups that you have described
22  having on the order of several dozen over some
23  period of time?
24     A.  Not that I recall.
25     Q.  And can you just help us understand?

Page 28

1  When you do the focus groups, do you go in with a
2  set of questions that you're asking people
3  specifically?
4     A.  I'm trying to remember our most recent
5  ones.  Usually, they're sort of open-ended
6  conversations where we ask parents to start with
7  some of their perspectives, and then we go from
8  there.
9          Sometimes we might have a topic, but we
10  don't come in with, like, a list of questions.
11     Q.  Okay.  So there's -- there's not --
12  there's not somewhere some list of questions that
13  you-all just use as a baseline for kicking off the
14  conversation?
15     A.  No.
16     Q.  Okay.  And in terms of coming out of
17  those parent focus groups, is -- there's no set of
18  notes or minutes recording what you-all learned?
19     A.  I don't think so.
20     Q.  Do you-all recall those conversations
21  in any other way, either -- any kind of electronic
22  means?
23     A.  I don't think so.
24     Q.  In terms of the electronic recordings,
25  would that answer apply equally to the teen

Page 29

1  advisory groups?
2     A.  Yes.  I'm trying to remember if there's
3  been times where we've recorded them.  And it's
4  possible, but I don't recall.
5     Q.  So if I wanted to know today, tell me
6  about the contents of those -- well, actually, let
7  me take a step back.
8          Do you have recorded anywhere the names
9  of the parents who have participated in those
10  parent groups?
11     A.  We get, sometimes, RSVPs.  So that
12  might be somewhere.  But I don't have at my -- I
13  don't have it, a list of parent names, no.
14     Q.  How do you identify the parents who are
15  going to participate or that you're going to invite
16  in the first place?
17     A.  It's happened in different ways.  We
18  have a parent who's part of our team who helps
19  connect us to other parents.
20     Q.  How does that parent connect you to
21  other parents?
22     A.  That parent is just well connected in
23  the community and helps advise within the schools
24  or within their network of -- of parenting groups.
25     Q.  And are these focus groups -- can you

Golkow Technologies,
A Veritext Division

HIGHLY CONFIDENTIAL

Page 30

1 tell me the name of that parent?
2       A.  I don't know if that's something
3 that's -- I should disclose.  I don't know.
4       Q.  So if I ask you, "What is the name of
5 that parent?" will you answer the question?  Or are
6 you saying you won't answer the question?
7             MR. OLIVER:  Hold on a second,
8 Dr. Telzer, and let me look at the question.
9             THE WITNESS:  Yeah, I think I can
10 answer that question.
11            MS. JONES:  She just said she thinks
12 she can answer the question.
13            THE WITNESS:  I'm pretty sure she's on
14 our website.
15 BY MS. JONES:
16       Q.  Okay.
17       A.  I just don't want --
18            MR. OLIVER:  Hold on.  Hold on.
19            THE WITNESS:  I'm sorry.
20            MS. JONES:  Excuse me, Counsel.  Let me
21 finish my statement, and then --
22            MR. OLIVER:  Do you know what, let's
23 take a little break, okay?  Do you want to take a
24 break?
25            MS. JONES:  No.

Page 31

1             MR. OLIVER:  Or are you going to let me
2 put my objection on the record?
3             MS. JONES:  Well, you're going to let
4 me finish my sentence first.
5             Dr. Telzer has indicated that she
6 believes that she can provide the name of the
7 parent.
8             Make your objection.
9             MR. OLIVER:  I've got an objection.
10 And I'm not going to tell the witness not to answer
11 because it's her decision.  I don't know the rules
12 of these parental boards.  I don't know the rules
13 of the teen advisory boards.
14            But, Dr. Telzer, if you have a
15 confidentiality concern about disclosing a parent
16 or teen's name associated with this, you can tell
17 Ms. Jones that you have that concern.
18            And we're happy to find out what the
19 confidentiality obligations of Dr. Telzer are with
20 regard to that, and we'll get back to you.
21            That's my objection.
22 BY MS. JONES:
23       Q.  Dr. Telzer, are you able to tell me the
24 name of the parent who helps you identify other
25 parents who participate in these focus groups?

Page 32

1       A.  Yeah.  I think I can.  I want to make
2 sure that their name is already on our website as
3 somebody who's willing to be, you know -- her name
4 mentioned.
5       Q.  Are you able to check that for me on a
6 break?
7       A.  I think I can --
8       Q.  You don't have to do it right now.  On
9 a break, are you able to check that for me?
10      A.  If I -- yeah, if I'm given -- I guess
11 on my phone I can --
12      Q.  Okay.
13      A.  -- try to look it up.
14      Q.  All right.  Are you relying for your
15 opinions in this case on any of the discussions
16 that you have had in the several -- I think you
17 said several dozen focus groups that you've been a
18 part of?
19      A.  Are you asking am I relying on those
20 discussions for my opinion?
21      Q.  Yes.
22      A.  I'm not relying on any single
23 discussion or all those discussions for my opinion.
24            I'm relying on the totality of all the
25 research that I've done, on my education, on the --

Page 33

1 working in the field more generally, but not in any
2 single conversation or single focus group, for my
3 opinions.
4       Q.  Sure.  I want to just make sure I
5 understand your answer.  And I -- I understand you
6 have a lot of different categories of things that
7 you might be relying on that collectively form the
8 basis for your opinion.
9             I'm specifically asking if you are
10 drawing on the contents of any of your discussions
11 during these parent focus groups for purposes of
12 your opinions in this case.
13      A.  I'm not drawing on any of those
14 conversations from the focus groups --
15      Q.  Okay.
16      A.  -- for my opinions, no.
17      Q.  Okay.  I'm sorry to step on the end of
18 your answer.
19            The last item that's listed here is:
20 direct consultation with educators.
21            Do you see that?
22      A.  I do.
23      Q.  What is that referring to specifically?
24      A.  We're currently working with dozens of
25 superintendents across the state of North Carolina

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

Page 34

1  to advise on school-based policies for social media
2  and smartphones in the school.
3      Q.  And when you say you're "currently
4  working with dozens of superintendents across the
5  state of North Carolina," what does the work
6  entail?
7      A.  Well, right now, we are sort of in the
8  discussion phase where we're meeting with
9  superintendents to hear about their concerns.
10         We are about to launch some research
11  across the state with dozens of schools across
12  North Carolina to do fieldwork within their schools
13  so that we can collect very specific data that help
14  make very scientifically informed policies within
15  the schools based on the needs within each of their
16  schools.
17     Q.  And is there anywhere documentation of
18  planning for this research that you just described?
19     A.  Any documentation --
20     Q.  Yes.
21     A.  -- for this study?  Well, this is in
22  partnership with the North Carolina Collaboratory.
23  So we created a -- basically, a proposal.  And then
24  we have an IRB which describes the methods of the
25  research.  So all of those pieces, I guess, would

Page 35

1  be considered documentation.
2      Q.  Okay.  Any communications with the
3  folks at either the North Carolina Collaboratory or
4  any of the grouping of superintendents that you
5  described that are documented in writing anywhere?
6      A.  Are the conversations documented?
7      Q.  Yeah.  Have you had any communications
8  in writing?
9      A.  Most of our communications are over
10  Zoom.
11     Q.  Okay.  And is there any documentation
12  in the form of minutes or an agenda or notes that
13  have come out of those discussions?
14     A.  Not with any of the superintendents.
15  And I'm trying to think otherwise of some of our
16  meetings whether there's any documentations from
17  our team.  I don't have any.  I don't know if any
18  of my team members do.
19     Q.  Are you relying for purposes of your
20  opinions in this case on what you describe here as
21  the "direct consultation with educators"?
22     A.  Am I relying on the direct consultation
23  with educators for my opinions?
24     Q.  Yes.
25     A.  Is that the question?  I'm not relying

Page 36

1  on any of those consultations with the educators
2  per se for my opinions.
3         My opinions are really based upon the
4  totality of everything put together and not any
5  singular consultation.  It just -- these all just
6  contribute to my broader understanding of what's
7  happening sort of in the field, so to speak.  It
8  gives me more context.  But that is not what I'm
9  relying on for my opinion.
10     Q.  And, very quickly, at the very
11  beginning of this listing of things that starts
12  with "combined with," there's a reference to "my
13  own fieldwork in schools"?
14     A.  Uh-huh.
15     Q.  You have to say "yes" or "no."
16     A.  Yes.
17     Q.  Yes.  Do you -- I had understood that
18  to be a reference to the research that you've done
19  across some number of years about the use of social
20  media by students in schools.
21         Is that correct in understanding what
22  that's a reference to, or is that a reference to
23  something else?
24     A.  I think that the -- the fieldwork in
25  schools is both sort of the research that I've

Page 37

1  done, but also going into the schools giving talks
2  to the kids and teachers and having conversations
3  that come from those talks.
4         So it's just, really, the -- the
5  broader work that I've done in the field.  I know
6  that I'm just using that same word there, but the
7  work that -- when I'm going into the schools --
8      Q.  Yeah.
9      A.  -- giving talks, doing that kind of
10  communication.
11     Q.  Can you give me a sense of the number
12  of -- kind of in this category of fieldwork how
13  many talks in schools you have done on this topic
14  of social media use in schools?
15     A.  I don't recall off the top of my head.
16  I can't recall off the top of my head.
17     Q.  Can you give me a -- just a, you know,
18  ballpark?  Is it more or less than ten?
19     A.  Maybe a dozen or so.
20     Q.  Are the schools all in North Carolina?
21     A.  Some of them are North Carolina, but
22  we'll often get -- I'll often get invitations to
23  give virtual talks.  So I've done some over Zoom.
24     Q.  Are -- are there PowerPoint decks or
25  notes that you use to give these talks?

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

Page 38

1    A.  A lot of times, there's PowerPoints
2  that I use.  Sometimes it's sort of a -- less
3  formal kind of conversation.
4    Q.  Are there -- you also mentioned
5  conversations with kids and teachers --
6    A.  Uh-huh.
7    Q.  -- earlier --
8    A.  Yes.
9    Q.  -- in terms of your fieldwork.
10      Are those conversations that are
11  happening in the context of these talks that you're
12  describing, or are those separate sessions that
13  you're having with folks?
14    A.  I think that there's probably a
15  diversity of ways in which those are happening.
16      I've gone to, for example, open houses
17  at a school where we set up a -- like, a little
18  booth in the main area.  And so we might have a
19  parent or people just coming up to us individually.
20      We've also -- after giving a talk,
21  we'll, as part of that, have conversations with
22  some of the parents.  So there's a diverse way that
23  that might happen.
24    Q.  Do you have documented anywhere, first
25  of all, the names of the parents or kids that you

Page 39

1  might have talked to in those settings?
2    A.  I don't have that documented, no.
3    Q.  Do you have notes from any of those
4  communications with the parents or kids?
5    A.  Not that I can think of.
6    Q.  Okay.  Are you -- are you relying on
7  any of those discussions that you just described --
8  more informal discussion that you just described
9  between parents and kids in these kind of open
10  house-style settings for purposes of your opinions
11  in this case?
12    A.  I would answer that similarly to the
13  other things.  I'm not relying on any conversation
14  or -- yeah, any of these conversations to form my
15  opinions.
16      I think that all of these conversations
17  in totality combined with my research with -- my
18  own research doing -- research of others, my
19  education, all of that together gives me the
20  understanding of -- and the basis of my opinions.
21    Q.  And just so I understand, if I said,
22  for example, "Provide me with documentation that
23  kind of lets us know what those conversations
24  entail," you don't have documentation of that; is
25  that right?

Page 40

1    A.  Do I have documentation of --
2    Q.  Yes.
3    A.  -- conversations with the parents at
4  open houses?
5    Q.  Yes.
6    A.  No, I do not.
7    Q.  Okay.  Turn for me in Exhibit 1 to
8  Page 148, if you wouldn't mind.
9      And, Dr. Telzer, you may or may not be
10  relieved to hear that we are not going to re-cover
11  all the ground we covered in your first deposition.
12      So we're going to talk about something
13  we didn't talk about in your first deposition,
14  which is the opinions you've offered.
15      MR. OLIVER:  Did you say Paragraph 148?
16      MS. JONES:  I said Page 148.  It's
17  Paragraph 328.
18      And I know I'm talking super fast.  I
19  was just talking too fast, so forgive me.
20  BY MS. JONES:
21    Q.  I want to talk a little bit about the
22  opinions that you've offered on the subject of
23  social media use in school, okay?
24    A.  Yes.
25    Q.  And as we understand it, starting at

Page 41

1  Page 148 of your report at Exhibit 1 and, I think,
2  running roughly to Page 164 is where you lay out
3  your opinions with the -- on the subject
4  specifically of social media use and school.
5    A.  Okay.  I see those sections.
6    Q.  And am I right in understanding, kind
7  of generally -- generally speaking, that's where
8  those opinions are clustered in your report?
9    A.  No, I don't think so.  I think my -- I
10  think this describes some of -- and I'd have to
11  look a little more to be able to answer that in
12  particular.
13      But I think that this is giving some of
14  that context, but not necessarily all of -- all of
15  it.  Nor is this, like I said, the -- the full
16  basis of my opinions.
17      Because it is based on all of the
18  research that I reviewed and my materials
19  considered list as well as my education, my work in
20  the schools and talking to educators, and the other
21  research that is reviewed throughout here that
22  contributes to some of our understanding of effects
23  in schools.
24    Q.  Okay.  Dr. Telzer, so the -- your
25  opinions with respect to the use of social media in

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 42

1  schools really focuses on gathering data around
2  smartphone use during the course of the day,
3  generally speaking.  Is that fair to say?
4        MR. OLIVER:  Object to the form.
5        THE WITNESS:  Can you ask that again,
6  please?
7  BY MS. JONES:
8     Q.  Sure.  Your -- your opinions with
9  respect to the use of social media in schools
10 are -- maybe not exclusively but include the
11 discussion of data with respect to the use of
12 smartphones by students during the course of a day?
13    A.  I think that understanding their use in
14 the schools is one sort of thing that we are
15 considering in the broader scheme of their social
16 media use and how it might be interfering with
17 their ability to focus with distractions.
18       Their social media use outside of
19 school impacts their social well-being and
20 educational well-being in school.  Their nighttime
21 use, things that are happening outside of school on
22 social media can bleed into the school day.
23       So I don't think I'm relying only on
24 the hours of the school day to come to that
25 opinion.

Page 43

1     Q.  Yeah.  I -- let me just focus you in a
2  little bit.
3        On Page 149 of your report, you, at
4  Paragraph 329, refer to:  Smartphone use during
5  school in our dataset.
6        Do you see that?
7     A.  I see that.
8     Q.  Okay.  And in connection with the data
9  that you and your colleagues have collected on that
10 topic, those -- that is data collected from phones
11 that students brought to school; is that right?
12    A.  The question is, is -- this is data --
13 is this data from phones that were brought to
14 school?
15    Q.  Yes.
16    A.  Is this data from phones that were
17 brought to school?
18       I mean, these are data collected from
19 their smartphone across the 24-hour period.  And we
20 can look at smartphone use during particular hours
21 of school instruction hours, when they were at
22 school and their phone is with them at school.
23    Q.  Sure.  And my -- my question was just:
24 These are smartphones that the students have --
25 it's just their personal smartphones that they are

Page 44

1  bringing to school with them, yes?
2     A.  Yes.
3     Q.  Okay.  And these are smartphones that
4  the schools, at least at the time, allowed them to
5  keep with them throughout the day, yes?
6        MR. OLIVER:  Object to the form.
7        THE WITNESS:  At the time of data
8  collection, there were not yet school bans on
9  smartphones.  So --
10 BY MS. JONES:
11    Q.  Well, that -- that was my -- that was
12 my question.  The -- the data that we're talking
13 about, including with respect to this discussion at
14 Paragraph 329 of your report, that relates to
15 smartphones that the schools permitted to be
16 brought in and kept throughout the course of the
17 day, yes?
18       MR. OLIVER:  Object to the form to the
19 extent that these schools had different policies at
20 different times.
21       THE WITNESS:  I don't know what the
22 schools permitted or did not permit.  Generally
23 speaking, there were not yet school bans on
24 smartphones, that we know of.
25 BY MS. JONES:

Page 45

1     Q.  Well, let's look at -- well, since
2  we're having -- let's look at what you specifically
3  wrote here.
4     A.  Yeah.
5     Q.  Okay?  Paragraph 329, you write:  In
6  2021, when adolescents were 16.48 years on average,
7  we collected objective measures of smartphone use.
8  Correct?
9     A.  Correct.
10    Q.  That's a true statement, right?
11    A.  Yes.
12    Q.  And it goes on to say:  At each hour of
13 the day, we were able to measure how much screen
14 time, notification, and pickups they had.  Right?
15    A.  Yes.
16    Q.  And just so we're clear on our
17 terminology, "screen time" is how much time the
18 students spent, essentially, using their phones,
19 yes?
20    A.  Yes.
21    Q.  "Notifications" is the number of
22 notifications that they might have received from
23 apps that were on their phone, right?
24    A.  Yes.
25    Q.  And "pickups" is how many times they

HIGHLY CONFIDENTIAL

Page 46

1 actually opened the phone up; is that right?
2    A.  Yes.
3    Q.  Okay.  Adolescents also indicated
4 whether they had gone to school each day.  Yes?  I
5 read that correctly?
6    A.  Yes.
7    Q.  Importantly, we knew the schools that
8 adolescents attended, and therefore could restrict
9 analyses to focus on hours during school
10 instruction.  Right?
11    A.  Yes.
12    Q.  And it goes on to say:  Thus, we were
13 able to compare smartphone data across school days
14 and non-school days at each hour of the day.
15       Do you see that?
16    A.  Yes.
17    Q.  Okay.  And that's an accurate
18 description of the -- the dataset that is described
19 at Paragraph 329, yes?
20    A.  Yes.
21    Q.  All right.  And it goes on to say:  We
22 also know that the schools did not have any phone
23 restrictions during school hours.  Right?  Yes?
24    A.  Yes.
25    Q.  And so to go back to my earlier

Page 47

1 question, at least with respect to that dataset,
2 you were dealing with schools that, at the time at
3 least, allowed students to bring their smartphones
4 into the school and to keep them throughout the
5 day, yes?
6    A.  I guess I'm having trouble with the --
7 the wording there, because I don't know if schools
8 allowed the kids to have their phones and keep them
9 throughout the day.
10       We do know that they did not have phone
11 restrictions, and I realize that that sounds like
12 the same thing.  But I can't necessarily say that
13 they allowed them.
14    Q.  Let me see if I can kind of parse out
15 the distinction, because I think you might be --
16 that that might be a fair distinction.
17       There was not something that the school
18 may have said that would say, "You cannot keep your
19 phone with you today."  They were not making kids
20 put their phones in a locker or in some kind of
21 little pouch, right?
22    A.  Yeah, we're not aware of any of that.
23    Q.  Right.
24       But it's not necessarily the case, it
25 sounds like -- I think this is the distinction

Page 48

1 you're drawing.  There's -- it's not necessarily
2 the case that the school was affirmatively saying
3 to people, "You may bring your phone, and you may
4 keep it throughout the course of the day"; is that
5 right?
6    A.  Generally, yes.  Yeah.
7    Q.  Okay.  All right.  You specifically
8 refer to, at Pages 148 and 149, a study by
9 Common Sense Media.  Do you see that at the bottom
10 of the page, 148?
11    A.  148, yes.
12    Q.  It says:  Common Sense Media conducted
13 a study that found that adolescents were more
14 likely to check their phone over 100 times per day.
15       Do you see that?
16    A.  I do.
17    Q.  Do you have an understanding that that
18 dataset from the Common Sense Media report was not
19 focused exclusively on the school day?
20    A.  I'd have to go back and look.  I recall
21 there being data looking at the school day.
22    Q.  Well, I -- I understand there might
23 have been data that was looking at the school day,
24 but do you understand that that specific reference
25 to 100 times a day was not necessarily based on 100

Page 49

1 times a day during the school day?
2    A.  I would have to go back and look at
3 that to be able to answer.
4    Q.  You don't know one way or the other?
5    A.  I don't recall specifically because
6 they were looking at school time use.  So I don't
7 recall for that.
8    Q.  Well, let's look at that report.  And I
9 think this is going to be Exhibit Number 4.
10       (TELZER EXHIBIT 4, Common Sense Media
11 Report titled 2023 Constant Companion:  A Week in
12 the Life of a Young Person's Smartphone Use, was
13 marked for identification.)
14 BY MS. JONES:
15    Q.  So this is for you, Exhibit Number 4.
16       MS. JONES:  This is for you.  Thank
17 you.
18 BY MS. JONES:
19    Q.  Dr. Telzer, what you have in front of
20 you is what we've marked as Exhibit Number 4 to
21 your deposition, and that is a copy of the 2023
22 Common Sense Media report that is described in your
23 expert report; is that right?
24    A.  Let me quickly look, please.
25    Q.  And if it helps you at all -- I'm not

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL

Page 50

1 trying to -- you can look at whatever you want to,
2 but on -- it looks like -- one, two, three, four --
3 maybe five pages in, right before the table of
4 contents, there's a reference to the authors --
5    A.  Uh-huh.
6    Q.  -- including Radesky, if that helps
7 kind of confirm that it is what it is.
8    A.  Yes, I see that.
9    Q.  Okay.  Let me ask you to look at Page 3
10 of the Common Sense Media report that we've marked
11 as Exhibit Number 4.
12    A.  Okay.
13    Q.  And there's -- you can see there's a
14 heading at the top that says "Key Findings."
15    A.  Yes.
16    Q.  Are you there?
17    A.  Yes.
18    Q.  And one of the key findings was, at
19 Number 1:  The smartphone is a constant companion,
20 both providing background buzz and encouraging
21 regular pickups over the more than four hours of
22 teen smartphone use on an average day.
23        Do you see that?
24    A.  Yes.
25    Q.  Let me ask you to go take a look at

Page 51

1 what appears in the third paragraph of that key
2 finding.  Do you see that?
3    A.  The bottom paragraph?
4    Q.  Yeah.  It's the paragraph that begins
5 with the word "And."
6    A.  Yes.
7    Q.  Do you see that?
8        It says:  And for most of the teens in
9 our sample, their smartphones were close at hand
10 and picked up and checked frequently throughout the
11 day.
12        Do you see that?
13    A.  I do.
14    Q.  And that reference is not specifically
15 to the school day, correct?
16    A.  Correct.
17    Q.  It goes on to say:  a median of 51
18 times per day, ranging from 2 to 498 times per day.
19        Do you see that?
20    A.  I do.
21    Q.  And there is no specific reference
22 there to the school day, correct?
23    A.  Correct.
24    Q.  It goes on to say:  Younger
25 participants (11 to 12 years old) tended to pick up

Page 52

1 their phones less frequently each day, while
2 adolescents (age 13 and older) were more likely to
3 check their phones over 100 times per day.
4        Do you see that?
5    A.  I do.
6    Q.  Is that "100 times per day" reference
7 the data that you are citing in connection with the
8 reference in your expert report at Pages 148 to
9 149?
10    A.  That looks, perhaps, where that came
11 from.  But I would need to look throughout the
12 report to see if there might be another place where
13 that's coming from.
14    Q.  Okay.  Well, let me just ask you one
15 follow-on question to that.  There's no reference
16 with respect to that particular data point that is
17 specific to the school day, correct?
18    A.  I don't recall.  But -- but I think --
19 I mean, the sentence that I have here is similar to
20 the sentence that you read here in Paragraph 3.
21 That was about the full day, and I don't specify
22 here as -- neither does the Common Sense that it's
23 during the school day.
24    Q.  Okay.  So at -- and I understand you
25 may want to look at the whole thing.  And if you

Page 53

1 need to do that, just in the interest of time, I'd
2 ask you to do it on a break.
3        But for current purposes, the reference
4 here to "100 times per day" that seems to be
5 reflected in your report does not limit itself to
6 the school day, correct?
7    A.  It appears that that is for the full
8 day.
9    Q.  Thank you.
10        Let me ask you to take a look at
11 Page 5, which is the second key finding in the
12 Common Sense Media report.  Do you see that?
13    A.  I do.
14    Q.  And that -- that key finding, actually,
15 specifically focuses on phone use during school
16 hours, correct?
17    A.  I see that, yes.
18    Q.  It says:  Phone use during school hours
19 is nearly universal but varies widely, reflecting a
20 patchwork of different school policies.
21        Do you see that?
22    A.  I see that.
23    Q.  And that -- that first para goes on to
24 say:  Smartphone use at schools is fairly
25 widespread, and it varies based on school rules,

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL

Page 54

1 teacher and staff enforcement, and student
2 compliance.
3         Do you see that?
4     A.  I see that.
5     Q.  Do you understand that to be a true
6 statement?
7     A.  Yes.
8     Q.  Including that smartphone use at
9 schools can vary based on teacher and staff
10 enforcement?
11     A.  Yes.
12     Q.  Including that smartphone use at
13 schools can vary based on student compliance with
14 any rules that might apply with respect to the use
15 of smartphones, correct?
16     A.  I -- yes, I understand that smartphone
17 use can vary based upon many things.
18     Q.  Okay.  And then they go on to actually
19 talk specifically about the school day in the next
20 sentence.  Do you see that?
21     A.  I see that.
22     Q.  It says:  During school hours
23 (Monday through Friday, 8 a.m. to 3 p.m., excluding
24 holidays), 97 percent of participants used their
25 phones, for a medium -- median of 43 minutes

Page 55

1 (ranging from less than one minute to six and a
2 half hours).
3         Do you see that?
4     A.  I see that.
5     Q.  And just so we're clear, the median
6 would be -- if you have a bunch of different data
7 points, it would be the number right in the middle;
8 is that right?
9     A.  That's correct.
10     Q.  I had to draw on my probably elementary
11 school education to come up with that.
12         Okay.  So the median number of pickups,
13 as reported here, during the school day was 13 per
14 school day, correct?
15     A.  Correct.
16     Q.  Ranging from less than 1 to 229,
17 correct?
18     A.  Correct.
19     Q.  And then it goes on to say:  The app
20 categories that took up the highest proportion of
21 time during school hours were -- were social media.
22         Do you see that?
23     A.  Yes.
24     Q.  Gaming, yes?
25     A.  Yes.

Page 56

1     Q.  And YouTube.  Do you see that?
2     A.  Yes.
3     Q.  Among participants who use those app
4 categories.  Do you see that?
5     A.  I do.
6     Q.  And even among social media, that --
7 the social media category, generally, there is not
8 a breakdown in that data amongst the different
9 social media platforms, correct?
10     A.  In this case, it's lumping it across
11 all social media use during school hours.
12     Q.  So that could include, for example,
13 Instagram or Snapchat or TikTok, yes?
14     A.  Yes.
15     Q.  But it could also include other types
16 of social media, yes?
17     A.  It can include -- I don't -- I don't
18 know how they define "social media" here.  I'm
19 guessing they collapse across all types of
20 platforms.
21         But we do know -- and whether it is in
22 this report, I would have to look -- that the top
23 apps that adolescents are using for social media
24 are Instagram and TikTok and Snapchat and YouTube.
25 So I think we can be pretty confident that the

Page 57

1 majority of that is those platforms.
2     Q.  Well, let me just be -- let me come
3 back to you on that.
4         Are you saying that you believe this
5 report includes that finding that you just
6 articulated?
7     A.  I don't recall, but that's usually the
8 case across most of these studies.  And I think
9 that the Common Sense -- I don't know if it's in
10 this report, but they certainly have shown some of
11 those stats about the sort of top social media apps
12 that are used by adolescents.
13     Q.  Now, you said that's -- it's usually
14 the case across these studies -- across most of
15 these studies that Instagram, Snapchat and TikTok
16 are the most commonly reported used social media
17 apps in terms of school use.  Is that what you were
18 saying?
19     A.  I'm saying that when one looks at
20 adolescents' social media use, the top apps that
21 are used are those platforms.
22     Q.  Sure.  And I -- I want to just make
23 sure we're on the same page.
24         You were not suggesting that the -- the
25 data suggests that -- in terms of use of social

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL

Page 58

1 media at school, that Instagram and Snapchat and
2 TikTok are consistently the most commonly used
3 social media apps in schools?
4     A. I'd have to -- I don't recall off the
5 top of my head. I think that there are data
6 suggesting that, but I don't recall an example off
7 the top of my head.
8     Q. Okay. So if -- and I -- and I just
9 want to make sure I've pinned this down. And if
10 you don't remember, that's totally fine.
11        But just so I understand, sitting here
12 today, you could not cite for me a paper that
13 says -- and we'll talk a little bit about your own
14 research and data on this.
15     A. Uh-huh.
16     Q. But you could not cite to me a paper
17 that says, during the school day, when you're
18 accounting for social media use, it is mostly
19 Instagram, TikTok and Snapchat?
20     A. I can think of a couple of papers that
21 have looked at the specific platforms that are
22 published. And I'm pretty sure I can't tell you
23 the stats off the top of my head. But there are at
24 least two publications that I'm thinking of that do
25 show that.

Page 59

1     Q. What are the two?
2     A. I think I cite Christakis's paper in
3 "JAMA." And I'm pretty sure that they show the
4 different social media platforms. And then --
5 yeah, I have that here in my report on Page 151. I
6 don't recall the details, and I'm pretty sure that
7 they're able to show the different platforms. I
8 don't recall the specifics.
9        And then other paper, Burnell, shows,
10 in JAMA Open Network, the specific platforms as
11 well.
12     Q. Okay. Any other papers that you're
13 thinking of?
14     A. I think that -- I -- I can't think off
15 the top of my head. There may be others, but...
16     Q. Okay. If we go back to your report --
17        MS. JONES: We've been going about an
18 hour. I'm happy to keep going, but if you need a
19 break, this would be a --
20        THE WITNESS: Yeah.
21        MS. JONES: -- breaking point.
22        THE WITNESS: I think a break would be
23 nice.
24        MS. JONES: Why don't we take a break.
25        THE WITNESS: Thank you.

Page 60

1        MS. JONES: Okay.
2        THE VIDEOGRAPHER: Going off the
3 record. The time is 10:00 a.m.
4        * * *
5        (Whereupon, there was a recess in the
6 proceedings from 10:00 a.m. to 10:19 a.m.)
7        * * *
8        THE VIDEOGRAPHER: Going back on the
9 record. The time is 10:19 a.m.
10 BY MS. JONES:
11     Q. Dr. Telzer, did you have an opportunity
12 during the break to determine whether or not you
13 were able to tell me the name of the parent who
14 connects you with other parents to participate in
15 the focus groups that you described earlier?
16     A. I looked on our website and --
17        MR. OLIVER: Same object -- sorry.
18 Just same objection I lodged earlier.
19        THE WITNESS: Sorry.
20        I looked on our website, and they are
21 not publicly shown on there. So I don't feel
22 comfortable disclosing their name without
23 understanding sort of what UNC's rules are and the
24 broader confidentiality of that person.
25 BY MS. JONES:

Page 61

1     Q. Okay. I appreciate you checking.
2        Let me ask you to go to Page 149 of
3 Exhibit Number 1, which is back in your primary MDL
4 report. And I'm going to direct you eventually to
5 Paragraph 329.
6     A. I'm sorry. What page?
7     Q. 149.
8        MR. OLIVER: That's where we were last
9 time.
10        THE WITNESS: Okay.
11 BY MS. JONES:
12     Q. Down toward -- this is the same
13 paragraph that's entitled "Smartphone use during
14 school in our dataset." Do you see that?
15     A. I do.
16     Q. And towards the bottom of that
17 paragraph -- it's five lines up from the bottom of
18 Paragraph 329 -- there's a sentence that begins
19 "During school instruction." Do you see that?
20     A. I do.
21     Q. It specifically says: During school
22 instruction hours -- and in parentheses,
23 (8 a.m. to 2:59 p.m.) -- adolescents spent 2.7
24 hours total on their phones.
25        Do you see that?

Page 62

1     A.  I do.
2     Q.  And it goes on to say:  That means
3 adolescents spent [sic] 39 percent of their time at
4 school on their phones distracted from learning.
5         Do you see that?
6     A.  I do.
7     Q.  Is that dataset on which that statement
8 is based -- does that include information on how
9 the students were using their phones once they had
10 them open?
11     A.  This is just their total screen use.
12     Q.  So that -- that statement there about
13 the use of phones during school instruction
14 hours --
15     A.  Yeah.
16     Q.  -- that does not account for whether
17 they were using their phones for social media
18 versus text messaging versus reading a website; is
19 that right?
20     A.  This is just their total time on their
21 phones.
22     Q.  Okay.  And I want to make -- so that
23 means we don't know during that time how the time
24 was being used; is that right?
25     A.  We don't know, but I think I go on in

Page 63

1 the next paragraph to describe some of the apps
2 that we know that they are using.
3     Q.  Dr. Telzer, I'm going to ask you about
4 Paragraph 330.  I'm actually asking you
5 specifically about the statement that appears in
6 329 that I just directed your attention to.
7         With respect to that dataset, does it
8 include data on how exactly the students were using
9 their phones?
10     A.  I think I need to answer that in the
11 same way because the following paragraph describes
12 some of the ways that they're using their phones.
13     Q.  Are those two paragraphs describing
14 different datasets?
15     A.  I would have to look back.
16     Q.  Let me hand you what we're going to
17 mark as Exhibit Number -- Exhibit Number 5.
18         MS. JONES:  Sorry my arms aren't
19 longer.
20         MR. OLIVER:  That's all right.
21         (TELZER EXHIBIT 5, Dataset titled
22 Primary Study, was marked for identification.)
23 BY MS. JONES:
24     Q.  Dr. Telzer, you have in front of you
25 what we have marked as Exhibit Number 5, which is a

Page 64

1 dataset that was produced to us in spreadsheet
2 form, I think, via your counsel.  Do you recognize
3 Exhibit Number 5?
4     A.  Yes.
5     Q.  Do you recognize Exhibit Number 5 as
6 the dataset on which this statement we've been
7 talking about in Paragraph 329 is based?
8         MR. OLIVER:  I'll just lodge an
9 objection.  And I don't know the answer to this; it
10 seems like this is just one more page.  If there's
11 more pages that she needs to look at, I would
12 object to that.  But she may know.
13         THE WITNESS:  I'm just looking more
14 carefully so I can answer that.
15 BY MS. JONES:
16     Q.  Sure.
17     A.  I recall there being another dataset I
18 shared.  This is showing the averages during the
19 school hours.  But based on the 2021, I think it
20 is.
21     Q.  And just -- Exhibit Number 5 breaks out
22 information about screen time, pickups and
23 notifications, correct?
24     A.  Screen time, pickups and notifications,
25 yes.

Page 65

1     Q.  And it breaks out that information
2 across different hours of the day, correct?
3     A.  Correct.
4     Q.  There is no information reflected in
5 this dataset with respect to how the students were
6 using their phones during that time period,
7 correct?
8     A.  Right, but -- correct, but this is data
9 that we have published extensively on in other
10 publications.  The top apps that they're using most
11 heavily are the social media, albeit I think that
12 those two datasets are collapsing across the entire
13 day showing those app usage.
14         MS. JONES:  Can we actually pull up --
15 I wasn't ask -- sorry.  I'm asking folks on this
16 side.  Can we pull up Burnell 2025?
17 BY MS. JONES:
18     Q.  Because when you're referring to the
19 dataset with respect to the top most heavily used
20 apps, you're referring to the Burnell 2025 paper;
21 is that right?
22     A.  There's multiple Burnell 2025 papers, I
23 believe.  Can I see --
24     Q.  Yes, I'm going to hand you a copy.
25     A.  Okay.

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

Page 66

1    Q.  We're pulling it out of a box.
2         MS. JONES:  Why don't we mark this as
3   Exhibit Number 6.
4         (TELZER EXHIBIT 6, Burnell, et al.,
5   Paper titled U.S. adolescents' daily social media
6   use and well-being:  Exploring the role of
7   addiction-like social media use, was marked for
8   identification.)
9  BY MS. JONES:
10   Q.  Dr. Telzer, we have handed you what we
11  have marked as Exhibit Number 6 to your deposition.
12        Do you recognize Exhibit Number 6 as
13  the Burnell paper -- Burnell and others paper
14  published in 2025 -- 2025 on U.S. adolescents'
15  daily social media use and well-being?
16   A.  Yes.
17   Q.  And is this paper the paper on which
18  Paragraph 330 in your report is based?
19   A.  I -- a minute to look through it.
20   Q.  Okay.
21   A.  I'm not seeing those stats yet.  So it
22  might take me a minute to find them.
23   Q.  Well, let me -- I want to spare you
24  having to read through the whole thing while we're
25  on the record.

Page 67

1         Let me just ask you.  Is there another
2   2025 Burnell paper that you're thinking of that
3   that reference might be connected to?
4    A.  I took that directly from a Burnell
5   2025 paper.  So I'm not -- I can't see if it's this
6   one this quickly, but it is from one of Burnell's
7   papers.
8    Q.  The -- do you know what the participant
9   group size was for the Burnell 2025 paper that
10  you're referencing at Paragraph 3000 -- excuse
11  me -- 330?
12   A.  Do I know the -- the size of the
13  sample?
14   Q.  Yes.
15   A.  Not off the top of my head.
16   Q.  Do you know if it was more or less than
17  100 participants?
18   A.  We had two -- we -- depending on the
19  paper that we are looking at, there was a couple
20  with a slightly smaller sample size and a couple
21  with a larger sample size.  So I don't recall
22  whether this is one of those.
23   Q.  Okay.
24   A.  Or which one of those that is.
25   Q.  Got it.  When you say -- let's talk

Page 68

1   about those two.  When you say a "slightly smaller
2   sample size," how big are we talking?
3    A.  I believe in the 200s, I think.  It
4   should be described in here.  I can't find it in
5   this moment, sorry.  But --
6    Q.  That's okay.  Let me ask you about
7   Exhibit Number 6 on Page 199.
8         Do you see the Participants paragraph
9   in the Method section there?
10   A.  I do.
11   Q.  And do you see that it refers to the
12  current research used data from a follow-up --
13  excuse me.  The current sample consisted of
14  103 adolescents aged 15 to 18.
15        Do you see that?
16   A.  Yes.
17   Q.  And it goes on to say in the next
18  paragraph:  Of the 103 adolescents, 94 had at least
19  one day of ecological momentary assessment data on
20  self-report social media use and subjective
21  well-being.
22        Do you see that?
23   A.  Yes.
24   Q.  And then of those 94, 71 had at least
25  one day of objective social media data.

Page 69

1         Do you see that?
2    A.  Yes.
3    Q.  Okay.  Is there any -- is there any
4   dataset that you're aware of that is larger than
5   200 adolescents that actually breaks out during the
6   course of the school day which -- whether students
7   are using social media versus some other function
8   on their phone?
9    A.  I don't recall the sample size of the
10  Christakis paper.  I believe that was over 71, but
11  I don't remember their sample size.
12   Q.  Okay.  We will come to that paper.
13        All right.  Let me take you back to
14  Exhibit Number 5, which is the -- this one, the
15  spreadsheet.  Sorry.
16        There -- there is a reference at the
17  bottom in the notes to data collected in 2021, when
18  adolescents were 16 and a half years on average.
19        Do you see that?
20   A.  Yes.
21   Q.  Do you know whether schools were still
22  closed at this point because of COVID?
23   A.  I believe this is when they were back
24  in school.
25   Q.  And when you say you "believe" that,

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

1 what is that based on?
2    A.  I -- I'm trying to think back to this
3 time point.  I remember our earlier time points we
4 collected data during remote learning.  And this is
5 one of the latter time points when, I believe, that
6 they were back in person in school.
7    MS. JONES:  Let's go to the Christakis
8 paper, if we could, please.  Okay.  This is
9 Exhibit 7.
10    MR. OLIVER:  Is this the whole thing?
11    MS. JONES:  It is.
12    MR. OLIVER:  Got it.
13    (TELZER EXHIBIT 7, Christakis, et al.,
14 letter titled Adolescent Smartphone Use During
15 School Hours, Christakis, et al., was marked for
16 identification.)
17 BY MS. JONES:
18    Q.  Dr. Telzer, what you have in front of
19 you is what we've marked as Exhibit Number 7, which
20 is, I believe, the Christakis -- the 2025
21 Christakis work that you reference in your report.
22 Is that right?
23    A.  I don't see his name on here.
24    Q.  It's at -- it's on the very last page
25 of the document.

Page 71

1    MR. OLIVER:  It's the other side,
2 Doctor.
3    THE WITNESS:  Oh.
4 BY MS. JONES:
5    Q.  Oh.  I might have handed you two of
6 them, which also complicated things.
7    A.  Yeah.
8    Q.  Let me -- yeah.  I handed you two
9 copies.  You just need the one with the sticker on
10 it.  My apologies for creating the confusion.
11    MR. OLIVER:  That's fine.
12 BY MS. JONES:
13    Q.  If you'll go to the very last page on
14 the upper left-hand side?
15    A.  Okay.
16    Q.  You see the reference to Dr. Christakis
17 up at the top there?
18    A.  Yes.
19    Q.  Okay.  And then, if you look at the
20 first page of the document -- it is a little bit of
21 an unusual format, at least for me -- there is
22 the -- on the right-hand side:  Adolescent
23 Smartphone Use During School Hours.
24    Do you see that?
25    A.  Yes.

Page 72

1    Q.  Is this the work that you are referring
2 to on, for example, Page 151 of your report at
3 Paragraph 332?
4    A.  Yes.
5    Q.  And we were talking earlier about the
6 sample size in the Christakis paper.  If we go to
7 the second page of the -- that publication -- this
8 is also reflected in your report -- it says there
9 was a sample size of 117 participants.
10    Do you see that?
11    A.  I do.
12    Q.  Okay.  Do you have an understanding of
13 the extent to which the Christakis paper that you
14 cite in your report actually includes findings
15 about when during the school day smartphone use was
16 occurring?
17    A.  I think I would need to reread it.  I
18 don't recall.
19    Q.  Okay.  Do you know whether, when the
20 papers that actually do break out use by platform,
21 including your own research, whether the research
22 is including Instagram Messenger or not?
23    MR. OLIVER:  Object to the form.  It's
24 overbroad.
25 BY MS. JONES:

Page 73

1    Q.  Use of Instagram Messenger.  I
2 apologize.
3    A.  Do I know if -- sorry.  Do I know --
4    Q.  It wasn't a great question.
5    A.  Okay.
6    Q.  Let me start again.
7    So there's -- there -- you have
8 referred to certain research that, in evaluating
9 school time use of social -- of -- of smartphones,
10 some of that research breaks it down into specific
11 social media apps that might be used by students,
12 correct?
13    A.  Correct.
14    Q.  Some of your own work has done that,
15 yes?
16    A.  Yes.
17    Q.  And, for example, some of your work has
18 broken out whether students were using TikTok or
19 Snapchat or Instagram, right?
20    A.  Correct.
21    Q.  Or YouTube, right?
22    A.  Yes.
23    Q.  In the Instagram counting, were you --
24 let's just talk about your research.
25    A.  Uh-huh.

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 74

1    Q.   Were you including Instagram Messenger
2  in -- in that Instagram bucket?
3    A.   I don't recall.  I need to go back to
4  see how that is -- is indicated in the data.  I
5  don't know.  I don't know for sure whether those
6  are differentiated or not in the way that it is
7  coded.
8    Q.   Do you have a view on whether -- in
9  terms of your opinions on the effects on teen users
10  whether there's a difference between Instagram, the
11  traditional concept of Instagram that we're
12  familiar with, and Instagram Messenger, those two
13  different functionalities?
14    A.   I think I have largely thought about
15  this sort of more holistically as the different
16  sort of functions and features underlying those --
17  the -- the platforms in Instagram.  I don't -- I
18  have not collected data, I don't think,
19  specifically on Instagram Messenger.
20    Q.   Okay.  And I -- I appreciate that.  And
21  my question may not have been very precise.
22         In terms of your opinions about the
23  effect of social media use -- and I'm focusing for
24  a minute on Instagram --
25    A.   Uh-huh.

Page 75

1    Q.   -- for purposes of this question.
2         Do you have a view that there are
3  different effects as between using Instagram and
4  using Instagram Messenger?
5    A.   I guess I didn't consider that
6  specifically in forming my opinions whether --
7  whether Instagram Messenger and Instagram more
8  generally speaking.
9         I think that the sort of basis of my
10  opinions was more really trying to understand and
11  look at the features of the different platforms
12  and, again, shared across the different platforms.
13         DM'g, so to speak, the Instagram
14  Messenger is part of what I think of when I think
15  of these platforms.  So I haven't necessarily
16  differentiated that.
17    Q.   Did you know -- do you have an
18  understanding of how, if at all, Instagram
19  Messenger is distinct from using the text messaging
20  function on your smartphone?
21    A.   My opinion is that it is distinct from
22  a text message on one's smartphone.
23    Q.   In what way?
24    A.   I mean, it's linked to the -- the
25  platforms.  So it is not, you know, merely about

Page 76

1  text-to-texting.  I think that, by being part of
2  these platforms, there's other sort of features
3  that contribute to it.
4    Q.   Do you have any awareness of the extent
5  to which teens who use Instagram are using
6  Instagram Messenger more versus the other elements
7  of the Instagram platform?
8    A.   I think probably I have seen that in
9  some of the literature.  I can't recall off the top
10  of my head.
11    Q.   You say you probably have seen it in
12  the literature.  What literature are you thinking
13  of?
14    A.   The broader literature of publications
15  on these social media platforms, potentially within
16  the internal documents.  I don't recall off the top
17  of my head, but...
18    Q.   I'm sorry.  The broader literature of
19  publications on the social media platforms
20  potentially within the internal documents.  So let
21  me just break that out into two parts.
22         It sounds like you don't -- you're not
23  thinking of a specific publication where you have
24  focused on the difference in the rates of use for
25  teens as between Instagram Messenger and the other

Page 77

1  functionality of Instagram.  Is that right?
2    A.   I can't think of a specific
3  publication, no, but I -- I -- and I don't recall
4  anything specific.  But I believe that I have seen,
5  potentially, research or stats showing Instagram
6  Messenger use versus broader Instagram use.
7         I don't know.  I'm sorry.
8    Q.   Yeah, I -- and it's okay.
9    A.   Yeah.
10    Q.   I'm just trying to make sure I -- we
11  have a handle on what you have seen or have not
12  seen.
13         When you say you -- you believe you've
14  seen, potentially, research or stats, it sounds
15  like there's nothing coming immediately to mind for
16  you concretely.  Is that fair?
17    A.   I can't recall anything specifically.
18    Q.   Okay.  And then you also described --
19  you kind of made a passing reference to internal
20  documents.
21         Is there some internal document that
22  you are thinking of where you focused on the
23  difference in the rates of the use of Instagram
24  Messenger versus the other components of Instagram
25  among teens?

HIGHLY CONFIDENTIAL

Page 78

1    A.  I can't think of anything specific.
2    Q.  In the Christakis paper that you cite
3  in your report, do you have an understanding of the
4  extent to which the authors of that paper actually
5  determined during what parts of the day students
6  might have been using smartphones?
7    A.  I believe you asked this question, and
8  I previously said I would have to go back and
9  reread it to be able to answer that.  I don't
10  recall whether they looked at the specific
11  instances within the school day.
12    Q.  Okay.  Well, let's very quickly look at
13  what we have.  This is a pretty short little paper.
14    A.  Uh-huh.
15    Q.  In Table 1, there's something entitled
16  "Descriptive Statistics of Study Sample."
17    Do you see that?
18    A.  Yes.
19    Q.  And there is, as far as I'm observing,
20  no reference to information on the time of day
21  during the school day during which students were
22  using smartphones; is that correct?
23    I'm not sure we're looking at the same
24  thing because you're looking at the document.
25    A.  Table 1?

Page 79

1    Q.  I'm -- Table 1 is on a preceding page,
2  I believe?
3    MR. OLIVER:  There's two Table 1s.
4    MS. JONES:  Oh, there are two Table 1s.
5  Tricky.
6  BY MS. JONES:
7    Q.  Okay.  I'm looking at the part of
8  Table 1 that's on Page 476.  Let me be more
9  specific.
10    Do you see any reference in Table 1 to
11  information gathered about the time of the school
12  day during which students were using their phones?
13    A.  It looks like this Table 1 is
14  descriptive.  It's about the participant sample.
15    Q.  Okay.  And then if you look at
16  Table 1 -- the carryover part of Table 1 on
17  Page 477, there is data in the -- in Table 1 with
18  respect to school-day smartphone use, correct?
19  Under that first heading?
20    A.  In Line 3 of the data?
21    Q.  Yes.
22    A.  School-day smartphone use?
23    Q.  Yes.
24    A.  Yes.
25    Q.  And then there's a reference to

Page 80

1  school-day social media use right under that,
2  right?
3    A.  Yes.
4    Q.  And -- and then above -- immediately
5  above those, there are actually reference to
6  24-hour smartphone use and 24-hour social media
7  use.
8    Do you see that?
9    A.  I do.
10    Q.  And then immediately below that,
11  there's a breakdown of smartphone application use
12  during school day -- do you see that? --
13    A.  I see that.
14    Q.  -- with the minutes.
15    And then it lays out various different
16  ways in which a student might have been using a
17  phone during the day, right?
18    A.  Yes.
19    Q.  And the first thing, the item they have
20  at the top of the list, is:  Messaging and chat.
21    Do you see that?
22    A.  Yes.
23    Q.  There is no reference in Table 1 to the
24  Christakis paper to the time of the school day
25  during which some of these students might have been

Page 81

1  making use of their phones?
2    A.  In this table, it does not reference
3  that.
4    Q.  Okay.  And then Table Number 2 has a
5  description of associations between
6  sociodemographic characteristics and school time
7  spent on smartphone, correct?
8    A.  Yes.
9    Q.  And there is no data there on how --
10  what part of the school day students might have
11  been making use of their phones, correct?
12    A.  In that table, it does not say anything
13  about the time of day.
14    Q.  And then that's -- that's essentially
15  the entirety of the paper.
16    Is there other data that you're aware
17  of associated with this paper that you've cited in
18  your report that actually breaks the data out by
19  the time of the school day in which a student might
20  have been making use of his or her phone?
21    A.  I recall there being a supplemental
22  file.  But perhaps -- the formatting of this is
23  hard to see where that would be.
24    Q.  Do you think there is a supplemental
25  file that includes information on the time of the

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

1 school day during which students might have been
2 using their smartphone?
3      A.  I don't recall.  But they do have a
4 Supplement 1 and a Supplement 2, so it's possible.
5      Q.  But you don't know sitting here today?
6      A.  I can't recall.
7      Q.  It -- is it possible that some of this
8 smartphone use might have been during a lunch hour?
9          MR. OLIVER:  Object to the form.
10          THE WITNESS:  Is it possible that some
11 of their smartphone use can be during school?  I
12 mean during lunch?  Sorry.
13 BY MS. JONES:
14      Q.  Yes.
15      A.  They are showing here during the
16 school-day smartphone use.  I believe, with being
17 able to see that there is a minimum of .04 and a
18 maximum of 5.84, that some of that could be during
19 lunch.  But that certainly bleeds out of lunchtime.
20      Q.  Is it possible that some of those --
21 some of the time that was spent on smartphones in
22 the data that's reflected here was spent during
23 noninstructional settings?
24          MR. OLIVER:  Form.
25          THE WITNESS:  I -- by

Page 83

1 "noninstructional" time, most of that would
2 probably be lunchtime or between-class time.
3          Again, it's possible that some of that
4 time occurred within that noninstructional time.
5 But by looking at the stats, especially with some
6 of the adolescents using it more, that would
7 certainly bleed into instructional time.
8 BY MS. JONES:
9      Q.  What -- could I just ask you to look at
10 table -- the second Table 1 on Page 477 of Exhibit
11 Number 7?
12          The median -- and I'm going to focus on
13 the smartphone application use -- I don't know why
14 I'm looking at that screen like I can see it -- the
15 "Smartphone application use during school day by
16 minute."
17          Do you see that heading?
18      A.  Uh-huh.
19      Q.  You have to say "yes" or "no."
20      A.  Sorry.  Yes.
21      Q.  And then there's a column for the
22 median.
23          Do you see that?
24      A.  I do.
25      Q.  And there are a number of different

Page 84

1 numbers there which reflect the median number of
2 minutes that students, at least in this sample of
3 117, would have been using their smartphone in some
4 way; is that right?
5      A.  I need to see if this is looking at
6 minutes or hours.
7      Q.  Well, I'm just looking at where it
8 says:  during school day, M-I-N.
9      A.  During -- sorry.  I don't see it.
10      Q.  It's also on your screen.
11      A.  Oh.  Oh, I see.  Okay.
12      Q.  Do you understand that to be a
13 reference to minutes?
14      A.  I -- I think so, yes.  Because the top
15 says H, so I think that is hours and this is
16 minutes.
17      Q.  Okay.  So if you look at the median
18 minutes for Instagram, it is 13.32, right?
19      A.  Yes.
20      Q.  And we're talking about 13.32 minutes,
21 correct?
22      A.  That's what that says.
23      Q.  And that means that if you have data
24 points from, let's say, all 117 of your
25 participants, there were some who were below 13.32

Page 85

1 minutes and some who were above, right?
2      A.  Half were below and half were above.
3      Q.  Yes.  And I was -- you were getting
4 ahead of me.  13.32 was right in the middle, right?
5      A.  Correct.
6      Q.  Okay.  So, certainly, the students who
7 were at 13.32 minutes or below could have been
8 using their phones during their lunch hour, right?
9      A.  It's possible that some students are
10 using their phone during the lunch hour.
11      Q.  Okay.  And the same thing with respect
12 to TikTok, for example, where the median minute is
13 9.23, right?
14      A.  It's possible that, for some
15 adolescents, they're using their phone during
16 lunchtime.
17      Q.  Okay.  And the same thing with respect
18 to Facebook, which also appears in this chart here.
19 The median minutes are 7.33 minutes, correct?
20      A.  Yes.  So that means that for half of
21 students, they're using their phone -- or for the
22 middle proportion, they're -- they're using it for
23 7.33 minutes.
24          But, again, the maximums and the median
25 is saying that half of students are higher.  And so

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1 for those, they may be using it more extensively
2 during instructional time.
3    Q.  Sure.  And I'm not -- I don't want to
4 work through all the math.  But, certainly, if your
5 median is 13.32, your maximum is not going to be so
6 high that it overtakes the entire school day,
7 right?  Because to get to 13.2 [sic] in the middle,
8 your max can only be so high, right?
9    A.  No.  That would be if this were an
10 average.  But with the median, your max can be
11 pretty high.
12    Q.  Okay.  Do you -- do you know one way or
13 the other what the upper limit is here?
14    A.  Well, you can see here with the
15 maximum.  So, yes, we know.
16    Q.  Oh, you're right.  I apologize.  Okay.
17         Okay.  Give me just a second.
18         All right.  So just to round out our
19 discussion of the Christakis paper, the 75th
20 percentile for Instagram would have been 26.42
21 minutes, correct?
22    A.  Correct.
23    Q.  And, again, we're straining my very
24 faraway education on this point.  But that means 75
25 percent of the participants would have been at or

Page 87

1 below 26.42 minutes; is that right?
2    A.  That's what that means, yes.
3    Q.  Okay.  And for TikTok, the 75th
4 percentile was 35.75 minutes; is that right?
5    A.  Yes.  That's what that says.
6    Q.  And that means for, essentially,
7 75 percent of the participants, their use would
8 have been at or below -- let's say 36 minutes.  We
9 can round it up.  Yes?
10    A.  Yes, that's what that means.
11    Q.  And the same questions for Facebook,
12 that the 75th percentile would have been 20.27
13 minutes or below for 75 percent of those folks,
14 yes?
15    A.  That's what that means, yes.
16    Q.  Okay.  And so, again, for 75 percent
17 or -- for 75 percent of the participants in the
18 Christakis study, those rates suggest that that
19 smartphone use for Instagram, for TikTok, for
20 Facebook could have occurred during a
21 noninstructional setting.  Can you agree with me on
22 that?
23    A.  I think I would -- if -- if they -- and
24 I don't recall, but if they have in their
25 Appendix 1 as broken down by the hour, I think we

Page 88

1 could answer that more precisely.
2         But based on this table alone, I don't
3 think we know when in the school day that overall
4 amount is happening.
5    Q.  Okay.  But there's -- it is entirely
6 possible that the vast majority of that time was
7 being spent during noninstructional hours.  Can we
8 agree on that?
9         MR. OLIVER:  Objection.
10         THE WITNESS:  I don't think I can
11 speculate that the vast majority.  I don't think we
12 know from this table.
13 BY MS. JONES:
14    Q.  Okay.  Let me actually ask you to look
15 at Exhibit Number 2, which is your MDL rebuttal
16 report.
17         MR. OLIVER:  Are we done with
18 Christakis for the moment?
19         MS. JONES:  Yes, I don't think we're
20 going to revisit Christakis unless you have a
21 Christakis exam you plan to conduct.
22 BY MS. JONES:
23    Q.  Do you have Exhibit 2?
24         MR. OLIVER:  I do, yes.
25         MS. JONES:  Not you.  The witness.

Page 89

1         MR. OLIVER:  Oh, sorry.
2         MS. JONES:  I also want you to have
3 Exhibit 2, but I'm --
4         MR. OLIVER:  I do.
5         MS. JONES:  -- I'm asking Dr. Telzer.
6 BY MS. JONES:
7    Q.  Okay.  Do you have Exhibit 2 in front
8 of you, Dr. Telzer?
9    A.  I do.
10    Q.  I -- I want to first ask you about a
11 specific reference on Page 17 of Exhibit Number 2.
12         In Paragraph Number 53, you describe a
13 letter to the editor that you submitted to
14 "The New York Times."  Do you see that?
15    A.  I do.
16    Q.  And you say:  As I discussed in my
17 letter to the editor to "The New York Times," it is
18 the addictive use of social media that predicts
19 whether adolescents develop suicidal thoughts.
20         Do you see that?
21    A.  I do.
22    Q.  Let's look at that letter to the
23 editor.
24         MS. JONES:  That's yours.
25         MR. OLIVER:  Thank you.

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 90

1        MS. JONES:  Yep.
2        (TELZER EXHIBIT 8, Letter to editor
3  titled Filling Jobs, and Bridging the Blue-Collar
4  Gap, July 4, 2025, was marked for identification.)
5  BY MS. JONES:
6        Q.   Dr. Telzer, you should have in front of
7  you what we've marked as Exhibit Number 8.  Your
8  letter to the editor actually appears on the
9  second-to-last page of that document.  Do you see
10  that?
11       A.   Yes.
12       Q.   And is that the letter to the editor
13  that is referred to in your rebuttal report at
14  Paragraph Number 53?
15       A.   Yes.
16       Q.   And you were responding specifically to
17  an article that had run in "The New York Times"
18  entitled "Addictive Technology Use Can Put Youth
19  Mental Health at Risk."  Do you recall that
20  article?
21       A.   Yes.
22       Q.   And I believe that article was in
23  connection with a paper that had come out in the
24  "Journal of the American Medical Association"; is
25  that right?

Page 91

1        A.   "JAMA."
2        Q.   "JAMA."
3        A.   Yeah.
4        Q.   What was it -- let me just ask you as a
5  kind of basic question.
6        A.   Uh-huh.
7        Q.   What was it that prompted you to write
8  your letter to the editor that we've marked as
9  Exhibit Number 8?
10       A.   One of our new comms directors at the
11  Winston Center is trying to ensure that we get work
12  out for the public to see, and she encouraged me to
13  write this.
14       Q.   When you say encouraged you to --
15  excuse me.  When you say you have a comms director
16  who was trying to ensure that we get work out for
17  the public to see, I'm -- I'm not sure I understand
18  what that means exactly.  What work?
19       A.   Just, we launched the new pan-campus
20  Winston Center on campus and are trying to
21  highlight the work that we're doing, highlight
22  other people's work, get more sort of out in the --
23  outside of the sort of the academic bubble of
24  getting research and science out there to the
25  public.

Page 92

1        Q.   Your deposition in this case was
2  June 12th of this year; is that right?
3        A.   That sounds right.
4        Q.   Okay.
5        A.   You mean the -- the JCCP --
6        Q.   Yes.
7        A.   -- June 12th --
8        Q.   I think it -- it was --
9        A.   Yeah.
10       Q.   -- your first and only deposition so
11  far.  Was that -- roughly, June 12th.  If you don't
12  remember the exact date, that's fine.
13       A.   Yeah.
14       Q.   Is that right?
15       A.   Yes.
16       Q.   And your letter to the editor was, I
17  believe, submitted July the 4th.  You can look at
18  the first page.
19       A.   Yes.
20       Q.   So this was published after your
21  deposition -- your first deposition, correct?
22       A.   It was.
23       Q.   By the time you had published this
24  letter to the editor in July of this year, by our
25  calculations, you had billed to plaintiffs' counsel

Page 93

1  roughly 370-odd hours of work.  Do you have any
2  reason to dispute that?
3        A.   I don't think I have a reason to
4  dispute, no.
5        Q.   And can we go to Exhibit -- what I
6  think we've marked as Exhibit Number 3, which are
7  the -- the new set of invoices that your counsel
8  produced to us.  Do you have Exhibit Number 3 in
9  front of you?  The question is, do I have Exhibit
10  Number 3 somewhere?
11       A.   Yes.
12       Q.   I have it.  I'm good.
13            And, again, just by our calculations,
14  to date, you have at least billed to plaintiffs'
15  lawyers in these cases close to $250,000.  Does
16  that seem roughly in the ballpark?
17       A.   I have not done the math.  I'm not sure
18  if -- sure, yeah.
19       Q.   Let me ask you this question:  Do you
20  have any reason to doubt that?
21       A.   I don't have a reason to doubt your
22  calculations.
23       Q.   Okay.  So as of -- and I guess this
24  is -- sitting here as of today, you have billed
25  roughly a quarter of a million dollars to the

HIGHLY CONFIDENTIAL

Page 94

1  plaintiffs' lawyers in these cases, yes?
2      A.  Sure, I'll take your word for that
3  amount.
4      Q.  And how much -- how much do you make as
5  a professor at UNC?
6      A.  I don't know the total amount off the
7  top of my head.
8      Q.  Do you have a base salary?
9      A.  I have a nine-month salary.
10     Q.  Okay.  What is your nine-month salary
11  at UNC?
12     A.  One seventy.
13     Q.  Okay.  So you have made, as a paid
14  expert in these cases, well over what your
15  nine-month salary is as a professor at UNC,
16  correct?
17     A.  Well, on top of my nine-month salary, I
18  also have summer salary and stipends that probably
19  add up to more than that amount.
20     Q.  Okay.  How much would that take you to?
21     A.  I don't know off the top of my head.
22     Q.  Okay.  When you say it's probably more
23  than the quarter of a million dollars that you have
24  billed in these cases, how much more?
25     A.  Roughly, around that amount.

Page 95

1      Q.  Okay.  So you have, as a paid expert in
2  these cases, made roughly the same amount that you
3  make in your day job, right?
4      A.  Sure.
5      Q.  Let me ask you about a specific
6  reference in Exhibit Number 3 on Page 17.
7      A.  Yes.
8      Q.  There's a reference at the very bottom
9  of the -- that Invoice Number 14 that refers to
10  "COI updates."  Do you see that?
11     A.  I do.
12     Q.  What does that refer to?
13     A.  Following the deposition, I went back
14  to the publications that did not have, based on our
15  discussion in the deposition, conflicts of
16  interests reported.  And I reached out to the
17  journals to ensure that those were on there.
18     Q.  Which -- what specific publications did
19  you go back and make a conflict of interest
20  disclosure for?
21     A.  The Flannery paper that we discussed
22  during the first deposition, and then there was
23  another one that I identified and also submitted an
24  update to that one as well.
25     Q.  Any other ones?

Page 96

1      A.  No.
2      Q.  Did you provide any explanation to the
3  journals for why you were making your update?
4      A.  I explained that it was an oversight
5  and it needed to be added.
6      Q.  Let me ask you one other just very
7  quick kind of ministerial question.  The -- on
8  Page 18, the last date is July the 29th.  Do you
9  see that?
10     A.  Yes.
11     Q.  Have you done any additional work since
12  July the 29th for which you still need to bill and
13  invoice?
14     A.  Any work after this report that -- or
15  this -- this invoice that I need to submit?
16     Q.  Yes.  After July 29th, yes.
17     A.  Nothing in July.  But starting in
18  August, there's some work.
19     Q.  Okay.  And tell me what that work has
20  been.
21     A.  It has been a couple of meetings with
22  attorneys.  Reviewing and reading things in
23  preparation for today.  Beyond what's here, I don't
24  think anything else.
25     Q.  Okay.  How many meetings with attorneys

Page 97

1  since July 29th?
2      A.  Maybe three.
3      Q.  Were they all with Mr. Oliver here?
4      A.  Yes, and Ms. Couch.
5      Q.  How long did those meetings last?
6      A.  Each one is roughly an hour.
7      Q.  And then when you say "review and
8  reading," what were you reviewing and reading?
9      A.  I looked over the MDL report that I
10  prepared.  I looked over the rebuttal I prepared.
11         I looked at some -- on Wednesday, I
12  pulled together all of the fMRI studies on social
13  media and -- fMRI -- an sort of created a table of
14  all of that work to help me sort of get a sense of
15  the full scope of all that research.
16         I think that sort of covers the things
17  that I did.
18     Q.  How many hours did all that take?
19     A.  I don't recall.
20     Q.  Was it more or less than five hours?
21     A.  More than five hours.
22     Q.  Was it more or less than ten hours?
23     A.  More than ten hours.
24     Q.  Was it more or less than 15 hours?
25     A.  I haven't calculated it.  Probably more

25 (Pages 94 - 97)

Page 98

1  than 15 hours.
2      Q.  Okay.  Was it more or less than 20
3  hours?
4      A.  Maybe around 20 hours.
5      Q.  Okay.  So since July the 29th, you
6  have, by my math, billed another 23 -- well, you
7  will eventually invoice plaintiffs' counsel for
8  another 23 hours' worth of work; is that right?
9      A.  Roughly.
10     Q.  And, again, all this is money
11 that you are being paid in your personal capacity.
12 You are not giving it back to the University of
13 North Carolina, correct?
14     A.  Correct.
15     Q.  This table that you've created and
16 produced laying out all the fMRI studies --
17     A.  Uh-huh.
18     Q.  -- is there any other content on that
19 table beyond you laying out all the fMRI studies?
20     A.  It is -- I have a table of sort of the
21 citation, the general topic of the paper and the
22 method used in the paper.
23     Q.  Do you remember how many studies you
24 have on the list?
25     A.  32.

Page 99

1      Q.  Okay.  And did you rely on that list in
2  any way in terms of your opinions that you're
3  sharing today?
4      MR. OLIVER:  Object to the form.
5      THE WITNESS:  That list helped me sort
6  of put into perspective the -- the really, I think,
7  robust foundation of which my opinions are part of.
8      I didn't rely on that list.  It helps
9  me -- the list was created well after my opinions
10 were formed.  The list goes back into and just
11 visualizes all of the research.  I think it helps
12 underscore the robustness of this field.
13     There's 32 papers that show links
14 between social media use and the brain development
15 or brain activation.  And that was the -- the
16 reason for putting that table together.
17 BY MS. JONES:
18     Q.  And just -- I'm sorry.  Just to go back
19 to the additional time that you spent since
20 July 29th, Ms. Antoine has kindly informed me that
21 that would be roughly billings of an additional
22 $17,250.  Will you accept my math on that?
23     A.  I'll accept your math.
24     Q.  Okay.  So that would be in roughly the
25 last week or so you -- you are -- you have done

Page 100

1  work for which you will bill almost $20,000?
2      A.  Since August 1, I guess, would be --
3      Q.  Yes.
4      A.  -- so -- yeah.
5      Q.  About a week, yeah.
6      A.  Yeah.
7      Q.  So you -- you published a letter to the
8  editor in July of this year after your deposition.
9  And by the time you had -- you published your
10 letter to the editor, you had, in fact, been paid
11 maybe not quite $250,000, but over $200,000.
12     Do you understand that to be the case,
13 based on looking at your invoices?
14     A.  I haven't done the math.  I'll take
15 your word for it.
16     Q.  Okay.  And in your letter to the
17 editor, you say, among other things, that the
18 addictive use of social media, not the time spent
19 using it, predicts whether adolescents develop
20 suicidal thoughts.
21     Do you see that?
22     A.  I do.
23     Q.  You don't at any point -- and that's
24 one of the opinions that you are offering in this
25 litigation, correct?

Page 101

1      A.  I don't think I offered that opinion in
2  my report.
3      Q.  You're not offering the opinion that
4  the addictive use of social media can lead to
5  "adolescents develop suicidal thoughts"?
6      A.  Sorry.  I -- specifically, like, not --
7  the time spent using it was not part of my report.
8  I think --
9      Q.  Let me -- let me ask you a --
10     A.  Yeah.
11     Q.  -- slightly better question.
12     A.  Yeah.
13     Q.  Are you offering the opinion in this
14 litigation that the addictive use of social media
15 predicts whether adolescents develop suicidal
16 thoughts?
17     A.  I think my broader opinions in my
18 report talk about the addictive or problematic ways
19 of using social media and how that relates to
20 adolescent mental health.
21     I -- I don't recall if I specifically
22 reference suicidal thoughts in my reports, but more
23 generally, about their mental health and brain
24 development is -- is the basis of my -- or the
25 foundation of my opinions.

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

Page 102

1    Q.  As -- as I read the letter to the
2  editor that you submitted to "The New York Times"
3  in July of 2025, you at no point disclosed that you
4  had been retained by -- well, let me talk about
5  what you did disclose.
6        On that next page, the last page of
7  your letter to the editor, you disclose your name
8  and where you live, right?
9    A.  Yes.
10    Q.  And you disclose some of what, I think,
11  we can fairly characterize as your credentials to
12  opine on some of the issues reflected in the letter
13  to the editor, correct?
14    A.  Yes.
15    Q.  You say you are the co-director of the
16  Winston Center on Technology and Brain Development
17  at the University of North Carolina at Chapel Hill,
18  correct?
19    A.  Correct.
20    Q.  You did not, at any point in your
21  letter to the editor, disclose that you are, in
22  addition to that, a paid litigation expert for the
23  plaintiffs in this litigation, right?
24    A.  I did not put that in this -- in this
25  letter to the editor.  This was written in my

Page 103

1  capacity as the co-director.  This went through my
2  comms director.
3    Q.  Do you -- do you think that it's
4  important for people who might be reading
5  "The New York Times" and reading your views on
6  these issues, some of which relate to this
7  litigation, to know that in addition to being the
8  co-director of the Winston Center on Technology and
9  Brain Development, that you are also someone who
10  has made or will make a couple hundred thousand
11  dollars as a paid litigation expert?
12        MR. OLIVER:  Object to the form.  It's
13  argumentative.
14        THE WITNESS:  The letter to the editor
15  is based on science.  It's not based on anything
16  I'm paid for.  It's based on a very specific
17  scientific study that came out as well as other
18  scientific findings in the field.
19        I wrote it in my capacity as the
20  director of the Winston Center and helping the
21  center to get out more work to the public.
22  BY MS. JONES:
23    Q.  Do you think that someone could fairly
24  conclude that you having now billed plaintiffs'
25  lawyers in this litigation roughly a quarter of a

Page 104

1  million dollars could cause you to have a conflict
2  of interest in terms of your views on these issues?
3        MR. OLIVER:  Object to the form.
4        THE WITNESS:  My views are based on the
5  science.  I direct a center that oversees this
6  exact topic on technology and brain development and
7  adolescent mental health, and I wrote that -- this
8  in my capacity as the director of the center.
9  BY MS. JONES:
10    Q.  You just -- have you told the
11  Winston Center how much money you have made as a
12  paid expert in this litigation?
13    A.  No.
14    Q.  You just told me that after your
15  deposition in June, that you went back and reported
16  to journals -- that you've made a conflict of
17  interest disclosure to certain journals, correct?
18    A.  Correct.
19    Q.  Explain, just so we understand it, how
20  you are judging when you're going to disclose the
21  fact that you are a paid litigation expert and when
22  you're not.
23    A.  Generally speaking, when there --
24        MR. OLIVER:  Objection.  Argumentative.
25        THE WITNESS:  -- are requirements to

Page 105

1  disclose in an academic setting, in a published
2  academic journal where that is a requirement, I
3  make sure to disclose.
4  BY MS. JONES:
5    Q.  And so if there is not a requirement
6  that you disclose the fact that you are a paid
7  plaintiffs' expert in this litigation, you are not
8  going to disclose that; is that right?
9        MR. OLIVER:  Objection to form.  That
10  mischaracterizes her testimony.  It's
11  argumentative.
12        THE WITNESS:  When it is required
13  within an academic setting -- for example, a
14  journal article publication where they have a
15  specific form to disclose that -- I will make sure
16  to do that.
17        I did not say that I would not in other
18  settings, but the opportunity is not always there.
19  In this case, I was submitting this on behalf of my
20  role in the Winston Center as a co-director.
21  BY MS. JONES:
22    Q.  Do you think that your overriding duty
23  of candor and professional integrity to the court
24  would require that in that setting you advise that
25  you have been paid some number of hundred of

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL

Page 106

1 thousands of dollars by the lawyers in the case?
2        MR. OLIVER: Objection. That calls for
3 a legal conclusion. The certification to the court
4 has nothing to do with "The New York Times."
5        THE WITNESS: I think that the
6 certification is me saying I'm going to tell the
7 truth and be truthful in this case. I signed,
8 based on these sentences here, my certification I'm
9 being truthful. I am being open and honest. I am
10 not doing anything out of not being fully truthful
11 and having integrity.
12 BY MS. JONES:
13    Q. Okay. And that -- that includes being
14 honest about the extent to which you've been
15 compensated by counsel, yes?
16    A. I don't think I need to disclose how
17 much I've been compensated by counsel.
18    Q. To the court?
19    A. Oh, to the court?
20        MR. OLIVER: Object to the form.
21        Can we clarify what we're talking
22 about? Are you talking about "The New York Times,"
23 or are you talking about the court?
24        MS. JONES: I'm actually not sure
25 that -- I mean, you might be confused. I'm not

Page 107

1 sure Dr. Telzer is confused.
2 BY MS. JONES:
3    Q. My question is: Do you think that your
4 obligation of integrity and candor with respect to
5 the court requires you to disclose what you've been
6 paid?
7        MR. OLIVER: Objection. Disclose to
8 whom?
9        THE WITNESS: Yeah, I don't understand
10 who I'm disclosing --
11 BY MS. JONES:
12    Q. The court.
13    A. I've disclosed within my invoices how
14 much I've been paid.
15    Q. Okay. And so you won't have an
16 objection if that is shared in the context of
17 testimony that you provide in any trial that comes
18 up?
19    A. I don't understand the context of this
20 or what trial encompasses, so I don't know.
21    Q. Okay. Let me ask you in that same
22 rebuttal report to go to Page 13.
23        And I am at a logical breaking point,
24 if you want a break, but we can also keep going.
25    A. A break would be nice. Thank you.

Page 108

1        MS. JONES: Okay. Let's take a break.
2        THE VIDEOGRAPHER: Going off the
3 record. The time is 11:14 a.m.
4        * * *
5        (Whereupon, there was a recess in the
6 proceedings from 11:14 a.m. to 11:23 a.m.)
7        * * *
8        THE VIDEOGRAPHER: Going back on the
9 record. The time is 11:23 a.m.
10 BY MS. JONES:
11    Q. Dr. Telzer, let me -- I think you have
12 Exhibit 2 in front of you, which is your MDL
13 rebuttal report. And I'm going to ask you to go
14 for me to Page 13, Paragraph 41.
15        Are you there?
16    A. Yes.
17    Q. Okay. And in Paragraph 41 of your
18 rebuttal report, the section is entitled "Design
19 Features of the Social Media Platforms are Driving
20 Causation," correct?
21    A. Uh-huh.
22    Q. You have to say "yes."
23    A. Yes.
24    Q. And then it goes on to say:
25 Defendants' experts attempt to argue that the

Page 109

1 content is the cause of any harms --
2        And then you have a parenthetical
3 referring to various defense experts.
4        -- and completely disregard the large
5 body of research that shows that it is not simply
6 the content adolescents encounter on social media
7 that predicts negative mental health outcomes, but
8 rather the design features of the platforms
9 themselves.
10        Do you see that?
11    A. Yes.
12    Q. I want to actually start by just asking
13 you: When you're thinking about this concept of
14 content versus features, what, for you, qualifies
15 as content?
16    A. I guess content is what one produces
17 and posts on Instagram or Snap or whatever it might
18 be.
19        But then the features of those
20 platforms can change that content because a beauty
21 filter or some of the other design features change
22 that content.
23    Q. Okay. So, for example, from -- is it
24 your view that photos are content?
25    A. Like, a photo posted on a platform.

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

Page 110

1    Q.  And just to be a little more precise,
2  in case it makes it easier, for the moment I'm just
3  asking you about a photo, a static image that is
4  posted without any kind of filters or anything else
5  applied to it.
6        MR. OLIVER:  Object to form to the
7  extent that there ends up or already is a legal
8  definition of "content."  That's my objection.
9        She can, obviously, answer the
10  question.
11        MS. JONES:  Yeah, that's fair enough.
12  BY MS. JONES:
13    Q.  And I -- to be clear, I'm not asking
14  you for a legal conclusion.  I'm asking you with
15  respect to how you're thinking of content in terms
16  of your opinions.
17    A.  Yeah.
18    Q.  Would a photo be content?
19    A.  Simply, yes, I think.  A photo is -- is
20  content.
21    Q.  Would a video be content?
22    A.  I think a video includes content.
23    Q.  You -- I think you told me before that
24  you sometimes use Instagram yourself; is that
25  right?

Page 111

1    A.  I have used Instagram.
2    Q.  And so sometimes on Instagram, people
3  might have a post that is text.  So, for example,
4  UNC might be announcing details about an upcoming
5  event at the school.
6        Would -- do you know what I'm thinking
7  about when I'm describing it in that way?
8    A.  I don't know if I've seen that, but I
9  know what you're generally describing.
10    Q.  Sometimes people post, you know,
11  inspirational sayings --
12    A.  Uh-huh.
13    Q.  -- on Instagram.  Do you know what I
14  mean?
15    A.  I know, yes.
16    Q.  Do you consider posts like that to be
17  content?
18    A.  I guess that would be content.
19    Q.  All right.  What about comments that
20  are made on a picture, for example?  Is that
21  comment content?
22    A.  I think the comments start to get at a
23  feature because the comment is something that is
24  part of the platform that could potentially change
25  or supplement or modify the experience of that

Page 112

1  content.  I don't think the comments are the
2  content.
3    Q.  So I want to just drill down on that
4  for a moment.  So let's say you post a -- I'm not
5  saying would you do this.  But let's say you post a
6  picture from your vacation on your Instagram feed.
7        Are you with me?
8    A.  Uh-huh.
9    Q.  "Yes" or "no"?
10    A.  Yes.  Sorry.
11    Q.  Okay.  And let's assume that we are
12  somehow connected on Instagram.
13        Okay?  Still with me?
14    A.  Yes.
15    Q.  And I include a comment that says:
16  Looks like you guys are having a great time.
17        Okay?  Are you still with me?
18    A.  I'm with you.
19    Q.  Is my comment content or a feature?
20    A.  You know, I haven't considered that
21  specific example the way I've done the research in
22  this report.  So I have not considered that.
23        I think that the mechanism of being
24  able to provide content -- comments is a feature.
25  I have not considered that.

Page 113

1    Q.  Okay.  Let me -- let me ask you a
2  slightly different hypothetical.
3        Let's say -- again, I'm not assuming
4  you would do this.  But let's say you posted a
5  picture of yourself in a particular outfit.
6  Sometimes people take pictures of themselves and
7  put them on the Internet.
8        Okay?  Are you with me?
9    A.  I'm with you.
10    Q.  A "selfie," let's call it.
11        And let's say I post a comment that
12  says:  God, I hate that dress.
13        Just stick with me for a moment, okay?
14        Would that comment be content?
15        MR. OLIVER:  Same objection I raised
16  earlier.
17        THE WITNESS:  I mean, similar answer.
18  I don't think I've considered that sort of specific
19  way of thinking about it.
20        I've more broadly thought about the
21  comment ability as a sort of a function or feature
22  of the platforms.  I have not considered your
23  examples in the work I've done under this report.
24  BY MS. JONES:
25    Q.  What -- what about direct messages via

29 (Pages 110 - 113)

Page 114

1 Instagram Messenger?  Are those content?
2        MR. OLIVER:  Object to the form.
3        THE WITNESS:  I don't think I've
4 considered that.
5 BY MS. JONES:
6    Q.  What about -- let's go back to our
7 hypothetical where you're on vacation.  You've
8 posted a picture.  And instead of adding a comment,
9 I "like" the picture.  Is that "like" content?
10    A.  The "like" is not content.  The "like"
11 is a feature.
12    Q.  What about a notification?
13    A.  Is a notification --
14    Q.  Hold on.  Let me finish my question.
15    A.  Sorry.
16    Q.  I have a bad habit of pausing, and
17 people don't always know whether I'm done or not.
18        If there is a notification from a
19 social media platform, is that content, in your
20 view, or is that a feature?
21    A.  I think notifications are a feature of
22 the platforms.
23    Q.  If the notification says, for example,
24 "Joe liked your post," is that content or is that a
25 feature?

Page 115

1    A.  I think that would probably be a
2 feature.  I have not considered that specific
3 example.  I think that the notifications is a
4 feature.
5    Q.  So other than pictures, videos, and the
6 kind of textual messages that we were talking about
7 where people will kind of in a post say, "Hang in
8 there," or something like that, are there any other
9 things that you would categorize as content?
10    A.  I have not sat down and thought about
11 what to characterize as content.  So I would need
12 some time to think about that.
13    Q.  Okay.  You have not -- I'll move on.
14        Let me, actually, ask you about some
15 quick examples in your rebuttal report, if I could.
16        Can you go to Page 14 of that same
17 report, Exhibit Number 2.  And I want to ask you
18 about Paragraph 43.
19        Are you there, Dr. Telzer?
20    A.  Yes.
21    Q.  It says:  There need not be content for
22 the brain to respond to an anticipated reward.
23        Do you see that?
24    A.  I do.
25    Q.  As a clear example of this, fMRI

Page 116

1 research has shown that youth who engage in
2 habitual social media use show enhanced activation
3 in the reward center of the brain just when viewing
4 a black screen with a white circle because that
5 white circle is a learned cue associated with peer
6 feedback.
7        Do you see that?
8    A.  I do.
9    Q.  You go on to say:  I will walk through
10 this carefully to make it clear.  In this study --
11 and there's a reference to the Maza paper in 2023
12 on which you're a co-author -- adolescents came to
13 the lab and were scanned using fMRI.  Prior to the
14 scan, they were trained that they would see some
15 shapes (i.e., cue) during the scan, and those
16 shapes are associated with an outcome.
17        Do you see that?
18    A.  I do.
19    Q.  It goes on to say:  A white circle
20 indicates they could receive a reward (i.e., a peer
21 smiling), a white triangle indicates they could
22 receive a threat (i.e., peer scowling), and a white
23 diamond indicates that the outcome is neutral
24 (blurred peer face).
25        Do you see that?

Page 117

1    A.  Yes.
2    Q.  And then it goes on to say:  After
3 learning what each cue means, they complete the
4 fMRI task.  Right?
5    A.  Yes.
6    Q.  And the figure at the top of Page 15 of
7 your rebuttal report, is that just a kind of a
8 graphic depiction of what is described in
9 Paragraph 43?
10    A.  That is a -- yeah, a sort of graphical
11 representation of that description pulled from
12 another paper.
13    Q.  Okay.  I want to ask you.  Do you
14 consider these different cues, whether it's a white
15 circle or a diamond or a triangle associated with
16 images -- do you consider that to be content?
17        MR. OLIVER:  Objection.
18        THE WITNESS:  Do I consider that to be
19 content?  I consider that to be a cue.  It's a
20 shape.
21 BY MS. JONES:
22    Q.  Okay.  My question is:  Is it content?
23    A.  I think that's too abstract.
24    Q.  Well, Paragraph 43 begins by saying:
25 There need not be content for the brain to respond

HIGHLY CONFIDENTIAL

Page 118

1  to an anticipated reward.  Right?
2      A.   Correct.
3      Q.   And then you go on to describe your
4  research in the Maza paper, yes?
5      A.   Yes.
6      Q.   Okay.  So you've invoked content in
7  this paragraph, yes?
8          MR. OLIVER:  Object to the form.
9  "Invoked."
10         THE WITNESS:  I will mention something
11 that is in response to the Kishida rebuttal, where
12 this was directly coming from, which was removed
13 when I realized this wasn't meant to be in response
14 to their rebuttals, was that the example Kishida
15 gave is that one -- one's brain does not respond to
16 something like a white circle on a black
17 background.
18         So that's generally where this is
19 coming from where this is not necessarily content.
20 This is a cue that is going to elicit, potentially,
21 an outcome.  And our brains do respond to that.
22 BY MS. JONES:
23     Q.   So sitting here today, you couldn't --
24 and it's okay if you can't.  But sitting here
25 today, you couldn't tell me if, within this

Page 119

1  content-versus-features dichotomy, whether seeing
2  these images -- a white circle, a diamond, a
3  triangle -- whether that would qualify as content
4  in terms of what's precipitating the reaction?
5          MR. OLIVER:  Object to the form.
6  Misstates testimony.
7          THE WITNESS:  Yeah, I think it's an
8  abstract concept here of what you're asking about
9  content.
10         This is not necessarily content because
11 we're looking at neural responses to cues.  I was
12 responding to one of the defense experts indicating
13 that our brain only responds to content and it does
14 not respond to a white circle on a black
15 background.
16         But, indeed, our brains do respond to
17 something that is not necessarily showing rich
18 content because our brains have associated what
19 we're seeing there with something, for example,
20 rewarding or threatening in our environment.
21 BY MS. JONES:
22     Q.   In the -- in the study -- in the study
23 that is described here, the neural response that
24 you're talking about is determined by which of the
25 shapes the individual -- the participants saw, yes?

Page 120

1      A.   The neural response is associated
2  following seeing that cue and that learned
3  association of that cue might be associated with a
4  particular outcome.  Their -- their brains respond
5  in different ways.
6      Q.   So if you see a -- a white circle, that
7  might be associated with happy, just based on this
8  graphic, yes?
9      A.   If you see a white circle, you may or
10 may not receive a -- a happy face from your peers.
11     Q.   Yes.  And if you see a diamond, the
12 response would be neutral, right?
13     A.   If you see a diamond, no matter what,
14 you will see a blurred peer face, which is
15 described as neutral.
16     Q.   And if you see a white triangle, you
17 would see an angry peer face, right?
18     A.   If you see a white triangle, you may or
19 may not see, following that, an angry face.
20     Q.   But the differences that are being
21 captured here are based on which of the shapes
22 you're seeing, yes?
23     A.   Well, the neural activation is after
24 they saw that shape when they see a target.  So it
25 is based on this learned association between those

Page 121

1  cues.  And following seeing that cue, we're looking
2  at neural activation when seeing that target and
3  what is the brain doing in the absence of any real
4  content.
5          In the absence of anything -- and, in
6  fact, across all the conditions, what they're
7  seeing on the screen is exactly the same.
8          But they have learned this association
9  based on the training beforehand that they could be
10 rewarded or could be given a sort of social
11 punishment.
12     Q.   But they're -- but they're -- we're not
13 talking -- they're not -- they're not seeing the
14 same shapes, right, across the different
15 categories, yes?
16     A.   So the way it works, if you look at
17 this --
18     Q.   Uh-huh.
19     A.   -- in the black panel, they see a shape.
20 And then after the shape, they see this target, no
21 matter the shape.
22         So we're looking at brain activation
23 when they see that target, which is identical
24 across every single condition.  So we're looking at
25 brain activation when seeing that shape on the

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 122

1 screen.
2       And the only thing that's different is
3 that prior to that, they saw something that will
4 tell them that they may or may not receive a reward
5 or punishment later.
6     Q.  And what they saw prior is different
7 shapes, right?
8     A.  The cue is three different shapes.
9     Q.  Yeah.  Let me ask you to turn to
10 Page 18.  And I'm going to ask you, actually, to
11 start by looking at Paragraph 55 towards the top.
12       Are you there?
13     A.  I am.
14     Q.  It says:  A host of empirical research
15 has shown that ranking algorithms target those with
16 poor body image.  For instance, individuals with
17 eating disorders are over 4,000 percent more likely
18 to be fed videos that are appearance-oriented -- do
19 you see that?
20     A.  I do.
21     Q.  -- featuring dieting and exercise, and
22 showcase toxic eating behaviors, compared to those
23 without an eating disorder.
24       Do you see that?
25     A.  I do.

Page 123

1     Q.  Would you say that those videos that
2 are described in that paragraph are content?
3       MR. OLIVER:  Object to the form.
4       THE WITNESS:  I think the videos
5 themselves include content.  But that content is
6 being fed at an exponential rate because of the
7 algorithms.
8 BY MS. JONES:
9     Q.  Okay.  And the -- what the algorithms
10 are doing, I think, in your accounting is sharing
11 more of that type of videos or photos; is that
12 right?
13     A.  I believe that the algorithms are
14 feeding those with eating disorders more and more
15 and more and more -- 4,000 percent more -- content
16 that includes dieting, exercise, toxic eating --
17 and showcase toxic eating behaviors.
18     Q.  Sure.  Understood.  And I understand
19 what you wrote here.  I just want to make sure I
20 understand.
21       You agree that the videos include
22 content.  You are also making the point that the
23 algorithm, in your view, has the effect of feeding
24 more of that content to people, yes?
25     A.  The videos include content.

Page 124

1     Q.  Yes.
2     A.  And the algorithms exponentially
3 increase the likelihood of those with eating
4 disorders being fed content that is
5 appearance-oriented, featuring dieting and exercise
6 and showcasing toxic eating behaviors, amongst
7 those with an eating disorder.
8     Q.  Okay.  Let me ask you about one other
9 point, just to follow up on this issue.
10       So at the bottom of the same page, 18,
11 there's a reference to a -- this is Paragraph 57 --
12 "a body of experimental studies has shown that."
13       Do you see that?  It's the bottom of
14 Paragraph 57?
15     A.  The very bottom, yes.
16     Q.  Uh-huh.  It says:  A body of
17 experimental studies has shown that exposure to the
18 effects of beauty and cosmetic surgery image
19 filters can directly harm body satisfaction and
20 contribute to disordered eating behaviors.
21       For example, Kleemans conducted a
22 randomized experiment in which early-adolescent
23 girls (aged 11 to 13) were randomly assigned to
24 view either retouched Instagram photos or unedited
25 images of peers.

Page 125

1       Do you see that?
2     A.  Yes.
3     Q.  And you specifically include a figure
4 immediately below Paragraph 57 featuring some of
5 those images; is that right?
6     A.  Correct.
7     Q.  Okay.  In Figure Number 1, let's start
8 with the first image that appears on the far
9 left-hand side.
10       Is that content?
11     A.  I mean, this is, I think, directly from
12 their publication showing examples of the stimuli
13 used in their study.  Whether that's -- there is
14 content included on the screen there of that.
15     Q.  Yeah.  My question is:  Is that -- the
16 image on the left, is that content?
17     A.  The --
18       MR. OLIVER:  Which -- object to the
19 form.  Which -- which of the images?  There's --
20       MS. JONES:  There are four of them, and
21 I'm asking about the one on the left.
22       MR. OLIVER:  The far left?  The
23 singular one?
24       MS. JONES:  Yes.
25       THE WITNESS:  Is this singular thing

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

Page 126

1 content?
2 BY MS. JONES:
3      Q.  Yes.  Sure.
4      A.  Sure.  There is an image there that
5 would be considered content.
6      Q.  Okay.  And what about the next --
7 second-from-the-left image?  Is that content?
8      A.  That includes content that has been
9 altered by a beauty filter.
10     Q.  Okay.  And in your view, is a beauty
11 filter content or is it a feature?
12     A.  A beauty filter is a feature of the
13 platform.
14     Q.  All right.  What about the third image
15 from the left in Figure Number 1 in Paragraph 57 of
16 your rebuttal report?  Is that content?
17     A.  Again, this is an example of the
18 experimental task from their studies, so these are
19 created stimuli of a task and not real.
20         But that is an image of a person.  If
21 that image were on actually Instagram, that would
22 be content.
23     Q.  And the same question as to the very
24 last far-right image in Figure Number 1.  Is that
25 content?

Page 127

1      A.  That image on the far right is the
2 stimuli in the experimental task that has been
3 modified with a beauty filter.  So it is content
4 that has been modified with a beauty filter.
5         (TELZER EXHIBIT 9, Vidal, et al., paper
6 titled Problematic Social Media Use or Social Media
7 Addiction in Pediatric Populations, was marked for
8 identification.)
9 BY MS. JONES:
10     Q.  Dr. Telzer, I'm handing you what we
11 have marked as Exhibit Number -- I think it's 8.
12        MS. JONES:  9?  Okay.  Thank you.
13 BY MS. JONES:
14     Q.  Is that Exhibit Number 9 in front of
15 you, Dr. Telzer?
16     A.  Yes.
17     Q.  Okay.  Thank you.
18        Okay.  Dr. Telzer, one of the papers
19 that you cite is the Vidal paper from 2024,
20 correct?
21     A.  Can you point me where I cite it?
22     Q.  Sure.  Go to Page 13 of your rebuttal
23 report at Footnote 48.
24     A.  Okay.  Yes.
25     Q.  And if you look at what we've marked as

Page 128

1 Exhibit Number 9 to your deposition, is this the
2 Vidal paper that you were referring to at Footnote
3 Number 48 to your rebuttal report?
4      A.  It looks like it's the same thing, yes.
5      Q.  Okay.  And I actually just have one
6 quick question on Vidal, which is:  Does Vidal
7 include any original research?
8      A.  I believe this is a review paper.
9      Q.  And so that means "no"?
10     A.  I'm looking.
11     Q.  Okay.
12     A.  I'm unsure, but I don't believe so.  I
13 don't think there's any data in this paper.
14     Q.  Okay.  Bear with me for just a second.
15 I'm actually finding things I can skip.  So this
16 is --
17        You discuss in your rebuttal report --
18 let me ask you to go to Page 20.
19        MR. OLIVER:  Is Vidal 8?
20        THE WITNESS:  9.
21 BY MS. JONES:
22     Q.  9.
23     A.  Do I need this?
24     Q.  You can put that to the side.  We are
25 done with that.  Thank you.

Page 129

1        Dr. Telzer, at Paragraph -- I'm sorry.
2 I didn't mean to jump ahead of you.  Are you there?
3      A.  Okay.
4      Q.  At Paragraph 60 on Page 20 of your
5 rebuttal report, there's a para that begins with
6 "Importantly."  Do you see that?
7      A.  I do.
8      Q.  It says:  Importantly, the social media
9 companies were well aware that design features,
10 like beauty filters, cause extreme harms.  Margaret
11 Gould Stewart, the vice president of product design
12 and responsible innovation at Facebook, did
13 extensive research on this, as discussed in her
14 deposition.
15        Do you see that?
16     A.  I do.
17     Q.  And it goes on to talk about what Meta
18 leadership, according to you, was aware of, based
19 on reviewing the literature in consultation with
20 experts, about the potential effects of beauty
21 filters, correct?
22     A.  Correct.
23     Q.  Did you review Margaret Gould Stewart's
24 deposition?
25     A.  I did.

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

Page 130

1    Q.  Did you read the entirety of it?
2    A.  I did.
3    Q.  Have you ever spoken with Ms. Gould
4  Stewart?
5    A.  Not that I'm aware of.
6    Q.  Did you look up other research that
7  Ms. Gould Stewart did on beauty filters?
8    A.  As part of the exhibits, I think you
9  call them, there was some of the research she had
10  done.  So I looked at those.
11    Q.  Okay.  What about other research that
12  might have been done by other Meta researchers
13  about beauty filters?
14    MR. OLIVER:  Vague.
15    THE WITNESS:  Did I look up --
16  BY MS. JONES:
17    Q.  Did you review -- let me ask --
18    A.  Okay.
19    Q.  -- my question again.
20    Did you review -- I'm now seeing on the
21  realtime that was not a remotely clear question.
22    Did you review research by others at
23  Meta on the subject of beauty filters?
24    A.  I recall seeing lots of documents on
25  beauty filters.  I don't remember specifically.

Page 131

1  They're in my materials considered if I did.
2    Q.  Let me just generally -- and you, at
3  certain points in your expert reports, discuss
4  dopamine, right?
5    A.  Yes.
6    Q.  And dopamine is what?
7    A.  Well, I think I discuss in terms of
8  dopaminergic pathways in the brain.  These are
9  areas of the brain that are rich in dopamine, which
10  is generally describing areas of the brain that are
11  highly sensitive to rewards.
12    Q.  Is dopamine release a part of normal
13  brain function?
14    A.  Dopamine release part of normal brain
15  function?  When the brain is responding or engaging
16  in things that are rewarding, at least in the way
17  that I talk about it in my report, we talk about it
18  as dopamine-rich areas of the brain that are
19  activating, not necessarily dopamine -- a specific
20  dopamine response at the cellular level, but we're
21  talking about at the neural level -- neural level
22  in dopamine-rich areas of the brain.
23    This is something that we see in
24  response to things that are pleasurable or
25  rewarding.

Page 132

1    Q.  And my question was:  Is what you just
2  described a normal part of brain function?
3    A.  I don't quite understand what you mean
4  by "normal brain function."  But the brain
5  functions in a way that it has areas of the brain
6  that are rich in dopamine circuits, dopaminergic
7  pathways of the brain that respond to rewards.
8    When our bodies feel a sense of reward,
9  when we engage in pleasurable activities, when we
10  anticipate things that could be rewarding or give
11  us a thrill, these areas of the brain are
12  activated.
13    Q.  So there was a time when social media
14  did not exist at all, yes?
15    A.  Yes.
16    Q.  And prior to the time when social media
17  existed, the -- the dopamine -- the dopamine
18  activity and activation that you just described,
19  that happened, yes?
20    A.  The brain responds to things that are
21  pleasurable.  So prior to the advent of social
22  media, there are ways in which the brain might
23  respond to things outside of the social media
24  context that might elicit a dopamine response.
25    Q.  And that would include things that are

Page 133

1  pleasurable activities, right?
2    A.  Generally speaking, pleasurable
3  activities can activate the dopamine center.
4    Q.  And that can include situations where
5  you might be anticipating things that could be
6  rewarding?  I'm just using your words from earlier.
7    A.  Yeah.  Generally speaking, anticipating
8  something that is rewarding can elicit a dopamine
9  response.
10    Q.  And there are within those broader
11  categories different ways that you can have this
12  dopamine activation that you've described, like,
13  for example, getting a chance to sit down with
14  friends you haven't seen for a long time and having
15  a good meal, yes?
16    A.  I'm not aware of any data that show
17  that the -- there's a dopamine response when
18  sitting with friends or having a good meal.
19    Q.  Well, I'm not asking you about whether
20  there's specific data that says that.
21    I'm asking, within what you've just
22  described about pleasurable activities and the
23  anticipation of a reward, there are things like
24  having an opportunity to get together with people
25  with whom you enjoy their company that might prompt

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

Page 134

1 some of the dopamine activity that you've
2 described, yes?
3        MR. OLIVER:  Object to the form.  Asked
4 and answered.
5        THE WITNESS:  Yeah, I think that I
6 could speculate.  But there's not data on that
7 exact scenario.
8 BY MS. JONES:
9    Q.   Let me ask you a different question.
10   A.   Yeah.
11   Q.   What data -- based on the data that
12 you've seen --
13   A.   Uh-huh.
14   Q.   -- what are the types of activities
15 that don't relate to social media --
16   A.   Uh-huh.
17   Q.   -- where people might have a dopamine
18 activation of the type that you've described?
19   A.   Yeah, there's different scenarios in
20 which we see dopaminergic activation in the brain,
21 and it's very context-dependent, and there's a lot
22 of individual differences.
23        So, for example -- and I describe this
24 in my rebuttal -- when we scan brains of
25 adolescents and they are showing dopamine responses

Page 135

1 to something very prosocial, that can potentially
2 be related to other positive outcomes.
3        But when we see dopaminergic responses
4 to negative risks, that is related to increases in
5 risk-taking and depression.
6        And so there's individual differences
7 in dopaminergic responses to these things.  It's
8 not like a one-size-fits-all, and it's very
9 context-dependent as well.
10   Q.   Okay.  So sitting here today, you're
11 not able to tell me, for example, for someone who
12 really loves soccer, getting to go to the World
13 Cup, that might, in fact, prompt the type of
14 dopamine activity that you're describing?
15   A.   I don't think I have data on that type
16 of example.
17   Q.   Okay.  Having dinner with family and
18 friends, you don't know because you don't have
19 data?
20   A.   I don't have data on that.
21   Q.   Okay.  Playing a sport yourself, you
22 don't know because you don't have data; is that
23 right?
24   A.   I -- there may be data on -- on -- no,
25 I don't -- I can't think of any data on playing a

Page 136

1 sport.
2    Q.   All right.  Anticipating the arrival of
3 a family member you love who you have not seen in a
4 long time, you can't tell me if that might prompt a
5 dopamine activation like what you described?
6    A.   We could speculate about specific
7 examples.  But in terms of actual scientific data
8 to support this, I don't have evidence for any of
9 these.
10   Q.   So is your testimony that the only
11 concrete thing, real-world thing that you can think
12 of that prompts dopamine activity like what you've
13 described in your report is social media?
14   A.   Oh, I don't say that in my report, nor
15 did I say that right now.  I say that it's sort of
16 context-dependent.
17        In my rebuttal, I talk about other ways
18 in which adolescents show dopaminergic responses;
19 including when they engage in risky behaviors,
20 there's a dopamine response.  And there's
21 individual variability in that that is predictive
22 of positive or negative outcomes.  So I don't think
23 I said that social media is the only thing.
24   Q.   Are you aware of any data that has
25 determined that the release -- or the activation of

Page 137

1 dopamine of the type that you've described in your
2 report is at a greater level from using social
3 media than it might be from some other form of
4 communication or human interaction?
5    A.   I can't think of an example of where
6 our research tests how the quantity of dopamine
7 response is more or less in social media versus
8 something else.
9        I think what's important is that we see
10 these neural activations that tells us that
11 dopaminergic pathways are activated.  Whether it's
12 more or less is -- I don't -- I am not sure if
13 that's been tested, nor does that sort of answer
14 the question of whether social media is activating
15 these systems.
16   Q.   Dr. Telzer, before your deposition, we
17 were provided with a further copy of your materials
18 considered list.  Are you aware of that?
19   A.   I'm aware that my materials considered
20 list was expanded upon.
21   Q.   Do you know by how much it was
22 expanded?
23   A.   In working on my rebuttal report and
24 reviewing more literature, I don't know by how
25 much, but I read a lot more.

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL

Page 138

1    Q.  Is there anything that you reviewed or
2 relied upon for your opinions in your rebuttal
3 report -- actually, let me hand you what we've --
4 we're going to mark.
5         (TELZER EXHIBIT 11, Materials
6 Considered List, was marked for identification.)
7 BY MS. JONES:
8    Q.  This is what we've marked as
9 Deposition Exhibit Number 11, which is a copy of
10 your --
11        MS. JONES:  Brian might have to walk
12 this over to him.  I'm not going to hurl it across
13 the table.
14 BY MS. JONES:
15    Q.  -- which is a copy of your materials --
16 a copy of your materials considered list, which I
17 think was -- was provided in connection with your
18 MDL report.  Do you recognize it as such?
19        MR. OLIVER:  This is 11?
20        MS. JONES:  This is 11, yes.
21        THE WITNESS:  Yes.
22        MR. OLIVER:  What was 10?
23        THE WITNESS:  I don't know.
24        MS. JONES:  It was probably Vidal.  Oh,
25 you know what?  We never used 10.  Is that okay for

Page 139

1 us just to have --
2        MR. OLIVER:  Okay.
3        MS. JONES:  We -- we ended up not
4 using it.
5        MR. OLIVER:  All right.
6        MS. JONES:  Yeah.
7        MR. OLIVER:  I feel better.
8        MS. JONES:  Okay.  Yes.
9 BY MS. JONES:
10    Q.  Actually, before we get to your
11 materials considered list, I want to go back to
12 the -- the discussion we were having about the use
13 of cosmetic surgery/beauty filters that are
14 discussed in connection with your -- your report
15 and where you talk about Margaret Gould Stewart.
16        Do you know whether the cosmetic
17 surgery/beauty filters that were being discussed at
18 the company were created by Meta or by third
19 parties?
20    A.  Do I recall from her deposition or
21 materials whether the beauty filters were created
22 by Meta or third parties?  I don't recall off the
23 top of my head.
24    Q.  So Exhibit Number 11 is your materials
25 considered list, which is now slightly over 1200

Page 140

1 pages.  Is there anything that you reviewed or
2 relied upon in preparing your report or your
3 opinions in this case that is not reflected in
4 Exhibit Number 11?
5    A.  In preparing my report and my opinions,
6 this is one of the things that I relied upon
7 amongst my education, my research, my general
8 fieldwork, my conversations with parents and
9 teachers and teens.  So this is just one of the
10 things that I considered.
11    Q.  Do you know, sitting here today, how
12 many documents all in are reflected in your
13 materials considered list, Exhibit Number 11?
14    A.  I don't know the number of documents,
15 no.
16    Q.  I'm going to represent to you that it's
17 more than 8,000 documents.  Will you accept my
18 representation on that?
19    A.  Sure.
20    Q.  Did you review each and every thing
21 that is reflected on Exhibit Number 11, your
22 materials considered list?
23    A.  Did I review everything --
24    Q.  Yes.
25    A.  -- in here?

Page 141

1        Yes, I at least looked at and opened
2 every material on here.
3    Q.  Okay.  And I want to make sure that
4 we're clear about what we're talking about.  Did
5 you review in its entirety everything reflected on
6 Exhibit Number 11?
7    A.  I did not necessarily read in entirety
8 every single document in here.
9    Q.  There are, by our count, I think,
10 roughly 1600 -- what I will refer to as
11 "company documents," documents that were produced
12 by the defendants in these cases, on your materials
13 considered list.  Are you aware of that?
14    A.  I don't know the number.
15    Q.  Did you review all of those documents
16 in their entirety?
17    A.  I at least opened every document listed
18 here.  I did not review in entirety every single
19 document.
20    Q.  Well -- and for the documents that you
21 just opened them, what did you do with them?
22    A.  What do you mean, what did I do with
23 them?
24    Q.  I mean, if you weren't reading them in
25 their entirety --

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL

Page 142

1    A.  Yeah.
2    Q.  -- what were you doing with them other
3 than opening a file?
4    A.  Well, as an example, I was reading one
5 deposition and the exhibits associated with it
6 about some inappropriate child sexual content, and
7 I opened some documents and saw things that made me
8 uncomfortable and immediately closed them.
9        So I did not look through those in
10 entirety.  I opened them and shut them down.
11    Q.  Yeah.  What other -- what -- okay.
12        What other stuff did you say, I -- you
13 just opened up the file and then decide I wasn't
14 going to read the whole thing?
15    A.  I think a lot of them were in
16 reference --
17        MR. OLIVER:  Object to the form.
18        THE WITNESS:  I'm sorry.
19        MR. OLIVER:  Go ahead.
20        THE WITNESS:  I think a lot of them
21 were all of the materials and exhibits from some of
22 the depositions that I opened to look at.  Some of
23 them were doing searches within the database, and I
24 would open some documents up.  I might skim over
25 some of it and decide that it's not necessary to

Page 143

1 read in its entirety.
2        There was a lot of consistency as I
3 considered more and more of the internal documents
4 and didn't always need to spend all of that time
5 reading everything in its entirety.
6 BY MS. JONES:
7    Q.  You have, by our count, again, in
8 combination, roughly 3,000 deposition transcripts
9 and deposition exhibits on your materials
10 considered list.  Did you know that?
11    A.  I don't know the specific number.
12    Q.  Did you review the entirety of all
13 those depositions?
14    A.  I did not read the entirety of every
15 single deposition.  Some of them I read in
16 entirety.  Some of them I skimmed through more
17 thoroughly.  Some of them I just looked at.
18    Q.  How did you decide which deposition
19 transcripts you were going to read or not read?
20    A.  I think that as I looked through some
21 of them, they became clear that they were very
22 relevant, like the one we were just talking about
23 about the beauty filters.
24        Other ones related -- I remember
25 reading one in entirety about -- I think it was a

Page 144

1 Meta researcher doing some of the sleep research.
2        Other ones, as I looked at them, were
3 just, I think, less relevant to my opinions in this
4 report, and so I didn't spend all of the time to
5 read them in entirety.
6    Q.  There are -- what about the deposition
7 exhibits?
8    A.  I looked through, especially for the
9 ones like Margaret -- sorry.  I can't recall her
10 full name.
11        I looked through, especially the ones
12 that are most relevant to my opinions, all of the
13 documents, some of which more thoroughly than
14 others, depending on how informative they were, how
15 much new information they were providing.
16        Some of them were sort of duplicative
17 with other information.  So I didn't need to read
18 them in entirety.
19    Q.  And you have on your list, by our
20 count, more than 4,000 items that are listed under
21 "Literature Review."  Do you know that?
22    A.  Like, empirical literature review?
23    Q.  Yes.
24    A.  I don't know if it's 4,000.
25    Q.  Okay.  Do you have any reason to doubt

Page 145

1 that?
2    A.  That sounds like a lot, but I don't
3 have a reason to doubt that.  I did a huge amount
4 of reviewing of the literature and sort of threw
5 them all into a place for sort of records of what I
6 had reviewed.  But I didn't keep count, so I don't
7 have a reason to dispute you.
8    Q.  Do you have a file somewhere where
9 you've included every piece of literature that you
10 reviewed in connection with your opinions in this
11 case?
12        MR. OLIVER:  Object to the form.
13        THE WITNESS:  I don't have a singular
14 file of all of those, no.
15 BY MS. JONES:
16    Q.  For the items of literature that you
17 have listed, did you review all of those in their
18 entirety?
19    A.  I didn't necessarily read every
20 research article in entirety.  Some of them I may
21 have skimmed in full.  Some of them I may have read
22 in full.  Some of them I may have looked at the
23 abstract.
24        There's a large body of work, and it's
25 sort of in its totality helped to contribute to my

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 146

1 understanding of the field.
2     Q.   And just kind of all in, it looks like,
3 based on your invoices, that you spent around 180
4 hours on document review, analysis, research, work
5 on your report.  Does that sound right?
6     A.   I have no sense, but I will take your
7 word for that.
8     Q.   Okay.  Similarly, asking you if you
9 will take our word for it, but our math in terms of
10 the number of hours that might have been spent on
11 documents, that would have potentially required you
12 to review 44 documents per hour over close to 200
13 hours, just based on the number of things on this
14 list.
15     A.   Well, some documents was like a
16 one-line email; others were longer.  So I don't
17 think we can calculate a number of documents per
18 hour in that way.
19     Q.   Was anyone helping you review all these
20 things?
21     A.   No.  I read -- I reviewed them myself.
22     Q.   Did you take notes on anything that you
23 reviewed?
24     A.   I mean, as I wrote my report, that was
25 sort of some of my notekeeping of some of this.

Page 147

1 But, no, I didn't keep notes.  I had a folder of
2 where I was sort of storing all the things I was --
3 like, my materials considered.
4     Q.   Some -- some of the documents that you
5 have listed on your materials considered list were
6 in the 300- to 500-page range.  Do you know that?
7     A.   I mean, depositions were hundreds of
8 pages long; so, sure, yeah.
9     Q.   And you know that there are some other
10 documents that are also quite lengthy?
11     A.   Possibly.  I don't necessarily -- like
12 I said, I was -- I was trying to be cognizant of
13 time in reviewing everything.  So I didn't
14 necessarily read all three to five hundred pages of
15 everything.
16         I at least looked at and reviewed the
17 things in this list of materials.  Some of them --
18 some of the depositions, I read the hundreds of
19 pages that existed.  Some of them, I did not
20 necessarily.
21     Q.   And just so we can make sure that we're
22 able to do the math on all of this, did you bill
23 plaintiffs' counsel for all of the review of all
24 the documents on this 1200-page list?
25     A.   I billed for the time I spent reviewing

Page 148

1 materials for this case, yes.
2     Q.   Okay.  So if we want to know how much
3 time you actually spent in review of the thousands
4 of documents on this list, we just need to look at
5 your invoices.  Is that fair?
6     A.   Yes.
7     Q.   Okay.  There wasn't time that you were
8 spending on that that you didn't charge people for,
9 yes?
10     A.   I may have spent a little bit of time
11 looking at a few things that I didn't feel the need
12 to charge for.
13     Q.   And what -- of the deposition
14 transcripts, specifically, what percentage of them
15 did you read in their entirety?
16     A.   I can't recall.
17     Q.   Was it more or less than 50 percent?
18     A.   I can't tell you a percentage because I
19 don't know how many off the top of my head are on
20 there.
21     Q.   Do you know if it was more or less for
22 certain defendants in the case?
23     A.   I think I may have read proportionately
24 more for Meta, but I read some across the board.
25         MS. JONES:  I think this is probably a

Page 149

1 useful time to go ahead and take our break.
2         MR. OLIVER:  Our lunch break?
3         MS. JONES:  Yes, I think this is a --
4         MR. OLIVER:  Okay.  Are we --
5         MS. JONES:  -- rational --
6         MR. OLIVER:  Can we do that -- and it
7 doesn't have anything to do with anything.  Can we
8 do that pretty quickly?  I mean, as quickly as we
9 can?
10         MS. JONES:  Yes.
11         MR. OLIVER:  Okay.
12         THE VIDEOGRAPHER:  Going off the
13 record.  The time is 12:12 p.m.
14             * * *
15         (Whereupon, there was a luncheon recess
16 in the proceedings from 12:12 p.m. to 12:40 p.m.)
17             * * *
18         THE VIDEOGRAPHER:  Going back on the
19 record.  The time is 12:40 p.m.
20 BY MS. JONES:
21     Q.   Dr. Telzer, have you ever reviewed any
22 of Instagram's safety and well-being-related
23 features?
24     A.   Have I reviewed them within the app or
25 more broadly?

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL

Page 150

1    Q.   That's a fair question.  Let's start
2  with within the app.  Have you ever gone into the
3  app and actually assessed and looked at the
4  specific safety and well-being-related features
5  that are part of the application?
6    A.   Yes.  I've gone in and looked through
7  as part of, probably a long time ago, originally
8  setting up my own; but also, more recently, just to
9  explore it myself now.
10    Q.   What specific features are you familiar
11  with, safety and well-being features, on Instagram?
12    A.   I can't recall, like, names of specific
13  features off the top of my head.
14    Q.   Okay.  Are you familiar at all with
15  Teen Accounts?
16    A.   I -- if you mean the more recent change
17  in Instagram to include something that's more --
18  the safety features directed more towards teens?
19    Q.   Uh-huh.  Yes.
20    A.   I'm familiar with that, yeah.
21    Q.   Yes.  Do you -- do you know anything
22  about the specific elements of Teen Accounts?
23    A.   I can't recall off the top of my head
24  those specific elements.
25    Q.   Dr. Telzer, since your last deposition

Page 151

1  in June, have you reviewed the medical records of
2  any of the individual plaintiffs who have brought
3  personal injury claims in the federal MDL?
4    A.   I have not.
5    Q.   Do you know anything about the specific
6  individual plaintiffs who have brought personal
7  injury claims in the MDL?
8    A.   I do not.
9    Q.   Recognizing that you have opinions
10  about social media use and teenagers more
11  generally, do you have any specific opinions about
12  any of the specific plaintiffs who have brought
13  personal injury claims in the MDL?
14    A.   I have not reviewed their records, so I
15  don't have personal opinions about specifics.
16    Q.   Are you familiar with what school
17  districts have brought claims against the
18  defendants in the federal MDL?
19    A.   I'm not.
20    Q.   Are you offering any opinions about the
21  specific school districts that have brought claims
22  in the MDL?
23    A.   I don't know the specific schools, so I
24  can't offer specific opinion about a specific
25  school.

Page 152

1    Q.   Let me ask you to go back to your
2  primary MDL report, Exhibit Number 1.  And I'm
3  going to direct you to Page 154, please.
4    A.   Okay.
5    Q.   And roughly midway down on Page 154,
6  there are two graphs reflecting time spent on
7  smartphones by hour and minutes and time spent on
8  social media in minutes, correct?
9    A.   Hour and minutes.  Yes.
10    Q.   And is this -- this data that's
11  reflected at the figure on 154, that is the data
12  that you're referring to in the immediately
13  preceding sentence that says:  For reference, in
14  our study, school hours were 8 a.m. to 3 p.m. --
15  which means that 10 percent of their school hours
16  were spent specifically on social media.
17    A.   Can you say that question again?  I'm
18  sorry.
19    Q.   Sure.  That's -- it, perhaps, was a
20  little confusing.
21         Right above those figures, there's a
22  sentence that begins:  For reference.
23         Do you see that?
24    A.   Yes.
25    Q.   It says:  For reference, in our study,

Page 153

1  school hours were 8 a.m. to 3 p.m. -- which means
2  that 10 percent of their school hours were spent
3  specifically on social media.
4         Do you see that?
5    A.   I see that.
6    Q.   And then immediately below that, there
7  is a figure and then a figure note.
8         Do you see that?
9    A.   I see that.
10    Q.   Is the -- are the figures that are
11  reflected here a depiction -- a kind of visual
12  depiction of the point that you make in that
13  sentence above?
14    A.   I believe so.  I need to look.
15    Q.   Yes, of course.  That's fine.
16    A.   Okay.  Yeah.  These two figures are the
17  data that are referenced in the prior paragraphs.
18    Q.   Okay.  Got it.
19         So I want to focus your attention for a
20  moment on the graph that appears on the left:  Time
21  Spent on Smartphones by Hour (Minutes).
22         Do you see that?
23    A.   I do.
24    Q.   And then -- so that -- that is the data
25  on the time spent on smartphones overall; is that

HIGHLY CONFIDENTIAL

Page 154

1 right?
2     A.  Correct.  That's their total screen
3 time on their smartphone.
4     Q.  Okay.  And then the graph on the right
5 shows time spent on social media on school days
6 versus non-school days, correct?
7     A.  Correct.
8     Q.  All right.  On the left-hand side, the
9 green bars, do those reflect smartphone and social
10 media use only on school days or some combination?
11     A.  I'm trying to reference my previous
12 similar graphs.
13     Q.  Sure.
14     A.  I realize that the legend didn't come
15 all the way through here to differentiate the light
16 green and dark green bars.
17        Is that what you're asking about is the
18 light green and dark green bars?
19     Q.  Actually, I'm asking something slightly
20 different --
21     A.  Okay.
22     Q.  -- which is -- I'm -- I'm assuming that
23 the light green and dark green are differentiating
24 between total screen time and screen time that
25 involves social media; is that right?

Page 155

1     A.  I think so, although I'm realizing that
2 the legend did not come through.
3     Q.  It's true.  We're -- well --
4     A.  Yeah.
5     Q.  So if you look -- if you look at the
6 figure note --
7     A.  Oh, yes.
8     Q.  -- that may give you some sense.
9        So it says:  The left figure shows time
10 spent on social media across the day on school
11 days -- it says "dark blue," but I actually think
12 that should say "green," perhaps -- and non-school
13 days (light blue bars left panel).
14        Does that help at all?
15     A.  Yes.  So that is showing total screen
16 time, differentiating it by total minutes on
17 smartphone versus total minutes on social media
18 apps.
19     Q.  Okay.  And the other thing that we
20 thought might be the case is that the description
21 in the figure note, the first part of that
22 description about the right figure we think applies
23 to, actually, the left --
24     A.  Left.
25     Q.  -- figure.  Is that right?

Page 156

1     A.  Yes.
2     Q.  Okay.  That's helpful.
3        And then the description about the left
4 figure we think applies to the right figure.
5     A.  Yes.
6     Q.  Is that right?
7     A.  Yeah.
8     Q.  Okay.
9     A.  I apologize for that error.
10     Q.  No, no, no.  That's totally fine.  I'm
11 glad we cleared it up.  Okay.
12        So the left figure shows total screen
13 time in dark green, yes?
14     A.  Yes.
15     Q.  And then the light green shows social
16 media time.
17     A.  Yes.
18     Q.  Yes?  So the question that I was just
19 trying to -- hope we -- I was trying to figure out
20 if we can button up is:  Does the left figure
21 reflect just school days or school days and
22 non-school days?
23     A.  That would be school days.
24     Q.  Okay.  Got it.  That's helpful.
25        And the way that you collected this

Page 157

1 data was you had participants take screenshots in
2 their Apple iOS Screen Time app to show how much
3 time they spent using apps in certain categories;
4 is that right?
5     A.  Yeah.  Under the, like, screen use
6 stats that the phone collects, every day for
7 14 days they took a screenshot of multiple of those
8 screens for the current day which shows the time
9 across the day, and it also shows it based on
10 different categories.
11     Q.  And one of the categories of apps is
12 Social; is that right?
13     A.  I believe so.
14     Q.  Do you know how many apps are included
15 in the Social category?
16     A.  I don't recall off the top of my head,
17 and it might even be -- it might even be
18 nondisclosed by Apple.  I don't recall.
19     Q.  Okay.  So, for example, could there be
20 as many as ten apps included in the Social
21 category?
22     A.  I have no idea.  I think it -- it
23 compiles probably similar to the Common Sense Media
24 report we were looking at earlier, the different
25 platforms that they may be using.

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL

Page 158

1    Q.  Okay.  So in terms of the information
2 that's reflected here in the left figure, time
3 spent on smartphones by hour and the social media
4 information in particular, we don't know how many
5 Social category apps might have been included in
6 that data; is that right?
7    A.  I don't recall specifically.  I think
8 what we do have information on is the top apps that
9 that does include.
10       And I don't want to misstate it without
11 having the exact data.  But similar to the previous
12 dataset, the top Social apps were always those that
13 we're talking about today.
14    Q.  Well, let me -- I just want to take a
15 step back.
16       So on the -- in the Apple system, you
17 are able to go in and essentially figure out how
18 much time are you spending in different categories
19 of apps, right?
20    A.  Correct.
21    Q.  Okay.  And it sounds like earlier you
22 told me that you don't -- you don't -- and it's
23 fine if you don't.  But you don't know actually how
24 many apps are captured in that Social category in
25 the Apple system; is that right?

Page 159

1    A.  I don't believe we know specifically
2 the total apps.  But we do have for each person the
3 top apps that that does include.
4    Q.  Sure.  But that's not -- that's not
5 data that you are getting from the Screen Time
6 function in -- on the iPhone, right?
7    A.  The Screen Time gives us, across the
8 different categories, the total amount within that
9 category.  Within that category, we can see the top
10 apps that were used.
11    Q.  Okay.  When you say "within that
12 category, we can see the top apps that were used,"
13 where is that information coming from?
14    A.  It's also from the screenshot.  It
15 shows -- it's hard to, like, visualize and -- and
16 walk through without an actual visual of it.  But
17 it will show the time usage.  And then, right under
18 that, it says the top apps.
19    Q.  Do you know if the Social category in
20 the Screen Time setting includes, for example,
21 Reddit?
22    A.  I'm not sure if I know what it includes
23 and if it includes Reddit.
24    Q.  Okay.  So for -- you don't know if it
25 includes, for example, X, what was formerly known

Page 160

1 as Twitter?
2    A.  I could know that by looking at the top
3 apps used if those ever merged.  I can look back at
4 the data to determine that.  Off the top of my
5 head, I don't recall.
6    Q.  Going back to your charts, your data
7 reflects that overall smartphone use during school
8 hours was between, it looks like, 9 minutes and
9 16 minutes per hour; is that right?
10    A.  I believe that I indicated the
11 average -- and that's the average across all
12 participants and across all days -- increased
13 across the day.  So, on average, it's 9.2 minutes
14 at 8 a.m., and it increased to 16.8 minutes at
15 2 p.m.
16    Q.  Okay.  And that -- that roughly tracks,
17 I think, visually to the figure on the left with
18 the green bars, "during the school hours" box; is
19 that right?
20    A.  Yeah.
21    Q.  Okay.
22    A.  That looks visually similar.
23    Q.  Yeah, okay.  And so the -- the fact
24 that you have this -- and -- and to be clear,
25 the -- the green lines and -- excuse me.

Page 161

1       The green bars and the light -- the
2 dark green bars and so the light green bars --
3 strike all that.
4       The dark green bars and the light green
5 bars are at different levels, it looks like, during
6 the entirety of the school hours window; is that
7 right?
8    A.  The amount of smartphone use for total
9 versus social is different at each hour.
10    Q.  Right.  And that suggests that students
11 are, in fact, using their phones not just for
12 social media but for other things, right?
13    A.  It suggests, certainly, that there are
14 other things beyond the social app or the Social
15 category.
16       And I want to qualify that because I
17 believe the Apple category includes YouTube in a
18 separate category of entertainment, I believe.  So
19 this is not capturing YouTube time, and that would
20 be sort of thrown into the dark green bar.
21       I would have to go back and
22 specifically check that, but that's my
23 recollection.
24    Q.  Dr. Telzer, I just had just a couple of
25 additional questions, and then I'm going to pass

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL

Page 162

1  you to counsel for -- I believe Snap is going to go
2  next.
3       Could I ask you to go to -- back to
4  Exhibit 2, which is your supplemental report?
5       MR. OLIVER:  Rebuttal report?
6       MS. JONES:  I'm sorry?
7       MR. OLIVER:  Rebuttal report?
8       MS. JONES:  Yes, rebuttal.  I
9  apologize.  I said "supplemental."  Thank you.
10      MR. OLIVER:  I just want to make sure
11 I'm looking at the right --
12      MS. JONES:  No, no, no.  I thank you.
13      MR. OLIVER:  -- in the right --
14      MS. JONES:  Yeah.  If there's a
15 supplemental report, we want to know that, too.
16 BY MS. JONES:
17      Q.  Okay.  50, please.
18      A.  Page 50?
19      Q.  Yes, please.
20      Dr. Telzer, on Page 50 at Paragraph
21 150, there is a sentence at the very bottom of that
22 paragraph that I wanted to ask you about.  It
23 begins with "based on all."
24      Do you see that?
25      A.  I do.

Page 163

1      Q.  It says:  Based on all the research and
2  data available through neuroscience, psychology,
3  behavioral science, and now from the platform's own
4  internal documents and research, a comprehensive
5  risk-benefit analysis strongly favors the
6  conclusion that the risks of social media outweigh
7  its benefits, particularly for younger and more
8  vulnerable users.
9      Do you see that?
10      A.  I do.
11      Q.  And I actually just wanted to follow up
12 on this reference here to a comprehensive
13 risk-benefit analysis.
14      Do you see that?
15      A.  I do.
16      Q.  Just -- just so we understand, what --
17 what do you consider to be included within what you
18 describe here as a comprehensive risk-benefit
19 analysis?
20      A.  This is me weighing all of the things
21 that I have reviewed -- all of the analyses across
22 different papers, what we know from some of the
23 foundational neuroscience work, also from my work
24 in schools and talking to teens, all of the
25 totality of that -- sort of weighing what we know

Page 164

1  about the different risks and potential benefits.
2  That's my -- what I'm doing here is a comprehensive
3  risk-benefit analysis.
4      Q.  Okay.  Let me ask you one other
5  question.  Go to the preceding page, 49.  It's
6  actually the only paragraph on that page, Paragraph
7  149.
8      Do you see it?
9      A.  I do.
10      Q.  It says:  Empirical studies continue to
11 show associations between social media use and
12 increased mental -- mental health problems, sleep
13 disruption, loneliness, poor body image, suicidal
14 thoughts and behaviors, disruptive engagement in
15 school, and alterations in brain circuits involved
16 in reward, emotional regulation, and social
17 processing.
18      Do you see that?
19      A.  I do.
20      Q.  And you include citations for all of
21 those different outcomes, yes?
22      A.  Yes.
23      Q.  Do any of those studies show causation
24 between social media use and the specific outcomes
25 that you outline here?

Page 165

1      A.  I'd have to look at individual studies
2  about that.  It's more about the totality of all of
3  these studies help us establish causation.
4      I think some of these -- and I don't
5  necessarily rely solely on these.  These are
6  examples of some of the empirical studies that
7  support that there's associations between social
8  media use and these outcomes.
9      But across the board and putting all of
10 what we know together, I think that there's pretty
11 clear and consistent and compelling evidence to
12 establish causality.
13      Many of these studies -- for example,
14 the Kleemans study establishes very strong
15 causality because it was a experimental design
16 where we can make very strong causal claims.
17      Other -- other studies in here are
18 longitudinal studies, where we can be very
19 confident in causality.
20      But it's really about the totality of
21 all the research and all of the work in each of
22 these areas that we can know that these links are
23 causal.
24      Q.  If you -- if you have that level of
25 confidence about what these studies show in terms

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL

Page 166

1 of causation, why did you not say here that these
2 studies show causation as opposed to association?
3    A.  I think that that's just a difference
4 in lexicon.  It's essentially what I am saying
5 here.  There is -- and I've repeated it throughout
6 my report and through our discussions.  There is
7 strong evidence of causality.  I did not
8 necessarily use that word here.
9    Q.  And so when you say "show associations"
10 here, you mean -- what you mean by the word
11 "associations" is causation?
12    A.  I mean that there is strong evidence
13 that social media use is causing increased mental
14 health problems, sleep disruption, loneliness, poor
15 body image and suicidal thoughts and behaviors and
16 disrupted engagement in school as well as
17 alterations in brain circuits.
18    Q.  And you're using -- I just want to make
19 sure I understand.  You're using the word
20 "associations" interchangeably with "cause" in that
21 paragraph?
22    A.  Yeah.  I think that it's just a word
23 choice here that doesn't have bearing on what I
24 mean here.  There -- the research in totality and
25 the basis of my opinions that I've talked about is

Page 167

1 that this is showing causal links between social
2 media and all of these outcomes.
3    Q.  Does any one of the studies listed here
4 between Footnotes 135 and 141 actually use the word
5 "cause" as opposed to "association"?  Do you know?
6    A.  I don't know off the top of my head.
7 Some of these were experimental designs with sort
8 of a randomized experimental condition where you in
9 the field traditionally make very strong causal
10 statements.
11       So I speculate with -- with especially
12 the Kleemans paper, maybe there's a few others in
13 here that there are causal -- causal terminology in
14 there.  I'd have to go back and look.
15    Q.  You don't know, sitting here today?
16    A.  I don't know off the top of my head if
17 each of these papers used the word specifically
18 "causal."  But I think, perhaps, in at least one,
19 if not more, of them.
20    Q.  And -- okay.
21       MS. JONES:  I'm going to pass the
22 witness.  I think, actually, counsel for Snap is
23 going to be asking questions.  It will be via Zoom.
24       So I think the documents will be on the
25 screen in front of you.

Page 168

1       THE VIDEOGRAPHER:  Can we go off the
2 record for one second?
3       MS. JONES:  Yes, of course.
4       THE VIDEOGRAPHER:  Going off the
5 record.  The time is 1:04 p.m.
6              *  *  *
7       (Whereupon, there was a recess in the
8 proceedings from 1:04 p.m. to 1:05 p.m.)
9              *  *  *
10       THE VIDEOGRAPHER:  Going back on the
11 record.  The time is 1:05 p.m.
12              *  *  *
13          EXAMINATION
14 BY MS. PARK:
15    Q.  Hi, Dr. Telzer.  My name is Ariella
16 Park, and I am an attorney at Munger Tolles & Olson
17 representing Snap, the maker of Snapchat, in this
18 litigation.
19       Thanks very much for your time, and I'm
20 sorry I'm not there in person with you.  But thank
21 you for your flexibility doing this over Zoom.  And
22 I recognize you are now looking at lots of
23 different cameras, so I appreciate it.
24       I just have a couple of questions for
25 you on some, like, Snap-specific issues that

Page 169

1 hopefully will be pretty narrow questions, and so
2 we can hopefully move through this pretty quickly.
3       My questions will be pretty narrow and
4 specific, and so I'd just ask that you also be
5 careful to listen to the question and keep your
6 answers similarly focused.
7       So -- oh.  Also, at any point in time
8 if you can't hear me or if there's something going
9 wrong with the Zoom, just flag for me and we can
10 restart.
11       So, first, I wanted to just establish a
12 little bit more the scope of your rebuttal report
13 and the opinions you express in your rebuttal and
14 your other prior reports you've submitted in this
15 matter.
16       Did you read Dr. Stephen Buka's expert
17 report?
18    A.  Stephen Buka's expert report.  I
19 believe I looked at it.
20    Q.  Okay.  I don't believe I saw you
21 reference his report or any of his specific
22 opinions in your rebuttal report; is that right?
23    A.  I don't recall specifically if I did or
24 didn't.
25    Q.  You can take a look to confirm if you'd

43 (Pages 166 - 169)

Page 170
1 like, but I didn't see any reference to it.
2    A.  Okay.
3    Q.  So if you're not offering any specific
4 opinions in your rebuttal report, is that fair to
5 say that you're not offering any specific opinions
6 in response to him?
7    A.  Oh, not necessarily.  I think that,
8 generally speaking, some of my rebuttal opinions
9 apply to many of the defense experts' reports, even
10 if I didn't specifically name them.
11       Many of -- there was some similarities
12 across reports.  Sometimes I just gave an example
13 of somebody who brought up that topic.  So it could
14 apply to other expert defense reports.
15       And then in other places, I was
16 responding specifically to a comment in one defense
17 report, in which case that applied to that specific
18 comment.
19       But I would not necessarily say that my
20 rebuttal does not -- does not respond to that
21 report.
22    Q.  Sure.
23       Sitting here today, is there anything
24 in particular specifically as to Dr. Buka that you
25 would like to respond to?

Page 171
1    A.  I don't have anything to respond to at
2 this moment.
3    Q.  Okay.  And I believe in your rebuttal
4 report you cite three specific studies.  If you
5 want to look at your rebuttal report on Page --
6 it's Paragraph 65 and 66.  Paragraph 65 starts on
7 Page 21 but spills over into Page 22.
8       And it looks like there are three
9 specific studies that looked at Snapchat, in
10 particular, that you cite on this page of your
11 report.  And I'd like to confirm that those are the
12 only Snapchat-specific studies that you cite in
13 your rebuttal report; is that right?
14    A.  I can't recall off the top of my head
15 if that's the only ones in my rebuttal report.  But
16 there is broader literature that I've relied -- or
17 not "relied."
18       My materials considered list includes
19 other work as well, but these are the three -- or
20 maybe there's four papers here.  One second.  But
21 in terms of this paragraph here, these are the
22 papers that I'm discussing specifically.
23    Q.  Sure.  You can take time to review your
24 rebuttal report, if you'd like.
25       But it appears that -- I think it's

Page 172
1 three studies between Footnote 79 and 82.  Those
2 are the only ones that you specifically cited in
3 your rebuttal report, I believe.  Could you
4 confirm?
5    A.  Well, if that's the case, then it's
6 four, not three.  But those are the ones on that
7 page.
8    Q.  Yeah, I think the study at -- the
9 van Essen study appears at both Footnote 80 and 82.
10 So I believe it's the same study.
11    A.  Oh, I see, yeah.
12    Q.  And so you're saying you may have
13 included other Snapchat-specific studies in your
14 materials considered list.
15       Are there any other Snapchat-specific
16 studies that you cited in any of your reports,
17 whether this rebuttal report or your JCCP report or
18 your primary MDL report?
19    A.  I can't recall off the top of my head.
20 But many of the research studies that I have read
21 and examined are often focused on some of the
22 features of platforms that certainly apply to
23 Snapchat.
24       So even if the study wasn't a specific
25 Snapchat study, many of the studies that we've

Page 173
1 looked at would certainly still apply to Snapchat.
2    Q.  All right.  My question was whether you
3 cited any other studies that specifically looked at
4 Snapchat features.  And what I'm hearing is that
5 your answer is "no"; is that right?
6    A.  I don't think I said "no."  I said, on
7 this page, I cite those three papers.  There may be
8 more in my materials considered list.  And the
9 broader literature that I've relied upon and read
10 applies to many of the Snapchat features and apply
11 to Snapchat because of that.
12    Q.  But sitting here today, you can't tell
13 me, you know, the author, the year of the specific
14 other studies that looked at Snapchat?  Not just at
15 social media platforms' features that you're
16 contending might be relevant to Snapchat, but
17 looked at Snapchat specifically?  You can't -- can
18 you name any specific studies like that?
19    A.  I can't recall off the top of my head
20 other specific studies.  They may be in my
21 materials considered list.  But, also, the broader
22 literature on social media and many of the shared
23 features would still apply to Snapchat even if not
24 specifically on Snapchat.
25    Q.  All right.  Well, let's look at --

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL

Page 174

1 let's focus on these three specific Snapchat
2 studies that you did identify in your rebuttal
3 report.
4        So if we turn to -- back to your
5 rebuttal report, at the -- I believe this is around
6 the top of Page 22.  You reference the Vaterlaus
7 2016 study.
8        And you specifically state:  Because
9 photos and videos on Snapchat disappear after a
10 brief time, young adults have shared that some
11 users exploit this perceived impermanence to engage
12 in sexting.
13        And there's a Footnote 79 that drops to
14 the Vaterlaus study; is that right?
15     A.  You read that correctly.
16     Q.  Great.  So keep your rebuttal report
17 handy because I'll refer back to it again.
18        But I would like to now introduce -- I
19 believe we're at Exhibit 12 -- the Vaterlaus study,
20 which you should be able to see on your screen.
21 I'm sorry I don't have a paper copy for you.
22        (TELZER EXHIBIT 12, Vaterlaus, et al.,
23 study titled "Snapchat is more personal":  An
24 exploratory study on Snapchat behaviors and young
25 adult interpersonal relationships, was marked for

Page 175

1 identification.)
2 BY MS. PARK:
3     Q.  Does this look like a copy of the study
4 that you cited?
5     A.  Yes.
6     Q.  Great.  And now let's turn to Page 599.
7        Do you see in the -- do you see in
8 the right-hand column towards the bottom of the
9 page there is a paragraph that's titled
10 "7.2 Functionality"?
11     A.  I see that.
12     Q.  And then about halfway down that
13 paragraph, there's a sentence where these all --
14 where these authors of this study that you cite in
15 your report also conclude that:  Snapchat, quote,
16 alleviates the potential for miscommunication
17 because snaps include pictures overlaid with text
18 that can clarify meaning and share emotion within
19 relational communication.
20        That's another finding from the study
21 that you cite, right?
22     A.  I'm not sure if that's a finding from
23 the study.  I can't tell if that's a finding or a
24 sentence that they've written, based on this one
25 paragraph.

Page 176

1     Q.  Well, you can feel free to read the
2 rest of the paragraph, if you'd like.  This is a --
3 you just included this in your rebuttal report from
4 last week, so...
5     A.  Yeah, I just -- normally, without
6 seeing the full paper, it's harder for me to see
7 the context of that sentence.  But thank you for
8 zooming out a little bit for me.
9        Okay.  I mean, that sentence is written
10 there.
11     Q.  Right.
12        And so this is something that the
13 author wrote about what they found about
14 Snapchat -- right? -- in this study that you cited
15 in your rebuttal report?
16     A.  I think that's what that sentence is
17 showing.
18     Q.  Great.  But you didn't -- you didn't
19 discuss that particular finding in your report, did
20 you?
21     A.  I did not write every single result
22 from all the papers in my report, no.
23     Q.  Let's look at the paragraph under that,
24 which is -- the subheading is "Enhance connection
25 in existing interpersonal relationships."

Page 177

1        So about halfway down that paragraph,
2 you'll see there's -- these authors also write --
3 they conclude that, quote:  Young adults perceived
4 that Snapchat could enhance connection within their
5 relationships with family, friends, and romantic
6 partners.  Some young adults even suggested
7 Snapchat could strengthen their interpersonal
8 relationships.
9        So that's another finding from this
10 study you cited, right?
11     A.  I believe that's another finding, yes.
12     Q.  And you didn't mention that finding in
13 your report, right?
14     A.  Like I said, I did not include every
15 single finding from their paper in my report.  But
16 the full paper is in my materials considered.  So I
17 considered all of their findings in forming my
18 opinions.
19     Q.  Right.  You considered it, but you
20 didn't expressly state that particular finding in
21 your report; is that right?
22     A.  I did not include that particular
23 finding.  But as you can probably see in the later
24 portions of my report, I do talk about how the
25 short-term perceived benefits of feeling connected

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL

Page 178

1 to others is outweighed by some of the more severe
2 harms.
3        Predatory -- predators and sexting
4 online and on this platform is probably considered
5 much more harmful than a short-term feeling of
6 connection to a partner.
7    Q.  And did you cite any research for that
8 conclusion that you just articulated --
9    A.  I --
10    Q.  -- that --
11    A.  I'm sorry.
12    Q.  Go ahead.  No, sorry.  Go ahead.  I
13 interrupted you.
14    A.  Yeah, I -- in the -- I think it's one
15 of the final sections of my report, I do talk about
16 sort of the risks and benefits of social media and
17 acknowledge that there are these potential
18 short-term benefits where individuals might have
19 this feeling of connection, but that is outweighed
20 by the harms.  And one of those harms is -- some of
21 the findings that they found is exploiting these
22 images with sexting.
23    Q.  And you -- there was no
24 Snapchat-specific study you looked at that did that
25 specific weighing of benefits and costs that you're

Page 179

1 talking about?
2    A.  I'm talking about the totality of the
3 research, including some of the Snapchat studies,
4 but also the broader literature, my work -- work --
5 my work in the schools and talking to teens and
6 parents and all of the materials that I considered.
7 So it is based on the totality of everything.
8    Q.  Let's look at how these authors thought
9 about the potential benefits of Snapchat.  If you
10 look a little bit earlier in this same paragraph,
11 it looks like the authors compare the results of
12 their research about -- and I think what you said
13 in your words, increased connection with previous
14 research that, quote, "has identified that texting
15 connects youth with their parents and promotes more
16 social connection with their social networks."
17        And so you don't mention that -- the
18 similarities these authors found between the
19 impacts of Snapchat and texting in your report,
20 right?
21    A.  I apologize.  I don't know where we are
22 in the paper.
23    Q.  I'm sorry.  This is under 7.3, that
24 same paragraph we were just looking at.  The first
25 sentence in that paragraph.

Page 180

1        So I can read it again.  So the authors
2 compare their own results about strengthening
3 interpersonal relationships through Snapchat with
4 previous research that has identified that texting
5 connects youth with their parents and promotes more
6 social connection with their social networks,
7 right?
8    A.  I see that sentence now, yes.
9    Q.  Yes.
10        And you didn't mention the fact that
11 these authors found similarities between the
12 impacts of Snapchat and texting in your report,
13 right?
14    A.  I mean, I did not talk about all of
15 their statements or -- or summaries of the research
16 in my report, no.
17    Q.  Okay.  Well, let's turn back to your
18 rebuttal report now, to the same page, 22,
19 Paragraph 65, that appears there.
20        The last sentence of that paragraph
21 says -- you write -- sorry.  I'll just wait for the
22 exhibit to catch up in case you need the reference.
23        You write:  Other qualitative and
24 quantitative research on Snapchat indicate its use
25 is detrimental for users' mental health and

Page 181

1 romantic relationships.
2        Do you see that sentence?
3    A.  I see that.
4    Q.  And then you cite to this Dunn study
5 from 2020 at Footnote 81 in support; is that right?
6    A.  That's right.
7    Q.  All right.  So let's turn now --
8        MS. PARK:  I'll mark that as
9 Exhibit 13, the Dunn 2020 study.
10        (TELZER EXHIBIT 13, Dunn, et al., study
11 titled "Oh Snap!": A Mixed-Methods Approach to
12 Analyzing the Dark Side of Snapchat, was marked for
13 identification.)
14 BY MS. PARK:
15    Q.  And does that look like the study you
16 reviewed?
17    A.  Yes.
18    Q.  Do you recall the methodological design
19 for this study?
20    A.  I'd have to look back at it.
21    Q.  If you go to Page 77 -- which we'll get
22 there.  If you can flip there.  Yeah -- you will
23 see there's a section that talks about how -- here,
24 let me see.
25        This was a cross-sectional survey of

HIGHLY CONFIDENTIAL

Page 182

1 118 students in an online survey, with 10
2 participants who engaged in an in-depth interview,
3 and 11 partook in focus groups; is that correct --
4 is that a correct description of the survey -- of
5 the study methodology?
6      A.   That looks right.
7      Q.   And now let's turn to Page 83 where the
8 study authors are discussing -- actually, maybe if
9 we show you Page 82 to show you more of the
10 context.
11      82, you see this -- the heading that
12 says "Results," subheading "Mental Health," and it
13 looks like this is now the section of the report
14 where the authors are discussing their study
15 results.  Is that fair to say?
16      A.   Yes.
17      Q.   So at the -- in the paragraph that
18 appears on Page 83, the authors write:  From the
19 regression results, it appears that spending time
20 on Snapchat is related to lower levels of mental
21 health, regardless of age, gender, ethnicity, and
22 sexual orientation.  It could also be that
23 individuals with lower levels of mental health
24 spend more time on Snapchat.
25      So, in other words, the authors are

Page 183

1 explaining that their study results can't
2 differentiate whether time spent on Snapchat might
3 lead to lower mental health or whether individuals
4 with lower levels of mental health are more likely
5 to spend time on Snapchat, right?
6      A.   Yeah, this is a cross-sectional study
7 looking at correlations between variables.  So
8 they're saying that Snapchat is related to lower
9 levels of mental health, but given that it's at one
10 time point, we don't know if it could also be that
11 individuals with lower levels of mental health
12 spend more time on Snapchat.
13      Q.   And this was the one study that you
14 cited in your rebuttal report to support your
15 conclusion that Snapchat use is detrimental to
16 users' mental health in romantic relationships,
17 right?
18      A.   This was just one example of other work
19 that has shown links between Snapchat and mental
20 health in romantic relationships.
21      I think the totality of the research
22 doesn't take away from my opinion here that
23 Snapchat is detrimental for users' mental health in
24 romantic relationships.
25      Q.   But like we've discussed, you can't,

Page 184

1 right now, off the top of your head, think of any
2 other specific Snapchat study that would have found
3 results like this, right?
4      A.   I think I said that I can't think of
5 any papers off the top of my head, but I have lots
6 of things that were in my materials considered list
7 and lots of research that has not necessarily
8 focused on the Snapchat platform, but look at the
9 features that are similar and we can apply to all
10 platforms, including Snapchat.
11      And so we don't need to necessarily
12 rely on a singular paper or singular correlation to
13 understand these links.
14      Q.   You've spoken a couple times now about,
15 like, similarities and features that might allow
16 you to extrapolate from nonspecific --
17 non-Snapchat-specific studies.  In your mind, what
18 are those features?
19      A.   We talked about, earlier today, beauty
20 filters.  I think that that is a huge part of
21 Snapchat and all of the other platforms here.
22      Snapchat has short-form video content
23 as well, which includes algorithms.  There's
24 notifications.  There's quantifiable metrics
25 involved in it.

Page 185

1      So all of these different features are
2 shared across the platforms, and that's a lot of
3 what the research has focused on, is these features
4 that are similar across these platforms.
5      Q.   But that's not what this study was
6 looking at -- right? -- none of those features that
7 you were just talking about?
8      A.   I don't know what you mean.
9      Q.   So you just listed a couple of features
10 that might be similar across Snapchat and other
11 platforms.  Do you recall if this particular study
12 that we're talking about was looking at that
13 feature level of analysis?
14      A.   I don't believe that this study was
15 looking at features -- those features specifically.
16 But those features are embedded in using Snapchat.
17      It shows here -- in fact, I think it
18 does include that, because it includes things like
19 looking at stories, chatting, using Snap Map.
20 Those are -- those are built-in features of
21 Snapchat.
22      Q.   And would you agree that, actually, a
23 lot of those -- so you just pointed to these -- I
24 assume you're looking at these, like, variables
25 about Snapchat behavior.

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL

Page 186

1        Would you agree that things like
2 sending snaps, receiving snaps, posting snaps,
3 those all relate to communication among users on
4 the platform?  Is that fair to say?
5      A.  I don't think I understand the
6 question.  Is sending snaps related to
7 communication?
8      Q.  Yes.
9      A.  Sending snaps is one way that one might
10 communicate.
11      Q.  Right.
12        Okay.  Turning back to your rebuttal
13 report on Page 22, in Paragraph 66 now, the last
14 Snap-specific study you cite is related to a
15 sentence that you state in the middle of the
16 paragraph, where you talk about how, quote,
17 "adolescents who maintain more Snapchat streaks
18 show an increase in problematic smartphone use and
19 also are more likely to have lower self-control."
20        Do you see that?
21      A.  I see that.
22      Q.  And that's the one -- and the one
23 source you cite in support of your opinion is this
24 van Essen 2023 study -- right? -- which appears at
25 Footnote 82?

Page 187

1      A.  That is one citation that is referenced
2 there.
3        MS. JONES:  And so I'll mark that as --
4 I think it's Exhibit 14 now, the van Essen study.
5 Let's take a look at that.
6        MR. OLIVER:  You-all don't have copies
7 of these?  Just -- I mean, I'm trying to read them
8 on the screen, but...
9        MS. JONES:  I don't know who "you-all"
10 is.  We -- I assume we don't have copies of them
11 here.
12        MS. PARK:  We can provide copies via
13 email later, if that's helpful.
14        MR. OLIVER:  Less helpful than it needs
15 to be.  But it's your examination.  I made my
16 objection.  Just try to make it as big as you can
17 on the screen.
18        (TELZER EXHIBIT 14, van Essen, et al.,
19 article titled Snapchat streaks-How are these forms
20 of gamified interactions associated with
21 problematic smartphone use and fear of missing out
22 among early adolescents?, was marked for
23 identification.)
24 BY MS. PARK:
25      Q.  All right.  Dr. Telzer, you'll tell me

Page 188

1 if you have trouble reading the document on the
2 screen, right?
3        MR. OLIVER:  But I have to be able to
4 read it, Counsel.
5        MS. PARK:  Yes, I understand that.
6        MR. OLIVER:  All right.
7        MS. PARK:  But I just want to confirm
8 that the witness can read it and has been answering
9 my questions.
10        MR. OLIVER:  She has a different screen
11 than I have.
12        THE WITNESS:  Yeah, it's more
13 challenging to read it on the screen without
14 control of what I'm looking it, but it will do.
15 BY MS. PARK:
16      Q.  Okay.  So looking at this van Essen
17 study, will you turn to Page 4 of the study.  We'll
18 navigate there.
19        MS. JONES:  Do -- do you want this one?
20 I can see --
21        MR. OLIVER:  Sure.
22        MS. JONES:  -- this reasonably --
23        MR. OLIVER:  That's fine.
24        MS. JONES:  -- well.
25        MR. OLIVER:  That's fine.

Page 189

1        MS. JONES:  You can move -- you can
2 move that.  I didn't -- I didn't --
3        MR. OLIVER:  I would actually like it.
4 Perfect.  Thank you.  Thank you, folks.
5 BY MS. PARK:
6      Q.  Okay.  So we're at -- we're at Page 4,
7 the last paragraph in the right-hand column of that
8 page, if we can zoom in there.
9        If we take a look at the first
10 sentence, the sentence says:  The effect size of
11 all variables, though statistically significant,
12 are relatively small.  Is that right?
13      A.  That's what it says.
14      Q.  You didn't mention one way or the other
15 in your rebuttal report the effect size that --
16 effect sizes that were found in this study, right?
17      A.  I didn't go into the details of effect
18 sizes in this paragraph.
19      Q.  Gotcha.
20        If we turn to Page 5 of the document,
21 and if you zoom in on the left-hand column, those
22 first two paragraphs.  We're actually going to look
23 at the first full paragraph in there.
24        So -- sorry.  I should have given you
25 more context for this.  Would you -- do you want to

48 (Pages 186 - 189)

Page 190

1 go back and look at the prior page? This is the
2 "Discussion" section of the paper where the -- it
3 is titled "Discussion" section.
4     A. I'm okay for now, but I might need
5 to --
6     Q. Okay. So I'm going to read to you the
7 first full paragraph under "peers" there -- I'm
8 sorry. It's: In practice, this might mean for
9 parents and educators that they should not be too
10 concerned about children's engagement with Snapchat
11 streaks as it pertains to their children's FOMO,
12 problematic smartphone use, and social media
13 self-control.
14         Although each of these items have a
15 statistically significant correlation with the
16 number of people and the number of days adolescents
17 maintained Snapchat streaks, it is important to
18 acknowledge that there may be other factors not
19 addressed in this study that could have a more
20 significant impact on adolescents' use of Snapchat
21 streaks.
22         Did I read that correctly?
23     A. Yes.
24     Q. Okay. You didn't include the authors'
25 interpretation of the small effect sizes they found

Page 191

1 in your rebuttal report, right?
2     A. I did not include that statement in my
3 rebuttal report.
4     MS. PARK: Okay. All right. Well,
5 that's all for me, Dr. Telzer. Thanks very much
6 for your time.
7     MS. JONES: Andy, do you want to switch
8 spots? Do you want to be up here?
9     MR. KEYES: I'm fine here.
10     MS. JONES: Okay.
11         * * *
12         EXAMINATION
13 BY MR. KEYES:
14     Q. Good afternoon, Dr. Telzer. My name is
15 Andrew Keyes. I'm an attorney with the law firm of
16 Williams & Connolly, and we represent YouTube and
17 Google.
18         Would you turn to your rebuttal report?
19 I think it was marked as Exhibit 2.
20         Do you have that in front of you?
21     A. Yes.
22     Q. And would you go to Page 43? Are you
23 on Page 43?
24     A. Yes. Yes.
25     Q. I'd ask you to turn your attention to

Page 192

1 Paragraph 132.
2         You say, quote: While platforms like
3 YouTube can have educational value, we know from
4 research that many students primarily engage with
5 it for noneducational purposes, even during school.
6 This is not just anecdotal; it is supported by a
7 growing body of literature, including my own
8 empirical work, peer-reviewed research and
9 nationally representative surveys such as those
10 from Common Sense Media.
11         Did I read that correctly?
12     A. Yes.
13     Q. And then you have a footnote for that
14 proposition, Footnote 121, correct?
15     A. Correct.
16     Q. And Footnote 121 cites to a Common
17 Sense report, correct?
18     A. Correct.
19     Q. Do you cite anything else for your
20 statement in Paragraph 132 that I just read?
21     A. There is, I think, nothing else cited
22 in that particular spot.
23     Q. Okay. Would you turn to what was
24 previously marked as Telzer Deposition Exhibit 4.
25         Do you have that in front of you?

Page 193

1     A. I do.
2     Q. And Exhibit 4 is a Common Sense study,
3 correct?
4     A. Correct.
5     Q. This is the Common Sense study that you
6 cite in Footnote 121, correct?
7     A. I believe so.
8     Q. Is that a "yes"?
9     A. I think so.
10     Q. Okay. Would you turn to Page 5 of this
11 report? Are you there?
12     A. I am.
13     Q. And do you see that YouTube is not in
14 the Social Media category?
15     A. I do.
16     Q. Okay. And then would you turn to
17 Page 27 of this report?
18     A. Of Common Sense?
19     Q. Yes. Are you there?
20     A. I am.
21     Q. Okay. There are a few paragraphs on
22 the left side of that page. Turn your attention to
23 the first full paragraph.
24         Are you there?
25     A. The "while time" paragraph? Or is that

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL

Page 194

1 not the full --
2     Q.   The paragraph starts "while time."
3 It's a long --
4     A.   Yeah.
5     Q.   -- paragraph.
6          I'd ask you to start from the bottom of
7 that paragraph and go up four lines. It starts:
8 Our methodology cannot tell us exactly what content
9 youth saw on their phones.
10          Do you see that?
11     A.   I see that.
12     Q.   Okay.  So do you understand that the
13 Common Sense report authors were saying that under
14 the methodology they're reporting in this survey,
15 they cannot tell exactly what content youth saw on
16 their phones, correct?
17     A.   Well, I'd have to go and review it
18 more.  But that's what that sentence says.
19     Q.   Okay.  Are you aware of anything in
20 this Common Sense report that is Exhibit 4 that
21 says that students primarily engage with YouTube
22 for noneducational purposes?
23     A.   I don't recall.
24     Q.   Okay.  Going back to your rebuttal
25 report, Paragraph 132.

Page 195

1          Are you there?
2     A.   I am.
3     Q.   Okay.  You cite or refer to "nationally
4 representative surveys such as those from Common
5 Sense Media."
6     A.   Uh-huh.
7     Q.   We looked at the one source you
8 identified in the footnote, correct?
9     A.   Yes.
10     Q.   Are you able to identify for me any
11 nationally representative survey that shows that
12 students primarily engage with YouTube for
13 noneducational purposes even during school?
14     A.   I think I need to -- I don't know off
15 the top of my head.
16     Q.   Okay.  Can you name one right now?
17     A.   I'd have to look back through my
18 materials considered.
19     Q.   Okay.  You also refer to "peer-reviewed
20 research."
21          Can you identify for me peer-reviewed
22 research that shows or finds that students
23 primarily engage with YouTube for noneducational
24 purposes even during school?
25     A.   I'd need to look back at my materials

Page 196

1 considered list.
2     Q.   Can you identify any peer-reviewed
3 research right now?
4     A.   Off the top of my head, I can't.
5     Q.   And you don't cite any here, correct?
6     A.   It's not cited here.  But I would have
7 to look through my materials considered.
8     Q.   Okay.  And then you also refer to a
9 "growing body of literature" in the same sentence,
10 yes?
11     A.   That's what that says, yes.
12     Q.   You don't cite any of that literature
13 either in the paragraph or in the footnote,
14 correct?
15     A.   It's not cited in that paragraph, no.
16     Q.   Are you able to identify for me any of
17 the literature that you're describing as the
18 growing body of literature that you say shows or
19 finds that students primarily engage with YouTube
20 for noneducational purposes even during school?
21     A.   I can't recall off the top of my head.
22     Q.   Okay.  You also cite your own empirical
23 work, correct?  You refer to it?
24     A.   Including my own empirical work, yes.
25     Q.   Do you see that?

Page 197

1     A.   I see that.
2     Q.   And you don't cite any of that
3 empirical work either in -- in the paragraph or in
4 Footnote 121, right?
5     A.   It's not cited there, correct.
6     Q.   Okay.  Are you able to identify for me
7 any of your own empirical work that has found that
8 students primarily engage with YouTube for
9 noneducational purposes even during school?
10     A.   I believe I reference something in my
11 main report here, but it would take me a minute to
12 find it.
13     Q.   Okay.  Can you think of anything right
14 now that is your own empirical work that shows or
15 finds that students primarily engage with YouTube
16 for noneducational purposes even during school?
17     A.   Yeah.  I think I referred to it in the
18 primary MDL report.  But it would take me a minute
19 to find it.
20     Q.   What is it?
21     A.   I recall --
22     Q.   It's a long report.  What are you
23 thinking of?
24     A.   Yeah, I recall showing data showing --
25 describing that it is -- I don't remember the

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL

Page 198

1 specific. I'm sorry. But --
2    Q.  Do you believe it talks about how
3 students use YouTube?
4    A.  I don't recall. Sorry.
5    Q.  You believe it shows that students are
6 using YouTube primarily for noneducational purposes
7 as opposed to educational purposes even during
8 school?
9    A.  I believe what I'm trying to think of
10 is educational logging on the app is not -- sorry.
11 I don't recall.
12    Q.  Okay.
13    A.  I'm mixing up my thoughts here, and I
14 can't recall off the top of my head.
15    Q.  Okay. So for the statement that I read
16 to you in Paragraph 132, which is your own words,
17 can you identify for me anything to support your
18 assertion that we know from research that many
19 students primarily engage with YouTube for
20 noneducational purposes even during school?
21    A.  Yeah, I would have to go back and look
22 through my materials considered. I can't --
23    Q.  You can't think of anything right now?
24    A.  -- give you a specific cite right now.
25    Q.  Okay. And you can't give me any

Page 199

1 general cite, right, either than what you put in
2 Footnote 121?
3    A.  Not off the top of my head.
4    Q.  Now, you discuss some of your empirical
5 work in your report, correct, including some
6 empirical work that's based on data collected from
7 students in North Carolina?
8    A.  There's a discussion of data from North
9 Carolina in my report.
10    Q.  Yeah. Could you go to your main
11 report, which was marked as Telzer Deposition
12 Exhibit 1? Are you there? And can you go to
13 Page 122.
14    A.  Yes.
15    Q.  Okay. Paragraph 280. Do you see that?
16    A.  Yes.
17    Q.  Okay. In the second paragraph to 280,
18 you refer to data that your collaborators and you
19 have been collecting. And you refer to it as "data
20 from a rural, lower socioeconomic status North
21 Carolina school district," correct?
22    A.  That's what it says there, yes.
23    Q.  Okay. Have you collected data that
24 you're relying on for your opinions about schools
25 from students in any other North Carolina school

Page 200

1 district?
2    A.  I'm not relying on any specific --
3 like, I'm not just relying on this data for my
4 opinions on the schools. It's the broader
5 literature writ large and my education.
6    Q.  Right. But you refer to data collected
7 from students in this North Carolina school
8 district.
9       I want to know: Did you collect
10 similar data from any other school district that
11 you're using in any way in this expert engagement?
12    A.  Unless it's in my materials considered
13 list, I'm not necessarily relying on other
14 information.
15       But, again, my opinions are not just
16 based on a singular thing here. It's the -- the
17 totality of everything.
18    Q.  What is the name of this North Carolina
19 school district?
20    A.  I'm not at liberty to disclose that.
21 It's confidential to the schools, who've asked not
22 to have that --
23    Q.  Okay. And you say this data includes
24 all of the middle schools in that district?
25    A.  Correct.

Page 201

1    Q.  How many middle schools are there in
2 that district?
3    A.  Three.
4    Q.  Are you able to give me the name of any
5 of those middle schools?
6    A.  No, I'm not.
7    Q.  That's also confidential?
8    A.  That is.
9    Q.  Did that school district, whatever the
10 name is, did it allow students to access YouTube on
11 devices that were connected to its network?
12    A.  Did it allow YouTube to --
13    Q.  No. Ma'am, it says --
14    A.  Sorry.
15    Q.  -- did that school district, whatever
16 its name is, allow students to access YouTube on
17 their devices when connected to the school
18 district's network?
19    A.  Did the schools -- I don't know. I'm
20 confused a little bit by the question. I'm sorry.
21       Are they allowing their students to
22 access YouTube on their devices?
23    Q.  On their devices when their devices are
24 connected to the school district's network.
25    A.  I don't have the answer for that. I

51 (Pages 198 - 201)

Page 202

1 don't know about the schools' network.
2     Q.  Okay.  And for any of these middle
3 schools in this district, did any of those schools
4 allow students to access YouTube on their devices
5 when those devices were connected to the school's
6 network?
7     A.  I don't have information about the
8 phones being connected to the school's network.
9     Q.  You don't know one way or the other?
10    A.  I don't know.
11    Q.  Okay.  Did this school district whose
12 name you can't provide allow teachers to direct
13 students to use YouTube for work in the classroom?
14    A.  I don't recall if there were teachers
15 who did that.  It was not on the students' devices
16 if they did.
17    Q.  My question is whether the school
18 district allowed teachers to direct students to use
19 YouTube for work in the classroom.
20    A.  I don't know.
21    Q.  Okay.  And did any of the middle
22 schools in this district allow their teachers to
23 direct students to use YouTube for work in the
24 classroom?
25    A.  I think you just asked the same

Page 203

1 question.  Sorry.  Can you --
2     Q.  I asked about the school district.  Now
3 I'm asking about individual schools within the
4 district.
5     A.  Okay.
6     Q.  To your knowledge, did those schools
7 allow teachers to direct students to use YouTube
8 for work in the classroom?
9     A.  I don't know.
10    Q.  Was YouTube part of the curriculum that
11 this school district followed?
12    A.  I don't know about their curriculum.
13    Q.  Did any of the schools within the
14 school district have a curriculum that included
15 YouTube content?
16    A.  I don't know about their curriculum.
17    Q.  Do you know whether this school
18 district whose name you can't supply ever banned
19 cell phones at schools within the district?
20    A.  Have they ever --
21    Q.  Yes.
22    A.  -- banned them?
23    Q.  Ever.
24    A.  I don't know the specifics of their
25 later cell phone policies.

Page 204

1     Q.  Did the school district ever ban cell
2 phones at schools within the district for the
3 period of time for which you collected data?
4     A.  They did not.
5     Q.  Did any of the middle schools within
6 that district do so?
7     A.  Sorry.  My -- my previous answer was
8 about the middle schools, not the school district.
9     Q.  Okay.  What about the district?
10    A.  I believe it's the same answer for the
11 district, but I know more about our specific
12 participating schools.
13    Q.  Okay.  Do you know whether this
14 district whose name you can't supply ever
15 considered banning cell phones?
16    A.  I don't know.
17    Q.  You don't know whether they considered
18 it one way or not?
19    A.  I don't know what their considerations
20 were.
21    Q.  How many school districts are there in
22 North Carolina?
23    A.  I should know the answer because we're
24 working now in every single school district in our
25 current research.  Twelve to eighteen, I think.

Page 205

1     Q.  Okay.  Did you collect any data from
2 any students in any of the other 11 to 17 school
3 districts in connection with any of your work?
4     A.  We have collected data in other school
5 districts.  We are currently collecting data in
6 other school -- in every single school district.
7     Q.  Did you review any of that data for the
8 purposes of your expert engagement here?
9     A.  I don't believe I've necessarily looked
10 at data in other North Carolina school districts
11 specifically in regards to some of the phone use
12 data.
13        We're currently and we have looked very
14 broadly across the state at some of that.  But the
15 data itself, we looked more broadly but not data
16 itself.
17    Q.  Why didn't you look at any of the data
18 for these other 11 to 17 school districts in North
19 Carolina for purposes of this work?  Why did you
20 limit it only to this one school district whose
21 name you can't supply?
22    A.  We had a, as I mentioned, and I think
23 you read the sentence, a 20-year working
24 relationship with this school district.
25        The school district is -- while it's

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL

Page 206

1 rural, it's very diverse, so it has individuals
2 from low to mid socioeconomic diversity and a very
3 large range of ethnic diversity. So it's sort of,
4 as researchers, what we think of as an ideal sample
5 to look at for research.
6        I think, in terms of feasibility of
7 going into every single school district in the
8 state, at the time, that was not something feasible
9 for us.
10        But it is something we're doing now
11 that we've established some of these connections
12 across the state and are working with the North
13 Carolina Collaboratory to be able to do that.
14    Q.  Well, I wasn't asking about whether you
15 went out and asked for data from these other 11 to
16 17 school districts. I understood you to say you
17 did have data from some of those 11 to 17 school
18 districts. Correct?
19    A.  Well, we've collected data in children
20 and teens not just in the school district.
21    Q.  Understood. And I understand you to
22 say that for that set of data from these other 11
23 to 17 school districts, you have not looked at that
24 data for purposes of this expert engagement; is
25 that correct?

Page 207

1    A.  I have not looked at other data from
2 other samples yet in North Carolina. It's ongoing
3 work.
4    Q.  Okay. And I understand you to say the
5 reason you looked at this particular school
6 district data is because you think it has -- it's
7 representative because, among other things, it's
8 racially diverse, yes?
9    A.  Yeah. It's an ideal sort of sample for
10 being able to look across socioeconomic and racial
11 ethnic diversity.
12    Q.  Why didn't you go, then, and look at
13 the other data you have for these other 11 to 17
14 school districts just to get a gut check on what
15 you're purporting to provide based on a single
16 school district?
17        MR. OLIVER: Objection. Argumentative.
18        THE WITNESS: I think I mentioned that
19 that is ongoing work that we're doing now. This
20 data and these projects were conducted several
21 years ago.
22        So as we developed those connections
23 across all the school districts, we are doing that
24 now. At the time, it was not something we had
25 access to.

Page 208

1 BY MR. KEYES:
2    Q.  Okay. Would you turn back to your
3 rebuttal report, which is Telzer Deposition
4 Exhibit 2, and would you go to Page 23?
5        Are you there?
6    A.  I am not yet. Okay.
7    Q.  You are there now?
8    A.  Yes.
9    Q.  Okay. There's a Section VIII, where
10 you say: YouTube is a Social Media Platform, with
11 Similar Features to Snapchat, Instagram/Facebook
12 and TikTok.
13    A.  Yes.
14    Q.  Correct? Okay. Would you turn to the
15 next page.
16    A.  Yes.
17    Q.  At the top of the page, in
18 Paragraph 75, you say: Although YouTube is
19 sometimes categorized as a -- categorized as a
20 video platform or entertainment site, it meets the
21 widely accepted definition of social media:
22 platforms that allow users to create, share, and
23 interact with user-generated content and engage in
24 social networking.
25        And then you cite a Kaplan and Haenlein

Page 209

1 paper from 2010.
2        Did I read that correctly?
3    A.  You did.
4    Q.  Okay. When you refer to this "widely
5 accepted definition of social media," are you
6 getting that definition from -- from Kaplan and
7 Haenlein?
8    A.  I don't recall if I got it specifically
9 from that paper. I'd have to go back and look at
10 it. I think it's more broadly this definition that
11 is -- that's used.
12    Q.  Okay. When you say in your
13 Paragraph 75 the "widely accepted definition of
14 social media" --
15    A.  Uh-huh.
16    Q.  -- what source or sources are you
17 relying on to show that is a widely accepted
18 definition of social media?
19    A.  I think that that is -- I don't have a
20 source for that. It is -- I mean, this is my area
21 of expertise. That is the definition of "social
22 media use." It's based on how we've sort of been
23 defining it in the field.
24        There are certainly diverse, maybe,
25 ways of saying the same thing. But these are many

HIGHLY CONFIDENTIAL

Page 210

1 of the aspects that help us to understand and
2 define what this is.
3          And I go on underneath to discuss all
4 of these sort of hallmark features of social media
5 that make it clearly a social media platform.
6     Q.  All right.  My question, though, was:
7 What source or sources are you relying on to show
8 that this is the widely accepted definition of
9 social media?
10          MR. OLIVER:  Asked and answered.
11          THE WITNESS:  As an expert in this
12 field, I am relying on my knowledge and expertise
13 of -- of this.
14 BY MR. KEYES:
15     Q.  Can you point to anything else as a
16 source for your assertion that what you're saying
17 is the definition of social media is widely
18 accepted?
19          MR. OLIVER:  Asked and answered.
20          THE WITNESS:  I told you that the
21 source for this is my expertise.  I could probably
22 pull out dozens and dozens of papers that use a
23 similar definition.  But the widely accepted
24 definition and me defining it here is based on
25 being an expert in this area.

Page 211

1 BY MR. KEYES:
2     Q.  Are you able to identify any of those
3 papers right now?
4     A.  I can't hand you a paper, off the top
5 of my head.  I'm sure they're in my materials
6 considered list.
7     Q.  Okay.  And whether you can hand me a
8 paper or not, can you identify any such paper that
9 you say also confirms that the definition you're
10 using here of social media is the "widely accepted
11 definition of social media"?
12          MR. OLIVER:  Asked and answered.
13          THE WITNESS:  I cannot hand you --
14 sorry.  By "hand you" -- I correct myself -- I
15 cannot identify a singular article that -- that
16 necessarily says that.  But as I said, that is
17 based on knowing this as an expert in this field.
18 BY MR. KEYES:
19     Q.  Okay.  And then you say that YouTube
20 shares all the hallmark features of social media.
21 Do you see that in the next sentence?
22     A.  I do.
23     Q.  Okay.  And what is your source for
24 saying that the features you list in the bullet
25 points are the, quote, "hallmark features of social

Page 212

1 media"?
2     A.  I think that similar to my previous
3 answer, this is, in part, just because I'm an
4 expert on this and know this.  I discussed it at
5 length in my report.  I believe many of the other
6 plaintiff experts discuss these same hallmark
7 features in their reports.  It's just common
8 knowledge.
9          There is clear features on these
10 platforms.  I think even the internal documents
11 talk about many, if not all, of these sort of
12 hallmark features of social media.  This is based
13 on my expertise in this area.
14     Q.  Right.  You said that it's based on
15 your expertise.  And are you saying that the judge
16 or the jury in this case should just take your
17 say-so on it --
18          MR. OLIVER:  Object to the form.
19 That's argumentative.
20 BY MR. KEYES:
21     Q.  -- or are you saying there are other
22 sources out there that corroborate your say-so?
23     A.  I think that my education, my work in
24 this area, the research that I do, all of the
25 things that I have considered, which includes

Page 213

1 thousands of documents that we talked about, all
2 help us to have this very what I think of as a
3 basic foundational understanding of what these
4 hallmark features are.
5     Q.  Okay.  And then you cite in
6 Paragraph 77 some organizations that have given
7 their definition of social media, correct?
8     A.  I think I cite here a couple of
9 examples where other associations and other --
10 other sort of, yeah, big societies have also
11 discussed and describe and defined social media as
12 including YouTube, including the Pew Research
13 Center, which, in fact, changed the way that it
14 defines it, likely due to some of the changing
15 features of YouTube that have made it a social
16 media platform.
17     Q.  Right.  And you identify three here?
18     A.  The American Psychological Association,
19 the American Academy of Pediatrics, and the
20 Pew Research Center as three examples.
21     Q.  You said earlier, though, that if you
22 look at screen time usage on iPhones, YouTube is
23 not categorized as social media, correct?
24     A.  I -- I said I believe that YouTube is
25 categorized as -- as entertainment under Apple's

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL

Page 214

1 categories.
2    Q.  And, therefore, not categorized as
3 social media, correct?
4    A.  And, therefore, according to Apple's
5 categories, is categorized as entertainment.  But
6 that does not necessarily mean that that is my
7 opinion nor any of these huge societies' opinions
8 on whether it is a social media platform or not.
9    Q.  And we did look at the one document you
10 cited in Footnote 121 -- right? -- in support of
11 your -- your assertion in Paragraph 132.  And that
12 doesn't categorize YouTube as social media,
13 correct?
14    A.  I don't recall.
15    Q.  Well, we just looked at it a few
16 moments ago.  Can you go back to Telzer Deposition
17 Exhibit 4, the Common Sense report.  Do you have
18 that in front of you?
19    A.  I do.
20    Q.  This is the document you cite in
21 Footnote 121 of your rebuttal report?
22    A.  Okay.  Yes.
23    Q.  Okay.  Telzer Exhibit 4 is the document
24 you cite in Exhibit -- Footnote 121, correct?
25    A.  Correct.

Page 215

1    Q.  Okay.  And then go back to Page 5 of
2 this report.  And, again, you see that Common Sense
3 does not categorize YouTube as social media,
4 correct?
5    A.  In their categories -- I don't remember
6 how they -- how they did that.  It's not
7 necessarily because of how they defined it.  I'd
8 have to --
9    Q.  Well, just look --
10    A.  -- look back --
11    Q.  -- at Figure 3 that purports to show
12 the median duration of use of different smartphone
13 app categories during school hours.  Do you see
14 that?
15    A.  I do, but that might be because,
16 similar to our data, that's how Apple defined it,
17 and so that's how it is collected.
18    Q.  Okay.  But do you see the first
19 category is "Social Media" and the second category
20 is "YouTube"?
21    A.  I do.
22    Q.  Those are different categories as used
23 by Common Sense?
24    A.  As I said, it depends on the methods in
25 which they collected it and how it was

Page 216

1 characterized in the data that they collected.
2 Like us, we don't have control over how Apple
3 categorizes those things.
4    Q.  I'm not asking you for the reasons why
5 they categorize differently.  You agree that
6 according to Common Sense's own report, social
7 media and YouTube are different categories,
8 correct?
9    A.  I did not say that, and I don't
10 necessarily agree with that.  They categorize it in
11 this way perhaps because of the way the way data
12 were collected.  I'd have to go back and look at
13 the specifics of how the data were collected,
14 because similar to our own work, Apple collects the
15 data and categorizes it in certain ways.
16    Q.  But, Dr. Telzer, again, you keep
17 talking about the reasoning behind certain
18 categorizations.  I'm not asking you for why
19 Common Sense did anything.
20        I just want you to acknowledge that on
21 Figure 3, when it talks about the median duration
22 of use of different smartphone app categories
23 during school hours, YouTube is in a different
24 category than social media.  Do you dispute that?
25    A.  They have two columns -- well, they

Page 217

1 have lots of columns here, two of which are social
2 media and YouTube.
3    Q.  Okay.  And those are different columns,
4 to use your phrase?
5    A.  Those are different columns.
6    Q.  Okay.  And you were a co-author of a
7 paper in May of 2025 that said that YouTube
8 arguably should not be considered social media
9 because YouTube typically affords solitary content
10 consumption in the one-to-many format indicative of
11 traditional media, correct?
12    A.  Can you show me that?
13    Q.  Well, you were asked about it in your
14 last deposition.
15    A.  Okay.  I can't say that that
16 sentence -- that generally is what was written.  I
17 can't agree that those are the exact words because
18 I'm not --
19    Q.  Okay.
20    A.  -- looking at it.
21    Q.  You agree it was -- that's generally
22 what was written in a paper that you co-authored
23 and that was published in May of 2025, correct?
24    A.  That is generally the -- what was
25 written in there.

55 (Pages 214 - 217)

Page 218

1    Q.  Okay.  So if that is what was said in a
2  paper you co-authored in May of 2025, and YouTube
3  is in a different category from social media in the
4  Common Sense report, the one thing you cited in
5  Paragraph 132, and YouTube is in a different
6  category than social media on the iPhone, what is
7  your basis for saying that YouTube meets the,
8  quote, "widely accepted definition of social
9  media"?
10        MR. OLIVER:  Objection.  Asked and
11  answered.  Compound question.  Argumentative.
12 BY MR. KEYES:
13    Q.  You can answer.
14    A.  I think I clearly lay out here all of
15  the aspects of YouTube that make it clearly a
16  social media platform.  There are many, many
17  features.  And of course, these have been added,
18  some of these, more recently.  So perhaps some of
19  our original definitions of YouTube may not have
20  included it as a social media platform.
21        But today and my opinions as put forth
22  in my report are that YouTube is a social media
23  platform.  This is based on understanding and being
24  an expert in this field, understanding what social
25  media is.

Page 219

1        There are other large societies
2  recognizing YouTube as a social media platform.
3  Understanding and seeing all the internal documents
4  that list and talk about many of these features and
5  how to increase engagement of youth, using
6  algorithms and other aspects of this all help us
7  come to the very clear conclusion that YouTube is a
8  social media platform.
9    Q.  Using that definition, can you identify
10  for me other platforms besides the defendants in
11  this case that you believe are social media?
12    A.  I'm not here today to talk about other
13  platforms.
14    Q.  Can you identify a single one,
15  according to what you say is the widely accepted
16  definition of social media?
17    A.  I'm not here today to talk about other
18  platforms.
19    Q.  Are you refusing to answer my question,
20  or you --
21    A.  I'm not --
22    Q.  -- you're not able to answer?
23    A.  I have not --
24        MR. OLIVER:  Objection.  Argumentative.
25        THE WITNESS:  I have not considered

Page 220

1  other platforms in any of --
2  BY MR. KEYES:
3    Q.  Okay.  So for --
4    A.  -- my work on this.
5    Q.  -- purposes of your work in this case,
6  you have not looked at any other platform besides
7  the defendants' platforms in -- in figuring out
8  what platforms meet the definition of "social
9  media"?  Is that fair?
10    A.  I have not thought or deeply considered
11  other specific platforms.  I've thought about what
12  counts as social media, based on all of the
13  features of the social media platforms.  But I have
14  not sat and thought about what other platforms
15  qualify as that or not.
16    Q.  Okay.  So you're not able to identify
17  any platform besides the defendants that you
18  believe meets your definition of social media?
19    A.  There may be others.  I have not
20  considered those in discussing my opinions here.
21    Q.  Right.  There may be others.  Are you
22  able to identify any of them?
23    A.  Not at this moment.
24        MR. KEYES:  Okay.  Thank you,
25  Dr. Telzer.  I appreciate your time.

Page 221

1        MR. OLIVER:  You've got three minutes.
2            * * *
3            EXAMINATION
4  BY MR. CHERNACK:
5    Q.  Dr. Telzer, Greg Chernack.  We met back
6  in June.  I represent TikTok.  Just a couple of
7  very, very brief questions.
8        I may have misheard you.  Were you
9  asked how many school districts you believe are in
10  the state of North Carolina?
11    A.  I think I was asked how many school
12  districts there are.
13    Q.  And you said you thought there were
14  between 12 and 17?
15    A.  Well, I believe we're working with
16  12 -- between 12 and 17 areas.  I don't think it's
17  necessarily a school district.  Perhaps there's
18  more school districts within each of those broader
19  areas.  I apologize if I misspoke.
20    Q.  Okay.  If I saw there were almost 400
21  school districts in the state of North Carolina,
22  you have no reason to disagree with that, do you?
23    A.  I have no reason to disagree with that.
24  There's -- there's regions.  I'm sorry.  That's
25  what I was referring to in that number.

56 (Pages 218 - 221)

Page 222

1    Q.  Okay.  And then we looked at -- I
2 believe it's Exhibit 1, Paragraph 280.  You talked
3 about this rural school district you have data from
4 for 20 years, correct?
5    A.  Yes.
6    Q.  Do you have access to that data?
7    A.  Sorry.  Can you repeat --
8    Q.  I don't mean right here right now, but
9 generally speaking, you have access to that data?
10    A.  I -- sorry.  I'm going to the page and
11 trying to --
12    Q.  It's about the rural school district
13 you talked about, saying you have 20 years of data.
14 Are you familiar with -- do you remember -- recall
15 that?
16    A.  I said we've been working in a school
17 district for 20 years.
18    Q.  Right.  And you have data from that
19 school district that you have access to; am I
20 correct?
21    A.  We have data that we've been
22 collecting.
23    Q.  Have you provided that data to be
24 produced in this litigation?
25    A.  I think I've provided the underlying

Page 223

1 data for unpublished work as part of the request,
2 yes.
3    Q.  That's all been provided to plaintiffs'
4 counsel in this litigation?
5    A.  The --
6    MR. OLIVER:  Go ahead.
7    THE WITNESS:  The underlying data for
8 the unpublished --
9    MR. OLIVER:  Objection.
10    THE WITNESS:  -- work in my report has
11 been provided.
12 BY MR. CHERNACK:
13    Q.  Okay.  And that would include the data
14 from this North Carolina school district that you
15 cannot name?
16    A.  That is the data, yes.
17    Q.  Okay.  I just wanted to confirm that.
18    MR. CHERNACK:  All right.  That's all I
19 have.
20    MR. OLIVER:  All right.  Can we go off
21 the record real quick?
22    THE VIDEOGRAPHER:  Going off the
23 record.  The time is 2:05 p.m.
24        * * *
25    (Whereupon, there was a recess in the

Page 224

1 proceedings from 2:05 p.m. to 2:06 p.m.)
2        * * *
3    THE VIDEOGRAPHER:  Going back on the
4 record.  The time is 2:06 p.m.
5    MR. OLIVER:  Madam Court Reporter, what
6 exhibit number are we on?
7    THE REPORTER:  I think it's 15.
8        * * *
9        EXAMINATION
10 BY MR. OLIVER:
11    Q.  Dr. Telzer, I'm going to hand you what
12 we'll mark as Telzer Exhibit -- this seems to say
13 12, but -- if it's 12, it's 12.  But, 12.
14    THE REPORTER:  It's not.  She did some
15 remotely.
16    MS. ANTOINE:  All the virtual ones.
17    MR. OLIVER:  Oh.  All right.  Well,
18 we'll -- all right.  We're going to mark this as
19 15.
20    (TELZER EXHIBIT 15, Summary of Studies
21 on Social Media and the Brain, was marked for
22 identification.)
23 BY MR. OLIVER:
24    Q.  All right.  And I'm going to hand you a
25 copy of that.  Is this a true and --

Page 225

1    MS. JONES:  Are you going to hand us a
2 copy of it?
3    MR. OLIVER:  Yes, I'm going to hand --
4 well, I'm going to hand you a copy.  And I'm going
5 to hand, I guess, Andy, a copy.  And the other
6 folks can look on.
7 BY MR. OLIVER:
8    Q.  So do you recall some questions that
9 Ms. Jones asked you earlier about a chart of fMRI
10 studies that you had composed in the last week or
11 two?
12    A.  Yes.
13    Q.  Is that a true and correct, accurate
14 copy of the chart that Ms. Jones asked you
15 questions about?
16    A.  Yes.
17    Q.  Did she ask you to produce a copy of it
18 during her questioning?
19    A.  No.
20    Q.  Okay.  My next question is --
21    MR. KEYES:  Hey, Lance, if you're
22 moving on to -- is this something that was produced
23 before now --
24    MR. OLIVER:  No.
25    MS. JONES:  No.

HIGHLY CONFIDENTIAL

Page 226

1    MR. OLIVER: It was produced --
2    MR. KEYES: Was this produced with any
3 of the supplements that came in over the last few
4 days?
5    MR. OLIVER: No. And I should clarify:
6 All of this is information and data that is on
7 Dr. Telzer's reliance list. This is not new data
8 or materials or reliance materials. It is simply a
9 consolidation, in my understanding, of what was
10 already in her reliance materials.
11    MR. KEYES: Do you dispute it's a new
12 document?
13    MR. OLIVER: No. It's a new document.
14 It's absolutely -- I mean, she created the document
15 in the last week, which I believe Ms. Jones
16 effectively established.
17    MS. JONES: Are we still on the record?
18 Could you go ahead and finish your questioning?
19 BY MR. OLIVER:
20    Q. Are all of your opinions, Dr. Telzer,
21 supported by your literature, your professional
22 experience, your education and your training?
23    A. Yes.
24    Q. And you talked with Ms. Jones earlier
25 about some of your experience in the school systems

Page 227

1 in the state of North Carolina. Do you remember
2 that?
3    A. Yes.
4    Q. And you talked about some experience
5 you have interacting with students, parents and
6 educators. Do you remember that?
7    A. Yes.
8    Q. You indicated that that information was
9 not recorded in notes, correct?
10    A. Correct.
11    Q. And you indicated that that information
12 was also confidential; is that correct?
13    A. Correct.
14    Q. Is the reason that those meetings are
15 not recorded in notes and the reason that they're
16 kept confidential to make them effective?
17    A. Well, we need our participants to
18 understand that it is a comfortable, open,
19 anonymous space for them to talk openly with us.
20    Q. Okay. You said you were not relying in
21 your opinions on any specific conversation you had
22 during -- you know, during the things we just
23 talked about. But are those things part of your
24 qualifications and experiences that inform your
25 opinions in this case?

Page 228

1    MS. JONES: Let me just object to
2 leading.
3    You can answer.
4    THE WITNESS: Yeah, no singular
5 conversation is what I relied upon, but the work
6 that I do within the schools and talking to parents
7 and kids and teachers is part of my background and
8 expertise.
9    MR. OLIVER: Okay. That's all I have.
10    * * *
11    EXAMINATION
12 BY MS. JONES:
13    Q. Dr. Telzer, did you receive a copy of
14 the deposition notice for your deposition --
15    MR. OLIVER: I'm sorry, Counsel. Your
16 time has expired, I believe. Do we have extra
17 time?
18    MS. ANTOINE: We've got time --
19    MR. CHERNACK: You asked questions.
20    MR. OLIVER: Oh, yeah, that's right.
21 That's right. I'm sorry. Go ahead. You're right.
22 BY MS. JONES:
23    Q. Dr. Telzer, did you receive a copy of
24 the deposition notice that established your
25 deposition for the MDL?

Page 229

1    A. The -- yes, I believe so.
2    Q. Did you see that in that deposition
3 notice there were document requests?
4    A. Yes.
5    Q. And did you review the document
6 requests?
7    A. Yes.
8    Q. Did you produce and give to your
9 counsel everything that would have been called for
10 by those document requests?
11    A. I produced everything to counsel that,
12 I guess, was reasonable to be able to provide, and
13 other things, I believe, are being --
14    MR. OLIVER: What she's referring to
15 is, we have some --
16    MS. JONES: I -- please don't testify.
17    MR. OLIVER: Hey, hey, you know what?
18    MS. JONES: No.
19    MR. OLIVER: We can stop the deposition
20 right now. I am going to make an objection, and I
21 want to make this --
22    MS. JONES: Then --
23    MR. OLIVER: -- clear.
24    MS. JONES: Well, listen, then make
25 your objection.

58 (Pages 226 - 229)

HIGHLY CONFIDENTIAL

Page 230

1    MR. OLIVER: Okay.
2    MS. JONES: Don't give me a speech.
3 Make your objection. What is the --
4    MR. OLIVER: My --
5    MS. JONES: -- objection?
6    MR. OLIVER: -- objection is, she is
7 referring to materials to which we objected in your
8 document request that we have already told you
9 about that we are not producing for legal reasons.
10    It's the stuff you asked for, all of
11 her underlying data for all of her studies or
12 whatever. I'm not even sure if you're aware of
13 this conversation. But that's --
14    MS. JONES: Are you --
15    MR. OLIVER: -- the only --
16    MS. JONES: Okay.
17    MR. OLIVER: -- thing that was not
18 produced.
19    MS. JONES: I got it. Are you done?
20 Are you done?
21    MR. OLIVER: I am done.
22 BY MS. JONES:
23    Q. Okay. Dr. Telzer, did you understand
24 that there was a request in the document notice
25 that you received for a complete copy of your file

Page 231

1 in these cases?
2    A. Complete document of what file? Sorry.
3    Q. Do you know that there was a document
4 request --
5    A. I know there's a --
6    Q. -- in the --
7    A. -- document request.
8    Q. Okay. And did you know that there was
9 a document request for a complete copy of your file
10 on these cases?
11    A. I don't know -- I don't know if I know
12 what is meant by a "complete file."
13    Q. Well, any documents that you are
14 generating in connection with your work as a paid
15 litigation expert in this lawsuit, did you know
16 that there was a request for a complete copy of
17 your file on these cases?
18    A. I saw what you're -- what you're
19 referring to. I produced what I was asked to and
20 able to produce.
21    Q. And when did you produce what has now
22 been marked as Exhibit 15 to your counsel?
23    A. This is something that I just created
24 in the past day I sent to them as well.
25    Q. "The past day" as in yesterday you

Page 232

1 created it?
2    A. Yesterday -- yeah.
3    Q. Okay. And how much time did you spend
4 on creating it yesterday?
5    MR. OLIVER: I think that misstates her
6 testimony. Maybe not.
7    THE WITNESS: Yeah, I put this
8 together. I started it on -- what's today?
9 Friday? I started putting a few of these together
10 on Wednesday and completed it yesterday.
11 BY MS. JONES:
12    Q. And you gave it to your counsel
13 yesterday?
14    A. Yes.
15    Q. Okay. And do you know one way or the
16 other whether it was produced in response to the
17 document request associated with your deposition
18 notice in this case?
19    A. I don't know.
20    Q. Okay.
21    MS. JONES: Does anybody else have any
22 other questions?
23    MR. OLIVER: That's it.
24    MS. JONES: Well, can I say one other
25 thing, which is, we -- this is probably implicit in

Page 233

1 what both Mr. Keyes and myself have said. We,
2 obviously, object to you sitting on a document
3 that's plainly responsive to the deposition notice
4 in this case.
5    Whether we asked for its production in
6 the midst of the deposition or not, if it was
7 provided to you by Dr. Telzer yesterday, you should
8 have produced it yesterday.
9    MR. OLIVER: Obviously, I don't agree
10 with that. Ms. Jones asked extensive questions
11 about this document. And I was sitting here, just
12 for the record, thinking, "Is she going to actually
13 ask for the document and get it produced?" Because
14 we have copies. You never asked if she had a copy.
15 You never asked her to give you a copy.
16    At the beginning of every deposition, I
17 ask an expert if they have something to give me; do
18 they have anything for the deposition, you know,
19 notes or any additional documents.
20    So we weren't holding it back. I
21 thought of just mentioning it while you were
22 questioning, but you kept sort of getting mad when
23 I said anything other than "objection."
24    So I said, You know what? She doesn't
25 want to see it now. We'll get it to her at the end

Golkow Technologies,
A Veritext Division
877-370-3377    www.veritext.com

Page 234

1 of the deposition. She obviously knows it's there.
2 She's asking questions about it. If she wants a
3 copy on the record -- or, you know, she could do
4 this little setup where she gets more time or
5 something at the end -- which is what I think
6 happened.
7         So we haven't withheld anything. I
8 don't know what you're talking about. You asked
9 her questions about it. She could have handed you
10 a copy. You had three hours to ask her questions.
11 But you didn't do that.
12        MS. JONES: Okay. Counsel, just -- I
13 assume you've been doing this long enough to know
14 that if there's a document request, you don't get
15 to not produce the document, and then if we don't
16 ask the magic question, then you can say,
17 "Well, too bad. Here's the document after your
18 time is over."
19        I don't think we have any other
20 questions on the defense side.
21        MR. OLIVER: Yep. Okay. Great.
22        THE VIDEOGRAPHER: Before we go off the
23 record, the total time on the record for Meta was
24 3 hours and 2 minutes; Snap, 25 minutes; YouTube,
25 31 minutes; and TikTok, 2 minutes.

Page 235

1         Total time on the record today is
2 4 hours and 10 minutes.
3         That ends this deposition. The time is
4 2:15 p.m.
5         (WHEREUPON, the deposition was
6 concluded at 2:15 p.m.)
7         (The witness reserves the right to read
8 and sign this transcript.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 236

1         DEPOSITION ERRATA SHEET
2
3 Our Assignment No: 7523625
4 Case Caption: Social Media Adolescent Addiction/
5 Personal Injury Products Liability Litigation
6 (MDL No. 3047)
7
8         DECLARATION UNDER PENALTY OF PERJURY
9         I declare under penalty of perjury that I
10 have read the entire transcript of my Deposition
11 taken in the captioned matter or the same has been
12 read to me, and the same is true and accurate, save
13 and except for changes and/or corrections, if any,
14 as indicated by me on the DEPOSITION ERRATA SHEET
15 hereof, with the understanding that I offer these
16 changes as if still under oath.
17         Sign on the _____ day of
18 _____, 20 __.
19
20
21         _____
22         EVA H. TELZER, Ph.D.
23
24
25

Page 237

1         DEPOSITION ERRATA SHEET
2
3 Page No. _____ Line No. _____ Change to: _____
4 _____
5 Reason for Change: _____
6 Page No. _____ Line No. _____ Change to: _____
7 _____
8 Reason for Change: _____
9 Page No. _____ Line No. _____ Change to: _____
10 _____
11 Reason for Change: _____
12 Page No. _____ Line No. _____ Change to: _____
13 _____
14 Reason for Change: _____
15 Page No. _____ Line No. _____ Change to: _____
16 _____
17 Reason for Change: _____
18 Page No. _____ Line No. _____ Change to: _____
19 _____
20 Reason for Change: _____
21
22 SIGNATURE: _____ DATE:_____
23         EVA H. TELZER, Ph.D.
24
25

60 (Pages 234 - 237)

HIGHLY CONFIDENTIAL

Page 238

1    DEPOSITION ERRATA SHEET
2
3  Page No. _____ Line No. _____ Change to: _____
4  _____
5  Reason for Change: _____
6  Page No. _____ Line No. _____ Change to: _____
7  _____
8  Reason for Change: _____
9  Page No. _____ Line No. _____ Change to: _____
10 _____
11 Reason for Change: _____
12 Page No. _____ Line No. _____ Change to: _____
13 _____
14 Reason for Change: _____
15 Page No. _____ Line No. _____ Change to: _____
16 _____
17 Reason for Change: _____
18 Page No. _____ Line No. _____ Change to: _____
19 _____
20 Reason for Change: _____
21
22
23 SIGNATURE: _____ DATE: _____
24       EVA H. TELZER, Ph.D.
25

Page 239

1       CERTIFICATE OF REPORTER
2
3       I, Cindy A. Hayden, Registered Merit
4  Reporter and Notary Public for the State of North
5  Carolina at Large, do hereby certify that the
6  foregoing transcript is a true, accurate, and
7  complete record.
8       I further certify that I am neither related
9  to nor counsel for any party to the cause pending
10 or interested in the events thereof.
11      Witness my hand, I have hereunto affixed my
12 official seal this 11th day of August, 2025 at
13 Charlotte, Cabarrus County, North Carolina.
14
15
16
17 _____
18       Cindy A. Hayden, RMR, CRR
         My Commission expires
19       April 7, 2027
20
21
22
23
24
25