**Exhibit 76**

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE GENERAL CAUSATION TESTIMONY OF PLAINTIFFS' EXPERTS**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE: SOCIAL MEDIA          )

5    ADOLESCENT ADDICTION/        ) Case No.

6    PERSONAL INJURY PRODUCTS     ) 4:23-MD-03047-YGR

7    LIABILITY LITIGATION         ) MDL No. 3047

8    _____ )

9    THIS DOCUMENT RELATES TO: ) CONTAINS CONFIDENTIAL

10   ALL ACTIONS                  ) INFORMATION

11   _____ )

12

13

14

15

16

17

18                 V O L U M E   I

19      VIDEOTAPED DEPOSITION OF JEAN M. TWENGE, Ph.D.

20                 SEPTEMBER 17, 2025

21                    9:12 A.M.

22

23

24   Job No. MDLG7525839

25   Reported by: Leslie A. Todd, CSR No. 5129 and RPR

CONFIDENTIAL

Page 2

1      Videotaped deposition of JEAN M. TWENGE,
2  Ph.D., held pursuant to notice, before Leslie Anne
3  Todd, California Certified Shorthand Reporter in
4  and for the State of California, who officiated in
5  administering the oath to the witness, at the:
6
7          COURTYARD SAN DIEGO RANCHO BERNARDO
8          LAKESIDE ROOM
9          11611 Bernardo Plaza Court
10         San Diego, California 92182
11         (858) 613-2000
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1          A P P E A R A N C E S
2
3  ON BEHALF OF THE PLAINTIFFS:
4      KELLY K. McNABB, ESQUIRE
5      LIVIA JARAMILLO, ESQUIRE
6      MATIAS BUSTAMANTE, ESQUIRE (via Zoom)
7      LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
8      250 Hudson Street
9      8th Floor
10     New York, New York 10013-1413
11     (212) 355-9500
12
13     DAVID BONNIN, ESQUIRE (via Zoom)
14     EILAND & BONNIN, PC
15     1220 Colorado Street
16     Suite 300
17     Austin, Texas 78701
18     (512) 482-3260
19
20     MATTHEW JANSSEN, ESQUIRE
21     TENNESSEE OFFICE OF THE ATTORNEY GENERAL
22     315 Deaderick Street
23     Nashville, Tennessee 37243
24     (615) 741-1671
25

Page 4

1  APPEARANCES (Continued):
2
3      ZACH RICHARDS, ESQUIRE (via Zoom)
4      KENTUCKY OFFICE OF THE ATTORNEY GENERAL
5      1024 Capital Center Drive
6      Suite 200
7      Frankfort, Kentucky 40601
8      (502) 892-8538
9
10     VERNA PRADAXAY, ESQUIRE (via Zoom)
11     NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
12     Richard J. Hughes Justice Complex
13     25 Market Street
14     Trenton, New Jersey 08611
15     (800) 242-5846
16
17     KELSEY BURAZIN, ESQUIRE (via Zoom)
18     WASHINGTON OFFICE OF THE ATTORNEY GENERAL
19     800 Fifth Avenue
20     Suite 2000
21     Seattle, Washington 98104-3188
22     (206) 516-2997
23
24
25

Page 5

1  APPEARANCES (Continued):
2
3      EMILY MIGLIORE, ESQUIRE (via Zoom)
4      ILLINOIS OFFICE OF THE ATTORNEY GENERAL
5      500 South Second Street
6      Springfield, Illinois 62701
7      (217) 782-1090
8
9      AELISH BAIG, ESQUIRE
10     ROBBINS GELLER RUDMAN & DOWD, LLP
11     One Montgomery Street
12     Suite 1800
13     San Francisco, California 94104
14     (415) 288-4545
15
16     KAITLYN KARPENKO, ESQUIRE
17     ANNETTE KITAMORA WILSON, ESQUIRE (via Zoom)
18     CHRISTINA CHAN, ESQUIRE (via Zoom)
19     MASSACHUSETTS OFFICE OF THE ATTORNEY GENERAL
20     100 Cambridge Street, 11th Floor
21     Boston, Massachusetts 02108
22     (617) 727-2200
23
24
25

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

1  APPEARANCES (Continued):
2
3       KRISLYN M. LAUNER, ESQUIRE
4       CONNECTICUT OFFICE OF THE ATTORNEY GENERAL
5       165 Capitol Avenue
6       Hartford, Connecticut 06106
7       (860) 808-5318
8
9       ANN RITTER, ESQUIRE
10      MOTLEY RICE, LLP
11      28 Bridgeside Boulevard
12      Mount Pleasant, South Carolina 29464
13      (843) 216-9000
14
15  ON BEHALF OF THE TIKTOK DEFENDANTS:
16      KATHRYN S. LEHMAN, ESQUIRE
17      KEVIN BOYCE, ESQUIRE
18      KING & SPALDING LLP
19      1180 Peachtree Street, NE
20      Suite 1600
21      Atlanta, Georgia 30309
22      (404) 572-4600
23
24
25

Page 7

1  APPEARANCES (Continued):
2
3  ON BEHALF OF THE META DEFENDANTS
4       GREGORY L. HALPERIN, ESQUIRE
5       DOMINIC BOOTH, ESQUIRE
6       MOLLIE SWEARS, ESQUIRE (via Zoom)
7       BRIAN REISER, ESQUIRE (via Zoom)
8       COVINGTON & BURLING LLP
9       620 Eighth Avenue
10      New York, New York 10018-1405
11      (212) 841-1166
12
13  ON BEHALF OF THE GOOGLE AND YOUTUBE DEFENDANTS:
14      MATTHEW DONOHUE, ESQUIRE
15      WILSON SONSINI GOODRICH & ROSATI, LLP
16      953 East Third Street, Suite 100
17      Los Angeles, California 90013-1955
18      (323) 210-2939
19
20  ON BEHALF OF THE SNAP DEFENDANTS:
21      GARRETT SOLBERG, ESQUIRE
22      MUNGER TOLLES & OLSON, LLP
23      350 South Grand Avenue, 50th Floor
24      Los Angeles, California 90071-3426
25      (213) 683-9100

Page 8

1  APPEARANCES (Continued):
2
3  ALSO PRESENT:
4       TIM HUNTER, Videographer
5       MARC ZAMORA, Trial Technician
6       CORIN STIGALL, paralegal (via Zoom)
7       AKOSUA G. DUAH (via Zoom)
8       ANNETT WILSON (via Zoom)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 9

1         C O N T E N T S
2  EXAMINATION OF JEAN M. TWENGE, Ph.D.          PAGE
3       By Ms. Lehman              19
4       By Mr. Solberg            175
5       By Mr. Donohue            197
6       By Mr. Halperin           220
7
8
9         E X H I B I T S
10      (Attached to transcript)
11  TWENGE DEPOSITION EXHIBITS                   PAGE
12  No. 1    Expert Report of Dr. Jean M.
13      Twenge, Ph.D., May 16, 2025        48
14  No. 2    Rebuttal Expert Report of
15      Dr. Jean M. Twenge, Ph.D.,
16      July 30, 2025             48
17  No. 3    Amended Notice of Deposition      49
18  No. 4    Social Media and Mental Health:
19      A Collaborative Review            84
20  No. 5    Article: Making iGen's Mental
21      Health Issues Disappear           93
22  No. 6    Excerpt from 10 Rules for Raising
23      Kids in a High-Tech World        106
24  No. 7    Video                     128
25  No. 8    Video                     135

3 (Pages 6 - 9)

CONFIDENTIAL

Page 10

E X H I B I T S

(Attached to transcript)

| TWENGE DEPOSITION EXHIBITS | PAGE |
|---|---|
| No. 9    Excerpt from Generation Me | 157 |
| No. 10    Transcript of Deposition of Jean M. Twenge, Ph.D., taken June 26, 2025 | 176 |
| No. 11    Expert Rebuttal Report of Krista Hayakawa | 178 |
| No. 12    Jean M. Twenge, Ph.D. Report Materials Considered | 194 |
| No. 13    Article: Gender differences in associations between digital media use and psychological well-being: Evidence from three large datasets | 221 |
| No. 14    Book titled: 10 Rules for Raising Kids in a High-Tech World | 225 |
| No. 15    Plaintiffs' Second Amended Master Complaint (Personal Injury) | 230 |
| No. 16    Master Short-Form Complaint and Demand for Jury Trial | 233 |

Page 11

E X H I B I T S

(Attached to transcript)

| TWENGE DEPOSITION EXHIBITS | PAGE |
|---|---|
| No. 17    Article: Linear correlation is insufficient as the sole measure of associations: The case of technology use and mental health | 246 |
| No. 18    Article: Associations between screen time and internalizing disorder diagnoses among 9- to 10-year-olds | 251 |
| No. 19    Jean Twenge, Ph.D. invoices, Beginning Bates No. TWENGEMDL000001 | 256 |
| No. 20    Expert Report of Dr. Jean M. Twenge, Ph.D., June 6, 2025 | 261 |
| No. 21    Response and Objections to the Notice of Deposition of State's Retained Expert, Jean Twenge, and Request for Production of Documents | 262 |
| No. 22    Article: Social Media and Depressive Symptoms | 274 |

Page 12

E X H I B I T S

(Attached to transcript)

| TWENGE DEPOSITION EXHIBITS | PAGE |
|---|---|
| No. 23    Article: Alcohol, Tobacco, and Firearm Promotion in Digital Media: Corporate Influences on Adolescent Health | 276 |
| No. 23A    Article: Media Influences on Self-Harm, Suicidality and Suicide | 276 |
| No. 24    Online Reference to Substack Generation Tech (not attached) | 285 |
| No. 25    (Number not used) | |
| No. 26    Substack post: The Pandemic was bad for teen mental health: The smartphone and social media were worse | 287 |
| No. 27    NPR transcript: How Smartphones Are Making Kids Unhappy | 291 |
| No. 28    NPR: The Scientific Debate Over Teens, Screens and Mental Health | 295 |
| No. 29    Article: Worldwide increases in adolescent loneliness | 298 |
| No. 30    Book Chapter: Technology and Cultural Change | 303 |

Page 13

E X H I B I T S

(Attached to transcript)

| TWENGE DEPOSITION EXHIBITS | PAGE |
|---|---|
| No. 31    Article: Trends in U.S. Adolescents' Media Use, 1976-2016: The Rise of Digital Media, the Decline of TV, and the (Near) Demise of Print | 315 |
| No. 32    Article: Media Use is Linked to Lower Psychological Well-Being Evidence from Three Datasets | 322 |
| No. 33    Article: Not all screen time is created equal: Associations with mental health vary by activity and gender | 324 |
| No. 34    Article: Associations between screen time and short sleep duration among adolescents varies by media type: Evidence from a cohort study | 326 |
| No. 35    Video | 334 |
| No. 36    Article: Digital Media May Explain a Substantial Portion of the Rise in Depressive symptoms Among Adolescent Girls: Response to Daly | 344 |

CONFIDENTIAL

Page 14

E X H I B I T S

(Attached to transcript)

TWENGE DEPOSITION EXHIBITS          PAGE

No. 37    Article: Specification curve
          analysis shows that social
          media use is linked to poor
          mental health, especially among
          girls                          355

No. 38    Article: Considering All of the
          Data on Digital-Media Use and
          Depressive Symptoms: Lipshits-
          Braziler, and Rosenberg (2020)    365

No. 39    Article from February 2022,
          titled Nearly Half of Tennessee
          Kids Spend More Than Two Hours
          Per Day on Non-Educational Screen
          Time                           374

No. 40    Gallup Poll: Teens Spend Average
          of 4.8 Hours on Social Media Per
          Day                            382

No. 41    Article: Declines in non-digital
          social interaction among Americans,
          2003-2017                      414

No. 42    Video                          419

No. 43    Printout from CDC website      448

Page 15

E X H I B I T S

(Attached to transcript)

TWENGE DEPOSITION EXHIBITS          PAGE

No. 44    Printout from CDC website      450

No. 45    2024 National Survey on Drug
          Use and Health: Graphics to
          Support Estimates from the
          Annual National Report         452

No. 46    Youth Risk Behavior Surveillance
          Survey data                    460

Page 16

P R O C E E D I N G S

------------------

THE VIDEOGRAPHER:  Here begins the videotaped deposition.  Today's date is September 17th, 2025.  The time on the record is 9:12 a.m.

MR. HALPERIN:  I'll just note for the record that Arkansas and Massachusetts are in attendance at this deposition, notwithstanding a federal court order that says, "Deposition in Arkansas non-MDL case" -- and then it says, quote -- let me get the right entry here. "Depositions in Arkansas and Massachusetts non-MDL cases to be taken separately."

Massachusetts and Arkansas have known for months.  There were a variety of depositions on the position that they should not be here, that this deposition is not being taken in Arkansas and Massachusetts.  We continue to be disappointed that those two states are blatantly violating a

Page 17

federal court order and seem to be engaging in self-help --

THE REPORTER:  Counsel, I'm having a hard time hearing you.

MR. HALPERIN:  We're disappointed that Arkansas and Massachusetts have blatantly violated a federal court order and engaged in self-help, without seeking any relief from that order from their federal or state court.

MS. BAIG:  So this is -- this is Aelish Baig from Robbins Geller, on behalf of the State of Arkansas. We're here today -- well, let me just say also that Dr. Twenge has already served an expert report in the Arkansas state court action against Meta, which is near identical to Dr. Twenge's reports previously served in the other litigations.

Arkansas is not subject to MDL court jurisdiction; we're subject to state court jurisdiction.  And we are here subject to an agreement in

5 (Pages 14 - 17)

Page 18

1    writing with Meta that was never
2    revoked prior to this deposition.
3         MS. KARPENKO:  Good morning.
4    My name is Kaitlyn Karpenko. I'm an
5    Assistant Attorney General for
6    Massachusetts.  The Commonwealth of
7    Massachusetts states, for the record,
8    that we had timely served, prior to
9    today's deposition, an opening report
10   and a rebuttal report from Dr. Twenge
11   in our litigation, the Commonwealth v.
12   Meta Platforms and Instagram, LLC,
13   Suffolk Superior Court Civil Action
14   Number 2384CD02397.
15        Similar to Arkansas, these
16   reports are substantively identical as
17   those served by the MDL plaintiffs,
18   and, thus, for purposes of
19   coordination and efficiency, issued a
20   cross-notice into today's deposition.
21        As a result, the Commonwealth
22   opposes any efforts to further depose
23   Dr. Twenge, based on Massachusetts'
24   disclosures, but are happy to meet and
25   confer on that issue at the

Page 19

1    appropriate time, if and/or when it
2    becomes ripe.
3         MR. HALPERIN:  I don't believe
4    any cross-notice has been served.
5    I'll state for the record that we know
6    of no vehicle for two states that are
7    not parties to the case to show up and
8    sit in this room without any sort of
9    cross-notice.
10        MS. LEHMAN:  All right.  With
11   that, if you'll swear the witness,
12   please.
13        JEAN M. TWENGE, Ph.D.,
14   having first been duly sworn, was
15   examined and testified as follows:
16        EXAMINATION
17 BY MS. LEHMAN:
18   Q.   Good morning, Dr. Twenge.  How
19 are you today?
20   A.   I'm good.  Thank you.  How are
21 you?
22   Q.   Good.  We met a few months ago in
23 the same room.  My name is Katy Lehman.  I'm
24 going to be taking your deposition again
25 today.

Page 20

1         Are you prepared to discuss your
2    final opinions in the MDL today?
3    A.   Yes.
4         MS. LEHMAN:  All right.  We
5    have counsel standing up.
6         MS. LAUNER:  If we could just
7    put something on the record as well.
8         MS. LEHMAN:  Sure.
9         MS. LAUNER:  Kryslin Launer for
10   the state MDL AGs.  I just wanted to
11   put on the record that the MDL state
12   AGs, to date, still have not received
13   any notice of deposition for
14   Dr. Twenge from any defendant counsel.
15        Given the Court's prior order
16   regarding today's deposition, it is
17   our understanding that this is simply
18   an oversight.
19        With that understanding, the
20   MDL state AGs are present and prepared
21   to proceed today in an effort to
22   promote efficiency.  However, we do
23   reserve all rights and waive none
24   regarding the failure to serve.
25        MR. HALPERIN:  And I'll just

Page 21

1    state that, as I put in an e-mail
2    yesterday, notice was served that
3    expressly relates to "All actions in
4    MDL 3047."  Of course, the AGs' case
5    is an action in MDL 3047.
6         We also, last night, to the
7    extent the AGs thought that they did
8    not -- were not parties to that prior
9    notice, we served a Meta-specific
10   notice on the AGs last night to cure
11   any purported defects.  But our
12   position is you received a notice
13   related to "All actions," including
14   the MDL.
15 BY MS. LEHMAN:
16   Q.   All right.  Dr. Twenge, I think
17 that means you and I are back on the mic.
18   A.   Okay.  One second.  Just getting
19 reading glasses out, in case I need them.
20   Q.   All right.  No problem.  Are you
21 prepared to discuss your final opinions in the
22 MDL today?
23   A.   Yes.
24   Q.   Do you need to conduct any
25 additional work in order to develop or discuss

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

1  your final opinions in the MDL?
2      A.    No.
3          MS. McNABB:  Objection to form.
4  BY MS. LEHMAN:
5      Q.    Are you aware of any reason that
6  you'll be unable to give full and complete
7  answers today?
8      A.    I am not.
9      Q.    Have any of your opinions about
10  social media or the impacts of social media
11  changed since your deposition on June 26th,
12  2025?
13      A.    No.
14      Q.    Have you developed any new
15  opinions about social media since your
16  deposition on June 26th, 2025?
17      A.    No.
18      Q.    Have you performed any additional
19  research on social media since your deposition
20  on June 26th, 2025?
21      A.    I have several ongoing research
22  projects, some of which are relevant for that
23  topic, yes.
24      Q.    And are any of those research
25  projects that you started since your last

Page 23

1  deposition?
2      A.    One of them, yes.
3      Q.    And what is that project?
4      A.    Using Monitoring the Future data
5  to look at associations between depressive
6  symptoms, social media use, and watching
7  videos.
8      Q.    And do you anticipate publishing
9  an article, or how do you plan to use that
10  data?
11      A.    It's currently under review at a
12  journal.  That process often takes quite a
13  while.
14      Q.    When did you submit the article?
15      A.    About a week ago.
16      Q.    And are you a coauthor on the
17  article?
18      A.    Yes.
19      Q.    Who are your coauthors?
20      A.    I'm actually a single author
21  this particular time.
22      Q.    And what is the journal who is
23  reviewing the article?
24      A.    Computers and Human Behavior.
25      Q.    And do you have an expectation,

Page 24

1  if it's accepted for publication with that
2  journal, how long it would take until it's
3  published?
4      A.    No.
5      Q.    All right.  Have you started any
6  other research projects related to social
7  media since your last deposition?
8      A.    Started?  No.
9      Q.    Have you added anything to your
10  materials considered list for the MDL that
11  were not part of your materials considered
12  list for the JCCP?
13      A.    Yes, I believe that there's a
14  few articles that we have added.
15      Q.    Okay.  And what was the purpose
16  in adding those articles?
17      A.    Just to represent things that I
18  had read or -- read between then and now.
19      Q.    And did those additions change
20  any of your opinions or support the opinions
21  that you have previously disclosed?
22      A.    They supported my previous
23  opinions.
24      Q.    Okay.  Have you reviewed any
25  document produced by a school district in the

Page 25

1  MDL?
2      A.    Can you say more about what you
3  mean by a document produced by a school
4  district?
5      Q.    Yeah.  So in the MDL, school
6  districts produced to the defendants a number
7  of different types of documents, so school
8  district documents.  That could be e-mails,
9  policies, all sorts of things.  Have you
10  reviewed any of those documents?
11      A.    Not to my knowledge, no.
12      Q.    Have you reviewed any deposition
13  of a school district employee taken in the
14  MDL?
15      A.    No.
16      Q.    Have you performed any analysis
17  of the harms suffered by any individual school
18  district?
19      A.    Can you maybe word that in a
20  different way?
21      Q.    Sure.  Have you conducted any
22  analysis of the impact of social media on any
23  individual school district who is a plaintiff
24  in the MDL?
25      A.    No.

Golkow Technologies,
A Veritext Division
877-370-3377                                        www.veritext.com

CONFIDENTIAL

Page 26

1    Q.    Will you be offering any opinions
2 about the harms caused to any individual
3 school district as a result of social media?
4    A.    Certainly some of the research
5 results may apply to that situation, but an
6 individual school district, I don't believe
7 so, no.
8    Q.    Okay.  And when you say some of
9 the research results may apply to that
10 situation, what do you mean by that?
11    A.    Well, that with increased levels
12 of depression, that school districts may have
13 increased absenteeism of students, which has a
14 direct impact on their budget.  That they may
15 need to spend more money providing mental
16 health services.  That's just a conjecture on
17 my part, given what I know about how the
18 system works.  But obviously, not exactly in
19 my lane of expertise.
20    Q.    Will you be offering any opinions
21 about any harms to school districts as a
22 result of social media that is distinct from
23 the harms to the students themselves?
24    A.    Well, it's not my -- I mean, I
25 think that's not what I was charged to do in

Page 27

1 this report.
2    Q.    Okay.  And that's a perfectly
3 acceptable answer.  That's why I'm asking,
4 right, if that's something that you're going
5 to opine about.
6         Have you performed any
7 quantitative data analysis related to any
8 school district who is a plaintiff in the MDL?
9    A.    I'd have to see a list of the
10 plaintiffs.  Because, for example, the
11 Monitoring the Future study, which I draw from
12 extensively, works with school districts.
13    Q.    Okay.  So that's a fair point.
14 But putting aside the possibility that one of
15 the school districts has students that have
16 answered the Monitoring the Future study, have
17 you performed any quantitative analysis
18 related specifically to any individual school
19 district that is a plaintiff in the MDL?
20    A.    I don't believe so.  I mean, I'm
21 hedging simply because I've given a lot of
22 talks at schools.  And they do sometimes
23 provide to me data that they have collected,
24 or reflections on the impact of technology in
25 their schools.  But quantitative analysis for

Page 28

1 a specific school district, that doesn't come
2 to mind.
3    Q.    Have you ever been hired by any
4 school district to consult about the impact of
5 social media on their district?
6    A.    Unless you count speaking
7 engagements -- well, I did do what could be
8 described as consulting for Cathedral
9 Catholic, here in San Diego.  They brought me
10 in for a speaking engagement, but before that,
11 we had a Zoom discussion about the impact of
12 technology on their students, both within and
13 outside of school.  So I mean, it wasn't a
14 district, it was a specific school.  But in
15 that way, yes.
16    Q.    Okay.  Have you been hired to
17 consult with any school district, other than
18 what you just told us about for Cathedral
19 Catholic, to consult about the impact of
20 social media on their district?
21    A.    I mean, I think the speaking
22 engagements have some overlap with that
23 question, so it's difficult for me to answer
24 it as worded.
25    Q.    When you say that -- you're

Page 29

1 referencing speaking engagements.  As part of
2 those speaking engagements, what do you talk
3 to the school district about?
4    A.    So it varies, but as part of
5 some of those speaking engagements, I have met
6 with administrators and with teachers, to
7 discuss the impact of technology on their
8 students, and what they can do about it.
9    Q.    And are all of those speeches,
10 are they reflected on your CV?
11    A.    Some of the school district ones
12 are not listed on my CV, because my CV is
13 mostly going to be academic talks.  So it
14 would mostly reflect those that would be on
15 college campuses or for academic conferences,
16 and not necessarily where I visited a middle
17 school or a high school or an elementary
18 school.
19    Q.    And do you recall the names of
20 the school districts where you had those
21 speaking engagements, where you met with
22 administrators and teachers to discuss the
23 impact of technology on their students and
24 what they can do about it?
25    A.    It would be difficult for me to

8 (Pages 26 - 29)

CONFIDENTIAL

1 give you a comprehensive list. So I can tell
2 you, I can't do that. But I could name a few.
3    Q.    Okay.
4    A.    Holy Names in Tampa, Florida.
5 St. John's in Houston. Another school in
6 Houston, I think it was called the Cooper
7 School. Those are three that come to mind.
8 I'm sure there's more. Those are just the
9 more recent ones.
10    Q.    Okay. Well, you know, during the
11 day today, if you think of any others, please
12 do let me know.
13    A.    Okay.
14    Q.    Have you ever been hired by any
15 school district to develop a plan to
16 ameliorate or mitigate the impacts of social
17 media on their district?
18    A.    I mean, Cathedral Catholic
19 specifically wanted to look into their phone
20 policy during the school day, which is
21 relevant for social media, simply because
22 that's one of the issues that comes up when
23 students have access to their phones during
24 the school day.
25        And that certainly has come up

1 in many of the speaking engagements that I
2 have done. The Cooper School, I know that
3 came up as well, that they were thinking of
4 changing their policy on phones during the
5 school day. So that -- it's a little hard for
6 me to answer the question as asked, but I have
7 certainly talked to school districts about
8 that issue.
9    Q.    And when you talk to school
10 districts about the idea of a phone policy,
11 what -- do you have a specific policy or
12 approach that you recommend?
13    A.    I do. I recommend no phones
14 during the school day, bell to bell. That the
15 phone is physically in another location or in
16 a pouch, such as a Yondr pouch. Second best
17 would be in the backpack and off. But that it
18 should not be a policy that's classroom by
19 classroom. It should not be a policy that
20 they can have their phones at lunch or breaks.
21 That it's the whole school day.
22    Q.    Okay. And what are the benefits
23 of a bell-to-bell no-phone policy?
24    A.    So there -- so the argument is
25 that there's clearly benefits in the classroom

1 for paying attention to the teacher and the
2 school work, as opposed to being distracted by
3 the phone and social media. That at lunch and
4 during breaks, that students can talk to each
5 other in realtime, face to face, as opposed to
6 being on their phones.
7        At the Cooper School, there was
8 a boy who came up to me afterward, and said, I
9 really want to talk to my friends at lunch,
10 but they're all on their phones, what can I
11 do? And the sad fact is there's very little
12 that I could recommend to him, other than his
13 school having a no-phones during the school
14 day bell-to-bell policy, because if everyone
15 was not allowed to be on their phone at lunch,
16 then he could talk to his friends.
17    Q.    How long have you been advocating
18 for a no-phones bell-to-bell policy?
19    A.    It would be difficult for me to
20 put an impact date on that. I'd have to go
21 back and look to see when I first started to
22 talk about that. At least a year, probably
23 more like two or three, but that's a guess.
24    Q.    So somewhere in the 2002 to 2003
25 time frame, is that when you began advocating

1 for the no-phones bell-to-bell policy?
2    A.    Do you mean 2022?
3    Q.    Oh, gosh, yes.
4    A.    I do that all the time, too.
5    Q.    All right. Let me reask it and
6 get this right. Was it sometime in the 2022
7 to 2023 time frame that you began advocating
8 for the no-phones bell-to-bell policy?
9    A.    It may very well have been
10 before that. I just don't recall exactly
11 when. I know that well before that, I did
12 some consulting for Yondr. And that was
13 before the pandemic. So it very well might
14 have been 2019. I just don't -- I just don't
15 recall.
16    Q.    Okay. Have you helped any school
17 districts implement a no-phones bell-to-bell
18 policy?
19    A.    I have advocated for it, and I
20 have talked to them about the research that
21 may support that policy. But the
22 implementation is up to the administrators,
23 the principals, the teachers. I have made
24 recommendations. But I have not sat down and
25 said, Here's exactly how you implement it.

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

1    But I have certainly tried to
2 help with talking about the reasons behind the
3 policy, and the research in the area with
4 parents and students and teachers.
5    Q.    And have you spoken to any of the
6 administrators or other individuals from the
7 school districts that you work with, after
8 they have implemented such a no-phones
9 bell-to-bell policy, about what that
10 experience was like?
11    A.    I did in at least one case.
12 There was a school outside of Seattle, and I
13 am blanking on the name of it, because it was
14 quite a while ago.  The principal's name, I
15 believe, is Blake DeYoung.  And after -- it
16 was like a good year or so after I spoke at
17 his school, he e-mailed me, and told me about
18 the results that he had gotten.
19    Q.    And did they have good results
20 when they implemented that policy?
21    A.    They did.
22    Q.    Okay.  Did he say anything to you
23 or reveal that they had had any problems
24 implementing a bell-to-bell no-phones policy?
25    A.    He did not mention any problems,

Page 35

1 to my recollection.
2    Q.    Okay.  You mentioned several
3 times that when you are encouraging either
4 parents, or teachers, or administrators to
5 implement a no-phones bell-to-bell policy, you
6 mentioned that you talked to them about what
7 the research shows.  And what do you tell them
8 that the research shows?
9    A.    So this is an area where the
10 research is emerging.  So there's one study
11 that was done in Norway, I believe, that found
12 some positive results, particularly for girls.
13 That there's several school districts in, I
14 believe, Colorado and Massachusetts that saw
15 significant declines in discipline issues
16 after implementing a no-phones bell-to-bell
17 policy.
18    Those are the three that come to
19 mind.  I'm sure there's more.  But those are
20 the three specific things that I can think of,
21 in terms of the research.
22    Q.    And are those results from
23 Norway, Colorado, and Massachusetts, are they
24 published somewhere, or how do you know about
25 those -- those experiences?

Page 36

1    A.    So the Norway study, I am trying
2 to remember if that was a preprint or
3 published.  It was one of the two.  It was an
4 academic study.  Colorado and Massachusetts,
5 those, I believe, were based on -- I believe I
6 heard about them through news articles.
7    Q.    And when you say news articles,
8 were those in the education press or the
9 common, lay media?  Where were they, if you
10 recall?
11    A.    I don't recall.
12    Q.    When did you consult for Yondr?
13    A.    2018, perhaps.
14    Q.    How long did you consult for
15 Yondr?
16    A.    I met with their founder, and
17 had an initial conversation, and then did a
18 webinar.  I do remember perhaps having some
19 communication with them over the course of a
20 few years.  But the initial conversation,
21 meeting the founder and doing the webinar,
22 that was over the course of maybe three
23 months.
24    Q.    Did you charge Yondr for your
25 consulting or did you do it gratis?

Page 37

1    A.    I charged them.
2    Q.    When was the last time that you
3 did any work for Yondr?
4    A.    Paid work, it would have been
5 before the pandemic.  And I don't recall
6 exactly what year that would have been.  2018
7 or 2019, perhaps.
8    Q.    You said paid work, and so I just
9 want to make sure.  Have you ever done any
10 unpaid work for Yondr?
11    A.    I did communicate with them more
12 recently that -- it was just, you know, more
13 informal, and it was not -- I did not charge
14 them for my time in that case.
15    Q.    And just so the record is clear,
16 when we're talking about Yondr, we're talking
17 about the company that manufactures Yondr
18 pouches, correct?
19    A.    Correct.
20    Q.    All right.  Thank you.  Have you
21 ever worked in a school?
22    A.    You mean a K-through-12 school?
23    Q.    I do.
24    A.    Okay.  No.
25    Q.    Are you an epidemiologist?

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

1    A.    I am not, although many -- I am
2  not, although much of what is taught in
3  epidemiology overlaps with areas in which I do
4  have expertise.
5    Q.    Have you ever taught a class in
6  epidemiology?
7    A.    I have not, but I have taught
8  many classes in research methods within
9  psychology, which do have a fair amount of
10  overlap with epidemiology.
11    Q.    Are you an expert in computer
12  science?
13    A.    No.
14    Q.    Are you an expert in data science
15  and analytics?
16    A.    So the definition of data
17  science is a little unclear to me.  If it
18  means analyzing data, then, yes.
19    Q.    Okay.  Are there specific types
20  of data that you hold yourself out as an
21  expert in analyzing?
22    A.    You're going to have to give me
23  more context for what you mean by specific
24  types of data.
25    Q.    Sure.  Well, so you told me in

Page 39

1  your last answer that -- I asked if you were
2  an expert in data science.  And you said,
3  Well, if it means analyzing data, then yes.
4  And so I'm asking you, are you saying you're
5  an expert in analyzing all data, or are there
6  certain types of data in which you would hold
7  yourself out as an expert?
8    A.    You'd have to tell me more about
9  what you mean about types of data for me to
10  answer that.
11    Q.    Sure.  Well, let me -- let me ask
12  the question in a slightly different way.  Are
13  you an expert in artificial intelligence?
14    A.    No, although I'm certainly
15  familiar with some of the recent cases about
16  young people interacting with AI companions,
17  and some of the mental health problems, and
18  even suicides that have resulted.
19    Q.    Okay.
20        MS. LEHMAN:  And I'm going to
21    respectfully move to strike as
22    nonresponsive, starting with
23    "although."
24  BY MS. LEHMAN:
25    Q.    Are you an expert in computer

Page 40

1  learning?
2    A.    No.
3    Q.    Are you an expert in app design?
4    A.    No.
5    Q.    Are you an expert in algorithm
6  design?
7    A.    No.
8    Q.    Are you an expert in
9  neuroscience?
10    A.    No.
11    Q.    Are you an expert in
12  neurogenetics?
13    A.    No.
14    Q.    Are you an expert in linguistics?
15    A.    No.
16    Q.    Are you an expert in social work?
17    A.    No, although there's some
18  overlap between social work and psychology.
19    Q.    Okay.  And what would be the
20  areas that you identify as overlapping between
21  psychology and social work?
22    A.    Some aspects of abnormal and
23  clinical psychology.  Some aspects of -- much
24  of the research on the impacts of, say,
25  childhood trauma is certainly covered in

Page 41

1  psychology.  I -- I think there's many areas
2  of overlap.  It's hard to give a complete
3  list.
4    Q.    Okay.  In your report, you talk
5  about trend data in several places.  And I
6  want to ask you some questions about trend
7  data.
8    A.    Okay.  And there's many names
9  for that, so I want to make sure I understand.
10  Time series analysis being one of those.
11    Q.    Yes.  All right.  So I want to
12  talk about time series analysis right now.
13    A.    Okay.
14    Q.    Do you agree that time series
15  analysis related to prevalence of mental
16  health conditions does not alone support a
17  conclusion as to the cause of that change in
18  prevalence of mental health conditions?
19        MS. McNABB:  Objection.  Form.
20        THE WITNESS:  I think it can be
21    one element of the broad view of the
22    literature that points towards
23    causation.
24  BY MS. LEHMAN:
25    Q.    Understanding that, and so I

11 (Pages 38 - 41)

CONFIDENTIAL

1  think -- I think I understand what you're
2  saying, so let me make sure, okay?  You're
3  saying that that could be one data point as to
4  many that could be used to point towards
5  causation; is that correct?
6         MS. McNABB:  Objection.  Form.
7         THE WITNESS:  I wouldn't put it
8      in exactly that way.  I think because
9      time series analysis is generally not
10     as subject to reverse causation as
11     cross-sectional and correlational
12     studies, it's a very important part of
13     that picture.  And it's -- when you're
14     looking at many different studies with
15     many different methods, it's difficult
16     to say that any alone would be
17     completely definitive.  That's not how
18     science works.
19 BY MS. LEHMAN:
20     Q.    Okay.  And so would you also
21  agree, then, that time series data alone,
22  right, so if you look at time series data in
23  isolation, as to the prevalence of mental
24  health conditions, that that data does not
25  allow you to conclude what percentage of the

1  trend in changing prevalence of mental health
2  conditions was caused by social media use?
3      A.    I think it's just very difficult
4  to answer that as asked, because narrowing
5  down a percentage is generally not how those
6  studies work.
7      Q.    Your MDL report does not discuss
8  confounders, correct?
9         MS. McNABB:  Objection.  Form.
10        THE WITNESS:  It did discuss
11     confounders.
12 BY MS. LEHMAN:
13     Q.    Which confounders did your MDL
14  report discuss?
15     A.    Let me make sure I understand
16  what you mean by confounders.
17     Q.    Okay.  Well, I think we talked
18  about last time that confounders are something
19  -- if you were looking at a cause and effect,
20  a confounder is something else that may be
21  causing the effect, other than the cause
22  you're looking at.
23     A.    So I would put it a little
24  differently, in that, say, in a correlational
25  or cross-sectional study, for example, that A

1  can cause B, B can cause A or C, a third
2  variable, a confounder could cause both.
3      Q.    Okay.  All right.  And so which
4  confounder or confounders did your MDL report
5  address?
6      A.    So the studies that are
7  discussed in that report controlled for many
8  different confounders.
9      Q.    Okay.  And maybe let me -- I'm
10  asking a slightly more specific question,
11  right?  So I'm not asking you, did you cite
12  studies that control for confounders.  I'm
13  asking, is there anyplace in your MDL report
14  where you specifically talk about confounders?
15     A.    All right.  So I'm going to open
16  up the report.
17     Q.    Okay.
18     A.    So we can take a look to see.
19  Certainly the studies did have those controls.
20  Okay.  So here's -- there's several examples.
21  Here's one that I found quickly on page 25.
22  The note under Figure 12 says, "Controlled for
23  grade, race/ethnicity, mother's education, and
24  in-person social interaction frequency."
25     Q.    Okay.  And so is there

1  anyplace -- I see the note that you've pointed
2  me to under Figure 12.  And that's pulled out
3  of a 2020 analysis by Twenge and Martin?
4      A.    Yes.
5      Q.    Okay.  My question, is there
6  anywhere in your analysis, right, so your
7  discussion section of your report, where you
8  look at and discuss potential confounders that
9  would explain changes in prevalence of mental
10  health conditions?
11     A.    Okay.  So that's a different
12  question, because now we're back to time
13  series.
14     Q.    Okay.  Great.
15     A.    You said changes in prevalence.
16     Q.    Right.  So if you could answer
17  that question.
18     A.    Okay.  So I want to make sure I
19  understand the question.  So maybe you can
20  word it in a different way.
21     Q.    Okay.  So what I'm asking --
22  you've pointed me to -- I asked you about
23  confounders, and you pointed me to the note
24  under Figure 12.  Okay.  So I'm asking a very
25  basic question here.  I understand that that's

CONFIDENTIAL

Page 46

1 in the note. I'm asking, in your analysis in
2 your report, right -- I mean, you have, I
3 don't know, a hundred and some -- right at a
4 hundred paragraphs.
5          Do any of these paragraphs
6 discuss confounders in your analysis, right,
7 so not pointing to a figure or something, is
8 there a discussion of them?
9          MS. McNABB: Objection. Form.
10          THE WITNESS: So in the text
11     that refers to -- so the same page 25,
12     at the top, it says, "In my analysis,
13     I control for race, grade, mother's
14     education level, thus ruling out these
15     factors as third variables." Third
16     variables are another phrase -- or
17     another way to describe confounders.
18 BY MS. LEHMAN:
19     Q.    Okay.
20     A.    And then there's also a
21 discussion of confounders on page 28. Okay.
22 So paragraph 77 discusses which confounders or
23 controls are appropriate versus not
24 appropriate to include in an analysis.
25     Q.    Okay. Anything else you want to

Page 47

1 point me to?
2     A.    You mentioned time series
3 before. And if we're going to talk about
4 confounders for time series, just to throw out
5 an example, that might include something like
6 the racial and ethnic breakdown of the
7 population changing over time.
8          And thus, you would have to make
9 sure that that wasn't the cause. So the way
10 you would do that is to do the analyses
11 separately by race and ethnicity, which I have
12 done in several Substacks. And I believe some
13 that are cited in this analysis, if that's
14 what you're concerned with, in terms of
15 confounders. And I believe I specifically
16 address that in my rebuttal report.
17     Q.    In your rebuttal report? Okay.
18 Well, we'll get to that in a second. Let's --
19 you've opened -- is that your -- what you have
20 open, is that your May 16th expert report in
21 the MDL?
22     A.    It is.
23     Q.    Okay.
24          MS. LEHMAN: We'll mark that as
25     Exhibit Number 1.

Page 48

1          (Exhibit No. 1 was marked for
2     identification.)
3 BY MS. LEHMAN:
4     Q.    I'm going to hand you the sticker
5 for the notebook. And you have a second
6 notebook. Is that -- what's in your second
7 notebook?
8     A.    That is the rebuttal report
9 dated July 30th.
10          MS. LEHMAN: We'll mark that as
11     Exhibit Number 2.
12          (Exhibit No. 2 was marked for
13     identification.)
14 BY MS. LEHMAN:
15     Q.    And both Exhibits 1 and 2 are
16 both your reports from the MDL, correct?
17     A.    Yes.
18     Q.    Okay. Did you bring anything
19 else with you besides those two notebooks?
20     A.    Water and snacks.
21     Q.    Okay. All right. And I'm going
22 to hand -- we're going to mark your amended
23 notice of deposition as Exhibit 3. And I will
24 tell you, these got printed before the
25 amendment. I believe the amendment is -- we

Page 49

1 added the word amendment and the start time.
2 So we have an electronic copy. This will be
3 tab 600.
4          (Exhibit No. 3 was marked for
5     identification.)
6 BY MS. LEHMAN:
7     Q.    I will hand you a printed copy,
8 if you'd like to look at it. It's just --
9 it's slightly different than what's going to
10 actually be Exhibit 3.
11          And had you seen the notice of
12 deposition before coming here today?
13     A.    Yes.
14     Q.    Okay. And did you have any other
15 documents that were responsive to the requests
16 that have not already been provided?
17     A.    I don't believe so, no.
18     Q.    Okay. Did you prepare for your
19 deposition today?
20     A.    Yes, I did.
21     Q.    How much time did you spend
22 preparing for your deposition?
23     A.    Oh, hard to put a specific
24 number on it. Eight or nine hours.
25     Q.    What did you do to prepare?

CONFIDENTIAL

Page 50

1    A.   I spoke with counsel.  I read my
2  report.  I read my rebuttal report.  I read my
3  prior testimony.
4    Q.   Your prior testimony from your
5  deposition earlier this summer?
6    A.   Yes.
7    Q.   Did you review anything else to
8  prepare for your deposition?
9    A.   I may have read a few of the
10  articles, but I don't recall which ones.
11    Q.   Okay.  How long did you speak
12  with counsel in preparation for your
13  deposition?
14    A.   I mean, a virtual meeting, which
15  was maybe a half hour, or hour.  And then we
16  met for about two hours yesterday.
17    Q.   Okay.  And so are those the only
18  two meetings, either in person or virtual,
19  that you had with counsel to prepare for your
20  deposition?
21    A.   I believe so, yes.
22    Q.   Did you speak with anyone other
23  than plaintiffs' counsel to prepare for your
24  deposition?
25    A.   No.

Page 51

1    Q.   And who attended the virtual
2  meeting that you had with counsel to prepare
3  for the deposition?
4    A.   I'm not sure I know.
5    Q.   Well, how many people were there?
6    A.   It was a virtual meeting, so,
7  you know, sometimes people have cameras off.
8  I couldn't tell you.
9    Q.   Okay.  How many different boxes
10  were on the screen?
11    A.   Four maybe.  Five.
12    Q.   Who do you remember talking to
13  during that meeting?
14    A.   Ms. McNabb.  I believe Zach from
15  Kentucky might have been there.  And then some
16  of the other attorneys who are sitting here
17  today.
18    Q.   Okay.  So those would be some of
19  the attorneys for different states?
20    A.   Yes.
21    Q.   Okay.  And you don't remember
22  which ones they were, or how many there were?
23    A.   From one meeting to another, no.
24    Q.   Okay.  And I'm sorry, when was
25  that virtual meeting that we're discussing?

Page 52

1    A.   Last week.
2    Q.   Okay.  So within the last ten
3  days?
4    A.   Yes.
5    Q.   All right.  And then you also met
6  with counsel yesterday, you said?
7    A.   Yes.
8    Q.   That was in person?
9    A.   Yes.
10    Q.   Where did you meet?
11    A.   At my home.
12    Q.   Who was there?
13    A.   The folks you see here today,
14  except I think Matt was not there yet.
15    Q.   All right.  So there were six
16  attorneys at your house yesterday for the
17  meeting?
18    A.   Yes.
19    Q.   All right.  Was anybody -- any
20  other attorneys who are not here today, who
21  were there yesterday?
22    A.   I don't think so.
23    Q.   Did anyone participate by Zoom in
24  that meeting?
25    A.   I believe that Matt, because he

Page 53

1  had not made it there yet, we Zoomed him in
2  for part of it.
3    Q.   Okay.
4    A.   And then Zach from Kentucky was
5  also on Zoom.
6    Q.   All right.  So you had six
7  attorneys in the house, plus at least two more
8  that you remember on Zoom?
9    A.   Yes.
10    Q.   That was yesterday?
11    A.   Yes.
12    Q.   Okay.  Do you agree that
13  unhappiness is a normal human emotion?
14        MS. McNABB:  Objection.  Form.
15        THE WITNESS:  I'm not sure I
16    understand the question as asked.
17  BY MS. LEHMAN:
18    Q.   Sure.  Is there something unusual
19  about a human experiencing unhappiness?
20    A.   So, you know, "normal" and
21  "unusual" are not usually words that we would
22  describe, or use in the research literature to
23  describe emotions.  I mean, there's a very,
24  very wide range of emotions that human
25  experience.  And you need a definition of

CONFIDENTIAL

Page 54

1 "normal" or "unusual" for me to be able to
2 answer that.
3      Q.   Okay.  Is mere unhappiness
4 diagnostic of any DSM diagnosis?
5           MS. McNABB:  Objection to form.
6           THE WITNESS:  It is predictive,
7      and can be used as a -- as the
8      screening that is highly correlated
9      with a DSM diagnosis usually of a mood
10     disorder.
11          MS. LEHMAN:  Okay.  I
12     respectfully move to strike.
13 BY MS. LEHMAN:
14     Q.   My question is different.  I am
15 not asking if something is predictive or
16 correlative.  I asked, is mere unhappiness a
17 diagnostic criteria for any DSM diagnosis?
18          MS. McNABB:  Objection to form.
19          THE WITNESS:  I would
20     definitely not put "mere" in front of
21     that, because unhappiness can still be
22     considered human suffering.  So
23     unhappiness alone would not meet
24     criteria for a DSM mood disorder, no.
25 BY MS. LEHMAN:

Page 55

1      Q.   Okay.  Is unhappiness alone a
2 diagnostic criteria for any DSM diagnosis?
3           MS. McNABB:  Objection.  Form.
4           THE WITNESS:  There are for
5      most DSM -- for all DSM diagnoses,
6      there are multiple criteria, so, no.
7           And quick pause, if I can ask
8      the videographer.  I don't want to see
9      myself on the screen in front of me,
10     if you could get rid of that.
11          MS. LEHMAN:  All right.  We can
12     go --
13          THE WITNESS:  It's fixed.
14 BY MS. LEHMAN:
15     Q.   Okay.  Do you agree that
16 unhappiness is not a diagnosis under the DSM?
17     A.   It is not.
18     Q.   Okay.  Do you agree that
19 loneliness is not a diagnosis under the DSM?
20     A.   It is not.
21     Q.   Okay.  Is loneliness alone a
22 diagnostic criteria for any DSM diagnosis?
23          MS. McNABB:  Objection.  Form.
24          THE WITNESS:  Nothing alone is
25     a criteria, but these are -- the

Page 56

1      things we're discussing here are all
2      predictive, and may be included in
3      criteria.
4 BY MS. LEHMAN:
5      Q.   Okay.  What, if any, diagnosis
6 recognized by DSM-5-TR includes a potential
7 diagnostic criteria that is loneliness?
8           MS. McNABB:  Objection.  Form.
9           THE WITNESS:  I don't think I
10     understand the question as worded.
11 BY MS. LEHMAN:
12     Q.   Sure.  So I -- let me ask maybe
13 my previous question.  Perhaps I
14 misunderstood.  Is there any disease that is
15 identified in the DSM-5-TR, that the DSM-5-TR
16 provides the diagnostic criteria, and one of
17 those criteria that can be used to evaluate
18 whether someone has that disease is
19 loneliness?
20          MS. McNABB:  Objection.  Form.
21          THE WITNESS:  I would have to
22     have those DSM criteria in front of me
23     to be able to answer that question.
24 BY MS. LEHMAN:
25     Q.   Okay.  Is low self-esteem a DSM

Page 57

1 diagnosis?
2           MS. McNABB:  Objection.  Form.
3           THE WITNESS:  No, although I
4      believe it may be included in some of
5      the mood disorder diagnoses as one
6      criteria.
7 BY MS. LEHMAN:
8      Q.   Okay.  Which mood diagnoses?
9      A.   Again, I would need to have that
10 in front of me to be able to tell you.
11     Q.   Okay.  Is fear of missing out, or
12 FOMO, is that a diagnosis under the DSM?
13          MS. McNABB:  Objection.  Form.
14          THE WITNESS:  No.
15 BY MS. LEHMAN:
16     Q.   Okay.  Is fear of missing out, or
17 FOMO, a criteria for any diagnosis under the
18 DSM?
19          MS. McNABB:  Objection.  Form.
20          THE WITNESS:  Not to my
21     knowledge.
22 BY MS. LEHMAN:
23     Q.   Do you agree that the DSM
24 provides diagnostic criteria to evaluate
25 whether symptoms warrant a mental health

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

1  diagnosis?
2      A.    Can you ask that again?
3      Q.    Yes.  Do you agree that the DSM
4  provides diagnostic criteria to evaluate
5  whether an individual's symptoms warrant a
6  mental health diagnosis?
7      A.    If I'm understanding your
8  question correctly, yes, the DSM has criteria
9  that need to be met for a diagnosis.
10     Q.    Right.  And as part of the -- a
11 clinician evaluates whether symptoms meet
12 those criteria in assessing whether a
13 diagnosis is appropriate, correct?
14         MS. McNABB:  Objection.  Form.
15         THE WITNESS:  Yes, although I
16     should also put this in context.  I do
17     not diagnose and treat patients
18     myself.
19 BY MS. LEHMAN:
20     Q.    Understood.  And, you know, you
21 told me that last time.  And so I'm trying not
22 to just reask the exact same questions as
23 before, but I appreciate that clarification.
24 Thank you.
25         Do you agree that a DSM relies on

Page 59

1  a clinician's evaluations of observable
2  symptoms and criteria in making a diagnosis?
3         MS. McNABB:  Objection.  Form.
4         THE WITNESS:  It may depend on
5     what you mean by observable.  And
6     since I don't diagnose myself, I'm not
7     exactly sure.
8  BY MS. LEHMAN:
9      Q.    Do you agree, then, that clinical
10 training and experience are needed to use the
11 DSM to determine a clinical diagnosis?
12         MS. McNABB:  Objection.  Form.
13         THE WITNESS:  I mean, certainly
14     clinicians need to be licensed, and
15     have an internship, and have
16     experience before they can get a
17     license to be able to diagnose.
18 BY MS. LEHMAN:
19     Q.    All right.  I want to turn to a
20 new topic.  How long is the average video on
21 social media?
22         MS. McNABB:  Objection.  Form.
23         THE WITNESS:  That's not
24     something I have knowledge of.
25 BY MS. LEHMAN:

Page 60

1      Q.    Okay.  How long is the average
2  video on TikTok?
3         MS. McNABB:  Objection.  Form.
4         THE WITNESS:  Again, not
5     something I have knowledge of.
6  BY MS. LEHMAN:
7      Q.    How long is the average video on
8  YouTube?
9         MS. McNABB:  Objection.  Form.
10         THE WITNESS:  Not something I
11     have knowledge on, although I'm sure
12     that the companies have that data.
13 BY MS. LEHMAN:
14     Q.    Okay.  How long is the average
15 show on Netflix?
16         MS. McNABB:  Objection.  Form.
17         THE WITNESS:  And that's just
18     going on my personal experience.  It
19     would depend on if we're talking about
20     -- whether we're talking about a movie
21     or a TV show.
22 BY MS. LEHMAN:
23     Q.    Okay.  Talking about shows, not
24 movies, do you know how long the average show
25 is on Netflix?

Page 61

1         MS. McNABB:  Objection.  Form.
2         THE WITNESS:  I don't know.
3  BY MS. LEHMAN:
4      Q.    Okay.  Do you agree that people
5  binge watch shows on Netflix that are 45
6  minutes to an hour in length?
7         MS. McNABB:  Objection.  Form.
8         THE WITNESS:  That's not
9     something that I was charged to do in
10     the report, and not something I have
11     ever researched.
12 BY MS. LEHMAN:
13     Q.    Okay.  Have you ever researched
14 people's use of Netflix?
15     A.    I have analyzed data that has
16 asked about hours watching TV or other videos,
17 if that's included.
18     Q.    Okay.  Well, was that included in
19 what you analyzed?
20     A.    In some of these studies, that
21 is the wording of some of the questions, yes.
22 And I have analyzed that data on, for example,
23 associations between time spent watching TV,
24 and then in more recent studies, time spent
25 watching TV and videos, and mental health.

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

1    Q.    Okay.  And did any of the data
2  that you analyzed look at the impact of the
3  length of the video?
4    A.    So not that I have done,
5  personally.  Although I have read several
6  studies that specifically looked at short form
7  video, and their links to mental health and
8  other outcomes.
9    Q.    And when you say short form
10 video, how long is a short form video?
11   A.    I don't know if they defined it
12 specifically in those studies.  I would have
13 to go have those studies in front of me to
14 answer that.
15   Q.    Okay.  Now, I asked you about
16 Netflix, but you would agree, I mean, Netflix
17 is not the only service where someone can
18 watch TV shows, correct?
19       MS. McNABB: Objection. Form.
20       THE WITNESS:  It is not.
21 BY MS. LEHMAN:
22   Q.    Okay.  And even if you haven't
23 looked at it, specifically, are you aware,
24 from general knowledge, that people binge
25 watch shows on Netflix and other streaming

Page 63

1  platforms?
2       MS. McNABB: Objection. Form.
3       THE WITNESS:  I don't know if
4       binge watch has a specific definition,
5       but I'm aware that sometimes people
6       will watch Netflix for several hours,
7       yes.
8  BY MS. LEHMAN:
9    Q.    Okay.  Have you ever watched
10 Netflix for several hours, show after show?
11   A.    Rarely, but yes.
12   Q.    Okay.  Well, I mean, do you agree
13 that an individual can spend many hours
14 watching shows sequentially without taking a
15 break on Netflix or other streaming services?
16       MS. McNABB: Objection. Form.
17       THE WITNESS:  That is possible,
18       yes.
19 BY MS. LEHMAN:
20   Q.    And you haven't -- have you
21 looked at any data to see the prevalence of
22 that behavior among people who are streaming
23 shows on Netflix and other streaming services?
24       MS. McNABB: Objection. Form.
25       THE WITNESS:  Hard to answer

Page 64

1  that.  But I have looked at data that
2  asked about hours spent watching TV or
3  videos.
4  BY MS. LEHMAN:
5    Q.    Okay.  But I'm asking a more
6  detailed question.  Have you looked at data
7  that looks at the percentage of people who are
8  streaming shows on Netflix or other services,
9  who are watching shows for hours on end,
10 without taking a break?
11       MS. McNABB: Objection. Form.
12       THE WITNESS:  I have not
13       researched that myself, no.
14 BY MS. LEHMAN:
15   Q.    You mentioned earlier today,
16 Substack.  And is it correct that Substack is
17 a media app that connects users with creators?
18   A.    I would describe it as a blog
19 platform.
20   Q.    Okay.  It's a blog platform.  You
21 can post blogs of words, but you can also post
22 videos and podcasts, correct?
23   A.    Yes, although my own Substack is
24 just a blog.  I have never posted videos or
25 anything other than longer form text.

Page 65

1    Q.    Sure.  And when you think about
2  your role on Substack, do you think of
3  yourself as an author or a publisher?  How do
4  you conceptualize your role?
5       MS. McNABB: Objection. Form.
6       THE WITNESS:  I would say as an
7       author.
8  BY MS. LEHMAN:
9    Q.    Okay.  And as an author, you get
10 to decide whether your work is placed behind a
11 paywall or if it's free, correct?
12   A.    Yes.
13   Q.    All right.  And do users have the
14 ability to comment on what you publish on
15 Substack?
16   A.    Yes, although that varies
17 sometimes from one post to another.  It also
18 varies whether paid or unpaid subscribers can
19 comment.  There's a number of settings on the
20 platform.
21   Q.    Those are all things that the
22 author controls, correct?
23   A.    To my knowledge, yes.
24   Q.    Okay.  And so is your work behind
25 a paywall or is your work available for free?

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

1    A.    It depends on the post.
2    Q.    Okay.  And do you have the
3 settings such that people can make comments on
4 your posts?
5    A.    I believe -- I'd have to look,
6 but I believe I have it set so it's paid
7 subscribers to comment.
8    Q.    And then is everyone able to see
9 the comments made by the paid subscribers?
10    A.    I actually don't know.
11    Q.    Okay.  So you're not sure if it's
12 only the paid subscribers who can see the
13 comments or all --
14    A.    Yeah, I don't know.
15    Q.    And do you have the ability to
16 respond to a comment?  So if somebody, you
17 know, asks a question in their comment, do you
18 have the ability to answer it?
19    A.    Yes.
20    Q.    Okay.  And do you sometimes do
21 that?
22    A.    I do, although fairly rarely.
23    Q.    Okay.  Is there an age minimum
24 for someone to join Substack?
25    A.    I don't know.

Page 67

1    Q.    Okay.  Is there any sort of age
2 gating or age verification process for
3 Substack?
4    A.    I don't know.
5    Q.    Is there any content moderation
6 by Substack?
7        MS. McNABB:  Objection.  Form.
8        THE WITNESS:  I don't know.
9 BY MS. LEHMAN:
10    Q.    Do you have to submit your posts
11 for approval or any kind of peer-review
12 process before it goes up on Substack for the
13 public to read it?
14    A.    It's not a requirement.  I do
15 sometimes do that with colleagues, but it's
16 not a requirement.
17    Q.    Okay.  And I want to make sure I
18 understand.  Are you actually vetting your
19 work independently before you put it on
20 Substack, or is that something that's required
21 by the Substack platform?
22        MS. McNABB:  Objection.  Form.
23        THE WITNESS:  It's not
24    required, although I do sometimes do
25    that independently.

Page 68

1 BY MS. LEHMAN:
2    Q.    Does Substack have a process
3 where you can submit posts for their approval
4 before posting, if you want to do that?
5    A.    Not that I know of.
6    Q.    Okay.  Now, what is the name of
7 your Substack?
8    A.    Generation Tech.
9    Q.    When did you create the
10 Generation Tech Substack?
11    A.    Not completely sure.  I want to
12 say the summer of 2023.
13    Q.    Did anyone help you set up the
14 Generation Tech Substack?
15    A.    No, although I got some advice
16 from some other people who had set up
17 Substacks.
18    Q.    What kind of advice did you get?
19    A.    About having a different URL
20 than Substack.  About the length of posts.
21 About what most people do on Substacks.  About
22 how much to charge if you did have paywalls.
23    Q.    When you say having a different
24 URL, can you explain what you mean by that?
25    A.    Forgive me.  This will be a

Page 69

1 little bit of a long answer.
2        So the way X works now, what
3 used to be Twitter, is it deprioritizes posts
4 with links.  So if you want to put your
5 Substack post with a link on X, it is
6 specially -- because Substack, they consider
7 it to be a competitor.  So even though it's
8 kind of strange they would think that, they --
9 you usually will have better luck if you go
10 and buy a different URL.  So I bought
11 Generation Tech Blog.
12    Q.    And so then if somebody goes to
13 Generation Tech Blog, does that take them to
14 your Substack post?
15    A.    I think they're one and the
16 same.  And I don't have a great understanding
17 of exactly how it works.
18    Q.    Does that help, then, if you post
19 something on Twitter or X, and you link, your
20 post gets better priority because the URL is
21 going to the Generation Tech web address,
22 instead of a Substack web address?
23        MS. McNABB:  Objection.  Form.
24        THE WITNESS:  That -- that is
25    why I set it up that way.  I don't

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

1    think it's actually worked out that
2    way, though.
3 BY MS. LEHMAN:
4    Q.    Why do you think it hasn't worked
5 out that way?
6    A.    Just it seems to -- the
7 algorithm on X just seems to deprioritize
8 anything with a link, whether it's Substack or
9 not.
10    Q.    Have you worked with anybody to
11 try to prevent the deprioritization of your
12 posts on Twitter?
13    A.    I have not worked with anyone,
14 nor done anything about that, no.
15    Q.    Okay.    What advice did you get
16 about the length of your Substack posts?
17    A.    Basically, that they could be
18 any length that you wanted, but that it really
19 just depended on the topic.
20    Q.    Okay.    And did you get advice
21 that lengths of certain posts might be more
22 audience-friendly?
23        MS. McNABB:    Objection.    Form.
24        THE WITNESS:    I was told that
25    beyond a certain amount, it wouldn't

Page 71

1    -- the entire post would not show up
2 on e-mail.    So to just be aware of
3    that.
4 BY MS. LEHMAN:
5    Q.    And so have you tried to have a
6 shorter length post, so that the entire post
7 will show up on e-mail?
8    A.    I haven't really thought about
9 it that much.    I have generally written to
10 whatever length I thought appropriate for the
11 topic.
12    Q.    How often do you post on your
13 Generation Tech Substack?
14    A.    Oh, it's varied quite a bit.
15 Last summer, it was much more frequent.    And
16 then this summer, I've been busy with other
17 things, so it's been more like once a month.
18    Q.    Okay.    What do you charge when
19 you charge for -- to review your posts?
20    A.    So it varies, how it's set up.
21 Most -- some posts are free from the
22 beginning.    Others are under a paywall for
23 about -- approximately the first week to ten
24 days.    And the cost for the paid subscription,
25 on the advice of others, I chose the lowest,

Page 72

1 which I believe is $40 a year.
2    Q.    And is that $40, does that get a
3 user access to all content behind a paywall,
4 or does that just give them access to the
5 content behind your paywall?
6    A.    I believe it's just my paywall.
7    Q.    Okay.    And so if a user goes on
8 and signs up, and is going to pay the $40 a
9 year, do you get the $40?
10    A.    Through Substack and through
11 Stripe, yes.    So not completely directly, but
12 yes.
13    Q.    Okay.    And so how much money are
14 you -- did you make last year through Substack
15 subscribers?
16    A.    I would have to go look to
17 answer that question.
18    Q.    Okay.    How much money have you
19 made this year through Substack subscribers?
20    A.    Same.    I'd have to go look at
21 the numbers.
22    Q.    How often do you get -- do you
23 get a check from Substack, or how do they
24 transmit the money to you?
25    A.    It's directly to a bank account

Page 73

1 through a program called Stripe.    And I think
2 it was originally set up for every payment,
3 and then I set it up to be once a month.
4    Q.    And so right now, is it once a
5 month?
6    A.    Yes.
7    Q.    And what was the payment for last
8 month?
9    A.    I'd have to go look.
10    Q.    Are there any months where you
11 remember how much the payment was?
12    A.    No.
13    Q.    Do you know how many subscribers
14 you have on your Substack posts?
15    A.    No.
16    Q.    Do you do anything to publicize
17 your Substack posts?
18    A.    I have the link to my Substack
19 on my website.    And I usually post on X about
20 the Substack posts, although that's very
21 ineffective.
22    Q.    How often do you post on Twitter
23 or X?
24    A.    It varies quite a bit.    It's not
25 that often these days.    And there are times

Golkow Technologies,
A Veritext Division

877-370-3377                                                    www.veritext.com

CONFIDENTIAL

Page 74

1  when I don't post at all, like on vacation or
2  other times when I'm taking a break.
3      Q.    Do you have a goal for how much
4  time you spend on a week creating or
5  publicizing your Substacks?
6      A.    No.
7      Q.    Do you also post on Jonathan
8  Haidt's After Babel Substack?
9      A.    Sometimes, yes, my posts are
10  cross-posted there. It's not -- we're not
11  doing that as much these days, but
12  occasionally, yes.
13     Q.    How often does that happen?
14     A.    Well, there was one recently,
15  but I think that was the first time this year.
16     Q.    Are there any other Substacks
17  where your posts are cross-posted?
18     A.    Not that I know of.
19     Q.    Does your Generation Tech
20  Substack contain any warnings?
21     A.    What do you mean by warnings?
22     Q.    I mean, like, is there a banner
23  across the top that has warning language about
24  using Substack?
25     A.    No.

Page 75

1      Q.    Is there a banner across the top
2  of your Substack about using social media,
3  generally?
4      A.    I'm not sure I understand what
5  you mean.
6      Q.    I mean, have you somehow set up
7  your Substack so that when someone goes to
8  look at a post that they are receiving warning
9  language about possible implications of using
10  social media?
11     A.    Certainly some of my Substack
12  posts have been about the dangers of using
13  social media, particularly for children and
14  teens.
15     Q.    No, no, I'm not asking about the
16  content of your posts. I'm asking, is there a
17  big warning label across the top of it?
18         MS. McNABB: Objection. Form.
19         THE WITNESS: No.
20  BY MS. LEHMAN:
21     Q.    Okay. Do you have any warning
22  label across the top of any of your -- of your
23  Twitter page about the dangers of using social
24  media?
25     A.    I certainly discuss the dangers

Page 76

1  of using social media, particularly for
2  children and teens, on X.
3      Q.    Okay, but I'm not asking if
4  that's what you discuss. I'm asking, if
5  somebody goes to your Twitter page, is there a
6  big warning across the top about social media?
7          MS. McNABB: Objection. Form.
8          THE WITNESS: On my profile,
9      there's mentions of the books where I
10     discuss the dangers of social media.
11  BY MS. LEHMAN:
12     Q.    Okay. But there's no big warning
13  label across the top that says something like,
14  "Danger: Social Media XYZ," correct?
15         MS. McNABB: Objection. Form.
16         THE WITNESS: No.
17  BY MS. LEHMAN:
18     Q.    All right. And do you -- just to
19  make sure that the record is clear, on your
20  Substack page, there's no big banner across
21  the top that warns about dangers to the
22  community of using Substack, correct?
23         MS. McNABB: Objection. Form.
24         THE WITNESS: No.
25  BY MS. LEHMAN:

Page 77

1      Q.    Okay. Does Substack have any
2  kind of notifications about how long someone
3  has been on reading posts?
4      A.    I don't know.
5      Q.    When you post something new to
6  Substack, is there some sort of alert or
7  notification that goes out to your
8  subscribers?
9      A.    They receive an e-mail with the
10  blog post.
11     Q.    Okay. And do they receive just
12  one e-mail or, you know, if you've posted
13  something and they haven't gone and read it,
14  do they get a follow-up e-mail?
15     A.    No, not to my knowledge.
16     Q.    Okay. Is there -- do subscribers
17  get an e-mail notification of a new post on
18  Substack as soon as you post it?
19         MS. McNABB: Objection. Form.
20         THE WITNESS: I generally
21     schedule my posts for a specific time.
22     And, yes, when the post is scheduled
23     to go live, they receive an e-mail.
24  BY MS. LEHMAN:
25     Q.    Okay. Do they -- do they receive

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 78

1 the notification in advance, sort of so they
2 can plan, you know, if Dr. Twenge's
3 publication is coming out tonight at 7:30,
4 that they could go read it then, or do they
5 just read it, once it comes -- or they just
6 get the e-mail, once it goes live?
7      A.   They read it once it goes live,
8 although on occasion, I have posted on X that
9 I have a post coming up the next morning.
10     Q.   Okay.  What time do you try to
11 schedule your Substacks to go live?
12     A.   Generally, it's 8:00 a.m.,
13 Pacific -- sorry, let me amend that.  It's
14 8:00 a.m., Eastern, 5:00 a.m., Pacific, or
15 thereabouts.
16     Q.   Okay.  And so if somebody is in
17 California when your post goes live, they get
18 an e-mail at 5:00 a.m. that says, Dr. Twenge
19 has posted XYZ article on her Substack?
20          MS. McNABB:  Objection.  Form.
21          THE WITNESS:  Generally, it
22     will give the title of the Substack.
23 BY MS. LEHMAN:
24     Q.   Yeah, I -- I don't think that was
25 really -- so I was trying to use that as a

Page 79

1 placeholder.
2      A.   Yeah, yeah, I know.
3      Q.   Now, if a user is a subscriber
4 to, you know, five or ten different Substacks,
5 so maybe who subscribes to you, they subscribe
6 to Jonathan Haidt, and they have some others,
7 if you and Jonathan Haidt post on the same
8 day, will they get one e-mail for your post
9 e-mail, and another e-mail for Jonathan
10 Haidt's post?
11          MS. McNABB:  Objection.  Form.
12          THE WITNESS:  Yes.
13 BY MS. LEHMAN:
14     Q.   Okay.  And so Substack doesn't
15 send everybody one e-mail notification per
16 day.  It's every time there's a new post on a
17 Substack where they subscribe to, they're
18 going to get an e-mail notification; is that
19 correct?
20          MS. McNABB:  Objection.  Form.
21          THE WITNESS:  That's -- that is
22     my understanding how it works.
23 BY MS. LEHMAN:
24     Q.   And are there any rules at
25 Substack, such as, We only send notifications

Page 80

1 during certain hours of a day, or do they
2 always send the notification whenever the
3 author publishes?
4      A.   I believe you can send the
5 e-mail at any time that you like.  And I
6 should be clear, I think that that -- getting
7 an e-mail is a very different thing from
8 getting, say, a push notification on a phone.
9      Q.   Okay.  Now, when you publish
10 something on Substack, do you have to go in
11 and create the e-mail that's going out to your
12 subscribers, or does Substack do that
13 automatically when you post something?
14     A.   Substack does that
15 automatically.  It -- you know, it has the
16 post in it.  But I have created the post.  I
17 have put the images in it.  I have put the
18 graphs in it.  And then they send the e-mail
19 automatically when it is live.
20     Q.   Okay.  Now, in paragraph 63 of
21 your report, you mention the open source
22 literature review that you, Jonathan Haidt,
23 and Zach Rausch prepared, which you cite as
24 Haidt 2025, correct?
25     A.   Haidt et al., 2025.

Page 81

1          MS. McNABB:  Katy, we've been
2     going for about an hour, if you're
3     switching gears.
4          MS. LEHMAN:  I just got told
5     the exact same thing.  No problem.
6          THE VIDEOGRAPHER:  We're going
7     off the record at 10:15 a.m.
8          (Recess.)
9          THE VIDEOGRAPHER:  We're back
10     on the record at 10:29 a.m.
11 BY MS. LEHMAN:
12     Q.   Okay.  Before the break, you
13 mentioned that there's a difference between an
14 e-mail and a push notification.  What's the
15 difference?
16     A.   Well, my understanding is that a
17 push notification is on a phone, and not
18 within the e-mail program.
19     Q.   And so would there be any
20 difference between receiving an e-mail and a
21 push notification if the user has their phone
22 set to give them a notification on their
23 screen when they get a new e-mail?
24          MS. McNABB:  Objection.  Form.
25          THE WITNESS:  If they have that

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

1    setting, I imagine it would be
2    somewhat similar, although it would
3    maybe be coming from an e-mail program
4    versus a push notification being from
5    a social media platform and news
6    platform.
7    BY MS. LEHMAN:
8        Q.    Do you agree that Netflix and
9    other platforms that stream TV shows and media
10   and movies can be addictive?
11          MS. McNABB: Objection. Form.
12          THE WITNESS: That's not
13       something that is even remotely
14       connected to what I said in this
15       report.
16   BY MS. LEHMAN:
17       Q.    I understand. I'm just asking,
18   do you agree that Netflix and other platforms
19   that stream TV shows and movies can be
20   addictive?
21          MS. McNABB: Objection. Form.
22          THE WITNESS: I don't think I
23       can really answer that question.
24   BY MS. LEHMAN:
25       Q.    Okay. All right. So before the

Page 83

1    break, we were talking about Haidt 2025. So
2    I'm going to mark that as Exhibit Number 4.
3    I'm going to hand you a copy, and I'm just
4    going to tell you upfront that that Substack
5    is quite long, so we didn't print the whole
6    thing. You can probably tell, because I just
7    handed --
8        A.    This is not a Substack.
9        Q.    Okay. I'm sorry, it's the Haidt
10   2025. It's the open source literature review.
11       A.    Yes.
12       Q.    Thank you. It's -- the open
13   source literature review is quite long.
14       A.    Yes.
15       Q.    So we did include the table of
16   contents, and then we have select pages. So
17   let me know if there's a problem, but I think
18   you're going to able to answer my questions,
19   based on what we've provided.
20          MS. McNABB: And I'll just put
21       an objection on the record, to the
22       extent this is not the entirety of the
23       document.
24          MS. LEHMAN: Okay. This is
25       going to be tab 725.

Page 84

1           (Exhibit No. 4 was marked for
2       identification.)
3    BY MS. LEHMAN:
4        Q.    All right. If you'll turn to
5    page 7 of the collaborative review document.
6    Yeah, but it's Exhibit 4, just so the record
7    is clear. If you'll turn to page 7 of the
8    collaborative review document, do you see it
9    says, "Cautions and Caveats"?
10       A.    Yes.
11       Q.    All right. And the first
12   numbered paragraph in the section says, "We
13   all must be aware of the risk of repeating
14   previous moral panics over comics, TV, video
15   games, et cetera. Whenever a new fad or
16   technology sweeps through the child or teen
17   population, stories get written about how the
18   new trend is harming children. These stories
19   play well in a media environment that thrives
20   on eliciting fear in parents. Later research
21   often shows that there was no detectable
22   harm."
23           Did I read that correctly?
24       A.    Yes.
25       Q.    Okay. And this is in the opening

Page 85

1    discussion -- the "Cautions and Caveats" of
2    the open source literature review that you
3    coauthor with Dr. Haidt and Zach Rausch,
4    correct?
5        A.    Yes, and I should also point out
6    that Dr. Haidt wrote this section, not me.
7        Q.    Okay. Have you ever asked
8    Dr. Haidt to change this section?
9           MS. McNABB: I'm sorry, Katy,
10       can I just -- if it's possible to just
11       X out the video screen of Jean. I'm
12       not sure if we can do that.
13          THE WITNESS: Yeah, thank you.
14       I don't want to see that. There we
15       go.
16          MS. McNABB: Thank you.
17          THE WITNESS: Cool.
18          MS. McNABB: Sorry, Katy, go
19       ahead and reask your question.
20          MS. LEHMAN: No problem.
21   BY MS. LEHMAN:
22       Q.    All right. So my question is,
23   have you ever asked Dr. Haidt to remove or
24   edit this caution or caveat?
25       A.    We had a discussion about doing

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

1 that, and never got around to doing it.
2    Q.    Okay.  When was that discussion?
3    A.    January, perhaps.
4    Q.    Okay.  And do you agree that were
5 -- is it correct that there were moral panics
6 over radio?
7    A.    So this is something that
8 Dr. Haidt and I disagree on.  I am not a fan
9 of the phrase "moral panic."  I think it has
10 been misapplied in many, many cases.
11    Q.    Okay.  Well, do you agree that
12 radio was blamed for making children lose
13 sleep?
14        MS. McNABB:  Objection.  Form.
15        THE WITNESS:  I don't have
16    knowledge of that, no.
17 BY MS. LEHMAN:
18    Q.    Okay.  What was -- you agree that
19 radio was blamed for youth crime and
20 delinquency?
21    A.    Again, that's not something I
22 considered in my report.  I don't believe I've
23 read anything about that, no.
24    Q.    Okay.  What are the situations
25 where you think moral panic is an appropriate

Page 87

1 term to use?
2        MS. McNABB:  Objection.  Form.
3        THE WITNESS:  Well, for one
4    thing, you'd think a moral panic would
5    have to be about morals.  So if it's
6    about teen pregnancy, I might see the
7    application of the term.
8 BY MS. LEHMAN:
9    Q.    Okay.  Well, do you agree that
10 comic books were blamed for making children
11 criminals and for becoming promiscuous?
12        MS. McNABB:  Objection.  Form.
13        THE WITNESS:  Again, not
14    something that I have considered in
15    this report.
16 BY MS. LEHMAN:
17    Q.    Okay.  Are you aware that there
18 were Congressional hearings on comic books in
19 the 1950s?
20        MS. McNABB:  Objection.  Form.
21        THE WITNESS:  Not something
22    that I've been exposed to, no.
23 BY MS. LEHMAN:
24    Q.    Okay.  Are you aware that
25 television has been blamed for youth mental

Page 88

1 health issues, delinquency, antisocial
2 behavior, and social isolation?
3        MS. McNABB:  Objection.  Form.
4        THE WITNESS:  That I have read
5    about, and even done a little research
6    on myself.  So, yes, I -- television
7    has been implicated for many hours a
8    day of television watching being
9    linked to depression, although at a
10    much lower rate than the links with
11    social media use.
12        MS. LEHMAN:  Okay.  And I'm
13    going to respectfully move to strike
14    as nonresponsive, starting with
15    "although at."
16 BY MS. LEHMAN:
17    Q.    In fact, there were Congressional
18 hearings on the alleged harms of television in
19 the 1950s, correct?
20        MS. McNABB:  Objection.  Form.
21        THE WITNESS:  It's not
22    something I have knowledge of.
23 BY MS. LEHMAN:
24    Q.    Okay.  Are you aware that video
25 games have been blamed for offline aggression?

Page 89

1        MS. McNABB:  Objection.  Form.
2        THE WITNESS:  Yes, I am -- I am
3    aware of that.
4 BY MS. LEHMAN:
5    Q.    Okay.  Are you aware that there
6 have been claims that radio, television, and
7 video games are addictive?
8        MS. McNABB:  Objection.  Form.
9        THE WITNESS:  That's something
10    I'm not familiar with.
11 BY MS. LEHMAN:
12    Q.    Okay.  All right.  If you'll turn
13 to page 13.  In the paragraph under the images
14 there, do you see that it says, "We, Haidt and
15 Twenge, agree with the authors' claims that
16 'moderate' use of digital technology is not
17 intrinsically harmful and may be advantageous
18 in a connected world.  We think the Goldilocks
19 hypothesis is true, as it shows up in several
20 other studies listed below."
21        Did I read that correctly?
22    A.    You did, although I would amend
23 that statement, given this was written a good
24 five or six years ago.  I would change
25 "moderate" out for "light."

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

1    Q.    In the collaborative review
2  document, as it's currently available in its
3  current iteration, it says, "'Moderate' use of
4  digital technology is not intrinsically
5  harmful and may be advantageous in a connected
6  world," correct?
7    A.    That is what the words say.
8    Q.    Okay.  Now, how would you define
9  "light"?
10    A.    It depends on the specific
11  study, but in this case, and where I would
12  amend these statements we were just discussing
13  today, given the research that has come out in
14  the last five to six years, is that even in
15  this study, if you're going to put "moderate"
16  and interpret that word as being at the
17  middle, that is not where you get the best
18  outcomes.
19        Where you get the best outcomes
20  is at, say, less than an hour or an hour of
21  use.  That shows up in this study.  It shows
22  up in some other studies, particularly for
23  older adolescents and adults.  The pattern,
24  particularly for social media, is much more
25  linear for younger adolescents and children.

Page 91

1    Q.    Okay.  The collaborative review
2  currently says that the Goldilocks hypothesis
3  is true, correct?
4    A.    That's what the words say.
5    Q.    Okay.  And what is your
6  understanding of the phrase "Goldilocks
7  hypothesis"?
8    A.    My understanding is that these
9  authors were arguing that moderate use had the
10  best outcomes.  And I actually published a
11  paper about a year after -- well, sorry, about
12  two or three years after this paper came out,
13  showing what the Goldilocks hypothesis would
14  predict, which would be best outcomes at
15  moderate use, and then what the actual data
16  shows, which is something different, that you
17  get the best outcomes at light use.
18        But that also depends, because
19  you're talking about younger adolescents,
20  you're talking about children, and you're
21  talking about social media, you actually get
22  the best outcomes, most of the time, at no
23  use.
24    Q.    Okay.  And when you say you
25  published a paper, which paper are you

Page 92

1  referring to?
2    A.    It was the one that was
3  published in Psychiatric Quarterly.
4    Q.    Okay.  Is that different from the
5  Psychology Today article that you published in
6  2017?
7    A.    I don't recall -- okay,
8  Psychology Today would have been a blog post,
9  not an academic publication.
10    Q.    Okay.  Well, do you agree that
11  smartphone use, internet use, and social media
12  use for up to an hour a day is not linked with
13  mental health issues?
14    A.    I would not agree with that as
15  stated, no.
16    Q.    Okay.  How would I need to amend
17  that statement for you to agree with it?
18    A.    I think it would depend on, for
19  one thing, the age of the user, because there
20  are different results, based on the age of the
21  user.  And the pattern is different, based on
22  the age of the user.
23        So Figure 13 in my report is a
24  great example of that, where the trend is much
25  more linear at the younger ages, ages 12, 13,

Page 93

1  and 14.  And Kelly et al. also shows that
2  result, where you get the best outcomes at
3  non-use.
4        In some studies, especially with
5  older age groups, it's more of a curve, where
6  you get the best outcomes at light use.
7    Q.    Okay.
8        MS. LEHMAN:  All right.  Can we
9    have 705?  All right.  We're going to
10    look at tab 705, and we'll mark this
11    as Exhibit Number 5.
12        (Exhibit No. 5 was marked for
13    identification.)
14  BY MS. LEHMAN:
15    Q.    All right.  I'm going to hand you
16  what I've marked as Exhibit Number 5.  Can you
17  confirm that this is an article that you
18  wrote, titled Making iGen's Mental Health
19  Issues Disappear, on August 31, 2017?
20    A.    Yeah, so this would have been a
21  blog post.
22    Q.    Okay.  And you're the author of
23  this post, correct?
24    A.    Yes.
25    Q.    Now, when you write a blog post,

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

1  do you apply the same academic rigor that you
2  apply when you're writing other pieces of
3  literature?
4       MS. McNABB: Objection. Form.
5       THE WITNESS: It depends on
6    what you mean by academic rigor. If
7    you mean, do I spell out the methods,
8    do I include the details about all the
9    statistical analyses in the same way
10   that I would do in an academic journal
11   article, no.
12 BY MS. LEHMAN:
13      Q.  Well, in blog posts, do you do
14  your very best to provide accurate and
15  complete information, just as you would in an
16  academic article?
17       MS. McNABB: Objection. Form.
18       THE WITNESS: Yes, although the
19    definition for complete information
20    would be quite different from a blog
21    post compared to an academic journal
22    article.
23 BY MS. LEHMAN:
24      Q.  All right. For example, the blog
25  post might not have the discussion of

Page 95

1  methodology as you just outlined for me?
2       A.  Or exactly how the statistics
3  were done, or the exact number of the sample
4  size. There are many, many examples in which
5  they might differ.
6       Q.  Do you still -- to the extent you
7  provide information in a blog post, do you
8  still provide accurate information?
9       A.  That is certainly my goal, yes.
10      Q.  Okay. Do you intend for people
11  to get accurate information that they can rely
12  upon when they read a blog post that you've
13  written?
14      A.  Can you put that in a different
15  way?
16      Q.  Sure. I mean, you want people,
17  when they read a blog post that you've
18  written, you still want them to be able to
19  rely on the information that you provide,
20  correct?
21      A.  Yes.
22      Q.  Okay. All right.
23        So turning to the post that we've
24  marked as Exhibit Number 5, if you'll turn to
25  page 5, immediately above Figure 3.10, you

Page 96

1  write, and I quote, "As others have also
2  found, smartphone or internet use of up to an
3  hour or two a day is not linked with mental
4  health issues or unhappiness."
5       Did I read that correctly?
6       A.  Yes.
7       Q.  Okay. And do you agree that the
8  science has found that smartphone or internet
9  us of up to an hour or two a day is not linked
10  with mental health issues or unhappiness?
11      A.  Yes, although I have to amend
12  that by saying that it depends on which
13  question we're looking at, because the same is
14  usually not true for social media use. You
15  will get the best outcomes at light use for
16  smartphone use or internet use, but often,
17  especially in younger populations, you do not
18  see that same pattern for social media use.
19      Q.  Okay. Well, let's look
20  immediately below Figure 3.10, and what you
21  wrote in this blog post. In this post in
22  2017, you wrote, "The same is true for social
23  media. It's two hours a day of use and beyond
24  where unhappiness really starts to increase."
25      Did I read that correctly?

Page 97

1       A.  You did, but this is a very long
2  time ago, and we have a lot more data since
3  that came out. Kelly was not published at
4  this point. Orben, that I was just referring
5  to, was not published at this point. We had
6  just had only -- we barely had anything on
7  hours a day of social media use in Monitoring
8  the Future, and now we have much more. So I
9  would not write that same sentence today.
10       MS. LEHMAN: Okay. I'm going
11    to respectfully move to strike as
12    nonresponsive, starting with "but
13    this."
14 BY MS. LEHMAN:
15      Q.  Have you issued a retraction for
16  this blog post that's on Psychology Today?
17      A.  That is generally not done,
18  given that when you're writing it, it's
19  understood that you are writing about the data
20  that you have available at the time.
21      Q.  Okay. So then is it correct that
22  you have not issued a retraction for this blog
23  post?
24       MS. McNABB: Objection. Form.
25       THE WITNESS: I have not.

25 (Pages 94 - 97)

CONFIDENTIAL

1 BY MS. LEHMAN:
2    Q.    Okay.  You mentioned the
3 Psychology Quarterly article.  Is that --
4    A.    Psychiatric Quarterly.
5    Q.    Psychiatric Quarterly.  Is that
6 in your materials considered list?
7    A.    Let's look.  It would be in the
8 reference section.  It's definitely on my
9 vitae.  But I don't -- I would have to check
10 here.  Let's see.
11        I'm not seeing it on the
12 reference list.  However, given the amount I
13 have read and researched this topic, it's not
14 surprising that not everything is here.  It is
15 on my vitae.
16    Q.    Okay.  All right.  I want to turn
17 back to Exhibit 4, the collaborative review.
18 And I want to turn further into the copy I
19 already gave you.  It's page 245.  And this is
20 tab 725, yeah.
21        It should be titled -- I think
22 you had it, yeah, "4.2, Studies Showing That
23 Teens Credit Social Media With Improving
24 Mental Health."
25        And so this was a post that

1 reflects a study from Pew, P-E-W, correct?
2    A.    Yes.
3    Q.    All right.  And the collaborative
4 review document here has a title for the Pew
5 study as Connection, Creativity, and Drama:
6 Teen Life on Social Media in 2022.
7    A.    Where does it say that?  Sorry.
8    Q.    Yeah, it says it sort of as a
9 subtitle.  It says 4.2.1 at the top of the
10 page.
11    A.    Oh, yes, I see it now.
12    Q.    Okay.  And here, this is -- is
13 this just a screenshot from a graphic of a Pew
14 study?
15    A.    It appears to be, yes.
16    Q.    Okay.  And what is Pew?
17    A.    Pew Research Center does polls
18 on various topics.
19    Q.    In your experience, do they
20 conduct reliable polls?
21    A.    I mean, it would depend on how
22 you define reliable.  Their sample sizes are
23 sometimes often small.  They don't generally
24 analyze the data in a way that an academic
25 would, but they are a respected organization

1 that it's usually understood that they do good
2 research.  Just I would put some caveats on
3 that, depending on sample size and so on.
4    Q.    Okay.  And there are several Pew
5 studies that are reflected in your materials
6 considered list, correct?
7    A.    Yes.
8    Q.    Okay.  And would you include a
9 Pew study in your collaborative review if you
10 did not think that it was a reliable study?
11    A.    Well, it's not a study.  So
12 that's a distinction we need to make.  It's a
13 poll.  We included it because it asks some
14 questions that have not been asked as much in
15 academic research.
16    Q.    Okay.  And what the collaborative
17 document shows here is a poll conducted by Pew
18 that collected self-reported data from teens,
19 correct?
20    A.    Yes.
21    Q.    And the self-reported data from
22 the teens showed that the majority of teens
23 said that social media provided them with a
24 space for connection, creativity, and support,
25 correct?

1    A.    Say that again.
2    Q.    Yes.  The Pew survey showed that
3 the majority of teens said that social media
4 provided them with a space for connection,
5 creativity, and support.
6    A.    Yes, although that does include,
7 the majority in that group said it was a
8 little, not a lot.
9    Q.    Okay.  The 2022 Pew survey says
10 that the majority of teens are more likely to
11 say that social media sites have a positive,
12 rather than a negative effect on them,
13 correct?
14    A.    Yes, although I should add, I
15 believe this has been updated with more recent
16 data, and those findings have changed.
17    Q.    Okay.  And is that updated Pew
18 survey in your collaborative review document?
19    A.    Not that I know of, no.
20    Q.    All right.  The 2022 Pew poll
21 found that 32 percent of teens said that
22 social media had a mostly positive effect on
23 them personally, correct?
24    A.    That's what the screenshot
25 shows, yes.

CONFIDENTIAL

1     Q.    Okay.  And the 2022 Pew poll
2 found that only 9 percent of teens said that
3 social media had a mostly negative effect on
4 them personally, correct?
5     A.    Yes, I believe that it's not
6 here in the screenshot, but they found higher
7 numbers for those saying that it had a
8 negative effect on others.  And I believe that
9 those numbers, in terms of the negative
10 effects, are now higher in the more recent
11 poll.
12          MS. LEHMAN:  Okay.  And I
13     respectfully move to strike, starting
14     with "I believe."
15 BY MS. LEHMAN:
16     Q.    Now, Dr. Twenge, you've recently
17 had a book come out, correct?
18     A.    I did.
19     Q.    All right.  And the title is 10
20 Rules For Raising Kids in a High-Tech World?
21     A.    Yes.
22     Q.    Congratulations on the new book.
23     A.    Thank you.
24     Q.    It came out September 2nd; is
25 that right?

1     A.    Yes.
2     Q.    Is it okay if I refer -- it's a
3 long title, so is it okay if I refer to the
4 book as 10 Rules?
5     A.    That is fine.
6     Q.    Is that how you think of it, too,
7 the 10 Rules?
8     A.    It is.
9     Q.    Okay.  Now, when did you first
10 conceive of writing the 10 Rules book?
11     A.    Let's see.  It was sometime in
12 the spring or summer of 2024.
13     Q.    Was it your idea or your
14 publisher's idea?
15     A.    One second.  Sorry.
16          It was my idea.
17     Q.    And when you first decided to
18 write your book, Generations, had you
19 considered writing the 10 Rules book before
20 then?
21     A.    I did, yes.
22     Q.    Okay.  And what made you decide
23 to write Generations instead of 10 Rules at
24 the time?
25     A.    It was a tough decision.  It was

1 a discussion between my agent and my editor
2 and myself.  And we decided that we'd do
3 Generations first.
4     Q.    Why?
5     A.    I'm trying to remember the
6 reasoning that we had at the time.  Yeah, I
7 just -- I don't recall.
8     Q.    Was it because -- did the
9 literary agent think that Generations would
10 sell better?
11          MS. McNABB:  Objection.  Form.
12          THE WITNESS:  No, I don't
13     believe that was it.
14 BY MS. LEHMAN:
15     Q.    Okay.  And what prompted you to
16 circle back, then, you know, if you had
17 thought about it -- well, let me back up.
18          Generations was published in
19 2019, correct?
20     A.    No, 2023.
21     Q.    Okay, 2023.  What made you circle
22 back after you wrote Generations to the 10
23 Rules book?
24     A.    Well, one factor was that when I
25 would give talks on generational differences,

1 even to corporate audiences, where I was
2 focused on the workplace, technology would
3 come up in that talk.
4          And by the third or fourth
5 question, even though it was supposed to be on
6 the workplace, what would often happen is,
7 someone would raise their hand and say, I have
8 a question that's not about the workplace; I
9 want to know what to do with -- about my kids
10 and their technology use, because I find it
11 very difficult to manage.
12     Q.    Now, in the book, you use the
13 word "kids," but you use that term broadly to
14 include both children and teens, correct?
15     A.    Yes.
16     Q.    And in the book, you just say,
17 well, it's more concise to say "kids"?
18     A.    Yes.
19     Q.    Okay.  And you also, in the book,
20 use the term "device" to mean an electronic
21 device.  And you use that broadly to
22 encapsulate smartphone, laptop, tablet, gaming
23 console?
24     A.    Yes.
25     Q.    Okay.  And you also use the term

27 (Pages 102 - 105)

CONFIDENTIAL

1 in the book "smartphone" to mean a phone with
2 internet access, correct?
3     A.    Yes.
4     Q.    Now, I want to look, and we're
5 going to -- I'm going to tell you.  We bought
6 your book, but we had to copy it to make this.
7 So I hope -- I hope you don't get upset that
8 we made copies of your book.  We're not
9 passing them out.
10    A.    I understand.
11          MS. LEHMAN:  Okay.  So if we
12    can look at 10 Rules.  This should be
13    tab 701.  And we'll mark this as
14    Exhibit Number 6.
15          (Exhibit No. 6 was marked for
16    identification.)
17 BY MS. LEHMAN:
18    Q.    All right.  And do you recognize
19 Exhibit 6 as your book, 10 Rules For Raising
20 Kids in a High-Tech World?
21          MS. McNABB:  I'll just object
22    to the extent it's not the entirety of
23    the document.
24          MS. LEHMAN:  I actually think
25    it might be the whole thing.  I'm not

1     sure.  It may just be part of it,
2     but --
3           THE WITNESS:  With the
4     recognition that it is a copy, rather
5     than an original, yes.
6 BY MS. LEHMAN:
7     Q.    All right.  And this is the book
8 that just came out, what, like, two weeks ago?
9     A.    Approximately, yes.
10    Q.    All right.  If you'll flip to
11 page 6, please.
12    A.    Page 6 of the book.
13    Q.    Yeah, and -- yeah, it still has
14 the page numbers up at the top.
15    A.    Yes.
16    Q.    All right.  And on page 6,
17 there's Figure 0.1, which is Symptoms of
18 Depression in U.S. Teens From 1991 to 2023,
19 correct?
20    A.    Yes.
21    Q.    All right.  And this chart shows
22 that since 2021, the symptoms of depression
23 have declined among U.S. teens, correct?
24    A.    Yes.
25    Q.    All right.  Now, if you'll turn

1 to page 9, do you see there's Figure 0.4,
2 which shows rates of clinical-level depression
3 in the U.S., 12-year-olds to 17-year-olds
4 between 2005 and 2023?
5     A.    Yes.
6     Q.    And the source for this data is
7 the National Survey on Drug Use and Health?
8     A.    Yes.
9     Q.    All right.  And Figure 0.4 shows
10 that clinical depression rates have declined
11 among those 12- to 17-year-olds in the United
12 States since 2021, correct?
13    A.    Yes, which is to be expected,
14 because of the effects of COVID and then those
15 effects fading.
16    Q.    What is clinical-level
17 depression?
18    A.    In this case, we're referring --
19 it refers -- it's more of a lay person's term
20 for major depressive episode in the last year.
21    Q.    Okay.  Is clinical-level
22 depression distinct from subclinical
23 depression?
24    A.    To my understanding, yes.
25    Q.    And what's your understanding of

1 the difference?
2     A.    So clinical-level depression, in
3 this case, is going to mean fitting those DSM
4 criteria.  And they also have to be at a
5 certain level, while, say, Figure 0.1 is
6 symptoms of depression, which are strongly
7 correlated with clinical-level depression, but
8 may be at a lower level, and are not
9 necessarily precisely based on the DSM
10 criteria, although there is a fair amount of
11 overlap.
12    Q.    Would you agree that
13 clinical-level depression is not someone who
14 is suffering from short-term sadness, so that
15 they might report that they're feeling sad or
16 colloquially describe themselves as depressed?
17          MS. McNABB:  Objection.  Form.
18          THE WITNESS:  So there's a good
19    amount of overlap with someone who, if
20    you ask, are you depressed, and then
21    the DSM criteria.  But those are
22    somewhat different measures.
23 BY MS. LEHMAN:
24    Q.    Okay.  Do you agree that it's
25 possible to protect kids from the worst

CONFIDENTIAL

Page 110

1  aspects of today's intrusive and immersive
2  technology?
3          MS. McNABB: Objection. Form.
4          THE WITNESS: So I would say
5      that, yes, that is in the book, but it
6      has to be considered in the context of
7      the rest of the document, where, yes,
8      parents can take steps. However, that
9      parents are in a really, really
10     difficult position because these
11     technologies are so unregulated.
12 BY MS. LEHMAN:
13     Q.   Okay. Well, let's look at it in
14 the context in the book. If you'll turn to
15 page 13, in the middle of the page, the
16 paragraph starting "but."
17         All right. And this is from your
18 book. It says, "But that doesn't mean we
19 should give up. It is possible to protect
20 kids from the worst aspects of today's
21 intrusive and immersive technology. We just
22 need a few rules, not halfway or squishy
23 rules, and not 'let's talk to kids about good
24 digital citizenship' rules, not 'it depends'
25 rules, but concrete rules for how to stem the

Page 111

1  digital tide and keep our kids healthy and
2  happy."
3          Did I read that correctly?
4      A.   Yes, although so I will strongly
5  point out that it has to be in the context of
6  the previous paragraph, which begins, "With so
7  little regulation and so much peer pressure
8  for kids to be the 'only one who doesn't have
9  a smartphone or social media,' parents are
10 struggling."
11     Q.   Okay. But my point is, this is
12 -- what you have written in the book that was
13 just published two weeks ago is that, one, you
14 think it is possible to protect kids from
15 technology. And, two, the -- you believe that
16 the 10 Rules that you set out will do that,
17 correct?
18         MS. McNABB: Objection. Form.
19         THE WITNESS: So what I believe
20     is that the 10 Rules will help
21     parents, but that this is a very, very
22     difficult job that parents have. So
23     possible, but difficult.
24 BY MS. LEHMAN:
25     Q.   Okay. And what you encourage

Page 112

1  parents to do in your book is to apply your
2  rules as concrete rules, and that that will
3  ameliorate and protect their children to keep
4  them, in your words, healthy and happy,
5  correct?
6          MS. McNABB: Objection. Form.
7          THE WITNESS: To the extent
8      possible. And again, if you take it
9      in the whole context of the whole
10     document, I describe my own struggles
11     trying to use parental controls and
12     implement them, and how difficult that
13     turned out to be.
14 BY MS. LEHMAN:
15     Q.   All right. Well, let's talk
16 about -- Rule 1 is "You're in charge,"
17 correct?
18     A.   Yes.
19     Q.   All right. And I will tell
20 you -- I'm happy for you to turn to Rule 1. I
21 don't -- I think you're going to able to
22 answer my questions about Rule 1 without
23 looking at it, but if you need to, you feel
24 free to look at the book, okay?
25     A.   Always good to have it in front

Page 113

1  of you.
2      Q.   All right. Now, in the book,
3  you're talking to the parents, correct?
4      A.   Yes.
5      Q.   So when you're saying Rule 1 is
6  "You're in charge," what you're saying to the
7  parents is, Hey, parents, parents are in
8  charge?
9      A.   As opposed to, say, having a
10 permissive parenting style, where the kid can
11 do whatever they want, yes.
12     Q.   Okay. And one of the ways that
13 parents are in charge is that they are often
14 buying the device, right, whether it's a
15 phone, or a tablet, or something else. The
16 parents are often buying it, correct?
17     A.   Most of the time, I would
18 imagine so. And some parents tell teens that
19 they need to earn their own money to buy the
20 device.
21     Q.   And when the parent is buying the
22 device, they are in charge of what the device
23 is, right? So they are making the decision,
24 is it a phone with or without internet access?
25 Are there limits on the types of things that

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1 can be put on the phone? Correct?
2    A.   Yes, although I have found, in
3 talking to lots of parents, that many of them
4 are not aware that there are other options,
5 other than internet-enabled phones. Many of
6 them, for example, are not aware that there
7 are phones out there that are designed for
8 kids, that don't have internet access or
9 social media on them.
10   Q.   But those phones are out there,
11 right, that are designed to have only specific
12 functionality, correct?
13   A.   Yes, but many parents are not
14 aware they exist.
15   Q.   Okay.  Now, another way that
16 parents are in charge is, when they are
17 allowing their kids to have access to the
18 device, correct?
19       MS. McNABB: Objection. Form.
20       THE WITNESS: What do you mean
21   by access?
22 BY MS. LEHMAN:
23   Q.   I mean -- and we'll talk about
24 this.  One of your rules is no phones in the
25 bedroom, right?  So the parent is the one who

Page 115

1 makes the decision, Hey, this doesn't come
2 with you at night when you go into your
3 bedroom?
4    A.   Yes, the parent makes that
5 decision, but that doesn't make it easy to --
6 to implement that every single night,
7 especially with teenagers.
8    Q.   Well, I think probably everyone
9 who has ever parented a teenager will tell you
10 that there's nothing easy about parenting a
11 teenager.  So I think -- I think that's
12 probably a place of vast agreement.
13       Now, another way that parents are
14 in charge is that they are paying, in most
15 instances, for the internet access in their
16 home, correct?
17       MS. McNABB: Objection. Form.
18       THE WITNESS: Do you mean WiFi
19   as opposed to --
20 BY MS. LEHMAN:
21   Q.   That's exactly what I mean.
22   A.   So, yes, they pay for WiFi.
23   Q.   Okay.  And so that also
24 necessarily means that the parents are in
25 charge of who can access that WiFi, right?  So

Page 116

1 they're in charge of who has the password?
2    A.   Yes, although that doesn't help
3 much when you can hotspot off of cell service.
4    Q.   But again, parents are in charge
5 of their -- the cell phone accounts that
6 they're paying for, they're in their name,
7 correct?
8       MS. McNABB: Objection. Form.
9       THE WITNESS: Most of the time,
10   yes.
11 BY MS. LEHMAN:
12   Q.   Okay.  Parents can also be in
13 charge by using parental controls on devices
14 or platforms, correct?
15       MS. McNABB: Objection. Form.
16       THE WITNESS: They can.
17   However, many parents are not aware of
18   those controls, and those controls are
19   very frequently ineffective.
20       MS. LEHMAN: Okay.  And I'm
21   going to respectfully move to strike,
22   starting with "however."
23 BY MS. LEHMAN:
24   Q.   Now, Rule Number 2 is -- and we
25 just previewed this, "No electronic devices in

Page 117

1 the bedroom overnight," correct?
2    A.   Yes.
3    Q.   All right.  And in the book, and
4 this is on page 37 if you want to look at it,
5 down at the bottom, you say, "Teens whose
6 parents let them stay up until midnight are 24
7 percent more likely to suffer from depression,
8 and 20 percent more likely to have suicidal
9 thoughts than those whose parents have set a
10 bedtime of 10:00 p.m. or earlier," correct?
11   A.   Yes.
12   Q.   All right.  And so do you agree
13 that it is incumbent on parents to make sure
14 that their children go to bed and get enough
15 sleep?
16       MS. McNABB: Objection. Form.
17       THE WITNESS: Yes, although
18   with teenagers, sometimes that can be
19   difficult to enforce.
20 BY MS. LEHMAN:
21   Q.   Okay.  Now, in your rules, when
22 you say, no devices in the bedroom, that means
23 not just no phones, tablets, or laptops, but
24 you also mean no TVs, and no gaming consoles
25 in the kids' bedrooms, correct?

CONFIDENTIAL

1    A.    Yes.  The research is very clear
2  that having gaming consoles and TVs is also an
3  issue.
4    Q.    Right.  And when you say having
5  TVs and gaming consoles in the bedroom is also
6  an issue, you mean that it also leads kids to
7  not sleep enough, correct?
8        MS. McNABB:  Objection.  Form.
9        THE WITNESS:  Yes, although
10        the -- that's some -- I think it's
11        difficult to answer that as asked,
12        because there's complexities to this.
13        And there's the question of the
14        presence of the device versus the use
15        of the device.
16  BY MS. LEHMAN:
17    Q.    Okay.  Well, do you agree that
18  decades of research have found that kids who
19  have a TV or gaming console in their room
20  don't sleep enough?
21    A.    Yes.
22    Q.    Okay.  And do you agree that
23  middle and high school kids are already
24  predisposed to stay up late due to the shift
25  in their circadian rhythm?

1    A.    Yes.
2    Q.    Okay.  Is it your recommendation
3  that all devices, so phones, TVs, tablets,
4  gaming consoles, all devices must be outside
5  kids' bedrooms after bedtime?
6    A.    Yes, although I do think the
7  phone is the most important.
8    Q.    Okay.  Do you also recommend that
9  parents put their own phone, tablet, and
10  laptop outside their bedroom?
11    A.    I do.
12    Q.    Okay.  And do you recommend using
13  parental controls to shut down the kids'
14  devices at bedtime?
15    A.    Yes.
16    Q.    Okay.  And do you explain in your
17  book that parental control dashboards have a
18  setting that allows parents to restrict the
19  hours when the phone can be used?
20    A.    Yes.
21    Q.    Okay.  And so during those hours,
22  the device automatically shuts off, or can
23  only be used for an essential function like
24  calling, and it can't be used again until that
25  window opens back up in the morning?

1        MS. McNABB:  Objection.  Form.
2        THE WITNESS:  So, yes, but I
3        have to go into a little detail to
4        truly answer that question, because
5        trying to set that up within the
6        device controls is difficult.  And
7        teens especially very frequently find
8        workarounds, say, on iPhone devices,
9        by changing the time zone.  It happens
10        all the time.
11        So most of the time, if you
12        really want that device to shut down,
13        you have to buy a device designed for
14        kids or purchase third-party parental
15        control software.
16  BY MS. LEHMAN:
17    Q.    And you outline, in Rule 6 of
18  your book, how to use parental controls,
19  correct?
20    A.    Yes, although that's also
21  discussed in Rule 9.
22    Q.    Okay.  And it's also discussed a
23  little bit in what we've been talking about in
24  Rule 2, correct?
25    A.    Correct.

1    Q.    All right.  Now, you suggest to
2  parents having the phone and laptop shut off
3  at least a half hour before bedtime, correct?
4    A.    Yes.
5    Q.    Okay.  And one of the benefits of
6  the rule, no devices in the bedroom at night,
7  is that it is, as you explain in your book,
8  very straightforward and costs nothing,
9  correct?
10    A.    With the amendment that if
11  you're also going to use the parental controls
12  and purchase the third-party software, that
13  that is an expense.  But physically getting
14  the device out of the bedroom most of the time
15  doesn't cost anything.  Although some families
16  have found the need to buy a lockbox, so there
17  may be some costs incurred.
18    Q.    Okay.  But that's -- we can agree
19  that buying a lockbox would be a fairly low
20  cost investment?
21        MS. McNABB:  Objection.  Form.
22        THE WITNESS:  They're about $40
23        on Amazon.
24  BY MS. LEHMAN:
25    Q.    Okay.

31 (Pages 118 - 121)

CONFIDENTIAL

1     A.    We have them for Girl Scout
2 cookies, which is how I know.
3     Q.    Okay.  And in the book, you tell
4 parents that if they have the bandwidth to
5 follow only one rule in the book, it should be
6 Rule 2, no devices in the bedroom at night,
7 correct?
8     A.    Yes.
9     Q.    All right.  Rule number 3 is that
10 you recommend that parents do not allow
11 smartphones or social media until age 16,
12 correct?
13    A.    Let's turn to it.  I think it's
14 more specific than that.  So Rule 3 is
15 "No social media until age 16 or later."
16 Smartphones are discussed in other rules.
17    Q.    Okay.  Is it correct that you
18 recommend to parents that they not allow
19 either social media or smartphones until the
20 age of 16?
21    A.    Yes, that's correct, based on
22 the other rules as well, yes.
23    Q.    Okay.  All right.  And for
24 clarity, Rule 3 is "No social media until age
25 16 or later"?

1     A.    Correct.
2     Q.    Okay.  And you are concerned
3 about harmful and disturbing content on social
4 media.  Correct?
5     A.    I'm concerned with both content
6 and the features that increase time spent and
7 compulsive use.
8     Q.    Okay.  My question is different.
9 And looking at what's outlined in the book,
10 one of the things that you raise, that you say
11 you're concerned about is harmful and
12 disturbing content, correct?
13    A.    It is one of the concerns, yes.
14    Q.    Okay.  And for example, one of
15 the things you say is that "Even adults post
16 cruel things on social media that they would
17 never say to someone's face," correct?
18    A.    Yes.
19    Q.    You also talk about cruel posts
20 that can create cyberbullying and drama,
21 correct?
22    A.    Yes, that's one among many of
23 the things that I discuss.
24    Q.    Okay.  Now, I want to change
25 topics slightly.  With respect to TikTok, is

1 everyone's feed different?
2         MS. McNABB:  Objection.  Form.
3         THE WITNESS:  Yes, although
4     it's a little more complex than that.
5     Certainly, say, to girls of the same
6     age who have similar interests might
7     see some of the same videos.  But,
8     yes, the feed, to my understanding, is
9     individualized.
10 BY MS. LEHMAN:
11    Q.    Okay.  And in talking about the
12 TikTok feed in your book, you note that one
13 individual had said, you know, on TikTok, I'd
14 see prettier girls than me, and that would
15 make me upset, correct?
16    A.    Yes.
17    Q.    All right.  And in your opinion,
18 a girl may become upset if she watches videos
19 of prettier girls; is that correct?
20    A.    That's what this individual
21 said.
22    Q.    Okay.  Do you believe that
23 watching a video of a prettier girl causes
24 mental health disorders?
25    A.    It may cause social comparison,

1 which then may be linked to body image issues.
2 That's what Meta's internal research said.
3         MS. LEHMAN:  Okay.  I'm going
4     to respectfully move to strike the
5     last.
6 BY MS. LEHMAN:
7     Q.    Do you agree that merely engaging
8 in social comparison is not diagnostic of any
9 mental health disorder?
10        MS. McNABB:  Objection.  Form.
11        THE WITNESS:  My understanding
12    is that social comparison can be
13    predictive of mental health disorders.
14    It is often a mediator.
15 BY MS. LEHMAN:
16    Q.    Okay.  So do you think that there
17 are any teenagers, whether they use social
18 media or not, who do not engage in social
19 comparison?
20        MS. McNABB:  Objection.  Form.
21        THE WITNESS:  Teenagers do
22    engage in social comparison on a
23    regular basis, although I cannot tell
24    you if every single one of them does.
25 BY MS. LEHMAN:

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

1    Q.    Okay.  Do you know what kinds of
2  videos are the most popular on TikTok?
3    A.    No.
4    Q.    Which TikTok accounts have the
5  most users?
6    A.    I don't know.
7    Q.    Okay.  Have you ever heard of
8  Cabi Lane?
9    A.    No.
10   Q.    Okay.  Have you ever watched one
11 of his videos?
12   A.    No.
13   Q.    Do you know what kind of videos
14 he posts?
15   A.    No.
16   Q.    Okay.  Have you ever heard of
17 Charli D'Amelio?
18   A.    No.
19   Q.    Okay.  Ever watch one of her
20 videos?
21   A.    No.
22   Q.    Know what kind of videos she
23 posts?
24   A.    No.
25   Q.    Have you ever heard of Mr. Beast?

Page 127

1    A.    Yes.
2    Q.    Okay.  What kind of videos does
3  he post?
4    A.    Generally, some kind of strange
5  challenge or something to raise money for
6  charity.
7    Q.    Okay.  Do you think that
8  Mr. Beast's videos cause any mental health
9  impacts among adolescents?
10        MS. McNABB:  Objection.  Form.
11        THE WITNESS:  That's not
12    something that I did research on, or
13    that I was able to find research on
14    for this report.
15 BY MS. LEHMAN:
16   Q.    Well, do you have an opinion
17 about it?
18   A.    No.
19   Q.    Okay.  Have you ever heard of
20 Bella Porch?
21   A.    No.
22   Q.    Ever watch one of her videos?
23   A.    No.
24   Q.    Know what kind of videos she
25 posts?

Page 128

1    A.    No.
2    Q.    Okay.  Are you aware that TikTok
3  allows users to mark their videos with
4  hashtags?
5    A.    I have never used TikTok, so I
6  don't have knowledge of that, no.
7    Q.    Do you know what the most popular
8  hashtags are on TikTok?
9    A.    No.
10   Q.    Are you familiar with the dog
11 videos that are on TikTok, specifically the
12 videos where they show a dog, and then there
13 will be a voiceover?
14   A.    No.
15   Q.    Okay.  All right.  Well, I want
16 to show you a video and we're going to mark
17 this.  This is tab number 950.  We'll mark
18 this as Exhibit Number 7.
19        (Exhibit No. 7 was marked for
20        identification.)
21 BY MS. LEHMAN:
22   Q.    All right.  Let's play the video.
23        (Video played.)
24 BY MS. LEHMAN:
25   Q.    Okay.  The puppy is named Maple

Page 129

1  and the big Golden is named Daisy.  So do you
2  think that dog videos like Daisy and Maple, do
3  you think videos of cute dogs like that cause
4  eating disorders?
5        MS. McNABB:  Objection.  Form.
6        THE WITNESS:  That's not really
7    something I was charged to do in this
8    report.  I didn't spend a whole lot of
9    time on body image issues or eating
10    disorders.  I did look at mental
11    health.  And if a child or teen spent
12    ten hours a day watching dog videos
13    like that, so they weren't sleeping
14    enough, they weren't seeing friends in
15    person, and so on, yes, I think that
16    could have effects.
17 BY MS. LEHMAN:
18   Q.    Okay.  Let's talk about that.  Do
19 you think that cute dog videos like that cause
20 suicidality?
21        MS. McNABB:  Objection.  Form.
22        THE WITNESS:  Same answer that
23    I gave before.
24 BY MS. LEHMAN:
25   Q.    Okay.  What's -- and what is the

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

1  mechanism by which dog videos like that --
2  cute dog videos cause suicidality?
3        MS. McNABB: Objection. Form.
4        THE WITNESS: Well, I didn't
5     say that they did cause that. I said
6     with my previous answer, that if
7     someone spent hours and hours and
8     hours a day of, say, eight to ten
9     hours a day being one example, that
10    that would have effects.
11       That, for example, if then they
12    were not getting enough sleep, not
13    getting enough sleep is a very strong
14    risk factor for suicidality.
15 BY MS. LEHMAN:
16    Q.    All right. And so I just want to
17 make sure I understand. You think if someone
18 watched ten hours a day of those cute dogs,
19 that that could lead them to stop sleeping,
20 and then that they would have suicidality. Is
21 that correct or is that not correct?
22       MS. McNABB: Objection. Form.
23       THE WITNESS: That's not what I
24    said.
25 BY MS. LEHMAN:

Page 131

1    Q.    Okay.
2    A.    So that if at -- especially
3  those very high levels of use, if that child
4  is also going to school, and eating and
5  surviving, then -- then spending ten hours a
6  day is going to crowd out time for sleep.
7  They will not sleep enough. And that is a
8  risk factor for mood disorders and
9  suicidality.
10   Q.    Okay. Well, so other than the
11 extreme situation of someone watching ten
12 hours a day of dog videos, is it your opinion
13 that dog videos like that cause suicidality?
14       MS. McNABB: Objection. Form.
15       THE WITNESS: So what I was
16    charged to do in the report was to
17    look primarily at time spent, and then
18    how that predicts mental health
19    disorders. And that is agnostic to
20    content.
21 BY MS. LEHMAN:
22    Q.    Okay, but my question is more
23 specific. So if someone watches dog videos
24 like that on TikTok for two hours a day, does
25 that cause suicidality?

Page 132

1        MS. McNABB: Objection. Form.
2        THE WITNESS: So we'd have to
3     go back to the research literature,
4     and look to see what links we would
5     find. Now, suicidality, if we're
6     going to say depressive symptoms,
7     we're going to take those two
8     interchangeably, then, yes, especially
9     at younger ages, there is a connection
10    to spending two hours a day on social
11    media, having -- it leading to an
12    increase in depressive symptoms, low
13    life satisfaction, and so on.
14 BY MS. LEHMAN:
15    Q.    Okay. Well, I -- I want to make
16 sure that we're being clear, because I have
17 not asked about depressive symptoms or low
18 life satisfaction. I have asked if watching
19 two hours of dog videos causes suicidality.
20       MS. McNABB: Objection. Form.
21    Asked and answered many times.
22       THE WITNESS: So I would,
23    again, go back to the research
24    literature, and say in the time series
25    data, that at the time that, say,

Page 133

1  watching videos online became more
2  popular, that suicidality went up.
3        That in the correlation on
4  cross-sectional studies, that the
5  Youth Risk Behavior Surveillance
6  Survey, for example, asks about
7  general screen time, and links to
8  suicidality. And does find a fairly
9  linear increase. So that's how I
10 would answer that. It was to try to
11 go back to the research literature
12 about time spent.
13 BY MS. LEHMAN:
14    Q.    Okay. And does any of the
15 research literature that you have looked at,
16 and that you're pointing me to, look at the
17 type of material that someone is looking at?
18       MS. McNABB: Objection. Form.
19       THE WITNESS: What I reviewed,
20    for the most part, no. What I
21    reviewed looked at time spent, which
22    is agnostic to content. Now, there's
23    may be other research on content, but
24    I was mostly looking at time spent.
25 BY MS. LEHMAN:

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

1    Q.    And would your answer be the same
2  if I asked you these questions about not
3  suicidality, but instead self-harm,
4  depression, unhappiness, low psychological
5  well-being?
6    A.    Yes, my answer would be the
7  same.
8    Q.    Would your answer be the same if
9  I asked you the same questions about
10  loneliness and low self-esteem?
11    A.    Self-esteem, yes. Loneliness is
12  a little more complicated.
13    Q.    Okay. How is loneliness
14  different?
15    A.    You would have to make sure -- I
16  mean, it's always a good idea, but especially
17  for loneliness, to control for levels and
18  frequency of in-person social interaction.
19    Q.    Okay. All right. Are you
20  familiar with the AI videos of interviews with
21  babies that are on TikTok?
22    A.    Yes. Well, let me amend that.
23  I've seen them on X.
24    Q.    Okay. All right. So I want to
25  make sure that you and I are talking about the

Page 135

1  same thing. And we'll mark this as
2  Exhibit Number 8. And this is tab 954.
3        (Exhibit No. 8 was marked for
4    identification.)
5        (Video played.)
6  BY MS. LEHMAN:
7    Q.    Do you agree that watching a
8  video like that could be pleasant?
9        MS. McNABB: Objection. Form.
10        THE WITNESS: Sure.
11  BY MS. LEHMAN:
12    Q.    I mean, do you agree that
13  watching a video, whether it's, you know, an
14  AI baby being interviewed or cute dogs, that
15  that can provide a break from a stressful day?
16        MS. McNABB: Objection. Form.
17        THE WITNESS: I would argue,
18    based on the literature, that I know
19    that a better break from a stressful
20    day would be exercise, going outside,
21    or talking to someone face to face.
22  BY MS. LEHMAN:
23    Q.    Okay. But do you -- I mean, do
24  you agree -- I mean, that video is, I don't
25  know, ten seconds long. And so do you agree

Page 136

1  that watching that ten-second video, that that
2  can -- that can make someone smile, and
3  there's a benefit to that?
4        MS. McNABB: Objection. Form.
5        THE WITNESS: I think that's
6    pretty different from what I was
7    charged to do in this report.
8  BY MS. LEHMAN:
9    Q.    Yeah, but I'm just asking the
10  question. I mean, as -- as someone with your
11  background, someone who is just an adult, I
12  mean, don't you agree that watching a
13  ten-second video like that can make someone
14  smile, and that there's a benefit to that?
15        MS. McNABB: Objection. Asked
16    and answered many times.
17        THE WITNESS: Again, you know,
18    I was focused much more on time spent.
19    And I also can't let it go without
20    saying that cute baby and cute dog
21    videos are not all of what's on
22    TikTok. There's many other types of
23    content on there that are extremely
24    disturbing.
25  BY MS. LEHMAN:

Page 137

1    Q.    Okay. And don't you agree that
2  people have different responses, based on
3  whether they're reviewing a cute dog video, or
4  a cute baby video, or something that's more
5  disturbing?
6        MS. McNABB: Objection. Form.
7        THE WITNESS: Can you word that
8    in a different way?
9  BY MS. LEHMAN:
10    Q.    Sure. People respond differently
11  to different types of material, so they will
12  respond differently to something that's
13  disturbing, as compared to cute Daisy and
14  Maple, the dog video, or that baby talking
15  about his grandpa?
16        MS. McNABB: Objection. Form.
17        THE WITNESS: So when you say
18    respond differently, what kind of
19    responses are you thinking of?
20  BY MS. LEHMAN:
21    Q.    I'm not thinking of -- I'm
22  thinking very broadly.
23    A.    I'm not -- without knowing what
24  you mean by respond, I don't know how to
25  answer that.

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

1    Q.    Okay. Well, let's back up,
2  because you told me, and I'm going to read it
3  to you, "There's many other types of content
4  on there that are extremely disturbing." And
5  so when you say extremely disturbing content,
6  what are you talking about?
7    A.    Oh, things like the video that
8  Chase Nasca watched right before he took his
9  own life that talked about how death was a
10  gift, and had the train coming straight for
11  someone. And that's how he took his own life.
12  That's one example.
13    Q.    Okay. And would you agree that
14  the video you're talking about, about
15  something like death being a gift, that --
16  that has a different impact on people's mental
17  health, as compared to videos like that cute
18  dog video or that cute baby video?
19    A.    That's not something that I have
20  researched.
21    Q.    Okay. So you are not prepared to
22  offer an opinion about the impact of watching
23  what you have described as extremely
24  disturbing content, as compared to cute babies
25  and cute dog videos; is that correct?

Page 139

1         MS. McNABB: Objection. Form.
2         THE WITNESS: I have not
3    researched and don't discuss in this
4    report research on content. The focus
5    is on time spent, which is agnostic to
6    content.
7  BY MS. LEHMAN:
8    Q.    Okay. And so, then, is it
9  correct, since you have not researched the
10  impact of content, you are completely unable
11  to offer an opinion about the impact of
12  content on people?
13         MS. McNABB: Objection. Form.
14         THE WITNESS: What do you mean
15    by impact?
16  BY MS. LEHMAN:
17    Q.    I mean impact. Like, does it
18  cause, does it contribute to any of the mental
19  health conditions that you have talked to?
20  And by that, I mean, suicidality, self-harm,
21  depression, unhappiness, loneliness, low
22  psychological well-being, and low self-esteem?
23         MS. McNABB: Objection. Form.
24         THE WITNESS: I think what the
25    literature shows is that content plays

Page 140

1    a role, but so does time spent, and
2    thus, the feature of these platforms.
3  BY MS. LEHMAN:
4    Q.    Okay. And are you able to tell
5  me what percentage is related to content
6  versus what percentage is not related to
7  content?
8         MS. McNABB: Objection. Form.
9         THE WITNESS: That's not how
10    these studies work. I can tell you
11    that time spent, agnostic to content,
12    has a causative relationship to mental
13    health.
14  BY MS. LEHMAN:
15    Q.    All right. And what study are
16  you referring to that has completely
17  controlled for content, that shows that there
18  is a causative relationship to mental health?
19         MS. McNABB: Objection. Form.
20         THE WITNESS: So the
21    experimental studies, for example,
22    that ask people to cut back the time
23    they spend on social media, or give it
24    up entirely. Because the content that
25    individual people are watching is

Page 141

1    going to differ, that is agnostic to
2    content. And those experiments show
3    that when people cut back or give up
4    social media, their mental health
5    improves.
6  BY MS. LEHMAN:
7    Q.    Okay. And which study are you
8  referring to?
9    A.    All the ones in my report that
10  use an experimental design.
11    Q.    So you believe that every single
12  experimental study that you cite in your
13  report that asks people to cut back on the
14  time they spend on social media, or give it up
15  entirely, controls for content?
16    A.    That's not what I said. I said
17  that many of the experimental studies show
18  that when people give up or cut back on social
19  media, that their mental health improves.
20    Q.    Okay. My question is a little
21  bit different, so I want to make sure that
22  we're on the same page.
23         Please tell me the name of any
24  study you're referring to that completely
25  controls for content, that shows that there is

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

1 a causative relationship --
2         MS. McNABB: Objection. Form.
3    Q.    -- to mental health?
4         MS. McNABB: Objection. Asked
5    and answered.
6         THE WITNESS: So I wouldn't say
7    controls. I would say that people's
8    individual content is going to be very
9    different. And thus, if you're
10   focused in those experimental studies
11   on giving up social media or cutting
12   back, then I wouldn't word it in
13   exactly that way, but it does mean
14   it's agnostic to content.
15 BY MS. LEHMAN:
16   Q.    Okay. And so do you -- I want
17 to -- I'm going to give you the chance to give
18 me the name of any study or studies that you
19 think controls for content.
20   A.    I would not use the word
21 "controls." But that is agnostic to content?
22 I would say Alcott, Hunt. Those are two
23 examples.
24         MS. McNABB: Katy, we've been
25   going about an hour, if you --

Page 143

1         MS. LEHMAN: Yeah, let's just
2    round this out, and we'll take a quick
3    break.
4 BY MS. LEHMAN:
5    Q.    All right. So any other studies
6 that you want to name, other than Alcott and
7 Hunt?
8    A.    Well, let's take a look.
9         Schmidt-Persson -- sorry,
10 Schmidt-Persson, 2024. Davis and Goldfield,
11 2025. Those are all examples of experiments
12 where individuals reduced their social media
13 use.
14   Q.    Okay. All right. Well, there's
15 a request for a break, so we'll go off the
16 record.
17         THE VIDEOGRAPHER: We're going
18   off the record at 11:28 a.m.
19   (Recess.)
20         THE VIDEOGRAPHER: We're back
21   on the record at 11:40 a.m.
22 BY MS. LEHMAN:
23   Q.    Okay. Before lunch, you said
24 that your opinions are agnostic to content.
25 And when you say it's agnostic to content,

Page 144

1 you're not just saying that it's agnostic to
2 content on social media, you're saying it's
3 agnostic to content as to whether it's social
4 media, correct?
5         Because wouldn't your opinions,
6 as they relate to time spent, also apply to
7 whether it's time spent on a screen playing
8 games, or time spent on a screen surfing the
9 internet, or time spent on the screen reading
10 magazines or newspapers?
11         MS. McNABB: Objection. Form.
12         THE WITNESS: So I should be
13   clear that it's -- that I said that
14   the time spent in the studies is
15   agnostic to content, not necessarily
16   that my opinions are per se, but that
17   that's what the studies are focused
18   on.
19         And then to answer your
20   question, there have been several
21   studies that have been able to
22   distinguish between time spent on
23   different types of screen time and
24   their associations with depression,
25   low life satisfaction, self-esteem and

Page 145

1   self-harm.
2 BY MS. LEHMAN:
3    Q.    So is it your opinion that if
4 someone spends ten hours a day on -- playing a
5 video game on a gaming console, that that will
6 or will not increase their risk of depression,
7 self-harm, and low life satisfaction?
8         MS. McNABB: Objection. Form.
9         THE WITNESS: It will, but not
10   as much as time spent on social media.
11   That's what the studies show.
12 BY MS. LEHMAN:
13   Q.    And is it your opinion that if
14 someone spends ten hours a day on the
15 internet, not on social media, but looking at
16 other types of materials, that that will
17 increase their risk of depression, self-harm,
18 and low life satisfaction?
19   A.    Yes, general internet use is
20 also linked to those outcomes, although I
21 should note that one of the studies that
22 looked at those different types of screen
23 time, was using the Millennium Cohort study,
24 which the way the internet question is asked
25 may also include social media use.

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

1    Q.    Okay.  Before our last break, we
2  were talking about TVs and gaming consoles in
3  the bedroom.  And I remember you saying
4  something like, those raise issues other than
5  interfering with sleep.  Do they -- do gaming
6  consoles and TVs in the bedroom, what are the
7  issues they raise, other than impairing sleep?
8        MS. McNABB:  Objection.  Form.
9        THE WITNESS:  That it's just
10        more difficult for parents to know how
11        long their kids are using devices if
12        the device is in the bedroom.  And
13        it's more difficult for them to know
14        what they're doing on the device if
15        the child is using the device in their
16        bedroom.
17  BY MS. LEHMAN:
18    Q.    And is it true that depending on
19  the sophistication level and the age of the
20  TV, some TVs may not even have a parental
21  control option available, other than an on and
22  off switch?
23    A.    Yeah.  I don't have a lot of
24  knowledge of parental controls on TVs.
25    Q.    Okay.  Do you have knowledge of

Page 147

1  parental controls on gaming consoles?
2    A.    I know they exist, and I read a
3  little bit about them when I wrote 10 Rules,
4  but I have not personally implemented them.
5    Q.    Okay.  Now, speaking of parental
6  controls, Rule 6 is "Use parental controls,"
7  correct?
8    A.    Yes.
9    Q.    All right.  And you discuss
10  operating system parental controls, correct?
11    A.    Yes.
12    Q.    And you encourage parents to use
13  parental controls at both the device and
14  social media platform level, correct?
15    A.    I don't believe I discuss
16  parental controls on social media platforms.
17  I believe I discuss them at the level of
18  operating system or third-party software.  I
19  mean, I'd have to go through all 200 pages,
20  but I think that's the primary focus, rather
21  than the parental controls within social
22  media platforms specifically.  And that's
23  partially because I advise parents to not let
24  their kids on social media at all until
25  they're at least 16.

Page 148

1        MS. McNABB:  I'll just object
2        that the document does not include the
3        entirety of Rule 6 or 5.
4  BY MS. LEHMAN:
5    Q.    Okay.  And Rule -- your Rule 7
6  is, "Create no-phone zones," correct?
7    A.    Yes.
8    Q.    But that's different from Rule 2,
9  which is "No phones in the bedroom overnight,"
10  correct?
11    A.    The bedroom is one of the
12  no-phone zones, but Rule 7 digs into others.
13    Q.    Okay.  What are the other
14  no-phone zones that you recommend to parents?
15    A.    And these are suggestions, these
16  are things that, you know -- implementation
17  may differ somewhat.  But one is the hour, or,
18  at least, the half hour before bedtime, family
19  dinner, face-to-face conversations, vacations,
20  camping outside time, summer or weekend
21  downtime, and that's it.
22        And, yes, we're missing the rest
23  of the chapter, it looks like.
24    Q.    Okay.  Well, if, at any point,
25  you're unable to answer a question because a

Page 149

1  page was not in the excerpt that we printed,
2  just let me know, all right?
3    A.    I will.
4    Q.    Okay.  Now, Rule 8 is, "Give your
5  kids real world freedom," correct?
6    A.    Yes.
7    Q.    All right.  And do you agree that
8  in today's culture, kids get fewer chances to
9  have freedom than those kids' parents did when
10  they were teenagers?
11    A.    Yes.
12    Q.    And that -- do you agree that
13  that pattern really begins today, even before
14  someone is a teenager?
15    A.    Yes.
16    Q.    And so, for example,
17  ten-year-olds once had free range in their
18  neighborhoods, but now some kids are not even
19  allowed to go out anywhere by themselves when
20  they're ten; is that correct?
21    A.    Yeah, and that's a trend that
22  started in the '90s.
23    Q.    Okay.  And so, you know,
24  admittedly, this would be true for me.  When I
25  was 13, I was babysitting, but now some kids,

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

1 when they're 13, the parents think they need a
2 babysitter, correct?
3     A.    Yes.
4     Q.    All right.  And you -- you
5 encourage parents to allow teenagers to hang
6 out with their friends and build their
7 independence outside of the watchful gaze of
8 adults, correct?
9     A.    I would put it a little
10 differently.  I would say I emphasize that
11 teens getting together with their friends in
12 person is important.
13     Q.    Okay.  Well, do you agree that
14 you recommend giving kids and adolescents more
15 independence?
16     A.    More independence in the real
17 world, yes.
18     Q.    And do you agree that giving
19 children and adolescents more freedom will
20 reduce anxiety and depression?
21         MS. McNABB:  Objection.  Form.
22         THE WITNESS:  There is one
23     study that did look at that, yes.  So
24     that research is still in its infancy.
25 BY MS. LEHMAN:

Page 151

1     Q.    Okay.  Well, let's turn to
2 page 131 in the book.  And there at the top of
3 the page, you write, "In fact, independence is
4 being tested as treatment for kids with
5 diagnosed anxiety disorder."  Do you see that?
6     A.    Yes.
7     Q.    And did I read that correctly?
8     A.    Yes.
9     Q.    All right.  And then you go on in
10 the next paragraph to talk about "A great
11 organization advocating for kids' independence
12 is called Let It Grow" --
13     A.    No, it's called Let Grow.
14     Q.    Oh, Let Grow.  Thank you.  And in
15 your book, you continue, "Its mission
16 statement says, in part, 'we believe today's
17 kids are smarter and stronger than our culture
18 gives them credit for.  We reject the idea
19 that they are in constant physical, emotional,
20 or psychological danger from creeps,
21 kidnapping, frustration, failure, baby
22 snatchers, bad grades, disappointing play
23 dates and/or the perils of a non-organic
24 grape.'"
25         Did I read that correctly?

Page 152

1     A.    Yes.
2     Q.    All right.  And then it continues
3 at the end of the paragraph, "Giving your kids
4 real world freedom means stepping back, so the
5 kids can step up.  Parental worries go down as
6 kids do more and more."  Did I read that
7 correctly?
8     A.    Yes.
9     Q.    Okay.  Now, you agree that lack
10 of independence in the real world and
11 overprotective parenting is a reason for the
12 increase in depression and anxiety in
13 adolescents, correct?
14     A.    I would not put it that way, no.
15     Q.    How would you put it?
16     A.    So I had a Substack post that
17 dug into this.  That it was -- so the decline
18 in child and teen independence started in the
19 '90s, and that you did not see the increase in
20 depression and anxiety until around 2012.
21         So it seems to be the
22 combination of the lack of real world freedom
23 and the growth of social media and
24 smartphones, it's the double whammy, which led
25 to depression and anxiety.  The decrease in

Page 153

1 independence overall did not seem to have that
2 effect without the components of the
3 smartphone and social media.
4     Q.    And are you able to say what
5 percentage of the increase in depression and
6 anxiety is caused by lack of real world
7 freedom versus what percentage is caused by
8 the growth of social media and smartphones?
9         MS. McNABB:  Objection.  Form.
10         THE WITNESS:  That's generally
11     not how these research studies work.
12 BY MS. LEHMAN:
13     Q.    And so, no, you're not able to --
14 to give such an opinion?
15     A.    I can say that I -- I can say
16 that, based on the research literature with
17 the time series studies, that social media and
18 smartphones are the primary cause of the
19 increase in teen depression and anxiety.
20 They're likely not the only cause.  The lack
21 of real world freedom may be one of the other
22 causes, but the rise of those technologies is
23 the primary cause.
24     Q.    What do you -- what are the other
25 causes, other than social media and lack of

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

CONFIDENTIAL

1 real world freedom?
2     A.    So there may be others.  But the
3 other causes that have been suggested don't
4 fit the data.  So in that Substack post I was
5 referring to about 13 other explanations, none
6 of the other explanations fit the data in
7 terms of the time sequence or in terms of
8 being -- having an impact on day-to-day life,
9 or having a negative impact on mental health,
10 and so on.  That was -- smartphones and social
11 media was the primary cause.  And then I
12 mentioned in that Substack post that the lack
13 of real world freedom may have played a role,
14 but not until the 2010s.
15     Q.    Now, Rule 9 is, "Beware the
16 laptop, and the gaming console, and the
17 tablet," and dot dot dot, correct?
18     A.    Yes.
19     Q.    Okay.  And in Rule 9, you are
20 warning parents about all of those types of
21 devices, including tablets, gaming consoles,
22 school laptops, and personal laptops, correct?
23     A.    Yes.
24     Q.    And in Rule 9, you recommend that
25 parents never put a gaming console or desktop

1 computer in their child's bedroom?
2     A.    Yes.
3     Q.    Rule 10 is, "Advocate for no
4 phones during the school day," correct?
5     A.    Yes.  I don't believe we have
6 that in our packet here.  We don't have all of
7 it.  Yeah, we don't have Rule 10.
8     Q.    Okay.  And is Rule 10 -- is that
9 the same -- well, strike that.  Let me start
10 again.
11         Do you advise parents in Rule 10
12 that they should try to have their schools
13 have bell-to-bell phone bans?
14     A.    I suggest that they advocate for
15 that.  In most cases, that is not under the
16 parents' direct control.
17     Q.    Okay.  Do you provide a sample
18 letter to school boards encouraging schools to
19 adopt a bell-to-bell phone ban that parents
20 can use?
21     A.    The sample letter is to
22 principals, not to school boards.
23     Q.    Okay.  But it's a sample letter
24 for a parent to send, advocating for a
25 bell-to-bell phone ban?

1     A.    Yes.
2     Q.    Okay.  Do you also, in Rule 10,
3 identify other resources for parents to
4 attempt to have phone-free schools?
5     A.    So I'd need to have it in front
6 of me, and that chapter is missing.
7     Q.    Okay.  Are you aware of the Away
8 For The Day Campaign?
9     A.    Yes.
10     Q.    What is the Away For The Day
11 Campaign?
12     A.    So Delaney Ruston, who is the
13 producer of the Screenagers documentaries,
14 founded that campaign.  And it -- Away For The
15 Day also advocates for no phones during the
16 school day, bell to bell.
17     Q.    Okay.  Have you done any work on
18 the Away For The Day Campaign?
19     A.    I have spoken to Dr. Ruston, but
20 I have not directly worked on the campaign.
21 She helped me come up with that sample letter,
22 and then I edited it.  It was a joint effort.
23 I changed a fair amount of it, but I used her
24 template.
25     Q.    When was the inaugural for the

1 Away For The Day Campaign?
2     A.    I don't know.
3     Q.    Do you recommend low-tech schools
4 where students read hard copy books?
5     A.    So this is something I haven't
6 done research on myself, but I have read some
7 of the research suggesting that the one-on-one
8 device policy for electronic devices in
9 schools has been a failure, and that schools
10 might want to consider going back to paper
11 books.
12     Q.    And do you encourage schools
13 where students take notes and do homework on
14 paper instead of on a laptop?
15     A.    Yes, based on some research
16 studies out there suggesting that performance
17 is better, particularly in comprehensive
18 exams, when students take notes on paper, as
19 opposed to typing them in a laptop.
20     Q.    Okay.  All right.  I'm going
21 to --
22         MS. LEHMAN:  Can we have 702?
23     I'm going to show you what we're going
24     to mark as Exhibit Number 9.
25         (Exhibit No. 9 was marked for

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 158

1    identification.)
2  BY MS. LEHMAN:
3      Q.   All right.  And can you confirm
4  that I have handed you an excerpt from your
5  book entitled Generation Me, Why Today's Young
6  Adults Are More Confident, Assertive,
7  Entitled, and More Miserable Than Ever Before?
8      A.   Yeah, this is from 2006.  It
9  looks --
10         MS. McNABB:  I'll object --
11  sorry, go ahead.
12         THE WITNESS:  And it's not the
13  whole document.
14  BY MS. LEHMAN:
15     Q.   Sure.  We just printed an
16  excerpt, instead of printing the entire book,
17  but if you're unable to answer any question
18  that I ask because I haven't given you the
19  whole book, just please let me know, okay?
20     A.   Okay.
21     Q.   All right.  And were you a
22  coauthor or a sole author on this book?
23     A.   Sole.
24     Q.   All right.  And is it okay if I
25  refer to this book, in short, as Generation

Page 159

1  Me?
2      A.   Yes.
3      Q.   All right.  Now, and I'm going to
4  refer you to page 3, in case you need a
5  reference.  It's down at the bottom.  You
6  define Generation Me as people born in the
7  1970s, '80s, and '90s, correct?
8      A.   I do in this book.  However,
9  when I updated this book in a second edition,
10  later on, I changed that definition.
11     Q.   How did you change it in the
12  second edition?
13     A.   I changed it so it overlapped
14  with the more commonly accepted birth years
15  for Millennials, which is most of the time
16  going to the 1980 to 1994.
17     Q.   Okay.  In the book, you shorthand
18  it and call them GenMe, correct?
19     A.   Yes.
20     Q.   Okay.  And if you turn to page 4,
21  the next page, you wrote that "Since GenMe'ers
22  were born, we've been taught to put ourselves
23  first."  Did I read that correctly?
24     A.   Yes.
25     Q.   All right.  And you go on to

Page 160

1  explain that "GenMe's high expectations,
2  combined with an increasingly competitive
3  world, have led to a darker flip side, where
4  we blame other people for our problems and
5  sink into anxiety and depression," correct?
6      A.   Yes.  And I have to put this in
7  context, that at the time, we didn't have a
8  whole lot of data on what was happening in the
9  late '90s, early 2000s, partially because
10  those large datasets that I now work with
11  weren't online yet.  So this was based on more
12  incomplete information than I have now.
13     Q.   Okay.  But just so the record is
14  clear, in the book that you published as a
15  sole author in 2006, you said that people sink
16  into anxiety and depression due to an
17  increasingly competitive world, where we blame
18  other people for our problems, correct?
19     A.   That is one theory for why there
20  was an increase in depression and anxiety,
21  from the Silent Generation through to the Baby
22  Boomers, through to Gen X, when they were
23  young.
24     Q.   Okay.  And I appreciate that, but
25  my question is, that's actually what you wrote

Page 161

1  in 2006, correct?
2         MS. McNABB:  Objection.  Form.
3  Asked and answered.
4         THE WITNESS:  That is in the
5  introduction to this book, which is a
6  very short summary of a very long
7  book.
8  BY MS. LEHMAN:
9      Q.   And in 2006, you said that "The
10  U.S. and other Western nations, such as
11  Canada, Great Britain, Australia, and Germany
12  experienced a movement towards focusing on the
13  needs of the self, as well as the dark flip
14  side of increased depression and anxiety,"
15  correct?
16     A.   Can you show me where that is?
17     Q.   Yes.  We're going to look on
18  page 7.  All right.  If you look at the bottom
19  paragraph, that says, "This book focuses on
20  changes among young Americans and on trends
21  that have arrived at different times, or not
22  at all in many other cultures.  However, many
23  of the changes here can be generalized to
24  other nations, particularly other Western
25  nations such as Canada, Great Britain,

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1 Australia, and Germany. These cultures have
2 also experienced the movement toward focusing
3 on the needs of the self, as well as the dark
4 flip side of increased depression and
5 anxiety," correct?
6     A.    Yeah. So this is focusing
7 primarily on the increase between, say, the
8 1950s and the early 1990s. At the time I
9 wrote this book, we did not have a lot of
10 data. Late '90s, early 2000s, we had some,
11 but not much, because those big datasets were
12 not online yet. So this is not a complete
13 picture.
14     Q.    Okay. But in 2006, when you
15 published this book, you said that the U.S.
16 and other Western nations, including Canada,
17 Great Britain, Australia, and Germany had
18 experienced increased depression and anxiety,
19 correct?
20     A.    Yes. And that primarily refers
21 to between the 1950s and the early 1990s.
22     Q.    Okay. And in 2006, you opined
23 that that increase in depression and anxiety
24 was due to a movement towards focusing on the
25 needs of the self, correct?

Page 163

1     A.    That is one of the possible
2 explanations, yes.
3     Q.    Okay. Now, in 2006, you said
4 that "A stunning 29 percent of teenagers
5 answered 'yes' to a 2003 government survey
6 that asked if, during the past year, they ever
7 'felt so sad and hopeless almost every day for
8 two weeks or more in a row that they stopped
9 doing some usual activities,'" correct?
10     A.    Can you show me where that is?
11     Q.    Yes. That will be on page 106.
12 And that will be down at the bottom in the
13 last full paragraph.
14     A.    So this is the Youth Risk
15 Behavior Surveillance Survey. And at this
16 point, at least to my knowledge, there was not
17 a way to access all of the data. So again,
18 this is an incomplete picture.
19     Q.    Okay. And my question is, in --
20 it is correct that in 2006, you said that 29
21 percent of teenagers answered yes to a 2003
22 government survey that asked if, during the
23 past year, they ever felt so sad and hopeless
24 almost every day for two weeks or more in a
25 row that they stopped doing some usual

Page 164

1 activities, correct?
2         MS. McNABB:  Objection. Form.
3     Asked and answered.
4         THE WITNESS:  Note that this is
5     one year, and we don't have a
6     comparison to the other years, because
7     of that data availability issue.
8 BY MS. LEHMAN:
9     Q.    Okay. But this is the data that
10 you included in your 2006 book, correct?
11     A.    Yes.
12     Q.    Okay. Now, in 2006, you also
13 said that "At the Kansas State University
14 Counseling Center, the number of students
15 treated for depression doubled between 1988
16 and 2001," correct?
17     A.    Can you show me where that is?
18     Q.    Yes. That should be on the same
19 page.
20     A.    Oh, I see it.
21         Right. So that's a study based
22 on the folks who run the counseling center at
23 Kansas State, and they are describing how many
24 students were treated for depression at that
25 university, at that counseling center, which

Page 165

1 is a different question from saying, what is
2 the trend in symptoms of depression.
3 Treatment and symptoms of depression sometimes
4 have different trends.
5     Q.    Okay. Now, in 2006, you also
6 said that "Anxiety increased so much that the
7 average college student in the 1990s was more
8 anxious than 85 percent of students in the
9 1950s," correct?
10     A.    Yes. And I would like to make
11 the clarification that that study only went up
12 through, I believe, 1993 for the data. So
13 when I'm saying the '90s, it's the early '90s.
14     Q.    Okay. And what was the data
15 source?
16     A.    Okay. Let me make sure that
17 we're talking about the same thing. So which
18 page is this on?
19     Q.    107.
20     A.    Okay. At the top. So it says,
21 "As part of my doctoral dissertation." And I
22 later published that in a journal.
23     Q.    And at the time, in 2006, you
24 also wrote that "The trend for children was
25 even more striking. That children as young as

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

1 nine years ago were markedly more anxious than
2 kids had been in the 1950s," correct?
3     A.    Yes.  And notice that that data
4 only goes to the '80s, the 1980s, not further.
5     Q.    Okay.  And in 2006, you observed
6 that "Normal school children in the 1980s
7 reported higher levels of anxiety than child
8 psychiatric patients in the 1950s," correct?
9     A.    Yes.
10     Q.    Now, in 2006, you said that the
11 increases in depression and anxiety were due
12 to, "Our growing tendency to put the self
13 first," because -- and these are your words --
14 "it also creates an enormous amount of
15 pressure on us to stand alone," correct?
16     A.    Yes.
17     Q.    And you said, in 2006, that "The
18 downside of the focus on the self is that our
19 disappointments loom large, because we have
20 nothing else to focus on," right?
21     A.    Can you show me where that is?
22     Q.    Yes.  It's on page 109.
23     A.    So where is it on the page?
24     Q.    Yeah, so it's in the bottom
25 paragraph.

Page 167

1     A.    Mm-hmm.
2     Q.    In the middle, "Our growing
3 tendency to put the self first leads to
4 unparalleled freedom, but it also creates an
5 enormous amount of pressure for us to stand
6 alone."
7     A.    Yeah, because in this era, and
8 again, to be clear, we're talking about, say,
9 the 1950s to the early 1990s, that there was a
10 huge change in the culture at that time toward
11 more individualism.
12         And thus, it made sense that,
13 given the mental health trends, that that may
14 be one of the explanations, because that was
15 the largest change in the culture at that
16 time.
17     Q.    Okay.  And when you say at that
18 time, just to be clear, we're talking about
19 2006, because if you look at the start of the
20 paragraph we're looking at, it says, "There's
21 no better time to be alive than right now."
22 So when you're writing in 2006, you're
23 actually writing about the year 2006, you're
24 not writing about some previous decade or time
25 period, correct?

Page 168

1     MS. McNABB:  Objection.  Form.
2     THE WITNESS:  I am writing
3 about a previous time period, because
4 if you looked at the context here, in
5 the previous -- so just based on the
6 data that I had at the time, most of
7 it only went up to a certain point.
8 BY MS. LEHMAN:
9     Q.    Okay.  And when you were writing
10 in 2006, and this is just continuing after
11 what we looked at before, you wrote that "The
12 downside to the focus on the self, when we are
13 fearlessly independent and self-sufficient,
14 our disappointments loom large because we have
15 nothing else to focus on," correct?
16     A.    That's what the words say.
17     Q.    All right.  And then what you
18 wrote in 2006 is that "All too often, the
19 result is crippling anxiety and crushing
20 depression," correct?
21     A.    Yes.
22     Q.    You also said in 2006 that "For
23 many in GenMe, the instability in close
24 relationships began at an early age with their
25 parents' divorce," correct?

Page 169

1     A.    Can you show me where that is?
2     Q.    That's on page 110.  At the very
3 bottom.
4     A.    Right.  Because this refers to
5 the huge increase in divorce that occurred
6 from the 1960s, primarily through the '80s.
7 And then after that, I forget at which point,
8 sometime in the '80s, the divorce rate
9 actually started to decline.  So here, I
10 remember, because in this book, I'm including
11 people born in the '70s.  So it -- in other
12 words, Gen Xers, that we're talking about that
13 previous era and those impacts.
14     Q.    Okay.  And is it your opinion
15 that the impacts of divorce have changed on
16 the modern generation or they remain the same?
17     A.    That is not a research area I
18 have looked at recently.  I can say that fewer
19 parents are divorced now than in the '80s, or
20 at least -- it depends on how you cut the
21 statistics, but that the divorce rate has
22 declined since the 1980s.
23     Q.    Okay.  And if you turn on
24 page 111, in 2006, you said, "Almost half of
25 GenMe has seen their parents divorce or have

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

1 never known their father at all. This has a
2 clear link to rise of depression, as children
3 of divorce are more likely to be anxious and
4 depressed," correct?
5      A.   Correct, yes.
6      Q.   All right. And do you agree
7 today that based on the research that you have
8 done, that children of divorce or who do not
9 know one of their parents are more likely to
10 be anxious and depressed?
11     A.   Given that this is 18 years ago,
12 I would want to take a more recent look at
13 that research literature.
14     Q.   All right. And then continuing
15 on to page 132. And this is in the middle.
16 In 2006, you wrote that "People who's primary
17 motivations are financial are much more likely
18 to be anxious and depressed than people who
19 value strong relationships with others,"
20 correct?
21     A.   Yes.
22     Q.   Okay. And do you agree that that
23 is still true today, that people whose primary
24 motivations are financial are much more likely
25 to be anxious and depressed than people who

Page 171

1 value strong relationships?
2      A.   I believe so. The research
3 that's based on, I don't think has been
4 updated in quite a while, because that
5 researcher has since retired. And the
6 following sentence is definitely not correct
7 anymore with recent research.
8      Q.   Okay. All right. Do you agree
9 that this was true in 2006, and today, that
10 "We focus so much on our individual wants,
11 feeling empty inside, that depression is often
12 the result"?
13     A.   Can you show me where that is?
14     Q.   Sure. It's on page 134.
15     A.   Let me see the context. Right.
16 So this is an explanation for, again, this
17 particular time period, with this huge change
18 in the culture between the 1950s and the early
19 1990s, in terms of the rise of individualism.
20     Q.   Sure. In 2006, talking about the
21 changes since the 1950s, you wrote, "We focus
22 so much on our individual wants, feeling empty
23 inside, that depression is often the result,"
24 correct?
25     A.   That's what it says.

Page 172

1      Q.   And you would agree today that
2 even in modern society, that if someone
3 focuses on their individual wants, that
4 depression is often the result?
5      A.   That's something I would have to
6 reconsider, given it's been so long since I
7 wrote this, to see what the research says now
8 about that, especially because the way
9 individualism plays out in our current society
10 is different than it was then.
11     Q.   Do you agree today that people
12 who believe that outside forces determine
13 their fate are more likely to be depressed and
14 anxious and cope poorly with stress?
15     A.   So can you show me where that
16 is?
17     Q.   Sure. It's on page 157.
18     A.   Okay. So this is referring to
19 locus of control. That's another research
20 literature that I have not reviewed since I
21 wrote a paper on it. I believe my last paper
22 on locus of control was 2002. So I'd have to
23 go over that research again. At least at that
24 time, yes, there was a strong association
25 between external locus of control and

Page 173

1 depression.
2      Q.   Okay. And just to round this
3 out, in 2006, you said that people who have a
4 low external locus of control -- I'm sorry,
5 let me start again.
6           You wrote in 2006 that people
7 that have an high external locus of control,
8 that is, they believe that outside forces
9 determine their fate, that those individuals
10 are more likely to be depressed, anxious, and
11 cope poorly with stress?
12     A.   Yes. At the time, that is
13 certainly what the research literature showed.
14     Q.   Okay. And you have not updated
15 that research to know if that research shows
16 the same or something different?
17     A.   I have not looked at that
18 research literature recently, no.
19         MS. LEHMAN: Okay. All right.
20     We're going to go off the record. I'm
21     going to pass the questioning to one
22     of my colleagues.
23         THE VIDEOGRAPHER: We're going
24     off the record at 12:13 p.m.
25         (Lunch recess.)

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

1      THE VIDEOGRAPHER:  We're back
2  on the record at 12:56 p.m.
3      MS. LAUNER:  The state AGs have
4  been asked to leave this part of the
5  deposition, and are now leaving.  The
6  MDL AG position is that because any
7  information elicited hereafter leaves
8  us with no notice of the testimony or
9  information by this witness, and with
10  no ability to object, question, or
11  follow up, this portion is
12  inadmissible in any MDL AG trial.
13      MR. HALPERIN:  Meta certainly
14  disagrees with that position.  We have
15  not asked the AGs to leave the room.
16  There is a process and a protocol for
17  the AGs to get transcripts after our
18  co-defendants have reviewed the
19  transcripts, to designate any portions
20  they believe to be confidential.  And
21  we certainly do not waive the right to
22  use any aspect of the transcript in
23  any future AG trial in the MDL or
24  otherwise.
25      (Whereupon the AG plaintiffs

Page 175

1  leave the deposition room.)
2          EXAMINATION
3  BY MR. SOLBERG:
4      Q.   Thank you.  Good afternoon,
5  Dr. Twenge.  My name is Garrett Solberg.  I'm
6  with Munger Tolles & Olson representing Snap,
7  Inc. in these cases.  And I'm going to ask you
8  some questions about your opinions,
9  specifically as they relate to Snapchat.
10      In your last deposition in these
11  cases, you were asked whether it would cut
12  towards an app meeting your definition of
13  social media if it had a messaging function
14  that was used the vast majority of the time.
15  Do you remember that?
16      A.   I don't.  You're going to have
17  to refresh my memory.
18      Q.   Do you remember that you
19  responded that it would be really hard to say
20  which way that would cut, because it's such a
21  hypothetical?
22      MS. McNABB:  Objection.  Form.
23      THE WITNESS:  So put that in
24  context for me.  What were we
25  discussing exactly?

Page 176

1  BY MR. SOLBERG:
2      Q.   So here, I'll show you a copy of
3  the transcript from that deposition.
4      A.   Good.
5      Q.   Which I'll mark as Exhibit 10.
6      (Exhibit No. 10 was marked for
7  identification.)
8  BY MR. SOLBERG:
9      Q.   And is, I believe, tab A for the
10  reporter.  If you could please turn to
11  page 441.
12      Do you see right at the bottom of
13  page 441, line 25, where the question begins?
14      A.   Yes.
15      Q.   And the question, which then
16  continues on to the next page reads, "Okay, so
17  if there's an app that has a messaging
18  function and an algorithmic content viewing
19  function, and the messaging function is used
20  the vast majority of the time, that would cut
21  towards that app not being within your
22  definition of social media."
23      And then you responded, "Really
24  hard to say, because that's such a
25  hypothetical."

Page 177

1      Did I read that correctly?
2      A.   Yes.
3      Q.   Do you still agree with that
4  response?
5      A.   I do -- sorry, hold on.
6      I do because it is very
7  hypothetical, because, for one thing, we have
8  to know what features are in the app, and then
9  how users use the app, which is going to
10  differ from -- you know, across individuals.
11  We have to say what the average is.  And then
12  since these functions all work together, it
13  seems like a hypothetical that's difficult to
14  answer.
15      Q.   And for example, that's a
16  hypothetical as applied to Snapchat, because
17  you do not know the percentage of the time
18  that teenage users on Snapchat spend using the
19  various Snapchat features; is that right?
20      MS. McNABB:  Objection.  Form.
21      THE WITNESS:  Correct.  I don't
22  know that, and I'd have to consider
23  whether that was -- was relevant,
24  given that I'm sure they spend time on
25  things other than messaging within the

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

1    app.
2  BY MR. SOLBERG:
3      Q.    All right.  I'm going to show you
4  a document I'll mark as Exhibit 11.  And this
5  is tab B, for our tech.
6          (Exhibit No. 11 was marked for
7       identification.)
8  BY MR. SOLBERG:
9      Q.    This is an expert rebuttal report
10 authored by Krista Hayakawa.  Do you see that
11 at the top of this document?
12     A.    Yes.
13         MS. McNABB:  And I'll put an
14     objection in that this document was
15     produced in the JCCP litigation, and
16     we are here today on the MDL
17     litigation.
18         MR. SOLBERG:  Thank you.
19 BY MR. SOLBERG:
20     Q.    Please turn to page 2.  It's the
21 second page.  It has page 1 at the bottom.
22 And look at paragraph number 3.  It says, "I
23 am currently employed as a data engineer at
24 Snap, Inc."  Did I read that right?
25     A.    Yes.

Page 179

1      Q.    And please turn to the next page,
2  and look at paragraph 10.  It reads,
3  "According to our usage statistics for Q1
4  2025, 13- to 17-year-old users in the United
5  States spent about 78 percent of their time
6  using the messaging and camera portions of the
7  Snapchat app during that period."
8          Did I read that right?
9      A.    That's what it says.
10     Q.    Do you have any reason to doubt
11 those numbers?
12     A.    No, but I also don't have a lot
13 of information about how that data was
14 collected.  And given what I do, that's what I
15 would want to be able to judge it.
16     Q.    Is it fair to say that the amount
17 of time that Snapchat users spend using the
18 different features of Snapchat is not
19 something that you considered when forming
20 your opinion?
21     A.    Can you put that in a different
22 way?
23     Q.    When you were forming your
24 opinion, did you perform any analysis of how
25 much time Snapchat users spend using certain

Page 180

1  features of Snapchat, as opposed to other
2  features of Snapchat?
3          MS. McNABB:  Objection.  Form.
4          THE WITNESS:  Well, I think
5       they all work together.  And if they
6       all work to increase time spent, I'm
7       not sure how much of an impact that
8       would have on my opinion.  It probably
9       wouldn't have much.
10         I mean, for example, part of
11      that 78 percent of the time is going
12      to driven by wanting to keep up to
13      your Snap Streak.  And that's
14      potentially going to lead to more time
15      spent, and thus harm.
16 BY MR. SOLBERG:
17     Q.    Did you review any data about the
18 percentage of time that Snapchat users spend
19 on certain parts of the app versus other parts
20 of the app?
21     A.    I don't believe I did, no.
22     Q.    In your previous deposition in
23 these cases, you testified that you did not
24 know what part of Snapchat a user sees when
25 they initially open the app; is that right?

Page 181

1          MS. McNABB:  Objection.  Form.
2          THE WITNESS:  Yes, although
3       since then, I've learned a little more
4       about how the app works.  And that
5       there's a Discover page, very similar
6       to, say, the Explore page on
7       Instagram, so it's not just a camera.
8  BY MR. SOLBERG:
9      Q.    So when a Snapchat user opens the
10 app, what is your current understanding of
11 what they see?
12     A.    It could be the camera, it could
13 also be a page with ads and with videos, and
14 other types of posts, that that's also part of
15 the app.
16     Q.    So I'm not asking you if it's
17 part of the app.  I'm asking you, when a user
18 opens Snapchat, is it your testimony that the
19 first page that it opens to is a Discover page
20 with content, as opposed to a camera?
21     A.    I don't know.
22         MS. McNABB:  Objection.  Form.
23 BY MR. SOLBERG:
24     Q.    So sitting here today, you do not
25 know what a Snapchat user sees when they open

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

1 the app; is that right?
2      A.    I'm familiar with some of the
3 features, but I don't know what they see when
4 they first open the app as a default, no.
5      Q.    Do you have any reason to doubt
6 that Snapchat opens to its camera feature
7 instead of a page that shows a feed of content
8 and advertisements?
9      A.    Given my research background, I
10 would want to see that for myself, ideally.
11      Q.    Is there any other app that you
12 consider to be social media that opens to a
13 camera, rather than a feed of content?
14          MS. McNABB:   Objection.  Form.
15          THE WITNESS:   Not that I know
16     of, although there are many social
17     media platforms.
18 BY MR. SOLBERG:
19      Q.    Putting Snapchat aside, can you
20 identify any app that you consider to be
21 social media, where its users spend 78 percent
22 of their time using the camera and messaging
23 features, rather than viewing content?
24      A.    That's extremely difficult to
25 say, because the companies keep a pretty tight

Page 183

1 hold on their data.
2          I'm not, off the top of my head,
3 familiar with research that has dug into that
4 on the other platforms, but that's partially
5 because that's not what I was focused on in my
6 report.
7      Q.    We talked about the rebuttal
8 report you filed in the MDL earlier today.  Do
9 you remember that?
10      A.    Briefly, yes.
11      Q.    And in that report, you respond
12 to the opinions of some of the defendants'
13 experts, right?
14      A.    Yes.
15      Q.    That report does not mention
16 Snapchat, right?
17      A.    I would have to read the whole
18 thing.  And it is a number of pages, so if we
19 could do a search function.
20      Q.    All right.  I'll represent to you
21 that I did not find any mention of Snapchat
22 using a search function.  And sitting here
23 today, do you recall mentioning Snapchat in
24 the rebuttal report?
25      A.    I don't -- I don't recall.

Page 184

1 However, there's a lot of data in here that
2 would still be relevant for Snapchat under my
3 opinion.
4      Q.    It would be relevant to Snapchat
5 as well as other platforms.  Is that right?
6      A.    Yes.
7      Q.    The rebuttal report doesn't come
8 to any conclusion about Snapchat specifically.
9 Is that right?
10      A.    Yes, correct.
11      Q.    Do you cite any studies in the
12 rebuttal report that reach conclusions
13 specific to Snapchat?
14          MS. McNABB:   Objection.  Form.
15          THE WITNESS:   There's one study
16     I know of that is platform-specific.
17     It is cited in my primary report, but
18     not in the rebuttal report.
19 BY MR. SOLBERG:
20      Q.    Understood.  Sitting here today,
21 are you offering any rebuttal opinions about
22 Snapchat that are not disclosed in the
23 rebuttal report?
24      A.    In terms of the rebuttal towards
25 defendants' experts, no.

Page 185

1      Q.    Have you reviewed the report of
2 Nick Allen in this case?
3      A.    I don't believe so, no.
4      Q.    The next question is going to
5 seem a little silly.  Are you offering any
6 opinions in response to Nick Allen's opinion?
7      A.    No.
8      Q.    Okay.  A few more of these.  Have
9 you reviewed the report of Stephen Buka in
10 this case?
11      A.    That name sounds familiar, but I
12 don't believe so, no.
13      Q.    Are you offering any opinions in
14 response to Stephen Buka?
15      A.    No.
16      Q.    Have you reviewed the report of
17 Sandeep Chatterjee in this case?
18      A.    No.
19      Q.    Are you offering any opinions in
20 response to Sandeep Chatterjee?
21      A.    No.
22      Q.    Is one of the features of social
23 media platforms that you believe causes harm,
24 algorithms that curate and recommend content
25 to users?

47 (Pages 182 - 185)

CONFIDENTIAL

Page 186

1   A.    That is one of the features,
2  yes.  There are many, but, yes, those
3  algorithms that curate and recommend content
4  are one of those features.
5   Q.    And the studies that you cite in
6  your report, do they reflect harm caused by
7  those algorithms?
8   A.    So the studies in my report are
9  focused on time spent on social media, and to
10  the extent that that time spent is increased
11  by those algorithms, yes.
12   Q.    So is it fair to say that if a
13  study measures harm, based on time spent, and
14  algorithms are one of the features that is
15  causing harm to users, then that harm caused
16  by the algorithms is going to be reflected in
17  that study?  Is that accurate?
18       MS. McNABB: Objection.  Form.
19       THE WITNESS:  So that was a
20   very complicated question.
21  BY MR. SOLBERG:
22   Q.    I apologize.  We can take a few
23  more runs at it.
24   A.    Yeah, let's do that.
25   Q.    So I'm trying to get at, if a

Page 187

1  study shows that time spent goes up, and harm
2  goes up, or time spent goes down, then harm
3  goes down, that indicates to you that
4  something about using the social media
5  platform is causing harm.  Is that fair to
6  say?
7       MS. McNABB: Objection.  Form.
8       THE WITNESS:  I wouldn't put it
9   quite that way.  It's more complex
10   than a "yes" or "no."
11       So because the example that
12   you're offering is more -- sounds
13   more, to me, like a correlational or
14   cross-sectional study.  So if you go
15   to the experimental studies, and use
16   that rubric, then, yes, something
17   about that platform and the time spent
18   on that platform is leading to the
19   harm, like depression, so yeah.
20  BY MR. SOLBERG:
21   Q.    And it's your opinion that one of
22  the aspects of the social media platforms that
23  causes that harm that shows up in the studies
24  is these algorithms we were just discussing;
25  is that right?

Page 188

1   A.    Yes, that is one of the factors.
2   Q.    So the harm caused by those
3  algorithms to those users is reflected in the
4  studies that you're discussing.  Is that fair
5  to say?
6       MS. McNABB: Objection.  Form.
7       THE WITNESS:  Yes, although
8   there are many other factors.
9  BY MR. SOLBERG:
10   Q.    And another one of those factors
11  is short form content that appears on the
12  platforms.  Is that right?
13   A.    Can you tell me what you mean by
14  short form content?
15   Q.    Content that is of, for example,
16  short videos, as opposed to longer videos.
17   A.    Yes, although it would have to
18  be in the context of features such as
19  autoplay, such as the algorithms that curate
20  that content, the infinite scroll.  Those
21  other types of factors.
22   Q.    How about ephemeral or
23  disappearing content?
24       MS. McNABB: Objection.  Form.
25       THE WITNESS:  So that would be

Page 189

1   another aspect, because it drives time
2   spent, and it drives coming back to
3   the platform again to spend even more
4   time with the fear that the content
5   will disappear, and then you won't see
6   it, et cetera.
7  BY MR. SOLBERG:
8   Q.    And how about features that allow
9  users to share or save content privately?
10       MS. McNABB: Objection.  Form.
11       THE WITNESS:  So that was not
12   something I really explored in the
13   report, because it's not as relevant
14   for time spent.  But having done this
15   work for a decade, yes, I have
16   certainly come across cases where
17   being able to hide things, say, from
18   parents, like in the For Your Eyes
19   Only, caused, to put it mildly, some
20   issues.
21  BY MR. SOLBERG:
22   Q.    How about push notifications on
23  the platforms?
24   A.    So push notifications would be
25  another example of something that would

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

1  increase time spent by encouraging people to
2  come back to the platform and spend more time.
3  So that would be another example of a feature
4  that might be relevant.
5       Q.    So going back to when we were
6  talking about what these studies measure.
7  These studies that measure the harm associated
8  with social media platforms.  That harm that
9  you refer to in those studies, it includes any
10 harms caused by all those features we just
11 discussed.  Is that right?
12      A.    It's hard for me to say that,
13 because that is not what the studies were
14 charged to do, and that's not what I was
15 charged to do in the report.  I'm going on the
16 research suggesting that those features
17 increase time spent, increase compulsive
18 behaviors, may increase the feeling of
19 addiction.  And that could be distressful as
20 well.
21      Q.    The studies that you cite as
22 showing harm in association with social media
23 use, they do not control for any effects of
24 the features I just mentioned; is that right?
25           MS. McNABB:  Objection.  Form.

Page 191

1           THE WITNESS:  So in terms of
2       controlling for the effects of the
3       features, I mean, the questions on the
4       big surveys, for example, that's not
5       -- again, that's not what they're
6       doing.  They're asking individuals how
7       much time they spend.  And it can't --
8       they're not asked about features.
9  BY MR. SOLBERG:
10      Q.    Right.  So these studies don't
11 say, there was this amount of harm, and we've
12 identified the amount of harm that was caused
13 by algorithms, and we've taken that off to one
14 side.  Here's just the harm that was measured,
15 excluding that harm caused by algorithms.  The
16 studies -- the studies don't do anything like
17 that; is that right?
18           MS. McNABB:  Objection.  Form.
19           THE WITNESS:  The studies that
20      I reviewed, to my knowledge, don't do
21      that.  There may be studies out there
22      that have done that.  But that's -- to
23      my recollection, that is not what the
24      studies that I analyzed do, no.
25 BY MR. SOLBERG:

Page 192

1       Q.    And in your opinion, you don't
2  give an opinion that there's an amount of harm
3  that's been demonstrated that excludes any
4  effects of the features that we've talked
5  about; is that right?
6           MS. McNABB:  Objection.  Form.
7           THE WITNESS:  So I mean, I
8       think it would just be difficult to do
9       that.  I think that the features all
10      work together, and that they are
11      designed to increase time spent.  And
12      that is one of the mechanisms of harm.
13 BY MR. SOLBERG:
14      Q.    Can you rank the features we just
15 discussed, in terms of which are more or less
16 harmful?
17           MS. McNABB:  Objection.  Form.
18           THE WITNESS:  Based on the
19      research that I've reviewed, no.
20 BY MR. SOLBERG:
21      Q.    Is that because the research that
22 you reviewed doesn't provide the information
23 that you would need to give that kind of
24 ranking?
25           MS. McNABB:  Objection.  Form.

Page 193

1           THE WITNESS:  Correct.
2  BY MR. SOLBERG:
3       Q.    From all the studies and data you
4  reviewed for your report, can you assign a
5  percentage of harm that's caused by algorithms
6  or any other particular feature?
7           MS. McNABB:  Objection.  Form.
8           THE WITNESS:  That's not really
9       how these studies work.
10 BY MR. SOLBERG:
11      Q.    And your report doesn't assign
12 that kind of percentage either; is that right?
13      A.    Correct.
14      Q.    Your report is focused on the
15 effects that social media platforms have on
16 users' mental health.  Is that fair to say?
17      A.    That is its primary focus,
18 although the time series studies on the trends
19 in adolescent mental health are a little bit
20 different from that, but yes.
21      Q.    Do you think that the way a
22 social media platform is designed is relevant
23 to the effects that the platform has on its
24 users' mental health?
25      A.    Can you ask that in a different

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 194

1 way?
2    Q.    Do you think that the process
3 that a company follows for designing its
4 platform has any effect on how that platform
5 affects its users' mental health?
6    A.    Yes.
7    Q.    I'm going to show you the
8 materials considered list from your report in
9 this case, which I'll mark as Exhibit 12.
10    (Exhibit No. 12 was marked for
11 identification.)
12    MS. McNABB:  I'll just put an
13 objection on the record.  I don't
14 believe this is the most up-to-date
15 materials considered list, in that --
16 it's not the most up-to-date materials
17 considered list.  So do you know what
18 date this list was provided?
19    MR. SOLBERG:  This one -- I
20 don't have that in front of me.  I
21 believed that this was the most recent
22 list filed with the full report, as
23 opposed to the rebuttal report.  But
24 I'm happy to ask my questions about
25 this list.

Page 195

1    MS. McNABB:  Okay.  I'll just
2 have an objection with respect to this
3 list not being the most up-to-date
4 materials considered list.
5 BY MR. SOLBERG:
6    Q.    If you turn to the last page,
7 there are five documents near the middle of
8 the page that start with "Snap," and then have
9 some numbers on them.  Is that right?
10    A.    I see that, yes.
11    Q.    And you were asked about this
12 materials considered list, this document at
13 your last deposition.  Do you remember that?
14    A.    I believe so.
15    Q.    And it's your understanding that
16 those documents that start with "Snap" were
17 produced by Snap in this litigation.  Is that
18 right?
19    A.    That's my understanding.
20    Q.    At your last deposition, you
21 testified that that set of five documents, the
22 lawyers for plaintiffs selected those five
23 documents for you.  Do you remember that?
24    MS. McNABB:  Objection.  Form.
25    THE WITNESS:  Yes, but although

Page 196

1 that was, of course, based on what I
2 was focused on in the report.
3 BY MR. SOLBERG:
4    Q.    Did you review any other
5 documents that were produced by Snap in this
6 case or just those documents?
7    A.    I believe it was just these
8 documents.
9    Q.    Did you review any documents
10 discussing the process that Snap follows for
11 making design decisions for Snapchat?
12    A.    No.
13    Q.    Did you ask plaintiffs' counsel
14 for any documents that discuss that process?
15    A.    I don't believe so.
16    MR. SOLBERG:  I have no further
17 questions and will pass to other
18 counsel.  Thank you.
19    MR. DONOHUE:  Can we go off the
20 record?
21    THE VIDEOGRAPHER:  We're going
22 off the record at 1:21 p.m.
23    (Recess.)
24    (Whereupon, the AG plaintiffs
25 resume attendance at the deposition.)

Page 197

1    THE VIDEOGRAPHER:  We're back
2 on the record at 1:22 p.m.
3    EXAMINATION
4 BY MR. DONOHUE:
5    Q.    Good afternoon, Dr. Twenge.  We
6 met at your prior deposition, but I don't
7 blame you if you've forgotten.  My name is
8 Matt Donohue.  I represent Google and YouTube
9 in these cases.
10    So let me start by asking, is
11 there any testimony you gave about YouTube at
12 your prior deposition that you now think is
13 inaccurate or otherwise would want to amend?
14    A.    I think I may have a few
15 additional things to say, but I wouldn't amend
16 what I said before.
17    Q.    What do you mean by, you might
18 have a few additional things you would want to
19 say?
20    A.    Just the research project that I
21 completed between those times.
22    Q.    Are you referencing the new
23 journal article that you wrote that you
24 discussed in the questioning earlier today?
25    A.    Yes.

50 (Pages 194 - 197)

CONFIDENTIAL

Page 198

1    Q.    Okay.  And can you remind me,
2  what is the title of that article?
3    A.    Oh, I don't think I even
4  remember the title.  But it looks at watching
5  videos, and then using social media, and links
6  to depressive symptoms among 8th and 10th
7  graders, in Monitoring the Future.  It's not
8  an article yet.  It's just under review, but I
9  completed that between the two depositions.
10    Q.    Did you start that between the
11  two depositions, or did you start it before
12  the first deposition, but complete it between
13  the first and the second?
14    A.    I started it after the last
15  deposition.
16    Q.    Okay.  And was that research
17  prompted by the conversation we had in the
18  last deposition?
19    A.    No, it was independent of that.
20  It was something I had wanted to do for a
21  while, and just hadn't gotten around to being
22  able to do it.  And finally, over the summer,
23  was able to.
24    Q.    And is any of the research
25  reflected in the reports that you've submitted

Page 199

1  in this case?
2    A.    No, because they were due before
3  I completed it.  Yeah.
4    Q.    Okay.  And so if I understand
5  correctly from your testimony earlier, you
6  don't intend to offer any testimony that is
7  not reflected in the reports you've submitted
8  in this case, right?
9    A.    Correct.
10    Q.    So this study is not something
11  that you intend to testify about at trial in
12  these cases?
13        MS. McNABB:  Objection.  Form.
14        THE WITNESS:  Well, I'd have to
15      know more about the procedure, because
16      certainly the reports are not going to
17      freeze as the research literature
18      moves on.  So I would reserve the
19      right to testify on research that came
20      out after that time, including my own.
21  BY MR. DONOHUE:
22    Q.    Can you tell me generally what
23  the conclusions of your new paper are?
24    A.    So that new paper found that
25  watching videos and spending time on social

Page 200

1  media were both linked to depressive symptoms
2  at about the same effect size, with a small
3  difference in the pattern.
4    Q.    Can you explain what you mean by,
5  with a small difference in the pattern?
6    A.    That the lowest level of
7  depressive symptoms for social media was at no
8  use.  And for videos, the lowest level of
9  depressive symptoms was, instead, at very
10  light use of less than an hour a day.
11    Q.    And I realize I don't have the
12  paper, so I'm sort of in the dark a little bit
13  about what all these terms mean.  When you
14  talk about watching videos, what does that
15  include?
16    A.    So the way the question is
17  worded in Monitoring the Future, it includes
18  streaming services, television.  The way the
19  question is worded, by my interpretation, it
20  would also include YouTube, and possibly
21  TikTok.
22    Q.    So I think when we spoke earlier,
23  you were asked -- or I guess earlier today,
24  not necessarily with me, there were questions
25  about Netflix, and binge watching on Netflix.

Page 201

1  And you said you had no opinion, and hadn't
2  done any research on the effect of binge
3  watching things on Netflix; is that right?
4    A.    Well, not exactly.  By my memory
5  about what I said, I said I had done research
6  on television watching, just not binge
7  watching, in particular.
8    Q.    Okay.  And so your new paper,
9  which you've written between your last
10  deposition and this one, will discuss the
11  effect of watching videos, including on
12  Netflix, including on YouTube, and all the
13  other streaming platforms that have come out
14  over the last decade?
15        MS. McNABB:  Sorry.  Objection.
16      Form.
17        THE WITNESS:  Yeah, so that --
18      that -- the way that that question is
19      worded, it does lump all of those
20      together.
21  BY MR. DONOHUE:
22    Q.    When did you first have a draft
23  of the paper that we're talking about?
24    A.    I'm trying to remember.  About
25  three or four weeks ago maybe.

51 (Pages 198 - 201)

CONFIDENTIAL

Page 202

1    Q.    Okay.  And am I correct that that
2  draft has not been produced to counsel in this
3  case?
4    A.    Correct.  It has not.  And,
5  yeah, it hasn't been published, and it will
6  change form, you know, when and if it is
7  published.  That's how the process usually
8  works.
9    Q.    And when was the -- when was the
10  paper submitted to the journal?
11    A.    About a week ago.
12    Q.    All right.  So let me shift
13  gears.  The other thing I want to talk about
14  is your new book that came out since our last
15  talk, 10 Rules For Raising Kids in a High-Tech
16  World, or 10 Rules for short.
17    A.    Yes.
18    Q.    That came out on September 2nd,
19  2025?
20    A.    Yes.
21    Q.    And so just for the record,
22  that's about two weeks ago at the time of this
23  deposition, right?
24    A.    Yes.
25    Q.    And Rule Number 3 in your book is

Page 203

1  "No social media until age 16 or later."
2    A.    Yes.
3    Q.    Right?
4    MS. McNABB:  Objection.  Asked
5    and answered.
6  BY MR. DONOHUE:
7    Q.    And in that section, you offer
8  recommendations for which apps kids should not
9  have before 16, and which a parent might
10  consider letting them use at 15 and younger,
11  though with limits?
12    A.    Yes.
13    MS. McNABB:  Same objection.
14  BY MR. DONOHUE:
15    Q.    And in the book, you do this by
16  offering a list that you call the No List, and
17  then the Maybe List, correct?
18    A.    Yes.  And let me pull that up,
19  so we're literally on the same page.
20    Q.    I suggest you look at page 59.
21    A.    Right.  And I'm guessing that
22  you're headed to page 65.
23    Q.    We'll get there.  So the No List
24  includes Instagram, TikTok, Snapchat, Discord,
25  and X, formerly known as Twitter, correct?

Page 204

1    A.    Yes.
2    Q.    And those are the apps that you
3  advise parents should not let kids have before
4  age 16?
5    A.    Yes.
6    Q.    And then the Maybe List consists
7  of WhatsApp and YouTube, right?
8    A.    Yes.
9    Q.    And those are the apps that you
10  say a parent might consider letting kids use
11  at age 15 or younger, though with limits; is
12  that right?
13    A.    Yes.
14    Q.    So just to be clear, when you say
15  in the book, "No social media until age 16 or
16  later," you're not saying that parents should
17  necessarily not allow the kids to use YouTube
18  at all prior to age 16?
19    A.    Yes, it's -- the limits is, of
20  course, what we have to get into the details
21  of, that, for example, there's a difference
22  between having an account on YouTube, and then
23  watching videos without an account, as just
24  one example.
25    Q.    So let's talk about that for a

Page 205

1  second.  So on page -- let me see, it's 65 to
2  66, you discuss YouTube on your Maybe List,
3  right?
4    A.    Yes.
5    Q.    And you offer a couple of
6  suggestions for how parents might want to use
7  YouTube's parental controls?
8    A.    I don't believe it's YouTube's
9  parental controls, per se.  So let me just
10  remind myself exactly what I say.
11    So not to allow the YouTube app
12  on their phones, to limit the use of YouTube
13  on their laptops, meaning I mostly mean a time
14  limit.  And so there I'm talking about
15  third-party or operating system controls, not
16  the YouTube controls themselves.
17    Q.    So let me take a step back, and
18  be a little more specific in my question.  So
19  one recommendation you suggest is that parents
20  should turn off autoplay on YouTube for their
21  children, right?
22    A.    Yes.
23    Q.    Are you aware that YouTube sets
24  autoplay off by default for users whose age is
25  stated to be under 18?

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

1    A.    So that's a tough question to
2  give a "yes" or "no" answer to, because of the
3  part that you used, "stated to," which doesn't
4  have age verified.  That's why parents need to
5  use controls, because the apps don't verify
6  age.
7    Q.    But so I guess my question --
8  that's why I wanted to avoid this in my
9  question.  I tried to be specific.  You're
10  aware that when a user creates an account in
11  YouTube, and states that their age is under
12  18, by default, YouTube will not have autoplay
13  enabled, right?
14    A.    I'm not tremendously familiar
15  with that, but that's likely because, my
16  understanding is, it is extremely easy to lie
17  about your age when you're signing up for
18  accounts.  So if I did know that, I may not
19  have thought it was relevant, given that
20  limitation.
21    Q.    Would you consider that to be a
22  positive design choice by YouTube?
23        MS. McNABB:  Objection.  Form.
24        THE WITNESS:  I would only
25     consider it a positive design choice

Page 207

1     if age was actually verified.
2  BY MR. DONOHUE:
3    Q.    So you also recommend in your
4  book that especially for kids 12 and under,
5  "Parents should use YouTube Kids instead of
6  the regular app or site, as its content is
7  more appropriate for kids," correct?
8    A.    Yes.  And the key word there is
9  more.  There still may be inappropriate
10  content.
11    Q.    Can you explain what makes the
12  content on YouTube Kids more appropriate for
13  kids?
14    A.    Well, that would be something
15  that I would honestly want to ask YouTube of
16  how they determine the content on YouTube Kids
17  versus the rest of YouTube.  Because I would
18  love to know exactly how they make that
19  determination.  I'm not tremendously familiar
20  with that.
21    Q.    Do you think it's important for
22  parents to be familiar with the parental
23  control options that they have?
24        MS. McNABB:  Objection.  Form.
25        THE WITNESS:  Yes, although

Page 208

1     that's not always easy.
2  BY MR. DONOHUE:
3    Q.    Do you agree that parents should
4  try to model responsible technology use for
5  their children?
6    A.    What do you mean by "model" in
7  this case, just to make sure I'm understanding
8  you correctly.
9    Q.    That parents should be cognizant
10  of their use of technology, the same way they
11  want their children to be.
12    A.    Yes.
13    Q.    So shifting gears a little bit,
14  when we spoke previously at your last
15  deposition, we discussed the fact that you
16  relied on a number of studies that separated
17  out social media use from video use, right?
18  Correct?
19    A.    Yes.
20    Q.    And specifically, we discussed
21  the Millennium Cohort Study and the Monitoring
22  the Future Study both treat video watching as
23  a separate category of use than social media,
24  correct?
25        MS. McNABB:  Objection.  Form.

Page 209

1        THE WITNESS:  Yes.
2  BY MR. DONOHUE:
3    Q.    And I believe you testified in
4  your last deposition that you might, in your
5  rebuttal report, look at more recent data
6  related to watching videos online.  Do you
7  recall that testimony?
8    A.    I do.  And that's what I ended
9  up doing in that paper, although I wasn't able
10  to complete that research in time to include
11  it in the rebuttal report.
12    Q.    Okay.  So just -- you mostly
13  answered this question, but that additional
14  research is not reflected in your rebuttal
15  report, correct?
16    A.    Correct.
17    Q.    So you mentioned that you're
18  doing your new paper, which we'll discuss,
19  video watching as a category.  Have you done
20  any research to compare the effect of watching
21  YouTube, as opposed to other streaming
22  platforms?
23    A.    So I haven't done that
24  personally.  Well, let me amend that.
25        So in -- in some previous

53 (Pages 206 - 209)

CONFIDENTIAL

Page 210

1 research, I did look at the Youth Risk
2 Behavior Surveillance System. And that
3 dataset distinguishes, at least it did at the
4 time, it distinguished between television
5 watching, and then general use of a computer,
6 a laptop, a phone. And the links between
7 suicidal thoughts, for example, were much
8 stronger for those electronic devices, as
9 opposed to television. So I have looked at it
10 in that dataset.
11    Q.    Okay. Thank you. I guess my
12 question was a little more narrow. I was
13 thinking about the difference between not
14 YouTube and traditional television, but
15 YouTube and other digital streaming services,
16 like Netflix, or Amazon Prime, or Paramount+?
17    A.    I don't believe research has
18 necessarily -- or the research I reviewed, I
19 don't think was able to distinguish that.
20 There may be research out there that has
21 examined the difference between, say, watching
22 TV on cable TV and watching TV on a streaming
23 service, but I don't believe that's something
24 that was in the research that I reviewed for
25 the report.

Page 211

1    Q.    Okay. And that's not an opinion
2 that you intend to offer in this case on the
3 difference between YouTube and other streaming
4 services?
5        MS. McNABB: Objection. Form.
6        THE WITNESS: I mean, given
7        that streaming services are often
8        watched on a television, it's a little
9        hard for me to answer that as asked.
10 BY MR. DONOHUE:
11    Q.    So, okay, you don't intend to --
12 you're aware that YouTube can also be watched
13 on a television, right?
14    A.    Yes, although I think that's not
15 very common.
16    Q.    And you're aware that Netflix can
17 be watched on an iPhone?
18    A.    Yes, although the data that I
19 was analyzing, that I was mentioning from the
20 Youth Risk Behavior Surveillance System was
21 from about ten years ago, when that was not
22 done as often as it is now.
23    Q.    But there's no reason you could
24 not control for what device a user watches a
25 streaming service on, to compare two streaming

Page 212

1 services, right?
2    A.    I don't know. That's very
3 hypothetical.
4    Q.    But you haven't done that kind of
5 work?
6    A.    No.
7    Q.    You testified earlier that the
8 opinions you're offering in this case are
9 content agnostic, correct?
10    A.    I wouldn't put it in that way.
11 I would say that the studies that I focused on
12 look at time spent, which is agnostic to
13 content.
14    Q.    So can you explain -- what about
15 my question is not correct? Are the opinions
16 that you're offering in this case not content
17 agnostic?
18    A.    I just wouldn't put it that way.
19 I would come back to the research studies and
20 what they measured.
21    Q.    So is there a reason you can't
22 answer the question of whether your opinions
23 in this case are content agnostic?
24        MS. McNABB: Objection. Form.
25        THE WITNESS: I suppose because

Page 213

1        as I've said in this deposition and my
2        previous one, that content plays a
3        role, but there's also the features
4        and time spent.
5        So I have mentioned content
6        before in the context of my opinion.
7        It's not that I have never talked
8        about it. So that's why I tripped on
9        the question.
10 BY MR. DONOHUE:
11    Q.    Okay. So your opinion is content
12 can play a role in the experience that a user
13 has with social media, right?
14    A.    Yes, but that the features and
15 time spent also play a role.
16    Q.    And if a particular user has a
17 strongly negative experience, you'd agree that
18 could be because of the kind of content that
19 they're seeing?
20        MS. McNABB: Objection. Form.
21        THE WITNESS: That's possible.
22        But it's also very hard to separate
23        out from the features, such as the
24        algorithm that serves up the content.
25 BY MR. DONOHUE:

54 (Pages 210 - 213)

CONFIDENTIAL

Page 214

1    Q.    So I just want to be clear.
2 You -- you agree that you cannot -- you
3 personally have not done anything to separate
4 out the effect a user might have from content,
5 as opposed to algorithms or other aspects of a
6 service?
7         MS. McNABB:  Objection.  Form.
8         THE WITNESS:  I mean, that's
9    not what I was charged to do in the
10    report.  I know there is some research
11    that has looked at content, like
12    cyberbullying, and other things to try
13    to look at the effects of those.  But
14    that's not what I was doing here.
15 BY MR. DONOHUE:
16    Q.    And when you say that -- when you
17 talk about the effect of algorithms, to be
18 clear, you're talking about content
19 recommendation algorithms, correct?
20    A.    Yes, although I think we have to
21 distinguish between a recommendation, like
22 Netflix might make of "You might like this
23 movie" versus YouTube or TikTok, where it's,
24 "Here is the next movie," and it just comes
25 up -- or not movie, sorry, next video.  That's

Page 215

1 what I meant.
2    Q.    Well, there are movies on
3 YouTube, correct?
4    A.    True.  True.
5    Q.    Can we go back to Exhibit 6, your
6 book?  And can I have you flip to page 51.
7 There should be a heading that says, "What's
8 so bad about social media."  Do you see that?
9    A.    I do.
10    Q.    And in this section, you list
11 features of social media that you think are
12 bad for kids.  Is that a fair description?
13    A.    I wouldn't say features exactly.
14 I'd use a broader term, although I'm not sure
15 what term, but things that kids may
16 experience.
17    Q.    If we go forward to page 54, do
18 you see a subheading that says, "Disturbing
19 content"?
20    A.    Yes.
21    Q.    And this is one of those, I guess
22 you called it, things kids may experience on
23 social media that you consider to be bad or
24 unhealthy for them.
25    A.    Yes.

Page 216

1    Q.    And in the section, you give the
2 example of a student in your college class,
3 Jamie.  Do you recall that?
4    A.    Yes.
5    Q.    And you say, "Jamie used to love
6 watching funny cat videos on social media, but
7 now receives heartbreaking videos of cats in
8 critical condition on Instagram Reels"?
9    A.    Yes.
10    Q.    Would you agree that Jamie
11 probably had a more positive experience when
12 he was watching the funny cat videos than when
13 he is watching heartbreaking videos of cats in
14 critical condition?
15         MS. McNABB:  Objection.  Form.
16         THE WITNESS:  So that's what he
17    says.  But my understanding of his
18    experience is that he didn't seek out
19    the heartbreaking videos of cats in
20    critical condition.  That they were
21    served up to him by the algorithm.  So
22    it's not just the content, it's that
23    the algorithm showed it to him.  And
24    that was one of the reasons why he
25    wanted to get off the platform.

Page 217

1 BY MR. DONOHUE:
2    Q.    So if I'm understanding
3 correctly, do you believe his experience would
4 have remained positive if he had continued
5 seeing funny cat videos, instead of
6 heartbreaking videos of cats in critical
7 condition?
8         MS. McNABB:  Objection.  Form.
9         THE WITNESS:  I can't speak to
10    his experience, and it may also depend
11    on his situation.  So if his cat had
12    recently died, even seeing the more
13    positive videos might have been
14    distressing.
15 BY MR. DONOHUE:
16    Q.    Shifting gears a bit, you
17 mentioned earlier that you've done work for
18 Yondr, the company that sells Yondr pouches,
19 right?
20    A.    Yes.
21    Q.    Do you know how much a Yondr
22 pouch costs?
23    A.    It may have changed, given
24 inflation, since I worked with the company.  I
25 do not know.

55 (Pages 214 - 217)

CONFIDENTIAL

1    Q.    Ballpark, do you have an idea?
2    A.    $100.
3    Q.    And just a couple of questions
4 about your rebuttal report as it relates to
5 YouTube in this case, which I believe is
6 Exhibit 2, although I don't know if you'll
7 need it for these questions, but feel free to
8 look at it, if you feel that you do.
9    A.    All right.
10   Q.    So your rebuttal report contains
11 several discussions about trends in social
12 media as in your opening report, right?
13   A.    What do you mean by trends in
14 social media?
15   Q.    You -- let me talk about it this
16 way.  You talk about time series studies in
17 your report, right?
18   A.    Yes.
19   Q.    And you discuss usage of social
20 media over time, and how that can be, well,
21 explanatory of other outcomes.
22   A.    Right.  If you mean, say, the
23 section 2.3.
24   Q.    Yes.
25   A.    Yes.

1    Q.    And when you're discussing social
2 media trends here, you are using the same
3 definition of social media as in your opening
4 report, correct?
5    A.    Yes, especially because what I'm
6 doing here is the way it's defined in
7 Monitoring the Future.
8    Q.    So -- and as we discussed, the
9 Monitoring the Future Study is one of those
10 studies that separates out video watching from
11 social media, when asking respondents to
12 describe how they use their time?
13   A.    Yes.
14   Q.    So the -- so then the data that
15 you use in that section to discuss trends in
16 social media use would not necessarily reflect
17 trends in YouTube use?
18       MS. McNABB:  Objection.  Form.
19       THE WITNESS:  Hard to say.  You
20   would have to do that specifically,
21   although the graph right above
22   paragraph 25 does look at internet
23   use.  And depending on how that
24   question is worded, that could
25   certainly include YouTube videos.

1 BY MR. DONOHUE:
2    Q.    But fair to say, you haven't done
3 anything in this section to look at trends in
4 YouTube use, separate from trends in internet
5 use?
6       MS. McNABB:  Objection.  Form.
7       THE WITNESS:  Correct.
8       MR. DONOHUE:  Thank you.
9    That's all I have for today.  I can
10   pass the witness to my colleagues.
11   Should we go off the record?
12       THE VIDEOGRAPHER:  Off the
13   record at 1:45 p.m.
14       (Recess.)
15       THE VIDEOGRAPHER:  Back on the
16   record at 1:54 p.m.
17       EXAMINATION
18 BY MR. HALPERIN:
19   Q.    Dr. Twenge, my name is Greg
20 Halperin.  I represent Meta.  You and I had
21 met a few months ago.  It's good to see you
22 again.
23   A.    You, too.
24   Q.    I may jump around a bit today,
25 just by virtue of going fourth.  Some of the

1 things I might have already asked you about
2 have been covered.  I'm going to do my best
3 not to repeat myself, but by virtue of that, I
4 may just be a bit more disjointed than I would
5 if I had gone first.
6       I'm going to start by handing you
7 a document that we've marked as Exhibit 13.
8       (Exhibit No. 13 was marked for
9   identification.)
10 BY MR. HALPERIN:
11   Q.    If you could turn with me to
12 page 100 of Exhibit 13, please.  At the bottom
13 of the page, there's a section called
14 "Declaration of Competing Interests."  Do you
15 see that?
16   A.    Yes.
17   Q.    And first of all, this is an
18 article that you authored with Gabriel Martin?
19   A.    Yes.
20   Q.    Under the "Declaration of
21 Competing Interests," it says, "JMT has
22 received speaking honoraria and consulting
23 fees for presenting research, and is the
24 author of several books, most recently, iGen,
25 Why Today's Super-Connected Kids Are Growing

56 (Pages 218 - 221)

CONFIDENTIAL

Page 222

1 Up Less Rebellious, More Tolerant, Less Happy,
2 and Completely Unprepared For Adulthood.  Do
3 you see that?
4     A.    Yes.
5     Q.    JMT is you; is that correct?
6     A.    Yes.
7     Q.    What's the purpose of a competing
8 interest disclosure in a publication?
9     A.    Well, there's been a long and
10 varied history about those declarations.
11 Generally, the point is to disclose any
12 financial relationships that you have, so the
13 reader can make their own judgment about other
14 things that you do, and how they might be
15 connected to the research.
16          Most of the time, these
17 declarations have to do with -- in a medical
18 journal, if you are studying a particular
19 medical device, if you got funded or received
20 consulting income from the company.  But in
21 recent years, they have evolved, so many
22 journals ask for you to disclose any financial
23 relationship that you had, any other way you
24 get money, other than your primary job.
25     Q.    Conflict of interest disclosures

Page 223

1 allow the reader to assess for themselves
2 potential biases of the authors, true?
3     A.    That's how often they're
4 presented, yes.
5     Q.    And you, as a scholar, want to
6 know if scholars whose scholarship you're
7 reviewing have those potential biases, so you
8 can evaluate how that might impact their work,
9 true?
10     A.    The idea is you put all the
11 information out there, and then let the reader
12 judge.
13     Q.    And that's an important function
14 to do, right?
15     A.    It is important to be
16 transparent, yes.
17     Q.    And you take your obligation to
18 transparently disclose financial relationships
19 seriously, true?
20     A.    I do.  They are not always going
21 to be disclosed in every article, depending on
22 their topic.  Same thing about speaking
23 engagements or other interviews.  It is my
24 general practice to offer those disclosures,
25 although they're not always going to show up

Page 224

1 in every article.
2     Q.    It's your practice to disclose
3 competing financial interests, where you have
4 them, so that the reader can evaluate how they
5 might impact your scholarship, true?
6     A.    Yes.
7     Q.    Okay.  Let's talk -- switch gears
8 and talk about your 10 Rules book, what we've
9 all been calling 10 Rules.
10     A.    Yes.
11     Q.    We've already established that
12 10 Rules puts Instagram and TikTok and
13 Snapchat on what you call the No List of apps
14 that kids should not have before age 16,
15 correct?
16     A.    Yes.
17     Q.    Okay.  I'm going to hand you a
18 copy of your book, and I'm going to give you
19 an actual book, because we bought a few
20 copies, and this is the complete book.
21     A.    Okay.
22     Q.    And so we'll mark the complete
23 book -- if you hand that back to me, we'll put
24 a sticker on it, and mark it as Exhibit 14.
25 Or if you want to just put a sticker on

Page 225

1 yourself, that's fine, too.
2          (Exhibit No. 14 was marked for
3     identification.)
4 BY MR. HALPERIN:
5     Q.    Go with me, if you will, to page
6 53.  In the second paragraph -- I'm sorry, let
7 me give you a chance to get there.
8          In the second paragraph, you say,
9 "U.K. teen Molly Russell's Instagram delivered
10 more than 300 posts a month related to
11 suicide, self-harm, and depression before she
12 took her own life at the age of 14."  Do you
13 see that?
14     A.    Yes.
15     Q.    Molly Russell's story helps
16 explain why your rules, like no Instagram, or
17 TikTok, or Snapchat before the age of 16, are
18 necessary and appropriate, right?
19          MS. McNABB:  Objection.  Form.
20          THE WITNESS:  I would not put
21     it that way.  The rules come from many
22     different sources, not just this
23     story.
24 BY MR. HALPERIN:
25     Q.    I'm not saying it's only this

CONFIDENTIAL

Page 226

1  story, but this is one of the stories that
2  helps support your view that Instagram and
3  other social media should be on the "No List,"
4  true?
5        MS. McNABB: Objection. Form.
6        THE WITNESS: I would say it's
7     a small part, because there's such a
8     long list of harms and reasons why I
9     think parents should not allow their
10    children on these apps until they're
11    at least 16.
12 BY MR. HALPERIN:
13    Q.   Small or otherwise, it is a part
14 of the reason why teens should stay off
15 Instagram, and Snapchat, and TikTok before the
16 age of 18, correct?
17       MS. McNABB: Objection. Form.
18    Asked and answered.
19       THE WITNESS: So the content
20    that the algorithm serves up, yes, is
21    one of the reasons.
22 BY MR. HALPERIN:
23    Q.   Okay. Let's look at page 60 --
24 page 60, please. And actually, if you flip
25 immediately prior, to page 59, this is the

Page 227

1  start of the No List, correct?
2     A.   Yes.
3     Q.   Okay. So if you go to page 60,
4  it says, "'Teens often feel addicted, and know
5  that what they're seeing is bad for their
6  mental health, but feel unable to stop
7  themselves,' concluded Meta's internal
8  research on Instagram," correct?
9     A.   Yes.
10    Q.   And then at the bottom of the
11 page, you describe more internal research that
12 found that 13 percent of British teen users
13 and 6 percent of American teen users who had
14 suicidal thoughts said their desire to kill
15 themselves traced back to Instagram, correct?
16    A.   Yes.
17    Q.   And that internal research,
18 again, is used to support why Instagram and
19 other social media should be on the No List,
20 correct?
21    A.   I would, once again, emphasize
22 that that is only one part of the reason, and
23 there are many others.
24    Q.   It is a reason why teens -- why
25 Instagram and other social media should be on

Page 228

1  the No List, correct?
2     A.   It is a reason.
3     Q.   Okay. Go to page 11, please.
4  You say, "The stories behind these statistics
5  are harrowing." Do you see that?
6     A.   Yes.
7     Q.   "When Alexis Spence was 11, she
8  opened an Instagram account on her iPad
9  without her parents knowing. As Alexis
10 consumed more and more thinspiration content,
11 she began starving herself. By 15, she
12 developed a severe eating disorder, and spent
13 time in a residential treatment center as she
14 battled anorexia and suicidal thoughts." Do
15 you see that?
16    A.   Yes.
17    Q.   And stories like Alexis Spence's
18 also help explain why your rules, like no
19 Instagram or TikTok or Snapchat before the age
20 of 16, are necessary, true?
21       MS. McNABB: Objection. Form.
22       THE WITNESS: I think that
23    needs to be put in the context of the
24    rest of the book, where I say that
25    those are extreme outcomes. And there

Page 229

1     are many other reasons why your
2     children should not be on social
3     media, not just the extreme outcomes.
4  BY MR. HALPERIN:
5     Q.   Are stories like the story of
6  Ms. Spence presented in support of your rules?
7        MS. McNABB: Objection. Form.
8        THE WITNESS: They're presented
9     as part of the book. Partially to let
10    parents know about some of the
11    horrible outcomes that can happen on
12    social media.
13 BY MR. HALPERIN:
14    Q.   And it's stories like
15 Ms. Spence's that help you convey to parents,
16 this is why you should follow my rules,
17 correct, because this is what could happen at
18 the extreme end if you don't, true?
19       MS. McNABB: Objection. Form.
20       THE WITNESS: It is one part --
21    one reason, among many.
22 BY MR. HALPERIN:
23    Q.   Okay. By the time you published
24 this book, you had already been serving as an
25 expert for plaintiffs, true?

58 (Pages 226 - 229)

CONFIDENTIAL

Page 230

1    A.    Yes.
2    Q.    By the time you conceived of the
3  book in the spring of 2024, you had already
4  been serving as an expert for plaintiffs,
5  correct?
6    A.    Yes.
7    Q.    You've read, as part of your work
8  in this case, the MDL plaintiffs' complaint,
9  true?
10    A.    I've read what?
11    Q.    The MDL plaintiffs' complaint in
12  the MDL, true?
13    A.    Yes.
14    Q.    It's on your materials considered
15  list, right?
16    A.    Yeah.
17    Q.    Okay.  Let me hand you a copy.
18  I'll put a sticker on it.  Give me one second.
19  This is going to be Exhibit 15.
20        (Exhibit No. 15 was marked for
21    identification.)
22  BY MR. HALPERIN:
23    Q.    This is the Plaintiffs' Second
24  Amended Master Injury -- Master Complaint, in
25  parentheses, Personal Injury.  Do you see

Page 231

1  that?
2    A.    Yes.
3    Q.    And it was filed in MDL
4  Number 3047, In Re:  Social Media Adolescent
5  Addiction Personal Injury Product Liability
6  Litigation, correct?
7    A.    That's what it says.
8    Q.    Okay.  Go to page 83, please.
9  Paragraph 279.  Let me know when you're there.
10    A.    I'm there.
11    Q.    "This phenomenon was cast into
12  vivid relief when 14-year-old Molly Russell
13  took her own life after viewing reams of
14  content related to suicide, self-injury, and
15  depression on Instagram and several other
16  products."  Do you see that?
17    A.    Yes.
18    Q.    Your book talks about the same
19  tragic suicide as plaintiffs' complaint, true?
20        MS. McNABB:  Objection.  Form.
21        THE WITNESS:  Yes, although if
22    you look in the notes of the book,
23    you'll see that the description that I
24    give came from a news article, not
25    from this complaint.

Page 232

1        MR. HALPERIN:  Move to strike
2    everything after "yes."
3  BY MR. HALPERIN:
4    Q.    Go to page 95, please.  I'm
5  sorry, go to page 91, please.  Paragraph 301.
6  There are two block quotes on the page.  Do
7  you see the second one?
8    A.    Is it the one that begins "In
9  the focus groups"?
10    Q.    Yes.  "In the focus groups, teens
11  told us that they don't like the amount of
12  time they spend on the app, but feel like they
13  have to be present.  They often feel addicted,
14  and know that what they're seeing is bad for
15  their mental health, but feel unable to stop
16  themselves."  Do you see that?
17    A.    Yes.
18    Q.    The same research you present in
19  your book, correct?
20        MS. McNABB:  Objection.  Form.
21        THE WITNESS:  I don't recognize
22    this as being from the book.  What
23    part -- what page of the book has
24    this?
25  BY MR. HALPERIN:

Page 233

1    Q.    Go back to page 60 of the book.
2    A.    Okay, I see it now.
3    Q.    It's the same research as you
4  present in your book, correct?
5    A.    Yeah.
6    Q.    Go to page 95.  Third bullet,
7  "Among teens who reported suicidal thoughts,
8  13 percent of British users and 6 percent of
9  American users traced the desire to kill
10  themselves to Instagram."  Do you see that?
11    A.    Yes.  And I did not learn about
12  that from this complaint.  I learned about it
13  from the documents published in the Wall
14  Street Journal.
15    Q.    I just asked if you saw it.
16    A.    I saw it.
17    Q.    Okay.  The same research that you
18  present in your book, correct?
19    A.    Yeah.
20        MS. McNABB:  Objection.  Form.
21  BY MR. HALPERIN:
22    Q.    I'm going to hand you Exhibit 16.
23        (Exhibit No. 16 was marked for
24    identification.)
25  BY MR. HALPERIN:

59 (Pages 230 - 233)

CONFIDENTIAL

Page 234

1    Q.    This is a complaint brought by
2  Alexis, Kathleen, and Jeffrey Spence in MDL
3  3047, In Re:  Social Media Adolescent
4  Addiction Personal Injury Product Liability
5  Litigation.  Do you see that?
6    A.    Yes.
7    Q.    This is the complaint by Alexis
8  Spence and her parents, correct?
9    A.    Yes.
10    Q.    She alleges, if you look at
11  page 5, anorexia.  Do you see that?
12    A.    I see it.
13    Q.    And she alleges suicidality,
14  which is suicidal thoughts, correct?
15    A.    Yes.
16    Q.    You're offering opinions on
17  behalf of plaintiffs in MDL 3047, including
18  Plaintiff Alexis Spence, true?
19    A.    Let me make sure I understand
20  what you're asking.  Do you mean, are Alexis,
21  Kathleen, and Jeffrey Spence one of the
22  plaintiffs in the MDL?
23    Q.    Are they plaintiffs that you are
24  offering opinions on behalf of as MDL
25  plaintiffs?

Page 235

1    A.    Well, I mean, I'm offering
2  general causation, rather than specific, if
3  that's what you're asking.
4    Q.    But you're not -- you haven't
5  said, I'm only offering opinions on behalf of
6  these MDL plaintiffs, and not these other MDL
7  plaintiffs, right?  Your opinions are being
8  used to support all MDL plaintiffs, true?
9        MS. McNABB:  Objection.  Form.
10        THE WITNESS:  That is my
11    understanding, yes.
12  BY MR. HALPERIN:
13    Q.    Okay.  So your opinions are being
14  used to support the claims of Alexis Spence,
15  true?
16    A.    As she is, and her parents are,
17  one of the plaintiffs, yes.
18    Q.    Your book mentions other
19  plaintiffs in the social media litigation,
20  like Selena Rodriguez and England Roberts,
21  correct?
22    A.    Yes.
23    Q.    Their stories, too, help explain
24  why your 10 Rules for raising kids in a
25  high-tech world are important, correct?

Page 236

1        MS. McNABB:  Objection.  Form.
2        THE WITNESS:  So I wouldn't say
3    it in exactly that way.  That, again,
4    it's only one small part of it.  And
5    that the characterization in the book
6    comes from a news story, not from the
7    complaints.
8  BY MR. HALPERIN:
9    Q.    You include their stories as
10  examples of what could happen if parents don't
11  follow your rules, correct?
12        MS. McNABB:  Objection.  Form.
13  BY MR. HALPERIN:
14    Q.    On the extreme end?
15    A.    I would not necessarily put it
16  that way, no.  I would say, I offer their
17  stories as examples of some of the extreme
18  outcomes that can happen when children and
19  teens use social media.
20    Q.    And don't follow your rules,
21  correct?
22        MS. McNABB:  Objection.  Form.
23        THE WITNESS:  So, again, I
24    would not put it in that way, because
25    the rules are not meant to be, follow

Page 237

1    this or this will happen.  They are
2    meant to help parents try to keep
3    their kids safe, which is an extremely
4    difficult job, given the lack of
5    regulation in this area.
6  BY MR. HALPERIN:
7    Q.    Let me use your phrase.  The
8  stories of England Roberts and Selena
9  Rodriguez are offered as examples of some of
10  the extreme outcomes that can happen when
11  children and teens use social media, correct?
12    A.    Yes.
13    Q.    And they're offered to help
14  explain to parents, Here's why you should
15  follow my rules, correct?
16    A.    Again, I would not put it in
17  that way.
18    Q.    Okay.  You're offering opinions
19  on behalf of England Roberts and Selena
20  Rodriguez as well, correct?
21        MS. McNABB:  Objection.  Form.
22        THE WITNESS:  I believe they
23    are plaintiffs in this case.
24  BY MR. HALPERIN:
25    Q.    And so you're offering opinions

60 (Pages 234 - 237)

Page 238

1 on their behalf, true?
2    A.    That sounds like a -- more like
3 a legal phrasing that I'm not sure I
4 understand.
5    Q.    Are you excluding England Roberts
6 and Selena Rodriguez as plaintiffs on whose
7 behalf you are offering opinions in the MDL?
8        MS. McNABB: Objection. Form.
9        THE WITNESS: No.
10 BY MR. HALPERIN:
11    Q.    Can you tell me where in your
12 10 Rules book, you disclose to parents who
13 might be relying on your guidance that you're
14 getting by plaintiff lawyers to serve as an
15 expert in support of multiple people you talk
16 about in your book?
17    A.    I have never seen a trade book
18 that discloses consulting or financial
19 relationships. It is not standard, or as far
20 as I can tell, ever done in trade books in the
21 way it is in journals.
22    Q.    Is the answer, then, that you do
23 not disclose to parents who might be relying
24 on your guidance, that you're getting paid by
25 plaintiff lawyers to serve as an expert in

Page 239

1 support of multiple people you talk about in
2 your book?
3        MS. McNABB: Objection. Form.
4        THE WITNESS: Correct, because
5    that is not standard, and as far as I
6    know, never done.
7        MR. HALPERIN: Move to strike
8    everything after "correct."
9 BY MR. HALPERIN:
10    Q.    You don't, in your 10 Rules book,
11 disclose to parents who might be relying on
12 your rules that you're getting paid by
13 plaintiff lawyers to support plaintiffs who
14 make the same research allegations you put
15 forward in your book, true?
16        MS. McNABB: Objection. Form.
17        THE WITNESS: I've been doing
18    research in this area for a decade,
19    and my conclusions were formed before
20    I was retained.
21        MR. HALPERIN: Move to strike
22    as nonresponsive.
23 BY MR. HALPERIN:
24    Q.    In your 10 Rules book, you don't
25 disclose to parents who might be relying on

Page 240

1 your rules that you're getting paid by
2 plaintiff lawyers to support plaintiffs who
3 make the same research allegations you put
4 forward in your book, true?
5        MS. McNABB: Objection. Form.
6    Asked and answered.
7        THE WITNESS: I've already
8    answered your question.
9 BY MR. HALPERIN:
10    Q.    What's the answer to my question?
11    A.    The answer is, it's a very small
12 part of the book. I formed my opinions long
13 before I was retained, and it is not standard
14 to give conflict of interest disclosures in a
15 trade book.
16    Q.    You do not disclose to parents
17 who might be relying on your findings that
18 you're getting paid by plaintiff lawyers to
19 support plaintiffs who make the same research
20 allegations you put forward in your book, do
21 you?
22        MS. McNABB: Objection. Form.
23        THE WITNESS: I have answered
24    that question at least five times.
25 BY MR. HALPERIN:

Page 241

1    Q.    Do you disclose it, yes or no?
2        MS. McNABB: Greg, asked and
3    answered.
4        MR. HALPERIN: Asked, but not
5    answered.
6        MS. McNABB: It has been
7    answered. You can look at the
8    transcript.
9 BY MR. HALPERIN:
10    Q.    Do you disclose it, yes or no?
11    A.    No.
12    Q.    As Mr. Blaschke asked you, you
13 give a variety of reasons of why social media
14 is "so bad" in your book, correct?
15    A.    Can you point me out to where
16 that is?
17    Q.    Sure. Look at page starting 51.
18 It goes all the way to 59. There is a
19 heading, "What's so bad about social media?"
20 Correct?
21    A.    Yes.
22    Q.    Among other things, you talk
23 about something called the time sink on
24 page 55, correct?
25    A.    Yes.

61 (Pages 238 - 241)

CONFIDENTIAL

Page 242

1    Q.    You talk about sexualization of
2  girls and women, correct?
3    A.    Yes.
4    Q.    You talk about competition for
5  likes and followers?
6    A.    Yes.
7    Q.    You talk about social comparison?
8    A.    Yes.
9    Q.    You talk about mental health
10  issues, correct?
11    A.    Yes.
12    Q.    You understand from reading the
13  complaint that the plaintiffs make all of
14  those allegations in this lawsuit?
15      MS. McNABB:  Objection.  Form.
16  Foundation.
17      THE WITNESS:  Maybe because
18    they're true.
19  BY MR. HALPERIN:
20    Q.    Do you understand that they are
21  making those allegations?
22      MS. McNABB:  Objection.  Form.
23  And foundation.
24      THE WITNESS:  This is a very,
25    very long document, so I would have to

Page 243

1    go back through it to see all of the
2    accusations.
3  BY MR. HALPERIN:
4    Q.    You read it, right?
5    A.    I'm sure I read it at one time.
6  However, it is very, very long, and the
7  details of it are not going to be at front of
8  mind, unless we point to a specific section,
9  and I have it in front of me.
10    Q.    Okay.  You don't, anywhere in
11  your 10 Rules book, disclose to parents that
12  you're getting paid by plaintiff lawyers to
13  support plaintiffs who are making allegations
14  that social comparison, or time sink, or
15  sexualization of minors, or competition for
16  likes, or social comparison, or mental health
17  issues, correct?
18      MS. McNABB:  Objection.  Asked
19  and answered.
20      THE WITNESS:  I have answered
21    that question several times now.
22  BY MR. HALPERIN:
23    Q.    Is the answer you don't disclose
24  that?
25    A.    No.

Page 244

1    Q.    Okay.  You're in the middle of a
2  book tour in connection with 10 Rules,
3  correct?
4    A.    No.  Book tours haven't been
5  done for about 30 years.
6    Q.    Okay.  You're in the middle of
7  going on podcasts and other media to discuss
8  your book, correct?
9    A.    Yes.
10    Q.    Okay.  In any of the interviews
11  or media appearances you've done in connection
12  with 10 Rules, have you disclosed to the
13  public that you're getting paid by plaintiff
14  lawyers to support plaintiffs who are making
15  the same allegations you make in your book?
16      MS. McNABB:  Objection.  Form
17  and foundation.
18      THE WITNESS:  So I have done
19    many, many podcasts.  I believe I have
20    mentioned that I was retained as an
21    expert in this case at least once but
22    I would be very hard-pressed to point
23    out exactly which one.  But I believe
24    I have discussed that in at least one
25    case.  And I would also note that

Page 245

1    podcasts, again, similar to trade
2    books, it is not standard or ever done
3    really to have a conflict of interest
4    disclosure at the beginning of a
5    podcast.  I don't think I've ever seen
6    that.
7  BY MR. HALPERIN:
8    Q.    Can you tell me what podcast you
9  disclosed that you're serving as an expert?
10    A.    I cannot.  I've done so many.  I
11  can't remember.
12    Q.    Do you make a habit when you do
13  podcasts or media appearances in connection
14  with 10 Rules of disclosing to the public that
15  you're being paid by plaintiff lawyers to
16  support plaintiffs making the same allegations
17  you make in your book?
18      MS. McNABB:  Objection.  Form.
19      THE WITNESS:  No.  Because that
20    is not standard.
21  BY MR. HALPERIN:
22    Q.    Would the fact that you're
23  getting paid hundreds of thousands of dollars
24  by plaintiff lawyers be relevant to the public
25  in evaluating the claims you make in your

62 (Pages 242 - 245)

CONFIDENTIAL

Page 246

1 book?
2        MS. McNABB: Objection. Form.
3    Foundation.
4        THE WITNESS: No. Because I
5    formed these opinions before I was
6    retained.
7 BY MR. HALPERIN:
8    Q.   Okay. We'll let the jury decide
9 that.
10       MS. McNABB: Objection to the
11   argumentative statement.
12 BY MR. HALPERIN:
13   Q.   During your last deposition, you
14 were -- you testified that you were retained
15 in July of 2024. Do you recall that?
16   A.   Yes.
17       MR. HALPERIN: We will mark this
18 as Exhibit 17.
19       (Exhibit No. 17 was marked for
20       identification.)
21 BY MR. HALPERIN:
22   Q.   This is an article you authored
23 with Jessica Hamilton. Do you see that?
24   A.   Yes.
25   Q.   And it was published on

Page 247

1 August 11, 2022. Do you see that on the
2 bottom left-hand corner of page 1?
3        MS. RITTER: On behalf of New
4    Mexico, is there a copy of these for
5    the screen for other counsel at the
6    table?
7        MR. HALPERIN: There are not
8    screen copies, but there's an
9    additional paper copy that we can pass
10   out.
11       MS. RITTER: I think that would
12   be the standard practice at
13   depositions.
14 BY MR. HALPERIN:
15   Q.   Do you see that this was
16 published on August 11, 2022, at the bottom
17 of -- bottom left-hand corner of page 1?
18   A.   Yes.
19   Q.   Okay. Go to the conflict of
20 interest disclosures here called "Declaration
21 of competing interest" on the bottom of
22 page 10.
23   A.   Yes.
24   Q.   "JMT" --
25       That's you?

Page 248

1    A.   Yes.
2    Q.   -- "has received speaking
3 honoraria for presenting research, has
4 consulted for law firms and state attorneys
5 general about social media and mental health."
6        Do you see that?
7    A.   Yes.
8    Q.   By August 2022, had you been
9 retained by state attorneys general in
10 connection with this litigation?
11   A.   So that's a tough question to
12 answer, because yes, I was retained officially
13 for the MDL in whatever it was you said, July
14 2024, but I had started doing work for the
15 plaintiff attorneys and the state attorneys
16 general before that. It just was before it
17 was consolidated. That's my understanding of
18 it. I may be wrong on some of the details
19 there.
20   Q.   Okay. So were you first retained
21 by lawyers bringing lawsuits against social
22 media companies in connection with teen mental
23 health?
24   A.   I think the very first
25 retention -- this is a while ago, my memory

Page 249

1 may be off. But I think it might have been
2 November 2021.
3    Q.   November 2021 is when you believe
4 you were first retained, correct?
5    A.   Yes. And that was by plaintiff
6 attorneys, not by state attorneys general.
7    Q.   Who -- what plaintiff attorney
8 retained you first?
9    A.   Matt Bergman.
10   Q.   Of Social Media Victims Law
11 Center?
12   A.   Yes.
13   Q.   Who retained you next?
14   A.   It would have been the attorneys
15 general.
16   Q.   What attorneys general retained
17 you and when?
18   A.   Oh, I think it was Chris Dunbar
19 who was in charge of the contract, and I could
20 not say what the date of that contract was. I
21 believe it was sometime in 2022, but I don't
22 know exactly when.
23   Q.   Have you been retained by any
24 other private counsel besides Social Media
25 Victims Law Center in connection with the

Page 250

1 social media litigation?
2     A.    I think Beasley Allen had
3 reached out to me by some point in 2022, but,
4 again, I can't recall exactly when.
5     Q.    Do you have separate agreements
6 with Social Media Victims Law Center and
7 Beasley Allen?
8     A.    I did, but since they're now
9 part of the MDL, I believe those have been
10 merged together.
11     Q.    Do you have any other agreements
12 with private lawyers?
13     A.    With private lawyers, I don't
14 believe so, no.
15     Q.    Apart from Tennessee, do you have
16 agreements with other attorneys general?
17     A.    Yes.
18     Q.    What attorneys general?
19     A.    Massachusetts, Arkansas, and
20 then I have also worked with the attorneys
21 general office of Florida and indirectly with
22 the attorneys general of Louisiana.
23     Q.    Anyone else?
24     A.    Just trying to rack my brain.
25 That's what I can recall at the moment.

Page 251

1     Q.    You -- New Mexico --
2     A.    Yes --
3     Q.    -- is here?
4     A.    -- New Mexico, of course.
5 Sorry.
6     Q.    Do you have an agreement with
7 them?
8     A.    Yes.
9     Q.    Anyone else that you can recall?
10     A.    No.
11     Q.    Okay.  If you remember anyone
12 else, let me know please --
13     A.    I will.
14     Q.    -- while we're here today.
15         Let me refresh -- see if I can
16 help refresh your recollection on a start
17 date.  This will be Exhibit 18.
18         (Exhibit No. 18 was marked for
19         identification.)
20 BY MR. HALPERIN:
21     Q.    This is an article that you
22 co-authored that was -- I'm sorry.  I handed
23 you the wrong document.  I can take that one
24 back.  I can take this one back.
25         MR. HALPERIN:  Does one of

Page 252

1 those have highlighting on it?  If so,
2 I may have handed you mine.
3         MS. McNABB:  Yes.  Here.  Do
4 you want me to just --
5         MR. HALPERIN:  Yeah, let me
6 give you this one.  Sorry about that.
7         MS. McNABB:  Okay.  There you
8 go.
9         THE WITNESS:  Thank you.
10 BY MR. HALPERIN:
11     Q.    All right.  This is Exhibit 18
12 and this was published -- available online on
13 May 18th, 2022.
14     A.    Yeah.
15     Q.    And it was received in March of
16 2022.
17         Do you see that?
18     A.    Yes.
19     Q.    If you go to the conflict of
20 interest disclosures on page 535, it says,
21 "Dr. Twenge has received speaking honoraria
22 from various organizations, has consulted for
23 law firms about social media and mental
24 health, and has authored several books."
25         Do you see that?

Page 253

1     A.    Yes.
2     Q.    Does this tell you whether you
3 had been retained by state attorneys general
4 as of May 18th, 2022?
5     A.    Considering it says consulted
6 for law firms, I don't think we can tell from
7 that, no.
8     Q.    So you don't know whether it was
9 before or after --
10     A.    I don't.
11     Q.    -- May of 2022?
12     A.    I don't.
13     Q.    Okay.  But by then and even
14 earlier, you believe you had already been
15 retained by private law firms including SMVLC
16 and Beasley Allen, correct?
17     A.    Yes.  And I think there was
18 another firm in there too, Motley Rice,
19 perhaps, that I had forgotten to mention
20 earlier.
21     Q.    Okay.  Anyone else while we're
22 here that --
23     A.    That's all I can recall.  As I'm
24 sure you know, sometimes the law firm names
25 blend together.

64 (Pages 250 - 253)

CONFIDENTIAL

Page 254

1    Q.   We all sound alike.
2    A.   Yes.
3    Q.   We have not received any invoices
4 from prior to April of 2024.  I'm sorry.
5 We've not received any invoices from prior to
6 July of 2024.  Are there invoices to any of
7 the law firms or attorneys general that you
8 just mentioned from prior to July of 2024?
9    A.   Yes.  I invoiced them for work
10 before that time, yes, before they were -- it
11 was all consolidated.
12    Q.   Okay.  Those invoices were
13 requested by the notice; they should have been
14 produced.  We'd ask for their immediate
15 production.
16    MS. McNABB:  Greg, I can
17    represent that we produced the
18    invoices that were relevant to the MDL
19    and we've produced the invoices that
20    we've received as part of the MDL
21    which is what the notice was asking
22    for.
23    MR. HALPERIN:  I don't think
24    that's right.  We can talk about it
25    off the record.

Page 255

1 BY MR. HALPERIN:
2    Q.   Can you estimate how much you
3 have been paid by lawyers bringing suits
4 against social media companies prior to July
5 of 2024?
6    A.   I could not give an estimate on
7 that, no.
8    Q.   Would it be more than $100,000?
9    A.   I doubt it, but I don't know for
10 sure.
11    Q.   Would it be more than $50,000?
12    A.   No idea.
13    Q.   Okay.  We are going to ask that
14 those invoices be immediately produced.  We
15 are also going to hold open the deposition for
16 failure to produce them.
17    MS. McNABB:  And we'll object.
18 BY MR. HALPERIN:
19    Q.   Let's look at the invoices that
20 you have produced that were given to us last
21 night.
22    MR. HALPERIN:  And we don't
23    have an extra copy of this one because
24    we printed it at the hotel when it was
25    produced at 9 p.m. last night.

Page 256

1    MS. McNABB:  In response to the
2    notice that we received not even 24
3    hours before.
4    MR. HALPERIN:  I don't think
5    that timing is right, but okay.
6    MS. McNABB:  And that would
7    have been 9 Eastern.  It was produced
8    well before 6 Pacific.
9    MR. HALPERIN:  I was already on
10    a flight.  But that's fine.  We don't
11    need to argue about it on the record.
12    (Exhibit No. 19 was marked for
13    identification.)
14 BY MR. HALPERIN:
15    Q.   I've added up the invoices in
16 Exhibit 19 from August 1, 2024, through August
17 11, 2025.  That's the temporal scope of these
18 invoices, correct?
19    A.   I believe so, yes.
20    Q.   That's just over a year, right?
21    A.   Yes.
22    Q.   And when I add up all the numbers
23 here, I get $144,650.  Does that sound
24 accurate?
25    A.   Sure.

Page 257

1    Q.   And when we were together last
2 time, you told Ms. Lehman that your salary,
3 your annual salary, is approximately $150,000,
4 correct?
5    A.   Which annual salary?  From whom?
6    Q.   Your annual salary from the
7 university where you are a professor, correct?
8    A.   So that may be a little
9 confusing because I'm a professor at San Diego
10 State, but I'm on leave this semester, and I'm
11 working for the University of Florida instead.
12 But, yes, that's my SDSU annual salary,
13 although it will be less this year.
14    Q.   Okay.  So your work as a paid
15 plaintiff expert nearly doubled your annual
16 San Diego State salary, correct?
17    MS. McNABB:  Objection.  Form.
18    THE WITNESS:  I wouldn't look
19    at it that way, considering that I
20    also publish books and do speaking
21    engagements, so I don't really think
22    of the work in that way.  I would not
23    necessarily compare it to that one
24    other source of income.
25 BY MR. HALPERIN:

65 (Pages 254 - 257)

CONFIDENTIAL

Page 258

1    Q.    Okay.  But just as a mathematical
2   matter, your work over the last 12 months and
3   11 days nearly totaled your work as a
4   professor for San Diego State University,
5   correct?
6         MS. McNABB:  Objection.  Form.
7         THE WITNESS:  Yes.  Not at all
8    surprising, however, given how poorly
9    we're paid.
10  BY MR. HALPERIN:
11   Q.    What is your total annual income,
12  including speaking engagements, publishing
13  books, et cetera, exclusive of your work as an
14  expert?
15   A.    I have no idea.  I let my
16  husband deal with all of the financial tax
17  documents.  I earn the money.
18   Q.    Do you earn -- setting aside your
19  work as a paid plaintiff expert, do you earn
20  annually more than $500,000?
21       MS. McNABB:  Objection.  Form.
22       THE WITNESS:  Can you word that
23    in a different way?
24  BY MR. HALPERIN:
25   Q.    Sure.  Setting aside the income

Page 259

1   that you've earned over the past year and even
2   before that, unbeknownst to us, setting aside
3   the income you've earned testifying as a paid
4   plaintiff expert, do you earn annually more
5   than $500,000 from all of your income sources?
6         MS. McNABB:  Objection.  Form
7    and argumentative.
8         THE WITNESS:  So you mean from
9    my professorship, from my speaking
10    engagements, from the royalties of
11    books, from other types of consulting;
12    so all -- all told, does my income
13    from those sources add up to more than
14    500K a year?
15  BY MR. HALPERIN:
16   Q.    Correct.
17   A.    Yes.
18   Q.    Does it total more than a million
19  a year?
20   A.    I don't think so, but I don't
21  know for sure.
22   Q.    Does it total more than 750,000 a
23  year?
24   A.    I couldn't tell you.
25   Q.    So you can't tell us anything

Page 260

1   other than it's more than a million but -- or
2   excuse me -- that it's more than 500,000 but
3   probably less than a million?
4         MS. McNABB:  Objection.
5         THE WITNESS:  It's my husband
6    who has the MBA, not me.
7   BY MR. HALPERIN:
8    Q.    The $144,650, does that include
9   any amounts you billed to Tennessee over that
10  same time frame?
11   A.    Directly to Tennessee, well --
12  so yes and no.  Tennessee has been handling
13  much of the invoicing, but I did work on a
14  separate report for them with some Tennessee
15  specific data and, no, that's not included
16  here.
17   Q.    And the reason I ask is these
18  invoices are all addressed to specific people,
19  either Kelly McNabb or Jared Rinehimer, and
20  Grace Yuh.  I think that's the only people
21  that these invoices are -- are directed to,
22  correct?
23   A.    Yes.
24   Q.    Does this -- does the amount in
25  Exhibit 19 include amounts that you've billed

Page 261

1   Tennessee, or is that additional to
2   Exhibit 19?
3    A.    That's additional, although it's
4   not tremendously much.  But, yes, there are
5   additional amounts billed specifically to
6   Tennessee for the Tennessee specific report.
7    Q.    Let me hand you a copy of your
8   Tennessee report, which will be Exhibit 20.
9         MR. HALPERIN:  I think one of
10    those copies, Exhibit D may have
11    fallen off, so whoever's it is can
12    just attach this to the end.
13       THE WITNESS:  I have it.
14       (Exhibit No. 20 was marked for
15    identification.)
16  BY MR. HALPERIN:
17   Q.    If you go to Exhibit C, towards
18  the end of that document there's a statement
19  of compensation.
20       Do you see that?
21   A.    Yes.
22   Q.    There's an additional $8,327
23  billed specifically for your Tennessee report.
24       Do you see that?
25   A.    Yes.

66 (Pages 258 - 261)

Page 262

1    Q.    Would that be in addition to
2  144,650?
3    A.    Yes.
4    Q.    Okay.  I'm going to hand you one
5  more.  This will be Exhibit 21.
6        (Exhibit No. 21 was marked for
7    identification.)
8  BY MR. HALPERIN:
9    Q.    Do you recognize Exhibit 21?
10   A.    Well, the first part of it is a
11 response to requests written by the attorneys.
12   Q.    Did they show you that before it
13 was provided to us?
14   A.    I -- I believe so, although I
15 think I may have seen the MDL version when --
16   Q.    Okay.  Well, look at --
17       THE COURT REPORTER:  I'm sorry.
18 The MDL version when --
19       MR. HALPERIN:  I think she said
20 this one may be slightly different.
21       MS. McNABB:  This one may be
22 slightly different.
23 BY MR. HALPERIN:
24   Q.    Look with me at page 13, please.
25       Do you see it says, Tennessee

Page 263

1  compensation earned June 6 to August 20, 2025,
2  $4,350, correct?
3    A.    Yes.
4    Q.    So your -- the additional amount
5  that you've been paid to date from Tennessee
6  is the 8,327 plus the 4,350, correct?
7    A.    I don't know if that's true.  I
8  don't know if this part was also included in
9  that 8,000 whatever dollars, I'm not sure.
10   Q.    Well, look with me at Exhibit 20.
11 Do you see it's dated June 6, 2025?
12   A.    Yes.
13   Q.    So it, obviously, couldn't
14 include time billed after June 6, 2025, right?
15   A.    If that's the correct date, then
16 yes, correct.
17   Q.    So your Tennessee income is the
18 8,327 plus 4,350, correct?
19   A.    Yes.
20   Q.    Which is just shy of $13,000,
21 correct?
22   A.    Yes.
23   Q.    And we need to add that 13,000 to
24 the 144,650, correct?
25       MS. McNABB:  Objection.

Page 264

1        THE WITNESS:  Yes.
2  BY MR. HALPERIN:
3    Q.    So that takes us through MDL,
4  JCCP, and Tennessee, correct?
5    A.    Mm-hmm.
6    Q.    Is there a separate -- your
7  amounts for Massachusetts are also included in
8  Exhibit 19, correct?  Some of these bills are
9  directed to lawyers from Massachusetts, right?
10   A.    Yes.  Although I believe that
11 there was a separate billing for the
12 Massachusetts specific work which is not here.
13   Q.    Okay.  How much have you
14 additionally billed Massachusetts?
15   A.    I would have to look that up to
16 know.
17   Q.    More than 10,000?
18   A.    No.
19   Q.    More than 5,000?
20   A.    It might have been around 5,000.
21 I just don't remember.
22   Q.    How about Arkansas, additional
23 bills to the State of Arkansas?
24   A.    It'd be -- it'd be similar.
25   Q.    About 5,000?

Page 265

1    A.    Yeah, I think so.
2    Q.    How about New Mexico, additional
3  bills to New Mexico?
4    A.    I have not yet invoiced New
5  Mexico, so I couldn't give you a number on
6  that one.
7    Q.    Are there amounts that you will
8  be billing New Mexico?
9    A.    Yes.
10   Q.    Do you have a ballpark of how
11 much you will be billing New Mexico?
12   A.    I do not know.
13   Q.    Would it be more than 10,000?
14   A.    I doubt it.
15   Q.    Would it be more than 5,000?
16   A.    Possibly.  Not sure.
17   Q.    If we add up the various amounts
18 we've been talking about, it sounds like all
19 told from the JCCP, the MDL, Tennessee,
20 Massachusetts, Arkansas, and New Mexico,
21 you've earned about $200,000 or so since
22 August of 2024.  Does that sound about right
23 to you?
24       MS. McNABB:  Objection.  Form.
25       THE WITNESS:  I'd have to check

CONFIDENTIAL

Page 266

1     the math on that.
2  BY MR. HALPERIN:
3     Q.    Okay.  Well, it's 144 -- 144,650
4  plus 8,327 plus 4,350 plus 5,000 plus 5,000
5  plus possibly more than 5,000.  So --
6            MS. McNABB:  Objection.
7  BY MR. HALPERIN:
8     Q.    You tell me about what that is.
9     A.    It sounds like it's a little
10  less than 200K, but it's probably about right.
11     Q.    So a little less than $200,000
12  you've earned testifying against social media
13  companies since August 1, 2024, correct?
14            MS. McNABB:  Objection.  Form.
15            THE WITNESS:  Yes.
16            MS. McNABB:  And misstates the
17  documents.
18  BY MR. HALPERIN:
19     Q.    Now, look with me, if you will,
20  please, at the invoices, Exhibit 19.  Starting
21  in July of 2025, you split your bills between
22  Lieff Cabraser and the Massachusetts AG.
23            Do you see that?
24     A.    Yes.
25     Q.    At various percentages that have

Page 267

1  changed over time, correct?
2     A.    Yes.
3     Q.    How did you -- why did you decide
4  to start splitting your bills like that?
5     A.    So that was how the attorneys
6  worked it out amongst themselves.  I don't
7  have knowledge of exactly how they negotiated
8  that.
9     Q.    So the attorneys picked those
10  percentages, not you; is that accurate?
11     A.    Yes.
12     Q.    Okay.  If you look at the July
13  invoice, there's an entry for testimony, 8.5
14  hours.
15            Do you see that?
16     A.    Yes.
17     Q.    And it says, 3.655 hours at $750
18  an hour for MDL/JCCP, correct?
19     A.    Yes.
20     Q.    And 4.845 hours at $750 for the
21  AGs, correct?
22     A.    Yes.
23     Q.    The only testimony you gave in
24  July of 2025 was the deposition that was taken
25  in this room in the JCCP, correct?

Page 268

1     A.    Yes.
2     Q.    There are no AGs in the JCCP, are
3  they?
4     A.    I -- I don't know.  I guess not.
5  This is how the attorneys decided to work it
6  out.
7     Q.    So you billed the AGs 57 percent
8  of your testimony for a case that they are not
9  in, correct?
10            MS. McNABB:  Objection.  Form.
11            THE WITNESS:  I think that
12  misstates how this was done.
13            I was not privy to these
14  negotiations behind the scenes, and
15  I'm sure they had a reason for why
16  they divided it in that way.
17  BY MR. HALPERIN:
18     Q.    Is what I said factually true,
19  that you billed the AGs 57 percent for the
20  testimony in a case that they are not in?
21            MS. McNABB:  No.  Objection to
22  form and foundation.
23            THE WITNESS:  I don't know --
24            MR. HALPERIN:  To the extent
25  the lawyer began that with no, which I

Page 269

1  think she did, it's inappropriate for
2  the lawyer to be answering a question.
3            MS. McNABB:  Objection.  It
4  misstates the document.
5            THE WITNESS:  So, again, I
6  wasn't the one who negotiated this
7  split, so I don't think I can answer
8  your question.
9  BY MR. HALPERIN:
10     Q.    Can you tell me whether you
11  billed AGs for testimony in a case they are
12  not in?
13            MS. McNABB:  Objection.
14  Misstates the document.
15            THE WITNESS:  I billed my time
16  and the attorneys decided how to split
17  it.
18  BY MR. HALPERIN:
19     Q.    Now, you've been deposed in
20  several other cases on behalf of AGs in cases
21  not directly against social media companies,
22  correct?
23     A.    Well, I've been deposed in two
24  cases where the plaintiff was NetChoice which
25  represents social media companies.

68 (Pages 266 - 269)

CONFIDENTIAL

Page 270

1    Q.    Those cases involve NetChoice,
2  not social media companies themselves,
3  correct?
4    A.    Yes.
5    Q.    Those cases -- you were deposed
6  first in a case called NetChoice v. Moody,
7  correct?
8    A.    Yes.
9    Q.    And there you were testifying as
10  an expert for the Florida Attorney General,
11  Ashley Moody, correct?
12    A.    Yes.
13    Q.    NetChoice versus Murrill, you
14  testified as an expert for the Louisiana
15  Attorney General Liz Murrill, correct?
16    A.    Yes.
17    Q.    And you submitted a -- was it a
18  disclosure in NetChoice versus Reyes, or an
19  affidavit of some sort?
20    A.    I think I know what you're
21  referring to.  Do you mean not my report but
22  the declaration about how the opposing expert
23  made up his quotes and citations apparently
24  from using AI?
25    Q.    You were -- you served a

Page 271

1  declaration in NetChoice versus Sean Reyes
2  where you were -- where you served that
3  declaration on behalf of the Attorney General
4  of Utah, Sean Reyes, correct?
5    A.    Oh, you're referring to the Utah
6  case.  Yes, I did.
7    Q.    Okay.  You were paid by attorneys
8  general in all three of those cases, correct?
9    A.    In Louisiana, I worked with a
10  firm that works with the Louisiana AGs, so it
11  wasn't completely direct.
12    Q.    Did the AGs pay the check at the
13  end of the day, whether it passed through
14  another firm?
15    A.    I believe it did pass through
16  another firm.  But I -- I don't know.  I don't
17  know the behind-the-scenes negotiations that
18  went on.
19    Q.    Okay.  Let me try it this way:
20  Were you paid by the Florida attorney generals
21  office?
22    A.    Yes.
23    Q.    Were you paid by the Utah
24  attorney generals office?
25    A.    Yes.

Page 272

1    Q.    Were you paid to testify on
2  behalf of the Louisiana attorney generals
3  office?
4    A.    On behalf of, yes.
5    Q.    Okay.  How much income did you
6  earn from those testifying engagements?
7    A.    Okay.  So for Louisiana, it was
8  about $25,000.  And it was only that much
9  because the expert on the other side made up
10  his citations, so I had to spend quite a lot
11  of time tracking those down and trying to
12  figure out what happened.
13          For the others, it's been long
14  enough I don't think I could give you the
15  numbers.  The Louisiana one was the most
16  recent.  That's why that number is more front
17  of mind.
18    Q.    So 25,000 for Louisiana?
19    A.    Yes.
20    Q.    And something less than 25,000
21  for Florida?
22    A.    I don't know what the Florida
23  one was.  I would have to go look at those
24  invoices, and I don't have them in front of
25  me.

Page 273

1    Q.    Do you have those invoices saved
2  on -- at your home or on your computer
3  someplace?
4    A.    I believe so.
5    Q.    Okay.
6          MR. HALPERIN:  We're going to
7      ask that those be produced.  We think
8      they were within the scope of our
9      deposition notice.
10          MS. McNABB:  And we'll object.
11  BY MR. HALPERIN:
12    Q.    The Utah Attorney General, can
13  you tell me how much you earned testifying on
14  behalf of the Utah Attorney General?
15    A.    So I didn't testify.  I mean, I
16  wasn't on -- it was a report.
17    Q.    You understand that a declaration
18  is a form of written testimony?
19          MS. McNABB:  Objection.  Form.
20          THE WITNESS:  So I couldn't
21      tell you because that was longer ago
22      and I don't have that number in my
23      head.
24  BY MR. HALPERIN:
25    Q.    Okay.  But you did provide

69 (Pages 270 - 273)

Page 274

1 written testimony on behalf of the Utah
2 Attorney General, correct?
3    A.   Yes.
4    Q.   And you can't tell me how much
5 you were paid for that testimony, correct?
6    A.   I cannot.
7    Q.   Okay.
8       MR. HALPERIN:  Again, we'll ask
9 that those invoices be produced.
10      (Exhibit No. 22 was marked for
11   identification.)
12 BY MR. HALPERIN:
13   Q.   I will hand you what I've marked
14 as Exhibit 22.  This is a book chapter that
15 you wrote in the 2025 edition of the "Handbook
16 of Children and Screens"; is that right?
17   A.   Yes.
18   Q.   It's titled "Social Media and
19 Depressive Symptoms"?
20   A.   Yes.
21   Q.   That's something you're getting
22 paid by plaintiff lawyers to offer opinions
23 about in this case, right, the relationship
24 between social media and depressive symptoms?
25      MS. McNABB: Objection.  Form.

Page 275

1       THE WITNESS:  Yes.  That's what
2    my report was focused on.
3 BY MR. HALPERIN:
4    Q.   Look at page 139, please.  It
5 says, "Conflict of Interest and Funding
6 Disclosures."
7       Do you see that?
8    A.   Yes.
9    Q.   Can you tell me what it says
10 there?
11   A.   It says "none."
12   Q.   That's not accurate, is it?
13      MS. McNABB: Objection.  Form.
14      THE WITNESS:  That may have
15   been an oversight either on the part
16   of me or the fact that this was not a
17   journal.  So I think what may have
18   happened here is that this was
19   originally set to be published
20   somewhere else and then was published
21   as part of this handbook, and that may
22   have gotten lost in the shuffle.
23   Because it is usually my -- my policy
24   to do those disclosures.
25 BY MR. HALPERIN:

Page 276

1    Q.   It's not accurate, correct?
2       MS. McNABB:  Objection.  Form.
3    Asked and answered.
4       THE WITNESS:  Yes.
5 BY MR. HALPERIN:
6    Q.   I will hand you another one.
7 This is going to be Exhibit 23.
8       (Exhibit Nos. 23 and 23A were
9    marked for identification.)
10 BY MR. HALPERIN:
11   Q.   This is another chapter from that
12 same Handbook of Children and Screens from
13 earlier this year in 2025, correct?
14   A.   Yes.
15   Q.   It's titled "Media Influences on
16 Self-Harm, Suicidality, and Suicide," correct?
17   A.   Yes.
18   Q.   And if you look at the bottom
19 right-hand corner of page 1, it says, "In this
20 summary chapter, we review current evidence on
21 SSITBs."
22      Do you see that?
23   A.   Yes.
24   Q.   SSITBs are suicidal and
25 self-injurious thoughts and behaviors,

Page 277

1 correct?
2    A.   Yes.
3    Q.   And so in this summary chapter,
4 "We review current evidence on suicide and
5 self-injurious thoughts and behaviors and
6 three dominant forms of media," one of which
7 is social media use, correct?
8    A.   Yes.
9    Q.   Let's look at the conflict of
10 interest and funding disclosures in this
11 chapter, page 145.  It says, "JN writes," and
12 then it provides a disclosure for JN.
13      Do you see that?
14   A.   Yes.
15   Q.   JN is Jacqueline Nesi, correct?
16   A.   Yes.
17   Q.   Last sentence:  "No other authors
18 reported a conflict of interest."
19      Do you see that?
20   A.   Yes.
21   Q.   That would include yourself,
22 correct?
23   A.   Yes.
24   Q.   You have a conflict of interest,
25 correct?

70 (Pages 274 - 277)

CONFIDENTIAL

Page 278

1       MS. McNABB: Objection. Form.
2    Argumentative.
3       THE WITNESS: It heavily
4    depends on how you define a conflict
5    of interest. This is the same
6    handbook as the previous one where
7    that was an oversight on my part.
8    BY MR. HALPERIN:
9       Q.    Well, let me ask you: Are you
10   being funded by plaintiff lawyers to talk
11   about the evidence on suicide and
12   self-injurious thoughts and behaviors and
13   social media use?
14      A.    I was funded to write a report
15   about --
16      Q.    On that topic, correct?
17      A.    Not -- not exactly on that
18   topic, no, but --
19      Q.    Does your report --
20      MS. McNABB: Greg, she wasn't
21   finished. Just let her finish her
22   answer, and then you can ask a
23   question.
24      MR. HALPERIN: I thought she
25   was finished.

Page 279

1    BY MR. HALPERIN:
2       Q.    Go ahead, Doctor.
3       A.    I'm just saying that the report
4    goes beyond what is here in this article, and
5    that the report was not solely on self harm,
6    suicidality, and suicide.
7       Q.    No dispute about that. Does your
8    MDL report cover the topic of the relationship
9    between social media use and suicide and
10   self-injurious thoughts and behaviors?
11      A.    Yes.
12      Q.    Okay. And you were funded by
13   plaintiff lawyers to prepare a report
14   including on that topic, correct?
15      MS. McNABB: Objection. Form.
16      THE WITNESS: Yes.
17   BY MR. HALPERIN:
18      Q.    Let's look at one more chapter
19   from this book. And I'm out of exhibit
20   stickers.
21      I've handed you another chapter
22   from the 2025 edition of the Handbook of
23   Children and Screens that I've marked as
24   Exhibit 23.
25      Do you see that?

Page 280

1       A.    Yes.
2       Q.    And this one you did not author,
3    correct?
4       A.    Correct.
5       Q.    Look at the conflict of interest
6    disclosure from these authors starting on page
7    96. Are you with me?
8       A.    Yes.
9       Q.    J-PA, Jon-Patrick Allem.
10      Do you see that?
11      A.    Yes.
12      Q.    "Jon-Patrick Allem has received
13   fees for consulting services in court cases
14   pertaining to the content on social media
15   platforms."
16      Do you see that?
17      A.    Yes.
18      Q.    I'm sorry. I didn't pass out a
19   copy.
20      Another author disclosed serving
21   as an expert in litigation related to social
22   media as a conflict of interest and funding
23   disclosure, correct?
24      MS. McNABB: Objection. Form.
25      THE WITNESS: Yes.

Page 281

1    BY MR. HALPERIN:
2       Q.    You did not in either of your two
3    chapters, correct?
4       MS. McNABB: Objection. Form.
5       THE WITNESS: Correct.
6    BY MR. HALPERIN:
7       Q.    Now, the authors of this handbook
8    are Dr. Christakis and Dr. Hale, true?
9       A.    Yeah. Well, no. They're the
10   editors.
11      Q.    I'm sorry. I misspoke. The
12   editors of this book are Dr. Christakis and
13   Dr. Hale, correct?
14      A.    Yes.
15      Q.    Do you understand that they too
16   are serving as experts for plaintiffs in
17   social media litigation?
18      A.    Yes.
19      MS. McNABB: Objection. Form.
20      Foundation.
21   BY MR. HALPERIN:
22      Q.    Do you know them from your work
23   in this case?
24      A.    I met Dr. Hale at a conference
25   before this litigation occurred. It was

71 (Pages 278 - 281)

CONFIDENTIAL

Page 282

1 perhaps in 2018. I don't believe I have ever
2 met Dr. Christakis in person.
3      Q.    Have you ever spoken to them in
4 connection with this litigation?
5      A.    No.
6      Q.    Okay. You've spoken to them in
7 order to submit these -- or strike that.
8            You've corresponded with them in
9 order to submit these chapters for this book,
10 correct?
11      A.    Not directly. I believe it was
12 one of the other authors here who was the
13 editor of this specific section. Paul Weigle,
14 although I don't know how to pronounce his
15 name, he was the last author on that first
16 article here. Most of my correspondence was
17 with him. I may have exchanged an e-mail or
18 two with Lauren Hale in regards to these
19 chapters.
20      Q.    Do you plan to correspond with
21 Dr. Hale or Dr. Christakis or Dr. Weigle to
22 say, the conflict of interest and funding
23 disclosure for my chapters is inaccurate, will
24 you please correct it?
25            MS. McNABB: Objection. Form.

Page 283

1            THE WITNESS: That would
2      probably be a good idea.
3 BY MR. HALPERIN:
4      Q.    Okay. We will ask that you
5 produce any such communications that you have
6 on that topic.
7            And I think -- I don't know
8 exactly how long we've been going. This is
9 probably a good time for a break.
10            MS. McNABB: That's fine.
11            THE VIDEOGRAPHER: Off the
12      record at 2:50 p.m.
13            (Recess.)
14            THE VIDEOGRAPHER: Back on the
15      record at 2:59 p.m.
16 BY MR. HALPERIN:
17      Q.    You talked with some of my
18 co-counsel this morning about a new article
19 that you submitted for publication in the last
20 week or so.
21      A.    Yes.
22      Q.    Did you disclose that you were
23 serving as a paid plaintiff expert in that
24 submission?
25      A.    Yes.

Page 284

1      Q.    You also spoke at length with my
2 co-counsel about your Substack Generation
3 Tech, correct?
4      A.    Yes.
5      Q.    You've got more than 11,000
6 subscribers to Generation Tech, right?
7      A.    If you say so. I tend not to
8 keep very good track of that.
9      Q.    We can pull it up right in the
10 deposition --
11      A.    I believe you.
12      Q.    -- and see if we can --
13      A.    It's fine. I believe you.
14      Q.    I don't want you to have to take
15 my word for it. Let's just pull up your --
16      A.    All right.
17      Q.    -- Substack quickly.
18      A.    All right.
19      Q.    Do you see it says 11- -- this is
20 your Substack, right?
21      A.    Yes.
22      Q.    Do you see 11,000 plus
23 subscribers?
24      A.    Yes.
25      Q.    Okay. We can take that down.

Page 285

1 Any reason to dispute that you've got 11,000
2 plus subscribers?
3      A.    No.
4            MS. McNABB: Greg, for the
5      record, are you marking that as an
6      exhibit?
7            MR. HALPERIN: I can if you
8      want. I don't need to, but if you
9      want to mark it as Exhibit 24, that's
10      fine. We'll mark that as Exhibit 24.
11            (Exhibit No. 24 was marked for
12      identification.)
13 BY MR. HALPERIN:
14      Q.    You often post on your Substack
15 about the relationship between social media
16 and mental health, right?
17      A.    It depends on how you define
18 often. That's certainly not the only thing
19 that I discuss on the Substack, and I have not
20 been great about posting to it in the last six
21 months or so.
22      Q.    Well, you said this morning that
23 certainly some of your Substack posts have
24 been about the dangers of using social media,
25 particularly about children and teens, right?

72 (Pages 282 - 285)

CONFIDENTIAL

Page 286

1    A.    There have been posts about, for
2  example, the association between social media
3  use and depressive symptoms.
4    Q.    And in your report, the list of
5  references to your report by my count has
6  seven different Substacks posts you authored
7  on Generation Tech.  Do you have any reason to
8  dispute that?
9    A.    I believe that's correct.
10   Q.    Let me show you an example.
11         MR. HALPERIN:  We'll mark this as
12  Exhibit 25.
13         MS. McNABB:  I actually think
14  we're on Exhibit 26.
15         MR. HALPERIN:  I just marked 24
16  as the --
17         MS. McNABB:  The Substack
18  should be 25.  Exhibit 24 was the
19  Alcohol, Tobacco, and Firearm
20  Promotion.
21         MR. HALPERIN:  I apologize.  So
22  Exhibit 25 will be the Substack.  And
23  this is going to be Exhibit 26.  And
24  let me just hand you the sticker, you
25  can put on top of it so we keep a

Page 287

1  clean record.
2         (Exhibit No. 26 was marked for
3  identification.)
4  BY MR. HALPERIN:
5    Q.    Exhibit 26 is a Substack post
6  from you from January 9, 2025, correct?
7    A.    Yes.
8    Q.    The title is, "The Pandemic was
9  bad for teen mental health:  The smartphone
10  and social media were worse."
11   A.    Yes.
12   Q.    Do you see that?
13   A.    Yes.
14   Q.    Your report in this case opines
15  that "The pandemic and lockdowns cannot be the
16  cause of the increase in depression,
17  self-harm, and suicide," right?
18   A.    To clarify, what the report says
19  is that the pandemic cannot be the cause of
20  the rise in teen depression that began around
21  2012.
22   Q.    Look with me at Exhibit 1,
23  please, your MDL report.  Go to page 21.  Go
24  to paragraph 55, second sentence.  Do you see
25  the language, the same language I asked you

Page 288

1  whether you opined about?
2    A.    Hold on.  I got the rebuttal
3  instead.  Tell me the page number again,
4  please.
5    Q.    21, paragraph 55.
6    A.    I'm there.
7    Q.    Do you see where it says, "The
8  pandemic and lockdowns cannot be the cause of
9  the increases in depression, self-harm, and
10  suicide between 2008 and 2019"?
11   A.    Yes, I see that.
12   Q.    Nowhere in your Substack post on
13  the pandemic, Exhibit 26 -- strike that.
14         Exhibit 26, from January 9, 2025,
15  you had already been serving as an expert for
16  plaintiffs for several years, correct?
17   A.    Yes.
18   Q.    Nowhere in Exhibit 26 do you
19  disclose that you're being paid by
20  plaintiffs to opine that social media, not the
21  pandemic, is responsible for teen mental
22  health?
23   A.    That's correct.
24         MS. McNABB:  Objection.  Form.
25         THE WITNESS:  I don't think

Page 289

1    I've ever seen a conflict of interest
2    disclosure on a Substack.
3  BY MR. HALPERIN:
4    Q.    Is there anything barring you
5  from making a conflict of interest disclosure
6  on a Substack?
7    A.    It's just not standard practice.
8    Q.    Do Substacks' terms of service
9  preclude you from disclosing conflicts of
10  interest?
11   A.    I have no idea.  That's -- it's
12  a pretty long document.  I'd have to read the
13  whole thing.
14   Q.    You made a choice not to disclose
15  that you were getting paid by plaintiff
16  lawyers on your Substack, correct?
17   A.    I followed the standard of
18  Substack post, which is not to have conflict
19  of interest disclosures.  It's just not
20  standard.
21   Q.    And you decided not to do it,
22  correct?
23         MS. McNABB:  Objection.  Form,
24  argumentative.
25         THE WITNESS:  I don't know if

73 (Pages 286 - 289)

CONFIDENTIAL

Page 290

1      it was a conscious decision given it's
2      not standard.
3  BY MR. HALPERIN:
4      Q.   Okay. Well, look at exhibit --
5  or page 6, please, under the heading
6  "subscribed to Generation Tech."
7          Do you see that?
8      A.   Yes.
9      Q.   It says, "Psychologist and
10 author, Jean M. Twenge, shares the latest
11 research on teens and social media," and it
12 goes on, correct?
13     A.   Yes.
14     Q.   It doesn't say psychologist and
15 author and paid plaintiff expert, Jean M.
16 Twenge, does it?
17         MS. McNABB: Objection. Form,
18     argumentative.
19         THE WITNESS: I don't think
20     I've ever seen a bio on Substack, or
21     really anywhere else, that has that
22     type of disclosure within the
23     extremely short time limited, word
24     limited bio.
25 BY MR. HALPERIN:

Page 291

1      Q.   Can you identify a single
2  Substack post in which you've disclosed that
3  you're getting paid by plaintiff lawyers to
4  offer opinions that social media is causing
5  declines in mental health?
6          MS. McNABB: Objection. Form
7      and misstates testimony and what she's
8      getting paid for.
9          THE WITNESS: So again, not
10     standard, so no.
11 BY MR. HALPERIN:
12     Q.   Okay. I want to talk to you
13 about some of the things you've said before
14 you started getting paid as a paid plaintiff
15 expert in 2021 or 2022. I will hand you what
16 I've marked as Exhibit 27.
17         (Exhibit No. 27 was marked for
18     identification.)
19 BY MR. HALPERIN:
20     Q.   Exhibit 27 is the transcript of
21 an interview you did in 2017 with NPR.
22         Do you see that?
23     A.   Yes.
24     Q.   Go to page 3, please.
25         You were asked, "Is it

Page 292

1  specifically the smartphone or is it social
2  media? Or is it the number of hours per day
3  spent on those things?"
4      Q.   Do you see that?
5      A.   Yes.
6      Q.   Go to the bottom of the page,
7  please, last sentence. "You can't absolutely
8  prove causation, but by a bunch of different
9  studies there's this connection between
10 spending a lot of time on social media and
11 feeling lonely."
12         Do you see that?
13     A.   So this is from 2017, which --
14 help me out -- is eight years ago, before
15 there were a lot of experimental studies. So
16 given the amount of research I and many others
17 have done since then, my opinion has evolved.
18     Q.   And my only question was: Do you
19 see that? The way this proceeds, with all
20 respect, Doctor, is I ask questions, you
21 answer them. So my question was: Do you see
22 that?
23         MS. McNABB: Greg, let's keep
24     it professional, please.
25         THE WITNESS: I see that.

Page 293

1  BY MR. HALPERIN:
2      Q.   Okay. Were you being accurate
3  and truthful in August of 2017 when you said
4  you can't absolutely prove causation between
5  spending a lot of time on social media and
6  harms?
7          MS. McNABB: Objection. Form.
8          THE WITNESS: So at the time --
9      so this is based on my book iGen which
10     came out around that same time,
11     August 2017 -- there were a few
12     experimental studies but only a few.
13     There's now much more and so --
14 BY MR. HALPERIN:
15     Q.   And I just -- go ahead.
16     A.   Let me finish, please. Thank
17 you.
18         That's probably why I phrased it
19 in that way, is that there wasn't as much
20 research at that point as there is now.
21     Q.   And I'm trying to understand your
22 views over time. So I -- I'm really just
23 asking about what you believed in August of
24 2017.
25         In August of 2017, did you

74 (Pages 290 - 293)

Page 294

1 believe that based on the science as it
2 existed then, you -- you can't absolutely
3 prove causation?
4    A.    It's hard to say because this is
5 also in the context of only one type of study.
6 It looks like here I'm focusing on time
7 series, which is not -- let me amend that.
8 I'm just -- let me -- let me -- give me a
9 second to read this, so I can make sure to
10 answer correctly.
11        (Peruses document.)
12        So yes, at the time -- I think
13 I'd state it this way, that at the time, in
14 2017, given the research we had then, that my
15 view was you couldn't absolutely prove
16 causation.  But notice the qualification
17 there, that I certainly was coming to believe
18 that there was causation but was hoping there
19 would be more research.
20    Q.    So in 2017, given the research
21 you had then, your view was you couldn't
22 absolutely prove causation, correct?
23    A.    I said absolutely prove, yes.
24    Q.    Okay.  Let me show you another
25 document.  This is 28.  This is going to be

Page 295

1 Exhibit 28.
2        (Exhibit No. 28 was marked for
3    identification.)
4 BY MR. HALPERIN:
5    Q.    This is another NPR article.
6 This one is from August of 2019, two years
7 later.
8        Do you see that?
9    A.    I do.  I would like to note that
10 I wrote a response to this article because it
11 had so many mistakes in it.
12    Q.    Okay.  Well, look at page 4,
13 please.  There's a quote attributed to you.
14    A.    I don't know if I have page
15 numbers.
16    Q.    They're on the bottom right-hand
17 corner, at least on mine.  Page 4.
18    A.    Oh, okay.  I see it now.  Yes.
19    Q.    It says "Twenge isn't claiming to
20 have proved that smartphones cause depression.
21 The datasets she works with, essentially large
22 surveys, don't allow."
23        Do you see that?
24    A.    Yes.
25    Q.    And then you're quoted, correct?

Page 296

1    A.    Yes.
2    Q.    Do you have any belief that you
3 were inaccurately quoted here?
4    A.    It's certainly possible given
5 how much -- how many other things this
6 reporter made mistakes about.  So it is -- it
7 is certainly possible.
8    Q.    Well, when you published a
9 response to this article, did you say, I was
10 misquoted?
11    A.    I'd have to go look and -- I'd
12 have to go back and look at that response.
13    Q.    You don't have any recollection
14 of doing that?
15    A.    So I -- I -- it's hard to say.
16 What I'm saying here is simply that time
17 series studies are not a random control trial,
18 and I stand by that.
19    Q.    And you go on to say, "We cannot
20 prove causation given that limitation,"
21 correct?
22        MS. McNABB:  Objection.  Form.
23        THE WITNESS:  So in -- that
24    statement refers to the previous
25    statement which is about time series

Page 297

1    studies which alone cannot prove
2    causation.  So I was referring to a
3    very specific type of study when I
4    made that statement.  I was not
5    referring to the preponderance of the
6    evidence that I discuss in this
7    report.
8 BY MR. HALPERIN:
9    Q.    Well, let me just ask you:  In
10 August of 2019, did you believe that you can
11 prove causation between social media and
12 depression?
13    A.    In 2019?  Hard to say.  I was
14 certainly getting there.  I think this is a
15 bad example because it's about a specific type
16 of study, not the propon- -- not all of the
17 different types of studies.
18    Q.    Are you -- is it your testimony
19 that causation could be proven in August of
20 2019?
21        MS. McNABB:  Objection.  Form.
22    Asked and answered.
23        THE WITNESS:  Hard to answer
24    that.  I'd have to put myself in the
25    mindset of exactly what studies we had

CONFIDENTIAL

1    and what data we had in -- in 2019.  I
2    think certainly by that point, I was
3    definitely convinced that the rise of
4    smartphones and social media had
5    caused the increase in teen
6    depression.  And even though the
7    design of those time series studies
8    cannot absolutely prove that, it was
9    that combined with a lot of the other
10   data, and it's really difficult for me
11   to pinpoint exactly when my opinion
12   turned over to say, yes, we can prove
13   it.  But sometime around that.
14 BY MR. HALPERIN:
15   Q.   Okay.  Let's look at another
16 document.  This will be Exhibit 29.
17       (Exhibit No. 29 was marked for
18   identification.)
19 BY MR. HALPERIN:
20   Q.   This is an article that you were
21 the lead author on from July 20th, 2021.
22       Do you see that?
23   A.   Yes.
24   Q.   Go to page 1, please, under
25 "Conclusions."

1       "The psychological well-being of
2 adolescents around the world began to decline
3 after 2012, in conjunction with the rise of
4 smartphone access and increased internet use."
5       Do you see that?
6   A.   Yes.
7   Q.   That's something you talk about
8 in your report in this case, right?
9   A.   Yes.
10   Q.   "Though causation cannot be
11 proven, and more years of data will provide a
12 more complete picture."
13       Do you see that?
14   A.   I do.
15   Q.   Were you being truthful when you
16 said in July of 2021 that "Causation cannot be
17 proven, and more years of data will provide a
18 more complete picture"?
19   A.   So I think we have to make sure
20 this is put in context, which is, again, this
21 is talking about only a specific type of study
22 which is time series.  This is also a very,
23 very standard disclaimer that is given in
24 almost every journal article that uses this
25 type of method.

1   Q.   Is it true that time series
2 cannot prove causation?
3   A.   So the other problem that we're
4 running into is what type of causation are we
5 discussing?  Are we discussing scientific
6 causation or are we discussing more likely
7 than not?  So in a journal article like this,
8 or even in an NPR interview with a science
9 reporter, I'm going to focusing on scientific
10 causation which is different from more likely
11 than not.  By this point, I absolutely thought
12 more likely than not --
13   Q.   I didn't ask you --
14   A.   -- for causation.
15   Q.   I -- I didn't ask you what your
16 beliefs were on more likely than not.
17       I'm gonna move to strike your
18 answer, and I'd ask the court reporter to flag
19 that answer for when we move the Court for
20 additional time with Dr. Twenge.
21       Just yes or no, when you said in
22 July of 2021 that, quote, causation cannot be
23 proven, and more years of data will provide a
24 more complete picture, close quote, did you
25 believe that statement to be true?

1       MS. McNABB:  I'll object --
2 I'll object to the statement before
3 the question as argumentative and
4 intended for -- to intimidate the
5 witness.  I ask that you keep it
6 professional, Greg.
7       You can go ahead and answer if
8 you can.
9       THE WITNESS:  So I would say
10 that through one single time series
11 study, scientific causation cannot be
12 proven, and that is the context in
13 which this statement was made.
14 BY MR. HALPERIN:
15   Q.   Did this statement say, "Through
16 one single time series study, causation cannot
17 be proven, yes or no?
18       MS. McNABB:  Objection to form.
19       THE WITNESS:  It is in a single
20 time series study, so by necessity,
21 yes.
22 BY MR. HALPERIN:
23   Q.   Do you stand by the statement you
24 made in Exhibit 29?
25   A.   What statement are you referring

76 (Pages 298 - 301)

CONFIDENTIAL

Page 302

1 to?
2    Q.    The one we've just been talking
3 about, "Causation cannot be proven, and more
4 years of data will provide a more complete
5 picture."
6    A.    In the context in which I
7 offered in my previous answer, yes, I stand by
8 the statement. But that context is extremely
9 important.
10    Q.    Could causation be proven in
11 2022?
12    A.    So we're -- you'll have to
13 rephrase your question because I'm not sure
14 what you're asking.
15    Q.    As of 2022, do you believe you
16 had evidence to prove causation between social
17 media and mental health harms?
18        MS. McNABB: Objection. Form.
19        THE WITNESS: Taking all
20    evidence together, yes. For an
21    individual study with a particular
22    design, that answer may be no. It
23    depends. It's not as simple as that.
24 BY MR. HALPERIN:
25    Q.    Taking all evidence together, do

Page 303

1 you believe you had evidence of causation in
2 2023?
3    A.    Yes.
4    Q.    2024?
5    A.    Yes.
6    Q.    2025?
7    A.    Yes.
8    Q.    When did you first have evidence
9 to prove causation, taking all the evidence
10 together?
11    A.    That's very difficult to
12 pinpoint.
13    Q.    Okay.
14    A.    That viewpoint evolved over
15 time.
16        (Exhibit No. 30 was marked for
17    identification.)
18 BY MR. HALPERIN:
19    Q.    I'm going to hand you Exhibit 30.
20        This is a book chapter from 2025,
21 correct?
22    A.    Yes.
23    Q.    Published in the "Handbook of
24 Social Psychology," 6th edition, true?
25    A.    Yes.

Page 304

1    Q.    You're the sole author, right?
2    A.    Yes.
3    Q.    There's a section starting at the
4 16th page, although, unfortunately, there are
5 no page numbers in the online version titled
6 "Mental Health."
7        Let me know when you have it.
8    A.    I see this section.
9    Q.    Mental Health, it says,
10 "Indicators of mood disorders increased
11 markedly between the 1960s and the 1990s."
12        Do you see that?
13    A.    Yes.
14    Q.    And by "mood disorders" you mean
15 things like depression, anxiety, suicidality,
16 the things you discuss in your expert report,
17 right?
18    A.    Yes.
19    Q.    In fact, Figure 6 of your expert
20 report -- I'm sorry.
21        In fact, Figure 6 of this book
22 chapter is the same as Figure 1 of your expert
23 report with a slightly different range of
24 years, correct?
25    A.    Likely. Yeah, I believe the

Page 305

1 range --
2    Q.    Take a look at Exhibit 1.
3        Figure 1 is on page 6 of
4 Exhibit 1.
5    A.    Yes. The range of years is
6 different, because the one in Exhibit 1 is
7 based on the publicly available dataset, and
8 the one in the chapter here is more than
9 likely based on the data that I was able to
10 download and merge myself.
11    Q.    So same graph, slightly different
12 years, correct?
13    A.    Yes.
14    Q.    Okay. Figure 7 of the book
15 chapter is the same as Figure 2 of your expert
16 report, correct, again with slightly different
17 years?
18    A.    Somewhat different years, yes.
19    Q.    You didn't disclose to the public
20 in this book chapter that you were serving as
21 an expert for plaintiff lawyers when you
22 presented the very same evidence earlier this
23 year, correct?
24        MS. McNABB: Objection. Form.
25        THE WITNESS: I am not sure I

77 (Pages 302 - 305)

CONFIDENTIAL

Page 306

1    was even given the opportunity to do
2    this since this was a book chapter
3    rather than a journal article.
4    BY MR. HALPERIN:
5    Q.    Did you ask, can you disclose my
6    financial interest serving as an expert for
7    plaintiff lawyers presenting the very same
8    evidence?
9        MS. McNABB: Objection. Form.
10       THE WITNESS: I don't recall if
11       I asked. I think it's just not
12       standard to do that in book chapters.
13   BY MR. HALPERIN:
14   Q.    So you have no affirmative
15   recollection of asking to disclose your
16   financial interest, correct?
17   A.    I don't think so.
18   Q.    Look with me at page 19, please,
19   which has Figure 8 on it, the actual figure --
20   the descriptor of Figure 8 starts on the prior
21   page.
22   A.    Is it this?
23   Q.    Yes. We're looking at the same
24   thing.
25       You write, "Although causation

Page 307

1    cannot be proven, there are several mechanisms
2    by which digital technology use may have
3    caused the sudden and large increase in mood
4    disorders among adolescents and young adults."
5        Did I read that correctly?
6    A.    Yes.
7    Q.    Is that an accurate statement of
8    your views in 2025?
9    A.    It is an accurate statement
10   about time series studies with the -- because
11   this is in a scientific book -- that causation
12   here is understood as scientific causation.
13   And this is, again, a standard disclaimer for
14   this type of publication.
15   Q.    Does this say, "Causation cannot
16   be proven with time series studies"?
17   A.    That's not exactly what it says,
18   no.
19   Q.    You say "causation cannot be
20   proven," correct?
21   A.    In this context.
22   Q.    Tell me where in your expert
23   report you say, quote, causation cannot be
24   proven?
25       MS. McNABB: Objection. Form.

Page 308

1        THE WITNESS: So in a book
2    chapter like this, it is standard for
3    the editors to ask that in any type of
4    study that is not experimental, that
5    you use this type of disclaimer. That
6    is not the standard in reports. For
7    example, the Bradford Hill analysis
8    specifically says you can discuss lots
9    of different types of methods, and
10   they don't necessarily have to be a
11   random controlled trial to point
12   toward causation and to prove
13   causation.
14   BY MR. HALPERIN:
15   Q.    Did you apply the same
16   methodological rigor in your expert report
17   that you apply in your academic work?
18   A.    Tell me what you mean by
19   "rigor."
20   Q.    Do you understand what rigor
21   means?
22   A.    I understand what the word
23   means, just not in this context.
24   Q.    Did you apply the same set of
25   principles, scientific principles, about how

Page 309

1    causation can and can't be proven to your
2    expert work as you apply in your academic
3    work?
4    A.    It's difficult to answer that as
5    asked, because the -- they're two different --
6    they're two different things. In terms of
7    rigor in terms of wanting things to be
8    correct, absolutely. In terms of disclaimers
9    you need to make and exactly how it's written
10   and the type of evidence and how you weigh it
11   and scientific versus more likely than not,
12   there's differences truly.
13   Q.    Are you applying a lesser
14   standard of causation in court as you apply in
15   your academic work?
16       MS. McNABB: Objection. Form.
17       THE WITNESS: My understanding
18       is that there is a difference between
19       scientific causation and general
20       causation in court.
21   BY MR. HALPERIN:
22   Q.    So are you applying a lesser
23   standard of causation in court than you apply
24   in your academic work?
25       MS. McNABB: Objection. Form.

Golkow Technologies,
A Veritext Division
877-370-3377                                    www.veritext.com

CONFIDENTIAL

Page 310

1      Asked and answered.
2          THE WITNESS:  I don't know if I
3      would use "lesser."  I would say it is
4      a different standard.
5  BY MR. HALPERIN:
6      Q.    Is there a higher bar to proving
7  scientific causation than more likely than
8  not?
9          MS. McNABB:  Objection.  Form.
10         THE WITNESS:  Hard to answer.
11     I don't -- I don't know if I would put
12     it in that way.  It's a different
13     standard.
14  BY MR. HALPERIN:
15     Q.    Well, what's the difference
16  between scientific causation and general
17  causation in court, as you understand it?
18     A.    So scientific causation often
19  says, hey, you're not gonna be able to prove
20  causation without a random controlled trial,
21  and that is generally not what you need for
22  more likely than not.  It's also not what you
23  need when you take the preponderance of the
24  evidence, and, for example, apply the Bradford
25  Hill criteria rather than solely relying on

Page 311

1  experimental studies.
2      Q.    Let me see if I can break that
3  down.
4          For scientific causation, you
5  need a random controlled trial, correct?
6          MS. McNABB:  Objection.
7          THE WITNESS:  I wouldn't put it
8      in exactly that way.  That's the gold
9      standard for proving causation.  But
10     if you take a lot of other studies
11     from different designs, you might be
12     able to point towards scientific
13     causation, but it would not be the
14     type of thing where you could say in a
15     scientific journal article, I have
16     absolutely proved causation.  That's a
17     really, really high standard that in
18     scientific journal articles is usually
19     met only by experiments, and that's
20     not really true in terms of trying to
21     prove something more likely than not.
22     It's not true in terms of looking at
23     the preponderance of the evidence by
24     the Bradford Hill criteria.
25  BY MR. HALPERIN:

Page 312

1      Q.    Can Bradford Hill criteria prove
2  scientific causation?
3      A.    I don't know.
4      Q.    Bradford Hill criteria, as you
5  understand it, can prove what you call general
6  causation?
7      A.    Yes.
8      Q.    Would you ever write a scientific
9  journal saying, "I apply the Bradford Hill
10  criteria and, therefore, causation can
11  absolutely be proven?
12     A.    I may not use the word
13  "absolutely," but that this could prove
14  causation, yes, I -- I could see myself saying
15  that probably in a book chapter rather than a
16  journal article because it's easier to publish
17  a review in a book chapter.
18     Q.    And a book chapter doesn't have
19  to go through peer-review, right?
20     A.    No.  It does.  It does.  This
21  book chapter that's in front of us here was
22  reviewed extensively by three different
23  people, I believe, maybe two.
24     Q.    Okay.  Can you go back to my
25  question, which is:  Is there anywhere in your

Page 313

1  report where you say, quote, causation cannot
2  be proven?
3          MS. McNABB:  Objection.  Form.
4          THE WITNESS:  Not that I know
5      of.
6  BY MR. HALPERIN:
7      Q.    All right.  It's your opinion
8  that mental health among adolescents began to
9  worsen in the early 2010s, around 2012,
10  correct?
11     A.    It depends on which indicator
12  we're looking at.  For depression, yes.
13     Q.    For the indicators that you
14  discuss in your report, you believe that they
15  began to worsen in the early 2010s, around
16  2012, correct?
17     A.    Yes.  Although in a couple of
18  cases, for example, suicide and self-harm,
19  those increases began slightly earlier.
20     Q.    So when did they begin for those
21  indicators?
22     A.    Let's take a look.  So for
23  self-harm, I would say they began around 2010.
24  For suicide, 2008, roughly.
25     Q.    So it's your opinion that mental

79 (Pages 310 - 313)

CONFIDENTIAL

Page 314

1 health among adolescents began to worsen in
2 the 2008 to 2012 time frame, correct?
3    A.    Yes.
4    Q.    You believe one of the reasons
5 for that is that adolescent smartphone
6 ownership grew in that time frame, correct?
7    A.    Yes.
8    Q.    Smartphones became widely used in
9 the early 2010s?
10   A.    Yes.  So we don't have great
11 data on adolescents, but the Pew Research
12 Center, for example, found that among American
13 adults, the percentage owning a smartphone
14 crossed 50 percent at the end of 2012 and the
15 beginning of 2013.
16   Q.    Teens use smartphones to text?
17   A.    Yes.
18   Q.    They use them to play video
19 games?
20   A.    Well, they use them to play
21 games.  I don't know if you'd call it video
22 games.
23   Q.    They use them to play games,
24 correct?
25   A.    Yes.

Page 315

1    Q.    They use them to surf the
2 internet?
3    A.    If -- if -- yeah.  If we're
4 talking about a smartphone as opposed to, say,
5 a phone designed for kids, yes.
6    Q.    And so smartphones don't just
7 access social media, right?
8    A.    Correct.
9    Q.    Teens use them to do all sorts of
10 things, right?
11   A.    Yes.
12   Q.    I will hand you what I've marked
13 as Exhibit 31.
14       (Exhibit No. 31 was marked for
15       identification.)
16 BY MR. HALPERIN:
17   Q.    It's an article that you
18 published as the lead author.
19       Do you see that?
20   A.    Yes.
21   Q.    And if you go to page 332,
22 there's a figure showing digital media use,
23 hours per day over time.
24       Do you see that?
25   A.    Yes.

Page 316

1    Q.    And, specifically, this shows the
2 hours per day 12th graders spent on various
3 forms of digital media annually between 2006
4 and 2016, although some of the lines start
5 later, correct?
6    A.    Which -- sorry.  Which figure
7 are we looking at?
8    Q.    Figure 1.
9    A.    Figure 1.  Okay.  Got it.
10   Q.    So does this show the hours per
11 day that 12th graders spent on various forms
12 of digital media annually between 2006 and
13 2016, although for some of the lines it starts
14 after 2006?
15   A.    Yeah.  Because they didn't ask
16 the questions until later so -- but yes.
17   Q.    So let me start with that 2012
18 date that you've used in some of your
19 publications and in your report.  Time spent
20 by 12th graders on the internet, which is the
21 solid line, solid black line, increased from
22 about one and a half hours per day in 2012 to
23 about two and a quarter hours per day in 2016,
24 correct?
25   A.    Yes.

Page 317

1    Q.    And that's about a 50-percent
2 increase over those five years?
3    A.    Roughly.
4    Q.    Gaming, which is the dashed black
5 line, increased from about 1.3 hours in 2012
6 to about 1.5 hours per day in 2016, correct?
7    A.    Yes.
8    Q.    Another increase, correct?
9    A.    Mm-hmm.
10   Q.    And so the time that teens spent
11 on other forms of digital media increased at
12 the same time that it was increasing on social
13 media, correct?
14   A.    Yes.  Although give me a moment
15 because I want to remind myself how they asked
16 about internet use.  So internet use did
17 include instant messaging, which some people
18 might have interpreted to include Facebook.
19   Q.    Do you know that to be true?
20   A.    It's an educated guess.
21   Q.    And no one would have interpreted
22 gaming to mean Facebook, right?
23   A.    Weren't there games on Facebook
24 at that point, like Farmville?
25   Q.    Do you know whether there were

Golkow Technologies,
A Veritext Division

877-370-3377                                                                                      www.veritext.com

1 games on Facebook between 2011 and 2016?
2     A.    I don't know.  I'm the last
3 person in my generation who never had a
4 Facebook account, so I don't know.
5     Q.    You never had a Facebook account?
6     A.    No.
7     Q.    Have you ever had an Instagram
8 account?
9     A.    No.
10     Q.    Have you ever used Facebook or
11 Instagram?
12     A.    No.
13     Q.    Some of your research -- much of
14 your research has focused more broadly than
15 just social media on the impact of what you
16 call digital media on well-being, correct?
17         MS. McNABB:  Objection.  Form.
18         THE WITNESS:  Yes.  Although
19     that was a phrase that I used around
20     the time this article came out and
21     then didn't use as much going forward,
22     because going forward, I was able to
23     break down the specific uses a little
24     bit better.
25 BY MR. HALPERIN:

1     Q.    You've used various terms for it:
2 digital media, screen media, smartphone,
3 right?
4     A.    Yes.  There's many different
5 terms in this area.  It's -- there's just a
6 variety of terms that have been used,
7 including by me.
8     Q.    Regardless of the terminology,
9 much of your research has focused more broadly
10 on screen time as opposed to just social media
11 specifically, correct?
12         MS. McNABB:  Objection to form.
13         THE WITNESS:  I wouldn't put it
14     that way.
15         I think, especially in the
16     years after this article was
17     published, I started to focus much
18     more on social media specifically.
19 BY MR. HALPERIN:
20     Q.    You'd agree -- well, your book,
21 for instance, we've colloquially been
22 referring to it as 10 Rules, but the full
23 subtitle is "How Parents Can Stop Smartphones,
24 Social Media, and Gaming From Taking Over
25 Their Children's Lives," correct?

1     A.    Yes.
2     Q.    And so your book isn't just rules
3 for social media, it's also rules for
4 smartphones generally and video games, right?
5     A.    Correct.  But that -- some of
6 that is because, for example, the reason
7 parents should be giving kids basic phones
8 instead of smartphones as their first phone is
9 to keep them from using social media, which is
10 very difficult to do.
11     Q.    And to keep them from using the
12 internet and spending time -- too much time on
13 the internet generally, correct?
14         MS. McNABB:  Objection.  Form.
15         THE WITNESS:  Not quite as much
16     because most kids at that age have
17     internet access on their laptops.
18 BY MR. HALPERIN:
19     Q.    Okay.  Well, let's go through it.
20 You'd agree that links between digital media
21 use and well-being have been found for
22 smartphone use generally, correct?
23         MS. McNABB:  Objection.  Form.
24         THE WITNESS:  Say that one more
25     time.

1 BY MR. HALPERIN:
2     Q.    Links between digital media use
3 and well-being have been found for smartphone
4 use, correct?
5         MS. McNABB:  Objection.  Form.
6         THE WITNESS:  There's a couple
7     articles I can think of that looked at
8     smartphone use overall.  However, more
9     recent research tends to look at
10     specific activities rather than
11     general smartphone look -- smartphone
12     use.
13 BY MR. HALPERIN:
14     Q.    Links between digital media use
15 and well-being have been found for time
16 online, correct?
17     A.    Yes.
18         MS. McNABB:  Objection to form.
19 BY MR. HALPERIN:
20     Q.    Links between digital media use
21 and well-being have been found for computer
22 use?
23         MS. McNABB:  Objection.  Form.
24         THE WITNESS:  I think so but,
25     again, that's -- that's -- that's

CONFIDENTIAL

Page 322

1     older research.
2  BY MR. HALPERIN:
3     Q.    Links between digital media use
4  and well-being have been found for gaming?
5         MS. McNABB: Objection. Form.
6         THE WITNESS: Yes.
7  BY MR. HALPERIN:
8     Q.    Links between digital media use
9  and well-being have been found for texting?
10        MS. McNABB: Objection. Form.
11        THE WITNESS: Yes.
12 BY MR. HALPERIN:
13    Q.    Okay. I'm going to hand you
14 another document. This will be Exhibit 32.
15        (Exhibit No. 32 was marked for
16    identification.)
17 BY MR. HALPERIN:
18    Q.    This is an article that you
19 published. This will be Exhibit 32. And you
20 published it with Keith Campbell.
21        Do you see that?
22    A.    Yes.
23    Q.    Go with me, if you will, to
24 page 318.
25        The bottom of the page, you say,

Page 323

1  "Thus, links between digital media use and
2  well-being replicate across several measures
3  of well-being, different measures of digital
4  media use," and then you list the measures of
5  digital media use, right?
6     A.    Yes.
7     Q.    Including smartphone use,
8  correct?
9     A.    Yes.
10    Q.    And including computer use,
11 right?
12    A.    Yes.
13    Q.    So back to my question: Links
14 between digital media use and well-being have
15 been found for smartphone use, true?
16        MS. McNABB: Objection. Form.
17        THE WITNESS: Yes.
18 BY MR. HALPERIN:
19    Q.    Links between digital media use
20 and well-being have been found for computer
21 use, correct?
22    A.    Yes.
23        MS. McNABB: Objection. Form.
24 BY MR. HALPERIN:
25    Q.    Teens who were heavy users of the

Page 324

1  internet are more likely to be depressed or
2  unhappy than their peers who are on screens
3  less often, true?
4     A.    I would word it as using the
5  internet less often, to be more precise, but,
6  yes.
7     Q.    So teens who are heavy users of
8  the internet are more likely to be depressed
9  and unhappy than teens that use the internet
10 less often, true?
11    A.    Yes.
12    Q.    Your research has found that
13 internet use among adolescent girls is the
14 most strongly associated with compromised
15 mental health out of all types of screen time,
16 true?
17        MS. McNABB: Objection. Form.
18        THE WITNESS: Can you tell me
19    which study or dataset you're
20    referring to with that statement?
21        MR. HALPERIN: Sure. Why don't
22    we look at it.
23        This will be Exhibit 33.
24        (Exhibit No. 33 was marked for
25    identification.)

Page 325

1  BY MR. HALPERIN:
2     Q.    This is an article you published
3  with Eric Farley in 2021, correct?
4     A.    Yes.
5     Q.    Under the abstract conclusion,
6  you say, "Thus, not all screen time is created
7  equal. Social media use and internet use
8  among adolescent girls are the most strongly
9  associated with compromised mental health,"
10 correct?
11    A.    Yes. And I also -- I always
12 have to point this out, that this is a
13 Millennium Cohort Study, and their question
14 about using the internet very well could
15 include time spent on social media as well.
16    Q.    Has your research found that
17 internet use among adolescent girls is the
18 most -- is among the most strongly associated
19 with compromised mental health out of all
20 types of screen time?
21        MS. McNABB: Objection. Form.
22        THE WITNESS: So this study
23    wasn't able to look at all types. It
24    looked at four types, and, yes, social
25    media and internet use were more

CONFIDENTIAL

Page 326

1   strongly associated with self-harm,
2   depressive -- sorry, self-harm,
3   depressive symptoms, life
4   satisfaction, and self esteem.  Social
5   media and internet had larger
6   associations than gaming and TV,
7   generally.
8  BY MR. HALPERIN:
9       Q.    Girls who spent two or more hours
10 per day using the internet are more likely to
11 self-harm than girls who spend less than two
12 hours per day using the internet, correct?
13      A.    Yes.
14      Q.    Spending too much time surfing
15 the internet is associated with multiple
16 dimensions of impaired sleep, true?
17      A.    Can you refer me to the study or
18 dataset you're using for that?
19      Q.    This is going to be Exhibit 34.
20          (Exhibit No. 34 was marked for
21      identification.)
22 BY MR. HALPERIN:
23      Q.    An article you co-authored in
24 2020.  Do you see that?
25      A.    Yes.

Page 327

1       Q.    Conclusion, in the abstract,
2  "Spending too much time on electronic devices
3  is associated with multiple dimensions of
4  impaired sleep, especially if this time on
5  devices is used for social media or surfing
6  the internet."
7          Do you see that?
8       A.    Yes.
9       Q.    So spending too much time surfing
10 the internet is associated with multiple
11 dimensions of impaired sleep, correct?
12          MS. McNABB: Objection.  Form.
13          THE WITNESS: With the caveat
14      this is also a Millennium Cohort
15      Study, and the way they asked about
16      internet use could include social
17      media time.
18 BY MR. HALPERIN:
19      Q.    And you don't know if it did
20 include social media time, correct?
21      A.    It depends on how they
22 interpreted the question, but it very well may
23 have.
24      Q.    And you're trying to interpret
25 what teens were thinking in response to a

Page 328

1  question, correct?
2       A.    Right.
3       Q.    "Teens who are heavy users of
4  electronic games are more likely to be
5  depressed or unhappy than their peers who are
6  on screens less often," correct?
7          MS. McNABB: Objection.  Form.
8          THE WITNESS: Can you point out
9      where that's coming from?
10 BY MR. HALPERIN:
11      Q.    Take a look at your book, please.
12      A.    Mm-hmm.
13      Q.    Page 9.
14      A.    Which page?
15      Q.    Nine.
16      A.    Nine.
17      Q.    Bottom of the page, "Across
18 dozens of studies, teens who are heavy users
19 of screen media," and then it lists electronic
20 games among them, "are between 30 and 200
21 percent more likely to be depressed or unhappy
22 than their peers who are on screens less
23 often."
24          Do you see that?
25      A.    Yes.

Page 329

1       Q.    Teens --
2       A.    So -- yes.
3       Q.    "Teens who are heavy users of
4  electronic games are more likely to be
5  depressed or unhappy than their peers who are
6  on screens less often."  True?
7       A.    Yes.  Although that association
8  is less than it is for social media.
9       Q.    Move to strike everything after
10 yes.
11          Your research has found there's
12 an association between problematic gaming and
13 suicidal ideation, correct?
14          MS. McNABB: Objection.  Form.
15          THE WITNESS: You'll have to
16      point me to that document as well.
17 BY MR. HALPERIN:
18      Q.    It is -- it's going to be one of
19 your 2025 book chapters, which is Exhibit 23.
20      A.    I don't know if I can put my
21 hands on that very quickly, so give me a
22 minute.
23          Oh, here it is.  23 is one that
24 I'm not an author on.
25      Q.    You are -- I'm looking at media

83 (Pages 326 - 329)

CONFIDENTIAL

Page 330

1 influences on self harm, suicidality, and
2 suicide.
3    A.    I have two that are labeled 23.
4    Q.    We'll fix that later. Look at
5 the one titled "Media Influences on Self-Harm,
6 Suicidality, and Suicide."
7    A.    Okay.
8    Q.    Go to page 143, please.
9        There's a heading, "Video Games
10 and SSITBs."
11    A.    Yeah.
12    Q.    And, again, SSITBs is suicidal
13 and self-injurious thoughts and behaviors,
14 correct?
15    A.    Yes.
16    Q.    And it says, "Evidence shows an
17 association between problematic gaming and
18 suicidal ideation," correct?
19        MS. McNABB: Objection. Form.
20        Misstates the document.
21        THE WITNESS: Yes. Although I
22        would want to see the sources that
23        were cited here, as this is a review
24        article, to see how they measured it
25        and see if there's any overlap with

Page 331

1        social media.
2 BY MR. HALPERIN:
3    Q.    Did you believe that statement to
4 be true when you signed your name to this
5 chapter?
6    A.    Yes.
7    Q.    Go to the next page. It says,
8 "In a 2022 Meta analysis of twelve studies
9 focused on problem gaming and suicidality,
10 eleven showed a positive association between
11 problem gaming and suicidal ideation, and
12 three showed a positive association between
13 problem gaming and suicide attempts."
14        Do you see that?
15    A.    Yes.
16    Q.    Your research has found that
17 gaming is associated with shortened sleep
18 duration, correct?
19    A.    Yes. Although if memory serves,
20 that association was weaker than that with
21 social media.
22    Q.    Move to strike everything after
23 yes.
24        Can you pull back out Exhibit 32,
25 please. It's Twenge and Campbell, 2019.

Page 332

1    A.    Got it.
2    Q.    Look with me, if you will, at
3 Figure 3, please, on page 319.
4        Figure 3 shows mean happiness by
5 hours a day texting, social media, gaming, and
6 online among eighth, tenth, and twelfth
7 graders from 2013 to 2016 in the Monitoring
8 the Future study, correct?
9    A.    Yes.
10    Q.    Now, social media is the SNS
11 line; is that right?
12    A.    Yes.
13    Q.    And that's the gray solid line?
14    A.    Yes.
15    Q.    Mean happiness increases between
16 zero and less than an hour of social media
17 use, then starts to decline, correct?
18    A.    Yes. Although I would have to
19 see if that difference was statistically
20 significant. It may not be.
21    Q.    If you look at the texting line,
22 that's the gray dashed line.
23    A.    Yes.
24    Q.    Mean happiness increases between
25 zero and less than an hour of texting, then

Page 333

1 starts to decline, correct?
2    A.    Yes.
3    Q.    If you look at the gaming line,
4 that's the dashed solid line -- I'm sorry, the
5 dashed black line.
6    A.    Yes.
7    Q.    Mean happiness increases between
8 zero and less than an hour of gaming, then
9 starts to decline, correct?
10    A.    Yes. Although that may also not
11 be statistically significant.
12    Q.    Surfing the web is the online
13 black solid line, correct?
14    A.    Yes.
15    Q.    And, again, that line, surfing
16 online, increases between zero and less than
17 an hour, and then starts to decline, correct?
18    A.    Yes.
19    Q.    And so in your view, it's
20 definitely a mistake to say it's only the
21 social media; clearly, it's technology and
22 screens as a whole as well, correct?
23        MS. McNABB: Objection. Form.
24        THE WITNESS: That's stated --
25        what do you mean by "it's"? You said

84 (Pages 330 - 333)

CONFIDENTIAL

Page 334

1    "it's definitely." What does that
2    mean? I'm not sure what "it" refers
3    to.
4  BY MR. HALPERIN:
5    Q.    You'd agree that it's definitely
6  a mistake to say it's only the social media
7  causing mental health harm among teens,
8  because clearly it's technology and screens as
9  a whole as well, correct?
10    MS. McNABB: Objection. Form.
11    THE WITNESS: That's not how I
12    would put it, no.
13  BY MR. HALPERIN:
14    Q.    Okay. Let's play a video which
15  the tech should have as tab 26, please. And
16  we'll mark this as the next -- I'm sorry.
17  We'll mark this as the next exhibit, which is
18  Exhibit 35.
19    (Exhibit No. 35 was marked for
20    identification.)
21    (Video played.)
22    MS. McNABB: Can you tell me
23    what year this was?
24    MR. HALPERIN: I don't have
25    that offhand.

Page 335

1  BY MR. HALPERIN:
2    Q.    Do you recall going on that --
3  doing that interview?
4    MS. McNABB: I'll just put an
5    objection on the record that this is
6    only an excerpt of what appears to be
7    a quite longer interview.
8    MR. HALPERIN: I got limited
9    time.
10    THE WITNESS: I know I have
11    spoken with Dr. Ruston at least twice
12    on her podcast. I don't know if this
13    is the more recent time or if this was
14    a time much longer ago.
15  BY MR. HALPERIN:
16    Q.    Was that your voice in the video?
17    A.    Yes. As far as I can tell.
18    Q.    Do you deny saying it's
19  definitely a mistake to say it's only the
20  social media; clearly, it's technology and
21  screens as a whole as well?
22    MS. McNABB: Objection. Form.
23    THE WITNESS: It's really hard
24    to answer that based on -- I don't
25    know what year this was; I don't know

Page 336

1    the context of the rest of the
2    interview and what we were -- we
3    are -- we were discussing on that
4    podcast. And the context is very
5    important.
6  BY MR. HALPERIN:
7    Q.    Were you being truthful when you
8  gave that answer?
9    MS. McNABB: Objection.
10    Argumentative, form.
11    THE WITNESS: Yes.
12  BY MR. HALPERIN:
13    Q.    Okay. You're not offering the
14  opinion that digital media or screen media is
15  responsible for all teen depression, correct?
16    A.    Correct.
17    Q.    There are many causes of
18  depression, right?
19    A.    Correct.
20    Q.    Technology use is not the cause
21  of most depression?
22    MS. McNABB: Objection. Form.
23    THE WITNESS: Just to be clear,
24    I want to make sure we're -- that I
25    understand your question. We're

Page 337

1    talking about at the individual level
2    in terms of all causes. We're not
3    talking about the causes of the
4    increase in teen depression.
5  BY MR. HALPERIN:
6    Q.    We'll come to the increase.
7    A.    Okay.
8    Q.    I just want to --
9    A.    Okay. So in that case --
10    Q.    -- walk -- let's walk before we
11  chew gum.
12    A.    Okay.
13    Q.    Technology use is not the cause
14  of most depression, correct?
15    MS. McNABB: Objection.
16    THE WITNESS: Among
17    individuals, no.
18  BY MR. HALPERIN:
19    Q.    No, it's not correct or, no, it's
20  not the cause?
21    A.    It is -- technology is not the
22  cause of most depression among individuals,
23  because that is going to be genetic
24  predisposition that's going to be the largest
25  cause.

85 (Pages 334 - 337)

CONFIDENTIAL

Page 338

1    Q.    Technology is not the cause of
2  most depression among teens either, correct?
3    A.    Correct.
4    Q.    There are many causes of suicide
5  and self-harm, true?
6    A.    Yes.
7    Q.    You're not offering the opinion
8  that digital media is responsible for all teen
9  suicide or self-harm or suicidality, correct?
10    A.    Correct.
11    Q.    Technology use is not the cause
12  of most teens' suicide or self-harm or
13  suicidality, correct?
14        MS. McNABB: Objection. Form.
15        THE WITNESS: That's a little
16      harder to answer just because many
17      have -- many suicides and self-harm
18      behaviors have multiple causes.
19  BY MR. HALPERIN:
20    Q.    Well, the suicide rate was higher
21  in the 1990s before smartphones existed than
22  it was in the 2010s, correct?
23    A.    No.  2018 it was higher than
24  that.
25    Q.    Was the suicide rate higher in

Page 339

1  the 1990s before suicide existed than it was
2  in 2012?
3        MS. McNABB: Objection. Form.
4        THE WITNESS: My understanding
5      of the data on suicide rates is that
6      the peak among -- in the teen suicide
7      rate in 2018 was a higher rate than in
8      the 1990s.
9  BY MR. HALPERIN:
10    Q.    I didn't ask about 2018.  I asked
11  about 2012.
12        Was the suicide rate higher in
13  the 1990s, before smartphones existed, than it
14  was in 2012?
15    A.    Yes.
16    Q.    Was it higher in the 1990s before
17  2013 and 2014 and 2015 and 2016 and 2017?
18        MS. McNABB: Objection. Form.
19        THE WITNESS: Yes.
20  BY MR. HALPERIN:
21    Q.    You're not offering the opinion
22  that digital media is responsible for all
23  declines in teen sleep, correct?
24        MS. McNABB: Objection. Form.
25        THE WITNESS: I am offering the

Page 340

1      opinion that the decline in teen sleep
2      that began in 2012 is primarily caused
3      by smartphones and social media.
4  BY MR. HALPERIN:
5    Q.    You're not offering the opinion
6  that digital media is responsible for all
7  teens not getting enough sleep, correct?
8        MS. McNABB: Objection to form.
9        THE WITNESS: Correct.
10  BY MR. HALPERIN:
11    Q.    There are lots of reasons teens
12  don't get enough sleep, correct?
13    A.    Correct.
14    Q.    It is your opinion, which I think
15  is what you were coming to, it is your opinion
16  that digital media explains the increase in
17  depression and suicidality you believe has
18  been observed since 2012, correct?
19    A.    That it is the primary cause,
20  not the only one, but the primary cause.
21        MS. McNABB: Objection to form
22      to that last question.
23  BY MR. HALPERIN:
24    Q.    And it's your opinion that
25  digital media is an explanation -- strike

Page 341

1      that.
2        It's your opinion that digital
3  media is an explanation for decreases in sleep
4  observed since 2012, correct?
5        MS. McNABB: Objection to form.
6        THE WITNESS: Can you ask that
7      again?
8  BY MR. HALPERIN:
9    Q.    Sure.
10        It's your opinion that digital
11  media explains the decrease you've observed in
12  teen sleep since 2012, correct?
13        MS. McNABB: Same objection.
14        THE WITNESS: Primary cause,
15      yes.
16  BY MR. HALPERIN:
17    Q.    As to all of the mental health
18  harms that you discuss in your report, you
19  believe that the increase or the decrease is
20  primarily caused, not exclusively caused, by
21  smartphone use, correct?
22        MS. McNABB: Objection. Form.
23        THE WITNESS: Yes.  Although,
24      it is tough to be specific about those
25      other causes.  It's been difficult to

CONFIDENTIAL

Page 342

1    pin down any other clear primary
2    cause, so I can't tell you what
3    percentage is due to what.
4    BY MR. HALPERIN:
5        Q.    And you answered my next
6    question:  Can you tell me what percentage of
7    the increase you've observed in teen
8    depression is due to screen media?
9            MS. McNABB:  Objection.  Form.
10           THE WITNESS:  So based on the
11   research literature, I think it is the
12   primary cause, but I can't put a
13   specific percentage on it.  That's
14   just not how this research works.
15   BY MR. HALPERIN:
16       Q.    You can't tell me what number,
17   what percentage of the increase you've
18   observed in teen depression since 2012 is due
19   to screen media?
20       A.    Correct.
21           MS. McNABB:  Objection.  Form.
22           THE WITNESS:  No.
23   BY MR. HALPERIN:
24       Q.    You can't tell me what percentage
25   of the increase you've observed in self-harm

Page 343

1    or suicidality since the early 2010s is due to
2    screen media, correct?
3            MS. McNABB:  Objection.  Form.
4            THE WITNESS:  I believe it is
5        the primary cause and a significant
6        cause, but I can't put a specific
7        percentage on it.
8    BY MR. HALPERIN:
9        Q.    You can't put a number on it,
10   correct?
11       A.    Correct.
12       Q.    You can't tell me what percentage
13   of the decline you've observed in teen sleep
14   since the early 2010s is due to screen media,
15   correct?
16           MS. McNABB:  Objection.  Form.
17           THE WITNESS:  So same answer:
18       It's a primary cause, a significant
19       and meaningful cause, but I can't put
20       a specific number on it.
21   BY MR. HALPERIN:
22       Q.    You can't put a number on it,
23   correct?
24       A.    Correct.
25       Q.    Now, even if the increase in

Page 344

1    digital media time were a hundred percent of
2    the cause of the increase in depression,
3    social media use alone would explain only a
4    fraction of that increase, correct?
5            MS. McNABB:  Objection.  Form.
6            THE WITNESS:  I don't think
7        it's that simple, because it's not --
8        all these things work together.  Most
9        social media use is on a smartphone,
10       for example.
11   BY MR. HALPERIN:
12       Q.    Do you disagree with the
13   statement I just made:  Even if the increase
14   in digital media time were a hundred percent
15   of the cause of the increase in depression,
16   social media use alone would explain only a
17   fraction of the increase?  Do you disagree
18   with that?
19           MS. McNABB:  Objection.  Form.
20           THE WITNESS:  It's hard to put
21       an exact number on it, and I'm not
22       sure what you mean by fraction.
23           MR. HALPERIN:  Okay.
24           (Exhibit No. 36 was marked for
25       identification.)

Page 345

1    BY MR. HALPERIN:
2        Q.    I handed you what I've marked as
3    Exhibit 36.
4            This is a letter to the editor
5    that you were the primary author of.
6            Do you see that?
7        A.    Yes.
8        Q.    The bottom -- or at the top of
9    the second column, do you see the exact same
10   language I just asked you if you agreed or
11   disagreed with?
12       A.    I do see that.
13       Q.    So can you tell me whether you
14   agree or disagree with your own statement?
15       A.    So this was a while ago.  2018.
16   So we're talking seven years.  Plus, what this
17   article was doing was different from what
18   you've been asking me about.  First of all,
19   it's based on a -- what we discuss in several
20   other comments similar to this one in the same
21   journal was a poor measure of social media
22   use.
23           So this comment here was not
24   really designed to answer the exact question
25   that you were answering before.  What it's

CONFIDENTIAL

Page 346

1 saying here is that based on the data we've
2 got here, with social media measured in this
3 way, which was a poor measure, that that
4 statement is true. So it has to be taken in
5 the context of the whole article.
6 BY MR. HALPERIN:
7      Q.   Move to strike as nonresponsive.
8 I'm going to read you a statement. I just
9 want to know whether you agree with it or
10 disagree with it. Or if you can't tell me if
11 you agree or disagree, that's fine too.
12      A.   So --
13      Q.   Hang on a second. I haven't read
14 you the statement yet.
15      A.   Okay.
16      Q.   "Adolescents also spend time
17 gaming, watching videos, and online. Thus,
18 even if the increase in digital media time
19 were a hundred percent of the cause of the
20 increase in depression, social media use alone
21 would explain only a fraction of the
22 increase."
23          Do you agree with that, disagree
24 with that, or can you not tell me?
25          MS. McNABB: Objection to form.

Page 347

1          THE WITNESS: I think I can't
2     tell you, because I would have to redo
3     this analysis with a better measure of
4     social media and take into account
5     what I have learned from the research
6     literature in the seven years since I
7     wrote this.
8 BY MR. HALPERIN:
9      Q.   Okay. Let me try it this way:
10 Can you tell me what percentage of the
11 increase in depression you believe you've
12 observed since 2012 is due to social media as
13 opposed to other forms of digital media?
14          MS. McNABB: Objection. Form.
15          THE WITNESS: I cannot answer
16     that. That's not the way this
17     research works.
18 BY MR. HALPERIN:
19      Q.   Can you tell me what percentage
20 of the increase in depression you believe
21 you've observed since 2012 is due -- strike
22 that.
23          Can you tell me what percentage
24 of the increase in suicidality or self-harm or
25 suicide attempts or suicides you believe

Page 348

1 you've observed since 2012 is due to social
2 media as opposed to other forms of digital
3 media?
4          MS. McNABB: Objection. Form.
5          THE WITNESS: So again, that
6     same answer, that's not how this
7     research works, to put a specific
8     number on it.
9 BY MR. HALPERIN:
10      Q.   So you can't tell me that
11 percentage, correct?
12      A.   No.
13      Q.   No, that's not correct, or, no,
14 you can't tell me?
15      A.   I can't tell you.
16      Q.   You can't tell me what percentage
17 of the decrease you believe you've observed in
18 teen sleep since the early 2010s is due to
19 social media as opposed to other forms of
20 digital media, correct?
21      A.   I can't --
22          MS. McNABB: Objection. Form.
23          THE WITNESS: I cannot put a
24     specific percentage on that, no.
25          MS. McNABB: Greg, we've been

Page 349

1     going about an hour.
2          MR. HALPERIN: I need about
3     five minutes and then we can take a
4     break.
5          MS. McNABB: Okay.
6 BY MR. HALPERIN:
7      Q.   You can't tell me what percentage
8 of all teen depression is due to social media,
9 can you?
10          MS. McNABB: Objection. Form.
11          THE WITNESS: Can you ask that
12     again?
13 BY MR. HALPERIN:
14      Q.   Can you tell me what percentage
15 of all teen depression today is due to social
16 media?
17      A.   I'm pausing because that's not
18 the way the studies work. I can tell you that
19 a teen who's a heavy -- heavy user of social
20 media is, in many studies, twice as likely to
21 be depressed as a non or light user.
22          And -- but that -- I think
23 that's different from your question, and the
24 statistics that I use don't answer that
25 question. So I would say, no, I can't tell

88 (Pages 346 - 349)

CONFIDENTIAL

1 you that.
2    Q.    There's some population of teens
3 today, whatever the number is, that is
4 depressed, correct?
5    A.    Mm-hmm.
6    Q.    You can't tell me what percentage
7 of them are depressed because of social media
8 as opposed to some other forms of digital
9 media or other causes, correct?
10         MS. McNABB: Objection. Form.
11         THE WITNESS: That's just not
12    the way the research literature works.
13 BY MR. HALPERIN:
14    Q.    And so you can't tell me that
15 percentage, right, because the research
16 doesn't answer it?
17         MS. McNABB: Objection to form.
18         THE WITNESS: I have seen some
19    people try to set a percentage on it.
20    But that's not the way this research
21    works, no.
22 BY MR. HALPERIN:
23    Q.    And so you can't tell me a
24 percentage, correct?
25    A.    No.

1         MS. McNABB: Objection. Form.
2 BY MR. HALPERIN:
3    Q.    You can't tell me what percentage
4 of teens who have made a suicide plan or
5 attempted suicide or committed suicide or had
6 suicidal thoughts have done so because of
7 social media as opposed to other causes,
8 correct?
9         MS. McNABB: Objection. Form.
10    Asked and answered.
11         THE WITNESS: I think that's
12    especially difficult to answer because
13    there are so many causes of these
14    things we've been discussing,
15    particularly of suicide.
16 BY MR. HALPERIN:
17    Q.    Not only is it difficult to
18 answer, you can't answer it, correct?
19         MS. McNABB: Objection. Form.
20         THE WITNESS: I can't put a
21    specific number on it, no.
22 BY MR. HALPERIN:
23    Q.    You can't tell me what percentage
24 of teens who don't get enough sleep today
25 don't get enough sleep because of social media

1 as opposed to other digital media or other
2 non-media causes, correct?
3         MS. McNABB: Objection to form.
4         THE WITNESS: Correct.
5         MR. HALPERIN: Why don't we
6    take a break.
7         THE VIDEOGRAPHER: Going off
8    the record at 4:00 p.m.
9         (Recess.)
10        THE VIDEOGRAPHER: And we're
11    back on the record at 4:16 p.m.
12 BY MR. HALPERIN:
13    Q.    Dr. Twenge, do you recall going
14 on Delaney Ruston's podcast at the end of
15 April of this year?
16    A.    Yes.
17    Q.    And her podcast is "Screenagers;"
18 is that right?
19    A.    I don't recall the name of her
20 podcast.
21    Q.    Okay. Why don't we pull up the
22 website for the Screenagers podcast, please.
23 And if we scroll up to the top, it says, the
24 "Screenagers podcast, Join Delaney Ruston,
25 MD," and then it goes on, right?

1    A.    Yes.
2    Q.    And so Dr. Ruston's podcast is
3 the Screenagers podcast, right?
4    A.    Yes. It looks like it says
5 "Parenting in the Screen Age."
6    Q.    Let's go -- if you scroll down,
7 please, to the April 28, 2025, entry, it says,
8 "How Screens Trap Teens in Depression,"
9 join -- "Jean Twenge Explains the Trap."
10    Do you see that?
11    A.    Yes.
12    Q.    Let's hit play starting at the 9
13 minute mark, please, until 9:30.
14    (Podcast played.)
15 BY MR. HALPERIN:
16    Q.    That's the same clip that we
17 played earlier where you asked me when is it
18 from, right?
19    A.    Yes.
20    Q.    And so that answers the question,
21 it was from April 28th of this year, correct?
22         MS. McNABB: And I'll just
23    object that it's only a clip of a
24    longer episode that seems to be about
25    half an hour long.

89 (Pages 350 - 353)

CONFIDENTIAL

Page 354

1        MR. HALPERIN:  And I'm limited
2    with time, so I'm not going to play a
3    half-hour video or audio clip.
4  BY MR. HALPERIN:
5        Q.    Do you stand behind that
6  statement from April 28th of this year?
7        A.    I stand behind the statement
8  that social media is one factor among several.
9        Q.    Do you stand behind the statement
10  that it's definitely a mistake to say it's
11  only social media; clearly, it's technology
12  and screens as a whole as well?
13        MS. McNABB:  Objection.  Form.
14        THE WITNESS:  So we had to put
15    that in context of what "it" is in
16    terms of what parents need to be
17    concerned about in terms of the links
18    to mental health.  Yes, social media
19    is a substantial cause, but it is not
20    the only one.
21  BY MR. HALPERIN:
22        Q.    It's technology and screens as a
23  whole that are also responsible, in your view,
24  for mental health harms among teens, correct?
25        A.    They are also causes along with

Page 355

1  social media.
2        Q.    Would you agree that the specific
3  social media platform and the way a teen uses
4  a platform may matter more than the raw number
5  of hours of use per week?
6        A.    Can you say that again?
7        Q.    Sure.  Would you agree that the
8  specific social media platform and the way a
9  teen uses a platform may matter more than the
10  raw number of hours of use per week?
11        MS. McNABB:  Objection.  Form.
12        THE WITNESS:  I don't think I
13    would put it that way because I would
14    say that both have an impact; that
15    both time spent and the way it's used
16    and the specific platform are all
17    going to be factors.
18        MR. HALPERIN:  Okay.
19        (Exhibit No. 37 was marked for
20    identification.)
21  BY MR. HALPERIN:
22        Q.    Let's look at what I've marked as
23  Exhibit 37.
24        This is an article you were the
25  lead author on, from 2022, correct?

Page 356

1        A.    Yes.
2        Q.    Go with me, if you will, to
3  page 10, second paragraph.  You say, "We
4  acknowledge that the specific social media
5  platform and the way a teen uses a platform
6  may matter more than the raw number of hours
7  of use per week."
8        Do you see that?
9        A.    Yes.
10        Q.    Was that a truthful statement
11  when you wrote it in 2022?
12        A.    I would word it a little
13  differently now.  But I think this also gets
14  across the idea that all of those are
15  important factors.
16        Q.    So you do not stand behind that
17  statement as written today?
18        A.    I wouldn't put it that way.  As
19  I said, I think I would word it a little bit
20  differently.  But the basis of the statement
21  that the specific platform, the way it's used,
22  and the raw number of hours are important, so
23  I -- I would probably change the wording
24  somewhat.
25        Q.    Okay.  I want to look at your

Page 357

1  book chapter from 2025 on social media and
2  depressive symptoms, which was Exhibit 22.
3        Let me know when you have it.
4        A.    I have it.
5        Q.    Go to page 138, please under the
6  heading "Future Research."
7        Do you see that?
8        A.    Yes.
9        Q.    "The most pressing research
10  questions worthy of future research in this
11  area include."
12        Do you see that?
13        A.    Yes.
14        Q.    The third bullet says "Which
15  social media platforms and types of social
16  media uses are most likely to lead to
17  depression?  For example, is the use of
18  Instagram, Snapchat, or TikTok most strongly
19  linked to depression?"
20        Do you see that?
21        A.    Yes.
22        Q.    You don't know the answer to that
23  question sitting here today, do you?
24        MS. McNABB:  Objection.  Form.
25        THE WITNESS:  I -- I do, to an

CONFIDENTIAL

Page 358

1    extent.  I -- maybe not with
2    depression, but in the van der Wal
3    study, that's almost exactly what they
4    did.  I don't think it was depression
5    that they were measuring, it might
6    have been another measure of
7    psychological well-being, but that
8    study did answer that question.  And
9    that study had not come out at the
10   time I wrote this chapter.
11   BY MR. HALPERIN:
12       Q.    When did that study come out?
13       A.    I couldn't put an exact date on
14   it, but I know it was after I wrote this
15   chapter.
16       Q.    You wrote this chap- -- this
17   chapter was published in 2025, correct?
18       A.    Yes.  Although it had a long,
19   long lead up to being published, so I probably
20   wrote those words in 2023.
21       Q.    Do you plan to go to your
22   editors, Dr. Christakis and Dr. Hale, and ask
23   them to change this language?
24       A.    I don't see the need for that,
25   because this says "future research," and that

Page 359

1    was future research that helped to answer that
2    question.
3        Q.    So you don't plan to issue a
4    correction to that statement, correct?
5        A.    A correction's not necessary.
6    The statement's not inaccurate.  It's a
7    question about future research, and that
8    future research came out and helped to answer
9    that question.
10       Q.    Let me ask you:  Before that
11   research came out, was there -- was that
12   question -- did you know the answer to that
13   question?
14       A.    Before that research came out?
15       Q.    Correct.
16       A.    No.
17       Q.    Do you understand that the New
18   Mexico Attorney General has brought suit only
19   against Facebook and Instagram?
20       A.    Yes.
21       Q.    Do you understand that the
22   Tennessee Attorney General has brought suit
23   only against Instagram?
24       A.    Yes.
25       Q.    Can you tell me what percentage

Page 360

1    of the rise in teen depression since 2012 is
2    due to Instagram specifically?
3            MS. McNABB:  Objection.  Form.
4            THE WITNESS:  I cannot tell you
5        a specific percentage, although I
6        think it is a substantial and
7        important factor.
8    BY MR. HALPERIN:
9        Q.    You can't tell me the specific
10   percentage of the rise in teen depression
11   since 2012 that's due to Instagram
12   specifically, correct?
13           MS. McNABB:  Objection.  Form.
14           THE WITNESS:  I cannot give you
15       a specific number, no.
16   BY MR. HALPERIN:
17       Q.    You can't tell me the specific
18   percentage of the rise in teen depression
19   since 2012 that's due to Facebook
20   specifically, correct?
21       A.    No.
22           MS. McNABB:  Objection.  Form.
23   BY MR. HALPERIN:
24       Q.    You can't tell me what percentage
25   of the rise in self-harm or suicidality or

Page 361

1    suicide attempts or suicides is due to
2    Instagram specifically, correct?
3        A.    No.
4            MS. McNABB:  Objection.  Form.
5    BY MR. HALPERIN:
6        Q.    No, not correct, or, no, you
7    can't tell me?
8        A.    No, I cannot tell you.
9        Q.    Same question for Facebook:  You
10   can't tell me what percentage of the rise in
11   self-harm or suicidality or suicide attempts
12   or suicides is due to Facebook specifically,
13   correct?
14           MS. McNABB:  Objection.  Form.
15           THE WITNESS:  No.
16   BY MR. HALPERIN:
17       Q.    No, you can't tell me, or, no,
18   not correct?
19       A.    No, I can't tell you.
20       Q.    You can't tell me what percentage
21   of the decline in teen hours slept since the
22   early 2010s is due to Instagram specifically,
23   correct?
24           MS. McNABB:  Objection.  Form.
25           THE WITNESS:  No, I can't tell

91 (Pages 358 - 361)

CONFIDENTIAL

Page 362

1    you.
2  BY MR. HALPERIN:
3      Q.   You can't tell me what the
4  percentage of the decline in teen hours slept
5  since the early 2010s is due to Facebook
6  specifically, correct?
7          MS. McNABB:  Objection to form.
8          THE WITNESS:  No, I can't tell
9      you that.
10  BY MR. HALPERIN:
11     Q.   And that's true for all of the
12  platforms, for Snapchat, for TikTok as well,
13  correct?
14         MS. McNABB:  Objection.  Form.
15         THE WITNESS:  I think that new
16     research helps us, to an extent, to
17     understand the links between the
18     specific platforms and psychological
19     well-being.
20  BY MR. HALPERIN:
21     Q.   But it doesn't give you the
22  percentage of harm attributable to any
23  specific platform, correct?
24     A.   Correct.
25     Q.   And we've been talking about the

Page 363

1  increase since the early 2010s.  You can't
2  tell me what percentage of all teenage
3  depression since 2012 is due to Facebook or
4  Instagram, right?
5          MS. McNABB:  Objection.  Form.
6          THE WITNESS:  No, I cannot.
7  BY MR. HALPERIN:
8      Q.   You can't tell me what percentage
9  of all teenage suicides since 2012 is due to
10  Facebook or Instagram, correct?
11         MS. McNABB:  Objection.  Form.
12         THE WITNESS:  Correct.
13  BY MR. HALPERIN:
14     Q.   You can't tell me what percentage
15  of all teenage suicide attempts or self-harm
16  since 2012 is due to Facebook or Instagram,
17  correct?
18         MS. McNABB:  Objection.  Form.
19         THE WITNESS:  Correct.
20  BY MR. HALPERIN:
21     Q.   You can't tell me what percentage
22  of all teens who don't get enough sleep since
23  2012 are due to Facebook or Instagram,
24  correct?
25         MS. McNABB:  Objection.  Form.

Page 364

1          THE WITNESS:  Correct.
2  BY MR. HALPERIN:
3      Q.   Or to any individual platform,
4  correct?
5      A.   Correct.
6      Q.   Now, during your last deposition,
7  you were asked what time limits you recommend
8  parents set for social media, and you said no
9  more than an hour on each one app and no more
10  than about two or three hours total.
11         Do you recall that?
12     A.   Yes.
13     Q.   Your own research has found, and
14  I think one of my colleagues spoke to you
15  about this earlier, your own research has
16  found that the best outcomes appeared at light
17  use, not no use, correct?
18     A.   Not quite.  It depends on which
19  dataset and the age of the individuals.  So in
20  Kelly et al, 2019, for example, the best
21  outcomes are at no use.  In Monitoring the
22  Future, in the older data, the best outcomes
23  are at light use.  In the more recent data,
24  it's at no use.  So there's a -- there's a
25  little bit of variation.  Sometimes you get

Page 365

1  the best outcomes at no use, sometimes at
2  light use.
3          (Exhibit No. 38 was marked for
4          identification.)
5  BY MR. HALPERIN:
6      Q.   I hand you Exhibit 38.  This is
7  an article you published in 2020, correct?
8      A.   Yes.
9      Q.   This came out after Kelly, 2019,
10  correct?
11     A.   Yes.
12     Q.   Look at page 382, please, second
13  column, first full paragraph.  "We agree with
14  Ophir et al. that digital media use is not all
15  negative.  In fact, we found in Twenge et al.
16  2018C that the best outcomes appeared at light
17  use, not no use.  This J-shape pattern has
18  been replicated in numerous studies."
19         Do you see that?
20     A.   I do.  There's often a delay
21  between when something is written and when
22  it's published, so it'd be hard for me to tell
23  you if I had seen Kelly et al., 2019 before
24  this was written.  And I definitely had not
25  seen the more recent data for Monitoring the

CONFIDENTIAL

Page 366

1 Future because it didn't -- it wasn't
2 released. It didn't even exist, for the most
3 part, yet.
4    Q.    My only question was, do you see
5 that? And so I'm going to move to strike
6 everything after "I do."
7        Was this an accurate statement
8 when you wrote it?
9    A.    When I wrote it, yes.
10    Q.    In many cases, the literature
11 shows that nonusers of technology are slightly
12 worse off than those who use technology about
13 an hour a day.
14        MS. McNABB: Objection. Form.
15        THE WITNESS: So it depends on
16    the study. Some studies find that;
17    others find that the best outcomes are
18    at no use.
19 BY MR. HALPERIN:
20    Q.    So --
21    A.    Sorry. Hold on one sec. I need
22 to -- I need to amend my statement. It looks
23 like I do cite Kelly et al. here, so clearly
24 that article was -- I was aware of that
25 article when I wrote this. So at the time,

Page 367

1 maybe that was the exception, and now it is
2 not.
3    Q.    Okay. Do you agree that in many
4 cases, the literature shows that nonusers of
5 technology are slightly worse off than those
6 who use technology about an hour a day?
7        MS. McNABB: Objection. Form.
8        THE WITNESS: Some studies show
9    that, yes.
10 BY MR. HALPERIN:
11    Q.    Now, in your own research, you've
12 analyzed data on how much time teens spend on
13 social media. Correct?
14    A.    Yes.
15    Q.    Let's go to the very first
16 exhibit I gave you, which I think is
17 Exhibit -- I think it's going to be 13.
18        Give me one second. It's Twenge
19 and Martin, 2020. Exhibit 13.
20    A.    I have a lot of exhibits in
21 front of me. I'm trying to find it. I'm
22 doing the best I can, but it's taking me a
23 little time.
24    Q.    I totally understand, Doctor,
25 you've written a lot, and I've read a lot of

Page 368

1 your writings, so we will work our way through
2 it.
3    A.    I am just not finding that one.
4    Q.    The title is Gender Differences.
5    A.    It's around here somewhere.
6    Q.    The title is Gender Differences.
7    A.    Yeah. Okay.
8    Q.    It's in the Journal of
9 Adolescence. It says it in big at the top.
10    A.    Oh, dang. It's at the bottom.
11    Q.    At the bottom of the stack.
12    A.    Got it.
13    Q.    Always the case. All right.
14        Look with me, please, at page 94.
15 And I want to look at Table 1 at the bottom of
16 the page. That table shows gender differences
17 in hours a day of specific types of digital
18 media use.
19        Do you see that?
20    A.    Yes.
21    Q.    And for social media, you use
22 Monitoring the Future, correct?
23    A.    Yes.
24    Q.    Beginning in 2013, Monitoring the
25 Future began asking about hours per week spent

Page 369

1 on social media. Right?
2    A.    Yes.
3    Q.    And for that reason, you focused
4 in this article on 2013 to 2016 for Table 1,
5 correct?
6        You say it at the very top of the
7 page, if that helps.
8    A.    Yes.
9    Q.    So Table 1 shows for males and
10 females, the hours a day they spend on average
11 on social media, according to Monitoring the
12 Future, correct?
13    A.    Yes.
14    Q.    And 2013 to 2016 is shortly after
15 the time period that you started to see a rise
16 in mental health harms in teens, correct?
17    A.    Yes.
18    Q.    According to Monitoring the
19 Future, between 2013 and 2016, males spent an
20 average of 1.2 hours a day across all social
21 media platforms, correct?
22    A.    By -- by the way it's defined by
23 Monitoring the Future and in that time period,
24 yes.
25    Q.    And according to Monitoring the

Golkow Technologies,
A Veritext Division

877-370-3377                                      www.veritext.com

CONFIDENTIAL

Page 370

1 Future and the way it's defined in that study,
2 between 2013 and 2016, males spent an average
3 of 1.91 hours across all social media
4 platforms, correct?
5         MS. McNABB: Objection to form.
6         THE WITNESS: I think you mean
7         females. You might want to reword.
8 BY MR. HALPERIN:
9     Q.    Let me reask my question.
10    According to Monitoring the
11 Future and the way it's defined in that study,
12 between 2013 and 2016, females spent an
13 average of 1.91 hours across all social media
14 platforms, correct?
15    A.    Yes.
16    Q.    Both of those numbers, male and
17 female, are below your all app daily limit of
18 two to three hours a day, correct?
19    A.    Yes.
20    Q.    So according to Monitoring the
21 Future, the average male and the average
22 female is below your all app daily limit,
23 correct?
24        MS. McNABB: Objection. Form.
25        THE WITNESS: I think that has

Page 371

1     to be put in the context, first, of
2     the years we're talking about, and it
3     has to be put in the context of the
4     next part of the table, which is the
5     highest level of use.
6 BY MR. HALPERIN:
7     Q.    And I'm just focused on the
8 average for now.
9     A.    Okay.
10    Q.    According to Monitoring the
11 Future, the average male and the average
12 female is below your all app daily limit of
13 two to three hours per day, correct?
14        MS. McNABB: Objection. Form.
15        THE WITNESS: Yes.
16 BY MR. HALPERIN:
17    Q.    Do you know what percentage of
18 males or percentage of females is above your
19 all app daily limit of two to three hours a
20 day?
21    A.    I would have to go back to the
22 dataset and look.
23    Q.    So you don't have that number,
24 correct?
25    A.    At my fingertips, no.

Page 372

1     Q.    You've not looked at it in
2 connection with your report in this case,
3 correct?
4         MS. McNABB: Objection. Form.
5         THE WITNESS: I don't believe
6     so.
7 BY MR. HALPERIN:
8     Q.    You've not included it in your
9 report, correct?
10    A.    I don't believe so.
11    Q.    Do you know what these numbers
12 look like today either for males or females?
13    A.    So I don't think I know it off
14 the top of my head for Monitoring the Future,
15 but Gallup found that the average was now 4.8.
16    Q.    And we will talk about that
17 Gallup study in a moment.
18        You don't know what Monitoring
19 the Future number is today, correct?
20    A.    No.
21    Q.    Have you looked for Tennessee
22 specific data on how much time teens spend on
23 social media?
24        MS. McNABB: Objection. Form.
25        THE WITNESS: So Monitoring the

Page 373

1     Future doesn't break the data down by
2     state due to privacy reasons, so no.
3 BY MR. HALPERIN:
4     Q.    Have you looked for any data from
5 another source on how much time Tennessee
6 teens spend on social media?
7         MS. McNABB: Objection. Form.
8         THE WITNESS: I don't think I
9     was -- so did I look for that at some
10    point to see if there was another
11    source that might have that broken
12    down by state? Yes, but I don't think
13    I found anything.
14 BY MR. HALPERIN:
15    Q.    So you did not include in your
16 Tennessee report any data on how much
17 Tennessee teens -- how much time Tennessee
18 teens spent on social media, correct?
19        MS. McNABB: Objection. Form.
20        THE WITNESS: I don't believe
21    so, no.
22 BY MR. HALPERIN:
23    Q.    Did you look for New Mexico
24 specific data?
25    A.    I did look for New Mexico

94 (Pages 370 - 373)

CONFIDENTIAL

Page 374

1  specific data on several of the factors I was
2  considering, but given that Monitoring the
3  Future, if that's what you are referring to,
4  is not broken down by state, I would not have
5  found it.
6      Q.   You didn't include any data from
7  any source in your New Mexico report on how
8  much time New Mexico teens spend on social
9  media, correct?
10      MS. McNABB:  Objection.  Form.
11      THE WITNESS:  I don't believe
12  so, no.
13      (Exhibit No. 39 was marked for
14  identification.)
15  BY MR. HALPERIN:
16      Q.   Okay.  I handed you what I will
17  mark as Exhibit 39, an article from February
18  2022, titled Nearly Half of Tennessee Kids
19  Spend More Than Two Hours Per Day on
20  Non-Educational Screen Time.
21      Do you see that?
22      A.   Yes.
23      Q.   If you look at the first page, it
24  says "Nearly 50 percent of Tennessee parents
25  said their children spend two hours or more on

Page 375

1  non-educational screen time each day, despite
2  over two-thirds of parents reporting that they
3  place limits on screen time.  Results come
4  from the latest analysis of the annual
5  Vanderbilt Child Health Poll."
6      Do you see that?
7      A.   Yes.
8      Q.   Are you familiar with the
9  Vanderbilt Child Health Poll?
10      A.   No.
11      Q.   Have you ever tried to get access
12  to its data?
13      A.   No.
14      Q.   Non-education screen time would
15  include time spent on social media,
16  presumably.  Correct?
17      MS. McNABB:  Objection.  Form.
18      THE WITNESS:  I would have to
19  see how the question was asked.
20  BY MR. HALPERIN:
21      Q.   If the question was just, how
22  much time had -- how much non-educational
23  screen time have you had on average a day, it
24  would include social media.  Right?
25      MS. McNABB:  Objection.  Form.

Page 376

1      THE WITNESS:  I would assume
2  so, but, again, I would have to see
3  how the question was worded.  I would
4  also have to see what age children
5  we're talking about.
6  BY MR. HALPERIN:
7      Q.   If the question provided no
8  specifics beyond non-educational screen time,
9  it would also include things like texting and
10  video games and surfing the internet, correct?
11      MS. McNABB:  Objection.  Form.
12      THE WITNESS:  I would assume it
13  would include all of those things, as
14  well as social media, yes.
15  BY MR. HALPERIN:
16      Q.   So according to this poll, the
17  average Tennessee teen spends less
18  non-educational time on screens generally than
19  your all app daily limit for social media
20  specifically.  Correct?
21      MS. McNABB:  Objection.  Form.
22      THE WITNESS:  Say that again.
23  BY MR. HALPERIN:
24      Q.   According to this poll by
25  Vanderbilt, the average Tennessee teen spends

Page 377

1  less non-educational time on screens generally
2  than your all app daily limit for social media
3  specifically.  Correct?
4      MS. McNABB:  Objection.  Form.
5      THE WITNESS:  So I am not, as I
6  said, familiar with this poll.  I'm
7  not sure how they collected this data.
8  I'm not sure how they asked the
9  question.
10      If their average is two hours
11  of non-educational screen time a day,
12  that is wildly off from the national
13  limits that I'm aware of from, say,
14  Common Sense Media.  So I would
15  definitely want to check out more of
16  the details about how this was done.
17  BY MR. HALPERIN:
18      Q.   And you didn't look at this in
19  connection with your Tennessee report,
20  correct?
21      A.   I did not.
22      Q.   You don't know if it's accurate.
23  Correct?
24      A.   I have no idea.
25      Q.   Let's talk about your per app

95 (Pages 374 - 377)

CONFIDENTIAL

Page 378

1 limit of one hour a day. Can you point me to
2 any publication in which it said teens should
3 spend no more than an hour on each app
4 regardless of how many social media apps they
5 use?
6      A.    I'm not sure I understand your
7 question.
8      Q.    Well, you told us in our last
9 deposition that teens should spend no more
10 than an hour an each app. Correct?
11     A.    Can you read me the exact
12 phrasing? That would be helpful.
13     Q.    Sure.
14            You said no more than an hour on
15 each app, and no more than about two or three
16 hours total.
17     A.    So to be clear, was that talking
18 about children over the age of 16, given that
19 I almost always say children 15 and under
20 should not be on social media at all?
21     Q.    Looking at Exhibit 10, which is
22 probably the biggest one you have there. It's
23 your transcript of your deposition from last
24 time. I think it's in the stack right in
25 front of you. I can see the binder clip.

Page 379

1      A.    Yeah.
2      Q.    Page 144.
3      A.    Oh, this is something different.
4      Q.    Okay. You should have a big one
5 there that is your deposition. If not, I can
6 hand you another copy if it's easier.
7      A.    Okay. Go ahead.
8      Q.    Page 144.
9      A.    And that's the little page
10 numbers?
11     Q.    Yeah. Yours are four to a page.
12 I've got the big one if it's easier to see.
13     A.    Okay. That's all right.
14            That's for gaming. That's not
15 for social media.
16     Q.    You say, "If your child does have
17 social media, put a time limit on it. You
18 know, exactly how much depends on how many
19 apps they are using."
20     A.    Wait, wait, wait, wait. I want
21 to make sure that we're talking about the same
22 thing.
23     Q.    Yes. Look with me at the bottom
24 of page 144, starting on line 24.
25     A.    Okay. All right. So I was

Page 380

1 looking earlier on that. Okay.
2      Q.    You say, "If your child does have
3 social media" --
4      A.    I see it.
5      Q.    -- "put a time limit on it."
6            And then you say, "No more than
7 an hour on each one app, and no more than two
8 or three hours total."
9            Correct?
10     A.    Yes. Yes.
11     Q.    And you confirm that that's per
12 day, right?
13     A.    Yes. That has to be taken in
14 the context that I recommend no social media
15 at all for those 15 and under.
16     Q.    Okay. So can you tell me
17 anywhere for any age group where you've
18 published the opinion that children should
19 spend no more than an hour on each one app,
20 regardless of the number of apps they use?
21     A.    So the idea, I think with that,
22 is that so the total doesn't end up beyond
23 that two hours a day where, in the research
24 literature, we start to see the significant
25 increases in depression.

Page 381

1      Q.    I think you may have missed my
2 question. Let me try it one more time.
3            Can you tell me anywhere for any
4 age group where you've published the opinion
5 that children should spend no more than an
6 hour on each one app regardless of the number
7 of apps they use?
8            MS. McNABB: Objection. Form.
9            THE WITNESS: I think because
10     in the research literature I'm focused
11     on general social media use, I don't
12     think I have published that particular
13     opinion about each app. It's more
14     focused on the total amount of use.
15 BY MR. HALPERIN:
16     Q.    Do you know how much time the
17 average teen spends on Facebook in a day?
18     A.    No.
19     Q.    Do you know how much time the
20 average teen spends on Instagram in a day?
21            MS. McNABB: Objection. Form.
22            THE WITNESS: No.
23 BY MR. HALPERIN:
24     Q.    You referenced the Gallup poll.
25 Right?

96 (Pages 378 - 381)

CONFIDENTIAL

Page 382

1    A.    Yes.
2    Q.    The Gallup poll actually provides
3 that data by app, correct?
4    A.    I would have to have it in front
5 of me. I haven't read it in quite a while.
6    Q.    Okay. Let's look. This is going
7 to be Exhibit 40. And apologies, it's a
8 little small. The only way we could get it to
9 print without losing content was to make it a
10 little small.
11        (Exhibit No. 40 was marked for
12    identification.)
13 BY MR. HALPERIN:
14    Q.    This is the Gallup poll you
15 referenced, right?
16    A.    Yes.
17    Q.    Okay. Look with me at page 2.
18 At the top of the page, it says, "Hours spent
19 per day on social media platforms among U.S.
20 teens."
21        Do you see that?
22    A.    Yes.
23    Q.    And it breaks it down by gender
24 and app, correct?
25    A.    Yes.

Page 383

1    Q.    So according to this Gallup poll,
2 teen boys spend an average of .3 hours on
3 Facebook, correct?
4        MS. McNABB: Objection. Form.
5        THE WITNESS: Yes.
6 BY MR. HALPERIN:
7    Q.    And lawyers are used to tenths of
8 an hour, because we record our time that way.
9        .3 hours is 18 minutes. Correct?
10        MS. McNABB: Objection. Form.
11        THE WITNESS: It's hard to do
12    that math in my head, but I will
13    believe you.
14 BY MR. HALPERIN:
15    Q.    One-tenth of 60 minutes is six,
16 times three is 18, right?
17    A.    Yes.
18    Q.    Okay. So teen boys spend an
19 average of 18 minutes per day on Facebook,
20 according to Gallup, correct?
21    A.    Yes.
22        MS. McNABB: Objection. Form.
23 BY MR. HALPERIN:
24    Q.    Within your recommended per app
25 limit of an hour. Correct?

Page 384

1        MS. McNABB: Objection. Form.
2        THE WITNESS: Yes.
3 BY MR. HALPERIN:
4    Q.    Teen girls spend .4 hours on
5 average on Facebook, which is 24 minutes per
6 day. Correct?
7    A.    Yes.
8    Q.    Also within your per app limit,
9 correct?
10        MS. McNABB: Objection.
11        THE WITNESS: Yes.
12 BY MR. HALPERIN:
13    Q.    Can you tell me what percentage
14 of U.S. teens spend more than an hour per day
15 on Facebook?
16        MS. McNABB: Objection. Form.
17        THE WITNESS: I don't know.
18 BY MR. HALPERIN:
19    Q.    Turning to Instagram, teen boys
20 spend on average .9 hours per day on
21 Instagram. Correct?
22        MS. McNABB: Objection. Form.
23        THE WITNESS: That's the total
24    for all teenagers.
25 BY MR. HALPERIN:

Page 385

1    Q.    The average, correct?
2    A.    Yes.
3    Q.    The average teen boy spends less
4 than your per app limit of an hour. Correct?
5        MS. McNABB: Objection. Form.
6        THE WITNESS: Yes.
7 BY MR. HALPERIN:
8    Q.    Teen girls spend 1.1 hours on
9 average per day on Instagram. Correct?
10        MS. McNABB: Objection. Form.
11        THE WITNESS: Yes.
12 BY MR. HALPERIN:
13    Q.    That's just six minutes above
14 your recommended per app limit. Correct?
15    A.    Yes.
16    Q.    Can you tell me what percentage
17 of U.S. teens spent more than an hour per day
18 on Instagram?
19    A.    No.
20    Q.    Do you know how much time the
21 average Tennessee teen spends on Instagram?
22    A.    No.
23        MS. McNABB: Objection. Form.
24 BY MR. HALPERIN:
25    Q.    Do you know how much time the

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 386

1  average New Mexico teen spends on Facebook or
2  Instagram?
3        MS. McNABB: Objection. Form.
4        THE WITNESS: No.
5  BY MR. HALPERIN:
6     Q.   Do you know that Meta has
7  actually produced data on that for every state
8  in the country on a month-by-month basis in
9  this litigation?
10       MS. McNABB: Objection. Form.
11       THE WITNESS: I did not know
12    that. Where is that data made
13    available?
14 BY MR. HALPERIN:
15    Q.   Did you review it in connection
16 with your report?
17    A.   I don't recall reviewing that,
18 no.
19    Q.   If it's not on your reliance
20 list, you didn't review it, right, or your
21 materials considered list?
22       MS. McNABB: Objection. Form.
23       THE WITNESS: Correct. It may
24    be there, though. There's, as you
25    know, a long list of documents there.

Page 387

1  BY MR. HALPERIN:
2     Q.   If I told you there's not a
3  single state in the country suing Meta for
4  consumer protection violations where the
5  average teen minutes per day in a month was
6  above 60 minutes in any month, would you have
7  any basis to disagree with me?
8        MS. McNABB: Objection.
9     Foundation.
10       THE WITNESS: No. And I don't
11    think the average is the key problem
12    here.
13 BY MR. HALPERIN:
14    Q.   Okay. When did video autoplay
15 come to Facebook?
16    A.   I don't know.
17    Q.   When did video autoplay come to
18 Instagram?
19    A.   I don't know.
20    Q.   When did -- did videos autoplay
21 on Facebook or Instagram in 2012?
22    A.   I don't know.
23    Q.   When did Facebook start sending
24 push notifications?
25    A.   I don't know.

Page 388

1     Q.   When did Instagram start spending
2  push -- start sending push notifications?
3     A.   I don't know.
4     Q.   Did Facebook or Instagram have
5  push notifications in 2012?
6        MS. McNABB: Objection. Form.
7        THE WITNESS: I don't know.
8  BY MR. HALPERIN:
9     Q.   When did cosmetic surgery effect
10 filters launch on Facebook?
11    A.   I don't know.
12    Q.   When did cosmetic surgery effect
13 filters launch on Instagram?
14    A.   I don't know.
15    Q.   Did Facebook or Instagram have
16 cosmetic surgery effect filters in 2012?
17    A.   I don't know.
18       MS. McNABB: Objection. Form.
19 BY MR. HALPERIN:
20    Q.   When did Facebook start using an
21 algorithmic feed?
22    A.   I'm not sure, but I thought that
23 was sometime in the early 2010s.
24    Q.   Do you know?
25    A.   The exact year, I do not.

Page 389

1     Q.   Do you know if it was in fact the
2  early 2010s?
3     A.   I don't know for sure, no.
4     Q.   When did Instagram start using an
5  algorithmic feed?
6     A.   I believe also early to mid
7  2010s, but I don't know the exact year.
8     Q.   Did Facebook or Instagram --
9  strike that.
10       When did Facebook start having
11 ephemeral content?
12    A.   I don't know.
13    Q.   When did Instagram start having
14 ephemeral -- strike that.
15       Did Facebook or Instagram have
16 ephemeral content in 2012?
17       MS. McNABB: Objection. Form.
18       THE WITNESS: I don't know.
19 BY MR. HALPERIN:
20    Q.   When did Instagram start having
21 "like" counts?
22    A.   That was also early 2010s.
23    Q.   Are you sure?
24    A.   Fairly -- fairly sure, yes.
25    Q.   Okay. Now, outside of

98 (Pages 386 - 389)

CONFIDENTIAL

Page 390

1 litigation, you've laid out various mechanisms
2 for how you think social media can influence
3 mental health. Correct?
4     A.   I don't know what you are
5 referring to, so maybe that would help me
6 answer.
7     Q.   Have you published statements
8 about potential mechanisms for how social
9 media can cause the harms you discuss? Have
10 you ever published on that topic?
11     A.   I believe in some papers, I have
12 written about possible mechanisms, yes.
13     Q.   One way that social media can
14 influence mental health, in your view, is
15 through exposure to suicide and self-injury
16 content. True?
17     A.   That is one mechanism, yes.
18     Q.   It's your belief that suicide and
19 self-injury content is so prevalent, that most
20 adolescent exposure to such content is
21 unintentional. Correct?
22         MS. McNABB: Objection.
23 Foundation.
24         THE WITNESS: I don't know what
25     you are referring to to put that in

Page 391

1     context.
2 BY MR. HALPERIN:
3     Q.   Okay. Look at your book chapter
4 from 2025 on suicide and self injury. It's
5 going to be Exhibit 22. I'm sorry, it's going
6 to be one of the Exhibit 23s.
7         The one, Media Influences on
8 Self-Harm, Suicidality --
9     A.   Got it.
10     Q.   And if you have a pen there, why
11 don't you just write 23A on it, so that we
12 clear that up for the record.
13     A.   (Witness complies.)
14     Q.   Thank you.
15         Do you see on page 143, the
16 heading, Exposure to Suicide and
17 Self-Injurious Thoughts and Behavior Content,
18 2.2.1?
19         Are you with me, Doctor?
20     A.   Yes.
21     Q.   The last sentence of that section
22 says, "Moreover, suicide and self-injurious
23 thought and behavior content is so prevalent
24 that most adolescent exposure to such content
25 is unintentional."

Page 392

1         Do you see that?
2     A.   Yes.
3         MS. McNABB: Objection. Form.
4 BY MR. HALPERIN:
5     Q.   And was that -- is that an
6 accurate statement?
7     A.   I believe so, although I'm --
8 I'm pretty sure it's one of my coauthors who
9 wrote that and not me.
10     Q.   You don't disagree with it, do
11 you?
12     A.   Let me read it again.
13         I agree with the statement.
14     Q.   Given how prevalent it is, in
15 your view, the more time teens spend on social
16 media, the more opportunity they have to come
17 across that content. Right?
18     A.   Yes.
19     Q.   And exposure to suicide and
20 self-injury content can increase the risk of
21 suicide and self-injury thoughts and
22 behaviors. True?
23     A.   Yes.
24     Q.   Another mechanism for how social
25 media can influence mental health, in your

Page 393

1 view, is by exacerbating existing negative
2 thinking as users seek out consistent content.
3 Correct?
4         MS. McNABB: Objection. Form.
5         THE WITNESS: I think I know
6     what you mean.
7         Can you point me to the
8     direct -- to the specific source?
9 BY MR. HALPERIN:
10     Q.   Yeah. Look at Exhibit 22, which
11 is the other book chapter you published in
12 this book. The one on depression.
13         And go to page 138, please.
14     A.   Okay.
15     Q.   You say, on the left-hand side,
16 last paragraph, "Fourth, social media can
17 exacerbate existing negative thinking as users
18 seek out consistent content which reinforces
19 their emotions and cognitions."
20         Do you see that?
21     A.   I do.
22     Q.   "For instance, users who are
23 depressed might seek out depression content
24 and exacerbate their depressive thoughts."
25 Right?

99 (Pages 390 - 393)

CONFIDENTIAL

1        MS. McNABB:  I will object to
2    the prior question as to form.  It
3    doesn't state the entire sentence.
4        THE WITNESS:  So yes, although
5    I think if I wrote this today, I would
6    also probably write social media can
7    exacerbate exposure to negative
8    content due to the algorithms serving
9    it up.  Because this is seeking out --
10   this says seek out, and that's not the
11   only way that users are exposed to
12   negative content and go down rabbit
13   holes.
14        So I would write it a little
15   differently today than I did whenever
16   I wrote this chapter, which was
17   probably two years ago.
18 BY MR. HALPERIN:
19   Q.    And I'm not asking if it's the
20 only way.  Is one way that you believe social
21 media can cause the mental health harms you
22 discuss, that people who are suffering from
23 mental health harms seek out more of that
24 content, exacerbating their mental health
25 challenges?

1    A.    It's --
2        MS. McNABB:  Objection.  Form.
3        THE WITNESS:  It's one of
4    several mechanisms.
5 BY MR. HALPERIN:
6    Q.    Another mechanism for how you
7 think social media can influence mental health
8 is through cyberbullying.  Correct?
9    A.    Yes.
10   Q.    And cyberbullying is when users
11 engage in bullying online through their words
12 or images or otherwise, right?
13   A.    Yes.
14   Q.    Through content, right?
15       MS. McNABB:  Objection.  Form.
16       THE WITNESS:  Yes.  Although in
17   this case, I think it's difficult to
18   separate the content from the
19   features, particularly given things
20   like push notifications, gamification,
21   where teens are going onto the
22   platform over and over, even if,
23   perhaps, that's against their best
24   interest because they are seeing the
25   cyberbullying because they get those

1    notifications.
2 BY MR. HALPERIN:
3    Q.    Teens engaged in cyberbullying
4 even before there were notifications on social
5 media.  Right?
6    A.    Sure.
7    Q.    As soon as teens had the ability
8 to comment on someone else's post, they could
9 engage in cyberbullying, correct?
10   A.    Yes.  Although with push
11 notifications, they would be more likely to
12 see that content sooner.
13   Q.    Teens could engage in
14 cyberbullying as soon as they had the ability
15 to post on someone's Facebook wall.  Right?
16   A.    Yes.
17       MS. McNABB:  Objection.  Form.
18 BY MR. HALPERIN:
19   Q.    Teens who engage in
20 cyberbullying are more likely to engage --
21 strike that.
22       Teens who experience
23 cyberbullying are more likely to engage in
24 self-harm, true?
25   A.    I believe that's true, but it

1 would be helpful if you showed me the specific
2 source.
3    Q.    Look with me at your self-harm
4 article, 23A.  Page 143, there's a section,
5 Cyberbullying.
6        Do you see that?
7    A.    I do.
8    Q.    "Research suggests that youth
9 victims of cyberbullying are over twice as
10 likely to engage in self-harm or report a
11 suicide attempt and report suicidal thoughts
12 when compared to non-victims."
13       Do you see that?
14   A.    Yes.
15   Q.    Is that accurate?
16   A.    Yes.
17   Q.    So teens who experience bullying
18 are more likely to engage in self-harm?
19   A.    Yes.
20   Q.    They are more likely to report a
21 suicide attempt?
22   A.    Yes.
23   Q.    They are more likely to report
24 suicidal thoughts?
25   A.    Yes.

100 (Pages 394 - 397)

CONFIDENTIAL

Page 398

1    Q.    Another mechanism for how you
2 think social media can influence mental health
3 is encouraging social comparison with other
4 people.  Correct?
5    A.    Yes.
6    Q.    Teens compare themselves to how
7 others look in images and to what others say
8 online.  Right?
9    A.    Yes.
10    Q.    They compare themselves to other
11 people's content.  True?
12        MS. McNABB:  Objection.  Form.
13        THE WITNESS:  Can you point me
14    to the specific thing you are
15    referring to?
16 BY MR. HALPERIN:
17    Q.    I'm not referring to anything.
18 I'm asking you, do teens compare themselves,
19 engage in social comparison with respect to
20 other teens' content?
21        MS. McNABB:  Objection.  Form.
22        THE WITNESS:  Yes.
23 BY MR. HALPERIN:
24    Q.    Body image content leads to more
25 appearance concern and social comparison, in

Page 399

1 your view?
2        MS. McNABB:  Objection.  Form.
3        THE WITNESS:  It depends on
4    what you mean by body image content.
5 BY MR. HALPERIN:
6    Q.    Okay.  Let's play tab 37, please.
7    Okay.  We will come back to that.
8        We talked earlier about Alexis
9 Spence.
10    A.    Yes.
11    Q.    Have you ever spoken to Alexis
12 Spence?
13    A.    No.
14    Q.    Have you ever reviewed her
15 medical records?
16    A.    No.
17    Q.    Do you know anything about her
18 other than what's been reported in the media
19 or what their lawyers have said in public
20 court filings?
21    A.    Yes.  I was given some materials
22 based on her journals.
23    Q.    Who gave you those materials?
24    A.    Social Media Victims Law Center.
25    Q.    Okay.  Those materials -- public

Page 400

1 materials or materials that have not been made
2 public?
3    A.    I'm not sure.
4    Q.    As part of your book tour, you
5 were asked what the causal mechanism of
6 Ms. Spence's injuries were, correct, as part
7 of your media speaking in connection with your
8 10 Rules book?
9    A.    You would have to remind me of
10 what -- the context there.
11    Q.    Okay.  Can you play tab 38A,
12 please.
13        (Video played.)
14 BY MR. HALPERIN:
15    Q.    Do you recall going on the
16 Michael Shermer Show in the last couple of
17 weeks to publicize your book?
18    A.    Yes.
19    Q.    Do you recall being asked what
20 the causal mechanism of Ms. Spence's injuries
21 was?
22    A.    Yes.
23    Q.    You actually gave an answer to
24 that, even though you are not a clinician and
25 haven't reviewed her medical records and

Page 401

1 haven't met her.  Correct?
2    A.    Yes.
3        MS. McNABB:  Object to the
4    extent you didn't play the answer.
5        THE WITNESS:  Yeah.
6        MS. McNABB:  And you didn't
7    play the entirety of the clip.
8 BY MR. HALPERIN:
9    Q.    Let's play what you said about
10 Alexis Spence.
11        Let's play tab 38B, please.
12        (Video played.)
13 BY MR. HALPERIN:
14    Q.    In Ms. Spence's case, you said
15 that the causal mechanism was comparing
16 herself to photoshopped bodies she saw on
17 Instagram.  Correct?
18        MS. McNABB:  Again, I will put
19    an objection on the record that we
20    have no idea what was said before or
21    after that small clip.
22        MR. HALPERIN:  Let's not have
23    speaking objections, please.
24        THE WITNESS:  So I'm -- as you
25    can see, at the end of that clip in

101 (Pages 398 - 401)

CONFIDENTIAL

Page 402

1    particular, I'm talking in general.
2    And I base that off of the news
3    reports and then also those journals
4    that I was given by the Social Media
5    Victims Law Center.
6 BY MR. HALPERIN:
7    Q.    And based on what you saw and
8 heard and read, you believe that in Alexis
9 Spence's case, the causal mechanism is
10 comparing herself to photoshopped bodies,
11 correct?
12        MS. McNABB: Objection. Form.
13        THE WITNESS: I believe that is
14    one of the causal mechanisms. It may
15    not and probably is not the only one.
16 BY MR. HALPERIN:
17    Q.    You said "the cause" in that
18 video. Correct?
19        MS. McNABB: Objection. Form.
20        THE WITNESS: Not that I know
21    of. I mean, he asked me what the
22    causal mechanism was, and I brought up
23    one of the possible cause -- causal
24    mechanisms.
25        MR. HALPERIN: Let's play it

Page 403

1    one more time, please.
2        (Video played.)
3 BY MR. HALPERIN:
4    Q.    You said it was, right, singular?
5    A.    So on a podcast like this, you
6 have to keep your answers very short, usually
7 30 seconds or less per question, and I could
8 not list every single one of the causal
9 mechanisms, so I focused on one of the most
10 prominent.
11    Q.    And that one of the most
12 prominent causes was comparing herself to
13 content, correct?
14        MS. McNABB: Objection. Form.
15        THE WITNESS: I would say
16    comparing herself to the perfect
17    bodies on Instagram, or whatever I
18    said in the clip.
19 BY MR. HALPERIN:
20    Q.    And perfect bodies on Instagram
21 appear through content, correct?
22        MS. McNABB: Objection. Form.
23        THE WITNESS: That content is
24    served up through the algorithm.
25 BY MR. HALPERIN:

Page 404

1    Q.    Is it content -- are perfect
2 bodies content, yes or no?
3        MS. McNABB: Object.
4 Objection. Form.
5        THE WITNESS: I think that
6    doesn't give the complete picture of
7    how she was exposed to that content.
8 BY MR. HALPERIN:
9    Q.    Okay. But it was exposure to
10 content that you believe was one of the most
11 prominent causes, correct?
12        MS. McNABB: Objection. Form.
13        THE WITNESS: Part of it, yes.
14    But certainly not the only.
15 BY MR. HALPERIN:
16    Q.    Can you rule out that
17 comparing -- strike that.
18        Can you rule out that exposure to
19 content was one of the most prominent causes
20 of Jessica D'orazio's injuries?
21        MS. McNABB: Objection. Form.
22        THE WITNESS: I don't think I'm
23    familiar with that plaintiff.
24 BY MR. HALPERIN:
25    Q.    So you can't rule that out,

Page 405

1 correct?
2        MS. McNABB: Objection. Form.
3        THE WITNESS: I don't have
4    specific information about that
5    individual.
6 BY MR. HALPERIN:
7    Q.    Can you rule out that
8 comparing -- strike that.
9        Can you rule out that exposure to
10 content was one of the most prominent causes
11 of Laurel Clevenger's injuries?
12        MS. McNABB: Objection. Form.
13        THE WITNESS: I don't have
14    specific information on that specific
15    individual.
16 BY MR. HALPERIN:
17    Q.    So you can't rule that out,
18 correct?
19        MS. McNABB: Objection. Form.
20        THE WITNESS: Given that I have
21    no knowledge of that particular case,
22    no.
23 BY MR. HALPERIN:
24    Q.    Can you rule out that exposure to
25 content was one of the most prominent causes

102 (Pages 402 - 405)

CONFIDENTIAL

Page 406

1 of Nuala Mullen's injuries?
2        MS. McNABB: Objection. Form.
3        THE WITNESS: Same answer.
4     That is not a case that I -- that I
5     have the details on.
6 BY MR. HALPERIN:
7     Q.    So you can't rule it out,
8 correct?
9        MS. McNABB: Objection. Form.
10       THE WITNESS: Correct.
11 BY MR. HALPERIN:
12    Q.    Can you rule out that
13 comparing -- that exposure to content was one
14 of the most prominent causes of Jessica
15 Smith's injuries?
16       MS. McNABB: Objection. Form.
17       THE WITNESS: That is another
18    individual case of which I am not
19    familiar.
20 BY MR. HALPERIN:
21    Q.    So you can't rule it out,
22 correct?
23       MS. McNABB: Objection. Form.
24       THE WITNESS: Correct.
25 BY MR. HALPERIN:

Page 407

1     Q.    Can you rule out that exposure to
2 content was one of the most prominent causes
3 of David Melton's injuries?
4        MS. McNABB: Objection. Form.
5        THE WITNESS: So once again,
6     it's not a specific case I'm familiar
7     with.
8        I should also put this in the
9     context that I'm not a specific
10    causation expert. I'm a general
11    causation expert.
12 BY MR. HALPERIN:
13    Q.    So you can't rule it out, right?
14       MS. McNABB: Objection. Form.
15       THE WITNESS: Correct.
16 BY MR. HALPERIN:
17    Q.    Can you rule out that exposure to
18 content was one of the most prominent causes
19 of Kaylie G.M.'s injuries?
20       MS. McNABB: Objection. Form.
21       THE WITNESS: That is not an
22    individual I have information on.
23 BY MR. HALPERIN:
24    Q.    So you can't rule it out, right?
25       MS. McNABB: Objection. Form.

Page 408

1        THE WITNESS: Right.
2 BY MR. HALPERIN:
3     Q.    Can you rule out that exposure to
4 content was one of the most prominent causes
5 of Heaven Moore's injuries?
6        MS. McNABB: Objection. Form.
7        THE WITNESS: Not an individual
8     I have information on.
9 BY MR. HALPERIN:
10    Q.    So you can't rule it out, right?
11       MS. McNABB: Objection. Form.
12       THE WITNESS: Right.
13 BY MR. HALPERIN:
14    Q.    Can you rule out that exposure to
15 content was one of the most prominent causes
16 of Shawna Johnson's injuries?
17       MS. McNABB: Objection. Form.
18       THE WITNESS: I do not have
19    information about this individual.
20 BY MR. HALPERIN:
21    Q.    So you can't rule it out, right?
22    A.    Right.
23       MS. McNABB: Objection. Form.
24       (The court reporter asks for
25 clarification.)

Page 409

1 BY MR. HALPERIN:
2     Q.    Can you rule out that exposure to
3 content was one of the most prominent causes
4 of Princess M.Y.'s injuries?
5        MS. McNABB: Objection. Form.
6        THE WITNESS: Not an individual
7     I have information on.
8 BY MR. HALPERIN:
9     Q.    So you can't rule it out, right?
10       MS. McNABB: Objection. Form.
11       THE WITNESS: Right.
12 BY MR. HALPERIN:
13    Q.    Can you rule out that exposure to
14 content was one of the most prominent causes
15 of Kayton Booth's injuries?
16       MS. McNABB: Objection. Form.
17       THE WITNESS: Not an individual
18    I have information on.
19 BY MR. HALPERIN:
20    Q.    So you can't rule it out, right?
21       MS. McNABB: Objection. Form.
22       THE WITNESS: Right.
23 BY MR. HALPERIN:
24    Q.    Can you rule out that exposure to
25 content was one of the most prominent causes

Golkow Technologies,
A Veritext Division
877-370-3377                                    www.veritext.com

CONFIDENTIAL

Page 410

1 of Jaime Loach's injuries?
2          MS. McNABB: Objection. Form.
3          THE WITNESS: Not an individual
4    I have information on.
5 BY MR. HALPERIN:
6     Q.    You can't rule it out, right?
7          MS. McNABB: Objection. Form.
8          THE WITNESS: Right.
9 BY MR. HALPERIN:
10     Q.    Can you rule out that exposure to
11 content was one of the most prominent causes
12 of Russell C.'s injuries?
13          MS. McNABB: Objection. Form.
14          THE WITNESS: That is not an
15    individual I have information on.
16 BY MR. HALPERIN:
17     Q.    So you can't rule it out, right?
18          MS. McNABB: Objection. Form.
19          THE WITNESS: Right.
20 BY MR. HALPERIN:
21     Q.    Can you rule out that exposure to
22 content was one of the most prominent causes
23 of Paul Kelly's injuries?
24          MS. McNABB: Objection. Form.
25          THE WITNESS: Not an individual

Page 411

1    I have information on.
2 BY MR. HALPERIN:
3     Q.    So you can't rule it out, right?
4          MS. McNABB: Objection. Form.
5          THE WITNESS: Right.
6 BY MR. HALPERIN:
7     Q.    Can you rule out that exposure to
8 content was one of the most prominent causes
9 of Ivan P.'s injuries?
10          MS. McNABB: Objection. Form.
11          THE WITNESS: Not an individual
12    I have information on.
13 BY MR. HALPERIN:
14     Q.    So you can't rule it out, right?
15          MS. McNABB: Objection. Form.
16          THE WITNESS: Right.
17 BY MR. HALPERIN:
18     Q.    Can you tell me what percentage
19 of the rise in teen depression is attributable
20 to social media through a mechanism unrelated
21 to content?
22          MS. McNABB: Objection. Form.
23          THE WITNESS: Time spent is
24    agnostic to content, and that was the
25    focus of my report. That is what I

Page 412

1    did across all of those pages is to
2    show that there was that link, yes.
3 BY MR. HALPERIN:
4     Q.    You told me that you couldn't
5 tell me what percentage was attributable to
6 social media generally, correct?
7          MS. McNABB: Objection. Form.
8          THE WITNESS: That is correct,
9    I cannot put a specific percentage on
10    it. I can just say it is a
11    significant, meaningful, and important
12    cause.
13 BY MR. HALPERIN:
14     Q.    And so my question is, can you
15 tell me what percentage of the rise in teen
16 depression is attributable to social media,
17 independent of content?
18          MS. McNABB: Objection.
19 BY MR. HALPERIN:
20     Q.    Can you put a percentage on that?
21     A.    No.
22     Q.    Can you put a percentage on the
23 percentage rise in self-harm or suicidality or
24 suicidal thoughts or suicidal behaviors or
25 completed suicides that are attributable to

Page 413

1 social media independent of content?
2          MS. McNABB: Objection. Form.
3          THE WITNESS: No. Because, to
4    repeat my previous answer, that's not
5    how these research studies work. You
6    can't put a specific percentage on it,
7    other than to say it is significant,
8    important, and meaningful.
9 BY MR. HALPERIN:
10     Q.    You can't put a percentage on it.
11 Correct?
12          MS. McNABB: Objection. Form.
13          THE WITNESS: Correct.
14 BY MR. HALPERIN:
15     Q.    You can't tell me what percentage
16 of the decline in teen hours slept is
17 attributable to social media independent of
18 content, correct?
19          MS. McNABB: Objection. Form.
20          THE WITNESS: I can tell you it
21    is an important, meaningful, and
22    significant cause.
23 BY MR. HALPERIN:
24     Q.    Can you tell me a percentage?
25          MS. McNABB: Objection. Form.

104 (Pages 410 - 413)

CONFIDENTIAL

Page 414

1          THE WITNESS: No.
2  BY MR. HALPERIN:
3      Q.    Let's talk about time series
4  studies. Time series studies are sometimes
5  referred to as time trend studies; is that
6  right?
7      A.    I usually don't use that label,
8  but we can use it.
9      Q.    Those two things are synonymous,
10  right, even if you don't use it?
11      A.    Sure.
12      Q.    Studies of time trends cannot
13  determine causation. True?
14      A.    Considered alone?
15      Q.    Studies --
16      A.    If we're talking about
17  scientific causation, no. But we'd have to
18  clarify whether we're talking about general
19  causation in a legal sense or scientific
20  causation.
21      Q.    Okay. Let's look at Exhibit 41,
22  please.
23          (Exhibit No. 41 was marked for
24          identification.)
25  BY MR. HALPERIN:

Page 415

1      Q.    This is an article that you were
2  lead author on, along with Brian Spitzberg,
3  correct?
4      A.    Yes.
5      Q.    Look with me at page 366, please.
6          First full paragraph, you say,
7  "Although studies of time trends cannot
8  determine causation" --
9      A.    Yes.
10      Q.    -- "it is notable that
11  adolescents and young adults who experience
12  the largest decline in non-digital social
13  interaction have also experienced the largest
14  increases in depression and suicidal
15  ideation."
16          Do you see that?
17      A.    Yes.
18      Q.    Do you agree with what you wrote
19  here, that studies of time trends cannot
20  determine causation?
21      A.    So this is, as we've been
22  discussing, a pretty standard disclaimer in a
23  scientific journal article, because the
24  definition of causation scientifically is
25  somewhat different.

Page 416

1          And yes, alone, for a scientific
2  causation point of view, it cannot.
3      Q.    Do you agree --
4      A.    So we would have to be more
5  specific about the wording here for me to say
6  whether I agree or disagree with it, because
7  it depends on the context.
8      Q.    Were you being truthful when you
9  said in your publication that, quote, studies
10  of time trends cannot determine causation?
11  Yes or no?
12      A.    Scientific causation at the
13  level expected in a journal article, which is
14  usually going to be a random controlled trial,
15  no, it's not a random controlled trial.
16      Q.    The simultaneous rise in
17  depression and social media use cannot prove
18  causation. True?
19          MS. McNABB: Objection. Form.
20          THE WITNESS: It can strongly
21      point towards causation.
22  BY MR. HALPERIN:
23      Q.    Can it prove it?
24      A.    From a scientific percent --
25  point of view, excuse me, no. But I don't

Page 417

1  know if that's how you are using the word
2  causation. If you are using it in a legal
3  sense, say, in a Bradford Hill analysis, it
4  can certainly be a -- part of proving
5  causation.
6      Q.    I'm using causation in the way
7  that you used it in your academic scholarship.
8      A.    Okay.
9      Q.    In that manner, can the
10  simultaneous rise in depression and social
11  media prove causation?
12          MS. McNABB: Objection. Form.
13          THE WITNESS: So the way I use
14      it here is scientific causation, and
15      the way these types of methods are
16      understood, no, it cannot prove
17      scientist causation. It can point in
18      that direction, but it cannot prove it
19      in a scientific sense.
20  BY MR. HALPERIN:
21      Q.    It cannot prove it. True?
22          MS. McNABB: Objection. Form.
23          THE WITNESS: It cannot prove
24      causation in a scientific sense, and
25      that's how I'm using that word in this

105 (Pages 414 - 417)

CONFIDENTIAL

Page 418

1     academic journal article.
2  BY MR. HALPERIN:
3       Q.    The simultaneous rise in
4  self-harm and social media cannot prove
5  causation in a scientific sense.  True?
6            MS. McNABB:  Objection.  Form.
7            THE WITNESS:  Yes, although I
8       have to quality that by saying it can
9       point toward causation.
10 BY MR. HALPERIN:
11      Q.    The simultaneous rise in suicide
12 attempts and social media cannot prove
13 causation in a scientific sense.  True?
14           MS. McNABB:  Objection.  Form.
15           THE WITNESS:  Same answer.
16 BY MR. HALPERIN:
17      Q.    The simultaneous decline in sleep
18 and social media cannot prove causation in a
19 scientific sense.  True?
20           MS. McNABB:  Objection.  Form.
21           THE WITNESS:  Same answer.
22           MR. HALPERIN:  Let's take a
23      break.
24           Ms. McNABB:  Okay.
25           THE VIDEOGRAPHER:  Going off

Page 419

1       the record at 5:11.
2            (Recess.)
3            THE VIDEOGRAPHER:  We're back
4       on the record at 5:22 p.m.
5  BY MR. HALPERIN:
6       Q.    Before we broke, I asked you
7  whether body image content leads to more
8  appearance concern and social comparison, and
9  you told me it depends on what you mean by
10 body image content.
11           Do you recall that?
12      A.    Yes.
13      Q.    Let's play tab 37, please.  And
14 we will mark this as Exhibit 42.
15           (Exhibit No. 42 was marked for
16      identification.)
17           (Video played.)
18 BY MR. HALPERIN:
19      Q.    Do you recall about five months
20 ago going on the Fred Pinto Podcast?
21           MS. McNABB:  I will just object
22      to the extent that's only a fraction
23      of a longer video that was played.
24           THE WITNESS:  I know this isn't
25      five months ago, because my background

Page 420

1       is different.  It may have been when
2       it was posted, but this was at least a
3       year ago.
4  BY MR. HALPERIN:
5       Q.    Okay.  Do you recall going on the
6  Fred Pinto Podcast?
7       A.    Yes.
8       Q.    Was that you in the video?
9       A.    Yes.
10      Q.    And you said that body image
11 content leads to more appearance concern and
12 social comparison, right?
13      A.    Yes.
14      Q.    And were you being truthful when
15 you said that?
16      A.    Yes.
17      Q.    Let's look at your Tennessee
18 report, please.
19           I want to look at some of the
20 figures.  Many of these figures are in your
21 MDL report, too, but they are all in the
22 Tennessee report.  So rather than make you go
23 back and forth between the reports, we're just
24 going to use the Tennessee report, Exhibit 20.
25 Okay?

Page 421

1       A.    Okay.
2       Q.    Let's start with Figure 1,
3  please, on page 8.
4            The source of Figure 1 is the
5  National Survey on Drug Use and Health,
6  correct?
7       A.    Yes.
8       Q.    Does that survey have any
9  questions that focus on social media usage?
10      A.    I don't believe so.  No.
11      Q.    And Figure 1 has on the X axis,
12 year and on the Y axis, percentage.  Right?
13      A.    Yes.
14      Q.    There is nothing in this graph on
15 social media usage.  Correct?
16      A.    Correct.
17      Q.    You interpret this graph to
18 attribute harm to social media usage, but the
19 graph itself doesn't pertain to social media
20 usage.  Right?
21      A.    The graph itself is a time
22 series study, which is part of the totality of
23 the evidence proving the causation with social
24 media.
25      Q.    And to be clear, it's a time

106 (Pages 418 - 421)

CONFIDENTIAL

Page 422

1 series study not of social media usage, but of
2 an entirely different variable here, major
3 depressive episodes, correct?
4      A.    I wouldn't put it in that way.
5 I would say it's a time series study of teen
6 depression, and the pattern shows an increase
7 at the time that social media became popular
8 among teens.
9      Q.    But there is nothing in Figure 1
10 that relates to social media, right?  Figure 1
11 shows depression over time.
12      A.    Yes.
13      Q.    You don't know what percentage of
14 the 12- to 17-year-olds who reported a major
15 depressive episode in any year in Figure 1
16 used social media.  Correct?
17      A.    From this dataset, no.
18      Q.    Not correct or, no, you don't
19 know?
20      A.    So I don't know what percentage
21 used social media in this dataset, because
22 this dataset doesn't ask about it.  However,
23 there are other datasets that have nationally
24 representative samples in those years that do
25 ask about social media.

Page 423

1      Q.    That's not part of your analysis
2 in Figure 1, correct?
3      A.    In Figure 1, no.  But Figure 1
4 is part of the time series studies which do
5 make the link to social media.
6      Q.    There's nothing -- you did not do
7 an analysis of the blue line or the red line
8 in connection with your expert report to say
9 what percentage of these 12- to 17-year-olds
10 reported a major -- or used social media.
11 Correct?
12           MS. McNABB:  Objection.  Form.
13      Asked and answered.
14           THE WITNESS:  So I have used
15      this exact data in other graphs that
16      show the rise of social media along
17      with the rise of depression.  But no,
18      social media is not in this particular
19      graph.
20 BY MR. HALPERIN:
21      Q.    And those graphs you are
22 referencing are not in any of your expert
23 reports, correct?
24      A.    They are in other publications,
25 but I don't believe they are in this report,

Page 424

1 no.
2      Q.    You didn't include those graphs
3 in any of your expert reports as part of your
4 opinions in this case.  Correct?
5           MS. McNABB:  Objection.  Form.
6           THE WITNESS:  My rebuttal
7      report does have several graphs on the
8      rise of use in social media.
9 BY MR. HALPERIN:
10      Q.    But not on the percentage of the
11 boys and girls in Figure 1 that used social
12 media, correct?
13      A.    Correct.
14      Q.    You can't tell me sitting here
15 today how the percentage of boys or girls in
16 this graph who had a major depressive episode
17 in any year, you can't tell me how the
18 percentage that used social media compares to
19 the percentage who didn't, correct?
20           MS. McNABB:  Objection.  Form.
21           THE WITNESS:  I'm not sure I
22      understand the question.
23 BY MR. HALPERIN:
24      Q.    You can't tell me whether the
25 percentage of boys who had a major depressive

Page 425

1 episode in any year, whether the percentage
2 used social media is more than the percentage
3 who didn't use social media?
4      A.    I still don't understand the
5 question.  So you're saying --
6      Q.    Let me try and ask a better
7 question.
8      A.    Okay.
9      Q.    Among the boys who had a major
10 depressive episode between 2008 and 2019, you
11 can't tell me whether more used social media
12 or didn't use social media.  Correct?
13           MS. McNABB:  Objection.  Form.
14      Asked and answered.
15 BY MR. HALPERIN:
16      Q.    From -- from this data?
17      A.    From another dataset, I can tell
18 you that for most of these years.
19      Q.    You can't link up specific people
20 from one dataset to another dataset.  Correct?
21      A.    No.
22      Q.    So you can't tell me how many of
23 these specific boys used social media versus
24 didn't, correct?
25      A.    Correct.

Golkow Technologies,
A Veritext Division
877-370-3377                                              www.veritext.com

CONFIDENTIAL

Page 426

1    Q.    You can't tell me how many of
2  these specific girls used social media versus
3  didn't. Correct?
4    A.    No.
5    Q.    Not correct or, no, you can't?
6    A.    So I can't in this dataset.
7    Q.    Okay. You can't tell me how many
8  of the boys or girls in this dataset used
9  Facebook or Instagram specifically. Correct?
10    A.    Correct.
11        MS. McNABB: Objection. Form.
12  BY MR. HALPERIN:
13    Q.    Let's look at Figure 2, please.
14        Figure 2 comes from the CDC
15  WISQARS database. Correct?
16    A.    Yes.
17    Q.    Am I pronouncing that correctly,
18  WISQARS?
19    A.    I have no idea.
20    Q.    Okay, we will go with WISQARS.
21        Does that database have any
22  questions that focus on social media usage?
23    A.    So this database is from the
24  CDC. It's not a survey dataset. It's
25  emergency department admissions for self-harm

Page 427

1  behaviors. And no, that is not linked with
2  measures of social media use.
3    Q.    So you can't tell me for either
4  of these red lines, the light or the dark,
5  what percentage of these specific individuals
6  used social media?
7    A.    The specific individuals, no,
8  but I could tell you from another dataset in
9  these years from a nationally representative
10  sample what those numbers would look like.
11    Q.    You didn't put that analysis in
12  your report. Correct?
13    A.    That's in the rebuttal report.
14    Q.    That graph is in the rebuttal
15  report?
16    A.    From that other dataset, yes.
17    Q.    Okay. Can you tell me what
18  percentage of the light red line or the dark
19  red line in Figure 2 used Facebook or
20  Instagram specifically, looking at these
21  specific individuals?
22    A.    For these specific individuals,
23  no, I cannot tell you that.
24    Q.    Okay. Look with me, please, at
25  Figure 3, which also comes from the CDC

Page 428

1  WISQARS database.
2        Do you see that?
3    A.    Yes.
4    Q.    You can't tell me for the red,
5  girls, or the blue, boys, what percentage of
6  these specific individuals used social media,
7  correct?
8        MS. McNABB: Objection. Form.
9        THE WITNESS: So this is from a
10    dataset on suicides, so not a survey
11    dataset. So you cannot tell from this
12    behavioral data, which specific
13    individuals used social media, no.
14  BY MR. HALPERIN:
15    Q.    So you can't tell me what
16  percentage of these specific individuals used
17  social media, correct?
18    A.    No. Although I will mention
19  again that in other nationally representative
20  datasets that you can say that.
21    Q.    And that analysis is not in your
22  expert report, correct?
23    A.    It is in my rebuttal report, and
24  in several other publications that predate
25  this litigation.

Page 429

1    Q.    Those analyses existed, and you
2  did not include them in your initial report.
3  Correct?
4        MS. McNABB: Objection. Form.
5  BY MR. HALPERIN:
6    Q.    They existed at the time of this
7  report, and you didn't include them?
8    A.    So they existed at the time of
9  the report. I believe they were originally in
10  here, and then -- in another form, and then
11  they --
12    Q.    Were taken out?
13    A.    Were taken out, yeah.
14    Q.    Okay. Can you tell me what
15  percentage of the red or the blue used
16  Facebook or Instagram specifically?
17    A.    For these individuals, no.
18    Q.    Figure 4 is the same dataset, but
19  limited to Tennessee. Correct?
20    A.    Yes.
21    Q.    Can you tell me what percentage
22  of the individuals reflected in green, those
23  specific individuals, used social media
24  generally or Instagram specifically?
25        MS. McNABB: Objection. Form.

108 (Pages 426 - 429)

CONFIDENTIAL

Page 430

1    THE WITNESS: Since this is
2  from a database of completed suicides,
3  that does not have any link that I
4  know of in this public dataset to
5  specific data on how much social media
6  they used, no.
7  BY MR. HALPERIN:
8    Q.   So no, you cannot tell me what
9  percentage of the individuals reflected in
10 green, these specific individuals, used social
11 media generally or Instagram specifically,
12 true?
13   MS. McNABB: Objection. Form.
14   THE WITNESS: No, I cannot.
15 BY MR. HALPERIN:
16   Q.   Let's look at Figure 6, please.
17   This figure comes from the Youth
18 Risk Behavior Surveillance Survey?
19   A.   Yes.
20   Q.   That survey does not have any
21 questions that focus specifically on social
22 media usage, correct?
23   A.   The 2023 version does, but the
24 publicly available data at the moment only
25 goes up to 2021, and it does have questions on

Page 431

1  digital media use, which can include social
2  media.
3    Q.   So this graph, Figure 6, goes up
4  to 2021, correct?
5    A.   Yes.
6    Q.   For the entire period reflected
7  in Figure 6, you don't have any data on social
8  media usage specifically, as opposed to
9  digital media usage generally, correct?
10   A.   Correct.
11   Q.   You can't tell me for the light
12 blue or the dark blue lines in Figure 6, what
13 percentage of these specific individuals used
14 social media. Correct?
15   MS. McNABB: Objection. Form.
16   THE WITNESS: Correct.
17 BY MR. HALPERIN:
18   Q.   Figure 7 comes from that same
19 dataset but is limited to Tennessee, correct?
20   A.   Yes.
21   Q.   You can't tell me for the light
22 blue or the dark blue, what percentage of
23 these specific individuals used social media
24 generally or Instagram specifically. Correct?
25   MS. McNABB: Objection. Form.

Page 432

1    THE WITNESS: Correct.
2  BY MR. HALPERIN:
3    Q.   Let's look at Figure 8, please.
4    There's two different sources for
5  Figure 8. One of them is the Youth Risk
6  Behavior Surveillance Survey, and the other is
7  Monitoring the Future. Correct?
8    A.   Yes.
9    Q.   And again, for the entire period
10 reflected in Figure 8, the Youth Risk Behavior
11 Surveillance Survey did not have information
12 on social media use specifically, correct?
13   MS. McNABB: Objection. Form.
14   THE WITNESS: Correct, but
15 Monitoring the Future did.
16 BY MR. HALPERIN:
17   Q.   Okay, and we'll -- I'm just
18 focused on the Youth Risk Behavior
19 Surveillance Survey for now.
20   A.   Yes. Correct.
21   Q.   And that's the dark red, right?
22 The colors are very similar. It's hard to
23 tell.
24   A.   I know it's hard to see, but
25 yes, I believe so.

Page 433

1    Q.   Okay. So for the dark red, you
2  can't tell me what percentage of these
3  individuals, specific individuals used social
4  media generally or Facebook or Instagram
5  specifically, correct?
6    MS. McNABB: Objection. Form.
7    THE WITNESS: Correct.
8  BY MR. HALPERIN:
9    Q.   Now, Monitoring the Future did
10 not ask about hours per week spent on social
11 media until 2013, correct?
12   A.   Correct.
13   Q.   So for the first more than half
14 of the graph reflected in Figure 8, correct?
15   A.   Yes. Although they did ask
16 about social media use on a scale from never
17 to almost every day.
18   Q.   And you don't think that data is
19 very informative because it lacks variance,
20 right?
21   A.   It depends on what you are using
22 the data for. So if you are using that data
23 on never to every day for a time series, it is
24 useful. If you are using it for individual,
25 correlational or cross-sectional studies, it

CONFIDENTIAL

Page 434

1 lacks variance and, thus, has big issues.
2         The variance issue only comes up
3 in the cross-sectional, correlational studies,
4 not in time series.
5     Q.   Okay.  Have you done an analysis,
6 reflected in your expert report, of what
7 percentage of the folks in the light red,
8 Monitoring the Future line, used social media
9 generally or Instagram or Facebook
10 specifically?
11     A.   So if we can turn to the
12 rebuttal report.
13     Q.   Is that analysis in your rebuttal
14 report?
15     A.   I believe so, but let me
16 confirm.
17     Q.   Okay.
18     A.   (Peruses document.)
19         Figure -- sorry, I didn't label
20 the figures, apparently.  Page 9 and page 10
21 of the rebuttal report.
22     Q.   Contain that analysis?
23     A.   Yes.
24     Q.   Did that analysis exist as of
25 June 6, 2025?

Page 435

1     A.   Yes.
2     Q.   Okay.  And you did not include it
3 in your June 6, 2025 opening report, correct?
4         MS. McNABB:  Objection.  Form.
5         THE WITNESS:  The graph on
6     page 10, or version of the graph on
7     page 10 was originally in that report.
8 BY MR. HALPERIN:
9     Q.   And you took it out, correct?
10     A.   Yes.
11     Q.   Let's look at Figure 9, please,
12 which is the Tennessee specific version of
13 Figure 8; is that right?
14     A.   Let me get back to that.
15         I'm there.
16     Q.   Figure 9 comes from the Youth
17 Risk Behavior Surveillance Survey, which you
18 told me did not have information on social
19 media use during this time period.  Right?
20     A.   Correct.
21     Q.   And so the green line in
22 Figure 9, you can't tell me what percentage of
23 these specific individuals used social media
24 generally or Instagram specifically, correct?
25         MS. McNABB:  Objection.  Form.

Page 436

1         THE WITNESS:  Correct.
2 BY MR. HALPERIN:
3     Q.   I've asked a series of questions
4 about whether you can tell me how many used
5 social media or Facebook or Instagram.  You
6 can't tell me how many hours any of them used
7 social media or Facebook or Instagram, those
8 specific individuals, for any of these
9 figures.  Correct?
10         MS. McNABB:  Objection.  Form.
11         THE WITNESS:  For Monitoring
12     the Future, we have that data starting
13     in 2013.
14 BY MR. HALPERIN:
15     Q.   So only for Figure 8, correct?
16     A.   Yes.
17     Q.   No other figure can you tell me
18 how much time any of the individuals reflected
19 in your lines spent on social media generally,
20 or Facebook or Instagram specifically.
21 Correct?
22         MS. McNABB:  Objection.  Form.
23         THE WITNESS:  Yes.
24 BY MR. HALPERIN:
25     Q.   So you can't tell me, for

Page 437

1 instance, how many of them spent more than two
2 or three hours per day, correct, on social
3 media?
4     A.   Correct.
5     Q.   You can't tell me how many of
6 them spent more than an hour on any individual
7 social media app.  Correct?
8     A.   Correct.
9     Q.   Go back, please, to Figure 1.
10         Figure 1 stops in 2019; is that
11 right?
12     A.   Yes.
13     Q.   Is there more recent data
14 available?
15     A.   Yes.  Although you have to
16 download it and merge it, so the publicly
17 available data -- well, let me amend that.
18         The -- there's -- it's
19 different, depending on whether you are
20 looking at what is publicly available without
21 having to download the statistics program, and
22 then what you can do with the -- with the data
23 with the statistics program.  So with the
24 statistics program with the merged files, I
25 believe that that data is available up to

110 (Pages 434 - 437)

CONFIDENTIAL

Page 438

1 2024.
2    Q.    Okay.  Why did you not include
3 data through 2024?
4    A.    Because I didn't want to produce
5 my merged data files, which are my
6 intellectual property.
7    Q.    So you had the data; you chose
8 not to include it in your report.  Correct?
9    A.    It was also for other reasons.
10 Because what we're discussing in this report
11 is primarily focused on that increase that
12 began around 2012, and that is amply shown
13 here without having to show the more recent
14 years of data.
15    Q.    Well, you did include graphs
16 going up to 2023 in your expert report,
17 correct?
18    A.    Which figure are you referring
19 to?
20    Q.    Figure 2, for instance.
21    A.    Right, because there --
22    Q.    Figure 3, for instance.
23    A.    There you don't have to download
24 and merge dataset, and it's not an
25 intellectual property issue.

Page 439

1    Q.    You didn't decide to cut off more
2 recent data because it was irrelevant for
3 other graphs.  Correct?
4        MS. McNABB:  Objection.  Form.
5        THE WITNESS:  I'm not sure what
6    you mean.
7 BY MR. HALPERIN:
8    Q.    Well, you told me one of the
9 reasons was it's intellectual property; the
10 other was your report was primarily focused on
11 an earlier time period.  Correct?
12    A.    There were those two reasons.
13 The primary one was the intellectual property
14 issue.  Because in the other figures where
15 these were publicly available without the IP
16 issue, then I show all the years that were
17 available.
18    Q.    Okay.  So you have data for
19 Figure 1 through 2024, and you chose not to
20 include it in your report, correct?
21    A.    Given the IP issues, correct.
22    Q.    Okay.  For Figure 1, you include
23 data from 2012 -- or for 12- to 17-year-olds,
24 correct?
25    A.    Yes.

Page 440

1    Q.    Your reports, your Tennessee
2 report doesn't present Figure 1 for Tennessee
3 teens specifically.  Correct?
4        MS. McNABB:  Objection.  Form.
5        THE WITNESS:  That's correct.
6 BY MR. HALPERIN:
7    Q.    Your New Mexico report doesn't
8 present any data on New Mexico teens
9 specifically.  Correct?
10    A.    Correct.
11        MS. McNABB:  Objection.  Form.
12 BY MR. HALPERIN:
13    Q.    Do you know what this graph looks
14 like for the state of Tennessee?
15    A.    I do not, because that dataset
16 doesn't provide data broken down by state.
17    Q.    Do you know what the graph looks
18 like for New Mexico?
19    A.    No.
20    Q.    Let's go to Figure 2, please.
21        For Figure 2 -- actually,
22 Figure 1, you present data for both boys and
23 girls.  Correct?
24    A.    Yes.
25    Q.    For Figure 2, you present data

Page 441

1 only for females, correct?
2    A.    Yes.
3    Q.    There is data that you could have
4 presented for males.  Correct?
5    A.    Yes.
6    Q.    You chose not to include it.
7 Correct?
8    A.    I chose not to include it
9 because the data for girls showed that pattern
10 by age, and I felt it was important to show
11 that.  It would be difficult to show that on
12 the same graph with boys.
13    Q.    Could you have included a
14 separate figure, like Figure 2, for boys?
15    A.    I could have.
16    Q.    And you chose not to, correct?
17    A.    And I chose not to.
18        MS. McNABB:  Objection.  Form.
19 BY MR. HALPERIN:
20    Q.    For Figure 3, you did include
21 boys, correct, even though it comes from the
22 exact same dataset?
23    A.    It's not exactly the same,
24 actually.  There's two different datasets:
25 One is for fatal and one is for nonfatal.

111 (Pages 438 - 441)

CONFIDENTIAL

Page 442

1 Self-harm is for nonfatal and, for example,
2 doesn't break data down by state. The
3 Figure 3 is for suicide, that's from the fatal
4 dataset, and it does have data broken down by
5 state.
6      Q.   Okay. So even though they both
7 come from the WISQARS database, you chose to
8 include the boys in Figure 3 and not in
9 Figure 2, correct?
10         MS. McNABB: Objection. Form.
11         THE WITNESS: Correct.
12 BY MR. HALPERIN:
13      Q.   You understand that associations
14 between high use of digital media and lower
15 psychological well-being are stronger among
16 girls than boys?
17         MS. McNABB: Objection. Form.
18         THE WITNESS: That is true most
19 of the time. Not every study finds
20 that.
21 BY MR. HALPERIN:
22      Q.   Now, for ER admissions, Figure 2,
23 you broke out the data into two age
24 categories, 10 to 14, and 15 to 19. Right?
25      A.   Yes.

Page 443

1      Q.   For Figure 3, also from WISQARS,
2 you present 10- to 19-year-olds as a group,
3 correct?
4      A.   Yes.
5      Q.   You didn't break down the data
6 between 10 to 14 and 15 to 19. Correct?
7      A.   Yes. I could have done that,
8 and I have in other publications.
9      Q.   Why did you present the data
10 differently for two figures that both come
11 from WISQARS?
12      A.   Well, as I said, they're
13 different -- they're different datasets. It
14 is the same age range, 10 to 19, in both
15 graphs. It's just one has just girls, and the
16 other has both girls and boys.
17      Q.   So why did you decide to present
18 the data broken down by age in Figure 2 and
19 not broken down by age in Figure 3?
20      A.   I didn't want to overwhelm the
21 reader with millions of figures. There's a
22 lot already. So it was a judgment call.
23      Q.   WISQARS allows you to pick any
24 age range, correct?
25      A.   As long as you are going back to

Page 444

1 just 2001, yes.
2      Q.   Okay. Why did you pick a
3 different age range for Figures 2 and 3 than
4 you used for Figure 1?
5      A.   Because the National Survey of
6 Drug Use and Health does not allow you to pick
7 whatever age range you want.
8      Q.   You understand that 19-year-olds
9 are not minors. Correct?
10      A.   I understand that, yes.
11      Q.   You chose to present data -- you
12 could have presented Figures 2 and 3 for the
13 same age group as Figure 1, 12 to 17.
14 Correct?
15      A.   I could have. I did 10 to 19
16 because -- well, for a few reasons. First,
17 19-year-olds are usually still considered to
18 be adolescents. Also because, although now in
19 WISQARS you can break things down by whatever
20 age group you want, in older data, these are
21 the age buckets that they use. So I thought
22 it would be useful to use the same age buckets
23 as the older data.
24      Q.   Now, for Figure 4, which is the
25 Tennessee specific version, you present both

Page 445

1 sexes together, correct?
2      A.   Yes.
3      Q.   And you group three years
4 together, right?
5      A.   Yes.
6      Q.   Does WISQARS have data that would
7 have allowed you to present the suicide rate
8 in Tennessee on an annual basis by sex, just
9 as you did for the U.S. as a whole?
10      A.   It's not as simple as a "yes" or
11 a "no" in that case. Because the sample size
12 is lower when you break down by state. It is
13 not as reliable. That's noted in the footnote
14 of why I did it that way. It draws from a
15 smaller population. It's combined across
16 gender and in groups of years to increase
17 reliability, and that is why I made that
18 choice.
19      Q.   I understand you made a choice.
20 My question is could you have presented
21 Figure 4 in the same manner in which you
22 presented Figure 3, annually by sex?
23         MS. McNABB: Objection. Form.
24         THE WITNESS: I could.
25 However, there would be some years

CONFIDENTIAL

Page 446

1    which would have no data, if I
2    remember correctly. I'd have to go
3    back and look at the database. But
4    the CDC database doesn't -- sometimes
5    doesn't even report a number if the
6    numbers are low, very low, like less
7    than 20, I believe.
8  BY MR. HALPERIN:
9        Q.    Have you analyzed the suicide
10  rate in New Mexico specifically?
11      A.    I don't recall if I've looked at
12  that yet.
13      Q.    Do you know what this graph looks
14  like for New Mexico?
15      A.    I don't recall. And I -- I
16  don't even remember if I looked at it yet.
17      Q.    It's not your New Mexico report,
18  right?
19      A.    I would have to have that report
20  in front of me to answer that question.
21      Q.    Your Tennessee report does not
22  present ER admissions for self-harm behavior
23  specific to Tennessee. Correct?
24      A.    Yes, because the data is not
25  provided by state.

Page 447

1        Q.    So you don't know what it looks
2  like, correct?
3        A.    Correct?
4              MS. McNABB: Objection. Form.
5  BY MR. HALPERIN:
6        Q.    You don't know what that data
7  looks like in New Mexico either. Correct?
8              MS. McNABB: Objection. Form.
9              THE WITNESS: Correct. Because
10      the CDC doesn't report it that way.
11  BY MR. HALPERIN:
12      Q.    Let's go to Figure 6, please.
13            Figure 6 presents the percentage
14  of high school students in the U.S. who
15  seriously considered a suicide attempt or made
16  a plan to attempt suicide. Correct?
17      A.    Yes.
18      Q.    And you presented this data
19  across both sexes, correct?
20      A.    Yes.
21      Q.    Sex specific data is available?
22      A.    Yes.
23      Q.    You chose not to include it in
24  your report. Correct?
25      A.    Yes.

Page 448

1        Q.    Figure 6 stops in 2021, correct?
2        A.    Yes.
3        Q.    There's more recent data
4  available that you chose not to include in
5  your report. Correct?
6              MS. McNABB: Objection. Form.
7              THE WITNESS: Not in the online
8      data analysis tool. The online data
9      analysis tool, which is what I'm
10      relying on here, only goes up to 2021,
11      or at least it did when I made this
12      graph.
13            (Exhibit No. 43 was marked for
14      identification.)
15  BY MR. HALPERIN:
16      Q.    I have marked as Exhibit 43 a
17  printout from the CDC website.
18            Do you see "High school students
19  who made a plan about how they would attempt
20  suicide"?
21      A.    So this is not the online portal
22  I'm referring to, just to be clear.
23      Q.    Is this a public website that has
24  the same data that you used for Figure 6?
25      A.    No, because it's for the whole

Page 449

1  United States and not Tennessee specifically.
2        Q.    Is Exhibit 43 for Tennessee
3  specifically?
4        A.    It says, "Location, United
5  States."
6        Q.    Isn't Figure 6 percentage of U.S.
7  high school students?
8        A.    Oh, sorry. I thought we were
9  talking about the Tennessee one.
10            So this was not the portal that
11  I -- that I -- I don't believe this was the
12  portal that I used.
13      Q.    Okay. Look with me at Figure 6,
14  the light blue line, Suicide Plan, in 2021 was
15  17.6, thereabouts, in your Figure 6, correct?
16      A.    Mm-hmm.
17      Q.    It's the same data in Exhibit 43?
18            MS. McNABB: Objection. Form.
19            THE WITNESS: I believe so.
20  BY MR. HALPERIN:
21      Q.    Okay. Publicly on the internet,
22  there is data for 2023 that you could have
23  included in Figure 6. True?
24      A.    Seeing this, yes, but that
25  wasn't the portal that I was relying on.

113 (Pages 446 - 449)

CONFIDENTIAL

1     Q.    Do you see that from 2021 to
2  2023, the percentage of high school students
3  who made a plan about how they would attempt
4  suicide decreased from 17.6 to 16.4 percent?
5     A.    I do see that.
6     Q.    You didn't include that your
7  report, correct?
8     A.    Correct.  I would also want to
9  know when this went up online, if it was
10 before or after I made this graph.
11    Q.    I will show you another graph.
12          This is going to be Exhibit 44.
13          (Exhibit No. 44 was marked for
14    identification.)
15 BY MR. HALPERIN:
16    Q.    This is YRBS high school students
17 who seriously considered attempting suicide.
18 Do you see that?
19    A.    Yes.
20    Q.    And again, this contains data,
21 the same data in your report through 2023,
22 correct?
23    A.    Yes.
24          Looking at this, I strongly
25 suspect that they updated it to 2023 after I

1  made this graph, after I submitted the report.
2     Q.    And according to Exhibit 43 -- or
3  excuse me, 44, again, there was a decline from
4  22.2 to 20.4 percent between 2021 and 2023,
5  correct?
6     A.    Yes, very consistent with other
7  datasets that also show a similar pattern of
8  mental health issues declining somewhat
9  post-pandemic.
10    Q.    Now, Figure 6 is based on YRBS,
11 correct?
12    A.    Yes.
13    Q.    That survey is conducted every
14 two years?
15    A.    Yes.  Although -- yes.  I think
16 sometimes that got disturbed, like during the
17 pandemic, but most of the time, yes, it's
18 every two years.
19    Q.    NSDUH puts out annual data on
20 adolescents, age 12 to 17, who had serious
21 thoughts of suicide, made a suicide plan or
22 attempted suicide.  Correct?
23    A.    What is NSDUH?
24    Q.    NSDUH.
25    A.    Oh.  Yes.

1     Q.    I said NSDUH.  Maybe --
2     A.    Yeah.  NSDUH does do that every
3  year, yes.
4     Q.    And you rely on NSDUH data
5  elsewhere in your report, such as in Figure 1,
6  correct?
7     A.    Yes.
8     Q.    Have you looked at the NSDUH
9  annual data on adolescents who had serious
10 thoughts of suicide, made a suicide plan or
11 attempted suicide?
12    A.    Yes.
13    Q.    It shows declines in all three
14 categories from 2022 to 2024.  Correct?
15    A.    I would have to have that in
16 front of me, but that would be consistent with
17 most of the other datasets, yes, that there
18 are post-pandemic declines.
19    Q.    I'll hand you Exhibit 45.
20          (Exhibit No. 45 was marked for
21    identification.)
22 BY MR. HALPERIN:
23    Q.    This is the 2024 NSDUH graphics
24 to support estimates from the annual national
25 report.

1          Do you see that?
2     A.    Yes.
3     Q.    Is this a document you are
4  familiar with?
5     A.    Yes.
6     Q.    Look at page 69, please.
7          This shows data for 2021 to 2024,
8  percentage who had suicidal thoughts or
9  behaviors in the past year among adolescents
10 age 12 to 17.  Correct?
11    A.    Yes.
12    Q.    It shows declines in, had serious
13 thoughts of suicide, made a suicide plan, and
14 attempted suicide, in all three categories
15 from 2022 to 2024.  Correct?
16    A.    Yes.  And I have to point out,
17 though, that this does not show the enormous
18 increase -- wait.  The reason I said wait is
19 that I would have to go back and look in the
20 data file to see if these questions were asked
21 of adolescents before 2021.  If they were, I
22 would want to see the whole pattern, going
23 back to the first time they were asked.  But I
24 don't recall if they were asked before 2021 in
25 this age group.

Page 454

1        I know they were asked of adults
2 before that time. I don't know if they were
3 asked of adolescents before that time. And I
4 don't know if this is in the publicly
5 available, downloadable dataset or not.
6        Q.    You chose to use NSDUH data for
7 Figure 1, depression, but not to include that
8 data for suicide and self-harm. Correct?
9        A.    My understanding was that those
10 questions weren't even asked of adolescents,
11 so it's -- it's -- again, I would have to
12 confirm this, but I believe that these
13 questions are not available for adolescents
14 over that whole time period.
15        So, for example, a publication
16 of mine in the Journal of Abnormal Psychology,
17 we looked at these questions, but they were
18 only available for adults.
19        Q.    Do you know it to be true that
20 they weren't available for teens prior to
21 2021?
22        A.    I believe that's correct, but
23 I'd have to go confirm that. And it could be
24 that they can analyze them, but it may not be
25 in the downloadable datasets that I use.

Page 455

1        Q.    Did time spent on social media
2 decline from 2022 to 2024, to your knowledge?
3        A.    I --
4        Q.    Among teens?
5        A.    I don't know. I'd have -- I'd
6 have to go back to analyze data to find that
7 out.
8        Q.    You didn't analyze Monitoring the
9 Future data on that question in connection
10 with your report?
11        A.    Not in that way, no.
12        Q.    Okay. Let's look at the
13 Tennessee specific version of your graph,
14 which is Figure 7.
15        Do you see the note under the
16 graph, "Data were not collected in Tennessee
17 in the 1995, 1997, 1999 or 2001
18 administrations"?
19        A.    Yes, I see that.
20        Q.    There is no Tennessee specific
21 data from 1993 to 2003, correct?
22        A.    I believe that's correct, yes.
23        Q.    You can't say whether the rate of
24 Tennessee high school students who seriously
25 considered attempting suicide went down or up

Page 456

1 or both during that ten-year period. Correct?
2        MS. McNABB: Objection. Form.
3        THE WITNESS: You can compare
4     1993 to 2003.
5 BY MR. HALPERIN:
6        Q.    But you can't -- you don't know
7 what happened in between those years, correct?
8        A.    Correct.
9        Q.    You don't know what happened in
10 between those ten years for the percentage of
11 Tennessee high school students who made a
12 suicide plan. Correct?
13        A.    Correct.
14        MS. McNABB: Objection. Form.
15 BY MR. HALPERIN:
16        Q.    So it's not necessarily accurate
17 to draw a straight line over a ten-year
18 period, from 1993 to 2003, as you've done in
19 Figure 7, correct?
20        MS. McNABB: Objection. Form.
21        THE WITNESS: I disagree. That
22     is standard practice when making
23     graphs, is to graph the data that you
24     have. Sometimes people will put
25     little hashmarks or something like

Page 457

1     that, but not always.
2 BY MR. HALPERIN:
3        Q.    Do you know that YRBS, when it
4 presents this data for Tennessee, has no line
5 between 1993 and 2003?
6        A.    That's their choice.
7        Q.    You made a different choice,
8 right?
9        A.    Correct.
10        Q.    Your New Mexico report doesn't
11 present data on the percentage of New Mexico
12 high school students who seriously considered
13 attempting suicide or made a suicide plan.
14 Correct?
15        MS. McNABB: Objection. Form.
16        THE WITNESS: You'd have to put
17     that report in front of me for me to
18     answer that question.
19 BY MR. HALPERIN:
20        Q.    YRBS has that data for New
21 Mexico, correct?
22        MS. McNABB: Objection. Form.
23        THE WITNESS: I don't know. I
24     don't recall.
25 BY MR. HALPERIN:

115 (Pages 454 - 457)

CONFIDENTIAL

Page 458

1    Q.    Do you know any reason why they
2  would have it for Tennessee but not New
3  Mexico?
4    A.    It's very common for states to
5  not participate in certain years, as you see
6  in the note on Figure 7.  And sometimes if
7  there is not enough data and enough years,
8  then I wouldn't be able to graph it.  And I
9  can't tell you what that looks like for New
10  Mexico without looking it up myself.
11    Q.    All right.  Let's look at
12  Figure 8, please.
13          For both Monitoring the Future
14  and YRBSS, you presented combined data across
15  both sexes, correct?
16    A.    Yes.
17    Q.    Is sex-specific data available on
18  YRBSS?
19    A.    Yes.
20    Q.    Is sex-specific data available in
21  Monitoring the Future?
22    A.    Yes.
23    Q.    You chose not to include those in
24  your report, correct?
25          MS. McNABB:  Objection.  Form.

Page 459

1          THE WITNESS:  Correct.
2  BY MR. HALPERIN:
3    Q.    Figure 8 stops in 2015.  Right?
4    A.    It does.  And so this was
5  another place where I relied on a published
6  paper, due to IP issues with the underlying
7  dataset that had been merged over decades of
8  work.
9    Q.    For Figure 9, you present more
10  recent data specific to Tennessee, right?
11    A.    Yes.
12    Q.    You chose not to do that for
13  Figure 8 for U.S. data, correct?
14          MS. McNABB:  Objection.  Form.
15          THE WITNESS:  So Figure 8 is
16    based on a published paper.  So
17    because that paper was published in
18    2017, I reproduced the graph from that
19    paper.
20          For Figure 9, it was looking at
21    the Youth Risk Behavior Surveillance
22    publicly available data, which had --
23    then I looked at the Tennessee-
24    specific data.
25  BY MR. HALPERIN:

Page 460

1    Q.    There's publicly available data
2  for YRBSS going all the way up to 2023 you
3  could have included in Figure 8, correct?
4          MS. McNABB:  Objection.  Form.
5          THE WITNESS:  Yes.
6  BY MR. HALPERIN:
7    Q.    You chose not to do that, right?
8    A.    Yes.  Probably to be -- probably
9  because I chose to grab the figure from the
10  publication.
11          MR. HALPERIN:  Okay.  Let me
12    show you what that data looks like.
13          (Exhibit No. 46 was marked for
14    identification.)
15  BY MR. HALPERIN:
16    Q.    This is Exhibit 46.  This is the
17  YRBSS data reflected in Figure 8.
18    A.    So these are two different
19  variables.  So Figure 8 says the percent of
20  adolescents getting fewer than seven hours of
21  sleep on most nights.  What you handed me for
22  Exhibit 46 is the opposite:  High school
23  students who got eight or more hours of sleep.
24    Q.    And so you used Exhibit 46 to
25  calculate the numbers in Figure 8 of your

Page 461

1  report, correct?
2          MS. McNABB:  Objection.  Form.
3          THE WITNESS:  No, I used the --
4    I used the downloadable files.
5  BY MR. HALPERIN:
6    Q.    Okay.  Could you have used the
7  data in Exhibit 46 to generate that same
8  number?
9          MS. McNABB:  Objection.  Form.
10  BY MR. HALPERIN:
11    Q.    Through 2023?
12    A.    I'm not sure, given that these
13  are two different ways of cutting the data.
14    Q.    Okay.  Does your New Mexico
15  report have New Mexico specific data on the
16  percentage of adolescents getting seven or
17  fewer hours of sleep?
18    A.    I'd have to have that in front
19  of me to tell you.
20    Q.    Do you know if you've analyzed
21  that data?
22    A.    I don't recall.
23    Q.    Do you know what it shows?
24    A.    I do not know.
25          MR. HALPERIN:  All right.  I

116 (Pages 458 - 461)

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 462

1  think it's a good breaking point for
2  the evening.  One minute past our
3  deadline.
4       MS. McNABB:  Okay.
5       THE VIDEOGRAPHER:  Off the
6  record at 6:01 p.m.
7       (Whereupon, the deposition of
8  JEAN M. TWENGE, Ph.D. was adjourned
9  at 6:01 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 464

1       INSTRUCTIONS TO WITNESS
2       Please read your deposition over
3  carefully and make any necessary corrections.  You
4  should state the reason in the appropriate space on
5  the errata sheet for any corrections that are made.
6       After doing so, please sign the errata
7  sheet and date it.
8       You are signing same subject to the
9  changes you have noted on the errata sheet, which
10 will be attached to your deposition.  It is
11 imperative that you return the original errata
12 sheet to the deposing attorney within forty-five (45)
13 days of receipt of the deposition transcript by
14 you.  If you fail to do so, the deposition
15 transcript may be deemed to be accurate and may be
16 used in court.
17
18
19
20
21
22
23
24
25

Page 463

1   CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2      The undersigned Certified Shorthand Reporter
3  does hereby certify:
4      That the foregoing proceeding was taken
5  before me at the place and time therein set forth,
6  at which time the witness was duly sworn; That the
7  testimony of the witness and all objections made at
8  the time of the examination were recorded
9  stenographically by me and were thereafter
10 transcribed, said transcript being a true and
11 correct copy of my shorthand notes thereof; That
12 the dismantling of the original transcript will
13 void the reporter's certificate.
14      In witness thereof, I have subscribed
15 my name this date: September 10, 2025.
16
        _Leslie Anne Todd_
17 _____
18      LESLIE A. TODD, CSR, RPR
19      Certificate No. 5129
20
21 (The foregoing certification of
22 this transcript does not apply to any
23 reproduction of the same by any means,
24 unless under the direct control and/or
25 supervision of the certifying reporter.)

Page 465

1       - - - - - -
2       E R R A T A
3       - - - - - -
4  PAGE LINE CHANGE
5  ____ ____ _____
6  REASON: _____
7  ____ ____ _____
8  REASON: _____
9  ____ ____ _____
10 REASON: _____
11 ____ ____ _____
12 REASON: _____
13 ____ ____ _____
14 REASON: _____
15 ____ ____ _____
16 REASON: _____
17 ____ ____ _____
18 REASON: _____
19 ____ ____ _____
20 REASON: _____
21 ____ ____ _____
22 REASON: _____
23 ____ ____ _____
24 REASON: _____
25

117 (Pages 462 - 465)

CONFIDENTIAL

Page 466

1        ACKNOWLEDGMENT OF DEPONENT
2            I,_____, do
3    hereby certify that I have read the foregoing
4    pages, and that the same is a correct transcription
5    of the answers given by me to the questions therein
6    propounded, except for the corrections or changes
7    in form or substance, if any, noted in the attached
8    Errata Sheet.
9
10   _____
11   JEAN M. TWENGE, Ph.D.            DATE
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 467

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE: SOCIAL MEDIA        )

5    ADOLESCENT ADDICTION/      ) Case No.

6    PERSONAL INJURY PRODUCTS   ) 4:23-MD-03047-YGR

7    LIABILITY LITIGATION       ) MDL No. 3047

8    _____ )

9    THIS DOCUMENT RELATES TO: ) CONTAINS CONFIDENTIAL

10   ALL ACTIONS                ) INFORMATION

11   _____ )

12

13

14

15

16

17

18            V O L U M E   I I

19     VIDEOTAPED DEPOSITION OF JEAN M. TWENGE, Ph.D.

20              SEPTEMBER 18, 2025

21                 12:19 P.M.

22

23

24    Job No. MDLG7593823

25    Reported by: Leslie A. Todd, CSR No. 5129 and RPR

CONFIDENTIAL

Page 468

1    Videotaped deposition of JEAN M. TWENGE,
2    Ph.D., held pursuant to notice, before Leslie Anne
3    Todd, California Certified Shorthand Reporter in
4    and for the State of California, who officiated in
5    administering the oath to the witness, at the:
6
7         COURTYARD SAN DIEGO RANCHO BERNARDO
8         LAKESIDE ROOM
9         11611 Bernardo Plaza Court
10        San Diego, California 92182
11        (858) 613-2000
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 469

1         A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFFS:
4         KELLY K. McNABB, ESQUIRE
5         LIVIA JARAMILLO, ESQUIRE
6         MATIAS BUSTAMANTE, ESQUIRE (via Zoom)
7         LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
8         250 Hudson Street
9         8th Floor
10        New York, New York 10013-1413
11        (212) 355-9500
12
13        MATTHEW JANSSEN, ESQUIRE
14        TENNESSEE OFFICE OF THE ATTORNEY GENERAL
15        315 Deaderick Street
16        Nashville, Tennessee 37243
17        (615) 741-1671
18
19        ZACH RICHARDS, ESQUIRE (via Zoom)
20        KENTUCKY OFFICE OF THE ATTORNEY GENERAL
21        1024 Capital Center Drive
22        Suite 200
23        Frankfort, Kentucky 40601
24        (502) 892-8538
25

Page 470

1    APPEARANCES (Continued):
2         GARDNER REED, ESQUIRE (via Zoom)
3         WASHINGTON OFFICE OF THE ATTORNEY GENERAL
4         800 Fifth Avenue, Suite 2000
5         Seattle, Washington 98104-3188
6         (206) 516-2997
7
8         ABBY CUNNINGHAM, ESQUIRE (via Zoom)
9         WEST VIRGINIA OFFICE OF THE ATTORNEY GENERAL
10        1900 Kanawha Boulevard East
11        Charleston, West Virginia 25305
12        (304) 558-8986
13
14        AELISH BAIG, ESQUIRE
15        ROBBINS GELLER RUDMAN & DOWD, LLP
16        One Montgomery Street, Suite 1800
17        San Francisco, California 94104
18        (415) 288-4545
19
20        KAITLYN KARPENKO, ESQUIRE
21        CHRISTINA CHAN, ESQUIRE (via Zoom)
22        MASSACHUSETTS OFFICE OF THE ATTORNEY GENERAL
23        100 Cambridge Street, 11th Floor
24        Boston, Massachusetts 02108
25        (617) 727-2200

Page 471

1    APPEARANCES (Continued):
2         KRISLYN M. LAUNER, ESQUIRE
3         TESS SCHNEIDER, ESQUIRE (via Zoom)
4         CONNECTICUT OFFICE OF THE ATTORNEY GENERAL
5         165 Capitol Avenue
6         Hartford, Connecticut 06106
7         (860) 808-5318
8
9         ANN RITTER, ESQUIRE
10        MOTLEY RICE, LLP
11        28 Bridgeside Boulevard
12        Mount Pleasant, South Carolina 29464
13        (843) 216-9000
14
15        ALEX AGEE, ESQUIRE (via Zoom)
16        BASS BERRY & SIMS, LLP
17        100 Peabody Place, Suite 1300
18        Memphis, Tennessee 38103
19        (901) 543-5900
20
21        CORINNE GILCHRIST, ESQUIRE (via Zoom)
22        INDIANA OFFICE OF THE ATTORNEY GENERAL
23        302 W. Washington Street, 5th Floor
24        Indianapolis, Indiana 46204
25        (317) 232-6330

2 (Pages 468 - 471)

CONFIDENTIAL

Page 472

1  APPEARANCES (Continued):

2

3  ON BEHALF OF THE TIKTOK DEFENDANTS:

4      KATHRYN S. LEHMAN, ESQUIRE

5      KEVIN BOYCE, ESQUIRE

6      KING & SPALDING LLP

7      1180 Peachtree Street, NE, Suite 1600

8      Atlanta, Georgia 30309

9      (404) 572-4600

10

11 ON BEHALF OF THE META DEFENDANTS

12     GREGORY L. HALPERIN, ESQUIRE

13     DOMINIC BOOTH, ESQUIRE

14     MOLLIE SWEARS, ESQUIRE (via Zoom)

15     COVINGTON & BURLING LLP

16     620 Eighth Avenue

17     New York, New York 10018-1405

18     (212) 841-1166

19

20 ON BEHALF OF THE GOOGLE AND YOUTUBE DEFENDANTS:

21     MATTHEW DONOHUE, ESQUIRE

22     WILSON SONSINI GOODRICH & ROSATI, LLP

23     953 East Third Street, Suite 100

24     Los Angeles, California 90013-1955

25     (323) 210-2939

Page 473

1  APPEARANCES (Continued):

2

3  ON BEHALF OF THE SNAP DEFENDANTS:

4      GARRETT SOLBERG, ESQUIRE

5      JOHN B. MAJOR, ESQUIRE (via Zoom)

6      MUNGER TOLLES & OLSON, LLP

7      350 South Grand Avenue, 50th Floor

8      Los Angeles, California 90071-3426

9      (213) 683-9100

10

11 ALSO PRESENT:

12     TIM HUNTER, Videographer

13     MARC ZAMORA, Trial Technician

14     CORIN STIGALL, paralegal (via Zoom)

15     ANNETT WILSON (via Zoom)

16     IAN STIMSON (via Zoom)

17

18

19

20

21

22

23

24

25

Page 474

1          C O N T E N T S

2  EXAMINATION OF JEAN M. TWENGE, Ph.D.      PAGE

3      By Mr. Halperin          477, 588

4      By Ms. Lehman            552

5      By Ms. McNabb            584

6

7

8          E X H I B I T S

9      (Attached to transcript)

10 TWENGE DEPOSITION EXHIBITS          PAGE

11 No. 47    Invoices              479

12 No. 48    Article: In Their Own Words: How

13     Adolescents Use Social Media and

14     How It Affects Them          483

15 No. 49    Article: User perception of time

16     spent in Instagram, beginning

17     Bates No. META3047MDL-032-00000933  486

18 No. 50    Article: Power Users & Goals,

19     beginning Bates No. META3047MDL-

20     047-00912997          497

21 No. 51    Document entitled Promoting

22     Connection: Designing Social Media

23     Experiences to Support People with

24     Eating Disorders, beginning Bates

25     No. META3047MDL-020-00250464      503

Page 475

1          E X H I B I T S

2      (Attached to transcript)

3  TWENGE DEPOSITION EXHIBITS          PAGE

4  No. 52    Article: Increases in Depressive

5      Symptoms, Suicide-Related

6      Outcomes, and Suicide Rates Among

7      U.S. Adolescents After 2010 and

8      Links to Increased New Media

9      Screen Time          512

10 No. 53    Preprint version: The Association

11     Between Well-Being and

12     Objectively Measured Versus

13     Self-Reported Smartphone Time    520

14 No. 54    Article: No More FOMO: Limiting

15     Social Media Decreases Loneliness

16     and Depression          525

17 No. 55    The Lancet Psychiatry Commission

18     on youth mental health paper      534

19 No. 56    Article: Roles of cyberbullying,

20     sleep, and physical activity in

21     mediating the effects of social

22     media use on mental health and

23     well-being among young people in

24     England: a secondary analysis of

25     longitudinal data          537

3 (Pages 472 - 475)

CONFIDENTIAL

Page 476

1           E X H I B I T S
2       (Attached to transcript)
3    TWENGE DEPOSITION EXHIBITS          PAGE
4    No. 57    Article: Association of Habitual
5              Checking Behaviors on Social
6              Media With Longitudinal
7              Functional Brain Development     540
8    No. 58    Article: Brain structural co-
9              development is associated with
10             internalizing symptoms two
11             years later in the ABCD cohort     546
12   No. 59    Article: Brain structural
13             covariation linked to screen
14             media activity and externalizing
15             behaviors in children        549
16   No. 60    Preprint of article       556
17   No. 61    Document entitled "Presentations"   579
18   No. 62    Article: Why increases in
19             adolescent depression may be
20             linked to the technological
21             environment           584
22
23
24
25

Page 477

1          P R O C E E D I N G S
2           ----------------
3          THE VIDEOGRAPHER:  And here
4    begins the videotaped deposition of
5    Jean Twenge, in the matter of Social
6    Media Adolescent Addiction Personal
7    Injury, MDL Number 3047, versus
8    TikTok, Inc.
9          Today's date is September 18th,
10   2025, and the time on the record is
11   12:19 p.m.
12         My name is Tim Hunter, your
13   legal videographer.  Our court
14   reporter today is Leslie Todd.
15   Counsel will be noted on the record.
16         Madam Reporter, would you
17   please swear the witness to start the
18   deposition.
19         JEAN M. TWENGE, Ph.D.,
20   having first been duly sworn, was
21   examined and testified as follows:
22        FURTHER EXAMINATION
23   BY MR. HALPERIN:
24   Q.    Good morning, Dr. Twenge.
25   A.    Good afternoon.

Page 478

1    Q.    Good afternoon, I should say.  It
2    is now afternoon.
3          I hope you had a good evening and
4    a productive meeting this morning.
5    A.    Yes.
6    Q.    I'm going to start by --
7    actually, before I do that, did you do
8    anything overnight to prepare for your
9    deposition after we left the room yesterday?
10   A.    I did some reading on my own
11   yesterday evening, and a little bit over
12   lunch.
13   Q.    What reading did you do?
14   A.    Let's see if I can recall.
15   Looked over -- I just did a brief skim of the
16   rebuttal report.  And then this morning, I
17   verified some details with the Youth Risk
18   Behavior Surveillance portal.
19   Q.    What details did you verify with
20   the Youth Risk Behavior Surveillance portal?
21   A.    I verified that the portal that
22   I used only had data up to 2021.  And I
23   verified the years the data were available for
24   Massachusetts on some of the variables that we
25   had been discussing.

Page 479

1    Q.    Okay.
2    A.    Just to refresh my memory.
3    Q.    Anything else that you did
4    overnight?
5    A.    No.
6    Q.    Did you have any substantive
7    conversations with the lawyers here today or
8    virtually?
9    A.    No.
10         MS. McNABB:  I'll just object
11   to the extent -- I guess you already
12   answered.
13         THE WITNESS:  Sorry.
14         MS. McNABB:  No, that's okay.
15   If he asks you questions about
16   conversations with attorneys, just yes
17   or no.  I'll object to privilege if it
18   goes further than that.
19         THE WITNESS:  Understood.
20   BY MR. HALPERIN:
21   Q.    All right.  Let me hand you
22   Exhibit 47, which are three invoices that were
23   provided a few minutes before we walked into
24   the room this morning.
25         (Exhibit No. 47 was marked for

4 (Pages 476 - 479)

CONFIDENTIAL

Page 480

1    identification.)
2 BY MR. HALPERIN:
3    Q.    Do you recognize these as your
4 invoices?
5    A.    I'm just taking a moment to
6 verify.
7        (Peruses documents.)
8        Yes.
9    Q.    Sure.
10    A.    Yes.
11    Q.    And these are invoices that you
12 sent -- the first two pages are to Beasley
13 Allen, correct?
14    A.    Yes.
15    Q.    And the third page is to Motley
16 Rice, correct?
17    A.    Yes.
18    Q.    And the -- all three of these
19 invoices are from the summer of 2022, correct?
20    A.    Yes.
21    Q.    Did you do any work in connection
22 with the Social Media Teen Mental Health
23 litigation between the summer of 2022 and July
24 of 2024?
25    A.    I know there was a long pause in

Page 481

1 there somewhere. I believe I did do some work
2 in that period with the Social Media Victims
3 Law Center.
4    Q.    Okay. Any other law firms that
5 you would have billed time to between the
6 summer of 2022 and the summer of 2024?
7    A.    I would have to go look to
8 verify, but it's possible that I would have
9 billed the State of Tennessee.
10    Q.    Anyone else?
11    A.    Well, I did the work for Utah
12 during that time period.
13    Q.    Okay. In connection with the
14 NetChoice litigation?
15    A.    You tell me. It all -- I can
16 never keep track of it, but it was the
17 report -- we talked about it yesterday, that I
18 did for Utah. And so I would have billed time
19 probably in that time period to them.
20    Q.    And when you say you billed to
21 Utah, you billed to Utah in connection with
22 the challenge to legislation in Utah, correct?
23    A.    I believe that's the case, but
24 I'd have to go take look at it, yes.
25        MR. HALPERIN: I'll reiterate

Page 482

1 my request to Mr. Janssen for the
2 invoices prior to 2024 -- or prior to
3 the summer of 2024 that Dr. Twenge
4 submitted that are responsive to the
5 notice of deposition. And I'd would
6 ask that they be produced imminently,
7 so that we can use them in this
8 deposition.
9        I also understand from counsel,
10 Ms. McNabb, that they are attempting
11 to obtain invoices from SMVLC. And we
12 hope that those get produced while the
13 deposition is still ongoing.
14 BY MR. HALPERIN:
15    Q.    These invoices that were produced
16 from the summer of 2022 total to just over
17 $10,000. Does that seem accurate to you?
18    A.    Yes.
19    Q.    Do you know how much you
20 invoiced, whether it's SMVLC or Tennessee or
21 anyone else, prior to the summer of 2024?
22    A.    I do not.
23    Q.    Okay. You can set that document
24 aside.
25        You mentioned yesterday the

Page 483

1 van der Wal study. Do you recall that?
2    A.    Yes.
3    Q.    And you told me that that
4 answered the question of which social media
5 platforms are most likely to lead to
6 depression, correct?
7    A.    I may have said depression, as
8 well as low psychological well-being. I was
9 trying to recall the outcome variable.
10    Q.    But it's your opinion that the
11 van der Wal study answers what you described
12 as an unanswered question in your book chapter
13 of which social media platforms are most
14 likely to lead to harm, correct?
15    A.    So it's one study. I would not
16 call it definitive. I don't want to be
17 misinterpreted as saying that. But, yes, one
18 of the strengths of that study is it does
19 break down use by platform.
20        (Exhibit No. 48 was marked for
21        identification.)
22 BY MR. HALPERIN:
23    Q.    Okay. Let me hand you a copy of
24 the van der Wal study. And this will be
25 Exhibit 48.

5 (Pages 480 - 483)

CONFIDENTIAL

Page 484

1    First of all, can you confirm
2 that this is the van der Wal study that you
3 were referencing?
4    A.    I don't believe it is, no.
5    Q.    Okay.  Is there a different
6 van der Wal study?
7    A.    Yes.
8    Q.    When was that van der Wal study
9 published, or can you tell me any information
10 about it?
11    A.    Let me consult my report to
12 answer that question.  Okay.
13    So it's in the references of my
14 original report.  It's titled Social Media Use
15 Leads to Negative Mental Health Outcomes For
16 Most Adolescents.  It's a preprint that was
17 posted to PsyArXiv.
18    Q.    Okay.  What reference number is
19 it in your report?
20    A.    I don't think there's a
21 reference number.  I don't think I numbered
22 the references, but it is on page 45.
23    Q.    Got it.  Okay.  You can set
24 Exhibit 48 aside, then.
25    MS. RITTER:  What's the exhibit

Page 485

1 number for the original report?
2    THE WITNESS:  It's Exhibit 1.
3 BY MR. HALPERIN:
4    Q.    All right.  Can you go to page 25
5 of Exhibit 1, please?
6    A.    I'm there.
7    Q.    Give me one second.  I seem to
8 have not brought my copy of the report, so I'm
9 just pulling an electronic copy.  It will take
10 me ten seconds.
11    A.    No problem.
12    Q.    All right.  On page 25, you opine
13 that a Meta study found that people -- I'm
14 sorry, at page 33.
15    A.    33, okay.
16    Q.    And I actually have the wrong
17 report open.  I'm looking at your Tennessee
18 report.  So give me just a few more seconds,
19 and I will be on the same page as you.
20    A.    Okay.
21    Q.    So it is page 25 of your MDL
22 report, paragraph 69.
23    A.    I'm there.
24    Q.    Okay.  You say, "A Meta study
25 found that people who spend more than an hour

Page 486

1 a day on Instagram are more likely to report
2 negative mood."  Do you see that?
3    A.    Yes.
4    Q.    And you cite a document ending in
5 the Bates stamp 933, specifically page 966 of
6 that document, correct?
7    A.    Yes.
8    Q.    Okay.  Let me hand you that
9 document, please.
10    MS. McNABB:  I'll just object
11 that that misreads the report.
12    THE WITNESS:  And give me just
13 a moment to grab my glasses.
14    (Exhibit No. 49 was marked for
15    identification.)
16 BY MR. HALPERIN:
17    Q.    Yes.
18    A.    I'm ready.
19    Q.    Okay.  This -- what I've marked
20 as Exhibit 49 is a slide deck titled User
21 Perception of Time Spent on Instagram, by
22 ████████, among others.  Do you see that?
23    A.    Yes.
24    Q.    And if you go to page 936, it
25 says, "What we did."  It's the fourth page of

Page 487

1 the document, if that helps.
2    A.    Okay.
3    Q.    The authors conducted an e-mail
4 survey over approximately one week in May of
5 2018, correct?
6    A.    That's what it says.
7    Q.    Okay.  Let's go to page 966, the
8 page that you cite at least initially in your
9 report.  And it's actual slide number 33.  Are
10 you there?
11    A.    Yes.
12    Q.    Okay.  It says, "Those who spend
13 longer than one hour on IG have higher
14 negative well-being."  Do you see that?
15    A.    Yes.  A word -- assuming that IG
16 means Instagram and WB means well-being, which
17 I would agree is correct.
18    Q.    Okay.  And that was based on
19 users' self-perceptions in answering that
20 e-mail survey, correct?
21    A.    So it's been a little bit since
22 I saw this document.  So just -- let me make
23 sure.
24    So assuming this is the same
25 study that you walked -- you had, the previous

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 488

1 page is the method, and we have the time spent
2 on Instagram, and then it says, "Survey
3 measures used 5-point Likert scale." So, you
4 know, this is not as complete as a scientific
5 paper. But I'm going to assume that that was
6 self-reported, the positive affect, life
7 satisfaction, negative affect are
8 self-reported, so yes.
9     Q.    Okay. Let me just ask you. Do
10 you know the methodology of this document that
11 you rely on for your opinions?
12    A.    I know what was in the document.
13    Q.    Can you tell me how the numbers
14 on slide 33 were generated?
15    A.    Given that I do not have the
16 underlying dataset and was not provided the
17 underlying dataset, I don't think I have every
18 detail of the methods, no.
19    Q.    Would you want to understand the
20 methods before assessing the reliability of
21 this research?
22    A.    Yes.
23    Q.    Did you ask the lawyers whether
24 the underlying dataset was available for you
25 to review?

Page 489

1     A.    I believe I did. So whether it
2 was this specific study or not, I don't
3 recall. But I do recall having several
4 conversations with the attorneys over the
5 years that I would very much like to receive
6 the underlying datasets for some of the
7 internal research.
8     Q.    Did you request from the lawyers
9 any documents spelling out the methodology of
10 the research set forth in Exhibit 49?
11    A.    Given that it already has some
12 description of the method, ideally, you want
13 the dataset, but it's pretty standard that
14 this type of internal research doesn't have
15 the type of detail as a scientific study, and
16 that you have to interpret it based on what's
17 here.
18    Q.    And so did you request from the
19 lawyers any documents spelling out the
20 methodology of the research set forth in
21 Exhibit 49, beyond what it says in this
22 document?
23    A.    I don't -- I don't believe so,
24 although I do remember having conversations
25 about datasets, so I can't say that for sure.

Page 490

1     Q.    Do you know if there are any
2 research plans or other documents spelling out
3 how the research would be done before it was
4 actually conducted?
5     A.    I'm not sure I understand what
6 you're asking. What do you mean, how the
7 research would be done?
8     Q.    Do you know whether there were
9 any documents laying out in writing how these
10 authors were going to do the research before
11 they actually did it and reported the results
12 in Exhibit 49?
13    A.    So their -- their research plan
14 is a separate document -- is that what you're
15 saying?
16    Q.    I'm asking whether you know
17 whether there was any sort of research plan
18 set out for this research.
19    A.    I don't know.
20    Q.    You weren't provided that
21 document, correct?
22        MS. McNABB: Objection.
23 Foundation.
24        THE WITNESS: Unless this was
25    another document that I reviewed and

Page 491

1    have forgotten, no.
2 BY MR. HALPERIN:
3     Q.    You weren't provided the
4 underlying data for this research, correct?
5        MS. McNABB: Objection.
6 Foundation.
7        THE WITNESS: I do not have a
8    data file that reflects this, no.
9 BY MR. HALPERIN:
10    Q.    Okay. It says here that -- on
11 page 33, "All survey measures use the 5-point
12 Likert scale." Do you see that?
13    A.    Let me make sure I know what --
14 I get back to that page.
15    Q.    Sure.
16    A.    So that's the one with the
17 results, and that's the note in gray at the
18 bottom, "All survey measures use the
19 five-point Likert. 1, strongly disagree; 5,
20 strongly agree."
21    Q.    Are you familiar with Likert
22 scales?
23    A.    Yes.
24    Q.    And so a Likert scale like this,
25 where 1 is "strongly disagree" and 5 is

7 (Pages 488 - 491)

CONFIDENTIAL

Page 492

1 "strongly agree," 3 is neutral, correct?
2    A.    Yes.
3    Q.    If we start with the positive
4 affect graph, I feel happy most of the time,
5 even among users who spent longer than three
6 hours per day on Instagram, on average, users
7 agreed to feeling happy most of the time,
8 correct?
9    A.    That's what the graph shows.
10 And this is a pretty typical result, that
11 you're going to get much higher positive
12 affect than negative.  It's also a very
13 typical result that you're going to get
14 smaller effect sizes for positive affect than
15 for negative.
16        MR. HALPERIN:  Move to strike
17    everything after "It's also."
18 BY MR. HALPERIN:
19    Q.    Let's look at life satisfaction.
20 Even among users who spent longer than three
21 hours per day on Instagram, on average, users
22 agreed to feeling their life was going well,
23 correct?
24    A.    I see that.  However, I can see
25 the significant difference between those who

Page 493

1 used it less often.
2    Q.    Do you know if those results are
3 statistically significant?
4    A.    Given that there are error bars,
5 that would strongly suggest that they are.
6 Those tiny little marks above that graph are
7 usually meant to convey a standard error.  And
8 if the standard errors don't overlap, then
9 it's statistically significant.
10        Also, on 936 that you referred
11 me to has the total N, which is quite high,
12 which would also point in the direction of
13 those results being statistically significant.
14    Q.    Well, you mentioned the total N.
15 Do you know how many people answered these
16 specific survey questions?
17    A.    I'm trying to see if that is
18 noted here in this document.  It doesn't say
19 on this specific page.
20    Q.    So do you know?
21    A.    Unless I'm missing something,
22 the way this is presented, I would assume it
23 was the same as the N put on 936, unless there
24 is information elsewhere, suggesting that this
25 is only part of the sample.  But I haven't, of

Page 494

1 course, had a chance to read the entire
2 document, as we're sitting here.
3    Q.    Is it sometimes the case that
4 when surveys go out to users, different
5 questions get asked of different survey
6 participants?
7    A.    Yes, that happens.
8    Q.    Do you know if that happened in
9 this survey?
10    A.    I would have to read the entire
11 document to answer that question.
12        Would you like me to do so?
13    Q.    Do you know, sitting here today,
14 whether that happened in this survey that you
15 rely upon in your expert report?
16        MS. McNABB:  Objection.  Form.
17        THE WITNESS:  I'm trying to
18    determine that right now.  It is
19    difficult with slide decks like this,
20    because they tend not to have the
21    level of detail that a scientific
22    article has.  That would be the type
23    of thing I would hope they would
24    report.  Regardless, the error bars
25    don't overlap, so the result is

Page 495

1    statistically significant.
2 BY MR. HALPERIN:
3    Q.    Do you know, sitting here today,
4 whether different users got different
5 questions in this survey?
6        MS. McNABB:  Objection.  Form.
7        THE WITNESS:  I'm not seeing
8    that noted in what passes for their
9    methods section.  So again, I would
10    have to read the entire document to be
11    able to answer that question.
12 BY MR. HALPERIN:
13    Q.    So you don't know, correct?
14    A.    It does not appear so, from what
15 I have been able to read in this short period
16 of time.
17    Q.    Is it sometimes the case that
18 users start taking a survey and drop off
19 without completing it?
20    A.    Yes.  And then the researcher
21 needs to report that, and decide if they're
22 going to keep the first part of the data or
23 eliminate that case entirely.
24    Q.    Do you know what the drop-off
25 rate was in this study?

8 (Pages 492 - 495)

CONFIDENTIAL

Page 496

1     A.    Unless it's in this document,
2  and I can find it in the next few seconds, no.
3     Q.    Do you know whether they reported
4  data for those that started the survey, but
5  didn't complete it as part of the findings in
6  Exhibit 49?
7     A.    I haven't been able to locate
8  that at the moment, no.
9     Q.    Was this survey limited to teens?
10    A.    Well, let's see what they say
11 about what their sample is.  So far, given the
12 language they are using, I don't think it was
13 just teens, but again, I'd have to read the
14 whole document.
15    Q.    Was this survey limited to a
16 population in the U.S.?
17    A.    No, it was not.  That's very
18 clear.
19    Q.    Go back to 966, please.
20          Looking all the way on the right
21 at the negative affect, I feel bad most of the
22 time, even among users who spent longer than
23 three hours per day on Instagram, on average,
24 users disagreed that they felt bad most of the
25 time, correct?

Page 497

1     A.    I see that, and I'm not sure
2  I've ever seen a sample, other than the one
3  that was highly selected that didn't have
4  that.  It's very, very common for that number
5  to be below 3 on the Likert scale, on average.
6     Q.    Okay.  Go back with me, please,
7  to your MDL report, Exhibit 1.  There's a
8  second document you cite at the end of that
9  same sentence we were looking at in
10 paragraph 69, that ends -- the last three of
11 the first page of that document were 997.  Do
12 you see that?
13    A.    Yes.
14    Q.    And you cite specifically page
15 033, correct?
16    A.    Yes.
17    Q.    Let me hand you that document.
18 This will be Exhibit 50.
19          (Exhibit No. 50 was marked for
20          identification.)
21 BY MR. HALPERIN:
22    Q.    Go to page ending 033, please,
23 the page you cite.  The second bullet says,
24 "People who spend more than an hour a day on
25 IG are more likely to report, 'I felt bad most

Page 498

1  of the time' over the last week."  Do you see
2  that?
3     A.    Yes.
4     Q.    And then at the bottom, there's a
5  citation, correct?
6     A.    Yes.
7     Q.    "Data:  User perception of time
8  spent on Instagram, album by ████████, May
9  2018," correct?
10    A.    Yes.
11    Q.    That's the same study we just
12 looked at, right?
13    A.    It appears to be.  The top page
14 doesn't have a date, but the author --
15    Q.    The survey itself was from May of
16 2018, as we discussed, the e-mail survey.
17    A.    Okay, yeah, but the title is the
18 same, the first author is the same, although
19 the other authors are not listed on this
20 second document.
21    Q.    You don't have any reason to
22 think there are actually two different studies
23 finding the same thing, correct?
24    A.    No.
25    Q.    Immediately after where we just

Page 499

1  looked in the second bullet, there's a
2  parenthetical.  Do you see that?
3     A.    In the -- where again?
4     Q.    "People who spend more than an
5  hour a day," the second bullet.
6     A.    Yes, I see it.
7     Q.    Do you see there's a
8  parenthetical?
9     A.    Yes.
10    Q.    It says, "Correlation, not
11 causation," correct?
12    A.    Yes.
13    Q.    Do you agree that this survey
14 only shows correlation, not causation?
15    A.    Since we're talking about a
16 single cross-sectional correlational survey,
17 yes, that's correct.  But we're not talking
18 about the preponderance of the evidence, just
19 to make that clear.  When you're talking about
20 the preponderance of the evidence, my answer
21 might be different.
22          MR. HALPERIN:  Move to strike
23          everything after "yes, that's
24          correct."
25 BY MR. HALPERIN:

9 (Pages 496 - 499)

CONFIDENTIAL

Page 500

1    Q.    Go back, please, to your MDL
2  report.  You go on to cite on the next page,
3  page 26 of your MDL report, another page from
4  that same document ending in 933.  Page 960.
5  Do you see that?
6    A.    Is that paragraph 70?
7    Q.    Yes.
8    A.    I see that.
9    Q.    Okay.  Go back with me, please,
10  to Exhibit 49, and let's look at that page,
11  page 960.
12        "Users were asked, 'in your
13  opinion, did this break from Instagram make
14  you feel better or worse than how you felt
15  before?'"  Do you see that?
16    A.    Yes.
17    Q.    How long was the break that users
18  were asked to take?
19    A.    You'll have to give me a moment
20  to refresh my memory, as I haven't seen this
21  document in a while.
22        So on the page marked 953, it
23  says, "Overall, 42 percent of the survey
24  respondents have taken a break from
25  Instagram."

Page 501

1        And the question says, "Have you
2  ever taken a break from using Instagram; i.e.,
3  intentionally stopped using Instagram for some
4  period of time?"
5        So if I'm reading this
6  correctly, it does not give a specific time
7  period.
8    Q.    How long after they took a break
9  did they take this survey, asking if it made
10  them feel better or worse?
11    A.    Okay.  So I have to amend my
12  previous statement, because it does say, on
13  955, the breakdown of how long their break was
14  from Instagram:  From less than a couple of
15  hours to more than a week, with more than a
16  week being the most common.
17        And I am not -- unless I missed
18  it, I'm not seeing a description of the length
19  of time between that break and when they
20  answered this question.
21    Q.    How long did them feeling better
22  or worse last after they took a break?
23    A.    Again, unless I'm missing it, I
24  don't think they asked that.
25    Q.    Do you know what this data looks

Page 502

1  like for teens, specifically?
2    A.    Okay.  Well, it does say on 951,
3  "A time management feature might have more
4  opportunities among high time spent users and
5  younger users less than 25 years old," so they
6  did apparently draw some conclusions, at least
7  about young adults.
8    Q.    I'm asking specifically about the
9  results on page 960, whether taking a break
10  made users feel better or worse.  Do you know
11  what that looks like for teens?
12    A.    So page 959 says that "More
13  younger users have taken a break than older
14  users," and they give 13 to 15, 16 to 17,
15  showing that the numbers are higher in that
16  group of those who took a break.
17    Q.    And my question is a little bit
18  different.  Do you know what the impact of
19  taking that break was, in terms of whether it
20  made them feel better or worse?
21    A.    So the graph on page 960 --
22    Q.    Do you know what that graph looks
23  like for teens?
24    A.    So again, without the
25  opportunity to sit down and read this in

Page 503

1  detail, it appears that that data was not
2  broken down by age.
3    Q.    Let's go back to your MDL report,
4  please.  Paragraph 69, on the carry-over page
5  from 25 to 26.
6        You say, "Meta also found that
7  more time on social media was linked to a
8  greater likelihood of developing an eating
9  disorder," and then you cite a document ending
10  in 464.  Do you see that?
11    A.    Yes.
12        (Exhibit No. 51 was marked for
13        identification.)
14  BY MR. HALPERIN:
15    Q.    I'm going to hand you that
16  document, which will be Exhibit 51.
17        Your report doesn't cite any
18  particular page of Exhibit 51, correct?
19    A.    I believe that's correct, yes.
20    Q.    I will represent to you that the
21  only reference we could find in this entire
22  document to time spent is at the top of
23  page 3.  Can we go to that page, please?
24        And if you have contrary
25  information, that it discusses time spent

Page 504

1 elsewhere in the document, please let me know.
2    A.    All right.  Let me take a look.
3 I believe that's correct, although I would
4 have to read it in detail to be sure.
5    Q.    Okay.  So look with me at the top
6 of page 3, please.  There is a sentence that
7 begins, "Preliminary research."
8    A.    Yes, I see that.
9    Q.    It says, "Preliminary research
10 found a correlation between more time spent
11 online and higher levels of disordered eating
12 among females."  Do you see that?
13    A.    Yes.
14    Q.    It cites an article, Mabe,
15 Forney, and Keel, 2014.
16    A.    Yes.
17    Q.    That article isn't on your
18 materials considered list; is that correct?
19    A.    Let me look.  That's correct.
20    Q.    You've not reviewed that article
21 in connection with your work in this case,
22 correct?
23    A.    I don't believe so.  I certainly
24 have reviewed other articles in this area, but
25 I don't believe I have reviewed that one.  But

Page 505

1 it's very -- I have to give the qualification,
2 it's very hard for me to say, given that I've
3 been doing research in this area for a decade.
4    Q.    Well, let me ask you.  Do you
5 have any basis, having not reviewed that
6 article for your report in this case, to
7 dispute that that research was, quote,
8 preliminary?
9    A.    I would need to read the article
10 to be able to determine that.  And I find that
11 an odd characterization, given that there's
12 many other studies with similar findings.
13    Q.    Do you have any basis, not having
14 reviewed the article for your report in this
15 case, to dispute that the research only found
16 a correlation?
17    A.    I don't have a reason to dispute
18 that statement, no.
19    Q.    Do you know whether that research
20 looked at time spent on social media or what's
21 described here as time spent online,
22 generally?
23    A.    So according to the title of
24 this article, it examined Facebook use.
25    Q.    It goes on to say, on page 3,

Page 506

1 "More carefully controlled studies are needed
2 to fully understand if and how social media
3 sites influence disordered eating."  Do you
4 see that?
5    A.    Yes.
6    Q.    Do you agree with that
7 characterization?
8    A.    So I have to give the
9 qualification, I did not dig into the eating
10 disorder literature very deeply.  That wasn't
11 my main charge in the report.
12        However, my understanding is
13 that there are experiments and carefully
14 controlled studies in this area that have been
15 conducted in the last five to seven years,
16 which may warrant an update to this.  I don't
17 know if this -- I don't have a date on this
18 article, given that what it's citing is 2014.
19 There very well may be updates to that.  And
20 given what I've read, I would disagree with
21 that statement.
22    Q.    Now, you include in your report
23 that Meta found a link, right?
24        MS. McNABB:  Objection.  Form.
25        THE WITNESS:  You've got to

Page 507

1    tell me where you're referring to.
2 BY MR. HALPERIN:
3    Q.    That very sentence citing this
4 document, on the carry-over from 25 to 26.
5 "Meta found that more time on social media was
6 linked," right?
7    A.    That is what it says, yes.
8    Q.    "Meta also found that more
9 carefully controlled studies are needed to
10 fully understand," right?
11        MS. McNABB:  Objection.  Form.
12        THE WITNESS:  So I think you're
13    correct that -- that was an oversight
14    on my part, and that was not a Meta
15    study, so I should have reworded that.
16 BY MR. HALPERIN:
17    Q.    Okay.  Let's look at page 14 of
18 your MDL report, please.  In paragraph 44, you
19 say, "None of the potential alternative causes
20 often suggested fit the data as well as the
21 increasing popularity of smartphones and
22 social media."  Do you see that?
23    A.    Yes.
24    Q.    And then you go on in a series of
25 paragraphs to discuss, I believe, 12 different

11 (Pages 504 - 507)

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 508

1 potential alternative causes. Is that right?
2     A.    I would have to count, but it's
3 around that.
4     Q.    Go ahead and do that.
5     A.    All right. I'm getting 12. I
6 know I have considered more than that at some
7 point in my decade of research, but there are
8 12 included here.
9     Q.    Okay. Have you performed any
10 regression analysis that accounts for the
11 impact of all 12 of these potential alternate
12 causes on any mental health outcome?
13    A.    I have performed regression
14 analyses that account for some of these, not
15 all 12.
16    Q.    Have you done a regression
17 analysis that accounts for all 12?
18    A.    No.
19    Q.    And you did not report the
20 results of any such regression analysis in
21 your report, correct?
22    A.    Correct.
23    Q.    All right. Let's talk about
24 experimental studies. Experimental studies on
25 children and adolescents are scant, true?

Page 509

1         MS. McNABB: Objection. Form.
2         THE WITNESS: That statement is
3     too broad. Can you word that more
4     specifically?
5 BY MR. HALPERIN:
6     Q.    Sure. Experimental studies on
7 children and adolescents, in relation to
8 social media and depression, are scant. Do
9 you agree with that?
10        MS. McNABB: Objection. Form.
11        THE WITNESS: Yes.
12 BY MR. HALPERIN:
13    Q.    Experimental studies on children
14 and adolescents in relation to social media
15 and suicidality are scant. True?
16        MS. McNABB: Objection. Form.
17        THE WITNESS: Yes. And I have
18    to also point out that in both of
19    these cases, there are many studies in
20    adults, and there is no reason to
21    believe that studies on adolescents or
22    children would show different results.
23        MR. HALPERIN: Move to strike
24    everything after "Yes."
25 BY MR. HALPERIN:

Page 510

1     Q.    Experimental studies on children
2 and adolescents in relation to social media
3 and sleep are scant. True?
4         MS. McNABB: Objection. Form.
5         THE WITNESS: I believe that's
6     the case, yes. I'm hesitating simply
7     because there's a lot more experiments
8     in that area.
9 BY MR. HALPERIN:
10    Q.    Without experimental evidence, we
11 cannot be certain that the increase in new
12 media screen time is the cause of the increase
13 in mental health issues after 2011. True?
14        MS. McNABB: Objection. Form.
15        THE WITNESS: So I believe what
16    you're doing is probably quoting from
17    one of my past articles, at a time
18    when there was not as much
19    experimental data, and at a time
20    before I had had the opportunity to
21    review all of the evidence in this
22    area, using all of these different
23    methods, including Bradford Hill,
24    which helped me come to that
25    conclusion that the preponderance of

Page 511

1     the evidence does show causation.
2 BY MR. HALPERIN:
3     Q.    Would you agree that without
4 experimental studies, we cannot be certain
5 that the increase in new media screen time is
6 the cause of the increase in mental health
7 issues after 2011? Is that true or not true?
8         MS. McNABB: Objection. Form.
9     Asked and answered.
10        THE WITNESS: Given the data
11    that has come out, given many other
12    considerations, such as using the
13    Bradford Hill criteria, I no longer
14    agree with that statement.
15 BY MR. HALPERIN:
16    Q.    Okay. So you do not believe we
17 need experimental evidence to be certain that
18 the increase in new media screen time is the
19 cause of the increase in mental health issues
20 after 2011?
21    A.    I would put it differently. I
22 would say that experimental evidence is very
23 helpful, and it is the gold standard. That is
24 why it is included in my report. However,
25 these -- especially with children and

12 (Pages 508 - 511)

CONFIDENTIAL

Page 512

1  adolescents, you can't always do experimental
2  studies in an ethical way.  You can't randomly
3  assign 12-year-olds to spend eight hours a day
4  on Instagram.
5      Q.   My question was a little
6  different.  Do you need experimental evidence,
7  in your view, to determine whether new media
8  screen time is the cause of the increase in
9  mental health issues after 2011?  Is
10  experimental evidence necessary?
11         MS. McNABB:  Objection.  Form.
12         THE WITNESS:  It is helpful,
13      but may or may not be necessary, given
14      the body of other evidence in the
15      field.
16      (Exhibit No. 52 was marked for
17      identification.)
18  BY MR. HALPERIN:
19      Q.   Okay.  I handed you what I've
20  marked as Exhibit 52.  This is an article with
21  you as the lead author; is that correct?
22      A.   Yes.
23      Q.   Go to page 14, please.
24         The final paragraph on the
25  left-hand side, do you see where it says, "Of

Page 513

1  course, without experimental evidence, we
2  cannot be certain that the increase in new
3  media screen time is the cause of the increase
4  in mental health issues after 2011."  Do you
5  see that statement?
6      A.   I see it.
7      Q.   Do you disagree with it?
8      A.   I would put it -- so, yes.
9  However, I would put it a little bit
10  differently, because this is within the four
11  corners of one journal article on time series
12  studies from 2018.  And, yes, my opinion has
13  evolved since then, as we have gotten more
14  evidence, not just experimental, but also time
15  series, correlational, and longitudinal
16  studies.  And that preponderance of the
17  evidence shows that social media is a cause of
18  the adolescent mental health crisis.
19      Q.   My question was a bit simpler.
20  Just yes or no, do you disagree with this
21  statement from Exhibit 52, page 14?
22         MS. McNABB:  Objection.  Form.
23      Asked and answered.
24         THE WITNESS:  In the context of
25      this journal article, and in 2018,

Page 514

1      where these disclaimers are standard,
2      I'm not at all surprised I wrote this
3      sentence.  But I would not write it
4      today in the same way, given the
5      research that we have today.  And
6      given that this article is about one
7      study, and not the preponderance of
8      the evidence, which is what I was
9      focused on in the report.
10  BY MR. HALPERIN:
11      Q.   Respectfully, Dr. Twenge, I
12  didn't ask you whether you'd write it
13  differently.  I asked you, do you agree or
14  disagree with this sentence?  Can you tell me
15  that?
16      A.   Right now?
17      Q.   Right now.
18      A.   Right now, I disagree with it.
19      Q.   Thank you.  You talk about
20  various experimental studies in your report,
21  correct?
22      A.   Yes.
23      Q.   You talk about Alcott, 2020?
24      A.   Yes.
25      Q.   And Alcott, 2020 was a study of

Page 515

1  adults, correct?
2      A.   Yes.
3      Q.   You talk about Hunt, 2018?
4      A.   Yes.
5      Q.   Hunt, 2018 looks at undergraduate
6  students, correct?
7      A.   Yes.
8      Q.   And college freshmen are
9  generally 18 or 19 years old, right?
10      A.   I don't know if it was just
11  freshmen.  I would have to go back to the
12  methods section to see the age range.  Most of
13  these studies are going to be primarily
14  freshmen, but also include sophomores,
15  juniors, and seniors, as well, so it's
16  probably got a fuller age range than that.
17      Q.   And the reason I asked about
18  freshmen is freshmen are generally younger
19  than sophomores, juniors, and seniors, right?
20      A.   Yes.
21      Q.   And freshman, generally, are 18
22  or 19 years old, correct?
23      A.   Most of the time, yes, but I'd
24  need to have the study in front of me to see
25  what their age range was.  And you can, in

13 (Pages 512 - 515)

CONFIDENTIAL

Page 516

1 these studies -- yes, the lowest is usually
2 going to be 18, but then that can often range
3 up to late twenties, and even older.
4      Q.   So Hunt primarily was of adults,
5 correct, if you're looking at a population of
6 undergraduate students?
7      A.   I would imagine, yes, that if
8 we're talking about 18 being legal adulthood,
9 yes, although they would definitely be at the
10 younger -- most of them are going to at the
11 younger end of that.
12      Q.   You talk about Davis and
13 Goldfield, 2025.
14      A.   Yes.
15      Q.   And Davis and Goldfield, 2025
16 looked at Canadian university students, 17 to
17 25 years old, with mental distress, correct?
18      A.   Yes.
19      Q.   That's not representative of the
20 general teen population, correct?
21      A.   So there's a couple of things to
22 unpack in that question.  Yes, this is -- this
23 is an older population, older than most teens,
24 although it does have some 17-year-olds.
25           And, yes, correct, this is not

Page 517

1 a -- a general sample.  They did select for
2 those who already had mental distress, that is
3 correct.  The most vulnerable is what they're
4 suggesting -- or excuse me, the most
5 vulnerable is what they selected for.
6      Q.   There's only one experiment that
7 you include in your report that looked
8 primarily at a population of teenage users,
9 and that's Schmidt-Persson, correct?
10      A.   That study had children of all
11 ages, so it wasn't just teenagers.
12      Q.   But it -- look with me at page 33
13 to your report, please.  You say, "Although
14 Davis and Goldfield included some
15 17-year-olds, most experiments on social media
16 reduction have involved only participants over
17 18," correct?
18      A.   Yes.
19      Q.   And that's a true statement,
20 right?
21      A.   Yes.
22      Q.   You go on to say, "A notable
23 exception is a recent experiment that randomly
24 assigned Danish families with children ages 4
25 to 17," and then you go on, and you're talking

Page 518

1 about Schmidt and Persson, right?
2      A.   Yes.
3      Q.   So Schmidt-Persson is the one
4 exception -- the notable exception to
5 experiments focusing on adults, correct?
6      A.   Yes.
7      Q.   Schmidt Persson, the experimental
8 group received non-internet-enabled cell
9 phones, correct?
10      A.   Yes.
11      Q.   They couldn't surf the internet,
12 right?
13      A.   At least on the cell phone.
14      Q.   Right.  They couldn't use their
15 device to surf the internet, correct?
16           MS. McNABB:  Objection.  Form.
17           THE WITNESS:  They couldn't use
18      -- they couldn't use the phone.  Now,
19      I know that there were some exceptions
20      made for homework and things like
21      that.  But the phones that they were
22      given, yes, were non-internet-enabled.
23 BY MR. HALPERIN:
24      Q.   The phones they were given
25 couldn't be used to play video games on their

Page 519

1 phones, correct?
2           MS. McNABB:  Objection.  Form.
3           MR. HALPERIN:  Other than maybe
4      Tetris or some other basic game that
5      might have come on the phone.
6           THE WITNESS:  Right.  So that's
7      -- that's why I'm not sure.  We'd have
8      to look back at the article to see
9      exactly what apps those phones had.
10 BY MR. HALPERIN:
11      Q.   They couldn't be used to play
12 internet-enabled video games, correct?
13           MS. McNABB:  Objection.  Form.
14           THE WITNESS:  I believe that's
15      correct, yes.
16 BY MR. HALPERIN:
17      Q.   The intervention group reduced
18 all types of screen time, not just social
19 media used, correct?
20      A.   Yes.
21      Q.   Let's talk about correlational
22 studies.  Many of the correlational studies
23 you cite relied on users' own reports about
24 how much time they spent on social media,
25 correct?

14 (Pages 516 - 519)

CONFIDENTIAL

Page 520

1    A.    Yes.
2    Q.    You've done research on the
3  association between self-reported screen time
4  and objective measures of screen time,
5  correct?
6    A.    There's a -- so there's a paper
7  under review that's not published yet that I'm
8  an author on, that did look at that.
9    Q.    What paper is that?
10    A.    The first author is Lisa Welsh,
11  and I don't even know the current status of
12  that paper.
13    Q.    Okay.  That's the paper I'm going
14  to show you right now, which we'll mark as
15  Exhibit 53.
16       (Exhibit No. 53 was marked for
17       identification.)
18  BY MR. HALPERIN:
19    Q.    Is this the paper you just
20  referenced?
21    A.    I believe so, yes.
22       And if we could, after this
23  section, take a break, I'd appreciate it.
24    Q.    Sure.  Why don't we finish this
25  document, and then we'll take a break, if

Page 521

1  that's okay.
2    A.    Yes.  So I should note -- it's
3  important to note, this is a preprint from
4  five years ago.  And as I mentioned, I don't
5  know the current status.  So it is entirely
6  possible that much of this document is
7  different at this point.
8       MR. HALPERIN:  Move to strike
9       because there was no question pending.
10  BY MR. HALPERIN:
11    Q.    Do you know if there's a more
12  recent version of this document than the one
13  I've handed you?
14    A.    I would have to contact
15  Dr. Welsh to find out.
16    Q.    You are a coauthor of this
17  article, correct?
18    A.    Yes.
19    Q.    Go with me, please -- first of
20  all, this study, in part, compared
21  self-reported smartphone and social media
22  times with objectively measured times,
23  correct?
24    A.    That's one of the things it did.
25  It did many things, but, yes, that was one of

Page 522

1  its goals.
2    Q.    If you look at page 14, please,
3  in the first full paragraph, it's -- it says,
4  "Participants' average self-reported social
5  media time and objective social media time in
6  minutes were less similar:  A difference of
7  117.89 minutes."  Do you see that?
8    A.    Yeah, I think we have to put
9  that in context of less similar compared to
10  what, which I believe is the previous
11  paragraph, where they found that the average
12  self-reported smartphone time and objective
13  smartphone time were almost identical, and
14  that the social media time, that those were
15  more discrepant.
16    Q.    And for social media time,
17  "Participants reported, on average, spending
18  231 minutes; whereas, objective measures
19  showed 113 minutes," correct?
20    A.    Yes.
21    Q.    The objective measures were less
22  than half the self-reported measures, correct?
23    A.    Yes.
24    Q.    And it was a difference of 118
25  minutes, which is just shy of two hours,

Page 523

1  correct?
2    A.    Yes.
3    Q.    You go on to say, "The histogram
4  of social media discrepancy scores also showed
5  a widespread of error in people's estimates,
6  with most overestimating their use."  Do you
7  see that?
8    A.    Yes.
9    Q.    And is that an accurate
10  statement?
11    A.    I haven't seen this in quite a
12  while, so give me a moment.
13       (Peruses document.)
14       Yes, I see that.
15    Q.    Is it an accurate statement?
16    A.    Yes.
17    Q.    You say, "People misestimated
18  their average daily social media time by an
19  average of 129.18 minutes.  Overall, most
20  participants, 69.8 percent, misestimated their
21  objective social media time by an hour per day
22  or more."  Do you see that?
23    A.    Yes.
24    Q.    And is that, again, an accurate
25  statement, that close to 70 percent of

15 (Pages 520 - 523)

CONFIDENTIAL

Page 524

1 participants misestimated their social media
2 time by an hour or more?
3          MS. McNABB: Objection. Form.
4          THE WITNESS: So that is what
5    it says here, and I have to give the
6    caveat that this preprint is five
7    years old. And I don't know what the
8    current document looks like.
9 BY MR. HALPERIN:
10    Q.    Was that an accurate -- does this
11 document reflect your understanding of what
12 the data showed as of when this preprint was
13 put online in August of 2020?
14    A.    Yes. And I should also note,
15 since I wasn't the first author, I don't have
16 the dataset. I can't independently confirm
17 this.
18    Q.    But you don't have any reason to
19 think this data, as reported, is inaccurate,
20 correct?
21    A.    No.
22          MR. HALPERIN: Why don't we
23    take a break.
24          THE WITNESS: Okay.
25          THE VIDEOGRAPHER: We're going

Page 525

1    off the record at 1:15 p.m.
2          (Recess.)
3          THE VIDEOGRAPHER: We're back
4    on the record at 1:26 p.m.
5          MR. HALPERIN: I hand you what
6    I've marked as Exhibit 54.
7          (Exhibit No. 54 was marked for
8    identification.)
9 BY MR. HALPERIN:
10    Q.    Are you familiar with Exhibit 54?
11    A.    Yes.
12    Q.    You rely on it for your opinions
13 in your report, correct?
14    A.    It is one of the papers I cite,
15 yes.
16    Q.    Now, this study was sort of two
17 studies in one, right? There was a fall
18 study, and then a spring semester study,
19 correct?
20    A.    Let me refresh my memory.
21    Q.    Sure. If you just look at the
22 procedure, starting on page 757, there's a
23 fall semester and then a spring semester.
24    A.    (Peruses document.)
25          Okay. Yes, I see that.

Page 526

1    Q.    I want to focus on the spring
2 semester. In the spring, the researchers
3 collected both self-reported usage data and
4 actual usage data from users' screen time; is
5 that correct?
6    A.    Can you show me where it says
7 that?
8    Q.    Yeah, it's going to require
9 piecing a couple of sections together. So
10 let's start on 758, under spring semester.
11    A.    Okay.
12    Q.    The first paragraph says,
13 "Second, instead of having subjects send in
14 screenshots every night, we instructed them to
15 send in screenshots displaying the past seven
16 days of usage once a week." Do you see that?
17    A.    Yes.
18    Q.    And so they got objective data
19 from the phones on usage on a weekly basis,
20 correct?
21    A.    Yes.
22    Q.    They also, if you go to page 759,
23 under "Results," the second paragraph under
24 "Results," say, "In the spring, we asked
25 subjects to give us estimates of their use,

Page 527

1 essentially retrospective self-report data, as
2 is used in most correlational studies of
3 social media use and well-being."
4          Do you see that?
5    A.    I see that.
6    Q.    So in the spring, they had two
7 sets of data, the objective screen time data
8 and then the self-reported data, right?
9    A.    Yes.
10    Q.    What they found was that the
11 self-reported usage data was correlated with
12 well-being, but the objective usage data was
13 not, correct?
14    A.    Point me to that place in the
15 results.
16    Q.    Yep. Look at 759, exactly where
17 we were. The first paragraph under "Results"
18 says, "Actual usage during the first week of
19 baseline monitoring was not associated with
20 well-being at the end of the week, controlling
21 for baseline well-being." Do you see that?
22    A.    And I'm sorry, I don't see it
23 yet. Can you tell me where to find it again?
24    Q.    Of course. The first paragraph
25 under "Results," there's a sentence that

16 (Pages 524 - 527)

CONFIDENTIAL

Page 528

1 begins "Similarly."
2    A.   I see it.  Okay.  Okay, I see
3 that.
4    Q.    So the actual usage data was not
5 associated with well-being, correct?
6    A.    It says, "During the first week
7 of baseline monitoring," we'd have to look to
8 see if that was different at other times of
9 measurement.
10    Q.    If you go down to the next
11 paragraph, where it talks about the
12 self-reported data, it says, "Interestingly,
13 estimated use was significantly negatively
14 correlated with perceived social support, and
15 marginally negatively correlated with both
16 self-esteem and overall well-being," right?
17    A.    Yes.
18    Q.    So there's a discrepancy between
19 the self-reported data and the objective data,
20 in terms of the correlation with well-being,
21 right?
22    A.    I need to look this over in more
23 detail.  Give me a moment.  So I see that,
24 although it's a little confusing, because I'm
25 also not seeing -- the way they have this laid

Page 529

1 out, there's some things missing.  I'm not
2 seeing, like, actual and estimated, and a
3 correlation with each variable for each of
4 these semesters.  It's incomplete reporting,
5 which does happen.
6    Q.    Is this a reliable study?
7         MS. McNABB:  Objection.  Form.
8         THE WITNESS:  So it is a study
9    of 143 undergraduates, and it's one
10    study.  Trying to judge whether it's
11    reliable, in isolation, is a little
12    difficult.
13 BY MR. HALPERIN:
14    Q.    Well, you wouldn't have relied on
15 it in your report unless you thought it was a
16 valid study to inform your opinions, correct?
17    A.    No, I wouldn't put it that way.
18 There's plenty of studies that I cite in there
19 that I think have some issues.
20    Q.    You didn't describe any issues
21 with this study in your report, correct?
22    A.    No.
23    Q.    No, not correct, or, no, you
24 didn't do it?
25    A.    I don't believe I cited any

Page 530

1 issues with this study in the report, no.
2    Q.    And based on the description on
3 page 759, there is a discrepancy between
4 self-reported data and objective data, in
5 terms of the relationship between time spent
6 and well-being, correct?
7         MS. McNABB:  Objection.  Form.
8         THE WITNESS:  I think it's
9    difficult to judge that, based on the
10    information that's here.  It seems to
11    be incomplete in this section.  The
12    sections describing the experimental
13    results are more complete.
14 BY MR. HALPERIN:
15    Q.    If you go -- so you can't say
16 whether there is a discrepancy between
17 self-reported data and objective data, in
18 terms of the relationship between time spent
19 and well-being?
20    A.    I would want to see the full
21 correlation matrix to make that judgment.
22    Q.    Are you familiar with Melissa
23 Hunt?
24    A.    I am familiar with her as the
25 author of this paper.

Page 531

1    Q.    Do you know that she's serving as
2 an expert in this litigation?
3    A.    I did not know that until right
4 now.
5    Q.    Do you plan to ask her for the
6 correlation matrix?
7    A.    I suppose I could.  I have not
8 yet.
9    Q.    Do you plan to?
10    A.    I don't know.
11    Q.    Okay.  At the end of the
12 paragraph, it says, "People were not very good
13 at estimating their actual use."  Do you see
14 that?
15    A.    I see that.
16    Q.    And that's consistent with your
17 own preprint, Exhibit 53, right?
18    A.    So I would not call it my own,
19 because I am later on the author list.  I
20 would call it Lisa Welsh's preprint.
21    Q.    It's consistent with a preprint
22 on which you were a coauthor, correct,
23 Exhibit 53?
24    A.    Yes.
25    Q.    It goes on to say, "And

17 (Pages 528 - 531)

Page 532

1 retrospective self-report bias appears to
2 explain at least some of the correlational
3 findings." Do you see that?
4    A.    I see it.
5    Q.    Do you understand what
6 retrospective self-report bias is?
7    A.    Yes.
8    Q.    What is retrospective self-report
9 bias?
10    A.    Well, there can be inaccuracy in
11 recalling what you did in the past. And then
12 there can also be bias in one direction or
13 another, such as overestimazation, which is
14 what Lisa Welsh's paper finds.
15        I think this statement goes a
16 little further than I would if I had written
17 it. Based on the data provided here, it's, I
18 think, tough to make that judgment, based on
19 what's here.
20    Q.    Well, do you agree that
21 retrospective self-report bias is a concern,
22 when it comes to self-reported usage data?
23    A.    I think it's a concern only if
24 it's correlated with the outcome variable.
25    Q.    Do you know whether it's

Page 533

1 correlated with the outcome variable or not?
2    A.    No.
3    Q.    Have you done anything to measure
4 that?
5        MS. McNABB: Objection. Form.
6        THE WITNESS: Other than
7    possibly in Lisa Welsh's study, no.
8    I'd have to look at this in more
9    detail, because it's been five years,
10    to tell you whether we did it in that
11    study.
12 BY MR. HALPERIN:
13    Q.    Are you familiar with something
14 called a calibration study?
15    A.    No.
16    Q.    You've never done a calibration
17 study then, I take it?
18    A.    Well, since I don't know what it
19 is, it's hard for me to answer that question.
20    Q.    You've never done something that
21 you've called a calibration study, right?
22    A.    No.
23    Q.    No, not right, or, no, you've
24 never done it?
25    A.    I haven't done it, although I

Page 534

1 would love to know the definition so I could
2 find out.
3    Q.    Okay. Let's talk about
4 longitudinal studies. Data from longitudinal
5 studies are scarce, true?
6        MS. McNABB: Objection. Form.
7        THE WITNESS: It depends on how
8    you define "scarce." Longitudinal
9    studies are more difficult to do than
10    correlational or cross-sectional
11    studies.
12 BY MR. HALPERIN:
13    Q.    Are they scarce?
14        MS. McNABB: Objection. Form.
15    Asked and answered.
16        THE WITNESS: I think it
17    heavily depends on exactly how you
18    define "scarce." They are definitely
19    less common.
20 BY MR. HALPERIN:
21    Q.    Are they scarce as you define
22 scarce?
23    A.    I don't know.
24    (Exhibit No. 55 was marked for
25    identification.)

Page 535

1 BY MR. HALPERIN:
2    Q.    Let's look at Exhibit 55, please.
3        This is a document from 2024
4 called the Lancet Psychiatry Commission on
5 Youth Mental Health.
6        Do you see that?
7    A.    Yes.
8    Q.    And you were a member of this
9 commission, correct?
10    A.    Yes, along with many, many, many
11 other people.
12    Q.    Okay. Look at page 740, please.
13 The right-hand paragraph about halfway down
14 the paragraph, there's a sentence that begins
15 "Although."
16    A.    Okay. Hold on. What's the page
17 number again?
18    Q.    740. And if it helps, there's a
19 graph on the left-hand side.
20    A.    Yes.
21    Q.    If you look at the very top of
22 the graph on the left-hand side and just go
23 straight to the right, you should see a
24 sentence that begins "Although."
25    A.    I see it.

18 (Pages 532 - 535)

CONFIDENTIAL

Page 536

1    Q.   It says, "Although the temporal
2 association is strong, data from longitudinal
3 and well-controlled experimental studies are
4 scarce."
5         Do you see that?
6    A.   I do.
7    Q.   Do you agree with that sentence
8 in this report that you coauthored?
9    A.   I'd have to know how they define
10 scarce.  They are definitely less common than
11 cross-sectional studies.
12   Q.   Did you tell this commission, I
13 don't agree with this sentence; we need to
14 rewrite it?
15   A.   I didn't say I disagree with it.
16   Q.   Do you disagree with it?
17        MS. McNABB:  Objection.  Form.
18        THE WITNESS:  I would word it
19 differently, but I wouldn't go so far
20 as to say I disagree with it.
21 BY MR. HALPERIN:
22   Q.   Okay.  You rely in your report,
23 your expert report, on Viner, 2019, a
24 longitudinal study?
25   A.   I believe so, yes.

Page 537

1    Q.   This will be Exhibit 56, which is
2 Viner, 2019.
3         (Exhibit No. 56 was marked for
4         identification.)
5 BY MR. HALPERIN:
6    Q.   Do you see that?
7    A.   Yes.
8    Q.   And if you go to page 686 under
9 "Data Sources," bottom left-hand column, it
10 says, "We use data from the first three waves
11 of the Our Future study."
12   A.   I see it.
13   Q.   If you go to page 688, the table,
14 the middle section of the table is "mental
15 health and well-being outcomes."
16   A.   Yes.
17   Q.   They did not assess any mental
18 health and well-being outcomes in wave one,
19 correct?
20   A.   That is what this table seems to
21 suggest, yes.
22   Q.   They collected mental health or
23 well-being outcomes in waves two and three but
24 not wave one, correct?
25   A.   Let me confirm that with the

Page 538

1 methods.
2         (Peruses document.)
3         Yes, that's correct.
4    Q.   Okay.  If you go to page 695,
5 first full paragraph on the right-hand side,
6 there's a sentence that begins, "Furthermore,
7 the lack of."
8    A.   695?
9    Q.   Yep.  Right-hand column, halfway
10 through the first full paragraph.
11   A.   I see it.
12   Q.   "Furthermore, the lack of mental
13 health or well-being data in wave one meant
14 that we were unable to examine whether earlier
15 psychological distress could have led to later
16 social media use."
17        Do you see that?
18   A.   I see it.
19   Q.   Is that an accurate limitation of
20 this paper?
21   A.   It is, although because this is
22 three waves and not two, it's a limitation
23 that they didn't have it in wave one but they
24 had it in wave two and three, so it's still a
25 longitudinal study.

Page 539

1    Q.   Is it accurate that they could
2 not examine whether earlier psychological
3 distress could have lead to later social media
4 use?
5    A.   I don't know if that's true.  I
6 would have to refresh my memory as to this
7 study.  Given that it is described as a
8 longitudinal study and given that they do have
9 mental health at two different waves, I'm not
10 sure that would be the case, but I would have
11 to read it in more detail to be sure.
12   Q.   Would you defer to the authors
13 who conducted the study about whether they
14 were or were not able to examine?
15   A.   So they're only talking about
16 wave one here.  This statement may not mean
17 that they couldn't do that for waves two to
18 three.
19   Q.   Did they do it for waves two to
20 three?
21   A.   I would have to read the
22 document in more detail to tell you for sure.
23   Q.   So you can't tell me without
24 doing that for a paper you cited in your
25 report, correct?

19 (Pages 536 - 539)

CONFIDENTIAL

Page 540

1        MS. McNABB: Objection. Form.
2        THE WITNESS: I cited many
3    papers in my report. I don't have
4    them all completely memorized, so I
5    would have to, yes, go back and
6    refresh my memory about what they
7    controlled for and how they did the
8    study from one wave to wave three.
9    And I am happy to do that.
10 BY MS. LEHMAN:
11    Q.    Okay. Why don't we talk about
12 something else, because I don't want to waste
13 time doing that.
14        Let's talk about -- let's look at
15 your report, Exhibit 1, page 30, please.
16 Paragraph 86, you talk about
17 longitudinal studies that have identified
18 changes in brain structure, right?
19    A.    Yes.
20    Q.    And you identify two studies
21 there: Maza, 2023 and Zhao, 2023, correct?
22    A.    Yes.
23        (Exhibit No. 57 was marked for
24    identification.)
25 BY MR. HALPERIN:

Page 541

1    Q.    I marked as Exhibit 57, this is
2 Maza, 2023, right?
3    A.    Yes.
4    Q.    Go to page 161, please.
5        In the bottom left-hand corner,
6 there's a sentence that begins, "Given the
7 limited research."
8    A.    I see it.
9    Q.    It says, "Given the limited
10 research exploring longitudinal neural
11 activation in relation to social media
12 behaviors, we conducted exploratory
13 whole-brain analyses to determine which brain
14 lesions showed the greatest differences in
15 neural activation longitudinally."
16        Do you see that?
17    A.    Yes.
18    Q.    And then they say, "To our
19 knowledge, results from this study would
20 provide the first insight into how habitual
21 social media behaviors may be altering
22 adolescent brain development," right?
23    A.    Yes.
24    Q.    The authors are saying no one has
25 done this before, correct?

Page 542

1        MS. McNABB: Objection. Form.
2        THE WITNESS: They're saying to
3    their knowledge --
4 BY MR. HALPERIN:
5    Q.    And you don't --
6    A.    -- and then the rest of the
7 sentence. So I -- I think it's important to
8 take the sentence as written.
9    Q.    They're saying, to their
10 knowledge, no one has done what they are
11 purporting to do in this study, correct?
12        MS. McNABB: Objection. Form.
13        THE WITNESS: I think we have
14    to take the sentence as written. I
15    can't extrapolate from it.
16 BY MR. HALPERIN:
17    Q.    To their knowledge, this would be
18 the first of its kind, right?
19        MS. McNABB: Objection. Form.
20        THE WITNESS: Again, I think
21    I've answered that. I think we have
22    to take the sentence as written.
23 BY MR. HALPERIN:
24    Q.    Okay. You don't disagree with
25 the sentence here, right? You don't have

Page 543

1 different knowledge that there are earlier
2 studies that do this?
3        MS. McNABB: Objection. Form.
4        THE WITNESS: Again, I would
5    have to read it in detail to know. I
6    think we have to take the sentence as
7    written.
8 BY MR. HALPERIN:
9    Q.    You didn't cite any earlier
10 studies that do what this study does, correct?
11    A.    I would have to look back,
12 and -- and see when each of these studies were
13 published, particularly because both of the
14 studies cited in that paragraph were published
15 in the same year.
16    Q.    Can you identify for me any
17 studies prior to 2023 that do what the authors
18 purport to do in Maza?
19    A.    I mean, there are studies on the
20 same topic before that year, but it's always,
21 you know, splitting hairs to say exactly what
22 had been done before. Again, I think we have
23 to take this sentence as written.
24    Q.    Okay. Let's go to the
25 limitations please, page 165.

20 (Pages 540 - 543)

CONFIDENTIAL

Page 544

1        It says, "This study has
2 limitations, notably because differences in
3 neural trajectories already existed between
4 participants with habitual and non-habitual
5 checking behaviors at the start of the study.
6 It is difficult to determine whether social
7 media use prior to data collection caused
8 these distinct neural trajectories or
9 preexisting differences in neural activation
10 placed some youth at risk for more habitual
11 checking behaviors," correct?
12    A.   I see that, yes.
13    Q.   The authors are saying their
14 study cannot be interpreted causally, correct?
15        MS. McNABB:  Objection to form.
16        THE WITNESS:  I think they're
17    putting the standard disclaimer that
18    one single study is not going to be
19    definitive in terms of causation.
20 BY MR. HALPERIN:
21    Q.   Can this study prove causation,
22 yes or no?
23    A.   Again, I would really want to
24 read it in more detail to determine that.
25    Q.   Can you -- are you offering the

Page 545

1 opinion that this study proves causation?
2        MS. McNABB:  Objection to form.
3        THE WITNESS:  So I would offer
4    the opinion that as a longitudinal
5    study, it can help eliminate the
6    possibility of reverse causation.
7    But, again, I would appreciate the
8    opportunity to look at it in more
9    detail.
10 BY MR. HALPERIN:
11    Q.   Take a look at it and tell me if
12 this study proves causation.
13    A.   So as I have said, for
14 causation, what you want is the totality of
15 the evidence.  Some studies are better than
16 others, some studies can use methods that are
17 stronger for proving causation, but the
18 totality of the evidence is the important
19 thing.
20    Q.   Does this evidence prove -- does
21 this article, this study, Maza, 2023, prove
22 causation, yes or no?
23        MS. McNABB:  Objection.  Form.
24        THE WITNESS:  Give me a moment
25    to look at it in more detail.

Page 546

1        (Peruses document.)
2        So as with most longitudinal
3    studies, I was -- I would describe it
4    as pointing toward causation and being
5    part of the totality of the evidence
6    that does prove causation.
7 BY MR. HALPERIN:
8    Q.   Does this study in isolation
9 prove causation?
10        MS. McNABB:  Objection to form.
11    Asked and answered.
12        THE WITNESS:  I just wouldn't
13    put it in that way.
14 BY MR. HALPERIN:
15    Q.   Are you an expert in brain
16 imaging?
17    A.   No.
18        (Exhibit No. 58 was marked for
19    identification.)
20 BY MR. HALPERIN:
21    Q.   I've handed you Zhao, 2023.
22        Do you see that?
23    A.   Yes.
24    Q.   And this will be Exhibit 58.  If
25 you go to page 82, bottom left-hand corner,

Page 547

1 there's a section on measures.
2    A.   Yes.
3    Q.   It says, "The primary SMA measure
4 was baseline youth self-reported total number
5 of hours spent on non-school related SMAs on
6 typical weekdays, i.e. Mondays through
7 Fridays, and weekends, i.e. Saturday and
8 Sunday, in the past year."
9        Do you see that?
10    A.   Yes.
11    Q.   What is SMA?
12    A.   I have a guess, but I don't want
13 to guess, because this a -- so the beginning
14 of it says screen media activity.
15    Q.   So this study looked at screen
16 media generally, not social media
17 specifically, correct?
18    A.   Sometimes there will be a total
19 and then also a breakdown.
20    Q.   Do you see any breakdown in
21 Exhibit 58?
22    A.   In Table 2 I see a breakdown of
23 different devices.
24    Q.   Not different types of screen
25 media activity, correct?

21 (Pages 544 - 547)

CONFIDENTIAL

Page 548

1    A.    So yes.  And, again, I'd want to
2   read this in more detail, but I think it
3   appears that this is overall screen media
4   activity, which means that my report should be
5   amended to say screen media instead of social
6   media in that sentence.
7    Q.    And that's exactly what I was
8   going to ask you.  Your report at page 30
9   says, "Those who use social media for more
10  than seven hours a day showed differences in
11  development in several areas of the brain,"
12  and you cite this study, right?
13   A.    If this is the correct study,
14  then, yes, that should be screen media
15  instead.
16   Q.    And if you look, you cite at the
17  end of that page, page 30 of your MDL report,
18  Zhao et al, 2023.
19   A.    Yes.
20   Q.    If you go to the references for
21  your report, you only cite a single Zhao
22  et al., 2023, and it is Exhibit 58, correct?
23  It's the page 46 of your report.
24   A.    Okay.  Let me confirm that.  So
25  there is another Zhao paper, so it's also

Page 549

1   possible that I mixed up the citations.
2    Q.    And we'll look at it in a second.
3    A.    Okay.
4    Q.    But if your citation is correct,
5   then the statement at page 30 should say
6   screen media, not social media, correct?
7    A.    Yes.
8    Q.    Okay.  Let's look at the other
9   Zhao that you cite, and this will be
10  Exhibit 59.
11       (Exhibit No. 59 was marked for
12       identification.)
13  BY MR. HALPERIN:
14   Q.    This is the other Zhao; is that
15  right?
16   A.    Yes.
17   Q.    And, again, if you look at
18  measures on page 419, it says, "The primary
19  SMA measure was the total number of hours
20  spent on all SMA activities based on youth
21  self-report."
22       Do you see that?
23   A.    Yes.  I see it does include
24  social media among that total.
25   Q.    And if you go to the limitations

Page 550

1   on page 423, toward the end of the limitations
2   section is a sentence that begins, "However."
3    A.    Okay.
4    Q.    It says, "However, positive
5   correlations that exist across all types of
6   SMA and are focused on structural co-variation
7   common across multiple morphological measures
8   limited our ability to identify
9   neuromechanisms specific to individual types
10  of screen media activity," correct?
11   A.    That's what it says.
12   Q.    And so this study, Zhao, 2022,
13  also was not looking specifically at social
14  media, correct?
15   A.    That appears to be the case,
16  yes.
17   Q.    So going back to your report,
18  page 30, it is not accurate to say that those
19  who use social media specifically showed
20  differences in development in several areas of
21  the brain, correct?
22       MS. McNABB:  Objection.  Form.
23       THE WITNESS:  It should say
24   screen instead of social in that
25   sentence, yes.

Page 551

1       MR. HALPERIN:  Why don't we
2   take a break, and I'm going to take a
3   look at my notes.
4       THE VIDEOGRAPHER:  Off record
5   at 1:53 p.m.
6       (Recess.)
7       THE VIDEOGRAPHER:  We're back
8   on the record at 2:07 p.m.
9       MR. HALPERIN:  Dr. Twenge,
10  thank you very much for the last two
11  days, the time you've given us.
12       As I discussed with opposing
13  counsel off the record, I'm going to
14  reserve 15 minutes of questioning to
15  cover invoices that I understand
16  counsel is trying to track down and
17  produce to us, and hopefully will be
18  produced in the next 45 minutes or so.
19       Barring that, though, Meta's
20  position is that we'll -- we're
21  reserving 15 minutes to take a Zoom
22  deposition of you at a future date
23  related to those invoices.
24       And I'm going to pass the baton
25  back to TikTok to ask 26 minutes of

22 (Pages 548 - 551)

CONFIDENTIAL

Page 552

1    questions with our remaining time.
2        MS. McNABB:  And, just for the
3    record, the personal injuries and
4    school district plaintiffs may object
5    to holding the deposition open, but we
6    are happy to meet and confer with
7    counsel on a 15-minute Zoom deposition
8    at a later time.
9        MR. JANSSEN:  And we concur, on
10   behalf of the State of Tennessee.
11       MS. LAUNER:  As well as the
12   state AG in the MDL.
13       MS. LEHMAN:  And TikTok would
14   also join in holding open the
15   deposition pending inquiry regarding
16   the hopefully-to-be-produced invoices.
17       FURTHER EXAMINATION
18   BY MS. LEHMAN:
19   Q.    All right.  With that,
20   Dr. Twenge, I have 26 minutes to ask
21   questions.  So nice to see you again.  How are
22   you feeling?
23   A.    I'm doing all right.  Thank you.
24   Q.    You're still able to concentrate
25   fully and accurately and answer my questions?

Page 553

1    A.    Yes.
2    Q.    Okay.  Have you reviewed any
3    internal TikTok documents that reflect the
4    process that the company follows for designing
5    its platform?
6    A.    So I have to look at my
7    materials considered.  I know I did review
8    some TikTok documents.  That they were about
9    the design of the platforms, not that I
10   recall.
11   Q.    Okay.  Similar question:  Have
12   you reviewed any internal TikTok documents
13   that reflect the process the company follows
14   for designing its algorithm?
15   A.    I don't believe so, no.
16   Q.    Okay.  What is the process that
17   is followed generally, so not -- not focusing
18   on any specific algorithm, but, generally,
19   what is the process that is followed when an
20   algorithm is developed?
21       MS. McNABB:  Objection.  Form.
22       THE WITNESS:  Since I'm not an
23   app developer, I'm not sure why you're
24   asking me that.
25   BY MS. LEHMAN:

Page 554

1    Q.    And if you -- if you don't know,
2    I -- I understand.  I just -- you know, I --
3    if you do know, I wanted to -- to elicit what
4    your opinion on that was.
5    A.    I mean, I have a general
6    understanding that many algorithms are
7    designed to increase time spent, if that's
8    what you're asking.
9    Q.    No, that's not.  My question is
10   different.  I am -- I'm asking what is the
11   process that is followed, generally, when a
12   algorithm is developed.
13       MS. McNABB:  Objection to form.
14       THE WITNESS:  I don't know.
15   BY MS. LEHMAN:
16   Q.    Now, when you -- when one of your
17   articles goes into preprint, what does it mean
18   for an article -- one of your articles to go
19   into preprint?
20   A.    So not all articles go into
21   preprint.  Sometimes authors choose to post an
22   article as a preprint that is under review at
23   a journal or that they have completed, and
24   those standards vary a lot from one field to
25   another and they varied over time.

Page 555

1    Q.    Does the author or author group
2    make the decision that an article will go into
3    preprint?
4    A.    Generally, the first author
5    makes that decision, although certainly other
6    authors may have veto power.
7    Q.    Okay.  And when an article goes
8    into preprint, like, where does it actually
9    become available when it's in preprint?
10   A.    There's different servers online
11   that will post preprint articles.
12   Q.    Okay.  When you are preparing to
13   publish an article, do you always preprint
14   your articles?
15   A.    No.
16   Q.    How do you make the -- are there
17   times when you do preprint your articles?
18   A.    Yes.
19   Q.    Okay.  How do you, when you're an
20   author, make the decision to preprint an
21   article?
22   A.    It usually depends on the author
23   group and the discussion amongst us.
24   Q.    Okay.  Do you only go into
25   preprint if you feel comfortable that your

23 (Pages 552 - 555)

CONFIDENTIAL

1 article is reliable and close to final?
2        MS. McNABB: Objection. Form.
3        THE WITNESS: That's not really
4    how it works. I mean, it's a little
5    different from that, because a
6    preprint is not peer-reviewed. And so
7    once it's peer-reviewed and the editor
8    weighs in and all of that, there can
9    be changes. The author group could
10    also discover that something has
11    changed and needs to be corrected. So
12    a preprint is not a final document.
13 BY MS. LEHMAN:
14    Q.    Okay. Now, you mentioned
15 earlier -- you mentioned it yesterday, an
16 article -- I think it's a preprint -- by
17 van der Wal, titled, quote, Social Media Use
18 Leads to Negative Mental Health Outcomes for
19 Most Adolescents.
20        Was that the van der Wal article
21 or preprint that you were referencing?
22    A.    Yes.
23        MS. LEHMAN: Okay. We're going
24 to mark that as Exhibit No. 60, and it is
25 tab 808.

1        (Exhibit No. 60 was marked for
2    identification.)
3 BY MS. LEHMAN:
4    Q.    And unfortunately, I do not have
5 a hard copy since that is something that you
6 mentioned yesterday --
7    A.    Okay.
8    Q.    -- but we do have it on the
9 screen.
10    A.    Okay.
11    Q.    All right. And so can you
12 confirm that the image on the screen is the
13 preprint that you were referencing?
14    A.    I would need it to be paged
15 through --
16    Q.    Okay. Sure.
17    A.    -- for me to make that
18 determination.
19    Q.    All right. Let's do that.
20    A.    And it's now very small. And
21 this isn't close enough to me. I'm sorry.
22 Okay. So I would want --
23    Q.    Can we --
24    A.    That's better. That's better.
25 Okay. But I -- I want to page through it to

1 just make sure that the table that I remember
2 is there.
3    Q.    All right.
4        MS. LEHMAN: Let's go to the
5    first page so she can see the cover
6    page.
7        THE WITNESS: Okay. Just keep
8    -- keep moving. There's a specific
9    table I want to see to make sure that
10    this is the correct article. Okay.
11    Good. Keep going. Almost there.
12    Keep going. Okay.
13    Yes, it is.
14 BY MS. LEHMAN:
15    Q.    Okay. Now, this article doesn't
16 look at individual features on social media
17 platforms, does it?
18    A.    It looks at individual
19 platforms.
20    Q.    Okay.
21    A.    I would have to read it more
22 carefully to tell you how much it looked at
23 features. I don't recall.
24    Q.    Don't recall.
25        MS. LEHMAN: All right. Let's

1    turn, if we can, to page 18, and let's
2    look -- if you can blow up the, sort
3    of, bottom half of the page. We're
4    going to look -- no, no, no, no. Stop
5    scrolling. Hold on.
6 BY MS. LEHMAN:
7    Q.    We're going to -- we're going to
8 look immediately above explanations for our
9 negative results. And do you see that the
10 article says, quote, "More research is
11 urgently needed to explore how specific design
12 features may contribute to and potentially
13 counteract these negative outcomes"?
14    A.    I do see that, yes.
15    Q.    Do you see that?
16    A.    Yes.
17    Q.    Okay. All right. So I want to
18 take a -- take a step back and talk about the
19 methodology for this article. If we can go to
20 page 27, please. All right. And do you see
21 here at the top the heading "Method"?
22    A.    Yes.
23    Q.    All right. And the project was
24 approved by the ethics review board of the
25 Faculty of Social and Behavioral Sciences at

24 (Pages 556 - 559)

CONFIDENTIAL

Page 560

1 the University of Amsterdam, correct?
2     A.    Yes.
3     Q.    All right.
4         MS. LEHMAN:  Can we -- can we
5     scroll down to the next paragraph.
6 BY MS. LEHMAN:
7     Q.    All right.  And then do you see
8 there's a discussion of the participants
9 involved?
10     A.    Yes, I see that.
11     Q.    Okay.
12         MS. LEHMAN:  Can we just scroll
13     down just a hair more.  Yeah, perfect.
14     Thank you.
15 BY MS. LEHMAN:
16     Q.    All right.  So the -- the
17 participants in the van der Wal article are
18 from the Netherlands, correct?
19     A.    Yes.
20     Q.    In fact, 96.9 percent of them
21 were born in the Netherlands, correct?
22     A.    That's what it says, yes.
23     Q.    Okay.  And they were all citizens
24 of the Netherlands or living in the
25 Netherlands at the time that this study took

Page 561

1 place, correct?
2     A.    That's a little bit of an
3 extrapolation, but from what's said here, yes.
4     Q.    Okay.  Well -- and here, if we
5 read, it says, "480 adolescents, age 14 to 18,
6 from various regions" --
7     A.    Yes.
8     Q.    -- "in the Netherlands enrolled."
9     A.    Yes.  But I don't know anything
10 about their citizenship or the basis of that.
11     Q.    Well, and that's why -- that's
12 why I said "or lived in" because I wanted to
13 acknowledge that.
14     A.    Right.
15     Q.    All right.  So can we turn to
16 page 28, please.
17         And if we can look at the second
18 paragraph.  All right.  And so we're still
19 looking at the methodology here, correct?
20     A.    I would call it "Methods," but,
21 yes.
22     Q.    Okay.  Methods.  All right.  And
23 the questionnaires -- the way this study was
24 conducted is that participants received a link
25 to a baseline questionnaire, correct?

Page 562

1     A.    That's one of the things that it
2 involved, yes.
3     Q.    Yes, yes.  That happened at the
4 start, and then every day participants
5 received one questionnaire, via an m-Path app
6 for a hundred days, correct?
7     A.    That's what it says, yes.
8     Q.    All right.  And the
9 questionnaires were sent every night at 8:30
10 p.m., correct?
11     A.    That's what it says, yes.
12     Q.    All right.  And if the
13 participants had not completed the
14 questionnaire, they got another reminder at
15 9:15; and if they still hadn't done it, they
16 got another reminder at 10:00 p.m., correct?
17     A.    That's what it says, yes.
18     Q.    All right.  And the questions
19 were somewhere between 34 and 38 questions,
20 correct?
21     A.    Yes.
22     Q.    All right.  And so are you
23 familiar with the app that they were using to
24 study, the m-Path app?
25     A.    I'm not familiar with that

Page 563

1 specific app, but certainly there's experience
2 sampling studies that have used similar apps
3 and methods.
4     Q.    Okay.  And so are you familiar
5 with the notification, the follow-up that they
6 would receive every night at 9:15 and 10:00 if
7 they had not yet completed the questionnaire?
8     A.    I haven't used this particular
9 app myself, so I can't speak to what that
10 looks like.
11     Q.    Okay.  So it may have been that
12 the participants were receiving a notification
13 on their device, hey, don't forget your
14 questionnaire, at 9:10 and then again at 10,
15 correct?
16     A.    I think that's unclear from
17 what's here.  It says reminders.  I'm not sure
18 how -- how exactly that was done.
19     Q.    Okay.  Well -- all right.
20         But we do know the reminders were
21 sent at 9:15 p.m. and 10 p.m., correct?
22     A.    That's what it says, yes.
23     Q.    All right.  So what's -- if we
24 could zoom back out, and I want to look at the
25 bottom paragraph.

25 (Pages 560 - 563)

CONFIDENTIAL

1      Okay. Now, participants'
2 compliance was monitored daily, correct?
3      A.    That's what it says.
4      Q.    And if participants had any
5 questions or issues, then they could
6 communicate that by telephone, by e-mail, or
7 through WhatsApp, correct?
8      A.    It says -- yeah, questions or
9 issues were addressed via WhatsApp, telephone,
10 and e-mail, yes.
11      Q.    All right. So let's go down to
12 page 18.
13      Well, actually, let me ask you a
14 question. So this is a study that you cite in
15 your reliance materials, correct?
16      A.    Yes.
17      Q.    Okay.
18      A.    I believe I cite it in the
19 report as well, yes.
20      Q.    Okay. And what -- what the
21 participants were asked about in these
22 questionnaires, right: They were asked about three
23 aspects, right: They were asked about
24 well-being, self-esteem, and friendship
25 closeness, correct?

1      A.    It'd be great if I could see
2 that right now. I can't.
3      Q.    Okay. Sure. Well, why don't we
4 look at -- would it be helpful for you to look
5 at that chart that you wanted to look at?
6      A.    No. This would probably still
7 be in the method section. I'd want to know
8 the -- the measure section of the method
9 section.
10      Q.    Okay. Why don't we look then,
11 the method section was on page 27.
12      A.    Okay. Procedure. Probably --
13 it's probably the next page.
14      MS. LEHMAN: Okay. Go to the
15 next page for her.
16      THE WITNESS: Compliance and --
17 I'm not seeing it yet. Keep going. Measures.
18 It wouldn't be that. It would be the
19 well-being. That's what you were asking
20 about.
21 BY MS. LEHMAN:
22      Q.    Right. Yeah. So -- and it's --
23 it starts here --
24      A.    Yeah.
25      Q.    -- and then it goes to the next

1 page. They are being asked about well-being,
2 self-esteem, and friendship closeness,
3 correct?
4      A.    Okay. So that -- yeah, the
5 well-being is the Panis (phonetic).
6      Okay. Next page.
7      Okay. Keep going. Right. And
8 there's a self-esteem, and then the friendship
9 closeness. So, yes, I see that.
10      Q.    Okay. Now, the van der Wal
11 article does not evaluate any mental illness,
12 correct?
13      A.    It evaluates several things
14 which are strongly correlated with -- can be
15 strongly correlated with mental illness,
16 especially mood disorders.
17      Q.    All right. I -- respectfully, I
18 move to strike. That's not my question.
19      There is no metric that is
20 measured that is evaluating a mental illness
21 in this article, is there?
22      A.    Not that I can see, but I'd be
23 hard-pressed to find an article that used a
24 DSM diagnosis in a study like this. It would
25 be very unusual. It's very standard to use

1 these types of measures that they use.
2      Q.    So it's your position that it's
3 unusual to find a study that actually uses
4 DSM-5 diagnoses when evaluating social media
5 use, correct?
6      MS. McNABB: Objection. Form.
7      THE WITNESS: So what I would
8      say is in an experience sampling study
9      like this, that would be unusual.
10 BY MS. LEHMAN:
11      Q.    Okay. And you told me that the
12 measures that they used in this article are
13 closely related to mental health diagnoses.
14 Can you cite me to any article that says that
15 friendship closeness is correlated to any
16 mental health illness -- or mental illness?
17      A.    Social support, which is closely
18 related to friendship closeness, is closely
19 related to -- to depression.
20      Q.    Okay. And I respectfully move to
21 strike because I'm not asking about social
22 support.
23      My specific question is: Can you
24 cite me to any article that says that
25 friendship closeness is correlated to any

26 (Pages 564 - 567)

CONFIDENTIAL

Page 568

1 mental illness?
2        MS. McNABB: Objection. Form.
3        THE WITNESS: Friendship
4    closeness is very close to social
5    support. Some would probably even
6    argue that they're interchangeable, so
7    I think it is relevant.
8 BY MS. LEHMAN:
9    Q.   Okay. Well, I guess my question
10 is -- I still haven't heard an answer, so
11 maybe the answer's you don't know -- but can
12 you cite me to any specific peer-reviewed
13 article that says that friendship closeness is
14 correlated to a mental illness?
15       MS. McNABB: Objection to form.
16       THE WITNESS: I can point you
17    to many articles showing that social
18    support, which -- of which friendship
19    closeness is a part, is related to
20    mood disorders.
21 BY MS. LEHMAN:
22    Q.   Okay. What are they?
23    A.   I would ask to search a database
24 to be sure. The classic study was House, I
25 believe, quite a number of decades ago. But I

Page 569

1 would have to go review the research
2 literature. But there is a very strong link
3 between social support and psychological
4 well-being, including mood disorders.
5 BY MS. LEHMAN:
6    Q.   Okay. The method followed in the
7 van der Wal article did not include an
8 evaluation by any healthcare professional,
9 correct?
10       MS. McNABB: Objection to form.
11       THE WITNESS: I believe that's
12    correct. That's not how these studies
13    are done.
14 BY MS. LEHMAN:
15    Q.   Okay. And there was no
16 evaluation in the van der Wal article as to
17 whether any participant had a clinical
18 diagnosis related to their mental health,
19 correct?
20       MS. McNABB: Objection to form.
21       THE WITNESS: There was not,
22    but there are these measures of
23    psychological well-being which are
24    strongly correlated with mood
25    disorders.

Page 570

1 BY MS. LEHMAN:
2    Q.   Okay. And I respectfully move to
3 strike as nonresponse after "there was not."
4    All right.
5        MS. LEHMAN: If we could turn to
6 page 19. And I would like to look in the
7 middle of the first -- it's very small. And
8 if you can blow it up, I would appreciate it.
9        MS. McNABB: The front desk is
10    able to print, so if you wanted to
11    print a copy, we could take a break
12    and you could get a copy.
13       MS. LEHMAN: I'm good. Thank
14    you.
15 BY MS. LEHMAN:
16    Q.   All right. If you look here in
17 the middle, do you see the word -- it says
18 "However"?
19    A.   I see that.
20    Q.   All right. And it says, in the
21 van der Wal article, quote, However it is also
22 important to consider the potential role of
23 negativity bias. As adolescents accumulate
24 experiences throughout the day, negative
25 events may increasingly overshadow positive or

Page 571

1 neutral ones. By the time they reflect on
2 their day in the evening, these negative
3 experiences may dominate their perceptions,
4 leading to a heightened report of negative
5 effects. As part of ongoing discussions on
6 the optimal methods for assessing media
7 effects, further research is needed to explore
8 how different assessment times influence the
9 detection of social media's impact, end quote.
10       Did I read that correctly?
11    A.   I can't see the last couple of
12 lines.
13    Q.   Okay.
14       THE WITNESS: Just scroll up
15    just a little bit.
16    Yes, I see that.
17 BY MS. LEHMAN:
18    Q.   Okay. And what the -- what the
19 articles are saying here is they're pointing
20 out the potential impact of negativity bias
21 because this -- the questionnaires were
22 completed at the end of the day, correct?
23    A.   That's what they seem to be
24 saying, yes.
25    Q.   Okay. And so this is in -- part

27 (Pages 568 - 571)

CONFIDENTIAL

Page 572

1 of a discussion suggesting that ongoing
2 research should consider how different times
3 of day may impact the assessment results,
4 correct?
5           MS. McNABB: Objection. Form.
6           THE WITNESS: That's what
7      they're saying is it is something that
8      would be good to explore in future
9      research.
10 BY MS. LEHMAN:
11      Q.    Okay. Now, we -- we talked at
12 length yesterday about your 10 Rules book, and
13 I brought you a printed copy, but then
14 co-counsel showed up with the actual book. So
15 I wanted to follow up and ask you about a
16 couple of different rules.
17           And the first one -- or different
18 passages in the book. And if you'll look at
19 the book -- you have it in front of you, I
20 think the hard copy -- if you'll look at
21 page 2 of the book.
22           All right. And I want to look
23 about halfway down in the paragraph starting
24 with the word "Parents." Okay. And what you
25 write in the book is, quote, Some kids would

Page 573

1 play video games every waking hour if they
2 could, end quote.
3           Did I read that correctly?
4      A.    Yes.
5      Q.    All right. And is it -- is it
6 accurate, and do you agree, that some kids
7 would play video games every waking hour if
8 they could?
9           MS. McNABB: Objection to form.
10           THE WITNESS: Yes.
11 BY MS. LEHMAN:
12      Q.    Okay. Now I'd like to look at
13 page 152. And I want to look -- and it's
14 almost right in the middle of the page. It
15 starts "Games are designed."
16           Do you see that?
17      A.    (Witness nodding.)
18      Q.    All right. And what you write in
19 your book is, quote, Games are designed to be
20 extremely engaging. It's difficult for many
21 kids to stop playing and do homework or come
22 to dinner, end quote.
23           Did I read that correctly?
24      A.    Yes.
25      Q.    All right. And is it your

Page 574

1 opinion, as you sit here today, that video
2 games are designed to be extremely engaging?
3           MS. McNABB: Objection to form.
4           THE WITNESS: I can't say that
5      for every single game, but most, yes.
6 BY MS. LEHMAN:
7      Q.    And as you sit here today, do you
8 agree that it's difficult for many kids to
9 stop playing and do homework or come to
10 dinner?
11           MS. McNABB: Objection to form.
12           THE WITNESS: I think we have
13      to put that in context of the previous
14      sentence, that it is difficult for
15      many kids to stop playing electronic
16      games and start doing their homework
17      or come to dinner, yes.
18 BY MS. LEHMAN:
19      Q.    Okay. And you also point out in
20 your book that games played alone are --
21 especially games that are played on phones are
22 less likely to have benefits as they don't
23 involve social interaction with others,
24 correct?
25           MS. McNABB: Objection. Form.

Page 575

1           THE WITNESS: Yes.
2 BY MS. LEHMAN:
3      Q.    Okay. Now, you -- we've talked
4 about most of the rules in your book. But
5 there is not a rule that advises parents to
6 ban social media from their home entirely,
7 correct?
8      A.    I'm not sure what you mean.
9      Q.    Sure.
10           Let me ask it more simply. If we
11 look at the list of rules in your book, there
12 is not a rule that says, parents, do not --
13 should not allow social media in their home,
14 correct?
15           MS. McNABB: Objection.
16           THE WITNESS: Tell me what you
17      mean by "in their home."
18 BY MS. LEHMAN:
19      Q.    I mean, there's not a rule that
20 says -- you have a -- you have a rule that
21 says you're in charge; you have a rule that
22 says no electronic devices in the bedroom
23 overnight; you have a rule that says no social
24 media until age 16 or later. There is no rule
25 that says no social media, period?

28 (Pages 572 - 575)

CONFIDENTIAL

Page 576

1    A.    For anyone of any age?
2    Q.    Correct.
3    A.    That is correct, the book does
4 not say that.
5    Q.    Yeah.  The book does not say,
6 Parents, you should -- you should remove
7 social media from your lives in every way
8 possible, does it?
9         MS. McNABB:  Objection.  Form.
10        THE WITNESS:  No.
11 BY MS. LEHMAN:
12    Q.    Okay.  The book does not say,
13 Parents, you should remove social media from
14 the lives of your children in every way
15 possible, does it?
16        MS. McNABB:  Objection to form.
17        THE WITNESS:  It says no social
18    media until age 16, so it depends on
19    the age of the child.  For those 15
20    and under, it does say that.
21 BY MS. LEHMAN:
22    Q.    Right.  But for a 17-year-old, it
23 doesn't -- there's no rule that says a
24 17-year-old should not be allowed to use
25 social media, is there?

Page 577

1         MS. McNABB:  Objection.  Form.
2         THE WITNESS:  So we have to put
3    this in context of what's discussed in
4    the chapter and not just the title of
5    the chapter, which says:  "18, the age
6    of legal adulthood actually does make
7    some sense," meaning some sense for
8    that being the actual -- the youngest
9    age that individuals use social media,
10    "given the agreements users must
11    accept when opening a social media
12    account.
13         "What other contract can minors
14    sign, other than those allowing social
15    media apps access to their personal
16    data?  Even 17-year-olds are required
17    to get a parent's signature just to go
18    on a school field trip."
19         So it makes -- the rule says,
20    16 or later because some parents may
21    decide 18's better and that there's a
22    valid argument for doing so.
23 BY MS. LEHMAN:
24    Q.    Okay.  And I respectfully move to
25 strike as -- as nonresponsive.

Page 578

1         If we look at -- on the contents
2 page -- so there's not a page number, it's the
3 page before page number 1 -- do you see
4 there's a list of the 10 rules?
5    A.    Yes.
6    Q.    Okay.  And the contents page,
7 that page accurately reflects what the --
8 language that -- of the 10 rules, correct?
9    A.    It reflects that -- the rules
10 and the chapter titles.  It, of course, does
11 not reflect the entire chapter.
12    Q.    Okay.  All right.  On your CV,
13 and I think -- I want to make sure that I got
14 this correctly, did you tell me that your CV
15 does not include a comprehensive list of all
16 of the presentations that you have made?
17    A.    That's correct.  It includes the
18 academic presentations.
19    Q.    Would it be accurate that you
20 have made more than 250 presentations since
21 your first presentation on Generation Me in
22 2006?
23    A.    Oh, I'd have -- that would be
24 very difficult for me to answer.  I -- I'd
25 have to go back and make a count.

Page 579

1    Q.    Okay.
2         MS. LEHMAN:  Can you hand me
3    tab 715, please, and we'll mark this
4    as Exhibit No. 61.
5         Perfect.  Thank you.
6         (Exhibit No. 61 was marked for
7    identification.)
8 BY MS. LEHMAN:
9    Q.    So I will tell you that I
10 actually did that for you.
11    A.    Oh.
12    Q.    So this is a numbered list of
13 presentations.
14    A.    Okay.  From my CV?
15    Q.    I just pulled it straight from
16 your CV.
17    A.    Understood.
18         MS. McNABB:  I'll object to the
19    extent that her presentations listed
20    on her C- -- are listed on her CV, and
21    this is a document created by counsel,
22    not Dr. Twenge.
23         MS. LEHMAN:  All right.  That's
24    fine.
25 BY MS. LEHMAN:

29 (Pages 576 - 579)

Page 580

1    Q.   All right.
2         So Dr. Twenge, so, like, I
3    know you haven't memorized all of your
4    presentations, but as you flip through it
5    quickly, does this appear to be presentations
6    that you've made?
7    A.   It does.
8    Q.   Okay. Are most of the
9    presentations that you have made about your
10   books: Generations, iGen, the Narcissim
11   Epidemic, and Generation Me?
12   A.   Say that again.
13   Q.   Sure.
14        Are almost all of your
15   presentations centered around your books:
16   Generations, iGen, the Narcissim Epidemic, and
17   Generation Me?
18   A.   It depends on what era we're
19   talking about. So early on, no, because I
20   hadn't published any books yet. And even in
21   the mid-2000s after Generation Me came out, I
22   did plenty of presentations that weren't about
23   the books. I would say since 2009 or so, the
24   majority are centered around the books.
25   Q.   Are your books available for

Page 581

1    purchase at your speeches?
2    A.   Usually no.
3    Q.   Do you autograph your books at
4    any of your speeches?
5    A.   Sometimes. It's rare, but
6    sometimes.
7    Q.   Okay. When your speeches are not
8    about your books -- and I'm speaking now in
9    the last five or ten years -- what are they
10   about?
11   A.   Some of them are -- have been at
12   academic conferences about specific research
13   studies or a review of certain areas. That's
14   the most common.
15        You know, obviously, there's an
16   overlap with the book in -- in some of those
17   cases, but, yeah, each -- each one is a little
18   bit different, and it just depends on the --
19   on the particular venue and audience.
20   Q.   What is your stan- ---
21        MS. McNABB: Katy, you're --
22   Katy, you're out of time.
23        MS. LEHMAN: No. I'm at 25:13.
24        MS. JARAMILLO: Oh, can we get
25   a time check?

Page 582

1         MS. McNABB: Yeah, we'll get a
2    time check.
3         MS. LEHMAN: Fine.
4         THE VIDEOGRAPHER: An hour and
5    50 minutes.
6         MS. JARAMILLO: Sorry. What
7    was that?
8         THE VIDEOGRAPHER: 1:50, one
9    five zero.
10        MS. JARAMILLO: Time on the
11   record since the last break?
12        THE VIDEOGRAPHER: Yes.
13 BY MS. LEHMAN:
14   Q.   So what is your standard
15   compensation rate for a speech?
16        MS. McNABB: Katy, we're
17   waiting -- we can go off the record
18   and get the time check.
19        MS. LEHMAN: You just got the
20   time check.
21        MS. McNABB: Since the last --
22   how many minutes since the -- we have
23   a different count than you. You can
24   ask one question. We'll do one
25   question. We're fighting over half a

Page 583

1    minute.
2  BY MS. LEHMAN:
3    Q.   What is your standard
4    compensation rate for a speech?
5    A.   I don't have a standard rate.
6  It's different for everyone.
7    Q.   Okay. What's the range?
8         MS. McNABB: Katy, we're done.
9  We're done. You guys have had 17
10 hours with Dr. Twenge. If this was
11 that important, you should have asked
12 it before.
13        MS. LEHMAN: You know -- you
14 know what --
15        MS. McNABB: We're done with
16 questions.
17        MS. LEHMAN: That's fine.
18        You know, I reserve the right
19 to call her back and have another
20 deposition if I've been shorted time.
21        MS. McNABB: That's fine.
22 We can go off the record.
23        THE VIDEOGRAPHER: We're going
24 off the record at 2:35 p.m.
25        (Recess.)

30 (Pages 580 - 583)

Page 584

1    THE VIDEOGRAPHER: And we're
2  back on the record at 2:48 p.m.
3    MR. HALPERIN: Kelly, before
4  you start, I assume an objection for
5  one is an objection for all?
6    MS. McNABB: Yeah.
7    MR. HALPERIN: Thanks.
8    EXAMINATION
9  BY MS. McNABB:
10   Q.   Dr. Twenge, good afternoon. I am
11 going to hand to you what we will mark as
12 Exhibit 62.
13   (Exhibit No. 62 was marked for
14   identification.)
15 BY MS. McNABB:
16   Q.   And this document is your article
17 titled: "Why increases in adolescent
18 depression may be linked to the technological
19 environment," that was published in 2020 in
20 the Current Opinion in Psychology Journal,
21 correct?
22   A.   Yes.
23    MR. HALPERIN: Do you have
24   copies for counsel?
25    MS. McNABB: Yes.

Page 585

1  BY MS. McNABB:
2    Q.   If you turn to the last page of
3  this article under "Direction of Causation,"
4  you are looking at the totality of evidence
5  here, akin to what you did in your reports for
6  this litigation?
7    MR. HALPERIN: Objection.
8    Leading.
9    THE WITNESS: Yes.
10 BY MS. McNABB:
11   Q.   Under "Conclusions" you write,
12 the last sentence of column -- the column on
13 the left side, you state, "Using for criteria,
14 the technology environment is a plausible
15 cause of the decline in well-being."
16   Do you see that?
17   A.   I do.
18    MR. HALPERIN: Object to form.
19 BY MS. McNABB:
20   Q.   And did you agree with that
21 statement in 2020?
22   A.   In 2020, yes.
23   Q.   Okay. Sitting here today,
24 considering the additional evidence that has
25 come out since 2020, would you change this

Page 586

1  statement?
2    A.   I would modify it a little bit.
3  I would say the technological environment is a
4  substantial cause of the decline in
5  well-being, and I would also add, just as I
6  did in my report, on page 38, paragraph 108,
7  the totality of the evidence, "Including from
8  time series, correlational, longitudinal, and
9  experimental studies, demonstrates that social
10 media use is a causal factor in the youth
11 mental health crisis."
12   Q.   Okay. And does science require
13 100 percent certainty in order to show
14 causation?
15   A.   No.
16   Q.   Does science require that only
17 one kind of study prove causation?
18   A.   No.
19   Q.   Does science require that only
20 randomized controlled trials show causation?
21   A.   No.
22   Q.   Does science instead look at the
23 totality of the evidence?
24   A.   Yes, it does.
25   Q.   And using the totality of

Page 587

1  evidence, is there a reasonable degree of
2  scientific certainty that social media use is
3  a major contributor to the harms in this case?
4    A.   Yes.
5    Q.   Dr. Twenge, you're not a lawyer,
6  are you?
7    A.   No, I'm not.
8    Q.   Do you intend to give legal
9  conclusions in this case?
10   A.   No.
11   Q.   And did you employ the same
12 methods in this case that you frequently use
13 in your academic research?
14   A.   I did.
15   Q.   And did you apply those methods
16 to the facts of this case in the same manner
17 you would have in your academic work?
18   A.   Yes.
19   Q.   And Dr. Twenge, does any aspect
20 of your compensation in this case depend on
21 the substantive conclusions you reached?
22   A.   No.
23   Q.   Does your compensation depend on
24 the outcome of this litigation?
25   A.   No.

31 (Pages 584 - 587)

CONFIDENTIAL

Page 588

1    Q.    What are you being compensated
2 for then?
3    A.    My time.
4    Q.    And do the opinions that you've
5 provided over the last two days hold true for
6 the Massachusetts and Arkansas cases?
7    A.    Yes.
8         MS. McNABB:  Thank you,
9 Dr. Twenge.  That's all the time I
10 have -- or questions I have.
11        MS. LEHMAN:  We'll go off the
12 record.
13        THE VIDEOGRAPHER:  Going off
14 the record at 2:51 p.m.
15        (Recess.)
16        THE VIDEOGRAPHER:  We're back
17 on the record at 2:54 p.m.
18        FURTHER EXAMINATION
19 BY MR. HALPERIN:
20    Q.    Dr. Twenge, under "Direction of
21 Causation" on page 93, you say, "The studies
22 reviewed thus far are correlational and cannot
23 show causation," correct?
24        MS. McNABB:  Objection.  Are we
25    talking about the study that is --

Page 589

1         MR. HALPERIN:  62.
2         MS. McNABB:  62.
3         THE WITNESS:  Page 93?
4 BY MR. HALPERIN:
5    Q.    93, first sentence, "Direction of
6 Causation."
7    A.    That's what the sentence says.
8    Q.    You don't say that in your expert
9 report in this case, do you?
10        MS. McNABB:  Objection.
11    Misstates the report.
12        THE WITNESS:  Yeah, so the
13    report -- so I think if you look at
14    that sentence, then other evidence is
15    discussed after that sentence.  It's
16    not a concluding sentence.
17 BY MR. HALPERIN:
18    Q.    Does that sentence, or anything
19 that says that same substance, appear in your
20 expert report in this case?
21        MS. McNABB:  Objection.
22        THE WITNESS:  I am fairly
23    certain -- I need to confirm -- that
24    there is a statement in the report
25    about correlational studies.

Page 590

1         Correlational studies can show an
2         association between variables.  So
3         that is on page 4.
4 BY MR. HALPERIN:
5    Q.    Do you say in your expert report
6 that correlational studies, quote, cannot show
7 causation?
8    A.    The expert report says, it is
9 true that correlation is not causation.
10    Q.    Do you say that it cannot show
11 causation?
12        MS. McNABB:  Objection.  Form.
13    Asked and answered.
14        THE WITNESS:  Different
15    wording.  It's a slightly different
16    wording, but I would call those
17    effectively the same statement.
18 BY MR. HALPERIN:
19    Q.    Okay.  So --
20        MS. McNABB:  Greg, you are out
21    of time.
22        MR. HALPERIN:  Okay.
23        MS. McNABB:  Yeah, we can go
24    off the record.
25        THE VIDEOGRAPHER:  Going off

Page 591

1 the record at 2:55.
2         (Whereupon, the deposition of
3    JEAN M. TWENGE, Ph.D. was concluded
4    at 2:55 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

32 (Pages 588 - 591)

CONFIDENTIAL

Page 592

1  CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2  The undersigned Certified Shorthand Reporter does
3  hereby certify:
4      That the foregoing proceeding was taken before
5  me at the place and time therein set forth, at which
6  time the witness was duly sworn; That the testimony
7  of the witness and all objections made at the time
8  of the examination were recorded stenographically by
9  me and were thereafter transcribed, said transcript
10 being a true and correct copy of my shorthand notes
11 thereof; That the dismantling of the original
12 transcript will void the reporter's certificate.
13      In witness thereof, I have subscribed my
14 name this date: September 22, 2025
15  _____
16  _____
17  LESLIE A. TODD, CSR, RPR
18  Certificate No. 5129
19
20
21 (The foregoing certification of
22 this transcript does not apply to any
23 reproduction of the same by any means,
24 unless under the direct control and/or
25 supervision of the certifying reporter.)

Page 593

1      INSTRUCTIONS TO WITNESS
2      Please read your deposition over
3  carefully and make any necessary corrections.  You
4  should state the reason in the appropriate space on
5  the errata sheet for any corrections that are made.
6      After doing so, please sign the errata
7  sheet and date it.
8      You are signing same subject to the
9  changes you have noted on the errata sheet, which
10 will be attached to your deposition.  It is
11 imperative that you return the original errata sheet
12 to the deposing attorney within forty-five (45) days of
13 receipt of the deposition transcript by you.  If you
14 fail to do so, the deposition transcript may be
15 deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24
25

Page 594

1      - - - - - -
2      E R R A T A
3      - - - - - -
4  PAGE LINE CHANGE
5  ____ ____ _____
6  REASON: _____
7  ____ ____ _____
8  REASON: _____
9  ____ ____ _____
10 REASON: _____
11 ____ ____ _____
12 REASON: _____
13 ____ ____ _____
14 REASON: _____
15 ____ ____ _____
16 REASON: _____
17 ____ ____ _____
18 REASON: _____
19 ____ ____ _____
20 REASON: _____
21 ____ ____ _____
22 REASON: _____
23 ____ ____ _____
24 REASON: _____
25

Page 595

1      ACKNOWLEDGMENT OF DEPONENT
2      I,_____, do hereby
3  certify that I have read the foregoing pages, and
4  that the same is a correct transcription of the
5  answers given by me to the questions therein
6  propounded, except for the corrections or changes in
7  form or substance, if any, noted in the attached
8  Errata Sheet.
9
10 _____
11 JEAN M. TWENGE, Ph.D.                DATE
12
13
14
15
16
17
18
19
20
21
22
23
24
25

33 (Pages 592 - 595)