# Exhibit 79

# PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE GENERAL CAUSATION TESTIMONY OF PLAINTIFFS' EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA          : MDL No.

ADOLESCENT                   : 4:22-md-3047-YGR

ADDICTION/PERSONAL INJURY    :

PRODUCTS LIABILITY           : MDL No. 3047

LITIGATION                   :

_____

THIS DOCUMENT RELATES TO:    :

ALL CASES                    :

                    -   -   -

              AUGUST 12, 2025

                    -   -   -

              Videotape deposition of

SHARON A. HOOVER, Ph.D., taken pursuant

to notice, was held at the law offices of

Kessler Topaz Meltzer & Check LLP, 280

King of Prussia Road, Radnor,

Pennsylvania 19087, commencing at 9:05

a.m, on the above date, before Amanda Dee

Maslynsky-Miller, a Court Reporter and

Certified Realtime Reporter.

                    -   -   -

        GOLKOW, A Veritext Company

    877.370.3377 ph| 917.591.5672 fax

CONFIDENTIAL

Page 2

APPEARANCES:

KESSLER TOPAZ MELTZER & CHECK, LLP
BY: MELISSA L. YEATES, ESQUIRE
BY: JORDAN E. JACOBSON, ESQUIRE
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706
myeates@ktmc.com
jjacobson@ktmc.com
Representing the Plaintiff

KING & SPALDING LLP
BY: KATHRYN S. LEHMAN, ESQUIRE
Southeast Financial Center
200 S Biscayne Boulevard
Suite 4700
Miami, Florida 33131
(305) 462-6000
Klehman@kslaw.com
- and -
BY: YELENA KOTLARSKY, ESQUIRE
1185 Avenue of the Americas
34th Floor
New York, New York 10036
(212) 556-2100
ykotlarsky@kslaw.com
Representing the Defendants,
TikTok Inc., ByteDance Inc.,
ByteDance Ltd., TikTok Ltd., and
TikTok, LLC

Page 3

APPEARANCES: (Continued)

WILLIAMS & CONNOLLY LLP
BY: J. ANDREW KEYES, ESQUIRE
BY: DANIEL WHITELEY, ESQUIRE
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
akeyes@wc.com
dwhiteley@wc.com
Representing the Defendants,
YouTube, LLC, Google LLC, and
Alphabet Inc.

COVINGTON & BURLING LLP
BY: MICHAEL N. KENNEDY, ESQUIRE
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
mkennedy@cov.com
Representing the Defendants,
Meta Platforms, Inc. f/k/a
Facebook, Inc.; Facebook Holdings, LLC;
Facebook Operations, LLC; Facebook
Payments, Inc.; Facebook
Technologies, LLC; Instagram, LLC
Siculus, Inc.; and Mark Elliot
Zuckerberg

KIRKLAND & ELLIS LLP
BY: JACK NOLAN, ESQUIRE
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jack.nolan@kirkland.com
Representing the Defendants,
Snap Inc.

Page 4

APPEARANCES: (Continued)
VIA ZOOM:

BEASLEY ALLEN LAW FIRM
BY: SLADE METHVIN, ESQUIRE
301 St Louis Street
Mobile, Alabama 36602
(251) 308-1515
slade.methvin@beasleyallen.com
Representing the Plaintiff,
DeKalb County School District

CARELLA, BYRNE, CECCHI, BRODY &
AGNELLO, P.C.
BY: MICHAEL A. INNES, ESQUIRE
BY: DAVID G. GILFILLAN, ESQUIRE
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700
minnes@carellabyrne.com
dgilfillan@carellabyrne.com
- and -
BY: ZACHARY S. BOWER, ESQUIRE
2222 Ponce De Leon Boulevard
Miami, Florida 33134
(973) 994-1700
zbower@carellabyrne.com
Representing the Plaintiff,
Irvington Public Schools

Page 5

APPEARANCES: (Continued)
VIA ZOOM:

EILAND & BONNIN LAW FIRM
BY: CRAIG EILAND, ESQUIRE
BY: DAVID BONNIN, ESQUIRE
2200 Market Street
Suite 501
Galveston, Texas 77550
(409) 763-3260
ceiland@eilandlaw.com
dbonnin@eilandlaw.com
Representing the Plaintiffs

WAGSTAFF & CARTMELL
BY: JONATHAN P. KIEFFER, ESQUIRE
4740 Grand Avenue
Suite 300
Kansas City, Missouri 64112
(816) 701-1100
jpkieffer@wcllp.com
Representing the Plaintiffs

BROCKSTEDT MANDALAS FEDERICO, LLC
BY: MATTHEW P. LEGG, ESQUIRE
BY: ERIKA SNEERINGER, PARALEGAL
2850 Quarry Lake Drive
Suite 220
Baltimore, Maryland 21209
(410) 421-7777
mlegg@lawbmf.com
Representing the Plaintiff's
Steering Committee

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

APPEARANCES: (Continued)
VIA ZOOM:

GURSKI LAW FIRM
BY: PATRICK H. GURSKI, ESQUIRE
2200 Market Street
Suite 502
Galveston, Texas 77550
(409) 331-5956
Representing the Plaintiffs


LEVIN SEDRAN & BERMAN LLP
BY: MICHAEL M. WEINKOWITZ, ESQUIRE
510 Walnut Street
Suite 500
Philadelphia, Pennsylvania 19106
(877) 882-1011
mweinkowitz@lfsblaw.com
Representing the Plaintiffs



O'HANLON, DEMERATH & CASTILLO
BY: KAYLIE MORGAN, ESQUIRE
117 West Craig Place
San Antonio, Texas 78212
(210) 310-3030
kmorgan@808west.com
Representing the Plaintiff,
Texas School Districts

ALSO PRESENT:
Brian McGee, Videographer
Vince Rosica, Trial Technician

Page 7

- - -
I N D E X
- - -

Testimony of:  SHARON A. HOOVER, PhD

By Attorney Lehman            13


- - -
E X H I B I T S
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Hoover-1 | No Bates Interviewee List | 25 |
| Hoover-2 | No Bates, 5/16/25 Expert Report | 33 |
| Hoover-3 | No Bates 5/10/25 Curriculum Vitae of Sharon A. Hoover, Ph.D. | 34 |
| Hoover-4 | No Bates 8/1/25 Curriculum Vitae of Sharon A. Hoover, Ph.D. | 34 |
| Hoover-5 | No Bates Materials Considered List | 37 |
| Hoover-6 | No Bates 7/30/25 Rebuttal Report | 38 |
| Hoover-7 | No Bates 6/20/25 Amended Expert Report for Breathitt County Board | |

Page 8

- - -
E X H I B I T S
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Hoover-8 | No Bates 8/7/25 Rebuttal Report for Breathitt County Board of Education | 39 |
| Hoover-9 | No Bates 6/20/25 Case-Specific Report for Charleston County School District | 40 |
| Hoover-10 | No Bates 8/1/25 Case-Specific Rebuttal Report for Charleston County School District | 41 |
| Hoover-11 | No Bates 6/20/25 Case-Specific Amended Report for DeKalb County Schools | 41 |
| Hoover-12 | 8/7/25 Case-Specific Rebuttal Report for DeKalb County Schools | 42 |
| Hoover-13 | No Bates 6/20/25 Case-Specific Report for Board of Education for Harford County | 43 |
| Hoover-14 | No Bates 8/1/25 Case-Specific Rebuttal Report Harford County Public Schools | 43 |
| Hoover-15 | No Bates 6/20/25 Case-Specific Amended Expert Report for Irvington Public Schools | 44 |

Page 9

- - -
E X H I B I T S
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Hoover-16 | No Bates 8/7/25 Case-Specific Rebuttal Report for Irvington Public Schools | 45 |
| Hoover-17 | No Bates 6/20/25 Case-Specific Report for Tucson Unified School District | 45 |
| Hoover-18 | No Bates 8/7/25 Case-Specific Rebuttal Report for Tucson Unified School District | 46 |
| Hoover-19 | No Bates Notice of Deposition | 55 |
| Hoover-20 | HOOVER000081-0087 Hoover Behavioral Health Invoices | 67 |
| Hoover-21 | No Bates University of Maryland School of Medicine Web Page, Sharon A. Hoover, Ph.D. | 97 |
| Hoover-22 | No Bates Hoover Behavioral Health Invoice | 121 |
| Hoover-23 | No Bates American Psychological Association Health Advisory on Social Media Use in Adolescence | 173 |

3 (Pages 6 - 9)

CONFIDENTIAL

Page 10

- - -

E X H I B I T S

- - -

NO.    DESCRIPTION    PAGE

Hoover-24   No Bates
What Is Driving Youth Mental
Health Problems? It's Not Just
About Social Media,
Prothero            202

Hoover-25   No Bates
Written Testimony Submitted
to the United States Senate
Committee on Finance For the
Full Committee Hearing    207

Hoover-26   No Bates
Written Testimony Submitted
to the United States Senate
Committee on Health, Education,
Labor, and Pensions (HELP)
For the Subcommittee on
Children and Families     208
Hearing

Hoover-27   No Bates
Burnout in Urban Teachers:
The Predictive Role of
Supports and Situational
Responses            334

Hoover-28   No Bates
Schools As a Vital Component
of the Child and Adolescent
Mental Health System      338

Hoover-29   No Bates
Healthy Students and Thriving
Schools: A Comprehensive
Approach for Addressing
Students' Trauma and
Mental Health Needs      376

Page 11

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
Page Line   Page Line    Page Line
None

Request for Production of Documents
Page Line   Page Line    Page Line
31     7

Stipulations
Page Line   Page Line    Page Line
12      1

Question Marked
Page Line   Page Line    Page Line
171    16

Page 12

(It is hereby stipulated and agreed by and among counsel that sealing, filing and certification are waived; and that all objections, except as to the form of the question, will be reserved until the time of trial.)

- - -

VIDEO TECHNICIAN:  We are now on the record.  My name is Brian McGee.  I'm a videographer for Golkow, a Veritext division. Today's date is August 12th, 2025, and the time is 9:05 a.m.

This video deposition is being held in Radnor, PA, in the matter of In Re: Social Media Adolescence Addiction/Personal Injury Products Liability Litigation for the United States District Court, Northern District of California.  The deponent is Sharon A. Hoover, Ph.D.

Page 13

Counsel will be noted on the stenographic record.

The court reporter is Amanda Miller and will now swear in the witness.

- - -

SHARON HOOVER, Ph.D., after having been duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY ATTORNEY LEHMAN:

Q.   Good morning.

A.   Good morning.

Q.   How are you today?

A.   I'm doing well.  Thank you.

Q.   What is your full name, please?

A.   Sharon Ann Hoover.

Q.   Dr. Hoover, as I said when we met a few moments ago, my name is Kathryn Lehman.  I'm going to be taking the first part of your deposition today.

CONFIDENTIAL

Page 14

A.    Okay.

Q.    What is your professional address?

A.    So my professional address is 737 West Lombard Street in Baltimore, Maryland.

And that's where the National Center for School Mental Health is located.

Q.    And do you currently work for any entity other than the National Center for School Mental Health?

A.    So I work, actually, technically, for the University of Maryland School of Medicine.  And I do not currently work for another entity.

I do some consulting, though, so.

Q.    And do you do your consulting through any consulting firm?

A.    So I have my own S Corp, which is Hoover Behavioral Health Incorporated, and most of it goes through that.

Page 15

Q.    And is all of your consulting through the Hoover Behavioral Health Incorporated?

A.    I would say most of it.  So I -- any speaking engagement that I might do, for example, would go through that.  Yeah.

Q.    When you say "most of it," the lawyer in me wants to ask, well, what about the rest of it?

A.    Okay.  Well, I think as far as I know, all of it would go through Hoover Behavioral Health.

I'm just thinking that sometimes, erroneously, someone might pay, like, a stipend for a talk that I would do to my personal name; you know, they would write something to Sharon Hoover, but then I would transfer it over to my corporation.  If that makes sense.

Q.    And what is your current position at the University of Maryland School of Health?

A.    So, actually, as of

Page 16

June 1st, I retired as a professor.  But I still retained status as professor.  They granted me emeritus professor status, then.

So I've been on faculty there since 2004 and am currently emeritus professor tenured in the division of child and adolescent psychology.

Q.    As a professor emeritus, do you have any ongoing obligations to the university in terms of teaching, administration or anything else?

A.    So we have an understanding, when you become an emeritus professor, that you do still have a partnership and a role with the university.

And so my role would be to continue to mentor faculty and to continue to contribute to their -- their mission, which includes teaching and research work.

Q.    Are you currently teaching any classes at the University of

Page 17

Maryland?

A.    I'm not currently teaching classes.  And that, honestly, was never a large part of my role, since my role was really primarily around clinical work and research work.

So teaching was something I did, but it wasn't in the traditional sense of teaching coursework.

Q.    Are you currently engaged in clinical work at the University of Maryland?

A.    I'm not currently engaged in clinical work at the University of Maryland.

Q.    When was the last time that you were actively engaged in clinical work at the University of Maryland?

A.    I would probably want you to define what you mean by "clinical work." Because the term is a bit broad.

So there's kind of direct clinical work with patients, there's other -- there's supervisory work,

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

there's clinical programming work.

So when you say "clinical work" --

Q. Sure.

A. -- I want to understand.

Q. That was your term, but let's use direct patient care.

Do you provide direct patient care at the University of Maryland?

A. I have. Not currently, no.

Q. When is the last time that you provided direct patient care at the University of Maryland?

A. I'd probably have to look at my CV to know the exact date.

Q. Okay. Well, I'm happy for you to look at your CV.

Do you have a copy of it?

A. I do.

Q. Okay.

A. Yeah. I think it's in here. So I can do that.

Sorry. My CV is about

Page 19

70 pages long, so it may take just a moment.

I'm looking for where it says the actual clinical work in the schools. My teaching service. International. Okay.

Yeah. So according to this, the last direct clinical work I would have done in the schools would have been through 2008. I provided direct clinical supervision to trainees, psychology interns, postdoctoral fellows up until probably about a year or two ago.

So I'm involved in the direct patient care in that way. So when cases come up, I'll work with them on that.

Q. Okay. But in terms of you personally, not in a supervisory role or a teaching role, but providing direct patient care, the last time was approximately 17 years ago?

ATTORNEY YEATES: Object to the form.

Page 20

THE WITNESS: So as I stated, the last time that I worked directly in patient care was about 2008.

And we consider clinical supervision still related to direct patient care so. So -- and I've done that up until probably about a year or two ago.

BY ATTORNEY LEHMAN:

Q. And are you currently working anywhere other than your consulting work and any work that you do as a professor emeritus at the University of Maryland?

A. No.

Q. Okay. Are you prepared today to express your final opinions in this case?

A. Am I prepared to express my opinions? Yes.

Q. Your final opinions.

A. Yes.

ATTORNEY YEATES: Object to

Page 21

the form.

BY ATTORNEY LEHMAN:

Q. Do you need to perform any additional work in order to reach your final opinions?

A. No.

Q. Do you anticipate conducting any work between now and any testimony at trial?

A. When you say do I "anticipate conducting any work," tell me what you mean by that.

Q. Right. So I mean do you anticipate doing anything other than maybe re-reviewing in order to prepare for trial?

A. So what I'll say is that in the course of my work as a professor, and, you know, I'm an editor for school mental health journals, for example, I would anticipate reviewing articles that come my way for that.

But, no, I don't anticipate doing additional work specific to this

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

litigation, unless, you know, instructed to do otherwise.

But, I'm -- you know, again, that's probably a legal process that I'm less familiar with.

Q. So we're going to be here for, I suspect, the day today. So I usually take a break about every 60 to 90 minutes. But if you need a break before then, please let me know.

A. Will do.

Q. My only request will be we sort of finish maybe the question or whatever topic we're talking about and then happy to take a break, all right?

A. That sounds good.

Q. If at any point I ask a question and you don't understand, please let me know. I'm happy to talk about that; that way you and I are -- are effectively communicating.

A. Uh-huh.

Q. All right. Now, unfortunately -- so I'm just going to use

Page 23

this as an example.

So our court reporter is taking down everything you and I say. So if you can try to give verbal answers instead of uh-huh or uh-uh, that makes her job much harder, and you and I will get a talking to at a break.

So if you can answer yes or no, that would make her job easier, okay?

A. Will do.

Q. I will do my best to remind you. Please don't think I'm being rude if I do that; just trying to making sure we have a clear transcript, okay?

A. Understood.

Q. Now, the final thing I'll say, this is just normal human conversation. There's going to come a time when you know where I'm going with a question or I think you're done with an answer, and we sort of talk over each other.

Again, let's both -- we can both remind each other. If I start a

Page 24

question before you're done, let me know and I'm happy to let you finish; and vice versa, if you sort of start before I finish my question, I'll remind you.

Again, just making sure we have a clean transcript, okay?

A. Will do.

Q. All right. Are you taking any medications or suffering from any illnesses that would interfere with your ability to accurately and truthfully testify today?

A. No.

Q. Is there any health reason or any other reason why you would not be able to provide your best and most complete opinions today?

A. No.

Q. Now, I see that you have brought a notebook with you.

What do you have in your notebook?

A. So these are just the binders of my reports. So -- and my CV

Page 25

copies.

Q. All right. So let's -- in the front flap of the notebook, I think you have a page which your counsel reminder -- handed us and described as a reminder.

ATTORNEY LEHMAN: We'll mark that as Exhibit-1.

- - -

(Whereupon, Exhibit Hoover-1, No Bates, Interviewee List, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q. Did you prepare this document?

A. I did.

Q. All right. And what is it?

A. So it's just a document of the dates and the names and titles of the folks that I spoke with for the key informant interviews as part of this process.

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

And I generated it, really, just as a reminder for myself as to, kind of, the names and titles of who I spoke with, in case asked about it today.

Q. And are the dates listed in the left column, are those the dates that you spoke to these individuals?

A. Yes.

Q. Who selected the individuals that you would interview?

A. So I provided guidance to counsel, based on the typical methodology that I would use when talking with school districts to get key informant interviews, about the types of folks in a district that I need to speak with.

So it would be people, for example, who are knowledgeable about the impact of social media on students and the school environment. It would include people who are familiar with the comprehensive school mental health system.

And they took that

Page 27

information and provided it, I believe, to the school district, to select those folks. So it was the typical methodology that I would use here.

Q. And is this list that we've marked as Exhibit-1, is this a complete list of the key informant interviews that you conducted?

A. Yes.

Q. All right. And it reflects individuals from all six of the school districts?

A. It reflects individuals from twelve school districts, including the six school districts, yes.

Q. All right. Is there anyone that you interviewed who was not listed on Exhibit-1?

A. I don't believe so, no.

Q. All right. Is there anyone that you asked to interview or a type of person that you asked to interview that you were not allowed to interview?

A. No.

Page 28

Q. Did you personally interview each of these individuals listed on Exhibit-1?

A. I did.

Q. Did anyone else participate in the interviews other than you and the interviewee?

A. Nobody participated in the interviews. Counsel was present but did not participate in the interviews, if that's what you mean.

Q. All right. So when you say "counsel was present," you're referring to counsel representing the plaintiff in this matter?

A. Yes.

Q. All right. And how many attorneys were present on behalf of the plaintiffs in these interviews?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Typically, one was present, to my recollection.

I mean, I -- again, I was

Page 29

more focused on the people I was interviewing, so.

BY ATTORNEY LEHMAN:

Q. Were the interviews conducted in person or using a remote medium?

A. They were conducted using a remote medium.

Q. All right. So were they video or phone?

A. They were over video.

Q. All right. How long was each interview?

A. I was going to see if I listed it there, but I didn't.

So the interviews were anywhere from one to two hours.

Q. Was there anyone that you spoke to on more than one occasion?

A. No.

Q. Was there a script that you used for the interviews?

A. No. I have kind of a standard set of, you know, kind of topics

Golkow Technologies,
A Veritext Division
877-370-3377                                        www.veritext.com

CONFIDENTIAL

Page 30

that I cover when I'm doing the interviews. And those are what contributes to the report. So it's outlined that way in my report.

Q. And so is there a written set of topics that you use to guide these conversations?

A. No. I mean, I had the report outline and then followed according to that, so.

Yeah. I can point you to, you know, the outline in the report if needed.

Q. Sure. We'll talk about that in a moment.

Would those -- when you say the "outline" from the report, is that just the major topic headings from your report?

A. Exactly.

Q. Did you record the interviews in any way?

A. No -- well, let me -- let me clarify.

Page 31

So I took contemporaneous notes, which is what I would typically do when I'm interviewing folks for my district. So I took notes that were essentially part of the report. Yeah.

Q. Okay. So I don't believe we have received those notes.

So we are going to ask to receive those, okay?

A. There's no notes beyond what's in the actual report. So when I say I took notes, they, then, were iteratively developed into the report.

So it's not a separate set of notes. So that's why I was clarifying.

Q. Okay. And so, then, are all of the comments made by each of these interviewees reflected in the individual district reports?

A. So as you'll see in the reports, what I did, which, again, would be typical of what I would do when I'm interviewing any district -- and I

Page 32

interview districts all the time -- is I take notes through the interview and then I synthesize the information and pull in illustrative quotes, for example.

And that's what's in the report.

Q. And so are there any -- is there any remaining documentation of the entirety of what these interviewees have said other than the illustrative quotes that have remained in your reports?

A. No.

ATTORNEY YEATES: Object to the form. Misstates testimony.

BY ATTORNEY LEHMAN:

Q. Did you invite any counsel from the defense to attend any of the interviews that you conducted?

A. I don't think that would have been my role. So if you're asking if I did, no.

Q. Do you anticipate conducting any other key informant interviews beyond what's reflected in Exhibit-1?

Page 33

A. No.

Q. All right. I think we were going through what's in your notebook.

You said the second thing was -- was your report.

Which report is that? What's the date of it?

A. Let me take a look.

So the first thing that's in here, other than the cover page, is the expert report from May 16th, 2025.

Q. Okay. What's next?

ATTORNEY LEHMAN: We'll mark that as Exhibit Number 2.

- - -

(Whereupon, Exhibit Hoover-2, No Bates, 5/16/25 Expert Report, was marked for identification.)

- - -

THE WITNESS: So what's next is a copy of my CV, dated May 10th, 2025.

ATTORNEY LEHMAN: All right.

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

So we'll mark that as Exhibit-3.

- - -

(Whereupon, Exhibit Hoover-3, No Bates, 5/10/25 Curriculum Vitae of Sharon A. Hoover, Ph.D., was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q. We received, within the last week, an updated CV.

Is that the same as the CV that you have in front of you?

A. The next part that's in here, behind this blue sheet, is the updated CV.

Q. All right. And what's the date of the updated CV?

A. August 1st, 2025.

ATTORNEY LEHMAN: We'll mark that as Exhibit Number 4.

- - -

(Whereupon, Exhibit Hoover-4, No Bates, 8/1/25

Page 35

Curriculum Vitae of Sharon A. Hoover, Ph.D., was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q. And what was the change or changes that were made between the May 10th and August 1st CVs?

A. I'd have to go through line by line to actually recall.

But it would have -- to my recollection, it would have been the date, it would have been any changes in positions or if -- you know, for example, in a standard academic CV, if you have a funding -- a grant that has ended, you move it to the completed grant. So I would have indicated that.

I added several publications, because I'm continuously publishing. So I try to keep those updated. So those would have been added in.

And any other speaking

Page 36

engagements I would have added in as well.

And that's just part -- typically what we do when we're updating our CVs.

Q. Do you have any active grants at present?

A. So because I retired June 1st, I'm not currently on the grants. So I transferred those to colleagues within our National Center for School Mental Health.

Q. And do you have any updates that would need to be made to your August 10th -- I'm sorry.

Do you have any updates that would need to be made to the August 1st, 2025, CV in order to bring it fully up to date?

A. I'm trying to think if I've published anything in the last week.

I don't think so.

Q. Okay. Do you have any publications that have been accepted for

Page 37

publication but not yet been published?

A. I -- yes. And that's indicated in there. So I included that.

Q. All right. What else is in your notebook?

A. Let's see. So there's Exhibit-B, materials considered. And this would have been materials considered for that May 16th report.

ATTORNEY LEHMAN: We'll mark that as Exhibit-5.

- - -

(Whereupon, Exhibit Hoover-5, No Bates, Materials Considered List, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q. What else is in your notebook?

A. So this is the rebuttal report -- my rebuttal report that was submitted -- or that's dated July 30th, 2025.

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

- - -

(Whereupon, Exhibit Hoover-6, No Bates, 7/30/25 Rebuttal Report, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.   All right.  So both the report from May 16th, 2025, and the rebuttal report from July 30th, 2025, those are both your general reports that are not specific to any individual school district; is that correct?

A.   That's correct.

Q.   Okay.  Is there anything else in your notebook?

A.   Not this first notebook, no.

Q.   Do you have a second notebook in front of you or is that a copy of the same notebook?

A.   I have a second and a third.

Q.   Okay.  What's in your second notebook?

A.   So the first thing that's in

Page 39

here is an amended expert report for Breathitt.  So this was the expert report.  It's dated June 20th, 2025.

ATTORNEY LEHMAN:  All right.  We'll mark that as Exhibit Number 7.

- - -

(Whereupon, Exhibit Hoover-7, No Bates, 6/20/25 Expert Report for Breathitt County Board of Education, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.   What else is in the notebook?

A.   The rebuttal -- amended rebuttal report for Breathitt dated August 7th.

ATTORNEY LEHMAN:  We'll mark that as Exhibit Number 8.

- - -

(Whereupon, Exhibit Hoover-8, No Bates, 8/7/25

Page 40

Rebuttal Report for Breathitt County Board of Education, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.   What else is in that book?

A.   The next thing that's in here is the amended expert report for Charleston County School District, dated June 20th, 2025.

ATTORNEY LEHMAN:  All right.  We'll mark that as Exhibit-9.

- - -

(Whereupon, Exhibit Hoover-9, No Bates, 6/20/25 Case-Specific Report for Charleston County School District, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.   What else is in the notebook?

A.   Rebuttal report for

Page 41

Charleston County School District, August 1st, 2025.

ATTORNEY LEHMAN:  We'll mark that as Exhibit-10.

- - -

(Whereupon, Exhibit Hoover-10, No Bates, 8/1/25 Case-Specific Rebuttal Report for Charleston County School District, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.   What else is in the notebook?

A.   The amended expert report for DeKalb County schools, June 20th, 2025.

ATTORNEY LEHMAN:  We'll mark that as Exhibit Number 11.

- - -

(Whereupon, Exhibit Hoover-11, No Bates, 6/20/25 Case-Specific Amended Report for DeKalb County Schools, was marked

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.   What else is in the notebook?

A.   The rebuttal report for DeKalb County School District, amended, and it's dated August 7th, 2025.

ATTORNEY LEHMAN:  We'll mark that as Exhibit-12.

- - -

(Whereupon, Exhibit Hoover-12, 8/7/25 Case-Specific Rebuttal, Report for DeKalb County Schools, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.   Does that complete the second notebook?

A.   That is Binder 2.

Q.   All right.  And what is in Binder 3?

A.   Binder 3, we've got our

Page 43

cover page, just like in the other ones.

And the first thing that's in here is the amended expert report -- my amended expert report for the Board of Education for Harford County, and that's June 20th, 2025.

ATTORNEY LEHMAN:  We'll mark that as Exhibit-13.

- - -

(Whereupon, Exhibit Hoover-13, No Bates, 6/20/25 Case-Specific Report for Board of Education for Harford County, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.   What else is in the notebook?

A.   The next thing is the rebuttal -- my rebuttal report for Harford County Public Schools, August 1st, 2025.

ATTORNEY LEHMAN:  We'll mark that as Exhibit-14.

Page 44

- - -

(Whereupon, Exhibit Hoover-14, No Bates, 8/1/25 Case-Specific Rebuttal Report Harford County Public Schools, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.   What else is in your notebook?

A.   So it's the amended expert report for Irvington Public Schools, dated June 20th, 2025.

ATTORNEY LEHMAN:  We'll mark that as Exhibit-15.

- - -

(Whereupon, Exhibit Hoover-15, No Bates, 6/20/25 Case-Specific Amended Expert Report for Irvington Public Schools, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Page 45

Q.   And what's -- what's next in your notebook?

A.   The amended rebuttal report for Irvington Public Schools, dated August 7th, 2025.

ATTORNEY LEHMAN:  We'll mark that as Exhibit-16.

- - -

(Whereupon, Exhibit Hoover-16, No Bates, 8/7/25 Case-Specific Rebuttal Report for Irvington Public Schools, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.   All right.  What else is in the notebook?

A.   The amended expert report -- my amended expert report for Tucson Unified School District, dated June 20th, 2025.

ATTORNEY LEHMAN:  We'll mark that as Exhibit-17.

- - -

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

(Whereupon, Exhibit Hoover-17, No Bates, 6/20/25 Case-Specific Report for Tucson Unified School District, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.   And anything else in your notebook?

A.   One more thing.

Q.   Okay.

A.   The amended rebuttal report for Tucson Unified School District, dated August 7th, 2025.

ATTORNEY LEHMAN:  All right.

- - -

(Whereupon, Exhibit Hoover-18, No Bates, 8/7/25 Case-Specific Rebuttal Report for Tucson Unified School District, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.   And does that complete all

Page 47

of the materials that you've brought with you?

A.   It does.

Q.   All right.  Based on my math, given -- if we count for the amendments -- so you initially -- you have the general report dated May 16th, 2025, and then you have the rebuttal general report dated August -- or, sorry, July 30th, 2025.

So that's two reports, correct?

And then you issued a report in each of the six districts, which was subsequently amended, and those amendments were dated June 20th, 2025, correct?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I think I just stated the -- all of them.  Do you want me to go back and look through --

BY ATTORNEY LEHMAN:

Page 48

Q.   No, no, no.

A.   Oh, okay.

Q.   I'm just trying to make sure.  Right.  So by my count --

A.   Okay.

Q.   -- we have -- for each school district individually there was a report that was amended and then there was a rebuttal report which was also amended; is that correct?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Yes.  I mean, to my understanding, that -- that's correct.

So for each district I've got the expert report and then the rebuttal report and -- yes.

BY ATTORNEY LEHMAN:

Q.   Right.  And the ones that you have are actually the amended reports of the dates that you've just indicated when we went through them?

ATTORNEY YEATES:  Object to

Page 49

the form.  Misstates facts.

THE WITNESS:  So they are the reports that were submitted on the dates that I stated.

BY ATTORNEY LEHMAN:

Q.   Okay.  Is that a complete set -- meaning the three notebooks that we've just walked through, is that a complete set of your operative reports, both general reports and for the school districts?

A.   Yes.

Q.   Okay.  Is there another report that you have prepared that is not included in those notebooks?

A.   No.

Q.   Is there anything in -- contained in the reports that we have just marked as Exhibits-2, 6 and 7 through 18, that is inaccurate?

A.   Not to my knowledge, no.

Q.   Do you have any opinions that are not included in the reports that we have just marked in Exhibits-2 and 6

13 (Pages 46 - 49)

Page 50

through 18?

A. Do I have any opinions with respect to this litigation --

Q. Yes.

A. -- that are not in there?

Q. Yes.

A. No.

Q. Did anyone help you prepare your reports?

A. No. I drafted the reports, wrote the reports myself.

Q. Now, as we -- as we talk today and -- if I refer to social media, I'm going to refer to either the platform or the associated app, okay?

A. Okay.

Q. Is that acceptable to you?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I'm not sure what you mean by "acceptable."

BY ATTORNEY LEHMAN:

Q. Okay. Well, I guess I just want to clarify for you that that's how

Page 51

we're going to use the terms.

And if, for some reason, you would need to clarify your answer --

A. Okay.

Q. -- based on a distinction, please go ahead and do so, okay?

A. Okay. Will do.

Q. All right. And I would also tell you that I will use psychiatric disorders and mental health disorders to mean the same thing, okay?

A. Okay.

Q. All right. What is your definition of adolescence?

A. So typically when we think about adolescence, as a clinical psychologist, I would think about roughly the age range of about 11 to 18.

But often that age range we also extend beyond that if we're talking about kind of young adulthood.

So adolescence, though, can be anywhere, again, from about 11 to 18. We use different age ranges sometimes as

Page 52

we're thinking about adolescence. But it's in the period beyond, you know, elementary school, childhood and we're really thinking about -- you know, I work in schools a lot, so we often are thinking about middle and high school students.

Q. Have you been deposed before?

A. So I -- I want to say it was about eight or nine years ago, I think, I was deposed for a -- and I know that might sound strange to an attorney, but I'm not typically involved in legal proceedings. And so I think I was deposed for a small case.

Q. What kind of case was that?

A. It was a case where I was brought in as an expert around promotion. It was somebody who was challenging a university about being promoted -- or, excuse me, about being denied promotion.

And so because I have experience in academic promotion and

Page 53

tenure, I was brought on for that.

Q. Is that the only time that you've been deposed?

A. Yes.

Q. Have you previously testified before any legislatures?

A. Yes.

Q. Tell me about that.

A. So most recently it would have been -- again, I'm happy to look at my CV if you need dates.

But most recently I've testified a couple of times for the United States Senate.

Q. Other than testifying before the United States Senate, have you ever testified in front of any other legislative body?

A. To my recollection, I would have testified for the Maryland Congress as well. So Maryland State Senate and House of Representatives.

Q. And what did you testify before the U.S. Senate about?

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

A. So I testified -- two different hearings. And in one hearing, I was testifying about the transition supports from high school to college and kind of what supports need to be put in place in terms of comprehensive school mental health supports for young people, again, particularly with a focus on transitioning from high school to college.

And in the other hearing, which would have been for the Senate Finance Committee, it was really looking at kind of how school mental health services are financed and what some of the, you know, mechanisms are that need to be improved, really, including better leveraging Medicaid for school mental health services.

Q. What was the topic of your testimony before the Maryland Congress?

A. Oh, honestly, it's been a few years. I'd have to -- I might have to go back to my CV to recall what the

Page 55

topic was.

We -- you know, working at the state university, we often get called on to provide knowledge translation. And so I would have been asked probably to go in and speak to school mental health.

But the exact testimony, I'd have to retrieve.

Q. And have there been any occasions where you have submitted an affidavit or other sworn statement in any other setting?

A. Not to my knowledge.

Q. Now I want to look at your notice of deposition.

ATTORNEY LEHMAN: We'll mark this as Exhibit Number 19.

- - -

(Whereupon, Exhibit Hoover-19, No Bates, Notice of Deposition, was marked for identification.)

- - -

ATTORNEY LEHMAN: This is

Page 56

Tab Number 1.

BY ATTORNEY LEHMAN:

Q. All right. Can you confirm that what I've handed you is defendants' notice of videotaped deposition of plaintiffs' retained expert witness, Dr. Sharon A. Hoover and request for production of documents at time of deposition?

A. Are you asking me to confirm that?

Q. Yes. I'm just asking you to confirm --

A. Yes.

Q. -- that that's actually --

A. I confirm that's what it says here. Yes.

Q. Have you seen this document before today?

A. I have.

Q. All right. And I know we've already gone through what you've brought with you.

Have you either provided to

Page 57

us in advance or brought with you all of the documents responsive to Exhibit A?

ATTORNEY YEATES: Object to the form. Subject to objections that were served.

THE WITNESS: Yeah, I'm not sure. I'd have to --

BY ATTORNEY LEHMAN:

Q. Sure. And if you look -- if you look on Page 6, there's Exhibit A, which is appended to what we have now marked --

A. Right.

Q. -- as Exhibit Number 19.

A. I remember that, yeah.

Q. All right. And so have you provided all of the documents or materials that are in your file for this litigation?

A. Yes, I believe so.

Q. And are the materials considered lists that were previously provided, are they full and complete lists of the materials that you

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

considered in developing your opinions in this matter?

A.   Sorry, can you repeat the question? I was also just reviewing this.

And I note here that compensation, I don't think I've provided a list of all of the compensation received.

ATTORNEY YEATES: We objected to that.

THE WITNESS: Okay. So.

So if you don't mind restating your -- your most recent question.

BY ATTORNEY LEHMAN:

Q.   No problem.

Are the materials considered lists that were previously provided full and complete lists of the materials that you considered in developing your opinions in this matter?

A.   Yes.

Q.   Now, in your materials

Page 59

considered lists, there are -- are a list of expert reports that you reviewed.

Is that a complete and accurate list of the expert reports that you reviewed?

A.   I'm happy to look in the report at the materials considered. It was at the end of the reports.

Yes.

Q.   Who selected which expert reports you would review?

A.   I asked for expert reports that would be relevant, and these were the ones provided to me by counsel.

Q.   Did you ask to review any other expert reports --

A.   I did --

Q.   -- aside from the witnesses listed?

A.   I did not.

Q.   Have you spoken to anyone who has been named as an expert witness in this case?

A.   No.

Page 60

Q.   Have you ever worked with anyone else who has been named as an expert witness in this case?

A.   I don't know all of the experts that have been named.

But I've never worked with the ones that are on the documents that I reviewed.

Q.   Have you ever met any of the expert witnesses who are listed in the reports that you reviewed?

A.   I have not.

Q.   When were you first contacted in connection with this litigation?

A.   I'd have to go back to my e-mail, to be honest with you.

But I want to say it was roughly spring of last year. So maybe April, May.

Q.   So spring of 2024?

A.   Spring or summer. I can't -- yeah. I -- I'd have to go back if you need an exact date, because I

Page 61

don't have that in my memory.

Q.   Who first contacted you?

A.   That's, again -- jog -- I'd have to jog my memory.

I don't remember the name of the person who first contacted me.

Q.   Was it someone that you had worked with previously?

A.   No.

Q.   Did they -- did -- whoever contacted you, did they -- did they tell you how they had found you?

A.   To my recollection, it was they were seeking someone with expertise in comprehensive school mental health, and my name had been recommended to them by most people they had talked with, given my experience in the field.

Q.   When did you first agree to serve as an expert for the plaintiffs in this litigation?

A.   Again, that's challenging my memory a bit.

It would have been after

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

that conversation and after consideration, you know. So it would have been sometime within that kind of spring to summer of 2024.

Q. Before you were retained as an expert in this litigation, before you -- before that -- you made the agreement, did counsel provide you with any materials to review?

A. I don't think so, no.

Q. Have you previously worked with any of the plaintiffs' counsel in this litigation on other matters?

A. No.

Q. What were you asked to do as an expert?

A. So I was asked to consider the impact of social media on young people with respect to their mental health, but also the impact on schools, and to develop a strategic plan, if warranted, for school districts, bellwether school districts, to both prevent and mitigate the -- the harms

Page 63

discovered on young people and on schools.

Q. And is the -- are the plans that you developed, are those isolated to dealing solely with the impacts of social media or are those broader comprehensive plans intended to address all caused student mental health?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So the plans I developed are very specific to the impacts of social media. And to the extent that social media might intersect with other mental health factors, it -- you know, you could argue that it would be part of those reports.

But the reports that I developed are really specific to the impacts of social media.

BY ATTORNEY LEHMAN:

Q. For any district, do you have quantitative information about how

Page 64

much time district students spend on social media during the school day?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So for the specific bellwether districts, to my knowledge, I do not have specific time that students spend.

And, frankly, you know, in working with hundreds of districts, they don't have the capacity to gather that data on their students. It's just not something that there -- that we would have been able to even retrieve in terms of the number of minutes that students spend.

BY ATTORNEY LEHMAN:

Q. For any district, do you have quantitative information about how much time students spend on screen time that is not social media?

ATTORNEY YEATES: Object to the form.

Page 65

THE WITNESS: So for the bellwether districts, I do not have the number of minutes that students were on screens.

But I relied on the extensive data that does exist for the amount of time that teenagers and children spend on screens to inform some of my opinions.

BY ATTORNEY LEHMAN:

Q. What -- is it correct that your fee is $625 an hour for reviewing materials and writing your report?

A. That's correct. For this litigation, yes.

Q. And are you also charging $625 an hour when consulting with counsel?

A. When I have calls with counsel, yes.

Q. And do you charge $625 an hour for testifying in deposition and trial?

A. Yes.

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

Q. Are there any other activities where you charge a different hourly rate for your work in this case?

A. No.

Q. Do you charge for travel time?

A. You know, I don't think we've discussed that, to be honest with you. So that's something I'd have to talk with counsel about.

But I don't know that that's actually -- that that's been discussed yet.

Q. All right. Well, so we're sitting here today in Radnor, Pennsylvania, outside Philadelphia.

And you do not live within a few miles of this location, correct?

A. That's correct.

Q. All right.

A. Yeah.

Q. So you had to travel here from your home in Maryland?

A. I did. I don't live in

Page 67

Radnor.

Q. Okay. And do you -- do you plan to submit an expense -- or bill for the time it took you to travel here?

A. Again, that's something I'd have to discuss with counsel. We haven't, I don't think, actually discussed that yet.

ATTORNEY LEHMAN: Let's mark Tab 3, your invoices, as Exhibit Number 20.

- - -

(Whereupon, Exhibit Hoover-20, HOOVER000081-0087, Hoover Behavioral Health Invoices, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q. And those will be displayed on the screen.

And I apologize, I don't have a written copy because we received those after I was already in transit. But we received these from counsel.

Page 68

ATTORNEY LEHMAN: Can you just scroll through quickly, just at the page level?

ATTORNEY YEATES: Do any of defense counsel have a copy printed?

ATTORNEY KEYES: Excuse me?

ATTORNEY YEATES: Do any defense counsel have a copy of the invoices printed? It's hard for me to see on the screen here.

ATTORNEY KEYES: I do not.

ATTORNEY LEHMAN: These are the ones we received from your office within the last two days.

ATTORNEY YEATES: I know where they came from.

BY ATTORNEY LEHMAN:

Q. All right. So how many invoices have you submitted in this case, Dr. Hoover?

A. I don't know if I recall the number. And you just went through them pretty quickly, so I didn't count as you

Page 69

were doing it.

But I'd have to go back to my own records, which these appear to reflect.

Q. All right. So looking at Page 1, down at the bottom, do you see that there's a page number or a Bates number that's Hoover and ends in 81?

A. Yes, I do.

Q. Okay. And do you see up at the top, the date on this is January 16th, 2025?

A. I do.

Q. All right. And along the left column, there's a date and then there's a description of service, the number of hours and the fee, correct?

A. I see.

Q. And the earliest date that I see on this invoice is July 10th, 2024.

A. Correct.

Q. All right. And would that be consistent with your memory of approximately when you agreed to serve as

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

an expert in this matter?

ATTORNEY YEATES: Object to the form.

THE WITNESS: As I said, I don't recall the exact date that I agreed to serve as an expert.

BY ATTORNEY LEHMAN:

Q. Okay. Well, are you -- do you have any invoices reflecting time that you spent on this matter before July 10th, 2024?

A. This is the first invoice I would have submitted. So this is the time that -- the first time that I would have invoiced for. And this is the time that I would have spent on the litigation.

Q. Okay.

ATTORNEY LEHMAN: Now, if we can go to the last page, please.

BY ATTORNEY LEHMAN:

Q. And do you see the date at the top here is May 24th, 2025?

A. I see that, yes.

Page 71

Q. Have you submitted any invoices in this matter for work since May 24th, 2025?

A. I'm not sure. I'd have to go back to my records, honestly.

Q. How much additional time, if any, have you spent working on this matter since May 19th, 2025?

A. Do you mean May 24th?
Oh, I see, the 19th.

Q. I don't.

A. I didn't see -- it hadn't scrolled yet. May 19th.
I don't know the exact number of hours. Again, I'd have to go back to my own, you know, records or my invoice draft, if I haven't submitted an invoice yet.

Q. Do you have an invoice drafted for time spent since May 19th, 2025?

A. Perhaps. I'd have to look -- I'd have to look at my records.

Q. Okay.

Page 72

A. Yeah.

Q. Do you believe that you've spent more than 20 hours working on this matter since May 19th, 2025?

A. Yes.

Q. Do you think that you spent more than 50 hours since that time?

A. It's hard for me to estimate beyond the 20 hours. I know it's been at least 20.

Q. Now, by my count, the invoices submitted reflect $152,343.75 that you have billed on this matter.
Is that accurate?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't know. Sorry.
I'd have to go and add it all up again.

BY ATTORNEY LEHMAN:

Q. Well, if -- if I have correctly added up the amounts reflected in these invoices, would that reflect the

Page 73

full amount that you have billed in this matter?

A. I don't know. Are you asking me to assume that the math is correct?

Q. No, actually, I'm not. That's --

A. Okay.

Q. That's why I phrased --

A. I may have a misunderstanding.

Q. -- the question as I did.
If I correctly add up the amounts reflected in the invoices received from counsel, is that the full amount that you have submitted for payment in this matter?

A. I don't know.

Q. Okay. All right. So I want to make sure.
We're not sure if we have all of the invoices and we're not sure how much time has not been invoiced.
Is that -- is that the sum

CONFIDENTIAL

Page 74

and substance of where we are on this?

A. I --

ATTORNEY YEATES: Object to the form.

THE WITNESS: I can't speak to whether you're not sure about it.

I can tell you that what I'm seeing are invoices that I have submitted.

BY ATTORNEY LEHMAN:

Q. Okay. Well, I don't -- I don't -- let's not quibble.

This is my question: I have received these invoices from your counsel. I need to know if there are more that exist.

And so what would you need to look at in order to tell me the dates of the invoices that you have submitted?

A. I would need to look at my invoices.

Q. Okay. And where are they?

A. They would be -- well,

Page 75

counsel would have ones that I've submitted, I assume. Or I would have them in my invoice record.

Q. Okay. And where is your invoice record kept?

A. That would be in my invoice folder of, you know, my --

Q. Is that on your computer?

A. Yes.

Q. Is that something that you have with you?

A. No.

Q. All right. Is that something that you have with you in Pennsylvania?

A. It's on a drive that I could access from there, yes.

Q. Okay. All right. We are going to need confirmation about the invoices.

So is that something that you could look at tonight and let us know tomorrow?

A. I could. I could let you

Page 76

know, yes.

Q. Okay. Did you prepare your materials considered list?

A. Yes.

Q. Did anyone help you prepare those lists?

A. I reviewed it with counsel. So I'm not sure what you mean by "did anyone help" me.

But I generated the materials reviewed list that went along with the reports.

Q. Did anyone suggest to you materials that should be added or deleted to the materials considered list?

A. No.

Q. Were there any materials that you reviewed that are not reflected in your materials considered list?

A. Were there any materials reviewed?

Q. Yes.

A. No.

The only qualification I

Page 77

would make is that, you know, as an academic professional, I'm, you know, consistently reading articles as part of my work. And, you know, I edit journals. I review for journals.

So -- but as far as materials considered for this, it's -- the list is inclusive of all that's been considered to inform the opinions, yeah.

Q. Now, putting aside for a moment the -- the depositions that you received from counsel.

Did you receive any of the articles or other materials in your materials considered list from plaintiffs' counsel?

ATTORNEY YEATES: Object to the form.

THE WITNESS: No.

BY ATTORNEY LEHMAN:

Q. For the articles and depositions that are identified in your materials considered list, did you review every page of those?

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

A.   I reviewed the articles thoroughly.  You know, I've -- over 25 years in academia, I've gotten to be a pretty fast reader.  So yeah.

Q.   And for the depositions, did you review every page or did you review selectively?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I don't know what you mean by "review selectively."  I looked at all of the depositions that were included.  If I included them in my list of materials considered, I would have reviewed them all.

BY ATTORNEY LEHMAN:

Q.   When you say you "reviewed" them, does that mean that you reviewed every page?

A.   So I probably looked at every page.  Did I -- did I memorize each word in the deposition?  No.  And did I read word for word?  No.

Page 79

I mean, I -- there's a difference, I would say, between skimming and reading quickly and then, you know, noting every word.

But did I read the depositions?  Yes.  Did I review them?  Yes.

Q.   Did you take any notes while you reviewed the depositions?

A.   Nothing that -- that wasn't part of my report.

Q.   Did you take any notes while you reviewed the articles included in your materials considered list?

A.   No.

Q.   Now, there is a heading on your materials considered list called, TikTok Documents, and it lists four documents.

A.   Correct.

Q.   Did you select those four documents?

A.   I did not.

Q.   Who selected those four

Page 80

documents?

A.   When you say "who selected" them, they were sent to me, I believe, by counsel.

Q.   Are those -- is it correct that you have only reviewed, in total, four internal TikTok documents?

A.   Yes.

Q.   Have you reviewed any documents internal to any other defendant in this case?

A.   No.

Q.   Do you know who the defendants in this litigation are?

A.   Yes.

Q.   Who are they?

A.   So they are the defendants' platforms.  Let's see if I can -- so Snapchat, TikTok, Instagram, Meta or Facebook.

Which one am I leaving out here?  Snapchat, TikTok, Instagram, Meta -- YouTube.

Q.   In your review, did you

Page 81

review the Steinsbekk article from 2023 titled Social Media Behavior and Symptoms of Depression and Anxiety, a Four-Year Cohort Study From Ages 10 to 16?

A.   I'd have to look through my -- I reviewed a lot of studies.  So I can go --

Q.   And please do look at your materials considered list.

A.   I will, yeah.

So I don't see that listed here in this first list.  And I don't see it in this rebuttal report.

Q.   In your review, did you review the 2024 article by Maheux titled, Longitudinal Change in Appearance-Related to Social Media Consciousness and Depressive Symptoms, a Within Person Analysis During Middle and Early Adolescence?

ATTORNEY YEATES:  Can you spell the name of that author.

ATTORNEY LEHMAN:  Yes.  It's M-A-H-E-U-X.

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

ATTORNEY YEATES:  Thank you.

THE WITNESS:  It's not in this list considered.

No.

BY ATTORNEY LEHMAN:

Q.   In your review of materials, did you consider the 2021 article by Boer entitled, Social Media Use Intensity, Social Media Problems, and Mental Health Among Adolescents in Investigating Directionality and Mediating Processes?

A.   Not that I see here.  Let me look here just to confirm.

No.

Q.   In your review, did you review the 2021 article by Beeres titled, Social Media and Mental Health Among Early Adolescents in Sweden, a Longitudinal Study With Two-Year Follow-Up?

ATTORNEY YEATES:  What is that author's name.

ATTORNEY LEHMAN:  Beeres, B-E-E-R-E-S.

Page 83

THE WITNESS:  No.

BY ATTORNEY LEHMAN:

Q.   Did you -- in your review, did you review the 2020 article by Puukko -- that's spelled P-U-U-K-K-O, entitled, Social Media Use and Depressive Symptoms, a Longitudinal Study From Early to Late Adolescence?

A.   No.

Q.   In your review, did you review the 2018 article by George titled, Concurrent and Subsequent Associations Between Daily Digital Technology Use and High-Risk Adolescents' Neuro Health Symptoms?

A.   George spelled G-E-O-R-G-E?

Q.   Correct.

A.   Okay.  No.

Q.   In your review, did you review the 2019 article by Jensen entitled, Youth Adolescence Digital Technology Use and Media Health Symptoms, Little Evidence of Longitudinal or Daily Linkages?

Page 84

A.   No.

Q.   In your review, did you review the 2018 article by Houghton entitled, Reciprocal Relationships Between Trajectories of Depressive Symptoms and Screen Media Use During Adolescence?

A.   No.

Q.   In your review, did you review the 2023 article by Leggett-James entitled, The Consequences of Social Media Use Across the Transition Into Adolescence, Body Image and Physical Activity?

A.   No.

Q.   In your review, did you review the 2022 article by Maes -- spelled M-A-E-S -- entitled, Adolescent Girls' Instagram and TikTok Use Examining Relations With Body-Image Related Constructs Over Time Using Random Interpretation Cross-Lagged Models?

A.   No.

Q.   In your review, did you

Page 85

review the 2017 article by Russo entitled, The Reciprocal and Indirect Relationship Between Facebook Use Comparison on Facebook and Adolescents' Body Dissatisfaction?

A.   No.

Q.   In your review, did you review the 2023 article by Chu entitled, Screen Time and Suicidal Behavior Among U.S. Children 9 to 11 Years of Age, a Prospective Cohort Study?

A.   Chu, C-H-U?

Q.   Correct.

A.   I just want to make sure I'm looking in the right place on the list.

No.

Q.   In your review, did you review the 2022 article by Achterberg -- spelled A-C-H-T-E-R-B-E-R-G -- entitled, Longitudinal Associations Between Social Media Use, Mental Health Well-Being and Structural Brain Development Across Adolescence?

A.   No.

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

Q.   In your review, did you review the 2020 article by Odgers -- O-D-G-E-R-S -- entitled, Screen Time Social Media Use and Adolescent Development?
A.   No.
Q.   Did you review any deposition of someone employed by any defendant?
A.   Not to my knowledge, no.
Q.   Looking at your report, and this is in Paragraph 25, you reference, quote, Direct interactions with state and local education leaders, including district and school administrators, teachers and school mental health and health professionals.
ATTORNEY YEATES:  Which report?
THE WITNESS:  I was just going to ask that.
ATTORNEY LEHMAN:  It's the May 16th report.
THE WITNESS:  You said it

Page 87

was Paragraph 25?
BY ATTORNEY LEHMAN:
Q.   Yes.  Under methodology.
A.   Yes.
Q.   Okay.  Who are the education leaders that you're referring to?
A.   Yeah.  So -- so I've worked at the National Center for School Mental Health for 25 years.  And in that role -- or in that capacity, I served as director of research for a few years and then co-director for 15 years of the National Center.
And as part of that role, we -- and I specifically -- have spoken with education leaders from state departments of education, districts and schools.
So when I speak about -- did you ask about education administrators or educators?
Q.   Yeah.
I asked, who were the education leaders referred to in

Page 88

Paragraph 25?
A.   Yeah.  So that would include state superintendents.  It would include district leaders of student support, district superintendents.  It would include school principals from hundreds of school districts across the country.
Q.   And so is the reference in Paragraph 25, is that a general reference to the interactions that you have had over the years in your profession as opposed to specific conversations that you had for purposes of developing opinions in this litigation?
ATTORNEY YEATES:  Object to the form.
THE WITNESS:  Let me look as to how I phrased it.
So in Paragraph 25 that you referenced, I spoke about interviews with people from the specific bellwether districts, and I spoke about interactions with state and local education leaders,

Page 89

including district and school administrators, teachers and school mental health and health professionals.
So that's really -- that last part that you quoted is really speaking to my years of experience in the field broadly, which did inform my opinions.
BY ATTORNEY LEHMAN:
Q.   Okay.  And just to be clear, that's the last part.
And the previous section, those are the key informants from the school districts, and those are the individuals who were listed in the list that you provided and that we've marked as Exhibit-1, correct?
A.   That's correct.
Q.   All right.  When you were hired to testify in this case, were you hired as an individual consultant as opposed to the National Center being hired?

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

A.   I was hired as an independent expert, yeah.

Q.   And so when you speak, you're not speaking on behalf of the National Center, you're speaking on behalf of Dr. Sharon Hoover?

A.   I'm speaking based on my experience working at the National Center for 25 years.

Q.   Understanding that.  I can't -- you're not divorced from your experience --

A.   Right.

Q.   -- your background is your background.

A.   Right.

Q.   I just want to make sure that you're sitting here today speaking on your behalf as a consultant.

You're not actually speaking on behalf of the National Center, correct?

ATTORNEY YEATES:  Object to the form.

Page 91

THE WITNESS:  Yeah, I'm not -- I'm not sure, you know, if the legal term "speaking on behalf of," kind of what that means.

The university was aware that I was participating in this, and I had approval to do so.  So -- and I'm still employed there.

So I'm speaking as Dr. Sharon Hoover, who, again, was co-director of the National Center and remains an emeritus professor there.

So it's hard to divorce those two, I would say.

BY ATTORNEY LEHMAN:

Q.   But your retention agreement, or whatever agreement you have, that's on behalf of Dr. Sharon Hoover, correct?

A.   That's -- it's in my name.

Q.   Did you do anything to prepare for your deposition?

Page 92

A.   Yes.

Q.   What did you do to prepare for your deposition?

A.   I reviewed all of my reports, and I met with counsel.

Q.   Anything else?

A.   I reviewed -- I went and reviewed some of the literature and documents cited.

So that's -- yeah.

Q.   How much time did you spend reviewing your reports in preparation for your deposition?

A.   I don't -- I didn't add the hours up.  So I'm not sure.

Q.   How many times did you meet with counsel in order to prepare for your deposition?

A.   How many times?  I would say three specific to preparing for deposition.

Q.   How much time did you spend meeting with counsel in order to prepare for your deposition?

Page 93

A.   Maybe 15 hours.

Q.   Over what -- how long ago was the first meeting that you had to prepare for your deposition?

A.   Four days ago.

Q.   So 15 hours over the last four days?

A.   Yes.

Q.   All right.  What literature or documents did you re-review for preparation for your deposition?

ATTORNEY YEATES:  And I'll just counsel you, Dr. Hoover, not to talk about anything that you discussed with counsel during the course of your preparation.

THE WITNESS:  Yeah, so I don't know that your question is different than the one you asked before.

But I reviewed my reports and the source documents.

Maybe I misunderstood.

BY ATTORNEY LEHMAN:

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

Q.   So when I asked you before what you did, you told me you reviewed reports, you met with counsel.  And then you separately said you reviewed literature and documents cited in the report.

So I'm just asking what literature and documents cited in the report you re-reviewed for purposes of preparing for your deposition?

ATTORNEY YEATES:  And, again, I'll just counsel you not to disclose which documents you reviewed with counsel.

THE WITNESS:  Okay.  So I reviewed the reports that are in my binders.

BY ATTORNEY LEHMAN:

Q.   All right.  So let me -- let me ask it differently.

Did you -- outside of conversations and documents that you reviewed with plaintiffs' counsel, did you review any other literature and

Page 95

documents cited in the reports to prepare for your deposition?

A.   I did my own review of my reports, just to review, right, just to look at them, yeah.

Is that what you're asking?

Q.   I'm asking -- putting aside -- I know you reviewed the reports, and I know you reviewed documents with counsel.

Did you review anything else to prepare for your deposition?

A.   Just looked at some of the source materials that are in my report.  So articles, for example, I may have looked at, you know.

So, no, there's nothing else outside of that.

Q.   And are there -- what articles did you look at, other than articles that you reviewed with plaintiffs' counsel, in order to prepare for your deposition?

A.   So I looked at -- I don't

Page 96

know the specific articles.  But I went back through my article list just to review what was in my reports.

Q.   How much time, on a monthly basis, do you spend in your professor emeritus capacity serving the University of Maryland?

A.   Well, this is new, since I've worked, you know, full time about 60 to 80 hours a week, probably, prior to -- prior to June 1st.

So in emeritus capacity, I would say a few hours a week.

Q.   Less than five?

A.   It depends.  It depends.  You know, again, as I mentioned, the role involves supervising, you know, faculty that are there.  Given that I've worked there for so long, there's a lot of questions that folks still have about taking over the Center and how to engage with school districts, et cetera.

So there's a lot of

Page 97

communication and engagement.

Q.   How much time did you spend on behalf of the University of Maryland last week?

A.   I don't know.  I don't know the number of hours.

Q.   All right.

ATTORNEY LEHMAN:  If we can look at Tab Number 6, and we'll mark this as Exhibit Number 21.

- - -

(Whereupon, Exhibit Hoover-21, No Bates, University of Maryland School of Medicine Web Page, Sharon A. Hoover, Ph.D., was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.   Can you confirm that this is a printout of your biography from the University of Maryland web page?

A.   I haven't visited the web page in a -- in a little while, so I'm not sure if this is -- you know, when

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

this was dated.

But this looks like something that I've seen on the web page before.

Q. All right.

ATTORNEY LEHMAN: Just scroll down to the bottom.

BY ATTORNEY LEHMAN:

Q. All right. Do you maintain the biography on the web page?

A. So the -- it's kind of multi-pronged.

But when I say that basically they have us, to my recollection -- I'm trying to remember how this website -- this particular website, because I'm on a few different websites for the university.

So this particular one, I think that we are able to go in and update certain things on the website.

And I can't -- this must be for the School of Medicine website. It's a pretty cumbersome interface. So I

Page 99

think I've -- you know, the last time I went in here, I'm not certain.

Q. Have you ever recommended to the University of Maryland that it discontinue using social media?

A. I have not recommended to the university that they discontinue using social media.

Q. Does the University of Maryland have any warnings about social media use in its student handbook?

A. I have no idea.

Q. Have you ever recommended to the University of Maryland that it add warnings about social media use to its student handbook?

A. I have never recommended that they add warnings to their student handbook.

Q. Does the University of Maryland School of Medicine have classes that teach medical students about diagnosing and treating addiction?

A. So let me clarify, because

Page 100

I'm at the School of Medicine.

So the University of Maryland is a very big system. So are you talking about within the whole system of the University of Maryland, within the University of Maryland School of Medicine?

Q. My question is confined to the University of Maryland School of Medicine.

A. Right. And so you're asking about whether they teach courses about addiction?

Q. About diagnosing and treating addiction in patients.

A. They teach their medical residents about diagnosing and treating.

Do they teach a full course? I'm not familiar with the entire course handbook at the University of Maryland School of Medicine.

Q. Have you ever taught any class to a med student at the University of Maryland School of Medicine about

Page 101

diagnosing or treating addiction?

A. I have not. We have addiction departments at the university.

Q. And have you ever been a member of an addiction department at the University of Maryland School of Medicine?

A. I've worked on grants related to addiction. I've never been a member of the division of addiction. It's a part of the department that I'm a part of.

Q. And what is the name of that department?

A. I'd have to look.

Q. Is it the department of psychiatry?

A. Oh, of the department? Sorry. I thought you were asking specifically about the division related to addiction.

Our department is the department of psychiatry, yes.

Q. So let me --

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

A. I know that.

Q. Let me -- let me make sure.

You were talking -- the department of psychiatry is the one that you're in. But there's a separate division for addiction, and you're not sure of the name of that division, correct?

A. That's correct.

And it's not -- let me, if I may.

The -- it's not a separate division from the department. It falls under the umbrella of the department.

Q. Sure. It's sort of a subspecialty within the department of psychiatry?

A. Correct.

Q. So you've never been a part of that addiction subspecialty?

A. I've never been faculty within the addiction division.

Q. Do you continue to receive compensation from the University of

Page 103

Maryland as a professor emeritus?

A. I do not.

Q. By education, are you a psychologist?

A. I'm a clinical psychologist.

Q. Are you a psychiatrist?

A. No. I'm a clinical psychologist.

Q. Are you an educational psychologist?

A. No. I'm a clinical psychologist.

Q. All right. And so when you make that distinction, when you -- when you point out, well, no, I'm a clinical psychologist, what is -- what is the importance of that clinical distinction to you?

A. So it's just the degree that we receive. And clinical psychology, really, you are trained to be a scientist practitioner who can work in a variety of settings, including in schools.

Q. Do you have any degrees in

Page 104

epidemiology?

A. I do not.

Q. Do you have any degrees in public health?

A. I do not have a degree in public health. But I work in the area of public health and have for over 20 years.

Q. Since 2008 -- well, strike that.

For those patients that you either directly treated or supervised those who were providing direct patient care, what were the types of conditions that they were receiving treatment for?

A. So that's a wide range of issues that they were receiving treatment for.

Do you want me to provide a list? I can give some examples.

Q. Give some examples, please.

A. Yeah. So it would include mood disorders, depressive disorders, anxiety disorders. It would include behavioral disorders, including, for

Page 105

example, attention deficit hyperactivity disorder, ADHD. It would include substance use disorders, comorbid disorders, certainly, between substance use and mental health disorders. It would include post-traumatic stress disorders.

So there's a number of different disorders that we would have treated and supervised -- I would have treated and supervised.

Q. It sounds like it ran the gamut of mental health conditions?

A. Correct.

Q. Okay.

A. Well, let me -- let me actually clarify my answer, if I may.

There are some conditions that are specific to adulthood. And so I was treating in the capacity of the university primarily the child and adolescent population.

Q. And so is that age zero to 18?

27 (Pages 102 - 105)

CONFIDENTIAL

Page 106

A. Typically, my -- the students I'm serving are K through 12. So that's more roughly age 5 to 18 or 19.

We do have an early childhood center as well that's a part of our division.

Q. Did you -- did you personally make mental health diagnoses in that -- in your role at the University of Maryland?

A. I did.

Q. Okay. And during your work as a clinician, that was before the advent of many of defendants' social media platforms, correct?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I don't know the start date of all of the social media platforms, the defendants' platforms.

During my supervision of many clinicians in the last, you know, decade plus, that would not

Page 107

have been before that time. So that would have overlapped with the defendants' platforms.

BY ATTORNEY LEHMAN:

Q. Okay. Is it correct that you started providing patient care at the University of Maryland in 2001?

A. That sounds right, yes. 2001.

Q. Okay. And from the period from -- the first decade, so from 2001 to 2011, did you diagnose and treat children and adolescents with psychological and behavioral problems?

A. Yes.

Q. Including all of those examples that you just gave, mood disorder, depression, behavioral, et cetera?

A. Generally speaking, yes. I'd have to go back to patient charts, which I don't have access to, to actually know all of the different diagnoses.

But I would have treated

Page 108

children and adolescents with that range, yes.

Q. Have you ever diagnosed anyone with social media addiction disorder?

A. No, I have not.

Q. And is it correct that from 2006 to 2008 you served as the director at the Maryland Psychological Assessment and Consultation Center?

A. That's right.

Q. And what is the Maryland Psychological Assessment and Consultation Center?

A. So it's within the division of child and adolescent psychiatry. And it is an assessment clinic for children and adolescents where we do -- you know, we get referrals to assess mental health issues in children.

And it's, again -- well, it actually includes early childhood as well, so that goes a bit below the kindergarten level.

Page 109

And so that operates once a week. We do assessments on children. We do a wide variety of assessments, and then generate reports, meet with schools and students and families about them.

Q. Are those assessments that you're talking about through the Maryland Psychological Assessment and Consultation Center, are those different from diagnoses that you would have reached while you were providing patient care?

A. So the process is different. We do -- to my recollection, within the reporting for the assessment clinic, we may offer diagnoses, if those are things either that we retrieve from the history of the patient files or that come out as part of the assessment process.

So when you say is it different, some of the diagnoses that I would have offered as a clinician treater, you know, may overlap with diagnoses that are in reports from the assessment center.

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

Q. Did you continue to either perform or oversee those types of assessments even after 2018, once you were no longer the director?

A. There may have been an overlap time. But no, I don't think I would have overseen them after that.

Q. During the time -- up until you stopped overseeing patient care by others, was there a standard set of questions that were asked to collect medical history from patients to make a diagnosis?

A. Well, are you asking within the context of the assessment clinic or as a clinician?

Q. As a clinician.

A. Oh, as a clinician.

So there are always questions that we ask, as a clinician, to understand diagnoses. But does the process look the same for every student that I would have met with? No.

Q. Okay. Did you have, at any

Page 111

point during your clinical practice, a written set of questions that you would either give to patients or their parents or guardians?

A. There may have been surveys. I don't recall.

Yeah. I don't recall.

Q. When you were making an initial -- well, strike that. Let me start again.

When you were collecting a patient's history in your clinical practice or when you were overseeing someone who was doing that, was it standard practice to ask about their digital usage?

A. I'd have to think back.

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I'd have to think back.

And you're -- you're talking about my clinical practice or the practice I supervise?

Page 112

BY ATTORNEY LEHMAN:

Q. Both.

A. Both.

I would say as technology and the use of social media has become more prevalent for children and adolescents it's become more typical, probably, to ask about it in the context of clinical settings.

Q. At any time when you were personally practicing, so distinct from when you were overseeing others, did you ever ask a patient about their social media use?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I may have.

BY ATTORNEY LEHMAN:

Q. You don't -- as you sit here today --

A. It's been -- it's been a while, so it's hard to say.

Q. When you were overseeing others who were providing patient care,

Page 113

did you ever recommend or encourage them to ask about a patient's social media use?

A. Absolutely. The topic of social media and student use, because it's now so related to student mental health challenges, this would be something that comes up in the context of the interviews that my supervisees would ask about.

Q. Would they also ask about other digital usage, such as gaming or television watching?

A. Well, television watching, I think we might get laughed at if we ask adolescents that question these days.

But gaming may be asked about.

Q. Okay. What about -- so maybe not watching on TV, but streaming Netflix or Hulu or --

A. YouTube.

Q. -- Apple TV?

A. I don't know that they're

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

asking that question specifically. I just don't know.

Q. Would you ever make -- or strike that.

During your practice, did you assess the cause of adolescents' mental health problems?

A. Did I assess the cause? We certainly inquired about the causes of mental health issues of our adolescents, yeah.

Q. When you say you "inquired," what does that mean?

A. Well, when you're in a clinical setting and you're meeting with a patient, in this case, a student, often if I was in the context of a school, we would try to understand the factors that might contribute to their mental health issues. And so we would ask about that -- we would ask about those.

Q. Would you ever make an assumption about the cause of an individual's mental health problem?

Page 115

A. I try not to make assumptions. So I'm not sure what you mean by that.

So we -- I try to -- I would have tried to really understand what was happening with the students that I work with to understand or certainly to inform a diagnosis.

Q. Do you agree that the cause of a person's mental health issues can be a complex multifactorial question?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So do I agree that there might be multiple factors that contribute to a mental health challenge? Yes. I think most people in the field would understand that.

BY ATTORNEY LEHMAN:

Q. In your clinical practice, did you use the DSM?

A. Yes.

Q. How did you use the DSM?

Page 116

A. So the DSM is one tool in the field that is used as a way to establish criteria for making diagnose -- mental health diagnoses.

So I would have used it as a reference for -- it's often used, frankly, in the context of insurance billing. So if you're making a diagnosis and you're billing, then you would use that diagnosis. So that's one way that it's used.

But, certainly, just in the context of working with students and families, if we make a diagnosis, that would be one reference that I would use.

Q. Did you use the diagnostic criteria from the DSM throughout your clinical practice and then into the period when you were overseeing others in their clinical practice?

A. It's one of the --

ATTORNEY YEATES: Object to the form.

THE WITNESS: It's one of

Page 117

the references that I would have used, yes.

BY ATTORNEY LEHMAN:

Q. What are the other references that you used?

A. So, you know, there's -- so the DSM is -- is one reference that's commonly used in the U.S.

The ICD-10 is another reference that's more globally accepted.

I typically would have referred to the DSM if I was using, like, a manual. But I also would have relied on my graduate training, which was -- you know, informed me about diagnoses and mental health conditions of young people.

Q. Now, in addition to listing specific diagnostic criteria, the DSM also lists risk factors for various mental health conditions, correct?

A. It does.

Q. And so, for example, some of the risk factors listed for major depressive disorder are adverse childhood

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

experiences and genetics, correct?

A.   I'd have --

ATTORNEY YEATES:  Object to the form.  Foundation.

THE WITNESS:  I'd have to look at the most recent version of the DSM to see what is specifically listed.  I'm happy to look at it if you want me to look.

BY ATTORNEY LEHMAN:

Q.   Well, what is your understanding about the risk factors for major depressive disorder?

A.   So there are potentially a number of risk factors for major depressive disorder.  And that might include adverse childhood experiences.

Q.   Okay.  What others would be -- would that include?

A.   I don't know that I could give you an exhaustive list of risk factors.

It might include -- I mean, adverse childhood conditions or

Page 119

experiences, or what we would call ACES in the field, come to mind.

There may be other predisposing factors -- you know, biological factors in a young person, for example.

Q.   And in the field, when you talk about ACES, what are some examples of ACES?

A.   So the field has evolved over time.  When it was first established in the late '90s, ACES was really just based on a research questionnaire of about ten questions that looked at things, you know, that included having a substance-using family member, being exposed to violence.

It's expanded over the years conceptually to include things like poverty, for example, as a social determinant of how there's a social factor that can contribute to health.

ATTORNEY YEATES:  Counsel, can we take a break soon?  It's

Page 120

been about an hour, 15.

ATTORNEY LEHMAN:  Sure.  We can take a break now.

THE WITNESS:  Great.  I need some tea.

VIDEO TECHNICIAN:  The time is 10:29 a.m.  We are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN:  The time is 10:45 a.m.  We are on the record.

ATTORNEY YEATES:  Counsel, I wanted to note for the record that Dr. Hoover did produce all of her invoices to counsel.  And we went back and looked, and there was a mistake with the production, which was a technical mistake on our part; the last invoice was left off of the production from this

Page 121

weekend.

And so the June and July invoice is here.

ATTORNEY LEHMAN:  All right.  So this is -- this is an additional invoice beyond what was produced to us previously?

ATTORNEY YEATES:  Correct.

ATTORNEY LEHMAN:  Okay.  And so we'll mark this as Exhibit Number 22.

- - -

(Whereupon, Exhibit Hoover-22, No Bates, Hoover Behavioral Health Invoice, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.   And so do you have a copy of this in front of you, Dr. Hoover?

A.   I don't.

Q.   All right.

A.   Now I do.

Q.   Now you do.  Okay.

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

Can you confirm this is dated August 6th, 2025?

A. Let me grab my glasses.

Yes.

Q. And this reflects time between June 4th and July 30th?

A. Correct.

Q. All right. Between July 30th and August 12th, have you billed any additional time on this matter?

A. Have I billed any additional time yet? And invoiced? Or what do you mean?

Q. Let me ask a better question.

Have you worked any additional time on this matter between July 30th and August 12th that is not yet invoiced?

A. Yes.

Q. How much time have you worked on this matter since July 30th?

A. I would roughly say about -- somewhere, roughly, 20, 25 hours. I'd

Page 123

have to -- I'd have to --

Q. Okay. When you conducted the key informant interviews that we looked at previously, did you record all of that time on your invoices?

A. I'm happy to go back to the invoices to look at them. But to my knowledge, I would have recorded that time, yes.

Q. That -- that would have been your standard practice, to record --

A. That would --

Q. -- that time on your invoices?

A. That would be my standard practice.

Q. All right. Would you agree that social media use is not a diagnostic criteria for any mental health condition listed in the DSM?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Sorry, can you state that one more time?

Page 124

BY ATTORNEY LEHMAN:

Q. Would you agree that social media use is not a diagnostic criteria for any mental health condition listed in the DSM?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I'd have to look through the DSM to see if it's listed or not as a criteria.

BY ATTORNEY LEHMAN:

Q. Are you aware of social media use being listed -- well, strike that.

Based on your clinical practice, was social media use a diagnostic criteria for any mental health diagnosis?

A. When you're talking about clinical practice, are we talking about my direct patient care?

Q. Well, I am including both your direct patient care and when you were overseeing others in their direct

Page 125

patient care.

A. Okay. So you're saying within the clinical practice.

And the question was?

Q. Are you aware of social media use being a diagnostic criteria for any mental health diagnosis?

A. So it depends how you define "diagnostic criteria." We think about -- when we're making a diagnosis, we do think about the factors that are a part of, you know, what contributes to a diagnosis.

So in my supervision of clinicians, oftentimes the impact of social media would be something, for example, that may contribute to the diagnosis of depression or anxiety.

Q. Okay. And is -- when you say it "may contribute to the diagnosis," it is correct that someone is not diagnosed with depression based on whether or not they use social media, correct?

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I don't think I would agree with how the question -- how you put it in the question, that they would not be diagnosed based on their use of social media.

Somebody is diagnosed with depression.  And the cause of that depression or the things that influence that would be a part of that diagnostic process, if that makes sense.

And social media has been a part of that diagnose -- diagnostic process, if that makes sense.

BY ATTORNEY LEHMAN:

Q.   All right.  So my question is a little bit different.

So if you have two patients that come into a clinical practice and they have the exact same clinical

Page 127

presentation, one uses social media and the other does not use social media, they would receive the same diagnoses irrespective of their social media use, correct?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I never had two patients come in with the exact presentation, first of all.

And so it's a -- it's a hypothetical that would be hard to answer.  So I don't know that I can actually answer it as asked.

BY ATTORNEY LEHMAN:

Q.   Okay.  So are you telling me that if someone has all -- meets all of the diagnostic criteria for depression, whether they are actually diagnosed as depressed depends on whether or not they use social media?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I don't think

Page 128

I stated that, no.

BY ATTORNEY LEHMAN:

Q.   Okay.  Do you agree that social media addiction is not a recognized clinical disorder in the DSM?

A.   So my understanding of the DSM -- again, I'm happy to take a look at the DSM in its most recent version -- but is that social media -- did you use the term "social media addiction"?

Q.   Yes, I did.

A.   That that's not currently in the DSM.

But it -- there is general consensus that it is something that contributes to mental health diagnoses.

And, frankly, it doesn't surprise me that something may not be in the DSM that is a relatively novel issue for young people.

It takes a long time for things to actually get into the DSM.

ATTORNEY LEHMAN:  And I'm going to respectfully move to

Page 129

strike as nonresponsive starting with "but there is."

BY ATTORNEY LEHMAN:

Q.   When you say there is "general consensus," general consensus among whom?

A.   So I would say that mental health practitioners, and many experts in the field of child and adolescent mental health, would agree that there is a significant problem with social media use among adolescents and children that's impacting their mental health, certainly in the work that I do in schools.

This is something that we see daily.  So if you want to think about who I'm talking about with general consensus, it's not just experts and practitioners, it's also all of the schools that we work with.

There's not a school that I would go into that doesn't speak to how social media is impacting their schooling and the mental health of their students.

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

Q.   Do you agree that self-reported symptoms do not provide objective evidence of a psychiatric disorder?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  No, I don't agree with that, actually.

BY ATTORNEY LEHMAN:

Q.   Do you agree that self-reports of symptoms of anxiety or depression are not the same as a diagnosis of a psychiatric disorder?

A.   Actually, we rely on self-reported symptoms all the time when informing diagnoses.

Q.   Well, and my question is a little bit different.

Because do you not -- in reaching a diagnosis, do you not also apply your training and education and other information that you collect in order to reach a diagnosis rather than simply asking the patients, do you have,

Page 131

you know, insert diagnosis?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I don't -- I can't imagine any practitioner that would just simply ask, do you have X diagnosis.

So we rely on self-reported information all the time to inform our diagnoses.  I mean, that is part of how you determine a diagnosis is to understand what a student or patient is experiencing.

BY ATTORNEY LEHMAN:

Q.   Would you agree that the self-report is only one source of information, one data point that you rely on in reaching a diagnosis?

A.   It depends on the clinical situation we're talking about.

So, you know, when I think about patients that I've interacted with, sometimes the self -- their self-reported

Page 132

symptoms and experiences are what is used to inform that diagnosis.

Q.   Conversely, have you had situations where a patient has come in and told you that they are depressed but you find that they -- they do not meet the criteria for a clinical diagnosis of depression?

A.   Again, that's -- that's a hypothetical situation.  I'd have to go back if, you know, we're really talking about specific cases of people that I've seen.

So it's hard -- it's hard for me to answer that.

Q.   Okay.  So, just, I want to make sure I understand.

Is it correct that, sitting here today, you can't tell me if you ever had -- I'm going to start again.

Is it correct that, sitting here today, that you can't tell us that you ever had a situation where a patient came in and reported something that they

Page 133

were having, for example, depression and, in fact, you did not diagnose them as clinically depressed?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I can't tell you whether that has happened or not, no.

BY ATTORNEY LEHMAN:

Q.   Well, if that's the case, Doctor, is it correct that you are still collecting a history and doing your own assessment or did there come a time when you would just ask patients what they thought that their diagnosis should be?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Are you asking if I asked my patients what they thought their diagnosis should be?

BY ATTORNEY LEHMAN:

Q.   Yes.

A.   Not that I recall, no.

Q.   It would be almost laughable

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

to do that, wouldn't it?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't think it would be laughable, actually, to ask an opinion of a patient about their experiences, no.

BY ATTORNEY LEHMAN:

Q. Well, but I'm not asking -- that's not the question that I'm positing.

I'm asking, do you think it would be an appropriate thing for a clinician to do, to simply ask a patient, what do you think your diagnosis should be and allow that to, in fact, be the diagnosis --

ATTORNEY YEATES: Object to --

BY ATTORNEY LEHMAN:

Q. -- just based on their self-report?

ATTORNEY YEATES: Object to the form.

Page 135

THE WITNESS: I mean, that's a hypothetical that I don't -- again, I'd go back to what I said, which is I -- I would think it would be appropriate, in certain circumstances, to ask a patient their perspective on their diagnosis and to allow that to inform your, you know, clinical work.

BY ATTORNEY LEHMAN:

Q. And would it ever be appropriate for a clinician to simply accept that diagnosis, to do -- to exercise no discretion or experience or knowledge, but to simply accept what the patient has said and allow that to be the diagnosis?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So you're asking, I believe, if -- if you asked one question of a patient, what is -- what do you think your

Page 136

diagnosis is, would you then make that diagnosis with having no other conversation with a student?

BY ATTORNEY LEHMAN:

Q. That's precisely what I'm asking.

A. I can't think of a circumstance where that would have happened in terms of a diagnosis.

Q. Is it accurate to say that adolescents' mental health is affected by a variety of factors?

A. Yes, it would be accurate.

Q. Do you agree that societal issues such as racial discrimination or community violence can -- can contribute to an adolescents' stress or anxiety?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So there are certain circumstances where things like racism or -- what was the other example that you used?

BY ATTORNEY LEHMAN:

Page 137

Q. Community violence.

A. -- or community violence may impact adolescents' mental health.

Q. Would you agree that a student's home life plays a significant role in their emotional and psychological development?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So there are, as I've said, a number of factors that may contribute to young people's mental health, children and adolescents' mental health, including their home life; it may contribute.

BY ATTORNEY LEHMAN:

Q. Do you agree that students living in households with financial hardship are at greater risk of mental health illness?

A. So I would say that financial hardship can present adversity to some children that could influence

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

their mental health.

Q. Do you agree that students living in households with domestic conflict or abuse may be at greater risk for mental health illness?

A. They may be.

Q. Have you ever served as a school psychologist?

A. I've served as a clinical psychologist in schools.

Q. And was there ever a time that you were employed in a high school or middle school?

A. Yes.

Q. When was that?

A. So -- well, let me clarify.

So oftentimes in school mental health, you have community mental health partners who work in high schools. And so I did that throughout my 20-plus years.

So -- where I would have been an employee of the University of Maryland, for example, but then was based

Page 139

primarily in schools, in -- in high schools. I also worked in other levels of schooling.

Q. When was the last time that you were based primarily in a high school or middle school?

A. So that would have been my last direct clinical role. And I believe that would have been, as we talked about earlier, in 2008, where I was primarily based in a high school.

Q. Have you ever served as a school superintendent or school board member?

A. I have not served as a school board member or superintendent. I've just worked with them throughout my practice.

Q. Now, in 2002 to 2004, you developed a program called Healthy Choices?

A. I'd have to look to my CV for the exact dates. But --

Q. Well, I'll represent to you

Page 140

that I actually got the dates from -- from your CV.

A. Uh-huh.

Q. What was Healthy Choices?

A. It's been a while, so I'm going to refer back to my CV.

From what I can recall, it was a program that we developed for adolescents in high schools to help them make healthy relationship choices.

Q. What kind of relationships?

A. It's been a while, again. So I'd have to go back.

I don't know that we have the documentation at this point for it. But it would have been relationships with -- you know, their dating relationships and their friendships, to my recollection.

Q. And do you agree that dating and friendship relationships can impact an adolescent's mental health?

A. Do I think that, you know, relationships in general are part of the

Page 141

composition of young people's mental health? Yeah, I do.

Q. From 2004 to 2006, you developed modules related to family engagement wellness and other program development?

ATTORNEY YEATES: Object to the form.

BY ATTORNEY LEHMAN:

Q. What kind of modules -- can you tell us more about those modules?

A. You're jogging my memory here, because it's been over 20 years since that particular set of modules.

But it -- do I have it in my CV? It likely would have been, at that time period, part of some of our NIMH-funded work on bolstering school mental health through better engaging families, promoting wellness and program development.

I believe it would have been kind of evidence-based interventions for -- for young people in schools.

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

Q.   Have you ever worked for a technology company?

A.   No.

Q.   Have you ever developed a technology product?

A.   So I've partnered with technology companies to develop online systems, for example, that help schools and districts assess their comprehensive school mental health programming.

So am I the tech person on that?  No.  I'm the -- the mental health expert.

Q.   What are the names of those technology products that you worked with?

A.   So the one that comes to mind -- well, there's a couple that come to mind.  And they are clearly detailed in my CV.

But one of them is the School Health Assessment and Performance Evaluation System, or the SHAPE system.  And that is essentially a quality improvement platform that school

Page 143

districts and schools can use to improve their quality.

There's also Maryland Behavioral Health, or MD Behavioral Health, which is an online learning system for mental health practitioners to engage in professional development.

So those are two of the more kind of prominent technology products that I've been a part of working with.

Q.   Have you ever worked for or consulted with a social media company?

A.   No.

Q.   Have you ever published a peer-reviewed article about social media?

A.   Let me look at my list of publications, more recent years.

So I'm just looking through my list of publications.  And can you just restate the question so I make sure I'm answering it?

Q.   Yes.

Have you ever published a peer-reviewed article about social media?

Page 144

A.   So it depends how you think about it.  You know, I've published about 100 peer-reviewed articles about school mental health.  And I would say that when we're talking about mental health in schools, that social media contributes to that.

So it depends how you think about the question.

Q.   Have you ever published a peer-reviewed article that talks about social media?

ATTORNEY YEATES:  Object to the form.  Asked and answered.

THE WITNESS:  I don't know if I've -- I don't know if I've specifically talked about social media in these articles.  I'd have to go back to each of the articles to look at the language.

Again, we're talking 100 publications and multiple pages within those.  So I would -- it wouldn't surprise me if I had

Page 145

spoken about social media as part of the publications.

BY ATTORNEY LEHMAN:

Q.   As we sit here today, do you recall any peer-reviewed article that you published that speaks about social media?

A.   Well, again, when I think about speaking about social media, I think about it as a contributing factor to student mental health.

So I would say, in that sense, yes.

Q.   Okay.  Can you, as you sit here today, recall any peer-reviewed article that you published that specifically and explicitly names any social media platform from the -- of any defendant?

A.   As I sit here today, no.  My research and publications typically focus on comprehensive school mental health systems.

Q.   Now, the majority of your articles listed in your CV -- and this is

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

Page 33 to 65.

A.   Yes.

Q.   -- those are described as web-based articles.

Are --

A.   The majority of my articles are not web-based articles.

Q.   Okay.  Well, so this is a question that I have for you.

Because looking at your CV, and we can start on Page 33, the title there is, Web-Based Articles.

Do you see that?

A.   I see that on Page 33.

Q.   Right.  And that list, by my count, goes through Page 61, Number 426.

A.   Can I ask a clarifying question?

Are you looking at the August 1st copy of this or the --

Q.   I don't -- no.  The one I have is May 10th.

A.   Okay.  So I'm there.

So the list of web-based

Page 147

articles in what I'm looking at goes from Page 33 to 34.  And then it moves to major invited speeches.

Q.   Okay.  So, then -- all right.  Thank you.

So the major invited speeches start on Page 35?

A.   Correct.

Q.   All right.  And when you say a "major invited speech," what constitutes major?

A.   It's -- it's a term that's used in academia where you -- essentially if you're invited to give a talk or a speech, then it's listed here.

And so then it's broken down, as you can see, by local, national, international.

Q.   Is there such a thing as a minor invited speech?

A.   Well, I would say that I've done, you know, several informal discussions with school districts, for example, quality improvement,

Page 148

consultation, that kind of thing, that may not be listed as a major invited speech.

So there is kind of a -- you know, in academia, an understanding of a major speech under this category would be something that you're invited to present.

Q.   And are -- the web-based articles listed in your CV, are those peer-reviewed?

A.   So let me -- let me answer kind of in two ways.

So I do have a section on peer-reviewed journal articles.

Q.   Correct.

And my question is based on the articles that are listed under the subheading web-based articles.

A.   Okay.  All right.  So I'd have to look at these to see if these are peer reviewed or not.

So what I can say is that most of these would have gone through a -- in fact, all of them would have gone

Page 149

through a review process within the organization with which they were designed for the web-based articles.

The 100 or so peer-reviewed articles are listed elsewhere.

Q.   And so the web-based articles, although they may have gone through an internal review process within the organization, they are not, in fact, peer reviewed, correct?

A.   It depends what you mean by "peer reviewed."

Q.   Well, you have peer-reviewed articles separated out.

So what is the definition that you were using of "peer reviewed" in your CV?

A.   So the definition for these peer-reviewed articles are typically within a journal -- an academic journal that you submit for formal peer review.

And there's a peer-review process that's under an editorial board.

Q.   And so is it correct that

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

the web-based articles were not subject to that formal peer-reviewed process that you have just outlined?

A. That's correct. That would be typical in academic work, that you list your web-based articles that are not part of an editorial process in a separate section.

Q. Okay. What is your definition of social media?

A. So for the purpose of the opinions that I generated in the reports, I was -- under the umbrella of social media were the defendants' platforms; so the ones that we spoke about earlier.

Q. And so do you have a working definition of what constitutes social media other than the specific defense platforms?

A. Do I have a working definition? No. I considered social media in this case to be the defendants' platforms.

Q. Okay. Would you consider

Page 151

Twitter, or X, to be social media?

A. So for the purpose of this litigation, when I'm using the term "social media," I'm talking about the defendants' platforms.

Q. Okay. Do you see a distinction between the defendants' platforms and Twitter or X?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I'm not offering an opinion on the distinction between Twitter and the defendants' platforms.

BY ATTORNEY LEHMAN:

Q. Okay.

A. My understanding -- if I may just -- my understanding is they may, you know, share features. But I don't really have an opinion on the distinction between them.

Q. Okay. Do you see a distinction between defendants' platforms and Pinterest?

Page 152

ATTORNEY YEATES: Object to the form.

THE WITNESS: Again, I'm not offering an opinion on the distinction between the defendants' platforms and Pinterest.

BY ATTORNEY LEHMAN:

Q. Do you know whether or not Pinterest shares features with the defendants' platforms?

A. I do not know.

Q. Do you consider Discord to be social media?

A. Again, I'm not offering an opinion on that.

Q. Do you know if Discord shares features with defendants' platforms?

A. I don't know.

Q. Do you consider Substack to be social media?

A. I'm not offering an opinion on that.

Page 153

Q. Do you know whether Substack shares features with any of the defense platforms?

A. I don't -- I don't know.

Q. In your opinion, is there a difference between the defense social media platforms?

A. Is there a difference between the defense social media platforms? Sure. There are differences between the platforms.

Q. And what are the differences that are significant for your opinions?

A. So I didn't see my role as, you know, really looking at all of the specific features across every platform and the distinctions between them. But I did rely on other expert reports who really did do a deeper dive into some of the design features of the different platforms.

But if you're asking me, you know, for the details of each of the different platforms' features, that's not

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

something I offered an opinion on.

Q. Do your opinions apply equally to all of the defense social media platforms?

A. I'm not sure I know how to answer that question.

Do my opinions apply equally? I didn't necessarily think about them as -- I didn't parse out an opinion and it's, you know, 20 percent YouTube and 30 percent, you know, Meta, et cetera. So I didn't think about it that way.

So it applies to the defendants' platforms -- the opinions that I offer apply to the defendants' platforms.

Q. Have you ever used any of the defendants' social media platforms or apps?

A. I have.

Q. Which ones?

A. Sorry. Hold on. Mike fell off, if you couldn't see.

Page 155

So I would have used YouTube, Instagram. I would have used Facebook, under Meta. I have very lightly used Snapchat.

So -- and then which did I not say?

Q. Have you ever used TikTok?

A. Again, very lightly. Yeah.

Q. When you say that you have "lightly" used TikTok, what does that mean?

A. So I think that I may have downloaded an app and looked at videos on it. And I've seen -- you know, so I've seen kind of that interface, the platform.

But it's not something that I use regularly. And I honestly can't think of the last time I would have looked at it.

Q. Have you ever signed up for an account on TikTok?

A. Probably. But honestly, I don't know.

Page 156

Q. Can you say that you spent more than an hour looking at TikTok?

A. Maybe. I think it has that continuous thing where you just -- it kind of keeps you engaged.

Q. So when you say "maybe," does that mean you're not sure how much time you've spent on TikTok?

A. Yeah, I'm not sure. If you're asking me the number of minutes I've spent on TikTok, I absolutely could not tell you that.

Q. Have you looked at the interface from TikTok more than once?

A. I would think so, yeah. Yes.

Q. When was the last time you looked at TikTok?

A. As I said, I'm not sure the last time I looked at it.

Q. When you said that you have used Snapchat lightly, what does that mean?

A. So I believe I may have

Page 157

downloaded it. And I'm not sure if I have an account. I think, actually, yes, I do have an account, because I was engaging with it at one point. So I remember seeing some of the features of Snapchat.

But when I say use it lightly, I haven't used it in a long time, as far as I know.

Q. Has it been more than a year since you used Snapchat?

A. I don't know.

Q. How often do you use YouTube?

A. I would say that I use more regularly. So that may be something I use, you know, at least during the course of a week.

Q. And during a week, how much time, on average, would you spend on YouTube?

A. I have no idea. I think oftentimes we underestimate the amount of time that we spend on social media.

40 (Pages 154 - 157)

CONFIDENTIAL

Page 158

Q.   When was the last time you were on YouTube?
A.   I don't know.  It may have been as recently as yesterday, but I'm not sure.
Q.   What did you look at if -- the last time you were on YouTube?
A.   I'm not sure, to be honest with you.  I can't recall the exact content that I looked at.  Maybe a newscast.
Q.   When you -- when you go on YouTube, is that what you usually look at, newscasts?
A.   No, not necessarily.
Q.   Is there any particular type of video that you like to watch on YouTube?
A.   I think I've watched different things on YouTube.  So it's not that I like a particular thing or not.  I've viewed different things on YouTube.
Q.   And when was the last time you were on Instagram?

Page 159

A.   Probably within the last week.  I often have used it, really, as a way to attempt to monitor kids' -- my kids' own use.
Q.   Meaning your offspring?
A.   My off -- well, my children, yes.
Q.   Okay.  I just wanted to clarify that it wasn't --
A.   Not my students?
Q.   Correct.
And do you have an Instagram account?
A.   Yes, yes.
Q.   How often do you go on Instagram?
A.   I don't know.
Q.   When was the last time?
Oh, you already told me that.
A.   Didn't you just ask me that?
Q.   I did.  Sorry.
A.   That's okay.
Q.   When was the last time you

Page 160

were on Facebook?
A.   It would have been within the last week, probably.
Q.   How often do you use Facebook?
A.   I've tried to limit my use, so -- but I would say it varies over time.
So it may be regularly.  Over the course of a day or week, I might, you know, open it on occasion because I have it on my phone.  So it's there and it's easy to open.
Q.   When you go on Facebook, how much time do you usually spend?
A.   I've set limits on myself because of some of the features on it that are, you know, perpetually engaged.
So I spend, I think my -- the limit I set on there is no more than 20 or 25 minutes in a day.  You know, they have -- so.
Q.   And what do you typically look at when you go on Facebook?

Page 161

A.   It depends.  I mean, it's -- you know, the feed kind of feeds you certain things and so there's -- I certainly, you know, see advertisements or things that are fed to me on a feed.
I also will look at, you know, pictures of friends and colleagues.
Q.   Are there any other social media platforms that you use other than the defense platforms that we just discussed?
A.   Can you identify which platforms you're talking about?
Q.   Sure.
A.   That's hard for me to --
Q.   Do you use any programs such as Twitter, or X, LinkedIn?
A.   So I don't necessarily -- so do I use Twitter and X?  I have used Twitter and X before.  I used it more frequently at one point, and then, really, I can't think of the last time I've been on it.
And then what was the other

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

one you asked about?

Q.   LinkedIn.

A.   Oh, I have a LinkedIn account.

Q.   How often do you use LinkedIn?

A.   I would say maybe every couple of weeks or so.

Q.   Do you have a Substack account?

A.   I think I did create a Substack account, yes.

Q.   When was the last time you used Substack?

A.   In fact, I think I used it yesterday, because I had -- for the first time in I don't even know how long, I don't know that I had used it before that -- but I had a friend who -- yes, I had somebody who engaged me in a Substack account, and I opened it.

So I recall that.

Q.   When you say they "engaged" you in a Substack account, what does that

Page 163

mean?

A.   It means their husband had an accident.  So they were informing me about it.  They were creating a blog about that.

Q.   Have you conducted any research specific to any of the defense platforms?

A.   No.  That's not my role is -- to conduct research on the defense platforms.

What I do conduct research on is school mental health.

Q.   Have you examined the extent to which the harms you describe in your report result from students' use of defendants' platforms as opposed to other digital media?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, you know, in forming the opinions for this report, I relied on a number of sources, including the

Page 164

peer-reviewed literature and including expert reports.

And within the expert reports specifically, and within the peer-reviewed literature, those did look specifically at the defendants' platforms, yes.

BY ATTORNEY LEHMAN:

Q.   And so when you say "they looked specifically at the defendants' platforms," what article or articles would you refer me to as you -- that are unique to TikTok that you relied on?

A.   I'd have -- I mean, you would have to present -- I'd have to go back to all the articles again.  I cited probably well over 100 in review articles consistently.  So I don't know that I could point you to a specific article.

But if you'd like me to look at all my articles --

Q.   Well --

A.   -- and go back through, I'm happy to.

Page 165

Q.   Well, we're certainly -- we're certainly going to look at specific articles.

But would it be accurate, then, that as we sit here, without me walking you through each individual article, that you're not able to identify specific articles that relate to your opinions that are specific to any individual defense platform?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I think that's a really, frankly, confusing way to ask it.  Because the majority, I would say, of -- or most -- many of the articles that I looked at and that -- that I looked at or that -- excuse me, the plaintiff experts that I reviewed -- looked at were specifically referring to the defendants' platforms.

And so, you know, when I think about the -- the Telzer's

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

report, for example, and some of the other information I looked at, the defendants' platforms were clearly the most predominantly used social media platforms of young people.

So the research that I looked at on the social media platforms very consistently were specific to the defendants' platforms, if that makes sense.

BY ATTORNEY LEHMAN:

Q. Okay. And so my question is just a little bit different, right.

So I'm not talking about research that looks globally at the defense platforms. I'm looking at any effort to individually examine a single defense platform.

And so my question is, as you sit here today, for any individual defense platform, can you identify a peer-reviewed study that identifies the harms unique to that platform as opposed

Page 167

to social media writ large?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I believe I've already answered that, that I'd have to go back to every specific article to look through to see if they actually looked at specific, you know, distinct platforms.

But, again, the literature that I looked at did look at -- and some of them looked at one platform or two platforms, to my recollection.

But, again, I'd have to go back to the articles to see which platforms they were specifically looking at.

BY ATTORNEY LEHMAN:

Q. All right. You mentioned before that you have children.

How many children do you have?

Page 168

A. I have three children.

Q. How old are your children?

A. They are 17, 19 and 21.

Q. Do any of your children use social media, the defense platforms?

A. They do.

Q. Which children?

A. All three of my children.

Q. All right. Have you ever forbidden any of your children from using social media?

A. Yes.

Q. Tell me about that.

A. Tell you about forbidding my children to use social media?

Q. Yes.

A. Do you mean what the process was or --

Q. When did it happen? Why did it happen?

A. So --

ATTORNEY YEATES: I would just sort of object to this line of questioning to the extent that

Page 169

you're uncomfortable.

If you're comfortable talking generally. But I don't think you need to go into the specifics of, you know, each of your children and the conversations you've had with them.

THE WITNESS: Yeah, that's helpful. Because I don't, you know, tend to talk about my children in, you know -- so I can tell you generally that we have put in place different mechanisms, whether it's the plastic phone box where we keep it out of their bedrooms at night or the, you know, disallowing it at the dinner table or when they have friends over, or waiting until certain ages for them to be able to use the defendants' platforms.

So in -- so we've done several things to limit their use.

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

BY ATTORNEY LEHMAN:

Q.   At what age did you allow your children to use the defense platforms?

A.   I can't give you a specific age.

Q.   Have any of your children ever received a mental health diagnosis that you attributed to social media use?

A.   So is this the point that I can say that I would prefer to --

Q.   Well, I -- I would tell you, as -- as the defense lawyer who is asking these questions, I think -- I think it's a fair question.

So I would ask that you answer it.

ATTORNEY YEATES:  My position is that any mental health diagnoses of her children are not relevant to this litigation.

ATTORNEY LEHMAN:  They go directly to bias.  So if you want to take that to the judge, we can

Page 171

argue it.

BY ATTORNEY LEHMAN:

Q.   Or you can just answer the question.

ATTORNEY YEATES:  If you're not comfortable talking about your children's mental health, then I think we can take that to the judge.

THE WITNESS:  Yeah, I mean, I just think it's -- it feels like it goes beyond what I'm typically comfortable speaking about in a public forum.

ATTORNEY LEHMAN:  All right.  Then we will make a note about that and address that with the court.

BY ATTORNEY LEHMAN:

Q.   Do you agree that there is a difference between the amount of time that a user spends on social media depending on the content that they're looking at?

Page 172

A.   Sorry, can you rephrase the question?

Q.   Yes.

Do you agree there's a difference between -- do you agree there is a difference in the nature of a user's experience on social media depending on the content that they are reviewing?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I'd have to understand what you mean by "nature."

I mean, if they're looking at one thing versus another, might their experience be different?

Yes.

So it's a general -- it's a pretty broad question, so.

BY ATTORNEY LEHMAN:

Q.   Do you agree that every individual has a unique and personal experience on social media?

ATTORNEY YEATES:  Object to

Page 173

the form.

THE WITNESS:  I would agree, in general, people's experiences are unique and individual, whether they are walking in the park or looking at social media, so.

BY ATTORNEY LEHMAN:

Q.   Are you offering an opinion about any single individual's experience on social media in this case?

A.   So I'm offering an opinion about the impact of social media on students and on schools.  So I'm not focusing on one specific individual.

ATTORNEY LEHMAN:  Can we look at Tab 7, please?  And we will mark this as Exhibit Number 23.

- - -

(Whereupon, Exhibit Hoover-23, No Bates, American Psychological Association Health Advisory on Social Media Use in Adolescence, was marked for

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

identification.)
- - -
BY ATTORNEY LEHMAN:

Q. Can you confirm that I've handed you, and that we're showing on the screen, the publication from the American Psychological Association entitled, Health Advisory on Social Media Use in Adolescence?

A. Yes.

Q. Are you a member of the American Psychological Association?

A. Yes.

Q. How long have you been a member?

A. I'd have to look at my CV, if you want the exact dates.

So 1996.

Q. Have you been a member of the American Psychological Association continuously since 1996?

A. It's hard to say. I mean, I believe so. Did I let membership lapse and have to renew it? Possibly. But

Page 175

yes, essentially.

Q. Have you ever served as an officer in the American Psychological Association?

A. No.

Q. Have you ever been asked to serve on a committee?

A. Have I been asked to serve on a committee? I don't recall being asked, but I get asked to serve on a lot of committees, so.

Q. Have you ever, in fact, served on a committee for the American Psychological Association that related to social media?

A. I don't think so, no.

Q. Do you agree that the American Psychological Association is a well-respected organization?

A. I would say that there are many in the field who respect the American Psychological Association. Yeah, that's reasonable.

Q. All right. If you will turn

Page 176

to Page 3.

And looking under Section A, do you see that it says, Social media is not inherently beneficial or harmful to young people?

A. I see that.

Q. And do you agree with the American Psychological Association that social media is not inherently beneficial or harmful to young people?

A. I would not --

ATTORNEY YEATES: Dr. Hoover, I would just let you know this is a long document, so if you need to take a chance to take a look through it, you're welcome to do so.

THE WITNESS: So I'm happy to look through the document.

But with respect to that one statement, are you asking do I agree with the American Psychological Association that it's not inherently beneficial or

Page 177

harmful? I wouldn't agree with that statement outright in the -- you know, absent the context -- absent the context of actually reviewing this entire document.

BY ATTORNEY LEHMAN:

Q. Okay. Why would you disagree with the statement that social media is not inherently beneficial or harmful?

A. Because what I would say is that based on my review of the literature and based on my review of expert reports who really looked into the impacts of social media, there is overwhelming evidence of the harms of social media to young people's mental health and -- and to the school environment.

So, no, I think that this statement itself, taken kind of outside of -- out of context is -- you know, could be misleading.

It would suggest that -- it could suggest, oh, it's not -- it's not

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

harmful to young people. And I would wholeheartedly disagree with that, based on the literature and the science at this point.

Q. And do you agree that for some adolescents that social media use is beneficial?

A. So, you know, frankly, it's not what I hear on a regular basis when I'm working with schools. I'm not hearing about the benefits. I'm hearing about the harms of social media.

And when you look to, you know, again, the literature what you're typically seeing are the harms and the, again, overwhelming evidence around those.

Is there some discussion in the field about potential benefits of social media? Yes. You know, just -- yes, there's some discussion in the field about that, that there's, you know, potential benefits of social media.

Do they negate or outweigh

Page 179

the harms and risks of social media? Absolutely not.

Q. Well, let's keep looking at -- and I want to look at some specific statements in this document. But let's stay in Paragraph A.

All right. Do you see there it says, quote, In most cases, the effects of social media are dependent on adolescents' own personal and psychological characteristics and social circumstances, intersecting with the specific content, features or functions that are afforded within many social media platforms?

A. I see that, yes.

Q. And do you agree that the impact of social media is dependent on the adolescent's own personal psychological characteristics, including the content that they view on social media?

ATTORNEY YEATES: Object to the form.

Page 180

THE WITNESS: So, you know, again, based on my review of the literature, my review of expert reports, my interactions with adolescents and families and with schools, I would say that, first of all, it's very hard to divorce the content from the features.

And, actually, I'd say what I've seen more of is that the features themselves are actually what are really kind of interfering with young people's mental health and with the school environment.

So I think your question was asking specifically about content and if that's what's involved here. And I would tend to actually agree with the later part of this statement, which is that the features or functions that are afforded on social media platforms are problematic.

Page 181

BY ATTORNEY LEHMAN:

Q. Okay. Would you agree with the American Psychological Association where it says, The effects of social media likely depend on what teens can do and see online, teen's pre-existing --

A. I'm sorry, we're at the next sentence?

Q. The next sentence.

-- the teen's pre-existing strengths or vulnerabilities and the contexts in which they grow up?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So just give me a minute to look at this.

So the effects of social media -- so I wouldn't agree with it as it's stated. Because I think it's saying it likely depends on this.

But, actually, I think that there's significant research that says that -- that demonstrates

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

that actually independent of content, young people's mental health is harmed and the school environment is harmed.

So, actually, I don't agree with how it's stated here, no.

BY ATTORNEY LEHMAN:

Q. What research is that, that you're referencing, that demonstrates that harm is independent of content?

A. So, again, if you are asking me to cite specific studies, which I did in my report, I'm happy to go back and look through the specific studies.

But I did cite studies that speak specifically to -- and I looked at the expert reports who actually dove into this much more deeply, where they look at, in the absence of contact -- content, rather, that it's actually the features that are driving some of the harm.

And what I can tell you is that regardless -- when I think about the work that I do in school environments,

Page 183

for example, regardless of the content, it is that compulsive checking of the phones, the social media platforms. It is the -- kind of the need to know, whether content, whatever that content is, is, you know, engaged in by peers, et cetera.

So I derive that kind of response, really, more from the research and from my experience in the field.

Q. Okay. And so separating other expert reports that you have reviewed, right. So we will depose them about their opinions.

My question to you is, as we sit here today, can you identify any peer-reviewed article that separates content from features to identify what caused the harm?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So a couple of things.

First of all, my opinions

Page 184

are informed, in part, by the other expert reports. So if you're asking me to, you know, kind of forget what I, you know, read and understood from those reports, it's going to be hard to do.

And I would have to go back to the -- each specific article to know which ones it was that actually -- you know, which ones referenced content in the absence of the features, or that separated it out, as you put it, I think.

BY ATTORNEY LEHMAN:

Q. Let's go down to -- stay on the same page, let's look at F.

A. Okay.

Q. And we're going to look in the middle of the paragraph, about roughly eight lines up. It says, Second. All right.

Do you see where it says, Second, long-term, i.e., multi-year

Page 185

longitudinal research often is unavailable; thus, the associations between adolescents' social media use and long-term outcomes, i.e., into adulthood, are largely unknown.

Did I read that correctly?

A. I don't know if you read it correctly. But I see the sentence, yes.

Q. Well, do you agree with the American Psychological Association that associations between adolescents' social media use and long-term outcomes are largely unknown?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I don't agree with that statement. I think that there has been research that has looked, longitudinally, at young people's experience over time. You know, have the platforms been around long enough to look longitudinally at all adolescents' experiences over time

47 (Pages 182 - 185)

CONFIDENTIAL

Page 186

into adulthood, as its referencing in this? Perhaps not.

But I don't agree with this statement that longitudinal research is often unavailable. I think it's, actually, an odd statement.

There is available longitudinal research. So I think we do have information about the impacts on adolescents beyond their first use of social media, if that makes sense.

BY ATTORNEY LEHMAN:

Q. Okay. Let's turn to Page 4. And I want to look at the fourth bullet here.

And do you see here that the APA says, quote, Social media may be psychologically beneficial, particularly among those experiencing mental health crises or members of marginalized groups that have been disproportionately harmed in online contexts?

Page 187

Do you see that?

A. I do see that.

Q. And do you agree that social media may be psychologically beneficial, particularly among those who are experiencing mental health crises?

A. I don't have evidence to suggest that that's the case.

In fact, I think it can be very risky for those who are experiencing mental health challenges.

Q. So you actually think that what the APA is recommending here is, in your words, risky?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I was referring to this specific sentence. You're talking about recommendations. I think I would have to review the whole document.

But if you're asking me about this specific sentence, I think I stated the answer.

Page 188

BY ATTORNEY LEHMAN:

Q. Let's look at the top of the page.

Do you see where it has the word "recommendations"?

A. So this is the top of Page 4?

Q. Yes. This is the page we're looking at, Page 4.

A. Okay. Yes. I see that.

Q. All right. And then do you see the recommendation underneath that, where it says, quote, Youth using social media should be encouraged to use functions that create opportunities for social support, online companionship and emotional intimacy that can promote healthy socialization.

Do you see that?

A. I do see that.

Q. Now, do you agree that one of the potential benefits of social media use is that active use on social media can allow adolescents to actually

Page 189

communicate with others and build social networks?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So what I would say is that may be something that adolescents attempt to use social media for. And while they do that, they are being exposed to risk.

I mean, it's just -- you know, it's like adolescents may attempt to form, you know, connectedness by joining a group where they're smoking tobacco, right. And that doesn't mean that it's not inherent with risks, so.

ATTORNEY LEHMAN: Let's look at Tab Number 19.

BY ATTORNEY LEHMAN:

Q. All right. Can you confirm this is an article entitled, What is Driving Youth Mental Health Problems? It's Not Just About Social Media, from

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

Education Week?

A. Yes.

Q. And this is an article by Arianna Prothero, dated November 29th, 2023?

A. Yes.

Q. And do you remember being interviewed by Ms. Prothero for this article?

A. So I get interviewed for a lot of things.

Do I remember this specific interview? Not necessarily. But I believe I was interviewed for this.

Q. All right. And if you -- if you turn to Page 3 of 7, do you see it says, In a recent conversation with Education Week, Hoover, who is also a co-director of the National Center for School Mental Health, explained why adults tend to focus on social media-related causes of mental health problems and what other factors educators should be attuned to?

Page 191

A. I do see that, yes.

Q. And do you remember that that was part of your conversation with Ms. Prothero for this article?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So what I recall is that Ms. Prothero was trying to understand kind of how adults and young people attribute mental health -- what -- what, you know, young people and adults attribute youth mental health issues to.

BY ATTORNEY LEHMAN:

Q. So let's -- let's look at the first paragraph on this page -- or, sorry, we'll start with, But it's oversimplifying.

A. Uh-huh.

Q. Do you see here you're reported as saying, But it's oversimplifying the issue to say that social media is the root cause of youth

Page 192

mental health problems, say experts such as Sharon Hoover, a professor of child and adolescent psychiatry at the University of Maryland School of Medicine. Hoover and others argue that fixating on just one variable such as social media as the cause of mental health problems is counterproductive.

Do you see that?

A. I do see that.

Q. And do you agree with the statement that you previously made in 2023 that focusing on just one variable, such as social media as the cause of mental health problems, is counterproductive?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I don't think this is a direct quote, first of all. It's not stated as a quote.

But do I think that -- you know, I stand by the statement or

Page 193

the concept that if one were to only focus on one factor as being the only cause of mental health issues in young people, that that may be an oversimplification.

That's consistent with what I've said, that there are other factors that may contribute to youth mental health problems.

I believe also later in that article I speak about the negative impacts of social media on youth mental health.

BY ATTORNEY LEHMAN:

Q. Well, you do talk about social media. And so I want to turn to Page 5. So this is 5 of 7.

And we're going to look at the second paragraph starting, I don't.

And there you do acknowledge that there can be harms from exposure to social media.

But what I want to focus on is I want to look at the last sentence.

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

There it says, Versus what teens may be more attuned to, which is active use of social media where they are actually finding the benefits, like communicating with others, building social networks.

Do you see that?

A. Yes.

Q. Okay. And you agree that in your interactions with teenagers that they report actually finding benefits to social media, such as communicating with others and building social networks, correct?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Actually, I think what I'm speaking to here was what Ms. Prothero was asking about specifically.

So this was not me reporting that I identified these benefits. I think she was saying, if teens, you know -- and, again, I'm -- you're asking me to remember an

Page 195

interview that was a couple of years ago.

But I think she was pointing out that teens may have identified these. And I was saying -- peers versus what teens may be more attuned to, which is the -- what they may be perceiving as benefits.

So I'm just -- sorry. I'm just trying to reread this statement here.

Yeah. So I think I was acknowledging that teens may be looking at other -- other factors of social media use. So I don't think, again, that it's contrary to what I said.

BY ATTORNEY LEHMAN:

Q. Okay. Well, and we can -- why don't we turn back to Page 3 of 7, because I just want to be clear.

This is not just an article where you're quoted once. This is

Page 196

actually an interview. And we can see down at the bottom of what's on the screen, it says, The interview has been edited for length and clarity, correct?

So this isn't just an article where you're quoted once. This is actually an article summarizing an interview with you, correct?

A. Let me just look through.

ATTORNEY YEATES: Object to the form.

THE WITNESS: Yeah, it appears to be, based on that statement. Yep.

BY ATTORNEY LEHMAN:

Q. Okay. All right. And if we turn back to Page 5, and I want to look at the last paragraph here -- I'm sorry -- yeah. The last paragraph.

And it says, quote, The other piece is that sometimes when we do this, when we look to blame one thing, social media or homework, we end up with and all -- with all-or-none solutions

Page 197

that don't recognize the complexity of each of these issues. So, for social media, there is harm caused by certain types of exposure, but there's also benefits.

Did I read that correctly?

A. I think that's what's stated here, yes.

Q. Okay. And as we sit here today in 2025, do you agree with the statements that you made in this interview in November 2023, that looking to blame one thing, whether it's social media or homework, that you end up with solutions that don't really recognize the complexity of mental health issues?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So what I would say is that I don't think any mental health professional, including me, would only blame one thing for child mental health issues.

50 (Pages 194 - 197)

CONFIDENTIAL

Page 198

So I think that what I said here makes sense. That if you only blame one thing, whether it's homework or something else, or social media in this case, that you would not recognize the complexity of youth mental health.

And I do, again, in this article, speak about the harms of social media as one of the significant contributing factors to youth mental health.

BY ATTORNEY LEHMAN:

Q. And do you agree in 2025 with the statement that you made in 2023 that social media, although there may be harm, there are also benefits?

A. So what I would say, which is what I've said before, is that some young people and, you know, some people in the field may say that there's benefits of -- you know, that I've found -- I think I've said here, you know, that there are certain types of

Page 199

exposure where they may be trying to identify a connection, for example.

I think when there's benefits of something in the context of significant public health harm, you focus on the harm. And it's not to suggest that there may not be some benefits.

But, again, you know, I think about the analogy of smoking, where if you asked adolescents, do I feel, you know, more comfortable or more included in a group where they're vaping or smoking, just because they recognize it as a benefit doesn't mean that it's not something that's incredibly harmful to them.

Q. Just so we don't lose my question.

You agree that there can be benefits to social media, correct?

ATTORNEY YEATES: Object to the form. Asked and answered.

THE WITNESS: I was just about to say, I think I've already

Page 200

answered that.

That I think that some adolescents, for example, might, you know, identify that they are feeling, you know, a benefit of engaging with social media. And that in no way negates the harms that they may be exposed to.

BY ATTORNEY LEHMAN:

Q. Are you offering the opinion that all adolescents are harmed by social media?

A. No. I mean, we have a lot of adolescents -- well, not so many these days, but some that don't use social media. So I think it would be unfair to say that all adolescents.

But what I will say is that, you know, again, I'm working in schools and with schools. And so even those who aren't using, unfortunately, are now impacted by their peers who are using social media.

So, you know, it's --

Page 201

it's -- the argument can certainly be made that if peer -- if adolescents are engaging with peers who are using social media, even if they're not using it, they are impacted by the classroom disruptions and by the -- you know, the kind of viral things that are happening in their school context that are, you know, fed by these platforms.

Q. All right. Do you agree that content on social media can be educational?

A. So you'd have to give me a specific example.

But can content that is on a platform -- on a social media, on one of the defendants' platforms, could it be educational?

Q. Yes.

A. Could be.

Q. Do you agree that material that is on social media platforms can be motivational?

A. I'm not sure.

51 (Pages 198 - 201)

CONFIDENTIAL

Page 202

Q.   And I want to -- I apologize that I didn't ask this before.

ATTORNEY LEHMAN:  I want to go back to the article that we were just looking at from Education Week, and I need to mark this as Exhibit Number 24.

- - -

(Whereupon, Exhibit Hoover-24, No Bates, What Is Driving Youth Mental Health Problems? It's Not Just About Social Media, Prothero, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q.   And my other question for you is, in this article, when you were talking to the reporter, Ms. Prothero, how did you define social media?

A.   I'm not sure. I'd have to go back and look through the whole article.

Q.   Okay. Well, at that point

Page 203

when you were talking to Ms. Prothero, you didn't confine or make your definition consistent with just the four defense platforms, correct?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So it doesn't look like I offered a definition of social media.

What I can tell you is that the -- since you've asked about the four defendants' platforms, those are, you know, by the work that I do with students and schools, the ones that are most often brought up and used.

So can I speak to, you know, the exact definition? No, because there wasn't one offered here. When I speak about social media, it's talking about the platforms that young people are using, and those happen to be the defendants' platforms.

Page 204

BY ATTORNEY LEHMAN:

Q.   Are you aware that there is material on the defense social media platforms that actually supports mental health?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  You'd have to point me to specific information that you're speaking about.

BY ATTORNEY LEHMAN:

Q.   Okay. Are you aware that content can be delivered in different ways depending on the specific platform?

A.   I don't claim to be expert in all the delivery mechanisms of the defendants' platforms. So it's hard for me to answer that.

I imagine that they might be delivered differently.

Q.   When did you personally form the belief that social media can harm adolescents?

A.   When did I personally form

Page 205

that belief? That's an interesting question.

I mean, I think, you know, frankly, it would be impossible for me to put a date on it, right. But I would say that it's -- it's been pretty clear, as we've seen more and more young people engaging with social media, that it's harmful.

So it's a hard question to answer because I think you're asking for a specific date or time period that I established an opinion on this or -- and I couldn't do that. If that's what you're asking for.

Q.   Can you recall the first time that you publicly expressed concern about social media's impact on mental health?

A.   Oh, well, when you say publicly, I mean, again, I'm working in public with schools all the time.

So if you're saying if it's something, you know, on the record

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

versus -- I mean, publicly, I would have been talking about this with schools for at least a decade.

Q. And was that -- was that belief influenced by any specific event or study or personal experience?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Event, study or personal experience? I mean, as you would imagine, as director of the National Center for School Mental Health, who's worked with about every state and hundreds of school districts, there are lots of events that -- you know, where social media comes up.

So is it one specific event that informed that opinion? No. It's lots of information and interactions that I have with schools and districts.

ATTORNEY LEHMAN: I am turning to a new topic, I just

Page 207

wanted to check in. Do you need a break? I didn't know what the plan was for lunch, because it's noon.

ATTORNEY YEATES: Okay. Let's take a break, and I'll check on the lunch.

VIDEO TECHNICIAN: The time is 12 o'clock p.m., and we are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN: The time is 12:16 p.m., and we are on the record.

BY ATTORNEY LEHMAN:

Q. We spoke earlier about your testimony before Congress.

ATTORNEY LEHMAN: So I want to look at that. And we'll mark these next two exhibits as 25 and 26.

Page 208

- - -

(Whereupon, Exhibit Hoover-25, No Bates, Written Testimony Submitted to the United States Senate Committee on Finance For the Full Committee Hearing, was marked for identification.)

- - -

(Whereupon, Exhibit Hoover-26, No Bates, Written Testimony Submitted to the United States Senate Committee on Health, Education, Labor, and Pensions (HELP) For the Subcommittee on Children and Families Hearing, was marked for identification.)

- - -

ATTORNEY LEHMAN: So if we can start with Tab Number 21.

BY ATTORNEY LEHMAN:

Q. And can you confirm this is your written testimony submitted to the United States Senate Committee on Finance for the full committee hearing?

Page 209

A. Yes. It appears to be my written testimony.

Yes. There it is at the top. Sorry, I was making sure it wasn't my oral testimony. So, yes, I can see it was my written testimony.

Q. And this was testimony you gave on February 15th, 2022?

A. Yes.

Q. And the topic here is protecting youth mental health?

A. Yes.

Q. All right. And you testified about rising youth mental health needs, correct?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I'd want to refresh my memory on exactly what I spoke to.

So it looks like the topic was protecting youth mental health and identifying and addressing barriers to care. So this was for

53 (Pages 206 - 209)

CONFIDENTIAL

Page 210

the finance committee.

And I'm just looking.

So I was speaking specifically to barriers to care.

So if you're speaking about something specific, let me know.

BY ATTORNEY LEHMAN:

Q. Well, certainly, you were talking about factors that impact student mental health and the care that is available to those students, correct?

A. I have to go through to see where I spoke about factors that contribute to mental health.

Q. Well, let me ask you this: In this testimony before Congress on February 15th, 2022, did you mention social media at all?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I'll have to read through the testimony to see if I mention social media.

It looks like I was speaking

Page 211

more about what systems need to have and what policies need to be in place, not about -- I wasn't -- I wasn't really speaking about the contributing factors to youth mental health, upon my quick read of this.

BY ATTORNEY LEHMAN:

Q. Okay. You did not take the opportunity of your February 15th, 2022, testimony to the Senate committee on finance to at all address social media, correct?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So let me just be clear about what happens when you go testify.

So, for example, for this committee, I was being asked to speak specifically about the topic at hand, which looks like identifying and addressing barriers to care. And I would

Page 212

have been, probably, asked to speak specific to comprehensive school mental health systems and what needs to be put in place for that, which it looks like I did, as well as what are some of the policies that need to be put in place to increase access to school mental health services.

So -- and then, you know, we spoke about, because it's a finance committee, what are some of the financing mechanisms to do that.

BY ATTORNEY LEHMAN:

Q. Okay. And none of the policies that you recommended during your testimony in February 2022 related to social media, correct?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I can go back to the policies.

So what I would say, just in

Page 213

my view of looking at the policies, is that I'm talking about different aspects of school mental health promotion and prevention policies, as well as intervention and treatment policies.

It wasn't really specific to factors that contribute to mental health.

BY ATTORNEY LEHMAN:

Q. Okay. And just so we're clear, when you talked about the different aspects of school mental health, including promotion, prevention policies, none of those policies related to social media, correct?

A. I disagree with that, actually, I think.

Q. Okay. Then tell me -- tell me where -- what page -- we're looking at a five-page written testimony, where does -- where is social media referenced?

A. So --

54 (Pages 210 - 213)

CONFIDENTIAL

Page 214

ATTORNEY YEATES: Object to the form.

THE WITNESS: So the question you asked, I believe, was -- and maybe we need to go back to the question.

But as I understood your original question, it was, do the policies that you recommended relate to social media? And I would say -- in fact, I probably want to look at -- through each and every one of them, but just even the first few here, I would say, absolutely do.

BY ATTORNEY LEHMAN:

Q. Okay. So let's, as a starting point, point me to where the phrase "social media" or the name of any social media platform appears in this testimony.

A. So I can go word by word. But I don't think that the term "social media" or the platforms need to be named

Page 215

for the policies to be related to social media or the defendants' platforms.

So, for example, if I'm suggesting the requirement of indicators for student mental health and well-being, and we know, from the body of literature and from our experiences working in and with schools, that social media is related to student mental health and well-being, then when we're requiring a selection of indicators, or recommending that, it would be related to social media.

So when you're speaking in front of a Senate finance hearing committee you have limited time. And so you also know that they're going to read, you know, the precise recommendations.

And so the absence of naming a single platform, for example, does not suggest that it's not related to the platforms or to the policies recommended.

Q. As you crafted your policy recommendations that you submitted to the

Page 216

Senate, both orally and in writing, were you careful to specifically address the most important policies that you wanted the Senate to adopt?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So when crafting the policies, I would have likely considered the policies that I thought were most pertinent to the Senate Finance Committee with respect to identifying barriers and facilitators to school mental health.

BY ATTORNEY LEHMAN:

Q. So that would -- that included, for example, to require a selection -- require the selection of indicators of student mental health and well-being, incentivize teacher education programs, establish mental health as a required component of the curriculum; those were the types of recommendations

Page 217

that you made, correct?

A. Those are three of the list of recommendations that I made, that's correct.

Q. Okay.

ATTORNEY LEHMAN: Let's turn now to Tab Number 22, and we'll mark this as Exhibit Number 26.

BY ATTORNEY LEHMAN:

Q. All right. And can you confirm that this is your written testimony submitted to the United States Senate Committee on Health, Education, Labor and Pensions for the Subcommittee on Children and Families hearing on November 27th, 2022?

A. Yes.

Q. And here the topic was, Caring for Our Kids: Supporting Mental Health in the Transition From High School to College?

A. That's correct.

Q. And your testimony here is a little bit lengthier.

55 (Pages 214 - 217)

CONFIDENTIAL

Page 218

Do you know how much time you had to testify?

A. Well, so let me be clear. This is the written testimony. So that doesn't suggest that my time to testify is actually lengthier than the time I had to testify for the other document you referenced, because that was written testimony.

Q. How much time did you have for oral testimony in November of 2022?

A. I don't recall the exact number of minutes.

Q. And how much time did you have to testify when you testified in February of 2022?

A. I don't recall the exact number of minutes.

Q. Okay. Is any social media platform, or even social media generally, referenced in your testimony from November 27th, 2022, to Congress?

A. I'd have to read through the document. It's multi -- multiple pages.

Page 219

So I'm happy to read through it.

So I've seen one so far on the second page.

Q. Second page?

A. Uh-huh.

Q. Where does -- tell me where.

A. Tell you where it references -- so it says, Make environments more nurturing in three of four ways. And one of those is, Monitoring and setting limits on influences and opportunities to engage in problem behavior.

Q. All right. Where does it call out either social media generally or one of the platforms?

A. Well, when -- it doesn't call out one of the platforms.

And as I said earlier, you wouldn't necessarily -- the absence of naming a platform in this context would not suggest that it's not pertinent here.

So when I'm talking about monitoring and setting limits on

Page 220

influences and opportunities to engage in problem behavior, I -- most people who are working with young people and who are working in schools would recognize that social media is a part of that.

Q. Well, if you look at the bullet point above that, you specifically call out -- in what you describe as socially and biologically toxic conditions, you call out poor nutrition and housing insecurity.

Do you see that?

A. I do see that.

Q. So there you call out two specific instances.

Can we agree that not all adolescents suffer from poor nutrition or housing insecurity?

A. So not all adolescents suffer from poor nutrition and housing insecurity.

Q. Okay. So given that not all adolescents suffer from poor nutrition and housing security. But I understand

Page 221

you to have told me that social media is harming every adolescent.

There is no place in this testimony where you actually call out, like you do poor nutrition and housing insecurity, a social media platform, do you?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So to be clear, I think it's well understood by -- by the readers of this and by the Senate hearing that I was speaking to that social media is causing harms.

In the case of providing the context of poor nutrition and housing insecurity, it was likely because I thought they might not understand what biologically toxic conditions would be, so I was giving an illustrative example.

I think the third, Monitoring and setting limits on

56 (Pages 218 - 221)

CONFIDENTIAL

Page 222

influences and opportunities to engage in problem behavior -- you asked if I referenced social media; to me, that's a clear reference.

BY ATTORNEY LEHMAN:

Q.   So are there any other -- any other references where the actual phrase "social media" or the name of a platform is used?

A.   I'd have to read through the document.

So, again, on Pages 3 and 4, we're referencing -- I'm referencing policies that are certainly relevant in the context of the impact and harms of social media.

Q.   Okay.  Point me to where it specifically either identifies a defendant's platform or talks about social media.

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Again, it

Page 223

doesn't specifically identify one of the defendants' platforms.  And there's no need to in this context when I'm talking about policies here to support the mental health of young people in schools.

That's what I'm speaking to, the policies themselves.  And I don't specifically use the term that you're asking about.

But if you're asking am I referring to the harms that are caused by social media in recommending these policies, the answer would be yes.

BY ATTORNEY LEHMAN:

Q.   Okay.  Let me just make sure I understand.

So you had the opportunity to submit written testimony to the Senate.  These are literally the decision-makers of our country.

And you are making policy recommendations about how to support the

Page 224

mental health of adolescents.  And you do not take the time to call out social media, even though, according to your own words today, it is harming every adolescent in our country; am I understanding that correctly?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So to provide some context, this was also on the heels of the testimony of the Surgeon General, Dr. Vivek Murthy.  And I had carefully reviewed Dr. Murthy's testimony as well, and there was ample information around social media.

My role in this was to speak specifically to policies that should be implemented in schools and in comprehensive school mental health systems.  And that's what I did.

So there's already an understanding -- I think there's a

Page 225

general understanding in the field and the world around the impacts of social media on young people.

But my job here was to lay out policies specific to comprehensive school mental health and specific, you know, recommendations, for example, that could be taken legislatively to build and sustain comprehensive school mental health systems.

BY ATTORNEY LEHMAN:

Q.   Have you ever written to any government official asking that there be changes in access to social media for adolescents?

A.   That wouldn't be part of my role.

Q.   Have you ever, in any of the presentations that you've given -- so we just looked at two, but we talked earlier about the many -- I think you called them major invited presentations.

In any of those major

57 (Pages 222 - 225)

CONFIDENTIAL

Page 226

invited presentations, have you ever taken the opportunity to encourage that social media be banned?

A.    I'd have to go back through.

I mean, again, I've had over 600 invited presentations at conferences. So to ask me to remember the specific content may be hard. So I'm not sure if I can answer that.

I don't know that my role, typically though in those presentations, is to talk about whether -- you know, the banning of certain things or not. I'm usually speaking to, you know, the science and what's happening in schools and school mental health.

So I don't know that I would have, but I may have. I may have spoken about, you know, cell phone bans for -- in particular, to limit the use of the defendants' platforms.

Q.    And are you supportive of cell phone bans within schools to limit students' access to cell phones during

Page 227

the instructional day?

A.    You know, what I can say is that we've seen some very well-intended attempts at cell phone bans in schools to try to mitigate some of the risk caused by social media engagement.

And I think that they are very hard to implement. We've seen schools struggle to actually implement them. So -- and for a variety of reasons, you know, families may want their children to have phones. They don't necessarily want them to be on social media. But there are a variety of reasons.

The engagement features of social media make it really tempting and almost impossible for schools to not have students on phones during the day.

So it's a tough question. Am I supportive of them? You know, I would say that they're hard to implement. So I'm supportive of measures that attempt to limit social media engagement

Page 228

by young people because it's inherently risky.

Q.    And what are the measures that you support that attempt to limit social media engagement by young people?

A.    You know, again, I wouldn't say that I'm savvy with every measure that could be taken. You know, I think a lot of measures that could be taken are, really, in the hands and control of the defendants' platforms themselves, whether it's, you know, parental control features or age verification. And those, you know, I think can actually, you know, potentially really limit some of the engagement.

So there are a variety of, you know, actions that possibly could be taken to limit control -- excuse me, to limit exposure to social media.

The things that I'm most familiar with are what, you know, schools can do to, you know, prevent and mitigate the harms of social media. And that's

Page 229

really what I laid out in my report.

So that would be things like educating young people, educators, families about the harms of social media and educating them about navigating a landscape in which social media is consistently grabbing for their attention.

There's a lot of other things that we can do in schools in terms of mitigating. And those are, I think, pretty well laid out in my report.

Q.    Have you studied the parental control abilities of any of the defense platforms?

A.    So I know that they were discussed in some of the depositions that I reviewed.

But have I studied them in particular? No. That would not be something I had spent my time studying.

Q.    Have you studied the age verifications mechanisms for any of the defense platforms?

58 (Pages 226 - 229)

CONFIDENTIAL

Page 230

A.   So the -- when you say have I "studied them," first of all, I would think the technology involved in that is not really at the fingertips of most people that are outside of the defendants' platforms' kind of knowledge base.

But I don't study that as part of my typical day-to-day work.

Am I familiar with, you know, the idea that there are age -- attempts at age verification, I should say, perhaps. But my interactions with young people, with families, with teachers is that they're really ineffective. They're not well known about. They're not well understood. They're hard to access.

So that's my understanding of the age verification features.

Q.   Okay. Other than talking to people in your -- in your work and sort of anecdotally discussing with them their experience with age verification on the

Page 231

defendants' platforms, have you undertaken any other effort to understand or learn about the age verification on the defense platforms?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, again, I mean, I'll restate that I looked to the depositions where they -- it was spoken about, the specific -- some of the specific, I imagine, attempts at age verification.

But, you know, is it something that I study? No. I mean, you know, the experts in the reports that I relied on in part for my opinions, they went more deeply into looking at the actual features of the defendants' platforms. So that's not -- that doesn't really fall specifically within my wheelhouse.

And, you know, you

Page 232

characterize the discussions I have with people as anecdotes. But, you know, when you're hearing the same thing over and over and over from, again, parents, administrators, school districts, there does tend to be conclusions that you can draw, in part from that information, about the age verification quality, for example, and the ability to keep young people off of the platforms.

BY ATTORNEY LEHMAN:

Q.   Do you agree that you're not an expert in the actual design of defendants' social media platforms?

A.   I am not expert in the design. I would think that the experts in the design of the defendants' platforms are in-house in the defendants' platforms companies themselves.

So they are the folks who have that know-how.

Q.   And is it correct that

Page 233

you're not offering an opinion about the actual design of defendants' social media platforms?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, yeah, I probably would want to understand what you mean a little bit more by that question, because I certainly offer -- my opinions have to do with the design -- or at least some of the opinions that I offer have to do with the design features.

But I'm not offering specific opinions about specific features, as I believe maybe some of the other experts may have done.

So when I talk about social media and I detail this in my report, the design features themselves do certainly play a role in the harms that I'm

59 (Pages 230 - 233)

CONFIDENTIAL

Page 234

speaking to and in the harms that I'm proposing to prevent and mitigate in the strategic plan.

BY ATTORNEY LEHMAN:

Q. And do you have an opinion as to the specific harms caused by any one specific feature on a -- on a defense platform?

A. So, again, I would rely more on the experts who dove more deeply into that, right, who looked at each specific feature.

What I can say is that, you know, some of the features that I'm aware of and that I've, you know, certainly spoken, during the key informant interviews and during discussions with school districts and school leaders and families in my work, speak about specific features, whether it's the auto play and scrolling or the -- again, I've already spoken to some, the lack of parental controls, the age verification; those things certainly get our young people on

Page 235

social media.

The features that keep them engaged and kind of amplify things that happen and then cause disruptions in the schools, those are the things that we hear about.

Am I expert in the technology that drives that? No. Am I -- do I consider myself expert in kind of the -- what happens as a consequence of some of the design features in our school settings and in terms of the young people's mental health? Yes.

Q. Do you agree that you're not an expert in how algorithms work?

A. Well, algorithms is a broad statement -- or a broad term, I should say.

So I know what an algorithm is, I believe. But it's probably -- that term is probably used differently in different contexts.

So maybe you can specify a little bit.

Page 236

Q. Well, when you think about an algorithm, what does it mean to you?

A. Kind of -- let me think about how I would define algorithm.

So kind of a sequencing where if one thing happens -- this is not going to be an eloquent definition -- but if one thing occurs and it takes -- you know, there could be two pathways, right, after that thing occurs, if it's a yes/no -- I mean, I'm imagining a visual algorithm -- and if it goes one way, it would lead to one set of outcomes; if it goes another way, it would lead to another set of outcomes.

Q. Have you ever reviewed the source code for an algorithm?

A. I don't believe so. That's not something I would necessarily do.

I certainly have done, you know, coding and work in statistics. But I don't think I've looked at coding for algorithms for social media platforms.

My guess is a lot of that

Page 237

nobody has reviewed, other than those folks who are working within the platform organizations.

Q. Do you have a degree in computer science?

A. No, I do not.

Q. Have you ever taken a class in computer science?

A. I have to think about that.

I don't think I've taken a class in computer science, but I'm not sure.

Q. Do you have a degree in data science?

A. Well, my -- part of my role as a clinical psychologist is to be able to understand data. And we're -- as I said earlier we're trained as scientist practitioners. So I can certainly understand data when I look at, you know, an academic article, for example.

But I think if you're talking about a data science degree, the answer would be no. A specific degree,

60 (Pages 234 - 237)

CONFIDENTIAL

Page 238

no.

Q. Do you hold yourself out as an expert in warnings?

A. I do not hold myself as an expert in warnings.

Q. Do you intend to offer any opinion about whether any of the defendants' social media platforms did or did not meet industry standards?

A. I don't see that as my role in terms of the opinions.

I'm thinking through all the opinions that I offer. They were not about industry standards, no.

Q. Do you intend to offer any opinions about a safer alternative design for social media platforms?

A. I'm trying to -- my opinions don't get at the -- no. The answer would be no to that.

Q. Are you offering any opinions about how the defendants responded to any concerns that have been expressed about their platforms?

Page 239

A. Can you say that one more time?

Q. Yes.

Are you offering any opinions about how the defendants responded to any concerns that have been expressed about their platforms?

A. No, that's not part of my opinions.

Q. Are you offering any opinion about the motive for any of defendants' actions or conduct?

A. I can't speak to the motives of -- no, I'm not offering an opinion on that.

Q. Are you offering any opinion about whether any of defendants' platforms should be banned?

A. That's not in my opinions, no.

Q. Are you offering any opinion about whether -- or strike that.

Are you offering any opinion about any of defendants' conduct or their

Page 240

business practices?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Yeah, it's an interesting -- I mean, so I certainly offer opinions about how the design of these -- of the defendants' platforms impact student mental health in schools.

So I don't know if that fits with -- under -- under the umbrella of what you're asking about in that question.

BY ATTORNEY LEHMAN:

Q. Okay. Understanding the opinion that you have just carved out.

Other than that, do you intend to offer any opinion about defendants' conduct or business practices?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I mean, it's hard to say. I don't -- I am

Page 241

speaking, in my opinions, about the -- you know, how these defendants' platforms have impacted young people.

Whether that gets at their conduct? I mean, arguably their conduct is the development and design of these platforms. And so if I'm offering opinions about how those have negatively impacted our children and adolescents, I suppose it's -- I suppose the answer could be yes.

It's a little hard for me to understand, because the term "conduct" is quite broad. So if it's about all of the behaviors that have led to the design and development of these, perhaps.

BY ATTORNEY LEHMAN:

Q. Are you offering an opinion about who should pay for the 15-year comprehensive plan outlined in your report?

61 (Pages 238 - 241)

CONFIDENTIAL

Page 242

A.   That's not part of the opinions that I offered.  I may have spoken to that in the context of the report.  It wasn't part of the opinions.

Q.   Do you hold yourself out to your colleagues an expert in digital technology?

A.   So what I would say is that under my expertise as, you know, director of the National Center for School Mental Health, part of that is looking at programming that is offered in schools.

And part of that is sometimes things that have to do with digital technology or digital literacy. So in that respect, yes.

Q.   Have you performed a Bradford Hill analysis in reaching your opinions in this case?

A.   Well, it depends how you would define how I've done a Bradford Hill analysis.

I mean, my understanding of the Bradford Hill -- I don't know if

Page 243

you'd like to define it, but I'm happy to answer the question based on my understanding of that concept.

Q.   Sure.  What do you understand the Bradford Hill to be?

A.   So it's essentially a set of criteria that you use to determine or infer causality.  Often it's used in the absence of a, you know, randomized controlled trial, for example.

And it's a set of criteria that's, as I understand it, really widely accepted in the field in the absence of RCTs, for example, randomized controlled trials, which are often not feasible to do, right, and -- whether there's ethics considerations or logistics considerations.

So the criteria for Bradford Hill is really thinking about kind of what would need to exist or what are some of the things that would be in place for you to be able to infer or determine causality.

Page 244

Q.   And have you performed a Bradford Hill analysis in reaching your opinions in this case?

A.   So I've certainly used some of the criteria in the Bradford Hill kind of mechanism for determining, you know, whether something is causal or not, yes.

I mean, because, you know, as I mentioned, there are certain things that align with the research that I reviewed and the expert reports that show that there is data to suggest things like temporal sequencing, like multiple studies that show correlation, for example.

Q.   And what study do you believe shows temporal sequencing?

A.   Again, just like I answered before, given all of the studies I looked at, I would probably need to go back and review each of the studies to see which one actually looks -- one or more look at temporal sequencing.

And also, as I said, I also

Page 245

relied on the expert reports that also used, you know, different articles.

So there's a lot of articles.  So I can't name a specific article.

Q.   Your report does not include a Bradford Hill analysis, correct?

A.   I wouldn't say that.  I mean, it's -- a Bradford Hill analysis, as you're calling it, is really using that criteria to determine whether there is causality or whether there's reason to believe that one variable might cause another.

And so actually I would argue that I did, I used that criteria.

Q.   Okay.  And do you set out anywhere in your report the Bradford Hill analysis, the evaluation of the nine criteria?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  It's, I would say, throughout my report.  If you

62 (Pages 242 - 245)

CONFIDENTIAL

Page 246

look at the background where I spoke through kind of the -- and referenced many different studies that look at the impact of social media on young people's mental health or on schooling, the -- many of those really fit with under -- fit under, rather, the criteria.

So, yeah, it's throughout the report.

BY ATTORNEY LEHMAN:

Q. But we can -- we can agree that there's nowhere in any of your reports where you identify each of the nine factors and go through an analysis with respect to each individual factor, correct?

A. You don't need to --

ATTORNEY YEATES: Object to the form.

THE WITNESS: That's not typically something I would do in practice, nor would many folks.

Page 247

They wouldn't necessarily always say, I'm using the Bradford Hill criteria. It's kind of a well established set of criteria in the field.

So I think, you know, when you're publishing, for example, in peer-reviewed literature, or when you're speaking to it amongst academics, you wouldn't necessarily always say, and here are the specific criteria that fall under this, because it's a well understood set of criteria.

BY ATTORNEY LEHMAN:

Q. Do you agree that correlation is not the same as causation?

A. Of course.

Q. So do you agree that two things can be associated with each other but there might not be a causal relationship between the two?

A. Yes. There's certainly instances where there is a correlation or

Page 248

association but not causation.

Q. So, for example, a correlation might reflect bidirectional influences?

A. Bidirectional influences, certainly. Or reverse, yes; one way that you're anticipating it's not, yes.

Q. And other factors commonly known as confounders or confounding factors can also come into play?

A. When you say they can "come into play," you mean that that could -- tell me what you mean by that.

Q. What I mean is a third factor could actually be causing the effect that you're attempting to evaluate.

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't know if you're talking about a specific study or a specific -- because I'm not attempting to evaluate anything in the context of that.

Page 249

But in terms of -- yeah, so I -- you probably have to restate it.

BY ATTORNEY LEHMAN:

Q. Sure.

Do you agree that -- well, what is your understanding of what a confounder is?

A. So in the context of a study --

Q. In the context of a study.

A. -- a confounder might be a variable that is influencing one or more of the variables that you're looking at that may not have been a hypothesized variable that you're directly studying.

Q. Okay. Do you agree that saying that there is an increased risk does not mean that there is a causal relationship?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Can you provide context for that?

63 (Pages 246 - 249)

CONFIDENTIAL

Page 250

BY ATTORNEY LEHMAN:

Q. Sure.

So would you agree that, for example, if you're looking at risk factors for a mental health illness, that just because someone has a risk factor doesn't necessarily mean that that risk factor has caused their mental health illness?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So if someone has a risk factor, does that mean that it has caused their mental health challenge or illness?

BY ATTORNEY LEHMAN:

Q. Yes.

A. Not necessarily. But that may be hard to -- it may be hard to determine.

Q. Okay. When you use impact or association in your expert report, you do not mean causation, do you?

ATTORNEY YEATES: Object to

Page 251

the form.

THE WITNESS: So, you know, you'd have to point -- point me to a specific place in the report. But I certainly speak about causation in the report.

And, actually, when I'm talking about impact in many instances in the report, and certainly in my opinions, I'm speaking about social media causing the harms that we're talking about here.

So that one variable, social media, leading to the outcomes that we're talking about, whether it's school outcomes or student mental health and well-being, yes.

BY ATTORNEY LEHMAN:

Q. Do you agree that in order to determine whether or not an association is valid or true that bias and confounding must be ruled out?

A. So what I would say is that,

Page 252

you know, there's a lot of -- a lot of ways that we might come to the determination, in the public health field or in the mental health field, about causation.

And it's certainly important to look at confounding factors. Can you rule out every single confounding factor in a study? Most studies don't have every possible confounder. Do we attempt to look at confounders? Certainly.

And you talked about -- I think you said -- it was kind of a double question. You also --

Q. I also asked bias.

A. So about bias.

ATTORNEY YEATES: Object to the form.

BY ATTORNEY LEHMAN:

Q. So let -- I'll --

A. If you want to restate that.

Q. Sure.

Do you agree that in order to determine whether an association is

Page 253

true or valid, bias must be ruled out?

A. I don't even know that I know what you mean by that, when you say "bias must be ruled out."

What kind of bias are we talking about?

Q. Well, you're aware that there are multiple different kinds of bias, correct?

A. There's -- yes. That's, I think, why I'm asking the question. What do you mean by bias?

Q. So, then, my question to you is this: What are the types of bias that you're aware of?

A. In terms of, I mean, there's -- I can name some. There's implicit bias. I mean, I often think about bias when we're -- when we're talking about the school context.

So in teaching, for example, you might have implicit bias or explicit bias. You may have bias -- you know,

64 (Pages 250 - 253)

CONFIDENTIAL

Page 254

someone might be biased against someone because of their prior experiences, which is related to the implicit and explicit bias that we're talking about.

So if you're talking about a specific bias, I'm happy to know what you're talking about.

Q. Well, let's -- let's walk through them.

Do you agree that bias can produce error in the outcome of a study?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Can you just tell me what you mean by "bias"? Since you said there's many forms of bias.

BY ATTORNEY LEHMAN:

Q. Sure.

A. What kind of bias are you speaking about?

Q. So I'm speaking largely about selection bias, dropout bias, information bias, recall bias and

Page 255

confirmation bias.

A. So those are all things that we may want to consider in the context of a study, certainly.

Q. And so do you agree that bias, including the biases I've just set out, can produce error in the outcome of a study?

A. They can produce error. And that's why we are rigorous in our studies about trying to rule those things out.

You know, there are certainly other things, you know, that we just talked about that could introduce potential error.

Just because there are things that can cause error, though, certainly does not mean that you can't draw conclusions, even if there is the potential for error in a study.

I mean, that's why you do multiple studies, it's why you have peer-reviewed processes, so that you can look at the rigor of the study and the

Page 256

potential for error to actually influence the outcomes.

Q. Do you agree that causation cannot be determined based on a correlational study?

A. No, I disagree with that, actually.

So, first of all, I would never necessarily draw a conclusion just from one study. But, you know, there's -- it's well established, and I think we just talked about some of the criteria that's used to draw conclusions about causation.

And one of those is, if you have multiple correlational studies, now that's just one criteria, but if you do have multiple correlational studies, that certainly can contribute to our understanding of whether something is causal.

There are other things you might want to consider as well.

Q. Okay. Do you agree that it

Page 257

is not appropriate to make a causation determination based solely on correlational studies?

A. So I wouldn't agree with it how you said it.

I think that correlational studies is one of the things that you can use to draw conclusions about causation.

And cross-sectional studies can actually offer a lot of good information about causation, right. Especially if you have, I mentioned already, temporal sequencing within it or if you have multiple correlational studies and if those studies have been conducted, you know, with different populations or in different settings.

Again, we're kind of going back to the Bradford Hill criteria. But yeah.

Q. And you said that you offer opinions about causation in your report.

And are you able to reach those causation opinions without relying

65 (Pages 254 - 257)

CONFIDENTIAL

Page 258

on correlational studies?

A. Well, that would be a hypothetical, I think, because there are correlational studies that demonstrate the social -- the impact of social media.

Q. And let me -- let me just be clear. I'm not asking you at all a hypothetical question.

I am asking you in your analysis of causation, are you able to reach that causation opinion irrespective of the correlational studies?

A. I don't have to.

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't have to. I mean, again, it is a hypothetical, because the correlational studies exist.

So I don't have to -- I wasn't asked to draw a conclusion without the wealth of studies that do exist looking at association, for example.

Page 259

BY ATTORNEY LEHMAN:

Q. All right. So that's not an analysis that you have performed, i.e., determining if social media causes the harms outlined in your report without relying on the correlational studies?

A. That would be very --

ATTORNEY YEATES: Object to the form.

THE WITNESS: That would be very atypical, that somebody would then just disregard the correlational studies that exist and say, well, could I just determine this without those?

That's just not -- I wasn't -- that wouldn't be something that I would do. And I think you use the studies that you have -- in this case that you're speaking about, the hypothetical case, you know, correlational studies, you would use those to contribute as one piece of

Page 260

information towards your conclusions, which is what I did.

BY ATTORNEY LEHMAN:

Q. Okay. All right.

ATTORNEY LEHMAN: It's shortly after 1:00, and I think our lunch has been sitting around for maybe an hour. So I don't know if there's mayonnaise on those sandwiches. But perhaps now is a good time to take a lunch break.

THE WITNESS: Sounds good.

VIDEO TECHNICIAN: The time is 1:02 p.m., and we are off the record.

- - -

(Whereupon, a luncheon recess was taken.)

- - -

VIDEO TECHNICIAN: The time is 1:52 p.m., and we are on the record.

BY ATTORNEY LEHMAN:

Page 261

Q. What are the Bradford Hill criteria, like, what are the specific factors?

A. I don't know that I can name every one of them offhand. But I can speak to some of them.

So they include things like having multiple correlational studies. I know one of them is having kind of temporal sequencing. I believe one is having multiple studies across -- or, rather, let me rephrase that, having studies across various populations or areas.

So those are a few of the criteria.

Q. Can you remember any other of the specific factors in Bradford Hill?

A. I'm not sure if I can offhand.

Q. Okay. In your analysis that you performed, how did you weight each of the Bradford Hill criteria against each other?

66 (Pages 258 - 261)

CONFIDENTIAL

Page 262

ATTORNEY YEATES: Object to the form.

THE WITNESS: I took all of the information I had to inform my opinion. Generally, when I'm forming an opinion, I don't think about it like that, like, I don't think, you know, this criteria was 3 percent of my decision and this criteria was 10 percent of my decision.

So I don't -- I don't think about it like that. I don't think that's typical as kind of how I would form opinions or conclusions.

BY ATTORNEY LEHMAN:

Q. Did you perform a Bradford Hill analysis for any individual social media platform?

A. So I didn't distinguish -- the answer would be no to that. Did I conduct a Bradford Hill analysis for any individual platform? No.

Page 263

Q. Did you perform a Bradford Hill analysis for any specific feature on a social media platform?

A. Well, I mean, so it's an interesting question, I guess, even thinking about the last question you're asking, did I form a Bradford Hill analysis.

We think about -- or at least when I think about Bradford Hill, you're using a set of criteria, and the idea is that if you have some of these criteria, it helps you to make a determination about causation, especially in the absence of other, you know, types of evidence.

And so did I use -- I think the question was -- you can restate the question. But I believe -- go ahead.

Q. So my specific question was, did you perform a Bradford Hill analysis for any specific feature on a social media platform?

A. So, again, I mean, I think

Page 264

as I thought about and as I formed the opinions, it's really -- you know, I wasn't thinking or pulling -- teasing apart each specific feature.

And, frankly, you know, when I look to the reports of some of the other experts, they, as I mentioned earlier, dove much more deeply into the kind of distinctions between features.

So I wouldn't say that I was performing an analysis. But did I consider kind of the studies, as I was reading different studies, which elements of Bradford Hill may be relevant for that particular study? Yes. And did some of the studies that I looked at possibly focus on specific features? Yes.

But, again, if you're asking about did you look at this specific study and consider it, I would have to go back to each of the studies.

Q. And as we sit here, are you able to identify any specific study that is relevant to any specific element of

Page 265

the Bradford Hill analysis that you performed?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So as we sit here, I would have to go back and look at every one of the studies.

But what I can say is that the Bradford Hill criteria is something that you -- that you and that I would consider, that I considered generally in looking at the information that I get.

It's just something that you do as part of your practice. You're thinking about -- I mean, it really is a way of thinking about all of the evidence that you have. And so you're thinking about, you know, each of these different things and how does it inform your conclusions.

So I'm not sure that I would be able to say, this study, you

67 (Pages 262 - 265)

CONFIDENTIAL

Page 266

know, just sitting here, because I don't have the studies in front of me, and I don't -- you know, I can't infer just from the list of studies.

BY ATTORNEY LEHMAN:

Q.   What conditions do you intend to testify are caused by social media?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  It's hard for me to predict what would be asked. So I don't know that I'm intending to testify to anything specific, because I can't necessarily predict what would come up in the context of testimony.

BY ATTORNEY LEHMAN:

Q.   I understood your testimony before lunch to state that you had made -- reached an opinion that social media caused harms.

And so what I'm -- what I'm

Page 267

asking for is when we say -- when you talk about what harms are caused by social media, what harms is it your opinion are caused by social media?

A.   Okay.  I mean, I'm happy to go back to my report and lay out what I've described in my opinions as far as the specific harms.

So in Opinion 1 in the May 16th report, I spoke about negative impacts on their ability to effectively learn and succeed in school and on their mental health and overall well-being.

And in Opinion 2, I went on to describe impacts or harms specifically associated with students' social media use, including increased distraction from instruction and decreased academic focus and learning; erosion of in-person social skills development; diminished teaching effectiveness; and detrimental effects on student mental health.

And I named a few here, including disruptive sleep pattern --

Page 268

disrupted sleep patterns, increased symptoms of anxiety, depression and self-harm and greater levels of body dissatisfaction and negative self-comparison.

In Opinion 3, I then went on to talk about how schools have then been required to expend and redirect already limited resources.  So I would consider that a harm.

And districts and schools, I spoke about what they've been increasingly tasked with doing, so addressing mental health challenges arising from students' social media use, educating students on the risk and responsible use of social media, managing behaviors such as distraction during instruction, peer conflict, emotional disregulation and addiction as a result of social media, and navigating strained family-school partnerships, with social media-related concerns dominating time meant for educational engagement.

Page 269

So those are the opinions that I offered in my general report.

Q.   And have you performed a Bradford Hill analysis for each individual condition that you outlined, including negative impacts on learning, mental health, distraction, decreased academic focus, decreased social skills, disrupted sleep patterns, body -- body dissatisfaction?

A.   I mean --

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So arguably, yes, in the sense that did I consider the -- all of the factors that would lead me to infer causation?  Yes.

And that's really what Bradford Hill is about.  It's about looking at different criteria that you can use to infer causation.

And so part of my opinion

68 (Pages 266 - 269)

CONFIDENTIAL

Page 270

development was using that criteria. Part of it, as I laid out in the report, was also relying on the information from the expert reports. And part of it is relying on my work with school districts for decades.

BY ATTORNEY LEHMAN:

Q.   Okay.  Is there any place in your report where you specifically set out each of the Bradford Hill criteria and address them uniquely for each of these individual harms that we've just talked about, including mental health, negative impacts on learning, distractions and so on?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Doubtful, because that would be very atypical to do in this type of report.  That would not be how I typically would write a report, is to go through every harm and then

Page 271

write out every single Bradford Hill criteria and think about it in -- I shouldn't say think about it -- but write about it in a report like this.

So that would be very atypical.

BY ATTORNEY LEHMAN:

Q.   And other than in the social media litigation, how many other times have you submitted an expert report?

A.   I haven't.

Q.   When you say -- you've referred me back to your report and the specific opinions about harms and you've just outlined them for individual opinions.

In your report, you have, in a number of locations, footnoted support for a specific sentence or statement.

In those footnotes, are you citing all of the support that you rely on for that individual statement?

A.   I'd have to go through

Page 272

statement by statement.  I'm happy to look at specific statements.

But I can tell you, generally, that, as I stated in the methodology in the report at the outset of the report, that the opinions are informed not just by the literature cited but also by expert reports, which I did cite, but also by my extensive experience working with schools and families.

Q.   And appreciating that this is all informed by your experience with schools and families, as you wrote the report and you included footnotes with either references to other expert reports and/or studies, were you including the best support that you had for your assertions in the footnotes?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I think the term "the best" is a bit subjective.  Because I would argue in many cases some of -- some good

Page 273

information that you can get -- I don't know that I'll restate the term "the best," because, again, I think that's subjective -- but there's a lot of really valuable ways that you can gather information to draw conclusions, part of which really is based on working directly in the field with families and schools.

So I think that's often some of the most realtime information that I can get, you know.  When I'm hearing daily from teachers, administrators, school board professionals, school administrators, superintendents that social media is harming their children, to me, that is a piece of very good information.

So is that the best -- are you asking if one citation is the best information I can get?  I'd have to say no.  And that the term

69 (Pages 270 - 273)

CONFIDENTIAL

Page 274

"best" is pretty subjective.

BY ATTORNEY LEHMAN:

Q.   Okay.  Well, let's just -- let's take an example.

So in Paragraph 63 of your report --

A.   The May 16th report?

Q.   The May 16th report.

Paragraph 63.  You make the assertion, that quote, Many students engage with social media late into the night, disrupting their sleep and negatively affecting their academic performance.

And immediately following that is Footnote 44.

Do you see that?

A.   I do.

Q.   Okay.  And Footnote 44 cites to a study published in 2024 by Nafisah.

Do you see that?

A.   I see that.

Q.   And I apologize, how do you say that, the lead author's last name?

Page 275

A.   Your guess would be as good as mine.

Nafisah would be my guess.

Q.   Okay.  So, just, I want to make sure, in circumstances like this, you didn't -- you didn't hold back citations to studies that supported your point, you included them in the footnotes, didn't you?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  If I understand your question, you're asking did I include a footnote that supported the sentence?

BY ATTORNEY LEHMAN:

Q.   Well, it's a little bit different.

A.   Okay.  So restate it.

Q.   In the footnotes that you include, you include the references that support your point, don't you?

A.   So we're talking about one specific sentence.  So here I include one

Page 276

reference that supports my point.

This particular sentence, since you've called it out, is also completely aligned with my experience from the key informant interviews for all of the bellwether districts and from speaking with school personnel and district personnel for years about the impact of social media.

Q.   Okay.  So I understand.

It would be impossible for you to put in your 20 years of experience, right?  Hard to -- hard to footnote that.

But my question is this:  Does your report accurately reflect what you believe is the scientific peer-reviewed literature that supports these opinions?

And, yes, I've called out this one example with the sentence in Paragraph 63 and Footnote 44.

And so my question is, have you -- have you documented what you

Page 277

believe is the science that supports the opinions that you have included in your reports?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I've absolutely documented science that I think speaks to the statement in this particular sentence related to social media disrupting students because they're engaging with it late into their night and disrupting their sleep.

And I don't think it's hard to document my level of experience.  In fact, I start the report out with that, with 25 years of experience.  And I'm very clear that a number of the conclusions really are also formed based on that extensive experience.

BY ATTORNEY LEHMAN:

Q.   Okay.  And so is it correct

70 (Pages 274 - 277)

CONFIDENTIAL

Page 278

that throughout your report you have included footnotes with the peer-reviewed scientific literature that supports your statements, or is it that you have failed to do that?

ATTORNEY YEATES: Object.

BY ATTORNEY LEHMAN:

Q. I just want to make sure.

I -- I feel like -- to me, I'm asking a very clear question. And I feel like we're talking past each other. So I just want to make sure.

Have you included footnotes with the literature that you believe supports your assertions in your report?

A. I think I've already answered that.

I've put citations in my report that I do believe support the statements that they are directly coming after.

Q. Okay. So yes. All right. Understood. All right.

Are you able to separate out

Page 279

what percentage of the harms that you have outlined for us were caused by any specific platform?

A. So I would not be able to, sitting here at this moment, be able to say, for example, TikTok contributed 30 percent to sleep disruption and, you know, Meta contributed 20 percent.

I'm making an -- you know, coming up with a hypothetical example here.

So, you know, the -- as I mentioned earlier, the experts who looked more specifically into the plat -- distinctions between platform use may have, you know, gotten into that a little bit more, in terms of the distinctions.

But I could not tell you nor would it be typical for me to be able to say, you know, that this platform contributed this and this platform contributed this.

Q. Are you able to separate out what percentage of the harms you have

Page 280

outlined were caused by features of social media versus the content on social media?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Yeah, I mean, you know, what I can tell you is I think it's quite difficult, first of all, to separate the two, to separate content from features.

I think there's this kind of false notion that, you know, it's -- there's positive content and negative content and the negative content harms our young people, our children, adolescents, when in fact it's often just the process of engagement of our young people, right. They are engaging compulsively.

So I think about -- when I think about kind of what's harming schools, we see students who are checking their phones, you know,

Page 281

hundreds of times, right, during the school day.

I think it was during the school hours, you know, the Telzer report looked at an average of six -- I think -- I think, I'd have to reference my report -- but an average of 65 times in a day.

So you can imagine in a school day that that's directly impacting what's happening with, you know, classroom instruction, students' ability to learn, et cetera.

So I would say that, you know, the design features that you're talking about, regardless of the content, are absolutely contributing to the disruptions and the harm.

And I find it -- I would find it very hard to divorce the two.

BY ATTORNEY LEHMAN:

71 (Pages 278 - 281)

CONFIDENTIAL

Page 282

Q.   All right.  Can you name any study that looked at features and controlled for the content?
A.   I'd have to go back to all the studies to look through them.
Q.   For what population are you analyzing potential cause and effect in your Bradford Hill analysis?
A.   I'm sorry, can you just say that one more time.  I got distracted.
Q.   No problem.
A.   I just looked away.
Q.   For what population are you analyzing the potential cause and effect in your Bradford Hill analysis?
ATTORNEY YEATES:  Object to the form.
THE WITNESS:  For what population?  So my report is specifically, you know, looking at -- well, it looked at studies that had different age ranges.  So it's a bit of a difficult question to answer in that sense.  Because

Page 283

the different studies I looked at had different age ranges.
The recommendations in the strategic plan are specific to K through 12, which is typically about age 5 to age 18.
BY ATTORNEY LEHMAN:
Q.   Do you agree that studies performed on social media use for, say, college students in another country, such as China or Pakistan, would not be generalizable to high school or middle school students in the United States?
ATTORNEY YEATES:  Object to the form.
THE WITNESS:  So I would not agree that you would not use that information in drawing opinions.  It doesn't mean that you would use that information from one study -- I wouldn't use any information from one study from a sample in the United States.
But generally, you know, we

Page 284

are -- we're -- we think about studies that come from across the globe.  Like, we don't just restrict ourselves to thinking about students in the U.S.
Do we think about students in the U.S. in some of the studies?  Certainly.  But would I discard a study because it was about, you know, students from another country?  No.
And with respect to college students versus high school students, I think you can gather, actually, some information about what's happening with students at the college level and consider what the experience might be for high school students as well.
Again, would that be the only piece of data that's used?  Not necessarily.
BY ATTORNEY LEHMAN:
Q.   If an author wrote in their

Page 285

paper that it's not generalizable to students in the United States, would you disagree with the author?
A.   Well, what I can say is that very often, you know, it's standard practice for authors to list out their limitations.  And I would say it's pretty common for authors to say this information is not generalizable, because they don't want to suggest that this is going to apply to every single student that was not within the study.
That does not mean, though, that you can't actually use the information.  If -- I mean, if a study was only relevant to the students that were in that study, there's no reason to publish it, right.
The reason that things get put into the peer-reviewed literature is because it can have implications and application to other populations.
Q.   Well, but the reason that authors put limitations in their paper is

72 (Pages 282 - 285)

CONFIDENTIAL

Page 286

to ensure that the study is not used inappropriately by other people, correct?

A.   I -- I don't know that I would agree with that, actually.

Q.   Then is it your -- do you believe that papers should contain limitations at all?

A.   Do I believe that papers should contain limitations?

Q.   Yes.

A.   Yes. I think that's pretty standard practice, for people to include limitations as part of their, you know, submitted peer-reviewed literature, yes.

Q.   And don't you agree that the limitations are beneficial to allowing other people who are reading the paper to understand how that information can be interpreted and applied?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  It depends.  I mean, you know, there are hundreds of thousands of research articles

Page 287

that are published, right.  And so people put -- I can't speak to the intention of why people are putting limitations in.

Generally, as a scientist, we might read the limitation section and use that information to kind of think through how we might interpret the data.

But I have to say, many authors don't list out the limitations of their studies or they might list some limitations and not others.

So I wouldn't, you know, rely exclusively on what an author says about their own limitations.

I would also, as a scientist, think about what do I see the limitations of this study being?

BY ATTORNEY LEHMAN:

Q.   When was the first -- when was there first a statistically

Page 288

significant association between social media and the harms outlined in your report?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I don't know that I can answer that.  I'm not sure the specific date that an association was determined.

BY ATTORNEY LEHMAN:

Q.   Is it correct that correlational studies assess both exposure, so in this case, social media, and the outcome, in this case, the harms in your report, at the same point in time?

A.   It completely depends on the study.  So it depends, is the answer.

Q.   What is your definition of a correlational study?

A.   So a correlational study is a study that looks at the association between variables.  It could be two variables.  It could be more than two

Page 289

variables.

Q.   Do you agree that correlational studies cannot establish temporality, namely which event came first?

A.   No, not necessarily, if a study actually has a temporal sequencing.

So, for example, if somebody is studying the -- you know, exposure to social media platforms, and then within that study they look at its association to sleep disruption, and they're looking at use of social media during the day and then sleep disruption that night, that could be considered a correlational study, but it has temporal sequencing in it.  And so it can be used to consider causal -- causal inference.

Q.   Okay.  So you would disagree, then, with all of the literature that states that correlational studies cannot establish temporality; is that correct?

ATTORNEY YEATES:  Object to

73 (Pages 286 - 289)

CONFIDENTIAL

Page 290

the form.

THE WITNESS:  So you're asking me to know every study, then, that's ever been written about that?

BY ATTORNEY LEHMAN:

Q.    No, not all.

A.    Maybe rephrase the question. Okay.

Q.    Not at all.

A.    Because you said would I disagree with all of the studies.

Q.    Would you disagree with the textbooks and other statistical manuals that state that correlational studies cannot establish temporality?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I -- that's not something that I would agree with in general, that correlation cannot include temporal sequencing.

BY ATTORNEY LEHMAN:

Page 291

Q.    You mentioned, when we were talking before lunch, that correlational studies were part of the material that you reviewed.

So in addition to correlational studies, what are the other types of studies that you reviewed?

A.    Oh, well, I'd have to go back and look at all the studies to know the specific designs of each of the different studies.

Q.    And did you -- in making your analysis and reaching your conclusions, how did you weight the different types of studies that you reviewed?

A.    Well, again, I weighted -- I weighed the studies that I was looking at along with other sources of information.

So I looked at studies.  And usually we think about the scientific rigor of studies as we're looking at them.  The studies I included were largely, for the most part -- I would

Page 292

say, the studies specifically were from peer-reviewed articles.  And so with that, once they're in a peer-reviewed journal, there's some level of scientific rigor.

But, you know, in terms of how I looked at the different articles, I don't know that I, then, looked at them relative to each other with respect to strength of the science.

So I'm not sure if I answered your question specifically, but --

Q.    When you were performing your analysis and reaching your conclusions, how did you weight different study designs?

A.    I don't know that I thought about it in that sense, weighting the different study designs.

I mean, I certainly considered the study designs as I was reading through the articles.  That's something I would do as a scientist.

Page 293

But, you know, you weight -- you weigh a lot of things as you're drawing opinions, not just kind of the study design.  That might be a piece of it.

Q.    What is the relative risk of an adolescent who uses social media for one hour a day to experience mental health impacts compared to a student who does not use social media?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I don't know. That's not my area of study.

BY ATTORNEY LEHMAN:

Q.    Okay.  What is the magnitude of the association between student social media use and mental health harms?

A.    Can you repeat the question? I'm not sure that I know what you mean by that.

Q.    What is the magnitude of the association -- I'm speaking of quantification of the association --

74 (Pages 290 - 293)

CONFIDENTIAL

Page 294

between student social media use and mental health harms?

A.   I don't think I can answer that specifically.

Different studies have determined different magnitudes of association.  So I don't know that there is an agreed-upon specific magnitude, a number, if you're looking for a specific number.  I don't know that I can say there is one number.

There is consensus that there is harm.  And, again, my role was to think about the harm that's being caused to children and adolescents.  And as a public health issue, then, what should be put in place, what could be put in place to prevent and mitigate that harm.

Q.   So I want to follow up on something you just said.

You said, quote/unquote, there is consensus that there is harm.

So are you telling me that

Page 295

you did not review any peer-reviewed studies that found that there was no causation between social media and mental health harms?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I would not say that that's accurate.  I reviewed literature that included information about association, as I've already said.

And from the information, the articles that I reviewed, it certainly pointed to the conclusions that I came to in the opinions, which had to do with causation.

BY ATTORNEY LEHMAN:

Q.   Okay.  Did you analyze dose response?

A.   If I recall correctly -- again, I'd have to look to the specific studies -- but I know that there were certain studies that do look at dose

Page 296

response in terms of kind of the -- the time spent and the relative impact.

Q.   Can you identify any of the studies that you rely on in your personal analysis of dose response?

A.   Not offhand.  Again, there's so many articles that it would be something I'd have to go back and look at them all again.

Q.   In a school where students do not use social media, would you still recommend the same comprehensive plan that you outlined in your report?

A.   I have yet to be in a school where students are not using social media, so that would be really hard to imagine.

It's a hypothetical that's, frankly, almost impossible to imagine at this point.

Q.   Okay.  But I'm asking, if you -- if you were asked to consult -- you're hired as a consultant for a school and they say -- you know, you get there

Page 297

on day one, they're informing you about their student population, what's going on, and they say, our students do not use social media.

Would you still want to implement the same plan?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  It's a hypothetical that just doesn't exist.

If they said that, I would say, then you don't have an understanding, probably, of your students.

I mean, because, you know, again, the number of schools I've worked with over the years, the number of districts, it certainly would be completely out of step with any school that I've encountered.

So it's -- it's -- you know -- and I wouldn't even know

75 (Pages 294 - 297)

CONFIDENTIAL

Page 298

what is meant by that, they don't use social media during the day, which I've also not seen, they don't use social media at night.

It doesn't exist. I mean, that would be a world in which the defendants' platforms didn't exist, frankly.

And so I just -- I don't know how to answer that question.

BY ATTORNEY LEHMAN:

Q. Do you attempt to quantify how much students in a school or school district are using social media before you develop a plan?

A. Are you talking about this specific plan?

Q. No. I'm talking about in your consulting practice, outside of litigation, when you -- when you're going to help a school district and you've put together a plan -- have you done that situation, where outside of this litigation, you go and develop a

Page 299

comprehensive multiyear plan for a school district?

A. So I worked with many school districts, and I've developed plans for them. I've worked with them on developing their own continuous quality improvement plan.

Yes. So the answer is yes.

I think you asked a different question before, but I've forgotten it already.

Q. My question is, when you do that, when you go to a school -- this is outside of litigation and you're going to help them develop a plan -- do you attempt to quantify how much their students are using social media?

A. What I've done before in the context of many of those consultations is talked with them about their perspective on the impact of social media on young people, which, to me, would be important to understand versus necessarily the number of minutes that each student -- I

Page 300

mean, frankly, I know from working with school systems that they likely don't have the data infrastructure yet to capture the data that you're even asking me about.

So, instead, what I would ask is -- what I would typically ask, what do you imagine the harm -- not what do you imagine -- what do you experience the harms to be of the students in your schools?

Or the "impact" is usually the term I would use. So that they could give their perspective on their perception and their experience of the impact of social media.

Q. A student who does not use social media -- let me start again.

Do you agree that a student who does not use social media should still have access to a school counselor?

A. Yes. I would agree that a student who does not use social media should have access to a school counselor.

Page 301

Q. Do you agree that a student who does not use social media should still receive digital literacy education?

A. Yes. I would argue that students should receive digital literacy education.

Q. Do you agree that a student who does not use social media should still receive mental health literacy education?

A. Yes. I would argue that they should. The content of the mental health -- mental health literacy may, you know, be impacted by their behaviors, including whether they're engaging with social media.

But, yes, I think that student should receive social media -- excuse me, mental health literacy.

Q. Do you agree that a student who does not use social media should still receive training and education about life skills?

A. I do. And if we're talking

76 (Pages 298 - 301)

CONFIDENTIAL

Page 302

about life skills specific to social media -- I mean, again, there's so few students at this point who are not exposed to social media, or at least the harms associated with social media, that it would be, I think, irresponsible to suggest that people not get educated about social media when there is certainly a likelihood that they will be exposed and that they will be, then, exposed to the risks.

Q. Do you agree that a student who does not use social media should still receive education about screen time management for uses of digital devices other than social media?

A. Sure. I mean, there's no reason that student shouldn't receive education about screen time management.

And they should also receive information about screen time management that is specific to social media, because we know from the data that most screen time for children and adolescents is

Page 303

social media.

Q. When you use the term "cyberbullying," what is your definition of cyberbullying?

A. So in the context of this report, when I'm speaking about cyberbullying, I'm talking about bullying that is occurring in the context of the defendants' platforms.

Q. Do you agree that cyberbullying can occur via text message?

A. I think that cyberbullying -- that's interesting. I mean, I wouldn't have used that term necessarily to describe bullying behavior that happens over texting.

And certainly in the context of this report when I spoke about cyberbullying, it was really with respect to what's happening on the defendants' platforms.

Q. Do you agree that cyberbullying -- let me ask it this way: Do you agree that bullying can occur via

Page 304

text message?

A. I agree that bullying could occur via text message.

Q. Do you agree that bullying could occur via e-mail?

A. I -- so bullying could occur in a variety of different forms, including on e-mail, yes.

Q. Do you agree that bullying could occur via other digital communications where there's a messaging component, whether that's a gaming platform or some other social application that's not one of the defendants' social media platforms?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So bullying could occur on a different mechanism. I think you mentioned gaming as one example. It could occur on that platform.

BY ATTORNEY LEHMAN:

Q. Do you agree that a student

Page 305

who does not use social media should still receive anti-bullying, including cyberbullying, support?

A. So when you say anti-cyberbullying support, what I would say is that I think it's incumbent upon schools, given, you know, the exposure to cyberbullying, that there is -- when I say "incumbent upon schools," it -- schools are a good place for this to happen, because we know that schools are where kids can get educated about things.

So do I think that students who are not using social media should be educated about cyberbullying that occurs on social media? Yes. Because they are at risk for engaging with social media.

And they also -- whether they're a bystander or whether they're a peer of somebody who is getting bullied, let's say on social media platforms, it's pretty important for them to understand that and what that's like.

So I do think that it's

Golkow Technologies,
877-370-3377        A Veritext Division        www.veritext.com

CONFIDENTIAL

Page 306

important, yeah.

Q. Do you agree that a student who does not use social media should still experience a positive school culture?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I would hope that all students would experience a positive school culture.

BY ATTORNEY LEHMAN:

Q. Do you agree that a student who does not use social media should still receive targeted mental health support if needed?

A. Yes. I would agree that students who need social media -- excuse me, who need mental health services should get it -- should get them.

Q. Do you agree that a student who does not use social media should still receive a referral to community-based wellness programs, if needed?

Page 307

A. Students who need mental health services should receive the supports that they need, whether it's a referral to a community provider or an on-site provider, yes.

Q. Do you agree that technology has changed over the last 15 years?

A. Certainly technology has changed over the last 15 years.

Q. In the plan that you outline in your report, do you address the development and spread of artificial intelligence?

ATTORNEY YEATES: Object to the form.

THE WITNESS: That was outside of the scope of my report.

BY ATTORNEY LEHMAN:

Q. Do you agree that social media platforms have changed in the last five years?

A. Again, I don't consider myself expert in all of the features of the defendants' platforms, for example,

Page 308

but I would imagine that they have increased ways of engaging students and that there are ways that it's likely changed over time.

Q. Do you know whether social media platforms have been created or disappeared over the last five years?

A. I can't speak to that specifically, no. I imagine possibly yes.

Q. Have you studied, in any way, the changes in the last 15 years on any social media platform?

A. Have I studied specifically the changes on the social media platforms?

Q. Yes.

A. No, not -- not systematically, I haven't studied the changes on the social media platforms.

Q. Have you looked at any data about how content changes on social media platforms?

ATTORNEY YEATES: Object to

Page 309

the form.

THE WITNESS: I don't even know that I understand what you're asking with that question.

BY ATTORNEY LEHMAN:

Q. Sure. Sure.

Are you aware, based on your use of social media and conversations that you've had, that the form of content on social media platforms is constantly changing?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't know. I'm not sure what you mean by the "form of content."

BY ATTORNEY LEHMAN:

Q. Well, are you aware that the content that is popular is constantly changing?

A. I mean, would it surprise me that content might change over time? No.

Q. Does your -- does the program that you outline in your report

78 (Pages 306 - 309)

CONFIDENTIAL

Page 310

have any mechanism to keep up with changes in social media, whether it's features or content or even broad platforms?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So first of all, it's -- you mention a program. So what I've recommended is a comprehensive set of recommendations. And it's laid out over a number of years to address changes -- and I speak specifically to this in my report -- to address changes that might occur, but also to really address the harms that have already occurred for young people and that may continue to occur with exposure to social media.

BY ATTORNEY LEHMAN:

Q. Now, you state in your report that the 15-year timeline mirrors other successful public health responses

Page 311

to youth risk behaviors. And you used tobacco as an example.

Is there any other peer-reviewed article that you would cite supporting the analogy that you are making between addressing social media and tobacco?

A. So can you point to where it is in my report so I can just look to the citation that I did use?

Because you're asking me about other citations, so I want to make sure that I --

Q. Sure. It's Paragraph 107.

A. Right. So here I cited the Office of the Surgeon General report, which, to my understanding, is really the most kind of comprehensive look at the study. So I didn't see a need to cite a different reference here.

Are there other reports and studies on this? Perhaps. That was not necessarily what I needed to cite to demonstrate what I was indicating in this

Page 312

particular paragraph.

Q. Okay. Well, the citation here is to the 2012 Surgeon General's report on smoking and health, correct?

A. It's to the 2012 public health service, Office of the Surgeon General, a National Center for Chronic Disease Prevention and Health Promotion, Preventing Tobacco Use Among Youth and Young Adults: A Report of the Surgeon General.

Q. And this 2012 report of the Surgeon General, it doesn't outline a 15-year plan with the same types of components that your plan does, correct?

A. So there are actually some overlapping components.

I mean, first of all, you wouldn't expect it to be identical, right. We're talking about two different things. We're talking about smoking cessation and the harms caused by tobacco and we're talking about social media.

So it's not identical. But

Page 313

there are certainly overlapping components.

So health education, as I've outlined here; capacity building in schools; and the integration of behavior change supports through students' developmental years.

So there are certainly overlapping components, as there would be with public health kind of interventions around this type of harm caused to young people.

Q. What is your understanding of the school-based prevention of efforts -- hold on. Let me start again.

What is your understanding of the school-based prevention efforts related to tobacco?

A. Yeah, so I don't come here pretending to be an expert on tobacco prevention.

But I do know and have reviewed the particular public health efforts that showed this massive decrease

79 (Pages 310 - 313)

CONFIDENTIAL

Page 314

in harm -- or in use, in this case, of 73 percent over this time period from 1997 to 2015.

As far as the school-based efforts, I'd have to go deeper at this point or refresh into the report to really understand all of the specific school-based components.

Q. Okay. Well, certainly there is a difference between social media and tobacco in the sense that social media use is behavior and tobacco is a substance that is ingested, correct?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I think both tobacco and social media involve behaviors. And, I mean, you're ingesting -- you're ingesting -- well, I won't -- I won't expand upon that.

They both involve behavior.

BY ATTORNEY LEHMAN:

Q. Okay. You understand that

Page 315

the DSM has recognized tobacco use disorder as a substance addiction not as a behavioral addiction, correct?

A. So I think that's actually an artificial distinction, that we wouldn't describe it that way in the mental health field.

Because substance use is behavioral, right. In fact, we've changed the term, often in the context of talking about mental health, to behavioral health specifically to describe substance use disorder.

So the term "behavioral health disorders" very commonly is used as an umbrella term to talk about substance use disorders.

Q. So would you disagree with the DSM characterization of tobacco use disorder as a substance use disorder?

ATTORNEY YEATES: Object to the form.

THE WITNESS: It's classified within the DSM as a

Page 316

substance use disorder, which is a behavioral health disorder.

BY ATTORNEY LEHMAN:

Q. What behavioral addictions does the DSM recognize?

A. I'd have to have a copy of the DSM to make sure that I'm giving a list of those.

Q. What evidence do you have, other than the 2012 report from the Surgeon General that you cite in Footnote 117 of your report, that school-based prevention efforts actually caused youth tobacco use to decline?

A. So, again, this was part of a -- as I understand it, again, not being a tobacco expert, but as I understand it, schools were a part of the public health effort to decrease this, including building capacity in schools and behavior change, intervention programming at schools.

Do I know all the details of it? No. Again, that's not my area.

Page 317

Tobacco prevention is not my area. So I'd have to go back and look at all the specific components.

Q. And do you have an understanding about when the public health effort to decrease youth tobacco use began?

A. Do I have an understanding of when it began --

Q. Yes.

A. -- in general?

I suppose it depends on what you mean by when did the public health effort begin. This particular report talks about the change from '97 to 2015.

Q. And do you have any information about what efforts were underway to curb youth tobacco use prior to 1997?

A. I don't have that at my disposal, no.

Q. In your rebuttal report, you referenced the anti-obesity initiatives in Opinion 5.

80 (Pages 314 - 317)

CONFIDENTIAL

Page 318

What anti-obesity initiatives are you referencing?

A.   Let me just turn to my rebuttal report.

Okay.  So here I don't know that I'm referring to -- and I haven't cited a specific obesity initiative or anti-obesity initiative, but I'm talking about the public health effort to reduce childhood obesity.

Q.   And is it your opinion that that has been successful?

A.   So, again, I don't come as an obesity expert.  So I'm not offering an opinion on that.

Q.   Okay.  And then what is -- what are the parts of the plan that you are proposing that are also part of the anti-obesity initiative that you reference in Opinion 5?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  What are the parts of the plan that I developed

Page 319

that are part of the anti-obesity initiative?

BY ATTORNEY LEHMAN:

Q.   Yes.

Is there overlap between the two plans?

A.   So to go back to Opinion 5, I was referencing anti-obesity efforts to describe that, often, pervasive public health issues take long-term investment, stage implementation and ongoing evaluation.

So to the question of what parts of my program are related to anti-obesity, my strategic plan is very specific to the harms of social media.

Q.   How did you select the 15-year duration of your proposed plan?

A.   Yeah.  I mean, you know, the 15 years, I would say, is really grounded in kind of three different pillars of, you know, input.  And I go into detail on that in my report.  But I can describe those.

Page 320

So the first is really, you know, basing it on other public health frameworks.  So we've talked a little bit about that.  We've talked about the tobacco exemplar of a large public health effort that was harming our youth that took a multi-component effort to actually cause deep and sustained change in young people's behavior.

So I look to those public health examples as one part of really thinking through, you know, what would best practice be in the length of this type of plan.

And we are talking about a highly complex issue, social media impact, with multiple harms in a system, education, that is pretty complex.  So I thought the -- you know, the corollary there is important.

The second piece, you know, is I thought about -- we're talking about K-through-12 education, where we know that, first of all, most young people who

Page 321

receive mental health services receive those in schools.  And it offers the opportunity for multi-tiered systems of support, as I go into pretty great detail in my report.

So that often happens in a K-through-12 setting, right, young people spend about 15,000 hours, between kindergarten and 12th grade, in schools.  And so it does offer an opportunity for this type of public health intervention.

And so the second pillar was really around that K-through-12 cohort that in order to really be able to look at a cohort over time from kindergarten, age 5, up until 18, that you would want to have a multi-year -- in this case, I propose 15 years because it covers that full cohort with enough time, as I laid out in the plan, a little bit of planning and hiring time, and a bit of time for sustaining the implementation.

So that cohort, the K-through-12 cohort is kind of that

81 (Pages 318 - 321)

CONFIDENTIAL

Page 322

second pillar, right.

So we've talked about the public health frameworks and the K through 12 pillar -- cohort, rather.

And the third piece is really, as I detailed in here, I looked to the implementation science literature. So, in particular, I know I referenced the National Implementation Research Network, amongst others, who really have looked at, what does it look like to implement programming?

Now, in that report, they do look at what does it look like to implement a single program in a single setting. What I'm talking about is a multi-component plan. So I looked within the implementation literature to what does it take to actually implement multi-component interventions in a complex system like education.

And that very clearly lays out that it's often multiple years. In fact, they cite over ten years in that

Page 323

particular monograph.

So those three things combined really informed the decision for laying out a 15-year plan that I think is not only reasonable in this case but really necessary to address the harm over time, to be able to study it, evaluate it, and adjust it as needed over time. And I talk about that in the evaluation component.

And also just to be able to implement something with fidelity over time, you need the time to do that. And that's what is really -- when I talk about a third pillar, you know, the NIRNians, the National Implementation Research Network folks, who really are considered kind of the -- they're -- they're leading in this area of implementation science, that's what they've suggested.

So those were the factors.

Q.   Just to be clear, the NIRNians, they didn't actually suggest 15

Page 324

years, do they?

A.   So I'd have to go back to the report that I cited.

But what I can tell you is that they very specifically talk about different kind of types of interventions and different lengths of years depending on that.

And I think I've -- I mean, I'm happy to go back to the report to pull out specific things that I used to draw my conclusions from their information.

So they do talk about, I believe -- but, again, it would probably be more helpful if I just looked at the report. So I can do that.

Q.   You mentioned things in sort of Bucket 1, in response to my question, other public health frameworks.

Did you look at other public health frameworks other than tobacco and anti-obesity?

A.   So I think in my report I

Page 325

probably also referenced trauma-informed school efforts. And certainly in my own experience when I've looked at -- you know, so I was referencing my own experience in the field of working in implementation science in schools for years.

And so, for example, one of the -- one of the efforts and frameworks that comes to mind for me is positive behavior interventions and supports or multi-tiered systems of support.

And what we do see in the field is that it can take a very long time, in this case, over a decade, to actually implement those things with fidelity.

Q.   What is the longest program that one of your consultant clients has ever implemented at your recommendation?

A.   When you say "the longest program," I'm not entirely sure what you mean by that.

Q.   Sure. What was the

82 (Pages 322 - 325)

CONFIDENTIAL

Page 326

duration -- the longest duration of a plan that one of your consulting clients implemented at your recommendation?

A. Well, so when you think about the length of time that I've been a part of the National Center, we've worked with some of our school districts -- again, I've been there for 25 years -- I would say many of them are still doing continuous quality improvement on multi-tiered systems of support, for example. So that would be roughly two decades that they are implementing that.

I mean, it often is a continuous quality-improvement effort.

Q. Well -- and my question is different.

When you started -- when those school districts started implementing that multi-tiered system, did they say at the outset, I intend to implement this for 20 or 25 years, or did they say, we intend to implement a multi-tiered system and they've been

Page 327

changing it ever since they implemented it?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Yeah, I don't -- I don't know what a district would have said. I mean, we're talking about multiple districts, first of all.

But would they have said, I intend to implement and then stop this in five years, for example? No, not necessarily.

BY ATTORNEY LEHMAN:

Q. What is the average tenure of school superintendents across the country?

A. I don't know the actual answer to the number of years. I know that it's highly variable, having worked with a lot of school districts. Some stay for shorter terms, some stay for longer terms.

Q. Do you know what the average

Page 328

turnover is amongst school superintendents in a given year?

A. Do I know the exact number? Not off the top of my head.

Q. Can you approximate?

A. No. I wouldn't feel comfortable approximating. It's not necessary.

Q. Do you agree that implementing a multi-tiered program, such as the program that you have suggested, that it requires consistency and sustained implementation?

A. So what I would suggest is that it requires -- consistency is an interesting word, because what I would say is that it requires continuous quality improvement. And I speak to that in the report.

And the second term you used was sustainment -- or sustainability, does it require --

Q. I said sustained implementation.

Page 329

A. Sustained implementation. It's ideal if there is sustained implementation.

Q. Do you agree that superintendents often bring their own agendas when they are hired by a school district?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I think superintendents, you know, are very different in every district I've worked in.

So many superintendents build on what's already there and they, you know, leverage the programming that already exists.

But part of the reason, I mean, I have to say, that you want to implement a longer-term plan is so that you're not kind of driven by the whims of somebody who might come in and have a specific agenda.

83 (Pages 326 - 329)

CONFIDENTIAL

Page 330

And usually when there is kind of a longer-term comprehensive plan that is well resourced, a superintendent is not going to just shut that down, typically, overnight.

BY ATTORNEY LEHMAN:

Q. Well, I mean, isn't the reason that new superintendents are hired, in many circumstances, is so that the school district can change and evolve?

A. There are so many reasons that new superintendents are hired. I think that calls for some speculation that, you know -- I think oftentimes superintendents are hired, you know, for various reasons. I'll just say that.

Q. Okay. In your -- within your consulting clients, have you seen school districts who stop following a program when a new superintendent is hired?

A. I don't know if I can think

Page 331

of a specific example of that. I mean, what I can say is that, based on my experience, most programming that is in place when a new superintendent is -- you know, comes into a district remains in place.

I mean, there's not typically an entire upheaval of all programming when a new superintendent comes in. That's not been my experience.

Q. Do you know how long the average tenure is of school board members?

A. Again, it does vary across districts. So if you're talking about a national average and a specific number, I don't have that off the top of my head.

Q. In general, do you agree that schools face -- face persistent recruitment challenges?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Yeah, that's a broad question. So can you be

Page 332

more specific?

Are you -- recruitment of --

BY ATTORNEY LEHMAN:

Q. Sure.

Let's -- let's start with in general. Do you agree that schools face challenges hiring qualified, certified teachers?

A. Again, I'm not a hiring expert. So I don't know that I can answer that question in good faith.

I know that, you know, there's attrition in the field, just like any other field. And that they put hiring practices in place to hire educators.

Q. Have you ever looked at -- let me start again.

Have you ever studied or attempted to quantify the impact of teacher turnover on the implementation of educational programs?

A. Have I ever looked at it or studied it?

Page 333

Q. Yes.

A. So I've certainly in my editorial role at the School of Mental Health Journal, and in reading hundreds if not thousands of school mental health articles, I'm sure that I have looked at implementation science that speaks to the role of educator turnover on, you know, the fidelity with which interventions are implemented.

Q. And in your review of that literature, have you seen that urban teachers are particularly at risk for burnout?

A. So I recall -- again, I'm not going to be able to cite a specific study right now because, you know, we're talking about a general area.

But I do recall reviewing information that speaks to and maybe even written about and spoken about burnout. You know, I've worked in Baltimore city schools, for example, for 30 years.

So I'm familiar with an

84 (Pages 330 - 333)

CONFIDENTIAL

Page 334

urban context, as well as other school district contexts. And I know that there is some literature looking specifically at burnout of educators in urban school settings.

Q. All right.

ATTORNEY LEHMAN: I'm going to hand you what -- this is going to be Tab 47. We've marked it as Exhibit Number 27.

- - -

(Whereupon, Exhibit Hoover-27, No Bates, Burnout in Urban Teachers: The Predictive Role of Supports and Situational Responses, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Q. All right. Can you confirm that this is an article that you co-wrote entitled, Burnout in Urban Teachers: The Predictive Role of Supports and Situational Responses?

Page 335

A. I can. See, I was right. I thought I may have written about something in this area.

Q. And this was -- it looks like it was accepted for publication on April 28th, 2021.

A. Correct.

Q. All right. And I want to turn to the second page, Page 817.

And looking at the paragraph directly above the header for 1.1. Do you see that it says, Urban teachers are particularly at risk for burnout and leaving the profession early, with certain urban districts exhibiting yearly turnover rates which exceed 40 percent.

Did I read that correctly?

A. Yes. I see that here.

Q. All right. And so was it your understanding, at the time you published this article in 2021, that some urban districts were experiencing yearly turnover rates in excess of 40 percent?

A. So it looks like I'm citing

Page 336

a specific study, Barnes, et al, 2007. So I would have to go back to that study to understand.

Because I use a bit of a general term there, with certain urban districts. So that could be, you know, .01 percent of urban districts, it could be more than that. I just don't know, so.

Q. Well, would it -- it would have been your practice, when you were drafting and editing this article, that if that information was no longer accurate, you would not have included it in your article, correct?

A. So I wouldn't have used it if it weren't accurate.

And what I'm saying is that when I use the term "certain urban districts exhibiting yearly turnover rates," it's certainly not implying that that's the average or that that's even common.

Q. What is the average turnover

Page 337

rate in urban districts?

A. I don't know that offhand.

Q. Okay. And do you agree that there is a tight labor market for specialized professionals who work in the educational system?

A. You know, I don't know. Again, I would come back to that I'm -- as someone who is not a hiring specialist, I don't know that I know -- the term you just used was "a tight labor market for specialized professionals." I don't -- I don't know the answer to that.

Q. Does your plan include any information about how the districts are to go about retaining the numbers of individuals that you propose that they hire?

A. So what I would say is that the plan, first of all, accounts for some attrition. And -- and I speak about -- I'm trying to think, in my -- I have to go reference my rebuttal reports. So I'm happy to do that, if that's useful.

85 (Pages 334 - 337)

CONFIDENTIAL

Page 338

But I do -- I do speak to this topic, about recruiting and retaining staff.

So I'm happy to look to that if that would be helpful.

Q.   Well, I guess I'm not -- I'm not asking to just repeat the rebuttal report.

A.   Okay.

Q.   So let's look at something else that you published in.

ATTORNEY LEHMAN:  Let's look at Tab 48.

THE WITNESS:  Okay.

ATTORNEY LEHMAN:  And we'll mark this as Exhibit Number 28.

- - -

(Whereupon, Exhibit Hoover-28, No Bates, Schools As a Vital Component of the Child and Adolescent Mental Health System, was marked for identification.)

- - -

BY ATTORNEY LEHMAN:

Page 339

Q.   And we're going to turn to Page 39, under persistent obstacles.

But just -- just to be clear, can you confirm that I've handed you an article entitled, Schools As a Vital Component of the Child and Adolescent Mental Health System?

A.   Yes.

Q.   And this is an article that you co-wrote and published in January of 2021?

A.   Yes.

Q.   So, then, if you'll turn to Page 39, under persistent obstacles.

And you wrote here, quote, Several challenges impede the integration of mental health supports and services into schools.  First, schools are driven by competing and frequently changing priorities, often not informed by data.  Despite evidence that school mental health positively influences students' academic and psychosocial functioning, competing interests sometimes make it

Page 340

difficult to sustain resources and momentum for school mental health.

Did I read that correctly?

A.   Yes.

Q.   And do you agree today, in 2025, that there are a number of challenges that impede the integration of mental health supports and services into school, including competing and frequently changing priorities?

A.   So I think what I would say there is that the context for the competing interests and priorities often has much more to do with resource constraints.

So if there are not the resources, for example, to fund a school psychologist or to -- you know, let's say there's enough resources to hire either a school psychologist or an English teacher, a school might have to make a tough decision there.

So -- and the priorities of one school board member versus another

Page 341

may have to speak to that.

So often these competing priorities are in the context of limited resources to address specific areas.

Q.   Other than limited resources, what are the other challenges that you see in terms of implementing mental health supports and services into schools?

A.   Yeah, I mean, I would say that, frankly, resources is a big one.  Because, oftentimes, resources will dictate whether you can get appropriate staffing or professional development to implement something that's important to do, whether it's, you know, English literacy or mental health literacy.

And so you could say, well, there's a challenge of limited professional development.  But, frankly, when you kind of dig down into what's driving that, it's often limited resources to do what's needed, to support kids, whether it's in their academics or

86 (Pages 338 - 341)

CONFIDENTIAL

Page 342

their social-emotional development.

So those are some of the issues that come along with that resource constraint.

Q.  Does your plan take into account leveraging existing resources that the school districts already have in place?

A.  So what I would say is this: The -- I did take a look at the services and staffing, as I always do, in my methodology when I'm working with school districts. I look at who their staff is, what their service array is, what resources they might have in place and how to best leverage it.

And in this report, I was really addressing the impacts of social media, which, as I outline in the report, are a novel and unique set of new circumstances for young people that are causing new harms that are laid out in my report and the reports of other experts.

And so what we found, and,

Page 343

again, this is not inconsistent -- what we found in the bellwether districts is not inconsistent with other districts, is that their current programming was often piecemeal, patchwork, limited, and that their staffing would not have been adequate to address -- the current staffing would not have been adequate to address the new needs.

So did I consider it? Yes.

Q.  Okay.

A.  But would it -- you know, their -- their current folks are being pulled into social media, that's causing a lot of fragmenting of current systems, if that makes -- if that's understandable.

Q.  And so, then, when you wrote out your plans, did you make adjustments for each district based on the resources they already have?

A.  So because we're talking about a new set of harms to young people and a new set of concerns, let's say,

Page 344

that our young people are experiencing with respect to mental health, and a new set of concerns that the schools are experiencing with classroom disruption and impacts on teaching, the interventions that I -- or the programming that I offered is really additive to what's there.

Did I consider in every district that I spoke with and that I looked at the data from kind of how their current resources would intersect with the plan? Yes. And I laid that out in each of the district reports.

Q.  In your previous answer, you said -- and I'm just going to read it from the transcript that's in front of me -- And so what we found -- and, again, this is not inconsistent, what we found in the bellwether districts is not inconsistent with other districts. And then you went on.

But my question is, who is "we"?

Page 345

A.  Oh, I'm probably using the term -- I often use that colloquially to mean me, I; what I found.

Q.  Okay. All right. So when you said "we" --

A.  I meant me.

Q.  -- what -- what Dr. Hoover found?

A.  What I found, yes. What I found.

I mean, I'd have to go back to the exact statement I was making. But I imagine that if I was talking about what I found in the bellwether districts, it would be me.

Q.  Okay.

A.  Yeah.

ATTORNEY YEATES:  Counsel, can we take a break soon?

ATTORNEY LEHMAN:  Sure. We can take a break now.

VIDEO TECHNICIAN:  The time is 3:07 p.m., and we are off the record.

87 (Pages 342 - 345)

CONFIDENTIAL

Page 346

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN: The time is 3:29 p.m., and we are on the record.

BY ATTORNEY LEHMAN:

Q. Dr. Hoover, do you have any quantitative data about how adolescents use their time when they are on social media?

A. So I recall in my report -- and if I need to, you know, cite specific numbers, I'm happy to go through the report.

But I recall in the report speaking to the expert reports and their kind of deeper dive into how time was spent, as well as referencing the peer-reviewed literature that the predominance of time was spent on the defendants' platforms.

Q. And my question was a little

Page 347

bit different. So I'm not -- I'm not asking about how much time is spent on platforms.

What I'm asking is, do you have any information about how the users spend their time while they are on the defendants' platforms?

So to use an example, whether they're posting versus reading something versus watching movies or doing something else?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I want to go back to the actual studies, because I seem to recall there being information about, you know -- at least in some studies, looking at how they spent time. I don't have it at my fingertips at the moment, no.

BY ATTORNEY LEHMAN:

Q. Have you ever, prior to this litigation, created a plan for a school

Page 348

district that is intended to address only impacts of social media?

A. So outside of the context of this litigation, I have not created a plan only to address social media for a school district.

Social media has been something that's been considered in the context of creating other plans. But no, not specifically outside of this litigation.

Q. And when you say that in prior plans that you've created outside of litigation social media is something that has been "considered," what do you mean?

A. So what I would say is that in -- you know, when I'm meeting with districts, it would be rare these days for social media not to come up as a concern for students and the harms to the schools, the harms to students.

I don't know how much depth you want me to go into there, but that's

Page 349

what I mean by that. That it's something that would have been considered.

Because when I meet with schools, they're consistently talking about this.

Q. In the last five years, have you created any plans for school districts intended to be a comprehensive plan to address the social emotional, mental health needs of their students?

A. In the last five years, yes, I would have come up with plans and also just supported districts in developing their social, emotional and mental health needs, yes.

Q. How many -- in the last five years, how many of those plans have you come up with?

A. It would be hard for me to quantify, to be honest with you.

Again, as co-director of the National Center for School of Mental Health, it's a large part of our job to actually, you know, run learning

88 (Pages 346 - 349)

CONFIDENTIAL

Page 350

collaboratives with school districts and help them develop quality improvement plans for mental health services.

So the nature of the plans can be different as well. So to say, you know, X number of plans would be virtually impossible, because I've worked with so many districts over five years, much less 20-something years.

Q. For those plans that you have created in the last five years that are intended to be a comprehensive plan to address the social, emotional, mental health needs of the students, what is the planned duration of those plans?

A. What I would say is that it's variable. And, you know, some plans have a specific time period that may be, for example, shaped by the inquiry -- or by the request, rather.

So if a school district says, we need a five-year plan, we'll say, to, you know, really put into place health education programming.

Page 351

And so I do want to be clear, you're talking about comprehensive plans. Oftentimes, school districts do come and say, like, we really want to focus on a specific area, you know, and that could be resource constrained, right. So it could be, we need to focus on school mental health screening.

And so sometimes they'll put a request in that says, you know, we need -- we have five years within which we can do this. Sometimes that may be because they have a certain, you know, set of grant funds that shape a time period and the topics that they can focus on.

There are other times, and this is not infrequent, this is actually pretty frequent, that we work with school districts where they are wanting to, you know, improve their mental health systems -- and it may be a specific part of their mental health system -- and we give them guidance on that without

Page 352

specifying X number of years. So it would be, here is a continuous quality improvement plan.

Q. Has any school district ever come to you and asked you to develop a plan solely to address social media?

A. Not that I can recall. Not that I can recall, no.

Q. Has any school district ever come to you and asked you to develop a plan with a 15-year duration?

A. I would guess that many school districts wish that they could come with that.

But, you know, frankly, as I've already alluded to, a lot of school districts may, you know, say, we have a grant that's three years long, and so we need to establish a plan that we can be funded for, for three years, to do X.

And what I will say is that, you know, it's -- we have school districts, as I've already kind of indicated, that will come to us knowing

Page 353

that they -- that, you know, supporting student mental health, for example, is part of, you know, what they do.

And so they may not come with X number of years, but that doesn't mean that they don't intend to carry something out for several years.

Q. And so is it correct, then, you don't recall any district ever coming to you and asking for a 5-year plan -- I'm sorry, asking for a 15-year plan?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So do I recall a district coming to me and saying, we need a 15-year plan for X? No.

BY ATTORNEY LEHMAN:

Q. In the plans that you developed in this litigation, did you adjust the plan based on prior professional development that had already been provided to teachers and staff?

A. So in the bell -- in the

89 (Pages 350 - 353)

CONFIDENTIAL

Page 354

districts for these specific plans? All the specific district reports --

Q. Yes.

A. -- you're talking about now?

Q. Yes. Yes.

A. So I did inquire about and take a look at the professional development, for example, in the key informant interviews and in documents reviewed.

It was something I considered in terms of then developing a strategic plan.

Q. And did you make any adjustments based on their prior professional development that had been provided?

A. So what I found, really, across the districts, was that even if they were implementing, let's say, components of social emotional learning or components of, you know, teacher training on social media policies, they were -- they might have looked different

Page 355

in the districts, but there was a consistency in that they were not adequate to address the social media as it currently is and in terms of the harms that we're seeing in young people.

And, also, the staffing is -- well, we were talking about professional development. So I'll stop there.

Q. Okay. Is it correct, then, that you found the prior professional development in all of the districts that you evaluated to have been inadequate?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I think that's probably a bit too broad of a question for me to be able to answer.

Certainly, you know, the districts are putting in effort. And I think I note that in my reports. They're putting in effort to try to -- with respect

Page 356

to social media professional development, they are trying their best.

But, frankly, you know, it's a whole new layer of issues that are being introduced to their students and to their schools.

So, you know, I don't want to say that everything they're doing is inadequate. That wouldn't be fair. But, you know, they're just not equipped or resourced to actually address what's happening with respect to the schools and students in terms of the impact of social media.

BY ATTORNEY LEHMAN:

Q. You mentioned earlier that you had done work with Baltimore. How long have you been working with the Baltimore School District?

A. Well, so I've -- I've lived in, you know, that area and been -- you

Page 357

know, the School of Medicine is located in Baltimore. Some of my first clinical experiences were in the Baltimore schools.

So I would say almost 30 years now.

Q. Outside of litigation, have you ever provided Baltimore with a plan to address social media?

A. With a plan only to address social media?

Q. Yes.

A. No, not that I'm aware of.

Q. Outside of litigation, have you provided Baltimore with a plan that would address social media?

A. I'm trying to remember if I personally have provided a specific plan. I mean, I don't know that that would have fallen within my role.

You know, has our center provided guidance to Baltimore city schools on mental health services? Yes. And would mental health services

90 (Pages 354 - 357)

CONFIDENTIAL

Page 358

inevitably, in this day and age, be addressing social media? Likely so.

Q. How would you describe your role with Baltimore schools?

A. So it's evolved over the years. So I'm going to have to look to my CV for exact dates. But roughly speaking, I was a clinician in the schools. And I've been in at least a couple of schools as a clinician in the schools. And then I was a direct supervisor for clinicians who were in the schools.

And then, you know, again, as co-director of a National Center, we work with lots of districts. So how I work with Baltimore city may be quite similar to how I would work with other districts in that capacity, in that we provide best practices, we provide guidance, we provide updated research to school districts.

And if they reach out to us with inquiries about mental health

Page 359

supports and services, we'll often respond to those.

Q. And have Baltimore city schools implemented the plans that the National Center put together to address the mental health issues within their district?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Yeah, I mean, I -- to be honest, I feel like that question is probably a little bit too broad for me to answer.

Like, their -- the plans is -- is -- I'm not sure what you mean by "the plans," because we provide, as I mentioned, general technical assistance. They may have attended a Webinar from our National Center. We may have talked with them about continuous quality improvement. We may have provided a specific training for Baltimore city school clinicians.

Page 360

So have they implemented some of the things that we have offered to them? Perhaps. I would think so.

But, you know, have they implemented everything? I couldn't say.

BY ATTORNEY LEHMAN:

Q. Okay. Are you able to specifically identify any of the guidance that the center provided to Baltimore city schools that have been implemented?

A. I know -- and, again, I'm speaking now more broadly for the National Center.

I believe that there was guidance around measurement-based care, for example, that was offered to Baltimore city clinicians that was implemented over the course of the last several years.

So that's one example.

Q. How did you decide which studies to review in forming your

Page 361

opinions in this case?

A. So we're moving away from Baltimore city now?

Q. Yes.

A. Okay. All right. I just want to make sure I understand where you're going here.

So can you repeat the question?

Q. How did you decide which studies to review in forming your opinions in this case?

A. So, you know, I used my typical process, the methodology, which is to really look to the databases, or what we might think of as repositories, that might include PsycInfo or PubMed, those are some of the databases that I use.

I also, in my role, you know, as an editor in school mental health, often come across studies. So I looked to the literature using, you know, within those repositories, certain search

91 (Pages 358 - 361)

CONFIDENTIAL

Page 362

terms, for example, school mental health, those kinds of things.

That's how you would typically do a search for articles. So I drew upon that, looked at impact, social media, school mental health, that kind of thing.

And then, also, if I happened to have an article that came across my desk as an editor or in my work as the director of the -- or co-director of the National Center for School Mental Health, that may have been an article that was included for consideration.

I also did consider articles -- some of the articles that some of the expert witnesses, the other experts, the other plaintiff experts, may have included in their reports. But I generally, in that case, would rely on the opinions of those experts.

Q. On circumstances when you reviewed the expert reports of defense experts, did you go and look at any of

Page 363

the articles that they had cited that you had not already reviewed?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So just so I can clarify, because all the legal language is new to me.

So the defense experts, you're talking about the rebuttal reports that they would have sent?

BY ATTORNEY LEHMAN:

Q. Well, so I saw in your list, you had a number of defense experts that were listed as people that you had reviewed their reports.

A. I assume those are the rebuttal reports.

Q. When you reviewed the reports of the defense experts, and so --

A. Do you want to specify who?

Q. Sure.

A. Okay.

Q. By that I'm referring to Diana Wildermuth, Ethan Hutt, Stephen

Page 364

Aguilar and so on.

When you reviewed those reports, did you go and look at any of the articles that they cited you had not previously reviewed?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Honestly, I can't recall. I mean, I'm -- if I did, I likely would have -- they would have been in the articles considered in my response to their rebuttals, so.

BY ATTORNEY LEHMAN:

Q. Okay. So you don't remember doing it. But it would be reflected in those materials --

A. That's what I'm saying --

Q. -- considered list?

A. -- if I did, it would be in the -- in the documents considered.

And I think there were a few new things that were included in the response to the rebuttals.

Page 365

Q. When you looked in the databases and you said that you ran search terms, did you review all of the articles that came back in response to the search terms or did you cull them down in some way?

A. So I'm trying to recall. I mean, oftentimes we cull it down.

And I may have looked for articles that seemed particularly pertinent to the question at hand, right, looking at social media and its impacts on students, mental health and on schooling.

So that's how -- when I think about how I would have culled it down, that would be -- you know, if I'm thinking about broad impacts, that's how I would have culled it down.

Q. Okay. How would you have made that cut? Would you have done that based on the abstract or would you have read the entire article? How would you go about that?

92 (Pages 362 - 365)

CONFIDENTIAL

Page 366

A.   It depends.  I mean, as a -- as a scientist who's reviewed and read articles, again, for over 30 years at this point, including graduate training, you get kind of pretty savvy about being able to determine -- I would never make a conclusion from one abstract, but you can determine whether it's going to be relevant to, you know, your task at hand.

So I may have looked at an abstract, for example, and determined this is really kind of outside of the scope of what we're thinking about here, what I'm thinking about.

But, yeah, oftentimes it was doing a skim or a review of a full article to determine whether to consider it.

Q.   Did any studies in your materials considered list not find correlation?

A.   Oh, I'd have to go back to all the studies to really determine that.

Q.   Do you agree that sexual

Page 367

identity or sexual orientation is a potential cause of mental health issues in adolescents?

A.   I think that's quite complicated.  I know that certainly some young people do struggle with their sexual identity.

Did you include sexual identity and sexual orientation --

Q.   I did.

A.   -- were those the two terms?

So I know that, certainly, those can be issues that young people struggle with in terms of their experience and that can impact their mental health functioning.

Q.   Do you agree that neglect or abuse in the home is a potential cause of mental health issues in adolescents?

A.   So I do -- I certainly would say that neglect in the home can be a factor for mental health in adolescents.

Q.   Do you agree that the death of a loved one or a chronic illness in a

Page 368

loved one can be a cause of mental health issues in adolescents?

A.   Yes.

Q.   Do you agree that COVID was a potential cause of mental health issues in adolescents?

A.   I would say that one is a little bit different.  Because, I mean, COVID caused -- you know, it's a virus, right.

So it's really kind of what happened in the context of the pandemic that we may look to to understand how it may have impacted young people's mental health.

So I'll give you an example.

So young people, we know, not all, but many, were engaged in distance learning or they were at least isolated.  And in that context, many of them were using social media platforms, including the defendants' platforms, at a greater degree than prior to.

So if they're home, they are

Page 369

isolated, they're distance learning, they may have been exposed to more social media.

So it's the factors that occurred in the context of the pandemic.  So the question is a little tough, you know.

Does the pandemic itself cause mental health challenges?  It's really kind of the circumstances around that that I need more specificity around, if that makes sense.

Q.   All right.  Well, do you agree with this statement --

A.   Okay.

Q.   -- the Covid-19 pandemic and the resulting impact of social isolation, economic hardship, grief and trauma is related to mental health concerns for children and adolescents?

A.   It sounds like something that I would have said, because I think that the resulting hardships that may occur -- and that's really aligned with

93 (Pages 366 - 369)

CONFIDENTIAL

Page 370

what I had just said, that it's really not the virus itself, it may be some other contextual factors around the pandemic that may have contributed to mental health challenges in our young people.

Q.   Do you agree that school shootings can be a cause of mental health issues in adolescents?

A.   So, again, having worked with a number of school districts that have experienced school shootings, what I would say is that there's kind of a concentric circle of impact when there's, you know, an incident of violence.

So do I think that a school shooting could have an impact on young people and their mental health?  Sure. Yes, of course that could be the case.

Is it, you know, to the same degree as other mental health challenges that we're seeing that are more pervasive or other influencers or factors like social media platforms?  Probably not.

Page 371

Q.   Have you seen any studies that compare the pervasiveness or influence of social media as compared to school shootings on adolescent mental health?

A.   So, you know, I can't think of particular studies that look at that directly.

What I can tell you is that, you know, I've worked with lots of schools and students who -- and, you know, the amount that I hear about school shootings is often really quite constrained to the schools where that has occurred.  And social media comes up as harmful in about every school if not every school that I engage with.

So it's not necessarily a study that would inform that, because I don't know that the study has been done. If there is, it doesn't come to mind at this moment.

Q.   Do you agree that the impacts of a school shooting are not

Page 372

confined to only the school where the shooting happened, but, in fact, spread out across the school district and, indeed, across the state?

A.   Yeah.

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Well, actually, let me -- I didn't hear the -- I answered you before you finished.  So I broke the rules here.

So you said indeed across the state.  So that was kind of added on at the end.

So what I would -- what I would say is that the impacts of a school shooting are not constrained to just the people in the school.

And, frankly, even within a school where a school shooting happens, there's, you know, variability in terms of the

Page 373

impacts of an incident like that on the people in the school.

BY ATTORNEY LEHMAN:

Q.   Do you agree that having a school shooting incident within a school district can impact the mental health of students across the district, not just those who are physically present in the building where the shooting happened?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  You know, again, I mean, does an incident of community violence -- you're talking about a school shooting here, does it impact people in the district?  Maybe.  Could it? Maybe.

BY ATTORNEY LEHMAN:

Q.   Do you agree that when there is an incident, within a school district, of sexual abuse between either a teacher or staff member with a student, that that can impact the mental health of students

94 (Pages 370 - 373)

CONFIDENTIAL

Page 374

throughout the district?

ATTORNEY YEATES: Object to the form.

THE WITNESS: It depends what you mean by "impact" students throughout the district. Impact their mental health?

BY ATTORNEY LEHMAN:

Q. Yes.

A. Impact -- perhaps.

Q. Do you agree that if a student experiences personal trauma, that that can cause a mental health issue?

A. If a student experiences personal trauma, can that cause a mental health issue in that student?

Q. Yes.

A. It could. We know that about 80 percent -- 80 to 90 percent of people -- actually, of children, don't go on to develop post-traumatic stress after an incident of trauma.

So there's often kind of an overestimate as to how many people will

Page 375

go on to experience that. But could they be impacted? Sure.

Q. Okay. Are you also aware that at least 50 percent of American youth have experienced a potentially traumatic event?

ATTORNEY YEATES: Object to the form. Foundation.

THE WITNESS: I mean, there's -- frankly, you know, I'm aware of the data looking at the prevalence of traumatic incidents and adverse child experiences we talked about earlier.

The numbers look different depending on, you know, the data that you're looking at. But am I aware that it is a large number of children, adolescents, perhaps over 50 percent, that have been exposed to what we would call a potentially traumatic event, it doesn't mean that it's traumatic, but to -- I don't know the term

Page 376

that you used -- did you use a traumatic event?

BY ATTORNEY LEHMAN:

Q. The term that I used was a potentially traumatic event.

A. Yeah. So may have been exposed to a potentially traumatic event.

So what -- just to kind of clarify what that means, that's an event that may or may not be experienced as traumatic, right. It's something that could happen to a student that may lead to traumatic stress or may not.

Q. Okay.

ATTORNEY LEHMAN: I want to look at an article, and we'll mark this as Exhibit Number 28.

- - -

(Whereupon, Exhibit Hoover-29, No Bates, Healthy Students and Thriving Schools: A Comprehensive Approach for Addressing Students' Trauma and Mental Health Needs, was marked

Page 377

for identification.)

- - -

ATTORNEY LEHMAN: This is Tab 17. Oh, we're on 29. All right. Then I correct myself. We'll mark this as Exhibit-29.

BY ATTORNEY LEHMAN:

Q. All right. Can you confirm that I have handed you a document titled, Healthy Students and Thriving Schools: A Comprehensive Approach for Addressing Students' Trauma and Mental Health Needs?

A. Yes.

Q. And you were one of the co-authors of this document?

A. Correct.

Q. All right. And what was the purpose behind preparing this report?

A. Well, it may be stated differently in the executive summary.

But I can tell you the context for developing this -- well, actually, if you don't mind, I just want to make sure, because it's been a few

95 (Pages 374 - 377)

CONFIDENTIAL

Page 378

years. So I want to make sure that I'm refreshing my memory for a moment when you ask about the purpose of it.

Q. All right. Why don't we -- let's go to Page 6.

A. Okay.

Q. And do you see Page 6 is the introduction?

A. Yes.

Q. All right. And here it talks about, Highlighting the connection between mental health and educational outcomes?

A. Where is here? Oh, right in the beginning.

Q. Right at the beginning.

A. In recent decades, research highlighting the connection between mental health and educational outcomes -- okay.

Q. All right. And then if you -- if you look at the second paragraph in that left column, it says, Federal, state and local interest in

Page 379

school-based health services accelerated following the tragic school shooting in Newtown, Connecticut, in 2012 and has continued to accelerate following additional school shootings and high-profile cases of youth suicide associated with bullying over the past several years.

Did I read that correctly?

A. Yes.

Q. And so was -- was interest in health services, that renewed or that increased interest following the school shooting in Newtown and additional shootings and youth suicide, was that what drove the creation of this report?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So not to my recollection, in terms of, you know, the purpose of this report. And -- no. I mean, that's not what -- what drove the writing of this specific report, if that's

Page 380

what you're asking me.

Not to my recollection, at least.

BY ATTORNEY LEHMAN:

Q. All right. And was this report issued on behalf of For the Child Health and Development Institute of Connecticut?

A. Yes.

Q. Do you agree with the statement that interest, at the federal, state and local interest in health services, accelerated following the school shooting in Newtown, Connecticut, in 2012?

A. So what we often see, not surprisingly, is after a well-publicized incident in a school or school community, there is a rush to invest in or to, you know, intervene around an incident. Not always, but sometimes that's the case.

And so in this instance, you know, we're talking about a school shooting in Newtown, Connecticut. I

Page 381

certainly recall that at that time there was increased interest and attention. And we see that sometimes after school shootings, that there's --

And that's for a variety of reasons. You have, you know, lawmakers who may be interested in -- I don't want to say leveraging, because that sounds opportunistic, but in kind of addressing something when it occurs like that.

Q. If you'll turn to the next page, Page 7.

And we're going to look in that first paragraph, about midway down it starts, Exposure.

All right. Do you see it says, Exposure to adverse experiences and potentially traumatic events also significantly contributes to children's mental health concerns and increases risk for academic difficulties. It is estimated that at least 50 percent of American youth have experienced a potentially traumatic event, with rates

96 (Pages 378 - 381)

CONFIDENTIAL

Page 382

of exposure being even higher in urban communities.

A. Yeah.

Q. Do you see that?

A. I do.

Q. And do you -- do you agree that rates of exposure to potentially traumatic events are even higher in urban communities?

A. So there is data to suggest that rates of exposure to potentially traumatic events, and, in particular, traumatic events like community violence, are higher in some urban communities, yes.

Q. Do you agree that children suffer when a close family member has a substance abuse problem?

A. So certainly sometimes, in the context of substance use disorders in the family, children may struggle.

Q. And can that struggle, as a result of a family member's substance use or abuse, can that be the cause of a

Page 383

mental health concern?

A. It could contribute to a mental health concern for a young person.

Q. Do you agree that political divisiveness or the tenor of the community can contribute to an overall decrease in well-being?

ATTORNEY YEATES: Object to the form.

THE WITNESS: That's a very broad statement. So decrease in well-being, is that -- is there a context for that? Because that -- I'm not sure what you're asking me to agree to.

If it's something I said, it would be helpful to have the context for it.

BY ATTORNEY LEHMAN:

Q. Sure. Sure. And I'll tell you this is actually something that you said in the interview that I believe we've marked as Exhibit Number 24.

A. Okay.

Page 384

ATTORNEY LEHMAN: So if we can just go back to 24. I say 24 --

ATTORNEY YEATES: Counsel, I've given you some leeway here, but you were limited to five hours on the general report.

Are you planning on switching to the case-specific reports soon?

ATTORNEY LEHMAN: We are going to switch soon. I'm just wrapping up a few things, since we did have to spend a few minutes on -- on sort of case-specific issues in the earlier section.

So just wrapping up a few issues.

ATTORNEY YEATES: Okay. You're about 30 -- 30 or so minutes over, so.

ATTORNEY LEHMAN: I don't think that's right, because we started --

Page 385

ATTORNEY YEATES: How much time is on the record?

VIDEO TECHNICIAN: Five hours and 13 minutes.

ATTORNEY YEATES: You're 13 minutes over. So you can take a minute or two, but then let's move on.

ATTORNEY LEHMAN: Okay. Well, I don't know I agree we need to move on that quickly. But we can take a break in a minute or two.

BY ATTORNEY LEHMAN:

Q. All right. So if you'll go to Page 6.

And I want to look at the paragraph that starts, Not to ignore.

And just for context, do you see we're talking about other issues that can impact mental health, such as poverty, food insecurity, housing insecurity?

A. Where are you referring to

97 (Pages 382 - 385)

CONFIDENTIAL

Page 386

right now?

Q. Well, right now, I'm looking at the top of what's on the screen.

A. Okay. I see what's on the top of the screen.

Q. Right. And then -- then you go through and talk about how grief and loss can also impact adolescents' mental health.

Do you see that?

A. I see that.

Q. And then just looking at the last paragraph, do you see it says, Not to ignore some of the more systemic issues -- what do you want to call it, political divisiveness or just the tenor of the nation right now, a lot of people will say that's contributing to an overall decrease in well-being among the general population.

A. Okay.

Q. So do you agree with the statement that you made during your interview in 2023 that political

Page 387

divisiveness or just the tenor of the nation can contribute to an overall decrease in well-being?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I think actually I would agree with the statement as it's said here, not as you kind of changed it.

So the way it's said here is that a lot of people will say that it's contributing to an overall decrease in well-being among the general population.

BY ATTORNEY LEHMAN:

Q. And do you agree that that would be true for adolescents as well?

ATTORNEY YEATES: Object to the form.

THE WITNESS: That a lot of people are talking about it?

BY ATTORNEY LEHMAN:

Q. Yes.

A. I don't know, actually. I

Page 388

mean, I talked about the general population here.

Q. Do you agree that not all body dissatisfaction is part of an eating disorder?

A. So if I understand the question correctly, could people have body dissatisfaction and not meet criteria for an eating disorder?

Q. Yes.

A. Yes. We have a lot of instances of, you know, subthreshold, you might want to think about it, that still impact functioning.

Q. Do you agree that poor-quality sleep does not necessarily rise to the level of a diagnosable sleep disorder?

A. What I would say is that there's a lot of sleep disruption that may not rise to the criteria of a sleep disorder but that still may cause significant impairment in one's functioning, especially when we're

Page 389

talking about child and adolescent development and brain functioning and their ability to engage in the school environment.

So just because an adolescent, for example, doesn't meet criteria for a sleep disorder would in no way suggest that it doesn't impede their ability to get school work done, to sleep at night, or to -- excuse me, to engage in the classroom, et cetera.

Q. Okay.

ATTORNEY LEHMAN: And I would move to strike, respectfully, starting with "but that still."

BY ATTORNEY LEHMAN:

Q. In your clinical practice -- and I refer to your direct patient care clinical practice -- did you treat eating disorders?

A. So I'm trying to -- yes, I mean, I would have treated eating disorders in that context. Yes.

Q. In your clinical practice --

98 (Pages 386 - 389)

CONFIDENTIAL

Page 390

what percentage of your clinical practice was eating disorders?

A. I was just going to say, it was a relatively small percentage of my -- the students and patients that I saw, which is consistent with the prevalence in the population.

But it's -- it was relatively small, I would say.

Q. Are you able to estimate or quantify?

A. I don't know that I can, because it's been some time now.

Q. In your clinical practice -- and here I'm referring, again, to your direct patient care clinical practice --

A. Okay.

Q. -- did you treat sleep disorders?

A. So I saw a lot of young people who had sleep issues. It was not often a primary diagnosis that I was treating.

Q. Okay.

Page 391

ATTORNEY LEHMAN: All right. Why don't we -- let's call a break, and we can go off the record and talk about next steps.

VIDEO TECHNICIAN: The time is 4:07 p.m. We are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN: The time is 4:10 p.m., and we are on the record.

ATTORNEY LEHMAN: Okay. At this point, I'm going to pass the questioning to counsel to start talking about the case or district-specific questioning.

Mr. Keyes is going to handle that questioning. And since this is a natural break and we are near the end of the day, we will resume that in the morning.

Page 392

ATTORNEY YEATES: And I would just like to note there's been a conversation among counsel off the record where we have asked defense counsel to continue the deposition today over the normal course of a seven-hour deposition day.

I let them know at 9 o'clock this morning that Dr. Hoover has a hard stop tomorrow at 4 o'clock so that she can catch a flight. And so we expected this to be a full seven-hour deposition day.

Defense counsel is indicating they do not want to continue today. They need to take a break and start tomorrow morning.

And as a result, I have told them that is their choice, our preference is to continue, seven hours on the record today. They're refusing to do that. And

Page 393

so they are taking the choice to start again tomorrow at 9 o'clock.

We will conclude the deposition at 4:00 p.m., along with a 45-minute lunch break, as we took today, and the same number and length of breaks that we took today, which we can calculate and put on the record tomorrow morning.

And if they do not meet their 11 hours that they have been granted by the court, the deposition will not remain open. And we will not bring Dr. Hoover back.

ATTORNEY LEHMAN: And we would respectfully disagree with all of that, including the characterization of the conversation.

What counsel has said is correct, that we were first informed for the first time this

99 (Pages 390 - 393)

CONFIDENTIAL

Page 394

morning that there would be a hard stop tomorrow, despite the fact that these dates were agreed to, the deposition was properly noticed well in advance for both today and tomorrow.

We have, however, in an accommodation, agreed that we will respect the 4 o'clock hard stop but that we have plenty of time tomorrow to accommodate the rest of the balance of questioning in the time that has been allotted by the court.

We do, however, note that if counsel intends to filibuster or otherwise delay the deposition, that we may not be able to accommodate the hard stop and would need to either continue after 4 o'clock or on another date.

As we have already told counsel, we do not anticipate that

Page 395

that will be a problem, because there is plenty of time for the allotted seven hours between the start time of 9 o'clock and the hard stop that we have been informed of.

ATTORNEY YEATES: And I'll just further clarify for the record that defense counsel has given no reason as to why they cannot continue this deposition for a seven-hour typical deposition day, other than a natural stopping point.

ATTORNEY LEHMAN: And I will just let the record reflect that it's 4:15. And once we take a break, it will be 4:40. And that's why we're not starting. Thank you.

ATTORNEY KEYES: See you tomorrow.

VIDEO TECHNICIAN: I'll now be stating the on the record times

Page 396

for each party.

Katie Lehman, representing TikTok, went five hours and 18 minutes.

The time is 4:13 p.m. We are off the record.

- - -

(Whereupon, the deposition was adjourned at 4:13 p.m.)

- - -

Page 397

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

*Amanda Miller*

Amanda Maslynsky-Miller
Certified Realtime Reporter
Dated: August 14, 2025

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

100 (Pages 394 - 397)

CONFIDENTIAL

Page 398

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 400

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages,  1 - 396, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
SHARON A. HOOVER, Ph.D.           DATE

Subscribed and sworn to before me this
_____ day of _____, 20_____.

My commission expires:_____

_____
Notary Public

Page 399

- - - - - -
E R R A T A
- - - - - -

PAGE  LINE  CHANGE

____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____

Page 401

LAWYER'S NOTES

PAGE  LINE

____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____

101 (Pages 398 - 401)

CONFIDENTIAL

Page 402

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA          : MDL No.

ADOLESCENT                   : 4:22-md-3047-YGR

ADDICTION/PERSONAL INJURY    :

PRODUCTS LIABILITY           : MDL No. 3047

LITIGATION                   :

_____

THIS DOCUMENT RELATES TO:    :

ALL CASES                    :

- - -

AUGUST 13, 2025

VOLUME II

- - -

Videotape deposition of

SHARON A. HOOVER, Ph.D., taken pursuant

to notice, was held at the law offices of

Kessler Topaz Meltzer & Check LLP, 280

King of Prussia Road, Radnor,

Pennsylvania 19087, commencing at

8:59 a.m, on the above date, before

Amanda Dee Maslynsky-Miller, a Court

Reporter and Certified Realtime Reporter.

- - -

GOLKOW, A Veritext Company

877.370.3377 ph| 917.591.5672 fax

CONFIDENTIAL

Page 403

APPEARANCES:

KESSLER TOPAZ MELTZER & CHECK, LLP
BY: MELISSA L. YEATES, ESQUIRE
BY: MATTHEW T. MACKEN, ESQUIRE
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706
myeates@ktmc.com
mmacken@ktmc.com
Representing the Plaintiff

KING & SPALDING LLP
BY: KATHRYN S. LEHMAN, ESQUIRE
Southeast Financial Center
200 S Biscayne Boulevard
Suite 4700
Miami, Florida 33131
(305) 462-6000
Klehman@kslaw.com
Representing the Defendants,
TikTok Inc., ByteDance Inc.,
ByteDance Ltd., TikTok Ltd., and
TikTok, LLC

Page 404

APPEARANCES: (Continued)

WILLIAMS & CONNOLLY LLP
BY: J. ANDREW KEYES, ESQUIRE
BY: DANIEL WHITELEY, ESQUIRE
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
akeyes@wc.com
dwhiteley@wc.com
Representing the Defendants,
YouTube, LLC, Google LLC, and
Alphabet Inc.

COVINGTON & BURLING LLP
BY: MICHAEL N. KENNEDY, ESQUIRE
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
mkennedy@cov.com
Representing the Defendants,
Meta Platforms, Inc. f/k/a
Facebook, Inc.; Facebook Holdings, LLC;
Facebook Operations, LLC; Facebook
Payments, Inc.; Facebook
Technologies, LLC; Instagram, LLC
Siculus, Inc.; and Mark Elliot
Zuckerberg

KIRKLAND & ELLIS LLP
BY: JACK NOLAN, ESQUIRE
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jack.nolan@kirkland.com
Representing the Defendants,
Snap Inc.

Page 405

APPEARANCES: (Continued)
VIA ZOOM:

BEASLEY ALLEN LAW FIRM
BY: SLADE METHVIN, ESQUIRE
301 St Louis Street
Mobile, Alabama 36602
(251) 308-1515
slade.methvin@beasleyallen.com
Representing the Plaintiff,
DeKalb County School District

CARELLA, BYRNE, CECCHI, BRODY &
AGNELLO, P.C.
BY: DAVID G. GILFILLAN, ESQUIRE
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700
dgilfillan@carellabyrne.com
- and -
BY: ZACHARY S. BOWER, ESQUIRE
2222 Ponce De Leon Boulevard
Miami, Florida 33134
(973) 994-1700
zbower@carellabyrne.com
Representing the Plaintiff,
Irvington Public Schools

Page 406

APPEARANCES: (Continued)
VIA ZOOM:

EILAND & BONNIN LAW FIRM
BY: CRAIG EILAND, ESQUIRE
BY: DAVID BONNIN, ESQUIRE
2200 Market Street
Suite 501
Galveston, Texas 77550
(409) 763-3260
ceiland@eilandlaw.com
dbonnin@eilandlaw.com
Representing the Plaintiffs

O'HANLON, DEMERATH & CASTILLO
BY: KAYLIE MORGAN, ESQUIRE
117 West Craig Place
San Antonio, Texas 78212
(210) 310-3030
kmorgan@808west.com
Representing the Plaintiff,
Texas School Districts

KING & SPALDING LLP
BY: YELENA KOTLARSKY, ESQUIRE
1185 Avenue of the Americas
34th Floor
New York, New York 10036
(212) 556-2100
ykotlarsky@kslaw.com
Representing the Defendants,
TikTok Inc., ByteDance Inc.,
ByteDance Ltd., TikTok Ltd., and
TikTok, LLC

ALSO PRESENT: Brian McGee, Videographer
Vince Rosica, Trial Technician

2 (Pages 403 - 406)

CONFIDENTIAL

Page 407

- - -

I N D E X

- - -

Testimony of:  SHARON A. HOOVER, PhD

By Attorney Keyes            410
By Attorney Nolan            808

- - -

E X H I B I T S

- - -

NO.        DESCRIPTION              PAGE

Hoover-30   No Bates
    SHAPE District Profile,
    School Mental Health
    Profile?District Version    564
Hoover-31   No Bates
    The National Association of
    School Psychologists, Student
    to School Psychologist Ratio
    2023?2024 Based on the U.S.
    Department of Education
    Common Core of Data        642
Hoover-32   No Bates
    American School Counselor
    Association
    Student-to-School-Counselor
    Ratio 2023?2024            648

Page 408

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
Page Line   Page Line    Page Line
None

Request for Production of Documents
Page Line   Page Line    Page Line
None

Stipulations
Page Line   Page Line    Page Line
409   1    1

Question Marked
Page Line   Page Line    Page Line
None

Page 409

- - -
(It is hereby stipulated and agreed by and among counsel that sealing, filing and certification are waived; and that all objections, except as to the form of the question, will be reserved until the time of trial.)

- - -
VIDEO TECHNICIAN:  We are now on the record.  My name is Brian McGee.  I'm a videographer for Golkow, a Veritext division.  Today's date is August 13th, 2025, and the time is 8:59 a.m.

This video deposition is being held in Radnor, PA, in the matter of In Re: Social Media, Adolescent Addiction Personal Injury Products Liability Litigation for the United States District Court, Northern District of California.

The deponent is Sharon A.

Page 410

Hoover, Ph.D.

Counsel will be noted on the stenographic record.  The court reporter is Amanda Miller and will now swear in the witness.

- - -
SHARON A. HOOVER, Ph.D., after having been duly sworn, was examined and testified as follows:

- - -
EXAMINATION
- - -
BY ATTORNEY KEYES:

Q.   Good morning, Dr. Hoover. We met yesterday.

A.   Good morning.

Q.   As a reminder, my name is Andrew Keyes.  I'm with the law firm of Williams and Connolly, and we represent the Google and YouTube defendants.

A.   Great.

Q.   Do you understand that you are still under oath?

A.   I do.

3 (Pages 407 - 410)

CONFIDENTIAL

Page 411

Q. And this is a continuation of the deposition that began yesterday?

A. I do.

Q. Did you review anything in connection with this matter since the end of your deposition yesterday evening?

A. I just reviewed my reports.

Q. Which reports did you review?

A. Frankly, I looked through kind of all of the reports; the expert report from May, as well as the rebuttal reports and the district-specific reports.

Q. Since the end of the first day of your deposition yesterday, did you review anything besides your reports?

A. No.

Q. Did you speak with counsel about this matter?

A. No.

Q. Did you speak with anyone else about this matter?

A. No.

Page 412

Q. You have submitted reports that relate to six school districts in particular, correct?

A. Correct.

Q. Tucson, Charleston, Breathitt, Irvington, DeKalb and Harford.
Did I get that list correct?

A. Yes.

Q. Okay. For any year from 2017 to the present, can you tell me what percentage of Tucson High School students had access to a cell phone or personal electronic device outside of school?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I could not give you that number off the top of my head, no.

BY ATTORNEY KEYES:

Q. Did you get that data from Tucson or its counsel?

ATTORNEY YEATES: Object to the form. Foundation.

THE WITNESS: So ask the

Page 413

question again, because the way I heard it, as stated, that likely it would be very difficult to get.
But you're welcome to ask it again.

BY ATTORNEY KEYES:

Q. Sure.
For any year from 2017 to the present, can you tell me what percentage of Tucson High School students had access to a cell phone or personal electronic device outside of school?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I cannot tell you that. And I think the data would be very difficult to get. Even if there was a metric of it, I think it would be difficult to interpret.

BY ATTORNEY KEYES:

Q. For any year from 2017 to the present, can you tell me what percentage of Tucson Middle School

Page 414

students had access to a cell phone or personal electronic device outside of school?

A. No.

ATTORNEY YEATES: Object to the form.

THE WITNESS: Sorry.

BY ATTORNEY KEYES:

Q. For any year from 2017 to the present, can you tell me what percentage of Tucson High School students spent time on defendants' platforms outside of school?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I can't tell you specific to Tucson what percentage, no.

BY ATTORNEY KEYES:

Q. For any year from 2017 to the present, can you tell me what percentage of Tucson Middle School students spent time on defendants' platforms outside of school?

4 (Pages 411 - 414)

CONFIDENTIAL

Page 415

A.   No, not specific to Tucson.

Q.   For any year from 2017 to the present, can you tell me what percentage of Tucson High School students spent time on social media outside of school?

A.   Outside of school?

Q.   Yes.

A.   I couldn't tell you specifically.

I could tell you what we know based on national data.  But if you're asking specifically for Tucson, no.

Q.   For any year from 2017 to the present, can you tell me what percentage of Tucson Middle School students spent time on social media outside of school?

A.   I don't know that that data exists.

Q.   For any year from 2017 to the present, can you tell me what percentage of Charleston High School

Page 416

students had access to a cell phone or personal electronic device outside of school?

A.   So just so I understand, we're moving to Charleston now?

Q.   We are.

A.   Okay.

No.

Q.   For any year from 2017 to the present, can you tell me what percentage of Charleston Middle School students had access to a cell phone or personal electronic device outside of school?

A.   No.  Again, I think that that data would be very hard to identify.

Q.   For any year from 2017 to 2025, can you tell me what percentage of Charleston High School students spent time on defendants' platforms outside of school?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  No.

Page 417

BY ATTORNEY KEYES:

Q.   For any year from 2017 to 2025, can you tell me what percentage of Charleston Middle School students spent time on defendants' platforms outside of school?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  No.

BY ATTORNEY KEYES:

Q.   For any year from 2017 to 2025, can you tell me what percentage of Charleston High School students spent time on social media outside of school?

A.   No, not a specific amount of time that they spent.

Q.   For any year from 2017 to 2025, can you tell me what percentage of Charleston Middle School students spent time on social media outside of school?

A.   The specific percentage in Charleston, no.

Q.   Okay.  So let me broaden it a bit, then.

Page 418

For Breathitt or Irvington or DeKalb or Harford, can you tell me, for any year from 2017 to -- to the present, what percentage of either high school students or middle school students had access to a cell phone or a personal electronic device outside of school?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So based on national data, it would be a significant number of the students.

But do I have it specifically for those districts?  No.

BY ATTORNEY KEYES:

Q.   For Breathitt or Irvington or DeKalb or Harford, can you tell me, for any year from 2017 to the present, what percentage of either high school students or middle school students spent time on defendants' platforms outside of school?

5 (Pages 415 - 418)

CONFIDENTIAL

Page 419

ATTORNEY YEATES: Object to the form.

THE WITNESS: I can't. Nor would it change the conclusions that I came to or the opinions that I offered.

BY ATTORNEY KEYES:

Q. For Breathitt or Irvington or DeKalb or Harford, can you tell me, for any year from 2017 to the present, what percentage of either high school students or middle school students spent time on social media outside of school?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I cannot, nor would it change the opinions I offered.

BY ATTORNEY KEYES:

Q. I've asked you a number of questions about whether you can tell me what percentage of students in a particular district had access to a cell phone outside school, had access to a

Page 420

personal electronic device outside of school, or what percentage of those students spent time on defendants' platforms or social media outside school.

Did you ask any of those plaintiffs or their counsel for that data?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I didn't specifically ask. And part of that is because in working with schools for so long, I know that their data systems don't typically collect that information. And that's, in part, because the data systems are still trying to catch up to the information that you're asking about.

So it wasn't something that I would have needed to inform the opinions that I made.

BY ATTORNEY KEYES:

Q. Okay. But to be clear, you

Page 421

didn't ask for that data, correct?

ATTORNEY YEATES: Object to the form. Asked and answered.

THE WITNESS: Not that I recall. I don't recall asking specifically for the data that you spoke about.

BY ATTORNEY KEYES:

Q. Okay. Can you tell me, for any year from 2017 to the present, how many Tucson students were diagnosed with social media addiction?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I can't tell you that.

And, frankly, it wouldn't be something I would have access to, given that that would be confidential information.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to the present, how many Charleston students were diagnosed with

Page 422

social media addiction?

A. Again --

ATTORNEY YEATES: Object to the form.

THE WITNESS: -- that would be confidential information that I wouldn't have access to.

BY ATTORNEY KEYES:

Q. For Breathitt or Irvington or DeKalb or Harford, can you tell me, for any year from 2017 to the present, how many students were diagnosed with social media addiction?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Again, that's not something that I would have access to. It's confidential information.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to 2025, how many Charleston students were identified as needing an assessment for social media

6 (Pages 419 - 422)

CONFIDENTIAL

Page 423

addiction?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So what I can say is that that's not something that I can imagine a school district collecting at this point. And so I don't have that data.

But it's not because of any reason other than I doubt that it exists.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to the present, how many Tucson students were identified as needing an assessment for social media addiction?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Again, working with schools, that's not something that would be collected at this point in time.

BY ATTORNEY KEYES:

Page 424

Q. Can you tell me, for any year from 2017 to the present, how many Breathitt students, how many Irvington students, how many DeKalb students or how many Harford students were identified as needing an assessment for social media addiction?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I cannot tell you, because that data likely doesn't exist.

BY ATTORNEY KEYES:

Q. For any year from 2017 to the present, can you tell me how many Tucson students were identified as being distracted?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I can tell you, based on the interviews that I did with Tucson folks, that they said that it was a constant -- that the defendants' platforms

Page 425

were a constant, consistent form of distraction in their classrooms.

BY ATTORNEY KEYES:

Q. Did the Tucson folks, as you use the term, identify for you how many Tucson students had been identified as being distracted?

A. So let me be clear. I'm talking about Tucson education leaders and was using the term "folks" colloquially.

But they didn't have a percentage, if that's what you're asking for.

Did they have a specific number of students who were distracted? That's not something that would be collected.

Q. Okay. For any year from 2017 to the present, can you tell me how many students in Breathitt or Irvington or DeKalb or Harford were identified as being distracted?

Page 426

ATTORNEY YEATES: Object to the form.

THE WITNESS: That's not something that would typically be collected, as far as a number of students. So it's not something that I would have, no.

BY ATTORNEY KEYES:

Q. For any year from 2017 to the present, can you tell me how many Tucson students were identified as having diminished social skills?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So, again, as I -- as I detailed in the report, a number of district leaders indicated that students had deficits in social skills. It's also consistent with what we see nationally.

As far as do I have the exact number of students who have deficit in social skills, no.

7 (Pages 423 - 426)

CONFIDENTIAL

Page 427

BY ATTORNEY KEYES:

Q. I didn't ask for an exact number.

I said, can you tell me, from 2017 to the present, how many Tucson students were identified as having diminished social skills?

Are you able to quantify that in any way?

ATTORNEY YEATES: Object to the form. And asked and answered.

THE WITNESS: I'm happy to quantify it.

It's a significant number of students. When you asked how many, I assumed that that's an exact number. But certainly from the reports of the educators and the school administrators and the district leaders, it's a large number of students that are distracted by defendants' platforms during the school day.

BY ATTORNEY KEYES:

Page 428

Q. And you say the number was significant, and you say the number was large.

Did they give you a number, a number of Tucson students who were identified as having diminished social skills?

A. Okay.

ATTORNEY YEATES: Object to the form.

THE WITNESS: So you didn't want a number, but you want a number now.

They wouldn't have had that data system in place to be able to extract a specific number of students.

BY ATTORNEY KEYES:

Q. I do want numbers, Dr. Hoover. I'm asking about numbers.

So if you don't have the numbers, that's fine. But I am asking for numbers, not adjectives that you heard from interviews you had with

Page 429

unspecified people in the district, okay. So I am asking for numbers.

A. I --

ATTORNEY YEATES: I'm going to --

THE WITNESS: If I may.

ATTORNEY YEATES: Sorry. I'm going to object. That's argumentative. And you did just tell her you didn't want a specific number. So you're also being a little confusing.

So now that you want numbers that's fine. But don't be argumentative with the witness, please.

ATTORNEY KEYES: I'm not being argumentative. She said -- when I asked how many, she assumed that I wanted an exact number.

BY ATTORNEY KEYES:

Q. I want as precise a number as you can give, if you can give a number.

Page 430

But I am asking you if you have any data at all to quantify any of the things that you've been talking about, okay?

So, for the record, are you able to tell me, for any year from 2017 to the present, how many Tucson students were identified as having diminished social skills?

ATTORNEY YEATES: Object to the form.

THE WITNESS: No.

And just, also, I want to be clear that the people were not unspecified. You mentioned in your last comment that this was unspecified individuals.

And the -- I was not at all unclear about who the people were whose information -- it's all in my sources reviewed.

BY ATTORNEY KEYES:

Q. Are you able to tell me, for any year from 2017 to the present, how

8 (Pages 427 - 430)

CONFIDENTIAL

Page 431

many Charleston students were identified as having diminished social skills?

ATTORNEY YEATES: Object to the form.

THE WITNESS: No, I cannot give you a number.

What I can say is that according to the administrators and the frontline educators, it was a significant amount.

BY ATTORNEY KEYES:

Q. For any year from 2017 to the present, can you tell me how many Breathitt or Irvington or DeKalb or Harford students were identified as having diminished social skills?

ATTORNEY YEATES: Objection. Form.

THE WITNESS: So, again, I can tell you that it came up consistently, across all of the interviews that I did, that students are consistently distracted or have decreased

Page 432

social skills and that that's increased over time in -- through their engagement with social media platforms.

BY ATTORNEY KEYES:

Q. Could you tell me, for any year from 2017 to the present, how many Tucson students were identified as being bullied?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't think I have that specific data. So no.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to the present, how many Charleston students were identified as being bullied?

ATTORNEY YEATES: Objection. Form.

THE WITNESS: No. Again, you know, you're asking me for data that I think inadequate data systems don't fully capture.

Page 433

So we know, for example, that bullying goes underreported. So if you're asking me how many students are bullied, I just don't think our data systems capture the full scope of bullying at this point. So it would be hard to say.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to the present, how many Breathitt, Irvington, DeKalb or Harford students were identified as being bullied?

ATTORNEY YEATES: Objection. Form.

THE WITNESS: So what we often do when we're estimating numbers like this for a district if the data doesn't exist, is we would look to national data. And there's been enough study of things like bullying, and even distraction, to understand the

Page 434

picture across districts.

If you're asking for specific numbers from those districts, the data doesn't exist.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to the present, how many Tucson students were identified as being disruptive in the classroom?

ATTORNEY YEATES: Objection. Form.

THE WITNESS: So, again, the data systems in Tucson, very similar to many districts, do not capture the full extent of classroom disruption.

So we often, in typical practice, also speak to the people who are experiencing disruption. And from the reports of district leaders and frontline educators in Tucson, they were very clear that there are a lot of disruptions in the classroom and that they are

9 (Pages 431 - 434)

CONFIDENTIAL

Page 435

related to engagement with social media platforms.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to the present, how many Tucson students were identified as being disruptive in the classroom because of their use of social media?

ATTORNEY YEATES: Objection. Form.

THE WITNESS: So what I can tell you is that the discussions that I had with the leadership from Tucson indicated that the disruptions that were happening in the classroom were largely related to defendants' social media platforms; that students were consistently on the platforms during classroom instruction, which is consistent with the data that was reported in the expert reports where they noted that students are spending, you know,

Page 436

over two hours a day during instructional time on social media platforms.

So all of the data corroborates that this is a significant disruption in the classroom.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to the present, how many Tucson students were identified as being disruptive in the classroom because of their use of social media?

A. That data doesn't exist, because the data systems have not been able to catch up to this new, evolving harm to young people, so.

Q. Can you tell me, for any year --

ATTORNEY YEATES: Can I just -- just to remind you to give me a moment to object.

THE WITNESS: Yes. Will do.

ATTORNEY YEATES: So I have

Page 437

an objection to the form to the last one. Thank you. I appreciate that.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to the present, how many Tucson students were identified as being disruptive in the classroom because of their use of defendants' platforms?

ATTORNEY YEATES: Objection. Form.

THE WITNESS: So, what I would say is that, again, the data systems do not yet capture what you're asking for in specific detail. So it would be impossible to give you the exact number that you're asking for.

BY ATTORNEY KEYES:

Q. Could you tell me, for any year from 2017 to 2025, the present, how many students in Charleston or Breathitt or Irvington or DeKalb or Harford were identified as being disruptive in the

Page 438

classroom?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So as you may know, part of my plan is to help the districts develop data systems to capture the things that you're asking about, because those data systems have not had to exist in the way that they do now, in light of the defendants' social media platforms and how they are significantly disrupting the classroom.

BY ATTORNEY KEYES:

Q. All right. But my question was, can you tell me today, for any year from 2017 to the present, how many students in Charleston or Breathitt or Irvington or DeKalb or Harford were identified as being disruptive in the classroom?

A. It would be --

ATTORNEY YEATES: Object to

10 (Pages 435 - 438)

CONFIDENTIAL

Page 439

the form. Asked and answered.

THE WITNESS: It would be hard to give you that information, because, as I said, the data systems have not been able to catch up to the need to collect disruptions in the classroom related to social media platforms.

BY ATTORNEY KEYES:

Q. For any year from 2017 to the present, can you tell me how many Charleston or Breathitt or Irvington or DeKalb or Harford students were identified as being disruptive in the classroom because of their use of social media?

ATTORNEY YEATES: Objection to form.

THE WITNESS: So having spoken with leadership from all of those districts consistently, as I noted in my report, the specific statements from the individuals that I listed as to who I

Page 440

interviewed, and from the deposition data, they were clear that there is a significant number of students who are disrupted in the classroom due to social media platform engagement.

They do not yet have the data systems in place to be able to capture what's happening in terms of disruption to social media -- disruption due to social media engagement.

And that's part of why it's included in my plan.

BY ATTORNEY KEYES:

Q. So you -- it is true to say that you cannot tell me, for any year from 2017 to the present, how many students in Charleston or Breathitt or Irvington or DeKalb or Harford were identified as being disruptive in the classroom because of their use of social media, correct?

ATTORNEY YEATES: Objection.

Page 441

Form. Asked and answered.

THE WITNESS: So as I stated, the data systems within the school districts have not been able to keep up with the increasing and rapid and evolving issues that are being caused by the defendants' social media platforms, including significant disruption in the class, which is why we go to multiple sources of data, including national data and including speaking directly with the people who are working in the districts and in the schools, to understand what's happening on the ground.

And I detailed in the reports that across those districts, they are experiencing significant disruption in the classroom based on engagement with social media platforms.

BY ATTORNEY KEYES:

Page 442

Q. Can you tell me, for any year from 2017 to the present, how many students in Charleston or Breathitt or Irvington or DeKalb or Harford were identified as being disruptive in the classroom because of their use of defendants' platforms?

ATTORNEY YEATES: Objection. Form.

THE WITNESS: So I thought I just answered that. But I can answer again.

So the data systems do not yet exist to be able to capture specifically the disruptions in classroom due to engagement with social media.

And that's part of why it's included in the plan. So there is other information that we have to rely on, including speaking directly with the district leadership, which I did in every district, as well as school

11 (Pages 439 - 442)

CONFIDENTIAL

Page 443

building-level leadership and educators. And they all indicated that there is significant disruption in the classroom specific to the defendants' social media platforms.

And those platforms were specifically identified by the individuals from the districts that I spoke with. And they've been documented in the national literature to be the primary sources of disruption for students.

BY ATTORNEY KEYES:

Q. Okay. So you, in your answers, have said you don't have any data specific to one of these six school districts. You have information that was supplied by these key informants and you have national data.

Did I get that right?

ATTORNEY YEATES: Objection. Form. Misstates testimony.

Page 444

THE WITNESS: So we consider all data when we're doing work with districts. And it's actually a very well-accepted form of data to speak with the leadership who are actually on the ground in classrooms leading schools, leading student support services and leading districts.

That is a part of our inquiry process when we meet with districts to understand what's happening, because we understand both that -- that quantitative data doesn't always capture especially new and evolving harms, and that the data systems that exist, as I detail in my report in each district, have significant limitations in terms of their ability to capture some of the information about the new, evolving harms of the social media platforms, the defendants'

Page 445

platforms.

BY ATTORNEY KEYES:

Q. Okay. And when you refer to the qualitative descriptions you've gotten from people in the district, you're talking about the key informants that you describe in your reports and that you identified in what we previously marked as Exhibit-1, correct?

A. So that's a part of what I'm talking about when I say "qualitative information." So it also includes information from the depositions that were gathered from people in the district.

And I have a list of those, if you'd like me to refer to it. It's in the list of documents reviewed.

Q. So you've identified key informant interviews. You've identified deposition testimony. And you've identified national data.

Can you point to anything else that you are relying on to say that

Page 446

there is a problem with students either being diagnosed with social media addiction, being identified as needing an assessment for social media addiction, identified as being distracted or having diminished social skills, identified as being bullied or identified as being disruptive in the classroom; all of the things I've been asking you about?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So as I listed in my report, there are several sources of information. So you named some.

There's also the plaintiff fact sheets that detailed the experiences of district and school leadership with respect to the indicators that you just asked about.

In some of the districts, there is other data about, for example, mental health referrals.

12 (Pages 443 - 446)

CONFIDENTIAL

Page 447

But some of the questions you asked -- in fact, to my recollection, most of them were about social media assessments or social media impact.

And, as I said, and it's detailed in my report, the data systems have not yet been able to capture some of that, which is precisely why it's included as a necessary part of the strategic plan for addressing the harms of social media.

And when there is an absence of data, typical in the field, as a scientist, we would look to what forms of data actually do exist. And so as part of our scientific inquiry, we would do qualitative data, we would ask, as was done from the plaintiff fact sheets, what information do you have about this issue? And we would look to national data.

Page 448

I also, of course, as someone who has worked with districts across the country for 25 years, would lean on some of my experience in working with school administrators and district administrators and families and students regularly.

BY ATTORNEY KEYES:

Q.    Okay.  Is Tucson urban, suburban or rural?

A.    So those -- just to -- to clarify a little bit.

Districts sometimes will classify themselves as urban, sometimes urban-suburban, sometimes suburban-rural. And when you look at different kind of sources of that information, it's not always the same.

So my understanding of Tucson is that it's urban.  But in some areas, it might be classified as urban-suburban.

Q.    Based on what source?

Page 449

A.    I can't name the source right now.  When I spoke with the school district leaders and gained an understanding of the school district, as well as when I looked at the plaintiff fact sheets, there's information about the school districts.

So when you're asking about a specific source, again, I've worked with school districts for 25 years.  So you start to get to know the school districts as well and where they are located, and you have an understanding of them.

Q.    Can you tell me, for any year from 2017 to the present, how many Tucson students were diagnosed with depression?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So that data would not be at my disposal.  So, no, it's not something I can tell you.

Page 450

BY ATTORNEY KEYES:

Q.    Okay.

A.    Usually -- sorry.  If I may just finish.

The -- the mental health records of students are usually kept confidential.  So that's information that I wouldn't have at my fingertips, no.

Q.    Can you tell me how many Tucson students, for any year from 2017 to the present, were treated for depression?

ATTORNEY YEATES:  Objection. Form.

THE WITNESS:  What I can say is that that information is both confidential, but, also, across a variety of providers, it would be hard for me to know, at this point, how many were treated.

But that information just wouldn't be something I could access, how many were treated for depression.

13 (Pages 447 - 450)

CONFIDENTIAL

Page 451

BY ATTORNEY KEYES:

Q.   Are you telling me that the number of Tucson students who were treated for depression, at any year from 2017 to the present, would be confidential?

A.   So very often in mental health records, students' specific diagnoses and the challenges that they are facing are not something that's accessible.

That's covered, often, under FERPA or HIPAA privacy laws.  And so those are not things that are typically accessible to somebody who is just engaging with a district to understand what's happening with their mental health services, for example.

Q.   Can you tell me, for any year from 2017 to the present, how many Tucson students were identified as being depressed?

ATTORNEY YEATES:  Objection to the form.

Page 452

THE WITNESS:  Okay.  I thought I had answered that, but --

BY ATTORNEY KEYES:

Q.   Well, I asked you about diagnosed.

A.   Oh, okay.

Q.   I asked about treated.

And now I'm asking you about identified as being depressed.

A.   Got it.  Okay.

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, no, for the same reasons, that that information would be confidential, unless, you know -- well, it would be confidential, to my knowledge.  And I don't have that data.

BY ATTORNEY KEYES:

Q.   For any year from 2017 to the present, are you able to tell me how many students in Charleston or Breathitt or Irvington or DeKalb or Harford were

Page 453

treated for depression?

ATTORNEY YEATES:  Objection.  Form.

THE WITNESS:  Again, that data is confidential and it would not be something I have.  So no.

BY ATTORNEY KEYES:

Q.   Are you able to tell me, for any year from 2017 to 2025, how many Charleston, Breathitt, Irvington, DeKalb or Harford students were treated for depression?

ATTORNEY YEATES:  Objection to form.

THE WITNESS:  So, again, that data would not be something I have, nor would it have changed the opinions in any of my reports or my strategic plan.

BY ATTORNEY KEYES:

Q.   Well, you say that data wouldn't be something that you have.

So you're not able to tell me, correct?

Page 454

ATTORNEY YEATES:  Object to the form.

BY ATTORNEY KEYES:

Q.   Are you -- my question was, are you able to tell me, for any year from 2017 to 2025, how many Charleston, Breathitt, Irvington, DeKalb or Harford students were treated for depression?

ATTORNEY YEATES:  Object to the --

BY ATTORNEY KEYES:

Q.   Are you able to tell me?

ATTORNEY YEATES:  Object to the form.  And asked and answered.

THE WITNESS:  Again, I thought I answered that.

So I'm not able to tell you that.  And that information, I would assume -- well, that information is typically confidential within a treatment situation or within a school district, for example.

BY ATTORNEY KEYES:

14 (Pages 451 - 454)

CONFIDENTIAL

Page 455

Q.   Are you able to tell me, for any year from 2017 to the present, how many Charleston, Breathitt, Irvington, DeKalb or Harford students were identified as being depressed?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  No.  That is not something that would typically be shared, as far as how many students were identified as being depressed.  That's not something that I have, nor would it be something that I would need or would have needed to inform the opinions in this case.

BY ATTORNEY KEYES:

Q.   Are you able to tell me, for any year from 2017 to the present, how many students in Tucson or Charleston or Breathitt or Irvington or DeKalb or Harford self-reported that they felt depressed?

ATTORNEY YEATES:  Object to

Page 456

the form.

THE WITNESS:  So I don't believe that I could tell you how many students self-reported being depressed, no.  Nor would it change the opinions that I offered in my reports nor my strategic plan.

It's just not information, necessarily, that I would have needed to inform these opinions.

BY ATTORNEY KEYES:

Q.   Are you able to tell me how many Tucson students, in any year from 2017 to the present, were diagnosed as being suicidal?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  No.  That's, again, something that would be confidential, typically, within a school district.

It may be something -- I'd have to look back specifically

Page 457

to -- because I know that some of the plaintiff fact sheets have information about some of the mental health supports or services offered.

So I would have to go back -- if you're asking me about every single district, I'd have to go back.  So I reviewed a lot of documents for this.

But if you're asking me as I sit here, can I tell you exactly the number?  No.  Is it something that I may have reviewed if the district had it?  If they -- I may have looked at that data.  But I can't tell you just sitting here today.

BY ATTORNEY KEYES:

Q.   And you didn't put it in any of your reports, correct?

A.   I would not have put -- well, I'd have to go back, honestly, through all my reports to indicate -- to

Page 458

indicate if I had listed specific -- if a district supplied it, I may have put it in the report.  But I don't know that I did.

Again, it's not something that -- the exact numbers of students who may have been diagnosed with depression is not something I would have put in to inform the opinion.

Q.   Are you able to tell me, for any year from 2017 to the present, how many students in Charleston or Breathitt or Irvington or DeKalb or Harford were diagnosed as being suicidal?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I mean, I can go to the reports to see if there's anything in there that would have indicated it.

But, again, I -- I don't recall, sitting here, a specific number of students who reported being suicidal or expressing

15 (Pages 455 - 458)

CONFIDENTIAL

Page 459

suicidal ideation.

BY ATTORNEY KEYES:

Q. Do you have any data from any of those districts that show how many students were identified as being diagnosed as being suicidal?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So there's a lot of information I looked at from the districts. So I'm happy to go back and look through it.

But I don't have it right at my fingertips here. So I would have to go back. If you want me to look at a specific document or something that I reviewed -- again, I was reviewing documents from these six districts. So I'd have to go back and look.

And, you know, it may have come up in testimony as well. So it's a lot of documents.

So if there's something

Page 460

specific you would like me to look at, I certainly could do that.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to the present, how many students in Tucson or Charleston or Breathitt or Irvington or DeKalb or Harford were identified as engaging in self-harm?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So, again, it's something I probably have to look to -- back through the data and the depositions to see if there was any information specific to that.

Sitting here in this moment, do I have the numbers in my head? No.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to the present, how many students in Tucson or Charleston or

Page 461

Breathitt or Irvington or DeKalb or Harford were identified as being diagnosed with body dysmorphic disorder?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So, again, I would have to go back through my reports. So if there's something specific or a source of data that you want me to -- that you want to point to, I'm happy to look to it.

But I'd have to go back to all of the source documents.

Sitting here in this moment, do I know the exact number of students who would have been diagnosed with body dysmorphic disorder from each of those districts? No.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to the present, how many students in Tucson or Charleston or Breathitt or Irvington or DeKalb or

Page 462

Harford were identified as having issues with negative body image?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So, again, you know, if there's specific data that you're referring to that you'd like me to look at, I can.

Otherwise, to answer that question as to whether that was something that I have, I'd have to go back through all of the source documents.

But I can't sit here and say, here is the specific number of students who would have been diagnosed with those things.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to the present, how many students in Tucson or Charleston or Breathitt or Irvington or DeKalb or Harford were identified as being sleep deprived?

16 (Pages 459 - 462)

CONFIDENTIAL

Page 463

ATTORNEY YEATES: Object to the form.

THE WITNESS: What I would say is that the -- it would be very atypical of any data systems, and certainly not something I would typically ask in my typical interactions with the school district, because I know that that data would be -- could be difficult to produce.

Is there something in the source documents I reviewed for one of the districts or some of the districts that spoke to sleep deprivation, probably, but I would have to go through all of the source data to look at that.

So can I give you a specific number about any of those districts sitting here with you today about the number of students who are sleep deprived? No.

BY ATTORNEY KEYES:

Page 464

Q. Can you tell me, for any year from 2017 to the present, how many students in Tucson or Charleston or Breathitt or Irvington or DeKalb or Harford were identified as being diagnosed with anxiety disorder?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So, again, I'd have to go back to all of the information that I reviewed to see if there was specific information about anxiety disorders for any of those districts.

BY ATTORNEY KEYES:

Q. Can you tell me, from any year from 2017 to the present, how many students in Tucson or Charleston or Breathitt or Irvington or DeKalb or Harford were identified as being treated for an anxiety disorder?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I'd have to

Page 465

go back to the source data to -- to -- to see whether that was something, within each of those districts, that they reported.

But I don't have that number off the top of my head for any of those districts, no.

BY ATTORNEY KEYES:

Q. Can you -- can you tell me, for any year from 2017 to the present, how many students in Tucson or Charleston or Breathitt or Irvington or DeKalb or Harford were identified as being anxious?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So, again, could that information have been in something I reviewed? Possibly. I'd have to go back to every one of the source documents to see. So I don't want to guess at that.

But if you're asking off the top of my head sitting here with

Page 466

you today, do I know the numbers of students who may have been identified as being anxious? No.

And, again, I'll just restate that the data systems that exist typically would not be an accurate count of the number of students who feel anxious. That's not something that's -- I mean, sometimes you might have surveillance data or something along those lines.

But I would have to, again, look in the source documents to see if there was something available with that information.

BY ATTORNEY KEYES:

Q. Can you tell me, for any year from 2017 to the present, how many students in Tucson or Charleston or Breathitt or Irvington or DeKalb or Harford were identified as self-reporting that they felt anxious?

ATTORNEY YEATES: Object to

17 (Pages 463 - 466)

CONFIDENTIAL

Page 467

the form.

THE WITNESS:  If you'd like me to look at a specific piece of data for a district, I'm happy to do that.

But I'd have to go through all the source information to see, for each district, if that was something that was within their documents.

BY ATTORNEY KEYES:

Q.  Well, you're the expert and you've offered opinions that these are all, quote, significant problems.

And so I'm trying to probe whether you have any data -- certainly you didn't include any data in your reports -- whether you have any data to quantify any of these -- any of these problems.

ATTORNEY YEATES:  Objection.

BY ATTORNEY KEYES:

Q.  So do you have any data to quantify any of these problems that are

Page 468

specific to one of these six school districts?

ATTORNEY YEATES:  Objection to form.  Argumentative.  And misstates the reports.

THE WITNESS:  So I think I actually provided significant data around the mental health challenges that young people are experiencing.

And there's a variety of forms of data, as we've already gone over, including information from the directors of student supports and others who are directly involved with mental health supports for young people.

And they consistently reported high numbers of mental health concerns and, as we've already talked through, the impact of the defendants' social media platforms on mental health as providers of mental health

Page 469

services in the schools.

I also indicated that we do look to national data to understand mental health challenges, especially where data systems are limited.

And I detailed that in my reports.  And certainly in my general report, I spoke to that and drew on a lot of the national data with respect to mental health challenges in young people and indicated that I relied on other expert testimony or reports that describe, at length, the mental health challenges that young people are experiencing and their intersection with social media platforms.

So I actually think it's not accurate at all to suggest that I didn't have specific data to inform my opinions with respect to the mental health challenges that

Page 470

are experienced in the districts and their intersection with social media platforms.

BY ATTORNEY KEYES:

Q.  Do you offer any opinion in your reports on what the measurable impact of your plan would be in any of the six districts?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So -- so you want me to summarize across all six districts?

BY ATTORNEY KEYES:

Q.  Well, I'm happy to address any one of the six districts.

A.  Okay.

Q.  But you have offered reports for six districts.

And I want to know, in any of your reports for any of those six districts, have you offered an opinion on what the measurable impact of your plan will be if the strategic plan you're

18 (Pages 467 - 470)

CONFIDENTIAL

Page 471

recommending is implemented by the district?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, look, with any long-term strategic plan that addresses a complex public health issue, it is -- it would be challenging to say this is going to be the exact percentage of decrease of social media use, for example, or, here is the specific or exact impact on mental health challenges.

I don't have a crystal ball. I can't look into the future and determine exactly what that's going to be.

So what I did in the reports is look at other public health frameworks, including the tobacco prevention effort, and I did note that if a multi-pronged approach, such as the tobacco effort, as

Page 472

well as other types of public health efforts were implemented, we would anticipate a steep and sustained decrease in the challenges, not only in social media use, but also in the challenges and the harms that have been experienced as a result of that use.

BY ATTORNEY KEYES:

Q.   For any of the six school districts for which you submitted reports, do your reports include any estimate of the extent to which the number of students who are diagnosed with depression would go down?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  That wouldn't be something that would be standard practice when you're proposing a strategic plan.

What I did do was overall indicate that we would expect a

Page 473

steep and sustained decrease in the mental health challenges and in the harms to schools that are being experienced.

So I'll leave it at that.

BY ATTORNEY KEYES:

Q.   And are you able to offer any quantification of what this, quote, deep and sustained decline, that you project?

A.   Sure.  So the exemplar that we use, which is probably one of the best exemplars in the field of a concerted public health effort for something that's harming young people, was tobacco.

And over the 18-year period in that particular effort, there was a demonstrated 73 percent decrease.  It's detailed in the report.

So oftentimes when you're doing, you know, implementation of this type of sustained effort over a long period of time, you're not in a position to predict it's going to be exactly this

Page 474

number of students.

I mean, I think it's -- it's honestly -- well, I don't want to criticize the question.

I just -- it's not something that would be typical to be able to say, and you're going to see this specific percentage of decrease in depressed students because of an intervention.

What you can say is that if you put your public health framework that's multi-component, based on evidence-based practices and programming, based on the best available science right now, you can expect to see a significant improvement and decrease of harm and risk to young people.

And that's very typical when you're talking about any public health approach to a significant harm for young people.

Q.   For any of the six school districts for which you submitted reports, do your reports include any

19 (Pages 471 - 474)

CONFIDENTIAL

Page 475

estimate of the extent to which the number of students who are diagnosed with anxiety would go down if your plan were implemented?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Again, that would not be something that's typical when you're laying out this type of plan.

And, again, I don't have a -- a crystal ball to look into the future to say, here is exactly the precise number, or estimate, even, of students who would decrease in their anxiety.

What we would predict is that there would be a substantial decrease. And we draw on public health frameworks that do exist and have been tested, which is what you would do in implementation science, it's what you would do in the public health

Page 476

field when you are dealing with a new -- new and evolving harm to young people.

We just don't have the data for past testing of that, because it's a new and evolving harm. So we draw on former public health frameworks.

And, as I said, the percentage decrease that we saw within the best exemplar for that was 73 percent decrease in use.

BY ATTORNEY KEYES:

Q. For any of the six school districts for which you submitted reports, do your reports include any estimate of the extent to which the number of students who are identified as being suicidal or engaging in self-harm would go down if your plan were implemented?

ATTORNEY YEATES: Object to the form.

BY ATTORNEY KEYES:

Page 477

Q. Same answer?

A. So I'm happy to restate it again.

That we would not be able to predict with specificity because this is a new and evolving harm. So what we would do in implementation science is rely on past implementation efforts that have addressed, successfully, the improvement in or the effectiveness of this type of multi-factor or multi-pronged approach to address a complex issue, which is exactly what I did in my reports.

Q. For any of the six school districts for which you submitted reports, do your reports include any estimate of the extent to which the number of students who were diagnosed with body dysmorphic disorder or identified as having issues with negative body image would go down if your plan were implemented?

ATTORNEY YEATES: Object to

Page 478

the form.

THE WITNESS: Yes. Again, we -- I indicated in my reports that there would be a steep and sustained, akin to the 73 percent decrease in the tobacco exemplar.

So that's typical of what you would do when you're proposing a public health effort that is relying on frameworks that have been successful in the past for a new and evolving harm.

It's typical of what you would do. You would rely on the data, including quantitative data, which I did include in my report. It's very difficult to predict specifically for each specific disorder for a new and evolving harm how a new public health approach would specifically alter those diagnoses that you're asking about.

BY ATTORNEY KEYES:

20 (Pages 475 - 478)

CONFIDENTIAL

Page 479

Q. For any of the six school districts for which you submitted reports, do your reports include any estimate of the extent to which the number of students who were identified as being sleep deprived would go down if your plan were implemented?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Again, yes. So when you consider this type of public health approach for a new and evolving harm, you look to existing successful public health approaches, like the tobacco effort, to reduce youth tobacco use. And we saw a 73 percent decrease in that over time.

And so we pull from that existing science to apply it to the new approach for a new, evolving harm.

Because this is a new, evolving harm, you have to rely --

Page 480

and it's typical in the field to rely on existing public health approaches that have been successful.

BY ATTORNEY KEYES:

Q. For any of the six school districts for which you submitted reports, do your reports include any estimate of the extent to which the number of students who were disruptive in the classroom or were disciplined for misconduct in connection with their use of social media would go down if your plan were implemented?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I think I'm very clear in the report that the disruptions would be expected to go down with the implementation of this strategic plan.

And if you're asking about specific estimates, what I include in the report is based on existing

Page 481

public health frameworks. Because that is typically what you would use when you're predicting how a new, evolving harm framework, a public health framework to address that, would improve outcomes.

BY ATTORNEY KEYES:

Q. And you've used the tobacco analogy, correct?

And you've said that there was a 73 percent improvement there, correct?

A. I did say that.

If you want me to look to my report, I certainly can do that. But that's the number that I recall sitting here.

Q. If your plan were implemented by any of the six school districts, it would be impossible to quantify whether your plan is making a difference; because we have no data specific to any of these school districts about any of these problems, you can't

Page 482

come up with a percentage, correct?

ATTORNEY YEATES: Object to the form. Foundation.

THE WITNESS: I totally disagree, actually. And it's part of why we actually recommend a long-term plan that includes data infrastructure and a -- an evaluation. That's what you would use to actually collect the data.

So as I've said, data are limited, schools are strapped right now to try to understand the impact and even get baseline information about the harms of social media.

They have been attempting their best to be able to measure the harms of social media. But it's an external factor that has really been put upon schools to navigate, which is why it's necessary to build an evaluation structure, which I've laid out in

21 (Pages 479 - 482)

CONFIDENTIAL

Page 483

detail in the report, and to have a data system that actually can measure the outcomes that we're talking about.

This is why you wouldn't do this in a two-year effort. You have to have a long-term plan that actually allows for measuring.

So what we do, when we don't have -- or when we have limited data systems, is you rely on the sources of data that you do have, which is what, as you know, I did in my reports.

We relied on direct information from leaders who are actually contending with these issues every day in their schools, we relied on national data, we relied on experts who spend their -- have spent their careers, in recent years, trying to study and understand the impact of social media.

Page 484

That's the data that we've relied on.

BY ATTORNEY KEYES:

Q.    Your plan that you are recommending to each of the school districts is intended, in part, to deal with disruptions in the classroom in that school from students' use of social media in the classroom or at school, correct?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So the plan is intended to address holistically the harms of social media.  And I have laid out that a part of those harms that has been well documented in the research literature are disruptions to classrooms.

And specific to the districts, it's very clear from the administrators, student support personnel and educators that disruptions are a significant

Page 485

part of the harm in schools. Students just are not able to access the instructional material because they're consistently being disrupted by social media alerts and notifications and engagement and all of the features that keep them engaged for hours during when they're supposed to be learning in the school system.

BY ATTORNEY KEYES:

Q.    And those disruptions would be eliminated or significantly reduced if students were not allowed access to their cell phones or personal electronic devices during the school day, correct?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I actually would have to disagree with that. Because, you know, we've seen some attempts at reducing cell phone use during the school day.  And they are incredibly challenging to

Page 486

implement, as I noted throughout my reports.

We heard that from the school district leaders, both during my interviews with them and also from deposition data that -- and we know this, having watched this nationally at this point, there are many reasons why reducing cell phone time during the day is quite difficult.

And, frankly, even if you were to eliminate cell phone use during the day, which we've seen is virtually impossible for a variety of reasons, students are able to get around it with VPNs on their Chromebooks, they are able to bring burner phones, families are insistent upon students having a phone for safety reasons, et cetera, et cetera, it would still in no way suggest that if you were to eliminate cell phone use during

22 (Pages 483 - 486)

CONFIDENTIAL

Page 487

the day that they would -- that the disruptive behaviors would be eliminated. No.

BY ATTORNEY KEYES:

Q. Well, my question was about eliminated or significantly reduced.

A. Okay. I heard it.

Q. Do you -- do you offer the opinion that a cell phone ban implemented by a school district would not significantly reduce distractions and disruptions from cell phone use in the -- in the school?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I did not offer an opinion on that.

Frankly, in the field, I can tell you it's still an evolving question. We still don't know the answer to that. It is such a new area, that districts are attempting to implement cell phone bans, states are attempting to.

Page 488

But what I can tell you is that there are a lot of challenges. And within the six districts, we heard that over and over for those that had attempted to -- because of social media engagement, right, because of the platform use, they've tried with the limited resources they've had. So they've had to make very difficult decisions. And some of those have had to be put towards locking up cell phones, for example. And even with that, they have consistently said that it remains a challenge.

So would it significantly reduce disruptions? Not from what I've heard to this point. And I think the data is still -- you know, it's unclear.

BY ATTORNEY KEYES:

Q. Have any of the six school districts, Tucson, Charleston, Breathitt,

Page 489

Irvington, DeKalb or Harford, instituted a cell phone ban at any point from 2017 through the present?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So you're asking me to consider whether they've implemented one. I know that across the districts there have been. I'd have to go and look specifically into each district, just to make sure I'm recalling the specific attempts that they've had.

So I don't want to misstate which district it was.

BY ATTORNEY KEYES:

Q. Well, do you know, sitting here, whether any of the six districts instituted a cell phone ban at any point since 2017?

ATTORNEY YEATES: Object to the form. And asked and answered.

THE WITNESS: Again, to my

Page 490

recollection, at least one of the districts has attempted -- eliminating cell phones during the day.

I'd really have to go into the reports to look at specifically which district did what with respect to eliminating cell phones -- or attempting to eliminate them, I should say, during the day.

BY ATTORNEY KEYES:

Q. Okay. And for the school district you have in mind, I realize you don't know the name of the school district, when was that cell phone ban instituted?

A. That's something I can't answer.

ATTORNEY YEATES: Object to the form.

BY ATTORNEY KEYES:

Q. And was there any testimony by anyone from that school district about

23 (Pages 487 - 490)

CONFIDENTIAL

Page 491

the results of the cell phone ban?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Honestly, I'd have to go back and look through the testimony. So if you have something you'd like me to look at, I'm happy to look at it.

But we're talking about six districts, lots of people I've spoken with, lots of depositions I've read, lots of school district documents.

So I wouldn't feel comfortable stating, you know, a specific from an arbitrary school district at this point. I would need to look at the school district data, which I did, but I would have to look again.

BY ATTORNEY KEYES:

Q. Well, did you undertake, in preparing your opinions in this matter, to see what school leaders said in their

Page 492

deposition about the results of a cell phone ban?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I was, as you know, not in control of what was asked during the deposition.

So the question, I think, is a little confusing. Because it suggested I attempt to understand, I think. So maybe I'm not understanding your question. Maybe you can restate it or ask it again.

BY ATTORNEY KEYES:

Q. Did you undertake, in preparing your opinions in this matter, to see what school leaders said in their deposition about the results of a cell phone ban?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I looked holistically at all of the

Page 493

deposition data that is listed in my source documents from district leaders and administrators and student support personnel across the districts to understand their experience of platform use, the defendants' platform use.

Some of the testimony included information about cell phone bans. So it would have been something that I considered in forming my opinions.

ATTORNEY YEATES: Counsel, can we take a break?

ATTORNEY KEYES: Sure. Let me just try to finish up this topic.

BY ATTORNEY KEYES:

Q. Did you see any testimony from anyone in any of the six districts about the results, as they described them, of instituting a cell phone ban?

ATTORNEY YEATES: Object to the form.

Page 494

THE WITNESS: I'd have to go back and look at the information.

BY ATTORNEY KEYES:

Q. Did you discuss a cell phone ban with any of the so-called key informants you spoke with in any of the six districts?

ATTORNEY YEATES: Object to the form. And the use of "so-called."

THE WITNESS: I was just going to say, that's an interesting term "so-called." They were key informants. These are the leaders of the school districts that are at issue here. So they're real people who are experiencing this every day.

So can you restate the question? That term threw me off also.

BY ATTORNEY KEYES:

Q. Well, you've called them -- you've referred to them as key

24 (Pages 491 - 494)

CONFIDENTIAL

Page 495

informants, right?

A. Correct. It just --

Q. Okay. And the folks --

A. -- felt like a dismissive term. That's all.

Q. I'm not dismissing anything. I'm trying to use your terminology.

You have referred to them as so-called key informants.

A. I've referred to them as key informants.

Q. Okay. In any of your conversations with any of these key informants, did you discuss with them cell phone bans?

A. I'd have to go back to the interviews. But I do recall, in discussion, that there was discussion of cell phone -- attempts to remove cell phones from students.

That's about as good as I'm going to be able to give you without actually going back to the specific data. Because I don't want to misrepresent what

Page 496

I spoke with them about.

Q. And I asked you before about any cell phone bans instituted by the school districts.

Did you look for any testimony from any school district employees about cell phone bans instituted at a school level?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So, again, I mean, I think the question is interesting. I didn't look for specific information, as you're describing it.

I looked to the depositions in -- in totality, right. I looked through the depositions to understand the impact of the defendants' platforms on a variety of factors that I speak about in my report.

BY ATTORNEY KEYES:

Q. So you didn't say, hey, I'd

Page 497

like to know what the -- what the school districts did in terms of instituting a cell phone ban or not; that isn't an area of inquiry that you focused on?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I disagree with the kind of underlying suggestion that it's not something I focused on.

What I asked about when I spoke with interview -- interviewees, key informants interviews, was the measures that they were taking in their schools to address the harms of the social media platforms.

BY ATTORNEY KEYES:

Q. Do you recall any testimony from any school district employee about the results of cell phone bans at the school level?

A. So, again, I would have to go back to the actual testimony or

Page 498

depositions to see if that information was in there.

Q. Did you discuss with any of the key informants any cell phone bans that have been instituted at the school level?

A. So, again, I would have to go back. Specifically, you're asking across six districts, multiple people per district. So it would be something I would have to go back.

I can go back through the key informant information that's in the reports. But I'd have to go back to that.

Q. Well, you include in your reports some quotes that you attribute to key informants, not by name but by category, right?

A. As would be typical practice, I included information that was gathered during the key informants. I included some quotes, if they were illustrative of the information I was

25 (Pages 495 - 498)

CONFIDENTIAL

Page 499

sharing in the report. That's correct.

Q. So separate from whatever you put in the reports, sitting here today, do you have a recollection of speaking with any of these key informants about the results of any cell phone ban instituted at the school level?

A. I would have a hard time recalling, because you're talking about the distinction between a district level and a school level.

So I don't think I can answer that question to my recollection.

ATTORNEY KEYES: Why don't we take a ten-minute break?

THE WITNESS: Okay.

VIDEO TECHNICIAN: The time is 10:05 a.m. We are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN: The time

Page 500

is 10:18 a.m., and we are on the record.

BY ATTORNEY KEYES:

Q. Dr. Hoover, have you ever made a request to any of the defendants in this case to discontinue any feature or function on its platform?

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: Any -- that would not be my role.

BY ATTORNEY KEYES:

Q. Have you ever made a request to any defendant in this case to modify any feature or function on its platform?

ATTORNEY YEATES: Object to the form. And not case specific. You've already used that time.

THE WITNESS: Not that I'm aware of.

BY ATTORNEY KEYES:

Q. Have you ever publicly advocated, any speech or presentation or article, that any of the defendants'

Page 501

platforms not be made available to middle school students?

ATTORNEY YEATES: Object to the form. And not case specific. You're over your time allotted by Judge Kang.

BY ATTORNEY KEYES:

Q. You can answer.

A. So what I would say is I've given, you know, over 600-plus presentations. So it's hard to recall the specific details of every one of those presentations.

And I wouldn't see it in, you know, my role to advocate in a way that you're suggesting.

Q. So can you think of any instance where you've publicly advocated, in any speech or presentation or article, that any of the defendants' platforms not be made available to middle school students?

ATTORNEY YEATES: Are you going to continue to ask

Page 502

non-case-specific questions today during the case-specific part of the deposition, which you reserved for today?

ATTORNEY KEYES: I am going to ask my questions. This is consistent with the court's order.

ATTORNEY YEATES: This is not --

ATTORNEY KEYES: She can answer.

ATTORNEY YEATES: This is not consistent. How is this a case-specific question?

ATTORNEY KEYES: It falls squarely within lots of the statements she's made in her reports, if she's offering these opinions as to these six school districts.

BY ATTORNEY KEYES:

Q. So you can answer.

ATTORNEY KEYES: I'm not going to argue with you.

26 (Pages 499 - 502)

Page 503

ATTORNEY YEATES: So today you have six hours, one hour for each of the districts. So which district does this question relate to?

ATTORNEY KEYES: Judge Kang did not limit us to one-hour blocks for each of the districts. He gave us 11 hours and explained his reasoning for how he arrived at the 11 hours.

We're going to finish our deposition within that 11 hours. But we are going to ask our questions.

ATTORNEY YEATES: Which case-specific report are you asking about?

ATTORNEY KEYES: I'm asking about all six of the reports about these school districts.

ATTORNEY YEATES: What is case specific about that question?

ATTORNEY KEYES: Melissa,

Page 504

I'm not going to argue with you. You can -- you can object.

If you want to instruct her not to answer, you can do that. I don't think it's advisable.

But I am going to ask the questions I have.

ATTORNEY YEATES: Okay. Why don't we take a break and call the judge, then?

ATTORNEY KEYES: Sure.

VIDEO TECHNICIAN: The time is 10:21 a.m. We are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN: The time is 10:26 a.m. We are on the record.

BY ATTORNEY KEYES:

Q. Dr. Hoover, have you ever publicly advocated, in any speech,

Page 505

presentation or article, that any of the defendants' platforms not be made available to middle school students?

ATTORNEY YEATES: Object to the form. And not case specific. You're over your time allotted by Judge Kang.

THE WITNESS: So, as I've said, I've given hundreds of presentations. So it would be virtually impossible for me to remember every single thing that I said in the presentations.

I likely -- well, I don't want to make a guess at it.

But have I spoken, in my work with school districts, about the harms of social media? Yes. Would I necessarily consider it within my role to advocate for what you're talking about or have I said that before? I can't recall that.

BY ATTORNEY KEYES:

Page 506

Q. Have you ever publicly advocated, in a speech or presentation or article, that any of defendants' platforms not be made available to high school students?

ATTORNEY YEATES: Object to the form. And not case specific. You're over your time allotted by Judge Kang.

THE WITNESS: I don't think that that's -- I can't recall, when thinking back to the hundreds of presentations I've given, whether that's something I've specifically advocated for.

BY ATTORNEY KEYES:

Q. Have you publicly advocated, in any speech, presentation or article, that social media not be made available to middle school or high school students?

ATTORNEY YEATES: Object to the form. And not case specific. You're over your time allotted by Judge Kang.

27 (Pages 503 - 506)

CONFIDENTIAL

Page 507

THE WITNESS: Again, I don't recall everything I've said in the hundreds of presentations that I've given.

So I can't recall if I've specifically advocated for what you're asking about.

BY ATTORNEY KEYES:

Q. Have you ever publicly advocated, in any speech, presentation or article, that any of the defendants' platforms discontinue or modify any feature or function?

ATTORNEY YEATES: Object to the form. And not case specific. You're over your time allotted by Judge Kang.

THE WITNESS: I'd be reluctant to try to recall the specific detail about a function of a social media platform from the hundreds of presentations that I've given, because I don't want to misspeak.

Page 508

BY ATTORNEY KEYES:

Q. During your work on this matter, have you advocated to any of the six school districts that they block students' access to YouTube on their network?

ATTORNEY YEATES: Object to the form.

THE WITNESS: That would have absolutely fallen outside of my role in this -- in this engagement.

My role with these districts, as I think you know, was to get an understanding of their experience with the defendants' platforms in the school environment and its impacts there, as well as on their students, and to develop an aligned strategic plan according to the harms.

BY ATTORNEY KEYES:

Q. During your work on this

Page 509

matter, have you advocated to any of the six school districts that they block students' access to YouTube on school district-issued devices?

A. Again, that would have fallen outside of my responsibilities and role on this, and I think would have been, actually, quite inconsistent with what I was intending to do here, which was to get an understanding of the impact of the defendants' platforms in their schools and on their students, and then develop a prevention and mitigation strategic plan for them.

So that would have not been a part of my role.

Q. During your work on this matter, have you advocated to any of the school districts that they pull down their YouTube channel for purposes of communicating with students, families or the community?

A. So, again, that would not have been part of my role in working with

Page 510

these six districts to understand the impact of social media platforms, the defendants' platforms in their schools and on their students and to develop a strategic plan.

Q. During your work in this matter, have you advocated to any of the school districts that they pull down their social media accounts for purposes of communicating with students, families or the community?

A. I want to clarify something, because I actually -- I'm wondering. I want to make sure I'm interpreting your question correctly.

When you say are you -- have you advocated to the school districts, I'm -- I've interpreted that, for maybe the last three questions or so, however often you asked that, was I doing that actively when speaking with the school districts.

Are you asking if that was in my strategic plan and report or did I

28 (Pages 507 - 510)

CONFIDENTIAL

Page 511

advocate to them in the course of discussion with them?

Because I may have misinterpreted your questions.

Q.    Well, let's take them one at a time.

A.    Okay.

Q.    In any of your conversations with any of the people you identify as key informants for the six school districts, did you urge them to block students' access to YouTube on their school district network?

A.    Okay.  So I understand that you're asking that about the conversations that I had during key informant interviews, and did I urge them to act during those, with respect to the specifics that you mentioned across all of the interviews.

My role -- that would have been inconsistent with my role in interviewing them to understand the impacts of social media and to understand

Page 512

their comprehensive school mental health system.

When I go in to do key informant interviews, I'm not there serving to advocate for them to do A, B, or C or to, you know, address -- I'm going in to inquire about their experiences.

Q.    In any of your conversations with any of the people you identify as key informants for the six school districts, did you urge them to block students' access to YouTube on school district-issued devices?

A.    Again, that would have been inconsistent with my typical process for conducting key informant interviews, which is to understand from them what the impacts of social media are and the platforms are on their schools and on their students and to then go and develop a report after that.

So my role would not have been to urge them to do something with

Page 513

their school district YouTube site, for example.

I think it was a multi-part question.  But, no, I did not urge them to do something as part of my interview, nor would that be consistent with my practices doing key informant interviews.

That's just not what you do, as a scientist, when you're going in to research or understand a district.

Q.    So in any of your conversations with any of the people you identify as key informants for the six school districts, did you urge them to bring down their YouTube channel and not use it to communicate with students, parents or the community?

ATTORNEY YEATES:  Object to the form.  And asked and answered.

THE WITNESS:  So when you're going in as a consultant, as a scientist to talk with school districts, to inquire about their experiences to inform a strategic

Page 514

plan, my role would not have been to urge them to take action in that moment.  That was not my role with these school districts.

My role was to do a process of scientific inquiry with them, which is what I did.

BY ATTORNEY KEYES:

Q.    And in any of those conversations with any of the people you say are key informants, did you encourage them to stop having their school districts use social media to communicate with students or parents or the community?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, again, as I spoke with the key informants, through my typical process of inquiry to understand the impact of the platforms on students and on their schools, my role would not have been to urge them to do

29 (Pages 511 - 514)

CONFIDENTIAL

Page 515

anything specific with the platforms in their schools.

So that wouldn't have been something that I typically would have done in that type of interview, no.

BY ATTORNEY KEYES:

Q. So in any of your speeches or any of your presentations or any of your articles, have you ever advocated that any school districts block students' access to YouTube on its network, block students' access to YouTube on school district-issued devices, bring down its YouTube channel and stop using it to communicate with students, faculty, parents or the community, or stop using social media to communicate with students; ever -- ever advocate for any of those things?

ATTORNEY YEATES: Object to the form. And not case specific. You're over your time allotted by Judge Kang.

Page 516

THE WITNESS: So, again, you're asking me to remember the details from over, you know, 25 years of hundreds of presentations.

So I want to be, you know, careful about saying I never said something specific to a specific platform with -- you know, with districts.

What I can -- well, so the answer is, I can't recall if I said anything specific to what you're asking about in the hundreds of presentations that I've done.

BY ATTORNEY KEYES:

Q. Have you offered any opinion, in any of the reports that you've issued in this case, that defendants' platforms not be made available to middle school or high school students?

A. So the opinions that I

Page 517

offered were related to the strategic plan, which I can go through the specific -- I'm happy to go -- is there a specific district you'd like me to look at to go through --

Q. Well --

A. -- the plan.

Q. -- I assume you're familiar with your reports.

A. I am.

Q. You prepared them and you reviewed them last night.

My question is, in any of those reports, did you offer an opinion that defendants' platforms not be made available to middle school or high school students?

A. So I'm very familiar with my report. And I've written them.

But there's also several reports and there's six districts. And I was responding to multiple experts in the rebuttal.

So I just want to make sure

Page 518

that I'm stating -- I want to make sure, because you're asking specifically whether I spoke about this in my opinions.

So did I ask them to limit their use of a specific platform in -- for middle or high school students? Did I use that terminology? Is that what you're asking?

Q. I'm not asking about terminology.

I'm asking you, in any of your reports --

A. Okay.

Q. -- that you've prepared in this case, have you offered an opinion that defendants' platforms should not be made available to middle school or high school students?

A. So I'll answer -- because the question is general, I can answer generally that I don't think I made that broad sweeping of a recommendation that the platforms not be available to them.

30 (Pages 515 - 518)

CONFIDENTIAL

Page 519

What I think I've done is clearly lay out the harms of students' personal social media use and the harms, then, that causes both for schools, in terms of disruption, sleep deprivation for students, et cetera, and for students.

Q.   In any of the reports that you've prepared in this case, have you offered any opinion that any of defendants' platforms discontinue or modify any particular feature or function?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So to be clear, my role was to come up with a strategic plan for schools and for districts.

So if you're asking about modifying the features of the platforms, again, I'm not a tech expert, but my understanding is the ability to do that usually

Page 520

resides within the defendants' organizations themselves.

So I don't know that I would have made a recommendation to the school districts to say, for example, YouTube needs to change their settings, their features, their design.  That would be up to the organizations.

BY ATTORNEY KEYES:

Q.   You said you don't know whether you would have.  My question is very specific about the reports that you did prepare.

In any of the reports that you prepared in this case, did you offer an opinion that any of the defendants' platforms should discontinue or modify any particular feature or function?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  That would not have been something I would have done, because I was offering

Page 521

opinions for the school districts, in terms of the strategic plan.

So let me back up, because I want to -- I want to look to the opinions that were related to the harms, because I want to just make sure that I'm comprehensively -- hold on.  Let me go back to the general report, which is in Binder 1.

And if you have a specific opinion in mind, feel free to point me to it.  But otherwise I'm just going to look through, since you're asking about my opinions, which there were multiple across multiple reports.

BY ATTORNEY KEYES:

Q.   Well, I've reviewed your reports carefully, and there is no such opinion.

But I want to make sure you're not disagreeing.  That's why I'm asking the question.

Page 522

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So what I can say, I'm looking -- again, I'm looking at my general report, May 16, is that I offer opinions that are related to the real and observable harms.  And I do speak, in those opinions, about the design and the engagement of the platforms themselves being harmful to students.

So my opinions are related to the facts that demonstrate the harm, the cause of the harm  I then speak about.  Because of the harm, these are the opinions being offered to develop a strategic plan; this is what I think schools need to do in response to that.

BY ATTORNEY KEYES:

Q.   Dr. Hoover, we have limited time, and I need you to answer the questions I ask.

31 (Pages 519 - 522)

CONFIDENTIAL

Page 523

My question was not about, hey, tell me what you said in your reports. And I don't need you to keep telling me what you said in your reports. I just want you to answer my question.

My question was, in any of the reports that you prepared in this case, did you offer an opinion that any of the defendants' platforms should discontinue or modify any particular feature or function; yes or no?

ATTORNEY YEATES: Object to the form. And the speech. Dr. Hoover is doing her best to answer your question.

THE WITNESS: So I was about to say, I'm doing my best to answer the question. And I didn't see it as a yes-or-no question, because I'm really thinking through the opinions that I offered and want to be really precise about whether that's something I offered in the context

Page 524

of the opinions, which is why I've gone through at least -- you know, respecting time, just going through one of, I don't know, 20 reports -- I don't know how many exactly it is. But it's a lot of reports that I had to write.

So to the question did I specifically recommend -- do you want to rephrase -- or not rephrase but just restate the --

BY ATTORNEY KEYES:

Q. I'm not going to rephrase it.

A. Not rephrase --

Q. I'm going to --

A. -- that's why I said restate.

Q. I'll repeat to you again. But, again, just please answer my question.

My question is, in any of the reports that you prepared in this case, did you offer an opinion that any

Page 525

of the defendants' platforms should discontinue or modify any particular feature or function?

ATTORNEY YEATES: Object to the form. And argumentative.

THE WITNESS: So, again, I'm doing my best to answer the questions. And I just want to be thorough with my response and make sure I'm understanding your question.

BY ATTORNEY KEYES:

Q. I'll take that as a given for every answer you give me. So you don't need to tell me that anymore.

A. Okay. Well, then, likewise, I would say I know, when you suggest, answer your question, I am just reminding you that I am doing my best to answer the question.

So I don't think in my opinions that I have suggested that -- given that my role in the opinions here was around strategic planning for

Page 526

schools, I don't think I'm offering an opinion that the social media companies change their design.

Do I speak to that in my report about the design features and how they harm children? Yes.

Q. In any of the reports that you've issued in this case, have you offered an opinion that the defendants in this case should be required to do something or should be prohibited from doing something?

A. So that's an interesting question.

I mean, I would argue that I've spoken to the design features of the social media platforms and the harms that they've caused. And inherent in that, I've indicated that the design features are what are causing the harm. And that would include things like, you know, parental monitoring not being in place and age restrictions not being verifiable, et cetera, which is what's

32 (Pages 523 - 526)

CONFIDENTIAL

Page 527

implied in the opinions here.

So I'm talking -- and then I go into much greater detail in the report about that. So it's inherent in the opinions that I've offered.

I don't know how to answer --

Q. When you say it's --

A. -- beyond that.

Q. -- inherent in your opinions, please identify for me anything specific that you said the defendants should be required to do or should be prohibited from doing.

A. There's nothing that states they should be required or prohibited, because my role was to look at and identify the harms, which I did, which are specific to the features and the design of the platforms and how they harm young people.

So my opinions are specific to the evidence for those harms related to the features.

Page 528

Look, I don't have, you know, control over what the social media companies are doing at this point. So my -- what I've offered is opinions about the harm that they are causing to young people and what school districts need to do as a result of those harms. That's -- that's my role.

Q. When did you first become the co-director of the National Center for School Mental Health?

ATTORNEY YEATES: Object. Not case specific. You're over your time allotted by Judge Kang. And we covered this yesterday.

THE WITNESS: So I first became the co-director of the National Center in 2010.

BY ATTORNEY KEYES:

Q. And you stopped serving as the co-director of the National Center for School Mental Health on June 1st, 2025.

Who, if anyone, succeeded

Page 529

you or replaced you as co-director?

A. So --

ATTORNEY YEATES: Same objections.

THE WITNESS: So the structure of the National Center was modified slightly when I retired, so that my co-director for the last 15 years, Dr. Nancy Lever, became executive director of School Mental Health and then we identified two new co-directors, Dr. Jill Bohnenkamp and Dr. Brittany Patterson.

BY ATTORNEY KEYES:

Q. Did you show a draft of any of your reports to Dr. Lever, Dr. Bohnenkamp or Dr. Patterson?

A. Absolutely not.

Q. Did you show a draft of any of your reports to anyone who was a director or an officer or an employee of the National Center of School Mental Health?

Page 530

A. Absolutely not.

Q. Has anyone at all at the National Center of the School for Mental Health seen your reports in this case?

A. Nobody has seen my reports in this case, as far as I'm aware, other than me and counsel, and then who counsel would have shared it with, you.

Q. And why do you say "absolutely not," you did not show it -- the drafts to anyone who was affiliated with the National Center for School Mental Health?

A. Because it was part of my agreement, in serving as an expert, that I not share information about this with my colleagues. And so I adhered to that.

Q. Does the National Center for School Mental Health have a website?

A. Yes.

Q. Does the website have any discussion about the impact of students' use of social media on schools or the school environment?

33 (Pages 527 - 530)

CONFIDENTIAL

Page 531

ATTORNEY YEATES: Object to the form. Not case specific. You're over your time allotted by Judge Kang.

THE WITNESS: So does our website, which has a lot of tabs and a lot of resources on there, does it have anything specific to the impact of social media?

BY ATTORNEY KEYES:

Q. Does the website have any discussion about the impact of students' use of social media on schools or the school environment?

ATTORNEY YEATES: Same objections.

THE WITNESS: I would honestly have to go through all of the -- you know, our website is constantly updated -- I shouldn't say constantly updated. It's updated regularly. And I'd have to go through to see what's on the website and through the documents

Page 532

on the website to be able to answer that question.

BY ATTORNEY KEYES:

Q. Does the National Center for School Mental Health publish reports?

ATTORNEY YEATES: Same objection.

THE WITNESS: So the National Center is involved in contributing to reports and we contribute to peer-reviewed literature. So we've certainly contributed to reports.

BY ATTORNEY KEYES:

Q. Has the National Center for School Mental Health published any reports that discuss the impact of students' use of social media on schools?

ATTORNEY YEATES: Object to the form. Not case specific. You're over your time allotted by Judge Kang.

THE WITNESS: So you have to understand our National Center has

Page 533

been in existence for 30 years and we've produced a lot of reports and documents over time.

So I can't say to you whether any of those reports have any mention of the impact of social media, that you're asking me to remember a whole series of reports.

BY ATTORNEY KEYES:

Q. Well, in preparing your opinions and reports in this case, did you go to any repository to see whether the National Center for School Mental Health has published any reports that discuss the impact of students' use of social media on schools?

A. So as I laid out in the report, my methodology was to do a standard literature review. And any of the sources that I used in forming the opinions were in the report.

To my recollection, there was not a National Center for School

Page 534

Mental Health report that I included in those source documents.

Q. In your reports, you say that the National Center for School Mental Health has partnered with the U.S. Department of Health and Human Services, the Substance Abuse and Mental Health Services Administration, the Centers for Disease Control and Prevention and the U.S. Department of Education on, quote, multiple initiatives.

Did you discuss any of those initiatives in any of your reports in this case?

A. If I need to answer specifically, I'd have to go to the report.

But what I can say is, to my recollection, I recall speaking about SAMHSA evaluation practices, as one example, when drawing upon best practices for school mental health evaluation.

So that would be an example of where I would have referenced work

34 (Pages 531 - 534)

CONFIDENTIAL

Page 535

that we had done with the Substance Abuse Mental Health Services Administration in the report.

Frankly, I speak to my years of experience throughout the report. And a lot of it is informed by those partnerships with federal partners and certainly state agencies, because this is the work we do.

So it's hard to tease apart, you know, did you mention a specific initiative, because a lot of the work that we do with the Department of Education, with SAMHSA, with HHS, and others, is really woven into, you know, decades' worth of experience. And that did inform the entire report. It is one of the sources I drew upon.

Q. Did any of the partnerships that you mentioned as being between the National Center for School Mental Health and the U.S. Department of Health and Human Services, the Substance Abuse and Mental Health Services Administration,

Page 536

the Centers for Disease Control and Prevention or the U.S. Department of Education target the issue of the impact of students using social media on schools?

ATTORNEY YEATES: Object to the form.

THE WITNESS: It's a very broad question. And I'll answer kind of equally broadly.

The -- the efforts that we've done in partnership include efforts to improve comprehensive school mental health systems across the United States. And in those efforts, when we are improving mental health systems over the last several years, there is no doubt that social media would have been a part of something that school -- schools and districts are attempting to navigate and address and mitigate the harms of.

Page 537

BY ATTORNEY KEYES:

Q. Can you identify any initiative between the National Center for School Mental Health and these agencies that you've listed that targeted the impact of students using social media on schools?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So what I would say is that when we're -- especially thinking about recent years, when we've been gaining more and more evidence about the harms of the defendants' platforms on young people's mental health in schooling, when you look to -- I mean, you're asking about specific initiatives.

I can go into specific initiatives that we've been involved in, like Project AWARE, you know, comprehensive school safety initiatives with the

Page 538

National Institute for Justice, the school-based mental health professionals, services across the state, those are grants that are awarded to states.

There are many initiatives that we've been involved in partnering around. And inevitably those address if they're looking to enhance either the workforce pipeline or school mental health systems in states and districts. Because social media has such an impact on the mental health of young people and on schooling, school districts would have been addressing those within the context of those initiatives.

BY ATTORNEY KEYES:

Q. Ma'am, my question was, can you identify an initiative between the National Center for School Mental Health and these agencies that you've listed that targeted the issue of the impact of

35 (Pages 535 - 538)

CONFIDENTIAL

Page 539

students using social media on schools?

ATTORNEY YEATES: Object to the form. And asked and answered.

THE WITNESS: I think I just did.

BY ATTORNEY KEYES:

Q. The initiatives you just described targeted the issue of the impact of students' use of social media on schools?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I suppose it's an interesting question, because you'd have to define what you mean by "targeted."

Targeted in -- you know, in the way that I think about it as a scientist working with schools, as somebody who consults with schools to improve their services, means that the efforts that they are being supported -- through technical assistance, through

Page 540

funding, some of the grants that I mentioned, that part of what they're targeting could include social media.

So I answered and gave you several specific examples.

BY ATTORNEY KEYES:

Q. You say in your reports that as the co-director of the National Center of School Mental Health, you've co-hosted the Annual Conference on Advancing School Mental Health for 15 years.

Your report doesn't identify any program or presentation or paper that was made at this annual conference about the issue of students using social media or the impact of that use on schools.

Can you identify for me any program or presentation or paper that addressed that topic?

ATTORNEY YEATES: Object to the form.

THE WITNESS: In the 30 years of our conference? I'm

Page 541

happy to go back and look through the program booklets for each of them.

BY ATTORNEY KEYES:

Q. Well, can you -- can you identify one for me now?

ATTORNEY YEATES: Object to the form.

THE WITNESS: No.

And just to be clear, we usually have over 100 sessions in each of our conferences. So I'd have to go back to the program booklets to look at that.

BY ATTORNEY KEYES:

Q. Did any program or presentation or paper that was made at any of these annual conferences discuss a strategic plan for how schools should address the consequences of students using social media?

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: I can't answer

Page 542

that. I wouldn't know offhand, from several years of conferences, if a specific presentation addressed that.

BY ATTORNEY KEYES:

Q. You also say in your reports that you co-hosted a pre-conference school mental health summit.

And your reports doesn't identify any program or presentation or paper that was made in any of these pre-conferences about the issue of students using social media or the impact of that use on schools.

Can you identify for me any such program or presentation or paper that touched on those topics?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I'd have to go back to the research summit information to know if those were presented.

So the answer is no, can I,

36 (Pages 539 - 542)

CONFIDENTIAL

Page 543

sitting here with you today, name every paper or anything that was presented specific to social media? No.

BY ATTORNEY KEYES:

Q. Did any program or presentation or paper that was made at this pre-conference summit discuss a strategic plan for how schools should address the consequences of students using social media?

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: As I've said, I cannot tell you the details of the presentations from 12 years of research summits and 30 years of the conference.

BY ATTORNEY KEYES:

Q. Did you yourself present, at any of these conferences or pre-conference summits, a strategic plan for how schools should address the consequences of students using social

Page 544

media?

A. No, I would not have presented that. I've not presented that at the conference or at the research summit.

And that honestly -- if I may finish -- I often was serving in a host role with other people presenting for the research summit. So we try to leave space for others in the field to present as well.

Q. Well, you say you've delivered over 600 professional presentations.

In any of those 600 professional presentations, have you presented a strategic plan for how schools should address the consequences of students using social media?

A. I think we talked about this yesterday. But I'm happy to revisit that.

First of all, I want to preface by saying it's hard to remember

Page 545

the details from over 600 presentations.

Do I recall presenting a comprehensive strategic plan to address the impacts of social media in my public presentations? No.

Q. In your reports, you reference a few materials that you've prepared over the course of your career. And one of them that you refer to is the National School Mental Health Best Practices: Implementation Guidance Modules For States, Districts, and Schools.

That's a series of documents that consists of two guides, one for participants, one for trainers, and a series of PowerPoint presentations.

Did I get that right?

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: Essentially. There's also -- yes, essentially. That's a -- that's a reasonable description of what that is.

Page 546

BY ATTORNEY KEYES:

Q. Okay. And did you participate in drafting them?

ATTORNEY YEATES: Same objections.

THE WITNESS: I did participate in drafting them.

BY ATTORNEY KEYES:

Q. Okay. So focusing on the training guide for trainers, does that guide discuss the impact of teen use of social media on schools?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: Do you have the guide for me to read through? Because it's been a few years since it was developed. So I would not want to misspeak and say that it doesn't -- you know, does or doesn't contain specific information.

BY ATTORNEY KEYES:

Q. I have limited time. And I

37 (Pages 543 - 546)

CONFIDENTIAL

Page 547

don't have the time to let you scroll through long documents.

But sitting here today, can you think of anything in that guide that discusses the impact of teen use of social media on schools?

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: Again, those are really quite comprehensive modules. So I wouldn't be comfortable saying specifically the content that's in them.

They are addressing the, you know, different components of comprehensive school mental health systems.

BY ATTORNEY KEYES:

Q. I had asked you about the guide for trainers. Now I want to turn to the guide for participants.

Can you think of anything in the guide for participants that discusses the impact of teen use of social media on

Page 548

schools?

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: So, again, I'm happy to look through the documents, if you have them. It sounds like that would be beyond the time limits you have.

But I want to be cautious about trying to remember all of the details of the content in either the trainer's or the participant's manuals.

And, you know, what I can tell you is that these are manuals that cover the broad core components of quality school mental health systems. So I can leave it at that.

But if you want me to get into kind of the details of what's actually in each of those set of multiple modules that were developed a few years back, I'd

Page 549

probably want to look to the actual documents.

BY ATTORNEY KEYES:

Q. And then turning to these six PowerPoint presentations, do any of those PowerPoint presentations that you participated in drafting discuss the impact of teen use of social media on schools?

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: Again, I'd probably need to look through them. If you're asking me to remember what we developed specifically, you know, in several modules and whether it contained specific information about social media, I'd have to look at the documents.

BY ATTORNEY KEYES:

Q. Can you think of anything, sitting here right now, in any of those Power -- PowerPoint presentations that

Page 550

discusses the impact of teen use of social media on schools?

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: So I would have difficulty recalling specifically all of the details of multiple modules that were developed several years ago, given that we develop many documents and do many presentations.

So I'm just cautious to speak to the specifics of, you know, a -- if I recall, it was hundreds of slides for each module.

So it gets a little complicated to jog my brain for a specific topic within those. I'm happy to look through the documents.

BY ATTORNEY KEYES:

Q. In your reports, you reference your scholarship, including

38 (Pages 547 - 550)

CONFIDENTIAL

Page 551

three school mental health intervention manuals.

Can you identify for me what those manuals are?

A. I can. I can reference my CV to get the exact titles.

But I'll give you -- so there's the second edition of the Cognitive Behavioral Intervention for Trauma in Schools. There's an adaptation of that for Native American Alaska native youth. And there's also an intervention called Supporting Transition Resilience of Newcomer Groups, or STRONG, which is to support the coping skills of newcomer students.

Q. Would you pull out your August 1st, 2025, CV, which was previously marked as Exhibit-4?

A. Got it.

Q. And can you identify for me on your CV where those manuals are listed?

A. So they are listed under

Page 552

books on Page 31 of the August 1st CV.

Q. Okay. And there are three items listed under the books section?

A. Correct.

Q. Those are the three school mental health intervention manuals you're referring to in your reports?

A. Correct.

Q. Okay. Do any of those three mental health intervention manuals discuss the impact of teen use of social media on schools?

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: So to be clear, the intervention manuals are specific to specific topic areas.

So the Cognitive Behavioral Intervention for Trauma in Schools manual and its adaptation were specific to addressing trauma in students.

And the Supporting

Page 553

Transition Resilience of Newcomer Groups was specific to addressing their transition to new communities, new countries, new schools.

Whether we spoke in the manuals about social media use, I want to say it was probably included as examples. But, again, these are, you know, hundred-plus -- I think the STRONG manual is about 200 pages.

So to my recollection, we use social media -- we may use social media as an example, certainly when it's being trained in. It might be something that comes up because it's a common experience of the age range, because we're talking about K through 12 students in those.

So in those manuals and in this type of cognitive behavioral intervention, you're often

Page 554

bringing in real-world examples, including students' engagement with social media.

I can tell you for the CBITS manuals, the first edition of that was in the early 2000s, likely before we knew about, certainly to the extent that we do today, the harms of social media and likely before students were engaging.

And one of the attempts in the second edition -- iteration of it was to not make too many changes. But we may have included examples related to social media in that. I would have to go back and look through the manual.

BY ATTORNEY KEYES:

Q. My question was very specific. I didn't ask whether these manuals discussed social media.

A. Oh, I must have --

Q. And I didn't ask whether they discussed teens using social media.

39 (Pages 551 - 554)

CONFIDENTIAL

Page 555

My question was, do any of those three manuals -- mental health intervention manuals discuss the impact of teen use of social media on schools?

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: Not that I'm aware of, because that would not have been the intention of group cognitive behavioral intervention manuals. That's not the purpose of those manuals.

BY ATTORNEY KEYES:

Q. You discuss in your reports being an investigator and co-investigator on various grants.

Did any of the grants for which you are a principal investigator study the impact of students' use of social media on schools?

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: So the grants on which I was a principal

Page 556

investigator looked at comprehensive school mental health systems among other things.

And as part of comprehensive school mental health systems, we do consider factors that impact young people. So is social media a part of that? Certainly.

BY ATTORNEY KEYES:

Q. Well, did any of the grants for which you are a principal investigator focus on the issue of the impact of students' use of social media on schools?

A. Exclusively?

ATTORNEY YEATES: Object --

THE WITNESS: Go ahead.

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: Did any of the grants on which I'm a principal investigator or co-investigator -- were you asking PI or co-I?

BY ATTORNEY KEYES:

Page 557

Q. I was asking about PI.

A. PI.

So any of the grants that I was a PI on, did they look at the impacts of social media exclusive to all other factors?

Q. No.

Did they look at the impacts of students' use of social media on schools?

ATTORNEY YEATES: Same objections.

THE WITNESS: So, arguably, the grants that I was PI on that were looking broadly at school mental health systems would have -- social media would have fallen under that umbrella, so.

BY ATTORNEY KEYES:

Q. How about the grants for which you were a co-investigator as opposed to a principal investigator?

ATTORNEY YEATES: Object to the form. And not case specific.

Page 558

THE WITNESS: Again, there's probably over 50 grants that I spoke about or that I reference in my CV. So I can answer broadly, because it's a broad question. But I'm also happy to go through different grants.

So because the grants -- I mean, I'm not only a co-I on grants related to school mental health. But the grants for which I'm a co-I related to school mental health, certainly in recent years, if they are addressing comprehensive school mental health systems, social media would likely have been something that came up in the context of those grants.

BY ATTORNEY KEYES:

Q. Something that came up, but it wasn't the focus of the -- of the grant investigation?

ATTORNEY YEATES: Object to the form. Not case specific. And

40 (Pages 555 - 558)

CONFIDENTIAL

Page 559

misstates testimony.

THE WITNESS: I think "focus" is a bit of a tricky word.

Was it, you know, the one independent variable exclusive to other variables that were looked at in terms of impact? I mean, none of the grants -- well, I'll state it similar to how I stated it before.

Social media was something that would have been considered or looked at in the context of those grants. But was it the -- done exclusive of other factors? No, I can't say that.

BY ATTORNEY KEYES:

Q. You reference in your reports the National Center for School Mental Health's SHAPE profiles.

What is a SHAPE profile?

A. Sure. So SHAPE stands for the School Health Assessment and Performance Evaluation System, which is a

Page 560

platform that is intended for state leaders and districts and schools and individuals to assess different components of their school mental health system.

And the SHAPE profile is an assessment that gets at -- that inquires about the service array that's offered within a comprehensive school mental health system, the staffing and the data infrastructure that exists in a school mental health system.

Q. When was the SHAPE profile first released?

A. I honestly don't know the date. I'd have to look. I don't -- I don't know the specific date and not even the year. I don't know that I can say what year it was.

I'd have to go back to see what the date was for it.

Q. Has it been revised or amended over time since it was first released?

Page 561

A. The SHAPE profile, I honestly would have to go back to look to see if it's been revised since its -- since we first developed it.

Q. What was your role in the development of the SHAPE profile?

A. I was one of the contributors to it. It was a team effort at the National Center for School Mental Health.

Q. And who at the National Center for School Mental Health had to approve the SHAPE profile before it was issued as a recommendation that school districts or school administrators use it as an assessment of their mental health system?

A. So I think I probably would respond -- or phrase it a bit differently.

It wasn't necessarily an approval process. It was, you know, a collaborative development process of an instrument that was used. And I couldn't

Page 562

name for you every person at the center who was involved in that co-development process.

Q. Your reports cite SHAPE profiles for the six school districts in this case, correct?

A. Yes.

Q. And are those SHAPE profiles that the school districts had filled out separate from this case or as part of your engagement?

A. As part of my engagement with this case.

Q. And do you know who at each of the school districts filled out the SHAPE profile?

A. I do not know specifically who filled out the SHAPE profile for each of the districts.

What we recommend is that it's filled out by leadership within the school district that has the most knowledge about the different dimensions that are being asked about; so in this

41 (Pages 559 - 562)

CONFIDENTIAL

Page 563

case, staffing, services and the data infrastructure.

So sometimes it might be filled out by one leader, if they have the most knowledge about that; sometimes it's a collective effort at the district.

Q. Did you make any tweaks or additions to the SHAPE profile that you asked the school -- six school districts to fill out?

A. No, I don't recall doing that.

Q. Did you not make any changes because you thought the SHAPE profile was an appropriate vehicle for assessing the school district's mental health system?

A. I didn't make any changes, in part, because I was asked to follow standard practice, right. So I was -- I know my understanding is that when engaging with the school districts, I would be following the standard practice to understand their school mental health system.

Page 564

So it is a common tool that we use. It does get at many of the domains that are -- that were important to informing my opinions in this case.

So I thought it would be a helpful tool to get a snapshot, a look at what their service array, their staffing and their data systems were.

ATTORNEY KEYES: Vince, can you display Tab 36, which we'll mark as Exhibit-30?

- - -

(Whereupon, Exhibit Hoover-30, No Bates, SHAPE District Profile, School Mental Health Profile?District Version, was marked for identification.)

- - -

BY ATTORNEY KEYES:

Q. Do you see that on your screen --

A. I do.

Q. -- Dr. Hoover?

ATTORNEY KEYES: And, Vince,

Page 565

if you can just scroll through so she can see the document in its entirety.

BY ATTORNEY KEYES:

Q. Does that look like the SHAPE profile that you've used in the past and you used in this case?

ATTORNEY YEATES: Object to the form.

THE WITNESS: It does.

ATTORNEY KEYES: Can you go to Section 2, Vince?

BY ATTORNEY KEYES:

Q. Section 2 is on staffing, correct?

A. Yes, correct.

Q. And it lists a variety of team members and asks the school district to identify whether someone holds that position; if so, whether they are employed by the school or employed by the community, correct?

A. Yes.

Q. Okay. Does this SHAPE

Page 566

profile include a district director of digital safety position?

A. You have to scroll down through the whole list for me to look at. If you have a hard copy, I'm happy to look at that also.

Sorry to make whoever is scrolling go up and down. But I just want to -- I think there's a second page here.

It includes a category for other, but it does not specifically have a category for that, no.

Q. Does this SHAPE profile include a district director of digital literacy?

A. No.

Q. Does this SHAPE profile include a district director of life skills education?

A. No, not that -- I'm trying to remember what was on the first tab now.

But no.

42 (Pages 563 - 566)

CONFIDENTIAL

Page 567

Q. Does this SHAPE profile include a district director of mental health literacy?

A. No, not in -- not in this profile.

Thank you whoever did that. Now I can see both tabs.

Q. Does this SHAPE profile include a district director of student mental health?

A. No.

I mean, it doesn't surprise me that it doesn't include any of these, because there's often district-level positions that are not reflected in -- in this report.

This is -- you know, as I'm looking at the staffing that's included here, these are often school building level staff.

But, no, to the last question that you had. No.

Q. Does this SHAPE profile include a district director of family

Page 568

engagement and education?

A. No. It includes what you would see at the -- the school level, possibly, which is family support partner or family member.

Q. Does this SHAPE profile include an educational technology specialist position?

A. That would have been under the other category, if included. It's not listed specifically on here.

Q. Does this SHAPE profile include a digital literacy specialist position?

A. No.

Q. Does this SHAPE profile include a life skills specialist position?

A. Sometimes school counselors offer life skills or social/emotional learning. But it's not stated in that way on this profile.

Q. Does this SHAPE profile include a mental health literacy

Page 569

specialist?

A. No.

Q. Does this SHAPE profile include a family engagement coordinator position?

A. It includes a family support partner. So it's a different title that you're asking about.

But, oftentimes, if you have a family support partner, they would be a person who is involved in family engagement.

Q. I've just gone through a list of the positions that you are recommending that each of the school districts create.

Why doesn't the SHAPE profile assessment form that the National Center for School Mental Health uses include any of those positions?

A. Well, I think, as you're well aware, the -- the harms of the defendants' platforms to schools and students is being increasingly understood

Page 570

and it's a relatively, relatively, new and evolving issue.

So we know, having worked with lots of districts and schools, who they might typically have on staff. And the -- some of -- many of the positions that you just spoke about that are more specific to social media, which is what my plan was intended to address, are things that schools have not yet been able to put in place because they don't have the resources to do so or because they're still just trying to understand and navigate the impact of social media on their schools and students.

When we developed this particular profile, our thinking would have been to capture -- because you have to be careful about trying to ask everything under the sun of a school district, right, we wanted to capture, what are the typical employees or roles that are part of your school mental health system.

43 (Pages 567 - 570)

CONFIDENTIAL

Page 571

And, unfortunately, because schools don't have the resources and they're still trying to understand and grapple with the impacts of social media, the positions that I recommend in the strategic plan are often not yet available to schools because they don't have the resources to actually support the -- you know, address the harms that they're seeing every day in their schools.

So it doesn't surprise me that those positions are not on a profile that was developed a few years back, because we would have been looking at, what do schools typically have?

Q.   Did you make any recommendation, at any point, to the National Center for School Mental Health that it revise the SHAPE profile to include any of the positions that you are recommending these six school districts hire?

A.   So we have internal

Page 572

discussions about iterations to assessments.  And, again, there's kind of a -- you have to be cautious about constantly updating platforms, not only because there's an expense, right, we have limited funds, as well, to update specific instruments.

So to my recollection, we have -- we had not planned in the immediate future, in part due to cost, to update this.  And this was funded under a specific, you know, set of funding, the development of this would have been.

So to my knowledge, the National Center doesn't have funding to update.  So, again, it wouldn't surprise me that we're not able to add specific positions.

And, frankly, again, based on the logic that I just talked about, while I would, you know, hope that schools were positioned to hire the folks to address the impacts of social media, the reality is they are not yet equipped

Page 573

to do that.  They did not anticipate this new external imposed harm on them.

So, you know, I wouldn't anticipate that even if we did put that there that there would be a lot of response.

So, again, in the interest of being parsimonious with the data you collect from school districts, in the interest of time and respecting their time to fill things out, you typically put the things that they're likely to have.

If schools were somehow equipped to start addressing social media, then that could be something that's added.  But, again, it makes sense to me that the positions that are listed here are the ones listed.

Q.   You have referenced key informants and your interviews with them.

And you said yesterday that you did not record those interviews and you did not take notes of those

Page 574

interviews, correct?

A.   That's incorrect.  I took contemporaneous notes as I was conducting the interviews, which then became part of the body of each of the school district reports.

Q.   Are you able to attribute any specific quoted statement in one of these reports to a particular, quote, key informant?

A.   So part of my standard practice is to take notes, including direct statements made, and to not attribute them to specific people, as we talked about yesterday, in part, to retain their individual confidentiality.

To balance that, I provided a list of the names of the individuals that were interviewed as part of the key informant interviews.

Q.   Are you able to attribute any specific quoted statement in one of these reports to a particular key informant?

44 (Pages 571 - 574)

CONFIDENTIAL

Page 575

ATTORNEY YEATES: Object to the form. Asked and answered.

THE WITNESS: Yes. I think in several of the reports I actually cite specific statements that are made as part of the deposition testimony of individuals who are, you know, in leadership positions, of which there was large overlap with the people that I interviewed for the key informant interviews.

And I used their direct quotes and cited them within the reports.

BY ATTORNEY KEYES:

Q. I'm not asking about deposition testimony. I'm asking about your interviews with these, quote, key informants.

And in your reports, you purport to quote key informants, based on your interviews with them.

My question is, for those

Page 576

quotes that purport to come from your conversations with key informants, are you able to attribute particular quotes to particular people?

ATTORNEY YEATES: Object to the form. And the use of air quotes every time you say "key informants."

THE WITNESS: So the question initially asked was actually, was there anybody that you had directly quoted in your reports and identified them, which is why I referenced the deposition information.

But the question you just asked, as I understand it, was with respect to key informant interviews.

So you're asking, I believe, did I attribute those to individuals? And I think I've already answered that. But, no, because it's part of my standard

Page 577

practice not to do so.

BY ATTORNEY KEYES:

Q. Well, you don't attribute particular quotes to particular key informants.

My question is, sitting here today, are you able to attribute particular quotes to particular informants?

A. No. That wouldn't be part of my standard practice, to go back to key informant interviews where I indicated that I wouldn't be tying their direct statements to their names in the interest of, you know, supporting a comfortable key informant interview process, which is very standard for practice when you're conducting key informant interviews.

Q. When you spoke with each of the key informants in these six school districts, did you tell them, at the beginning of the conversation, that you would not be attributing particular

Page 578

statements to them?

A. Yes, I believe I did.

Q. And you assured them of that confidentiality at the outset of these interviews with key informants?

A. I believe I let them know that I wouldn't be tying their names to specific quotes. But yeah.

Q. Okay. And so you have no record and no recollection that allows you to go through, quote by quote that you've attributed to key informants, and identify the specific person who said that --

ATTORNEY YEATES: Object --

BY ATTORNEY KEYES:

Q. -- is that fair?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I think I've already answered that.

But I would not. And, again, this is very typical of key informant practice, that you

45 (Pages 575 - 578)

CONFIDENTIAL

Page 579

interview the individuals and that when you report it, you're doing it in aggregate, which is exactly what I did.

So I did it in aggregate, it's not that quotes, outside of the deposition testimony, are not attributable to specific individuals.

The specific individuals are, however, named in terms of who I interviewed.

BY ATTORNEY KEYES:

Q.   Did you estimate in any of your reports how much, if your strategic plan were implemented, students' use of social media would decline?

ATTORNEY YEATES:  Object to the form.  And asked and answered.

THE WITNESS:  I'm sorry, I think I'm -- I was in the space of key informant interviews.

So can you just ask that again?

Page 580

BY ATTORNEY KEYES:

Q.   Sure.

A.   Are we still talking about key informant interviews?

Q.   No.

A.   Okay.

Q.   Did you estimate in any of your reports how much, if your strategic plan were implemented, students' use of social media in that district would decline?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So as we talked about, because this is a 15-year plan that, you know, looks into the future, of course, and it's something that -- that there's a built-in proposal for evaluation into the future, it's hard to predict exactly the extent to which social media will decline.

And so, what we did, which

Page 581

is standard for public health science, is you look to other existing exemplars of similar public health frameworks to address issues that are harming young people.

And within that context, I describe a decrease, a substantial decrease, the number, if I recall correctly, over roughly a 15-year period was a 73 percent decrease.

And so the way that, then, I extrapolated that data was to say, this is likely -- this is good evidence that with this type of public health multi-part framework, you would expect a steep and sustained decline.

Can I give you the exact percentage that students' social media use would decline over a 15-year period?  No.  That would be virtually impossible in the context of this type of public

Page 582

health framework proposal.

BY ATTORNEY KEYES:

Q.   Would you turn to your June 20th amended expert report for Charleston County School District, which we previously marked as Hoover Exhibit-9.

ATTORNEY YEATES:  Counsel, I'd like to take a break.  Is now a good time?

ATTORNEY KEYES:  Sure.

ATTORNEY YEATES:  Okay. Great.

VIDEO TECHNICIAN:  The time is 11:31 a.m.  We are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN:  The time is 11:45 a.m.  We are on the record.

BY ATTORNEY KEYES:

Q.   Dr. Hoover, do you have

46 (Pages 579 - 582)

CONFIDENTIAL

Page 583

Hoover Exhibit-9 in front of you?

A. I don't know that I have them listed that way. Could you just say what it -- the document actually is?

Q. Sure. It's your amended expert report for Charleston County School District, dated June 20th, 2025.

A. Yes, I have that.

Q. And would you -- this is the report you issued mapping out the strategic plan that you recommend Charleston County voluntarily implement, yes?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I just want to clarify, because you're talking about voluntarily implement. This is a plan that I'm recommending be implemented by Charleston County in order to address the harms of social media platforms, the defendants' platforms, yes.

Page 584

I don't know --

BY ATTORNEY KEYES:

Q. Okay.

A. I think what threw me is the term "voluntarily."

Q. Okay. But the goal of the strategic plan that you're recommending is to address the harms of students' use of social media on schools?

A. So, again, part of the purpose of the plan is to address the broad impacts of the defendants' platforms on the harms that they have caused, which include schools.

But there are many harms that I laid out in the opinions and in the content of the report.

Q. And what harms are you attempting to mitigate through the plan, separate from harms to schools?

A. So as I detail in the report, I'm speaking about harms to students, including their mental health and well-being, which intersect with

Page 585

harms to schools, but also harms to schools and the school environment.

So they all fall within kind of what's happening in schools. So if students' mental health is harmed, schools are having to deal with it.

So that's why I'm saying to schools. But, yes, it's kind of what's also -- as students are experiencing it, it's the schools who are having to address it. And that's why the plan is targeting schools.

Q. Okay. If I understand you correctly, you're saying that students' use of social media causes them harms, which harms then have a spillover effect and cause harms to schools or the school environment.

Did I get that right?

ATTORNEY YEATES: Object to the form. Misstates testimony.

BY ATTORNEY KEYES:

Q. How is that wrong?

A. I don't think that's what I

Page 586

said.

What I said is that the strategic plan that I laid out in the report is intended to address the harms caused by platforms to schools, which includes how students' mental health impacts how they are, you know, showing up in schools and the things that schools have to contend with. I can put it that way.

So schools are having to contend with many issues, including disruptions to their classroom, interference with class instruction, having to think about technologies to put in place to try to address the design features that are taking away their students from instruction. They're having to put mental health supports in place, et cetera, et cetera.

So there are many things that schools are having to do that I would say kind of fall within the umbrella of harms that I talk about in

47 (Pages 583 - 586)

CONFIDENTIAL

Page 587

much more detail in the report.

Q. You say in your report for each of the six school districts that, The strategic plan is to prevent and mitigate the negative impact of social media on the school district, its schools, the school environment, student learning and mental health.

Did I get that right?

A. Can you refer me to the page?

Q. Sure. Paragraph 9 on Page 3 of your report.

A. Page 3 of the report, Paragraph 9. So is this Opinion 6? I just want to make sure we're looking at the same thing. Paragraph 9, Opinion 6?

Q. That's what it says.

A. Okay.

Q. So do you agree that in your report you say that for each of the six school districts, The strategic plan is to prevent and mitigate the negative

Page 588

impact of social media on Charleston County School District, its schools, the school environment, student learning and mental health?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I think you asked me does it say that in every school district report. And the answer would be no, because I'm looking at Charleston County School District report.

So in this school district report for Charleston County, it talks about that. It says, Prevent and mitigate the negative impact of social media on Charleston County School District, its schools, the school environment, student learning and mental health.

BY ATTORNEY KEYES:

Q. Okay. Maybe we're having a nomenclature issue.

Page 589

A. Okay.

Q. You have six separate reports, one for each school district. And the goal of each of those reports is to lay out a strategic plan for a particular school district?

A. So the -- part of the goal of the report for each of the six school districts is to detail a district-specific strategic plan that prevents and mitigates the harms of the defendants' platforms. That's --

Q. Okay. Then if you'd go to Page 23 of the same report.

A. Okay.

Q. One component of your strategic plan for Charleston is new staffing, correct?

A. That's correct.

Q. And you also have a component of new staffing in your strategic plan for each of the other five school districts, correct?

A. I do.

Page 590

Q. Another component of your strategic plan for Charleston is training?

A. I call it professional development. And that's part of the plan for Charleston, yes.

Q. And you also have a component of professional development in your strategic plan for each of the other five school districts, correct?

A. I do have professional development as part of the other five school district plans.

Q. And another component of your strategic plan for Charleston is data systems?

A. That's correct. I do have a component of the plan that's to build and sustain a data system to address the harms, that's correct.

Q. And you also have a component of data systems in your strategic plan for each of the other five school districts, correct?

48 (Pages 587 - 590)

CONFIDENTIAL

Page 591

A. Yes. I have -- I have a data system proposed in each of the five other district plans.

Q. Okay. Focusing first on the strategic plan for Charleston, on Page 23, you identify the hiring that you are recommending Charleston undertake as part of the strategic plan, correct?

A. Yes.

Q. And you are recommending that Charleston hire six district staff; a director of digital safety, a director of digital literacy, a director of life skills education, a director of mental health literacy, a director of student mental health and a director of family engagement and education, correct?

A. That's correct.

Q. You also recommend in the strategic plan for each of the five other school districts hiring the same six positions at the district level?

A. So they would be specific to their -- to each of the other districts.

Page 592

But one of the things that we know, having done this work for a long time with districts, is that it's really essential to have district-level leadership in positions where you are creating new supports in the schools.

So it makes sense that these positions would be both -- or in Charleston as well as proposed in the other five districts.

So these same positions -- position titles, I should say, are recommended across the district reports. That's correct.

Q. Okay. My question was a yes or no.

You also recommend in the strategic plan for each of the five other school districts hiring the same six positions at the district level?

ATTORNEY YEATES: Object to the form.

BY ATTORNEY KEYES:

Q. The answer is correct,

Page 593

right?

ATTORNEY YEATES: Object to the form. Asked and answered.

THE WITNESS: So I'm giving context, because you're saying the same positions.

It's the same position titles in each of the six districts.

BY ATTORNEY KEYES:

Q. Okay. Then in addition to the positions that you recommend the district create at the district level, you also recommend hiring positions at the school level, correct?

A. In Charleston? Or are you asking about all --

Q. Yes.

A. -- six districts?

Q. In Charleston.

A. Yes.

Q. And you also do the same thing for the other five school districts?

Page 594

A. Yes.

Q. Okay. And there are some positions that you suggest the school district hire one per school, right?

A. Yes.

Q. Specifically, you recommend in your strategic plan for each of the six school districts that they hire one IT staff for educational technology specialist per school?

A. Yes.

Q. You recommend in your strategic plan for each of the school districts that they hire one life skills specialist per school?

A. Yes.

ATTORNEY YEATES: Object to the form.

THE WITNESS: Yes.

BY ATTORNEY KEYES:

Q. You recommend in your strategic plan for each of the six school districts that they hire one family engagement coordinator per school?

49 (Pages 591 - 594)

CONFIDENTIAL

Page 595

A.   Yes.

Q.   You recommend in your strategic plan for each of the six school districts that they hire one peer coordinator per school?

A.   Yes.

Q.   You recommend in your strategic plan for each of the six school districts that they hire one crisis intervention specialist per school?

A.   Yes.

Q.   Okay.  And then for Charleston you recommend that it hire, as part of your strategic plan, certain positions where the number of positions is based on the number of students, correct?

A.   Yes.

Q.   And you do the same thing for the five other school districts?

A.   Yes.

Q.   And for each of the six school districts, you recommend that the school district hire a digital literacy

Page 596

specialist for every 500 students in the district?

A.   Yes.

Q.   And for each of the school districts, you recommend that the school district hire a mental health literacy specialist position for every 500 students in the district?

A.   Yes.

Q.   And you -- for each of the school districts, you recommend that the school district hire a school-based mental health clinician for every 500 students in the district?

A.   Yes.

Q.   And for each of the school districts, you recommend that the school district hire a school psychologist for every 500 students in the district?

A.   Yes.

Q.   And then there are other positions where, for each of the school districts, you've recommended that the school district hire a position for every

Page 597

250 students, correct?

A.   I see one position where it's per 250 students, yes.

Q.   And what position is that?

A.   The school counselor position.

Q.   Okay.  And so for each of the six school districts, you've recommended that the school district hire one school counselor for every 250 students in the district?

A.   Yes.

Q.   And then you have recommended that each school district, as part of your recommended strategic plan, hire one school-based therapist for every 750 students?

A.   Yes.

Q.   So other than the number of schools or the number of students in one of these six districts changing, have you made any different recommendations across your strategic plans for these six school districts?

Page 598

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So yes.  What professional development looks like, based on whether they have a certain number of elementary, middle or high school students, and the number of people who would be trained and the corresponding number of hours that new staff would be trained would vary across the school districts.

And as would be expected, when you're offering a strategic plan, you want it to be based in best practice and have some consistency, in terms of drawing on best practice programs and best practices related to staffing.

So there's some consistency across districts, as you would hope for when you're designing a plan based on evidence-based practices.

50 (Pages 595 - 598)

CONFIDENTIAL

Page 599

BY ATTORNEY KEYES:

Q. Okay. With respect to the staffing recommendations that you're making in these six strategic plans, do your recommendations regarding staffing vary from school district to school district?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So the recommendations do vary with respect to the number of people to be hired, based on the number of students in the school district and the types of schools, whether it be elementary, middle or high school.

BY ATTORNEY KEYES:

Q. Okay. So the only variation in the number of staff that you're recommending be hired by each school district is based on how many schools they have or the size of their student population; but, otherwise, your staffing

Page 600

recommendations are consistent across the strategic plans?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So the staffing recommendations based on the ratios are consistent across the districts. Because they are based on the same principles of what it would take to actually remedy -- or address, would probably be the better term, address, you know, prevent and mitigate the harms of social media.

So you're drawing on the same logic for staffing across districts. The number of folks would depend on the students.

And this is very typical. When you're thinking about staffing up a program for a certain intervention, you look to the student body, the number of

Page 601

students that you have, to determine what staffing would be needed, for example, to do curriculum; so number of teachers may be based on how many students you have in a district, the number of school psychologists might be based on that as well.

So that consistency across districts is not only to be expected that would be, you know, what you do to draw on best practices.

BY ATTORNEY KEYES:

Q. How many school districts in the country have a district director of digital safety?

A. I could not tell you how many districts across the country have a director of digital safety.

Q. How many school districts in the country have a district director of digital literacy?

A. Again, to my point earlier,

Page 602

some of these roles are more newly being developed because of the impacts of social media being newer. So I would not be surprised if they don't yet have them.

But I don't have the exact number, if you're asking me, across, you know, the -- the tens of thousands of schools across the country how many have that. I don't know.

Q. How many school districts in the country have a district director of life skills education?

A. I would not know that. In fact, I don't think the data would exist in one place. And I don't know how many have a director of life skills.

Q. How many school districts in the country have a district director of mental health literacy?

A. I don't know.

Q. How many school districts in the country have a district director of student mental health?

A. So, again, I don't have a

51 (Pages 599 - 602)

CONFIDENTIAL

Page 603

specific number there.

But what I can say is that many districts have district-level leadership around mental health.

What I'm calling for in the plan is specific to mental health issues that arise related to social media. So because school systems are often not resourced to do that, I would be surprised to find that many had them.

Q. How many school districts in the country have a district director of family engagement and education?

A. Again, I couldn't give you an exact number. I'm not sure who could give you an exact number of that.

But what I can tell you is that there are a number of districts who hire -- they may call them family support specialists or family engagement specialist or family liaisons.

That's different than the district director role that I'm -- that I talk about in my strategic plans, which

Page 604

focuses on a family -- a district director of family engagement specific to the harms of social media.

Q. When advocating that these six school districts hire a district director of digital safety, did you look to any model and borrow that position from another model?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So the general answer is yes. Because, again -- so, you know, I've worked in developing multi-tiered systems of supports for schools for two decades-plus.

And the -- when you look to the implementation science around how to actually implement multi-tiered systems of support, consistently across the literature, it documents that those types of kind of comprehensive school mental health

Page 605

systems are more successful when you hire and utilize district-level supports.

So if you're recommending a certain body of work, let's say a new mental health area, the science would say it's important that if you're going to try to do this across schools, you need to hire someone at the district.

One framework that comes to mind for that would be the positive behavior interventions and supports, where they consistently document, and, in fact, start with, the district-level leadership in order to support the school-level leadership.

So those are the frameworks that I would have based that on.

BY ATTORNEY KEYES:

Q. Can you identify any specific districts that have the staffing

Page 606

plan that you are advocating these six school districts adopt?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I would be surprised, given the resource constraints of schools and the relatively new and evolving harms to social -- of social media and the defendants' platforms on young people and on schools, if they have yet staffed up this.

Again, this plan is really looking, you know, holistically at what are schools experiencing as a result of the platforms and what would be best practices to address those harms?

So, unfortunately, schools really haven't had the luxury of putting that in place. They are trying their best, as you see throughout the testimony of all of the school folks, they are trying

52 (Pages 603 - 606)

CONFIDENTIAL

Page 607

their best to address the harms. They are putting certain pieces in place and plugging certain holes.

But, again, it wouldn't surprise me that this particular district staffing model, which is, really, what would -- what would need to be in place to address the harms, if you don't see that in districts.

BY ATTORNEY KEYES:

Q. Can you identify any specific districts that have the staffing plan that you are advocating these six school districts adopt?

A. No.

ATTORNEY YEATES: Object to the form. And asked and answered.

BY ATTORNEY KEYES:

Q. You say in your report that the position of district director of student mental health should have social media expertise.

A. Are you asking me that?

Page 608

Q. Well, I'm -- I'm referring you to that.

A. Okay.

Q. What do you --

A. Yes. I see it.

Q. -- mean when you say that position should have, quote, social media expertise?

A. So in my plan, I lay out pretty comprehensively -- I'm happy to read it, but I won't belabor it, unless you'd like me to -- the school mental health -- or the mental health competencies that a team would need to have in a school to address the harms of social media.

And the district-level person would, as is laid out in the professional development plan, need to be able to oversee not only the professional development but also the implementation of those specific competencies.

So that would include things like -- I won't give you an exhaustive

Page 609

list, it's in the -- a list of those competencies is in the report.

But it would include things like being able to screen for the impacts of social media harm on young people, being able to support students who are experiencing impairment in their mental health functioning.

Those are a couple of the ones that are listed.

Q. Is there any specific degree or certification that demonstrates someone has, quote, social media expertise, end quote, as you use the term?

A. So this person would likely be a licensed certified mental health professional. And there's various degrees that would fall under that, right. So that could be a psychology degree, a social work degree, a counseling degree, a licensed marriage family therapist.

Those are often people who

Page 610

work in schools to support student mental health.

The field, to my understanding, has not yet developed a certificate for social media expertise, which is -- when that's the case, you often lay out the competencies that would be necessary for someone to demonstrate that expertise, which is what I did in the plan.

Q. So how would a school district, under your plan, evaluate whether someone applying for the position has, quote, social media expertise, as you use the term?

A. So I'm happy to turn to the list of competencies.

But, first of all, there would not necessarily be the expectation that they would be hired with all of the expertise, which is why there is a professional development plan in place.

And part of that is having district-level leaders who would be newly

53 (Pages 607 - 610)

CONFIDENTIAL

Page 611

hired engage in professional development on those topics.

But as we would do when we hire school mental health clinicians, just as you would do if you hire a district-level leader position, you would go through the competencies.

And I imagine during the interview process you would be asking about that and their experience with that and also areas where they might need additional professional development.

Given that the mental health impacts of social media platform engagement for students is a relatively new area, there may be some new training that needs to happen for those staff.

And that would not be unprecedented. That's what you do when, you know, there's a new harm to students. So it would have been done, for example, when students started using tobacco, when they started using specific types of substances. New trainings are developed,

Page 612

new competencies are developed.

It doesn't mean that overnight there's a certificate or a license for that competency or that area of expertise. But the field evolves to develop those competencies.

Q. Can you identify for me any professional organization that recommends that school districts hire the six district-level positions you're advocating for?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't know that I can point to one professional organization that recommends all six positions.

There are professional organizations that recommend hiring of different competency areas, like life skills or social/emotional learning or digital literacy.

BY ATTORNEY KEYES:

Page 613

Q. What are those organizations?

A. So, for example, for life skills, you have the Collaborative For Academic and Social Emotional Learning. That's probably the go-to national resource for social emotional learning. They work with districts all across the country to support social emotional learning, sometimes called life skills. I chose life skills because it's often a more accepted term.

But that's a national organization that would recommend life skills professionals in each school that can support that instruction for students.

I'd have to go back to my report to look at the national body around digital literacy, if you're looking for the exact name.

Q. Okay. Can you name any other professional organization that recommends hiring of the positions that

Page 614

you've recommended these school districts hire?

A. Sure. So with respect to a director of student mental health, for example, or school mental health, if you look to the mental health organizations, like the National Association of School Psychologists, the School Social Workers of America, the American School Counseling Association, they recommend district-level leadership to support school mental health.

Again, I think most of, if not all of, those organizations are still navigating how to address and staff this new area of social media harms on students.

So do they recommend district-level leadership for school mental health? Yes.

Q. Would the six district-level positions that you're advocating be created only do work relating to defendants' platforms?

54 (Pages 611 - 614)

CONFIDENTIAL

Page 615

ATTORNEY YEATES: Object to the form.

THE WITNESS: So what I recommended in the plan is that the positions are overseeing the work related to the harms caused by defendants' platforms.

That work involves a wide area of topics, including life skills, digital literacy, mental health literacy. Those are specific to the harms of the defendants' platforms. That's what I was instructed to do.

BY ATTORNEY KEYES:

Q. Instructed by whom?

A. By myself. I mean, I'm saying instructed to do. That's kind of what I see as, like, my role in this, is to develop a plan. And so --

Q. Okay. So would the district-level positions that you're advocating these six school districts create provide services to students who

Page 616

had not used defendants' platforms?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So you're asking would these positions have anything to do with students who might not have yet engaged with the defendants' platforms?

BY ATTORNEY KEYES:

Q. Yes.

Would they provide services that would be received by students who had not used the defendants' platforms?

A. Okay. So what I laid out included, as I've said, a multi-tiered system of support, which is based on a public health framework which includes prevention.

And so especially for our younger kids, let's say our kindergarten, first grade students, who may not yet -- although they certainly may have, but may not yet -- have had direct exposure or be personally using a defendants' platform,

Page 617

they would still be a part of receiving support from those professionals because they would be, for example, receiving the skills for how to navigate the impacts on the schools and also potential mental health impacts for exposure.

Given how many young people, even at the elementary age, do start using, you want to start prevention early.

Just like most kindergarteners are not perhaps smoking cigarettes, but you still start substance abuse prevention early with them just to help them gain the skills so they know how to navigate it.

And there are other skills that are within, you know, the programming that I offer that would be quite relevant to preparing students to not only engage with social media, if they do so, but also to be learning in environments where there's disruptions related to social media.

Page 618

So even if a young person is not experiencing it themselves, they may be impacted by the harm in their school, if that makes sense.

Q. Okay. Separate from the education or prevention component of your plan, with respect to the remainder of your plan that is providing services to students, would students who have never used defendants' platforms be eligible for those services?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So it's hard for me to say what the eligibility criteria would be for the services, first of all.

But can I imagine, since you're asking me to, you know, kind of think about implementation of the specific plan, can I imagine students who may have not engaged with a social media platform still benefiting from the

55 (Pages 615 - 618)

Golkow Technologies,
A Veritext Division

877-370-3377                                                www.veritext.com

CONFIDENTIAL

Page 619

services because they had been harmed by or impacted by exposure of other students? Yes.

So if a student is in a classroom where they are trying to learn and the teacher is spending a third of their time trying to re-engage students who are disengaged, that impacts other students. They may suffer, their academics may suffer, they may seek the support of a school counselor. In that case, sure.

BY ATTORNEY KEYES:

Q. Okay. So you do envision the services, besides education being provided under your strategic plan, being available to students who have never used defendants' platforms?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I think I've already answered that services -- the plan is intended to address

Page 620

the -- to prevent and mitigate harms.

Harms include disruptions to the classroom, mental health harms to students, just, you know, problems in the classroom environment and in the school climate.

Those impact the broader swath of students, not just those who are immediately engaged, but also other students in the school building.

So you would hope that any plan to mitigate the harms that impact the entire -- or at least a substantial part of a student population would engage students who may be suffering as a result.

So I would hate to see, you know, criteria be only for a student who happened to be on a platform at a particular time. Because other students may also be

Page 621

feeling the impact of student engagement and how that impacts the schools.

BY ATTORNEY KEYES:

Q. So under the plan that you're recommending these six school districts adopt, the staffing that is created by your plan would be available to services who have never used defendants' platforms, yes?

ATTORNEY YEATES: Object to the form. And asked and answered.

THE WITNESS: So what I said is --

BY ATTORNEY KEYES:

Q. I didn't ask under -- under what circumstances.

I asked you to confirm that the staffing that is created by your plan would be available to provide services to students who never used defendants' platforms?

ATTORNEY YEATES: Please do not cut off the witness. Let her

Page 622

answer the question.

ATTORNEY KEYES: Well, I want her to answer my question and not give me another speech. Because we have limited time.

ATTORNEY YEATES: Objection. Argumentative.

THE WITNESS: So the services that would be available to students under this plan would be for students who are experiencing harm related to the platforms.

That doesn't necessitate that they would have used the defendants' platform directly themselves, because we see harm to other students who are in a school building that's impacted by the defendants' platforms.

BY ATTORNEY KEYES:

Q. Okay. And I'm not asking for your rationale on whether it's appropriate or not.

56 (Pages 619 - 622)

CONFIDENTIAL

Page 623

I just want you to confirm for me that students could get the benefit of services provided under these new staffing positions even if they had never used defendants' platforms.

Is that correct?

ATTORNEY YEATES: I object to the form. And asked and answered multiple times.

THE WITNESS: I think I've said that that's -- that, yes, students who may not have used the platforms could still benefit from services that are offered to address the harms, because the harms are not exclusive to those students who may have used the platforms.

They pervade the school. They pervade peer relationships. They pervade learning across the board. And there's a prevention mechanism as well.

So for all of those reasons,

Page 624

it would be essential to put services in place for those students who may not have yet used a platform directly themselves.

BY ATTORNEY KEYES:

Q. And that would include students who have never used social media at all?

ATTORNEY YEATES: Object to the form. Asked and answered.

THE WITNESS: So the plan itself is for the entire school, which includes universal interventions for all students in the school, including things like digital literacy, mental health literacy, life skills, so that they can navigate a learning landscape that is negatively impacted by the defendants' platforms.

BY ATTORNEY KEYES:

Q. And that would include students who have never claimed to be

Page 625

addicted to defendants' platforms or social media?

ATTORNEY YEATES: Object to the form.

BY ATTORNEY KEYES:

Q. You can laugh all you want. I'm trying to understand the parameters of your plan. So I --

A. No, I'm laughing --

Q. -- appreciate the respect of just answering the question.

A. I'm absolutely intending to answer the question. I'm laughing because of my daily experience with students.

So I'm imagining students, you know, and kind of how they talk about themselves and their engagement to social media. I'm not laughing at you nor the question.

ATTORNEY YEATES: I object to the form. And argumentative.

THE WITNESS: So forgive me for the distraction there.

Page 626

But can you repeat the question?

BY ATTORNEY KEYES:

Q. Yeah.

I want you to confirm that students could get the benefit of services provided under these new staffing positions even if they had never claimed to be addicted to defendants' platforms or social media?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So, again, it's a broad question.

But could a student who had never claimed to be addicted to social media platforms or the defendants' platforms benefit from some of the services in the plan? Of course. You would hope so.

BY ATTORNEY KEYES:

Q. And they would be eligible for the services you've outlined?

ATTORNEY YEATES: Object to

57 (Pages 623 - 626)

CONFIDENTIAL

Page 627

the form.

THE WITNESS: Again, eligibility for the services is often defined upon implementation.

So, you know, these are -- part of the plan is -- you know, it's tailored at the district level and districts would determine specific eligibility, perhaps.

But inherent in the plan is that students who may not have been exposed to or may not be saying that they're addicted to social media could engage in the services.

But, again, there's a variety of services that are offered here, including things like restorative practices after conflict that may erupt in relation to social media, which often involves many students, whether they're on social media,

Page 628

not on social media, saying they're addicted to social media or not.

The services themselves could apply to students who, you know, don't meet the criteria that you're laying out here.

BY ATTORNEY KEYES:

Q. Okay. So students would be eligible to receive non-education services from the various positions that you're recommending without having to make a showing of some sort that they have a need connected to social media?

You're intending to benefit the entire student population?

ATTORNEY YEATES: Object to the form. And misstates testimony.

THE WITNESS: So there's a few parts of how you said that that I wouldn't be -- I think you're asking me to agree with something. And I would not agree

Page 629

with it.

First of all, I think you called the services non-educational?

BY ATTORNEY KEYES:

Q. I'm asking about the component of your plan that is not education, that is actually providing services to individual students.

A. That's what I --

Q. And I want to -- I want to understand, are those services available to anyone or do students need to make some kind of showing that they have some kind of need that relates to social media?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I'm going to address the first part of how you phrased the question, because I just want to make it clear that I would not describe the services here as non-educational.

Page 630

When we talk about even mental health services that happen in schools, they are directly related to a student's education and their learning. It's -- you know, part of the primary role of child development is to engage in a school setting.

And so I just -- I would just, you know, kind of not want to say, yes, I agree, non-educational, right, because they are educational services in the way that we think about them.

Would a -- the second part of your question, I think, was more about would a student have to show something related to social media to be eligible.

So the positions and the services are specific to the impact of social media. And so they would be, in some way, for some of the services -- I'm

58 (Pages 627 - 630)

CONFIDENTIAL

Page 631

thinking through the list of services that we have.

For some of them, they would be specific to social media. So a student might indicate that they were harmed by social media, for example, or someone referring them might.

But there are other services within the plan where -- for example, a prevention service, where they're learning skills to navigate a social media landscape or a learning environment where they wouldn't have to say, hello, I'm being impacted by social media. They would receive the service because we know that they are impacted by social media.

That's very consistent with how we do multi-tiered systems of support in schools.

BY ATTORNEY KEYES:

Q. Do you agree that every

Page 632

teenager can benefit from learning better stress management?

A. I think most people, so teenagers included, always can develop skills around stress management.

Q. Do you agree that every teenager can benefit from coping skills education?

A. So I certainly think that teenagers can benefit, in general, from coping skills education.

Q. Do you agree that every teenager can benefit from social emotional learning?

A. So I think -- you know, we're talking about every teenager. And my mind starts going to, also, students who have severe developmental, cognitive issues, et cetera.

But can most -- so I'm going to use the term "most," because I think that there's always, you know -- so can most students benefit from social emotional learning? I think so. Yeah.

Page 633

Q. Okay. Do you agree that every teenager can benefit from education on digital misconduct?

A. So I think teenagers can benefit from education on digital misconduct.

I mean, I would be curious what you mean by "digital misconduct." But yes.

Q. You use that term in your plan.

A. So if it's how I used it, sure.

Q. Okay. Do you agree that every teenager can benefit from education on digital literacy?

A. I think teenagers can benefit from education on digital literacy.

Q. Do you agree that every teenager can benefit from education on healthy online behaviors?

A. Yes, I think teenagers can benefit from that.

Page 634

Q. Do you agree that every teenager can benefit from positive digital habits education?

A. I think teenagers can benefit from that, yes.

Q. Do you agree that every teenager can benefit from education on emotional regulation?

A. Yes.

Q. Do you agree that every teenager can benefit from education on responsible decision-making?

A. Yes.

Q. Do you agree that every teenager can benefit from education on mental health awareness?

A. I do think that most teenagers can benefit from that.

Q. Do you agree that every teenager can benefit from help-seeking behaviors?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Can they

59 (Pages 631 - 634)

CONFIDENTIAL

Page 635

benefit from help-seeking behaviors? I actually don't -- I'm not totally sure what you mean by that.

Can they benefit from education on --

BY ATTORNEY KEYES:

Q. Do you agree that every teenager can benefit from education on help-seeking behaviors?

A. I think that that's a helpful thing for teenagers to have.

Q. Do you agree every teenager can benefit from stigma reduction education?

A. So I think teenagers can benefit from stigma reduction around mental health. Sure.

Q. Including education on it?

A. Oh, yeah. Yeah. Education on mental health stigma and how to decrease that? Yes. I think it's -- I think it's valuable for teachers -- excuse me, for teenagers -- to use your

Page 636

term -- to have that, yes.

Q. And I just gave a list of the components of your plan, right?

Because your plan envisions education on all of those topics.

ATTORNEY YEATES: Object to the form.

BY ATTORNEY KEYES:

Q. Yes?

A. So you gave me a list of components -- some components from my plan. That was not a comprehensive list of all of the components of the plan.

Q. Okay. I gave you a list.

You agreed that all or most teenagers would benefit from education for -- on all of those topics?

A. So to be clear, because the plan that I lay out -- I think the terms that you use were actually quite broad, and I think I'm quite specific in the plan to suggest that those categories would be specific to social media engagement.

Page 637

So I agreed with the statements or the -- some of the questions you asked earlier about, could students benefit from mental health literacy? Could they benefit from digital literacy? Yes.

Do I also think students could benefit from some of the types of mental health literacy and digital literacy laid out in the plan that are specific to how to engage with social media or how to engage with school systems that are impacted by social media harms? Yes.

Q. And under your plan, all students in the school could participate in all of this education?

A. So in the plan, there's clearly laid out a multi-tiered system, part of which is Tier 1, which is considered universal, which is usually for most students in a school building.

You're not always going to be able to capture every student, whether

Page 638

there's a student who is missing a day of school, et cetera. So I'm always reluctant to use the term "all."

But is it intended for the school population, the universal Tier 1 supports? Yes.

Q. And in order to get the benefit or participate in any of that education, do students need to make any showing at all?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Any showing of --

BY ATTORNEY KEYES:

Q. Any showing of harm? Any showing of need? Any showing of eligibility?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So the nature -- to kind of go through the public health model, the nature of Tier 1 universal

60 (Pages 635 - 638)

CONFIDENTIAL

Page 639

supports is actually that you're providing a foundation of, broadly speaking, health prevention and promotion, just like you would for tobacco prevention.

It's another, you know, kind of helpful analogy here in the sense that you would provide that type of education universally, recognizing that there's lots of evidence to suggest that when you provide that, given the risk that's in the environment for children and adolescents of, in this case, we're talking about tobacco, but in our case, we're talking about social media, there's a lot of evidence to suggest that when you put in early intervention, including education, promotion and prevention, that it mitigates the risk.

So by its very nature, you would not have to show that you've

Page 640

been harmed. Because it's to prevent harm moving forward. For some of the services.

BY ATTORNEY KEYES:

Q. In your plan for each of the six school districts, you recommend a ratio of 1 school psychologist to 500 students, correct?

A. Yes.

Q. And that's based on a ratio recommended by the National Association of School Psychologists?

A. That's correct, yes.

Q. Do you belong to the National Association of School Psychologists?

A. I want to say that my membership is current. I've certainly belonged, and I think I have current membership. You have to renew every year.

Q. You recommend in your plan for each of the six school districts that they hire one counselor for every 250

Page 641

students, correct?

A. Yes. Yes.

Q. And that's based on the ratio recommended by the American School Counselor Association?

A. Yes. And recognized by the field, yes.

Q. Do you belong to the American School Counselor Association?

A. No.

Q. How many states meet the National Association of School Psychologists recommendation of one psychologist for every 500 students?

A. I don't know offhand that number. So I can't answer that offhand, how many states meet that.

Q. Did you check at all or look into that as part of your work?

A. I don't know that I checked the number across the states. I don't think that that information would have been necessary when looking for the specific information or when developing

Page 642

opinions around the six specific school districts who are only within six states, no.

ATTORNEY KEYES: Vince, would you display Tab 32, which we'll mark as Exhibit-31?

- - -

(Whereupon, Exhibit Hoover-31, No Bates, The National Association of School Psychologists, Student to School Psychologist Ratio 2023?2024 Based on the U.S. Department of Education Common Core of Data, was marked for identification.)

- - -

BY ATTORNEY KEYES:

Q. This is a document from the National Association of School Psychologists. It's titled, Student to School Psychologist Ratio, 2023 to 2024.

Have you seen this document before?

A. I may have. I look at lots

61 (Pages 639 - 642)

CONFIDENTIAL

Page 643

of documents in my work, including some from the National Association of School Psychologists. So it's hard to say.

Q. If you scroll to the bottom, you'll see that this data is as of January 24th, 2025.

Do you see that?

A. I do.

Q. And do you see that the data is from the U.S. Department of Education National Center for Education Statistics, the Common Core of Data?

A. I do.

Q. Are you familiar with the Common Core of Data?

A. I am, to a degree.

Q. Did you look at any Common Core of Data as you formed your opinions in this case?

A. Not to my recollection. I would have cited it in my sources if so. But it wasn't necessary to inform my opinions in this case.

Q. Did you look at any Common

Page 644

Core of Data as you prepared your recommended strategic plan?

A. I don't think I cited that. And if not, it's not something I would have considered, nor would I have needed to, to inform my opinions in this case.

Q. According to this list, do you see that there are only two states that meet the National Association of School Psychologists' recommendation of one psychologist for every 500 students?

A. You're going to have to give me --

ATTORNEY YEATES: Object to the form.

THE WITNESS: You're going to have to give me a minute to actually look at what this is.

Because, again, I'm not sure if I've seen it before. But I certainly don't recall it.

So the data was provided -- will be monitoring. I'm trying to figure out what the numbers on the

Page 645

right mean and what the bars mean.

I don't see the --

BY ATTORNEY KEYES:

Q. Well, if you scroll down, the bar shows a ratio of 500 students to one school psychologist. And the number on the right shows what the ratio actually --

A. The ratio number.

Q. -- is for each state.

So as you scroll down, do you agree with me that, according to the National Association of School Psychologists, which sponsors this recommended ratio, there are only two states, Maine and Connecticut, that meet it?

ATTORNEY YEATES: Object to the form. Dr. Hoover, you can take your time to review the data.

THE WITNESS: Yeah. I'm just looking.

So I see that Maine, it appears to meet it. I see Puerto

Page 646

Rico. And then I see Connecticut. And -- yes.

And there's variability across the other states.

So I see those meeting the 1 to 500 ratio, yes.

BY ATTORNEY KEYES:

Q. Okay. So of the 50 states there are only two, Maine and Connecticut, that meet the ratio?

A. According to this piece of data.

Q. Do you have any understanding as to why 48 of the 50 states do not meet the recommended ratio?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't know that I can speak specifically to what's happening in each of the states with respect to why they don't meet the ratio.

I can speak to some of the general issues.

62 (Pages 643 - 646)

CONFIDENTIAL

Page 647

I'm aware, as I detail in the report, that there has been -- we have a context and a history of a context of workforce challenges with respect to school psychologists. And I'm aware of that, you know, because of the work that I do in the field.

Each state is a bit different in terms of some of the challenges.

Oftentimes -- and, again, in my experience with districts, it's because they don't have the resources to hire the needed professionals. So when I'm working with schools, they are often lamenting, you know, if they, you know, need an additional psychologist but might not have one. So it's often because they don't have the funding to hire a needed school psychologist.

So this doesn't surprise me

Page 648

that schools can't meet the ratios, because they are often -- they often have very limited funding to do so.

So I think I mentioned yesterday, they might have to make a decision between a teacher or a school psychologist. It's a hard decision to make.

ATTORNEY KEYES: Vince, would you show Tab 33, which we'll mark as Hoover Exhibit-32?

- - -

(Whereupon, Exhibit Hoover-32, No Bates, American School Counselor Association Student-to-School-Counselor Ratio 2023?2024, was marked for identification.)

- - -

BY ATTORNEY KEYES:

Q. This is a document that's available from the American School Counselor Association. It lists the

Page 649

student to school counselor ratio for 2023 to 2024.

Do you see that?

A. I do see that.

Q. Did you undertake, in forming your opinions in this case, to look at what the actual student to school counselor ratio was across the country?

ATTORNEY YEATES: Object to the form.

THE WITNESS: It would have been unnecessary to inform my opinions.

BY ATTORNEY KEYES:

Q. Did you undertake, in formulating your strategic plan that you're recommending, to look at what the actual student to school counselor ratio is across the country in different states?

ATTORNEY YEATES: Object to the form.

THE WITNESS: It would not have altered my opinions. So it

Page 650

was not part of informing the opinion.

ATTORNEY KEYES: If you scroll to the bottom, Vince.

BY ATTORNEY KEYES:

Q. Dr. Hoover, do you see that the data source for these ratios is also the U.S. Department of Education, National Center for Education Statistics, Common Core of Data?

A. I do see that.

Q. And do you see that this chart has an entry for each U.S. state, and it shows a bar graph and the number that reflects the actual student-to-school-counselor ratio for that state?

ATTORNEY YEATES: Object to the form.

THE WITNESS: It appears so. I would have to go through my state song if I want to actually count them all out.

But I think so, yeah.

63 (Pages 647 - 650)

CONFIDENTIAL

Page 651

BY ATTORNEY KEYES:

Q. Okay. And do you see that if you scroll from the top to the bottom, there are only three states that have a student-to-school-counselor ratio of 250 or less? It's Hawaii, New Hampshire, and Vermont.

Do you see that?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I do see that. I also see that the American School Counselor Association recommends a ratio of 250 to 1 on the form.

BY ATTORNEY KEYES:

Q. Right. Which you said before.

A. Correct.

Q. Yes.

Do you know what research went into either of the recommended ratios that we've reviewed, either the one for the National Association of

Page 652

School Psychologists or the American School Counselor Association?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I don't know that I could speak to the exact research methodology because I was not a part of it.

I did note in my report that these have been long-established ratios in the field. They are widely accepted in the field. And they're generally based on -- first of all, I should say, they are coming from the organizations that represent these professions.

And they, to my understanding, are revisited and looked at. And they reflect the types of services that these professionals may provide in schools, you know, at a certain point in time. They've been around for some time now.

Page 653

BY ATTORNEY KEYES:

Q. And these ratios for both organizations are aspirational; that is, they hope the school districts over time will some day get to those ratios?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I'm laughing because I think that they might wish that they were in place today. But for limited resources in our education system, they may not be.

I can't speak to whether they might describe them as only aspirational. I think that, rather, where I've heard them described, it's this would be best practice to meet kind of the, you know, minimum standards of baseline mental health care and support for students or for school counselors. You know, they also do some college and career

Page 654

readiness work.

So how I understand these is this is considered best practice in the field, best practice standards, not just kind of something we would wish for but it's okay if it doesn't happen.

BY ATTORNEY KEYES:

Q. So when you formulated your strategic plan for each of the six school districts and you identified how many school counselors or school psychologists should be hired under your plan, you took the total population of students for that district and then divided it by the recommended ratio?

A. For the -- for the different categories. So for the school counselor -- the ones that we went over that said, you know, 1 to 500, 1 to 250, that would be accurate.

Q. And then for purposes of identifying how many school counselors or school psychologists you recommend be

64 (Pages 651 - 654)

CONFIDENTIAL

Page 655

hired under your plan, you ignored however many school counselors or school psychologists the school district already has --

ATTORNEY YEATES: Object to the form.

BY ATTORNEY KEYES:

Q. -- correct?

You didn't factor that into the new staffing?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I certainly didn't ignore the staffing they already had. I asked about it. I documented it in my report. It's on the SHAPE profile. It came up in the context of interviews and deposition information. Much of it was in the plaintiff fact sheet.

So far from ignoring it, I actually considered the staffing that they had. And without fail,

Page 656

the staffing was, in many cases -- most cases, I would say, for many of the existing mental health supports, they didn't even meet the basic national standards for some of these disciplines.

And beyond that, the testimony, whether it was depositions or informant interviews, was very clear that the existing capacity they had was stretched thin, having to do work to try to address some of the social media harms that were taking them away from some of the other intended roles for their positions.

So in developing a staffing plan, I absolutely considered who they had and the number of positions and the nature of what their work looks like right now in the school system.

BY ATTORNEY KEYES:

Page 657

Q. But you didn't include the existing school counselors or school psychologists in your calculation of how many new school counselors or school psychologists should be hired to get a particular ratio?

A. Very intentionally so.

Q. Okay.

A. Because it's well documented that when you try to lay on new -- especially something of this magnitude that is causing significant harm, you will likely diminish the other activities that they can do and their effectiveness. And the fidelity with which they're going to be able to implement will suffer.

Q. Okay. Have you calculated what the ratio would be for school counselors in any of the six school districts if you include both the school counselors that they already have and the school counselors you suggest they hire?

A. I wouldn't have done that, because that would have been inconsistent

Page 658

with the plan that I'm proposing.

Q. Have you calculated what the ratio would be for school psychologists for -- in any of the six school districts if you include both the school psychologists they already have and the school psychologists you suggest they hire?

A. Again, I wouldn't have done that. That would have been inconsistent with my plan, because I'm proposing that you need new staffing to address new harms.

Q. Okay. And going back to the ratios that the National Association of School Psychologists and the American School Counselors Association recommend, those are ratios they recommend for all purposes in a school district, correct?

ATTORNEY YEATES: Object to the form.

ATTORNEY KEYES: You can take that down, Vince.

THE WITNESS: So as we've

65 (Pages 655 - 658)

CONFIDENTIAL

Page 659

talked about, the ratios have been around for some time, well before the impacts of social media.

And so I don't think I would -- I know I wouldn't respond to your question in the affirmative, in the sense that I don't think these ratios -- I know they were established before the impacts of social media.

And so do I think that the ratios, as established, took into account the potential harm and resource strain of what's happening right now in schools from the defendants' platforms? Absolutely not.

BY ATTORNEY KEYES:

Q.    Have you seen anything from the National Association of School Psychologists that the ratio should be adjusted because of some issue of students' use of social media?

ATTORNEY YEATES:  Object to

Page 660

the form.

THE WITNESS:  So I have not seen the ratios shift in recent years, nor would that suggest that they're not recognizing the harms of social media.

BY ATTORNEY KEYES:

Q.    Have you seen anything from the American School Counselor Association that the ratio should be adjusted because of some issue of students' use of social media?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, again, the ratios have been longstanding.  I know they use that to advocate for kind of the basic mental health supports prior to the advent, even, of social media and certainly prior to our better understanding of the impacts.

So they have not necessarily changed it.  But that doesn't

Page 661

surprise me.  Again, when you're contending with a new and evolving harm, you're still trying to navigate how to best staff and support that.

BY ATTORNEY KEYES:

Q.    My question was, have you seen anything from the American School Counselor Association that the ratio should be adjusted because of some issue of students' use of social media?

ATTORNEY YEATES:  Object to the form.

BY ATTORNEY KEYES:

Q.    Have you seen anything?

ATTORNEY YEATES:  Object to the form.  And asked and answered.

THE WITNESS:  I think I answered.

But I see lots of documents in the course of my work.  I should preface with that.

To my recollection, I haven't seen that they have

Page 662

recommended adjusting the ratios that they've had in place for many years at this point.

But that doesn't negate that they recognize the impacts of social media.

BY ATTORNEY KEYES:

Q.    Have you seen anything from the National Association of School Psychologists that their recommended ratios should be adjusted because of some issue of students' use of social media?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, again, I look at lots of documents.  I believe that I've seen things related to the impacts of social media by national professional guild groups that represent school folks.

Do I recall seeing a specific document where they recommend changing their ratios?

66 (Pages 659 - 662)

CONFIDENTIAL

Page 663

No. But it wouldn't surprise me.

Again, these are longstanding ratios that were established before the advent of social media and our understanding of its harms.

BY ATTORNEY KEYES:

Q. Have you gone to the National Association of School Psychologists and suggested that they change the recommended ratio?

A. That -- that would be outside of my role to do that.

Q. Have you gone to the American Association of School Counselors and suggested that they change the recommended ratio?

A. No. That would not be outside -- that would be outside of my role to do that for those national professional guild groups.

So the answer is no, I have not made a recommendation that they change their ratios to date.

Page 664

Q. And why would that be outside of your role, given that you hold yourself out as an expert on school mental health and you're the co-director of the National Center for School Mental Health?

A. Because those ratios are established internal to the organizations and to the leadership of the organization.

Again, I can't speak to the specific methodology or timing of the establishment of the ratios, but those are done within the organization. I'm not an employee of the National Association of School Psychologists or the American School Counselors Association.

So if asked to be a part of a committee around that, in a hypothetical, would I give my input, given my expertise? Perhaps. But would I assume to be able to go to an organization that I'm not an employee of

Page 665

and tell them to change those national ratios? No.

That doesn't mean that I think -- and in my conversations with districts, many people suggest that these ratios are actually quite conservative. So even if they're close to meeting the ratio or they meet the ratio, they are still struggling with mental health concerns of their students to meet the demand in the schools.

Q. And so it's never occurred to you to reach out to either organization and say, based on everything I know and based on everything I believe, these ratios are too low or these ratios need to be adjusted because of this problem of students using social media and the consequences that imposes on schools?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So in fact, I have had conversations over the

Page 666

years with folks in these organizations. They've all -- leadership from these organizations have been on our advisory board, for example.

And in conversation, it is not uncommon at all, over the years, for us to lament the ratios being inadequate to address the mental health needs, especially as they've increased over recent years.

ATTORNEY KEYES: Why don't we take a break for lunch?

ATTORNEY YEATES: Sure.

VIDEO TECHNICIAN: The time is 12:50 p.m. We are off the record.

- - -

(Whereupon, a luncheon recess was taken.)

- - -

VIDEO TECHNICIAN: The time is 1:33 p.m., and we are on the

67 (Pages 663 - 666)

CONFIDENTIAL

Page 667

record.

BY ATTORNEY KEYES:

Q. Dr. Hoover, other than the key informant interviews that you reference in your reports, did you speak with anyone else from any of the six school districts?

A. Outside of the key informant interviews, no, I did not.

Unless -- at least not as part of this litigation, no.

Q. Did you conduct any kind of survey of the staff or employees of any of the six school districts for whom you offered reports in this case?

A. So the survey that I got data from was the SHAPE profile, the school mental health profile.

Outside of that, I didn't personally conduct surveys with staff, no.

Q. Before this engagement, did you do any consulting for any of the six school districts?

Page 668

A. I don't believe so, no. Not specifically with any of these school districts.

Q. In connection with this engagement, did you speak with anyone who was a consultant for any of the six school districts?

A. Outside of the litigation are you asking? Sorry. I may have --

Q. No. I said --

A. -- missed the beginning.

Q. No. I asked in connection with this engagement, did you speak with anyone who was a consultant for any of the six school districts?

A. Not that I'm aware of, no.

Q. Have you ever been in any of the schools in Breathitt, Kentucky?

A. Not that I'm aware of.

And the reason I'm pausing is because I know I've presented across the state of Kentucky before. And I know I've been in schools.

But I don't believe that

Page 669

I've been in a school in Breathitt.

Q. Have you ever been in any of the schools in Charleston, South Carolina?

A. I've worked -- I presented in Charleston, South Carolina, at some point.

I don't know that I've been in the schools in Charleston, inside of a school building, no.

Q. Have you ever been in any of the schools in Harford, Maryland?

A. I may have over the course of my time living in Maryland. I honestly cannot recall.

I've been in many schools across the state. I don't know if I've been in a school in Harford County.

Q. Have you ever been in any of the schools in DeKalb, Georgia?

A. So, again, I know I've worked in the state. I don't recall being in a school in DeKalb.

Q. Have you ever been in any of

Page 670

the schools in Irvington, New Jersey?

A. I'd have to say the same, that I know I've worked in New Jersey; I've presented in New Jersey.

I can't recall being in school buildings in Irvington over the course of, you know, two decades or so.

Q. Have you ever been in any of the schools in Tucson, Arizona?

A. Similar here; I've worked a fair amount in the state of Arizona with state Department of Ed people, for example.

But I don't know that I've been in schools -- in a school building in Tucson.

Q. Is it your opinion that Breathitt has inadequately funded its schools?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I think that's, honestly, a bit of a -- too general of a question for me

68 (Pages 667 - 670)

CONFIDENTIAL

Page 671

to answer, whether Breathitt has inadequately funded its schools.

School funding is complicated. And I'm not budget expert for schools. So I think that falls a little bit outside of my expertise. And I did not offer an opinion on that specific question, to my knowledge.

BY ATTORNEY KEYES:

Q. Is it your opinion that Breathitt has inadequately funded mental health resources in its schools?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Again, I think my opinions were more around whether they have adequate staffing to address the current issues.

So the question -- I don't think I can answer the question of have they inadequately funded. I think that feels a bit subjective

Page 672

and, again, comes down to a budget question that, to me, would require, you know, more budget expertise.

BY ATTORNEY KEYES:

Q. Is it your opinion that Breathitt has not provided funding for the right number or right type of positions for mental health resources in its schools?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Again, I think that's a loaded question in one way, in the sense that I think that, as I've talked about in detail in my report, the mental health needs of students have evolved recently due to external, you know, harms.

So whether they have adequate resources -- I feel more equipped to say that they don't have adequate resources to address

Page 673

the issues that they're contending with.

BY ATTORNEY KEYES:

Q. For Charleston, Harford, DeKalb, Irvington or Tucson, are you offering an opinion that any of those school districts have inadequately funded their schools?

ATTORNEY YEATES: Object to the form.

THE WITNESS: The opinion that I offered is that they don't have adequate resources to address the harms.

BY ATTORNEY KEYES:

Q. For Charleston or Harford, DeKalb, Irvington or Tucson, is it your opinion that those school districts have inadequately funded mental health resources in their schools?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Again, I think that's -- the way the question is

Page 674

phrased, to me -- the reason I'm reluctant to agree to that is because it suggests that the schools would -- in my opinion, this is how I'm hearing the question -- that they should be responsible for funding certain services.

And I, as I offer in my report, indicate that they are inadequately resourced to address some of the mental health needs that their students are experiencing.

BY ATTORNEY KEYES:

Q. Is it your opinion that Charleston or Harford or DeKalb or Irvington or Tucson has not provided funding for the right number or right type of positions for mental health resources in their schools?

ATTORNEY YEATES: Object to the form.

THE WITNESS: The reality is

69 (Pages 671 - 674)

CONFIDENTIAL

Page 675

I think they are often doing the best they can.

I think the districts -- I mean, you're asking me a broad question across six districts. I don't think that I can speak to the specific budgets without, you know, doing an analysis, which I would not necessarily be equipped to do to look budget line item by budget line item. So I did not offer that opinion.

What I did offer was that they are inadequately resourced to address the mental health issues of their students, particularly when it comes to -- in the context of this, I talk -- I did offer an opinion about they're not adequately resourced to support the mental health impact related to social media.

BY ATTORNEY KEYES:

Q.   Well, who bears

Page 676

responsibility for the schools in these six districts being inadequately resourced to address some of the mental health needs their students are experiencing?

ATTORNEY YEATES:  Object to the form. Scope.

THE WITNESS:  So I don't, first of all, think I said that they were -- well, did you say inadequately funded or inadequately resourced?

BY ATTORNEY KEYES:

Q.   I used your term. You said before --

A.   Okay.

Q.   -- that these schools are inadequately resourced to address some of the mental health needs their students are experiencing.

So my question is, who bears responsibility for that inadequate resourcing?

ATTORNEY YEATES:  Object to

Page 677

the form. Scope.

THE WITNESS:  So, again, I don't know that it falls within my scope to say who bears responsibility for addressing the harms of the, you know, defendants' platforms.

My experience in the field is that when there is an externally imposed harm, let's say, vaping or tobacco, for examples that I've seen in schools, that responsibility sometimes does, often does, fall on those who are imposing that harm.

BY ATTORNEY KEYES:

Q.   Did Breathitt seek more funding from the state of Kentucky for mental health resources, as far as you know?

A.   I don't know off the top of my head, nor did I do -- I don't know, is the --

Page 678

Q.   Did Charleston seek more funding from the state of South Carolina for mental health resources, as far as you know?

A.   I don't know whether they sought additional resources from the state.

What I can tell you, both in Breathitt and in Charleston, given the conversations that I had with their district and school leaders, is that they are wishing for more support.

So whether they actually were able to seek that -- often the funding is unavailable, you know, to seek for the harms that we're talking about here.

So I don't know whether they did or not. But, to me, that would not speak to whether or not they're experiencing the harms. They're directly saying they are.

Q.   In your prior answer, when you refer to district and school leaders

70 (Pages 675 - 678)

CONFIDENTIAL

Page 679

in Breathitt and Charleston, are you referring to the key informants you spoke with?

A. I'm referring to the key informants. But also the information from the plaintiff fact sheets and also the deposition testimony. And any other documents, you know, that I would have cited that pertain to the question.

Q. And do you have an understanding whether, given your belief that these district and school leaders in Breathitt and Charleston wished for more support, whether they had actually taken steps to get more financial support from the state or from other -- some other source to fund their mental health resources?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I'd have to go into each of the district reports to see what information I had with respect to requesting

Page 680

additional supports.

What I can tell you generally is that many of the districts -- or districts that I spoke with as part of this referred, for example, to grants that they had tried to secure and other funds to try to address mental health services as one example.

Again, you know, the fact is they all clearly laid out that they could benefit from and desperately need additional supports to deal with the harms that are caused by the defendants' platforms, so.

BY ATTORNEY KEYES:

Q. Did Harford seek more funding from the state of Maryland for mental health resources?

A. Again, I don't know whether Harford sought additional funding from the state of Maryland, outside of I am --

Page 681

because, you know, I'm closely tied to the work in the state of Maryland, I know that they've been part of a statewide effort and sought additional funds through something called the Consortium on Coordinated Community Supports Partnerships, where they did seek additional mental health supports as part of a statewide-funded initiative. So I am aware of that.

But what I will say is that there may be other areas where they've sought support that I'm unaware of.

Q. Did Harford, Maryland, participate in that statewide effort?

A. To my knowledge, yes.

Q. And what was the result of that statewide effort?

A. It's an ongoing effort.

Q. So as far as you know, as a result of the statewide effort, the state of Maryland has not provided more mental health resources to Harford?

ATTORNEY YEATES: Object to

Page 682

the form.

THE WITNESS: I'm not sure what you're asking. Did they not provide more resources?

BY ATTORNEY KEYES:

Q. I'm asking, as far as you know, did the state of Maryland provide more mental health resources to Harford as a result of the statewide effort you just described?

A. I don't believe in that effort they -- they provided funding directly to the schools. There may be training and technical assistance support that they've offered.

And similar to other school districts and, you know, as detailed in the report, there may be ways that the districts have sought support.

I don't know if you're speaking only about financial support, for example, but training and technical assistance support, et cetera, from the states.

71 (Pages 679 - 682)

CONFIDENTIAL

Page 683

Q. Did DeKalb seek more funding from the state of Georgia for mental health resources?

A. I don't know offhand whether -- and if it's -- if it's documented in their -- in the documents that I reviewed and if I -- I would have included it -- I may have included it, I should say, in the section on the resources that they have.

Q. Did Irvington seek more funding from the state of New Jersey for more mental health resources?

A. I don't know just sitting here, without looking into the details of the report.

And I don't know that I would have -- I know that I wouldn't have all of the details, nor would it have informed or shaped whether -- the opinions that I drew in this case.

Q. And did Tucson seek more funding from the state of Arizona for more mental health resources?

Page 684

A. I don't know. There may be information documented.

Again, I recall documenting some information, for example, about grants that were sought, additional efforts, ways that they had to re-allocate their funds.

And I detailed those in my report across districts. They re-allocated existing funds towards social media-related efforts.

Q. So when you reach the conclusion, for each of these six school districts, that they had inadequate resources to address some of their mental health needs, did you undertake any systematic effort to figure out whether, in fact, any of these school districts had asked for more mental health resources?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So in the course of the key informant

Page 685

interviews, as well as in looking at the plaintiff fact sheets, and in some of the deposition testimony -- again, we're talking across six school districts, so, you know, I'm happy to look into that for each of the school districts.

Can I recall generally that they spoke to the resources that had been sought to try to support this issue? Yes. But if you're asking for specific -- within specific districts or for specific people or what they said, I'd have to go back to the source.

BY ATTORNEY KEYES:

Q. In formulating what you are recommending as a strategic plan for each of the six school districts, did you undertake to estimate the cost of implementing those plans?

A. So that was not part of my role in this.

Page 686

What I did was lay out best practices. As a part of that, do I consider, you know, is this something -- what does staffing look like and do I have some understanding of kind of some costs associated? Yes.

But I don't pretend to be an economist or somebody who knows all of the salaries of the different positions.

Q. So did you consider any kind of budget that would be required to fund any of your strategic plans as you were working on formulating them?

A. It depends on what you mean by consider the budget. I mean, I think, you know, as we -- as I develop plans, having worked with schools and districts, I understand some information about budgets and about salaries.

But did I develop a budget for this? No. That was not something I was asked to do.

Q. Well, separate from whether you formed a budget, did you think about

72 (Pages 683 - 686)

CONFIDENTIAL

Page 687

the budgetary implications of your strategic plan as you were formulating it for any of the six school districts?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So it's hard to, you know, develop a plan, working in schools without thinking about potential budgets.

But frankly, my -- what I envisioned, you know, really, my role to be in developing the plan was to lean on what would the best practices be to actually have an effective, comprehensive plan to prevent and mitigate the harms of the defendants' platforms.

So did I consider those things? Did it come into my mind? What could this cost? First of all, I'm not an econometrics -- an economist, rather. But it wouldn't be, necessarily, what would have formed or influenced

Page 688

the opinions about what should be in the plan.

Because my plan is based on here is what best practices would need to be. Here is what it would need to look like to address the issue at hand.

BY ATTORNEY KEYES:

Q. Without regard to cost?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't think -- again, to restate, I don't think, again, that my plan was completely without regard. I think I certainly, as you're developing plans, think about it.

But the components, the staffing of the plan was really focused on, what would it take to actually address the impacts of the defendants' platforms on students and on schools?

BY ATTORNEY KEYES:

Page 689

Q. At any point during your engagement on this matter, did you suggest or encourage that any of the six school districts block access to any of the defendants' platforms on their network?

A. That would not have been something I would have done in the course of a key informant interview. That would have been highly unusual to do in that type of work.

When you're doing a key informant interview, you're going in with scientific inquiry to kind of understand what's happening on the ground level.

My role there would not have been to say, and here is the actions that you need to take. That wasn't part of the process, nor would it be typical.

Q. At any point during your engagement on this matter, did you suggest or encourage that any of the six school districts block access to any of the defendants' platforms on their

Page 690

school-issued devices?

A. So, again, I just want to clarify. This is similar to something I raised earlier, because I want to make sure I'm understanding the question as you intend it, or the intent of the question.

So you say "in the course of this" did I suggest this. Are you talking about in my direct communication with the districts, is this something I recommended? Or are you talking about is this something that's in the plan?

I just want to make sure I know what you're talking about.

Q. At any point since the time you started working on this engagement, did you suggest or encourage to anyone in any of the six school districts that they block access to any of the defendants' platforms, either on their network or on school-issued devices?

ATTORNEY YEATES: Object to the form.

73 (Pages 687 - 690)

CONFIDENTIAL

Page 691

THE WITNESS: So you're talking about including what I included in the reports, not just in speaking with the districts? I just want to make sure I understand the full umbrella.

When you say in any -- in any communication --

BY ATTORNEY KEYES:

Q. Well --

A. Because I don't think -- go ahead.

Q. You're seeking clarification.

You don't say anywhere in any of your written reports that the school districts should block access to the defendants' platforms either on their network or on school-issued devices?

A. So you are --

ATTORNEY YEATES: Objection to form.

THE WITNESS: -- asking about the reports?

Page 692

BY ATTORNEY KEYES:

Q. I'm not asking about the reports. Because I know those reports don't say that.

A. Well, I --

Q. I'm not asking about the reports.

I'm asking about in any of your dealings --

A. Including --

Q. -- with school --

A. -- the reports?

Q. -- district -- no, not in the reports.

A. Not the reports.

Q. Because I know what the reports say and I know what they don't say. I'm not asking about the reports.

In any of your dealings with anyone in any of the six school districts, anyone you talked to, anyone you otherwise correspond with, any of their consultants, any of the lawyers, did you suggest to any of them that the

Page 693

school districts block access to any social media platforms, including the defendants' platforms, either on the school district's network or on school-issued devices?

ATTORNEY YEATES: Object to the form.

And you don't need to talk about anything you discussed with lawyers.

THE WITNESS: So as I said, the only direct interactions that I've had with the district would have been in the -- for this litigation, would have been in the conduct of key informant interviews. And it would have been something I wouldn't have done as part of that.

So in that context, in my direct communications with key informant interviews in each of these districts, those are not recommendations that would have

Page 694

even come up.

BY ATTORNEY KEYES:

Q. As you were formulating your strategic plan for any of the six school districts, is there any suggestion or recommendation that you ended up excluding from the plan because you thought it would be too expensive?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Not that I can think of. I mean, I really was designing a plan that I felt aligned with public health frameworks on how to address complex issues that harm children and aligning a plan directly to, how do you address the harms that have been identified for social media with respect to schools and young people?

So the plan was what it would take to actually do this effectively. It was not

74 (Pages 691 - 694)

CONFIDENTIAL

Page 695

intended -- or wasn't informed by, is this going to cost, you know, a certain amount?  It was, what is best practice to address the issues at hand?

BY ATTORNEY KEYES:

Q.    Have you worked with any school district in your career that could afford a plan of the magnitude that you're proposing in these six strategic plans?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Again, that's, frankly, hard to say, because school budgets are -- they are highly variable, first of all. You have small rural districts.

You're asking about any district I've worked with.  I don't know.  Again, I'm not an economist.  I don't manage school budgets.

Schools have to make

Page 696

decisions about how they spend. And to my knowledge, none has been able to -- at least let me speak to the six bellwether districts, since that is what we're talking about.

They haven't been able to address the issues here and fully implement this type of plan, no.

BY ATTORNEY KEYES:

Q.    Earlier in this deposition you said that you need new staffing to address new harms.

Do you remember that testimony?

A.    I remember saying that -- that in my reports, I recommended that the six school districts include new staffing or hire new staffing to address new harms.

Q.    So is it the case, then, that if there are new harms in the future that are attributable to something else, such as video gaming, you will need yet

Page 697

additional new staffing to address that new set of harms?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, first of all, it's hard to predict what new harms may come.

What I can say is that we're talking here not just about a harm, we're talking about a significant, pervasive novel harm that is directly impacting the student population in the districts that we're talking about and across districts nationally.

So it's hard to imagine. Could it happen?  It's hard to imagine something of this scale.

But because of this scale of magnitude, right, we're talking about the number of students, the degree of harm, it warrants the new staffing that is described in the plans.

Page 698

BY ATTORNEY KEYES:

Q.    So if, in the future, there is a significant, pervasive new harm that's directly impacting the student population in these six school districts, is it your opinion that you would need yet additional staffing on top of that to address that new harm?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  It's hard to say.  I mean, you know, you're asking me to look into a future that we don't know yet and to understand kind of what the staffing might look like if these had, in fact, been implemented, and then what would the staffing look like if a new harm came.

So it's -- it's almost impossible to answer the question. I can't -- I can't answer that.

BY ATTORNEY KEYES:

Q.    Well, I'm not asking you to

75 (Pages 695 - 698)

CONFIDENTIAL

Page 699

predict whether there will be or won't be a, to use your term, significant, pervasive new harm.

I'm asking you, if there is a significant, pervasive new harm that directly impacts the student population, will we need a whole other strategic plan to address that harm --

ATTORNEY YEATES: Object --

BY ATTORNEY KEYES:

Q. -- whether it be from artificial intelligence or online gambling or video gaming or something else?

A. It's hard to say.

ATTORNEY YEATES: Object to the form. Asked and answered.

BY ATTORNEY KEYES:

Q. Why is it hard to say?

A. Because you'd have to actually look at what the data was telling you then. You would have to speak to school districts to understand what their experience was. You would

Page 700

have to understand how students are being harmed, how schools are being harmed as a result.

So to say if there was a new harm, it's -- it's just too much of a hypothetical to know what that would look like, to then say, so you would need to do A, B and C.

That's why you do an analysis of what the harm looks like now. You look to the science that exists. And you look at what's happening in the school districts on the ground.

Q. So you might need new staffing if the additional staffing is maxed out and you might not need new staffing if the current staffing has capacity; you don't know?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I think it's fair to say that I don't know what new harms could warrant new staffing.

Page 701

BY ATTORNEY KEYES:

Q. If sometime in the next 15 years one of the defendants' platforms stop being available, would you make any adjustments to your strategic plan?

A. Not -- not that I'm aware of, right.

So my plan is based on the -- this moment in time and the harms that we're seeing. And the plan is based on the platforms being in existence and the harms that exist.

So, again, that's a hypothetical that I think you would have to look at, at the time.

But in this moment sitting here, I would say the plan would remain the same. There is built into the plan, as it says in the evaluation section, an opportunity for continuous quality improvement.

But once harm has occurred, it's often the case that you need that continued mental health treatment, right,

Page 702

when -- let's say if social media platform engagement has led to or exacerbated anxiety in a young person. That mental health treatment wouldn't end the moment, you know, YouTube went offline, for example.

Q. I asked you earlier whether there was any kind of eligibility requirement for students to get the benefit of the services provided by the new positions that you suggest be created.

And I understood you to say that at least when it comes to education or prevention efforts, those could benefit everybody and, therefore, everybody would be eligible; is that fair?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So what I said is that within a public health framework, as is the case in other public health initiatives, as is

76 (Pages 699 - 702)

Golkow Technologies,

877-370-3377                A Veritext Division                www.veritext.com

CONFIDENTIAL

Page 703

the one that I laid out here, you have a universal level of support that includes education and prevention efforts that would apply to all students.

My -- as I asserted earlier, that's not to suggest that they are not experiencing potential harms as a result of social media exposure or as a result of the harms in the school. But that would be at the universal level.

Then you have your Tier 2, your Tier 3, as I lay out in the plan, where Tier 2 would be for students identified as at risk or experiencing mild to moderate concerns related to social media harms. Tier 3 would be for those who are experiencing more moderate to severe harms.

BY ATTORNEY KEYES:

Q.   So what is the gating mechanism, under your plan, for deciding

Page 704

who can participate in Tier 2 services?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So as laid out in the mental health competency section, and in kind of the data structure -- it's in a couple of places in the report -- there would need to be mechanisms to identify which students are actually experiencing, again, at risk for, mild to moderate concerns, or, you know, do they meet criteria for Tier 3 services?

There would need to -- and that's -- part of the plan is to develop the data infrastructure and to develop the competencies and to train your staff, it's part of the policies and programming and professional development, to train staff to be able to identify those.

And it's very consistent

Page 705

with how you would implement other training and screening and identification systems for an issue that a young person might experience.

BY ATTORNEY KEYES:

Q.   Okay.  So students would need to meet criteria for Tier 2 or Tier 3 services?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I'm not sure what you're asking me.  Would need to meet it for what?

BY ATTORNEY KEYES:

Q.   You said there would need to be mechanisms to identify which students are actually experiencing, again, at risk for, mild to moderate concerns or, you know, do they meet criteria for Tier 3 services.

They are your words.

A.   Right.

Q.   So I just want a straight

Page 706

answer.

Do students, under your plan, need to meet some kind of criteria to get services under Tier 2 or Tier 3?

ATTORNEY YEATES:  Object to the form.  And asked and answered.

THE WITNESS:  So to be clear, within a public health framework, Tier 2 services are not intended for the entire service population -- or the entire student population, rather.

It's typically only for students who are experiencing mild to moderate concerns or who are at risk for, let's say, mental health concerns in this case.

But we'll -- in the plan here, it's around harms where they may be experiencing mild to moderate impairment related to those harms.

And to receive those services, typically, again, they

77 (Pages 703 - 706)

CONFIDENTIAL

Page 707

would be at risk for or they would be experiencing mild to moderate.

So I don't know how to phrase it other than that. That's how we define Tier 2 in our framework.

BY ATTORNEY KEYES:

Q. Ma'am, with all due respect, I mean, I've been, I think, quite patient over the day, with you giving long answers that don't really answer the question.

And we're going to come back -- or we're going to at least go to the judge and ask for more time, because we're going to point to him the hundreds of instances where we -- I ask straightforward questions that call for a yes or no, and you then give a long answer that doesn't answer the question.

My question was, do students under your plan need to meet some kind of criteria to get services under Tier 2 or Tier 3?

Page 708

You can say yes, no, or I don't know.

ATTORNEY YEATES: Objection.

BY ATTORNEY KEYES:

Q. Which is it?

ATTORNEY YEATES: Object --

BY ATTORNEY KEYES:

Q. I can't get a straight answer from you as to what you need to do under your plan to get services under Tier 2 or Tier 3.

Is it everyone? Is it everyone who shows some kind of risk? Is it someone who shows some kind of risk attributable to social media? What is it?

The jury and the judge are going to want to know. So I'd like to hear the answer today.

ATTORNEY YEATES: Object to the form. Argumentative. Dr. Hoover has been doing her best to answer your questions. Many questions cannot be answered with

Page 709

a yes or no. She's giving context, and that's totally appropriate.

BY ATTORNEY KEYES:

Q. Dr. Hoover, your counsel can ask you whatever questions she wants to provide context. I'm entitled to the answer to my question.

Do students, under your plan, need to meet some kind of criteria to get services under Tier 2 or Tier 3; yes or no?

ATTORNEY YEATES: Object to the form. Asked and answered multiple times. And object to the multiple speeches that were inappropriate and unnecessary.

THE WITNESS: So as I stated, this is not a yes-or-no question, because I think it warrants the context that students -- and I've already said this -- would need to meet criteria for having -- being at

Page 710

risk for harm or at risk for impairment or be experiencing mild to moderate concerns.

I think I've already said that.

BY ATTORNEY KEYES:

Q. So you just said students would need to meet criteria for being at risk for harm or at risk for impairment and to be experiencing mild to moderate concerns.

Is that for Tier 2 or Tier 3 or both?

A. So what I just described that you just restated was for Tier 2.

Q. So there are criteria for students to get Tier 2 services?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So it depends what you're asking about.

Are you talking about specific to this plan? In general, there -- Tier 2 can be

78 (Pages 707 - 710)

CONFIDENTIAL

Page 711

applied to other areas.

For this plan, yes, there would be, as what -- there would be for other areas, there's specific criteria that defines what would constitute appropriateness for Tier 2 services.

And I just laid those out.

BY ATTORNEY KEYES:

Q.   Okay.  And for those students who need to meet criteria to show they're at risk for harm or at risk for impairment and to be experiencing mild to moderate concerns, do they need to link up that risk or those impairment concerns to someone's use of social media?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So for this plan in particular, the risk for Tier 2 or the mild to moderate concerns would have to be related

Page 712

to social media impact.  That's the intent of the plan.

That doesn't mean, necessarily, that it had to be that student's personal use of social media, or the defendants' platforms, it could also be that they were experiencing mild to moderate concerns related to the impacts in the classroom, for example, that we talked about many times.

BY ATTORNEY KEYES:

Q.   Okay.  And so if a student could not show a risk for -- a risk of harm or mild to moderate concerns that were somehow related to social media impact, they would not be eligible for services under Tier 2?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Under Tier 2 in this plan or in -- Tier 2 in a school in general?

Page 713

BY ATTORNEY KEYES:

Q.   I'm talking about -- I'm talking about your plan.  Your plan. Your plan.

A.   Okay.

Q.   Just as we have been for the bulk of today.

ATTORNEY YEATES:  Objection. Form.

THE WITNESS:  Okay. Sometimes you're asking about kind of broader things in a school and sometimes you're asking about the plan.  So I just want to make sure that I'm being clear.

So the -- the services -- I want to make sure I have the question right now.

BY ATTORNEY KEYES:

Q.   I'll ask it again.

A.   Okay.

Q.   If a student could not show a risk of harm or impairment or mild to moderate concerns that were somehow

Page 714

related to social media impact, they would not be eligible for services under Tier 2 under your plan for these six school districts?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So that's consistent with how I have described Tier 2 in the plans, yes, that they would -- to be eligible, essentially, and -- I mean, to be appropriate for the services that would be offered in Tier 2 in this plan, yes, that would be the general criteria that you would consider for someone to be eligible for Tier 2.

BY ATTORNEY KEYES:

Q.   Okay.  And are there eligibility criteria for a student in one of these six school districts to be eligible for Tier 3 services under your strategic plan?

ATTORNEY YEATES:  Object to

79 (Pages 711 - 714)

CONFIDENTIAL

Page 715

the form.

THE WITNESS: So in general, for students to be appropriate for services at the Tier -- Tier 3 level, they would be experiencing moderate to severe distress or impairment. Those are kind of the general ways that we think about who would be eligible for Tier 3.

And in this case, within the district plans, it would be related to social media harm.

BY ATTORNEY KEYES:

Q. What is your estimate of the percentage of the population of any of the six school districts' students who are at risk for harm or risk for impairment with moderate concerns --

ATTORNEY YEATES: Object --

BY ATTORNEY KEYES:

Q. -- mild to moderate concerns?

ATTORNEY YEATES: Object to the form.

Page 716

THE WITNESS: So because you asked about what percent are at risk for, I would say 100 percent.

If you mean -- I don't know what you mean. But because you used the term "at risk for," it could be anybody in the school building.

At what level would we estimate the number of students who might be eligible for Tier 2 services or who might be appropriate for Tier 2 services, if we look at our typical public health frameworks and multi-tiered systems of support and how it applies to these plans, the top tier is typically about 3 to 5 percent of students. The next tier is typically about 10 to 15 percent -- or excuse me -- I've got to get the numbers correct here.

They talk about the 10 to

Page 717

15 percent, 3 to 5, and then at the bottom, roughly 85 percent of students.

However, what I will say is that, in fact, literature cited -- literature recently talked about how the numbers need to be adjusted at those tiers because of the increase in mental health issues in students in recent years.

So I could point to specific literature that talks about how those numbers at Tier 2 and Tier 3 have increased over time.

BY ATTORNEY KEYES:

Q. That's within a typical MTSS?

A. That's within a multi-tiered system of support for school mental health services.

Q. But you are offering a strategic plan that creates a separate MTSS for students who have some risk of

Page 718

harm or some impairment concerns linked with social media, right?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I'm offering a tiered framework for how you would address the harms for social media, yes.

BY ATTORNEY KEYES:

Q. Okay. So do you have an estimate of what percentage of the student body for any of these six school districts is at risk of harm or risk of impairment with mild to moderate concerns that are related to social media such that they would be eligible for your Tier 2 services?

ATTORNEY YEATES: Object to the form.

THE WITNESS: In some respects, it's hard to put a number on it right now because, you know -- so I'm leaning on, as I have with other things here,

80 (Pages 715 - 718)

CONFIDENTIAL

Page 719

other public health frameworks like multi-tiered system of support for school mental health. And that's why I provided the numbers that I did.

Because data systems are still to be built and the screening is still in process of -- or would need to be created, some of these numbers are to be determined.

It's hard to estimate, because this is a new, novel harm to schools. And so to give you precise numbers or even estimates about, here is the number of students that are specifically suffering today would be hard to do.

In terms of that term "at risk," I would say that the majority of your school population, if not all, are at some level of risk.

Page 720

But as far as mild to moderate concerns, it would be a bit hard to estimate, I would say, right now.

BY ATTORNEY KEYES:

Q.   And when you say it's "hard to estimate" because this is a new and novel harm to schools, how novel is it, based on all of your work on these cases?

A.   Well, it would be hard to give you a precise date at which the harms started.

But I know we've talked about the time window for these cases of 2017 to 2025. And I would say certainly over that time, that relatively limited time period, eight years, this has been something they have been contending with.

Q.   And do you have an understanding of why none of these school districts for which you're offering strategic plans have any data systems to track all of the harms that you say exist, that you say are significant but

Page 721

that you cannot quantify?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Do I have -- first of all, you're asking about all the data systems in all the districts.  But I think if you're -- if you want me to answer generally do I have an understanding about why systems -- school systems, including these six districts, do not yet have the capacity to track all of the harms of the defendants' platforms, I think it's because they're woefully underresourced to have been able to develop the platforms, and we're still, as a science, really understanding how to best measure some of this.

But school districts don't have the funding, at this point, to measure and address every harm of social media that they are

Page 722

experiencing, which is why we are using other forms of data, including speaking with the personnel who are working in the school districts and in the schools.

BY ATTORNEY KEYES:

Q.   Did you have any conversation with any of the key informants for any of the six school districts about why they didn't track any of these harms?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  Yes.

BY ATTORNEY KEYES:

Q.   What did they tell you?

A.   In -- just generally across all the school districts?

Q.   Well, across the six school districts for which you're offering these strategic plans.

A.   Right.

ATTORNEY YEATES:  Object to

81 (Pages 719 - 722)

CONFIDENTIAL

Page 723

the form.

THE WITNESS: So generally across those school districts? You prefer that I not look specifically to the testimony, just kind of give you a general recollection of what they said?

BY ATTORNEY KEYES:

Q. I want your understanding of what people from the six school districts said to explain why they don't have any systems to track any of the harms that you say are significant based on your conversations with them.

ATTORNEY YEATES: Object to the form. Foundation.

THE WITNESS: So to be clear, it wasn't just the conversations with them that informed my opinions about the -- the extent -- or the existence and extent of harm.

But generally, in the discussions and the key informant

Page 724

interviews, it was shared -- and, again, I'm not going to be specific, because I'm not opening the reports. I'm happy to go -- detail through the reports.

But in general, there was a consistent theme that they did not have the data infrastructure to do so yet, and that that was likely due to limited resources.

So that certainly came up in the discussions in the key informant interviews.

BY ATTORNEY KEYES:

Q. And didn't modify their data infrastructure at all over an eight-year period to track what they claim is a significant problem?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I didn't say that.

So --

BY ATTORNEY KEYES:

Page 725

Q. You did tell me they don't have the data infrastructure that tracks the harms.

ATTORNEY YEATES: Please let Dr. Hoover answer the question. Object to the form.

BY ATTORNEY KEYES:

Q. So my question is, why didn't they modify their data infrastructure over an eight-year period so that they could track, for some period of time, what they claim is a significant problem in their school districts?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I didn't say that in each of the these six school districts that they have made no modifications to their data infrastructure.

What I did say is -- and what I experienced and documented in the context of the key informant interviews and in

Page 726

looking at the other source documents, including plaintiff fact sheets, is that the data systems, if -- if they exist, do not yet track enough to understand the impact of the platforms on students and on schools.

If you're asking why, I think I've answered that. But I'm happy to go into more detail.

BY ATTORNEY KEYES:

Q. In each of your reports for the six school districts, you say that your opinions were also informed by scientific literature on the subject matter.

And you say that you used literature review methods that are a regular and ongoing part of your practice and you said you routinely utilize academic search engines.

Did I get that right?

A. I can look at what I referenced in the -- the language sounds

82 (Pages 723 - 726)

CONFIDENTIAL

Page 727

familiar.

Q. Paragraph 26 of your reports.

A. Which report?

Q. Any one of them for any of the six school districts.

A. Yes.

Q. Okay. You say, I routinely use academic search engines to identify relevant scientific literature.

Did you use academic search engines to identify relevant scientific literature for purposes of your six school district reports?

A. Yes.

Q. Did you use PubMed?

A. I -- honestly, I don't know. I can't recall which specific search engines I used, in part, because I use search engines regularly.

So I'm not sure which specific search engines I used.

Q. So you don't know whether you used PubMed or PsycInfo or Google

Page 728

Scholar for purposes of identifying relevant scientific literature for these six school district reports?

A. Correct.

ATTORNEY YEATES: Object to the form.

BY ATTORNEY KEYES:

Q. You say that you, Routinely use academic search engines to identify relevant scientific literature using different combinations of keywords, such as -- and then you give a number of those keywords in quotes.

Do you see that?

A. I do see that.

Q. Did you actually use all of these keywords in your search of the scientific literature for purposes of this engagement?

A. I don't have the list of search terms that I used. It would not surprise me if I used these in conjunction with others like social media.

Page 729

Q. Okay. Well, do you have a list somewhere of the search terms that you ran against some search engine to identify relevant scientific literature for purposes of your work in this case?

A. I do not.

ATTORNEY YEATES: Object to the form. And asked and answered.

BY ATTORNEY KEYES:

Q. No way of reconstructing which words you actually used?

ATTORNEY YEATES: Object to the form.

THE WITNESS: No.

BY ATTORNEY KEYES:

Q. Okay. Is it your belief that you used all of the keywords that you list in Paragraph 26 of your reports for purposes of identifying scientific literature that's relevant to your opinions in this case?

A. I don't know. I can't recall.

Q. Do you have a recollection

Page 730

of using any other keywords besides the ones that are listed in Paragraph 26 of your report for purposes of identifying scientific literature that's relevant to your opinions in this case?

A. As I said, a term that I would have used would have been social media.

Q. You're confident that you used social media as a term in searching for relevant scientific literature by using academic search engines?

ATTORNEY YEATES: Object to the form.

THE WITNESS: As far as I can recall, yes.

BY ATTORNEY KEYES:

Q. For whatever keywords you used in these academic search engine or engines, when they hit on scientific literature, did you print out or put in a folder all of the studies or literature that were hit on?

A. No. The articles that --

83 (Pages 727 - 730)

CONFIDENTIAL

Page 731

that I ended up using for this I have in a folder.

But no. I mean, I scan them as they are coming -- you know, as I'm pulling them. So I'll look at them in that way.

So did I save them all in a folder? No.

Q. Okay. So as I understand it, you used some search terms, you don't remember what they are, against some search engine, but you're not -- you don't know which one.

But when it -- when a search term hit on a study, you would review the study and some of the studies you would then pull into a separate folder?

ATTORNEY YEATES: Object to the form.

THE WITNESS: That's my recollection of how -- how I saved the documents.

I mean, you have to understand I do this as part of my

Page 732

regular academic work as well. I'm consistently reviewing.

And I also may have used articles that came across my desk as an editor of a journal or just in my regular reading of journals, if that makes sense. As an academic, that's something we do, so.

BY ATTORNEY KEYES:

Q. And what is that separate folder called?

A. No idea.

Q. Where is that separate folder located?

A. I -- I have it as the source documents folder. So I don't know.

Q. And are all of the studies or reports in that folder included on your materials considered list?

A. Yes.

Q. So if you looked in your folder, you don't believe there's a study or a report sitting in that folder that

Page 733

you failed to list in your school district-specific reports?

A. Correct.

Q. And so would you just sort of skim a study or a report that hit on one of these keywords to decide whether you thought it was relevant?

ATTORNEY YEATES: Object to the form.

THE WITNESS: It really depends. Again, having done this for 30 years now, you get pretty experienced at being able to review abstracts, as well as determining if there are articles that you need to go more deeply into to determine, in this case, whether they would inform the opinions.

So whether I skimmed or looked at abstracts or went into more detail would vary.

BY ATTORNEY KEYES:

Q. So given whatever keywords

Page 734

you used against whatever search engine you used, that didn't hit on the National Academies of Sciences, Engineering and Medicine's publication entitled, quote, Social Media and Adolescent Health?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't know if it hit on that. And I'd have to look to my source documents to say whether it was something that I included as a source document.

BY ATTORNEY KEYES:

Q. Well, it's not listed in your source documents.

Are you familiar with the National Academies of Sciences, Engineering and Medicine?

A. Yes.

Q. Are you a member?

A. No.

Q. Have you ever been a member in the past?

A. No.

84 (Pages 731 - 734)

CONFIDENTIAL

Page 735

Q.   Have you ever been invited to be a member?

A.   Not that I'm aware of.

Q.   Is the National Academies of Sciences, Engineering and Medicine part of the National Institute of Health, also known as NIH?

A.   To be honest, I don't know.

Q.   Do you agree that the National Academies of Sciences, Engineering and Medicine is a preeminent source for research and objective advice on science, engineering and health matters?

ATTORNEY YEATES:  Object to the form.  Asked and answered.

THE WITNESS:  You know, I think it's a source that is respected in the field.

I think you used the word "preeminent."  I don't know that all scholars in the field would think of that as the preeminent source for scholarship, no.

Page 736

BY ATTORNEY KEYES:

Q.   Have you ever presented your views on any subject to the National Academies of Sciences, Engineering and Medicine?

A.   I think I may have.  But I'd actually have to go to my CV to -- to look.

Q.   On what topic or topics did you present your views to the National Academies of Sciences, Engineering and Medicine?

A.   I'm going to have to look through my presentations, unless you have it offhand.

But I would have to go through to see what topic it was.

Q.   Well, if you listed it in your CV, it would be identified as something you presented to the National Academies?

A.   Correct.

Q.   Okay.  Given your confidence that you used the term "social media" as

Page 737

one of the keywords against some academic search engine and that the National Academies of Sciences, Engineering and Medicine published something titled, quote, Social Media and Adolescent Health, end quote, do you think you reviewed it --

A.   I don't --

Q.   -- as part --

ATTORNEY YEATES:  Object to the form.

BY ATTORNEY KEYES:

Q.   -- of your work in this engagement?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I don't know if I reviewed it.  If it was something that I considered, it would have been listed in the documents reviewed.

BY ATTORNEY KEYES:

Q.   But it's not listed in the documents reviewed.

Page 738

A.   Okay.

Q.   So I'm trying to understand, did you -- did your search not pick up on it?  Or your search picked up on it and you made a determination that it wasn't something you were going to move into this folder?

A.   I don't know.

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I don't know.  And I don't know if it was in the peer-reviewed literature or if this is a monograph you're speaking about.

I don't know if it's a document that you're -- I'd have to see it to know what you're talking about.

But the answer to your question is, I don't know.

BY ATTORNEY KEYES:

Q.   Well, before I asked you about this report titled, Social Media

85 (Pages 735 - 738)

CONFIDENTIAL

Page 739

and Adolescent Health, did you know about it? Had you ever heard of it?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't know. I'm not sure.

BY ATTORNEY KEYES:

Q. Did you see it referenced in any of the other expert reports in the case?

A. I don't know. I'd have to go back to their reports.

Q. Is it something you're curious about now because the National Academies of Sciences, Engineering and Medicine has published something on, quote, Social Media and Adolescent Health?

A. I'm a curious person. So I'm always curious.

Q. Okay. Well, given that you're a curious person, did you know that the National Academies' report concluded that, quote, The committee's

Page 740

review of the literature did not support the conclusion that social media causes changes in adolescent health at the population level?

Did you know they had a report that found that?

ATTORNEY YEATES: Object to the form. And not case specific. You've already exceeded -- well exceeded your time allotted by Judge Kang.

BY ATTORNEY KEYES:

Q. You can answer.

A. So you're asking if I know about a report that I can't recall reviewing and a specific sentence it says in there that I don't have in front of me.

But I can look at it.

Q. You said you reviewed the Telzer and Christakis reports --

A. Correct.

Q. -- as part of your work in this case?

Page 741

A. Correct.

Q. Were you ever apprised that there were other experts in this case who offered responses to Telzer and Christakis?

A. I'm trying to remember, because I was focused on my rebuttal responses.

So I don't know that I saw responses to their reports, no.

Q. Did you ever ask plaintiffs' counsel, hey, I've read Telzer and Christakis, which are plaintiffs' side, did the defendants offer any kind of rebuttal expert to those opinions?

Did you ever ask?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't recall asking that. What I recall focusing on were the rebuttals to the reports that I did, which included, you know, references to Telzer and Christakis.

Page 742

So my -- I would, you know -- I would have focused on any concerns that came out with respect to my reports at that time.

BY ATTORNEY KEYES:

Q. Well, given that you said you reviewed the -- the relevant scientific literature and you reviewed Telzer and Christakis, whom you say looked at the literature, weren't you curious to know what other experts in the case said about the same literature --

ATTORNEY YEATES: Object to form.

BY ATTORNEY KEYES:

Q. -- or what they identified as the relevant literature?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't know what you mean, wasn't I curious about it.

I mean, I honestly was quite

86 (Pages 739 - 742)

CONFIDENTIAL

Page 743

focused on making sure I did a very thorough job responding to the responses to my reports.

BY ATTORNEY KEYES:

Q. Okay. But I'm asking about something else.

I'm saying you said that you tried to identify the relevant scientific literature. And you did that using keywords, albeit ones you can't remember, and you did it against a search engine or engines, albeit ones you don't know which, right?

If you were trying to identify the relevant scientific literature, why didn't you look at what other experts in the case flagged as the relevant scientific literature?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I would disagree that I didn't look at what other experts noted in the literature.

Page 744

I reviewed their reports. I looked at what they presented. But it does not mean that I didn't consider things that they were citing.

BY ATTORNEY KEYES:

Q. You said your materials considered list was complete, right?

A. Correct.

Q. Your materials considered list doesn't cite any of the expert reports that were offered in rebuttal to Telzer or Christakis.

So you didn't review any of the rebuttal reports --

ATTORNEY YEATES: Object to the form. Misstates facts.

BY ATTORNEY KEYES:

Q. -- right?

A. My understanding is that I reviewed all of the rebuttal reports for my reports. And I reviewed the original expert reports, for example, I listed them all, but Telzer, Christakis, and

Page 745

others that are listed.

Q. I'm asking you about rebuttals to Telzer and Christakis that talk about the, quote, relevant scientific literature.

And I'm trying to understand why you didn't look at what any of the other experts in the case said in response to Telzer or Christakis, whom you cite, or what they say about the relevant scientific literature, which you say you were seeking to find.

Why didn't you read those rebuttals to Telzer and Christakis?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So, first of all, I was focused on the review of the response to my rebuttals. And I had the information that I needed to inform the opinions that I offered.

So I certainly didn't feel that I needed additional

Page 746

information to inform those opinions.

BY ATTORNEY KEYES:

Q. Did you review, as part of your work in this case, the 2022 study by Sewall, S-E-W-A-L-L, titled, Does Objectively Measured Social Media or Smart Phone Use Predict Depression, Anxiety or Social Isolation Among Young Adults?

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: So I have a few areas that I'm going to have to look, if you want me to speak to one specific study and whether I cited it.

It's not in this one.

So I'm looking across multiple reports.

BY ATTORNEY KEYES:

Q. I don't think your lists are different by report. But if you want to check them all, that's fine.

87 (Pages 743 - 746)

Golkow Technologies,
877-370-3377    A Veritext Division    www.veritext.com

CONFIDENTIAL

Page 747

Let me know if you find any reference in any of the materials considered list to the Sewall report from 2022.

A.   The lists are different, which is why I'm checking multiple reports.

Q.   You reviewed different -- scientific literature for different school-district-specific reports?

A.   No, sorry.  I was speaking to the main report and the -- or the general report, I should say, using your language, and then the follow-up reports.

So I just wanted to make sure, because I have articles listed at the end of each of these, so.

Okay.  I don't see that particular report -- or particular article cited, no.

Q.   Again, in Paragraph 26, you talk about identifying the relevant scientific literature, which is literature that you then cited and

Page 748

considered for your opinions, correct?

ATTORNEY YEATES:  Where are you reading that from?

ATTORNEY KEYES:  Paragraph 26.

ATTORNEY YEATES:  Of which report?

ATTORNEY KEYES:  Any of them.

THE WITNESS:  Paragraph 26 of any of them.  So I can look to the district reports?

BY ATTORNEY KEYES:

Q.   Yes.

A.   Okay.  So I've just got to Paragraph 26.

Your -- did you have a question?

Q.   Yes.

Paragraph 26, you talk about identifying the relevant scientific literature.  And that's the literature that you then cited in your report and considered for your opinions, correct?

Page 749

A.   That's correct.  The opinions in the report were cited -- were informed by scientific literature.  And that's what I cited in the reports.

Q.   So can you explain for me whether it's a failure of your keywords to identify the report or it was your determination that it wasn't relevant that you didn't review the 2023 Steinsbekk report or study?

ATTORNEY YEATES:  Object to the form.  And asked and answered.  And not case specific.

THE WITNESS:  I thought you were actually asking me earlier about a Sewall study.

BY ATTORNEY KEYES:

Q.   I was.

Now I'm asking about Steinsbekk.

A.   So would you like me to go back and identify whether that's something I cited?

Q.   No.  Because you were

Page 750

already asked a whole bunch of studies whether you reviewed, and you said no.  I'm not going to cover that.

What I am asking you is, when you talk about reviewing the relevant scientific literature for the purposes of these six school districts, do you have an explanation for why studies weren't included in your analysis?

Was it because the keywords you used didn't flag the study or the report, or is it that based on your review you decided it wasn't relevant and you didn't put it in the folder?

And so I'd like to know, what is your answer when it comes to the 2023 Steinsbekk report?

ATTORNEY YEATES:  Object to the form.  And not case specific.  And if you're asking about studies she was asked about yesterday during the general piece of this deposition, then counsel should

88 (Pages 747 - 750)

CONFIDENTIAL

Page 751

have asked follow-up questions yesterday.

It's not for you, today, to use your case-specific time to ask follow-ups that were left out yesterday.

ATTORNEY KEYES: I'm asking specifically about the relevant scientific literature she talked about identifying and relying on for her six school district reports.

ATTORNEY YEATES: And we covered it yesterday.

BY ATTORNEY KEYES:

Q. Dr. Hoover, you can answer.

Was it because the keywords you used didn't flag the study or the report or is it based on your review, you decided it wasn't relevant and you didn't put it in the folder?

ATTORNEY YEATES: Object to --

BY ATTORNEY KEYES:

Page 752

Q. Which is it?

ATTORNEY YEATES: -- the form.

THE WITNESS: I don't think either of those would be a correct characterization.

And, frankly, if you're speaking about specific studies, I'd have to look at the study, just as I would have done then, if I -- if I saw it and reviewed it, to make a determination about why.

But I can't speak to a specific study that I don't see or that I'm not sure about and what I would have thought in that moment if I did happen to review it.

BY ATTORNEY KEYES:

Q. Is it the same answer for all the other studies that Ms. Lehman asked you about yesterday?

ATTORNEY YEATES: Object to the form. And not case specific. And I'd like to take a break.

Page 753

ATTORNEY KEYES: I'm going to finish this line of questioning.

BY ATTORNEY KEYES:

Q. Is it the same answer?

A. Is what the same answer?

Q. I can go through each one of these.

But I'm trying to understand, for all these studies that you were specifically asked about yesterday, did you review it, and you said no, I'm trying to understand what is your explanation?

Is it that your keywords didn't flag the study or they did flag the study and you determined, based on your review, it wasn't relevant?

What is the explanation for not having reviewed all of these studies?

ATTORNEY YEATES: Object to the form. And asked and answered. And not case specific. You've exceeded your allotted time by

Page 754

Judge Kang.

THE WITNESS: So the documents that I cited in my reports were the ones that were considered for the opinion.

Just because it's not listed in a document cited doesn't mean it was something that wouldn't have been looked at, right. But it doesn't -- it means that it wasn't considered for this opinion -- the opinions that were offered here.

So when you say, like, what was the decision point about was it something that wasn't flagged or that I didn't think was pertinent, for example, to rephrase what you said, I can't speak to articles that I don't have in front of me, because I don't know.

So it is -- so if you're asking if my answer is the same, I

89 (Pages 751 - 754)

CONFIDENTIAL

Page 755

guess it's the same. Because I don't have each of those articles.

I can't remember from yesterday's deposition what the articles were, nor do I think I had them in front of me. I was just looking through my sources to see if I had cited them.

BY ATTORNEY KEYES:

Q. You just testified that the documents you cited in your reports, your school district-specific reports, were the ones that you were -- that were considered for your opinions.

A. That's correct.

Q. Okay. And that's what the materials considered list is for, right? It's to have a comprehensive list of everything that you considered in forming your opinions and preparing your report, right?

A. Correct.

Q. And that's the definition you used in preparing your materials

Page 756

considered list?

A. Correct. That's my understanding of what a materials considered list is, that it's the materials that you considered -- that I considered as I was developing the report and informing the opinions.

Q. So all of the studies that Ms. Lehman reviewed with you that you said you didn't review and aren't on your materials considered list, by definition, are things you didn't consider, right?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Suppose it -- it's -- it's dependent upon what you mean by "considered."

So in the course of my review process and in the course of my daily reading, et cetera, I may have considered that it wasn't pertinent to an opinion. That doesn't mean it didn't come across my desk or come up in a search

Page 757

engine, right.

So if you were to include, for example, everything that came up in a search engine, that would not -- that would be more than what's in the materials considered, if that makes sense.

BY ATTORNEY KEYES:

Q. Okay. So your materials considered list is actually the materials you considered and deemed pertinent as opposed to the materials you just considered?

A. That's what you do as a scientist, right, is you're looking through -- as you're doing a literature review, if there's a study that comes up, and let's say the abstract has nothing to do with the question at hand, or it feels like it would not be helpful in informing your opinion, that would not be something that you would use to consider it.

Q. So for these studies that you, yesterday, said you didn't review

Page 758

and today you're saying aren't things you considered and deemed pertinent, is it because you just overlooked them or because you decided you weren't going to view them as pertinent?

ATTORNEY YEATES: Object to the form.

BY ATTORNEY KEYES:

Q. I'm trying to understand. Like, you've got a methodology. I'm entitled to understand your methodology.

And, clearly, your methodology didn't cover all of these studies. Why not?

ATTORNEY YEATES: Object to the form. And the speech. And not case specific.

THE WITNESS: So I was going to answer. I'm forgetting the first part of your question, because you followed it up with I'm trying to understand, et cetera.

90 (Pages 755 - 758)

CONFIDENTIAL

Page 759

So I think you -- you perhaps misstated that yesterday I indicated that I had never reviewed documents or reviewed articles.

I think what I was answering, but I'd have to go back to the deposition testimony, because it was yesterday about the general report, I think I indicated that those were not in my source documents, so that they were not used in formulating the report and considering -- and the opinions in the report.

Does it mean it never came up in a search engine? Does it mean that it wasn't something that could have appeared in a search? No.

I think that's very standard for academic searches, so.

BY ATTORNEY KEYES:

Q.   Can you go to the last page

Page 760

of your report on Page 45?

A.   Which report are you looking at?

Q.   The same one we were looking at a moment ago. But you can look at any of them.

A.   Which is which one?

Q.   How about your amended expert report for the Charleston County dated June --

A.   Charleston?

ATTORNEY YEATES:  Counsel, are you going to let me go to the restroom any time soon?

ATTORNEY KEYES:  I'd be happy to in just one minute.

ATTORNEY YEATES:  Thank you.

THE WITNESS:  So the June 20th, amended report on, Page -- say it again.  Page?

BY ATTORNEY KEYES:

Q.   45.

A.   45. Okay.

Q.   Okay.  Do you see that

Page 761

certification at the bottom?

A.   I do.

Q.   Did you include that certification on each of your reports in this case?

A.   As far as I know, at least something similar to it.

I think it was similar or if not identical in language, yes.

Q.   And did you sign each report showing that you were signing the certification?

A.   I did.

Q.   And do you believe that this report meets that certification?

A.   Let me just review it.

I'd have no reason to believe otherwise.  But I want to -- yes, the primary -- yes.

Q.   Do you believe that that certification requires you to make a balanced presentation of what the scientific literature shows to the court?

ATTORNEY YEATES:  Object to

Page 762

the form.

THE WITNESS:  I believe what I attested to here is that I have a duty of candor and professional integrity, which, to me, means being honest, being truthful and presenting with professional integrity, which I absolutely have done in this case.

BY ATTORNEY KEYES:

Q.   And do you believe or understand that that certification requires you to make a balanced presentation of what the scientific literature shows to the court?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  What I believe I attested to is that I have an overriding duty of candor and professional integrity to help the court on matters within my expertise and in all submissions, et cetera.

91 (Pages 759 - 762)

CONFIDENTIAL

Page 763

So I don't see the word "balanced" in here. So you're saying something that's actually not within this.

BY ATTORNEY KEYES:

Q. I'm asking for your understanding of the certification you signed.

My question is, do you believe or understand that this certification requires you to make a balanced presentation to the court of what the scientific literature shows?

You can say, yes, I have that understanding; no, I don't have that understanding; or I don't know.

ATTORNEY YEATES: Object to -- object to the form. And asked and answered.

THE WITNESS: Or I can say what I actually believe it means, which is that I have a duty to be truthful and honest and to act with professional integrity, which

Page 764

is what I am attesting to.

BY ATTORNEY KEYES:

Q. And you can't say whether that requires you, as part of that duty, to give a balanced presentation to the court of what the scientific literature shows and doesn't show?

You're not willing to say it covers that?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I'm willing to say what I said, which is that I'm attesting that I'm being truthful and honest and acting with professional integrity throughout the entire case.

I think the term "balanced," as you're using it, is very hard to define. I don't know even what you mean by that.

BY ATTORNEY KEYES:

Q. I mean present both sides of what the scientific literature shows.

Page 765

With that explanation, do you have an understanding as to whether this certification requires you to give a balanced presentation to the court of what the scientific literature shows?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I would argue that there aren't just two sides to any issue here and that there's multiple factors that I considered and presented truthfully, with candor and professional integrity.

ATTORNEY KEYES: Why don't we take a break?

VIDEO TECHNICIAN: The time is 2:46 p.m., and we are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN: The time

Page 766

is 3:01 p.m. We are on the record.

BY ATTORNEY KEYES:

Q. Dr. Hoover, are you currently helping any of the six school districts implement the strategic plan that you've recommended?

A. Am I currently helping them implement the plan? No.

Q. Have any of the six school districts approached you about you helping them implement the strategic plan, in whole or in part?

A. No.

Q. Is it your expectation that if the school district implements the strategic plan, in whole or in part, they would consult with you or hire you to help them in that effort?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I can't predict what the districts are going to do. But I have no

92 (Pages 763 - 766)

CONFIDENTIAL

Page 767

intention of that.

BY ATTORNEY KEYES:

Q. Have you ever been an associate superintendent for any school district?

A. No.

Q. Have you ever been an administrator for any school district?

A. No.

Q. Have you ever been a school social worker?

A. No.

Q. Have you ever been a school counselor?

A. No.

Q. Have you ever been a school nurse?

A. No.

Q. Have you ever been a school administrator?

A. No.

Q. Have you ever been a principal?

A. No.

Page 768

Q. Have you ever taught in a middle school?

A. No.

Q. Have you ever taught in an elementary school?

A. No.

Q. Have you taught in a high school since 2008?

A. The reason I'm pausing is because I'm trying to think in the context of supervision, would I have gone in and taught a class or a seminar?

But outside of that, no.

Q. Have you taught any class or any seminar in a high school in the last ten years?

A. Honestly, that would be hard for me to know. Because I work in and with schools a fair amount.

I don't know that I've taught in a high school, a seminar, in the last ten years. Is it out of the question? No. But I don't recall doing that.

Page 769

Q. In a recent update to your CV, you identified some recent publications or articles where you were quoted. One of them was a July 2025 Ed Week article.

Do you remember talking to a reporter from Ed Week?

ATTORNEY YEATES: Object to the form. And this was covered yesterday. And it's not case specific. We're not going to go through that article again.

BY ATTORNEY KEYES:

Q. Do you remember that article?

A. I do. So I just pulled up my CV to make sure, because there are a few from Ed Week.

But you're talking about the July 2025 one?

Q. Yes.

A. Yes.

Q. Did you disclose to the journalist preparing that article that

Page 770

you were a paid expert for the plaintiffs?

ATTORNEY YEATES: Object to the form. And not case specific. And we covered this article yesterday. Today is not a day to do the cleanup for yesterday.

BY ATTORNEY KEYES:

Q. You can answer.

A. I don't recall the specifics of the conversation. I've seen the article. But I don't recall the specifics of the conversation.

I don't know that I would have. My understanding is that I'm not to share that I'm a part of the litigation, so.

Q. Well, have you disclosed to any journalist you've spoken with that you're a paid expert for the plaintiffs?

ATTORNEY YEATES: Object to the form. And not case specific. You've exceeded your time allotted by Judge Kang.

93 (Pages 767 - 770)

CONFIDENTIAL

Page 771

THE WITNESS:  Not that I'm aware of, no.

BY ATTORNEY KEYES:

Q.  Have you disclosed to any professional journal to which you've submitted any kind of article for publication that you're a paid expert for the plaintiffs?

ATTORNEY YEATES:  Do you have any case specific questions?

BY ATTORNEY KEYES:

Q.  You can answer.

ATTORNEY YEATES:  Object to the form.  And not case specific. You've exceeded -- well exceeded your time allotted by Judge Kang. And we covered this yesterday.

THE WITNESS:  So, typically, when you're submitting, if you perceive a conflict of interest, you may submit -- or you may be asked to submit.  To my recollection, I would not have done that for any of the recently

Page 772

published articles.

BY ATTORNEY KEYES:

Q.  You don't view it as a disclosable conflict of interest to let the journal know that you are a paid expert in civil litigation for the plaintiffs and have been paid almost a quarter of a million dollars when asking the publication to publish your work?

ATTORNEY YEATES:  Object to the form.  Foundation.  And not case specific.  You've exceeded your time allotted by Judge Kang.

THE WITNESS:  So the reason I'm looking through my CV is because the conflict of interest that you state for a publication is typically if you perceive it to be a conflict of interest related to a topic that you're presenting on and if that's part of the journal requirement, et cetera.

So it's not as easy as saying, you know, kind of just

Page 773

broad sweeping, you present every consulting agreement you're working with or every litigation you might be working with.

So the -- so in these cases -- or in these most recent publications, I don't believe that that's something that I would have submitted, no.

BY ATTORNEY KEYES:

Q.  Since July of 2024, when you were engaged by the plaintiffs in this litigation, have you disclosed to any professional journal or any reporter that you are a paid expert for the plaintiffs?

A.  No.

ATTORNEY YEATES:  Object to the form.  And not case specific.

THE WITNESS:  I don't believe I would have.  And I don't believe that it would have been a conflict of interest that would have been reportable in those circumstances.

Page 774

BY ATTORNEY KEYES:

Q.  When you reviewed the relevant scientific literature for purposes of your opinions in the reports you've issued, what did you need to see in order to determine that there was a causal link between students' use of social media and harms to schools?

ATTORNEY YEATES:  Object to the form.  Not case specific.  And covered yesterday.

THE WITNESS:  So when I'm reviewing the literature, I don't look at it as, you know, I'm -- I'm looking at this article to determine whether there is a causal link.

Really, when I'm forming the opinions in this case, I'm looking at the totality of the literature that I've used to form the opinions.  And those are the things that you consider together. And we went over this,

94 (Pages 771 - 774)

CONFIDENTIAL

Page 775

again, yesterday. But in the absence of certain types of studies, you would look to other factors, whether there is multiple correlational studies across settings, whether there is temporal sequencing, whether there is a mechanism of change that's theoretically defensible, et cetera, et cetera.

So those are some of the factors I would look at in the literature to determine whether it's relevant for causality.

BY ATTORNEY KEYES:

Q. All right. You say you're looking at the totality of the literature, and you said you're looking for certain factors.

And you mentioned three of them. You mentioned temporal sequencing, whether there's a mechanism of change that's theoretical -- theoretically defensible and whether there are multiple

Page 776

correlational studies across settings.

Are there other factors that you're looking for as you review the literature before you offer an opinion that there is a causal link between students' use of social media and harms to schools?

ATTORNEY YEATES: Counsel, we're not going to go through a deposition today of what we covered yesterday. This is not case specific. This is not a day two of yesterday's deposition where you get to re-ask questions that were asked by other counsel. I'm sure Judge Kang is now available. So I'd like to know if you have any case-specific questions.

ATTORNEY KEYES: It is case specific.

ATTORNEY YEATES: It is not. And it was already covered.

BY ATTORNEY KEYES:

Page 777

Q. In your first report, the very first report, did you talk about the six school districts?

A. The first report being the May 16th general report?

Q. Yes.

A. Honestly, I have to go back to it. It's been a while.

Did I speak to the specific districts? I don't know that I did. I'd have to go look.

Do you want --

Q. You said --

A. -- to point me to a specific place in here, I'm happy to --

Q. You said you were going to offer separate reports that were specific to the school districts.

A. Where was that?

Q. Do you dispute that your general report said that you were going to submit separate school district-specific reports?

A. I've written so many reports

Page 778

at this point, I just want to make sure that it's actually in here that I said I was going to submit them.

Q. Well, separate from whether you said it in your first report, you did submit six school district-specific reports?

A. That is correct. As well as the response to the rebuttals, six of those as well.

Q. Okay. And you, in those six school district-specific reports, talk about the impact of student social media use on those school districts and those school environments and the student mental health and learning in those school districts, correct?

A. Yes. I speak about that in the district-specific reports.

Q. Okay. And so you are drawing a connection between students' use of social media and what you say is the impact on school districts, schools and the school environment and student

95 (Pages 775 - 778)

CONFIDENTIAL

Page 779

mental health and learning.

It's Paragraph 2 of each of your reports, right?

A.   Paragraph 2?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  I'm looking at one district report and Paragraph 2 of my report, I'm speaking about what I've been retained as an expert for and that I'm talking about the impact of students' social media use on school districts, schools and the school environment, student mental health and learning.

BY ATTORNEY KEYES:

Q.   And so for each of these six school district-specific reports, you're offering an opinion that students' use of social media causes adverse consequences to that particular school district, the schools in that district, that school's environment and the student mental health

Page 780

and learning of students in that school district?

A.   So in Opinion 2 -- I'm looking specifically at the Breathitt report right now -- I offer that, as I opined in my general report, that the damaging effects of students' social media use on school district, schools and the school environment, student well-being and learning can be addressed through a plan specific to Breathitt.

Q.   Okay.

A.   In terms of the impact that's stated in Opinion 1, and I'm talking about the cumulative negative impacts of social media use on school districts and -- and including Breathitt County Board of Education.

Q.   And when you say "the cumulative negative impacts of students' social media use," you're saying that students' use of social media has a cumulative negative impact on the particular school district, its schools

Page 781

and its school environment, as well as the mental health and learning of the students in that school district?

A.   So what I'm saying in Opinion 1 -- I'm looking at Breathitt County's report right now -- is that -- that I have opined that the cumulative negative impacts -- and I am general in that beginning of the statement -- and then I speak specifically here about Breathitt County having to expend and redirect already limited resources and what they're increasingly tasked with as a result of that.

Q.   Are you offering an opinion that students' use of social media causes harm to each of the six school districts?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I do offer the opinion that the defendants' platforms have caused harm in each of the school districts, on the schools, and on the students in

Page 782

the schools.

BY ATTORNEY KEYES:

Q.   Okay.  So for purposes of your opinion that the defendants' platforms have caused harm in each of the six school districts and their schools and the students in those schools, I'm trying to understand what you need to find in order to conclude or support your opinion that there is a causal connection, a causal link between the two.

A.   Okay.  So you want me to go into the data --

ATTORNEY YEATES:  There's no question pending.

THE WITNESS:  Okay.  You're trying to understand that.

BY ATTORNEY KEYES:

Q.   You said --

A.   So what is the question?

Q.   -- I said I look at the totality of the literature and I look at factors.  And you mentioned three

96 (Pages 779 - 782)

CONFIDENTIAL

Page 783

factors.

And I'm asking, for purposes of your opinion on causation for these school districts, are you looking at any other factors, besides the three you listed, to support your opinion that there is a causal link between students' use of social media and the harms you're identifying.

A.   So, first of all --

ATTORNEY YEATES:  Object to the form.  Not case specific.  And covered yesterday.

ATTORNEY KEYES:  It's totally case specific.

THE WITNESS:  So, first of all, I think I referred to the totality of the literature that I used in consideration for this, not the totality of the literature in the statement that I made before.

I think you were referencing a prior statement.  To my

Page 784

recollection, I was talking about that I reviewed the totality of literature that I documented considering for this case, and with respect to other information that I used to demonstrate causation.

So I started speaking -- I didn't provide an exhaustive list of what I consider in the literature when considering causation, right.  So that would include prospective cohort studies, longitudinal studies, et cetera.

Outside of the peer-reviewed literature, looking specifically to the cases, that is exactly why it was important to actually look at district-specific information.

So as I've mentioned, I looked through the plaintiff fact sheets, which detail their experiences with mental health

Page 785

systems and with the impact of social media.  And it's why I spoke with the people who are actually leading the district and who are working directly in schools.

It's also why I looked to the depositions, as one part of the report, to understand the experiences of the individuals who are leading and working in schools.

So those are part -- part of what informed the causation of -- within the districts.

BY ATTORNEY KEYES:

Q.   So is part of your opinion that there's a causal link here the fact that some people said there was in their depositions?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So, again, the deposition testimony was one piece

Page 786

of information that I used to inform the opinions in this case.

In terms of the causation, the testimony and the depositions may have spoken to that. Certainly the key informant interviews also spoke to some of the elements of causation as well.

BY ATTORNEY KEYES:

Q.   I'm trying to understand the basis for your opinion that there's a causal link between students' use of social media and the harms you've identified for these six school districts.

Are you saying that part of the basis for that opinion is that some people in their deposition said there's a causal link?

ATTORNEY YEATES:  Object to the form.

THE WITNESS:  So I think I considered all of the information that I had when forming my

97 (Pages 783 - 786)

CONFIDENTIAL

Page 787

opinions. And that included information from the depositions, that included information from the key informant interviews, that included the scientific literature on this, this included information received from the districts or information about the districts on the plaintiff fact sheets.

BY ATTORNEY KEYES:

Q. And can you identify for me any other factor or any other framework, besides what you've said, that, from the perspective of the scientific literature, is the basis for your opinion that there's a causal link between students' use of social media and the harms that you're talking about?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: So the scientific literature certainly informed, and the expert reports that I reviewed that went into

Page 788

great detail about the science on the -- not only the association but the causation of social media, the defendants' platforms, in this case, on schools and on students. So that was a piece of the information.

And then I also looked to other information when forming my opinions.

BY ATTORNEY KEYES:

Q. You say that the opinions that you're offering in these six school district reports draw upon your more than 25 years of experience as a researcher.

That's in Paragraph 2. Do you see that?

A. Twenty-five years as a clinician, researcher and consultant in child and adolescent mental health within school settings.

Q. So you see the language I'm referring to?

A. I see the term "researcher"

Page 789

and I see the "25 years," yes.

Q. Have you conducted any peer-reviewed research on whether students' use of social media causes harm to those students' mental health?

ATTORNEY YEATES: Object to the form. Not case specific. And covered yesterday.

THE WITNESS: So my research is quite broad. I've got about 100 peer-reviewed articles, most of which focus generally on comprehensive school mental health systems.

My -- I wouldn't say that my specific research area has been the focus of social media impact. My articles -- and reflect more the school mental health. And the research that I've done have looked at school mental health broadly.

That being said, when we think about student mental health,

Page 790

we're looking at different impacts on student mental health. We're talking about children, adolescents, and, certainly, social media is something that impacts student mental health.

So there are some experts who -- whose, you know, specific areas are looking at the design of social media, for instance.

My area of expertise, as I laid out here, is really in comprehensive school mental health, part of which includes the factors that might impact student mental health. A significant and relatively new one being social media.

So it's a little hard to tease apart, I guess, is the answer.

BY ATTORNEY KEYES:

Q. My question was very specific.

98 (Pages 787 - 790)

CONFIDENTIAL

Page 791

Have you conducted any peer-reviewed research on whether students' use of social media causes harm to those students' mental health?

ATTORNEY YEATES: Objection. Form. Asked and answered. Not case specific. And covered yesterday.

THE WITNESS: I think my research has looked at factors that impact student mental health.

It has not exclusively looked at the impact of social media on student mental health.

BY ATTORNEY KEYES:

Q. Well, can you identify -- can you go to your CV and identify for me any peer-reviewed research that you've conducted on whether students' use of social media causes harm to those students' mental health?

ATTORNEY YEATES: Object to the form. Asked and answered. Not case specific. Covered

Page 792

yesterday.

THE WITNESS: So I'm going to go back to my CV and look through my publications or my grants or --

BY ATTORNEY KEYES:

Q. You can look wherever you want.

I just want you to identify with specificity any research -- peer-reviewed research that you've conducted on whether students' use of social media causes harm to their mental health.

A. Well --

ATTORNEY YEATES: Object to the form. Asked and answered. Not case specific. Covered yesterday.

THE WITNESS: I think what I just said is that the research that I've conducted would not have looked at the -- that social media as a factor exclusive of other

Page 793

factors that impact student mental health.

And much of my research is looking at the implementation of school mental health systems.

BY ATTORNEY KEYES:

Q. So is that to say you can't identify what I'm asking for?

ATTORNEY YEATES: Same objections.

THE WITNESS: I'm happy to look through to see if there's something specific to social media. I think we went through most of this yesterday.

But I don't recall, within the peer-reviewed literature or within the grants, specifically studying the impact of social media on student mental health.

BY ATTORNEY KEYES:

Q. Have you conducted any peer-reviewed research on whether students' use of social media causes harm

Page 794

to schools?

ATTORNEY YEATES: Object to the form. Not case specific. Covered yesterday.

THE WITNESS: Okay. I thought I just answered that.

But I would say, no, that I don't think that my research focus has been specifically looking at social media exclusive of other factors on mental health of young people or student mental health.

BY ATTORNEY KEYES:

Q. Have you published any article, peer reviewed or not, that says students' use of social media causes harm to their schools?

ATTORNEY YEATES: Object to the form. Not case specific. Covered yesterday.

THE WITNESS: Peer reviewed or not? I honestly cannot -- given all the publishing that I've done, I don't know if I've

99 (Pages 791 - 794)

CONFIDENTIAL

Page 795

mentioned social media in my publications or not.

Have I done unique research? Part of the reason that, you know, if you're a general specialist in school mental health, that you look to other experts who are doing that research is because they specialize in a certain topic, like the direct impact of social media.

So you know I reviewed other experts here.

BY ATTORNEY KEYES:

Q. I'm just trying to understand whether, prior to issuing the school district-specific reports that we've been talking about, you can point to any research that you conducted, or any research that you published about, that talks about students' use of social media causing harm to schools.

Can you identify any such research or publication?

Page 796

A. So as I've said --

ATTORNEY YEATES: Object to the form.

THE WITNESS: So as I've said, to know whether I had actually spoken about specifically social media within the context of my publications, both peer reviewed and not, I would have to go back and look at the publications.

BY ATTORNEY KEYES:

Q. Ma'am, I'm not asking whether you've spoken specifically about social media. My question is very specific.

It's about whether students' use of social media causes harm to schools. That's what my question is about.

So I'm asking you, sitting here today, with the benefit of your extensive CV and given all of your publications and all of your

Page 797

presentations and all of your -- your articles, have you, in any of those, talked about students' use of social media causing harm to schools?

ATTORNEY YEATES: Object to form.

BY ATTORNEY KEYES:

Q. If you can't identify one, that's fine.

But if you can, tell me what it is specifically.

ATTORNEY YEATES: Object to the form. Argumentative. Not case specific. Covered yesterday.

THE WITNESS: So now we're including the presentations, just to be clear, so the over 600 presentations.

You want me to think about, in addition to the publications, all the presentations, whether I've ever talked about the impact, the cause, or the fact that social media causes mental health harms

Page 798

in young people?

That would be virtually impossible for me to do.

BY ATTORNEY KEYES:

Q. I'll break it down. I'll break it down.

A. Great.

Q. Okay. So to be very clear, have you published any peer-reviewed article or non-peer-reviewed article where you talk about students' use of social media causing harm to schools?

Can you identify that?

ATTORNEY YEATES: Object to the form. Not case specific. Already covered yesterday. You've allotted your time -- you've exceeded your allotment of time offered by Judge Kang.

THE WITNESS: I would have to go back, given that there's about -- there's over 100 articles, to see whether I spoke about social media causing mental

100 (Pages 795 - 798)

CONFIDENTIAL

Page 799

health impact within my publications.

BY ATTORNEY KEYES:

Q. Can you think of any one sitting here right now?

ATTORNEY YEATES: Same objections.

THE WITNESS: No. I couldn't do that, because I would have to go back to them to look through them.

BY ATTORNEY KEYES:

Q. Okay. Have you given any presentations to any professional audience where you talk about students' use of social media causing harm to schools?

ATTORNEY YEATES: Object to the form. Not case specific. Covered yesterday.

THE WITNESS: So it would be hard for me to know, within over 600 presentations, whether I've made that statement or not.

Page 800

BY ATTORNEY KEYES:

Q. Can you think of any one sitting here right now?

A. No.

Q. Have you given any speech to any audience where you talk about students' use of social media causing harm to schools?

ATTORNEY YEATES: Object to the form. Not case specific. Covered yesterday. Asked and answered.

THE WITNESS: I certainly may have. But it would hard -- would be hard for me, without the transcripts from all my presentations, to know whether I had made that statement.

BY ATTORNEY KEYES:

Q. Can you think of any sitting here right now?

ATTORNEY YEATES: Same objections.

THE WITNESS: No. No.

Page 801

BY ATTORNEY KEYES:

Q. What is Myspace?

A. What is Myspace?

Q. Uh-huh.

ATTORNEY YEATES: That's certainly not case specific. I'll object to that.

THE WITNESS: I think it was an online -- I don't even know what I would call it. I don't know.

BY ATTORNEY KEYES:

Q. Did you understand that Myspace was social media?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: I just said I didn't --

ATTORNEY YEATES: Covered yesterday.

THE WITNESS: I just said I didn't know what it was, so.

BY ATTORNEY KEYES:

Q. Have you ever heard of

Page 802

Myspace?

ATTORNEY YEATES: Same objection.

THE WITNESS: I've heard of Myspace.

BY ATTORNEY KEYES:

Q. Did you understand it to be a social media company that ultimately failed?

ATTORNEY YEATES: Object to the form. Outside the scope. Not case specific.

THE WITNESS: I don't -- I don't think I know enough about it to know what it was, to be totally honest with you.

BY ATTORNEY KEYES:

Q. Do you know whether adolescents will be using social media at all 15 years from now?

A. I think it would be hard to predict what social media will look like. I think, given its pervasiveness and in its current form,

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

CONFIDENTIAL

Page 803

the design features are such that it would be pretty hard for young people to move away from it.

So I can't predict what the defendants' platforms are going to do or if they're going to put, you know, age restrictions on or if they're going to -- it's really hard for me to know what that is going to look like 15 years from now.

Q. Do you know whether adolescents will be using social media ten years from now?

A. Again, it would be hard for me to predict. I would imagine that they certainly would, given the current climate and limited support that the defendants' platforms have put in place to cut -- cut back on this.

So I can't imagine. But it's hard for me to predict.

Q. Have you conducted any studies yourself attempting to forecast any anticipated changes in how adolescents use social media?

Page 804

A. No, I have not.

ATTORNEY YEATES: Object to the form.

BY ATTORNEY KEYES:

Q. Have you done any research of any studies by anyone else forecasting anticipated changes in how adolescents will use social media?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I'm actually trying to think if any of the literature that I looked at spoke about forecasting into the future. It may have, and I can't recall.

What I can say is that I've certainly -- well, I don't know if it's in the peer-reviewed literature, but there are certainly statements like, it's not going anywhere, it's not going away, the harms are not going away.

So I don't know if that

Page 805

speaks to your question. But that's the best forecast that I can recall hearing about.

BY ATTORNEY KEYES:

Q. For the strategic plans that you are recommending in these reports on the six school districts, can you identify any school district that has adopted such a strategic plan because of the purported consequences of students using social media?

ATTORNEY YEATES: Object to the form. Asked and answered.

THE WITNESS: So I just want to make sure I understand the question, because you said for the specific -- the six districts and then you said can you identify any district.

Do you mean any of the six districts or any district in the universe that has adopted this plan?

BY ATTORNEY KEYES:

Page 806

Q. Well, we know the six districts have not --

A. Okay.

Q. -- adopted the strategic plan.

A. You started the question with the six districts. So I just wanted to make sure that I understood the question.

Q. But I want to zero you in on the strategic plan you're recommending --

A. Okay.

Q. -- for these six school districts.

A. Okay.

Q. Okay. Can you identify any district, anywhere in the country, that has adopted the strategic plan that you are recommending in these six reports?

ATTORNEY YEATES: Object to form. Asked and answered.

THE WITNESS: So I thought we had covered that. But I'm happy to restate that, to my

102 (Pages 803 - 806)

CONFIDENTIAL

Page 807

knowledge, no district has been able to yet fully implement what it would take to prevent and mitigate the impact of the defendants' platforms as I've laid out in the strategic plans.

ATTORNEY KEYES: Dr. Hoover, thank you for your time. I'll pass the witness.

VIDEO TECHNICIAN: The time is 3:33 p.m., and we are off the record.

- - -

(Whereupon, a brief recess was taken.)

- - -

VIDEO TECHNICIAN: The time is 3:34 p.m., and we are on the record.

- - -

EXAMINATION

- - -

BY ATTORNEY NOLAN:

Q. Good afternoon, Dr. Hoover.

Page 808

My name is Jack Nolan. I represent Snap.

A. Good afternoon.

Q. So for the district-specific plans that you propose, you use the term "social media" throughout those plans, fair?

A. I do use the term throughout the plans.

Q. But what you mean by social media is the defendants' platforms; YouTube, Facebook, Instagram, TikTok and Snapchat, true?

A. That is what I'm using it in reference in these plans, yes.

Q. All right. If a student were to be cyberbullied over text message, would -- and they required Tier 2 services -- or Tier 2 services were appropriate for them, would they be able to receive any of the Tier 2 services you are recommending in your district-specific plans?

ATTORNEY YEATES: Object to the form.

Page 809

THE WITNESS: So the district-specific plans are specific to the impacts of the defendants' platforms.

There may be services in place at their school to address other forms of bullying.

BY ATTORNEY NOLAN:

Q. Okay. So in terms of the plans that you're proposing, the additional staffing, the additional programming, the additional interventions that are provided would not apply to certain students who are bullied over Discord, text message, Bluesky, Truth Social, Reddit, any of those platforms that are not belonging to the defendants, true?

ATTORNEY YEATES: Object to the form.

THE WITNESS: What I can say is that the plan was intended to address the harms caused by the defendants' platforms.

Page 810

And so the staffing that would be put in place, the plans, the programs, et cetera, are intended to address students who are harmed specifically by those platforms.

BY ATTORNEY NOLAN:

Q. And so if a student were harmed by actions on another platform that wasn't one of the defendants, would they be turned away under your strategic plans?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So to be clear, my plans are to be built on a foundation of existing services in a school. And many schools do support students who may have been bullied in -- in the context you're offering of text messaging. They might have that.

So when you say would they be turned away, they may receive

103 (Pages 807 - 810)

CONFIDENTIAL

Page 811

services. So it's not that they would never get a service. But would they be considered within this strategic plan? That's not what we were looking at.

BY ATTORNEY NOLAN:

Q. Okay. So they would have to use some of the resources that currently exist at the school if they had to deal with cyberbullying over text message, true?

A. Not necessarily. They may choose to use school resources or they may have -- they may not choose to use school resources.

But they would not be specifically part of the plan that we've laid out for the districts.

Q. Okay. Sitting here today, have you -- are you offering any opinions with respect to Snapchat that are not covered in your reports?

A. Am I offering opinions -- I don't think I'm offering opinions that

Page 812

are outside of the report.

Q. Okay. And that's true for Snapchat, as well as every other platform?

A. The -- I mean, the opinions I offer are with respect to the defendants' platforms. Understood.

But I'm not offering opinions that are not in the reports, if that's what you're asking.

Q. Understood.

A. Okay.

Q. So if your opinion -- if your reports are silent on a particular issue, that means you're not offering that opinion, true?

ATTORNEY YEATES: Object to the form.

THE WITNESS: So I'm not offering that opinion in the context of these reports. I laid out the opinions that I had to offer in the context up -- to date.

Page 813

BY ATTORNEY NOLAN:

Q. Now, do you have any sense, for any of the school districts, the six school districts, how many students are bullied on text message or some other platform versus how many are bullied on a defendants' platform?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't know that -- I certainly don't know that offhand. I don't know that I have the data on that.

And, frankly, related to some of the things I talked about earlier, the data infrastructure for a lot of the schools that we work with, including in these districts, likely would not have been resourced enough and advanced to be able to make those distinctions.

So unfortunately not.

BY ATTORNEY NOLAN:

Page 814

Q. Does the technology exist to make those distinctions currently?

A. So that's -- I mean, that's an interesting question.

Does the technology exist to make the distinctions? You could certainly attempt, with existing technology, to make distinctions between sources of bullying. And that may have happened. I'm not a tech expert.

But, again, I don't -- you know, part of the plan is to help build data infrastructure to allow for that, to allow for at least an understanding of the source of impact, and you mentioned cyberbullying.

Q. But what the school districts would implement with respect to -- I'm going to call it data collection.

Is that a fair term?

A. Sure.

Q. What the school districts would implement with respect to data

104 (Pages 811 - 814)

CONFIDENTIAL

Page 815

collection to gather this information, nothing new needs to be invented in order for them to do that, true?

A. I don't know that that's true. I don't know the tech -- in terms of the technology for creating, you know, an intra-operable data system.

Again, I don't -- know that systems exist to collect mental health data, for example, or mental health referral data. I don't know that it has caught up to some of the direct impacts of social media harm in schools.

And, you know, you're talking about distinguishing between platforms. I don't know that that technology exists, because I'm not a technologist.

Q. So with respect to mental health referrals, that technology exists currently, true?

A. The technology to --

Q. Track them.

A. -- track mental health

Page 816

referrals?

It exists to an extent. And a lot of school districts do not have it or have it in very limited and poor form.

Q. Understood. But it exists. And so if they had the money, they could buy it today?

A. Maybe. Would there need to be, you know, improvements on it? Perhaps. Could there be -- could it be improved? Perhaps. But is there some technology that exists? Yes.

Q. But are you saying that the technology needed to implement your plans does not exist in full form currently?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I'm not suggesting that. Again, not a technologist here, so I want to be a little bit cautious about what I say exists in the technology field and what doesn't.

In my experience in schools,

Page 817

there exists data systems that help with tracking referrals and that help in identifying students who may have mental health concerns.

BY ATTORNEY NOLAN:

Q. Okay. So there are certain data systems that exist?

A. Yes.

Q. And these school districts have just chosen not to purchase or implement those data systems, fair?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Not fair.

BY ATTORNEY NOLAN:

Q. Well --

A. No.

Q. -- true or -- yes or no, have they implemented the data systems that exist?

A. So you're --

ATTORNEY YEATES: Object to the form.

Page 818

THE WITNESS: So you're asking broadly across six districts and each of them has different technology systems. And some, you know, may have more limitations than others, which is very consistent with what we see in districts across the country.

And so you phrased the question as they've chosen not to. I would say that they are limited by what they're -- they've been able to resource.

BY ATTORNEY NOLAN:

Q. Because they've made the decision to spend their resources on other things, right?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Well, what I would -- how I would phrase it is that they have limited budgets and have -- I can't, first of all, speak to the intentions behind

CONFIDENTIAL

Page 819

these specific school districts and their purchasing.

What I can say is that I know school districts struggle to prioritize. And they have to make very difficult decisions.

And so every one of the six districts that I spoke with did report in investing in some way of trying to track mental health, whether it's the, you know, student referrals that we talked about or mental health outcomes.

BY ATTORNEY NOLAN:

Q. And for the six districts that you issued reports on, was there investment in mental health referrals or tracking mental health following the COVID-19 pandemic?

ATTORNEY YEATES: Object to the form.

THE WITNESS: Was there a specific distinct investment?

BY ATTORNEY NOLAN:

Page 820

Q. Well, yeah, did they start doing that after COVID?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I don't know, honestly. I don't know the date at which some of the systems were put into place. I believe that some of their mental health data systems have been in place for longer than the pandemic, so.

BY ATTORNEY NOLAN:

Q. Okay. And even though those mental health tracking systems have been in place for years at this point, they don't track the reason for the referral --

ATTORNEY YEATES: Object to the form.

BY ATTORNEY NOLAN:

Q. -- to the level that would say it was related to one of the defendants' platforms or some other reason?

Page 821

ATTORNEY YEATES: Object to the form.

THE WITNESS: So, again, we're talking about data systems across six different districts, because they are under the umbrella of the one question.

But in -- in my experience looking at the information about the data systems, and in my discussions during key informant interviews, I do not believe, at this point, that they had the capacity in their data systems to consistently track whether a -- one of the defendants' platforms was involved -- I think you gave the example of an incident of cyberbullying or a mental health referral, I guess, was the next question that you asked.

Do I think some data systems attempt to capture that? I recall people saying, you know, sometimes

Page 822

they were able to add notes.

Having working -- having worked with lots of school districts, and even in speaking with these particular school districts, they often said that they were not able to document even within the existing systems.

BY ATTORNEY NOLAN:

Q. They were completely unable to document the cause or the suspected cause of the mental health referral?

ATTORNEY YEATES: Object the form.

THE WITNESS: Across all six districts or are you asking about --

BY ATTORNEY NOLAN:

Q. Is there a particular district that you're thinking of right now that was completely unable to document the underlying cause for the mental health referral?

ATTORNEY YEATES: Object to

106 (Pages 819 - 822)

CONFIDENTIAL

Page 823

the form.

THE WITNESS: I can't recall. I'd have to go back to see what the different systems allowed for in terms of being able to capture this.

But, in general, you know, you're asking about were they able to document? And I would say, as I've said, they had limited capacity to capture the data, to understand all of the unique causes or impacts of social media harm.

BY ATTORNEY NOLAN:

Q. Okay. So they don't have the data to understand all of the unique causes or impacts of social media harm; was that your testimony?

ATTORNEY YEATES: Object to the form.

THE WITNESS: What I am saying is that their data systems are limited. And that's part of

Page 824

why I included a data infrastructure need as part of the strategic plan.

BY ATTORNEY NOLAN:

Q. Okay. Did you consider any Snap internal documents in formulating your opinions?

A. No.

Q. Did you consider the deposition testimony of any Snap employee in formulating your opinions?

A. No.

Q. Did you review any academic literature that was specific to Snap or Snap -- the Snapchat platform?

A. So the scientific literature that I reviewed, as well as scientific literature that was cited by experts that I cited in my reports, much of that included Snap.

Q. But were any of the articles just about the Snapchat platform?

ATTORNEY YEATES: Object to the form. And not case specific.

Page 825

THE WITNESS: I don't recall.

Sorry.

I don't recall.

BY ATTORNEY NOLAN:

Q. You mentioned yesterday that you do have a Snapchat account, right?

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: I think so.

BY ATTORNEY NOLAN:

Q. Okay. Do you know what the user name is?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: I have no idea.

BY ATTORNEY NOLAN:

Q. Okay. Do you have any sense of when the last time you used Snapchat was?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: No.

Page 826

BY ATTORNEY NOLAN:

Q. Any sense of how much time, in total, you've ever spent on Snapchat?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: Maybe a couple of hours total.

BY ATTORNEY NOLAN:

Q. Over what period of time?

A. My life.

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: My life.

BY ATTORNEY NOLAN:

Q. Okay. That's fine.

And when you created the Snapchat account, was this, like, a couple of months ago? A decade ago? A couple of years ago? Like, any -- any sense of when in time?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: I don't recall. It was not in the last

107 (Pages 823 - 826)

CONFIDENTIAL

Page 827

month.

BY ATTORNEY NOLAN:

Q.  Okay.

A.  It was more than a year ago.

Q.  Okay.  Have you ever sent or received a Snap?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  Yes.

BY ATTORNEY NOLAN:

Q.  Okay.  Have you ever sent or received a chat on Snapchat?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  So the difference between a Snap and a chat on Snapchat is?

BY ATTORNEY NOLAN:

Q.  Snap is a picture.  A chat is a message.

ATTORNEY YEATES:  Same objections.

THE WITNESS:  So I've sent a chat.  I don't know if I've sent a

Page 828

picture.

BY ATTORNEY NOLAN:

Q.  Okay.  Have you ever used Snapchat to view, like, a story or video?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  I have no idea.

BY ATTORNEY NOLAN:

Q.  Okay.  Have you ever used a Snapchat lens?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  What is that?  Is that the things that --

BY ATTORNEY NOLAN:

Q.  You know, like, the doggy ears?

A.  Oh.  Yes.

Q.  Okay.  Was the doggy ears the one that you used?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  I don't know.

Page 829

BY ATTORNEY NOLAN:

Q.  Okay.  Have you ever had a streak on Snapchat with a friend?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  No.

BY ATTORNEY NOLAN:

Q.  Do you know what a Snap streak is?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  So I'll give you my understanding, is that it's when you have a consistent communication between people and you.

So I don't know if it's daily.  I not sure exactly what it is.  But that's my understanding.

It's another mechanism to -- what I understand -- the reason I understand it is because young people say they have to stay on it, even when they're at camp or

Page 830

on vacation, so that they can maintain a streak.  That's why I know what it is.

BY ATTORNEY NOLAN:

Q.  Do you have any sense of how long it takes to maintain a streak?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  I do not.

BY ATTORNEY NOLAN:

Q.  Have you ever used the Snap Map feature?

ATTORNEY YEATES:  Object to the form.  Not case specific.

THE WITNESS:  I don't think so.

BY ATTORNEY NOLAN:

Q.  Have you ever visited Snapchat's Here For You resources?

ATTORNEY YEATES:  Object to the form.  Not case specific.

You've exceeded your time allotted by Judge Kang.

THE WITNESS:  I don't know.

108 (Pages 827 - 830)

CONFIDENTIAL

Page 831

BY ATTORNEY NOLAN:

Q. Okay. If you did, would it be in your materials considered list?

ATTORNEY YEATES: Same objection.

THE WITNESS: Not necessarily.

I think you just asked have I seen it or reviewed it. But I don't know that it would be in my materials reviewed.

BY ATTORNEY NOLAN:

Q. Has your use of Snapchat for a couple of hours over the course of your life harmed your mental health?

ATTORNEY YEATES: Object to the form. Not case specific. You've exceeded your time allotted by Judge Kang.

THE WITNESS: I don't know.

BY ATTORNEY NOLAN:

Q. Have you ever spoken to a doctor or medical professional or mental health professional about your use of

Page 832

Snapchat and its -- any effect on you?

ATTORNEY YEATES: Object to the form. Not case specific. Outside the scope.

THE WITNESS: I was going to say, are we going to detail my personal health history here? That feels like a private matter. But the answer would be no.

BY ATTORNEY NOLAN:

Q. Okay. Could you explain to me, at a high level, the different sections or tabs within Snapchat?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: I don't think I could, no.

BY ATTORNEY NOLAN:

Q. Are you aware of any other applications that use streaks?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: I'm actually not.

Page 833

BY ATTORNEY NOLAN:

Q. Have you ever used Duolingo?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: I think I may have used it, like, downloaded it, used it, and then never used it again. It was -- it was an ambitious goal.

BY ATTORNEY NOLAN:

Q. What about Headspace?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: I think I've seen Headspace.

BY ATTORNEY NOLAN:

Q. Is it your opinion that all apps with streaks are necessarily harmful?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: I didn't offer an opinion on that.

BY ATTORNEY NOLAN:

Page 834

Q. Do you have any idea what sort of information is displayed on a Snapchat user's profile?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: I could not say with specificity.

BY ATTORNEY NOLAN:

Q. Do you know what Spotlight is within Snapchat?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: Spotlight? No.

BY ATTORNEY NOLAN:

Q. Do you know if Snap has likes?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: I don't know that.

BY ATTORNEY NOLAN:

Q. When a user posts a public story on Snapchat, is the number of times

109 (Pages 831 - 834)

CONFIDENTIAL

Page 835

a story has been viewed public?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: I do not know.

BY ATTORNEY NOLAN:

Q. Do you know what the average age of a Snapchat user is?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: I want to say that some of that was detailed in the expert reports I looked at.

I know we certainly -- you know, as I was writing, they certainly looked at, you know, age of different platform use.

Can I tell you, in this moment, the average age of a Snap user? No.

BY ATTORNEY NOLAN:

Q. Can you tell me what percentage of students within any of the school districts -- any of the six school districts use Snapchat?

Page 836

ATTORNEY YEATES: Object to the form.

THE WITNESS: I cannot give you that number. Usually when that number -- part of the reason you couldn't get that number is because the data might not exist within the school district. So you would have to extrapolate it from national data, which is pretty typical in the field, that you would do that.

If you don't have the data infrastructure to collect that within a certain site, you would look to nationally collected data.

BY ATTORNEY NOLAN:

Q. Okay. But you don't know if, for any of the six school districts, that data varies from the national rate?

ATTORNEY YEATES: Object to the form.

THE WITNESS: I wouldn't know. Because the data

Page 837

infrastructure might not be there within the district, which is why we recommend building district data infrastructure so that they can actually navigate this issue.

BY ATTORNEY NOLAN:

Q. And since you don't know for the specific districts and you're using national data, do you know how much time Snapchat users, on average, spend using different features on the Snapchat app?

ATTORNEY YEATES: Objection to the form. Not case specific.

THE WITNESS: So, again, I would have to recall specifically the expert reports, where they did go into some detail about features and the different platforms and time spent.

But do I have that number for you right now? No.

BY ATTORNEY NOLAN:

Q. And in order to get those numbers, you would be relying on the

Page 838

other experts in this case; you didn't independently identify that information, true?

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: So I looked to the other experts because I recall -- just since we're doing a bit of a memory test here, I could recall, you know -- I'd have to look to the expert.

Could that have also been in some of the literature that I reviewed? Possibly.

BY ATTORNEY NOLAN:

Q. Okay. And you believe that the literature you reviewed may have included a breakdown of how much time Snapchat users spend using different aspects of the platform?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: What I'm saying is I -- it could be

110 (Pages 835 - 838)

CONFIDENTIAL

Page 839

possible. I didn't say I believe that. I don't know.

BY ATTORNEY NOLAN:

Q. Sitting here today, you don't know?

A. I don't know --

ATTORNEY YEATES: Same objections.

THE WITNESS: -- sitting here today.

BY ATTORNEY NOLAN:

Q. So, for example, you don't know how much time Snapchat users spend messaging using the chat feature on Snap, true?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: So sitting here today, I can't give you the number of minutes that users on Snap use messaging.

BY ATTORNEY NOLAN:

Q. Have you seen that number anywhere to your recollection?

Page 840

ATTORNEY YEATES: Same objection. And you have three more minutes.

THE WITNESS: So I don't know if that specific number you're asking about, about that feature of Snap, was in the literature I've reviewed or the expert reports.

BY ATTORNEY NOLAN:

Q. Did you ask the plaintiffs' lawyers for that information?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: Did I ask or could I ask?

BY ATTORNEY NOLAN:

Q. Did you --

A. I misunderstood your question.

Q. Did you --

A. Did I --

Q. -- ask the plaintiffs' lawyers?

Page 841

A. -- ask that information?

Q. Did you ask the plaintiffs' lawyers for that information, the amount of time Snapchat users spend using the messaging portion of the app?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: Did I ask that question specifically? No.

BY ATTORNEY NOLAN:

Q. Okay. When a user opens the Snapchat app, what do they see?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: I don't know every user and what they see when they open it.

BY ATTORNEY NOLAN:

Q. Well, every user, when they open it, sees the camera.

Any reason to dispute that?

ATTORNEY YEATES: Object to the form. Not case specific.

THE WITNESS: I just don't

Page 842

know what they see when they open it.

BY ATTORNEY NOLAN:

Q. Okay. And I just have a few more questions here.

Did you recommend to any of the school districts that you consult for that they bring a lawsuit against the defendants in this case?

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: Did I recommend that they bring a lawsuit? No.

BY ATTORNEY NOLAN:

Q. Okay. Have you -- do you believe that social media should be banned?

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: So I don't think I've ever called for a ban on social media.

What I've called for is that

111 (Pages 839 - 842)

Golkow Technologies,
A Veritext Division
877-370-3377                                                    www.veritext.com

CONFIDENTIAL

Page 843

we support schools, in this case in these six districts, to address the harms that the defendants' platforms have caused to the students in their schools and on the school experience itself.

BY ATTORNEY NOLAN:

Q. But only the defendants' platforms, right?

ATTORNEY YEATES: Object to the form.

THE WITNESS: In the case of this litigation, that's what I'm offering an opinion on, are these six districts.

BY ATTORNEY NOLAN:

Q. Is it your opinion that no other social media platform has caused any harm at all to students or schools?

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: I didn't offer an opinion on that.

What I did detail in my

Page 844

report is that the defendants' platforms account for a -- the vast majority of use by young people; so elementary and secondary students.

BY ATTORNEY NOLAN:

Q. And by "vast majority," what do you mean?

ATTORNEY YEATES: Object to the form. Not case specific. And covered yesterday.

THE WITNESS: So I detail -- I provided detailed numbers in the reports around the different plat -- the defendants' platforms and levels of use.

So -- and it's gone into in much more detail in some of the expert reports that I reviewed.

BY ATTORNEY NOLAN:

Q. Okay. What percentage of your income, since you've started working on this litigation, has been from your work as an expert in this case?

Page 845

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: I'd have to calculate that. I do trainings that generate income and some consulting work. So I'm not entirely sure.

BY ATTORNEY NOLAN:

Q. So sitting here today, you can't tell me what percentage of your income, since you were retained in this case, is from your expert work for these six school districts, true?

ATTORNEY YEATES: Object to the form. And not case specific.

THE WITNESS: I can't give you a percentage, no.

BY ATTORNEY NOLAN:

Q. Okay.

ATTORNEY NOLAN: Anybody else?

ATTORNEY YEATES: I have no questions. Thank you.

VIDEO TECHNICIAN: I will

Page 846

now be stating the on-record times for each party.

Andrew Keyes, representing YouTube, went five hours, four minutes. John Nolan, representing Snap, went 25 minutes.

The time is 3:59 p.m. We are off the record.

- - -

(Whereupon, the deposition concluded at 3:59 p.m.)

- - -

112 (Pages 843 - 846)

CONFIDENTIAL

Page 847

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

Amanda Miller

Amanda Maslynsky-Miller
Certified Realtime Reporter
Dated:  August 14, 2025

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

Page 849

- - - - - -
E R R A T A
- - - - - -

PAGE  LINE  CHANGE
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____

Page 848

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 850

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages,  1 - 847, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
SHARON A. HOOVER, Ph.D.          DATE

Subscribed and sworn to before me this _____ day of _____, 20____.

My commission expires:_____

_____
Notary Public

113 (Pages 847 - 850)

CONFIDENTIAL

Page 851

LAWYER'S NOTES
PAGE  LINE
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____

Golkow Technologies,
A Veritext Division
877-370-3377                                    www.veritext.com