# Exhibit 90

# PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE GENERAL CAUSATION TESTIMONY OF PLAINTIFFS' EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3
 4   IN RE: SOCIAL MEDIA         )
     ADOLESCENT ADDICTION/       )
 5   PERSONAL INJURY PRODUCTS    )  MDL No. 3047
     LIABILITY LITIGATION        )
 6                               )
                                 )
 7
 8    SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE
       COUNTY OF LOS ANGELES - SPRING STREET COURTHOUSE
 9
10   COORDINATION PROCEEDING    )
     SPECIAL TITLE [RULE 3.400] )
11                              )
     SOCIAL MEDIA CASES         )  Lead Case No.
12   _____)  22STCV21355
     This Document Relates To   )
13                              )
     STATE OF TENNESSEE, ex rel.)
14   JONATHAN SKRMETTI,         )
     ATTORNEY GENERAL and       )
15   REPORTER,                  )
     v.                         )
16   META PLATFORMS, INC., and  )
     INSTAGRAM, LLC.            )
17   _____)
18
            CONFIDENTIAL - ATTORNEYS' EYES ONLY
19               PURSUANT TO PROTECTIVE ORDER
                        VOLUME 1
20               VIDEO-RECORDED
              DEPOSITION OF ARTURO BEJAR
21                  (Pages 1 - 351)
              Held at Baker Botts
22     1001 Page Mill Road, Palo Alto, California
             Monday, April 7, 2025, 9:20 a.m.
23                   - - - -
24   REPORTED BY:  ELAINA BULDA-JONES, CSR 11720
25
```

CONFIDENTIAL

Page 2

```
 1              APPEARANCES
 2
 3  For the Plaintiffs:
 4      BY: TOM CARTMELL, ESQ.
        BY: JACK HYDE, ESQ.
 5      BY: KATHLEEN HUDNALL
        BY: MAUREEN MURPHY, ESQ. (VIA ZOOM)
 6      BY: LUCY MALONE (VIA ZOOM)
        BY: ANGELA PRIEST (VIA ZOOM)
 7      BY: ROB GROVES, ESQ. (VIA ZOOM)
        BY: TRICIA L. CAMPBELL, ESQ. (VIA ZOOM)
 8      BY: JONATHAN P. KIEFFER, ESQ. (VIA ZOOM)
        BY: LINDSEY SCARCELLO, ESQ. (VIA ZOOM)
 9      Wagstaff & Cartmell
        4740 Grand Avenue, Suite 300
10      Kansas City, Missouri 64112
        816.701.1100
11      Tcartmell@wcllp.com
        jhyde@wcllp.com
12
        BY: LEXI J. HAZAM, ESQ. (VIA ZOOM)
13      Lieff, Cabraser, Heimann & Bernstein
        275 Battery Street, 29th Floor
14      San Francisco, California 94111
        415.956.1000
15      Lhazam@lchb.com
16      BY: ALEXANDRA WALSH, ESQ. (VIA ZOOM)
        Anapol Weiss, LLP
17      14 Ridge Square, NW, 3rd Floor
        Washington, DC 20016
18      771.224.8065
        Awalsh@anapolweiss.com
19
        BY: GRACE QUINLAN, ESQ. (VIA ZOOM)
20      BY: KIRK GOZA, ESQ. (VIA ZOOM)
        Goza & Honnold, LLC
21      900 Nall Avenue, Suite 400
        Overland Park, Kansas 66207
22      913.451.3433
23
24
25
```

Page 3

```
 1  For the Witness, Arturo Bejar:
 2      BY: MICHAEL W. WARD, ESQ.
        BY: CHINMAYI MANJUNATH, ESQ.
 3      Baker Botts LLP
        1001 Page Mill Road
 4      Building One, Suite 200
        Palo Alto, California 94304-1007
 5      650.739.7500
        Michael.ward@bakerbotts.com
 6      Chinmayi.manjunath@bakerbotts.co
 7
 8  For the Defendants Meta Platforms, Inc., f/k/a
    Facebook, Inc.; Facebook Holdings, LLC; Facebook
 9  Operations, LLC; Facebook Payments, Inc.; Facebook
    Technologies, LLC; Instagram, LLC; Siculus, Inc.;
10  and Mark Elliot Zuckerberg:
11      BY: PHYLLIS A. JONES, ESQ.
        BY: CECILIA BOBBITT, ESQ.
12      BY: PATRICK NUTTER, ESQ.
        BY: MARIAH K. WATSON, ESQ. (VIA ZOOM)
13      BY: GAVIN JACKSON, ESQ. (VIA ZOOM)
        BY: HUNTER BJAZEVICH, ESQ. (VIA ZOOM)
14      BY: CONNOR KENNEDY, ESQ. (VIA ZOOM)
        BY: PAUL SCHMIDT, ESQ.
15      Covington & Burling LLP
        OneCity Center
16      850 Tenth Street, NW
        Washington, DC 20001-4956
17      202.662.6000
        Pajones@cov.com
18
        BY: KATHRYN WALKER, ESQ. (VIA ZOOM)
19      Bass Berry & Sims
        21 Platform Way South, Suite 3500
20      Nashville, Tennessee 37203
        615.742.7855
21      Kwalker@bassberry.com
22      BY: MEREDITH MANDA, ESQ. (VIA ZOOM)
        BY: ALYSSA J. METCALF, ESQ. (VIA ZOOM)
23      Davis Polk & Wardell LLP
        450 Lexington Avenue
24      New York, New York 10017
        212.450.3563
25      Meredith.manda@davispolk.com
```

Page 4

```
 1  For the State of Indiana:
 2      BY: CORINNE GILCHRIST, ESQ. (VIA ZOOM)
        Office of the Attorney General Todd Rokita
 3      302 W Washington Street, Suite 5
        Indianapolis, Indiana 46204
 4      317.232.6201
        Corinne.gilchrist@atg.in.gov
 5
 6
    For the State of New York:
 7
        BY: NATHANIEL KOSSLYN, ESQ.
 8      Office of the Attorney General of New York
        28 Liberty Street
 9      New York, New York 10005
        800.771.7755
10      Nathaniel.kosslyn@ag.ny.gov
11
12  For the State of West Virginia:
13      BY: ABBY CUNNINGHAM, ESQ. (VIA ZOOM)
        Office of the West Virginia Attorney General
14      1900 Kanawha Boulevard, E
        Room 26
15      Charleston, West Virginia 25305
        Abby.g.cunningham@wvago.gov
16
17
    For the State of Massachusetts:
18
        BY: DOUG MARTLAND, ESQ.
19      BY: CHRISTINA CHAN, ESQ.
        BY: CORY TASLEY (VIA ZOOM)
20      Office of the Attorney General
        State of Massachusetts
21      1 Ashburton Place, 20th Floor
        Boston, Massachusetts 02108
22      617.727.2200
23
24
25
```

Page 5

```
 1  For the State of Tennessee:
 2      BY: BRIAN PHELPS, ESQ.
        BY: CHRIS DUNBAR, ESQ.
 3      BY: ELIZABETH SPICA, ESQ. (VIA ZOOM)
        BY: SHANTE PICHE (VIA ZOOM)
 4      BY: KEATON MURPHY, ESQ. (VIA ZOOM)
        State of Tennessee
 5      Attorney General
        UBS Tower
 6      315 Deaderick Street
        Nashville, Tennessee 37243
 7      615.741.3519
 8
 9  For the State of Arkansas:
10      BY: AELISH BAIG, ESQ. (VIA ZOOM)
        Robbins Geller Rudman & Dowd LLP
11      One Montgomery Street, Suite 1800
        San Francisco, California 94104
12      415.288.4545
        aelishb@rgrdlaw.com
13
14
    For Defendant Snap:
15
        BY: PRISCILA CORONADO, ESQ. (VIA ZOOM)
16      BY: MAGGIE BUSHELL, ESQ. (VIA ZOOM)
        Munger, Tolles & Olson LLP
17      350 South Grand Avenue, 50th Floor
        Los Angeles, California 90071
18      213.683.9239
        Priscila.coronado@mto.com
19
20
    For the Defendants TikTok, Ltd.; Tiktok, LLC;
21  Tiktok, Inc.; ByteDance Ltd.; and ByteDance, Inc.:
22      BY: LENNETTE LEE, ESQ. (VIA ZOOM)
        King & Spalding LLP
23      633 West Fifth Street, Suite 1600
        Los Angeles, California 90071
24      213.218.4011
        Llee@kslaw.com
25
```

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

```
 1  For the Plaintiffs:
 2      BY: LANCE OLIVER, ESQ. (VIA ZOOM)
        BY: ANNIE E. KOUBA, ESQ. (VIA ZOOM)
 3      BY: JODI FLOWERS, ESQ. (VIA ZOOM)
        BY: PREVIN WARREN, ESQ. (VIA ZOOM)
 4      Motley Rice LLC
        28 Bridgeside Boulevard
 5      Mt. Pleasant, South Carolina 29464
        843.216.9057
 6
 7
    For the State of Connecticut:
 8
        BY: TESS SCHNEIDER, ESQ. (VIA ZOOM)
 9      Office of the Attorney General
        165 Capitol Avenue
10      Hartford, Connecticut 06106
        860.808.5318
11
12
    For State of California:
13
        BY: MEGAN O'NEILL, ESQ. (VIA ZOOM)
14      California Department of Justice
        Office of the Attorney General
15      455 Golden Gate Avenue, Suite 11000
        San Francisco, California 94102-7004
16      415.510.4400
17
18  For the State of New Jersey:
19      BY: VERNA PRADAXAY, ESQ. (VIA ZOOM)
        BY: MANDY WANG, ESQ. (VIA ZOOM)
20      Assistant Attorney General
        State of New Jersey
21      124 Halsey Street, 5th Floor
        Newark, New Jersey 07102
22      609.712.2828
23
24
25
```

Page 7

```
 1  For the State of Arizona:
 2      BY: NATHAN WHELIHAN, ESQ. (VIA ZOOM)
        Office of the Attorney General
 3      2005 N. Central Avenue
        Phoenix, Arizona 85004
 4      602.542.5025
 5
 6  For the Plaintiffs:
 7      BY: PAIGE BOLDT, ESQ. (VIA ZOOM)
        Watts Guerra, LLP
 8      4 Dominion Drive, Building 3, Suite 100
        San Antonio, Texas 78527
 9      210.448.0500
10
11  Also present:
12    Hayley Chang, Meta (VIA ZOOM)
      Tyler Smith, Meta
13    Jim Lopez, trial tech
      Chris Reynolds, trial tech
14    James Vonwiegen, videographer
      Tara Lamer (VIA ZOOM)
15    Nicole Lopez (VIA ZOOM)
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
 1          INDEX OF EXAMINATIONS
 2
 3  EXAMINATIONS                      PAGE
 4  MR. CARTMELL                      11
 5
 6
 7
 8          INDEX OF EXHIBITS
 9  NO.         DESCRIPTION          PAGE
10  Bejar       Photograph           21
    Exhibit 1
11
    Bejar       The Wall Street Journal, His    23
12  Exhibit 2   Job was to Make Instagram Safe
                for Teens. His 14-year-old
13              Showed Him What the App was
                Really Like
14
    Bejar       E-mail, 5/22/2014, To:        57
15  Exhibit 3   ████ From: ████,
16              Subject: Bullying Prevention
                Centre Launch Coverage,
                META3047MDL-065-00002727
17
    Bejar       The New York Times, Meet      59
18  Exhibit 4   Facebook's Mr. Nice
19  Bejar       Memo, 8/15/2019, Chat with    77
    Exhibit 5   Arturo Bejar,
20              META3047MDL-046000099995
21  Bejar       Random Meeting Notes, 10/16,  79
    Exhibit 6   Chat with Arturo,
22              META3047MDL-020-00612694
23  Bejar       E-mail, 8/27/19, To: Arturo   92
    Exhibit 7   Bejar, From: ████,
24              Subject: Re: Next Steps,
                BEJAR0000004
25
```

Page 9

```
 1  Bejar       Arturo Conversion (Internal   97
    Exhibit 8   Version),
 2              META3047MDL-047-00060085
 3  Bejar       Negative Experiences Survey - 118
    Exhibit 9   October 2019 Edition,
 4              META3047MDL-059-00000216
 5  Bejar       Factors that Cause Meta's     144
    Exhibit 10  Instagram App to be Unsafe for
 6              Kids
 7  Bejar       Slipsheet                     191
    Exhibit 11
 8
    Bejar       List of videos                196
 9  Exhibit 12
10  Bejar       Slipsheet                     198
    Exhibit 13
11
    Bejar       Instagram Community Guidelines 208
12  Exhibit 14  FAQs, April 19, 2018
13  Bejar       Slipsheet                     217
    Exhibit 15
14
    Bejar       Slipsheet                     233
15  Exhibit 16
16  Bejar       Instagram Bad Experiences     235
    Exhibit 17
17
    Bejar       E-mail, 1/13/2020, To: ████   243
18  Exhibit 18  ████ From: Arturo Bejar,
                Subject: Fwd:
19              Reporting/Bullying Catching
                Up, META3047MDL-014-00014758
20
    Bejar       "Bad Experiences" Measurement, 255
21  Exhibit 19  Plan for a 2021 Plan
22  Bejar       E-mail, 12/19/2020, To: Arturo 274
    Exhibit 20  Bejar, From: Miki Rothschild,
23              Subject: Re: Update Since We
                Spoke META3047MDL-031-00077850
24
25
```

3 (Pages 6 - 9)

Page 10

1  Bejar      Bad Experiences and Encounters  284
   Exhibit 21   Framework (BEEF) Survey,
2            META3047MDL-004-00015029
3  Bejar      Which Specific Emotions Did    293
   Exhibit 22   you Feel: Please select All
4            That Apply,
             META3047MDL-034-00504794
5
   Bejar      Slipsheet                       316
6  Exhibit 23
7  Bejar      Slipsheet                       323
   Exhibit 24
8
   Bejar      How Prevalent Were Adult        332
9  Exhibit 25   Nudity and Sexual Activity
             Violations?
10
   Bejar      How Prevalent Were Bullying     338
11 Exhibit 26   and Harassment Violations?
12 Bejar      How Prevalent Were Child        341
   Exhibit 27   Endangerment Violations?
13
   Bejar      How Prevalent Were Suicide and  343
14 Exhibit 28   Self-Injury Violations?
15
16
17
18
19
20
21
22
23
24
25

Page 11

1        THE VIDEOGRAPHER:  We're now on the
2  record.  My name is James Vonwiegen.  I'm a
3  videographer for Golkow.
4        Today's date is April 7, 2025, and the
5  time is 9:20 a.m.                        0
6        This video deposition is being held in
7  Palo Alto, California, in the matter of Social Media
8  MDL 3047, State of Tennessee versus Meta Platform's
9  Inc., for the Superior of the State of California
10 for the County of Los Angeles.
11       The deponent is Arturo Bejar.
12       Counsel will be noted on the stenographic
13 record.
14       The court reporter is Elaina Bulda-Jones,
15 California CSR 11720, who will now swear in the
16 witness.
17       ARTURO BEJAR,
18 called as a witness by the Plaintiffs herein, being
19 first duly sworn by the Certified Shorthand Reporter
20 was thereupon examined and testified as is
21 hereinafter set forth.
22          EXAMINATION
23 BY MR. CARTMELL:
24 Q.  Good morning, Mr. Bejar.
25 A.  Good morning.

Page 12

1  Q.  How are you today?
2  A.  I'm good.  Good.  Thank you.
3  Q.  My name is Tom Cartmell.  We have never
4  met in person, but we have met formerly or before on
5  Zooms; is that right?
6  A.  That's correct.
7  Q.  Okay.  You are here today in Palo Alto for
8  us to take your deposition; is that right?
9  A.  That's correct.
10 Q.  And is it true that you are a former
11 employee of Meta?
12 A.  That's correct.
13 Q.  And is it true that when you were working
14 at Meta, you were working in the area of online user
15 safety?
16 A.  That's correct.
17 Q.  Did that include work on -- in online user
18 safety for kids?
19 A.  It did, yes.
20 Q.  Okay.  As I said, my name is Tom Cartmell.
21 I represent families of kids and kids who have
22 actually filed a case against Meta and other social
23 media companies claiming that they have been harmed.
24       Do you understand that?
25 A.  I do.

Page 13

1  Q.  In addition, I represent school districts
2  across the country who allege that the epidemic of
3  social media use among kids has seriously damaged
4  the school environment and harmed the ability to
5  properly educate kids.
6       Do you understand that?
7  A.  I do.
8  Q.  Okay.  The kids and schools that I
9  represent are -- have a common interest with the
10 Attorney Generals across the country, who are also
11 suing Meta as well as other social media companies.
12 But I don't represent any of the states; although,
13 there are other attorneys here who do represent the
14 states, and they may ask you questions later.
15       Do you understand that?
16 A.  I do.
17 Q.  Okay.  Now, have you had a deposition
18 taken before today?
19 A.  I have, yes.
20 Q.  I think you were deposed, actually, in the
21 action that the Federal Trade Commission has against
22 Meta; is that right?
23 A.  That's correct.
24 Q.  Okay.  You understand today that you are
25 under oath, I take it?

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

1    A.  I do.
2    Q.  And do you understand that that oath is
3 the same as if you were sitting in a courtroom
4 testifying?
5    A.  I do.
6    Q.  Okay.  Let's talk a minute about some
7 things we can do today to make this run more
8 smoothly.
9        One of those is, if you can try to make
10 your -- your answers audible and -- rather than
11 uh-huh or huh-uh, that sort of thing, that would be
12 very helpful to Elaina over here, who is our court
13 reporter.  Okay?
14    A.  I will do my best.  And if I forget,
15 please remind me.
16    Q.  Fair enough.  The other thing is,
17 I'll try not to interrupt you.  A lot of times in
18 normal speech we do that.  I would appreciate it if
19 you tried to let me get my question out before you
20 answer.  We will work together to make sure they --
21 that we do that for Elaina as well.  But there may
22 be times when I have to restate or rephrase a
23 question.
24        Do you understand that?
25    A.  I do.

Page 15

1    Q.  Okay.  And then lastly, you can take a
2 break any time you want today.  I would ask that if
3 there is a pending question, that we answer the
4 question before we take a break.  But honestly, for
5 any reason, if you feel like you need a break, just
6 tell your attorney sitting next to you, Mr. Ward,
7 and we will take a break.
8    A.  Thank you.
9    Q.  Okay.  You are here, as I mentioned, with
10 your lawyers today.
11        Michael Ward, Mr. Ward, is he your lawyer?
12    A.  Yes, he is.
13    Q.  He's from the law firm of Baker Botts; is
14 that right?
15    A.  Correct.
16    Q.  Okay.  And did you meet with Mr. Ward and
17 other lawyers from his law firm to prepare for your
18 deposition today?
19    A.  I did, yes.
20    Q.  Okay.  Now, you and I have met before on
21 Zooms -- I think I mentioned that before -- correct?
22    A.  That's correct.
23    Q.  We have never met in person before
24 today; is that right?
25    A.  That's correct.

Page 16

1    Q.  When I met with you over Zooms, you were
2 always with your lawyers.  In other words, your
3 lawyers were always present as well; is that fair?
4    A.  That's correct.
5    Q.  And then during those Zooms there were
6 also many other lawyers from state Attorney
7 Generals' Offices; is that right?
8    A.  That's correct.
9    Q.  Do you remember that there were lawyers
10 from the Massachusetts Attorney General's Office?
11    A.  Yeah, I believe so.  Like, I didn't really
12 track which offices everybody was -- I just trusted
13 the process.
14    Q.  Okay.  In other words, there were lots of
15 different lawyers that you talked to before this
16 deposition, some from Attorney General's Office,
17 some from my office and other law firms; is that
18 fair?
19    A.  That's fair.
20    Q.  But at all times your lawyers were there
21 as well?
22    A.  At all times.
23    Q.  Okay.  Now, let me ask you, has anybody
24 ever told you at any time to do anything during this
25 deposition other than tell the truth?

Page 17

1    A.  No.
2    Q.  And is anybody compensating you to be here
3 to testify?
4    A.  No.
5    Q.  I want to talk about your background at
6 Meta and your work in some detail, but first I want
7 to ask you some specific questions.
8        First, do you have expertise in the area
9 of social media user safety?
10    A.  I do, yes.
11    Q.  And how many years have you worked in that
12 area?
13    A.  I mean, I think if we go from today, it
14 would go back to 1994.  So that would be, like,
15 30 years, give or take.
16    Q.  Would that area that would -- strike that.
17        Would that area include the safety of kids
18 on social media?
19    A.  Yes, it would.
20    Q.  And how did -- strike that.
21        Did you work at Meta in the area of online
22 safety and security?
23    A.  Yes, I did.
24    Q.  Including online safety and security of
25 kids?

CONFIDENTIAL

Page 18

1    A.  Yes.
2    Q.  Did your work at Meta include assessing
3  whether Meta was adequately protecting and
4  preventing harms to kids on Meta's social media
5  apps?
6    A.  Yes.
7    Q.  And did your work include making
8  recommendations to Meta's senior leadership about
9  how to protect kids and prevent harms on Meta's
10 social media apps?
11   A.  Yes, I did.
12   Q.  How long did you work on social media
13 safety and security at Meta?
14   A.  My first stint there was six years, and
15 then I came back and I worked on that for another
16 three years.
17   Q.  So eight years total?
18   A.  Eight years total, yeah.
19   Q.  Are you prepared today to talk about your
20 work in safety and security at Meta?
21   A.  I am, yes.
22   Q.  Are you also prepared today to discuss
23 your assessment as to whether Meta's Instagram
24 platform is safe for kids?
25   A.  I am, yes.

Page 19

1    Q.  Right up front I want to ask you, based on
2  your 30 years of experience as a user safety and
3  security expert, including your eight years of work
4  at Meta, what is your assessment as to whether Meta
5  adequately protects kids on its social media app
6  Instagram?
7    A.  Meta does not adequately protect kids on
8  Instagram.  And I believe that's true today.
9    Q.  Now, while you were working at Meta as its
10 online safety expert, did you take those concerns
11 for the safety of kids of Meta's Instagram --
12 related to Meta's Instagram app all the way to the
13 highest level of the company?
14   A.  I did, yes.
15   Q.  All the way to the highest executives of
16 the company?
17   A.  Yes.  I took them to Mark Zuckerberg and
18 Sheryl Sandberg and Adam Mosseri and people who lead
19 the company.
20   Q.  Did you tell Mr. Zuckerberg that you
21 thought Meta did not adequately understand the harms
22 that Instagram users, including kids, were
23 experiencing?
24   A.  Yes, I did.
25   Q.  What did you tell Mr. Zuckerberg as far as

Page 20

1  whether Meta was adequately protecting kids from
2  harm on Instagram?
3    A.  That you cannot adequately protect kids if
4  you don't understand the harm that they are
5  experiencing, so they were not adequately protecting
6  kids.
7    Q.  Let me ask you, did he respond to you?
8    A.  He didn't respond to me.
9    Q.  Have you formed an opinion about whether
10 or not Meta executives prioritized growth and
11 engagement of Instagram over the safety of the
12 users?
13   A.  I have, yes.
14      MS. JONES:  Excuse me, Mr. Bejar.
15      Objection.  Foundation.
16      You can go ahead.
17 BY MR. CARTMELL:
18   Q.  What is your opinion?
19   A.  I believe that growth and engagement are a
20 top priority and that safety is an afterthought.
21   Q.  Now, since you left Meta, have you told
22 people outside of Meta that Meta does not adequately
23 protect kids from harms on Instagram?
24   A.  I have, yes.
25   Q.  Have you been subpoenaed by witnesses,

Page 21

1  including Attorney Generals -- strike that.
2      Have you been subpoenaed by Attorneys
3  General from different states to give testimony
4  about Meta's safety and practices with respect to
5  Meta?
6    A.  I have, yes.
7    Q.  Were you subpoenaed to testify at a
8  congressional hearing about your experience and
9  knowledge related to Meta's protections of kids on
10 social media?
11   A.  I was, yes.
12      (Whereupon, Meta-Bejar Exhibit 1 was
13 marked for identification.)
14 BY MR. CARTMELL:
15   Q.  Handing you Exhibit 1.
16      MS. JONES:  Mike, do you have an extra
17 copy?
18      MR. WARD:  I can send them over.
19      MS. JONES:  That's fine.
20 BY MR. CARTMELL:
21   Q.  Mr. Bejar, what is Exhibit 1?
22   A.  That's me taking the oath in front of the
23 Judiciary Committee.
24   Q.  Where are you?
25   A.  In Washington, D.C., at the Judiciary

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

1 Committee chamber, I believe.
2    Q.   Briefly tell us, what did you tell
3 Congress about whether Meta adequately protects kids
4 from harms?
5       MS. JONES:  I am going to object to this
6 line of questioning based on the narrative.
7       You can answer.
8       THE WITNESS:  I told them that Meta
9 executives were aware of the harms that teens were
10 experiencing on their platform and that they had
11 chosen to not adequately address it, reduce it,
12 understand it.
13 BY MR. CARTMELL:
14    Q.   What did you point out to the Judiciary
15 Committee about whether Meta's public reporting of
16 the safety of Instagram is accurate?
17       MS. JONES:  Same objection.
18       THE WITNESS:  That the public reporting
19 was misleading, that the Transparency Center, the
20 numbers they talked about, they do not convey the
21 harm that people were experiencing on the platform,
22 and they were misleading people and regulators as to
23 the harm that was unfolding there.
24 BY MR. CARTMELL:
25    Q.   Now, had you been interviewed for an

Page 23

1 article by the Wall Street Journal?
2    A.   I was, yes.
3    Q.   Was there actually a feature in the Wall
4 Street Journal article talking about your opinions
5 related to Meta's safety of young kids?
6    A.   Yes.
7       (Whereupon, Meta-Bejar Exhibit 2 was
8 marked for identification.)
9 BY MR. CARTMELL:
10    Q.   I have handed you Exhibit 2, Mr. Bejar.
11       What is Exhibit 2?
12    A.   It is the Wall Street Journal article for
13 which I was interviewed.
14    Q.   Is that article titled "His Job Was to
15 Make Instagram Safe For Teens.  His 14-Year-Old
16 Showed Him What the App Was Really Like"?  Is that
17 the title of the article?
18    A.   Yes, that's the title of the article, and
19 my daughter did show me what Instagram was really
20 like.
21    Q.   We will discuss that.
22       Were you interviewed by the author of this
23 article multiple times?
24    A.   Yes.
25    Q.   And did it truthfully, this article,

Page 24

1 truthfully and accurately reflect your statements
2 about Meta?
3    A.   Yes, it did.
4    Q.   Let me ask you, have you made any money by
5 sharing your knowledge about Meta with the public?
6    A.   I have not.
7    Q.   You don't have any book deal, do you?
8    A.   No, no.
9    Q.   Do you regret going public?
10    A.   No, I think it was important for me to do.
11    Q.   Why is that?
12    A.   I mean, the job is protecting kids, right.
13 And it got to a point where I realized that the most
14 effective way I could serve that, that I could help
15 kids get -- become more protected online was by
16 going public.
17    Q.   We will talk more about that later.  Let's
18 switch gears though -- strike that.
19       Let's switch gears and talk about your
20 background even before Meta in a little more detail.
21       Where are you originally from, Mr. Bejar?
22    A.   I'm originally from Mexico.
23    Q.   Is that where you grew up?
24    A.   Yeah.
25    Q.   Did you graduate from high school in

Page 25

1 Mexico?
2    A.   I did, yeah.
3    Q.   When did you first become interested in
4 computers and working in the technology industry?
5    A.   First interested in computers when I was
6 like 9 or 10.  And my first job in the computer
7 industry was when I was 15, working for IBM in
8 Mexico City.
9    Q.   What were you doing for IBM when were you
10 15 years old?
11    A.   When I first started, I was kind of
12 helping them make presentations and just whatever I
13 could do to help.  I just really wanted to be on the
14 inside.  By the end of my time there, when I was 17,
15 I wrote the system that calculated taxes for payroll
16 for the HR department.
17    Q.   So how long did you work for IBM in Mexico
18 City?
19    A.   I mean, I worked for IBM for like six
20 years total, starting in Mexico City and ending up
21 in the UK.
22    Q.   How did you end up in the UK?
23    A.   I -- at Mexico City I ended up meeting
24 Steve Wozniak, one of the cofounders of Apple.  And
25 I was able to go visit the UK with him, and I

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

1 thought it would be an incredible place to study.
2 And he generously offered to support me in doing
3 that. And so I was able to move to the UK with his
4 support. And I also got a job in IBM in the UK,
5 continuing my work there.
6     Q.   Let me follow up on that. You said you
7 missed -- you met Mr. Wozniak. Was it in Mexico
8 City?
9     A.   That's correct.
10     Q.   What was he doing in Mexico City?
11     A.   He was studying Spanish.
12     Q.   Okay. And how was it that you became
13 acquainted with him?
14     A.   He stayed in a house that belonged to a
15 friend of my father, and my father said Steve from
16 Apple is staying at this house. And I was like,
17 which Steve? There are two Steves, Steve Jobs and
18 Steve Wozniak. And he was like, Steve Wozniak. No.
19 He actually -- my dad didn't tell me which Steve it
20 was.
21     So I called on the phone and I said, Is
22 this Steve? And he was like, Yeah. And I said, Is
23 this Steve Jobs? And he's like, No. It's Steve
24 Wozniak. And I was like, Oh -- I was just really
25 embarrassed.

Page 27

1     And Steve Wozniak, as a geek kid, was like
2 my favorite Steve, because he is the one that came
3 up with the Apple II. So to meet him was an
4 incredible experience to learn from him about what
5 it was like to make computers and dream of what they
6 could do.
7     Q.   Did you develop a friendship with him?
8     A.   I did, yes.
9     Q.   Did he actually offer to pay for your
10 education?
11     A.   He did. I -- when I -- the opportunity to
12 go study abroad came up, I called him and I asked
13 him, Will you help me find somebody -- I'll pay them
14 back -- who can pay for this? And he said, I will
15 do it.
16     Q.   What were the terms, sort of, of that
17 agreement that he would pay for your college?
18     A.   After I graduated and got my first
19 good-paying job, I went back to him and I said, I
20 would like to pay you back. And he said, You don't
21 have to. Just make sure to carry this forward with
22 other people.
23     Q.   Do you feel like you have done that?
24     A.   Yeah. I have continued to do it.
25     Q.   Okay. Let me ask you, so did you get a

Page 28

1 degree from college in the UK?
2     A.   Yes, I did.
3     Q.   Where was that?
4     A.   It was at King's College in London.
5     Q.   Was that in 1993, I believe?
6     A.   That's correct.
7     Q.   What was your degree in?
8     A.   Pure mathematics.
9     Q.   Has Mr. -- strike that.
10     So what did you do after you got your
11 degree at King's College in 1993?
12     A.   So at that point I had been working at
13 IBM. I worked on their research labs in the UK. I
14 got my first internship in a Silicon Valley startup
15 that IBM and Apple had started. And I just really
16 loved the culture here. And so when I graduated, I
17 went back to Mexico for a year so that my wife could
18 finish her degree and then moved immediately to
19 Silicon Valley to start working on a company that
20 was focused on social and security and all of these
21 issues. And that was my first job and that was
22 properly in safety and security space.
23     Q.   So when was it that you came to the
24 Silicon Valley?
25     A.   I believe it was summer of 1993, but it

Page 29

1 might be in '92 sometimes I get them backwards.
2     Q.   And have you essentially lived here in the
3 Silicon Valley ever since?
4     A.   I have, yes.
5     Q.   That first company that you mentioned, did
6 you say that that was a social media company in
7 part?
8     A.   Yeah. Like my internship in '93,
9 actually, was to build distributed systems for
10 cyberspace, so they had little avatars there. And
11 then the company in '94 that was called Electric
12 Communities was focused on security and also the
13 social definition of security, which was my first
14 exposure to that.
15     Q.   Now, I noticed that you don't have a
16 degree in engineering, but did you develop
17 engineering skills?
18     A.   From when I was, like, 10 or 12. So, as I
19 said, IBM hired me as an engineer. They -- I wrote
20 their payroll system. I did engineering internships
21 for IBM in the UK and then Electric Communities
22 hired me as one of their most senior engineers.
23 Kaleida Labs hired me as a first engineering intern.
24 So, yeah, kind of a lifetime of work on it.
25     Q.   How long did you stay working at Electric

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 30

1 Communities, that first job you had out of college?
2     A.   Until 1998.
3     Q.   And then what did you do in 1998?
4     A.   I went over to Yahoo!.
5     Q.   Yahoo!, the current company, the --
6     A.   Yeah.  Yahoo!, the search engine, with a
7 love for purple.
8     Q.   In 1998, how long had Yahoo! been around?
9     A.   Just a few years.  The company was very
10 small.  When I started there, there were like around
11 a hundred engineers.  And I think there might have
12 been, like, 3 or 400 employees total.
13     Q.   And how long -- we will talk about that in
14 more detail.
15         But how long did you end up working at
16 Yahoo!?
17     A.   11 years.
18     Q.   And what was your job title when you were
19 hired at Yahoo!?
20     A.   Technical Yahoo!.  So an engineer.
21     Q.   When we talk about being an engineer, are
22 we talking about you working in computer
23 engineering?
24     A.   That's correct.
25     Q.   Explain what that is, if you don't mind.

Page 31

1     A.   Yeah.  So you write code that then you put
2 on their servers for different purposes, right.  And
3 so there were engineers working on Yahoo! Chat, and
4 they wrote the Chat rooms.  And what I wrote was the
5 security code.
6         And so I wrote code that helped protect
7 against bad things happening.  I also wrote their
8 encryption library, so like how do you store data
9 securely, how do you transmit it securely.  I wrote
10 also the login page.  I wrote their Wallet, so like
11 how you store your credit card and use it for
12 payments.  So those are coding systems for which I
13 was an engineer and eventually an engineering
14 manager of a small team.
15     Q.   Were you the first engineer at Yahoo!
16 dedicated to writing security code?
17     A.   Yes, I was.
18     Q.   What about product security?  Were you
19 also responsible for that?
20     A.   Yeah.  So the job of writing security code
21 turned into the job of watching the security of all
22 of the products at Yahoo!.  So it was Chat secure,
23 Yahoo! Mail secure, Yahoo! Groups secure.  So that
24 was a team I started called The Paranoids.  This
25 team's job was to make sure that every product that

Page 32

1 Yahoo! made was safe for the people who were using
2 it.
3     Q.   So the team you started at Yahoo! that was
4 called The Paranoids, why was it called that?
5     A.   I was concerned, when you come up to
6 people and you say you work in security, that it
7 would be off-putting.  So I tried to come up with a
8 term that would make people kind of smile when you
9 came up.  So my first business cards that Yahoo!
10 printed had the title called Paranoid Yahoo!.  And
11 by the end of my tenure it was, like, in the cost
12 centers and it was in the HR system.  It became a
13 formal title for the company.
14     Q.   Did you ultimately become the chief
15 security officer at Yahoo!?
16     A.   I became the equivalent of a chief
17 security officer.  So eventually I was in charge of
18 the security of the products, the security of the
19 network, so a data center's -- physical security of
20 data center, server security and every aspect that
21 had to do with the business around security, and
22 also dealing with issues like safety, like, for
23 example, if a kid was getting groomed in Yahoo!
24 Mail, if there were viruses, all that stuff would
25 come to our team to work on and help the teams that

Page 33

1 were in Mail, in Groups, and different parts of the
2 company.
3     Q.   Was a significant part of your job at
4 Yahoo! to be involved in protecting kids from a
5 safety standpoint?
6     A.   Yes, absolutely.
7     Q.   Did your work at Yahoo! involve working
8 with the senior executives?
9     A.   Yes.  From very early on, it was either --
10 if there was an incident or something that needed to
11 be looked at, executives would come to me to
12 investigate and to figure out what were accurate
13 things that you could say about what happened.
14         And then, also, I was part of all of, sort
15 of, the leadership meetings, setting strategy,
16 talking about how different groups were performing
17 in their security duties.  And this was to the head
18 of technology, the head of engineering, and frequent
19 interactions with the CEO.
20     Q.   While you were first employed at Yahoo!,
21 were you contacted actually by Meta representatives
22 to come to work at Meta?
23     A.   I was, yes.
24     Q.   Tell us about that.
25     A.   I wanted to give a talk at Stanford

9 (Pages 30 - 33)

CONFIDENTIAL

1 talking about how you protect logins from hackers,
2 and so how do you stay in control of your account
3 even though there might be people trying to get into
4 it. And there were two people from Meta at the
5 talk. And then they told somebody to call me and
6 ask me if I was interested to go work at Facebook at
7 the time.
8     Q. And did you actually accept an offer to go
9 to work at Meta?
10    A. I did, yes.
11    Q. And what year was that?
12    A. That was in 2009.
13    Q. Why was it that you left Yahoo!?
14    A. It was a combination of two things. One
15 of them was the CEO had spoken in front of the whole
16 company and said something derogatory about the
17 team. And this was the first time I had heard that
18 feedback. And, you know, I'm always open, if
19 anything's wrong, tell me, right, and I'll work on
20 it. And I'm not opposed to that being talked about
21 publicly at all. But it shouldn't be the first time
22 to hear from the CEO and then all kinds of something
23 like that. I found it very demoralizing.
24        And that's when the call came in. And I
25 met -- I went to meet with the people at Facebook

1 and I spoke to, like, Schrep, my manager, the CTO.
2 Like all these -- Mark Zuckerberg, Sheryl Sandberg,
3 all these people, and they were really, like,
4 interested -- I was really -- I found what they had
5 to say really interesting and compelling and it
6 seemed to be like a place to go do good work.
7     Q. You were actually interviewed by Mark
8 Zuckerberg?
9     A. I was, yes, in his backyard.
10    Q. And Sheryl Sandberg as well?
11    A. Yeah.
12    Q. Okay. So 11 years, was that the time you
13 spent at Yahoo!?
14    A. That's correct.
15    Q. You saw it grow from what to what, how big
16 was it when you left?
17    A. When I left it was over 10,000 employees.
18        When I started it was, like, a few hundred
19 million -- I think it was like a hundred million
20 people using the product and when I left it was like
21 hundreds and hundreds of millions. And so it was a
22 period of significant growth for the company.
23    Q. Let's talk about your work at Meta.
24        And is it true that you've had two stints
25 at Meta?

1     A. That's correct.
2     Q. The first stint that -- when you worked at
3 Meta, was that from 2009 until 2015?
4     A. That's correct.
5     Q. So six years?
6     A. Yeah.
7     Q. Okay. And then you worked in your second
8 stint from -- at Meta from 2019 to 2021; is that
9 right?
10    A. That's correct.
11    Q. Okay. Let's talk about your first stint
12 starting in 2009. And why don't you just, if you
13 don't mind, just in general tell us about working
14 during that six years at Meta and what you were
15 doing.
16    A. Yeah. So they hired me to manage the site
17 integrity engineering team. And so these are the
18 people that stopped the bad things from happening.
19 So fake accounts, login, spam, like -- like scams,
20 things like that.
21        Within my first year or so, I think after
22 six months, I also got the team that did all of the
23 tools for customer care. So the products, so when
24 you go on the site and you say, I need to report
25 something, that's the product side of customer care.

1 As well as all of the internal tools for customer
2 care so the things you look to review content. And
3 so I got that team.
4        I also got developer tools. I also got
5 one of the engineering teams that built the core
6 infrastructure of Facebook as a product for
7 everything. And I also had responsibilities with
8 security engineering and other aspects of the
9 business.
10    Q. Okay. That's a lot to unpack. So let me
11 go back and follow up with that about -- strike
12 that.
13        Let me go back and follow up on what you
14 just said.
15        But did you start on the engineering side
16 of the company?
17    A. Yes, I started on the engineering side
18 reporting to the CTO.
19    Q. And so were you a senior director at that
20 time?
21    A. I was, yes.
22    Q. Okay. And ultimately, did you become the
23 senior engineer and product leader?
24    A. For protect and care, yes.
25    Q. Okay. Let's go -- let's, if we can, break

10 (Pages 34 - 37)

CONFIDENTIAL

1 it down.
2          You said you were responsible for site
3 integrity. What does that mean?
4      A. Site integrity is stopping spammers,
5 attackers, hackers, people that are trying to put
6 exploitative information on the site.
7          Also, for example, if you got a message
8 for somebody who is trying to trick you into sending
9 them money, that was all things that site integrity
10 protected against.
11      Q. Okay. What about product infrastructure,
12 were you responsible for that?
13      A. I was.
14      Q. What does that mean?
15      A. So if you think of Facebook as sort of the
16 app that you use. And then there's a really big set
17 of databases underneath. Incredible in scope. You
18 have to make sure that you show people the right
19 data, that you don't expose people's privacy.
20          So whenever the product says Tom is coming
21 in, let's give them Tom's information, it goes
22 through a layer of software that makes sure that
23 only the right information gets delivered. That
24 layer in the middle that makes sure that the
25 requests were correct, that's what product

1 infrastructure worked on. It was kind of the
2 foundation of the application.
3      Q. I should have made it clear.
4          But was Facebook the only app that the
5 company Facebook, as it was called at that time,
6 had?
7      A. During my time there, they acquired
8 Instagram and WhatsApp. And Instagram and WhatsApp
9 relied on the safety and security infrastructure
10 that the teams that I managed built.
11      Q. When you were hired in -- let me start and
12 tell you something before.
13          I'm going to refer to the company as Meta
14 today. Is that okay with you?
15      A. Yes, that's okay.
16      Q. And I'm going to refer to them as Meta
17 even when they were Facebook back before 2021. Fair
18 enough?
19      A. I understand.
20      Q. If I'm talking about Facebook, I'll be
21 talking about the Facebook app, okay. So let me
22 make it clear.
23          In 2009, when you were hired by Meta, what
24 was the only app Meta had?
25      A. The Facebook app.

1      Q. And then was it sometime later that
2 actually Meta acquired Instagram?
3      A. That's correct.
4      Q. Okay. Did we talk about security
5 infrastructure?
6      A. No, not yet.
7      Q. Tell me what that entailed as far as your
8 job responsibilities.
9      A. Yes. So security infrastructure is -- is
10 about building technology that was resilient to
11 attacks and misuse. And so what you really want
12 when you're building safety or security features is
13 you want to build something that if it's used in an
14 unexpected way it still protects. So that's an
15 engineering discipline, to build things that way.
16          And so the security infrastructure team
17 built the language on which the Facebook web pages
18 were written, tools that analyzed code, just lots of
19 thing. And the focus was to do that.
20          The other area that was important for
21 security infrastructure is if, for example, you
22 asked for your data to be deleted and there's going
23 to be an auditor to come in and check that it
24 happens. They built the thing that makes sure that
25 your data is deleted in a timely fashion and that if

1 an auditor comes in or a regulator comes in we can
2 demonstrate that that's the case.
3      Q. Those are privacy issues?
4      A. Yeah, privacy and security-related.
5      Q. Now, you mentioned the protect and care
6 team; is that right?
7      A. That's correct.
8      Q. Tell us what the protect and care team was
9 that you started.
10      A. So the idea was to combine into one team
11 what's called site integrity. So security. And
12 then the customer care part, which is how users let
13 you know that something bad has happened and how you
14 use that information to then protect other people.
15 And so protect and care was the group of people that
16 did that job.
17      Q. Tell us what the -- your responsibilities
18 were as the leader and one who started the protect
19 and care team.
20      A. Yes. I managed engineering, product user
21 research, started line manage, data analytics,
22 design, and content. So the language that they use
23 in the app. So all of the disciplines that went
24 into making these products, I managed. And then I
25 would lay out the strategy for the area.

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

1    Then I was responsible for reviewing that
2 with the executive team every six months.  And in
3 the case that there were any issues or incidents
4 that -- things that needed attention, I would get a
5 message from one of the executives.  We would
6 investigate and then we would communicate back to
7 the executive team and the legal team what were the
8 accurate representations that you could make about
9 what happened.
10    Q.  You said you were meeting with senior
11 leadership every -- was it half or quarter?
12    A.  Every half.
13    Q.  And tell us who that was.
14    A.  So that was Mark Zuckerberg, Sheryl
15 Sandberg, Mike Schroepfer, Chris Cox.  Andrew
16 Bosworth when he got to that level.
17    And then -- it's basically a room that's
18 led by Mark, who really sets the strategy and
19 direction for the company, and then all of the most
20 senior leaders in -- across the board.
21    Q.  Okay.  And how big was the company when
22 you started in 2009?
23    A.  Oh, it was so small.  It was 250
24 engineers, give or take.  I think around a thousand
25 people.  I remember because it was a badge of pride

Page 43

1 to say you have one engineer per million users.
2    Q.  I was going to ask you how many users
3 Facebook had when you started, for instance, in
4 2009?
5    A.  Yeah.  When I started they had 250 million
6 active users.
7    Q.  And do you remember what the number of
8 users on Facebook's, the app, was when you left in
9 2015?
10    A.  Yeah, 1.2 billion.
11    Q.  Let's talk first a minute about the care
12 team that you led.
13    Is that the team that actually was working
14 on safety issues for users?
15    A.  That's correct.
16    Q.  And did that team, the care team, actually
17 work on child safety issues?
18    A.  They did, yes.
19    Q.  Did you build what was called a child
20 safety framework?
21    A.  Yeah, yeah, we did at the time.
22    Q.  Tell us about that.
23    A.  So the work was -- so we found that there
24 was an option on reporting called bullying and
25 harassment.  And our tool for teenagers where you

Page 44

1 report issues, the teenagers were not using it.  So
2 one in ten teenagers would go in there and actually
3 tell us what was going on.  And that's pretty bad if
4 one in ten are telling you what's going on.
5    So then we worked with outside experts
6 from Yale and from other universities and we
7 developed this framework, which is pretty simple,
8 which was step number one, are you able to
9 effectively report, let us know what happened,
10 right.  What happened, where it happened, how bad is
11 it, like, how you felt.
12    Number two, you use that information to
13 protect other teens from experiencing the same thing
14 where appropriate.  It depends on the severity.
15    Number three, sometimes you have to give
16 feedback to the people that do the bad stuff.
17    And then number four, you needed to
18 measure how well this tool was working in order to
19 be able to keep track of the program.  And that's --
20 we developed that, we applied it and ran it for a
21 number of years.
22    Q.  The example you just gave involved
23 bullying of teens; is that right?
24    A.  Well, I think that -- that told us what
25 was something going on was the label of bullying.

Page 45

1 But the thing is that's not what the tool was about.
2 The tool was about providing safety across different
3 areas.  So things like self-harm, things like --
4 there were like a variety of topics that we
5 developed in running user research with teenagers.
6    And so I think that the way -- the
7 accurate way to describe those set of tools, it was
8 a framework or a set of tools to help teenagers with
9 the issues that they were dealing with.
10    Q.  What other issues other than bullying, for
11 example, were you working on protecting kids from?
12    A.  Yeah.  So dealt extensively with grooming,
13 for example.
14    Q.  What is grooming?
15    A.  It's when somebody befriends you and in
16 reality they're an adult that's looking to get you
17 to meet with them in order to sexually exploit you.
18 And so they connect to you through messages.  They
19 have a long Chat and eventually at some point they
20 go, oh, how about we meet tonight.  And then, I
21 mean, the most terrible things happen.
22    And so during my time at Facebook -- and
23 this was also something I worked on at Yahoo -- part
24 of the work was how do you recognize people who are
25 trying to groom children.  Looking at the messages

CONFIDENTIAL

Page 46

1  and the kinds of Chat that they did in order to
2  proactively detect them and prevent them.  And also
3  conversations with parents or survivors of these
4  issues so that you can understand how to effectively
5  protect them.
6      Q.   What about -- I think I've seen in the
7  documents that you were involved in dealing with
8  sextortion?
9      A.   Eventually -- we didn't call it that back
10 then.  And so back then what would happen is people
11 would get into your messages and push emotional
12 buttons to get you to send your money.  And that was
13 true probably in the first six months I was there.
14 I remember because of the campus that this was in.
15          And so that -- and these people were based
16 in -- most often in Africa.  And they had a script.
17 And then they dealt directly with getting people
18 emotionally activated and sending money.  And that
19 was something I started working on probably in 2009,
20 early 2010.
21     Q.   The tool that you mentioned and the things
22 that you were doing in order to protect kids, did
23 you find that that safety framework or those tools
24 was successful in reducing or substantially reducing
25 those harms to kids?

Page 47

1      A.   I mean, I think in the case of, for
2  example, grooming, yeah, absolutely, right.  You
3  find these ways to detect people who are doing that.
4  You have a team dedicated to finding those people.
5  You let a kid let you know when it might be
6  happening.  The combination of those things, right,
7  is very effective at reducing these harms.
8          I think for things like the most intense
9  experiences that kids could be having that are
10 related to more like content-based things, the job
11 there that's absolutely critical is you need to make
12 sure that the teenager feels supported, that they
13 were able to tell you what was going on, where it
14 happened, and how bad was it, so that you can offer
15 them immediate support.
16          And that's how you have to design the
17 tools then because if a kid feels really alone, they
18 might, as has happened in recent years too many
19 times, they might commit suicide.
20     Q.   I saw in some of your documents that there
21 was something called compassion work.  Tell us about
22 that.
23     A.   Yeah.  So the compassion work, the basic
24 idea was how well do we understand the harm that
25 people are experiencing.  And so you want to

Page 48

1  research to understand if there's an issue there and
2  then you want to find out how extensive that is.
3          That's also the team that dealt with
4  things like issues like suicidal ideation.  So if
5  somebody's thinking of committing suicide and you
6  notice it's a friend, you not only have to help the
7  person, you also have to help the friend because,
8  like, what do you do, right.  I mean, you're -- you
9  want to help the person that says, hey, I think that
10 Patty might be thinking about doing this.
11         We also dealt with end of life.  So what
12 happens when somebody dies, how do you treat the
13 account respectfully.  And so there was a lot of
14 work around that.
15         So if you think about life and all of the
16 bad stuff that happens in life when you get people
17 together, the compassion team's job was to
18 understand that and develop products that helped
19 with those issues.
20     Q.   Were you in charge of the compassion team?
21     A.   Yes, I was.
22     Q.   Okay.  And were you ultimately responsible
23 at Meta during -- strike that.
24         And what you just talked about, that was
25 all during your first stint, your first six years at

Page 49

1  Facebook?
2      A.   That's correct.
3      Q.   Okay.  And were you ultimately responsible
4  for protecting the safety and security of all users
5  on the Facebook app?
6      A.   On the Facebook app and then as other
7  companies got acquired.
8      Q.   Did you actually develop products that
9  were specifically designed to help keep teenagers
10 safe?
11     A.   Yes, we did.
12     Q.   Have you told us about those or...
13     A.   I mean, I think that, for example, we knew
14 that teenagers were not using the reporting tools so
15 we built a special version for 13- to 15-year-olds.
16 And we went from one in ten finishing -- like,
17 giving us feedback there to eight out of ten giving
18 us feedback there that we could then use to drive
19 every other aspect of the safety program.
20         We also did one for 15- to 16-year-olds.
21 So like a different one for when they were older
22 teenagers.  As well as the things that we did for
23 preventing grooming and understanding the harm that
24 kids were experiencing.
25     Q.   Was that something called teen reporting

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

1 flows?
2     A.  That's correct.
3     Q.  Okay.  We'll talk more about that later.
4         Did you actually, though, build, as a
5 result of the reporting flows, tools that made it
6 easier for teens to report?
7     A.  Yeah, that was one of the key goals for
8 the team.
9     Q.  Okay.  And with respect to that, in other
10 words, teens reporting to Facebook during your first
11 stint, was that actually when you increased the
12 reporting of teens shown to decrease the harm to
13 teens?
14     A.  It was shown to decrease harm on the teen
15 who's submitting the report.  So we studied that
16 with Yale.  And asked the teen how they were feeling
17 better.  Then the feedback mechanism that we used
18 where appropriate.
19         The feedback from that is most people
20 who -- to whom we gave feedback appreciated
21 receiving feedback and were more mindful of the
22 actions that they were taking later on.
23         And then when we used this to detect bad
24 actors, people who were really out to harm, we would
25 then block or checkpoint those people so they

Page 51

1 couldn't take further action.  And so all those
2 measures decreased the harm in this space.
3     Q.  You mentioned doing work during your first
4 stint when you were working at Meta on the Facebook
5 app, doing work with outside experts.  When you say
6 "outside experts," what do you mean?
7     A.  Well, I mean that as an engineering or
8 product manager, which I was, I don't have the
9 expertise to understand what's an effective
10 intervention in like a suicide hotline or what's an
11 effective intervention in an eating disorder center
12 or how you help with a teenager that's dealing with
13 a very distressing experience.
14         What I know how to do is how to build
15 products that people use.  And so what you want to
16 do is you want to take people who have dedicated a
17 lifetime working directly with kids and then put
18 them in the product team, with the engineering team,
19 to get their expertise of how you effectively
20 support a teenager who's dealing with these issues
21 directly.
22         And then you take the product and
23 engineering expertise and combine those and in the
24 process of doing that, you can create tools like our
25 teen reporting tool, which again, was used by a lot

Page 52

1 more teens.  It allowed them to tell us what was
2 happening and how bad it was.  We used that
3 information to help them.  And we used that
4 information to protect other people.
5         And then -- I cannot really stress how
6 important it is to do that because we know that --
7 we learned from talking to these experts from Yale,
8 from Berkeley, from multiple universities across the
9 US, the best that we could find, that teens, when
10 they're young, their brains are developing, and they
11 feel things so intensely so that if something bad is
12 happening and you're a teenager you're likely to be
13 feeling it much worse.  And that puts a lot of
14 responsibility on the tools that you give teenagers
15 when they're dealing with something bad.
16     Q.  When you worked at Meta on the Facebook
17 app for the first six years, was Meta actually
18 willing to be transparent and work with outside
19 experts?
20     A.  They were, yes.  Every six months we held
21 a conference that was engineers and product managers
22 with external researchers.  We published all of the
23 data about which options kids were using on the teen
24 tools that we provided.  And we also talked about
25 the things we got wrong, lessons learned.

Page 53

1         And so there was a -- and I believe that
2 this was essential to the industry.  And this is not
3 a competitive issue.  The job was to be transparent
4 about what's going on for kids, how do we learn of
5 it, how do we make it better, and here's the lessons
6 that we learned in trying to make it better.
7     Q.  As the leader of the protect and care
8 team, was that something, being transparent and
9 working with outside experts, that you made clear
10 was very important to you and for the safety of
11 kids?
12     A.  Most importantly to the safety of kids,
13 yes.
14     Q.  And did you try to promote a culture that
15 would allow for transparency even of data internally
16 that might show there was problems or issues or
17 harms to kids, did you believe that it was important
18 to share that with outside experts?
19     A.  I thought it was essential to share that
20 with outside experts because the -- Meta is at the
21 most extraordinary position of being able to help a
22 teenager at that time at which they ask for help.
23         And so to be able to help academics
24 understand, oh, yeah, these are examples of bad
25 stuff that are kind of lightweight and they happen

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

1 in volume but this is kind of part of the discourse.
2          But for example, this really bad thing
3 where the teenager's telling us they're very afraid,
4 this is what that looks like.  So you know and you
5 can work and you can make it better.  And so you
6 believe it's essential to be transparent.
7     Q.   Does that help actually reduce harm to
8 kids?
9     A.   It does.  Because the more people
10 understand harm as it unfolds on these platforms,
11 the more you can deploy effective ways of preventing
12 it.  It's a cycle.
13     Q.   Okay.  Let me ask you a few more things
14 about your time at Meta during your first stint.
15          How many people reported to you?  And I'm
16 sure it grew over time.
17     A.   Yeah, I mean, I think initially it was
18 around 10 to 15.  And by the time I left I think it
19 was like a few hundred.
20     Q.   And who did you report to?
21     A.   I reported to Mike Schroepfer, who was a
22 CTO of the company.
23     Q.   And who did Mike Schroepfer report to?
24     A.   Mike Schroepfer reported to Mark
25 Zuckerberg.

Page 55

1     Q.   I want to give the jury a little
2 understanding about Meta.
3          And you said when you joined it was in its
4 first five years of existence; is that right?
5     A.   I think it was the -- on the sixth year of
6 existence because we had the sixth birthday party.
7     Q.   Okay.  And Instagram had not yet been
8 acquired by Meta; is that correct?
9     A.   That's correct.
10     Q.   Okay.  And then in 2012, did Meta actually
11 acquire Instagram?
12     A.   They did, yes.
13     Q.   Okay.  Were you involved in the
14 acquisition in any way?
15     A.   Yes, the -- they -- our integrity systems
16 were a big part of the selling point for Instagram
17 to come be part of Facebook or Meta.  And so I
18 remember being part of the due diligence when it
19 came to safety and security.
20     Q.   Okay.  And after Instagram was acquired by
21 Meta in 2012, was Instagram given access to all of
22 the safety and security systems and framework that
23 you had put in place?
24     A.   They did, yes.
25     Q.   Did you work with the Instagram leadership

Page 56

1 once they were acquired related to security and
2 safety?
3     A.   I did, yes.
4     Q.   Tell us about that.
5     A.   Well, whenever something came up, again,
6 part of it was this bad thing is happening, help me,
7 Mike Krieger would write to me asking for help in
8 dealing with issues.
9          I also had many exchanges with Kevin
10 Systrom, the founder, about these kinds of issues.
11 He really cared about trying to make it an
12 environment that was safe.  And so we talked about
13 that.
14     Q.   By the time you left in 2015, do you know
15 whether Instagram had actually implemented the
16 safety infrastructure that you had on Facebook?
17     A.   They had only begun implementing some of
18 the reporting infrastructure.  And so by that I mean
19 being able to, say, report and say the reason why
20 and then have people being able to review content
21 and that basic plumbing.  When we talk about the
22 framework, that had not started, as far as I recall.
23     Q.   Were there times where you were at Meta
24 from 2009 until 2015 that the company puts you sort
25 of out there as the face of the company for media,

Page 57

1 things like that?
2     A.   Yes, there were.
3          (Whereupon, Meta-Bejar Exhibit 3 was
4 marked for identification.)
5 BY MR. CARTMELL:
6     Q.   Take a minute and look at that if you
7 would, Mr. Bejar.  I'm just going to ask you about
8 the first page.
9     A.   Okay.
10     Q.   Mr. Bejar, I've handed you Exhibit 3.
11 This is an e-mail that was produced to us in this
12 litigation from your files.  And it looks like it's
13 an e-mail, at the top, from ██████████, on
14 May 22nd, 2014, to you and lots of others.
15          Do you see that?
16     A.   Yeah.
17     Q.   So this was during your first stint at
18 Meta, right?
19          And the subject of this e-mail is
20 "Bullying Prevention Centre launch coverage."
21          Do you see that?
22     A.   I do.
23     Q.   The e-mail states, "All, We've seen really
24 strong, widespread coverage on the Bullying
25 Prevention Centre launch.  We had the opportunity to

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

1 introduce Arturo to the press in the UK, France and
2 Germany. Below is a summary of the main coverage
3 (but there is so much more!)"
4        Do you see that?
5    A. Yeah.
6    Q. So this Bullying Prevention Centre, tell
7 us about that.
8    A. So the idea was to accompany the teen
9 reporting tools that we had developed. We wanted to
10 create resources for parents, teachers, everybody.
11 Because the idea was, like, we're not just
12 responsible for whatever bullying might play out in
13 the platform. We have a responsibility to the world
14 to help people's understanding of what -- how
15 bullying actually plays out and what were good
16 infrastructure.
17        One of the things that was in the centre
18 that was developed with Yale and translated to many
19 languages were these detailed PDF guides that said
20 if your son has -- or daughter has experienced
21 bullying, here is what you can do. If your son has
22 been accused of -- or daughter has been accused of
23 bullying others, here's what you can do.
24        And we did that because at the time
25 everybody said, well, you know, this stuff has

Page 59

1 happened, you have to have a conversation. But
2 nobody told anybody what conversation to have. So
3 we developed, like, scripts being, like, you know,
4 if you're upset, wait until you talk to your kid.
5        There were really nicely detailed guides
6 that were for teachers, for parents, and for teens
7 with what we knew at the time of how you navigate
8 these issues. And we made that available as
9 downloadable PDFs or whatever was the easiest way to
10 get at it.
11        And then if something was happening in the
12 app that had to do with these things, we would also
13 provide these things as resources so that people
14 would help know how to navigate the circumstance
15 better.
16    Q. And it sounds like that bullying centre
17 received a lot of press recognition; is that right?
18    A. That's correct. That's correct.
19    Q. Were there other times or lots of times
20 when the company would put you forward as the
21 representative talking about safety issues?
22    A. Yes. And I mean, I didn't keep track of
23 all the interviews.
24    Q. Let me hand you Exhibit 4.
25        (Whereupon, Meta-Bejar Exhibit 4 was

Page 60

1 marked for identification.)
2        THE WITNESS: Yeah. There was this
3 interview.
4 BY MR. CARTMELL:
5    Q. Yeah. Let me ask you about Exhibit 4.
6 Exhibit 4 is a New York Times article title of
7 October 22nd, 2014, "Meet Facebook's Mr. Nice."
8        Do you see that?
9    A. I do.
10    Q. Is this an article about you?
11    A. Yes. I was always a little embarrassed
12 about the headline, but yes, it is.
13    Q. Why were you called Mr. Nice?
14    A. I mean, I think that fundamentally in the
15 work that we always did, right, is you -- you have
16 to understand the things that happened to people.
17 You have to respect everybody.
18        So if somebody was saying, like, I'm going
19 to kill you tomorrow and that gets flagged in some
20 way, or somebody posted something that you find
21 really upsetting, everybody deserves to be treated
22 with respect. Everybody deserves feedback, because
23 they might not be aware of the impact of what they
24 were doing.
25        And we found this over and over and over

Page 61

1 in the work that -- working within this framework or
2 methodology was good for the community and well
3 received by every party involved. And so, I mean,
4 that's what the article really talks about, is,
5 like, you know, a lot of the harm, the people that
6 cause it, that's not their intention, and maybe you
7 should let them know that that is the case. Again,
8 not always, because bad stuff happens.
9        And I think that made them put the
10 headline, but I think, as I said, I'm a little
11 embarrassed about the title.
12    Q. It states: Of Facebook's 7,185 employees,
13 Arturo Bejar may have the most difficult job.
14        Do you see that?
15    A. Yeah.
16    Q. Did you think you had a difficult job?
17    A. I thought it was an extraordinary
18 opportunity to be of service to help pay Steve back.
19    Q. When you say Steve --
20    A. Steve Wozniak.
21    Q. Meaning what?
22    A. Well, in all of my time with Steve
23 Wozniak, he was always kind to people and he always
24 was very thoughtful about trying to do the right
25 thing. And he helped anybody that would come up to

16 (Pages 58 - 61)

CONFIDENTIAL

1 him. This random kid from Mexico, right. I mean,
2 why would he support me in, like, paying for my
3 university?
4        And so then I always took the job as an
5 opportunity to help people with the stuff that was
6 going to happen no matter how bad it was. And
7 that's what protect and care was built to do, is to
8 help people with the things that can happen in life.
9    Q.  Have we talked generally, and we can talk
10 more about it later, but about your work that you
11 did during your first stint at Meta related to child
12 safety issues?
13    A.  I think we have talked about it in detail.
14    Q.  Okay. And when you -- strike that.
15        You left Meta in 2015, right?
16    A.  Uh-huh.
17    Q.  Why did you leave?
18    A.  My marriage was -- had fallen apart over
19 the preceding months. And I separated in January.
20 And I was trying to balance parenting and work. And
21 it was really clear to me that I wasn't going to be
22 able to do either of them well enough because of the
23 responsibility of this job.
24        And so I felt that there was a good
25 framework in place. I felt there was a really good

1 team that was tackling these issues in a way that
2 would make me feel good about giving my kids
3 Instagram or Facebook when they were old enough.
4 And so then I left so that I could focus on spending
5 time with my teenagers and sort of look at the rest
6 of my life.
7    Q.  When you left Meta in 2015, how old were
8 your kids?
9    A.  My daughter was 11 and my son was, like,
10 14.
11    Q.  Okay. You mentioned that you felt good
12 about the safety framework that you thought was in
13 place at Facebook; is that right?
14    A.  That's right. I mean, I think for me the
15 work always was creating an environment that would
16 be good for all of our kids.
17    Q.  Just for context, when you left in 2015,
18 was there much competition from the big social media
19 companies like TikTok or Snap, those other companies
20 at that time?
21    A.  No, no. Facebook and Instagram were where
22 it was all at. So Facebook and Instagram were where
23 it was at. Sorry. Like, they were like -- they had
24 won the internet at that point.
25    Q.  At the point you left in 2015, was the

1 Facebook app basically dominating social media?
2    A.  Absolutely.
3        MR. CARTMELL: How long have we been
4 going?
5        TRIAL TECHNICIAN: Hour and two.
6        MR. CARTMELL: Do you mind if we take a
7 break? Ten minutes, real quick?
8        MR. WARD: That's fine.
9        THE VIDEOGRAPHER: The time is 10:22.
10 We're off the record.
11        (Whereupon, a brief recess was taken.)
12        THE VIDEOGRAPHER: The time is 10:38.
13 We're back on the record.
14 BY MR. CARTMELL:
15    Q.  Mr. Bejar, we're back on the record after
16 a short break.
17        Are you ready to proceed?
18    A.  I am ready.
19    Q.  Okay. So we were talking about you
20 leaving Meta in 2015, given the family -- your
21 family circumstances.
22        Do you recall that?
23    A.  I do.
24    Q.  Before we move on I want to ask, though,
25 when you left Meta in 2015 did you feel like you had

1 the trust of the senior executives?
2    A.  Yeah, I did. I had a very moving
3 conversation with Sheryl on the way out. She was
4 very kind and supportive about what I was going
5 through.
6    Q.  And what about with respect to very
7 important, time-sensitive projects that Meta had?
8 Were they -- were you somebody that they trusted
9 with those types of projects?
10    A.  Yeah, absolutely. You mean in my first
11 stint did --
12    Q.  Yes.
13    A.  -- they entrust me with -- like it was
14 something important? Yeah, they did. Yeah.
15    Q.  Why don't you tell us about that?
16    A.  I mean, a couple of examples from my first
17 stint are there was a time at which there were a lot
18 of people upset with Meta because of privacy
19 settings, that the privacy controls were too
20 complicated. I think there was something happening
21 in Canada as well.
22        And Mark decided that they were going to
23 rewrite the code that dealt with privacy and give
24 people a better interface to deal with it, like a
25 master switch that you could be, like, I want to

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

1 take my account from public to private.
2      So they got two of the best engineers in
3 the company, a really -- a product manager named
4 Naomi Gleit. I was the engineering manager in the
5 room. And we had two weeks from, like, when Mark
6 called us to when the company was going to announce
7 this new privacy control. So that was one of the
8 examples.
9      There was also lockdowns, which is sort of
10 the company name for all hands on deck from some
11 part of the company. Mark watches it really
12 closely. And then they were, like, we need to go do
13 something incredibly important in, like, 30 days.
14 And they even had a neon sign for when the lockdown
15 was happening.
16      So there was -- when Google+ came out
17 there was a lockdown. And there were six areas of
18 the company that got tapped to do meaningful work
19 during that time. And I was one of the six leaders
20 that they tapped for dealing with issues of both
21 integrity, as well as what became the compassion
22 work was originated in that lockdown.
23      Q.  When you mention Mark, you are talking
24 about Mark Zuckerberg?
25      A.  Correct. When I say Mark I mean Mark

Page 67

1 Zuckerberg.
2      Q.  And that sort of work that they would task
3 you for, did that give you faith or a belief that
4 actually the senior executives had a lot of trust in
5 you?
6      MS. JONES:  Excuse me. Objection to the
7 foundation.
8      Go ahead.
9      THE WITNESS:  Like, from the interview I
10 had with Mark Zuckerberg throughout the first six
11 years I was there, I felt I had the trust and could
12 approach him; Chris Cox, the head of product; Schrep
13 my manager; directly, Sheryl Sandberg. I could
14 approach any of them at any point. They would
15 approach me whenever they had issues they had to
16 work through. So I felt that there was trust and a
17 good working relationship with all of them.
18 BY MR. CARTMELL:
19      Q.  I want to talk about after you left, but
20 before I do that I want to ask you some questions
21 about your opinions and beliefs that you have as a
22 30-year-plus now online user safety expert. Okay?
23      A.  Correct, yes.
24      Q.  First of all, do you believe it's
25 important for social media companies like Meta to do

Page 68

1 their best to protect kids who are using their
2 social media apps?
3      A.  Yes, I do.
4      Q.  Do you agree that user safety, including
5 teen safety, needs to be the top priority for social
6 media companies like Meta?
7      A.  I do. If you are doing something that you
8 know it's going to be used by teens, you have such a
9 responsibility to make it safe for them.
10      Q.  Let me ask you, do you believe if a social
11 media company like Meta knows that kids are being
12 harmed on its app, the social media company should
13 make its top priority the prevention of those harms
14 to kids?
15      A.  Absolutely.
16      Q.  And should the social media company take
17 swift action to try to prevent those harms to kids?
18      A.  Absolutely.
19      Q.  Let me ask you something about warnings.
20 Tell me if you agree or disagree with this.
21      If a social media company like Meta knows
22 that kids are at risk of harm from use of its apps,
23 should the social media company inform the users and
24 the public about those risks?
25      A.  Yes, I agree.

Page 69

1      Q.  For example, do you believe that if a
2 social media company like Meta knows that its social
3 media app may increase kids' risk of mental health
4 issues, should the social media company inform the
5 public, including parents, about that risk?
6      A.  Yes, they should.
7      Q.  Do you believe it's important that a
8 social media company inform users and the public of
9 the harms its apps cause or contribute to cause so
10 that people can make informed decisions about
11 whether or not to use the social media app?
12      A.  I think it's absolutely essential. Like,
13 as a parent, I want to know how safe something is
14 before I hand it to my kids.
15      Q.  Let's talk about the time that you were
16 away from Meta from 2015 to 2019. Okay?
17      A.  Okay. May I add one quick thing on what
18 you just asked me?
19      Q.  Well, let me ask you a question. Do you
20 have something to add to your last response?
21      A.  I do, yes. I have something to add to my
22 last response.
23      Q.  Go ahead.
24      A.  Which is -- and this is not just specific
25 to safety. I mean, this has been the playbook for

18 (Pages 66 - 69)

Page 70

1  security for as long as I have been in the industry,
2  which is when you are aware that somebody is
3  experiencing a harm, you have to immediately address
4  it. And if you are aware that they got hacked or
5  something bad happened to them, you have to let them
6  know and you have to send -- again, be transparent
7  about these issues. So this is not just specific to
8  safety. It's about security and safety of people
9  online.
10     Q.  When you left Meta in 2015, did you
11 continue to work at all?
12     A.  I did some consulting that would fit
13 within my obligations as a parent.
14     Q.  What type of consulting?
15     A.  Consulting on security and safety. The
16 areas that I have a lifetime of expertise on.
17     Q.  Give us some examples of the type of
18 consulting you did during that time?
19     A.  So Airbnb was, like, starting its efforts
20 for protecting both the people who rent and the
21 people who host. And so they brought me in to talk
22 with, like, the team, the product managers, the
23 engineering managers, and talk about how is it that
24 you could sort of improve those efforts. They also
25 had me mentor their -- the person who was on track

Page 71

1  to be their CSO.
2     Q.  And then you were spending, I take it, a
3  lot of time with your daughter -- daughters and --
4  strike that.
5        And you were spending a lot of time with
6  your kids; is that right?
7     A.  Yeah. I would pick them up from school,
8  help with homework, with my son and my daughter.
9     Q.  At some point did you start thinking about
10 returning to Meta?
11    A.  Yeah, I did.
12    Q.  What gave rise to that?
13    A.  So when my daughter was 14, she went on
14 Instagram. And I would make sure we had, like, a
15 good dialogue about everything that happened to her.
16 And she started to tell me stories about things that
17 she shouldn't be experiencing, like unwanted penis
18 pictures or people asking for sex. And this is when
19 she was 14. And I would ask her what did you do?
20 Did you try to report it? And, I mean, there is a
21 whole arc of things that I discussed with her that
22 happened.
23       And then the other thing is I saw a lot of
24 criticism about the company coming from the outside.
25 And to be honest, I didn't want to be somebody who

Page 72

1  criticized the company from the outside. I wanted
2  to be somebody who kind of went back in and
3  understood what was going on and tried to make it
4  better.
5        And so if I was feeling, like, oh my god,
6  they should be doing this differently, I directed
7  that to going back in and looking at what was going
8  on.
9     Q.  Was your daughter's experience unique? Do
10 you know?
11    A.  No. So one of the most surprising things,
12 when I was first learning of these issues, is I
13 would ask her, well, what about all of your friends?
14 And it turns out that all of her friends were having
15 similar experiences.
16       And so you began getting a glimpse of the
17 life of a teenager within this context. And I would
18 see, like, exchanges happening that would make her,
19 like, really anxious. I would see sometimes
20 somebody would make a comment that she would be so
21 upset, like they would come at me crying. I'm
22 really grateful that she would talk to be about
23 these things because I think a lot of kids don't.
24       And all the time I would be asking, like,
25 did you try reporting them? How is the tool

Page 73

1  helping? How are these things happening? And she
2  tried, and she didn't get any help. There was --
3  she would try reporting these Chats or the things
4  that she was experiencing, and she just wasn't
5  getting any help. And that was important, so
6  important.
7     Q.  Let me ask you that. So you and your
8  daughter would discuss that she needed to report
9  those types of things?
10    A.  Yeah. She would come up to me and say,
11 Dad, like, somebody sent me a message asking for
12 sex, right. Who was it? Oh, it was like a friend
13 of a friend, like a kid in the school nearby. It
14 wasn't like an adult that had slid into her direct
15 messaging.
16       I mean, the way Instagram works is you
17 have a directory with pictures, and then you can be
18 like oh, you're friends with her. I'm going to
19 slide into her DMs, right, to look at the picture,
20 send the message. And that -- you think that that
21 is somebody in another school.
22       And so I kept asking her a little bit more
23 detail. She was like, yeah, you know, it's just a
24 boy in another school, and she is sending me these
25 things. And to be honest, when I started hearing

CONFIDENTIAL

Page 74

1  about the unwanted penis pictures, I was, like, what
2  did you do?  And she said, I tried to report it, but
3  I couldn't.  Like, how come you couldn't.  Tried it.
4       So I sat down with her.  And there was not
5  an option that could say this is an unwanted --
6  like, in language that works for her.  Because we
7  learned the work in the first stint that
8  designing a product that a teenager uses, a key part
9  of that is using the language they use.
10      And so I saw that.  And I was, like, how
11  did you not stop that?  How -- so I asked her, like,
12  what do you do when it happens?  And she was, like,
13  I just block them.  And you think that works?  And
14  she was, like, No.  Because they just move on to the
15  next person and send that.
16      And so it was really -- I don't know --
17  like, I have learned when I was working on all of
18  these issues that if it is happening to one person,
19  it's happening to a million or 2 million or 3
20  million people.
21      Q.  Let me ask you about that.  Your daughter,
22  you said, she would report it, and were they -- my
23  question is were they responding from Meta or not?
24      A.  Most of the time they wouldn't respond at
25  all.  And when they did respond, they would respond

Page 75

1  saying this doesn't violate any of our policies, our
2  community standards or guidelines.
3      Q.  Okay.  Were you keeping in contact with
4  your contemporaries you worked with at Meta during
5  this period of time?
6      A.  I was, yes.  During this time I wrote an
7  e-mail to Schrep and Andrew Bosworth, who I worked
8  with closely, saying I'm really concerned with some
9  of the things I'm seeing, and I'm thinking of
10  sending a note to Mark Zuckerberg outlining some
11  things that could be different to make things
12  better.  So I had that exchange with them.
13      ████████████ who, when I was in my first
14  stint working on protect and care, had been the head
15  of user research for protect and care, reporting to
16  me, had now become the head of user research for
17  Instagram.  And so I would exchange messages with
18  him about his experiences there.  And he was very --
19  very -- he was like, oh you need to come back.  We
20  really need some of the stuff.
21      I mean, and I say you need to come back.
22  The stuff is not about me, right.  It's about sort
23  of how you understand and address harm
24  effectively.  And so Pete told me about that.
25      And I probably had other contacts.  Like,

Page 76

1  when press would contact me, I would contact PR and
2  be, like, is there anything I should know here?  So
3  I would coordinate with their PR while I was not an
4  employee or contractor.
5      Q.  Now, you had not worked really much on
6  child safety at Instagram when you left in 2015,
7  correct?
8      A.  That's correct.  I was focused on
9  Facebook.
10     Q.  Okay.  So let's talk about you returning
11  to Meta.
12         How did that specifically come about?
13     A.  Yeah.  So I believe ████████
14  introduced me to ████████.  And I went to have a
15  conversation with them where I had talked about some
16  of the lessons learned developing the framework that
17  we talked about.  And Yoav was like, oh my god,
18  that's, like, really interesting.  I didn't know
19  anything about this.  Which was I think, in
20  hindsight, a little bit of a -- something to make a
21  note of.
22     Q.  Let me ask you, who was Mr. ████████
23     A.  Yoav ████ was the engineering leader
24  for the well-being team on Instagram.  The
25  well-being team being the team for Instagram that

Page 77

1  focused on these kinds of issues that have to do
2  with the harm that teenagers experience on the
3  platform.
4      Q.  Did you and Mr. ████████ have lunch?
5      A.  I believe so.
6      Q.  And did Mr. ████████ ask you to come talk
7  to his well-being team?
8      A.  Yeah, he did.
9         (Whereupon, Meta-Bejar Exhibit 5 was
10  marked for identification.)
11  BY MR. CARTMELL:
12     Q.  Mr. Bejar, I have handed you Exhibit 5,
13  which is a document that Meta produced in this case
14  from your file.
15         Do you see that?
16     A.  I do.
17     Q.  This is a -- an e-mail from ████████ to
18  several individuals, including Mr. ████████ about
19  the subject "Chat with Arturo Bejar."
20         Do you see that?
21     A.  I do.
22     Q.  This is in August of 2019.  Would that --
23  is that right?
24     A.  That's correct.
25     Q.  Would that be before you returned to Meta?

Page 78

1   A.  Yeah.
2   Q.  It states:  Hi, Well-Being Research fam.
3 Yoav has set up an amazing opportunity for our team
4 to chat with Arturo Bejar, who led Facebook PAC --
5 is that protect and care?
6   A.  Correct.
7   Q.  -- who led Facebook PAC from its beginning
8 for six years.  He has a lot of insight learned
9 across integrity and well-being and has been
10 gracious enough to offer to chat with us about some
11 of those insights, research learnings, and
12 opportunities.  Please try to attend if you can.
13      Do you see that?
14   A.  I do.
15   Q.  And then there is sort of a little bio
16 paragraph about you below that; is that right?
17   A.  That's correct.
18   Q.  Okay.  So this is about a meeting that is
19 going to happen, and you are going to actually go in
20 to Meta and meet with the well-being team; is that
21 right?
22   A.  Yeah.
23   Q.  And did you actually go in and do that?
24   A.  I did, yes.
25   Q.  Now, at this period of time had you made a

Page 79

1 decision yet regarding whether or not you were going
2 to return to Meta?
3   A.  I had not.  I was very open to it, but I
4 had not made the decision yet.
5      MR. CARTMELL:  Let me hand you Exhibit 6.
6      (Whereupon, Meta-Bejar Exhibit 6 was
7 marked for identification.)
8 BY MR. CARTMELL:
9   Q.  Before I ask you about Exhibit 6, let me
10 ask you a few questions.
11      This meeting on August 15th of 2019, if
12 you look back, was ███████ one of the recipients
13 of that invite and attendees?
14   A.  Yes, yes she was.
15   Q.  And do you have a recollection of this
16 meeting that you had inside Meta before you actually
17 went back to work there?
18   A.  I do, yes.
19   Q.  Okay.  Was ███████ there?
20   A.  Yes, she was.
21   Q.  And what was the general nature of why you
22 were going in to talk to the well-being team at Meta
23 in August of 2019?
24   A.  It was to share this framework that we had
25 developed and applied for as part of the protect and

Page 80

1 care team and to talk about lessons learned in
2 developing and applying this framework.
3   Q.  Okay.  If you look at the second page of
4 Exhibit 6, there is actually an -- well, actually --
5 strike that.
6      Let's go back to page 1.  I apologize.
7      Exhibit 6, it states:  Random meeting
8 notes.
9      Do you see that?
10   A.  I do.
11   Q.  Okay.  I will represent to you that
12 this -- these are notes that came out of Ms. ████
13 custodial file.  Okay?  You need to respond.
14   A.  Correct.
15   Q.  Okay.  If you go to the second page, there
16 is actually an entry from August 15th of -- I will
17 tell you that's 2019.
18      Is that consistent with your memory?
19   A.  Yes, it is.
20   Q.  It states:  Well-being research chat with
21 on Arturo Bejar.
22      Do you see that?
23   A.  Correct.
24   Q.  And if you -- take a second if you need
25 to.  If you look at these notes, do they reflect

Page 81

1 sort of the conversation that you were having with
2 the well-being team before you returned to Meta in
3 2019?
4   A.  Yeah, it does.  Right.  I mean, if you
5 have a reporting flowing tool and the action rate is
6 low, you have a bad reporting flow.  I believe that.
7 And I have a lot of experience with that.  Yeah.
8 These are all things that I have been talking about
9 for years.
10   Q.  Okay.  Let's -- strike that.
11      Let me ask you about what you just
12 mentioned.  It's the first bullet point, I think.
13      It says:  If you have a reporting flow and
14 the action rate is low, you have a bad reporting
15 flow.
16      What does that mean?
17   A.  So what it means is that, if you think
18 about a reporting flow, as you are telling the
19 company, like, somebody is selling drugs, for
20 example, and the company reviews the report.  Some
21 of them is going to say there is nothing wrong --
22 there is nothing we can see there that was violating
23 our community guidelines.  In some of the cases they
24 are going to be like, yep, to our definition of our
25 community guidelines, that breaks the rules, and

CONFIDENTIAL

Page 82

1 that is called an action.
2       So if you have like a hundred reports and
3 you act on six or seven of them, that's a low action
4 rate. And usually that means that the reporting
5 tool is wrong in some way.
6       For example, when I was working on these
7 issues on my first stint, we saw that in Latin
8 America the action rate for hate -- somebody saying
9 this is hate speech, right, we all have an idea of
10 that. That was like around 5 percent or 3 -- within
11 3 and 5 percent. And it turns out that where people
12 were reporting were not saying, like, kill this set
13 of people or directed at that. It had more to do
14 with issues around the football team or other areas.
15      And so if you added an option that says
16 this insults something that is really important for
17 me, people use it, and the action rate goes to,
18 like, 30 or 40 percent. And because that's kind of
19 how you know that the right report is in the right
20 place, because it shouldn't be three or five or
21 seven out of a hundred. It should be much higher
22 than that.
23      And so if you have a low action rate, it
24 tells you that you need to go improve the tools you
25 give people to report issues.

Page 83

1    Q. Was it your understanding at this time in
2 August 2019 from the well-being team that in fact
3 Meta on the Instagram app had a low action reporting
4 flow?
5       MS. JONES: Let me object to foundation.
6       THE WITNESS: So before I -- before I
7 started, I had no visibility about that time. All I
8 had was people who had told me that they reported
9 something and no action had been taken.
10 BY MR. CARTMELL:
11   Q. Okay. I understand. So I want to make
12 sure that the jury really understands a reporting
13 flow.
14      Am I right that on the Instagram app there
15 is a mechanism where a kid, for example, if they
16 have a bad experience, something they feel is a
17 negative experience or a harmful experience, they
18 are given an option to report that to the company?
19   A. That's correct. If they are on the
20 Instagram app, if you get a photograph, a video, or
21 a message, you can push something that then brings
22 up the little red report text. You hit that, and
23 you get presented with a menu of things to pick
24 from.
25   Q. Okay. We will talk about that. And what

Page 84

1 you are saying, if I understand, is you are telling
2 the company that you want a high action rate. In
3 other words, you want lots of reporting, because
4 that's important, and then you want the company to
5 take action on those reports.
6       Is that what you were saying?
7    A. Yes, that's what I was saying.
8       MS. JONES: I'm sorry, Mr. Bejar. Just
9 note my objection.
10      THE WITNESS: I'm sorry. I apologize.
11      MS. JONES: No, no. My apologies.
12      Go ahead.
13      Object to the form.
14 BY MR. CARTMELL:
15   Q. You can answer.
16   A. Okay. There are two things that really
17 matter when you look at an application like this,
18 like Instagram, and the reporting functionality that
19 you offer people. One of them is of the people who
20 start, how many complete. And that's a really
21 important number because that tells you people are
22 using the tool.
23      And then the second one is what is the
24 action rate on the things that get submitted to
25 people or computers to review. Because that will

Page 85

1 tell you again -- it's like the canary in a coal
2 mine. It tells you that you might have deeper
3 issues there if the action rate is low.
4    Q. Okay. I want to go down to the middle of
5 the page. It's the second bullet point, the most
6 left bullet point.
7       It says "to get leadership attention."
8       Do you see that?
9    A. I do, yes.
10   Q. It states "to get leadership attention,
11 ask the questions we're afraid to ask - for example,
12 mental health questions, are you lonely, are you
13 using Facebook instead of hanging out with your
14 friends, are you really upset."
15      Do you see that?
16   A. I do, yes.
17   Q. Why are you talking about that?
18   A. Those are, like, the most important
19 questions you have to ask to understand what it is
20 that you need to work on.
21   Q. Now, you say "to get leadership
22 attention," right? Why do you say that?
23   A. The only way, in my experience at Meta, to
24 get things substantially resourced was if you had a
25 very strong case based on data. So if you were able

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

1 to say accurately we asked teenagers using Instagram
2 if they were feeling worse about themselves after
3 spending an hour on the app and, let's say,
4 10 percent of them said yes. That is, like,
5 incredible data that you can then take to an
6 executive and say, hey, we need to work on this.
7      And so you have to ask questions that you
8 might not want to ask about bad experiences or harm
9 so that you can then get representative data that is
10 solid enough to bring to the attention of leadership
11 so that they can resource. And you want to ask
12 these questions over time to know whether the
13 changes that you're doing make these areas better.
14   Q.  You mentioned 10 percent of, for example,
15 kids may have a problem. If that's the case, is
16 that on Instagram millions and millions of kids?
17   A.  Exactly. That's --
18      MS. JONES: Excuse me.
19      THE WITNESS: Sorry.
20      MS. JONES: Objection. Foundation.
21      Go ahead.
22      THE WITNESS: Okay. Sorry. I'll give a
23 little more space.
24      MS. JONES: If you give me a beat, it will
25 help me not interrupt you.

Page 87

1      Go ahead.
2      THE WITNESS: Okay. Will do.
3 BY MR. CARTMELL:
4   Q.  You can answer.
5   A.  Thank you.
6   Q.  You want me to re-ask it?
7   A.  Yes, please.
8   Q.  Okay. And just specifically, you
9 mentioned harms being in the range of 10 percent,
10 that there is data that suggests that. On
11 Instagram, as of this time, that could be millions
12 and millions of kids; is that correct?
13      MS. JONES: Objection to the form. And
14 foundation.
15      Go ahead.
16      THE WITNESS: That's correct. And on
17 Instagram, something that affects 1 percent of teens
18 affects so many kids that it's important to
19 understand it and mitigate it.
20 BY MR. CARTMELL:
21   Q.  You mentioned here, under that,
22 integrity -- strike that.
23      It states, under that, "integrity needs to
24 be woven into the DNA of the company, the way that
25 growth or engagement is."

Page 88

1      Do you see that?
2   A.  I do, yes.
3   Q.  What are you talking about there when you
4 told the well-being team that?
5   A.  So every -- in an app like Instagram, you
6 see the videos, you see photos, you see the little
7 heart at the top, you see messages, all of those are
8 teams of people. And all of those teams of people,
9 they do things -- their compensation is based on how
10 much people use what they build.
11      And so you set goals based on metrics and
12 you say how many people watch this over how much
13 time. How many people clicked on the heart when it
14 turned a little red on top.
15      And so Meta and Instagram are, like, some
16 of the most accomplished people in the world at
17 creating products and features that people want to
18 use. But instead they tap videos that you spend
19 time looking at. And that's woven into how every
20 team works.
21      It was woven there from my very first
22 stint where you send a birthday notification to
23 somebody because you know it will bring them back
24 into the product and they're going to be spending
25 time there. And it was woven to every aspect of the

Page 89

1 Instagram team.
2      Now, I know from my experience working on
3 security at Yahoo! and then my first stint at Meta,
4 that things like safety, security, integrity, they
5 kind of have to be part of the way teams work
6 because otherwise you create attention, right, a
7 push and pull to do things.
8      And so the right way to go about this in
9 terms of prioritization is that if you're developing
10 a product that is recommending videos or something
11 like that, there has to be, like, what are the
12 safety implications of this. It has to be really
13 thought through and it has to be built into the way
14 the thing is built.
15      And that's what I mean by it needs to be
16 woven. It needs to be not just a consideration but
17 one of the core considerations when you're creating
18 something in particular that's going to be used by
19 teenagers, right. I think that the standard is much
20 higher when you know that teens or little kids are
21 going to be using your product.
22      MS. JONES: I'm just going to object to
23 the narrative and to the nonresponsive answer.
24 BY MR. CARTMELL:
25   Q.  Yeah. I'll try to ask you specific

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

1 questions, but let me go back and follow up on that.
2     A.  Yeah.
3     Q.  When you say that -- strike that.
4         When it says here "integrity needs to be
5 woven into the DNA of the company," are you talking
6 about safety?
7     A.  I am, yes.
8     Q.  Okay.  And it says that safety then needs
9 to be woven into the DNA of the company the way that
10 growth or engagement is?
11    A.  That's correct.
12    Q.  Okay.  And at this time you're not back at
13 Meta, right?
14    A.  That's correct.
15    Q.  Do you know at this time whether or not
16 Meta is prioritizing engagement and growth over
17 safety?
18    A.  Not yet.
19    Q.  Okay.  We'll talk more about that.
20        Then you -- if you go down a couple bullet
21 points, the notes state "how do you motivate this
22 work?"
23        Do you see that?
24    A.  I do, yes.
25    Q.  [As read]:

Page 91

1         How do you motivate this work?  Ask people
2 what the worst stuff on Facebook is, what do you
3 hate most about Facebook.  Measure reach of those
4 things.  Show the m-team that people hate those
5 things, that they have high reach, but that they're
6 allowed within policy."
7         Are you referring there in general to
8 understanding the extent of the harm that, for
9 example, kids are having on the app?
10    A.  Yes, I am.
11    MS. JONES:  Counsel, just -- I'm simply
12 objecting because this is a highly confidential
13 document for which Mr. Bejar was not the custodian.
14    (Reporter clarification.)
15    MS. JONES:  I think the guidance from
16 Judge Kahn is that the bounds of the document has to
17 be redacted to the extent that you have not
18 established a foundation for the rest of it.  I
19 don't think it has to happen now, obviously, but
20 just noting that for the record.
21    MR. CARTMELL:  Okay.  Thank you.
22    Q.  Do these notes appear to accurately
23 summarize the meeting you had with the well-being
24 team at Meta in August of 2019?
25    A.  They do.

Page 92

1     Q.  Remind us the date that you started your
2 second stint at Meta.
3     A.  It was, I believe, in October of 2019.
4         (Whereupon, Meta-Bejar Exhibit 7 was
5 marked for identification.)
6 BY MR. CARTMELL:
7     Q.  Following your meeting that you had with
8 the well-being team at Meta in August of 2019, did
9 you then start having conversations with Meta
10 representatives about returning to work?
11    A.  I did, yes.
12    Q.  I've handed you Exhibit 7, which is an
13 e-mail string that was provided to us by Meta in
14 this litigation from your files.  Take a second if
15 you need to but I want to ask you some questions
16 about -- strike that.
17        I was just pointed out something.
18        Let me ask the question again.
19        I'm handing you Exhibit 7, Mr. Bejar,
20 which is an e-mail string between you, it looks
21 like, and ██████████.
22        Do you see that?
23    A.  I do, yes.
24    Q.  And the date is August 27, 2019?
25    A.  That's correct.

Page 93

1     Q.  The subject is "Next steps."
2         Do you see that?
3     A.  I do, yes.
4     Q.  This was, I believe, produced by you in
5 this case.  Is that your understanding?
6     A.  Yes.
7     Q.  Okay.  Let me ask you some questions about
8 this first e-mail from you to Mr. █████ --
9 actually, I want to go to the second page.
10        The date is August 27, 2019, and you are
11 e-mailing Mr. █████ "Next steps," right?
12    A.  Yeah, I am.
13    Q.  It states, "Hi █████ I wanted to follow up
14 on the visit, I think in hindsight my listening to
15 speaking ratio might have been off."
16        What did you mean by that?
17    A.  I mean that -- the work in the space is
18 primarily about listening and understanding.  And I
19 was worried that I spent too much time talking about
20 my prior experience and not enough time listening
21 and understanding their experience.
22    Q.  You say, "If you and the teams are
23 interested, I would like to visit again with the
24 goal to listen and ask questions.  I would also like
25 to continue the conversation you and I started.

CONFIDENTIAL

Page 94

1     "Also, if there is interest in deeper
2 engagement, including some of the folks I know who
3 would be helpful, we can discuss that too."
4     Do you see that?
5     A. I do, yes.
6     Q. The conversation that had been started,
7 what do you recall about that?
8     A. It was about me coming back in in some
9 form or shape that would work for everybody.
10     Q. If you go to the response on the first
11 page from Mr. ███ to you, he states "Hi! Thanks
12 for reaching out! We'd love to engage formally and
13 more. I got amazing feedback from the teams. Your
14 ratio and everything else was fine."
15     That's his response to you; is that right?
16     A. That's correct.
17     Q. Okay. And then did you all start talking
18 about a consulting arrangement?
19     A. Yes, we did.
20     Q. Tell us about that.
21     A. Yeah. The idea was for me to go back in
22 part time and work with different people in the
23 well-being team working on the topics that had been
24 covered in that lunchtime meeting that I had with
25 them. So taking advantage of the lessons that we

Page 95

1 had learned at the company working on these issues
2 in my first stint. And then helping mentor young,
3 smart, really talented people who cared about this
4 stuff in how to navigate being a successful worker
5 in this field.
6     Q. And why was it at this time that you were
7 interested in going back to Meta after four years
8 being away?
9     A. It was a combination of the experience
10 that my daughter was having, some of the things I
11 was seeing in the news, and I was kind of really
12 feeling that there was something that wasn't quite
13 right because things that I would have expected or
14 hoped the company would do well or help with in
15 terms of reporting tools and -- and the things
16 that -- the tools I gave kids, like my daughter and
17 other kids.
18     And so I wanted to start by listening,
19 right. You can't go back into this -- yeah.
20     Q. Well, let me ask you this, was one of your
21 goals when you were going to return to Meta to try
22 to help increase safety measures on Instagram for
23 kids?
24     A. Absolutely.
25     Q. Okay. If you go to the top of the second

Page 96

1 page, you and Mr. ███ are talking about setting
2 up a contract for you to consult.
3     And you say "it takes time to get the
4 contract set up, we can spend time at no charge
5 until the contract comes through (so there is no
6 conflict with retroactive fees), so that we can move
7 fast and support the work that is going on, which is
8 the most important thing."
9     What did you mean by that?
10     A. I wanted to start as soon as they could
11 have me because this stuff is time-sensitive and the
12 earlier you start working on it, the more you can
13 do.
14     Q. You mentioned that there were things in
15 the news that -- about Meta that helped influence
16 you or make you decide to go back.
17     What were those things?
18     A. I had begun seeing reports of addiction
19 and kids having -- experiencing harm out of the time
20 that they spent and some of the things that they
21 were experiencing in the product.
22     I was also really worried about
23 divisiveness in other areas. And so I was really --
24 I mean, I think, as I had said before, like, you
25 kind of have a responsibility to do these things,

Page 97

1 understand them, make future changes that make them
2 better. And I wasn't seeing that from the outside
3 so I wanted to go back in and understand and help
4 that.
5     Q. What was your understanding as to why Meta
6 wanted to hire you back?
7     A. I mean, I was an expert in the field at
8 this point. Like, even the first time they hired
9 me, I had a ton of experience already. So I think
10 they wanted the experience that I had and the
11 knowledge that I had in order to help the well-being
12 team.
13     (Whereupon, Meta-Bejar Exhibit 8 was
14 marked for identification.)
15 BY MR. CARTMELL:
16     Q. Why don't you take a minute to look at
17 Exhibit 8.
18     A. I'm going to have to get my reading
19 glasses at some point.
20     Q. Mr. Bejar, I've handed you Exhibit 8, and
21 this is a document that was produced by Meta in this
22 litigation. I want to ask you these questions. But
23 do you believe you have seen this document before?
24     A. Yeah, I believe I have.
25     Q. Okay. And do you believe that you may

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

1  have been involved in reviewing this document as of
2  the time back in 2021 when this was put together?
3      A.  Yes.
4      Q.  If you look at the last page, the date,
5  the first entry at the bottom is, ███████,
6  created the document March 2nd, 2021.
7          Do you see that?
8      A.  I do, yes.
9      Q.  Who is Mr. ████?
10     A.  ████████ was the head of engineering
11  for a good part of the Instagram engineering team.
12  He was Yoav's manager.  And he was -- when I came
13  back I was reporting to him as -- in my contracting
14  role.  And I had known him from my first stint.
15     Q.  What is your understanding of what this
16  document is?
17     A.  So initially, my engagement was supposed
18  to be six months' long.  And then it became a year.
19  And it kept getting extended.  But it is my
20  understanding that in California you can only do
21  that for so long before things get complicated for
22  the company.  And so this was I think at 18 months
23  in, they asked the question of what if we are able
24  to turn you into a part-time employee so you can
25  continue the work ongoing.

Page 99

1      Q.  So let me ask you, I want to make this
2  clear for context, you said you started back at Meta
3  in October of 2019; is that right?
4      A.  Correct.
5      Q.  And you had been gone from the company I
6  think since June of 2015; is that right?
7      A.  Correct.
8      Q.  And then you ended up working for Meta for
9  the next two years; is that right?
10     A.  Correct.
11     Q.  Until October of -- or the end of October
12  of 2021?
13     A.  That's correct.
14     Q.  And is this a document that talks about
15  your duties and responsibilities during that two
16  years?
17     A.  Yes.
18     Q.  Okay.  Let me ask you some things about
19  this document and your duties and responsibilities
20  at Meta from 2019 to 2021.
21          Do you see on the first page, it says,
22  "Arturo Conversion," and then below that, it says,
23  "SOW Version."
24          Is that SOW, scope of work?
25     A.  Correct.

Page 100

1      Q.  Okay.  It says, "We are asking Arturo for
2  several deliverables towards Instagram Well-Being's
3  mission to create safe, supportive, and equitable
4  experiences that foster trust in Instagram."
5      A.  Correct.
6      Q.  Was that the mission?
7      A.  That was the mission.
8      Q.  Okay.  The first paragraph states, "A
9  summary of insights from Arturo's experience as to
10  what data we need to collect, from whom, in what
11  formats, in order to understand what makes Instagram
12  users have bad experiences on the platform."
13          Did I read that correctly?
14     A.  You did.
15     Q.  Was your understanding when you came back
16  that you were going to try to give advice and
17  recommendations as an expert on what data the
18  company needed to understand the harms that kids
19  were having on Instagram?
20     A.  Yes, it was.
21     Q.  Second paragraph states "Survey designs."
22          Do you have expertise in survey design?
23     A.  I do, yes.
24     Q.  Are surveys something that you have been
25  involved with overseeing and developing and

Page 101

1  implementing during your career?
2      A.  Yes.
3      Q.  Did that start way back in 2009 when you
4  were at the company?
5      A.  Yes.
6      Q.  Was one of your responsibilities when you
7  went back to Meta to help to develop and oversee and
8  implement surveys?
9      A.  Yes.  That's the first step.
10     Q.  When I say "survey," I think I'm -- strike
11  that.
12          When you say "survey," what do you mean?
13     A.  I mean, you ask people, did you experience
14  this in the last seven days.  Where did it happen.
15  What did you do.  How bad was it.  And you use that
16  information to inform product changes in order to
17  get a better handle on the harm and then reducing
18  it.
19     Q.  Okay.  The next paragraph says [as read]:
20          Provide consulting to Instagram
21  Well-Being, central integrity and other
22  cross-function partners regarding the collection of
23  data.
24          Do you see that?
25     A.  I do, yes.

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

1    Q.  Was that one of your responsibilities when
2  you returned in 2019 to Meta?
3    A.  It was, yes.
4    Q.  Go down to the Job Description section.  I
5  want to ask you about that.
6        The first paragraph states, "The Instagram
7  Well-Being organization is looking for a world-class
8  leader with both breadth and depth in a number of
9  areas, all aimed towards our collective vision of
10 making Instagram a force for good in this world."
11       Do you see that?
12   A.  I do, yes.
13   Q.  Were you actually the individual that they
14 were proposing to fulfill this position that needed
15 a world-class leader?
16   A.  Yes.
17   Q.  And then the third paragraph says, "This
18 leader should have in-depth experience in
19 understanding user bad experiences (qualitatively
20 and quantitatively), translating it to product ideas
21 with the relevant cross-function experts and
22 designing long-term, cross-Instagram (and
23 cross-family of apps, potentially cross-industry)
24 technical architectures to support users as they
25 experience these bad moments.  We would expect this

Page 103

1  person to be a thought-leader in this space, with
2  considerable (10-plus years) experience with online
3  harm understanding, measurement, and remediation."
4        Do you see that?
5    A.  I do, yes.
6    Q.  Were you the expert that they were hiring
7  to fulfill that job description?
8    A.  Yes.
9    Q.  If you go to the next page, in the first
10 paragraph at the -- or -- excuse me -- the second
11 paragraph, it says, "Finally, we would hope this
12 leader helps coach and grow our personnel."
13       Was that one of the things you were doing
14 when you returned to Meta?
15   A.  Yes, I was.
16   Q.  Under Responsibilities, it states, "Work
17 with the Well-Being research team to lead
18 Instagram's efforts to understand bad experiences on
19 our platform; what are users experiencing, how do
20 they perceive it?  Help design user surveys,
21 interviews, and other research methods,
22 participating directly as needed."
23       Was that part of your responsibility when
24 you returned?
25   A.  Yes.

Page 104

1    Q.  And were you also -- in the second bullet
2  point, it states, "Work with the Well-Being data
3  science team."
4        Were you also working with that team?
5    A.  Yes.
6    Q.  In the third bullet point, it states,
7  "Influence resource allocation."
8        What does that mean?
9    A.  Trying to make sure that the way that
10 people get assigned that the areas that need work
11 have enough people working on them.
12   Q.  Let's look at Business Justification.
13       What is your understanding of what
14 business justification, or that section, is
15 referring to?
16   A.  Oh, just want to make sure that for
17 approvals that people know what is the purpose of
18 this person and this contract for the company.
19   Q.  Okay.  It states, "The combination of
20 responsibilities describes above is quite rare; it's
21 world-class expertise in user understanding
22 (research), the ability to translate it into a
23 product roadmap, as well as an engineering plan, all
24 in a highly specialized space (Well-Being).  There
25 are fewer than 10 people in the world meeting these

Page 105

1  qualifications, we estimate, most of whom are
2  retired or employed at our competitors."
3        Do you see that?
4    A.  I do, yes.
5    Q.  Was your understanding that that was
6  Meta's business justification for hiring you back as
7  a safety expert to support the --
8    A.  Yes.
9    Q.  -- Instagram Well-Being team?
10       MS. JONES:  Just note my objection to the
11 characterization.
12       Go ahead.
13       THE WITNESS:  Yes.
14 BY MR. CARTMELL:
15   Q.  And world-class expertise, at this period
16 of time, were you actually one of only a few people
17 or ten or less people in the world that had your
18 expertise in safety?
19       MS. JONES:  Objection.  Foundation.
20       Excuse me.
21       THE WITNESS:  Yes, I was.  There aren't
22 that many people in the world who had the
23 opportunity in multiple companies to be dealing with
24 these issues directly and learn what it takes to
25 make them better.  And it's accurate.  I mean, there

27 (Pages 102 - 105)

Page 106

1  were a few of us and many of them were retired or
2  they were at other companies.
3  BY MR. CARTMELL:
4      Q.   Second paragraph says, "Arturo would bring
5  industry-leading expertise to bear on a
6  high-priority space with positive impact on the
7  daily lives of 1 billion-plus users on Instagram."
8          Was your understanding when you went back
9  to Meta in 2019 that there were more than 1 billion
10 users on Instagram?
11     A.   Yes.
12     Q.   And then it says, "If he joins, he can
13 work for us exclusively, bringing a significant
14 competitive advantage.  He is regularly courted by
15 Twitter, Google, TikTok, and similar competitors."
16         Did I read that correctly?
17     A.   You did, yes.
18     Q.   Was that the case, as of this time, that
19 you had been courted by those other social media and
20 technology companies for your expertise?
21     A.   Correct.  I was courted by Twitter to be
22 the head of all of these issues for them, product
23 and engineering.  I had conversations with Google,
24 with TikTok as well.
25     Q.   Now, it does mention below that, "The

Page 107

1  current blocker is not interest, but his ongoing
2  partnership writing and composing an opera with
3  █████████."
4          What is that referring to?
5      A.   So I don't know if -- ████████ is like
6  the nerd version of Taylor Swift or Lynyrd Skynyrd
7  telling a rock fan do you want to come help me with
8  something, so -- almost nobody knows who he is.  I
9  was a huge fan.  I go to meet him, spent time with
10 him, and began collaborating with him in projects
11 after I left Facebook.
12         And so at the time, I had begun
13 conversations with him about me writing the libretto
14 for an opera for which he would compose the music.
15 And that was just an extraordinary opportunity.
16         Philip at the time I think was 84 or 85
17 and so really there was a clock on being able to do
18 this work with him and that was very important for
19 me.
20     Q.   He's a composer?
21     A.   Yeah.  ████████ is a composer that has
22 done movie soundtracks, opera, symphonies, just a
23 ton of things.  He's really cool.
24     Q.   He's been nominated for Academy Awards,
25 hasn't he?

Page 108

1      A.   Academy Awards, all kinds of things.  He
2  has, like, the medal that the president, like, puts
3  on you, the -- for the arts.
4      Q.   Yes.
5      A.   And so, yeah, he did like the soundtrack
6  for The Hours.  I don't know, like, I really -- if
7  you're going to go on to ████████, we're going
8  to be here all day.
9      Q.   No, no, not at all.
10     A.   So I'm trying to be very measured in my
11 response, other than I admire him deeply.
12     Q.   I appreciate that.
13         But at the time you went back in 2019, you
14 started part time; is that right?
15     A.   That's correct.
16     Q.   And was that, in part, because you had
17 this commitment to ████████?
18     A.   That's correct.  We were doing projects
19 together.  And so it was parenting, work with ████
20 ████ and work at Instagram.  That was my life
21 during that period.  There was no time.  Even though
22 I got courted by other companies while I was a
23 consultant, and I could have done it, I decided to
24 focus my energy on Instagram, being a parent, and
25 work with ████████.

Page 109

1      Q.   Okay.  And you started part time but did
2  your time that you spent at Instagram and working
3  with the well-being team and giving your advice and
4  expertise to them increase over time during that two
5  years?
6      A.   Yes, it did.
7      Q.   Explain that.
8      A.   Well, initially I think it was, like,
9  something among -- it quickly became like multiple
10 hours a week.  Some weeks, if there was an incident
11 or something happening, there was press and it was
12 kind of an all-hands-on-deck effort, like when the
13 monkey banana emoji issue happened, then I would be
14 doing a lot of hours that week and -- because you
15 did what was needed.  And so over time I did a lot
16 more hours than what was initially specified.
17     Q.   I want to switch gears a little bit and
18 now talk about your time when you returned to Meta
19 in October of 2019.
20         But let me ask you right off the bat, when
21 you returned to Meta in 2019, was it a good
22 experience?
23     A.   I was really grateful to be able to go
24 back in and be able to be of service and do the
25 work.  And I really liked the team.  There were also

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

1 things I was concerned about, and it took me time to
2 make sense of those.
3    Q.  When you talk about the team, are you
4 talking about the well-being Instagram team?
5    A.  Correct.  I'm talking about the well-being
6 team in Instagram, ██████████, Shilpa, engineers,
7 product managers, different people that I spent time
8 with.
9    Q.  I'm going to ask you some opinions
10 throughout the day, and I would appreciate it if you
11 would respond to those based on a regular -- --
12 strike that.
13       I'm going to ask you opinions based on
14 your expertise throughout the day, and I would
15 appreciate it if you would respond to those based on
16 a reasonable degree of engineering or technological
17 or scientific certainty.  Okay?
18    A.  Understood.
19    Q.  Okay.  When you returned to Meta in late
20 2019, what did you find as far as whether or not
21 Instagram was a safe place for kids?
22       MS. JONES:  Objection to the form and
23 calls for a narrative.
24       THE WITNESS:  When I returned in 2019, I
25 do not -- I believe that Instagram was not a safe

Page 111

1 place for teens.
2 BY MR. CARTMELL:
3    Q.  When you returned to Instagram in 2019,
4 what did you find as far as whether Meta's
5 leadership was making user safety a priority on
6 Instagram?
7       MS. JONES:  Objection to the foundation.
8       THE WITNESS:  I found that safety was not
9 a priority for the company in the way that other
10 things are.
11 BY MR. CARTMELL:
12    Q.  We will talk more about that.  Let me ask
13 you some questions about Instagram.
14       When you returned had it changed
15 significantly since you were there in 2015?
16       MS. JONES:  Objection.  Foundation.
17       THE WITNESS:  It had, yes.  It was much,
18 much bigger.
19 BY MR. CARTMELL:
20    Q.  Okay.  How big -- strike that.
21       Had Adam Mosseri taken over as the lead
22 executive at Instagram?
23    A.  That is correct.
24    Q.  Did you know during your first stint from
25 2009 to 2015 that Instagram was Meta's app that was

Page 112

1 very appealing to young kids?
2    A.  Could you repeat the question, please?
3    Q.  During -- I'm taking you back in time, and
4 I apologize because I forgot to ask you.
5       But did you know during your first stint
6 at Meta, during 2009 to 2015, that Instagram was
7 Meta's app that was loved by very young kids?
8       MS. JONES:  Objection to the form and
9 foundation.
10       THE WITNESS:  Yes, we did.  Like, we --
11 when -- my first stint, there was many conversations
12 with many people about how Instagram was used by
13 kids.
14 BY MR. CARTMELL:
15    Q.  Okay.  And when you returned in 2019, was
16 it not just a lot bigger, but was it still an app
17 that was very popular with young kids?
18    A.  Yes, it was.
19    Q.  When you started back at Instagram in 2019
20 with the well-being team, what did you do to get up
21 to speed on the Instagram app?
22    A.  Had meetings with people working on user
23 research to understand what was some of the research
24 being done to date.  I had meetings with product
25 managers to understand what were some of the efforts

Page 113

1 underway.  I had meetings with some of the engineers
2 to understand what was going on.  So I talked to
3 across the disciplines to try and build a picture of
4 the team.
5    Q.  I have seen documents that the well-being
6 team talks about working on problems or issues.
7       Do you know what they call -- what they
8 work on?
9    A.  Yeah.  I think some conversations had --
10 or things that I was part of during that time
11 included, like, eating disorder, body image content,
12 racism and sort of, like, experiences people were
13 having with that.  Their reporting tools and how all
14 of those worked.  And there is others that I'm not
15 recalling right now.
16    Q.  Did the well-being team need to decide
17 each half what their priorities would be to work on?
18    A.  Yes, they did.
19    Q.  Do you recall what the priorities the
20 well-being team at Instagram was working on when you
21 came back as a safety expert?
22    A.  Yeah.  The priority was working on
23 features for influencers that would help them with
24 some of the stuff that they were experiencing.
25    Q.  Explain what influencers are, please.

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1    A.  Yeah.  So --
2    Q.  Go ahead.
3    A.  Sorry.  Giving the beat.
4        Yeah.  So basically Instagram, what you do
5  is you can create a photo or post a video or do --
6  create things that you put on there, videos or
7  photos.  And if a lot of people see your photos,
8  they like them, they comment on them, then you can
9  become what is called an influencer, which means
10 that I can create content that reaches large
11 audiences.
12       Sometimes that means that I might get --
13 like, things that I promote, I might get stuff for
14 free.  And you can have a lot of reach.  So it's
15 really like the content that is created by
16 influencers that feeds a lot of the activity on
17 Instagram.  It's a small group of people that create
18 things that have a long -- big reach.
19    Q.  Was child safety on Instagram a priority
20 for the well-being team when you started?
21    A.  There were no discussions about child
22 safety that I'm aware of when we started.  And when
23 looking at the stuff that they were working on,
24 there were tools to help with certain kinds of
25 harassment.  And I was, like, maybe they should be

Page 115

1  for teens.  But at the time conversations I had with
2  different people were, like, the way these things
3  gets resourced is if you make them for creators, and
4  that's why the well-being team was focusing on that
5  at that time.
6    Q.  Did you set out to determine, when you
7  started in October of 2019, what harms users,
8  including kids, were suffering from on Instagram?
9    A.  Yes, I did.
10    Q.  How -- how did you determine that when you
11 returned?
12    A.  So the first step in understanding harm is
13 looking at user research, right.  What are the
14 studies that had been done to understand what people
15 are experiencing?  And so I looked around.  I spoke
16 with people in the research team.  They showed me
17 some of their work.  And I also found work done by
18 other parts of the company where they had been
19 studying the harm that people were experiencing.
20 And I think it was sort of during that time that
21 I -- that when I began looking at that research,
22 which was part of my job, that I found that the
23 research was talking about a particular harm
24 affecting a lot of people, like 20 percent, give or
25 take.  And I thought that was extremely significant.

Page 116

1    1      And so I pursued that to try and
2    2  understand better what was the harm that people were
3    3  experiencing on, primarily, Instagram, but I had
4    4  seen it be done for Facebook, the app.
5    5      MR. CARTMELL:  Can we take a break?  I
6    6  promise, it's been a little over an hour, but this
7    7  may be the last -- we will go longer than an hour
8    8  the next times.
9    9      MR. WARD:  Sure.
10   10     MR. CARTMELL:  Ten minutes.
11   11     MR. WARD:  Off the record.
12   12     THE VIDEOGRAPHER:  The time is 11:43.
13   13  We're off the record.
14   14     (Whereupon, a brief recess was taken.)
15       11:56 15     THE VIDEOGRAPHER:  Time is    .
We're
16
16   16  back on the record.
17
17   17  BY MR. CARTMELL:
18
18   18     Q.  Mr. Bejar, we're back on the record after
19
19   19  a short break.
20
20   20      Are you ready to proceed?
21
21   21     A.  I am.
22
22   22     Q.  You are back at Meta now.  It's in 2019.
23
23   23  And I think you mentioned that you wanted to figure
24
24   24  out the harms that were happening to users on
25
25   25  Instagram.

Page 117

1        Is that right?
2    A.  Correct.
3    Q.  And at this time when you come back to
4  Meta in 2019, has the competitive environment for
5  teens specifically changed?
6    A.  Yes, it had.
7    Q.  Tell us briefly about that.
8    A.  TikTok entered the chat.
9    Q.  Okay.  And so when you left in 2015,
10 Facebook and Instagram were dominating, but when you
11 came back, now there is a lot of competition for
12 teens; is that fair?
13    A.  Yeah, that's correct, between TikTok and
14 Snapchat.
15    Q.  Okay.  You mentioned that you looked for
16 Meta's internal research, like, surveys that they
17 had been doing at that time.
18       Do you recall that?
19    A.  I do, yes.
20    Q.  Okay.  And was one of the surveys that you
21 recall looking at that time called the Negative
22 Experiences Survey?
23    A.  Yes.
24    Q.  Was your understanding that that survey
25 subsequently became Schrep?

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

1  A.  Yes, for Instagram.
2  Q.  For Instagram.  Okay.  And ██████████ --
3  we talk about her notes -- was she one of Meta's
4  researchers that was working on actually a survey
5  called Negative Experiences Survey?
6  A.  Yes.
7      (Whereupon, Meta-Bejar Exhibit 9 was
8  marked for identification.)
9  BY MR. CARTMELL:
10  Q.  Mr. Bejar, I have handed you what's been
11  marked as Exhibit 9.  And this is a document that
12  was produced to us by Meta in this case.
13      Have you seen this document before?
14  A.  I have, yes.
15  Q.  What is this document?
16  A.  This is one of the presentations that the
17  research team makes to share the findings of a
18  research they have conducted.
19  Q.  Okay.  I want to ask you about this
20  document.  If you go to the second page it states:
21  Goals.  Get a current snapshot of people's
22  perception of negative experiences on Instagram and
23  identify top problem areas.
24      Did I read that correctly?
25  A.  Yes.

Page 119

1  Q.  It also then talks about which negative
2  experiences are perceived most commonly and which
3  are most intense.
4      Do you see that?
5  A.  Yes.
6  Q.  When Meta uses the word "intense," what
7  does that mean?
8  A.  It means that you need to know how intense
9  the experience was for the person in the form of,
10  like, what emotion they experienced and how much.
11  Q.  This survey, was your understanding that
12  this was a survey of 30,000 Instagram users?
13  A.  Yes.
14  Q.  And tell me if I'm wrong, but what -- what
15  Meta would do is actually implement a survey that
16  would go out to, in this case, 30,000 people and ask
17  them about what negative experiences they have had
18  on Instagram; is that right?
19  A.  That's right.
20  Q.  It says:  Who we asked.  We surveyed
21  30,000 Instagram users with an in-app survey.
22      What is in-app survey?
23  A.  It means that you are scrolling using Instagram
24  and then you get a "could you answer a few questions
25  for us," and then you say yes and you answer those

Page 120

1  questions.
2  Q.  Okay.  Under what is a negative experience
3  it states:  We asked people about seeing or
4  experiencing 18 different negative experiences which
5  covered many of the areas that the well-being team
6  is working on.  And then it lists bullying and
7  harassment, nudity and sexual content, inauthentic
8  engagement, misinformation.
9      Do you see that?
10  A.  I do, yes.
11  Q.  And so these 18 negative experiences, when
12  the well-being team, for instance, was putting
13  together a survey, would they actually know from
14  reports what negative experiences were going on in
15  the real world and so what they needed to ask about?
16      MS. JONES:  Excuse me.  Objection.
17  Foundation.
18      THE WITNESS:  It depended on whether
19  people can report it or not.
20  BY MR. CARTMELL:
21  Q.  Okay.  Let's go through the results of
22  this -- strike that.
23      Let's go through the results of the
24  survey.  So turn, if you would, please, to page .6.
25  You can see the numbers on the top right.

Page 121

1      What is this slide of this presentation
2  related to this survey, the Negative Experiences
3  Survey?
4  A.  It tells you, of the people who responded
5  to the survey, how many said they had had these
6  experiences.
7  Q.  Okay.  So to make it clear, this is 30,000
8  people's responses and what they said they had
9  experienced; is that right?
10  A.  That's correct.
11  Q.  It states:  In the past seven days.
12      So was Meta actually asking these 30,000
13  people what negative experiences they had had in the
14  last week?
15  A.  Correct.
16  Q.  Okay.  Under -- strike that.
17      What does "perceived reach" mean?  I guess
18  what does "reach" mean?
19  A.  Reach means, like, what percentage of a
20  population sees something or experiences something.
21  So how far it gets.
22  Q.  Is -- tell me if I'm wrong, but is reach
23  the number of people it's affecting?
24  A.  Yes.  It's -- you basically take
25  25 percent of a hundred million people.  That is

CONFIDENTIAL

Page 122

1 going to be the reach.
2    Q.  I see.  Okay.  And then on the left here
3 in this slide -- strike that.
4        Are these the results of the Negative
5 Experiences Survey as far as you know?
6    A.  Yes.
7    Q.  And on the left side there are 18 -- I
8 guess you would call them negative experiences
9 listed; is that right?
10    A.  That's correct.
11    Q.  I want to ask you about some of these.
12 For example, bullying_seeing, it states 28 percent.
13 And then it says:  Seen someone else being harassed
14 or bullied on Instagram.
15        Do you see that?
16    A.  I do, yes.
17    Q.  What does that mean?
18    A.  It means you ask somebody, in the last
19 seven days, have you seen somebody else being
20 harassed or bullied, and they said yes to that
21 question.
22    Q.  So does that mean that more than one out
23 of every four people who responded to this said that
24 they had seen bullying or harassment on Instagram?
25    A.  Yeah.

Page 123

1    Q.  Okay.  What about hate?  Hate is
2 25 percent, seen any hate speech or threats that you
3 feel don't belong on Instagram.
4        Do you see that?
5    A.  Yeah, I see that.
6    Q.  And is that one out of every four people
7 said they had seen that?
8    A.  That's correct.
9    Q.  Explain nudity, please.
10    A.  So the question is, have you seen any
11 nudity or sexual content that you feel doesn't
12 belong on Instagram?  And 23 percent, approximately
13 one in four people, said yes in the last seven days.
14    Q.  What about violence?
15    A.  Have you seen any violent content that you
16 feel doesn't belong on Instagram?  And then you get
17 one in five people said yes in the last seven days.
18    Q.  Child safety is 19 percent.  And is the
19 question asked, seen anything on Instagram that made
20 you worried that a child was unsafe?
21    A.  That's correct.
22    Q.  So almost one in five people said they had
23 seen that in the last week?
24    A.  That's correct.
25    Q.  Eating disorders is 18 percent.  Seen

Page 124

1 anyone on Instagram who was promoting eating
2 disorders or unhealthy weight loss; is that correct?
3    A.  That is correct.
4    Q.  So almost one in five there, too, right?
5    A.  That is correct.
6    Q.  What is solicitation?
7    A.  Seeing anybody on Instagram trying
8 to sell -- buy or sell sexual activity or services.
9    Q.  That's 17 percent?
10    A.  That's correct.
11    Q.  What is NCII?  Is that nonconsensual
12 inappropriate interactions?
13    A.  That's correct.
14    Q.  What was the question there?
15    A.  Have you seen any nudity or sexual content
16 on Instagram that you were worried was shared
17 without the person's permission?
18    Q.  Is that -- I may be wrong, but is that
19 something that happens with sextortion?
20    A.  It happens on sextortion and it happens on
21 revenge porn.
22    Q.  SSI, what does that mean?
23    A.  Have you seen anyone on Instagram who you
24 were worried might hurt themselves or commit
25 suicide?

Page 125

1    Q.  Does SSI stand for suicide or self-harm?
2    A.  Correct.
3    Q.  And that is 12 percent.  So more than --
4 almost one in nine people; is that right?
5    A.  That's correct.
6    Q.  And it talks about drugs, seen anyone on
7 Instagram offering to sell drugs or promoting drug
8 use.  That's nine -- I'm sorry.  Let me go back.
9        Suicide and self-injury was 12 percent; is
10 that right?
11    A.  That's correct.
12    Q.  And drugs, 9 percent, seen anyone on
13 Instagram offering to sell drugs or promoting drug
14 use; is that right?
15    A.  That's correct.
16    Q.  What is bullying_experiencing?  We saw
17 bullying_seeing up above.  What is
18 bullying_experiencing?
19    A.  It's when you are the target.  So that you
20 experience this firsthand.
21    Q.  And this says that 8 percent had been
22 bullied or harassed on Instagram in the last seven
23 days?
24    A.  That's correct.
25    Q.  Were all of these responses from 30,000

32 (Pages 122 - 125)

Page 126

1 people within the last seven days?
2    A.  That is correct.
3    Q.  What was your reaction when you saw this
4 data in Meta's files?
5    A.  Let me just take a moment.
6    Q.  Take your time.
7    A.  I mean, this is -- the reason you ask
8 30,000 people or more is so you develop an accurate
9 understanding of harm on your platform.  And what
10 this is telling you is, like, even the smallest
11 number, you are talking around between 9 or
12 10 percent of a lot of people who are experiencing
13 each of these harms.
14        And so then the responsibility, what you
15 have to do is you have to go and investigate and
16 understand each of these categories.  And each of
17 these categories should be a team, right.  So this
18 is telling me that there is a meaningful amount of
19 harm happening on Instagram every seven days and
20 that we know about it.
21    Q.  Did you know before you returned to
22 Instagram that there was this extent of harm going
23 on on Instagram?
24    A.  I did not.
25    Q.  Were you concerned when you found out?

Page 127

1    A.  Absolutely.
2    Q.  Go to the next slide at .7, please.
3        One of the things about these numbers,
4 Mr. Bejar, is if you extrapolated these 30,000 to
5 the entire community, would it be millions and
6 millions of people?
7        MS. JONES:  Objection.  Foundation.
8        THE WITNESS:  Yes, it would be millions of
9 people.  As I said, if it happens to one or two
10 people, it's happening to a million people.
11 BY MR. CARTMELL:
12    Q.  There is more than 1 billion people on
13 Instagram at this time?
14    A.  That is correct.
15    Q.  So you could say maybe happening, if it is
16 20 percent, to 200 million people?
17    A.  That is correct.
18        MS. JONES:  Excuse me.  Note my objection.
19 Foundation.
20        THE WITNESS:  That is correct.
21 BY MR. CARTMELL:
22    Q.  Was the extent the numbers of people that
23 were having these negative experiences a concern for
24 you?
25    A.  Yes, it was.

Page 128

1    Q.  This slide states:  Perceived Reach:
2 Teens and Adults.
3        Do you see that?
4    A.  I do.
5    Q.  It says:  Overall, teens have
6 significantly more negative experiences than adults.
7        What does that mean?
8    A.  It means that in the survey results there
9 was a statistically significant difference, that you
10 could say significantly more negative experiences
11 than adults.  And so it means that teens were having
12 more bad experiences than adults by a big enough
13 margin that you could say significantly more.
14    Q.  What is the relevance of that to you as a
15 30-year user safety expert?
16    A.  That the company understands that
17 teenagers are having harmful experiences on their
18 platform.
19    Q.  And if you look at the negative
20 experiences that we talked about on the last
21 slide --
22        Jim, if you wouldn't mind, please,
23 highlighting bullying_seeing down to
24 bullying_experiences.
25        In every one of those cases, are the teens

Page 129

1 percentage of these negative experiences higher than
2 the adults?
3    A.  Yes.
4    Q.  Turn to slide 10, if you would, please.
5        MS. JONES:  Belatedly object to
6 mischaracterization of the data on the document.
7 BY MR. CARTMELL:
8    Q.  This slide is entitled "Intensity," right?
9    A.  Correct.
10    Q.  It says:  Seeing someone get bullied or
11 harassed, seeing terrorist content, and seeing
12 suicide and self-injury content top the list in
13 terms of intensity.
14        Do you see that?
15    A.  I do.
16    Q.  On the right, up there at the top it says:
17 Percent rating is a very bad experience.  And then
18 it says:  In top two intensity buckets, very bad or
19 pretty bad.
20        Do you see that?
21    A.  I do.
22    Q.  So what is this graph here showing?
23    A.  So this graph is showing -- so the way
24 these surveys are set up it's like a series of
25 questions.  And so if you experience one of these

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

1 issues, how bad was it, and the ranking was sort of
2 very bad, pretty bad, and sort of the right language
3 there. And so then of the people who have
4 encountered the issues that selected a rating of how
5 bad the experience was, this is a percentage of them
6 that said it was a very bad experience.
7    Q. So, Jim, if you don't mind highlighting
8 bullying_experience down through -- let's see. No,
9 you can't do it on this one.
10    So, for instance, if you look at
11 bullying_experience -- strike that.
12    If you look at child safety, for example,
13 45 percent of the people in this survey stated that
14 it was a very bad or bad experience.
15    A. That's of the people who answered the
16 questions I described, yeah.
17    Q. Okay. Same thing, for example, nudity?
18    A. Yeah. 39 percent.
19    Q. Does intensity measurements like this on a
20 survey tell you anything about whether the
21 experience is capable of causing serious harm?
22    A. Yes.
23    MS. JONES: Excuse me. Object to the form
24 and foundation.
25    THE WITNESS: Yes.

Page 131

1 BY MR. CARTMELL:
2    Q. You can -- strike that.
3    Explain that, please.
4    A. So when we built the teen tools during my
5 first stint, in our conversations with Yale and
6 external experts, they told us it was essential to
7 learn how intense the experience was for the teen,
8 because that let's you know what is going on and how
9 you should be able to help them.
10    And so if a teen is telling you that they
11 are feeling very afraid or very angry, that is
12 essential information to help the teen in the moment
13 and also take further action as needed.
14    And we learned during my first stint that
15 you couldn't often tell from the content how intense
16 the experience was. So it was an essential piece of
17 information that you had to collect in order to
18 understand how important it was to address
19 something. How urgent, actually.
20    Q. If you go back to slide 7 real quick, the
21 Perceived Reach: Teens and Adults.
22    I want to ask you, in your experience as
23 an online child safety expert, are kids more
24 vulnerable to online harms like these than adults?
25    MS. JONES: Objection. Foundation.

Page 132

1    THE WITNESS: Yes. It was one of the
2 things that we learned from working with Yale, and
3 we actually had slides dedicated to that during our
4 compassion presentations where we showed how teens'
5 brains work developmentally, how they felt things
6 more intensity, and how important it was to do the
7 kind of work that we described.
8 BY MR. CARTMELL:
9    Q. Okay. So let me ask you, at this time,
10 when you are seeing this data, had you worked
11 actually on the prevention of online suicide from
12 negative experiences like these?
13    MS. JONES: Objection to the form.
14    THE WITNESS: I had, yes.
15 BY MR. CARTMELL:
16    Q. Had you actually worked on the prevention
17 of online harm to kids from bullying?
18    MS. JONES: Excuse me. Objection to the
19 form.
20    THE WITNESS: I had, yes.
21 BY MR. CARTMELL:
22    Q. Had you worked in the past in the area of
23 prevention of online harms to kids from sextortion?
24    A. It wasn't called that then. I was dealing
25 with grooming and with people -- the label came

Page 133

1 later, but we had worked on that class of issues for
2 years.
3    Q. And what about the prevention of negative
4 impacts to kids' mental well-being? Had you worked
5 on that as a safety expert over the years?
6    MS. JONES: Objection. Form.
7    THE WITNESS: I had, yes.
8 BY MR. CARTMELL:
9    Q. And over the years, at this time in 2019,
10 had you actually worked with parents and kids
11 related to online harmful experiences?
12    MS. JONES: Objection to the form.
13    THE WITNESS: I had, yes.
14 BY MR. CARTMELL:
15    Q. Can you explain that, please.
16    A. So the process for developing the tools
17 for teens began with focus groups held by
18 teenager -- with teenagers by teenagers where we
19 understood the harms that they were experiencing.
20 Imagine this research as a conversation in a room
21 where we asked who has been bullied or harassed
22 here, and nobody raised their hand. Who here has
23 had something bad happen to them? Everybody raises
24 their hand. What's happened to you? And then we
25 got a list of issues that teens told us that shaped

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

1 the product.
2      I also work with parents to understand the
3 experiences that their kids had had, parents of kids
4 that had been groomed successfully. And so there
5 was always -- the job was go and understand from the
6 person who had the harmful or terrible experience,
7 talk to them, listen, and then understand how you
8 can change the product to make it better as informed
9 by an expert on the field.
10     Q. When you saw these results in October of
11 2019 or shortly thereafter, how long had these
12 harmful experiences to kids on Instagram going --
13 been going on? Did you know?
14     MS. JONES: Objection to the form and
15 foundation.
16     THE WITNESS: I believe that the way that
17 these things work, that it had been going on for as
18 long as the product had been around. And as the
19 number of people who used the product grew, the
20 number of people having this experiences grew.
21 BY MR. CARTMELL:
22     Q. Based on your expertise in this area of
23 safety for kids online, did you believe that
24 Instagram was adequately protecting kids and all
25 users from these online harms as of October of 2019?

Page 135

1     A. I believe it was not.
2     Q. Had Instagram done anything that you know
3 of to actually try to prevent and substantially
4 reduce these types of harms as of this time?
5     MS. JONES: Objection. Foundation.
6     THE WITNESS: It has not.
7 BY MR. CARTMELL:
8     Q. Let me ask you this, Mr. Bejar. Had this
9 data that was in Meta's files been published to
10 anybody outside the company; do you know that?
11     A. Not as far as I was aware.
12     Q. You talked about transparency during your
13 first stint, right?
14     A. Correct.
15     Q. Did you believe that this data that they
16 had in their files related to harms to kids on
17 Instagram should be published to the public and
18 parents and kids?
19     A. Absolutely.
20     Q. Now, I noticed that there's nothing in
21 this survey about addiction or problematic use; is
22 that correct?
23     A. That's correct.
24     Q. Are you familiar, as an online child
25 safety expert, with addiction to social media?

Page 136

1     A. I am, yes.
2     MS. JONES: Excuse me.
3     THE WITNESS: Sorry.
4     MS. JONES: Objection to the form.
5 BY MR. CARTMELL:
6     Q. Are you familiar, as an online child
7 safety expert, with the problem of teenage or kids
8 getting addicted to social media?
9     MS. JONES: Same objection.
10     THE WITNESS: I am, yes.
11 BY MR. CARTMELL:
12     Q. I've seen documents of -- that sometimes
13 it's referred to problematic use; is that right?
14     A. That is correct.
15     Q. Did Meta actually use the phrase
16 "problematic use" and "addiction" interchangeably?
17     A. It is my understanding that you were not
18 supposed to say "addiction." You were supposed to
19 say "problematic use."
20     Q. Did you have an understanding why that
21 was?
22     MS. JONES: Objection. Foundation.
23     THE WITNESS: Yes, I did.
24 BY MR. CARTMELL:
25     Q. What's that?

Page 137

1     A. So when I returned in my second stint, one
2 of the people I sought out was ███████████,
3 who had been a lead researcher in my first stint at
4 understanding the harm that people were experiencing
5 that we used to guide the work that we did in my
6 first stint.
7      And I wanted to understand because she was
8 working on well-being metrics and I wanted to orient
9 myself about what work was being done. And I talked
10 about it with her. I asked her about addiction.
11 Because I had already seen research come out and I
12 had also been experiencing it at home.
13      And the -- she told me in that
14 conversation that the topic was somewhat
15 radioactive. That you weren't supposed to use the
16 term "addiction." That when you looked into it that
17 it would get attention from the leadership of her
18 organization. And that you -- you couldn't call it
19 addiction. That instead they had labeled it
20 "problematic use." And then they had defined
21 problematic use to be very narrow.
22      So let's say -- this is not the accurate
23 number, but it's going to be, like, yeah, you have
24 to be on there for, like, ten hours a day in order
25 to be able to call it problematic use, which meant

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

1 that the company could say things like, oh, we've
2 looked into problematic use and it's not an issue.
3         And it's not what I would understand.
4 When I heard the word "problematic use," I would
5 probably think what a lot of people were
6 experiencing. And so my understanding from talking
7 to her is if you're going to work on it you're going
8 to get a lot of attention on you.
9         And they had redefined the language around
10 the subject matter so it was not studied and
11 understood in what I believe is sort of good faith
12 of these issues.
13      Q. Was Meta actually even monitoring kids'
14 addiction to Instagram or problematic use at
15 Instagram at that time?
16      A. Not as far as I know.
17      Q. They didn't include it in any surveys, did
18 they?
19         MS. JONES: Let me object to foundation.
20         Go ahead.
21         THE WITNESS: Not as far as I know.
22         And when I started working with the
23 well-being team, again, I met with many people,
24 covered many issues, and there was not a single
25 mention of addiction in that context that I recall.

Page 139

1 BY MR. CARTMELL:
2      Q. You mentioned that you were experiencing
3 addiction. Was that with your daughter?
4      A. Correct.
5      Q. Based on your experience as a child safety
6 expert, do you believe that Instagram and social
7 media can cause addiction?
8         MS. JONES: Objection. Foundation.
9         THE WITNESS: I do, yes. And I have both
10 experienced it, I have read things and have also
11 talked to people that are sort of survivors that
12 have had personal experience of that issue.
13 BY MR. CARTMELL:
14      Q. And let me ask you, what do you believe --
15 strike that.
16         Are there -- do you believe as an online
17 safety expert, and somebody who has actually built
18 tools for social media apps, that the design of
19 Instagram can cause or contribute to cause
20 addiction?
21         MS. JONES: Objection. Foundation.
22         THE WITNESS: I do, yes.
23 BY MR. CARTMELL:
24      Q. What features or tools do you believe with
25 respect to Instagram can cause or contribute to

Page 140

1 cause addiction or problematic use?
2         MS. JONES: Same objection.
3         THE WITNESS: I think there are different
4 factors. One of them is nature and frequency of
5 notifications. Another one is sort of like a
6 never-ending -- like an infinite feed of images or
7 videos to watch.
8 BY MR. CARTMELL:
9      Q. Is that referred to as infinite scroll?
10      A. Yeah, people refer to that as infinite
11 scroll. So you just have a never-ending set of
12 things that you can look at so you can spend as much
13 time on there as your body and attention allows.
14         Also, there are other things like if you
15 take certain actions you get different rewards. So
16 you get like little hearts and things that happen.
17 I mean, the...
18      Q. You mean like likes; is that what you're
19 referring to?
20      A. Yeah. Thank you. Yeah.
21         So likes are a good example of that. A
22 notification like saying, oh, your friend did
23 something. A good example of that.
24         And so I would notice, we were trying to
25 watch a movie together as a family, and my daughter

Page 141

1 would pick up the phone every 20 or 30 seconds to
2 see whether she had notifications. And it was
3 really painful to try and get her to put the phone
4 away at dinnertime because she was, like, well, what
5 if one of my friends writes to me or something is
6 happening on there, so...
7         And, again, this is not what I even would
8 think of as -- this is -- I think that was bad. But
9 I have spoken to people who have lived experience
10 with these issues and it can get so much worse.
11      Q. Let me ask you, did you hear that, in
12 fact, for the well-being team to actually do work on
13 addiction or problematic use, it was held to a
14 higher standard than, for example, work that would
15 be done for engagement, for growth, those sorts of
16 things?
17         MS. JONES: Objection to form.
18         MR. CARTMELL: Let me restate the
19 question. I'll withdraw it.
20         MS. JONES: I'll restate the objection.
21         But go ahead.
22 BY MR. CARTMELL:
23      Q. Had you heard at Instagram that there was
24 a higher standard of proof for the well-being -- for
25 anybody to work on well-being issues like addiction

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

1 or problematic use?
2         MS. JONES:  Objection to the form.
3 Foundation.
4         THE WITNESS:  Yes, I did.
5 BY MR. CARTMELL:
6     Q.  Explain what you mean by that or what the
7 higher proof standard was?
8         MS. JONES:  Same objections.
9         THE WITNESS:  So there were two sides to
10 that.  I think one of them was if you approach a
11 subject like addiction, then you would get people at
12 a very high level in the research and hence the
13 growth organization come in and look at what you
14 were doing.
15         And then I think for many other aspects
16 having to deal with, for example, body image issues
17 or other areas, there was this thought that you had
18 to show causality.
19         And this is something that I discussed
20 with Jennifer in that conversation because I think
21 anybody with a public health background knows that
22 things that are -- might be affecting population
23 level issues, causality is an unreasonably high bar.
24 That what you really look for is strong correlation
25 in order to have a -- more than enough reason to

Page 143

1 act.
2         And so -- and she was not the only person
3 with whom I've had conversations about causality.
4         And so the bar for a well-being feature
5 and resourcing or working on a problematic area was
6 high.  And the bar to work on growth engagement,
7 something that you would think would drive usage,
8 was none, right.  You could just -- you had to have
9 a good thesis to say I believe this will increase
10 usage by this much percentage or I believe this
11 will -- this feature is going to be very successful
12 and you were, like, off you go, right.
13         And so -- and I noticed in my second
14 stint, right, that the well-being team had an
15 incredibly difficult job at trying to define and
16 implement features that would make a difference.
17         MS. JONES:  I'm going to object to the
18 narrative response.
19 BY MR. CARTMELL:
20     Q.  For addiction and problematic use work,
21 when you looked around in 2019, as you have settled
22 in, did you find that the well-being team or any
23 other team was doing anything to prevent or
24 substantially reduce kids' addiction or development
25 of problematic use from Instagram?

Page 144

1         MS. JONES:  Excuse me.
2         Objection to the form.  And foundation.
3         THE WITNESS:  I was not aware of any team
4 working on addiction in 2019.
5 BY MR. CARTMELL:
6     Q.  And did you at any time while you were
7 there from '19 to '21 see that Instagram or Meta had
8 actually published any internal research on
9 addiction or problematic use?
10     A.  I did not.
11     Q.  What about warning the public of the
12 increased risk to kids of addiction or problematic
13 use from Instagram, did they ever warn the public,
14 kids, or parents of that?
15     A.  They did not.
16     Q.  Do you believe, based on your expertise as
17 a child safety expert, that Instagram did enough to
18 actually try to prevent or substantially reduce
19 addiction or problematic use to kids on Instagram?
20         MS. JONES:  Objection to the form.
21 Foundation.
22         THE WITNESS:  They did not.
23         (Whereupon, Meta-Bejar Exhibit 10 was
24 marked for identification.)
25         (Whereupon, a brief discussion off the

Page 145

1 record.)
2 BY MR. CARTMELL:
3     Q.  Now, after you were able to discover the
4 data from the negative experiences survey and you
5 understood the extent of the harm on Instagram, what
6 did you do?
7     A.  At the time my job was to understand --
8 part of my job was to understand why the well-being
9 team didn't -- was not working on these issues.  And
10 so I sought out similar surveys in other parts of
11 the company.  And also asked people about their
12 experience in trying to work on these issues.
13     Q.  Did you try to do an assessment of Meta's
14 or Instagram's safety systems or framework in place
15 to see why there was so much harm to kids on
16 Instagram?
17     A.  I did, yes.
18     Q.  And when you reviewed Instagram's safety
19 features or tools or framework in place, what did
20 you find?
21     A.  I found that there were no features,
22 safety features that meaningfully reduced the harms
23 that we were talking about.  I found that there were
24 issues with the reporting tools.  I found difficulty
25 trying to propose and get implementations of safety

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

1 features. And I found that there was not a -- like
2 a comprehensive metrics framework that incentivized
3 the team to reduce the harms that you see here.
4 Like, which is really the -- I believe the job.
5      Q. When I met with you and other Attorney
6 Generals before this deposition, did I ask you what
7 factors you thought were causing Meta's Instagram
8 app to be unsafe for kids?
9      A. Yes.
10     Q. And did you actually provide a list of the
11 factors that you believed were substantial
12 contributing factors to why kids were not being
13 protected on Instagram?
14     A. I did, yes.
15     Q. I've handed you Exhibit 10, Mr. Bejar.
16         Is this the list of factors that you
17 provided to me, factors that cause Meta's Instagram
18 app to be unsafe for kids?
19     A. Yes.
20     Q. And you've listed five things here; is
21 that correct?
22     A. Yes.
23     Q. What I would like to do is just go through
24 each of these one by one.
25         Is that okay with you?

Page 147

1      A. Yes.
2      Q. Okay. So --
3         MS. JONES: And Counsel, I'm just going to
4 object to the use of this Exhibit Number 10 as
5 something that should have been --
6         (Whereupon, a brief discussion off the
7 record.)
8         MS. JONES: I'm going to object to
9 Exhibit Number 10 and its use as something that
10 should have been produced in connection with Meta's
11 subpoena to Mr. Bejar.
12        MR. CARTMELL: Well, okay, I take this as
13 a demonstrative that is based on --
14        MS. JONES: Same objection.
15        Go ahead.
16 BY MR. CARTMELL:
17     Q. Okay. Number one factor that you list
18 here is "Meta Leadership's Top Priority is Growth
19 and Engagement, Not Safety."
20         Did I read that correctly?
21     A. Yes.
22     Q. Tell us what you meant by that.
23     A. What I mean by that is during the time
24 that I was there in my second stint, every other
25 team I was aware of in Instagram was working on

Page 148

1 growth and engagement. And only the well-being team
2 was working on safety and it was not well resourced
3 enough. It was not something that was treated as a
4 priority. When I was there in 2019, Reels was the
5 priority. It's very clear.
6      Q. When you say "Reels was the priority," are
7 you talking about a product that was released by
8 Instagram around that time?
9      A. That is correct. When I talk about the
10 Instagram app, Reels is Instagram's response to
11 TikTok. And so it's short-form videos. And that
12 was a priority. You could see it in the way Adam
13 talked about it and you could see it in the way
14 resources were elevated.
15     Q. And was Reels something that was released
16 by Meta in order to compete with TikTok; is that
17 what you're saying?
18     A. Correct.
19     Q. Okay. And was Reels something that was
20 released by Instagram and Meta in order to maintain
21 teens on Instagram or grow teens on Instagram?
22        MS. JONES: Objection to the form. And
23 foundation.
24        THE WITNESS: That's correct.
25        (Whereupon, an interruption.)

Page 149

1 BY MR. CARTMELL:
2      Q. You mentioned Adam Mosseri. He's the head
3 of Instagram; is that right?
4      A. That is correct.
5      Q. Okay. And did he, in fact, say that Reels
6 was the number one priority?
7      A. Yes.
8      Q. When you were at Meta, did you develop an
9 understanding generally about Meta's business model?
10     A. Yes.
11     Q. Based on your understanding eight years at
12 Meta, does Meta make essentially all of its revenue
13 from advertising on the platforms?
14     A. They do.
15     Q. Does Meta make more money if its users use
16 Instagram more frequently?
17     A. They do.
18     Q. Does Meta make more money if its users use
19 Instagram for longer periods of time?
20     A. They do.
21     Q. And all things being equal, does Meta make
22 more money if it has more users?
23     A. They do.
24     Q. You talked about previously the importance
25 of metrics at Instagram, correct?

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

1    A.  Correct.
2    Q.  Does Meta have metrics for all of those
3  engagement and growth factors that it's -- strike
4  that.
5        Does Meta actually have metrics that track
6  sessions and engagement and growth?
7        MS. JONES:  Objection.  Foundation.
8        THE WITNESS:  Yes, they do.
9  BY MR. CARTMELL:
10    Q.  And do they track those very closely?
11    A.  Yes, they do.
12    Q.  Based on your experience in the industry
13  and eight years at Meta, can building safety
14  measures on an app like Instagram have a negative
15  impact on users' engagement on the app?
16    A.  Yes, it can.
17    Q.  Can you give an example of that?
18    A.  If you make it easy for a teen to say, you
19  know, I only want to spend an hour a day and when
20  the hour comes up, I'm out, don't let me back in,
21  this is -- I have finals this week, I need you to
22  help me.  That would mean that the teen would spend
23  less hours on Instagram during that week.
24        If you reduce notifications that would
25  mean there would be less people coming back and then

Page 151

1  they know when you come back that you're going to be
2  spending a certain amount of time.
3    Q.  Reducing those things might help addiction
4  or problematic use, right?
5    A.  Correct.
6    Q.  Was your experience at Meta that they were
7  willing to do those sort of things, reduce the time
8  spent, reduce the notifications, were they willing
9  to do that?
10        MS. JONES:  Objection to the form.  And
11  foundation.
12        Sorry.  That was too fast.
13        Objection to the form.  And foundation.
14        THE WITNESS:  Sorry.  I was going to say
15  I'm not the only one talking too fast.
16        It was my experience that Instagram and
17  Meta were not willing to substantively address the
18  issue of reducing the time that people spend or
19  getting them less notifications.
20  BY MR. CARTMELL:
21    Q.  Based on your experience, did Meta
22  prioritize the growth and engagement metrics over
23  the safety measures to make Instagram safe?
24        MS. JONES:  Same objection.
25        THE WITNESS:  Yes.

Page 152

1  BY MR. CARTMELL:
2    Q.  And can that -- strike that.
3        And can putting in place safety measures
4  on Instagram actually decrease the amount of money
5  Meta makes?
6    A.  They could, yes.
7    Q.  Let's talk about number two on the factors
8  that you provided.
9        "Meta's Organizational Structure Creates a
10  Conflict in Favor of Growth, not Safety."
11        Did I read that correctly?
12    A.  Yes.
13    Q.  What do you mean by that?
14    A.  What I mean by that is that the protect
15  and care team, after I left, got broken up and key
16  parts of it were moved under what's called the
17  growth team.  A way to translate that is like
18  putting the safety team underneath the sales team.
19        And so in my first six years there, it was
20  important to be independent from growth so that you
21  could provide a balance to keep the system
22  appropriately safe and also not pushed too hard on
23  the growth side of things.  But the moment you put
24  that under, you create a conflict of interest, for
25  anybody who's working on safety, with their

Page 153

1  managers.
2    Q.  Do you believe Meta's organizational
3  structure in place when you returned created a
4  conflict of interest?
5        MS. JONES:  Objection.  Foundation.
6        THE WITNESS:  I do, yes.
7  BY MR. CARTMELL:
8    Q.  What about compensation factors, was that
9  a part of the issue related to the organizational
10  structure and hampering safety on Instagram?
11    A.  Absolutely.  Your manager determines your
12  compensation based on the goals that they approve.
13  And so if you are setting goals based on time, how
14  much time people spend on a certain product or how
15  many times they click on the like button, right,
16  they're going to -- you're going to get paid more
17  money for doing that, for driving usage.
18        But if you're working on the safety team,
19  like I believe your compensation should be, like, in
20  part, related to how much harm you are actually
21  reducing.  This is something the company knows to do
22  better than almost any company in the world.  And so
23  I think that compensation should have been about
24  harm reduction, which then has the right incentive
25  structures.  But that's not what I saw.

CONFIDENTIAL

Page 154

1     Q.  As Meta's online safety expert providing
2 support to the well-being team, did you believe that
3 Meta's organizational structure was negatively
4 impacting the well-being team's ability to make
5 Instagram a safe place for kids?
6         MS. JONES:  Objection.  Foundation.  And
7 form.
8         THE WITNESS:  Yes, I did.  And I had
9 conversations to that effect.
10 BY MR. CARTMELL:
11     Q.  In your opinion, did Meta's organizational
12 structure that had well-being and safety teams
13 reporting to the growth teams play a substantial
14 factor in why there was a lack of safety features
15 and systems in place on Instagram?
16         MS. JONES:  Same objection.  Form.
17 Foundation.
18         THE WITNESS:  I do want to say that the
19 central safety team was the one that reported in to
20 growth within Instagram and had a different
21 reporting structure.  But what they since -- what
22 the team in Instagram that worked on well-being was
23 able to do was subject, in part, by approval and
24 oversight on the central integrity team.
25 ///

Page 155

1 BY MR. CARTMELL:
2     Q.  Number three is -- on your list of factors
3 that caused Meta's Instagram app to be unsafe for
4 kids -- is, "Meta Does Not Provide Adequate
5 Resources or Support for Safety/Well-Being Work."
6         Did I read that correctly?
7     A.  Yes.
8     Q.  What was your experience at Meta related
9 to whether or not leadership at Meta would provide
10 adequate resources or support for the well-being or
11 safety work?
12     A.  The team was, like, tragically small
13 relative to the impact that users were having.
14         And the other thing that happened is the
15 team really only had resources to work on one or two
16 things at a time.  That meant if something happened
17 you just have to move on to the next thing and leave
18 something half-finished or not out.  And so the team
19 by such a large margin did not have adequate
20 resources for the tasks they were being asked to do.
21     Q.  How did the resources or funding of the
22 well-being safety work at Instagram compare to the
23 resources and funding on the growth side of the
24 business?
25         MS. JONES:  Objection.  Foundation.  Form.

Page 156

1         THE WITNESS:  So the -- a good way to put
2 it is that think of every engineer working on every
3 other feature for Instagram.  They are basically
4 working on growth and engagement.  And then you
5 compare that to the number of engineers and product
6 managers that are working on well-being issues.
7         But really what should be the case is for
8 every product and every initiative you should have
9 dedicated safety teams and resources to make sure
10 that Reels is safe, that all these issues are
11 tackled.  And so all of that gets resourced if it's
12 a priority.  Reels, they would poach engineers.
13         And then the well-being team did not get
14 the same support and they were kind of off to, like,
15 the side from all the work being done, and so then
16 it's -- it doesn't have adequate resources to
17 support.
18 BY MR. CARTMELL:
19     Q.  Did you believe the lack of resources and
20 funding provided by Meta leadership to the safety
21 work or the well-being work impacted the ability to
22 keep kids safe on Instagram?
23         MS. JONES:  Objection.  Foundation.  Form.
24         THE WITNESS:  Yes, I did.
25 ///

Page 157

1 BY MR. CARTMELL:
2     Q.  And was that one of the things you were
3 doing while you were at Meta as their safety expert
4 supporting the Instagram Well-Being team?  Were you
5 trying to convince leadership to provide adequate
6 resources and funding?
7     A.  Yes, that was one of the key goals I had.
8     Q.  When you were there in 2019 to 2021, was
9 Meta making billions of dollars in revenue?
10     A.  Yes, they were.
11     Q.  What is your opinion regarding whether
12 this lack of resources and support from Meta
13 leadership for safety and well-being, whether that
14 was a substantial factor in contributing to harmful
15 experiences on Instagram?
16         MS. JONES:  Objection.  Form.  Foundation.
17         THE WITNESS:  I think the lack of
18 resources was central to Instagram's lack of
19 meaningful safety tools and features at the time.
20         MR. CARTMELL:  Mike, you had said
21 45 minutes, but I'm willing to go on.  It's up to
22 you all.
23         MR. WARD:  Sure, we can continue.
24 BY MR. CARTMELL:
25     Q.  Number four states, "Instagram's Approach

Page 158

1 to Safety is Inadequate and Not Effective to Prevent
2 or Substantially Reduce Harms to Kids."
3        Did I read that correctly?
4    A.  Yes.
5    Q.  What -- why don't you explain what you
6 mean by that?
7    A.  Like, what you need is a framework where
8 people can effectively -- it's a framework that has
9 four components.  Component number one is for people
10 to be able to effectively report an issue they
11 experience.  What happened to them, where it
12 happened to them, and how bad was it, the intensity.
13        Then step number two is you use the
14 information from step number one to protect other
15 people, right.  You know something bad is happening,
16 you have enough information about it to then go
17 protect other people from experiencing that.
18        Number three, where appropriate, you give
19 feedback to the person who is initiating the harmful
20 action because everybody deserves to be treated with
21 respect.  And also, if you give feedback some people
22 will stop and some people are going to continue.
23 And those people who continue are the ones that you
24 really need to pay attention to.
25        Those are the groomers, the

Page 159

1 sextortionists, the people that once you've told
2 them they're not supposed to do this they press on.
3 And you can find them and remove them.
4        And four, driving all of this, you have to
5 monitor and measure, right.  You have to have a good
6 set of metrics, a good -- everything in Meta is
7 driven by metrics.  It's the lifeblood of the
8 company.  So you need a robust metrics framework and
9 a monitoring framework to know that what you're
10 doing as part of this methodology that's a cycle is
11 effectively reducing harm.
12        So when I look at Instagram's approach
13 during the time that I was there, is they were
14 not -- there were no metrics, people were not able
15 to tell them what was happening effectively, they
16 weren't gathering any information that could help
17 them protect others.  There was this effort on
18 short-term features like hidden words.  And, again,
19 not clear -- there was not a metric for hidden
20 words.  So -- I mean, I can give more examples of
21 this.
22    Q.  Let me follow up if I can.
23        MS. JONES:  And let me just object to the
24 narrative response.
25        Go ahead.

Page 160

1 BY MR. CARTMELL:
2    Q.  You mentioned that I think step one is
3 reporting from the users to the company about bad
4 experiences; is that right?
5    A.  That is correct.
6    Q.  And when you looked at Instagram's
7 reporting flow or that reporting system, did you
8 find it was flawed?
9    A.  Yes, I did.
10    Q.  In what respect?
11    A.  The -- it was not designed for teenagers.
12 Teenagers and adults got exactly the same
13 categories.  And the categories are not -- do not
14 reflect the harms that were, for example, in the
15 Negative Experiences Survey.  And we knew from the
16 work I had done in my first stint that you have to
17 give people reasons that match what they are
18 experiencing in order for them to select and use the
19 tools that you are giving them.
20        And so if you see -- if somebody sends you
21 a dick pic, I don't know what you select in the
22 options that they have, which is one of the examples
23 I used extensively in my second stint, when I was
24 talking to people at Instagram saying, like, when a
25 teenagers gets an unwanted nude, what do they do?

Page 161

1 And to this day, today, when a teenager gets an
2 unwanted nude, what do they do?  I keep testing this
3 regularly in the hope that there is going to be
4 something, which is the first step.
5    Q.  Okay.  So -- and did you discover, when
6 you were looking, whether or not actually kids were
7 using the reporting flow and they had a meaningful
8 amount of kids reporting harms?
9        MS. JONES:  Objection.  Foundation.  Form.
10        THE WITNESS:  When we looked at the
11 reporting tools that they provide, one of the things
12 that we found is of the people who have had -- who
13 told us they had a bad experience, only 1 percent of
14 them finished submitting feedback through the
15 reporting tool.  Like, one in a hundred people
16 actually used the tool all the way through.
17        I believe, based on prior experience and
18 the way this is assigned, that that number for
19 teenagers is likely much lower.
20        And then, like, how can you prevent harm
21 if you're not letting people tell you when it's
22 happening.
23 BY MR. CARTMELL:
24    Q.  Is one of the things that you did when you
25 were at Meta from 2019 to 2021 as their safety

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1 consultant related to well-being and other safety
2 issues, did you try to recommend and convince
3 leadership to correct what you called the flawed
4 reporting flow?
5        MS. JONES:  Objection to the form.
6        THE WITNESS:  Yes, I did.
7 BY MR. CARTMELL:
8    Q.  How did they react?  Strike that.
9        Were you able to convince Meta's
10 leadership to do that?
11    A.  As far as I can tell, the reporting flow
12 is the same today that it was in 2021 and very
13 similar to the way it was in 2019, and so it hasn't
14 changed.  And I think that's a pretty good measure
15 of how they received the feedback that is in the
16 Negative Experiences Survey as well as all of the
17 work that I did in my second stint.
18    Q.  And based on your experience, can a low
19 reporting flow like that contribute to cause harm to
20 kids on Instagram?
21        MS. JONES:  Objection.  Foundation.
22        THE WITNESS:  Yes, it can.  It's the first
23 step.  If people cannot tell you about harm, then
24 how can you prevent it?
25 ///

Page 163

1 BY MR. CARTMELL:
2    Q.  You mentioned that there were no metrics
3 in place; is that right?
4        MS. JONES:  Objection to form.
5 BY MR. CARTMELL:
6    Q.  Strike that.
7        You mentioned that one of the steps to
8 have an appropriate safety framework is that there
9 needs to be metrics in place for safety, correct?
10    A.  Correct.
11    Q.  Do you believe that Instagram had
12 appropriate metrics in place for safety?
13    A.  They did not.
14    Q.  Do they today?  Do you know?
15    A.  I don't know.
16    Q.  Real quick, I want to ask you about when
17 you went back in 2019, did you actually also look at
18 the Facebook reporting flow?
19    A.  Yes, I did.
20    Q.  And did you actually also find that the
21 Facebook reporting flow was flawed?
22    A.  Yes, I did.
23    Q.  What did you find?
24    A.  So I found that they had brought back a
25 lot of the changes that we had done, which led to

Page 164

1 more accurate reports and reducing the number of
2 reports that needed to be reviewed.  And so I spoke
3 to the -- both the product manager and the
4 engineering manager for their team at Facebook that
5 was responsible for the reporting tools.
6    Q.  And what did you find out?
7    A.  I found out that, in the words of the
8 engineering manager -- well, I'm not going to -- let
9 me tell you what I found out and -- and as a result
10 of the conversations I had with all of them.
11        So this is not one person, but it was,
12 like, multiple people said this.  The manager for
13 the team, the product manager, and the engineering
14 manager.
15        And what I learned from talking to them
16 was that they had had some difficulty maintaining
17 some of the older flows that were based on previous
18 infrastructure.  So they removed the flows, at which
19 point reporting went up significantly, and they did
20 not have enough people to review.
21        So they adjusted the flow to add something
22 called friction, which is add steps that make people
23 drop off, so they don't complete the task, and that
24 they had always added a blue button that people
25 clicked in the knowledge that they believe they had

Page 165

1 submitted a report when the blue button dismissed
2 the flow.
3        And this was something that everybody that
4 I spoke to within that part of the company was aware
5 of.  And I found that very problematic.
6    Q.  Was Meta actually making design changes to
7 the Facebook reporting flow to discourage reporting?
8        MS. JONES:  Objection.  Foundation.
9        THE WITNESS:  That is correct.
10 BY MR. CARTMELL:
11    Q.  And did Meta actually intentionally
12 include what you called a blue button to try to
13 lower the amount of reporting?
14        MS. JONES:  Same objection.
15        THE WITNESS:  That is correct.
16 BY MR. CARTMELL:
17    Q.  Let me ask you.  Your reaction to that,
18 you said it was problematic.
19        Did that tell you anything about Meta's
20 commitment to safety?
21        MS. JONES:  Objection to the form.
22        THE WITNESS:  Yes, it did.
23 BY MR. CARTMELL:
24    Q.  What did it tell you?
25    A.  Not a priority.  It's more important to

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

1  reduce the number of reports that you get than it is
2  to make a better product that helps people tell you
3  what the harm is and then do the work of going and
4  reducing that harm.
5      Q.  You mentioned that you also did an
6  assessment of the safety tools and features on
7  Instagram during your stint during 2019 to '21; is
8  that right?
9      A.  That's right.
10     Q.  When you did an assessment of Instagram's
11 safety tools and features, did you find that there
12 were any that were effective at preventing or
13 substantially reducing harms to kids on Instagram?
14     A.  I believe that at the time there were no
15 tools that were effective at reducing the harm that
16 kids were experiencing on Instagram.
17     Q.  I have seen that you described Instagram's
18 safety tools and features as placebo; is that right?
19     A.  I have, yes.
20     Q.  What does that mean?
21     A.  It means that they are tools that sound
22 good but that don't effectively -- or reduce
23 real-world harm.  And so they -- I think that they,
24 like, sound really good in the press and sound good
25 for regulators or people trying to pass legislation,

Page 167

1  but when you test the substance of it, they don't
2  make teens' life meaningfully safer.
3      Q.  When you did your assessment of the safety
4  features during that stint in 2019 to '21, did you
5  find that most of the safety features or all of the
6  safety features are actually opt-in safety features
7  at that time?
8      MS. JONES:  Objection to foundation and
9  characterization.
10     THE WITNESS:  When I looked at the
11 features, they were both opt-in and also there were
12 no meaningful efforts to get people to use them,
13 which is something I discussed.
14 BY MR. CARTMELL:
15     Q.  From a safety engineering perspective and
16 child safety expert like you have been for 30 years,
17 does the fact that a safety tool or feature is off
18 opt-in affect whether or not that will prevent or
19 reduce harms?
20     MS. JONES:  Objection to the form and
21 foundation.
22     THE WITNESS:  If a feature is opt-in,
23 almost nobody will use it.  And I can provide many
24 examples of that throughout my career.
25 ///

Page 168

1  BY MR. CARTMELL:
2      Q.  And did Meta know that, that if they made
3  their safety features opt-in on Instagram, that the
4  adoption rate or the number of kids, for instance,
5  that would use them would be very low?
6      MS. JONES:  Objection to the form and
7  foundation.
8      THE WITNESS:  Yes.
9  BY MR. CARTMELL:
10     Q.  Meta could have made safety features and
11 tools default features that kids had to use,
12 correct?
13     MS. JONES:  Same objection.
14     Excuse me.
15     Go ahead.
16     THE WITNESS:  Did you get to say?
17     MS. JONES:  Objection.  Form and
18 foundation.
19     THE WITNESS:  Yes.
20 BY MR. CARTMELL:
21     Q.  Did Meta choose not to do that though?
22     MS. JONES:  Same objections.
23     THE WITNESS:  Yes.
24 BY MR. CARTMELL:
25     Q.  And if they had been default features, do

Page 169

1  you think that a substantially higher number of kids
2  would have used those safety tools and features?
3      A.  Yes.
4      MS. JONES:  Excuse me.
5      THE WITNESS:  Sorry.
6      MS. JONES:  No, no.  That's okay.
7      Objection.  Foundation.
8      THE WITNESS:  Yes.
9  BY MR. CARTMELL:
10     Q.  Did you assess whether the safety tools
11 and features were effective to prevent harms from
12 addiction and problematic use?
13     A.  Yes.
14     Q.  From negative social comparison or body
15 image issues?
16     A.  Yes.
17     Q.  From unwanted sexual interactions or
18 inappropriate interactions with adults?
19     A.  Yes.
20     Q.  From bullying and harassment?
21     A.  Yes.
22     Q.  Did you find any safety features while you
23 were there from 2019 to 2021 effective to prevent or
24 substantially reduce harms to kids?
25     A.  I did not.

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

1    MR. CARTMELL: Can we take a break?
2    MR. WARD: Is this a lunch break?
3    MR. CARTMELL: Yeah.
4    MR. WARD: Everybody all right? Okay.
5    THE VIDEOGRAPHER: Time is 1:02. We're
6 off the record.
7    (Whereupon, a brief recess was taken.)
8    THE VIDEOGRAPHER: Time is 1:57 we're back
9 on the record.
10 BY MR. CARTMELL:
11    Q. Mr. Bejar, we're back on the record after
12 a lunch break.
13    Are you ready to proceed?
14    A. Yes, I am.
15    Q. Before lunch we were talking about number
16 four on the factors that you provided that caused
17 Meta's Instagram app to be unsafe for kids. And you
18 were talking about -- I think you used the word sort
19 of the framework that needed to be in place to help
20 prevent harms to kids.
21    Do you recall that?
22    A. I do.
23    Q. What I would like to do is, if we could,
24 have you state that framework again. I want it to
25 be very clear what you are talking about with

Page 171

1 respect to what safety framework you think needed to
2 be in place at Meta on Instagram to keep kids safe.
3    MS. JONES: Objection to the form and
4 calls for a narrative.
5    THE WITNESS: Okay. So there are four
6 things you need.
7    Number one is effective reporting where
8 people can tell you what happened, where it happened
9 to them, and how intense it was and how bad was it.
10    Then number two, you use that information
11 that you collected to help prevent other people from
12 experiencing similar harms.
13    Number three, where appropriate, you give
14 feedback to the actor, like the person who initiated
15 the negative experience.
16    And then number four is you need to
17 monitor and measure the effectiveness of the
18 framework because it is a methodology. It is a
19 cycle.
20 BY MR. CARTMELL:
21    Q. Okay. Great. Now, let me follow up on
22 that.
23    I would like to, if you could, take an
24 example for, let's say, an unwanted sexual advance
25 that a kid is having, and if you could take us

Page 172

1 through that framework and how that would work to
2 prevent harms in the future.
3    A. Absolutely. So you start when you ask
4 teenagers and they tell you I have experienced an
5 unwanted advance in the last seven days. Where have
6 you experienced it? Oh, some of them might be in
7 messages or maybe through comments, for example.
8    Then you go to number one. Number one is,
9 is there a way for a teenager to effectively report
10 that they have experienced this? So you want a
11 button that they will use where they can say, hey, I
12 just wanted to -- an unwanted advance. You want to
13 make sure that button is right next to where the
14 harm is happening so you know where it's happening.
15 And you also want to know kind of how bad is it.
16 Because you can, most of the time, not tell how bad
17 an experience is from just looking at the content.
18    So now you have important information.
19 You have what did the teen experience, what
20 interaction appears the conduct was connected to,
21 what happened, and how bad was it.
22    Then number two is you use that
23 information to prevent other kids from experiencing
24 the same issue. So if you allowed a teenager to
25 say, hey, that was an unwanted advance, then you can

Page 173

1 keep a counter on the server and say, oh, look, that
2 person initiated unwanted advance three or four
3 times. Maybe you should either block them or tell
4 them that they shouldn't do it, depending on -- now
5 you have information you can find that.
6    So once you have that signal of the
7 unwanted advance, you can use it to find people that
8 maybe did it a lot, and then that is where the
9 predators, the sextortionists and those people live.
10 They behave differently than two people that might
11 have been doing this to each other.
12    Then number three is if it is the first
13 few times, and this is so critical, you use the
14 information to go, excuse me, Pat, you should know
15 that Instagram Direct Messaging is not an
16 environment where you should send unwanted advances.
17    Because in probably 20 or 30 products that
18 are built between 2009 and 2015, we found that most
19 people, when you tell them respectfully they are not
20 supposed to do that, they stop. And so then you are
21 affecting the source.
22    Also, the other benefit of telling that to
23 somebody respectfully is that if people keep doing
24 it, then that person might be a predator. There
25 might be other issues there. And then you can have

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

1 very effective interventions that find predators,
2 that isolate them, find people that are doing, for
3 example, sextortion, and then finding other similar
4 accounts and then eradicating them.
5        And then number four, well, how do you
6 know if all of these things are working, right. The
7 number of kids who were telling you they were
8 getting unwanted advances should go down. The
9 number of reports, once you have implemented the
10 full cycle and had a chance to run over time, should
11 go down. You especially don't want the same person
12 having the experience multiple times, because that
13 tells you, again, things might be going wrong.
14        And so if you allow a teenager to, number
15 one, tell you when they have experienced unwanted
16 advance, use that information to prevent it from
17 others, give feedback where appropriate, and then
18 measure the cycle, you could dramatically reduce the
19 amount of unwanted advances that are happening on
20 the platform.
21    Q.  In your opinion, based on your expertise
22 and training and experience, that framework, will it
23 more likely than not reduce the harm?
24        MS. JONES: Objection. Foundation.
25        THE WITNESS: Yes.

Page 175

1 BY MR. CARTMELL:
2    Q.  Okay. And that framework that we just
3 talked about was an example of a bad actor, for
4 example, right?
5    A.  Correct.
6    Q.  So would the same thing happen or could it
7 be adaptable to -- strike that.
8        Can that framework be adaptable to a bully
9 who is doing something, a bad actor bully?
10    A.  That is correct. And so one of the things
11 that we found is that, like, when a teen is
12 experiencing bullying that is most distressing, you
13 really cannot tell from the content how -- how bad
14 it is. It could even be a compliment about
15 somebody's glasses. Once you talk to the teen or
16 understand the circumstances, it makes a lot of
17 sense.
18        So you use that information to make sure
19 that, again, a teen is able to tell you. We knew
20 from the work with Yale that step number one, this
21 effective reporting that I described, makes the teen
22 feel safer at the end of step one, which is
23 essential when it comes to bullying or harassment.
24        And then, again, you find -- are these
25 people doing it all over the place? Do you have

Page 176

1 somebody that is going from post to post to post,
2 like, bullying or harassing people? Which there are
3 people who go around spreading that kind of harm.
4 And then you go, like, okay. I'm going to stop you
5 from doing that. Now you know.
6        Number three, you tell them, hey, this is
7 not the place where you do that kind of activity.
8 And if they don't listen to you, then you know you
9 have a different kind of problem.
10        Number four, you should see, right, as you
11 communicate to people in -- this works the same in
12 schools as it works the same in workplaces. As you
13 give feedback to people, you should see the number
14 of repeat incidents by individuals go down over
15 time, and over a longer period of time the numbers
16 should absolutely go down.
17    Q.  So in these circumstances that you have
18 just given examples of bullying and unwanted
19 advances, is it content agnostic?
20    A.  Yes.
21        MS. JONES: Object to the form and
22 foundation.
23 BY MR. CARTMELL:
24    Q.  What does content agnostic mean?
25    A.  Content -- and for these cases, like,

Page 177

1 unwanted sexual advances, bullying, it doesn't
2 matter what the content is. What matters is the
3 distress that the teen is experiencing and helping
4 them with that, and then noticing patterns in
5 conduct.
6        So I don't have to define all of the
7 millions of ways that people can do this to each
8 other. I mean, just in conversations with my
9 daughter, just having her describe the different
10 messages that she was getting, I know from, like, a
11 lifetime in the field you couldn't take something
12 that takes, for example, especially like Netflix and
13 Chill, which is a colloquial way for asking for sex,
14 as something that you would want to build a tool to
15 stop those words, right. It wouldn't work.
16        But I know that, for example, a
17 compliment, like, you look so good today, when you
18 look at the Chat logs of predators and groomers,
19 they are all compliments.
20        And so then if somebody is telling you
21 this compliment made me really uncomfortable
22 intensity, then you might know that you are in a
23 grooming circumstance.
24        It doesn't matter what the content is.
25 What matters is the response. And then you look for

CONFIDENTIAL

Page 178

1 patterns in conduct to prevent further harm.
2    Q.  So you're not in that framework asking
3 Meta to take anything down as far as content,
4 correct?
5    A.  That is correct.
6    Q.  It's behavior that is being changed; is
7 that right?
8    A.  That is correct.
9    Q.  Okay.  And the tools and features that you
10 have described in the framework that you believe
11 Meta should have had on Instagram, would that be
12 adaptable as well to harms to teens related to body
13 image issues or suicide and self-injury content they
14 are seeing, that sort of thing?
15    MS. JONES:  Objection to the form and
16 foundation.
17    THE WITNESS:  Yes, they would.
18 BY MR. CARTMELL:
19    Q.  Can you explain that, please.
20    A.  So in talking to people who have lived the
21 experience with eating disorders, I learned that the
22 kind of content they get recommended are things like
23 recipes, lose weight fad, body image issues that are
24 profoundly distressing to them.
25    So if you made it easy for somebody to

Page 179

1 say, again, report effectively, oh, don't show me
2 that content, why, what is happening, or it's bad
3 for eating disorders.  And, again, you want to find
4 the language that works for them.  This is like
5 established research of how to go about that.
6    And then you ask them, well, how important
7 this is for you?  How intense this is?  And they
8 might be, like, yeah, this is pretty important, help
9 me.
10    Then you can actually do two things that
11 are incredibly important.  One of them is you can
12 ensure that that teenager no longer gets recommended
13 that kind of content, because you can control that.
14    Q.  Meta can control that?
15    A.  Yes.  So Meta can control -- the way they
16 can -- the way Instagram can give you a selection of
17 cat videos or other related things, they can also
18 say, no, you don't get cat videos, right.  So there
19 is internal tools that manage content this way.  And
20 so you could say don't recommend to me this kind of
21 content.  And then you record that.
22    So like number one, again, you go to like
23 step number two, prevent the teen from getting
24 further of that content, and then you are stopping
25 the harm that that teen is experiencing.

Page 180

1    But, also, let's say -- I don't know -- 3
2 to 5 percent of teens are telling you about, like,
3 body image, stuff that makes them uncomfortable.
4 Well, maybe you should not be recommending that
5 content based on community feedback.  It's not that
6 the content shouldn't be posted.  As long as
7 anything is allowed by the terms of service, people
8 should be able to post it.
9    Again, I profoundly believe in the freedom
10 of speech and people to express whatever the
11 platform allows.  But if a teenager is telling you
12 don't recommend that to me because it's eating
13 disorder content and it's very distressing to me,
14 that should be a very high signal for you to maybe
15 not be recommending that content to other teens.
16    And then in the process of doing that, you
17 are going to reduce the likelihood that teens are
18 going to experience that kind of content, kind of
19 what you see in the survey.
20    Then the next step is feedback.  You might
21 want to let content creators know, hey, your content
22 is getting less distribution because community has
23 told us that they kind of identified with eating
24 disorder, and this is the feedback from the
25 community to you.  Maybe you should think about --

Page 181

1 if you want more reach, maybe think about adjusting
2 your content.
3    And number four, you really want to be
4 able to measure and track over time are teens seeing
5 to them what is eating disorder content, and that
6 number should go down if this system -- if this
7 methodology is correctly implemented.
8    MS. JONES:  I am going to object to the
9 narrative.  Nonresponsive.
10    Go ahead.
11 BY MR. CARTMELL:
12    Q.  Okay.  Thank you for that.
13    Now was Meta doing on Instagram any of
14 those things that you mentioned as a part of an
15 appropriate framework for safety on Instagram?
16    A.  They were not.
17    Q.  And as a result of that, do you believe
18 that safety of kids on Instagram -- strike that.
19    As a result of that, do you believe that
20 the lack of that framework caused or contributed to
21 cause an unsafe Instagram for kids?
22    MS. JONES:  Objection to the form and
23 foundation.
24    THE WITNESS:  I do.
25 ///

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

1 BY MR. CARTMELL:
2     Q.   Let's move to -- actually, before we do
3 that, I have a few more questions for you on number
4 four.
5         That framework that you had told us about
6 to help protect kids on Instagram, based on your
7 expertise, do you believe that framework should have
8 been in place by the time you arrived at Meta for
9 your second stint in 2019?
10    A.   Yes, I do.
11    Q.   Why is that?
12    A.   That framework had been in place for
13 Facebook during my first stint. So the way through
14 which we discovered and reduced harm that people,
15 including teens, were experiencing was by the
16 application of that framework.
17    Q.   So it was obviously technically feasible
18 for Meta to do that well before 2019?
19        MS. JONES: Objection. Foundation.
20        MR. CARTMELL: I'll restate it.
21    Q.   Was it technically feasible for Meta to
22 put in place that safety framework on Instagram
23 before 2019?
24        MS. JONES: Same objection.
25        THE WITNESS: Yes, it was technically

Page 183

1 feasible. And then as new technologies entered, it
2 would have gotten so much more effective than it
3 originally was.
4 BY MR. CARTMELL:
5     Q.   I want to switch gears a little bit, but
6 still talking about number four.
7         Is actually age verification a part of an
8 appropriate safety framework?
9     A.   Yes, it is.
10    Q.   In other words, do you believe Instagram
11 should have had appropriate age verification in
12 place to keep kids safe on Instagram?
13    A.   Yes, I do.
14    Q.   Let's talk about your first stint at Meta
15 when you were working on the Facebook app and they
16 purchased Instagram. Okay?
17    A.   Yes.
18    Q.   In 2012 they purchased Instagram, correct?
19    A.   Correct.
20    Q.   And then between 2012 and 2015 was the
21 period of time that you were at Meta and working
22 some in conjunction with Instagram's leaders; is
23 that correct?
24    A.   That is correct.
25    Q.   At that time in 2012 to 2015, on Instagram

Page 184

1 what was the required minimum age for a kid to have
2 an account?
3     A.   At the time, on Instagram, there was a
4 "don't ask, don't tell" policy.
5     Q.   Okay. Was there a written --
6         MS. JONES: Let me just object to that
7 answer as nonresponsive to the question.
8         Go ahead.
9         THE WITNESS: Okay.
10 BY MR. CARTMELL:
11    Q.   I'll restate the question.
12        In 2012, from that time until you left in
13 2015, at Meta, was there a written policy related to
14 the minimum required age for kids on Instagram?
15    A.   There was not.
16    Q.   Was the required age that people discussed
17 13? In other words, was there a terms of service or
18 something that stated that you had to be -- a kid
19 had to be 13 to be on Instagram?
20    A.   No.
21        MS. JONES: Objection to the form.
22 BY MR. CARTMELL:
23    Q.   What was your understanding while you were
24 at Meta from 2012 to 2015 about Instagram's age
25 verification policy?

Page 185

1         MS. JONES: Objection. Foundation.
2         THE WITNESS: So I had many conversations
3 about this with many people, including the product
4 manager that I managed who was responsible for age
5 verification on Facebook. And those conversations,
6 it was common knowledge that there were young kids
7 using Instagram. And, I mean, that was a big reason
8 behind the accusation.
9 BY MR. CARTMELL:
10    Q.   What do you mean, that was a big reason
11 behind the acquisition?
12        MS. JONES: Objection. Foundation.
13        THE WITNESS: In the conversations that I
14 had with many people at the time, that that was one
15 of the key reasons of the -- for the Instagram
16 acquisition.
17 BY MR. CARTMELL:
18    Q.   Meta wanted the very young kids on their
19 social media apps?
20        MS. JONES: Same objections. Lack of
21 foundation.
22        THE WITNESS: Yes.
23 BY MR. CARTMELL:
24    Q.   Let me ask you, so was it well-known at
25 Meta in 2012 to 2015 that there were kids on

47 (Pages 182 - 185)

CONFIDENTIAL

Page 186

1 Instagram who were under the age of 13?
2        MS. JONES: Objection. Foundation.
3        THE WITNESS: Yes.
4 BY MR. CARTMELL:
5     Q. Did leadership at Meta know that at that
6 time?
7        MS. JONES: Same objection.
8        THE WITNESS: I would have to think so
9 given how it was common knowledge in the
10 conversations that I had with the people working on
11 these issues.
12 BY MR. CARTMELL:
13    Q. And what, as far as you know, was the
14 policy that was being implemented there as far as
15 kids under 13 being on Instagram?
16       MS. JONES: Objection to the form.
17       THE WITNESS: I was not aware of any
18 policy being implemented about kids being under 13
19 on Instagram.
20 BY MR. CARTMELL:
21    Q. You mentioned don't ask, don't tell,
22 correct?
23    A. That is correct.
24    Q. What did you mean by that?
25    A. It means that you know that there are kids

Page 187

1 under 13 there but you do not really talk about it
2 and you don't ask about it. Like, if you didn't
3 know somebody was under 13, then you didn't have to
4 do anything about it.
5     Q. Do you remember whether Instagram during
6 your first stint was asking kids for their age at
7 sign up?
8     A. They were not.
9     Q. When you returned to Meta in 2019,
10 October, do you know whether Instagram was asking
11 kids for their age when they would sign up for an
12 Instagram account?
13       MS. JONES: Objection. Foundation.
14       THE WITNESS: I believe they began asking
15 at some point in 2019 but I don't recall the
16 specific date.
17 BY MR. CARTMELL:
18    Q. Was your understanding that from 2012,
19 when Meta acquired Instagram, until sometime in
20 2019, Meta was not asking kids for their age when
21 they would sign up for an account?
22    A. Yes.
23       (Whereupon, a brief discussion off the
24 record.)
25 ///

Page 188

1 BY MR. CARTMELL:
2     Q. Based on your understanding, when you
3 returned to Meta in 2019, was it still well-known
4 among the employees at Meta that there were kids on
5 Instagram who were younger than 13?
6        MS. JONES: Objection. Foundation.
7        THE WITNESS: Yes. But it was also
8 something you did not talk about.
9 BY MR. CARTMELL:
10    Q. Did you have any estimation from your
11 conversations or your work and research at Meta when
12 you returned in 2019 about the extent of the problem
13 with kids younger than 13 on Instagram?
14       MS. JONES: Same objection.
15       Excuse me. Objection. Form. And
16 foundation.
17       Go ahead.
18       THE WITNESS: I did not.
19 BY MR. CARTMELL:
20    Q. Do you believe that it was likely millions
21 and millions of kids?
22    A. Absolutely.
23       MS. JONES: Hold on.
24       Same objection to the foundation as
25 earlier.

Page 189

1        THE WITNESS: Absolutely.
2 BY MR. CARTMELL:
3     Q. And what is that based on?
4     A. It's a combination of the number of people
5 that I knew that had talked about their kids being
6 under 13 going on Instagram. So it played out in my
7 kids' schools. And then later on by just doing
8 basic testing of the product to see if we could find
9 those kinds of accounts.
10    Q. Was the policy, so to speak, at Meta when
11 you returned in 2019 about age verification and
12 underage kids still don't ask, don't tell?
13    A. I think for Instagram that depends on the
14 dates they start asking. I think up to the point
15 where they started asking is when you say yes for
16 Instagram.
17       I think for Facebook, the policy was from
18 the beginning. If we become aware of an account,
19 then we will remove it and we'll ask for age at
20 sign-up. This is one of the things that I managed
21 in my first stint.
22    Q. Okay. How was it when you returned to
23 Meta in 2019 that they would actually manage or act
24 on kids under the age of 13 having accounts; do you
25 know?

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

1    A.  At Instagram, I was not aware of any
2  efforts to detect or remove under-13 accounts.
3    Q.  Do you believe that Instagram -- strike
4  that.
5        Do you believe that Meta was diligent in
6  trying to remove kids that were under age 13 from
7  Instagram?
8        MS. JONES:  Objection.  Foundation.
9        THE WITNESS:  Absolutely not.
10 BY MR. CARTMELL:
11   Q.  Was that concerning to you as an online
12 child safety expert?
13   A.  Yes.
14   Q.  You testified previously that you did not
15 believe that Instagram was a safe place for kids,
16 correct?
17   A.  That is correct.
18   Q.  And I'm guessing the same thing would be
19 true definitely for kids younger than 13?
20   A.  Absolutely.
21   Q.  Did Instagram have the ability to build
22 effective tools to try to prohibit kids younger than
23 13 from being on Instagram?
24   A.  Yes, they did.
25   Q.  Did they ever do that while you were

Page 191

1  there?
2    A.  Not as far as I'm aware.
3        MS. JONES:  Excuse me.
4        I'm going to object to the last two
5  questions on foundation.
6  BY MR. CARTMELL:
7    Q.  Go ahead.
8    A.  Not as far as I'm aware.
9    Q.  If Meta's executives say that they do not
10 allow kids under 13 on Instagram, how would you
11 respond to that?
12   A.  I think that's lying.
13   Q.  Do you think that's a truthful statement?
14   A.  No, I don't think that's a truthful
15 statement.
16   Q.  What if Meta's executives state that they
17 don't allow them -- they try to find them and they
18 try as quickly as possible to get kids under 13 off
19 of Instagram; do you agree with that?
20       MS. JONES:  Objection to the foundation.
21       THE WITNESS:  I profoundly disagree with
22 that.
23       (Whereupon, Meta-Bejar Exhibit 11 was
24 marked for identification.)
25 ///

Page 192

1  BY MR. CARTMELL:
2    Q.  I've handed you Exhibit 13 -- oh -- strike
3  that.
4        I've handed you Exhibit 11.  And we're
5  going to play a clip of testimony from Adam Mosseri.
6        Adam Mosseri is who?
7    A.  He's the head of Instagram.
8    Q.  Is this Adam Mosseri on the screen?
9    A.  Yes, it is.
10       (Video playing.)
11       MR. CARTMELL:  Just start -- I think you
12 could get a little more of the first word, 13, I
13 don't know, Jim, but try one more time, please.
14       (Video playing.)
15       MS. JONES:  I'm going to object to the
16 out-of-context play of the deposition clip for which
17 Mr. Bejar has no foundation to testify.
18       Go ahead.
19 BY MR. CARTMELL:
20   Q.  You heard Mr. Mosseri talking about Meta's
21 policy related to having kids under 13 on the
22 platform?
23   A.  Correct.
24   Q.  Do you agree with Mr. Mosseri's testimony?
25   A.  I do not.

Page 193

1    Q.  Why is that?
2    A.  Because they do allow, like, practically
3  allow under-13 kids on the platform and they do not,
4  and I was not aware of at the time, have any decent
5  efforts at identifying them and removing them.
6        If you search -- so Instagram you have
7  these things called hashtags.  And you can search
8  for the hashtag like eighth birthday, which is
9  something that -- labels people put on their posts.
10 And on the first page of results there are multiple
11 kids that on their profile page they say, I am
12 eight.  And they are so easy to find and there are
13 many on there.  And if we go back to sort of we were
14 talking about, trying to report them is nearly
15 impossible.
16       And one of my responsibilities on my first
17 stint was the infrastructure that detected fake
18 accounts.  And I cannot tell you how sophisticated
19 people can be at creating fake accounts.  That
20 infrastructure that was available in 2011 or '12
21 could be used to so effectively identify accounts
22 created by eight-year-olds in order to then require
23 further verification to establish whether they are
24 actually the kid, what age they are, if their
25 parents are aware.

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

1        And this is something we used to do at
2 Facebook and I was not aware of any substantive
3 efforts to do that at Instagram.
4        Q.   Even after Meta started asking for kids'
5 ages on -- when kids would sign up for Instagram, in
6 December of 2019 were there still kids on Instagram
7 under the age of 13?
8        MS. JONES:  Objection.  Foundation.
9        THE WITNESS:  Yes.
10 BY MR. CARTMELL:
11       Q.   And at that point, even after they were
12 asking for age -- ages, I take it some kids would
13 lie?
14       A.   Yes.
15       Q.   Is that well-known in the industry, that
16 kids lie when they sign up for an Instagram or other
17 social media account?
18       MS. JONES:  Foundation.  Objection.
19 Foundation.
20       THE WITNESS:  Yes.
21 BY MR. CARTMELL:
22       Q.   Do you know that based on your 30 years in
23 the industry?
24       A.   Yes.  And managing this issue for Yahoo!
25 and managing this issue for Facebook.

Page 195

1        Q.   Even after Instagram started asking for
2 ages of kids and knowing that kids would lie, were
3 they diligent in trying to find those kids and make
4 sure that they were not on Instagram?
5        MS. JONES:  Objection.  Foundation.
6        THE WITNESS:  I believe that they actually
7 were the opposite of that.  That they made it almost
8 impossible to report underage accounts and -- that
9 there were features that were designed to appeal to
10 those kids and that you can find them today, like a
11 week ago, and they're still -- videos where kids --
12 there is, a little song it goes, like, "I am 16,
13 going on 17."  And Instagram has a feature that
14 allows you to use that song in a video that you
15 make.
16        And, like, a week ago or two, I found
17 this -- some kids using that song, 22,000 of them,
18 and they say how old they are and the number goes on
19 the screen and so, "I am 16, going on 17."  And they
20 go like this and the actual age pops up.  And it
21 reads 11, 9, 8, 7, all of these numbers.  And
22 there's 22,000 of them.  I think if your technology
23 doesn't find those kids, I really don't know what
24 you're trying to find.
25 ///

Page 196

1 BY MR. CARTMELL:
2        Q.   You're talking about testing that you did
3 a week ago; is that right?
4        A.   In the most recent weeks.  So beginning --
5 like for the last month I've been doing some
6 testing.
7        Q.   Okay.  I'm going to hand you what has been
8 marked as Exhibit 12.
9        (Whereupon, Meta-Bejar Exhibit 12 was
10 marked for identification.)
11 BY MR. CARTMELL:
12       Q.   And ask you what Exhibit 12 is.
13       This was something that you produced from
14 your files in this litigation; is that correct?
15       A.   That is correct.
16       Q.   So tell us, you mentioned that you had
17 done testing on accounts in the past, correct?
18       A.   That is correct.
19       Q.   And is this a -- an account of the testing
20 you've done over time?
21       A.   That is correct.
22       Q.   Why don't you go ahead and just explain
23 briefly what this document is that we just marked as
24 Exhibit 12.
25       A.   Yeah.  So in November of 2023, I really

Page 197

1 wanted to see what the experience was of a teenager
2 on Instagram.  And so I wanted to create a few test
3 accounts in order to understand that and I could
4 give concrete examples.
5        The testing protocol I use, sort of the
6 steps I followed, is kind of like what you would do
7 as a parent if you gave your kid a phone.  So got
8 the phone out of the drawer, erased it, create an
9 account on Apple with the right age, so 13 or 14.  I
10 tested both ages.  I tested boy/girl.  These list
11 the girls that I kind of focused on.
12        And then I created Instagram, downloaded
13 it, and just went in initially all defaults.  I
14 didn't do any searches.  I didn't do any of the
15 things that kind of prime algorithms just to see how
16 things work.  And I have continued to test those
17 accounts.
18       Q.   And this document outlines that testing.
19 And what are the pages attached to it with dates
20 starting as early as 2023?
21       A.   So it outlines what I did to test.  And
22 then these are videos that I took from the phone
23 while I was doing the testing that were -- that's
24 kind of what the phone recorded.  And I labeled the
25 videos to describe what the videos captured.

50 (Pages 194 - 197)

CONFIDENTIAL

Page 198

1    Q.   You mentioned that you did some testing to
2  look at whether or not there were underaged kids on
3  Instagram; is that correct?
4    A.   That is correct.
5        (Whereupon, Meta-Bejar Exhibit 13 was
6  marked for identification.)
7  BY MR. CARTMELL:
8    Q.   Mr. Bejar, I have provided you Exhibit 13
9  which is a slipsheet for a clip of a video that you
10  took during your testing that involves looking for
11  underage kids on Instagram.  It's -- the source is
12  BEJAR0002542.
13        Do you see that?
14    A.   I do.
15    Q.   Okay.  And can you tell us what, before we
16  start the video, what it was you did with this
17  phone?
18    A.   Yeah.  So -- so I had -- I tried different
19  things with different accounts.  So my initial
20  testing for the very first account was -- was to see
21  sort of how some features were implemented.  And
22  then I also searched for some gymnastics content and
23  then sort of got recommended videos of very young
24  girls in different kinds of outfits.  That is the 32
25  ending account.

Page 199

1        For the other accounts, the only thing I
2  did for a long period of time was to create the
3  account, go into Reels, no searches, no follows, and
4  watch videos and then if a particular video that met
5  that criteria came -- fed to me, I would watch it to
6  completion.  And then I would swipe quickly videos
7  didn't meet that criteria.
8        So for example, if a video looked a little
9  racy, I would watch the video.  If a video looked a
10  little violent, I would watch that video.  If that
11  video was created by somebody who appeared to be
12  under 13, I would watch that video.  And as a result
13  of that, what I found is within 8 to 12 minutes,
14  sometimes 18, the Reels algorithm adapted to give me
15  a stream of that content which I had watched.
16    Q.   You said this was in -- or your first
17  testing was in November of 2023?
18    A.   That is correct.
19    Q.   Why were you doing it at that time?
20    A.   I've always believed it's really important
21  to speak accurately about these things.  And so I
22  really wanted to be able to be well informed, as I
23  was sort of entering public discourse around these
24  things, to be able to make accurate representation,
25  so what teens were getting delivered, and to be able

Page 200

1  to understand how the features were working in terms
2  of preventing issues.
3    Q.   Was November of 2023 when you went public?
4    A.   It was, yes.
5    Q.   Did you draw on your -- excuse me.
6        Did you draw on your 30-plus years of
7  experience in this industry when performing these
8  tests?
9    A.   Yes, I did.  I have 30-plus years of
10  experience of testing safety features and security
11  features and -- so that you can make accurate
12  representations about what they do or don't do.  And
13  that was the protocol I tried to follow.
14        MR. CARTMELL:  Okay.  Let's show clip 77,
15  please.
16        (Video playing.)
17  BY MR. CARTMELL:
18    Q.   So, Mr. Bejar --
19    A.   Can I have just a moment?
20    Q.   Yeah.  Take your time.
21    A.   Thank you.
22    Q.   So first of all, I have some questions
23  about that.
24        How long did it take you to find all these
25  kids that are underage?

Page 201

1    A.   Less than a day of testing.
2    Q.   How -- how is it that Meta doesn't make
3  sure that those kids aren't on there if they're
4  doing adequate age verification?
5        MS. JONES:  Objection.  Foundation.
6  Characterization.
7        You can answer.
8        THE WITNESS:  I mean, if you can't find
9  these accounts, you're not even trying.
10  BY MR. CARTMELL:
11    Q.   How many kids under the age of 13 did
12  you -- did you find in your testing?
13    A.   I didn't keep count.  And, again, one of
14  the principles that always guided this work is if
15  there's one, there's a million.  I mean, it's --
16  when you're dealing with a billion people the math
17  gets really big, really fast.
18    Q.   I don't totally understand where all those
19  kids were and why they were singing that song.  What
20  was that?  Is that an Instagram-provided song or
21  what are they doing?
22        MS. JONES:  Objection to the form.  And
23  foundation.  Lacks foundation.
24        THE WITNESS:  So one of the things that I
25  was testing Instagram for different features, the

CONFIDENTIAL

Page 202

1 first thing I tested was a feature where you go in
2 and you can add a little audio to your -- to the
3 video that you're making that you're sharing.
4         And I was able as a 13-year-old account to
5 create a video where the audio was called sexy girl
6 masturbating done by a porn star.  And then when you
7 see a video with a song you can click on that and
8 say, oh, let me use that song for my video.  And so
9 what you see is a feature provided by Instagram
10 where kids see other kids talking about their age
11 and they copy what they are doing and they copy the
12 song.  And Instagram makes it very easy to do that
13 so that you can create your own video.
14 BY MR. CARTMELL:
15     Q.  Does that video and the fact that you
16 found that many underage kids in a small, short
17 amount of time support your opinion that Meta does
18 not do an adequate job of age verification and
19 ensuring that kids under the age of 13 are on
20 Instagram?
21     A.  Yes.
22     Q.  Let me restate that.
23         Does that video support your opinions that
24 Meta does not do an adequate job of age
25 verification?

Page 203

1     A.  Yes.
2     Q.  Can the fact that underage kids like that,
3 under the age of 13, are on the platform, can that
4 have an impact on safety?
5         MS. JONES:  Objection to the form.
6         THE WITNESS:  Absolutely.  Because if you
7 think about every harm that we've talked about,
8 unwanted sexual advances, exposure to content that
9 is distressing or harmful, all these things, and
10 then you give those to, like, a 7- or 8-year old, I
11 mean, it's -- I can't imagine what it does to them.
12 And so I think that it's incredibly important at a
13 minimum to ensure that the kids are on the platform
14 are at least 13 years of age.
15         MR. CARTMELL:  Okay.  Let's go back to
16 Exhibit 10, please.  Sorry.  Okay.  Let's go back
17 to -- you guys, do you mind if I -- I'm going to run
18 outside and clear my throat.
19         MS. JONES:  Sure.
20         MR. CARTMELL:  Sorry.
21         (Whereupon, a brief discussion off the
22 record.)
23 BY MR. CARTMELL:
24     Q.  Okay.  Mr. Bejar, let's go to number five
25 on your list of factors.

Page 204

1         It states, "Meta Only Enforces and
2 Discloses Violations of Narrowly Defined Community
3 Standards Rather than Preventing and Disclosing
4 Actual Harmful Experiences."
5         Did I read that correctly?
6     A.  Yes.
7     Q.  What do you mean by that?
8     A.  So during that time, from 2019 to 2021,
9 there was a lot of emphasis put on what Meta calls
10 its Transparency Center where they listed out
11 different harms, the kind we have been talking about
12 today.
13         But if you talked about, for example, some
14 nudity and sexual content, the number that was
15 quoted is something called prevalence.  And the
16 prevalence of nudity was a fraction of a percent.
17 While internal surveys, like the negative
18 experiences survey, was saying one in five people
19 experienced it in the last seven days.
20         And so I believe that this Transparency
21 Center was deeply misleading as to what is the
22 likelihood that your kid is going to experience a
23 certain harm.  But the numbers -- I mean, I think to
24 me the best example of this is on, like,
25 self-suicidal ideation content, SSI.

Page 205

1     Q.  Let's go to -- actually you're looking at
2 the next survey.
3     A.  Yeah.
4     Q.  Exhibit 9.  Let's look at Perceived Reach.
5     A.  Yeah.  So here it is -- for SSI is
6 12 percent.
7         MR. CARTMELL:  Let's highlight that, Jim.
8 Thank you.
9         THE WITNESS:  And if you look at the
10 Transparency Center around these dates around the
11 topic of suicide and self-harm, what it says is
12 number is so small we don't even put it up here.
13         And so as a parent, as a professional, as
14 a person, I'm not sure how they can say that the
15 number of suicidal -- SSI content on the platform is
16 so small they can't report it when 12 percent of
17 people are telling you -- of the people who
18 responded to the survey, are telling you that they
19 saw it in the last seven days.
20 BY MR. CARTMELL:
21     Q.  Okay.  So is that published on their
22 website in the Transparency Center?
23     A.  That is correct.
24     Q.  Okay.  And do they publish, for example,
25 this information from the next survey on their

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

1 Transparency Center website?
2      A.  No.
3      Q.  Why is that?
4      MS. JONES:  Objection.  Foundation.
5      THE WITNESS:  I don't talk about people's
6 motivations because I don't know why they make the
7 choices that they make.  But what is out there is
8 profoundly misleading.  And as a parent, this is a
9 number that I would want to know so that I can take
10 appropriate measures and have the right
11 conversations with my kid.
12 BY MR. CARTMELL:
13      Q.  The prevalence of data that you mentioned,
14 is that a part of the community standards
15 enforcement report?
16      A.  Correct.
17      Q.  And you mentioned I think that there are
18 community standards or community guidelines that
19 apply to Instagram; is that right?
20      A.  Correct.
21      Q.  Just in general, what are those standards
22 or guidelines for Instagram?
23      A.  So you start with like a high-level issue
24 like nudity or sexual content and then from there
25 you have to define what you mean by that, right.

Page 207

1 And so do you see a bit, right, sort of private
2 parts, and that would be criteria under which you
3 would act on those standards.
4      Q.  Okay.
5      A.  And so you have a high-level statement,
6 then you have the policy that is published as the
7 one that is for that topic, and then you have like
8 an internal playbook that says when we look at this
9 piece of content if it meets the following three
10 criteria we will remove it because it violated this
11 community standard.
12      Q.  Were you actually involved in putting
13 together those guidelines of how to define what is
14 in violation of the community standards when you
15 were at Facebook?
16      A.  I was part of that process.  And so there
17 was a team, the policy team, that was focusing on
18 defining these.  There was another team that
19 reviewed all of the reports.  And there was my team
20 that let people tell us when a violation was
21 happening.  And we would work together.  The
22 definition was responsibility of the policy team.
23      Q.  All right.  I want to make sure that the
24 jury understands what Instagram's community
25 guidelines or standards are.

Page 208

1      So let me hand you what's been marked as
2 Exhibit 14.
3      (Whereupon, Meta-Bejar Exhibit 14 was
4 marked for identification.)
5      (Whereupon, a brief discussion off the
6 record.)
7 BY MR. CARTMELL:
8      Q.  Mr. Bejar, I have handed you Exhibit 14,
9 which comes from Instagram's website.  And I will
10 represent to you that it's still up today.  This is
11 called "Instagram Community Guidelines FAQs."
12      Do you see that?
13      A.  Yes.
14      Q.  The date is April 19th, 2018.  But, again,
15 it is still up on the website today.  But can you
16 tell us what this is?
17      A.  Yes.  So this communicates to people what
18 are the community guidelines for being on Instagram.
19 And so it covers -- this is on page 2 -- a series of
20 topics like intellectual property.  Appropriate
21 imagery, so that would include nudity, the kinds of
22 things we were talking.  Spam, so commercial content
23 that's not allowed.  Illegal content, so terrorism,
24 drugs, offering sexual services.  Hate speech,
25 bullying and abuse.

Page 209

1      Q.  Let's go through this, if we can.
2      It states, "What are community guidelines
3 and how do they differ from Terms of Use?"  On the
4 first page.
5      Do you see that?
6      A.  Yes.
7      Q.  "We want Instagram to continue to be a
8 safe place for inspiration and expression.  Our
9 Community Guidelines set out our policies for what
10 we do and don't allow on Instagram in order to
11 achieve this."
12      Did I read that correctly?
13      A.  Yes.
14      Q.  So are community guidelines on Instagram
15 guidelines that set forth what Instagram does and
16 does not allow on the website -- or -- excuse me --
17 on the app?
18      A.  Yes.
19      Q.  Okay.  And as you said, there are
20 different topics that it covers.  If we go down.
21      "What do our community guidelines cover?
22 Intellectual Property."
23      But then the second bullet is,
24 "Appropriate Imagery - We don't allow nudity on
25 Instagram."

53 (Pages 206 - 209)

CONFIDENTIAL

Page 210

1    Did I read that correctly?
2    THE WITNESS:  Yes.
3 BY MR. CARTMELL:
4    Q.   So this is telling people on their website
5 publicly that on Instagram they don't allow nudity;
6 is that fair?
7    A.   Yes.
8    Q.   Okay.  And then the second page, as you
9 said, it does include spam.  I want to go to the
10 second bullet point.
11    It says, "Illegal Content.  Offering
12 sexual services and selling firearms and drugs are
13 also prohibited."
14    Do you see that?
15    A.   Yes.
16    Q.   And then the next bullet is, "Hate Speech,
17 Bullying and Abuse - We remove credible threats of
18 violence, hate speech and the targeting of private
19 individuals."
20    Do you see that?
21    A.   Yes.
22    Q.   Those are things that this Instagram
23 guideline is saying are not allowed on Instagram,
24 correct?
25    A.   Correct.

Page 211

1    Q.   "Self-Injury - We do not allow
2 glorification or encouragement of self-injury,
3 including eating disorders."
4    Do you see that?
5    A.   I do.
6    Q.   So if somebody was going to read this,
7 parent of a kid was going to come read the
8 guidelines, they would be told by this that
9 self-injury, as well as eating disorder content, is
10 not allowed on Instagram, fair?
11    A.   Yes.
12    Q.   And then graphic violence as well.
13 Graphic violence is not allowed.
14    A.   Correct.
15    Q.   So let's, if we can, put up Exhibit 9,
16 Perceived Reach, next to these Community Guidelines.
17 I want to ask you something.
18    The slide on the right is the perceived
19 reach from the NES survey.
20    Is that your recollection?
21    A.   Yes.
22    Q.   And that's a 30,000-person survey that
23 asked people if they had had negative experiences?
24    A.   Yes.
25    Q.   On the left are the community guidelines,

Page 212

1 and let's start with appropriate imagery that says:
2 We don't allow nudity on Instagram.
3    And then pull that out, Jim, and then pull
4 out nudity on the right.
5    So is it true, Mr. Bejar, that Meta's
6 internal 30,000-person survey in 2019 on Instagram
7 was reporting that 23 percent of the individuals who
8 were asked about seeing nudity or sexual content --
9 strike that.
10    Is it true, Mr. Bejar, that Meta's
11 internal 30,000-person survey, the NES survey,
12 states that 23 percent of those asked said they had
13 seen nudity or sexual content that they felt did not
14 belong on Instagram within the last seven days?
15    A.   Correct.
16    Q.   How is it that that happens when Meta's
17 guidelines, community guidelines, says that nudity
18 is not allowed on Instagram?
19    A.   Because they do allow sexual content on
20 Instagram.
21    Q.   Does sexual content violate Instagram's
22 community standards?
23    A.   I believe so.
24    Q.   But then why is it allowed on Instagram --
25 strike that.

Page 213

1    But yet it ends up being on Instagram; is
2 that right?
3    A.   Correct.
4    MS. JONES:  Objection to form and
5 foundation.
6 BY MR. CARTMELL:
7    Q.   Do you know why that is?
8    MS. JONES:  Same objection.
9    THE WITNESS:  Because there is not enough
10 efforts to understand what is in this 23 percent.
11 And all of these people that are telling you that
12 they are seeing nudity or sexual content on
13 Instagram, you have to understand what is happening
14 here in order for you to then effectively reduce the
15 experience of people of that on the platform.
16    In my own testing one of the things that I
17 found was both sexual content as well as nudity.
18 BY MR. CARTMELL:
19    Q.   Let's pull out, Jim, self-injury and --
20 suicide and self-injury, please.
21    And Instagram's NES survey states that
22 12 percent of those people asked had seen someone on
23 Instagram who they were worried about might hurt
24 themselves or commit suicide.
25    Do you see that?

54 (Pages 210 - 213)

CONFIDENTIAL

Page 214

1    A.  Yes.
2    Q.  And the guidelines from -- the community
3  guidelines on the website say that self-injury is
4  not allowed, correct?
5        MS. JONES:  Objection to the
6  characterization.
7        THE WITNESS:  Correct.
8  BY MR. CARTMELL:
9    Q.  Let's pull out bullying, please, Jim.
10       Instagram's internal survey with respect
11  to bullying says 8 percent of those asked had been
12  bullied or harassed on Instagram within the last
13  seven days; is that right?
14   A.  Correct.
15   Q.  The community standards say that we remove
16  credible threats of violence, hate speech and the
17  targeting of private individuals, correct?
18   A.  Correct.
19   Q.  Do you have an opinion regarding whether
20  or not the Instagram community standards or
21  guidelines are narrow in their definitions of what
22  is violative?
23       MS. JONES:  Objection to the form.
24       THE WITNESS:  So I think what happens with
25  these things is you have like a top-level statement,

Page 215

1  like we remove credible threats of violence, hate
2  speech and the targeting of private individuals, to
3  very explicitly say we do not allow attacks.  That's
4  a really important sentence.  And you read that and
5  think they don't allow attacks.
6        Now, when you go down to somebody
7  reporting something for bullying or harassment,
8  which I have also recently tested and have many
9  years of experience with, like more often than not,
10  like most of the time, it doesn't get removed and
11  they did allow it.  And what you have here through
12  these numbers is that approximately one in three
13  people saw it happening, which has a terrible
14  normalizing effect, because you think it's okay to
15  do threats and attack and hate speech and that,
16  like, around one in ten are experiencing it
17  firsthand all in the last seven days.
18       So these numbers tell you they don't
19  remove the credible issues in a timely fashion and
20  they -- so let me restate.
21       They don't remove threats or violence or
22  hate speech in a timely fashion.  And they do allow
23  attacks.  And part of that is because of the way
24  that these things are implemented, where what it
25  takes to get a piece of content removed is very

Page 216

1  narrow.
2        MS. JONES:  Objection.  Let me just object
3  to the nonresponsive narrative portion of that
4  answer.
5        Go ahead.
6  BY MR. CARTMELL:
7    Q.  So this demonstration we are looking at
8  where the community guidelines are saying
9  that information or material is not allowed on
10  Instagram, yet Meta's internal survey is showing
11  that people are actually experiencing it, what does
12  that tell you about whether Meta's enforcement of
13  the community guidelines and standards on Instagram
14  is protecting teens or users?
15       MS. JONES:  Objection to the form and
16  foundation -- lack of foundation.
17       THE WITNESS:  It tells me that the
18  enforcement of community standards is not
19  effectively protecting the people from the harm they
20  are experiencing.
21  BY MR. CARTMELL:
22   Q.  In your testing, do you have actually
23  examples of -- strike that.
24       In your testing that you did, did you look
25  for examples of the type of content that is allowed

Page 217

1  on Instagram and is not precluded, but yet is
2  harmful?
3    A.  Yes, I did.
4    Q.  Let's look at clip 51.
5        MS. JONES:  Do you have a slipsheet for
6  this one?
7        MR. CARTMELL:  Yes.  I'm going to hand you
8  Exhibit 15.
9        (Whereupon, Meta-Bejar Exhibit 15 was
10  marked for identification.)
11  BY MR. CARTMELL:
12   Q.  Exhibit 15 is a slipsheet for the video
13  that we're about to play, Bejar 002322.
14       And this is a video, I will represent to
15  you, that I believe your representation was that it
16  had sexual content; is that correct?
17   A.  Correct.
18   Q.  I personally wanted to warn everybody in
19  the room about this.
20       Do you want to say anything about that?
21   A.  Yeah.  I mean, if you are sensitive to
22  this kind of thing, it's -- you will see.
23       One of the things I found very surprising
24  when I was doing the testing in between 2023 and the
25  start of 2024, is that I was able to take a

Golkow Technologies,
A Veritext Division
877-370-3377                                                  www.veritext.com

CONFIDENTIAL

Page 218

1  brand-new account, and I recorded from the moment of
2  account creation going straight into Reels to the
3  point where I was getting back-to-back sexual Reels
4  recommended to that account.  That took on average 8
5  to 12 minutes.
6       And I was profoundly distressed at the
7  kind of content that the Instagram Reels algorithm
8  was recommending to a test account for a 13-year-old
9  girl or a 14-year-old boy.
10      Q.  Okay.  Can you just put it up, Jim, please
11 and not start it.
12      Do you know, Mr. Bejar, when it was that
13 this video was done from your test account?  Can you
14 tell?
15      A.  It's on that list of -- where it has the
16 dates of recordings.  So I think -- I wanted to make
17 sure that I preserve the dates of the video that was
18 recorded, and it was in that list.
19      Q.  That's Exhibit 12; is that right?
20      A.  Yeah.
21      MR. CARTMELL:  Okay.  And why don't we go
22 ahead and play the video, and then I'm going to have
23 some follow-up questions for you.
24      (Video playing.)
25 ///

Page 219

1  BY MR. CARTMELL:
2       Q.  So --
3       MS. JONES:  Let me just object for the
4  record to the use of this out-of-context video.
5       Go ahead.
6       MR. CARTMELL:  Pardon me?
7       MS. JONES:  I'm objecting for the record
8  to the use of the video.  It's out of context and
9  not the result of an actual expert process.
10      Go ahead.
11 BY MR. CARTMELL:
12      Q.  Mr. Bejar, that video that we just saw, is
13 that a recording that you made of one of the teen
14 accounts that you set up?
15      A.  Correct.
16      Q.  Okay.  And how old was the teen account
17 that you set up?
18      A.  13.
19      Q.  What did you do to that account so that
20 content like that would be provided, if anything?
21      A.  Went into Reels, swiped quickly.  You can
22 see me doing it in the videos.  If the video doesn't
23 match the criteria, I just swipe through quickly and
24 then watch the videos that met a certain criteria to
25 completion.

Page 220

1       Q.  Was that account set up before that?  And
2  if so, do you know how long before that?
3       A.  Yes.  I mean, I think that the record for
4  account creations for these accounts is in this
5  document and then it can connect videos to accounts
6  very easily so that it can -- I was pretty
7  disciplined about keeping track and having control
8  of the different experiments I was doing in order to
9  be able to make accurate claims as to what the
10 videos were representing.
11      Q.  So does this demonstration that you showed
12 demonstrate what was available to kids, 13-year-old,
13 on Instagram even as late as last year?
14      MS. JONES:  Objection to the form and
15 foundation.
16      THE WITNESS:  Correct.  And I want to
17 be -- this is an important distinction there, which
18 is there is a difference between available and
19 recommended.  So available, you go in and you can
20 search and you see the videos in context.  This was
21 content that was recommended by Instagram.  And so
22 it's in the Reels algorithm.  It's Instagram that
23 picks the videos that you get to see.  And that was
24 the nature of these tests of the content that Reels
25 was delivering to a teen account.  It was all

Page 221

1  defaults on.
2  BY MR. CARTMELL:
3       Q.  Okay.  Have you ever seen anything that
4  Meta has published to parents or users or anybody in
5  the public domain that there is a risk that their
6  kids will see this type of material on Instagram?
7       A.  I have not seen anything from Meta that
8  would let people know that their kids might be
9  getting recommended this kind of content.  And I
10 believe that that kind of content is what comes up
11 when you ask people have you seen unwanted sexual
12 content on Instagram, or as you see in any -- the
13 kind of content that is sexual that kids do not want
14 to see, did not ask for, did not search for, it gets
15 recommended to them.
16      Q.  So the teen account you set up, so it's
17 clear, did not search for any of that material; it
18 was recommended to them.  Correct?
19      A.  Correct.  The only manipulation was
20 watching a video, which could have been watched out
21 of interest or could have been watched out of
22 disgust.
23      Q.  And kids watch racy videos, right?
24      A.  Yes.  I think that for sexual content, for
25 violent content, for self-harm content, for eating

56 (Pages 218 - 221)

CONFIDENTIAL

Page 222

1 disorder content, the first time you watch it, it
2 might be just out of shock or racy, like it's --
3 it's like -- it's human. You see something like
4 this and you are like what is going on. It's the
5 fire hose of that that is, I think, very dangerous.
6   Q.   Do you know, does any of that material we
7 just saw violate community standards for Instagram?
8   A.   Based on my understanding of how they are
9 implemented, only the video where the woman flashes
10 herself and you can see her private parts for a
11 couple of frames, it does.
12   Q.   But the masturbation and all of the other
13 sexual nature in there is not violating Instagram's
14 community standards to the best of your knowledge?
15   A.   To the best of my knowledge. And this is
16 an issue that was known for as long as I have been
17 working in this space, which is when you draw a line
18 saying this is what content is going to get deleted,
19 people will immediately test that line and figure
20 out what is the content that is just above the line
21 that wouldn't get deleted if reported. And the
22 fundamental problem here is the recommendation of
23 that content to teens. And then younger people than
24 that.
25      I believe that in general, Feed and

Page 223

1 Discovery surfaces ought to be kind of PG for a
2 13-year-old. And that's kind of the content that is
3 being curated by Instagram's algorithms and then
4 delivered to the kids' phones.
5   Q.   To the best of your knowledge, could that
6 type of content we just saw be recommended to, for
7 example, the 7 and 8 and 9 and 10-year-olds that we
8 saw that were on Instagram?
9   A.   Yes.
10   Q.   Do you believe that that type of content
11 that we just saw in your recorded testing -- strike
12 that.
13      Do you believe that the content or the --
14 what we just saw -- I'm sorry. Let me start over.
15      Do you believe, Mr. Bejar, that the sexual
16 content we just saw could be harmful to kids?
17   A.   Yes.
18   Q.   While you were at Instagram from 2019 to
19 2021, was Instagram doing anything to prevent the
20 harms from that type of content?
21   A.   No.
22   Q.   How long have we been going?
23      THE VIDEOGRAPHER: Hour and 18.
24      MR. CARTMELL: Can we take a break?
25      MR. WARD: Sure.

Page 224

1      THE VIDEOGRAPHER: Time is 3:15. We're
2 off the record.
3      (Whereupon, a brief recess was taken.)
4      THE VIDEOGRAPHER: Time is 3:36. We're
5 back on the record.
6 BY MR. CARTMELL:
7   Q.   Mr. Bejar, we're back on the record after
8 a short break.
9      Are you ready to proceed?
10   A.   Yes, I am.
11   Q.   We looked at Exhibit 15, which is a video
12 from one of your test accounts that included sexual
13 content, correct?
14   A.   Correct.
15   Q.   And I want to actually ask you about one
16 portion of that video. We're not going to play the
17 whole video again, but why don't we go ahead and
18 look at this because I think you took some action
19 during the video to demonstrate a feature. So I'll
20 ask you questions on the other side of this.
21      (Video playing.)
22 BY MR. CARTMELL:
23   Q.   So what were you demonstrating there in
24 the video as you scrolled through the blue Follow
25 buttons?

Page 225

1   A.   It was a girl that appeared to be under
2 13, dancing, exposing her belly, with 29,000
3 followers. And then you click through the followers
4 and scroll down, and you see that the vast majority
5 are men. And if you click through those, which I
6 have tested in other circumstances, you find these
7 men also follow other young girls who post similar
8 videos. And I think that's an example of how the
9 application design and the way it distributes
10 content encourages that girl to create racy content
11 so that she now has 30,000 followers.
12      I also think that is one of the key
13 features of that stream of videos, because they are
14 like showing to a girl who is watching, if you look
15 at the videos, and you look at the amount of likes
16 they have or amount of comments they have, you kind
17 of realize, oh, if I make racy content or if I make
18 sexual content, I'm going to get more distribution.
19      And so -- and the last thing I wanted to
20 say about the video is that -- so I saw the account.
21 It was ███████, which is one of the ones that had
22 no searches. Even if there had been searches done,
23 I don't believe that, like, an account that -- that
24 is testing the experience of a 13-year-old should
25 ever be able to be manipulated to deliver that kind

57 (Pages 222 - 225)

CONFIDENTIAL

Page 226

1 of stream of content.
2      Like, for a safety feature to be called a
3 safety feature, it has to be resilient. And so at
4 that time, it shouldn't be able to get that list of
5 recommendations no matter what you did if the way
6 you are accessing them is an account of a
7 13-year-old.
8      MS. JONES: Let me just object to the
9 nonresponsiveness.
10      Go ahead.
11 BY MR. CARTMELL:
12    Q. You mentioned that you are aware of which
13 test account that was.
14      And did you say that on that test account
15 for the video we showed there were no searches?
16    A. Correct.
17    Q. So does that mean that you were only
18 scrolling through Reels in that account?
19    A. That is correct. Only scrolling through
20 Reels, only looking at public content.
21    Q. Okay. And the example of the young girl
22 who was dancing and the Follows, is that a safety
23 issue?
24      MS. JONES: Objection to the form.
25      THE WITNESS: Absolutely.

Page 227

1 BY MR. CARTMELL:
2    Q. Explain that to the jury, please.
3    A. If you create an environment where if you
4 are a pedophile looking for young girls dancing in
5 revealing ways, right, and you reward that by making
6 it easy to find that content and recommending it,
7 and you create an environment that takes young
8 girls, including girls under 13, and you reward them
9 for creating that kind of content, you are creating
10 an environment that facilitates grooming, sexual
11 endangerment, child pornography, account selling
12 child pornography, which I found in the course of my
13 testing, and -- I didn't find they were selling
14 child pornography. What I found were accounts of
15 kids that appeared to be under 13, like 7, 8, 9,
16 with a Cash App link on their profile. Or they
17 would use the words "selling."
18      And so that's an environment, right, in
19 which the worst kind of person on the internet are
20 rewarded by the way the application is designed.
21    Q. While you were at Instagram in 2019
22 through 2021, was Meta aware that there was a
23 problem or issues with inappropriate interactions
24 between adults and kids?
25      MS. JONES: Objection. Foundation.

Page 228

1      THE WITNESS: Yes.
2 BY MR. CARTMELL:
3    Q. And based on your experience there as the
4 safety expert for Meta that was supporting the
5 well-being team, do you believe that Instagram was
6 taking appropriate preventive actions to prevent
7 that sort of thing?
8      MS. JONES: Same objections. Foundation.
9      THE WITNESS: They were not.
10 BY MR. CARTMELL:
11    Q. And based on your experience for 30 years
12 and meeting with parents and meeting with kids and
13 doing surveys, do you believe that parents know when
14 their kids have Instagram accounts that they are
15 going to be recommended that type of content?
16    A. Parents do not know that their kids are
17 going to be recommended that kind of content.
18    Q. I mean, is it a parent's fault? In other
19 words, should parents know that without Meta telling
20 them that?
21      MS. JONES: Objection. Foundation and
22 form.
23      THE WITNESS: Parents should absolutely
24 know, right. I mean, when I looked at these
25 community standards and other documentation that

Page 229

1 Instagram produces, to me it says this is an
2 environment where your kid is not going to get
3 unwanted sexual content. Your kid is not going to
4 experience inappropriate contact. Your kid is not
5 going to be exposed to graphically violent content
6 or self-harm content.
7      And I have spoken to the parents of many
8 kids who, again, have lived harm experience. And
9 one thing that was in common is they all told me I
10 wasn't worrying about what my kid was getting
11 recommended because they thought that part was going
12 to be safe. They were worried about who their kid
13 was talking to and what their kid was posting.
14      So I believe it's absolutely critical for
15 parents to know the substance of what Meta is
16 recommending. And something like the survey, the
17 Negative Experiences Survey, gives you a good
18 indicator of what that is and areas that need to be
19 worked on.
20 BY MR. CARTMELL:
21    Q. Okay. I want to make sure you understand
22 my question, because we may not have been
23 communicating. But I asked you if, in fact, it's
24 the parents' fault for not knowing that their kids
25 are going to be exposed to the unwanted sexual

Golkow Technologies,
A Veritext Division

877-370-3377                                                    www.veritext.com

CONFIDENTIAL

Page 230

1 advances and the, you know, suicide and self-injury
2 type of content and the bullying and the violence
3 and all of those things.
4      Do you have an opinion regarding whether
5 or not it's the parents' fault for not knowing that?
6      MS. JONES: Objection. Form. Foundation.
7      THE WITNESS: It is absolutely not the
8 parents' fault.
9 BY MR. CARTMELL:
10     Q. And even to this day, has Meta warned
11 parents and the public about the risk of harmful
12 experiences from this kind of content on Instagram?
13     A. It has not.
14     Q. You mentioned that, in fact, Meta actually
15 puts on their transparency website the fact that
16 there is less than 1 percent of that kind of content
17 on Instagram; is that right?
18     MS. JONES: Objection. Hold on.
19 Objection. Form. Foundation. Characterization.
20     Go ahead.
21     THE WITNESS: That's correct.
22 BY MR. CARTMELL:
23     Q. Does Meta actually put on their website,
24 on their Transparency Center, the fact that that
25 type of content -- sexual content, suicide and

Page 231

1 self-injury content, bullying and harassment
2 content, hate speech content, violence, those sorts
3 of things, does Meta actually advertise to the
4 public on their transparency website that there is
5 very little of that, less than 1 percent of that, on
6 Instagram?
7      MS. JONES: Objection to the form and
8 foundation. Characterization.
9      Go ahead.
10     THE WITNESS: What Meta has in its
11 Transparency Center, it says a fraction of a
12 percent, like point zero-something or other. Like,
13 it's tiny, tiny numbers. And for something like
14 eating disorder content, you would look at that and
15 believe there is no way they are going to be
16 recommending that to my kid. They seem to be really
17 on top of it. And that is not the case in my
18 experience or my testing.
19 BY MR. CARTMELL:
20     Q. Okay. Let's go back, Jim, if you would,
21 to Exhibit 9. I'm sorry. Exhibit 10.
22     Mr. Bejar, we're looking again at
23 Exhibit 10. And you were talking about number 5,
24 the factors that you mentioned that cause Meta's
25 Instagram app to be unsafe for kids. And we were

Page 232

1 talking specifically about how Meta only enforces
2 and discloses violations of the community standards,
3 correct?
4      A. Of narrowly defined community standards.
5      Q. Okay. And let's, Jim, put up the
6 Perceived Reach from Exhibit 9 slide.
7      Did Meta, during the time that you were
8 working there as their safety expert from 2019 to
9 2021, actually do anything as far as safety
10 prevention for kids related to all of these negative
11 experiences?
12     MS. JONES: Objection. Foundation and
13 form.
14     Go ahead.
15     THE WITNESS: They did not.
16 BY MR. CARTMELL:
17     Q. Mr. Bejar, did you actually in one of your
18 tests set up a new account for a kid and do nothing
19 else other than watch what happened as far as the
20 content and scroll through the content over time?
21     A. Correct.
22     Q. How long did you scroll through that
23 content for?
24     A. Do you mean like initially?
25     Q. Yes.

Page 233

1      A. I think in order to get recommended sexual
2 content or graphically violent content, the test, on
3 average, were around 8 to, like, 18 minutes.
4      MR. CARTMELL: I'm going to hand you
5 Exhibit 16, which is a slipsheet for a video.
6      (Whereupon, Meta-Bejar Exhibit 16 was
7 marked for identification.)
8 BY MR. CARTMELL:
9      Q. And we're going to go ahead and play that
10 for a period of time, and then I'll ask you some
11 questions.
12     (Video playing.)
13 BY MR. CARTMELL:
14     Q. Is this one of your test videos, first?
15     A. Yes, it is.
16     Q. Okay.
17     (Video playing.)
18     MS. JONES: Same objection I made earlier
19 today to the video.
20     Go ahead.
21 BY MR. CARTMELL:
22     Q. Mr. Bejar, is this video the first six
23 minutes of a 13-year-old's experience on Instagram?
24     A. Yes, it is.
25     Q. In other words, did you set up a

59 (Pages 230 - 233)

CONFIDENTIAL

Page 234

1  13-year-old account, and this is showing what the
2  first minutes of the content were that were
3  recommended to a 13-year-old?
4      A.  That is correct.
5      Q.  Let's continue.
6          (Video playing.)
7          MS. JONES:  Before you ask your question,
8  let me note my objection to the playing of the
9  video.
10         Go ahead.
11 BY MR. CARTMELL:
12     Q.  Mr. Bejar, that video that we just saw, I
13 think you said was set up.  It was a 13-year-old
14 girl's account.  And there was actually no searching
15 on that account.
16         Correct?
17     A.  Correct.
18     Q.  Was there anything else done to manipulate
19 that account other than setting it up and watching
20 what the material was that was recommended to that
21 13-year-old?
22     A.  There was not.  You see from the moment of
23 account creation, going straight into Reels, and
24 every action that I took in Reels during that
25 testing.

Page 235

1      Q.  What happened to the nature of that
2  account over time as that six minutes went on?
3      A.  It started getting recommended more and
4  more sexual content that -- I'm sorry.  And when you
5  look at the content, the amount of likes, right, on
6  the content, and the nature of it using songs for
7  children's movies paired with masturbation or other
8  things, I think is pretty inappropriate for what is
9  a brand-new account of a 13-year-old, a test
10 account.
11     Q.  Based on your experience as an expert in
12 this industry for 30 years, do parents know that
13 their 13-year-old may be seeing that type of
14 material or posts?
15         MS. JONES:  Objection.  Foundation.
16         THE WITNESS:  In my experience, parents do
17 not know that is the kind of content that might be
18 recommended to their kids.
19         MR. CARTMELL:  Let's look at Exhibit 17.
20         (Whereupon, Meta-Bejar Exhibit 17 was
21 marked for identification.)
22 BY MR. CARTMELL:
23     Q.  Mr. Bejar, this is a PowerPoint
24 presentation that was produced in this case by Meta,
25 and it's titled "Instagram Bad Experiences.  What

Page 236

1  are Bad Experiences and why we should care."
2          Do you see that?
3      A.  I do.
4      Q.  Tell us just in general what this
5  presentation was about.
6      A.  So I had been focusing my time on how do
7  you understand sort of these harmful experiences
8  that people are having.  And so we call those bad
9  experiences.  We wanted to have a name that we could
10 use to refer to this kind of work.  And what we were
11 trying to do is we were trying to illustrate what
12 are the gaps in understanding of the issues for the
13 company, what are some examples of these bad
14 experiences in order to get funding and support to
15 do more work on this area.
16     Q.  I want to ask you some questions about the
17 slide on .21.  It's hard to see.
18     A.  Yeah.
19     Q.  Okay.  Now, what is this demonstration
20 slide?
21     A.  So we had found through the research that
22 the Instagram Well-Being team had done that out of
23 10,000 people that have a bad experience, a hundred
24 of them end up submitting a report and two of them
25 get help because the report gets acted on.

Page 237

1          So the graphic on the right is intended to
2  illustrate 10,000 people.  The yellow dots that are
3  at the bottom are the hundred people that submitted
4  a report.  And the two green dots are the ones that
5  got help from the enforcement of the narrowly
6  defined community standards.
7      Q.  Is this actually a demonstration of what
8  you were talking about in your fifth factor?  Is
9  this a demonstration of that?
10     A.  Yes.  The -- this talks about measuring
11 and understanding the harmful experiences that
12 people have on the platform.  And the work that you
13 have to do is you have to look at every single gray
14 dot on that page and understand what happened there
15 in order to be able to -- as we talked about, this
16 framework of understanding what happened, preventing
17 that affecting -- from other people, and then
18 measuring the work.
19         And at Facebook measurement drives
20 everything.  So we wanted to be really good about
21 understanding, if you have a harmful experience,
22 what do you do, and then if you get help from the
23 current approach.
24         And the two green dots on that page are
25 the people who got help from the current approach,

CONFIDENTIAL

1 and the 9,998 other people in that page did not.
2    Q.  Was Meta even looking at trying to
3 understand the other 9,998 bad experiences?
4    A.  It was not.
5       MS. JONES:  Hold on.
6       THE WITNESS:  Sorry.
7       MS. JONES:  Objection.  Foundation.
8       Sorry.  Go ahead.
9       THE WITNESS:  It was not.
10 BY MR. CARTMELL:
11    Q.  So it's clear, I want to be clear for the
12 jury, there are dots that are gray.
13       Actually, go back if you don't mind, Jim.
14       These gray dots are supposed to
15 represent -- or the total chart is supposed to
16 represent 10,000 bad experiences; is that right?
17    A.  Correct.
18    Q.  And the yellow line at the very bottom is
19 the number of people on Instagram out of those
20 10,000 bad experiences that report?
21    A.  Yes.  That used the reporting tool and got
22 to the end and submitted report.
23    Q.  Is -- based on your experience, is that
24 evidence of a flaw in the reporting tool on
25 Instagram that Meta had?

1    A.  Yes, it is.
2    Q.  These two green dots on the right, those
3 are, out of all of the hundred reports, the only
4 reports that Meta took action on?
5    A.  That is correct.
6    Q.  Does that reflect a problem in the system?
7    A.  Correct.  Just that line shows a pretty
8 profound problem.  That line, in the context of
9 every other bad experience, represents what I think
10 of as a material problem or a critical problem.
11    Q.  The harms to users on Instagram that we
12 saw in the NES survey, like violence and suicide and
13 self-injury and bullying and sexual content, are
14 those types of experiences included in these 9,998
15 dots here?
16       MS. JONES:  Objection to the form.
17 Foundation.
18       THE WITNESS:  Yes.  And eating disorders
19 and self-harm content and graphically violent
20 content, and people being targets of bullying,
21 people watching it happening, all of these
22 categories that had been researched about the harm
23 that people were experiencing on Instagram.
24 BY MR. CARTMELL:
25    Q.  Did you try to convince Meta's leadership

1 that they should try to understand and look at the
2 9,998 reports -- excuse me.  I'll state it again.
3       Did you try to convince Meta's leadership
4 that they should have a safety system in place that
5 would look at the 9,998 bad experiences that they
6 weren't looking at?
7       MS. JONES:  Objection to the form.
8 Characterization.
9       THE WITNESS:  Yes, I did.
10 BY MR. CARTMELL:
11    Q.  Were you successful in that regard?
12    A.  Not as far as I can tell.
13    Q.  So I want to sort of recap and change
14 gears a little bit.
15       We talked about how you discovered the
16 harms that were occurring on Instagram by
17 discovering the NES survey, internal survey of
18 30,000 Instagram users, correct?
19    A.  Correct.
20    Q.  And then you did an assessment, I think
21 you testified, of the safety systems and framework
22 that was in place at Instagram; is that correct?
23    A.  Correct.
24    Q.  After discovering the harms and
25 discovering that the system, in your words, was

1 flawed, what did you set out to do?
2    A.  I set out to gather significant data that
3 could be shared with the executive leadership like
4 Mark Zuckerberg and Adam Mosseri.  So in my 30 years
5 of experience, one of the things I had to do was
6 executive escalations when you became aware of a
7 significant harm or issue or gap for the company.
8       And so what I did is I started a process
9 to get documentation that I felt was to the level to
10 which we were bringing to Mark Zuckerberg as an
11 example of gaps the company was having at the time.
12    Q.  Let's go back to Exhibit 8.  Exhibit 8 is
13 the conversion document that we talked about
14 previously that has the job responsibilities for you
15 when you returned to Meta, correct?
16    A.  Correct.
17       MS. JONES:  Hold on.  I'm going to object
18 to the characterization of that.
19       But go ahead.
20       MR. CARTMELL:  Let me restate it.
21    Q.  Exhibit 8 is titled "Arturo Conversion."
22       Do you recall that?
23    A.  Yes.
24    Q.  And what is this document?  Refresh our
25 memory.

61 (Pages 238 - 241)

CONFIDENTIAL

Page 242

1   A.  It described what I had been doing for
2  Instagram up to that point and what my job would
3  have been as a part-time employee had the conversion
4  gone through.
5      Q.  Let's go to .2 under Responsibilities.
6  And I have a question for you.
7          The last bullet point under
8  Responsibilities, why don't you read that, please.
9      A.  Represent Instagram's work in this area to
10 our management chains, including Instagram leads,
11 central integrity, central customer support and
12 related groups, up to and including Facebook
13 executive team members.
14     Q.  So did your job working for Meta as a
15 safety expert from 2019 to 2020 and supporting the
16 Instagram Well-Being team include the responsibility
17 that if you had concerns or problems, you should
18 escalate that up to the executives?
19     A.  Yes, I did.
20     Q.  And, as you said, that was something that
21 you had done in the past when you were working for
22 Meta during your first stint; is that correct?
23     A.  That's correct.
24         MR. CARTMELL:  Okay.  I want to hand you
25 Exhibit 18.

Page 243

1          (Whereupon, Meta-Bejar Exhibit 18 was
2  marked for identification.)
3  BY MR. CARTMELL:
4      Q.  Mr. Bejar, during the time that you were
5  at Meta from 2019 to 2021, did you spend
6  approximately two years trying to convince Meta's
7  leadership to make safety on Instagram a priority?
8          MS. JONES:  Objection to the
9  characterization.
10         Go ahead.
11         THE WITNESS:  Yes.
12 BY MR. CARTMELL:
13     Q.  Did you recognize going in to doing that
14 that it would be a difficult job for you to do?
15     A.  I -- one of the things that was important
16 for me when I came back and people talked to me,
17 they said Adam will listen, Adam will make hard
18 choices, Instagram is a place where Adam will make a
19 difference on these issues.  And so I believed that
20 you had to do the work but that Adam would listen.
21 And in my experience with Mark Zuckerberg and Sheryl
22 and Chris Cox is that they would listen as well.
23         So I knew what I had to do but I also knew
24 I had to be very thoughtful and respectful about it.
25     Q.  Did you know that you had to show them how

Page 244

1  serious the safety problem was on Instagram for
2  kids?
3      A.  Correct.  You cannot walk in and be, like,
4  hey, this is broken.  That's disrespectful to the
5  team that is working on those issues and doesn't
6  show appropriate diligence and responsibility when
7  it comes to doing this work.
8          And so the moment I became aware of data
9  that in my experience indicated that there was harm
10 that was not being looked at, I immediately wrote to
11 Adam about it, Adam Mosseri, the head of Instagram.
12     Q.  Okay.  Let's talk about that.
13     I've handed you Exhibit 18, which is an
14 e-mail from you to Adam Mosseri; is that correct?
15     A.  That is correct.
16     Q.  And if we go to the last page, dot 4, the
17 first e-mail in this chain is dated December 12,
18 2019, right?
19     A.  Correct.
20     Q.  At that point you had been actually
21 working at Meta and consulting as an expert and
22 supporting the Instagram Well-Being team for less
23 than two months?
24     A.  Correct.
25     Q.  And you're writing to the top executive at

Page 245

1  Instagram at that time; is that correct?
2      A.  That's correct.
3      Q.  You say, "Hi Adam, Not sure if you heard,
4  but Samir/Yoav brought me in to do some consulting
5  with the Well-Being team, they are a good bunch.
6  I've been spending time with the teams working on
7  support/bullying and have some observations that
8  could be helpful."
9          Did I read that correctly?
10     A.  Yes.
11     Q.  And you asked him specifically if you
12 could meet with him; is that right?
13     A.  That is correct.
14     Q.  If you go to the dot 3, he responds to
15 your e-mail; is that correct?
16     A.  Correct.
17     Q.  And he says, "I did hear, wild."
18         And then he asks you to share your
19 observations over e-mail; is that right?
20     A.  Correct.
21     Q.  Okay.  Let's look at your e-mail that you
22 shared with him about your concerns.  And it's dated
23 December 13, 2019.  It's the bottom of dot 2.
24         Do you see that?
25     A.  I do.

CONFIDENTIAL

Page 246

1    Q.  You say, "So the action rate for content
2  reporting is between 7.1 percent and 7.7 percent,
3  that generally means there is something else going
4  on."
5        Did I read that correctly?
6    A.  Yes.
7    Q.  What did you mean by that?
8    A.  I mean that there is harm that people are
9  experiencing but they are not able to communicate to
10  the company through the reporting flow.
11    Q.  Okay.  You say, "Usually the way
12  product/engineering think about reporting flows is
13  that the goal is to help people by enforcement.  But
14  helping people and enforcing policy are actually two
15  different goals."
16        What did you mean by that?
17    A.  What I mean by that is the enforcement of
18  community standards' internal definition is one
19  problem that you have to work on and solve.  But
20  also helping people with issues, the harm that they
21  were experiencing, is a different but related
22  problem.
23        So if you are experiencing, like, eating
24  disorder content, that doesn't mean that the content
25  has to be removed.  It just means that they

Page 247

1  shouldn't be recommending it to you.
2    Q.  You say, "Proactive identification and
3  correct handling of policy violating or borderline
4  content is essential, but we found that a lot of the
5  time people needed help with things that had nothing
6  to do with policy."
7        Do you see that?
8    A.  Yes.
9    Q.  Are you telling Mr. Mosseri about your
10  concerns that the company's focus on enforcement of
11  the community standards without looking at the other
12  bad experiences potentially is not protecting
13  people, including kids, on Instagram?
14    MS. JONES:  Objection to the form.
15    THE WITNESS:  That is correct, that the
16  enforcement of the narrow interpretation of the
17  community standards is not protecting people.
18  BY MR. CARTMELL:
19    Q.  Okay.  And then he actually responds, if
20  you go to above your e-mail on dot 2, says, "Thanks
21  for taking the time to write this up."
22        And what does he respond to you?
23    A.  Well, he says it -- that how do you think
24  about prioritizing this work relative to the
25  traditional policy enforcement and relative to more

Page 248

1  proactive work like we tried to do with bullying.
2        So he's asking me how do you prioritize
3  this work relative to the things that they had been
4  doing up to that point.
5    Q.  And so he's asking you what the
6  prioritization of this work you're recommending
7  should be?
8    A.  Correct.
9    Q.  And what do you tell him?
10    A.  "...the work of understanding what people
11  need help with is as important as the traditional
12  policy enforcement."
13        And it benefits, right, because you're
14  learning about harm.  It is more important than
15  proactive work because it informs the proactive work
16  to understand the harm that people are experiencing
17  than shapes the proactive work so it's effective at
18  being proactive.
19        And I gave different examples of that
20  because this is a cycle that I had done many times
21  in my first stint.
22    Q.  Okay.  Let's go to the second paragraph.
23        Actually, I want to read where it states,
24  "What are high prevalence low intensity issues that
25  could lead to proactive social features?  What high

Page 249

1  intensity low prevalence issues are missed by the
2  current tools?"
3        What did you mean when you said, "What
4  high intensity low prevalence issues are missed by
5  the current tools?"
6    A.  It means things like unwanted sexual
7  advances, bullying, the people who might be at risk
8  of, like, anorexia or some forms of illness.  It
9  means things that might not be, like, in the -- in,
10  like, 70 percent of the population but they're
11  incredibly important no matter how many people they
12  affect.
13        In my first stint the team was split into
14  two parts.  One part was stuff that happens a lot
15  but it's not that bad.  And stuff that happens less
16  frequently but it's incredibly bad.  And that was
17  the things that I was worried were missing by the
18  current approach.
19    Q.  Let me ask you, in the fourth paragraph,
20  it states, "Ideally you end up with a team that has
21  resources."
22        What did you mean there?
23    A.  Yeah.  That you have a team that has
24  enough resources that are dedicated to the issues
25  that people are dealing with.  I also recommend that

63 (Pages 246 - 249)

CONFIDENTIAL

Page 250

1  you can do this through the reporting tools, like
2  effective reporting tool. And then that data can be
3  used to make everything safer.
4      Q.  And had you discovered by this time within
5  just a few months that the well-being team was
6  underresourced and undersupported for the work they
7  were doing?
8          MS. JONES: Objection. Foundation.
9          THE WITNESS: Yes, I had found that.
10 BY MR. CARTMELL:
11     Q.  Were you asking Mr. Mosseri, the number
12 one executive, to try to provide more resources for
13 the well-being work?
14     A.  Yes, I was.
15     Q.  And -- strike that.
16         You state in that paragraph, "That data
17 will then be used to help make the policy work
18 higher signal (for ML" -- is that machine learning?
19     A.  Correct.
20     Q.  -- "(for machining learning training and
21 human review), and help identify areas/measurements
22 for proactive work."
23     A.  Correct.
24     Q.  What are you telling Mr. Mosseri there?
25     A.  What I'm telling Mr. Mosseri is that if

Page 251

1  you understand harmful experiences, if you
2  understand what content is driving them, where they
3  are happening, what people do with it, that is
4  covered with the framework, that is
5  invaluable to then be more effective at enforcing
6  policy. Like we saw some examples of actual nudity.
7  And you could find that better if people were
8  allowed to tell you, yeah, this is some unwanted
9  sexual content.
10         And then once you have that information,
11 you can use it to train the infrastructure that I
12 know the company has, that my team that I managed in
13 my first stint built, to find the content not
14 recommended and to make much better use of the
15 people who are looking at reports. And so that
16 information is the first step in a proactive work
17 effort.
18     Q.  Was this the first escalation by you about
19 your safety concerns for users and kids on Instagram
20 during -- during your work at Meta from 2019 to
21 2021?
22     A.  Yes.
23     Q.  Go back, if you would, to Exhibit 6. I
24 want to ask you something real quick.
25     A.  Okay. Eight. Yes.

Page 252

1      Q.  If you go to .5, these are notes from your
2  conversation with ███████.
3          Do you see that?
4      A.  Yes.
5      Q.  And ███████, I think we talked about,
6  she was a user researcher on the Instagram
7  Well-Being team; is that right?
8      A.  Correct.
9      Q.  She was involved in the NES user survey,
10 negative experiences survey?
11     A.  Correct.
12     Q.  This is dated 10/16. And I will represent
13 to you that that is a meeting you had with her on
14 October 16th of 2020.
15         Do you see that?
16     A.  Yeah.
17     Q.  It says "chat with Arturo about
18 prioritizing work on user perceived problems."
19         Did I read that correctly?
20     A.  Yes.
21     Q.  It states, "How do we convince people that
22 reducing negative experiences (even if not policy
23 violating) is worth trading off a bit with growth
24 and/or free speech concerns."
25         Do you see that?

Page 253

1      A.  Yes.
2      Q.  Were you experiencing, by this time in
3  October of 2020, the tension between the company
4  prioritizing engagement and growth versus actually
5  safety for kids on Instagram?
6          MS. JONES: Objection to the form. And
7  foundation.
8          THE WITNESS: Yes.
9  BY MR. CARTMELL:
10     Q.  You say, "Make the case with data - this
11 is the size of the problem, this is how bad it makes
12 people feel, this is how many people leave because
13 of it."
14     A.  Correct.
15     Q.  What did you mean by that?
16     A.  For -- metadata wins arguments and so I
17 believe that with the appropriate testing and
18 resources you could get data that showed that some
19 of the videos we've been seeing really affect
20 people's experience. Sometimes drive them off the
21 product.
22         And if you had data that showed that, then
23 you could say, yeah, maybe we shouldn't be
24 recommending those videos to a 13-year-old. And --
25 and maybe you should curate the feed that's kind of

CONFIDENTIAL

Page 254

1 age-appropriate or safer for that. And that it's a
2 trading off with the engagement of the content, that
3 you could see had hundreds of thousands of likes in
4 some context, and to be able to say, yeah, you know
5 we're not going to be recommending some things to
6 minors.
7        Again, at no point do I ever really say,
8 oh, we have to change the moderation line or change
9 the definition of that. It's all about what content
10 you feed a teenager.
11    Q.  By October of 2020 you had been working at
12 Meta as the expert on safety supporting the
13 Instagram Well-Being team for about a year; is that
14 right?
15    A.  Correct.
16        MS. JONES: I'm going to object -- excuse
17 me.
18        Objection to characterization.
19        Go ahead.
20        MR. CARTMELL: I'll restate. I think
21 there was some overlap in talking.
22    Q.  As of October of 2020, when you're having
23 this conversation with Ms. ███ you had been
24 working at Meta as Meta's safety consultant with the
25 Instagram Well-Being team for approximately a year?

Page 255

1        MS. JONES: Same objection.
2        Go ahead.
3        THE WITNESS: Yes, I had been.
4 BY MR. CARTMELL:
5    Q.  I didn't ask you. But did Mr. Mosseri
6 make sure that the well-being team got the
7 appropriate funding and resources and support in
8 response to your e-mail to him?
9    A.  He did not.
10    Q.  And as of October of 2020, had the
11 well-being team received support and funding and the
12 appropriate resources for the well-being team to be
13 working on safety features to protect kids on
14 Instagram?
15        MS. JONES: Objection to the form. And
16 foundation.
17        THE WITNESS: They had not.
18        MR. CARTMELL: Exhibit 19.
19        (Whereupon, Meta-Bejar Exhibit 19 was
20 marked for identification.)
21 BY MR. CARTMELL:
22    Q.  Mr. Bejar, Exhibit 19 is a PowerPoint
23 presentation that Meta produced in this litigation
24 from your files.
25        Do you see that?

Page 256

1    A.  Yes, I do.
2    Q.  The document is titled "'Bad Experiences'
3 Measurement, Plan for a 2021 plan."
4        Do you see that?
5    A.  I do.
6    Q.  And it is dated November 19, 2020; is that
7 correct?
8    A.  Correct.
9    Q.  Is this a document that you authored?
10    A.  Yes, co-authored.
11    Q.  Okay. And tell us what this document is
12 or this presentation was.
13    A.  This presentation was to help the
14 Instagram Well-Being leads support and resource in
15 efforts to understand -- to better understand the
16 harm that people were experiencing on Instagram at
17 the time with the goal of getting resources and
18 support for proactive safety work at Instagram.
19    Q.  This is another attempt for you to ask
20 leadership for the appropriate amount of funding and
21 support and resources to help protect kids on
22 Instagram?
23    A.  Correct. It was one of the key drivers
24 for me for all of the work that I did is to make
25 sure that -- I'll do the best I could to help that

Page 257

1 team have the support that it needed to get done the
2 work that it needed to get done.
3    Q.  If you go to page 3, there is a mention of
4 the goals. Is that the goals of this presentation?
5    A.  Correct.
6    Q.  And you said that this was a presentation
7 to the leads of the well-being team; is that right?
8    A.  Correct.
9    Q.  Was that Miki Rothschild; do you remember?
10    A.  Correct.
11    Q.  Who else?
12    A.  Miki Rothschild, ███████, ██ -- I
13 forget her last name, data science. ████████,
14 who was user research. And I'm probably missing a
15 couple of names.
16    Q.  The first goal is to "Share ambition and
17 key examples of problems to solve."
18        Do you see that?
19    A.  I do.
20    Q.  What were the problems that you were
21 trying to solve?
22    A.  Raise awareness and get resources for
23 addressing the harms that people were experiencing.
24    Q.  Were you feeling sort of a sense of
25 urgency at this point?

CONFIDENTIAL

Page 258

1    A.  I was, yes.  I had been trying for some
2  time now to get some features added that would
3  create information about the harm people were
4  experiencing.  And I had not been able to do that to
5  date and I was trying to understand why that was the
6  case.  And then I realized what was needed was data
7  from like just rock-solid, well-crafted research
8  data that showed how big the problem is in order to
9  get resources that were proportional to the harm.
10    Q.  Meanwhile, did you believe that day after
11  day, week after week, kids were continuing to be
12  harmed on Instagram?
13        MS. JONES:  Objection to the form.
14  Foundation.
15        THE WITNESS:  I mean, I think when we look
16  at all of these things, the sentence that I keep
17  coming back on over and over is "in the last seven
18  days."  And that tells you what happened in the last
19  seven days since that survey was done and after the
20  work that we did for this.
21  BY MR. CARTMELL:
22    Q.  Let's go to slide 8.
23        It states at the top left, "Context - Why
24  Bad Experiences."
25        Are you asking why -- you're presenting on

Page 259

1  why the company should focus on bad experiences?
2    A.  Correct.
3    Q.  What does this slide mean?
4    A.  The slide is saying that a hundred percent
5  of the community standards policy focuses on
6  enforcement.  So deleting content -- there's a
7  series of actions that you take when a policy
8  violation happens.
9        And what I'm saying there is that, as we
10  had seen on negative experiences survey, and
11  something else called TRIPS, T-R-I-P-S, what people
12  were experiencing on these issues was 100 times to
13  400 times greater than what was in the community
14  standards report.  And so this is why this work is
15  important.  It's every gray dot in that graph that
16  we saw.
17    Q.  I want to make sure it's clear that when
18  you talk about enforcing policy, is policy the
19  community standards?
20    A.  It's the narrow interpretation of the
21  community standards.
22    Q.  Okay.  Let's go to slide 10, please.
23        On this slide it looks like you are
24  presenting to the Instagram Well-Being leads the
25  types of gaps between policy and bad experiences,

Page 260

1  correct?
2    A.  That's correct.
3    Q.  And, again, when you're talking about the
4  gaps, you are talking about the type -- the gap
5  between enforcement of the community standards and
6  looking at what actually is happening in real time
7  as far as bad experiences on Instagram?
8    A.  That is correct.
9    Q.  And the gap is huge; is that correct?
10    A.  That is correct.
11    Q.  And they're not doing anything about that
12  gap?
13        MS. JONES:  Objection.  Form.  Foundation.
14        THE WITNESS:  They are not doing anything
15  to understand the gap.  Like, this is trying to be,
16  like, it's urgent to understand.
17  BY MR. CARTMELL:
18    Q.  Let me rephrase that because of the
19  objection.
20        Is Instagram doing anything to understand
21  that gap and to put together safety tools and
22  features to prevent the harms or substantially
23  reduce the harms?
24        MS. JONES:  Same objection to the form and
25  lacks foundation.

Page 261

1        THE WITNESS:  No.
2  BY MR. CARTMELL:
3    Q.  It states:  Policy can be effective, but
4  number one, incident doesn't meet the policy bar
5  though clearly bad.
6        What do you mean by that?
7    A.  If you look at a video where you can see
8  that apparently a woman is -- sorry to be graphic
9  about this, but apparently a woman appears to be
10  giving a blow job, but you don't see penetration.
11  That is an example of something that you look at and
12  you go, like, well that's pretty bad.  But in order
13  for the content to be removed, you might need to see
14  the member and penetration.  So that's an example of
15  something that is clearly bad.
16        There's other examples for each of the
17  categories that we talked about.
18    Q.  And can that be harmful to a young kid?
19    A.  I believe that can be as harmful as
20  policy-violating content to a kid.
21    Q.  You say incident is hard to detect in,
22  number three, by human or automated review.
23        What is an example of that?
24    A.  So unwanted sexual advances are something
25  that you look at the messages, and it's hard to

Golkow Technologies,
A Veritext Division
877-370-3377                                            www.veritext.com

CONFIDENTIAL

Page 262

1 proactively detect whether that was an unwanted
2 advance, but I believe you should completely trust
3 when a kid is telling you to me that was an unwanted
4 sexual advance.
5       So there are some things that by the
6 content or the message you could not detect an
7 advance. But once you got information about that
8 message combined with this actor and this kid, you
9 could then use it to detect further on. And so,
10 again, these are things that policy can be
11 effective, but it has a really hard time with that.
12 I knew that for years of working in this field.
13       Q. And as a result of that enforcement of the
14 community standards only, that can create a lot of
15 bad experiences going unknown to the company; is
16 that correct?
17       MS. JONES: Objection to the form.
18       THE WITNESS: I mean, that's correct. I
19 mean, the way I kind of think about like policy
20 enforcement and prevalence, is imagine there's
21 like -- there's this story about this. You are
22 walking down the street and you see this guy and
23 there is a lamp, and he is looking for keys under
24 the lamp. And you go help him. Oh, where are the
25 keys? And let me help you with that. And you are

Page 263

1 searching for a while there. And it's pretty clear
2 that the keys are not there. And you are going,
3 like, Where did you lose the keys? And the person
4 goes, like, oh, yeah, I dropped them in those bushes
5 over there. And you go, like, Why aren't we looking
6 in the bushes over there where you dropped the keys?
7 And they say, Well, the light is better here.
8       And so I think what happens is, when you
9 talk about narrow policy enforcement, you can build
10 infrastructure that can detect some things very
11 well. You can detect female nipples. You can
12 detect certain sentences. There's a little
13 incredible engineering on Meta's part being able to
14 detect these things at scale. But is that what is
15 going on in the bushes? Right. And that's -- what
16 I'm trying to call out is you need to have this
17 detection of policy-violating content as far as you
18 can see it, but you have to have an understanding,
19 and the whole life cycle I talked about, for all of
20 the other things that are not captured by this. And
21 what is in this presentation is all of these other
22 things are hundreds and hundreds of times. We're
23 talking about 9,998 things out of 10,000.
24       MS. JONES: Let me just object to the
25 narrative.

Page 264

1       Go ahead.
2 BY MR. CARTMELL:
3       Q. If you go to slide 13, is this an example
4 of something that occurs online on Instagram but is
5 not picked up as a violation by Instagram?
6       MS. JONES: Objection. Foundation.
7       THE WITNESS: That is correct.
8 BY MR. CARTMELL:
9       Q. It states: When I received rape threats
10 in my DMs, Instagram offered me no help at all.
11       Do you see that?
12       A. Yes.
13       Q. It states: I have been on the receiving
14 end of an unsolicited dick pic or two in my time. I
15 laughed them off at first. Then the same man
16 started sending explicit descriptions of violent
17 sexual fantasies he had about me. This included
18 rape, choking, putting me in crutches, and forcing
19 my mother and father to watch.
20       What is this an example of that you
21 included when you presented to the well-being leads
22 at Instagram?
23       A. It is an example of unwanted sexual
24 advances in every paragraph of that. It starts with
25 the unsolicited dick pics, and then it escalates

Page 265

1 into violent sexual fantasies of being told of you
2 being raped in front of your family.
3       And these things, they should never
4 happen, like in the first place. They are such an
5 awful experience. And then you put that on a
6 13-year-old or a 14-year-old, and they get a message
7 like this. And today, there's still no way for them
8 to effectively report something like this.
9       Q. So this is not a violation of Instagram's
10 community standards?
11       MS. JONES: Objection. Foundation and
12 form.
13       THE WITNESS: If you read the community
14 standards, they very explicitly say they would
15 not -- they do not allow things like this. It says
16 if you -- I don't have it here, but it says we don't
17 allow that. But the interpretation of that is if
18 you get this message, and you try to report it, one,
19 what category do you select? Right. That's really
20 broken. And then if you do submit a report, will
21 they act on it?
22       And I tested it again in the last week
23 between two test accounts a message similar to this.
24 I tried to report it. And I got the feedback saying
25 this does not violate our community guidelines.

CONFIDENTIAL

Page 266

1 We're not going to remove it.
2        And it was understood by the team that the
3 keyword here is the way Instagram uses the word
4 "credible." If they -- if by their judgment they
5 don't think that this is a real rape threat, they do
6 not do anything about it.
7        And when I was discussing this with my
8 daughter, when she spoke to all of her friends, and
9 people that I have spoken to since that have
10 received threats, rape threats, unwanted sexual
11 advances, unwanted dick pics, that again should
12 never be like a thing, their response is the same.
13 They feel powerless because they don't have the
14 tools that would help them protect themselves and
15 protect others.
16        So when I talk about the urgency of this
17 issue, it is exactly about messages like this.
18        MS. JONES: Let me object to the
19 nonresponsive narrative answer.
20        Go ahead.
21 BY MR. CARTMELL:
22    Q.  Is that why you included this example of
23 something that was not excluded from Instagram when
24 you were presenting to the Instagram leads?
25    A.  That is correct.

Page 267

1    Q.  Were you trying to tell them how serious
2 this problem was?
3    A.  Yes, I was.
4    Q.  If you go to slide 14, this is another
5 example, and it's called "Thinspiration."
6        What is that?
7    A.  Thinspiration was the internal label we
8 used for content that encouraged being, like, too
9 skinny, like, too thin. So this is "thin
10 inspiration" pushed together. And that was one of
11 the labels that was discussed internally at the time
12 and used in Instagram the product to promote content
13 that was related and would cause body image issues.
14    Q.  Why were you including this as an example
15 of information that is allowed on Instagram and not
16 enforced as a community standards violation?
17    A.  I'm sorry. I'm just -- it's important, I
18 think, for people to read some of the text and look
19 at the images around these things.
20    Q.  Why don't you go ahead and do that.
21    A.  Yeah. Don't report me. Just block me.
22 I'm pro recovery. My Twitter handle is Starving is
23 Cool.
24        Right. So this is the kind of content
25 that is encouraging starving, just by the -- the

Page 268

1 label on it.
2        And if you look at, like, the -- the
3 pictures here, right, the "Don't mind me. It's
4 breakfast." It's Kermit having just a cup of tea
5 for breakfast. Right.
6        And these were examples that Instagram
7 Well-Being team knew had affecting body image issues
8 for girls.
9        And the other thing that is really
10 important about this slide is -- yeah. You can see,
11 like -- I will be happy when I hit my -- that's a
12 weight reference. Don't mind me. It's breakfast.
13 You can't work off a binge. I mean, these are all
14 that kind of content that in a fire hose, right, in
15 these walls of content are promoting, like, body
16 image issues and eating disorder.
17        And then if you look at the text on the
18 right of the slide, what we are saying there is we
19 are teaching people to click a Report button or call
20 the phones, and then -- this is really important.
21 This comes over and over in research, research that
22 was done in 2010 and research that was done later.
23 Teenagers don't like to hit Report. They don't like
24 the word "Report" because it is worried that they
25 are going to get themselves in trouble and kind of

Page 269

1 afraid to hit it because of that. And then they are
2 worried they are going to get somebody else in
3 trouble.
4        So we knew that the word report did not
5 work for teens to select that as an option. And in
6 2011 or '12 we changed that word to be something
7 else that teens would feel comfortable clicking so
8 we could get the information about the things that
9 they were having.
10        MS. JONES: Let me just object again to
11 the narrative nonresponsive answer. And just to be
12 very clear, we're going to seek to strike all of
13 these answers as being speeches. They are not
14 responsive to your questions.
15        Go ahead.
16        MR. CARTMELL: Well, I'm just going to
17 respond to that one because I think it calls for a
18 response.
19        Okay. We will move on.
20    Q.  Was eating disorder content and body image
21 content something that Meta knew was frequent on
22 Instagram?
23        MS. JONES: Objection. Foundation.
24        THE WITNESS: Yes.
25 ///

68 (Pages 266 - 269)

CONFIDENTIAL

Page 270

1 BY MR. CARTMELL:
2    Q.  And did Meta know from its internal
3 research that there was content that was frequent on
4 Instagram that was promoting or encouraging body
5 image issues and eating disorders?
6        MS. JONES:  Objection to the form and
7 lacks foundation.
8        THE WITNESS:  Yes.
9 BY MR. CARTMELL:
10    Q.  Were you using this example to show the
11 Instagram Well-Being leads that this type of content
12 was frequent on Instagram and not violating the
13 community standards?
14    A.  Yes.
15    Q.  Was that because you were telling the
16 Instagram leads -- strike that.
17        Did you do that because you were telling
18 the Instagram leads that there was harm to girls and
19 kids on Instagram from this type of content?
20    A.  Yes.
21    Q.  Did Instagram ever, that you know of, warn
22 parents or the public that it knew there was content
23 that was frequent on Instagram that was promoting or
24 causing or contributing to cause eating disorders
25 and body image issues?  Do you know?

Page 271

1        MS. JONES:  Object to the form.
2 Foundation.
3        THE WITNESS:  I'm sorry.  Could you repeat
4 the question?
5 BY MR. CARTMELL:
6    Q.  Yes.  Did -- strike that.
7        As far as you know, did Instagram ever
8 warn the public or parents or users that there was
9 frequent content on Instagram that was promoting or
10 encouraging eating disorders and that could lead to
11 body image issues?
12    A.  No.
13    Q.  Do you think they should have?
14    A.  Absolutely.
15    Q.  You talk about one type of triggering
16 content.
17        What do you mean by triggering content?
18    A.  It -- when you talk to people who are
19 survivors of eating disorders, that's how this kind
20 of content is referred to, that they will see this
21 kind of content and you will skip the next meal.
22    Q.  What is doomscrolling?
23    A.  Doomscrolling was the internal term that
24 referred to when somebody was spending a long amount
25 of time looking at a single topic or a set of

Page 272

1 related topics.
2    Q.  Did Meta know that kids were involved
3 frequently on Instagram doomscrolling?
4    A.  Yes.
5    Q.  Can doomscrolling be harmful to kids?
6    A.  Yes.
7    Q.  Did Meta ever warn the public or parents
8 that there was a risk of doomscrolling on Instagram
9 that could cause mental well-being harms to kids?
10    A.  No.
11    Q.  Do you think they should have?
12    A.  Absolutely.
13    Q.  What were you asking the well-being leads
14 for in this presentation?
15    A.  Resources to do a large-scale study to
16 understand the harmful experiences that people were
17 having on Instagram.
18    Q.  What type of large-scale study?
19    A.  User research.
20    Q.  A survey?
21    A.  Yeah, a survey.
22    Q.  We talked previously that there was the
23 NES survey, and you mentioned the TRIPS survey.
24        Why was it that you believed that there
25 needed to be another survey related to negative or

Page 273

1 harmful or bad experiences on Instagram?
2    A.  One of the things that I did when I first
3 became aware of the Negative Experiences Survey and
4 TRIPS is talk to a fair number of people to
5 understand if they had tried to bring those numbers
6 down and what they had learned in the process.
7        So I talked to people at Instagram.  I
8 talked to people at Facebook to try and understand.
9 And it became clear to me that you needed more
10 information in order to make the survey more
11 actionable by the kinds of features that the company
12 could build.
13        And also there were some categories that
14 were not covered by the other surveys, and I wanted
15 to make sure that we had a good comprehensive survey
16 of the issues that people were dealing with in
17 Instagram.
18    Q.  Did the Instagram leads or leadership at
19 Meta provide you with the resources and funding and
20 support that you asked for in that presentation?
21    A.  They did, yes.
22    Q.  And was that for the actual survey you are
23 talking about?
24    A.  Correct.
25        MR. CARTMELL:  I'm going to hand you

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

Page 274

1 Exhibit 20.
2        (Whereupon, Meta-Bejar Exhibit 20 was
3 marked for identification.)
4 BY MR. CARTMELL:
5    Q.   Mr. Bejar, Exhibit 20 is an e-mail chain
6 from you to Mr. Cox.  And it is dated December 12,
7 2020.
8        Do you see that?
9    A.   Yes.
10    Q.   This is an e-mail chain that was produced
11 in this litigation from your files from the time you
12 were at Meta.
13        Do you understand that?
14    A.   Yes.
15    Q.   And December of 2020, now you had been at
16 Meta working as the safety consultant to the
17 well-being team at Instagram for a year and a few
18 months; is that right?
19    A.   Correct.
20    Q.   Okay.  Now, you are escalating your
21 concerns to another executive; is that correct?
22    A.   That's correct.
23    Q.   Chris Cox, what was his position?
24    A.   Chris Cox was the head of product for the
25 company.  And he was Mark Zuckerberg's right-hand

Page 275

1 person when it came to product issues for the
2 company.  And somebody with whom I had worked with
3 extensively during my first stint.
4    Q.   So was Chris Cox essentially one of the
5 very, very top executives at the company other than
6 Mark Zuckerberg?
7    A.   Correct.  He was one of the top, like,
8 three people in the company.
9    Q.   Okay.  You say:  Hi, Chris.  I wanted to
10 give you an update since we spoke last week.
11        So you must have had a conversation with
12 him, I take it, before this?
13    A.   Correct.
14    Q.   Okay.  You said:  After we spoke I felt I
15 did not do a good job of articulating what I have
16 come to understand, and after conversations with
17 people across the company and working closely with
18 the Instagram Well-Being team, I have a better
19 framing.
20        And so did you then set out the framing of
21 what you were intending to tell Mr. Cox?
22    A.   Correct.
23    Q.   What are you -- if you would, just sort of
24 generally state.  What are you laying out here to
25 Mr. Cox?

Page 276

1    A.   So when I -- so the part of it is how
2 you -- the things that I found from all of my
3 conversations with people who have been working on
4 prevalence, who had been working on TRIPS.  And one
5 of the things that became clear to me is that people
6 didn't understand why the company would be saying
7 point something percent of nudity and why people
8 were saying that, like, one in five of them had
9 experienced it in the last seven days.  Pick your
10 category for any one of these.
11        And so I would ask people do you
12 understand the gap between these two numbers.  And
13 most people would be like, no, I don't understand
14 the gap between these two numbers.  And that's
15 ideally the point where you invite people to look at
16 the content so that you can understand what is the
17 gap.
18        And so I'm laying out what is the gap
19 between the experiences of harm from a user's
20 perspective and prevalence.
21    Q.   Are you telling Mr. Cox, like you did
22 Mr. Mosseri, that the company didn't understand the
23 harm that was going on on Instagram?
24    A.   That is correct.
25    Q.   Were you nervous talking to the very top

Page 277

1 executives at the company that is a multibillion
2 dollar company and telling them that they don't
3 understand the harm that is happening on Instagram?
4    A.   Not at all.
5    Q.   Why not?
6    A.   I used to sit above or below them for most
7 of my time, like in the floor.  And if something
8 happened like this that I became aware of it, I
9 would walk over to Chris Cox's desk and say, hey, we
10 just discovered this really bad thing.  Here are the
11 numbers.  I would just make sure that you know.
12        And I would do that with Chris Cox, with
13 Mark Zuckerberg and with Sheryl Sandberg.  And Mike
14 Schroepfer, my manager, always knew when I was doing
15 this.  And every time I had a conversation like that
16 during my first stint, it always led to immediate
17 action that would help address the gap.  Because
18 ultimately what I was trying to do is protect the
19 people who use Facebook or Instagram.
20    Q.   You state:  Today we don't understand well
21 the relationship between bad experiences or harm
22 from our user's perspective, what TRIPS captures --
23        That's a survey, correct?
24    A.   Correct.
25    Q.   -- and prevalence, policy-violating

70 (Pages 274 - 277)

CONFIDENTIAL

Page 278

1 content. In Instagram 20 percent of daily active
2 user witness what they consider to be hate over the
3 last seven days. Five percent report being targets.
4 During that period 70,000 reports are submitted the
5 Hate category in FRX?
6        What is that? Is that another database of
7 surveys?
8    A.   No. FRX is the reporting tool that is the
9 interface where people report issues.
10    Q.   Okay. "And only a small fraction of those
11 is action."
12        So are you saying 70,000 reports are made
13 on hate during that period of time and the action
14 rate is low?
15    A.   Yeah. Very low for the hate issues.
16    Q.   "I think this explains one of the sources
17 of negative perception of our products and by our
18 employees."
19        What do you mean that this explains the
20 negative perception of our products and by our
21 employees?
22    A.   During that time I had seen a lot of
23 people that I was connected with on Facebook quit,
24 and in their goodbye post they would say there is
25 just a lot of crap here. I don't want to be dealing

Page 279

1 with this crap. So I'm just going to close my
2 account and go away.
3        And at the time there was always a lot of
4 reports of things that employees were finding
5 distressing, because there was a lot of different
6 kinds of hate playing out on the platform.
7    Q.   Okay. "In the conversations I have had, I
8 found that for many people prevalence equals harm.
9 My guess from what I have seen is that Mark thinks
10 about it this way."
11        Are you referring to Mark Zuckerberg?
12    A.   Yes.
13    Q.   And what do you mean that he thinks about
14 it that way, that many -- that prevalence equals
15 harm?
16    A.   That every time I saw Mark speaking
17 publicly or internally about harm, he would
18 immediately talk about it in terms of prevalence.
19    Q.   And did you know from your experience, at
20 this time around 25 years of experience, in the
21 industry as a safety and security expert, that
22 prevalence, that metric didn't have anything to do
23 with the actual harm going on on Instagram?
24        MS. JONES: Objection to the form.
25 Foundation.

Page 280

1        THE WITNESS: Yes, I did. During my first
2 stint there were different conversations about
3 having a spam metric. And, basically, it was, like,
4 grading your own homework. Here are the things I
5 can find. And I did a really good job of deleting
6 the things I could find. And we found that any
7 meaningful event that impacted user safety was
8 generally around things that were not caught by our
9 existing tools and our existing filters.
10 BY MR. CARTMELL:
11    Q.   One of the last things you say is: If we
12 get really good at finding, understanding, and
13 addressing the unintended harms that people
14 experience in our products, I think it would be
15 motivating for employees as well as true to our
16 mission.
17        Do you see that?
18    A.   Yes.
19    Q.   Was there a morale problem, was that your
20 understanding, within the well-being team at that
21 time?
22        MS. JONES: Objection to the form.
23        THE WITNESS: Yes, there was.
24 BY MR. CARTMELL:
25    Q.   And was that -- what was your

Page 281

1 understanding of why that was?
2        MS. JONES: Lacks foundation.
3        MR. CARTMELL: Let me restate it.
4    Q.   What was your understanding of why there
5 was a morale problem within the well-being team as
6 of this time?
7        MS. JONES: Same objection.
8        THE WITNESS: There was -- like, a lot of
9 the harm that we have been talking about was common
10 knowledge for the people I work with and the
11 well-being team. It was discussed in different
12 contexts.
13        And there was not enough resources to deal
14 with issues. And if there was an incident, like,
15 for example I think I mentioned already racism
16 experienced by black athletes, then you would stop
17 working on what you were working on and then you
18 would go work on that fire for, like, a few weeks.
19        And you really -- it's hard to do this
20 kind of work without the right support. It can be
21 pretty demoralizing.
22 BY MR. CARTMELL:
23    Q.   Did you believe that -- strike that.
24        Do you believe that Meta was, at this
25 time, acting true to its mission?

71 (Pages 278 - 281)

Page 282

1    MS. JONES: Objection. Foundation and
2 form.
3    THE WITNESS: I think it was not.
4    MR. CARTMELL: How long have we been
5 going?
6    THE VIDEOGRAPHER: Hour and 21.
7    MR. CARTMELL: Hour and 21?
8    THE VIDEOGRAPHER: Yes.
9    MR. CARTMELL: Can we take a break?
10    MR. WARD: We can, yeah.
11    THE VIDEOGRAPHER: Time is 4:57. We're
12 off the record.
13    (Whereupon, a brief recess was taken.)
14    THE VIDEOGRAPHER: Time is 5:12. We're
15 back on the record.
16 BY MR. CARTMELL:
17    Q.  Mr. Bejar, we're back on the record after
18 a short break.
19    Are you ready to proceed?
20    A.  Yes, I am.
21    Q.  Before the break we were talking about how
22 you had decided that there was a need for -- I think
23 you said a bigger, more robust survey; is that
24 correct?
25    A.  Correct.

Page 283

1    Q.  And what was the purpose of that as far as
2 trying to escalate your concerns to the executives?
3    A.  To help get resources for the Instagram
4 Well-Being team.
5    Q.  Did that survey become known as the Bad
6 Experiences and -- hold on --
7    MS. JONES: Encounters.
8 BY MR. CARTMELL:
9    Q.  -- encounters. Let me start over.
10    Thank you, Phyllis.
11    Did that survey become known as the Bad
12 Experiences and Encounters survey?
13    A.  Yes, it did.
14    Q.  Okay. And were you involved actually in
15 the development of that survey?
16    A.  Yes, I was.
17    Q.  Did you have involvement with Mr. █████
18 █████
19    A.  That's correct.
20    Q.  Who is █████████?
21    A.  █████████ was a user researcher that
22 was part of the well-being research team at
23 Instagram.
24    Q.  I think actually he is a doctor. Does he
25 go by Dr. ████████?

Page 284

1    A.  Correct.
2    Q.  I'm sorry about that.
3    You and Dr. █████ did you work together
4 to sort of put together the protocol, that sort of
5 thing, related to the survey study?
6    A.  Correct.
7    Q.  And that survey, did it occur in June --
8 well, between June and July of 2021?
9    A.  I believe so, yes.
10    MR. CARTMELL: I'm going to hand you what
11 has been marked as Exhibit 21.
12    (Whereupon, Meta-Bejar Exhibit 21 was
13 marked for identification.)
14 BY MR. CARTMELL:
15    Q.  With respect to the BEEF survey, as far as
16 the experiences that were going to be tested in
17 that, did you have involvement in actually that
18 process of deciding what questions were going to be
19 asked of the users?
20    A.  Yes.
21    Q.  Okay. Was this survey, the Bad
22 Experiences And Encounters framework survey, a more
23 robust survey than the prior TRIPS or NES surveys?
24    MS. JONES: Objection. Foundation.
25    THE WITNESS: Yes.

Page 285

1 BY MR. CARTMELL:
2    Q.  In what respects?
3    A.  In one of them was the number of people
4 that would ask the questions. So it was a few
5 hundred thousand of people that got the questions.
6 It was also covering more topics or more areas that
7 were not covered in some of the other surveys. And
8 then you were going to get details about, going back
9 to the framework, like where it happened, how it
10 happened, and how bad it was.
11    Q.  And was that something that you sort of
12 insisted on with respect to this survey, you wanted
13 it to ask that information to give Meta more
14 information about harms?
15    MS. JONES: Objection to the form.
16    THE WITNESS: That's correct. Because
17 that information is very actionable.
18 BY MR. CARTMELL:
19    Q.  When you say "actionable," what do you
20 mean?
21    A.  It means that if you know where it
22 happened, then you know where you can change the
23 product in order to help people with that
24 issue. If you know what happened, then you have the
25 content and the data. And if you know how intense

Page 286

1 it is, you can prioritize the work because you can
2 find the things that are more urgent to investigate.
3     Q.   Is -- this document in front of us, Bad
4 Experiences and Encounters Framework (BEEF) Survey,
5 the author of this presentation is ███████; is
6 that right?
7     A.   Correct.
8     Q.   And is this a presentation that has a
9 summary of the findings from the BEEF survey?
10    A.   Correct.
11    Q.   Have you seen this document before?
12    A.   Yes, I have.
13    Q.   Let's take a look at this document.  Why
14 don't you go ahead and look at page 3.
15        It states, "Why are we doing this?"  It
16 states, "To develop a holistic, consistent picture
17 of user bad experiences on Instagram that allows us
18 to track our progress each half."
19        Do you see that?
20    A.   Yes, I do.
21    Q.   Was the BEEF survey supposed to be set up
22 so that it would be done every six months?
23    A.   Yes.
24    Q.   When it says "half," that means every half
25 year?

Page 287

1     A.   Correct.
2     Q.   What was the reason why it was going to be
3 repetitive in nature?  In other words, it was going
4 to be done each half?
5     A.   So you could track the progress that you
6 were making at preventing harmful issues.
7     Q.   So, for example -- or hypothetically, if
8 you had a survey and a user told you that they were
9 having a bad experience from bullying or unwanted
10 sexual advances or something like that and they told
11 you it was 20 percent, then you would look and do
12 the survey again and see if it had gotten worse or
13 gotten better; is that correct?
14    A.   That's correct.
15    Q.   And would the idea be -- tell me if I'm
16 wrong.  But would the idea be during the
17 intermittent time between the surveys, you would try
18 to build safety tools and features to reduce the
19 harm?
20    A.   That's correct.
21    Q.   It states consistent -- wait -- strike
22 that.
23        It states, "Holistic: TRIPS focuses on
24 policy-violating experiences, but there are
25 additional causes of bad experiences on Instagram.

Page 288

1 By contrast, the BEEF survey pulls issues from the
2 Bad Experiences and Encounters Framework, which
3 sourced issues from all of our user input channels."
4        What does that mean?
5     A.   It means that there's different ways in
6 which you get information from users.  There is ways
7 to report bugs.  There's user research.  There is
8 reporting.  There's different fronts.  And this
9 pulled issues from all of the user channels that
10 were available at the time.
11    Q.   Under the paragraph Consistent, it says,
12 "The BEEF survey asks a random sample of users the
13 top 22 issues from BEEF, so we can compare and
14 contrast easily."
15        Do you see that?
16    A.   Correct.
17    Q.   So were there 22 actual issues, meaning
18 bad experiences, that were asked about in the
19 survey?
20    A.   That's correct.
21    Q.   And when I say "issues" or "bad
22 experiences," that's like bad experiences from
23 bullying or suicide and self-injury or violence,
24 those sorts of things?
25    A.   Correct.

Page 289

1     Q.   And then it says, "Track our progress:
2 Without a control group, it's impossible to
3 determine causality from our other signals.  The
4 BEEF survey was fielded to both the well-being
5 holdout and production groups."
6        Do you see that?
7     A.   Yes, I do.
8     Q.   Was this study supposed to have two groups
9 that were surveyed, one that would have had the
10 safety features and tools in place and another group
11 that didn't have safety tools and features in place
12 so you could compare them and see whether or not one
13 had less harm than the other?
14        MS. JONES:  Objection to form.
15        THE WITNESS:  That's correct.  That was a
16 widely used practice for all of my time at Facebook.
17 BY MR. CARTMELL:
18    Q.   And so were you actually, with the help of
19 Mr. ██████ responsible for ensuring that Instagram
20 for the first time was doing that comparison?
21    A.   Correct.
22    Q.   Let's go to page 5.
23        There's a list here on the left and right,
24 I guess, two columns of the 22 issues, or bad
25 experiences, that were asked about in this survey;

73 (Pages 286 - 289)

CONFIDENTIAL

Page 290

1 is that right?
2    A.   Correct.
3    Q.   And so on the left it starts with "False
4 or misleading" and then "Violence" and then "Hate"
5 and "Bullying."  That sort of thing?
6    A.   Correct.
7    Q.   On the right, there's "Unwanted advances,"
8 "Account security," "Impersonation," "Civic
9 content."
10       That sort of thing, correct?
11    A.   Correct.
12    Q.   "Self-harm"?
13    A.   Correct.
14    Q.   And then, are these the actual questions
15 that were asked?
16    A.   That's correct.
17    Q.   What's the relevance of this to this
18 survey?
19    A.   Well, when you look at a label like
20 "Nudity," we all kind of have our definition of what
21 that is, but when you design one of these surveys
22 it's really all about the questions.
23       So, "Have you ever seen nudity or sexual
24 images on Instagram that you didn't want to see?"
25       Or, like, "Have you ever felt worse about

Page 291

1 yourself because of other people's posts on
2 Instagram?"  That's the question for the "Negative
3 Social Comparison" topic.  But it really gets at
4 what happens to people.
5       And so for each of these categories, it's
6 really the questions that tell you what the harm is
7 connecting to.
8    Q.   Did you and Mr. ▮▮▮▮▮▮ believe that this
9 study would provide Meta with important data for
10 future work on reducing the harms on Instagram?
11    A.   Yes, we did.
12    Q.   And this study, I believe, was 238,000
13 people who were surveyed; is that right?
14    A.   That's correct.
15    Q.   And that's eight times as big,
16 approximately, than the prior NES survey that we
17 looked at, correct?
18    A.   That's correct.
19    Q.   Let's go to the next page, dot 6.  Survey
20 questions and log data context.  And I want to ask
21 you just a few questions about this.
22       "Frequency."  It says, "In the last 7
23 days, how many things have you seen" -- I'm sorry.
24 Let me start over.
25       It says, "In the last 7 days, how many

Page 292

1 times have you seen something like this?"
2       Do you see that?
3    A.   Yes.
4    Q.   So was this survey asking for the 238,000
5 users on Instagram to say what bad experiences they
6 had in the last week?
7    A.   It was in the last seven days.  And then
8 this question is about if you said, for example, yes
9 to one of the harms, in the last week how many times
10 did you see something like this.  So that you get a
11 sense of how frequent you run into that harm during
12 the last seven days if you had indeed experienced
13 it.
14    Q.   And I don't think the NES survey, did it
15 have that or do you know?
16    A.   It did not.
17    Q.   Okay.  It also asks for emotional data; is
18 that correct?
19    A.   That's correct.
20    Q.   Explain that, please.
21    A.   So we knew it was very important to
22 understand the severity of the issue to understand
23 which emotion the person was experiencing.  And so
24 then for somebody that experienced a particular
25 issue, you want to know what emotion they felt

Page 293

1 related to the issue that they were experiencing.
2    Q.   Okay.  I'm going to hand you actually an
3 exhibit that we were produced in the files of Meta
4 that I think is a list of emotions that were asked
5 about in the BEEF study.
6       Handing you Exhibit 22.
7       (Whereupon, Meta-Bejar Exhibit 22 was
8 marked for identification.)
9 BY MR. CARTMELL:
10    Q.   I want to ask you if, in fact, this looks
11 like -- I'll wait for Jim.
12       Let me ask you, Exhibit 22 is a list of
13 emotions.  It says, "Which specific emotions did you
14 feel?  Please select all that apply."
15       And then it has several emotions listed;
16 is that right?
17    A.   That's correct.
18    Q.   And are these emotions that you and
19 Mr. ▮▮▮▮▮ decided would be appropriate to ask
20 about in this survey?
21    A.   That's correct.  And also, like, select
22 all that apply because it was very important to know
23 if somebody felt angry and powerless, right.  I
24 mean, the combination of this is very telling.
25    Q.   And would the users -- they were

Golkow Technologies,
A Veritext Division

877-370-3377                                              www.veritext.com

CONFIDENTIAL

Page 294

1 instructed to do that, and they would provide that
2 data, the company could use that data to determine
3 how severe the harm is potentially -- let me restate
4 that.
5        And could the company use that data
6 related to emotions to determine the severity of the
7 bad experience?
8    A.  That is correct.  The severity of the bad
9 experience.  And then whether the user had agency,
10 they felt there was something they could do about
11 it.
12    Q.  It actually asks length of emotional
13 reaction.  Do you see that -- let's go back, sorry,
14 Jim, I'm ahead of you.
15        Let's go back to the BEEF study and look
16 at the survey questions from the presentation.
17 Exhibit 22.
18        It also asks "Specific emotion felt."
19 Which specific -- strike that.
20        It also asks "Length of emotional
21 reaction" for "How long after the experience did you
22 feel this way?"
23        You see that?
24    A.  I do, yes.
25    Q.  Why was that important?

Page 295

1    A.  Because it is a critical proxy as to how
2 intense the experience was.
3    Q.  When you say "intense," are you talking
4 about severity?
5    A.  Yeah, about how bad it was.  Feel angry
6 for a week.  Feel afraid.  It's a big deal.
7    Q.  Is it true that that set of questions on
8 the length of emotional reaction had not been
9 something that before you arrived had been in the
10 surveys about bad experiences with Instagram?
11    MS. JONES:  Objection.  Foundation.
12    THE WITNESS:  Not as far as I was aware.
13 BY MR. CARTMELL:
14    Q.  Okay.  And was that something that you
15 felt strongly, based on your expertise as a safety
16 expert, needed to be in the survey?
17    A.  That is correct.
18    Q.  If you turn real quickly just to dot 7,
19 you'll see, I just wanted to point out that this is
20 the sample size.  We already talked about it.
21        But if you go to the right, the bottom
22 right, it states the respondents were 237,923 users
23 of Instagram.
24        Do you see that?
25    A.  I do, yes.

Page 296

1    Q.  Is that a big survey?
2    A.  Yes, it's a survey that is -- think of
3 those as statistically significant.  So it's -- you
4 ask enough people so that it's an accurate
5 representation of the Instagram population.
6    Q.  I see.
7        So the results that you can get from a
8 survey that size are results that you can then
9 extrapolate to the entire Instagram community?
10    MS. JONES:  Objection to the form.  And
11 foundation.
12    MR. CARTMELL:  Let me restate it.
13    Q.  Can you, with results from a survey this
14 size, take the information and are you supposed to
15 be able to, if it's statistically significant,
16 extrapolate that to the greater Instagram community?
17    MS. JONES:  Same objection.  Form.  Lacks
18 foundation.
19    THE WITNESS:  That's correct.  That's why
20 you do a survey this size is so that you could --
21 are able to make claims about what people on
22 Instagram are experiencing which are accurate.
23 BY MR. CARTMELL:
24    Q.  Okay.  Let's go to page 19 in the Results
25 section.

Page 297

1        It states, "Respondents experiencing one
2 or more issues.  A little over half of respondents
3 (51.6 percent) experienced at least one issue in the
4 past 7 days."
5        Do you see that?
6    A.  I do, yes.
7    Q.  Now, the other thing that this survey had
8 that the prior NES and TRIPS survey did not have was
9 a breakdown of ages, including categories of
10 teenagers; is that right?
11    A.  That's correct.
12    Q.  And as we see here, there was a category
13 for 13- to 15-year-olds; is that right?
14    A.  That's correct.
15    Q.  And then a category for 16- to
16 17-year-olds, right?
17    A.  That's correct.
18    Q.  Why did you think that was important for
19 Meta to be getting a breakdown of responses in data
20 related to the teenagers?
21    A.  Because it's essential to know what
22 teenagers are experiencing so that you create safety
23 features that protect them.
24    Q.  This states that 54.1 percent of 13- to
25 15-year-olds experienced one or more of these bad

75 (Pages 294 - 297)

CONFIDENTIAL

1 experiences?
2     A.  That's correct.
3     Q.  In the last seven days, right?
4     A.  The last seven days.
5     Q.  So more than half?
6     A.  Yes.
7     Q.  Okay.  Of the 16- to 17-year-olds it's
8 even more.  It's 57 percent that had experienced one
9 or more of these bad experiences within the last
10 seven days; is that right?
11     A.  That's correct.
12     Q.  Was that data concerning to you?
13     A.  Yes.
14     Q.  Why is that?
15     A.  Because it tells you that teens are
16 having -- for each one of these 22 issues, they are
17 having this harmful experiences and it -- I mean,
18 it's so important to create a -- tools and an
19 environment which is safe for them.
20         And so if they're telling me they are
21 experiencing multiple issues multiple times, it is
22 an urgent issue that the company needs to address.
23     Q.  Let's go to page 21 and look at the
24 results by age groups.
25         This chart has the results by age groups;

1 is that right?
2     A.  That's correct.
3     Q.  And it states, "Younger people report
4 higher rates of every issue, with some issues felt
5 more universally than others."
6         You see that?
7     A.  I do, yes.
8     Q.  It states, in the paragraph below that,
9 "(the age group with the highest rate of
10 experiencing an issue) are within the four youngest
11 age groups."
12         Do you see that?
13     A.  I do, yes.
14     Q.  And if you look at the 13- to
15 15-year-olds, did they actually experience higher
16 rates of bad experiences in the most categories?
17     A.  Yes.
18     Q.  Is that concerning?
19     A.  Absolutely.
20     Q.  Let's look at some of this information for
21 the youngest category.
22         And actually, let's go out and pull 16-
23 and 17-year-olds, too, if you wouldn't mind, Jim.
24 Thank you.
25         For "bully witness," that was something we

1 looked at in the NES survey, right?  In this survey,
2 for 13- to 15-year-olds, it's 27.2 percent.  And --
3 for 13 to 15.  And 29.4 percent for 16- to
4 17-year-olds in the last seven days.
5     A.  That's correct.  One in three saw it
6 happen.
7     Q.  Let's go down to "bully target."  That's
8 actually referring to the users or the kids who are
9 themselves a target of the bullying; is that right?
10     A.  That's correct.
11     Q.  Let me ask you, I didn't ask you, can
12 witnessing bullying be harmful to kids?
13         MS. JONES:  Objection.  Foundation.
14         THE WITNESS:  Absolutely.  We knew that
15 it's not the same thing if somebody comes to you at
16 a school and says, I'm going to make sure you don't
17 get invited to the party tonight.  That just happens
18 then and it's the people who hear it.
19         When that happens on Instagram, we knew
20 also from working on this issue on my first stint,
21 these comments get amplified and so suddenly
22 everybody in the school is seeing it and people in
23 schools nearby are seeing it.  And we knew that was
24 profoundly distressing for teenagers who are asking
25 for help telling us please urgently help take this

1 down.  So the teen reporting tools that we gave
2 them.
3         And so the combination of, like,
4 approximately one in ten kids being the target and
5 then one in three watching it happening is very
6 distressing for them and also normalizes the
7 behavior so that people who are watching because
8 they think it's okay to do things like that.  If
9 that's what you see, it's what you do.  Like people
10 copy the behavior that they see.
11 BY MR. CARTMELL:
12     Q.  So let me ask you, did -- bullying in
13 school is a bad thing, right?
14     A.  Correct.
15     Q.  Is bullying online potentially more
16 harmful to kids for the reasons you just stated?
17         MS. JONES:  Objection.  Foundation.
18         THE WITNESS:  Absolutely.
19 BY MR. CARTMELL:
20     Q.  Are they the same, in your mind?  In other
21 words, is online bullying just a reflection of what
22 happens in the real world?
23     A.  No.
24     Q.  Why is that?
25     A.  Because online bullying is persistent,

76 (Pages 298 - 301)

CONFIDENTIAL

Page 302

1 amplified, so the audience to it is bigger. It
2 lives a much longer period of time. As long as the
3 content stays up. And we know this from both
4 research and work.
5         In the first time around the kid who is
6 experiencing it feels really alone the moment that
7 it happens. And the moment that that escalates the
8 feelings get more intense. So it can be profoundly
9 anxiety-inducing. It could be profoundly
10 distressing. It can runaway, right. It goes viral
11 and suddenly you have a million views. Just imagine
12 what that does to a 13-year-old.
13    Q. And let's look at "bullying target."
14 States that 10.8 percent of 13- to 15-year-olds and
15 9.7 of 16- and 17-year-olds.
16        So about one in ten kids or teens on
17 Instagram had been the target of bullying on
18 Instagram within the last week?
19    A. Correct.
20    Q. And some multiple times, right?
21    A. Correct. And I -- that's correct.
22        And I would like to say that as part of
23 the work I've been doing to this I have talked to
24 the parents of kids who have committed suicide
25 because of bullying.

Page 303

1    Q. Let me ask you a question about that. I
2 was going to ask you about that.
3    A. Yeah.
4    Q. Have you actually, in your work since
5 leaving Meta, been involved with working with or
6 talking with parents across America whose kids have
7 been bullied on Instagram?
8    A. I have, yes.
9    Q. Tell us about that.
10    A. Okay. So --
11        MS. JONES: Just object to the question as
12 a narrative.
13        Go ahead.
14        THE WITNESS: So I have talked to parents,
15 three of them, their names are here, whose kids have
16 committed suicide because of experiencing intimate
17 distress through Instagram. So it kind of narrowed
18 that conversations to that.
19        And the things I found in common in
20 talking to them was that they didn't know this was
21 happening to their kids. They were pretty on top of
22 the kids' usage but kids had secret accounts on
23 their phones that they got bullied in. That it got
24 to the point where their kids took their own lives
25 in a way they think is preventable.

Page 304

1        And that then the parents, and this is
2 three or four of the parents I spoke to, later
3 themselves were the targets of bullying and were
4 told, you put your kid in a body bag, or sort of
5 similar comments about them killing their kids. And
6 then they try to report those issues to Instagram.
7        And yet again, when you look at the action
8 rate of bullying and harassment, that's really what
9 we're talking about. If you look at intensity, what
10 we knew in 2012 and 2011, is if it's really intense
11 it can get really bad.
12        And so I talked to these parents and have
13 them explain what happened to me and the patterns
14 where we tried to bring it to this attention of
15 Instagram. They didn't act. When my kid died it
16 took me months to get any data as to what had
17 happened to them. And then when I went public about
18 these things I was the target of bullying and
19 harassment and there was nothing I could do about
20 it.
21 BY MR. CARTMELL:
22    Q. You've done a lot of work over your
23 30-year career on trying to prevent online bullying;
24 is that correct?
25    A. That is correct.

Page 305

1    Q. In all of your work, have you ever seen in
2 any other place as much bullying that goes on on
3 Instagram?
4        MS. JONES: Objection. Foundation. Form.
5        THE WITNESS: No. I have not seen as much
6 bullying in other environments as I have seen in
7 Instagram. I believe that the way the product is
8 designed facilitates bullying, which would be okay
9 if they can -- if they did have effective measures
10 to help with that. So then they wouldn't be
11 experiencing it as much. But the fact that they
12 don't, exacerbates the problem and the harm that
13 comes from it.
14 BY MR. CARTMELL:
15    Q. Have you ever seen Meta warn parents or
16 the public about the risk of bullying that can lead
17 to problems with mental well-being or suicide?
18    A. I have not.
19    Q. Do you think they should warn parents of
20 that?
21    A. Absolutely.
22    Q. And do they know if Meta -- inside Meta
23 that there is frequent bullying on Instagram?
24        MS. JONES: Objection to the form. And
25 foundation.

77 (Pages 302 - 305)

CONFIDENTIAL

Page 306

1    THE WITNESS: Yes, they do.
2 BY MR. CARTMELL:
3    Q.  Let's pull up quickly some other results
4 and then I want to go to another page.
5        But if you look at "negative comparison,"
6 there's 21 percent for 13- to 15-year-olds and
7 almost 20 percent for 16- to 17-year-olds.
8        Do you see that?
9    A.  I do, yes.
10    Q.  We haven't talked a lot about negative
11 comparison.  What is negative comparison?
12    A.  Negative comparison is when somebody feels
13 worse about themselves because a post they saw by
14 somebody else on Instagram.
15    Q.  And this is about one in every five teen
16 in those age groups is having that on Instagram
17 within a week, right?
18    A.  That's correct.
19    Q.  Sometimes many times within a week,
20 correct?
21    A.  That is correct.
22    Q.  Let's look at "nudity" and "unwanted
23 advances."
24        Both, Jim, if you would, please.
25        For "nudity," for the teenagers, it's

Page 307

1 about one in five within a week that had
2 experienced.  And we looked at the question, right,
3 related to that.  Do you recall what the question
4 is?
5    A.  Yeah.  In the last seven days, did you see
6 nudity or unwanted sexual content on Instagram.
7    Q.  Okay.  "Unwanted advances."
8        Let's pull up the actual questions, Jim,
9 if you don't mind.  It's dot 5.  Okay.
10        So for "Unwanted advances," the question
11 was, it's up there on the right, in the questions,
12 "Have you ever received unwanted sexual advances on
13 Instagram?"
14        What was the actual response rate for that
15 for the teenagers?
16    A.  So for 13- to 15-year-olds, 13 percent,
17 one in eight said yes in the last seven days.
18    Q.  Did you have personal, actual experience
19 with that with your daughter?
20    A.  Yes, I did.
21    Q.  One in eight within the last seven days
22 and some had multiple; is that right?
23    A.  That is correct.
24    Q.  Did that concern you?
25    A.  Absolutely.

Page 308

1    Q.  Did all this data that Meta was getting at
2 this time concern you deeply about harms that could
3 be happening on Instagram?
4        MS. JONES:  Objection.
5        Excuse me.
6        Objection to the form.  And foundation.
7        Go ahead.
8        THE WITNESS:  Absolutely.  This was -- I
9 thought the data was staggering and that it was
10 critical as soon as reasonably possible to bring it
11 to the attention of the executive team.
12        MR. CARTMELL:  Let's pull up "self-harm"
13 and "violence," please.
14    Q.  Looks like for self-harm for the
15 teenagers, 8.4 percent for 13- to 15-year-olds and
16 7.2 percent for 16- to 17-year-olds?
17    A.  That is correct.
18    Q.  And if we -- strike that.
19        If you did actually extrapolate this data
20 that was statistically significant to the community,
21 could that be tens of millions of kids?
22        MS. JONES:  Objection to the form.  Lacks
23 foundation.
24        THE WITNESS:  Correct.  I mean, the thing
25 about these numbers is that it's so important to

Page 309

1 keep in mind when you look at them, is that behind
2 each number there's a person, like a kid, and if you
3 are saying that one in eight kids on Instagram got
4 unwanted sexual advances in the last seven days,
5 that is a staggering amount of kids.
6 BY MR. CARTMELL:
7    Q.  And the question is, for self-harm, "Have
8 you ever seen someone harm themselves, or threaten
9 to do so, on Instagram?"  Is that right?
10    A.  That's correct.
11    Q.  And seeing that as a 13- to 15-year-old or
12 even a 16- to 17-year-old, in your experience of
13 30 years as a child safety expert online, can that
14 cause harm to kids?
15        MS. JONES:  Objection to the form.
16 Foundation.
17        THE WITNESS:  It can.  And for the parents
18 of the kids that I've spoken to who committed
19 suicide due to exposure to that kind of content at
20 a -- a kid at a vulnerable moment it might plant the
21 idea of committing suicide.
22        (Whereupon, a brief discussion off the
23 record.)
24        THE WITNESS:  For a kid who's experiencing
25 a vulnerable moment seeing content like this might

78 (Pages 306 - 309)

CONFIDENTIAL

Page 310

1 plant the seed about them committing suicide.
2 BY MR. CARTMELL:
3    Q.  You saw the NES survey before this.  But
4 did you know the extent of the actual harms or
5 harmful experiences to kids prior to seeing this
6 data?
7    A.  I did not.
8    Q.  And Meta didn't know that either, did it?
9       MS. JONES:  Objection.  Foundation.
10      MR. CARTMELL:  Let me restate it.
11   Q.  Did Meta know the extent of the actual
12 harmful experiences that kids were having on
13 Instagram prior to this BEEF survey data in June and
14 July of 2021?
15   A.  Not as far as I knew.
16      MS. JONES:  Excuse me.
17      Same objection to foundation.
18      THE WITNESS:  Not as far as I knew.
19 BY MR. CARTMELL:
20   Q.  And they -- did they know, though, from
21 the NES survey that there was a lot of harm?
22   A.  That is correct.
23      MS. JONES:  Excuse me.
24      Note my objection.  Also lacks foundation.
25 ///

Page 311

1 BY MR. CARTMELL:
2    Q.  Let's go to slide 11 that talks about
3 frequency.
4       The BEEF survey actually asked about the
5 frequency of each of these bad experiences in the
6 last seven days; is that right?
7    A.  That is correct.
8    Q.  And why don't you go ahead and tell us the
9 relevance of this information.
10      MS. JONES:  Objection.  Calls for a
11 narrative.
12      Go ahead.
13      THE WITNESS:  So in order to understand
14 sort of how -- how many people experience these
15 things and how frequently they do, meaning, if you
16 do this in the last seven days, and if so, like,
17 approximately how many times, because that kind of
18 frequency information, especially combined with
19 intensity, is incredibly important to establish the
20 harm.
21 BY MR. CARTMELL:
22   Q.  Can that help the company know just how
23 severe the harm is?
24      MS. JONES:  Objection to the form.  Lacks
25 foundation.

Page 312

1       THE WITNESS:  That is correct.  If you
2 have somebody who is looking at, like, body image
3 content, many times in the last seven days and they
4 are very distressed about it, then it's critical
5 that you do the work to understand that and address
6 that.
7 BY MR. CARTMELL:
8    Q.  Let's look at some examples of this, but
9 for nudity.  If you look at that, it looks like the
10 overall rate was 16.3 percent.  And of that
11 16.3 percent, 82 percent of them experienced nudity
12 more than once, correct?
13   A.  Correct.
14   Q.  And some as many as ten times in a week?
15   A.  Correct.  I mean, when you look at this,
16 it's really important to look at 2 to 3, 6 to 9 but
17 then the ten-plus column is very important.
18   Q.  If you look at self-harm, for instance,
19 tell us about that.
20   A.  Yeah.  So what you are seeing here is of
21 the people who reported seeing the kind of content
22 of self-harm that was covered by the question,
23 33 percent saw it once.  38 percent reported seeing
24 it two to three times.  And you go through where you
25 get to 11 percent of them saw it over ten times.

Page 313

1    Q.  In one week?
2    A.  In one week, right.  And that's a giant
3 red flag.
4    Q.  What about negative self -- strike that.
5       What about negative social comparison?
6    A.  Yeah.  So then you look, like, two or
7 three times 40 percent, again, of the people who
8 answered that question, 16 percent over ten times.
9 And I think when you talk about like a fire hose of
10 harmful content, that it's the ten-plus percent.
11   Q.  What about unwanted sexual advances?
12   A.  I'm sorry.  I need to take a moment.  It's
13 just I have to keep thinking of every kid that is
14 telling you this is what is happening to me.  And to
15 look at some -- a kid that might have experienced
16 this two to three times, four to five times, six to
17 nine times, and then look at the percentages, it's
18 like ten-plus times, 8.4 percent of the people who
19 responded to this said that they experienced this
20 more than ten times in the last seven days, and like
21 40 percent more than once.  If you look at the one
22 that says 33.5 percent, but of the people who
23 experienced this issue, 40 percent, two to three
24 times in the last seven days.
25   Q.  Let's look at bullying target.  That

79 (Pages 310 - 313)

CONFIDENTIAL

1 states that 8.1 percent of the respondents had been
2 the target of bullying, and it looks like 62 percent
3 of them had had been the target more than once in a
4 week, and nearly 12 percent had been the target of
5 bullying ten times or more in a week; is that right?
6    A.   Yes.  So 11.8 percent.  And, again, this
7 is why intensity is so important, right, because
8 this might be somebody who is under a -- like,
9 sometimes kids gang up on each other, and it can get
10 pretty grim.  And so yes, that number of
11 11.8 percent tells you somebody that experienced
12 this -- telling you they experienced this over ten
13 times in the last seven days.
14    Q.   Does the ten-plus category, is that --
15 does that suggest to you at all as a safety expert,
16 online safety expert, that the algorithm or Meta is
17 feeding or recommending these bad experiences?
18       MS. JONES:  Objection to the form.
19 Foundation.
20       THE WITNESS:  For nudity, negative
21 comparison, bully witness -- I'm not going to list
22 all of them, but for many of them, yes, it is --
23 these experiences were delivered by Meta's
24 algorithm.
25 ///

1 BY MR. CARTMELL:
2    Q.   You said you were concerned about this
3 data.
4       Were the other members of the well-being
5 team concerned about this data as well?
6    A.   Yes.
7    Q.   What was your expectation once you
8 received this data and presented it to the
9 leadership and executives at the company that they
10 would do?
11    A.   That they would immediately start the work
12 to address these harms.
13    Q.   Did you think there was urgency?
14    A.   Absolutely.
15    Q.   Was there a question in your mind as a
16 30-year online safety expert whether this data
17 supported severe harm to kids on Instagram?
18       MS. JONES:  Objection to the form.
19       THE WITNESS:  There was no question in my
20 mind that this data illustrated harm, that kids most
21 importantly, but also everybody else who uses
22 Instagram was experiencing.
23 BY MR. CARTMELL:
24    Q.   Did you think that the results or findings
25 from BEEF were no big deal?

1    A.   Absolutely not.  I -- I take the
2 responsibility of escalating something to an
3 executive incredibly seriously.  I mean, my career
4 was built in part by doing that very well.  And so
5 no, I thought this was critical, for the company to
6 look at this data and start addressing it.
7       And while there was data already in the
8 Negative Experiences Survey around teens
9 experiencing some of these issues, this to me,
10 because of the reach of the survey, the quality of
11 the instrument, the information gathered, felt like
12 something that was solid, that needed to be taken to
13 the executive team.  And they believed that the
14 moment that they became aware of this data, they
15 would start acting on it to try and understand these
16 harms and to try and prevent these harms.
17    Q.   Would you ever call these less severe bad
18 experiences?
19    A.   Under no circumstances would I do that.
20    Q.   Okay.  I want to show you testimony from
21 Mr. Mosseri, and I want to ask you some questions
22 about it.
23       I'm going to hand you Exhibit 23, which is
24 the slipsheet for Mr. Mosseri's testimony.
25       (Whereupon, Meta-Bejar Exhibit 23 was

1 marked for identification.)
2       (Video playing.)
3       MS. JONES:  Before you ask your question,
4 let me object to the out-of-context play of
5 testimony that Mr. Bejar would have no basis to have
6 a view on.
7       Go ahead.
8 BY MR. CARTMELL:
9    Q.   Did you ever tell Mr. Mosseri that the
10 BEEF bad experiences were much less severe?
11    A.   No.  I would never do that.
12    Q.   What is your reaction to that?
13    A.   I mean, I think it's minimizing the harm
14 that the BEEF survey brought to light and the harm
15 that is pretty much in every e-mail that I sent to
16 this topic to the executive team where I always talk
17 about high-intensity issues and how important it is
18 to address that and how issues that are not policy
19 violating can be as harmful as the ones that are.
20 And that's why it was so critical to do the work of
21 investing in the well-being team to understand these
22 issues and reduce them.
23    Q.   Had your experience been at Meta from 2019
24 to 2021, when you were serving as the safety
25 consultant to the Instagram Well-Being team, that

Golkow Technologies,
A Veritext Division

Page 318

1 the leadership, the executives, were sort of
2 downplaying the severity of the nonviolative bad
3 experiences on Instagram?
4        MS. JONES: Objection to the form. Lacks
5 foundation.
6        THE WITNESS: My experience with members
7 of the executive team, including Adam Mosseri, Chris
8 Cox, and Sheryl Sandberg, was that they understood
9 the severity of these issues, and they thanked me
10 for bringing them to their attention. And I was --
11 within my conversations with them, I did not get any
12 impression of them downplaying the severity that I
13 was communicating to them.
14 BY MR. CARTMELL:
15    Q.  I want to look quickly at slide 13. We're
16 still on Exhibit 21. This is a slide that states:
17 Relationship between respondent and antagonist.
18        What does that mean?
19    A.  You wanted to understand the relationship
20 between the person that had had the bad experience
21 or the harmful experience and the person who had
22 either created the content or had the contact.
23    Q.  Okay. If you look at bullying target
24 here, for instance, 69.4 percent of them said that
25 they didn't know the antagonist who was bullying

Page 319

1 them.
2        Is that true?
3    A.  That's correct.
4    Q.  For nudity, it was 87.1 percent of the
5 people who -- I guess that's who produced that
6 nudity, they didn't know them; is that right?
7    A.  That's correct.
8    Q.  Unwanted sexual advances, it was
9 93.8 percent of the people who were making these
10 unwanted sexual advances, the respondent didn't know
11 that person.
12        Do you see that?
13    A.  That's correct.
14    Q.  What is the significance of these things
15 to you?
16    A.  It means that they are experiencing these
17 issues from strangers and interactions facilitated
18 by the product design of Instagram.
19    Q.  It's the design -- strike that.
20        Is it the design of the actual platform
21 that facilitates that?
22        MS. JONES: Objection. Form. Foundation.
23        THE WITNESS: That is correct.
24 BY MR. CARTMELL:
25    Q.  Explain that, please, if you can.

Page 320

1    A.  So in the case of unwanted sexual
2 advances, Instagram is a directory of teenagers, and
3 often their profile photos are of themselves. And
4 it facilitates the sending of messages to teenagers.
5 So there is a message button that you can click.
6 And then you can make an unwanted sexual advance.
7 And then there is no category for the team to report
8 that issue to Instagram. So the only thing that the
9 teen can do is block.
10        But in the way that sort of these
11 recommendations algorithms work, right, it takes the
12 girls and matches them with the people who are
13 interested in content that is made by girls. And it
14 creates an environment, right, where there might be
15 a vulnerable teen here, an adult here, and they are
16 able to send a message.
17        In the case of nudity, if somebody creates
18 the kind of sexual content that we looked at, it is
19 Instagram's algorithm that is promoting it and
20 putting it into, like, Reels feed. And it's picking
21 that content. And that's how the teenager is
22 receiving that, and then all that comes with
23 receiving that.
24        In the case of bullying target, something
25 which my daughter experienced and I have seen

Page 321

1 significantly afterwards in my testing, you take
2 comments and the kind of comments that people do
3 with each other from a stranger, in the case of
4 public accounts, can be pretty staggering in terms
5 of how awful they are.
6        And my daughter came at me crying when she
7 was young and was experiencing this in the first
8 place. And then other people have similar
9 distressing experiences, many of them.
10    Q.  Based on your time at Meta and your
11 experience in the industry, did Meta have the tools
12 and features that could be built to prevent those
13 things?
14        MS. JONES: Objection. Foundation.
15        THE WITNESS: Yes, they did.
16 BY MR. CARTMELL:
17    Q.  And you were trying -- strike that.
18        Were you trying to get leadership and the
19 executives to build those types of safety features
20 and tools to prevent or substantially reduce those
21 types of harms on Instagram?
22    A.  That is correct. My whole goal in
23 gathering this data and escalating it was to get
24 resourcing and support for the people working on
25 these issues.

CONFIDENTIAL

Page 322

1    Q.  Let's go back to page .6, please.  This is
2  the questions about emotions that I want to ask you
3  again about.
4         And was your testimony that you believed
5  this was very important data to receive from this
6  survey from the users?
7    A.  That's correct.
8    Q.  You wanted information, I take it, from
9  the users about not only the emotion that they were
10  feeling but the frequency and the length of emotion
11  as well?
12    A.  That is correct.
13    Q.  And is that something that you had told
14  Mr. ██████ you felt very strongly about that being
15  information included in this survey?
16    A.  That is correct.
17    Q.  Okay.  And Mr. Mosseri said that, you saw
18  in his testimony, that you had said to him that this
19  was less severe or much less severe, correct?
20    A.  Correct.
21    Q.  If we wanted to see how severe these harms
22  were, we might look at the data from the responses
23  to the frequency -- or excuse me -- to -- strike
24  that.
25         If we wanted to see how severe these

Page 323

1  harmful experiences or bad experiences of BEEF were,
2  we might look at the data from the specific emotion
3  felt and the length of emotional reaction?
4    MS. JONES:  Objection to the form.
5  BY MR. CARTMELL:
6    Q.  Is that true?
7    A.  That's true.
8    MS. JONES:  Excuse me.  And foundation.
9  BY MR. CARTMELL:
10    Q.  I'll restate it.
11         What would you look at if you as a safety
12  expert wanted to determine how severe the bad
13  experiences were that kids were experiencing in this
14  survey?
15    A.  I would look at emotion felt, period of
16  time, just intensity information.
17    Q.  Okay.  So that data that was received, in
18  your mind, would that be very important to know?
19    A.  Absolutely.
20    (Whereupon, Meta-Bejar Exhibit 24 was
21  marked for identification.)
22  BY MR. CARTMELL:
23    Q.  I'll play you a clip from Dr. ██████ and
24  then I'm going to ask you questions.  I have handed
25  you the slipsheet from his testimony in this case.

Page 324

1         Is that Dr. ██████
2    A.  Yeah, that is.
3    (Video playing.)
4  BY MR. CARTMELL:
5    Q.  Mr. Bejar --
6    MS. JONES:  Excuse me, Counsel.  Let me
7  note my objection to playing this video out of
8  context, and Mr. Bejar does not have a foundation to
9  offer testimony.
10    Go ahead.
11  BY MR. CARTMELL:
12    Q.  Mr. Bejar, were you ever told that the
13  emotions data, including the data related to how
14  long the emotion lasted, was destroyed?
15    MS. JONES:  Objection to the
16  characterization.  Foundation.
17    MR. CARTMELL:  I'll restate it.
18    Q.  Mr. Bejar, were you ever told at any time
19  while you were at Meta that the data from the BEEF
20  survey related to emotions, including the length of
21  time of the emotions, was deleted?
22    MS. JONES:  Same objection.
23    THE WITNESS:  I was not.
24  BY MR. CARTMELL:
25    Q.  Were you ever told that the data was not

Page 325

1  analyzed?
2    A.  I was not.
3    Q.  I noticed that the emotions data that was
4  supposed to be asked about is not in this PowerPoint
5  presentation that provides the findings from the
6  BEEF survey, is it?
7    A.  That's correct.
8    Q.  What is your reaction to a company that
9  tells its researchers to delete data that is
10  important related to emotions of their users?
11    MS. JONES:  Objection. Foundation.  And
12  characterization of the record.
13    THE WITNESS:  It is a company who doesn't
14  want to know the harm that people are experiencing
15  on its platform, in particular teens.  And it is a
16  company that doesn't want to know the data necessary
17  to prioritize the work that is needed in terms of
18  the harm that teens are experiencing.
19  BY MR. CARTMELL:
20    Q.  In your experience at Meta from '19 to
21  '21, when you were working as their safety expert,
22  did you have the experience that they did not want
23  to know the severity of the emotions or the severity
24  of the harms that were going on on Instagram?
25    MS. JONES:  Objection to the form.  Lacks

82 (Pages 322 - 325)

Page 326

1 foundation.
2        THE WITNESS: No, I wasn't aware of it at
3 the time. Had I become aware of, like, of that data
4 not being studied or pursued, I would have, like,
5 immediately escalated that to -- all the way through
6 the top of the company, because I think it is both
7 essential to doing the work to understand the
8 severity of issues, and it's ethically inappropriate
9 to -- to not follow through on understanding the
10 harms that people are experiencing, in particular
11 teenagers.
12 BY MR. CARTMELL:
13    Q.  If a social media company like Meta has a
14 survey that is asking about the harms or potential
15 harms and bad experience to its users and it deletes
16 the severity data and doesn't analyze it, do you
17 think that's reckless?
18        MS. JONES: Excuse me. Foundation.
19 Mischaracterization of the record.
20        THE WITNESS: I think it's -- I think it's
21 beyond reckless.
22 BY MR. CARTMELL:
23    Q.  Did Mr. Mosseri ever see that data? Do
24 you know?
25    A.  Not as far as I know.

Page 327

1    Q.  Was this BEEF data that came from the
2 survey coming out in its final form from Dr. █████
3 at a time when the company was under a lot of
4 scrutiny?
5    A.  Yes, it was.
6    Q.  What was the scrutiny that the company was
7 under at the time that this BEEF data was coming out
8 and being put in final form by Dr. █████
9    A.  There were a series of articles beginning
10 to be published around something called the Facebook
11 files that was a series of internal documentation,
12 and that's also when Frances Haugen began talking
13 about her experience.
14    Q.  Who is Frances Haugen?
15    A.  She used to be a product manager within, I
16 believe, the civic integrity team and then spoke out
17 publicly against the company about a series of very
18 important issues.
19    Q.  What did she reveal?
20    A.  One of the things that came out in the
21 Facebook files was research done by the team I was a
22 part of around body image issues and other forms of
23 harm that teenagers were experiencing. And that was
24 one of the things that she spoke about and helped
25 bring to light.

Page 328

1    Q.  Had that internal data showed you and
2 others at Meta that, in fact, there was harm to kids
3 in that respect?
4        MS. JONES: Objection. Foundation.
5        THE WITNESS: Absolutely.
6 BY MR. CARTMELL:
7    Q.  And that was internal data that -- strike
8 that.
9        Was that internal data that Meta was not
10 sharing with the public?
11        MS. JONES: Objection. Foundation.
12        THE WITNESS: That is correct.
13 BY MR. CARTMELL:
14    Q.  After Frances Haugen leaked or made public
15 the research showing the harm to kids, did Meta lock
16 down the research that they -- strike that.
17        MS. JONES: I apologize.
18        MR. CARTMELL: That's okay. I'll start
19 over.
20    Q.  After Frances Haugen made public the
21 internal research related to harms to kids on Meta's
22 apps, did Meta actually lock down internally the
23 research around harms to users?
24        MS. JONES: Objection. Foundation.
25        THE WITNESS: That is correct.

Page 329

1 BY MR. CARTMELL:
2    Q.  Do you know whether or not the company
3 destroyed the BEEF emotions data because the company
4 was under scrutiny related to Frances Haugen's leak
5 of research to the public?
6        MS. JONES: Objection. Foundation.
7        THE WITNESS: I don't know that.
8 BY MR. CARTMELL:
9    Q.  Let me wrap this up. But if Meta asked
10 Kyle █████ to delete the emotions data from the
11 BEEF survey, what, if anything, does that tell you
12 about the safety as a priority for Meta?
13        MS. JONES: Objection. Foundation.
14 Mischaracterizes the evidence.
15        Go ahead.
16        THE WITNESS: That safety is not a
17 priority, that the harm that teens are experiencing
18 and how bad it is is something to be hidden or
19 removed, that things that parents and everybody
20 should know about the reality of a harming place on
21 Instagram, that that is something that Meta doesn't
22 want people to know.
23 BY MR. CARTMELL:
24    Q.  Were any of the BEEF survey findings made
25 public by Meta?

83 (Pages 326 - 329)

CONFIDENTIAL

Page 330

1    A.  They were not.
2    Q.  Do you believe Meta should have made the
3 BEEF survey findings available to the public?
4    A.  Absolutely.
5    Q.  Including parents?
6    A.  Parents need to know.  Yes, including
7 parents.  Absolutely.  So important.  I cannot
8 stress this enough.  How do you know what goes on
9 when you hand your kid the phone and you help them
10 install the app.  How are you going to know what
11 they are going to experience without this data.  You
12 are blindfolded as a parent.
13    Q.  You talked earlier today about the
14 importance of transparency; is that correct?
15    A.  That is correct.
16    Q.  Can sharing research like these BEEF
17 results and findings be -- and being transparent
18 with the public and parents help reduce harm to kids
19 on Instagram?
20    A.  Yes, it's absolutely essential.
21    Q.  Do you believe that Meta's lack of
22 transparency by failing to inform the public of its
23 research, like BEEF, has contributed to harms to
24 kids on Instagram?
25      MS. JONES:  Objection.  Foundation.

Page 331

1      THE WITNESS:  Yes, absolutely.
2 BY MR. CARTMELL:
3    Q.  Can publishing data like this from the
4 BEEF findings actually serve as a warning to kids
5 and parents and the public that Instagram can lead
6 to harmful experiences?
7      MS. JONES:  Objection.  Foundation.
8      THE WITNESS:  Yes, it can.  It helps you
9 have an informed conversation with your kids about
10 the things that they might be experiencing when they
11 go online, and that's the least you can do as a
12 parent.
13 BY MR. CARTMELL:
14    Q.  Meta does have a website that it has where
15 it publishes -- strike that.
16      Meta does have a website where it
17 publishes what it calls safety data, correct?
18    A.  That's correct.
19    Q.  It's called the Transparency Center,
20 correct?
21    A.  That's correct.
22    Q.  Could Meta put this BEEF data and their
23 internal research related to harms to kids on the
24 Transparency website?
25    A.  They could and they should.

Page 332

1    Q.  They never have, have they?
2    A.  No.
3    Q.  Instead, what do they put on the website,
4 the Transparency website?
5    A.  They put these prevalence numbers that
6 keep saying a fraction of a percent experience this.
7 It's so low.  And, in effect, they mislead parents
8 and, you know, the rest of the world as to what is
9 the actual unfolding of harm on Instagram.
10      MR. CARTMELL:  I'm going to hand you
11 Exhibit 25.
12      (Whereupon, Meta-Bejar Exhibit 25 was
13 marked for identification.)
14 BY MR. CARTMELL:
15    Q.  Exhibit 25 is a page from the Transparency
16 website at Meta.
17      Do you see that?
18    A.  I do.
19    Q.  And it has on it some prevalence data.
20      Do you see that?
21    A.  I do.
22    Q.  Does Meta publish prevalence data for all
23 of the -- if you blow that up a little bit, Jim --
24 all of the categories of bad experiences on the
25 left?

Page 333

1    A.  Well, for the -- it's not all the
2 categories.  It's some of the categories of bad
3 experiences.
4    Q.  Are these the categories that Meta
5 publishes prevalence data about?
6    A.  That is correct.
7    Q.  So, for example, adult nudity and sexual
8 activity and bullying and harassment and the other
9 list of bad experiences there on the left?
10    A.  That's correct.
11    Q.  Okay.  What we have here that is being
12 displayed is the question for nudity.  Let's go to
13 that.
14    A.  Yeah.
15    Q.  The question for nudity is highlighted.
16 Have you ever seen nudity or sexual images on
17 Instagram that you didn't want to see?
18      Do you see that?
19    A.  Yes, I do.
20    Q.  Okay.  If we go to the BEEF data for
21 nudity -- let's pull that out, Jim, if you would,
22 please -- Meta's internal survey of 238,000 users
23 states that 19 percent of 13- to 15-year-olds and
24 18 percent 16-, 17-year-olds experience nudity in a
25 week's time, correct?

84 (Pages 330 - 333)

Golkow Technologies,
877-370-3377        A Veritext Division        www.veritext.com

CONFIDENTIAL

Page 334

1    A.   Correct.  Multiple times.
2    Q.   And then if we look at what Meta puts on
3 its website in the Transparency Center, let's look
4 at that.
5        How prevalent were adult nudity and sexual
6 activity violations, and let's pull out that
7 .02 percent.  See what it says.
8        It says .02 percent to .03 percent of
9 views showed violating content.  In other words,
10 every 10,000 content views, an estimate of 2 to 3
11 would contain adult nudity and sexual activity.
12       Do you see that?
13    A.  I do, yes.
14    Q.   So on the left here is Meta's internal
15 survey about bad experiences of 238,000 users,
16 correct?
17    A.  Correct.
18    Q.   And we have 19.2 percent for 13- to
19 15-year-olds.  And on the right here we have what
20 Meta puts on its website.
21       Do you see that?
22       MS. JONES:  Let me object to the
23 mischaracterization of the record.
24       MR. CARTMELL:  I'm not sure I got the
25 question out.  So I'm going to restate it.

Page 335

1        MS. JONES:  I knew where you are going,
2 but go ahead.  I will say it again.
3        MR. CARTMELL:  You can say it again.
4    Q.   On the right side we have what Meta puts
5 on the Transparency Center, correct?
6    A.  That is correct.
7    Q.   Are those numbers two one-hundredths of a
8 percent to three one-hundredths of a percent,
9 meaning the amount of adult nudity and sexual
10 activity on the website, Instagram?
11       MS. JONES:  Objection to the form.
12 BY MR. CARTMELL:
13    Q.   Strike that.
14       Does the .02 percent to .03 percent mean
15 the amount of nudity and sexual activity on
16 Instagram?
17       MS. JONES:  Objection to the form and the
18 characterization.
19       THE WITNESS:  It does not.
20 BY MR. CARTMELL:
21    Q.   What does it mean?
22    A.   It means that that these are the number --
23 of 10,000 pieces of content, there were two or three
24 that contained adult nudity or sexual activity.
25    Q.   I see.  So two one-hundredths of a percent

Page 336

1 to three one-hundredth percent is the prevalence of
2 nudity that is reported to the public; is that
3 correct?
4    A.   That's correct.
5    Q.   And internally, what is reported to the
6 company but not made public is the 19 percent and
7 the 18 percent for teens, correct?
8        MS. JONES:  Objection to the
9 characterization of the document.
10       THE WITNESS:  That is correct.
11 BY MR. CARTMELL:
12    Q.   What is the discrepancy there?
13    A.   The BEEF number tells you, like, that
14 people are experiencing unwanted sexual activity and
15 nudity on Instagram of kids one in five in the last
16 seven days.  More often than not, multiple times.
17       And on the right it generates the
18 impression that you're not going to get that kind of
19 content recommended to you on Instagram.  I mean, I
20 think that that is the fundamental problem with the
21 Transparency Center, is that I look at this as a
22 parent and somebody who has worked in the field and
23 I think, oh, yeah, it's very unlikely that my kids
24 are going to be getting any of the stuff.  Things
25 are good.

Page 337

1        But the reality is what's on the left,
2 right.  And so like prevalence is sort of grade your
3 own homework version of harm where they are looking
4 under the light but what's actually happening in the
5 bushes is what BEEF captures and what's happening in
6 the bushes is what people are experiencing.
7    Q.   In your opinion as an online child safety
8 expert for 30 years, do you believe it's appropriate
9 for Meta to publish the prevalence data on the right
10 without publishing their internal data related to
11 the actual bad experiences that are occurring on
12 Instagram?
13       MS. JONES:  Objection.  Foundation.
14       THE WITNESS:  I believe it's inappropriate
15 for them to do that because I think it's very
16 misleading.
17 BY MR. CARTMELL:
18    Q.   And how long has Instagram been doing
19 this -- strike that.
20       How long has Meta been doing this,
21 publishing prevalence data without their internal
22 research?
23       MS. JONES:  Objection.  Foundation.
24       THE WITNESS:  I don't recall when the
25 Transparency Center was initially published and when

85 (Pages 334 - 337)

CONFIDENTIAL

Page 338

1 they started reporting Instagram data as part of the
2 Transparency Center.
3        MR. CARTMELL:  I'm going to hand you
4 Exhibit 26.
5        (Whereupon, Meta-Bejar Exhibit 26 was
6 marked for identification.)
7 BY MR. CARTMELL:
8    Q.   Exhibit 26 is another document from the
9 Transparency Center that's talking about "How
10 prevalent were bullying and harassment violations?"
11        Do you see that?
12    A.  I do, yes.
13    Q.   And if you look at this, this is July to
14 September 2021.
15        Do you see that?
16    A.  Yes.
17    Q.   That's the same time period when the BEEF
18 data came out, isn't it?
19    A.  Yes, that's correct -- well, that's --
20 yeah, that's the same data, the same time during
21 which the BEEF research was done.
22    Q.   Okay.  Let's look at and compare what Meta
23 is telling the public on its Transparency Center
24 about bullying and harassment versus what they know
25 internally, okay?

Page 339

1    A.  Correct.  Yes.
2    Q.   Okay.  We have here a question about
3 bullying.  What is the question?
4    A.  "Have you ever seen anyone do any of these
5 things to someone else on Instagram?  Insult or
6 disrespect them.  Contact them in an inappropriate
7 way.  Damage their reputation.  Threaten them.
8 Exclude them or leave them out."
9    Q.   And as far as the internal data from the
10 BEEF study, bully target, you can see down here, has
11 8.1 percent, overall 10 percent for 13 to 15, and
12 9 percent for 16 to 17; is that right?
13    A.  That is right.  Though we just covered the
14 question for bully witness.
15    Q.   Oh, I'm sorry.  Let's -- let's go to bully
16 witness.
17        Bully witness results from the internal
18 BEEF study were 28 percent overall, 27 percent for
19 13 to 15, and 29 percent for 16 to 17; is that
20 correct?
21    A.  That's correct.  Approximately one in
22 three.
23    Q.   Okay.  And then bully target, if we go
24 down, the results there are 8 percent, 10.8 percent
25 for 13 to 15, and 9.7 percent for 16 to 17; is that

Page 340

1 right?
2    A.  That's correct.
3    Q.   And that is data that came from the BEEF
4 study, the results came out in September of 2021,
5 right?
6    A.  That is correct.  That is data when you
7 ask somebody have you experienced one or more of
8 these things, the answer was yes in the last seven
9 days.
10    Q.   And during that same time period, what was
11 Meta telling the public, including parents, on the
12 Transparency Center website?
13        MS. JONES:  Object to the
14 mischaracterization of the document.
15        THE WITNESS:  That the prevalence of
16 bullying and harassment violations was .05 to
17 .06 percent of 10,000 content views, five or six of
18 them would contain bullying and harassment.
19 BY MR. CARTMELL:
20    Q.   Does that prevalence metric that Meta
21 publishes on its Transparency Center website have
22 anything to do with the actual harm or bad
23 experiences that are occurring to kids on Instagram?
24        MS. JONES:  Objection to the form.
25        THE WITNESS:  It does not.

Page 341

1 BY MR. CARTMELL:
2    Q.   Do you think that parents should have been
3 warned about the data internally and the frequency
4 of bullying, as well as receiving the prevalence
5 data that they put on their transparency website?
6    A.  Yes, absolutely.
7        MR. CARTMELL:  Let's look at Exhibit 27.
8        (Whereupon, Meta-Bejar Exhibit 27 was
9 marked for identification.)
10        (Whereupon, a brief discussion off the
11 record.)
12 BY MR. CARTMELL:
13    Q.   Exhibit 27, the prevalence states, "How
14 prevalent were child endangerment violations?"  And
15 it says, "We cannot estimate prevalence for child
16 endangerment right now.  We will continue to expand
17 prevalence measurement to more areas as we confirm
18 accuracy and meaningful data."
19        Do you see that?
20    A.  I do, yes.
21    Q.   And this is from the same time period as
22 the BEEF data, correct?
23    A.  Correct.
24    Q.   And if you look at what the company Meta
25 knew internally about unwanted advances, what do

86 (Pages 338 - 341)

Page 342

1 they know?
2      A.   When they ask kids "Have you ever received
3 unwanted sexual advances on Instagram," 13 percent,
4 one in eight of 13- to 15-year-olds said yes in the
5 last seven days.  And 14 percent --
6          (Whereupon, a brief discussion off the
7 record.)
8          THE WITNESS:  14.1 percent of 16- to
9 17-year-olds said yes in the last seven days.
10 BY MR. CARTMELL:
11     Q.   So publicly Meta tells parents and others
12 that they don't have any data, but internally they
13 have the data you just described?
14         MS. JONES:  Objection to the
15 characterization of the evidence.  And foundation.
16         THE WITNESS:  Yes, they do.
17 BY MR. CARTMELL:
18     Q.   Publicly Meta tells parents and others
19 that they don't have currently any data on how
20 prevalent child endangerment violations were, but
21 internally in the BEEF study, they have results of
22 unwanted sexual advances?
23     A.   That's correct.
24     Q.   Do you believe it was appropriate for them
25 to not provide that data to the public?

Page 343

1          MS. JONES:  Objection.  Characterization.
2          THE WITNESS:  I think it was extremely
3 inappropriate.
4          MR. CARTMELL:  What time is it?
5          MR. WARD:  I think --
6          MR. CARTMELL:  I think it's a decent time
7 to take a break.  Let me do one more, one more real
8 quickly.
9          MR. WARD:  Okay.
10         MR. CARTMELL:  It will take 12 minutes.  I
11 promise.  Don't hold me to it.
12         (Whereupon, Meta-Bejar Exhibit 28 was
13 marked for identification.)
14 BY MR. CARTMELL:
15     Q.   I'm handing you Exhibit 28, Mr. Bejar,
16 which is a page from Meta's website for the
17 community standards enforcement reports.  And it is
18 a statement about the prevalence of suicide and
19 self-injury violations on Instagram.
20         Do you see that?
21     A.   Yes, I do.
22     Q.   Let's compare what Meta puts on its public
23 transparency website about suicide and self-injury
24 violence and the prevalence of that compared to what
25 they knew from their internal data from the BEEF

Page 344

1 survey, okay?
2      A.   Correct.
3      Q.   On its website from September of 2000 --
4 or the third quarter of 2021, Meta tells the public
5 when asked how prevalent suicide and self-injury
6 violations are, "Views of violating content that
7 contains suicide and self-injury are very
8 infrequent, and we remove much of this content
9 before people see it.  As a result, many times we do
10 not find enough violating samples to precisely
11 estimate prevalence."
12         Do you see that?
13     A.   Yes, I do.
14     Q.   So once again, on the transparency website
15 for Meta, there's no data for this category, being
16 suicide and self-injury.
17         Do you see that?
18     A.   I do.
19     Q.   And if you look at what Meta knew
20 internally from the BEEF survey related to the
21 frequency that users reported of self-harm, it was
22 8.4 percent for 13- to 15-year-olds, 7.2 percent for
23 16- and 17-year-olds.
24         MS. JONES:  Objection to the
25 characterization.

Page 345

1          THE WITNESS:  That's correct.
2 BY MR. CARTMELL:
3      Q.   The question was, "Have you ever seen
4 someone harm themselves, or threaten to do so, on
5 Instagram?"  Is that right?
6      A.   That's correct.
7      Q.   So no data according to their published
8 website, but internally they know that there's
9 millions of kids who are suffering from or reporting
10 that they have seen self-harm?
11         MS. JONES:  Objection.  Foundation.
12 Mischaracterizes.
13         THE WITNESS:  That's correct.  I mean,
14 think about every 13- to 15-year-old kid, or
15 younger, that is on Instagram and what is
16 8.4 percent of them.  How many times did they see
17 it.  What did it do to them.
18         So it's no surprise when you've heard
19 about teens like Molly Russell or other kids that
20 have committed suicide after experiencing thousands
21 of pieces of this kind of content.
22         And so that 8.4 percent, I think in my
23 mind, it means it's urgent to go investigate what
24 that content is, how much of it are you recommending
25 to teenagers, and to change the recommendation

CONFIDENTIAL

Page 346

1 algorithms so that you do not recommend this to a
2 teenager on any surface.
3        MS. JONES:  Excuse me, Counsel.
4        I'm going to object to the nonresponsive
5 narrative answer.
6 BY MR. CARTMELL:
7        Q.   This time period is in September of 2021,
8 right?
9        A.   That is correct.
10       Q.   Do you think Meta should have taken those
11 measures you just stated much earlier than that?
12       A.   Absolutely.
13       Q.   You think that Meta should have told
14 parents and the public about the risk of harm from
15 self -- suicide and self-injury content on
16 Instagram?
17       A.   Absolutely.
18       Q.   They should have warned about that; do you
19 believe?
20       A.   Absolutely.
21       Q.   Was it well-known among the well-being
22 team at Meta and others that suicide and self-injury
23 and self-harm content was easily accessed on
24 Instagram by kids?
25       MS. JONES:  Objection.  Foundation.

Page 347

1        THE WITNESS:  Yes, it was.
2        MR. CARTMELL:  Why don't we break for
3 tonight if it's okay for you.
4        THE VIDEOGRAPHER:  Time is 6:43.  We're
5 off the record.
6        (Whereupon, the deposition was adjourned
7 at 6:43 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 348

1        INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over carefully
4 and make any necessary corrections.  You should
5 state the reason in the appropriate space on the
6 errata sheet for any corrections that are made.
7        After doing so, please sign the errata
8 sheet and date it.
9        You are signing same subject to the
10 changes you have noted on the errata sheet, which
11 will be attached to your deposition.
12        It is imperative that you return the
13 original errata sheet to the deposing attorney
14 within thirty (30) days of receipt of the deposition
15 transcript by you.  If you fail to do so, the
16 deposition transcript may be deemed to be accurate
17 and may be used in court.
18
19
20
21
22
23
24
25

Page 349

1        ERRATA SHEET
2
3 PAGE   LINE    CHANGE
4 ____  ____ _____
5        REASON:_____
6 PAGE   LINE    CHANGE
7 ____  ____ _____
8        REASON:_____
9 PAGE   LINE    CHANGE
10 ____  ____ _____
11        REASON:_____
12 PAGE   LINE    CHANGE
13 ____  ____ _____
14        REASON:_____
15 PAGE   LINE    CHANGE
16 ____  ____ _____
17        REASON:_____
18 PAGE   LINE    CHANGE
19 ____  ____ _____
20        REASON:_____
21 PAGE   LINE    CHANGE
22 ____  ____ _____
23        REASON:_____
24
25

88 (Pages 346 - 349)

CONFIDENTIAL

Page 350

1  ACKNOWLEDGMENT OF DEPONENT
2
3
4
5       I,_____, do hereby certify
6  that I have read the foregoing pages, and that the
7  same is a correct transcription of the answers given
8  by me to the questions therein propounded, except
9  for the corrections or changes in form or substance,
10 if any, noted in the attached Errata Sheet.
11
12
13 _____  _____
14  ARTURO BEJAR          DATE
15
16
17
18
19
20
21
22
23
24
25

Page 351

1  STATE OF CALIFORNIA  )
2  COUNTY OF YOLO      )
3       I, ELAINA BULDA-JONES, a Certified Shorthand
4  Reporter of the State of California, duly authorized
5  to administer oaths pursuant to Section 2025 of the
6  California Code of Civil Procedure, do hereby
7  certify that
8            ARTURO BEJAR,
9  the witness in the foregoing deposition, was by me
10 duly sworn to testify the truth, the whole truth and
11 nothing but the truth in the within-entitled cause;
12 that said testimony of said witness was reported by
13 me, a disinterested person, and was thereafter
14 transcribed under my direction into typewriting and
15 is a true and correct transcription of said
16 proceedings.
17      I further certify that I am not of counsel or
18 attorney for either or any of the parties in the
19 foregoing deposition and caption named, nor in any
20 way interested in the outcome of the cause named in
21 said deposition dated the _____ day of
22
23
24
25 ELAINA BULDA-JONES, CSR 11720

89 (Pages 350 - 351)

CONFIDENTIAL

Page 352

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3
    IN RE: SOCIAL MEDIA
 4  ADOLESCENT ADDICTION/
    PERSONAL INJURY PRODUCTS          MDL No. 3047
 5  LIABILITY LITIGATION
    ----------------------------/
 6
     SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE
 7      COUNTY OF LOS ANGELES - SPRING STREET COURTHOUSE
 8
 9  COORDINATION PROCEEDING
    SPECIAL TITLE [RULE 3.400]
10  SOCIAL MEDIA CASES               Lead Case No.
    ----------------------------/    22STCV21355
11  This Document Relates To
12  STATE OF TENNESSEE, ex rel.
    JONATHAN SKRMETTI,
13  ATTORNEY GENERAL and
    REPORTER,
14  v.
    META PLATFORMS, INC., and
15  INSTAGRAM, LLC.
    ----------------------------/
16
17          CONFIDENTIAL - ATTORNEYS' EYES ONLY
               PURSUANT TO PROTECTIVE ORDER
18                      VOLUME 2
         VIDEO-RECORDED DEPOSITION OF ARTURO BEJAR
19              (Pages 352 through 751)
               Held at Baker Botts
20        1001 Page Mill Road, Palo Alto, California
                 Tuesday, April 8, 2025
21
    Stenographically reported by:
22  LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
    California CSR No. 10523
23  Washington CSR No. 3318
    Oregon CSR No. 19-0458
24  Texas CSR No. 11318
25  Job No.:  MDLG 7222558
    California Firm Registration No.:  48
```

Page 353

```
1        A P P E A R A N C E S
2
3   For the Plaintiffs:
4      BY: TOM CARTMELL, ESQ.
       BY: JACK HYDE, ESQ.
       BY: KATHLEEN HUDNALL
5      BY: MAUREEN MURPHY, ESQ. (VIA ZOOM)
       BY: LUCY MALONE (VIA ZOOM)
6      BY: ANGELA PRIEST (VIA ZOOM)
       BY: ROB GROVES, ESQ. (VIA ZOOM)
7      BY: TRICIA L. CAMPBELL, ESQ. (VIA ZOOM)
       BY: JONATHAN P. KIEFFER, ESQ. (VIA ZOOM)
8      BY: LINDSEY SCARCELLO, ESQ. (VIA ZOOM)
       Wagstaff & Cartmell
9      4740 Grand Avenue, Suite 300
       Kansas City, Missouri 64112
10     816.701.1100
       Tcartmell@wcllp.com
11     jhyde@wcllp.com
12     BY: LEXI J. HAZAM, ESQ. (VIA ZOOM)
       Lieff, Cabraser, Heimann & Bernstein
13     275 Battery Street, 29th Floor
       San Francisco, California 94111
14     415.956.1000
       Lhazam@lchb.com
15
       BY: ALEXANDRA WALSH, ESQ. (VIA ZOOM)
16     Anapol Weiss, LLP
       14 Ridge Square, NW, 3rd Floor
17     Washington, DC 20016
       771.224.8065
18     Awalsh@anapolweiss.com
19     BY: GRACE QUINLAN, ESQ. (VIA ZOOM)
       BY: KIRK GOZA, ESQ. (VIA ZOOM)
20     Goza & Honnold, LLC
       900 Nall Avenue, Suite 400
21     Overland Park, Kansas 66207
       913.451.3433
22
23   (Continued)
24
25
```

Page 354

```
1        A P P E A R A N C E S
2
3   For the witness, Arturo Bejar:
4      BY: MICHAEL W. WARD, ESQ.
       BY: CHINMAYI MANJUNATH, ESQ.
5      Baker Botts LLP
       1001 Page Mill Road
6      Building One, Suite 200
       Palo Alto, California 94304-1007
7      650.739.7500
       Michael.ward@bakerbotts.com
8      Chinmayi.manjunath@bakerbotts.com
9   For the Defendants Meta Platforms, Inc., f/k/a
    Facebook, Inc.; Facebook Holdings, LLC; Facebook
10  Operations, LLC; Facebook Payments, Inc.; Facebook
    Technologies, LLC; Instagram, LLC; Siculus, Inc.;
11  and Mark Elliot Zuckerberg:
12     BY: PHYLLIS A. JONES, ESQ.
       BY: CECILIA BOBBITT, ESQ.
13     BY: PATRICK NUTTER, ESQ.
       BY: MARIAH K. WATSON, ESQ. (VIA ZOOM)
14     BY: GAVIN JACKSON, ESQ. (VIA ZOOM)
       BY: HUNTER BJAZEVICH, ESQ. (VIA ZOOM)
15     BY: CONNOR KENNEDY, ESQ. (VIA ZOOM)
       BY: PAUL SCHMIDT, ESQ. (VIA ZOOM)
16     Covington & Burling LLP
       One City Center
17     850 Tenth Street, NW
       Washington, DC 20001-4956
18     202.662.6000
       Pajones@cov.com
19
       BY: KATHRYN WALKER, ESQ. (VIA ZOOM)
20     Bass Berry & Sims
       21 Platform Way South, Suite 3500
21     Nashville, Tennessee 37203
       615.742.7855
22     Kwalker@bassberry.com
23
24   (Continued)
25
```

Page 355

```
1        A P P E A R A N C E S
2
    For the Defendants Meta Platforms, Inc., f/k/a
3   Facebook, Inc.; Facebook Holdings, LLC; Facebook
    Operations, LLC; Facebook Payments, Inc.; Facebook
4   Technologies, LLC; Instagram, LLC; Siculus, Inc.;
    and Mark Elliot Zuckerberg:
5
       BY: MEREDITH MANDA, ESQ. (VIA ZOOM)
6      BY: ALYSSA J. METCALF, ESQ. (VIA ZOOM)
       Davis Polk & Wardell LLP
7      450 Lexington Avenue
       New York, New York 10017
8      212.450.3563
       Meredith.manda@davispolk.com
9
    For the State of Indiana:
10
       BY: CORINNE GILCHRIST, ESQ. (VIA ZOOM)
11     Office of the Attorney General Todd Rokita
       302 W Washington Street, Suite 5
12     Indianapolis, Indiana 46204
       317.232.6201
13     Corinne.gilchrist@atg.in.gov
14  For the State of New York:
15     BY: NATHANIEL KOSSLYN, ESQ.
       Office of the Attorney General of New York
16     28 Liberty Street
       New York, New York 10005
17     800.771.7755
       Nathaniel.kosslyn@ag.ny.gov
18
    For the State of West Virginia:
19
       BY: ABBY CUNNINGHAM, ESQ. (VIA ZOOM)
20     Office of the West Virginia
       Attorney General
21     1900 Kanawha Boulevard, E
       Room 26
22     Charleston, West Virginia 25305
       Abby.g.cunningham@wvago.gov
23
24   (Continued)
25
```

Page 356

```
1        A P P E A R A N C E S
2
    For the State of Massachusetts:
3
       BY: DOUG MARTLAND, ESQ.
4      BY: CHRISTINA CHAN, ESQ.
       BY: CORY TASLEY (VIA ZOOM)
5      BY: NICHOLAS WILLING (VIA ZOOM)
       Office of the Attorney General
6      State of Massachusetts
       1 Ashburton Place, 20th Floor
7      Boston, Massachusetts 02108
       617.727.2200
8
    For the State of Tennessee:
9
       BY: BRIAN PHELPS, ESQ.
10     BY: CHRIS DUNBAR, ESQ.
       BY: ELIZABETH SPICA, ESQ. (VIA ZOOM)
11     BY: SHANTE PICHE (VIA ZOOM)
       BY: KEATON MURPHY, ESQ. (VIA ZOOM)
12     State of Tennessee
       Attorney General
13     UBS Tower
       315 Deaderick Street
14     Nashville, Tennessee 37243
       615.741.3519
15
    For the State of Arkansas:
16
       BY: AELISH BAIG, ESQ. (VIA ZOOM)
17     Robbins Geller Rudman & Dowd LLP
       One Montgomery Street, Suite 1800
18     San Francisco, California 94104
       415.288.4545
19     aelishb@rgrdlaw.com
    For the Defendant Snap:
20     BY: PRISCILA CORONADO, ESQ. (VIA ZOOM)
21     BY: MAGGIE BUSHELL, ESQ. (VIA ZOOM)
       Munger, Tolles & Olson LLP
22     350 South Grand Avenue, 50th Floor
       Los Angeles, California 90071
23     213.683.9239
       Priscila.coronado@mto.com
24
25   (Continued)
```

2 (Pages 353 - 356)

Page 357

```
 1        A P P E A R A N C E S
 2
     For the Defendants TikTok, Ltd.; Tiktok, LLC.;
 3   Tiktok, Inc.; ByteDance Ltd.; and ByteDance, Inc.:
 4        BY: LENNETTE LEE, ESQ. (VIA ZOOM)
          King & Spalding LLP
 5        633 West Fifth Street, Suite 1600
          Los Angeles, California 90071
 6        213.218.4011
          Llee@kslaw.com
 7
     For the Plaintiffs:
 8
          BY: LANCE OLIVER, ESQ. (VIA ZOOM)
 9        BY: ANNIE E. KOUBA, ESQ. (VIA ZOOM)
          BY: JODI FLOWERS, ESQ. (VIA ZOOM)
10        BY: PREVIN WARREN, ESQ. (VIA ZOOM)
          Motley Rice LLC
11        28 Bridgeside Boulevard
          Mt. Pleasant, South Carolina 29464
12        843.216.9057
13   For the State of Connecticut:
14        BY: TESS SCHNEIDER, ESQ. (VIA ZOOM)
          Office of the Attorney General
15        165 Capitol Avenue
          Hartford, Connecticut 06106
16        860.808.5318
17   For State of California:
18        BY: MEGAN O'NEILL, ESQ. (VIA ZOOM)
          California Department of Justice
19        Office of the Attorney General
          455 Golden Gate Avenue, Suite 11000
20        San Francisco, California 94102-7004
          415.510.4400
21
     For the State of New Jersey:
22
          BY: VERNA PRADAXAY, ESQ. (VIA ZOOM)
23        BY: MANDY WANG, ESQ. (VIA ZOOM)
          Assistant Attorney General
24        State of New Jersey
          124 Halsey Street, 5th Floor
25        Newark, New Jersey 07102
          609.712.2828
```

Page 358

```
 1        A P P E A R A N C E S
 2
     For the State of Arizona:
 3
          BY: NATHAN WHELIHAN, ESQ. (VIA ZOOM)
 4        Office of the Attorney General
          2005 N. Central Avenue
 5        Phoenix, Arizona 85004
          602.542.5025
 6
     For the Plaintiffs:
 7
          BY: PAIGE BOLDT, ESQ. (VIA ZOOM)
 8        Watts Guerra, LLP
          4 Dominion Drive, Building 3, Suite 100
 9        San Antonio, Texas 78527
          210.448.0500
10
11   Also present:
12        Kathryn Lawrimore - Motley Rice Paralegal
                    (VIA ZOOM)
13        Hayley Chang, Meta (VIA ZOOM)
          Tyler Smith, Meta
14        Tara Lamer (VIA ZOOM)
          Nicole Lopez (VIA ZOOM)
15        Jim Lopez, trial tech
          James VonWiegen, videographer
16
17
18            ---oOo---
19
20
21
22
23
24
25
```

Page 359

```
 1            I N D E X
 2        INDEX OF EXAMINATION
 3   EXAMINATION BY                    PAGE
 4   MR. CARTMELL (Resumed)            364
     MR. PHELPS              517
 5   MS. JONES               613
 6            ---oOo---
 7     INDEX OF EXHIBITS MARKED FOR IDENTIFICATION
 8   EXHIBIT      DESCRIPTION        PAGE
 9   Exhibit 29  Instagram test account still   371
10              photo and post, P2177
11   Bejar
     Exhibit 30  Instagram test account still   371
12              photo and post, P2181
13   Bejar
     Exhibit 31  Instagram video and comments,   371
14              Clip 57
15   Bejar
     Exhibit 32  Instagram still photo and post,   371
16              P2186
17   Bejar
     Exhibit 33  Instagram test account still   371
18              photo and post, P2180
19   Bejar
     Exhibit 34  Instagram video clip, Clip 54   371
20
     Bejar
21   Exhibit 35  Instagram still photo and posts,   371
              P2182
22
     Bejar
23   Exhibit 36  Instagram screenshot with   371
              hashtag #iwanttohurtmyself,
24              P2043
     Bejar
25   Exhibit 37  Article published by the Molly   371
              Rose Foundation, P1863
```

Page 360

```
 1   INDEX OF EXHIBITS MARKED FOR IDENTIFICATION
 2   EXHIBIT      DESCRIPTION        PAGE
 3   Bejar
     Exhibit 38  Slipsheet, P2174         371
 4
     Bejar
 5   Exhibit 39  Instagram video clip, Clip 76   371
 6   Bejar
     Exhibit 40  Document entitled "Issues by all   423
 7              age groups"
 8   Bejar
     Exhibit 41  Document entitled "Issues by all   423
 9              age groups"
10   Bejar
     Exhibit 42  Document entitled "Issues by all   423
11              age groups"
12   Bejar
     Exhibit 43  Letter draft            437
13              (META3047MDL-019-00127577 -
              META3047MDL-019-00127590)
14   Bejar
     Exhibit 44  e-mail correspondence, dated   452
15              9/26/2021, subject: Something
              for you to read
16              (META3047MDL-014-00014794 -
              META3047MDL-014-00014793)
17   Bejar
     Exhibit 45  e-mail correspondence, dated   463
18              10/6/2021, subject: Gap in our
              understanding of harm and bad
19              experiences
              (META3047MDL-031-00118100 -
20              META3047MDL-031-00118102)
     Bejar
21   Exhibit 46  Facebook post by Mark   478
              Zuckerberg, dated 10/5/2021
22              (META3047MDL-062-00000159 -
              META3047MDL-062-00000162)
23   Bejar
     Exhibit 47  Workplace post entitled   499
24              "Reducing Bad Experiences for
              Our Users"
25              (META3047MDL-062-00000374 - MET
              A304 7M DL-062-00000380)
```

3 (Pages 357 - 360)

CONFIDENTIAL

Page 361

INDEX OF EXHIBITS MARKED FOR IDENTIFICATION
EXHIBIT     DESCRIPTION     PAGE
Bejar
Exhibit 48   Video, Clip 81     512

Bejar
Exhibit 49   e-mail correspondence, dated   519
             9/4/2024, subject: Possible
             Oversight Board Engagement
             (BEJAR0000305 - BEJAR0000443)
Bejar
Exhibit 50   Slide presentation entitled   521
             "Addressing online harms for
             children at Meta," dated
             9/26/2024 (BEJAR0000444 -
             BEJAR0000469)
Bejar
Exhibit 51   Coroner's regulation report to   535
             prevent future deaths
Bejar
Exhibit 52   News article entitled "Health   537
             secretary tells social media
             firms to protect children after
             girl's death"
Bejar
Exhibit 53   Document entitled "Changes We're   539
             Making to Do More to Support and
             Protect the Most Vulnerable
             People who Use Instagram," dated
             2/7/2019
Bejar
Exhibit 54   Meta document entitled "Our   548
             tools, features and resources to
             help support teens and parents"
Bejar
Exhibit 55   Meta document entitled "New   558
             Tools to Manage Your Time on
             Facebook and Instagram," dated
             8/1/2018
Bejar
Exhibit 56   Article entitled "Facebook Knows   567
             Instagram is Toxic for Teen
             Girls, Company Documents Show

Page 362

INDEX OF EXHIBITS MARKED FOR IDENTIFICATION
EXHIBIT     DESCRIPTION     PAGE
Bejar
Exhibit 57   NPR article entitled "4   570
             takeaways from senators'
             grilling of Instagram's CEO
             about kids and safety," dated
             12/8/2021
Bejar
Exhibit 58   Meta press release article   570
             entitled "Raising the Standard
             for Protecting Teens and
             Supporting Parents Online,"
             dated 12/7/2021
Bejar
Exhibit 59   Instagram press release entitled   579
             "Introducing Family Center and
             Parental Supervision Tools on
             Instagram and in VR," dated
             3/16/2022
Bejar
Exhibit 60   Instagram press release entitled   583
             "Intagram Quiet Mode:  A New Way
             to Manage Your Time and Focus,"
             dated 1/19/2023
Bejar
Exhibit 61   Instagram press release entitled   586
             "Introducing Instagram Teen
             Accounts:  Built-In Protections
             for Teens, Peace of Mind for
             Parents," dated 9/17/2024
Bejar
Exhibit 62   News article entitled "House   593
             committee advances Kids Online
             Safety Act," dated 9/18/2024
Bejar
Exhibit 63   News article entitled "Careless   595
             People' author to testify during
             a Senate hearing about
             Facebook," dated 4/4/2025

Page 363

INDEX OF EXHIBITS MARKED FOR IDENTIFICATION
EXHIBIT     DESCRIPTION     PAGE
Bejar
Exhibit 64   Meta press release entitled   597
             "We're Introducing New Built-In
             Restrictions for Instagram Teen
             Accounts, and Expanding to
             Facebook and Messenger," dated
             4/8/2025
Bejar
Exhibit 65   News article entitled "Hot or   608
             Not?  Website Briefly Judges
             Looks," dated 11/4/2023

Bejar
Exhibit 66   Facebook post by Arturo Bejar,   628
             dated 2/5/2018
Bejar
Exhibit 67   Screenshot   648
             (META3047MDL-044-00086786)
Bejar
Exhibit 68   e-mail correspondence, dated   653
             10/6/2020, subject: Question on
             time spent
             (META3047MDL-208-00046709 -
             METAMDL-208-00046710)

Bejar
Exhibit 69   e-mail correspondence, dated   718
             10/26/2019, subject: Facebook
             Contingent Worker Orientation
             Hosted by ProUnlimited on 10/28
             (BEJAR0000165 - BEJAR000018)

             ---oOo---

Page 364

1          TUESDAY, APRIL 8, 2025
2          PALO ALTO, CALIFORNIA
3          9:08 a.m. PST
4          THE VIDEOGRAPHER:  We're now on the record.
5   Today's date is April 8th, 2025.  The time is
6   9:08 a.m.
7          This is a continuation of Arturo Bejar's
8   deposition in the matter of Social Media MDL 3047,
9   State of Tennessee versus Meta Platforms, Inc.
10         The court reporter is Lorrie Marchant,
11  California CSR 10523.
12         And will now swear in the witness.
13         THE STENOGRAPHER:  Do you want him sworn in
14  again?
15         MR. CARTMELL:  I don't think so, unless you
16  want the --
17         MS. JONES:  As long as he understands he is
18  still under the same oath.
19         MR. CARTMELL:  I'll ask him.
20         EXAMINATION BY MR. CARTMELL (Resumed)
21         BY MR. CARTMELL:
22   Q.   Good morning.
23   A.   Good morning.
24   Q.   Mr. Bejar, we are starting fresh after an
25   overnight break.

4 (Pages 361 - 364)

CONFIDENTIAL

Page 365

1    Do you understand that you're still under
2 oath today?
3    A.   Yes, I do.
4    Q.   Okay.
5    When we broke we were talking about the
6 BEEF study, which is Meta's internal survey of bad
7 experiences and encounters; correct?
8    A.   Correct.
9    Q.   That's the internal survey that Meta did in
10 July through September of 2021; is that right?
11    A.   That's correct.
12    Q.   Okay.  And that was a survey of
13 approximately 238,000 users of Instagram; is that
14 right?
15    A.   Yes.
16    Q.   I want to talk about the data from
17 Exhibit 21 and Exhibit 26.
18    Before you, you will see that on the right
19 side there is information that Meta was providing on
20 its Transparency Center website about the prevalence
21 of bullying and harassment; is that right?
22    A.   That's correct.
23    Q.   And what was Meta telling the public about
24 the prevalence of bullying and harassment on
25 Instagram?

Page 366

1    A.   That out of 10,000 content views, five or
2 six would contain bullying and harassment.
3    Q.   Based on your expertise and working in this
4 safety -- child safety -- online child -- strike
5 that.
6    Based on your experience working for
7 30 years in online child safety, what do you believe
8 viewers of that information would perceive the risk
9 bullying on Instagram to be?
10    MS. JONES:  Excuse me.
11    Objection to the form.  Lacks foundation.
12    THE WITNESS:  I believe that anybody
13 looking at this data would believe that it was
14 extremely unlikely that somebody experiences
15 bullying and harassment on Meta's products.
16    BY MR. CARTMELL:
17    Q.   On the left side here, we have the results
18 of the BEEF survey from Meta at the same time
19 period.  And what are the results for kids 13 to 15
20 and 16 to 17?
21    A.   So for 13 to 15, approximately 1 in 3 kids
22 said that they witnessed, they saw, bullying and
23 harassment happening.  And approximately 11 percent,
24 around 1 in 10, said they were the target of it.
25    Q.   Would you categorize the discrepancy in

Page 367

1 what Meta is telling the public about the prevalence
2 of bullying views online and their internal data to
3 be a large discrepancy?
4    MS. JONES:  Objection to the
5 characterization and lack of foundation.
6    THE WITNESS:  Yes.
7    BY MR. CARTMELL:
8    Q.   How would you characterize the discrepancy
9 between what Meta is telling the public about the
10 prevalence of bullying and harassment and what --
11    MS. JONES:  Same --
12    BY MR. CARTMELL:
13    Q.   -- and what Meta knows from its internal
14 survey is happening on Instagram related to bullying
15 and harassment?
16    MS. JONES:  I apologize, Counsel.
17    Objection to the form and lacks foundation.
18    THE WITNESS:  Okay.  So the internal data
19 is saying 1 in 3 kids see bullying happening.  And
20 the external representation says -- in the last
21 7 days.  And the external representation says out of
22 10,000 views, only 5 or 6, right, like a fraction of
23 a percent.
24    And so I think that is a material or a
25 critical gap of what teens are communicating they've

Page 368

1 experienced versus what the company is representing
2 people see.
3    Q.   Okay.  Let's move to looking at child
4 endangerment violations and unwanted sexual
5 advances.
6    On the bottom of this, there is information
7 from Meta's Transparency website about the frequency
8 of child endangerment violations; is that correct?
9    A.   That's correct.
10    Q.   And what does Meta tell the public about
11 the frequency of child endangerment violations as of
12 September of 2021?
13    A.   It says (as read):
14    "We cannot estimate prevalence of
15    child endangerment right now.  We will
16    continue to expand prevalence measurement
17    to more areas as we confirm accuracy and
18    meaningful data."
19    Q.   Now, above that is what information Meta
20 had as of September '21 related to unwanted sexual
21 advances that were being reported on Instagram from
22 13 to 15 year olds and 16 to 17 year olds; is that
23 correct?
24    A.   That's correct.
25    Q.   What internal information did Meta have in

5 (Pages 365 - 368)

CONFIDENTIAL

Page 369

1 September of 2021 at the same time they were telling
2 the public that child endangerment was very
3 infrequent?
4        MS. JONES: Excuse me.
5        Objection to the form. Mischaracterizes
6 the record. Foundation.
7        MR. CARTMELL: Strike that. I'll restate
8 it.
9        BY MR. CARTMELL:
10    Q. What type of internal information or what
11 data did Meta have internally from its BEEF survey,
12 and, frankly, from the NES survey before that, at
13 the same time in September of '21 it was telling the
14 public that they could not estimate the prevalence
15 for child endangerment right now?
16       MS. JONES: Same objection to form.
17 Characterization. And lack of foundation.
18       THE WITNESS: That 13 to 15 year olds got
19 an unwanted sexual advance, one in 8, 13 percent, in
20 the last 7 days. And 16 to 17s, 14 percent in the
21 last 7 days.
22       BY MR. CARTMELL:
23    Q. In your opinion as an online child safety
24 expert, was there a very large discrepancy between
25 what Meta was telling the public about unwanted

Page 370

1 sexual advances or child endangerment compared to
2 what Meta knew from its internal research, including
3 the BEEF survey?
4        MS. JONES: Objection to the form. And
5 foundation.
6        THE WITNESS: Yes. I believe that the
7 internal data is meaningful data about child
8 endangerment.
9        BY MR. CARTMELL:
10    Q. Now, did you believe that there was a very
11 large discrepancy between what Meta was telling the
12 public about the prevalence or frequency of suicide
13 and self-harm versus what Meta knew internally?
14    A. Yes.
15    Q. Did you believe also that the same was true
16 for what Meta knew internally about nudity and
17 sexual activity on Instagram versus what Meta was
18 telling the public?
19    A. Yes.
20    Q. Was the same true with what Meta knew
21 internally about the amount of violence and that
22 type of content on Instagram versus what Meta was
23 telling the public?
24    A. Yes.
25    Q. Is the same true with hate content that was

Page 371

1 on Instagram? Was Meta telling the public something
2 very different from what they knew internally?
3    A. Yes.
4        MS. JONES: Excuse me.
5        Objection to the form.
6        BY MR. CARTMELL:
7    Q. Did Meta know from its internal data,
8 including the BEEF research, that all of those bad
9 experiences on Instagram were, in fact, frequent?
10       MS. JONES: Objection. Foundation. Form.
11       THE WITNESS: Yes.
12       BY MR. CARTMELL:
13    Q. Did Meta tell the public that ever?
14    A. They did not.
15    Q. Did you actually in your test accounts that
16 you prepared and that we talked about yesterday look
17 at examples of unwanted sexual advances and bullying
18 that you found on Instagram during the time of your
19 testing?
20    A. Yes, I did.
21    Q. I'm going to hand you actually a lot of
22 exhibits right now. I'm going to hand you
23 Exhibits 29 through 39. And we'll go through those.
24       (Marked for identification purposes, Bejar
25       Exhibits 29 through 39.)

Page 372

1        MS. JONES: Counsel, would you mind,
2 whenever you get started, just saying what the
3 exhibit number is and what corresponds in the upper
4 right hand just so we can mark it with the right
5 number?
6        MR. CARTMELL: Sure.
7        MS. JONES: Thank you.
8        MR. CARTMELL: I got a cheat sheet.
9        MS. JONES: Okay. Thank you.
10       BY MR. CARTMELL:
11    Q. While those are being handed out,
12 Mr. Bejar, let me ask you: We talked yesterday
13 about actually the testing on Instagram that you had
14 done over, I believe it was, the last three years
15 starting in November of 2023; is that correct?
16    A. Yes.
17    Q. Okay. And you -- we have marked as an
18 exhibit the protocol that you provided, which is
19 Exhibit 12, which outlines sort of the process that
20 you underwent when you were testing your accounts?
21    A. Yes.
22    Q. And is it true that you set up 3 or 4 test
23 accounts for kids the age of 13; is that right?
24    A. That's correct. Thirteen and 14. It was,
25 I think, a total of, like, 7 accounts I believe.

6 (Pages 369 - 372)

CONFIDENTIAL

Page 373

1    Q.  And then briefly explain, if you would, for
2  the jury, what you did after setting those accounts
3  up.
4        I want to talk about that before we go
5  through some of the actual results or demonstrations
6  of what you found when you tested those accounts.
7    A.  Yeah.  So I -- I took a phone.  I wiped it.
8  I installed Instagram, like the parent would hand
9  the phone to a kid.  Created an account with all the
10  defaults.
11       And then from there, depending on the
12  accounts, I tried different things in the product to
13  see how it would behave for a teenager.
14    Q.  Were you looking to test -- strike that.
15       What were you looking to test, for example?
16    A.  I was looking to get an understanding of
17  the kind of content that was getting recommended to
18  teen accounts, as well as how the different features
19  behaved.
20    Q.  When you say "features," are you talking
21  about what?
22    A.  I'm talking about the safety features.
23    Q.  All right.  So let's take a look at
24  Exhibit 29, which is P2177.
25       MS. JONES:  Thank you.

Page 374

1       BY MR. CARTMELL:
2    Q.  Is Exhibit 29 a still and a post with
3  comments that you received in one of your test
4  accounts?
5    A.  That's correct.  I only looked at accounts
6  that were public.
7    Q.  So this was -- well, explain what this --
8  this is.  You mentioned a public account.  Explain
9  what that is.
10    A.  Yeah.  So in Instagram, you can create
11  accounts that are either private or public.  When an
12  account is private, only people who follow you can
13  see the videos or photos that you post.
14       On an account that's public, anybody who
15  uses Instagram can see your videos that you post.
16       And so this is an account that is public
17  that appears to be, again, a very young girl.  I
18  would say under ten.  And this was a video that was
19  recommended to me by the Reels algorithm by
20  Instagram.
21       And then I looked at the video.  And then I
22  opened the comments.
23    Q.  In your experience, let me ask you, over
24  30 years in the industry and working in child safety
25  online, do you have an understanding of whether kids

Page 375

1  like to have public accounts versus private
2  accounts?
3    A.  I think that kids -- some kids like public
4  accounts because they like the attention that they
5  get from that.  And I think other kids like having
6  private accounts.
7    Q.  Okay.  All right.  So why don't you just go
8  ahead and explain to us what you found and what this
9  represents as significant to you.
10    A.  So this is a girl that appears to be under
11  ten.  And when you open the comments, very quickly
12  you find, like, a body-shaming.  Image 1 begins with
13  a young girl.  "Hit the gym."
14    Q.  Okay.  Let's highlight what you're talking
15  about.
16       Are you talking about the first comment
17  that says, "Hit the gym"?
18    A.  Correct.
19       Then you get red hearts.
20    Q.  What does that mean?
21    A.  Love, love, love, love, love, love.
22       Then -- and then the third comment is --
23  and you see this in -- in the minor accounts
24  (as read):
25       "What's happening here?  I'm not

Page 376

1  watching these videos anymore."
2       Which I believe indicates that they get
3  recommended these kinds of videos with young girls,
4  and they watch them and are disturbed by them.
5       MR. CARTMELL:  Okay.  Let's go to the
6  other -- other side, Jim, please.
7       BY MR. CARTMELL:
8    Q.  What does this represent?
9    A.  So the top comment, "You got snap," is a
10  way to message with the minor that circumvents the
11  restrictions that are in place on Instagram.
12       So they -- it's asking to establish a
13  connection with the minor outside of Instagram.
14    Q.  Is that an adult, or do you know?
15    A.  I can't tell from what's here.  But I have
16  seen several accounts where these comments -- and
17  you click through account, it looks to be an adult.
18    Q.  I don't necessarily understand what you're
19  talking about.  I want to make sure the jury
20  understands.
21       Are they talking about going to another
22  social media app called Snap?
23    A.  That is correct.
24    Q.  Okay.  And what is your experience as an
25  online child safety expert as to why, for example,

7 (Pages 373 - 376)

CONFIDENTIAL

Page 377

1 an adult might ask a young child to go to Snap?
2          MS. JONES: Objection. Foundation.
3          THE WITNESS: To ask them for videos,
4 photos, sexual conversations, grooming, sextortion,
5 you name it.
6          BY MR. CARTMELL:
7     Q.  Okay.
8     A.  And then the -- the next comment -- sorry,
9 I just have a hard time with this sometimes -- has
10 the words "Boner Alert," indicating that somebody is
11 aroused by the video that is -- they're watching.
12    Q.  Okay. Let's go to dot 2 of this.
13         And is this the same girl dancing? It's
14 hard -- a little hard to see her, but the same girl?
15    A.  It is the same girl, same account.
16    Q.  And these are just additional comments that
17 she is getting --
18    A.  Yes.
19    Q.  -- on this post?
20    A.  Correct.
21    Q.  These are all on one post; is that correct?
22    A.  Correct.
23    Q.  Okay. Go ahead.
24    A.  So top comment (as read):
25         "Waiting for my reply back. I am

Page 378

1     single and looking."
2     Q.  And does that appear to be an adult?
3     A.  Yes.
4     Q.  Okay. And then she responds; is that true?
5     A.  Correct.
6     Q.  What does she say?
7     A.  (As read):
8         "Sorry, no."
9     Q.  Continue, please.
10    A.  Another like (as read):
11         "Hey, love, waiting for your reply or
12    DM me."
13         Again, these are people asking her to
14 initiate contact with them through the comments.
15    Q.  Can that be dangerous for kids?
16    A.  Yes, incredibly so.
17    Q.  Let's go to the next set of comments.
18    A.  So the top comment is (as read):
19         "Y'all, she's like ten. What the --
20    what the tuck?"
21    Q.  Why would -- why would somebody in your
22 experience say "tuck"?
23    A.  Because they're trying to type "Why the
24 fuck." But they weren't allowed to, so they changed
25 the word a little bit to convey the same thing.

Page 379

1     Q.  Okay.
2     A.  The fire is -- again, I've noticed it --
3 using it for when you think people are hot.
4         The next message is, "Add me back," which
5 in the context of Instagram means that she -- they
6 want her to follow them back, so then they can
7 message each other.
8         And then the other message is (as read):
9         "Why you so fat?"
10         And, again, this is an interesting thing to
11 note, that it doesn't say F-A-T. It says F-A-plus,
12 which is a way to circumvent -- easily circumvent
13 any of the features that look at you saying "fat"
14 and stop you from doing that or ask you not to do
15 that.
16         MS. JONES: I'm going to object to and move
17 to strike the nonresponsive narrative portion of
18 that answer.
19         BY MR. CARTMELL:
20    Q.  Okay. So which bad experiences that are
21 reflected in BEEF's internal surveys, including --
22 or, excuse me.
23         Which of the bad experiences that are
24 reflected in Meta's internal surveys, including BEEF
25 and prior research, does this demonstrate?

Page 380

1          MS. JONES: Objection. Foundation.
2          THE WITNESS: So this post and these few
3 comments demonstrates unwanted sexual advances; body
4 shaming; eating-disorder content; attempts at
5 circumventing message protection, so trying to
6 contact and initiate conversations with the minor;
7 and knowledge that this is, indeed, a minor that's
8 on Instagram.
9          BY MR. CARTMELL:
10    Q.  At the time of this testing in -- do you
11 know if this was 2023 or 2024?
12    A.  I believe this was in 2023, but I would
13 need to check my records.
14    Q.  And the records are on the -- in the
15 protocol that you've attached as an exhibit?
16    A.  That's correct.
17    Q.  Okay. At the time of this testing that you
18 did, was Meta doing anything to monitor or prevent
19 or try to substantially reduce these types of
20 harmful experiences?
21         MS. JONES: Objection. Foundation.
22         THE WITNESS: During -- in the months
23 leading up to this, not as far as I was aware,
24 because in the months leading up to this, I was
25 working in the well-being team. And I was not aware

8 (Pages 377 - 380)

CONFIDENTIAL

Page 381

1  of any efforts within the well-being team to address
2  the issues that I can see in this post.
3       BY MR. CARTMELL:
4       Q.  Okay.  And this is -- this is 2023;
5  correct?
6       A.  That is correct.
7       Q.  Okay.  Let's go to Exhibit 30, which is
8  P2181.
9       Mr. Bejar, Exhibit 30 is another still with
10  a video and some comments from one of the test
11  accounts for a 13 year old you set up; is that
12  correct?
13      A.  That is correct.
14      Q.  Why don't you please tell us the harmful or
15  bad experiences that this exhibit represents.
16      A.  So clearly a video of a very young girl
17  again and multiple comments showing condoms, which,
18  again, is, I think, an unwanted sexual advance.
19      There's the fire and another GIF that
20  says -- or a still image that says, "I'm going to be
21  wet for hours," on the right.
22      Q.  That's on the right?
23      A.  M-hm.
24      Q.  On the left at the bottom, it says "Your
25  trans?"

Page 382

1       A.  Yes.
2       Q.  What does that mean?
3       A.  It's -- it's --
4       MS. JONES:  Hold on.
5       Objection.  Foundation.
6       Go ahead.
7       BY MR. CARTMELL:
8       Q.  What does that mean to you as somebody who
9  has been a child -- online child safety expert for
10  30 years?
11      MS. JONES:  Same objections.
12      THE WITNESS:  I think that's a really awful
13  form of bullying to tell a young girl if she's
14  trans.  It's an insult that I can't imagine what
15  that does to a kid at that age.
16      Also note, like, first comment is "Too
17  young."
18      BY MR. CARTMELL:
19      Q.  What is the significance of that to you?
20      A.  When you see these videos, they're often
21  people who say, "You're too young to be on here.
22  What are you doing here?"
23      And I believe that the reason people do
24  that in comments is because these accounts are
25  almost impossible to report as being under 13.

Page 383

1       Q.  Okay.  Let's go to Exhibits 31 and 32.  And
2  I believe 31 is the slip sheet for a video.  It's
3  Clip 57.  And why don't we go ahead and play the
4  video, and then I'll ask you some follow-up
5  questions about it.
6       (Whereupon, video/audio played.)
7       MR. CARTMELL:  Okay.  Jim, if you wouldn't
8  mind, go back and just play the first part of the
9  video with the little girl dancing real quick.  And
10  we can stop it right after that.
11      (Whereupon, video/audio played.)
12      BY MR. CARTMELL:
13      Q.  Mr. Bejar, it seemed to be that there was
14  something reflecting or lights as she was dancing.
15      What was that?
16      MS. JONES:  Objection.  Foundation.
17      BY MR. CARTMELL:
18      Q.  Do you know?
19      A.  Yes.  It was a filter.
20      Q.  Explain to the jury what a filter is and
21  how that works, that a little kid can do a dance and
22  have sort of lights flashing as they do that.
23      A.  So Instagram has these features that when
24  you take a video, it can add a special effect to it.
25  So it can put things on your face.  It can make

Page 384

1  lights flash.  It -- it jazzes up the video.
2       Q.  Okay.  And is -- based on your experience
3  in the industry as a child -- online child safety
4  expert, is that something that a lot of kids, young
5  kids, like to use?
6       MS. JONES:  Foundation.  Objection.
7  Foundation.
8       (Stenographer interrupted for clarification
9       of the record.)
10      THE WITNESS:  Yes.  For example, if you
11  have something that puts little baby Yodas on your
12  face, that would be an example of a -- of a filter
13  that is designed for small children to use.
14      BY MR. CARTMELL:
15      Q.  Do you know the music that -- where that
16  comes from?
17      A.  Not on -- on this one.
18      Q.  Okay.  Let's look at some of the -- oh,
19  actually, before we go to the comment, what on the
20  right side of this photo of the dancing girl -- why
21  don't you tell the jury what those things are, those
22  numbers.
23      A.  Yeah.  So this -- the first with the heart
24  is how many people hearted or liked the video.  And
25  that video had been hearted 8,359 times.

Page 385

1    The comments are the little bubble with
2 the -- with the balloon -- the word balloon is
3 comments. So 209 of those.
4    And then the little paper airplane is
5 people that have shared that video with other people
6 in different context. And that is -- well, sorry.
7 That is 1,950 times people have shared this video.
8    Q.  Why are those numbers significant to you as
9 an online child safety expert?
10    A.  Well, I -- I don't -- I mean, I think
11 it's -- I think it's inappropriate to have a video
12 like this be getting as many likes. I think -- I
13 think the sharing of this, right, is -- is taking
14 what I believe is exploitative content of a minor
15 that is not explicit, so this is kind of sexually
16 suggestive, and then it's distributing it further.
17    And I think it creates an environment
18 that's very risky for the minor and rewards people
19 looking for this kind of content.
20    Q.  Okay. Let's look at some of the comments
21 that this post from this young girl received.
22    And -- whoops.
23    And, again, this is a post and comments
24 that came to an account that was set up as a
25 13-year-old girl; correct?

Page 386

1    A.  That is correct.
2    Q.  Now, these likes, for instance, that you
3 talked about, did those come from strangers?
4    A.  Most likely they did. I mean, that many
5 likes would come from, again, public content. So
6 anybody can see it. Anybody can like it.
7    Q.  Okay. Do you, from your experience, know
8 of any kids that have 8,000 friends in real life?
9    MS. JONES:  Objection. Foundation.
10    THE WITNESS:  I do not.
11    BY MR. CARTMELL:
12    Q.  Okay. Let's talk about what we found from
13 the comments to this post for this little girl.
14    A.  So you have, again, "Boner Alert," which
15 you've seen in many of these posts.
16    The -- the little flames and the hearts are
17 so -- it indicates, like, you're hot and love.
18    "So sexy" you see on the third screen.
19    And "You made something in my pants grow
20 bigger," which is somebody saying that they got an
21 erection from looking at this video.
22    And then I will note the little police car
23 emojis that -- in some of these, and you saw it when
24 you scrolled by. When it's an account that appears
25 to be really young, they use little police

Page 387

1 animations or little police car emojis to indicate
2 that this account is too young to be Instagram.
3    Q.  Do you know what the "NNN, it's December 1,
4 I sent you a pic" is?
5    MS. JONES:  Objection. Foundation.
6    THE WITNESS:  I don't.
7    BY MR. CARTMELL:
8    Q.  Have you ever heard of no-nut November?
9    MS. JONES:  Same objection. Foundation.
10    THE WITNESS:  Yes, I have.
11    BY MR. CARTMELL:
12    Q.  What does that represent based on your
13 knowledge?
14    A.  Yeah. It's a -- it's something where
15 people commit to not masturbating during the month
16 of November.
17    And so then that message says my month of
18 not masturbating is over. "It's December 1st. I
19 sent you a pic." Eyes with hearts and fire.
20    Q.  Let's go to the next set of comments to
21 this post.
22    What was significant to you here?
23    MS. JONES:  Let me just note an objection
24 on foundation.
25    Go ahead.

Page 388

1    THE WITNESS:  That the first comment is in
2 Spanish. It says (as read):
3    "How is it possible for a girl to do
4    this?"
5    I think actually that is an incredibly
6 important question.
7    Then you have (as read):
8    "Oil up. I am coming."
9    BY MR. CARTMELL:
10    Q.  Does that appear to be an older kid or man?
11    MS. JONES:  Objection. Foundation.
12    THE WITNESS:  Yes.
13    BY MR. CARTMELL:
14    Q.  Okay.
15    A.  And then on the comments on the right,
16 which is the one I made a note of when the video was
17 going by, it says (as read):
18    "I will make you scream if you know
19    what I mean."
20    Q.  What's the significance of that to you?
21    A.  That either through pleasure or pain, he'll
22 make the little girl scream or they will make the
23 little girl scream.
24    Q.  Okay. And there's a comment (as read):
25    "Are you autistic"?

10 (Pages 385 - 388)

Page 389

1    A.  That's correct.
2    Q.  What type of bad experience for a child can
3  that be?
4        MS. JONES:  Objection.  Foundation.
5        THE WITNESS:  It's bullying and harassment;
6  right?
7        I mean, I think when we talk about unwanted
8  sexual advances, bullying and harassment, all of
9  these issues, this is what we're talking about.
10  This is what people need to understand is happening
11  on Instagram.  This is the risk of having a public
12  account.
13        BY MR. CARTMELL:
14    Q.  Does Meta tell parents and the public about
15  these risks on Instagram?
16    A.  They do not.  And when you switch between
17  public and private account, which was in one of my
18  test videos, there's nothing that tells you what are
19  the risks of going into a public account from a
20  private account.  And this illustrates what those
21  risks are.
22    Q.  Do you believe that Meta should have told
23  the public, including parents, about these risks?
24    A.  Yes, absolutely.  My daughter approached
25  me -- (inaudible)

Page 390

1        (Stenographer interrupted for clarification
2         of the record.)
3        THE WITNESS:  Yes.  So my daughter asked me
4  if she could have a public account, had I known this
5  was what she was going to get exposed to, I would
6  not have given her permission to do that.
7        BY MR. CARTMELL:
8    Q.  Okay.  Let's look at Exhibit 33, please,
9  which is P2180.
10        What does Exhibit 33 reflect from your test
11  account for a 13 year old?
12    A.  So, again, you've got a video of a young
13  girl showing her stomach and her behind.  It has
14  3,000 likes up to this point.  And the comments say
15  (as read):
16        "Hot cute."
17        And then the girl responds (as read):
18        "Bro, I'm 13."
19    Q.  Is she responding to an unwanted sexual
20  advance from a stranger?
21        MS. JONES:  Objection.  Foundation.
22        THE WITNESS:  Yes.
23        BY MR. CARTMELL:
24    Q.  Okay.
25    A.  If you look at the next set of comments at

Page 391

1  the top you have (as read):
2        "I'm 19.  Is that okay?"
3    Q.  What do you believe that is?
4    A.  It's somebody saying, I am 19, can I date
5  you?  Can I be with you?  Is that okay?  Would you
6  be with me?
7    Q.  And does she respond?
8    A.  She does.
9    Q.  What does she say?
10    A.  "Thirteen."
11    Q.  Okay.
12    A.  The next one is, "Stunning," right, so
13  loving eyes, like, the little love eyes and
14  clapping.
15    Q.  Actually, before that on the bottom of the
16  previous comments page, it says (as read):
17        "She's kinda hot."
18    A.  That's correct.
19        Sorry, there's, like, so many of these
20  comments.  It's really -- it's a little bit of a
21  hard read, but it's a very important read.
22    Q.  After the "stunning" comment, does she
23  respond again?
24    A.  She does.
25    Q.  What does she say?

Page 392

1    A.  "Thirteen."
2    Q.  Is that three times in one post in the
3  comments just received here that she's responded to
4  comments to her that she's only 13 years old?
5        MS. JONES:  Objection.  Foundation.
6        THE WITNESS:  That is correct.
7        BY MR. CARTMELL:
8    Q.  And what is the next comment she receives?
9    A.  (As read):
10        "Oil up your special spots.  I'll be
11        there in ten minutes mommy."
12        With two emojis with eye -- the hearts in
13  the eyes.
14    Q.  Based on your experience, can these types
15  of comments be harmful to little kids 13 years old?
16        MS. JONES:  Objection.  Foundation.
17        THE WITNESS:  Absolutely.
18        BY MR. CARTMELL:
19    Q.  Let's look at Exhibits 34 and 35.  This is
20  a video clip, 54, and a still after that with
21  comments.
22        Let's go ahead and look at the video, and
23  then we'll look at the comments.
24        (Whereupon, video played.)
25  ///

11 (Pages 389 - 392)

CONFIDENTIAL

Page 393

1    BY MR. CARTMELL:
2    Q.  Okay.  So let me ask you some questions
3 about we -- what we just watched.  I think it's
4 still continuing.
5        MS. JONES:  And, Counsel, can I just lodge
6 an objection?
7        MR. CARTMELL:  Actually, I shouldn't have
8 interrupted.  It still going, and then you can.
9        MS. JONES:  Okay.  Sure.  That's fine.
10 Go ahead.
11        MR. CARTMELL:  Go ahead.
12        (Whereupon, video played.)
13        MR. CARTMELL:  Okay.  Before I ask any
14 questions, do you want --
15        MS. JONES:  Sure.  Let me just -- this
16 might make things easier.  Let me make an objection
17 to, I think starting with Exhibit No. 29 through --
18        (Stenographer interrupted for clarification
19         of the record.)
20        MS. JONES:  Starting with Exhibit No. 29
21 to -- I'm not sure what the number is, but to the
22 extent that you're asking him questions where you're
23 asking him to interpret posts or comments from
24 people for which he would have no foundation to
25 offer testimony, I would lodge an objection.

Page 394

1    May I have a running objection such that I
2 don't have to keep objecting?
3        MR. CARTMELL:  Sure.
4        MS. JONES:  Okay.  Thank you.
5        BY MR. CARTMELL:
6    Q.  Okay.  I want to ask you some questions
7 about what we just saw, and we may have to go back
8 and look at parts of this video.  But why don't you
9 just explain first what this is.
10    Obviously, it's a little girl singing, but
11 tell us what type of -- is this a trend or what is
12 this?
13    A.  So Instagram has a feature that allows you
14 to take an audio clip, and then you can attach it to
15 your own videos.  And then people can copy that.
16 And those are called "audio trends" or ...
17    And so this is -- this girl is doing this
18 trend where she's asking to be rated.  "Put a red
19 heart if you think I'm cute.  Put a yellow heart if
20 you think I'm fine.  And put a blue heart if you
21 think I'm ugly."
22    And so then she's asking anybody who sees
23 this video to respond in the comments.
24    Q.  I see.
25    And so what are -- is -- are the numbers

Page 395

1 here identifying or stating as far as the number of
2 likes and views and shares?
3    A.  So this one is not showing the views.
4        MR. WARD:  It's on the screen.
5        THE WITNESS:  Sorry?
6        MR. WARD:  It's on screen.
7        THE WITNESS:  Oh, thank you.
8    Yeah.  So this -- here this shows this has
9 been liked 13,000 -- 14,000 times, approximately.
10 There is 54,000 comments.  And it's been shared
11 7,000 -- over 7,000 times.
12        BY MR. CARTMELL:
13    Q.  So a little girl -- how old -- can you
14 estimate, in your experience, how old this little
15 girl is?
16    A.  I would say around 10 or 11.
17    Q.  Okay.  And did you say 54,000 comments on
18 one post?
19    A.  Correct.
20    Q.  Okay.  And let's look at the -- Exhibit 34.
21 We can talk about some of the comments.
22        MR. WARD:  Tom, is it Exhibit 35?
23        MR. CARTMELL:  Oh, I'm ...
24        (Discussion off the stenographic record.)
25        MR. CARTMELL:  Is it 35?

Page 396

1    I'm sorry, 35.
2        BY MR. CARTMELL:
3    Q.  Let's look, Mr. Bejar, at Exhibit 35.  And
4 tell us what this is.
5        MS. JONES:  And note my ongoing objection
6 to this.
7        THE WITNESS:  Also, I did -- I will -- I
8 will tell you what this says.  I just want to flag,
9 and then you can ask me about it.
10    The number of views was visible in one of
11 the screens that we looked at.  And it's important,
12 I believe.
13        BY MR. CARTMELL:
14    Q.  Okay.
15    A.  But answering your question about the --
16 the comments.  I've -- "I've never seen so much
17 blue.  Oh my God."
18    Q.  And blue means what?
19    A.  People who think she is ugly.  She's been
20 asking to be rated, and blue is how you tell her she
21 is ugly.
22    And a blue heart saying (as read):
23        "It's okay buddy (this is a racism
24    app.  Get out of here if you want
25    emotional support)."

12 (Pages 393 - 396)

Page 397

1    And that comment has 3,600 likes.
2    (As read):
3        "I am 25 years old" with hearts.
4    With red hearts, in the next panel
5    (as read):
6        "I am 62 when u got time?"
7    Q.  Did you actually go to that person's -- it
8    looks like a man's page to see who that was?
9    A.  Yes.
10   Q.  And what did you find?  Is this that, what
11   you found?
12   A.  That is that account.
13   Q.  ████████████████
14   A.  Yes.
15   Q.  Zero posts.
16       So does -- what does that reflect?
17   A.  This is generally somebody who goes on
18   Instagram, doesn't post anything, and just consumes
19   videos or things that other people make.
20   Q.  Why is that significant to you?
21   A.  When you click through to some of the
22   people viewing these videos made by young girls, you
23   often find accounts that appear to be adults who
24   don't do posts, who follow other young girls.
25   Q.  Okay.  We're going to -- you mentioned that

Page 398

1    there was in the video a mention of the number of
2    views of this video.  And I want to take a look at
3    that.
4        Okay.  It says "just watched," and it looks
5    like 1.3 million.
6        What is that?
7    A.  So that video of the girl asking to be
8    rated has been seen 1.3 million times.
9    Q.  What is the significance to you of that as
10   an online child safety expert?
11       MS. JONES:  Objection.  Foundation.  Calls
12   for speculation.
13       THE WITNESS:  I do not believe that there
14   is any world in which it's appropriate for a video
15   of a young girl asking to be rated to get a million
16   views.  I can't imagine what that does to the child,
17   especially when most of the comments are blue
18   hearts.
19       One of the comments said "Team Blue," and
20   it had almost a thousand likes.  And what does that
21   do to, like, a -- like, a young girl; right?
22   It's -- it's ...
23       And in 2016, there was a very good paper
24   talking about eating disorders and body image
25   issues.  And one of the key things they named is

Page 399

1    videos of teens asking to be rated.  And this is a
2    perfect example of that.
3        BY MR. CARTMELL:
4    Q.  Is Instagram actually promoting that?
5    A.  Yes, it is.  That's the only way a video
6    like this can get over a million views.
7    Q.  Okay.  We're going to pull up another
8    section of this video, and I have a question for
9    you.
10       (Whereupon, video played.)
11       BY MR. CARTMELL:
12   Q.  So what were you doing there in your test,
13   and what did you find?
14   A.  So you can click through to see who else
15   has used this audio clip to make their own videos.
16   And what I found was 9,000 accounts had been used to
17   do this kind of rating trend, were asking to be
18   rated.  And when you see me scrolling through that,
19   you see that they're almost exclusively little kids.
20   Q.  So does that reflect 9,000 kids had done
21   what this little girl did and asked people to rate
22   them with a red heart, yellow heart, or blue heart?
23       MS. JONES:  Objection.  Foundation.
24       THE WITNESS:  Approximately, yes.  There
25   are, in what I could see, two or three older people.

Page 400

1    But almost all of the 9,000 Reels are young kids.
2        BY MR. CARTMELL:
3    Q.  And what is the significance of that to you
4    as an online child safety expert?
5    A.  That Instagram, by design, is helping kids
6    create videos where they're asking to be rated at a
7    time in which we know that this is terrible for
8    their body image and can lead to eating disorders
9    and other issues.
10   Q.  What bad experiences or negative
11   experiences does this video reflect -- strike that.
12       What of the bad experiences that were
13   looked at in the BEEF study do you believe this
14   video reflects on Instagram?
15       MS. JONES:  Objection to the form.
16   Mischaracterization.
17       Go ahead.
18       THE WITNESS:  Negative social comparison.
19       BY MR. CARTMELL:
20   Q.  Okay.  I want to pull up the demonstrative
21   related to suicide and self-injury, Exhibit 21 and
22   Exhibit 28.
23       At the bottom of this demonstrative is
24   Meta's Transparency Center's prevalence statement
25   about how prevalent suicide and self-injury

13 (Pages 397 - 400)

CONFIDENTIAL

Page 401

1 violations are on Instagram.
2      Do you see that?
3  A.  Yes, I do.
4  Q.  And what does it state?
5  A.  (As read):
6      "Views of violating content that
7      contains suicide and self-injury are very
8      infrequent, as we remove much of this
9      content before people see it.  As a
10     result, many times we do not find enough
11     violating samples to precisely estimate
12     prevalence."
13  Q.  So was Meta, as of September of 2021,
14 telling the public that suicide and self-injury
15 content on Instagram is very infrequent?
16  A.  Yes.
17  Q.  And up above that is the BEEF results,
18 which is Meta's internal survey of 238,000 Instagram
19 users.
20      What does it state with respect to the
21 amount of users who were 13 through 17 and had seen
22 suicide or self-injury on Instagram?
23  A.  It says that 8.4 percent of 13 to 15 year
24 olds saw self-harm content in the last 7 days, and
25 7.2 percent of 16 to 17 year olds saw self-harm

Page 402

1 content in the last 7 days.
2  Q.  Is that another example of a large
3 discrepancy between what Meta is telling the public
4 about the frequency of suicide and self-injury
5 experiences on Instagram versus what Meta knows from
6 its internal studies?
7      MS. JONES:  Objection to the
8 characterization of the record.  Form.
9      THE WITNESS:  Yes.
10     BY MR. CARTMELL:
11  Q.  I want to ask you about Exhibits 36 and
12 30- -- well, strike that.
13     I want to ask you about Exhibit 36 that
14 I've handed you.
15     But let me ask you first, did you in your
16 testing actually determine whether or not there was
17 suicide or self-injury content available to kids on
18 Instagram?
19  A.  Yes.
20  Q.  Tell us about that, please.
21  A.  I opened search, and I started to search
22 for "I want to hurt myself."  This is a query that I
23 ran from the teen accounts over the period of over a
24 year.
25     For most of that year up to end of 2024,

Page 403

1 the -- the top result -- or one of the top results
2 that came back was an account called "I want to hurt
3 myself," for which the profile picture was of
4 cutting.  And you couldn't report the profile
5 picture that included cutting.
6      And then if you moved over to the hashtags
7 part of the search thing, there was a hashtag called
8 "I want to hurt myself."  And I tapped on that, and
9 it gave me a wall of content, including the image
10 that you see here, which I then tried to report.
11  Q.  Okay.  Let me ask you first, so this is
12 just a few examples in this exhibit of the posts
13 that were recommended to your kid account after the
14 search you just mentioned?
15     MS. JONES:  Counsel, can I just confirm if
16 this is Exhibit No. 37, which is 2043?
17     (Stenographer interrupted for clarification
18      of the record.)
19     MS. JONES:  I just want to make sure I'm
20 getting my numbers right.
21     Is that right?
22     Okay.  Thank you.
23     THE WITNESS:  Yes, this is content that was
24 recommended to that account when searching for this
25 string.

Page 404

1      BY MR. CARTMELL:
2  Q.  Of a 13 year old?
3  A.  Correct.
4  Q.  And what does this reflect?
5  A.  This is an image of Mickey Mouse having
6 murdered Minnie Mouse and then hanging himself.  So
7 it's a murder-suicide using Disney characters.
8  Q.  Why does this not violate Instagram's
9 community standards?
10     MS. JONES:  Objection.  Foundation.
11     (Stenographer interrupted for clarification
12      of the record.)
13     MS. JONES:  Form.
14     THE WITNESS:  I do not know.  I tried to
15 report it, and I was told -- and the account got the
16 feedback saying, "This doesn't violate our community
17 guidelines."
18     BY MR. CARTMELL:
19  Q.  You actually tried to report it?
20  A.  Correct.
21  Q.  And what were you told?
22  A.  That this image did not violate community
23 guidelines.
24  Q.  Okay.  What's the next image that you
25 received in your test account?  Tell us what this

14 (Pages 401 - 404)

CONFIDENTIAL

Page 405

1 is.
2    A.  It is an image of a teddy bear hanging
3 itself with the word "Suicide" on it.
4    Q.  Was this one you also tried to report, or
5 do you remember?
6    A.  I don't remember if I reported this one or
7 not.
8    Q.  Do you know why this does not violate
9 Instagram's community standards?
10       MS. JONES:  Objection.  Foundation and
11 form.
12       THE WITNESS:  I do not; right?  If -- if
13 the statement that they make on the transparency
14 report about moving content before people see it was
15 accurate, then I can't imagine why, like, this
16 content would have come up in a search result for a
17 13-year-old account.
18       BY MR. CARTMELL:
19    Q.  And did you actually see a wall of examples
20 of posts that you found to be supporting,
21 encouraging, or recommending suicide or self-harm?
22    A.  Yes, I did.
23    Q.  Okay.  These are just a few examples?
24    A.  Correct.
25    Q.  Do you know if Meta has ever warned parents

Page 406

1 or the public of the ease of the access to material
2 that recommends or encourages suicide or
3 self-injury/harm?
4       MS. JONES:  Objection to form.
5 Characterization.
6       THE WITNESS:  I don't believe Meta has
7 warned parents about how easy this content is to
8 find.
9       BY MR. CARTMELL:
10    Q.  I want to ask you, so you mentioned
11 yesterday that you have done some work with the
12 Molly Rose Foundation; is that right?
13    A.  Correct.
14    Q.  What is the Molly Rose Foundation?
15    A.  Molly Rose is a young girl who committed
16 suicide.  And her parent -- her dad and her parents
17 took it to court, and they found in court that Molly
18 had been recommended thousands of pieces of suicide
19 content and that she was on her phone and that she
20 put her phone down and took seven steps and took her
21 own life.
22    Q.  Was that in the UK?
23    A.  Correct, that was in the UK.
24    Q.  Did she sometimes go by "Molly Russell"?
25    A.  That is correct.

Page 407

1    Q.  And was she an Instagram user?
2    A.  Yes, she was.
3    Q.  Were the thousands, pieces of content
4 primarily from Instagram?
5    A.  Yes, they were.
6       MS. JONES:  Just note my objection to
7 foundation.
8       BY MR. CARTMELL:
9    Q.  Did the coroner in that case find that
10 Molly Russell's death by suicide was contributed to
11 by Instagram?
12    A.  Yes.
13       MS. JONES:  Objection -- excuse me.
14       Objection.  Foundation and
15 characterization.
16       THE WITNESS:  Yes, they did.
17       BY MR. CARTMELL:
18    Q.  Does the Molly Rose Foundation do research
19 including testing related to how accessible suicide
20 or self-injury content is on Instagram?
21    A.  Yes, they do.
22    Q.  And have you in your research and work as a
23 online child safety expert reviewed that research?
24    A.  Yes, I have.
25    Q.  And do you find that to be reasonably

Page 408

1 reliable?
2    A.  Yes, I have.
3    Q.  You've reviewed the methodologies that they
4 use to determine whether or not there is easily
5 accessible suicide and self-injury content on
6 Instagram?
7    A.  Yes, I have.
8    Q.  Okay.  I want to ask you about Exhibit 37.
9       MR. CARTMELL:  Did I -- did I screw up
10 again?
11       MS. JONES:  No, I don't think you screwed
12 anything up.  You're good.
13       BY MR. CARTMELL:
14    Q.  Exhibit 37 is a -- an article or paper
15 published by the Molly Rose Foundation and the
16 Bright line Initiative [sic].
17       Do you see that?
18    A.  Yes.
19    Q.  It's titled "Preventable yet pervasive."
20 (As read):
21       "The prevalence and characteristics
22       of harmful content, including suicide and
23       self-harm material, on Instagram, TikTok,
24       and Pinterest."
25       Do you see that?

15 (Pages 405 - 408)

CONFIDENTIAL

Page 409

1    A.  I do.
2    Q.  The date of this, if you look at the
3  bottom, is November of 2023; is that right?
4    A.  That's correct.
5    Q.  And this is a paper that you have reviewed
6  and have relied on in your work as a online child
7  safety expert?
8    A.  Yes.
9    Q.  Okay.  In fact, did you send this report
10 from the Molly Rose Foundation to Meta's oversight
11 committee or oversight board?
12   A.  Yes, I did.
13   Q.  Why did you do that?
14   A.  Because I think that this study did a good
15 job of capturing how self-harm content, as the title
16 says, is both preventable and pervasive.  And I
17 believe that in the case of Molly Russell that most
18 of the content that she got recommended that
19 contributed to her committing suicide is content
20 that would still be up today and -- and --
21 because -- because it gets recommended in some
22 circumstances.
23   Q.  What's the oversight board for Meta?
24   A.  So the oversight board is a series of
25 world-class experts of very diverse background,

Page 410

1  academics, I believe Nobel Prize winners, who help
2  Meta review complex policy decisions.
3    Q.  Does Meta actually fund their oversight
4  board?
5    A.  Yes, they do.
6    Q.  Do you know if Mark Zuckerberg is on that
7  board?
8    A.  I don't off the top of my head.
9    Q.  Okay.  At any rate, you have been retained
10 by Meta's oversight board since you went public to
11 make presentation to them; is that correct?
12   A.  That's correct.
13   MS. JONES:  Excuse me.
14   Objection to the characterization.
15   BY MR. CARTMELL:
16   Q.  All right.  I want to ask you some things
17 about this.  Let's go to dot 4, please.
18   There's a Summary.  And it states
19 (as read):
20   "In November of 2023, Molly Russell
21   would have celebrated her 21st birthday.
22   Almost five years after Molly died, the
23   senior coroner overseeing the inquest
24   into her death recorded a narrative
25   verdict that Molly died from an act of

Page 411

1    self-harm while suffering depression and
2    the negative effects of online content."
3    Is that consistent with your understanding
4  about the Molly Russell suicide?
5    A.  Yes.
6    Q.  If you will look at page dot 8, please.  It
7  states "Methodology" here.  And it states (as read):
8    "The research aims to assess the
9    availability and prevalence of harmful
10   content on three major social media
11   services, Instagram, TikTok, and
12   Pinterest."
13   And then it states in the next paragraph
14 (as read):
15   "For each platform, our objective was
16   to assess the prevalence of three main
17   content types:  Suicide-related content;
18   self-harm related content; and material
19   that contains themes of hopelessness,
20   misery, or worthlessness."
21   Do you see that?
22 A.  Yes.
23   Q.  What does that mean?
24   MS. JONES:  Objection.  Foundation.
25   THE WITNESS:  So when trying to understand

Page 412

1  what is the kind of content that could plant the
2  seed or encourage a teenager to commit suicide,
3  there are different kinds of that; right?
4    And so there's what might be more clearly,
5  like, self-harm-related content.  But also, it is
6  other content that is sort of very bleak, very
7  hopeless, and misery and worthlessness, things like,
8  you know, "The world is better off without me."
9    BY MR. CARTMELL:
10   Q.  The next paragraph states (as read):
11   "Across each of these categories,
12   relevant content was deemed reasonably
13   likely to be harmful if it promoted or
14   glorified suicide and self-harm;
15   referenced suicide methods; or if it
16   referenced suicide ideation or themes of
17   hopelessness, misery, or worthlessness in
18   a way that posed an increased risk when
19   watched cumulatively or in large volumes,
20   for example, because of recommender
21   algorithms or other high-risk design
22   choices."
23   What does that mean to you as an online
24 child safety expert?
25   MS. JONES:  Objection.  Foundation.

16 (Pages 409 - 412)

CONFIDENTIAL

Page 413

1    THE WITNESS:  It means that when you put
2  a -- a feed of -- a forced feed, right, of this kind
3  of content in a teenager's phone, that it can lead
4  to the teenager committing suicide.
5        BY MR. CARTMELL:
6    Q.  If you go to the next page, please, dot 9,
7  it states (as read):
8        "This analysis was undertaken using
9        the generated data samples and through
10       follow-up examination of content on the
11       relevant sites.  We examined this content
12       using social media accounts opened in the
13       identity of a 15-year-old girl."
14       So is this the methodology -- explaining
15  the methodology that the Molly Rose Foundation and
16  the Bright Initiative used in their research to
17  determine the amount of social media -- or, excuse
18  me, of -- of suicide and self-injury content on
19  Instagram?
20       MS. JONES:  Objection to the form and
21  foundation.
22       MR. CARTMELL:  I'll restate it.
23       BY MR. CARTMELL:
24   Q.  Does this section talk about the
25  methodology the Molly Rose Foundation used in its

Page 414

1  research?
2    A.  Yes.
3    Q.  And did they open actually a test account,
4  sort of like they did, but their's was of a
5  15-year-old girl?
6    A.  Yes.
7    Q.  Okay.  And then did they actually look at
8  what content they might get from certain searches?
9    A.  Yes.
10   Q.  Okay.  If you go to dot 16, it states
11  "Suicide and self-harm risks on Instagram."
12       Do you see that?
13   A.  Yes.
14   Q.  (As read):
15       "Following the initial media coverage
16       of Molly's death, the platform announced
17       a number of changes to how it moderates
18       suicide and self-harm material."
19       And then it states (as read):
20       "However, our research shows that
21       while some of these changes have resulted
22       in welcome targeted impacts, substantial
23       concentrations of harmful content,
24       including suicide and self-harm-related
25       material, continue to be freely

Page 415

1        accessible and discoverable."
2        Do you see that?
3    A.  Yes.
4    Q.  And is that consistent with the findings
5  you had in your tests a year later?
6        MS. JONES:  Objection.  Form and
7  foundation.
8        THE WITNESS:  Yes.
9        BY MR. CARTMELL:
10   Q.  Take a look at dot 18, please.  This is in
11  the Results section, and it states (as read):
12       "Overall, this would suggest that the
13       broad dynamics of suicide and
14       self-harm-related content have remained
15       largely unchanged over recent years; and
16       that despite high levels of public
17       scrutiny and multiple commitments from
18       Instagram to improve their response,
19       significant levels of potentially harmful
20       suicide and self-harm content remain
21       readily available and actively
22       discoverable."
23       Do you see that?
24   A.  Yes.
25   Q.  Has that actually been -- excuse me, and

Page 416

1  has that actually been your experience in your
2  research and testing of Instagram's accounts for
3  kids?
4    A.  Yes.
5    Q.  If you look at dot 19, "Prevalence of
6  harmful content on Reels."  (As read):
7        "Our research has found a
8        significantly greater prevalence of
9        harmful content on Instagram's short-form
10       video product, Reels, than on any other
11       part of this site."
12       Do you see that?
13   A.  Yes.
14   Q.  Is that your belief and experience as well?
15   A.  Yes.
16   Q.  (As read):
17       "As part of the research, we
18       undertook an analysis of 100
19       algorithmically recommended videos, each
20       of which were watched consecutively
21       through the autoplay function."
22       Do you see that?
23   A.  Yes.
24   Q.  (As read):
25       "Disturbingly, almost all of the

17 (Pages 413 - 416)

CONFIDENTIAL

Page 417

1    content we were algorithmically shown
2    (99 percent) contained material that
3    promoted or glorified suicide or
4    self-harm."
5        Do you see that?
6    A.   Yes.
7    Q.   This is dated November of 2023; is that
8    right?
9    A.   That's correct.
10   Q.   And you sent this to Meta in 2024; is that
11   right?
12   A.   That's correct.
13   Q.   Dot 21, please.  "Findings."  (As read):
14       "Our research demonstrates clear
15       evidence of systematic [sic] failures in
16       Instagram's response to harmful suicide
17       and self-harm content on its platform,
18       with the inconsistent allocation [sic] of
19       safety-by-design measures rolled out
20       following the initial media coverage of
21       Molly's death.
22       "There has also been an evident
23       ongoing failure to respond to agile and
24       constantly changing harm mechanisms.
25       These are explored in more detail below."

Page 418

1        Do you see that?
2    A.   Yes.
3    Q.   And has that been consistent with your
4    findings in your tests and research related to
5    suicide and self-injury content on Instagram?
6    A.   Yes.
7    Q.   I want to take a look at some examples of
8    what this research found.
9        If you look at dot 27, it states (as read):
10       "Hashtags including #suicidalthoughts
11       (13.6 posts), #selfharmm," with an extra
12       M, "and #selfharnn," with two Ns, "are
13       not only available but contain a
14       significant number of problematic and
15       harmful results."
16       Tell us what that means.
17       MS. JONES:  Objection.  Foundation.
18       THE WITNESS:  So what that means is that if
19   you -- if you start typing in, for example,
20   "#selfharm," and you misspell it a little bit, then
21   you end up in a -- in a feed, a scroll, of this kind
22   of suicidal ideation content.
23       And it is the case that the way that
24   Instagram search is designed, it actually helps you
25   do that, because if you start typing in "#self"

Page 419

1    thing or other, depending on what you're typing, it
2    will often offer up other tags that get you to the
3    harmful content without you needing to know the --
4    the misspelling of the tags.
5        BY MR. CARTMELL:
6    Q.   And are these posts that were found by this
7    research by the Molly Russell foundation?
8    A.   Yes.
9    Q.   Explain what these reflect.
10   A.   So the first post -- oh, man.  Sorry.  It's
11   Eeyore hanging himself on a tree with the quote
12   (as read):
13       "'You should -- you should have just
14       cheered up,' Pooh said, as Tigger wept."
15       The other post is a lot of pills, and it
16   says (as read):
17       "Oh pills, so colorful and pretty
18       pills."
19       Which, again, I believe encourages that.
20       And then the -- the post, it mimics the
21   kind of waiting that a computer gets you to do, but
22   "Waiting for death..."
23   Q.   Are those the types of posts you believe,
24   based on your expertise, can be harmful to kids?
25   A.   Yes.

Page 420

1    Q.   Go to dot 31, please.  This states above
2    the pictures (as read):
3        "Meta should urgently explore how it
4        can adopt similar approaches, in a way
5        that is sensitive to the needs of those
6        posting content, but that also
7        appropriately recognizes and responds to
8        the substantive and reasonably
9        foreseeable risks that such content may
10       become harmful or dangerous to some users
11       when consumed."
12       Do you agree with that?
13   A.   Absolutely.
14   Q.   And what are these posts that are reflected
15   below that?
16   A.   One of them is an image that shows a
17   happier place after a noose.
18   Q.   After a noose?
19   A.   A noose where you can hang yourself.
20       And then the other one says (as read):
21       "Maybe life isn't for everybody."
22   Q.   What's your experience with how these posts
23   like this can potentially be harmful to a young
24   kid, a 13 year old or a 14 year old or a 15 year
25   old?

18 (Pages 417 - 420)

CONFIDENTIAL

Page 421

1     MS. JONES:  Objection to the form and
2 foundation.
3     THE WITNESS:  I believe that posts like
4 these, which individually might not seem so
5 terrible, but thousands of them recommended to a kid
6 could have a really profound impact on them.  And
7 what I found, which is mentioned earlier in the
8 report, is that if you, for some reason, find this
9 kind of content, then Instagram's recommendation
10 algorithm is incredibly effective at recommending
11 similar content to you in a way that you cannot
12 defend yourself.  And I have examples of that from
13 my testing.
14     BY MR. CARTMELL:
15     Q.  So let me ask you this:  If a parent looked
16 at Instagram's transparency page that says "suicide
17 and self-injury content on Instagram is very
18 infrequent," based on your expertise, could a parent
19 know that it was easily accessible, as this research
20 found?
21     MS. JONES:  Objection to form and
22 foundation.
23     THE WITNESS:  No, a parent can't know.  You
24 look at that statement, and you think it's just not
25 available to your kid.

Page 422

1     BY MR. CARTMELL:
2     Q.  And based on your experience, do you
3 believe that Meta's statements publicly on its
4 Transparency Center related to suicide and
5 self-injury content are accurate?
6     MS. JONES:  Objection.  Foundation.
7     THE WITNESS:  I believe they are not at all
8 accurate.  I believe they are profoundly misleading,
9 dangerously misleading.
10     MR. CARTMELL:  How long have we been going?
11     THE VIDEOGRAPHER:  An hour 18.
12     MR. CARTMELL:  Let's take a break.
13     THE VIDEOGRAPHER:  The time is 10:26.
14 We're off the record.
15     (Recess taken from 10:26 to 10:45.)
16     THE VIDEOGRAPHER:  The time is 10:45.
17 We're back on the record.
18     BY MR. CARTMELL:
19     Q.  Mr. Bejar, we're back on the record after a
20 short break.
21     Are you ready to proceed?
22     A.  Yes, I am.
23     MR. CARTMELL:  I want to do a housekeeping
24 thing real quick here.  We had demonstratives that
25 I'd like to mark as Exhibits 40, 41, and 42.

Page 423

1 They're the demonstratives that had the comparison
2 between CSER and BEEF.
3     MS. JONES:  I noted my objection to the
4 substantive back and forth.  That's no problem.
5     (Marked for identification purposes, Bejar
6     Exhibits 40 through 42.)
7     MR. CARTMELL:  I'm just glad you admitted
8 it was substantive.
9     MS. JONES:  It was -- it was wrong.
10     But what -- I'm sorry, what number is this
11 one?  This is 40.
12     MS. HUDNALL:  That should be 40.
13     MS. JONES:  Okay.
14     MR. CARTMELL:  Okay.
15     MS. JONES:  Forty-one?
16     MS. HUDNALL:  Yep.  Forty-one.
17     MS. JONES:  Thank you.
18     Counsel, did you mark 38 and 39?
19     MR. CARTMELL:  Yeah, I did.  We're going to
20 do that right now.
21     MS. HUDNALL:  They were part of that stack
22 (indicating).
23     MS. JONES:  These (indicating)?
24     MS. HUDNALL:  Yeah.
25     MS. JONES:  Yeah.  Okay.  Thank you.  Got

Page 424

1 it.
2     (Discussion off the stenographic record.)
3     BY MR. CARTMELL:
4     Q.  Mr. Bejar, I want to talk about Exhibits 38
5 and 39.  Exhibit 39 is a clip sheet for Clip 76 that
6 we're going to play.
7     And before we do that, I'd like you to
8 explain what testing you did in Exhibit 38.
9     A.  Okay.  So I was -- I set up an adult
10 account in order to test in some instances parental
11 controls and in other instances messaging between
12 accounts and other safety features.
13     Q.  Okay.  So when you say you set up an adult
14 account, you wiped a phone clean and you set up an
15 account for somebody who was over 18?
16     A.  That is correct.  I got an iPad actually,
17 brand new, downloaded Instagram, most recent version
18 of the application, and then I created an account
19 for a 25-year-old male.
20     Q.  Okay.  You can continue.  Thank you.
21     A.  Okay.  So one of the things that I found
22 when I did the testing is that -- so one of the
23 things that I -- that I read as one of the key
24 protections, which I think is a very important
25 protection, is that adults shouldn't be able to

19 (Pages 421 - 424)

CONFIDENTIAL

Page 425

1 message minors if the minors [sic] doesn't follow
2 them back.
3        And so I created this account, and I
4 followed one of the -- my minor test accounts. So
5 every exchange I'm going to describe is going to be
6 between two test accounts.
7    Q.  Your test accounts?
8    A.  Yes.
9    Q.  Okay.
10   A.  That I created.
11   Q.  In other words, you were not texting
12 somebody that you didn't know. They were both your
13 accounts?
14   A.  Correct.
15   Q.  Okay.
16   A.  And so -- and so one of the things that I
17 tested was what happened when the minor account
18 posted a Reel, a post, or a story. And when the
19 minor account, which is what you see here, posted a
20 story, there's a little message box at the bottom.
21 And the adult account that is not followed by the
22 minor was able to write in the message box and start
23 a chat with the minor. That shouldn't be allowed
24 because the adult is not being followed by --
25 followed back by the minor.

Page 426

1        And once I realized that, I replicated that
2 in a couple of accounts, because of the test ones
3 that I have. And I also tested what happens if you
4 send a pretty aggressive message, because some of
5 the safety tools talk about how there are certain
6 things you shouldn't be able to say or if you try to
7 say them, you're going to get a warning when you try
8 to put them on.
9        And so I took this story that was posted by
10 the minor account, and in the UI provided to me by
11 Instagram on the adult account in the iPad, I wrote
12 "This is awful, and you should kill yourself" to be
13 sent to this test account of the minor and to see
14 what happened. And --
15   Q.  And this is reflecting the minor's account
16 that is your test account and the DM that you sent
17 from the adult account?
18   A.  Yes.
19   Q.  Okay.
20   A.  Through the story feature.
21   Q.  Okay.
22   A.  Because I tried to use other interfaces,
23 and there's no message button. And so there weren't
24 ways of opening a conversation.
25   Q.  Okay. So what happened after you sent

Page 427

1 this? Was there any sort of message from Meta
2 saying to you or the kid's account that this should
3 not be looked at or viewed or is not appropriate or
4 anything like that?
5        MS. JONES: Objection to the form.
6 Foundation.
7        THE WITNESS: No.
8        BY MR. CARTMELL:
9    Q.  What happened then? Did you try to report
10 it?
11   A.  Yes.
12   Q.  From your teen account?
13   A.  Correct.
14   Q.  What happened?
15   A.  I believe the content was not acted on.
16   Q.  Meaning what?
17   A.  Meaning you get the message -- message back
18 saying "This does not violate our community
19 guidelines."
20   Q.  So this type of message that you were
21 testing, didn't -- according to your experience in
22 the test -- didn't violate Meta's Instagram policy
23 guidelines?
24       MS. JONES: Objection. Foundation.
25       THE WITNESS: That's correct.

Page 428

1        BY MR. CARTMELL:
2    Q.  So if that's the case, would it show up in
3 Meta's prevalence metric that it presents to the
4 public on its transparency website?
5        MS. JONES: Same objection.
6        THE WITNESS: It would not.
7        BY MR. CARTMELL:
8    Q.  This interaction where a teen is told to
9 kill herself isn't bullying or SSI, what does that
10 tell you about whether or not the prevalent --
11 prevalence CSER reporting is misleading about the
12 risks on Instagram?
13       MS. JONES: Objection to the form.
14       THE WITNESS: It says that that report is
15 misleading because this is something that I believe
16 clearly should be included in transparency that the
17 company has, that Meta has.
18       BY MR. CARTMELL:
19   Q.  And to -- in your experience, both
20 eight years at Meta and then in your experience as a
21 online child safety expert since then -- since then
22 in researching Instagram's accounts -- Instagram
23 accounts, have you ever seen any type of warning to
24 the public or to parents about that?
25   A.  I have not.

20 (Pages 425 - 428)

CONFIDENTIAL

Page 429

1    Q.  Is that type of warning something that is
2  technically feasible for a company like Meta to do?
3        MS. JONES:  Objection.  Foundation.
4        THE WITNESS:  Yes, it's technically easy
5  for a company to do.
6        BY MR. CARTMELL:
7    Q.  In other words, they have the engineering
8  and technical know-how to give a warning about these
9  bad experiences kids are having on Instagram; is
10  that fair?
11    A.  Yes.
12    Q.  All right.  Let's switch -- oh, I'm sorry.
13  We're not switching yet.  I apologize.
14        You actually have a clip of what you did to
15  report this.  Let's take a look at that.
16        (Whereupon, video played.)
17        BY MR. CARTMELL:
18    Q.  What does that show us?
19    A.  Yeah.  So if you go back to the first
20  screen, what this is showing is I also tested what
21  happened between test accounts when you met certain
22  kinds of comments.
23        So the first comment is written in Spanish.
24  "You are a whore.  Kill yourself now."  And I was
25  testing to see if I got any warning when making that

Page 430

1  comment.
2        Then the second one is a similar kind of
3  comment, which is, oh, just "This is so terrible.
4  You should kill yourself."
5        And then what you see above is (as read):
6        "Your support request from March 7th
7        was just updated."
8        Which is when I made the request saying
9  this -- reporting this as what I thought was the
10  appropriate category at the time.  I believe I have
11  a video of the recording of the content.
12        And you get told, "No, this doesn't violate
13  community guidelines, so we're not going to act on
14  it."
15    Q.  Okay.  And you had experience from your
16  daughter, I believe, reporting multiple bad
17  experiences related to unwanted sexual advances and
18  harassment and not receiving reports; is that
19  correct?
20    A.  That's correct.  We would talk about that
21  and --
22    Q.  Let me --
23    A.  Sure.
24    Q.  You had experience like this with your own
25  daughter; is that correct?

Page 431

1    A.  That's correct.
2    Q.  Tell us about that.
3    A.  My -- whenever we spoke about her having
4  these kinds of experiences, I would always ask her,
5  "Did you report the content?"
6        And she always said, "Yes, I did," to this
7  date.
8        And I asked her, "Have you ever received
9  help from Instagram when reporting harassment or
10  sexual advances?" which she -- again, there's no
11  category for that.
12        And she said -- when asked, "Has Instagram
13  ever helped you with the issues you were
14  experiencing?"  She said, "Not once."
15    Q.  Has that been information that you have
16  included in developing your opinions related to the
17  safety of Instagram?
18    A.  Yes.
19    Q.  Okay.  I think there's a little bit more to
20  this clip.
21        (Whereupon, video played.)
22        BY MR. CARTMELL:
23    Q.  Okay.  Tell us what we just watched, what
24  that reflected.
25    A.  So I wanted to go through the different

Page 432

1  safety features and see what help was offered and
2  what resources that were available.
3    Q.  And what did you find?
4    A.  Again, this page that offered contacting a
5  help line, some suggestions from professionals
6  outside of Meta, and reaching out to a trusted
7  adult.
8    Q.  Okay.  I want to go to the BEEF results
9  that we looked at previously, page 21.  And we'll
10  put it up on the screen here.
11        This is Exhibit 21, and the Results
12  section -- if we can enlarge that.
13        This has the -- I believe 22 negative
14  experiences on Instagram that were surveyed, 238,000
15  users; correct?
16    A.  Correct.
17    Q.  I don't see that addiction or problematic
18  use was surveyed by Meta during this survey; is that
19  correct?
20    A.  That's correct.
21    Q.  Why is that?
22    A.  It was my understanding in conversations
23  that I had earlier that this is just something that
24  if you -- addiction was a topic that would bring a
25  lot of attention from executives if you kind of went

21 (Pages 429 - 432)

CONFIDENTIAL

Page 433

1 there.
2        And so I decided to -- for the sake of
3 everything else in the survey -- to not approach
4 that topic.
5        Q.  But is it fair to say that addiction or
6 problematic use was something that you and the
7 company knew about and that was happening to kids at
8 that time?
9        MS. JONES:  Objection.  Foundation.
10       THE WITNESS:  That's correct.
11       BY MR. CARTMELL:
12       Q.  And that was something that you as the
13 child safety consultant to the well-being team
14 wanted actually to be monitored and surveyed in the
15 BEEF survey?
16       A.  Yes.
17       Q.  And you think it should be or should have
18 been?
19       A.  Yes.  And I discussed product interventions
20 that would help gather that kind of data.
21       Q.  At this time, though, in September of 2021,
22 was Meta monitoring kid's addiction or problematic
23 use on Instagram that you know of?
24       A.  Not as far as I know.
25       MS. JONES:  Excuse me.

Page 434

1        Note my objection.  Foundation.
2        BY MR. CARTMELL:
3        Q.  And at this time, was Meta doing any
4 effective work to prevent or substantially reduce
5 addiction or problematic use as of that time?
6        A.  Not as far as I know.
7        Q.  You mentioned that you talked about
8 effective prevention safety tools.
9        What types of safety tools or features
10 could have been implemented by Meta to prevent
11 addiction or problematic use?
12       MS. JONES:  Objection.  Foundation.
13       THE WITNESS:  I think two things would make
14 a -- a really big difference.  One of them is a way
15 for a teenager to actually set a limit for
16 themselves.  And when I say "limit," I mean
17 something that after you've spent some time that
18 you've named, you actually get kicked out of the app
19 and you cannot come back in until the next day.
20       Though, what's currently in place called
21 "Limit" is more reminders saying "You've spent an
22 hour on the app," and you can just dismiss it.
23       BY MR. CARTMELL:
24       Q.  Let me ask you about that.
25       It's just a reminder?  In other words, it

Page 435

1 doesn't kick them out of the app; is that fair?
2        A.  That's correct.
3        Q.  In your experience, is that nearly as
4 effective with kids?
5        A.  No, it isn't.
6        Q.  Okay.  Go ahead.
7        A.  And then the other part of the conversion
8 [sic] that I discussed with the well-being team
9 during my tenure is that you could ask a teenager
10 how they're doing after they've spent, let's say,
11 45 minutes or an hour on the app and just ask really
12 the right questions, like, "Are you -- are you
13 feeling better?  Are you feeling worse?"
14       I mean, you -- this is the company that's
15 incredible at creating features that teens want to
16 engage with and use.
17       So if you apply that playbook to something
18 where a teenager has told you how they're doing, and
19 they're like, "Oh, I'm not feeling so great," then
20 just close the app right now and off you go, it
21 could make a huge difference.  And if you had a team
22 who was focused on that, that was measured by the
23 effectiveness of that intervention, of getting teens
24 to effectively walk away from the app, then it could
25 make a huge difference in terms of usage, I believe,

Page 436

1 for -- for good.
2        Q.  Could you ever convince the leadership at
3 Meta to do something like that for kids?
4        A.  I could not.
5        Q.  And that type of intervention or a
6 playbook, as you described, safety tools and safe --
7 let me restate it.
8        Those types of safety tools and features
9 that you say Meta could have implemented, when was
10 that available and feasible for a company like Meta
11 to do that?
12       MS. JONES:  Objection.  Foundation and
13 form.
14       THE WITNESS:  2010.
15       BY MR. CARTMELL:
16       Q.  At this time, in 2021, we're talking about
17 when the BEEF results come back and addiction is not
18 being monitored, has Meta warned the public,
19 including kids or their parents, that there is an
20 increased risk of addiction or problematic use from
21 the use of Instagram?
22       A.  It had not.
23       Q.  Okay.  You can put BEEF aside.  I want to
24 switch gears, and I want to ask you now, after you
25 got the BEEF results and your team did, the

22 (Pages 433 - 436)

CONFIDENTIAL

Page 437

1 well-being team, had the results, what did you set
2 out to do?
3    A.  I realized that in order to -- well, what I
4 set out to do is I set out to brief the executive
5 team about the contents of BEEF, which means that
6 you have to go through a process of talking to
7 everybody between you -- most people between you and
8 the executive team, such that by the time you arrive
9 to Mark Zuckerberg or Chris Cox or Sheryl Sandberg,
10 people that work for them are aware of the issues,
11 and they are comfortable with the way you're
12 representing them.
13    Q.  Did you actually gather a consensus from
14 the well-being team that, in fact, this was a very
15 significant and serious problem as far as kids'
16 safety on Instagram?
17    A.  Yes, I did.
18    Q.  I'm going to hand you Exhibit 43.
19        (Marked for identification purposes, Bejar
20        Exhibit 43.)
21        BY MR. CARTMELL:
22    Q.  Exhibit 43 is a document that was produced
23 in this litigation from Meta, and actually, it came
24 from your files at Meta.
25        And if you look at the last page, I believe

Page 438

1 you are the author of this document; is that
2 correct?
3    A.  That's correct.
4    Q.  It states on the last page at the very
5 bottom that this document was created
6 September 14th, 2021; is that right?
7    A.  That's correct.
8    Q.  Now, at that time the BEEF results, the
9 unadjusted results, had come out; is that right?
10    A.  That's correct.
11    Q.  But the final results for BEEF were not yet
12 out; is that right?
13    A.  That's correct.
14    Q.  What was the purpose -- well, let's go to
15 the first page.
16        It's titled "Letter draft," and it is to
17 Adam Mosseri; is that correct?
18    A.  That's correct.
19    Q.  Tell us what this draft letter is.
20    A.  So this is my escalation to the head of
21 Instagram, letting them know -- letting Adam Mosseri
22 know that there are, like, significant gaps in how
23 the company understands and addresses harm.
24        And so I created this draft letter that
25 covered many of the points.  And I still didn't have

Page 439

1 some of the data, so it's not in here.
2        And then having done this for 30 years, you
3 create a draft, and then you talk to the people that
4 are working on these issues besides yourself, and
5 you ask them, "Is this accurate?"  And that's what
6 this document is, is this process of vetting this
7 letter that was going to go to Adam.
8    Q.  And we've talked about Adam, but
9 Adam Mosseri was the lead executive at Instagram;
10 correct?
11    A.  That's correct.
12    Q.  Okay.  And did you work on this draft
13 letter with other members of the well-being team?
14    A.  Yes.
15    Q.  If you look at -- strike that.
16        Was the plan to send this same letter to
17 all of the Meta executives, or do you remember?
18    A.  Yeah.  I remember that what -- what I
19 realized was needed at this point was to send this
20 to Adam and then send it to Mark; right?  They're
21 talking about that escalation process.  That's very
22 important to follow so that nobody is surprised.
23        And then you check in with everybody and
24 you ask them, "Is this accurate?  Is there anything
25 I should change?"

Page 440

1        And then you go to the next level up.
2    Q.  Did you, as of this time in September of
3 2021, have the support of the well-being team leads
4 to send this letter to the very top executives?
5    A.  Yes, I did.
6    Q.  Okay.  And were the other members of the
7 well-being team, including the leads of the
8 Instagram well-being team, very concerned about the
9 safety of kids on Instagram?
10        MS. JONES:  Objection.  Foundation.
11        THE WITNESS:  Yes.
12        BY MR. CARTMELL:
13    Q.  Why -- strike that.
14        Were you going to be the signatory of this
15 draft letter?
16    A.  Yes.
17    Q.  Why was it that the well-being team chose
18 you to be the signatory of the letter to
19 Adam Mosseri and the other executives?
20    A.  Because I had an extensive working
21 relationship with them, had their trust.  And I was
22 very comfortable approaching them with these issues
23 and the knowledge that they were in the best
24 interests of the company and the best interests of
25 the people who used Instagram.

23 (Pages 437 - 440)

CONFIDENTIAL

Page 441

1    Q.  This draft letter that you started, if you
2  turn to page 2, under "Conversation History,"
3  there's a list of names below that.  And I counted
4  that.  I think it's 19 individuals and you.
5        Who are those people?  You don't have to
6  tell us every one, but I'm just saying in general,
7  who are these people?
8    A.  Yeah.  So it's -- at the -- at the bottom,
9  there's engineers and product managers within the
10  Instagram well-being team.
11       Then there's leads, the leads of the -- the
12  well-being team.
13       Then there are people from leadership --
14  leadership of the central integrity team; and, of
15  course, user research, both Kyle and his manager.
16       So this is, again, people that were in
17  leadership roles for product and engineering for
18  well-being and then also in leadership roles for
19  central integrity.
20    Q.  And all of these people, was it your
21  understanding, were in support of you that there
22  were significant harms occurring to kids on
23  Instagram?
24       MS. JONES:  Objection.  Foundation.
25       THE WITNESS:  That is correct.  Those

Page 442

1  people reviewed this, and I also had conversations
2  with them about this.
3       BY MR. CARTMELL:
4    Q.  Did you make sure that the information you
5  provided in your draft letter, which became a final
6  letter to the executives, was accurate and correct?
7    A.  Yes, to the best of my ability.  I asked
8  everybody here if there were any inaccuracies or
9  anything I should change to please let me know, and
10  I worked through any feedback that I was given.
11    Q.  If you go to the top of page 4, in fact, is
12  there a statement by you that reads (as read):
13       "Thank you for your -- for the
14       feedback.  I think what I'm trying to
15       communicate is that it would be good to
16       change how we approach our measurement,
17       as well as different solutions.  I did
18       make the choice of not making this a
19       survey of solutions.  In my experience,
20       when I used to work with the M-team,
21       there is value to when you let them know
22       that something needs their support.  My
23       goal in this is to help get resources and
24       funding into these areas and a mindset
25       that gets us faster to other kinds of

Page 443

1       features that will help create a safer
2       community, as well as the kind of
3       measurement that helps us better measure
4       our work."
5       Is that what you said?
6    A.  Yes.
7    Q.  And what did you mean by that?
8    A.  It means that I understood that if the
9  company set a goal to reduce unwanted advances, just
10  around that number, from the top, that it would
11  drive a lot of different features and ideas and
12  innovation that would effectively reduce that harm.
13       And then in order to do that work, M-team
14  had to drive that change.  M-team -- the direction
15  had to come from Mark Zuckerberg, Sheryl Sandberg
16  and Chris Cox to say, "We want the number of
17  unwanted advances as reported by people on Instagram
18  to be under 1 percent," and immediately mountains
19  would start moving.  And innovation would happen far
20  beyond what I could envision with the suggestions
21  that I had.
22    Q.  The M-team was the management team,
23  including Mr. Zuckerberg and the other highest
24  executives?
25    A.  That's correct.

Page 444

1    Q.  Okay.  And that was the purpose of this
2  letter, was to escalate it and convey that to the
3  M-team essentially?
4    A.  Yes.  To convey urgency and to request for
5  support.
6    Q.  We're now in September of 2021, and you
7  still have not been able to obtain the support and
8  funding and resources needed to actually do the --
9  the work to help protect kids on Instagram?
10    A.  That's correct.
11    Q.  A few paragraphs down at 9:42 p.m. --
12  actually, I think it's four paragraphs down, I want
13  to ask you about that.
14       ███████████████ ; is that right?
15    A.  I'm not sure I want to venture saying her
16  last name.
17    Q.  Okay.  ████ has an entry here that says
18  (as read):
19       "I think this specific example, but
20       also some of the others across the note,
21       point to a -- bad experiences with
22       interactions on Instagram-interactions in
23       comments and messages."
24       We just looked at interactions between
25  adults and little kids who were dancing and things

24 (Pages 441 - 444)

CONFIDENTIAL

Page 445

1  in messages and comments; correct?
2      MS. JONES:  Objection to the form.
3      THE WITNESS:  Correct.
4      BY MR. CARTMELL:
5  Q.  ▇▇ says (as read):
6      "We know that this is an area of
7      major concern for us where even
8      policy-violating experiences are not,
9      quote, taken care of, quote."
10     What does that mean to you?
11  A.  That it was known by the Instagram
12  well-being leads that in comments and messages,
13  there were instances of policy-violating harm that
14  were not being addressed.
15  Q.  Did Meta's leadership ever warn the public
16  about that?
17  A.  They did not.
18  Q.  Miki Rothschild gives you feedback at the
19  dot 5 at the bottom; is that correct?
20  A.  That's correct.
21  Q.  Who is Miki Rothschild at this time?
22  A.  At this time he was the head of product for
23  well-being for Instagram.
24  Q.  So he's actually the leader of the
25  well-being team?

Page 446

1  A.  Miki Rothschild and ▇▇▇▇ are the
2  leaders of the well-being team.
3  Q.  He says (as read):
4      "Perhaps you mean to say that we
5      don't have operational metrics for them,
6      and the strategy being pursued (reduce)
7      is incomplete and not the right one?"
8      Do you see that?
9  A.  Yes.
10  Q.  He's giving you feedback saying that the
11  strategy as it exists right now is not appropriate;
12  is that fair?
13  A.  Yes.
14  Q.  All right.  Let's look at the draft letter.
15  You say, going to the first page (as read):
16      "Dear Adam, it's been almost two
17      years since I started supporting the
18      well-being team at Instagram.  During
19      that time and through my conversations
20      with people, I have found what, in my
21      experience, is the most important thing
22      for the company to be working on."
23      Do you see that?
24  A.  I do.
25  Q.  Are you trying to express the urgency to

Page 447

1  this problem?
2  A.  Yes, I am.
3  Q.  (As read):
4      "I know that you and the rest of the
5      leadership team deeply care about the
6      people we serve and the communities we
7      are trying to nurture, yet there are many
8      challenges.  I would like to bring to
9      your attention that today we don't
10     understand or have solutions that improve
11     the community for most of the bad
12     experiences people have on Instagram."
13     Do you see that?
14  A.  Yes.
15  Q.  Then you say (as read):
16      "I believe that this gap is
17     responsible for the cycles of finding new
18     classes of harmful content through the
19     outside and some of the concerns people
20     have about our services."
21     What are you referring to?
22  A.  I'm referring to that -- up to that point
23  and afterwards, the way the harms come to light is
24  like a press article or some major external event,
25  and that people have been voicing concerns about

Page 448

1  Instagram for some time now that could be addressed
2  if they were a priority for Instagram leadership and
3  for Meta.
4  Q.  You then say (as read):
5      "Fifty-one percent of Instagram users
6      say, 'yes,' to having experienced one or
7      more of the TRIPS questions."
8      The TRIPS questions are another survey; is
9  that right?
10  A.  That's correct.
11  Q.  (As read):
12      "One percent of those report, and
13      2 percent of the reports have the content
14      taken down.  Of 10,000 people who have
15      had a bad experience on Instagram, 100
16      report, and 2 get the content taken
17      down."
18      Do you see that?
19  A.  Yes.
20  Q.  We discussed that yesterday, that, in fact,
21  you had a demonstration that showed that 9,998 of
22  the 10,000 bad experiences were not acted on by
23  Instagram; is that correct?
24      MS. JONES:  Objection.  Characterization.
25  Foundation.

25 (Pages 445 - 448)

CONFIDENTIAL

Page 449

1    THE WITNESS:  That's correct.
2    BY MR. CARTMELL:
3    Q.  If you go down several -- three paragraphs
4 or four paragraphs, it says (as read):
5        "Today most of the areas we are
6        investing in make bad experiences less
7        visible:  Hide/delete/downrank/
8        block/personalize/unfollow."
9        What do you mean by that?
10    A.  I mean that in Instagram, the application,
11 the tools that are made available at the time are
12 kind of magic ones that make the bad thing disappear
13 from you.  But, like, the person who posted it, as
14 far as they know, the content is still up.
15        So it basically does not help the community
16 get safer by letting people know that they've
17 participated in harmful interactions.
18    Q.  And then at the bottom you actually talk
19 about getting funding to support work; is that
20 correct?
21        If you go down, the last paragraph, it says
22 (as read):
23        "I believe that it is important to
24        get the following efforts well-funded and
25        prioritized."

Page 450

1        Do you see that?
2    A.  Correct.
3    Q.  And then you list, for example, the first
4 bullet (as read):
5        "What is the content that is causing
6        bad experiences for our users?  How
7        intense is the experience?"
8        We've talked a lot about that; is that
9 correct?
10    A.  Yes.
11    Q.  Is this the safety framework that you
12 discussed that you were trying to get Meta
13 leadership to put in place to help protect kids?
14    A.  Yes, it is.
15    Q.  You then -- when you wrap up, you say
16 (as read):
17        "If you would like, I can give more
18        details or specifics on this.  I am
19        appealing to you because I believe --
20        because I believe that working this way
21        will require a culture shift."
22        What did you mean by that?
23    A.  I meant that after two years of trying to
24 work with the well-being team on implementing
25 features that help us understand the harm that

Page 451

1 people were experiencing and develop the means of
2 preventing that harm, I was not able to do that
3 because it was near impossible to get work that
4 didn't have to do with prevalence increased.  And it
5 was my understanding at this point that that
6 direction to focus on prevalence as harm came all
7 the way from the top.
8        And the only way to create a culture that
9 substantively reduced the harm that teens were
10 experiencing on Instagram was if Adam, with the
11 support of Mark Zuckerberg, took a stand and said,
12 "This is not an environment where we will allow
13 unwanted sexual advances, body-image content,
14 suicide content."  All of these problems are very
15 workable if they are a priority.
16    Q.  Who was the person at Meta -- which by this
17 time was over 2 billion users, wasn't it?
18    A.  Correct.
19    Q.  And was making billions of dollars;
20 correct?
21    A.  Correct.
22    Q.  Who was the person at the company that
23 could and did influence the culture?
24    MS. JONES:  Objection to the form.
25    THE WITNESS:  Mark Zuckerberg.

Page 452

1    BY MR. CARTMELL:
2    Q.  I'm going to hand you Exhibit 54.
3    MS. HUDNALL:  Forty-four.
4    MR. CARTMELL:  Oh, strike that.  I'm going
5 to hand you Exhibit 44.
6    (Marked for identification purposes, Bejar
7    Exhibit 44.)
8    BY MR. CARTMELL:
9    Q.  Mr. Bejar, the draft letter that we just
10 reviewed that you worked on with 19 other members of
11 the well-being team, did that become the final
12 letter that you ended up sending to Mr. Mosseri and
13 other executives?
14    A.  I believe so.  I did other versions of it
15 as I went up.
16    Q.  Okay.  Exhibit 44 is an e-mail string from
17 your files at Meta that was produced in this
18 litigation.
19        Do you understand that?
20    A.  Yes.
21    Q.  And I want to ask you a few questions about
22 this.
23        This is dated September 20th, 2021, at the
24 bottom e-mail you send to Adam Mosseri; is that
25 correct?

26 (Pages 449 - 452)

CONFIDENTIAL

Page 453

1    A.  That's correct.
2    Q.  And you say (as read):
3         "Hi Adam, it's been almost two years
4    since I started supporting the well-being
5    team at Instagram.  During that time and
6    through my conversations with people, I
7    have found what, in my experience, is the
8    most important thing for Instagram to be
9    working on.  I think it is something that
10   needs your attention and leadership.
11   I've written it up here."
12        And then it looks like there is a link; is
13   that correct?
14   A.  That's correct.
15   Q.  And in that link is the letter that we
16   looked at in draft form but was sent to Adam in
17   final form?
18   A.  Correct.
19   Q.  You say in the second paragraph here
20   (as read):
21        "My goal in sharing this is to
22   support the well-being team, which is
23   such a wonderful team, with an approach
24   to measurement and a charter of visible
25   products that help maintain a self --

Page 454

1    safe and supportive community."
2         What did you mean "a charter of visible
3    products"?
4    A.  I said -- I -- I meant that in order to
5    help make a community safer, it's really important
6    for there to be many safety features that are
7    visible to the community that foster certain kinds
8    of behavior, like respectful comments, the kinds of
9    messages that you should send -- whether you should,
10   for example, be able to send an unwanted sexual
11   advance or a threat over DMs.
12   Q.  And as of this time, you had, I take it,
13   done an assessment of the safety features on
14   Instagram?
15   A.  Yes, I had.
16   Q.  Had you seen that the safety features on
17   Instagram -- strike that.
18        What was your opinion about the
19   effectiveness of the safety features and tools on
20   Instagram at that time?
21   A.  That they were not effective because they
22   were opt in.  They required, in some instances, a
23   lot of work by the users.
24        And then the end result was hiding things
25   in a way that doesn't make the community safer.

Page 455

1    Q.  Okay.  Read the last sentence, if you
2    would, please.
3    A.  (As read):
4         "My goal in sharing this is to
5    support the well-being team, which is
6    such a wonderful team, with an approach
7    of measurement and a charter of visible
8    products that help maintain a safe and
9    supportive community.  I would ask, based
10   on my time and experience I have with
11   Facebook and Instagram, if I could please
12   have some time with you to discuss."
13        Sorry.  I added the "please" there.
14   (As read):
15        "If I could have some time with you
16   to discuss."
17   Q.  Why did you reference your time and
18   experience that you had at Facebook and Instagram?
19   A.  This was my way of saying, you know, of
20   those six years that I spent protecting and taking
21   care through the teams that I managed, everybody who
22   used Instagram and Facebook and worked during that
23   time, I beg of you, please spend some time with me
24   because I think this is the most important thing
25   that the company needs to be working on.

Page 456

1    Q.  It looks like you waited three days, did
2    not hear back, and you e-mailed him again; is that
3    right?
4    A.  Correct.
5    Q.  And then what was Mr. Mosseri's response to
6    you when you were asking him on multiple occasions
7    if he could meet with you?
8    A.  That he was pretty under water right now
9    with a few big things, but he would try and read
10   what I sent him.
11   Q.  Okay.  Following this e-mail in September
12   to Mr. Mosseri and sending him the draft letter, did
13   you subsequently send that same draft letter to
14   Mr. Cox?
15   A.  I believe I did, yes.
16   Q.  And did you actually have a conversation
17   with Mr. Cox about your concerns with the safety of
18   kids on Instagram?
19   A.  Correct.  Unlike Adam Mosseri, when I
20   reached out to Chris Cox, he was like, "Let's talk
21   tomorrow morning."
22        And so the next day I had a phone call with
23   him.
24   Q.  Tell us about that phone call.
25   A.  So the way that I had been approaching

27 (Pages 453 - 456)

CONFIDENTIAL

Page 457

1  conversations around the gap between prevalence and
2  the numbers that we found is I would ask people, "Do
3  you know what the prevalence of this particular
4  issue is?"  And they would quote the number
5  reasonably precisely.
6        And then I would ask, "Do you know what
7  the -- what the -- when we asked users if they've
8  experienced that issue, what percentage of them say,
9  'yes,' in the last seven days?"  And most people I
10  spoke to working on these issues did not know what
11  people would say, "yes," to and then were very
12  surprised to hear, "Oh, like 20 percent or
13  30 percent of people said, 'yes,' in the last
14  seven days."
15        And then I would ask, "Do you understand
16  what that gap is?"  Because this is at the heart of
17  everything we're talking about today.
18        Unlike anybody else with whom I had the
19  conversation, when I asked Chris Cox, "Do you know
20  what percentage of a particular harm people are
21  experiencing?" Chris immediately off the top of his
22  head quoted something that was within a couple of
23  percentage points of what BEEF had found, which is
24  also within the realm of what TRIPS was showing
25  which is also within the realm of what the

Page 458

1  Negative Experience Survey was showing.
2        And I -- I found that pretty staggering
3  because, I mean, I -- I believe it is his
4  responsibility and Mark's responsibility to provide
5  a safe environment, in particular, to kids.  And if
6  I was aware of these numbers, like every day I
7  showed up to work, my first meeting would be, "How
8  are we doing on these numbers?  Do we understand
9  what's driving them?  What features do we have going
10  on?  And how can I support the work that you're
11  doing to reduce those numbers?"
12        I mean, that's what it means to be a
13  priority, is you get direct attention of the most
14  senior people.  You get resources.  You get -- you
15  have the wind on your back, the way Reels did that
16  when I was there.
17        And so to realize that the head of product
18  for Meta was aware of these numbers and was like,
19  "Yeah, so -- so what -- what" -- I mean, yeah.
20  Yeah.
21        And I was like, "So what do we do about
22  it?"
23        And then I described to him some of the
24  things that I talk about on the list, which is sort
25  of understanding, sort of, visible products, things

Page 459

1  that need to change.  And he was like, "Yeah, I'll
2  make sure that I tell Guy about it," Guy who was the
3  head of central integrity, and that was the end of
4  that call.
5      Q.  Were you surprised by the fact that Mr. Cox
6  actually knew about those numbers in BEEF or the
7  results from 238,000 Instagram users reflecting a
8  high rate of bad experiences?
9      A.  Yes, I was very surprised.  My working
10  assumption throughout everything that we've talked
11  about on my time was that the reason that Instagram
12  was not working on effective features to reduce harm
13  and was not studying the harm as it was imposing on
14  the product was because there was a disconnect
15  between the people on the ground and the executive
16  team.
17        And so then I took all the care that I had,
18  all of -- in 30 years working as a senior person on
19  safety, security, these issues, to craft the data
20  argument that was very exceptionally well crafted,
21  very thorough, big enough so that it would be an
22  accurate representation of what was going on at
23  Instagram.
24        And they believed that the moment that the
25  executive team became aware of these numbers, they

Page 460

1  would engage with them in a similar way to each time
2  I did something like this in my first stint, which
3  is like Chris does, "Let's talk tomorrow.  Let's go
4  through the numbers.  Help me understand.  Let's do
5  work that makes this better."
6      Q.  Now, Meta did have some, what they called,
7  safety tools and features on Instagram as of
8  September of 2021; is that right?
9      A.  That's correct.
10      Q.  You assessed those; correct?
11      A.  Correct.
12      Q.  And what was your opinion about whether
13  they were actually effective?
14      A.  They were not effective at reducing the
15  harm that people were experiencing on the platform.
16      Q.  After talking to Mr. -- strike that.
17        You provided the BEEF initial results to
18  Mr. Mosseri and Mr. Cox; is that correct?
19      A.  That's correct.  As soon as I had them,
20  like when Kyle said, "This is okay for you to send,"
21  again, everybody saw that these were going up, I --
22  where -- whenever I was working on these issues, my
23  responsibility was, the moment that you're aware of
24  a material or critical issue for the company --
25  ///

28 (Pages 457 - 460)

CONFIDENTIAL

Page 461

1    (Stenographer interrupted for clarification
2    of the record.)
3    THE WITNESS:  When you're aware of a
4 material or critical issue for the company, you have
5 to bring that to the attention of the executives
6 with the data that you have at that moment in time.
7    BY MR. CARTMELL:
8    Q.  Okay.  And there is -- is there what's
9 called adjusted and unadjusted data from the BEEF
10 survey?
11   A.  That is correct.
12   Q.  Explain what that means.
13   MS. JONES:  Objection.  Foundation.
14   THE WITNESS:  So Kyle, the researcher who
15 worked on BEEF, realized that there was an
16 adjustment he needed to do on calculating the
17 numbers for age based on denominators.  I can
18 explain in detail if needed.
19   But at some point Kyle reached out to me
20 and said, "Here are the adjusted numbers."  And
21 those were the numbers that I used from that point
22 on.
23   BY MR. CARTMELL:
24   Q.  Okay.  But when the unadjusted numbers --
25 meaning the non, not final numbers -- of data from

Page 462

1 BEEF came out, did you go ahead and send those to
2 the executives?
3    A.  Yes.
4    Q.  And then did you subsequently send the
5 adjusted numbers when they came?
6    A.  Yes.
7    Q.  Were the unadjusted and adjusted numbers or
8 data from the BEEF survey of almost 238,000
9 Instagram users equally alarming to you?
10   A.  Yes.
11   Q.  And so ultimately did you send this draft
12 letter that you had worked on with 19 others from
13 the well-being team to Mr. Zuckerberg?
14   A.  A version of it, yes, I did.
15   Q.  Did you change some things in the letter?
16   A.  Yes, I did.
17   Q.  Did you add some things to the e-mail you
18 sent to him?
19   A.  Yes, I did.
20   Q.  And with respect to what you communicated
21 to Mr. Zuckerberg, was that communication by e-mail?
22   A.  Correct.
23   Q.  Okay.  I'm going to hand you what's been
24 marked as Exhibit 45.
25 ///

Page 463

1    (Marked for identification purposes, Bejar
2    Exhibit 45.)
3    BY MR. CARTMELL:
4    Q.  Mr. Bejar, I've handed you Exhibit 45,
5 which is an e-mail string including an e-mail to --
6 from you to Mark Zuckerberg on October 5th, 2021.
7    Do you see that?
8    A.  Yes.
9    Q.  And this, I will represent to you, came
10 from the files at Meta in this lawsuit.
11   Do you understand that?
12   A.  Yes.
13   Q.  Now, I want to sort of set the scene or put
14 into context when you set this -- sent this e-mail
15 to Mr. Zuckerberg.
16   This is October 5th of 2021.  So this is
17 literally two years after you arrived as Meta's
18 safety consultant to the well-being team; correct?
19   A.  Correct.
20   Q.  And you were hired to actually look into
21 the safety of Instagram with the well-being team and
22 hired to give recommendations, advice, about how to
23 make Instagram a safe place for users, including
24 kids; is that right?
25   A.  That's correct.

Page 464

1    Q.  During that two years you were trying to
2 convince well-being's leadership to provide
3 appropriate resources, funding, and support to make
4 Instagram a safe place; is that right?
5    A.  I was trying to convince Instagram
6 leadership to provide the well-being team with
7 resources to do the work.
8    Q.  And in these two years leading up to the
9 e-mail that you sent to Mr. Zuckerberg on
10 October 5th, had you been able to achieve the
11 appropriate amount of funding and support and
12 resources?
13   A.  I had not.
14   Q.  At this point are you sending an e-mail to
15 the number one executive at Meta?
16   A.  Yes.
17   Q.  Had you had a working relationship with
18 Mr. Zuckerberg prior to this time?
19   A.  Yes.
20   Q.  During your first stint, six years from
21 2009 to 2015, did you work closely with
22 Mr. Zuckerberg?
23   A.  Yes.
24   Q.  And during that period of time, did you
25 have a good working relationship?

29 (Pages 461 - 464)

Page 465

1    A.  Yes, we did.
2    Q.  Did he rely on you for very critical safety
3  issues and helping to resolve those?
4    A.  Yes.
5    Q.  Were you nervous about sending this e-mail
6  to Mr. Zuckerberg on October 5th, 2021, and telling
7  him that there was a gap in his understanding and
8  the company's understanding of the harms that were
9  going on on Instagram?
10   A.  Yes, I was nervous.
11   Q.  Why is that?
12   A.  I was really hoping that the company would
13  really embrace the diminish- -- sort of addressing
14  these harms, and I felt that the harms were really
15  critical.  And, I mean, it's kind of a big deal to
16  send an e-mail like this.  And even though I had
17  done so much work to do it, I mean, if you look at
18  the time, it's like almost 10:00 p.m. at night.  But
19  it was what was needed in order to help reduce harm,
20  in particular, for teens, which is why I emphasize
21  that in the message.
22       And so I wrote the e-mail.  I reviewed it
23  many times after having it vetted.  And then I
24  clicked "Send."
25   Q.  The information contained in your e-mail to

Page 466

1  Mr. Zuckerberg, was this information primarily that
2  you had vetted with the other members of the
3  well-being team?
4    A.  Yes.
5    Q.  And you had the authority to send it
6  speaking on the entire well-being team's behalf?
7    A.  Yes.
8    Q.  Including the leads, ████████ and
9  Miki Rothschild?
10   A.  Absolutely.
11   Q.  Let's look at the e-mail.
12       It's from you and the subject is "Gap in
13  our understanding of harm and bad experiences" to
14  Mr. Mark Zuckerberg, and you cc Sheryl Sandberg,
15  Chris Cox, Adam Mosseri; is that correct?
16   A.  Yes.  All of them had been pre-briefed.
17   Q.  You had already talked to each of them
18  about your concerns?
19   A.  Correct.
20   Q.  And you had already sent each of them the
21  draft letter; correct?
22   A.  Correct.
23   Q.  You say (as read):
24       "Dear Mark, I saw the note you shared
25       today after the testimony, and I wanted

Page 467

1  to bring your attention what I believe is
2  a critical gap in how we as a company
3  approach harm and how the people we serve
4  experience it.  I've raised this to
5  Chris, Sheryl, and Adam in the last
6  couple of weeks."
7    Do you see that?
8    A.  Yes.
9    Q.  Now, you're talking about testimony.
10   What testimony are you talking about there?
11   A.  Oh, it was the -- the -- Frances Haugen's
12  testimony.
13   Q.  We have mentioned Frances Haugen, but
14  remind the jury who Frances Haugen is, please.
15   A.  Frances Haugen was a product manager that
16  used to work in civic integrity at Facebook.  And
17  through her, this thing called the "Facebook files"
18  came out that included significant research about
19  harm that teens were experiencing on Instagram.
20   Q.  She testified, it seems like, on that day;
21  is that correct?
22   A.  That's correct.
23   Q.  And was she, in general, testifying that
24  there was research within the company's files
25  showing that there was an association between harms

Page 468

1  to kids and Instagram?
2       MS. JONES:  Objection.  Form.
3  Characterization.  Foundation.
4       MR. CARTMELL:  I'll restate it.
5       BY MR. CARTMELL:
6    Q.  And was the general nature of
7  Frances Haugen's testimony that Meta had research in
8  its files showing that kids were being harmed by
9  using Instagram?
10   A.  Yes.
11       MS. JONES:  Excuse me.
12       THE WITNESS:  Oh, sorry.
13       MS. JONES:  Same objections.
14       No, no.  That's okay.
15       Go ahead.
16       THE WITNESS:  Yes.
17       BY MR. CARTMELL:
18   Q.  You during this actually state to him
19  (as read):
20       "I want to start by saying that my
21       personal experience and what I believe is
22       that you and the M-team care deeply about
23       everyone we serve, and my goal is sending
24       this -- in sending this is to be of
25       service to that."

30 (Pages 465 - 468)

CONFIDENTIAL

Page 469

1    What did you mean by that?
2    A.  I meant that my experience of working with
3  him and the rest of the M-team during my first stint
4  is that they cared about the people who used
5  Facebook and Instagram, and that I believe that they
6  would act in response to something like this in
7  order to reduce harm because at that time I thought
8  that they cared.
9    Q.  And your next paragraph talks about the
10  action rate and essentially that -- what we've
11  talked about, 98 percent don't have any action
12  taken, meaning Instagram users who report bad
13  experiences; is that right?
14    A.  Correct.
15    Q.  And then you tell him in the next paragraph
16  that you don't think that the current system of
17  focusing on enforcement of the community standards
18  is protecting people, including kids on Instagram;
19  is that right?
20    A.  That is correct.
21    Q.  If you turn to page 2, you actually
22  provided some data from the unadjusted data from
23  BEEF; is that right?
24    A.  That's correct.
25    Q.  And you were pointing out the data from the

Page 470

1  13 to 15-year-old age group from BEEF; is that
2  right?
3    A.  That's correct.
4    Q.  Why were you doing that?
5    A.  Because you have to protect kids, like
6  young kids.  It's so critical.  And I thought it was
7  urgent to bring these numbers to his attention so
8  there could be a meaningful investment in reducing
9  the harm that kids were experiencing on Instagram.
10    Q.  Did you believe that these types of
11  statistics or data from the BEEF study would make
12  Mr. Zuckerberg alarmed or shocked?
13    A.  Yes.  I think that these numbers or the
14  adjusted numbers are more than enough to highlight a
15  material or a critical gap in a critical area for
16  the company.
17    Q.  In the next paragraph, you say -- or strike
18  that.
19    In the next paragraph, you give an example
20  of some of the bad experiences your daughter has
21  had; is that right?
22    A.  That's correct.
23    Q.  And you say (as read):
24    "Another example is unsolicited penis
25    pictures. ███████ has received those from

Page 471

1  boys too since the age of 14, and her
2  tool is to block them.  I asked her why
3  boys keep doing that?  She said if the
4  only thing that happens is they get
5  blocked, why wouldn't they?"
6    Why did you give that example about your
7  daughter to Mr. Zuckerberg?
8    A.  Because when we talk about unwanted
9  advances, I mean, this is what we're talking about.
10  It's a -- it's a 14-year-old girl receiving a penis
11  picture from somebody she doesn't know and then not
12  being able to raise that to the attention of the
13  company so that then they can employ measures,
14  effective measures at reducing that in other
15  contexts because they know it's unwanted.  And if
16  all she can do is block them she said, they just
17  laugh it off and move on to the next person.
18    So it creates an environment that's
19  inherently unsafe.
20    Q.  By including the example of the bad
21  experiences that you had -- that your daughter had
22  had, were you trying to demonstrate the real-life
23  severity of the problems with safety on Instagram?
24    A.  That's correct.  I have always, in my
25  career, found if this happens to one person, it's

Page 472

1  happening to a million people.  It's just how these
2  numbers work for these services.
3    Q.  You say (as read):
4    "Policy is necessary when the content
5    is unambiguously inappropriate, yet it
6    has many limitations."
7    What did you mean by that?
8    A.  I mean that you have to have something that
9  says -- if somebody says, "Tom or Alice, you have to
10  kill yourself tomorrow," and that's just
11  unambiguous, you have to be able to find it and you
12  have to remove it.  And so you have to have that as
13  a -- as a baseline.
14    But when we looked at all of these examples
15  of, for example, self-harm or suicidal content, that
16  is not something that you can effectively address
17  with a policy about removing them.  In many
18  instances, it is important for people to share
19  things like that.  It just doesn't mean that you
20  should be recommending this content to a 13 year
21  old.
22    And so you have to have other approaches
23  other than content removal in order to create a safe
24  environment.
25    Q.  Content removal was the safety approach

31 (Pages 469 - 472)

CONFIDENTIAL

Page 473

1 that Meta was using on Instagram at that time?
2 A. Correct.
3 Q. At the bottom of this page you say
4 (as read):
5      "I might be wrong about my assessment
6      and welcome feedback about any effort or
7      data that I'm missing."
8      Why did you say that?
9 A. I would always say that in every
10 conversation I had with everybody all the way up to
11 Mark because I wanted to make sure that I was
12 accurate in what I was representing. And if at any
13 point somebody said, "We don't agree with your
14 assessment, your characterization of these issues,
15 the substance of them, or what you're recommending,"
16 I would always take that seriously and integrate it
17 in the different drafts that I was using.
18      And so every person that I spoke to about
19 these issue all the way to Mark Zuckerberg had this
20 paragraph or this in the verbal conversation around
21 it.
22 Q. You then say (as read):
23      "I believe that it is important to
24      get the following efforts well-funded and
25      prioritized."

Page 474

1      Were you asking Mr. Zuckerberg to fund and
2 make a top priority the safety of kids on Instagram?
3 A. Yes.
4 Q. And was Mr. Zuckerberg the person at the
5 company who could make that happen?
6 A. Yes.
7 Q. And then in the next several pages on -- or
8 strike that.
9      And then on the third page, you go through
10 a series of bullet points.
11      Are these your recommendations of what
12 needed to be done to make kids safe on Instagram?
13 A. Yes.
14 Q. And is this sort of the safety framework
15 that we've talked about and you set out earlier in
16 your deposition?
17 A. Yes.
18 Q. You end by saying (as read):
19      "If you would like, I can give more
20      details or specifics on this. I am
21      appealing to you because I believe that
22      working this way will require a culture
23      shift."
24      Do you see that?
25 A. Yes.

Page 475

1 Q. Was Mr. Zuckerberg the one and only person
2 at the company that could actually make the culture
3 of the company shift?
4 A. Yes.
5 Q. You said you were appealing to him.
6      Were you trying to appeal to his sense of
7 urgency?
8 A. Yes, I was trying to appeal to his sense of
9 urgency and to what we felt was right for a product
10 that is being actively promoted for teenagers;
11 right? If you're -- if you're creating something
12 that's going to be used by teens, I chose these
13 numbers to appeal to him to set the bar of what
14 should a product look like that is safe for
15 teenagers.
16 Q. What was your hope that Mr. Zuckerberg's
17 reaction would be?
18 A. I hoped that I would hear from him quickly
19 and that he would engage subsequently in
20 understanding what is the kind of harm we're talking
21 about and what are the kind of efforts that needed
22 to be funded and prioritized in order to reduce this
23 harm.
24 Q. If you go back to the first page, you
25 actually then forwarded your e-mail to

Page 476

1 Mr. Zuckerberg to other members of the well-being
2 team; is that right?
3 A. Correct.
4 Q. You forwarded your e-mail at 4:46 a.m., it
5 looks like, to Mr. ████ and Mr. Rothschild and
6 ████; correct?
7 A. Correct.
8 Q. And Mr. ████ and Mr. Rothschild were
9 both the leads of the well-being team; is that
10 correct?
11 A. Correct.
12 Q. And ████ was actually senior to
13 them; is that correct?
14 A. Correct.
15 Q. Was he also in support of going to the
16 executives, telling them that there were serious
17 concerns of harm to kids on Instagram?
18 A. Yes.
19 Q. Mr. Zuckerberg had a extremely large
20 responsibility as someone managing platforms with
21 billions of people, including hundreds of millions
22 of kids; right?
23 A. Correct.
24 Q. And did you expect him to take that
25 responsibility seriously and do things to fund and

32 (Pages 473 - 476)

Page 477

1 support the well-being of kids on Instagram?
2    A.   Yes, I did.
3    Q.   You mention in the e-mail to Mr. ███
4 and Mr. Rothschild -- or -- yeah, and Mr. ███
5 (as read):
6         "After seeing Zuck's post tonight, I
7     decided it was time to send him the note
8     below."
9         What are you referring to there?
10    A.   So Mark Zuckerberg did a post about the
11 testimony and an outage that had happened earlier
12 that week to employees and then public.  And I saw
13 Mark's post, Mark Zuckerberg's post.
14         And after reading that and reading some of
15 the things he said, I thought it was urgent to send
16 him the note.  And that's what -- part of what drove
17 the timing of this.
18         MR. CARTMELL:  Do you have your call,
19 Mr. Ward?
20         MR. WARD:  I do.
21         Do you have a convenient breaking time?  I
22 can leave my colleague for just a few minutes
23 without me.
24         MR. CARTMELL:  I mean --
25         MR. PHELPS:  Let's go off the record.

Page 478

1         MR. CARTMELL:  Let's go off the record.
2         THE VIDEOGRAPHER:  The time is 11:53.
3 We're off the record.
4         (Recess taken from 11:53 to 12:56.)
5         THE VIDEOGRAPHER:  The time is 12:56.
6 We're back on the record.
7         BY MR. CARTMELL:
8    Q.   Mr. Bejar, we're back on the record after a
9 short break.
10         Are you ready to proceed?
11    A.   Yes, I am.
12    Q.   Before the break we were talking about your
13 e-mail to Mr. Zuckerberg.
14         Do you recall that?
15    A.   I do.
16    Q.   And your e-mail to Mr. ███ and
17 Mr. ███ and Mr. Rothschild stated that you
18 actually were prompted, I guess -- tell me if I'm
19 wrong -- to send that e-mail by Mr. Zuckerberg's
20 post that day; is that right?
21    A.   That's correct.
22    Q.   I want to hand you Exhibit 46 which comes
23 from Meta's file in this lawsuit.
24         (Marked for identification purposes, Bejar
25         Exhibit 46.)

Page 479

1         BY MR. CARTMELL:
2    Q.   And ask you, is this the post by
3 Mr. Zuckerberg on October 5th, 2021, that you were
4 referring to?
5    A.   Yes, it is.
6    Q.   Is this the post that Mr. Zuckerberg posted
7 that triggered you to send the e-mail to
8 Mr. Zuckerberg?
9    A.   Yes, it is.
10    Q.   What is Workplace?
11    A.   Workplace is the version of Facebook that
12 was developed to be used internally by the company.
13 So it's how Facebook employees post messages, a lot
14 of internal work communications.
15    Q.   So was Mr. Zuckerberg's post on
16 October 5th, 2021, on Workplace?
17    A.   That is correct.  And I believe he also
18 posted it publicly.
19    Q.   Okay.  So is that your -- I was going to
20 ask you that, but that's your understanding, is that
21 he actually posted internally to all of the
22 employees of Meta and then posted it publicly on the
23 website or something like that?
24    A.   On Facebook, yes, that's correct.
25    Q.   Okay.  When you say that after seeing this

Page 480

1 post from Mr. Zuckerberg, you figured it was time to
2 send your e-mail to Mr. Zuckerberg, were you talking
3 about the contents of his post after the first
4 paragraph?
5    A.   Correct.
6    Q.   First paragraph is talking about an outage;
7 is that right?
8    A.   Correct.
9    Q.   And then he starts the second paragraph by
10 saying (as read):
11         "Second, now that today's testimony
12     is over, I wanted to reflect on the
13     public debate we're in."
14         Do you see that?
15    A.   Yes.
16    Q.   What testimony do you believe he was
17 talking about?
18    A.   Frances Haugen's testimony.
19    Q.   She was testifying before Congress that
20 day?
21    A.   Correct.
22    Q.   Is this post by Mr. Zuckerberg his response
23 to Frances Haugen's testimony?
24    A.   I believe so.
25    Q.   Did you know Frances Haugen when you were

33 (Pages 477 - 480)

CONFIDENTIAL

Page 481

1 working at Meta?
2   A.  No.
3   Q.  You had never met her before?
4   A.  No.
5   Q.  Have you since met her?
6   A.  Yes.
7   Q.  When was the first time you met her?  Do
8 you remember?
9   A.  Yeah, I don't recall the exact date.  I
10 think the first in-person meeting was after my
11 testimony.
12   Q.  Your testimony in front of Congress?
13   A.  Yes.
14   Q.  So sometime late 2023?
15   A.  That sounds right to me.
16   Q.  About two years after you had left Meta?
17   A.  Correct.
18   Q.  Let me ask you some questions about
19 Mr. Zuckerberg's post, but first let me ask you:
20 You have now had a chance to review his post, and
21 what in his post led you to send your e-mail to
22 Mr. Zuckerberg?
23   A.  I thought that there were many misleading
24 statements.
25   Q.  Okay.  Let's go through his post, and I

Page 482

1 want to ask you about a few things.
2      But tell me, what was the general topic of
3 Mr. Zuckerberg's post?
4   A.  I mean, there's a sentence says, We care
5 deeply about issues like safety, well-being, and
6 mental health.  And that was just not my experience
7 of the previous two years.
8   Q.  In the first full paragraph, it says
9 (as read):
10       "At the heart of these accusations is
11       the idea we prioritize profit over safety
12       and well-being.  That's just not true."
13       Do you see that?
14   A.  I do.
15   Q.  Based on your experience at Meta, as Meta's
16 well -- excuse me.  Strike that.
17      Based on your experience at Meta from 2019
18 to 2021, as Meta's online safety consultant, was
19 that your experience, what Mr. Zuckerberg said?
20   A.  My experience was that they prioritize
21 engagement and growth over safety and well-being.
22   Q.  And you've provided to us in your testimony
23 lots of examples of that; is that true?
24   A.  Correct.
25   Q.  He says in this second paragraph, as you

Page 483

1 said (as read):
2       "We care deeply about issues like
3       safety, well-being, and mental health."
4       Why was it that you say that that simply
5 was not true?
6   A.  Because when something is a priority for
7 the company, it has sufficient resources, it has a
8 comprehensive metrics framework that allows you to
9 assess the impact of that work.  It's -- you know
10 that it's discussion, you see it everywhere.  It's
11 in -- it's in the fabric of how the company
12 operates.
13      And so when I read that statement, I just
14 thought that's just not true.
15   Q.  If you go down to the last paragraph,
16 Mr. Zuckerberg says (as read):
17       "I'm particularly focused on the
18       questions raised about our work with
19       kids.  I've spent a lot of time
20       reflecting on the kinds of experiences I
21       want my kids and others to have online,
22       and it's very important to me that
23       everything we build is safe and good for
24       kids."
25       Based on your experience at Meta, do you

Page 484

1 believe that was an accurate statement?
2      MS. JONES:  Objection.  Foundation.
3      Go ahead.
4      THE WITNESS:  I believe that is just not
5 true.
6   BY MR. CARTMELL:
7   Q.  Did Mr. Zuckerberg have kids old enough at
8 that time to be on Instagram?
9   A.  He did not.
10   Q.  I want to focus on where he says
11 "everything we build is safe and good for kids."
12      He says that's very important to him;
13 right?
14   A.  Correct.
15   Q.  Based on your experience at Meta, did you,
16 when working with Instagram, believe that Meta
17 wanted Instagram -- strike that.
18      Based on your experience at Meta, do you
19 believe that Instagram was built safe and good for
20 kids?
21      MS. JONES:  Objection to the form.
22 Foundation.
23      THE WITNESS:  I believe Instagram is not
24 built to be safe or good for kids.
25  ///

34 (Pages 481 - 484)

Page 485

1    BY MR. CARTMELL:
2    Q.  And is that your opinion based on your
3 30 years of expertise as a online child safety
4 expert, that that's the case even today?
5    A.  Yes.  Absolutely.
6    Q.  He states (as read):
7        "Many of the claims don't make any
8      sense.  If we wanted to ignore research,
9      why would we create an industry-leading
10     research program to understand these
11     important issues in the first place?"
12       Was your experience at Meta that the
13 leadership would use the research to then go
14 implement safety features on Instagram for kids?
15    A.  That was not my --
16    MS. JONES:  Excuse me.
17    Objection.  Foundation.
18    THE WITNESS:  That was not my experience.
19 I wish it had been.
20    BY MR. CARTMELL:
21    Q.  If you go to the next page, dot 2, at the
22 fourth paragraph, he says (as read):
23        "But when it comes to young people's
24      health or well-being, every negative
25      experience matters.  It is incredibly sad

Page 486

1      to think of a young person in a moment of
2      distress who, instead of being comforted,
3      has their experience made worse.  We have
4      worked for years on industry-leading
5      efforts to help people in these moments,
6      and I'm proud of the work we've done.  We
7      constantly use our research to improve
8      this further work."
9        Let me follow up and ask you, do you agree
10 actually when it comes to young people's health or
11 well-being every negative experience matters?
12    A.  Absolutely.
13    Q.  And have you spent your career with that in
14 mind?
15    A.  Absolutely.
16    Q.  The next -- second sentence, do you agree
17 that it's incredibly sad for a young person in
18 distress to have their experience made worse?
19    A.  I think it's incredibly sad.
20    Q.  And have you, in fact, built safety
21 frameworks -- or did you build a safety framework
22 for the Facebook app during your first stint,
23 keeping that in mind?
24    A.  Absolutely.
25    Q.  Based on your experience working at Meta

Page 487

1 from 2019 to 2021 and your expertise related to
2 online safety and security, had you reached
3 conclusions about whether Instagram was comforting
4 kids in distress?
5    A.  Yes.
6    MS. JONES:  I'm sorry.  I didn't hear what
7 you said.
8    Doing what to kids in distress?
9    MR. CARTMELL:  Comforting kids.
10    MS. JONES:  Objection to the form and
11 foundation.
12    BY MR. CARTMELL:
13    Q.  You can answer.
14    A.  Can you repeat the question?
15    Q.  Yes.
16       Based on your experience working at Meta
17 and your expertise related to online safety and
18 security, had you reached conclusions about whether
19 Instagram was comforting kids in distress on
20 Instagram?
21    MS. JONES:  Objection to the form.
22 Foundation.
23    THE WITNESS:  Yes.
24    BY MR. CARTMELL:
25    Q.  What is your opinion or conclusion?

Page 488

1    A.  That Instagram was not comforting kids in
2 moments of distress, and that Instagram made each of
3 the experiences we're talking about meaningfully
4 worse.
5    Q.  Mr. Zuckerberg says that Meta has worked
6 for years on industry-leading efforts to help people
7 in moments of distress.
8       Do you see that?
9    A.  Correct.
10    Q.  He doesn't say what efforts he's talking
11 about; right?
12    A.  Right.
13    Q.  Based on your more than 30 years of
14 experience as an online safety expert, did Instagram
15 have any industry-leading safety products or
16 features on Instagram?
17    MS. JONES:  Objection.  Foundation.  Form.
18    (Stenographer interrupted for clarification
19     of the record.)
20    THE WITNESS:  They did not.
21    BY MR. CARTMELL:
22    Q.  He then states (as read):
23        "We constantly use our research to
24      improve this work further."
25       What did your experience at Meta tell you

35 (Pages 485 - 488)

CONFIDENTIAL

Page 489

1 about that claim by Mr. Zuckerberg?
2    A.   That it's just not true.  The research team
3 I worked with was struggling to have their research
4 applied.  And then when some of that research became
5 public, the company's response was to minimize it.
6    Q.   I also want to ask you about the third
7 sentence in the paragraph that states (as read):
8          "If we wanted to hide our results,
9          why would we have established an
10         industry-leading standard for
11         transparency and reporting on what we're
12         doing?"
13         Do you see that?
14   A.   I do.
15   Q.   Based on your experience at Meta, do you
16 believe that Meta had an industry-leading standard
17 for transparency?
18   A.   They didn't.
19        MS. JONES:  Excuse me.
20        Objection.  Foundation.
21        THE WITNESS:  They did not.
22        BY MR. CARTMELL:
23   Q.   In fact, did Meta actually not publish any
24 of its internal research, including BEEF, related to
25 the substantial harms that were occurring to kids on

Page 490

1 Instagram?
2         MS. JONES:  Objection to the form.
3         THE WITNESS:  That's correct.
4         BY MR. CARTMELL:
5    Q.   You talked about how being transparent and
6 publishing negative results of harms that were
7 occurring was something that could actually help and
8 increase the safety on a platform; correct?
9    A.   Absolutely.
10   Q.   Do you believe that Meta's lack of
11 transparency on research that was showing harms to
12 kids on Instagram, in fact, caused or contributed to
13 cause a lack of safety for kids on Instagram?
14        MS. JONES:  Objection to the form.
15 Foundation.
16        THE WITNESS:  I do.
17        BY MR. CARTMELL:
18   Q.   After Ms. Haugen's leak of Meta's research,
19 what was your impression of Meta's response as it
20 related to being transparent with Meta's internal
21 research about harms to kids?
22        MS. JONES:  Objection.  Foundation.
23        THE WITNESS:  I thought it was disgraceful
24 because there was research showing about body-image
25 issues internally, and instead the company minimized

Page 491

1 it.  It threw the research and the researcher under
2 the bus by saying it wasn't a lot of people that had
3 gone on that survey.
4         And I think that it would -- we would live
5 in a very different world if they, as a company,
6 would have said, "Oh, we know this is an issue.
7 It's a priority.  Here's the research we've done
8 about it.  Here are the features we're developing to
9 make it better.  Here are the academics with whom we
10 work externally to validate our findings.  And we're
11 going to do so in an environment of vertical
12 transparency because that's what parents deserve,"
13 and -- and rather than minimizing the issues that
14 are so critical for so many teens' lives.
15        BY MR. CARTMELL:
16   Q.   Instead of being transparent with the BEEF
17 results and other internal research after the Haugen
18 leaks, did the company actually lock down the
19 research?
20        MS. JONES:  Objection.  Foundation.
21        THE WITNESS:  Yes.
22        BY MR. CARTMELL:
23   Q.   What does it mean to be -- have a lockdown
24 at Meta?
25   A.   Well, in this context it means something

Page 492

1 different, which is that Meta as a core element of
2 company culture had transparency for employees.
3 This was from the first day I started.
4         And so you used to be able to go look at
5 research and work that other teams were doing.  And
6 after the Frances Haugen testimony happened or I
7 think around that time, they went and they made it
8 so that all of the user research was not available
9 to most of the company, just to the people that had
10 a need-to-know relationship to that research.
11        So they locked everything down.  All of the
12 research kind of disappeared from the awareness of
13 the company.  So if you were an employee,
14 traditionally you would have had access to something
15 like BEEF.  But after Frances, you did not.
16   Q.   Let me ask you, so was that the policy in
17 legal department that did that?
18        MS. JONES:  Objection.  Foundation.
19        THE WITNESS:  Yes.
20        BY MR. CARTMELL:
21   Q.   Is that the same department that told
22 Mr. -- or strike that.
23        Was that the same department that told
24 Dr. ▇▇▇▇ to delete the BEEF emotions data and not
25 analyze it?

36 (Pages 489 - 492)

CONFIDENTIAL

Page 493

1    MS. JONES: Again, objection. Foundation.
2    THE WITNESS: Yes.
3    BY MR. CARTMELL:
4    Q. So your e-mail in -- to Mr. Zuckerberg was
5 on October 5th of 2021, and when was your last day
6 at Meta?
7    A. Shortly after that.
8    Q. I think I've seen in some documents that it
9 was October 24th.
10    Is that consistent with your memory?
11    A. Yes.
12    Q. After sending the e-mail to Mr. Zuckerberg
13 on the 5th, did you ever hear anything from him?
14    A. I did not.
15    Q. No response at all?
16    A. No.
17    Q. Were you able to meet with Mr. Mosseri
18 before you left?
19    A. I was.
20    Q. Tell us what happened at that meeting,
21 please.
22    A. So I sent Adam a preread, which is a
23 briefing document that every -- people get and
24 everybody is expected to read before you have a
25 meeting that had the adjusted numbers, a link to the

Page 494

1 full BEEF presentation, as well as highlighting some
2 issues and some questions for us to discuss
3 together.
4    And then when I sat down with him, as I
5 did, like, again, "Please correct me if there's
6 anything that is inaccurate in what I'm saying," and
7 I talked about the importance of giving teenagers an
8 effective way of dealing with unwanted advances and
9 how important that was and that the content didn't
10 matter, that you could have just a button that says
11 "This is eww," right, and -- and teens will use it.
12    And then you say, "Well, what's the
13 matter?"
14    And it's like, "This is uncomfortable
15 sexually for me."
16    And then you design that so that the teen
17 will use it and that they feel immediately protected
18 afterwards.
19    And Adam agreed and thought it was a good
20 way of putting it. He added some thoughts as to how
21 the person could be made to feel safe after using
22 it.
23    And then we also covered the area of the
24 kinds of content that was addressed by BEEF. And we
25 talked about how it was important to give people

Page 495

1 tools to say, "That content is not for me because
2 it's sexually inappropriate. It's self-harm. It's
3 too racy." You have your reasons on how you could
4 use that information to let creators know that that
5 kind of content is not getting distributed and that
6 you shouldn't be recommending that content to kids
7 or other kids.
8    Q. So you provided Mr. Mosseri with the final
9 adjusted BEEF data?
10    A. Correct.
11    Q. And you discussed your recommendations for
12 solutions for how to make Instagram a safe place for
13 kids?
14    A. Correct. And in my pre-brief, I asked what
15 I think is a fundamental question around this, which
16 is, "So you're the leader of Instagram. What
17 percentage of 13 to 15 year olds should get an
18 unwanted advance on Instagram in the last 7 days?
19 Like, what should be the goal for the team of
20 unwanted sexual advances by 13 to 15 year olds on
21 Instagram?"
22    Q. At that time, in October of 2021, were
23 there any goals in place related to bad experiences
24 or negative or harmful experiences for kids on
25 Instagram?

Page 496

1    MS. JONES: Objection. Foundation.
2    THE WITNESS: There were not.
3    BY MR. CARTMELL:
4    Q. Yeah, I think you previously testified that
5 if there were not metrics and goals in place, the
6 company would not do the work; is that fair?
7    A. That's correct.
8    Q. Did Mr. Mosseri make any commitments to you
9 about safety?
10    A. He did not.
11    Q. Why did you leave Meta in late October of
12 2021?
13    A. My egg timer went out. So in California, I
14 believe, that if you work as a contractor for more
15 than two years, you kind of bring employment issues
16 for the company. So I was told that I had to leave
17 after two years. Actually, I think it was
18 originally one year, but they extended my contract.
19    And then you had to be away for six months
20 before you could come back. Although I did offer
21 under, again, nondisclosure to help continue
22 supporting the work because ultimately that's what
23 was important.
24    Q. And let me ask you, in your final days, did
25 you work on a post for Workplace that you wanted to

CONFIDENTIAL

Page 497

1 go out to all of the employees of Meta?
2     A.   Yes, I did.
3     Q.   Why did you want to post on Workplace
4 before you left?
5     A.   Because I felt it was really important for
6 the employees of Meta to know that it was critical
7 to reduce bad experiences for users and to talk, for
8 example, about unwanted advances.
9     Q.   Was this part of what you thought was
10 important, transparency?
11     A.   Absolutely.
12     Q.   And so did you want to post on Workplace
13 for all the employees to see the results of the BEEF
14 survey which showed high rates of harmful
15 experiences to kids on Instagram?
16     A.   Correct.  In particular, around unwanted
17 sexual advances.
18     Q.   Were you required by Meta to submit your
19 post or a draft of your post to the policy and legal
20 department at Meta before you left?
21     A.   Yes, I was.
22     Q.   And before you made the post?
23     A.   Correct.
24     Q.   Did you do that?
25     A.   Yes.

Page 498

1     Q.   Did the policy and legal department at Meta
2 allow you to be fully transparent in your
3 company-wide post?
4          MS. JONES:  Objection.  Foundation.
5          THE WITNESS:  They did not.
6          BY MR. CARTMELL:
7     Q.   Did the policy and legal department refuse
8 to allow you to include the BEEF survey data that
9 showed the harms to kids on Instagram?
10     A.   Correct.  They did not allow me to put the
11 data in the post.
12     Q.   Did they remove the data from the draft you
13 submitted?
14     A.   Either they removed it or they asked me to
15 remove it.
16     Q.   Is the policy and legal department the same
17 department that asked Dr. ████████ to delete and not
18 analyze the emotions data from the BEEF survey?
19          MS. JONES:  Objection.  Foundation and
20 mischaracterization.
21          THE WITNESS:  Yes.
22          BY MR. CARTMELL:
23     Q.   Was you given a reason why you couldn't
24 include Meta's own internal BEEF survey data in your
25 company-wide post?

Page 499

1     A.   No.
2     Q.   Did you do any haggling with the policy or
3 legal department about that?
4     A.   I remember that the -- that the policy or
5 legal person -- I think it was the policy person --
6 said, "Oh, but there is a way for teenagers to
7 report unwanted sexual advances."
8          And I was like, "No, there isn't.  Here are
9 the categories for the reporting tool."
10          And then they acknowledged that was true
11 and allowed me to put what I put in there.  But the
12 request was to turn what was specific data about
13 harm into a hypothetical.  And then they would
14 approve the post.
15     Q.   I'm handing you Exhibit 47, which is
16 produced from your files at Meta.
17          (Marked for identification purposes, Bejar
18          Exhibit 47.)
19          BY MR. CARTMELL:
20     Q.   And ask you if you can identify what
21 Exhibit 47 is, please.
22     A.   That is my Workplace post that I did before
23 I left.
24     Q.   It's titled "Reducing Bad Experiences For
25 Our Users."

Page 500

1          Let me restate that.
2          It's titled "Reducing Bad Experiences For
3 Our Users"; is that right?
4     A.   Yes.
5     Q.   And in this post, you wanted to include
6 BEEF data that would inform the employees of Meta
7 that there was serious harm to kids on Instagram; is
8 that right?
9     A.   That's correct.
10     Q.   And Meta's policy and legal department
11 refused to allow you to do that; is that right?
12     A.   That's correct.
13     Q.   Was there anything else that the policy and
14 legal department at Meta required you to change and
15 remove in your post that you recall?
16     A.   There was kind of how I -- I was describing
17 the user experience around some of these issues.
18 And so I think as I mentioned, we had to go from a
19 pretty concrete example to a hypothetical.
20     Q.   They made you change it to a hypothetical?
21     A.   Correct.
22     Q.   Was the truth, though, that that feature
23 was not there in the Instagram app?
24     A.   Yes.
25     Q.   That they wouldn't let you tell the truth

38 (Pages 497 - 500)

CONFIDENTIAL

Page 501

1 about that to other employees at Meta?
2     A.   That's correct.
3     Q.   What did that say to you about the
4 company's commitment to safety?
5        MS. JONES:  Objection.  Foundation.
6        THE WITNESS:  That it is a company that
7 would rather hide the truth of harm than it is to
8 let its own employees know about it.
9        BY MR. CARTMELL:
10    Q.   Mr. Zuckerberg had just told the public
11 that Meta had industry-leading transparency; is that
12 true?
13    A.   Correct.
14    Q.   But yet internally when you want to make a
15 post about the risk of harm to kids on Instagram and
16 include data, the policy and legal department shut
17 you down?
18    A.   Correct.
19    Q.   Did you feel that employees deserve to know
20 the risk of harms to kids on Instagram?
21    A.   Absolutely.
22    Q.   Did you believe that employees at Meta
23 needed to understand how serious the risks were?
24    A.   Absolutely.
25    Q.   Did you have to submit a watered-down

Page 502

1 version of the post you wanted to send to the
2 employees?
3     A.   Yes.
4     Q.   And is this it?
5     A.   Yes.
6     Q.   Just in general, tell us what your post
7 talks about.
8     A.   It is a variation on the message I sent to
9 Adam and the communications I made in my tenure that
10 says, "Can we take the harm that people experience
11 as the north star?"
12       And in a company like this when you name a
13 north star, what you're saying is "That's what we
14 use to base our goals on, our resources, our
15 prioritization."
16       And so it's the framework at the end of the
17 day; right?
18    Q.   Take your time.
19    A.   No. 2 is, are people able to effectively
20 report the issue; right?
21       Are we giving people the opportunity to
22 tell us the experiences that they are -- they are
23 having; right?
24       And then are we using that information to
25 protect them at that moment?

Page 503

1        And, I mean, there's the example of -- of
2 my daughter and the unwanted messages.  That is --
3 these reporting tools that they had, which have
4 these categories that teens could not even possibly
5 relate to, needs to be turned into a support flow
6 that captures what happened, where it happened, and
7 helps them with the issue:  Protect other people.
8        And then if you look at No. 3, it talks
9 about feedback; right?  Creating tools, visible
10 tools, that make the community safer over time,
11 assuming that people act with good intention, that
12 there are people who are seeking attention and you
13 treat differently, and then there's bad people that
14 are setting out to harm people.  So that in here,
15 it's a framework about how you have to approach
16 these issues in a way to meaningfully reduce issues
17 over time.
18       And I believe that this kind of framework
19 paired with BEEF data as a prioritization would have
20 led to meaningful reduction, and I thought it was
21 important for employees to be aware of this so
22 that -- in the hope that it could be applied.
23       MS. JONES:  Let me just object and move to
24 strike the narrative response.  And belatedly object
25 to the question calling for a narrative.

Page 504

1        (Stenographer interrupted for clarification
2         of the record.)
3        BY MR. CARTMELL:
4     Q.   Were you trying to, once again, leave the
5 safety framework that you had told the company about
6 for the last two years that would help keep kids
7 safe down on paper so that it could be adopted by
8 leadership at Meta after you left?
9     A.   Yes.
10    Q.   Okay.  After you left -- well, strike that.
11       The BEEF survey that we talked about I
12 think was supposed to be done every six months; is
13 that right?
14    A.   That's correct.
15    Q.   Do you know whether or not they continued
16 to do the BEEF survey after you left?
17       MS. JONES:  Object to foundation.
18       THE WITNESS:  I believe they did not, as
19 they laid off those researchers.
20       BY MR. CARTMELL:
21    Q.   Now, Version 2, I think, was already in
22 effect at the time you left.
23       Do you recall that?
24    A.   Yes.
25    Q.   After Version 2, do you know or do you

39 (Pages 501 - 504)

CONFIDENTIAL

Page 505

1 believe they ever did the BEEF survey again?
2    A.   I believe they did not.
3    Q.   You testified previously that you had some
4 hope and optimism that Meta would make the safety of
5 kids a priority after you left; is that right?
6    A.   That's correct.
7    Q.   Okay.  And at some point did your hope and
8 optimism in that respect change?
9    A.   Yes, it did.
10   Q.   Did something happen that caused you to
11 decide to go public with what you knew about Meta
12 and the harms to kids?
13   A.   Yes, it did.
14   Q.   Explain that to us, please.
15   A.   I was asked to testify as part of FTC
16 proceedings and --
17   Q.   Were you asked to testify on behalf of Meta
18 as a Meta former employee?
19   A.   That's correct.
20   Q.   Okay.  I'm sorry to interrupt.  Go ahead.
21   A.   And during that process, I saw my e-mail to
22 Mark about -- Mark Zuckerberg about BEEF and the
23 harms associated with it.  And it was pretty clear
24 to me at that moment that the company had not
25 substantively done anything to reduce any of the

Page 506

1 harms in that survey.
2        And I -- at that moment, the first step was
3 I resolved to be the most helpful and accurate
4 witness I could be.  And so in the context of
5 depositions, to show up as best -- to my ability,
6 very thoroughly, and with great accuracy about these
7 issues.
8        And then a few months later, that --
9 around, I think, March of that year, I -- I read
10 something that talked about -- like, that when you
11 dedicate your life to something, like safety, that
12 sometimes you have to remember that is the primary
13 responsibility and to ask yourself, "Who are you
14 protecting?"  Am I protecting kids, or am I
15 protecting executives in the company?
16       And that's the moment that I resolved to go
17 public because I thought that would be the most
18 effective way of protecting kids.
19   Q.   After you decided to go public, I think
20 we -- you testified previously that there was an
21 article in the Wall Street Journal; is that right?
22   A.   Correct.
23   Q.   And have you read and assessed that article
24 to determine whether or not it is accurate with
25 respect to what you reported to the author of that

Page 507

1 article?
2    A.   Yes.
3    Q.   Is it accurate?
4    A.   Yes, it is accurate.
5    Q.   Okay.  And were you entirely truthful with
6 the author of that when you were being interviewed?
7    A.   To the best of my ability.
8    Q.   And then you testified in front of
9 Congress, I believe, in November of 2023; is that
10 correct?
11   A.   That's correct.
12   Q.   You were subpoenaed to testify; is that
13 correct?
14   A.   That's correct.
15   Q.   And you were subpoenaed to give documents;
16 is that correct?
17   A.   That's correct.
18   Q.   Did you meet with members of Congress
19 before that?
20   A.   Yes.
21   Q.   Okay.  What was the general nature of your
22 testimony in front of Congress about what you knew
23 about Meta and its commitment to safety about -- or
24 for kids?
25   A.   That Mark Zuckerberg and the senior

Page 508

1 executives at Meta were aware of harms that
2 teenagers were experiencing on Instagram, meaningful
3 and significant harm, and they had chosen not to
4 address it.
5    Q.   You were sworn to tell the truth and under
6 oath when you gave that testimony?
7    A.   Yes.
8    Q.   And were you truthful?
9    A.   Yes.
10   Q.   You've also been subpoenaed by multiple
11 state attorney generals during investigations of
12 Meta; is that correct?
13   A.   Yes.
14   Q.   And have you been truthful when you have
15 testified in those investigations?
16   A.   Yes.
17   Q.   I think maybe I asked you, but do you know
18 how many different attorney generals you've met with
19 around the country?
20   A.   I don't recall.
21   Q.   Did Meta actually subpoena documents from
22 you in preparation for this deposition?
23   A.   Yes.
24   Q.   And did you actually do your best to look
25 through your files and give them responses to

40 (Pages 505 - 508)

Page 509

1 those -- to that subpoena?
2   A.   Absolutely.
3   Q.   And you produced a lot of documents, didn't
4 you?
5   A.   Yes, I did.
6   Q.   And do those documents include some of the
7 examples of the videos and testing you continued to
8 do to determine whether or not Instagram is safe for
9 kids?
10   A.   That's correct.
11   Q.   You mentioned that you have continued to
12 work on online child safety since you left; is that
13 correct?
14   A.   That's correct.
15   Q.   And have you worked with foundations like
16 the Molly Russell foundation -- excuse me, the
17 Molly Rose Foundation?
18   A.   Yes, I have.
19   Q.   Tell us kind of in general what your work
20 and commitment to online child safety has been since
21 you went public in November of 2023.
22       MS. JONES:  I'm going to object to the
23 question as calling for a narrative.
24       Go ahead.
25       THE WITNESS:  My goal since I decided to go

Page 510

1 public on these issues is to help people understand
2 how harm actually plays out in these products so
3 that there can be effective legislation, so that
4 there can be better studies and understanding of it,
5 and so that people can create also, like, safer
6 products.
7       And so I've been trying to capture what
8 I've learned in a lifetime of working in this, and
9 then I've been trying to communicate it to different
10 people in different contexts.
11       And so with Molly Russell, we had meetings
12 with different people in government as well -- as
13 well as with press in order to sort of accurately
14 represent these issues so that the world could
15 better understand -- so that parents could better
16 know what's the nature of harm as it unfolds in
17 Instagram and in the hope of reducing that harm in
18 the future.
19       BY MR. CARTMELL:
20   Q.   Is your work in that regard that you just
21 described pro bono work; in other words, time that
22 you're spending to help online child safety is done
23 without a fee, or you're not charging for that time?
24   A.   That's correct.
25       MS. JONES:  Excuse me.

Page 511

1       Objection to the form.
2       Sorry.
3       BY MR. CARTMELL:
4   Q.   You haven't made money from your work
5 trying to make these platforms safe for kids;
6 correct?
7   A.   I have not made any money.  And more often
8 than not, I've paid for my own travel in areas
9 around this, not always.
10       But, I mean, it's important, so I've
11 invested in it.
12   Q.   Now, the oversight board from Meta that we
13 talked about briefly, actually after you went
14 public, they retained you -- actually asked you to
15 come give a presentation to them; is that right?
16   A.   That's correct.
17   Q.   Okay.  And they paid you for your time?
18   A.   They did, yes.
19   Q.   Other than that, has there been any payment
20 to you related to this -- this work you're doing to
21 help kids be safe?
22   A.   There has not been other than occasional
23 travel reimbursement.
24   Q.   I want to play a -- well, let me ask
25 you -- strike that.

Page 512

1       Do you follow and have you followed over
2 time Meta's executive statements to Congress and
3 their testimony to Congress?
4   A.   Yes, I have.
5   Q.   Okay.  I want to play you a statement real
6 quick and ask you a question.  It's Exhibit 48, is
7 the slip sheet for the clip.
8       (Marked for identification purposes, Bejar
9       Exhibit 48.)
10       MR. CARTMELL:  And it is Clip 81.
11       (Whereupon, video/audio played.)
12       MS. JONES:  Let me just object to the
13 playing of the out-of-context statement by
14 Mr. Zuckerberg and on a foundation.
15       Go ahead.
16       BY MR. CARTMELL:
17   Q.   That's Mr. Zuckerberg's testimony to
18 Congress; correct?
19   A.   Correct.
20   Q.   You've seen that before?
21   A.   Yes.
22   Q.   What is your reaction to Mr. Zuckerberg's
23 statement?
24   A.   That it's very misleading.  He talks about
25 designing products to improve well-being, but by

41 (Pages 509 - 512)

Page 513

1 what measure?  What are the metrics around that?
2 How -- do we have any transparency around them?
3        And then they talk about designing products
4 for teens.  But, again, my experience was that the
5 products that Instagram was working on were not
6 designed for teens.  And they didn't even design or
7 implement appropriate teen safety features or
8 products that were designed for the overall
9 Instagram population.
10     Q.  Have you heard, Mr. Bejar, Mr. Zuckerberg
11 in the public domain and as part of his testimony
12 state that Meta spends billions of dollars on safety
13 and has tens of thousands of employees working on
14 safety?  Have you heard those comments?
15     A.  Yes, I have.
16     Q.  What is your reaction to those comments?
17        MS. JONES:  Objection.  Foundation.
18        MR. CARTMELL:  Let me ask the question.
19        BY MR. CARTMELL:
20     Q.  Based on your 30 years of experience as an
21 online safety expert and your 8 years of experience
22 working at Meta, two of those years as their safety
23 consultant, what is your reaction to those
24 statements by Mr. Zuckerberg?
25        MS. JONES:  Same objection.  Foundation.

Page 514

1 And form.
2        THE WITNESS:  That it's a very misleading
3 statement, because, for example, I think around the
4 time I was there at Instagram, Meta had
5 approximately 35,000 engineers, give or take.  And
6 the Instagram well-being team -- the subpart of the
7 Instagram well-being team that was working on
8 suicide, body-image issues, bullying and harassment,
9 teen -- like, account -- like, the -- the usage
10 features had around 10 or 15 engineers.  And so that
11 tells you in terms of prioritization.
12        So when Mark Zuckerberg talks about the
13 people, I believe that is likely counting all of the
14 people that they hire to do content review and other
15 people that are focusing on this policy violating
16 sort of prevalence.  But the number of actual people
17 working on what we think of as safety features for
18 teenagers is like a fraction of a percent of the
19 numbers that Mark is quoting.
20        BY MR. CARTMELL:
21     Q.  Have you heard Meta say that they have over
22 30 safety tools and features on Instagram?
23     A.  Yes, many times.
24     Q.  Based on your experience because a company
25 says they have over 30 safety tools on their

Page 515

1 platform, does that mean that the platform is safe?
2        MS. JONES:  Objection.  Foundation.  And
3 form.
4        THE WITNESS:  No.  I think that doesn't
5 mean the platform is safe.  A car manufacturer could
6 say -- have a car with 30 air bags, but if -- when
7 the car crashes, people die frequently, then what
8 good are those air bags?
9        BY MR. CARTMELL:
10     Q.  The safety tools and features have to
11 actually be adopted by people and effective to keep
12 kids safe; is that right?
13     A.  That is correct.  What matters is the
14 measurement of harm and the reduction of harm.
15     Q.  Based on your work and your research that
16 you continue to do related to the safety on
17 Instagram, do you believe there are still large gaps
18 in Meta's approach to safety on Instagram?
19        MS. JONES:  Objection.  Foundation.
20        THE WITNESS:  Yes, I do.
21        BY MR. CARTMELL:
22     Q.  Do you believe that there are still severe
23 harms happening to kids on Instagram?
24        MS. JONES:  Same objection.  Foundation.
25        THE WITNESS:  Yes, I do.

Page 516

1        BY MR. CARTMELL:
2     Q.  Do you have any ill will towards Meta?
3     A.  Absolutely not.  I really believe that it's
4 a company that can accomplish the most extraordinary
5 things when it sets its mind to it.  But they have
6 the capacity to build safety tools and to have
7 transparency that would be deeply beneficial for the
8 world.
9        And each time that they announce something,
10 I look at it with hope that it does what they say it
11 does.  And I have consistently found that the claims
12 that they make about their safety tools do not
13 accurately reflect what the safety tools actually
14 do.
15        And the first day that they announce
16 something -- and I'm very happy to talk about this
17 at any extent today -- that accurately prevents the
18 harm that they're talking about it preventing, I
19 will be the first person to say, "That tool is
20 amazing.  Congratulations to Instagram and Meta and
21 the team for having done that."
22        MS. JONES:  Let me -- I'm sorry.  I'm not
23 sure if he was done, but I'm going to object to the
24 narrative, nonresponsive portion of that answer.
25 ///

42 (Pages 513 - 516)

Page 517

1     (Stenographer interrupted for clarification
2      of the record.)
3         MR. CARTMELL:  Mr. Bejar, thank you very
4  much for your time.  I really appreciate it.  That's
5  all the questions I have for you right now.  I may
6  have some more after Meta's counsel asks you
7  questions.  Thank you.
8         THE WITNESS:  Okay.
9         THE VIDEOGRAPHER:  Go off?
10        The time is 1:43.  We're off the record.
11        (Recess taken from 1:43 to 1:51.)
12        THE VIDEOGRAPHER:  The time is 1:51.  We're
13  back on the record.
14        EXAMINATION BY MR. PHELPS
15     BY MR. PHELPS:
16     Q.  Hello, Mr. Bejar.  How are you?
17     A.  Good.  Thank you.
18     Q.  I'll introduce myself on the record.  My
19  name is Brian Phelps.  I represent the State of
20  Tennessee.
21        You and I have had the chance to meet
22  before; right?
23     A.  Yes.
24     Q.  Okay.  That was -- I actually took your
25  sworn statement in the context of an investigative

Page 518

1  subpoena that Tennessee served on you.
2        Do you recall that?
3     A.  I do.
4     Q.  Okay.  And now, as then, you understand
5  you're under the obligation to tell the truth, just
6  like you were with Mr. Cartmell?
7     A.  Yes, I do.
8     Q.  Okay.  I actually want to pick up and hit
9  on -- pick up where Mr. Cartmell left off to some
10  degree.
11        You talked with Mr. Cartmell extensively
12  about gaps in Meta's approach to teen safety; is
13  that right?
14     A.  That's correct.
15     Q.  And another issue you covered repeatedly
16  was that Meta needed to be much more transparent
17  with the public than it was being over the last
18  several years; is that true?
19     A.  Yes.
20     Q.  Okay.  And you also discussed with
21  Mr. Cartmell those two issues, gaps in safety and
22  failure to be fully transparent led to harms to kids
23  that could have been avoided on Instagram; right?
24     A.  Yes.
25     Q.  Okay.  And I think you may have touched on

Page 519

1  this briefly once or twice, and so I apologize, but
2  can you just remind me what the Meta Oversight Board
3  is?
4     A.  It is a series of experts of the highest
5  caliber in the world around issues of policy and
6  speech that Meta gathered to look at difficult
7  decisions around the content moderation.
8     Q.  And those topics we just discussed
9  regarding to safety on Instagram and transparency,
10  did you present some of the concerns you've just
11  discussed over the last day and a half with
12  Mr. Cartmell -- did you discuss those concerns with
13  the Meta Oversight Board in September of 2024?
14     A.  Yes, I did.
15     Q.  I'll introduce the next -- I have no clue
16  what exhibit we're on.
17        It's going to be 49.
18        (Marked for identification purposes, Bejar
19        Exhibit 49.)
20     BY MR. PHELPS:
21     Q.  And this is a lengthy e-mail exchange
22  printout.  You don't need to review the whole thing
23  unless you'd like to.  I just have a couple of basic
24  questions about it.
25        And if you just take a second and refresh

Page 520

1  yourself, and let me know what this e-mail exchange
2  is about.
3     A.  Yeah.  It was -- it was about the
4  Oversight Board engaging with me on issues, on both
5  my work and my views around teen mental health.
6     Q.  And what were the circumstances that led
7  the Oversight Board to reach out to you, to the best
8  of your knowledge?
9     A.  I had already done one engagement for them
10  after I left Instagram in -- I forget the year
11  precisely.  And then I had received a message from
12  them about sort of my testimony and when I had
13  entered the public conversation around these issues.
14     Q.  Okay.  Who reached out to you, if you
15  recall?
16     A.  I think it was ██████████, the
17  person in the e-mail thread here.
18     Q.  And why did you decide it was worth your
19  time to interact with the Meta Oversight Board in
20  September of 2024?
21     A.  Because I believe that they were
22  well-positioned to give Meta feedback and guidance
23  around content issues related to teenagers, and
24  there were lot -- also lots of people there that I
25  thought would benefit from understanding how harm

43 (Pages 517 - 520)

CONFIDENTIAL

Page 521

1 plays out for teenagers online.
2    Q.  And did you have an understanding, based on
3 your interactions with the board, that the board
4 valued your experience and expertise given your long
5 career in online safety issues?
6        MS. JONES:  Objection.  Foundation.
7        THE WITNESS:  Yes.
8        BY MR. PHELPS:
9    Q.  And did you in September of 2024 prepare
10 materials that you shared with the Oversight Board?
11    A.  Yes.
12        MR. PHELPS:  Let's mark the next exhibit,
13 which is going to be Exhibit 50.
14        (Marked for identification purposes, Bejar
15        Exhibit 50.)
16        BY MR. PHELPS:
17    Q.  You can set this e-mail chain to the side.
18        Let me know when you've had a chance to
19 thumb through that document.
20    A.  Yeah, I'm very familiar with it.
21    Q.  Okay.  What is the document in front of
22 you, Mr. Bejar?
23    A.  The document is a presentation that I
24 prepared and then gave to members of the
25 Oversight Board.

Page 522

1    Q.  Okay.  And when you say you presented and
2 gave to the Oversight Board, what do you -- can you
3 paint me a picture what you mean by that in a little
4 more detail?
5    A.  Yes.  I provided a copy of this
6 presentation.
7        And then there was a Zoom meeting with
8 members of the Oversight Board where I presented the
9 materials and then I answered questions and had
10 discussion around them.
11    Q.  Do you know -- do you recall who attended
12 that discussion by Zoom?
13    A.  I don't recall.
14    Q.  Do you recall any of the -- any of the
15 names?
16    A.  I do not.
17    Q.  Okay.  Do you have a recollection of
18 roughly the number of folks who attended that
19 presentation?
20    A.  Probably I would say around 10 to 15; but,
21 again, I don't recall in detail.
22    Q.  Do you remember how long the presentation
23 lasted, roughly?
24    A.  Yeah.  I think the presentation part was
25 probably around half an hour or so.  And then the

Page 523

1 rest was discussion.
2    Q.  Okay.  And is this document in front of you
3 the slide show associated with the presentation you
4 gave to the Oversight Board, the Meta Oversight
5 Board?
6    A.  Correct.
7    Q.  Can we take a few minutes and just go
8 through this document?
9    A.  Yes.
10    Q.  The title page represents that this was
11 prepared for the Oversight Board by you on or around
12 September 26th, 2024; is that right?
13    A.  Correct.
14    Q.  And is that an accurate statement?
15    A.  Yes.
16    Q.  We see on the next page (as read):
17        "Public sources for this
18        presentation."
19        Do you see that?
20    A.  Correct.
21    Q.  We see an articulation of the problem.
22        Do you see that page?
23    A.  Yes.
24    Q.  And this is actually something you
25 discussed, I think it was yesterday, with

Page 524

1 Mr. Cartmell; is that right?
2    A.  That's correct.
3    Q.  And so was your presentation to the board
4 about the problem consistent with the testimony you
5 provided in this deposition?
6    A.  Yes.
7    Q.  If you look at the next slide, there's a
8 discussion of the prevalence of bullying and
9 harassment that Meta posts on its Community
10 Standards Enforcement Reports.
11        Do you see that?
12    A.  Yes.
13    Q.  And the slide after contrasts what Meta
14 makes public with what you learned in the BEEF
15 survey; is that right?
16    A.  That's correct.
17    Q.  Okay.  And so here you were presenting to
18 the Meta Oversight Board that concept we discussed
19 yesterday and today regarding the discrepancy
20 between Meta's internal metrics regarding bullying
21 and harassment and what it was making public; is
22 that true?
23    A.  Yes.
24        MS. JONES:  Objection to the form.
25        THE WITNESS:  Yes.

44 (Pages 521 - 524)

CONFIDENTIAL

Page 525

1      BY MR. PHELPS:
2      Q.   And there's a description of -- on the next
3  page -- of how there's a material gap between the
4  approach Meta articulates in the public and what it
5  has -- what it -- what it understands internally
6  about bullying and harassment.
7          Do you see that?
8      A.  Yes.
9      Q.   And so what you presented to the board on
10  this slide is consistent with your testimony to
11  Mr. Cartmell; is that true?
12      A.  Yes.
13      Q.   And we can go on and on through this
14  presentation.  We see concepts about unwanted to
15  inappropriate content on page 8.
16          Do you see that?
17      A.  M-hm.
18      Q.   Negative comparison on page 9?
19      A.  M-hm.
20      Q.   Self-harm on page 10?
21      A.  M-hm.
22      Q.   Issues with the approach focused on content
23  policy.
24          Do you see that?
25      A.  Yes.

Page 526

1      Q.   And for each of these sort of categories,
2  you'd agree with me that you testified about those
3  in depth in this deposition; right?
4      A.  Yes.
5      Q.   And the presentation you made to the Meta
6  Oversight Board was consistent with the testimony
7  you provided today?
8      A.  Correct.
9          MS. JONES:  Objection.
10          BY MR. PHELPS:
11      Q.  In other words, what you've --
12          MS. JONES:  Excuse me.  Excuse me.
13          MR. PHELPS:  I'm sorry.
14          MS. JONES:  Objection to the form.
15          Go ahead.
16          BY MR. PHELPS:
17      Q.  In other words, what you've told the jury
18  here in the course of our time together is more or
19  less the same thing that you told Meta's
20  Oversight Board call it seven months ago; is that
21  true?
22          MS. JONES:  Objection to the form and to
23  the characterization.
24          THE WITNESS:  That is correct.
25  ///

Page 527

1      BY MR. PHELPS:
2      Q.   Can you turn to Slide 18 titled "The impact
3  of Meta's negligence"?
4          You write (as read):
5              "One of the most critical problems
6          with all of these issues is that Meta's
7          unwillingness to understand and address
8          these issues creates an environment where
9          harmful content and behavior is
10          normalized."
11          And then the last part of this slide, it
12  says (as read):
13              "Every risk discussed here could be
14          meaningfully reduced in a short amount of
15          time if it was a priority for Meta."
16          Do you see that?
17      A.  Yes.
18      Q.   You presented this message to Meta's
19  Oversight Board?
20      A.  Yes, I did.
21      Q.   Because you believe it?
22      A.  Absolutely.
23      Q.   You see the next slide titled "What could
24  improve child safety?"
25      A.  Yes.

Page 528

1      Q.   What did you present to Meta's
2  Oversight Board in terms of suggestions for how Meta
3  could improve child safety?
4      A.  That it was essential to have transparency
5  that incentivizes the reduction of harm that teens
6  experience in Meta products.
7          That for unwanted content and unwanted
8  contact, there needs to be an easy way for people to
9  report to them Step 1 of the framework.
10          Require that independent academic experts
11  are embedded in the product teams with the engineers
12  to work on issues of teen health and safety.
13          A thorough investigation of under 13
14  accounts and the kind of content that sexualizes and
15  exploits them.
16          And a process to ensure that there are
17  lessons learned and reasonable product changes after
18  a teen dies or ends up in hospital.
19      Q.   And you presented these recommendations to
20  the Meta Oversight Board as well; is that true?
21      A.  Yes, I did.
22      Q.   When you look at these recommendations for
23  how to improve child safety, are these geared at
24  increasing just content moderation within Meta or
25  are you recommending from a fundamental shift in how

45 (Pages 525 - 528)

CONFIDENTIAL

Page 529

1  the company approaches child safety on its social
2  media products?
3       MS. JONES: Objection to the form.
4       THE WITNESS: I am recommending a
5  fundamental shift in the approach of child safety in
6  the product and throughout my work on this have not
7  advocated for changes to content -- substantial
8  changes to content moderation or change policies.
9  The harm lives in many other places.
10      BY MR. PHELPS:
11      Q.  You can set that document to the side.
12      You touched on the issue of product
13  features in passing a couple of different times with
14  Mr. Cartmell, but I want to spend a few minutes
15  focusing on product features that Meta touts as
16  related to safety, if that's okay with you.
17      A.  Yes.
18      Q.  Do I understand correctly that you have
19  experience working in building safety features
20  related to online environments including social
21  media platforms?
22      A.  Yes.
23      Q.  Could you just briefly -- it's been awhile
24  since yesterday morning.  Could you just briefly
25  reorient us and the jury to your experience in

Page 530

1  building safety features geared at online safety?
2       A.  So for the 11 years I worked at Yahoo, I
3  developed both as an engineer, as an engineering
4  manager -- (inaudible)
5       (Stenographer interrupted for clarification
6        of the record.)
7       THE WITNESS: -- sort of features that had
8  to do with general user safety as well as the safety
9  of minors.
10      When I got hired by Facebook, that was what
11  I was hired to do, to manage the engineering team
12  and then the engineering and the product team that
13  build the infrastructure that kept people safe,
14  including features including teenagers.  And I did
15  that for six years.
16      BY MR. PHELPS:
17      Q.  When you returned to Instagram in 2019, did
18  you advise folks within Instagram on the well-being
19  team about safety features they might build?
20      A.  Yes, I did.
21      Q.  And we're going to have the opportunity to
22  talk about some product features specifically, but I
23  want to get your perspective on some high-level
24  concepts before we dig into specific examples.
25      From your experience working at Meta for a

Page 531

1  number of years, working in consulting in Meta for a
2  number of years, has the potential negative impact
3  on growth or engagement or revenue been a factor in
4  deciding whether the company would launch a safety
5  feature?
6       MS. JONES: Objection. Foundation.
7       THE WITNESS: I believe so.
8       BY MR. PHELPS:
9       Q.  If a proposed safety feature at Meta had a
10  negative impact on growth or engagement, would that
11  make it more or less difficult for that -- for the
12  team to get that feature launched?
13      MS. JONES: Same objection.
14      THE WITNESS: More difficult.
15      BY MR. PHELPS:
16      Q.  From your experience working in consulting
17  for Meta, are safety features subjected to a higher
18  standard of proof in order for them to be launched
19  as compared to growth features?
20      MS. JONES: Objection. Foundation.
21      THE WITNESS: Yes, they are.
22      BY MR. PHELPS:
23      Q.  Can you explain that just sort of in
24  layman's terms for someone who hasn't worked on
25  these issues as deeply as you have?

Page 532

1       A.  Absolutely.  I think that if I have an idea
2  of something that's going to make more people look
3  at a video longer, like a -- either a change to the
4  algorithm that's recommending the videos or a
5  notification or like a button or something in the --
6  a design interface, I can build it and I can test
7  it.  And if it shows that it makes that better, then
8  away it goes.  It gets shipped.  It touches a lot of
9  people's lives.
10      This was in every feature that I
11  experienced from my first day at Facebook in 2009.
12      Q.  And that -- and what you just described
13  relates to the scrutiny placed on growth that are
14  engagement-related features; right?
15      A.  Correct.
16      Q.  And how would that contrast with the way
17  safety-related features are scrutinized?
18      A.  So during my tenure and as a consultant,
19  there was, for example, a feature where there was
20  something that would help a teen girl who was
21  doomscrolling beauty content.  So a teen girl
22  falling into a dark hole of body-image content is
23  the translation of that.
24      And the team knew when it was happening.
25  They knew what content the teen girl was looking at

46 (Pages 529 - 532)

CONFIDENTIAL

Page 533

1 and had developed an intervention to push the
2 teenager away from that kind of content. And rather
3 than being able to ship it and test it and see how
4 well it made a difference on that, instead there was
5 scrutiny from multiple teams: policy, legal,
6 cross-functional. It took a long time to get
7 something out.
8        And then the feature got watered down on
9 its way to users such that by the time it shipped,
10 it was a shadow of what it could have been.
11    Q.  In your experience, does -- do public
12 relations play a role in determining whether and
13 when Meta launches safety features?
14    A.  Yes.
15    Q.  Do you know from your experience whether
16 Meta tends to launch safety features in response to
17 external pressure?
18        MS. JONES: Objection. Foundation.
19        THE WITNESS: Yes.
20        BY MR. PHELPS:
21    Q.  And what is your understanding?
22    A.  That if there's an article that gets or is
23 going to get a lot of traction, if there is
24 testimony that is coming up, that there are these
25 public events that are -- get a lot of attention,

Page 534

1 that those correlate or coincide with announcements
2 of safety features.
3    Q.  Did you, during your first six years at the
4 company, have experience in being asked to build
5 features quickly because of public scrutiny?
6    A.  Yes, I did.
7    Q.  Can you tell me just at a high level a
8 little bit about that experience?
9    A.  I spoke about it yesterday. One of many
10 examples was a crisis around privacy. And Mark
11 asked a small team, including me, that he had
12 two weeks to redo the privacy controls so that then
13 he would be able to speak about the new master
14 privacy control in a way that would help address the
15 narrative for the company.
16    Q.  The narrative in a -- in a public domain?
17    A.  That's correct.
18    Q.  And do I understand you correctly that
19 you've seen that pattern continue to play out in
20 this domain of public safety that we've been
21 discussing?
22        MS. JONES: Objection. Foundation.
23        THE WITNESS: That's correct.
24        BY MR. PHELPS:
25    Q.  Okay. You've discussed Molly Russell a

Page 535

1 couple of times.
2        Do I recall correctly that that's a teen
3 who died by suicide?
4    A.  Yes.
5        MS. JONES: Well, let me object as asked
6 and answered. We just talked about Ms. Russell
7 earlier today.
8        BY MR. PHELPS:
9    Q.  Did you -- do I recall that you followed
10 her place -- that you followed her case closely over
11 the years?
12    A.  I began following her case when I began
13 talking with her dad about his experience.
14    Q.  Okay.
15    A.  And then I looked at it in depth after
16 that.
17    Q.  I'm going to hand you an exhibit. This is
18 going to be 41.
19        TRIAL TECHNICIAN: Fifty-one.
20        MR. PHELPS: Fifty-one.
21        (Marked for identification purposes, Bejar
22         Exhibit 51.)
23        BY MR. PHELPS:
24    Q.  And we're not going to go back into depth
25 here, Mr. Bejar, with her tragic story. But why

Page 536

1 don't you just give this document a quick look so I
2 can ask you one or two questions about it.
3        Do you know what this document is?
4    A.  Yeah. It's -- it's a coroner's regulation
5 report to prevent future deaths.
6    Q.  Okay. Have you seen this document before?
7    A.  I have not.
8    Q.  Does this indicate in the circumstances of
9 death -- do you have any reason to dispute that this
10 is an accurate reproduction of a -- of a coroner's
11 report?
12        MS. JONES: Objection. Foundation.
13        THE WITNESS: I do not.
14        (Stenographer interrupted for clarification
15         of the record.)
16        BY MR. PHELPS:
17    Q.  And do you see the Circumstances of Death
18 section?
19    A.  Yes.
20    Q.  Okay. And does it indicate that
21 Ms. Russell passed away in November 2017?
22    A.  Correct.
23    Q.  And the rest of that section sort of
24 provides an overview of the story that we've -- that
25 you discussed with Mr. Cartmell earlier; is that

47 (Pages 533 - 536)

CONFIDENTIAL

Page 537

1 right?
2    A.  Yes.
3    Q.   And is this kind of consistent with your
4 understanding of the circumstances of Molly's death?
5    A.  Yes.
6    Q.   Okay.  When you testified a few minutes ago
7 that Meta has a tendency to launch product features
8 after facing public scrutiny, is the Molly Russell
9 case an example of that, in your view?
10     MS. JONES:  Bless you.
11     And objection.  Foundation.
12     THE WITNESS:  Yes.
13     BY MR. PHELPS:
14    Q.   You can set this document to the side, and
15 I'm going to hand you what we'll mark as Exhibit 52.
16     (Marked for identification purposes, Bejar
17      Exhibit 52.)
18     MR. PHELPS:  And, Jim, while we -- before
19 we load up 52, why don't we just do the first page
20 of the demonstrative that we're going to work
21 through.  I guess the second page.
22     BY MR. PHELPS:
23    Q.   And so we're going to come back to this
24 demonstrative, Mr. Bejar, a couple of times, but do
25 you -- does this date on the slide show in front of

Page 538

1 you, on the timeline in front of you, reflect the
2 date of Molly's passing that we just looked at?
3    A.  Yes, it does.
4     MR. PHELPS:  Okay.  Let's go to -- let's
5 bring 52 up, Jim.
6     BY MR. PHELPS:
7    Q.   Mr. Bejar, what is Exhibit 52?
8    A.   It's an article from The Observer about
9 Molly Russell and the health secretary telling
10 social media companies to protect children after her
11 death.
12    Q.   It says -- I think what you're referring to
13 is in the second paragraph.  It says Matt Hancock,
14 the health secretary, has warned companies,
15 including Meta and others, that he will use the
16 force to law to act should they fail to remove
17 inappropriate content.
18     Do you see that?
19    A.   I do.
20    Q.   And given this context, that would be
21 content related to suicide, presumably?
22     MS. JONES:  Objection.  Foundation.  Calls
23 for --
24     THE WITNESS:  Correct.
25     MS. JONES:  Excuse me.

Page 539

1     Calls for speculation.
2     BY MR. PHELPS:
3    Q.   Do you see a reference to suicide content
4 in the first paragraph of this document?
5    A.  Yes.
6    Q.   Okay.  And so the health secretary is
7 making a call -- is publicly calling out companies,
8 including Meta; right?
9    A.   Correct.
10    Q.   And do you see a date on this document?
11    A.   Yes.  Saturday, 26th of January, 2019.
12    Q.   Okay.  So more than a year after Molly's
13 death; right?
14    A.   Yes.
15     MR. PHELPS:  Let's do Exhibit 53.
16     (Marked for identification purposes, Bejar
17      Exhibit 53.)
18     BY MR. PHELPS:
19    Q.   Mr. Bejar, what is the document we've
20 handed you as Exhibit 53?
21    A.   It is a press release by Instagram about
22 changes that they're doing around -- I mean, from
23 what I can see it's about SSI -- or self-harm
24 content.
25    Q.   The first two paragraphs read (as read):

Page 540

1     "At Instagram, nothing is more
2     important to us than the safety of people
3     in the community.  Over the past month,
4     we have seen that we are not where we
5     need to be on self-harm and suicide and
6     that we need to do more to keep the most
7     vulnerable people who use Instagram safe.
8     "That's why today, following a
9     comprehensive review with global experts
10     and academics on youth, mental health,
11     and suicide prevention, we're announcing
12     further changes to our approach on
13     self-harm content."
14     And then there's a -- it goes on.
15     Do you see that?
16    A.   I do.
17    Q.   Okay.  And we don't need to get back into
18 the details on this, but do I recall from your
19 testimony over the course of this deposition that
20 you did not believe that Instagram solved the issue
21 of suicide and self-injury content at this time; is
22 that true?
23     MS. JONES:  Objection.  Foundation.  Form.
24     THE WITNESS:  That's true.
25 ///

48 (Pages 537 - 540)

CONFIDENTIAL

Page 541

1    BY MR. PHELPS:
2    Q.  Okay.  But they, nevertheless, put a press
3 release in -- that we see here relating to changes
4 they were making to suicide and self-injury
5 policies; right?
6        MS. JONES:  Excuse me.
7        Objection to the characterization of the
8 document.
9        (Stenographer interrupted for clarification
10        of the record.)
11       THE WITNESS:  Sorry.  Could you repeat the
12 question?
13       BY MR. PHELPS:
14   Q.  The company, nevertheless, put out a
15 press -- let me just ask them all again.
16       Do I recall correctly that you did not
17 think that at the time of this document Instagram
18 had adequately addressed the issue of suicide and
19 self-injury content on Instagram?
20   A.  At this time they had not addressed the
21 issues.  And when I look at the list of what's
22 changing, many of the things described here I was
23 able to reproduce in 2024 and 2025.
24   Q.  Okay.  And nonetheless, they put out this
25 press release at this time.

Page 542

1        Do you see that?
2    A.  I do.
3    Q.  And what's the date of this press release?
4    A.  February 7th, 2019.
5    Q.  And when you -- if you look back at
6 Exhibit 52, the last exhibit we gave you, what's the
7 relationship between the date of this article and
8 the company receiving a letter from the British
9 health secretary and this blog post?
10   A.  That --
11       MS. JONES:  I'm sorry, Mr. Bejar.
12       Let me object to the form and foundation.
13       Go ahead.
14       THE WITNESS:  That they're very closely
15 timed to each other.  And in my experience working
16 at Meta, that it was likely that they were related.
17       BY MR. PHELPS:
18   Q.  Okay.  You don't think it's a coincidence?
19   A.  I don't think so.
20       MR. PHELPS:  And, Jim, can we just go back
21 to the demonstrative and move that forward.
22       BY MR. PHELPS:
23   Q.  Okay.  So we have -- do you see this
24 demonstrative back in front of you?
25       You see Molly Russell suicide,

Page 543

1 November 2017.
2        The health minister letter, January 2019;
3 right?
4        And then we see Meta announces changes just
5 a couple of weeks later.
6        MR. PHELPS:  And if you go one more, Jim.
7        BY MR. PHELPS:
8    Q.  Just a couple of weeks later in
9 February 2019; is that right, based on the documents
10 we just saw?
11   A.  Correct.
12   Q.  You can put those documents to the side.
13       MS. JONES:  And, Counsel, can I just have a
14 running objection to this demonstrative, so I don't
15 have to keep objecting to it?
16       MR. PHELPS:  You may.
17       MS. JONES:  Okay.  Thank you.
18       BY MR. PHELPS:
19   Q.  Do I recall that not just building but also
20 assessing product features related to safety was
21 something you did throughout 30 years -- throughout
22 your 30 years working on online safety?
23   A.  Yeah.
24       MS. JONES:  Objection to the -- excuse me.
25       Objection to the form.

Page 544

1        BY MR. PHELPS:
2    Q.  Are there specific factors that you
3 consider when assessing whether a feature is likely
4 to be effective in keeping people safe online?
5    A.  Yes, there are.
6    Q.  And we'll be able to look at a couple of
7 examples, but could you give us a high-level sense
8 of some of the factors that you consider when
9 assessing whether a feature is likely to be
10 effective in keeping people safe online?
11   A.  Yes.  Assessing safety features is very
12 similar to assessing security features where you
13 want to be able to take the feature and test around
14 it and in it to see if it effectively prevents the
15 harm; right?
16       A security feature like a login page where
17 you type in your username and password is no good if
18 you can just get around it and hack -- get access to
19 somebody's data.
20       And so you kind of have to look at safety
21 features the same way, which is, are they easily to
22 circumvent?  Do they protect against what they say
23 they protect against?  And -- and then what are the
24 accurate representations that you can make about how
25 the safety feature is implemented?

49 (Pages 541 - 544)

CONFIDENTIAL

Page 545

1    And as I said, look, from a lifetime of
2  doing this, they just kind of have to be sturdy. If
3  you think of a toy, you kind of want a toy that when
4  you bang on the table, it doesn't fall apart into
5  things that the kid can swallow. It is the modern
6  equivalent of that.
7    Q.  From your experience within Meta and in the
8  industry more broadly, is whether a feature opt in
9  versus opt out -- would that impact your assessment
10  of whether the feature is likely to be effective at
11  keeping people safe?
12    A.  Yes. I have a lot of experience with that.
13  Security features that were opt in, no matter how
14  much protection they're afforded, were -- had
15  extremely low adoption rates, even when we had
16  meaningful efforts to get people to adopt them.
17    Q.  What about -- so, in other words, if a --
18  if a feature is opt in as opposed to opt out, it's
19  less likely to keep -- let me withdraw that.
20    For example, if a feature is opt in, it's
21  less likely to be effective at keeping people safe
22  than if it were opt out, everything else being
23  equal?
24    MS. JONES:  I'm sorry, Counsel.
25    Objection to the form and foundation.

Page 546

1    THE WITNESS:  Yes. Like by a very large
2  margin. We're talking about, like, maybe 1 or
3  2 percent of people if you're really doing well
4  adopting the -- like, the safety or security
5  feature.
6    So then that means that 99 percent of
7  people do not adopt that. That's why the -- you
8  need to know what is the adoption rate of these
9  things to understand how effectively they are
10  reducing harm.
11    BY MR. PHELPS:
12    Q.  Separate from opt in versus opt out, from
13  your experience in the industry, could the
14  prominence of the feature in terms of display,
15  meaning whether it's on the home screen versus
16  somewhere users would have to toggle in the
17  settings, could that impact how you'd assess whether
18  a feature is likely to keep people safe on a
19  platform?
20    MS. JONES:  Objection to form and
21  foundation.
22    THE WITNESS:  Significantly.
23    BY MR. PHELPS:
24    Q.  Can you tell me a little more about that?
25    A.  Yes. Very few people go to settings, and

Page 547

1  even less people go into the menus that the settings
2  offer. And so if you want somebody to use a
3  feature, you put it in the front page. You make it
4  responsive to touch on the user interface. You
5  point people at it.
6    There is many things that are
7  well-understood in the industry that you can do in
8  order to drive feature discovery and usage.
9    Q.  Okay. So making a feature that's sort of
10  hidden away in the settings, that would make it less
11  likely to be effective in keeping people safe than
12  if it were more prominently displayed.
13    Do I understand that correctly?
14    MS. JONES:  Objection to the form.
15    THE WITNESS:  Yes.
16    BY MR. PHELPS:
17    Q.  And these factors that we've been
18  discussing, I think we've been framing them in broad
19  terms.
20    Would those same factors be applicable if
21  you are assessing whether a safety feature is likely
22  to be effective for teenager users, in particular?
23    A.  Yes. The -- where you put it in the
24  product and the language that you use for it makes
25  an incredible amount of difference in the likelihood

Page 548

1  of a teenager using the product.
2    Q.  Same with this concept of opt in versus opt
3  out?
4    A.  Correct.
5    Q.  Why?
6    A.  In my experience, people only ever access
7  security features or these kind of things at a
8  moment of distress.
9    So we have the safety -- the security
10  center for accounts, and nobody ever visited it. We
11  would show you at login, "Hey, check your security
12  settings. Come on down." And almost nobody clicked
13  through that. But if your account got hacked or
14  you're worried about it, man, you were in and you
15  would work on it.
16    So in my experience with teenagers, from
17  the products that we built and everything we learned
18  from 2010 to 2015, they don't go into settings. It
19  kind of has to be right there for them when they ask
20  for help. And even then, you have to get the
21  language right, otherwise they just won't click on
22  it.
23    MR. PHELPS:  Let's mark Exhibit 54.
24    (Marked for identification purposes, Bejar
25    Exhibit 54.)

50 (Pages 545 - 548)

Page 549

1    BY MR. PHELPS:
2    Q.   Have you seen this document before,
3 Mr. Bejar?
4    A.   Yes, I have.
5    Q.   What is this document at a high level?
6    A.   This document is a list of tools and
7 features and resources that Meta has announced as
8 safety features --
9    Q.   Okay.
10    A.   -- or safety tools.
11    Q.   And in this document, Meta is publicly
12 calling attention to products that it is touting as
13 helping keep teens safe online; right?
14    A.   That's correct.
15    Q.   From your time at the company, do you have
16 an understanding of why Meta would want to showcase
17 these features publicly and externally in this way?
18    MS. JONES:  Objection to the form and
19 foundation.
20    THE WITNESS:  What I've noticed is
21 whenever, in recent times, substantive articles have
22 come that articulate -- that talk about harm that
23 happens on -- on Instagram, the response tends to be
24 "We have 30 or different number of safety features,
25 and that's how we show our commitment to safety of

Page 550

1 teenagers."
2    And I've seen this used in both press and I
3 believe in testimony sometimes.
4    BY MR. PHELPS:
5    Q.   Do I recall from -- you had an exchange
6 with Mr. Cartmell where you said it's your
7 assessment that Meta's safety features do not keep
8 users safe on Instagram?
9    A.   Yes.  These -- almost all of these tools do
10 not do what they say they do on their pages.
11    Q.   And when you were working or consulting for
12 Instagram between 2019 and 2021, was launching
13 effective safety features a top priority for
14 Instagram?
15    A.   It was not.
16    Q.   During that time period, did you witness
17 the company spending more resources on safety
18 features or features geared at increasing
19 engagement?
20    MS. JONES:  Objection.  Foundation.
21    THE WITNESS:  At features geared at
22 increasing engagement.  I saw the -- I saw the
23 company investing more on Reels and other products
24 over the safety tools.
25 ///

Page 551

1    BY MR. PHELPS:
2    Q.   Do you recall how many people were using
3 Instagram in 2019?
4    A.   I think it was around 1 billion.
5    Q.   Do you think safety should have been
6 Instagram's top priority in 2019 when it had over a
7 billion people on the platform?
8    A.   Absolutely.
9    Q.   Do you think it's responsible for a company
10 like Meta to be operating a platform like Instagram
11 with over 1 billion people on it, many of them kids,
12 and not treat safety as the number one priority?
13    MS. JONES:  Objection to the form.
14    THE WITNESS:  I think it's negligent for
15 them to do so.
16    BY MR. PHELPS:
17    Q.   You can set this document to the side.
18    I want to spend the next few minutes
19 focusing on one specific safety issue, the issue of
20 social media addiction.
21    Are you familiar with that concept?
22    A.   Yes.
23    Q.   Okay.  You spoke yesterday and maybe
24 earlier today with Mr. Cartmell about your work at
25 Meta from 2009 to 2015; is that right?

Page 552

1    A.   Yes.
2    Q.   And during that time period, you were the
3 head of Meta's protect and care team; is that true?
4    A.   Yes.
5    Q.   Okay.  And that position involved working
6 to keep people safe on Facebook; right?
7    A.   Yes.
8    Q.   And during that time period, was social
9 media addiction an issue you understood the company
10 to be working on?  And I'm referring to the 2009 to
11 2015 time period.
12    MS. JONES:  Objection.  Foundation.
13    THE WITNESS:  It was not.  I mean, I think
14 the -- both Facebook and Instagram was about seeing
15 the post of the people that you followed.  It didn't
16 have all of these infinite scroll features.  It
17 didn't have algorithmic feeds.  I think that the
18 first good paper understanding and highlighting
19 these issues came out around 2016, I believe.
20    BY MR. PHELPS:
21    Q.   Okay.  And that was going to be my
22 question, is if -- well, let me ask you this:  If
23 addiction were something the company were focused on
24 between 2009 and 2015, would that have fallen on the
25 plate of the protect and care team that you were

CONFIDENTIAL

Page 553

1 leading?
2    A.   Yes.
3        MS. JONES:  Hold on.
4        Objection.  Foundation.
5        THE WITNESS:  Yes.
6        BY MR. PHELPS:
7    Q.   But it wasn't; right?
8    A.   Correct.
9    Q.   And based on your experience as an online
10 safety expert, somebody who pays attention to the
11 industry, are you aware of any changes to the
12 Instagram product between the time you left in 2015
13 and the time you rejoined in 2019 that might have
14 made the Instagram product more addictive or more
15 difficult for users to turn away from?
16       MS. JONES:  Objection to the form.
17 Foundation.
18       THE WITNESS:  Yes.
19       BY MR. PHELPS:
20   Q.   Could you give me just a high-level
21 understanding of what those changes were?
22   A.   It's the shift from only getting the
23 content of the people that you follow in
24 chronological order to instead getting fed an
25 infinite stream of the images, depending on the

Page 554

1 surface, on search, all these areas, where you can
2 just spend as much time as you're called to do.  And
3 those areas being fed by algorithms that are
4 optimized for engagement.
5    Q.   And so by the time you began working at the
6 company, again, in 2019, there was an increase in
7 features, at least of Instagram, that would tend to
8 have this addicting effect; right?
9        MS. JONES:  Objection.  Foundation.  Form.
10       THE WITNESS:  Yes.
11       BY MR. PHELPS:
12   Q.   Okay.  And do I recall correctly that when
13 you rejoined Instagram in 2019, one of your
14 objectives when you started was to talk to people
15 within the company about topics relating to user
16 well-being?
17   A.   Correct.
18   Q.   And --
19   A.   Excuse me.
20       (Discussion off the stenographic record.)
21       MR. PHELPS:  Why don't we take one second
22 off the record.
23       THE VIDEOGRAPHER:  The time is 2:36.  We're
24 off the record.
25       (Recess taken from 2:36 to 2:38.)

Page 555

1        THE VIDEOGRAPHER:  The time is 2:39.  We're
2 back on the record.
3        BY MR. PHELPS:
4    Q.   One of those topics you discussed when you
5 were rejoining Instagram -- strike that.
6        Let me rephrase -- rephrase that.
7        Was one of -- was addiction, slash,
8 problematic use one of the topics you discussed when
9 you were -- when you rejoined Instagram?
10       MS. JONES:  Objection to the -- excuse me.
11 Objection to the form.
12       THE WITNESS:  Yes.
13       BY MR. PHELPS:
14   Q.   What did you learn at that time about the
15 concept of social media addiction from your
16 colleagues within Instagram?
17       MS. JONES:  Same objection to the form.
18 And also asked and answered.
19       THE WITNESS:  That it was a -- somewhat of
20 a radioactive topic, that if you worked on it, it
21 invited attention from executives.  And there were
22 some words we were not supposed to use, for example.
23       BY MR. PHELPS:
24   Q.   Let me write that down.  There were a
25 couple -- let me ask you this question first:  Did

Page 556

1 you learn from colleagues that there was a serious
2 problem with users becoming addicted or being
3 addicted to Instagram?
4    A.   Yes.
5    Q.   And do I understand your testimony
6 correctly that in spite of this serious problem,
7 there was an understanding within folks working on
8 well-being issues that the concept of addiction was
9 radioactive within the company?
10       MS. JONES:  Objection to the form.  Asked
11 and answered.
12       THE WITNESS:  Yes.
13       BY MR. PHELPS:
14   Q.   And when you -- you used the phrase to "it
15 would draw attention from executives."
16       Is that unwanted or negative attention if
17 executives learned that folks were working on
18 addiction?  Was that your understanding?
19   A.   Yes.
20   Q.   Was there an effort within the company to
21 use the term "problematic use" rather than the term
22 "addiction," as you understood it?
23   A.   Yes.
24   Q.   Do you think the way the issue of addiction
25 or problematic use was handled within Meta was

52 (Pages 553 - 556)

CONFIDENTIAL

Page 557

1 driven by public relations concerns?
2        MS. JONES: Objection. Foundation.
3        THE WITNESS: Yes.
4        BY MR. PHELPS:
5     Q.  What do you mean by that?
6     A.  It means that what I found at the time was
7 that what the company was trying to do was to change
8 the conversation in a misleading way by redefining
9 words, like being able to say, "We've looked at
10 problematic usage and found that it doesn't affect a
11 lot of people."
12        And they kind of redefined each of these
13 words in order to be able to make that statement,
14 which is, I think, something that they've continued
15 to do in other areas rather than to say, "Yeah, this
16 is -- this is an issue. We're going to investigate
17 it with transparency. We're going to invite experts
18 and invite them to talk about our understanding of
19 this issue and the effectiveness of the measures
20 that we have."
21        And then I think everybody would be like,
22 "Great."
23     Q.  Everybody within the well-being teams but
24 maybe not necessarily everyone at the executive
25 level; right?

Page 558

1        MS. JONES: Let me just object.
2 Foundation.
3        MR. PHELPS: I can withdraw the question.
4        THE WITNESS: Okay.
5        BY MR. PHELPS:
6     Q.  Based on your conversations with colleagues
7 in 2019, do you recall whether Meta had implemented
8 effective features relating to problematic use or
9 addiction?
10    A.  They had not.
11    Q.  Okay. Let's look at the next exhibit,
12 which will be Exhibit 55.
13        (Marked for identification purposes, Bejar
14        Exhibit 55.)
15        BY MR. PHELPS:
16    Q.  When you've had the chance to take a look,
17 can you just let me know what you understand
18 Exhibit 55 to be? And then I'll ask you some
19 follow-up questions.
20    A.  Yes. This is a press release for
21 time-spent tools on Facebook and Instagram.
22    Q.  Dated August 2018?
23    A.  Correct.
24    Q.  So this was in place when you began working
25 for Instagram in 2019?

Page 559

1     A.  Yes.
2     Q.  Okay. Let's take a look at this first
3 paragraph. Starting with "Today we are announcing."
4        Do you see that?
5     A.  I do.
6     Q.  I want to focus you --
7        MR. PHELPS: And, Jim, if we could
8 underline or highlight the last two sentences of
9 that first paragraph, "We want the time," through
10 the end of that paragraph.
11        BY MR. PHELPS:
12    Q.  It says (as read):
13        "We want the time people spend on
14        Facebook and Instagram to be intentional,
15        positive, and inspiring. Our hope is
16        that these tools give people more control
17        over the time they spend on our platforms
18        and also foster conversation between
19        parents and teens about the online habits
20        that are right for them."
21        Did I read that right, Mr. Bejar?
22    A.  Yes.
23    Q.  And with those two sentences, what's your
24 understanding of what is being conveyed to the
25 public?

Page 560

1        MS. JONES: Let me just object on
2 foundation.
3        Go ahead.
4        THE WITNESS: They're trying to convey that
5 it's a priority for them that the time people spend
6 on Instagram be intentional, positive, and
7 inspiring. And that these tools provide people
8 control over that time. And that they will help
9 inform good conversations between parent and teens
10 about online habits.
11        BY MR. PHELPS:
12    Q.  Do you think this tool was -- lived up to
13 that language?
14    A.  It does not.
15    Q.  Okay. Let's read the next paragraph.
16        I'll withdraw that.
17        Why do you not believe that this tool lives
18 up to that language?
19    A.  A number of reasons. It's not on by
20 default. So you have to go into a setting to turn
21 it on.
22        It doesn't actually give you control over
23 the time you spent; you get a reminder about time
24 spent. And when I think of control or I think of
25 limit, I think something that is a -- firm

53 (Pages 557 - 560)

CONFIDENTIAL

Page 561

1 boundary.
2      I think that when you look at
3 notifications, the options are sort of insufficient,
4 and you have to keep going in to say "Mute for
5 four hours, mute for four hours, mute for
6 four hours." And I don't know how many people did
7 that.
8      I don't know how many people stopped using
9 the app after the reminder, that trigger.
10      And I also understand that there were
11 issues with the implementation of this that were
12 well-known. But as far as I was aware in the time I
13 was there, there was nobody working on -- on this
14 tool.
15      Q.  You talked about opt-in features. You
16 talked about it not actually kicking people off the
17 platform.
18      Is another -- do you know if this tool is
19 something a user would have to navigate into the
20 settings to access?
21      MS. JONES:  Objection. Foundation.
22      THE WITNESS:  Yes. That was -- it's
23 something that you would have to navigate into
24 settings to turn on.
25 ///

Page 562

1      BY MR. PHELPS:
2      Q.  Okay. And would that also have an impact
3 on the adoption rate?
4      A.  Absolutely.
5      Q.  Okay. And you joined Instagram, like, a
6 little over a year after this feature was announced;
7 right?
8      A.  Correct.
9      Q.  Do you know what person or team had
10 responsibility for this feature at -- when you
11 joined Instagram?
12      A.  I believe the feature had been implemented
13 by the engineers who reported to ▓▓▓▓▓▓▓▓,
14 who was one of the engineering managers I worked
15 with closely during my time there.
16      Q.  Do you know if anyone actually had
17 responsibility within Instagram for working to
18 increase people's awareness of this tool?
19      A.  I was not aware of anybody working on
20 increasing usage of this tool.
21      And I would also say that when you look at
22 the first sentence, which is how they want people to
23 spend time on Facebook and Instagram, if it was a
24 prioritized effort, what I would expect to see was a
25 metric and a framework and a priority that was

Page 563

1 discussed by the well-being leads meetings ongoing
2 and then a team kind of dedicated to maintaining
3 that, increasing usage, and making sure that the
4 product was effective. And none of these things
5 were present as far as I was aware for the two years
6 I was at Instagram.
7      Q.  And the fact that there was no metric and
8 no folks sort of evaluating the tool on an ongoing
9 basis and working to increase adoption, what would
10 that -- what effect would that have in your view on
11 rendering this tool a success in mitigating
12 problematic use?
13      MS. JONES:  Objection to the form and
14 foundation.
15      THE WITNESS:  I believe it sets up a tool
16 for failure other than whatever purpose it served as
17 a press release.
18      BY MR. PHELPS:
19      Q.  It sounds like you're saying that launching
20 a feature and putting out a press release is really
21 just an initial step on the path towards making sure
22 people who need help get help; is that fair?
23      MS. JONES:  Objection to the form.
24      THE WITNESS:  That is correct. If -- if
25 it's a priority to help teens to effectively manage

Page 564

1 their time on Facebook, you have a team dedicated to
2 it. There are clear metrics. They're constantly
3 improving the product.
4      As the product changes, you adapt and you
5 learn. It's a commitment to the problem space over
6 a long period of time that requires resources,
7 attention, and metrics.
8      And then you would see the feature change
9 over time as they learned ways to make it better in
10 the way that you see the Facebook application change
11 constantly where they add things and things move
12 around. You can see -- you can see them working on
13 it as you update the application. And that was not
14 the case for a feature like this.
15      BY MR. PHELPS:
16      Q.  You talked about work being done on a -- on
17 a feature over a long period of time. That period
18 of time would include after the feature was
19 launched, not just building the feature, but on
20 an ongoing basis into the future; is that right?
21      MS. JONES:  Objection to the form.
22      THE WITNESS:  That's correct. A safety
23 feature is a commitment to that harm and that
24 feature over the lifetime of the product.
25 ///

54 (Pages 561 - 564)

Page 565

1     BY MR. PHELPS:
2     Q.  So if someone wanted to do a real
3  assessment of whether a safety feature was effective
4  in addressing whatever issue it's targeted at, they
5  couldn't just look at a press release; they would
6  need to look at and scrutinize what resources were
7  put into that feature in the months and years after
8  it was released; is that true?
9     A.  That's correct.
10    Q.  Okay.  You can set this document to the
11 side.
12    Are you aware of any other features that
13 Instagram launched that addressed the issue of
14 problematic use or addiction when you were
15 consulting for Instagram between 2019 and October of
16 2021?
17    A.  I am not.
18    Q.  Did you have the understanding during that
19 time period whether there was a tension between the
20 company's prioritization of growth and engagement on
21 one hand and any efforts to mitigate problematic use
22 or addiction on the other hand?
23    MS. JONES:  Objection to the form.
24    THE WITNESS:  What I witnessed firsthand
25 and had conversations with people about was that

Page 566

1  there were no substantive efforts to understand and
2  mitigate addiction.
3     And so then, like, it's -- there's no --
4  there's no competition; right?  Because as you look
5  at the company develop the product, it's kind of
6  like so many people developing features that are
7  intended to be used as much as possible.  And when
8  is that too much; right?  What's the backstop?
9  What's the balance?  How much time is too much time?
10 Which is really the question underlying addiction,
11 is what is the effect of time spent on teens and how
12 much time is too much time?
13    BY MR. PHELPS:
14    Q.  Do I recall you stopped working for
15 Instagram in October of 2021?
16    A.  Yes.
17    Q.  And was that a notable time for the company
18 in terms of some of these well-being issues we've
19 been discussing yesterday and today?
20    MS. JONES:  Objection.  Asked and answered.
21    THE WITNESS:  Yes.
22    BY MR. PHELPS:
23    Q.  Why is that?
24    A.  Frances Haugen's testimony got a lot of
25 traction in the press talking about issues like

Page 567

1  addiction or body-image issues for girls.
2     MR. PHELPS:  Let's do Exhibit 56.  We'll
3  just ...
4     (Marked for identification purposes, Bejar
5     Exhibit 56.)
6     BY MR. PHELPS:
7     Q.  And I'm not going to ask you substantive
8  questions about this.  I'm just going to sort of
9  orient us to timing.  But let me know when you've
10 had a chance to look at this document and
11 familiarize yourself.
12    A.  Yeah.
13    Q.  What's the document in front of you,
14 Mr. Bejar?
15    A.  It's an article by the Wall Street Journal
16 about Facebook or Meta's knowledge that Instagram is
17 toxic for teen girls.
18    Q.  Okay.  And if you look at the date, that
19 was September 14th, 2021; is that right?
20    A.  That's correct.
21    Q.  And this article is related to the
22 Frances Haugen issue because this is journalism that
23 was based on information she had shared with the
24 Wall Street Journal; is that true?
25    A.  That's correct.  With the Facebook files.

Page 568

1     Q.  And was it your experience in September and
2  October of 2021 that this journalism and the public
3  discussion around it increased the pressure within
4  the well-being teams to build and launch features
5  relating to youth safety?
6     MS. JONES:  Objection to the form.
7  Foundation.
8     THE WITNESS:  Yes.
9     BY MR. PHELPS:
10    Q.  Could you just tell me a little bit about
11 that experience?
12    A.  Yeah.  When -- when these articles started
13 coming out, the people in the well-being team were
14 very upset because, again, people that I had been
15 working with directly had worked on this research,
16 and they were initially very afraid that it would
17 mean that they would lose resources and access to do
18 this work.
19    And so they were afraid that the
20 consequence of Frances speaking publicly about this
21 issue would lead to them not being able to continue
22 developing these issues.
23    That turned into pressure for the company
24 to do something about these issues, both to speak
25 publicly about the research that came to light and

55 (Pages 565 - 568)

Golkow Technologies,
A Veritext Division
877-370-3377                              www.veritext.com

CONFIDENTIAL

Page 569

1 to work on features that I believe got announced
2 in -- around January of the following year.
3    Q.  Do you recall whether Frances was the only
4 person who testified before Congress in the wake of
5 this journalism?
6    A.  I recall her testimony, but I don't, at
7 this point, recall other testimony that you might be
8 referring to.
9    Q.  Do you know if Adam Mosseri testified
10 before Congress in the wake of this journalism?
11    MS. JONES:  Excuse me.
12    Objection.  Foundation.
13    THE WITNESS:  Yes, he did.
14    BY MR. PHELPS:
15    Q.  You recall that?
16    A.  Yeah, I do now.
17    Q.  Did you watch his testimony?
18    A.  I did later.
19    Q.  Yeah.
20    Do you have a sense of the timing of that?
21    A.  I'm not great with dates and so ...
22    Q.  Well, that's okay.
23    Let me hand you what we're going to mark as
24 Exhibit 57.
25 ///

Page 570

1    (Marked for identification purposes, Bejar
2    Exhibit 57.)
3    BY MR. PHELPS:
4    Q.  Mr. Bejar, does this refresh your
5 recollection about the timing of Mr. Mosseri's
6 congressional testimony?
7    A.  Yes, it does.
8    Q.  What's the date of this article?
9    A.  December 8, 2021.
10    Q.  Okay.  And do I recall you just testified
11 that Instagram announced product features around
12 this time?
13    A.  Yes.
14    Q.  Let's hand you what we'll mark as
15 Exhibit 58.
16    (Marked for identification purposes, Bejar
17    Exhibit 58.)
18    BY MR. PHELPS:
19    Q.  And what's this article?
20    A.  It's a press release by Meta talking about
21 safety features dated December 7th, 2021.
22    Q.  Okay.  And we're going to go into this
23 document in some detail, but before I do that, let's
24 just go back to the timeline we've been building.
25    MR. PHELPS:  So, Jim, you can pick up with

Page 571

1 the last one we were at, and let's get that up on
2 the screen.
3    BY MR. PHELPS:
4    Q.  And let's just -- why don't you just follow
5 along on the screen, Mr. Bejar, and see if you -- we
6 see the three Molly Russell dates.
7    And then do you see this Wall Street
8 Journal article reflected on September 2021?  Is
9 that consistent with Exhibit 56?
10    A.  Yes.
11    MR. PHELPS:  Okay.  And then if you want to
12 progress one slide, Jim.
13    BY MR. PHELPS:
14    Q.  And then on December 7th, 2021, you see an
15 announcement of "Take a Break."
16    Do you see that?
17    A.  Yes.
18    MR. PHELPS:  And then if you progress one
19 more slide, Jim.
20    BY MR. PHELPS:
21    Q.  The next day, December 8th, Adam Mosseri's
22 testimony; is that right?
23    A.  Yes.
24    Q.  Okay.  Do you think these dates are
25 coincidental?

Page 572

1    MS. JONES:  Objection.  Foundation.
2    THE WITNESS:  I do not think they're
3 coincidental.
4    BY MR. PHELPS:
5    Q.  Okay.  Let's focus on Exhibit 58.
6    Bear with me for one second.
7    Just lost my place.
8    I don't have a page number, but it's maybe
9 six or seven pages in, starting with "It's important
10 to me."
11    A.  And can you show me the page?  I'm having
12 trouble.
13    Q.  You're looking at the wrong document.
14    A.  Oh.  Sorry.
15    Q.  It's okay.
16    And it might be easier on the screen,
17 but --
18    A.  Yeah.  I'll take it from the screen.
19    Q.  It starts -- and Adam is the author here.
20    We saw that; right?
21    A.  Yes.
22    Q.  Okay.  And he says (as read):
23    "It's important to me that people
24    feel good about the time they spend on
25    Instagram, so today" -- excuse me -- "so

56 (Pages 569 - 572)

CONFIDENTIAL

1  today we're launching 'Take a Break' to
2  empower people to make informed decisions
3  about how they're spending their time.
4  If someone has been scrolling for a
5  certain amount of time, we'll ask them to
6  take a break from Instagram and suggest
7  that they set reminders to take more
8  breaks in the future.  We'll also show
9  them expert-backed tips to help them
10  reflect and reset."
11  Do you see that?
12  A.  I do.  I see that.
13  Q.  It says (as read):
14      "To make sure that teens are aware of
15  this feature, we'll show them
16  notifications suggesting they turn these
17  reminders on.  We're encouraged to see
18  that teens are using Take a Break.  Early
19  test results show that once teens set the
20  reminders, more than 90 percent of them
21  keep them on."
22      It says "We're launching this feature" in a
23  number of countries including the U.S., roughly.
24  Do you see that?
25  A.  Yes, I do.

1  Q.  Based on your experience in online safety
2  and well-being, do you have an assessment of this
3  product feature that's described in the paragraphs
4  we just looked at?
5  MS. JONES:  Objection.  Foundation.
6  THE WITNESS:  Yes, I do.
7  BY MR. PHELPS:
8  Q.  What is your -- what is that assessment?
9  A.  I -- I can't imagine this being effective
10  at helping a teenager quit out the app or put down
11  the phone and effectively take a break.  Because
12  what this is, is it's a little snooze.  It's a
13  reminder.  And you get -- the screen goes up and you
14  say, "Okay, I'm done."
15      And so I would imagine -- and I also
16  believe that there's the data very likely in the
17  company that shows, of the people that you show
18  the -- the notification about turning it on, how
19  many actually did turn it on?
20      And then how -- like, what's the behavior
21  when the Take a Break screen comes up?  Because if
22  the goal is to get teenagers to take a break, then
23  you would measure the feature as to how good it is
24  set getting teenagers to take a break.
25      And so if the screen comes up and it gets

1  dismissed rapidly, then it just becomes something
2  that you've trained the teenager to click away from.
3  Those teenagers that opted into the feature --
4  which, again, you would want to know how many that
5  is because when you look at the text that you just
6  shared with me, it's kind of cherry-picking the
7  wrong statistics in order to say, "Well, if people
8  who do turn it on, 90 percent of them keep them on."
9      But that's not the number that matters.
10  The number that matters is how many people adopted
11  it.  And the number that matters is how many people,
12  when shown the screens, took a meaningful break.
13  Q.  Let me just unpack that.
14      So you're not sure how many people actually
15  were prompted with this encouragement to take a
16  break to begin with from this press release; right?
17  A.  That's correct.
18  Q.  And you're not sure how many people opted
19  in to this feature from this press release; right?
20  A.  That's correct.
21  Q.  But you can tell from this press release
22  that this is an opt-in rather than an opt-out
23  feature; right?
24  A.  Correct.
25  Q.  And that would make you -- your assessment

1  would therefore be that this is less likely to be
2  effective than if it were an opt-out feature; true?
3  A.  Correct.
4  Q.  Okay.  And you don't know, I presume, based
5  on the timing of this, whether there was an internal
6  team dedicated to making sure this feature was a
7  success after it was launched; right?
8  MS. JONES:  Objection.  Foundation.
9  THE WITNESS:  Correct.  A success in terms
10  of doing what the feature says it does, which is
11  taking a break.
12      I think an accurate description of this
13  feature for people who did turn it on, it was a
14  reminder of how much time you had spent since you
15  had last hit the Snooze button.
16  BY MR. PHELPS:
17  Q.  A user can just scroll right past the --
18  the break encouragement that is described in this
19  tool; right?
20  A.  Correct.
21  Q.  And so do you have a perspective on how
22  valuable that would be for a teen struggling with
23  addiction to Instagram?
24  MS. JONES:  Objection.  Foundation.
25  THE WITNESS:  I would actually imagine

Page 577

1 that, A, it wouldn't help that teenager, to answer
2 the question; and, B, that you likely created data
3 about teens that are addicted, because if a teen
4 turned it on and just kept dismissing the "Take a
5 Break" warning as soon as it was shown many times a
6 day, I think that actually would be a pretty good
7 indicator of addiction or problematic usage.
8       BY MR. PHELPS:
9       Q.  In other words, Meta had information that
10 it could use to infer whether there was -- there
11 were users -- withdraw that.
12       In other words, Meta had information it
13 could have used to identify teens who were
14 struggling with addiction to Instagram; right?
15       MS. JONES: Objection to the form and --
16       THE WITNESS: That's correct.
17       MS. JONES: Excuse me.
18       And foundation.
19       BY MR. PHELPS:
20       Q.  And it could have taken action, for
21 example, to cut those users off of Instagram at a
22 certain point, daily or in some way; right?
23       MS. JONES: Same objection.
24       THE WITNESS: Absolutely.  And if you want
25 to go back to that first sentence that says "It's

Page 578

1 important to me that people feel good about the time
2 they spend on Instagram," by what measure?  Do they
3 ask teens about the -- how they feel about the time
4 they're spending?  Do they ask questions that would
5 bring to light when teens feel bad about the time
6 they spend on Instagram?
7       BY MR. PHELPS:
8       Q.  You don't know that that was ever done;
9 right?
10       A.  Not as far as I'm aware.
11       Q.  Elsewhere in this press release, there's a
12 reference to parental supervision.
13       Do you see that?
14       A.  Yes.
15       Q.  Do you think it's a coincidence that
16 Instagram announced plans to launch a parental
17 supervision tool in December of 2021, even though
18 the tool itself wasn't yet ready to be launched?
19       MS. JONES: Objection to the form and
20 foundation.
21       THE WITNESS: It was not.  And I think
22 it's, for a company like Meta, extremely rare for
23 them to announce that they were going to be doing a
24 feature later rather than to announce the feature
25 the moment it goes live.

Page 579

1       MR. PHELPS: Let's look at the next
2 exhibit, which is going to be 58 -- what did you
3 say?  Fifty-nine.
4       (Marked for identification purposes, Bejar
5       Exhibit 59.)
6       BY MR. PHELPS:
7       Q.  What is this document, Mr. Bejar?
8       A.  This is the Instagram press release by
9 Adam Mosseri about the parental supervision tools
10 for Instagram as well as for the VR efforts in the
11 company.
12       (Stenographer interrupted for clarification
13       of the record.)
14       MR. PHELPS: Keep us in line, please.
15       BY MR. PHELPS:
16       Q.  What's the date of this document,
17 Mr. Bejar?
18       A.  March 16, 2022.
19       Q.  Is parental supervision something you had
20 advocated for Meta to adopt prior to March of 2022?
21       A.  Yes.  I had a discussion about it with
22 Mark Zuckerberg in, I believe, 2011.
23       Q.  Eleven years before this press release?
24       A.  Yes.
25       Q.  In your discussion with Mark Zuckerberg in

Page 580

1 2011, did you indicate that building parental
2 supervision feature on -- at that time presumably
3 Facebook would have helped kept -- keep kids safe on
4 the platform?
5       A.  Yes, in the context that the company was
6 thinking about having kids under 13 on the platform.
7       And the question is, how do you design
8 parental supervision so that it helps parents and
9 kids to be safe online.
10       Q.  Was it your assessment in 2011 as a -- let
11 me withdraw that.
12       Were you managing engineers within Meta in
13 2011?
14       A.  Yes.
15       Q.  Was it your assessment in 2011 that Meta
16 had the engineering capacity to build a parental
17 supervision tool?
18       MS. JONES: Objection.  Foundation.
19       THE WITNESS: Yes.
20       BY MR. PHELPS:
21       Q.  Do you know why Meta didn't build parental
22 supervision tools until 11 years later?
23       A.  During the time that I was there, building
24 parental tools that helped people between 13 and 15,
25 at least self-declared people between 13 and 15, on

58 (Pages 577 - 580)

Page 581

1 the platform was not a priority.
2    Q.  As someone who's worked in the area of
3 online safety for many years, do you think it would
4 have been prudent for Meta to build parental
5 supervision tools much, much earlier than 2022?
6       MS. JONES:  Objection to the form.
7 Foundation.
8       THE WITNESS:  Absolutely.  I think that at
9 the moment that Instagram had all of these sort of
10 features that allowed contact and content and it was
11 made available to young people, that that is the
12 moment at which they should have started developing
13 and continued to develop tools that meaningfully
14 supported parents and kids in the partnership of
15 being safe online.
16      BY MR. PHELPS:
17   Q.  Based on this press release, is it your
18 understanding that the parental tools that the
19 company launched in 2022 was an opt-in feature?
20   A.  Yes.
21   Q.  Based on this press release, is it your
22 understanding that the parental supervision tools
23 the company launched in 2022 was something you had
24 to navigate into the settings to activate?
25      MS. JONES:  Objection to the form.

Page 582

1       THE WITNESS:  Yes.
2       BY MR. PHELPS:
3    Q.  What impact would those features of
4 parental supervision have for adoption and
5 effectiveness based on your industry experience?
6       MS. JONES:  Objection.  Foundation.  Calls
7 for speculation.
8       THE WITNESS:  It would mean that the
9 feature would not be adopted and then as such would
10 not be effective as a safety feature.
11      BY MR. PHELPS:
12   Q.  Do you know whether the company had teams
13 measuring the effectiveness of these parental
14 supervision tools in 2022?
15   A.  I did not have visibility on that.
16   Q.  If you were trying to assess the
17 effectiveness of this tool, would you want to know
18 if there were teams measuring and improving the tool
19 within the company?
20   A.  Absolutely.
21   Q.  And that -- that's, yet again, the concept
22 that a press release and launching a tool is really
23 just the first step into ensuring its success?
24      MS. JONES:  Objection to the form.
25      THE WITNESS:  Correct.  There has to be a

Page 583

1 long and deep commitment backed by measurement and
2 feature improvements to make sure that the tool is
3 effective at protecting the harm.
4       MR. PHELPS:  Let's go to the next document,
5 which is going to be Exhibit 60.
6       (Marked for identification purposes, Bejar
7       Exhibit 60.)
8       BY MR. PHELPS:
9    Q.  Are you familiar with this document,
10 Mr. Bejar?
11   A.  Yes, I am.
12   Q.  Is this a press release relating to the
13 "Quiet Mode" feature?
14   A.  Yes, it is.
15   Q.  Can you provide a brief overview of the
16 "Quiet Mode" feature?
17   A.  Yeah.  "Quiet Mode" feature is a good
18 example of a really good feature in terms of the
19 problem that it solves, which is not giving
20 notifications to teenagers at night so that they
21 feel compelled to be looking at their phone or
22 having to disrupt their sleep.
23      And so having something like Quiet Mode
24 will help, I think, a teenager get more rest.  And I
25 think it was a well-designed feature from the -- the

Page 584

1 way that it was conceived.
2    Q.  And do you know whether this is another
3 opt-in feature?
4    A.  Yeah.  That was the problem.  The problem
5 was that this was a good feature were it to be
6 turned on.  But the problem is that it was opt in.
7 And my experience is opt in is -- hardly anybody
8 uses the feature.
9       So then as long as this was opt in, its
10 primary lifetime would be in a press release because
11 it wouldn't effectively be preventing teenagers from
12 getting notifications at night.
13   Q.  And Instagram had data that would have
14 enabled it to tell which kids were spending a lot of
15 time on the application late at night; right?
16      MS. JONES:  Objection.  Foundation.  And to
17 form.
18      THE WITNESS:  Correct.
19      BY MR. PHELPS:
20   Q.  And if it noticed that kids were struggling
21 with that issue consistently, it could have
22 defaulted them into this feature or otherwise cut
23 off their nighttime Instagram usage; right?
24      MS. JONES:  Same objection.  Form and
25 foundation.

59 (Pages 581 - 584)

Page 585

1    THE WITNESS: Correct. If -- if it's a
2 priority to deal with addiction, then you understand
3 the problem, find people that might be affected by
4 it, and then you make sure that you either turn on
5 by default or you do a very hard sell of the
6 features for them in order for them to get an
7 effective protection. It's kind of the life cycle
8 of an effective safety feature.
9    BY MR. PHELPS:
10    Q. And that, what you just described, is not
11 what's reflected that the company did in this press
12 release at least; right?
13    A. Correct.
14    Q. You can set that to the side.
15    MR. PHELPS: I've been going, I think, over
16 an hour. I'm just trying to power through to get
17 him to you quickly.
18    MS. JONES: Okay.
19    MR. PHELPS: But if people need a minute,
20 I'm happy to give it.
21    MS. JONES: I defer to the witness and the
22 court reporter.
23    THE WITNESS: I'm okay.
24    MR. WARD: Yeah, we can keep going.
25    MR. PHELPS: Okay. I just wanted to --

Page 586

1    MS. JONES: Thank you.
2    MR. PHELPS: -- do that while we -- while I
3 transitioned.
4    MS. JONES: Are you still roughly on track
5 timewise?
6    MR. PHELPS: I won't be done in 13 minutes,
7 but I won't be too long.
8    MS. JONES: Okay.
9    MR. PHELPS: Mark Exhibit 61.
10    (Marked for identification purposes, Bejar
11    Exhibit 61.)
12    BY MR. PHELPS:
13    Q. And while we're passing it to you,
14 Mr. Bejar, are you familiar with the Instagram "Teen
15 Accounts" feature that was launched September of
16 last year?
17    A. Yes, I am.
18    Q. "Last year" being 2024?
19    A. Correct.
20    Q. What's your understanding of Teen Accounts,
21 as least as it's supposed to operate in theory?
22    A. So, I mean, I think the -- the way I kind
23 of look at these things is I see the description
24 that Instagram gives in the press release that talks
25 about what the feature does.

Page 587

1    So, again, new experiences for teen and
2 parents. They're introducing them to automatically
3 place teens in built-in protections and reassure
4 parents that they're having safe experiences, that
5 they will limit who can contact teens and what
6 content they can see, and they will ensure that
7 their time is well-spent and that teens under
8 16 will need a parent's permission to change any of
9 the built-in protections to be less strict within
10 Teen Accounts.
11    Q. And let me ask you, is that something -- if
12 it was well-designed and executed, is that the type
13 of feature you would embrace as a safety expert?
14    A. Absolutely.
15    Q. We can get into specifics, but let me just
16 ask you before we do that, is it your view that the
17 promise of Teen Accounts that you just described has
18 actually been lived up to by Instagram?
19    MS. JONES: Objection. Foundation and
20 form.
21    THE WITNESS: It is my view that Teen
22 Accounts make these big promises about teen safety
23 to parents and to teens and that the product as
24 implemented does not live up to those promises.
25 ///

Page 588

1    BY MR. PHELPS:
2    Q. And you've assessed the product through
3 some of the testing that you discussed in depth with
4 Mr. Cartmell?
5    A. Yes, I have.
6    Q. Okay. Let's go to the -- see a page
7 starting with "Reimagining Teens' Experiences on
8 Instagram"?
9    Do you see that?
10    A. I do.
11    Q. Okay. And we can read through it if we
12 need to, but just in the interest of time, let me
13 take a -- make an effort at summarizing it. And you
14 can tell me if I've got it right.
15    Does this paragraph roughly connote that
16 teens are going to be able to select topics that
17 they want to see and explore and that that will be
18 the focus of their experience on Instagram?
19    A. Correct, because people -- parents
20 shouldn't have to worry about their teens having
21 unsafe or inappropriate experiences.
22    Q. Okay. And do you see two images at the
23 bottom of this page?
24    A. I do.
25    Q. Okay. And when you look at the last

Page 589

1 sentence of this paragraph, "Teens will get access
2 to a new feature" and when you see this feature
3 illustrated, what do you think this is communicating
4 to parents?
5        MS. JONES: Objection. Foundation.
6        THE WITNESS: I think this communicates to
7 parents that what their teens are going to get
8 recommended are animals, sports, travel, all of
9 these categories and then some examples of what
10 sports looks like.
11       BY MR. PHELPS:
12   Q.   Okay.  And when you tested Teen Accounts,
13 that is not what you found; is that right?
14   A.   That is correct.  A teen account connected
15 to a parent account with default settings for
16 everything, including sensitive content controls,
17 was recommended graphically violent, sexual, and
18 other kinds of content that we've talked about.
19       And when I looked at the parent account, it
20 had the same sort of interface that showed the
21 interests here, but it did not give any transparency
22 to the parent about the kind of content that
23 Instagram was recommending that teen test account.
24   Q.   If you look at the next page, I refer you
25 to the -- I guess the first, the second, and the

Page 590

1 fourth bullets, which all sort of go to -- would you
2 agree with me that those three bullets all sort of
3 go to the concept of who teens can interact with on
4 Instagram?
5   A.   Correct.
6   Q.   And they -- would you agree with me that
7 these create the impression that there's going to be
8 meaningful limits on teens' interactions with
9 strangers or people they don't want to be
10 interacting with on Instagram?
11       MS. JONES: Objection.  Form and
12 foundation.
13       THE WITNESS: Correct.
14       BY MR. PHELPS:
15   Q.   And did you test that aspect of Teen
16 Accounts?
17   A.   I did.
18   Q.   And what was your experience in reality?
19   A.   So I found in initial testing across
20 multiple accounts that teens could be messaged by
21 people they don't follow and through a story.  This
22 was in the videos that I have provided.  That seems
23 to have been fixed now, which I'm really happy
24 that's the case.  But I was very disturbed to find
25 that when I first found it.

Page 591

1        And for those accounts, those chats are
2 still -- last time I checked, they work for an
3 account where the adult doesn't -- the teen doesn't
4 follow the adult, but the adult does follow the
5 teen.
6        Also, when I retested that, I was somewhat
7 disturbed to realize that -- you see how the -- how
8 this says how they can only be messaged by people
9 they follow or they are already connected to?  But
10 it doesn't talk about who the teen can message.
11       And so I was going through Reels, and I
12 just clicked on a couple of random profiles from
13 Reels recommendation.  And there was a "Message"
14 button there.  And I was able to click on "Message"
15 and initiate a conversation with a complete stranger
16 that there was no connection.
17       And so I found that pretty disturbing in
18 terms of what the expectations that this sets.
19   Q.   And then the next bullet, "Time limit
20 reminders."
21       Do you see that?
22   A.   I do.
23   Q.   What does the phrase "time limit" mean to
24 you?
25   A.   It means that it's a limit, something that

Page 592

1 stops you from using the application further.
2   Q.   And is that, as you understand it, a
3 feature of Teen Accounts in reality?
4   A.   It is not.  For the teenager and the
5 settings that they have access to, it is a reminder
6 of the amount of time used.  There is no way for a
7 teenager to set an actual limit for themselves.
8 That has to be done by the parent account.
9   Q.   Going back to the front of this document,
10 do you see the date?
11   A.   September 17, 2024.
12   Q.   Was that a significant time period for the
13 company in terms of issues relating to kids online
14 safety?
15       MS. JONES: Objection. Foundation. Form.
16       THE WITNESS: Yes, it was.
17       BY MR. PHELPS:
18   Q.   Why?
19   A.   The Kids Online Safety Act that had passed
20 the Senate with deep bipartisan support was heading
21 to the floor of the House either that day or, like,
22 the next day.  I think it was actually on Tuesday.
23 If this is a Tuesday, that was the day that that was
24 heading to the floor.
25       MR. PHELPS: Let's introduce the next

CONFIDENTIAL

Page 593

1  exhibit.  It's going to be 62.
2          (Marked for identification purposes, Bejar
3           Exhibit 62.)
4          BY MR. PHELPS:
5      Q.  So what's the headline of -- what is this
6  document, Mr. Bejar?
7      A.  It's a news article from September 18th,
8  2024, that talks about how the House Committee
9  advanced the Kids Online Safety Act despite
10 last-minute changes that left lawmakers discontent.
11     Q.  Okay.  And you understand that the -- well,
12 let me -- let me just ask you, do you see a date of
13 that article?
14     A.  Yes.  September 18, 2024.
15         MR. PHELPS:  And, Jim, let's just go back
16 to the demonstrative.
17         And so if you advance that one, Jim.
18         BY MR. PHELPS:
19     Q.  So September -- there's maybe a typo there.
20 I think it's -- I think the date of this article is
21 September 18th rather than 14th.
22         Do you see the typo.
23     A.  I see the typo.
24     Q.  Roughly; right?
25     A.  It's the 18th.

Page 594

1          MR. PHELPS:  And then if you advance that
2  one more, Jim.
3          BY MR. PHELPS:
4      Q.  And is this consistent with that?  This
5  article, this press release by Meta was effectively
6  concurrent with the House taking action on the
7  Kids Online Safety Act?
8      A.  Yes.
9      Q.  Do you think that's a coincidence?
10         MS. JONES:  Let me just object on
11 foundation.
12         THE WITNESS:  I don't think it's a
13 coincidence.
14         BY MR. PHELPS:
15     Q.  Are you familiar with the -- well, you can
16 put this document to the side.
17         MR. PHELPS:  You can leave -- and let's
18 leave that up, Jim.
19         BY MR. PHELPS:
20     Q.  Are you familiar with the book
21 Careless People by ███████████, Mr. Bejar?
22     A.  Yes, I am.
23     Q.  Is that a recent bestseller that has
24 explosive allegations regarding the author's time at
25 the company?

Page 595

1          MS. JONES:  Objection to the form and
2  foundation.
3          THE WITNESS:  Yes.
4          BY MR. PHELPS:
5      Q.  Okay.  Do you know whether or not
6  Ms.██████████ is scheduled to appear before the
7  United -- a committee of the United States Senate
8  tomorrow?
9          MS. JONES:  Objection.  Foundation.
10         THE WITNESS:  I did not know that.
11         MR. PHELPS:  Hand you an article.
12 Sixty-three.
13         (Marked for identification purposes, Bejar
14          Exhibit 63.)
15         BY MR. PHELPS:
16     Q.  What's the headline of this article?
17     A.  (As read):
18             "'Careless People' author to testify
19          during a Senate hearing about Facebook."
20     Q.  Okay.  And this was written on April 4th.
21         Do you see that?
22     A.  I do.
23     Q.  And it says in the first sentence -- first
24 two sentences, we see Ms.████████ will
25 testify -- the author is writing on April 4th that

Page 596

1  she'll be testifying next week.
2          Do you see that?
3          MS. JONES:  Let me just lodge an objection
4  to the use of this document with Mr. Bejar on
5  foundation grounds.
6          (Stenographer interrupted for clarification
7           of the record.)
8          BY MR. PHELPS:
9      Q.  Is that right?
10     A.  Yes.
11     Q.  And so Wednesday would be tomorrow,
12 April -- or April 9th; is that right?
13     A.  Yes.
14     Q.  Okay.  Do you know if this morning, the day
15 before that testimony is scheduled to occur, Meta
16 announced updates to the "Teen Accounts" feature
17 that we've been discussing?
18     A.  Yes, I am aware of that.
19     Q.  Why are you laughing?
20     A.  I mean ...
21         MS. JONES:  Let me just object to the
22 question as inviting a narrative.
23         THE WITNESS:  I mean, it's such a -- such a
24 game.  If safety was a priority, you announce these
25 things.  You have ongoing transparency.  You have

62 (Pages 593 - 596)

Page 597

1 commitment. You invite people from the outside of
2 the company deep into these teams to review these
3 features and give feedback on them.
4        There's so many things that you can do that
5 show a profound actual commitment to reducing the
6 harm that teenagers experience.
7        But my experience of this is that -- that
8 these releases of a lot of these tools, they're as
9 good as the paper that they're printed on, because
10 when you test the tools -- and have many examples of
11 this -- the tools do not live up to the promises
12 that they are making to parents about what they do.
13 And the timing of them seems to be optimized to deal
14 with PR fallout of hearings, news articles,
15 testimony, and judgments which should not be the
16 driver of this work. The driver of this work are to
17 be the safety of teenagers on Instagram.
18        BY MR. PHELPS:
19    Q.   Let me just hand you this press release
20 from -- let me just hand you one more document.
21 We'll mark it as Exhibit 64.
22        (Marked for identification purposes, Bejar
23        Exhibit 64.)
24        BY MR. PHELPS:
25    Q.   And does this appear to be a press release

Page 598

1 the company put out this morning?
2    A.   Yes.
3    Q.   Okay. I take it you haven't had the chance
4 to test it yet?
5    A.   Not -- not yet.
6    Q.   Okay. You can set that to the side.
7        MR. PHELPS: Jim, let's just go back to our
8 timeline.
9        BY MR. PHELPS:
10    Q.   And so we see "Teen Accounts in 2024."
11        MR. PHELPS: Let's just advance it one more
12 time, Jim.
13        BY MR. PHELPS:
14    Q.   "Teen Account Updates."
15        Do you see that, Mr. Bejar?
16        Does that reflect this press release,
17 Exhibit 64, that there's a Teen Accounts update
18 today?
19    A.   Yes.
20        MR. PHELPS: And one more, Jim.
21        BY MR. PHELPS:
22    Q.   And do you see -- does that accurately
23 reflect the article I showed you indicating that
24 Ms. ██████████ is scheduled to testify before a
25 Senate committee tomorrow?

Page 599

1    A.   Yes.
2    Q.   Set that to the side.
3        MR. PHELPS: And you can take that down,
4 Jim.
5        BY MR. PHELPS:
6    Q.   You think that's a coincidence?
7    A.   I do not think that is a coincidence. And
8 I -- I wish that that was a committee dedicated to
9 regularly hold hearings in order to drive advances
10 on safety.
11    Q.   A couple of final questions for you.
12 Hopefully we can move through these at some speed.
13        We're going to switch off of this topic
14 of -- of safety features. You can put those
15 documents to the side.
16        Without asking you to divulge names, have
17 any former Meta employees asked you for
18 recommendations regarding independent legal counsel
19 in connection with this action?
20    A.   Yes.
21    Q.   Aside from discussions about legal counsel,
22 have you discussed this litigation with any former
23 Meta employees?
24    A.   I have not.
25    Q.   To be clear, you haven't discussed the

Page 600

1 merits of this litigation with ██████████
2    A.   I have not.
3    Q.   ██████████  ██████████?
4    A.   I have not.
5    Q.   Vaishnavi Jayakumar?
6    A.   I have not.
7    Q.   ██████████
8    A.   I have not.
9    Q.   ██████████ [sic]?
10    A.   I have not.
11    Q.   ██████████?
12    A.   I have not.
13    Q.   ██████████?
14    A.   I have not.
15    Q.   ██████████?
16    A.   I have not.
17    Q.   ██████████?
18    A.   I have not.
19    Q.   ██████████?
20    A.   I have not.
21    Q.   ██████████?
22    A.   I have not.
23    Q.   ██████████?
24    A.   I have not.
25    Q.   Aza Raskin?

63 (Pages 597 - 600)

CONFIDENTIAL

Page 601

1    A.  I have not.
2    Q.  Brian Boland?
3    A.  I have not.
4    Q.  ██████████?
5    A.  I have not.
6    Q.  Lotte Rubaek?
7    A.  I have not.
8    Q.  Sarah ████████████
9    A.  I have not.
10   Q.  Frances Haugen?
11   A.  I have not.
12   Q.  Do you even know who all of those people
13   are?
14   A.  There were a lot of names in that list that
15   I'm not familiar with.
16   Q.  Okay.  In any event, would you ever take it
17   upon yourself to try to influence the testimony of
18   others in this case?
19   A.  Absolutely not.
20   Q.  Separate topic.  And sorry to bounce around
21   a little bit.
22       Are you familiar with Meta's integrity
23   classifiers that moderate or downrank or remove
24   content?
25   A.  I'm very familiar.

Page 602

1    Q.  Are you also familiar with Meta's algorithm
2    that reviews behavioral data to order content in a
3    user's feed?
4    A.  I'm somewhat familiar.
5    Q.  Are the integrity classifiers that downrank
6    or remove content different than the ranking
7    algorithm that orders content in a user's feed?
8    MS. JONES:  Objection to the form.
9    THE WITNESS:  Yes.
10   MS. JONES:  Excuse me.
11   Foundation.
12   BY MR. PHELPS:
13   Q.  Can you explain to me how those are
14   different?
15   A.  Yeah.  The -- the infrastructure that
16   evaluates content for harm, which was built under my
17   initial stint at Facebook, looks at a piece of
18   content and then based on a number of features is
19   able to label it.  And then if it meets certain
20   criteria, it can prevent that content from being
21   distributed within the network.  And that stack and
22   that decision-making is separate from the one that
23   does ranking for delivery.
24   Q.  Is the ranking for delivery really even
25   assessing or aware of the content's properties in

Page 603

1    terms of whether it's borderline or safe or unsafe,
2    or is it agnostic on that?
3    MS. JONES:  Objection to the form.
4    Foundation.
5    THE WITNESS:  The content that does
6    delivery is able to look at the labels that the --
7    that the integrity systems attach to the content and
8    can make decisions based on those labels.
9    BY MR. PHELPS:
10   Q.  But the -- but the integrity classifier is
11   a separate tool than the ranking algorithm that
12   actually determines what's ordered in the feed; is
13   that right?
14   MS. JONES:  Same objection.  Form and
15   foundation.
16   THE WITNESS:  That is correct.
17   BY MR. PHELPS:
18   Q.  Okay.  And does the ranking algorithm have
19   a viewpoint on whether content or -- is good or bad
20   in terms of Meta's policies or user safety?
21   MS. JONES:  Objection to the form.
22   Foundation.
23   THE WITNESS:  I do not believe that there's
24   such a thing as a neutral ranking algorithm.
25   Ranking algorithms use a certain set of criteria,

Page 604

1    like, they pick.  Like, this is a hand that goes
2    into the box, and of a billion videos, I'm going to
3    give you this stream of them.
4        And so that algorithm, inevitably, has sort
5    of a viewpoint and biases.
6    BY MR. PHELPS:
7    Q.  But the viewpoint in terms of what gets
8    presented to users, it's not the same process as the
9    integrity classifier process; is that true?
10   MS. JONES:  Objection to the form.
11   THE WITNESS:  That's correct.  The
12   integrity classifier process is its own
13   infrastructure, its own set of choices.
14       Imagine to some extent, like, you -- when
15   you put something in the mail, the first step is
16   integrity classifiers.  And it looks at the object.
17   And if it's bad enough, it's out.  But most of the
18   time, it says, "Oh, this X percentage likelihood
19   that this is something like this."
20       And it passes it on to the next part of the
21   system which is the one that picks it up and
22   determines whether it gets delivered to somebody or
23   not.
24   BY MR. PHELPS:
25   Q.  Switching topics again.

64 (Pages 601 - 604)

CONFIDENTIAL

Page 605

1    MR. PHELPS:  We don't need to watch the
2  full thing; but, Jim, could you pull up for me
3  Exhibit 34?
4    This is the video with the red heart,
5  yellow heart, blue heart.  I just want to reorient
6  on that for one second.
7    MS. JONES:  Let me object as asked and
8  answered, then, if this was the same video we
9  watched.
10    (Whereupon, video/audio played.)
11    BY MR. PHELPS:
12  Q.  And if -- you've seen that clip before?
13  A.  Yes, I have.
14  Q.  What is that clip -- does that clip show a
15  very young woman participating in a trend asking to
16  be ranked by the Instagram community in terms of her
17  appearance?
18    MS. JONES:  Objection. Foundation. Form.
19    THE WITNESS:  Yes.
20    BY MR. PHELPS:
21  Q.  And if we continue to log in the video, do
22  I recall correctly that we would see that there is
23  actually an audio clip that Instagram made available
24  that users could embed in a video so that they could
25  participate in this trend?

Page 606

1    MS. JONES:  Objection. Characterization.
2    THE WITNESS:  Correct.
3    BY MR. PHELPS:
4  Q.  Okay.  And do I recall your testimony that
5  that can be a really harmful experience?
6    MS. JONES:  Excuse me.
7    Objection. Foundation.
8    THE WITNESS:  Correct.
9    BY MR. PHELPS:
10  Q.  Meta had the technological capacity to keep
11  videos where girls are asking people to rate their
12  looks off of Instagram; right?
13    MS. JONES:  Objection. Foundation.
14    THE WITNESS:  Absolutely.
15    BY MR. PHELPS:
16  Q.  And it nevertheless permitted this trend
17  encouraging people to rate young girls in terms of
18  their looks?
19    MS. JONES:  Objection. Characterization.
20    THE WITNESS:  Yes.
21    BY MR. PHELPS:
22  Q.  If Mark Zuckerberg was personally concerned
23  about that issue, he could have made sure that type
24  of ranking and comparison was not available on
25  Instagram; right?

Page 607

1    MS. JONES:  Objection. Foundation.
2    THE WITNESS:  That is correct.  And that is
3  a call I received from Mark more than once during my
4  first stint at Facebook where we were reviewing all
5  of the content that Facebook was serving at the
6  time.
7    BY MR. PHELPS:
8  Q.  Meaning you received calls when he was
9  personally concerned about something, telling you to
10  take action on it?
11  A.  Yes.  And, like, for example, content.
12    So early on there was -- a lot of people
13  were -- started posting content around açai berry
14  kind of health products.  And we got the call from
15  Mark being like, "Yeah, we don't want any of that
16  stuff on the site."
17    And then we adjusted the integrity
18  algorithms in order to remove what was spam.
19  Q.  Did you ever get a call from
20  Mark Zuckerberg telling you to take down this trend
21  that enables folks to rank each other on Instagram?
22  A.  I'm not aware of any initiatives by Mark or
23  Adam Mosseri to remove this content from Instagram
24  or have it not be promoted.
25  Q.  Give you one more exhibit.  This is going

Page 608

1  to be Exhibit 65.
2    (Marked for identification purposes, Bejar
3    Exhibit 65.)
4    BY MR. PHELPS:
5  Q.  Have you seen this article before?
6  A.  Yes, I have.
7  Q.  What is this article?
8  A.  It's the -- it's an article about the --
9  it's "Hot or Not?" website that Mark Zuckerberg, I
10  believe, developed when he was younger.
11  Q.  The videos we just looked at were from
12  roughly 2023, 2024; right?
13  A.  That's correct.
14  Q.  And so the context of this article is it's
15  from 2003, roughly 20 years earlier?
16    MS. JONES:  Let me just object on
17  foundation to questioning on this document.
18    Go ahead.
19    THE WITNESS:  Correct.
20    BY MR. PHELPS:
21  Q.  Okay.  Let's just look at it.  It says --
22  the first paragraph, it says (as read):
23    "Harvard students often compete in
24    the classroom, but for at least a few
25    hours this weekend only one thing helped

65 (Pages 605 - 608)

CONFIDENTIAL

Page 609

1    them make the grade. Their looks."
2        Do you see that?
3    A. I do.
4    Q. The next sentence describes a website
5 created by Mark Zuckerberg that gave students a
6 chance to rate their peers using ID photos taken
7 from online house Facebooks.
8        Do you see that?
9    A. Yes.
10    Q. He asks, according to this article
11 (as read):
12        "Were we let in for our looks? No.
13    Will we be judged on them? Yes."
14        Do you see that?
15    A. I do.
16    Q. The next paragraph, it says (as read):
17        "Zuckerberg, a computer science
18        concentrator, said he created the site -
19        facemash.com - by hacking into the
20        online Facebooks and compiling ID photos,
21        allowing viewers to vote for the 'hotter'
22        of two randomly chosen photos or rate
23        their looks of students in a particular
24        house against fellow residents."
25        Do you see that?

Page 610

1    A. Yes.
2    Q. If you go to the page where the first
3 language is "95 minutes later."
4    A. I'm sorry, can you show me the text on the
5 screen? I have a hard time searching for text in --
6    Q. Yeah.
7    A. -- the printed document.
8    Q. There's a section that starts with "Let the
9 hacking begin."
10    MR. PHELPS: The page prior, Jim.
11    BY MR. PHELPS:
12    Q. And this is describing a -- it says
13 (as read):
14        "He chronicled the process in a
15        journal published on the site itself."
16        Do you see that?
17    A. Yes.
18    Q. And then I'm referring you to the next
19 page. It says (as read):
20        "The Kirkland Facebook is open on my
21        computer desktop, and some of these
22        people have pretty horrendous Facebook
23        pics. I almost want to put some of these
24        faces next to pictures of farm animals
25        and have people vote on which is more

Page 611

1    attractive."
2        Do you see that?
3    A. I do.
4    Q. Are those the comments of someone who can
5 be trusted to make decisions about teen safety and
6 whether young women should be subject to ranking
7 based on their appearance online?
8    MS. JONES: Objection to the form and
9 foundation. And characterization.
10    (Stenographer interrupted for clarification
11    of the record.)
12    THE WITNESS: I -- I don't believe that you
13 can hold to account somebody this young that made a
14 choice to do this.
15        What I believe is when you become aware of
16 an issue or a harm, did you learn from it, and does
17 your actions later in your life reflect that?
18    BY MR. PHELPS:
19    Q. And that's where I was going, that it might
20 be one thing to make an immature comment at a young
21 age, but 20 years later when we see an app promoting
22 a tool that encourages folks to be ranked based on
23 their appearance, young girls, in particular, is
24 that someone that can be trusted to keep kids safe
25 online?

Page 612

1    MS. JONES: Let me object to the
2 inappropriate speech by counsel. And asked and
3 answered. And my earlier objections equally apply
4 to this reiteration of the question.
5    THE WITNESS: What I believe -- okay?
6        What I believe is that every action on this
7 domain that I'm aware that Instagram and Facebook
8 has taken since approximately 2015 or 2016 when
9 there started to be papers talking about impact of
10 bullying and depression, addiction, and all of these
11 issues, when kids started dying, for which there's
12 timelines of kids dying or ending up in hospital
13 where there's reasonable cause that these products
14 are involved, I believe that the choices that
15 Mark Zuckerberg and Instagram has made every step of
16 the way demonstrate to us with each step that we
17 cannot trust them with the safety of our children,
18 that they would rather make lofty claims about
19 safety than building a product that is humbly and
20 accurately expressed as to the safety that it
21 provides, and a commitment to turning that product
22 into what they're claiming it is before it gets
23 announced.
24        And so it's not for this that I don't trust
25 him. It's that this morning we get another reminder

66 (Pages 609 - 612)

CONFIDENTIAL

Page 613

1  of another promise of features that don't provide
2  the protections that they say they do.
3        And so my experience as a consultant and my
4  experience since I've left is that they have yet to
5  show that we can trust them with our kids, and that
6  each seven days kids experience incredible harm, at
7  incredible rates. And until that is addressed,
8  Instagram is not a safe place, it's not a supportive
9  place, for teenagers.
10       MS. JONES: Let me just -- excuse me.
11       Let me just object and move to strike the
12 lengthy nonresponsive, narrative answer.
13       Go ahead.
14       MR. PHELPS: Thank you for your time. I
15 may have questions for you after Ms. Jones questions
16 you, but that's all I have for right now.
17       THE WITNESS: Thank you.
18       THE VIDEOGRAPHER: The time is 3:48. We're
19 off the record.
20       (Recess taken from 3:48 to 4:10.)
21       THE VIDEOGRAPHER: The time is 4:10. We're
22 back on the record.
23       EXAMINATION BY MS. JONES
24       BY MS. JONES:
25   Q.  Good afternoon, Mr. Bejar.

Page 614

1    A.  Good afternoon.
2    Q.  We met yesterday. I'm Phyllis Jones. I am
3  one of the lawyers for Meta Platforms in these
4  cases. It's nice to get a chance to speak to you
5  more directly, and we appreciate the time.
6        You've, obviously, testified at this point
7  for almost two days, and I'm mindful of time.
8        I'm going to ask -- I'm going to try very
9  hard to ask you "yes" or "no" questions. And if you
10 are able to give me a "yes" or "no" answer, I'd very
11 much appreciate it. If think you can't, just tell
12 me, and I'll try to ask a better question; is that
13 okay?
14   A.  That's okay.
15   Q.  Okay. I want to actually start by
16 talking -- I want to take us back in time and talk a
17 little bit about your time at what was then known as
18 Facebook and just to make sure that to the jury has
19 a clear sense of the basis for your views that
20 you've expressed over the last couple of days and
21 what you know versus what you might not know based
22 on your experience at the company; okay?
23   A.  Okay.
24   Q.  Okay. So you were first at Facebook from
25 2009 to 2015; is that right?

Page 615

1    A.  Yes.
2    Q.  And is it generally accurate to say that
3  your experience during that time period was
4  positive?
5    A.  Yes.
6    Q.  You had the resources that you felt that
7  your team needed; right?
8    A.  Okay. Yes.
9    Q.  And in your experience, resources were
10 provided promptly when a need was identified at the
11 company; is that right?
12   A.  Yes.
13   Q.  And when you didn't have the head count
14 that you needed for issues that might have been
15 confronting your team, you were able to get the
16 resources that you needed; right?
17   A.  That's not quite right.
18   Q.  Okay. What's wrong about it?
19   A.  You could get head count, but also there
20 was a challenge in filling the head count, so
21 getting people to go from boot camp to the team.
22 And so those were the resources that were needed,
23 were engineers in the seat.
24   Q.  Okay. That's a good point that I want to
25 make sure that we clarify for the jury.

Page 616

1        The way that the head count allocation
2  process worked at the company is you get awarded a
3  certain number of what are known as "heads"; right?
4    A.  Yes.
5    Q.  And then there is actually the process of
6  being able to fill those heads; right?
7    A.  Yes.
8    Q.  And there can be challenges with filling
9  those head-count spots because you're trying to
10 recruit people who are highly educated with
11 specialized engineering expertise; right?
12   A.  Yes.
13   Q.  And so my question was really -- and I
14 appreciate you giving us a chance to clarify that --
15 when you made -- when you had a need for head count
16 to be allocated to integrity issues that might have
17 been confronting your team, you were able to get the
18 head count allocated, even if there might have been
19 a challenge with getting the people hired
20 ultimately; is that fair?
21       MR. CARTMELL: Object to the form.
22       THE WITNESS: Could you repeat the
23 question? Sorry.
24       BY MS. JONES:
25   Q.  Sure.

67 (Pages 613 - 616)

Page 617

1    It sounds like in the head-count allocation
2 process, when you were just -- you got the seats
3 available, you did not have issues getting the
4 resources you needed, right, from 2009 to 2015?
5    A.   Again, not quite right because of the
6 resources.
7    Q.   So -- but the challenge that you would have
8 would actually be having to hire the people to fill
9 the seats; is that right?
10    A.   Not sounds right.
11    Q.   Okay.  What's wrong about what I just said?
12    A.   The challenge was getting the people who
13 were in boot camp, who had already been hired to the
14 company, to choose to come to the integrity and care
15 teams.
16    Q.   Got it.
17    So the issue that you would have was not
18 that leadership said you can't have head count
19 allocated to your team; right?
20    A.   Yes.
21    Q.   The issue that you would have is that you
22 would have to actually get the people who had been
23 hired and gone through some kind of boot camp
24 orientation process to decide "We want to work with
25 the integrity team"; is that right?

Page 618

1    A.   Yes.
2    Q.   Okay.  And according to your testimony over
3 the course of the last day or so, you had regular
4 interactions with folks like Mark Zuckerberg and
5 Chris Cox and Sheryl Sandberg during this period
6 from 2009 to 2015; is that right?
7    A.   Yes.
8    Q.   And I believe in earlier testimony that you
9 have provided under oath, you have described your
10 experience with some of those Facebook executives as
11 "impeccable"; isn't that right?
12    A.   Yes.
13    Q.   And that was a true statement when you gave
14 it; right?
15    A.   Yes.
16    Q.   And I want to focus for the moment on this
17 period from 2009 until 2015.  You did not have
18 questions or concerns about the integrity or the
19 motives or the principles of Mr. Zuckerberg or
20 Ms. Sandberg or Mr. Cox; correct?
21    MR. CARTMELL:  Object to the form.
22    THE WITNESS:  Could you repeat the
23 question, please?
24    BY MS. JONES:
25    Q.   Sure.

Page 619

1    During this period from 2009 to 2015 when
2 you've testified that you had an impeccable
3 experience with executives at the company, you
4 didn't have questions or concerns about the motives
5 or the principles or the integrity of
6 Mr. Zuckerberg, Ms. Sandberg, or Mr. Cox; correct?
7    MR. CARTMELL:  Same objection.
8    THE WITNESS:  That's not quite right.
9    BY MS. JONES:
10    Q.   Okay.  Tell me which part is not right.
11    A.   So whenever I interacted with them with
12 resources for the team, those were positive
13 interactions.
14    There had been some areas where the company
15 had made choices that were deeply upsetting for
16 users, which I covered in my interview with
17 Mr. Schroepfer and other areas.  And I think I was a
18 little, sort of, kind of, watchful that those things
19 would happen, though they did not happen during my
20 first six years there.
21    Q.   Okay.  So, again, let me just make sure I
22 understand and that the jury understands what you
23 just said.
24    It sounds like there had been issues that
25 had happened at the company before you got there in

Page 620

1 2009; is that right?
2    A.   Correct.
3    Q.   But from 2009 to 2015 when you were
4 actually at the company interacting with some of the
5 senior executives at the company, you had a good
6 regard for people like Mark Zuckerberg and
7 Sheryl Sandberg and Chris Cox; is that right?
8    A.   Yes.
9    Q.   And during that period you did not have
10 concerns about their motives; is that right?
11    A.   They're not comfortable because I don't --
12 I don't really like to talk about people's motives
13 in any context.
14    Q.   Okay.  And so I want to pause on that for a
15 moment because I've -- if I've understood your
16 testimony correctly over the course of the last
17 couple of days, you have, in fact, offered some
18 views on what you believe are the motives of people
19 like Mark Zuckerberg.
20    Did I hear that correctly?
21    MR. CARTMELL:  Object to the form.
22    THE WITNESS:  I believe not.  I believe
23 that I comment on their actions.
24    BY MS. JONES:
25    Q.   Okay.  And so you're not offering views or

68 (Pages 617 - 620)

CONFIDENTIAL

Page 621

1 opinions today or yesterday or tomorrow when we're
2 together during your deposition on Mr. Zuckerberg's
3 motives, are you?
4    A.   That doesn't -- let me think about that for
5 a moment.
6        So can -- is it okay if I play the question
7 back to you?
8    Q.   I actually -- in the interest of time, I'm
9 going to ask if you could just focus on the question
10 that I asked, which was, you are not offering
11 opinions about the motives of Mark Zuckerberg, are
12 you?
13   A.   No, I don't think so.
14   Q.   If, in fact, again, you have testified
15 under oath that folks like Mr. Zuckerberg and
16 Chris Cox and your former boss Mr. Schroepfer
17 supported integrity and care work that you were
18 doing; right?
19   A.   Yes.
20   Q.   And I believe you've also testified
21 previously that during your entire time at the
22 company from 2009 until 2015, you really could not
23 have better things to say about Mr. Zuckerberg,
24 Mr. Schroepfer, and Mr. Cox; right?
25       MR. CARTMELL:  Object to the form and

Page 622

1 foundation.
2        THE WITNESS:  Can you repeat the question,
3 please?
4        BY MS. JONES:
5    Q.   Sure.
6        You have testified previously under oath
7 that during your entire time at the company, from
8 2009 until 2015, you really could not have better
9 things to say about Mr. Zuckerberg, Mr. Schroepfer,
10 and Mr. Cox; is that right?
11       MR. CARTMELL:  Same objection.
12       THE WITNESS:  Yes.
13       BY MS. JONES:
14   Q.   And that was -- just to be clear, when you
15 said that before, that was truthful testimony;
16 right?
17   A.   Yes.
18   Q.   Now, you left the company -- and during
19 that period from 2009 to 2015, you were working full
20 time for the company; correct?
21   A.   Yes.
22   Q.   Working five days a week, maybe six or
23 seven days a week; right?
24   A.   Yes.
25   Q.   Long days; yes?

Page 623

1    A.   Yes.
2    Q.   And deeply involved with a lot of things
3 that were going on at the company; right?
4    A.   Yes.
5    Q.   And it sounds like, at least periodically,
6 directly engaged with senior executives at the
7 company; right?
8    A.   Yes.
9    Q.   Okay.  And then you left the company in
10 2015; right?
11   A.   Yes.
12   Q.   And you left with positive feelings with
13 the company in 2015; yes?
14   A.   Yes.
15   Q.   You didn't leave in 2015 because you were
16 unhappy about anything at the company; right?
17   A.   Yes.
18   Q.   You left because you had some family issues
19 that you were navigating your way through and you
20 wanted to spend more time with your kids; is that
21 right?
22   A.   Yes.
23   Q.   Right.
24       And just the demands of the job were making
25 it difficult to do both the things you wanted to do

Page 624

1 for your kids and also do the work that you needed
2 to do in your role at the company; yes?
3    A.   Yes.
4    Q.   Other than kind of the day-to-day
5 challenges or issues that you and your team might
6 have been responsible for navigating while you were
7 at Facebook from 2009 to 2015, during the four
8 year -- that period that you were there, you didn't
9 raise any concerns about the company's commitment to
10 child safety; right?
11   A.   Right.
12   Q.   And, in fact, you said highly positive
13 things about the company; right?
14       MR. CARTMELL:  Object to the form.
15       THE WITNESS:  No, that's not quite right.
16       BY MS. JONES:
17   Q.   Okay.  Well, let me ask -- let me ask you a
18 slightly different question.
19       Do you recall that between -- after you
20 left the company in 2015, from then until 2019, you
21 actually spoke about your positive views of Meta
22 publicly?
23       Do you recall that?
24   A.   Yes.
25   Q.   Including on social media; yes?

69 (Pages 621 - 624)

CONFIDENTIAL

Page 625

1    A.  Yes.
2    Q.  Because you use Facebook; right?
3    A.  Yes.
4    Q.  And you use Instagram.  Sitting here today,
5 you are a user of Instagram; correct?
6    A.  Yes.
7    Q.  And how long have you been on the platform?
8    A.  I opened my Facebook account the day before
9 my interview with Mark Zuckerberg.  So --
10   Q.  What year would that have been?
11   A.  It would have been 2009.
12   Q.  Okay.  And when did you first open your
13 Instagram account?
14   A.  I don't recall.
15   Q.  Do you have a rough estimation of how long
16 you've had an Instagram account?
17   A.  I do not.
18   Q.  Is it more or less than ten years?
19   A.  I don't know.
20   Q.  Okay.  Did you have an Instagram account
21 when you went back to the company in 2019 as a
22 consultant?
23   A.  Yes.
24   Q.  What about when you left the company in
25 2015?  Did you have an Instagram account then?

Page 626

1    A.  I think so.
2    Q.  And has it been the case that since 2009
3 you have been a user continuously on Facebook and
4 then eventually on Instagram?
5    A.  Yes.
6    Q.  Has there ever been any occasion when you
7 terminated your account on either of those
8 platforms?
9    A.  No.
10   Q.  And that is notwithstanding the fact that
11 you have testified before Congress and for the last
12 couple of days that Instagram and Facebook are
13 somehow harmful to young people; right?
14       MR. CARTMELL:  Object to the form.
15       THE WITNESS:  I don't -- that's not quite
16 right.
17       BY MS. JONES:
18   Q.  Well, my question is, during the -- this
19 period of time where you've testified -- let me back
20 up.
21       You testified before Congress in 2023; is
22 that right?
23   A.  Yes.
24   Q.  And you made a number of claims about what
25 you believe are the harms of the company's platforms

Page 627

1 for young people; yes?
2    A.  Yes.
3    Q.  And you have made a number of claims,
4 including in the last two days, about
5 Mark Zuckerberg, the CEO of the company; right?
6    A.  Yes.
7    Q.  Including that he cannot be trusted with
8 our children; right?
9       I think that's how you concluded your
10 testimony just now; is that right?
11   A.  Yes.
12   Q.  And notwithstanding, in spite of that
13 testimony, you have been a user of the company's
14 products since 2009; is that right?
15   A.  Yes.
16   Q.  And at no point have you ever terminated
17 the use of either of those platforms since you've
18 signed up; right?
19   A.  Yes.
20   Q.  Do you remember saying publicly on your
21 Facebook page that one of the things that you
22 remembered about being at Facebook after you left in
23 2015 was that everyone involved has good intentions?
24   A.  Yes.
25   Q.  And was that a true statement when you

Page 628

1 wrote it?
2    A.  Yes.
3       MS. JONES:  Can I see that tab number?
4       I think it's Tab No. 66, which might also
5 be our next exhibit.
6       (Discussion off the stenographic record.)
7       (Marked for identification purposes,
8        Exhibit 66.)
9       MS. JONES:  I'm going to hand Mr. Bejar
10 what we've marked as Deposition No. 66, which we're
11 also going to put up on the screen there.
12       BY MS. JONES:
13   Q.  And, Mr. Bejar, I -- we have marked for you
14 what has been identified as Exhibit No. 66 to your
15 deposition.
16       Do you recognize Exhibit No. 66?
17   A.  I do.
18   Q.  And this is, in fact, at the top of the
19 page a Facebook post by you dated February 5th,
20 2018.
21       Do you see that?
22   A.  Yes.
23   Q.  And immediately below that, there is a post
24 from Mr. Zuckerberg.
25       Do you see that?

70 (Pages 625 - 628)

Page 629

1  A.  Yes.
2  Q.  And what he is writing about on February
3  the 4th of 2018 is the fact that February the 4th is
4  Facebook's 14th birthday.
5      Do you see that?
6  A.  Yes.
7  Q.  And then I'm not going to read the entirety
8  of what he posted, but he basically kind of
9  describes in a -- a somewhat wistful way the
10 development of the company from something that he
11 started in college to what is now a very significant
12 organization; correct?
13     Please take a moment to look at it.
14 A.  Yeah.  I want to --
15 Q.  Sure.  Of course.
16     Mr. Bejar, before I ask you my next
17 question, I'm going to ask you what you just wrote
18 down.
19 A.  Oh, I just wanted to talk about sort of the
20 difference in language between motivations and
21 intentions.
22 Q.  Okay.  And we can do this on a break, but I
23 just want to make sure we have a chance to look at
24 that.
25     So Mr. Zuckerberg, you saw -- got a chance

Page 630

1  to review Exhibit No. 66 where he describes the fact
2  that February the 4th was Facebook's birthday;
3  right?
4  A.  Yeah.
5  Q.  And then you respond to Mr. Zuckerberg
6  right?
7  A.  Yes.
8  Q.  And so just to make sure we're tracking the
9  timeline correctly, this would have been maybe,
10 roughly three years, close to three years after you
11 had left the company in 2015; is that right?
12 A.  Yes.
13 Q.  And you start -- you're responding directly
14 to Mr. Zuckerberg; correct?
15 A.  Yes.
16 Q.  And so this reflects that, at least at this
17 point in time, you seem to have had a good regard
18 for Mr. Zuckerberg; is that right?
19 A.  Yes, we used to be friends on Facebook.
20 Q.  Okay.  And you write at the very beginning
21 of the post (as read):
22     "My experience of being at Facebook
23     was how human it is, everyone involved
24     has good intentions, makes choices, makes
25     mistakes, and I lived [sic] how open

Page 631

1      everyone is about learning from them,
2      especially when those mistakes took away
3      from the intention of serving community."
4      Do you see that?
5  A.  Yes.
6  Q.  And then there's a discussion in that
7  middle paragraph where you're offering some views on
8  the way forward in terms of the role that technology
9  plays in our lives; right?
10 A.  M-hm.
11 Q.  You have to say "yes" or "no."
12 A.  Sorry.  Let me just read that paragraph.
13 Q.  Yeah, sure.
14 A.  Yes.
15 Q.  Okay.  And then at the conclusion of your
16 post, you say (as read):
17     "Thank you, Mark and everyone there,
18     for what you bring into the world.  As
19     everything, it is a work in progress that
20     does and can do so much more good for
21     people in the world."
22     Do you see that?
23 A.  Yes.
24 Q.  And when you convey that view that
25 everything is a work in progress, was that of a

Page 632

1  sincere view held by you after spending six years at
2  the company?
3  A.  Yes.
4  Q.  And is that -- would that be a true
5  statement to make about just about any social media
6  or technology company that exists today?
7      MR. CARTMELL:  Object to the form.
8      THE WITNESS:  Can you repeat the question?
9      BY MS. JONES:
10 Q.  Sure.
11     The statement that everything is a work in
12 progress, would that be a fair statement to make
13 about just about every social media company that
14 exists today?
15     MR. CARTMELL:  Same objection.
16     THE WITNESS:  I guess.
17     BY MS. JONES:
18 Q.  Okay.  And some of the problems that you
19 have specifically talked about or described with
20 respect to your views on Instagram or Facebook, some
21 of those problems exist equally on other social
22 media platforms; isn't that true?
23     MR. CARTMELL:  Object to the form and
24 foundation.
25     THE WITNESS:  No.

71 (Pages 629 - 632)

CONFIDENTIAL

Page 633

1    BY MS. JONES:
2    Q.  You don't know that to be the case?
3    A.  The -- well, can I explain, or should I say
4    "yes" or "no"?
5    Q.  You can explain.
6    A.  Okay.
7    Q.  Go ahead.  Yeah.
8    A.  I just want to be mindful --
9    Q.  No, I --
10    A.  -- of your goals here.
11    Q.  -- I appreciate your attending to my
12    request.
13    A.  Okay.  So one of the things that I learned
14    in consulting with different companies and looking
15    at different products is that these things play out
16    differently in each platform.  So each platform has
17    affordances that fundamentally change how harm can
18    play out in them.
19    Q.  Okay.  And when -- you mentioned consulting
20    with different companies.
21        What specific other social media companies
22    have you consulted with?
23    A.  So Airbnb.
24    Q.  Let me just pause you.
25        Is Airbnb a social media company?

Page 634

1    A.  I think of it that way.
2    Q.  Okay.  What else?  Who else?
3    A.  And I had a -- conversations with people
4    that were working with TikTok on all of these
5    issues.  An organization called -- (inaudible)
6        (Stenographer interrupted for clarification
7        of the record.)
8        THE WITNESS:  Oh, yeah.  So I was working
9    with people that were consulting with TikTok around
10    these issues as well.
11    BY MS. JONES:
12    Q.  Okay.  You've consulted with Airbnb.
13        Have you ever been -- formally been engaged
14    as a consultant for TikTok?
15    A.  I have not.
16    Q.  Okay.  So in terms of other social media
17    companies that you've been formally engaged with,
18    other than Meta, is the only one Airbnb?
19    A.  I'm just thinking --
20    Q.  Sure.
21    A.  -- about work experience.
22        Yeah.
23    Q.  Do you have an understanding, sitting here
24    today, of -- if you just take the example of the
25    issue of bullying on social media, which is

Page 635

1    something that you talked about; right?
2    A.  Yes.
3    Q.  Do you know whether any other social media
4    platform has solved the problem of bullying on their
5    platforms?
6        Let me ask the question a different way.
7    A.  Yeah.
8    Q.  Are you aware of any other social media
9    platform that has been able to completely,
10    successfully eliminate bullying from their services?
11    A.  No.
12    Q.  Are you aware of any social media platform
13    that has been able to completely, successfully
14    eliminate unwanted sexual advances on their
15    services?
16    A.  Are you saying completely eliminate?
17    Q.  Completely and successfully, yes.
18    A.  I think you can make a good case about
19    Roblox.
20    Q.  Okay.  Anybody else?
21    A.  Not that I can think of right now.
22    Q.  And what is your basis for believing that
23    Roblox has completely and successfully eliminated
24    unwanted sexual advances from the platform?  How
25    have you evaluated that?

Page 636

1    A.  The -- the product design relies on
2    pre-canned, mediated messages between users.  And so
3    in that context of the youngest users, it would be
4    very difficult to express an unwanted sexual
5    advance, I believe.
6    Q.  Have you actually gone through the exercise
7    of evaluating whether there are -- there is an
8    absence of unwanted sexual advances on Roblox?
9    A.  I had a number of conversations with both
10    the CEO of Roblox as well as the head of the safety
11    team, and we discussed some of these issues, but I
12    have not done a methodical assessment of Roblox the
13    same way.
14    Q.  Okay.  So let me make sure I have an answer
15    to my question.
16        Have you actually gone through the exercise
17    of evaluating whether there is an absence of
18    unwanted sexual advances on Roblox?
19        MR. CARTMELL:  Objection.  Asked and
20    answered.
21        THE WITNESS:  No.
22    BY MS. JONES:
23    Q.  We've talked about bullying.  We've talked
24    about unwanted sexual advances.
25        You've talked about the issue of suicide --

72 (Pages 633 - 636)

Page 637

1 suicide encouraging and self-injury content on
2 social media; correct?
3     A.  Yes.
4     Q.  Are you aware of any social media company
5 that has completely and successfully eliminated the
6 presence of suicide or self-injury-related content
7 on its services?
8     A.  Sorry.  I keep -- I keep having a reaction
9 to the phrasing of the question.  But, no.
10     Q.  What about body image or eating
11 disorder-related contact?  Are you -- content.  Are
12 you aware of any social media company that has
13 completely and successfully eliminated the presence
14 of either eating disorder or body-image
15 disorder-related content from its services?
16     A.  No.
17     Q.  Are you aware of any social media company
18 that has managed to successfully and completely
19 address the problem of children who are under 13
20 lying about their age and signing up for accounts on
21 their services?
22         MR. CARTMELL:  Object to the foundation.
23         THE WITNESS:  No.
24         BY MS. JONES:
25     Q.  And so the issues that you've been

Page 638

1 describing and talking to counsel about for the last
2 couple of days, you couldn't identify for me any
3 social media company that has successfully and
4 completely eliminated those issues from their
5 services; right?
6         MR. CARTMELL:  Lacks foundation.
7         THE WITNESS:  Sorry.  I didn't hear what
8 Tom said.
9         MR. CARTMELL:  Lacks foundation.
10         MS. JONES:  He's --
11         THE WITNESS:  Okay.
12         MS. JONES:  It's not important.  Don't
13 worry about it.  No, I'm kidding.  I'm kidding.
14         THE WITNESS:  Like you, too.
15         MS. JONES:  No, no, no.  No, no.  It's
16 important that he make his objection.
17         Let me ask my question again.
18         BY MS. JONES:
19     Q.  So the issues that you've been describing
20 in the last almost two days, bullying and
21 harassment, unwanted sexual advances, suicide and
22 self-injury content, eating disorder content, the
23 problem of kids under 13 lying about their age and
24 creating accounts, you could not identify for me
25 but, more importantly, for the jury any social media

Page 639

1 company that has successfully and completely
2 addressed those issues; right?
3         MR. CARTMELL:  Same objections.
4         THE WITNESS:  No.
5         BY MS. JONES:
6     Q.  And can you agree with me that those are
7 complex issues to take on when you're talking about
8 billions of users across the world using your
9 platforms?
10     A.  Yes.
11     Q.  And, in fact, when you were at the company
12 from 2009 until 2015, some of those issues existed;
13 right?
14     A.  Yes.
15     Q.  And while you were at the company working
16 full time, working very hard, from 2009 to 2015, you
17 did not solve all those problems at the company;
18 right?
19     A.  Correct.
20     Q.  And that was despite the best efforts of
21 yourself and your team and many other people at the
22 company; right?
23     A.  Correct.
24     Q.  Okay.  When you testified in front of
25 Congress in 2023, you didn't mention to the senators

Page 640

1 the fact that you had had an impeccable experience
2 with the executives at the company from 2009 to
3 2015, did you?
4     A.  I don't recall doing that, but I would need
5 to look at the testimony in detail to make sure that
6 that's accurate.
7     Q.  Fair enough.
8         But sitting here today, you don't recall
9 saying that; right?
10     A.  I don't recall saying that.
11     Q.  And when you testified before Congress in
12 2023, you did not share with the senators what
13 you've now shared with the jury, that there is, in
14 fact, no social media company that you're aware of
15 that has successfully managed completely all of
16 these issues that you've been talking about for the
17 last almost two days; right?
18         MR. CARTMELL:  Same --
19         BY MS. JONES:
20     Q.  You did not tell the members of the Senate
21 that.
22         MR. CARTMELL:  I'm sorry, Ms. Jones.
23         MS. JONES:  That's okay.
24         MR. CARTMELL:  Same objection.
25         MS. JONES:  Okay.

73 (Pages 637 - 640)

CONFIDENTIAL

Page 641

1     BY MS. JONES:
2     Q.  I can ask the question again if that helps.
3     A.  Thank you again.  Yeah.
4     Q.  Okay.  Sure.
5     A.  I appreciate it.
6     Q.  When you testified before Congress in 2023,
7  you did not share with the senators there, which
8  you've now shared with the jury, that, in fact, some
9  of these very issues that you've talked about at
10 length are problems that affect every social media
11 company that exists; right?
12     MR. CARTMELL:  Objection.  Form and
13 foundation.
14     THE WITNESS:  No, it's not quite --
15     BY MS. JONES:
16     Q.  My question is just, did you tell that to
17 the folks who were on the committee hearing your
18 testimony before the Senate?
19     MR. CARTMELL:  Same objection.  Form and
20 foundation.
21     And I do think counsel needs to let the
22 witness answer.  I mean, you've instructed him that
23 he needs to answer "yes" or "no," but if he needs to
24 answer the question in full, he's allowed to do
25 that.

Page 642

1     BY MS. JONES:
2     Q.  Can you answer my -- can you answer my
3  question "yes" or "no"?  When you testified before
4  the Senate, did you share with the members of the
5  committee what you've shared with the jury today,
6  that, in fact, the problems that you have described
7  are problems that affect every social media company
8  that exists?
9     MR. CARTMELL:  Same objections.
10     THE WITNESS:  I don't recall whether I said
11 that sentence or not the way that you just phrased
12 it.
13     BY MS. JONES:
14     Q.  Okay.  And then as late as January of 2019,
15 you were grateful for your time at Facebook; right?
16     A.  Yes.
17     Q.  And you, in fact, conveyed that to
18 Mr. Zuckerberg in 2019.
19     Do you remember that?
20     A.  Is this -- is it this post, or is it
21 something else?
22     Q.  It's something else.
23     Do you remember -- I'm just asking you for
24 the moment, do you remember being in touch with
25 Mr. Zuckerberg in 2019?

Page 643

1     A.  Probably.  Again, I just want to say that
2  when it comes to dates, I really kind of look at --
3  as the exchanges as sort of the ground truth because
4  I -- I have a -- for me to put things in time, it
5  really helps me to have the exchanges.
6     Q.  Okay.  Understood.
7     We are in the process of getting that
8  printed.  So we'll come -- we'll come back to that.
9     But it sounded like you do recall that as
10 late as January of 2019, you were grateful for your
11 time at the company; right?
12     A.  Yes.
13     Q.  And between 2015 and 2019, you largely
14 pursued other interests, other areas of recreation
15 and engagement; is that fair?
16     A.  No, I don't think that's accurate.
17     Q.  Okay.  Let me ask you a slightly different
18 question.
19     You were not employed at Meta between 2015
20 and 2019; is that right?
21     A.  That's correct.
22     Q.  And so that means you would not have been
23 involved in any of the discussions at the company
24 around decisions that might have been made with
25 respect to issues that had to be addressed during

Page 644

1  that period between 2015 and 2019; right?
2     A.  Right.
3     Q.  And you would not have any insight into
4  why, for example, Mr. Zuckerberg might have made a
5  decision one way or the other in that particular
6  period of time; right?
7     A.  Right.
8     Q.  And same with respect to Ms. Sandberg and
9  Mr. Cox and people like Guy Rosen, you were not at
10 the company or in a position to know why people were
11 making certain decisions; right?
12     A.  Right.
13     Q.  During that period from 2015 to 2019, did
14 you formally consult with Meta at all?
15     A.  No.
16     Q.  The issues that you have talked about with
17 counsel for the last almost two days really relate
18 to this period when you were there from 2019 to 2021
19 as a consultant; is that right?
20     MR. CARTMELL:  Object to the form.
21 Characterization.
22     BY MS. JONES:
23     Q.  And I -- the question probably was not as
24 precisely worded as it should have been.
25     To the extent that you've raised concerns

74 (Pages 641 - 644)

CONFIDENTIAL

Page 645

1 about things that happened while you were somehow
2 affiliated with the company either as an employee or
3 as a consultant, what you've had to say has really
4 been focused on this time period between 2019 and
5 2021; is that fair?
6     MR. CARTMELL: Object to the form and
7 characterization.
8     THE WITNESS: No, that's not quite right.
9     BY MS. JONES:
10     Q. Well, you have already testified that your
11 experience with the company from 2009 to 2015 was a
12 positive one; right?
13     A. Yes.
14     Q. Okay. And you came back to the company
15 because you believed in the company's mission; yes?
16     A. That -- that's not quite right.
17     Q. Okay. Well, we'll talk about the specifics
18 around when you -- why you came back.
19     But just so the jury understands, from 2019
20 to 2021, you were at the company in a much, much
21 more limited role than you had been from 2009 to
22 2015; is that right?
23     MR. CARTMELL: Object to the form.
24     THE WITNESS: Sorry. I got a little
25 distracted.

Page 646

1     BY MS. JONES:
2     Q. I understand.
3     Let me ask the question again.
4     A. Thank you.
5     Q. Just so the jury understands, from 2019 to
6 2021, you were at the company in a much, much more
7 limited role than you had been when you were there
8 before; right?
9     MR. CARTMELL: Object to the form.
10     THE WITNESS: There's a lot of "much" there
11 and in a --
12     BY MS. JONES:
13     Q. Let me ask -- let me -- let me pull up a
14 "much" out of the question, and see if we can come
15 to ground on an answer.
16     A. Thank you.
17     Q. So the jury is clear, from 2019 to 2021,
18 you were at the company in a much more limited
19 role --
20     MR. CARTMELL: Same --
21     BY MS. JONES:
22     Q. -- relative to your earlier time; yes?
23     MR. CARTMELL: Same objection.
24     THE WITNESS: Yes.
25 ///

Page 647

1     BY MS. JONES:
2     Q. And to take one obvious example, you were
3 not a full-time employee; right?
4     A. Yes.
5     Q. And you actually weren't even technically
6 an employee of Facebook; right?
7     A. Yes.
8     Q. You were technically an employee of a
9 company called PRO Unlimited; right?
10     A. Yes.
11     Q. And when you were hired back in 2019, your
12 title at the company was not what I think counsel
13 referred to a number of times as safety consultant
14 or safety expert; right? That was not the formal
15 title that you had; right?
16     MR. CARTMELL: Object to the form. And
17 move to strike this reference to statement of
18 counsel.
19     THE WITNESS: Yeah. I mean, the way I kind
20 of thought about it was specified in the offer
21 letter that I got, but I don't recall how I showed
22 up in Workplace.
23     BY MS. JONES:
24     Q. From -- when you were actually hired back,
25 you were hired as what's known as a contingent

Page 648

1 employee; right?
2     A. I think so. Again --
3     Q. We can show you a document. That's fine.
4     And prior to the -- your time coming back
5 to the company in 2019, you had not worked on child
6 safety issues with respect to Instagram; right?
7     A. Right.
8     Q. I'm going to hand you what we've marked as
9 Exhibit No. 67.
10     (Discussion off the stenographic record.)
11     (Marked for identification purposes,
12     Exhibit 67.)
13     BY MS. JONES:
14     Q. Mr. Bejar, you have what we've marked as
15 Deposition Exhibit No. 67 in front of you.
16     Do you see that?
17     A. Yes.
18     Q. And you recognize your face there?
19     A. I do.
20     Q. And you also recognize your title that's
21 featured on this screenshot of what I believe is a
22 Messenger chat.
23     Do you see that?
24     A. Yeah.
25     Q. And just to go back to my earlier question,

75 (Pages 645 - 648)

CONFIDENTIAL

Page 649

1 your title at the company when you came back in 2019
2 was "contingent worker"; right?
3     A.  That was the title that was showing on
4 Workplace for me.
5     Q.  And just so the jury understands,
6 contingent worker means you were a temporary
7 employee; yes?
8     A.  Yes.
9     Q.  Not a full-time employee; yes?
10    A.  Yes.
11    Q.  And I'm not sure if this was fully clear
12 during your earlier testimony, but the company did
13 not ask you to come back, right, in 2019?
14    A.  Sorry.  What do you -- what do you mean by
15 that?
16    Q.  In terms of what prompted your return to
17 the company as a contingent worker, that was because
18 you reached out to someone at the company initially;
19 right?
20    A.  No.
21    Q.  What happened specifically?  Who made the
22 first outreach?
23    A.  ███████.
24    Q.  And what did ████████ say to you?
25    A.  Something along the lines of "We need you

Page 650

1 to come back."
2     Q.  And what was the reason that he said he --
3 they needed you to come back?
4     A.  Because he felt that they needed some of
5 the framework and work that we had done has part of
6 the protect and care group.
7 ███████ was the head of research for
8 Instagram and had been the head of research for
9 protect and care.
10    Q.  When you came back to the company in 2019
11 as a contingent worker, you were being paid by
12 the -- by the hour; is that right?
13    A.  Yes.
14    Q.  And you were not actually working that many
15 hours, were you?
16    MR. CARTMELL:  Object to the form.
17    THE WITNESS:  Sorry.  That's a somewhat
18 imprecise question.
19    BY MS. JONES:
20    Q.  Well, that's fair.  But I'm going to ask
21 you to take a crack at answering it.
22    You were not actually working that many
23 hours when you came back to the company in 2019?
24    MR. CARTMELL:  Same objection.
25 ///

Page 651

1     BY MS. JONES:
2     Q.  "Yes" or "no"?
3     MR. CARTMELL:  Same objection.
4     THE WITNESS:  Are you asking about it
5 during 2019?
6     BY MS. JONES:
7     Q.  Yes.  To 2021.
8     A.  Well, through 2021 it varied significantly
9 depending on what the company needed.
10    Q.  Okay.  Well, we'll get to that.
11    But your contract that established your
12 return as a consultant had you working roughly
13 three hours a week; yes?
14    MR. CARTMELL:  Objection to the form.
15    THE WITNESS:  That's what the contract
16 said.
17    BY MS. JONES:
18    Q.  Okay.
19    A.  That was not how it played out.
20    Q.  Well, you've testified under oath that your
21 time actually working likely averaged out to around
22 one day a week; right?
23    A.  I believe so, yes.
24    Q.  And so that's not anywhere close to being
25 full time; right?

Page 652

1     A.  That's right.  It is more than three hours.
2     Q.  Well, that's fair enough.
3     But on average, if you're working a day a
4 week, some weeks you might be working a few hours;
5 right?
6     A.  Yes.
7     Q.  And then some weeks you might be working
8 more; right?
9     A.  Yes.
10    Q.  But at the end of the day, you were
11 working, on average, about a day a week; right?
12    A.  Yeah.
13    Q.  And do you recall actually telling someone
14 that by October of 2020, you were pretty much
15 averaging three hours a week?
16    MR. CARTMELL:  Object to the form.
17    THE WITNESS:  I don't recall.
18    (Stenographer interrupted for clarification
19    of the record.)
20    BY MS. JONES:
21    Q.  I'm having a little bit of a hard time
22 hearing you, so as someone who's been yelled at all
23 day for not being loud enough, I'm going to -- she
24 wasn't yelling at me -- I'm going to suggest you
25 might want to speak up a little bit.

Golkow Technologies,
A Veritext Division
877-370-3377                                    www.veritext.com

CONFIDENTIAL

Page 653

1  A.  Okay.  I'll project.
2  Q.  Please, please.  With thanks.
3      (Discussion off the stenographic record.)
4      (Marked for identification purposes,
5      Exhibit 68.)
6  BY MS. JONES:
7  Q.  Mr. Bejar, you have in front of you what we
8  have marked as Deposition Exhibit No. 68.
9      You see that?
10 A.  Yes.
11 Q.  And then down at the bottom part of
12 Deposition Exhibit No. 68, I want to focus your
13 attention on an e-mail from you to Mr. ███████
14 dated October 2nd, 2020.
15     You see that?
16 A.  Yes.
17 Q.  And then there's a subject line of
18 "Question on time spent."
19     Do you see that?
20 A.  Yes.
21 Q.  And you wrote to Mr. -- you're welcome to
22 read as much of this as you'd like.
23 A.  Thank you.
24 Q.  But I'm going to ask you just to focus on
25 this first paragraph of this e-mail that you wrote

Page 654

1  Mr. ███████ in October of 2020; okay?
2  A.  Yeah.
3  Q.  It says (as read):
4      "Hello my good sir.  Over my time
5      here, I've been pretty much averaging the
6      three hours a week."
7      Do you see that?
8  A.  Yes.
9  Q.  (As read):
10     "Sometimes less."
11     Right?
12 A.  Yes.
13 Q.  And then (as read):
14     "Sometimes more."
15     Right?
16 A.  Yes.
17 Q.  And then you refer to (as read):
18     "Two things afoot that might mean
19     more hours, not a lot, but maybe six to
20     eight hours for a period of time, roughly
21     two months."
22     I included the "roughly."  But in
23 parentheses, "two months."
24     Do you see that?
25 A.  Yes.

Page 655

1  Q.  And then you talk about the two specific
2  reasons that you might be doing more than your
3  average three hours a week; right?
4  A.  Yes.
5  Q.  And what you said there in your e-mail to
6  Mr. ███████ in October of 2020, that was a truthful
7  representation of how much time you'd been putting
8  in as a contingent worker with the company in 2019
9  up to this point; right?
10 A.  Yes.
11 Q.  And so, again, not anything close to a
12 full-time schedule; right?
13 A.  Yes.
14 Q.  And for sure during the periods when you
15 were not focused on work that you were doing for the
16 company, there were lots of people working at the
17 company full time, five days a week; right?
18 A.  Yes.
19 Q.  And focused on a lot of the issues you've
20 talked about; right?
21 A.  Yes.
22 Q.  And I assume you would acknowledge that
23 there are probably things that were happening during
24 the rest of the workweek that you may not have been
25 fully synced up with because you were doing other

Page 656

1  things; right?
2  A.  No, I wouldn't agree with that
3  characterization.
4  Q.  Well, let me ask the question a slightly
5  different way.
6      It's not your testimony that you had a line
7  of sight into every element of well-being and safety
8  work that was going on at the company from 2019 to
9  2021, is it?
10     MR. CARTMELL:  Object to the form.
11     THE WITNESS:  What do you mean by "line of
12 sight"?
13     BY MS. JONES:
14 Q.  Visibility into.
15     MR. CARTMELL:  Same objection.
16     THE WITNESS:  Can you repeat the full
17 question, then?
18     BY MS. JONES:
19 Q.  Yeah.  And I can also ask it a slightly
20 different way.
21     Is it certainly the case that there are
22 lots of things that might have been going on and
23 were going on in terms of well-being and child
24 safety things at the company that you would not have
25 been involved in at all because you were working, on

77 (Pages 653 - 656)

Page 657

1 average, three hours a week?
2        MR. CARTMELL: Same objection.
3        THE WITNESS: I don't agree with that
4 statement.
5        BY MS. JONES:
6    Q. Okay. Are you -- is it your view that you
7 had a full sense of everything that was working --
8 let me strike that.
9        Is it your testimony that working, on
10 average, three hours a week, sometimes less,
11 sometimes more, that you had a full and complete
12 picture of everything that was going on at the
13 company in terms of teen well-being and safety work,
14 all of it?
15    A. Like all of it, everything happening in
16 every team, all of the time?
17    Q. Yes.
18    A. I guess -- I guess not.
19    Q. Of course not; right?
20    A. Well, I think it's -- it's a -- it's --
21 three hours when you spend them with the leads
22 talking about prioritization and efforts gives you a
23 very good perspective of everything that's happening
24 in the meeting. If one of your three hours is
25 talking to product managers or engineering

Page 658

1 leadership about what they're working on, it gives
2 you good visibility about these areas.
3        And so I think that -- that you can have a
4 very good vantage point as to what's happening
5 within the company with a few hours a week,
6 depending on how the time is spent.
7    Q. Okay. Fair enough.
8        Do you -- and we'll talk about this in more
9 detail.
10        You understand that there were teams
11 working on teen well-being and child safety issues
12 outside of the Instagram well-being team. You know
13 that; right?
14    A. Yes.
15    Q. And you were not plugged in to those teams.
16 You were associated with the Instagram well-being
17 team; right?
18        MR. CARTMELL: Object to the form.
19        THE WITNESS: That -- by being
20 "associated," you mean that I reported and worked
21 primarily with that team, then the answer to that
22 would be, yes. But I also talked to other teams in
23 other parts of the company.
24        BY MS. JONES:
25    Q. Sure. Sure.

Page 659

1        But just so the jury is clear, when you
2 talk about what you knew based on communications
3 with members of the Instagram well-being team, you
4 also recognize that there were plenty of other teams
5 who were focused on teen well-being and child safety
6 issues at the company; yes?
7        MR. CARTMELL: Same objection.
8        THE WITNESS: Yes.
9        BY MS. JONES:
10    Q. When you testified before the Senate, did
11 you mention, "Just, by the way, when I was there
12 from 2019 to 2021, I was really only averaging about
13 three hours a week in terms of work I was doing at
14 the company"?
15    A. I don't believe I used that sentence that
16 you just told me.
17    Q. Did you in any way communicate how limited
18 your role was when you went back to the company from
19 2019 to 2021?
20    A. Again, that all depends on how you define
21 "limited."
22    Q. Well, let's define it relative to your
23 full-time role some years back.
24        Your role from 2019 to 2021 was certainly
25 limited relative to that; right?

Page 660

1        MR. CARTMELL: Object to the form.
2        THE WITNESS: Yes.
3        BY MS. JONES:
4    Q. And let's put aside the Senate for the
5 moment. You've been testifying for a couple --
6 almost a couple of days now. You at no point -- and
7 I've listened very carefully -- shared with the jury
8 that when you were at the company from 2019 to 2021,
9 you were averaging three hours a week in terms of
10 how much time you were putting into that particular
11 role.
12    A. And -- and I'm very happy to share here
13 and -- my time cards and all the time that I spent
14 working on these things.
15    Q. During that period from 2019 to 2021, you
16 were not part of the central integrity team that is
17 responsible for addressing some of the safety issues
18 and child safety issues that you've testified about;
19 right?
20    A. Right.
21    Q. And you were not a part of the research
22 organization at the company; right?
23    A. I did not report into the management
24 structure of the research organization at the time.
25    Q. Okay. And so is -- I want to go back to my

78 (Pages 657 - 660)

CONFIDENTIAL

Page 661

1  question.
2        From 2019 to 2021, you were not part of the
3  research organization at the company; right?
4        A.  Right.
5        Q.  And you were not involved in well-being or
6  safety efforts relating to the Facebook app; is that
7  right?
8        A.  No, that's not quite right.
9        Q.  Okay.  You didn't -- did you do any work
10  on -- with teams that were focused on algorithmic
11  recommendations?
12        A.  I did work with a team on Facebook blue --
13  I forget the name of it -- that was focusing on
14  these class of issues.  And I believe part of that
15  included algorithmic recommendations.
16        MS. JONES:  And, Mr. Reynolds, we can pull
17  this document down from the screen.  And I want to
18  make sure that I'm asking the right question for the
19  right time period.
20        BY MS. JONES:
21        Q.  From 2019 to 2021, Mr. Bejar, when you were
22  functioning as a contingent employee for the
23  company, did you work with any teams doing --
24  focused on algorithmic recommendations?
25        A.  The -- can I give a little detailed answer,

Page 662

1  because I think that there's something here that's
2  important to convey?
3        Q.  Sure.
4        A.  Okay.  So the -- the bad experiences work
5  that was born on Instagram was also adopted and
6  there was a presentation done and conversations were
7  had with people that were in the Facebook blue
8  application.  And that team, I believe, one of the
9  responsibilities was looking at the content that was
10  getting recommended and harmful experiences.
11        Q.  Okay.  But beyond what it sounds like was
12  interactions that you might have had with folks on
13  Facebook blue in connection with your work on BEEFs,
14  did you work on any teams in this 2019 to 2021
15  period doing work related to algorithmic
16  recommendations?
17        A.  So what I just described was not about
18  BEEF.  It was about the general concept of bad
19  experiences as they play out in the different
20  surfaces of the product.  And in that context, I did
21  have -- I recall representation that I was part of
22  the discussions in crafting that for Facebook blue
23  that talked about the amount of time between a
24  Facebook user opening the app and the amount of time
25  that they got a recommendation that they found

Page 663

1  distressing.
2        Q.  Okay.  And other than that presentation,
3  did you work with any teams between 2019 and 2021
4  who were focused on algorithmic recommendations?
5        A.  Not that I recall.  But that doesn't mean I
6  didn't do that.  I -- I'm trying to think about all
7  the people that I interacted with during my time
8  there.
9        Q.  You have -- you've spent a fair bit of time
10  talking about Meta's Community Standards Enforcement
11  Report in the last day or so with counsel; yes?
12        A.  Yes.
13        Q.  Okay.  Did you ever do any work on the
14  company's Community Standards Enforcement Report?
15        A.  As in discussing it with people in central
16  integrity, or as in the creation and release of it?
17        Q.  Let me be more precise.  It's a fair
18  follow-up from you.
19        My question is, were you ever involved in
20  the development of the Community Standards
21  Enforcement Report?
22        A.  I was not.
23        Q.  And, in fact, when the company first
24  launched that reporting, you were actually not
25  there.

Page 664

1        Do you know that?
2        A.  Yes.
3        Q.  And so you don't know what the discussions
4  were around why the company decided to adopt the
5  Community Standards Enforcement Report as a
6  mechanism for sharing certain information on
7  prevalence of certain harms on the platform?
8        A.  No, that's not quite right.
9        Q.  Okay.  What part of it is not right?
10        A.  I believe I had discussions during the
11  two years I was there with people who worked on it
12  and about it.
13        Q.  Who specifically do you recall talking
14  about it with?
15        A.  I think Arcadiy within central integrity.
16  And I think both ▮▮▮▮▮▮▮ in central integrity,
17  as well as -- I'm forgetting her name right now.
18  She's a ▮▮▮▮▮▮▮ manager.  I should really
19  remember her name because she was actually part of
20  the protect and care team earlier in her tenure at
21  Meta.  I apologize.  I don't remember her name.
22        Q.  That's okay.  No apology necessary.
23        But in -- do you understand that the -- the
24  community standards enforcement reporting started in
25  2018; are you aware of that?

CONFIDENTIAL

Page 665

1    A.   Yes.
2    Q.   Okay.  And in terms of discussions
3  surrounding the decision at that time, discussions
4  at that time, to use the Community Standards
5  Enforcement Report as a way to communicate
6  information about certain harms, you would not have
7  been part of those discussions; right?
8    A.   Right.
9    Q.   And so you don't know based on any
10  involvement in actual decision-making around that
11  time why it was that the company decided to use a
12  Community Standards Enforcement Report as a way to
13  convey information about prevalence of certain
14  harms; right?
15    A.   I'm sorry.  That was, like, a really long
16  question.
17    Q.   It was.
18    A.   Can you go through it again?
19    Q.   Sure.
20        In terms of decision-making that happened
21  at the time that the company adopted the Community
22  Standards Enforcement Reporting program, you would
23  not know why it was that the company decided to do
24  that based on discussions at the time?
25    A.   I don't agree with that.

Page 666

1    Q.   Okay.  You weren't there in 2018; right?
2    A.   I was not there in 2018.
3    Q.   Okay.
4    A.   I did not participate in those
5  conversations when they happened.  But I did -- is
6  it okay?
7    Q.   You're certainly allowed to finish your
8  answer.  I will not stop you at a comma.  Go ahead.
9  You did what?
10    A.   Okay.  I did discuss that with people in
11  the central integrity structure after the fact,
12  trying to understand why that was a transparency
13  report and sort of the thinking behind it.
14    Q.   And in those discussions, did anyone from
15  central integrity tell you that the reason that the
16  company had adopted the Community Standards
17  Enforcement Reporting program was because they were
18  trying to somehow hide the true extent of harm on
19  its platforms?
20    A.   Sorry.  Are you asking me if that -- if
21  that was their motivation for that?
22    Q.   I'm not asking you what -- I do want to be
23  clear on this.  I'm not asking you what you think
24  the company's motivation was.
25        My question is, in the discussions that you

Page 667

1  had with folks from central integrity after the
2  fact, did anyone ever tell you that the reason that
3  the company had adopted the Community Standards
4  Enforcement Reporting program was because they were
5  trying to hide the true extent of harm on the
6  company's platforms?
7    A.   Not as far as I recall.  But I had
8  conversations with many people about the gaps
9  between that report and what TRIPS and other similar
10  surveys were finding.
11    Q.   Sure.  Under -- understood.
12        My question is just, did anyone ever tell
13  you that the reason that the company was using -- is
14  it okay if I say the term "CSER report"?  Will you
15  know what I mean when I --
16    A.   I do.
17    Q.   -- I say "CSER"?
18        That the reason that the company was using
19  the CSER program was because it was somehow trying
20  to hide the actual extent of harm on its platforms.
21        Did anyone ever tell you that?
22    A.   Not that I recall.
23    Q.   Did you work on age verification or age
24  prediction tools when you were back at the company
25  from 2019 to 2021 working as a contingent worker?

Page 668

1    A.   I did not.
2    Q.   Did you work on age verification or age
3  prediction tools at all when you were at the company
4  from 2009 to 2015?
5    A.   Yes.
6    Q.   What specifically did you work on in that
7  time frame?
8    A.   So we were responsible for the product side
9  of that.  So asking age, having some measures in
10  case somebody had said their age.  Like, if you try
11  to go in and say that you were, for example, 8, then
12  we were like, "Sorry, you can't come in" -- sorry.
13  Let me back up a little bit.
14        So there was a product side of age
15  verification, which is how you state your age when
16  you're signing up into the product, and then what
17  you do once they tell you the age.
18        And we had the -- set of tools that if
19  somebody told us that they were under 13 and then
20  they try to come back and change that, they would be
21  stopped and asked to provide further proofing or it
22  wouldn't be possible to sign up to the account.
23        We also had sort of the -- I had managed
24  the product manager and engineers that worked on
25  further proofing should it be necessary.  So we

80 (Pages 665 - 668)

CONFIDENTIAL

Page 669

1 called that "Checkpoint" where we'd checkpoint an
2 account once we had reason to believe that it was
3 underage. And we also did, I think, some basic
4 estimation efforts at the time.
5     Q.   And when you came back from 2019 to 2021,
6 you weren't involved in any of that work; is that
7 right?
8     A.   Not directly. That's right.
9     Q.   And by the -- by the time you left the
10 company in 2015, was it still the case that there
11 were kids who might lie about their age and end up
12 on platforms under the age of 13?
13     A.   Yes.
14     Q.   And that was even though -- it was despite
15 the fact that your team was doing everything they
16 could to try to prevent that?
17     A.   Uh ...
18     Q.   Let me ask the question a different way.
19     A.   Yeah. Thank you.
20     Q.   By the time you left the company in 2015,
21 having been there for six years -- yes?
22     A.   Yes.
23     Q.   In a director of engineering role; right?
24     A.   Yes.
25     Q.   Reporting up directly to the chief

Page 670

1 technology officer; right?
2     A.   Yes.
3     Q.   Had your team -- either just your team or
4 working with other -- reduced the number of kids who
5 might lie about their age and end up on Facebook or
6 Instagram to zero?
7     MR. CARTMELL:  Object to the form.
8     THE WITNESS:  I'm sorry.
9     MR. CARTMELL:  And foundation.
10     Sorry. Go ahead.
11     THE WITNESS:  Yeah.
12     No. But ...
13     MR. CARTMELL:  You can -- well, you can
14 finish your answer.
15     THE WITNESS:  Okay. Yeah. So --
16     BY MS. JONES:
17     Q.   Well, I want to make sure that your answer
18 is responsive to my question.
19     My question was just, by the -- you were at
20 the company for six years, from 2009 to 2015. By
21 the time you left in 2015, had you all reduced the
22 number of kids who might lie about their age and end
23 up on the company's platforms to zero?
24     MR. CARTMELL:  Okay. And I want to say he
25 needs to be able to finish his answer. And you gave

Page 671

1 him a direction that he needs to answer a question
2 if he can "yes" or "no." But in fairness, if the
3 witness cannot answer "yes" or "no" or needs to give
4 further context to it, he's allowed to do that. And
5 I just want to make that clear.
6     MS. JONES:  Well, let me just say, I'm not
7 sure it's entirely appropriate for you to be
8 coaching the witness, Mr. Cartmell, who's not even
9 your witness.
10     BY MS. JONES:
11     Q.   But can you answer my question "yes" or
12 "no," Mr. Bejar?
13     MR. CARTMELL:  Object to the form.
14     THE WITNESS:  It just -- I mean, I have to
15 say that -- that the way that the question is -- and
16 this is the other thing I wrote down since you were
17 asking me about what I write down. If you're asking
18 to zero or successfully and completely solving any
19 one of these problems, in my experience, that is
20 not, like, a reasonable standard.
21     These issues are ongoing issues. And the
22 key is about tracking how much you're reducing them
23 over time, about the efforts, and very importantly
24 what is it that you do when you become aware of
25 these issues. And that's what drives the work.

Page 672

1     And so the -- I think it's really important
2 to say -- if you say to -- if you say "to zero,"
3 "successful" and "completely" on all these other
4 things, then it's -- I mean, I would like the jury
5 to know that in my experience and lifetime of
6 working on these issues, I don't think that there's
7 anybody, in any company, in any circumstance, that
8 could ever answer that question with a "yes."
9     BY MS. JONES:
10     Q.   Understood. And agreed.
11     Tell the jury what the M-team is.
12     A.   It's Mark Zuckerberg, Sheryl Sandberg -- so
13 some of his direct reports. And then there are
14 other people that are not their direct reports that
15 are invited to be part of the M-team meeting.
16     So sometimes the head of a product area
17 that might report to Chris Cox would be in the
18 conversations.
19     Sometimes the -- the head of operations
20 would be in those meetings.
21     So you -- it was a group of, depending on
22 the point in time of the company, between I think
23 initially 6 and by the time I left probably around
24 15 people that would be receiving the messages that
25 you send to M-team.

81 (Pages 669 - 672)

CONFIDENTIAL

Page 673

1    Q.   Between 2019 and 2021 when you were at the
2  company as a contingent worker, were you ever in any
3  meetings of the M-team?
4    A.   I was not.
5    Q.   Do you have any idea during that period
6  what the M-team was discussing, including on some of
7  these well-being and child safety issues?
8    A.   I do not.
9    Q.   And there's also something at the company
10  known as "Small Group"; right?
11    A.   I'm not familiar with that term.
12    Q.   You don't know what Small Group is at the
13  company?
14    A.   No.
15    Q.   Okay.  So fair to say that you were not
16  participating in any Small Group meetings because it
17  sounds like you're not familiar with what that is;
18  is that right?
19    A.   Yes.
20    Q.   What about -- you understand that Meta has
21  a board of directors?
22    A.   Yes.
23    Q.   Were you ever involved in any meetings of
24  the company's board of directors, including on
25  subjects relating to team well-being or child safety

Page 674

1  issues?
2       And let me be more specific.  Between 2019
3  and 2021.
4    A.   Thank you.
5       No.
6    Q.   Sure.
7       (Discussion off the stenographic record.)
8    BY MS. JONES:
9    Q.   During this period, Mr. Bejar, from 2019 to
10  2021, can we agree that there would have been some
11  meaningful number of meetings and discussions going
12  on at the company that you simply would not have
13  been a part of because you were a contingent worker
14  working on average three hours a week?
15    A.   Yes.
16    Q.   Including on the subjects of teen
17  well-being and child safety?
18    A.   Yes.
19    Q.   You have made, I think, a number of
20  statements in the last couple of days about
21  resourcing around teen well-being and child safety;
22  yes?
23    A.   Yes.
24    Q.   Between 2019 and 2021, did you have any
25  role at all in the head-count allocation process for

Page 675

1  either well-being efforts or child safety efforts at
2  the company?
3    A.   I did not.
4    Q.   Do you have any awareness of how many heads
5  might have been allocated to particular teams
6  focused on teen well-being or child safety?
7    A.   Sorry, a little bit more context.  You mean
8  Meta overall?  Do you mean within Instagram
9  well-being team?
10    Q.   Good question.  Yeah.
11       I'm asking Meta overall, would you have any
12  awareness of how many heads would have been
13  allocated to teams that were focused on teen
14  well-being or child safety between 2019 and 2021?
15    A.   No.
16    Q.   Just asking the question Meta overall, do
17  you have any specific information about what efforts
18  were or were not funded with respect to teen
19  well-being and child safety efforts of the company?
20    MR. CARTMELL:  Object to the form.
21    THE WITNESS:  Outside of Instagram, I did
22  not.
23    BY MS. JONES:
24    Q.   You were not -- in between 2019 and 2021,
25  you weren't involved in hiring, were you?

Page 676

1    A.   I'm trying to recall if I helped interview
2  people, but I don't recall.
3    Q.   Okay.  And the company has what are known
4  as H1 and H2 plans; right?
5    A.   Correct.
6    Q.   And just give me the nutshell version,
7  truly the nutshell version, of what an H1 or H2 plan
8  is.
9    A.   So those describe halves of the year.  And
10  so H1 is for the first half of the year, and H2 is
11  for the second half of the year.
12    Q.   And is it the case that different teams at
13  the company are required to prepare H1 and H2 plans?
14    A.   Yes.  I did that for many years.
15    Q.   And when you say you did it for many years,
16  do you mean you did it from 2009 to 2015?
17    A.   Correct.
18    Q.   When you came back to the company as a
19  contingent worker from 2019 to 2021, did you have
20  any role at all in drafting H1, H2 plans for any
21  team at the company?
22    A.   Yes, I was part of some conversations for
23  drafting those plans for the well-being team for
24  Instagram.
25    Q.   Any others?

Golkow Technologies,
A Veritext Division

877-370-3377                                    www.veritext.com

CONFIDENTIAL

Page 677

1    A.   No.
2    Q.   And when you say you were parts -- part of
3  some conversations, what does that mean exactly?
4    A.   It meant that in the -- for example, in the
5  well-being leads meetings where we discussed the
6  plans, I would be invited to be part of those
7  meetings and give feedback.  I would also give
8  feedback on sort of metrics and goals, sometimes
9  feedback on features, and sort of the framing of
10  some of the issues.
11    Q.   During this period from 2019 to 2021, you
12  would not have been characterized as a member of
13  senior leadership at the company; right?
14    A.   Right.
15    Q.   And when you were at the company from 2019
16  to 2021 as a part-time consultant, I would also not
17  regularly meeting with Mark Zuckerberg or
18  Sheryl Sandberg or Adam Mosseri or Chris Cox; yes?
19  Is that right?
20    A.   Yes.
21    Q.   During that time period, from 2019 to 2021,
22  putting aside for a moment the e-mail that you sent
23  to Mr. Zuckerberg right before you finished your
24  time as a consultant, during that time period, did
25  you ever have any conversations with Mark Zuckerberg

Page 678

1  on any topic?
2    A.   I believe I -- before I came back, I
3  reached out to Mark Zuckerberg over a direct
4  messaging.  He didn't write back.  And I did not
5  have any conversations with him while I was a
6  contingent -- sorry, when I was back at Instagram.
7    Q.   Okay.  Let me just come back to my question
8  and make sure that the record is clear.
9        During the period that you were a
10  contingent worker at the company from 2019 to 2021
11  as a contingent -- excuse me.  Strike that.
12        During the period that you were a
13  contingent worker at the company, from 2019 to 2021,
14  did you ever have any conversations with
15  Mark Zuckerberg on any topic?
16    A.   I did not.
17    Q.   You never had a conversation with
18  Mr. Zuckerberg about teen well-being, right, from
19  2019 to 2021?
20    A.   Just, I'm pausing because it's important to
21  exclude the message I sent to him because it was
22  about that.
23    Q.   Yeah.  Let me take a step back.
24        When I -- when I say "conversation," I mean
25  an interactive you were talking to him and he was

Page 679

1  responding; okay?
2    A.   Okay.
3    Q.   Okay.  During that -- you never -- in that
4  period from 2019 to 2021, you never had any
5  conversations with Mr. Zuckerberg about the subject
6  of teen well-being; is that right?
7    A.   Correct.
8    Q.   And in that period from 2019 to 2021, you
9  didn't have any conversations with Mark Zuckerberg
10  about child safety; right?
11    A.   No in-person dialogue.
12    Q.   Right.
13        And you all didn't message with each other
14  back and forth on that subject either; right?
15    A.   Right.
16    Q.   He was not sharing with you his thinking on
17  why he was doing certain things or making certain
18  decisions; right?
19    A.   Right.
20    Q.   And you're not offering the view in your
21  deposition here that you somehow can opine on
22  Mr. Zuckerberg's intent with respect to decisions
23  that he's made as the leader of the company; right?
24    A.   I can comment about the choices that he
25  makes.

Page 680

1    Q.   And my question was a little bit more
2  specific, Mr. Bejar.
3        You are not in a position to offer an
4  opinion, expert or otherwise, on Mr. Zuckerberg's
5  intent with respect to those decisions?
6    A.   I mean, I think that ends up being pretty
7  nuanced in my view, because about the extent of time
8  with which I worked with him, I think I had a pretty
9  good mental model of what he was doing.
10        And then the other thing that I think is
11  important is kind of observing and sort of noticing
12  when these issues came up, all of the things that he
13  said about them were very kind of consistent.
14        And so I think that I can speak to sort of
15  the things that he was saying and what I believe
16  might be the underlying mental model behind those
17  things.
18    Q.   Are you -- I want to make sure I understand
19  both the answer to my question but also what you
20  mean by the "underlying mental model."
21        My question was pretty specific.
22        Are you offering an opinion, expert or
23  otherwise, about Mr. Zuckerberg's intent in making
24  certain decisions with respect to the company?
25        MR. CARTMELL:  Objection.  Asked and

83 (Pages 677 - 680)

CONFIDENTIAL

Page 681

1 answered.
2     THE WITNESS: Sorry, I'm just giving a
3 little bit of time for the question to -- turn.
4     I think I am giving well-formed sort of
5 thoughts. Again -- and part of it is I'm trying to
6 be very precise about what each of the words on that
7 means. But, I mean, I do have pretty well-formed
8 thoughts as to when we talk about harm, right, the
9 very consistent response from Mark and what he meant
10 of harm when I heard him talk about harm. And I do
11 think I have a well-formed opinion to talk about
12 that and what that means.
13     But I don't know what's in a man's heart.
14 And so that's why I kind of talk about motivations,
15 intentions, and all of these things. It's a pretty
16 complicated landscape. And so I try to guide the
17 representations that I make based on the choices
18 that I observe people making.
19     BY MS. JONES:
20     Q. And I apologize, Mr. Bejar, I'm not sure if
21 I heard an answer to my specific question, which was
22 whether you are offering opinions, expert or
23 otherwise, about Mr. Zuckerberg's intent in making
24 certain decisions with respect to the company?
25     MR. CARTMELL: Okay. I want to object and

Page 682

1 move to strike the statement of counsel. And same
2 objection, it's been asked and answered.
3     MS. JONES: Certainly asked. Not yet
4 answered.
5     BY MS. JONES:
6     Q. Do you want me to ask the question again or
7 has it -- do you have it?
8     A. I mean, I --
9     MR. CARTMELL: Same objection. I'm going
10 to move to strike the statement of counsel. Asked
11 and answered.
12     BY MS. JONES:
13     Q. I know this is a little disorienting.
14     Do you want me to ask the question one more
15 time?
16     A. No. I just --
17     Q. Or do you have it?
18     A. I just think I've answered it, so -- to the
19 best of my ability, I mean.
20     Q. And I want to -- you've answered it insofar
21 as you've said, yes, you are offering opinions on
22 his intent or, no, you're not?
23     A. I mean, I think I covered the landscape in
24 the answer that I gave.
25     And I would also like to say that I'm also

Page 683

1 noticing that I'm feeling very tired right now. So
2 when it's appropriate for the forum, I would really
3 like to take a break right now.
4     Q. We can take a break right now if you'd like
5 to. That's entirely fine.
6     A. Well, thank you.
7     Q. Okay.
8     A. Appreciate that.
9     THE VIDEOGRAPHER: The time is 5:27. We're
10 off the record.
11     (Recess taken from 5:27 to 5:44.)
12     THE VIDEOGRAPHER: The time is 5:44. We're
13 back on the record.
14     BY MS. JONES:
15     Q. Mr. Bejar, welcome back.
16     I wanted to actually come back to your time
17 after you left the company in 2015 but before you
18 came back in 2019; okay?
19     A. Okay.
20     Q. Was any of the consulting work that you
21 were doing related to teen well-being or child
22 safety issues?
23     A. It was not.
24     Q. You have testified that in your opinion,
25 the company was prioritizing growth and engagement

Page 684

1 over safety in this 2019 to 2021 time frame when you
2 were a part-time consultant; is that right?
3     A. Yes.
4     Q. And just so the jury understands when we
5 use the term "engagement," that's just -- are people
6 using the product that you're putting out in the
7 world? Is that a kind of casual or informal way to
8 say it?
9     MR. CARTMELL: Object to the form.
10     THE WITNESS: No. Engagement is a really
11 important topic; right? An engagement is a
12 combination of time spent, whether you comment or
13 like, or the different forms for which you can
14 engage with a product.
15     BY MS. JONES:
16     Q. Okay. And I appreciate the -- the
17 explanation there.
18     Engagement is not a bad thing; right?
19     MR. CARTMELL: Object to the form.
20     THE WITNESS: Unlimited engagement is a bad
21 thing. Engagement without measurement or of harm
22 that might come from that engagement can be bad too.
23     BY MS. JONES:
24     Q. Well, my question is -- well, let me ask it
25 this way: You have previously testified that

84 (Pages 681 - 684)

CONFIDENTIAL

Page 685

1 engagement is not inherently bad; is that true?
2    A.  Engagement on its own, without any bounds,
3 can be bad.  Engagement with right balance with
4 other metrics can be good.  You have to know that
5 people are using your product.
6    Q.  Understood.  Okay.
7       And on the -- on the demonstrative that you
8 were talking about with counsel yesterday -- you can
9 pull it up if you want to.  It's Exhibit No. 10,
10 Deposition Exhibit No. 10.  It's also going to be on
11 the screen, I think -- the first thing that you all
12 put on the list was (as read):
13       "Meta's leadership's top priority is
14       growth and engagement, not safety."
15       Do you see that?
16    A.  I do, yes.
17    Q.  And, again, you -- it sounds like you have
18 not had an actual conversation with Mark Zuckerberg
19 in -- has it been a decade?
20    A.  I don't remember the last time I spoke to
21 him.
22    Q.  Okay.  Have you spoken -- you have not
23 spoken to him since 2019; right?
24    A.  Right.
25    Q.  Do you recall whether you had any

Page 686

1 conversations with Mr. Zuckerberg between 2015 and
2 2019 when you were between your stints at the
3 company?
4    A.  I mean, I wrote to him during that time,
5 but I don't recall him responding.
6    Q.  Okay.  And so just going back to my
7 definition of conversation that we talked about
8 earlier, is it accurate to say that you have not, in
9 fact, had a conversation with Mark Zuckerberg in at
10 least a decade?
11    A.  I don't think that would be accurate
12 because I did actually talk to him before I left,
13 which was in June, and we're in March.  So just to
14 be very precise.
15    Q.  Okay.  Fair enough.
16       Nine years.  Has it been nine years since
17 you had any conversation with Mark Zuckerberg?
18    A.  Yeah.
19    Q.  Okay.  So on this demonstrative that you
20 put together with the lawyers here, you said
21 (as read):
22       "Meta's leadership's top priority is
23       growth and engagement, not safety."
24       Right?
25    MR. CARTMELL:  Object to the form.

Page 687

1    THE WITNESS:  Yeah.  Again --
2    (Simultaneous speakers - unclear.)
3    MR. CARTMELL:  I'm sorry.
4    MR. WARD:  Wait.
5    MR. CARTMELL:  Real quick.  And
6 characterization of the document creation.
7    BY MS. JONES:
8    Q.  I'm -- I think I'm just -- this is -- just
9 so the jury understands, what I'm showing you,
10 Deposition Exhibit No. 10, you recognize this as the
11 document that you walked through at great length
12 with the -- with counsel yesterday; right?
13    A.  Right.
14    Q.  What we have up on the screen here is the
15 very same document that I believe you testified you
16 put together; right?
17    A.  Right.
18    Q.  These are the opinions that you've
19 expressed over the course of the last two days;
20 right?
21    A.  Right.
22    Q.  And the first item that you have on your
23 list here is (as read):
24       "Meta leadership's top priority is
25       growth and engagement, not safety."

Page 688

1       Right?
2    A.  Right.
3    Q.  And just so we understand -- so the jury
4 understands, you have not had a conversation with
5 Meta's senior-most leader in nine years, right, at
6 least?
7    A.  Right.  I mean, I -- I only sort of looked
8 at all the teams I was working with and the efforts
9 around every area that I was involved with.
10    Q.  When you were at the company as a
11 contingent worker between 2019 and 2021, you were
12 not involved in making resourcing decisions or
13 making decisions about priorities between growth and
14 well-being; is that right?
15    A.  I mean, I do believe it's important for me
16 to say -- I would like you to repeat the question,
17 but you keep call me "contingent worker" and
18 "contingent worker, contingent worker," and I don't
19 think that's an accurate characterization of who I
20 was because a contingent worker covers so many
21 examples of different people.  And it -- whatever is
22 the title on Workplace about the job that I did is
23 not an accurate representation on the grounds of
24 which they hired me or the role to which I played.
25       I mean, you're looking at the three hours

85 (Pages 685 - 688)

CONFIDENTIAL

Page 689

1 thing, and the first bullet is with Yoav going on
2 leave, I am going to be working directly with the
3 leads on measurement and metrics; right?
4         And so when the leader of engineering for
5 well-being went on parental leave, I helped fulfill
6 some of his duties. And so that conveys more
7 accurately, I believe, the role that I played for
8 the company during the time that I was there.
9     Q.   Okay. Mr. Bejar, I'm going to move to
10 strike as nonresponsive the entirety of that answer.
11        My question -- first of all, you were, in
12 fact, a contingent worker from 2019 to 2021;
13 correct?
14    A.   I was a consultant hired for my expertise
15 and the work that I had done for a lifetime in the
16 industry to help this team to -- on its purchase to
17 protect kids.
18    Q.   I'm sorry. Is -- "yes" or "no" --
19    A.   Sorry.
20    Q.   "Yes" or "no," your formal title with the
21 company was contingent worker?
22        MR. CARTMELL: Well, I'm going to object to
23 that. It's not appropriate for counsel to instruct
24 the witness that he has to answer "yes" or "no." We
25 are in trial right now. That would never happen.

Page 690

1 It's not fair. He can answer the question the way
2 he sees fit.
3         MS. JONES: And I'm going to object to you
4 coaching the witness.
5         MR. CARTMELL: No, I'm not coaching the
6 witness. But what I'm saying is, Phyllis --
7         MS. JONES: And I don't -- I don't want to
8 spend -- I understand your objection.
9         MR. CARTMELL: -- we are in trial right
10 now, and that you know that would never be allowed
11 in trial; right?
12        And so I'm saying you cannot instruct --
13 and a judge would never allow it -- you cannot
14 instruct a witness to say "yes" or "no." He can
15 answer the question as he sees fit.
16        MS. JONES: Okay.
17        BY MS. JONES:
18    Q.   Mr. Bejar, do you recall us looking at
19 documents where you were referred to as a contingent
20 worker? "Yes" or "no"?
21    A.   Yes, we did.
22        MR. CARTMELL: Same objection.
23        THE WITNESS: Sorry.
24        MR. CARTMELL: Go ahead.
25        THE WITNESS: We saw those documents, yes.

Page 691

1         BY MS. JONES:
2     Q.   Okay. And during this time frame, from
3 2019 to 2021 -- from 2021, you were not involved in
4 making resourcing decisions as between growth and
5 well-being; right?
6     A.   Correct.
7     Q.   And let's take some examples of --
8         MS. JONES: Thank you.
9         BY MS. JONES:
10    Q.   -- of --
11        MS. JONES: Well, hold on. We may not use
12 that. Let me just hold on to that for a second.
13 Thank you.
14        BY MS. JONES:
15    Q.   Let's take some examples of things that you
16 talked about specifically yesterday.
17        Do you know, for 2019, how many employees
18 or heads, as they're referred to, at Meta were
19 allocated to the growth team?
20    A.   I do not.
21    Q.   Do you know for the year 2020 how many
22 employees were allocated at Meta to the growth team?
23    A.   I do not.
24    Q.   And for 2021 do you know how many employees
25 were allocated to the growth team for Meta?

Page 692

1     A.   I do not.
2     Q.   And I think you testified to this earlier,
3 but I want to just make sure we have it for the
4 record.
5         In 2019, across Meta, do you know how many
6 employees were allocated to well-being efforts
7 across the company?
8     A.   Not across the company, no.
9     Q.   Do you know for the year 2020 how many
10 employees were allocated to well-being efforts
11 across the company?
12    A.   Not across the company, no.
13    Q.   And in 2021 do you know how many employees
14 were allocated to well-being efforts across the
15 company?
16    A.   Not across the company, no.
17    Q.   Same question as to child safety
18 specifically.
19        Do you know for 2019 how many employees
20 were allocated to child safety efforts across the
21 company in 2019?
22    A.   Across the company, no.
23    Q.   What about 2020? Do you know how many
24 employees were allocated to child safety efforts
25 across the company in 2020?

CONFIDENTIAL

Page 693

1    A.   Across the company, no.
2    Q.   And how about in 2021?  Do you know how
3  many employees were allocated to safety efforts
4  across the company in 2021?
5    A.   Across the company, no.
6    Q.   Do you know how much money Meta spent on
7  growth-related initiatives in 2019?
8    A.   The thing about growth and engagement is
9  when I say "growth and engagement," I'm not
10  referring to the growth vertical.  I'm saying as a
11  methodology of product development.
12       And so, for example, the Reels team was
13  working on these videos.  The things they looked at
14  is the people looking at the videos, comments and
15  other areas.  And that was a methodology.
16       And so what I observed during my time is
17  that the methodology for product development --
18    Q.   Mr. Bejar, I don't mean -- I really don't
19  mean to be rude, and I don't want --
20       MR. WARD:  Please allow him to finish his
21  answer.  You can move to strike anything you want
22  after he's done, but let him complete his answer.
23       MS. JONES:  We're going to be -- we're
24  going to be here next week --
25       MR. WARD:  We'll here be as long as we need

Page 694

1  to be.  You have -- you have to let my client --
2       MS. JONES:  -- if we -- if I can't get an
3  answer to my question.
4       MR. WARD:  You have to let him answer the
5  question.
6       BY MS. JONES:
7    Q.   Finish your answer.
8    A.   Yeah.  So --
9    Q.   But can I just remind you of my question?
10       My question was --
11       MR. WARD:  He knows what the question was.
12  Let him finish his answer, please.  Let him finish
13  his answer, please.
14       MS. JONES:  Counsel, in the course of
15  two days of questioning by plaintiffs' counsel --
16       MR. WARD:  You can't interrupt a witness by
17  restating the question to them.  That's not a proper
18  objection --
19       MS. JONES:  And --
20       MR. WARD:  -- or interference with the
21  question.
22       MS. JONES:  And you may not scream at me in
23  this way.
24       MR. WARD:  I'm not.  I'm asking you to
25  respectfully let my client answer his question.  And

Page 695

1  don't interrupt him by restating the question in the
2  middle of his answer.
3       MS. JONES:  Counsel, may I speak now?
4       MR. WARD:  Yes.
5       MS. JONES:  In two days of questioning by
6  plaintiffs' counsel, you did not raise a single
7  objection.  I have been asking -- let me finish.
8  Let me finish.
9       I have been asking questions for an hour
10  and maybe ten minutes, and you are already yelling
11  at full volume.
12       I would like to withdraw my question.
13       BY MS. JONES:
14    Q.   And I'm going to ask you my next question
15  in the interest of time.
16       MR. CARTMELL:  For the record, I want to
17  make it clear, there was no yelling at full volume.
18       BY MS. JONES:
19    Q.   Mr. Bejar, how much did Meta spend on
20  growth-related initiatives in 2019?  Do you know?
21    A.   I don't.
22    Q.   What about 2020?
23    A.   I don't.
24    Q.   What about 2021?
25    A.   I don't.

Page 696

1    Q.   Do you know how much money Meta spent on
2  well-being efforts in 2019?
3    A.   I don't.
4    Q.   What about --
5    A.   Across the company; right?
6    Q.   Across the company --
7    A.   Yeah.
8    Q.   -- yes.
9    A.   I don't.
10    Q.   What about 2020?
11    A.   I don't.
12    Q.   What about 2021?
13    A.   I don't.
14    Q.   And how much did Meta spend on child safety
15  efforts in 2019?
16    A.   You mean across the company?
17    Q.   Across the company.  Thank you.
18    A.   I don't.
19    Q.   What about 2020?  Do you know that?
20    A.   Across the company, I don't.
21    Q.   Across the company, how much did Meta spend
22  on child safety efforts in 2021?
23    A.   I don't know.
24    Q.   And since you left the company in 2021 to
25  today, do you know how much money the company has

87 (Pages 693 - 696)

CONFIDENTIAL

Page 697

1  spent on team well-being efforts one way or the
2  other?
3      A.  I don't.
4      Q.  What about child safety efforts since you
5  left the company?  Do you know how much money the
6  company has spent on child safety efforts one way or
7  the other across the company?
8      A.  I don't.
9      Q.  And what about the growth team and
10  growth-related initiatives?  Do you know since you
11  left the company in 2021 how much money the company
12  has spent on growth-related initiatives since you
13  left until today?
14      A.  I do not.
15      Q.  The next item that you have on the
16  demonstrative that you created is -- I actually want
17  to ask if we can focus on Item No. 3.
18          Do you see No. 3, Mr. Bejar?
19      A.  I do, yes.
20      Q.  And that's (as read):
21          "Meta does not provide adequate
22          resources or support for safety and
23          well-being work."
24          Right?
25      A.  Right.

Page 698

1      Q.  And over the course of your testimony the
2  last two days, you were repeatedly described as a
3  person with 30 years of child safety expertise.
4          Do you recall those references?
5          MR. CARTMELL:  Object to the form.
6          THE WITNESS:  Thirty years of safety,
7  security, child safety expertise.
8          BY MS. JONES:
9      Q.  Okay.  Well, let me -- let's break that
10  down just a little bit.
11          Do you have 30 years of child safety
12  expertise?
13      A.  When I started working for Electric
14  Communities, that product was actually designed for
15  kids because it was a cyberspace.  That was one of
16  the aspects of it.
17          So that was definitely a consideration
18  early on based on the experience that the founders
19  of the company had building a game for kids in the
20  mid-'80s where they learned a lot of lessons around
21  these issues.
22      Q.  And what were the specific child safety
23  issues you were dealing with at -- is it Electric
24  Communities?
25      A.  Electric Communities.

Page 699

1      Q.  What were the specific issues you were
2  addressing there that were child safety related?
3      A.  That you wanted to create a product that
4  made it such that people couldn't interact with each
5  other in an unsafe fashion.  And that was intrinsic
6  to the way the product was designed as well to the
7  way the product was engineered.
8      Q.  How much of a -- how large of a component
9  of your role at Electric Communities was child
10  safety?
11      A.  I was the person in charge of engineering
12  the -- sort of the world layer of the product.  And
13  so then it was, like, sort of the foundation upon
14  which you can make representations about how people
15  interacted with each other.
16      Q.  And so I want to be sure I understand here.
17          When you have been referred to as someone
18  who has 30 years of child safety expertise, is that
19  accurate or inaccurate?
20          MR. CARTMELL:  Object to the form.
21          THE WITNESS:  I think it's accurate.
22          BY MS. JONES:
23      Q.  Okay.  Let's talk about that, including
24  with respect to your time at Meta.
25          I believe you've already testified that you

Page 700

1  didn't have anything to do with child safety on
2  Instagram before you left the company in 2015;
3  correct?
4          MR. CARTMELL:  Object to the form.
5  Characterization.
6          THE WITNESS:  Instagram did not have
7  efforts on that front during that time.
8          BY MS. JONES:
9      Q.  That's okay.  We can come -- we can come
10  back to the transcript on that.
11          Did you know that during the period where
12  you were at the company from 2019 to 2021 as a
13  contingent worker, that there were other teams
14  across the company that were focused on child safety
15  issues?
16      A.  Yes.
17      Q.  Do you know what the names of those teams
18  were?
19      A.  I can't -- no, I don't know the names of
20  those teams.
21      Q.  Are you -- you're familiar with central
22  integrity; yes?
23      A.  Yes.
24      Q.  And are you familiar with the integrity
25  ecosystem team?

88 (Pages 697 - 700)

Page 701

1    A.  Yes.
2    Q.  Are you familiar with the integrity
3  problems team?
4    A.  I don't have a complete inventory full of
5  the different teams and all of their names.
6    Q.  Well, that's fine.
7        Are you familiar with the integrity
8  problems team?
9    A.  It sounds familiar, but I'm -- I'm trying
10  to remember.  Again, as I said, I don't have a
11  complete inventory.  And sort of proper nouns are
12  something that my brain has a little bit of a hard
13  time with.  So it helps me to have, like, more
14  context sometimes.
15    Q.  Okay.  What about the integrity foundation
16  team?  Are you familiar with that?
17    A.  I don't recall that.
18    Q.  Okay.  What about community integrity?
19    A.  Oh, absolutely.
20    Q.  All right.  Were you familiar with the
21  Instagram trust and safety team?
22    A.  Yes.
23    Q.  And you also know that there was a team
24  known as youth protections?
25    A.  Yes.

Page 702

1    Q.  Okay.  And there was also a safety policy
2  team that's been at the company; yes?
3    A.  Yes.
4    Q.  And so you spent a lot of time over the
5  course of the last couple of days talking about the
6  Instagram well-being team, but it sounds like you
7  would readily acknowledge there were other teams
8  that you have not testified about who were also
9  focused on child safety issues; yes?
10    MR. CARTMELL:  Object to the form.  Move to
11  strike the statement of counsel.
12    THE WITNESS:  I mean, that's a weird
13  question because in my experience, for all the time
14  I worked at the company, is where -- the heart of
15  the work is, is with the engineers and the product
16  managers.  They're the ones that create the
17  features.  You have your research, and you have all
18  of these teams.  And that is what drives the changes
19  in the product that have the most substantive effect
20  on the safety that people have.
21        And so when I talk about that work, I talk
22  about that team which would be creating the features
23  that provide safety.
24    BY MS. JONES:
25    Q.  Understood.

Page 703

1        Let me bring you back to my question.
2        You would readily acknowledge that there
3  were other teams at Instagram in this period from
4  2019 to 2021 beyond Instagram well-being that were
5  also focused on child safety issues; yes?
6    A.  Yes.
7    Q.  Do you know what the head-count allocation
8  was for any of those teams from 2019 to 2021?
9    A.  I would know in a -- kind of an order of
10  magnitude, relatively speaking.  I mean, I know that
11  the central integrity team and those areas was a
12  much bigger team than the teams that we had on
13  Instagram at the time.
14    Q.  And let me just -- I just want to see if
15  you kind of get a sense of what you know about what
16  was going on at the -- at the -- in the child safety
17  space at the company from 2019 to 2021.
18        Do you know who was the tech lead on child
19  safety in central integrity from 2019 to 2021?
20    A.  I don't recall.
21    Q.  Does the name ███████████ ring
22  a bell for you?
23    A.  I don't recall.
24    Q.  Okay.  Who was the project manager on child
25  safety in central integrity during your time from

Page 704

1  2019 to 2021?
2    A.  I don't recall.
3    Q.  Okay.  Who was the team lead for child
4  safety operations in central integrity during your
5  time from 2019 to 2021?
6    A.  Can you repeat the question?  Sorry.
7  You're kind of running me through an org chart of a
8  different part of the company and it's -- can you
9  repeat the question?
10    Q.  Sure.
11        Who was the team lead for child safety
12  operations in central integrity during your time
13  from 2019 to 2021?
14    A.  I don't recall.
15    Q.  Are you familiar with what NCMEC is?
16    A.  Yes.
17    Q.  It's the National Center for Missing &
18  Exploited Children?
19    A.  Yes.
20    Q.  And you understand that there are folks at
21  Meta who are specifically focused on NCMEC
22  reporting, in particular?
23    A.  Yes.
24    Q.  Okay.  And during the course of your --
25  either your employment from 2009 to 2015 to your

CONFIDENTIAL

Page 705

1  consultancy from 2019 to 2021, were you ever a
2  representative for the company at a NCMEC roundtable
3  on the industry's work on child safety?
4      A.  So when both PhotoDNA came out and we were
5  looking at reporting, I was the executive sponsor
6  within Facebook to get Facebook to be the first
7  major Internet company to contribute to PhotoDNA and
8  the NCMEC databases and ███████, who was a
9  product manager, which I hired and then realized he
10  was incredibly good at working on child porn and
11  child engagement issues, when he was reporting to me
12  I had him dedicate full time to that work including
13  building tools, images, pipelines, so we could feed
14  the information to NCMEC.  And I believe that he
15  would be somebody who would be participating on
16  those roundtables on behalf of the company.
17      MS. JONES:  Yeah, I'm going to move to
18  strike all of that as nonresponsive.
19      BY MS. JONES:
20      Q.  Let me ask my question again.
21      During your time at the company, whether
22  from 2009 to 2015 or from 2019 to '21, were you ever
23  a representative for the company at a NCMEC
24  roundtable on the industry's work on child safety?
25      MR. CARTMELL:  Objection.  Asked and

Page 706

1  answered.
2      THE WITNESS:  I was not.
3      BY MS. JONES:
4      Q.  What is the Tech Coalition?
5      A.  Again, so some of these proper noun
6  questions, these might be things that I'm familiar
7  with, but I need a little bit of context in order to
8  be able to reply.
9      Q.  It's the industry's trade association for
10  combating online sexual exploitation and abuse.
11      Does that -- does that ring a bell for you?
12      A.  Yeah, absolutely.  Thank you.
13      Q.  Okay.  Did you ever participate in
14  Tech Coalition?
15      A.  I -- as part of a strategy that I set up
16  for the company during my first stint, it was a
17  priority -- and I testified about this before -- to
18  be an active member contributing to cross-company
19  efforts to help identify predators, child porn, any
20  of those areas that are not a competitive issue.
21  That was something that was a priority.  I helped
22  set up a lot of those programs.  I sponsored them
23  for many years.  I always considered it to be
24  central to the mission of the company to participate
25  in those kinds of forums.

Page 707

1      MS. JONES:  And I apologize, Mr. Bejar,
2  because I'm just not sure if you answered the
3  question that I asked.
4      So I'm going to move to strike as
5  nonresponsive and ask again.
6      BY MS. JONES:
7      Q.  Did you ever participate in Tech Coalition?
8      MR. CARTMELL:  Objection.  Asked and
9  answered.
10      THE WITNESS:  I mean, if you're asking
11  about that version at that point in time, not that I
12  recall.
13      BY MS. JONES:
14      Q.  Okay.  Do you know what INHOPE is,
15  I-N-H-O-P-E?
16      A.  Again, as I said, it really helps me to get
17  some context in some of these things so that I can
18  speak to them.
19      Q.  The name is not familiar to you?
20      A.  I don't recall right now.
21      Q.  Okay.  It's an international organization
22  that's focused on child safety issues.
23      Does that ring a bell?
24      A.  Yes.
25      Q.  Are you familiar with INHOPE?

Page 708

1      A.  Not very.
2      Q.  Okay.  And so am I right in thinking that
3  during the course of your time with the company, you
4  never attended any INHOPE meeting or event?
5      A.  That's right.
6      Q.  During the course of your time with Meta,
7  were you ever a representative to an industry child
8  safety hackathon hosted by the company?
9      A.  I think in my first stint, I don't believe
10  that we hosted such hackathons, but we did invite
11  teens to participate and give a lot of feedback as
12  part of the Compassion Research Days.
13      (Stenographer interrupted for clarification
14      of the record.)
15      BY MS. JONES:
16      Q.  Do you know what WeProtect is?
17      A.  Not off the top of my head.
18      Q.  It's an organization that Meta participates
19  in focused on reducing child exploitation online.
20      Does that ring a bell?
21      A.  I'm really glad they're doing that.
22      Q.  Is it -- are you familiar with the
23  organization?
24      A.  Not off the top of my head.
25      Q.  Okay.  Have you ever, in the course of your

90 (Pages 705 - 708)

CONFIDENTIAL

Page 709

1 time with the company, been a representative to a
2 WeProtect Global Alliance child safety meeting or
3 event?
4    A.   No, I have not been to one of those events
5 that I recall.
6    Q.   Okay.  Were you ever involved in or leading
7 a safety advisory board meeting as part of the
8 safety policy team's efforts?
9    A.   Actually, during my first stint, I was
10 participating, you know -- yes, in my first stint, I
11 was a big part of that.  I spent time with
12 representatives from -- from -- oh, I forget.  You
13 named the organization, but it was a big part of my
14 first stint.
15    Q.   Well -- and in your -- in your second
16 stint, did you have any role with the safety
17 advisory board?
18    A.   Oh, it's a safety advisory board.  Thank
19 you.
20         No, not in my second stint.
21    Q.   And in your second stint, did you have any
22 role as a representative for the company or as part
23 of the company's efforts with respect to these
24 organizations: The Tech Coalition, INHOPE,
25 WeProtect?

Page 710

1    A.   During my second stint at the company, I
2 wasn't somebody who was focused on external
3 representations.  All of my work was focused
4 internally.
5    Q.   And so you were -- I just want to make sure
6 I -- we have an answer for the record.
7         During your second stint at the company,
8 you were not involved in any of those organizations?
9    A.   No.
10    Q.   Let me ask you to look at Item No. 2 on
11 your demonstrative here, Exhibit No. 10, Mr. Bejar
12 which reads (as read):
13         "Meta's organizational structure
14         creates a conflict in favor of growth,
15         not safety."
16         Is that right?
17    A.   Yes.
18    Q.   And I think your testimony yesterday on
19 this was that the fact that central integrity is
20 part of the growth structure creates a conflict of
21 interest.
22         Is that what -- am I roughly approximating
23 what you said?
24    A.   Yes.
25         MR. CARTMELL:  Object to the form.

Page 711

1         BY MS. JONES:
2    Q.   Okay.
3    A.   Sorry.
4    Q.   Were you a part of any of the discussions
5 around the decision to have central integrity be
6 part of the growth organization?
7    A.   No.  But in my first stint, it was very
8 important that those be peer organizations for the
9 company.
10    Q.   Understand.
11         And in your first stint, you were leading a
12 team called "protect and care"; right?
13    A.   Correct.
14    Q.   And eventually protect and care became a
15 part of central integrity; is that right?
16    A.   No.  That's not right.
17    Q.   Okay.  Which part of it is not right in
18 your view?
19    A.   So the -- the protect and care had
20 different components.
21         One component was the infrastructure that
22 does all of the content classification for the
23 purposes of integrity, and I believe that got moved
24 under the infrastructure team.
25         Then you had the compassion team that was

Page 712

1 focusing on harmful experiences that were done by
2 people, and I believe that got moved under sort of
3 news feed under Will Cathcart when he was managing
4 that part of the company.
5         And then there was the part of the product
6 side of integrity and the care part, and I believe
7 that's the part that then moved under growth.
8    Q.   And did that shifting happen in that period
9 from 2015 to 2019 when you were no longer at the
10 company?
11    A.   Yes.
12    Q.   Okay.  So you would not have been involved
13 in the restructure; is that right?
14    A.   That's right.
15    Q.   Mr. Bejar, do you know, for Instagram
16 well-being specifically, how much head count was
17 allocated in 2019?
18    A.   Oh, I don't recall the specific number.
19    Q.   What about for 2020?
20    A.   I mean, I think I have a sense of order of
21 magnitude, but I don't recall the specific number.
22    Q.   What about for 2021?
23    A.   Again, same.  I have a sense of order of
24 magnitude but not the specific number.
25    Q.   Do you know how much money was spent by the

91 (Pages 709 - 712)

Page 713

1 company on Instagram well-being efforts specifically
2 in 2019?
3    A.  I don't know the exact amount.
4    Q.  What about 2020?
5    A.  I don't know the exact amount.
6    Q.  Same answer for 2021?
7    A.  I don't -- yes, I don't know the exact
8 amount.
9    Q.  Okay.  You mentioned Electric Communities
10 and work that you did on child safety issues,
11 I think was your testimony?
12    A.  Yes.
13    Q.  How -- well, do you recall what percent of
14 Electric Communities' users were minors?
15    A.  So Electric Communities did not end up
16 having a lot of users until it -- it was acquired --
17 oh, I forget the name.  At the end of my tenure,
18 there were other products acquired.  But during my
19 first years there, the idea was to build a product
20 that would be safe for everybody based on extensive
21 experience of building a product for kids in the
22 mid-'80s by the founders.
23    A.  Sure.
24       MS. JONES:  And, respectfully, I'm going to
25 move to strike as nonresponsive because I don't

Page 714

1 think that answered my question.
2       BY MS. JONES:
3    Q.  My question was, do you recall what percent
4 of Electric Communities' users were minors at the
5 time that you were working there?
6    A.  The Electric Communities never managed to
7 shift to a significant user base, so I don't know.
8    Q.  Were there any who were minors?
9    A.  Yeah, I believe that there were -- I mean,
10 again, look, this is a start-up whose goal was to be
11 as thoughtful as possible about how you create a
12 safe system; and, in that context, it was me
13 designing a product for kids.
14       But as often happens with Silicon Valley
15 start-ups -- as often happens -- thank you.  I
16 really appreciate it.
17       As often happens for Silicon Valley
18 start-ups, didn't quite manage to ship everything
19 that we were building.
20       And, in particular -- so we didn't manage
21 to ship a product for that, but that doesn't mean
22 that in every aspect of the way the product was
23 conceived and implemented that that was a
24 consideration in the way that I talk about
25 integrating safety and security into the way you

Page 715

1 think about every aspect of the design of a product.
2    Q.  Okay.  So just so I understand, Electric
3 Communities may not have had users because it didn't
4 have -- it didn't eventually ship a product?
5    A.  Yeah, that's what I said.
6    Q.  Okay.  And so Electric Communities did not
7 have actual users, whether adults or minors?
8    A.  That's correct.
9    Q.  Okay.  And so the -- to the extent that you
10 had child safety work that you did with that
11 organization, it would have been kind of focused on
12 what you might do if you ever shipped a product;
13 right?
14    A.  No, that's not accurate.
15    Q.  Well, what's inaccurate about it?
16    A.  Because we did build product.  We did build
17 features.  We did build infrastructure.  And
18 security and safety was intrinsic to every aspect of
19 the design of what we did.
20    Q.  But you didn't have the experience of
21 figuring out whether what you had built would
22 actually work in reducing harm because the company
23 never had any users; is that right?
24    A.  I did not have the experience from that.  I
25 got the experience of that when I went to Yahoo.

Page 716

1    Q.  Okay.  You, I think, talked about under
2 this Item No. 2 in your Demonstrative Exhibit
3 No. 10 -- I think you talked about compensation
4 yesterday in terms of that somehow creating or
5 making worse a conflict in favor of growth, not
6 safety.
7       Am I recalling that testimony correctly, or
8 did you not say that?
9    A.  I'm not sure that's how I would frame it,
10 the way you just said it.
11    Q.  Well, am I in the ballpark in terms of what
12 you said yesterday?
13    A.  I mean, I think what I say when I talk
14 about those issues is that -- is that your
15 management structure guides sort of the compensation
16 of the things that you do.  And so then it can
17 create a conflict of interest in terms of -- if --
18 if the person that is the top manager for your
19 organization is in charge of growth and has been for
20 years, as Javi was, that then if you put safety
21 underneath that, that that creates a conflict of
22 interest in the case where safety might compete with
23 growth.
24    Q.  Okay.  When you came back to the company
25 from 2019 to 2021, you were not part of the formal

92 (Pages 713 - 716)

Page 717

1 compensation system at Meta; right?
2    A.   Not when I came back, I was not part of the
3 formal compensation system.
4    Q.   You were being paid by the hour; yes?
5    A.   I mean, again, sorry to be picky about
6 these things, but -- no, I'm not sorry.  It's like
7 the -- the fact that I was in the role that I was as
8 a consultant supporting the team is -- sort of has
9 to be connected with the fact that during my first
10 stint in the first couple of years, I helped define
11 the -- a lot of the foundation for the review cycle
12 for engineering at Facebook.
13       And so I'm very intimately acquainted with
14 the way the review cycle works, how people get
15 compensated for work.  I participated in calibration
16 meetings for many years.  And so I have a lot of
17 understanding about how those mechanisms for
18 compensation work in the company.
19       And -- and I helped build Meta's -- or
20 particularly Facebook's engineering calibration,
21 review compensation cycle, the levels that were used
22 to manage people, all of those areas.
23       MS. JONES:  I'm going to move to strike as
24 nonresponsive.
25 ///

Page 718

1       BY MS. JONES:
2    Q.   From 2019 to 2021, were you being paid by
3 the hour?
4    A.   Yes, I was.
5    Q.   Let me ask you, just so -- since you've
6 raised it, and I just want to make sure we're clear
7 for the jury's purposes -- let me hand you what
8 we've marked as Deposition Exhibit No. 69.
9       (Marked for identification purposes, Bejar
10       Exhibit 69.)
11       BY MS. JONES:
12    Q.   And, Mr. Bejar, you're welcome to look at
13 whatever portion of this exchange that you would
14 like to, but I'm going to direct your attention to
15 page 3 of 4.
16    A.   Okay.
17    Q.   And this is a document -- you can tell by
18 looking at the bottom right-hand corner, this is a
19 document that you actually produced to us.
20    A.   Yes.
21    Q.   Yes?
22       And so just to orient ourselves, this is a
23 communication, generally speaking, from October of
24 2019 where you're having a back-and-forth about your
25 reengagement with the company in a consulting role;

Page 719

1 right?
2    A.   Correct.
3    Q.   And just because we've had some back and
4 forth about what your title was or was not, I'm
5 going to ask you to look at the e-mail from someone
6 named ███████████ on October 23rd, 2019.
7       Do you see that?
8    A.   Yeah, I do.
9    Q.   And it says "Dear Arturo Bejar."
10       That's you; yes?
11    A.   Yes.
12    Q.   And can we put this up on the -- I've run
13 off and left Mr. Reynolds.
14       MS. JONES:  Are you good, Chris?
15       Give us a second to put this up on the
16 screen.
17       THE WITNESS:  Okay.
18       MS. JONES:  Okay.  Can we go to page 3 of
19 that Exhibit No. 69, please?
20       BY MS. JONES:
21    Q.   And we're looking up at that e-mail dated
22 October 23rd, time is 2:32 from Ms. ██████ to you.
23       Do you see that?
24    A.   Yeah.
25    Q.   And it says (as read):

Page 720

1       "Dear Arturo Bejar, welcome and
2       congratulations on your new assignment at
3       Facebook."
4       Right?
5    A.   Right.
6    Q.   And it says (as read):
7       "We are so excited to have you join
8       the PRO Unlimited team!  As part of our
9       onboarding process, you are required to
10       attend Contingent Worker Orientation."
11       Right?
12    A.   Right.
13    Q.   (As read):
14       "PRO Unlimited only offers one per
15       week, and you have to attend before you
16       start your assignment."
17       Right?
18    A.   Right.
19    Q.   And if you turn to the next page of that
20 same document, down at the bottom there's a section
21 called FAQs.
22       Do you see that?
23    A.   Yeah.
24    Q.   And you understand that to refer to
25 frequently asked questions?

93 (Pages 717 - 720)

CONFIDENTIAL

Page 721

1    A.   Yes.
2    Q.   And we will skip over the Wardrobe section
3 of the FAQs and the Transportation section, but then
4 there's a reference there to (as read):
5         "What is a contingent worker?"
6    Do you see that?
7    A.   Yeah.
8    Q.   And in terms of your formal engagement with
9 the company in 2019, that's what you were, you were
10 a contingent worker; yes?
11   A.   I was a consultant.
12   Q.   Okay.  The words that appear here on the
13 document, can we agree, "contingent worker"?
14   A.   Yes, that's what the document says.
15   Q.   And it says (as read):
16        "What is a contingent worker?  Among
17        other things, being a contingent worker
18        at Facebook means you work for a company
19        that partners with Facebook."
20        Right?
21   A.   That's what the e-mail says.
22   Q.   And (as read):
23        "Because of this close partnership,
24        you often work on a Facebook campus and
25        alongside Facebook employees."

Page 722

1        Do you see that?
2    A.   I do see that.
3    Q.   Okay.  And then if we skip down to the next
4 line, it says (as read):
5         "Who is PRO Unlimited?"
6    Right?
7    A.   Right.
8    Q.   It says (as read):
9         "Your employer, exclamation part.  We
10       are also -- exclamation point.  We are
11       also Facebook's managed service provider,
12       so we hire and manage contractors as well
13       as on-board and off-board Facebook's
14       contingent workers."
15       Right?
16   A.   Right.
17   Q.   And this is a true and correct copy of this
18 e-mail from October of 2019; right?
19   A.   Yes.
20   Q.   Okay.  Now --
21       MS. JONES:  We can take that down.
22       BY MS. JONES:
23   Q.   Mr. Bejar, you understand that you have
24 raised the names of a number of folks who worked on
25 the Instagram well-being team in the course of your

Page 723

1 testimony yesterday and today; is that right?
2    A.   Yes.
3    Q.   So, for example, you mentioned
4 Yoav Shapiro; right?
5    A.   Yes.
6    Q.   You know Mr. Shapiro?
7    A.   I do.
8    Q.   Do you have a good regard for him?
9    A.   I do.
10   Q.   You mentioned Dr. ██████; yes?
11   A.   Yes.
12   Q.   You know him?
13   A.   Yes.
14   Q.   You have a good regard for him?
15   A.   I do.
16   Q.   You have respect for his expertise as a
17 scientist and a researcher?
18   A.   I do.
19   Q.   Okay.  Miki Rothschild.
20        You know Mr. Rothschild?
21   A.   I do.
22   Q.   You have a good regard for him?
23   A.   I don't.
24   Q.   Okay.  And -- well, tell me why that is.
25   A.   Because as the product leader for that area

Page 724

1 of the company, I think he had a big responsibility
2 to help drive these kinds of things that I talked
3 about.
4        And I felt that Yoav was supportive.  But
5 when I look at it, I found that Miki Rothschild was
6 not -- was -- I mean, even though he expressed
7 support and all the way through to what I did,
8 the -- at some point you have to ask what stand he
9 took with regards to these issues for the team in
10 order to drive what was the right work.  And I felt
11 that Yoav was very good at driving that side of
12 things and Miki was less so.
13   Q.   Understood.
14        All the folks we've just talked about,
15 Mr. ██████ Dr. ██████ Mr. Rothschild, they were
16 full-time employees working on well-being issues on
17 Instagram from 2019 to 2021; right?
18   A.   Yes.
19   Q.   They were not just working a few hours a
20 week; right?
21   A.   You keep saying that as if it was a bad
22 thing.
23   Q.   I'm not suggesting it was a bad thing.
24   A.   Okay.
25   Q.   I'm simply asking.

94 (Pages 721 - 724)

CONFIDENTIAL

Page 725

1  Do you have an understanding that they were
2  full-time employees who were not simply working a
3  few hours a week?
4  A. Yes.
5  Q. Okay. And do you have an understanding
6  that all of those folks have been deposed in these
7  cases?
8  A. I wasn't aware of that.
9  Q. Okay. Other than the little snippet from
10 Dr. _____ testimony that you were shown yesterday
11 by counsel, I take it you have not taken the time to
12 actually read their full testimony and know what
13 they had to say about these issues and their work as
14 full-time employees on the Instagram well-being
15 team?
16 MR. CARTMELL: Okay.
17 BY MS. JONES:
18 Q. Is that right?
19 MR. CARTMELL: Hold on a second. I want to
20 object.
21 Sorry. Go ahead. Finish your question.
22 And then I'll make my objection.
23 BY MS. JONES:
24 Q. I think I was -- well, let me say I'm not
25 sure if I finished my question before you started

Page 726

1  talking.
2  Yes, I finished my question. Go ahead.
3  MR. CARTMELL: Okay. I want to record to
4  be clear that's an improper question because clearly
5  counsel knows that he cannot read the entirety of
6  that deposition because it has been marked in a way
7  that the protective order provides he cannot read.
8  And so to ask him to answer that question is unfair
9  and it's inappropriate.
10 MS. JONES: Well, then I would want to
11 note, for the record, then, you all have probably
12 violated the protective order --
13 MR. CARTMELL: No, no, no.
14 MS. JONES: -- in showing him the
15 deposition video. But let's move on.
16 MR. CARTMELL: That --
17 (Simultaneous speakers - unclear.)
18 MR. CARTMELL: Well, hold on. Now, I have
19 to respond to that because you know that's not
20 appropriate.
21 MS. JONES: Well, I know it -- I know it to
22 be true.
23 (Simultaneous speakers - unclear.)
24 MR. CARTMELL: I have to, according to the
25 protective order, establish that he has knowledge,

Page 727

1  personal knowledge, of the information that he is
2  entitled to testify. It's Rule -- FRE602
3  essentially is what the protective order is talking
4  about. We established that foundation. We played
5  him that part.
6  But your question was insinuating that he
7  should have somehow gone out and read the entire
8  deposition, which he's not entitled to do.
9  MS. JONES: Are you finished?
10 MR. CARTMELL: Yes.
11 MS. JONES: Okay.
12 BY MS. JONES:
13 Q. Mr. Bejar, you did not -- the only parts of
14 testimony from people who were working full time at
15 Instagram from 2019 to 2021 that you have seen in
16 the context of this deposition are the parts that
17 counsel showed you; is that right?
18 A. Yes.
19 Q. And you -- for whatever the reason might
20 have been, you have not reviewed the entirety of the
21 testimony of people like _____ --
22 excuse me, or Miki Rothschild or Dr. _____ or
23 Adam Mosseri for that matter; right?
24 MR. CARTMELL: Same objection. I want the
25 record to be clear that counsel is asking a question

Page 728

1  insinuating that the witness should be able to read
2  depositions that he is not entitled to read
3  according to the protective order.
4  You can answer.
5  BY MS. JONES:
6  Q. You can answer.
7  A. No.
8  Q. Okay. Would you be -- let's start with
9  Mr. _____ who I think you've said you respected
10 and -- or had a good regard for; yes?
11 A. During the time that we worked together.
12 Q. Okay. And would you defer to Mr. _____
13 views on his assessment of the company's well-being
14 work on Instagram during that period from 2019 to
15 2021?
16 MR. CARTMELL: Object to the form.
17 THE WITNESS: No, I would not.
18 BY MS. JONES:
19 Q. Okay. What about Dr. _____ Would you
20 defer to his views and his expertise as someone with
21 a PhD on some of these well-being issues that you've
22 talked about in the last day or so?
23 MR. CARTMELL: Same objection.
24 THE WITNESS: No.
25 ///

95 (Pages 725 - 728)

CONFIDENTIAL

Page 729

1    BY MS. JONES:
2    Q.  And what -- and I take from it your earlier
3  comments that you would not defer to
4  Mr. Rothschild's views on what was happening on the
5  Instagram well-being team from 2019 to 2021 either?
6    MR. CARTMELL:  Same objection.
7    THE WITNESS:  No.
8    BY MS. JONES:
9    Q.  And that's the case even though they were
10  working full time on the team and you were working
11  on average three hours a week?
12    MR. CARTMELL:  Same objection.
13    THE WITNESS:  Again, I just want to say you
14  keep saying "three hours a week," and it just really
15  matters how that time is spent.  And -- and I think
16  that the time was very strategically spent to work
17  on these issues.  And I think I have a very good
18  perspective and I had a very clear picture of what
19  my interactions were with them at the time and what
20  they told me at the time about these issues.
21    BY MS. JONES:
22    Q.  Do you think -- let me ask the question
23  just a slightly different way.
24    Do you think you know better than
25  Mr. ██████ about what was going on with respect to

Page 730

1  the Instagram well-being team from 2019 to 2021?
2    MR. CARTMELL:  Object to the form.
3    THE WITNESS:  Yeah.  I mean, it -- it --
4  that seems -- know better; right?  I mean, my -- my
5  job has always been to try and see things accurately
6  and to be able to represent them, to provide
7  feedback, to create awareness, to get support.
8    And so the -- framing this as "better" is
9  just super weird to me because I'm -- I'm not -- I'm
10  just another person, and they're people.  And
11  there's a -- there's a -- and so I'm not -- I don't
12  like -- comfortable with the word "better."  I just
13  want to be really clear about that because that
14  implies some kind of superiority.
15    BY MS. JONES:
16    Q.  Okay.  So you are not testifying that you
17  know better than ██████ about what was going
18  on on the Instagram well-being team from 2019 to
19  2021?
20    MR. CARTMELL:  Same objection.
21    THE WITNESS:  I think I've already answered
22  that question.
23    BY MS. JONES:
24    Q.  I don't think you have.
25    Is that a "yes" you do know better or,

Page 731

1  "no," you're not comfortable saying you know better?
2    MR. CARTMELL:  Same objection.
3    THE WITNESS:  Again, I'm saying I think
4  I've already answered that question.
5    BY MS. JONES:
6    Q.  I don't think you have.
7    When you say you can't -- you don't feel
8  comfortable saying "better," does that mean you're
9  not comfortable saying that you know more than
10  Mr. -- let me ask the question a slightly different
11  way.
12    A.  I mean, I have a lot --
13    Q.  Excuse me --
14    A.  Well --
15    Q.  -- sir.
16    MR. WARD:  Just wait for a new question.
17    THE WITNESS:  Sorry.  Thank you.
18    BY MS. JONES:
19    Q.  Do you -- to the extent that Mr. ██████
20  recollections and impressions of what was going on
21  on the Instagram well-being team from 2019 to 2021
22  are different than yours, is it your view that you
23  are -- that you're willing to defer to his
24  impressions as someone who was working full time in
25  a leadership role on that team?

Page 732

1    MR. CARTMELL:  Object to the form.
2    THE WITNESS:  No.
3    BY MS. JONES:
4    Q.  And is the answer the same with respect to
5  Dr. ██████
6    MR. CARTMELL:  Same objection.
7    THE WITNESS:  That's correct.
8    BY MS. JONES:
9    Q.  And the answer is the same with respect to
10  Miki Rothschild?
11    MR. CARTMELL:  Same objection.
12    THE WITNESS:  That's correct.
13    BY MS. JONES:
14    Q.  Okay.  About six months into your contract
15  with the company, the pandemic started.
16    Do you recall that?
17    A.  How could I not?
18    Q.  How could you forget?
19    And you recall Meta actually closed its
20  campus?
21    A.  Yes.
22    Q.  In -- at some point in your time as a, call
23  it a consultant, call it a contingent worker, but
24  between 2019 and 2020, did you have to stop going
25  onto Meta's campus because they had closed it due to

96 (Pages 729 - 732)

CONFIDENTIAL

Page 733

1 the pandemic?
2    A.   2020, yes.
3    Q.   Okay.  When did that happen?
4    A.   I don't recall the date.
5    Q.   Was it March --
6        MS. JONES:  I'm sorry.  I'm so sorry.
7        THE STENOGRAPHER:  It's okay.
8        MS. JONES:  I've been a problem child all
9    day.  I apologize.
10       BY MS. JONES:
11   Q.   Let me ask the question again.
12   A.   Yeah.
13   Q.   Do you recall generally whether it was in
14   March of 2020 that you stopped going onto Meta's
15   campus?
16   A.   Yeah, I think that sounds about right.
17   Q.   And at that point were you then -- whatever
18   work you were doing, were you doing it remotely?
19   A.   Yes.
20   Q.   And is it your recollection generally
21   speaking that the company's offices actually
22   remained closed until July of 2021?
23   A.   Yeah, I think so.
24   Q.   During your time as a contingent worker
25   between 2019 and 2021, did you -- after things shut

Page 734

1 down in March of 2020, did you ever end up going
2    back on campus before your consultant arrangement
3    expired?
4    A.   I don't think I did.
5    Q.   Okay.  So from -- you were there from
6    October of 2019 to October of 2020; is that right?
7        Sorry.  Let me take it back.
8        You were there from October of 2019 to
9    October of 2021 in a consulting capacity; right?
10   A.   That's right.
11   Q.   And during that period from -- starting in
12   March of 2020, you were remote; right?
13   A.   Correct.
14   Q.   Until the end of your consulting agreement?
15   A.   Yes, I believe so.
16   Q.   Okay.  So you only had six months or so
17   where you were actually in person, on campus?
18   A.   Yeah.  I was actually -- the pandemic was
19   fantastic for the work I was doing because in my
20   first six months, I had -- you had to coordinate
21   meetings for me to be on-site.  And that could prove
22   to be challenging, so there was a lot of shuffling
23   around and I needed help with that.
24       But then after that, when anybody needed
25   something, I was able to talk to them.

Page 735

1    Q.   Now, Mr. Bejar, the first time you and I
2    ever met was yesterday; right?
3    A.   Yes.
4    Q.   But this deposition, that's not the first
5    time you've talked to these lawyers who asked you
6    questions for the plaintiffs and the state AGs;
7    right?
8    A.   Yes.
9    Q.   You have your own lawyer, Mr. Ward; right?
10   A.   Yes.
11   Q.   But these other lawyers, you understand,
12   are lawyers who are -- who are bringing suits
13   against Meta; right?
14       MR. CARTMELL:  Object to the form.
15       THE WITNESS:  As far as I know.
16       Sorry.  Can you repeat the question?
17       BY MS. JONES:
18   Q.   The other lawyers who have asked you
19   questions before I started asking questions,
20   Mr. Cartmell and Mr. Phelps, you understand those
21   are not your lawyers; right?
22   A.   No.  Let's hope not.
23   Q.   Right.
24       But you understand they represent parties
25   and entities that are suing Meta; yes?

Page 736

1    A.   Yes.
2    Q.   Okay.  And for some of these lawyers, you
3    actually have known them for years; right?
4        MR. CARTMELL:  Object to the form.
5        THE WITNESS:  Years?  I -- I don't think
6    that's accurate.
7        BY MS. JONES:
8    Q.   Okay.  Well, let me ask you to look at what
9    is Deposition Exhibit No. 1.
10       MS. JONES:  Can we call that up?
11       BY MS. JONES:
12   Q.   This was actually the first exhibit that
13   Mr. Cartmell used with you yesterday; yep?
14   A.   Yes.
15   Q.   And that's an image of you testifying
16   before the United States Congress; right?
17   A.   Right.
18   Q.   And so we recognize you.
19       Do you recognize anybody else in that
20   picture?
21   A.   I do.
22   Q.   Yes.
23       Oh, down in the bottom left-hand corner,
24   who is that?
25   A.   Him (indicating).

97 (Pages 733 - 736)

CONFIDENTIAL

Page 737

1    Q.   That's Mr. Phelps, Brian Phelps?
2    A.   Correct.
3    Q.   Who's a lawyer for the Tennessee Attorney
4 General's Office?
5    A.   Yes.
6        MS. JONES:  Can we circle Mr. Phelps' face,
7 please?
8        BY MS. JONES:
9    Q.   And so you were testifying before Congress
10 back in 2023; yes?
11   A.   2000-- yes.
12   Q.   And so when you said, "I don't think it's
13 accurate that I've known these lawyers for years,"
14 plural, that was not right; right?
15   A.   Yeah, that's right.  I -- as I said, like,
16 I think I turned 53 this year -- sorry, actually
17 turned 54.  And so these kinds of things, I have to
18 put dates down and then do the math in order to be
19 able to -- to get them a certain way.
20   Q.   Okay.  So just to go back to my original
21 question, you do go back years with some of these
22 lawyers who have brought lawsuits against the
23 company; right?
24   A.   Yeah, that's correct.
25   Q.   Okay.  Including Mr. Phelps, who's been

Page 738

1 here for the last two days; right?  Yes?
2    A.   Yes.
3    Q.   And who asked you questions earlier today;
4 right?
5    A.   Yes.
6    Q.   And I think Mr. Cartmell acknowledged right
7 up front that you met with these lawyers before your
8 deposition; right?
9    A.   Yes.
10   Q.   And part of the reason for those meetings
11 was you all were going to talk about what you were
12 going to be asked about at your deposition; right?
13       MR. CARTMELL:  Object to the form.
14       THE WITNESS:  No.
15       BY MS. JONES:
16   Q.   You all didn't talk at all about what was
17 going to happen at your deposition?
18   A.   I was -- we talked about -- they wanted to
19 understand how some of these things worked.
20   Q.   What does some -- what does "how some of
21 these things worked" mean?
22   A.   It means that -- what I've been doing in
23 every context that I've been participating in is to
24 explain how social media companies work in this --
25 in the context of safety and -- and so there were

Page 739

1 questions about that.
2    Q.   Well, let me just ask the question for you
3 directly, Mr. Bejar.
4        Isn't it the case that you all talked, at
5 least to some extent, about what was going to happen
6 at your deposition?
7    A.   I mean, we talked for around -- I think
8 around between 10 and 20 hours.  I didn't keep track
9 of how much.  The experience was very similar to
10 what I did with Meta counsel before I did the FTC
11 deposition.  And so that seemed to me kind of like
12 equivalent.
13   Q.   Do you know that we -- we, Meta counsel,
14 asked for a chance to talk to you before your
15 deposition and never heard back one way or the
16 other?  Did you know that?
17   A.   No, I don't -- I don't recall that.
18   Q.   And just so the jury understands, in the
19 meantime, you spent 10 to 20 hours with the lawyers
20 who have been asking you questions for the last
21 two days, Mr. Phelps and Mr. Cartmell?
22       MR. CARTMELL:  Object to the form.
23 Mischaracterization.
24       THE WITNESS:  Can you repeat the question,
25 please?

Page 740

1        BY MS. JONES:
2    Q.   Sure.
3        In the meantime, as you -- we did not have
4 a chance to speak with you, you spent 10 to 20 hours
5 meeting with the lawyers who have been asking you
6 questions for the last two days; right?
7    A.   Right.  Yeah.
8    Q.   Okay.  And --
9    A.   As I did with Meta lawyers when I prepared
10 for the FTC deposition.
11   Q.   Well, you know this is not the FTC case;
12 right?
13   A.   I know.  I just wanted to say that this
14 process that I've been through to get here was very
15 similar when I met with Meta lawyers in my
16 preparation for the FTC.
17       So it was -- it was kind of similar
18 meetings where I was kind of helping -- you know,
19 they were similar meetings.
20   Q.   Well, I want to be clear about what the
21 meetings were in connection with this deposition.
22       You and I had not met before yesterday;
23 right?
24   A.   No, we have not.
25   Q.   And for sure we did not meet for --

98 (Pages 737 - 740)

CONFIDENTIAL

1    A.  Slow down.
2       MS. JONES:  Do you want -- do we need a
3  break?  I saw you shaking your hand out.
4       THE STENOGRAPHER:  Just slow it down just a
5  little.
6       MS. JONES:  Yeah.
7       BY MS. JONES:
8    Q.  You --
9    A.  Yeah.  I think actually a break would be
10  kind of good.
11   Q.  Well, let me --
12   A.  I'm getting -- I'm getting hot.
13   Q.  Okay.  Can I ask just one more question,
14  and then we'll finish?
15   A.  Yes.
16   Q.  We'll not -- we won't finish, but we'll
17  give you a break.
18       You and I did not spend 10 to 20 hours
19  talking about your deposition; right?
20   A.  We did not.  But I'm always open to meet
21  with Meta, and that's always been up front about
22  that --
23   Q.  Okay.
24   A.  -- or Meta representatives.
25       MS. JONES:  Why don't we take a break.

1       THE VIDEOGRAPHER:  The time is 6:41.  We're
2  off the record.
3       (Recess taken from 6:41 to 6:57.)
4       THE VIDEOGRAPHER:  The time is 6:57.  We're
5  back on the record.
6       BY MS. JONES:
7    Q.  Mr. Bejar, you testified earlier that in --
8  in advance of your deposition this week, you spent
9  10 to 20 hours with counsel for the parties suing
10  Meta.
11       Who were the specific lawyers that you met
12  with?
13   A.  I don't have a complete list of that.
14   Q.  Was Tom -- was Mr. Cartmell one of the
15  people you met with?
16   A.  Yes.
17   Q.  And he was the one who asked you questions
18  for about a day and almost a half?
19   A.  Are you referring to, like, yesterday and
20  today?
21   Q.  Yes.
22   A.  Yes.
23   Q.  Yes.
24       And was Mr. Phelps one of the people that
25  you met with in -- as part of this 10 to 20 hours?

1    A.  At -- at times.
2    Q.  I'm not sure what you mean by "at times."
3    A.  Oh, it's just different people would be
4  present.  And so it just varied.  I didn't keep
5  track of any of that.
6    Q.  Okay.  But within the 10 to 20 hours, both
7  Mr. Cartmell and Mr. Phelps would have been in some
8  of those meetings or calls or whatever they were?
9    A.  Yeah, that's correct.
10   Q.  Okay.  Do you have a rough sense of how
11  many other lawyers participated in these various
12  discussions?
13   A.  No, not really.  The way I set up Zoom is
14  that I can see the person that's talking which helps
15  me focus.
16   Q.  Yeah.
17       And were all of the conversations by Zoom?
18   A.  Either, I think, Zoom -- did we do Teams?
19  I don't remember if we used Teams as well.
20   Q.  Let me ask the question in a better way.
21       Were any of the meetings in person?
22   A.  No.
23   Q.  So they were all by some remote means,
24  whether it was Zoom or Teams or some other platform?
25   A.  Correct.

1    Q.  Okay.  And when was the first of these
2  calls?
3    A.  I don't recall the specific date.
4    Q.  Was it within the last month?
5    A.  Yeah, I think so.
6    Q.  The first of -- let me make sure I
7  understand.
8       The first of these calls was within the
9  last month?
10   A.  Yeah, I think so.
11   Q.  Okay.  And so there were none before
12  March 1st?
13   A.  No, I don't think so.
14   Q.  So in the course of about a month, you had
15  10 to 20 hours with various different sets of
16  lawyers?
17   A.  Yeah.
18   Q.  Did counsel show you documents in those
19  discussions?
20   A.  Yeah.  We, for example, looked at some of
21  the videos that I had produced and sort of talked
22  through those.
23   Q.  And so did you know before you got here for
24  your deposition yesterday that all those videos
25  we've now watched together, that that was going to

99 (Pages 741 - 744)

CONFIDENTIAL

Page 745

1  be part of what you were shown at your deposition?
2  A.  No, I did not know that.  I just submitted
3  them as being -- the subpoena -- as part of the
4  research that I had done.
5  Q.  Okay.  What -- and you said -- you talked
6  about videos.
7  What about documents?  Did you talk about
8  documents with the lawyers during these 10 to
9  20 hours in the last month?
10  A.  Yeah.  I explained things like BEEF, for
11  example.
12  Q.  Do you know roughly how many documents you
13  looked at?
14  A.  Oh, no idea.
15  Q.  And was it the lawyers showing you
16  documents, or were you showing the lawyers
17  documents?
18  A.  There was somebody, you know, putting
19  somebody on the screen when we talked about it, but
20  I don't recall who it was, who was in charge of
21  putting the documents up.
22  Q.  So the lawyers were showing you documents?
23  A.  Yeah, I think so.
24  Q.  And you --
25  A.  That's a pretty vague question.  But, yeah.

Page 746

1  Q.  No.  Fair enough.
2  And you -- you've said you don't remember
3  the number of documents that you talked about with
4  the lawyers, but was it in the -- was it more or
5  less than 20?
6  A.  I don't recall.  I ...
7  Q.  Was it more or less --
8  MS. JONES:  Bless you.
9  BY MS. JONES:
10  Q.  Was it more or less than 50?
11  A.  I don't recall the number again.
12  Q.  Okay.  And I actually want to --
13  MS. JONES:  Can we go back to Exhibit --
14  Deposition Exhibit No. 10, please?
15  BY MS. JONES:
16  Q.  So this was the document that counsel
17  showed you yesterday and that you talked through
18  with counsel; correct?
19  A.  Yes.
20  Q.  Now, you had seen this document before you
21  got to your deposition yesterday; is that right?
22  A.  I authored this document.
23  Q.  Okay.  When did you write this document?
24  A.  I think the specific portion of this must
25  have been in -- in the last -- I would say around a

Page 747

1  week or so.
2  Q.  So within the last week you created
3  Deposition Exhibit No. 10; is that right?
4  A.  Yeah, which encapsulates a lifetime of
5  experience and then my journey, in particular, with
6  regards to these topics with Instagram.
7  Q.  Sure.
8  MS. JONES:  And I'm going to move to strike
9  everything after the word, "Yeah."
10  BY MS. JONES:
11  Q.  And did you create Deposition Exhibit
12  No. 10 for the purpose of your deposition?
13  A.  It helped me organize my thinking around
14  these issues.  So, yeah.
15  Q.  Did you do it at the request of any of the
16  lawyers?
17  A.  No.
18  Q.  Did you tell the lawyers in advance that
19  you had created this document?
20  A.  No.
21  Q.  Well, how -- let me ask you this:  You
22  recall yesterday --
23  A.  Yeah.
24  Q.  -- Mr. Cartmell, when he was asking you
25  questions --

Page 748

1  A.  Yeah.
2  Q.  -- he was the one who -- he had a copy of
3  the document; right?
4  A.  Yeah; correct.
5  Q.  How did he get a copy of this document?
6  A.  I provided the clip -- text to Mike.
7  Q.  Okay.  And by "Mike," you mean Mr. Ward?
8  A.  Mike Ward, yeah, my counsel.
9  Q.  Okay.  Do you know whether the lawyers for
10  Meta got a copy of that document before your
11  deposition?
12  A.  I don't.
13  Q.  Did you anticipate that you were going to
14  see Deposition Exhibit No. 10 at your deposition?
15  A.  I anticipated that we were going to touch
16  on all these topics and that my language might come
17  up.
18  Q.  Well -- and my question -- I'm not -- your
19  answer may have been a little orthogonal, to use a
20  Meta word, from my actual question.
21  My question was, did you anticipate that
22  you were going to see Deposition Exhibit No. 10 at
23  your deposition?
24  A.  I would assume that anything that I
25  provided Mike to be provided, like the videos or

100 (Pages 745 - 748)

CONFIDENTIAL

Page 749

1 other things, might come up in the context of the
2 deposition.
3       MS. JONES: All right, Mr. Bejar, I'm going
4 to suggest that we break for the moment. We're at a
5 sensible breaking point from my perspective.
6       So we can go off the record.
7       THE VIDEOGRAPHER: All right. Total time
8 for personal injury plaintiffs is 10 hours,
9 38 minutes.
10      Tennessee, 1 hour, 55 minutes.
11      Meta, 2 hours, 21 minutes.
12      The time is 7:04. We're off the record.
13      (Discussion off the stenographic record.)
14      THE STENOGRAPHER: Mr. Ward, are you
15 getting certified transcripts or roughs?
16      (Simultaneous speakers - unclear.)
17      MR. WARD: Please.
18      THE STENOGRAPHER: So certified transcripts
19 of all three days.
20      Do you need roughs also of all three days?
21      MR. WARD: No, I don't need a rough.
22      (Proceedings adjourned at 7:04 p.m. PST.)
23      ---oOo---
24
25

Page 751

1       STENOGRAPHER'S CERTIFICATE
2       I, LORRIE L. MARCHANT, Certified Shorthand
3 Reporter, Certificate No. 10523, for the State of
4 California, hereby certify that ARTURO BEJAR was by
5 me duly sworn/affirmed to testify to the truth, the
6 whole truth and nothing but the truth in the
7 within-entitled cause; that said deposition was
8 taken at the time and place herein named; that the
9 deposition is a true record of the witness's
10 testimony as reported to the best of my ability by
11 me, a duly certified shorthand reporter and a
12 disinterested person, and was thereafter transcribed
13 under my direction into typewriting by computer;
14 that request [ ] was [ X ] was not made to read and
15 correct said deposition.
16      I further certify that I am not interested
17 in the outcome of said action, nor connected with,
18 nor related to any of the parties in said action,
19 nor to their respective counsel.
20      IN WITNESS WHEREOF, I have hereunto set my
21 hand this 10th day of April, 2025.
22
23      Lorrie L. Marchant
24
        LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
25      Stenographic Certified Shorthand Reporter #10523

Page 750

1       DECLARATION UNDER PENALTY OF PERJURY
2
3       I declare under penalty of perjury under
4 the laws of the State of California that the
5 foregoing is true and correct.
6
7 Executed at _____ on _____.
            (Place)         (Date)
8
9
10
11      _____
12      ARTURO BEJAR
13
14
15
16
17
18
19
20
21
22
23
24
25

101 (Pages 749 - 751)

CONFIDENTIAL

Page 752

```
 1              UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3
 4   IN RE: SOCIAL MEDIA        )
     ADOLESCENT ADDICTION/      )
 5   PERSONAL INJURY PRODUCTS   )  MDL No. 3047
     LIABILITY LITIGATION       )
 6                              )
                                )
 7
 8    SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE
        COUNTY OF LOS ANGELES - SPRING STREET COURTHOUSE
 9
10   COORDINATION PROCEEDING    )
     SPECIAL TITLE [RULE 3.400] )
11                              )
     SOCIAL MEDIA CASES         )  Lead Case No.
12   _____)  22STCV21355
     This Document Relates To   )
13                              )
     STATE OF TENNESSEE, ex rel.)
14   JONATHAN SKRMETTI,         )
     ATTORNEY GENERAL and       )
15   REPORTER,                  )
     v.                         )
16   META PLATFORMS, INC., and  )
     INSTAGRAM, LLC.            )
17   _____)
18
19          CONFIDENTIAL - ATTORNEYS' EYES ONLY
                PURSUANT TO PROTECTIVE ORDER
20                      VOLUME 3
                     VIDEO-RECORDED
21           DEPOSITION OF ARTURO BEJAR
                  (Pages 752 - 1207)
22               Held at Baker Botts
        1001 Page Mill Road, Palo Alto, California
23          Wednesday, April 9, 2025, 8:37 a.m.
                       - - - -
24
     REPORTED BY:  ELAINA BULDA-JONES, CSR 11720
25
```

CONFIDENTIAL

Page 753

```
 1              APPEARANCES
 2
 3  For the Plaintiffs:
 4      BY: TOM CARTMELL, ESQ.
        BY: JACK HYDE, ESQ.
 5      BY: KATHLEEN HUDNALL
        BY: MAUREEN MURPHY, ESQ. (VIA ZOOM)
 6      BY: LUCY MALONE (VIA ZOOM)
        BY: ANGELA PRIEST (VIA ZOOM)
 7      BY: ROB GROVES, ESQ. (VIA ZOOM)
        BY: TRICIA L. CAMPBELL, ESQ. (VIA ZOOM)
 8      Wagstaff & Cartmell
        4740 Grand Avenue, Suite 300
 9      Kansas City, Missouri 64112
        816.701.1100
10      Tcartmell@wcllp.com
        Jhyde@wcllp.com
11
        BY: LEXI J. HAZAM, ESQ. (VIA ZOOM)
12      Lieff, Cabraser, Heimann & Bernstein
        275 Battery Street, 29th Floor
13      San Francisco, California 94111
        415.956.1000
14      Lhazam@lchb.com
15
        BY: KIRK GOZA, ESQ. (VIA ZOOM)
16      Goza & Honnold, LLC
        900 Nall Avenue, Suite 400
17      Overland Park, Kansas 66207
        913.451.3433
18
19
   For the Witness, Arturo Bejar,
20
        BY: MICHAEL W. WARD, ESQ.
21      BY: CHINMAYI MANJUNATH, ESQ.
        Baker Botts LLP
22      1001 Page Mill Road
        Building One, Suite 200
23      Palo Alto, California 94304-1007
        650.739.7500
24      Michael.ward@bakerbotts.com
        Chinmayi.manjunath@bakerbotts.co
25
```

Page 754

```
 1  For the Defendants Meta Platforms, Inc., f/k/a
        Facebook, Inc.; Facebook Holdings, LLC; Facebook
 2  Operations, LLC; Facebook Payments, Inc.; Facebook
        Technologies, LLC; Instagram, LLC; Siculus, Inc.;
 3  and Mark Elliot Zuckerberg:
 4      BY: PHYLLIS A. JONES, ESQ.
        BY: CECILIA BOBBITT, ESQ.
 5      BY: PATRICK NUTTER, ESQ.
        BY: MARIAH K. WATSON, ESQ. (VIA ZOOM)
 6      BY: GAVIN JACKSON, ESQ. (VIA ZOOM)
        BY: HUNTER BJAZEVICH, ESQ. (VIA ZOOM)
 7      BY: CONNOR KENNEDY, ESQ. (VIA ZOOM)
        BY: PAUL SCHMIDT, ESQ. (VIA ZOOM)
 8      BY: AINSLEY McMAHON (VIA ZOOM)
        Covington & Burling LLP
 9      One CityCenter
        850 Tenth Street, NW
10      Washington, DC 20001-4956
        202.662.6000
11      Pajones@cov.com
12      BY: KATHRYN WALKER, ESQ. (VIA ZOOM)
        Bass, Berry & Sims
13      21 Platform Way South, Suite 3500
        Nashville, Tennessee 37203
14      615.742.7855
        Kwalker@bassberry.com
15
        BY: SHANZAH KHAN, ESQ. (VIA ZOOM)
16      Davis Polk & Wardell LLP
        450 Lexington Avenue
17      New York, New York 10017
        212.450.3563
18      Shanzah.khan@davispolk.com
19
20  For the State of New York:
21      BY: NATHANIEL KOSSLYN, ESQ.
        Office of the Attorney General of New York
22      28 Liberty Street
        New York, New York 10005
23      800.771.7755
        Nathaniel.kosslyn@ag.ny.gov
24
25
```

Page 755

```
 1  For the State of West Virginia:
 2      BY: ABBY CUNNINGHAM, ESQ. (VIA ZOOM)
        Office of the West Virginia Attorney General
 3      1900 Kanawha Boulevard, E
        Room 26
 4      Charleston, West Virginia 25305
        Abby.g.cunningham@wvago.gov
 5
 6
   For the State of Massachusetts:
 7
        BY: DOUG MARTLAND, ESQ.
 8      BY: CHRISTINA CHAN, ESQ.
        Office of the Attorney General
 9      State of Massachusetts
        1 Ashburton Place, 20th Floor
10      Boston, Massachusetts 02108
        617.727.2200
11
12
   For the State of Tennessee:
13
        BY: BRIAN PHELPS, ESQ.
14      BY: CHRIS DUNBAR, ESQ.
        BY: ELIZABETH SPICA, ESQ. (VIA ZOOM)
15      BY: SHANTE PICHE (VIA ZOOM)
        BY: KEATON MURPHY, ESQ. (VIA ZOOM)
16      Office of the Attorney General
        UBS Tower
17      315 Deaderick Street
        Nashville, Tennessee 37243
18      615.741.3519
19
20
   For the State of Arkansas:
21
        BY: AELISH BAIG, ESQ. (VIA ZOOM)
22      Robbins Geller Rudman & Dowd LLP
        One Montgomery Street, Suite 1800
23      San Francisco, California 94104
        415.288.4545
24      aelishb@rgrdlaw.com
25
```

Page 756

```
 1  For the Defendant Snap:
 2      BY: PRISCILA CORONADO, ESQ. (VIA ZOOM)
        Munger, Tolles & Olson LLP
 3      350 South Grand Avenue, 50th Floor
        Los Angeles, California 90071
 4      213.683.9239
        Priscila.coronado@mto.com
 5
 6
   For the Defendants TikTok, Ltd.; Tiktok, LLC;
 7  Tiktok, Inc.; ByteDance Ltd.; and ByteDance, Inc.:
 8      BY: LENNETTE LEE, ESQ. (VIA ZOOM)
        King & Spalding LLP
 9      633 West Fifth Street, Suite 1600
        Los Angeles, California 90071
10      213.218.4011
        Llee@kslaw.com
11
12
   For the Plaintiffs:
13
        BY: ANNIE E. KOUBA, ESQ. (VIA ZOOM)
14      BY: PREVIN WARREN, ESQ. (VIA ZOOM)
        Motley Rice LLC
15      28 Bridgeside Boulevard
        Mt. Pleasant, South Carolina 29464
16      843.216.9057
17
18  For the State of Connecticut:
19      BY: TESS SCHNEIDER, ESQ. (VIA ZOOM)
        Office of the Attorney General
20      165 Capitol Avenue
        Hartford, Connecticut 06106
21      860.808.5318
22
23
24
25
```

2 (Pages 753 - 756)

Page 757

```
1  For State of California:
2      BY: MEGAN O'NEILL, ESQ. (VIA ZOOM)
       California Department of Justice
3      Office of the Attorney General
       455 Golden Gate Avenue, Suite 11000
4      San Francisco, California 94102-7004
       415.510.4400
5
6
   Also present:
7
       Hayley Chang, Meta (VIA ZOOM)
8  Holly Tambling, Meta (VIA ZOOM)
       Tyler Smith, Meta
9  Jim Lopez, trial tech
       Chris Reynolds, trial tech
10 James Vonwiegen, videographer
       Tara Lamer (VIA ZOOM)
11 Nicole Lopez (VIA ZOOM)
       Steven Kaufmann
12 Paige Boldt
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 758

```
1          INDEX OF EXAMINATIONS
2
3  EXAMINATIONS                    PAGE
4  MS. JONES            762
5  MR. CARTMELL         1092
6  MR. PHELPS           1147
7  MS. JONES            1163
8  MR. WARD             1191
9  MR. PHELPS           1196
10
11
12
13         INDEX OF EXHIBITS
14 NO.     DESCRIPTION           PAGE
15 Bejar   Demonstrative    1060
   Exhibit 70
16
   Bejar   Senior Mag 2023: Rallying and  923
17 Exhibit 71  Restoring: ███████ Pursues
       Interest in Automotive
18     Restoration
19 Bejar   Photograph       923
   Exhibit 72
20
   Bejar   Photograph       923
21 Exhibit 73
22 Bejar   Demonstrative    960
   Exhibit 74
23
24
25
```

Page 759

```
1  Bejar    E-mail, 1014. 2021, To:███  965
   Exhibit 75    From: Arturo Bejar,
2          Subject: Fwd: Pre-Read for Our
           Conversation Tomorrow,
3          META3047MDL-006-00000194
4  Bejar    Roblox is 'Hunting Ground for  967
   Exhibit 76  Child Sex Predators,' New
5          Lawsuit Claims, Feb 21, 2025
6  Bejar    Chat, BEJAR002535       1071
   Exhibit 77
7
   Bejar    E-mail, 11/8/23, To: Arturo  1073
8  Exhibit 78  Bejar, From: Linda Singer,
           Subject: Request for
9          Meeting/New Mexico Attorney
           General, BEJAR0024460
10
   Bejar    E-mail, 11/13/23, To: Arturo  1073
11 Exhibit 79  Bejar, From: Linda Singer,
           Subject: Civil Investigative
12         Demand, BEJAR002464
13 Bejar    Letter, November 12, 2023, To: 1077
   Exhibit 80  Arturo Bejar, From: Linda
14         Singer, Re: Motley Rice New
           Mexico Social Media
15         Litigation, BEJAR0002687
16 Bejar    E-mail, 9/19/19, To: Arturo  1108
   Exhibit 81  Bejar, From:████████
17         Subject: URGENT PRO
           Unlimited@Facebook - Position
18         Offer, BEJAR0000051
19 Bejar    Notes for Bad Experiences    1124
   Exhibit 82  Meeting with Adam
20
   Bejar    E-mail, 107/2021, To:███  1129
21 Exhibit 83  ████ et al., From: Arturo
           Bejar, Subject: Gap in our
22         Understanding of Harm and Bad
           Experiences,
23         META3047MDL-014-00014804
24
25
```

Page 760

```
1  Bejar    Written Testimony of Arturo  1137
   Exhibit 84  Bejar Before the Subcommittee
2          on Privacy, Technology, and
           the Law, November 7, 2023
3
   Bejar    Internal Instagram and      1172
4  Exhibit 85  Facebook Documents
5  Bejar    Molly Russell timeline      1203
   Exhibit 86
6
   Bejar    Excerpts from the transcript  1203
7  Exhibit 87  of Arturo Bejar, February 2,
           2023
8
   Bejar    Excerpts from the transcript  1203
9  Exhibit 88  of Arturo Bejar, May 16, 2023
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3 (Pages 757 - 760)

CONFIDENTIAL

Page 761

REFERENCED EXHIBITS

1
2                    PAGE    LINE
3  Meta-Bejar Exhibit 68........... 789    15
4  Meta-Bejar Exhibit 8............ 823    10
5  Meta-Bejar Exhibit 49........... 880    14
6  Meta-Bejar Exhibit 12........... 992    16
7  Meta-Bejar Exhibit 54........... 1045   17
8  Meta-Bejar Exhibit 9............ 1049   22
9  Meta-Bejar Exhibit 21........... 1057    4
10 Meta-Bejar Exhibit 43........... 1116    1
11 Meta-Bejar Exhibit 15........... 1155   13
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 762

1        THE VIDEOGRAPHER:  We're now on the
2  record.  The time is 8:37 a.m.
3        This is the continuation of Arturo Bejar's
4  deposition.
5        The court reporter is Elaina Bulda-Jones.
6        And we're going on the record.
7            EXAMINATION
8  BY MS. JONES:
9    Q.  Mr. Bejar, good morning.
10   A.  Good morning.
11   Q.  It's nice to see you again.
12       You understand you're still under oath as
13 you were yesterday and the day before that, yes?
14   A.  Yes, I do.
15   Q.  Okay.  I want to come back to something
16 that I think the jury heard a number of times during
17 the course of your testimony in the first day and a
18 half or so.
19       And I'm going to put this -- can I have
20 the Elmo, please -- up on the Elmo that we have
21 here.
22       You see it says 30 years of child safety
23 experience?
24   A.  Yes, I see.
25   Q.  And do you recall during the examination

Page 763

1  by counsel for the plaintiffs that at various points
2  they referred to you having 30 years of child safety
3  experience?
4    A.  Yes.
5    Q.  Is this -- and I just want to make sure
6  because I went to make sure the jury understands and
7  also that we have our math right.
8        Is that a true statement, that you have
9  30 years of child safety experience?
10   A.  I have 30 years of experience on working
11 on products that are designed with child safety
12 considerations in mind.
13   Q.  Okay.  And I want to make sure that I'm
14 clear on the answer to my question.
15       Is it true that you, Arturo Bejar, have
16 30 years of child safety experience?
17   A.  Yes.
18   Q.  Okay.  And to get to that 30 years that
19 you've referred to, you are going back to your role
20 at a company called Electric Communities; is that
21 right?
22   A.  Correct.
23   Q.  And I'm going to write that on the sheet
24 here.
25       And you started at elec- -- I wrote

Page 764

1  "electronic."  Excuse me.
2    A.  That's not right.
3    Q.  Electric Communities, right?
4    A.  Yes.
5    Q.  And actually, let me start with a fresh --
6  so we have a...
7        30 years of child safety experience.
8        That was your testimony, right?
9    A.  Yes.
10   Q.  And you are starting that 30 years with
11 your time at a company called Electric Communities,
12 correct?
13   A.  Correct.
14   Q.  And you were at Electric Communities from
15 1995 to 1998; is that right?
16   A.  Correct.
17   Q.  Okay.  And so that's three years, yes?
18   A.  Yes.
19   Q.  And I think what you told us yesterday was
20 that Electric Communities was a startup that never
21 actually had a product that it put into the market,
22 correct?
23   A.  That's correct.
24   Q.  So Electric Communities never had any
25 users, whether adults or children, right?

4 (Pages 761 - 764)

CONFIDENTIAL

Page 765

1     A.  That's correct.
2     Q.  And then you went from Electric
3  Communities to Yahoo!; is that right?
4     A.  Yes.
5     Q.  And I confess I didn't look this up.
6        Does Yahoo! have an exclamation point at
7  the end of it?
8     A.  It does, yes.
9     Q.  Okay.  Let me be accurate with that.
10       You went to Yahoo! and you started there
11  in 1998; is that right?
12    A.  Correct.
13    Q.  And you were there until 2009?
14    A.  Correct.
15    Q.  And that's roughly 11 years; is that
16  right?
17    A.  That's correct.
18    Q.  Okay.  And during your time at Yahoo! your
19  work was primarily focused on security,
20  anti-phishing, and web authentication?
21    A.  No, that's not accurate.
22    Q.  Okay.  How would you describe what you
23  were doing at Yahoo!?
24    A.  All aspects relating to sort of product
25  security and safety.

Page 766

1        (Whereupon, a brief discussion off the
2  record.)
3  BY MS. JONES:
4     Q.  Thank you.  They took my documents away
5  from me without my knowledge.
6     A.  It's hard when that happens.
7     Q.  Excuse me.
8        So while you were at Yahoo! you said that
9  you were involved in all aspects relating to sort of
10  security and safety; is that what you just said?
11    A.  For the products that Yahoo! put into the
12  market.
13    Q.  Okay.  Understood.
14       And that included, for example, at least
15  at the first part of your time at the company when
16  you were initially hired, that involved things like
17  encryption code; is that right?
18    A.  Correct.
19    Q.  And involved things like credit card
20  storage, right?
21    A.  Correct.
22    Q.  That involved things like authentication
23  systems, right?
24    A.  Correct.
25    Q.  That involved things like cookies, right?

Page 767

1     A.  Correct.
2     Q.  And none of those topics are --
3  specifically are uniquely focused on child safety,
4  are they?
5     A.  I mean, that's not a complete list of the
6  things that I worked on when I was at Yahoo! and so
7  those topics do play a role in terms of ensuring
8  that the systems are resilient when people try to
9  abuse them, which does have a -- some of an impact.
10       But then, for example, in my first few
11  months at the company, there were bugs with chat
12  rooms that were used by children.  And I had to fix
13  those bugs.  And I believe that my first encounter
14  with issues affecting children at Yahoo! was within
15  probably the first one or two months after I started
16  working there.
17    Q.  Okay.  Well, let's just talk about the
18  specific things that I raised.
19       You worked on encryption code, yes?
20    A.  Yes, that's one of the things I worked on.
21    Q.  Okay.  And credit card storage, right?
22    A.  Correct.
23    Q.  And can we agree that credit card storage
24  is not an issue related to child safety?
25    A.  Actually, the part of the work around

Page 768

1  credit card storage was when COPPA came out, when
2  there was reason to believe that somebody was a
3  minor, you had to have some way of verifying the
4  parents.
5        And as part of that, one of the things
6  that my team implemented was the credit card
7  collection from the parents to verify that it was a
8  parent or the parent sort of authenticating that --
9  the child account.  So that was one of the, I
10  believe, earliest efforts in the industry when it
11  came to child account verification.
12    Q.  Okay.  Let me go back to my question and
13  maybe let me ask it a slightly different and perhaps
14  better way.
15       Credit card storage is not specifically
16  about child safety, is it?
17    A.  That's correct.
18    Q.  And these other topics that we've been
19  talking about, encryption code, authentication
20  systems, cookies, those are not specifically or
21  uniquely about child safety, right?
22    A.  Not uniquely, no.
23    Q.  Okay.  And you eventually, while you were
24  at Yahoo!, became the equivalent of the chief
25  security officer there, right?

CONFIDENTIAL

Page 769

1    A.  Correct.
2    Q.  Okay.  And while you were in the position
3 of the equivalent of chief security officer, did you
4 have any responsibility -- let me ask it in a
5 different way.
6        While you were in the position of being
7 the equivalent of the chief security officer, you
8 were not responsible for building systems focused on
9 integrity or trust issues, were you?
10    A.  I was responsible to ensure that those
11 systems were built and that they performed as they
12 were prescribed.  And so at that point the team that
13 I was managing worked with the team that built all
14 of the integrity systems, all of the login systems.
15        One of the areas that I dealt with from
16 early in my tenure at Yahoo! was grooming.  And so
17 we worked with Yahoo Mail.  Yahoo! at the time had
18 probably, like, 20 or 30 products.  And I was
19 managing the central team that was responsible for
20 those 20 or 30 products being implemented in a form
21 that's secure and safe.
22    Q.  Let me go back.  I just want to make sure
23 I have an answer to my question.
24        While you were in the position of the
25 equivalent of being the chief security officer at

Page 770

1 Yahoo! you were not responsible for building systems
2 focused on integrity or trust issues, correct?
3        MR. CARTMELL:  Objection.  Asked and
4 answered.
5        THE WITNESS:  I believe I've already
6 answered the question.
7        I was responsible for ensuring that those
8 systems were built, that they performed well, the
9 testing of them, and make sure that there were
10 presentations that the company made about them were
11 accurate.
12 BY MS. JONES:
13    Q.  Do you remember being asked essentially
14 that same question when you were deposed in the FTC
15 antitrust matter?
16    A.  I don't recall.
17    Q.  Okay.  Well, let me hand you a copy of
18 your transcript from that testimony.
19        Mr. Bejar, we have handed you a copy of
20 your sworn testimony of February 2nd, 2023.
21        Do you see that on the front of the page?
22    A.  I do.
23    Q.  And you can see that this is your video
24 deposition testimony from the FTC versus Meta
25 Platforms action, right?

Page 771

1    A.  Right.
2    Q.  And when you were deposed in that matter,
3 you were under oath, right?
4    A.  Right.
5    Q.  You took an oath, just as you did before
6 we started this deposition, to tell the truth, the
7 whole truth, nothing but the truth, right?
8    A.  Right.
9    Q.  And did you do that?
10    A.  To the best of my ability.
11    Q.  Okay.
12        MR. PHELPS:  Hey, Phyllis, can I just jump
13 in and object on this.  I'm not sure that this has
14 been produced to the state agencies that are
15 participating in this.  I don't know.  We could
16 verify that, but I don't know that it is.  So far as
17 that's true, I just would ask for a running
18 objection.
19        MS. JONES:  You're certainly welcome to
20 have a running objection.  We recently produced it
21 to the MDL plaintiffs at their request.  We have a
22 copy if you want a copy.
23        MR. PHELPS:  So you're not --
24        MS. JONES:  But your objection is noted.
25        MR. PHELPS:  But you're not sure that you

Page 772

1 produced it to the States?
2        MS. JONES:  I'm not sure that -- and to be
3 fully transparent, I'm not sure to what extent we
4 got a comparable request from any of the States but
5 we got a specific request from the MDL plaintiffs
6 for the transcript and exhibits, which we have
7 produced recently, and obviously we're happy to give
8 you a copy.  I hope he has one --
9        Do you have a copy?
10        MR. PHELPS:  My objection has been noted.
11        MS. JONES:  Do you have a copy of the
12 transcript now?
13        MR. PHELPS:  I do now.
14        MS. JONES:  Okay.  And we can send you the
15 exhibits, too, if you wanted.
16    Q.  Okay.  Mr. Bejar, let me ask you to turn
17 to page 14 of what we've marked -- we have not
18 marked it -- but the copy of your sworn testimony
19 from February of 2023.
20        Are you there?
21    A.  Yes.
22    Q.  And at the bottom of page 14, there's a
23 question that says -- begins at line 22.
24        Do you see that?
25    A.  Yeah.

6 (Pages 769 - 772)

CONFIDENTIAL

Page 773

1    Q.  And it says, "And while you were in the
2  position of -- which had the equivalent of chief
3  security officer, did you have any responsibility
4  for integrity or trust issues."
5        Do you see that?
6    A.  I do.
7    Q.  And then your answer begins on page 15 so
8  you might have to turn the page.
9    A.  I do.
10    Q.  At line 1, it says, "Supporting this, we
11  worked on supporting the engineers who were building
12  those systems but we didn't -- we weren't
13  responsible for building those systems."
14        Do you see that?
15    A.  I do.
16        MR. CARTMELL:  I'm going to object.  Just
17  if I can have a running objection to the -- I think
18  you're trying to impeach him with his deposition but
19  you didn't ask the question.  It's inappropriate
20  impeachment.  So I object on that basis.
21        MS. JONES:  Okay.  Your objection is
22  noted.
23  BY MS. JONES:
24    Q.  Was that truthful testimony when you gave
25  it in February of 2023?

Page 774

1    A.  That is correct.
2    Q.  Okay.  And just so we capture it for
3  purposes of our --
4        Can you go back.  Thank you so much.
5        -- for purposes of what we're talking
6  about here.
7        And you left Yahoo! in 2009; is that
8  right?
9    A.  Correct.
10    Q.  Okay.  And --
11        MR. CARTMELL:  Just real quick.  Sorry,
12  Phyllis, to interrupt.
13        I'm going to object to the use of this
14  demonstrative as incorrect and also including the
15  improper impeachment.
16        MS. JONES:  Okay.  Your objection is
17  noted.
18    Q.  You left Yahoo! in 2009, right?
19    A.  Yes, I did.
20    Q.  And you -- that was when you started your
21  first stint at what was then Facebook is now Meta,
22  right?
23    A.  Correct.
24    Q.  I'm going to refer to that on the
25  demonstrative here as Meta 1; is that okay?

Page 775

1    A.  Yes.
2    Q.  And during that first window of time that
3  you worked with the company, that went from 2009 to
4  2015; is that right?
5    A.  Yes.
6    Q.  Okay.  And during that period -- I'm going
7  to create some lines here just to be able to be a
8  little more organized.
9        During that period I believe your
10  testimony has been that you were not really involved
11  in child safety issues on Instagram, right?
12    A.  During that period of time, I was
13  responsible for child safety issues for Meta, or
14  Facebook at the time, and that included Instagram
15  and WhatsApp where applicable.
16    Q.  Mr. Bejar, do you recall your testimony
17  from two days ago in this deposition?
18    A.  I do.  Yes, I do.
19        MS. JONES:  Okay.  Can we, Mr. Reynolds,
20  just put up on the screen --
21        And I will represent to you this is a
22  rough of the transcript.  It's not the final
23  transcript.
24        But could we put up page 75, please, from
25  day one and can we go to the first page.

Page 776

1        MR. CARTMELL:  Phyllis, can I object
2  before you do it as improper impeachment.
3        MS. JONES:  Certainly.
4        MR. CARTMELL:  Okay.
5        MS. JONES:  Can we go to --
6        MR. CARTMELL:  And have a running
7  objection on all these questions.
8        MS. JONES:  When you say "all these
9  questions," I don't think I can agree to that.  But
10  you can certainly have a running objection to the
11  use of the rough transcript --
12        MR. CARTMELL:  Okay.
13        MS. JONES:  -- from two days ago.
14        MR. CARTMELL:  Let me make it clear.
15        To impeach a witness with his prior
16  testimony you have to ask the question that you --
17  was asked and then get a response that allows you to
18  impeach.  So this is improper impeachment.
19        And I'd like a running objection to your
20  use of this in any respect if you haven't done it
21  correctly beforehand.
22        MS. JONES:  Okay.
23        MR. CARTMELL:  Thanks.
24        MS. JONES:  I'm not giving you a running
25  objection for the balance of the day.

7 (Pages 773 - 776)

CONFIDENTIAL

Page 777

1        MR. CARTMELL:  No, no, no.
2        MS. JONES:  But certainly as to this line
3 of questioning you got it.
4     Q.  Okay.  Do you see, Mr. Bejar, that this
5 is, if you look down at the bottom of the page,
6 again, admittedly a rough transcript of your
7 testimony from just two days ago, April 7, 2025,
8 right?
9     A.  Yes.
10    Q.  And before you started testifying, you
11 swore to tell the truth, right?
12    A.  Yeah.
13    Q.  And you were truthful on April the 7th,
14 Monday of this week?
15    A.  Yes.
16        MS. JONES:  Okay.  Let me ask us to go to
17 page 75, line 8 through 12, please.
18    Q.  You were asked, by Mr. Cartmell actually,
19 "Now, you had not worked really much on child safety
20 at Instagram when you left in 2015, correct?"
21        You see that question?
22    A.  I do.
23    Q.  And do you see your answer was, "That's
24 correct, I was focused on Facebook"?
25    A.  There was nobody working on child safety

Page 778

1 on Instagram at the time.
2     Q.  My question was, was your answer, just two
3 days ago, "That's correct, I was focused on
4 Facebook"?
5        MR. CARTMELL:  Just note my objection.
6        THE WITNESS:  That's what the transcript
7 says so that's what I said.
8 BY MS. JONES:
9     Q.  Okay.
10    A.  And I -- actually, like, at the time there
11 was nobody on Instagram working on child safety.
12 The focus at the time was establishing the basic
13 reporting flows and I worked on that with Instagram,
14 right, and so that was -- what work that was being
15 done at the time.
16        MS. JONES:  Well, let me move to strike
17 everything after "That is what the transcript says
18 so that's what I said."
19    Q.  And you were giving -- your testimony
20 Monday was truthful?  I just want to be clear about
21 that.
22        MR. CARTMELL:  Objection.  Asked and
23 answered.
24        THE WITNESS:  Yes, it was truthful.
25 ///

Page 779

1 BY MS. JONES:
2     Q.  Okay.  And --
3        We can take that down, Mr. Reynolds.
4 And -- actually, Mr. Reynolds, can we call it up one
5 more time, please.  Same page.  Because I want to
6 fairly recount -- oh, thank you.
7        Okay.  Thank you, Mr. Reynolds.
8        THE WITNESS:  Can I see that?
9 BY MS. JONES:
10    Q.  Yeah, sure.
11    A.  I can't see it.
12    Q.  You can't see -- which part can you not
13 see?
14    A.  Yeah, it -- for accuracy, could you add
15 there that I was responsible for safety and security
16 for all of the products that Meta was responsible
17 for, including acquisitions?
18    Q.  What I'm focused on right now is what you
19 said to us on Monday.
20    A.  Okay.
21    Q.  And if counsel wants to come back and have
22 you say something more, that's okay.  He is -- he
23 will have time to do that.
24        And then you left Meta in 2015, right?
25    A.  Right.

Page 780

1     Q.  And from 2015 to 2019, you were not
2 working, right, and I'm not picking on you, but you
3 were not working as a full-time employee anywhere,
4 right?
5     A.  I was not working as a full-time employee
6 anywhere.
7     Q.  Okay.
8     A.  I was a full-time parent, though.
9     Q.  Which is a job, to be fair and to be fully
10 accurate, yes.
11        You were not working outside of the very
12 important role that you were playing with respect to
13 your children.  Fair enough?
14    A.  That's -- other than the other work I did
15 in art, I think that is accurate.
16    Q.  Okay.  Well, you were not --
17    A.  And the consulting.  So I think if you go
18 back during that time, right, parent, number one.
19    Q.  Yes.
20    A.  So around three days a week.
21    Q.  Sure.
22    A.  Then around, like, time dedicated
23 sometimes to the art projects I was working on.
24        And then there was time spent both sort of
25 thinking and discussing with people the areas around

Golkow Technologies,
A Veritext Division
877-370-3377                                                                   www.veritext.com

CONFIDENTIAL

Page 781

1 security and safety.
2    Q.  I want to come back to that.
3      What you told me yesterday, I thought, was
4 none of the consulting work that you were doing
5 between 2015 to 2019 was related to child safety?
6      MR. CARTMELL:  Object to the form.
7      THE WITNESS:  I don't believe that's what
8 I said.  I think what I said yesterday is -- is I
9 worked on social products and I had conversations
10 with people and organizations around issues of child
11 safety.  Sometimes the work was not compensated.
12 That was not a priority for me at the time.
13      And it also means that throughout all this
14 time I continued thinking about the issue.  But
15 also, I had believed that at the point that there
16 was a framework at Meta that would carry on that --
17 to deal with that.
18      So I was okay having the work being
19 continued in such a way that it addressed the child
20 safety issues that had been identified and worked on
21 on my first stint.
22 BY MS. JONES:
23    Q.  Let me be very sure that we're clear on
24 the record here.
25      I believe you testified yesterday under

Page 782

1 oath that between 2015 and 2019 the consulting that
2 you did for Airbnb, is that right, formal
3 consulting?
4      MR. CARTMELL:  Objection to the statement
5 of counsel.  Improper impeach.
6      MR. PHELPS:  And characterization.
7 BY MS. JONES:
8    Q.  You can answer.
9    A.  At Airbnb and other companies that I might
10 not recall the name of right now.
11    Q.  Okay.  So yesterday you said you consulted
12 with Airbnb, yes?
13    A.  Yes, that's correct.
14    Q.  And you think now there might be other
15 companies you consulted with that you don't remember
16 the names of?
17    A.  Yeah, I mean, yesterday I talked about
18 Airbnb because that's the name I remembered.
19      I believe I, also during that time, did
20 other kinds of consulting engagements.  I don't
21 recall precisely what those are right now.
22    Q.  Okay.  So during this period you were
23 consulting -- I want to be fair to what you've
24 recounted.
25      You were consulting with Airbnb, yes?

Page 783

1    A.  Correct.
2    Q.  And you were possibly consulting with
3 other companies but you can't tell me what the names
4 of those companies are?
5    A.  So one I remember, for example, was an
6 organization called Mobius that was dedicated --
7      (Whereupon, a brief discussion off the
8 record.)
9      THE WITNESS:  Mobius, M-O-B-I-U-S.
10      Who was working on these kinds of issues
11 and was working with other companies.
12      Also, there were different forums
13 organized around responsible innovation, including
14 people that were working on child safety issues,
15 just sort of private meetings organized by people in
16 the industry that had people from Google, Roblox,
17 and other companies that, again, I don't remember
18 right now.  And I participated in those
19 conversations as well.
20      And I think also I spent a significant
21 amount of time thinking about these issues and
22 discussing them with my kids around that, because
23 this is always a topic that I cared about.
24 BY MS. JONES:
25    Q.  Okay.  You were not working on child

Page 784

1 safety issues in any formal employed capacity with
2 any company from 2015 to 2019, right?
3    A.  That's correct.
4    Q.  You were not serving in any official child
5 safety role with any or -- company, right?
6    A.  That's correct.
7    Q.  And, again, your first time -- role with
8 the company was six years, right, with Meta, excuse
9 me, yes?
10    A.  Correct.
11    Q.  And then there was this four-year period
12 where you weren't working full time, you were
13 parenting, spending some time on your interests in
14 the arts, and then it sounds like consulting, maybe
15 having conversations with people around responsible
16 innovation and child safety; is that what you said?
17      MR. CARTMELL:  Object to the form.
18      THE WITNESS:  I mean, I'd have to say, for
19 example, during this time, from a parenting
20 perspective, how important it was for me in
21 developing sort of my opinions and expertise to --
22 having conversations with my daughter about her
23 experiences, her usage of the tools that were made
24 available to her at the time, and the way these
25 things impacted her and all of her friends.

9 (Pages 781 - 784)

CONFIDENTIAL

Page 785

1 BY MS. JONES:
2    Q.  Okay.  And then you went back to the
3 company -- and by "the company," I mean Meta -- in
4 2019; is that right?
5    A.  That's correct.
6    Q.  All right.  And you were there for two
7 years, right?
8    A.  That's correct.
9    Q.  Okay.  And I'm going to refer to this as
10 Meta 2, right?  Is that okay?  I guess I should say.
11    A.  Yes, that's okay.
12    Q.  All right.  And I know we had some back
13 and forth yesterday about what your specific title
14 was one way or the other.
15        You described your role as a consultant
16 for the company, right?
17    A.  Correct.
18    Q.  And the paperwork that we looked at from
19 time to time described you as a contingent worker,
20 right?
21    A.  Right.
22    Q.  And most of the time that you were a
23 contingent worker you were remote, right?
24    A.  Correct.
25        I really have no sense of the bearing of

Page 786

1 that considering that the bulk of that time
2 everybody was remote.
3        MS. JONES:  Okay.  I'm going to move to
4 strike everything after "Correct."
5    Q.  And I believe we saw documentation,
6 including communications from you to Mr. ███
7 ███ that you were working on average three hours
8 a week, right?
9    A.  That is not accurate because that refers
10 to a period of time up to that e-mail.  After that
11 e-mail, that went up significantly.
12        And also, the three hours I billed for, I
13 mean, I think I would say that -- spent a lot more
14 of my time sort of thinking about the issues and
15 thinking about the area and so -- I mean, the way I
16 read this, it's like yeah, when you're on the clock,
17 right, that's the math for this.
18        And I don't think that's an accurate
19 characterization of a person that has spent the last
20 30 years thinking of working on successfully and
21 effectively by pretty much any measure, especially
22 when you look at Yahoo! and you look at Meta with
23 millions and millions of users, all of the risks
24 we're talking about today, and so when you leave the
25 job you continue thinking about it.  You continue

Page 787

1 having observations, realizations.
2        Actually, during my time in between those
3 things, wrote a series of essays capturing
4 everything I had learned and thought about during.
5 Those essays were submitted as work, as part of my
6 contract going into Meta.  My contract at Meta
7 allowed for me to work with other people.
8        So I mean, I think if you -- if what
9 you're trying to do is define this as hours on the
10 clock, I mean, I don't think that's an accurate
11 reflection of the amount of experience that I have
12 in thinking about these issues, writing about them,
13 talking about them.
14        And then most importantly, the track
15 record of building things, organizations, within
16 large companies that address them.
17        MS. JONES:  Let me move to strike all of
18 that.  It's nonresponsive.
19        MR. CARTMELL:  Okay.  So, Phyllis --
20        MS. JONES:  Yes.
21        MR. CARTMELL:  I don't think I legally
22 need to oppose your motions.
23        MS. JONES:  You do not.
24        MR. CARTMELL:  Can I have that running --
25        MS. JONES:  I will note your --

Page 788

1        MR. CARTMELL:  -- opposition?
2        MS. JONES:  I understand that you oppose
3 my motions on that issue.
4        MR. CARTMELL:  Okay.
5        MS. JONES:  And so let me just make sure.
6        I have made my motion to strike all that
7 as nonresponsive.  Mr. Cartmell has noted his
8 opposition to that and any forward-going motions to
9 strike as nonresponsive.
10    Q.  Mr. Bejar, I just want to make sure we're
11 very clear.
12        You have testified -- well, let me take a
13 step back.
14        We looked at documents yesterday where as
15 of, I believe, October of 2020 you reported to
16 Mr. ███ that you were working on average three
17 hours a week, right?
18        MR. CARTMELL:  Object to form.
19        THE WITNESS:  Can you repeat the question?
20 BY MS. JONES:
21    Q.  Yes.
22        We yesterday looked at documents where you
23 reported to Mr. ███ that as of October of 2020 you
24 were working on average three hours a week, right?
25    A.  That as of October of 2020, I had, like,

10 (Pages 785 - 788)

CONFIDENTIAL

Page 789

1 three hours of billable work at -- for Instagram.
2 Because, again, just really -- and I
3 apologize because part of this is me, sort of,
4 English as a second language thing.
5 But it's like the work I did was well
6 beyond those three hours but the billable hours were
7 the hours I was spending having meetings,
8 conversations with people, and I thought that was --
9 that is the correct way to go about that.
10 Q. Okay. Do you have Exhibit Number 68 in
11 front of you? I do want to be very clear about what
12 actually was in the document.
13 MR. WARD: 68, Counsel?
14 MS. JONES: 68 please.
15 (Whereupon, Meta-Bejar Exhibit 68 having
16 been previously marked, was introduced.)
17 BY MS. JONES:
18 Q. Do you recall us looking at Exhibit
19 Number 68 yesterday, Mr. Bejar?
20 A. Yes.
21 Q. And do you specifically recall us looking
22 at this e-mail from you to ██████, down at the
23 bottom of that document, on October the 2nd, 2020?
24 A. That is correct.
25 Q. And so October the 2nd, 2020, would have

Page 790

1 been about a year into your time working as a
2 consultant or a contingent worker with the company,
3 right?
4 A. That's correct.
5 Q. And let's just -- again, just to be very
6 clear about what you said at the time.
7 "Over my time here I've been pretty much
8 averaging the 3 hours a week, sometimes less,
9 sometimes more."
10 Right?
11 A. Three hours a week of billable time.
12 Q. Well, you didn't say of billable time in
13 that e-mail, did you?
14 A. I didn't say of work either.
15 Q. Okay.
16 (Whereupon, a brief discussion off the
17 record.)
18 THE WITNESS: I didn't write over my time
19 here I've been pretty much averaging three hours of
20 work a week.
21 BY MS. JONES:
22 Q. Well, you know, I didn't say of work.
23 A. That's what I heard you say.
24 Q. Okay. Well, then I apologize.
25 Let me make sure that I'm clear about what

Page 791

1 I'm -- I'm reading from the document and we can read
2 together.
3 On Exhibit Number 68, on October the 2nd,
4 2020, a year into your time back at the company you
5 reported to Mr. ████. "Over my time here I have
6 been pretty much averaging the 3 hours a week,
7 sometimes less, sometimes more."
8 Right? That's what you wrote?
9 A. Right.
10 Q. Okay. And, in fact, you have testified
11 under oath since then that your time actually
12 working might have averaged out to around one day a
13 week, right?
14 MR. CARTMELL: Objection. Asked and
15 answered.
16 THE WITNESS: Sorry?
17 MR. CARTMELL: Go ahead. You can answer.
18 THE WITNESS: Oh, okay. Thank you.
19 It depended on the period of time but I
20 think that's what it averaged out to.
21 BY MS. JONES:
22 Q. Okay. Well, let me ask you to look at an
23 additional set of your sworn testimony.
24 (Whereupon, a brief discussion off the
25 record.)

Page 792

1 BY MS. JONES:
2 Q. Do you recall being asked questions by
3 Mr. Phelps who was sitting down at the end of the
4 table back in -- I believe it was May of 2023?
5 A. I do.
6 Q. Okay. And you understand that you were
7 examined under oath in that setting as well?
8 A. Yes.
9 Q. And you committed to telling the truth
10 when you were asked questions in that setting as
11 well?
12 A. Yes.
13 Q. Okay. And if we put that up on the
14 screen, let's just show --
15 MR. CARTMELL: Before you do that, I
16 apologize for interrupting, I want to object. This
17 is improper impeachment. And can I have that
18 running objection through the use of this document
19 and especially while you're showing it?
20 MS. JONES: Yes, certainly.
21 MR. CARTMELL: Okay.
22 BY MS. JONES:
23 Q. Mr. Bejar, you see that this is the cover
24 page of the transcript from your testimony of
25 Confidential Proceedings Examination Under Oath of

11 (Pages 789 - 792)

Page 793

1 Arturo Bejar on May the 16, 2023?
2     A.  I do.
3     Q.  Let me ask you to turn to page 87.
4          And you -- do you recall that these were
5 questions that were being asked by Mr. Phelps from
6 the Tennessee Attorney General's Office who was
7 asking you questions yesterday?
8     A.  Yes.
9     Q.  So you had some experience with Mr. Phelps
10 getting to ask you questions before, right?
11     A.  Yes.
12     Q.  Okay.  And then down at the bottom of the
13 page, on page 87, do you see at line 23 you were
14 specifically asked, "How many hours a week, roughly,
15 did you work for the company between 2019 and 2021?"
16     A.  Yes.
17     Q.  And your answer, starting at line 25, was,
18 "I think it likely averaged out to around one day
19 week."
20          That's what it says, right?
21     A.  Correct.
22     Q.  It says, "It was done on an as-needed
23 basis so there were weeks where it was just a few
24 hours and then there were weeks where it was like
25 multiple days."

Page 794

1          Right?
2     A.  Correct.
3     Q.  Was that truthful testimony when you gave
4 it at the time?
5     A.  Yes.
6     Q.  And so just to be fair --
7          Can we go back to the Elmo, please.
8          Just to be fair to you, this three hours a
9 week that you reported to Mr. ▇▇▇ the document
10 suggests maybe that was up through October of 2020.
11          MR. CARTMELL:  Objection to the form.
12 BY MS. JONES:
13     Q.  Is that right?
14     A.  As I think I've said a couple of times in
15 this line of questioning, three billable hours a
16 week on average up to that point.  And then for the
17 reminder it had to be up significantly to then get
18 to the average that I was talking about.
19     Q.  Okay.  And then what you said in your
20 testimony in 2023 was that you averaged out to about
21 an hour a week -- not -- excuse me.
22          What you said in your testimony in 2023
23 was that you averaged out to about a day a week,
24 right?
25          MR. PHELPS:  Object to form.

Page 795

1 Characterization.
2          THE WITNESS:  That's what I testified
3 and -- yes.  It was three days parenting.  If this
4 work was needed here, I figured it out because
5 it's -- it was important to be responsive.  One day
6 a week on this and then one day a week on the other
7 areas of my life.
8 BY MS. JONES:
9     Q.  Okay.  And during that time period, you
10 were never full time, right?
11     A.  That's correct.
12     Q.  And during that time period, you were
13 working specifically with the Instagram Well-Being
14 team, right?
15     A.  That's correct.  Well, primarily.  Because
16 I did talk to other people in other parts of the
17 company.
18     Q.  Understood.
19          But in terms of your formal assignment and
20 the people to whom you were reporting, you were
21 working with the Instagram Well-Being team, right?
22     A.  That's correct.
23     Q.  You were not formally working with or
24 formally reporting into, for example, the central
25 integrity team, right?

Page 796

1     A.  Yes, that's correct.
2     Q.  And you were not formally working with or
3 formally reporting to the various child safety teams
4 or child safety-focused teams within central
5 integrity, right?
6     A.  That is correct.
7     Q.  And would the answer be the same with
8 respect to work, formal work, with members of the
9 safety policy team who were focused on child safety
10 issues?
11     A.  Do you mean like the central policy team
12 like --
13     Q.  Yes.
14     A.  -- ▇▇▇▇▇▇ and all those folks?
15     Q.  Yes.
16          I apologize.  Let me ask the question
17 again because I interrupted you.
18          Would the answer be the same in terms of
19 between 2019 to 2021, you did not have any formal
20 work or role with the safety policy team at the
21 company?
22     A.  That is correct.
23     Q.  And, Mr. Bejar, again, just to be very --
24 well, to be fair, but also to be accurate about what
25 we're talking about here, if we added up all of

12 (Pages 793 - 796)

CONFIDENTIAL

Page 797

1 these years and let's say we just gave you credit
2 for all the years that we've talked about, we still
3 don't get to 30 years, right?
4     A.   Sorry, I noticed that there's a whole
5 section missing there, which is between 2021 and the
6 present where I have continued to do work, write,
7 test, communicate on all of these areas, and so I
8 believe that we are in 2025, and I began actively
9 thinking of working on implementing things on these
10 issues in 1995.  I have not stopped doing that since
11 then.
12        And so I think it is accurate to say I
13 have 30 years of thinking, writing, working,
14 implementing effective programs that deal with all
15 of these issues for kids and for everybody else in
16 multiple contexts that involve up to billions of
17 people.
18     Q.   Okay.  And, Mr. Bejar, you've not actually
19 had a full-time job for -- since 2015; isn't that
20 right?
21     A.   That's correct.
22     Q.   Okay.  And certainly you've not had a
23 full-time role focused on child safety in, like,
24 roughly a decade, right?
25     A.   Full-time job paid, no.  That's correct.

Page 798

1     Q.   Okay.  And if -- and what you're counting
2 within this 30 years is a period of time where you
3 were working for a company that never actually
4 launched a product, Electric Communities, right?
5        MR. CARTMELL:  Object to the form.  Asked
6 and answered.
7 BY MS. JONES:
8     Q.   Right?
9     A.   I think that's mischaracterizing the work
10 that Electric Communities did, but -- I mean, you
11 seem pretty set on keeping referring to it as a
12 company that didn't ship a product to users, and
13 that is accurate, and at the same time, that is a
14 company that considered the issue deeply on profound
15 issues of security, issues of safety -- safety
16 without central moderation.  How do you build a
17 system that scales to billions of people.
18        And things that I learned at Electric
19 Communities were things that I spoke about with Mark
20 Zuckerberg during my interview that shifted the
21 interview, that I could visibly tell that it made
22 him comfortable hiring me.
23        It wasn't just that.  It was time thinking
24 about it.
25        But then within my first month at Yahoo! I

Page 799

1 had written code that had been running hundreds of
2 millions of times.  And during my time at Yahoo! I
3 dealt with grooming.  Like, I spoke to parents,
4 of -- the kids -- deployed countermeasures, dealt
5 with child pornography and other child endangerment
6 issues very effectively during that time.  And you
7 look at the track record within Yahoo! it's there.
8        That's why Meta hired me.  You look at the
9 track record on Meta, and, again --
10        (Whereupon, a brief discussion off the
11 record.)
12        THE WITNESS:  You look at the track record
13 within Meta, and, again, same set of problems,
14 starting from a small user base to a billion people,
15 established track record of frameworks and programs
16 and solutions, leadership for these areas in the
17 industry in terms of NCMEC tools, participation in
18 forums, sharing of internal knowledge and expertise
19 and development.
20        And then when the safety and policy team
21 came around, I thought my work was done.  That there
22 was a framework.  There was a company.  It was
23 happening.  And it was upon realizing that the work
24 was not done, through the experience of my daughter,
25 that I then went back to work and have continued to

Page 800

1 do so since.
2        And I do this not because I have to.
3 Fortunately, I don't need to have a full-time job,
4 and that's the reason why that hasn't been the case
5 since 2015.
6        But I think it's important enough that I
7 am here today and that I have been doing all of
8 these things, including offering to do it pro bono
9 in many instances.
10        MS. JONES:  I'm going to move to strike
11 all of that.  It's quite nonresponsive.
12     Q.   Do you remember what my question was,
13 Mr. Bejar?
14     A.   I do not anymore.
15     Q.   Okay.  Well, let me read it back to you.
16        Going back to our demonstrative here, in
17 your 30 years of child safety experience, you are
18 counting within that period time that you spent at a
19 company that never actually launched a product?
20        MR. CARTMELL:  Object.  Actually, I don't
21 think that was the question.  But I object.  That
22 question was asked and answered.
23 BY MS. JONES:
24     Q.   Well, I'm reading from the realtime.
25        But in any event, let me ask the question

13 (Pages 797 - 800)

CONFIDENTIAL

Page 801

1  so that it's clear.
2        Within your 30 years of child safety
3  experience, you are including Electric Communities
4  that never launched a product, right?
5        MR. CARTMELL:  Same objection.
6        THE WITNESS:  No, that's not quite right.
7  BY MS. JONES:
8     Q.  Did Electric Communities launch a product,
9  ever?
10    A.  Yes, by the end of the time I was at
11 Electric Communities, it incorporated other
12 companies that had shipped products.
13    Q.  But did it have a product that it had
14 launched while you were there?
15    A.  During the time I was there, they didn't
16 launch a product without testing, so not --
17       (Whereupon, a brief discussion off the
18 record.)
19       THE WITNESS:  -- beyond testing.  So we
20 had like a small testing program that we did with,
21 like, 50 people.
22 BY MS. JONES:
23    Q.  Okay.  Were those people adults?
24    A.  Some of those people were children.
25    Q.  How many?

Page 802

1     A.  A handful.
2     Q.  Okay.  And just to make sure I'm clear on
3  your answer, while you were at the company Electric
4  Communities had not formally launched a product,
5  right?
6        MR. CARTMELL:  Same objection.
7        THE WITNESS:  I think I've answered this
8  question.  But I do -- I mean, I have to say that
9  mischaracterizes the work done at Electric
10 Communities.  But it is accurate to say that
11 Electric Communities had not launched a product.
12 BY MS. JONES:
13    Q.  Okay.  And you're also including within
14 your 30 years of child safety experience a four-year
15 period where you were not working full time in any
16 child safety role at all, right, from 2015 to 2019?
17       MR. CARTMELL:  Objection.  Asked and
18 answered.
19       THE WITNESS:  Again, I think in the way
20 you are asking the question you are
21 mischaracterizing how that time was spent.
22       Like, I wrote things.  I published things.
23 I actually wrote an e-mail to -- that Mike
24 Schroepfer and Andrew Bosworth that was intended
25 to --

Page 803

1        (Whereupon, a brief discussion off the
2  record.)
3        THE WITNESS:  -- go to Mark Zuckerberg
4  around issues that I had been noticing that, based
5  on my experience, Meta could be doing a
6  difference -- doing much better at.
7        And so if you want to say not working full
8  time on the issue, I think that is an accurate
9  statement, but in the way that the question is
10 framed I think it mischaracterizes the time that I
11 spent.
12 BY MS. JONES:
13    Q.  Well, that's fine.  And let me assure you,
14 Mr. Bejar, Mr. Cartmell, Mr. Phelps, other lawyers
15 in the room will have a chance to give you an
16 opportunity to say whatever -- bless you -- to say
17 whatever else you want to say.
18       My hope is that you would just focus on my
19 question, if you wouldn't mind.
20       So I'm going to move to strike
21 respectfully, as --
22       MR. CARTMELL:  I move to strike the
23 statement of counsel.
24       MS. JONES:  Well, can I just finish my
25 question?

Page 804

1        MR. CARTMELL:  No, I'm striking your
2  statement before your question.  You can now ask
3  your question.
4        MS. JONES:  Okay.
5     Q.  Mr. Bejar, let me ask you to focus on my
6  question.  And at the same time I move to strike
7  your nonresponsive answer to my question earlier.
8        Within your 30 years of child safety
9  experience that you've talked about, you are
10 including a four-year period where you were not
11 serving in any formal full-time role as a child
12 safety professional, right?
13       MR. CARTMELL:  Same objections.  It's been
14 asked and answered now several times.
15       THE WITNESS:  Yeah, I believe I've
16 answered this question multiple times.  And I am
17 focusing on your question.  I just want to make sure
18 that I answer it accurately.
19 BY MS. JONES:
20    Q.  And the accurate answer to that question
21 would be yes, right?
22       MR. CARTMELL:  Object to form.
23       THE WITNESS:  Sorry.  I'm sorry.  I just
24 have to ask.  Are you supposed to tell me that the
25 correct answer to my question is yes?

14 (Pages 801 - 804)

CONFIDENTIAL

Page 805

1  BY MS. JONES:
2      Q.  Well, I'm -- what I actually mostly want
3  to do is make sure that I'm getting an answer to the
4  question that I've asked you.
5      A.  Okay.
6      Q.  And I --
7      A.  Just checking.
8      Q.  Well, the way it's supposed to work is I
9  ask you questions and then you give me answers.
10  That's the basic process.
11      So let me ask you the question --
12      MR. CARTMELL:  Before you ask it --
13  BY MS. JONES:
14      Q.  -- again.
15      MR. CARTMELL:  -- I'll move to strike your
16  statement.
17  BY MS. JONES:
18      Q.  Within your 30 years of child safety
19  experience, you're including four years of time
20  where you were not serving in any formal full-time
21  role as a child safety professional, correct?
22      MR. CARTMELL:  Objection.  Asked and
23  answered multiple times.
24      THE WITNESS:  I believe I have already
25  answered this question.

Page 806

1  BY MS. JONES:
2      Q.  And the answer to that is yes?
3      MR. CARTMELL:  Objection.  It's
4  argumentative.  It's been asked and answered and...
5      THE WITNESS:  And it --
6      MR. CARTMELL:  At this point it's becoming
7  harassing.
8      MS. JONES:  Well, and you are well past
9  coaching the witness to which I object.
10      MR. CARTMELL:  I'm not coaching the
11  witness.  I'm making an objection that you have
12  asked the same question now five times.
13      MS. JONES:  Well, I've certainly asked
14  it --
15      MR. CARTMELL:  And then once you --
16      MS. JONES:  -- five times without an
17  answer.
18      MR. CARTMELL:  -- ask the question you
19  then say -- you restate what he's answering to
20  saying isn't that a yes.
21      THE WITNESS:  I just want to say, actually
22  it makes me pretty uncomfortable when you say "and
23  the answer is yes" because that's not my answer.  I
24  think I've already given my answer.
25  ///

Page 807

1  BY MS. JONES:
2      Q.  Okay.  You can't give me a yes-or-no
3  answer to my question; is that your testimony?
4      MR. WARD:  I think he said he's given his
5  answer.
6      MS. JONES:  And you are now coaching the
7  witness.
8      Q.  Could you please answer my question?
9      MR. WARD:  No.  I'm objecting to the
10  continuing harassment of my client.  He's given the
11  answer several times and I think you're becoming
12  abusive of the witness.  And he's given his answer.
13  I'm going to direct him not to answer the question
14  further.
15      If you think that the court will find that
16  he has not answered the question, you can move to
17  compel.  I think at this point it's abusive.  He's
18  answered the question.
19      MS. JONES:  Okay.
20      Q.  And am I understanding that you can't --
21  you're not going to answer yes or no?
22      I am permitted to ask him if he's
23  accepting an instruction from his counsel not to
24  answer the question.
25      Can you answer that question?

Page 808

1      MR. WARD:  That's not what you were asking
2  him, Counsel.
3      MS. JONES:  That was literally my
4  question --
5      MR. WARD:  He's asked --
6      MS. JONES:  -- before you started
7  objecting.
8      MR. WARD:  He's been asked and answered --
9  and has answered the question several times.  He's
10  told you that he's answered the question to the best
11  of his ability.  And you persist in asking the
12  question over and over again.
13      What I'm asking you to do is mark the
14  transcript.  If you think it's nonresponsive, you
15  can ask the court.  You are not the court.  You
16  don't get to decide whether it's responsive.  You
17  can only object that it's not responsive and move to
18  strike.
19      And I think you should take that up with
20  the court if you think it's not responsive.  But you
21  don't get to decide whether the answer is
22  responsive.  You only get to object and move to
23  strike.  And you've done that multiple times now.
24      I think it's actually abusive of
25  Mr. Bejar's second language skills in English to

15 (Pages 805 - 808)

CONFIDENTIAL

Page 809

1  continue to comment that his statements and answers
2  are not responsive.  It reflects a bias against him
3  as a non-English speaker.
4        If you don't like his answers, that's
5  fine, but you can't reform his answers for him
6  and/or instruct him what his answer should be.  I
7  think that reflects a bias against him and I object
8  to it.
9        MS. JONES:  Well, I -- let me just respond
10 to that.
11       That is an, respectfully, absurd
12 accusation that I am somehow suggesting a bias
13 against Mr. Bejar.  So I take issue with that
14 suggestion.  It is offensive.  So I do not
15 appreciate that, Mr. Ward, because it is not a
16 suggestion that is made in good faith.
17    Q.  Are you accepting your counsel's direction
18 not to answer my question?
19       MR. WARD:  Yes.  You should not answer.
20 You have answered the question.
21 BY MS. JONES:
22    Q.  Are you accepting your counsel's direction
23 not to answer my question?
24       MR. WARD:  You have answered the question.
25       THE WITNESS:  I have answered the

Page 810

1  question.
2  BY MS. JONES:
3     Q.  Okay.  And to the extent that I asked you
4  again, you are accepting your counsel's direction
5  not to answer?
6        MR. WARD:  He's not not answering the
7  question.  He's saying that he has answered the
8  question.
9        MS. JONES:  Mr. Ward.
10       MR. WARD:  He's not going to answer the
11 question a sixth time, is what I'm saying.
12       MS. JONES:  Mr. Ward, if I -- if this
13 needs to be taken to the court, then I need to make
14 sure I understand where we are on the record.  That
15 you have instructed him not to answer and that he is
16 accepting that instruction.  That is all that I am
17 trying to establish is --
18       MR. WARD:  I've instructed him not to
19 answer the question for, I'm estimating, a sixth
20 time.  It may be more than that.
21 BY MS. JONES:
22    Q.  Mr. Bejar, are you accepting your
23 counsel's instruction not to answer my question?
24    A.  I have to say this sort of over and over
25 and over again, you're telling me the answer is yes

Page 811

1  is making me very uncomfortable.  I am here in good
2  faith.  I'm doing my best at understanding and
3  answering the questions.
4        I believe I have answered this question
5  already.  And, like, I -- I wish -- we should take a
6  break as soon as possible because this is moderately
7  upsetting and I want to be able to be present and be
8  able to answer the questions accurately.
9     Q.  Okay.  Let me ask you this question and
10 then we'll move on to our next topic.
11       What we -- and we will mark what we put
12 together here as an exhibit to the deposition.
13       But in terms of your claim that you have
14 30 years of child safety experience, if we were to
15 add your time after leaving Meta in 2021, is what's
16 reflected here how you are coming up with 30 years
17 of child safety experience?
18       And I will write on the paper "post-Meta
19 efforts."
20       Would that be inclusive of the 30 years
21 that you've been talking about?
22    A.  Are you asking me that what is there is
23 reflective of how I came up with the 30 years of
24 experience?
25    Q.  Yes.

Page 812

1     A.  Absolutely not.  Because the column on the
2  right and the bullets that you added mischaracterize
3  the work that I have done for 30 years.
4     Q.  Okay.  Well, putting aside how you feel
5  about the column on the right, is this -- are these
6  the different segments in terms of time frames that
7  you're including?
8     A.  The -- so if you add up 1995 to 1998, then
9  1998 to 2009 and 2009 to 2015, 2015 to 2019, 2019 to
10 2021, and 2021 to 2025, I believe that adds up to
11 30 years.
12    Q.  Okay.  Do you need to take a break because
13 this has been upsetting for you or are you okay to
14 keep going?
15    A.  No, I would very much like to take a
16 break.
17       MS. JONES:  Well, let's take a break,
18 then.
19       MR. CARTMELL:  On the record, before we
20 go, you said you were going to mark this exhibit.  I
21 want to note our objection to the use of this
22 exhibit as mischaracterizing his testimony.
23       MS. JONES:  I think that objection is
24 clearly noted on the record.
25       We can go off.

16 (Pages 809 - 812)

CONFIDENTIAL

Page 813

1    THE VIDEOGRAPHER: Time is 9:29. We're
2 off the record.
3        (Whereupon, a brief recess was taken.)
4    THE VIDEOGRAPHER: Time is 9:50. We're
5 back on the record.
6 BY MS. JONES:
7    Q. Mr. Bejar, welcome back.
8        Simply because this was raised in our last
9 bit before our break, you, and I think also your
10 counsel, invoked the fact that English is your
11 second language; is that right?
12    A. That's correct.
13    Q. Have you had a --
14    MR. CARTMELL: Objection. I'm sorry I'm
15 late, Phyllis.
16        But move to strike the statement of
17 counsel.
18    MS. JONES: I'm not sure -- well, your
19 objection is noted.
20    Q. Have you had a hard time understanding my
21 questions because English is your second language?
22    A. I'm trying to understand well what you
23 mean with certain words and so I pause to try and
24 understand what you mean by them when you're talking
25 about that. And I think that's connected to the

Page 814

1 fact that English is my second language.
2    Q. Now, before I got a chance to ask you any
3 questions, you had testified for almost 11 hours in
4 response to questions from plaintiffs' counsel,
5 right?
6    A. That is correct.
7    Q. Did you have problems -- and, in fact,
8 Mr. Phelps, before he started asking you questions,
9 said is there anything that would prevent you from
10 being able to answer questions.
11        Do you remember that?
12    A. That is correct.
13    Q. And your answer to that question was no,
14 right?
15    A. That is correct.
16    Q. And at no point during the almost 11 hours
17 of questioning by plaintiffs' counsel did you ever
18 say I can't understand the question because English
19 is my second language, did you?
20    A. No, that's not accurate. I'm not saying I
21 couldn't understand the question. I'm just talking
22 about the amount of work I have to do to understand
23 the question and I found the questions to be pretty
24 clear and I think -- I'm finding with some of your
25 questions that some of the things that you're saying

Page 815

1 I'm, like, in the question feel might be
2 mischaracterizing.
3        So I think when you talk about --
4 yesterday you asked me this question about, well,
5 this time that you spent away from, like, work and
6 you were kind of -- my impression of it is, like,
7 you know, kind of doing other things.
8        I had to listen to that very closely
9 because if later there's something in the question
10 that I might agree to, I don't want to say I agree
11 to that if you're, like, talking about my time that
12 I dedicated to parenting, which we talked about as a
13 job. And actually a job central to informing
14 experience and opinions in this domain.
15        And so then I have to, like, really pause
16 and consider the language with great care in order
17 to be able to provide a thoughtful and accurate
18 answer.
19    Q. And just to be clear, you're not having a
20 hard time being able to answer my questions because
21 English is your second language; is that right?
22    A. I'm taking time and sometimes I struggle
23 to understand what it is that you mean with your
24 questions. And so I believe that relates to the
25 fact that when you say things like motivations or

Page 816

1 intentions, I'm not quite sure that's the way that
2 they are understood or what I understand them to be
3 and so I have to pause.
4        I mean, I, really, yesterday was taking a
5 lot of time to be, like -- in some cases I'm, like,
6 what does she mean by that word so I can answer
7 accurately and I think that's related to sort of
8 the -- that English is not my native language.
9    Q. And you -- before you had your deposition,
10 you talked with plaintiffs' counsel for 10 to
11 20 hours in the last month, right?
12    A. That's correct.
13    Q. Were all those conversations in English?
14    A. Yes.
15    Q. And, in fact, you went to school in the
16 UK, right?
17    A. That is correct.
18    Q. And was your education in the UK back in,
19 what, the 1980s?
20    A. I'm sorry, I -- that wasn't in the 1980s.
21 In the 1980s, I was in Mexico until 19- -- I think,
22 what did I go to the UK on, on '89 -- I think it was
23 on '90 when I -- it was 1990 that I went to the UK.
24    Q. Okay.
25    A. So I grew up in Mexico and I lived in

17 (Pages 813 - 816)

CONFIDENTIAL

1 Mexico and I lived in Spanish until I was like 19 or
2 20.
3     Q.  Okay.  And when you did your schooling in
4 the UK, was that schooling in English?
5     A.  Correct.
6     Q.  Okay.  And you have worked in the tech
7 industry for at least 30 years, right?
8     A.  Oh, more than that.
9     Q.  Okay.  40 years?
10    A.  1986, I think it was 1986 when I had my
11 first job with IBM.  So I would say that goes to,
12 like -- say that's 39 years.
13    Q.  So close to 40 years?
14    A.  Yes.
15    Q.  In the tech industry?
16    A.  Yes.
17    Q.  Working in English, right?
18    A.  Correct.
19    Q.  Okay.  And the 30 years of child safety
20 work that you have claimed to have experience in,
21 that's all been work that you've done in English?
22        MR. CARTMELL:  Objection to form.
23 BY MS. JONES:
24    Q.  Right?
25    A.  Again, I pause there because you inserted

1 the word "claim" and I have to be, like, what does
2 that mean and then I can -- and then -- and if I say
3 yes, am I --
4     Q.  Well, I don't --
5     A.  -- meaning that you meant claim?
6     Q.  Let me be more --
7     A.  Correct?
8     Q.  Let me be more clear.  I don't mean to get
9 you tripped up on the claim point.
10    A.  Thank you.
11    Q.  You have testified that you have 30 years
12 of experience in child safety, yes?
13    A.  Yes.
14    Q.  Okay.  That 30 years of experience that
15 you have testified about, that work has either
16 overwhelming or exclusively been done in English,
17 correct?
18    A.  That is correct.
19    Q.  Okay.  And you have testified -- before
20 you got to this deposition, you have testified under
21 oath on three separate occasions, right?
22    A.  That is correct.
23    Q.  You testified in the FTC proceeding
24 involving Meta in February of 2023, right?
25    A.  That is correct.

1     Q.  You testified entirely in English,
2 correct?
3     A.  That is correct.
4     Q.  At no point did you say I can't understand
5 the questions for some reason because we're talking
6 in English, right?
7     A.  Which is not what I said today, right?
8     Q.  My -- let me just focus on my question.
9        My question is, in your deposition in
10 February of 2023 when you were testifying under
11 oath, you had at no point said I'm having a hard
12 time being able to answer questions because we're
13 talking in English, right?
14    A.  That is correct.
15    Q.  Okay.  And you testified again later that
16 year when you were talking to Mr. Phelps, also under
17 oath, and you testified in English, correct?
18    A.  That is correct.
19    Q.  And that you never raised concerns about
20 being able to understand the questions because the
21 questions were in English, right?
22    A.  That's correct.
23    Q.  And then you also testified that same year
24 before the United States Congress, right?
25    A.  That is correct.

1     Q.  And your testimony was entirely in
2 English, right?
3     A.  That is correct.
4     Q.  And you provided written testimony in
5 connection with your testimony before Congress,
6 right?
7     A.  That is correct.
8     Q.  And that was entirely done in English,
9 right?
10    A.  That is correct.
11    Q.  You have a website that I think is
12 entitled www.arturobejar.com, right?
13    A.  No.
14    Q.  What is the -- what is the web address?
15    A.  www.arturobejar.org.
16    Q.  And www.arturobejar -- O-R-G -- you have a
17 number of essays and other writings that you have
18 posted to that site, right?
19    A.  Correct.
20    Q.  Just based on my review, it is either
21 entirely or the majority in English, right?
22    A.  That is correct.
23    Q.  Okay.  You don't have a problem
24 understanding questions that are posed to you in
25 English, right?

18 (Pages 817 - 820)

CONFIDENTIAL

Page 821

1    A.   So what I'm experiencing that I was
2 referring to is I am not used to being asked
3 questions that in the body of the question might
4 mischaracterize the work that I have been doing and
5 then say yes/no at the end.
6       So then I am having to spend a lot of time
7 thinking about the different parts of the question
8 in order to make sure that I don't accidentally say
9 yes to something that is inaccurate.  And that
10 requires a lot of close attention to the language.
11       I think that most of the questioning under
12 oath or conversations that I've experienced to date,
13 that the questions are, like, pretty self-evidently
14 clear, and they don't contain these things that -- I
15 mean, I kind of am listening to the question, I'm
16 trying to parse it very thoughtfully.
17       And at some point there are these bits of
18 the question that make me think of -- of that scene
19 in Star Wars where the -- where Landos is coming in
20 and then Admiral Ackbar goes, "It's a trap."  And
21 I'm, like, if I say yes to that, am I admitting to
22 something that I wouldn't agree with.
23       And so when you look at some of the things
24 that we're looking at, you're laying all these
25 things out that mischaracterize a lifetime of work

Page 822

1 in the industry and then say yes or no.  And I have
2 to think about that really hard because it seems to
3 me that the way the questions are constructed there
4 are things in it that if I say yes to that, then
5 I'm -- might not be fully understanding what I'm
6 saying yes to and so I pause and I ask and I take
7 parts of that.
8       And so, yeah, I would say absolutely in
9 that context I am needing to do work between Spanish
10 and English that I'm not used to doing in this
11 context.
12       The work of explaining things accurately,
13 managing these efforts, communicating the nature of
14 these issues, managing engineers, all of these
15 areas, is yeah, I can do that in English very
16 comfortably.  But this is a different kind of use of
17 English that I think I'm having some trouble with
18 and that's why I take my time sometimes and that's
19 why I think I've answered the question even though
20 you keep asking the question sometimes.
21       And I understand that's your job, like, a
22 hundred percent respect that, but I just want to be
23 careful about understanding your question well
24 enough so that at the end when you say yes or no,
25 because the last sentence is something that is

Page 823

1 accurate, I'm not agreeing to everything that came
2 up to that.
3    Q.   Well, let me ask you this question,
4 Mr. Bejar.
5       Are you comfortable with me proceeding
6 with the deposition in English?
7    A.   Yes.
8    Q.   Okay.  Let me ask you to pull Exhibit
9 Number 8 out of your pile.
10       (Whereupon, Meta-Bejar Exhibit 8 having
11 been previously marked, was introduced.)
12 BY MS. JONES:
13    Q.   Do you remember Exhibit Number 8 being a
14 document that -- I believe it was Mr. Cartmell
15 showed you on the first day of your deposition?
16    A.   Yes.
17    Q.   And this reflects internal discussions
18 about a potential statement of work; is that a fair
19 general description of what Exhibit 8 is?
20    A.   Yes.
21    Q.   And the document was created in March of
22 2021, right?
23    A.   That's correct.
24    Q.   And March of '21 would have been well into
25 your time back at the company in that 2019 to 2021

Page 824

1 time period, right?
2    A.   18 months into what was originally a
3 six-month engagement.
4    Q.   Okay.  And the document continued to be
5 worked on even in September of 2021.
6       If you go to page 4 of the document, you
7 can see that there are annotations from different
8 people that are dated September the 17th, for
9 example?
10    A.   I'm sorry, page?
11    Q.   Page 4.
12    A.   Oh, sorry, I was looking at the wrong
13 page.
14    Q.   That's okay.  It's also on the screen, if
15 that helps.
16    A.   Oh, that's helpful, yeah.
17    Q.   Yeah.
18       Do you see that?
19    A.   Yeah.
20    Q.   And so this was -- that was just a month
21 or so before your consulting role ended with the
22 company in October 2021, right?
23    A.   Correct.
24    Q.   Okay.  So what is reflected in Exhibit
25 Number 8 is not a description of the role that you

19 (Pages 821 - 824)

CONFIDENTIAL

Page 825

1  had been doing since 2019, it's a description of a
2  potential forward-looking part-time role at the
3  company, right?
4      A.  No.
5          MR. CARTMELL:  Object -- give me just a
6  second.
7          THE WITNESS:  I apologize.
8          MR. CARTMELL:  Object to the form.
9  Mischaracterizes his testimony.
10         THE WITNESS:  Sorry, could you ask the
11  question -- the last part of the question again?
12  BY MS. JONES:
13     Q.  Yeah.  Sure.
14         MR. CARTMELL:  Subject to those
15  objections.
16         MS. JONES:  Yes.  Mr. Cartmell has noted
17  his objection now twice.
18     Q.  What is reflected in Exhibit Number 8, and
19  we know this, in part, because it's dated -- it runs
20  up until right before you left the company in 2021,
21  is not a description of the role that you had been
22  doing since 2019.  It's a description of a potential
23  forward-looking part-time role at the company.
24         MR. CARTMELL:  Same objection.
25         THE WITNESS:  It is both things.

Page 826

1  BY MS. JONES:
2      Q.  Okay.  Let me ask you about -- you did not
3  ultimately come back to the company as a part-time
4  employee associated with the Instagram Well-Being
5  organization; is that right?
6      A.  I did not.
7      Q.  Okay.  And if you go to page 3 of Exhibit
8  Number 8, at the very top of the page there is a
9  section entitled, "How many hours a week do you
10  think you would be available?"
11     A.  That's correct.
12     Q.  And do you understand that to be of what
13  you had shared with the team at the time about what
14  your availability might be in connection with an
15  ongoing role with the Instagram Well-Being team?
16     A.  In particular, this was while my kids were
17  still with me at home.
18     Q.  Uh-huh.
19     A.  And so we had talked about the possibility
20  after my kids had moved on of increasing the amount
21  of time that I was there.  But when I talk about two
22  days a week I was talking about all the time that I
23  wasn't with my kids.
24     Q.  Okay.  And up at the top of that page,
25  where it says, "How many hours a week do you think

Page 827

1  you'd be available," that first bullet says, "Right
2  now, I'm thinking 12, around a day and a half."
3          Do you see that?
4      A.  Yes.
5      Q.  And then the next -- the third sentence in
6  that same paragraph says, "My thinking is that it
7  would be on average, some weeks more, some weeks
8  less, depending on demand."
9          Is that right?
10     A.  That's correct.
11     Q.  Okay.  And then in the next bullet point,
12  it says, "Another way to think about it is my upper
13  bound over time is 2 days a week, but I hesitate to
14  commit to that many hours on advance [sic]."
15         Do you see that?
16     A.  That's correct.
17     Q.  Okay.  And, "On special weeks I would of
18  course do more, though there are weeks where less
19  might be needed."
20         Yes?
21     A.  That's correct.
22         Sorry.
23         MR. CARTMELL:  Just didn't object.  But
24  you did misread, and it's reflected in the
25  transcript, the statement before that.

Page 828

1          MS. JONES:  I don't know what you mean by
2  "the statement before that."
3          MR. CARTMELL:  You said "that many hours
4  on advance."  And it doesn't say that.  I'm just
5  alerting to that and objecting to reading of it.
6          MS. JONES:  Well, that -- that wasn't --
7  that was a -- just a mistake on my part.
8          Let me read it again.
9          The second bullet says, in the first
10  sentence, "Another way to think about it is my upper
11  bound over time is 2 days a week, but I hesitate to
12  commit to that many hours on average."
13     Q.  Did I read that correctly?
14     A.  Yes.
15     Q.  And is that an accurate recitation of what
16  you said to the Instagram Well-Being team about your
17  interest and availability for continuing to work on
18  safety issues?
19     A.  No.
20     Q.  With the team?
21     A.  No.
22     Q.  Okay.  That's not an accurate recitation
23  of what you told them?
24     A.  You left out the sentence that came after
25  that.

20 (Pages 825 - 828)

CONFIDENTIAL

Page 829

1    Q.   Well, my question is, is that first --
2  recognizing there are other sentences, which we'll
3  read, my question is, is that a component, that
4  first sentence, that my upper bound over two --
5  "over time is 2 days a week, but I hesitate to
6  commit to that many hours on average."
7    A.   Sorry, I didn't hear a question.
8    Q.   Well, I guess my question is -- let me
9  stick with my question.
10    I read that accurately, right?
11    A.   You read that sentence accurately.  It
12  does not include what was my commitment to the
13  offering at the company at the time.
14    Q.   Well, let me continue to read what you --
15  what was written at the time.
16    "On special weeks I would of course do
17  more, though there are weeks where less might be
18  needed."
19    Did I read that correctly?
20    A.   Yes.
21    Q.   And it says, "The one thing I would like
22  to -- up front about with you/Yoav is that the
23  artwork with [redacted] takes priority" -- you
24  wrote in parentheses -- "(he's 84), but usually
25  scheduled well in advance, so there will be times

Page 830

1  where I travel a couple of weeks to film/do that
2  work."
3    Do you see that?
4    A.   Yes.
5    Q.   And it goes on to say, "This is the way I
6  have been working for a while and it has not been
7  disruptive."
8    Do you see that?
9    A.   That's correct.
10    Q.   Well, why was it the case that you did not
11  ultimately end up taking on this further part-time
12  role?
13    A.   It was not offered to me.
14    Q.   Okay.
15    A.   Had I had the opportunity to continue
16  doing the work, I would have taken it because I -- I
17  mean, I -- it's so important.
18    Q.   Let me ask you just generally, Mr. Bejar.
19    Do you consider yourself to be an expert
20  on teen mental health issues?
21    A.   I consider me to be an expert on
22  developing products that address teen mental health
23  issues.
24    Q.   And I -- I'm not trying to give you a hard
25  time.  I just want to make sure that in terms of my

Page 831

1  question, do you consider yourself to be an expert
2  on teen mental health issues generally?
3    MR. CARTMELL:  Objection.  Asked and
4  answered.
5    THE WITNESS:  I mean, I think I've already
6  answered it.  But it is the knowledge that my
7  expertise is in building products that -- well, part
8  of my expertise is in building products that
9  mitigate and reduce harm.
10    But understanding that an essential part
11  of that is bringing in academic experts into the
12  product engineering teams so they can then help
13  inform with their deep lifetime expertise, the kind
14  of lifetime expertise I have in building safety
15  products, their lifetime expertise of working
16  directly with teenagers.
17    And I would not presume to know what they
18  know but I do know that the correct process is to
19  bring them into the team in order to, in
20  partnership, develop products that can be
21  effectively measured to address teen mental health
22  issues.
23  BY MS. JONES:
24    Q.   Okay.  And I think you said some version
25  of that on the first day of your deposition.

Page 832

1    That part of the reason that during the
2  time you were at the company from 2009 to 2015 that
3  you thought it was important to partner with
4  external experts on some of these issues was because
5  although you had some universe of experience, you
6  also wanted the benefit of folks who might have had
7  expertise on teen mental health issues more broadly?
8    MR. CARTMELL:  Object to form.
9    THE WITNESS:  I mean, I thought it was
10  absolutely essential if you're going to be working
11  on a tool that helps a teen with bullying to do it
12  with the person who has been studying these issues
13  in university.
14    We had different academic partners for
15  suicide prevention, for teen bullying, for
16  content-related harms.  That was Berkeley.  And so I
17  thought it wasn't good, I thought it was necessary
18  to be in partnership with them to do that work.
19  BY MS. JONES:
20    Q.   And can I take you back for just a moment
21  to your time at Yahoo!.
22    When you were in your role at Yahoo! for
23  those several years, did you have any work that was
24  specifically focused on bullying and harassment with
25  respect to teens?

21 (Pages 829 - 832)

CONFIDENTIAL

Page 833

1    A.  Yes.
2    Q.  Did you -- and what was that work?  Just
3  give me the nutshell version.
4    A.  Yeah.  So we had chat rooms and a
5  messaging product like instant messaging between
6  people.  We had groups.  And these were issues that
7  presented themselves in that context.
8    Q.  What about issues related to body image
9  and eating disorders, was that issues that you were
10  addressing at all in your role at Yahoo!
11    A.  No.
12    Q.  What about suicide and self-injury issues?
13    A.  Yes.
14    Q.  And how was suicide and self-injury coming
15  up in terms of your work at Yahoo!?
16    A.  Through chat and, again, this
17  communication products.  The social features that we
18  have.
19    Q.  I think you might have testified to this
20  already, Mr. Bejar, but your degree is in
21  mathematics; is that right?
22    A.  That is correct.
23    Q.  And you don't have any education, formal
24  education or training in psychiatry or psychology?
25    A.  No, no formal education.

Page 834

1    Q.  And you don't have any formal education or
2  training in childhood development?
3    A.  No formal education, but so much time
4  spent with experts in the area understanding the
5  considerations that go into building products that
6  serve that.
7    Q.  Sure.
8      You're not a medical doctor?
9    A.  No, my dad was.
10    Q.  Okay.  But you're not a medical doctor?
11    A.  I am not.
12    Q.  What kind of doctor was your dad?
13    A.  Pediatrics-focused ENT.
14    Q.  So --
15      (Whereupon, a brief discussion off the
16  record.)
17      THE WITNESS:  So it's ear, nose, and
18  throat focusing primarily on children.
19  BY MS. JONES:
20    Q.  Okay.
21    A.  As is my brother.
22    Q.  Interesting.
23      You're not a registered nurse?
24    A.  No.
25    Q.  You're not a social worker?

Page 835

1    A.  It depends on how you define social
2  worker.  But no.
3    Q.  Well, you understand that folks who work
4  full time in the field of social work, there are
5  degrees that one can get in that area?
6    A.  With due respect to people who do that
7  work.
8    Q.  Okay.
9    A.  All the respect in the world to people
10  that are on the ground helping people with issues
11  that they are experiencing.
12    Q.  Indeed.  And you are not a person who has
13  any special or formal training or education in the
14  field of social work?
15    A.  I am not.
16    Q.  You do not have any formal training or
17  education on the clinical diagnosis of addiction?
18    A.  I do not.  But I can tell when the company
19  does not earnestly seek to understand the issue in
20  order to establish whether there is a problem there.
21      MS. JONES:  Okay.  I'm going to move to
22  strike everything after "I do not."
23    Q.  You are not trained in any formal way to
24  evaluate whether behavior is problematic or
25  signaling addiction under any recognized clinical

Page 836

1  definition, right?
2      MR. CARTMELL:  Object to form.
3      THE WITNESS:  Can you ask the question
4  again?
5  BY MS. JONES:
6    Q.  Sure.
7      You were not trained in any formal way to
8  evaluate whether behavior is problematic or
9  indicative of addiction under any recognized
10  clinical definition, correct?
11      MR. CARTMELL:  Same objection.
12      THE WITNESS:  Again, I am trained and have
13  expertise in the context of a social media product,
14  you could identify problematic behavior, time spent,
15  amount of clicks, notifications, amount of times the
16  app was open within a short period of time.  I
17  definitely understand very well how you would engage
18  on what seems to be a, by any definition,
19  problematic or addictive use of an application.
20  BY MS. JONES:
21    Q.  And I want to just -- just so I'm clear,
22  my question was very specific.
23      Do you have formal training or education
24  in how to evaluate whether a behavior is problematic
25  or indicative of addiction under any recognized

22 (Pages 833 - 836)

CONFIDENTIAL

Page 837

1 clinical definition?
2        MR. CARTMELL: Same objection.
3        THE WITNESS: If what you're asking about
4 is have I done kind of medical study in that domain,
5 I have not.
6 BY MS. JONES:
7    Q.   And, in fact, no one has ever hired you as
8 an employee or a consultant to determine whether
9 someone is addicted to a substance or a product,
10 right?
11        MR. CARTMELL: Object to form.
12        THE WITNESS: I don't think that was ever,
13 like, in the list of things, but if you talk about
14 harms, I would assume that to be the case.
15        And in my first stint, had this been an
16 issue that the company wanted to investigate, I
17 would have been the person that -- I would have been
18 approached to study that --
19 BY MS. JONES:
20    Q.   Well --
21    A.   -- on behalf of the company and then bring
22 in the external experts to understand what the
23 issues were.
24    Q.   Okay. I want to --
25    A.   It's true of every similar issue from 2009

Page 838

1 to 2015.
2        MS. JONES: I'm going to move to strike as
3 nonresponsive, with respect.
4    Q.   No one has ever hired you as an employee
5 or a consultant to determine whether someone, an
6 individual, is addicted to a substance or product,
7 right?
8        MR. CARTMELL: Same objection.
9        THE WITNESS: -- I guess the answer to
10 that would depend on whether it's in the charter of
11 working on issues around safety and well-being. And
12 so in my mind, when I was hiring into the well-being
13 team, that was for -- given the expertise, that was
14 in the context of one of the areas where I could
15 support the well-being team had it been a priority.
16        And so I would say that I have been hired
17 to work on well-being and I believe that this is a
18 key aspect of well-being that was not called out as
19 an individual item in my description when I got
20 hired.
21 BY MS. JONES:
22    Q.   Mr. Bejar, your degree is in math, right?
23    A.   Correct.
24    Q.   Has anyone ever brought to you an
25 individual and said, Arturo Bejar, we need you to

Page 839

1 evaluate whether this person is addicted to a
2 substance or a product?
3    A.   No.
4    Q.   And while you were at Meta in either of
5 your periods at the company, you were not making
6 clinical evaluations about whether specific
7 individuals, and teens in particular, were addicted
8 to social media?
9        MR. CARTMELL: Object to the form.
10        THE WITNESS: I don't believe that there
11 was anybody at Meta making clinical evaluations
12 about teens being addicted at a time in which
13 literature, and I believe behavioral data in the
14 product, indicated that that might be a problem.
15        I think it would have been great if at the
16 time there had been people studying the issue from a
17 clinical perspective within the company and that
18 would have led to substantive product changes that
19 would have helped with that.
20 BY MS. JONES:
21    Q.   All right. Are you offering -- are you
22 familiar with the specific facts related to any
23 individual plaintiff in this litigation?
24        MR. CARTMELL: Object to form.
25        THE WITNESS: I mean, that seems like a

Page 840

1 really broad question. So I would need to have more
2 details in order to be able to be -- sort of a
3 question with "any" is like -- just feels too broad.
4 BY MS. JONES:
5    Q.   Well, have you -- are you familiar with
6 the -- of the names of any of the plaintiffs who
7 have brought claims in this litigation?
8    A.   I'm not recalling right now.
9    Q.   And you're not offering an opinion as to
10 any specific plaintiff in this litigation and
11 whether social media might have somehow caused or
12 contributed to that young person's mental health
13 concerns?
14        MR. CARTMELL: Object to the form.
15        THE WITNESS: I mean, I think I'm offering
16 many well-informed and considered opinions about the
17 general area of well-being, harms experienced by
18 teenagers, what the company could have done about
19 it, and my efforts of trying to bring those to the
20 attention of the executive team.
21 BY MS. JONES:
22    Q.   Sure.
23        My question is, are you offering an
24 opinion with respect to any specific plaintiff who's
25 brought a claim in this case?

23 (Pages 837 - 840)

CONFIDENTIAL

Page 841

1    MR. CARTMELL:  Object to the form.
2    THE WITNESS:  I believe I'm offering an
3 opinion in the general field.
4 BY MS. JONES:
5    Q.  Okay.  But you couldn't tell me today the
6 name of any of the plaintiffs in the litigation?
7    A.  I mean, I -- not immediately.  Like, I've
8 spoken to parents whose kids have tragically died
9 out of suicide or other issues and I don't know if
10 they are in -- some of the plaintiffs in this or
11 not.  And so I cannot name off the top of my head
12 right now.
13    Q.  Mr. Bejar, you are not a statistician, are
14 you?
15    A.  I'm just a mathematician.
16    Q.  No, fair enough.
17    But those are different.  Those are
18 different fields of study, right?
19    A.  No, actually, statistics is a subfield of
20 mathematics and it was one of the things that I
21 studied during my degree.
22    Q.  Well, you can have a -- you can have an
23 advanced degree in statistics specifically, right?
24    A.  Yes, you can.  I also, before I did my
25 degree in the UK that was mathematics, in Mexico I

Page 842

1 did both mathematics and I also started studying
2 actuarial sciences.
3    Q.  Okay.  But --
4    Let me just move to strike everything
5 after "Yes, you can."
6    You don't have an advanced degree in
7 statistics, right?
8    MR. CARTMELL:  Objection.  Asked and
9 answered.
10    THE WITNESS:  I believe I've answered the
11 question.
12 BY MS. JONES:
13    Q.  Okay.  And -- well, I'm actually not sure
14 you have answered the question.
15    You have what, I guess, the US equivalent
16 of an undergraduate degree in math, right?
17    A.  And pure mathematics, correct.
18    Q.  Okay.  And you don't have any advanced
19 degrees beyond that degree; is that right?
20    A.  By "advanced degrees," you refer to like a
21 master's or a Ph.D. or --
22    Q.  Yes, that's what I'm referring to.
23    A.  I do not.
24    Q.  You are not an epidemiologist?
25    A.  No, I am not an epidemiologist.

Page 843

1    Q.  Are you familiar with something known as
2 the Bradford Hill analysis?
3    A.  Yes.
4    Q.  And what --
5    A.  Vaguely.
6    Q.  And what is it?
7    A.  I am familiar with it but I can't recall
8 right now.  Like, the name -- again, as I said, we
9 talked about sometimes with proper nouns, I need a
10 little bit more context in order to be able to put
11 things together.
12    Q.  Okay.  Well, my question for the moment
13 is, can you tell me anything about what the Bradford
14 Hill analysis is?
15    A.  Is that an intensity emotional
16 measurement?
17    Q.  No.
18    A.  Okay.  Not off the top of my head.
19    Q.  Okay.  Have you ever in any of your
20 role -- roles had to conduct an analysis to
21 determine the difference -- well, let me actually
22 take a step back.
23    Do you know what the difference is between
24 association and causation?
25    MR. CARTMELL:  Object to form.

Page 844

1    THE WITNESS:  Do you mean the relationship
2 between correlation and causation?
3 BY MS. JONES:
4    Q.  No.  I mean do you know the difference
5 between association and causation?
6    MR. CARTMELL:  Same objection.
7    THE WITNESS:  I know the difference
8 between correlation and causation.
9 BY MS. JONES:
10    Q.  Okay.  Are you familiar with the term
11 "association"?
12    A.  You would have to define it in this
13 context.
14    Q.  Okay.  Could you define it for me in this
15 context?
16    MR. CARTMELL:  Object to the form.
17    THE WITNESS:  I believe I've answered that
18 question.  You would have to define it in this
19 context.
20 BY MS. JONES:
21    Q.  Okay.  Have you ever conducted any kind of
22 analysis to determine whether a relationship was
23 correlational versus causative?
24    MR. CARTMELL:  Object to form.  It's
25 vague.

24 (Pages 841 - 844)

CONFIDENTIAL

Page 845

1      THE WITNESS: So we did extensive research
2  working closely with data analytics and user
3  research under my direction where we went through
4  all of the data and the analysis with academics in
5  the room around once a week. So that was what
6  Fridays were for. And in some instances, for
7  example, you could say this piece of content made
8  the teenager express that they were having this
9  issue with this emotional intensity and I believe
10 that that set of connections is causal.
11      Which is different to say when there is
12 sort of a correlation with an issue, where you can
13 say a large number of people who experience this,
14 also experience that.
15      And I also did extensive analysis of that
16 kind during my first stint. Because in order to
17 deploy effective teen safety solutions you had to be
18 able to manage both.
19 BY MS. JONES:
20     Q. Other than what you just described, and
21 just going back to my original question, have you
22 ever conducted any kind of analysis to determine
23 whether a relationship was correlational versus
24 causative?
25     MR. CARTMELL: Objection.

Page 846

1  BY MS. JONES:
2     Q. Other than what you've just described?
3     MR. CARTMELL: Sorry about that.
4     MS. JONES: That's okay.
5     MR. CARTMELL: Object to the form. Asked
6  and answered.
7     THE WITNESS: I mean, if you say "any"
8  that just -- that opens up a very large universe of
9  things. And I would have to search for other
10 examples. I hope -- like the most relevant one that
11 came to mind, I think it is -- it is very likely
12 that I have done other things, but that's -- this
13 is -- the body of work that's applicable in this
14 context is the one that first comes to mind on that.
15 And I had many years of doing that.
16      Again, every Friday was dedicated to doing
17 that, not just for teenagers, it was also for, like,
18 suicide, for everybody, and in other areas of harm.
19 BY MS. JONES:
20     Q. When you say every Friday was devoted to
21 doing that, what -- let me just make sure I
22 understand kind of what we're talking about.
23      During what -- are you talking about one
24 of your stints at Meta?
25     A. Yeah, what you refer to as Meta 1.

Page 847

1     Q. Okay. So when you say every Friday was
2  devoted to that, what are you referring to
3  specifically?
4     A. I'm referring that Fridays were dedicated
5  to hands-on work, even though I was a senior leader
6  for the area, on what I was called the compassion
7  team. And so usually, they would start with a two-
8  to three-hour meeting that combined user research,
9  data analytics, product development, content
10 strategy, so the language, and engineering. And
11 then we would look at the results of both product,
12 behavior, and survey data in order to, with the help
13 of the academics in the room, interpret those.
14      And then the rest of the day was dedicated
15 to having conversations with engineers, product
16 managers, data scientists, and other areas of the
17 company on what would be the next steps to improve
18 the solutions that we had done based on what we had
19 learned from data in the morning.
20      And sometimes things were causal and
21 sometimes things were correlation. Sometimes you
22 could take something that was a correlation and not
23 establish causality. And sometimes there were
24 things that you could connect more tightly with each
25 other and both required different approaches in what

Page 848

1  we were developing.
2     Q. Were you -- in your -- what we'll refer to
3  as Meta 2, in your second stint with the company
4  from 2019 to 2021, did you ever conduct any kind of
5  analysis to determine whether a relationship was
6  correlative versus causative?
7     A. I tried. But the challenge there was that
8  I couldn't for the -- because of the way things were
9  prioritized, I couldn't get changes to, for example,
10 the reporting flow.
11      In order for the reporting flow to
12 generate information about causality, which it can
13 do -- a reporting flow that's well-designed that's
14 meant to engage with teenagers and ask questions
15 about intensity, allows you to accurately say, yeah,
16 given this piece of content this team had this
17 response and this is how bad it is and that's
18 essential data to do that.
19      And I tried to do that in the documents
20 you see here. I tried to work with the -- that team
21 that was responsible for the reporting tool on
22 Instagram to make those changes, but I couldn't do
23 that.
24      I also tried to change block so that you
25 could block somebody and then provide more context,

25 (Pages 845 - 848)

Page 849

1 which again, will allow you to establish better
2 causation given this interaction, this chat, this
3 person blocked because it was an unwanted advance.
4 So in that context you could have done that
5 analysis. But we couldn't that. We couldn't do
6 those changes.
7        The organization wouldn't prioritize that
8 work. And I believe it was because they were not
9 looking at the data of harm that then you go, like,
10 how do you go from there to -- to product
11 interventions that help establish causality.
12        And so that's why I focused my efforts on
13 the data that would say, given this sort of large
14 bodies of work of people that are experiencing harm, how do
15 you use that to then guide future changes that then
16 would allow you to establish causality so you can
17 more effectively address the issues. Which I had
18 done in my first stint many times over in different
19 contexts.
20    Q.    Mr. Bejar, do you have any advanced
21 degrees in any field of the social sciences? And by
22 that I mean psychology, sociology, economics, any of
23 those areas?
24    A.    I do not.
25    Q.    Do you know that there are, in fact, at

Page 850

1 Meta individuals who have advanced degrees,
2 including doctorate degrees, in some of those areas?
3    A.    Yes, I have worked closely with many of
4 them.
5    Q.    Okay. Are you familiar with the term
6 "peer-reviewed literature"?
7    A.    Yes.
8    Q.    And just so the jury understands,
9 generally speaking, when something is peer-reviewed,
10 it is a piece of work or analysis that is submitted
11 to experts who evaluate the quality of the research.
12        Are you generally familiar with that
13 process?
14    A.    I'm actually -- sorry. Go ahead.
15        MR. CARTMELL: Object to the form.
16        THE WITNESS: I am actually very familiar
17 with that process because during my first stint, we
18 brought in these academics with the deep expertise
19 as independent contractors, in the same way that I
20 was brought back in, so that they could have, in a
21 way, that honored privacy and security full access
22 to the data that they would then use with
23 appropriate safeguards to study the impact of the
24 interventions that we were having based on the raw
25 data of the product, for example, details of the

Page 851

1 bullying reporting flows.
2        (Whereupon, a brief discussion off the
3 record.)
4        THE WITNESS: Of the teen safety tool that
5 included things that weren't called bullying and
6 harassment but had many categories. So we had these
7 teen safety tools.
8        And so ▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ from
9 Yale came in. And part of the reason of having the
10 external scientist to be embedded in the team was so
11 that they could generate datasets that then could be
12 used for peer review in order to publish papers that
13 were well understood about the work that we had
14 done.
15        And we also thought that it was important
16 for these people to be independent from the company
17 so they're not part of the reporting structure of
18 the company because then the -- their academic
19 integrity with regards to the studies that they were
20 doing would be very high because they had to go
21 through all of their external processes for the
22 claims that they were making and all of this sort of
23 review processes that you have just described.
24        And so during my first stint, I supported
25 that kind of independent academic going in and I was

Page 852

1 very familiar with this process because as a leader
2 responsible for the area, I also wanted to make sure
3 that the full data was available, which is
4 tragically not the case today, for academics to
5 understand how harm actually played out in the
6 product.
7        But that that same data was responsibly
8 exported with the right privacy anonymization,
9 protections against for identification that allow
10 for an effective peer review of the papers that they
11 had published. And there were multiple papers
12 published by independent academics from Yale, and I
13 believe, Berkeley. And I'm forgetting right now the
14 university that we partnered with for the suicide
15 and self-harm work that were a result of this kind
16 of independent expert having access -- whole access
17 to the data.
18        And so yeah, I am very familiar with those
19 processes.
20 BY MS. JONES:
21    Q.    You -- would you agree that the
22 peer-review process is an important part of the
23 research and scientific process overall?
24    A.    Absolutely.
25    Q.    Okay. Have you ever published anything in

26 (Pages 849 - 852)

CONFIDENTIAL

Page 853

1 the peer-reviewed literature on the subject of teen
2 mental health?
3     A.   When we did the initial work, I was
4 offered to be one of the authors on some of these
5 papers that other people in the team were.  And I
6 declined to do that because I felt that the work, as
7 it continues to be today, wasn't about me.  It was
8 about sort of the integrity of the process and the
9 people who were doing, like, the academics that were
10 doing the work, the product managers, the engineers,
11 the data scientists that were on the ground doing
12 that, and I had a very deep and active role within
13 that.
14         But, again, it was always from a point of
15 my core expertise is in building safe and secure
16 products and I will defer in particular to external
17 academic experts to their expertise and lifetime of
18 work in the area.
19         And I do recall in my second stint having
20 conversations with different Ph.D.-level people that
21 I had also worked with in my first stint.
22         I think, for example, ███████ is an
23 example of a name like that.  Of course ██████
24 ███████ who is credibly talented.  And having many
25 conversations about how they struggled to do the

Page 854

1 kind of research that they felt was necessary in
2 order to understand the harm that was playing out on
3 the platform as well as understanding sort of the
4 well-being and the positive impacts that the
5 platform had.
6         And so I think one of my concerns was, for
7 the internal researchers, is that they didn't feel
8 that they could appropriately study the harms
9 because of the environment that I described in the
10 last couple of days.
11     Q.   Mr. Bejar, with apologies and with
12 respect, I'm going to move to strike that answer as
13 nonresponsive.
14         My question was simply, have you, Arturo
15 Bejar, published in the peer-reviewed literature on
16 the subject of teen mental health?
17     A.   I was offered to participate in publishing
18 papers around bullying and harassment and issues
19 that were affecting teen well-being.  I declined to
20 participate.  I am very familiar with the process.
21     Q.   And have you ever published in the
22 peer-reviewed literature on the subject of addiction
23 or so-called problematic use?
24     A.   I really appreciate that you called it
25 so-called because I think that's a good way of

Page 855

1 describing the label of problematic use.
2     A.   I have not.
3     MS. JONES:  And I'm going to move to
4 strike everything before "I have not."
5     Q.   Mr. Bejar, you have a website where you've
6 posted various essays with your thoughts on how to
7 address some of the issues you flagged in your
8 deposition testimony when it comes to teenagers and
9 the use of social media, yes?
10     A.   That is correct.
11     Q.   You have -- none of those essays have been
12 published in any peer-reviewed journal; is that
13 right?
14     A.   They have not.
15     Q.   I think at various points in your
16 deposition you have testified about speaking with
17 parents about some of these issues and I think you
18 specifically have talked about speaking to parents
19 who might have tragically lost their children to
20 suicide.
21         Am I correctly recalling that?
22     A.   Yes.
23     Q.   Roughly, how many parents have you spoken
24 to about these issues?
25     A.   Seven.

Page 856

1     Q.   Seven parents total?
2     A.   Actually, let me be more specific.
3     Q.   Okay.
4     A.   Seven parents who had good cause to
5 believe, rightly so, that it was through Instagram
6 that they have experienced this issues.
7         I think that the number of parents that I
8 have spoken to that have experienced these issues on
9 TikTok and on Snapchat is probably closer to 40
10 parents.
11     Q.   Okay.  And just focusing for a moment on
12 the parents you've spoken to on these issues with
13 respect to Instagram, I just want to make sure I
14 understand the number of teens we're talking about.
15         Are we talking about a mom and a dad?  How
16 does that break down in terms of the actual kids
17 involved?
18     A.   Yeah, I mean, I have a list -- I don't
19 have it with me -- of the parents with their names
20 and the ages of the kids when they died, the
21 circumstances under which it happened, and the
22 parents' process around it.  I think it was probably
23 around six moms and one dad.
24         And of the larger group I believe that it
25 was -- there were definitely a lot more dads in the

27 (Pages 853 - 856)

CONFIDENTIAL

Page 857

1 larger group of kids who have committed suicide, for
2 example, after seeing a challenge on TikTok. And so
3 those were a few dads that I spoke to.
4     Q. Okay. And the conversations that you've
5 had with the six moms and one dad with respect to
6 Instagram, when have you had those discussions?
7     A. I -- my first round of discussions with
8 them was in the early part of -- it was after my
9 testimony on the early part of 2024. I think it was
10 primarily the day that Mark Zuckerberg got --
11 testified in front of the Senate. I believe that
12 was in March of 2024.
13         And then as part of my preparation for
14 coming here, I sought out parents and I just wanted
15 to make sure that I understood their experience with
16 what happened to their kids and -- and sort of the
17 names and ages of their kids. And I did that in the
18 last month.
19     Q. And I just want to make sure I understand
20 the chronology and the groupings of people that
21 you're talking about.
22         The discussions that you mentioned in
23 terms of starting in early 2024, roughly, and sounds
24 like leading up to right before your deposition,
25 would that have been inclusive of parents who have

Page 858

1 had kids who were using Instagram and also parents
2 who had kids who were using TikTok and Snap?
3     A. Yes.
4     Q. Okay.
5     A. The universe of parents was parents
6 that -- whose kids have suffered or lost their lives
7 to social media harms.
8         And then the conversations that I had more
9 recently so I could be fresh and accurate on my
10 details were the parents of kids who lost their
11 lives through interactions that I -- very recently
12 have to do with the way Instagram was designed.
13     Q. And when you say "more recently" you mean
14 the last month?
15     A. That is correct.
16     Q. Other than those conversations that you
17 have described, Mr. Bejar, have you done any kind of
18 broader systematic survey work with respect to
19 parents of teenagers using social media platforms?
20         MR. CARTMELL: Object to the form.
21         THE WITNESS: I've done a broad -- oversaw
22 a broad systematic survey of teenagers and adults
23 experiencing harm on Instagram.
24 BY MS. JONES:
25     Q. Are you referring to BEEFs?

Page 859

1     A. Yes.
2     Q. Okay. Other than BEEFs, have you done a
3 systematic survey with respect to parents of
4 teenagers using social media platforms?
5     A. I mean, the only other thing that
6 immediately comes to mind on this is last summer I
7 was at the Family Online Safety Institute forum that
8 is all sort of safety professionals, and I spoke
9 about parental controls and I asked the audience if
10 anybody in the audience had used Instagram's or
11 their other products' parental controls and found
12 them useful and nobody raised their hand.
13     Q. Okay. Any other examples that you can
14 recall where you've done some kind of systematic
15 survey of parents of teenagers who have used
16 Instagram?
17     A. Not that I can recall. Many conversations
18 with parents, though, over the years.
19     Q. Understood.
20         Mr. Bejar, do you have any formal training
21 or education in survey methods?
22     A. I have many years of experience with -- I
23 managed a team that did that. And I also worked
24 very closely with Dacher Keltner who is a top -- oh,
25 let me spell that out. D-A-C-H-E-R K-E-L-T-N-E-R --

Page 860

1 who is a professor at Berkeley who has dedicated his
2 life to studying these kinds of issues.
3         And so I've spent significant amount of
4 time with him and with the person who became the
5 head of research at Instagram working on the design,
6 deployment, execution of surveys, what the questions
7 were, sort of methodological considerations around
8 that.
9         And it was always done in partnership
10 between user research and data science so we could
11 make accurate representations of what the survey
12 conveyed.
13     Q. And other than what you've just described,
14 Mr. Bejar, do you have any formal training or
15 education in the survey methods?
16     A. If by formal training you mean did I go to
17 a university and study these areas, I did not.
18 Similar to, like, for example, I did not study
19 computer science but I have been coding since I was
20 ten, and have actually multiple patents on very
21 complex computer science issues.
22         MS. JONES: Okay. I'm going to move to
23 strike everything after "I did not."
24     Q. Mr. Bejar, do you know what an
25 institutional review board is?

28 (Pages 857 - 860)

CONFIDENTIAL

Page 861

1  A.  Yes.
2  Q.  What is it?
3  A.  So, for example, when we worked with ████
4  ████ from Yale, and this was part of the
5  processes we had in place during my first stint, we
6  needed to make sure that the studies that we had
7  conducted with Yale were cleared by the
8  institutional review board of Yale so that we could
9  follow the right processes and procedures.
10  Q.  And have you as -- in any of your roles,
11  drafted questions for review by an institutional
12  review board?
13  A.  I have not -- oh, actually, wait.  Yes, I
14  have because the -- the -- in the work that we did
15  with, again, ████████, I did help craft the
16  language for those things that then ████████
17  submitted to review on some of the papers that -- I
18  don't recall how many of those got published, but I
19  was part of that process and I was part of the
20  drafting of the questions that went -- that were
21  submitted.
22  Q.  Other than that occasion, have you had
23  occasion to draft questions for the institutional
24  review board?
25  A.  If you say occasion as singular, then I

Page 862

1  would say yes, I believe I have done that on
2  multiple occasions.  As far as I can recall right
3  now, in the context of the papers that ████████
4  published and, say, sort of think about it, it's
5  likely that I did that as well in the papers that
6  Dacher Keltner worked to publish.
7  But, again, this work was some time ago
8  and I don't recall which papers eventually got
9  published but I was part of the process of how the
10  work was going to be studied within the context of
11  Facebook, also because there's a lot of
12  responsibility on how you do that in the context of
13  a social media product.  And so that was -- I was
14  responsible for that part.
15  Q.  And, Mr. Bejar, if we were to do a
16  literature search across the peer-reviewed
17  literature on teen well-being issues, would we find
18  any articles on which you are an author or coauthor?
19  MR. CARTMELL:  Object to the form.
20  THE WITNESS:  As I believe I've already
21  said, I was offered and I declined because, again,
22  the work was about the work, and at that point, I
23  had, like, all kinds of recognition in different
24  contexts and I didn't think it was appropriate.
25  ///

Page 863

1  BY MS. JONES:
2  Q.  You've offered a number of opinions, as I
3  have heard your testimony, and you can tell me if
4  I've gotten this wrong, about what Meta should have
5  shared or not with parents about certain issues
6  related to their children's use of Instagram.
7  Is that a fair summary?
8  A.  Absolutely.
9  Q.  Okay.  Are you offering views as an expert
10  on warnings that should be associated with products?
11  MR. CARTMELL:  Object to the form.
12  THE WITNESS:  I'm offering views as an
13  expert with actually a track record of essential
14  transparency when it came to issues of suicide, harm
15  teenagers were experiencing in the product, as well
16  as many other kinds of harms that were regularly
17  presented publicly in events sponsored by the
18  company, ended up in papers that were peer-reviewed
19  and went through the processes that you just
20  described, and also were shared with other companies
21  in great detail because the topic of safety was
22  something that was essential to the industry.
23  BY MS. JONES:
24  Q.  Let me just -- and I'm not trying to give
25  you a hard time.  I just want to make sure I

Page 864

1  understand the answer to my original question.
2  Are you offering views as an expert on
3  whether a warning should be associated with a
4  certain product?
5  MR. CARTMELL:  Object to the form.
6  THE WITNESS:  I deeply believe that
7  Instagram, as implemented today and as evidenced by
8  the videos and all of my testing of safety features,
9  needs warnings because parents have no idea what
10  they're handing their kids when they hand their kids
11  a phone and tell them it's okay to open an Instagram
12  account.
13  BY MS. JONES:
14  Q.  Have you ever been responsible for
15  deciding what kind of -- and by "what kind of," I
16  mean what specific language in a warning should be
17  associated with the product or a service?
18  A.  I have been involved many times in the
19  case of, sort of, security incidents on the language
20  that can -- that talks about what the product
21  accurately describes as what it does do and it
22  doesn't do.
23  And so I definitely since my time at
24  Yahoo! and during my first stint at Facebook, upon
25  external inquiry and conversations with the press, I

29 (Pages 861 - 864)

CONFIDENTIAL

Page 865

1 would help craft the language that accurately
2 described what the product did do and did not do.
3    Q.  Let me ask you this and for the moment I'm
4 just asking yes or no and then I will give you a
5 chance to explain.
6        Have you come up with a specific warning
7 that you believe should be associated with
8 Instagram?
9        MR. CARTMELL:  Object to the form.  And
10 move to strike the statement of counsel.
11 BY MS. JONES:
12    Q.  Let me ask a better question.
13    A.  Let me actually answer your question.
14    Q.  Well, no -- I'm going to withdraw my
15 question because I can ask a better one.
16 Mr. Cartmell can make his objection, but I'm going
17 to ask you a different question.
18        My question is, before you got to your
19 deposition on Monday, had you formulated the
20 language of a specific warning that you believe
21 should be associated with Instagram?
22        MR. CARTMELL:  Same objections.
23        THE WITNESS:  I believe so.
24 BY MS. JONES:
25    Q.  Did you write it down anywhere?

Page 866

1    A.  I would have to search my e-mail but in
2 many conversations I have had with reporters I have
3 said that Instagram, as it is designed today, is not
4 safe for a 13-year-old.  And I believe that
5 accurately describes a warning that I believe should
6 be on Instagram as it is designed today.
7    Q.  And let me make sure I understand.
8        Your testimony is that it's possible that
9 somewhere you have written down the specific
10 language of a warning that you think should be
11 associated with Instagram?
12    A.  I believe that in conversations that I've
13 had with reporters and, again, I don't know if
14 that's in testimony or not, I have said several
15 times, and I will say this today under oath, that
16 Instagram, as currently implemented, is not safe
17 enough for a 13-year-old.  And I believe that is a
18 warning and I believe that should be in the product.
19 And I believe parents should know this.
20    Q.  I understand you've had conversations on
21 this point.  My question is really more focused on
22 whether you have -- you think you might have
23 documented somewhere in writing that that language
24 needed to appear on Instagram?
25    A.  I believe that I would need to look at my

Page 867

1 e-mail to be able to authoritatively say that -- I
2 mean, this is something that I have been saying,
3 and, again, I would need to search my e-mail to see
4 if I wrote it, in particular after I did my
5 initial -- both from the initial findings, which are
6 of BEEF, which are bad enough to necessitate a
7 warning.  But most particularly, after I experienced
8 the content and the kind of contact I saw in the
9 product through the testing that I did.
10    Q.  If you find that you have somewhere
11 written down a specific warning that Instagram is
12 not safe for a 13-year-old, may I have your
13 agreement that you will produce that because I do
14 think it's responsive to the subpoena that you've
15 been served with.
16    A.  I would look to my counsel for guidelines
17 on any such matters.
18        MR. WARD:  I don't believe it is
19 responsive but I would be happy for counsel to point
20 out where that is requested and if it is, we will
21 produce it.
22        MS. JONES:  Okay.  And if it exists we
23 will look to receive it.
24    Q.  All right.  Now, you said that the warning
25 that should be applied is that -- actually, let me

Page 868

1 back up a moment.
2        You wrote very specific e-mails to Adam
3 Mosseri and Sheryl Sandberg and Mark Zuckerberg in
4 the fall of 2021; is that right?
5    A.  That is correct.
6    Q.  And in those e-mails, which you've been
7 shown by counsel, you laid out your thinking around
8 things that the company should do differently and
9 better to reduce harms to young people, right?
10        MR. CARTMELL:  Object to the form.
11        THE WITNESS:  In that the e-mails had
12 different components.  Some of it was my
13 recommendations about actions to the company.  Other
14 components of it included data that had been
15 developed by the well-being team.  And in
16 particular, the data around the ratio of bad
17 experiences to reports to content action.
18        And then there was also the data from the
19 BEEF survey.  And so I do not consider those things
20 to be my opinion at all.  I think those things are
21 sort of ground truth of -- as studied by Instagram's
22 own team of harm as it happens in the product.  And
23 so -- and I believe I also included some recounting
24 of firsthand experiences with my daughter as well.
25 ///

30 (Pages 865 - 868)

Page 869

1 BY MS. JONES:
2     Q.  Okay.  Did you, in any of those
3 communications in the fall of 2021, communicate to
4 Mr. Mosseri -- actually, let me take another step
5 back.
6         At what point exactly did you reach the
7 conclusion that Instagram was not safe for a
8 13-year-old?
9     MR. CARTMELL:  Objection.  Asked and
10 answered.
11     THE WITNESS:  When I realized that the
12 executive team, as you just described it, the people
13 I sent the e-mail to, were aware of their reach of
14 the harms that had -- just talked about and about
15 the inadequacy of prevalence of successfully
16 mitigating the harm that people were experiencing.
17         My experience in the industry when it came
18 to these kinds of issues for all of the time that I
19 had been working, especially my time at Yahoo! and
20 my first stint at Meta, is that you -- if the
21 executive doesn't know about an issue, the
22 responsibility is to bring it to their attention.
23 That's my responsibility.
24         And their responsibility is to initiate
25 meaningful efforts to understand, address, and

Page 870

1 reduce those things effectively.  And as long as you
2 do that, when you first learn of harm and then you
3 act on it, then generally it's okay.  It's like --
4 and so when I first testified for the FTC, it became
5 very clear to me at that point in time that even
6 though there was material, meaningful data of harm
7 experienced by people in the product, and knowing
8 how fast the company is able to deploy changes when
9 it is a priority, like lots of firsthand experience
10 and knowledge of that, by the time I testified, the
11 company had not deployed any visible changes that
12 would have reduced the harms.  Then I went and
13 tested and I found the harms.  And so faced with the
14 company that given material data of harm doesn't act
15 on it, I believe that warning like that is
16 absolutely necessary.
17 BY MS. JONES:
18     Q.  So you concluded that warning should
19 be attached to Instagram after your deposition in
20 February of 2023?
21     MR. CARTMELL:  Object to the form.
22 Mischaracterizes.
23     THE WITNESS:  I -- I mean, these things
24 are a process over time, and I think that throughout
25 2023 and in the beginning of 2024, as I talked to

Page 871

1 parents and I looked at the data, and I also looked
2 at the safety features that were being announced, I
3 just -- each time these things happened -- and I
4 would -- I want to say for the record, it's so
5 important, I would deeply love to be able to say,
6 like, I think it's important to have a product that
7 is safe for a 13-year-old that's designed with them
8 in mind that helps them when they experience harm
9 that has impeccable transparency about the harms
10 that they experience and that works in full
11 transparency with academics as to those harms with
12 the kind of processes that you described.
13         And in the absence of that, I have come to
14 this conclusion and is that the only warning, I
15 don't know.  I mean, that there's people with
16 expertise as to how these things apply.  But if the
17 bottom line is should people be warned as things
18 stand today, I would say absolutely.
19 BY MS. JONES:
20     Q.  And, Mr. Bejar, the specific warning that
21 you, I think, described was that Instagram is not
22 safe for a 13-year-old?
23     A.  Yes.
24     Q.  Am I recalling that correctly?
25     MR. CARTMELL:  Object to form.

Page 872

1 Mischaracterizes.
2 BY MS. JONES:
3     Q.  What about for a 14-year-old?
4     A.  It's not safe for a 14-year-old.  I would
5 say probably under 16 is -- it's -- yeah, it's
6 pretty -- it's pretty grim.
7     Q.  Mr. Bejar, do you have any kind of
8 regulatory background?  And by that I mean have you
9 ever worked for any kind of regulatory agency?
10     A.  In my -- in my work at Yahoo! and in my
11 work for Meta, I regularly interfaced -- was the
12 interface for the -- on the company's behalf with
13 different regulatory agencies, including, for
14 example, giving a talk to all of Facebook
15 engineering about the critical things that you have
16 to do to avoid an FTC consent degree.  That was
17 hosted by Mike Schroepfer, the CTO.
18     Q.  Okay.  And just to bring you back to my
19 question, have you ever -- and let me be a little
20 bit more precise in my question.
21         Have you ever been employed by any
22 regulatory agency?
23     A.  I have not been employed by a regulatory
24 agency.
25     Q.  And on this issue of warnings, you have

31 (Pages 869 - 872)

CONFIDENTIAL

Page 873

1  suggested, at least one, that Instagram is not safe
2  for a 13-year-old.
3          Have you done any kind of systematic
4  survey work of parents to evaluate whether that
5  warning would change decision-making with respect to
6  whether parents allow a teenager to use Instagram or
7  not?
8          MR. CARTMELL: Object to the form.
9  Mischaracterizes his testimony.
10          THE WITNESS: I mean, isn't, like, really
11  that the work, right? I mean, I wish that
12  Instagram's parents product -- the parental control
13  products adequately described to parents the harms.
14  And that in a way that I know Instagram and Meta can
15  do would study the effects of sort of the warnings
16  and behaviors and conversations to really create a
17  product that helps inform parents about the harms,
18  rather than as the parental controls sort of press
19  releases say, so that parents don't have to worry
20  about the content and contact that their kids
21  experience.
22          We have done all of this work. And so I
23  really wish that there was a team dedicated at
24  effectively warning parents. I have done
25  significant work in effective security notices and

Page 874

1  see what drives behavior or not. And so that's an
2  area where I have experience --
3  BY MS. JONES:
4          Q. Well --
5          A. -- in the context of Meta and Facebook --
6  I'm sorry -- and Yahoo!
7          Q. My specific question, Mr. -- and let me
8  actually take a step back.
9          You testified under questioning by
10  Mr. Cartmell and Mr. Phelps Monday and yesterday,
11  right?
12          A. Correct.
13          Q. And during the course of that testimony, I
14  don't have a recollection, and you can tell me if
15  I'm wrong about this, of you sharing any data from
16  survey or other research that you had done to
17  determine whether a warning to parents would change
18  their behavior with respect to whether they permit
19  their teenagers to use Instagram.
20          Have you done such work?
21          MR. CARTMELL: Object to the form.
22  Mischaracterizes.
23          THE WITNESS: If the question is have I
24  done a systematic survey of parents to establish how
25  they would respond to a warning? Is that what

Page 875

1  you're asking?
2  BY MS. JONES:
3          Q. Yes.
4          A. I have not.
5          Sorry, how long have we been going?
6          MS. JONES: I don't recall. We can take a
7  break here. I actually just have a little bit in
8  this section left and then we -- that would be a
9  logical breaking point. But if you need a break
10  right this moment we can take a break right this
11  moment.
12          THE WITNESS: Let's go a little longer.
13  I'm just sort of flagging. It's kind of been a
14  little while.
15          MS. JONES: I'm -- when I get to the
16  bottom of this page we'll take a break. Does that
17  work?
18          THE WITNESS: Thank you.
19          MS. JONES: Okay. Is that okay with you,
20  Madam Court Reporter?
21          (Whereupon, a brief discussion off the
22  record.)
23  BY MS. JONES:
24          Q. Mr. Bejar, as I understand your testimony,
25  in a variety of settings with respect to your

Page 876

1  daughter's experience on Instagram, you were
2  concerned about some of the things that she
3  encountered on the platform.
4          Is that a fair characterization?
5          A. Yes. And the lack of support --
6          Q. Understood.
7          A. -- that she got.
8          Q. Okay.
9          A. Or help.
10          Q. Sure.
11          And to the extent that you've offered
12  views on how to fix or address some of the issues
13  that your daughter might have experienced on
14  Instagram, are those your opinions?
15          A. I just want to say "daughter might have
16  experienced" --
17          Q. And let me just stop. I was not
18  suggesting that your daughter did not have those
19  experiences.
20          A. Thank you.
21          Q. I don't want to get hung up on that.
22          A. That is very important.
23          Q. Yeah, let me take a step back.
24          To the extent that you have thoughts or
25  views on what your daughter experienced on

32 (Pages 873 - 876)

CONFIDENTIAL

Page 877

1  Instagram, those are your opinions, correct?
2       MR. CARTMELL: Object to the form.
3       THE WITNESS: Sorry. I find the question
4  confusing. Could you please repeat it?
5  BY MS. JONES:
6    Q.  Certainly. If I can find it. Hold on.
7       To the extent that you have thoughts or
8  views that you've shared on what your daughter
9  experienced on Instagram, those are your opinions;
10  is that right?
11       MR. CARTMELL: Same objection.
12  Mischaracterizes.
13       THE WITNESS: I'm sorry. Are you saying
14  that the thoughts that I have offered about my
15  daughter's experience on Instagram, it's my opinion
16  that that was my daughter's experience?
17  BY MS. JONES:
18    Q.  No. And you know what, my question was
19  not well framed.
20    A.  Thank you.
21    Q.  To the extent that you've offered views on
22  how to address some of the issues that your daughter
23  experienced on Instagram, are those your opinions?
24       MR. CARTMELL: Same objections.
25       THE WITNESS: So -- so I think it's

Page 878

1  important to say daughter experienced, then sort of
2  lifetime of expertise building products that help
3  identify and reduce these harms, opinions, right.
4  Because I'm not doing this -- my daughter is 20 now
5  and she is doing well and I'm so grateful that she
6  could talk to me about these experiences.
7       Because I shudder to think all of the
8  kids, given the BEEF results, that are having these
9  experiences that don't talk to their parents or
10  someone they trust about it, I think that's
11  incredibly harmful. And that was backed up by the
12  very early knowledge about how harm impacts teens.
13       But the suggestions and opinions are not
14  about my daughter. They are about how you would
15  generally measure and understand unwanted sexual
16  advances. What would be product interventions that
17  would establish causal data between a piece of
18  content and a teenager telling you that they are
19  experiencing an unwanted sexual advance. And
20  then -- and then sort of the remediation factors
21  that would reduce that harm.
22       And so -- I mean, there is -- I want to be
23  mindful of time. There's I think a very relevant
24  example that I can offer but I will stop here
25  because I want to make sure you get through all of

Page 879

1  your questions.
2  BY MS. JONES:
3    Q.  I want to make sure of that, too, so I
4  appreciate the courtesy.
5       Mr. Bejar, has any court ever determined
6  that you are qualified as an expert to offer
7  opinions on the issues you've testified about for
8  the last two days?
9       MR. CARTMELL: Object to the form.
10       THE WITNESS: I mean, my experience
11  testifying on this is like FTC deposition, the
12  Tennessee Senate Judiciary Committee, and here. And
13  I don't have sort of term of art knowledge of how
14  the court sees me.
15  BY MS. JONES:
16    Q.  Okay. Well --
17    A.  Because I know these are special words
18  with very specific meaning.
19    Q.  Sure.
20       And I'm just asking as a factual matter,
21  do you know if in any proceeding a court has
22  determined that you are qualified as an expert to
23  offer opinions on these issues?
24       MR. CARTMELL: Same objection.
25       THE WITNESS: I'm not aware if I have or I

Page 880

1  haven't.
2       MS. JONES: Okay. Why don't we take a
3  break.
4       THE VIDEOGRAPHER: Time is 11:11. We're
5  off the record.
6       (Whereupon, a brief recess was taken.)
7       THE VIDEOGRAPHER: Time is 11:32. We're
8  back on the record.
9  BY MS. JONES:
10    Q.  Mr. Bejar, welcome back.
11       Let me -- can I ask you to grab what
12  should be in your stack as Exhibit Number 49. I
13  just wanted to follow up on one quick thing.
14       (Whereupon, Meta-Bejar Exhibit 49 having
15  been previously marked, was introduced.)
16  BY MS. JONES:
17    Q.  This is the e-mail exchange that I believe
18  Mr. Phelps showed you yesterday related to the
19  oversight board?
20    A.  That is correct.
21    Q.  Okay. And the date of at least the
22  most -- the latest e-mail appears to be -- well, it
23  generally is in the September 2024 time range; is
24  that right?
25       You can flip through and see if you'd like

33 (Pages 877 - 880)

CONFIDENTIAL

Page 881

1 to...
2    A.  That is correct.
3    Q.  Okay.  I wanted to ask you specifically
4 about -- and just to remind the jury, you did a
5 presentation for Meta's oversight board in the fall
6 of 2024; is that right?
7    A.  Yes.
8    Q.  And how did that come about?
9    A.  Manu reached out to me.
10        (Whereupon, a brief discussion off the
11 record.)
12        THE WITNESS:  ████████████ with
13 whom I had done a prior -- I had done a prior
14 engagement for the oversight board.
15 BY MS. JONES:
16    Q.  What was the prior engagement with the
17 oversight board?
18    A.  I helped the oversight board opinion as a
19 technical consultant around CrossCheck.
20    Q.  Had you had any other engagements with the
21 oversight board?
22    A.  No.
23    Q.  Can you turn for me -- and this,
24 Exhibit Number 49, is a document that your counsel
25 produced on your behalf, right?

Page 882

1    A.  Correct.
2    Q.  Can you turn for me to the page that
3 ends -- if you're looking in the upper right-hand
4 corner -- dot 135.
5    A.  Yes.
6    Q.  And down at the bottom of that page, there
7 is an e-mail from -- how do you pronounce the last
8 name?
9    A.  Parra.
10    Q.  Parra.  Okay.
11        An e-mail from Mr. Parra dated
12 September the 4th, 2024, right?
13    A.  Correct.
14    Q.  And he writes to you, "Hi Arturo, Hope
15 this e-mail finds you well!  It's been a long time
16 since we last chatted but this is a direct follow up
17 to the offer you made a while back on engaging with
18 the Board on all your work/views on teen mental
19 health."
20        Do you see that?
21    A.  Yes.
22    Q.  And I want to just focus your attention on
23 that reference to "this is a direct follow up to the
24 offer you made a while back."
25    A.  Correct.

Page 883

1    Q.  What offer had you made -- well -- let me
2 start by asking.
3        Do you know what he's referring to there?
4    A.  Yes.
5    Q.  What offer had you made?
6    A.  Manu asked me if I was willing to talk --
7 Manuel Parra, Mr. Parra, asked me if I was willing
8 to talk to the oversight board about these issues.
9 And I offered to do that.
10    Q.  When did he ask you that?
11    A.  I don't recall.
12    Q.  But it was before September 4th, 2024?
13    A.  Yes.
14    Q.  Do you know how far in advance of that it
15 was?
16    A.  I don't recall.
17    Q.  Do you know in what setting he made that
18 request?
19    A.  I don't recall.
20    Q.  And do you know what prompted his request
21 for that?
22    A.  I do not.
23    Q.  Okay.  And just so the jury understands,
24 you are not a member of Meta's oversight board, are
25 you?

Page 884

1    A.  I am not.
2    Q.  Have you ever been a member of the
3 oversight board?
4    A.  I have not.
5    Q.  You can put that to the side.
6    A.  Okay.
7    Q.  Mr. Bejar, do you agree that social
8 media -- and I'm not just talking about Instagram.
9 I'm talking about social media broadly -- can have
10 benefits?
11    A.  Yes.
12    Q.  And do you agree that social media can
13 have benefits for younger users, including
14 teenagers?
15    A.  Yes.
16    Q.  Social media can be a valuable source of
17 community for teenagers; is that fair?
18    A.  Yes, that's fair.
19    Q.  And that's -- that can be the case for
20 teenagers who might be part of a marginalized
21 community, right?
22    A.  Yes, that is correct.  And one of the most
23 disturbing findings when I started working for
24 Instagram is that Instagram was aware of people in
25 marginalized communities, being LGBTQ people and

34 (Pages 881 - 884)

CONFIDENTIAL

Page 885

1  people of color, experiencing harm through the
2  product and they were not doing work to address it.
3        That must have been in, like, almost like
4  the first week or two because we were talking about
5  creators of color experiencing racism and threats
6  and creators that were LGBTQ experiencing threats on
7  Instagram.  That was probably within the first week
8  or two of my second stint.
9        MS. JONES:  Okay.  And, again, with
10 respect, I'm going to move to strike everything
11 after "Yes, that is correct."
12    Q.  Social media can be a place for creative
13 expression for young people, including teenagers?
14    A.  Yes, it can be.
15    Q.  Social media can be a place where young
16 people, including teenagers, can have an opportunity
17 to stay in touch with friends and family and other
18 loved ones, right?
19    A.  Yeah, at best, it is.
20    Q.  And social media can have an educational
21 role for young people depending on what they're
22 interested in?
23    A.  Man, it could, but that education question
24 in the context of the videos I shared.  Oof.  It
25 can, actually.  And that's why that's such an

Page 886

1  important responsibility, like, what is the videos
2  that you're recommending, teaching the teens that
3  see them.
4     Q.  Okay.  And you testified earlier that you
5  have come to the conclusion that Instagram is not
6  safe for a 13-year-old, a 14-year-old, or a
7  15-year-old; is that right?
8        MR. CARTMELL:  Object to the form.
9  Well -- object to the form.  Sorry.
10       THE WITNESS:  I believe that Instagram as
11 it's designed today, with the features it has today,
12 is not safe for kids 16 and under.
13 BY MS. JONES:
14    Q.  So is Instagram safe as it exists today
15 for kids who are 16?
16       MR. CARTMELL:  Object to the form.  Asked
17 and answered.
18       Did you say 16?
19       MS. JONES:  I did.
20       THE WITNESS:  I thought I had answered
21 that.
22       But I think once you get to 16 and 17,
23 things really start changing developmentally and so
24 it's a different conversation than the one that is
25 really sort of 13 to 15, maybe 16.  I think to look

Page 887

1  at those ages, I would need to spend more time with
2  people that have good -- like ████████████ from
3  Yale and ███████████ from Yale to discuss.  People
4  that have studied those issues for that age bracket.
5  BY MS. JONES:
6     Q.  So as to my question on whether Instagram
7  is safe as it is today for kids or teenagers who are
8  16, it sounds like maybe, maybe not?
9        MR. CARTMELL:  Object to the form.
10 BY MS. JONES:
11    Q.  Or "I'm not sure."
12    A.  Again, it feels like you're putting words
13 in my mouth there.
14    Q.  That's truly not my intention.  I'm just
15 trying to make sure I understand kind of what your
16 view is on that question.
17    A.  Yeah, more diligence is needed.
18    Q.  Okay.
19    A.  From my perspective.
20    Q.  Okay.  And what about with respect to
21 teenagers who are 17, is Instagram as it's currently
22 designed safe for teenagers who are 17?
23       MR. CARTMELL:  Object to the form.
24       THE WITNESS:  I would say more diligence
25 on my part is needed to be able to have a

Page 888

1  well-formed opinion about that.
2  BY MS. JONES:
3     Q.  Okay.  And I think you've already told us
4  that you, yourself, use social media, right?
5     A.  Yes.
6     Q.  You have a Facebook account, yes?
7     A.  Yes.
8     Q.  You have had one since 2009, I think was
9  your testimony yesterday, right?
10    A.  Yes.
11    Q.  And I think you also testified that at
12 least as early as 2015 you have had an Instagram
13 account, right?
14    A.  Yes.
15    Q.  Is your Instagram account public?
16    A.  Yes.
17    Q.  And has it ever been the case -- and
18 forgive me, I may be asking you a question I asked
19 yesterday.  Charge it to my head, not my heart,
20 because I just don't remember.
21       Has it ever been the case since 2009 that
22 you ever closed your account on either Facebook or
23 Instagram?
24    A.  I have not.
25    Q.  And --

35 (Pages 885 - 888)

CONFIDENTIAL

Page 889

1    A.   It is -- it is a good way for me to keep
2  in touch, primarily with the people that I worked
3  with at Facebook because those are the only people
4  that are left on the Facebook side.
5        And on Instagram, it is a place where I
6  put my photographic work.  I really don't talk about
7  that because it's stuff that I --
8    Q.   And I apologize.  I didn't hear what you
9  said before "stuff."  "I really don't talk about" --
10 what stuff?  I --
11   A.   Oh, advocacy.
12   Q.   Advocacy.  Got it.
13   A.   So I -- Instagram, I've been posting
14 photographs that I make on Instagram primarily of
15 squirrels and birds for a long time.
16   Q.   Okay.  And --
17   A.   And flowers.
18   Q.   Which all sound wonderful.
19   Q.   And ████████.
20   Q.   And ████ -- yes.
21       (Whereupon, a brief discussion off the
22 record.)
23 BY MS. JONES:
24   Q.   We could play a drinking game with the
25 name ████████, I suspect, by the time this

Page 890

1  deposition is over.  We will all know who ████
2  ████ is.
3        Let me ask you, you testified yesterday
4  that you believe that Meta as a company has been
5  negligent with respect to teen well-being and child
6  safety issues.
7        Do I recall that correctly?
8    A.   Yes.
9    Q.   Okay.  And notwithstanding that testimony,
10 you have never decided, you have never decided using these
11 services because I believe the company is negligent?
12   A.   No, I mean, I think that the one thing I
13 did do is I unfriended Mark Zuckerberg that I had
14 been friends with since 2009 because I just -- I
15 thought it was -- I saw the posts that he would make
16 about these issues and I found them distressing.
17   Q.   Okay.  So you unfriended Mr. Zuckerberg.
18       When did that happen?
19   A.   The last few months, I don't recall the
20 exact date.
21   Q.   When you say "the last few months," do you
22 mean early 2025, late 2024?
23   A.   I would say yeah.
24   Q.   Yeah as to which one, late 2024, early --
25   A.   I don't recall the specific date.

Page 891

1    Q.   Okay.  But in the last six months or so?
2    A.   Yes.
3    Q.   But otherwise, you have never determined
4  that the company's negligence is such that you think
5  you should discontinue using the services?
6    A.   I think it's important for what I do to --
7  to both have my vantage point on the services so
8  kind of used them intentionally as I have and -- and
9  so to see what that experience is like.
10       There's also ex-employee forums and other
11 things that I value from that in terms of the things
12 that you described.
13       And also, there are things that I really
14 value in what Instagram provides.  And if the
15 question is, is there good in social media and do I
16 appreciate and partake in that, yes, I do.
17       It's just my strongly held view that the
18 harm is not necessary to it and that the harm is
19 preventable and that they have been negligent in
20 understanding and mitigating the harm.
21       But I have chosen to continue using
22 Facebook and have chosen to continue using Instagram
23 and WhatsApp because they play a role in my life, as
24 my daughter also continues to use Instagram as it
25 plays a role in her life.

Page 892

1    Q.   Understood.
2        And I am going to have some questions
3  about your daughter.
4        So sitting here today, you still have a
5  Facebook account, you still have an Instagram
6  account, right?
7    A.   Correct.
8    Q.   And you still get value out of both of
9  those, right?
10   A.   I do.
11   Q.   And, in fact, after you testified before
12 Congress in November 2023, a couple days later you
13 posted on Instagram.
14       Do you remember that?
15   A.   Yes.
16   Q.   When was the last time you checked your
17 Instagram account?
18   A.   Probably, like, two or three days ago, but
19 it might have been yesterday.  Definitely not today.
20 I don't think yesterday.  But I'm not totally sure.
21 But within the last week.
22   Q.   Okay.  I can't remember, Mr. Bejar, when
23 you testified before Congress, did you mention that
24 on that very day you still had both an Instagram and
25 a Facebook account?

36 (Pages 889 - 892)

CONFIDENTIAL

Page 893

1    A.  I don't think I said that.
2    Q.  Do you remember whether you told the
3 senators, "I'm going to walk out of this senate
4 chamber and I'm going to post on the platform the
5 same way I've been doing for many years now"?
6    A.  I mean, I'm not 13, and I think I was
7 50-something at the time.  And so, yeah, I thought
8 it was good for me to be using the products
9 intentionally.
10       I also -- I think sometime after that, I
11 don't recall the exact date, posted on the
12 ex-employee Facebook group, an "ask me anything"
13 because I just wanted to be open with people.  The
14 feedback group, which includes employees, I just
15 wanted to be open if people have questions for me
16 about what I had done.
17    Q.  Sure.  Understood on all.
18       My question was, do you remember whether
19 you told the senators before whom you testified in
20 2023, "Despite everything I said to you, I'm going
21 to leave this chamber and continue using the
22 Instagram platform"?
23    A.  I don't believe I said that sentence to
24 the senators.
25    Q.  You have used Instagram to support

Page 894

1 business ventures that you personally or some of
2 your family members are involved in?
3    A.  Yes.
4    Q.  You have -- you're somehow connected with
5 something called the █████████████
6    A.  Yes.
7    Q.  Tell the jury what that is.
8    A.  My sister moved to the US and acquired
9 this bakery in Carmel Valley and has been doing an
10 absolutely wonderful job of creating a great
11 environment there.  And I've exhibited my
12 photographs there.  There's one exhibit right now.
13    Q.  Do -- I think you mentioned you use
14 WhatsApp; is that right?
15    A.  That's correct.
16    Q.  Do you use Messenger?
17    A.  Very rarely these days.  I used to a lot.
18    Q.  Do you use TikTok?
19    A.  I did for a little while but I stopped
20 using it.
21    Q.  Why is that?
22    A.  For the same reason, as an adult I really
23 don't like spending time in Reels.  I like to be
24 very intentional about my social media use.
25       And so, for example, when I open

Page 895

1 Instagram, I very frequently, and I wish I could do
2 this as a default, go to the feed of the people I
3 follow.  I don't know why I have to select that
4 every time I open the app because what I'm
5 interested in is in the content that the people I
6 follow have created.
7    Q.  How long were you on TikTok?
8    A.  I don't recall.
9    Q.  Do you remember when you -- well -- let me
10 take a step back.
11       Did you close your TikTok account or did
12 you just stop using it?
13    A.  I think I might have closed it.  But I
14 don't recall.  Like, I found it very -- for the same
15 reason I don't like spending time in Reels as an
16 adult, that format is just -- really doesn't work
17 for me.
18    Q.  Okay.  What about Snapchat, do you use
19 Snapchat?
20    A.  No, I don't use Snapchat.
21    Q.  Have you ever used Snapchat?
22    A.  No, I don't -- have never used Snapchat,
23 although I have had many conversations with
24 different teens and have -- and understand their
25 experiences with harm on those platforms at a level

Page 896

1 of those conversations.  But it's not as if I have
2 opened the application and have known it and then
3 tested it methodically.
4    Q.  Do you use YouTube?
5    A.  Yes.
6    Q.  How long have you been using YouTube?
7    A.  For as long as I can recall.
8    Q.  Do you use LinkedIn?
9    A.  Yes, I do.
10    Q.  How long have you been using LinkedIn?
11    A.  I don't recall when I first created my
12 account.  I began posting more frequently after I
13 went public on these issues because I was -- I was
14 kind of, like, I think LinkedIn is a good way to
15 express professional concerns.
16       And I've only posted a couple times about
17 this on the Facebook pages because my relationship
18 with former Facebook employees is more sort of along
19 the friendship territory and I didn't feel it was
20 the right forum for me to talk about some of the
21 things I observed.  And so I try to use LinkedIn for
22 that.
23       Like, for a period of time I would post
24 once a week saying it's been another seven days
25 since I last brought out these issues to light and

37 (Pages 893 - 896)

CONFIDENTIAL

Page 897

1  one in eight kids have experienced unwanted
2  advances --
3       (Whereupon, a brief discussion off the
4  record.)
5       THE WITNESS:  In the last seven days, it's
6  been another seven days since the information became
7  public, and in those seven days, one in eight kids
8  have experienced unwanted sexual advances on
9  Instagram.  I intended to keep on doing that but I
10  did not.
11  BY MS. JONES:
12  Q.  Are there any other social media platforms
13  services that you use?
14  A.  Probably.  Like, I definitely believe
15  in -- oh, yes, I can -- what's it called.  There was
16  a really -- there was a really great one that I was
17  part of for a while that really had put a lot of
18  care in all of these issues.  I don't recall the
19  name now.  It was invite-only startup at the time
20  that people did at some point.
21       But, again, I do believe in the good that
22  social media can do and have worked a significant
23  amount of my life on social features.  And even
24  before I did my first job when I was an intern for
25  an IBM and Apple startup, what I implemented was,

Page 898

1  like, at chat rooms and, like, shared games.  And so
2  I had always believed in the potential of social
3  media and social products to do good in the world.
4  Q.  Mr. Bejar, I want to just follow up on
5  something that you said about having had
6  conversations with lots of different teens about
7  their use of social media.
8  A.  Correct.
9  Q.  When you say lots of different teens, can
10  you maybe start by just giving me a sense of what is
11  the number of teens?  And I know you've talked to
12  your daughter.  But putting those discussions to the
13  side, what's the number of teens you would say that
14  you've had conversations with about social media?
15  A.  Probably a few hundred at this point but I
16  couldn't give a number more precise than that.
17  Q.  Okay.  In what settings have you had these
18  conversations with probably a few hundred teenagers?
19  A.  Let's see.  So -- starting with when I was
20  at Yahoo! I had conversations with teens that were
21  the target of grooming.  And with their parents.  So
22  that was kind of like the first time I began doing
23  that.
24       Then during my second -- during my first
25  stint, there were more than what I'm going to name.

Page 899

1  But for example, there was a conference in New York
2  organized by high school students about sort of
3  different issues relating to social media.  And I
4  spoke there.  And then I spoke with teens both in a
5  group setting and in an individual setting.
6       For the five compassion research stays
7  that we held, the last two or three hours were
8  dedicated to bringing in a group of, on average, 10
9  to 15 teenagers.  Sometimes from marginalized
10  communities.  So LGBTQ teenagers or people from
11  schools in Oakland that had other sort of access or
12  challenges.  And the job was to have them tell us
13  whatever we should do differently.  It was an open
14  floor for them for me and the product team and the
15  scientists to kind of listen to them.
16       I gave talks at different schools and then
17  afterwards would have conversations with them.  And
18  then during the -- after I left -- and that's not
19  comprehensive, right, it just gives a thing.
20  Q.  Uh-huh.
21  A.  I did not -- like, primarily I spoke with
22  my daughter.  I think sometimes when she would have
23  friends over we would kind of have a little bit
24  broader conversations around some of the issues.
25       I also spoke with other family members

Page 900

1  that had issues to sort of help understand their
2  experience.  They were native to Snapchat and TikTok
3  and so I wanted to understand their experiences.
4       And then -- I mean, I could go on, being
5  mindful of time, the most recent time that I can
6  recall was within the last probably six months or
7  so.  I don't recall the exact date.
8       There was a group of teen girls that was
9  facilitated by this woman named Larissa May who's
10  part of this group called HalfTheStory.  She was on
11  Oprah.  And it was a group of like 15 --
12       (Whereupon, a brief discussion off the
13  record.)
14       THE WITNESS:  But she's a very wonderful
15  young advocate of these issues.  And this was a
16  circle with around 10 to 15 teenage girls where the
17  job was to listen to them talk about these topics.
18  BY MS. JONES:
19  Q.  Okay.
20  A.  Including unwanted sexual advances.  And I
21  have something to share about that if it's
22  appropriate.
23  Q.  Okay.  Well, let me move on to my next
24  question.
25       Mr. Bejar, simply because you've focused a

38 (Pages 897 - 900)

CONFIDENTIAL

Page 901

1 fair bit, both in your deposition but also in
2 various other settings, on your daughter's
3 experience I'm going to ask you some questions about
4 her, if that's okay?
5     A.  I believe so.
6     Q.  Okay.  Before I do that, you mentioned
7 that you also had a son who was a teenager at the
8 time that Meta acquired Instagram; is that right?
9     MR. CARTMELL:  Object to form.
10     THE WITNESS:  I'm sorry, I'm doing math.
11 BY MS. JONES:
12     Q.  I don't think that question was very well
13 put.
14         Is your son older than your daughter?
15     A.  Yes, he is.
16     Q.  Has your son ever used social media?
17     A.  Yes.
18     Q.  What platforms has he used?
19     A.  Primarily Reddit with some minor Instagram
20 use.  And Discord.  I don't think he ever used Snap
21 much.  And that's not a comprehensive list.  I was
22 very -- had very diligent conversations with my kids
23 about when they started using these applications and
24 about their usage of it.  My son related differently
25 to that world than my daughter did.

Page 902

1     Q.  Let me ask you what you mean by that when
2 you say your son related differently than your
3 daughter did to that world?
4     A.  My son was very disciplined about his time
5 spent and his interactions.  And so his -- his usage
6 of his phone was very reasonable throughout and --
7 and he very intentionally engaged with the platforms
8 that I've already named and -- and didn't really
9 seek to spend, like, a lot of time on it.
10         My daughter, when she finally went on
11 Instagram, that was not the case.  And so, for
12 example, if we sat and we watched a movie as a
13 family, which is one of the activities we did
14 together, my son would not once pick up his phone
15 throughout the movie and, like, somewhere later in
16 this, my daughter would pick up her phone to check
17 if there were notifications around any 20 or 30
18 seconds.  Which is something that I was kind of
19 keeping an eye on and had many conversations with
20 her about.
21     Q.  Mr. Bejar, just generally speaking, did
22 your son have a positive experience on social media?
23     A.  Yes.
24     Q.  And when you testified before the Senate,
25 did you mention the fact that you had a second child

Page 903

1 who had had a positive experience on social media?
2     A.  I don't think I did.
3     Q.  You, I believe, and you can tell me if
4 I've gotten this wrong, you testified yesterday that
5 your daughter might have been addicted to Instagram.
6         Did I hear that testimony correctly?  Or
7 correct me if I've got it wrong.
8     MR. CARTMELL:  Object to the form.
9 BY MS. JONES:
10     Q.  Let me ask the question a slightly
11 different way.
12         Are you offering the view that your
13 daughter was addicted to Instagram at any point?
14     A.  I believe that she, and these
15 conversations that I had with her, spent way too
16 much time on it.  And that notifications and the
17 challenges in trying to not have the phone during
18 dinner or during other forms of family time --
19         (Whereupon, a brief discussion off the
20 record.)
21         THE WITNESS:  The challenges in not having
22 the phone during family time were very distressing
23 and -- I mean, I think I have said what I would like
24 to say about that.  Because I would like to offer
25 that sort of detail recounting of my daughter's

Page 904

1 experience in this context is -- all what I've said
2 is fairly distressing to me and I want to be
3 incredibly mindful of her privacy as well.
4 BY MS. JONES:
5     Q.  Well, Mr. Bejar, you have testified
6 publicly and under oath about your daughter's
7 experience on Instagram, correct?
8     A.  Correct.
9     Q.  And you have been interviewed by
10 journalists and talked about your daughter's
11 experience on Instagram, correct?
12     A.  Correct.
13     Q.  I believe in connection with the book that
14 was published by Jeff Horwitz from the Wall Street
15 Journal he recounts information that you shared with
16 him about your daughter's experience on Instagram,
17 correct?
18     A.  That is correct.
19     Q.  Okay.  I do want to go back to the
20 question that I asked just to make sure that I
21 understand what your answer is.
22         Are you offering the view that your
23 daughter was addicted to Instagram?
24     MR. CARTMELL:  Objection.  Asked and
25 answered.

39 (Pages 901 - 904)

CONFIDENTIAL

Page 905

1    THE WITNESS: I think I've already
2 answered that question.
3 BY MS. JONES:
4    Q. Is that something that you've ever said
5 before in prior sworn testimony, as far as you can
6 recall?
7    MR. CARTMELL: Object to the form.
8    THE WITNESS: I have not.
9    I'm very sensitive to her privacy about
10 this and I've had many conversations with her about
11 how I relate her experience. And I want to do this
12 with the utmost respect in the world for her
13 privacy. For her privacy. And the fact that she's
14 now much older and has gratefully successfully
15 navigated many of these issues.
16 BY MS. JONES:
17    Q. Okay. And I also want to be respectful of
18 your daughter's personal situation but I -- simply
19 because you've raised her in the context of your
20 sworn testimony I do want to ask, was there ever any
21 determination by a clinician that your daughter was
22 addicted to Instagram?
23    A. I am not going to get into, under any
24 circumstances, about any clinical/medical work that
25 my daughter might have had. And so I want to make

Page 906

1 it exceptionally clear that I find that
2 conversation -- question deeply inappropriate
3 because for me to talk about a clinician diagnostic
4 it would mean getting into things that are not
5 appropriate for me to talk about in this context.
6    Q. Okay. Your daughter started using social
7 media when she was 14; is that right?
8    A. Yes, I -- I thought it was important to
9 wait until she was older.
10    Q. Okay. And why was it that you thought it
11 was important to wait until she was older?
12    A. I think at the time I had kind of some
13 low-grade concern around these issues. And I knew
14 that developmentally that extra year would be good
15 for her.
16    Q. When you say "at the time I had" -- let me
17 take a step back.
18    What year was it when your daughter was
19 14? Was it 2018?
20    A. Yeah, I believe so.
21    Q. Okay. And you said "at the time I had
22 kind of some low-grade concern around these issues."
23    A. Yeah.
24    Q. Let me just ask you --
25    A. Of course.

Page 907

1    Q. -- what do you mean specifically when you
2 say "I had kind of some low-grade concern around
3 these issues"?
4    A. I had had a lot of experience and good
5 understanding about how harm had played out in
6 Facebook during my first stint, right, all of the
7 work with teens and the tools that were developed.
8 And the knowledge of some of, like, the human
9 dynamics involved and the developmental aspects
10 around that, that in particular sort of how sensitive
11 kids are when things happen and how the medium
12 inherently by its nature facilitates
13 misunderstandings and people expressing
14 circumstances even in the best of worlds.
15    I decided to hold off a year so that she
16 could get another year of development behind her.
17    Q. Did your daughter continuously use
18 Instagram from the age of 14 until the present?
19    A. Yes.
20    Q. Was there any period during -- and how old
21 is your daughter today?
22    A. She's 20 now.
23    Q. Okay. So you've gotten both of your kids
24 out of the house, it sounds like, maybe not out of
25 the house, but they're adults under the standard

Page 908

1 definition.
2    A. Well, isn't the standard definition 21 or
3 is it 18?
4    Q. Yes, probably 18. But I won't assume
5 they're out of the house but I know how that goes.
6    A. Work in process.
7    Q. Yeah.
8    Was there any period from when your
9 daughter was 14 years old in 2014 until the present
10 when she was not on Instagram?
11    A. I don't think so.
12    Q. And just to be very clear, you knew that
13 your daughter had joined Instagram?
14    A. Oh, absolutely. I did this -- their
15 joining of any social media service was subject to
16 conversation and we had -- it was something that as
17 a parent I was extremely engaged in.
18    Q. And so, again, just to be very clear, your
19 daughter didn't sneak onto the platform without your
20 knowledge; is that right?
21    A. That is correct.
22    Q. Okay. Has she, as far as you know, used
23 other social media platforms?
24    A. Yes.
25    MR. CARTMELL: Object to form.

40 (Pages 905 - 908)

CONFIDENTIAL

Page 909

1 BY MS. JONES:
2    Q.  Has she used Facebook?
3    A.  Yes.
4    Q.  Is she on Facebook still?
5    A.  Yes.
6    Q.  When did she join Facebook, if you know?
7    A.  I don't know.  Later.
8    Q.  Okay.  Later than 2014?
9    A.  Yeah.
10   Q.  Has she used Snapchat?
11   A.  Yes.
12   Q.  When did she join Snapchat, if you know?
13   A.  After she joined Instagram.  I was at --
14 at the time when she joined Instagram, it was my
15 belief that that was a good place to start.
16   Q.  Bless you.
17       And is she still on Snapchat?
18   A.  I believe so.
19   Q.  Okay.  What about TikTok, has your
20 daughter used TikTok?
21   A.  Yes.
22   Q.  Do you know when she joined TikTok?
23   A.  I don't recall.
24   Q.  Is she still on TikTok today?
25   A.  I think so.  I don't think she's very

Page 910

1 active on it, though.
2    Q.  Okay.  What about YouTube?
3    A.  Yes.
4    Q.  And do you know if your daughter has a
5 YouTube account or if she just goes on it without
6 signing in?
7    A.  I believe she goes on without signing in
8 but I think at some point I helped her set up a
9 YouTube account.  I don't recall.
10   Q.  I'm sorry.  I didn't mean to step on your
11 answer.
12       Do you know for how long your daughter has
13 used YouTube?
14   A.  Yeah, so definitely didn't let them on
15 when they were younger.  At some point under -- in
16 public areas and under supervision in the house, we
17 were able to watch some videos or share things
18 there.  And then at some point she could access it
19 from her phone.
20       So they had kind of like a -- I had a
21 program with my kids about how much screen time
22 and -- and the kind of content or applications they
23 would get access to over time, which games and other
24 things.
25   Q.  Okay.  You have testified during the

Page 911

1 course of your deposition, and I think this is
2 roughly a direct quote, but you can correct me if
3 I'm getting any part of it right -- wrong, that
4 Instagram is not built to be safe or good for kids.
5       Was that your testimony?
6    A.  Yes.
7    Q.  And you have allowed both of your kids to
8 use Instagram; is that right?
9    A.  At the time at which I believed it was
10 safe.
11   Q.  Okay.  And after you concluded that --
12 well, let me ask a more specific question.
13       In the summer of 2021 is when I believe
14 you testified you were starting to become acquainted
15 with the results of things like the BEEF survey; is
16 that right?
17   A.  That is correct.
18   Q.  Okay.  And in 2021, your daughter, if I'm
19 doing the math right, would have been 17; is that
20 right?
21   A.  Correct.
22   Q.  After you learned about the BEEF survey
23 results, did you at any point say to your daughter
24 you can't be on Instagram anymore?
25   A.  At that time, I knew that the things and

Page 912

1 some of the most important things that were covered
2 in BEEF she had been experiencing directly.  We had
3 to talk through her strategies for dealing with
4 them.
5       I so wish I had known much earlier what
6 BEEF helped me see, which is the likelihood that she
7 had experienced these things.  At that point, she
8 had been experiencing them for years.  And what BEEF
9 really brought home for me is just how many other
10 kids were experiencing it.
11      Had I known the results of BEEF earlier,
12 right, had I had a good sense of how harm was
13 playing out earlier, under no circumstances would I
14 have allowed my daughter to go on social media until
15 she was much older.
16   Q.  I want to just make sure I have an answer
17 to my question.
18       After you learned about the BEEF survey
19 results in the summer of 2021, did you at any point
20 say to your daughter you cannot be on Instagram
21 anymore?
22       MR. CARTMELL:  Objection.  Asked and
23 answered.
24       THE WITNESS:  Have you ever told a
25 17-year-old that they can't do something?

41 (Pages 909 - 912)

CONFIDENTIAL

Page 913

1  BY MS. JONES:
2    Q.  I don't have a 17-year-old so you're -- I
3  just need you to -- I need you to just --
4    A.  No, I did not.  I did not tell my daughter
5  that.
6       But I will say that in knowledge of all of
7  the categories of BEEF, I believe that at that point
8  my daughter had effective strategies to deal with
9  those harms when she encountered them.  She was much
10  more mature.  She had developed a great priority of
11  strategies for dealing with every harm that we've
12  been talking about.  And I -- and so as a parent, it
13  was okay for her to be on Instagram based on that.
14    Q.  And just so I'm clear and, more
15  importantly, the jury is clear, you understood what
16  the -- that your daughter was experiencing harm on
17  Instagram.
18       That was your testimony, right?
19    A.  Correct.
20    Q.  And you understood that as early as when?
21    A.  When she first started talking about
22  unsolicited penis pictures and unsolicited sexual
23  advances when she was 14.
24    Q.  So that would have been in 2014?
25    A.  No.

Page 914

1    Q.  I apologize.  I probably have gotten it
2  wrong.
3    A.  She would have been ten at the time.
4    Q.  Okay.
5    A.  She couldn't have been on Instagram.
6  Shouldn't have been on Instagram.
7    Q.  So would that have been 2018?  I think I
8  wrote down the wrong year.
9    A.  Yes.
10    Q.  Okay.  So as early as 2018, you were aware
11  that your daughter was experiencing harm on
12  Instagram, right?
13    A.  Yes.
14    Q.  And then you returned to the company in a
15  consulting role in 2019, right?
16    A.  Correct.
17    Q.  And by 2000 -- when was it that you first
18  learned about the negative experiences survey?
19    A.  I think it would have been pretty early in
20  my tenure, and so I would guess around maybe 2019,
21  give or take.  Give plus/minus a little bit of time.
22    Q.  Okay.  Okay.
23       So in 2019, you are back at the company
24  and you've become aware of the negative experience
25  survey, right?

Page 915

1    A.  Correct.
2    Q.  And as that point in time, you did not go
3  to your daughter and say, you've got to come off of
4  Instagram; is that right?
5    A.  At that point in time, my daughter already
6  had a public account, and we had been discussing all
7  of the harms that she was experiencing there.  And
8  what the negative experiences survey and then BEEF
9  later on brought to my attention was about all of
10  the other kids who don't have a dad that had spent
11  kind of a lifetime working on these issues, that
12  they felt comfortable with approaching when, for
13  example, she got insulted for being Hispanic or she
14  got an adult commenting on her body parts.
15       And I can -- like, the quotes are really
16  disturbing so I try to be very circumspect about
17  some of the comments she got on her body as a
18  teenage girl that she responded to.
19       And I believe that even at that point I
20  had had the conversation with her, but I'm not clear
21  on the timing, where she gave up on reporting these
22  things because it would never get acted on, and
23  started choosing to leave them up because she was
24  worried that they would reduce engagement in the
25  product.  And that -- I respected her choice on that

Page 916

1  and her strategies of dealing with it.
2       But, again, I think my daughter, this is
3  really not about my daughter because she had me and
4  she had trust in me.  And so she had the support
5  structure to navigate all of these issues.  I don't
6  know how many kids in the world have parents who
7  have breadth and expertise such that when they
8  encounter some of these harms that we've talked
9  about they can get meaningful help from their
10  family.
11       The tools as implemented today do not help
12  with that.  They don't equip the kids of the parents
13  appropriately.  And so when I started looking at
14  surveys, I thought that applied to other kids
15  because my daughter had already -- all these things
16  had happened to her already and she was dealing with
17  them and she had support and she was maturing.
18    Q.  Okay.  I'm trying to remember what my
19  question was, Mr. Bejar.
20       I think my questions was, at this point in
21  time you did not go to your daughter and say you've
22  got to come off of Instagram?  When I say "this
23  point in time," I'm referring to 2019.
24       Let me ask you my next question, though.
25       Did you determine because your daughter

42 (Pages 913 - 916)

CONFIDENTIAL

Page 917

1 had developed strategies for navigating the platform
2 and that she had the benefit of a supportive parent
3 that it was acceptable for her to remain on
4 Instagram in 2018, 2019?
5    A.  In those factors -- did you say also that
6 she was much older in your question as you --
7    Q.  I did not say she was much older.  I just
8 said in 2018 and 2019.
9        Let me ask the question again.
10   A.  Thank you.
11   Q.  In 2018 and 2019, did you determine that
12 because your daughter had developed strategies for
13 navigating Instagram, and because she had the
14 benefit of a supportive parent in you, that it was
15 acceptable for her to remain on the platform?
16   A.  And she was older.  And not just a
17 supportive parent but the expertise that I had, then
18 yes.
19   Q.  And just to be clear, when you say "she
20 was older," in 2018 and 2019, your daughter was 14
21 and 15, correct?
22   A.  Correct -- I'm sorry, what was the
23 question you just asked for?  Can you refresh me on
24 the time period.  I mean, there's lots of parts and
25 I want to make sure I get that right.

Page 918

1        So you're saying in 2018.  Was the
2 question about --
3    Q.  Let me ask the question again if you're
4 unclear on the question.
5    A.  I am.
6    Q.  In 2018 and 2019, did you determine that
7 because your daughter had developed strategies for
8 navigating Instagram, and because she had the
9 benefit of a supportive parent in you, that it was
10 acceptable for her to remain on the platform?
11   A.  If you add to that sort of my awareness
12 over time of the harmful experiences that she was
13 having as she was bringing them up to me, each time
14 that we talked about a harmful experience we would
15 talk about it.  We would come up with strategies.
16 And then I'd say yeah, it's okay, you can continue
17 using Instagram.
18       So once she started getting unwanted
19 sexual advances, we discussed what her strategy was
20 going to be around that because the reporting tools
21 were not helping her.  And I did make the choice for
22 her to stay on the platform.
23       When she started getting harassing
24 comments and unwanted sexual advances over DMs after
25 she created a public account, something that she had

Page 919

1 no idea she was going to get when she opened that
2 public account, and that was true in the testing of
3 the product later, we talked about her strategies,
4 which initially were deleting -- reporting comments.
5 And then in failure of that, trying to delete them.
6        Also, by the way, during that time, she
7 tried to -- she would report comments and the
8 comments would not be hidden or deleted from her
9 which brought her ongoing distress.  But, again, we
10 thought it was important to see how these issues
11 played out because I was also trying to understand
12 the experience of her and other people.
13       And I wasn't worried for her safety, and I
14 wasn't worried about -- sort of these issues
15 creating sort of long-term issues for her because
16 she was proactively bringing them up and we were
17 discussing them.
18       (Whereupon, a brief discussion off the
19 record.)
20 BY MS. JONES:
21   Q.  Okay.  So because of all the factors that
22 you've just described, you concluded that it was
23 okay for your daughter to stay on Instagram in 2018
24 and 2019, right?
25   A.  That is correct.

Page 920

1    Q.  Okay.  And then by 2021, according to your
2 testimony, you became familiar with the BEEFs survey
3 data; is that right?
4    A.  That is correct.
5    Q.  And for the same -- given the same factors
6 that I think you've already described, did you still
7 conclude, as to 2020 and then 2021, that it was okay
8 for your daughter to stay on Instagram?
9    A.  Yes.
10   Q.  Was there ever any point in time from when
11 she started on Instagram in 2018 until the present
12 when you said to your daughter you should stop using
13 Instagram?
14   A.  No, there has not been.
15   Q.  And I think you've testified earlier, and
16 I'm not going to get into a lot of details, but I
17 think you testified earlier that your daughter is
18 now 20 years old and she's doing well?
19   A.  That is correct.
20   Q.  And when your daughter has used the
21 platform, she has gotten benefits from using it; is
22 that fair to say?
23   A.  She's gotten benefits and she has gotten
24 harms.
25   Q.  Understood.

43 (Pages 917 - 920)

CONFIDENTIAL

Page 921

1      For example, in your live congressional
2 testimony but in other settings you mentioned that
3 she is a big car fan, right?
4      A.  She is now a car professional.
5      Q.  Okay.  I -- excuse me.  I apologize.
6      She has what I think is a very cool
7 interest in rehabbing all types of interesting
8 vehicles, right?
9      A.  Correct.
10     Q.  Okay.  And that is an interest that she
11 has been able to pursue on Instagram -- at least
12 communicate with others about -- on Instagram, yes?
13     A.  Yes.  Communicate with others on
14 Instagram.
15     Q.  Okay.  So she will post on -- and she has
16 a public Instagram account, right?
17     A.  Correct.
18     Q.  And among other things, she will post
19 about cars, right?
20     A.  Correct.
21     Q.  Has she used Instagram to research
22 information on types of cars that she might be
23 interested in?
24     I can withdraw the question.  If you're
25 not sure, that's fine.

Page 922

1      A.  I think I know where she's researched the
2 cars that she's interested in.
3      Q.  Okay.  Let me ask you, while we're pulling
4 out another exhibit, your experience has been that a
5 teen can have experiences like the ones that your --
6      Go ahead and put the sticker on it.
7      -- that your daughter had without creating
8 long-term issues?
9      MR. CARTMELL:  Object to the form.
10     THE WITNESS:  Can you repeat the question?
11 BY MS. JONES:
12     Q.  Sure.
13     Your experience with your daughter has
14 been that a teen can have bad or negative
15 experiences on Instagram or any other social media
16 platform and have it not create long-term issues?
17     MR. CARTMELL:  Same objection.
18     THE WITNESS:  I have experiences with both
19 things.  I have experience with people that have had
20 long-term issues that I've spoken to, and I have
21 experience with people that have not had long-term
22 issues that I have spoken to.
23     MS. JONES:  Okay.  I'm going to hand you
24 what we've marked as -- well -- it might make sense
25 to break now for lunch just because the next bit

Page 923

1 might take longer than seven minutes and I think
2 we're going to break for lunch at 12:30, so I'm --
3      MR. WARD:  Sure.  That's fine.
4      THE VIDEOGRAPHER:  Time is 12:23.  We're
5 off the record.
6      (Whereupon, a brief recess was taken.)
7      THE VIDEOGRAPHER:  Time is 1:18.  We're
8 back on the record.
9 BY MS. JONES:
10     Q.  Okay.  Mr. Bejar, I'm going to hand you
11 what we've marked as Deposition Exhibit 71, 72, and
12 73.
13     (Whereupon, Meta-Bejar Exhibit 71 was
14 marked for identification.)
15     (Whereupon, Meta-Bejar Exhibit 72 was
16 marked for identification.)
17     (Whereupon, Meta-Bejar Exhibit 73 was
18 marked for identification.)
19     MS. JONES:  And we'll get those handed out
20 to counsel.
21     Having spoken with Mr. Ward on the break,
22 I understand he might want to put something on the
23 record with respect to Exhibit 71, 72, and 73.  And
24 this might be the appropriate time for that, if
25 that's okay.

Page 924

1      MR. WARD:  Thank you, Counsel.
2      On behalf of Mr. Bejar, we'd like to
3 express our appreciation to counsel for proactively
4 consulting about these upcoming exhibits.  I think
5 counsel respectfully appreciated Mr. Bejar's
6 sensitivity around the issues related to his
7 daughter's privacy and we appreciate the chance to
8 review these and consult with counsel about them,
9 recognizing that a lot of this content is, in fact,
10 discoverable somewhere on the internet.
11     We, nonetheless, appreciate counsel's
12 willingness to work together after the deposition to
13 avoid any unnecessary calling attention to personal
14 identifying information related to Mr. Bejar's
15 daughter.  And we thank you for that.
16     MS. JONES:  Happy.  Happy to do it.  And
17 thank you both for raising it and discussing it
18 cooperatively.
19     Q.  Mr. Bejar, let ask you to start by looking
20 at Deposition Exhibit Number 71, if you would,
21 please.
22     A.  Yes.
23     Q.  Do you have that in front of you?
24     A.  I do.
25     Q.  And if we just call out the -- and

44 (Pages 921 - 924)

CONFIDENTIAL

Page 925

1 recognizing that people will talk on a separate
2 occasion about what specific information with
3 respect to your daughter is included in the ultimate
4 version of this that might be shown at some point in
5 the future, let's call out just the top part of
6 Exhibit Number 71, if we could, please.
7        This is an article from something called
8 The Saratoga Falcon dated August 30th, 2023, right?
9    A.  Right.
10    Q.  And The Saratoga Falcon, as I understand
11 it, is a high school newspaper; is that right?
12    A.  I believe so.
13    Q.  And it is the newspaper for the school --
14 is it the school that your daughter graduated from?
15    A.  I believe so.
16    Q.  Let me ask you to look -- and the
17 title of the article is, "Senior Mag 2023: Rallying
18 and Restoring: ▇▇▇▇ pursues interest in
19 automotive restoration."
20    A.  Correct.
21    Q.  And ▇▇▇▇ is your daughter, correct?
22    A.  That's correct.
23    Q.  And the first paragraph -- and there's a
24 picture on the right-hand side of someone who's
25 sitting with a car and underneath the picture is the

Page 926

1 name ▇▇▇▇ right?
2    A.  Correct.
3    Q.  Is that your daughter?
4    A.  Yes.
5    Q.  Okay.  The first paragraph of Deposition
6 Exhibit Number 71 says, "At 15, after years of
7 begging her parents to buy her a project car,
8 ▇▇▇▇ [sic] (who goes by ▇▇▇ finally bought a
9 Porsche 914, a half Volkswagen and half Porsche
10 1970s car with pop-up headlights, her new pride and
11 joy, after months of searching."
12        Did I read that correctly?
13    A.  Yes.
14    Q.  And is that an accurate description that
15 at 15, you all, and by "you all" I mean, I assume
16 yourself, and maybe your ex-wife, purchased for your
17 daughter a car to work on in connection with her
18 interest in restoring cars?
19    A.  It was a combination of me and also some
20 of my daughter's savings.
21    Q.  Okay.  Got it.
22        And it goes on -- she was 15 at the
23 time?
24    A.  Correct.
25    Q.  But in 2023, your daughter would not have

Page 927

1 been 15, she would have been what age?
2    A.  19.
3    Q.  Okay.
4    A.  Approximately.  I'm not doing the precise
5 math.
6    Q.  Oh, no, no, no, I understand.  That's
7 fine.
8        It goes on to say, in that first -- same
9 first paragraph, "She took help pulling out the
10 engine and ignition, then took apart and rebuilt the
11 engine, scrubbing paint off the exterior and sanding
12 it down to metal."
13        Do you see that?
14    A.  Yes.
15    Q.  It says, "After fully stripping down the
16 car ▇ got it repainted."  Right?
17    A.  Right.
18    Q.  And much of the rest of the article -- I
19 want to ask you about some specific elements of the
20 article.  But much of the rest of the article
21 generally describes your daughter's interest in
22 restoring cars, generally speaking?
23    A.  Yes.
24    Q.  Okay.
25    A.  Yes.

Page 928

1    Q.  And if you look down at the paragraph
2 entitled -- that begins with "▇ passion" towards
3 the bottom of the page.
4    A.  Yes.
5    Q.  It says, ▇▇ passion for restoration is
6 uncomfortable in stagnancy - the second she grew
7 tired, she found herself a car on Facebook
8 Marketplace - a car that had not run since 1983."
9        Do you see that?
10    A.  Yes.
11    Q.  And is that consistent with your
12 recollection that your daughter had been able to
13 make use of Facebook Marketplace to find another car
14 that she was interested in potentially restoring?
15    A.  Correct.
16    Q.  Has she used Facebook -- and Facebook
17 Marketplace is one of the parts of the Facebook
18 application; is that right?
19    A.  Correct.
20    Q.  Okay.  Is that -- has she used -- has your
21 daughter, as far as you know, used Facebook
22 Marketplace to identify other cars that she's
23 interested in restoring?
24    A.  Yes, I know the car that she is talking
25 about.

45 (Pages 925 - 928)

CONFIDENTIAL

Page 929

1  Q.  Okay.  And so this -- this is -- just to
2  go back to what we were talking about earlier, I
3  think you mentioned there can be both bad and good
4  on social media.  This is an example of one of the
5  benefits that your daughter at least has seemed to
6  have gotten from using Facebook Marketplace; is that
7  right?
8     A.  Yes.
9     Q.  Okay.  And then if we look at the second
10 page of that same article, there is a paragraph that
11 begins with, "Though she enjoys" -- it's the
12 second-to-last paragraph.
13    A.  Yes.
14    Q.  The beginning of that says, "Though she
15 enjoys getting 'hands on, down and dirty' with her
16 project cars, ▮ also enjoys keeping her 13,500
17 Instagram followers up to date on her progress on
18 her account, ▮▮▮▮▮▮."
19        Do you see that?
20    A.  I do.
21    Q.  And is ▮▮▮▮▮▮ a reference to your
22 daughter's Instagram account?
23    A.  It is her public Instagram account.
24    Q.  I appreciate the clarification.
25        Is ▮▮▮▮▮▮ a reference to your

Page 930

1  daughter's public Instagram account?
2     A.  Yes.
3     Q.  And for how long has your daughter had
4  that public ▮▮▮▮▮▮ Instagram account?
5     A.  I'm trying to recall.  The reason it's
6  called a_car_gal was, in part, because we were very
7  mindful of her privacy when she first set it up.  It
8  was, I believe, around a year or so after she set up
9  the -- her private Instagram account.
10    Q.  Okay.
11    A.  But, again, estimates, right.  I would
12 need to scroll down and see the first post to be
13 accurate about the date.
14    Q.  That's fair.
15        And there's a reference here to
16 specifically the fact that your daughter has 13,500
17 followers on her public ▮▮▮▮▮▮ account; is that
18 right?
19    A.  Correct.
20    Q.  And you testified, if I recall correctly,
21 yesterday -- and you can correct me if I'm
22 mis-recalling your testimony because it's obviously
23 been a long couple days.
24        But I think you testified to something
25 along the lines of if there is a teen who has

Page 931

1  thousands of followers that that suggests that
2  something sinister or bad is somehow happening.
3         Is that something you roughly say?
4     A.  That's not accurate.
5     Q.  Okay.  So --
6     A.  I'm saying that a teen that is posting
7  sexualized content --
8     Q.  Okay.
9     A.  -- or provocative content that has
10 thousands of followers is definitely something super
11 sketch.
12    Q.  Okay.  So I want to just make sure that
13 the record is clear on this.
14        A teenager having 13,500 Instagram
15 followers is not in and of itself, as you just, I'm
16 going to use your term "super sketch," right?
17    A.  In and of itself it is not.
18    Q.  Okay.  And the fact that, at least as of
19 this time in 2023, that your daughter had 13,500
20 Instagram followers on her public ▮▮▮▮▮▮
21 Instagram account, that's not something you look at
22 and think, oh, that must be super sketch, right?
23    A.  No, she has been very disciplined about
24 sort of the social norms for her car_gal account and
25 has been trying to create an environment that is

Page 932

1  good for car discussion.  It has been made difficult
2  by the fact that Instagram does not provide her
3  tools to do that.
4     Q.  And when you say Instagram does not
5  provide her tools to do that, you're aware that
6  there is, in fact, a reporting function on
7  Instagram?
8     A.  Oh, I am.
9     Q.  Okay.  And just to go back to the
10 paragraph here that we were looking at, it goes on
11 to say, "She found that social media is a special
12 way for her to interact with the restoration
13 community, learn more from others, see what people
14 are doing with their own project cars and learn
15 technical talk."
16        Do you see that?
17    A.  Yes.
18    Q.  And is that consistent with your own
19 understanding of your daughter's experience?
20    A.  My understanding of my daughter's
21 experience is that she has gotten some of the good,
22 which is community, technical knowledge, I think
23 she's part of a group on Facebook around this kind
24 of car and asks questions and gets information.  And
25 so she's experienced the good of the product.

46 (Pages 929 - 932)

CONFIDENTIAL

Page 933

1     And by the same hand, she has experienced
2 preventable harm in the product life, when she
3 created this car_girl account, soon thereafter she
4 got a post commenting -- and I, like, really hate to
5 say this -- but on her tits.  As a young teenage
6 girl.  And this was profoundly distressing to her at
7 the time.  She tried reporting it.  It did not
8 violate community standards.  And she got feedback
9 that we're not going to do anything about that
10 comment.
11     And so I think her experience embodies the
12 good and the harm that -- the great thing about
13 community, connection, resources, knowledge, which
14 is the promise of Facebook.
15     And I remember really feeling that when I
16 started working there, and the preventable harm of
17 unwanted penis pictures, unwanted sexual advances,
18 kind of harassing comments for a public account,
19 experiencing that in that context.  And I just wish
20 that she could have the good without the bad.  And I
21 believe that's possible.  I believe you can prevent
22 the bad and where you can't prevent the bad you
23 should give teens effective tools at naming it and
24 reducing it.
25     Q.  And do I recall your testimony yesterday,

Page 934

1 Mr. Bejar, to be, that on social media platforms, it
2 might not be possible to completely eliminate the
3 bad side of the equation that you're describing?
4     MR. CARTMELL:  Object to the form.
5     THE WITNESS:  Sorry, could you repeat the
6 question?
7 BY MS. JONES:
8     Q.  Sure.
9     Do I recall your testimony from yesterday
10 to be that on social media platforms, including
11 platforms that have billions of users, it might not
12 be possible to completely eliminate the bad side of
13 the equation that you're describing?
14     A.  Yes, I do.
15     MR. CARTMELL:  Objection.
16     THE WITNESS:  Sorry.
17     Yes, I do.
18 BY MS. JONES:
19     Q.  Okay.  When you say "Yes, I do," you do
20 remember that testimony?
21     A.  Yes, I think that there's sort of a large
22 margin between sort of when you talk about 8, 10, or
23 20 percent of people experiencing something and a
24 fraction of people experiencing something.  And so I
25 think that number cannot go down to zero.  But I

Page 935

1 believe that those numbers could be a fraction of a
2 percent rather than 8 percent, 13 percent, or
3 20 percent of some of the accounts we have covered.
4     Q.  Understand.
5     And I just wanted to make sure that, at
6 least for the jury's purposes, I understood your
7 testimony that you're not suggesting that the number
8 is -- you're advocating that the number must be zero
9 on the potentially bad side of the equation of the
10 benefit versus the downside.
11     A.  I agree.
12     Q.  Okay.  And at least as of this time in
13 2023, August of 2023, it was still the case that in
14 consultation with you, her parent, and based on her
15 own ways of managing her time on Instagram, that it
16 was still, from her perspective and from your
17 perspective, okay for her to continue to be on
18 Instagram; is that right?
19     A.  Yes.
20     Q.  Okay.  And this article -- I just want to
21 finish this paragraph, actually, while we're talking
22 about it.
23     The very last sentence of this article is
24 she had -- starts with the word "She advised."
25     Do you see that?

Page 936

1     A.  Yes.
2     Q.  It says, "She advised those who are
3 interested in automotive restoration but lack
4 resources or time - or just don't know how to - to
5 use social media as a tool to do research and find
6 people whom they admire."
7     Do you see that?
8     A.  Yes.
9     Q.  And do you have any reason to doubt the
10 accuracy of what this is reporting in terms of your
11 daughter encouraging others to use social media as a
12 way to pursue an interest in automotive restoration?
13     A.  We had a conversation about this topic and
14 what we agreed is that when it came to the kinds of
15 issues we're talking about, it was sort of my job to
16 give them voice because she very much did not want
17 to be identified or associated with this
18 professionally.
19     She didn't want to be the girl that was
20 known for, like, the social media experiences, which
21 I completely understand and respect.  And so we --
22 from the beginning of the journey of public speaking
23 around this we had an understanding saying she's not
24 going to talk about it substantially.  She's not
25 going to show up in these kinds of contexts.

47 (Pages 933 - 936)

CONFIDENTIAL

Page 937

1 Because that is my job to do. I am here to be sort
2 of a voice for her. And I strive to do this with
3 her consent and understanding so that she knows what
4 kinds of representations I'm making.
5    Q.  Okay. And that's all fine and good. My
6 question may not have been clear enough.
7       That last sentence says that your daughter
8 had suggested that others who might have an interest
9 in automotive restoration should consider social
10 media as a tool to do research and find people who
11 they admire, right?
12    A.  Correct.
13    Q.  Do you have any reason to doubt the
14 accuracy that that was a suggestion that your
15 daughter had made?
16    A.  That was a suggestion that my daughter
17 made in this article.
18    Q.  Okay. Now, Mr. Bejar, this article is
19 from August of -- August 30th, 2023, right?
20    A.  Uh-huh.
21    Q.  Correct?
22    A.  Correct.
23    Q.  And you testified before Congress in
24 November of 2023, right?
25    A.  Correct.

Page 938

1    Q.  And right before that testimony, your
2 daughter was actually communicating about how much
3 value she had gotten from Instagram, right?
4    A.  She was communicating about her love of
5 cars and part of that love was a role that Instagram
6 played.
7    Q.  When you -- I want to just ask because
8 you've mentioned a couple of times --
9       And we can take that down, Mr. Reynolds.
10      You've mentioned a couple of times that
11 your daughter tried to use certain tools on
12 Instagram but didn't find them to be effective when
13 she would have negative experiences; is that right?
14    A.  She didn't get support or help trying to
15 use those tools.
16    Q.  Okay. Can you tell me specifically what
17 were the tools that your daughter tried to use?
18    A.  Yes. This list is not going to be
19 chronological.
20    Q.  Okay.
21    A.  So reporting, trying to report content,
22 so -- and messages. So, for example, unwanted
23 sexual advances or unsolicited penis pictures are
24 examples of that. Trying to report comments that
25 were sexually suggestive, misogynistic, or harassing

Page 939

1 in other forms in her account.
2       She used block. She used restrict. She
3 tried to use, I believe, hidden words. I don't
4 think she has had a need for limit. And those are
5 the list that I recall right now. She's a very
6 sophisticated user.
7       And so I kind of had to make sure when I
8 talk to her that she has tried all these different
9 things and to see from her experience how effective
10 they have been in terms of providing help or support
11 as she needed it.
12    Q.  When --
13    A.  She eventually ended up giving up on them.
14    Q.  And I apologize for stepping on the tail
15 end of your answer.
16      You've talked about reporting. What
17 happened when your daughter blocked someone -- bless
18 you.
19    A.  Sorry. There's two questions, right,
20 you're asking about reporting and then you said
21 block?
22    Q.  Yeah. I was just signaling that I think
23 you've testified already about your daughter's use
24 of the reporting function. And I was just going to
25 move to the next item that I think I heard you flag,

Page 940

1 which was the block function.
2    A.  Correct.
3    Q.  And what happened when your daughter
4 blocked other users?
5    A.  When you block a user, you disappear from
6 each other on Instagram.
7    Q.  Okay. And when you say that that wasn't
8 effective for her, what does that mean exactly?
9    A.  It meant that when she started getting the
10 penis pictures, unwanted sexual advances, she would
11 block the person, and then sometimes that person
12 would create a different account and block her. And
13 I was glad to see the improvements to block. That
14 meant you could block accounts from a similar
15 device.
16      But also didn't prevent other people that
17 were coming in from different devices, generally
18 fellow teenagers, from contact -- sliding into her
19 DMs and then doing unwanted sexual advances from
20 that place or sending unwanted penis pictures. I do
21 not recall how many of those there were. I do
22 believe it was -- one is too many.
23    Q.  And -- understood.
24      And you actually anticipated my next
25 question, which is, on how many occasions, if you

48 (Pages 937 - 940)

CONFIDENTIAL

Page 941

1 know, did your daughter block someone on Instagram?
2       And let me just -- I apologize.  I didn't
3 mean to startle you.
4       On either of her Instagram accounts?
5    A.  I don't know how many times she would have
6 done that on Instagram.
7    Q.  Do you know if it was more or less than
8 ten?
9    A.  I'd have no basis to know how many times
10 she has blocked people on Instagram.  I've just had
11 conversations with her about when she has done that
12 and how effective.  We had a good conversation about
13 how effective blocking is at deterring somebody from
14 sending an unwanted penis picture.
15   Q.  Okay.  But it sounds like you don't know
16 on how many occasions she might have used that
17 function?
18   A.  That is correct.
19   Q.  Okay.  What about reporting, on how many
20 occasions, if you know, did your daughter report
21 some kind of bad experience?
22   A.  It is my understanding that when she
23 experienced it she tried reporting it and then
24 eventually I believe she gave up on reporting
25 because when she reported an issue, I asked her if

Page 942

1 the content had been deleted and she had told me not
2 once.
3    Q.  And my question, Mr. Bejar, and I
4 apologize if I was not clear, do you know on how
5 many occasions your daughter reported some kind of
6 bad experience?
7    A.  I don't know a precise number.
8    Q.  Okay.  Do you know if it was more or less
9 than ten times?
10   A.  I have no basis to know exactly how many
11 times she reported contents.
12   Q.  Okay.  And you talked about the restrict
13 function on Instagram?
14   A.  Yes.
15   Q.  Did your daughter make use of the restrict
16 function?
17   A.  I believe so.
18   Q.  Okay.  And when you say you believe so,
19 what is your basis for thinking that might be the
20 case?
21   A.  Because we had talked about block and
22 restrict and its properties and when she would use
23 it.  And so that's the basis.  But it wasn't, like,
24 Dad, I restricted somebody today.
25   Q.  Do you know on how many occasions your

Page 943

1 daughter restricted another user on Instagram?
2    A.  I do not.
3    Q.  And to the extent that your testimony has
4 been that restrict was not a useful tool for her,
5 what was the problem?
6    A.  So the problem with restrict is basically
7 it's an invisible measure and so she got relief from
8 that one person that she restricted.  But we talked
9 about, from a community perspective, how those
10 people would continue and do harm to other people
11 because -- and restrict is a wonderful example of
12 that.
13       Restrict makes the invisibility be one
14 way, which in some context is important for safety,
15 but, again, if you want to create an environment
16 where penis pictures are not a norm for messages to
17 14-year-old girls, you kind of have to have visual
18 interactions.  And it's important for people to be
19 able to report or indicate that this was an unwanted
20 nude.
21       I think when you talk about timelines, it
22 was, I believe -- so we talked about 2018,
23 approximately six years ago, when she was 14, that
24 she received her first unwanted penis picture on
25 Instagram and was unable to find a reporting

Page 944

1 category that fit it and indicated that it was an
2 unwanted sexual advance.  She started blocking and
3 there was no way after she blocked somebody to
4 indicate that it was an unwanted sexual advance.
5       It was four years ago that we did the BEEF
6 study that brought up significant data about
7 unwanted sexual advances.
8       And also, an e-mail to Mark Zuckerberg
9 saying how my 14-year-old daughter, as other people
10 had experienced of that age, received unwanted penis
11 pictures.
12       And as the state of the art of all of
13 these things today in terms of safety features for
14 Instagram, it's a minor can still send an
15 unsolicited penis picture to another kid.  Actually,
16 somebody can send an unsolicited penis picture and
17 the safety feature blurs the penis picture and says
18 do you want to see it.  But does not offer the
19 opportunity to say this is an unwanted nude.  In
20 which context it creates a community where the
21 behavior is normalized because there's no way for
22 people to say that's an unwanted advance or an
23 unwanted picture.
24       And so in that six-year time frame, this
25 has been the case.  Just because we keep talking

49 (Pages 941 - 944)

CONFIDENTIAL

Page 945

1 about time I was thinking about that.
2    Q.  Okay.  You mentioned hidden words as a
3 tool that she used on Instagram; is that right?
4    A.  That's right.
5    Q.  Do you remember on how many occasions she
6 would have done that?
7    A.  It's a setting, so I think it's not
8 that -- used it multiple times.  It's that you go
9 into settings and you turn it on in order to be able
10 to use it.  And then whether you then go in and put
11 in the other words that you want to hide above and
12 beyond the ones that are being previously identified
13 by Instagram.
14    Q.  Okay.  And you also referred to limit.
15    A.  Yes.
16    Q.  And can you tell us how your daughter made
17 use of that tool?
18    A.  I think I said that I don't believe she
19 had a need for that because that -- limit is a tool
20 when you kind of get mobbed and so then it's kind of
21 like a switch that says okay, just stop everything
22 for a moment.
23        For a much broader criteria that likely
24 includes harmful as well as good content.  But it's
25 a switch that allows things to get better if you

Page 946

1 have a large following and then suddenly, you get a
2 significant amount of unwanted attention.
3    Q.  Okay.  And your daughter, since she opened
4 her a_car_gal Instagram account, it's always been
5 public; is that right?
6    A.  I believe so, yes.
7    Q.  Has there ever been any occasion when you
8 all discussed whether that account should be
9 private?
10    A.  No, actually, because that -- the way that
11 account was set up, the content shared, because we
12 were weird about her being reidentified from it,
13 there was a lot of care in the things that she
14 shared on that.  And so we did not talk about
15 closing it.
16        When she approached me about experiencing
17 harassment on that account, I kind of measured the
18 level of distress and kind of talked about
19 strategies.  And I did not ask her to close it.
20    Q.  Okay.
21    A.  Or turn it private.
22        (Whereupon, a brief discussion off the
23 record.)
24 BY MS. JONES:
25    Q.  Were there any other tools on Instagram

Page 947

1 that your daughter made use of to the extent that
2 you can recall that?
3    A.  If I had the list of tools in front of me,
4 I could probably match better.  These are the ones
5 that I recall right now.
6    Q.  Okay.  And in her -- in your daughter's
7 @car_girl public account, you have, in fact, been
8 tagged in photos over the years; is that right?
9    A.  That is correct.
10    Q.  And why don't we look at Deposition
11 Exhibit Number 72, which you should have in front of
12 you.
13        Do you have that, Mr. Bejar?
14    A.  I do.
15    Q.  And just so the jury is oriented to what
16 we're looking at, up in the upper left-hand corner
17 is the reference to your daughter's username on her
18 public Instagram account, a car girl -- sorry --
19 a_car_gal.  Thank you.  Excuse me.  G-A-L.
20    A.  Thank you.  It's an important distinction.
21    Q.  I know.  It's important.
22        Correct?
23    A.  Correct.
24    Q.  And then in the image there, is that a
25 picture of your daughter with one of the cars that

Page 948

1 she perhaps has rehabbed; is that what that is?
2    A.  It's a car that she grew up with.
3    Q.  Okay.  Got it.
4        And then a little further down --
5        If we can just maybe put a box around
6 this, Mr. Reynolds, so it's easy enough to see,
7 there's a reference to -- there's a little image of
8 a camera.
9        Do you see that?
10    A.  Yes.
11    Q.  And that means what?
12    A.  That I was the photographer.  That I was
13 the person who took that photograph.
14    Q.  Okay.  And then there's a reference to
15 @arturobejar.
16        Do you see that?
17    A.  I do.
18    Q.  And @arturobejar is your public Instagram
19 account; is that right?
20    A.  Correct.
21    Q.  Okay.  And so what that's telling us is
22 that you took the picture of your daughter that we
23 see here on the screen, right?
24    A.  Yeah.
25    Q.  And it also means that you were tagged

50 (Pages 945 - 948)

CONFIDENTIAL

Page 949

1 when she posted it on her public account; is that
2 right?
3    A.  That is correct.
4    Q.  Okay.  And then this was posted, if we go
5 to the very bottom of the screen, on September
6 the 9, 2020; is that right?
7    A.  Yes.  Getting out for a drive in the
8 pandemic.
9    Q.  Yes.  Well, that would have been an
10 important exercise in mental health, I'm sure.
11    A.  Yeah.
12    Q.  So September 9, 2020.  So this would have
13 been roughly a year into your time back at the
14 company as a consultant; is that right?
15    A.  Correct.
16    Q.  Including working on the Instagram
17 Well-Being team, right?
18    A.  Correct.
19    Q.  And I think you've testified that by this
20 time you were aware of, at minimum, the negative
21 experience survey data; is that right?
22    A.  That's correct.
23    Q.  Okay.  And so this is a -- but this is a
24 public post that your daughter made of a picture
25 that you took to her and -- took of her and that you

Page 950

1 were tagged in, right?
2    A.  That is correct.
3    Q.  And the fact that you were tagged means
4 that you would have known that the picture was
5 posted, right?
6    A.  Actually, before she posted pictures and
7 tagged me, we would discuss it.
8    Q.  Okay.  Got it.
9        So -- that is a helpful clarification.
10       So was it the case that before your
11 daughter would post pictures on her public Instagram
12 account that she would talk to you about her plans
13 to do that?
14    A.  Yes.
15    Q.  And when did -- does that continue to be
16 the case or did that stop when she turned 18?
17    A.  I think she still talk about it sometimes.
18 Again, I'd say this with a little bit of hesitation
19 for precision --
20    Q.  Uh-huh.
21    A.  -- because this is something that we do
22 together.
23    Q.  Yeah.  Understood.
24       And so no question you would have known
25 either because of the fact that you were tagged in

Page 951

1 the post or the fact that you all had had a
2 conversation that your daughter had made this post,
3 right?
4    A.  That is correct.
5    Q.  Okay.  Including after you learned about
6 the negative experience survey data?
7    A.  Yes, I mean, I think that by this time, I
8 was not -- I felt that my -- as I've already said,
9 that my daughter had sort of encountered issues, had
10 strategies, had support, had this whole scaffolding
11 around her so that it wasn't -- I mean, I think -- I
12 think when I look at my daughter today, I'm sort of
13 really proud of how she has carried herself and --
14 and found her way.  And I'm grateful that she had
15 the trust in me to have these conversations around
16 all the experiences that she had.
17    Q.  Okay.  But as of this date, you still
18 thought it was okay for your daughter to have a
19 public Instagram account, a_car_gal, yes?
20    A.  That is correct.
21    Q.  Okay.  Let me ask you to take a look at
22 Exhibit Number -- Deposition Exhibit Number 73.
23       And, Mr. Bejar, this is another post by
24 your daughter on her public Instagram account where
25 her username is a_car_gal, right?

Page 952

1    A.  That is correct.
2    Q.  And is that a picture of your daughter in
3 the red hat in front of the car?
4    A.  Yes.
5    Q.  And the date of this post -- well, before
6 we get to the date, there's that same icon and the
7 indication that you were tagged in the post.
8       Do you see that?
9    A.  That is correct.
10    Q.  And does that mean that you took the
11 picture?
12    A.  At some point -- I believe this picture
13 was from a trip we took a lot earlier.
14    Q.  Okay.  Well, I guess my question was, do
15 you understand that little camera icon to indicate
16 that you took this picture of your daughter?
17    A.  Yeah, yeah, the camera icon, being tagged
18 on it.
19    Q.  Okay.  And whether you knew about it
20 because you were tagged or because you all had had a
21 conversation about it, you were aware that your
22 daughter was posting on her public account a picture
23 that you had taken of her?
24    A.  That is correct.
25    Q.  Okay.  And you would have had an occasion,

51 (Pages 949 - 952)

CONFIDENTIAL

Page 953

1 an ability to see all the hashtags that appeared on
2 the post; is that right?
3    A.   That is correct.
4    Q.   Okay.  And down at the bottom of that
5 post, we can see the date, right?
6    A.   Correct.
7    Q.   And that's November 21st, 2021, yes?
8    A.   That is correct.
9    Q.   And so this would have been after you had
10 completed your time at the company as a consultant,
11 right?
12    A.   That is correct.
13    Q.   And this would have been after the time
14 that you had learned about the BEEF survey data,
15 right?
16    A.   That is correct.
17    Q.   And it would have been after the time that
18 you sent an e-mail to Adam Mosseri and Mark
19 Zuckerberg and Sheryl Sandberg about that data,
20 right?
21    A.   And Chris Cox.
22    Q.   And Chris Cox -- excuse me -- right?
23    A.   That's correct.
24    Q.   And as of this date, November 21st, 2021,
25 for all the factors, all the reasons that you've

Page 954

1 already explained, it was still fine and acceptable
2 to you that your daughter had a public account on
3 Instagram, yes?
4    A.   All the factors that I've explained.
5    Q.   Yes.
6        And so, Mr. Bejar, we were talking about
7 time earlier.
8        Can I have the Elmo, please.
9        I just want to talk a little bit about how
10 these things relate to each other.  I think you
11 testified that your daughter experienced her first
12 unwanted sexual advance in 2018; is that right?
13    A.   Correct.
14    Q.   And while I'm writing this out, was this
15 the case -- did your daughter ever have negative
16 experiences on any of the other social media
17 platforms that she was using?
18        MR. CARTMELL:  Object to the form.
19 Foundation.
20        THE WITNESS:  I mean, that's a really
21 broad question.  I think, for example, Discord, when
22 she went on there, gave her much better tools to
23 create a safe environment to talk about cars than
24 Instagram did.  So she had many lists, bad
25 experiences at Discord than she did at Instagram.

Page 955

1        I believe that her -- in the context of
2 Snapchat, sort of people she didn't know sliding
3 into her DMs was much less of an issue.  And so that
4 was a different kind of -- things that she
5 experienced there.
6        So I think in order to provide like an
7 accurate depiction of the harm that she experienced
8 I would have to touch base with her and ask her
9 about the different products.  It was my
10 understanding, though, in talking to her about these
11 things at the time that she experienced most bad
12 experiences on Instagram compared to other platforms
13 that she used.
14 BY MS. JONES:
15    Q.   Okay.  And just to make sure that I'm
16 precise in the question that I'm posing at the
17 moment, was it the -- you've testified that your
18 daughter was on a number of different social media
19 platforms, right?
20    A.   Over time.
21    Q.   Over time.  Sure.
22        Yes?
23    A.   Correct.
24    Q.   Did she have negative experiences on any
25 of those other social media platforms?

Page 956

1        MR. CARTMELL:  Objection.  Asked and
2 answered.
3        THE WITNESS:  I think I've already
4 answered that question that she had negative
5 experiences on other platforms but more on
6 Instagram.
7 BY MS. JONES:
8    Q.   Okay.  Understood.
9        So in 2019, I believe you've already told
10 us, was when you learned about the negative
11 experience survey data, right?
12    A.   Correct.  Which I believe did not include
13 information of unwanted sexual advances.
14    Q.   Okay.
15    A.   But I might be fuzzy on that right now.
16 It's been a long couple of days.
17    Q.   I know the feeling.  Okay.
18        And then in 2021, you learned about the
19 BEEFs data that you testified about, correct?
20    A.   That is correct.
21    Q.   And that included data on, as you've
22 described it, experiences with unwanted sexual
23 advances?
24    A.   That's correct.  And I also wrote to
25 Mr. Zuckerberg and Mosseri about -- and Chris Cox

52 (Pages 953 - 956)

CONFIDENTIAL

Page 957

1 and Sheryl Sandberg about these unwanted sexual
2 advances on Instagram, in particular, the penis
3 pictures.
4     Q.   And I'll note that since you've mentioned
5 it.
6         And then in 2023, you actually testified
7 on three separate occasions, right?
8     A.   Correct.
9     Q.   You testified in the FTC antitrust action,
10 right?
11    A.   Correct.
12    Q.   You testified in an investigative inquiry
13 with the Tennessee AG's Office, right?
14    A.   Correct.
15    Q.   And you testified before the United States
16 Senate, right?
17    A.   I did.
18    Q.   Or at least the committee of the United
19 States Senate, right?
20    A.   A judiciary committee.
21    Q.   Thank you.
22        And in those last settings, that last
23 setting in 2023 you raised a number of concerns
24 about harms to young people on Instagram, yes?
25    A.   That is correct.

Page 958

1     Q.   Okay.  During the entirety of this period,
2 your daughter had a public Instagram account, yes?
3     A.   No.  I believe that the public --
4     Q.   You're right.  I misstated that.
5     A.   Okay.
6     Q.   At least starting in 2018, your daughter
7 had a private Instagram account?
8     A.   Correct.
9     Q.   Yes?
10        And she was using it with your permission
11 and awareness continually, right up to today, right?
12    A.   That is correct.
13    Q.   And sometime later your daughter created a
14 public Instagram account, yes?
15    A.   That is correct.
16    Q.   And it sounds like you don't know exactly
17 when that was but it was sometime after she started
18 her account in 2018?
19    A.   Yes.
20    Q.   Okay.  And for her -- I'm not going to put
21 a dot on here because we're unsure about the
22 starting point.  But at least for that public
23 account, that continued to be used and open this
24 entire time period, right?
25    A.   Correct.

Page 959

1     Q.   And for all the reasons that you've
2 already explained to the jury, you thought it was
3 acceptable and okay for your daughter to continue to
4 use Instagram, right?
5     A.   Correct.
6     Q.   Okay.  And at the same time, you,
7 yourself, were using Instagram, right?
8     A.   I was.
9     Q.   And that had started at least as early as
10 2015, maybe earlier, right?
11    A.   Yes.
12    Q.   And has continued to be the case right up
13 until the present day?
14    A.   Yes.
15    Q.   You are an Instagram user, as you sit here
16 today, yes?
17    A.   I am, yes.
18    Q.   Instead of writing your daughter's name
19 I'm just going to write "Mr. B's daughter" on this.
20    A.   Thank you for that.
21    Q.   Sure.
22        Do you need to take a break?
23    A.   No, it's okay.
24    Q.   Okay.
25    A.   I'll get through it.

Page 960

1     Q.   Okay.  And so what is reflected here on
2 this timeline, this is an accurate representation of
3 both what you were learning over time but also you
4 and your daughter's actual use of the platform
5 Instagram, yes?
6     A.   Yes.
7         I look at that and --
8     Q.   I'm sorry, Mr. Bejar, there's not a
9 question pending.  So let me get to my next
10 question.
11    A.   Okay.  Of course.
12        MS. JONES:  Can you mark this, please.
13        (Whereupon, Meta-Bejar Exhibit 74 was
14 marked for identification.)
15 BY MS. JONES:
16    Q.   Let me thank you, Mr. Bejar, for letting
17 me ask you those questions.  I know your daughter is
18 near and dear to your heart.  And I am -- was not
19 doing it to upset you, obviously.
20        I'm moving on to another topic.  Do you
21 need a break before we do that?
22    A.   No, I'm okay.
23    Q.   Okay.  Now, I think you told me already
24 that --
25        And I'm going to just -- can you put this

53 (Pages 957 - 960)

CONFIDENTIAL

Page 961

1 at the bottom of your pile so we keep everything in
2 one place. Thank you.
3      MR. WARD: Thank you.
4 BY MS. JONES:
5      Q. I think you've already told me that some
6 of the issues that you've raised in terms of
7 potential bad experiences on Instagram are not
8 unique to Meta's platform; is that right?
9      MR. CARTMELL: Object to the form.
10      THE WITNESS: I mean, that's a pretty
11 broad statement. But yeah.
12 BY MS. JONES:
13      Q. Okay. And just to follow up on that,
14 there are predators who exist on other online
15 platforms, right?
16      A. There were predators when I started
17 working for Yahoo!. There were predators when I
18 started working for Facebook or Meta. And there
19 continue to be predators today.
20      Q. Right.
21      And you started working -- remind me
22 again. You started working at Yahoo! in 1998?
23      A. Yes.
24      Q. Okay. And so that's some years back,
25 right?

Page 962

1      A. Yes.
2      Q. The existence of predators on online
3 platforms has been kind of a chronic problem that
4 the industry has needed to work on, yes?
5      MR. CARTMELL: Object to the form.
6      THE WITNESS: Yes, that's a really -- to
7 call it a chronic problem is, I don't know, it's a
8 little weird to me. The job on my first stint was
9 completely -- again, knowing that the number to zero
10 is very difficult --
11      (Whereupon, a brief discussion off the
12 record.)
13      THE WITNESS: That getting things to zero,
14 like to say there's going to be zero people, but
15 we -- the job was to be extraordinarily aggressive
16 at removing predators from sites, including, for
17 example, we had classifiers that were looking at
18 messages to help find predators that were using
19 Facebook Messenger. Classifiers that I believe no
20 longer work in the context of end-to-end encrypted
21 messages.
22 BY MS. JONES:
23      Q. And I -- Mr. Bejar, I didn't mean to throw
24 you off by asking a question that may have seemed
25 weird.

Page 963

1      My question was simply, going back to your
2 time at Yahoo! in the 1990s, online predators were
3 something that companies had to deal with; is that
4 accurate?
5      A. Something that was -- should be a top
6 priority for every company to deal with.
7      Q. Sure.
8      A. But it should be eradicated as best as you
9 can from whatever platform that you are responsible
10 for.
11      Q. Okay. And predators exist offline as
12 well, right, unfortunately?
13      A. Unfortunately, they do.
14      Q. Okay. And --
15      A. They get more access online.
16      Q. Well -- fair enough.
17      But there's no question that predators are
18 not just online, they also exist offline, right?
19      A. That is correct.
20      Q. And -- and you have described your time at
21 Yahoo! and at Meta.
22      Has it -- was it your experience that
23 there -- that predators sometimes worked to get
24 around the types of tools that companies put in
25 place because the predators are trying to avoid

Page 964

1 detection?
2      MR. CARTMELL: Object to the form.
3      THE WITNESS: Can you repeat the question,
4 please?
5 BY MS. JONES:
6      Q. Sure. Let me remind myself of what the
7 question was exactly.
8      In your experience, predators sometimes
9 work around -- find ways to try and get around tools
10 that companies might put in place to stop their
11 behavior?
12      A. Yes, which is why it's so incredibly
13 important to give a teenager a good tool to tell you
14 when that is happening. My daughter would come up
15 with her phone and show me accounts of people that
16 she knew were fake. And she tried reporting as fake
17 and weren't taken down.
18      And at that point, right, when the request
19 first happens, it's a really powerful point where a
20 teenager can say that person is not who they say
21 they are. And you could use that to stop other
22 predators from doing that.
23      My daughter was not able to do that. When
24 she got that in messages, she was not able to
25 articulate that -- what was happening through the

54 (Pages 961 - 964)

CONFIDENTIAL

Page 965

1 reporting flow. So the company was deaf to her
2 efforts at identifying predators when she came
3 across them. Fortunately, she would talk to me
4 about it and she had a strategy. We had a plan.
5 She used block. I don't believe that at any point
6 in time she was vulnerable to that.
7        But having spoken to kids that have been
8 groomed, I understand all too well how moment of
9 vulnerability for a kid can play out into the most
10 disastrous of consequences.
11       MS. JONES: Okay. Let me move to strike,
12 with respect, everything after the word "Yes."
13       Let me hand you what we have marked as
14 Deposition Exhibit Number 75. This is my copy.
15       (Whereupon, Meta-Bejar Exhibit 75 was
16 marked for identification.)
17 BY MS. JONES:
18    Q.  Mr. Bejar, do you recognize what we've
19 marked as Deposition Exhibit Number 75?
20    A.  Yes, I do.
21    Q.  Okay. And if you look at the bottom of
22 Deposition Exhibit Number 75, this is at least one
23 version of the e-mail that you sent to Adam Mosseri
24 on October 14th, 2021?
25    A.  This was the preread I sent to Adam, I

Page 966

1 believe.
2    Q.  Okay. Got it.
3        And you're welcome to look at whatever in
4 here you would like to.
5        But at the bottom of the second page of
6 that e-mail with Mr. Mosseri, you said -- you have a
7 heading that says, "Can we shift the conversation
8 into one of hope and leadership?" Right?
9    A.  Yes.
10    Q.  And you have a bullet underneath that that
11 says, "Everyone in the industry has the same
12 problems right now." Right?
13    A.  Correct.
14    Q.  And that was a true statement when you
15 wrote it in 2021, right?
16    A.  Yes.
17    Q.  Okay. You -- I think yesterday when we
18 were talking about other social media platforms and
19 the extent to which they've been able to
20 successfully eliminate some of these harms, I think
21 you mentioned Roblox; is that right?
22    A.  I think I mentioned in the context of
23 certain age of accounts where the interactions are
24 mediated. That I believe in that context it would
25 be very difficult to express an unwanted sexual

Page 967

1 advance.
2    Q.  Did you know that, in fact, even as
3 recently as this year, Roblox has been the subject
4 of litigation around child sex predators?
5    A.  I did not know that.
6    Q.  Okay. Well, let me hand you what we've
7 marked as Deposition Exhibit Number 76.
8        (Whereupon, Meta-Bejar Exhibit 76 was
9 marked for identification.)
10 BY MS. JONES:
11    Q.  And just to orient ourselves, Mr. Bejar,
12 this is an article dated February 21st, 2025.
13        You can see that.
14    A.  Uh-huh.
15    Q.  And you're welcome to look at it -- as
16 much of it as you want to.
17        But February 21st is not too long ago, two
18 or three months, right?
19    A.  Correct.
20    Q.  And --
21        MR. CARTMELL: Can I, just real quick,
22 Phyllis, for the record, object to any questions on
23 this. Lacks foundation. It also is hearsay. And
24 I'll object to the form of these questions and any
25 use of this with the witness.

Page 968

1        You can go ahead.
2        MS. JONES: Sure. I think all your
3 hearsay objections are observed for purposes of the
4 record. But it's fine if you want to sit here. If
5 that makes you feel better, it's fine.
6        MR. CARTMELL: I probably shouldn't have
7 said it.
8        MS. JONES: No, no, no, it's okay. It's
9 okay. Although we're sustaining foundation
10 objections. I've got a lot of them on the record.
11    Q.  Okay. Exhibit Number 76, if we look at
12 the title of Deposition Exhibit Number 76, it says,
13 "Roblox is 'hunting ground for child sex
14 predators.'" Right?
15    A.  Correct.
16    Q.  And it refers to a lawsuit that's made
17 that claim, right?
18    A.  Correct.
19    Q.  And in the actual text of the article it
20 says, "A new lawsuit filed in San Mateo County court
21 claims Roblox, one of the most popular online gaming
22 platforms for children in the world, 'provides a
23 hunting ground for child sex predators.'"
24    A.  Correct.
25    Q.  Do you see that?

55 (Pages 965 - 968)

CONFIDENTIAL

Page 969

1    A.  I see that.
2    Q.  If you go to the second page, it says,
3  "The lawsuit was filed by law firm" -- and then it
4  names the law firm -- "earlier this month on behalf
5  of a 13-year-old boy who was an 'avid user of Roblox
6  and Discord.'  Adults can use Roblox and Discord to
7  contact minors through direct messages while
8  pretending to be children, the suit claims."
9        Do you see that?
10    A.  Yeah, I mean, I think that the really
11  important thing about this is that --
12    Q.  My -- I'm sorry, Mr. Bejar.  My question
13  was just do you --
14        MR. CARTMELL:  Whoa, wait.
15        MS. JONES:  Well, my question was, "Do you
16  see that?"
17        MR. CARTMELL:  But he gets to ask [sic] it
18  and then you, if you want to, you can move to strike
19  it.  But he was answering the question and you cut
20  him off, so...
21        MS. JONES:  Well, my -- well, no, he
22  wasn't.
23        MR. CARTMELL:  Go ahead.  Go ahead.  You
24  finish your answer.
25        THE WITNESS:  Okay.  So what --

Page 970

1        MS. JONES:  No, no, no, excuse me,
2  Mr. Bejar.
3        MR. CARTMELL:  That's the rules.
4        MS. JONES:  Well, my -- well, the rules
5  are he has to respond to my questions.  My question
6  was do you --
7        MR. CARTMELL:  You don't get to decide
8  whether he's responding to your question.
9  BY MS. JONES:
10    Q.  My question is, do you see that,
11  Mr. Bejar?
12        MR. CARTMELL:  You can finish your answer.
13        MS. JONES:  Mr. Cartmell, you are
14  inappropriately coaching the witness.
15        MR. CARTMELL:  I'm not coaching the
16  witness at all.  I witnessed what you did, which was
17  he was giving an answer and you cut him off and said
18  whoa, whoa, whoa, whoa, the question is this.
19        You get to let him answer and then he --
20  you can move to strike it and a judge decides later.
21  Phyllis Jones does not decide whether his answer was
22  responsive or not.
23        MS. JONES:  Okay.  I understand your
24  objection.  Thank you.  I understand your objection.
25    Q.  Mr. Bejar, do you see what I read there?

Page 971

1        MR. CARTMELL:  No, what I am saying is
2  he -- finish your answer --
3        THE WITNESS:  Yeah, let's --
4        MR. CARTMELL:  -- and then we'll resume.
5        THE WITNESS:  Can I finish?
6        MS. JONES:  Well, just to be clear, I want
7  an answer to my actual question so you can say
8  whatever you want but I'm going to go back to my
9  actual question.
10        So go ahead.
11        THE WITNESS:  Okay.  I see that the
12  lawsuit was filed on behalf of a 13-year-old boy who
13  has access to messaging where you can actually write
14  messages, which is different from the design of
15  Roblox for younger kids where you cannot type in a
16  message, you have to rely on canned sentences to
17  drive exchanges.
18        And so a messaging context will include
19  adults pretending to be children as sextortionists
20  do on Instagram, and that's one of the key areas
21  that companies have to work on.  So I was not
22  referring to Roblox for 13 and older.  I was
23  referring to the design for younger kids.
24  BY MS. JONES:
25    Q.  Okay.  But for purposes of teenagers who

Page 972

1  are allowed to be on platforms like Instagram,
2  Roblox has the same issue as reflected in this
3  exhibit, right?
4        MR. CARTMELL:  Object to the form.
5        THE WITNESS:  I believe that products that
6  allow direct messaging enable this, which is
7  actually why it's interesting that TikTok for
8  younger users does not allow direct messaging.
9  BY MS. JONES:
10    Q.  You, I think, testified, I think it was
11  Monday, that --
12        We can take that down.  Thank you,
13  Mr. Reynolds.
14        -- that in all of your work you have never
15  seen any other place that has as much bullying as
16  goes on on Instagram.
17        Did you say that?
18    A.  I mean, it was two days ago.  You can see
19  the transcript to be able to say whether that's the
20  words that I used.
21    Q.  Well, is that your view?
22        MR. CARTMELL:  Object to the form.
23        THE WITNESS:  Again, if you're asking me
24  to say do you recall a specific sentence that you
25  said, like, two days ago, like --

56 (Pages 969 - 972)

Page 973

1 BY MS. JONES:
2    Q.  That's not what I'm asking you.
3        I'm asking you, is it your view that in
4 all your work you have never seen any other place
5 that has as much bullying as what goes on on
6 Instagram?
7        And if that's not your view, it's fine.
8 I'm just trying to make sure I understand.
9    A.  No, I'm just -- I'm thinking about sort of
10 the statement because I do think that there's a big
11 difference between the large service providers, so
12 you think about things like Instagram and Snap and
13 the big companies, and then there's like these
14 smaller companies that don't really even begin to
15 try to deal with these kinds of issues.
16       There's kind of like applications that are
17 anonymous by design and I think that's like a
18 terrible environment where you might be experiencing
19 with those issues.
20       What I think when I look at Instagram, if
21 I look at the number of users combined with the
22 percentage of them that experience the issues,
23 combined with the percentage of them that witness
24 the issues happening, I believe that might be the
25 largest community of users that experience those

Page 974

1 issues.
2    Q.  Okay.  Have you actually done a systematic
3 analysis comparing the rate of bullying on Instagram
4 to bullying on other social media platforms?
5    A.  In order to -- for that systematic
6 analysis to be best done, ideally it is done by the
7 platforms within the context of the product with
8 external oversight.  And so it is very difficult but
9 necessary sometimes for external researchers to be
10 able to get enough data in order to be able to make
11 the same kinds of things that you could learn from a
12 survey like BEEF.
13   Q.  Okay.  Mr. Bejar, let me ask Mr. Reynolds
14 to show us page 304 from day one of your deposition
15 this week.
16       MR. CARTMELL:  I'll object to this line of
17 questioning as improper impeachment.
18 BY MS. JONES:
19   Q.  At the top of the page -- we're on
20 page 304.  Do you see line 1?
21   A.  I do.
22   Q.  And do you remember this was questioning
23 by Mr. Cartmell?  Maybe you don't remember.  It's
24 okay if you don't.
25   A.  I don't.

Page 975

1    Q.  Okay.  But you can tell it was not a
2 question by me, right, because I was objecting?
3    A.  I can see that you were objecting.
4    Q.  And I didn't ask any questions on the
5 first day, right?
6    A.  No.
7        MR. CARTMELL:  Can I have a continuing
8 objection to this?
9        MS. JONES:  Yes.
10       MR. CARTMELL:  Please.  Thank you.
11       MS. JONES:  You're welcome.
12   Q.  The question, starting at line 1, is, "In
13 all of your work have you ever seen in any other
14 place as much bullying that goes on on Instagram?"
15       That was the question, right?
16   A.  That is correct.
17   Q.  And your answer was, "No, I have not seen
18 as much bullying in other environments as I have
19 seen in Instagram."
20       Do you see that?
21   A.  Yes.
22   Q.  Okay.  And let me go back to my question.
23       Have you done a systematic analysis of the
24 rate of bullying across social media platforms?
25   A.  I have not.

Page 976

1        MS. JONES:  We can take that down, please,
2 Mr. Reynolds.
3    Q.  Do you -- do you -- is bullying a complex
4 issue in terms of trying to manage it and minimize
5 it as much as possible?
6        MR. CARTMELL:  Object to the form.
7        THE WITNESS:  Sorry, that -- can you
8 repeat the question?
9 BY MS. JONES:
10   Q.  Yes.
11       Is bullying a complex issue in terms of
12 trying to reduce it and also manage it when it
13 happens?
14       MR. CARTMELL:  Same objection.
15 BY MS. JONES:
16   Q.  Manage the results when it happens?
17       MR. CARTMELL:  Sorry.  Same objection.
18       THE WITNESS:  That question is too broad,
19 I believe, because the idea of providing a teenager
20 effective help and support when they are
21 experiencing bullying, that is not a -- that is
22 something that has already been done.
23       And there's significant amount of work
24 done by Facebook in my first stint as to the
25 properties that a tool should have that you give a

57 (Pages 973 - 976)

CONFIDENTIAL

Page 977

1  teenager to deal with -- I mean, if you use bullying
2  as a top level topic, but it really means a lot of
3  things.
4       And so if the question is about is it --
5  is it a complex problem to create a tool that
6  provides meaningful help for a teenager when they've
7  experienced bullying.  The answer to that is a lot
8  of complexity around it has already been worked out
9  and has been done.
10      You want the person to be able to express
11  the issue, to tell you the intensity of the issue,
12  and then you give them resources and support
13  depending on the combination of the issue and the
14  intensity, completely separate from whether the
15  content is something that you would remove or not.
16  Which takes lessons from how these things work in
17  school environments and other areas where it needs
18  to be addressed.
19  BY MS. JONES:
20      Q.  Mr. Bejar, by the time that you had left
21  Meta in 2015, had your team eliminated bullying on
22  Facebook or Instagram?
23      A.  I mean, I think we have established a
24  couple of times during the questions that you have
25  been asking me that the concept of elimination,

Page 978

1  right, to zero, I think successfully and completely
2  solving the problem is not -- I don't know even what
3  words to use at this point.  I think I've already
4  covered that.
5       But it's like some of these things, right,
6  you break them down, are you helping the person with
7  issue when they're experiencing it.  Are you using
8  that information to drive that the likelihood of
9  this information to happen -- of this issue
10  happening down.  Are you giving feedback to the
11  people that were initiating.
12      We saw from the work in -- from 2012 or
13  2011 to 2015, that teenagers that got told that they
14  were having a negative impact on other teenagers
15  appreciated receiving the feedback and adjusted
16  their behavior therefore driving down the likelihood
17  that they would be sources of bullying.
18      If you have a system like that running
19  over a long enough period of time, you create an
20  environment where it's not acceptable or the norm
21  for that to happen.
22      If you do not do that, you create an
23  environment where if somebody sees a comment
24  harassing somebody else with things like racism,
25  things -- other things that really might affect

Page 979

1  somebody in a moment of vulnerability, that
2  normalizes the behavior, and so it's so critical
3  that you follow these things.  And these things,
4  right, are very doable, very workable.
5       The company had been doing them with very
6  good metrics by 2015 and I was -- I really hoped
7  that the similar framework with the technology that
8  we have today is available to kids today because
9  that would make a big difference.
10      MS. JONES:  I'm going to move to strike
11  all of that as nonresponsive.
12      Q.  Is it the case that bullying happens in
13  schools?
14      A.  Yes.
15      Q.  And as far as you know, have schools been
16  able to eliminate bullying?
17      A.  A number of schools have been able to make
18  a huge reduction in bullying through the application
19  of something called -- one of the examples of
20  this -- called the RULER program, which was
21  developed by Yale.
22      And it was the results of the RULER
23  program that led us to partner with Yale to develop
24  products.  Because as far as I could tell, that was
25  best in class in the world at meaningfully reducing

Page 980

1  the amount of bullying that was happening in schools
2  in a measurable and sustainable fashion.
3       Q.  What is the specific -- what are the
4  specific schools that you're thinking of where,
5  based on what you just described, there was a huge
6  reduction in bullying?
7       A.  You have to look at the papers published
8  by ████████ and ████████ about the
9  application of the RULER program in schools.
10      Q.  Okay.  So could you give me a name of the
11  school today?
12      A.  I don't recall.  This was ten years ago.
13      Q.  Okay.
14      A.  Or more.
15      Q.  Let me take just one other example of this
16  notion of social comparison that you talked about.
17      You're familiar with that as just a
18  concept?
19      A.  Yes.
20      Q.  And the experience of comparing one's self
21  to another person, that can be just a natural part
22  of life.
23      Can we agree on that?
24      A.  Yes.
25      Q.  And comparison can be negative but it can

58 (Pages 977 - 980)

CONFIDENTIAL

Page 981

1 also be positive, right?
2    A.   That is correct.  I think, though,
3 negative in volume can be profoundly harmful.
4    Q.   Understood.
5       For example, I might compare -- in the
6 category of negative self-comparison, I might
7 compare my house to my neighbor's house and feel bad
8 because I wish I had a nicer house, right?
9    A.   In the context of negative comparison, two
10 of the parents that I spoke to, mothers in this
11 case, told me that in both cases the daughters, who
12 were absolutely beautiful, after spending a
13 meaningful amount of time on Instagram said, I'm not
14 beautiful enough.  I'm not good enough.  And this is
15 the case of two teen girls that I believe committed
16 suicide.
17       MS. JONES:  I'm going to move to strike
18 all of that as nonresponsive.
19    Q.   My question was, in the category of
20 negative social comparison, I might compare my house
21 to my neighbor's house and I might feel badly
22 because I wish I had a different or better house,
23 yes?
24       MR. CARTMELL:  Objection.  Asked and
25 answered.

Page 982

1       THE WITNESS:  I believe I've already
2 answered the question.
3 BY MS. JONES:
4    Q.   You have -- you have not.  But let's take
5 something closer to your example.
6       If I'm a teenager, I might see the outfit
7 that another teenager is wearing, and I might feel
8 some kind of negative feeling because I wish I had
9 different or better clothes, right?
10       MR. CARTMELL:  Object to the form.
11       THE WITNESS:  Yeah.
12 BY MS. JONES:
13    Q.   But social comparison can also play out in
14 a positive direction, right?
15    A.   It can play out on a positive direction
16 and a negative direction, which is absolutely
17 essential to get intensity data on the negative
18 direction so that you know whether you're talking
19 about a teenager that's comparing clothes or a
20 teenager who is feeling very bad about themselves
21 after spending a long time on Instagram.
22       MS. JONES:  Okay.  Let me move to strike
23 everything after the first -- the second direction
24 in that answer.
25    Q.   And just to take an example in that

Page 983

1 category, I might see that you play tennis well and
2 I might be inspired to improve my own tennis game,
3 right?
4       MR. CARTMELL:  Objection.
5       THE WITNESS:  I believe I've answered
6 this.  But one of the things that I've noticed in
7 the way that Meta talks about these issues is they
8 grab ahold of an example but they don't give enough
9 credit to the negative example and that's
10 fundamentally the problem that I believe we're
11 talking about today.
12       MS. JONES:  I'm going to move to strike
13 all of that as nonresponsive.
14    Q.   Mr. Bejar, it's my sincere hope that we
15 finish up today, but I really am going to ask that
16 you try your best to focus on my questions as you
17 can, okay?
18    A.   I am very focused on your questions.
19    Q.   Okay.  And some of the experiences, the
20 negative experiences that might relate to being a
21 teenager are things that could happen offline,
22 right?
23    A.   Correct.
24    Q.   So in your example, and it is no doubt
25 indeed a very tragic example, a teenager could

Page 984

1 observe another teen and draw comparisons between
2 her looks and someone else's looks offline, right?
3    A.   I believe that the difference between the
4 example that you quoted and the example that I
5 quoted is that -- and it's I believe one thing to
6 see one person in school and have feelings about it
7 and that's substantially different to seeing, like,
8 potentially thousands of posts that reinforce that
9 notion.
10       MS. JONES:  I'm going to, again, move to
11 strike as nonresponsive.
12    Q.   My question was simply an example that you
13 articulated earlier involving a teenage girl who's
14 comparing her looks to someone else's looks.  That
15 is something that could play out off the internet,
16 right?
17       MR. CARTMELL:  Objection.  Asked and
18 answered.
19       THE WITNESS:  I believe I was talking
20 about the example I articulated earlier.
21 BY MS. JONES:
22    Q.   Okay.  And that could happen off the
23 internet?
24    A.   I think it's fundamentally different on
25 the internet than off the internet.

59 (Pages 981 - 984)

CONFIDENTIAL

Page 985

1    Q.  Sure.
2        It could be different in intensity, it
3  could be different in volume, but it could also
4  happen off of the internet?
5    A.  Correct.
6    Q.  Yes?
7        Mr. Bejar, I want to talk a little bit
8  about your proposed -- what you referred to as the
9  framework, which you're familiar with, I assume?
10   A.  Yes.
11   Q.  Because that's the term you used during
12 the course of your testimony.  And just to, very
13 briefly, this is going to be the nutshell version of
14 what you said.
15       But as I understand the framework, the
16 elements of the framework are giving a teen the
17 ability to report an experience in terms of
18 including how it made the person feel and intensity,
19 right?
20   A.  Well --
21       MR. CARTMELL:  Object to the form.
22       THE WITNESS:  No, that's not --
23       MR. CARTMELL:  Mischaracterizes.
24       THE WITNESS:  That's not right.
25 ///

Page 986

1  BY MS. JONES:
2    Q.  What is the first element, the nutshell
3  version of the first element of the framework?
4    A.  The ability to -- effectively, right,
5  which means that the teen's able to say what they're
6  experiencing.  That was what was missing in what you
7  described.
8    Q.  Okay.  The ability to effectively report
9  what the teen is experiencing.
10   A.  Again, that's missing all of the elements
11 that you said, right.  I mean, I think the nutshell
12 version is for report is effectively -- which means
13 you're able to articulate the issue that they're
14 experiencing in terms that work for them.  You want
15 to be able to do intensity.  So you need to know,
16 like, where it happened, what happened, and how bad
17 it was.  So yeah -- so where it happened, what
18 happened, and how bad it was.  And that's what I
19 mean by effectively.
20   Q.  What's item number two, the nutshell
21 version of the framework?
22   A.  Item number two is to use the information
23 from number one to prevent other people from
24 experiencing similar issues.
25   Q.  And what does that mean, concretely?

Page 987

1    A.  It means that if a -- number one, a
2  teenager tells you I'm experiencing an unwanted
3  advance and it makes me really uncomfortable, it
4  should take probably one or two of those for you to
5  limit the people that the person is contacting or at
6  least for you to further investigate and go find
7  similar accounts.
8        And so if you take an example of
9  sextortion, the first moment that a teen realizes
10 what is happening, they should be able to
11 effectively say this person is fake, I believe
12 sextortion is happening, and then have the messages
13 where it happens.
14       The fact that -- how important this is for
15 them and you can use that information to then
16 identify that account and potentially similar
17 accounts that might be performing that activity.  So
18 that's what the prevent part does.
19   Q.  Okay.  That was the second element of the
20 framework?
21   A.  Yeah.
22   Q.  And third element of the framework, I'm
23 going to take a stab at nutshelling it, is, in
24 essence, giving feedback to the person who might
25 have been the source of the offending conduct?

Page 988

1        MR. CARTMELL:  Object to form.
2  Mischaracterizes.
3        THE WITNESS:  Yeah, that's not quite
4  right.
5  BY MS. JONES:
6    Q.  Okay.  Give me the nutshell version.
7    A.  Feedback where appropriate to the person
8  that initiated the contact or created the content.
9    Q.  Okay.  And then, again, I'm going to take
10 a stab at an abbreviated version of the fourth
11 element that I think I've heard you testify to,
12 which is measuring the effectiveness of your system.
13       MR. CARTMELL:  Same objections.
14       THE WITNESS:  Yeah, that's not correct.
15 BY MS. JONES:
16   Q.  Okay.
17   A.  Accurate.
18   Q.  What is the nutshell version in your
19 words?
20   A.  Ongoing measurement and monitoring of the
21 effectiveness of these -- of the interventions.
22   Q.  Okay.  You testified, I think it was on
23 the first day, and if you need to see it we can pull
24 up the transcript, that this framework was more
25 likely than not to reduce harm.

60 (Pages 985 - 988)

CONFIDENTIAL

Page 989

1     Do you recall that?
2  A.  Yes.
3  Q.  I do not recall you, in your testimony
4  either Monday or Tuesday, showing the jury any data
5  supporting the idea that your framework would reduce
6  harm more than a different framework?
7     MR. CARTMELL:  Object to the form.
8  BY MS. JONES:
9  Q.  Did you show the jury -- and, again, I'm
10  just -- we can -- you can explain as much as you
11  want to but I first just want to understand.
12     Have you shown the jury any data in the
13  course of the last two and a half days that confirms
14  that your framework would actually reduce harm?
15     MR. CARTMELL:  Object to form.
16     THE WITNESS:  I believe I have.  I think I
17  talked about, for example, the -- how the -- how
18  important it is for a teenager to say what
19  experience they're -- what issue they're
20  experiencing, which we built, what intensity it was,
21  which we built, and then an intervention that was
22  based on that information that provided them
23  support.
24     I believe I spoke about, which if I
25  didn't, then I can do it now, that part of that

Page 990

1  framework included in that context, where
2  appropriate, giving feedback to other teenagers or
3  other people that had initiated the interaction and
4  we measured that as well.  And a lot of the data
5  surrounding these issues was in presentations that
6  were made public between 2011 or '12 and 2015.
7  BY MS. JONES:
8  Q.  And my question, Mr. Bejar, was much more
9  specific.
10     In the course of your two and a half days
11  of deposition testimony so far, have you shown the
12  jury any specific data that confirms that the
13  framework that you've laid out would be more
14  effective at reducing harm than other tools that the
15  company is using?
16     MR. CARTMELL:  Same objection.
17     THE WITNESS:  I believe I've answered that
18  question in the context of the numbers and the
19  statistics that I've quoted about the teen tools
20  that were created during that period of time --
21  BY MS. JONES:
22  Q.  Do you --
23  A.  -- for Facebook.
24  Q.  Excuse me.
25     Do you have in your possession a

Page 991

1  spreadsheet or some other kind of document that
2  captures actual data that shows that the application
3  of your framework would reduce harm more than what
4  the company is already doing on Instagram?
5  A.  I provided the documentation to that
6  effect.  I believe in part of the documentation that
7  I produced included the presentations that I had
8  access to from compassion research days where we
9  talked about these issues in detail with metrics,
10  with both research on impact of talking to users,
11  both the people who were the targets of the issues,
12  and where appropriate the people who initiated the
13  issues.
14     So yeah, we -- and extensive results of
15  what you can accomplish by creating these kinds of
16  feedback loops.
17     So I think if you make those presentations
18  available and you look at them they have detailed
19  metrics and data which were made public about the
20  effectiveness of the framework.
21  Q.  Okay.  Mr. Bejar, in the interest of time,
22  I'm not going to keep asking the same question.  I'm
23  very hopeful that either Mr. Cartmell or Mr. Phelps
24  will be able to show that data to the jury before we
25  let you go, hopefully today.

Page 992

1     Let me talk to you --
2     MR. CARTMELL:  Hold on.  Let me object and
3  move to strike the statement of counsel.
4     And make it clear on the record that that
5  data that he just mentioned was produced to you.  So
6  you have it.
7     MS. JONES:  Well, we don't need to go back
8  and forth about what we think was produced or not.
9  Q.  I do hope to be able to see the data
10  before we finish your deposition, though.
11     Let me ask you about the testing that you
12  have described and shown videos from.
13     And I want to actually just first --
14     Can you pull up Deposition Exhibit
15  Number 12, please.
16     (Whereupon, Meta-Bejar Exhibit 12 having
17  been previously marked, was introduced.)
18  BY MS. JONES:
19  Q.  And this is a -- what you describe as a
20  protocol related to testing that you have done since
21  November of 2023; is that right?
22  A.  Correct.
23  Q.  And just so we're clear on the basic
24  parameters here, you, an adult user of the platform,
25  went onto Instagram and created a handful of

CONFIDENTIAL

Page 993

1 accounts pretending to be a 13-year-old girl; is
2 that right?
3    A.  No, I think that doesn't frame it
4 correctly.  I think that me as a -- somebody with a
5 lifetime of experience of these issues who wishes to
6 speak accurately about the experience of younger --
7 of a teen account and how well those features work
8 relative to Instagram's description of it went and
9 created a serious series of test accounts.
10       I will also say that I think it would be
11 so important for Instagram to have like a formalized
12 testing process that allows researchers unfettered
13 access from the perspective of these accounts so
14 that you could have independent verification beyond
15 what I was able to do or what other parties are
16 doing about how effective these measures that
17 Instagram has are at preventing harm for teenagers
18 or how effective they are at helping teenagers when
19 they experience harm.
20    Q.  And these accounts you created were
21 accounts where you were pretending to be a
22 13-year-old girl?
23    A.  Again, I think that's a --
24    Q.  Let me take -- if I remove the word
25 "pretending," maybe that's what you're getting hung

Page 994

1 up on.
2    A.  These were test accounts where the age was
3 13 and 14.  There were some accounts that were girls
4 and there were some accounts that were boys.
5    Q.  Well, let me come to that point.
6       How many accounts did you create of teen
7 girls and boys?
8    A.  I think initially it was approximately
9 seven.
10    Q.  And when you said -- you say initially it
11 was seven.  Did that number change in some way?
12    A.  No, because I kind of, like, stopped
13 looking at it -- at the boy accounts after my
14 initial testing.  And these are the accounts that
15 I've looked at since, the ones that I listed.
16    Q.  Okay.  And those are the 13-year-old girl
17 accounts?
18    A.  Correct.
19    Q.  All right.  And did anyone ask you to do
20 this?
21    A.  No.
22    Q.  You're not doing it as part of a law
23 enforcement effort?
24    A.  No.
25    Q.  You were not hired by Meta to do it?

Page 995

1    A.  No.
2    Q.  You were not hired by any other social
3 media company to do it?
4    A.  No.
5    Q.  You were not doing it as part of some kind
6 of research exercise being run through an academic
7 institution like a college or a university?
8    A.  No.
9    Q.  And did the lawyers ask you to do it?
10    A.  No.
11    Q.  You came up with this idea on your own?
12       MR. CARTMELL:  Object to the form.
13       THE WITNESS:  I thought about doing this
14 after reading some articles about how Instagram was
15 behaving and I thought I really wanted to get some
16 firsthand experience of what the articles were
17 conveying.
18 BY MS. JONES:
19    Q.  What articles did you read?
20    A.  The -- I think it was an article by Jeff
21 Horwitz of the Wall Street Journal that talked about
22 how frequently there were accounts of girls and how
23 they were followed by pedophiles and sort of that
24 whole network aspect of things, which was related to
25 my findings, although the -- the -- I think the

Page 996

1 challenge with it -- with the problem space is that
2 it's really important to separate out kind of
3 sexually provocative content or content that's sort
4 of exploitative from CSAM which is a definition
5 that's much more -- necessarily now.
6    Q.  And you understand that there are billions
7 of users on Instagram?
8    A.  Yes.
9    Q.  You created only seven accounts; is that
10 right?
11    A.  I believe so.
12    Q.  And of the seven accounts, you eventually
13 stopped tracking the boy accounts?
14    A.  Correct.
15    Q.  Why did you stop tracking the boy
16 accounts?
17    A.  The reason was, and sort of the gaps in my
18 testing, was that I found the testing very
19 distressing because -- I mean, in my lifetime of
20 doing security work, one of the things I regularly
21 did would be this exercise.  Like, I did that at
22 Yahoo!.  I created a team who did that at Yahoo!.  I
23 did this at Facebook.
24       I automated a lot of this work at Facebook
25 and so part of my process in looking at these issues

Page 997

1 was doing that. And full transparency, I was not
2 prepared emotionally for what I found and what I
3 saw.
4     Q.    Yeah, I'm sorry, Mr. Bejar, I'm not sure I
5 understood the answer to my question.
6         Why did you stop tracking the boy
7 accounts?
8         MR. CARTMELL:  Objection. Asked and
9 answered.
10        THE WITNESS:  I believe I've already
11 answered it.
12        I paused my testing because I found
13 emotionally -- I found it emotionally distressing,
14 and then eventually when I picked up my testing
15 again, I focused on the girl accounts because I had
16 all of them set up in a single phone and that made
17 the testing easier.
18 BY MS. JONES:
19    Q.    Okay. So let me just make -- I just want
20 to make sure I understand and, more importantly,
21 that the jury understands the sequence.
22        You started by creating seven accounts of
23 teen girls and boys in 2023; is that right?
24    A.    Correct.
25    Q.    And you did that on your own, no one asked

Page 998

1 to do it; is that right?
2    A.    Correct.
3    Q.    And how many boys and how many girls did
4 you start with?
5    A.    I believe it was four girls and three
6 boys. But, again, I don't recall in detail right
7 now.
8    Q.    Okay. And then it sounds like at some
9 point the results of the testing were distressing to
10 you and so you stopped focusing on the testing?
11    A.    Correct.
12    Q.    And then how far into the testing were you
13 when you stopped it at that point?
14    A.    I think that my first round of testing was
15 dedicated at understanding the kind of content that
16 was being recommended by Reels under different
17 testing circumstances.
18        And then I -- the one piece of testing I
19 revisited regularly was searching for the words "I
20 want to hurt myself" to see how the product behaved
21 in this context.
22        And then when I picked up my testing again
23 around a month ago my goal was to test Teen Accounts
24 and to add a parent account and then to see how the
25 different safety features behaved.

Page 999

1    Q.    How far apart or how much time passed
2 between when you stopped your testing because you
3 found the results distressing and when you picked it
4 back up recently?
5    A.    I would say around a year with what I said
6 that there were times where I did revisit it during
7 that year. And, again, the experience was very
8 distressing so then I would stop.
9    Q.    Okay. Let me ask you to look at
10 Deposition Exhibit Number 12. You have that in
11 front of you, yes?
12    A.    I do.
13    Q.    And this is the protocol for what you've
14 just described?
15    A.    Correct.
16    Q.    When did you create the protocol?
17    A.    I wrote this document recently by
18 gathering sort of the -- the -- my notes on the work
19 that I had done. And just validating my
20 recollection with file date creations and looking at
21 all of the sort of original -- so what I would do is
22 I would do the screen recordings raw, I would create
23 a backup of them, and then for clarity I would label
24 the recordings and -- in order to make sure that
25 this was accurate to the best of my ability. I

Page 1000

1 revisited each aspect of that.
2    Q.    And when you say you wrote the protocol at
3 Deposition Exhibit Number 12 recently, was it in
4 2025?
5    A.    Correct.
6    Q.    Okay.
7    A.    Well, I wrote this document in 2025. The
8 protocol that I used for testing was done in 2023
9 when I began the testing.
10    Q.    Is there a separate written protocol that
11 you created in 2023?
12    A.    I did not.
13    Q.    Okay. So the protocol that you created
14 got created after you had done, it sounds like, a
15 lot of the work; is that right?
16    A.    No, that's not right. Because in order
17 for the work to be reliable, I had to have out of
18 the gate a set of protocols that I followed
19 consistently.
20        So, again, I created the very first
21 account, which is covered here. And that was
22 different because I was just kind of getting my
23 bearings. And then being staggered by my initial
24 findings, I went, like, no, what I need to do is I
25 need to create other accounts and then have --

63 (Pages 997 - 1000)

CONFIDENTIAL

Page 1001

1  document from the account creation into Reels and
2  have the only thing that that account does do, Reel
3  video watching.  And I did that on three other
4  accounts.
5       And then the other thing that was a
6  consideration was that if you used the account
7  approximately once a day for around two weeks, which
8  I did for these three accounts, you start getting
9  ads recommended for those accounts.  Because I
10 wanted to see what kind of ads were adjacent to what
11 kind of content.
12  Q.  Just I want to be very clear, Mr. Bejar.
13      There is not a written protocol that you
14 put together before you started this, right?
15  A.  That is correct, as I have been doing all
16 my life.
17  Q.  Okay.  And you know that it is routinely
18 the case that when actual scientific experiences --
19 experiments are run, you start with a written
20 protocol so that you have a guide for how you should
21 carry out the work?
22      MR. CARTMELL:  Object to the form.
23 BY MS. JONES:
24  Q.  Are you familiar with that as a matter of
25 process?

Page 1002

1       MR. CARTMELL:  Same objection.
2  BY MS. JONES:
3  Q.  I can ask the question again.
4  A.  Thank you.
5  Q.  Are you familiar with the fact that it is
6  routinely the case when you run an actual scientific
7  experiment that you actually start with putting
8  together and writing down a written protocol?
9       MR. CARTMELL:  Same objections.
10      THE WITNESS:  I mean, if what you are
11 saying, right, is I'm testing a vaccine or I'm
12 dealing with issues, then there's methodologies and
13 procedures related to that.
14      Again, from having been doing this in the
15 industry for the longest time, what I did here was
16 similar to what I would do at Yahoo! and had team --
17 managed teams I did at Yahoo! as to sort of -- in
18 order to assess and understand the content.
19      But also the other aspect of this, right,
20 is that the -- sort of the importance of the -- of
21 the nature of the contents that was getting
22 recommended given what I was doing.  And I believe
23 that there should be, right -- and this is a process
24 where you start with something like this and then
25 you hand that to other people in order to establish

Page 1003

1  an ongoing process to do this at scale.
2       So that, for example, I believe -- and I
3  don't know and was never aware of this at Instagram,
4  whether there was an effort to do this kind of
5  testing in the product.  I don't know if anybody at
6  Instagram has done this kind of testing within the
7  product and seen what kind of content was getting
8  recommended to a teen account with sensitive
9  controls on.
10      And so -- so I think this is intended to
11 be sort of a -- early indication that it's
12 accurate for what it is and indicates the ease at
13 which this kind of content can be found.
14      And I believe that there ought to be
15 independent, thorough, ongoing testing of all of
16 these services and all of these safety features to
17 be done with the support of the companies because
18 it's hard to do this testing sometimes.
19      MS. JONES:  I'm going to move to strike
20 all of that as nonresponsive.
21  Q.  Mr. Bejar, if I wanted to look at a
22 document and say this is what Mr. Bejar planned to
23 do and then test it against what you actually did,
24 that document does not exist from 2023; is that
25 right?

Page 1004

1  A.  That document does not exist from 2023.
2  Q.  Okay.  And the protocol that you generated
3  recently, in 2025, does not include certain steps
4  that you took in terms of how you went about your
5  testing, right?
6  A.  So that's not accurate.  So the
7  documentation that I created in 2025 that captured
8  the protocol that I did in 2023 is also backed up by
9  a video that shows from start to finish from
10 account -- from the moment the account was created
11 for one of the accounts to the Reels getting
12 recommended, the actions that they took.  So I
13 consider that to be a very reliable indication of
14 what I did.
15  Q.  Well, let me ask you a very specific
16 question.
17      On Deposition Exhibit Number 12, which
18 you've described as your protocol --
19  A.  Uh-huh.
20  Q.  -- there is no discussion of the fact that
21 you started with seven accounts, including boys,
22 right?
23  A.  I was not comfortable with my
24 recordkeeping in the boys to include them in this
25 document and that's why I kind of focused on the

64 (Pages 1001 - 1004)

Page 1005

1  girl accounts.
2      Q.  Fair enough.
3          But in this document, if I was trying to
4  understand what you had actually done, if I looked
5  at this document, I would not know that you started
6  with seven accounts and then decided to drop three
7  of them, right, if I was just relying on your
8  protocol?
9      A.  That is correct.
10     Q.  Okay.  And I also wouldn't know from
11 looking at your document here at Deposition Exhibit
12 Number 12 that you start your testing in November of
13 2023 and then you stopped testing because you were
14 distressed by what you were seeing.
15         Is that reflected in Deposition Exhibit
16 Number 12?
17     A.  I did not put that in this document, I
18 believe.
19     Q.  Do you know or could you point me to
20 another example of an experimental setting where the
21 folks running the experiment are able to pause the
22 experiment because they are concerned or troubled by
23 the initial results of the experiment?
24         MR. CARTMELL:  Object to the form.
25 ///

Page 1006

1  BY MS. JONES:
2      Q.  Can you give me another example of that?
3          MR. CARTMELL:  Same objection.
4          THE WITNESS:  Actually, yes, I have had
5  conversations with CCDH around testing and in that
6  context, they -- we discussed with the head of
7  research, I think his name is Callum something or
8  other, at the time that they tried to do some things
9  and that the people doing the testing found them
10 emotionally distressing and as a result of that,
11 they decided to pause the testing and find emotional
12 support for the people who were doing the testing.
13 BY MS. JONES:
14     Q.  And --
15     A.  In a way, that's kind of similar to the
16 kind of emotional support that people who do content
17 review need when they're reviewing sort of
18 distressing content.
19     Q.  And just so the jury understands, CCDH is
20 what?
21     A.  It is an independent organization that
22 does studies of harm as it plays out in different
23 platforms.
24     Q.  And who -- I'm sorry, I didn't mean to
25 interrupt.

Page 1007

1      A.  Yeah, I don't recall right now what the
2  acronym stands for.
3      Q.  And who did you specifically talk to about
4  running an experimental test where the testing was
5  stopped because the people involved in it were
6  distressed by what the results yielded?
7      A.  The person who managed the testing team.
8  His first name is Callum.  I don't remember his last
9  name right now.  This was a conversation that I had
10 I think around a year ago.
11     Q.  Okay.  So in 2024?
12     A.  Correct.
13     Q.  Any other examples you can point me to of
14 experimental testing situations where the
15 researchers paused the testing because the
16 preliminary results were distressing to them?
17         MR. CARTMELL:  Object to form.
18         THE WITNESS:  I believe -- and I'm trying
19 to remember -- that this is also a topic that I
20 discussed with ████████, the PM in charge of
21 child endangerment and grooming and those issues.
22 And I believe also the people who do that kind of
23 research can find it very distressing and need
24 similar support structure.
25 ///

Page 1008

1  BY MS. JONES:
2      Q.  How did you -- when did you have that
3  conversation?
4      A.  I think it was during my first stint.
5      Q.  From somewhere between 2019 and 2015?
6      A.  Yes.
7      Q.  Okay.  And just in terms of how you went
8  about what you did here, did you rely on -- let me
9  start with an example -- any kind of textbook that
10 says this is how you run a test like this?
11     A.  There is no textbook about how you test
12 Reels.  I think the timeline of textbook development
13 would prohibit that.
14     Q.  Okay.  What about anything in the
15 peer-reviewed literature?  Did you rely on anything,
16 an article or something from a journal on this is
17 how you go about doing this?
18     A.  No, I relied on having been doing this.
19         Again, this was part of my
20 responsibilities at Yahoo!  And generally, I mean, I
21 think the testing of the product is always par for
22 the course for when you're responsible for one.
23     Q.  Did you rely on any kind of guidance from
24 any kind of professional organization like a law
25 enforcement organization or anybody else?

65 (Pages 1005 - 1008)

Page 1009

1    A.   I did not, but I did discuss testing that
2  I had done with Callum again.  So I discussed my
3  methodology.  I was helping them inform their own
4  methodology for testing.  And also they shared some
5  of their own findings and issues.  So I was kind of
6  helping them with that.
7         And I believe I also shared some of my
8  testing and testing protocol with Laura Edelson.
9    Q.   And I apologize.  Who is Laura Edelson?
10    A.   She's an academic who studies these kinds
11  of issues.
12    Q.   When you say you shared your testing
13  protocol, do you mean you shared Deposition Exhibit
14  Number 12 with Laura Edelson?
15    A.   No, because this was, again, a document
16  was written.  But when I say the "testing protocol,"
17  I'm talking about the testing protocol that I
18  defined in 2023.
19    Q.   Okay.  And other than the discussions that
20  you've described and your own experience, is there
21  any authoritative source out there in the world that
22  you could point me to and say this is what I drew
23  upon to figure out how to do what I did here?
24         MR. CARTMELL:  Object to form.
25         THE WITNESS:  No.

Page 1010

1  BY MS. JONES:
2    Q.   And other than the lawyers in these cases,
3  has anybody else seen Deposition Exhibit Number 12?
4    A.   I would need to check my e-mail records.
5    Q.   Do you have any recollection of sharing it
6  with anyone other than lawyers who might have been
7  involved in these cases?
8    A.   I don't have any recollection right now.
9         (Whereupon, a brief discussion off the
10  record.)
11         THE VIDEOGRAPHER:  Time is 2:56.  We're
12  off the record.
13         (Whereupon, a brief recess was taken.)
14         THE VIDEOGRAPHER:  Time is 3:20.  We're
15  back on the record.
16  BY MS. JONES:
17    Q.   And, Mr. Bejar, when we took our break we
18  were talking about Deposition Exhibit Number 12,
19  which is what you created this year in documenting
20  the testing that you've described during your
21  deposition, right?
22    A.   Right.
23    Q.   And I think you testified when you talked
24  about the -- this exercise that you went through
25  that you drew on 30-plus years of experience?

Page 1011

1    A.   Yes.
2    Q.   Now, the things that you did in terms of
3  the steps that you went through did not require
4  special experience or training or expertise, did it?
5    A.   I believe other people could reproduce
6  this easily.
7         (Whereupon, a brief discussion off the
8  record.)
9  BY MS. JONES:
10    Q.   Okay.  And for example, it didn't require
11  any special equipment of any kind?
12    A.   It did not.
13    Q.   You just needed an iPhone, right?
14    A.   Correct.
15    Q.   And if you're fortunate enough to have the
16  resources you can go out and by an iPhone, right?
17    A.   Or in this case, there was an old iPhone
18  from a drawer, as a parent I think would give their
19  kids.
20    Q.   And did you -- and I apologize if I
21  misheard this.
22         Did you also say that you had used an iPad
23  as part of this?
24    A.   I did, yes.
25    Q.   And -- and same question, an iPad is

Page 1012

1  accessible to someone who can go to the Apple store
2  and buy one, right?
3    A.   Yes, buy one and then returning it shortly
4  after.
5    Q.   Okay.  When you say you ended up
6  "returning it shortly after," why?
7    A.   Because I didn't want to own that iPad.  I
8  just needed a separate device so I could test the
9  experience across different devices from erasure and
10  I only had access to one iPhone and so then once I
11  created the account, I could potentially use a
12  different device to log into that account.
13    Q.   And I'm not sure I'm fully understanding,
14  Mr. Bejar, so please forgive me.
15         When you say you returned the iPad shortly
16  after, returned it to where?
17    A.   The Apple store, within, like, a week or
18  two.
19    Q.   Okay.  And the reason for that was what
20  exactly?
21    A.   I needed a device that I could fully wipe
22  and install Instagram in and do sort of the steps
23  that I described.  I only had one old iPhone at
24  home.  And so I bought -- went and bought a device,
25  did the testing, recorded the videos, recorded the

66 (Pages 1009 - 1012)

CONFIDENTIAL

Page 1013

1 information to access the account. And then I
2 returned the iPad as a matter of sort of, like, I
3 wasn't going to need that iPad moving forward.
4    Q.   You returned the iPad after you had used
5 it you mean?
6    A.   Correct.
7    Q.   Okay. And there's nothing in Deposition
8 Exhibit Number 12, this write-up that you did
9 earlier this year, that talks about how you made use
10 of an iPad, right?
11    A.   There is not.
12    Q.   Okay. You used, according to Deposition
13 Exhibit Number 12, an iCloud account, right?
14    A.   Correct.
15    Q.   And setting up an iCloud account doesn't
16 require special expertise or training, does it?
17    A.   It does not.
18    Q.   And creating an Instagram account and
19 signing up as a teenage girl doesn't require special
20 expertise or training, does it?
21    A.   Does not.
22    Q.   Creating an Instagram account and signing
23 up as a teenage boy doesn't require specialized
24 expertise or training, does it?
25    A.   It does not.

Page 1014

1    Q.   And I think you testified, and I may not
2 be recalling this specific adjective that you used,
3 but that you watched racy or -- racy videos; is that
4 right? "Sexualized" was the term you used in your
5 document.
6    A.   I'm sorry. What's the question?
7    Q.   The question was a little bit of a mess.
8 I apologize.
9        You watched what you described as
10 sexualized or violent videos, right?
11    A.   So that only describes part of it. Swiped
12 quickly through a video that didn't meet a specific
13 criteria and then I watched a video that met the
14 criteria for what I was testing.
15    Q.   Okay. And just to go back for one second.
16        You said earlier, "Once I created the
17 account, I could potentially use a different device
18 to log into that account."
19        What did you mean by that?
20    A.   I mean that I saved the account names and
21 passwords to access those accounts. And so for each
22 of these accounts, I followed the -- well, with the
23 teen girls, I followed what I described, which is
24 erase, create new iCloud account, download
25 Instagram, create account associated with that.

Page 1015

1        But then in order to ease my testing in
2 terms of how much time it took to switch between
3 them, I then erased the phone, logged into one of
4 the accounts, and then added the other accounts
5 using Instagram.
6    Q.   And you made the videos with screen
7 recording that is available on iPhone; is that
8 right?
9    A.   As part of iOS.
10    Q.   Okay. And that, again, does not require
11 special expertise or training, does it?
12    A.   Correct.
13    Q.   And some of what you've described in terms
14 of what you did did not make its way into this
15 document that you created in 2025, right?
16    A.   I'm sorry, what was the question?
17    Q.   Some of the things that you described in
18 terms of what you did as part of this process, did
19 not make its way into this document that you created
20 in 2025, right?
21    A.   That is correct.
22    Q.   And I think we talked about some of these
23 examples.
24        But for example, it doesn't talk about the
25 fact that you started with seven accounts, including

Page 1016

1 certain -- some boy accounts, right?
2    A.   That is correct.
3    Q.   And it doesn't talk about the fact that
4 you paused your testing because you were distressed
5 by the original results that you were getting back,
6 right?
7    A.   That is correct.
8    Q.   And it doesn't say that you ultimately
9 decided to stop following the boy accounts because
10 it was easier to track the girl accounts who were
11 all on one phone, right?
12        MR. CARTMELL: Object to form.
13        THE WITNESS: Sorry, could you repeat the
14 question?
15 BY MS. JONES:
16    Q.   Sure.
17        This document, Exhibit Number 12, that you
18 created earlier this year, it does not say that you
19 ultimately decided to stop following the boy
20 accounts because after you restarted your review, it
21 was easier to track the girl accounts who were all
22 on one phone?
23        MR. CARTMELL: Object to form. And
24 mischaracterizes.
25        THE WITNESS: Yeah, I mean, I -- that the

67 (Pages 1013 - 1016)

Page 1017

1  boy accounts are I believe still there, I haven't
2  tested that, and I focused on these accounts that
3  were on -- all on the phone I was talking about.
4  BY MS. JONES:
5      Q.   And when you say they were all on the same
6  phone, were they linked accounts?
7      A.   Yes, so what I did is, at Instagram you
8  can add other accounts, and so I -- I took the --
9  one of the accounts, I logged into the phone, and
10 then I went and I put in the username/password for
11 the other accounts which had been created
12 independently, and so in the context of what's
13 covered here, the initial set of videos were all
14 done before any linking happened.  And then later
15 on, I linked the accounts into the phone for ease of
16 testing.
17          And I kind of paused the Reels testing,
18 tested the suicide queries somewhat frequently, and
19 then picked up testing on particular -- there was a
20 different kind of testing thing, which was looking
21 at the safety features.
22     Q.   When in the process did you link the four
23 girl accounts?
24     A.   I don't recall the date.
25     Q.   Do you know whether it was 2023 or 2024?

Page 1018

1      A.   I don't recall the date.
2      Q.   And forgive me if I asked you this
3  already.
4          Do you remember when it was that you
5  stopped tracking the boy accounts?
6      A.   I don't recall the specific date.
7      Q.   And before you linked the four girl
8  accounts, were all the accounts on this -- you were
9  going to all of them on the same phone?
10     A.   Yes.  As I described here, each time I
11 would reset the phone, erase all settings, get into
12 the -- create a fresh iCloud account, download
13 Instagram.  So there's a series of steps that I
14 followed.
15     Q.   Was there a period of time where you had
16 all four of the girl accounts set up and you were
17 visiting them when they weren't linked?
18     A.   So for more of my initial testing, when I
19 would test the accounts, I would do the erasing
20 phone procedure.  At some point, I linked the
21 accounts, at which point I was able to move between
22 them.  It took less time.  The phone reset took
23 time.
24     Q.   And so let me just ask that more kind of
25 granular question because I just want to make sure I

Page 1019

1  understand.
2          If on a particular day you wanted to check
3  two of the four girl accounts before they were
4  linked -- do you have that in your mind, those
5  circumstances?
6      A.   Yes.
7      Q.   -- and you logged into one of those girl
8  accounts and you did whatever you were going to do
9  in terms of looking at it and then you decided, I
10 want to look at the next girl account that I have
11 set up, how did you get from that first account to
12 the second one?
13     A.   I would erase the phone, redownload
14 Instagram, and log into the other account.
15     Q.   Okay.  Thank you.
16     A.   I have a very intimate understanding of
17 how, both for Facebook and for Instagram, you know
18 when the accounts are coming from the same device.
19     Q.   Were your testing sessions planned in
20 advance?
21     A.   Yes.
22     Q.   Is that documented anywhere?
23     A.   No.
24     Q.   Do you have any notes at all related to
25 the testing that you did on the different accounts

Page 1020

1  starting in November 2023 up until recently?
2      A.   I bookmarked the audio trends that were
3  used for minors to talk about their ages.  And I
4  bookmarked the audio trends that were used by minors
5  that were posting sexualized content.  So I kept a
6  track of those links.  And then the other thing that
7  I used as my record of the testing was the videos
8  themselves which I did not edit.
9      Q.   So other than the bookmarked audio trends
10 and the videos, there are no other notes that you
11 maintained contemporaneously with the review that
12 you were doing?
13     A.   Not that I recall.
14     Q.   And if I wanted to know every date on
15 which you did review for any of the seven accounts
16 that you started with, is that written down
17 anywhere?
18     A.   My record of dates that I rely on is the
19 dates that the videos were recorded.  If I did
20 testing and I did not record that video -- record a
21 video -- I think actually no, I think pretty much
22 every -- every time I tested I recorded videos, yes.
23     Q.   Do you know that for certain that every
24 single time you did a test you recorded videos?
25     A.   To be very precise about that, I believe

68 (Pages 1017 - 1020)

CONFIDENTIAL

Page 1021

1 that every time that I had a testing session, I
2 would record part of the testing session. I didn't
3 record the entirety of the testing session because
4 what I was looking to do was to try and capture
5 sequences of things.
6     Q.   And did you maintain videos of the boy
7 accounts that you were tracking?
8     A.   I kept some, yes.
9     Q.   Did you keep all of them?
10     A.   Yeah, I did not remove any videos. I
11 downloaded all the videos to a separate device. I
12 kept all of the original file names in a separate
13 device and then I went and made copies of that to
14 change the file names in order to capture what
15 the --
16     (Whereupon, a brief discussion off the
17 record.)
18     THE WITNESS: What the videos were
19 depicting.
20 BY MS. JONES:
21     Q.   And was all of your testing always done on
22 an iPhone 11?
23     A.   Yes.
24     Q.   If I -- beyond what you did in terms of
25 saving the videos, is there any other documentation

Page 1022

1 of the dates on which you did your review?
2     A.   Not that I recall.
3     Q.   And did anyone else participate in the
4 review process?
5     A.   What do you mean by "review process"?
6     Q.   Well, your -- it's a good question.
7     You have described testing sessions?
8     A.   Correct.
9     Q.   Right? What do you mean by "testing
10 session"?
11     A.   I meant that I sat down and took the
12 phone -- I described a lot of this already. I would
13 go into Instagram in the account, and then I would
14 go into Reels and then swipe. And after I captured
15 the initial videos, I also did some basic following
16 to see how that impacted the recommendations.
17     Q.   Was anyone else present for any of those
18 sessions?
19     A.   No.
20     Q.   And in terms of the videos that you
21 recorded, have you shared those with anyone other
22 than lawyers?
23     A.   I believe so, yes.
24     Q.   Who?
25     A.   I think I had mentioned Laura Edelson. I

Page 1023

1 think I have also shared them with some reporters.
2 But other than that, I don't recall.
3     Q.   When did you share videos with Laura
4 Edelson?
5     A.   I don't recall.
6     Q.   Was it 2025?
7     A.   No.
8     Q.   Was it 2024?
9     A.   I don't recall but maybe.
10     Q.   And some of the sessions that you recorded
11 were done in 2025; is that right?
12     A.   Yes. So I did, again, this sort of
13 renewed round of testing that was focused on the
14 safety features.
15     Q.   You said you shared some of the videos
16 with reporters, yes?
17     A.   Of the initial -- so when I first did
18 the -- the sort of the -- the links to the trends
19 that I spoke about and some of the initial things I
20 noticed in the videos, I did around -- go ahead.
21     Q.   I'm sorry, I didn't mean to interrupt you.
22 I apologize.
23     A.   No, that's okay.
24     Q.   I was just going to ask what reporters did
25 you share the videos with?

Page 1024

1     A.   I don't recall.
2     Q.   Did you share with Jeff Horwitz?
3     A.   I don't recall.
4     Q.   When did you do the sharing?
5     A.   I think it was within sort of, like, Q1 of
6 2024, approximately, but I don't recall
7 specifically.
8     Q.   And the -- the accounts that you set up,
9 did you, with those accounts, follow other accounts?
10     A.   Sometimes I did.
11     Q.   Okay.
12     A.   Only public accounts, though. That was
13 very important.
14     Q.   Excuse me. I apologize.
15     Did you record the accounts that you
16 followed with the test accounts?
17     A.   Yes.
18     Q.   On every occasion where you did that?
19     A.   I did not have a record of that over time
20 other than when I captured it in a video.
21     Q.   Okay. In Deposition Exhibit Number 12,
22 you -- I'm looking specifically at the first
23 paragraph under that heading for ClaraAda10, 13, and
24 68.
25     Do you see that?

CONFIDENTIAL

Page 1025

1    A.  Sorry.
2    Q.  It starts -- I apologize.
3    A.  Which page?
4    Q.  First page.
5    A.  Okay.
6    Q.  In the paragraph starts with, "Initial
7  Instagram testing."
8    A.  Yeah.
9    Q.  You said the "Initial Instagram testing
10  protocol was to create the account, all default
11  settings, navigate to Reels, and while navigating
12  Reels stop and watch videos that met a certain
13  criteria."  Right?
14    A.  Correct.
15    Q.  Are those criteria written down anywhere?
16    A.  I think I've described them, which was
17  sexualized or violent videos.  As I wrote here.
18    Q.  Okay.  And is the -- the description --
19  did you have a way of determining how you defined
20  sexualized content?
21    A.  You can see the criteria that I used when
22  you look at the videos where I captured that.  In
23  particular, the videos that go from account creation
24  through to getting recommended that kind of content.
25    Q.  Do you have written down anywhere where

Page 1026

1  you kind of said in terms of looking for sexualized
2  content, I am looking for these particular elements
3  in the video?
4    A.  I did not.
5    Q.  What about for what you described here as
6  videos that are violent?
7      Do you see that?
8    A.  Yes.  What's the question?
9    Q.  My question is, do you -- what were the
10  criteria that you used to determine whether a video
11  was violent?
12    A.  Oh, it was, for example, somebody getting
13  hit by a car, falling off a building, apparently
14  breaking things.  Things that were shocking to see.
15    Q.  And do you have written down anywhere the
16  specific elements in a video that you looked for to
17  determine whether something was violent?
18    A.  No, I don't have that beyond what's
19  written in this document and what's documented in
20  the videos.
21    Q.  Did you use any search terms?
22    A.  Not initially.  So, again, if you look at
23  the videos over time, other than what I've
24  documented here, I did not use any search terms.  It
25  was exclusively Reels and time of -- and time spent

Page 1027

1  with a piece of content.
2    Q.  And you said "not initially."  At some
3  point did you use search terms?
4    A.  At some point I wanted to test, for
5  example, looking for SSI content.  And so at which
6  point I started testing, as I've documented, the
7  words "I want to hurt myself."  And that's one
8  search query that I have been doing consistently
9  since my initial testing in 2024.
10    Q.  And was that the only search query that
11  you used, "I want to hurt myself"?
12    A.  No, it was important to test variations of
13  search queries in order to establish the
14  effectiveness of hiding results and certain
15  circumstances.  I had seen safety features claiming
16  that certain kind of content wouldn't be recommended
17  and so I tested that.
18    Q.  Do you have written down somewhere all of
19  the search terms that you used as part of the
20  sessions that you conducted?
21    A.  I believe that any meaningful searching
22  that I did there's a video that -- where you can see
23  me typing and you can see how the search engine is
24  behaving.  I did not do that -- I did not capture
25  those videos as consistently later on when I found

Page 1028

1  that just searching for "I want to hurt myself"
2  consistently returned the same results for a teen
3  account for a very long period of time.
4    Q.  You said "I did not capture those videos
5  as consistently later on."  Is that right?
6    A.  That is correct.
7    Q.  Okay.  So are there -- are there -- are
8  there elements of some of your sessions that were
9  focused on SSI content that may not have been
10  captured in a video?
11    A.  That is correct.
12    Q.  Did you send messages from the mock
13  accounts that you set up?
14    A.  No, until my testing in, like, a month
15  ago, and then all the messages were done between
16  mock test accounts.  Any comments that I tested were
17  only done between test accounts.
18      The one exception to that, which was
19  fairly recent, is when I found that -- that an adult
20  was able to message a minor, that they didn't follow
21  them back through Stories, I went back and retested
22  that on Sunday just to make sure if it was still the
23  case.  I had imagined that the moment that the
24  videos were produced, that hopefully engineers would
25  have hopped on it and fixed it, as I would have done

Golkow Technologies,
A Veritext Division
877-370-3377                                          www.veritext.com

CONFIDENTIAL

Page 1029

1 in a similar circumstance. And it was good to see
2 that that did no longer work.
3        Then I went into Reels -- because there's
4 message buttons everywhere so part of the testing is
5 sort of in which context message buttons were. And
6 so the one instance that I had not done that is,
7 which I've documented and I have a video, complete
8 session, of going into Reels, picking out an account
9 at random of a Reel, seeing a message board on
10 there, and being extremely surprised at sending a
11 message and that initiating a conversation.
12       Because what I found in testing the fix of
13 the story to minor accounts issue is that you could
14 still type in the message and send it but then they
15 had added on the messaging screen a little piece of
16 text that said your messages are not getting
17 delivered because this account doesn't follow you
18 back. And so you were able to initiate that and you
19 saw it in the product.
20       And so I was wondering if I initiated the
21 conversation, if I would get a similar warning
22 saying you don't follow each other so the message
23 wasn't delivered. And I was very surprised that the
24 message went through. And I tested it one more time
25 and I was very surprised to see the message go

Page 1030

1 through.
2        That was the only instance in which one of
3 the mock accounts contacted an account that was not
4 a mock contact.
5    Q.   Are there any messages that you sent from
6 any of the mock accounts, are those written down
7 somewhere?
8    A.   All of those are video-recorded, and
9 they're all in sort of my video transcripts of -- on
10 my videos for all of those sessions.
11   Q.   And how did you decide what messages you
12 were going to send?
13   A.   I looked at what the safety tools were
14 claiming that they protected. And so there were
15 things like, oh, we blocked bullying or harassment.
16 And so -- for example, in comments in a post. And
17 so then I created between mock accounts that were
18 private this post and then I tested in different
19 combinations from the parent account or the minor
20 account. Which I recorded videos of all of these
21 things.
22       If you posted, and I think I've covered
23 this, in Spanish and in English, "you are a whore,
24 you should kill yourself," and see if that generated
25 the warnings. It did not initially. So I tried

Page 1031

1 reporting the content.
2        When I retested on Sunday, those messages
3 did no longer go through, so it appears to me, that
4 from the moment I -- the videos were initially
5 submitted to at least when I retested on Sunday that
6 some of the issues that the videos had identified
7 had been fixed in their most sort of plain scenario.
8 On Sunday I tested other similar statements and they
9 were able to get through.
10   Q.   You testified with respect to some of the
11 videos that you showed, I think Exhibit 16 in
12 particular, that it showed the first six minutes of
13 a 13-year-old's experience on Instagram.
14       Am I recalling that correctly?
15   A.   That is correct.
16   Q.   And just in looking at the video of you
17 scrolling through the Reels, was it the case that
18 you stopped and looked at things that were, under
19 your definition, racy?
20   A.   Correct.
21   Q.   I also noticed when looking -- when you
22 were showing us the show, that you flipped pretty
23 quickly through videos that didn't appear at first
24 blush to be racy; is that right?
25   A.   That is correct.

Page 1032

1    Q.   Okay. And just the fact of doing that
2 would influence how the Reels feed evolved, yes?
3    A.   That is correct.
4    Q.   And the other thing that I noticed when
5 you were showing your video was you didn't pause on
6 other things that a teen might signal interest in,
7 right?
8        MR. CARTMELL: Object to the form.
9        THE WITNESS: I mean, that's a big
10 hypothetical. That wasn't what I was testing.
11 BY MS. JONES:
12   Q.   Well, my -- I guess my -- let me ask the
13 question a slightly different way.
14       You were testing a scenario in which a
15 teen was actively looking for racy content and had
16 not otherwise through the use of Reels signaled an
17 interest in other specific topics?
18   A.   That is not --
19       MR. CARTMELL: Same objection.
20       THE WITNESS: That is not accurate.
21 BY MS. JONES:
22   Q.   I didn't see in the video that you
23 actually paused and watched in completeness videos
24 on things like basketball or skateboarding or
25 anything like that?

71 (Pages 1029 - 1032)

CONFIDENTIAL

Page 1033

1    A.  I mean, the reason I said that was not
2  accurate is that you said that it was a teen looking
3  for that kind of content.  And what I was trying to
4  replicate is somebody who might be looking at that
5  kind of content, not necessarily because they're
6  looking for it, but they might have been startled by
7  it and then kind of looked at more of it.
8        And so it wasn't that it was a -- seeking
9  that.  I believe that can also happen in an instance
10  where you look at a video out of shock or disgust
11  and then look at a few more as a result of that.
12    Q.  Sure.
13        And my question was on a slightly
14  different point, which is, in that hypothetical
15  scenario, a teen might also pause on videos that
16  reflect other areas of interest, right?
17    A.  Correct.
18    Q.  And in the recordings, you didn't actually
19  show that scenario where a teen might have also been
20  pausing on watching a cooking video or watching a
21  soccer game, right?
22        MR. CARTMELL:  Object to form.
23        THE WITNESS:  Sorry.  I -- oh, I believe I
24  understand the question.
25        I'll say that is correct.

Page 1034

1  BY MS. JONES:
2    Q.  Okay.  In the course of your -- what you
3  did here, did you report any of these technical
4  issues that you thought you had identified in terms
5  of the functionality of some of the company's tools?
6    A.  So I believe I was doing that the moment
7  that I shared the videos as part of this process.
8  And I was actually intending, sort of, being very
9  mindful about this and the timing of things, to
10  write a more detailed report about all of my
11  observations and experiences with the safety tools
12  and send that to ████████ kind of respectfully
13  indicating ways in which the safety tools could do
14  better.
15    Q.  I want to just make sure I understood your
16  answer.
17        You understood that you were reporting
18  technical issues that you might have identified by
19  sharing the videos in response to a subpoena in a
20  lawsuit?
21    A.  I believe that the -- the -- so the
22  process was, I began testing in order to be able to
23  prepare for this deposition.  I wanted to be able to
24  make accurate claims and descriptions of how the
25  safety features work.  I was very thorough about.

Page 1035

1  That in the process of doing that, I found issues
2  that I recorded on videos.
3        And pursuant to the subpoena, there was I
4  think a second batch of videos produced, which were
5  these which had recently been found.  I had not yet
6  at that point had the time to, in more detail,
7  document those issues and provide the kind of level
8  of detail that I would send in an e-mail to somebody
9  in the company bringing those issues to their
10  attention.  And I chose because of the nature of
11  this unfolding, and the time available, to do that
12  after this.
13        But I mean, this is -- if you look at the
14  dates on the videos and everything, it's been a
15  pretty hectic couple of weeks.
16        I do believe that it is important for me
17  to share all of the details of my findings directly
18  with Sayed because it is my hope that these things
19  are addressed to make the safety tools more
20  effective at what they say they do.
21        (Whereupon, a brief discussion off the
22  record.)
23  BY MS. JONES:
24    Q.  Mr. Bejar, other than what you described
25  in terms of believing you were reporting issues by

Page 1036

1  producing the videos in response to the subpoena in
2  these cases, did you make any other report of issues
3  that you found?
4    A.  Not yet.
5    Q.  Okay.  And I think you testified when
6  Mr. Cartmell was asking you questions that the
7  viewing of some of these videos could lead to harm?
8        MR. CARTMELL:  Object to the form.
9        THE WITNESS:  The viewing of which videos?
10  BY MS. JONES:
11    Q.  The videos that you shared with the jury
12  the first day and the second day of your deposition.
13    A.  I do.
14    Q.  And if that's the case, that harm would be
15  based on a teenager seeing the content, whether
16  sexualized or violent, in the video, right?
17        MR. CARTMELL:  Same objection.
18        THE WITNESS:  I mean, I believe that those
19  videos are representative of when somebody in BEEF
20  says they got unwanted sexual content.  And they're
21  good examples of videos that are not addressed by
22  the prevalence approach to removing content.
23  BY MS. JONES:
24    Q.  Sure.  And I want to be very specific
25  about my question.

72 (Pages 1033 - 1036)

CONFIDENTIAL

Page 1037

1    Under your view or opinion that harm could
2  be the result of viewing the violent or sexualized
3  videos that you captured, that harm would have been
4  the result of the content in those videos, right?
5    MR. CARTMELL: Objection to the form. And
6  mischaracterizes.
7    THE WITNESS: No, I believe I've covered
8  both the -- that there's -- the nature of the
9  content but also, really important, sort of the
10 frequency of it.
11 BY MS. JONES:
12  Q. Well, let me ask you this question.
13    If I was a teenager and instead of what
14 you did on Reels I mostly paused on videos of
15 cooking or how to do your nails or basketball, would
16 it be your view that that would be likely to lead to
17 harm?
18  A. I haven't tested what gets recommended in
19 that context. I don't know if -- I look at those
20 videos and at some point one of these other
21 videos gets dropped in and I watched how that steers
22 the Reels algorithm. I think it's incredibly
23 important to test that.
24    And I believe actually what BEEF is saying
25 is the importance of doing that kind of testing to

Page 1038

1  understand under which circumstances and which Reels
2  sort of preferences algorithm. Teens are getting
3  recommended this kind of content that they're
4  telling us they do not want because it's violent and
5  because it's sexual.
6    Q. And the part of the analysis that you did
7  was looking at what happens if a teen is exposed
8  through Reels to sexualized or violent content,
9  right?
10  A. No, that's not accurate.
11  Q. What part is not accurate?
12  A. What I tested was what was the ease
13 through which that kind of content would get
14 recommended frequently. And then I tested what was
15 the nature of the content that was being recommended
16 frequently. And I also looked at features that
17 facilitate the creation of that kind of content.
18  Q. Did you -- it sounded like you did not --
19    Mr. Reynolds, we can take the document
20 down. Thank you.
21    It sounded like you did not evaluate what
22 might happen if instead of pausing on sexualized or
23 violent videos, a teen were to mostly pause on art
24 that they liked or pictures of birds or flying a
25 kite, you did not test that?

Page 1039

1    A. That is correct.
2    Q. Other than sharing the results of what you
3  did with, you know, obviously the lawyers here, and
4  I think you said Laura Edelson --
5    A. Again -- sorry, I'll let you finish the
6  question. I apologize for interrupting you.
7    Q. No, go ahead. That's fine.
8    A. Oh, it's just -- I just wanted to be
9  really clear that when we talk about videos we're
10 talking about different sets of videos and so I just
11 want to be accurate about which videos I say what.
12  Q. Okay. Other than sharing what you did
13 here with the lawyers who received different -- who
14 received it -- and we obviously saw it in the course
15 of your deposition and it sounded like you might
16 have shared it with Laura Edelson at some point.
17    Is there anyone else that you shared kind
18 of the set of videos and your Deposition Exhibit
19 Number 12 with?
20  A. I don't recall.
21  Q. Have you shared it with any journalist?
22  A. I don't recall.
23  Q. Have you shared it with any subject matter
24 experts in teen mental health or child safety who
25 could say yeah, this was the right way to run an

Page 1040

1  experiment like this?
2    A. For the first set of videos, I think I
3  have covered both Laura Edelson and CCDH, who I
4  think are people that are qualified, definitely.
5    Q. Okay. And I just want to make sure I'm --
6  we're clear on the timing here.
7    You started in November of 2023; is that
8  right?
9    A. Correct.
10  Q. And at some point, you paused what you
11 were doing just because of what you were seeing in
12 the preliminary results?
13  A. Yeah, especially the videos of girls under
14 13 I found especially distressing.
15  Q. And you said that you think that pause
16 lasted for about a year; is that right?
17  A. On substantive Reels testing.
18    As I said, I did occasional revisiting but
19 not -- the testing that continued in earnest was the
20 one that began in March 2025.
21  Q. Okay.
22  A. That was aimed at the features.
23    (Whereupon, a brief discussion off the
24 record.)
25 ///

73 (Pages 1037 - 1040)

CONFIDENTIAL

Page 1041

1 BY MS. JONES:
2    Q.   Okay.  So this -- the substantive Reels
3 testing that you did started in November of 2023 and
4 it sounds like it might have paused sometime in
5 early 2024?
6    A.   Correct.
7    Q.   And then there was about a year before you
8 started the substantive Reels testing again?
9    A.   No.  The features testing.
10    Q.   I apologize.  The features testing?
11    A.   Correct.
12    Q.   And the features testing you did in
13 connection with getting ready for your deposition;
14 is that right?
15    A.   Correct.
16    Q.   Mr. Bejar, you have, I believe, testified
17 that the work that you've done since you left Meta
18 in 2021 you've done pro bono; is that right?
19    A.   Correct.
20    Q.   And is that, in part, due to the fact that
21 you don't actually need to work full time anymore?
22    A.   That is correct.
23    Q.   And is that because when you left Meta in
24 2015 you had gone through the company's initial
25 public offering and that had made you very wealthy?

Page 1042

1    A.   I also went through Yahoo!'s -- did I
2 start at Yahoo! after the public offering but I was
3 also part of Yahoo! at that point.
4    Q.   So as between Yahoo! and Meta, did
5 you basically become a millionaire as a result of
6 working at those two companies?
7    A.   Yes, I was able to get enough money so
8 that I didn't have to work full time.
9    Q.   Okay.  And you've not had a full-time job
10 since 2015; is that right?
11    A.   That is correct.
12    Q.   All right.  And so your ability to do what
13 you've been doing, as you have described it,
14 pro bono, is a function of the fact that you made
15 quite a lot of money working at two very large tech
16 companies, right?
17         MR. CARTMELL:  Object to form.
18         THE WITNESS:  Sorry?
19         MS. JONES:  He was just making an
20 objection.
21         THE WITNESS:  Sorry, could you repeat the
22 question?
23 BY MS. JONES:
24    Q.   Sure.
25         Your ability to do what you've been doing,

Page 1043

1 which you have been doing, as you described it
2 pro bono, is a function of the fact that you made
3 quite a lot of money working at two very large tech
4 companies, right?
5         MR. CARTMELL:  Same objection.
6         THE WITNESS:  I made money by having been
7 very successful at the job that I did for those
8 internet companies.
9 BY MS. JONES:
10    Q.   Sure.
11         And notwithstanding what you've said about
12 Meta, including that the company is negligent and
13 has been misleading, you have not, as a matter of
14 principle, given away the money that you made having
15 worked at that company, have you?
16    A.   As a matter of principle, as soon as my
17 divorce proceedings cleared, I sold all stock that I
18 held on Meta because to that point that was the
19 money that I had earned to that point.
20    Q.   And you -- I think by the time you left
21 Meta in 2015 you had almost 400,000 shares in the
22 company.  Does that sound right to you?
23    A.   I don't recall by far what the numbers
24 were.
25    Q.   Do you know if all your stock had vested

Page 1044

1 by then?
2    A.   I don't recall.  Because I perform, like,
3 a different awards of stock over time.
4    Q.   Okay.  I have documents that I could show
5 you on this point.
6         Do you have any reason to disagree with
7 the notion that you had several hundred thousand
8 stock, shares of stock that had been awarded to you
9 during your time at Meta from 2009 to 2015?
10    A.   I don't think I would dispute that.
11    Q.   Okay.  And if all of those shares had
12 vested by the time you sold your stock in 2016, that
13 would have been somewhere in the neighborhood of
14 tens of millions of dollars, right?
15    A.   Yes.
16    Q.   Mr. Bejar, would you acknowledge having
17 been at Meta for two separate stints that there are
18 many smart people at the company who have devoted
19 attention to the issues of teen well-being and child
20 safety on the company's platforms?
21    A.   Yes.
22    Q.   And do you agree that it's possible that
23 someone could disagree with your perspective on the
24 best way to tackle some of these issues that you've
25 described in terms of harms to teens on social

74 (Pages 1041 - 1044)

CONFIDENTIAL

Page 1045

1  media?
2      A.   Yes.
3      Q.   And someone could disagree with you and
4  not have -- someone could care very much about these
5  issues and still disagree with you; is that fair?
6      A.   Yes.
7      Q.   And the issues are involved enough, when
8  you're talking about a platform with billions of
9  people, that very smart people might come up with
10 different ways to try to address them?
11         MR. CARTMELL:   Object to form.
12         THE WITNESS:   I mean, that's why data is
13 so important.   That's why data is so important.
14 BY MS. JONES:
15     Q.   Let me ask you to go to what I think is
16 Exhibit Number 54 in your pile.
17         (Whereupon, Meta-Bejar Exhibit 54 having
18 been previously marked, was introduced.)
19         THE WITNESS:   54?
20 BY MS. JONES:
21     Q.   It should be, yeah, the list of tools and
22 features and resources.
23         Mr. Bejar, you recognize this as a
24 document that counsel marked with you I think
25 yesterday during Mr. Phelps' examination?

Page 1046

1      A.   Yes.
2      Q.   And just so the jury is situated in terms
3  of what we're looking at, this is a page from the
4  Meta Help Center.   You can see that up on the
5  left-hand side.
6      A.   Yes.
7      Q.   And the heading of this document is, "Our
8  tools, features and resources to help support teens
9  and parents."
10         Do you see that?
11     A.   Yes.
12     Q.   And the principal opening paragraph says,
13 "We've built numerous tools, features and resources
14 that help teens have safe, positive experiences, and
15 give parents simple ways to set boundaries for their
16 teens."
17         Do you see that?
18     A.   I do.
19     Q.   And it refers to a timeline below, right?
20     A.   Correct.
21     Q.   And that timeline runs from October of
22 2010 until December of 2024; is that right?
23     A.   Correct.
24     Q.   And recognizing that you may have
25 disagreements about how well some of these tools and

Page 1047

1  features work, would you agree with me that during
2  the time period when you were at the company from
3  October of 2019 --
4          Which is the second page, Mr. Reynolds, at
5  the top.
6          -- until October of 2021 --
7      A.   Sorry, could you name the dates again?
8      Q.   Sure.
9          October 2019.
10     A.   Yes.
11     Q.   Until October -- excuse me -- why don't we
12 just go down to August of 2021.
13     A.   Yeah.
14     Q.   Mindful that you may have concerns about
15 the effectiveness of some of these tools, while you
16 were at the company working on Instagram Well-Being,
17 the company was continuing to announce and push out
18 tools and resources that might be useful for users
19 in general but including teens?
20     A.   I guess it depends on how you define
21 useful.
22     Q.   Okay.   Well, let me ask it a different
23 way.
24         Putting aside whether you think they were
25 useful or not, would you agree with me that even in

Page 1048

1  the two-year period that you were at the company
2  from October 2019 until December of 2021 the company
3  released features and tools, yes?
4      A.   Yes, that's accurate.
5      Q.   And if we flip through, and you're welcome
6  to do this, all of the features that are listed in
7  Exhibit Number 54, you were shown yesterday a
8  demonstrative that Mr. Phelps was constructing on
9  the screen.
10         Do you remember that?
11     A.   I do.
12     Q.   And the suggestion that I think you agreed
13 with was the company only pushes out features and
14 tools when they're trying to address some public
15 relations issue.
16         Do you remember that back and forth with
17 him?
18         MR. CARTMELL:   Object to form.
19 Mischaracterizes.
20         THE WITNESS:   Yeah, I think that you used
21 the word "only."   And I don't think the words
22 "only" -- I think that the company primarily pushes
23 safety features in that context.   But I wouldn't say
24 "only."   And if I did say "only" I misspoke.
25 ///

Golkow Technologies,
A Veritext Division
877-370-3377                                          www.veritext.com

Page 1049

1 BY MS. JONES:
2     Q.  Okay.  And so you're not -- you were not
3 suggesting yesterday with Mr. Phelps that every time
4 the company released one of these features or tools
5 it was because of some public relations issue, were
6 you?
7     A.  Are we back at the correlation and
8 causation conversation?
9         I believe that there is a correlation
10 between some of these safety tools and the events
11 that we saw yesterday and I think it's a strong
12 correlation but there are instances where I believe
13 features were announced that were not responsive to
14 an article or press or a hearing.
15     Q.  Okay.  Mr. Bejar, I want to just touch
16 briefly on both the negative experience survey and
17 the BEEF survey that you talked about over the
18 course of the last couple of days.
19         Just starting with the negative experience
20 survey, could you go to Exhibit 9 in your pile,
21 please.
22         (Whereupon, Meta-Bejar Exhibit 9 having
23 been previously marked, was introduced.)
24 BY MS. JONES:
25     Q.  And I don't -- we don't need to go into

Page 1050

1 the nitty-gritty of this particular document, but I
2 just wanted to focus on this document on the date,
3 which is October of 2019.
4         Do you see that?
5     A.  Sorry.
6     Q.  First page.
7     A.  Yes, of course it's in the first page --
8     Q.  Yes.
9     A.  -- in big text.  I apologize.
10     Q.  No, no, that's okay.
11         And you were just starting your second
12 time with the company in October of 2019, right?
13     A.  Correct.
14     Q.  You were not personally involved in the
15 design of this survey, right?
16     A.  Correct.
17     Q.  You were not personally involved in
18 developing the questions were used -- that were used
19 in the survey, right?
20     A.  Correct.
21     Q.  You were not personally involved in the
22 interpretation of the data; is that right?
23     A.  You mean on the evaluation of the results
24 by Shilpa --
25     Q.  Yes.

Page 1051

1     A.  -- that led to this presentation?
2     Q.  Yes.
3     A.  I was not.
4     Q.  Okay.  And do you remember whether you
5 were actually in attendance at the presentation of
6 the data?
7     A.  I don't recall.
8     Q.  Okay.  Would you defer to what Ms. ■■■■
9 had to say in terms of the interpretation of the
10 data from this survey?
11         MR. CARTMELL:  Object to the form.  And
12 foundation.
13         THE WITNESS:  I mean, I think it really
14 depends on a period of time.  I mean, I think what I
15 rely on is the conversations that I have and the
16 data that is here.  I don't know what has happened
17 since.
18         MS. JONES:  Okay.  We can take that down.
19 Thank you.
20     Q.  Let me ask you about the BEEF survey,
21 Mr. Bejar.
22         I think you had -- you noted yesterday, or
23 maybe it was the day one of your deposition, that
24 there were actually two versions of BEEF.
25         If you want the exhibit number, it's --

Page 1052

1         MR. WARD:  Please.
2         MS. JONES:  I don't remember is the short
3 answer but we can find it for you.
4         MR. WARD:  Thanks.
5         MS. JONES:  Thank you, Jim.
6         MR. WARD:  Thank you.
7         MS. JONES:  Yep, sure.
8     Q.  You recall testifying yesterday that there
9 were, in fact, two versions of BEEF?
10     A.  Sorry.  What do you mean by "two versions
11 of BEEF"?
12     Q.  Well, there was -- there was a data
13 collection that was done in the summer of 2021,
14 right?
15     A.  Correct.
16     Q.  And then there was a second data
17 collection that was done in February of 2022, right?
18     A.  It was my rough understanding about the
19 second data collection.  I wasn't there for the
20 second data collection.
21     Q.  Okay.  And that was going to be my next
22 question.
23         You were not involved in the work that
24 went into the second data collection in February of
25 2022?

76 (Pages 1049 - 1052)

CONFIDENTIAL

Page 1053

1    A.  I believe that I had conversations with
2 Kyle about what you would do differently next time.
3    Q.  Okay.  Do you have any sense of how the
4 company made use of the results of the BEEF survey?
5    A.  I did not see any external product changes
6 based as the result of the BEEF survey in
7 particular, because I was very interested in seeing
8 what happened with unwanted advances.
9    Q.  But do you know specifically whether or
10 not the company made changes, whether they were
11 external facing or otherwise, based on the BEEF
12 survey?
13    A.  I'm not --
14       MR. CARTMELL:  Object to form.
15       THE WITNESS:  Sorry, could you repeat the
16 question?
17 BY MS. JONES:
18    Q.  Sure.
19       Do you know specifically whether the
20 company made changes, whether they were external
21 facing or otherwise, based on the BEEF survey?
22       MR. CARTMELL:  Same objection.
23       THE WITNESS:  Changes external or
24 otherwise.  I don't recall.
25 ///

Page 1054

1 BY MS. JONES:
2    Q.  And you were shown a video clip of Adam
3 Mosseri, I think it was on day one of your
4 deposition, but I'm losing track of the dates.
5       Do you remember seeing testimony that was
6 shown of Mr. Mosseri's -- let me strike that.
7       Do you remember seeing a video clip where
8 Mr. Mosseri was testifying about the meeting that he
9 had with you in the fall of 2021?
10    A.  Yes.
11    Q.  And do you recall that he said, I thought
12 Mr. Bejar raised some good points and there are ways
13 in which we've integrated some of those points into
14 what we do?
15       MR. CARTMELL:  Object to the form.  And
16 mischaracterizes.
17       THE WITNESS:  Yeah, again, I don't
18 remember the exact sentence that Adam said.  And I
19 also remember him saying that I spoke about the
20 issues in a way that was minimizing them or
21 something along those lines, which I -- is not the
22 case.
23 BY MS. JONES:
24    Q.  Okay.  I'm actually not sure that is what
25 he said but that's neither here nor there.

Page 1055

1    Dr. ███████, would you -- he was the
2 person who really ran the study from a research
3 subject matter expert perspective, right?
4       MR. CARTMELL:  Hold on.  Real quick.
5       Object and move to strike the statement of
6 counsel before the question.
7       MS. JONES:  Let me ask the question again.
8    Q.  Dr. ████ ████ was the person who really
9 ran the BEEF study from a research subject matter
10 expert perspective, right?
11    A.  Dr. █████████ was the researcher within
12 the Instagram Well-Being research team who ran the
13 study.
14    Q.  Okay.  And would you defer to what
15 Mr. █████ had to say about the BEEF study as the
16 person who ran it from the Instagram research team?
17       MR. CARTMELL:  Object to the form.
18       THE WITNESS:  I -- really depends on when,
19 right, because I had many conversations with Kyle
20 about this while it was happening.  And I don't know
21 what has happened since.
22 BY MS. JONES:
23    Q.  One quick question I wanted to be sure we
24 talked about is you used the term "harm" in
25 connection with describing the specific things that

Page 1056

1 are being evaluated in BEEFs, yes?
2       MR. CARTMELL:  I'm going to object to
3 form.
4 BY MS. JONES:
5    Q.  Let me ask you a better question.
6    A.  Thank you.
7    Q.  Exhibit Number 21, the BEEF survey, some
8 of the things that were addressed in the survey are
9 not, in fact, bad experiences or harms?
10       MR. CARTMELL:  Object to form.
11       THE WITNESS:  So they're all bad
12 experiences.  Some of them are more harmful than
13 others.
14 BY MS. JONES:
15    Q.  Well --
16    A.  And some of them are not -- like
17 commercial one is not what I would consider to be a
18 deeply harmful experience, even though I have seen a
19 lot of people express concerns with the amount of
20 ads that they get.
21    Q.  Okay.  And that was actually the question
22 I was getting at.
23       There are some survey questions in BEEFs
24 that are focused on things like have you ever felt
25 that not enough people see the things you share on

77 (Pages 1053 - 1056)

CONFIDENTIAL

Page 1057

1 Instagram, right?
2      Let's go to page -- can we go to
3 Exhibit 21, please, Mr. Reynolds.
4      (Whereupon, Meta-Bejar Exhibit 21 having
5 been previously marked, was introduced.)
6 BY MS. JONES:
7      Q.  This is page 5.
8      A.  Page 5?
9      Q.  Yes.
10     A.  Yeah.  The shadow banding question.
11     Q.  And on the right-hand side, there is a
12 reference to "Audience limitation."
13     A.  Correct.
14     Q.  That's not a harm necessarily, right?
15     A.  Actually, one of the reasons this was
16 there is it's not what I think of in the context
17 which was the one -- so in the messages I sent to
18 the executive team, I focused on the things that
19 were harms for teenagers.
20     In this context I believe this can be very
21 distressing for creators who have an audience who
22 rely on reaching people and then are bothered by --
23 or not bothered -- it might actually affect their
24 business or their livelihood --
25     (Whereupon, a brief discussion off the

Page 1058

1 record.)
2      THE WITNESS:  -- if suddenly the content
3 starts reaching less people which is why you need
4 intensity data as to their experience of that.
5      But it's -- you -- I don't believe you
6 could say harm in the same way that you talk about
7 unwarranted sexual advances.
8 BY MS. JONES:
9      Q.  Okay.  Understood.
10     And another example of that would be right
11 above "Audience limitation."
12     "Over enforcement.  Have you ever felt
13 that Instagram was wrong when it removed a post or
14 video for violating the rules?"
15     Right above "Audience limitation."
16     A.  I mean, I do think that can be, again, a
17 very significant issue for people, especially the
18 larger their audiences are, and that led to the
19 creation of the CrossCheck program.  That kind of
20 concern.  So, again, it's more like might be
21 financial harm or livelihood or somebody who feels
22 it's really important to have their posts seen by a
23 lot of people like political figures or people that
24 have large followings.  Again, not the traditional
25 version of that.

Page 1059

1      As Kyle documented, this collated
2 information from multiple channels, including bugs
3 and other areas that had been flagged as issues for
4 the platform.
5      Q.  Okay.  You --
6      We can take that down.  Thank you,
7 Mr. Reynolds.
8      During the examination, I think with
9 Mr. Cartmell, you were shown a number of comparisons
10 between the data from the BEEF survey and the data
11 that is recorded by the company in its Community
12 Standards Enforcement Reports, right?
13     A.  CSER you said yesterday, right?
14     Q.  Yes, I know.  And then I worried about
15 using the acronym.
16     You were shown various side-by-side
17 comparisons of the data from BEEFs and the data from
18 CSER in terms of particular harms, right?
19     A.  That is correct.
20     Q.  And just so the jury understands, the
21 prevalence data that's reflected in CSER is
22 different than the survey data that's reflected in
23 BEEFs, yes?
24     MR. CARTMELL:  Object to the form.
25     THE WITNESS:  Yeah, I mean, I think that

Page 1060

1 it is -- they are two different datasets that
2 represent two different things.
3 BY MS. JONES:
4      Q.  Okay.  And they can both be useful; is
5 that fair to say?
6      A.  Yes.
7      MS. JONES:  If we can take a ten-minute
8 break, I can take a hard look at what I have left
9 and it's just this little pile and might be able to
10 cut back and finish.  Is that okay with folks?
11     THE WITNESS:  Yes.
12     MR. WARD:  Yeah, I think that sounds like
13 a good idea.
14     THE VIDEOGRAPHER:  Time is 4:22.  We're
15 off the record.
16     (Whereupon, a brief recess was taken.)
17     (Whereupon, Meta-Bejar Exhibit 70 was
18 marked for identification.)
19     MS. JONES:  For the record, Madam Court
20 Reporter has asked that I note for the record that
21 we have marked Exhibit 70 as a demonstrative
22 exhibit.  Okay?
23     MR. CARTMELL:  Yes.
24     MS. JONES:  Okay.  And then do I need to
25 do the same thing for Exhibit 74?  Let me go ahead

78 (Pages 1057 - 1060)

CONFIDENTIAL

Page 1061

1 and do that for --
2          MR. CARTMELL:  I want to have them when I
3 sit in that chair.  Just -- I'm got going to write
4 on them.
5          MS. JONES:  Yes, you can have them, but
6 she wanted them for purposes -- let me also note for
7 the record that we marked Deposition Exhibit
8 Number 74 as a demonstrative exhibit.
9          THE VIDEOGRAPHER:  Time is 4:46.  We're
10 back on the record.
11 BY MS. JONES:
12     Q.   Mr. Bejar, I think when we were speaking
13 just a minute ago about the BEEF study and talking
14 about -- you were talking about certain experiences
15 that were captured by the survey that weren't
16 necessarily bad experiences of the type that an
17 unwanted sexual advance or unwanted nudity might be,
18 right?
19     A.   Correct.
20     Q.   And that included, for example, feeling
21 like not enough people were seeing the posts that
22 you were putting on Instagram or Facebook, right?
23     A.   Correct.
24     Q.   And the reason that you said that that
25 might affect being a concern for people in some

Page 1062

1 circumstances is that there are some people whose
2 livelihood depends on their ability to communicate
3 information out to the world via Instagram or
4 Facebook; is that right?
5     A.   Correct.
6     Q.   And, in fact, there are people who rely
7 very heavily on Instagram and Facebook as just a way
8 to maintain a record of their memories and pictures
9 and whatnot within their circle of family and
10 friends, right?
11     A.   Yes.
12     Q.   Okay.  And so can we agree, just in
13 general terms, that overenforcement can present a
14 challenge for folks who fall into those categories,
15 people who rely on these platforms to do their
16 business or people who otherwise rely on these
17 platforms to preserve memories within their social
18 and family circles?
19          MR. CARTMELL:  Object to the form.
20          THE WITNESS:  So is the question that --
21 is it okay if I repeat what I understood the
22 question to be in order to be --
23 BY MS. JONES:
24     Q.   Yes, of course, sure.  Yes, yes, yes.
25     A.   So is the question is, can overenforcement

Page 1063

1 be like a meaningfully bad experience for somebody
2 who is depending on Instagram for either their
3 livelihood or if they're using to store family
4 memories?
5     Q.   Yes.
6     A.   Yes.
7     Q.   Okay.  And just so the jury understands
8 what we're talking about when we talk about
9 overenforcement, we are talking about the
10 possibility of the inadvertent removal or suspension
11 of an account because of a belief that it's -- it is
12 somehow violating.
13          Is that a general fair summary?
14     A.   I think it can be removal of pieces of
15 content.
16     Q.   Okay.
17     A.   And it -- depending on the nature of the
18 violation, it might also be removal -- disabling of
19 the account.  There's checkpointing.  There's a
20 little landscape there that I don't think we need to
21 go into detail.
22     Q.   Okay.  And I was probably overly narrow in
23 my own description.
24          But among the things that can happen to an
25 account in the event of what we're describing as

Page 1064

1 overenforcement is that certain content might be
2 taken down, right?
3     A.   Correct.
4     Q.   Even though that content might not be
5 violating in any way, right?
6     A.   That is correct.
7     Q.   Or there can be a circumstance where an
8 account is suspended entirely, right?
9     A.   Correct.
10     Q.   Even though there's not actual content on
11 the account or behavior associated with the account,
12 the account that is violating, right?
13     A.   Correct.
14     Q.   You were asked a number of questions --
15 and let me actually ask one final question on that
16 point.
17          Is -- among the other priorities that
18 you've raised in the course of your testimony over
19 the last three days, do you think it's appropriate
20 for a social media company, including like Meta, to
21 be attentive to not doing things that will result in
22 overenforcement?
23          MR. CARTMELL:  Object to the form.
24          THE WITNESS:  I think it is important for
25 a company like Meta to keep detailed statistics of

79 (Pages 1061 - 1064)

CONFIDENTIAL

Page 1065

1 the kind of process we talked about for both
2 overenforcement as well as underenforcement. Both
3 of those can be significant issues --
4 BY MS. JONES:
5    Q.  Okay.
6    A.  -- that affect people.
7    Q.  Thank you.
8        You were asked questions either the first
9 or second day of your deposition about people under
10 13 using Instagram.
11       Do you recall that generally?
12   A.  Yes.
13   Q.  And I think you agreed with this when we
14 were talking yesterday but there's no question that
15 there are circumstances where kids under 13 lie
16 about their age and create online social media
17 accounts, right?
18   A.  Correct.
19   Q.  That's the case with Instagram and
20 Facebook, right?
21   A.  Correct.
22   Q.  It can also be the case with other social
23 media platforms, right?
24   A.  Correct.
25   Q.  And let me just ask you a question

Page 1066

1 generally and you're -- I will give you a chance to
2 explain, if you'd like to.
3        But can we generally agree that the
4 ability to identify across a platform of one or two
5 billion users that being able to proactively
6 identify under-13 users could be challenging?
7 MR. CARTMELL:  Object to the form.
8        THE WITNESS:  -- speaking as somebody who
9 managed infrastructure to the tech bank account for
10 1.2 billion accounts, I believe that Meta has that
11 infrastructure.
12 BY MS. JONES:
13   Q.  When you were -- and I just want to make
14 sure I'm recalling correctly.
15       When you were at the company from 2019 to
16 2021, were you involved at all in age
17 verification-related efforts?
18   A.  I'm trying to recall the substance of the
19 conversations that I had when youth accounts were
20 being considered.  But I don't recall in detail.
21   Q.  Okay.  And in terms of the video that you
22 showed of the various girls who were singing along
23 to the song showing their -- their age and I think
24 maybe their favorite color, if I'm recalling
25 correctly?

Page 1067

1    A.  Yes.
2    Q.  Is it fair to say that age admissions like
3 shown in the video that you showed the jury can come
4 in different forms?
5        MR. CARTMELL:  Object to the form.
6        THE WITNESS:  Do you mean in the context
7 of the product or...
8 BY MS. JONES:
9    Q.  Yes.
10   A.  So do you mean, for example, people who
11 say their age on their profile or people who post
12 pictures with hashtag a certain birthday or --
13   Q.  Yes.
14   A.  -- those considerations?
15   Q.  Yes.
16   A.  Yes.
17   Q.  Okay.  And for example, it wouldn't be
18 really feasible for or at scale for a company like
19 Instagram -- or -- excuse me -- Meta to apply a rule
20 that every time there's a post that says it's my
21 eighth birthday that that means that's an under-13
22 user, right?
23   A.  No, it's absolutely feasible, that scale,
24 and I can provide details about that if you would
25 like.

Page 1068

1    Q.  Let me just follow up on your answer to my
2 question.
3        In that scenario, it is possible that if a
4 mom posted a picture of her eight-year-old son or
5 daughter and included either a caption or a comment
6 bubble on the image that said it's my eighth
7 birthday, that would not be an account that needs to
8 be suspended or terminated because it's an under-13
9 user, right?
10   A.  And in particular, I'm not -- I did not
11 say that those accounts, depending on the
12 circumstances, need to be suspended or terminated.
13       What you described is how spam checking
14 works.  And so in -- between 2010 or '11, the site
15 integrity team had infrastructure that looked at
16 every message sent, every piece of content posted,
17 every link, I think there were trillions of links,
18 40 billion pieces of content a day, to determine if
19 something was spam.
20       So if a mom posted "I had a great acai
21 berry yogurt that morning," that would go through.
22 But if somebody posted something about acai berry
23 and other criteria that were evaluated very quickly
24 happened, that could be spam and then it got --
25 depending on the circumstances there were different

80 (Pages 1065 - 1068)

CONFIDENTIAL

Page 1069

1 things that you would do, right.
2         And so for something like what you're
3 talking about, I think it would be extraordinarily
4 straightforward at great scale to say if somebody
5 posts hashtag eighth birthday, flag the account to
6 have it be looked at in a little bit more detail and
7 if within at a certain amount of precision, like
8 80 percent, we say, oh, that might be. So then you
9 would do a checkpoint to say is this a minor
10 account. And you only need to do that once per
11 account. And then, again, it can go into details if
12 you would like about what are ways that you can
13 apply that checkpoint in order to do verification.
14         That checkpoint is similar to things that
15 I implemented at Yahoo! and that checkpoint is
16 similar to things that were implemented at Facebook.
17         With technology we have today, when I
18 tested the parent account, I got a checkpoint that
19 said we just need to verify that you are a real
20 human and I held up my phone and I moved my head.
21 And then it was able to determine that it was a real
22 human. And so you could do so much better than we
23 did back then.
24     Q.   Is overenforcement -- this issue that we
25 talked about of overenforcement, is that a risk that

Page 1070

1 can exist when you're talking about these issues of
2 age verification?
3     A.   Yes, over and underenforcement are risks.
4     Q.   Have you spoken to any current employees
5 at Meta about the development of a model to predict
6 the ages of users under 13?
7     A.   I have not.
8     Q.   Have you worked on or been involved in
9 discussions related to Meta's underage reporting
10 form or processes?
11     A.   I have given feedback about that multiple
12 times. It's the most terrible flow.
13         (Whereupon, a brief discussion off the
14 record.)
15         THE WITNESS: The number of steps it takes
16 and the way it's designed is I think -- I don't use
17 this word lightly, "shameful."
18         MS. JONES: I'm going to move to strike
19 everything after "I have given feedback about that
20 multiple times."
21     Q.   You were asked some questions, I think it
22 was yesterday, about Frances Haugen.
23         Do you recall that?
24     A.   Yes.
25     Q.   And I think you testified that while you

Page 1071

1 were at Meta you did not know Ms. Haugen?
2     A.   Correct.
3     Q.   Did you also testify yesterday that you
4 had never communicated with Ms. Haugen about this
5 litigation?
6     A.   I don't recall what I said yesterday about
7 that.
8     Q.   And if you have said that, that would not
9 be accurate, right?
10         MR. CARTMELL: Object to the form.
11         THE WITNESS: That would not be accurate I
12 think.
13 BY MS. JONES:
14     Q.   And that's because you have communicated
15 with Ms. Haugen specifically about the lawsuits that
16 were filed -- one of the lawsuits that was filed
17 against Meta by the New Mexico Attorney General,
18 right?
19     A.   I don't recall.
20     Q.   Well, let's look at the document if you
21 don't remember.
22         Let me hand you what we've marked as
23 Deposition Exhibit Number 77.
24         (Whereupon, Meta-Bejar Exhibit 77 was
25 marked for identification.)

Page 1072

1 BY MS. JONES:
2     Q.   We're checking on an exhibit, Mr. Bejar.
3         But do you recognize what we've marked as
4 Deposition Exhibit Number 77?
5     A.   Yes.
6     Q.   What is Deposition Exhibit Number 77?
7     A.   It -- I believe, and I mean, there's parts
8 of this I don't recognize, but I believe that this
9 was a chat with which I was -- with Frances Haugen
10 when the New Mexico Attorney General put in BEEF as
11 an exhibit that you could view and download on their
12 website.
13     Q.   Okay. And that's why when you testified
14 earlier that you had been in touch with Ms. Haugen
15 about the litigation, that confirms that for you?
16     A.   I mean, if by the litigation you mean
17 like -- I was really hoping that BEEF would see the
18 light of day and so I remember that chat.
19     Q.   Okay. And the chat was about specifically
20 a lawsuit that had been brought against the company
21 by the New Mexico Attorney General?
22     A.   The chat was about the BEEF presentation
23 being made available in that context.
24     Q.   Okay. Let me ask you just a couple of
25 quick questions about some of your more historical

81 (Pages 1069 - 1072)

CONFIDENTIAL

Page 1073

1 communications with counsel for the State Attorneys
2 General.
3      You have been in communication with the
4 State Attorneys General bringing suits against Meta
5 since 2023; is that right?
6   A.  Yes, I believe so.
7   Q.  I'm going to hand you what we've marked as
8 Deposition Exhibit Number 78.
9   A.  Okay.
10      (Whereupon, Meta-Bejar Exhibit 78 was
11 marked for identification.)
12 BY MS. JONES:
13   Q.  And I'm going to hand you one other
14 exhibit in just a moment.
15      (Whereupon, Meta-Bejar Exhibit 79 was
16 marked for identification.)
17      MS. JONES:  Thank you.
18   Q.  And I'm also on going to hand you what
19 we've marked as Deposition Exhibit Number 79.
20      And do you recognize both Deposition
21 Exhibit 78 and 79 as documents that you produced in
22 advance of your deposition this week?
23   A.  I do.
24   Q.  Okay.  And let's just start with
25 Deposition Exhibit Number 78.

Page 1074

1      This is an e-mail from someone named Linda
2 Singer at Motley Rice, right?
3   A.  Correct.
4   Q.  And it's dated November --
5      Can we go to -- do you need a tab number?
6      TRIAL TECHNICIAN:  Yeah.
7      MS. JONES:  Chris needs a tab number.
8 What is the tab number.
9      112.  112, please.
10      Can we just call out the top half of that
11 please, Mr. Reynolds.
12   Q.  So this is an -- this is Deposition
13 Exhibit Number 78.  This is an e-mail from Linda
14 Singer at Motley Rice to you dated November the 8,
15 2023; is that right?
16   A.  Yes.
17   Q.  And Ms. Singer writes to you, "Mr. Bejar:
18 We write on behalf of the Office of the Attorney
19 General of the State of New Mexico."
20      Do you see that?
21   A.  Yes.
22   Q.  "We are aware, of course, not only of your
23 congressional testimony, which was so important, but
24 the interview you earlier provided to State
25 Attorneys General through the multistate

Page 1075

1 investigation."
2      Do you see that?
3   A.  Yes.
4   Q.  And then she describes the fact that she's
5 been -- that New Mexico has been proceeding on a
6 separate investigation with the focus on additional
7 issues related to child safety.
8      Do you see that?
9   A.  Yes.
10   Q.  And then she essentially says would you be
11 willing to have a conversation, right?
12   A.  Right.
13   Q.  And you understand that Linda Singer is an
14 outside lawyer who is -- whose firm has been hired
15 by the State of New Mexico?
16   A.  I do.
17   Q.  Okay.  And did you eventually have a
18 conversation with Ms. Singer and her colleagues?
19   A.  Yeah, it was, I believe, just with
20 Ms. Singer.
21   Q.  Okay.  And if you go to Exhibit
22 Number 79 --
23      This is Tab 113, Mr. Reynolds, Exhibit
24 Number 79.
25      -- I'm going to ask you to look actually

Page 1076

1 at -- I'm going to ask you to look at the very
2 bottom of the first page of Exhibit Number 79, if
3 you would.
4      Do you see that?
5   A.  Uh-huh.
6   Q.  And -- you have to say yes or no.
7   A.  Yes.
8   Q.  Okay.  So after you had that initial
9 outreach from Ms. Singer on November the 12, 2023,
10 she writes to you and says, "Arturo, please review
11 and, if you approve, countersign the attached
12 retainer.  Let me know if you have any questions or
13 concerns."
14      Do you see that?
15   A.  Yes.
16   Q.  And then she says, "I have attached the
17 confidentiality agreement governing Meta's
18 production of documents to the New Mexico Attorney
19 General's Office."
20      Do you see that?
21   A.  Yes.
22   Q.  Do you recall receiving from Ms. Singer a
23 copy of a proposed retainer agreement with her firm?
24   A.  There might have been an attachment to one
25 of these e-mails, but I believe that I got asked

82 (Pages 1073 - 1076)

CONFIDENTIAL

Page 1077

1  about it and produced it.
2      Q.  Okay.
3      A.  But whatever was the attachment to this
4  e-mail.
5      Q.  Okay.  We're handing you what has been
6  marked as Deposition Exhibit Number 80.
7          (Whereupon, Meta-Bejar Exhibit 80 was
8  marked for identification.)
9  BY MS. JONES:
10     Q.  Sorry.  My arms are short.
11         Mr. Bejar, do you recognize what we've
12  marked as Deposition Exhibit Number 80?
13     A.  I don't think I actually opened the
14  attachment to the e-mail, but I would guess that
15  this is the attachment to that e-mail.
16     Q.  Okay.  And just to orient ourselves, this
17  is a letter dated November the 12th, 2023; is that
18  right?
19     A.  Correct.
20     Q.  And you can see it's on Ms. Singer's
21  letterhead, right?
22     A.  Correct.
23     Q.  And the Re line of the letter is: Motley
24  Rice New Mexico Social Media Litigation, right?
25     A.  Correct.

Page 1078

1      Q.  And it says, "This letter memorializes the
2  agreement between You ('Expert') and Motley Rice LLC
3  to serve as a consulting expert in connection with
4  an investigation and potential litigation by the
5  Office of the Attorney General of the State of New
6  Mexico against various social media platforms."
7          Right?
8      A.  That's what that says.
9      Q.  And my understanding is that you did not
10  ultimately sign a retainer agreement with the State
11  of New Mexico; is that right?
12     A.  Yeah, I -- when I first got this, these
13  are terms that I know have very specific meaning in
14  the context, so I -- that's why I wrote back that I
15  was checking in with my counsel about these issues.
16     Q.  And why -- did you eventually sign a copy
17  of the retainer?
18     A.  No.
19     Q.  Why is that?
20     A.  I don't recall the reason why.
21     Q.  Well, in your mind, did you have an
22  agreement with the State of New Mexico to serve as a
23  consulting expert in connection with the
24  investigation and potential litigation they were
25  bringing against Meta?

Page 1079

1      A.  No.
2      Q.  What about with other State Attorneys
3  General, do -- were there any discussions related to
4  a possible retention agreement with any other State
5  Attorneys Generals about this?
6      A.  Not that I recall.
7      Q.  Do you consider yourself to be serving as
8  a consulting expert for any of the plaintiffs in
9  these cases?
10     A.  Again, when you say "consulting expert," I
11  think that has a really specific legal definition
12  and so I don't think I can answer that question
13  accurately.
14     Q.  Well, let me ask you, I'm actually asking
15  probably in a more colloquial sense, do you consider
16  yourself to be serving as a consultant on behalf of
17  the plaintiffs who have brought claims against Meta
18  in this case?
19         MR. CARTMELL:  I'm going to object to the
20  form.  And I do think it calls for a legal
21  conclusion.
22         THE WITNESS:  Again, to say "consultant,"
23  I think that has really specific meanings as well
24  and so this is one of the instances where I think
25  the words that you're using have very important

Page 1080

1  meaning.  And I'm not comfortable saying yes or no
2  to that question without a full understanding of
3  what each words are in the context that we're
4  talking about in this.
5  BY MS. JONES:
6      Q.  You've told me that between 2019 and 2021
7  you were a consultant to Meta, right?
8      A.  Yes.
9      Q.  What is your understanding of the word
10  "consultant"?
11     A.  I had a contract, they paid me for my
12  time, kind of similar, like, I was a consultant to
13  the oversight board.
14     Q.  Well, you -- you were not a consultant to
15  the oversight board, were you?
16     A.  I think the right term for the first stint
17  was "technical advisor."  I don't recall from the
18  contract what the -- again, this goes to the whole
19  contract language thing, which I -- I'm not really
20  comfortable talking about because I'm not a lawyer.
21     Q.  Well, the -- the e-mail exchange that we
22  saw was related to a specific presentation that you
23  were going to make to the oversight board, right?
24     A.  Yes.
25     Q.  And have you done any work with the

Page 1081

1 oversight board since that presentation in the fall
2 of 2024?
3    A.  I have not.
4    Q.  Do you recall sharing with Ms. Singer news
5 articles about some of the issues of teen safety
6 that we've talked about as part of your deposition?
7    A.  I don't recall.
8    Q.  Okay.  Do you recall meeting with her in
9 person?
10    A.  I do, yes.
11    Q.  Okay.  How many times did you meet in
12 person with a lawyer representing the State of
13 New Mexico?
14    A.  Once.  Oh, I met with -- sorry, to be more
15 precise, I met with Linda Singer once prior to
16 this -- the second exchange that you shared with me.
17 So between her reaching out and then the second
18 e-mail I believe I met with her briefly in New York,
19 I think was it?
20    Q.  Who was the first State AG's Office to
21 reach out to you?
22    A.  I don't recall.
23    Q.  How many -- since 2023 how many meetings
24 have you had with representatives for the State AG's
25 Office?

Page 1082

1    A.  I don't recall.
2    Q.  Is it more or less than five?
3       MR. PHELPS:  Objection.  Form.  Vague.  I
4 don't know what the State AG's Office refers to.
5 There's a lot of them.
6       MS. JONES:  That's fair.
7    Q.  Since 2023, how many meetings have you had
8 with representatives of any State AG's Office in
9 connection with the issues you've been testifying
10 about for the last three days?
11    A.  I don't recall.
12    Q.  Is it more or less than ten?
13    A.  I would say with -- maybe within that but
14 I get really uncomfortable saying --
15       (Whereupon, a brief discussion off the
16 record.)
17       THE WITNESS:  It sounds like within the
18 ballpark but I'm not comfortable because I don't
19 recall and I would like to be specific or more
20 accurate about the things that I say.
21 BY MS. JONES:
22    Q.  Okay.  But no questions since 2023, you
23 have had communications with representatives for
24 some of the State AG's Office that are bringing suit
25 against Meta; is that right?

Page 1083

1       MR. CARTMELL:  Objection.  Asked and
2 answered.
3       THE WITNESS:  I believe I've already
4 answered that question.
5 BY MS. JONES:
6    Q.  Okay.  And the -- you know, the documents
7 in the record will so reflect.
8       The testing that you have described in the
9 course of the last three days, you started that in
10 November of 2023; is that right?
11    A.  Correct.
12    Q.  And that was the very same month that you
13 began your communications with Linda Singer at
14 Motley Rice, right?
15    A.  Correct.
16    Q.  Did you have any discussions with
17 Ms. Singer about the fact that you had started
18 running these test sessions?
19    A.  I don't recall it.  That meeting was a
20 long time ago.
21    Q.  In terms of your congressional testimony,
22 Mr. Bejar, how did that come to be specifically?
23    A.  Somebody, I don't recall who, knew people
24 at the offices of Blumenthal and Blackburn and
25 connected me with them.

Page 1084

1    Q.  You said, "Somebody, I don't recall who."
2       Let me start by asking, when was that
3 connection made?
4    A.  I think between, like, probably less than
5 a week from when I had my first meeting with them.
6    Q.  And I apologize because I'm -- I think I'm
7 losing track of who the "them" is.
8       Who is "them" in that sentence?
9    A.  The office of Blumenthal and Blackburn.
10    Q.  Okay.  So you -- so someone connected you
11 with the offices of Senators Blumenthal and
12 Blackburn; is that right?
13    A.  Yes.
14    Q.  Is it possible that it was a
15 representative from the State AG's Office for
16 Tennessee that made that connection for you?
17       MR. PHELPS:  Object to form.
18       THE WITNESS:  No.
19 BY MS. JONES:
20    Q.  Was it anyone else from any of the State
21 Attorneys Generals' Offices?
22    A.  No.
23    Q.  Was it someone associated with Meta?
24    A.  No.
25    Q.  Was it a friend or a family member?

84 (Pages 1081 - 1084)

Page 1085

1    A.   Yeah, I think so.  I don't recall.  I had
2 a very small trusted set of people that I was
3 talking about when -- when the article from Jeff was
4 about to come out.
5    Q.   Who was in that small trusted set of
6 people?
7    A.   I don't recall.  I mean, of course my
8 kids, I talked to them.  My spouse.  And I'm trying
9 to think back.  I don't recall in detail.
10   Q.   But whatever the initial connection --
11 what was the method by which you were connected with
12 the offices of Senators Blumenthal and Blackburn?
13   A.   I don't recall.
14   Q.   Was it by e-mail?
15   A.   Again, I don't recall.
16   Q.   Did whoever this unnamed person is who
17 connected you with the senators' offices reach out
18 to you by phone or by e-mail or by some other means?
19      MR. CARTMELL:  Object to the form.
20      THE WITNESS:  I don't recall.
21 BY MS. JONES:
22   Q.   And your testimony today is that you have
23 zero recollection of who that person was?
24   A.   Yes.
25   Q.   After you were first initially connected

Page 1086

1 with Senators Blumenthal and Blackburn, how far in
2 advance of your actual testimony did you meet with
3 them and their staff?
4    A.   I think it was a week.
5    Q.   So probably late October; is that right?
6    A.   Yes.
7    Q.   And I thought you had testified on Monday
8 that you received a subpoena in connection with your
9 Senate testimony.
10      Am I recalling that correctly?
11   A.   Yes.
12   Q.   Was that a subpoena for your testimony or
13 a subpoena for documents?
14   A.   I believe it was both.
15   Q.   Okay.  And do you know by what method you
16 were provided with that subpoena?
17   A.   I think it's likely e-mail, but --
18   Q.   Okay.
19   A.   -- again, this is all -- as you might
20 imagine, that time was pretty intense so it's a
21 little blurry now.
22   Q.   At some point in this course of
23 discussions with Senators Blumenthal and Blackburn's
24 staff and the senators, did you have discussions
25 with any of the representatives from the State AGs'

Page 1087

1 Offices?
2    A.   No.
3    Q.   And at some point along the way, the
4 Tennessee AG's Office got looped in to your actual
5 hearing, right?
6    A.   I don't -- I mean, I've seen the picture
7 but I have no visibility on any of that.
8    Q.   Do you recall talking at all with
9 Mr. Phelps?
10   A.   After the -- my testimony, I believe we
11 shook hands.
12   Q.   Mr. Bejar, a couple of other items and
13 then I'll be done.
14      On your -- on the testing sessions that
15 you described, you offered the opinion that
16 teenagers seeing the videos that you showed the jury
17 could lead to some kind of harm; is that right?
18   A.   Yes.
19   Q.   And the reason for that opinion is that
20 the videos are, as you've described them, sexualized
21 or violent, right?
22   A.   For those examples, yes.
23   Q.   Okay.  And in your opinion, sexual --
24 sexualized or violent content can be harmful for
25 teens; is that right?

Page 1088

1    A.   Yes.  And in the videos that I produced
2 from 2025 there were eating disorder issues and I
3 did talk also to people that have experienced that
4 about the kind of content that triggered them.
5    Q.   Okay.  And your theory -- the theory of
6 your -- underlying your testing sessions is that the
7 algorithm associated with Instagram responds to what
8 a teen might actually engage with in terms of
9 stopping and watching a video?
10      MR. CARTMELL:  Object to the form.
11 Mischaracterizes.
12      THE WITNESS:  I mean, it's a small subset
13 of what I was trying to communicate.
14 BY MS. JONES:
15   Q.   But was that part of what you were trying
16 to communicate?
17   A.   That the algorithm is responsive to the
18 videos that you watch?  Yes.
19   Q.   Okay.  And so the algorithm could share
20 things with you that are, in your view, harmful
21 content, right?
22   A.   Correct.
23   Q.   Or the algorithm could share with you
24 content that, in your view, might be completely
25 innocent and not harmful; is that right?

CONFIDENTIAL

Page 1089

1    A.   Correct.
2    Q.   Okay.  And the difference between whether
3  you actually experience harm as between those two
4  things is going to be a function, under your theory,
5  of what the algorithm actually serves up in terms of
6  what's in the video?
7         MR. CARTMELL:  Object to the form.
8  Mischaracterizes.
9         THE WITNESS:  Sorry, I didn't understand
10  the question.
11  BY MS. JONES:
12    Q.   The difference between whether you
13  actually experience harm as between those two things
14  that we were talking about, whether the algorithm
15  shows you violent, sexualized content or whether the
16  algorithm shows you kind of harmless,
17  age-appropriate content, that's going to be a
18  consequence of what you actually see, right?
19         MR. CARTMELL:  Same objections.
20         THE WITNESS:  You're saying that the
21  algorithm is showing you on what you actually see, I
22  don't understand the question.
23  BY MS. JONES:
24    Q.   Okay.  Well, let me take a step back.
25         Under your theory, for a teenager, the

Page 1090

1  type of sexualized or violent content that was
2  captured in your videos is harmful to teens, yes?
3    A.   Yes.
4    Q.   There are other types of content that one
5  might see on the Instagram Reels feed that would not
6  be harmful, right?
7    A.   That's correct.
8    Q.   And so that might include things that
9  might also be of interest to a teenager like sports,
10  right?
11    A.   Correct.
12    Q.   If a teen was interested in cooking, that
13  would be that kind of content, right?
14    A.   Bunnies.
15    Q.   Bunnies, kittens, right?
16    A.   Oh, yeah, kittens.
17    Q.   Pandas, right?
18    A.   Pandas are the best.
19    Q.   There's no reason under your theory that
20  if the algorithm showed a teenager sporting content
21  or cooking content or bunnies or pandas or kittens,
22  that that would lead to some kind of harm, right?
23    A.   Actually -- sorry, go ahead.
24         MR. CARTMELL:  Object to the form.
25         THE WITNESS:  Okay.  I would say that

Page 1091

1  would be my hope for a 13-year-old, that it would
2  consist of that kind of contents that you described.
3  BY MS. JONES:
4    Q.   And the reason that you have that hope is
5  because that content is age-appropriate, right?
6    A.   Correct.
7    Q.   And that content is not likely, under your
8  theory, to lead to harm, right?
9    A.   Correct.
10    Q.   But the other type of content that you
11  showed to the jury, sexualized, violent content,
12  that might lead to harm, right?
13    A.   An example of that, yes.
14         MS. JONES:  Okay.  I think --
15         THE WITNESS:  Especially in volume.
16         MS. JONES:  I'm sorry.
17         THE REPORTER:  I'm sorry?
18         THE WITNESS:  Sorry.  I'll stop.
19         MS. JONES:  If you'll stop, I'll stop.
20         THE WITNESS:  Deal.
21         THE VIDEOGRAPHER:  Time is 5:21.  We're
22  off the record.
23         (Whereupon, a brief recess was taken.)
24         THE REPORTER:  Do you want a copy of this
25  transcript and the previous days?

Page 1092

1         MR. WARD:  Yes.
2         (Whereupon, a brief recess was taken.)
3         THE VIDEOGRAPHER:  Time is 5:31.  We're
4  back on the record.
5              EXAMINATION
6  BY MR. CARTMELL:
7    Q.   Good afternoon, Mr. Bejar.  We're back on
8  the record.  Are you ready to proceed?
9    A.   Yes.  Would it be possible to move --
10    Q.   This thing?
11    A.   Yeah.
12    Q.   Yeah.
13    A.   Thank you.
14    Q.   Sure.  Okay.
15         So I'm going to follow up and have some
16  questions for you.  I'm going to try to be very
17  respectful for your time.
18         I'm going to start over.
19         I'm going to follow up and ask you some
20  questions and I'm going to try to be very respectful
21  of your time and everybody else's because you've
22  been here for a long time, okay.
23    A.   Thank you.
24    Q.   As you know, my name is Tom Cartmell and
25  I've asked you questions for a period of time.  I

86 (Pages 1089 - 1092)

CONFIDENTIAL

Page 1093

1 may skip around a bit because I want to follow up on
2 some things that Ms. Jones asked you.
3        And I'd like to start out with asking you
4 about, you know, your position that you were in when
5 you went back to Meta in 2019, okay?
6    A.  Okay.
7    Q.  Ms. Jones referred to you multiple times
8 during her questions as, I believe, a contingent
9 worker.
10    A.  Yes.
11    Q.  What is a contingent worker?
12    A.  I think it's the term that was used by
13 PRO Unlimited.  It's an internal label.
14    Q.  Okay.  So PRO Unlimited, just so it's
15 clear to the jury, was the company that -- that Meta
16 uses to have contracts with independent contractors;
17 is that right?
18    A.  Yes.
19    Q.  Okay.  So Meta wouldn't have a situation
20 where they have part-time employees come on.  They
21 had this third-party called PRO when somebody like
22 you who was going to be a consultant, they would
23 have you contract with them; is that fair?
24    A.  Yes.
25    Q.  Okay.  And that company, PRO, I guess,

Page 1094

1 called you a contingent worker; is that right?
2    A.  They did.
3    Q.  Okay.  Did anybody at Meta ever refer to
4 you as a contingent worker?
5    A.  No.
6    Q.  Okay.  And what was your understanding as
7 to what your position was that you were hired or
8 retained to hold when were you returned to Meta in
9 2019?
10        MS. JONES:  Objection to form.  And
11 foundation.
12        THE WITNESS:  I was a consultant that was
13 going to be looking at well-being issues.
14 BY MR. CARTMELL:
15    Q.  Okay.  Look at Exhibit 7, if you would,
16 real quickly.  We talked about this during your
17 testimony but this is an e-mail, if you see at the
18 top, from ███████ to you.
19        I'm sorry, let's -- I went to the wrong
20 e-mail.  Let's start over.
21        If you go to the bottom of the page, on
22 page 1, there's an e-mail to you responding to ████
23 ████ and you say, "Thoughts inline."  Correct?
24    A.  Correct.
25    Q.  Okay.  And what I'm referring -- want to

Page 1095

1 refer you to is, "What do you think makes sense from
2 a consulting arrangement?"
3        Do you see that?
4    A.  Can you highlight it, please?  I would
5 find that helpful.
6    Q.  Yeah.  It's in the --
7    A.  Oh, I see it now.
8    Q.  -- like fourth paragraph.
9    A.  Yeah.
10    Q.  And that is -- is that Mr. █████ asking
11 you that or are you asking that?
12    A.  It's █████ asking me that.
13    Q.  Okay.  And, in fact, Mr. █████ was
14 asking you to come back as a consultant; is that
15 correct?
16        MS. JONES:  Objection.  Foundation.
17        THE WITNESS:  Yes.
18 BY MR. CARTMELL:
19    Q.  Okay.  And he was asking you to come back
20 as a consultant.  Was it a safety consultant?
21    A.  Yes.
22    Q.  Okay.  And I see that under that paragraph
23 it says, "My usual consulting rate is $500" an hour.
24        Do you see that?
25    A.  Yes.

Page 1096

1    Q.  Do you remember what the rate was that you
2 were paid when you were consulting for Meta?
3    A.  I believe it was $500 an hour.
4    Q.  Okay.  You actually offered if they wanted
5 to do this on a pro bono basis, didn't you?
6    A.  Yes.
7    Q.  In other words, you offered to Meta that
8 you would come and spend time at the company or with
9 employees, by Zoom or remotely, to help them with
10 their safety on Instagram and you wouldn't even
11 charge?
12    A.  Correct.
13    Q.  Why did you do that?
14    A.  I mean, I didn't need to charge at the
15 time and that work was important.
16    Q.  Okay.  Now, you were asked questions about
17 how many hours you spent, and you were shown some
18 testimony from the Tennessee AG --
19        Yeah, what -- what exhibit was that?
20        MS. JONES:  We didn't mark it if you want
21 to mark it that's fine.
22        MR. CARTMELL:  I don't care to mark it.
23 I'd just like to pull up what you showed.
24        MS. JONES:  Okay.
25        MR. CARTMELL:  So we'll look at --

Page 1097

1    MS. JONES:  Then we'll mark it as an
2 exhibit, then.
3 BY MR. CARTMELL:
4    Q.   Okay.  So you were shown some testimony
5 from the Tennessee -- testimony you gave in the
6 investigation of the Attorney Generals; is that
7 right?
8    A.   Yes.
9    Q.   And if you go to page 87, it says at the
10 bottom --
11    MS. JONES:  And I'm sorry, Counsel, since
12 we had a back and forth about the use of the
13 transcript, I think this is an inappropriate use of
14 the transcript, for the record.  Objection.
15    Go ahead.
16 BY MR. CARTMELL:
17    Q.   Ms. Jones read to you where you said --
18 the question was, "How many hours a week roughly did
19 you work for the company between 2019 and '21?"
20    And you said, "I think it likely averaged
21 out to around one day a week.  It was done on an
22 as-needed basis so there were weeks where it was
23 just a few hours.  And then there were weeks where
24 it was like multiple days."
25    Is that what you said?

Page 1098

1    A.   Yes.
2    Q.   And you didn't -- she didn't ask you about
3 this, but below that you said, "And so I don't have
4 an exact average but I would always spend time with
5 them at least once a week on almost all weeks and
6 sometimes more as needed."
7    Is that correct?
8    A.   Yes.
9    Q.   And just so it's clear, did it vary over
10 time and did -- and let me strike that and ask it.
11    Did it vary over time how much time you
12 would spend working with Meta?
13    MS. JONES:  Objection to the form.
14    THE WITNESS:  Yes.
15 BY MR. CARTMELL:
16    Q.   And did the time become more as time went
17 on?
18    A.   Yes.
19    Q.   In other words, when BEEF was being
20 developed by you and Mr. ████ were you spending
21 more time?
22    A.   Yes.
23    Q.   And when you were meeting with the leads
24 like Miki Rothschild and ████████ and making
25 presentations to the leads about the safety

Page 1099

1 framework you wanted, were you spending more time?
2    A.   Yes.
3    Q.   Did you always spend the amount of time
4 you needed to try to convince leadership that they
5 needed to do more to try to protect kids on
6 Instagram?
7    MS. JONES:  Objection to the form.
8    THE WITNESS:  Yes.
9 BY MR. CARTMELL:
10    Q.   And after the BEEF survey started and you
11 were escalating your concerns with the well-being
12 team to senior leadership, were you spending more
13 time?
14    A.   Yes.
15    Q.   Now, you were an expert consultant; is
16 that what you were told as far as why you were
17 brought in?
18    MS. JONES:  Objection.  Form.  And
19 characterization.
20    THE WITNESS:  Yes.
21 BY MR. CARTMELL:
22    Q.   Who told you that?
23    A.   I think it was in my initial conversations
24 with Samir and Yoav about joining.
25    Q.   Okay.  Let's look at -- back at Exhibit 8.

Page 1100

1    Exhibit 8 we saw is Meta's document from
2 the files that talks about your job responsibilities
3 and duties, correct?
4    MS. JONES:  Objection to the
5 characterization.
6    THE WITNESS:  Correct.
7 BY MR. CARTMELL:
8    Q.   And this is in March of 2021 so 18 months
9 after you started?
10    A.   Correct.
11    Q.   Okay.  And I've highlighted some of the
12 things I want to ask you about real quick.
13    But it states, "We are asking Arturo for
14 several deliverables towards Instagram Well-Being's
15 mission."  And it talks about "consulting to
16 Instagram Well-Being, central integrity, and other
17 internal cross-function partners."
18    Do you see that?
19    A.   Yes.
20    Q.   Did you do that?
21    A.   Yes.
22    Q.   Okay.  "Consult and advise Engineering
23 leadership teams."
24    Did you do that?
25    A.   Yes.

88 (Pages 1097 - 1100)

CONFIDENTIAL

Page 1101

1    Q.  Up above, I didn't --
2        I'm sorry, Jim.
3        Up above, "Survey designs," did you help
4  design surveys?
5    A.  Yes.
6    Q.  Did you take whatever time was necessary
7  to do that and put that time in?
8    A.  Yes.
9    Q.  Okay.  If you go down to Job Description,
10  it states, we -- whoops.
11       If you go down to Job Description, it
12  says, "The Instagram Well-Being organization is
13  looking for a world-class leader."
14       Were they referring to you there?
15    A.  Yes.
16    Q.  Okay.  And they say --
17       MS. JONES:  I'm sorry.  Just note my
18  objection to foundation.
19       Go ahead.
20  BY MR. CARTMELL:
21    Q.  They say, "We would expect this person to
22  be a thought leader in this space, with considerable
23  (10-plus years) experience with online harm
24  understanding, measurement, and remediation."
25       Is that referring to you?

Page 1102

1    A.  Yes.
2    Q.  Okay.  If you go to the next page, there's
3  Job Responsibilities.  And I want to draw your
4  attention, it says, "Finally, we would hope this
5  leader helps coach and grow our personnel.  Again,
6  across functions."
7        That's referring to you, correct?
8    A.  Correct.
9    Q.  And did you do that?
10    A.  Yes.
11    Q.  Okay.  Under responsibility it states,
12  "Work with the well-being research team to lead
13  Instagram's efforts to understand bad experiences."
14        Did you do that?
15    A.  Yes.
16    Q.  And they -- that was your responsibility
17  that they hired you for, right?
18       MS. JONES:  Objections to the form.  And
19  foundation.
20       THE WITNESS:  Yes.
21  BY MR. CARTMELL:
22    Q.  "Work with the well-being data science
23  team to translate those understand efforts into
24  concrete metrics."
25        Did you work on trying to get that done

Page 1103

1  with the well-being team?
2    A.  Yes.
3    Q.  "Influence resource allocation."
4        Were you trying to get more resources from
5  leadership for the well-being team so they could
6  keep kids safe?
7        MS. JONES:  Objection to the form.
8        THE WITNESS:  Yes.
9  BY MR. CARTMELL:
10    Q.  "Work with well-being product teams."
11        Did you do that?
12    A.  Yes.
13    Q.  "Work with the well-being engineering
14  teams."
15        Did you do that?
16    A.  Yes.
17    Q.  "Be a bridge to other teams in the family
18  of apps."
19        Did you do that?
20    A.  Yes.
21    Q.  And then it says, "Represent Instagram's
22  work in this area to our management chains, for
23  example, leads, Instagram leads, central integrity,
24  central customer support, and related groups up to
25  and including Facebook executive team members."

Page 1104

1        Do you see that?
2    A.  Yes.
3    Q.  So one of your responsibilities was,
4  during the course of your work, as far as the work
5  you were doing and any concerns you had was to
6  escalate that all the way up to the senior
7  executives like Mark Zuckerberg, correct?
8        MS. JONES:  Objection.  Form.
9  Characterization.
10  BY MR. CARTMELL:
11    Q.  Is that correct?
12    A.  Yes.
13    Q.  Did you, in fact, do that?
14    A.  Yes.
15    Q.  Okay.  It says requirement, "Proven
16  experience in the field."
17        Did you have that?
18    A.  Yes.
19    Q.  And they -- they were requiring that you
20  had that when they actually hired you, right?
21    A.  Yes.
22    Q.  "Experience in management."
23        Did you have that?
24    A.  Yes.
25    Q.  You had worked for Yahoo! for 11 years; is

89 (Pages 1101 - 1104)

CONFIDENTIAL

Page 1105

1 that right?
2    A.  Yes.
3    Q.  In safety and security?
4    A.  Yes.
5    Q.  And you had worked for Facebook before it
6 became Meta on the Facebook app for six years; is
7 that right?
8    A.  Yes.
9    Q.  "A great listener with ability to
10 communicate with people of diverse disciplines."
11      That was required of you and one of the
12 things why they wanted to actually have you be their
13 safety consultant, correct?
14      MS. JONES:  Excuse me.
15      Objection.  Foundation.  And form.
16      THE WITNESS:  Yes.
17 BY MR. CARTMELL:
18    Q.  "20-plus years of industry experience."
19      That was required for them to retain you
20 as their safety consultant, correct?
21    A.  Yes.
22    Q.  And did you have that in 2019?
23    A.  Yes.
24    Q.  And then as we saw before, the Business
25 Justification specifically states [as read]:

Page 1106

1      The combination of responsibilities
2 described above is quite rare: it's a world-class
3 expert -- expertise in user understanding
4 (research), the ability to translate it into a
5 product roadmap, as well as an engineering plan, all
6 in a highly specialized space (Well-being).  There
7 are fewer than 10 people in the world meeting these
8 qualifications, we estimate, most of whom are
9 retired or employed at our competitors.
10      Do you see that?
11    A.  Yes.
12    Q.  No doubt, no question in your mind, that
13 is referring to you, correct?
14    A.  Yes.
15    Q.  And if you go to dot 8, in fact, of this
16 document, you'll see that in the conversation
17 history, he was putting this document together under
18 Business Justification, it states right above that,
19 you'll see, "           edited," on May 26, 2021.
20      Do you see that?
21    A.  Yes.
22    Q.  Okay.  And           at the time, he
23 was, was he not, the -- one of the leads of the
24 entire well-being pillar?
25    A.  Correct.

Page 1107

1    Q.  In other words, the pillar is called
2 well-being, and there's all kinds of teams under the
3 pillar, many of them are involved in safety, right?
4      MS. JONES:  Let me -- hold on.
5      Let me object to the form.  And to the
6 characterization.
7      Go ahead.
8 BY MR. CARTMELL:
9    Q.  There's a well-being pillar; is that
10 right?
11    A.  Correct.
12      MS. JONES:  Same objection.
13 BY MR. CARTMELL:
14    Q.  And then under the pillar, are there many
15 teams, one being the Mental Well-Being team, fair?
16    A.  Yes.
17    Q.  And then other teams that are also working
18 on safety?
19    A.  Yes.
20    Q.  Okay.  You were asked a lot of questions
21 about there's different teams other than the
22 well-being team working on safety.
23      Do you remember that?
24    A.  Yes.
25    Q.  Okay.  But           was actually a

Page 1108

1 lead above lots of those teams, right?
2      MS. JONES:  Objection to the
3 characterization.  And form.
4      THE WITNESS:  Yes.
5 BY MR. CARTMELL:
6    Q.  Was           actually the well-being
7 pillar lead who was managing and leading lots of
8 those teams?
9    A.  Yes.
10    Q.  Let's look at P2197.
11      And this is marked as Exhibit 81.  I just
12 have a quick question about it.
13      (Whereupon, Meta-Bejar Exhibit 81 was
14 marked for identification.)
15 BY MR. CARTMELL:
16    Q.  A couple, actually.
17      If you go to dot 9, this is actually an
18 e-mail from PRO to you.
19      Do you see that?
20    A.  Yes.
21    Q.  And PRO is that company that Meta uses to
22 contract with consultants like you, right?
23    A.  Yes.
24    Q.  And you weren't shown this by Ms. Jones,
25 but it says, "A congratulations is in order, as we

90 (Pages 1105 - 1108)

Page 1109

1 would like to extend an offer to you for a position
2 as a Policy and Security Specialist with PRO."
3        Do you see that?
4    A.  Yes.
5    Q.  Okay.  And one of the things, if you go to
6 .2, is one of the things that you were doing, if you
7 look at the bottom e-mail from you to ▮▮▮▮,
8 I think on September 18th, at PRO -- or -- excuse
9 me -- at Facebook, let's go to the bottom paragraph.
10       It says, "So, the issue here is that I'm
11 hired as a subject matter expert on issues that
12 relate to Facebook's business."
13       Do you see that?
14    A.  Yes.
15    Q.  This is in real time back in 2019 in
16 September and you're saying that you're being hired
17 as a subject matter expert, correct?
18    A.  Yes.
19    Q.  That's what -- that was your
20 understanding, right?
21    A.  Yeah.
22    Q.  "And I agree 100 percent that what I
23 discussed with Facebook/Instagram about their
24 platform is confidential and that any ideas that are
25 conceived for that context are property of

Page 1110

1 Facebook."
2        What are you discussing there?
3    A.  I'm discussing the nondisclosure agreement
4 that was part of the -- my contract with -- that was
5 part of my contract.
6    Q.  Okay.  And the next paragraph talks about
7 other things you're doing at that time in 2019
8 outside of Facebook or Meta; is that correct?
9    A.  Correct.
10    Q.  You say, "I'm doing this kind of advising
11 with a couple of people right now, as well as
12 writing on the subject matter, and it would not be
13 appropriate for Facebook to own what I do or write
14 about in the domain space of social networks if I'm
15 not a full-time employee."
16       Do you see that?
17    A.  Yes.
18    Q.  So explain what was going on and what you
19 were doing at this time outside of your work that
20 was about to start with Meta.
21    A.  So during this time, I was advising
22 different organizations, sometimes pro bono,
23 sometimes compensated, on social media matters and
24 it was important for me to continue doing that and
25 being able to do that afterwards in the

Page 1111

1 understanding that things that were related to the
2 scope, I say here, were not subject to the
3 nondisclosure which tends to be pretty
4 comprehensive.
5        It says anything you might have to do with
6 social media during the time of your employment,
7 Facebook will own, and so it was important me to
8 have a carveout because I was talking to multiple
9 people and I wanted to make sure I continued to be
10 able to do that, including writing and publishing.
11    Q.  You were asked multiple times by Ms. Jones
12 about what you were doing between 2015 and 2019; is
13 that right?
14    A.  Yes.
15    Q.  And is this document in September of '19
16 talking about you actually consulting for other
17 groups or individuals?
18       MS. JONES:  Objection to the
19 characterization.
20       THE WITNESS:  Yes.
21 BY MR. CARTMELL:
22    Q.  Okay.  And if you go to page -- or the
23 first page of this, there's an e-mail from you to
24 ▮▮▮▮ at Facebook.  And you actually tell
25 Ms. ▮▮▮▮ -- or is that Ms. ▮▮▮▮ do you know?

Page 1112

1    A.  I don't.
2    Q.  Okay.  You actually list things you're
3 doing as of September of 2019.
4        You say, "Currently I am: Writing about
5 the impact of social media and communication tools
6 on our society, the importance of development of
7 social norms, and ways to understand and measure so
8 that the work can be planned and its impact can be
9 measured."
10       What did you mean by that?
11    A.  Exactly what I wrote, which is I was
12 writing about social media and similar tools.  And
13 the importance of developing social norms which I
14 believe are essential for creating a safe
15 environment.  And ways of understanding and
16 measuring the impact of those implementations.
17    Q.  Were you writing essays and that sort of
18 thing on that?
19    A.  Correct.
20       MS. JONES:  Excuse me.
21       Objection to the form.
22 BY MR. CARTMELL:
23    Q.  What were you writing?
24    A.  I was writing essays about that.
25    Q.  Okay.  Then it says, "Part of a group

91 (Pages 1109 - 1112)

CONFIDENTIAL

Page 1113

1 called the Mobius council who is looking at how to
2 support improving the role technology plays in our
3 lives. This includes screen time, loneliness, the
4 attention economy, impact on social norms and
5 society."
6      Do you see that?
7    A. Yes.
8    Q. So what -- tell us about that work you
9 were doing as of or before you became Meta's safety
10 consultant in October of 2019?
11    A. Mobius was a group of people from
12 different backgrounds that was looking at these
13 issues and looking to work with different social
14 media companies around these issues.
15    Q. Okay. And then the last bullet is you
16 were, "Looking at similar engagements with Twitter,
17 Apple, and other entities who are shaping the role
18 of technology in our lives, which will include
19 helping them come up with their own solutions to the
20 challenges in this space, or -- possible facilitate
21 collaboration."
22      Correct?
23    A. Correct.
24    Q. And you wanted that work to stay
25 independent; is that fair?

Page 1114

1    A. That's fair.
2    Q. Okay. Now, we talked about you being
3 hired as Meta's safety consultant in October of
4 2019. Were you actually supporting the Instagram
5 Well-Being team?
6    A. Yes.
7    Q. Okay. And you were asked a lot of
8 questions about, you know, your job as a consultant
9 and things like that.
10      Did you feel kind of like it was --
11 Ms. Jones was downplaying the role you had?
12      MS. JONES: Hold on.
13      I'm going to object to the inappropriate
14 commentary on counsel. And form. And
15 characterization.
16      Go ahead.
17      THE WITNESS: Yes, I did.
18 BY MR. CARTMELL:
19    Q. Okay. And do you believe the -- when she
20 referred to -- strike that.
21      Do you believe that contingent worker or
22 employee is a fair representation of your work that
23 you did during those two years?
24    A. It is not.
25    Q. Why not?

Page 1115

1    A. Because I was a consultant working on
2 meaningful issues for all of the reasons that we
3 just covered in all of the documents we have seen.
4      (Whereupon, a brief discussion off the
5 record.)
6 BY MR. CARTMELL:
7    Q. Did any of the executives you met with or
8 communicated with during those two years ever tell
9 you that they didn't want to work with you or
10 believe your opinions on the safety on Instagram
11 were valuable because you were a part-time
12 consultant?
13      MS. JONES: Objection to the form.
14 Foundation.
15      THE WITNESS: Did you say that my opinions
16 were less valuable because I was a part-time
17 consultant?
18 BY MR. CARTMELL:
19    Q. Did any executive ever tell you that?
20    A. They did not.
21    Q. What did they tell you?
22    A. Everybody I spoke to welcomed the
23 conversations, the feedback, the experience, and the
24 manner in which it was delivered.
25      MR. CARTMELL: Let's look at Exhibit 43.

Page 1116

1      (Whereupon, Meta-Bejar Exhibit 43 having
2 been previously marked, was introduced.)
3 BY MR. CARTMELL:
4    Q. Exhibit 43 we looked at previously and
5 that's the letter draft to Adam Mosseri and you're
6 the signatory of that draft letter; is that correct?
7    A. Yes.
8    Q. And, again, Adam Mosseri is the number one
9 top executive at Instagram, correct?
10    A. Correct.
11    Q. And he still is today, right?
12    A. Yes.
13    Q. And if we look at the Conversation History
14 on dot 2, if you highlight that first two paragraphs
15 under Conversation History --
16      Jim, if you highlight the first two
17 paragraphs under Conversation History.
18      -- there's a list of names. I counted
19 them, if you want you can count them, but I think
20 it's 19 names.
21      Do you see that?
22    A. Yes.
23    Q. And are those all people that actually had
24 worked with you to try to escalate the concerns you
25 and the well-being team had about the safety of kids

CONFIDENTIAL

Page 1117

1 on Instagram?
2    A.  Yes.
3    Q.   And they nominated you to be the
4 spokesperson to take it to actually the executives?
5    A.  Yes.
6    Q.  Did you have enough time or spend enough
7 time to be nominated by the entire team of 19 people
8 and go speak to the executives?
9       MS. JONES:  Objection to the form.
10       THE WITNESS:  Yes.
11 BY MR. CARTMELL:
12    Q.   And these people include Miki Rothschild,
13 right, who is one of the leads of the entire
14 well-being pillar with ▮▮▮▮▮▮▮▮, correct?
15    A.  Correct.
16    Q.  In other words, Miki Rothschild is also --
17 was he -- strike that.
18       Was Miki Rothschild also one of the leads
19 of the entire well-being pillar that had lots of
20 different teams under it that were working on safety
21 on Instagram?
22    A.  Yes.
23    Q.  Is it possible that there were other
24 safety teams other than the well-being team that
25 were making Instagram a safe place and you just

Page 1118

1 missed it?
2       MS. JONES:  Objection to the form.  And
3 foundation.
4       THE WITNESS:  How about -- about Instagram
5 itself, specifically, I don't think so.
6 BY MR. CARTMELL:
7    Q.  In other words, did you do a full
8 assessment of the safety of kids on Instagram?
9       MS. JONES:  Objection to the form.
10       THE WITNESS:  Yes.
11 BY MR. CARTMELL:
12    Q.  And if there had been other safety teams
13 that were putting in place safety tools and features
14 to protect kids, would you have known about that?
15       MS. JONES:  Objection.  Foundation.
16       THE WITNESS:  Yes.
17 BY MR. CARTMELL:
18    Q.  You were asked a lot of questions about
19 not knowing the exact head count that were -- was in
20 place for different teams.
21       Do you remember that?
22    A.  Yes.
23    Q.  Okay.  Did you need to know the exact head
24 count of all the -- the teams or what they had in
25 order to know that there was a serious

Page 1119

1 underresourced problem for the well-being team?
2       MS. JONES:  Objection to the form.
3       THE WITNESS:  I did not need to know the
4 head count in order to be able to do that
5 effectively.
6 BY MR. CARTMELL:
7    Q.  Well, did you -- you've given an opinion
8 that there was a lack of a resource and support and
9 funding for the safety work and well-being work on
10 Instagram; is that right?
11    A.  Absolutely.
12    Q.  And what was the basis for your knowledge
13 in that regard?
14    A.  It was my familiarity with different
15 aspects of the well-being pillar including
16 engineering part of research and the people that
17 were working on these issues for that team.
18    Q.  Did you need to know the exact head counts
19 for each team in order to give that opinion and
20 opine that there was a lack of resources and funding
21 and support?
22    A.  You did not.  All you had to do was look
23 at the roadmap and talk to the people.
24    Q.  And you talked to people who actually told
25 you that; is that fair?

Page 1120

1    A.  Yes.
2       MS. JONES:  Objection to the form.
3 BY MR. CARTMELL:
4    Q.  Did you talk to people about that who told
5 you about the -- strike that.
6       Did you talk to other people at Meta who
7 told you that there was a lack of resources and
8 funding and support for the safety work on
9 Instagram?
10       MS. JONES:  Objection to the form.
11 Foundation.
12       THE WITNESS:  Yes.
13 BY MR. CARTMELL:
14    Q.  Was that well-known?
15    A.  Yes.
16       MS. JONES:  Same objections.
17       THE WITNESS:  Yes.
18 BY MR. CARTMELL:
19    Q.  Why would Meta, based on your expertise
20 and understanding from your time at Meta when they
21 had all those full-time employees, hire you as a
22 consultant?
23       MS. JONES:  Objection to the form.
24 Foundation.
25       THE WITNESS:  You hire a consultant

93 (Pages 1117 - 1120)

CONFIDENTIAL

Page 1121

1 because they can see things that full-time employees
2 can't see and they can say things that full-time
3 employees can't say.
4 BY MR. CARTMELL:
5     Q.  Let's take those one at a time.
6         What do you mean that a consultant like
7 you who is brought in can see things that maybe the
8 full-time employees can't?
9     A.  It means that the full-time employee has
10 the perspective of their manager and performance
11 reviews and where they sit in the organization.
12        And then an independent consultant,
13 something I did for Meta and other organizations,
14 can talk to them and to their manager and to their
15 managers' managers, to other people in other parts
16 of the company, so you can get a perspective on the
17 organization that the employee does not have.
18     Q.  And is that something that, in fact, you
19 did during the time you were there?
20     A.  Yes.
21     Q.  And you said also a consultant like you is
22 brought in because you can say things that full-time
23 employees can't say; is that right?
24     A.  That is correct.
25     Q.  Explain that, please.

Page 1122

1        MS. JONES:  I'm going to just note my
2 objection to form.
3        MR. CARTMELL:  Could you explain that,
4 please?
5        MS. JONES:  The first part of your
6 question.
7        MR. CARTMELL:  Okay.  That's what I wanted
8 to know because I want to restate it if you --
9 that's what you're talking about.
10        MS. JONES:  Okay.
11 BY MR. CARTMELL:
12     Q.  What did you mean when you said that there
13 are -- strike that.
14        What did you mean when you said a
15 consultant like you is important to be brought in
16 because that consultant can say things that
17 full-time employees cannot?
18     A.  What I mean by that is all 19 people in
19 this document and everybody else that I spoke to on
20 my way to the escalation that I did, none of them
21 were comfortable going to Mark Zuckerberg and say
22 the approach that the company is taking to safety
23 and security especially as it affects teens is
24 wrong.
25     Q.  Why is that?

Page 1123

1     A.  Because it would be admitting through your
2 management chain that the work that you are doing is
3 not having sort of an impact that you sort of talk
4 about doing.  I mean, there are -- when you look
5 at -- at what it means, for example, for Miki to say
6 yeah, you know, the roadmap that we've been working
7 on is wrong, and what we need to do is we need to
8 invest in the approach that's based on harm, there's
9 such a meaningful conflict of interest for him to
10 say that to his manager and his manager's manager
11 and it's in every performance review he has had up
12 to that point.
13        And so an external consultant can look at
14 all of this and say, no, actually, the approach is
15 wrong.  It needs significantly more resources.  And
16 then you check with the people because I am
17 representing their work.  Is this accurate, is this
18 something that you are comfortable with me taking to
19 Mark Zuckerberg.
20        And my experience is they were not just
21 comfortable, they were hopeful that I was able to go
22 up to Mark Zuckerberg, Chris Cox, Sheryl Sandberg,
23 and Adam Mosseri and say the things that I was able
24 to say because as an independent consultant you can
25 say things that full-time employees cannot say.

Page 1124

1     Q.  And based on your understanding, were you
2 designated as the spokesperson to go all the way to
3 the top of the organization about the concerns with
4 risks to kids on Instagram because of that reason,
5 in part?
6        MS. JONES:  Objection.  Form.  Foundation.
7        THE WITNESS:  Yes.
8 BY MR. CARTMELL:
9     Q.  And did anybody actually disagree, that
10 you know of, with your opinion in realtime, back in
11 2019 to 2021, with your opinion that, for example,
12 there was a big problem with well-being and safety
13 work not being adequately funded, supported, and
14 resourced?
15     A.  Nobody disagreed.
16     Q.  Did everybody who you were working with on
17 safety and well-being for Instagram agree with you
18 that the executives needed to be told about that in
19 order to try to get enough support and funding and
20 resources to try to help the safety of kids on
21 Instagram?
22     A.  Everybody agreed.
23     Q.  Let me hand you Exhibit 82.
24        (Whereupon, Meta-Bejar Exhibit 82 was
25 marked for identification.)

94 (Pages 1121 - 1124)

CONFIDENTIAL

Page 1125

1 BY MR. CARTMELL:
2    Q.  Exhibit 82 comes from Meta's files.  And
3 was in your files as well and they produced it in
4 this case.  It's called -- entitled "Notes for bad
5 experiences meeting with Adam."
6        Do you see that?
7    A.  Yes.
8    Q.  What is this documents; do you remember?
9    A.  Notes from the bad experiences meeting
10 with Adam.
11    Q.  Okay.  And you are working on preparing
12 for your final meeting with the top executive at
13 Instagram, Adam Mosseri?
14    A.  Yes.
15    Q.  Okay.  I just want to ask you a question
16 about dot 5 in the conversation or preparation of
17 these notes for your meeting with the top executive,
18 Adam Mosseri.
19    A.  Uh-huh.
20    Q.  I want to ask you about ████████
21 entry at 9:20 p.m.
22        Do you see that?
23    A.  Yes.
24    Q.  He states, "I agree with your hypothesis
25 and you're right, it needs to be" -- it probably --

Page 1126

1 strike that.
2        It states, "I agree with your hypothesis,
3 and you're right it needs to be verified.  But I
4 don't think that is the strongest talking point.  I
5 suggest a framing like we've had 500 to 1000
6 engineers working to reduce prevalence for 3 to
7 4 years (so, conservatively, 1500-person-years of
8 work!)  We've had maybe 5 engineers for maybe 6
9 months working on BEEF/TRIPS and we're seeing
10 promising results.  We need to change our investment
11 portfolio.  I think this language would resonate
12 with Guy too."
13        And then he says -- there's a -- maybe a
14 link to you; is that correct?
15    A.  Correct.
16    Q.  So what's your understanding of what
17 Mr. ██████ is saying?
18    A.  What Yoav is saying is that they've had
19 1500-person-years of work to reduce prevalence over
20 three or four years.  And they've had five engineers
21 for maybe six months working on BEEF.  And they're
22 seeking promising results so the investment
23 portfolio, the way the company invests engineers,
24 needs to change.
25        And I believe that that language

Page 1127

1 resonated -- would resonate with the head of central
2 integrity as well.
3        MS. JONES:  Counsel, I'm very sorry, I
4 should have lodged an objection on foundation based
5 on that Mr. Bejar is offering an opinion as to what
6 Mr. ██████ meant.  Please forgive me.
7 BY MR. CARTMELL:
8    Q.  And did you talk to Mr. ██████ about his
9 opinion in this regard?
10    A.  Many times.
11    Q.  Is Mr. ██████ saying here that there is
12 underresourcing, lack of support, and lack of
13 funding for the actual well-being and safety work at
14 Instagram?
15    A.  Yes.
16    Q.  And he held that opinion as strongly as
17 you did; do you know?
18    A.  Absolutely.
19        MS. JONES:  Excuse me.
20        Same objection on foundation.  And also
21 form.
22 BY MR. CARTMELL:
23    Q.  Do you know if Mr. ██████ held that
24 opinion as strongly as you did?
25    A.  I do know, yes, he did.

Page 1128

1    Q.  Is he indicating right here that Meta's
2 work on the prevalence metric, which is, we saw from
3 the community standards and enforcement report,
4 that's the metric that they would publish on the
5 website, right?
6        MS. JONES:  Objection.  Foundation.
7 BY MR. CARTMELL:
8    Q.  Was the prevalence metric that Mr. ██████
9 is referring to here what they would publish on
10 their transparency website?
11    A.  Yes.
12    Q.  Is Mr. ██████ talking about how many
13 and -- engineers the company would put towards that
14 investment towards the transparency websites?
15    A.  Yes.
16    Q.  And does it look like from this, if you do
17 the math, that there were up to 200 times as many
18 engineers working on prevalence versus working on
19 the bad experiences and encounters framework that
20 you were trying to get the company to proceed with?
21    A.  Yes.
22    Q.  Is that -- is that why you have the
23 opinion that there was a system of safety in place
24 that was inadequate to protect kids?
25    A.  Yes.

CONFIDENTIAL

Page 1129

1    Q.  Is that why you have the opinion, in part,
2  because -- strike that.
3        Is that support for your opinion that
4  there was severe underresourcing support and funding
5  for the well-being and safety work?
6    A.  Yes.
7    Q.  I'm going to hand you Exhibit 83,
8  Mr. Bejar.
9        (Whereupon, Meta-Bejar Exhibit 83 was
10  marked for identification.)
11  BY MR. CARTMELL:
12    Q.  Which is an e-mail string that was
13  produced to us by Meta in this case.  And it came
14  from your files.  Do you see that this is an e-mail
15  from you, on the bottom e-mail, to Mark Zuckerberg,
16  Sheryl Sandberg, Chris Cox, Adam Mosseri.
17        Do you see that?
18    A.  Yes.
19    Q.  Are those the -- like, if you had to look
20  at this period of time in October of 2021, are those
21  the top four ranking employees at the entire
22  company?
23        MS. JONES:  Well -- I'm sorry.
24        Objection to the characterization.  When
25  you said the entire -- oh, you're looking at --

Page 1130

1  sorry, go ahead.  I apologize.  I was looking at the
2  wrong e-mail.  Forgive me.
3  BY MR. CARTMELL:
4    Q.  Go ahead.
5    A.  Yes.
6    Q.  In other words, at this period of time in
7  2021, Instagram had 2 billion users, correct?
8    A.  Yes.
9    Q.  And the company is making tens of billion
10  dollars a year, correct?
11    A.  Yes.
12    Q.  And these four individuals that you are
13  e-mailing are the top four executives at this
14  company?
15    A.  Yes.
16    Q.  Okay.  And Mr. Mosseri responds to your
17  e-mail on October 6, 2021.
18        Do you see that?
19    A.  Yes.
20    Q.  And he is the top executive at Instagram,
21  right?
22    A.  Yes.
23    Q.  You had been trying to get a meeting
24  for -- with him for a pretty long period of time,
25  correct?

Page 1131

1    A.  Yes.
2    Q.  And he had told you he was too busy
3  multiple times?
4    A.  Yes.
5    Q.  He says, "Arturo, let's catch up next
6  week.  I've been swapped with the youth work and a
7  few other fires, but happy to go through this in
8  more detail with you.  I've also been talking to
9  Miki, Yoav, and Samir who have been echoing the
10  point of the large gap between perceived issues and
11  technically violating issues."
12        Do you see that?
13    A.  Yes.
14    Q.  What is that referring to?
15    A.  It's referring to the gap that --
16        MS. JONES:  I'm sorry.  Let me just object
17  on foundation insofar as you're asking Mr. Bejar to
18  opine on what Mr. Mosseri meant.
19        Go ahead.
20        THE WITNESS:  It refers to the large gap
21  between the issues people are experiencing and the
22  technically violating issues and that Yoav and Miki
23  and Samir had also been talking to him about these
24  issues.
25  ///

Page 1132

1  BY MR. CARTMELL:
2    Q.  Right.
3        Was your understanding that Miki and Yoav
4  and Samir all were echoing the exact same concerns
5  you had about safety of kids on Instagram to the
6  executives?
7        MS. JONES:  Objection.  Foundation.
8        THE WITNESS:  Yes, that was my
9  understanding.
10  BY MR. CARTMELL:
11    Q.  And they had designated you to be the one
12  actually who would escalate and tell in a formal
13  letter the executives they didn't have an
14  understanding of the harms that were occurring on
15  Instagram; is that right?
16    A.  That is right.  I could say what they
17  couldn't say.
18    Q.  And then he says "but I agree we have more
19  to do."
20        Do you see that?
21    A.  Yes.
22    Q.  What did that mean to you?
23    A.  That they have work to do on this space.
24    Q.  Did that tell you that Adam Mosseri, the
25  top executive at Instagram, admitted as of

96 (Pages 1129 - 1132)

Page 1133

1 October 2021 that there was a gap and there was more
2 work to do?
3      MS. JONES: Objection to the foundation.
4 And characterization.
5      Go ahead.
6      THE WITNESS: Yes.
7      MR. CARTMELL: Can you put up Exhibit 70,
8 please.
9      (Whereupon, a brief discussion off the
10 record.)
11 BY MR. CARTMELL:
12     Q.  Now, you went through with Ms. Jones this
13 chart that she titled 30 years of child safety
14 experience.
15     Do you see that?
16     A.  I do.
17     Q.  You were asked lots of questions and I
18 think she spent a lot of time going through your
19 career to see whether or not you really had 30 years
20 of child safety; is that correct?
21     MS. JONES: I'm going to object to the
22 improper commentary about counsel.
23 BY MR. CARTMELL:
24     Q.  Did Ms. Jones go through this with you in
25 excruciating detail?

Page 1134

1      MS. JONES: I might have the same
2 objection.
3 BY MR. CARTMELL:
4     Q.  Did Ms. Jones go through this -- let me
5 start over.
6      Did Ms. Jones --
7      MS. JONES: I will give you I went through
8 it in detail.
9      Go ahead.
10 BY MR. CARTMELL:
11     Q.  It took a while?
12     MS. JONES: Yeah.
13 BY MR. CARTMELL:
14     Q.  Did Ms. Jones --
15     A.  I'm sorry.
16     Q.  Let me start over.  I'll give you a
17 second.
18     A.  Okay.  Thank you.
19     Q.  Did Ms. Jones go through this
20 demonstrative that she put together to discuss your
21 career, essentially?
22     A.  Yes, she did.
23     Q.  Okay.  Do you think that this document
24 that Ms. Jones created while you were testifying
25 accurately reflects your work on child safety during

Page 1135

1 your career?
2     A.  It does not.
3     Q.  Why is that?
4      MS. JONES: Can I just note an objection
5 to the extent that the question invites a narrative
6 response.
7      Go ahead.
8      THE WITNESS: It would take many sheets of
9 paper with very different content or text to outline
10 all of the experiences I have had over the last
11 30 years working on these issues.
12 BY MR. CARTMELL:
13     Q.  Is it true and were you being accurate,
14 though, for the 30 years starting in 1995 until
15 today, you have been actively involved in issues
16 related to child safety on social media apps?
17     MS. JONES: Objection to the form.
18     THE WITNESS: On social products, yes.
19 BY MR. CARTMELL:
20     Q.  And you weren't -- strike that.
21     You haven't been full time employed for a
22 long period of time; is that correct?
23     A.  Correct.
24     Q.  But does that mean that you're not working
25 in that area?

Page 1136

1     A.  No, it doesn't mean that at all.
2     Q.  Have you continued to work in that area in
3 a pro bono basis ever since 2021?
4     A.  Yes, I've put in a significant amount of
5 time.
6     Q.  And from 2015 to 2019, even when you were
7 trying to be a very present parent for your
8 daughter, you were still doing things at that time,
9 as we saw earlier, related to child safety?
10     A.  Yes.
11     Q.  I just want to point out one thing because
12 Ms. Jones talked to you about whether or not you
13 actually told Congress about your part-time
14 position -- strike that.
15     I want to ask you this because
16 Ms. Jones -- strike that.
17     Do you remember Ms. Jones asking you if
18 you told Congress about your part-time position at
19 Meta?
20     MS. JONES: I'm going to object to the
21 mischaracterization of what he was asked.
22     Go ahead.
23     THE WITNESS: Yes.
24 BY MR. CARTMELL:
25     Q.  In fact, she asked you specifically, did

97 (Pages 1133 - 1136)

CONFIDENTIAL

Page 1137

1 you in any way communicate how limited your role was
2 when you went back to the company from 2019 to 2021.
3        That's what she asked you, right?
4    A.  Yes.
5        MR. CARTMELL:  Let's pull up P1215,
6 Exhibit 84.
7        (Whereupon, Meta-Bejar Exhibit 84 was
8 marked for identification.)
9 BY MR. CARTMELL:
10    Q.  Before you testified in front of Congress,
11 did you have to give them written testimony?
12    A.  Yes.
13    Q.  And did you prepare that testimony?
14    A.  Yes.
15    Q.  And is this exhibit your written testimony
16 that you prepared for Congress?
17    A.  Yes.
18    Q.  If you go to the last page of this on
19 dot 15, you were asked to give a biography of your
20 career at that time, correct?
21    A.  Correct.
22    Q.  And you attached your biography and you
23 said, "From 2019 to 2021, Arturo returned to
24 Facebook to work as a part-time independent
25 consultant and industry expert for the well-being

Page 1138

1 team at Instagram."
2        Do you see that?
3    A.  Yes.
4    Q.  Is it true that -- strike that.
5        You were not shown this, right?
6    A.  Sorry?
7    Q.  You were not shown this previously,
8 correct?
9    A.  Correct.
10    Q.  But it's true that you actually did tell
11 Congress that you were part time from 2019 to 2021,
12 correct?
13        MS. JONES:  Excuse me.
14        Same objection to the characterization of
15 what he was asked.
16        But go ahead.
17        MR. CARTMELL:  I read exactly what you
18 said.  I have the transcript.
19        MS. JONES:  Right.  But that's not
20 consistent with that document.
21        Go ahead.
22        MR. CARTMELL:  I think you got the end of
23 my question so I'm going to ask it again.
24        MS. JONES:  Okay.
25 ///

Page 1139

1 BY MR. CARTMELL:
2    Q.  You actually did tell Congress in your
3 biography and attached to your written testimony to
4 Congress that you were a part-time employee from
5 2019 to 2021, correct?
6    A.  Yes, I did.
7    Q.  Have you ever tried to hide that fact or
8 not been honest about the fact that you were part
9 time during that '19 to '21 stint with Meta?
10    A.  No.
11    Q.  You were asked multiple questions about
12 your use of Facebook and your daughter's use of
13 Facebook.
14        Do you recall that?
15    A.  Yes.
16    Q.  And you were also asked about your use of
17 Instagram and your daughter's use of Instagram?
18    A.  Yes.
19    Q.  Is there -- well -- strike that.
20        Why is it that if you have opinions that
21 Instagram is not safe for kids, why is it that you
22 and your daughter would have an Instagram account?
23        MS. JONES:  I'm going to object to the
24 extent the question invites a narrative.  Objection.
25        THE WITNESS:  I mean, those are two

Page 1140

1 separate issues.
2 BY MR. CARTMELL:
3    Q.  Does it kind of miss the point?
4        MS. JONES:  Excuse me.
5        Objection to the form.
6        THE WITNESS:  Yes.
7 BY MR. CARTMELL:
8    Q.  Explain that.
9        MS. JONES:  Same objection to inviting a
10 narrative.
11        THE WITNESS:  I'm using Instagram to stay
12 connected with people that I don't primarily.  My
13 daughter is using Instagram in a very conscious way.
14 I am engaging with her about it.  And that's
15 independent from the fact that given my experience,
16 my expertise, and my track record, and then my
17 experience within Instagram that I could have a
18 clear, well-informed set of opinions about how to
19 work in child safety is progressing.  I mean, it's
20 just two really different things.
21 BY MR. CARTMELL:
22    Q.  I think you always testified to and
23 written about in your essays that you agree that
24 there can be some benefit to social media, right?
25    A.  Absolutely.

98 (Pages 1137 - 1140)

Page 1141

1    Q.  You've never said or written that there's
2 not some benefit to social media; is that right?
3    A.  Absolutely.
4    Q.  But you also -- strike that.
5        Had you also written and testified that
6 there's harm as well?
7    A.  Yes.
8    Q.  And have you also written and testified
9 that despite the benefits, in your opinion,
10 companies like Meta need to do what they can to
11 prevent harm to kids?
12    A.  Absolutely.
13    Q.  You told Congress in your written
14 testimony that while there's plenty of good that
15 comes from your daughter's time using social media,
16 frequently she has to deal with awful problems,
17 didn't you?
18    A.  Yes, I did.
19    Q.  You were -- were you honest with Congress
20 that, in fact, there are some benefits your daughter
21 has received?
22    A.  Yes.
23    Q.  But what are you trying to protect?
24    A.  I'm trying to protect every kid that uses
25 Instagram.  And so that's really the reason I'm --

Page 1142

1 have been doing all of this, right?  My daughter is
2 okay.  She's going to be fine.  But I think of every
3 kid who's on there right now, and not only that, but
4 every kid that has been there for, like, since the
5 beginning of the product, and I think that is such
6 critical work and so I think that there's both
7 critical and urgent work.
8        MR. CARTMELL:  Let's pull up Exhibit --
9 71 -- 74.  Let's pull up Exhibit 74.
10    Q.  One of the things that you believe is that
11 not every kid has a parent like you who is an online
12 child safety expert?
13        MS. JONES:  Objection.  Foundation.
14        THE WITNESS:  Yeah, not a lot of kids have
15 that.
16 BY MR. CARTMELL:
17    Q.  Is that pretty rare?
18    A.  Yeah, I think it's pretty rare.
19    Q.  And --
20        MS. JONES:  I apologize.  I should have
21 noted my objection to the foundation.
22        Go ahead.
23        Lack of foundation.
24 BY MR. CARTMELL:
25    Q.  Is your daughter sort of lucky to have

Page 1143

1 that?
2    A.  I think the lucky is mutual.  I'm lucky to
3 have her as a daughter and I think my daughter is
4 very lucky that she trusts me and she has me to lean
5 on and look to when she was experiencing these
6 issues.
7    Q.  Do you have concern, though, for kids on
8 Instagram, young kids, like you said, I think 13 to
9 16, who don't have parents that have a lifetime of
10 child safety experience online?
11        MS. JONES:  Objection.  Foundation.
12        THE WITNESS:  I don't think that I have
13 enough words or accurate enough words to convey how
14 concerned I am.  Every action that I have taken on
15 this path has been to the service of protecting kids
16 online.  That's ultimately why I'm doing all of this
17 in the way that I'm doing it.
18 BY MR. CARTMELL:
19    Q.  Do you remember when you were asked about
20 this timeline that Ms. Jones put together and you
21 wanted to say something and she said your lawyer --
22 or the lawyers for -- strike that.
23        Do you remember when Ms. Jones asked you
24 about this timeline and there was something you
25 wanted to say about it and she said that the lawyers

Page 1144

1 can ask you that later.
2        Do you remember what that was?
3    A.  I do.
4    Q.  What is that?
5    A.  That this timeline should incorporate --
6 like, this has when I first learned of my daughter's
7 harms, but it also, like, really needs to be, like,
8 when did this harm start unfolding in the product.
9 Like way behind this.  And then refer to every other
10 kid that could have experienced these harms because
11 that is millions over so many years.
12        And this only reflects my own encounter
13 and understanding of these issues.  But I cannot
14 imagine how many teens and kids and young kids have
15 been experiencing these issues for how long on
16 Instagram.
17    Q.  Ms. Jones asked you several questions
18 about whether or not it's possible for Meta to get
19 rid of all the harm on Instagram.
20        Do you recall that?
21    A.  Yes.
22        MS. JONES:  Well, I'm going to object to
23 the characterization of the question.
24        But go ahead.
25 ///

99 (Pages 1141 - 1144)

CONFIDENTIAL

Page 1145

BY MR. CARTMELL:

1  BY MR. CARTMELL:
2     Q.  Is that true, that it's probably not
3  likely or maybe even impossible for social media
4  platforms to get the harm to zero?
5     A.  Yes.
6     Q.  Does that mean that they shouldn't do
7  everything they can to try?
8     A.  They should do everything they can to try.
9        The infrastructure that to this day Meta
10 uses to stop spam came from a meeting where I said
11 we need to have zero spam and zero false positives
12 in the knowledge that that was an impossible goal.
13       But my goal was to get the team thinking
14 about what would you build if the goal was to have
15 zero unwanted advances.  If the goal was to have
16 zero for all of the meaningful areas of harm that
17 we've covered.  I believe that opens up a tremendous
18 amount of room for innovation, and while you will
19 never get to zero, that is how you have to think
20 about it.
21    Q.  Is the fact that a social media platform
22 like Instagram likely cannot get the harms to zero,
23 why it is so important to be transparent and notify
24 and warn the public and parents of the risks?
25    A.  Absolutely.

Page 1146

1     Q.  And based on your experience at Meta, were
2  they even trying to get the harms on Instagram to
3  zero?
4        MS. JONES:  Objection.  Foundation.
5        THE WITNESS:  They were not.
6  BY MR. CARTMELL:
7     Q.  And were they warning parents and the
8  public of the substantial risks and harms that kids
9  were undergoing on Instagram?
10    A.  They were not.
11    Q.  You went public with your opinions and
12 have you suffered ramifications for that?
13    A.  Yes.
14    Q.  Will you have work in the technology
15 industry again?
16    A.  I don't think so.
17    Q.  Do you stand by your opinions that you've
18 given?
19    A.  Absolutely.
20    Q.  And do you regret that you went public
21 with what you found?
22    A.  Never.
23       MR. CARTMELL:  That's all I have.
24       THE VIDEOGRAPHER:  Good to go off?
25       Time is 6:32.  We're off the record.        0

Page 1147

1        (Whereupon, a brief recess was taken.)
2        THE VIDEOGRAPHER:  Time is 6:37.  We're
3  back on the record.
4        MR. CARTMELL:  Mr. Bejar, thank you very
5  much for your time.
6        EXAMINATION
7  BY MR. PHELPS:
8     Q.  Hello again, Mr. Bejar.
9     A.  Hello.
10    Q.  Brian Phelps, State of Tennessee.  How are
11 you this evening?
12    A.  I'm doing well, perhaps a little tired,
13 but here to see this through.
14    Q.  Okay.  You're ready to proceed with a
15 little further questioning?
16    A.  Absolutely.
17    Q.  I'm just surprised as you are that we're
18 going to have to talk about this in some depth.
19       But you were repeatedly asked questions
20 about your and my relationship by the lawyers for
21 Meta; is that true?
22    A.  Yes.
23    Q.  Was the first time we met when I collected
24 your sworn statement in May of 2023?
25    A.  Yes.

Page 1148

1     Q.  And is it your understanding that that
2  sworn statement was obtained under Tennessee law
3  because in my role as an Assistant Attorney General
4  I was part of an investigation into whether Meta had
5  violated the Tennessee Consumer Protection Act?
6     A.  Yes.
7     Q.  And is it your understanding or your
8  memory that I also attended sworn testimony that you
9  offered to the judiciary committee of the United
10 States Senate?
11    A.  Yes.
12    Q.  That hearing was open to the public?
13    A.  Yes.
14    Q.  Anyone was welcome to attend that hearing,
15 right?
16    A.  Yes.
17    Q.  You and I didn't communicate in advance of
18 that hearing?
19    A.  No.
20    Q.  I did not prepare you?
21    A.  No.
22    Q.  I think you testified earlier that we had
23 a friendly hello after the hearing and then we went
24 our separate ways, right?
25    A.  Correct.

Golkow Technologies,
A Veritext Division
877-370-3377                                        www.veritext.com

CONFIDENTIAL

Page 1149

1    Q.  And before the judiciary committee you
2  offered testimony that would be relevant and of
3  interest to the topics we've been discussing today,
4  right?
5    A.  Yes.
6    Q.  Okay.  It would be important for someone
7  investigating or litigating against Meta to -- on
8  these topics to understand your testimony before the
9  judiciary committee, right?
10       MS. JONES:  Excuse me.
11       Foundation.
12       Go ahead.
13       THE WITNESS:  Yes.
14 BY MR. PHELPS:
15    Q.  And from that time, in the fall of 2023,
16 you and I didn't meet in person again until we've
17 had the occasion to be here in this room for the
18 purposes of this deposition in April of 2025; is
19 that true?
20    A.  It is.
21    Q.  Okay.  Other than your sworn statement in
22 the Tennessee investigation, the brief hello after
23 your judiciary committee testimony, and in this
24 deposition have we met in person on any on
25 occasions?

Page 1150

1    A.  No.
2    Q.  Okay.  We haven't really had discussions
3  outside of those contexts, right?
4    A.  Correct.
5    Q.  Okay.  And every time we've met or
6  communicated it's been in connection with my role as
7  an attorney in the consumer protection division, the
8  State of Tennessee, right?
9    A.  Correct.
10    Q.  And you understand the work I've been
11 doing is in coordination with other states and in
12 some circumstances, lawyers representing schools,
13 districts, or individuals who are either
14 investigating or suing Meta, right?
15       MS. JONES:  Excuse me.
16       Objection.  Form.  Foundation.
17       THE WITNESS:  Yes.
18 BY MR. PHELPS:
19    Q.  Okay.  And in those discussions, have I
20 ever done anything but encourage you to tell the
21 truth?
22    A.  No.
23    Q.  Is there anything inappropriate about the
24 discussions we've had, in your view?
25    A.  No.

Page 1151

1       MS. JONES:  Sorry.
2       Objection.  Foundation.
3       THE WITNESS:  No.  No, there's not
4  anything inappropriate.
5  BY MR. PHELPS:
6    Q.  It's been an entirely professional
7  relationship related to Tennessee's investigation
8  and litigation against Meta?
9    A.  Yes.
10    Q.  You were asked some questions about an
11 attorney named Linda Singer.
12       Do you remember that?
13    A.  Yes.
14    Q.  Ms. Singer is not here today; is that
15 right?
16    A.  Yes.
17    Q.  Do you know if her client New Mexico is
18 participating in this deposition?
19    A.  I do --
20       MS. JONES:  Hold on.
21       Objection.  Foundation.
22       THE WITNESS:  I do not know.
23 BY MR. PHELPS:
24    Q.  Okay.  And has Ms. Singer ever done
25 anything in her conversations with you, insofar as

Page 1152

1  you've had conversations, other than encourage you
2  to tell the truth?
3    A.  Sorry, could you ask the question again?
4    Q.  Have you ever had conversations with
5  Ms. Singer?
6    A.  Yes.
7    Q.  Has she ever done anything other than
8  encourage you to tell the truth?
9    A.  No, she's never done anything other than
10 that.
11    Q.  Okay.  Has any lawyer representing any
12 state ever done anything other than ask you
13 questions and encourage you to tell the truth in
14 response to those questions?
15    A.  No.
16    Q.  Okay.  Do you understand that many State
17 Attorneys General have the authority or
18 responsibility to enforce consumer protection laws
19 in their states?
20       MS. JONES:  Objection.  Foundation.
21       THE WITNESS:  Yes.
22 BY MR. PHELPS:
23    Q.  And they do that work on behalf of the
24 citizens of their states who they serve, right?
25       MS. JONES:  Same objection.  Foundation.

101 (Pages 1149 - 1152)

CONFIDENTIAL

Page 1153

1      THE WITNESS:  Yes.
2 BY MR. PHELPS:
3    Q.  Okay.  Do you think that's a worthy
4 mission?
5    A.  Yes.
6      MS. JONES:  Hold on.
7      Same objection.  Foundation.
8 BY MR. PHELPS:
9    Q.  Okay.  And in terms of their
10 interaction -- your interactions -- let me withdraw
11 and rephrase it.
12      Reflecting on the totality of the
13 interactions you've had with members of the State
14 Attorney General community, do you have the view
15 that the lawyers representing the states are simply
16 doing their job by talking to you as a person with
17 information relevant to their claims against Meta?
18      MS. JONES:  Objection.  Foundation.
19      THE WITNESS:  Yes.
20 BY MR. PHELPS:
21    Q.  Okay.  And that would be true for lawyers
22 representing individuals who have been harmed by
23 Meta's products?
24    A.  Yes.
25    Q.  And that would be true of lawyers

Page 1154

1 representing school districts who have claims of a
2 similar nature?
3    A.  Yes.
4    Q.  Like Mr. Cartmell, I'm going to jump
5 around a little bit.  So transition to a different
6 topic.
7      You were asked a lot of questions about
8 the methodology you applied in collecting some of
9 the videos that were used in this deposition.
10      Do you recall that?
11    A.  Yes.
12    Q.  And there's really no such thing as a
13 perfect methodology.
14      Would you agree with that statement?
15      MS. JONES:  Excuse me.
16      Objection to the form.  Foundation.
17      THE WITNESS:  Yes.
18 BY MR. PHELPS:
19    Q.  Okay.  But in spite of that you made best
20 efforts based on your significant experience to use
21 a sound methodology to collect videos and
22 information relating to the topic of safety on
23 Instagram, right?
24      MS. JONES:  I'm so sorry, Counsel, I
25 didn't hear.  Would you mind just repeating the

Page 1155

1 question?  It's not registering on my realtime.  I
2 didn't hear it.
3      MR. PHELPS:  Are you able to read it back,
4 Elaina, or would you like me to -- sorry.
5      Let me -- don't worry about it.
6    Q.  You made best efforts based on your
7 experience to use a sound and reliable methodology
8 to collect videos relating to teen safety on
9 Instagram?
10    A.  Yes.
11      MR. PHELPS:  Okay.  And let's just pull up
12 Exhibit 15, Jim.
13      (Whereupon, Meta-Bejar Exhibit 15 having
14 been previously marked, was introduced.)
15      MR. PHELPS:  I'll -- as he does that, this
16 is one of the more disturbing videos that we
17 watched.  I'm not going to subject you or the jury
18 to the full thing.  I just want to ask you a
19 question or two so let's just watch 45 seconds or a
20 minute of this, Jim.  I'll tell you when to stop.
21      Are we getting audio?
22      (Video playing.)
23      MS. JONES:  Let me just make the same
24 objection that I've made to the earlier use of these
25 videos is --

Page 1156

1      (Whereupon, a brief discussion off the
2 record.)
3      MS. JONES:  Let me make the same objection
4 I've made earlier to the use of these videos both
5 because they are out of context and also because
6 they are not the product of a reliable expert
7 process.
8      Go ahead.
9 BY MR. PHELPS:
10    Q.  That clip we saw contains upsetting image
11 and videos.  Would you agree?
12    A.  Yes.
13    Q.  And if you recall, we -- we could go on
14 and there's more and more upsetting material if we
15 were to keep watching that, right?
16    A.  Correct.
17    Q.  And we're not going to do that in the
18 interest of time.
19      But would you agree with me that by
20 whatever methodology one might use, Instagram
21 should -- let me withdraw that.
22      Would you agree with me based on your
23 experience in the domain of child online safety that
24 whatever methodology used, Instagram should not be
25 feeding that series of Reels to 13-year-old girls?

102 (Pages 1153 - 1156)

CONFIDENTIAL

Page 1157

1  A.  Absolutely.
2  Q.  I think in that video we saw images of
3  masturbation?
4  A.  Yes.
5  Q.  Ejaculation?
6  A.  Yes.
7  Q.  If we would continue we'd see various
8  sexual acts being suggested or intimated in some
9  way?
10  A.  Correct.
11  Q.  Did you see any cooking videos?
12  A.  No.
13  Q.  Any videos about basketball?
14  A.  No.
15  Q.  Any videos about bunnies?
16  A.  No.
17  Q.  Any videos about pandas?
18  A.  No.
19  Q.  Any videos about kittens?
20  A.  No.
21  Q.  Okay.  And that's a Reel -- a series of
22  Reels that Instagram delivered to an account that
23  was set up as a 13-year-old girl, right?
24  A.  Correct.
25  Q.  Do you think parents should be informed

Page 1158

1  that that's how the Instagram application operates?
2      (Whereupon, a brief discussion off the
3  record.)
4  BY MR. PHELPS:
5  Q.  Do you think parents should be informed
6  that that's how the Instagram application operates?
7      MS. JONES:  Objection.  Foundation.  And
8  characterization.
9      THE WITNESS:  Absolutely.
10  BY MR. PHELPS:
11  Q.  Do you know if parents have been informed
12  of that?
13  A.  They have not.
14  Q.  Switching topics, I recalled you testified
15  in your discussions with Ms. Jones that both the
16  community standards enforcement reports, or CSER,
17  and BEEF, I think you said have utility?
18  A.  Yes.
19  Q.  As between the two, do you have a view on
20  which set of data would be more valuable to parents
21  who are trying to assess the safety of the Instagram
22  platform?
23  A.  Yes.
24      MS. JONES:  Hold on.
25      Objection.  Foundation.

Page 1159

1      Go ahead.
2  BY MR. PHELPS:
3  Q.  Based on your experience as an online
4  safety professional, which of those two sets of data
5  would be more valuable to parents trying to assess
6  the safety of Instagram?
7      MS. JONES:  Excuse me.
8      Same objection.  Foundation.
9      THE WITNESS:  BEEF.
10  BY MR. PHELPS:
11  Q.  Why?
12  A.  Because BEEF captures the likelihood that
13  their kid will be experiencing the harms that are
14  covered by it.
15  Q.  And by putting out the community standards
16  enforcement reports, but not the BEEF results or a
17  derivative thereof, do you believe Instagram -- or
18  Meta is -- is misleading the public about the safety
19  of the Instagram platform?
20      MS. JONES:  Objection.  Foundation.
21      THE WITNESS:  Yes.
22  BY MR. PHELPS:
23  Q.  Next topic.
24      Have you noticed a pattern where the
25  company tends to try to discredit people

Page 1160

1  particularly in this area of online safety whose
2  work might be inconvenient for the company?
3      MS. JONES:  Objection to the form.  And
4  foundation.
5      THE WITNESS:  Yes.
6  BY MR. PHELPS:
7  Q.  For instance, do I recall your testimony
8  earlier in this information that it was your view
9  that the company threw its own researchers under the
10  bus after there was Wall Street Journal reporting
11  some internal research that it's made its way into
12  the public?
13      MS. JONES:  Objection.  Foundation.
14      THE WITNESS:  Yes.
15  BY MR. PHELPS:
16  Q.  And the company threw those researchers
17  under the bus, in your view, even though the company
18  itself hired those folks and directed them to
19  perform their research at issue, right?
20      MS. JONES:  Objection.  Foundation.
21  Characterization.
22      THE WITNESS:  Directed the research,
23  evaluated it, published it internally, yes.
24  BY MR. PHELPS:
25  Q.  Do you feel that the company has sought to

103 (Pages 1157 - 1160)

CONFIDENTIAL

Page 1161

1 discredit you for offering opinions that the company
2 thinks are inconvenient?
3          MS. JONES: Objection. Characterization.
4 And foundation.
5          THE WITNESS: Yes.
6 BY MR. PHELPS:
7     Q.  Do you feel like the company has tried to
8 minimize your standing within the company in your
9 relationships with Meta executives?
10    A.  Yes.
11         MS. JONES: Excuse me.
12         Same objection. Characterization. And
13 lacks foundation.
14 BY MR. PHELPS:
15    Q.  Do you think Meta has tried to discredit
16 or undermine the role you had at Instagram between
17 2019 and 2021?
18         MS. JONES: Same objections.
19         THE WITNESS: Yes.
20 BY MR. PHELPS:
21    Q.  Do you feel that the company has tried to
22 discredit the value of the work you performed for
23 Instagram between 2019 and 2021?
24         MS. JONES: Same objections.
25         THE WITNESS: Yes.

Page 1162

1 BY MR. PHELPS:
2     Q.  Do you feel the company has tried to
3 discredit or undermine your longstanding career in
4 the domain of online safety?
5          MS. JONES: Same objections.
6          THE WITNESS: Yes.
7 BY MR. PHELPS:
8     Q.  Do you think this strategy is done in part
9 to disincentivize others within the company -- let
10 me withdraw that and rephrase it.
11         Do you think that this is done, in part,
12 to dissuade Meta's employees from speaking out?
13         MS. JONES: Objection. Vague.
14 Characterization. Foundation.
15         THE WITNESS: Yes.
16 BY MR. PHELPS:
17    Q.  And is that consistent with a company
18 culture that prioritizes user safety above all else?
19         MS. JONES: Same objections.
20         THE WITNESS: Categorically not.
21         MR. PHELPS: I do not have anything else
22 right now and I really appreciate your time over the
23 last three days.
24         THE VIDEOGRAPHER: Time is 6:54. We're
25 off the record.

Page 1163

1          (Whereupon, a brief recess was taken.)
2          THE VIDEOGRAPHER: Time is 7:02. We're
3 back on the record.
4          EXAMINATION
5 BY MS. JONES:
6     Q.  Mr. Bejar, nice to see you again, it's not
7 been all that long, I suppose.
8          Let me just ask a few follow-up questions
9 on the questions you were asked by counsel. I will
10 probably be also jumping around a little bit.
11         Counsel showed again Exhibit Number 15,
12 which is the video from one of the sessions that you
13 ran as part of your testing exercise; is that
14 correct?
15    A.  Yes.
16    Q.  Okay. And he asked you about the fact
17 that in those videos you didn't see basketball games
18 or kittens or pandas, right?
19    A.  Yes.
20    Q.  And isn't it the case that part of the
21 reason that you didn't necessarily see those things
22 is because as part of your testing you focused on
23 violent or sexual ad content?
24    A.  For that set of videos, yes.
25    Q.  You were asked a number of questions about

Page 1164

1 your connections with the Tennessee AG's Office and
2 other State AG Offices.
3          Do you recall that?
4     A.  Yes.
5     Q.  And just so that we're clear, you have had
6 communications with Mr. Phelps and others from State
7 AG Offices all over the country since at least as
8 early as 2023; is that fair to say?
9     A.  Yes.
10    Q.  And in the -- the month leading up to your
11 deposition this week you testified that you spent 10
12 to 20 hours communicating with the lawyers who have
13 asked you questions on behalf of the plaintiffs,
14 right?
15    A.  Yes.
16    Q.  And the testimony that you just
17 communicated was all you were told was you needed to
18 tell the truth, right?
19    A.  Yes.
20    Q.  And you knew before you had 10 to 20 hours
21 of time with lawyers that you needed to tell the
22 truth in the context of this deposition, right?
23    A.  I knew that from my meetings with Meta
24 lawyers prior to my FTC deposition.
25    Q.  Sure.

104 (Pages 1161 - 1164)

Page 1165

1    And you just knew that as a person in the
2 world, that it was important to be honest in your
3 testimony, right?
4    A.  Yes.
5    Q.  You wouldn't have needed to spend 10 to
6 20 hours on -- in discussions with plaintiffs'
7 counsel in the month before your deposition just to
8 have them say be sure you tell the truth, right?
9    MR. CARTMELL:  Object to the form.
10    THE WITNESS:  No, I did not need to meet
11 with them for them to tell me that.
12 BY MS. JONES:
13    Q.  Right.  And that's because the 10 to
14 20 hours that you spent with counsel before you came
15 and testified in your deposition, you spent doing
16 things more than just having them say tell the
17 truth, right?
18    A.  Yes.
19    Q.  Okay.  Let me ask you to pull up Exhibit
20 Number 81, which I think Mr. Cartmell marked during
21 his examination.
22    And I'm going to ask you to focus on
23 page 2 of this document, please, Mr. Bejar.
24    A.  Yes.
25    Q.  And the very bottom -- this is the same

Page 1166

1 e-mail that you were asked about -- on September
2 the 18th of 2019.
3    Do you see that?
4    A.  Yes.
5    Q.  And this is an e-mail from you, Arturo
6 Bejar, to ▓▓▓▓▓▓▓ at Facebook, right?
7    A.  Yes.
8    Q.  And down at the very bottom the of page I
9 want to focus on actually an element of this e-mail
10 that you were not shown by counsel just a few
11 minutes ago.
12    You see that paragraph that begins with,
13 "So, the issue here is"?
14    A.  Yes.
15    Q.  It says, "So, the issue here is that I'm
16 being hired as a subject matter expert on issues
17 that relate to Facebook's business" -- and this is
18 the part I want to focus on -- "and I agree
19 100 percent that what I discuss with
20 Facebook/Instagram about their platform is
21 confidential."
22    Do you see that?
23    MR. CARTMELL:  Hold on.
24    I actually read that sentence, so...
25    MS. JONES:  Excuse me, Counsel.  You

Page 1167

1 said -- I said I want to talk to you about a portion
2 that counsel did not focus on.
3    MR. CARTMELL:  No, you said that counsel
4 did not show you, but --
5    MS. JONES:  I'm pretty sure I --
6    MR. CARTMELL:  -- I actually read --
7    MS. JONES:  Well, I don't want to -- okay.
8    MR. CARTMELL:  Okay.  So I'm going to
9 object to whatever you said.
10    MS. JONES:  Hold on a second.
11    MR. CARTMELL:  You can start over.
12    MS. JONES:  I'll start over again.
13    MR. CARTMELL:  Okay.
14    MS. JONES:  I'm pretty sure you're not
15 correct about what I said but I will certainly start
16 over again if it will move us along.
17    Q.  I want to show you a portion of this
18 e-mail that counsel did not focus on with you, okay?
19    MR. CARTMELL:  Object to the form.
20    THE WITNESS:  I thought he did focus on
21 it.  But you're showing me a portion of this e-mail.
22 BY MS. JONES:
23    Q.  Okay.  And you realized that he had
24 focused on it after he just said on the record that
25 he had focused on it.

Page 1168

1    Is that when you realized that?
2    A.  No, I recall him showing me and reading
3 out this paragraph.
4    Q.  Okay.  Do you recall actually being asked
5 any questions by counsel about this portion of the
6 e-mail where it says you agreed "100 percent that
7 what I discuss with Facebook/Instagram about their
8 platform is confidential"?
9    MS. JONES:  Object to the form.
10 Mischaracterizes.
11    THE WITNESS:  Sorry, what was the
12 question?
13 BY MS. JONES:
14    Q.  Did counsel ask you any questions about
15 the portion of this e-mail where you said "I agree
16 100 percent that what I discuss with
17 Facebook/Instagram about their platform is
18 confidential"?
19    MR. CARTMELL:  Same objections.
20    THE WITNESS:  I don't recall any questions
21 about that part.
22 BY MS. JONES:
23    Q.  Okay.  Well, I want to ask you a couple of
24 questions about it.
25    Was it the case that you understood when

105 (Pages 1165 - 1168)

Page 1169

1 you came back to the company in 2019 that you had
2 certain confidentiality obligations?
3     A.  Yes.
4     Q.  And in connection with your testimony
5 before Congress, did you provide documents from the
6 company's files to the congressional committee?
7         MR. CARTMELL:  Scope.
8         THE WITNESS:  I provided documents that I
9 had been acquainted with during my time at the
10 company.
11 BY MS. JONES:
12     Q.  And how did you come to have those
13 documents two years after your consulting
14 arrangement had ended in 2023?
15         MR. CARTMELL:  Hold on.
16         I'm going to object to the scope of all of
17 this.  It's outside of our questioning.
18         MS. JONES:  First of all, it's connected
19 with an exhibit that you marked.  Second of all,
20 your objection is noted.
21     Q.  How was it that you came to have documents
22 from within the company two years after your
23 consulting arrangement had ended in 2021?
24         MR. CARTMELL:  Same objection.
25         THE WITNESS:  I asked friends if they had

Page 1170

1 kept documents from their time during the company or
2 if -- what they were in the machines that they had.
3 BY MS. JONES:
4     Q.  I'm not sure I understand what that means.
5         Who are the friends you're talking about?
6         MR. CARTMELL:  Same objection.  Outside
7 the scope.
8         THE WITNESS:  I don't recall.
9 BY MS. JONES:
10     Q.  And what did you ask your friends exactly?
11         MR. CARTMELL:  Same objection.  Outside
12 the scope.
13         THE WITNESS:  If they had a copy of the
14 e-mail I had sent to Mark.
15 BY MS. JONES:
16     Q.  And the documents that you provided to
17 Congress were not just a copy of the e-mail that you
18 had sent to Mr. Zuckerberg, right?
19         MR. CARTMELL:  Same objection.  Outside
20 the scope.
21         THE WITNESS:  That is correct.
22 BY MS. JONES:
23     Q.  You had given to Congress hundreds of
24 pages of documents that you had access to by virtue
25 of your time at the company as a consultant, right?

Page 1171

1         MR. CARTMELL:  Same objection.
2         THE WITNESS:  Again, I don't think that's
3 an accurate way of describing it.  I mean, the
4 documents that I gave were documents that I had
5 access to during my time at the company.
6         But at the time I left the company, I
7 returned all the equipment and the documents, other
8 than the documents that I found that I had kept a
9 copy of which were part of the subpoena that I gave
10 to -- to --
11         MR. CARTMELL:  This is all outside the
12 scope.
13         MS. JONES:  Yeah, your objection has been
14 noted.
15         MR. CARTMELL:  Well, I don't know that you
16 just get to keep doing it because we're here when
17 you're getting into things that none of us even
18 talked about.  We've been here for three days.  It's
19 now 7:10 p.m.  And you've decided to ask the witness
20 questions that have nothing to do with, you know,
21 with what our redirects were, so...
22         MS. JONES:  Well, you --
23         MR. PHELPS:  Or, frankly, the merits of
24 the case.
25         MR. CARTMELL:  Yeah.

Page 1172

1         MS. JONES:  Okay.  Are you done?  Are you
2 done?  Are both of you done?
3         MR. CARTMELL:  I'm done.
4     Q.  Okay.  Let me hand you what's been marked
5 as Deposition Exhibit Number 85.
6         (Whereupon, Meta-Bejar Exhibit 85 was
7 marked for identification.)
8 BY MS. JONES:
9     Q.  Do you recognize Deposition Exhibit
10 Number 85, Mr. Bejar?
11     A.  Yes.
12     Q.  Okay.  And Deposition Number -- excuse me.
13 Deposition Exhibit Number 85 is a set of
14 documents that you made available to Congress in
15 2023; is that right?
16         MR. CARTMELL:  Objection.  Outside the
17 scope.
18         THE WITNESS:  Yes.
19 BY MS. JONES:
20     Q.  How did you come to have the -- and just
21 flipping through it, this is hundreds of pages of
22 documents, right?
23         MR. CARTMELL:  Objection.  Outside the
24 scope.
25         THE WITNESS:  Going through them.

106 (Pages 1169 - 1172)

CONFIDENTIAL

Page 1173

1 BY MS. JONES:
2     Q.  And it's fine, Mr. Bejar, I'm not going to
3 make you count the number of pages.  Let me ask my
4 next -- the record will include the documents
5 themselves.
6         MR. CARTMELL:  Are you withdrawing that
7 question?
8         MS. JONES:  I am withdrawing the question.
9     Q.  Let me ask you my next question.
10        On the first page of Deposition Exhibit --
11 actually, it's pages 1 through 4, there is kind of a
12 cover summary to Deposition Exhibit Number 85; is
13 that right?
14     A.  Yes.
15        MR. CARTMELL:  Objection.  Outside the
16 scope.
17 BY MS. JONES:
18     Q.  Is that something you prepared?
19        MR. CARTMELL:  Objection.  Outside the
20 scope.
21        THE WITNESS:  Yes.
22 BY MS. JONES:
23     Q.  And how was it that you still had access
24 to these documents at Deposition Exhibit Number 85
25 two years after your consulting agreement --

Page 1174

1         MR. CARTMELL:  Same objection.
2 BY MS. JONES:
3     Q.  -- was over with the company?
4         MR. CARTMELL:  Sorry, sorry.  I talked.
5 Say it again because --
6         MS. JONES:  Honestly, I just -- it's just
7 white noise at this point.
8         MR. CARTMELL:  Same here.
9         MS. JONES:  Let me ask the question again.
10    Q.  How was it that you still had access to
11 these documents that we've marked as Deposition
12 Exhibit Number 85 two years after your consulting
13 agreement and even more years after you had
14 acknowledged in an e-mail that counsel walked
15 through with you where you said I recognize that
16 Facebook's information is confidential?
17        MR. CARTMELL:  Objection.  Outside the
18 scope.
19        THE WITNESS:  It was a combination of
20 things.  Some of the documents have come from the
21 Facebook files.  Some of the documents there were
22 published.  So might have come from the Wayback
23 Machine.  Or copies that I had kept on some of the
24 presentations that were given.
25        And then some of the documents were

Page 1175

1 sourced by friends who I asked if they had kept
2 e-mail that I had talked about with Mark Zuckerberg.
3 And when I asked that question it turns out that
4 some of these people had other documents and they
5 provided me with those.
6 BY MS. JONES:
7     Q.  And then you put those all together and
8 you turned them over to Congress; is that right?
9         MR. CARTMELL:  Same objection.
10        THE WITNESS:  Correct.
11 BY MS. JONES:
12    Q.  Did you consider that at the time,
13 Mr. Bejar, to be a violation of any confidentiality
14 agreement that you had with the company?
15        MR. CARTMELL:  Same objection.
16        THE WITNESS:  I considered that I had a
17 responsibility to bring this issue to light to
18 society.  And so that's what I did.
19 BY MS. JONES:
20    Q.  Have you ever formally sought
21 whistleblower status?
22        MR. CARTMELL:  Same objection.
23        THE WITNESS:  No.
24        MR. CARTMELL:  Outside the scope.
25        MR. WARD:  Calls for a legal conclusion.

Page 1176

1 BY MS. JONES:
2     Q.  Well, you've already said no.  Was that
3 your answer?
4         MR. CARTMELL:  Same objection.
5         MR. WARD:  I'm going to direct him not to
6 answer.  It calls for a legal conclusion and
7 it invades his consultations with counsel.
8 BY MS. JONES:
9     Q.  Well, my question -- I don't want to hear
10 about any conversations you had with Mr. Ward, okay?
11    A.  Correct.
12    Q.  Yes?
13    A.  Yes.
14    Q.  My question is, have you ever gone to any
15 governmental entity and asked for whistleblower
16 status?
17        MR. CARTMELL:  Same objection.  Outside
18 the scope.
19        THE WITNESS:  I have not.
20 BY MS. JONES:
21    Q.  You testified just a moment ago, I think
22 it was when Mr. Phelps was asking you questions,
23 that the BEEF survey captures the likelihood that a
24 kid will be affected by the harms that are reflected
25 in that survey.  Is that what you said?

107 (Pages 1173 - 1176)

CONFIDENTIAL

Page 1177

1    A.  Yes.
2    Q.  Isn't the BEEF survey, in fact, a
3 backward-looking assessment of the amount of harms
4 during a seven-day period?
5    A.  Yes, it was consistent with TRIPS and
6 similar surveys that had gone for a long period of
7 time.
8    Q.  Understood.  Okay.
9        Let me ask you about Deposition Exhibit
10 Number 82 which Mr. Cartmell marked with you.
11       Do you have that in front of you?
12    A.  I have 81.
13    MR. WARD:  You said 82?
14    MS. JONES:  82.
15    Q.  And I'm going to ask you to go back to the
16 page that were you discussing with counsel.  It's at
17 dot 5 of that document, please.
18       And up at the top counsel was asking you a
19 number of questions about what Mr. ▇▇▇▇ had
20 written on October 13, 2021, at 9:20.
21       Do you see that?
22    A.  Yes.
23    Q.  And I just want to be very clear for the
24 jury, would you defer to what Mr. ▇▇▇▇ has had to
25 say about what he thought and meant at the time that

Page 1178

1 we've been talking about --
2    MR. CARTMELL:  Objection.
3 BY MS. JONES:
4    Q.  -- with respect to Instagram Well-Being
5 efforts?
6    MR. CARTMELL:  Sorry.  You want to do it
7 again?
8    MS. JONES:  Sure.
9    Q.  Mr. Bejar, would you defer to what
10 Mr. ▇▇▇▇ has had to say about what he thought and
11 meant at the time, the time period we've been
12 talking about with respect to Instagram Well-Being
13 efforts?
14    MR. CARTMELL:  Objection.  Asked and
15 answered.  And I think it's improper asking one
16 witness to defer to another.
17    THE WITNESS:  I believe I've answered that
18 question multiple times.
19 BY MS. JONES:
20    Q.  And it sounds like you're not prepared to
21 say that you would defer to Mr. ▇▇▇▇ is that
22 right?
23    MR. CARTMELL:  Same objections.
24    THE WITNESS:  Sorry, you're putting words
25 in my mouth.  Can you repeat?

Page 1179

1 BY MS. JONES:
2    Q.  Sure.  I'm not trying to put words in your
3 mouth.  I'm just trying to make sure I understand
4 what your testimony is on this topic.
5        You know Mr. ▇▇▇▇ I think we talked
6 about this yesterday, has been deposed in these
7 cases.  You know that?
8    A.  I know that now.
9    Q.  Okay.  And I know this -- I know
10 Mr. Cartmell is going to have something to say about
11 this, but you have not read that testimony, right?
12    MR. CARTMELL:  Well, that's been asked and
13 answered.  And it's inappropriate for the same
14 reasons that counsel knows that there is a
15 protective order in place that would not allow him
16 to do so.  So I think it's entirely inappropriate
17 for counsel to ask.
18    MS. JONES:  Okay.  And I disagree with the
19 characterization of what I know.  But in any event.
20    Q.  You have not reviewed Mr. ▇▇▇▇
21 testimony, right?
22    MR. CARTMELL:  Same objections.
23    THE WITNESS:  I have not.
24 BY MS. JONES:
25    Q.  Okay.  And, Mr. Bejar, you testified --

Page 1180

1        We can take that down, Mr. Reynolds.
2        You testified, I believe, at the
3 conclusion of Mr. Cartmell's examination that you
4 will never work in the tech industry again.
5        Did I hear that correctly?
6    A.  That nobody in the tech industry will hire
7 me.
8    Q.  Have you actively sought out employment
9 since you left -- and by -- let me be more clear.
10       Have you actively sought out a full-time
11 employment role since you left Meta in 2015?
12    A.  I have not.
13    Q.  And as I think you've already told us, you
14 have had the good fortune of not having to work,
15 right?
16    MR. CARTMELL:  Objection.  Asked and
17 answered.
18    THE WITNESS:  I've already answered that.
19 Yes.
20 BY MS. JONES:
21    Q.  Okay.  And that's because as a function of
22 being at the company, both Yahoo! and Meta, you have
23 become independently wealthy, right?
24    MR. CARTMELL:  Same objection.
25    THE WITNESS:  Correct.

108 (Pages 1177 - 1180)

Page 1181

1 BY MS. JONES:
2     Q.  All right.  And I think you testified to
3 this.  But I want to be very clear.
4         You sold your shares in Meta in 2016,
5 right?
6     A.  As soon as my divorce proceedings made it
7 possible for me to do that, that was the limiting
8 factor.
9     Q.  Okay.  And to the extent that you sold
10 your shares and were able to cash out on those
11 shares, you didn't give that money away in protest,
12 did you?
13        MR. PHELPS:  Same objection.  It's been
14 asked and answered.  I think it's beyond the scope.
15 Harassing.
16        THE WITNESS:  I agree.
17        No, this is money that I earned for work
18 that was very effective and I also had the luck of
19 being in that company during that period of time
20 because there's very talented people that I have
21 worked with who have not done as well because they
22 weren't at these companies during this periods of
23 time.
24        MS. JONES:  Okay.  And I'm going to move
25 to strike the comment at the beginning of your

Page 1182

1 answer, "I agree," in response to counsel's
2 commentary.
3     Q.  You testified, I think, I can't remember
4 if it was Mr. Cartmell or Mr. Phelps, but you
5 testified that you had done a full assessment of the
6 safety of kids on Instagram.
7         Did I hear that correctly?
8        MR. CARTMELL:  Objection to the form.  And
9 mischaracterizes.
10        MS. JONES:  Well, I want -- if I
11 mischaracterized it, I want to be sure that I get it
12 right.
13     Q.  Did you do a full assessment of the safety
14 of kids on Instagram when you were at the company
15 from 2019 to 2021?
16        MR. CARTMELL:  Object to form.
17        THE WITNESS:  We've covered extensively
18 over the last couple of days, I looked at features,
19 teams, resourcing, research, oversaw the survey, so
20 I think it was a pretty comprehensive view, the kind
21 that you can have as an independent contractor of
22 the well-being team and efforts surrounding kid and
23 teen safety that were within the team adjacent to
24 that.
25 ///

Page 1183

1 BY MS. JONES:
2     Q.  Other than the documents that you've been
3 shown in the course of the last three days at your
4 deposition, including the e-mails that you sent to
5 Mr. Mosseri and Mr. Zuckerberg, is there any other
6 documentation of a formal written assessment that
7 you did of the safety of kids on Instagram?
8        MR. CARTMELL:  Object to the form.
9        THE WITNESS:  The e-mail I sent to Mark
10 was what I felt was most important during that
11 front.
12 BY MS. JONES:
13     Q.  Okay.  And there's no other -- I just want
14 to make sure there's nothing we are missing in terms
15 of the documentation.
16        There's no other documents that you're
17 aware of that constitutes, in your view, a full
18 assessment of the safety of kids on Instagram?
19        MR. CARTMELL:  Same objection.
20        THE WITNESS:  Not that I recall.
21 BY MS. JONES:
22     Q.  Okay.  And you -- I think during the
23 course of the deposition you've similarly referred
24 to having done an assessment of the tools on
25 Instagram?

Page 1184

1        MR. CARTMELL:  This is beyond the scope.
2        THE WITNESS:  Do you mean the safety
3 tools?
4 BY MS. JONES:
5     Q.  Yes.
6     A.  Yes.
7     Q.  Is that written down anywhere?
8     A.  Yes.
9     Q.  And what is the writing that reflects
10 that?
11     A.  So currently it's a spreadsheet that I
12 have put together where I listed all of the tools,
13 relevant links, categorized them, and wrote down
14 some observations about them.
15     Q.  And is that the spreadsheet that I believe
16 was produced by your counsel recently?
17     A.  Yes.
18     Q.  When did you first create that?
19     A.  Within the last month or so.
20     Q.  Okay.  So that was not an assessment of
21 safety tools that you did while you were at Meta
22 from 2019 to 2021, right?
23     A.  That is correct.
24     Q.  Okay.  What we're talking about is a
25 spreadsheet that you put together in the lead up to

109 (Pages 1181 - 1184)

CONFIDENTIAL

Page 1185

1 your deposition, right?
2     A.  Yes.
3     Q.  And was that during the course of the 10
4 to 20 hours that you were spending talking to
5 plaintiffs' counsel?
6         MR. CARTMELL:  Object to the form.
7         THE WITNESS:  No.
8 BY MS. JONES:
9     Q.  Was it during the same time frame that you
10 were putting that together?
11     A.  I believe it started earlier.
12     Q.  Okay.  And I think -- forgive me -- I
13 think you did say this.
14         But the company has -- you talked about
15 it's hard to get harm to zero but you should try,
16 right?
17     A.  Yes.
18     Q.  And you know that the company has
19 continued to develop tools and features after you
20 left in 2021?
21     A.  I know what has come out in the press
22 releases including the list of tools that I tested.
23     Q.  Okay.  And the -- just since you've
24 mentioned this spreadsheet, what specifically was
25 the test that you did to generate that spreadsheet?

Page 1186

1     A.  So what I did is I took -- across the
2 different accounts that I had created earlier that
3 have been covered, I looked at the feature, I read
4 the press release, and then I opened the product in
5 it's most up-to-date form and I tested the feature
6 to see how it behaved.
7     Q.  And so the spreadsheet that you've
8 referred to, that's part of this broader testing
9 process that you have talked about?
10     A.  Yes.
11     Q.  And your -- the criticism -- one of the
12 criticisms that I understand you to have made
13 against the company in terms of trying -- not trying
14 hard enough to get the harm to zero is that the
15 company has not adopted the safety framework that
16 you've described; is that right?
17         MR. CARTMELL:  Object to the form.  And
18 beyond the scope.
19         THE WITNESS:  That is one of the
20 criticisms.
21         I think the other one is that the set of
22 safety tools is not effective at doing what the
23 company claims they do.
24 BY MS. JONES:
25     Q.  Okay.  And you remember when I asked you

Page 1187

1 when I had a chance to ask you questions earlier,
2 whether you would -- you had shown the jury data
3 that showed that the application of your framework
4 would reduce harm to teenagers relative to what
5 Instagram was currently doing.
6         Do you remember me asking you that?
7     A.  Yes.  And I remembered, by the way, a very
8 relevant example about that.  After we spoke.
9     Q.  Sure.
10         And my question is actually very specific,
11 which is, during the additional questioning that
12 Mr. Cartmell did and Mr. Phelps did of you, did
13 either of them show you or, more importantly, the
14 jury data that suggests or confirms that the
15 framework that you've suggested would reduce harm to
16 teenagers?
17         MR. CARTMELL:  Objection.  Asked and
18 answered.
19         THE WITNESS:  Sorry.
20         MR. CARTMELL:  It's beyond the scope.
21         And I think you should be allowed to
22 give -- answer the question and give the example you
23 referred to.
24         If not, I'll ask him.
25         MS. JONES:  Okay.  Well, your objection is

Page 1188

1 noted.
2     Q.  You need to answer my question, please.
3         Do you need me to read the question back?
4     A.  Yes, please.
5     Q.  And my question, as I mentioned, is very
6 specific.
7         During the additional questioning that
8 Mr. Cartmell did and Mr. Phelps just did, did either
9 of them show you, more importantly, show the jury,
10 data that confirms that the safety framework that
11 you have suggested would reduce harm to teenagers?
12     A.  In which part of the -- sorry, I believe
13 that we have already had this conversation.  And
14 including all the things that I spoke about as a
15 result of the work on tools that were specifically
16 designed for teenagers.  The metrics around that and
17 sort of the entire approach that was done with that
18 methodology.  And so I don't understand how your
19 question is distinct from that.
20     Q.  Yeah.  Let me explain why it's distinct.
21         When -- after I finished my questioning,
22 Mr. Cartmell got back up, right?
23     A.  Yes.
24     Q.  And he asked you more questions, yes?
25     A.  Yes.

110 (Pages 1185 - 1188)

Page 1189

1    Q.   And he showed you some documents, yes?
2    A.   Yes.
3    Q.   And Mr. Phelps got back up and he had some
4    more questions, right?
5    A.   Yes.
6    Q.   And he reshowed you a video, right?
7    A.   Yes.
8    Q.   During that segment of your deposition on
9    day 3 of 3, did counsel show you any data that
10   confirms that the safety framework that you have
11   suggested would reduce harm to teenagers?
12       MR. CARTMELL:  Object to the form.  Scope.
13       THE WITNESS:  Counsel did not show me any
14   data.  I think that works the other way around.
15   BY MS. JONES:
16   Q.   Okay.  Is there any company that you could
17   identify -- and I know -- putting Meta to the side
18   because I understand your views on your first stint
19   with the company, is there any company that you can
20   point me to where your framework has been
21   implemented?
22       MR. PHELPS:  Objection.  Scope.
23       MR. CARTMELL:  Same objection.
24       THE WITNESS:  So Yahoo! I got my first
25   implementation so that early versions of that.

Page 1190

1        And then during the time I was in my first
2    stint, Twitter adopted both the -- all of the
3    language that we used in the reporting tools, and
4    they developed an internal infrastructure that was
5    very similar to what was at Meta at the time.  This
6    must have been around 2014 or 2015.
7    BY MS. JONES:
8    Q.   And as to those companies that you just
9    mentioned, did either counsel who just asked you
10   more questions show you data to suggest that the
11   application of your framework had reduced harm in
12   either of those companies?
13       MR. CARTMELL:  Object to the form.
14   Outside the scope.
15       MR. PHELPS:  Asked and answered.
16       THE WITNESS:  I believe I've answered that
17   question already.
18   BY MS. JONES:
19   Q.   I'm asking you as to Yahoo! and Twitter
20   which you've just mentioned.
21       MR. CARTMELL:  Same objections.
22   BY MS. JONES:
23   Q.   Did you see that data in their further
24   questioning of you?
25       MR. CARTMELL:  Same objections.

Page 1191

1        THE WITNESS:  I did not see that data in
2    the further questioning of me.
3        MS. JONES:  Okay.  Mr. Bejar, I am hopeful
4    that is the last time I ask you questions.  I have
5    nothing else at the moment.
6        THE WITNESS:  Thank you.
7        MS. JONES:  Thank you for your time.
8        MR. PHELPS:  I just want to ask about that
9    example.  I'll be quick.
10       MR. WARD:  That's fine.
11       Can I ask a few questions about the
12   production of these documents to the Senate and the
13   nondisclosure issue, any objection?
14       MS. JONES:  I don't think I have a basis
15   to prevent you from asking questions of your witness
16   if you want to.
17       MR. WARD:  Thank you.  I'll be very brief.
18           EXAMINATION
19   BY MR. WARD:
20   Q.   Mr. Bejar, the documents that were
21   produced to the United States Senate --
22       MS. JONES:  You need to put on your mic.
23       MR. WARD:  I'm sorry.  Thank you, Phyllis.
24   Q.   The documents produced in the United
25   States Senate were produced pursuant to subpoena?

Page 1192

1    A.   Correct.
2    Q.   That means you had a legal obligation to
3    produce those documents; is that right?
4        MS. JONES:  Hold on.
5        Objection to the lack of foundation.  And
6    I think you're asking for a legal conclusion.
7    BY MR. WARD:
8    Q.   Did you understand that you had a legal
9    obligation to turn over those documents?
10       MS. JONES:  Same objection.
11       THE WITNESS:  Yes, I did.
12   BY MR. WARD:
13   Q.   Okay.  When you left Facebook in 2021, did
14   you, to your knowledge, retain any documents
15   belonging to the company?
16   A.   Absolutely not.
17   Q.   When you produced documents to the United
18   States Senate, or to other bodies, did you include
19   all of these documents in Ms. Jones's Exhibit 85?
20       MS. JONES:  I object to the
21   characterization of it as being Ms. Jones's exhibit.
22       THE WITNESS:  I would have to review it
23   very closely to be able to accurately say that.
24   BY MR. WARD:
25   Q.   Specifically, I'm referring to documents

111 (Pages 1189 - 1192)

CONFIDENTIAL

Page 1193

1 related to report flows --
2    A.  With all the numbers?
3    Q.  Yeah.  Do you recognize these documents?
4    A.  I do, yes.
5    Q.  Yeah.  What are those documents?
6    A.  So those documents are the documentation
7 of -- of the company's understanding of harm during
8 2019, 2021.  Not everything.  But my e-mail to Mark
9 Zuckerberg, presentations that were related to
10 preparing that.  Presentations by the central
11 integrity team as related to all of these topics.
12        I also pulled in some of the things from
13 Jeff Horwitz' article that had the e-mail to Adam.
14        And then the -- there's the data from the
15 Facebook files around TRIPS which show that the
16 numbers that had appeared in BEEF had been
17 historically consistent.
18        And then the last part is all of the
19 presentations with detailed metrics and statistics
20 that show the effectiveness of the framework we've
21 been talking about.
22    Q.  So this Exhibit 85 is a combination of a
23 number of different sources of documents; is that
24 right?
25    A.  Correct.

Page 1194

1    Q.  Okay.  One of the documents is described
2 in your cover sheet as Facebook documents that have
3 been published to the public on the subject matter
4 of teens; is that right?
5        MS. JONES:  And, Counsel, I'm -- this is
6 your witness so I'm going to object to the leading.
7 BY MR. WARD:
8    Q.  You can answer.
9    A.  Yes.
10    Q.  And it includes finding some research and
11 product development that was made public by the
12 company?
13        MS. JONES:  Same objection.
14        THE WITNESS:  Yes.
15        MS. JONES:  Can I just have a running
16 objection to all this leading of your own witness?
17        MR. WARD:  Of course.
18        MS. JONES:  Okay.
19 BY MR. WARD:
20    Q.  The BEEF study, did you retain a copy of
21 that when you left the company?
22    A.  I did not.
23    Q.  When -- after you left the company, when
24 was the first time you saw the BEEF study?  From the
25 time you left the company, when was the first time

Page 1195

1 you saw it after you left?
2    A.  When New Mexico unredacted -- or published
3 their exhibits on the website.
4    Q.  And Exhibit 77 from your deposition today,
5 which Ms. Jones introduced the copy of the text
6 exchange between you and Frances Haugen and another
7 person named ▮▮▮▮▮ you refer to the publication by
8 the State of New Mexico of the BEEF study; is that
9 right?
10    A.  That's correct.
11    Q.  And what was your reaction to the
12 publication of this study?
13    A.  I was very happy.
14    Q.  And why is that?
15    A.  Because this study contains so much
16 information that parents and the public and
17 lawmakers and regulators needed to know.
18    Q.  And until it was published, you didn't
19 even have a copy of it to give to anyone?
20    A.  I did not.
21    Q.  So when you produced documents to the
22 United States Senate, did it include these documents
23 that you possessed from Facebook related to public
24 research on the subject matter of teens?
25    A.  Yes.

Page 1196

1    Q.  And the documents that we produced in
2 response to the subpoena from Facebook, did it
3 include all of these documents?
4    A.  Yes.
5        MR. WARD:  Thank you.  I have no more
6 questions.
7        MS. JONES:  Do I need to move?
8        MR. PHELPS:  I just want to be able to
9 make eye contact.
10        (Whereupon, a brief discussion off the
11 record.)
12        MS. JONES:  Is it okay before we finish, I
13 just have three things I want to note on the record,
14 not substantive, but like --
15        (Whereupon, a brief discussion off the
16 record.)
17            EXAMINATION
18 BY MR. PHELPS:
19    Q.  Hello, again, Mr. Bejar.
20    A.  Hello.
21    Q.  Brian Phelps.
22        You mentioned -- you just had the
23 opportunity to speak with Ms. Jones since you and I
24 have spoken?
25    A.  Yes.

112 (Pages 1193 - 1196)

CONFIDENTIAL

Page 1197

1    Q.  You mentioned in an answer to a question
2  she posed to you that an example had come to your
3  mind related to data supporting the notion that your
4  child safety framework was effective in reducing
5  harm that kids might experience on social media
6  platforms.
7        Do I recall that correctly?
8    A.  Yes.
9    Q.  And Ms. Jones didn't follow up and solicit
10  that example, right?
11    A.  Yes.
12    Q.  Are you able to provide me that example of
13  data supporting the notion that your framework that
14  you've discussed at length over the last several
15  days is effective in reducing harm to kids online?
16    A.  Yes, I am.
17        And I will say that the framework, while
18  most urgent to be applied to kids, can be applied to
19  safety and security issues in social systems
20  overall.
21        So in -- I believe it was early 2010, one
22  of the issues that was brought to my attention was
23  something called friend spam, which is people
24  receiving friend requests of people whom they didn't
25  know.

Page 1198

1        At the time, the company policy was one
2  similar to when we talk about prevalence, which is,
3  if you sent 5,000 friend requests, there was a label
4  that got applied, it was derogatory, I don't think
5  it serves anything for me to repeat it, and then
6  your account would be deactivated.  And many people
7  run into that.
8        When we looked at the issue, what we did
9  is we changed the language in the friend request to
10  allow people to express what was going on, in
11  particular, did you know the person who made the
12  friend request or not.  Do you know Brian, do you
13  know Sharon, do you know -- and when we changed the
14  language of whether you knew people or not, usage
15  went up significantly on people clicking on that
16  button.
17        And then they were able to tell us that
18  they didn't know the person.  Using around 50 or 40
19  examples of that, we gave feedback to people that
20  Facebook was a place where you sent friend requests
21  to people that you knew.  And approximately
22  75 percent of people changed their behavior based on
23  that.
24        Then there were people who would not
25  change their behavior and those were investigated

Page 1199

1  and it was important to do that because you had
2  separated out the people who would change behavior
3  based on feedback from the people who did not.
4        The result meaningfully dropped all of the
5  friend spam statistics for the company.  We did not
6  have to deactivate any more accounts with -- for
7  violating that particular policy or approach.
8        And the effect was so successful that Mike
9  Schroepfer, the CTO, would use it as an example in
10  boot camp to tell new engineers, this was a reason
11  that they should join protect and care.
12    Q.  Thank you for that.
13        The notion of confidentiality also came up
14  in your discussion with Ms. Jones.
15        Do you recall that?
16    A.  Yes.
17    Q.  Aside from the topic -- topics related to
18  your daughter, which I think we could all agree the
19  confidentiality protections may be relevant -- would
20  anything you testified about over the last three
21  days that were made public cause you embarrassment,
22  annoyance, or harm?
23        MS. JONES:  Objection to the form.  And
24  the characterization.
25        Go ahead.

Page 1200

1        THE WITNESS:  Not at all.
2  BY MR. PHELPS:
3    Q.  In your view, based on your eight years
4  within Meta, would any of the topics we discussed
5  over the last three days cause competitive harm to
6  Meta's business?
7    A.  Not at all.
8        MS. JONES:  Hold on.
9        Objection.  Foundation.  Calls for a legal
10  conclusion.
11  BY MR. PHELPS:
12    Q.  And so would it be your preference that
13  the information we've discussed over the last couple
14  of days, excluding your -- the discussion of your
15  daughter and family circumstances, and perhaps your
16  compensation, other than those personal topics,
17  would it be your view that our discussion over the
18  last several days is material that you would prefer
19  to be in the public domain?
20        MS. JONES:  Objection to foundation.
21        THE WITNESS:  Yes.
22        MR. PHELPS:  I have nothing else.
23        MS. JONES:  Can I just make a couple -- we
24  could probably let Mr. Bejar go.  But could I just
25  flag a couple things?

113 (Pages 1197 - 1200)

CONFIDENTIAL

Page 1201

1    MR. PHELPS:  Sure.
2    MS. JONES:  For the record.
3    I do think we probably should go ahead and
4 just mark the copies of the transcripts for
5 Tennessee AG and antitrust since we -- both sides
6 used it and it might make our lives easier down the
7 road.
8    (Whereupon, a brief discussion off the
9 record.)
10    MS. JONES:  Both sides used it and it
11 might make our lives easier down the road to just
12 have it be among the exhibits.
13    MR. PHELPS:  I would agree with that.
14    I also think we've been inconsistent in
15 marking demonstratives.  I would appreciate if we
16 could mark the demonstratives I've used if we've
17 marked other demonstratives.
18    MS. JONES:  For sure you can do that.
19 Okay.
20    The other item is I believe, Mr. Ward,
21 we're going to have a separate discussion about how
22 best to handle the exhibits related to Mr. Bejar's
23 daughter.  I don't think we should and I, frankly,
24 don't want to have that conversation tonight.  But
25 I'm happy to have a conversation about it at some

Page 1202

1 point.
2    And then thirdly, Mr. Cartmell and I have
3 had a conversation about Exhibit Number 6.  We
4 probably need to come to some kind of ground on what
5 our point of view is on whether it needs to be
6 redacted, and if so, to what extent.  So can we just
7 agree to try to hash that out?
8    MR. CARTMELL:  Yeah.
9    MR. PHELPS:  Can you just remind -- for
10 the record?
11    MS. JONES:  What Exhibit 6 was?
12    MR. PHELPS:  Yeah.  I'm just not sure that
13 those are discussions --
14    MS. JONES:  They may not -- yeah, that's
15 a -- it's a fair point.
16    MR. PHELPS:  There's more than just those
17 two parties in this so I'd ask the State AG --
18    MS. JONES:  You don't have to remind us
19 that you're also on the case, right?
20    MR. PHELPS:  Yeah, yeah.
21    MS. JONES:  Yeah, that -- of course you
22 can be part of that.  That's not a problem.
23    That's all I have.
24    MR. CARTMELL:  Can we talk about that one
25 word?

Page 1203

1    THE VIDEOGRAPHER:  Are we good to go off?
2    All right.  Total time for personal injury
3 plaintiffs is 11 hours 39 minutes.
4    Tennessee.  2 hours 17 minutes.
5    Meta.  9 hours 9 minutes.
6    Mr. Bejar's attorney.  5 minutes.
7    The time is 7:41.  We're off the record.
8    (Whereupon, the deposition was concluded
9 at 7:41 p.m.)
10    (Whereupon, Meta-Bejar Exhibit 86 was
11 marked for identification.)
12    (Whereupon, Meta-Bejar Exhibit 87 was
13 marked for identification.)
14    (Whereupon, Meta-Bejar Exhibit 88 was
15 marked for identification.)
16
17
18
19
20
21
22
23
24
25

Page 1204

1    INSTRUCTIONS TO WITNESS
2
3    Please read your deposition over carefully
4 and make any necessary corrections.  You should
5 state the reason in the appropriate space on the
6 errata sheet for any corrections that are made.
7    After doing so, please sign the errata
8 sheet and date it.
9    You are signing same subject to the
10 changes you have noted on the errata sheet, which
11 will be attached to your deposition.
12    It is imperative that you return the
13 original errata sheet to the deposing attorney
14 within thirty (30) days of receipt of the deposition
15 transcript by you.  If you fail to do so, the
16 deposition transcript may be deemed to be accurate
17 and may be used in court.
18
19
20
21
22
23
24
25

114 (Pages 1201 - 1204)

CONFIDENTIAL

Page 1205

```
1           ERRATA SHEET
2
3  PAGE  LINE   CHANGE
4  ____  ____  _____
5        REASON:_____
6  PAGE  LINE   CHANGE
7  ____  ____  _____
8        REASON:_____
9  PAGE  LINE   CHANGE
10 ____  ____  _____
11       REASON:_____
12 PAGE  LINE   CHANGE
13 ____  ____  _____
14       REASON:_____
15 PAGE  LINE   CHANGE
16 ____  ____  _____
17       REASON:_____
18 PAGE  LINE   CHANGE
19 ____  ____  _____
20       REASON:_____
21 PAGE  LINE   CHANGE
22 ____  ____  _____
23       REASON:_____
24
25
```

Page 1206

```
1       ACKNOWLEDGMENT OF DEPONENT
2
3
4
5      I,_____, do hereby certify
6  that I have read the foregoing pages, and that the
7  same is a correct transcription of the answers given
8  by me to the questions therein propounded, except
9  for the corrections or changes in form or substance,
10 if any, noted in the attached Errata Sheet.
11
12
13    _____  _____
14    ARTURO BEJAR          DATE
15
16
17
18
19
20
21
22
23
24
25
```

Page 1207

```
1  STATE OF CALIFORNIA  )
2  COUNTY OF YOLO     )
3      I, ELAINA BULDA-JONES, a Certified Shorthand
4  Reporter of the State of California, duly authorized
5  to administer oaths pursuant to Section 2025 of the
6  California Code of Civil Procedure, do hereby
7  certify that
8          ARTURO BEJAR,
9  the witness in the foregoing deposition, was by me
10 duly sworn to testify the truth, the whole truth and
11 nothing but the truth in the within-entitled cause;
12 that said testimony of said witness was reported by
13 me, a disinterested person, and was thereafter
14 transcribed under my direction into typewriting and
15 is a true and correct transcription of said
16 proceedings.
17     I further certify that I am not of counsel or
18 attorney for either or any of the parties in the
19 foregoing deposition and caption named, nor in any
20 way interested in the outcome of the cause named in
21 said deposition dated the _____ day of
22
23
24
25 ELAINA BULDA-JONES, CSR 11720
```

115 (Pages 1205 - 1207)

Golkow Technologies,
A Veritext Division
877-370-3377                                        www.veritext.com