# Exhibit 93

# PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE GENERAL CAUSATION TESTIMONY OF PLAINTIFFS' EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 1

```
 1          SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2                FOR THE COUNTY OF LOS ANGELES
 3
 4    COORDINATION PROCEEDING          JCCP No. 5255
      SPECIAL TITLE [RULE 3.400]
 5                                     For Filing Purposes:
                                       22STCV21355
 6    IN RE: SOCIAL MEDIA ADOLESCENT
 7    ADDICTION (JCCP No. 5255)
 8    _____
 9    THIS DOCUMENT RELATES TO:
10    Christina Arlington Smith,
      et al., v. TikTok Inc., et al.,
11    Case No. 22STCV21355,
      Los Angeles Superior Court
12    _____
13
14
15
16          CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
17            VIDEOTAPED DEPOSITION OF ARTURO BEJAR
18                   Palo Alto, California
19                  Thursday, July 10, 2025
20
21
22
23    Job No. 7460765
24    Pages 1 - 322
25    JENNY L. GRIFFIN, CSR No. 3969 - RMR, CRR, CCRR, CRC
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 2

```
 1
 2
 3
 4
 5
 6        Videotaped deposition of ARTURO BEJAR, at the law
 7  offices of Baker Botts, 1001 Page Mill Road, Palo Alto,
 8  California, Thursday, July 10, 2025, beginning at
 9  8:35 a.m. and ending at 4:58 p.m., before
10  Jenny L. Griffin, a Certified Shorthand Reporter,
11  Registered Merit Reporter, Certified Realtime Reporter,
12  California Certified Realtime Reporter, Certified
13  Realtime Captioner.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          A P P E A R A N C E S: (Continued)
 2  ON BEHALF OF THE PLAINTIFFS:
 3          MOTLEY RICE LLC
 4          BY: ANNIE KOUBA, ESQ.      (Via Zoom)
 5          JODI WESTBROOK FLOWERS, ESQ.  (Via Zoom)
 6          28 Bridgeside Boulevard
 7          Mount Pleasant, South Carolina 29464
 8          843.216.9000
 9          akouba@motleyrice.com
10          jflowers@motleyrice.com
11
12          GOZA & HONNOLD, LLC
13          BY: KIRK GOZA, ESQ.        (Via Zoom)
14             GRACE QUINLAN, ESQ.      (Via Zoom)
15             TARA LAMER, ESQ.        (Via Zoom)
16          900 Nall Avenue, Suite 400
17          Overland Park, Kansas 66207
18          913.451.3433
19
20          BEASLEY ALLEN LAW FIRM
21          BY: JOSEPH VanZANDT, ESQ.    (Via Zoom)
22          218 Commerce Street
23          Montgomery, Alabama 36104
24          800.898.2034
25          joseph.vanzandt@beasleyallen.com
```

Page 3

```
 1        A P P E A R A N C E S:
 2
 3  ON BEHALF OF THE PLAINTIFFS:
 4        WAGSTAFF & CARTMELL LLP
 5        BY: TOM CARTMELL, ESQ.
 6           JACK T. HYDE, ESQ.
 7           ROBERT G. GROVES, ESQ.   (Via Zoom)
 8           LUCY MALONE, ESQ.       (Via Zoom)
 9           MAUREEN MURPHY, ESQ.     (Via Zoom)
10           KATHLEEN HUDNALL, Paralegal
11           ANGELA PRIEST, Paralegal (Via Zoom)
12        4740 Grand Avenue, Suite 300
13        Kansas City, Missouri 64112
14        816.701.1100 - Cartmell
15        816.701.1195 - Hyde
16        816.701.1111 - Groves
17        816.701.1130 - Malone
18        816.701.1115 - Murphy
19        tcartmell@wcllp.com
20        jhyde@wcllp.com
21        rgroves@wcllp.com
22        lmalone@wcllp.com
23        mmurphy@wcllp.com
24        khudnall@wcllp.com
25        apriest@wcllp.com
```

Page 5

```
 1        A P P E A R A N C E S: (Continued)
 2
 3  ON BEHALF OF PLAINTIFF COUNTIES SAN DIEGO, SACRAMENTO
 4  AND DEL NORTE, CALIFORNIA:
 5        BARON & BUDD P.C.
 6        LINDSAY STEVENS, ESQ.     (Via Zoom)
 7        11440 W. Bernardo Court, Suite 265
 8        San Diego, California 92127
 9        619.999.7344
10        lstevens@baronbudd.com
11
12  ON BEHALF OF THE COMMONWEALTH OF MASSACHUSETTS ATTORNEY
13  GENERAL'S OFFICE:
14        COMMONWEALTH OF MASSACHUSETTS OFFICE OF THE
15        ATTORNEY GENERAL:
16        BY: CHRISTINA CHAN, ESQ.
17        One Ashburton Place
18        Boston, Massachusetts 02108
19        617-963-2912
20        christina.chan@mass.gov
21
22
23
24
25
```

2 (Pages 2 - 5)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 6

1      A P P E A R A N C E S: (Continued)
2
3  ON BEHALF OF PLAINTIFFS INCLUDING THE STATE OF ARKANSAS:
4      ROBBINS GELLER RUDMAN & DOWD LLP
5      BY:  AELISH M. BAIG, ESQ.   (Via Zoom)
6          TAEVA SHEFLER, ESQ.   (Via Zoom)
7      Post Montgomery Center
8      One Montgomery Street, Suite 1800
9      San Francisco, California 94104
10     415-288-4545
11     aelishb@rgrdlaw.com
12     tshefler@rgrdlaw.com
13
14 ON BEHALF OF THE WITNESS:
15     BAKER BOTTS LLP
16     BY:  MICHAEL WARD, ESQ.
17         CHINMAYI MANJUNATH, ESQ. (SF Office)
18     1001 Page Mill Road, Bldg. 1, Suite 200
19     Palo Alto, California 94304-1007
20     650.739.7538 - Ward
21     415.291.6291 - Manjunath
22     michael.ward@bakerbotts.com
23     chinmayi.manjunath@bakerbotts.com
24
25

Page 7

1      A P P E A R A N C E S: (Continued)
2
3  ON BEHALF OF THE PEOPLE OF THE STATE OF CALIFORNIA:
4      CALIFORNIA DEPARTMENT OF JUSTICE
5      OFFICE OF THE ATTORNEY GENERAL
6      BY: VIVIAN F. WANG, Deputy Attorney General
7          MEGAN O'NEILL, ESQ. (Via Zoom)
8      455 Golden Gate Ave., Suite 11000
9      San Francisco, California 94102-7004
10     415.510.4400
11     vivian.wang@doj.ca.gov
12     megan.oneill@doj.ca.gov
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1      A P P E A R A N C E S: (Continued)
2
3  ON BEHALF OF THE STATE OF TENNESSEE, OFFICE OF THE
4  ATTORNEY GENERAL & REPORTER:
5      TENNESSEE ATTORNEY GENERAL'S OFFICE
6      BY:  BRIAN PHELPS, ESQ.
7          CHRIS DUNBAR, ESQ.
8          MATTHEW JANSSEN, ESQ.    (Via Zoom)
9          ELIZABETH SPICA, ESQ.    (Via Zoom)
10     P.O. Box 20207
11     Nashville, Tennessee 37202.0207
12     615.741.3491 - Phelps
13     615.741.3519 - Dunbar
14     215.850.6479 - Janssen
15     615.741.3491 - Spica
16     brian.phelps@ag.tn.gov
17     chris.dunbar@ag.tn.gov
18     matthew.janssen@ag.tn.gov
19     elizabeth.spica@ag.tn.gov
20
21
22
23
24
25

Page 9

1      A P P E A R A N C E S: (Continued)
2
3  ON BEHALF OF THE WEST VIRGINIA ATTORNEY GENERAL'S
4  OFFICE:
5      WEST VIRGINIA OFFICE OF THE
6      ATTORNEY GENERAL
7      BY:  ABBY G. CUNNINGHAM, ESQ.  (Via Zoom)
8      812 Quarrier Street, Suite 100
9      Charleston, West Virginia 25301
10     304.558.8986
11     abby.g.cunningham@wvago.gov
12
13 ON BEHALF OF THE NEW JERSEY ATTORNEY GENERAL'S OFFICE:
14     OFFICE OF THE ATTORNEY GENERAL, STATE
15     OF NEW JERSEY
16     BY:  MANDY K. WANG, ESQ.     (Via Zoom)
17         VERNA PRADAXAY, ESQ. (Trenton) (Via Zoom)
18     124 Halsey Street, 5th Floor
19     Newark, New Jersey 07102
20     973.504.6200 - Wang
21     609.984.3900 - Pradaxay
22     mandy.wang@law.njoag.gov
23     verna.pradaxay@njoag.gov
24
25

3 (Pages 6 - 9)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 10

1      A P P E A R A N C E S: (Continued)
2
3  ON BEHALF OF THE ARIZONA ATTORNEY GENERAL'S OFFICE:
4      ARIZONA OFFICE OF THE ATTORNEY GENERAL
5      BY:  REAGAN HEALEY, ESQ.     (Via Zoom)
6      2005 N. Central Avenue
7      Phoenix, Arizona 85004
8      602.542.7728
9      Reagan.Healey@azag.gov
10
11 ON BEHALF OF THE KENTUCKY ATTORNEY GENERAL'S OFFICE:
12      KENTUCKY OFFICE OF THE ATTORNEY GENERAL
13      BY:  ZACHARY RICHARDS, ESQ.   (Via Zoom)
14      1024 Capital Center Drive
15      Frankfort, Kentucky 40601
16      502.696.5519
17      zach.richards@ky.gov
18
19
20
21
22
23
24
25

Page 12

1      A P P E A R A N C E S: (Continued)
2
3  ON BEHALF OF THE TikTok, INC. DEFENDANTS:
4      KING & SPALDING LLP
5      BY:  LENNETTE LEE, ESQ.     (Via Zoom)
6      633 West Fifth Street, Suite 1600
7      Los Angeles, California 90071
8      213.218.4011
9      llee@kslaw.com
10
11 ON BEHALF OF THE YouTube AND GOOGLE DEFENDANTS:
12      WILLIAMS & CONNOLLY LLP
13      BY:  JOSEPH SANDOVAL-BUSHUR
14      680 Main Avenue, SW
15      Washington, DC 20024
16      202.434.5013
17      jsandoval-bushur@wc.com
18
19
20
21      PRESENT ON ZOOM:
22  Michael Weinkowitz
23  Neil Kosslyn
24  Tess Schneider
25  Emily Jeffcott

Page 11

1      A P P E A R A N C E S: (Continued)
2
3  ON BEHALF OF THE META DEFENDANTS:
4      COVINGTON & BURLING LLP
5      BY:  PHYLLIS A. JONES, ESQ.
6          MARCELA INTERIANO, ESQ.
7      One CityCenter, 850 Tenth Street, N.W.
8      Washington, District of Columbia 20001
9      202.662.5868 - Jones
10      202.662.5203 - Interiano
11      pajones@cov.com
12      einteriano@cov.com
13
14 ALSO ON BEHALF OF THE META DEFENDANTS:
15      META PLATFORMS, INC.
16      BY:  EINAT SANDMAN CLARKE, ESQ.
17      Litigation at Meta Platforms, Inc.
18      1 Meta Way
19      Menlo Park, California 94025
20
21
22
23
24
25

Page 13

1      A P P E A R A N C E S: (Continued)
2
3  Tommy Maduena, Videographer, Golkow, a Veritext division
4  Darren Buchbinder, Core Legal Concepts
5  Daniel Lawlor, Trial Tech, Precision Trial Solutions
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

4 (Pages 10 - 13)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 14

1          C O N T E N T S
2
3 WITNESS: ARTURO BEJAR                    PAGE
4 EXAMINATION BY MS. JONES:            20
5 EXAMINATION BY MR. CARTMELL:            300
6 FURTHER EXAMINATION BY MS. JONES:        316
7 STENOGRAPHER'S CERTIFICATE:        319
8 DECLARATION:                320
9 DEPOSITION ERRATA SHEET:            321
10
11          E X H I B I T S
12      (Attached to Transcript)
13 EXHIBIT NUMBER    DESCRIPTION        PAGE
14 Exhibit 1    Letter from The Lanier Law Firm    21
15          to Counsel, dated 5/16/2025, Re:
16          JCCP 5255 Experts; (No Bates - 10
17          pages)
18 Exhibit 2    Arturo Bejar's rough draft titled    66
19          "Source Materials for Report";
20          BEJAR0002707 - BEJAR0002715
21
22
23
24
25

Page 15

1          E X H I B I T S  C O N T I N U E D
2 EXHIBIT NUMBER    DESCRIPTION        PAGE
3 Exhibit 3    Blog post titled "Changes We're    119
4          Making to do More to Support and
5          Protect the Most Vulnerable
6          People Who Use Instagram," by
7          Adam Mosseri, dated 2/7/2019; (No
8          Bates - 5 pages)
9 Exhibit 4    Email thread ending with an email    146
10          from Arturo Bejar to ████
11          ████ Miki Rothschild, ████
12          ████ and others; 10/6/2021;
13          Subject: Fwd: Gap in our
14          understanding of harm and bad
15          experiences; Attachments: BEEF by
16          Age.webp; BEJAR0001025 -
17          BEJAR0001027
18 Exhibit 5    Excerpt - Rebuttal Report of John    195
19          Starr; (No Bates)
20 Exhibit 6    Excerpt - Expert Report of Dr.    195
21          Emilio Ferrara; (No Bates)
22 Exhibit 7    Excerpt - Rebuttal Expert Report    196
23          of Dr. Emilio Ferrara; (No Bates
24          - 6 pages)
25

Page 16

1          E X H I B I T S  C O N T I N U E D
2 EXHIBIT NUMBER    DESCRIPTION        PAGE
3 Exhibit 8    Spreadsheet Timeline of Instagram  314
4          Safety Features; (No Bates - 7
5          pages)
6 Exhibit 9    Handwritten Notes of Arturo Bejar  318
7          Created 7/10/2025; (No Bates - 3
8          pages)
9
10      REQUESTED MARKED BY MS. JONES
11          PAGE    LINE
12          39    19
13          58    2
14          86    12
15          221    15
16
17      REQUESTED MARKED BY MR. CARTMELL
18          PAGE    LINE
19          93    5
20
21      DIRECTION TO WITNESS NOT TO ANSWER
22          PAGE    LINE
23          221    12
24          229    2
25          229    11

Page 17

1          P R O C E E D I N G S
2      THE VIDEOGRAPHER:  We are now on the
3 record.  My name is Tommy Maduena.  I am a
4 videographer for Golkow, a Veritext division.
5      Today's date is July 10, 2025, and the time
6 is 8:35 a.m. Pacific.
7      This video deposition is being held at
8 1001 Page Mill Road, Building 1, Suite 200,
9 Palo Alto, California 94304, in the matter of
10 Cristina Arlington Smith, et al., vs. TikTok, Inc.,
11 et al., for the Superior Court of the State of
12 California, County of Los Angeles.
13      The deponent is Arturo Bejar.
14      Counsel will be noted on the stenographic
15 record.
16      The court reporter is Jenny Griffin and
17 will now swear in the witness.
18          - - -
19      ARTURO BEJAR,
20 having been first duly sworn and/or affirmed by the
21 Certified Shorthand Reporter to tell the truth, the
22 whole truth, and nothing but the truth, testified as
23              follows.
24      MS. JONES:  I think counsel first had some
25 very brief remarks that they wanted to offer at the

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 18

1  outset.
2       MR. CARTMELL:  Very brief, thank you,
3  Phyllis.
4       My name is Tom Cartmell, and I'm here this
5  morning on behalf of the JCCP and the MDL
6  plaintiffs, PI plaintiffs.  I want to make a quick
7  record.
8       This is the deposition of Mr. Bejar.  He
9  has already testified for 22 hours and five minutes,
10 I believe.  Nine hours and five minutes,
11 approximately, has been questioning by Meta.
12      Our belief is that the scope of this
13 deposition is very narrow.  And pursuant to a ruling
14 by Judge Kuhl, and that is to solely question about
15 Mr. Bejar's nonretained expert opinions.  And we
16 want to make that clear as far as the scope of the
17 deposition.
18      The other thing is we have an agreement, I
19 believe, at this point, that this will be a half-day
20 deposition, meaning three and a half hours, with the
21 ability of us to question after that, meaning the
22 JCCP and MDL; and that if we question after that,
23 that you will be -- Meta will be entitled to the
24 equivalent amount of time.
25      Thank you.

Page 19

1       MS. CHAN:  Good morning.  My name is
2  Cristina Chan.  I'm an assistant attorney general on
3  behalf of the Commonwealth of Massachusetts.
4       We'd like to state for the record our
5  position is that we timely served a substantively
6  identical disclosure as that served by the JCCP and
7  MDL plaintiffs, designating Mr. Bejar as an
8  unretained expert in our litigation, Commonwealth v.
9  Meta Platforms and Instagram, LLC, Suffolk Superior
10 Court, Civil Action Number 2384CV02397; and for
11 purposes of coordination and efficiency, issued a
12 valid cross-notice in today's deposition.
13      As a result, we oppose any efforts to
14 further depose Mr. Bejar based on such disclosure in
15 our action, but are happy to meet and confer on that
16 issue if and when it becomes ripe.
17      MR. PHELPS:  Brian Phelps for the State of
18 Tennessee.  In the interest of time, I would just
19 say we would incorporate that same statement.  Our
20 position is the same as Massachusetts'.
21      MS. BAIG:  And Aelish Baig for the State of
22 Arkansas.  In the interest of time, I'd say the
23 same.
24      Arkansas has similarly disclosed to
25 defendants that it is designating the testimony of

Page 20

1  Mr. Bejar as a nonretained expert witness, and we
2  can meet and confer over any requests for additional
3  time at a later date if that becomes necessary.
4       MS. JONES:  And also in the interest of
5  time, the parties have gone back and forth on this
6  topic by email.  And Meta's position is set out in
7  that communication.  So why don't we go ahead and
8  start.
9            EXAMINATION
10 BY MS. JONES:
11  Q.  Mr. Bejar, good morning.
12  A.  Good morning.
13  Q.  We've met before at your earlier
14 deposition.  You were deposed on April 7th, 8th, and
15 9th of this year; is that right?
16  A.  Correct.
17  Q.  Did you go back and review that testimony?
18  A.  I reviewed it so that I could submit the
19 errata for it.
20  Q.  Did you review it for any other purpose?
21  A.  No.
22  Q.  You were under oath at your deposition back
23 in April; correct?
24  A.  Correct.
25  Q.  And all the testimony you gave at that

Page 21

1  deposition was true; yes?
2  A.  Correct.
3  Q.  You're aware that plaintiffs have
4  identified you as an unretained expert?
5  A.  Yeah.  My counsel communicated that to me.
6       MS. JONES:  Okay.  I'm going to ask --
7  we're going to hand you what we've marked as exhibit
8  number -- what we'll mark as Exhibit Number 1 to
9  your deposition.
10      (Exhibit 1 was marked for
11       identification and is attached to the
12       transcript.)
13 BY MS. JONES:
14  Q.  When did you first become aware that you
15 had been identified as an unretained expert?
16  A.  So should I be reviewing this?
17  Q.  No.  My question is when did you become
18 aware that you had been identified as an unretained
19 expert by plaintiffs' counsel?
20  A.  In the last few weeks in conversation with
21 my counsel.  I don't recall the exact date.
22  Q.  Now, on Exhibit Number 1, there is a date
23 of May 16th, 2025.
24      Do you see that?
25  A.  Yeah.

6 (Pages 18 - 21)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 22

1    Q.  Do you recall whether you learned that you
2  were going to be identified as an unretained expert
3  before or after May 16th of 2025?
4    A.  After May 16th?
5    Q.  You learned about --
6    A.  Wait.  Sorry.  Hold on.
7      Can you ask the question again?
8    Q.  Yes.  Did you learn that you had been
9  identified as an unretained expert before or after
10  May 16th of 2025?
11    A.  I don't recall the date in which I had that
12  conversation with my lawyer.
13    Q.  So you don't know if it was before or after
14  that date?
15    A.  Yeah.  I don't recall the exact date.
16    Q.  Have you seen Exhibit Number 1 before?
17    A.  Let me...
18      No, I have not seen this document before.
19    Q.  You've never seen Exhibit Number 1?
20    A.  A document with this heading and this
21  Lanier law firm specifically?
22    Q.  Yes.
23    A.  No, I have not seen this document before.
24    Q.  You see towards the middle of the first
25  page of Exhibit Number 1, there's a section that

Page 23

1  begins with the sentence:
2      "Finally, please note the
3      descriptions for plaintiffs' unretained
4      experts below."
5      Do you see that?
6    A.  I see that, yes.
7    Q.  And there's a specific reference to you,
8  Arturo Bejar; yes?
9    A.  Correct.
10    Q.  And if you flip through -- I think it's the
11  first seven pages of Exhibit Number 1 -- there's a
12  discussion of your background and what are described
13  as your opinions on various topics; correct?
14      MR. CARTMELL:  I'm going to object to the
15  form of the question.  It lacks foundation.  This is
16  a document prepared by attorneys related to what
17  testimony may be offered at trial.
18      MS. JONES:  Mr. Cartmell, can I just --
19      MR. CARTMELL:  I'm going to ask for a
20  standing objection.  That's why I'm telling you what
21  it is --
22      MS. JONES:  That's fine, but --
23      MR. CARTMELL:  -- on all the questions
24  about this document.  Is that okay?
25      MS. JONES:  That's fine.  Could I ask you

Page 24

1  not to coach the witness with your objections.
2      MR. CARTMELL:  No, no.  So here's --
3      MS. JONES:  Please and thank you.
4      MR. CARTMELL:  -- what I need to respond
5  to.  In California you are required to give the
6  actual basis for the objection.
7      MS. JONES:  No.  I understand your
8  objection.
9      MR. CARTMELL:  And the reason I wanted to
10  say that in some detail is because I want to ask and
11  not interrupt you on every question -- ask for the
12  standing objection on any questions that it lacks
13  foundation --
14      MS. JONES:  And you have it.  You have a
15  standing objection.
16      MR. CARTMELL:  All right.  Thanks.
17  BY MS. JONES:
18    Q.  Mr. Bejar, now that we've had a couple of
19  minutes of back and forth by the lawyers, have you
20  had a chance to see that on the first seven pages of
21  Exhibit Number 1 to your deposition there is a
22  description -- I'm describing it very generally --
23  of your background and various bullet points related
24  to what are described as your opinions as an
25  unretained expert?

Page 25

1    A.  Yes, I see that.
2    Q.  That particular textual portion of Exhibit
3  Number 1, had you ever seen that before just now?
4    A.  Hold on a moment.  I mean, I think to be
5  accurate, my counsel shared with me a document, but
6  I don't know if this text is the one that my counsel
7  shared with me.  I would have to have the documents
8  side by side so I can compare them, and I cannot
9  accurately say that they are the same document.
10    Q.  But did you, as far as you know, review
11  some document, whether it's Exhibit 1 or some other
12  document, that laid out what were intended to be
13  your background and opinions in your capacity as an
14  unretained expert?
15    A.  I think within the last week or so -- I
16  don't recall the exact date -- I reviewed a document
17  that my counsel gave me which included some of my
18  background, areas of expertise, that I have.
19    Q.  Prior to about a week ago, did you review
20  any document that was intended to summarize your
21  background and your opinions as an unretained
22  expert?
23    A.  Not that I recall.
24    Q.  And the document that we have marked as
25  Exhibit Number 1, you don't have any specific

7 (Pages 22 - 25)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 26

1 recollection of seeing any drafts of that before
2 today?
3    A.   No.
4    Q.   Okay.
5    A.   I do not.
6    Q.   And so you couldn't say, sitting here
7 today, whether what's reflected in Exhibit Number 1
8 is a complete and accurate representation of your
9 background and opinions; is that right?
10    A.   I mean, if you give me time to review it, I
11 can read through it in detail, and then I could
12 speak to -- if I have any reservations about what's
13 written in it.  Of course, I haven't had enough time
14 to do that.
15    Q.   Sure.  And we're going to spend some time
16 talking about some of the things that are written in
17 Exhibit 1, but it sounds like, absent being able to
18 take the time to read Exhibit 1, you couldn't tell
19 me yes, this is fully right, or no, I'm not sure if
20 that's right?
21    A.   Yeah, I think it would be accurate to say
22 if I haven't had a chance to review it, I can't have
23 an informed opinion about it.
24    Q.   Okay.  Is there any documentation that
25 memorializes your role as an unretained expert for

Page 27

1 plaintiffs in this case?
2        MR. CARTMELL:  Same objection.
3        THE WITNESS:  I mean, I think it's
4 important context here that -- I mean, from my
5 experience of this, I was a witness and I'm
6 testifying.  And then my counsel informed me of this
7 recently.
8        And so, as far as I'm concerned, I'm, like,
9 a witness under oath in this context that has a
10 little expertise in all of these areas because of
11 decades of experience working on them.
12        And -- but the area of, like, specific
13 designations and things like that and the mechanics
14 of that is something that is sort of more in the
15 legal framework.  And so I want to be mindful of not
16 expressing opinions on the legal framework around
17 these things.
18 BY MS. JONES:
19    Q.   Mr. Bejar, do you remember what my question
20 was to you?
21    A.   Not precisely.  Could you please repeat it?
22    Q.   Okay.  Respectfully, I'm going to move to
23 strike your last answer as nonresponsive.
24        My question was are you aware of any
25 documentation that memorializes your role as an

Page 28

1 unretained expert for the plaintiffs in this case?
2        MR. CARTMELL:  Objection.  Vague and
3 ambiguous.  Calls for speculation.
4        THE WITNESS:  So the documentation I have
5 seen, which is something I think I've already said a
6 few minutes ago, is the documentation that my
7 counsel shared with me.
8        If you talk in your question about
9 designation of all these other things, again, I
10 don't know what you mean when you say the
11 designation of so-and-so because, again, for me,
12 that's the mechanics of how that works.
13        And for me, I'm a witness under oath,
14 speaking truthfully about experience that I have and
15 opinions that I've earned through that experience.
16 BY MS. JONES:
17    Q.   Mr. Bejar, other than the document that was
18 shared with you by your counsel at a date you don't
19 recall, are there any other documents that you can
20 recall seeing relating to your identification as an
21 unretained expert in the litigation?
22        MR. CARTMELL:  Objection.  Mischaracterizes
23 his testimony.
24        THE WITNESS:  I think, as I just said,
25 right, you're talking about documents assigning --

Page 29

1 designating me as something.  And what I have is,
2 like, the subpoena to be here.  I'm under oath.  I
3 got another subpoena to be here, and here I am.
4        And so -- I mean, that's my answer in terms
5 of my recollection.  Like, I don't have a catalog of
6 each document or what this document means in the
7 context that you're talking about.
8 BY MS. JONES:
9    Q.   And that's probably fair.  My question is
10 you testified earlier that you received a document
11 from your counsel at some point after your first
12 deposition that, generally speaking, laid out your
13 background and some of your opinions in the case.
14 Is that right?
15    A.   Yeah.
16    Q.   Okay.
17        MR. CARTMELL:  Objection.  Just let me
18 insert an objection.  It mischaracterizes the prior
19 testimony.
20 BY MS. JONES:
21    Q.   Other than that document and the subpoenas
22 that you've referred to, are there any other
23 documents that you have seen since your first
24 deposition that purported to summarize your
25 experience and opinions in relation to your role as

8 (Pages 26 - 29)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 30

1  an unretained expert?
2      A.  Sorry, but haven't I answered this already?
3  It feels like you're asking the same question, and I
4  feel like I've already answered it in terms of the
5  document I recall my lawyer sharing with me.
6          I have not seen this document.  And I don't
7  recall seeing other documents that talk about the
8  designation that you're referring to.
9      Q.  Okay.  On the first page of Exhibit
10  Number 1, there is a reference to various other
11  individuals -- this is in the second paragraph of
12  Exhibit Number 1:  Drs. Dimitri Christakis,
13  Drew Cingel, Gary Goldfield, Anna Lembke,
14  Stuart Murray, Ramin Mojtabai, Eva Telzer, and
15  Jean Twenge.
16          Do you see that?
17      A.  I do.
18      Q.  Do you know, Mr. Bejar, who any of those
19  folks are?
20      A.  I do not.
21      Q.  Have you had any conversations with any of
22  those folks?
23      A.  I have not had any conversations with any
24  of the people that are listed here.
25      Q.  Are you being compensated in any way to

Page 31

1  serve as an unretained expert?
2      A.  Absolutely not.
3      Q.  Okay.  Since the last time that we saw each
4  other in April of this year, have you actively
5  sought full-time employment?
6      A.  I have not.
7      Q.  And so does that -- if I'm recalling our
8  earlier time together, you have not had a full-time
9  job since 2015; is that right?
10      A.  No.  Actually, I don't think that
11  characterizes what I testified to previously
12  correctly.
13          Like, I spend a significant amount of time
14  on sort of the issues that we're talking about today
15  in terms of sort of understanding them, discussing
16  them with many different parties like the DSA for
17  Europe, like Ofcom in the United Kingdom, the work I
18  did for the Oversight Board.  I was called to be on
19  a panel at Stanford that talked about, like,
20  bullying and unwanted sexual advances in minors.
21          So I think that -- it certainly feels like
22  more than a full-time job in terms of the amount of
23  work that I'm putting into these things right now.
24  Besides the other work, as I previously testified,
25  I'm also doing at the same time.

Page 32

1          And so I do believe that it's full-time
2  employment even if, for example, the work that I'm
3  doing around all of this is not compensated.
4      Q.  Well, that was actually going to be my next
5  question.
6          Have you been compensated for any of the
7  things you've just described?
8      A.  I have not been compensated for any of the
9  things that I've described on the domain of teen
10  safety and other areas.
11          I have had compensation on my artwork --
12  not much compensation, to be honest.  But on this
13  domain I have not had compensation.
14          The only thing I have had is I've had some
15  of my travel expenses, where appropriate, refunded.
16      Q.  Okay.  And have you been a compensated
17  employee of any organization since 2015?
18      A.  Do you mean has any company paid me for --
19  can you be more precise what you mean by "employee"?
20      Q.  What is your understanding of what an
21  employee is?
22      A.  Somebody that gets paid by a company to do
23  something.
24      Q.  Okay.  Let's --
25      A.  And so --

Page 33

1      Q.  I'm sorry to interrupt you.  Go ahead.
2      A.  Yeah.  Sorry.  So somebody that gets paid
3  by a company to do something.
4      Q.  Okay.  I want to just use your definition.
5  Have you been somebody that gets paid by a company
6  to do something since 2015?
7      A.  Yes.  I was paid by Airbnb to help them
8  with their security, integrity, and safety programs.
9          I was paid by multiple organizations on
10  helping them with their engineering programs.
11          I was paid by the Facebook Oversight -- or
12  Meta Oversight Board to provide expert opinion on
13  the crosscheck program and customer care processes
14  and things like that.
15          I was compensated by the Facebook Oversight
16  Board for my opinions and expertise on child safety
17  and my experience around that.
18          I was paid by Instagram to -- for the work
19  that I did for a couple of years there to help with
20  the safety and security program and the well-being
21  program within Instagram.
22          Those are the ones that I can recall right
23  now.  This is -- I mean, I'm sure there's some that
24  I'm missing, but I have had compensation from
25  companies for my safety background and expertise,

9 (Pages 30 - 33)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 34

1 for my expertise as an engineering manager and on
2 engineering. And so all the areas that we're
3 talking about today.
4    Q.   When I use the term -- thank you for that.
5         When I use the term "full-time employee,"
6 do you understand what I mean by that?
7         Well, let me ask a different question.
8         When I use the term "full-time employee,"
9 do you understand that to mean a person who is
10 working five days a week, potentially 40 hours or
11 more a week?
12        MR. WARD:  Object to the form.  You asked
13 him to define it and use his definition.  So I
14 object as to form.
15 BY MS. JONES:
16    Q.   Well, we were talking about the term
17 "employee."  My question was do you have an
18 understanding of what the term "full-time" --
19        MR. WARD:  But, Counsel, you asked him to
20 define it and to answer the question based on the
21 definition he gave you, and now you're asking to
22 change the definition.
23        So it's an objection to form and unfair to
24 the witness.
25        MS. JONES:  Well, your objection is noted.

Page 35

1 BY MS. JONES:
2    Q.   Mr. Bejar, you worked as a full-time
3 employee at Meta from 2009 to 2015; correct?
4    A.   So by "full-time employee," you mean in
5 terms of, like, five days a week exclusive contract
6 with them?
7    Q.   Yes.
8    A.   Yes.  I was a full-time employee at Meta
9 from 2009 to 2015.
10   Q.   Since 2015, have you worked as a
11 five-days-a-week exclusive contract employee for any
12 organization?
13   A.   I mean, I answered this already.  I mean,
14 we talked about this in the deposition, the
15 three days that we talked about this, which is that
16 since I left Meta in 2015, I combined time with
17 parenting, with thinking and working on issues
18 around safety, doing consulting around it.
19        And all of this was -- I was able to do
20 because, fortunately, I have a degree of
21 independence that allows me to do that.
22        Now, I did talk to Twitter, who wanted me
23 to become their head of, like, health and safety and
24 work on all of these issues in terms of full-time
25 employment.

Page 36

1         And there's been other companies that have
2 made overtures about me, have tried to recruit me
3 for what you call full-time employment.  But, again,
4 I'm fortunate that I'm able to sort of focus on
5 what's important from a place in which my opinions
6 are not bound to being sort of compensated by an
7 individual organization, which I think is important
8 for the kind of work I'm doing right now.
9         MS. JONES:  I'm going to move to strike all
10 of that as nonresponsive.
11 BY MS. JONES:
12   Q.   Mr. Bejar, my question was since 2015, have
13 you worked as a five-day-a-week exclusive contract
14 employee for any organization?
15        MR. CARTMELL:  Objection.  Asked and
16 answered.
17        MS. JONES:  Asked.  Not answered yet.
18        THE WITNESS:  No.  I mean --
19        MR. CARTMELL:  Move to strike the statement
20 of counsel.
21 BY MS. JONES:
22   Q.   Do you need me to ask the question again?
23   A.   No, I don't need to ask you to ask the
24 question again because I have answered the
25 question --

Page 37

1    Q.   I --
2    A.   Sorry.  You're interrupting me.
3    Q.   I just want to ask the question because I
4 want to make sure the record is clear.
5    A.   Okay.
6    Q.   Since 2015 have you worked as a
7 five-days-a-week exclusive contract employee for any
8 organization?
9         MR. CARTMELL:  Objection.  Asked and
10 answered.
11        THE WITNESS:  I believe that I have
12 answered that question already and in a fair amount
13 of detail.  If you would like, I could go through
14 that detail again.
15 BY MS. JONES:
16   Q.   I don't want you to walk through the detail
17 again because my question was actually different
18 than what I think your detail related to.
19        My question is simply, yes or no:  Since
20 2015 have you worked as a "five-days-a-week
21 exclusive contract employee for any organization?
22        MR. CARTMELL:  Objection.  Move to strike
23 the statement of the counsel.
24        THE WITNESS:  Again, I've already answered
25 the question with detail.  And so I've already

10 (Pages 34 - 37)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 38

1 answered it.
2 BY MS. JONES:
3    Q.   And are you refusing to answer that
4 question?  I just want to --
5       MR. CARTMELL:  Well --
6       MS. JONES:  Counsel, let me finish a
7 sentence.
8       MR. CARTMELL:  Okay.  Sorry.
9 BY MS. JONES:
10    Q.   Are you taking the position that you will
11 not answer that question?
12       MR. CARTMELL:  I will state for the record:
13 Objection.  Asked and answered.  He did answer the
14 question.
15       MR. WARD:  He's not refusing to answer the
16 question.
17       Arturo, go ahead and answer the question
18 again in complete.
19       THE WITNESS:  Okay.  Yeah.
20       So since 2015 I have dedicated my time to
21 being a parent, to being a consultant.  I've been
22 compensated by multiple parties, including the
23 Oversight Board, Meta itself.
24       I do work with academic institutions like
25 NYU and Northeastern and Stanford.  I have worked

Page 39

1 very hard throughout that period.
2       And as I have already described, I am very
3 fortunate that because I am independent, I'm able to
4 do this and pick the places and the amount of time I
5 dedicate.
6       I have been sought out for full-time
7 employment by multiple technology companies, sort of
8 based on my background.  But as my kids were
9 teenagers, and I think it's important to sort of see
10 them out of the door, and also, as I pursued other
11 areas of my life, which I covered in the first
12 testimony that we talked about.
13       The way that my weeks work out, I do
14 probably more than, like, 60 or 80 hours a week of
15 work, but it's sort of within that context.  I have
16 chosen to not be bound to an individual company.
17       MS. JONES:  I'm going to move to strike
18 that as nonresponsive.
19 ***    And, Madam Court Reporter, can you just
20 mark this portion of the transcript so we can raise
21 it with the Court when we have to ask for more time.
22 BY MS. JONES:
23    Q.   Mr. Bejar, how much time, if any, have you
24 spent related to your role as an unretained expert
25 in litigation?

Page 40

1       MR. CARTMELL:  Objection.  Vague and
2 ambiguous.  Lacks foundation.  Calls for a legal
3 conclusion.
4 BY MS. JONES:
5    Q.   Let me go back.  Let me ask the question.
6       Have you spent any time --
7       MR. CARTMELL:  Same objections.
8       MS. JONES:  I have not even finished my
9 question.
10       MR. CARTMELL:  Oh, sorry.  You paused.
11 I'm sorry.
12       MS. JONES:  That's because I speak that
13 way.
14 BY MS. JONES:
15    Q.   Mr. Bejar, have you spent any time in
16 connection with your role as an unretained expert?
17       MR. CARTMELL:  Same objection.
18       MR. WARD:  Object as to form.
19       THE WITNESS:  I think when I look at that
20 question, you're asking me to have an opinion about
21 whether, like, I'm going to retain an expert for
22 these things.  Again, I'm a witness.  I have a
23 lifetime of experience on all of these issues --
24 building, addressing, working on them.  I am here as
25 a witness.

Page 41

1       And I think the designation is a matter
2 for -- sort of -- again, I'm not a lawyer.  So if
3 you're asking me to make a legal conclusion as to,
4 like, my role as an unretained expert, I'm not
5 somebody -- that's not my job.  My job is to be here
6 as a witness and speak truthfully based on my
7 experience.
8 BY MS. JONES:
9    Q.   Let me ask you a different question.
10       Since your deposition of April of this
11 year, have you reviewed any documents in connection
12 with this litigation?
13    A.   The document that I mentioned that my
14 lawyer shared with me, that I've already covered in
15 a previous answer.  And then yesterday I got a
16 chance to review, not as closely as I could because
17 of the length, a number of reports.  I think two by
18 Dr. Ferrara and then another report -- I think the
19 last name is Starr.  I got to review those yesterday
20 but superficially.
21    Q.   Understood.
22       Other than those materials, since your
23 deposition in April of this year, are there any
24 other documents that you have reviewed related to
25 your role in this litigation as a witness of any

11 (Pages 38 - 41)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 42

1 kind? As an unretained expert or simply as a
2 witness?
3    A. I don't recall reviewing any documents
4 other than the ones that I've already described in
5 my previous answer.
6    Q. Okay. Let me ask you to go to page 7 of
7 Exhibit Number 1. And about -- I apologize. Are
8 you there?
9    A. It doesn't have page numbers.
10    Q. You are actually right. I apologize. It's
11 seven pages in.
12    A. I know. But it helps me to count.
13    Q. No. I understand. I've had to do the same
14 thing. That's fine. For whatever it's worth, I did
15 not create this particular document.
16    Are you on page 7?
17    A. I believe I am.
18    Q. And about midway down page 7 of Exhibit
19 Number 1, there's a paragraph that begins "Materials
20 considered by Mr. Bejar in forming his opinions have
21 been previously produced and marked as," and then
22 there are different, kind of, lawyerly numbered
23 designations of documents.
24    Do you see that?
25    A. I see that.

Page 43

1    Q. Do you understand that to be -- well, let
2 me ask you. Do you know what those documents are
3 that are referred to?
4    MR. CARTMELL: I'll renew my objection on
5 this. Lacks foundation. Calls for speculation. It
6 was prepared by an attorney. He's already testified
7 he's never seen it.
8    MS. JONES: Counsel, I gave you a standing
9 objection. You have a standing objection. I
10 promise.
11 BY MS. JONES:
12    Q. Mr. Bejar, do you know what those number
13 designations refer to?
14    MR. CARTMELL: Same objection.
15    THE WITNESS: As I've already said to a
16 previous answer I have not seen this particular
17 document before. I have not seen this paragraph
18 before; so I'm not sure what I can accurately say
19 about it.
20 BY MS. JONES:
21    Q. Okay. And that's entirely fair. But those
22 numbers are not meaningful to you in any way or
23 another?
24    MR. CARTMELL: Same objection.
25    THE WITNESS: I think I've already answered

Page 44

1 your question about this.
2 BY MS. JONES:
3    Q. Okay. And it sounds like since April of
4 this year, you reviewed the document that your
5 counsel gave you, you reviewed the expert reports of
6 Dr. Ferrara and Dr. Starr, those last two things,
7 yesterday.
8    Since your deposition in April, have you
9 reviewed any literature of any kind in connection
10 with your role as a witness?
11    MR. CARTMELL: Objection.
12 Mischaracterizes.
13    THE WITNESS: So since my deposition in
14 April, have I reviewed literature that's in
15 connection to my role as a witness?
16 BY MS. JONES:
17    Q. Uh-huh.
18    A. When I testified in April -- I mean,
19 that's -- no. I don't recall reading any new
20 literature since April.
21    I have revisited the Surgeon General
22 report, which I think is a really good sort of
23 piece -- piece of work, but I don't recall looking
24 at literature or anything that would sort of make
25 anything I say today any different than what I

Page 45

1 testified in April during my first deposition.
2    Q. Other than the reports of Drs. Ferrara and
3 Starr, have you reviewed any of the other expert
4 reports that have been created and exchanged in the
5 litigation?
6    A. No, not that I -- I don't think so.
7    Q. Other than -- I'm sorry to step on the end
8 of your answer.
9    Other than the reports for -- other than
10 Dr. Ferrara and Dr. Starr, do you know who any of
11 the other experts are in the litigation?
12    A. I mean, I see Lotte Rubaek's name on this.
13 So the names that are on this document, I know right
14 now. But prior to that, I was not aware of the
15 other experts on this process.
16    Q. We were asked by counsel for the
17 plaintiffs, I think a couple of days ago, to allow
18 you to get copies of the reports of Drs. Ferrara and
19 Starr, and it sounds like you had a chance to at
20 least review them at some level yesterday; is that
21 right?
22    MR. CARTMELL: I'm going to object and move
23 to strike the statement of counsel about what we
24 asked you to do. It has nothing to do with this
25 witness. He knows nothing about it. I mean, it --

12 (Pages 42 - 45)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 46

1 just ask your question.
2       MS. JONES:  Is this necessary?  That's not
3 even an objection.
4       MR. CARTMELL:  That is an objection.
5       MS. JONES:  You are just using -- and
6 you're wasting -- my time.
7       MR. CARTMELL:  That is not true.  If you're
8 going to designate a portion of this transcript, and
9 you're going to include "Counsel asked us to do
10 something" that he knows nothing about, that's not
11 fair.  It's an inappropriate question.  I object to
12 the form.
13       MS. JONES:  Counsel, I'm not -- I was not
14 trying to be provocative.  That is a factual
15 statement of how we got the request.  He didn't ask
16 us personally.
17       MR. CARTMELL:  Exactly.
18 BY MS. JONES:
19    Q.  Mr. Bejar, you were given copies of the
20 reports of Drs. Ferrara and Starr; is that right?
21    A.  Copies of -- was that three reports?  Two
22 by Dr. Ferrara and one by Dr. Starr yesterday.
23    Q.  Okay.  And did you have an understanding of
24 why you were given copies of those reports?
25    A.  I believe it's because they had to do with

Page 47

1 my testing and some of the things that I testified
2 to in my -- in the last three days we were here
3 talking through all of these issues.
4    Q.  And you -- I believe you testified earlier
5 that you reviewed the reports yesterday; is that
6 right?
7    A.  Yes.  I testified earlier that I had to do
8 some level of review.  Again, 100-page report
9 whatever, there's only so much you can do the day
10 before.
11    Q.  And so it sounds like you did not -- and
12 it's okay if the answer to this is yes, but it
13 sounds like you did not review the entirety of the
14 three reports that you were given; is that right?
15    A.  There was not enough time to review the
16 entirety of all three reports with the right amount
17 of detail that I would have liked in order to be
18 able to address -- I mean, I guess when -- if they
19 come up today, I'm going to need to look at the
20 paragraphs and the things that I might have
21 questions about.
22    Q.  But, sitting here today, you've not read
23 any of those expert reports at a level of detail
24 that allows you to respond to questions about any
25 specifics; is that right?

Page 48

1       MR. CARTMELL:  Object to the form.
2       THE WITNESS:  No, that's not accurate at
3 all; right?  I mean, I read sections of the reports
4 that had to do with, for example, algorithmic stress
5 testing and the misrepresentation of the testing
6 that I did.  That part I did read closely.
7       Now, the reports included lots of other
8 areas.  Like, for example, Dr. Ferrara's report
9 included areas talking about pooling policies and
10 processes.
11       I did get a chance to skim that and have an
12 understanding of that and what might be some of the
13 flaws in the thinking that he has around it, in the
14 same way that I think Dr. Starr's report, I was able
15 to review parts of it that I think, again,
16 mischaracterize the kind of harm that has to do with
17 sexualized content of children on the platforms, as
18 well as sort of like the criteria you use to assess
19 whether that harm is sufficiently addressed.
20       And so I got the reports.  It's a 100-page
21 report.  I didn't read the 100 pages and annotate
22 them as I did; I focused on some areas that
23 addressed things that I've tested or work that I've
24 done.  And I also have some cursory knowledge and
25 thoughts on the other parts of the report, although

Page 49

1 I did really appreciate Dr. Ferrara's comments about
2 the Facebook immune system.
3 BY MS. JONES:
4    Q.  Mr. Bejar, at this point, I'm just asking
5 if you have opinions or not.  I don't need to hear
6 what all of them are at this moment.
7       Based on your review of those reports, do
8 you have opinions in response to what you reviewed
9 in the reports of Dr. Ferrara and Dr. Starr?  And,
10 again, I'm not asking you to lay them all out at the
11 moment.  I'm just asking do you have responsive
12 opinions to those reports?
13    A.  I have responsive opinions to some of the
14 things that I've read and reviewed on those reports,
15 and I can have opinions on the whole report given
16 more time with it.
17    Q.  Do you know anything about the specific
18 plaintiffs whose cases have been brought in this
19 litigation?
20       MR. CARTMELL:  Objection.  Vague and
21 ambiguous.
22       THE WITNESS:  Can you be more precise what
23 you mean?  Do I know anything about --
24 BY MS. JONES:
25    Q.  Well, for example, do you know the names of

13 (Pages 46 - 49)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 50

1 any of the individual plaintiffs who have brought
2 lawsuits against the defendants in this litigation?
3    A.  I don't believe that I do.
4    Q.  Go ahead.  Were you finished?
5    A.  No.  Sorry.  I don't believe that I know
6 the names of individual plaintiffs on this
7 litigation.  I mean, I do know the states, for
8 example, and the states that I've talked to, but I
9 don't have a complete list of those.
10    Q.  That's fair.  You're referring to the state
11 attorneys general who have brought lawsuits; is that
12 right?
13    A.  Yeah.
14    Q.  And I should have been more clear.  My
15 question was focused on the individual plaintiffs
16 who have brought claims that are not the state
17 attorneys general.
18        Are you familiar with the names of any of
19 those individuals?
20    A.  Not that I recall.
21    Q.  And it sounds like you have not, as part of
22 your role as an unretained expert, gotten into the
23 details of any individual plaintiff's specific
24 circumstances or claims; is that right?
25        MR. CARTMELL:  Object to the form.

Page 51

1        THE WITNESS:  Can you be more specific,
2 please?
3 BY MS. JONES:
4    Q.  Well, for example, do you know the medical
5 history or clinical diagnosis or specific harms that
6 have been alleged by individual plaintiffs, any
7 individual plaintiff in the litigation?
8        MR. CARTMELL:  Object to the form.  Vague
9 and ambiguous.
10        THE WITNESS:  So you're asking me if I read
11 medical records?  What else?
12 BY MS. JONES:
13    Q.  I said medical records, clinical diagnoses
14 or alleged harm for any specific individual
15 plaintiff in the litigation.
16        MR. CARTMELL:  Same objection.
17        THE WITNESS:  I don't -- I'm not aware of
18 medical records.  I'm not aware of clinical
19 diagnoses.  I can definitely talk about harms in as
20 much detail as you would like me to.
21 BY MS. JONES:
22    Q.  At least as reflected in Exhibit Number 1,
23 which I understand you had not seen before today,
24 your opinions seem to be focused on Instagram.
25        Do you have specific opinions related to

Page 52

1 Facebook?
2        MR. CARTMELL:  Object and move to strike
3 the statement of counsel.  And misstates and
4 mischaracterizes prior testimony.
5        THE WITNESS:  Can you please repeat the
6 question?
7 BY MS. JONES:
8    Q.  Yes.  My question was do you have specific
9 opinions related to Facebook?
10        MR. CARTMELL:  Same objection.
11        MR. WARD:  Objection as to form.
12        THE WITNESS:  That's pretty vague.  Can you
13 tell what you mean by "specific opinions"?
14 BY MS. JONES:
15    Q.  Well, you offered a number of opinions at
16 your first deposition; correct?
17    A.  Correct.
18    Q.  And we at least have received this
19 designation from counsel at Exhibit Number 1 about
20 the platforms run by the company, issues that you
21 have raised with respect to those platforms.
22        Do you have opinions -- and I don't need to
23 know all of them at the moment, but do you have any
24 opinions that are specific to Facebook as opposed to
25 general opinions?

Page 53

1        MR. WARD:  Same objection as to form.
2        MR. CARTMELL:  Same objection.
3        THE WITNESS:  Yeah.  I mean, I think --
4 you're asking me do I have opinions.  That seems
5 like really broad.
6 BY MS. JONES:
7    Q.  My question was --
8    A.  So can you ask me do I have opinions on
9 specific areas or --
10    Q.  My question is do you have specific
11 opinions with respect to Facebook?
12        MR. CARTMELL:  Same objection.
13        MR. WARD:  Same objection.
14        THE WITNESS:  Again, the question seems
15 pretty vague to me, and I would really appreciate it
16 if you were specific.  Because if you're asking me
17 do I have specific opinions about different things,
18 that feels really broad to me.  And so I want to
19 make sure that I'm able to be more specific.  So if
20 you could please be more specific.
21 BY MS. JONES:
22    Q.  Let me ask you this:  You have purported to
23 have run a number of tests on Instagram; right?
24    A.  I have run a number of tests on Instagram.
25    Q.  Yes.  Did you do similar work with respect

14 (Pages 50 - 53)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 54

1 to the platform Facebook?
2      A.   Yes, I did, while I was employed there for
3 like six years.
4      Q.   Okay.  So --
5      A.   Absolutely.
6      Q.   -- you're referring to the period between
7 2009 and 2015; is that right?
8      A.   Yeah.  That's correct.
9      Q.   After you left the company in 2015, have
10 you done any testing with respect to Facebook?
11      A.   Yes.
12      Q.   What is that?
13      A.   So, for example -- and, again, this is not
14 intended to be comprehensive -- in, I think,
15 before -- I don't recall the exact date of this,
16 but, as you know, I manage the page of Philip Glass'
17 Days and Nights Festival.  And there was --
18      Q.   Mr. Bejar, could I just pause and ask you a
19 more focused question?  Because I think you're about
20 to answer something that's absolutely more broad.
21 It will be a timesaver.  I don't need to hear about
22 Philip Glass.  I actually do want to be more
23 focused.
24      Mr. Bejar, have you run testing on Facebook
25 that you conducted to evaluate the safety systems on

Page 55

1 Facebook with respect to teen users since 2015?
2      A.   I mean, what I was going to answer was
3 extremely relevant to the conversation that we're
4 having right now, but --
5      Q.   Well, that -- it sounded like you were
6 talking about Philip Glass, who has not been a
7 teenager for a long time.
8      A.   I was -- I was a moment away from saying
9 that --
10      Q.   Yes.  Go ahead.
11      A.   That account got sent through messages,
12 like, a pornographic video that was extremely
13 graphic and disturbing.  And I tested whether there
14 were different ways of reporting that video.  And
15 there was no way for the page receiving that video
16 to report that.
17      And that's important because when we talk
18 about a specific harm and we talk about the testing
19 that I've done on Instagram, one of the key
20 questions is if you have a harmful experience, are
21 you able to effectively report it.
22      And so I have done that kind of testing on
23 Facebook when it comes to sexual messages.  I've
24 also done it in terms of, like, scams and
25 Marketplace.  Like when you're in Marketplace, and

Page 56

1 somebody is trying to scam you, is there a reporting
2 option that you have to deal -- in doing that?
3      And so I have, like, on an ongoing basis,
4 ever since I left, sometimes I run into these
5 issues.  I also run into issues with, like,
6 impersonation that I have raised to the company.
7      So, I mean, it's something that I do on an
8 ongoing basis, this kind of testing, similar to what
9 I did specifically for Instagram.
10      Q.   The testing you're describing with respect
11 to Mr. Glass' account, when did that happen?
12      A.   I don't recall the date.
13      Q.   Was it before or after 2020?
14      A.   I don't recall the date.
15      Q.   Have you documented anywhere the testing
16 that you did?  And by that I mean did you write down
17 somewhere, This is how I did the testing and this is
18 what happened?
19      A.   I mean, I think when you talk about writing
20 down this is a test I did and what happened, you
21 have to take into account that when I was working
22 for Facebook for all of those years, this kind of
23 testing, which I would regularly bring to the
24 attention of Mark Zuckerberg, Sheryl Sandberg, Chris
25 Cox, Adam Mosseri, Will Cathcart, Mike Schroepfer,

Page 57

1 is -- is something that -- actually, it's not just
2 something that I did -- oh, I'm speeding now.  Thank
3 you.
4      THE STENOGRAPHER:  It's not just something
5 that I did...
6      THE WITNESS:  Yeah.  It's not just
7 something that I did; it's something that other
8 people in the team did and other people that I hired
9 at Yahoo to do.  It's -- and usually how it works is
10 they're kind of aware of an issue.  You try to test
11 it or reproduce it.  And if you find something, you
12 record what you find, and that is what you share.
13      And so I can't recall a single instance in
14 the six years I was working at Facebook where I had
15 to write, like, I'm going to test this, and tell
16 Mark, "I'm going to test this."  And then "This is
17 kind of the result of the test."
18      It was always trusting my experience and
19 judgment of not just me, but all the people that
20 worked in the team -- I mean, this is what red
21 teaming testing does on the outside, is you look at
22 a product to see if you can find any vulnerabilities
23 with it.
24      And so that's the kind of testing that I've
25 done my entire career, and that was consistent with

Golkow Technologies,
A Veritext Division

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 58

1 the testing I did for Instagram.
2 ***   MS. JONES:  Would you also just mark this
3 part of the transcript.  I'm going to move to strike
4 that as nonresponsive.
5 BY MS. JONES:
6   Q.  Mr. Bejar, my question was with respect to
7 the testing that you said you did as to Mr. Glass'
8 Facebook account, did you write down anywhere, "This
9 is how I did the testing and this is what happened"?
10   A.  I believe I sent an email to somebody on
11 the Pages team or somebody -- but I don't recall
12 when it was or how it was done -- saying, "There's
13 an issue that you cannot report this kind of thing
14 in Pages."
15   Q.  Is that the only documentation you're
16 recalling at the moment?
17   A.  That I can recall.  And I don't know if
18 I -- it might have been done while I was inside the
19 company or was sent through a message or a DM.  I
20 don't recall -- or even like a call.
21       Sometimes I would call people on issues
22 that I had found around security, because people
23 would appeal to me on security issues after I left
24 the company.  And I would then communicate those to
25 people inside the company.

Page 59

1   Q.  With respect to the testing you described
2 with respect to scams and impersonation, same
3 question.  Did you document anywhere, This is how I
4 did the testing and this is what the testing showed?
5   A.  As I've already covered in my previous
6 answer, when I would run into an issue like that, I
7 would send a message to different people within the
8 Instagram or Facebook organization so that they
9 could fix it.  And that process that I followed
10 there, kind of the logistics around it, was
11 consistent.
12       And sometimes I provided screenshots.
13 Sometimes I described the issues.  Sometimes it
14 would be over the phone.
15       I mean, I think because of the amount of
16 expertise and experience that I have in the field,
17 people trusted that if I -- or people that I worked
18 with and trusted or people that I hired to do that
19 kind of testing within the company -- or if a third
20 party reproduced that kind of testing, as security
21 auditors do, that that would be -- like, a color or
22 description would be a good indicator that there was
23 an issue that needed to be investigated.
24       MS. JONES:  I'm going to move to strike as
25 nonresponsive.

Page 60

1 BY MS. JONES:
2   Q.  My question was do you have any
3 recollection as to this testing you did on scams and
4 impersonation --
5   A.  I do have recollection --
6   Q.  Excuse me -- I was not finished with my
7 question.
8   A.  I'm sorry.
9   Q.  Do you have any recollection as to this
10 testing you did on scams and impersonation, whether
11 there is any documentation of you laying out, This
12 is how I did the testing and this is what the
13 testing showed?
14   A.  So as I've already answered in the previous
15 answer to this question, when I do this kind of
16 scenario testing or looking into things, usually the
17 proof is in the pudding, right, that you sometimes
18 need to describe where the issue is.
19       Sometimes you get a screenshot or a video
20 of the issue playing out.  This can take different
21 forms.
22       And in the -- for example, when I was at
23 Yahoo, I hired a team to do this kind of testing.
24 There was a whole unit within the company.  Facebook
25 had a similar team that did kind of similar kinds of

Page 61

1 testing.  And in those teams and those processes and
2 within the recon and response team, for example,
3 within site integrity that focused on discovering
4 new issues -- you keep talking about, like, writing
5 a test in advance and then doing the testing.
6       And for most of my career -- in different
7 context that I've been in -- you do the testing and
8 the testing -- shares the findings.  A framework
9 where you talk about writing the test in advance is
10 more akin to, like, unit testing, which is -- again,
11 I can talk about in detail if you would like me to.
12       MS. JONES:  I'm going to move to strike as
13 nonresponsive.
14 BY MS. JONES:
15   Q.  I want to just make sure -- there's no
16 document somewhere that says:  "I, Arturo Bejar, did
17 testing on Facebook with respect to how it handles
18 scams and impersonation, and this is what my testing
19 showed"?  Is there a document that you're thinking
20 of?
21   A.  I mean, I believe I have answered this
22 question already.  If there's an email where I sent
23 saying you cannot report this in this context, I
24 consider that to be documentation of an issue.
25       If I took a screenshot or recorded a video

16 (Pages 58 - 61)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 62

1 of the issue, and I then sent and shared that, I
2 consider that to be documentation of the issue.
3     And this is not just me. I mean, this is,
4 again, people that work at Facebook, people that
5 work at Yahoo, people that do red team penetration
6 testing or scenario testing for independent
7 companies, that's -- that's how that works.
8   Q.  And when you say, "I took a screenshot and
9 I sent it to someone," or, "I sent an email to
10 someone," that's what you're describing as your --
11 kind of documentation of your testing? I just want
12 to make sure I understand.
13   A.  As I answered in my previous answers to
14 this sort of line of questions, I believe sending a
15 screenshot of an issue or sharing a video of an
16 issue is an example of documentation of testing.
17     Sometimes you have to provide a little bit
18 of sort of more triangulation information so that
19 people know where the issue can be found and
20 reproduced. And so I believe I've done that as well
21 in different scenarios or different contexts.
22   Q.  Mr. Bejar, since we last spoke in April,
23 you continue to have social media accounts; is that
24 right?
25   A.  Yes, I have.

Page 63

1   Q.  Do you still have a Facebook account?
2   A.  Yes, I do.
3   Q.  You have not deleted your Facebook account?
4   A.  No. As a 50-year-old man that still has
5 some friends on Facebook that is not able to stay in
6 touch with them otherwise, I have chosen to keep my
7 Facebook account, even though it's somewhat
8 reluctantly given.
9     Like, I used to post a lot more then. I
10 used to. But I kind of have dialed that back
11 because -- yeah, it's kind of hard.
12   Q.  So I just want to make sure I understand.
13     Sitting here today, you still have a
14 Facebook account; yes?
15   A.  I believe I already answered the question.
16 As a 54-year-old man that still has a Facebook
17 account, uses it to stay in contact with a few
18 friends that I would not be able to be in contact
19 otherwise. But I do it reluctantly because I
20 clearly have profound reservations about how the
21 company treats teenagers.
22   Q.  Do you still have an Instagram account?
23   A.  As I answered your previous question, as a
24 50-year-old man and photographer and artist, I still
25 have an Instagram account because it provides some

Page 64

1 outlet for artwork that I do, including photographs
2 of nature and other things.
3     I have, again, lowered my posting
4 significantly from that because of the reservations
5 that I have; but, sadly, there's no alternative to
6 Instagram if you're an artist. And so it's -- if
7 you take yourself out of Instagram, you -- it's
8 really hard to get attention on your work otherwise,
9 which is pretty shameful.
10   Q.  You have spoken publicly on a number of
11 occasions about your daughter's experiences on
12 Instagram; yes?
13     MR. CARTMELL: Objection. Asked and
14 answered. And beyond the scope of this deposition
15 that is supposed to be about his unretained expert
16 opinions. We've covered that extensively before.
17 BY MS. JONES:
18   Q.  You can answer the question.
19   A.  Can you repeat the question, please?
20   Q.  You have spoken publicly on a number of
21 occasions about your daughter's experiences on
22 Instagram; correct?
23     MR. CARTMELL: Same objections.
24     THE WITNESS: I believe that we covered the
25 issue of my daughter and her experiences on

Page 65

1 Instagram quite extensively the last time I was
2 deposed. I think we spent a significant amount of
3 time answering that.
4 BY MS. JONES:
5   Q.  Well, I'm asking you the question today.
6     Are you refusing to answer the question
7 today?
8     MR. CARTMELL: Same objection.
9     MR. WARD: He's not refusing to answer.
10     Go ahead and answer the question.
11 BY MS. JONES:
12   Q.  Do you need me to repeat the question?
13     My question is you have spoken publicly
14 about your daughter's experiences on Instagram;
15 correct?
16     MR. CARTMELL: Same objections.
17     THE WITNESS: As I answered in my previous
18 deposition around all of these issues, I do talk
19 publicly in different contexts about the experiences
20 that my daughter had when she was 14, 15, 16. Now
21 that she's an adult, out of respect for her privacy,
22 I try to not talk about these things as much
23 because -- now that she's an adult.
24     I mean, really, the area that I focus, the
25 things I talk about, is the experience, as I covered

17 (Pages 62 - 65)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 66

1  last time, that she had as a minor and the
2  experiences that her friends had, and then how that
3  relates to the findings of the BEEF work.
4  BY MS. JONES:
5     Q.  Today your daughter still has a public
6  account on Instagram; correct?
7     A.  As we talked about this in the last
8  deposition, she had an Instagram account in the last
9  deposition when you asked me about it.  And now she
10 still has an Instagram account that's public that
11 she uses professionally.
12     MS. JONES:  Let me ask you to take a look
13 at what we're going to mark as Exhibit Number 2.
14     (Exhibit 2 was marked for
15     identification and is attached to the
16     transcript.)
17 BY MS. JONES:
18    Q.  Mr. Bejar, you have in front of you --
19 actually, before we move on, let me ask you.
20    Does your son still have an Instagram
21 account today?
22    A.  I mean, I think we -- asked me this last
23 time.  I haven't checked with him recently about it.
24 He might.  He doesn't -- I don't know if he's active
25 or not.  I would have to ask him about it.

Page 67

1     Q.  Let me --
2     A.  It's very different between my son and my
3  daughter because for my daughter, it's important for
4  her professionally.
5     Q.  Let me ask you to take a look at what we've
6  marked as Exhibit Number 2, which bears the Bates
7  stamp BEJAR 2707.
8     Do you see that?
9     A.  I do.  Yes.
10    Q.  Have you seen Exhibit Number 2 before?
11    A.  I have, yes.
12    Q.  Are you the person who wrote Exhibit
13 Number 2?
14    A.  Yes.  I am.
15    Q.  I want to ask you some questions about
16 Exhibit Number 2.
17    So Exhibit Number 2 is entitled "Source
18 Materials for Report."
19    Do you see that?
20    A.  Yes.
21    Q.  The first question is what report is that
22 referring to?
23    A.  I don't know yet.  These notes are a rough
24 draft that I intend to use in some way that I
25 haven't yet sort of finalized.  And so what I wanted

Page 68

1  to do is I was using this as a way of gathering
2  information that could be used for different things
3  that I haven't yet decided on.
4     Q.  When did you create Exhibit Number 2?
5     A.  I think in the last -- I think sometime
6  between, like, May and -- yeah, between May and
7  June.
8     Q.  Of 2025?
9     A.  Of 2025, yeah.
10    Q.  And you said you weren't sure exactly what
11 the report would be used for.
12    Do you have plans to make use of the report
13 in the context of this litigation?
14    A.  This report has absolutely nothing to do
15 with this litigation.  I was just capturing rough
16 notes about sort of testings and observations, like.
17    And so I don't think of this report at all
18 as having to do with the things that are applicable
19 here.  The things that are applicable here is what I
20 testified about the last time I was here and the
21 videos that I've produced.
22    This is just a rough draft.  But I'm not
23 sure where or how I'm going to use it yet.
24    Q.  Okay.  The first sentence of Exhibit
25 Number 2 says:

Page 69

1     "In March of 2025, we undertook a
2     comprehensive review of Meta's teen
3     accounts and all of the safety tools in
4     Instagram."
5     And then it says "as listed in" and
6  there's a web address there.
7     Do you see that?
8     A.  I do, yes.
9     Q.  Is this comprehensive review that's
10 described here different than the testing that you
11 already discussed at your first deposition?
12    A.  The -- so the things that are contained
13 within the spreadsheets that was produced as part of
14 this deposition was the foundation of the testing
15 that I was doing.
16    Now, this is, again, rough report, and I'm
17 pretty sure that I will, like, retest and do other
18 things around it as I kind of move forward on it.
19    Q.  Yeah.  And I guess my question was a little
20 bit more specific, which is:  Is this describing
21 anything different than what we talked about at your
22 deposition in April?
23    A.  No.  This describes the spreadsheet that I
24 submitted as part of the subpoena that I got on my
25 deposition.

18 (Pages 66 - 69)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 70

1  Q.  And it says --
2  A.  And other sort of thinking about it.
3  Q.  I'm not sure what you mean by "and other
4  sort of thinking about it."
5      What does that mean?
6  A.  Again, so this is a rough report.  But, I
7  mean -- again, and I just want to sort of say that I
8  want to be clear that this is me sort of writing
9  thoughts for myself that then I would edit and use
10 in other areas.  So there's going to be parts of it
11 where I'm going to be like, Well, that's not a fully
12 fleshed-out thought.
13     But one of the things that I really spent
14 time thinking about, which is an example to the
15 question that you asked, is sort of like the
16 importance of something that's a safety tool being
17 resilient; for example, in terms of, like, if you
18 give it unexpected inputs, does the safety tool fail
19 closed or does it fail open?
20     And that's an example of something that I
21 think I might have covered in the deposition, but I
22 felt that my way of articulating that is getting
23 better over time.  But it's consistent with
24 everything I've testified last time.
25 Q.  The first sentence in Exhibit Number 2

Page 71

1  says:  "In March of 2025 we undertook."
2      Who is "we"?
3  A.  It was the royal "we."
4  Q.  Okay.  So the references throughout this
5  document in the plural form are just you referring
6  to yourself in the royal form?
7  A.  Yeah.  That is correct.
8  Q.  So there is not another person who is
9  working with you on what's described here?
10 A.  No, not in the testing that was done in
11 March 2025.
12 Q.  Let me ask you to look at page 7.  It ends
13 in 708, which is page 2.
14 A.  Okay.
15 Q.  And about midway down the page, there's a
16 reference to "a note on reporting."
17     Do you see that?
18 A.  Yep.
19 Q.  Then it says:
20     "Reporting should not be."
21     Do you see that?
22 A.  Yep.
23 Q.  And that looks like it's just a sentence
24 that hasn't yet been built out because this is a
25 draft; is that right?

Page 72

1  A.  That is correct.  It's a rough note.
2  Correct.
3  Q.  And then a little further down it says:
4      "All these tests were done using
5      avatar teen accounts."
6      And then it describes what an avatar
7  is.
8      Do you see that?
9  A.  I do, yes.
10 Q.  Is that a reference to the accounts that
11 you created and that we talked about at your first
12 deposition, or is that referring to a different set
13 of avatar teen accounts?
14 A.  In this context it's referring to the teen
15 accounts that I created that I've already testified
16 about in my first deposition.
17 Q.  Is there any other testing that you have
18 done that involves the creation of what you describe
19 as avatar accounts?
20 A.  What I've been doing is I've begun
21 conversations with different academic and other
22 entities about using the protocols that I defined to
23 do sort of similar testing.
24     Because I do think that -- I was really
25 surprised when I did my testing that, as far as I

Page 73

1  could discern, these products did not have red team
2  security scenario testing when they went live,
3  because of the canceled things that I found so
4  quickly.
5      And so I think it's important for there to
6  be such independent testing.  And so what I have
7  done is I have been working with different entities
8  and institutions on having the testing protocols
9  replicated and updated regularly so they provide an
10 accurate picture of how the product is working that
11 day, which is also, I should say, separate from what
12 I found of how the product was working during the
13 time that I did the testing.
14 Q.  In the next paragraph, it says:
15     "Meta has been claiming recently
16     that independent tests of their
17     products are 'manufactured.'"
18     Do you see that?
19 A.  I do, yes.
20 Q.  What are you referring to specifically when
21 you say, "Meta has been claiming recently"?  Are you
22 referring to a particular person or other
23 communication?
24 A.  So different examples of that.
25     When the Wall Street Journal published an

19 (Pages 70 - 73)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 74

1 article based on Dr. Edelson's work on the
2 recommendation of sexual content to Instagram
3 accounts, Meta says, "Well, that's not
4 representative of what's happening."
5        And when designing for us, an accountable
6 tech published their article in the Washington Post
7 about the wrong test about the nature of the content
8 that in -- I think recent -- last month -- was
9 getting delivered to a teen account.  And they were
10 talking about some of the recommendations that they
11 got.
12        Again, Meta was claiming that's not
13 representative.
14        And I think that's a really misleading way
15 of framing what's important about the testing that I
16 have done and the testing that Laura Edelson and the
17 Washington -- and the Wall Street Journal did, and
18 the testing that design did for us and the
19 Washington Post published did.
20    Q.   And that's what you're referring to on
21 page 708?
22    A.   That's correct.
23    Q.   A little further down in that paragraph, it
24 says:
25        "There is an appendix listing out

Page 75

1        methodology, and we encourage people to
2        do independent testing."
3        Do you see that?
4    A.   I do, yes.
5    Q.   Now, there's not an appendix that we saw
6 associated with this document, but that just means
7 it has not been drafted yet, or does it exist
8 somewhere?
9    A.   No, it hasn't been drafted yet.  These are,
10 again, rough notes, early things.  And, as I said,
11 one of the things that I think is really important
12 is other people need to be doing testing like I have
13 done in order to help improve understanding of how
14 these features are implemented.
15        And so I'm helping other people define
16 their methodologies so they can then do their
17 testing in understanding of how the product works
18 and what it could do.  And this is sort of what my
19 expertise has to offer of, like, how you test these
20 things from a safety and security standpoint.
21    Q.   But that -- what you just described in
22 terms of your view on the methodology, that has not
23 been written out in the form of the appendix yet?
24    A.   As I talked about, I'm talking to different
25 people about these issues.  I'm helping them define

Page 76

1 their methodology.  I'm now, like, a fellow for NYU
2 and Northeastern and a research affiliate, I think
3 it's called, helping them define their testing
4 protocols.
5        I mean, I'm talking to multiple parties
6 about this, but I haven't written the document that
7 is referred to here yet because, again, I don't know
8 what I'm going to write or not write around this.
9 This is just me sort of creating sort of rough notes
10 around these issues.
11        And so a lot of these things are going to
12 be incomplete, or there's not going to be that.  I
13 mean, this was produced on your subpoena as an
14 abundance, of, like, transparency.
15    Q.   At the bottom of the page 708, it says:
16        "Report is done on a number of
17        sections."
18        And then carrying over to the next page, it
19 lists different topics?
20    A.   Uh-huh.
21    Q.   Six different topics.
22        Do you see that?
23    A.   That's correct.
24    Q.   And, again, this review of the document,
25 there are some of these topics that have been built

Page 77

1 out and some that have not; is that right?
2    A.   That is correct.
3    Q.   Do you have a timeline in mind for when you
4 plan to finish this report?
5    A.   I do not.  As I said, I don't even know
6 what report or reports or what form this will take.
7        This is, again, rough notes to help me
8 structure sort of my thinking and talking points
9 around it, and what I would write or flesh out if it
10 were to turn into a report.
11        MS. JONES:  Why don't we take a break.  I
12 think we've been going --
13        MS. WANG:  Can I just state for the record
14 my appearance?  I should have done it earlier.
15        I'm Vivian Wang, Deputy Attorney General
16 for the People of the State of California and the
17 MDL.
18        THE VIDEOGRAPHER:  Stand by.  The time
19 is 9:47 a.m., and we're going off the record.
20        (Recess taken.)
21        THE VIDEOGRAPHER:  The time is 10:06 a.m.,
22 and we are back on the record.
23 BY MS. JONES:
24    Q.   Mr. Bejar, I'm going to ask you to go back
25 to Exhibit Number 1.  And go to page 3, if you

Golkow Technologies,
A Veritext Division

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 78

1 would, please.
2    A.  I'm sorry.  I couldn't hear you.  Page?
3    Q.  Three.  And, actually, you might want to
4 start with page 2 because it kind of frames the list
5 of bullets that carry over to page 3.
6        There's a line towards the bottom of page 2
7 that says:
8            "Mr. Bejar may offer testimony on
9        the following subject matters."
10    A.  I see that.
11    Q.  And then there's a series of bullets that
12 starts on page 2 and carries over to page 3.
13        Do you see that?
14    A.  I see that.  Yes.
15    Q.  And the second bullet on page 3 refers to:
16            "His personal knowledge and
17        experience of harms associated with
18        Meta's platforms, including
19        addiction/problematic use, anxiety,
20        depression, eating disorders, body
21        dysmorphia, suicidality, self-harm, and
22        sexualization."
23        Do you see that?
24    MR. CARTMELL:  I'd just renew our
25 objections to your questioning about this document.

Page 79

1 Lacks foundation.  Calls for speculation and legal
2 conclusion.
3        MS. JONES:  And you do have a standing
4 objection, Counsel.
5        MR. CARTMELL:  No, I know.  But you went
6 away for a minute and you came back.  I want to
7 renew it.
8        MS. JONES:  Okay.
9 BY MS. JONES:
10    Q.  Mr. Bejar, you can answer the question.
11        Do you need me to ask you the question
12 again?
13    A.  Yes, please.
14    Q.  The second full bullet refers to:
15            "His personal knowledge and
16        experience of harms associated with
17        Meta's platforms, including
18        addiction/problematic use, anxiety,
19        depression, eating disorders, body
20        dysmorphia, suicidality, self-harm, and
21        sexualization."
22        My question was: Do you see that?
23    MR. CARTMELL:  Same objection.
24    THE WITNESS:  Yes, I see that.
25 ///

Page 80

1 BY MS. JONES:
2    Q.  One question I wanted to ask.  And I'm
3 mindful of the fact -- and counsel has made this
4 objection that this is not a document you have seen
5 before today.
6        But one question I had was do you have
7 personal experience with all of the issues that are
8 listed in that bullet?
9    A.  Can you be more specific, the specific
10 issue on the list, please?
11    Q.  Sure.
12        Addiction and problematic use.  Do you have
13 personal experience with that?
14    MR. CARTMELL:  Object to the form.  Vague
15 and ambiguous.
16    THE WITNESS:  So what do you mean by
17 personal experience in the context of addiction and
18 problematic use?  Or -- yeah, what do you mean?
19 BY MS. JONES:
20    Q.  Do you have personal experience in your
21 life, either through your family or close friends,
22 with addiction or problematic use?
23    MR. CARTMELL:  Same objection.
24    THE WITNESS:  Do I have experience in my
25 life, family or friends, with addiction or

Page 81

1 problematic use?
2        Yes, I have experience in my life.  Within
3 that, I also have experience and knowledge of the
4 domain from my internal perspective.
5 BY MS. JONES:
6    Q.  And I guess my question is the same with
7 respect to anxiety, depression, eating disorders,
8 body dysmorphia, suicidality, self-harm, and
9 sexualization.
10    MR. CARTMELL:  Same objection.
11    THE WITNESS:  Could you ask the question,
12 like, again, please, for them.
13 BY MS. JONES:
14    Q.  Do you have personal experience with
15 anxiety?
16    A.  In which context?
17    Q.  Do you remember what we talked about just a
18 minute ago, what I meant by "personal experience"?
19    A.  You mean with my life, with family and
20 friends, do I have personal experience?
21    Q.  Yes.
22    A.  Yes, I do.
23    Q.  What about depression?
24    A.  Yes, I do.
25    Q.  What about eating disorders?

21 (Pages 78 - 81)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 82

1    A.  Yes, I do.
2    Q.  What about body dysmorphia?
3    A.  Yes, I have experience with that as well in
4  personal.
5    Q.  What about suicidality?
6    A.  Yes, I have experience with that in my
7  personal life.
8    Q.  What about self-harm?
9    A.  I think in that context, it depends on how
10  you define self-harm.  I don't have personal
11  experience.  I have experience when it comes to
12  things like cutting, although I have helped -- the
13  examples I can think of had more to do with
14  suicidality than self-harm within personal
15  experience.
16       I have lots of personal experience with
17  self-harm content and reporting flows and issues
18  around that within the company.
19    Q.  And what about sexualization?
20    A.  I do not have -- had experience of that
21  with direct family.  I have had experience of
22  talking to parents of kids that have been groomed or
23  talking to kids that have been survivors, who are
24  now adults, who had survived being groomed or those
25  kinds of related issues, including the creation of

Page 83

1  exploitative content that then led to grooming.
2    Q.  Do you know what the DSM-5 is?
3    A.  Yes, I do actually.
4    Q.  What does "DSM" stand for?
5    A.  So my partner, ▮▮▮▮▮ is a
6  psychologist, and I know it's the catalog of
7  clinical or psychological definitions when it
8  relates to a set of issues.
9       But I don't recall right now what the words
10  "DSM" stands for.
11    Q.  Do you know who is responsible for creating
12  it, the DSM-5?
13    A.  I don't know who is responsible for
14  creating the DSM-5.
15    Q.  Are you familiar with what the APA is?
16       MR. CARTMELL:  I'm sorry.  I couldn't hear
17  you.
18  BY MS. JONES:
19    Q.  I said are you familiar with what the APA
20  is?
21    A.  Are you referring to the American
22  Psychological Association?
23    Q.  I was referring to the American Psychiatric
24  Association.
25       Are you familiar with that?

Page 84

1    A.  I was off by one profession on that one.
2       Yeah.  I am familiar with the American
3  Psychiatric Association.
4       But, again, I think when you talk about
5  these issues, there's a separation between sort of
6  clinical or academic expertise when it comes to
7  these labels versus product and product development
8  expertise or experience when it comes to these
9  issues, as well as lived experience within family,
10  friends, or people that I have talked to around
11  these issues.  So I just wanted to -- so I think
12  those are important distinctions in this context.
13       MS. JONES:  Okay.  And I'm going to move to
14  strike everything after the word "association."
15  BY MS. JONES:
16    Q.  I think you've already said this.  You
17  understand that, among other things, clinicians use
18  the DSM-5 to diagnose patients who might have
19  clinical disorders?
20    A.  I believe that we already covered all of
21  this ground in the deposition that I did, because I
22  remember you asking me related questions about sort
23  of clinical diagnosis around these issues.
24       And so I believe I answered that already.
25  But I am familiar that there are criteria that

Page 85

1  clinicians use to establish the clinician definition
2  about these words within that context.
3    Q.  Do you have an understanding, sitting here
4  today, that the DSM-5 does not recognize a clinical
5  condition of social media addiction?
6    A.  Again, if you're asking me my -- questions
7  around clinician knowledge of these issues or
8  clinician institutions around all of these issues, I
9  am not a clinician.  I am not trained as a
10  psychologist or psychiatrist.
11       I have what -- what I do have in the
12  context of addiction or problematic use is a wealth
13  of experience as to what would be details within
14  product of problematic use; about ways that the
15  product is designed so that it can cause -- just
16  extensive use of the product in a way that might
17  negatively impact the kid's life, what would be
18  effective interventions within the product developed
19  in conjunction with clinicians and academics that
20  would help with that.
21       I have expertise on what is sort of within
22  the log files and context and records that the
23  company has about usage.
24       I have expertise about product design
25  around all of these issues.

22 (Pages 82 - 85)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 86

1      And so when I talk about these issues, I
2  talk about all the experience I have, all building
3  effective interventions when it comes to safety
4  issues.
5      I don't talk about it from the perspective
6  of a clinician because it's not where my expertise
7  lies.  My expertise lies into effective
8  interventions within the product, amongst many other
9  areas.
10      MS. JONES:  I'm going to move to strike as
11  nonresponsive.
12  ***     Could you also mark this portion of the
13  transcript.
14  BY MS. JONES:
15      Q.  My question, Mr. Bejar, was do you have an
16  understanding, sitting here today, that the DSM-5
17  does not recognize a clinical condition of social
18  media addiction?
19      A.  So I believe that I just answered the
20  question, which is that I am not a clinician, and as
21  a clinician, I do not have the -- I don't -- I don't
22  engage with that literature.  It's not...
23      What I know is -- in the case of addiction,
24  I know how the part is designed that facilitates
25  problematic use or other areas; I know you can

Page 87

1  measure how many notifications a kid gets; I know
2  you can measure how much time a kid spends on the
3  platform; I know what would be effective
4  interventions to get the kid off the platform.
5      So there's a lot of body of knowledge
6  around these issues.  I totally know which kinds of
7  studies the company could conduct, in cooperation
8  with clinicians and academics, that would shed light
9  on all of these issues.  And that's an area where I
10  have a lot of expertise.
11      My area of expertise is not as a clinician
12  and it's not -- it's not as a clinician or a
13  psychiatrist or a psychologist because that's not
14  what I trained in or have extensive experience in.
15      MS. JONES:  I'm going to move to strike
16  that as nonresponsive.
17  BY MS. JONES:
18      Q.  Let me ask you a different question.
19      Have you ever consulted the DSM-5 to see if
20  social media addiction is recognized there?
21      A.  I have not consulted the DSM-5 for any
22  purpose when it comes to these kinds of issues.
23      Again, when you work through these issues
24  as a product manager, engineer, or somebody within
25  the company that understands these issues, is you

Page 88

1  engage with a clinician to develop effective
2  interventions, which I've already covered.
3      Q.  Are you able to point me today to any
4  authoritative source that recognizes the existence
5  of something known as social media addiction?
6      MR. CARTMELL:  Object to the form.
7      THE WITNESS:  Can you repeat the question
8  or be a little more specific, please.
9  BY MS. JONES:
10      Q.  Why don't I repeat the question and see if
11  you can answer on those terms.
12      Are you able to point me today to any
13  authoritative source that recognizes the existence
14  of something known as social media addiction?
15      MR. CARTMELL:  Same objection.
16      THE WITNESS:  I mean, I think that the
17  Surgeon General report highlights a significant
18  number of issues related to this topic and that
19  there's a lot of studies that have been done about
20  it.
21      But, again, my expertise is not in those
22  studies.  My expertise is in -- we should have data
23  about, like, the distribution of time spent on the
24  day of kids on the platform.  The platform should be
25  asking kids how they feel about certain amount of

Page 89

1  time spent.
2      There's a lot of things that the platform
3  needs to be doing.  And that's to establish and
4  understand these issues.  And that's the area where
5  I have a lot of expertise.
6      MS. JONES:  I'm going to move to strike as
7  nonresponsive.
8  BY MS. JONES:
9      Q.  You mentioned the Surgeon General's report.
10  Do you believe that the Surgeon General's report
11  recognizes the existence of a condition known as
12  social media addiction?
13      A.  So if you keep sort of asking me, right,
14  that to point at -- I mean, at a sort of like -- as
15  a clinician, is there a source of literature that
16  defines social media addiction?  Like, you lost me
17  at "clinician."
18      Because if we talk about this in terms of
19  problematic use, right -- because if you're going to
20  take a definition of the word "addiction," right, we
21  can talk about problematic use and then we can talk
22  about what are reasonable ways to approach defining
23  problematic use.
24      How many times is too many times that a kid
25  picks up a phone a day?  How much time is too much

23 (Pages 86 - 89)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 90

1 time spent?  What is the role that the product
2 design is having on the kids' well-being, on whether
3 they're doing homework, whether they're staying up
4 at night, all of these other issues.
5        And these are questions for which there is
6 a ground truth of data in the product, in the
7 company's logs, and the company can run
8 interventions to find it.  And that, I can -- you
9 can ask me any questions you want about that.
10        If you ask me, "As a clinician, have you
11 reviewed documentation," you lose me at "clinician."
12   Q.  Mr. Bejar, do you know that my question did
13 not include the word "clinician"?
14   A.  My understanding of your question --
15   Q.  Well, let me ask you my --
16        MR. CARTMELL:  Hold on.
17 BY MS. JONES:
18   Q.  Let me ask you my question.  I want you to
19 be clear about my actual question.  My question
20 was --
21        MR. CARTMELL:  No.  Wait.
22        MS. JONES:  Counsel --
23        MR. CARTMELL:  I'm not going to let you --
24 he just was finishing his question -- or his answer,
25 excuse me, to your question that you asked him.  He

Page 91

1 gets to finish that.  Then you get to ask your next
2 question.  And like we've done --
3        MS. JONES:  Yeah, I know how this works.  I
4 know how this works.
5        MR. CARTMELL:  Move to strike it.
6 BY MS. JONES:
7   Q.  Let me ask my question again, which did not
8 include the word "clinician."
9        My question is do you believe that the
10 Surgeon General's report recognizes the existence of
11 a condition known as social media addiction?
12        MR. CARTMELL:  Before you answer that, I
13 want to ask Mr. Bejar, were you done with your
14 answer?
15        MS. JONES:  Hold on.  You are not defending
16 this witness.  He has a lawyer here.
17        MR. CARTMELL:  I'm not acting like I'm
18 defending this witness.  I know the rules, and you
19 don't get to cut him off when he's giving an answer.
20        MS. JONES:  And you don't get --
21        MR. CARTMELL:  And you've done it multiple
22 times.  You have.
23        MS. JONES:  Counsel --
24        MR. CARTMELL:  I let you do it once.
25        MS. JONES:  You are being inappropriate.

Page 92

1        MR. CARTMELL:  No, I'm not.  He gets to
2 answer the question, Phyllis.
3        MS. JONES:  You are not permitted to ask
4 the witness questions.  You will get a chance to sit
5 in this chair and ask him whatever you want.
6        MR. CARTMELL:  Let's go off the record.
7        MS. JONES:  No.
8        MR. CARTMELL:  Because I'm not going to let
9 you --
10        MS. JONES:  I have --
11        (Simultaneous speakers.)
12        MR. CARTMELL:  -- not let him finish his
13 answer.
14        MS. JONES:  This is not appropriate.  I
15 need to -- I need to ask my question.
16        MR. CARTMELL:  He needs to finish his
17 answer.
18        MS. JONES:  Your objection has been noted.
19 Are you done?
20        MR. WARD:  Counsel, surely you don't
21 disagree that the witness is allowed to complete his
22 answer before you pose another question?
23        MS. JONES:  I'm not arguing with you two.
24 Certainly not on my time.  I need to ask the witness
25 a question.

Page 93

1 BY MS. JONES:
2   Q.  Do you believe, Mr. Bejar, that the
3 Surgeon General's report recognizes the existence of
4 a condition known as social media addiction?
5 ***    MR. CARTMELL:  Before you answer, I want to
6 mark this part of the transcript showing that the
7 witness was answering and was not allowed to finish
8 his answer.
9        THE WITNESS:  Okay.  So -- sorry.  Can you
10 repeat the question?
11 BY MS. JONES:
12   Q.  Do you believe that the Surgeon General's
13 report recognizes the existence of a condition known
14 as social media addiction?
15   A.  So what I was trying to say when you
16 interrupted me was that I think that in order to be
17 able to talk about something that is a condition --
18 that's the word that you used -- called this and
19 that -- that as I'm not a clinician, I cannot speak
20 to a condition that is a particular sentence or
21 following about that.  So I don't feel that I can
22 say that.
23        What I can say is that the Surgeon General
24 report covers a significant number of harms, many of
25 them related to problematic use or excessive use of

24 (Pages 90 - 93)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 94

1 the platform that I believe are eminently
2 addressable by every company that makes social media
3 features, and that they have extensive data about
4 usage and the effectiveness of the interventions
5 that they have put out, and I can evaluate their
6 interventions with experience.
7      And that's where you can be, like, "What do
8 you know about this?" And then I can comment about
9 that.
10      But if you ask me about a condition, right,
11 my experience on that is both within product
12 building and then as a parent and in other areas;
13 but I don't feel comfortable in the same way as a
14 legal designation to veer into saying that's a proof
15 of a condition of so-and-so when I really haven't
16 assessed it for that.
17      And I'm not qualified to assess it for that
18 because, as I was trying to say, I am not a
19 clinician.
20   Q.   You've read the Surgeon General's report?
21   A.   Yes, I have.
22   Q.   Do you have any recollection of any
23 reference to something known as social media
24 addiction in the Surgeon General's report?
25   A.   As I have answered my current recollection

Page 95

1 of the Surgeon General report is that it covered a
2 large number of harms or considerations for which I
3 believe there's data, effective interventions, and
4 more than enough evidence and research to be treated
5 as a priority by social media companies.
6   Q.   You also mentioned -- I asked you can you
7 point me to an authoritative source that says that
8 social media addiction exists, and you also
9 mentioned -- you mentioned the literature generally.
10      Is there a specific piece of literature
11 that you are thinking of that you believe identifies
12 social media addiction as a recognized condition?
13   A.   So as I've already answered about this, if
14 you're asking me to assess literature as a
15 condition, I feel that as -- because I am not a
16 clinician, I'm not somebody qualified to say, yeah,
17 that is something that meets the clinician
18 definition of "condition," but that doesn't mean
19 that there isn't significant harm there that needs
20 to be understood, interventions that can be done,
21 because of the way the product is designed. And
22 that I can talk about.
23   Q.   You've also -- you've talked about the
24 Surgeon General's report, you've referred to
25 literature.

Page 96

1      Is there any other source that you're aware
2 of that recognizes social media addiction as -- and
3 by "source," I mean authoritative source -- that
4 recognizes social media addiction as a condition?
5      MR. CARTMELL:  Object to the form.
6      THE WITNESS:  So --
7 BY MS. JONES:
8   Q.   And in the interest of time, I'm -- if
9 you've already addressed everything, that's fine.
10 I'm just trying to make sure there's nothing that
11 we've not already covered.
12   A.   I believe I've already answered this
13 question.
14   Q.   Since your deposition in April, how many
15 meetings, if any, have you had with attorneys? And
16 don't tell me about the substance of the
17 discussions. I just want to know how many meetings
18 have you had with lawyers since April of 2025?
19      MR. WARD:  Object as to form.
20      THE WITNESS:  So can you please be more
21 specific?
22 BY MS. JONES:
23   Q.   Which part do you not understand?
24   A.   What do you mean by "lawyers"?
25   Q.   Do you not know what a lawyer is,

Page 97

1 Mr. Bejar?
2   A.   I don't know if you're asking me whether I
3 have met with lawyers in person or live, because I
4 have some issues that I have to be dealing with
5 there or updating my trust. I don't know if you
6 mean lawyers that are friends of mine with whom I
7 have conversations. I don't know if you mean if
8 it's pursuant to sort of what's happening here.
9      So I would appreciate it if you would be
10 more precise because a question as, like, "Have you
11 met with any lawyers" --
12   Q.   Yeah.  That's fair.
13   A.   -- "since your deposition?" is pretty
14 broad.
15   Q.   I'm not interested in your meetings with
16 your trust and estates lawyers.  My question is have
17 you had meetings with lawyers since April of 2025
18 related to this litigation?
19   A.   I have had meetings with my counsel around
20 this.  And I had a couple of meetings with -- with a
21 number of state AGs and other folks.
22   Q.   All right.  By your counsel, you're
23 referring to Mr. Ward?
24   A.   Correct.
25   Q.   How many meetings have you had with

25 (Pages 94 - 97)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 98

1  Mr. Ward since April -- since your deposition in
2  April of 2025?
3      A.  I don't recall.
4      Q.  Is it more or less than five?
5      A.  I mean, as a meeting, do you mean like a
6  scheduled conversation at a certain time?  Is it
7  like a phone call?  What do you mean by "meeting"?
8      Q.  Whether by phone or in person or Zoom or
9  some other means, how many meetings have you had
10  with Mr. Ward since your deposition in April?
11      A.  I believe that I have spoken to Mr. Ward
12  more than five times since my deposition.
13      Q.  Have you been in contact with -- let me be
14  more clear.
15          Have you had meetings with Mr. Ward,
16  whether they were telephonic communications or Zoom
17  calls or in-person meetings that -- have you had
18  more than 10 of those since April, your deposition
19  in April?
20      A.  I would say it's probably around that
21  ballpark, but I don't recall the exact amount.  So I
22  would say probably like around 10, give or take, but
23  I really have no recollection of the exact number.
24  But it's not been, like, 30 or anything higher than
25  that that I can think of.

Page 99

1      Q.  Of the around 10 or so meetings that you've
2  had with Mr. Ward, how many of those have been in
3  person?
4      A.  I don't recall -- I don't think we've met
5  in person, but -- it might have been, like, one
6  meeting in person, but I don't recall in-person
7  meetings right now.
8      Q.  By what means were you communicating?
9      A.  Phone calls, video chat applications,
10  different things.
11      Q.  What's your memory of how long those
12  meetings ran?
13      A.  I mean, I think when I talked to Mr. Ward,
14  it can be like a five-minute phone call or it can be
15  like a longer conversation.  It really varies.  And
16  so I don't think I have, like, an average of that.
17  I mean, I think a handful of them were probably
18  around like five minutes or so.  And then there were
19  sometimes longer conversations.
20      Q.  What was the upper limit?
21      A.  I think around an hour and a half or two
22  hours at most.
23      Q.  You mentioned that you also met with
24  lawyers representing the state Attorneys General; is
25  that right?  Since your deposition in April of 2025?

Page 100

1      A.  That is correct, yes.
2      Q.  Who did you meet with specifically?  And by
3  "meet with," I mean by Zoom, by teleconference, in
4  person, any of those formats.
5      A.  Yeah.  So I had a couple of Zoom calls that
6  included Mr. Cartmell, I think attorney generals
7  from Arkansas, California, Massachusetts, Tennessee,
8  and others that I don't recall.
9          You know, you get the grid of pictures.
10  And so there were a lot of pictures in the grid, and
11  I don't recall the name of everybody who was in the
12  pictures.
13      Q.  And I apologize.  You said there was one
14  Zoom call or did you say there was more than one?
15      A.  There were two.
16      Q.  Two Zoom calls.  Now I'm remembering you
17  did say that.
18          When did those happen?
19      A.  In the last week or so.  In the lead-up.
20  Kind of very similar to the meetings I had with Meta
21  preparing for the FTC deposition.  And so -- so --
22  but these were pretty short, actually.  Those
23  meetings with Meta were, like, much longer.
24      Q.  That was in a different case; correct?
25      A.  Yes, that is correct.

Page 101

1      Q.  You said they were short meetings.  How
2  long were they?
3      A.  I think around an hour and a half.  And
4  Mr. Ward was always present.
5      Q.  And were those Zoom calls that were
6  happening in anticipation of your deposition today?
7      A.  Yes.
8      Q.  Did -- so the folks who are represented
9  here today, including Mr. Cartmell, you've met with
10  them a couple of times in the last week before your
11  deposition?
12      A.  I believe I've already answered that.
13      Q.  And at no point during those discussions
14  did anyone share with you a copy of Exhibit
15  Number 1?
16      A.  No.
17      Q.  Did anyone ever explain to you what it
18  meant to be an unretained expert in the litigation?
19      A.  I mean, I think this is talking about
20  conversations that I might have had with Mr. Ward
21  which, I believe, are attorney-client conversations;
22  so I just want to be mindful of not speaking to
23  something that is covered by that.
24      Q.  Well, I don't want to hear about what you
25  talked about with Mr. Ward.

26 (Pages 98 - 101)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 102

1     My question is did any of these other
2 lawyers tell you what it would mean to be an
3 unretained expert in the litigation?
4     A.   My conversations about that I had with
5 Mr. Ward.
6     Q.   None of the lawyers for the state attorneys
7 general or Mr. Cartmell told you: "This is what it
8 would mean if you're an unretained expert"?
9     A.   Not that I recall.
10     Q.   Other than the two Zoom calls that you had
11 in the last week before your deposition with
12 counsel, have you had any other discussions with
13 lawyers related to this litigation since your
14 deposition in April?
15     A.   Not that I recall.
16     Q.   In the conversations that you had with
17 counsel in the last week -- forgive me if I've
18 already asked this, but I don't think I have -- were
19 you shown any documents?
20     A.   I don't recall seeing documents in those
21 conversations.
22     Q.   So it was just talking for an hour and a
23 half on a couple of different Zoom calls?
24     A.   I mean, as far as I recall.  I mean, I
25 think that -- I'm trying to think about it, but as

Page 103

1 far as I recall.
2     Q.   Putting aside what Mr. Ward might have said
3 to you, what did counsel have to say to you on these
4 calls?
5     A.   Sorry.  I'm not sure I understand the
6 question.
7     Q.   Let's take the first Zoom call that you had
8 with Mr. Cartmell and the lawyers that you had for
9 the state attorneys general.
10          What did they say to you?
11     A.   I mean, I think --
12          MR. WARD:  Objection as to form.
13          MR. CARTMELL:  Same objection.
14          THE WITNESS:  That's really broad.  If you
15 asked me specific questions about did X, Y or Z get
16 covered, then I can -- I could say, depending on
17 what I can recall, answer them, but --
18 BY MS. JONES:
19     Q.   Did any of the lawyers, including
20 Mr. Cartmell or any of the lawyers for the state
21 attorneys general, talk to you about what was likely
22 going to be covered in your deposition today?
23     A.   Not in any substance.  Not that I recall in
24 any detail.  I mean, I think that -- I'm trying to
25 think.  I mean, again, that feels broad.

Page 104

1     I mean, the one thing that I'm recalling,
2 which I think there was a mention of there being a
3 report which I got a copy of yesterday, the three
4 reports that I've already talked about.  But there
5 was no substance around it.
6     Q.   What else do you remember, if anything,
7 about that first Zoom call?
8     A.   I don't really recall much in detail;
9 right?  I mean, when I know I'm going to do one
10 of -- a deposition like this, I spend a significant
11 amount of time reviewing things I've written or
12 things I've sort of talked about or things that I've
13 shared or other materials.
14          And so it's been -- your earlier point of a
15 full-time job, it's been kind of like a full-time
16 job for me to be sort of thoughtful about how I show
17 up today.  And within that context, I don't recall
18 specifics of those conversations.
19     Q.   What about the second Zoom call that you
20 had with counsel in the last week?
21     A.   I don't recall details about it.
22     Q.   You have no memory of anything that
23 happened on either of those calls?
24     A.   Not in detail enough so that I can talk
25 about it in confidence here.  Again, I've been

Page 105

1 reviewing a lot of my own sort of writing and
2 materials and some of the videos and other things
3 sort of preparing for today.  And so it's pretty --
4 it's a lot of work.
5     Q.   Were you given any direction by either
6 Mr. Cartmell or lawyers for the state attorneys
7 general about how you should respond to questions?
8     A.   Oh, absolutely not.
9     Q.   Let me ask you to look in Exhibit 1 at
10 page 5.  And at the very bottom of the page, there
11 is a bullet that begins with "Meta misleads the
12 public."
13          Do you see that?
14     A.   I do, yes.
15     Q.   And about two-thirds of the way down that
16 paragraph it says:
17          "More bullying occurs on Instagram
18          than Mr. Bejar has seen in any other
19          place he has worked, and it is because
20          of the way the product is designed."
21          Do you see that?
22          MR. CARTMELL:  Same objections to questions
23 related to this document.
24          THE WITNESS:  Yes, I see that.
25 ///

27 (Pages 102 - 105)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 106

1 BY MS. JONES:
2    Q.  I guess my first question is is that a true
3 statement?
4        MR. CARTMELL:  Objection.  Asked and
5 answered at the first deposition.
6        THE WITNESS:  As I covered on, like, the
7 first deposition -- and we spent a fair amount of
8 time on this -- the BEEF statistics on experienced
9 bullying and witnessed bullying on Instagram are the
10 highest that I've seen, including when I was working
11 on Facebook in my first stint.  And because of the
12 number of teenagers that use the platform, that is
13 tremendous reach and harm.
14        And so, yeah, that is more than I have seen
15 in other places where I have worked, including my
16 first stint at Meta.
17 BY MS. JONES:
18    Q.  And the bullying that you're -- the
19 bullying occurring on Instagram that you're
20 specifically referring to now is from the BEEF's
21 data?
22    A.  The BEEF data is a good indicator of teens
23 experiencing bullying on Instagram, especially
24 because of everything we learned on my first stint
25 about how prevalence is so ineffective at conveying

Page 107

1 an accurate picture of bullying as it happens on a
2 platform.
3    Q.  And I guess I just want to be very clear.
4        This particular statement compares that --
5 what you were just describing in terms of the rate
6 of bullying reflected in the BEEF's study -- to any
7 other place you have worked.
8        Do you see that?
9        MR. CARTMELL:  Same objections.
10        MR. WARD:  Objection.  Mischaracterizes the
11 contents of the document and the testimony.  There's
12 no reference to the BEEF survey in the document,
13 Counsel.
14 BY MS. JONES:
15    Q.  What other rates of bullying for Instagram
16 are you aware of beyond -- actually, let me take a
17 step back.
18        Have you gone through the exercise of
19 comparing the rates of bullying on Instagram to the
20 rates of bullying on any other platform that might
21 have been maintained by another company you worked
22 for?
23    A.  I have not gone through that exercise.
24 And, unfortunately, there is no meaningful
25 transparency because the public data available

Page 108

1 around these classes of issues -- most importantly,
2 perhaps, the transparency center does not accurately
3 report rates of bullying.
4        And so while I was inside Instagram, there
5 were multiple studies and multiple sources of that
6 information that I had experience with.
7        MS. JONES:  And I'm going to move to strike
8 everything after "I have not gone through that
9 exercise."
10 BY MS. JONES:
11    Q.  Have you evaluated the rates of bullying on
12 other social media platforms other than Meta's
13 platforms?
14    A.  As I just said in my previous answer to the
15 question that you just asked, the -- unfortunately,
16 there is no meaningful transparency from any
17 platforms around the rates at which bullying are
18 happening.  And that I believe this is something
19 that is absolutely essential to be addressed by
20 regulation or any other means that can help us
21 understand.
22        For example, if a kid experiences bullying,
23 what is the likelihood that they'll use the
24 reporting flow?  If they use the reporting flow,
25 what is the likelihood that they're actually going

Page 109

1 to get help from that?  Is the reporting flow
2 designed to provide immediate relief to the teen as
3 they're experiencing it?
4        And that is an area where I have expertise.
5 And I have not yet evaluated other platforms when it
6 comes to how they score in all of these different
7 areas, but I have a lot of knowledge and expertise
8 on how Instagram and potentially Facebook and other
9 products relate to these kinds of issues because I'm
10 intimately acquainted with the capacities of the
11 company.
12    Q.  Sitting here today, do you know what the
13 rates of bullying are on Reddit?
14    A.  As I just answered in my previous question,
15 other platforms do not provide meaningful
16 transparency on experienced harm, of which bullying,
17 I think, is one of the best examples where
18 prevalence does not convey the harm.
19        And so Reddit does not publish survey data
20 on the amount of experiences that their teens have
21 on the platform.
22    Q.  Sitting here today, do you know what the
23 rates of bullying are on 4chan?
24    A.  I do not believe that 4chan publishes any
25 information about what happens on that platform, but

28 (Pages 106 - 109)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 110

1  I'm not aware of that. I haven't looked at 4chan
2  closely.
3      Q.  Sitting here today, have you evaluated the
4  rates of bullying on Telegram?
5      A.  So as I said in my answer about Reddit
6  earlier today, there's no platforms that I am
7  currently aware of that publish, as it should be
8  published, the statistics of bullying as experienced
9  by teens.
10     And I cannot stress the importance of this
11 enough, because I believe that if parents knew that,
12 in the case of Instagram, there was a 1-in-10 chance
13 your kid is going to get bullied and 1-in-3 is going
14 to watch it happening, there would be much more
15 incentive on the part of the platforms to address
16 issues.
17     And, most importantly, parents would be
18 adequately informed about choosing between Instagram
19 or Reddit or Telegram -- all these areas -- about
20 what's the safer service that I can put my kid at.
21     And that transparency is necessary. But as
22 far as I can tell, it will not happen until it's
23 regulated in some way. These companies are so
24 reluctant to provide an accurate picture of harm.
25     Q.  Sitting here today, do you know what the

Page 111

1  rates of bullying are on Discord?
2      A.  As I just answered, in the context of
3  Reddit and Telegram and other areas, there is no
4  published data about the bullying that is
5  experienced by teenagers on Discord.
6      And without that experience data, you don't
7  have meaningful transparency that parents can use to
8  discern whether one service is safer than others for
9  their kids.
10     Q.  Sitting here today, do you know what the
11 rates of bullying are on Yahoo, Chat or message
12 boards?
13     A.  As I answered for Reddit, Telegram,
14 Discord, and 4chan, I'm not aware of a company
15 that's substantively publishing the rates at which
16 bullying is experienced by the kids who use the
17 platform, about the effectiveness of the reporting
18 tools that they're given, about sort of the nature
19 of the content within the bullying.
20     The last time I'm aware of a company
21 publishing that kind of information substantively,
22 it was Meta from 2011 to 2015 as part of the
23 transparency that we had on the bullying work on
24 those areas.
25     And so that kind of information that was

Page 112

1  published then is the kind of information that would
2  help a parent to decide whether one product would be
3  safer than the other for their kids.
4      Q.  Have you done anything to look at the rates
5  of bullying in schools?
6      MR. WARD:  Object as to form.
7      THE WITNESS:  So what do you mean by -- can
8  you just be more specific on the question? It's so
9  broad.
10 BY MS. JONES:
11     Q.  Sure.  Sure.
12     What have you done -- have you done
13 anything -- do you know, sitting here today, what
14 the rate of bullying is in middle schools
15 nationwide?
16     A.  The -- as I think I've covered earlier in
17 this conversation, my area of expertise is within
18 platforms and what happens in the platform and the
19 nature and the harm of those platforms.  And I also
20 have extensive experience with working closely with
21 academics and experts on how bullying plays out in
22 schools and what are effective interventions.
23     And I haven't looked recently at what is
24 the most recent published data about bullying as
25 experienced by teens in schools, and so I don't know

Page 113

1  that number today.
2      Q.  Mr. Bejar, just so I understand, Exhibit 1
3  suggests that -- and I understand this is not a
4  document that you've drafted necessarily, but it
5  suggests that you have the opinion that more
6  bullying occurs on Instagram than you have seen in
7  any other place you have worked.
8      What I'm understanding from your testimony
9  just now is that you don't have access to data for
10 non-Meta platforms.  Is that true?
11     MR. CARTMELL:  Objection.  Mischaracterizes
12 his testimony.
13     And the same objections related to asking
14 him questions about a document prepared by attorneys
15 and not him.
16     THE WITNESS:  Yeah, I mean, you're -- can
17 you repeat the question?  Sorry.  It's hard to keep
18 track with the objections.
19 BY MS. JONES:
20     Q.  Exhibit 1 suggests and, in fact, says that
21 you have the opinion that there is more bullying
22 that occurs on Instagram than you have seen in any
23 other place you have worked.
24     MR. CARTMELL:  Same objections.
25 ///

29 (Pages 110 - 113)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 114

1 BY MS. JONES:
2    Q.   My understanding from your testimony just
3 now is that you have not had access to data for
4 non-Meta platforms.
5        MR. CARTMELL:  Same objections.
6 BY MS. JONES:
7    Q.   Is that correct?
8    A.   There is today no meaningful or effective
9 transparency as to how bullying plays out in other
10 platforms.  So there is -- that's published by the
11 platforms based on engaging with their users, which
12 I think is going to be the closest thing to the
13 source of truth, which is -- I think something like
14 BEEF or Metz or related studies are so important and
15 so important to be made public.
16        And so in the absence of other platforms
17 publishing that kind of data, no parent or no -- has
18 access to that kind of data.  And I'm one of those
19 parents.
20    Q.   Okay.  And I'm not picking on you.  I'm
21 just asking the question.
22        It sounds like you've not done a comparison
23 of the rates of bullying on Instagram versus the
24 rates of bullying on other social media platforms
25 that are owned by other companies.

Page 115

1    A.   No.  I have not done that comparison
2 because the companies are not be publishing the data
3 that would be -- make it possible to make those
4 comparisons.
5        I would love that data.  I mean, every
6 parent would love that data.
7    Q.   And relatedly, it sounds like you have not
8 done a comparison of the rates of bullying on
9 Instagram to the rates of bullying in, for example,
10 middle schools or high schools.
11    A.   I mean, that is not an appropriate
12 comparison because you cannot compare bullying in
13 schools with bullying online.
14        Bullying online has three different
15 attributes that make it very different, which is
16 they have initial distribution and escalation to a
17 large audience; it's persistent; and because it's
18 not a sort of face-to-face -- and where the
19 remediation mechanisms around it can be felt very
20 intensely by teenagers with developing brains.
21        And so even if I had the school numbers
22 right here, you cannot compare an incident in a
23 schoolyard to an incident online.  They're very
24 different.
25    Q.   Are you aware of any reports that are

Page 116

1 created by third parties about the rates of bullying
2 on social media platforms?
3    A.   Yes.  I'm aware of the Neely study done, I
4 think, by -- I think it's USE.  And I think I've
5 seen some other related things that I can recall
6 right now.  But, again, I would need to look at the
7 specific reports or areas in order to kind of weigh
8 in about it.
9    Q.   Have you used any of that data to evaluate
10 the rates of bullying across social media platforms?
11    A.   What I have done is I've been engaging with
12 ▮▮▮▮▮ of the Neely Center to improve the
13 instrument that is working on -- this is also, I
14 think, with the help of ▮▮▮▮ a former Meta
15 employee -- to have a better instrument when it
16 comes to asking teenagers about -- their questions
17 of basic experiences on their issues on the
18 platforms.
19        And that study is in process.  And I helped
20 them formulate the questions of the survey and some
21 of the other questions that you want to be able to
22 get information out from something like that.
23    Q.   Let me ask you to go to page -- actually,
24 we're going to stay on page 5.
25        In that same paragraph, towards the end of

Page 117

1 the paragraph, it says:
2        "Meta also is aware that suicide
3        and self-injury content is easily
4        accessed by kids on Instagram, despite
5        its community standards, and fails to
6        disclose and warn of that risk."
7        Do you see that?
8    A.  Yes, I do.
9    Q.   Recognizing that this was not a document
10 that you drafted, is that an opinion that you hold?
11        MR. CARTMELL:  Same objections.  And asked
12 and answered.
13        THE WITNESS:  Yeah, I believe that -- as I
14 look at this, that during the first deposition we
15 get into a fair amount of detail around that,
16 because you have to combine a couple of things.
17        You have to combine the BEEF results on
18 kids telling the company that they've seen suicide
19 and self-harm content.  You have to combine the ease
20 at which that content can be found, even accidently
21 that I've found through my testing as reflected in
22 the spreadsheet.
23        You have to look at the Molly Rose reports
24 over time about sort of those kinds of content, even
25 within sort of the data that was -- I wrote through

30 (Pages 114 - 117)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 118

1 the inquest about Molly Rose's suicide.
2       And I think all of those things together
3 are pretty substantial awareness, including me
4 writing to the executive team, Adam Mosseri and
5 Mark Zuckerberg and Sheryl Sandberg, including the
6 number of kids that were reporting having been
7 exposed to self-harm content.
8 BY MS. JONES:
9   Q.  When we're talking about suicide and
10 self-injury content, what -- I just want to make
11 sure we're kind of on the same page.
12       What we're talking about is the possibility
13 that a teen who is using Instagram that will see
14 something that either describes or depicts
15 self-injury; is that right?
16   MR. CARTMELL:  Object to the form.
17 Mischaracterizes.
18       THE WITNESS:  No.  I mean more than that.
19 BY MS. JONES:
20   Q.  Let me ask you a question.  Do you have an
21 understanding that there is content that might fall
22 into the category of suicide and self-injury that
23 could include information that is shared as part of
24 a recovery journey by people who are struggling with
25 that?

Page 119

1   A.  Absolutely.  I'm very familiar with that.
2       MS. JONES:  And let me actually -- let's go
3 ahead and mark this.
4       This will be Exhibit Number 3, I think.
5       (Exhibit 3 was marked for
6       identification and is attached to the
7       transcript.)
8 BY MS. JONES:
9   Q.  Mr. Bejar, you have what we've marked as
10 Exhibit Number 3 in front of you.
11       Have you ever seen Exhibit Number 3 before?
12   A.  Yes, I have.
13   Q.  Okay.  And Exhibit Number 3 is a post -- a
14 blog post by Adam Mosseri dated February 7, 2019.
15       Do you see that on the first page?
16   A.  I do.
17   Q.  And the title is "Changes we're making to
18 do more to support and protect the most vulnerable
19 people who use Instagram."
20       Do you see that?
21   A.  I do, yes.
22   Q.  And in the very first paragraph, it says:
23       "At Instagram nothing is more
24       important to us than the safety of the
25       people in our community.  Over the past

Page 120

1       month we have seen that we are not
2       where we need to be on self-harm and
3       suicide, and that we need to do more to
4       keep the most vulnerable people who use
5       Instagram safe."
6       Do you see that?
7   A.  Yes, I see that.
8   Q.  And I would assume you would agree with
9 that statement?
10   A.  I really -- I cannot tell you how much I
11 wish that's what they were doing; right?  And I
12 think that's one of the areas that I found most
13 disturbing in my testing, is that they're saying --
14 talking about the importance of this, and that is
15 not what the product is doing.  And I think that is
16 of tremendous urgency.
17   Q.  And, in fact, what Mr. Mosseri says here
18 is:
19       "We have seen that we are not
20       where we need to be."
21       Right?
22   A.  That is correct.
23   Q.  And then if you go to the second page -- we
24 won't march through every word of this -- there's a
25 section entitled "What's changing."

Page 121

1       Do you see that?
2   A.  I do, yes.
3   Q.  And it lays out different things that the
4 company is doing in terms of its approach on these
5 issues.
6       Recognizing that you may not think that the
7 company has done it as well as you would like, but
8 that's generally what's described there; is that
9 right?
10   A.  I see that, yes.
11   Q.  And this is a publicly available blog post;
12 correct?
13   A.  Correct.
14   Q.  And this is a blog post that is, in fact,
15 acknowledging the reality that there is self-harm
16 and suicide content that might be present on the
17 Instagram platform; right?
18   A.  Yes, that's correct.
19   Q.  And if you go to the third page of that
20 same Exhibit Number 3, there's a section entitled
21 "Finding the right balance."
22       Do you see that?
23   A.  I do, yes.
24   Q.  And what Mr. Mosseri writes in this blog
25 post is:

31 (Pages 118 - 121)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 122

1    "Self-harm and suicide are complex
2    issues, and we rely on the input of
3    experts in these fields to help shape
4    our approach."
5        Do you see that?
6    A.  I do, yes.
7    Q.  Do you agree with the basic idea that
8  self-harm and suicide are complex issues?
9        MR. CARTMELL:  Objection to the form.
10       THE WITNESS:  That is such a broad
11  statement.  You need to ask me a more specific
12  statement about the nature of the complexity.
13  BY MS. JONES:
14   Q.  Well, if you don't agree, that's fine.  I'm
15  just asking if you agree.
16   A.  I didn't say I don't agree.  I just said
17  that the question was very broad.  And in order to
18  express an accurate opinion, I would ask you to be
19  specific about which aspect of the complexity you
20  have a question about.
21       Because it's like:  Is the world a
22  challenging place?  Yes.
23       I mean, it's a platitude in terms of how
24  high level it is.  And in order to be able to
25  provide accurate answers, I would ask you to please

Page 123

1  be more specific.
2    Q.  My question was simply do you acknowledge
3  that there are complexities?
4        We can talk about the details of the
5  complexities, but do you acknowledge that there are
6  complexities in terms of addressing self-harm and
7  suicide?
8        MR. CARTMELL:  Same objection.
9        THE WITNESS:  Again, as I said, this is a
10  really -- it's a 20,000-foot question.  And in
11  that -- from that perspective -- I mean, I think if
12  you want me to start getting into some of the
13  complexities and talking about them, I can do that.
14       But, like -- it's like the fact that
15  somebody posts something that is a cry for help,
16  does not mean that you have to recommend that
17  content to a 13-year-old.  Those are very separable
18  things which I've seen the company conflate.
19   A.  I've seen the company conflate the right of
20  somebody to post a cry for help -- which is an
21  opportunity for providing an intervention at that
22  moment -- family, friends -- and that's what the
23  company did.
24       And, by the way, it's some stuff that the
25  company deprecated.  One of the things I tested

Page 124

1  that's in the spreadsheet is three interventions
2  that had to do with suicide prevention that are just
3  no longer in the product.  And so the testing wasn't
4  looking to see if it was there.
5        And so the -- you have to separate out the
6  right of somebody to post a cry for help, sharing
7  that with friends and family, giving friends and
8  family tools to deal with that -- which is something
9  I worked on for years.
10       It was one of the top priorities in my time
11  at Meta -- from whether -- you take that piece of
12  content and recommend it, because Number 1 here
13  says, "We do not allow graphic images of self-harm
14  such as cutting."  And, "We will not show" -- very
15  absolute statement -- "nongraphic self-harm-related
16  content - such as healed scars - in search, hashtags
17  and the explore tab."
18       Except one of the tests that is documented
19  for a period of a year searching for "I want to hurt
20  myself," the top result is a profile of an account
21  that has a healed scar, a hand with a -- healed
22  scars on it.  And it showed.  And there's no way to
23  report it; right?
24       And so this "we will not show," I wish that
25  was the case.  But that's not the case.

Page 125

1        And so you can't conflate a cry for help
2  with the fact that the platform accidentally
3  recommends self-harm content, as evidenced by a lot
4  of my testing, in a way that a teenager, in a moment
5  of vulnerability, might fall into a rabbit hole of
6  that.
7        And so they have so much work to do there.
8  And I appreciate that he mentioned this in 2019, but
9  it's 2025.  And if I start searching for the word
10  "kill" in Spanish, it recommends me an account
11  saying "I want to kill myself" in Spanish.  And in
12  the description, there's pills, sleeping pills.
13       And so how does that even begin to scratch
14  the surface of the promises that are made in this
15  post?
16  BY MS. JONES:
17   Q.  Do you remember what my question was,
18  Mr. Bejar?
19   A.  You were asking me about the complexities
20  that come with this kind of domain.
21   Q.  Well, my question was --
22       MS. JONES:  And let me move to strike your
23  last answer as nonresponsive.
24  BY MS. JONES:
25   Q.  My question was simply did you acknowledge

32 (Pages 122 - 125)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 126

1  that there are complexities?
2       MR. CARTMELL: Objection. Asked and
3  answered.
4       THE WITNESS: I mean, if you want me to go
5  through that again --
6  BY MS. JONES:
7       Q. I don't.
8       A. -- I can do that because I have already
9  answered that question.
10  BY MS. JONES:
11      Q. I don't. If you're telling me you can't
12  answer that question --
13      MR. WARD: Mischaracterizes the witness's
14  answer.
15      THE WITNESS: Yeah. I mean, don't put
16  words in my mouth.
17  BY MS. JONES:
18      Q. Mr. Bejar, there's not a question pending.
19      A. Okay.
20      Q. Let me ask you to go back to the same
21  paragraph (as read):
22          "We rely on the input of experts
23      in these fields to help shape our
24      approach. Up until now, we've focused
25      most of our approach on trying to help

Page 127

1          the individual who is sharing their
2      experiences around self-harm. We have
3      allowed content that shows
4      contemplation or admission of self-harm
5      because experts have told us it can
6      help people get the support they need."
7          Do you see that?
8      A. I see that, yes.
9      Q. (Reading):
10         "But we need to do more to
11      consider the effect of these images on
12      other people who might see them."
13          Do you see that?
14      A. I see that.
15      Q. He goes on to say:
16          "This is a difficult but important
17      balance to get right."
18          Do you see that?
19      A. I see that.
20      Q. Then he goes on to say:
21          "During the comprehensive reviews,
22      the experts, including the Centre for
23      Mental Health and Save.org, reaffirmed
24      that creating safe spaces for young
25      people to talk about their

Page 128

1          experiences - including self-harm -
2      online, is essential."
3          Do you see that?
4      A. Yes, I see that.
5      Q. Do you know what the Centre for Mental
6  Health is?
7      A. I don't recall right now.
8      Q. Do you know what Save.org is?
9      A. I don't recall right now.
10      Q. Do you know what those organizations'
11  position is on this subject of needing to create
12  safe spaces for young people to talk about their
13  experiences, including self-harm, online?
14      A. The key thing here, though, right, is what
15  sometimes happens in a press release like this -- is
16  you have this kind of platitude statement.
17          It is important for young people to have
18  safe spaces, but then you have to evaluate that
19  against the ground truth of the reality that is the
20  product. Right?
21          And so if I had begun searching in my
22  testing for -- actually, let me give you a different
23  example.
24          In one of the avatar accounts, which is one
25  of the videos I submitted, I created a post. And in

Page 129

1  it I was given the option by an Instagram feature to
2  select the music "I want to kill myself." And that
3  was the music on it. And the text on it said, like,
4  "a cry for help."
5          And when I posted that, there was plenty of
6  information in the post where Instagram could have
7  been: Are you thinking about this? Are you not
8  feeling well? Let me direct you to a safe space
9  that's run by qualified people who can help you
10  navigate these issues. That would have been great.
11          If I finished typing a certain query, it
12  does put the resources up and it does put the blog
13  up; but if I start typing the query and the
14  auto-completion sends me to an account that appears
15  to be selling sleeping pills -- I didn't verify that
16  fully, but sleeping pills in the description link
17  below -- with images of flagged content, the kind
18  that Molly Russell saw when she committed suicide,
19  that is not creating a safe space.
20          So if you are asking me does the Centre for
21  Mental Health and Save.org -- and Arturo Bejar and
22  people who care about the well-being of kids --
23  believe that it's important to have safe spaces for
24  young people to talk about their experiences,
25  including self-harm, I think that's, again, one of

33 (Pages 126 - 129)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 130

1 the areas that I worked on in my first stint --
2 groups of people dealing with abuse, groups for
3 people dealing with rape. How do you build trust --
4 safe environment. How do you do moderation.
5      All that stuff is important. But what I
6 don't see in this, or in my testing of the product,
7 is Instagram actually creating safe spaces.
8      And so -- and so -- I mean, it's another
9 example of, like, something that promises a certain
10 safety in a certain domain, but the ground truth of
11 the product doesn't meet this -- other than you can
12 call a post a safe space.
13      And I've seen a post delivered or posted
14 by, like, an eight or nine-year-old girl where the
15 top comment is, "Go get a chair and a piece of
16 rope." Again, this is in the videos, right, in
17 terms of the ground truth of the product.
18      And so --
19      MS. JONES: I'm sorry, Mr. Bejar. I don't
20 want to be rude. You have been talking for
21 literally minutes, and I'm not sure that you're
22 anywhere close to where my question was.
23      So I'm going to move to strike as
24 nonresponsive and see if we can get ourselves back
25 onto a specific question.

Page 131

1      MR. CARTMELL: Just for the record, I want
2 it to be clear that he was in the middle of his
3 answer -- or the end -- I don't know -- but you cut
4 him off.
5      MS. JONES: Well, it was --
6      MR. CARTMELL: Hold on. You did not allow
7 him to finish. You are asking him specifically
8 about a document and asking him to comment on the
9 statements that you have highlighted. He was in the
10 middle of doing that, and you did not allow him to
11 finish.
12      MS. JONES: Are you done?
13      MR. CARTMELL: Yes.
14 BY MS. JONES:
15      Q. Mr. Bejar, you have not had any experience
16 providing services to young people who might be
17 struggling with suicidal thoughts; is that right?
18 And by that I mean in a professional capacity.
19      MR. CARTMELL: Object to the form.
20      THE WITNESS: I oversaw the team that built
21 that initial capacity for Facebook. I set up their
22 research partnerships with different universities
23 that drove that work.
24      As part of that, there were many groups
25 that were qualified to deal with these kinds of

Page 132

1 issues. And I hired a person on staff with lived
2 experience around all of these issues.
3      I have not been on the receiving end of
4 those calls or have had the training that is
5 involved with those calls, but I more than well
6 understand their importance and all the different
7 ways that should be integrated in the product like
8 some of the features that were deprecated as
9 evidenced in my spreadsheet.
10      MS. JONES: I'm going to move to strike
11 everything in that answer other than "I have not
12 been on the receiving end of those calls or have had
13 the training that is involved with those calls."
14 BY MS. JONES:
15      Q. You don't today provide treatment to young
16 people who are struggling with suicidal thoughts or
17 self-injury behaviors; is that right?
18      A. I mean -- let me put it this way, in terms
19 of my experience and domain in that area, which is
20 when a senior engineering leader for Instagram was
21 dealing with those kinds of issues with a teenager
22 in their personal life, I was the person they called
23 because they knew I could call the right person that
24 would connect them to the right resources and the
25 right contacts.

Page 133

1      So, again, this is an area where I have not
2 taken calls. I'm acutely aware of the importance --
3 I invested massively in it. I have connections with
4 academics and experts in the field, hired people
5 with lived experience.
6      And so -- and so -- I mean, I am somebody
7 who understands the severity with which needs to be
8 handled, and I know how to get somebody to deal with
9 that.
10      I also have dealt with this issue in
11 personal life. I've given advice to parents, other
12 parents in my kids' school, when my daughter
13 approached me saying, "A friend of mine is thinking
14 about committing suicide."
15      And, again, based on all the experience
16 that I've had around this, I knew sort of what the
17 right steps to take and the right resources and
18 connections, how to treat the privacy of the person
19 sensitively. So a lot of expertise there.
20      But I'm not the person who picks up the
21 phone in a call center.
22      MS. JONES: I'm going to move to strike all
23 of that other than "I'm not the person who picks up
24 the phone in a call center."
25 ///

34 (Pages 130 - 133)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 134

1 BY MS. JONES:
2    Q.  On the same page of Exhibit Number 1,
3 Mr. Bejar, there is a sentence that says -- it's
4 about midway down the same paragraph we've been
5 looking at, that last bullet.
6        "Mr. Bejar has consulted" --
7        Oh, I'm so sorry.  We're going back to
8 Exhibit 1.  Sorry.  Sorry.  Sorry.
9    A.  Which page?
10    Q.  Page 5.
11    A.  Okay.
12    Q.  It's the same bullet we were looking at
13 just a minute ago.  About midway down that
14 paragraph, it says:
15        "Mr. Bejar has consulted with
16        parents of kids who committed suicide
17        after being bullied on Instagram."
18        Do you see that?
19    A.  Yes, I do.
20    Q.  And is that a true statement?
21    A.  Yes, that is a true statement.
22    Q.  In what settings did you have -- let me
23 actually take a step back.
24        How many of those conversations have you
25 had?

Page 135

1        MR. CARTMELL:  Objection.  Asked and
2 answered.
3        THE WITNESS:  Yeah, I think I got this into
4 a fair amount of detail during my first three-day
5 deposition.
6        I mean, I think -- so I've already answered
7 this.  But if I need to answer it again, my guess is
8 between, like, 10 and 30 or give or take.  It
9 depends on the product and different platforms where
10 this might have happened.
11        It's a -- I've done it in the context of a
12 parents organization called ParentsSOS that gathers
13 parents of kids that have suffered pretty intense
14 harms through social media.
15 BY MS. JONES:
16    Q.  Do you have any -- and it would be totally
17 understandable and fine if you don't.  But do you
18 have any written documentation of the conversations
19 that you had with these parents?
20    A.  Not that I recall.  I mean, I might have
21 taken notes, but I recycle my notes taken -- books
22 constantly; so I don't think of it as documentation.
23    Q.  And I think in your earlier answer you
24 referred to platforms, plural.  And I just want to
25 make sure we're understanding.

Page 136

1        The statement in Exhibit 1 refers to
2 parents of kids who committed suicide after being
3 bullied on Instagram.
4        Have you had conversations with parents
5 whose kids committed suicide after being bullied on
6 some other platform?
7        Let me ask the question in a way that might
8 be a little clearer.
9        You mentioned 10 to 30 conversations;
10 right?
11    A.  Yeah.  The conversations -- sorry.  Go
12 ahead.
13    Q.  Of those -- is that what you said?  10 to
14 30 conversations roughly?
15    A.  Yeah.
16    Q.  Of those 10 to 30 conversations, how many
17 of them involved conversations around kids who
18 committed suicide after being bullied on Instagram
19 versus some other social media platform?
20    A.  I think I was sort of doing -- in my
21 recollection about this -- and I would need to go
22 back and double-check this, but there were also
23 parents in ParentsSOS that -- there were
24 approximately five conversations of kids that
25 were -- committed suicide after getting bullied

Page 137

1 on -- on Instagram.
2        And one conversation with a parent of a kid
3 that was bullied through an anonymous app that was
4 connected to Snapchat that I recall right now.
5        But the ratio is kind of similar to that,
6 where most of the conversations I've had with
7 parents of kids who have committed suicide for
8 bullying, and also about this bullying that the
9 parents subsequently experienced, was done on
10 Instagram.
11    Q.  And I just want to make sure I understand
12 the numbers here.
13        You said 10 to 30 conversations, and you
14 think 5 of those 10 to 30 involved Instagram and 1
15 of them might have involved Snapchat.
16        What makes up the remaining conversations?
17    A.  Yeah.  So I think in your question you have
18 to talk about the specific sort of kind of harm in
19 order to be able to narrow the numbers down.
20        So, in particular, I was talking about
21 bullying on Instagram and bullying on Snapchat.  And
22 then somebody who was experiencing that and then
23 ended up committing suicide, a youth person.
24        I've also, for example, spoken to parents
25 of kids who have died through challenges in TikTok.

35 (Pages 134 - 137)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 138

1  So I think there's probably like at least four or
2  five parents of the choking challenge that the kids
3  found on TikTok. And so I've spoken to those
4  parents.
5       I think I've also spoken to parents of kids
6  that had been hospitalized with eating disorders.
7  Primarily through Instagram is those parents. I
8  think those might be, like, three or four parents I
9  have spoken to around sort of those issues; but,
10  again, I would need to look at the roster to provide
11  a detailed accounting.
12       There were -- what were other examples of
13  this? Oh, yeah. Absolutely. I've spoken to
14  parents of kids that have died from drugs that they
15  acquired through different social media platforms.
16  Some of those parents of kids that have died from
17  acquiring drugs acquired the drugs on Snapchat.
18       I think those are, from my recollection of
19  this conversation, more on Snapchat. I only recall,
20  I think, one conversation with one parent of kids
21  who found drugs initially through Instagram. Some
22  of those are kind of cross-platform issues, where
23  the profile is found on Instagram and then it links
24  to the Snapchat profile.
25       And so, yes, I think that's kind of like a

Page 139

1  rough accounting of it. But if I go through the
2  ParentsSOS roster, talk about Ian Russell, talk
3  about the other parents that I've talked to --
4  because I've not only spoken to the parents within
5  ParentsSOS, I have spoken to other parents in other
6  contexts.
7       Q. And I appreciate that. I've probably
8  gotten us into kind of a muddled area in terms of
9  the conversations.
10       In terms of consultations or conversations
11  with parents of kids who committed suicide after
12  being bullied on Instagram, how many of those have
13  you had?
14       A. I think it's -- as I've answered in the
15  previous question that you had about this of the
16  different parents that I've spoken to -- because the
17  kids have either died or ended up in hospital from
18  social media harms -- around four of them would have
19  been on Instagram.
20       But, again, I would need to go review the
21  ParentsSOS site in order to be able to give you the
22  most accurate number.
23       Q. Did you -- and if you didn't, it would make
24  perfect sense, but I just want to make sure I
25  understand.

Page 140

1       Did you have any conversations with the
2  treating physicians or therapists or anyone else who
3  had been caring for or providing support to any of
4  those kids?
5       MR. CARTMELL: Object and move to strike
6  the statement of counsel.
7       THE WITNESS: So the conversations I've had
8  about kids that have committed suicide was with the
9  parents.
10       And then I understood how the harm played
11  out in the product and things that could have been
12  done that were not done by the platforms and --
13  and -- because that's -- again, that's the area
14  where I have -- especially in this -- in the context
15  of bullying and harassment -- a lot of expertise.
16       And I think that it was particularly
17  difficult for the parents of kids who committed
18  suicide on Instagram, because the tools that know
19  how to help a teen with that were partially or well
20  in place in 2015. And the current set of reporting
21  tools is so inappropriate for helping a teen deal
22  with bullying today.
23       MS. JONES: I'm going to move to strike as
24  nonresponsive, respectfully.
25  ///

Page 141

1  BY MS. JONES:
2       Q. But do you remember what my question was?
3       A. I believe that you asked me if I had talked
4  to physicians that were attending to those kids. Is
5  that accurate?
6       Q. That is accurate.
7       Did you talk to any of those kids' treating
8  physicians or counselors or therapists or other
9  folks who might have provided support to them?
10       A. As I covered in my previous answer, I
11  don't -- didn't talk to physicians. I only spoke to
12  the parents of the kids who committed suicide. And
13  I could talk to them about their experience with the
14  product and their kids' experience with the product.
15       Q. Do you -- roughly speaking -- and it
16  might -- it probably is a different answer for the
17  different conversations; but roughly speaking, how
18  much -- long were these conversations?
19       A. As long as they needed to be. I mean, I
20  think that once a parent gets a chance to tell you
21  about what happened to their kid, you just have to,
22  like, hear them out completely and thoroughly to see
23  what you have to learn from that.
24       And why doesn't Meta talk to these parents
25  substantively about the experience of their kids?

36 (Pages 138 - 141)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 142

1 It's like -- I don't understand why there isn't like
2 a -- like the equivalent of when the site goes down,
3 review when a kids dies.
4        You should bring in the parents.  You
5 should understand the circumstances.  You should
6 figure out how the product should change.
7        But one of the things that came out in
8 talking to the parents is they just were not able
9 to -- were not able to substantively engage with
10 Meta about what happened to their kids.
11        MS. JONES:  I'm going to move to strike
12 everything after "what you have to learn from that"
13 as nonresponsive.
14 BY MS. JONES:
15    Q.   Were these conversations on the order of
16 hours or minutes?
17    A.   Oh, goodness.  No.  I mean, I think each
18 parent would get at least half an hour to an hour
19 depending on context.
20        Sometimes -- I also had other conversations
21 that were shorter in nature with them.  So it
22 depended on the context.
23    Q.   Were there any conversations that ran for
24 longer than two or three hours?
25    A.   An individual?  Or with an aggregate group

Page 143

1 of parents?
2    Q.   Individual.
3    A.   Not that I recall.
4        MS. JONES:  Why don't we take a break.
5        THE VIDEOGRAPHER:  Stand by.  The time
6 is 11:21 a.m., and we're going off the record.
7        (Recess taken.)
8        THE VIDEOGRAPHER:  The time is 11:51 a.m.,
9 and we are back on the record.
10 BY MS. JONES:
11    Q.   Mr. Bejar, go back to Exhibit Number 1 and
12 go to page 4 for me, please.
13    A.   Okay.
14    Q.   I'm going to ask you to look at the fourth
15 bulleted paragraph which describes reporting flows
16 or talks about reporting flows.
17        Do you see that?
18    A.   I see that, yes.
19    Q.   And at the very end of the paragraph, it
20 says:
21        "Instagram's reporting flow is
22        flawed because it was not designed for
23        teens and does not reflect the harms
24        that they experience.  Only 1 in 100
25        would actually complete a report."

Page 144

1        Do you see that?
2    A.   Yes, I see that.
3    Q.   Are you familiar with that statistic?
4        MR. CARTMELL:  Objection.  Asked and
5 answered.
6        THE WITNESS:  Yes.  I believe we talked
7 about that statistic quite a bit in the deposition.
8 BY MS. JONES:
9    Q.   And my question is just -- my next question
10 is simply from what source is that statistic taken?
11    A.   That statistic is taken from the email I
12 sent to Mark Zuckerberg of work done with ████
13 ████  And I will say that the 1 in 100 is --
14 again, I did not write the sentence, so the 1-in-100
15 statistic is of people who had a bad experience on
16 Instagram.  So it wasn't a number that was for
17 teens.  I believe the number for teenagers is
18 slightly smaller than that.
19    Q.   Do you think that 1-in-100 number comes
20 from the email that you sent to Mark Zuckerberg in
21 October of 2021?
22    A.   Correct.
23        MS. JONES:  Can we pull that out and just
24 mark it.  I want to be clear on what we're talking
25 about.

Page 145

1 BY MS. JONES:
2    Q.   Mr. Bejar, while we're pulling that out,
3 the next sentence in that same paragraph says:
4        "The reporting flaw has the same
5        flaws today" -- excuse me -- strike
6        that.
7        The next sentence says:
8        "The reporting flow has the same
9        flaws today."
10        Do you see that?
11    A.   Yes, I do.
12    Q.   Do you know what the completion rate is
13 for -- the reporting flow for Instagram is today?
14    A.   Do you mean in general or teenagers?
15    Q.   Yeah, that's a fair question.  For
16 teenagers.
17    A.   Okay.  Are you doing that relative to the
18 number of teenagers who click on "report," or is it
19 relative to the number of teenagers who had a bad
20 experience?
21    Q.   The first one.  Do you know what that data
22 is today?
23    A.   Of the teenagers that click on "report" and
24 end up submitting a report -- because that's the
25 other aspect of that number that's important --

37 (Pages 142 - 145)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 146

1  because there's different pathways that are not
2  submitted reports, like marking as spam, or there's
3  other areas like that.
4      So I do not know what that number is today
5  or whether the way that number was done today has --
6  went -- the same amount of work went into it as the
7  number that I wrote to Mark Zuckerberg.
8      Q.  Do you know what that number has been since
9  you finished your role as a consultant in 2021?
10     A.  I don't know what that number is since.
11  What I have looked is at the reporting flow and see
12  how it has changed or not changed during then --
13  since then.
14     Q.  And so -- actually, let me show you what
15  we've marked as Exhibit Number 4.
16     A.  Okay.
17         (Exhibit 4 was marked for
18         identification and is attached to the
19         transcript.)
20  BY MS. JONES:
21     Q.  Just to go back to this point about the
22  1-in-100, Exhibit Number 4 is a copy of the email
23  that you sent to Mr. Zuckerberg in October of 2021.
24     If you scroll down to the -- you actually
25  have to go down to the bottom to grab the email to

Page 147

1  Mr. Zuckerberg.  Correct?
2      A.  Yes.
3      Q.  And I just want to make sure I understand.
4  The 1-in-100 figure that we've just been talking
5  about that's featured in Exhibit Number 1 to your
6  deposition, where is that here in your note to
7  Mr. Zuckerberg?
8      A.  Yeah.  (As read):
9          "51 percent of Instagram users say
10         'yes' to having had a bad or harmful
11         experience in the last seven days.  Out
12         of those, 1 percent report" -- submit a
13         report.  There's a typo here.
14         Out of those who do submit a report,
15  2 percent have the content taken down, a/k/a .02
16  percent.
17      I think we covered this pretty extensively,
18  that set of numbers, on my deposition.
19     Q.  Is this data in that paragraph at Exhibit
20  Number 4 -- is that data taken from the BEEF study?
21     A.  No.  That data, as I covered in, I think,
22  the last time you asked me about this -- or it came
23  out in a deposition -- was something I calculated by
24  ▮▮▮▮▮▮▮▮, with the help of other people, in
25  order to review the relationship of what we call

Page 148

1  sort of the funnel of harm; right?  And so that's
2  where that number came from.
3      We were exceptionally diligent about it, as
4  you have to be in an email that you send to Mark
5  Zuckerberg.
6      Q.  Mr. Bejar -- you can put that to the side.
7  I'm going to move on to something else.
8      You, at your last deposition -- you may or
9  may not recall -- I asked you if you had prepared a
10  written proposed warning that you believe should be
11  featured on Instagram.
12     Do you remember that?
13     A.  I would have to see the transcript.  I
14  remember that we had a conversation about warnings.
15     Q.  My recollection from the deposition is that
16  you said you would have to go back and look in your
17  files to determine if you had ever done that.
18     MR. CARTMELL:  Object.  Mischaracterizes
19  the testimony.
20     MS. JONES:  Well, I haven't asked my
21  question yet.
22     MR. CARTMELL:  Oh, sorry.
23  BY MS. JONES:
24     Q.  My question is do you have written down
25  anywhere a proposed warning that you believe should

Page 149

1  be associated with Instagram?
2      MR. CARTMELL:  Move to strike the statement
3  of counsel before the question.
4      THE WITNESS:  Do I have written down on
5  paper, like today, a proposed warning that today
6  should be given to parents of kids who -- sorry.
7      Like, are you talking about a blanket
8  warning or, like, a specific warning on a specific
9  aspect of the product?
10  BY MS. JONES:
11     Q.  Have you written down any kind of proposed
12  warning that should be featured on any part of
13  Instagram?
14     MR. CARTMELL:  Objection.  Asked and
15  answered.
16     THE WITNESS:  I mean, I think we've had
17  this conversation before, but I think that my
18  expertise is on, like -- and I believe that they are
19  needed, and I can talk about product interventions
20  that I have built around warnings and measured the
21  effectiveness of them and how you know it works or
22  not.  And that's an area where I have experience.
23     I do not have, like, a text that I've
24  drafted around a specific warning on a specific area
25  of their -- of the product.

38 (Pages 146 - 149)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 150

1  BY MS. JONES:
2     Q.  Mr. Bejar, let me ask you to look at --
3  back in Exhibit 1, page 6, the first bullet at the
4  top of the page.
5        Are you there?
6     A.  The one that begins with "being
7  transparent"?
8     Q.  It is.
9     A.  Yeah.
10    Q.  Okay.  It says:
11          "Being transparent and working
12       with outside experts is important for
13       designing and maintaining a platform
14       that is safe for kids."
15          Do you see that?
16    A.  Yes.
17    Q.  And I want to focus on the portion of the
18 statement that relates to working with outside
19 experts.
20        When you were at the company from 2009 to
21 2015, you had occasions where you were involved in
22 partnerships with external experts, whether
23 academics or other subject matter -- external
24 subject matter experts.  Is that right?
25        MR. CARTMELL:  Objection.  Asked and

Page 151

1  answered.
2        THE WITNESS:  As we covered in, I think,
3  the last -- the original three-day deposition, yes,
4  we did.
5  BY MS. JONES:
6     Q.  And when you were gone from the company
7  from 2015 to 2019, you would not have been involved
8  in discussions at the company about other
9  partnerships that might have gone on during that
10 period where you were not there; is that right?
11       MR. CARTMELL:  Objection.  Asked and
12 answered.
13       THE WITNESS:  I believe, as previously
14 answered in the earlier deposition, I was not.
15 BY MS. JONES:
16    Q.  And so from -- I guess, after you left in
17 2015 until 2019, you don't know what collaborations
18 or partnerships that the company was involved in?
19       MR. CARTMELL:  Same objection.
20       THE WITNESS:  I think we've covered this
21 already.  I did have conversations with some of the
22 people that were in the -- I think it's the safety
23 advisory board, but I might be getting the name of
24 the party incorrect in saying that.
25 ///

Page 152

1  BY MS. JONES:
2     Q.  I apologize.  I'm not sure if that was an
3  answer to my question.
4        When you were -- after you left in 2015, in
5  that period from 2015 to 2019, are you saying you
6  had conversations with someone at the company about
7  collaborations that they were doing?
8     A.  No.  The conversations I recall having are
9  with the academics around bullying and harassment,
10 that work from Yale that I had previously partnered
11 with that continued to be part of the advisory.
12       But, again, it might be the safety advisory
13 board or one of these things that I know the company
14 had around these issues.  And so I had conversations
15 with them about -- about how that was going.
16    Q.  Got it.
17    A.  It was during that time.
18    Q.  Got it.
19       But, sitting here today, in that four-year
20 period, you don't know what partnerships or
21 collaborations the company did or didn't have?
22       MR. CARTMELL:  Objection.  Asked and
23 answered.
24 BY MS. JONES:
25    Q.  Is that right?

Page 153

1     A.  I mean, as I said before, I do not have a
2  comprehensive list of -- of that.
3     Q.  What about since 2021, when you left your
4  stint as a part-time consultant to the company?
5        In the period from when you left your
6  consulting role in October of 2021 until the
7  present, do you have any visibility into what
8  partnerships or collaborations the company has
9  pursued specifically on the issue of teen safety and
10 well-being issues?
11    A.  I have had visibility into some of the
12 press releases that have gone, for example, around
13 Lantern, or some of the other features that have
14 been developed around sensitive body image, nudes --
15 I forget the exact name of the feature.  I would
16 need the press release in order to be able to quote
17 things specifically.
18       And so I have been reviewing the features
19 that the company has been announcing, which
20 sometimes includes partnerships with other people.
21    Q.  To the extent that there was a partnership
22 or a collaboration that was not described in a
23 public press release, is that something that you
24 would have been privy to after you left in
25 October of 2021?

39 (Pages 150 - 153)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 154

1    A.  I don't believe, other than what I've
2  already covered, that I was aware of other
3  partnerships, including things that might have been
4  done in confidentiality.
5    Q.  So is it possible, sitting here today, that
6  the company has had partnerships and collaborations
7  with external experts on child safety, teen safety,
8  and well-being issues that you just are not aware of
9  because you haven't been there since 2021?
10    MR. CARTMELL:  Objection.  Calls for
11  speculation.  Lacks foundation.
12    THE WITNESS:  Yeah, I mean, that again
13  feels like a really broad question -- like, is it
14  possible that something that I'm not aware of is
15  possible?  And so I don't have visibility about it.
16    And so, then, for the things I don't have
17  visibility about -- means that what I can talk about
18  is about how the product works; right?  And sort of
19  the -- sort of the ground truth of what that is.
20  BY MS. JONES:
21    Q.  Do you know what the Center for Social
22  Research is?
23    A.  Not off the top of my head.
24    Q.  Do you know anything about the work that
25  Meta has done with that organization?

Page 155

1    A.  I'm not aware of work that Meta has done
2  with the Center -- what did you call it again?
3    Q.  The Center for Social Research.
4    A.  The Center for Social Research.
5    Q.  What about Childnet International?  Is that
6  an organization you're familiar with?
7    A.  Yes, it is an organization I am familiar
8  with.  But, again, as I think we've covered, I'm a
9  little bit -- my brain needs kind of to look at the
10  site or some further information about the
11  organization for me to go, like, yeah, I know what
12  that is, and I've interacted with them or not.
13    Q.  Okay.  You're familiar.
14    Are you aware of that -- of the
15  collaboration work that Meta has done with Childnet
16  International?
17    A.  I can't recall right now.  I feel that if
18  you show me the work, I might be able to be, like,
19  yeah, I looked at that.  But in the abstract, it's
20  hard for me to triangulate.
21    Q.  Do you know what ConnectSafely is?
22    A.  It's similar to Childnet.  I am familiar
23  with ConnectSafely.
24    Q.  Are you aware of the work that Meta has
25  done with ConnectSafely?

Page 156

1    A.  As answered previously, I'm not privy to
2  the nature of their collaborations.  And all I can
3  speak to -- not all I can speak to, but I can speak
4  to changes that I've seen reflected in the product.
5    I mean, there's a relevant comment about
6  that from the Yale experts that were sitting in the
7  safety center thing.  But I want to be mindful of
8  time; so I'll mention but not go into any details
9  unless you ask me about it.
10    Q.  I appreciate it.  I would like you to be
11  mindful of time, if you wouldn't mind.
12    Are you familiar with something known as
13  iWIN, or the Institute of Watch Internet Network?
14    A.  The Institute of iWIN, that one does not
15  ring any bells for me.
16    Q.  Okay.  So you're not familiar with the work
17  that Meta has done with that organization?
18    A.  No, I am not familiar.
19    Q.  What about NetFamilyNews?  Are you familiar
20  with the organization known as NetFamilyNews?
21    A.  That's one of the ones that -- again,
22  similar to Childnet and similar to ConnectSafely, I
23  think I am familiar with that, but I would need more
24  information to be more precise on that.
25    Q.  Are you aware of the work that Meta has

Page 157

1  done with NetFamilyNews?
2    A.  As I answered about Childnet and
3  ConnectSafely and iWIN, I'm not privy to any sort of
4  collaboration details between those two companies --
5    Q.  What --
6    A.  -- or two entities.
7    Q.  I'm sorry.  I didn't mean to step on the
8  end of your answer.
9    What about Netsafe?  Are you familiar with
10  Netsafe?
11    A.  I'm not sure.  I am not sure whether I'm
12  familiar with Netsafe or not.  There are lots of
13  organizations that have "net" and "safety" in their
14  name.
15    Q.  That's a fair point.  I'm asking about
16  Netsafe, no space between "net" and "safe."
17    A.  Yeah.  I think, again -- my brain goes
18  like, there's -- I am aware with organizations that
19  have those two words in their name, but it might not
20  be this one.  I would need to look at more
21  information.
22    Q.  Are you aware of the work that Meta has
23  done with Netsafe?
24    A.  As I answered about Childnet,
25  ConnectSafely, iWIN, I'm not privy to what

40 (Pages 154 - 157)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 158

1 collaborations happen there.
2    Q.   What about Project Rockit?  And Rockit is
3 spelled with an "I" instead of an "E."  Are you
4 familiar with that?
5    A.   Yes, I am, actually.
6    Q.   Are you aware of the work that the company
7 has done with Project Rockit?
8    A.   As I've answered for Childnet,
9 ConnectSafely, iWIN, and Netsafe, I'm not privy with
10 the details about that effort.
11    Q.   What about SaferNet -- one word -- Brasil?
12 Are you familiar with that organization?
13    A.   SaferNet Brasil?
14    Q.   Yes.
15    A.   I'm just noticing that it's "net" and
16 "safe" in the same word but with "Brasil" added to
17 it.
18    Q.   Yeah.  Except it's "safer," not "safe."
19 SaferNet Brasil.
20       Are you familiar with that organization?
21    A.   No, I'm not familiar with SaferNet Brasil
22 that I recall.
23    Q.   Are you aware of the work that Meta has
24 done with SaferNet Brasil?
25    A.   As I answered previously for Childnet and

Page 159

1 the different organizations, I'm not privy to the
2 substance of those collaborations.
3    Q.   Are you aware that Meta has hosted eating
4 disorders and body image summits?
5    A.   Oh, yes.  I am.
6    Q.   And you understand that those summits are
7 held in partnership with the National Alliance for
8 Eating Disorders?
9    A.   Yes, I am.
10    Q.   And you know that Meta invites creators to
11 those events?
12    A.   Yes, I do.
13    Q.   Including -- they also invite experts on
14 body image issues?
15    A.   Yes, I do.
16    Q.   That Meta also invites members of treatment
17 centers in the US?
18    A.   Yeah.  I'm very familiar with events like
19 that.  I didn't host among this so many, but I
20 hosted similar events during my time at the company.
21    Q.   Do you know what Trust, Transparency &
22 Control Labs is?
23    A.   No, I'm not familiar with that.
24    Q.   So it sounds like you were not aware that
25 in 2018 the company started convening workshops

Page 160

1 around this TTC Labs concept, focused on designing
2 with teens and parents in mind?
3    A.   I mean, what I -- I'm very aware of is that
4 the company convenes a lot of workshops like this
5 with lots of different safety organizations, but
6 that -- like, when you open the reporting flow for a
7 teen account, that doesn't reflect changes from
8 that.
9       And that was consistent with my
10 conversation with the expert from Yale, which is
11 they would have these meetings, they would make
12 suggestions, but they wouldn't see effective product
13 changes in terms of things like the reporting flow,
14 where -- it's kind of where the rubber meets the
15 road -- one of the places where the rubber meets the
16 road.
17    Q.   Mr. Bejar, when we spoke at your last
18 deposition, I believe you testified that you oversaw
19 or managed engineers and product managers who worked
20 on age checkpoints.
21    A.   That is correct.
22    Q.   Sitting here today, do you know what
23 happens to an Instagram account during the
24 checkpoint process?
25    A.   Do you mean a checkpoint for -- because

Page 161

1 checkpoint is a pretty broad infrastructure, and
2 checkpoint can be used for a large number of
3 subjects.  And so --
4    Q.   That's a very fair point.  Let me be a
5 little more specific.
6    A.   Thank you.
7    Q.   Do you know what happens to an account
8 during the checkpoint process when the account is
9 checkpointed for the possibly that the user is under
10 13?
11    A.   I have not tested that.  I have not tested
12 the checkpoint on Instagram when a user is suspected
13 of being under 13.
14    Q.   Do you know what it takes to get an account
15 out of a checkpoint when the system recognizes the
16 possibility that a user might be under 13?
17    A.   So as I just answered, I don't have -- I
18 have not reviewed the experience today within the
19 product when an account gets checkpointed as being
20 under 13.
21    Q.   Do you know how often under-13 users are
22 cleared through the checkpoint process?
23    A.   I think, as I've covered in conversations
24 around this, there needs to be sort of transparency
25 about those kinds of completion, clearance rate, and

41 (Pages 158 - 161)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 162

1 related issues.
2      And if you were to show me today what the
3 checkpoint looked like, I could totally talk about
4 it well, because I built those for Yahoo and I built
5 those for Facebook.
6      And I'm very acquainted with all of the
7 issues related to completion rate of them, depending
8 on the proofing that you ask.
9      MS. JONES:  Respectfully, I'm going to move
10 to strike as nonresponsive.
11 BY MS. JONES:
12   Q.  My question is do you know how often an
13 under-13 user clears the checkpoint process?
14      MR. CARTMELL:  Object to the form.  Vague
15 and ambiguous.
16      THE WITNESS:  I believe that I have
17 answered the question at that -- I can evaluate a
18 checkpoint very well, given my experience with that
19 domain.  There's no published statistics about that
20 checkpoint or clearance, and I don't have access to
21 that data.
22 BY MS. JONES:
23   Q.  As part of recognizing that the
24 nonretained -- excuse me -- unretained expert
25 designation is more of an "us lawyers" thing than

Page 163

1 something you've necessarily focused on, did you do
2 any kind of comparative assessment across different
3 social media platforms to evaluate the effectiveness
4 of their age-gating and verification?
5      MR. CARTMELL:  Objection.  Move --
6      MS. JONES:  I am not finished with my
7 question.
8      MR. CARTMELL:  I'm sorry.  I'm sorry.
9 BY MS. JONES:
10   Q.  Did you do any kind of comparative
11 assessment across different social media platforms
12 to evaluate the effectiveness of their age-gating
13 and verification system?
14      MR. CARTMELL:  Object to the form and asked
15 and answered.
16      THE WITNESS:  I believe that we discussed
17 this already in the previous deposition, but I have
18 not yet done a systematic comparison between
19 platforms.
20 BY MS. JONES:
21   Q.  You said "not yet."  Are you planning on
22 doing it at some point?
23   A.  I think that, as part of the work that I've
24 begun with academic institutions, I believe that it
25 would be very good to have -- where there are

Page 164

1 comparisons to be made, to have those comparisons
2 happen.  So -- very early in terms of the way --
3 kind of thinking about it.
4      But I think that it's so important to have
5 sort of independent testing of how these different
6 platforms behave and documentation and comparison of
7 them.
8   Q.  Have you ever -- and I'm just -- this is
9 mostly just to understand if you have or have not.
10 And if you have, I'll follow up if needed.
11      But have you ever built a proactive
12 age-detection system?
13      MR. CARTMELL:  Object to the form as vague
14 and ambiguous.
15      THE WITNESS:  And you asked have I ever
16 built a proactive age-detection system?
17 BY MS. JONES:
18   Q.  I'm sorry.  Are you asking me if that was
19 my question?
20   A.  Yeah, I'm asking if that was your question.
21   Q.  Yes.  Yes.  My question was have you ever
22 built a proactive age-detection system?
23   A.  Yes.
24   Q.  Where did you do that?  At what company?
25   A.  We built one at Yahoo and we had some at

Page 165

1 Facebook.
2   Q.  Mr. Bejar, we talked at the beginning of
3 your deposition today about the reports that you
4 received from Dr. Ferrara and Mr. Starr, who are
5 experts in this litigation.
6      Do you recall us talking about those two
7 individuals?
8   A.  Yes, I do.
9   Q.  And I think you said earlier that you have
10 responsive -- and if I got this wrong, you can tell
11 me -- but that you have responsive views or opinions
12 to what you saw in the reports from Dr. Ferrara and
13 Mr. Starr; is that correct?
14   A.  That is correct.
15   Q.  What are those -- let's start with
16 Dr. Ferrara.
17      What are those opinions?
18   A.  Yeah.  So Dr. Ferrara characterized the
19 testing that I did as something called an
20 "algorithmic stress test," which is not an accurate
21 representation of the testing that I did.
22      The testing that I did is called "testing
23 scenarios."  And it comes from the field of security
24 testing.
25      And so I was not looking to answer the

42 (Pages 162 - 165)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 166

1 kinds of questions that you can get from algorithmic
2 stress testing. I looked at the spreadsheet which
3 was provided as part of this litigation, and out of
4 50 press releases, I tested 37 different things.
5 And the testing depended on the context of the
6 claims being made in the press releases like the one
7 that you shared earlier in the conversation.
8        So that's, I think, one issue which
9 might -- mischaracterizes the testing that I did.
10       I'm happy to talk in detail about
11 algorithmic stress test or unit testing or different
12 testing frameworks as it happens in the industry.
13       Another issue that I noticed is that -- in
14 Dr. Ferrara's reports -- is that basically he's
15 comparing -- that all of the -- all of the structure
16 that he lays out is based around prevalence.
17       And with all due respect to sort of
18 Dr. Ferrara, like, for example, where he talks about
19 bullying, there's kind of like a quote, "This is
20 kind of the policy of the company and these are the
21 things in place."
22       And, as I know from practice, multiple
23 service, and data, there are kind of pretty big gaps
24 there that he doesn't acknowledge.
25       To some extent, Dr. Ferrara's report is

Page 167

1 about content and content moderation; whereas BEEF
2 is about product design and harm as it happens in
3 the product. And so, then, in that context, it
4 doesn't really acknowledge what the gap is between a
5 teenager saying, "I've been bullied and it's very
6 intense and harmful," and the -- and whether that
7 content would actually trigger any of the policies
8 upon content review, which is sort of that
9 relationship between bullying and prevalence that we
10 talked about last time.
11       Other things that I noticed included, for
12 example, that he talks about, you know, reporting
13 flows could be misused. And he talks about somebody
14 who academically posited the idea.
15       And I think there's a really big difference
16 between sort of like an academic expert looking at
17 that question versus kind of the experience of
18 reviewing 800,000 bullying reports that included
19 information about intensity and not really seeing an
20 abuse of that such as brigading that he describes.
21       And so brigading applies in a different
22 context than the kinds of things that I talk about
23 in effective reporting.
24       I think that for Mr. Starr's report, it's
25 the same thing --

Page 168

1    Q.  I'm sorry. Can I just pause you for a
2 second.
3        Have we gotten through your responsive
4 views with respect to Dr. Ferrara, or are there
5 others?
6    A.  Those are the ones that I could do off the
7 top of my head. If you provide me a copy of the
8 report, I could be much more thorough about it;
9 right? I mean, this is what I was able to formulate
10 from the time I had with the report. I'm happy to
11 answer any specific questions around specific pages
12 around it.
13   Q.  Do you think it's possible you have other
14 opinions -- and it's okay if the answer is yes --
15 but do you have other opinions that just are not
16 occurring to you or that you think you will develop
17 down the road?
18       MR. CARTMELL: Object to the form.
19       THE WITNESS: I think that, given the time
20 to review the 100-page report, then I could be much
21 more methodical about calling out. And it's
22 possible that I will identify things that I did not
23 talk about just now.
24 BY MS. JONES:
25   Q.  And do you plan on going back and looking

Page 169

1 at Dr. Ferrara's report in that way?
2    A.  Yeah. I'll probably look at it in more --
3 with more time and space.
4    Q.  Okay. Let's talk about Mr. Starr.
5        What responsive opinions do you have with
6 respect to his report?
7    A.  So I think that there were a few that came
8 up again from the chance I got to review it. I
9 think the biggest one is, again, the similar tension
10 between when you talk about, like, CSAM, right, or,
11 like, content that you submit to NCMEC, where
12 there's clear exploitation in the continuity.
13       There's a very important and essential
14 criteria that goes into child exploitation images,
15 but -- that does not sort of capture what BEEF says
16 when you say, like, a kid gets an unwanted sexual
17 advance.
18       And so, for example -- which is something
19 that my daughter experienced as a teenager. She got
20 a message asking her to sell nude pictures of
21 herself. That is something that -- it is not really
22 clear in the reporting flow how she could have
23 reported it.
24       It is a grave matter when it comes to
25 minors and sexuality, and it was not covered by

43 (Pages 166 - 169)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 170

1  Mr. Starr's report.
2        And so there's this kind of
3  apples-to-oranges tension between what might be
4  exploitative content and the framework of seven
5  steps that he lays out about how do you deal with
6  these kinds of issues.
7        And if you were to put the seven things in
8  front of me, I was able to point out how what Meta
9  currently does is not responsive to the seven things
10 that he indicates.  But perhaps most importantly, he
11 doesn't talk about measurement.  He doesn't talk
12 about, like, providing interactions for minors to
13 indicate when they've experienced inappropriate
14 contact.
15       And so as an assessment of content-based
16 measures, it talks about a certain kind of content
17 accurately as an assessment of the design of the
18 product as it facilitates that harm, especially
19 relative to the testing I did about -- about, for
20 example, comments -- sexual comments that were shown
21 in the videos in the last deposition.  It's two
22 different things; right?
23       And so that was, I think, the main issue I
24 found with Mr. Starr's report.
25    Q.  Anything else, or is that what comes to

Page 171

1  mind for you at the moment?
2     A.  I mean, I think in both reports, the thing
3  that is really missing is an understanding of the
4  ground truth of a teenager that tells you they've
5  experienced something -- for which the content
6  moderation structure in place can address with.
7        And I understand this really well, because
8  one of the things I appreciated in Dr. Ferrara's
9  report is his mention about the Facebook immune
10 system and all of the features that went into the
11 design of that and how the company engaged with it
12 publicly, as well as the initial PhotoDNA
13 submissions.
14       And I was happy to see the acknowledgment
15 of that because that was the work that I oversaw
16 when I was working there for the company.  So I saw
17 the publication of that paper and their rebuilding
18 of that infrastructure.  And so I know what that
19 infrastructure can do.
20       And the question here is not about what
21 that infrastructure can do.  The question is about
22 what the infrastructure is not doing and where you
23 can find the gaps within that, which is what BEEF is
24 all about.
25    Q.  Do you have any other responsive opinions,

Page 172

1  having reviewed Mr. Starr's report?
2        MR. CARTMELL:  Object to the form.
3  Mischaracterizes.
4        THE WITNESS:  I mean, I think, as you asked
5  me earlier, with more time to review, I could
6  prepare a much more thoughtful set of -- I mean,
7  this is pretty -- what I shared is well-informed,
8  but I could be like, okay, in paragraph 17, this
9  thing is said and that.  And I could be much more
10 detailed about that.
11       Of course, there was no time to do that.
12 And so -- and so there's likely other things I will
13 find upon further review or a much more systemic
14 description of the issues on the report, given the
15 time to review.
16 BY MS. JONES:
17    Q.  Do you intend to go back and review this --
18 Mr. Starr's report in greater detail?
19    A.  I mean, I think -- I think it's always good
20 for me to sort of understand how people describe or
21 talk about a lot of these issues.  But, of course, I
22 would have to be extremely mindful of the
23 confidentiality provisions within this.  And so I'm
24 not sure if I will or not yet, and in how much
25 detail -- unless I know that I'm going to have to do

Page 173

1  something about it, if that makes sense.
2        MS. JONES:  Okay.  I'm almost finished and
3  also almost out of my principal time.  Why don't we
4  go off the record and take another break.
5        THE VIDEOGRAPHER:  Stand by.  The time
6  is 12:30 p.m., and we're going off the record.
7        (Recess taken.)
8        THE VIDEOGRAPHER:  The time is 12:51 p.m.,
9  and we are back on the record.
10 BY MS. JONES:
11    Q.  Mr. Bejar, go for me, if you would, back to
12 Exhibit Number 1, page 6.
13    A.  I have to change my glasses.
14    Q.  This is actually the same bullet.
15 Actually, this might be a different bullet than the
16 one we were talking about earlier.  No, it's the
17 same one.  The first bullet on the top of page 6,
18 the last sentence of that paragraph says:
19       "Despite Meta's public claims,
20 Meta is not an industry leader for
21 transparency."
22       Do you see that?
23    A.  Yes, I see that.
24    Q.  Is that an opinion that you hold?
25       MR. CARTMELL:  Objection.  Asked and

44 (Pages 170 - 173)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 174

1 answered.
2        THE WITNESS:  I mean, as we've talked about
3 extensively about transparency, yes, I do believe
4 that -- well, in particular, I believe that Meta's
5 CSER center is misleading.
6 BY MS. JONES:
7     Q.   Is there any company that you would
8 describe as the industry leader for transparency?
9     A.   There is not.
10     Q.   We were talking earlier about proactive
11 age-detection.
12        Do you remember that?
13     A.   Yes.
14     Q.   And I believe you said that you had a role
15 in developing proactive age-detection systems when
16 you were at Yahoo, and then I'd understood you to be
17 saying during your first tenure at Meta; is that
18 right?
19     A.   That is correct.
20     Q.   And just to make sure we're using the same
21 terms, when you think of a proactive age-detection
22 system, are you conceiving of that as an
23 age-modeling system to actually guess what someone's
24 age is?
25     A.   An age-modeling system would be a

Page 175

1 sub-example or an instance of proactive age
2 detection.  You could also review content or look at
3 other forms of behavior from a device, for example,
4 things like that.
5     Q.   When you were at Yahoo, did you have any
6 involvement in developing systems to model a user's
7 age to guess what that user's age was?
8     A.   So if your question is about looking at
9 features in content or account in order to estimate
10 age, I mean, I think a lot of the things that we
11 built when COPPA first came out was looking at
12 certain behavioral signals.
13        And, in particular, I think we looked at
14 places where kids were trying to manipulate the age
15 in the product and manipulating the age in the
16 product from specific devices.
17        At that time there were not yet available
18 the kind of machine-learning tools that was the fake
19 account infrastructure that the protect and care
20 team built as part of the Facebook immune system.
21     Q.   And I guess I want to just make sure I
22 understand your -- the answer to my question.
23        When you were at Yahoo, were you involved
24 in developing systems that were intended -- that
25 were modeled -- based on a model to guess what

Page 176

1 someone's age was?
2     A.   When I was at Yahoo as advancer, it was
3 involved in systems that look at certain behavioral
4 patterns in order to establish that the age of the
5 account might be something that needs to be acted
6 on, which would then turn into what can be generally
7 be called a checkpoint.
8        At the time we didn't have the
9 infrastructure that was initially built in 2010 --
10 2009, 2010.  And it's much more sophisticated now.
11     Q.   Remind me what years you were at Yahoo.  I
12 apologize.
13     A.   1998 through 2009.
14     Q.   And then, to the extent that you were
15 involved in that type of proactive age-verification
16 work at Facebook, during what time period was that?
17 What years?
18     A.   20- -- the entirety of my tenure, 2009 to
19 2015, the product manager that was in charge of that
20 reported directly to me, eventually, once the
21 product organization got consolidated.  And then the
22 engineers that worked on those issues also reported
23 through -- up to me through that part of the team.
24     Q.   And maybe focusing on the Facebook portion
25 of this, what's your specific understanding of what

Page 177

1 the engineering work involved in those projects
2 entailed?
3     A.   So, in general, basically, what you need to
4 do is you need to build classifiers that look at
5 different features in accounts.  That can be as
6 simple as a piece of text, like "account supervised
7 by parent" or that look and can do sort of
8 estimation on the bulk of the content of the
9 account.
10        There's, like, a number of features that
11 you can use to assign a score to an account where
12 you can basically say this is the likelihood that
13 this account is.
14        And then you pick your -- the
15 infrastructure to do that kind of, like, approximate
16 categorization based on features was one of the
17 things that I -- teams that I managed, built, and
18 deployed in different contexts.  So all this sort of
19 classifier infrastructure.
20        And then the other thing that you need,
21 which I also managed the team for, is once you have
22 a certain level of confidence about something, you
23 will take different action -- you can take different
24 actions depending on how confident you are about the
25 issue.

45 (Pages 174 - 177)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 178

1    One of the things that the team built that
2 the product manager talked about would work on is
3 the checkpointing system which, as we have
4 discussed, one of its purposes is to checkpoint an
5 account when you have reason -- sufficient reason to
6 believe that it might be a minor, and then you can
7 ask for further proofing information when that is
8 the case or, in particular, an account that's under
9 13, to be more precise about the stuff that we had
10 worked on.
11    Q.   Since you left Meta in 2015, have you had
12 any roles that involve supervising engineers who
13 were directly involved in the creation of proactive
14 age detection -- excuse me -- proactive
15 age-detection systems?
16    A.   During the time that I was at Instagram
17 from 2019 to 2021, I was not aware of any
18 substantive efforts around that.  And I believe that
19 those engineers would have reported through ███
20 ████████ who was responsible for that general class
21 of issues within Instagram.
22    MS. JONES:  I'm going to move to strike as
23 nonresponsive.
24 BY MS. JONES:
25    Q.   My question was since you left Meta in

Page 179

1 2015, have you had any roles that involve
2 supervising engineers who were directly involved in
3 the creation of proactive age-detection systems?
4    A.   I mean, adding to the answer I just gave, I
5 did not manage engineers during the time that I was
6 working on this class of issues during my second
7 stint at Meta.  But I have, gosh, decades of
8 experience managing engineers who built those kind
9 of systems.
10    Q.   Sure.  And I'm just focused on the time
11 after you left Meta in 2015.
12    Other than what you've described in terms
13 of your time at Meta as a consultant from 2019 to
14 2021, have there been any other periods since 2015
15 when you have been responsible for overseeing
16 engineering work on proactive age-detection systems?
17    A.   No, I have not, in the context of outside
18 of the things that we've already covered.
19    Q.   Did you testify earlier that the reporting
20 flow for Instagram has not changed over the years?
21    MR. CARTMELL:  Object to the form.
22 BY MS. JONES:
23    Q.   And if I have that wrong, that's fine.  I
24 just want to make sure.
25    Was your earlier testimony that the

Page 180

1 reporting flow for Instagram has not changed?
2    MR. CARTMELL:  Same objection.
3    THE WITNESS:  Again, that is too broad of a
4 question.  I believe I used the word
5 "substantively."
6    And so, for example, in -- when I first
7 became aware of the unwanted sexual advances issues
8 and what my daughter was experienced with regards to
9 receiving unwanted intimate pics, I reviewed the
10 flow.  That would have been in 2017, '18, when I
11 first came across it.  And the last time I reviewed
12 the flow for that same issue was yesterday.  And the
13 options are the same set of options that I believe a
14 teenager would never use.
15    And so I still believe that there's no
16 effective way for a teenager to indicate when
17 they've experienced unwanted sexual advances, as the
18 reporting flow is implemented both for messages as
19 well as for comments.
20 BY MS. JONES:
21    Q.   Okay.  Let me just make sure I understand.
22    You said you reviewed the flow in 2017 and
23 2018, and then you reviewed the flow for the same
24 issue yesterday; is that right?
25    A.   Yes.

Page 181

1    Q.   In that period between 2017, 2018, and
2 yesterday, did you have -- have you been
3 continuously checking the reporting flow for
4 Instagram to see what changes have happened?
5    A.   So from 2019 through 2021, I spent a
6 significant amount of time working with engineers
7 and the product managers for that part of the
8 product.  And I experienced firsthand the difficulty
9 of trying to do any changes to that part of the
10 product.  So I don't believe there were any
11 substantive changes about it, although I am aware of
12 a couple of minor changes that were done during the
13 time I was at Instagram.
14    Since the first time my daughter
15 experienced to present day, I keep looking and
16 hoping that -- that there is an option that does
17 allow a teen to say, you know -- I mean, you can't
18 even effectively say this account is fake, like --
19 which is, like -- again, when you look at everything
20 that we've learned about effective reporting flows
21 as part of the framework in place when I was there
22 originally.
23    Now, have I looked at every single option
24 and made sure that that list of options has not
25 changed over time?  That, I have not done because I

46 (Pages 178 - 181)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 182

1 tend to focus on a sort of few issues that I visit
2 regularly.
3    Q.   So after you left your consultant role in
4 2021, between then and yesterday, were there other
5 occasions where you checked the reporting flow for
6 Instagram?
7    A.   Yes, there were other occasions that I
8 checked the reporting flow for Instagram.
9    Q.   How many occasions?
10    A.   Wow.  Yeah, just off the top of my head, I
11 would say at least 30 to 50.
12    Q.   Prompted by what exactly?
13    A.   There were two primary drivers; right?  One
14 of them is after my conversation with Adam Mosseri
15 about unwanted sexual advances.  And the impression
16 that I got from him -- that it was something that
17 they would fix or address within the context of the
18 product -- and the ease of doing it and how you
19 design that interaction to be rewarding, I kept
20 hoping that change would show up; right?
21        Because I think, ultimately, when I look at
22 a press release, I don't understand how Meta can
23 make any claims about inappropriate contact when
24 there's no method for a teenager to indicate when
25 that is happening -- that I believe a teenager would

Page 183

1 use based on the experience of building those kind
2 of tools in my first stint.  That was the first sort
3 of reason for that.
4        But the other one is I tried to be sort of,
5 like, accurate in the way that I talk about these
6 things.  So, for example, prior to testifying in the
7 Senate, prior to talking to the Oversight Board at
8 Facebook, I would go and just test; right?
9        And yesterday I did it because I knew I was
10 going to be here.  And that was the one thing I
11 wanted to look at, which is is there a good
12 interaction for a teenager to flag when they've
13 experienced unwanted sexual advances.  And I could
14 not find that one yesterday.
15    Q.   Was there -- the next three words are going
16 to be in quotes, but was there an "involves a child"
17 category in 2017 in the reporting flow for
18 Instagram?
19    A.   As I said in the conversation earlier, I
20 did not map the entire tree out of doing that.  And
21 if there is such a category, I'm not sure that a
22 child would use it to indicate themselves.
23    Q.   Mr. Bejar, not in a legal capacity but in
24 your operational role that you've had, are you aware
25 that there are certain laws and regulations that

Page 184

1 govern the ability of a company to collect data
2 about children?
3    A.   Yeah.  I --
4        MR. CARTMELL:  Object to form.  Sorry.
5        THE WITNESS:  Sorry.  Go ahead.
6        MR. CARTMELL:  I just objected.
7        THE WITNESS:  Yeah.  I -- that was one of
8 the issues that I managed for the company because I
9 was responsible for the reporting flow.  So one of
10 the conversations was what are things that you can
11 and can't put in?
12        And the basis of the recommendations that
13 I'm making, the choice of language that I use, are
14 things that, based on all the experience -- I know
15 you could -- you can put into a flow without
16 triggering some of the obligations that come with
17 certain issues; right?
18        And so I understand very well, for example,
19 things around suicide.  If you have an open box
20 where a teenager can tell you what they're
21 experiencing with an issue, you need to make it
22 clear that that's not the place to indicate that
23 there might be, like, a suicide issue.  And that was
24 part of a dialogue with the policy team and the
25 legal team around considerations.

Page 185

1        Now, you can put open text fields where a
2 teenager is telling you what's happening.  You just
3 have to approach it with care when it comes to these
4 considerations.  And yes, I have experience,
5 extensive experience, with that.
6 BY MS. JONES:
7    Q.   Well, my question was just did you know
8 that there are rules about the collection of data
9 from kids?
10        It sounds like you did know that; is that
11 right?
12    A.   Absolutely.
13    Q.   Okay.  So, for example, you're familiar
14 with a statute known as COPPA?
15    A.   Yes, I am.  When COPPA first came out, I
16 was the engineering and product person at Yahoo
17 responsible for compliance, and it was one of the
18 areas that the protect and care team worked on.
19    Q.   How is it that you construct a system that
20 accounts for the legal and regulatory framework that
21 covers what information can be collected and
22 processed and retained about children on a social
23 media platform?
24    A.   Yes.  So the -- the line that is pretty
25 bright is when you are aware with enough confidence

47 (Pages 182 - 185)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 186

1 that an account is -- for example, under 13 in the
2 case of this context, and you have to treat that.
3        Now, the keyword there is "confidence" and
4 then "checkpoint." So you can build a set of
5 classifiers that discover the kind of content --
6 which I found an incredible amount of during my
7 testing.
8        And based on the features of those
9 accounts, you can then have a product intervention
10 where, if it's an account run by a parent or the
11 child claims, then you give them an opportunity to
12 demonstrate that. If -- but then you kind of have
13 to do identity verification of the parent within the
14 right privacy considerations.
15        You should be able to ask the parent -- a
16 chance to let you know how old is the kid actually.
17 And then the moment that you become aware in that
18 kind of disclosure that the account is under a
19 certain age, then you will delete it.
20        And there's sort of a tree there. In being
21 mindful of time, I'm not going to go through the
22 entire tree there.
23        Part of that, which is essential in these
24 programs, though, is the reporting of these
25 accounts. And that's one of the things which --

Page 187

1 asking about reporting flows -- I have tested
2 multiple times in recent years, which is the number
3 of steps that it takes to report an account as being
4 under 13.
5        And, as I indicated to the Oversight Board,
6 seven steps. You go off-site, you have to copy the
7 name of the account. That is something that is
8 designed with enough friction that I can't imagine
9 what the completion rate is on somebody beginning to
10 say this account is under 13 -- which you cannot
11 even do from Reels. You have to jump a number of
12 steps.
13        And that, I think, is part of the central
14 part of designing an effective program. You want
15 some detection. You want ease reporting. You want
16 a checkpointing infrastructure that's mindful of
17 privacy and uses different technologies.
18        I do believe that Meta has now much better
19 technologies than were available for us at the time,
20 like the selfie videos and other things, that would
21 be so effective at helping this thing, but then you
22 need to attend to every aspect of the program.
23        MS. JONES: Okay. I think -- where am I on
24 my time?
25        THE VIDEOGRAPHER: It's eight.

Page 188

1        MS. JONES: Oh, okay.
2 BY MS. JONES:
3        Q.  Would you agree, Mr. Bejar, that in the
4 last 10 years, there have been meaningful changes in
5 the technological landscape in terms of age
6 detection and prediction and verification methods
7 that are available?
8        MR. CARTMELL: Objection. Vague and
9 ambiguous.
10        THE WITNESS: Sorry. Are you saying if
11 a -- domain on technology has changed in the last
12 10 years?
13 BY MS. JONES:
14        Q.  Yes.
15        MR. CARTMELL: Same objection.
16        THE WITNESS: The question feels pretty
17 broad. Do you have a more specific question than
18 that?
19 BY MS. JONES:
20        Q.  No.
21        A.  So in that context, I do believe that there
22 have been technological improvements on age
23 verification. I have not seen evidence of those
24 improvements being applied. And I've seen evidence
25 of features like Yoda baby filter faces that, as far

Page 189

1 as I could tell, were primarily used by very young
2 children.
3        MS. JONES: Okay. Am I at my time, or do I
4 have time for another question?
5        (Brief discussion held off the
6        stenographic record.)
7        MS. JONES: Okay. We're going to mark your
8 notes per my discussion with your counsel at a
9 break.
10 BY MS. JONES:
11        Q.  I guess my last question, if I'm able to
12 get it in under the line, is is there any social
13 media company that you would say they have properly
14 optimized for age verification?
15        MR. CARTMELL: Object to the form.
16        THE WITNESS: So I think -- as I have said
17 earlier, I do think it is going to be important for
18 there to be kind of like a systematic assessment of
19 these different aspects of an age-verification
20 program and product solution that should be assessed
21 that -- I'm not aware of somebody having done that
22 kind of study yet. Because of my expertise in the
23 field, I know what would be involved in such a
24 thing.
25        I don't know if I'm going to help an

48 (Pages 186 - 189)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 190

1 academic institution undertake that work or not, but
2 I tend to focus in this context because I do have a
3 great breadth of expertise in the context of
4 particularly Meta's technologies.
5       MS. JONES: I think I'm at my time. I
6 would keep going but, assuming counsel will not
7 agree to that, I will just note for the record that
8 we have had issues with responsiveness, all due
9 respect, Mr. Bejar, and we'll almost certainly be
10 seeking additional time with this witness. But
11 we'll pass him for the time being.
12       MR. WARD: Thank you, Counsel. Have you
13 had sufficient time to ask him about Exhibit
14 Number 2, his rough notes of an intended future
15 article for --
16       MS. JONES: No.
17       MR. WARD: -- for reference's sake?
18       You asked him about -- you asked him about
19 them for several minutes, but I want to know if you
20 have more questions about Exhibit Number 2.
21       MS. JONES: Are you giving me more time?
22       MR. WARD: I am willing to give you more
23 time, Counsel.
24       MS. JONES: Is everybody else agreeing to
25 that?

Page 191

1       MR. CARTMELL: Well, we kind of had an
2 agreement it was three and a half hours. But if you
3 have additional questions on Exhibit 2, I guess --
4       MS. JONES: I have more questions on a lot
5 of things. So if I'm getting more time, it's going
6 to be more than just Exhibit 2.
7       MR. WARD: I'm willing to give you more
8 time to ask about Exhibit 2 right now.
9       Do you have more questions you'd like to
10 take on Exhibit Number 2?
11       MS. JONES: Well, not if we're later going
12 to say, "Well, you used your additional time."
13       MR. CARTMELL: I'm willing to let you ask
14 questions about Exhibit 2.
15       MS. JONES: Are you willing to have us get
16 more time with him later or no?
17       MR. CARTMELL: No.
18       MS. JONES: Okay. Well, then --
19       MR. CARTMELL: We're here today. His
20 attorney is saying that you can ask more questions
21 about Exhibit 2 if you want.
22       MS. JONES: We're passing him for the
23 moment.
24       MR. WARD: Do you have more questions about
25 the expert reports from Mr. Starr and Dr. Ferrara

Page 192

1 that you'd like to pose the witness today -- he said
2 he's reviewed them and he's prepared to answer
3 specific questions about those reports.
4       Do you have questions you'd like to pose to
5 him on those reports?
6       MS. JONES: What he said is he -- I don't
7 remember what the adverb was, but he reviewed them
8 at some medium-to-high level and that he plans to
9 review them in greater detail and will have further
10 thoughts on them. So --
11       MR. WARD: He did say that, but he also
12 said that he has reviewed them in enough detail that
13 he can answer, and he has additional observations
14 about the reports today that you're free to ask him
15 about if you'd like to right now.
16       Would you like to?
17       MS. JONES: Mike, if what you're doing is
18 making a record, you've made your record.
19       MR. WARD: I am -- I am --
20       MS. JONES: For the record --
21       MR. WARD: -- making a record. You're
22 correct.
23       MS. JONES: Yes. Your record is made.
24       MR. WARD: But I would like to continue to
25 make the record.

Page 193

1       MS. JONES: Would you do it --
2       MR. WARD: Don't interrupt me.
3       MS. JONES: Would you do it at a lesser
4 volume?
5       MR. WARD: I'm not yelling. So don't
6 suggest that I am. This is on videotape. People
7 will be able to tell that I'm not yelling.
8       MS. JONES: You're --
9       (Simultaneous speaking.)
10       MR. WARD: So don't waste time doing that.
11       The question is, for today, do you have
12 more questions you would like to ask the witness
13 about Mr. Starr's report and Dr. Ferrara's report?
14       MS. JONES: The witness has not said that
15 he's fully reviewed the reports and fully developed
16 all his opinions on the reports. No.
17       MR. WARD: He said he's reviewed them in
18 sufficient detail that he's willing to answer
19 questions about them, taking the --
20       MS. JONES: I've already made my position
21 on this -- on this issue clear.
22       MR. WARD: Perfect. Thank you.
23       MR. CARTMELL: I would just note that he --
24 I think he said that if you give him the reports and
25 ask him questions specifically about it, that he

49 (Pages 190 - 193)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 194

1 would have an opinion.
2      So we have the reports here.  If you want
3 to ask him questions, I'll allow questions on those
4 reports.
5      MS. JONES:  So how long are we going -- how
6 much more time are you giving me today?
7      MR. CARTMELL:  Well, on those reports, I
8 can't imagine you have a lot of questions.  But I'm
9 willing to -- because his attorney wants to nail
10 this right now and get it done -- he's already been
11 on the record for over 25 hours.
12      MS. JONES:  Yes, we can all do the math.
13      MR. CARTMELL:  12 of those -- or 12 and a
14 half of those are yours.  And so to get this done
15 for the witness's sake and sanity's sake, then I'll
16 let you ask about those two reports.
17      MS. JONES:  All right.  Well, let's take a
18 break.
19      MR. CARTMELL:  Okay.
20      THE VIDEOGRAPHER:  Stand by.  The time
21 is 1:16 p.m., and we're going off the record.
22      (Recess taken.)
23      THE VIDEOGRAPHER:  The time is 1:40 p.m.,
24 and we are back on the record.
25 ///

Page 195

1 BY MS. JONES:
2    Q.  Mr. Bejar, you have what appears to be an
3 expert report in front of you.
4      Whose expert report is that?
5    A.  This one is John Starr.
6    Q.  Okay.  Well, as a matter of good order, we
7 need to mark that as an exhibit, if that's the one
8 we're going to use.  So let me take that.
9      MS. JONES:  What number are we on?
10      MS. INTERIANO:  Five.
11      MS. JONES:  Okay.
12      (Exhibit 5 was marked for
13      identification and is attached to the
14      transcript.)
15      MS. JONES:  We can hand you-all excerpts
16 from John Starr's report, but -- if you want the
17 excerpts that refer to Mr. Bejar -- but we don't
18 have the whole thing.
19      MR. CARTMELL:  I think it's not necessary.
20 We have a copy.  Thanks.
21      MS. JONES:  Okay.  Let's also go ahead and
22 mark the reports for Dr. Ferrara.
23      (Exhibit 6 was marked for
24      identification and is attached to the
25      transcript.)

Page 196

1      MS. JONES:  I'm handing you what we've
2 marked as Exhibit 6, the opening report for
3 Dr. Ferrara.
4      (Exhibit 7 was marked for
5      identification and is attached to the
6      transcript.)
7      MS. JONES:  And in the interest of paper,
8 we're just handing you an excerpt from the
9 Dr. Ferrara -- what is known as a rebuttal report.
10 That would have been he did his opening report and
11 then he did a separate report after plaintiffs
12 served their own report.  So that's why there are
13 two of those.
14 BY MS. JONES:
15    Q.  Okay.  Have you now had an occasion to
16 review the entirety of the expert reports that were
17 served in the JCCP proceeding for Dr. Emilio Ferrara
18 and Mr. Starr?
19    A.  Yes.
20    Q.  Okay.  We'll come back to that.  Let me ask
21 you to pull out Exhibit Number 2.
22      Do you have that document in front of you,
23 Mr. Bejar?
24    A.  I do, yes.
25    Q.  And Exhibit Number 2 is the source

Page 197

1 materials for a report document that was produced
2 from your counsel.  We talked about it earlier;
3 correct?
4    A.  Correct.
5    Q.  And it refers to this March 2025
6 comprehensive review of Meta's teen accounts; right?
7    A.  Uh-huh.
8    Q.  In the third paragraph -- it's actually the
9 paragraph that comes right under the web address, it
10 begins with "the list."
11      Do you see that?
12    A.  Uh-huh.
13    Q.  It says:
14      "The list included 50 entries
15      about Instagram safety features."
16      Do you see that?
17    A.  Yes.
18    Q.  What list does that refer to?
19    A.  The list that is linked to about -- which
20 has -- I believe, had three further entries since I
21 first began working on it.  Again, there's also
22 proof for me for these things is the spreadsheet I
23 provided.
24    Q.  This is -- when you say the spreadsheet you
25 provided, you're talking about the spreadsheet that

50 (Pages 194 - 197)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 198

1  you provided before your first deposition?
2      A.   Correct.
3      Q.   Have there been changes to that spreadsheet
4  since your deposition in April of this year?
5      A.   I haven't added the rows to the -- for,
6  like, the three things that I noticed were now on
7  the page above.  I have, I think, one other version
8  of that spreadsheet which I've annotated for my
9  reference with -- with -- like, I put an X on the
10  things that I tested.
11      But it's a whole way of capturing
12  information that was on the initial version of the
13  spreadsheet.  I have not added anything substantive
14  to the spreadsheet other than annotating the things
15  that were already there based on the initial
16  testing, to be precise.
17      Q.   Well, let me ask you this:  Is there now --
18  are there now two spreadsheets that exist?  One
19  that's a copy of the other that's been changed in
20  some way?
21      A.   That is correct.
22      Q.   All right.  And the second version of the
23  spreadsheet, the changes that are included there are
24  what specifically?
25      A.   So what I did is I wanted to count the

Page 199

1  number of testing scenarios that I had done.  So I
2  added a column to help me run an account function on
3  the testing scenarios that I've done, which was, I
4  believe, 37.
5      Q.   I'm not sure I understood.  What was 37?
6  You've done 37 testing scenarios?  Is that what you
7  mean?
8      A.   That is correct.
9      Q.   Okay.  And when was the -- this separate or
10  second version of the spreadsheet created?
11      A.   Yesterday.
12      Q.   And do you know whether that's been -- have
13  you given that to your counsel so it can be produced
14  to us in response to the subpoena you received?
15      A.   No.  I have not given that to counsel.  I
16  haven't shared it.  It was just for me to work on --
17  on doing that count.
18      Q.   Do you have any problems with having it
19  produced to us in response to the subpoena you were
20  served with?
21      A.   I mean, I think I always rely on my
22  counsel's guidance on what gets reproduced.  I have
23  no problem producing it to my counsel.
24          MR. WARD:  We'll produce it.
25  ///

Page 200

1  BY MS. JONES:
2      Q.   Have there been -- for the first
3  spreadsheet that you produced, have there been any
4  changes to that copy of the spreadsheet?
5      A.   No.
6      Q.   And what was it that prompted you to make
7  the changes in the second version of the spreadsheet
8  that you did yesterday?
9      A.   I wanted to be able to count the number of
10  test scenarios that I had done, because there were
11  50 entries.  And then of the 50 entries, there
12  were -- I didn't test everything.  So, for example,
13  there's a set of features that relates to blocking
14  and that are kind of the evolution of blocking as a
15  feature.  I did not test that.  I tested many other
16  things.
17      And so that's why the number is 37 instead
18  of 50, because I separated out those instances where
19  I had a testing or evaluation scenario from the ones
20  that I did not.  But that's -- that date is in the
21  spreadsheet, the original spreadsheet annotations.
22      Q.   And why -- why is it that you would have
23  done 37 testing scenarios instead of 50?  I
24  apologize if I didn't catch that.
25      A.   Because part of the thing that I was doing

Page 201

1  is I was looking at things from the lens of what is
2  a safety tool.  And for the definition of a safety
3  tool, a tool like blocking or restricting or limit
4  is a tool that doesn't -- like, it's basically what
5  I labeled in the first version of the spreadsheet, a
6  damage-done tool.  So something bad has happened.
7  You block.  So block doesn't prevent the initial
8  damage that happened.
9      And unless a teen uses the reporting
10  function within block which, again, I've expressed
11  reservations about that -- or block meets a specific
12  narrow criteria.  It doesn't get used for protecting
13  other people.  And so I didn't test block for that
14  reason.
15      If you bring up the spreadsheet, I can give
16  you details about which ones I did and I didn't
17  test.  And I'm happy to go through it in as much
18  detail as you would like.
19      Q.   Well, we only have the first spreadsheet.
20  We don't have the second one; right?
21      A.   All I did is add Xs to the things that have
22  entries on the -- on the first spreadsheet.
23      Q.   Is it written down anywhere why you decided
24  to test the 37 tools but not the other 13?
25      A.   It's in the spreadsheet, but my thought

51 (Pages 198 - 201)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 202

1 process is not in the spreadsheet.
2    Q.   Okay.  Let's look at the same paragraph in
3 Exhibit Number 2.
4        So you have a list that included 50 entries
5 about Instagram safety features; correct?
6    A.   Uh-huh.
7    Q.   Yes?  You have to say "yes" or "no."
8    A.   Yes.
9    Q.   And it sounds like the review that you did,
10 you tested or ran testing scenarios for 37 of those
11 entries; is that right?
12    A.   That is correct.
13    Q.   And you kind of explain your thinking about
14 how you did the 37 of the 50.
15        The paragraph goes on to say:
16        "In the list there are tools that
17        have been deprecated (for example,
18        'Take a Break'), or fundamentally
19        changed as to not serve their original
20        purpose...some of the announcements are
21        improvements on Safety Tools."
22        Do you see that?
23    A.   Yes.
24    Q.   And when you say "in the list," you're
25 referring to what?  Your spreadsheet?

Page 203

1    A.   No.  The link above.
2    Q.   Oh.  I see.  Okay.
3        And you specifically refer to Take a Break
4 being deprecated in this document you've been
5 working on; right?
6    A.   That is correct.
7    Q.   When was Take a Break deprecated in your
8 understanding?
9    A.   I don't have data about when.  What I know
10 is in -- when I did the testing, as evidenced in the
11 spreadsheet, I could not find the feature or the
12 setting as described in the press releases.
13        And in that and other mental health
14 features, like topic nudges or time-spent nudges,
15 spending significant amount of time on the
16 application, I could not get those to trigger
17 either.
18        And so I could not get the product to be,
19 Oh, you've been looking at Reels for too long, or
20 You've been looking at Discover for too long, or
21 these things that -- I had gone from the -- what's
22 in the press release.
23        And a good example of that was Take a
24 Break, which talked about different interventions
25 and even working with creators to create different

Page 204

1 interventions so that it could -- would take a
2 break.  And I could not get that to trigger, and I
3 could not find any settings for it.
4    Q.   And this was in March of 2025 that you were
5 looking for Take a Break and couldn't find it?
6    A.   Yes, that is correct.  That's captured in
7 the spreadsheet.
8    Q.   And prior to March of 2025, did you know
9 one way or the other whether Take a Break was still
10 available on Instagram?
11    A.   What I know is that on March of 2025, it
12 was not.
13    Q.   And was March -- March of 2025, that was
14 the first time you had ever specifically been
15 looking to see whether that tool or feature
16 functioned?
17    A.   That is correct.  Because it was during
18 March of 2025 when I went and I looked at all of the
19 press releases and then assessed the feature
20 depending on what was called for testing
21 scenario-wise depending on the different examples.
22    Q.   Did you have -- when you were at the
23 company from 2019 to 2021 as a consultant, do you
24 know whether Take a Break was available then?
25    A.   I believe that it was.

Page 205

1    Q.   So sometime between 2021 when you left and
2 whenever you looked for it in March of 2025, your
3 account is that it is no longer available on
4 Instagram; is that right?
5    A.   Again, what I've said before and what
6 you've asked me is that when I tested in -- as
7 March of 2025, I could not find the presence of that
8 or other related mental health features like --
9 including topic nudges.  I could not get those to
10 trigger in my testing.
11    Q.   You would not have been a participant in
12 any discussions around whether or not Take a Break
13 would continue to be a feature on Instagram; right?
14        MR. WARD:  Object to form.
15        THE WITNESS:  So -- sorry.
16 BY MS. JONES:
17    Q.   You look confused.  Let me ask you a
18 different question.
19        Do you know one way or the other why
20 Take a Break is no longer a feature on Instagram, if
21 it's not?
22    A.   I don't have visibility of why they choose
23 to deprecate it or not.  I don't have visibility on
24 how effective it was on getting kids to take a
25 break.  Because of the design, I'm not sure that it

52 (Pages 202 - 205)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 206

1 actually was effective.
2      And I would love to see the statistics
3 around it. And I was not aware of any efforts to
4 meaningfully improve it while I was at Instagram
5 from 2019 to 2021.
6    Q.   And if there was a decision to no longer
7 have it on Instagram, that's not something that --
8 you would not have been involved in the
9 decision-making on that; right?
10    A.   Yeah. I mean, how could I -- if I -- I was
11 not -- again, I thought -- didn't I just answer
12 this?
13    Q.   I don't know, but you should answer it now,
14 please.
15    A.   Okay. So I don't -- I was not in
16 conversations about depreciating Take a Break. As
17 I've said previously, I tested and I could not find
18 it. And I did not see any evidence of that or other
19 mental health features that I've listed out in the
20 spreadsheet.
21    Q.   Do you know who was involved in any
22 decision-making around why Take a Break is no longer
23 available?
24    A.   So I think, as I've talked a little bit
25 earlier -- again, there were no conversations --

Page 207

1 well, within sort of Instagram as a company, after I
2 left, that I was a party to. And so I think the
3 important thing here, though, is that the product is
4 kind of the ground truth of how these things behave.
5 And that's what I was testing and that's what's
6 listed out on the spreadsheet.
7      MS. JONES:  I'm going to move to strike as
8 nonresponsive.
9 BY MS. JONES:
10    Q.   My question was do you know who was
11 involved in any decision-making around why
12 Take a Break would no longer be available?
13    A.   I think I might have said this as part of
14 my previous response, but I was not party of any
15 conversation around it, and as such, I would not
16 have known. What I know is the ground truth of what
17 I was present and a part of in my testing.
18    Q.   The other reference here in the same
19 paragraph is in the list there are tools that
20 fundamentally change as to not serve their original
21 purpose. And then you have in parentheses "Daisy."
22      Do you see that?
23    A.   Yes, I do.
24    Q.   And "Daisy" is a reference to whether or
25 not likes would be visible on Instagram, just as a

Page 208

1 shorthand?
2    A.   The shorthand is actually quite important
3 here because when Daisy initially got pushed out, it
4 was likes and views.
5    Q.   Okay. I just want to make sure we're
6 talking about the same thing.
7      Were you involved at all -- are you
8 familiar with what is described as Project Daisy?
9    A.   Yes. I am familiar with what's described
10 as Project Daisy. █████████, who was the person
11 that brought me into Instagram, who was the head of
12 user research at the time, did a lot of the research
13 that initiated Project Daisy. So he -- Pete -- and
14 I got to discuss that.
15    Q.   Were you involved in any of the discussions
16 around how Daisy would ultimately be launched on
17 Instagram?
18    A.   No, I was not part of the product
19 conversations around Daisy. I just remember when
20 Daisy was launched -- and looking at all the
21 original information about it, how it talked about
22 the importance of hiding likes and views as a mental
23 health measure for -- in general, I believe.
24    Q.   And just to be clear, you would not have
25 been involved in any discussions with Adam Mosseri

Page 209

1 or Mark Zuckerberg around the decision-making on how
2 Daisy would be launched on Instagram; is that right?
3    A.   I think I answered this in my previous
4 question. But I think, as I was saying, there
5 were -- these conversations I was not a part of.
6      In terms of Daisy's design, I do recall
7 seeing the articles that talked about the importance
8 of hiding likes and views.
9    Q.   Have you seen any peer-reviewed literature
10 that confirms that hiding likes or views has a
11 causal relationship with any particular mental
12 health outcome?
13    A.   Yeah. I mean, I think that -- in what you
14 said, there are two things that are very important;
15 right? You talked about peer reviewed. And I think
16 that -- what I did review, but I don't recall -- and
17 you would have to share a copy with me -- was the
18 internal research and discussion around it.
19      And I think that that internal research
20 around it, given sort of the -- Instagram's capacity
21 to understand what its users are experiencing, is
22 sort of, like, important to weigh into account.
23      And then the other word that you used,
24 which, again, in this context I think is not an
25 appropriate word, is this whole causal thing.

53 (Pages 206 - 209)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 210

1 Because, as I said in my first testimony, causality
2 is -- is -- I believe the wrong way to be thinking
3 about all these things here; right?
4      I mean, there is, like -- you do changes
5 and you look for, like, certain degrees of
6 correlations with the changes.
7      Causality is a whole other level of proof
8 that I don't think is appropriate in dealing with
9 harm issues. I think that the appropriate model for
10 dealing with issues around harm is correlation. And
11 I -- this is, again, a lot of work on this domain.
12   Q.  I want to go back to my original question.
13      Have you seen any peer-reviewed literature
14 that confirms that hiding likes or views has a
15 causal relationship with any particular mental
16 health outcome?
17      MR. CARTMELL: Objection. Asked and
18 answered.
19      THE WITNESS: I believe I just answered
20 your question.
21 BY MS. JONES:
22   Q.  You didn't.
23      Are you refusing to answer my question now?
24      MR. CARTMELL: Object -- hold on. I'll
25 object and move to strike the statement of counsel.

Page 211

1      MS. JONES: My question --
2      MR. CARTMELL: He's --
3      MS. JONES: Could you --
4      MR. CARTMELL: You just asked him if he's
5 refusing to answer. He's not refusing. He told you
6 that he did --
7      MS. JONES: Could you relax? Could you
8 just relax?
9      MR. CARTMELL: No.
10      MS. JONES: I need -- I need you to relax,
11 okay?
12      MR. CARTMELL: I'll try.
13 BY MS. JONES:
14   Q.  Mr. Bejar, are you declining to answer my
15 question?
16      MR. WARD: He's not refusing to answer.
17      Restate the question.
18      THE WITNESS: Yeah, please restate the
19 question. Do it again --
20 BY MS. JONES:
21   Q.  I'm not going to restate it. I'm going to
22 repeat my original question.
23      My question was have you seen any
24 peer-reviewed literature that confirms that hiding
25 likes or views has a causal relationship with any

Page 212

1 particular mental health outcome?
2      MR. CARTMELL: Same objection. Asked and
3 answered.
4      THE WITNESS: I believe I just answered
5 that question, but I can answer it again in the
6 context of saying that -- what I have reviewed is I
7 have reviewed, back when I was at Instagram, the
8 internal literature about Daisy and how users felt
9 about it.
10      And I think that information, because of
11 the kind of research that Instagram can run, is
12 important to be taken into consideration. And when
13 you then shift into the conversation of
14 peer-reviewed and causal, it's a different context.
15      And, in particular, I think that many
16 academics do not have the appropriate access that
17 they need in order to be able to answer some of
18 these questions or the data that would help them to
19 do that.
20      And then I also believe that a causal
21 relationship, right, is an unreasonably high bar,
22 because what you look for is correlation. And so to
23 say -- if -- causality in the context of harm is not
24 the appropriate way to think about it. When you
25 think about harm, you have to be thinking about

Page 213

1 correlation, the role you play with the harm, and
2 the reduction in the harm.
3      MR. WARD: Let me, if I may, Counsel,
4 interject. I'm glad to give you the opportunity to
5 ask additional questions about Exhibit 2 --
6      MS. JONES: Yeah, I know. You insisted on
7 it, in fact.
8      MR. WARD: Let me finish before you
9 interrupt.
10      I'm glad to give you the opportunity to
11 answer -- or ask additional questions about Exhibit
12 Number 2. I think the last several questions have
13 been beyond the scope of either Exhibit Number 2 or
14 the stated reason why we're allowing you to go over
15 your limit, which is to ask questions about
16 Dr. Ferrara and Mr. Starr's report.
17      We went back on the record at 1:45 p.m.
18 It's now 2:05 p.m., and we've not yet asked any
19 questions about those expert reports.
20      He's reviewed them. He's prepared to offer
21 his responses to Dr. Ferrara and Mr. Starr.
22      And so I would ask that if we have
23 questions, that you want to know about his reactions
24 to those criticisms of his own work, that we take
25 this extra time to spend -- afforded you and get

54 (Pages 210 - 213)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 214

1 Mr. Bejar's observations about those criticisms.
2       MS. JONES:  Are you done?
3       MR. WARD:  I am.  Thank you.
4 BY MS. JONES:
5    Q.   Okay.  Mr. Bejar, as far as you know, the
6 internal research that you're describing with
7 respect to Project Daisy, mentioned in Exhibit 2,
8 mentioned in Exhibit 2, was that internal research
9 subject to peer review?
10    A.   That internal research was subject to the
11 internal processes for published internal research.
12       MS. JONES:  Well, that was not my question.
13 I'm going to move to strike as nonresponsive.
14 BY MS. JONES:
15    Q.   You know what peer review is.  I think we
16 talked about this at your first deposition.
17       Do you know what peer review is?
18       MR. CARTMELL:  Objection.  Asked and
19 answered.
20       THE WITNESS:  During the last deposition,
21 you asked me about peer reviews.  And, yes, I'm very
22 well acquainted with the peer-review process of
23 academic publications.
24 BY MS. JONES:
25    Q.   Okay.  And my question for you is the

Page 215

1 internal research that you're describing with
2 respect to Project Daisy, was that subjected to the
3 peer-review process?
4    A.   So to be precise, are you referring to an
5 academic peer-review process by outside
6 institutions, separate from Instagram at the time,
7 or are you talking about internal peers in the
8 research organization that would review the
9 literature to make sure that it was good?
10    Q.   I'm talking about the first one.  Let me
11 ask my question again.
12       As far as you know, was the internal
13 research that you're describing with respect to
14 Project Daisy, which is referenced in Exhibit 2 to
15 your deposition which counsel permitted us to ask
16 more questions about, was that subjected to the
17 peer-review process?
18       MR. CARTMELL:  Objection.  Asked and
19 answered.
20       THE WITNESS:  Yeah, I think I just answered
21 that.  And I think if you're going to ask me that
22 again, I would ask you if you mean academic
23 peer-review process by outside entities versus --
24 because every --
25 ///

Page 216

1 BY MS. JONES:
2    Q.   Well, let me clarify for you.
3    A.   Every --
4    Q.   Let me clarify for you.
5    A.   -- piece of code you submit inside Meta is
6 subject to a peer review; right?  And so --
7    Q.   Well, I thought we had a shared
8 understanding of peer review, but let me -- let us
9 get on the same page.
10       When I say "peer review," I mean what we
11 talked about at your first deposition, which is the
12 academic peer-review process by outside entities and
13 subject matter experts.
14       Do you understand that that's what I mean
15 when I say "peer review"?
16    A.   Yeah.
17    Q.   Okay.  As far as you know, was the internal
18 research that you have referred to with respect to
19 Project Daisy subjected to peer review?
20    A.   As far as I know, that was not subject to
21 academic peer review by external institutions.
22       And I do want to say that I do not believe
23 that's a reflection whatsoever on the quality impact
24 or accuracy of the internal research.
25       I think that internal research that I've

Page 217

1 seen is exceptionally well carried out.  And I could
2 think of circumstances where research that's
3 conducted internally, which has essential findings,
4 would not go through a peer-review process, for
5 example, around creating a dataset that contains
6 enough information that's made available to other
7 people so they can validate the findings relative to
8 a dataset.  That can have significant privacy
9 implications.
10       So I don't think that academic peer review
11 is a proxy for quality or impact or meaning of the
12 research, especially in some things like Daisy or
13 some of the other research that I saw that
14 internally.
15       MS. JONES:  Let me move to strike
16 everything after the reference to "As far as I know,
17 there was not -- it was not subject to academic peer
18 review by external institutions."
19 BY MS. JONES:
20    Q.   Mr. Bejar, as far as you know, did the
21 internal research that you're referring to with
22 respect to Project Daisy actually demonstrate a
23 causal relationship between the hiding of likes or
24 views and mental health harms -- or outcomes?
25 Excuse me.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 218

1    A.  My recollection of that research is that it
2 showed a correlation.  But I would ask you, if
3 you're going to ask me any more questions about the
4 research, to give me a copy of the research so I can
5 be more accurate about it.
6    Q.  I think your counsel would tell me I'm not
7 allowed to do that under the circumstances.
8        My question is just is your -- your
9 recollection is that the internal research showed a
10 correlation but not necessarily causation; is that
11 right?
12    A.  And as I said in many different answers to
13 many questions during this deposition, I would not
14 expect or ask causality because that's too high a
15 bar.  It's about correlation.  Because if you demand
16 causality for some things, you're just not going to
17 meaningfully address so many harms.
18        And then I think that's the wrong -- that's
19 categorically the wrong bar to be applying for the
20 kinds of things that we're talking about.
21    Q.  Does that mean you're not going to come to
22 trial and say that there is a causal relationship
23 between things that happen on Instagram and mental
24 health harms?
25        MR. CARTMELL:  Object.  It's been asked and

Page 219

1 answered.  And it misstates his prior testimony.
2        THE WITNESS:  I've already answered the
3 question.  And this is -- this is like asking me to
4 speculate about the future.  So I don't want to
5 speculate.
6 BY MS. JONES:
7    Q.  In Exhibit Number 1, which has already been
8 marked to your deposition, do you know that the
9 section about your opinions that counsel prepared
10 refers to the term "cause" in connection with your
11 opinions?
12        Did you know that?
13        MR. CARTMELL:  Object to --
14        MR. WARD:  Object.  It's beyond the scope.
15 Pardon me, Tom.
16        MR. CARTMELL:  No.  Go ahead.
17        Just same objections, asking him about a
18 document you know has been prepared by lawyers.  And
19 he's already told you he hasn't seen it before
20 today.
21        MS. JONES:  Are you done?
22        MR. CARTMELL:  Yeah.
23        MR. WARD:  And my objection is it's beyond
24 the scope of the discretionary additional
25 questioning that the witness is allowing for

Page 220

1 purposes of asking him about his completion or his
2 preparation of Exhibit Number 2 and the defense
3 exhibits expert reports and his observations about
4 that.
5        If counsel has no additional questions
6 about either of these, and you might be moving on to
7 other subjects, then I think we're well beyond the
8 time limitation and we should wrap up the
9 deposition.
10        MS. JONES:  Oh, I have more -- I have more
11 questions about the -- about the --
12        MR. WARD:  Then I would ask --
13        MS. JONES:  -- items that we were talking
14 about.
15        MR. WARD:  -- let's turn to those, and
16 let's not deviate into other subject areas.  Because
17 this is -- the benevolence of Mr. Bejar, he's
18 willing to give you additional time to ask these
19 questions, but we don't want it to be abused.  So we
20 would really ask your diligence in staying on the
21 scope of Exhibit 2 and the expert reports.
22        And if we're going to go beyond that, then
23 we're going to conclude the deposition pursuant to
24 the order of the Court, which was that he would only
25 sit for three and a half hours.

Page 221

1        MS. JONES:  Okay.  Are you done?
2        MR. WARD:  I am done.
3 BY MS. JONES:
4    Q.  Mr. Bejar, do you remember my question
5 before all of that?
6    A.  Could you ask it again?
7    Q.  Did you know that in Exhibit 1, which at
8 least purports to lay out your opinions on certain
9 issues, that the use of the word "cause," not
10 "correlation" is used?
11        Did you know that?
12        MR. WARD:  And I'm going to object.  And I
13 am going to, in this case, instruct the witness not
14 to answer.
15 ***    MS. JONES:  Okay.  We'll note that --
16 please note that in the record.  That will be going
17 to Judge Kuhl.
18 BY MS. JONES:
19    Q.  Mr. Bejar, go back with me to Exhibit
20 Number 2 -- and you're accepting that instruction
21 not to answer that question?  Is that right,
22 Mr. Bejar?
23    A.  Yes, I am.
24    Q.  Okay.  The paragraph goes on to say:
25        "In the list there are tools that

56 (Pages 218 - 221)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 222

1    have been deprecated...or fundamentally
2    changed as to not serve their original
3    purpose...some of the announcements are
4    improvements on Safety Tools."
5        What is the reference here to "some of
6    the announcements are improvements on Safety Tools"?
7    A.   So, for example, there's block, and then
8    there's block that identifies other accounts that
9    might be created for the same device.  So there's
10   kind of feature improvements.
11       And some of the announcements are
12   improvements to existing features.  So it's not like
13   it's a separate tool; it's that a particular tool
14   has been improved in some way.
15   Q.   And the last sentence in paragraph -- that
16   same paragraph we've been looking at in Exhibit 2,
17   says:
18       "Most recently, Meta has
19       aggregated some of these tools and
20       added others under 'Teen accounts.'"
21       Do you see that?
22   A.   Yes, I do.
23   Q.   What specific tools are you referring to
24   when you say "Meta has aggregated some of these
25   tools?"

Page 223

1    A.   To answer with the appropriate precision, I
2    would need the teen accounts announcement, but some
3    of them include Quiet Mode -- this is not a
4    comprehensive list.  Some of them include Quiet
5    Mode, enabling hidden words by default.  There were
6    a couple of settings that were now turned on by
7    default.
8        Again, I would need to look at the
9    spreadsheet or specifically look at the teen
10   accounts announcement to be able to answer that in
11   detail.
12   Q.   Okay.  You don't recall, sitting here
13   today, what you were talking about in this document?
14       MR. WARD:  Objection.  Mischaracterizes the
15   testimony.
16   BY MS. JONES:
17   Q.   You can answer.
18   A.   Was that a question?
19   Q.   Yes, it was a question.
20       You don't recall, sitting here today, what
21   you were talking about in this document?
22   A.   I think as we covered earlier -- can you
23   ask the question again?  I just didn't hear the
24   question in that.
25   Q.   You don't recall, sitting here today, what

Page 224

1    you were talking about in this document, question
2    mark?
3    A.   No.  That doesn't frame what I'm saying
4    correctly.
5        What I am saying is that the -- when I
6    write something like this, it's a rough draft that
7    I'm not sure what I'm going to do with it.  And I
8    can tell you what I would do in order to be able to
9    refresh my memory.  I mean, I think -- I've been
10   like this for many hours today.  I think it's
11   understandable if I'm -- if -- if -- if I'm having a
12   little time right now conjuring up teen accounts.
13       And I think it actually is probably a good
14   time for a break.  Because I believed when we came
15   back here that you were going to ask me questions
16   about these reports.  And this has been going all
17   kinds of places on what I think is a good-faith
18   effort to make sure that you're able to get your
19   questions answered about these reports.
20   Q.   I'm sorry, Mr. Bejar.  We can certainly
21   take a break, but did you not have an understanding
22   that your lawyer said I could come back and ask you
23   more questions about Exhibit 2?
24       Did you misunderstand that?
25   A.   No.  I have been answering questions about

Page 225

1    Exhibit 2.  And I've been answering questions that,
2    as far as I can tell, are not that connected to
3    Exhibit 2.
4        But, as I said --
5    Q.   You need a break?
6    A.   A break would be a good idea right now.
7        MS. JONES:  Sure.
8        THE VIDEOGRAPHER:  Stand by.  The time
9    is 2:16 p.m.  We're going off the record.
10       (Recess taken.)
11       THE VIDEOGRAPHER:  The time is 2:28 p.m.,
12   and we are back on the record.
13   BY MS. JONES:
14   Q.   Mr. Bejar, let me ask you --
15       MR. WARD:  Counsel, let me interject for a
16   second.
17       Consistent with my earlier points, I think
18   we've talked now additionally beyond your time limit
19   for an additional 30 minutes, nearly, and primarily
20   about Exhibit 2 but also about some additional
21   issues.
22       And I'm glad you've had the opportunity to
23   answer these additional questions.  You, of course,
24   had the opportunity during the initial three and a
25   half hours to ask questions about Exhibit 2 as well.

57 (Pages 222 - 225)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 226

1    MS. JONES:  We didn't have Exhibit 2 at the
2  first deposition.
3        MR. WARD:  I meant this morning, Counsel.
4    MS. JONES:  Oh, you mean earlier.  Okay.
5  Go ahead.
6        MR. WARD:  Yeah.  So you had opportunities
7  during the initial three and a half hours and then
8  during this last half hour.  And I'm glad you've had
9  the opportunity to ask these questions.  I'm sure
10  you've got lots more questions that you'd like to
11  ask, but, of course, the Court imposed the
12  three-and-a-half-hour limit.
13        Mr. Bejar has been willing voluntarily to
14  give you additional time to ask about the expert
15  reports prepared, about commenting on his testing.
16  He's willing to answer questions about that.  If
17  we're willing to move to the questions about his
18  testing as prepared by Dr. Ferrara and Mr. Starr,
19  then we should turn to that.
20        If Counsel is not ready to ask about those
21  expert reports, then pursuant to the Court's limit
22  on the time which we've already extended, we would
23  declare a conclusion to this additional deposition
24  period and/or, I guess, pass the witness, if that's
25  part of it.

Page 227

1        But I think that Counsel's time has already
2  exceeded her time.  And we're still willing to
3  indulge and answer questions about Exhibits 6 -- 5,
4  6, and 7, the expert reports.  But if we're not
5  going to turn to those now, then we would conclude
6  the direct part of the testimony and ask that the
7  witness be passed.
8        MS. JONES:  Are you -- I'm sorry.  Are you
9  now -- I just want to make sure it's clear for the
10  record.
11        Are you now taking a position that I may
12  not ask any additional questions about Exhibit
13  Number 2?
14        MR. WARD:  I'm saying you may not ask any
15  other additional questions except with respect to
16  the expert reports for which we extended the time
17  beyond the Court-imposed limit.
18        MS. JONES:  Yes.  That wasn't my question.
19        MR. WARD:  I know, but I've given -- I've
20  given you a more complete answer than your question.
21        MS. JONES:  No.  You've given me a
22  different answer.
23        My question was are you taking the position
24  that notwithstanding you earlier saying, "I want you
25  to be able to ask any questions you want about

Page 228

1  Exhibit 2," that I am no longer permitted to ask --
2  from your perspective -- to ask any more questions
3  about Exhibit 2?  I just want to make sure that's
4  clear.
5        MR. WARD:  What I'm saying is I gave you
6  the opportunities to ask questions about Exhibit 2,
7  and you've taken advantage of them.  I'm glad you
8  had that opportunity.  And at this point, yes, I'm
9  saying that there will be no more questioning about
10  Exhibit Number 2 today.
11        MS. JONES:  And if I ask further questions
12  about Exhibit Number 2, are you going to instruct
13  the witness not to answer?
14        MR. WARD:  That's correct.
15        MS. JONES:  Okay.  Well, let me just go
16  through that exercise so we have it for the record,
17  and then we'll move on to the expert reports.
18  BY MS. JONES:
19    Q.  Mr. Bejar, go to Exhibit Number 2.
20        The next paragraph begins with the
21  reference to:
22        "Our comprehensive review of Teen
23        Accounts and Safety Tools found
24        significant issues with the
25        representations Meta makes."

Page 229

1        Do you see that?
2        MR. WARD:  I object to the scope and
3  instruct the witness not to answer.
4  BY MS. JONES:
5    Q.  Are you accepting that instruction?
6    A.  Yes, I am.
7    Q.  Okay.  And the sentence goes on to say:
8        "...Meta makes, as well as the way
9        the Safety Tools are implemented."
10        Do you see that?
11        MR. WARD:  Objection to scope and instruct
12  the witness not to answer.
13  BY MS. JONES:
14    Q.  Are you accepting that instruction?
15    A.  Yes, I am.
16    Q.  Okay.
17        "Teen Accounts do not deliver on
18        the promises Meta makes about them, as
19        they create a false impression of
20        safety around the way that Instagram is
21        implemented."
22        Do you see that sentence?
23        MR. WARD:  Counsel, are you intending to
24  ask multiple questions about this and try to get an
25  instruction not to answer for the rest of the

58 (Pages 226 - 229)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 230

1 exhibit?
2        MS. JONES: I don't actually have that many
3 more questions about this exhibit, but I do, for
4 purposes of the record, need to be clear that I am
5 being prevented from asking these questions --
6 excuse me -- about Exhibit 2 after you told me,
7 along with everybody else in the room, "No, no. If
8 you have questions about Exhibit 2, you should ask
9 him the question."
10        So if that's your position, that's fine,
11 but I need a record on that.
12        MR. WARD: It is my position. I think
13 we've made the record.
14        MR. CARTMELL: Can I ask how many more
15 questions you have about Exhibit 2?
16        MS. JONES: Not that many. It's just this
17 paragraph, Tom.
18        MR. CARTMELL: It's just this paragraph?
19        MS. JONES: Not that many. The next
20 paragraph --
21        MR. CARTMELL: Hold on.
22        MS. JONES: Yeah. What?
23        MR. CARTMELL: Can we appeal to Mr. Ward's
24 senses that she can ask about one more paragraph,
25 and then we'll move to the reports?

Page 231

1        MS. JONES: I've already tried to appeal to
2 his senses. You can appeal to him if you want to.
3        MR. CARTMELL: I'm trying.
4        MS. JONES: Okay.
5        Mr. Ward?
6        MR. WARD: We're talking about the
7 paragraph --
8        MS. JONES: The immediate -- the next
9 immediate paragraph, actually. I was just reading
10 those to set up my next question, which starts with
11 "all of the issues."
12        MR. CARTMELL: One paragraph?
13        MS. JONES: One sentence, I think.
14        MR. WARD: That's the paragraph? The
15 paragraph leading "all of the issues"?
16        MS. JONES: Yes.
17        MR. WARD: How many questions do you have
18 about that?
19        MS. JONES: I don't know the exact number
20 because it probably will depend on what the answers
21 are that I get from your witness.
22        MR. WARD: Go ahead, Counsel.
23 BY MS. JONES:
24     Q.   Mr. Bejar, do you have in front of you
25 Exhibit Number 2, and do you see the sentence that

Page 232

1 reads on the first page:
2        "All of the issues found in this
3        report can be addressed by Meta. As
4        one of the most advanced technology
5        companies of our time, they can
6        dedicate resources."
7        Do you see that?
8     A.   Yes, I do.
9     Q.   That -- is that a complete sentence, or is
10 there more to that sentence that just hasn't been
11 put into the draft yet?
12     A.   Again, this is a draft. And we talked
13 about earlier there's going to be incomplete
14 sentences. And I don't know what I would type after
15 what I wrote.
16     Q.   Okay. That was really my question, is if
17 there's something else to the sentence that's just
18 not apparent there.
19        You have written here:
20        "All of the issues found in this
21        report can be addressed by Meta. As
22        one of the most advanced technology
23        companies of our time, they can
24        dedicate resources."
25        When you say "addressed by Meta," what

Page 233

1 do you mean exactly?
2     A.   I mean that if Meta decided to put in, for
3 example, effective search protections that ensure,
4 as promised in this exhibit that you handed me
5 earlier today, that certain kinds of results are not
6 served as part of typing in a query, they completely
7 have the ability to do that.
8        And that's one of over 30 examples I could
9 give of things that Meta could do if it was a
10 priority to meaningfully reduce these different
11 harms. Examples like -- for example, just changing
12 the language in which you use a query to -- part of
13 reveal that that protection was not available in
14 different languages. And so I could go through this
15 for each row of the spreadsheet.
16        Fundamentally, the -- I believe that Meta
17 has the technology, the expertise, to fundamentally
18 address these issues, and they are aware of them.
19 And just like the unwanted advances button that we
20 talked about, for years and years and years, they've
21 chosen not to.
22        And God knows how much harm is the result
23 of the way that they've approached the product
24 design and their lack of earnest efforts when it
25 comes to these areas.

59 (Pages 230 - 233)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 234

1   Q.   You've just said "their lack of earnest
2   efforts."  And that same sentence in Exhibit
3   Number 2 refers to "Meta can dedicate resources."
4       Do you see that language in your document?
5   A.   Yes, I do.
6   Q.   Do you know, sitting here today, how much
7   the company devotes in terms of financial resources
8   to addressing these issues right now, for example?
9       MR. CARTMELL:  Objection.  Asked and
10  answered.
11      THE WITNESS:  Yeah.  I mean, we went
12  through this extensively in the first three days of
13  my deposition.
14      And the question about that is not, I
15  believe, a dollar amount.  It's about, like -- do --
16  like, even the promises that are made in this press
17  release are kind of like effectively implemented --
18  by what measure are they independently tested for
19  resilience?
20      And I think that you could make an argument
21  that they spent a lot of money.  But if you want to
22  type "I hurt myself" -- "I want to hurt myself," and
23  for, like, the best part of a year, the top result
24  is one that -- here they say in their document
25  they're not going to serve is one of many examples

Page 235

1   of these areas.
2       And so it might be investing a lot of
3   money, but if they're serving the content based on
4   those queries, I'm not sure where the money is
5   going.
6       MS. JONES:  I'm going to move to strike as
7   nonresponsive.
8   BY MS. JONES:
9   Q.   You said the question about that is not, I
10  believe, a dollar amount.  My question actually
11  was -- and I may not have been sufficiently clear
12  about a dollar amount.
13      Do you know what amount the company devotes
14  to addressing the issues that are outlined in
15  Exhibit Number 2?
16      MR. CARTMELL:  Object and move to strike
17  the statement of Counsel.  Asked and answered.
18      THE WITNESS:  As I've answered both in the
19  first three days of my deposition, as I just talked
20  about it, I've heard Mark so many number of times
21  throw "thousands of people; billions of dollars."
22      And the ground truth is if, for example, in
23  the teen accounts, they talk about not showing, for
24  example, violent videos of, like, people fighting --
25  I think is one of the lines on that press release.

Page 236

1       And the product is delivering violent
2   videos to a teen account of an account called "Only
3   Broken Bones," where there's a punch and the arm
4   breaks, and you see the limb hanging; right?
5       Then, again, you have to go back to
6   billions of dollars to what effect?  Because when
7   those violent videos were delivered, one of the
8   things that I tested, as I covered, I think, in the
9   first round of deposition, is hitting "not
10  interested" many times in a row on videos that they,
11  on their own website says, "We will not recommend
12  this to a teen account," and seeing no effect in the
13  delivery of that.
14      And so -- billions of dollars?  To what
15  effect?  I truly don't know because of the kind of
16  harm that is at the surface of the product, which is
17  the ground truth.  The product is the truth of how
18  this is happening.
19      MS. JONES:  Okay.  I'm going to move to
20  strike as nonresponsive.
21  BY MS. JONES:
22  Q.   In terms of the dollar figure, is the only
23  dollar figure that you're aware of the figures that
24  Mr. Zuckerberg has shared publicly in some of his
25  testimony?

Page 237

1       THE VIDEOGRAPHER:  Counsel, we lost
2   internet.
3       MS. JONES:  We should go off the record.
4   I'm not in charge of the internet.
5       THE VIDEOGRAPHER:  The time is 2:39 p.m.
6   We're going off the record.
7       (Recess taken.)
8       THE VIDEOGRAPHER:  The time is 2:52 p.m.,
9   and we are back on the record.
10  BY MS. JONES:
11  Q.   Mr. Ferrara, let me ask you to go to what
12  we've marked as Exhibit Number 6.
13  A.   I think you called me Mr. Ferrara.
14  Q.   I'm sorry.  It's because I was -- and he's
15  Dr. Ferrara, not Mr.  I was looking at his report
16  but referring to you.
17      Mr. Bejar, can you go to what we've marked
18  as Exhibit Number 6 --
19  A.   Yes.
20  Q.   -- which is the expert report of
21  Dr. Emilio Ferrara.
22  A.   Uh-huh.
23  Q.   Is that what you have in front of you?
24  A.   It is.
25  Q.   And this is the report that, as we

60 (Pages 234 - 237)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 238

1  understand it, you were provided a copy of
2  yesterday; is that right?
3      A.  Yes, that's correct.
4      Q.  And you testified earlier that you reviewed
5  it at some level yesterday; yes?
6      A.  That is correct.
7      Q.  And then have you further reviewed
8  Exhibit Number 6, Dr. Ferrara's expert report, today
9  on a break during the deposition?
10     A.  Yes, I did.
11     Q.  Have you at this point read the entirety of
12 Dr. -- let me just note for the record, if you look
13 at page 100 of the report, it is dated June 13th,
14 2025.
15        So you may hear me refer to it as the
16 June 13th report from Dr. Ferrara.  But I want to
17 make sure you have a chance to see that.
18     A.  Page 100.  Yeah.
19     Q.  Okay.  So have you now had an opportunity
20 to review the entirety of the June 13th, 2025,
21 expert report of Dr. Ferrara?
22     A.  Yes, I have.
23     Q.  And have you read it in sufficient detail
24 to offer all of the opinions in response that you
25 have to Dr. Ferrara's written report?

Page 239

1      A.  Yes, I have.
2      Q.  You do not require any additional review to
3  offer your opinions in response to Dr. Ferrara; is
4  that right?
5      A.  That is correct.
6      Q.  And so you are not going to go review it
7  more and then have other opinions.  Am I right in
8  thinking that?
9      A.  That is correct.
10     Q.  Were you familiar with who Dr. Ferrara was
11 before you received his report yesterday?
12     A.  No, I was not familiar with --
13        MS. JONES:  Excuse me, Mr. Bejar.  We have
14 a colleague from Baker Botts here.
15        Let's go off the record.
16        MR. WARD:  You can keep going.
17        MS. JONES:  Keep going?
18        MR. WARD:  Yeah.
19        MS. JONES:  I remember my question, but I
20 don't know that I heard your answer.
21 BY MS. JONES:
22     Q.  Were you aware of Dr. Ferrara before you
23 received his expert report yesterday?
24     A.  I was not aware of him prior to reading
25 this report.

Page 240

1      Q.  Okay.  And now that you've had a chance to
2  read his report, you understand that he has both
3  bachelor and Ph.D. degrees and a master's degree?
4      A.  Yes.  I understand that.
5      Q.  And his bachelor's degree is in computer
6  science, his master's degree is in computer science,
7  and he also has a Ph.D. degree; yes?
8      A.  Yes.
9      Q.  Okay.  On the copy that you have in front
10 of you, is that the copy that we marked with the
11 exhibit number or is that a different copy?
12     A.  No.  It's a different copy that counsel
13 gave on which I placed some yellow stickies.
14     Q.  Well, I think probably the most sensible
15 way to do this is to go through your yellow
16 stickies.  So let's start with the first one.
17     A.  Okay.
18     Q.  And let me just ask you, while you're
19 getting there, do you have -- in terms of your
20 responsive opinions to Dr. Ferrara, do you have
21 opinions that go beyond his discussion of you and
22 your testimony and your testing specifically?
23        MR. WARD:  Object as to form.
24        THE WITNESS:  Yeah, that seems like a
25 really broad question, to have opinions of things

Page 241

1  that are not in the report.
2  BY MS. JONES:
3      Q.  Well, did you see when you were --
4      A.  Because I had --
5        (Stenographer interrupted for
6         clarification of the record.)
7        THE WITNESS:  Oh, sorry.  I said I had a
8  pastry this morning and I have an opinion about
9  that.  And that's outside of the report.  So I would
10 ask you to please ask me a more specific question.
11 BY MS. JONES:
12     Q.  Oh, okay.  You understand that there is a
13 section in Dr. Ferrara's June 13th, 2025, report
14 that is focused on you and the testing that you did?
15     A.  Yes, I am very aware of that.
16     Q.  Okay.  And then you understand that there
17 are many, many pages in the report that are not
18 specifically about you or your testing; right?
19     A.  Yes, I understand.
20     Q.  My question is, to the extent that you have
21 opinions in response to Dr. Ferrara, do they relate
22 to the portions of his report that do not address
23 you or your testing?
24     A.  Yes.  I have opinions about the parts of
25 the report that do not address me and my testing,

61 (Pages 238 - 241)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 242

1 and I have opinions about the parts of the report
2 that address me and my testing.
3    Q.   Okay.  So you have, it looks like, about a
4 dozen yellow tape flags on a copy of the June 13th
5 Ferrara report that we should probably also mark.
6        Have you annotated that copy in any way?
7    A.   No.
8    Q.   You just put tape flags on it?
9    A.   Yeah.
10    Q.   Okay.  Go to the very first of your tape
11 flags, please, and tell me what page it's on.
12    A.   It is on page 5, the qualifications.
13    Q.   And what specifically were you flagging
14 there?
15    A.   Basically noticing that he doesn't have
16 industry experience in dealing with all of the
17 issues that are covered in the report; in
18 particular, the building and operation of, like, the
19 system set that he describes at scale in a
20 production environment.
21    Q.   You saw in the report that he actually
22 worked for Amazon?
23    A.   Yeah.  So in the report --
24    Q.   Let me just finish my question.
25    A.   Go ahead.

Page 243

1    Q.   You saw in the report that he actually has
2 worked as a visiting academic with Amazon in their
3 Alexa AI department.  You saw that; yes?
4    A.   Yes, I did see that, and what I said
5 incorporates that.
6    Q.   And was there anything else that your tape
7 flag on page 5 was referencing?
8    A.   No.  It's just basically somebody very
9 accomplished academically.  But, again, the Amazon
10 experience I don't think is representative of all of
11 the issues that he writes about.
12    Q.   Okay.  And, in fact, did you see when he
13 described his Amazon experience that he specifically
14 talked about research initiatives to prevent Alexa
15 from providing inappropriate responses to customers?
16    A.   Yes.  And having done such engagements with
17 academics, there's a difference between bringing in
18 an academic to help, as he did here, kind of like
19 taxonomy of problematic content, models that have to
20 deal with that, and the production version of that
21 which is the Facebook immune system that he talks
22 about, or the application of reporting and content
23 moderation policies in the system, or sort of the
24 ways sort of like in those contexts discover harm.
25        I did notice his work on bots and on

Page 244

1 Twitter, and I had the question of whether any of
2 his findings about Twitter resulted in part of
3 changes within Twitter.
4        Because, again, I think that -- the thing
5 that -- having hired many Ph.D.s into a protect and
6 care, there's a distinction between academic
7 expertise and analysis of issues, which is very
8 valuable --
9        THE STENOGRAPHER:  Excuse me.
10        THE WITNESS:  -- academic expertise and
11 analysis of issues, which is very valuable, versus,
12 like, a lot of the things that he writes about,
13 which is building out an infrastructure that
14 protects and prevents harm.
15        And so that was kind of like calling the
16 distinction between industry experience in the field
17 or the domain versus somebody who studies the
18 systems from the outside.
19 BY MS. JONES:
20    Q.   Where is your next yellow sticky?  What
21 page?  I might have a question for you before we get
22 to that, but what's the page?
23    A.   It's on page 13.
24    Q.   Before we get to page 13, I want to ask you
25 to go to page 7 of Dr. Ferrara's June 13th report.

Page 245

1 And in paragraph 8, that's where he describes his
2 Amazon experience in 2021.
3        "I also began working with Amazon
4        as a visiting academic in their Alexa
5        AI department."
6        Do you see that?
7    A.   Uh-huh.
8    Q.   You have to say "yes" or "no" for the
9 transcript.
10    A.   Yes.
11    Q.   And he describes about halfway down:
12        "I also design machine-learning
13        techniques."
14        And then he lists a series of things.
15        Do you see that?
16    A.   Yes.
17    Q.   One of the things he lists is "Prevent
18 indexing problematic content from the web and social
19 media services."
20        Yes?
21    A.   Yes.
22    Q.   Detecting and filtering out problematic
23 content early on from the index data.
24        Yes?
25    A.   Yes.

62 (Pages 242 - 245)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 246

1    Q.  "Detect questions that are unsuitable to a
2  machine-generated answer."
3       Correct?
4    A.  Correct.
5    Q.  (As read):  And "Detect unsuitable answers
6  to specific audience, for example, children."
7       Yes?
8    A.  Correct.
9    Q.   And then the last two items that he's been
10  involved in designing machine-learning techniques
11  for are detecting social media trends that might be
12  reflected in inquiries to Alexa; right?
13   A.  Right.
14   Q.  And anticipating inappropriate content from
15  social media feeds.
16      Do you see that?
17   A.  Right.
18   Q.  Have you been involved in designing
19  machine-learning techniques?
20   A.  Yes.
21   Q.  Was that at Yahoo or at Facebook?
22   A.  I mean, I think we can get to -- when we
23  get to the part of the report where Dr. Ferrara
24  talks about the Facebook immune system.
25   Q.  Well, at the moment I'm just asking, when

Page 247

1  you say that you've been involved -- I keep looking
2  at the realtime.
3       When you say that you've been involved in
4  designing machine-learning techniques, was that at
5  Yahoo or was that at Facebook?
6    A.  It was at Facebook.
7    Q.  Let's go to page -- I think you said 13.
8       What did you flag on page 13?
9    A.  The number 19, where he describes my
10  testing as a stress test, which -- "a purported
11  stress test," which is not what I did.
12   Q.  Okay.  We'll get to that section.
13      Where is your next yellow sticky?
14   A.  Page 16.
15   Q.  What did you flag on page 16?
16   A.  (Reading):
17          "Meta invested early in automated
18       defense systems, in particular what is
19       called here the Facebook Immune System,
20       which launched early in 2011 and
21       represents Meta's first attempts at
22       realtime integrity infrastructure
23       designed to detect and mitigate a wide
24       range of abuses, including phishing,
25       spam, and policy-violating content

Page 248

1  across billions of users a day.
2          "And also in 2011, Meta began
3       using PhotoDNA, a technology used to
4       detect known signals of child sexual
5       imagery, on its services."
6    Q.  And why did you flag that particular
7  paragraph?
8    A.  Because I was the engineering product and
9  technical leader behind both of those endeavors,
10  amongst others.
11   Q.  Okay.  Where is your next yellow sticky?
12   A.  It is on page 21, item 48, "Restrictions on
13  AI-enhanced Moderation Tools."
14   Q.  What were you flagging there?
15      Let me actually ask a slightly better
16  question, hopefully.
17      Do you have a specific responsive opinion
18  to what is reflected in paragraph 48 of
19  Dr. Ferrara's June 13th report?
20   A.  Yes.  That in this context for this entry,
21  that the GDPR for the kinds of machine-learning
22  models and for the kinds of harms that we're talking
23  about, that you can significantly reduce harm
24  because you have access to information that helps
25  you do that that is not covered by the GDPR.

Page 249

1       And, again, one of the areas that I managed
2  for Facebook was a compliance on, like, privacy
3  issues and data audits by the interstate Data
4  Protection Authority.
5       So I'm familiar both about sort of what the
6  privacy legislation and content there is and also
7  how that impacts the development of production
8  systems to detect and prevent harm.
9    Q.  Is there a specific element of or sentence
10  in paragraph 48 that you're disagreeing with?
11   A.  Yeah.  That he says:
12          "May limit the ability to use
13       AI-enhanced moderation tools that rely
14       on extensive user data."
15      And I believe that you can create
16  AI-enhanced moderation tools that are not limited by
17  the GDPR.
18   Q.  Have you been involved in actually creating
19  such AI-enhanced moderation tools?  And by
20  "involved," I mean personally involved in the design
21  and engineering of such tools.
22   A.  Yes.  Absolutely.  The Facebook Immune
23  System, which further down the road describes that
24  as the beginning of work of these issues.
25      I was the engineering manager and product

63 (Pages 246 - 249)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 250

1  manager for that entire part of the company,
2  including the people who built the infrastructure
3  that was published in the paper that he talks about
4  earlier, incident response, the part of the company
5  that did the security audits around it.
6      I mean, I can go on.
7  Q.  That's okay.
8      Is there any other portion of paragraph
9  number 48 that you are offering specific criticisms
10  or responses to?
11  A.  No.  I was focusing on GDPR limiting the
12  ability to use content moderation of creating
13  AI-enhanced content moderation tools.
14  Q.  And, in fairness, you're not suggesting
15  that you are an expert in the GDPR and its
16  requirements, are you?
17      MR. CARTMELL:  Object to the form.
18      THE WITNESS:  Sorry?  I didn't hear what
19  Tom said.
20      MR. CARTMELL:  Object to the form.
21      THE WITNESS:  I would say that I am an
22  expert in compliance to these issues, that I have
23  managed -- one of the teams that I managed, called
24  the security infrastructure team, was the team --
25  and also the product infrastructure team were teams

Page 251

1  that were dedicated to the implementation in code of
2  many of these regulations.
3  BY MS. JONES:
4  Q.  Are you referring to your time at the
5  company between 2009 and 2015?
6  A.  That is correct.
7  Q.  Do you know when the GDPR went into effect?
8  A.  What I recall is working on -- with the
9  Data Protection Authority from Ireland, on the
10  regulations that were in place up to 2015.
11      MS. JONES:  That wasn't my question.  My
12  question -- and move to strike as nonresponsive.
13  BY MS. JONES:
14  Q.  My question was do you know when the GDPR
15  went into effect?
16  A.  I don't recall the -- the exact date on
17  which the GDPR went into effect.
18  Q.  Was it after you left Facebook in 2015?
19  A.  Again, I think I've answered that.  I don't
20  recall the exact date, but I have extensive
21  experience in dealing with privacy laws like the
22  GDPR.
23  Q.  Okay.  But if the GDPR did not actually go
24  into effect until after you left the company, you
25  would not have had a role in managing compliance of

Page 252

1  that specific provision; right?
2  A.  I would have had a role managing privacy
3  laws like the GDPR if the date for the GDPR is after
4  I left the company.
5  Q.  What other privacy laws are you thinking of
6  that's not the GDPR?
7  A.  So in the US is COPPA and in -- for Europe
8  it was the Data Protection Authority, for which sort
9  of Ireland conducted a pretty extensive audit.
10      I think whatever laws were under effect
11  about privacy.  That includes cookies, data storage,
12  data deletion.  All of these were things that were
13  under my supervision in the time I was at...
14  Q.  Okay.  Where is your next yellow sticky?
15  A.  50.  "Tension Between Free Speech and
16  Content Removal."
17  Q.  And what specifically did you flag on that
18  page?
19      I'm sorry.  Are you looking at paragraph 50
20  or page 50?
21  A.  No, page 22, Item 50.
22  Q.  Okay.  All right.  Go ahead.
23  A.  Just -- again, one of the key areas when we
24  talk about reducing harm, is -- is people talk about
25  the tension between somebody's ability to express

Page 253

1  something and the content needing to be removed.
2      And it's like this sort of generally as
3  saying you can meaningfully reduce harm without
4  removing content.  And most of the harm that I talk
5  about has nothing to do with moderation.
6      I mean, when we talk about problematic
7  usage, when we talk about many other harms -- or
8  addiction, when we talk about unwanted sexual
9  advances, these are not free speech and content
10  removal issues.
11      And so I believe that this tension that's
12  here is to try and cast the problem in a frame that
13  it's a problem about content moderation and removal
14  when I do not believe that is the case.
15  Q.  So does that mean you don't believe that
16  such a tension exists?
17  A.  I believe there's a tension between free
18  speech and content removal, but I think that gets
19  used as a reason to not do other measures that don't
20  have to do with content removal.
21  Q.  I see.  Okay.  Where is your next yellow
22  sticky?
23  A.  Here.
24  Q.  Could you give me a page and paragraph
25  number.

64 (Pages 250 - 253)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 254

1    A.  Yeah, of course.
2         So on page 25, about Item 58, there's a
3    conversation about "Cultural Challenges and
4    Complexity of Language."
5         And the reason that I flagged this is that
6    the -- that I agree with what is said here in terms
7    of classifiers having trouble with being able to
8    label certain kinds of -- of context-specific
9    nuances of language, which I think underlines the
10   importance of having an effective reporting strategy
11   that allows people to address these issues.
12        And this is something that I have extensive
13   firsthand experience with, because one of the ways
14   through which I reduced workload -- which is the
15   number of reports that need to be reviewed --
16   significantly for Facebook between 2009 and 2015 was
17   by adapting the reporting flow to different cultural
18   contexts.
19   Q.  Is there something specifically in
20   paragraph 58 that you disagree with or that you have
21   a responsive opinion to?
22   A.  I think it doesn't sufficiently address the
23   need for product design in reporting to address
24   cultural challenges and complexity of language.
25   Because if you just leave AI models to work on that

Page 255

1    issue, they don't have enough information in order
2    to effectively deal with it because it lacks a
3    significant amount of context.
4    Q.  Where is your next yellow sticky?
5    A.  Page 28, Item 64, "Data Scarcity for
6    Training."
7    Q.  Is there some element of paragraph 64 to
8    which you have a responsive opinion?
9    A.  Yeah.  That the -- sort of the scarcity in
10   this part of the opinion is related, for example, to
11   scarcity of CSAM, for example, or scarcity of what
12   he describes in particular, what I was responding
13   to, as self-harm imagery.
14        And I think that that scarcity only applies
15   to sort of like the more strictly defined versions
16   of these issues.  I do not believe there's data
17   scarcity for training on self-harm imagery.  I do
18   not believe there's data scarcity for training of
19   content where small children are doing sexualized
20   behavior.
21        And so for those classes of issues, I do
22   not believe this Data Scarcity for Training.
23        But I do believe that there is -- because
24   of the design of the reporting flow, there is a
25   significant scarcity of user feedback and labeling

Page 256

1    that then -- I have built systems -- I built the
2    system at Facebook that takes user feedback,
3    reports, content review, and used that to train AI
4    systems.  So I'm very familiar with that entire
5    pipeline.
6    Q.  What is the basis for your view that there
7    is not data scarcity with respect to CSAM content
8    that might be necessary to train an effective AI
9    model for content moderation?
10   A.  If you'll recall, in my answer I did not
11   say "CSAM content" because there is -- I was not
12   talking about CSAM content.
13        I was talking about content where children
14   are -- like the kind of the videos that I produced
15   where you have a seven- or eight-year-old kid
16   lifting up their shirt or wearing, like, provocative
17   and doing dances or putting their lips up to the
18   screen.
19        I think of that -- there's enough content
20   in order to effectively train a classifier.  And I
21   believe that content is -- is -- in terms of
22   precision and recall -- adjacent to content that
23   then needs to be treated differently as CSAM has to
24   be done.
25   Q.  So that's fair, and I appreciate the

Page 257

1    clarification.
2         What is your basis for the view that there
3    is sufficient content of the type that you just
4    described available to build an effective AI model
5    for content moderation?
6    A.  One of the things that I found in the
7    videos that I produced is that the Reels algorithm
8    created a feed that was consistently, primarily made
9    up of that kind of content.
10        And so in one of the accounts, video after
11   video after video after video were little girls,
12   soliciting comments by adults.  And it was actually
13   very precise at identifying that.
14        And then for some of them, when you click
15   through them, you would find trends with different
16   videos that use, for example, one feature which is a
17   song.  And they're all kind of, again, made up of
18   small children -- seven, eight, nine, ten -- doing
19   certain things.
20        And that is data that in a training set
21   is -- would be invaluable in terms of allowing to
22   accurately train a classifier -- that would be
23   devastating at -- at a minimum, not giving the data
24   the kind of distribution that it gets based on the
25   viewing numbers and the data.  And I think, perhaps

65 (Pages 254 - 257)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 258

1 more importantly, a good indicator of accounts that
2 maybe should be checkpointed, depending on sort of
3 the nature of the content.
4     So I think in the world of precision and
5 recall, that is the dataset that is not what
6 sometimes is sort of like -- I think I saw this
7 here. I don't know if the flags are on or not.
8     What you want -- one of the things you want
9 when you do machine-learning training is you want
10 accuracy. And that's one of the areas where I think
11 that there's enough information to accurately create
12 a classifier that would be so effective at --
13     Q. Um --
14     A. -- dealing with that content.
15     Q. I apologize for stepping on the end of your
16 answer.
17     So just so I understand, the basis for your
18 view that there is enough of that type of content is
19 the testing that you did?
20     A. The testing that I did, my understanding of
21 the multiple Wall Street Journal articles about
22 pedophiles and pedophile networks, and my
23 understanding of how these systems are implemented
24 internally, combined with the law of large numbers.
25     Because I know that the testing that I did

Page 259

1 scratches the surface, but I also know when you're
2 dealing with a service with 2 billion people, that
3 anything that was found has meaningful multipliers.
4     And so I know -- had I been inside the
5 company and done that testing, as I would have done
6 as part of my normal job, that the first thing I
7 would have done when I got in Reels to do that, is
8 to walk to the engineers in recon and response, or
9 the equivalent part of the company, and be, like,
10 "Okay, go find like content. Create a classifier
11 based on this. Do, like, the following three types
12 of analysis around it. Tell me sort of what the
13 specifics are around that."
14     And then talk to, like, Mark and Sheryl and
15 Chris Cox and those people about, like, what might
16 be good pertinent divisions to deal with that. I
17 mean, because of my experience in the space, I know
18 that the videos that I found scratch the surface at
19 much faster context, and I know the company's
20 capacity to take something like that and extrapolate
21 on it with great precision, which is something that
22 Dr. Ferrara does a good job of capturing in his
23 paper.
24     Q. Dr. Ferrara -- and elsewhere in the report,
25 but also in paragraph 64 that we've been talking

Page 260

1 about -- cites specific literature in the footnotes.
2     Do you see that?
3     A. Yes.
4     Q. And there are footnote references
5 associated with some of the specific statements that
6 he makes; right?
7     A. Uh-huh.
8     Q. You have to say "yes" or "no."
9     A. Yes.
10     Q. Have you gone and actually looked at any of
11 those specific references that are footnoted in that
12 section?
13     A. Yeah. I read the Smith article when it
14 first came out because, again, that is my area, and
15 that was one of the things I was working on and was
16 intimately acquainted with all of the issues of
17 scale there.
18     I believe -- no, actually, I have not read
19 the 2025 one, the "Journey to 1000 models." I have
20 not read that one.
21     And I have not read the Gorwa report.
22     And I will say that in my experience
23 dealing with these issues, there's a certain kind of
24 knowledge and expertise that you have from building
25 the infrastructure and in dealing with these issues,

Page 261

1 and that is different from the kind of expertise
2 that an academic like Dr. Ferrara from the outside
3 has in being able to understand and analyze them
4 from the vantage point that he has.
5     Q. Sure. Let me come back, bring you back to
6 my question.
7     It sounds like you think that you read what
8 has been footnoted as the Smith paper or the article
9 at Footnote 64; is that right?
10     A. Yes.
11     Q. What about the articles and references that
12 are identified at Footnotes 65 through 72 associated
13 with that section?
14     MR. CARTMELL: Objection. Asked and
15 answered.
16     THE WITNESS: Yeah. I mean, I think I've
17 already answered this.
18     The one I can recall right now -- because I
19 cannot have an immediate recollection of every paper
20 I've read -- is the survey on hate speech detection
21 using natural language processing.
22     I believe I have read that. But I would
23 need to look at the paper in order to confirm that.
24 BY MS. JONES:
25     Q. You're talking about Footnote Number 68?

66 (Pages 258 - 261)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 262

1    A.  Footnote Number 68.
2    Q.  There's nothing else in that set of
3 references that is familiar to you; is that right?
4        MR. CARTMELL:  Object to the form.
5 BY MS. JONES:
6    Q.  Other than Footnote 64.
7        MR. CARTMELL:  Same objection.
8        THE WITNESS:  I believe I've already
9 answered that question.
10 BY MS. JONES:
11    Q.  That's not an answer.  You have to answer
12 my question.
13    A.  I believe that I had read 68 and 64, and I
14 don't recall whether I read or not the other --
15 through to 72, between 64 and 72.
16    Q.  Are there any -- is there any literature or
17 other source that you're -- in terms of a writing
18 that you're relying on for your view that there is
19 sufficient -- there is sufficient content of the
20 type that you were describing earlier to build an
21 effective AI model for content moderation?
22    A.  I have -- gosh, that was one of the primary
23 aspects of my job from 2009 to 2015.
24    Q.  Sure.
25    A.  Every time, like, Mark would call me and

Page 263

1 be, like, there's this thing happening.  And I would
2 get handed -- the team would get handed a very small
3 corpus of images around some kind of new attack that
4 either we found through our proactive systems or
5 came in through reporting or Mark mentioned.
6        And with very small datasets, we were able
7 to use machine-learning and infrastructure to then
8 go and very quickly detect large swaths of content.
9        And so my basis from that is experience of
10 doing this for years and how effective that
11 experience was.
12        I mean, it's talked about in Dr. Ferrara
13 here, but if you look at a product like Facebook or
14 Instagram, spam -- as we know it -- is pretty hard
15 to come by.  And that is what the company can do
16 with small datasets and resources and priorities to
17 try and mitigate a particular harm.
18        And so I have extensive experience with
19 that.
20        MS. JONES:  I'm going to move to strike as
21 nonresponsive.
22 BY MS. JONES:
23    Q.  Do you remember what my question was?
24        Do you remember what my question was,
25 Mr. Bejar?

Page 264

1    A.  Can you repeat the question, please?
2    Q.  My question was is there any literature
3 that you could point us to or some other written
4 source that supports your view that there is
5 sufficient content of the type you were describing
6 earlier --
7    A.  Uh --
8    Q.  Let me finish my question.
9        -- that would be necessary to build an
10 effective AI model for content moderation?
11        Is there a paper or some other article that
12 you are thinking of?
13    A.  As I believe I have already answered, I
14 cannot think of right now a paper that I could point
15 to.  I can point at experience.
16    Q.  Where is your next yellow sticky?
17    A.  Yeah, it --
18    Q.  Excuse me, Mr. Bejar.  My question was
19 where is your next yellow sticky?
20    A.  Page 30, item 65.
21    Q.  Is there a portion of paragraph 65 -- are
22 there specific sentences in paragraph 65 with which
23 you disagree?
24    A.  No.  The reason I stickied it was about
25 Twitter and biases and algorithms.  But it's not a

Page 265

1 specific disagreement with what's written here.
2    Q.  Where is your next yellow sticky?
3        Can you give us a page and a paragraph,
4 please?
5    A.  Yes.  Page 35.  And it was around IV, which
6 is the statement:
7        "Meta's content moderation
8        policies are comprehensive and
9        appropriately balanced."
10    Q.  Am I right in assuming you disagree with
11 that paragraph, paragraph 75?
12    A.  That is correct.
13    Q.  Oh.  Excuse me -- it's actually --
14    A.  The heading.
15    Q.  The heading is Section IV.  Okay.
16        Where is your next yellow sticky?
17    A.  Page 41, Entry 86.
18    Q.  Okay.  Is there -- let me just ask you a
19 question.
20        Is there a specific sentence or concept in
21 paragraph 86 that you disagree with or have a
22 responsive opinion to?
23    A.  I have a responsive opinion to the
24 conundrum in the context of content moderation of
25 auto-enforcement on all SSI content where the --

67 (Pages 262 - 265)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 266

1 when I refer to "auto-enforcement," I mean different
2 soft actions, not just content deletion.
3      And I think that the safety professionals
4 mostly believe that SSI admission should provide
5 resources to the users.  And my comment is that in
6 my testing, I found that SSI admission could lead to
7 recommendations of SSI content and not provide
8 resources to the users.
9    Q.   And the testing you're referring to was the
10 testing that's described in Exhibit Number 2 and
11 that we talked about at your first deposition?
12    A.   That is correct.
13    Q.   Okay.  Where is your next -- is there
14 anything else in that paragraph that you have a
15 responsive opinion to?
16    A.   No.  That's what I was referring to.
17    Q.   Where is your next yellow sticky?
18    A.   So page 48, 105.
19    Q.   And I think it says:
20         "Policy Lab protects users from
21          sensitive content while accounting for
22          situations in which such content may
23          serve a purpose.
24         "Understanding that different
25          people have different sensitivities,

Page 267

1          Meta frequently adds warning screens."
2         I don't understand what the basis is for
3 them to say "frequently" here because in the testing
4 that I did, I found content that meets the
5 descriptions of these categories and they did not
6 have warning screens.
7         And I was not able to say that it was not
8 infra set to avoid that content getting recommended.
9 And so that was my observation about that.
10        I think that, in principle, this is good.
11 In practice and of the application, I did not see
12 this in effect.
13    Q.   And in terms of you saying you did not see
14 it in effect, you're talking about the testing that
15 you describe in Exhibit Number 2 and that we talked
16 about at your first deposition; is that right?
17    A.   That is correct.
18    Q.   Where is your next yellow sticky?
19    A.   Page 49.  "Child Safety Content."  It's
20 related to the blue box.  And it says here:
21         "Content that solicits sexual" --
22          Sorry.
23         "Content that constitutes or
24          facilitates inappropriate interactions
25          with children."

Page 268

1         And I wanted to say, again, based on the
2 testing that I did that I've already covered in this
3 deposition, in particular, testing done in 2024,
4 that I found many inappropriate interactions with
5 children where you can see the comments that adults
6 are making about children -- condoms, implied
7 masturbation, and all of these other areas.
8         And I consider that to be child safety
9 content that is described here in a very reasonable
10 way, but it doesn't match the ground truth of how
11 the product is implemented.
12        And so I don't know if Dr. Ferrara did any
13 engagement of these measures in the context of the
14 product.
15    Q.   Anything else in paragraph 108 beyond what
16 you've already testified about?
17    A.   Not on that section.
18    Q.   Okay.  Next yellow sticky, please.
19    A.   Yeah.  This is on page 51, 111.
20         "Meta has an SSI Borderline Policy
21          that covers things" -- like, for
22          example -- "SSI-adjacent like dark and
23          depressing content."
24          Or:
25         "ANSA Borderline Policy that

Page 269

1          covers 'things like implied sexual
2          intercourse and stimulation.'"
3         And I found, again, in my testing on a
4 teen account with sensitive content controls,
5 that -- and, again, this is -- I want to be clear
6 that what I'm talking about is not -- is not about
7 the content -- well, in this case it is about Meta
8 saying this is what we do for that kind of content,
9 and then me finding that kind of content from a teen
10 account.
11        And the protection of saying you won't be
12 able to search for it or we will not recommend it
13 was not effective in the basis of the testing that I
14 did.
15    Q.   Just so I understand, you don't necessarily
16 have a criticism of the text in paragraph 111; it's
17 just that when you did your own testing, you found
18 out that it didn't play out that way in practice; is
19 that right?
20    A.   My criticism -- thank you.
21         My criticism would be that, as far as I
22 could read in this, it's not apparent to me that
23 Dr. Ferrara tested any of these borderline policies
24 or any of these implementations.
25         And so I think that he can describe them,

Golkow Technologies,
A Veritext Division
877-370-3377                                                    www.veritext.com

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 270

1 but I'm not sure how strong assertions you can make
2 about them without testing them.
3    Q.   Okay.  Where is your next yellow sticky?
4    A.   It is page 53, Number 1 (as read):  "Meta's
5 Early Leadership in Proactive System Detection."
6         And it -- does a very good job of
7 describing the Facebook Immune System.  In
8 particular, on page 54 at 120 -- well, this whole
9 section, actually, talks about explicit signals,
10 user feedback, implicit behavior within the product,
11 training data, classifiers on machine-learning, FXL
12 to find these issues.
13        And so my main thing is to say this is the
14 infrastructure that was built during the time that I
15 managed these teams, responsive to the guidance that
16 I gave the team, and I know the competence of this
17 infrastructure.
18        So when I comment on other content types,
19 or the kinds of things that the company would be
20 able to detect, and do soft actions, covers,
21 warnings, other areas as a matter of product design,
22 this is a good place to come from.
23    Q.   So I just want to be clear, because I
24 mostly focused on whether you have responsive or
25 rebuttal opinions to Dr. Ferrara.

Page 271

1         It doesn't sound like you're criticizing
2 anything in that portion of the report; you're just
3 reflecting on how he's described what was developed.
4 Is that right?
5    A.   Yes.  I'm reflecting on what was -- as I
6 talked about it, what was described, developed while
7 I was at Meta.
8    Q.   Okay.  Next sticky, what page and what
9 paragraph?
10    A.   Yeah, so it was at page 61, 140, when an
11 account has repeatedly posted prohibited content.
12        And I think as to this section and some
13 other ones that I've talked about, the descriptions
14 of the policies, if that's how they are actually
15 implemented, is good.
16        But I think in general -- I'm trying to
17 sort of correlate that with other kinds of abuses
18 that an account might do on the platform that might
19 not be captured by a content moderation approach,
20 unwanted sexual advances on minors being a good
21 example of that.
22    Q.   Anything else in that -- I guess it's
23 paragraph 140 -- in terms of responsive opinions
24 that you're offering?
25    A.   No.

Page 272

1    Q.   Where is your next yellow sticky?
2         MS. JONES:  Do you need a break, Madam
3 Court Reporter?
4         (Brief discussion held off the
5         stenographic record.)
6         THE WITNESS:  I think this one we can skip
7 based on the criteria of what we've already covered
8 on the questions.
9 BY MS. JONES:
10    Q.   Just so we have it for the record, what
11 page and paragraph was that?
12    A.   It was page 63, 147.
13    Q.   And is your opinion the same as the one
14 you've expressed before, which is if this is the way
15 it works, it's fine; but you found that it didn't
16 work that way?
17    A.   And that -- as I've said before, I'm not
18 sure that Dr. Ferrara tested some of these issues.
19 Because I covered an example of a suicide content
20 that was tested, and it didn't trigger these things
21 as far as I could discern.
22    Q.   Okay.  Where is your next yellow sticky?
23    A.   It is on page 79:  "In-House and
24 Third-Party Human Reviewers."
25        But, again, being considerate to what we've

Page 273

1 covered so far, it's just saying that this is an
2 area where I have a lot of experience in terms of
3 human reviewers, content operations, human
4 decisions, content labeling.
5         A lot of the infrastructure that Meta has
6 used over the years was built between 2009 and 2015.
7 But that's not a responsive comment about that.
8    Q.   Okay.  Where is your next yellow sticky?
9    A.   Page 89.  The section that begins -- well,
10 actually, it starts with 223 and then goes for the
11 next few pages where he talks about the testing that
12 I did.
13        MS. JONES:  Okay.  I'm going to have some
14 questions, a good number of questions on this
15 section.
16        Madam Court Reporter, do you want a break
17 now?
18        THE STENOGRAPHER:  Yes.
19        MS. JONES:  Yes.  Okay.
20        THE VIDEOGRAPHER:  Stand by.  The time is
21 3:41 p.m., and we're going off the record.
22        (Recess taken.)
23        THE VIDEOGRAPHER:  The time is 4:02 p.m.,
24 and we're back on the record.
25        MR. WARD:  Counsel, before you resume -- so

69 (Pages 270 - 273)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 274

1 I think we've been on the record five hours and
2 10 minutes.
3         And before you resume the next part of your
4 exam on the expert reports, we'd like to tell you
5 that I need you to pass the witness at 4:20 p.m.
6 It's almost 20 minutes from now.
7         MS. JONES: I will do my absolute best.
8 Mr. Bejar has a part to play in that insofar as he
9 can be responsive and efficient in his responses.
10        MR. WARD: Yes.
11        MS. JONES: But I certainly am happy to
12 endeavor to do that.
13        MR. WARD: Yes, he will.
14        Actually, you have to do that because we're
15 beyond your time, and Mr. Bejar has personal
16 commitments that he needs to meet. So we're going
17 to have to conclude the deposition.
18        I don't believe Mr. Cartmell has more than
19 five minutes of exam.
20        MS. JONES: How can that be? That can't be
21 right.
22        MR. WARD: You get a matching time to that.
23 So I do need you to conclude the questioning by
24 4:20.
25        MS. JONES: I will do my very best.

Page 275

1         To be clear, the reason we've spent some
2 meaningful time talking about this particular expert
3 report -- and I'm not faulting Mr. Bejar -- is that
4 he came into the room with a copy of the report with
5 many, many, many tape flags in it, which is a matter
6 of just appropriate diligence and examination I need
7 to ask him about.
8         So why don't we go ahead and get started so
9 we can try to finish up at an appropriate time,
10 mindful of Mr. Bejar's scheduling limitations today.
11 BY MS. JONES:
12    Q.   Mr. Bejar, on page 88 of Exhibit Number 6,
13 which is the June 13th, 2025, expert report from
14 Dr. Ferrara, there is a section entitled "Expert
15 Assessment of the Algorithmic Stress Test of
16 Instagram's Reels Surface."
17        That heading is on page 88.
18        Do you see that?
19    A.   I'm sorry. I forgot to put my microphone
20 on.
21        Yes, I see that.
22    Q.   And then on the -- on page 89, between
23 paragraphs 225 and 226, there is a heading entitled
24 "Mr. Bejar Conducted a Truncated Algorithmic Stress
25 Test."

Page 276

1         Do you see that?
2    A.   Yes, I see it.
3    Q.   And I understand from your testimony
4 earlier in the day that you believe that that is an
5 inaccurate description of what you did.
6         Yes or no?
7    A.   Yes. That is not an accurate description
8 of what I did. And I think --
9    Q.   I'm sorry, Mr. Bejar. I really am trying
10 to be respectful of your time limits. My question
11 was just was your earlier testimony that that is not
12 an accurate account of what you did.
13    A.   Yes. That is not an accurate account of
14 the testing that I did.
15    Q.   And what you said earlier, I believe, was
16 that what you did was what you described as "running
17 testing scenarios." Is that right?
18    A.   That is correct. They're called testing
19 scenarios.
20    Q.   Okay. And I want to ask you to look at
21 page 90 of Exhibit Number 6.
22        And just to be clear, from your
23 perspective, a testing scenario is something
24 different than an algorithmic stress test; is that
25 right?

Page 277

1    A.   That is correct.
2    Q.   Okay. And if you look at paragraph 229, I
3 want to ask you about the second -- actually, the
4 third sentence of paragraph 229 that begins with "In
5 the context of."
6         Do you see that?
7    A.   "In the context of algorithmic systems"?
8    Q.   Yes.
9         Do you see that?
10    A.   "A legitimate stress test."
11        Yes, I see that.
12    Q.   So what Dr. Ferrara says in his report is:
13        "In the context of algorithmic
14        systems, a legitimate stress test is a
15        controlled, repeatable, and
16        statistically grounded procedure."
17        Do you see that?
18    A.   Yes, I see that.
19    Q.   If we replace the words "stress test" with
20 the words "testing scenario," would that statement
21 be true?
22        Let me ask you a better question because it
23 might help us with our timing.
24        Is a legitimate testing scenario something
25 that is repeatable?

70 (Pages 274 - 277)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 278

1      MR. CARTMELL:  Object to the form.
2      THE WITNESS:  A legitimate testing scenario
3 is something that is not necessarily repeatable.
4 Because what you might have found as a result of a
5 testing scenario might have -- be found through a
6 combination of variables relating to the system.
7      And so testing scenarios, the kind that I
8 did around this, is something that I have, again,
9 done for most of my career.
10     And I'm happy to go through the spreadsheet
11 with -- talk about some of the things there.  Some
12 of them are repeatable.  Some of them are not going
13 to be identically repeatable because of the
14 combination of factors that went into the creation
15 of the video.
16     That doesn't mean that that video doesn't
17 accurately capture something that's important.  And
18 this has been true of not just my -- but any sort of
19 red-teaming testing that safety products need to
20 have.
21 BY MS. JONES:
22     Q.  Does a testing -- a legitimate testing
23 scenario need to be a statistically grounded
24 procedure?
25     A.  A legitimate testing scenario can be run

Page 279

1 once and find an issue once, and then you can make
2 an accurate presentation about that issue.
3     Q.  I'm not --
4     A.  And that doesn't mean if you talk about a
5 statistically grounded procedure, if the testing has
6 to do with the likelihood that some content is going
7 to be recommended -- if a testing scenario is one
8 where you're discussing likelihoods, for example,
9 then that does need to be statistically grounded in
10 the sample of the things that you undertook.
11     But that is for a subset of possible
12 testing scenarios.  It's not true of all testing
13 scenarios.
14     Q.  Does a legitimate testing scenario need to
15 be controlled?
16     MR. CARTMELL:  Vague and ambiguous.
17     THE WITNESS:  If you define -- yeah,
18 "controlled" is a vague word; right?
19     So a legitimate testing scenario, you run
20 through possible multiple test cases.  And you have
21 to be responsive to the way that the product is
22 behaving.
23     And so that is a form of control, but it's
24 very different from something like unit testing,
25 which I can explain in detail, where the term

Page 280

1 "control" has a much more specific meaning.
2     Or stress testing as -- algorithmic stress
3 testing as articulated by Dr. Ferrara, which, again,
4 does not apply to a testing that I did.
5 BY MS. JONES:
6     Q.  Let me ask you to look at page 91,
7 paragraph 231.  Dr. Ferrara's report.
8     If you are running a testing scenario that
9 is focused on evaluating particular types of harms,
10 do you need clearly defined harm categories?
11     MR. CARTMELL:  Object to the form.
12     THE WITNESS:  You do not.  When you do
13 testing scenarios as done by, like, red-team testing
14 or other areas, it is likely that you're going to
15 find harms or issues that -- again, that are not
16 being clearly outlined prior to undertaking the
17 testing.
18     And so the job here is you can start doing
19 something and then if you find issues, you have to
20 follow the issues in a way that's responsive.
21     I mean, one of the reasons that
22 Dr. Ferrara's description does not at all apply to
23 my testing is that searching for self-harm content,
24 if I typed a full query and I hit "submit" and I'm
25 looking for a prevalence-based definition of, like,

Page 281

1 self-harm content, that gets delivered -- that would
2 preclude the actual relevant important finding,
3 which was when I began typing the words,
4 autocomplete offered results that then surfaced that
5 kind of work which then influenced other surfaces.
6     And so for something like that, you do not
7 go in saying, like -- the definition of harm
8 categories -- and so being necessarily very broad,
9 because you might start pulling on a thread, which I
10 have done in my life, and then suddenly end up in
11 something that -- and then suddenly end up in something that
12 has to do with child porn; right?
13     And so these are things that -- that are
14 not unusual to happen when you do this kind of
15 scenario testing.
16 BY MS. JONES:
17     Q.  I'm trying to be mindful of your time
18 issues; so let me see if I can cut to the chase.
19 And I'm going to ask you to just be as focused as
20 you can on my question.
21     On page 91 and 92, in paragraphs 232 to
22 237, Dr. Ferrara lays out different methodological
23 components in those paragraphs.
24     Do you see that?
25     A.  Yes, I do.

71 (Pages 278 - 281)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 282

1    Q.   Are any of those methodological components
2   required for a testing scenario?
3         MR. CARTMELL:  Object and move to strike
4   the statement of counsel before the question.
5         THE WITNESS:  They do not apply to testing
6   scenarios.
7   BY MS. JONES:
8    Q.   Okay.  Is there any -- you may have noticed
9   that at Footnote 344 on page 89 of his report,
10  Dr. Ferrara refers to "the vast body of literature
11  that rigorously outlines protocols for algorithmic
12  audits including" -- and then he cites a couple of
13  articles.
14        Do you see that?
15   A.   Yes, I see that.
16   Q.   Do you know one way or the other whether
17  there is a body of literature that outlines the
18  protocols for testing scenarios?
19   A.   Testing scenarios are common practice of
20  security and safety practitioners.  I have been
21  doing them since literally my first month at Yahoo.
22  I have done them for Mark Zuckerberg.
23        The exercise of looking at something and
24  coming up with a way of testing it in the product
25  and then capturing the result of that is something

Page 283

1   that I created a team at Yahoo to do.
2         And I could go on, but this is kind of just
3   really standard practice of security practitioners
4   when it comes to testing products in ways that are
5   responsive to the way that the product behaves.
6         MS. JONES:  I'm going to move to strike as
7   nonresponsive.
8   BY MS. JONES:
9    Q.   My question was do you know one way or the
10  other whether there is a body of literature that
11  outlines the protocols for testing scenarios?
12        MR. CARTMELL:  Objection.  Asked and
13  answered.
14        THE WITNESS:  I believe I answered the
15  question in terms of what I am aware of is extensive
16  practices both by companies as well as external
17  auditing companies that are all built around testing
18  scenarios and test cases.
19        MS. JONES:  Yeah.  Again, I'm going to move
20  to strike as nonresponsive.
21  BY MS. JONES:
22   Q.   My question is -- I understand that you
23  have experience in carrying out testing scenarios.
24  Yes?
25   A.   Yes.  That is correct.  And it's a standard

Page 284

1   practice for a field of practitioners.
2    Q.   Understood.  My question is is there any
3   literature that lays out how testing scenarios
4   should be done that you're aware of?
5         MR. CARTMELL:  Objection.  Asked and
6   answered.
7         THE WITNESS:  I believe I have answered in
8   the previous questions that I am aware of this in
9   practice in innumerable contexts.  I don't recall
10  having seen literature or academic studies to the
11  effect of testing scenarios and testing cases when
12  it comes to security red-team testing of products.
13  BY MS. JONES:
14   Q.   I want to ask you one very quick follow-up
15  question on the Ferrara report from June the 13th.
16   A.   Is that Exhibit 6, or is it --
17   Q.   I apologize.  That's the same exhibit we've
18  been talking about.
19   A.   Okay.
20   Q.   And we were talking earlier about the
21  scarcity or not of content necessary to create
22  reliable content moderation classifiers.
23        Do you remember that discussion generally?
24   A.   Yes, I generally remember that discussion.
25   Q.   And I think what you said was you had

Page 285

1   experience with being able to develop classifiers
2   based on small datasets.  Is that right?
3    A.   That is correct.
4    Q.   Can you recall what are the specific
5   examples that you're thinking of where you were able
6   to use small datasets to create a reliable content
7   moderation classifier?
8    A.   Yeah.  I mean, I think probably -- I would
9   say more than 10 times, likely up to 20.
10        For example, Mark Zuckerberg would send me
11  a message saying:  I ran across this piece of spam.
12  Our systems didn't catch it.  Can you adjust the
13  system so that we do catch it?
14        And this was from Mark for multiple sources
15  of examples like this.
16        Another example is when we heard about
17  somebody being impersonated, that was another
18  example where you have a small dataset around the
19  practice of impersonation.  And we were able to
20  build very effective classifiers with relatively few
21  features based on a small impersonation dataset.
22        In the examples that I gave about spam,
23  that would either be in the text of posts or images
24  as well.
25   Q.   Are there any other examples beyond spam

72 (Pages 282 - 285)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 286

1 and impersonation that you can think of from your
2 time at the company where you were able to develop
3 classifiers based on small datasets?
4      MR. CARTMELL:  Mischaracterization.
5      THE WITNESS:  I mean, I can -- I want to be
6 mindful of time; right?  I could just go on -- oh,
7 another good example of that is actually -- but this
8 is, again, not an exhaustive list because this was
9 part and parcel of the work that we did as a team
10 and stuff that came to me that then I managed and
11 oversaw directly.
12      Another example is similar to sextortion,
13 the Nigerian scams that were affecting people.  They
14 didn't happen very frequently, but there was a small
15 dataset.  And we were able to build a message
16 classifier that looked at the messages getting
17 exchanged and established a likelihood that it was a
18 scammer and then able to proactively deal with that
19 issue.
20      And there was another example of a small
21 dataset classifier used to reduce harm in the K4
22 messages.
23 BY MS. JONES:
24  Q.  Are there any others that you can think of?
25 And I understand this was years ago and this may not

Page 287

1 be exhaustive, but are there any others that you can
2 think of?
3      MR. CARTMELL:  Same objection.
4      THE WITNESS:  I've seen grooming.  I mean,
5 I think I can walk through, like, nudity,
6 pornography, I can think of examples of having done
7 it.
8      I can think of -- we already kind of
9 covered spam.
10      Oh, general fake-account detection
11 independent of -- separate from impersonation.  So
12 you would get, like, a small example of fake
13 accounts that have been identified, and you use that
14 to detect large corpuses of fake accounts.
15      I mean, these systems are exceptionally
16 good at being able to extrapolate from fairly small
17 datasets as long as the dataset -- the accuracy of
18 the dataset is high, then you have high-quality data
19 with which -- between the classifiers.  So then
20 precision and recall are good.
21 BY MS. JONES:
22  Q.  I'm sorry.  Did you say you-all were able
23 to develop a classifier based on a small dataset of
24 pornography content?
25  A.  Yes, I believe so.

Page 288

1  Q.  When you say you believe so, do you
2 remember doing that?
3  A.  Yes, I remember doing that.  I also
4 remember problems with early AI detection of
5 pornography, which is one of the other areas that I
6 worked on when I was there.
7  Q.  Mr. Bejar, in the interest of time, and
8 mindful that you may have many other things to say
9 about Dr. Ferrara's specific section on your
10 testing, are there any other portions of his report
11 or responsive opinions that you have about his
12 report that we have not talked about?
13      And I want to be very clear.  I just want
14 to know about things that we have not discussed
15 already.
16  A.  I think that -- and this is, I think, most
17 evident in the other report, but there is this
18 notion of prevalence equals harm.  And as long as
19 you do a good job of prevalence, you're reducing
20 harm.
21      And absent in all of Dr. Ferrara's report
22 is this understanding of harm that is not captured
23 by prevalence, which is, I think, central to the
24 conversation of meaningfully reducing harm.
25  Q.  Okay.  Anything else?

Page 289

1  A.  No.
2  Q.  Let's talk very quickly about Mr. Starr.  I
3 think you have in front of you a -- yes.
4      And is that a complete copy -- I only have
5 an excerpt with me, but do you have a complete copy
6 of Mr. Starr's report?
7  A.  This is a complete copy of Mr. Starr's
8 report.
9  Q.  Okay.  Which we've marked as Exhibit
10 Number 5.
11      It looks like you have yellow stickies?
12  A.  Very few.
13  Q.  Well, I appreciate your judiciousness.
14      Let me just start by asking before today --
15 before you received this report yesterday, had you
16 ever heard of Mr. Starr or otherwise crossed paths
17 with him?
18  A.  I had not.
19  Q.  Do you have an understanding that he was
20 employed by the FBI, the Federal Bureau of
21 Investigation?
22  A.  Yes.  From the -- from...
23  Q.  From his qualification section?
24  A.  Yes.
25  Q.  Okay.  And you understand that he also

73 (Pages 286 - 289)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 290

1 worked at NCMEC for a time?
2    A.   Yeah.  I mean, I think I remember reading
3 the qualification section, and so I believe I saw
4 that.  But I would have to read it again right now
5 to just be like:  Oh, yes.
6    Q.   No, you don't have to read it again right
7 now.
8         And are you familiar with THORN?
9    A.   Yes.  I am very familiar with THORN.
10    Q.   Okay.  And you understand he was also
11 affiliated with THORN for a time?
12    A.   Yes, I understand that.
13    Q.   And that he was the president of the
14 Tech Coalition?
15    A.   I believe that was part of his
16 qualifications.
17    Q.   Why don't we very quickly, at the speed of
18 lightning, go through your yellow stickies.
19         What is the first page and paragraph?
20    A.   Page 26, paragraph 37.  The topic is
21 "Finsta Accounts."
22    Q.   Okay.
23    A.   And I think what I wanted to say about that
24 is that in -- every parent that I spoke to whose
25 child died from -- reasonably role that Instagram

Page 291

1 played within them -- every parent found a finsta
2 account on their kid's phone that they were not
3 previously aware of.
4         And so I do believe that finstas are
5 something that should be surfaced to parents as part
6 of parental controls.  And I do believe that finstas
7 and disappearing messages are features that
8 encourage risky behavior.
9    Q.   Is there anything specific in paragraph 37
10 of Mr. Starr's report that you are disagreeing with
11 or offering responsive opinions to?
12    A.   That I believe finstas did encourage
13 proliferation and shielded from parental supervision
14 with predictably dangerous consequences.
15         And then in the following pages, there's
16 different conversations about finstas.  And I do, in
17 general, have reservations in how Mr. Starr
18 characterizes finstas, because I do believe that
19 finstas encourage dangerous, risky behavior.
20         And I think I've already said that.  So
21 being mindful of time, if you ask me about this
22 whole section, I would have to say finstas are
23 something that parents should know about so they can
24 have informed conversations about this with their
25 kids.

Page 292

1         And I do believe the feature of that, as
2 well as the design of disappearing messages,
3 encourages risky behavior that is very dangerous.
4    Q.   Let's go to your next yellow sticky note.
5 What page and paragraph is that attached to?
6    A.   It is page 41, the discussion of IIC on
7 Instagram Direct Messaging.
8    Q.   So this is Section vi, Subsection vi,
9 paragraph 58?
10    A.   Correct.
11    Q.   Do you have specific -- either responsive
12 opinions or criticisms of anything Mr. Starr says in
13 that section of his report?
14    A.   Yeah.  I think that there's a number of
15 things.  So one of them is the sentence of (as
16 read):
17         "It is unrealistic to expect
18         Meta -- or any platform -- could fully
19         eliminate these risks."
20         I think on the table is not full
21 elimination.  On the table is meaningful reduction.
22 And so these are issues that could be meaningfully
23 reduced.
24         And then the underlying email thread --
25 sort of a proactive and timely response to new

Page 293

1 information pertaining to an online child safety
2 risk or potential harm.
3         And I do not believe at all that's how the
4 company behaved because -- the reason I keep coming
5 back to the 1-in-8 kids experiencing unwanted sexual
6 advances is that I believe that that is a leading
7 indicator that requires urgent investigation of --
8 like the sexual risk.
9         And I think that number is related to the
10 number that was in the messaging email exchange.
11         And I believe that the company's response
12 on that front has been negligent because of the
13 volume of the issue and the fact that, as of
14 yesterday, still no way for a minor to indicate IIC
15 in an effective way through the reporting flow when
16 they were experiencing it or -- and comments.
17    Q.   The reference to 1 in 8 that you made in
18 your last answer, is that from -- what dataset is
19 that drawn from?
20    A.   That is from B, which is my next posted.
21    Q.   Okay.  Let's go to your next yellow sticky.
22 What page and paragraph?
23    A.   Yeah.  So this is on page 43 and Item 62.
24    Q.   Okay.
25    A.   It basically -- again, this shows that --

74 (Pages 290 - 293)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 294

1 gives a stark distinction for an approach that is
2 based on detectable CSAM, which is specific images
3 that meet a very specific criteria, and a teen
4 telling you, like, "Somebody might be grooming me,"
5 or "I think sextortion is about to happen."
6      And I think that is like the real-world
7 sexual harm that sort of plays out in the product.
8      And so somebody who cares about that harm,
9 it's important to really prioritize that number and
10 understand what is the makeup of that 1 in 8 that
11 was in the BEEF survey. And you should change the
12 product. You should do investigations.
13      I mean, I've always believed that that
14 number was an all-hands-on-deck moment of which the
15 executive team at Meta was on notice. And still I
16 don't know how they -- how they can make any claims
17 about preventing inappropriate contact without
18 meaningful product interventions in the messaging
19 application.
20      Q. Mr. Bejar, just while I have the question
21 on my mind, have you ever had any kind of role in
22 law enforcement?
23      A. Have I worked directly, like, at law
24 enforcement?
25      Q. Have you worked as a law enforcement

Page 295

1 officer of any kind?
2      A. I have not worked as a law enforcement
3 officer of any kind.
4      Q. And I think -- please do forgive me because
5 I legitimately don't recall if we talked about this
6 at your first deposition.
7      Have you ever had any role with NCMEC? And
8 by that, what I should say more precisely is have
9 you ever worked for NCMEC?
10      A. I have not worked for NCMEC. I was
11 responsible for Facebook embracing PhotoDNA,
12 providing images to NCMEC. The head product manager
13 for THORN was my product manager on child safety
14 issues at Meta.
15      So this is an issue that I had experience
16 with. And I have discussed with law enforcement the
17 issues.
18      Q. What is your next yellow sticky? We need a
19 page and paragraph, please.
20      A. Yeah. Page 49, paragraph 70, which is the
21 problem of unsolicited sex talk on Instagram.
22      And I think my reservation is that this
23 paragraph is dismissive of what I think is a
24 supercritical issue that my daughter has experienced
25 that you can find in the product in comments of men

Page 296

1 to little girls.
2      And so, again, the reliance on prevalence
3 here is -- it really does not even begin to scratch
4 the surface of the harm.
5      Q. Was that your last yellow sticky?
6      A. It is, yes.
7      Q. Just so I ask the question, there is a
8 section in Mr. Starr's report that is entitled
9 "Deposition Testimony of Meta Employee,
10 Arturo Bejar."
11      Did you review that section in the report?
12      A. Yes, I did review that.
13      Q. Did you have any responsive opinions or
14 critiques of that section that we would not have
15 already covered in the context of talking about
16 Dr. Ferrara's report?
17      A. Could you please remind me of the page?
18      Q. Oh, I'm so sorry. Page 51. The paragraph
19 number is 72.
20      A. Give me a moment. I reviewed this very
21 closely yesterday.
22      Q. Okay.
23      A. Yeah. There's a number of issues here.
24 So -- that I saw yesterday. I think that the first
25 thing you want to say about this is in 72, he talks

Page 297

1 about the MaCSA framework mentioned above.
2      And I do not believe that this breaks the
3 cycle that I described. I think the cycle that I
4 described is one where a minor gets a message, an
5 inappropriate sexual advance over text or in
6 comments, and that there is no effective measures to
7 detect that.
8      This is why effective reporting is
9 important because, again -- and it goes back to CSAM
10 and CSC. And from a child's perspective, when
11 they're beginning to experience a harm, you want
12 something that they will use.
13      The thing that he talks about, level of
14 intensity, is more burden on reporting parties and
15 it's often inconsequential in terms of moderation of
16 reporting decisions. That is, again, terribly
17 misinformed, because whenever you have looked at
18 conversations that have to do with grooming or
19 sexual advances or other things, they're often
20 compliments. So things like prevalence operator
21 approaches are ineffective at dealing with that.
22      And so to know that somebody is -- might
23 have made you extremely uncomfortable because
24 they're being a creep, or some other version of
25 sextortion -- they're asking me for images, they're

75 (Pages 294 - 297)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 298

1 not who they say they are -- things that are
2 impossible to report today.
3          And given the option of intensity, it's not
4 burdensome. And we saw in the completion rate of
5 the flows that we built earlier that it did not have
6 a negative impact on completion rates when teens
7 were given the option to do that.
8          And you can provide effective support at
9 that moment when they tell you it's pretty bad.
10 Then you know that it's urgent to connect them to
11 resources that help them with that.
12          And then I think we talked about giving
13 feedback. And there's nowhere in the product,
14 right, that a teenager is able to say, "This person
15 is initiating an unwanted advance."
16          And on the basis of that, if somebody has
17 an issue they don't want that advance multiple
18 times, we're going to give them feedback that this
19 is not the place to do that.
20          As a result of that, I believe that there
21 is rampant -- in as much as this 1-in-8 number
22 conveys, inappropriate sexual advances that have to
23 be investigated from a complete prototypal
24 perspective.
25          And the fact that this dismisses that, in

Page 299

1 the context of CSAM, is just completely missing, I
2 believe, the point of how these conversations play
3 out online.
4     Q.  Mr. Bejar, were you at the company -- and
5 by "the company," I mean Meta -- when the MaCSA
6 framework was created?
7     A.  I was not.
8     Q.  Do you know anything about the MaCSA
9 framework other than what you've read in Mr. Starr's
10 expert report?
11     A.  I don't know anything further about the
12 MaCSA framework other than what I've read in this
13 report and what I've been able to sort of connect in
14 testing of their descriptions of features which I
15 tested.
16     Q.  Have we discussed all of your critiques or
17 responsive opinions with respect to Mr. Starr's
18 expert report?
19     A.  Yes.
20          MS. JONES:  Okay. I can pass the witness.
21          Do you want to switch sides?
22          MR. CARTMELL:  Sure.
23          THE VIDEOGRAPHER:  Stand by. The time
24 is 4:36 p.m., and we're going off the record.
25          (Recess taken.)

Page 300

1          THE VIDEOGRAPHER:  The time is 4:38 p.m.,
2 and we're back on the record.
3                EXAMINATION
4 BY MR. CARTMELL:
5     Q.  Good afternoon, Mr. Bejar.
6     A.  Hello.
7     Q.  As you know, my name is Tom Cartmell and I
8 represent plaintiffs in this litigation against Meta
9 and other social media companies; correct?
10     A.  Correct.
11     Q.  We're now at day four of your deposition.
12 Is that right?
13     A.  Yes.
14     Q.  It's late in the afternoon. I think it's
15 4:38 in the afternoon. Is that right?
16     A.  Correct.
17     Q.  And you have just been asked questions for,
18 I think, five hours and 45 minutes by Meta's
19 counsel; is that correct?
20     A.  That is correct.
21     Q.  At this point in your deposition, you have
22 been asked questions by lawyers for 27-plus hours;
23 is that right?
24     A.  Yes, that's right.
25     Q.  Okay. I'm going to try to be very quick,

Page 301

1 and -- but I do need to follow up on a few things.
2 So I may jump around a little bit. And I apologize
3 about that.
4          Let me ask you, first of all, you were
5 asked by Ms. Jones, Meta's lawyer, about meetings
6 that you had with lawyers before this fourth day of
7 your deposition; right?
8     A.  That's correct.
9     Q.  And I think you talked about how you have
10 met with your lawyer, Michael Ward, I think you said
11 between the last day of your deposition and this day
12 of your deposition between five and ten times or
13 something like that; is that right?
14     A.  Something like that.
15     Q.  Okay. You also told Ms. Jones that you
16 have met with lawyers from multiple state AG
17 offices; is that correct?
18     A.  That is correct.
19     Q.  My memory is that you referred to lawyers
20 from the state AG's office in Arkansas; correct?
21     A.  Correct.
22     Q.  Tennessee?
23     A.  Yes.
24     Q.  California?
25     A.  Yes.

76 (Pages 298 - 301)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 302

1    Q.   Massachusetts?
2    A.   Yes.
3    Q.   And I think you said others, but you can't
4  remember, as you sit here today, necessarily who
5  those are.  Is that right?
6    A.   Yes.
7    Q.   Okay.  And I think you told Ms. Jones that
8  you had two meetings with the state AG lawyers as
9  well as with me and lawyers for the plaintiffs -- or
10 personal injury plaintiffs in this case; correct?
11   A.   That is correct.
12   Q.   Okay.  You talked about some of the topics
13 that you discussed with us at those meetings.
14       Do you recall that?
15   A.   As best as I could recall.  These are
16 intense days.
17   Q.   You invited Ms. Jones to ask you specifics
18 about what was talked about; correct?
19   A.   Correct.
20   Q.   And did she take you up on that and ask you
21 about that?
22       MS. JONES:  Let me just object to the
23 characterization of the back-and-forth with the
24 witness.
25       Go ahead.

Page 303

1    THE WITNESS:  Yes.
2  BY MR. CARTMELL:
3    Q.   Okay.  And I want to ask you about a few
4  things that we talked about at those meetings as
5  well, try to refresh your recollection.
6        Do you recall that during those meetings
7  you were asked about some of your prior deposition
8  testimony during the first three days, for example?
9    A.   Yeah.  That sounds familiar.
10   Q.   Okay.  And do you recall that you were
11 asked by the State AGs, for example, about your
12 affiliation with academics that you currently have?
13   A.   Yes, that was familiar.
14   Q.   Okay.  And tell us about that.  In other
15 words, your new affiliation with academics and the
16 work that you're doing related to child safety on
17 social media platforms.
18   A.   Yes.  So I am now a research affiliate and
19 a fellow at the Cybersecurity Center for Democracy
20 from NYU and Northeastern University.  And I'm
21 helping them develop their testing scenarios around
22 a lot of the issues that I encountered in my own
23 testing earlier this year.
24       I also have begun conversations with the
25 DSA in Europe about sort of related topics and with

Page 304

1  the Home Office in the UK on related topics.
2    Q.   Do you recall that you were also asked by
3  the lawyers who met with you about your affiliation
4  or your work with the Molly Russell Foundation?
5    A.   Yes, I recall that as well.
6    Q.   And tell us what you told us about your
7  updated or your current work with the Molly Russell
8  Foundation.
9    A.   Yeah.  So we're looking for, again, places
10 in the UK that can do local testing scenarios and
11 also hopefully having conversations with Ofcom, the
12 UK regulator, DSIT, the part of the government
13 that is in charge of technology, and the
14 Home Office.
15       And those conversations are facilitated by
16 the Molly Rose Foundation as part of the work that I
17 do with them.
18   Q.   We also discussed during your meeting
19 before your deposition that you have had meetings
20 with the EU; is that correct?
21   A.   Yeah.  So I've had meetings with the EU at
22 their request, as it is with many of these other
23 cases.  Like NYU approached me as well around these
24 issues.  And so I've had multiple meetings with them
25 about the same kind of issues that we're talking

Page 305

1  about here.
2    Q.   You also talked about your meetings that
3  you had previously and testified about with the
4  Oversight Board at Meta; is that correct?
5    A.   Yes, that is correct.
6    Q.   That was the subject that was talked about,
7  and you've talked about that in your deposition;
8  correct?
9    A.   Yes.  That's correct.
10   Q.   Okay.  You also were asked about your
11 review of the Surgeon General report.
12       Do you remember that?
13   A.   Very faintly.  Like, again, there was a lot
14 of topics covered.  But I do remember talking about
15 that.
16   Q.   And you've talked about that today as well?
17   A.   Yeah.
18   Q.   Okay.  You talked about the basis for your
19 opinions that you offered in your deposition
20 previously and that you were going to offer today;
21 correct?
22   A.   Yes, that is correct.
23   Q.   Okay.  You talked about future work that
24 you were contemplating, just like you talked about
25 today; correct?

77 (Pages 302 - 305)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 306

1    A.  Yeah, in a way that's consistent with
2  everything I've said today.
3    Q.  Okay.  You were asked about your testing
4  protocol, and you have testified to that today;
5  correct?
6    A.  Yes, I have.
7    Q.  You were asked questions by the attorney
8  generals -- lawyers for the attorney generals about
9  Meta's reporting flow; correct?
10    A.  Yeah.  That's correct.
11    Q.  And you've talked about that in your
12  deposition; is that correct?
13    A.  Yes, that's correct.
14    Q.  Okay.  You have -- you were asked about
15  opinions related to your warning -- strike that.
16        You were asked about your opinions related
17  to warnings.
18        Do you recall that?
19    A.  Yes, I recall that.
20    Q.  And you have testified to that today;
21  correct?
22    A.  Yes, I have.
23    Q.  And same is true with respect to your
24  opinions related to problematic use?
25    A.  That is correct.

Page 307

1    Q.  And you've testified to those today;
2  correct?
3    A.  That is correct.
4    Q.  Let me ask you, was there anything that you
5  were asked about by the attorneys for the state
6  attorney generals or by me or any other attorney
7  that for some reason needed -- you needed to hide or
8  needed to be hidden?
9    A.  No, absolutely not.
10    Q.  Did you tell us in the meetings the truth
11  and the whole truth and nothing but the truth?
12    A.  Absolutely.  I hold the integrity with
13  which I conduct myself, whether I'm under oath or
14  not, to a very high degree.
15    Q.  We talked about you've met with Meta's
16  attorneys in the FTC action?
17    A.  Yes.
18    Q.  And you sort of compared how you handled
19  those meetings the same way you've handled them with
20  lawyers in this case; is that right?
21    A.  That is correct.
22    Q.  Okay.  And in both instances, with both
23  sides, have you told the truth and nothing but the
24  truth?
25    A.  That is correct.

Page 308

1    Q.  Real quick, I want to change gears a little
2  bit.  And you've just been asked, I believe, close
3  to two hours of questions or over an hour and a half
4  of questions related to defendants' experts'
5  opinions, and specifically Dr. Starr and
6  Dr. Ferrara; correct?
7    A.  Correct.
8    Q.  Is your understanding that both Dr. Starr
9  and Dr. Ferrara are paid expert witnesses for Meta?
10        MS. JONES:  I'm going to object.
11  Foundation.
12        You can answer.
13        THE WITNESS:  I noticed that in the
14  reports.
15  BY MR. CARTMELL:
16    Q.  In other words, they have been hired by
17  Meta to give opinions?
18    A.  Yes.
19    Q.  And did you notice that Dr. Starr is being
20  paid $600 an hour for his opinions?
21    A.  I did, yes.
22    Q.  And did you notice that Dr. Ferrara is
23  being paid $1,200 an hour for his opinions?
24    A.  I certainly did.
25    Q.  Okay.  Dr. Ferrara criticized your testing;

Page 309

1  correct?
2    A.  Correct.
3    Q.  But did Dr. Ferrara do any testing?
4        MS. JONES:  Let me just object to
5  foundation.
6        Go ahead.
7        THE WITNESS:  Not as far as any evidence in
8  the report.
9  BY MR. CARTMELL:
10    Q.  Does Dr. Ferrara's report give the
11  impression that Instagram is a safe platform for
12  kids?
13        MS. JONES:  Let me just object to
14  foundation.
15        Go ahead.
16        THE WITNESS:  Yeah, I believe so, because
17  of this sort of -- all the work around prevalence
18  and policies and -- I mean, Dr. Ferrara's report
19  matches beat by beat what I've seen communications
20  from the company to be around all of these issues.
21        Like the arguments that I've seen the
22  company make in multiple instances were present in
23  Dr. Ferrara's report with great consistency.
24  BY MR. CARTMELL:
25    Q.  In other words, is Dr. -- based on your

78 (Pages 306 - 309)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 310

1  experience and expertise in your review of
2  Dr. Ferrara's report, is he just actually stating
3  the same thing that Mark Zuckerberg and the
4  higher-up executives at Meta told you about the
5  safety of the platforms?
6       MS. JONES:  Excuse me.  Objection to the
7  form and foundation.  And also to all the lead-in.
8       But go ahead.
9       THE WITNESS:  Yes.  That was my impression
10 of the report, that the report was beat by beat the
11 talking points I've seen in the press,
12 Mark Zuckerberg, and other areas relating to the
13 issues of harm and prevalence.
14 BY MR. CARTMELL:
15      Q.  You were asked a lot of questions about
16 what literature you've read.  And let me ask you
17 something.
18      Mark Zuckerberg relied on you to solve
19 Meta's most pressing safety and security concerns
20 for six years at the company; correct?
21      MS. JONES:  Hold on.  Let me object to the
22 characterization.
23      Go ahead.
24      THE WITNESS:  Yes, that is correct.
25 ///

Page 311

1  BY MR. CARTMELL:
2       Q.  Okay.  Did Mark Zuckerberg, when he was
3  relying on you, ever ask you to go read literature
4  before trying to solve and protect the users of the
5  platforms at Meta?
6       A.  He never did during either interview or all
7  of the time that I worked there.
8       Q.  You were asked a lot about parents that you
9  have talked about who have had kids who committed
10 suicide.
11      Do you remember that?
12      A.  I do, yes.
13      Q.  And you, I believe, testified that you've
14 talked to a lot of parents that have had that
15 happen; correct?
16      A.  Yeah.  I think I covered the amount of
17 parents that I talked to.
18      Q.  Let me ask you:  Do parents who have kids
19 who commit suicide, do they always know whether or
20 not a platform like Instagram caused or contributed
21 to cause the suicide?
22      A.  The parents that I spoke to --
23      MS. JONES:  I'm sorry, Mr. Bejar.  Let me
24 just object on foundation.  Excuse me.
25      Go ahead.

Page 312

1       THE WITNESS:  I believe every parent that I
2  spoke to had very good grounds to believe that it
3  contributed.  I mean that each story that I heard
4  from each of those parents, had I been working
5  for -- and in my former role at Meta, I would have
6  invited that parent in and have the parent brief the
7  integrity team.
8       And I would immediately have thought about
9  measures that could have prevented any similar
10 deaths from that one, because there were aspects of
11 the death that were in the platform that are
12 eminently preventable.
13 BY MR. CARTMELL:
14      Q.  Are there parents, though, who -- as kids,
15 for example, based on your expertise -- may have
16 been using, for example, Instagram, and Instagram
17 contributed to cause or caused the suicide but
18 parents never find out?
19      MS. JONES:  Objection to form and
20 foundation.
21      THE WITNESS:  Yes.
22      MS. JONES:  And to the extent that you're
23 inviting a legal conclusion.
24      Go ahead.
25      THE WITNESS:  I believe and have talked to

Page 313

1  parents, right, who can't unlock their kids' phones
2  and then don't have access to say -- or they'll go
3  in and don't really know where to look.  They don't
4  understand Instagram well enough to look.
5       And so I think that -- in my experience
6  dealing with harm, if you take, like, the most
7  intense version of the harm, which is the parents --
8  for which there is reason to believe there's likely
9  an order of magnitude more which have experienced
10 that but have not come forward or didn't figure it
11 out or didn't find it.
12      And then there's another magnitude more of
13 kids that are exposed to similar risks or harms.
14      And so that's why -- the framework that I
15 talk about -- because really the parents that you
16 can see -- I can see how it contributed -- it's,
17 again, a law of large numbers; right?  A leading
18 indicator.
19 BY MR. CARTMELL:
20      Q.  Is part of the reason that parents -- lots
21 of parents don't ever know or find out because the
22 tech companies like Meta is not transparent with the
23 data and the information?
24      MS. JONES:  Objection to the form and
25 foundation.

79 (Pages 310 - 313)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 314

1    THE WITNESS:  Yes.  Absolutely.
2    MR. CARTMELL:  Okay.  I want to mark as
3  Exhibit 8 a copy of the spreadsheet that you have
4  talked about during the first three days of your
5  deposition and again today.
6    (Exhibit 8 was marked for
7    identification and is attached to the
8    transcript.)
9  BY MR. CARTMELL:
10    Q.   Is that what Exhibit 8 is?
11    A.   Yes.
12    Q.   Why don't you just briefly tell the jury
13  what Exhibit 8 is, the spreadsheet that you talked
14  about.
15    A.   Yeah.  So -- so what I did was I took
16  Meta's page that listed all of the different safety
17  features.  I put them in the spreadsheet by year,
18  month, text on the page, and then linked to the
19  press releases.  I classified as to which product
20  the press release applied to.  I came up with a
21  tidying framework to orient that.
22    And then for each one of these roles, I
23  kind of evaluated whether I would do, like, a
24  testing scenario or not.  And the testing scenario
25  depended on sort of what the role had to say.

Page 315

1  So, for example, if you have one that talks
2  about common keyword filters that allow people to
3  filter out inappropriate and offensive comments,
4  then it would be a testing scenario that would try
5  out inappropriate or offensive comments, which
6  touches on a number of these.
7    And so -- or for usage, time spent, mental
8  health controls -- again, there was a different
9  testing scenario.
10    And then I captured my notes about those on
11  the right-hand column around these issues, and I
12  documented what I found in the videos and
13  screenshots that I submitted.
14    Q.   And did you produce the spreadsheet marked
15  as Exhibit 8 many months ago to both Meta's counsel
16  and other counsel in these cases?
17    A.   Yes, I did.
18    MR. CARTMELL:  I don't have any further
19  questions at this time.
20    Thank you very much, Mr. Bejar.
21    MS. JONES:  How long did he go?  I'm going
22  to go equally long.
23    No.  I actually just have one question.
24    Would you hand me the microphone?
25    MR. CARTMELL:  Yes.  Can I stay here?

Page 316

1    MS. JONES:  Yes, please.
2    FURTHER EXAMINATION
3  BY MS. JONES:
4    Q.   Mr. Bejar, you've testified earlier about
5  the work that you're doing as a research affiliate
6  at NYU and Northeastern; is that right?
7    A.   That is correct.
8    Q.   Okay.  And I think you said you were
9  working with those institutions, helping them
10  develop testing scenarios of their own?
11    Did I hear that correctly?
12    A.   Yes, that is correct.
13    Q.   Have you exchanged any written
14  communications with folks at NYU or Northeastern
15  related to the work that you're doing together on
16  the development of testing scenarios?
17    A.   Primarily, it's been Zoom conversations,
18  and then I sent them Exhibit 8.
19    Q.   Exhibit 8, meaning the spreadsheet?
20    A.   Yeah.
21    Q.   Okay.  Has there been any other written
22  communication that you've had with the people at NYU
23  or Northeastern on the topic of developing testing
24  scenarios?
25    A.   No.  The conversation was about -- the

Page 317

1  testing was set up through conversations.
2    Q.   And I just want to make sure I pin down the
3  specific point.
4    Have you sent them any kind of written
5  documentation of your views on this is how a testing
6  scenario should be done?
7    A.   What I did is I sent them the spreadsheet,
8  and then I spent time with the student that's
9  replicating the testing, discussing the different
10  testing scenarios for the different things that I
11  tested.
12    Q.   Are you working with a specific member of
13  the faculty at NYU?
14    A.   So it's, again, a joint center between NYU
15  and --
16    Q.   Northeastern?
17    A.   -- Northeastern.
18    Q.   I apologize.  I didn't appreciate that.
19  Okay.
20    A.   Yeah.  So the members of the faculty of
21  the -- of the center are Laura Edelson and I believe
22  Damon McCoy.
23    MS. JONES:  Okay.  I don't have anything
24  else.
25    Thank you.

80 (Pages 314 - 317)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 318

1        THE VIDEOGRAPHER:  Stand by.  Stand by.
2   One moment.
3        This concludes the deposition of
4   Arturo Bejar as witness for plaintiffs.
5        Total time on the record is six hours and
6   four minutes.
7        Total time for plaintiffs, 17 minutes.
8        Total time for defendants, five hours and
9   47 minutes.
10        I, Tommy Maduena, the videographer for the
11   deposition of Arturo Bejar, as witness for
12   plaintiffs on July 10th, 2025, certify the
13   correctness, completeness, and accuracy of the video
14   recording.
15        Going off the video record at 4:58 p.m.
16        (Time:  4:58 p.m.)
17        (Exhibit 9 was marked for
18        identification after the record was
19        closed upon agreement of counsel and
20        is attached to the transcript.)
21
22
23
24
25

Page 319

1        ---oOo---
2
3        I, JENNY L. GRIFFIN, hereby certify:
4        That I am a certified shorthand reporter in and for
5   the County of Alameda, State of California;
6        Prior to being examined, ARTURO BEJAR, the witness
7   named in the foregoing deposition, was by me duly sworn
8   to testify to the truth, the whole truth, and nothing
9   but the truth; that said deposition was taken pursuant
10   to notice at the time and place therein set forth, and
11   was taken down by me in stenotype and thereafter
12   transcribed by means of computer-aided transcription,
13   and that said deposition is a true record of the
14   testimony given by the witness.
15        I further certify that I am neither counsel for nor
16   related in any way to any party to said action, nor
17   otherwise interested in the outcome thereof.
18        In witness whereof, I have hereunto subscribed my
19   name July 14, 2025.
20
21
22        _____
23        JENNY L. GRIFFIN, CSR #3969
24        Certified Shorthand Reporter
25

Page 320

1        DECLARATION UNDER PENALTY OF PERJURY
2
3   Case Name:  Christina Arlington Smith, et al.,
4        v. TikTok Inc., et al.
5   Name of Witness:  ARTURO BEJAR
6   Date of Deposition:  July 10, 2025
7   Job No.: 7460765
8
9        I, ARTURO BEJAR, hereby certify under
10   penalty of perjury under the laws of the State of
11   California that the foregoing is true and correct.
12        Executed this _____ day of
13   _____, 2025, at _____.
14
15
16        _____
17
18        ARTURO BEJAR
19
20
21
22
23
24
25

Page 321

1        DEPOSITION ERRATA SHEET
2   Case Name:  Christina Arlington Smith, et al.,
3        v. TikTok Inc., et al.
4   Name of Witness:  ARTURO BEJAR
5   Date of Deposition:  July 10, 2025
6   Job No.: 7460765
7   Reason Codes:  1. To clarify the record.
8        2. To conform to the facts.
9        3. To correct transcription errors.
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24   Page _____ Line _____ Reason _____
25   From _____ to _____

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 322

1      DEPOSITION ERRATA SHEET (Continued)
2   Page _____ Line _____ Reason _____
3   From _____ to _____
4   Page _____ Line _____ Reason _____
5   From _____ to _____
6   Page _____ Line _____ Reason _____
7   From _____ to _____
8   Page _____ Line _____ Reason _____
9   From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  _____ Subject to the above changes, I certify that
        the transcript is true and correct.
21
        _____ No changes have been made.  I certify that
22      the transcript is true and correct.
23
24      _____
25          ARTURO BEJAR

Golkow Technologies,
A Veritext Division
877-370-3377                                                                www.veritext.com